Pages 1 - 99

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

IN RE:  FACEBOOK, INC.           )
CONSUMER PRIVACY USER            )      MDL NO:  2843
PROFILE LITIGATION               )
                                 )      MD 18-2843 VC
_____  )


                         San Francisco, California
                         Wednesday, July 18, 2018

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

Lauren Price             MORGAN & MORGAN COMPLEX LITIGATION GROUP
                         201 North Franklin Street, 7th Floor
                         Tampa, FL   33602
                    **BY:  RYAN MCGEE, ESQ.**

Scott Schinder           BLEICHMAR FONTI & AULD, LLP
                         555 12th Street, Suite 1600
                         Oakland, CA  94607
                    **BY:  LESLEY WEAVER, ESQ.**
                         **EMILY ALDRIDGE, ESQ.**

                         GUSTAFSON GLUEK, PLLC
                         120 South Sixth Street, Suite 2600
                         Minneapolis, MN    55402
                    **BY:  DANIEL HEDLUND, ESQ.**
                         **MATTHEW WEILER, ESQ.**

Patricia King            GIBBS LAW GROUP, LLP
                         505 14th Street, Suite 110
                         Oakland, CA   94612
                    **BY:  ERIC GIBBS, ESQ.**


(Additional Appearances on Following Pages)

Reported by:  Vicki Eastvold, RMR, CRR, Official Reporter

Howard O'Kelly          STUEVE SIEGEL HANSON, LLP
                        460 Nichols Road, Suite 200
                        Kansas City, MO    64112
                   BY:  **NORMAN SIEGEL, ESQ.**

Theresa Beiner          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Brandon Haubert         Embarcadero Center West
                        275 Battery Street, 29th Floor
                        San Francisco, CA    94111
                   BY:  **MICHAEL SOBOL, ESQ.**

                        CARNEY BATES & PULLIAM, PLLC
                        519 West 7th Street
                        Little Rock, AR   72201
                   BY:  **HANK BATES, ESQ.**

Ashley Gennock          LOCKRIDGE GRINDAL NAUEN, PLLP
                        100 Washington Avenue South, Suite 2200
                        Minneapolis, MN    55041
                   BY:  **ARIELLE WAGNER, ESQ.**

Matthew Lodowski        HUGHES ELLZEY, LLP
                        2700 Post Oak Boulevard, Suite 1120
                        Houston, TX    77056
                   BY:  **WILLIAM CRAFT HUGHES, ESQ.**

Suzie Haslinger         KELLER ROHRBACK, LLP
                        1201 Third Avenue, Suite 3200
                        Seattle, WA    98101
                   BY:  **DEREK LOESER, ESQ.**
                        **CARRIE LAUFENBERG, ESQ.**

Debra Kooser            THE HANNON LAW FIRM, LLC
                        1641 Downing Street
                        Denver, CO    80218
                   BY:  **KEVIN HANNON, ESQ.**

Taylor Picha            MOTLEY RICE, LLC
                        28 Bridgeside Boulevard
                        Mount Pleasant, SC    29464
                   BY:  **MARLON KIMPSON, ESQ.**

Lucy Gerena             CASEY GERRY SCHENK FRANCAVILLA BLATT
                            & PENFIELD, LLP
                        110 Laurel Street
                        San Diego, CA    92101
                   BY:  **GAYLE BLATT, ESQ.**

```
Audrey Diaz              AHDOOT & WOLFSON, P.C.
Sanchez                  10728 Lindbrook Drive
                         Los Angeles, CA    90024
                    BY:  TINA WOLFSON, ESQ.


Elaine Pelc              SAUL EWING ARNSTEIN LEHR
                         500 East Pratt Street, 9th Floor
                         Baltimore, MD    21202
                    BY:  APRIL DOSS, ESQ.
                         LINDA DARDARIAN, ESQ.


Barbara Vance-Guerbe     LEVI & KORSINSKY, LLP
                         44 Montgomery Street, Suite 650
                         San Francisco, CA    94104
                    BY:  ROSEMARY RIVAS, ESQ.


Ben Redmond              RUYAK CHERIAN, LLP
                         1700 K Street, NW, Suite 810
                         Washington, DC    20006
                    BY:  ROBERT RUYAK, ESQ.


Bridgett Burk            COHEN MILSTEIN SELLERS & TOLL, PLLC
                         1100 New York Avenue, Suite 500
                         Washington, DC    98104
                    BY:  ANDREW FRIEDMAN, ESQ.


Victor James             SULAIMAN LAW GROUP, LTD
   Comforte              2500 South Highland Avenue, Suite 200
Brendan Michael          Lombard, IL    60148
   Carr             BY:  JAMES VLAHAKIS, ESQ.


Jackie Williams          BEASLEY ALLEN CROW METHVIN PORTIS
                            & MILES, PC
                         272 Commerce Street, PO Box 4160
                         Montgomery, AL    36103
                    BY:  ARCHIBALD GRUBB, II, ESQ.


Jonathan D. Rubin        PHILLIPS ERLEWINE GIVEN & CARLIN, LLP
                         39 Mesa Street, Suite 201
                         The Presidio
                         San Francisco, CA    94129
                    BY:  NICHOLAS CARLIN, ESQ.


Danielle Reninger        POWER ROGERS AND SMITH, PC
                         70 West Madison Street, 55th Floor
                         Chicago, IL    60602
                    BY:  TODD SMITH, ESQ.
```

For Defendant:


For Defendant              GIBSON DUNN AND CRUTCHER
Facebook, Inc.             200 Park Avenue
                           New York, NY    10166
                    BY:  **ORIN SNYDER, ESQ.**

                           GIBSON DUNN AND CRUTCHER
                           555 Mission Street, Suite 3000
                           San Francisco, CA    94105
                    BY:  **BRIAN LUTZ, ESQ.**
                         **JOSHUA LIPSHUTZ, ESQ.**
                         **KRISTIN LINSLEY, ESQ.**

 1   **Wednesday - July 18, 2018**                    **10:09 a.m.**

 2                    **P R O C E E D I N G S**

 3                        **---oOo---**

 4        **THE CLERK:**  Calling case number 18-MD-02843, In Re:

 5   Facebook, Inc., Consumer Privacy User Profile Litigation.

 6        Counsel, please step forward and state your appearances

 7   for the record.

 8        **THE COURT:**  Come on up.

 9        **MS. WOLFSON:**  Good morning, Your Honor.  Tina Wolfson

10   on behalf of plaintiff Diaz Sanchez.

11        **THE COURT:**  Good morning.

12        **MR. SOBOL:**  Good morning, Your Honor.  Michael Sobol

13   from Lieff Cabraser Heimann & Bernstein on behalf of plaintiffs

14   Beiner and Haubert.

15        **THE COURT:**  Good morning.

16        **MR. SIEGEL:**  Good morning, Your Honor.  Norm Siegel,

17   Stueve Siegel Hanson in Kansas City, for Plaintiff O'Kelly.

18        **MS. WEAVER:**  Good morning, Your Honor.  Lesley Weaver,

19   Bleichar Fonti & Auld, on behalf of plaintiff Scott Schinder.

20        **MS. DOSS:**  Good morning, Your Honor.  April Doss from

21   Saul Ewing Arnstein & Lehr, on behalf of plaintiff Elaine Pelc.

22        **MR. LOESER:**  Morning, Your Honor.  Derek Loeser from

23   Keller Rohrback on behalf of plaintiff Haslinger.

24        **MR. KIMPSON:**  Good morning, Your Honor.  Marlon

25   Kimpson, with the law firm of Motley Rice, on behalf of

1  plaintiffs Picha and Skotnicki.

2       **MR. FRIEDMAN:**  Good morning, Your Honor.  Andrew

3  Friedman with Cohen Milstein Sellers & Toll, on behalf of

4  plaintiffs Burk, Grisi and Ariciu.

5       **MR. GIBBS:**  Good morning, Your Honor.  Eric Gibbs,

6  Gibbs Law Group, on behalf of plaintiff King.

7       **MS. BLATT:**  Good morning, Your Honor.  Gayle Blatt

8  from Casey Gerry on behalf of plaintiff Lucy Gerena.

9       **MS. RIVAS:**  Good morning, Your Honor.  Rosemary Rivas

10  of Levi & Korsinsky on behalf of plaintiff Barbara

11  Vance-Guerbe.

12       **MR. RUYAK:**  Morning, Your Honor.  Robert Ruyak of

13  Ruyak Cherian on behalf of the Redmond, et al, plaintiffs.

14       **MR. CARLIN:**  Morning, Your Honor.  Nicholas Carlin,

15  Phillips, Erlewine, Given & Carlin, on behalf of plaintiff

16  Rubin.

17       **MR. BATES:**  Good morning, Your Honor.  Hank Bates with

18  Carney Bates & Pulliam on behalf of plaintiff Theresa Beiner.

19       **MR. SMITH:**  Good morning, Your Honor.  Todd Smith,

20  Power Rogers and Smith, on behalf of the plaintiff Reninger.

21       **MR. GRUBB:**  Good morning, Your Honor.  Archie Grubb

22  from Beasley Allen Law Firm on behalf of plaintiff Victoria

23  Williams and Lee Sims.

24       **MR. VLAHAKIS:**  Good morning, Your Honor.  James

25  Vlahakis, V-L-A-H-A-K-I-S, on behalf of plaintiffs Victor

1   Comforte and Michael Carr.

2         **MR. HEDLUND:**  Good morning, Your Honor.  Dan Hedlund

3   from Gustafson Glueck on behalf of plaintiff Scott Schinder.

4         **MR. McGEE:**  Good morning, Your Honor.  Ryan McGee from

5   the law firm of Morgan and Morgan on behalf of the plaintiff

6   Lauren Price.

7         **MR. HUGHES:**  Good morning, Your Honor.  Craft Hughes

8   on behalf of plaintiff Matthew Lodowski in the Texas matter.

9   Thank you.

10        **THE COURT:**  All right.  And for the defendants?

11        **MR. SNYDER:**  Morning, Your Honor.  Orin Snyder from

12  Gibson Dunn for  Facebook, the defendants.  Kristin Linsley,

13  Josh Lipshutz and Brian Lutz, from Gibson Dunn, as well.

14        **THE COURT:**  Good morning, everyone.  So we have a

15  handful of things to talk about today, I guess.  Let me maybe

16  tic off a list of things that I want to cover.  And then if

17  anybody has any suggestions for things to add, let me know.

18      I suppose we could start with discussing the applications

19  to be lead counsel.  We should discuss the schedule.  I saw

20  that Facebook proposed a schedule for adjudicating a motion to

21  dismiss, or motions to dismiss, and we can talk about whether

22  that makes sense or whether the plaintiffs' suggestions about

23  scheduling make more sense.

24      We can discuss also whether -- we can at least have a

25  preliminary discussion of whether it makes sense to stay

discovery.  My guess is that it might not be -- it might be better to not decide that at this status conference but give you an opportunity to brief it a little further.  But we can at least have a preliminary discussion about that.

I want to talk -- I want to have a preliminary discussion about how the bankruptcy proceedings relate to this proceeding. Talk about what kind of magistrate judge referrals, if any, we should do for these proceedings.  Settlement or discovery.  In my other MDL, I handled the discovery disputes myself and I'd be open to doing that here, as well, but we can talk about that.

And I have a few other little questions that will probably come up along the way, but those are the primary items I wanted to discuss today.

Maybe if anybody -- if anybody from the group of ten has a suggestion about anything else we should be discussing, you can bring that up when we talk about your application to be lead counsel.  But for now, from Facebook, is there anything else we ought to cover today?

**MR. SNYDER:**  No, Your Honor.  That sounds exactly right.

**THE COURT:**  Then why don't we start with hearing from the ten lawyers I identified as quote/unquote "finalists" in this beauty contest.  And why don't I just hear from you in the order you were listed on the order I put out a couple of days

ago.  Which means that Gayle Blatt is first.

       **MS. BLATT:**  Good morning, Your Honor.

       **THE COURT:**  Good morning.

       **MS. BLATT:**  It's a pleasure to be here.  So if you want me to just add to my application and provide some information I'm happy to do that, unless you want to ask any questions preliminarily.

       **THE COURT:**  No.  I mean, I guess one question I might ask you is why does your client have standing?

       **MS. BLATT:**  Well, that's a very good question.  My client has standing because my client has had their PII, or the documents and the information that was contained in their Facebook -- in their Facebook -- I can't think of the word -- but their Facebook program taken through the unconsented to friends of people who downloaded the personality test.

   So for that reason, I believe that the terms of service that to the extent that they are applicable here -- and I think there's going to be a big dispute about that, at least certain portions of them -- would be an irrelevant -- an irrelevant issue.

       **THE COURT:**  Well, what's the injury that -- what's the actual injury?  Because in federal court, you know, you have to have Article III standing which means you have to have suffered an actual injury.  What's the actual injury that your client suffered as a result of Facebook's misuse of your information?

1          **MS. BLATT:**  Well, I think there are constitutional

2     violations.  I think there are violations of right to privacy.

3     I think there are violations of contract with Facebook.  I

4     think that there is a cognizable injury in the sense that all

5     of the plaintiffs, or all of the Facebook users, are at an

6     increased risk of having their data used nefariously.

7          I will also say that in our complaint I believe that we

8     point out some of the statements from one of the app developers

9     who did not use the information nefariously where he stated

10    that Facebook was just giving him the data, giving him the

11    data; and with the data that he had that he could, basically,

12    recreate the persona of the friends of the people who

13    downloaded the digital This-Is-Your-Digital-Life application.

14         So I believe there are grave consequences and I do believe

15    that the plaintiffs will be able to establish standing on

16    several claims.

17         And so do you have any other questions or would you like

18    me to just add something -- I don't want to repeat what's

19    already in my papers.

20         **THE COURT:**  If you have anything to add or any short

21    summary, please feel free to do so.

22         **MS. BLATT:**  Sure.  Well, one of the things I wanted to

23    just point out is I do believe that injunctive relief is going

24    to be a major component of this case.  I think that the key

25    here, at least preliminarily, is to find out who has the data

```
 1   that can be used nefariously, give back the data, and find out
 2   how to correct the consumers' interests.  So that would be one
 3   of the priorities that I would set and for that reason I think
 4   there should not be a stay on discovery.  Because despite
 5   public statements that information was going to be revealed, it
 6   has not been revealed.  And we all know about the violations of
 7   the previous consent decree.  So I think there's going to need
 8   to be some additional interaction with the Court on this to
 9   compel the information that is needed to begin to understand
10   the magnitude of the problem and how to fashion a solution to
11   protect the consumer.
12       I also just wanted to point out a few cases that are not
13   in my papers directly because I was -- they were not in the
14   Northern District of California.  The U.S. District Courts.
15   But one of them was the Sung case which Magistrate Judge Beeler
16   just granted final approval on, which Ms. Rivas was my
17   co-counsel on that.
18       And one of the -- one of the requirements in that case
19   included a robust.  It was a company that fell for a phishing
20   scam and released the W-2 information for their employees.  And
21   one of the issues there was that clearly there was inadequate
22   training, or that retraining was necessary.  And one of the
23   things that Ms. Rivas and I insisted upon in that case was that
24   an independent trainer come through and do the training in
25   addition to regular updates on training on how people are
```

1    supposed to deal with PII.  And the court did retain

2    jurisdiction to oversee the reports of that injunctive relief.

