Pages 1 - 50

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

IN RE:  FACEBOOK, INC.            )
CONSUMER PRIVACY USER PROFILE     )
LITIGATION,                       )    **MD 18-02843 VC**
_____   )

                         San Francisco, California
                         Thursday, August 23, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

Co-Lead Plaintiffs' Counsel:
                         Keller Rohrback LLP
                         1201 Third Avenue, Suite 3200
                         Seattle, WA 98101-3052
                         (206) 623-1900
                         (206) 623-3384 (fax)
                    BY:  **DEREK WILLIAM LOESER**
                         **BENJAMIN BLYSTAD GOULD**

Co-Lead Plaintiffs' Counsel:
                         Bleichmar, Fonti & Auld, LLP
                         555 12th Street, Street, Suite 1600
                         Oakland, CA  94612
                         (415) 445-4003
                         (415) 445-4020 (fax)
                    BY:  **LESLEY ELIZABETH WEAVER**
                         **JOSHUA SAMRA**

For Defendant Facebook, Inc. (via speaker telephone):
                         Gibson Dunn & Crutcher LLP
                         200 Park Avenue
                         New York, NY  10166-0193
                         (212) 351-4000
                         (212) 351-4055 (fax)
                    BY:  **ORIN SNYDER**

Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

1    **APPEARANCES**:

2    For Defendant Facebook, Inc.:
                          Gibson Dunn & Crutcher LLP
3                         555 Mission Street, Suite 3000
                          San Francisco, CA  94105-2933
4                         (415) 393-8200
                          (415) 393-8306 (fax)
5               **BY:   KRISTIN A. LINSLEY**
                       **JOSHUA SETH LIPSHUTZ**
6                      **BRIAN MICHAEL LUTZ**

7    For Defendant Facebook, Inc.:
                          Gibson Dunn & Crutcher LLP
8                         1050 Connecticut Avenue, N.W.
                          Washington, D.C.  20036-5306
9                         (202) 955-8500
                          (202) 530-9513 (fax)
10              **BY:   CHRISTOPHER B. LEACH**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
1 | **Thursday - August 23, 2018**                                    **10:30 a.m.**
2 | **P R O C E E D I N G S**
3 | ---oOo---
4 | **THE CLERK:**  Give me one minute.  I need to call
5 | CourtCall for this one.
6 | **THE COURT:**  Okay.
7 | **THE CLERK:**  Counsel in the *Facebook* matter, you can
8 | come on up and set up.  I'm just trying to get CourtCall on the
9 | line.
10 | Kristen, with Judge Chhabria, in San Francisco.
11 | (Discussion off the record.)
12 | **THE CLERK:**  You have two people on the line.  Is that
13 | right?  Okay.  We'll probably have -- I'm just going to need to
14 | mute the incoming volume, unless the Judge sounds like he wants
15 | to have counsel talking.  That's just for your information.
16 | And as soon as we end the case, we can go ahead and hang up.
17 | One second.  I need to make them live.  Thanks.  Can you hear
18 | me?  Hello?  I'm going to call the case now.
19 | Calling Case Number 18-MD-02843, In Re: Facebook, Inc.,
20 | Consumer Privacy User Profile Litigation.  Counsel, please
21 | state your appearances for the Record.
22 | **MR. LOESER:**  Derek Loeser, from Keller Rohrback, for
23 | the plaintiffs.
24 | **MS. WEAVER:**  Lesley Weaver, Bleichmar Fonti & Auld,
25 | for plaintiffs.

PROCEEDINGS

1        **MR. LIPSHUTZ:**  And Joshua Lipshutz, for the

2   defendant.  And I believe we have Mr. Snyder on the phone, as

3   well, perhaps calling from Istanbul.

4        **THE COURT:**  Mr. Snyder, what time is it in Istanbul?

5        **MR. SNYDER:**  Your Honor, I'm actually taking off in a

6   couple of hours, so -- but it's ten hours further ahead.

7        **THE COURT:**  That's not too bad.  So --

8        **MR. SNYDER:**  I'm officiating at a wedding,

9   Your Honor, in Istanbul.  So I'm very excited about that.

10        **THE COURT:**  I hope you have a great trip.

11        **MR. SNYDER:**  Thank you, Judge.

12        **THE COURT:**  Okay.  So --

13        **THE CLERK:**  Do you want to keep them live on the

14   phone?

15        **THE COURT:**  No.  You should definitely mute

16   Mr. Snyder.

17      (Laughter in the courtroom.)

18        **MR. LIPSHUTZ:**  Is that as a general matter,

19   Your Honor, or --

20        **THE COURT:**  That's under submission.

21      So obviously I've looked more closely at this case than I

22   had the last time we met, but I have not looked nearly as

23   closely at it as the next time we meet -- right? -- which

24   presumably will be or potentially will be a hearing on a motion

25   to dismiss.  So you have to take, you know, everything I say

1    here with a grain of salt.  I have not done a super deep dive

2    into the issues, and into the question of standing, and into

3    the merits; but I guess where -- I guess I find -- based on

4    where I am now, I find the question of whether to allow

5    discovery a bit more difficult than I did, you know, last time

6    we met.

7        It's -- regardless of how we judge what happened from a

8    moral or an ethical standpoint, it's not obvious to me how

9    Facebook violated the law.  And if Facebook violated the law,

10   it's not obvious to me how people were "injured" by it, in the

11   Article III, Federal Court sense of the word.  Right?  There's

12   a very particular definition of "injury" for purposes of

13   Article III standing doctrine -- right? -- which is different

14   from sort of regular-person understanding of the word "injury,"

15   perhaps.

16       So I guess what I want to hear from you -- from the

17   plaintiffs -- is, you know, what is your best argument for

18   standing right now?  And what is your best argument for why you

19   will have a claim on the merits against Facebook that will get

20   past 12(b)(6)?

21           MR. LOESER:  You want to take that?

22           MS. WEAVER:  Good morning, Your Honor.

23       A significant question.  So as a threshold matter --

24           THE COURT:  I won't hold you to it.  If you want to

25   lead with something different in January, that's fine; but as

PROCEEDINGS

1  you sit here --

2          MS. WEAVER:  As long as opposing counsel doesn't hold

3  me to it.

4          THE COURT:  As you sit here now.

5          MS. WEAVER:  Well, first, as a very simple economic

6  matter, there are out-of-pocket damages for people who paid for

7  credit monitoring following the Cambridge Analytica

8  revelations.  We'll have clients pleading those claims.

9          THE COURT:  Why would it be reasonable for them to

10 pay for credit monitoring following the Cambridge Analytica

11 revelations?

12         MS. WEAVER:  Because the scope of the information and

13 data that has been released is far beyond the scope and data of

14 information that is even regularly alleged in cases of regular

15 data breach.  If you'll -- if you'll give me a moment to

16 describe the kinds of things that have been collected, I think

17 Your Honor might understand.

18      And, of course, the standard under *Spokeo* is concrete, or

19 particularized, or actual, or imminent.  And I'm going to give

20 you some examples of each of those.

21         THE COURT:  I don't think that's right.  I think it's

22 concrete and particularized.

23         MS. WEAVER:  Okay.  Concrete and particularized.

24      I think we satisfy all of these.

25      So let's start, for just example, with the HUD Complaint

**PROCEEDINGS**                                                                        7

1  that was actually -- we referenced in the earlier hearing that

2  the Complaint was filed on Friday.  The Department of Justice

3  joined that.  So in that very narrow example, Facebook allowed

4  advertisers to check off certain boxes for people they wanted

5  to target.  And among those boxes was race.  And let's just

6  stick with just race, although the claims asserted in that

7  Complaint are broader.  They have to do with single mothers not

8  having access to advertising.

