# Exhibit B

1    William M. Audet  (SBN 117456)
        waudet@audetlaw.com
2    Gwendolyn R. Giblin  (SBN 181973)
        ggiblin@audetlaw.com
3    Ling Y. Kuang  (SBN 296873)
        lkuang@audetlaw.com
4    AUDET & PARTNERS, LLP
        711 Van Ness Avenue, Suite 500
5    San Francisco, CA 94102-3275
        Telephone:   (415) 568-2555
6    Facsimile:   (415) 568-2556

7    *Attorneys for Plaintiffs Leah Ballejos,*
     *Audrey Ellis, and Tameika Martin*

8

9

10              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11                        **COUNTY OF SAN MATEO**

12

13   LEAH BALLEJOS, AUDREY ELLIS, and       Case No:       18-CIV-03607
     TAMEIKA MARTIN,
14                                          **PLAINTIFFS' RESPONSE IN OPPOSITION**
                                            **TO DEFENDANT'S MOTION TO STAY**
15                    Plaintiffs,           **PROCEEDINGS**

16          v.                              [Declaration of Ling Y. Kuang in Support of
                                            Plaintiffs' Response and [Proposed] Order
17   FACEBOOK, INC., a Delaware             Denying Defendant's Motion to Stay Proceedings
     corporation, and DOES 1 through 100,   Filed Concurrently Herewith]
18
                      Defendants.           Hearing Date:      September 11, 2018
19                                          Hearing Time:      9:00 a.m.
20
                                            Department:        Law & Motion / Dept. 16
21                                          Judge:             Hon. Richard H. DuBois
22
                                            Complaint Filed:   July 11, 2018
23
                                            Trial Date:        None Set
24

25

26

27

28

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO STAY        No. 18-CIV-03607

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A&P | AUDET & PARTNERS LLP

# TABLE OF CONTENTS

*Page*

INTRODUCTION ...................................................................................................... 1

RELEVANT FACTS ................................................................................................. 2

   I.    In the Age of Social Media, the Privacy of Personal Information Competes Directly with Corporate Avarice ............................................................ 2

   II.   Facebook's Past and *Continued* Disregard for Protecting Personal Information Showcases the Ongoing Harm to California Residents ................................. 3

ARGUMENT ............................................................................................................ 4

   I.    The *Ballejos* Action is Unique and Allows for the Efficient and Appropriate Resolution of Harm Faced by California Residents ..................................... 4

        A.   California's "strong policy of comity" can only be achieved by allowing a California state court to resolve this case. ............................................. 5

        B.   The federal MDL process poses significant danger that the injunctive relief sought in *Ballejos* would be relegated to an afterthought. ...................... 6

   II.   Many of Facebook's Underlying Assertions are No Longer True or Incorrect ....... 10

   III.  Analysis of the Relevant Legal Factors Plainly Demonstrate That a Stay is Unwarranted ................................................................................................ 11

        A.   The critical factor of comity is achieved by denying the stay request. ............ 11

        B.   Any potential for "unseemly conflicts" is manufactured solely by Facebook. 11

        C.   The federal action cannot sufficiently address the issues raised nor determine the relief sought by Plaintiffs here. ............................................................ 13

        D.   Judicial economy will not be materially impacted by denying the stay. .......... 13

CONCLUSION ....................................................................................................... 14

<u>T</u><small>ABLE OF</small> <u>A</u><small>UTHORITIES</small>

*Page(s)*

**State Cases**

*Berg v. Mtc Electronics Techs. Co.* (1998) 61 Cal.App.4th 349 ....................................... 11

*Caiafa Prof. Law Corp. v. State Farm Fire & Cas. Co.* (1993) 15 Cal.App.4th 800........................ 11

*Farmland Irrigation Co. v. Dopplmaier* (1957) 48 Cal.2d 208................................... 11, 13

*Gregg v. Superior Court* (1987) 194 Cal.App.3d 134 ....................................... 4

*In re Tobacco II Cases* (2009) 46 Cal.4th 298................................................. 1, 5

*Johnson v. Monsanto Co.* (2018), S.F. Super. Ct. Case No. CGC-16-550128 ..................... 7

*McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945 ............................................... 5

*Simmons v. Superior Court of Los Angeles County* (1950) 96 Cal.App.2d 119............................. 5, 6

*Thomson v. Continental Ins. Co.* (1967) 66 Cal.2d 738 ....................................... 5

*Townsend v. Superior Court* (1998) 61 Cal.App.4th 1431 ....................................... 12

*Valley Bank of Nev. v. Superior Court* (1975) 15 Cal.3d 652 ....................................... 1

**Federal Cases**

*Andrews v. Am. Tel. & Tel. Co.* (11th Cir. 1996) 95 F.3d 1014 ....................................... 10

*Briggs v. Merck Sharp & Dohme* (9th Cir. 2015) 796 F.3d 1038................................... 12

*Castano v. Am. Tobacco Co.* (5th Cir. 1996) 84 F.3d 734 ....................................... 9

*Davidson v. Kimberly-Clark Corp.* (9th Cir. 2017) 873 F.3d 1103................................... 5, 6, 11

