Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC., CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843 |
| | Case No. 18-md-02843-VC |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | **CORRECTED EXHIBIT 1 TO DECLARATION OF LESLEY E. WEAVER IN SUPPORT OF JOINT DISCOVERY LETTER [ECF No. 206-2]** |
| | Judge: Hon. Vince Chhabria |

Orin Snyder (*pro hac vice*)
    osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Joshua S. Lipshutz (SBN 242557)
    jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

Kristin A. Linsley (SBN 154148)
    klinsley@gibsondunn.com
Brian M. Lutz (SBN 255976)
    blutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant Facebook, Inc. and
Mark Zuckerberg*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DEFENDANT FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES** |

Defendant Facebook, Inc. ("Defendant" or "Facebook"), by and through its attorneys, and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the Local Civil Rules of the U.S. District Court for the Northern District of California, the Court's orders in this action, and the parties' agreements and conferences among counsel, provides the following responses and objections to Plaintiffs' First Set of Interrogatories (the "Interrogatories").

## PRELIMINARY STATEMENT

1.        Facebook's responses to the Interrogatories are made to the best of Facebook's current knowledge, information, and belief.  Facebook reserves the right to supplement or amend any responses should future investigation indicate that such supplementation or amendment is necessary or appropriate.

2.        Facebook's responses to the Interrogatories are made solely for the purpose of and in relation to this action.  Each response is given subject to all appropriate objections (including, but not limited to, objections concerning privilege, competency, relevancy, materiality, propriety, and admissibility).  All objections are reserved and may be interposed at any time.

3.        Facebook's responses are premised on its understanding that Plaintiffs seek only that information that is within Facebook's possession, custody, and control.

4.        Facebook incorporates by reference each and every general objection set forth below into each and every specific response.  From time to time, a specific response may repeat a general objection for emphasis or some other reason.  The failure to include any general objection in any specific response shall not be interpreted as a waiver of any general objection to that response.

5.        Nothing contained in these Responses and Objections or provided in response to the Interrogatories consists of, or should be construed as, an admission relating to the accuracy, relevance, existence, or nonexistence of any alleged facts or information referenced in any Interrogatory.

# GENERAL OBJECTIONS

1.      Facebook objects to each Interrogatory to the extent that it seeks information beyond the limited discovery permitted under Pretrial Order No. 11, entered on August 27, 2018, as Dkt. 130 in this Action ("PTO-11").

2.      Facebook objects to each Interrogatory, including the Definitions and Instructions, to the extent that it purports to impose obligations beyond those imposed by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Civil Rules of the U.S. District Court for the Northern District of California, and any agreements between the parties.

3.      Facebook objects to each Interrogatory to the extent that it is not limited to the relevant time period, thus making the Interrogatory overly broad, unduly burdensome, and not relevant to the claims or defenses in this action.  Unless otherwise specified in its responses, Facebook's responses will be limited to information generated during the period—November 1, 2009 to present.

4.      Facebook objects to each Interrogatory to the extent that it seeks information unrelated and irrelevant to the claims or defenses in this litigation and not reasonably calculated to lead to the discovery of admissible evidence.

5.      Facebook objects to each Interrogatory as overly broad and unduly burdensome, particularly in view of Facebook's disproportionate cost necessary to investigate to meet the September 7, 2018 production deadline requested by Plaintiffs and as weighed against Plaintiffs' need for the information.  For example, many of the Interrogatories seek broad and vaguely defined categories of information that are not reasonably tailored to the subject matter of this action.

6.      Facebook objects to each Interrogatory to the extent that it purports to request the identification and disclosure of information or documents that were prepared in anticipation of litigation, constitute attorney work product, reveal privileged attorney-client communications, or are otherwise protected from disclosure under any applicable privileges, laws, or rules.

Facebook hereby asserts all such applicable privileges and protections, and has made every effort to exclude privileged and protected information from its responses to each Interrogatory. *See generally* Fed. R. Evid. 502; Cal. Code Evid. § 954. Inadvertent production of any information or documents that are privileged or otherwise immune from discovery shall not constitute a waiver of any privilege or of any other ground for objecting to the discovery with respect to such information or documents or the subject matter thereof, or the right of Facebook to object to the use of any such information or documents or the subject matter thereof during these or any other proceedings. In the event of inadvertent disclosure of any information or inadvertent production or identification of documents or communications that are privileged or otherwise immune from discovery, Plaintiffs and their counsel are instructed to return the information and documents to Facebook and shall be precluded from disclosing or relying upon such information or documents in any way.

