Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **STATEMENT OF RECENT DECISION**<br><br>Judge:  Hon. Vince Chhabria<br>Courtroom:  4, 17th Floor |

Plaintiffs file this Statement of Recent Decision to alert the Court to the recent Order by the Honorable Judge Fern Flanagan Saddler in the Superior Court of the District of Columbia, Denying Defendant Facebook, Inc.'s Opposed Motion to Dismiss, or in the Alternative, to Stay Proceedings in *District of Columbia v. Facebook*, No. 2018 CA 8715 B (D.C. Super. Ct. May 31, 2019). This decision relates to the arguments made by Plaintiffs in their Opposition to Motion of Defendant Facebook Inc. to Dismiss Plaintiffs' First Amended Consolidated Complaint, ECF No. 266 at pp. 12-17, 41-42. A copy of this decision is attached hereto as Exhibit A.

Dated: June 5, 2019                                    Respectfully submitted,


KELLER ROHRBACK L.L.P.                        BLEICHMAR FONTI & AULD LLP

By:    */s/ Derek W. Loeser*                          By:    */s/ Lesley E. Weaver*
       Derek W. Loeser                                       Lesley E. Weaver


Derek W. Loeser (admitted *pro hac vice*)            Lesley E. Weaver (SBN 191305)
Lynn Lincoln Sarko (admitted *pro hac vice*)         Matthew S. Weiler (SBN 236052)
Gretchen Freeman Cappio (admitted *pro hac vice*)    Anne K. Davis (SBN 267909)
Cari Campen Laufenberg (admitted *pro hac vice*)     Joshua D. Samra (SBN 313050)
Benjamin Gould (SBN 250630)                          555 12th Street, Suite 1600
1201 Third Avenue, Suite 3200                        Oakland, CA 94607
Seattle, WA 98101                                    Tel.: (415) 445-4003
Tel.: (206) 623-1900                                 Fax: (415) 445-4020
Fax: (206) 623-3384                                  lweaver@bfalaw.com
dloeser@kellerrohrback.com                           mweiler@bfalaw.com
lsarko@kellerrohrback.com                            adavis@bfalaw.com
gcappio@kellerrohrback.com                           jsamra@bfalaw.com
claufenberg@kellerrohrback.com
bgould@kellerrohrback.com


Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com


*Plaintiffs' Co-Lead Counsel*

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

I, Lesley E. Weaver, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of June, 2019, at Oakland, California.

/s/ *Lesley E. Weaver*
Lesley E. Weaver

# EXHIBIT A

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

|  |  |
|---|---|
| **DISTRICT OF COLUMBIA,** | ) |
| **Plaintiff,** | ) **Case number: 2018 CA 8715 B** |
| **vs.** | ) |
|  | ) |
| **FACEBOOK, INC.,** | ) **Judge Fern Flanagan Saddler** |
| **Defendant.** | ) |

## ORDER DENYING DEFENDANT FACEBOOK, INC.'S OPPOSED MOTION TO DISMISS, OR IN THE ALTERNATIVE, TO STAY PROCEEDINGS

This matter is before this Court based upon Defendant Facebook, Inc.'s Opposed Motion to Dismiss, or in the Alternative, to Stay Proceedings, filed on February 1, 2019; and Plaintiff District of Columbia's opposition thereto, filed on February 15, 2019. The parties came before the Court for a motion hearing on March 22, 2019.

This case presents the novel issue of personal jurisdiction in the realm of online social media and the distribution and maintenance of Facebook users' personal data. The issue of specific personal jurisdiction within the District of Columbia is central to this Order. Based upon the arguments of counsel, the parties' filings, and the entire record herein, Defendant Facebook, Inc.'s Motion to Dismiss, or in the Alternative, to Stay Proceedings, is hereby denied.

### BACKGROUND AND PLEADINGS

On December 19, 2018, the District of Columbia Office of the Attorney General (hereinafter, "the D.C. OAG") filed a Complaint against Facebook, Inc. (hereinafter, "Facebook") alleging that Facebook failed to honor its promise to protect consumers' personal data in violation of the District of Columbia Consumer Protection Procedures Act (hereinafter, "CPPA"), D.C. Code §§ 28-3901 to 28-3913.

The D.C. OAG alleges that Facebook collects and maintains a trove of consumers' personal data, and data concerning consumers' digital behavior both on and off of Facebook's website. Facebook allegedly permits third party developers, including developers of applications and mobile device makers, to access this sensitive information in connection with offering mobile applications to Facebook users. The D.C. OAG alleges that Facebook users reasonably expect Facebook to take steps to maintain and protect their data, but Facebook fails to do so.

The D.C. OAG cites the 2013-2015 example of Facebook permitting Cambridge University researcher Aleksander Kogan to use a third party application to harvest the personal data of approximately 70 million Facebook consumers in the United States and then sell the data to Cambridge Analytica, a political consulting firm. Although Mr. Kogan's application was only installed by 852 Facebook consumers in the District of Columbia, the application allegedly collected the personal information of users' Facebook "friends," including more than 340,000 District of Columbia residents who did not download the application.

The D.C. OAG alleges that this particular sequence of events regarding Cambridge Analytica was caused by Facebook's failure to effectively oversee and enforce their consumer protection policies. The D.C. OAG alleges that Facebook failed to review the terms of Mr. Kogan's application, which would have alerted Facebook to the fact that Mr. Kogan planned to improperly sell consumers' data. The D.C. OAG also alleges that Facebook should have taken reasonable steps to protect consumers' privacy by ensuring that the data was accounted for and deleted from Cambridge Analytica's databases. Finally, the D.C. OAG alleges that Facebook failed to alert the public, including District of Columbia residents, that millions of users' data was sold to Cambridge Analytica. The D.C. OAG also alleges that Facebook has engaged in

2

similar schemes with other applications and companies, and that the Cambridge Analytica incident is not an isolated event.

Both parties have noted that several news articles were published regarding Facebook's alleged sale of consumers' private data to Cambridge Analytica in March 2018. In the wake of the publication of said news articles, the following two legal actions took place:

(1) More than thirty (30) consumer class actions were filed across the country and consolidated into a federal Multi-District Litigation (hereinafter, "MDL") in the Northern District of California.

(2) The Federal Trade Commission (hereinafter, "FTC") launched an investigation to determine whether Facebook violated a 2012 Consent Order between the FTC and Facebook.

The instant case concerns the D.C. OAG's Consumer Protection and Procedures Act (CPPA) claims against Facebook.

## 1. Defendant Facebook's Motion to Dismiss

Facebook moves to dismiss the instant proceedings on the following grounds: First, that the Court lacks personal jurisdiction over Facebook in the instant matter; and second, that the D.C. OAG's CPPA claim cannot withstand scrutiny. Alternatively, Facebook argues that this Court should stay the instant case pending the resolution of the MDL proceeding, and the FTC investigation.

### a. Facebook Argues that It is Not Subject to the General or Specific Jurisdiction of the District of Columbia

First, Defendant Facebook contends that it is not subject to general jurisdiction in the District of Columbia. Facebook argues that it is not "at home" in the District of Columbia and therefore cannot be subject to the District of Columbia's general jurisdiction. Def.'s Mot. 6 (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011)).