3         And in addition, I just finished a case where preliminary

4    approval -- it's not finished yet -- but it was in the state

5    court in San Diego where preliminary approval was just granted

6    last week where we had the same thing.  It was a violation of

7    landlord/tenant rights and improper taking -- allegations -- of

8    security deposit funds.  And that, too, required the

9    settlement -- a very robust multi-million dollar injunctive

10   program wherein the defendant is required to submit reports to

11   the court and to counsel periodically over the next several

12   years.  And we are -- the court retained jurisdiction to

13   enforce those if the audits of those -- of the compliance is

14   not accurate.

15        And I have a few others.  *Blue Shield*, which was before

16   Judge Wiss, which was recently granted final approval.  And

17   that was a dispute out of *Blue Shield* denying out-of-network or

18   in-network charges when they got involved in Obamacare.  And

19   they just didn't keep anything straight and representations

20   were made that doctors were in network but then they were

21   charged as out of network or *Blue Shield* refused to pay.

22        And that, as well, included a significant injunctive

23   program for which Judge Wiss requires follow-up by the

24   attorneys.  And we have a date to return or to submit that all

25   requirements have been made.

And I will also tell you -- and partially I'm revealing this because of -- I understand that you have an issue with follow-up on what happens to class actions once they leave your courtroom.  But the other reason is I just want you to know how deeply the firm -- and I'm sure every counsel in this room feels the same way -- but another case which I had which was improper taxation of cell phone use, I just want you to know that the firm, what we did, was we called every single -- thousands of residents of the city of Chula Vista who had submitted to phishing claims to make sure that they knew exactly what they needed to do to fix them.  We held town hall meetings in the community, and we also distributed flyers to every cell phone carrier store that would allow us to put them in about the settlement and encouraging people to comply.

So I just think that it's important and I respect your concern about follow-up and what's in the best interests of the class.  And I just want you to know we're on board with that.

Lastly, I think -- the thing is I don't want to go over my allotted time -- but I think that -- I'm not sure if you're asking about individual input on the discussion as to whether discovery should be stayed, which I already commented on.  I think that -- in a case of this magnitude, I do not think it would be inappropriate to have co-leads or even a small PSC. And I think that the case can be run efficiently without duplication and will assist in resolving the case in an

1  expeditious manner to protect the consumers.

2          **THE COURT:**  Thank you very much.

3          **MS. BLATT:**  Thank you.

4          **THE COURT:**  Okay.  So we listed you all in

5  alphabetical order, I think.

6      Is it Ms. Doss?  Ms. Doss next.

7          **MS. DOSS:**  Good morning, Your Honor, and thank you.

8      This litigation may be one of the most consequential

9  pieces of privacy litigation for this decade.  This is really

10  fundamentally different than the typical data breach matter.

11  And for those reasons, I think it's really absolutely critical

12  that the plaintiffs' lead representation include lawyers who

13  have some significant background in cyber security and data

14  privacy.  And I'm very fortunate to have been given those

15  opportunities and have some of that background.

16      This is a case I'm passionate about.  I mean, we're

17  talking about a defendant that has two billion users, half a

18  trillion dollar market capitalization, and yet they failed to

19  follow their own privacy policies.

20          **THE COURT:**  Is there any argument -- this is not

21  something I've thought carefully about, but is there any

22  argument that the work you did on the Hill somehow creates some

23  sort of conflict with the work that you're proposing to do

24  here?

25          **MS. DOSS:**  It's a great question.  It's one that I've

1  talked with our ethics counsel at my firm about to be sure that

2  there was no concern there.  And I don't think so, and I'll

3  tell you why.

4      Certainly, I was exposed to information from the Facebook

5  and Cambridge Analytic defendants.  However, I was representing

6  the committee and all of my confidentiality obligations are to

7  the committee.  None of the information that was provided by

8  the various witnesses to the investigation was provided under

9  the scope of any kind of nondisclosure agreement as to

10 committee personnel.

11     **THE COURT:**  I was going to ask that.  So you didn't

12 review any information that was submitted pursuant to a

13 protective order or some equivalent of a protective order that

14 would not be accessible to the public?

15     **MS. DOSS:**  No.  Well, information -- certainly there

16 was information which I imagine has not yet been provided to

17 the public, but not pursuant to a protective order as such.

18     **THE COURT:**  Classified information?

19     **MS. DOSS:**  Yes, but none of that, of course, would

20 come into play here.  Because classified information I would

21 protect in accordance with my ongoing obligations to protect

22 classified information.

23     So I view my past work on the committee as being very

24 similar to having been opposing counsel to the same defendant

25 in other matters.  You know, if I had been civil litigation

1   attorney sitting opposite Facebook counsel on some other

2   matter, I would presumably in that context have received

3   discovery information that gave me some contextual knowledge or

4   awareness but would not be germane to the instant case unless

5   and until that information was provided in discovery in the

6   instant case.

7              THE COURT:  What do you think is your best claim?

8              MS. DOSS:  So, you know, that's a great question.  I

9   think the claims under the Federal Wiretap Act, the Stored

10  Communications and Electronic -- the Stored Communications Act

11  and Electronic Communications Privacy Act are important federal

12  claims.  But, you know, really, the traditional invasion of

13  privacy and intrusion on seclusion and making public

14  information that ought to be private are also very important

15  claims here.

16       Because this is, again, so different from a typical data

17  breach.  This isn't just about credit card information or

18  social security numbers.  When people post things on Facebook,

19  they've got photographs of their children that they think are

20  only being seen by their family members.  They've got the

21  affinity groups they belong to.  They've got the facts that

22  they haven't liked or participated in pages related to

23  substance abuse or related to suicide prevention or related to

24  gender and sexuality issues.  All kinds of things that they

25  intended to keep private that were then shared outside the

terms of the privacy policy they understood the platform provided to them.

And although perhaps that information hasn't been made public in the sense of being published openly somewhere, it is certainly an invasion of privacy to have spread it broadly to third parties who had no right or other reason to access it.

So, again, I think this case is fundamentally different than a typical data breach matter.

**THE COURT:**  Okay.  Anything you want to briefly add to what you've submitted on paper?  I have read everything carefully, but --

**MS. DOSS:**  No.  Thank you for that, Your Honor.  And I would just say, you know, I really believe that the breadth and scope of my firm I think leads us to be well positioned to have a leadership role in this.  I would certainly agree with some of my other, you know, counterparts here on the plaintiffs' side that I think a co-leadership or a leadership structure is absolutely appropriate in this case.

I would say that our firm, because our bread and butter work involves billing in six-minute increments, we are very accustomed to managing litigation costs.  We work regularly for general counsel who go over our bills with a fine-tooth comb and are looking for cost savings and efficiencies.  And we bring that, as well, of course, as a real willingness to work collaboratively with whomever might be appointed in this

1   matter.

2              **THE COURT:**   Thank you.

3         **MS. DOSS:**   Thank you.

4         **THE COURT:**   Okay.  Who's next?  Mr. Friedman?

5         **MR. FRIEDMAN:**   Good morning, Your Honor.  Andrew

6   Friedman again with Cohen Milstein Sellers & Toll.

7         I really don't have much to add to my submissions so I'll

8   try to be brief.

9         I started with Cohen Milstein back in 1985.  At the time

10  we were an eight-person shop, and I was the junior associate

11  there.  We've grown into some call a class-action powerhouse.

12  We have over 90 attorneys all across the country, but our main

13  operation is in D.C.  I'm extremely proud to have worked at the

14  firm for 33 years.  We do great work for class members, and we

15  always have, and that's our commitment.

16        But Your Honor has singled out a number of excellent

17  attorneys here.  And they're all in this room.  A lot of whom

18  I've worked with before.  Among them, Mr. Sobol of Lieff

19  Cabraser, Norm Siegel of Stueve Siegel, and several attorneys

20  from the Keller Rohrback firm.

21        I single out these firms, Your Honor, not because there

22  aren't other excellent attorneys here -- and there are, make no

23  mistake about that -- but I think this case has the potential

24  to require a significant amount of resources from a firm or

25  maybe several firms.  A lot of the data breach cases --

1          **THE COURT:**  On that point, I would like to ask you a

2    little bit more about that.  So we've now had three people come

3    up and I think all three have suggested that maybe there ought

4    to be co-lead counsel.  A number of people suggested that in

5    their applications.

6          Just how big of a discovery project is this going to be?

7    And why can't -- why couldn't it -- why couldn't we expect it

8    to be handled by one firm?

9          **MR. FRIEDMAN:**  Your Honor, it could be handled by one

10   firm.  I think it would put a tremendous strain on just one

11   firm.

12         The discovery process could be far reaching.  We're

13   talking about potentially adding a number of defendants.  We're

14   talking about discovery that could be taken on multiple

15   continents.  That puts a large strain on firms.  So I think a

16   co-lead counsel might be the way to go.  It's obviously up to

17   Your Honor.  Or maybe a PSC.  But --

18         **THE COURT:**  So what's -- what would be the discovery

19   plan?  I mean, what would be your plan of attack for doing

20   discovery in this case?  What would you need to do?

21         **MR. FRIEDMAN:**  I'm kind of belt and suspenders, so

22   what I normally do is we start out, we do RFP's, we ask for

23   documents, so we get a better idea what's going on and we don't

24   go into depositions cold.  We're able to review the documents,

25   analyze them, and really go in, you know, on our feet rather

```
 1   than reactionary.

 2        THE COURT:  But as you sit here today, do you have a

 3   sense of, you know, who you need to do discovery of, whose

 4   deposition you need to take, that sort of thing?  Or is it just

 5   too early to know?

 6        MR. FRIEDMAN:  I'd say it's too early.  I can

 7   speculate about 25 people I might want to take a deposition of.

 8   But I think it's premature at this point.  Certainly, Cambridge

 9   Analytica and the individuals that created the program that

10   caused this whole thing.  There are certain individuals at

11   Facebook.  We'll learn a lot about that from the 26(a)

12   disclosure.  Who was involved.  Defendants will provide that.

13   We'll provide 26(a) disclosures to them.  And that's a good way

14   to start.

15        Your Honor --

16        THE COURT:  Because, I guess, I -- you know,

17   obviously, none of us know the ins and outs of the case yet

18   other than maybe the folks at Facebook, or who represent

19   Facebook.  But at least at first glance it doesn't seem like --

20   and, again, I'm comparing it just, for example, to my other

21   MDL, right? involving Monsanto.  Where that -- you understand

22   why there's, you know, you need a bunch of lawyers on that

23   case.  There's a massive amount of discovery.  Discovery is

24   unique to each individual plaintiff.

25        Here, I mean, why isn't it more akin to, you know, like a
```

somewhat complex securities class action or something like that

where, you know, the facts are somewhat confined and the amount

of discovery you would do is somewhat confined?

     **MR. FRIEDMAN:**  That may be so, and I don't know yet,

but that may be so within Facebook.  We don't know where this

is going to lead us, though.  Basically, we're talking about in

other terminology almost a conspiracy here.  Conspiracy between

Cambridge Analytica, those that led, it may go even beyond

that.

     So we're talking about really flying in the blind right

now.  People tend to say, I know what's there.  We don't really

know what's there until we roll up our sleeves and turn over

rocks.  And the more you turn over rocks the more you find out

and the better you do for your class.

     I can't predict what's going to happen here in terms of

past cases.  Obviously, some cases -- and there's been a slew

of data breach cases and privacy cases -- that actually have

settled at relatively early stage.  I don't know that that's

going to happen here, but I think whoever Your Honor chooses

they have to be really prepared with the resources and the

impetus to push this case.

     Again, that may mean doing discovery all around the

country, around the world.  It may be -- it may be adding

numerous defendants.  Regardless, that's how you get the best

result for your class.  And that's, frankly, how we got the

1   best result for our class in the *Anthem* case.

2       On a related note, Your Honor, you asked us for a

3   description of the core people in our group.  I've laid that

4   out in my submission, and they're all excellent attorneys.  And

5   I'm sure every group has excellent attorneys.

6       I just did want to turn your attention to two of those

7   specifically.  My partner Geoff Graber, and an associate, Julia

8   Horowitz.  Both of them are presently litigating what is a very

9   relevant and almost related cyber attack case on behalf of the

10  Democratic National Committee regarding the Russia and the

11  WikiLeaks hack.  In fact, yesterday CNN reported that it may,

12  in fact, be that Russia has the Cambridge Analytical data that

13  we're talking about here in this case.

14      Also as described in her bio, which is part of my

15  submission, Ms. Horowitz is a published author on privacy

16  matters.  And she previously was an attorney before she joined

17  our firm at the Electronic Privacy Information Center.

18      In conclusion, Your Honor, I think my experience really

19  speaks to what is needed here.  The track record that I've

20  shown, and the resources of my firm, I think would really serve

21  the class very well.

22      I'd be honored to represent the class in this very

23  important case.

24          **THE COURT:**  Thank you very much.

25          **MR. FRIEDMAN:**  Thank you.

```
 1              THE COURT:  I had Mr. Kimpson next, but since you're

 2    up here, go ahead.

 3              MR. LOESER:  I guess I need to look at the list more

 4    carefully.

 5              THE COURT:  Go ahead.  You're up here.  Try to cut in

 6    line in front of Mr. Kimpson.  Come on.

 7              MR. KIMPSON:  Thank you, Your Honor.  My name is

 8    Marlon Kimpson.  I'm a member at Motley Rice LLC in Charleston,

 9    South Carolina.

10        Your Honor, this is a big case.  85 million or more, at

11    least, people whose privacy has been compromised.  My firm has

12    an international reputation for pioneering litigation all

13    across the globe.  We were the negotiators of one of the

14    largest settlements in American jurisprudence, the tobacco

15    settlement.  We are currently financing an operation against

16    global terrorism in the 911 cases.  And we have unique -- the

17    unique ability, whether MDL cases or class action cases, or

18    securities cases, or the like, to resolve complex matters.

19        Most recently we were -- my partner, Joe Rice, was lead

20    negotiator, although he was not the lead of the MDL in the

21    Volkswagon case, he was one of the lead negotiators by which we

22    worked with some very able lawyers, including lawyers in this

23    courtroom.

24        Your Honor, I started out working as an associate at the

25    firm.  I clerked for a federal court judge, Judge Matthew
```

1   Perry.  But I started out building asbestos cases and trying

2   those cases in Mississippi, Kentucky, Alabama.

3        Then I transitioned into securities litigation whereby I

4   represent a number of clients in securities class action cases

5   under Rule 10(b) and the section of the securities exchange

6   causes of action, Section 10, and other breach of fiduciary

7   cases in the shareholder derivative context.

8        I've worked on merger and acquisition cases.  The reason

9   why I say that is because all of these cases we have

10  voluminous, particularly the *M & A* cases, we have voluminous

11  documents dumped on our firm.  And we are a firm with over 90

12  lawyers, 250 support staff, and we're able to get through that

13  material and reduce it to information that we can readily use

14  in the process of preparing for discovery and trial.

15           **THE COURT:**  How do you have time to also be a state

16  senator?

17           **MR. KIMPSON:**  Your Honor, I got to eat.

18           **THE COURT:**  Is it a part-time gig out there?

19           **MR. KIMPSON:**  Yes, sir.  Yes, sir, Your Honor.  In

20  South Carolina it's a part-time legislature.

21           **THE COURT:**  So how often do you guys meet?