9       So the claim that HUD is bringing is that Facebook

10 violated the law, in allowing advertisers only to target people

11 of a certain race.  That's a violation of law.

12      I, as a Facebook --

13           **THE COURT:**  But wait a minute.

14           **MS. WEAVER:**  Yeah.

15           **THE COURT:**  The question that you're supposed to be

16 answering right now, I think, is --

17           **MS. WEAVER:**  I was discriminated --

18      Yeah.

19           **THE COURT:**  Why should somebody be paying --

20      We're talking about standing.

21           **MS. WEAVER:**  Right.

22           **THE COURT:**  And you are saying that an injury that

23 some plaintiffs asserted is that they had to pay for credit

24 monitoring.  So what does this have to do with somebody's need

25 to pay for credit monitoring?

1          **MS. WEAVER:**  Fair enough.  This is a different

2    example of harm.  And if you'll allow me --

3          **THE COURT:**  Okay.

4          **MS. WEAVER:**  -- let me just finish with the HUD, and

5    then we can come back to the credit monitoring, because of the

6    scope of what was revealed.

7          So this first example is:  I sign up for Facebook.  They

8    tell me I'm going to decide what is -- you know, what is

9    revealed to third parties.  I control my Privacy Settings.

10         And instead, what happens is I was discriminated against

11   by Facebook because -- by my race, or some subset of people, as

12   they decide what -- how advertisers can choose to advertise and

13   target information to me.

14         That's a real and credible harm.  Discrimination is a real

15   and credible harm.

16         Two.  The credit monitoring.

17         The scope of the information collected here is an

18   egregious intrusion into the right of privacy.  Facebook is not

19   just collecting and sharing basic attributes, like where you

20   live and where your friends are.  They allow third parties

21   to -- they enter into relationships where they allow third

22   parties to access Facebook's own database, and match the

23   database of the advertiser with Facebook's advertising base,

24   and then target people specifically.

25         And the collection doesn't just occur from you.

PROCEEDINGS

1     **THE COURT:**  But I still haven't heard anything that

2  would cause somebody reasonably to conclude that they need to

3  pay for credit monitoring.

4     **MS. WEAVER:**  Okay.  Well, they are -- for example,

5  Facebook has reached data-sharing partnerships with at least 60

6  device makers.  The allegations include --

7     And it depends --

8     I'm now going up to the very high level, instead of the

9  very specific level.

10    They are reading e-mail.  They are reading the messages of

11 the Facebook Messengers.  That is going out to third parties.

12 Anybody who wanted -- if I am e-mailing in a private forum --

13    **THE COURT:**  When you say, "Reading e-mail" --

14    **MS. WEAVER:**  Yes.

15    **THE COURT:**  -- what do you mean by that?

16    **MS. WEAVER:**  It means --

17    **THE COURT:**  What does that mean:  Reading e-mail?

18    **MS. WEAVER:**  It means that they have the ability to,

19 in real time, see the message or the communication, and use

20 that information to create a digital profile of who you are.

21    I mean, in some larger sense, this is identity theft that

22 is so far beyond just your Social Security number.  It is so

23 far beyond it, that they have --

24    You have -- basically, every Facebook user has an

25 equivalent of a digital profile or avatar that --

PROCEEDINGS

1      **THE COURT:**  Right.  So information that one would use

2   to target advertising at you.

3      But you say it's so much larger than a Social Security

4   number; but as far as I can tell, it doesn't include the Social

5   Security number.

6      **MS. WEAVER:**  Well, for example, as recently as

7   April 2018 Facebook was seeking medical data from hospitals.

8   They asked major US hospitals to share -- they say "anonymized

9   data" about their patients, such as illness and prescription

10  info for a proposed research project.

11      They say that they've suspended that, but what they are

12  doing with the data that they get from LendingClub and from

13  other parties is matching the database that they have.  And

14  it's not anonymized.  What they can do is actually match it to

15  the individuals.

16      And so then there is -- medical data is also, for purposes

17  of Article III standing, good grounds to find that there is

18  threat of imminent injury or actual injury.  And that is an

19  example there with the health monitoring, but also with other

20  financial institutions that are targeting the individuals.

21      So on its face, the collection and aggregation of these

22  intimate details is -- is highly personal.  And when you

23  compare this to the kinds of invasions of privacy that other

24  Courts have found give Article III standing, like the right to

25  authorize an employer to gain access to employment history --

1    that has already been collected.  And is sitting there.

2         Or in *Vizio*, for example, they're tracking the movements

3    of users on the Web.  Article III standing was there.

4         Facebook admits that it collects credit-card information.

5    So that is information that is collected.

6              **THE COURT:**  Well, but it's not about Facebook

7    collecting information.

8         It's about Facebook sharing information with third

9    parties.  Right?

10             **MS. WEAVER:**  Well, it's about sharing and targeting.

11   This is the next thing.  This is about the ability to

12   manipulate Facebook users; so beyond the scope of, *I am being*

13   *targeted by somebody who knows everything about me.*  And

14   there's no disclosure about who's doing the targeting.

15        So it's an entire field of study that's called

16   "psychographic metrics."  And it was the basis for the work of

17   Cambridge Analytica.  They understand the psychological profile

18   about predicting how people will react to certain stimulus.

19   And that's the data that Facebook has gathered.  And it's used

20   on Facebook to get people to act.  Sometimes it's purchases.

21   Sometimes it's other choices.

22        So -- and the data that's collected is so --

23        Here's an example.  In 2017 *The Australian* reported on a

24   23-page document created by Facebook employees, which documents

25   Facebook's algorithms, and allowed advertisers to pinpoint

1  moments when young people need a confidence boost.  There's a

2  litany of teen emotional states, this document says, that the

3  company claims it can estimate based on how teens use the

4  service, including worthless, unsure, defeated, anxious, silly.

5          **THE COURT:**  What's illegal about what you just

6  described?

7          **MS. WEAVER:**  So what's illegal about it is that

8  that -- that was not consented to.  Like, *Oh, we are going to*

9  *use the information of your communications with your friends to*

10 *develop a profile for you, and then we will allow third parties*

11 *access to that, to target very narrow messages to you to*

12 *manipulate your behavior, without telling you where the*

13 *messages are coming from.*

14         **THE COURT:**  Well --

15         **MS. WEAVER:**  And if you're just sticking with teens,

16 for example, there are all kinds of regulations in the real

17 world --

18         **THE COURT:**  But let me just ask you.

19         **MS. WEAVER:**  Sure.

20         **THE COURT:**  I mean, your response was --

21     You know.  Say what's illegal about that.

22     And your response was that they didn't consent to that.

23     But looking at the Data Use Policy, I mean, you know,

24 it's -- to be sure, it's not a model of clarity; but I think,

25 you know, the message that emanates from the discussion of

1   other apps and the information that other apps can obtain is

2   that if you share stuff with your friends, and your friends --

3   if you share stuff with your friends, then your friends -- then

4   third parties can access that information from your friends,

5   unless you choose a particular setting in your -- on your

6   Facebook page.  Right?

7       And I can't remember --

8           **MS. WEAVER:**  That's not exactly correct.

9       If that were correct, then maybe there would be a much

10  stronger argument for Facebook.

11      The way they've set it up is when you --

12          **THE COURT:**  Why is it not -- why is it not correct?

13  I mean, it says --

14          **MS. WEAVER:**  Yeah.  Let me explain.  So when you go

15  to your Profile Settings, Your Honor --

16          **THE COURT:**  Yeah.

17          **MS. WEAVER:**  -- there's, like, a separate page.  So

18  they have --

19      First of all, let me just say the consent is very minor.

20  There are at least, I think, 21 different -- there's the S --

21  the Statement of Rights and Responsibilities.