*Davis v. Astrue* (N.D. Cal. 2012) 874 F. Supp. 2d 856................................... 7

*Gariety v. Grant Thornton, LLP* (4th Cir. 2004) 368 F.3d 356 ....................................... 9

*In re Am. Med. Sys.* (6th Cir. 1996) 75 F.3d 1069 ....................................... 9

*In re Anthem Inc. Data Breach Litig.* (N.D. Cal. Feb. 2, 2018) No. 15-md-02617-LHK ................. 7

*In re Hyundai & Kia Fuel Economy Litig.* (9th Cir. 2018) 881 F.3d 679 ....................................... 9

*In re LifeUSA Holding Inc.* (3d Cir. 2001) 242 F.3d 136 ....................................... 9

*In re Lipitor* (C.D. Cal. May 10, 2018) 2018 U.S. Dist. LEXIS 80284 ....................................... 12

*In re St. Jude Med., Inc.* (8th Cir. 2005) 425 F.3d 1116................................... 10

*Jabbari, et al. v. Wells Fargo & Company, et al.* (N.D. Cal.) No. 15-cv-02159-VC ..................... 8

<small>PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO STAY</small>           No. 18-CIV-03607

*L.A. Unified Sch. Dist. v. Garcia* (9th Cir. 2012) 669 F.3d 956 ......................................................... 5

*Monterrubio v. Best Buy Stores, L.P.* (E.D. Cal. 2013) 291 F.R.D. 443 ............................................ 6

*Munoz v. Giumarra Vineyards Corp.* (E.D. Cal. June 20, 2017) 2017 U.S. Dist. LEXIS 95910 ....... 7

*Pecover v. Elec. Arts Inc.* (N.D. Cal. Dec. 21, 2010) 2010 U.S. Dist. LEXIS 140632 .................. 6, 7

*Perry v. MSPB* (2017) 137 S.Ct. 1975 ............................................................................................. 13

*Szabo v. Bridgeport Machs., Inc.* (7th Cir. 2001) 249 F.3d 672 .................................................. 9, 10

*United States v. Stauffer Chemical Co.* (1984) 464 U.S. 165 .......................................................... 13

*Walsh v. Ford Motor Co.* (D.C. Cir. 1986) 807 F.2d 1000 .............................................................. 10

A&P AUDET & PARTNERS LLP

**INTRODUCTION**

The motion to stay sought by Defendant Facebook, Inc. ("Facebook") is nothing more than a procedural scheme to avoid accountability owed to California residents. By moving for a stay, in essence, Facebook hopes to see the strong and quick relief available under the California Unfair Competition Law ("UCL") reduced to a bargaining chip for future settlement talks in the federal cases. As discussed below, the *only* relief sought in the instant *Ballejos* action—declaratory and injunctive relief—is put in grave danger if not litigated in this state Court. Only a California state court can adequately effectuate the intent of the California legislature when it crafted the UCL—to stop current and future unfair business practices. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 319 [the "primary" form of relief under the UCL is injunctive relief.])

The MDL proceedings pending in federal court cannot fully achieve the specific outcome sought in this action. The primary relief sought in the MDL actions is monetary, not injunctive nor declaratory relief. Reforms to Facebook's practices must be at the forefront and not just one of the multiple outcomes sought in the MDL. Furthermore, given Facebook's past and *ongoing* misconduct, it is imperative that swift and meaningful injunctive relief be obtained. Otherwise, the strong interest California residents have in protecting the privacy of their personal information will be irreparably violated. (*Valley Bank of Nev. v. Superior Court* (1975) 15 Cal.3d 652, 656 [Cal. Const., art. I, § 1 "elevated the right of privacy to an "inalienable right" expressly protected by force of constitutional mandate."]) Finally, the MDL involves class action claims which will require class discovery and class-related motion practice that is not necessary herein. These class-specific hurdles will delay and possibly prevent the injunctive relief that could be obtained through these state court proceedings.

This action presents a unique opportunity for a California state court to address a California state statute through the prism of California state legal jurisprudence. Doing so will not only serve the public policy of comity, but further avoid the myriad of pitfalls as discussed below that are associated with class action litigation in a federal courts. Allowing this case to proceed will not impede the federal cases as the recently appointed class counsel in the MDL can still seek monetary and other relief for the class. Accordingly, California residents Leah Ballejos, Audrey Ellis, and

---

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO STAY          No. 18-CIV-03607

Tameika Martin ("Plaintiffs") respectfully request that the Court safeguard their *constitutional* and *inalienable* rights by denying Facebook's motion to stay.