7. Facebook objects to each and every Interrogatory to the extent that the information sought is more appropriately pursued through another means of discovery, or Plaintiffs have already had opportunity to obtain the information.

8. Facebook objects to each and every Interrogatory, Definition, and Instruction to the extent that it seeks information outside of Facebook's possession, custody, and control.

9. Facebook objects to each Interrogatory to the extent that it requests information protected by the right of privacy of Facebook and/or third parties, or information that is confidential, proprietary, or competitively sensitive.

10. Facebook objects to each Interrogatory to the extent that it seeks information already in Plaintiffs' possession or available in the public domain. Such information is equally available to Plaintiffs.

## OBJECTIONS TO DEFINITIONS

1. Facebook objects to Plaintiffs' definition and use of the terms "You," "Your," or "Facebook" as vague, ambiguous, overly broad, and unduly burdensome to the extent the terms are meant to include "directors, officers, employees, partners, members, representatives, agents

(including attorneys, accountants, consultants, investment advisors or bankers), and any other Person purporting to act on [Facebook, Inc.'s] behalf. . . . parents, subsidiaries, affiliates, predecessor entities, successor entities, divisions, departments, groups, acquired entities and/or related entities or any other entity acting or purporting to act on its behalf" over which Facebook exercises no control, and to the extent that Plaintiffs purport to use these terms to impose obligations that go beyond the requirements of the Federal and Local Rules.

## OBJECTIONS TO INSTRUCTIONS

1.     Facebook objects to Plaintiffs' "Instructions" to the extent that they impose obligations that go beyond the requirements of the Federal and Local Rules, or of PTO-11.

## SPECIFIC RESPONSES AND OBJECTIONS

### INTERROGATORY NO. 1:

Identify and describe the relationship between Facebook and Aleksandr Kogan and his app, thisisyourdigitallife.

### RESPONSE TO INTERROGATORY NO. 1:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook further objects to this Interrogatory on the following additional grounds:

(A)     Facebook objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Interrogatory to exclude information protected by these privileges and protections, and is not voluntarily providing any information that is so protected.

(B)     The Interrogatory seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

On November 2, 2013, Dr. Aleksandr Borisovich Kogan ("Dr. Kogan"), a Cambridge University psychology professor and researcher, created an application for the Facebook Platform that purported to assist his research into personality traits based on information from users' Facebook profiles. This app was originally named "CPWLab"—a reference to Dr. Kogan's Prosociality and Well-Being Lab at Cambridge—but was later renamed "GSRApp" (on June 11, 2014), and then "thisisyourdigitallife" (on July 18, 2014) (generally referred to as "the App").

At that time, Facebook's platform, Graph API V1, allowed app developers, like Dr. Kogan, to request consent from individual users to access information from the installing user—such as name, gender, birthdate, location (i.e., current city or hometown), photos and Page likes—and also (depending on, and in accordance with, each friend's own privacy settings) the same or similar categories of information about that user's friends. Permitting users to move their data and the data made available to them by their friends had the benefit of expanding opportunities for users to take their Facebook data to other developers who could create a broad range of social and useful experiences with the users' data, not available on Facebook directly. For example, a Facebook user might want to use a music app that allowed the user to (1) see what his or her friends were listening to and (2) give the app permission to access the user's friend list and thereby know which of the user's friends were also using the app. Such access to information about an app user's friends required not only the consent of the app user, but also required that the friends whose data would be accessed have their own privacy settings set to permit such access by third-party apps. In other words, Dr. Kogan's App could have accessed a user's friends' information only for friends whose privacy settings permitted such sharing.