3

Facebook further argues that the United States Constitution's Due Process Clause prohibits the exercise of specific personal jurisdiction over Facebook in the District of Columbia. Facebook contends that the only basis for specific personal jurisdiction articulated in the D.C. OAG's Complaint is that Facebook "suppli[es] social networking services through the operation of its website, www.facebook.com, and accompanying mobile applications, to consumers in the District of Columbia." Def.'s Mot. 7. Facebook argues that only two situations permit District of Columbia courts to exercise personal jurisdiction over "purely online activities," and the D.C. OAG has failed to allege facts to support a finding of jurisdiction in either situation. *Id.* (citing *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 22 (D.D.C. 2017)).

First, Facebook argues that there is no indication that its website "functions as [Facebook's] storefront in the forum." *See* Def.'s Mot. 7. Facebook argues that it does not buy or sell services to District of Columbia consumers through its website; does not schedule deliveries to District of Columbia residents; and does not transact any business with District of Columbia residents. *Id.* at 8. Second, Defendant argues that the Complaint does not (and cannot) allege that Facebook "aimed" "unabashedly malignant acts" specifically at the District of Columbia, or that the "brunt of [the purported] harm" was felt in the District of Columbia. *See id.* (citing *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000)).

Defendant further argues that other courts have concluded that they lack specific personal jurisdiction over Facebook in similar cases. *See* Def.'s Mot. 8-9 (citing *Georgalis v. Facebook, Inc.*, 324 F. Supp. 3d 955 (N.D. Ohio 2018); *Ralls v. Facebook*, 221 F. Supp. 3d 1237, 1244 (W.D. Wash. 2016) (holding that the court lacked jurisdiction as the plaintiff had not provided any evidence that Facebook "purposefully directed [its] activities towards Washington.")). Defendant Facebook therefore contends that personal jurisdiction over Facebook may not exist

4

simply because a user avails himself of Facebook's services in a jurisdiction other than Delaware, where Facebook is incorporated, or California, where Facebook has its principal place of business. *See* Def.'s Mot. 9 (quoting *Ralls*, 221 F. Supp. 3d at 1244).

## b. Facebook Argues that It is Not Subject to Specific Personal Jurisdiction in the District of Columbia Under the District of Columbia Long-Arm Statute, D.C. Code § 13-423

Facebook also argues that it is not subject to specific personal jurisdiction in the District of Columbia under the District of Columbia Long-Arm Statute, D.C. Code § 13-423. Facebook contends that a finding of personal jurisdiction in the present context would violate the District of Columbia's Long-Arm Statute because Facebook is not subject to personal jurisdiction under the Due Process Clause. Defendant Facebook further argues that the instant Complaint does not sufficiently allege any one of the seven requirements for the Long-Arm Statute to be satisfied, thereby barring jurisdiction in the District of Columbia. *See* D.C. Code § 13-423(a)(1)-(7)[1].

## c. Facebook Argues that the D.C. OAG Fails to State a Claim Under the District of Columbia Consumer Protection Procedures Act (CPPA)

Facebook argues that the D.C. OAG's claims fail under the CPPA because no actions or omissions by Facebook could be interpreted as "misleading" by a reasonable consumer. Def.'s Mot. 12. Specifically, Facebook argues that the D.C. OAG's allegations regarding "misrepresentations" and "misleading statements" in Facebook's Statement of Rights and

---

[1] D.C. Code § 13-423(a)(1)-(7) states in pertinent part that: "[a] District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's – (1) transacting any business in the District of Columbia; (2) contracting to supply services in the District of Columbia; (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia; (5) having an interest in, using, or possessing real property in the District of Columbia; (6) contracting to insure or act as surety for or on any person, property, or risk, contract, obligation, or agreement located, executed, or to be performed within the District of Columbia at the time of contracting, unless the parties otherwise provide in writing; or (7) marital or parent and child relationship in the District of Columbia…"

5

Responsibilities and Data Use Policy did not mislead consumers in the District of Columbia to falsely believe that their personal data was protected. *See id.*

Facebook first contends that it disclosed the practices that the D.C. OAG characterizes as "misleading" to consumers. Def.'s Mot. 13. Facebook argues that "every policy" contested by the D.C. OAG was disclosed to users in Facebook's Statement of Rights and Responsibilities and Data Use Policy. Facebook further contends that the Statement of Rights and Responsibilities and Data Use Policy contain policies that all Facebook consumers must agree to before creating a Facebook account. *Id.*

Second, Facebook argues that it had no legal duty to notify consumers of the Aleksander Kogan and Cambridge Analytica conduct that took place in 2015. Def.'s Mot. 16. Facebook contends that, even if there was a legal duty to disclose Cambridge Analytica's conduct to Facebook's users, this legal duty would be imposed by D.C. Code § 28-3852,[2] not the CPPA. *See id.* Facebook claims that D.C. Code § 28-3852 supersedes the CPPA because it is a "more specific statute" that governs disclosures to consumers following data breaches. *Id.* Facebook argues that D.C. Code § 28-3852 did not impose a duty on Facebook to disclose to consumers that their data was misused in 2015, as the data at issue did not meet the statutory definition of "personal information" and was not obtained pursuant to a breach of Facebook's security systems. *Id.* at 17. Facebook further argues that a reasonably well-informed consumer in the District of Columbia would have been on notice of the 2015 events by way of news coverage, which negated the need for Facebook to disclose Cambridge Analytica and Aleksander Kogan's illicit conduct to Facebook consumers. *Id.*

---

[2] D.C. Code § 28-3852 imposes upon "any person or entity" who conducts business in the District of Columbia a duty to provide prompt notice to individuals whose personal information has been compromised by a **breach of the security system** maintained by that person or entity.

6

**d. Alternatively, Facebook Argues that the Instant Case Should be Stayed Pending the Resolution of the Multi-District Litigation Proceeding and/or the Federal Trade Commission Investigation**

Finally, Defendant argues that the Court should stay this matter pending resolution of the Multi-District Litigation (MDL) proceeding, and the Federal Trade Commission (FTC) investigation. Facebook first asserts that the MDL proceeding involves similar factual allegations regarding Facebook's conduct and practices. Facebook argues that, because the MDL was filed first and has been pending before the Northern District of California for over a year, the federal case should take precedence over the instant case. *See* Def.'s Mot. 16-17 (citing *Thomas v. Disabled Am. Veterans Ass'n*, 930 A.2d 997, 1000-01 (D.C. 2007); *Gilles v. Ware*, 615 A.2d 533, 536 (D.C. 1992); *Doe v. Hills*, 217 F. Supp. 3d 199, 207 (D.D.C. 2016)). Facebook further argues that proceeding with the instant case while the MDL is pending would be unduly burdensome and may result in inconsistent rulings. Def.'s Mot. 17.

Facebook also argues that this case should be stayed pending the outcome of the FTC investigation. Similar to its position on the MDL, Facebook contends that this case should be stayed because of overlapping issues. Def.'s Mot. 19. Facebook argues that the FTC is in a better position to determine, and possibly resolve, the technical issues present in this case about Facebook's responsibility to users regarding the use or dissemination of users' data. *See id.* (citing *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 493 (D.C. Cir. 2015)). Facebook asserts that staying this case will prevent potentially inconsistent rulings and allow the FTC to freely implement new consumer data policies. Def.'s Mot. 19.   Facebook contends that "[a]ny injunctive relief ordered in this case 'would preempt the [FTC] from implementing what amount to policy decisions…and technical questions on' Facebook's consumer data policies." *Id.* (citing

7

*Allnet Communication Service, Inc. v. Nat'l Exchange Carrier Ass'n*, 965 F.2d 1118, 1121 (D.C. Cir. 1992)).