22           **MR. KIMPSON:**  We are there -- the second week in

23  January we start three days a week, and we adjourn the second

24  week in May.

25        Now during the time I am in the legislature I work, I have

1   a place in Columbia, and Joe Rice doesn't allow me not to carry

2   my load at the firm.  But I'm out in May and I'm involved in

3   some significant cases, most notably the *SCANA* case, which is a

4   big debacle in South Carolina.  And also we just settled the

5   10(b) case of *Worldwide Acceptance*, which was a securities

6   case, which was a good resolution for the class.

7          THE COURT:  Could I ask you another question that's

8   been on my mind about the bankruptcy?

9          MR. KIMPSON:  Sure.

10         THE COURT:  How do we deal with the fact that

11  Cambridge Analytica is in bankruptcy?  Where are they?  Where

12  is the bankruptcy?

13         MR. KIMPSON:  That is in the bankruptcy court in New

14  York, Judge Lane.  Your Honor, we -- because of our experience,

15  Motley Rice's experience, in bankruptcy courts most recently

16  being appointed to the creditor's committee in *Takata*, we felt

17  it appropriate to get someone over there and file a notice of

18  appearance so that we could participate in the preliminary

19  meeting, which was the 341 meeting whereby the trustee

20  appointed, Sal Lamonica, had an opportunity to question the

21  representative put up by Cambridge Analytica about the Chapter

22  7 and the schedule of assets and liabilities.

23      We have transcribed notes from that Section 341 meeting

24  and it led us to file some additional motions with the

25  bankruptcy court.  One, to -- similar to what the Court ordered

in this case with Lieff Cabraser to subpoena or preserve

documents.  So we filed a motion in the bankruptcy court so

that the debtors there, which were Cambridge Analytical and SCL

and related entities to preserve documents.

In addition, we --

**THE COURT:**  Let me ask you a question.  So I know

virtually nothing about bankruptcy matters.

How do we proceed in this case in light of the bankruptcy

proceedings that are going on?  I mean, there's this automatic

stay that's in place, right?  So what does that mean?  How does

that restrict us in the way that we can proceed in this case?

I mean, should the case be stayed as to Cambridge

Analytica?  Should -- should there be no discovery allowed as

to Cambridge Analytica?  If so, is there a manageable way to

draw the line between discovery against Facebook and discovery

against Cambridge Analytica?  What's the plan for how to deal

with that?

**MR. KIMPSON:**  Your Honor, I must tell you I'm not a

bankruptcy lawyer, either.  We have engaged very able

bankruptcy counsel, Michael Etkin of the Lowenstein Sandler

firm.

But my limited understanding is that the bankruptcy

against Cambridge Analytica, the fact that they filed for

Chapter 7 will stay litigation in the MDL.  And so we will have

an opportunity, although it be limited, to represent the class

1   interest through our purported class representatives that we

2   represent, Ms. Picha and Mr. Skotnicki, on the bankruptcy

3   proceeding.

4        So it can be parallel with respect to -- you can have your

5   proceedings here with respect to Facebook, but the discovery

6   and the litigation will be stayed.  There will be activity

7   mainly with respect to examining the assets and liabilities of

8   Cambridge Analytica and related entities in the bankruptcy

9   courts.

10       Do they have money?  What are their liabilities?  Who are

11  going to be their creditors?  In the *Takata* case, my law

12  partner, Kevin Dean, was able to successfully form a creditor's

13  committee in the bankruptcy while the case proceeded against

14  *Honda*.  And so I think the bankruptcy courts offer a unique

15  opportunity.

16       We have filed a notice of appearance and have actively

17  participated in the bankruptcy courts.  And whatever documents

18  we may get in the bankruptcy court, we will do -- we will use

19  the Rules of Civil Procedure so that we can use those documents

20  to benefit the class if appropriate.

21       There were some questions in the bankruptcy court as to

22  related entities created prior to the Chapter 7.  We filed a

23  motion for -- I believe it is a 2014 -- to conduct further

24  discovery on that issue.

25       And so, Your Honor, I would just simply like to close by

1    saying we're one of the largest plaintiffs' firms in the

2    country.  We're uniquely located in Charleston, South Carolina,

3    on the east coast, in the deep south.  We believe that many of

4    the people who had their data compromised live in the south for

5    various reasons that Cambridge Analytica targeted and used for

6    political purposes.

7         We stand eager and ready to assist this Court in whatever

8    structure that the Court deems to create, and we'd like to be a

9    part of the leadership in this case.

10        **THE COURT:**  Thank you.

11        Okay, Mr. Loeser.

12        **MR. LOESER:**  Your Honor, I appear to struggle with the

13   alphabet, but I'm good at managing complex litigation.

14        First, Your Honor, I just want to thank you for including

15   me on the list.  I think you've put together an excellent group

16   of attorneys with a lot of experience in these cases and I'm

17   honored to be considered for this task.

18        This case involves a large corporation that put profits

19   ahead of ethics, that took advantage of and violated the trust

20   of its customers.  And it's a front-page story with extremely

21   high stakes for the company, with its regulators, with state

22   and federal government.  It is a congressional scandal.

23   There's congressional testimony.  The class is huge.  The per

24   consumer damage is complicated, but it's serious and wide

25   ranging and it will require creative thought and expert

1   analysis.

2       If there's a settlement, the class is very large, and

3   notice and administration will be complicated.  It will require

4   state-of-the-art technology and sophistication.

5       That should sound somewhat familiar; that's frankly how I

6   view the *Wells Fargo* case.  And I think Your Honor has a good

7   measure of idea of how I would lead this case based on our

8   experience in that case.

9       **THE COURT:**  What's your view on co-lead counsel?  I

10  mean, if I were to appoint you lead counsel, or if I were

11  inclined to point you lead counsel, would you say to me there

12  really ought to be co-lead counsel here?

13      **MR. LOESER:**  Your Honor --

14      **THE COURT:**  And if so, why?

15      **MR. LOESER:**  I think that, echoing some other thoughts

16  that have been expressed, it is possible to manage this case

17  with one firm.  It needs to be a large firm with resources.  I

18  think we have that.  I think in *Jabbari* we showed we can do

19  that.

20      That said, a case like this, when you start out a case,

21  it's unclear what's going to happen in this case, how many

22  other defendants are going to be brought in, how much

23  discovery.  And I think you could probably see from the work in

24  the *Jabbari* case that it involved a lot of attorneys at Keller

25  Rohrback to manage and handle that case solely on our own.

1          So really I don't think that there's a right way to do it

2     or a wrong way.  I think it comes down to management.  So if

3     Your Honor appoints co-lead counsel, it's very important that

4     those co-leads can work together well, that perhaps have a

5     track record of doing so where responsibility can be divided

6     efficiently and effectively.  You don't want to end up in a

7     situation where you appoint more than one counsel and they just

8     fight with each other how to manage litigation.

9          We are quite well known, as are many other firms on your

10    list, for being able to work cooperatively.  And frankly, it

11    would be a significant burden to do this case with one firm.

12    It's certainly possible, but I can see good reasons to make it

13    more than one firm.

14         Your Honor did ask about discovery.  And here I mean there

15    could be many -- Facebook doesn't even know how many other

16    third parties it shared or gave access to this data.  I could

17    see a small committee that's put together, a steering

18    committee, a couple of firms that could be assigned particular

19    responsibility in the event the case sort of mushrooms.  I

20    think that would be useful.  But really it comes down to making

21    sure that the person or people you put in charge have a record

22    of managing litigation and making sure it doesn't spin out of

23    control.

24         You know, this is very public work.  And I think Your

25    Honor saw in the *Jabbari* case, obviously in your other MDL

1    experience, there's a lot of people watching, there's a lot of

2    critics, and it's important to operate knowing that everybody's

3    watching.  I don't think Your Honor would -- no one could look

4    askance at appointing more than one firm.  I think it is

5    important not to create some sort of massive structure that's

6    difficult to manage.  But whether it's one firm or two firms

7    that are in charge, and whether it's a couple of firms and a

8    PSC, I think that's a sensible way to do it.

9          THE COURT:  What about the idea -- obviously, there's

10   more to discuss about staying discovery pending the motion to

11   dismiss, but could you imagine a scenario where lead counsel

12   from just one firm or one person is appointed as lead counsel

13   during the initial phase, at least if discovery is stayed, to

14   litigate the motion to dismiss and sort of revisit whether

15   somebody needs to be brought -- somebody else needs to be

16   brought on as co-lead after the motion to dismiss is

17   adjudicated?

18         MR. LOESER:  Yeah, I think that's a sensible approach.

19   It's -- particularly if litigation ends up being stayed.

20   Plaintiffs believe strongly that in a case like this it's

21   important to start discovery immediately because it will allow

22   you to fill out the contours of a complaint in terms of other

23   parties that may get added.  But if, in fact --

24         THE COURT:  But you're not really supposed to do

25   discovery to be able to discover claims that you might be able

1   to assert that you wouldn't be able to assert without the

2   discovery.

3          MR. LOESER:  Well, not -- well, cases do evolve with

4   discovery.

5          THE COURT:  They do, but they're not supposed to --

6   we're not really supposed to be saying, Well, there might be

7   other claims out there that we don't know about now so we

8   should start discovery.

9          MR. LOESER:  I'm less concerned about claims and more

10  concerned about parties, Your Honor.  I think that what's

11  unknown in this case -- I mean, the list of claims is pretty

12  long and pretty broad.  And people, I think, have searched long

13  and hard to come up with what are the strongest claims,

14  certainly important to have a federal claim for reasons that

15  have become clear in this circuit.  But the list of parties, I

16  think, is the unknown.

17        But I don't think it would be -- I don't think there be

18  would be anything wrong with taking the approach that the group

19  should start out small.  It's very common in leadership orders

20  for lead counsel to have the ability to bring in other counsel

21  to assist.  I think what's really important when you do that,

22  to communicate with the court so it doesn't end up being a

23  surprise later.

24        These cases sometimes -- there's a tremendous amount of

25  work.  Even the task of reviewing millions of pages of

1    documents.  One firm can handle it, but it's a task that is

2    often shared.  And, again, if it's managed appropriately

3    there's nothing wrong with taking that approach.

4         I would like to just note -- Your Honor asked for

5    submission describing team members.  And I really -- one of the

6    things I'm most proud about with our work at Keller Rohrback is

7    we work in a collaborate team environment.  On many cases, we

8    bring together people that come in and out on a case based on

9    particular expertise they may have.

10        And here -- and in *Jabbari* the success -- I mean, I'm not

11   solely responsible by any stretch or means for that case.  I

12   had the assistance of my partners like Gretchen Cappio, among

13   others, who really were instrumental in that case and very

14   helpful particularly with complicated issues of experts and

15   damages which I think as Your Honor's questions indicated

16   that's very much an issue here.  This case will require some

17   thought, development of the law, on issues of standing, issues

18   of damages.  And if you consider what we did in *Jabbari* with

19   the credit damage, that was a very novel claim, it's a very

20   novel type of harm and approach to figure out how do you deal

21   with that.

22        Here you're going to have that issue perhaps even on a

23   grander scale because our world is very different now.  Our

24   information is housed by companies like Facebook.  And when

25   circumstances like this happen, that information goes out

there.  And if you had tried to imagine something like this
happening where private information is used to manipulate
people in an election, I mean, that's a very bizarre,
difficult-to-wrap-your-arms-around type of damage, but it's a
very real harm.  And so I think this case will require some
real creative thought, some novel theories, and experts to help
put that together.  And I think, Your Honor, we've shown that
we're capable of doing that type of work.

Other members of the team -- this is not -- I agree with
other comments that have been made; this is not really a data
breach case per se.  Facebook wasn't hacked.  It sold this
information.  And so there are -- we have significant data
breach experience, but I do think that the type of litigation
will be more along the lines of the *Jabbari* case.

That said, there's obviously important issues of data,
data privacy, data security; and the work of Gretchen Cappio
and also my partner Cari Laufenberg who we described in our
pleadings and who is here with me today, both of them have had
leadership roles and lead data breach cases.  So to the extent
we head down a pure data breach path, if there's issues of
expertise that requires, the team at Keller Rohrback certainly
has that expertise.

Finally, I would add on the bankruptcy issue, that is an
important issue and it is a difficult one.  We've had many
cases where one of the defendants, if not the primary

defendant, has sought bankruptcy court protection.  And the --

it's -- the statute can stop cases in its track.  The

bankruptcy stay can be a problem.

    We've had a lot of success in negotiating relief from

bankruptcy stays for the non-bankrupt defendants to be able to

proceed on a class case.  That's certainly what we would seek

to do here.  And we have bankruptcy experience both Mr. Sarko,

the managing partner, and other partners at our firm who

specialize in bankruptcy practice.

    The other aspect of that is within the bankruptcy, class

counsel can file a class claim and pursue the class claim in

the bankruptcy itself.  We've had cases like in the *Enron* case,

for example, where we had parallel proceedings going on.  We

were pursuing *Enron* in the bankruptcy court itself, and then we

had relief from stay to pursue other defendants and individual

defendants and other companies.  And that worked quite well.

    It's a complicated process and it works well when the

bankruptcy judge and the district court judge coordinate, but

we have had experience in that and it can be a successful

approach.

    Your Honor, that's really all I have to say.  I have

managed a large number of cases.  I've been fortunate to

represent governments and class members and consumers and

retirees.  And I would say that overall, the guiding principle

needs to be what serves the best interests of the class.

1   Because as I said, there's a lot of people watching and there's

2   a lot of critics.  It's extremely important to be above board,

3   up front in the Court.  Here's a case where we'll need to

4   advance the law; but my commitment to the Court is to always be

5   up front, always be transparent, and not to, you know,

6   embarrass the Court in any way.  So --

7           **THE COURT:**  That's not entirely in your control,

8   unfortunately.  Okay.  Great.  Thank you.

9        Let's see.  Who's next here.  Ms. Rivas.

10          **MS. RIVAS:**  Good morning, Your Honor.  Rosemary Rivas

11  of Levi Korsinsky.  I started out litigating consumer class

12  action cases 18 years ago.  That was my first case.  I hope

13  when I retire in 20 years that that's my last case.  I think

14  that class actions are important vehicles for the vindication

15  of consumer rights.  I enjoy my work in that aspect, and I'm

16  very honored that the Court considered me as a finalist.

17       I started out working in data privacy cases about ten

18  years ago.

19          **THE COURT:**  I saw that you worked on this *Lily versus*

20  *Jamba Juice* case.  Was that the case -- was that Judge Tigar's

21  case that resulted in a Ninth Circuit ruling on

22  ascertainability?  Or am I mixing that up with a different

23  case?

24          **MS. RIVAS:**  You're mixing that up, Your Honor.  That

25  was -- Judge Tigar certified an issues class for liability, and

1   we ultimately resolved the case for injunctive relief.   And

2   that did not go up on appeal.

3        I worked on one of the very first cases about Article III

4   standing.   The *Ruiz v. Gap* case that went up to the Ninth

5   Circuit.   And there we argued that an increased risk of

6   identity theft sufficed for Article III standing.

7             THE COURT:   Is there an increased risk of identity

8   theft in this case?

9             MS. RIVAS:   No.

10            THE COURT:   I mean, it sort of brings me back to the

11  question, the initial question I asked, about standing, right?