22      And then they refer there to the Data Policy.  And I'm not

23  sure a regular Facebook user is going to sit down and read the

24  Data Policy.  It's called a Data Policy.  And it's the Data

25  Policy that talks about friends.  And it doesn't include

PROCEEDINGS

1  friends of friends.

2          THE COURT:  Well, that may be an issue, but --

3          MS. WEAVER:  Yeah.  No.  Okay.  So --

4          THE COURT:  -- you contend that the Data Policy was

5  breached.

6          MS. WEAVER:  Right.  So -- well, I don't know whether

7  we're going to agree that there's a contract or not, frankly.

8          THE COURT:  Okay.

9          MS. WEAVER:  Maybe we're going to be talking about

10 unjust enrichment from our side.  We haven't decided that yet.

11         THE COURT:  Okay.

12         MS. WEAVER:  But just, sort of, on what is being --

13     So those two policies say, *Go to your Privacy Settings*.

14 *You can control what happens here*.

15     And if you go to your Privacy Settings and you say, *I only*

16 *want friends of friends to see these things, and I only want*

17 *friends of friends to see these things, or just friends*, or if

18 you took the most-narrow restrictions, that doesn't control

19 what happens to you.

20         THE COURT:  But that is in reference to people going

21 to your page.  Right?  And who -- who can see stuff on your

22 page?  Only friends, or only friends of friends.

23         MS. WEAVER:  Right --

24         THE COURT:  But this --

25         MS. WEAVER:  Right.  So that's exactly right.  Yeah.

1        **THE COURT:**  But this Data Use Policy seems to say

2    however -- even if you -- however you set up your page, if you

3    share information with your friends, then people can -- third

4    parties can obtain that information from your friends, unless

5    you -- what's the -- hold on one quick second here -- unless

6    you turn off all Platform applications.  Right?

7        **MS. WEAVER:**  Right.  It's not just what you share

8    with your friends.  It's everything about you.  So the entire

9    profile through your friends -- so your weakest link betrayed

10   you completely.

11       **THE COURT:**  Okay.

12       **MS. WEAVER:**  And that is not clear.

13       So -- and then -- and then it went -- so there's --

14       **THE COURT:**  You mean they get -- you mean the

15   third-party app gets something about you that your friend could

16   not get --

17       **MS. WEAVER:**  Yeah.

18       **THE COURT:**  -- from looking at your page?

19       **MS. WEAVER:**  First of all, I can't get it.  I don't

20   have what Facebook has collected on me.  And they have this

21   whole -- it's almost like a digital avatar.  It's this massive

22   document that they have created.

23       And this is what I'm saying.  It's this one-way mirror,

24   where they know exactly how to target and manipulate me.

25       And if you want to talk about laws -- I mean, again, this

**PROCEEDINGS**                                                     16

1    is premature, and we're still analyzing this; but if I'm

2    sitting in front of my television, and I get a political ad,

3    and it's at all affiliated with a party -- you know, *This ad is*

4    *associated with Candidate X, and I approve this message*.

5         What's happening on Facebook is there's no attribution to

6    the content that's coming at you.   There are all of these laws

7    that are kind of lost in the ether.

8         **THE COURT:**   You seem to be saying that it's unlawful

9    to manipulate people.

10        **MS. WEAVER:**   I'm saying it's unlawful to communicate

11   advertisements that are in violation of the laws that regulate

12   advertisements, without attributing anything to where they're

13   coming from.   And Facebook did not audit or control any of

14   these messages.

15        I'm saying that when you're talking to teens, there are

16   certain restrictions on the kinds of communications that can be

17   made to people of a certain level.   Those are supposed to be

18   regulated; and everywhere else in the world they are, but not

19   on Facebook.

20        **THE COURT:**   Are there any teens who are named

21   plaintiffs in these cases?

22        **MS. WEAVER:**   Well, we haven't filed our Complaint

23   yet; have we?

24        **THE COURT:**   Okay.

25        **MS. WEAVER:**   But setting that aside, it's adults.

PROCEEDINGS

1    It's, frankly, how law firms advertise.  You have to -- you get

2    the disclaimer.  There are certain restrictions.  There's all

3    of this.

4        What's happening right now is all of this unregulated

5    content is coming at you, without --

6        And so there are, going back --

7        Look.  Under the UCL, what we need is a loss of personal

8    property.

9        Now let's talk about property and economic harm.  This

10   case is very different.  Facebook talks about average revenue

11   per user.  They have put a dollar value on each of us, based on

12   the data that they get.  They have an aggregate --

13           THE COURT:  But what does that have to do with the

14   economic harm that a user may have suffered from --

15           MS. WEAVER:  Because they have taken something from

16   me of value that I didn't agree to.  And it's beyond the scope

17   of what I thought.  I mean, the consent is not, Oh, I

18   understand --

19           THE COURT:  Beyond the scope of what you bought?

20       You didn't buy anything.

21           MS. WEAVER:  No.  What I said:  It's beyond the scope

22   of what I consented to.

23       And, by the way, a purchase -- a barter does not have to

24   be with dollars.  I mean, let's assume --

25           THE COURT:  That argument sounds like quite a stretch

1  to me.

2          **MS. WEAVER:**  Well, but just hear me out.  So I --

3  let's say the average user says, *I know on Facebook it's free,*

4  *but maybe they're going to, you know, follow my "Likes" or*

5  *something like that.*

6      The value of that before these digital profiles were

7  built, at one point in time, is very low.

8      It increased dramatically over time, as the weight -- and

9  this became --

10          **THE COURT:**  Oh, I agree with that.

11          **MS. WEAVER:**  Yes.

12          **THE COURT:**  But what's the economic harm to you --

13          **MS. WEAVER:**  Yeah.

14          **THE COURT:**  -- the user?

15          **MS. WEAVER:**  Facebook is the broker.  I could go sell

16  that somewhere else.  I don't have to be on Facebook.  I can --

17  well, no.  But it's legitimate.  I mean, there are other

18  competing entities that gather this.  There are marketing firms

19  that gather this.  You know, that --

20          **THE COURT:**  That sounds like a pretty fanciful

21  theory, but we'll have plenty of time to argue more about that,

22  I assume.

23          **MS. WEAVER:**  Yeah.  That's an expert question.  The

24  initial question of:  Am I harmed by the creation of this

25  digital profile out there, where businesses are making

19

 1    real-life decisions?  I mean, in the HUD example, we're talking

 2    about businesses saying, *You don't get to have housing in this*

 3    *because of your race.*

 4        When I signed up, I had no idea.

 5        What about banks who have compiled my credit history,

 6    unbeknownst to me?  And I haven't filed an application.  And I

 7    file an application, and they are using this data that they

 8    have received back.  And there's a difference.  There's a

 9    period in time where Facebook was actually allowing third

10    parties to collect the data when they queried the database,

11    under API 1.  So they actually possessed that information, and

12    that's gone.

13        So that's another thing.  Here I am, and I have this

14    digital profile that is in the hands of third parties in

15    foreign countries.  And we can't ever get that back.  And the

16    risk of identity theft based on those very attributes is huge.

17        But Facebook will come in and tell you, *One of the reasons*

18    *we're collecting, for example, how your mouse moves, is to*

19    *confirm your identity.*

20        It's a tautology.  They have already stolen my identity.

21    They know exactly where I eat, what I pay, who my friends are.

22    If somebody wanted to create a digital me, they can do it; and

23    there's no safety restriction on this right now.

24        So without -- and this all happened without a sole -- that

25    whole piece is the irreparable harm.  That's the data breach.