## RELEVANT FACTS

### I.  In the Age of Social Media, the Privacy of Personal Information Competes Directly with Corporate Avarice

Increasingly, California residents find their private personal information digitized on the internet and put at risk of exploitation.  Facebook's business practices represent a prime example of this trend as, unbeknownst to many, the company collects an astonishing amount of information about each individual consumer. (*Ballejos* Compl. ¶¶ 7, 19.)  This includes private information such as "religion and political views,…relationship details, friend[s], education history, work history,…book reading activity, fitness activity, music listening activity, video watch[ing] activity, news reading activity" and other facets of life. (*Ibid.*)  More shocking, Facebook uses this vast array of collected information to further discern seldom publicized characteristics about an individual— such as whether a woman publicly breastfeeds. (*Id.* at ¶ 22.)  The massive scope of information maintained by Facebook, combined with the scale and reach of Facebook's products (more than 2 billion people worldwide, 17 million in California alone), necessitates careful consideration of the relief sought through this case. (*Id.* at ¶¶ 7, 18, 31.)

The need for scrutiny is amplified as Facebook's corporate interests are directly aligned *against* the interests of protecting privacy and personal information. (*Id.* at ¶¶ 9, 60-61.)  A stark reminder of this fact was put on display immediately after the filing of the *Ballejos* complaint.  On July 26, 2018, Facebook's stock price saw the "biggest one-day drop in [U.S. market] history" due in part to implementing new privacy laws. (See Ex. A[1] [CBS News article: *Facebook stock suffers largest one-day drop in history, shedding $119 billion*].)  It comes as no surprise then that Facebook lacks any motivation to "police itself"[2] but rather finds ample incentives to turn a blind eye towards privacy concerns. (*Ballejos* Compl. ¶ 9 ["Parakilas, who worked at Facebook enforcing privacy and

---

[1] Unless otherwise indicated, all "Ex." references relate to exhibits attached to the Declaration of Ling Y. Kuang filed concurrently herewith.

[2] See Ex. B [Vox article: *The $120-billion reason we can't expect Facebook to police itself*].

other rules until 2012, stated: "The people whose job is to protect the user always are fighting an uphill battle against the people whose job is to make money for the company."].)  Eroding privacy is not merely a side-effect of Facebook's business practices.  Undermining privacy and sharing user information with third-parties is the *entirety* of its business model. (*Id*. at ¶ 23.)  Facebook's past and current misconduct—and even the actions taken in this litigation—proves a painful reminder that the company's focus on corporate profits trumps privacy considerations. (*Id*. at ¶¶ 62-65.)

## II.  Facebook's Past and *Continued* Disregard for Protecting Personal Information Showcases the Ongoing Harm to California Residents

Facebook's past and continuing misconduct is well-documented.  In 2012, it entered into a consent decree with the FTC which barred misrepresentations about privacy or the security of user data.  The consent decree required that Facebook obtain express consent before sharing user data and establish a comprehensive program to address privacy risks. (*Id*. at ¶ 62.)  The privacy and data breach problems earlier this year marked a clear violation of the consent decree. (*Ibid*.)  And once again, Facebook promised to clean up its act, as it has done many times in the past. (*Id*. at ¶ 64 ["an associate professor at the University of North Carolina who studies how technology affects society, said Facebook "made similar promises many times before," but the same concerns keep resurfacing].)  These hollow promises hold little weight though as demonstrated below.

If past is prologue, it should come as no surprise then that less than 24 hours after the *Ballejos* Complaint was filed, reports surfaced on July 12, 2018 that Facebook allowed third-party marketers to collect information on "names, employers, locations, email addresses and other info" after a user joined what he or she thought was a private closed Facebook group.[3]  Less than a month later, Facebook became embroiled in controversy stemming from a *quid pro quo* proposed exchange with banking institutions for "detailed financial information" on consumers. (See Ex. D [Wall Street Journal article: *Facebook to Banks: Give Us Your Data, We'll Give You Our Users*].)  Even more troubling, just last week it was revealed that Facebook's vaunted attempts to protect user privacy may in fact be subtle and covert efforts collect *even more* user data. (See Ex. E

---

[3] See Ex. C [Engadget article: *Marketers collected personal info from closed Facebook groups*].

– 3 –

1   [Independent article: *Facebook Privacy App Pulled After Apple Says It Violates People's Privacy*]

2   ["A Facebook app that was intended to protect people's browsing privacy has been pulled by Apple

3   from its app store because <u>it actually collected significant data about the people using it</u>."]

4   [underline added].)  These unending assaults on privacy, all of which occurred after the filing of

5   this lawsuit, demonstrates the clear and ongoing harm California residents must confront.

6   Faced with this threat, California residents Leah Ballejos, Audrey Ellis, and Tameika Martin

7   ("Plaintiffs") brought this action against Facebook seeking *only* declaratory and injunctive relief to

8   enhance the safeguards afforded to the protection and privacy of personal information. (See

9   *Ballejos* Compl. at pp. 28-29.)