In early 2014, Facebook introduced changes to provide users more choice and control over what information apps received, to reduce the amount of data that could be shared with third-party apps, and to establish a new review and approval process for any new third-party apps that sought to request anything more than basic information about the installing user. These changes accompanied a new version of the platform API, Graph API V2, which incorporated

several key new elements.  The changes included:  (1) institution of a review and approval process, called App Review (also called Login Review), for any app seeking to operate on the new platform that would request access to data beyond the user's own public profile, email address, and a list of friends of the user who had installed and authorized the same app; (2) generally limiting the data that apps on the new platform could access about friends of the installing user; and (3) providing users with even more granular controls over their permissions as to what categories of their data an app operating on the new platform could access.

On May 6, 2014, a week after Facebook announced its planned transition to the Graph API V2 platform, Dr. Kogan applied to Facebook's App Review to ask that his App be permitted to access more data than the limited, basic data that Apps operating on the Graph API V2 platform could obtain without Facebook approval.  Upon Dr. Kogan's App's transition to the Graph API V2 platform, the App otherwise could not have obtained user data beyond public profile information, email address, and a list of friends who used the App, without clearing Facebook's new App Review process.  Dr. Kogan's App Review application sought extended permissions for the App to access the following information about users of the App:  fields from a user's profile including "about me," birthday, hometown, current city, education history, religion/political viewpoints, relationship status, likes/interests, photos, events, fitness activity, reading activity, music listening activity, news reading activity, and places checked into, as well as the user's News Feed, Messenger threads, and posts on Timeline.

In connection with his App Review application, Dr. Kogan represented to Facebook that the App would be used only for research purposes and "never" for commercial purposes. Specifically, he stated:  "This app is part of a research program in the Department of Psychology at the University of Cambridge.  We are using this app for research purposes—learning about how people's Facebook behaviour can be used to better understand their psychological traits, well-being, health, etc and overcome classic problems in social science.  Users of the app will be presented with a description of the types of data we gather and the scientific purpose of the data.

Users will be informed that the data will be carefully protected and never used for commercial purposes."

Facebook rejected Dr. Kogan's application the next day, stating that the App would not be using the data requested to enhance the user's in-app experience. Facebook's denial of Dr. Kogan's request for extended permissions to access user data meant that, as of May 2015, the App could no longer obtain data other than the user's public profile data, email address, and list of friends who also installed the App.

On December 11, 2015, The Guardian published an article reporting that Cambridge Analytica had used "psychographic profiles" derived from tens of millions of Facebook users' information to support Senator Ted Cruz's presidential campaign. Facebook contacted Dr. Kogan and his company, Global Science Research Ltd. ("GSR"), the same day The Guardian article was released and demanded that they explain what data they had collected, how they had used it, and to whom they had disclosed it. Upon learning that the data collected by the App may have been used for a commercial purpose, in violation of Facebook's Platform Policy, Facebook took immediate steps to terminate the App's access rights to the Facebook login service on December 17, 2015. Dr. Kogan executed signed certifications on behalf of himself and GSR on June 11, 2016, which were provided to Facebook's outside counsel on June 14, 2016. These certifications assured irretrievable deletion of any user or user-derived data.

In March 2018, Facebook received pre-publication inquiries from the media suggesting that the certifications it received may not have been accurate. Since then, Facebook actively investigated the issue, including requesting an on-site audit of Dr. Kogan. Facebook's audit of Cambridge Analytica and Dr. Kogan has been paused at the request of the UK Information Commissioner's Office request, which is conducting a regulatory investigation into Cambridge Analytica (based in the UK).

Separate and apart from the relationship described above, Facebook was put in touch with Dr. Kogan (then a researcher at the University of Cambridge) in late 2012, about a possible collaboration on research relating to the potential relationship between Facebook friendship ties

and economic trade volumes between countries.  Dr. Kogan collaborated with current and former Facebook employees on approximately ten academic papers.  As part of these collaborations, Dr. Kogan could only to fully anonymized, aggregated data from Facebook.  Facebook frequently partners with academic researchers to address topics pertaining to wellbeing, innovation, and other topics of public importance, following strict protocols to ensure personal information is safeguarded.  In October 2015, Facebook retained Dr. Kogan on a short-term contract to consult on a research project related to predicting survey outcomes.