## 2. **The District of Columbia's Opposition to Defendant Facebook, Inc.'s Motion to Dismiss**

The D.C. OAG opposes Defendant Facebook's Motion to Dismiss on grounds that the District of Columbia courts have personal jurisdiction over Facebook. The D.C. OAG argues that this is a government enforcement case, so the personal jurisdiction analysis must begin with the fact that the District of Columbia has a "manifest interest" in providing a forum for adjudicating violations of its own laws. *See* Pl.'s Opp. 5 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985)). The D.C. OAG asserts that the Court's interest in providing a forum for adjudicating violations of its own laws is particularly strong in this case, as the D.C. OAG seeks to enforce the D.C. CPPA, which "establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be received in the District of Columbia." *See* D.C. Code § 28-3901(c). The D.C. OAG explains that the District of Columbia may exercise personal jurisdiction over Facebook under both the United States Constitution's Due Process Clause and the District of Columbia's Long-Arm Statute, D.C. Code § 13-423.

### a. **The D.C. OAG Argues that Facebook is Subject to Personal Jurisdiction Under the United States Constitution's Due Process Clause**

First, the D.C. OAG argues that Defendant Facebook is subject to personal jurisdiction in the District of Columbia under the United States Constitution's Due Process clause. The D.C. OAG asserts that the District of Columbia Court of Appeals applies the "minimum contacts" analysis by examining whether: (1) the nonresident "purposefully directed" its activities at District of Columbia residents; (2) the litigation results from alleged injuries that "arise out of or relate to" those activities; and (3) the assertion of personal jurisdiction comports with "traditional

8

notions of fair play and substantial justice." *See* Pl.'s Opp. 5-6 (citing *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 330-31, 34 (D.C. 2000)). The D.C. OAG argues that Facebook satisfies the "minimum contacts" requirements through its activities in the District of Columbia.

The D.C. OAG first argues that Facebook purposefully directed its activities to the District of Columbia by directing its social networking services to District of Columbia consumers. The D.C. OAG argues that Facebook purposefully directed its activities to the District of Columbia, as evidenced by: (1) Facebook's regulatory filings with the District of Columbia Department of Consumer and Regulatory Affairs (hereinafter, "DCRA"); (2) case law from similar state government enforcement cases; and (3) federal precedent examining online businesses like Facebook that operate on a national scale. *See* Pl.'s Opp. 6. The D.C. OAG asserts that it does not matter that Facebook "operates in the same manner in all jurisdictions," as it is more than sufficient that Facebook made misleading representations to hundreds of thousands of consumers in the District of Columbia, signed them up for its social networking services, and then exploited their data for commercial gain through the sale of targeted advertisements. *See id.*; Compl. ¶¶ 1, 14, 17, 72-76. The OAG argues that Facebook operates and monetizes a sophisticated social networking service used by nearly half of all District of Columbia residents, and estimates that Facebook earned more than $10 million in the fourth quarter of 2018 from selling targeted advertising in the District of Columbia. *See* Pl.'s Ex. 1; Shirey Aff. ¶¶ 3-4.

The D.C. OAG further argues that the instant action satisfies the Due Process Clause's "minimum contacts" requirement because it arises out of Facebook's representations to District of Columbia consumers. *See* Pl.'s Opp. 10 (citing *Shoppers Food Warehouse*, 74 A.2d at 328). The D.C. OAG asserts that the District of Columbia Court of Appeals has interpreted the "nexus

9

requirement" in the minimum contacts analysis to require only a "discernible relationship" between the cause of action and the forum activities. *See id.* (citing *Shoppers Food Warehouse*, 74 A.2d at 335). The D.C. OAG argues that, in the instant case, the nexus between the cause of action and the forum activities satisfies this requirement, as the D.C. OAG's claims arise directly out of Facebook's forum activities, namely, Facebook's representations and services provided to District of Columbia consumers. *See id.* The D.C. OAG concludes that exercising jurisdiction over Facebook would be fair based upon the representations Facebook consistently makes to its extensive network of District of Columbia consumers in a jurisdiction where it regularly transacts business. *See id.*

### b. The D.C. OAG Argues that Facebook is Subject to Personal Jurisdiction Under the District of Columbia Long-Arm Statute, D.C. Code. § 13-423

In addition to arguing that Defendant Facebook is subject to personal jurisdiction in the District of Columbia under the Due Process Clause, the D.C. OAG also argues that Facebook is subject to personal jurisdiction under the District of Columbia Long-Arm Statute, D.C. Code. § 13-423. The D.C. OAG first notes that the District of Columbia Long-Arm Statute, D.C. Code § 13-423(a)(1) is "coextensive" with the Due Process Clause, and thus the Long-Arm Statute analysis is included within the Due Process Clause inquiry. *See* Pl.'s Opp. 12.

Further, the D.C. OAG notes that Facebook admitted to providing its social networking services in the District of Columbia, and it counts hundreds of thousands of District of Columbia consumers among its users. *See id.* The D.C. OAG asserts that Facebook's argument that "[it] does not conduct business in the District of Columbia" because Facebook's social networking services are provided "free for all users worldwide" is factually and legally incorrect. *Id.* The D.C. OAG contends that Facebook fails to address the D.C. OAG's allegations that Facebook's networking services are part-and-parcel of a business model that monetizes consumer data

10

"through the sale of targeted advertising." *See id.* Moreover, the D.C. OAG argues that neither the CPPA nor jurisdictional case law require a monetary exchange to find that a defendant "transact[s] any business" in the District of Columbia. *See id*. 12-13.

Moreover, the D.C. OAG argues that Facebook is subject to personal jurisdiction under D.C. Code § 13-423(a)(3), which authorizes personal jurisdiction over a defendant "who caus[es] tortious injury in the District of Columbia by an act or omission in the District of Columbia." Pl.'s Opp. 13. The D.C. OAG argues that the alleged injuries were plainly suffered in the District of Columbia, which is also the residence of Facebook's District of Columbia consumers. *See id*. The D.C. OAG also argues that Facebook's CPPA violations occurred in the District of Columbia because "it is there that [District of Columbia] consumers accessed Facebook's services." *Id.* Additionally, the D.C. OAG contends that Facebook's documents confirm that Facebook employees based in the District of Columbia were involved in the response and oversight of the Cambridge Analytica incident, further establishing that Facebook's relevant acts and omissions took place in the District of Columbia. *Id*.

Furthermore, the D.C. OAG argues that D.C. Code § 13-423(a)(4) authorizes jurisdiction over Facebook. *See* Pl.'s Opp. 13. D.C. Code § 13-423(a)(4) provides that a defendant may be subject to personal jurisdiction in the District of Columbia if the defendant causes tortious injury in the District of Columbia by acts or omissions "outside" the jurisdiction when the defendant "regularly does or solicits business…or derives substantial revenue from services rendered" in the District of Columbia. *See* Pl.'s Opp. 13-14. The D.C. OAG contends that Facebook's corporate filings, Facebook's consumers in the District of Columbia, and the estimated \$10 million in District of Columbia advertising revenue from a single fiscal quarter demonstrate that Facebook engages in regular business transactions in the District of Columbia. *See id*.