12  I mean, let me give you a real world -- it's not a hypothetical

13  because it's something that actually happens to me sometimes,

14  right?

15       Like I'm on ESPN and I'm reading about the 49ers.   And all

16  of a sudden they figure out that I keep going to the 49ers and

17  so these ads pop up for Jimmy Garoppolo jerseys, right? for me

18  to buy.   So they've collected information about me, about my

19  preferences, and they have subjected me to propaganda about

20  Jimmy Garoppolo jerseys.

21       How have I been injured by that?   And if I haven't been

22  injured by that, how is the -- how is this case different from

23  that?

24            MS. RIVAS:   So, Your Honor, I wouldn't rule out that

25  there's no increase of identity theft here.   I don't think we

1    know the whole scope of the type of data that's been collected.

2    I know there's likes, information about people's religious

3    views, political views, people who were friends of those people

4    who agreed to the participate in the This-Is-Your-Digital-Life

5    app.  But that information is still, in my view, protected by

6    the right of privacy.  And the fact that that information, in

7    my view, was stolen and used for improper purposes, that's an

8    injury.

9         There's also an issue of whether --

10        **THE COURT:**  But how would you -- how would you

11   articulate the injury?  How would you describe the injury?

12        **MS. RIVAS:**  Well, there's two.  There's a violation of

13   statutory rights.  That's an injury.  I don't think there's

14   *Spokeo* issues here.  And then there's the right of privacy in

15   your information that is out there.

16        My understanding is that Facebook doesn't know if

17   Cambridge Analytica, or whoever it is, still has that

18   information.  I think consumers have an interest in making sure

19   that that information isn't in the wrong hands and isn't used

20   for nefarious purposes.

21        My understanding is that some apps -- or, some

22   corporations have information and phone numbers and that they

23   use Facebook to match people up based on phone numbers that

24   they have.

25        So I think there's definitely an injury.  I think there's

1    an irreparable harm, an ongoing harm, in terms of an invasion

2    of privacy.  And I think, again, that the violations of the

3    consumer statutes here such as the Stored Communications Act,

4    and I think there's been an unauthorized disclosure -- or,

5    unauthorized access of stored information.  I think that those

6    provide the standing that's necessary.

7         I wanted to answer some of your other questions.  I don't

8    think a stay is appropriate.  I was recently appointed co-lead

9    counsel by Judge Simon in the District of Oregon in the *Intel*

10   case.  He is allowing us to proceed with certain discovery and

11   we're negotiating that with the defendant.

12        **THE COURT:**  So in that case -- and I don't know

13   anything about that case -- but it wasn't a situation where the

14   discovery floodgates were opened.  There was sort of

15   consideration about what sort of limited discovery might be

16   appropriate while a motion to dismiss was still pending?

17        **MS. RIVAS:**  Exactly, Your Honor.  He gave us some very

18   thoughtful comments on what he believed was necessary, and

19   where we're considering that and possibly other areas.  But

20   with the goal of it not being full blown open until after the

21   motion --

22        My understanding in the *Vizio* case, which is in front of

23   Judge Stanton in the Central District, she also denied a motion

24   to stay discovery pending a resolution of the motion to

25   dismiss.

1    In terms of the bankruptcy proceedings, Your Honor, I

2    profess that I'm not an expert in bankruptcy proceedings, but I

3    do have a little bit of knowledge on it.  I think that once

4    interim counsel is appointed they can discuss -- or, reach out

5    to the trustee who's responsible for that, those bankruptcy

6    proceedings.  I think the litigation against Facebook can go

7    forward.

8    My firm has offices in New York and Connecticut and

9    Washington D.C., so we have attorneys who will be able to

10   participate in those bankruptcy proceedings.  I would tell the

11   Court that if appointed lead counsel, I would most likely hire

12   someone who has experience in bankruptcy proceedings or even

13   look to some of the law firms here for some guidance on that.

14   And in terms of the lead counsel structure, Your Honor, my

15   firm is completely capable of managing the litigation, of

16   making decisions; however, we would not want to be hamstrung,

17   so to speak, in terms of bringing other lawyers on to the

18   extent that we need assistance with some of the discovery.  I'm

19   not opposed to a two co-lead structure or a PSC given, Your

20   Honor, that there are the potential for multiple defendants in

21   this case.  My understanding is that there are hundreds of

22   other third-party applications that have data and those

23   companies may be brought in as defendants, as well.

24   The last point I would like to make is in terms of my

25   team.  My partner, Joel Levi, actually has two engineering

degrees.  He's worked on developing software.  And I think he

would be crucial in this case in terms of the digital forensic

evidence in terms of determining is that information still out

there?  Who has it?  Is it -- has it been deleted?

     And unless the Court has any other questions, that's all I

have.

          **THE COURT:**  Great.  Thank you.

          **MS. RIVAS:**  Thank you.

          **MR. SIEGEL:**  Good morning, Your Honor.  Norman Siegel,

Stueve Siegel Hanson, for plaintiff O'Kelly.

     I think there's two concepts that have percolated up

through the discussion this morning about the appointment of

lead counsel.  I think on the one hand the Court, if you look

at Rule 23, if you look at the manual of complex litigation,

looks to counsel that has the substantive experience on the

issues before the Court.

     So let me just start with that, and that was obviously the

bulk of our submission.

     In this kind of case where you are vetting a lot of

plaintiffs, figuring out how to plead very important privacy

claims, the technical experts you need, those are all things

that we've been fortunate enough to do.  It's, basically -- not

all, but nearly all I've been doing over the last five years

beginning with the Target data breach litigation, through the

*Home Depot* and *Equifax* cases where I was appointed lead

1   counsel, and also working closely with the lead counsel in

2   *Anthem*, *Office of Personnel Management*, and others.

3        So in terms of just that substantive experience, I think

4   we checked those boxes.

5             **THE COURT:**  Can I ask you a question?

6             **MR. SIEGEL:**  Please.

7             **THE COURT:**  You mentioned figuring out how to plead

8   important privacy cases or important privacy claims.  And, you

9   know, if you collect all of the claims that have been asserted

10  in each of the individual cases that are now part of this MDL,

11  there's like what?  70 of them or something like that?

12            **MR. SIEGEL:**  There's quite a few.  I think we list --

13  there are scores of them, yes.

14            **THE COURT:**  So how does one -- so if you're appointed

15  lead counsel, how do you -- and you need to file a consolidated

16  complaint, how do you -- how do you figure out which claims to

17  assert and which claims to, you know, place emphasis on?

18       I mean, I guess let me back up and ask a more simple

19  question and perhaps an ignorant question.  But do you include

20  all of the claims that every plaintiff has asserted in every

21  case?  And sort of decide which ones to emphasize in the

22  consolidated complaint?  Or do you have the ability as lead

23  counsel in an MDL to say, you know what?  Half of these claims

24  are not appropriate to assert --

25            **MR. SIEGEL:**  Right.

1        **THE COURT:**  -- and so I'm only going to assert 30

2   claims here instead of 70 claims or whatever.

3        **MR. SIEGEL:**  Right.  I think the response is part

4   technical, part just how -- efficiency.  On the technical point

5   I think it's a question of whether it's truly a superseding

6   consolidated amended complaint.  And in that instance, it would

7   take the place of all those prior complaints.  So you own those

8   -- you own the superseding consolidated amended complaint.

9        The trend, in my experience, is that lead counsel

10   identifies the better claims -- which still may be numerous --

11   and pleads those claims.  Those other claims are still there.

12        **THE COURT:**  So the other claims are not in this new

13   complaint.

14        **MR. SIEGEL:**  You don't have a kitchen sink --

15        **THE COURT:**  But the new complaint does not supersede

16   the claims in the other -- in the individual complaints.  Those

17   ones are just sort of put to the sideline and we figure out how

18   to sort those out later?

19        **MR. SIEGEL:**  Exactly.  That complaint becomes the

20   operative complaint in the MDL.  So all of the parties know

21   what they're dealing with.

22        I think it's lead counsel's job to sift through at least

23   -- let me tell you what our approach would be, and not

24   promising any numerical cap.  But I do think it's incumbent on

25   lead counsel to identify the better claims and jettison those

1   that are not as good.

2       The whole point here, I think, is to point a path forward

3   that's most efficient for the Court and the parties.  And

4   prioritizing claims is certainly an important initial step in

5   that regard.

6       And just a couple more points on the substantive point

7   you've raised to several of my colleagues here, the concept of

8   standing.

9       I think I argued the last standing case in a privacy case

10  in an appellate court in front of the Fourth Circuit in

11  *Haughton versus the National Board of Examiners in Optometry.*

12  So we've checked that box.  And, Your Honor, I've also tried a

13  class action trial, which is sort of a rare thing these days.

14  And we're a long way from trying this case; but again, in terms

15  of contemplation of the merits of lead counsel under a strict

16  Rule 23(g), how do they fit in with the potential needs of the

17  case, I think I, my colleagues that I've identified in our

18  supplemental submission, checked those boxes.

19      Then there's the separate issue that a couple folks that

20  talked about -- Mr. Loeser perhaps most in-depth --

21          **THE COURT:**  By the way, did you win that Fourth

22  Circuit case?

23          **MR. SIEGEL:**  I won and got the trial court reversed.

24          **THE COURT:**  What was that case?

25          **MR. SIEGEL:**  This is *Haughton versus National Board of*

1    *Examiners in Optometry*.  And this is an --

2            **THE COURT:**  There was another Fourth Circuit case that

3    came out badly for you -- for your side -- on standing.  I

4    think *Beck versus McDonald* or something like that.  Am I

5    mis-remembering that?

6            **MR. SIEGEL:**  What's the case name?

7            **THE COURT:**  *Beck versus McDonald*.

8            **MR. SIEGEL:**  Predated our case.  So if you look at

9    *Haughton*, we dealt with *Beck*.  They stepped back from *Beck*.

10   They kind of navigated around it.  But the trial court

11   dismissed it based on *Beck*, and we just won a reversal.  The

12   decision came out in June, a month ago.

13        So we've been on the front lines of that very specific

14   issue.  And, look, I think everybody on both sides, if they

15   were being honest here -- as we all should be -- this is an

16   evolving issue, right?  It's not something that is set in stone

17   that you can go look at the constellation of cases out there

18   and say, Ah, yes, this is the way the case will come out on the

19   standing issue on this particular claim.  Even going back to

20   *Spokeo*, you have a concurrence from Justice Thomas that talks

21   about a privacy right.  And wait a minute, those are the kinds

22   of rights that perhaps should be treated differently because

23   they were treated differently at common law.

24        So I think -- I think -- the question's the right

25   question.  I think we're a long way away from being able to

1    give an answer -- that anybody in this room on either side

2    could give you with some definitive certainty and cite a case

3    based on the facts that we know so far.

4         So the second piece of what I wanted to talk about was the

5    case management piece.  Because I do think you have nearly all

6    of the folks that have preceded me talk about that; how many

7    lawyers should the structure be.

8         This is very, very judge-preference driven, in my view.  I

9    think our job, whether it's one or two, or two leads and a

10   small PSC, our job, again -- same thing with your question on

11   what this complaint looks like -- it's to zealously represent

12   our clients as efficiently as possible consistent with Rule 1;

13   that we deal with the defense counsel to prioritize the issues

14   that can move the case forward; that we resolve issues where we

15   can and don't bring to the Court at every moment issues that

16   counsel really should be able to resolve on their own so we can

17   get these critical issues before the Court in the most

18   efficient way possible for both sides.

19        And so that -- in terms of skill set?  When Judge Thrash

20   appointed me as lead counsel in *Home Depo*, and some colleagues,

21   we were able to very efficiently bring that case to final

22   resolution within a year after appointment.  Just by

23   happenstance, *Equifax* went back to Judge Thrash, completely

24   different case.  *Equifax* is also located in Atlanta.  And Judge

25   Thrash got that case.  We had about 330 complaints on file.

1   There was 100 applicants, not 30, for lead counsel.  And Judge

2   Thrash, with serious competition from many quality lawyers,

3   appointed me and some of my colleagues as lead in that case.

4        And I think -- did we get a good result for the class?

5   Yes.  Were we able to efficiently run a case that had

6   40 million class members?  Yes.  And I think -- I don't know

7   this, but I suspect the efficiency and the case management

8   techniques we were able to bring to bear in *Home Depot* is

9   probably a significant reason why Judge Thrash selected me

10  in -- when I came back in *Equifax*.  Because, again, I do think

11  as far as the court is concerned, you want an efficiently-run

12  case where we are bringing these issues to a head as quickly as

13  we can.

14       So we put this in our supplement.  The size of the

15  structure doesn't matter.  I think whether it's me or whomever

16  else you choose, lead counsel should have that skill set to

17  manage and should have the ability, be empowered to identify

18  other lawyers when needed when the case demands it to go say,

19  Oh, Ms. Doss, you have a very specific experience.  To the

20  extent you can talk about it, we'd like to navigate this issue.

21  We heard from Ms. Wolfson who can speak Russian.  Maybe that's

22  an important skill set.  But lead counsel should have the

23  ability to look to the folks in this room and others that are

24  known to be leaders in this field.

25       And that's just a final point I want to make.  I've been

 1    litigating these cases now for over five years.  I know nearly

 2    all these folks and have worked with them and many others and

 3    they're all outstanding lawyers in this field.  We need the

 4    ability to call on their skill sets when the case demands it.

 5    And again, everybody doesn't need to be in a big structure;

 6    it's the ability with the Court's permission to include folks

 7    where needed.

 8         Thank you, Your Honor.

 9              THE COURT:  Thank you.

10              MR. SIEGEL:  I had one final point.  It will be very

11    quick.

12              THE COURT:  Sure.

13              MR. SIEGEL:  You asked about these other issues and

14    how we could approach them, whether there were any additions.

15    My only comment is, a suggestion, is that it wait until the

16    appointment of lead counsel, for example.  It seems to me -- I

17    think there were competing proposals about when a consolidated

18    amended complaint would be filed, either 45 or 60 days after.

19    It seems to me that after appointment, the lead counsel and

20    counsel for Facebook can get together and probably all those

21    issues you identified can be resolved probably within a week.

22         So that was my only suggestion rather than try to grapple

23    with it here.

24              THE COURT:  I think that's a good point.  It's

25    worthwhile having a preliminary discussion about some of that

1   stuff.  But well taken.  Thank you.

2           **MR. SIEGEL:**  Thank you, Your Honor.

3           **THE COURT:**  Mr. Sobol.

4           **MR. SOBOL:**  Good morning, Your Honor.

5       Your Honor, I lead my firm's efforts to protect consumers'

6   privacy and defend their rights to basic cyber security.  My

7   submissions, including yesterday's, describe my years of

8   experience in this district prosecuting privacy and consumer

9   class actions and successfully resolving litigation

10  efficiently.

11      I am based in the Northern District.  My firm was founded

12  here over 40 years ago and a significant part of my practice

13  takes place every day through this court.

14      I am fortunate to work with talented and committed,

15  diverse group of lawyers at Lieff Cabraser, many of whom are

16  here in the back rows sitting with me, on privacy issues every

17  day, the highest levels of professional standards.  We are well

18  respected by courts, by our colleagues, and our adversaries.

19  This is reflected in our submissions of the support we received

20  from the plaintiffs' group, all of whom are among best lawyers

21  in the country who have dedicated their practice to protecting

22  consumers.