PROCEEDINGS

1    That data is gone.  It's in the ether.  And it's a problem.

2    It's a problem for security.  It's a problem for financial

3    institutions.

4        So -- and Facebook did that.  They didn't audit.  They've

5    admitted they didn't audit Cambridge Analytica.  They're

6    investigating.  They're trying to --

7            THE COURT:  That's sort of a separate set of claims,

8    I suppose.

9            MS. WEAVER:  I agree.

10           THE COURT:  I mean, there's this -- some of these

11   claims are about, *Well, they took my information, and they* --

12   you know.  *I didn't consent to their taking and aggregating and*

13   *collecting my information.*

14       And then there's this other sort of alleged wrongdoing

15   that you might put in a different category, I suppose, which

16   is:  They made promises that the data was only going to be used

17   consistent with Facebook's policies, but they were negligent in

18   failing to live up to those promises.

19           MS. WEAVER:  That's right.

20       And then maybe a third bucket, which is under, I would

21   say, the UCL, which is an unfair-business claim.

22           THE COURT:  Yeah, but I still --

23       I get the theory, whether it's a negligence theory or a

24   breach-of-contract theory or whatever, but I'm still having a

25   little trouble wrapping my brain around the Article III

1   question as it relates to that.

2          MS. WEAVER:  This is concrete.  I mean, if you look

3   at the typical data-breach cases, look at what Judge Koh found

4   in *Anthem*.  Right?  I mean *Anthem*, admittedly, was different,

5   because they paid; but there are cases --

6          THE COURT:  They paid.  And there were -- you know,

7   there was actual data stolen that could be used to engage in

8   identity theft.

9          MS. WEAVER:  How is that not this?  There is this

10  data that was stolen.

11         THE COURT:  But I haven't heard you explain how it is

12  this.  Right?  I mean, I haven't heard.  I don't yet understand

13  from what I've read thus far.

14         MS. WEAVER:  Uh-huh.

15         THE COURT:  I mean, it's not Social Security numbers.

16         MS. WEAVER:  It's credit-card numbers.  It's where I

17  shop.  It's my banking.

18         THE COURT:  I haven't seen the credit-card number

19  thing yet.

20         MS. WEAVER:  Okay.  We'll get that.  You know.

21         THE COURT:  I haven't seen reference to that.

22         MS. WEAVER:  Yeah.  It's actually in the media.  And

23  I don't actually have a Complaint citation right here, but it

24  is financial information.  It's where I bank.

25      For example, if you go, you can look, and they will tell

**PROCEEDINGS**

1   you the entities that they have let target you, which is

2   banking institutions, et cetera.  And they are matching

3   information they already know about you.  And then -- it's

4   called -- I'm just learning this, myself, in depth.  It's

5   called "mapping."

6        So if a bank wants to target you for an ad, and Facebook

7   already has information about you, it gets mapped.  And you get

8   a targeted ad that is based on all of the information the bank

9   possesses on you.

10       And this is -- this is an opportunity for manipulation

11  that's really never existed before.

12            **THE COURT:**  Well, manipulation is different from

13  identity theft.

14            **MS. WEAVER:**  Okay.  Fine.

15            **THE COURT:**  Right?  And, I mean, manipulation of

16  people to get them to buy things or to get them to act in a

17  certain way in the political arena, or whatever -- I mean,

18  that's as old as our republic.

19            **MS. WEAVER:**  But it's highly regulated, Your Honor.

20  That's why we have laws about what political ads can say; what

21  lawyers can say; what doctors can say.  That's why, when I see

22  an ad about a drug company, there's a thousand disclaimers

23  about the many illnesses I might get.

24       This message -- this content -- is coming to users without

25  any --

**PROCEEDINGS**

1    **THE COURT:**  But that sounds -- to the extent you're

2  complaining that people are being manipulated in -- you know,

3  in violation of regulations about advertising, aren't you

4  complaining about the third parties who are doing the

5  manipulating, as opposed to Facebook?

6    **MS. WEAVER:**  Well, Facebook is the one doing it,

7  because they're the ones sending the message.  You're right,

8  Your Honor.  This is exactly right.  This is the third bucket.

9  It's under the UCL; the unlawful prong.  They don't comply with

10  the regulations about how advertisements are done.  It comes to

11  me, and then I suffer harm because of that.

12    But I want to get back to the identity theft.  I don't

13  think -- I'm not prepared -- and maybe Derek has to talk about

14  how -- I can't imagine anything that's more concrete than

15  identity theft, than all of these factors in creating a

16  fictitious person that applies for a loan online.  They know

17  where I live.  They have my address.  They have my name.  They

18  know where I bank.  They have credit cards.

19    **THE COURT:**  Well, that -- so -- and I will look

20  forward to seeing that articulated in -- in a Complaint, I

21  assume --

22    **MS. WEAVER:**  Yes.

23    **THE COURT:**  -- if you decide to go that route; but

24  that sort of bleeds into the next question, which is:  A number

25  of times during our discussion, you know, we've gotten to a

1  point where you've said, *Well, I don't know.  We're still*

2  *deciding whether to include this claim or that claim.  And*

3  *we -- you know, we need to research this more.*

4      Every time you say that, it makes me think, well, maybe we

5  shouldn't allow discovery to go forward now.  Maybe we should

6  see what's in the Complaint, so that we're not aiming at a

7  moving target when we're trying to figure out what discovery is

8  appropriate, and what discovery is not appropriate.

9          **MS. WEAVER:**  I hear what you're saying, but what I

10  can say is that when we had our very first hearing in front of

11  Your Honor, you were --

12      And I get that you think you want to take the sneak peek.

13      I don't think that's the law.  I mean, if you look at

14  *Singh v. Google* and what Judge Labson Freeman held, it was:

15  Only if you're going to deny a Complaint in its entirety

16  without leave to amend, and the discovery will not bear on the

17  claims -- that's when you stay discovery.

18          **THE COURT:**  Well, I mean, to -- I think the real

19  answer is that every case is different.  And you have to look

20  at the entire picture, and make a decision about whether

21  discovery before 12(b)(6) is appropriate.

22          **MS. WEAVER:**  Right.

23          **THE COURT:**  And so I don't -- to the extent you're

24  suggesting there is some rigid criteria that has to be met

25  before you do allow discovery or prevent discovery, I don't

1    think that's right.

2        You know, every case is different.  And you have to -- you

3    look at the whole case, and think about -- you know, think

4    about what makes sense from a cost standpoint; from the

5    standpoint of the advancing the litigation.  You have to

6    balance everything.

7        Let me ask Mr. Lipshutz if he wants to --

8        Sorry.  Did you want to add one?

9        **MR. LOESER:**  Yeah.  I was just going to add a couple

10   thoughts on the discovery piece.  And Your Honor can probably

11   tell we're trying to divide issues, so that we each can focus

12   on particular things.  And so I'd like to just think out loud

13   for a minute about discovery, because one of the things that I

14   think is really unique about this case is we're in such a

15   evolving landscape of what is happening; what Facebook is

16   doing.

17       You know, their business has not stayed the same over

18   time.  It's changed significantly.  In 2012 they had a

19   Consent Decree with the FTC that alleged -- and they settled

20   the claims about their misuse of privacy data.  And they

21   committed to a variety of things that they were going to stop

22   doing; not that they never did them before and they're never

23   going to do them again.  But things they did the FTC said was

24   wrong -- if they exposed privacy data, they had to stop.