10   **ARGUMENT**

11   **I.      The *Ballejos* Action is Unique and Allows for the Efficient and Appropriate**

12   **Resolution of Harm Faced by California Residents**

13   Facebook expends tremendous energy to selectively choose allegations from various federal

14   complaints to match them to language in the *Ballejos* Complaint—a task rendered easier by the 20

15   federal complaints from which to choose from. (See Defendant's July 27, 2018, Motion to Stay

16   Proceedings [hereafter, "Mot. to Stay"] at pp. 3-4, but see, *Gregg v. Superior Court* (1987) 194

17   Cal.App.3d 134, 138 ["We find no precedent for preventing a litigant in the circumstances of this

18   case from pursuing an action because other litigants are suing the same defendants over similar

19   grievances in another forum."])  In doing so, Facebook purposefully and outright ignores the most

20   important distinction present in the *Ballejos* case: this is a **non-class** action involving Plaintiffs

21   seeking **only public injunctive relief** grounded upon unique California statutes and distinctive

22   California principles of law.  Comity can only be achieved if the injunctive relief issue is resolved

23   by a California state court.   Allowing Plaintiffs' claims to be subsumed into the federal MDL

24   process will bring heightened and unnecessary risks to the non-class relief sought by Plaintiffs

25   herein.  Indeed, as discussed in detail below, allowing this case to proceed in state court is not only

26   an available route, but should be the preferred one for Plaintiffs, California's courts, and

27   California's residents.

28

A&P | AUDET & PARTNERS LLP

### A.  California's "strong policy of comity" can only be achieved by allowing a California state court to resolve this case.

As the California Supreme Court's recent April 2017 pronouncement made clear, "public injunctive relief remains a remedy available to private plaintiffs under the UCL and the false advertising law[.]" (*McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945, 961 [216 Cal.Rptr.3d 627, 393 P.3d 85].)  Indeed, injunctive relief is not only an *available* remedy, but is "the *primary* form of relief available under the UCL to protect consumers from unfair business practices[.]" (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 319.)  Federal courts also recognize the importance of having a California **state court** adjudicate California legal issues. (See, e.g., *L.A. Unified Sch. Dist. v. Garcia* (9th Cir. 2012) 669 F.3d 956, 963 ["rather than decide this novel question of California law ourselves, we respectfully request that the California Supreme Court decide the certified question in order to provide an authoritative answer to California's [issues.]"]).  Moreover, in the context of UCL injunctive relief when faced with the potential of a federal court adjudicating the issue, the Ninth Circuit is particularly deferential to California state courts so as to avoid the possibility of "California's consumer protection laws [being] effectively gutted[.]" (*Davidson v. Kimberly-Clark Corp.* (9th Cir. 2017) 873 F.3d 1103, 1115-16 [raising concerns in the removal context].)

These authorities highlight the frailty of Facebook's argument that the California Supreme Court has a "strong policy of comity" that favors staying state court cases. (Mot. to Stay at 1:6-8, 7:15-16, citing *Thomson v. Continental Ins. Co.* (1967) 66 Cal.2d 738, 747.)  Facebook has presented the correct policy, but the wrong results.  To truly achieve comity among the courts—a mantra Facebook repeat numerous times—a California **state court** must adjudicate and determine the unique relief sought in this state court action. (See *Davidson*, *supra*, 873 F.3d at p. 1115 ["[a]llowing a defendant to undermine California's consumer protection statutes and defeat injunctive relief simply by removing a case from state court [and having a federal court decide the issue] is an unnecessary affront to federal and state comity [and] … an unwarranted federal intrusion into California's interests and laws."] [underline added, citation omitted].)  Thus, Facebook erroneously relies upon the discussion of comity in *Thomson*, *supra*, and *Simmons v.*

1   *Superior Court of Los Angeles County* (1950) 96 Cal.App.2d 119.  These cases instead support

2   Plaintiffs' proposition that a California state court should resolve the injunctive relief issue—to

3   adopt Facebook's application of the law would amount to an "affront" to both federal and state

4   comity. (*Davidson*, *supra*, 873 F.3d at p. 1115.)

5        As further evidence of this, the *Davidson* court highlighted the cognizable danger in

6   "plaintiffs filing their state law consumer protection claims in California state court, defendants

7   removing the case to federal court, and the federal court <u>dismissing the injunctive relief claims for</u>

8   <u>failure to meet Article III's standing requirements</u>" (*Ibid*. [underline added].)  This is more than a

9   hypothetical risk.  The exact same risk has been confirmed by the federal judge currently

10  overseeing the federal cases. (See Ex. F [Law360 Article].)  The Honorable Judge Vince Chhabria

11  expressly stated that "it's not obvious to [him] how Facebook violated the law, … It's not obvious

12  to [him] how people were injured by [Facebook] **in the Article III sense**." (*Ibid*. [emphasis

13  added].)  These facts demonstrate why proceeding in state court, absent Article III roadblocks,

14  would be the more suitable approach to securing relief for Plaintiffs and other California residents.

15      **B.  The federal MDL process poses significant danger that the injunctive relief
16      sought in *Ballejos* would be relegated to an afterthought.**

17       The federal MDL process presents considerable risk to the injunctive relief sought by

18  Plaintiffs—so much so, that any ultimate resolution in the federal court actions could completely

19  deny Plaintiffs the relief sought here.

20       *First*, the MDL proceedings will certainly involve a protracted and contentious fight over

21  class certification and scope of the class definition. (*Monterrubio v. Best Buy Stores, L.P.* (E.D. Cal.