## INTERROGATORY NO. 2:

Identify and describe by type and volume all user data that Aleksandr Kogan or his app, thisisyourdigitallife obtained (with or without Facebook's permission) as a result of the relationship between Facebook and either Aleksandr Kogan or his app, thisisyourdigitallife, indicating whether a log or record of such user data exists.

## RESPONSE TO INTERROGATORY NO. 2:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook further objects to this Interrogatory on the following additional grounds:

(A)     Facebook objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Interrogatory as though it excludes information protected by these privileges and protections.

(B)     Facebook objects to the Interrogatory's request that Facebook identify and describe all user data actually "*obtained*" by Aleksandr Kogan or his app, thisisyourdigitallife. (emphasis added).  This request exceeds the scope of discovery permitted by PTO-11, which requires Facebook to produce "documents and information relating to the type and amount of user data Kogan or thisisyourdigitallife *would have been able to obtain* (with or without Facebook's permission) as a result of this relationship."  (Emphasis added).  Facebook will

construe this Interrogatory to seek only information concerning Facebook user data that Kogan or his app, thisisyourdigitallife could have obtained.

(C)    Facebook objects to the Interrogatory to the extent that it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(D)    Facebook objects to the Interrogatory's request that Facebook "indicat[e] whether a log or record of such user data exists." This request exceeds the scope of discovery of permitted by PTO-11 because the Interrogatory calls for discovery regarding the existence or non-existence of a document or documents, which does not itself "relat[e] to the type and amount of user data Kogan or thisisyourdigitallife would have been able to obtain as a result of the relationship between Facebook."

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

From November 2, 2013 until May 2, 2015, when the App was forced to migrate to the Graph API V2 Platform, it had permissions to collect the following categories of data, depending on the privacy settings of the installing user and his/her friends:

- **Installing User**: Public profile data, including name and gender; birthdate; "Current City," if specified in the "about" sections of the user's profile; friend list; and Pages the user had liked. In addition, likely during the initial "CPWLab" phase of the App, Facebook's current records indicate that approximately 1,300 users granted the App permission to collect their Facebook messages (through Facebook Messenger). Five users granted the App permission to collect the user's photos; these users appear to have been researchers affiliated with Dr. Kogan's lab and/or Cambridge University.

- **Friends of Installing User**: Public profile data, including name and gender; birthdate; "Current City," if specified in the "about" sections of the friend's profile; and Pages the friend had liked. For approximately 1200 users, it appears that the App also requested consent to access the hometowns that the users' friends had specified in the "about"

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

section of their profiles. During the initial phase, it appears that the App also requested and was granted permission by the five aforementioned researchers to obtain photos of their friends; Facebook is unable to determine (1) how many friends those five consenting researchers had at the relevant time or (2) whether the privacy settings of those friends authorized at the relevant time sharing of their photos with both their friends and apps used by their friends.

After May 2, 2015, after the App was forced to migrate to Graph API V2, the App could no longer access any Facebook user data other than the installing user's public profile information, email address, and list of friends who also had installed the App.

The App never had access to any data about the installing user that the installing user did not consent to share with the App, nor did the App ever have access to any data about friends of the installing user that was not (1) made available by those friends to the installing user, (2) shared with the App in accordance with those friends' own privacy settings regarding such sharing with third-party apps, and (3) authorized by the installing user in the same manner as regularly practiced by other digital platforms including Apple's iOS and Google's Android operating systems and related app platforms.

The information that Dr. Kogan was able to access did not include social security numbers, passwords, banking information, drivers' license information, home addresses, home or cell phone numbers, or financial or medical information. Facebook does not collect users' social security numbers or driver license numbers. Users can choose to add a credit or debit card number to their Facebook profile to facilitate certain activities (e.g., buying goods or services from a business' Page, purchasing games on Facebook), but, to be clear, the App did not have permission to access such information about either installers or friends of installers. The security and privacy of users' payment information is a top priority for Facebook. The steps taken by Facebook to secure this information is detailed at https://www.facebook.com/payer_protection/.

During the App's approximately two-year span of operation on the Facebook Platform (from November 2013 through December 2015), approximately 300,000 Facebook users

worldwide installed the App.  Facebook believes that Dr. Kogan and GSR may have obtained access to Facebook information of up to approximately 87 million users.  This is Facebook's best estimate of the number of users who installed the App, plus the number of additional users who theoretically could have had their data shared with the App due to installations of the App by their friends.