11

Finally, the D.C. OAG contends that Facebook "marginalizes" its District of Columbia consumer base by arguing that "[District of Columbia consumers] cannot possibly be a source of 'substantial revenue' because they constitute 'a mere .01 percent' of [Facebook's] global user base." Pl.'s Opp. 14. The D.C. OAG argues that a "substantial revenue" determination involves examining both the "absolute amount" and the "percentage of total sales," and that a small percentage of total sales can constitute substantial revenue when the absolute amount is "well into the millions." *See id.* Accordingly, the D.C. OAG argues that the District of Columbia Long-Arm Statute authorizes jurisdiction over Facebook in several ways. *See id.*

### c. The D.C. OAG Argues that It Successfully States a Claim Under the District of Columbia Consumer Protection and Procedures Act (CPPA)

In addition to arguing that Facebook is subject to jurisdiction in the District of Columbia, the D.C. OAG contends that it successfully states a claim under the CPPA. The D.C. OAG first argues that Facebook's disclosures to its consumers were inconsistent, inaccurate, and ambiguous. Pl.'s Opp. 14. While the D.C. OAG alleges that these disclosures were both material and "had a tendency to mislead consumers," the D.C. OAG also argues that materiality and "tendency to mislead" are questions of fact that cannot be resolved at this stage of litigation. *Id.*

Furthermore, the D.C. OAG asserts that Facebook misled consumers by claiming that Facebook "is not responsible for how third parties used consumers' personal data," as this statement directly conflicted with Facebook's promise to ensure that third parties respected consumers' privacy. Pl.'s Opp. 15. The D.C. OAG further argues that Facebook failed to hold third parties accountable to the privacy policies Facebook advertised to its consumers. *See id.* at 15-17.

12

## d. The D.C. OAG Argues that the Instant Matter Should Not be Stayed Pending the Resolution of the Multi-District Litigation Proceeding and/or the Federal Trade Commission Investigation

The D.C. OAG argues that Facebook has failed to establish that a stay of the proceedings is warranted in this case, as Facebook has not "ma[de] out a clear case of hardship" if the stay were to be denied. *See* Pl.'s Opp. 19 (citing *Landis v. N. Am. Co.*, 57 S. Ct. 163, 255 (1936)). The D.C. OAG argues that this case is distinguishable from the MDL because, in the instant case, the D.C. OAG is pursuing a state consumer protection claim on behalf of the residents of the District of Columbia, while the MDL involves claims asserted by private individuals. *See* Pl.'s Opp. 19. The D.C. OAG further argues that the MDL Court has already decided a similar issue regarding jurisdiction over consumer protection claims filed by the Cook County, Illinois State Attorney's Office, which resulted in the case being remanded back to Cook County because the court determined that the case was properly heard in state court. *See id.* (citing *In re Facebook, Inc. Consumer Privacy User Profile Litig.,* 2019 WL 348892, at \*2 (N.D. Cal. Jan. 29, 2019)).

Moreover, the D.C. OAG argues that the FTC investigation is wholly distinct from the claims brought by the D.C. OAG under the CPPA. *See* Pl.'s Opp. 20. The D.C. OAG contends that the FTC investigation seeks to determine whether Facebook's conduct violates a 2012 Consent Order entered into by the FTC and Facebook, an issue which has no bearing on the D.C. OAG's claims. *See id.* The D.C. OAG argues that, even if the FTC investigation and this case presented overlapping issues, it would be imprudent to stay this proceeding. *See id.*

## THE COURT'S RULING

## 1. Facebook is Subject to Personal Jurisdiction in the District of Columbia

Defendant Facebook is incorporated in Delaware, and thus is a foreign corporation. Therefore, jurisdiction over Facebook depends upon the application of the Due Process Clause of

13

the United States Constitution and the District of Columbia's Long-Arm Statute, D.C. Code § 13-423(a). *See Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 727 (D.C. 2011). The Due Process Clause analysis requires the Court to analyze a defendant's ties to the venue under both general personal jurisdiction and specific personal jurisdiction. *See Daimler AG v. Bauman*, 571 U.S. 117, 137-39 (2014). This Court finds that Defendant Facebook is not subject to general personal jurisdiction in the District of Columbia. However, Facebook is subject to specific personal jurisdiction under the Due Process Clause and the District of Columbia's Long-Arm Statute, D.C. Code § 13-423(a). The Court's findings are explained below.

### a. The District of Columbia Lacks General Personal Jurisdiction Over Facebook

The Court first finds that Facebook is not subject to general personal jurisdiction in the District of Columbia. A court may assert general personal jurisdiction over a defendant corporation if the corporation is either incorporated or has its principal place of business in the court's jurisdiction. *See Daimler AG*, 571 U.S. at 138-39 (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

In this case, Defendant Facebook is a Delaware corporation with its headquarters and principal place of business in California. Compl. ¶ 9. Accordingly, as Facebook is neither incorporated in, nor has its principal place of business in the District of Columbia, this Court lacks general personal jurisdiction over Defendant Facebook.

### b. Facebook is Subject to Specific Personal Jurisdiction in the District of Columbia

The Court finds that it does have specific personal jurisdiction over Facebook. When a forum seeks specific personal jurisdiction over an out-of-state defendant, the Due Process Clause's "fair warning" requirement is satisfied if the defendant has "purposefully directed" its activities to the forum and the lawsuit results from alleged injuries that "arise out of or relate to"

14

those activities. *Burger King Corp.*, 471 U.S. at 472-73 (internal citations omitted). In other words, there must be "minimum contacts" between the defendant and the forum state before specific personal jurisdiction can be exercised consistently with the Due Process Clause. *See International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Once a court has determined that a defendant has purposefully established minimum contacts within the forum state, these contacts should be considered in light of other factors to determine whether the assertion of specific personal jurisdiction would comport with "fair play and substantial justice." *Burger King Corp.*, 471 U.S. at 476 (citing *International Shoe Co.*, 326 U.S. at 320).

The District of Columbia Court of Appeals's minimum contacts analysis requires the Court to examine the quality and nature of the nonresident defendant's contacts with the District of Columbia and whether those contacts are voluntary and deliberate or only random, fortuitous, tenuous, and accidental. *See Daley*, 26 A.3d at 727-28 (citing *Shoppers Food Warehouse*, 746 A.2d at 329). In other words, "minimum contacts" in the District of Columbia are established if the Court finds that the non-resident defendant's conduct and connection with the jurisdiction are such that the defendant "should reasonably anticipate being haled [sic] into court [here]." *See Daley*, 26 A.3d at 727 (quoting *Gonzalez v. Internacional de Elevadores, S.A.*, 891 A.2d 227, 234 (D.C. 2006)). The D.C. OAG must therefore establish that Facebook has sufficient "minimum contacts" in this jurisdiction by demonstrating that Facebook purposefully directed its activities at District of Columbia residents. *See Gonzalez*, 891 A.2d at 234.

The relationship between a defendant's online activity and its susceptibility to suit in a foreign jurisdiction remains ill-defined, and the United States Supreme Court has yet to offer guidance in this particular area. *See Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 23 (D.D.C. 2017), *aff'd*, 2018 U.S. App. LEXIS 19699 at *5-7 (D.C. Cir. 2018). However, it is clear

15

that "mere accessibility" of the defendant's website in the forum cannot by itself establish the necessary minimum contacts. *Triple Up Ltd.*, 235 F. Supp. 3d at 23 (citing *GTE New Media Servs. v. Bellsouth Corp*., 199 F.3d 1343, 1350 (D.C. Cir. 2000). District of Columbia residents' access to a defendant's website is therefore not enough to establish personal jurisdiction, as this does not by itself show any persistent course of conduct by the defendant in the forum. *See Triple Up, Ltd.*, 2018 U.S. App. LEXIS 19699 at \*6.