23      Facebook also is represented by excellent counsel who will

24  no doubt zealously and thoughtfully defend their client, as

25  they should.  And we will all need to work together, working

1  hard, respectfully, towards one another and collaborating

2  wherever possible as we have, in fact, done already amongst the

3  plaintiffs in submitting a joint CMC statement.  And, in fact,

4  in reaching agreement with Facebook on a proposed initial

5  schedule.

6      It wasn't clear to me in your opening comments whether the

7  Court appreciated that, but the plaintiffs' statement actually

8  is a result of a negotiation already with the defendants about

9  a proposed schedule.

10     **THE COURT:**  Oh, I thought -- no, I didn't realize

11 that.  Thank you.  I thought there was some disagreement from

12 the plaintiffs about when a consolidated complaint should be

13 filed and that, therefore, there would be disagreement about

14 the schedule by which it would be -- a motion to dismiss would

15 be adjudicated.

16     **MR. SOBOL:**  We resolved that disagreement by talking

17 with the defendants and proposing in our statement where -- it

18 may not be clear because it's in our statement, not a joint

19 statement -- but we preface it by noting that we now have an

20 agreed-upon schedule and it's set forth in the plaintiffs' case

21 management statement.

22     **THE COURT:**  Oh, okay.  Okay.

23     **MR. SOBOL:**  Yeah.

24     **THE COURT:**  Oh, good.

25     **MR. SOBOL:**  Your Honor, this is going to be a very

1   demanding case.  It's a very important case.  There's no

2   question about it.  And you know the way plaintiffs' counsel

3   work and I think demands of this case are going to require more

4   than one firm.  It can be -- I echo everything that my

5   colleagues have said about that.  I won't repeat it here.

6        I'll say that, you know, I have worked closely with many

7   of the lawyers in the room, many of them who have taken the

8   podium earlier today and will take the podium later on,

9   effectively as co-lead counsel.

10       Ms. Wolfson and I have worked together on consumer

11  matters.  I've worked with Keller Rohrback, in fact, on a

12  privacy matter involving the *Sony Pictures Entertainment*,

13  including with Ms. Laufenberg who's here today and Lynn Sarko.

14  I'm co-counsel, lead counsel, with Mr. Sarko in a case pending

15  in the District of Arizona against *Theranos*, which is a Silicon

16  Valley startup company you may have heard of.

17       So, you know, the important thing really is whether or not

18  we can effectively manage the case according to the needs of

19  the case.  And there are times when you need all hands on deck.

20  There are times when you need direction from just a couple of

21  lawyers.  I think the class would be benefited by the group of

22  -- by a small group of lawyers, or at least co-lead counsel,

23  with varied experience.  Two heads are better than one

24  sometimes.  These are difficult, complex issues.  The data --

25  the technical aspects will be very challenging.  The damages

1   theories will be difficult and will need a lot of creative

2   thought.  And putting heads together on that is going to be

3   very important.

4        Your Honor, I'd like to highlight three aspects of my

5   experience which I think makes me uniquely qualified to run the

6   litigation for the plaintiffs.

7        Among the many several privacy cases I have litigated to a

8   successful conclusion includes one against Facebook.  I have

9   investigated deeply into Facebook's stated public policies,

10  their actual practices, and the operation on a technical level

11  including down to their source code.  I'm very familiar with

12  certain aspects of how Facebook processes users' information

13  and converts it for commercial gain.

14       In our settlement, Facebook was forced to acknowledge the

15  practices revealed only by intensive technical discovery.  We

16  confirmed an end to those practices, some of which are still

17  ongoing.  And we added transparency with new plain English

18  disclosures.  As Chief District Judge Hamilton acknowledged,

19  almost all the relief available to the class was obtained, and

20  almost no other case she had seen in 17 years was litigated as

21  extensively pre-settlement.  That experience gained in

22  litigation will certainly inform and improve any proceedings

23  here.

24       I have litigated other data privacy cases involving the

25  intentional harvesting of users' private data similar to the

conduct that engaged in by -- alleged conduct engaged in by

Facebook here.   Includes the interception of the contents of

consumers' private electronic communications, the tracking of

children's geo-location and their online activities, and a near

constant and surreptitious surveillance of some consumers who

take extra efforts to keep their affairs private but are

thwarted anyways.   This experience will be invaluable, I think,

in contributing to understanding the magnitude of the harm here

and in being able to fashion a reasonable remedy to address it.

      You know, I'd like to sort of -- I want to address a

couple of the issues that you raise but I want -- I do want to

sort of emphasize as a way of closing; and that is that we at

Lieff Cabraser believe these cases are tremendously important

to our society in ways that are big and small, personal and

political, and seen and unseen.   The development of digital

technology that has exponentially propelled incursions into

Americans' private lives is very new and we're struggling with

how to deal with it.   But the recognition in society of the

importance of privacy is actually very old.

      The cases here -- this case, I believe -- will shape

privacy on the internet and the precedent that Your Honor will

set will guide corporations in the years to come.   I think it's

important litigation that can preserve our long-held cultural

values while technology inexorably moves forward.

      As lead counsel, I and my team at Lieff Cabraser can offer

1  not only our significant resources and our expertise in

2  resolving complex class actions, including privacy class

3  actions, but also our commitment to preserving and vindicating

4  the rights to privacy and autonomy.

5      Your Honor, I don't believe a stay of discovery is

6  appropriate here.  Our case management statement lays out

7  something very contrary to that.  We're asking for initial

8  disclosures that are -- go beyond, frankly, what might usually

9  be requested.  And there's a good reason for that.

10     And the reason is that we -- the incursion of privacy here

11  needs to be nipped in the bud and we need to maintain the

12  status quo of the privacy.  We need to figure out the extent of

13  the harm right away.  And that's what those initial disclosures

14  request.

15     We need to know what has been done and the scope of the

16  problem.  The reason why we need to know it is because we have

17  this sort of drip-drip in the public record of --

18         **THE COURT:**  Can I just ask you?  I'm looking at your

19  four categories of information you identified in the case

20  management statement.

21         **MR. SOBOL:**  Yes.

22         **THE COURT:**  Is the idea that that is the discovery

23  that would happen before motions to dismiss are adjudicated?

24  The discovery would be limited to that until the motions to

25  dismiss are adjudicated?

1      **MR. SOBOL:**  That is not exactly the collective

2   plaintiffs' proposal.  The collective plaintiffs' proposal is

3   that discovery for all purposes would commence upon the filing

4   of the amended complaint.  If I'm speaking -- not what is laid

5   out there, but I think that those four categories of

6   information, if we were able to get that prior to an

7   adjudication of a motion to dismiss, I think that's a

8   reasonable compromise to a discovery stay.

9      That information is very central.  It includes, of

10  course -- as you have in front of you -- includes, of course,

11  the investigations and audits that Facebook says that it's

12  undertaken and will give us a sense of what the scope of the

13  issue is here.  So I think it's so central and so crucial to

14  protect consumers and to make sure that we understand what the

15  status quo is that that would be a good way to proceed.

16      There is -- there are a couple of entities in bankruptcy

17  here, Your Honor, but I don't think -- you know, bankruptcy --

18  none of us who practice in bankruptcy regularly particularly

19  like it or are somewhat fearful of it.  But I think --

20      **THE COURT:**  Certainly my feeling.

21      **MR. SOBOL:**  We've retained a bankruptcy counsel.  He's

22  someone who's worked with us in complex litigation before and

23  MDL litigation.  In particular, I'm thinking of the *General*

24  *Motors*, the GM ignition case where you're really proceeding

25  against a bankrupt entity which is just -- who's going through

1    a reorganization.

2         Here we have a liquidation of a rather small entity.  And

3    the crucial aspect is to make sure that the evidence doesn't go

4    anywhere.  I don't think it's realistic to think that Cambridge

5    Analytica is going to be -- other than through, I think,

6    mandatory injunctive relief -- really providing much of a

7    remedy to these -- to this class.

8         And so, obviously, before the automatic stay took place we

9    sought to get and secure a commitment for them to maintain

10   evidence.  Because that's really the most important thing that

11   we have from them.  But we do have an appearance on file

12   through our retained bankruptcy lawyer and we're monitoring

13   that.

14        But in terms of proceeding here technically, we cannot

15   technically, and literally, we cannot proceed, of course,

16   against the bankrupt entity at this time.  And if we need -- if

17   it turns out that whomever you appoint as lead counsel and

18   their consultants determine that it's worth proceeding against

19   those defendant entities in bankruptcy, then the thing to do is

20   to get a relief from stay and be able to pursue it.

21        I wouldn't complicate these proceedings by pursuing that

22   claim in bankruptcy.  That would be inefficient.  The core

23   discovery and the core issues are all going to resolve out of

24   Menlo Park and Palo Alto predominantly, and we don't need to

25   involve the bankruptcy court other than getting permission if

1   indeed we do end up proceeding against those defendants.

2       If there's any other questions Your Honor has.  Otherwise,

3   I appreciate the opportunity to address the Court and thank you

4   for the opportunity to potentially represent this class in this

5   very important case.

6       Thank you, Your Honor.

7           **THE COURT:**  Great.  Thank you.  We have two people

8   left.  Ms. Weaver and Ms. Wolfson.  And after that we'll take a

9   break because I know we've been going for awhile.

10          **MS. WEAVER:**  Good morning, Your Honor.  Leslie Weaver

11  of Bleichmar Fonti and Auld.

12      I had five points in five minutes prepared, but it's more

13  like seven points in hopefully seven minutes given your

14  questions.

15      These are the things I was hoping to address.  One, why

16  isn't this a securities case?  Two, what's our best claim?  I'd

17  like to respond to your ESPN surfing question.  Three --

18          **THE COURT:**  I have a question for you.  Why do you

19  have a picture of a bull on your law firm --

20          **MS. WEAVER:**  That's a bull market.

21          **THE COURT:**  Bull market?

22          **MS. WEAVER:**  I guess so.  It's advertising, I guess.

23  There should be a little girl standing next to it, probably, if

24  you've been to Wall Street lately.

25      In any event, best claim, structure, how do you construct

1    a comprehensive pleading, bankruptcy, and case management.

2         So why isn't this a securities case?  The arc of the law

3    that has developed, and primarily in the Northern District on

4    this specific issue, really starting with *LinkedIn* in front of

5    Judge Koh in *Low v. LinkedIn*.  Subsequently, *Facebook*, which

6    Judge Davila had.  This is not a data breach case as has been

7    pointed out to you.  It has to do with data that's being

8    collected by people who are working in a safe environment.

9         So if you look, for example, at paragraph 23 of our

10   complaint, Facebook's data use policy promised:  We don't share

11   information we receive about you with others unless we have

12   received your permission and give you notice.

13        So you didn't get a warning like that when you were

14   surfing on the ESPN site.  That's exactly the claim that I

15   tried against Positive Singles in 2014 before Judge Carrie

16   Zepeda.  They made specific promises to people working in a

17   closed environment about what would be done with their data.

18   So it's not somebody dumpster driving and collecting

19   information about you when you're in a forum where you have no

20   real expectation of privacy.

21        The claim we pled that nobody else has pled, other than a

22   case that Judge Koh subsequently had called *Fraley v. Facebook*,

23   is civil -- California Civil Code, Section 3344.  That's

24   misappropriation of identity.  It's an interesting concept.  It

25   would admittedly be novel.  But the elements are, you know, the

use of the identity, the appropriation of that identity to the defendants' advantage, commercially or otherwise, lack of consent, and resulting injury.

You want to know about the injury.  Well, in that case Judge Koh specifically held -- this is 830 F.Supp. 2d 785 at 799 -- the plaintiffs had concrete, proveable valuable in the economy at large and that could be measured by the additional profits that Facebook earned.

So in that context we didn't plead a case just about Cambridge Analytica.  And that's your next question, is the structure of this case.  This isn't about one app.  It's about 200.  And if you read through the testimony that Mr. Zuckerberg gave and all of the subsequent investigations, we believe -- as Mr. Sobol just said -- that very first category of information that should be disclosed immediately is critical.  How many apps have this information and what is scope of it?  And that's probably -- I think we know, it's already in the record, but this case is much larger than Cambridge Analytica.

Going then to the next point, Your Honor.  Forgive me here.  The conversation that we've had today is one of the things that I love best about working in the plaintiffs' bar.  This collaborative structure.  And to come back to that first question why isn't this a securities case?  Because it's not a 10(b).  Those are easy cases.  I mean, not that you always win them, but it's very clear what the standard is.  Is there

falsity?  Is there *scienter*?  Is there damage?  Did the stock
move?

     Here you have -- and I believe you asked the question --
in our case management statement we identified 37 causes of
actions pled in 41 complaints.  And that tells you that
everybody quite can't get their fingers on it.

     And the collaborative discussion that we're having here is
why I like working in the plaintiffs' bar and it's why we need
the resources on the plaintiffs' side to really think about
this.  It's not to say that one firm can't do it, I think my
firm could, but I think having input really does help.  And in
4, page 3, of my initial submission we cite that Harvard Law
Review that all the Silicon Valley companies are discussing
which is the value in diversity in collaborative contexts.  And
there is -- approaching this as a strict data breach case is
probably not the way to go.  And I'd like you to consider also
the defendants' resources here.

     If you look at just investigations launched in the United
States, it's the FTC, the SEC, the FBI, the DOJ, HUD, and the
state attorneys general.  Those are the ones that we know
about.  International investigations --

          **THE COURT:**  What's HUD investigation?

          **MS. WEAVER:**  Discrimination in the collection of
information that was then used by companies in determining
where they were going to allow loans.  So it's the collection

1   -- it's the penumbra of this collection of information that is

2   so great and can be --

3          **THE COURT:**  I thought you were saying they were

4   investigating Facebook.

5          **MS. WEAVER:**  They are, Your Honor.

6          **THE COURT:**  They are?

7          **MS. WEAVER:**  They are.  In fact, I can tell you -- the

8   Department of Housing and Urban Development reopened its

9   investigation in April into whether Facebook violated the Fair

10  Housing Act by allowing ads that discriminate against protected

11  classes.

12     So Facebook has law firms, upon law firms, upon law firms.

13  And I know because I saw it in *Clean Diesel*.  And as Judge

14  Breyer famously said in *Clean Diesel*:  This isn't a whodunnit.

15  It's not.  But the problem, as in *Clean Diesel*, is the fix.

16  And it's the remedy for the harm that has already been a

17  incurred.

18     So there's a similarity.  How do we clean up the

19  environment for what has occurred?  We can't.  We know that

20  there are new statutes that are taking effect.  The California

21  Privacy Act, January 1, 2020, Facebook will be complying with.

22  Facebook has admitted they have at least a thousand employees

23  working to comply with the general data protection regulation.

24  So -- and those will impose standards that the Court will want

25  to consider in crafting the future remedy.  And the question is

1    how do we look backward here?

2          I would respectfully submit that these things all need to

3    be thought about carefully and that the firms that are looking

4    at it need to understand this isn't another repeat of a case

5    that's been litigated in the past.  They need to have the

6    ability to negotiate with those state attorney generals and all

7    of the other regulatory agencies in constructive ways.  And the

8    power of *Clean Diesel*, which I was honored to be involved in,

9    and actually by invitation in the settlement because I had good

10   relationships with some of the state attorneys general, was

11   that we were all facing the same direction at once.