25       And so now we're in a place where their business has

**PROCEEDINGS**

1  evolved, and they're doing things with data that are hard to

2  understand, and they're hard to figure out.  And you can read

3  all of their disclosure statements.  You can read the consent

4  forms.  You can read everything.  You still don't know really

5  what really is going on out there with this data.  And that, I

6  think, is where the discovery focused.  What we really --

7        **THE COURT:**  What about -- I -- I understand that,

8  but -- but it's -- it's a -- discovery is also not supposed to

9  be a fishing expedition.  And assuming you get past the

10 12(b)(6) stage, you will be able to figure out precisely --

11 hopefully be able to figure out precisely what's going on.

12       What about -- you know, I guess one question I have is --

13       One thing I'm convinced of is that your discovery request

14 is vastly overbroad, at least for this stage; but what about --

15 there was reference -- there was a letter that Facebook sent to

16 the Department of Commerce [sic] in the wake -- not the

17 Department of Commerce; the Senate Commerce Committee --

18       **MR. LOESER:**  Right.

19       **THE COURT:**   -- in the wake of the hearings that took

20 place back in June, or April, or whenever it was.  And Facebook

21 noted that it was conducting an investigation of these

22 thousands of third-party apps.  And it had made a decision to

23 suspend about 200 of those apps, pending further investigation

24 of, you know, misuse of data.

25       What about just -- what about limiting discovery to just

PROCEEDINGS

1  those -- those -- you know, the 200 or so third-party apps

2  referenced in that letter.

3      **MR. LOESER:**  Yeah.  Well --

4      **THE COURT:**  Sort of get all, you know, nonprivileged

5  documents relating to that, and be able to do some

6  interrogatories about that, and whatnot.

7      **MR. LOESER:**  You're either reading my mind, or mine

8  yours, but we have tried.  You know, after getting Facebook's

9  brief, you know, we looked at their objection to the breadth.

10  We looked at our request.  And we started trying to figure out:

11  How can we narrow these things?  How can we get information

12  that really goes directly to the argument we know they're going

13  to make?  And I think that that's a very good idea.

14      And so, for example, if you look at our first request in

15  our brief, which sets forth this, you know --

16      **THE COURT:**  Just narrow it all to those 200 apps?

17      **MR. LOESER:**  Narrow it all.

18      And we would have a description.  It would be limited to

19  third parties Facebook has determined improperly accessed or

20  sold Personal Data of Facebook users.

21      That answers this question like --

22      **THE COURT:**  So it wouldn't even necessarily be the

23  200.  It would be, of the 200, however many Facebook has

24  determined improperly sold data.

25      **MR. LOESER:**  Yeah.  We'd be more than happy to get

1   the 200; but really, I think one of the tasks we're trying to

2   sort out is:  Is Cambridge Analytica unique, or is it not?

3       Now, when Cambridge Analytica got all of that this data,

4   it was under this AP1 system, where third parties could simply

5   -- or Kogan could go in, and get everything about me.

6       And then they were supposed to change that policy with the

7   Consent Decree, and it wasn't supposed to happen anymore; but

8   there were a lot of entities that got that data.

9       We would like to know -- I think it would be very useful

10  for understanding -- who are these other entities that Facebook

11  has identified?

12      What was the data?

13      Because that goes to the exact factual arguments that

14  Facebook is making about the kinds of information; like, in

15  their brief, they keep talking about, *There's nothing*

16  *inappropriate about our disclosing the information that*

17  *Facebook users share*.

18      Well, that's not at all what that case is about.  It

19  really -- it's not about the "Likes" and -- and things that

20  people are sharing.

21      It's about all of that other information that Facebook is

22  going outside of Facebook and getting.  So let's identify who

23  are the other entities.  What did they get?  What did they do

24  with it?

25      And the same question for Cambridge Analytica.  To the

1  extent there's anything opaque still, like What was it?  Who

2  was it?  What was done with it?  Where is that data now?

3      And that would help us.  That will address the very issues

4  that, Your Honor, you know you're going to face.  They're going

5  to make a standing argument.  We know exactly what the

6  arguments are, because they put them all in their brief.

7  They're about the nature of the data -- What was it? -- about

8  how it was used; and about whether it exceeds the consent.

9      So if we focus on that information, I think we can get you

10  a Complaint that has the facts that we would simply have to

11  amend and add after we got that information.

12          THE COURT:  Well, you're saying if we don't do any

13  discovery, we're just going to have to amend the Complaint

14  again later?

15          MR. LOESER:  I think --

16          THE COURT:  I mean, I assume that we'll go -- you

17  know, say this case gets past 12(b)(6).  Assume, regardless,

18  there are going to be several iterations of the consolidated

19  Complaint.  Right?

20          MR. LOESER:  I think that's right, but I think

21  probably more so, even, than other cases, because it's not like

22  you can pick up anything Facebook has said, and understand:

23  Who are these other apps?  What did they get?  What did they

24  do?  What did they do with it?

25      And if you look -- and I did try and capture a few of the

PROCEEDINGS

1   arguments; the specific arguments that Facebook is making.

2   They say that, for example, the data, itself, that we claim was

3   improperly accessed or shared doesn't have any value.

4       Well, you know, that's a strange thing for Facebook to

5   say, since 98 percent of its revenue comes from selling access

6   to that data.

7       They say that everything that was disclosed -- there was

8   consent.

9       Well, you know, how do you brief that argument, if we

10  still don't have from them a description of, well, what was

11  everything that was disclosed?

12      And so, I mean, you can go through every argument that

13  they're making.  And their fundamental point is they claim that

14  we're putting the cart before the horse in trying to get this

15  information; but frankly, they've put these factual arguments

16  forward already.  And I think we can identify specific

17  information necessary so the Court can evaluate those

18  arguments -- those factual arguments they're making -- with

19  this limited discovery that will help us answer that.

20      So I do think, you know, our thinking has evolved.  I'm

21  hoping Facebook's thinking has evolved.  We can narrow.

22  Your Honor's suggestion is a good one.  Narrow the discovery

23  down.

24      The other category that's out there are prior Government

25  productions.

PROCEEDINGS

1    And frankly, the reason why we're focused on those is that

2 in other cases that's an easy, low-hanging-fruit type of thing

3 to deliver, because there's no burden associated with

4 delivering it.

5    Here, one thing we could do -- our request is broad:  All

6 Government productions.  But frankly, we could narrow that.

7 And we've talked very briefly to Mr. Lipshutz about narrowing

8 that just to -- for example, the FTC investigation.  That's --

9 obviously, they are looking at the same things that this case

10 is looking at.  That's information that has been packaged.  You

11 know, it's gone to out to them.  So that's easy, and it

12 eliminates what usually is the objection to early discovery,

13 which is burden.

14          **THE COURT:**  Mm-hm.

15          **MR. LOESER:**  So I think you put those two things

16 together.  We have a narrow request.  We are sensitive to the

17 notion of asking for too much.

18    The brief -- you know, we tried to describe the categories

19 in a way that identified the types of information; but we can

20 get that information through a narrower approach, such as what

21 Your Honor is suggesting.

22          **THE COURT:**  Mr. Lipshutz.

23          **MR. LIPSHUTZ:**  Good morning, Your Honor.

24    Well, I have to say, having listened to my opposing party

25 --

1      **THE COURT:**  I mean, the main thing I want you to

2   respond to is the idea of the narrower discovery, along the

3   lines of what we've just discussed.

4      Let's say the 200 apps that Facebook told the Senate

5   Commerce Committee it was investigating and/or, you know, the

6   materials produced to the FTC.

7      **MR. LIPSHUTZ:**  Sure, Your Honor.  I will address

8   those.

9      Let me just start by saying that we're only four weeks

10   away from the filing of a Complaint.  And so I think the proper

11   place to start discussions is:  What's the rush?  Right?

12      In four weeks we should know, hopefully, what the theory

13   of the case is, and who the plaintiffs are.  We don't know that

14   right now.  And then nothing speaks to that further than the

15   colloquy that Your Honor just had with plaintiffs' counsel.