22  2013) 291 F.R.D. 443, 455 [finding "probable that protracted litigation over class certification"

23  would occur].)  The class certification problems are even more pronounced when injunctive relief is

24  sought in federal courts. (See *Pecover v. Elec. Arts Inc.* (N.D. Cal. Dec. 21, 2010) 2010 U.S. Dist.

25  LEXIS 140632, at *43 ["[T]he court is unsure, given plaintiffs' limited submissions, what, if any,

26  benefit certifying an injunctive class would serve…the court must conclude that monetary damages

27  sought by the plaintiff class predominate over the desired injunctive and declaratory relief.…[T]he

28  court, at the class certification stage — even when well briefed — is in a difficult position to

gauge"], see also, *Davis v. Astrue* (N.D. Cal. 2012) 874 F. Supp. 2d 856, 868. ["injunctive relief generally should be limited to apply only to named plaintiffs"].)  Plaintiffs herein should not have to suspend the litigation of their individual claims while the lengthy and burdensome process necessary to conduct class-related discovery and to decide class-related issues plays out in the MDL action.  (See, e.g., *Munoz v. Giumarra Vineyards Corp.* (E.D. Cal. June 20, 2017) 2017 U.S. Dist. LEXIS 95910, at *26-27 [noting that the "case has been pending in one form or another for 12 years which is a long time for any class member to wait."] [quotation marks omitted], see also, *In re Anthem Inc. Data Breach Litig.* (N.D. Cal. Feb. 2, 2018) No. 15-md-02617-LHK [privacy and data breach class action that proceeded in federal court and witnessed 331 attorneys/staff from 53 law firms billing 78,892.5 hours of legal work].)

Allowing this action to proceed would void any such concerns given the complete absence of class issues in the *Ballejos* case.  Plaintiffs' counsel will be able to focus, without distraction, upon seeking the most suitable injunctive relief for Plaintiffs and other California residents. Moreover, state court proceedings can provide efficient and dramatic relief without negatively impacting purportedly 'related' federal cases.[4]

*Second*, as part of any resolution or settlement negotiations, the federal proceedings will focus heavily on the **monetary** relief that can be achieved.  (See *Pecover*, *supra* ["conclud[ing] that monetary damages sought by the plaintiff class predominate over the desired injunctive and declaratory relief"].)   This is especially the case given the history between the federal judge and one of the two lead counsels in the Facebook MDL proceedings.  Specifically, the Facebook lead counsel in the MDL has recently appeared as lead class counsel in front of the Honorable Judge Vince Chhabria in another prominent class action: the Wells Fargo fake account scandal that rocked

---

[4] For a recent example of a state court proceeding, moving in conjunction with a federal MDL, see *Johnson v. Monsanto Co.* (2018), S.F. Super. Ct., Case No. CGC-16-550128.  The *Johnson* state court case produced a landmark $289 million dollar verdict while the federal MDL proceeded without issue.  To ensure minimal issues, federal courts frequently appoint "liaison counsel" for the purpose of "[c]oordinating between the MDL and the various state court actions currently pending or later filed." (See Ex. G [*Monsanto/RoundUp* PTO No. 4: Plaintiffs' Leadership Structure], at p. 3.) The federal judge in the Facebook MDL will likewise be aware of this possibility given that the same judge is overseeing the *Monsanto/RoundUp* MDL. (*Id.* at 4.)

A&P | AUDET & PARTNERS LLP

the financial institution in 2016/2017. (See *Jabbari, et al. v. Wells Fargo & Company, et al.* (N.D. Cal.) No. 15-cv-02159-VC.)   Striking similarities exist between the Wells Fargo case and the Facebook case beyond just the judge and lead counsel.  Both lawsuits had a defendant with a long track record of abuse;[5] both defendants had additional appalling conduct exposed as litigation unfolded;[6] and both sought to resolve the dispute on behalf of a nationwide class of consumers. (See Mot. to Stay at p. 1:21 ["the class definitions of the federal actions, which assert putative *nationwide* classes of Facebook users"]).  These similarities reveal that a settlement, if any, in the Facebook federal MDL will focus unilaterally on monetary damages in lieu of other relief.[7]

To be clear, counsel in the Wells Fargo action was not wrong to prioritize monetary relief for the class.  This is a clearly acceptable approach to take given the financial relief that can be afforded to class members *in a class action setting*.  However, this approach is neither sought nor necessary in the *Ballejos* case because Plaintiffs are seeking injunctive relief only.  Given the belief held by lead counsel that a larger settlement fund should be made at the expense of other relief, Plaintiffs herein have a valid concern that injunctive relief will not receive adequate attention in the MDL proceeding.  Injunctive relief focused on protecting California privacy interests will certainly be even harder to achieve as California is one of only ten states with privacy protections enshrined in its constitution. (Compare, Ex. J [Excerpt of Wells Fargo hearing transcript] at p. 83-84 [noting

---

[5] See Ex. H [The Week article: *Wells Fargo's disgraceful discrimination scandal: A guide*].