Facebook does not know exactly how many users had their data shared with the App. Using as expansive a methodology as reasonably possible, the figure that Facebook provided above constitutes its best estimate of the number of unique accounts that directly installed the App as well as the number of users whose data theoretically may have been shared with the App by the installers.  To this point, however, it is important to note several caveats that apply to this figure:

- First, this figure does not include users who installed the App but have since deleted their Facebook account (since Facebook no longer has that information).

- Second, Facebook's counts of potentially affected friends of installers of the App are likely substantially higher than the "true" number of affected friends, because (a) the counts include any friend of any installer of the App during any time between when the App first became active on the Platform in November 2013 and when the App's access to friends' data was limited in May 2015, even though the friend may not have been a friend when the App was actually installed by a relevant user; (b) the counts include any friend of any installer even if they changed their privacy settings during the relevant period to disallow sharing with apps installed by their friends (due to limited historical information about when or how users updated their settings), such that some of their data may not have been shared with the App; and (c) Facebook's counts include anyone who installed the App during its existence on Facebook's Platform, even if they installed the App at a time when its access to user data, including data from friends of installers, was more limited (due to limited historical information about when individual users installed the App).

The numbers Facebook is providing reflect Facebook's best current understanding.

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

Separate and apart from any Facebook data that Dr. Kogan accessed and collected through the App, Facebook provided Dr. Kogan with two datasets in 2013 as part of the research collaboration described above in response to Interrogatory No. 1, both of which datasets were anonymized and aggregated.  Facebook is not aware of any allegations or evidence that those anonymized and aggregated datasets were used or shared for any non-academic purpose.

**INTERROGATORY NO. 3:**

For each category of data identified in Interrogatory No. 2 above, state when and how the user data was obtained, when Facebook first became aware that Aleksandr Kogan obtained it, and whether such data is still in the possession of Aleksandr Kogan.

**RESPONSE TO INTERROGATORY NO. 3:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook further objects to this Interrogatory on the following additional grounds:

(A)     Facebook objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Interrogatory as though it excludes documents protected by these privileges and protections.

(B)     Facebook objects to the Interrogatory's request that Facebook identify and describe all user data actually "***obtained***" by Aleksandr Kogan or his app, thisisyourdigitallife. (emphasis added).  This request exceeds the scope of discovery permitted by PTO-11, which requires Facebook to produce "documents and information relating to the type and amount of user data Kogan or thisisyourdigitallife ***would have been able to obtain*** (with or without Facebook's permission) as a result of this relationship."  (Emphasis added).  Facebook will construe this Interrogatory to seek only information concerning Facebook user data that Kogan or his app, thisisyourdigitallife could have obtained.

(C)     Facebook objects to the Interrogatory to the extent that it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook directs Plaintiffs to Facebook's responses to Interrogatories Nos. 1 and 2.

**INTERROGATORY NO. 4:**

Identify and describe by date and substance any restrictions Facebook imposed on Aleksandr Kogan or his app, thisisyourdigitallife regarding the use or dissemination of user data.

**RESPONSE TO INTERROGATORY NO. 4:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Interrogatory on the following additional grounds:

(A)     Facebook objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Interrogatory as though it excludes documents protected by these privileges and protections.

(B)     The Interrogatory seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook directs Plaintiffs to Facebook's Responses to Plaintiffs' Requests for Production No. 5, and responds as follows:

Facebook limited the use and sharing of data that third-party consumer apps, including the thisisyourdigitallifeapp, could access or collect through Graph API V1 in a number of ways, including primarily by (1) implementing technical restrictions and providing users with tools to control what information they shared and with whom, and (2) establishing and enforcing policies and agreements with third-party app developers that restricted their rights to the data that Facebook users shared with them.

<u>1. Technical Restrictions and Controls</u>

Facebook implemented technical restrictions and offered users tools to control whether and to what extent their data could be shared with third-party apps through Graph API V1. These tools fell into four categories.