However, the Court's analysis does not end there. In the context of Internet-based corporations, federal courts in the District of Columbia commonly find Internet-based personal jurisdiction in at least two situations. *See Triple Up Ltd.*, 235 F. Supp. 3d at 24. First, personal jurisdiction may exist where "residents use a website to engage in electronic transactions with the defendant"—that is, where the website functions as the defendant's storefront in the forum. *Id.* at 24 (citing *Gorman v. Ameritrade*, 293 F.3d 506, 512-13 (D.C. Cir. 2002) (finding that defendant's website was "conducting business" in this jurisdiction through its everyday online transactions with District of Columbia residents)). Second, jurisdiction may attach under the "effects test" articulated in *Calder v. Jones*, 465 U.S. 783 (1984), which looks to whether "the defendant's conduct is aimed at or has an effect in the forum state." *Triple Up*, 235 F. Supp. 3d at 24 (citing *GTE New Media Servs.*, 199 F.3d at 1349).

### i. Facebook's Online Accessibility and "Transactions" Satisfy the District of Columbia's Minimum Contacts Analysis

The Court finds that Facebook's accessibility and transactions with District of Columbia residents, coupled with Facebook's repeated DCRA filings and business dealings in the District of Columbia, satisfy the required minimum contacts necessary to establish personal jurisdiction.

16

## A. Facebook's Website Qualifies as a "Storefront" in the District of Columbia

The Court first finds that Facebook's website functions as the its "storefront" in the District of Columbia, as Facebook transacts continuous and systematic business with District of Columbia residents through its online platform. *See Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 512 (D.C. Cir. 2002) (citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)). In order to establish minimum contacts in the District of Columbia, the website must be used by a defendant to do business with residents in the forum state in a "continuous and systematic way." *See Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 51 (D.D.C. 2003). The question is not whether District of Columbia residents "can" transact business in the District of Columbia with a non-resident defendant through its website, but whether non-resident defendants actually "do" engage in sustained business activities in a continuous and systematic way. *Id.* at 52 (citing *Gorman*, 293 F.3d at 512-13).

This Court finds that District of Columbia residents' widespread utilization of, and repeated exchange of personal information through Facebook's online social networking service, constitute "transactions" for purposes of establishing personal jurisdiction in the District of Columbia. In reaching this conclusion, the Court compares Facebook with other websites that have been found to "transact business" with District of Columbia residents.

The United States Court of Appeals for the District of Columbia Circuit previously found that the website Ameritrade was "transacting business" with District of Columbia residents through online brokerage accounts. *See Gorman*, 293 F.3d at 512-13. Ameritrade's website allowed for District of Columbia users to transmit funds, use the online accounts to buy and sell securities, and to enter binding contracts with Ameritrade online twenty-four hours a day. *See id.* The D.C. Circuit found that Ameritrade's consistent, around-the-clock transactions allowed for

17

the website to have "continuous and systematic" contacts with the District of Columbia, thereby suggesting that Ameritrade was "conducting business" in the District of Columbia for purposes of establishing personal jurisdiction. *See id.* (citing *Zippo Mfg. Co.*, 952 F. Supp. at 1124).

In contrast to *Gorman*, the D.C. Circuit recently found that a Chinese video-hosting website, Youku,[3] was not "transacting business" in the District of Columbia because it could not establish that any United States viewers had purchased or otherwise engaged in business transactions on the Youku website. *See Triple Up Ltd.*, 235 F. Supp. 3d at 24, *aff'd*, 2018 U.S. App. LEXIS 19699 at \*5-8. Furthermore, the D.C. Circuit noted that there was no plausible allegation suggesting that Youku designed its website to purposefully target users in the United States.[4] *See Triple Up Ltd.*, 2018 U.S. App. LEXIS 19699 at \*6.

The instant case concerns Defendant Facebook's free social media service that is distinct from Youku or Ameritrade, as Facebook does not utilize a traditional form of merchant-consumer transactions. Facebook is an American website that is widely used and accessed all over the globe through individual computers, mobile telephones, and other electronic devices. *See* Compl. ¶ 10. To begin using Facebook, a consumer creates a Facebook account, which requires users to provide basic personal information such as their name, telephone number, email address, date of birth, and gender. *See id.* ¶ 11, 13. A Facebook profile costs nothing to create and maintain. *See id.* ¶ 17. Facebook users can add other users as "friends," and build a social network on the website by accumulating Facebook "friends." *Id.* ¶ 11. Facebook users also have the option to supply additional information through their Facebook profile such as their

---

[3] Youku is incorporated in the Cayman Islands and its principal place of business is in China. Youku has no offices or employees in the United States, and it does not market its products or services here. *See Triple Up Ltd.*, 235 F. Supp. 3d at 19. However, Youku stock has been traded in the New York Stock Exchange, and it has maintained an agent for service of process in New York. *Id.*

[4] Youku operates two website platforms on which users can view and publish high-quality videos, and an online search engine where users can search for and view online videos. *See Triple Up Ltd.*, 2018 U.S. App. LEXIS 19699 at \*18. Youku generates revenue from online advertising services and subscription or pay-per-view online services. *See id.* at \*19.

hometown, residence, educational history, work experience, relationship status, political and religious views, and personal photographs. *Id.* ¶ 13. It is through users' accumulation of Facebook "friends" and sharing of personal data that social media "networks" are developed on the Facebook platform. *Id.* ¶ 11.

As Facebook consumers share information, grow their social networks, and interact with other "friends" on the Facebook website, users' information and activity is digitally collected, recorded, and maintained by Facebook. *Id.* ¶ 12. The D.C. OAG asserts that Facebook users' data can be divided into two broad categories: (1) data directly supplied by consumers, and (2) data pertaining to consumers' activity on and off Facebook's website. *Id.* The D.C. OAG alleges that Facebook then relies on its collection of consumer data, and the personal information and preferences derived from each individual's data, to sell targeted advertising space to marketers and to "harvest" users' personal data for third parties. *See id.* ¶¶ 1, 17.

In addition to Facebook's online activities, Facebook has physically conducted business within the District of Columbia. First, Facebook made repeated filings with the District of Columbia Department of Consumer and Regulatory Affairs (hereinafter, "DCRA"), and registered as a foreign corporation in the District of Columbia in 2009. *See* Pl.'s Opp. 6; Pl.'s Ex. 2. Additionally, Facebook purportedly operates an office with over 150 employees within the District of Columbia. *See* Pl.'s Opp. 13. Finally, it is alleged that Facebook acquired an estimated $10 million in revenue from its District of Columbia users in the fourth quarter of 2018 alone, thereby suggesting that Facebook has consistently acquired substantial revenue from its consumers within the District of Columbia. *See id.* at 14; Pl.'s Ex. 1; Shirey Aff. ¶¶ 3-4.

This Court concludes that the substantial revenue Facebook has allegedly derived from its activities in the District of Columbia area, coupled with Facebook's repeated DCRA filings and

19

operations within the District of Columbia, qualify Facebook's online social networking services as "business transactions" for purposes of establishing specific personal jurisdiction. The Court first notes that Facebook provides a free online service to its users, and that "services" may qualify as business "transactions" for purposes of the CPPA. *See* D.C. Code § 13-423(a)(2). Facebook's "transactions" involve Facebook users freely sharing their personal data with other users, which Facebook then allegedly collects and sells to third parties. *See* Compl. ¶¶ 13-17.