12         Facebook's very important to our community, it's important

13   to our economy, and they have changed the world.  But it's also

14   clear they need some regulation.  They violated the FTC consent

15   decree.  They have violated their own terms of use.  And it's

16   this Court that can hold them to account.

17         There is another Facebook case up the Ninth Circuit is

18   reviewing.  That's Judge Davila's case that may be of import.

19   But the facts here are so very different than the facts that

20   were before Judge Davila because of the revelation of the

21   manipulation and the targeting of these individuals.

22         So in conclusion, Your Honor, you had two other questions;

23   one was about bankruptcy.  Because I don't see the case as just

24   about Cambridge Analytica, the bankruptcy of that entity really

25   doesn't play a huge role in this litigation.  I had a case in

front of Judge Alsup probably 15 years ago called *In Re:*
*Northpoint Securities Litigation*.  And in that case the company
went under.  I had the glory of litigating against all the DSL
startup cases.

    And when it's the entire ball of wax, or as in *Enron* you
have a problem on the ability to recover, sometimes in those
cases we named individual defendants to trigger insurance
policies.  There are ways out.  But Facebook here has the
wherewithal to pay so that's not really an issue here.  Yes,
it's to be monitored, but it shouldn't be wagging the tail, as
you say.

    On case management issues, I do think it would be
imperative immediately to sit and have the ESI discussion with
the defendants about what their preserving that's consistent
with the ESI protocol for the Northern District of California.

    The reason for that, obviously, is the scope of the kinds
of communications that are available here and the very specific
discussion of the preservation of data that continues, frankly,
to plaintiffs' bar.  And I'll give you an example.

    We can't get the substance of texts usually, or the
substance of instant messages in our private civil litigation.
The government gets them so sometimes we get them because the
government has received them.  But having those preservation
conversations early is really critical so that the defendants
don't come back and say, Oh, we didn't preserve this.  It's

going to cost $500,000 to restore everybody's text messages, or

something like that.

I know from my litigation against Twitter that they have

other kinds of instant messaging disappearing apps now that

they use.  I know they can check out of default applications.

All of those things are discussions that we would like to have

now rather than wait.

So I believe, Your Honor, that's covered everything.  If

you have any questions, I'm available to answer them.

**THE COURT:**  Appreciate it.  Thank you.

**MS. WEAVER:**  Thank you.

**MS. WOLFSON:**  Good morning, Tina Wolfson on behalf of

Audrey Diaz Sanchez.

All people are by nature free and independent and have

inalienable rights.  Among these are enjoying and defending

life and liberty, acquiring, possessing, and protecting

property, and pursuing and obtaining safety, happiness and

privacy.  That's from Section 1 -- Article I, Section 1, of the

California Constitution.

I think this case is about the fundamental right to

privacy that we as Americans all enjoy.  And I think it's about

Facebook's systemic violation of that right to privacy and a

breach of the consumer trust.  So I don't think -- I think

Cambridge Analytica is just one example.

I also echo my colleague's comments about how this case

1   really does stand at the crossroads of history and I think it
2   will be a pivotal case that informs how we as a society deal
3   with this fundamental right to privacy while technology evolves
4   at an exponential pace.
5       I think I'm uniquely qualified among my distinguished
6   colleagues here -- and you really do have an embarrassment of
7   riches -- but I think I am uniquely qualified to lead this
8   case.  First because of my experience.  In addition to 20 years
9   of class action experience both in the MDL context and
10  otherwise, I have very deep passion for and experience in
11  particularly privacy class actions.
12      From financial privacy cases back in the '90s that I
13  litigated in front of Judge Kramer down the street in superior
14  court, complex litigation, which somewhat mirrored the facts
15  here.  Banks there were collecting financial information about
16  their consumers, creating financial dossiers, and selling those
17  to third-party telemarketers; to my very deep data breach
18  experience that I described in my application; and to cutting
19  edge biometric privacy cases that we are now litigating in the
20  Illinois Northern District.
21      So we're not just familiar with the issues.  We are the
22  forefront of making precedent on those issues such as the
23  seminal *Neiman Marcus* case, Article III standing case.  And I
24  should mention, Your Honor, that the appeal in that case was a
25  two-person job.  My amazing partner, Ted Maya, who I list on my

1    core team, and myself.  This kind of intimate knowledge of

2    privacy cases will significantly benefit the class.  We won't

3    need to reinvent the wheels here.  We know where the issues

4    are, we know how to conduct discovery, to flush out these types

5    of issues.  We know what types of experts we need and so on.

6         **THE COURT:**  Could I ask you the question that I asked

7    one other attorney?  I can't remember who anymore.

8         On the issue of filing a consolidated complaint, you know,

9    you've got all these claims.  I assume some of them are

10   significantly weaker than others.  I assume some of them

11   probably aren't worth bringing.  I don't know that for sure,

12   but --

13        How do you -- how do you -- what's the process for sifting

14   through the claims?  And do you assert everything in the

15   consolidated complaint?  Or do you assert some of them with the

16   understanding that the other plaintiffs who assert other claims

17   that you haven't asserted in the consolidated complaint, those

18   claims kind of sit to the side and get sorted out later?  How

19   does it work?

20        **MS. WOLFSON:**  I think it's, basically, the latter,

21   Your Honor.  I think my job as lead counsel, were I to be

22   appointed, is to present to you sort of the core issues for

23   pre-trial purposes.  And here, unlike in some of the data

24   breach cases where there is no uniform law necessarily and you

25   have to do state-by-state analysis, Facebook in its own terms

1    and conditions agrees that California law applies.  And so my

2    vision for the case primarily is California claims for a

3    nationwide class.

4          Now, in terms of case management there are many different

5    ways to approach that.  I think the purpose of an MDL is to

6    flush out the core substantive issues for pre-trial purposes,

7    not to present to you a kitchen sink complaint of every single

8    state claim that may be out there.  It is definitely to

9    streamline the proceedings and kind of get to the meat of the

10   case hopefully for a global resolution.  And if not, to inform

11   the subsequent trial proceedings in the respective forums of

12   how those should go forward.

13         So just want to sort of give a shout out to one other

14   member of my core who recently -- core team who recently joined

15   our firm.  And that's Courtney Ballard Searcy.  She brings 12

16   years of complex litigation to the table, including five years

17   at Quinn Emmanuel -- or, Quinn Oliver -- or it's Sullivan now,

18   I think.  She has deep experience in complex litigation but

19   also in bankruptcy dealing with regulatory and government

20   agencies IP issues and international law which may all come

21   into play here.

22         And I should mention that the experience that I listed for

23   myself and my team is our experience.  We're not resting on the

24   laurels and experience of others at some big firm.  We are a

25   small shop, but I think we have a significant effect.

1          Another thing I want to talk about briefly is personal

2     accountability.  I've never had the pleasure of appearing

3     before you in the past, but I get the sense that you're looking

4     for a leader who will be personally accountable to you, who

5     won't fudge or hide the ball, who answers questions directly

6     first and then provides explanations.  One who's leading the

7     big picture, but is also thinking about and familiar with the

8     details.  And I can promise you that I can deliver that because

9     that's how I practice.

10          I also should mention that I deliberately made space for

11    this case in my workload.  For example, recently although I

12    filed an *Intel* case I refrained from applying for leadership

13    position there.  Congratulations to Ms. Rivas for getting that

14    lead counsel.  That's fantastic.  And other than my settlement

15    work in *Experian*, which is now in settlement mode, I don't have

16    any current MDL lead positions although I am serving on several

17    PSC's.

18          And my final point, Your Honor, is commitment.  I think

19    you have some amazing lawyers in front of you who are dedicated

20    to protect the rights of the plaintiff class.  And while I am

21    dedicated to all of my cases, this one is unique and special.

22          Because of my personal background, and it's not just

23    Mr. Siegel's comment about my speaking Russian as my first

24    language; but having grown up in a totalitarian society where

25    there were no civil rights, I think I have a little bit of a

1    unique appreciation perhaps and emotional intelligence of what

2    it means not to have those rights.  And so I bring that kind of

3    personal passion to my privacy cases, and particularly this

4    case, and I think that it will serve me well in terms of my

5    commitment and my motivation to drive it to a speedy and just

6    resolution.

7        By the way I want to thank Your Honor for a couple of

8    things.  One is your standing order regarding confidentiality.

9    I think that's really important overall, but in this case

10   particularly.  This is a case of public interest and I think

11   the public has the right to know of what we're doing here.  And

12   I also want to thank you for your work ethic.  I know you're

13   fond of orders where responses are required in less than 24

14   hours, and I actually welcome that and I appreciate that hard

15   work because I know that it will lead to a speedy resolution

16   for the class here.

17       Just a couple of comments on the issues that we've

18   discussed today.

19       In terms of lead counsel, I would just implore you not to

20   handcuff the plaintiff class.  We've got five lawyers here from

21   Gibson Dunn just for a CMC.  They're amazing attorneys.  I've

22   worked with them before.  They don't miss anything.  And they

23   probably have another army back in their respective offices

24   across the country working on this case.  And it is in the

25   class's best interest to be able to use all the talent that's

come forward and shown an interest to litigate this case.  So
however you structure it formally, I would just ask that you
don't limit us in using all the talent that's available.

Discovery stay.  I don't know what more to say on that
other than an interesting fact.  I recently read an article
that the Cambridge Analytical principals -- former principals,
actually:  Moving on with life and starting other data
companies.

Who knows who has the information still and what they'll
do with it in their future endeavors.  So I think discovery
should proceed immediately.

In terms of magistrates, we really appreciate Your Honor's
volunteering to handle discovery issues.  Of course, if that
becomes cumbersome -- we don't anticipate, hopefully the sides
will cooperate -- but if it does a magistrate discovery might
be appropriate.  And a settlement discovery as well.  I think
whatever lead counsel you appoint is going to want to move the
case very quickly and efficiently in both litigation and
potential settlement fronts.  And I think that's another reason
that a collaborative effort is appropriate here.

And unless you have any other questions, I'm done.

**THE COURT:**  Great.  Thank you very much.

**MS. WOLFSON:**  Thank you.

**THE COURT:**  I'm inclined to think that we should take
a lunch break and then come back.  I don't have a great sense

1    of how much more time we will spend together today, but I'd

2    rather not sort of try to fit everything in before lunch.  I

3    think even if we don't decide a ton of stuff now, it will be

4    good to start talking about a lot of this stuff.

5         So why don't we take a lunch break and return at quarter

6    to 1.  And I'm happy to hear from Facebook about any of the

7    issues that were discussed today, sort of preliminary thoughts

8    on any of the issues that were discussed today.  Obviously

9    including discovery.

10        I gather it's not really your place to get involved in who

11   -- in the question of who should be appointed, but if you have

12   any concerns that you think I should be thinking about, you

13   know, I think it's appropriate for you to raise those.  If

14   there is any -- I'm gathering there probably is not a conflict

15   issue with Ms. Doss, but if there's a concern that you think I

16   should be thinking about with respect to that or anything else,

17   I think it would be appropriate for you to flag it with me.

18        And, yeah, that's about it.  So we'll see you back here at

19   quarter to 1.  Thanks.

20                   (Recess taken at 11:54 a.m.)

21               (Proceedings resumed at 12:49 p.m.)

22        **THE COURT:**  All right.  Anything you'd like to talk to

23   me about?

24        **MR. SNYDER:**  Yes, Your Honor.  So nice to just sit and

25   relax.

1          Thank you, Your Honor.

2          I'll briefly address the points you raised and other

3    points that were raised here in an effort to assist the Court

4    in fashioning the most efficient and just approach to the case.

5          As I was sitting here I collected a number of comments.  I

6    would say admissions, advisedly, made by counsel.  And it's

7    actually extraordinary.

8          Flying blind.  Unclear.  Creative thought.  Novel claims.

9    Difficult to wrap arms around.  Not a data breach.  Figuring

10   out how to plead important privacy claims.  No one can say with

11   certainty or cite a case.  An evolving issue.  Not something

12   set in stone.

13         One counsel -- I forgot who, but he was impressive --

14   checked his box on expertise but had no articulation of injury.

15   Another articulated the harm as information in the wrong hands.

16   Another one said, No one knows.  Another one said, Breach of

17   trust.  Another said, Difficult and complex issues.  Another

18   said, Damages theories will be difficult and require a lot of

19   creative thought.  Another one proclaimed that, We're at the

20   crossroads of history.  We may be.  We may not be.  Another one

21   said, This is a case about the fundamental right to privacy.  I

22   don't think they meant the 14th amendment, but it wasn't clear

23   which right they were referring to.  Another said --

24              **THE COURT:**  California Constitution, I think.

25              **MR. SNYDER:**  California Constitution.  Okay.  Another

1   said, This isn't a repeat of another case that's happened in

2   the past.   Another, I think, said, Echoing comments made by

3   many we need regulation.

4        And so I think this is a long way to say that no counsel

5   has articulated -- not one -- a concrete or particularized

6   injury here.   And if they can't articulate their own injury at

7   this point in time, there's no purpose, it seems to us, served

8   by discovery, plenary or otherwise.   Because the question of

9   standing is not only a threshold issue, it is a dispositive

10  issue that is the trip wire for so many privacy class actions

11  in this court and around the country on facts where the

12  articulation of harm is far greater than even here.

13       Interestingly, the *Haughton* case, the Fourth Circuit case,

14  the district court dismissed that case, erroneously in the eyes

15  of the Fourth Circuit.   And in that case there was a data

16  breach, social security numbers, credit cards.   One plaintiff

17  had a credit card opened in his or her name by a thief.   And

18  even there the district court reading of the case law,

19  erroneously, but citing substantial authority, dismissed that

20  case.   And the Fourth Circuit finding a closer case sent it

21  back.

22       Of course, here --

23           **THE COURT:**  I mean, I get the idea.   I get what you're

24  about to say is that there's no -- there's no apparent risk of

25  identity theft.   I mean, peoples' social security numbers

1   weren't taken, peoples' credit card information presumably

2   wasn't taken.   And so the injury, or the risk of injury, seems

3   somewhat more ephemeral, right?

4        On the other hand, though, of course, we're not going to

5   reach a final decision about standing or even about whether

6   discovery should go forward today --

7             MR. SNYDER:   Of course not, Your Honor.

8             THE COURT:   -- but just to sort of begin the

9   conversation.   Even though the injury seems somewhat more

10  ephemeral than perhaps your typical data breach case, these

11  people entered into a relationship with Facebook and there was

12  allegedly an understanding of some sort between these people

13  and Facebook that they would be putting information about

14  themselves onto their page or otherwise sharing information

15  about themselves with a select group of people that they

16  wouldn't want spread all over the world.   And Facebook caused

17  that private information to be spread all over the world, sort

18  of contrary to the understanding that it had with its users.

19       And so that does seem like -- you know, somebody made

20  reference to Justice Thomas's concurrence in *Spokeo*.   That does

21  seem like kind of a privacy violation that is tangible enough

22  to constitute Article III injury.

23            MR. SNYDER:   That is the argument, I think, that we'll

24  hear.   And I'll have two just brief responses and then I will

25  endorse Your Honor's admonition that we're not arguing for all

1   time here.  But my impressions are, first, just a factual

2   clarification.  Even as alleged, I think Facebook didn't cause

3   the information to be spread into the world.  There was no data

4   breach.  Users shared certain information, obviously, with

5   third-party apps.  They gave their consent to Facebook to do

6   so.  And then things went wrong when a developer, Mr. Kogan and

7   Cambridge Analytica, violated Facebook's policies and then

8   misled people about how they intended to use that information.