16   They don't know what the case is.  They've said housing

17   discrimination, medical records, you name it -- they seem to

18   think that all of Facebook is illegal.

19      That's not what the case is.  That's not what the case is

20   going to be.

21      **THE COURT:**  It does seem that they think that all of

22   Facebook is illegal.

23      **MR. LIPSHUTZ:**  It does, Your Honor.  And their

24   discovery requests, frankly, reflect that.  They now describe

25   their discovery requests as being overbroad, but if you read

1  the discovery requests that they put into their brief that

2  Your Honor ordered, it asks for everything; every app.  And we

3  have 80 million apps.

4      (Reporter requests clarification.)

5          **MR. LIPSHUTZ:**  80 million apps on the Facebook

6  platform.

7          **MR. LOESER:**  If we could just have one line on each

8  app --

9          **MS. WEAVER:**  And the record.

10          **MR. LIPSHUTZ:**  In the proper course of procedure, we

11  would wait to see what the Complaint actually says.

12      And the discovery that is being sought, of course, has to

13  be tied to the claims that they're seeking.  We don't know what

14  these claims are yet.  We do know that we are going to have

15  substantial defenses to whatever those claims will be, based on

16  the various descriptions we've heard.

17      So Your Honor has heard and read the arguments not only

18  about standing, which is a significant issue.  Frankly, there's

19  square case law on the identity-theft; on what we've just heard

20  described.  There's a notion of buying the identity-theft

21  protection.

22          **THE COURT:**  But it strikes me that on the issue of

23  standing -- let's take identity theft.  It's easy for a

24  plaintiff to allege -- it seems to me in a case like this, it

25  would be easy for a plaintiff to allege facts from which you

1  would conclude that it was reasonable for somebody to purchase

2  identity-theft monitoring.  Right?

3      Whether those facts turn out to be true, of course, is

4  another question.  Right?

5      But the point that I'm trying to get at, and I'm not doing

6  it in a very artful way, is there is -- you know, at least in

7  the Ninth Circuit there are facial standing challenges, and

8  factual standing challenges.  Right?

9          **MR. LIPSHUTZ:**  Sure.

10         **THE COURT:**  And, you know, it kind of seems like your

11  standing challenge may end up being more of a factual standing

12  challenge, which is, of course, something that happens after

13  discovery -- right? -- because if they allege that, you know,

14  Facebook -- that, you know, third parties had access to our

15  credit-card information, and our name, and where we live, and

16  et cetera, et cetera, then they are going to have a sufficient

17  allegation of standing as it relates to identity theft.  It may

18  turn out not to be an accurate allegation, but they're going to

19  have the allegation.  And they're going to get past a 12(b)(1)

20  motion; at least a facial standing challenge.  Right?

21         **MR. LIPSHUTZ:**  Respectfully, Your Honor, I don't

22  agree with that.  The United States Supreme Court, in the

23  *Clapper* decision, flatly disagreed with that.  That was at the

24  pleadings stage.

25         **THE COURT:**  Yeah, but that's not a case about

1  identity theft, and the need to spend money for fear of

2  identity theft.

3      It's a -- there are lots of cases that have been decided

4  since *Clapper* that say, *If somebody -- if your Social Security*

5  *number has been stolen, and you need it to purchase*

6  *identity-theft monitoring, that gives you Article III standing.*

7          **MR. LIPSHUTZ:**  Of course, Your Honor, if your Social

8  Security number has been stolen, I'd agree with you.  The

9  thing --

10         **THE COURT:**  Or, I assume, your credit-card number.

11  Right?

12         **MR. LIPSHUTZ:**  Perhaps that's correct, but I don't

13  think named plaintiffs can make that allegation consistent with

14  their Rule 11 obligations.  There's no factual basis for that.

15      And there's a difference between a user giving that

16  information to Facebook, which is actually what was described

17  by opposing counsel.  If a user voluntarily gives that

18  information to Facebook, that's not identity theft.  That's

19  very different from somebody else stealing the information.

20  And I don't think there's any way for them to allege --

21         **THE COURT:**  What?  But their argument is that, to the

22  extent Facebook had access to this information, there was no

23  permission to give other -- give third parties access to the

24  same information.

25         **MR. LIPSHUTZ:**  But that's flatly contradicted by the

1   contract between the parties and Facebook.  And that is

2   something Your Honor should consider.

3       There are lots of cases throwing out, on 12(b)(6) motions,

4   allegations that are inconsistent with Facebook's contracts.

5   So I don't -- I do think that's standing will be at least a

6   significant problem for them.  Whether they eventually overcome

7   it or not remains to be seen, but the point is --

8           **THE COURT:**  What's wrong with -- what's the harm with

9   allowing discovery on the material that's been produced to the

10  FTC, and, you know, material relating to this investigation

11  that Facebook has conducted of these 200 apps referenced in the

12  letter to the Senate Commerce Committee?

13          **MR. LIPSHUTZ:**  Respectfully, Your Honor, there's a

14  lot wrong with that.

15      With respect to the FTC investigation, the FTC

16  investigation is confidential.  Under statute, even the

17  existence of an FTC investigation is confidential.  Now, it

18  happens to be the case that here, it was leaked; but the

19  existence of that investigation is confidential.  And certainly

20  the scope of that investigation is also confidential.

21          **THE COURT:**  Well, I mean, I assume that you might

22  need to get --

23      Maybe you need to get consent from the FTC before turning

24  it over.  I don't know.

25      But if the FTC didn't object to Facebook disclosing to the

1   plaintiffs whatever information Facebook has disclosed to the

2   FTC in connection with this investigation, what's the problem?

3   What's the harm in disclosing it to the plaintiffs in

4   connection with this litigation?

5        **MR. LIPSHUTZ:**  There are several problems,

6   Your Honor.  First of all, documents produced to the FTC are

7   produced pursuant to this 2012 Consent Order that was entered

8   into between Facebook and the FTC.

9        The FTC has a right, under that Consent Decree, to ask for

10  documents pertaining to a wide range of subjects that, frankly,

11  have nothing to do with even what was described here today.  So

12  actually the scope of any productions given to the FTC would be

13  significantly potentially broader or different than what could

14  possibly be encompassed by their Complaint.

15       **THE COURT:**  Okay, but I feel fairly confident that

16  Facebook kept careful track of what it gives to the FTC; and

17  that it would not -- in the grand scheme of things, would not

18  be terribly difficult for Facebook to pull out what would be

19  relevant to this case from the materials it gave the FTC.

20       **MR. LIPSHUTZ:**  Well, I disagree with that,

21  Your Honor.  We don't know what's relevant to this case,

22  because we don't know what this case is about.

23       Second of all, it's not easy to do that, because Facebook

24  would have to re-review all of that information.  The documents

25  that were produced to the FTC were not produced to pursuant to

PROCEEDINGS

1   the Federal Rules.  They would have to review all of that

2   information again; make objections; assert privilege; things

3   that were not able to assert in connection with the FTC.  It's

4   a very different process.

5        Civil discovery under the Federal Rules is a very

6   different process from responding to an FTC request that is

7   pursuant to a Consent Order.  There are different sets of the

8   documents.  There's no overlap.

9        And Judge Alsup, in the *In Re: Graphics* decision,

10  addressed this exact situation.  And he said, *There would be*

11  *the issue of various objections that might be assertable*

12  *against Plaintiffs that were unasserted against the Government.*

13  *Defendant would be entitled to interpose possibly valid*

14  *objections that would take time to evaluate.  And regardless of*

15  *the foregoing, the compelled act of turning records over to the*

16  *Government pursuant to the subpoena does not mean that everyone*

17  *else has an equal right to rummage through the same records.*

18  *Defendants have a legitimate interest in maintaining the*

19  *confidentiality of their records.*

20       We would assert that all of that presents enormous

21  problems here, where the FTC investigation, itself, is

22  confidential.  The scope of that investigation is confidential.