[6] Wells Fargo's fake account scandal, like Facebook's privacy breach, was not a singular, isolated incident.  Rather, it was just one link in a long chain of "countless consumer abuses." (See Ex. I [CNN Money article: Wells Fargo's 20-month nightmare].)

[7] Lead counsel in the Facebook MDL has previously stated at a Wells Fargo preliminary approval hearing:

> I think for us as class counsel, we have, you know, to use a tired old metaphor, we have a bird in the hand, it's $142 million, it's based on claims that have been certified before in other cases, it's based on a careful evaluation and balancing of risks, and then you have these identity theft statutes where there's never been a successful class action, as far as we can tell, the claims are very difficult, they have a fraud component. It's just a completely different analysis for a claim like that. So I think it would be, your Honor, for probably lack of any better description, highly imprudent for us as class counsel to turn down what this settlement provides on this gamble that you can take these really -- in cases that are meant for individual identity theft claims

(See Ex. J [Excerpt of Wells Fargo hearing transcript] at pp. 85-86 [underline added].)

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO STAY      No. 18-CIV-03607

the difficulty in providing *nationwide* relief when "it's not 50 states that have these statutes, it's 20, and of that 20, they don't all have statutory penalties, it's 10."]) Simply put, injunctive relief focused on privacy protections will not be accorded the attention it needs.

Given Facebook's business model and immense financial interests in thwarting any sort of long-term injunctive relief safeguarding consumer privacy (see *supra* at p. 3 fn. 2-3 [Facebook losing nearly 20% of stock value in nearly one day due in part to privacy issues]), injunctive relief will simply not be crucial to the federal class action proceedings. Allowing the case to proceed here will avoid the dangers associated with rendering the injunctive relief into a bargaining chip to be traded away for a financial recovery.

*Third*, and finally, because of the federal jurisprudence on class actions, a great deal of uncertainty exists in whether nationwide class actions are susceptible to class treatment. (See Mot. to Stay at p. 1:21 ["the class definitions of the federal actions, which assert putative *nationwide* classes of Facebook users"]). The importance and critical nature of this analysis has been recently reinforced by the Ninth Circuit in its decision in *In re Hyundai & Kia Fuel Economy Litig.* (9th Cir. Jan. 23, 2018) 881 F.3d 679. In *Hyundai*, the Ninth Circuit vacated a district court's order granting certification of a settlement class that would have entitled class members to approximately $210 million dollars. (*Ibid*.) The decision was principally based upon the district court's abuse of discretion in its failure to "conduct a rigorous analysis" to see whether state law variations undermined the predominance requirement at the settlement stage. (*Id*. at 690.)[8] Given that the Facebook MDL proceedings are moving forward as a *nationwide* case, the disparate state consumer protection and privacy laws will almost certainly present challenges towards any eventual resolution of the claims. This problem is a common hurdle across the various federal Circuits and potentially forecasts the disposition of any subsequent *en banc* decision by the Ninth Circuit.[9] Once

[8] On July 27, 2018, the Ninth Circuit granted plaintiffs' petition for *en banc* review of the *In re Hyundai* decision. No *en banc* decision has been rendered at the time of Plaintiffs' filing of its Opposition to the Motion to Stay.

[9] See, e.g., *In re LifeUSA Holding Inc.* (3d Cir. 2001) 242 F.3d 136, 147 [district court must analyze choice-of-law issues prior to class certification], *Gariety v. Grant Thornton, LLP* (4th Cir. 2004) 368 F.3d 356, 370 [same], *Castano v. Am. Tobacco Co.* (5th Cir. 1996) 84 F.3d 734, 740-41 [same], *In re Am. Med. Sys.* (6th Cir. 1996) 75 F.3d 1069, 1085 [same], *Szabo v. Bridgeport Machs., Inc.* (7th Cir.

– 9 –

A&P AUDET & PARTNERS LLP

again, allowing the *Ballejos* state action to proceed will immediately eviscerate any of these obstacles towards obtaining suitable injunctive relief.

## II.    Many of Facebook's Underlying Assertions are No Longer True or Incorrect

As discussed above (see *supra* at pp. 4-5), Facebook mischaracterized the *Ballejos* Plaintiffs as asserting "identical" claims to those in the federal proceedings. (See Mot. to Stay at p. 2.) Beyond this misleading statement, many of Facebook's other arguments are also premised upon false assertions of fact.  For example, Facebook's claim that "the bankruptcy filing has stayed all…claims" against Cambridge Analytica can no longer be true. (See, Mot. to Stay at p. 4:19-22, compare with, Ex. K [Facebook MDL Lead Counsel Letter to Court] ["Plaintiffs sought [and successfully achieved] limited relief from the automatic stay"].)  In fact, these same bankruptcy proceedings will now only further bog down the federal MDL process—a procedural obstacle absent in the present case because Cambridge Analytica is *not* a named defendant in *Ballejos*.