First, the app had to obtain express permission from the app user to access any user-provided data beyond certain limited, publicly available information. In 2010, with the introduction of the Granular Data Permissions ("GDP") model, Facebook required third-party app developers expressly to disclose the categories of user information they wished to collect and ask the app user to share that information. Apps could not access an app user's non-public information unless and until the app user gave the necessary permission. Facebook implemented GDP in part to respond to feedback from users seeking more visibility into the function and purpose of an app before granting the app permission to access data. In April 2014, in conjunction with the move to Graph API V2, Facebook refined the GDP model by giving app users the ability to authorize or refuse to authorize particular categories of requested data before authorizing the installation of an app. Accordingly, app users today have even more precise controls over the information they share with third-party apps.

Second, Facebook offered users a tool to restrict how their information was re-shared with apps by their friends. This tool, which became known as the "Apps Others Use" setting, was available to all users through their App Settings page. The tool allowed an app user's friends to control whether the app user could re-share their data with third-party apps authorized by the app user.

Third, Facebook offered users the option to opt out of sharing all information through Platform. This Platform opt-out option gave users the ability to choose that their information is not shared with third-party apps and websites that integrate with Facebook to provide consumer experiences. This option remains available today.

Fourth, Facebook permitted users to block individual apps. Once a user blocked an app, the app could not see that the user exists or access the user's information, and the user could not see any content posted by the app.

Facebook's 2014 Platform changes (including the migration to Graph API V2) improved on these robust protections that had been available under Graph API V1. These voluntary enhancements under Graph API V2 included significant limitations on third-party apps' ability to request access to data about a user and the user's friends. For example, with Graph API V2, apps could no longer request that users re-share non-Public information that their friends had shared with them. (Of course, if those friends also used the app, the friends may have separately shared their information with the app.) Facebook also launched App Review, a mandatory review of all third-party apps using Graph API V2 that seek access to more than basic data (i.e., public profile, email, and friend list) about the user. Since April 2014, Facebook has required each app using Graph API V2 that wishes to request users' permission to access data beyond that basic data to undergo App Review. Developers must not only describe their need for permissions, but also submit videos or screenshots illustrating the data's functionality from the user's perspective. After reviewing the submissions for each requested permission, the App Review team—a subdivision of Facebook's Developer Operations team—uses test accounts to use the app as a user would in order to verify that the permissions serve their stated purpose. Once Facebook approves a request for a new permission, the app is authorized to ask users to share information encompassed by that permission. The app does not receive access to the information without user consent.

2. Policy Restrictions on Data Sharing

In addition to user controls, Facebook's policies and agreements with third-party app developers also restricted the use or sharing of data accessed or collected through Graph API V1.

An app developer is required first to register as a Facebook user. As part of that registration, the app developer is required to accept Facebook's Statement of Rights and Responsibilities (the "SRR," now called the "Terms of Service"). Specifically, when signing up

to use Facebook, a user (including an app developer) is clearly informed that by doing so, he or she agrees to Facebook's SRR and Facebook's Data Policy (which are hyper-linked directly from the sign-up screen).

An app developer then is required to register as a developer with Facebook. This step requires the developer to affirmatively accept Facebook's Platform Policy. Further, each time the developer creates a new app, he or she is asked to again agree to Facebook's Platform Policy. By agreeing to the Platform Policy and continuing to use Platform, developers agree to comply with the terms of the Policy and any future updates to it. Only by agreeing to those terms can a developer obtain an API key (which permits the app to access the Graph API).

Accordingly, third-party developers who created apps using Graph API V1 were required to consent to and comply with the SRR and Data Policy (which applied to all Facebook users) and the Platform Policy (which applied to developers using Platform). The relevant sections of the SRR and Platform Policy are discussed below.

SRR

Facebook's SRR governs all Facebook users, including developers. As of May 1, 2009, the SRR contained a section titled "Special Provisions Applicable to Developers/Operators of Applications and Websites" containing a number of provisions restricting apps' use of data, including the following:

1.    You are responsible for your application and its content and all uses you make of Platform. This includes ensuring your application or use of Platform meets our Platform Guidelines.