As previously noted, over 340,000 District of Columbia residents' Facebook data was allegedly acquired by Cambridge Analytica between 2013-2015, and Facebook allegedly accrued an estimated $10 million in revenue from District of Columbia residents' data in the fourth quarter of 2018. *See id.* ¶¶ 2, 30; Pl.'s Opp. 14. These records showcase Facebook's practice of redistributing and selling users' personal data for significant profit, which forms the basis of Facebook's online business and revenue. This Court finds that Facebook's distribution of District of Columbia users' personal data for profit therefore qualifies as systematic and continuous "transactions" between Facebook and its consumers in the District of Columbia.

Additionally, this Court finds Facebook's operations and filings with the District of Columbia DCRA demonstrate that Facebook consistently transacts business in the District of Columbia. In its Application for Certificate of Authority for Foreign Business & Professional Corporation, filed on April 24, 2009, Facebook stated that it would transact business in the District of Columbia in the form of "ONLINE SOCIAL NETWORKING." *See* Pl.'s Ex. 2 (emphasis in original). Facebook made similar statements in its DCRA filings in 2011, 2014, 2016, and 2018. *See id.* Moreover, Facebook purportedly maintains a large corporate presence within the District of Columbia. *See* Pl.'s Opp. 11. Accordingly, this Court finds that Facebook's

20

Facebook's website qualifies as an online "storefront" in the District of Columbia for purposes of establishing minimum contacts.

### B. Facebook's Conduct Had an Effect in the District of Columbia

Further, this Court finds that Facebook's conduct "had an effect" in the District of Columbia, thereby subjecting Facebook to personal jurisdiction. *See Triple Up Ltd.*, 235 F. Supp. 3d at 23. Although Facebook "operates in the same manner in all jurisdictions," Facebook purposefully directed its social networking services to the District of Columbia as evidenced by its multiple filings with the DCRA. *See* Pl.'s Opp. 6; Pl.'s Ex. 2. Specifically, Facebook filed an Application for Certificate of Authority for Foreign Business & Professional Corporation with the DCRA in 2009, and consistently filed Two-Year Reports for Foreign Business in 2011, 2014, 2016, and 2018. *See* Pl.'s Ex. 2. Facebook's obligation to keep the District of Columbia apprised of its business activities within the District of Columbia strongly suggests that Facebook had an eye towards attracting District of Columbia users. Moreover, Facebook's practices clearly had an "effect" in this jurisdiction when over 340,000 District of Columbia residents' personal data was collected by Cambridge Analytica from 2013-2015. *See* Compl. ¶ 2-3, 30; Pl.'s Opp. 9. At this stage of litigation, this Court finds that Facebook's conduct has had an effect in the District of Columbia, thereby permitting specific personal jurisdiction under the Due Process Clause.

### c. Facebook Is Subject to Personal Jurisdiction in the District of Columbia Under the District of Columbia Long-Arm Statute, D.C. Code § 13-423

In addition to finding that Defendant Facebook is subject to specific personal jurisdiction under the Due Process Clause of the United States Constitution, the Court also finds that Defendant Facebook is subject to personal jurisdiction under the District of Columbia Long-Arm Statute, D.C. Code § 13-423.

If a defendant does not reside within or maintain a principal place of business in the District of Columbia, then the District of Columbia's Long-Arm Statute, D.C. Code § 13-423, provides the only basis upon which a court may exercise personal jurisdiction over the defendant. *Quality Air Servs., LLC v. Milwaukee Valve Co.*, 567 F. Supp. 2d 96, 99 (D.D.C. 2008) (internal citations omitted). The Long-Arm Statute provides, *inter alia*, that a District of Columbia court may exercise personal jurisdiction over a defendant as to a claim for relief arising from the defendant: (1) transacting any business in the District of Columbia; (2) contracting to supply services in the District of Columbia; (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; and/or (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia, if the defendant regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia. *See* D.C. Code § 13-423(a)(1)-(4).

The Court finds that all four relevant prongs are met in this context. First, D.C. Code § 13-423(a)(1) is satisfied because Facebook "transacted business" in the District of Columbia by acquiring revenue from its District of Columbia users' data. Additionally, Facebook's repeated filings with the DCRA indicate that Facebook intended to conduct business in the District of Columbia from 2007 through the present. *See id.* ¶ 14. The Court therefore finds that Facebook "transacted business" in the District of Columbia for purposes of satisfying section (a)(1) of the Long-Arm Statute.

Furthermore, the Court finds that D.C. Code § 13-423(a)(2) is satisfied because Facebook contracted to supply services in the District of Columbia. As noted previously, Facebook provides a free social media services to its users around the world, including to District of

22

Columbia residents. Facebook's users effectively enter into a contract with Facebook when they create a Facebook profile, agree to Facebook's Terms of Service, and in return receive access to Facebook's social media service. *See* Compl. ¶ 44-48. Accordingly, jurisdiction under D.C. Code §13-423(a)(2) is also authorized.

The Court also finds that D.C. Code § 13-423(a)(3) is satisfied because Facebook's alleged tortious conduct occurred within the District of Columbia. The D.C. OAG alleges that Facebook misrepresented how it would collect and maintain its users' data in its Terms of Service and Privacy Policy, which are available and accessible by Facebook users in the District of Columbia. Facebook's alleged misrepresentations in its Statement of Rights and Responsibilities and Data Use Policy misled District of Columbia Facebook users to believe that their personal data was secure and protected from illicit distribution. Accordingly, this Court finds that Facebook's alleged tortious conduct was committed in the District of Columbia when Facebook allegedly misled District of Columbia residents through its Statement of Rights and Responsibilities and Data Use Policy, thereby satisfying section (a)(3) of the District of Columbia Long-Arm Statute.

Finally, the Court finds that D.C. Code § 13-423(a)(4) is satisfied. The District of Columbia Court of Appeals has held that the Long-Arm Statute's "transacting business" provision, D.C. Code § 13-423(a)(4), is coextensive with the Due Process Clause. *See Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 727 (D.C. 2011). District of Columbia Code § 13-423(a)(4) therefore applies if personal jurisdiction under the Due Process Clause has been established, as it has in this case. As stated previously, Facebook's social media platform allows for Facebook and District of Columbia residents to "engage in a persistent course of conduct." Moreover, Facebook derives substantial revenue from its services rendered in the District of

Columbia, as demonstrated by the purported $10 million in revenue Facebook accrued from its District of Columbia users in the fourth quarter of 2018. Based upon the available evidence, this Court finds that Facebook's regular business transactions, combined with the social media services it provides to District of Columbia residents on a continuous basis, subject Facebook to personal jurisdiction under both D.C. Code § 13-423(a)(4) and the Due Process Clause.

## 2. The D.C. OAG's CPPA Claims Satisfy the Civil Procedure Rule 8(a) Pleading Standard

In addition to finding that Facebook is subject to jurisdiction in the District of Columbia, this Court finds that the allegations in the D.C. OAG's Complaint are sufficient to satisfy Rule 8(a) of the Superior Court Rules of Civil Procedure. A complaint should be dismissed under Rule 12(b)(6) if it fails to satisfy the pleading standard outlined in Rule 8(a). Specifically, a complaint should be dismissed if it fails to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *See Potomac Devel. Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C. 2011). When evaluating a party's motion to dismiss, the Court must construe the pleadings in the light most favorable to the party not seeking dismissal—in this case, the D.C. OAG. *Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 562 (D.C. 2002).