9        So while Facebook was a necessary --

10       **THE COURT:**  I don't think that's how they allege it or

11  how many of them allege it, right?  The way they allege it is

12  that Facebook made a promise not to allow third parties to get

13  user information without permission, and Facebook allowed these

14  apps to operate in a way that Facebook knew was going to give

15  third parties information about users who had not given their

16  permission.

17       **MR. SNYDER:**  I guess my point is, Your Honor, that

18  consent was given to --

19       **THE COURT:**  But that's not how it's alleged.  I mean,

20  you made reference to it.  Even as they allege it happened this

21  way --

22       **MR. SNYDER:**  Fair enough.

23       **THE COURT:**  -- I don't think that's correct.

24       **MR. SNYDER:**  Fair enough.  So the first point is in

25  terms of the causative link I think that really -- that while

Facebook was a link in the chain of events, had Facebook's
policies not been abused and violated by third parties and had
they not misled people about how they intended to use the
information, the information would not have been broadly
disseminated.

The second point is I do think that under Article III and
*Spokeo* and its progeny, more is required than not only -- not
the threadbare, but really the nonexistent actual injury
alleged here.

I'll give you an example.  I think we keep on beating this
drum in our papers.

Two of the complaints allege -- or, a number of the
complaints allege -- that the injury is battery drainage.
Another says Donald Trump's election.  Those obviously are
silly and not going to be actionable.  But I think you need to
say more than, My information was taken by a third-party and
used, and I didn't like the way they used it.  You gave consent
to the third-party to take your information and use it for some
other purpose.

And I think this will be for Your Honor to grapple with.
And my point in raising these issues today is simply to say
that this standing issue is threshold, is dispositive.  In
fact, some of the counsel approached me in the hall and said,
If I'm lead counsel I might be in agreement with you that we
should get a consolidated complaint on file, see whether it's

1    30 or 70 or 700 causes of action.  We then will look at the

2    complaint, we'll promptly file a motion; mostly on standing,

3    but there are other fatal flaws in a number of the main claims.

4    And we could meet and confer with lead counsel.

5         And there may be some small group of documents that could

6    be helpful to them and we would agree to produce.  We may look

7    at it and say we think more than ever that a complete stay is

8    necessary.  But I think it's premature to burden the Court with

9    that issue now.  And I'm hopeful that lead counsel and we can

10   agree on ground rules and the efficient progress of the case so

11   we can tee up this issue quickly, get it in front of Your

12   Honor.

13        **THE COURT:**  Let me ask you a couple additional

14   questions about that, if I could.

15        Number one, do you -- I want to talk about the way in

16   which it would be teed up.  But first, one more question about

17   your anticipated motion to dismiss.

18        **MR. SNYDER:**  Yes.

19        **THE COURT:**  I realize a consolidated complaint has not

20   been filed so you can't predict what you'll say in your motion

21   to dismiss.

22        **MR. SNYDER:**  Sure.

23        **THE COURT:**  But if you lose on standing, do you agree

24   that some of these claims would be able to go forward?

25        **MR. SNYDER:**  It depends on what the claims are.  For

1    example, if they're Unfair Competition Law claims are deficient

2    on multiple grounds.  Stored Communication Act claims we think

3    are fatally flawed.  Negligence, barred by the economic laws

4    rule.  Breach of contract we think is fatally flawed.  Unjust

5    enrichment, duplicative of the barred contract claim.  Invasion

6    of privacy we think doesn't meet any of the statutory criteria.

7    And that, again, we don't think there is a legally protected

8    privacy interest in the Facebook data on the facts of this case

9    as alleged under the constitutional right to privacy that's

10   been invoked.

11        So the answer is --

12        **THE COURT:**  But, I mean, if they have enough factual

13   allegations from which you could conclude that they suffered a

14   privacy injury, then I assume it also means that they have --

15   will have stated a claim for invasion of privacy.

16        **MR. SNYDER:**  Those are big ifs.  And so we think that

17   the entire complaint will be --

18        **THE COURT:**  I'm just trying to get a sense of -- in

19   terms of assessing whether discovery should go forward before a

20   motion to dismiss is adjudicated, I'm trying to get a sense of

21   whether the only thing I really need to take a hard look at is

22   standing; or whether if I conclude that, you know, that they

23   will be able to allege standing, or they will likely be able to

24   allege standing, is that -- can we -- from there can we say,

25   Well, they're going to be able to pursue at least some of their

1  substantive claims.

2      **MR. SNYDER:**  So let me be clear.  And this is not a

3  reflexive knee jerk defendant who always says the case should

4  be dismissed.  But we do not believe that there is a claim on

5  these facts.  We understand that people are angry, upset.  We

6  understand that this created a broad discussion about the

7  nature of the digital age and the boundaries of privacy and the

8  rights and responsibilities of companies; and obviously,

9  leaders, regulators, legislators and others are grappling with

10  these important issues.  And my client has made clear that it

11  agrees that this is a very important debate to have.

12      So whether we're at the crossroads of history in terms of

13  the internet or not, we believe that this is not the forum to

14  decide or adjudicate any of these issues.  And so whatever

15  claim is slapped onto or labeled this conduct, this conduct is

16  not actionable.

17      So this is a long way to say we believe we'll have an

18  omnibus motion that is directed at the entire complaint.  And

19  that for that reason, among others, discovery now is putting

20  the cart before the horse.  This is not, Your Honor, you know,

21  the privacy, surveillance, identity theft, data harvesting,

22  data breach case that the plaintiffs' imagine.  It's just not.

23      And I understand why people jumped on the bandwagon here

24  in filing this lawsuit, or these lawsuits, because these events

25  did -- a broad discussion about critical issues in our society.

1  But that doesn't mean they translate into cognizable claims.

2  And we think that in the end when Your Honor looks at

3  everything, particularly given the state of the law today, that

4  you'll agree with us.  And for that reason, it's efficient and

5  fair and sensible to defer discovery.

6     I'll say one other thing.  One counsel talked about

7  preserving the status quo.  The status quo is preserved.

8  There's no emergency here.  No one's home is burning down and

9  no one's -- there's no imminent harm.  And I think another

10  counsel acknowledged tacitly, or even explicitly, that they

11  want to conduct discovery now as a fishing expedition to find

12  new claims.  And I don't blame them; because the ones they have

13  they just don't make it.

14     This is not only a case that is a work in progress, one

15  person called it a kitchen sink or not a kitchen sink.  It's

16  really a jumping of the gun filing a lawsuit and then

17  realizing, woops, this is not a data breach case.  How are we

18  going to figure out a cause of action here to fit these facts?

19  And there is no cause of action on these facts way beyond just

20  standing.

21     So --

22        **THE COURT:**  So on the issue of timeline and teeing all

23  of this up -- so I apologize for not noticing this before if

24  somebody pointed it out to me, but you have now reached an

25  agreement on the timeline for adjudicating a motion to dismiss.

1          MR. SNYDER:  Yes, Your Honor.

2          THE COURT:  That's in the plaintiffs' case management

3    statement.

4          MR. SNYDER:  Yes.

5          THE COURT:  And so whenever class counsel is

6    appointed, lead counsel is appointed, 60 days from then the

7    plaintiffs file a consolidated complaint.  Let's say I appoint

8    lead counsel on Friday.  So that -- so in like mid September

9    they would file a consolidated complaint?

10         MR. SNYDER:  Yes.

11         THE COURT:  And then early November you would file

12   your motion to dismiss.  Or the defendants would -- if there

13   are other defendants, motions to dismiss.

14       And then early December, opposition.  Late December,

15   reply.  Hearing sometime in January or February is, basically,

16   what you're contemplating.

17         MR. SNYDER:  Yes, Your Honor.  And I would add,

18   consistent with my earlier comments, that we would propose that

19   in September and October while we're preparing our motion we

20   will meet and confer with lead counsel on discovery issues.  If

21   we believe, after reading the consolidated complaint, that a

22   stay of all discovery is appropriate we'll take that position

23   in the meet and confer.  Maybe lead counsel will agree, maybe

24   they won't.  Maybe they'll ask for some limited discovery and

25   we'll agree.  And if not, we'll file a motion to stay on a

1    substantially parallel track with a motion or --

2        THE COURT:  It seems to me that what might make

3    sense -- and tell me what you think of this -- is let's say I

4    appoint lead counsel in the next couple days.  That we tee up

5    your motion to stay discovery quite promptly.  And we -- so we

6    tee that up so that it can be -- it can be resolved sometime in

7    the next several weeks.  So that we know, even before -- even

8    while -- so that we know even before lead counsel files the

9    consolidated complaint we know, and they know, whether they're

10   going to get discovery.

11       MR. SNYDER:  The problem with that, Your Honor,

12   respectfully, is that I don't think it's fair at all to even

13   contemplate discovery particularly in a case of this magnitude

14   when we have -- when we don't have an operative pleading.

15   There's no exigent or exceptional circumstance to, I think,

16   create --

17       THE COURT:  Well, what I was thinking is that if we

18   wait until after the consolidated complaint is filed, right?

19   And then let's say I conclude --

20       I'm trying to think ahead and prevent this case from being

21   bolloxed up in the pleadings for too long.  It may be the case

22   -- that the cases are dismissed on the pleadings.  But if

23   they're not going to be dismissed on the pleadings, I don't

24   want it to be bolloxed up in the pleadings for too long before

25   we really get the case moving.

1    So my concern is the following scenario:  You know, lead

2    counsel gets appointed, we wait 60 days for the filing of a

3    consolidated complaint, you file your motion to dismiss, we

4    start fighting over whether discovery should go forward.  While

5    you all are briefing your motion to dismiss, I conclude that

6    discovery should go forward.  They start getting discovery and

7    then they want to amend their complaint based on the discovery

8    that is received.  So we end up not even adjudicating the

9    motion to dismiss you've filed in early November or whenever it

10   is that you would file it, and we'd have to start that whole

11   process again based on yet another amended complaint that's

12   based on the discovery they have.

13   So that's why I was thinking why not decide this discovery

14   question earlier rather than later.  Maybe you win on it and

15   maybe there's no discovery until next January or February.

16   Maybe you lose on it.  But if you lose on it, you've lost on it

17   at a time where we've not created any significant

18   inefficiencies.

19       **MR. SNYDER:**  I guess my response would be again, Your

20   Honor, before we have a consolidated complaint it's going to be

21   difficult to have a meaningful discussion with the other side.

22   Because for all we know there are going to be 25 new theories.

23   And it sounds like from the case management statement they want

24   to substantially expand not only the legal theories but also

25   the factual allegations to include maybe hundreds of other

acts.  So we just don't know what we're shooting at.  So it
would be a formalistic conversation that isn't worth having.

    And I also think -- meaning to say I don't think until I
see the complaint I can be in a position to consent to any
discovery, assuming we're going to consent to anything.

        **THE COURT:**  Well, the place where we're in now, you
may say we don't have an operative complaint.  You do.  You
have many operative complaints.

        **MR. SNYDER:**  Right, but I think the contemplation, and
all plaintiffs agree, that should not be the operative
complaint in this proceeding.  We should have a consolidated
complaint.  Meaning the plaintiffs agree there should be a
single complaint here that will not resemble the 30 complaints
that are now strewn across the country.

    The other thing --

        **THE COURT:**  Excuse me.  Before I forget, can I ask you
-- I'll remember my question.  Go ahead.  I don't want --

        **MR. SNYDER:**  I know the question.  I read your mind.
I also think the reason we put 45 days and not 60, by way of
example, and 21 days instead of 30, in our briefing, which is
not as aggressive as we could have asked for, is because we
don't want to be the defendant who is trying to slow down the
case.

    And I actually think that if Your Honor grants the motion
and it goes up to the Ninth Circuit, if Your Honor denies the

1   motion, February and January is not, I think, an inordinate

2   delay in a case of this magnitude where we're here in mid-July

3   for the first time.  It's no fault of either party that we

4   were, quote, "delayed," close quote, in an MDL proceeding.

5       So for all intents and purposes it's mid-July.  And

6   waiting until January or February to see the contours of the

7   operative pleading, maybe Your Honor will dismiss it all, maybe

8   you'll dismiss 80 percent of it.  Then fashion a discovery plan

9   off of a complaint that exists at the time.  I think that's a

10  reasonable time frame, and I don't see that as undue delay at

11  all.  And I think it is the sensible and fair approach.  I

12  think it's unfair to ask a defendant who is now facing 30

13  complaints, is going to face a 300-page complaint we haven't

14  seen yet --

15          **THE COURT:**  I hope it's not 300 pages.

16          **MR. SNYDER:**  Well, now whoever is drafting the

17  complaint can't do a 300-page complaint, so that's why I said

18  it.

19          **THE COURT:**  Have to have less than 300.  299.

20          **MR. SNYDER:**  I'm just being honest, to have a

21  conversation, much less advise my client on discovery, when we

22  don't know what the pleading is that we're fighting I think is

23  just not fair.  And it doesn't really make sense here.  And I

24  can assure Your Honor that if there is a discovery plan that we

25  will attack it with dispatch and we will not be ever the party

seeking to delay.  That's not our -- that's not the way my firm

litigates, not the way Facebook litigates.  If the case is

going forward on the merits we want to get to those merits.

And we will.  If we get to them in February as opposed to

November, I think it's really -- I think that's the prudent

approach here.

To your question that you didn't ask but I divined --

**THE COURT:**  Are you going to --

**MR. SNYDER:**  Let's see.

**THE COURT:**  Go ahead.

**MR. SNYDER:**  I think that if they cut causes of action

from the complaint, and now let's say complaints 2 through 26

have cause of action that were abandoned in this consolidated,

what happens, right?

I think that -- we were just talking about it.  We haven't

researched this, but our sense is that it can't be that after

the case is MDL'd and litigated through summary judgment it

then gets remanded to their home districts and then you have

plenary discovery on those claims that weren't filed in the

consolidated case.

**THE COURT:**  I think that's probably right.  The

question is whether we in these MDL proceedings would do

wrap-up on any claims that some other plaintiff wanted to

pursue that lead counsel determined should not be in the

consolidated complaint.

1          **MR. SNYDER:**  Right.   I think that if a plaintiff from

2     one of the 30 cases wants to pursue a case -- a claim here that

3     lead counsel doesn't, and there's a dispute as to that, maybe

4     those do get severed.   But I think we need to research it.

5          **THE COURT:**  So maybe those do get severed.   What is --

6     I'm not holding you to anything --

7          **MR. SNYDER:**  No, no.   It may be that at that point

8     there needs to be some recognition that that plaintiff, you

9     know, either has to find a way to preserve his rights; and it

10    may be to sever that claim from the consolidated action.   We're

11    going to research this.   I'm sure it's come up.

12         As to Cambridge Analytica and its bankruptcy, we don't

13    really take any position there.   Really it's for the plaintiffs

14    to figure out.   I agree they have to go to the bankruptcy court

15    if they want to get discovery from the entity.   They don't need

16    bankruptcy court approval if they want discovery from the

17    individuals.   But I assume the individuals would hide behind

18    the entity.   It's our experience that bankruptcy courts,

19    particularly in this circumstance, routinely grant such

20    permission.