23  And the process of producing documents to the FTC, which, by

24  the way, included communications with the FTC; letters back and

25  forth.  Undoubtedly, the FTC would not want that produced, and

1  certainly wouldn't give back our confidentiality --

2        (Reporter requests clarification.)

3        **MR. LIPSHUTZ:**  Would not want that produced, and

4  neither would Facebook.

5     And so there is no way to simply turn over that package of

6  material consistent with the Rules.  It would involve

7  significant burden or our part.

8        **THE COURT:**  Okay.  What about the 200 apps?

9        **MR. LIPSHUTZ:**  Well, the 200 apps that are being

10  referenced are in connection with an internal investigation

11  that Facebook is undertaking that is -- that Facebook has

12  undertaken in response to Cambridge Analytica events.  Facebook

13  undertook a -- is in the process of undertaking an internal

14  investigation, where it is investigating apps and their use of

15  data.  That investigation is privileged, and is being

16  undertaken at the direction of counsel.  And --

17        **THE COURT:**  But that doesn't mean that every document

18  you uncover in that investigation is privileged.  It just means

19  that the strategic aspects of the investigation are privileged.

20  Right?

21        **MR. LIPSHUTZ:**  Well, I don't know if that's correct,

22  Your Honor.  The --

23        **THE COURT:**  The fact of the investigation is not --

24        **MR. LIPSHUTZ:**  The fact of the investigation is not;

25  but the identity of the apps being investigated, and the

1  reasons for investigating those apps certainly would fall under

2  attorney-client privilege and attorney work product.

3      The 200 apps that are being referenced -- I believe the

4  purpose of using that number has to do with apps that Facebook

5  has suspended, pending the investigation.  So no finding of

6  wrongdoing on our part.  Those are essentially the apps that

7  are being investigated.  And the results of that investigation

8  are not complete.  The company doesn't have --

9          THE COURT:  But so what?

10     I mean, what's wrong about with identifying the apps that

11 have been suspended, and producing all documents relating to

12 the reasons why the apps have been suspended, and the

13 relationship that Facebook has with those apps, and the kind of

14 data that Facebook has shared with those apps?

15         MR. LIPSHUTZ:  Well, first, because --

16         THE COURT:  Given access.  Given those apps access

17 to.

18         MR. LIPSHUTZ:  For a number of reasons, Your Honor.

19     First, because it's privileged.  The identity of the apps

20 being investigated.  And the -- and the reasons for --

21         THE COURT:  Why?

22         MR. LIPSHUTZ:  Because the reasons for selecting --

23 the basis for the investigation is to figure out what legal

24 obligations Facebook has vis-à-vis those apps, whether it's

25 potential affirmative litigation that Facebook may want to

PROCEEDINGS

1   launch against those apps; defensive litigation, like the one

2   proposed here.  It's all being conducted under the guidance and

3   direction of counsel.

4        The apps, themselves -- by definition, if you're only

5   asking about apps that are under investigation, by definition,

6   you are broader in scope than the potential scope of this

7   litigation.

8        These are apps that are suspected, potentially, of

9   violating Facebook's policies.  It has nothing to do with

10  wrongdoing on Facebook's part.  These are apps that Facebook is

11  looking at to determine whether they violated Facebook's

12  policies.  That's not relevant, frankly, to the litigation,

13  because --

14            THE COURT:  Well, it is, potentially.

15       I mean, I spoke with Ms. Weaver about one bucket of claims

16  which relates to Facebook not doing a good job of policing what

17  is happening to this data --

18       Right?

19            DEFENDANT LIPTON:  Yes, Your Honor.

20            THE COURT:  -- despite promises to users that it

21  takes care to protect their data.

22            MR. LIPSHUTZ:  That was one of many theories

23  discussed; but again, we have to find out whether that's a

24  viable theory.  And, as we set forth in our brief, we have an

25  addendum that went through negligence, among many other

1   possible causes of action.

2       We've identified significant problems with bringing a

3   negligence action here.  These are contractual relationships.

4   There's no negligence under California law in the context of a

5   contractual relationship like this, unless there's a special

6   relationship, which clearly does not exist here.  The Data Use

7   Policy and the consent that is on the face of the Data Use

8   Policy prevents there from being any negligence, because

9   there's actually a waiver in the Data Use Policy that says that

10  Facebook -- that users waive any possibility of litigation

11  against Facebook or liability by Facebook for the acts or

12  actions of third-party apps.  So on the face of the contracts,

13  alone, there clearly can be no negligence cause of action here.

14      Plaintiffs mentioned a UCL cause of action.  Prop 64 makes

15  that impossible.  There's no loss of property or money here.

16  These are intangible harms, at best, as there's no possibility

17  of UCL action here.

18      So there's simply no fire.  There may be a lot of smoke,

19  but there's no fire.  There's no cause of action.  And there's

20  really no reason not to wait four weeks to find out what

21  they're actually going to allege and who the plaintiffs are

22  going to be, at which point we can file a motion to dismiss.

23      We -- if you'd like, Your Honor, we can file another

24  motion to stay discovery; concurrent motion to dismiss.

25          THE COURT:  As a practical matter, you're not asking

PROCEEDINGS

1   to wait four weeks.  You're asking to wait until after a ruling

2   on your motion to dismiss.

3          MR. LIPSHUTZ:  That's right, Your Honor, but what I

4   was trying to say -- if Your Honor is not convinced that we

5   should wait that long, we could wait; see the what the

6   Complaint says.  We could file a motion to dismiss; a formal

7   motion to stay discovery in connection with that motion to

8   dismiss, which is the normal process here in the Northern

9   District of California.  That way, you can see how the motion

10  to stay relates to the motion to dismiss, and decide whether

11  they have any viable claims, and what the scope of those claims

12  is.

13         THE COURT:  Okay.

14         MR. LOESER:  Your Honor, if I may, this comes down to

15  a bit of Facebook having to pick a horse.

16     So they took their time in their motion to describe for

17  you the grounds on which they intend to move to dismiss the

18  Complaint.  They are inherently and completely fact-based

19  arguments.

20     So just my going through --

21         THE COURT:  They've got to wait until you pick your

22  horses before they pick their horses.

23         MR. LOESER:  Well, they have a pretty good idea from

24  30 Complaints.  And we're going to refine the claims and

25  allegations, but everybody knows the case is because of the

1  Cambridge Analytica event, and whether that same thing is

2  happening with other apps.  And we know from the limited

3  disclosures that have been made to Congress that there might be

4  many more.  There are these 200 that are identified that are

5  under investigation.  So it could be much broader in that

6  sense.

7       **THE COURT:**  Could I?  Let me -- sorry.  Just one

8  small question came to my mind.  I don't know how small it

9  really is; but do we even know at this point what information

10 was given to Cambridge Analytica?  Do we have -- well, or what

11 information was obtained by Cambridge Analytica?

12      **MR. LOESER:**  We have a general description, but --

13 and that's a really important question.  And, again, it shows

14 how factual these arguments that Facebook wants to make.

15      **THE COURT:**  Mm-hm.

16      **MR. LOESER:**  What information is in a Facebook User

17 Profile?

18      **THE COURT:**  Mm-hm.

19      **MR. LOESER:**  Mr. Lipshutz wants to say, over and over

20 again -- and their brief says in several instances -- it's

21 based on the information shared by users on Facebook.  And

22 that's a very convenient way of describing it, because that's

23 information that people made available on Facebook, and made

24 available, under certain restrictions, to their friends.