Another incorrect statement relates to Facebook claiming that the *Ballejos* Complaint contains "nearly identical factual allegations…copied from the same two news reports—articles in *The New York Times* and *The Guardian* published on March 17, 2018." (*Id.* at 4:7-9.)  First, the *Ballejos* complaint is not premised on "copying" two news articles.  The Complaint focuses on the many unscrupulous practices in which Facebook has engaged in the years leading up to the filing of this action.  The Complaint also alleges developments that post-date the March 17, 2018 news reports, such as: (i) Facebook agreeing to data sharing arrangements with over 50 separate electronic device manufacturers (*Ballejos* Compl. ¶¶ 5, 37); (ii) Facebook exposing user data to companies with links to foreign intelligence agencies which represent a clear risk of harm given that the House Intelligence Committee has stated one of these companies "cannot be trusted to be free of foreign state influence" (*Id.* at ¶ 38); or (iii) Facebook CEO Mark Zuckerberg's testimony to Congress and apparent lies that were made (*Id.* at ¶ 58.)  Facebook's attempt to cherry-pick facts,

A&P AUDET & PARTNERS LLP

2001) 249 F.3d 672, 674 [same], *In re St. Jude Med., Inc.* (8th Cir. 2005) 425 F.3d 1116, 1121 [same]; *Andrews v. Am. Tel. & Tel. Co.* (11th Cir. 1996) 95 F.3d 1014, 1024 [same], see also, *Walsh v. Ford Motor Co.* (D.C. Cir. 1986) 807 F.2d 1000, 1016–17.

1   (see *supra* at pp. 4-5), and ignore salient new developments further highlights the absurdity of their

2   claim that this is a "copy-cat action." (Mot. to Stay at p. 10.)

3   **III.    Analysis of the Relevant Legal Factors Plainly Demonstrate That a Stay is**
4            **Unwarranted**

5            Analysis of the factors identified in *Caiafa Prof. Law Corp. v. State Farm Fire & Cas. Co.*

6   (1993) 15 Cal.App.4th 800, also demonstrates that a stay is unwarranted in this action.  "It is black

7   letter law that…[the state] court has the discretion *but not* the obligation to stay the state court

8   action." (*Caiafa*, 15 Cal.App.4th at 804 [emphasis added].)  "The trial court [will] not abuse its

9   discretion in denying a stay" that would have an effect of "compel[ling] plaintiff to await a

10  judgment that cannot respond to its need." (*Farmland Irrigation Co. v. Dopplmaier* (1957) 48

11  Cal.2d 208, 216.)  The rationale is understandable, given that "the trial court do[es] have a duty to

12  ensure fair treatment to California plaintiffs." (*Berg v. Mtc Electronics Techs. Co.* (1998) 61

13  Cal.App.4th 349, 356 [in the context of analyzing a motion to stay].)  In looking at the totality of

14  the factors, a stay is manifestly inappropriate given the California plaintiffs' unique relief sought

15  and the California state court's ability to adjudicate the issue.

16           **A.  The critical factor of comity is achieved by denying the stay request.**

17           Facebook repeatedly asserts that the "strong policy of comity" supports staying this action.

18  (See Mot. to Stay at pp. 6:28, 7:15-16.)  To the contrary, and as discussed above, comity can only

19  be adequately achieved by allowing the state court to adjudicate the injunctive relief sought by

20  Plaintiffs. (See *supra* at pp. 4-6.)  Article III considerations pose a realistic threat to achieving

21  injunctive relief; and because injunctive relief is the "primary" form of relief under California's

22  UCL, a state court must adjudicate this issue or risk California residents being denied such relief.

23  (*Ibid.*)  To do otherwise would amount to an "affront" to both state and federal comity. (*Davidson*,

24  *supra*, 873 F.3d at p. 1115.)

25           **B.  Any potential for "unseemly conflicts" is manufactured solely by Facebook.**

26           Multidistrict litigation, including the pendency of actions in both state and federal court, "is

27  a relatively common occurrence in the modern legal world." (*Coordinating Multi-Jurisdiction*

28

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO STAY          NO. 18-CIV-03607

1   *Litigation: A Pocket Guide for Judges* (2013) at p. 1.)[10]   State courts will frequently coordinate or

2   interact with their federal counterparts to minimize problems or to clarify procedural issues. (See,

3   e.g., *In re Lipitor* (C.D. Cal. May 10, 2018) 2018 U.S. Dist. LEXIS 80284, at *156 ["[State court]

4   Judge Carolyn Kuhl…noted that it was appropriate to explain the coordination procedures of her

5   court to aid federal courts seek[ing] to understand California state court coordination procedures"

6   and further noting that "[c]oordination is a very flexible structure for case management."]

7   [quotation marks omitted].)   The Ninth Circuit recently confirmed the same mindset that effective

8   coordination effectively moots concerns over unseemly conflicts or inconsistent rulings. (*Briggs v.*

9   *Merck Sharp & Dohme* (9th Cir. 2015) 796 F.3d 1038, 1045 ["the fact that this Court has been in

10   coordination with the Los Angeles state court, the risk of inconsistent rulings is unpersuasive at this

11   point."].)   Given the early stages of this litigation where an operative and consolidated complaint

12   has *not* even been filed in the MDL, risks of conflicting rulings are simply overblown. (See Ex. F

13   [noting the lack of details on the forthcoming consolidated complaint in the federal MDL and what

14   causes of action might be included.])