2.    When users add your application or connect it to their Facebook Account, they give permission for you to receive certain data relating to them. Your access to and use of that data will be limited as follows:

      1.    You will only use the data you receive for your application, and will only use it in connection with Facebook.

      2.    You will make it clear to users what data you are going to use and how you will use, display, or share that data.

      3.    You will not use, display, or share a user's data in a manner inconsistent with the user's privacy settings without the user's consent.

4.    You will delete all data you received from us relating to any user who removes or disconnects from your application unless otherwise permitted in our Platform Guidelines.

5.    You will delete all data you received from Facebook if we disable your application or ask you to do so.

6.    We can require you to update any data you have received from us.

7.    We can limit your access to data.

8.    You will not transfer the data you receive from us without our prior consent.

Facebook amended this section on August 28, 2009, by adding new language to provision (2) that expressly prohibited developers from requesting data that they did not need to operate their apps and from enabling the transfer of data received from Facebook without Facebook's consent. Facebook also added a provision requiring developers to have a privacy policy, or otherwise make clear to users what user data their apps would use and how the developers would use, display, or share that data.

On October 4, 2010, Facebook made several substantive changes to the provisions of the SRR restricting developers' use of data collected or accessed through the API, including adding prohibitions on the transfer of such data to third parties. Notably, Facebook added a new provision prohibiting developers from directly or indirectly transferring any data received from Facebook to (or using such data in connection with) any ad network, ad exchange, data broker, or other advertising-related toolset, even if a user consented to that transfer or use. Facebook also prohibited developers from selling user data. And Facebook added new language providing that Facebook could require apps to delete user data if such data was used in ways inconsistent with Facebook's policies.

These provisions remained in place until January 30, 2015. On that date, Facebook issued a new version of the SRR that removed the detailed prohibitions applicable to developers (i.e., the "Special Provisions Applicable to Developers/Operators of Applications and Websites") and migrated these requirements to a more comprehensive Platform Policy, while simultaneously requiring developers to comply with the Platform Policy.

17

Platform Policy

The Platform Policy communicates to developers Facebook's expectations and contractually-binding requirements for accessing Facebook's Platform. The Platform Policy imposes a variety of obligations on developers about the features, functionality, data collection and usage, and content for apps on Platform, as well as Facebook's right to take enforcement action if an app or developer violates the Platform Policy. The Platform Policy specifically sets out Facebook's requirements for how app developers must protect users' privacy.

The Platform Policy has evolved over the years, but it has consistently placed strict restrictions on developers' use of user data. Since at least 2012 – and at all times since – the Platform Policy has required developers to maintain and abide by a privacy policy, to delete any data not publicly available if the developer stops using Platform (absent user consent), and to obtain express consent before using data not publicly available outside the app. The Platform Policy has also specifically prohibited developers from using friends' data outside the context of the user's experience on the app. Further, it has prohibited developers from requesting data beyond what is needed for the app, transferring data to ad networks or other monetization platforms, and selling or licensing data obtained through Platform.

Facebook has continued to refine the Platform Policy since 2012. Key refinements included:

- Requiring each app to provide a "conspicuous" link to its privacy policies, failing which any data accessed by the app (including basic account information) could only be used in the context of the user's experience in that app;

- Expanding the provision prohibiting developers from selling data by prohibiting developers from purchasing or selling data that anyone had obtained from Facebook;

- Prohibiting apps from displaying, sharing, or transferring a user's data in a manner inconsistent with the app's privacy policy; and

- Specifying that Facebook could analyze any app, its content, and its data, for any purpose.

18

Facebook restructured its Platform Policy as part of its transition to Graph API V2, which entailed significant Platform changes aimed at further enhancing the protection of user data, as described above. Since July 2014, the provisions of the Platform Policy have been grouped around several organizing principles, the first three of which are "Build a quality product," "Give people control," and "Protect data." This last section restricts apps' use of Facebook data by requiring that apps protect information received from Facebook against unauthorized access or use and that apps that use friends' data to establish social connections only do so if each friend also grants the app access to that information (in other words, also installs the app). In November 2014, Facebook added a provision to the "Give people control" section specifying that developers must use Account Information from users only in accordance with the app's privacy policy and Facebook's policies. Facebook also clarified that developers cannot use data other than users' Account Information outside of the app without express user consent.