While Rule 8(a) does not require "detailed factual allegations," it does require more than a mere "unadorned the-defendant-unlawfully-harmed-me accusation." *See Atraqchi*, 788 A.2d at 562 (citations omitted). Essentially, "a complaint must set forth sufficient information to outline the legal elements of a viable claim for relief or to permit inferences to be drawn from the complaint that indicate that these elements exist." *Williams v. District of Columbia*, 9 A.3d 484, 488 (D.C. 2010).

The entirety of the Court's findings with respect to Facebook's Rule 12(b)(6) Motion should be read with the applicable legal standard in mind, namely, that the D.C. OAG's

24

allegations must be sufficient to satisfy the Rule 8(a) pleading standard. Accordingly, the Court must address the adequacy of the D.C. OAG's CPPA claims under Rule 8(a).

District of Columbia courts have consistently recognized that the CPPA is "a comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers." *Snowder v. District of Columbia*, 949 A.2d 590 (D.C. 2008) (internal citations omitted). In the instant case, the D.C. OAG brings CPPA claims under D.C. Code §§ 28-3904 (e), (f), and (f-1). The Court must therefore determine whether the D.C. OAG's complaint satisfies the Rule 8(a) pleading standard with respect to its claims under D.C. Code §§ 28-3904 (e), (f), and (f-1).

Sections (e), (f), and (f-1) of the CPPA provide:

It shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby, including to

(e) misrepresent as to a material fact which has a tendency to mislead;
(f) fail to state a material fact if such failure tends to mislead;
(f-1) [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead[.] D.C. Code §§ 28-3904 (e)-(f-1).

When the CPPA is utilized to remedy unfair trade practices, the Court should consider the allegedly deceptive practices "in terms of how [the practices] would be viewed and understood by a reasonable consumer." *See Pearson v. Chung*, 961 A.2d 1067, 1075 (D.C. 2008). As a general rule, accurate statements are not misleading to reasonable consumers. *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 444 (D.C. 2013). However, what a "reasonable consumer" would consider material or misleading is generally a question for the jury, and cannot necessarily be resolved at the motion to dismiss stage of litigation. *Id.* at 442, 444-45. Instead, the Court must determine whether the allegations, taken as true, *could be reasonably interpreted* by a consumer as misleading, and if so, the pleading standard set forth in Rule 8(a) is satisfied.

25

District of Columbia courts have also held that misleading statements may constitute violations of D.C. Code §§ 28-3904(e), (f), and (f-1), even if the statement is technically accurate, because a reasonable consumer could still be misled by technically accurate information. *National Consumer's League v. Doctor's Assocs.*, 2014 D.C. Super. LEXIS 15 (D.C. Super. Ct. Sept. 12, 2014); s*ee also Federal Trade Commission v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 41-42 (D.C. Cir. 1985).

Pursuant to the above legal standard, the Court's Rule 12(b)(6) analysis concerning the D.C. OAG's CPPA claims must focus on whether the D.C. OAG alleges sufficient facts to demonstrate that Facebook's alleged statements, actions, or omissions could be interpreted by a reasonable consumer as material and misleading. This determination is made irrespective of whether the information provided to consumers was "technically accurate." In sum, the Court's Rule 12(b)(6) inquiry must determine whether D.C. OAG's allegations under D.C. Code §§ 28-3904 (e), (f), and (f-1) are sufficient to satisfy the Civil Procedure Rule 8(a) pleading standard.

### a. The D.C. OAG's Claims Pursuant to D.C. Code § 28-3904(e) Satisfy the Pleading Standard Set Forth in Superior Court Civil Procedure Rule 8(a)

First, this Court finds that, if true, the D.C. OAG's claims pursuant to D.C. Code § 28-3904(e) satisfy the pleading standard set forth in Rule 8(a). D.C. Code § 28-3904(e) prohibits misrepresentations as to material facts that have a tendency to mislead, whether or not any consumer is in fact misled, deceived, or damaged thereby.

In its Complaint, the D.C. OAG alleges that Facebook violated subsection (e) by falsely representing to consumers that:

(1) Facebook would protect the privacy of consumers' personal information;
(2) Facebook would require applications and third-party developers to respect the privacy of consumers' personal information; and
(3) The agreement between consumers and third-party applications would control how those applications used consumers' data.

26

The D.C. OAG notes that Facebook's 2013 Statement of Rights and Responsibilities provides, in pertinent part, that: "FACEBOOK IS NOT RESPONSIBLE FOR THE ACTIONS . . . OF THIRD PARTIES." Def.'s Mot. Ex. 3 at 7. (emphasis in original). At the same time, the Statement of Rights and Responsibilities stated, "[Facebook] require[s] applications to respect [users'] privacy, and [users'] agreement with the [third party] application will control how the [third party] application can use, store, and transfer that content and information." *Id.* at 1.

The D.C. OAG further alleges that Facebook allowed third parties to override consumers' privacy settings and obtain information that consumers opted not to share. Facebook asserts that it disclosed this practice in its Data Use Policy by informing consumers that Facebook would "give [users'] information to the people and companies that help [Facebook] provide, understand, and improve the services [Facebook] offer[s]." Def.'s Mot. Ex. 8 at 16.

This Court has determined that, pursuant to Rule 8(a), the D.C. OAG properly pleads a viable claim under § 28-3904(e) by stating that consumers were misled by Facebook's Statement of Rights and Responsibilities, which allegedly failed to provide consumers with a clear explanation of how much responsibility Facebook undertook to protect consumers' personal data from third parties. Further, D.C. OAG has asserted viable claims under § 28-3904(e) by alleging that Facebook's disclosure—that it may share some users' personal information with its partner companies—could lead a reasonable consumer to believe that the information obtained by third-parties from Facebook would be limited to the data users' opted to share in their privacy settings. Accordingly, this Court finds that the D.C. OAG's allegations are sufficient to set forth a *prima facie* case against Defendant Facebook under D.C. Code § 28-3904(e).

27

## b.    The D.C. OAG's Claims Pursuant to D.C. Code § 28-3904(f) Satisfy the Pleading Standard Set Forth in Superior Court Civil Procedure Rule 8(a)

Further, this Court finds that the D.C. OAG's claims pursuant to D.C. Code § 28-3904(f) also satisfy the pleading standard set forth in Rule 8(a). D.C. Code § 28-3904(f) prohibits "failures to state material facts if such failures tend to mislead." The District of Columbia Court of Appeals has held that D.C. Code § 28-3904(f) does not require plaintiffs to plead and prove a duty to disclose information. *See Saucier v. Countrywide Home Loans*, 64 A.3d 428, 444 (D.C. 2013). Moreover, District of Columbia courts have found that the issue of materiality is generally an issue of fact for the jury. *See id.* at 442, 444-45. The Court must therefore solely determine whether the D.C. OAG's allegations are legally sufficient to sustain a claim under D.C. Code § 28-3904(f).

In this case, the D.C. OAG alleges that Facebook failed to adequately warn its users that their personal data was improperly obtained, harvested, and used by third parties without the consumers' knowledge or affirmative consent, in violation of Facebook's policies. The D.C. OAG also alleges that Facebook failed to disclose to users that it allowed certain companies to override users' privacy settings and access consumers' personal data without their knowledge or consent. The D.C. OAG contends that several courts have found that fine print and obscurely placed disclosures, even if contained within a privacy policy, may be insufficient to give consumers reasonable notice that their personal information may be shared with third parties. *See, e.g., Minnesota v. Fleet Mortg. Corp.*, 158 F. Supp. 2d 962 (D. Minn. 2001); *In re Vizio, Inc.*, 238 F. Supp. 3d 1204 (C.D. Cal. 2017); *Federal Trade Commission v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35 (D.C. Cir. 1985). This Court finds that the D.C. OAG's allegations could be viewed by a reasonable consumer as misleading omissions of material facts in violation of § 28-3904(f), and therefore are legally sufficient to meet the Rule 8(a) pleading standard.