21         And we certainly share the plaintiffs' view that discovery

22    from Cambridge Analytica is essential because Cambridge

23    Analytica's role in the underlying events is central not only

24    to the case but a cornerstone of our defense.   To the extent we

25    go to the merits.

1          **THE COURT:**  So I gather what you're saying is that you

2    would, in the bankruptcy court, you would support the

3    plaintiffs' request for permission to pursue discovery against

4    Cambridge Analytica in this case.

5          **MR. SNYDER:**  Yes.  Because obviously, we would be at a

6    severe disadvantage if we had to respond to discovery, sit for

7    depositions, answer interrogatories, without concurrently

8    developing our theory of the case.  Which, of course, on the

9    facts here is that Cambridge Analytica, Mr. Kogan and others,

10   violated our policies and then lied to our users about how they

11   intended to use this information.

12       And so this is another reason why we think it makes sense

13   to defer discovery also until resolution of the motion to

14   dismiss because we need to play that out in the bankruptcy

15   court.  Because if in the bankruptcy court -- I think unlikely

16   but it's possible -- we're denied essential discovery, we may

17   be here asking for a stay because our due process rights can't

18   be preserved if Cambridge Analytica is hiding behind the

19   bankruptcy court and not producing vital information.

20       Again, this is premature.  But I think it's another reason

21   why we should hit the pause on discovery, sort out the

22   bankruptcy issues, sort out the motion to dismiss, and then we

23   can start fresh and ready for action in 2019.  Hard to believe.

24       Let's see.  Is there anything else?  I think I've hit

25   everything.  And I'm praying that now all 30 lawyers don't

```
 1   respond to me.

 2           THE COURT:  God, no.  Let me just --

 3           MR. SNYDER:  Raise your hand if you disagree with

 4   everything I said.

 5           THE COURT:  Let me look at my list and see if there

 6   was anything else I wanted to discuss with you.

 7       I mean, should we -- I suppose -- you know, probably the

 8   best thing to do -- I think it is worth starting to have the

 9   conversation about these issues.  But probably the best thing

10   to do is appoint lead counsel and then have a case management

11   conference.  Even telephonic.  We don't need to make everybody

12   fly out here.  But just for the purpose of talking about things

13   like when will I decide the motion to stay discovery?

14           MR. SNYDER:  When will we go to bankruptcy court.

15   Maybe we can come up with a plan to go to bankruptcy court

16   together hand in hand.

17           THE COURT:  Sounds like that part will be hand in

18   hand.  Let me see.

19       Do you want to tell me sort of -- give me a summary of

20   everything you've done to make sure that evidence is preserved

21   in this case?

22           MR. SNYDER:  Yeah.  I mean, I can say that immediately

23   upon the -- these issues arising, Facebook preserved all

24   documents, was -- and issued all appropriate document retention

25   notices to all relevant custodians.  That's been in place.
```

1    That's been in place for many months now.  Obviously, as

2    reported and as commented on Facebook, it is subject to

3    regulatory review throughout the United States, outside the

4    United States.  And so everything is locked down, and has been

5    locked down.

6            THE COURT:  What about -- somebody mentioned texts.

7            MR. SNYDER:  I think that the document hold applies to

8    all electronic communications.  And it's been issued -- I think

9    it's been updated and additional custodians are added as

10   they're identified, et cetera, et cetera.  But this is being

11   handled, you know, according to, you know, to the letter and

12   spirit of the law and Facebook's own internal policies which

13   are quite robust on these issues.  So there's no reason for

14   concern about document preservation in this case.

15           THE COURT:  One small thing.  I'm sure you've seen in

16   my standing order this reference -- sort of statement to

17   defendants in class actions urging them to consider whether to

18   do cross motions for summary judgment as to named plaintiffs

19   before proceeding with -- before doing class cert proceedings.

20   I assume you would say that in this case that's not an

21   appropriate way to go about it.  That we would want to do class

22   cert first, then do summary judgment.

23           MR. SNYDER:  May I confer with my --

24           THE COURT:  Sure.  And you can think about it and talk

25   to me about it next time.

1      (Pause.)

2          **MR. SNYDER:**  The smartest people I know in the world

3    tell me that we would want to do summary judgment motions as to

4    named plaintiffs before because it may be they have no

5    individual injury as opposed to -- as opposed to -- you know --

6          **THE COURT:**  So that's something that we'll need to

7    talk about further when we -- usually I defer to the defendant

8    on that.  In a normal class action, I defer to the defendant on

9    that.  In MDL context I'm not sure that I would.  I would want

10   to think carefully about it as to whether it makes sense.  My

11   gut was it does not make sense in this context, but we can talk

12   further about that.

13        Let me see.

14        **MR. SNYDER:**  Oh.  Your Honor, there's one issue on my

15   checklist.  I'm not sure you and I discussed, but just to be

16   complete and complete the record so it's not left as a dangling

17   participle.

18        There was one counsel who served on a Senate committee.

19   And we've discussed the matter with her, and based on her

20   representations and what we know at present we have no

21   objection to her involvement in the case in any role that she

22   plays.

23        **THE COURT:**  Okay.  Thank you.  Any views on whether

24   this should go to a magistrate judge for settlement purposes

25   for discovery purposes?

1     **MR. SNYDER:**  My answer is whatever Your Honor wishes,

2    but I can't imagine you'd want to miss out on all the fun.

3    Obviously, we defer to Your Honor's judgment and position on

4    that.

5          **THE COURT:**  Okay.  So -- all right.  Well, I guess the

6    way we should proceed is --

7         Oh, one other item on my list.  We have all these cases

8    that were filed in the Northern District that were related to

9    me but have not been consolidated by the MDL panel to be part

10   of the proceedings yet.  I assume there's no reason why I

11   shouldn't just go ahead and consolidate all those cases.

12         **MR. SNYDER:**  No reason, Your Honor.  We agree.

13         **THE COURT:**  And I assume just -- if some plaintiff's

14   counsel disagrees with that, raise your hand.

15      (No response.)

16         **THE COURT:**  All right.  Don't see any.  And then there

17   was one -- there's one separate case called *Burk versus*

18   *Facebook* that you identified in your case management statement

19   as being related.  That's maybe in front of Judge -- Chief

20   Judge Hamilton.  Is that right?  Oh, Yvonne Gonzalez Rogers.

21   Oh, she's referred it to us.  Okay.  Okay.

22         **MR. SNYDER:**  Apparently, *sua sponte* referral that

23   hasn't been resolved yet.

24         **THE COURT:**  Got it.  So Kristen just told me that she

25   has referred it to us to relate.  And we haven't done that yet.

So we'll do that.  And then we'll consolidate all of those

cases.  So, yeah, we can go ahead and grant that.  We can go

ahead and relate that case from Judge Gonzalez Rogers and we

can go ahead and consolidate all of the individual Northern

District of California cases into the MDL.

     And then I think that's it.  So I think that what we'll do

is we will appoint -- we'll -- I'll appoint lead counsel and

schedule a telephonic case management conference with you all

for about two weeks after that and we will decide how to tee up

the discovery issue.

     My tentative inclination here is to tee up the discovery

issue quickly.  And my tentative inclination is that the

proposal in the plaintiffs' case management statement for

allowing that discovery to go forward before a motion to

dismiss is adjudicated makes sense.  That the floodgates should

not be opened.  But that plaintiffs' -- that proposal in the

case management statement to allow that discovery to go forward

makes sense.  But I will allow you to file briefs on that.

          **MR. SNYDER:**  Let me just say, because I didn't respond

to that.

          **THE COURT:**  Sure.

          **MR. SNYDER:**  With -- respectfully, we think that the

discovery plan that they outline is not only overbroad, but

almost irrationally broad.  As framed their requests,

basically, call for every document under the sun, many of which

1    are not tailored to the facts of this case at all.

2         **THE COURT:**  Yeah, but the facts of this case -- I

3    mean, I'm glad you -- I'm glad you continued this discussion.

4    Because the facts of this case, the cases were precipitated by

5    the Cambridge Analytica revelation.  But the facts alleged in a

6    lot of these complaints are that Facebook is violating, has

7    violated, my rights, privacy rights, Stored Communications Act

8    rights, whatever else, by sharing my information with third

9    parties, with third-party app developers, even though Facebook

10   told me that they were going to seek my permission before they

11   did that.

12        And so the allegations I don't think, at least in some of

13   the complaints, are limited to the information that Facebook

14   allegedly provided Cambridge Analytica.  Right?

15        **MR. SNYDER:**  But, Your Honor, they did give their

16   permission in every case.

17        **THE COURT:**  Right.  But I'm talking about their

18   allegations.  The plaintiffs' allegations.  The allegations are

19   I didn't give permission.  Right?

20        **MR. SNYDER:**  Right, but --

21        **THE COURT:**  And at some point, whether it's through

22   something that's judicially noticeable at the motion to dismiss

23   stage or at summary judgment, you're going to be able to

24   dispute that.  But what they allege is that they told me that

25   they were going to get my permission before they did it, and

1    they didn't get my permission.

2          MR. SNYDER:  But a bare allegation which is

3    demonstrably false, and I can pull up right now and show you

4    and you can take judicial notice --

5          THE COURT:  Well, I don't know what we can take

6    judicial notice of --

7          MR. SNYDER:  My point is when we make a sworn

8    representation, which we will at the appropriate time, that

9    this was the state of user consent at the time.  That the

10   information could not and would not have been provided to a

11   third-party app unless the user gave permission and consent.

12   In the face of that evidence, given the fact that there are so

13   many grounds for dismissal with prejudice, why should they be

14   entitled to just go on a fishing expedition --

15         THE COURT:  Because the key word that you just uttered

16   was "evidence," right?

17         MR. SNYDER:  Well, I meant evidence which supports --

18         THE COURT:  You don't use evidence in a motion to

19   dismiss.

20         MR. SNYDER:  Okay.  I misspoke.  Information about

21   which the Court can take judicial notice under every convention

22   and rule.  I'll give you an example.

23         THE COURT:  But the information you were describing

24   doesn't sound like the kind of information of which the Court

25   can take judicial notice.

1    **MR. SNYDER:**  I think the Court could take judicial

2    notice.  And I actually don't think a single plaintiff would

3    dare allege under Rule 11 --

4    **THE COURT:**  Especially with that threatening look you

5    just gave.

6    **MR. SNYDER:**  Your Honor, this is not -- this is not a

7    controversy.  There's no debate that every user whose

8    information ended up in Aleksandr Kogan's quiz, that all that

9    information was given to Aleksandr Kogan and his quiz app with

10   permission of the user.  No one's going to dispute that.

11   What they're saying, is what Kogan did with that, in

12   violation of our policies, caused them harm and gives rise to a

13   cause of action.  Not -- and so in the face of that, they want

14   us to immediately identify all app developers whom Facebook

15   gave permission to access user data information.  That's Words

16   With Friends.  That's every single -- that's millions and

17   millions and potentially billions of pieces of information.

18   The first one is bizarrely overbroad.  The second one

19   makes no sense:  Disclose the means to identify all Facebook

20   users whose personal information was accessed or obtained by

21   app developers.  Well, that's going to be perhaps a billion

22   700 million people.  I don't know how many billions.  Two

23   billion people?  Consumers' personal information was obtained

24   by app developers because that's the whole point of -- that's

25   why people love Facebook.  Because you can access apps, whether

```
 1    the PayPal app, or the ESPN app.  That's just the way the
 2    internet works.
 3              THE COURT:  But it was Facebook's choice to conquer
 4    the world.  So if we need a world-wide search for stuff that
 5    Facebook's done wrong, isn't that Facebook's problem?
 6              MR. SNYDER:  No, Your Honor, because there is no
 7    allegation that Facebook allowing users to access third-party
 8    apps for their benefit and sharing information with that
 9    third-party app is unlawful; yet they want us to identify every
10    single app developer whom Facebook gave permission to access
11    user information.  That's every app on Facebook's platform.
12    That is so overbroad.
13              THE COURT:  Maybe it should be limited.  The way they
14    wrote it is including via friends' permission practice.  Maybe
15    it should be only via its friends permission practice.  I don't
16    know.  Maybe that wouldn't narrow it down, though.
17              MR. SNYDER:  It wouldn't narrow it down.  And they're
18    not alleging giving access to your friends in the old version
19    that I guess was abolished in 2013.  They're not even alleging
20    that that is actionable.  Sharing friends' information with a
21    third-party app --
22              THE COURT:  I think you may have engaged in a -- I
23    mean, that's why it would be useful, of course, to have a
24    consolidated complaint.  And maybe this is an indirect way of
25    supporting the point you're making in that regard.
```

1          **MR. SNYDER:**  Yes, Your Honor.

2          **THE COURT:**  But I think you're engaging in a little

3    bit of a selective re-writing of their complaints.  But it will

4    be a lot easier to determine that once we have a consolidated

5    complaint.

6          **MR. SNYDER:**  And we've read the complaints carefully

7    and in their totality because we're obviously thinking about

8    the motion to dismiss.  And it is not the plaintiffs' theory,

9    nor could it be, that every time personal information was

10   obtained by an app developer that that's actionable.  That --

11   otherwise every third-party interaction with Facebook users is

12   unlawful; yet third-party app interaction with Facebook users

13   is part of the fabric of the Facebook platform, why so many

14   people use it, like it, benefit from it, and for all sorts of

15   reasons.  Mostly good.  Almost entirely good.

16        And so what they want us to do is essentially identify

17   every single third-party app.  And then every user who ever --

18   whose personal information was accessed.  That's probably

19   2 billion people.  Billion, 700 million people.  That's nothing

20   to do with this case.  It's not a fishing expedition.  This is

21   an irrational series of requests untethered to the issues in

22   this case.  And I was going to say the claims in this case, but

23   I don't even know what the claims in this case are yet so how

24   is it fair for them to get plenary discovery into our data when

25   we don't know what the claims are.

1       I can assure Your Honor this:  When we get their

2   consolidated complaint, I can demonstrate, Your Honor, why each

3   of these requests is not only overbroad, but untethered to

4   anything in this case.

5            THE COURT:  Okay.  I appreciate your comments.

6            MR. SNYDER:  Thanks.

7            THE COURT:  Okay.  So I will issue an order appointing

8   lead counsel and scheduling a telephonic case management

9   conference fairly shortly, either later this week or sometime

10  next week.

11           MR. SNYDER:  Your Honor, should we meet and confer in

12  advance and submit something very short, two pages, if we come

13  up with something or have ideas that we agree on maybe that you

14  appoint lead counsel --

15           THE COURT:  You mean --

16           MR. SNYDER:  In advance of the next phone conference?

17           THE COURT:  Yeah.  I'll probably ask you to -- what

18  I'll do is I'll schedule the conference roughly two weeks after

19  the appointment of lead counsel and ask you to submit something

20  in advance.

21           MR. SNYDER:  Thank you.

22           THE COURT:  Thanks very much.

23           MR. SNYDER:  Thanks for the time, Judge.

24               (Recess taken at 1:33 p.m.)

25                       ---oOo---

1

2

3                         **<u>CERTIFICATE OF REPORTER</u>**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Thursday, July 19, 2018

8

9

10

11    _____/s/Vicki Eastvold_____

12                   Vicki Eastvold, RMR, CRR
                        U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25