25      But what we've learned from the scandal and the fallout

1    from Cambridge Analytica is that there's a tremendous amount of

2    additional information that is collected not from -- well, both

3    from Facebook users' actions -- not their "Likes" and other

4    posts; but, you know, their eye movements and mouse movements,

5    all of these other bizarre things that are being tracked.

6         Then there's this universe of other information, which,

7    frankly, is what I'm concerned about.  What other information

8    is being gathered when Facebook goes out into the world, pulls

9    information?  Is it financial information?  Is it health

10   information?  Because that is directly relevant to these

11   factual arguments that Facebook wants to make to attack

12   standing, and to attack the claims.

13        And so I think it's a very sound idea to require Facebook

14   to do something that is not unusual in litigation of this type:

15   Put forward some information that will make this exercise of

16   motions to dismiss meaningful.

17        Otherwise, it takes months.  These motions to dismiss --

18   you know, Your Honor probably gets tired of reading 50-page

19   briefs, or however long they get, with massive attachments; but

20   it is a long process.  It will be months before the motion is

21   briefed, heard, decided.  And then we'll just have to do it all

22   over again on these basic questions of:  What data is

23   collected?  Who accessed it?  How was it accessed?

24        And if we can at least narrow it down to -- for the

25   entities that Facebook has identified, in its own worldview,

1   have misused the data, then let's look at those, because that

2   will allow us to put a Complaint forward that puts the

3   information together that directly rebuts the factual arguments

4   that we think they're going to make.

5        Otherwise, you know, you're just going to have a motions

6   practice where they say, *We didn't collect any data, other than*

7   *what was shared on Facebook*.  *It's a fact issue*.  *No data was*

8   *accessed, other than what people gave permission to access*.

9   *It's a fact issue*.  *No data was sold*.  *It's a fact issue*.  And

10  you're going to go down the whole list.  It's just kind of a

11  useless exercise.  And we'd like to make it more meaningful for

12  the parties and for the Court.

13        **MR. LIPSHUTZ:**  Your Honor, our motion to dismiss and

14  our papers here are not presenting fact issues.  They're simply

15  take the allegations, and they compare and contrast them with

16  Facebook's own contracts, which are going to be incorporated

17  into the Complaint.  There's no fact issue, and there won't be

18  a fact issue in our motion to dismiss.  It will be legal

19  arguments.

20        **MR. LOESER:**  Well, just one final thing on that, Your

21  Honor.  Look at Cambridge Analytica.  There was a contract.

22  Okay?  If we're going to take their view of how to decide the

23  world, there would be no Cambridge Analytica, because the

24  contract did not allow, apparently, what Cambridge Analytica

25  did.  So the answer can't be Facebook's contracts, by itself.

1   It also has to look at what actually happened with the data.

2           MR. LIPSHUTZ:  Cambridge Analytica violated

3   Facebook's contract with Cambridge Analytica; but there's no

4   allegation and there can be no allegation that Facebook

5   violated its User Agreement with Cambridge Analytica.

6           THE COURT:  All right.  So I will take that under

7   submission.  I'll issue a ruling very shortly.

8       There are a couple of things that I wanted to flag for you

9   all.  And then if there's anything else you want to discuss

10  with me or update me on --

11      First, there's a Ninth Circuit decision that came out a

12  few days ago that I haven't read yet on judicial notice; taking

13  judicial notice of documents that are incorporated into the

14  Complaint.  That is going to be an issue that you all need to

15  think about.  And I just want to -- I can't remember the name

16  of the case, but it came out a few days ago.

17          MR. LIPSHUTZ:  I read the case.

18          MS. WEAVER:  *Khoja v. Orexigen*.

19          THE COURT:  And then there are a couple cases which,

20  again, I haven't looked at yet, but speak to this question that

21  we spoke of last time, which is:  What becomes of the claims

22  asserted by plaintiffs in the 30 cases that don't make it into

23  the Consolidated Complaint?  And I know that Judge Fuhrman has

24  dealt with that issue in his MDL.

25      There was one other case -- again, I haven't read them

1  yet, but I just wanted to make sure I have brought them to your

2  attention.  Yeah.  Judge Fuhrman in SDNY in the *General Motors*

3  *Ignition Switch Litigation*.

4       And then Judge Selna, in Los Angeles, in the

5  Central District, has dealt with this issue in the Toyota MDL.

6       There may be others, but I wanted to just bring those to

7  your attention.

8       Anything anybody wants to update me on?

9            **MR. LOESER:**  Yeah.  First, on that -- the last issue,

10  on claims and what's going to happen with them, we have been

11  putting a lot of time into trying to sort that out.  And what

12  you'll see when you read Judge Fuhrman's decision is it is a

13  very complicated issue, and there are different ways to handle

14  it, which is why, in one of the orders we submitted on Lead

15  Counsel duties and responsibilities, we sort of created

16  flexibility; that the two approaches are -- one is you dismiss

17  those claims without prejudice, as Judge Fuhrman did.  You set

18  in motion this process for briefing on those claims, so people

19  can reassert those claims.  That approach makes particular

20  sense where you have a lot of ancillary litigation.

21            **THE COURT:**  At the tail end, sort of?

22            **MR. LOESER:**  No.  He has it set up so it happens -- I

23  mean, that whole discussion in that case kind of happened

24  midstream.  So there's a lot of reasons why that approach may

25  be somewhat unique, and not terribly helpful here; but

1  midstream in the process on one of the Consolidated

2  Complaints -- not the first one -- claims had been dismissed.

3  Parties that had ancillary litigation were upset about that,

4  and wanted an opportunity to try and argue for those claims to

5  be included again.

6      There are some benefits to that.  The down side is it

7  creates a lot of kind of ancillary litigation over the claims.

8  And so I think we really have to think about if we want to do

9  that.

10     The other approach that a lot of courts have followed is

11  to simply have all of the claims get included in the

12  Consolidated Complaint -- every single one of them -- and then

13  have a prioritization by Lead Counsel over, *These are the*

14  *claims that we want to deal with now*.  *Let's stay these other*

15  *claims*.  That, I think, is a more efficient way.

16          **THE COURT:**  I think Judge Koh may have done it that

17  way in the *Anthem* case.

18          **MR. LOESER:**  Yeah.

19          **MS. WEAVER:**  And in *Apple*.  Judge Davila's handling

20  those claims.

21          **THE COURT:**  Yeah.

22          **MR. LOESER:**  Yeah.  And there's good reason for that.

23  It does prevent a lot of all of this, sort of, side litigation

24  by other parties.  So we're thinking through that.  And the

25  order provides some flexibility.

1    The one other thing I just wanted to note is that we saw

2  that in the order we submitted on timekeeping, the order refers

3  to an Exhibit A.  Somehow we managed to screw that up, and not

4  actually upload Exhibit A with the order.  So we need to file a

5  précis that has the exhibit.

6          **THE COURT:**  You can go ahead and do that.  Anything

7  else?

8          **MR. LIPSHUTZ:**  Nothing from me, Your Honor.

9          **THE COURT:**  Okay.  Aisle issue something on this very

10  shortly.

11          **MR. LIPSHUTZ:**  Thank you, Your Honor.

12          **MR. LOESER:**  Thank you.

13    (At 11:29 a.m. the proceedings were adjourned.)

14  I certify that the foregoing is a correct transcript from the

15  record of proceedings in the above-entitled matter.

16

17  *Lydia Zinn*

18  _____    August 24, 2018
   Signature of Court Reporter/Transcriber    Date
19  Lydia Zinn

20

21

22

23

24

25