15   From day one, Plaintiffs have expressed willingness to work with Facebook to effectuate

16   coordination and to avoid any potential conflicts that might arise. (See Ex. M [July 27, 2018

17   Plaintiffs' Letter to Facebook].)   To date, these efforts have been rewarded with questionable

18   responses from Facebook—*i.e.*, asking Plaintiffs to meet and confer about a motion to stay, but then

19   filing said motion without warning 2 days later; or, asking Plaintiffs for certain procedural relief on

20   Friday at 7:36 p.m., then quickly indicating Facebook was moving *ex parte* for the same relief on

21   Monday at 7:56 a.m. (See Ex. N [July 30, 2018 Plaintiffs' Letter to Facebook].)   While Facebook

22   may be indifferent to the idea of informal resolution of issues and to avoid burdening the court

23   (*Townsend v. Superior Court* (1998) 61 Cal.App.4th 1431, 1439 ["the law requires that counsel

24   attempt to talk the matter over, compare their views, consult, and deliberate."]), Plaintiffs

25   nevertheless remain committed to coordinating these cases to avoid unnecessary burdens from

26   arising.

27

28   [10] See Ex. L [Excerpt of Federal Judicial Center's *Coordinating Multi-Jurisdiction Litigation: A Pocket Guide for Judges*].

AUDET & PARTNERS LLP
A&P

**C.  The federal action cannot sufficiently address the issues raised nor determine the relief sought by Plaintiffs here.**

The additional procedural hurdles associated with the federal MDL process and its inability to adequately supply the relief sought by Plaintiffs have been previously discussed above. (See *supra* pp. 6-9.)  This, by itself, is sufficient reason to deny the stay. (*Farmland*, *supra*, 48 Cal.2d at 216 [trial court properly denied the stay when it would have the effect of "compel[ling] plaintiff to await a judgment that cannot respond to its need."])  Moreover, given the unknown contours of any potential settlement, Facebook's promise of the federal MDL providing "declaratory and injunctive relief that *fully* encompasses the more specific topics that Plaintiffs list in their Complaint"—is a worthless assurance. (See Mot. to Stay at p. 9:3-4 [emphasis added].)  While the federal actions can certainly determine the rights of many issues, it cannot adequately adjudicate the issues raised in the *Ballejos* Complaint and determine the unique relief sought herein.

**D.  Judicial economy will not be materially impacted by denying the stay.**

Facebook asserts that judicial economy will be gravely impacted by this action but completely ignores how that concern is largely offset by Plaintiffs' willingness to coordinate with the MDL proceedings. (See *supra* at p. 11.)  This Court is more than capable of working with its federal counterpart to determine how this case should proceed and what form of injunctive relief is appropriate here.  As explained by the Supreme Court, any preservation of judicial economy is minimal at best where litigation still proceeds. (*United States v. Stauffer Chemical Co.* (1984) 464 U.S. 165, 178 [104 S.Ct. 575, 582, 78 L.Ed.2d 388, 398] ["Judicial economy is not served for the simple reason that no litigation is prevented; the prior litigant is subject to one black-letter rule rather than another."])  Furthermore, having this unique California issue addressed by the federal MDL process poses real risks that it might be bounced back to a state court—judicial economy will instead be harmed because it was *not* efficiently addressed here in the first instance. (See, e.g., *Perry v. MSPB* (2017) 137 S.Ct. 1975, 1991 [198 L.Ed.2d 527, 546] [questioning the frequent reliance on judicial economy because "isn't it more than a little strange that [a plaintiff] should be sent to district court only to be bounced back to the Federal Circuit—with each trip undertaken in the name of "judicial economy"?"].)  Delay for the sake of delay should not be encouraged.  In

– 13 –

1   pursuit of judicial economy, this Court must not forsake the merits of a case which centers on issues

2   of great import (safeguarding constitutional and significant privacy interests).  The unique legal

3   issues posed by the *Ballejos* Plaintiffs require a California court to address the issue.

### CONCLUSION

5        Facebook maintains an ongoing, pervasive and profit-driven threat to the privacy of

6   Plaintiffs' and other California residents.  Given the importance of the personal information at risk,

7   an injunction affords all those in harm's way with the urgent relief that is needed here.  Denial of

8   the Motion to Stay will allow a California court to adjudicate a California statute and California

9   principles of law without the burden of the MDL process attached.  Unshackled from the monetary

10  bargaining that will invariably be part of the federal action, injunctive relief under the UCL and

11  FAL can be accorded its due deference.  For all the foregoing reasons, this Court should deny

12  Defendant's Motion to Stay the Proceedings.

14  Dated:  August 27, 2018                          Respectfully submitted,

                                                     AUDET & PARTNERS, LLP

                                                     By: _____
                                                         Ling Y. Kuang
                                                         Gwendolyn R. Giblin
                                                         William M. Audet

                                                     *Counsel for Plaintiffs Leah Ballejos,*
                                                     *Audrey Ellis, and Tameika Martin*

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO STAY          NO. 18-CIV-03607