On March 25, 2015, Facebook made its final update to the Platform Policy before the transition to Graph API V2 was complete. That update added new language in the "Give people control" section that reinforced that apps must obtain consent from users before collecting and processing data about them. Facebook also added new language to the "Protect data" section requiring developers to protect the information they received from Facebook against unauthorized disclosure.

For details regarding the restrictions Facebook placed on Dr. Kogan following the transition to the Graph API V2 and following the publication of the December 11, 2015 Guardian Article please refer to Facebook's Response to Interrogatory No. 1.

**INTERROGATORY NO. 5:**

Identify and describe by date and substance any efforts Facebook made to enforce any restrictions that Facebook imposed on Aleksandr Kogan or his app, thisisyourdigitallife regarding the use or dissemination of user data.

**RESPONSE TO INTERROGATORY NO. 5:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Interrogatory on the following additional grounds:

(A)     Facebook objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Interrogatory as though it excludes documents protected by these privileges and protections.

(B)     The Interrogatory seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

Facebook requires every app on its Platform have a publicly available and easily accessible privacy policy that explains what data the app is collecting and how the developer intends to use such data. The URL for that privacy policy must be listed on each app's settings page. Facebook uses web crawlers to determine whether the privacy URLs provided by app developers link to real webpages; if they do not, an automated message is sent to the app developer warning them to provide a valid privacy policy URL. Consistent with industry practice, given the number of apps operating on the Platform at any given time (for example, between March and April 2018, there were approximately ████ apps active on Facebook), Facebook is not able to review the content of apps' terms of service or privacy policies as part of its Platform enforcement efforts or during the App Review process.

On March 3, 2014 and June 17, 2014, respectively, Dr. Kogan added the following privacy policy URLs in response to such automated messages from Facebook to the App's settings page:  https://cpwlab.psychol.cam.ac.uk/Facebook/privacypolicy.aspx and https://gsr.azurewebsites.net/Facebook_X/PrivacyPolicy.html.  Facebook does not believe it was provided an electronic version of either policy at the time, and the URLs provided by Dr. Kogan in 2014 are no longer operational.

Facebook also directs Plaintiffs' to its Responses to Interrogatories No. 1 and No. 4.


DATE:  September 7, 2018                    Respectfully submitted,

                                           **GIBSON, DUNN & CRUTCHER, LLP**

                                           By:  */s/  Joshua S. Lipshutz*
                                           Joshua S. Lipshutz (SBN 242557)
                                           jlipshutz@gibsondunn.com
                                           GIBSON, DUNN & CRUTCHER LLP
                                           1050 Connecticut Avenue, N.W.
                                           Washington, DC 20036-5306
                                           Telephone:  202.955.8500
                                           Facsimile:  202.467.0539

                                           Orin Snyder (*pro hac vice*)
                                           osnyder@gibsondunn.com
                                           GIBSON, DUNN & CRUTCHER LLP
                                           200 Park Avenue
                                           New York, NY 10166-0193
                                           Telephone:  212.351.4000
                                           Facsimile:  212.351.4035

                                           Kristin A. Linsley (SBN 154148)
                                           klinsley@gibsondunn.com
                                           Brian M. Lutz (SBN 255976)
                                           blutz@gibsondunn.com
                                           GIBSON, DUNN & CRUTCHER LLP
                                           555 Mission Street, Suite 3000
                                           San Francisco, CA 94105-0921
                                           Telephone:  415.393.8200
                                           Facsimile:  415.393.8306

                                           *Attorneys for Defendant Facebook, Inc.*

## PROOF OF SERVICE

I, Christopher Leach, hereby certify that on September 7, 2018 I served the foregoing

document by email to counsel of record listed below:


Lesley E. Weaver
Bleichmar Fonti & Auld LLP
555 12th Street, Suite 1600
Oakland, CA 94607
lweaver@bfalaw.com


Derek W. Loeser
Keller Rohrback LLP
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
dloeser@KellerRohrback.com


Dated:  September 7, 2018                 By:___/s/ *Christopher Leach*_____
                                          Christopher Leach

                                          *Attorney for Facebook, Inc.*