28

Additionally, this Court rejects Facebook's argument regarding D.C. Code § 28-3852 with respect to the D.C. OAG's CPPA claims. Facebook argues that the disclosure requirements set forth under D.C. Code § 28-3852 supersede the CPPA's disclosure requirement because "it is a more specific statute governing disclosures to consumers after data breaches." Def.'s Mot. 16. The Court notes that, while Facebook argues that D.C. Code § 28-3852 supersedes the CPPA, Facebook also admits that D.C. Code § 28-3852 does not apply in this context. Def.'s Mot. 16. Accordingly, this Court rejects Facebook's arguments concerning D.C. Code § 28-3852.

## c. The D.C. OAG's Claims Pursuant to D.C. Code § 28-3904(f-1) Satisfy the Pleading Standard Set Forth in Superior Court Civil Procedure Rule 8(a)

Finally, this Court finds that D.C. OAG's claims pursuant to D.C. Code § 28-3904(f-1) satisfy the Rule 8(a) pleading standard. D.C. Code § 28-3904(f-1) prohibits "the use of an innuendo or ambiguity as to a material fact that has a tendency to mislead." The D.C. OAG specifically asserts that Facebook violated D.C. Code § 28-3904(f-1) because:

(1) Facebook failed to explain to consumers how to control how information is shared with third-party applications, and how to change privacy settings with respect to applications;
(2) Facebook represented to consumers that it would protect the privacy of consumers' personal information;
(3) Facebook represented to consumers that it requires applications and third-party developers to respect the privacy of consumers' personal information; and
(4) Facebook represented to consumers that consumers' agreement with third-party applications will control how those applications use consumer data.

The question of whether Facebook's disclosures actually gave consumers unambiguous notice of its data-sharing practices, and their implications, is a question of fact for a jury. However, this Court holds that the allegations in the D.C. OAG's Complaint, if true, could lead a reasonable consumer to find Facebook's disclosures ambiguous and misleading, in violation of D.C. Code § 28-3904(f-1). Thus, in consideration of the Rule 8(a) pleading standard, this Court finds that the D.C. OAG's allegations are sufficient.

29

### 3. **This Case Will Not Be Stayed Pending the Completion of the Multi-District Litigation Proceeding and/or the Federal Trade Commission Investigation**

The Court finds that a stay is not warranted at this stage of the case, regardless of the pending MDL proceeding in the Northern District of California or the pending FTC investigation. The determination as to whether to stay proceedings in the Superior Court of the District of Columbia pending resolution of a related action in District Court, or any other federal court, is within the sound discretion of the Court. *See Thomas v. DAV Ass'n*, 930 A.2d 997, 1000-01 (D.C. 2007); *Landis v. N. Am. Co.,* 299 U.S. 248, 254 (1936) (recognizing that "…the power to stay proceedings is incidental to the power inherent in every court to control the disposition of its docket with economy of time and effort for itself, for counsel, and for litigants.").

The District of Columbia Court of Appeals has specifically recognized that there is "no general requirement that the Superior Court defer to the District Court when related actions are pending in both courts, but it often will be prudent and efficient to do so, especially when the federal court was the first to acquire jurisdiction." *Thomas*, 930 A.2d at 1000-01. In making this determination, the Court "must weigh competing interests and maintain an even balance." *Landis*, 299 U.S. at 254-55 (citations omitted). However, the burden is on the moving party to "make out a clear case of hardship or inequity in being required to go forward[.]" *Id.* at 255.

Here, the Court finds that staying proceedings in this case would not be prudent, as the local legal issues that are present in the instant case are distinct from the issues before the MDL Court. The Court recognizes that there is some overlap between the two matters, particularly as they involve the same defendant, Facebook, and both seek to adjudicate issues regarding

30

consumer data and privacy. Nevertheless, this Court finds that the law upon which the two cases are brought and the two sets of plaintiffs are distinct.

The Court notes that the majority of plaintiffs in the MDL case are individual Facebook users who have brought claims in their personal capacity or "on behalf of a proposed nationwide class of people whose data had been obtained by Cambridge Analytica or other third parties." *In re Facebook, Inc*., 354 F. Supp. 3d 1122, 1123 (N.D. Cal. 2019). In the instant case, the Plaintiff is the District of Columbia, a governmental entity seeking relief regarding Facebook's alleged violations of District of Columbia laws. The Court recognizes that the claims brought in the MDL matter involve the consumer protection statutes of other states, such as Alabama, Colorado, and Illinois. However, the District of Columbia CPPA claims will not be addressed by the MDL, making it unlikely that the MDL will decide issues that are dispositive to the instant case.

Moreover, staying proceedings in this case could unduly prejudice the D.C. OAG. The MDL has been pending before the Northern District of California for over a year, and the MDL court is presently litigating Defendant Facebook's Motion to Dismiss the Amended Consolidated Complaint. This Court finds that the size and breadth of the MDL case make it uncertain whether and when any factual issues relevant to this proceeding will be resolved by the MDL Court.

This general concern was also recognized by the MDL Court in regards to the Cook County State's Attorney's case, *People of the State of Illinois, ex rel. Kimberly M. Foxx, State's Attorney of Cook County, Illinois v. Facebook, Inc., et al*., 2018 CH 3868. In its Order remanding the case, the MDL court specifically stated:

> When a case is folded into multidistrict litigation, it will almost inevitably be delayed. Its fate will be bound up in the fates of many others. The transferee judge may decide that certain claims should be prioritized or addressed first. The plaintiff may thus lose control over the direction of the lawsuit. And this

31

is a serious concern if the plaintiff is a government entity or official—the multidistrict litigation process would intrude on state or local sovereignty.

*In re Facebook, Inc.*, 354 F. Supp. 3d 1122, 1125 (N.D. Cal. 2019). While this Court recognizes that staying litigation is distinct from having this case enveloped by the MDL, the expressed concerns regarding efficiency and state sovereignty remain the same. The Court therefore concludes that it is more efficient to proceed with litigation in this matter, rather than to allow this case to remain in an indeterminate state for many months, if not years.

Further, the Court similarly finds no basis to stay proceedings in this matter pending the conclusion of the FTC investigation. The Court notes that the FTC investigation seeks to determine whether Facebook violated the FTC's 2012 Consent Order, whereas the focal point of litigation in this case is Facebook's alleged violation of the CPPA. While there is some factual overlap between the FTC investigation and this case, the Court finds that this overlap is insufficient to merit staying litigation in this matter.

Accordingly, upon consideration of the representations made, the entire record herein, and for good cause shown, it is this $3/5\dagger$ day of May 2019, hereby

**ORDERED,** that Defendant Facebook, Inc.'s Opposed Motion to Dismiss, or in the Alternative, to Stay Proceedings is **DENIED**.

**FERN FLANAGAN SADDLER**
**ASSOCIATE JUDGE**

32

**COPIES TO:**

Ben Wiseman, Esquire
Randolph T. Chen, Esquire
*Counsel for Plaintiff District of Columbia*
(via e-service)

Christopher Leach, Esquire
Joshua S. Lipshutz, Esquire
Chantale Fiebig, Esquire
*Counsel for Defendant Facebook, Inc.*
(via e-service)