Pages 1 - 138

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

```
                                )
                                )
IN RE:  FACEBOOK, INC.          )   NO. 18-MD-02843 VC
        CONSUMER PRIVACY USER   )
        PROFILE LITIGATION.     )
                                )
_____ )
```

San Francisco, California
Wednesday, May 29, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        KELLER ROHRBACK LLP
        1201 Third Avenue - Suite 3200
        Seattle, Washington  98101
    BY:  **DEREK W. LOESER, ESQ.**
        **CARI C. LAUFENBERG, ESQ.**

        BLEICHMAR, FONTI & AULD LLP
        555 12th Street, Suite 1600
        Oakland, California  94607
    BY:  **LESLEY E. WEAVER, ESQ.**
        **MATTHEW S. WEILER, ESQ.**
        **JOSHUA D. SAMRA, ESQ.**
        **ANNE K. DAVIS, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana M. Dub, RDR, CRR, CCRR, CRG, CCG
        Official Reporter, CSR No. 7445

**APPEARANCES**:   (CONTINUED)

For Defendant:

                           GIBSON, DUNN & CRUTCHER LLP
                           200 Park Avenue
                           New York, New York  10166-0193
            BY:  **ORIN SNYDER, ESQ.**

                           GIBSON, DUNN & CRUTCHER LLP
                           1050 Connecticut Avenue, NW
                           Washington, D.C.  20036
            BY:  **JOSHUA S. LIPSHUTZ, ESQ.**

                           GIBSON, DUNN & CRUTCHER LLP
                           555 Mission Street - Suite 3000
                           San Francisco, California  94105
            BY:  **KRISTIN A. LINSLEY, ESQ.**

1  <u>**Wednesday - May 29, 2019**</u>                    <u>**10:34 a.m.**</u>

2                    <u>**P R O C E E D I N G S**</u>

3                        ---o0o---

4          (Call to Order of the Court.)

5          **THE CLERK:**  Calling Case Number 18-MD-2843, In Re

6  Facebook Inc. Consumer Privacy User Profile Litigation.

7      Can one member from the plaintiff and from the defendant

8  please step forward and state the appearances of your parties.

9          **MR. LOESER:**  Good morning, Your Honor.  Derek Loeser

10 from Keller Rohrback for the plaintiffs.  If it's okay with

11 the Court, I'll allow my colleagues to introduce themselves.

12         **THE COURT:**  Sure.

13         **MS. WEAVER:**  Good morning, Your Honor.  Lesley Weaver,

14 Bleichmar Fonti & Auld.

15         **THE COURT:**  Good morning.

16         **MS. LAUFENBERG:**  Good morning, Your Honor.  Cari

17 Laufenberg, Keller Rohrback.

18         **THE COURT:**  Good morning.

19         **MS. DAVIS:**  Anne Davis, Bleichmar Fonti & Auld.

20         **THE COURT:**  Good morning.

21         **MR. GOULD:**  Benjamin Gould, Keller Rohrback.

22         **THE COURT:**  Good morning.

23         **MR. SAMRA:**  Good morning, Your Honor.  Josh Samra,

24 Bleichmar Fonti & Auld.

25         **THE COURT:**  Good morning.

1          **MR. WEILER:**  Good morning, Your Honor.  Matthew

2    Weiler, Bleichmar Fonti & Auld, for plaintiffs.

3          **THE COURT:**  Good morning.

4          **MR. SNYDER:**  Good morning, Your Honor.  Orin Snyder,

5    Gibson Dunn, for Facebook; and I'm joined by my colleagues Josh

6    Lipshutz, Kristin Linsley, and Christopher Leach.

7          **THE COURT:**  Hi, everyone.

8          **MR. SNYDER:**  Hi, Judge.

9          **THE COURT:**  Okay.  Why don't I start with Facebook,

10   and why don't we start with the last question that I posed to

11   you, which is, let's assume -- I know you strongly disagree

12   with this; but let's assume, for the sake of argument, that

13   Facebook suggested to its users that if your settings are to

14   share stuff with friends only, only your hundred friends --

15   let's say a user has 100 friends -- and you adjust your

16   settings so that your posts and your likes and whatnot, your

17   photographs are shared only with your friends, we, Facebook,

18   will make sure not to give anyone else access to that

19   information.  Okay?  And let's say that in contravention of

20   that assurance, Facebook actually disseminated the photographs

21   and the likes and the posts to hundreds of companies.

22        Wouldn't that be a really serious privacy violation?

23          **MR. SNYDER:**  The answer, Your Honor, is no, and I'll

24   explain why.

25        The answer to your full question is both.  We do really

**PROCEEDINGS**

1   contend that this is not serious enough to give rise to a claim

2   of invasion of privacy or any other privacy --

3           **THE COURT:**  You also say that that's not what

4   happened.  I understand that.

5           **MR. SNYDER:**  And so let me explain why.  Addressing

6   your hundred friends --

7           **THE COURT:**  Yes.

8           **MR. SNYDER:**  -- example -- and this really goes to the

9   core of Facebook's argument, both on standing, which I

10  understand we're going to put a pin in and hopefully you'll

11  give me a moment but maybe not, and to consent -- and to the

12  consent questions.

13      Your Honor, first, the gravamen, obviously, of any privacy

14  tort, including any invasion of privacy tort, is a reasonable

15  expectation of privacy, whether it's seclusion upon intrusion,

16  whether it's public disclosure of private facts, or any

17  constitutional privacy right that may exist under California

18  law.

19      And what's key here, Your Honor, is that the plaintiffs

20  admit, throughout their lengthy Complaint, that they shared

21  their Facebook information with, in this case, a hundred

22  friends, friends of friends, or even strangers.

23          **THE COURT:**  Okay.  But let's talk about my example.

24          **MR. SNYDER:**  Okay.  Your analysis.  Let's just keep

25  it --

PROCEEDINGS

1          **THE COURT:**  Okay.

2          **MR. SNYDER:**  -- to friends.

3     Plaintiffs admit they were told that they could control

4     their sharing to not control [sic] with friends.  That's part

5     of your hypothetical.  Plaintiffs admit they were told by

6     Facebook that Facebook cannot --

7          **THE COURT:**  Wait.  Start over.  Okay?  Put your

8     talking points away, maybe, and listen to my question.  Okay?

9     My question is, assume -- forget about what the plaintiffs

10    are alleging right now.  Okay?  We're talking about a

11    hypothetical.  Okay?

12    The hypothetical is, a Facebook user sets her settings so

13    that only her friends can see her photographs.

14         **MR. SNYDER:**  Yes.

15         **THE COURT:**  Okay?  And Facebook assures the user that

16    if you only share stuff with your friends, we, Facebook, will

17    not give access to those photographs to anyone else.

18         **MR. SNYDER:**  Yes.

19         **THE COURT:**  And assume, despite that assurance that

20    Facebook gives the user, that Facebook actually disseminates

21    those photographs to hundreds of companies.

22         **MR. SNYDER:**  And there are no other disclosures under

23    this hypothetical?

24         **THE COURT:**  Correct.

25         **MR. SNYDER:**  Okay.

PROCEEDINGS

1          **THE COURT:**  Okay?

2          **MR. SNYDER:**  Same answer.

3          **THE COURT:**  Now, so is that a serious privacy invasion

4    by Facebook?

5          **MR. SNYDER:**  No.  There is no privacy interest,

6    because by sharing with a hundred friends on a social media

7    platform, which is an affirmative social act to publish, to

8    disclose, to share ostensibly private information with a

9    hundred people, you have just, under centuries of common law,

10   under the judgment of Congress, under the SCA, negated any

11   reasonable expectation of privacy.

12         **THE COURT:**  But, so how is that different from --

13   okay.  Let's say -- I mean, I sort of vaguely remember when I

14   was a kid, my dad would invite a bunch of people over and he

15   would show a slideshow of our family vacation to Europe.

16   Right?  And he might invite 20 friends and show them the

17   photographs.

18      I mean, if somebody gets ahold of that information and

19   disseminates it to a thousand companies --

20         **MR. SNYDER:**  Yes.

21         **THE COURT:**  -- isn't that -- I mean, the fact that he

22   showed those slides to 20 people doesn't prevent him from

23   asserting a privacy interest --

24         **MR. SNYDER:**  It does --

25         **THE COURT:**  -- in those slides.

PROCEEDINGS

1          **MR. SNYDER:**  -- Your Honor.

2      And if you let me explain, as a matter of law, it clearly

3  does.  The gravamen of any privacy tort is a reasonable

4  expectation of privacy, and whether it's the Restatement,

5  whether it's California common law, whether it is old

6  British -- English common law.

7      I'll read -- I'll read what the Restatement 652D

8  says (reading):

9              There's no tort liability when a defendant merely

10         gives further publicity to information that the

11         plaintiff has already publicized.

12     It is --

13         **THE COURT:**  But "publicized," that's an important

14  word --

15         **MR. SNYDER:**  Yes.

16         **THE COURT:**  -- right?

17         **MR. SNYDER:**  Yes, it is.  But let me explain.

18     100 people.  The social act of broadcasting your private

19  information to 100 people negates, as a matter of law, any

20  reasonable expectation of privacy.  The very premise of

21  Facebook --

22         **THE COURT:**  You seem to be treating it as a binary

23  thing, like either you have a full expectation of privacy or

24  you have no expectation of privacy at all.  And I don't

25  understand why we should think of it in that way.

1          I mean, if I don't tell anybody something, if I don't

2    share a certain thing with anybody, I have a full expectation

3    of privacy in that.  If I share it with ten people, that

4    doesn't eliminate my expectation of privacy.  It might diminish

5    it, but it doesn't eliminate it.

6          And if I share something with ten people on the

7    understanding that the entity that is helping me share it will

8    not further disseminate it to a thousand companies, I don't

9    understand why I don't have -- why that's not a violation of my

10   expectation of privacy.

11          **MR. SNYDER:**  Because, Your Honor, what the plaintiffs

12   are doing here and what Your Honor's hypothetical suggests is a

13   brand-new right of privacy that has never been recognized

14   before.

15          And if you'll let me be heard, Your Honor, the plaintiffs

16   say in their brief, and Your Honor is suggesting, that, quote,

17   the disclosure of private information, bracket, to 100 people,

18   closed bracket, is itself a brand-new privacy right.

19          That's just not right, Your Honor.  There is no privacy

20   right when the act is the negation of any expectation of

21   privacy.  I believe, Your Honor, it is not a close call.

22          Let me give you a hypothetical of my own.  I go into a

23   classroom and invite a hundred friends.

24          This courtroom.  I invite a hundred friends, I rent out

25   the courtroom, and I have a party.  And I disclose --

**PROCEEDINGS**

1       **THE COURT:**  These people are not all your friends.

2       **MR. SNYDER:**  No.

3    And I disclose something private about myself to a hundred

4    people, friends and colleagues.

5       Those friends then rent out a 100,000-person arena, and

6    they rebroadcast those to 100,000 people.

7       I have no cause of action because by going to a hundred

8    people and saying my private truths, I have negated any

9    reasonable expectation of privacy, because the case law is

10   clear.  And I can cite --

11      **THE COURT:**  If you disclose -- let me -- I agree with

12   you that if you turned around right now in open court, on the

13   record, and disclosed something about yourself, you would not

14   have an expectation of privacy in that.

15      But what if you shared with your partners in your

16   New York -- you're in the New York office?

17      **MR. SNYDER:**  Yes, Your Honor.

18      **THE COURT:**  What if you shared with your partners in

19   your New York office some medical condition that you had?

20      **MR. SNYDER:**  Absent any fiduciary or other legal duty,

21   I would be out of luck.  And let me tell you, Your Honor --

22      **THE COURT:**  Wait a minute.  So you say -- the

23   partnership has an agreement.  Okay?  "You can share stuff with

24   us and it won't be disclosed."

25      And so you share with a hundred people -- your hundred

**PROCEEDINGS**

1  partners in your New York office a serious medical condition

2  that you have that's going to put you out of commission for a

3  while, and then the Gibson Dunn office does a press release

4  about it.  Your privacy has not -- your privacy rights have not

5  been invaded?

6      **MR. SNYDER:**  It has not, Your Honor.  And I know

7  Your Honor is looking at me skeptically, but all you need to do

8  is go to the common law.  And I'll march through some cases, if

9  Your Honor wishes.

10     But you have to, as a matter of law -- the Restatement,

11  the annotations to the Restatement, the cases going back

12  literally centuries, hold that you have to closely guard

13  something in order to have a reasonable expectation of privacy.

14  It's commonsensical.

15     This is why every parent says to their child, "Do not post

16  it on Facebook if you don't want to read about it tomorrow

17  morning in the school newspaper," or, as I tell my young

18  associates if I were going to be giving them an orientation,

19  "Do not put anything on social media that you don't want to

20  read in the Law Journal in the morning."

21     There is no expectation of privacy when you go on a social

22  media platform, the purpose of which, when you are set to

23  friends, is to share and communicate things with a large group

24  of people, a hundred people.  And, of course, I want --

25     **THE COURT:**  But there are different levels of risk you

1    take; right?  I mean, you may -- when you disseminate

2    information to your 20 friends or your 50 friends or your

3    hundred friends, you're certainly taking a risk that other

4    people will learn about that information.  Just like when you

5    tell a secret to your best friend, you're running the risk that

6    your best friend is going to tell his wife about that, and his

7    wife is going to tell her friend, and a larger circle of people

8    will learn about it.  But what you're not risking, a risk that

9    you're not necessarily taking on is that the entity that's

10   helping you disseminate that information to your friends will

11   then turn around and disseminate it to a thousand different

12   corporations.

13       MR. SNYDER:  Your Honor, the hypothetical you gave --

14   which, of course, bears no resemblance to the facts of this

15   case at all because of the disclosures that negated any

16   reasonable expectation of privacy because users were told --

17   this is an asterisk to your hypothetical -- "We can't control

18   what third parties do with your information.  Your friends are

19   going to share things with other people, including app

20   developers, including others."

21       So put the disclosures aside.  The disclosures are the

22   icing on the cake in negating and vitiating any reasonable

23   expectation of privacy.  But even without disclosures, in your

24   hypothetical, and certainly without consent as an issue, as a

25   matter of black letter common law, the user no longer has any

1    expectation of privacy over information after she shares it

2    with a hundred people.

3         Now, the reason is, Your Honor, because they shared the

4    information -- this is what the case law, if you stretch it

5    out, teaches -- you've lost control over the information and

6    its subsequent disclosure, which is why, if you look at the

7    congressional judgment behind the SCA, for example, it

8    expressly authorizes the recipient of information with consent

9    to share it with the world.  And it's commonsensical.

10        So the case law --

11        **THE COURT:**  Well, it doesn't expressly authorize the

12   recipient of the information to share it with the world.  It

13   just says that if the recipient of the information shares it,

14   it's not a violation of the SCA.

15        **MR. SNYDER:**  Okay.  Fair enough.

16        But my point, Your Honor, is that the SCA and the

17   congressional judgment underlying it, reflects the

18   commonsensical common law principle that if you don't hold

19   something private, it's not private.  And if you don't hold

20   something private and publicize it to a hundred people, as a

21   matter of law, you have no reasonable expectation of privacy.

22        In your hypothetical, do you have a breach of contract

23   action against Facebook?

24        **THE COURT:**  Oh, I would think so, yeah.

25        **MR. SNYDER:**  Perhaps so under your hypothetical.  But

**PROCEEDINGS**

 1   let me give Your Honor a couple of cases.

 2          **THE COURT:**  Well, no.  Let me ask you first.  I think,

 3   for the most part -- the Complaint is riddled with these

 4   statements by Facebook executives with, sort of, grandiose

 5   statements about privacy and "Your privacy is important to us"

 6   and all that kind of stuff.  I think, for the most part, those

 7   statements aren't terribly relevant.  I mean, they may be a

 8   little bit relevant.  They may be a little bit relevant to how

 9   the user understands the disclosure language.  And we can get

10   to that in a bit.  But for the most part, I think that stuff is

11   a little bit of a sideshow, except with respect to this

12   question.

13      I mean, what you are saying now seems contrary to the

14   message that Facebook itself disseminates about privacy.

15          **MR. SNYDER:**  I would --

16          **THE COURT:**  I mean, would Facebook -- I mean, if we

17   were asking the CEO or whoever about -- if they were standing

18   here instead of you, would they be saying the same thing?

19      That if Facebook promises not to disseminate anything that

20   you send to your hundred friends and Facebook breaks that

21   promise and disseminates your photographs to a thousand

22   corporations, that that would not be a serious privacy

23   invasion?

24          **MR. SNYDER:**  First of all, I can't speak for the CEO,

25   but I can speak for Facebook.

PROCEEDINGS

1          THE COURT:  Okay.

2          MR. SNYDER:  And what I can say to Your Honor is,

3    first of all, I don't think any of the statements were

4    grandiose.  I think they're fully consistent with the robust

5    and layered disclosures that Facebook makes to these users.

6          THE COURT:  Facebook doesn't think that that is a

7    serious privacy issue?

8          MR. SNYDER:  Your hypothetical?

9          THE COURT:  Yeah.

10         MR. SNYDER:  I think it may be -- there's a difference

11   between Facebook's statement, as the CEO has said repeatedly,

12   about its commitment to privacy and what it wants to do above

13   and beyond the law to respect privacy issues.

14         THE COURT:  But my hypothetical is not --

15         MR. SNYDER:  But it's not --

16         THE COURT:  Facebook does not consider that to be a

17   serious privacy breach?

18         MR. SNYDER:  Facebook does not consider that to be

19   actionable, as a matter of law under California law, because

20   the very act of sharing with a hundred friends vitiates, as a

21   matter of basic common law, any expectation of privacy.

22      Let me point Your Honor just to random cases that we found

23   in response to Your Honor's order last night.

24      There's a Georgia case, Supreme Court case,

25   *C-o-t-t-r-e-l-l versus Smith*, 299 Georgia 517, where an

**PROCEEDINGS**

1   extramarital affair was already exposed on blogs and to

2   Facebook friends, so it wasn't a private fact.  No tort; no

3   privacy interest.

4        There are other cases involving --

5             THE COURT:  Was it friends only?  Because you just

6   said "blogs."

7             MR. SNYDER:  Facebook friends.

8             THE COURT:  Yeah, but you just said "blogs."

9             MR. SNYDER:  And --

10            THE COURT:  So if it's out on the blogs --

11            MR. SNYDER:  And Facebook.

12            THE COURT:  -- for everybody to see, then that's a

13   different story.

14            MR. SNYDER:  And Facebook.

15            THE COURT:  Right.  But the whole point, I mean,

16   Facebook's whole point, I thought, in sort of communicating to

17   consumers how important privacy is, is that if you share stuff

18   only with your friends, that doesn't mean you're sharing it

19   with the world.

20            MR. SNYDER:  No, Your Honor, Facebook never says that.

21   Facebook says when you -- are we in your hypothetical, or are

22   we in the real world?  Because I'd like to go to the real

23   world.

24            THE COURT:  Okay.  Let's go to the real world.

25            MR. SNYDER:  In the real world, in the real world, not

**PROCEEDINGS**

1    only is it common sense and a matter of basic common law that

2    when you share private information with a hundred people,

3    you've lost any control over that information and its privacy;

4    but the belt and suspenders on this case that negates any

5    privacy interest as a matter of basic common sense, again, are

6    the disclosures, because the disclosures here -- I made a board

7    that is -- just sort of strips it down to its basics.

8         **THE COURT:**  Great.  And let me just pull up the actual

9    document, because when -- this usually happens in patent cases

10   where the lawyers pull out portions of a disclosure, and then I

11   go to the full document -- so I always like to have the full

12   document up when --

13        **MR. SNYDER:**  That's fine, Your Honor.

14        **THE COURT:**  -- a lawyer is showing me a poster board.

15        **MR. SNYDER:**  My last board had the full document, and

16   for the Court's convenience, I condensed it.  So --

17        **THE COURT:**  That's perfectly fine.

18        **MR. LOESER:**  Your Honor, this is very apropos where we

19   can't actually see.

20        **THE COURT:**  Well, you're free to move around and go

21   wherever you want.

22        **MR. LOESER:**  Some judges get very angry when you

23   walk --

24        **THE COURT:**  No, no, no.  Knock yourself out.

25        But let me just pull up the -- so this is Exhibit 45?

**PROCEEDINGS**

1        So this is Exhibit 45.  This is the December 11th, 2012,

2   Data Use Policy.

3            **MR. SNYDER:**  Yes.  And so this also --

4            **THE COURT:**  And what page of that filing should I go

5   to?

6            **MR. SNYDER:**  Let me make the broader point,

7   Your Honor, as my colleagues are looking for the page number.

8        So the broader point is that not only is it a matter of

9   common sense and common law that when you disclose your private

10  information to a hundred people, you have no privacy interest

11  in that information, but here, the disclosures to Facebook were

12  multiple and they said two things.

13       One, when you share information with friends, friends

14  could share it with third parties, including apps.  That's what

15  happened here.

16           **THE COURT:**  This is on page 10 of 16, right --

17           **MR. SNYDER:**  Yes.

18           **THE COURT:**  -- of the disclosure?

19           **MR. SNYDER:**  Yes.

20       ". . . information you share on Facebook can be

21       reshared.  This means that if you share something on

22       Facebook, anyone" -- that goes to your question about

23       scale -- "anyone who can see it" --

24           **THE COURT:**  So one of the phrases that you took out --

25  that's not the beginning of the sentence.  "Information you

PROCEEDINGS

1  share on Facebook can be reshared."

2     The beginning of the sentence is:

3         "Just like when you share information by e-mail

4     or elsewhere on the web, information you share on

5     Facebook can be reshared."

6         Right?

7     MR. SNYDER:  It proves my point double, yes.  I'm just

8  trying to give the salient sentence, which says anyone can see

9  it -- anyone who can see it, your hundred friends --

10     THE COURT:  But when you share -- when you send an

11  e-mail, when you share information by e-mail, you don't

12  necessarily expect that the company that operates the e-mail

13  system will take that information and disseminate it to a

14  thousand other companies.

15     MR. SNYDER:  The question is:  Do you have an

16  expectation of privacy in the information?

17     And in your hypothetical, when you send it to a hundred

18  people, anyone who can see it -- the hundred people -- can

19  share it with others, meaning, potentially, tens of thousands

20  or more, including the games, applications, and websites they

21  use.  And that's this case, of course.  And --

22     THE COURT:  No, that's not this case because they

23  haven't sued because their friends are resharing information.

24     MR. SNYDER:  Well, it's the case that their

25  information was shared with friends who shared it with Kogan;

**PROCEEDINGS**

1  and then Kogan, in violation of our policies, gave it to

2  Cambridge Analytica and served back ads to the users.

3     Facebook, on a board I'm about to show you, made clear,

4  as, again, is common sense, that once the sped arrow is

5  launched, once your private information is shared with a

6  hundred people, Facebook can't control what a third-party app

7  or game might do with that information.  And that, again, is

8  common sense.  And so --

9     **THE COURT:**  But here's the thing.  I know that we

10  can't just focus on this language, and you have other language

11  that is maybe a little more helpful to you.

12     But if we do look at this language in isolation, I would

13  say that it's a little bit misleading, because what it -- the

14  image that it invokes -- right? -- is, you post a message and

15  you share that message with your friend or you send an e-mail

16  to a friend or you make photographs available to a friend, and

17  then your friend may turn around and forward it to somebody

18  else.  Right?  But it doesn't really invoke the image of your

19  friend playing FarmVille through Facebook and the act of your

20  friend playing FarmVille through Facebook giving Zynga -- is

21  that the name of the company?

22     **MS. WEAVER:**  Yes.

23     **THE COURT:**  -- giving Zynga access to all of your

24  Facebook information that your friend could potentially see.

25     This paragraph that you've put up does not invoke that

**PROCEEDINGS**

1  image.  It invokes a much more benign image of your information

2  being passed along.

3         **MR. SNYDER:**  Well, it depends on what you're talking

4  about, if you're talking about apps, if you're talking about --

5         **THE COURT:**  I'm talking about apps now.

6         **MR. SNYDER:**  Apps.  So I respectfully disagree, but I

7  believe that this provides ample notice --

8         **THE COURT:**  Okay.  But --

9         **MR. SNYDER:**  -- to users --

10         **THE COURT:**  -- on a 12(b)(6) motion?

11         **MR. SNYDER:**  Yes.

12         **THE COURT:**  As a matter of law?  I mean, that's

13  another --

14         **MR. SNYDER:**  Yes.

15         **THE COURT:**  -- issue I'm struggling with.

16     You're saying that the only conclusion that a reasonable

17  Facebook user could draw from this paragraph that you've called

18  out now is that the user is going to understand that when their

19  friend is playing FarmVille through Facebook, Zynga is going to

20  be able to go in and grab all the information that is available

21  to your friend from your Facebook account.

22         **MR. SNYDER:**  Your Honor, it's not just this language.

23  It is the multiplicity of disclosures, the layered disclosures,

24  that plaintiffs paste throughout their Complaint that we cite

25  to in our moving brief and reply brief.

**PROCEEDINGS**

1              **THE COURT:**  I mean, so far, arguably, I mean, this is

2     a little bit of a head fake.  I mean, I'm not saying it was

3     intentional, but you could -- it seems to me that you could

4     view this paragraph as a little bit of a head fake.

5              **MR. SNYDER:**  Well, if you look at "Controlling what is

6     shared when the people you share with use applications," which

7     is on Document 187-45, page 10 of 16, that disclosure says:

8                   "Just like when you share information by e-mail

9              or elsewhere . . . ," dot-dot-dot.

10             Then it says:

11                  "Your friends and other people you share

12             information with often want to share your information

13             with applications to make their experiences on those

14             applications more personalized and social.  For

15             example, one of your friends might want to use a music

16             application that allows them to see what their friends

17             are listening to.  To get the full benefit of that

18             application, your friend would want to give the

19             application her friend list -- which includes your

20             User ID -- so the application knows which of her

21             friends is also using it.  Your friend might also want

22             to share the music you," the user, "'like' on

23             Facebook.  If you have made that information public,

24             then the application can access it just like anyone

25             else.  But if you've shared your likes with just your

**PROCEEDINGS**

 1        friends, the application could ask your friend for

 2        permission to share them."

 3            THE COURT:  Okay.  So that's a good counterpoint to

 4    what I said, but -- so that's sort of the Spotify example;

 5    right?

 6            MR. SNYDER:  Yes.

 7            THE COURT:  And then, if you go down to the last

 8    sentence in that section of the disclosures, it says:

 9            "If an application asks permission from someone

10        else to access your information, the application will

11        be allowed to use that information only in connection

12        with the person that gave the permission and no one

13        else."

14        So it seems to me one way to interpret that is:

15    All right.  So we're talking about Spotify now.  So your friend

16    goes on Spotify, and Spotify wants to point out to your friend

17    what their friends are listening to.  So Spotify might want to

18    tell your friend what you are listening to or what music you

19    like, what music you've said that you liked on Facebook, or

20    something like that.  Right?

21            MR. SNYDER:  Correct.

22            THE COURT:  So in connection with that interaction

23    between Spotify and your friend, Spotify may have access to

24    your information and may point that out -- may point that

25    information out to your friend.

PROCEEDINGS

1       But it doesn't follow, it seems to me, automatically, that

2  this means that Spotify will also have access to your

3  information outside the context of its interactions with your

4  friends.  And so that gets to the question that I asked you.  I

5  can't remember what --

6         **MR. SNYDER:**  Question 5, Your Honor.

7         **THE COURT:**  -- number it was.

8       Yeah, Question 5.

9         **MR. SNYDER:**  So the answer to Question 5 -- and I

10  appreciate the questions because we can answer them directly,

11  "yes" or "no" or "maybe."

12       And in this case, the answer is, the words "only be

13  allowed" do not describe, as a matter of law, on a 12(b)(6)

14  motion, a technological limitation on what Spotify --

15         **THE COURT:**  I don't think it -- I don't think, as a

16  matter of law, that we have to interpret it that way.

17         **MR. SNYDER:**  What I'm saying --

18         **THE COURT:**  In other words, the plaintiffs aren't

19  moving for judgment --

20         **MR. SNYDER:**  I'm sorry.

21         **THE COURT:**  -- on the pleadings --

22         **MR. SNYDER:**  I misspoke.

23         **THE COURT:**  -- here.

24         **MR. SNYDER:**  No reasonable reading of this

25  paragraph --

PROCEEDINGS

```
 1              THE COURT:  Why not?

 2              MR. SNYDER:  -- supports the notion --

 3              THE COURT:  Why?

 4              MR. SNYDER:  -- that "only be allowed" describes a

 5    technological limitation.

 6              THE COURT:  Why not?

 7              MR. SNYDER:  Well, I'll tell you.  The plain and

 8    ordinary definition of "allowed," the word "allowed," is like

 9    "may" and "can."

10        "Allowed" is not "Is it physically feasible?" but what is

11    permissible, acceptable, sanctioned.  If you look at the Oxford

12    English dictionary, "allowed" is --

13              THE COURT:  No, I understand that.  But I'm saying

14    there's another sort of colloquial use of "allowed."  Let me

15    give you an example.  Okay?

16        March Madness brackets.  Okay?  I don't know if your

17    office does this, but many offices say to employees, "Look, you

18    cannot use your work computer to fill out your March Madness

19    brackets," for whatever reason, because we're uptight or

20    because it creates a server problem or something like that.

21              MR. SNYDER:  You can't use your office computer to go

22    on Facebook.  You're not allowed to.

23              THE COURT:  Oh, another example.

24              MR. SNYDER:  We don't like that rule, but it exists

25    somewhere.
```

**PROCEEDINGS**

1      **THE COURT:**  So there are two -- so you're not allowed

2  to do that.  There are two possible ways that could be

3  implemented.

4      One is, we're going to trust you not to do it.  And if we

5  catch you doing it, you're going to be in trouble.

6      The other way is to just block the website.

7      And so I might be on my computer and I may want to go to

8  my March Madness brackets, and up pops a message:  You are not

9  allowed to go to this website.

10     And so that's a technological barrier to my being able to

11  access that information.  And I don't understand why it's not

12  at least plausible that a user could interpret that language

13  that way.

14     **MR. SNYDER:**  I'll explain why it's not reasonable nor

15  plausible.  Not only is it the plain, ordinary --

16     **THE COURT:**  The question isn't:  What's more

17  plausible?

18     **MR. SNYDER:**  No, Your Honor.  What I'm saying is, it

19  is an unreasonable, implausible reading, as a matter of law, to

20  read it the way Your Honor suggested.

21     **THE COURT:**  Why?

22     **MR. SNYDER:**  I'm about to explain.

23     First is, when you look to the canons of construction,

24  which is what we need to do in discerning the plain language,

25  if it is plain, is first you look to the dictionary definition.

PROCEEDINGS

1   And there's no question that every dictionary definition,

2   whether it's Merriam-Webster, Oxford English, does not make the

3   colloquial point Your Honor is making -- let me start with

4   that -- but makes clear that the word "allow" means --

5           THE COURT:  Well, but do you disagree --

6           MR. SNYDER:  -- permission.

7           THE COURT:  -- that people use the word "allow" that

8   way?

9           MR. SNYDER:  But the second canon of construction

10  which is applicable here and dispositive in support of what I'm

11  saying is that when Facebook -- the canon of construction is

12  that in trying to discern words of a contract, you don't just

13  look at the word at issue, but you look at the word in the

14  context of the integrated agreement.

15      The integrated agreement makes clear that when Facebook

16  wanted in its disclosures to refer to technical limitations, it

17  did not use what you say is a colloquial "allow."

18          THE COURT:  Okay.  Show me that.

19          MR. SNYDER:  It used words that are descriptive and

20  accurate to technological restraint or disability.

21      So the Data Use Policy --

22          THE COURT:  Same document?

23          MR. SNYDER:  -- November 15th, 2013, page 10 --

24          THE COURT:  Okay.  Hold on.  Let me get there.

25      All right.  Go ahead.

PROCEEDINGS

```
 1              MR. SNYDER:  "Once you remove an app, it won't be
 2       able to" --
 3              THE COURT:  Wait.  Hold on.  Let me find the language
 4       that you're reading.  Can you tell me where on --
 5              MR. SNYDER:  Yeah.  Page 10.
 6              THE COURT:  -- where on the page you are?
 7              MR. SNYDER:  Yeah.  It is --
 8              THE COURT:  Oh, I found it.
 9              MR. SNYDER:  -- the third paragraph.
10              THE COURT:  I found it.
11              MR. SNYDER:  -- "it won't be able to continue to
12       update the additional information you've given them
13       permission to access . . . ."  Dot-dot-dot.
14       If you look at that same page -- where is that, Chris? --
15       it says:
16              "You always can remove apps you've installed by
17       using your apps settings . . . ."
18       And then it gives a --
19              THE COURT:  You said the next page?  Sorry.
20              MR. SNYDER:  I'm sorry.  Same page.  Page 10.
21              THE COURT:  Okay.
22              MR. SNYDER:  Let me see where that is.
23       Yeah, it's the bottom of the third paragraph, the last
24       sentence.
25              THE COURT:  Okay.  Bottom --
```

**PROCEEDINGS**

 1        **MR. SNYDER:**  And then it says:

 2            "But remember, apps may still be able to access

 3        your information . . . ."

 4        And so when Facebook wanted to refer to scope of

 5    permission to use data, they refer to it as, in the referenced

 6    language, "allowed."  When they wanted to refer to a physical

 7    constraint or limitation, they used --

 8        **THE COURT:**  "Able."

 9        **MR. SNYDER:**  -- "able to," "be able to."

10        And then other language in the Data Use Policy further

11    discloses that Facebook "cannot physically," cannot physically

12    or technologically limit how apps -- Kogan, in this case -- use

13    data once they've obtained it.

14        **THE COURT:**  Where's that?

15        **MR. SNYDER:**  Page 9 of the same policy.

16        **THE COURT:**  Okay.

17        **MR. SNYDER:**  And that's the board -- that's the second

18    board that is -- I don't need the board.  Let me just --

19        And there they say:

20            "Remember that these games, applications and

21        websites are created and maintained by other

22        businesses and developers" --

23        **THE COURT:**  Wait.  Hold on.  I want to find the

24    language that you're reading.

25        **MR. SNYDER:**  And I apologize, Judge.

**PROCEEDINGS**

1        **THE COURT:**  That's okay.  I found it.

2        **MR. SNYDER:**  "Remember that these games, applications

3     and websites" --

4        **THE COURT:**  Wait.  Hold on.  Give me one sec.  I just

5     want to read the paragraph --

6        **MR. SNYDER:**  Yeah.

7        **THE COURT:**  -- that precedes it.

8     Okay.  Go ahead.

9        **MR. SNYDER:**  And this language, Your Honor, again,

10    goes to any reasonable expectation of privacy.

11       **THE COURT:**  "Remember that these games, applications

12       and websites are created and maintained by other

13       businesses and developers who are not part of, or

14       controlled by, Facebook, so you should always make

15       sure to read their terms of service and privacy

16       policies to understand how they treat your data."

17       **MR. SNYDER:**  Right.

18       **THE COURT:**  But this doesn't speak to the issue that

19    we were just talking about, because this is telling me about my

20    own interaction with apps on the Facebook platform.

21       **MR. SNYDER:**  Right.  Precisely.

22       **THE COURT:**  But this is an issue about my friends

23    being able to share my information with the app.

24       **MR. SNYDER:**  Precisely.  And that's why these layered

25    disclosures, in combination, are so effective and robust.

**PROCEEDINGS**

 1   You're told a number --

 2            **THE COURT:**  Effective from the standpoint of?

 3            **MR. SNYDER:**  User disclosure and user understanding.

 4       *Smith v. Facebook* looks at these exact same terms in the

 5   cookies context, and the Ninth Circuit said there is no claim

 6   because these disclosures are sufficient.

 7       The district court in that case, the district court in

 8   that case, in a decision, a written decision, held, as a matter

 9   of law, there is no privacy claim here because these

10   disclosures put the folks on notice that this was going to

11   happen.

12       And so here what you have, Your Honor, are multiple

13   layered disclosures.

14       The first disclosure is:  What do you share on Facebook?

15            **THE COURT:**  Since you bring up the *Smith* case, it

16   seems like courts often just say -- just go straight to the

17   question it was disclosed or it was not disclosed, and they

18   don't really pay attention to what the test should be,

19   depending on which stage of the litigation you're at.

20       And that sort of gets to this other question that I had

21   that I asked you.  I mean, is it -- we're at the 12(b)(6)

22   stage.  So I would think that you would have to -- the question

23   is:  What would a reasonable Facebook user interpret this to

24   mean?

25            **MR. SNYDER:**  Yes.

**PROCEEDINGS**

1         **THE COURT:**  Do you agree with that?

2         **MR. SNYDER:**  Yes.  It's an objective test.  Courts --

3         **THE COURT:**  And then I would think that you could only

4  win at the 12(b)(6) stage if your interpretation is the only

5  plausible interpretation.  Do you agree with that?

6         **MR. SNYDER:**  I agree that if my interpretation -- you

7  could say it both ways.  If my interpretation is the only

8  plausible, or the defendant's interpretation is unreasonable or

9  implausible.

10    And we believe this case is ripe for 12(b)(6) dismissal

11  because, as in *Smith v. Facebook*, an ordinary, reasonable user

12  in an objective test would understand these layered

13  disclosures, which are robust and blunt, to mean, one, when I

14  share with a hundred friends, my hundred friends may share with

15  apps; two, we don't control what those apps, Kogan, may or may

16  not do.

17    And Cambridge Analytica demonstrates that in a dramatic

18  way; that in the end, we can't control Kogan.  We can only

19  contract with him and hope that he honors his obligations to

20  us.

21    So if you're concerned, user, about what your friends

22  might be doing with apps or if you're concerned about what apps

23  might be doing with your data, you have multiple options.

24    Option 1, you can control, in a granular sense, your

25  privacy settings.  You have control over your information.

PROCEEDINGS

1      THE COURT:  Well, privacy settings don't help.

2      MR. SNYDER:  Privacy settings do help.  You can -- and

3  that's the next disclosure.  You can control most of the

4  information other people share with applications.

5      And then in another disclosure --

6      THE COURT:  But that's not privacy settings.  That's

7  app settings.

8      MR. SNYDER:  The notion that Facebook was hiding

9  anything, we think, is preposterous, because in multiple places

10 on multiple pages, repeatedly and clearly Facebook is saying:

11 If you share something with your friends, they might share it

12 with their apps; and if you're concerned about what the apps

13 are doing with your information, check their policies.

14     This is from the plaintiffs' own Complaint, paragraph 599:

15          "Facebook told users that by using their App

16      settings, they could prevent an App from accessing

17      their data via a Friend that used the App.  This was

18      true at all relevant times."

19     There was no coercion.  There was no surprise.  There was

20 full disclosure.

21     THE COURT:  It was true that Facebook told them at all

22 relevant times.

23     MR. SNYDER:  Yes.

24     THE COURT:  Not that it was the case, I think is what

25 they're saying.

1      **MR. SNYDER:**  Right.  My point, though, is that having

2   been told "There is no expectation of privacy," you can't cry

3   foul that there's gambling going on in this establishment when

4   you've been warned.

5      Second, 593 of the Complaint:

6         "At all relevant times, the SRR told users, 'You

7      own all of the content and information you post on

8      Facebook, and you can control how it is shared through

9      your privacy [hyperlinked] and application

10     [hyperlinked] settings.'"

11     So if you are a user concerned about your friends taking

12  your data and information and sharing it with Spotify, and who

13  knows what Spotify will do because you've been told Facebook

14  does not control Spotify, we have given you a user-friendly

15  mechanism for protecting that.

16     It goes on, on 594:

17        "The Data Policy . . . discussed in more detail,"

18     below, I guess, "[told] . . . users" -- "discussed in

19     more detail" -- oh -- "how users could use the

20     Privacy . . . and App Settings to control whether and

21     how other users or other entities could access one's

22     own content and information."

23     Unless we treat Facebook users as imbeciles, which the law

24  does not, a reasonable user, which is the standard in this

25  district, as a matter of law, renders implausible the notion or

1    argument that these disclosures were either misleading or

2    insufficient.

3        The privacy settings, which are clearly disclosed and

4    accessible to users -- not buried in the fine print on the

5    bottom of an airline ticket or the bottom of a cruise line

6    disclaimer, but prominent, accessible, hyperlinked -- control

7    which friends can see your info.  That is dispositive here.

8        **THE COURT:**  You say we don't treat them as imbeciles,

9    and, of course, I agree with that.  But it does raise another

10   question in my mind, which is, I assume that when we're

11   applying the "reasonable Facebook user" test, we are kind of

12   going back in time; right?  We're imagining the reasonable

13   Facebook user in 2012 when they signed up for Facebook.  Would

14   you agree with that?

15       **MR. SNYDER:**  At the time the alleged -- I would say at

16   the time the alleged misconduct or privacy breach occurred

17   because --

18       **THE COURT:**  Why wouldn't it be at the time that

19   they --

20       **MR. SNYDER:**  Because you're bound by --

21       **THE COURT:**  Okay.  We'll get to that in a second.

22       **MR. SNYDER:**  That's the incorporated by reference.

23       **THE COURT:**  So it's sort of hard, because I guess what

24   I would say is that:  Okay.  I know about the Cambridge

25   Analytica scandal.  I read all the news articles or some of the

1    news articles when the scandal broke.  And then I, of course,

2    started paying more attention and learning more once I got

3    assigned this case.  And I've spent a tremendous amount of time

4    studying the disclosures and reading the words of the

5    disclosures in the context of what has happened -- right? -- in

6    the context of Kogan getting this information and disseminating

7    it to Cambridge Analytica, in the context of the excellent

8    briefs that both sides have filed.  Right?  And so when I drill

9    down and I spend the probably hundreds of hours that I've spent

10   looking at this issue, I can read this language and I can

11   figure it out.

12        And I think your interpretation probably is the best

13   interpretation -- right? -- for an extremely well-informed

14   person who is trying to figure out what this language

15   discloses.

16        But if I go back in time to 2012 or whenever somebody

17   signed up for Facebook and nobody had even heard of Cambridge

18   Analytica, and this concept of a friend sharing information

19   with an app was much more abstract, would a reasonable user be

20   able to go through these layers of disclosures as you've

21   described them?

22        You seem to think that word helps.  I'm not sure --

23   I think it's actually sort of counterproductive to your

24   argument.

25        But would a reasonable Facebook user at the time, not an

 1  extraordinarily well-informed Facebook user who's familiar with

 2  Cambridge Analytica, but a reasonable Facebook user at the time

 3  be able to go through all these layers of disclosures and

 4  figure out that if they send stuff to their friends, that it

 5  will inevitably result in the dissemination of all their

 6  information to hundreds, if not thousands, of corporations

 7  unless they go in and they change their app settings?

 8       **MR. SNYDER:**  Your Honor, I respectfully but forcefully

 9  reject the premise of the question.  You don't need to go back

10  in time.  There's no Cambridge Analytica moment that changes

11  the canons of construction or the contract interpretation.

12  There's no drill-down needed.  There's no hundreds of hours

13  needed.  There's no well-informed person standard.

14       There is an objective reasonable user standard, and that

15  is governed by contract interpretation.  And in the *Yahoo* case,

16  this district held whether the terms of service adequately

17  notified the reasonable platform user, that's the standard.

18  And you can discern what the intention of the parties is from

19  the writing here in only one way.

20       **THE COURT:**  And this is what I struggle with.  Even if

21  I agree that your interpretation is the best interpretation

22  after staring at it for a long time and thinking about it and

23  reading your briefs, we're talking about a reasonable user;

24  we're talking about a 12(b)(6) motion.  And am I really in a

25  position, at this point, to conclude from all these words that

 1  the Facebook user who signs up in 2012 could only interpret

 2  this language in the way that you're suggesting?

 3          MR. SNYDER:  Well, the answer is -- the answer is yes,

 4  there is only one reasonable reading of this language.

 5      And let me tell you again, the three sources of truth in

 6  the disclosures that are dispositive, as a matter of law under

 7  12(b)(6), that there's only one reasonable reading.

 8      The privacy settings control which friends can see your

 9  information.  So you can -- if you really want to be private,

10  there are people who have archival Facebook pages that are like

11  their own private mausoleum.  It's only set to me, and it's for

12  the purpose of repository, you know, of your private

13  information, and no one will ever see that.

14          THE COURT:  That's so strange.  I'm curious.  Do you

15  know how many -- like, what percentage of Facebook users --

16          MR. SNYDER:  I don't, but it's more common than you

17  think, because people like the user interface; they like the

18  functionality.  And it's --

19          THE COURT:  One thing I could imagine is, whether it's

20  an individual or a business, starting off with the settings

21  private while they set up their --

22          MR. SNYDER:  Correct.

23          THE COURT:  -- Facebook page --

24          MR. SNYDER:  Correct.

25          THE COURT:  -- and then they go live with it.

1      **MR. SNYDER:**  So the privacy settings control which

2    friends can see your information.

3      Once you go to friends, the gig is over because you've

4    just gone -- taken a hundred people and pronounced your

5    personal likes and dislikes.  In fact, the very act of liking

6    something and showing your friends that you like something is a

7    non-private act.  It's the whole premise of Facebook and social

8    media, is to render not private your likes, your dislikes, your

9    expressions.  When I tag someone in a photo, it's to tell

10   people, not keep private, that I'm sitting on a park bench with

11   John Smith.  So it's the opposite of private when you do that.

12     But second, the app settings then control whether friends

13   can share your data with apps.  So that's the second point

14   where you can say, "No, this is private.  I want to have

15   privacy rights in this information."

16     But you're told if you don't change your app settings,

17   friends can take your data and tell Spotify what music you

18   like.  If that's not enough, Facebook gives belt and

19   suspenders, and the data policy says, "We can't control what

20   these apps do with your information, so be careful; read their

21   terms of service."

22     And, Your Honor, there is no need to spend hundreds of

23   hours with those paragraphs.  The Courts rule repeatedly,

24   whether it's the *Yahoo* case, the *Perkins* case in Google, the

25   *Smith* case in Facebook, that where, as here, terms of service

1    and privacy policies are reduced to writing, it is appropriate,

2    as a matter of contract interpretation, as a matter of law, to

3    read them reasonably and not read them unreasonably.

4         It would be unreasonable to read these provisions --

5              **THE COURT:**  Unreasonably.

6              **MR. SNYDER:**  -- unreasonably.

7         Let me say one more point on that.  I say layered

8    disclosures.  The reason I say that, it sounds good, but also,

9    Facebook took pains to make sure that it told its users, in

10   multiple places that they might look, how to control friend

11   sharing.  It wasn't just in one place so that if a user elides

12   over it, they may miss the action.

13        If Facebook intended, as counsel suggested when I had the

14   board blocking them, that Facebook was trying to hide

15   something, there's a very easy way to deep-six these

16   disclosures.  Facebook did the opposite, put it on multiple

17   touch points, data policy, app settings, privacy settings.

18        And what's telling about the Complaint is -- which does

19   take a hundred hours to read.  In paragraph 408, this is an

20   admission that is binding on the plaintiffs and, again,

21   dispositive of Facebook's argument that there is no reasonable

22   expectation of privacy here.

23             "In order to gain access to non-public content

24        and information, App Developers needed to request

25        permission from the App User.  Through this process,

**PROCEEDINGS**

1          App Developers gained access to the App User's content

2          and information and the user's Friends' content and

3          information."

4          In other words, this is the paragraph 121 and 122 from

5     their original Complaint that they struck in this Complaint,

6     which acknowledged -- and I think it was fatal, which is why it

7     came out of the Complaint -- that no app developer, Kogan or

8     other app developer, obtained information in excess of or in

9     contravention of any Facebook user's privacy settings.

10          This is not a case where people go on Facebook and they're

11    blindsided because friends are getting their data and sharing

12    it with apps.  This is a case where what happened up until

13    Kogan was exactly, exactly what was advertised.

14          And, of course, Facebook users have another choice if they

15    don't like the platform.  And ultimately, that's what this case

16    is, Your Honor.  If you read the Complaint and spend the

17    hundred -- because it's 200 hours to read it twice -- what you

18    realize is this is really just a broadside against Facebook.

19    And I'm not going to argue right now.  I'm going to beg you for

20    five minutes at the end to argue standing.  But this is why the

21    Complaint is really a Complaint about ubiquitous sharing on

22    social media platforms.

23          They don't like it because when you go on a social media

24    platform and share your information with a hundred people,

25    you've lost control.  And that creates anxiety, and that

**PROCEEDINGS**

1    creates concern.  It doesn't give rise to a claim, which is why

2    we say, in the raging debate that's going on in this country

3    about what does privacy mean in the digital age, we're only

4    about five years or six years into the digital age in the sense

5    that apps were not widely adopted until maybe 2014, 2013, 2015.

6    So we're less than half --

7            **THE COURT:**  Yeah, I think that really cuts against

8    you, because it speaks to what a reasonable Facebook user would

9    understand when they're reading these disclosures in 2012.

10           **MR. SNYDER:**  No, Your Honor.

11           **THE COURT:**  That's my whole point --

12           **MR. SNYDER:**  No.

13           **THE COURT:**  -- is that the concept of an app and the

14   interaction between your friend and an app is so much more

15   abstract to the 2012 reader pre-Cambridge Analytica than it is

16   now.

17           **MR. SNYDER:**  Facebook told users what would happen

18   clearly, bluntly, repeatedly, and it happened.

19        The point I was making is that to the extent that these

20   plaintiffs or similarly situated people feel aggrieved by how

21   the Internet has developed and how information sharing on the

22   Internet has revolutionized human civilization, because people

23   are now sharing things in a digital realm that they never did

24   before, that's not for the federal district courts to invent

25   new privacy rights.

1    And it's why -- it's why -- it's why, Your Honor, you have

2    Congress debating these issues, why you have the FTC

3    investigating these issues.  But that does not mean in this

4    case, on these facts, given the allegations, that this case can

5    or should proceed because there is no common law tort or tort

6    analogue that fits these facts.

7         THE COURT:  Do you want to talk a little bit about

8    business partners?

9         MR. SNYDER:  Yes.

10        THE COURT:  They label these companies as "business

11   partners."  I don't know -- I can't remember where they got

12   that from.  Maybe they got that from *The New York Times* article

13   or something.

14        MR. SNYDER:  Yeah.

15        THE COURT:  You label them as "device manufacturers."

16        MR. SNYDER:  Um-hmm.

17        THE COURT:  It's not clear to me where you get that.

18   I mean, it seems like you're rewriting their Complaint when you

19   describe them as "device manufacturers."

20        MR. SNYDER:  So let me explain that.  And thank you

21   for asking for that clarification.

22    This may be the most cynical of their arguments and, also,

23   the one that demonstrates the point I just made, which is that

24   the Complaint here is how Facebook operates, not that there is

25   an actionable conduct.  Let me explain why.

**PROCEEDINGS**

 1      First, you have to -- the Complaint conflates -- and maybe

 2  we fell into the trap.  I don't think we did -- device

 3  manufacturers with so-called whitelisted apps and other apps.

 4  So if you break down the players into four categories, you have

 5  Kogan and Cambridge Analytica.  That's the Cambridge Analytica

 6  parties.  You have other apps, Spotify.  You have the so-called

 7  whitelisted apps, which are the so-called --

 8          THE COURT:  Yeah, I know.  I'm just asking you, how

 9  did you come up with "device manufacturers" to describe what

10  they call "business partners"?

11          MR. SNYDER:  Because originally, they were --

12          THE COURT:  Because they had a list of business

13  partners.

14          MR. SNYDER:  They do.  They do.

15          THE COURT:  And they don't seem like device

16  manufacturers.

17          MR. SNYDER:  Some of them are; some of them aren't.

18          THE COURT:  Okay.

19          MR. SNYDER:  Let me break them up into their

20  constituent categories.  And page -- thanks, Josh.

21  Paragraph 483 of the Complaint is what we're going to respond

22  to now, as well as Your Honor's Question 6.  And it's alleged:

23          "Facebook partnered with a diverse set of

24      companies, including Business Partners, to develop and

25      integrate Facebook's User Platform on multiple devices

1          and operating systems."

2          And so on and so forth.

3          And so let me address why that business partner allegation

4    does not get to first base under 12(b)(6).

5          First and critically, as to the *Clapper* requirement of

6    particularity, the Complaint, again, suffers fatally from the

7    absence of any allegation, among the thousands of allegations

8    in the Complaint, that any plaintiff's information was shared

9    with any of these business partners.

10         **THE COURT:**  Well, I mean, I don't know.  I mean, let's

11   say we're just limiting ourselves to these 53 business

12   partners.  If I'm on Facebook and these business partners have

13   access to my data based on my interaction with them or based on

14   my friends' interaction with them, it's a virtual certainty

15   that at least one, and likely many more, of these business

16   partners will have my data.

17         **MR. SNYDER:**  I respectfully disagree.  And I also,

18   again, respectfully disagree with the premise that "virtual

19   certainty" is the standard.  Under *Clapper* and *Lujan*,

20   L-u-j-a-n, this is precisely the kind of non-particularized

21   speculation, and the *Lujan* case made clear -- that was the

22   *Wildlife* case where --

23         **THE COURT:**  I know the case.

24         **MR. SNYDER:**  Yeah.

25         And so there is no "reasonable likelihood" or "virtually

**PROCEEDINGS**

1   certain" test.  There's a duty to investigate, and these

2   plaintiffs are required -- this is my first point.  There are

3   many other points.  But the first point, they're required to

4   allege, plausibly, that any of these so-called business

5   partners received their data.  They didn't.  That is a pleading

6   failure.  You can't just assume that they accessed Facebook on

7   a BlackBerry during that stump period between when Facebook

8   launched and apps were developed.  And that's when the

9   BlackBerries of the world and the Apples of the world built

10  Facebook-like environments then.

11         **THE COURT:**  Okay.

12         **MR. SNYDER:**  Okay.

13         **THE COURT:**  I understand that argument.

14  And then your second argument is that this, too, was

15  disclosed.

16         **MR. SNYDER:**  Yeah.  So, yes.  As to all categories,

17  the disclosures were more than sufficient.  And I think I have

18  a board for that one too.

19  And this really, Your Honor, is not only commonsensical --

20  before we get to the language -- it really is no good deed goes

21  unpunished.  I remember, because I was an early adopter of

22  Facebook in 2007, being excited that I could actually go on my

23  BlackBerry and access my Facebook information on my BlackBerry.

24  It was exciting because, before that, you had the flip phones

25  and maybe you could text on a flip phone.  So now I had my

1    BlackBerry.

2       And BlackBerry built this really kind of protoskeletal

3    Facebook-like environment so that I could access my Facebook

4    data on my BlackBerry.

5       As a BlackBerry user and a Facebook user, heretofore only

6    using Facebook on my desktop, how do I think my information got

7    from Facebook to BlackBerry?

8            THE COURT:  Well, I think this is why you have changed

9    the name of "business partners" to "device manufacturers."

10           MR. SNYDER:  No, I haven't.

11           THE COURT:  And it's why you're using BlackBerry as an

12    example.

13           MR. SNYDER:  No.

14           THE COURT:  Because I actually think you have a -- to

15    the extent that they are complaining that information was

16    shared with device manufacturers, I think they have a pretty

17    weak argument there.

18           MR. SNYDER:  Well, I'm not --

19           THE COURT:  And so I'm not as concerned with the

20    device manufacturers.

21           MR. SNYDER:  Let me get to the others, then.

22       I'm not changing any names, Your Honor, respectfully.

23    Paragraph 486 of the Complaint -- thank you, Josh -- says:

24           "Facebook formed Business Partnerships as early

25       as 2007.  These deals allowed Facebook to expand its

**PROCEEDINGS**

1    reach by outsourcing to Business Partners the time,

2    labor and money required to build Facebook's Platform

3    on different devices and operating systems."

4         So my understanding is that the gravamen of that

5    allegation is device manufacturers.  But then elsewhere in the

6    Complaint, they talk about whitelisted apps and other apps.

7         **THE COURT:**  Let's assume that the Complaint makes

8    pretty clear that business partners are not limited to device

9    manufacturers.

10        **MR. SNYDER:**  So let's go to other apps and so-called

11   whitelisted apps.  Those are the other categories other than

12   device manufacturers.

13        **THE COURT:**  No.  Let's stick with business partners --

14        **MR. SNYDER:**  But --

15        **THE COURT:**  -- which consists of a universe of

16   companies that is greater than device manufacturers.

17        **MR. SNYDER:**  Well, I can list them, Your Honor,

18   because I have a list of them in front of me, and they are --

19   they fall into two categories:  other apps or so-called

20   whitelisted apps.  And those are the only two other categories

21   in the Complaint, other than device manufacturers and Kogan, at

22   issue.

23        And as to those categories of so-called business partners,

24   from the user perspective, all apps are the same.  Users are

25   told, as we've marched through over the past half an hour or 45

1    minutes, that their friends could share their information with

2    apps.  It didn't say with public apps or private apps or big

3    apps or small apps.

4         **THE COURT:**  But I don't think the allegation about

5    business partners is that the business partners got Facebook

6    users' information through friends.  If I'm misunderstanding,

7    you can correct me, but I don't think that's the allegation

8    relating to business partners.

9         I think the allegation relating to business partners is

10   that Facebook simply gave business partners access to this

11   data.

12        **MR. SNYDER:**  I don't think so, Your Honor.  My

13   understanding of the allegation is that they either gave it to

14   device manufacturers to facilitate a Facebook-like experience

15   on these other operating systems, one; or, two, that these

16   companies obtained Facebook user information, the so-called

17   business partners, as a result of friend sharing.

18        **THE COURT:**  Interaction with friends?

19        **MR. SNYDER:**  Friend sharing.

20        **THE COURT:**  Where does it say that?  I mean, where

21   does it say that in the Complaint?  I interpreted the Complaint

22   to mean:  Okay, we've got the app problem here where apps are

23   getting information about you through your friends without your

24   knowledge; and then we've got this separate problem with

25   business partners where Facebook was just giving data to these

1   business partners willy-nilly.

2       And some of them are device manufacturers.  And we can

3   kind of understand why device manufacturers needed to get data.

4   But we have these other companies and --

5           **MR. SNYDER:**  If you look at the allegation, 563, Apple

6   had access to the contact numbers.

7           **THE COURT:**  Wait.  Hold on.  Let me go to 563.

8           **MR. SNYDER:**  If you look at all of the partners,

9   because I have them all broken down here on my outline, in each

10  instance, it was to either facilitate use on an operating

11  system or the ability to read -- there's an allegation, 557:

12      Up to 2017, Yahoo had access to users' news feeds,

13  including posts and users friends, for 100,000 users per

14  month -- I guess that's what Your Honor is referring to -- for

15  a feature that Yahoo had discontinued in 2012.

16      But that was with user permission, Your Honor.  They're

17  apps.  And so that's my point here.  My point is that as to all

18  categories, whether it's these private companies or public apps

19  or otherwise, users are told that their information will be

20  shared with third parties for purposes of targeting advertising

21  back to the users, which the plaintiffs acknowledge the

22  targeting of advertising is neither actionable or unlawful in

23  any way.

24      And so it's hard to discern, again, I guess --

25          **THE COURT:**  I mean, I admit the allegations are a

**PROCEEDINGS**

1  little fuzzier here than they are in the third-party app

2  context.

3       **MR. SNYDER:**  This is the problem with the Complaint,

4  Your Honor.  What happened is, they took every newspaper

5  article and they just reprinted what they saw, without

6  conducting a reasonable enough investigation to back any of it

7  up as to this.

8       And there's no claim here, Your Honor, that there is a

9  data breach.  There's no claim here that there is any use by

10 any of these so-called business partners in excess of or in

11 contravention of user settings.

12      And so despite having so many at bats here, the most they

13 can come up with on this business partner claim is an

14 allegation that they don't like that these big companies got

15 their data.

16      Well, they had the ability, Your Honor, to restrict what

17 information was shared or not shared on the privacy settings

18 that we went through a little earlier.  So this is not, again,

19 forced or coerced sharing.  This is sharing with the consent

20 and knowledge of users.

21      And so this is -- this stands in no different camp or no

22 different analytical framework than any third-party app.  And

23 the question is:  Is there a reasonable expectation of privacy

24 where users were told that business partners, so-called, which

25 are just another category of apps, would get their information?

1        Again, Your Honor, what we're talking about here is a

2   complaint about information sharing on Facebook.  The

3   plaintiffs don't like it, and it's their right not to like it,

4   but there is no common law tort, common law analogue, statute

5   of Congress that makes it illegal for a social media company to

6   share information that users voluntarily share with friends in

7   circumstances where they were told, in clear and no uncertain

8   terms, that once you share your information, you lose control

9   of it and, even more, Facebook can't control what third parties

10  do with it.

11       So not only is there no serious invasion of privacy,

12  there's no invasion of privacy at all, which, of course, brings

13  us full circle to the taboo topic, which I'm not going to get

14  to, which is Article III.

15       **THE COURT:**  The other question that we haven't given

16  you a chance to address yet -- I think you've addressed

17  everything that I put out there except for this last issue,

18  which is changing the terms of service after somebody agrees to

19  it.

20       And mainly, I guess what I want from you -- if you want --

21  I'm happy for you to argue it, if you want; but mainly, I want

22  to make sure I'm just not missing any cases that you think are

23  favorable to you --

24       **MR. SNYDER:**  Yes, Your Honor.

25       **THE COURT:**  -- at this point.

**PROCEEDINGS**

1          **MR. SNYDER:**  And I appreciated the question because

2      I think there is some misunderstanding, not in this Court, but

3      in general in the jurisprudence because of some of these old

4      cases that are hard to follow.

5          And I think this is a really easy, easy question.  So the

6      answer is, there is clear incorporation by reference.  You

7      don't have to say "incorporated by reference" under the case

8      law.  And the best cases showing that the Data Use Policy,

9      sometimes called the privacy policy, was incorporated by

10     reference into the SRR --

11         **THE COURT:**  No.  I was actually asking --

12         **MR. SNYDER:**  Oh.

13         **THE COURT:**  -- the change -- I was more interested in

14     hearing from the plaintiffs on that question --

15         **MR. SNYDER:**  Got it.

16         **THE COURT:**  -- because I think they're a little bit

17     behind the eightball on that issue.

18         **MR. SNYDER:**  Yes.

19         **THE COURT:**  But I think you are probably behind the

20     eightball on the issue of changing the terms of service after

21     users signed up.

22         **MR. SNYDER:**  Aah.

23         **THE COURT:**  And so I wanted to --

24         **MR. SNYDER:**  Yes.

25         **THE COURT:**  And as I said, I'm happy to hear you argue

**PROCEEDINGS**

1   that a little bit --

2        **MR. SNYDER:**  Yes.

3        **THE COURT:**  -- but mainly, I want to make sure I'm not

4   missing any of the cases on that.

5        **MR. SNYDER:**  Okay.

6        **THE COURT:**  I know there were a couple of cases from

7   San Jose on that.  I think there was a Judge Koh decision and a

8   Judge Grewal decision on that that are somewhat favorable to

9   you.

10       **MR. SNYDER:**  There are good Ninth Circuit cases too,

11  Your Honor.

12       **THE COURT:**  There's a Donato decision that is

13  distinguishable but, I suppose, partly helps you; partly helps

14  the plaintiffs.

15       What else -- there was one other case I think I read on

16  this.  But I just want to make sure I'm not missing any cases.

17       **MR. SNYDER:**  There's actually a plethora of cases.

18       **THE COURT:**  Okay.

19       **MR. SNYDER:**  We can send them to Your Honor, or I can

20  put them into the record.  But --

21       **THE COURT:**  Go ahead and tell me what other cases

22  support you on this.

23       **MR. SNYDER:**  There are two principles.  There are two

24  operative, dispositive principles here.

25       The first is, users are bound, under California law, by

**PROCEEDINGS**

1   updated user agreements where the company, as here, updates its

2   agreements on the platform, where, as here, there is a

3   so-called unilateral modification clause which exists here.

4        *Tompkins versus 23andMe*, Ninth Circuit case from 2016,

5   840 F.3d 1016.  There, the Court held that the modification --

6   unilateral modification clause is enforceable in California

7   when -- and the Ninth Circuit didn't condition its holding on

8   any sort of notice requirement.

9             THE COURT:  I have that in my stack, but I haven't --

10            MR. SNYDER:  That was a --

11            THE COURT:  I haven't read that yet.

12            MR. SNYDER:  That was a motion to dis- -- that was

13   decided on the pleadings.

14            THE COURT:  Okay.

15            MR. SNYDER:  *Ali*, A-l-i, *versus JPMorgan Chase*, Ninth

16   Circuit 2016; *Procurium*, holding the same.  Not unconscionable,

17   fully enforceable.  Again, no notice requirement.  And, again,

18   the issue was decided on the pleadings.

19        Then the second, several district courts have, as

20   Your Honor noted, held that continued use after posting of new

21   terms constitutes assent.  It's the *Facebook versus Profile

22   Tech* case, Judge Grewal, 2013.

23        There is a *Google* case from 2016, Judge Koh decided,

24   September 23, 2016, *M-a-t-e-r-a v. Google*.  And same holding.

25        And then there is the *DeVries* case, I think Your Honor

**PROCEEDINGS**

1    mentioned, from 2017 which holds:

2         "In general, courts have enforced new terms where

3     prior agreements included change-in-terms provisions."

4     There's the *Campos* case, another Northern District case

5    from 2019, Judge Corley:

6         "Plaintiff has not shown that the [unilateral

7     modification] provision is subsequently

8     unconscionable, especially given that the arbitration

9     agreement that applies to plaintiff's dispute is the

10    agreement she expressly agreed to."

11    There's a *West versus Uber* case, Judge Gutierrez, 2018,

12   citing *Biometric*, which I'll get to in a minute, and find that

13   the plaintiffs assented to unilaterally modified terms when

14   they continued using Uber for a year after receiving notice of

15   the changes in terms.

16        THE COURT:  And then *Biometric* was Judge Donato's

17   case; right?

18        MR. SNYDER:  Yeah.

19        THE COURT:  Yeah.

20        MR. SNYDER:  And then --

21        THE COURT:  That was the one where they sent --

22   Facebook sent e-mails to --

23        MR. SNYDER:  Yes.

24        THE COURT:  And maybe that happened here too.

25        MR. SNYDER:  Yes.

1        **THE COURT:**  We're going on the Complaint right now --

2        **MR. SNYDER:**  Well, yeah.

3        **THE COURT:**  -- which doesn't contemplate --

4        **MR. SNYDER:**  The truth is that Facebook did more than

5   merely post the revised contract on its website.  It gave users

6   notice in a variety of ways.

7        **THE COURT:**  But we have to assume that it didn't for

8   purposes of this motion; right?

9        **MR. SNYDER:**  Well, you know, I think that in, again,

10  the Donato case, Facebook users agreed, you know; and so --

11       **THE COURT:**  But that was, like, after -- that wasn't

12  just a summary -- that wasn't a motion to dismiss.  I don't

13  think it was even summary judgment.  Right?  It was after an

14  evidentiary hearing.

15       **MR. SNYDER:**  We don't need to -- the fact is, just so

16  Your Honor could be comfortable knowing that Facebook wasn't

17  trying to get one over, we did go beyond what the law required,

18  which, again, is an example of how the Complaint is not only

19  overblown --

20       **THE COURT:**  So let's talk about what the law requires,

21  then.  I mean, I guess what I -- it does seem that there are

22  cases going in both directions on this issue and the courts are

23  sort of all over the map.

24       But I guess what I'm having trouble wrapping my head

25  around is, your argument seems to stand for the following

1   proposition.  All right?  Facebook has terms of service which

2   say -- let's say I sign up in 2012, and the terms of service

3   say you can share information with your friends and under no

4   circumstances will we, Facebook, permit the disseminat- --

5   allow the dissemination of that information to anybody else.

6   Your friends might do it.  We can't prevent your friends from

7   doing it.  But we will not provide that information to anybody

8   else.  We will not give access to that information to anybody

9   else under any circumstance.

10       And I sign up for that.  And then a year later, Facebook

11  changes the terms of service and says:  We have the right to

12  disseminate all the information you make available to your

13  friends to anybody we like for any reason under any

14  circumstances.  And ten minutes later, Facebook disseminates

15  all of my information to a thousand companies.

16       Your position, it seems to me, stands for the proposition

17  that that's perfectly okay --

18           **MR. SNYDER:**  I would say --

19           **THE COURT:**  -- from a legal standpoint.

20           **MR. SNYDER:**  No, Your Honor, because I neglected to

21  say and was about to say -- and then Josh reminded me to say --

22  all of this is subject to the covenant of good faith and fair

23  dealing.  So you can't act in bad faith and you can't deal

24  unfairly.

25       But as a matter of contract interpretation and

**PROCEEDINGS**

1   enforcement, you have a remedy.  If you don't --

2       **THE COURT:**  You can't invoke the covenant of good

3   faith and fair dealing where you do something that is directly

4   authorized by the contract.

5       **MR. SNYDER:**  Well --

6       **THE COURT:**  And so if you are -- if the contract

7   explicitly says that Facebook has the right to change the terms

8   of service any time it wants without you agreeing to it, then I

9   don't think there could be a breach of covenant of good faith

10  and fair dealing claim because Facebook is doing what is

11  explicitly authorized by the contract.

12      **MR. SNYDER:**  I would say, I have not studied that

13  issue because it's not implicated here.  But I will say that

14  every case to consider this issue has held that, under certain

15  circumstances, there could be an implied covenant of good faith

16  and fair dealing claim.

17      But let me make two other points, because your

18  hypotheticals are challenging but, thankfully, are not this

19  case.

20      And so the terms here did not change in such a dramatic

21  fashion.  They're minor changes.  But more important than that,

22  what the cases say, each of them -- or many of them, at

23  least -- is that the plaintiff has a remedy if they don't like

24  this contract, if they don't like this bargain which says

25  Facebook can change its terms of use from time to time.  They

**PROCEEDINGS**

1  have two remedies.  They can review them from time to time to

2  see how they've changed, "or," or they can discontinue using

3  the service if they don't like the rules of the road.

4      And, of course, that, ultimately, is another fatal

5  problem.

6          THE COURT:  So if I'm using Facebook, I need to --

7  every day I need to go check to see if my terms of service have

8  changed?

9          MR. SNYDER:  Actually not, because as the plaintiffs

10  know -- and I believe the Court could take judicial notice

11  under Rule 12(b)(6) -- Facebook announces any major changes

12  prominently, repeatedly, in press releases, on its website,

13  often e-mails.  I mean, in the Donato case, often e-mails,

14  e-mails to users.

15      And California courts --

16          THE COURT:  But what you're asking me to rule is that

17  if I sign up for Facebook, it's my obligation to read the terms

18  of service every day --

19          MR. SNYDER:  That's not --

20          THE COURT:  -- to make sure that they haven't changed.

21          MR. SNYDER:  That's not what I said, Your Honor.  What

22  I said is that you're bound by the contract, and the

23  contract --

24          THE COURT:  Which says that we can change our terms of

25  service --

**PROCEEDINGS**

1          **MR. SNYDER:**  Yes.

2          **THE COURT:**  -- any time we want.

3          **MR. SNYDER:**  Yes, Your Honor.  That's the contract.

4  And if you don't like a contract, you don't have to sign it.

5  They have a remedy.  They could discontinue service.

6          **THE COURT:**  The problem is, I haven't yet agreed to

7  the new terms of service because I don't know what they are.

8          **MR. SNYDER:**  You don't have to.  Every case to

9  consider this that I've seen --

10          **THE COURT:**  That's not correct.  There are cases going

11  both ways on this.

12          **MR. SNYDER:**  Well, okay.  Well, I'm not aware of

13  either a controlling Ninth Circuit case --

14          **THE COURT:**  For example, Judge Tigar's *Safeway* case.

15          **MR. SNYDER:**  Okay.  So whether there's an outlier case

16  or not, the weight of authority, the substantial weight of

17  authority, including from the Ninth Circuit in the Tompkins

18  case -- and I haven't gotten to the California Supreme Court

19  cases -- hold --

20          **THE COURT:**  We'll get to those because this is a

21  question of California law.

22          **MR. SNYDER:**  Right.

23          **THE COURT:**  Tell me about the California Supreme Court

24  cases.

25          **MR. SNYDER:**  The California --

 1          **THE COURT:**  I would be bound by those cases; right?

 2          **MR. SNYDER:**  Well, the California cases all support

 3   Facebook.

 4          **THE COURT:**  Okay.  What are they?

 5          **MR. SNYDER:**  There's *Casas*, C-a-s-a-s, which is a 2014

 6   intermediate appellate court.

 7          ". . . even a modification clause not providing for

 8          advance notice does not render an agreement illusory,

 9          because the agreement also contains an implied

10          covenant of good faith and fair dealing."

11          And California courts have held, Your Honor, that even in

12   the face of a direct contractual right -- and this is from the

13   *Tompkins* case at page 1016, 840 F.3d 1016.  The Ninth Circuit

14   writes:

15          "California courts have held that the implied

16          covenant of good faith and fair dealing prevents a

17          party from exercising its rights under a unilateral

18          modification clause in a way that would make it

19          unconscionable."

20          There's no allegation here that anything unconscionable

21   occurred.

22          There's another case, *Serpa*, S-e-r-p-a.

23          **THE COURT:**  So, in other words, if the provision that

24   is adopted later would have been unconscionable when adopted

25   originally, then it can't be adopted later.  Is that what that

**PROCEEDINGS**

1   stands for?

2        **MR. SNYDER:**  I believe it says -- and the *Casas* case

3   holds this.  *Tompkins* is quoting or citing Casas.  The *Serpa*

4   case, I think, holds this -- that if a subsequent modification

5   renders the contract unconscionable, such as some hypothetical

6   that we can think of --

7        **THE COURT:**  Right.

8        **MR. SNYDER:**  -- then the implied covenant of good

9   faith and fair dealing may step in and bar the contracting

10  party from exercising its contractual rights in a way that

11  would be --

12       **THE COURT:**  So, in other words, if you could never

13  have agreed to it in the first place, you're not -- Facebook

14  isn't allowed to adopt the same provision later.

15       **MR. SNYDER:**  I'm not sure whether unconscionability is

16  only in the substantive outcome or the change, or delta --

17              (Co-counsel confer.)

18       **MR. SNYDER:**  Yeah.  Okay.  Thank you.

19     So *Perdue* actually answers the question, *Perdue versus*

20  *Crocker Bank*, California Supreme Court, 38 Cal3d. 913, at

21  page 924:

22       ". . . we hold as a matter of law that the card is a

23       contract authorizing the bank to [unilaterally] impose

24       such charges, subject to the bank's duty of good faith

25       and fair dealing in setting or varying such charges."

1    So in the end, if a party is acting in a piggish or

2  blatantly commercially unreasonable way, the courts are going

3  to step in, in equity, and say -- in law and equity and say,

4  "No, we're not allowing this."

5    And so this is not that case.

6         THE COURT:  That's about, like, increasing fees

7  without -- okay.

8         MR. SNYDER:  And that's not this case, of course.

9         THE COURT:  Could I ask you, though.  I mean, why

10  would it be so difficult for Facebook to simply say -- let's

11  say I agree to a terms of service, and then there's some

12  significant change in the terms of service.  And I go on to my

13  Facebook account.  Why would it be so hard for Facebook to just

14  create a pop-up which says, "Our terms of service have changed.

15  You need to agree to the new terms of service before you

16  continue to use Facebook"?

17              (Co-counsel confer.)

18         MR. SNYDER:  Okay.  Two answers to that.

19    One -- I got it, Josh.

20    One, they did.

21         THE COURT:  Okay.  But that's not in this motion.

22         MR. SNYDER:  I understand you asked a question.

23    And so Judge Donato writes, Facebook sent -- that -- the

24  fact that the terms were changing, quote:

25         "They were provided notice that the terms of the

PROCEEDINGS

```
 1        user agreement were changing through an e-mail from

 2        Facebook sent directly to the e-mail addresses each

 3        plaintiff had on file with Facebook.  Each

 4        plaintiff -- none of whom disputes remaining an active

 5        Facebook user to this day -- would also have received

 6        a 'jewel notification' on his individual Facebook

 7        newsfeed.  This individualized notice" --

 8             THE COURT:  I read --

 9             MR. SNYDER:  Okay.

10             THE COURT:  I read --

11             MR. SNYDER:  So that's point one.

12        Point two is, as a commercial actor, Facebook has its own

13   business reasons why it does or doesn't decide to have pop-ups

14   as opposed to e-mail notifications.  But that doesn't give rise

15   to any cause of action under the common law or any

16   congressional statute.

17        And, again, it comes full circle, Your Honor, to

18   Facebook's basic point.

19        Your Honor just asked a good question, a very good

20   question.

21        Should the Facebooks of the --

22             THE COURT:  Facebook pays you a lot of money to say

23   things like that --

24             MR. SNYDER:  No.

25             THE COURT:  -- to me.
```

**PROCEEDINGS**

1              **MR. SNYDER:**  No, Your Honor.

2         Should social media platforms be required to provide

3    pop-up notices when they change their terms of service?  That's

4    a very interesting question.  I'm sure editorialists would

5    agree and disagree; legislators should agree and disagree.

6         If that is going to be the law of the land, it's going to

7    be because either Article II legislature says so, a state

8    legislator says so, the executive branch, the FTC says so.

9              **THE COURT:**  Or because California contract law

10   requires it.

11             **MR. SNYDER:**  Or because California contract law

12   requires it.

13        And there is no principle of contract construction or

14   canons of interpretation that would read the SRR and California

15   law to render invalid Facebook's absolute constitutional and

16   contractual right, because the right to contract is

17   constitutionally based.  We have a right to write our contracts

18   reasonably.  And so long as they're not unconscionable or

19   violate the implied covenant of good faith and fair dealing, as

20   Judge Grewal said and other judges said, the plaintiff is not

21   without a remedy.  They can stop using Facebook if they don't

22   like it.

23             **THE COURT:**  Okay.  So what I would like on this issue

24   is just a letter from both sides by Friday, listing -- no

25   argument, no parenthetical -- just listing the cases that I

 1   should read on this issue.  Okay?  Because it wasn't -- it

 2   didn't -- I know there were page limits in the brief, and it's

 3   nobody's fault, but it didn't get great treatment in the

 4   briefs, and I think it's an interesting and important question.

 5          **MR. SNYDER:**  I know I'm about to sit down.  May I just

 6   ask two questions?  The first is:  Does Your Honor want me to

 7   address Question 2, which is the incorporation by reference

 8   question?

 9          **THE COURT:**  No.  That's okay.

10          **MR. SNYDER:**  Okay.  And then, two, I'll just ask

11   Your Honor to consider giving me five minutes.

12          **THE COURT:**  Let's see where we are at the end

13   because --

14          **MR. SNYDER:**  It's very pertinent to -- of course, I

15   showed restraint, and I hope -- but the arguments I just made

16   obviously dovetail with an informed standing analysis.

17          **THE COURT:**  I will tell you that I've given a

18   tremendous -- both at the last hearing and in preparation for

19   this one, I've given a tremendous amount of consideration to

20   the standing issue.

21          **MR. SNYDER:**  Of course.

22          **THE COURT:**  And I really don't think I need to hear

23   any further argument on it.

24          **MR. SNYDER:**  Well, I will just -- I appreciate and

25   respect that.  If I can reserve, at Your Honor's sole

**PROCEEDINGS**

 1   discretion, three minutes at the end, I'd appreciate you

 2   begging my indulgence.

 3         THE COURT:  So what I propose that we do now is, I

 4   propose that we take a five-minute break.  We've been going for

 5   about an hour and a half.  And then we can return and I can

 6   hear from the plaintiffs and maybe give Facebook the last word

 7   briefly, hopefully not on standing.

 8         And we'll aim to wrap up at about 1 o'clock so that people

 9   can get some lunch.  Okay?

10         All right.  Thank you.

11         THE CLERK:  Court is in recess.

12                   (Recess taken at 12:02 p.m.)

13                (Proceedings resumed at 12:12 p.m.)

14         MR. LOESER:  Your Honor, while people are piling in, I

15   have a PowerPoint that I'll hand up to you.

16         THE COURT:  You realize you're not going to be able to

17   get through this PowerPoint.

18         MR. LOESER:  I know.  But you read everything; so --

19         THE COURT:  We don't need to go through this

20   PowerPoint.  What I would like to do is maybe just jump right

21   in and have you respond on the consent points.  I mean, I think

22   that's sort of the meat of it.

23         How do you want to respond to their points regarding

24   consent with respect to third-party apps and business partners?

25   Why don't we start with third-party apps.

1    MR. LOESER:  Sure.  And tracking with the questions

2    that you asked -- and just so you know, I'll be answering some

3    of the questions, including the consent questions.  Ms. Weaver

4    will jump up for other matters.  And at some point, we'll

5    probably occupy both podiums unless you tell us not to.

6         THE COURT:  Great.  That's fine.

7         MR. LOESER:  And the -- and so Question Number 2 is

8    this issue of corporation; so we'll get back to that and we'll

9    talk about consent.

10        First, just as a threshold issue, this notion that there

11   are no privacy rights for people on Facebook, I won't waste a

12   lot of time on that.  It's obviously -- it relates to consent

13   in the sense that they're saying that it really doesn't even

14   matter if you consented or not; there's no privacy rights.  And

15   that's clearly wrong and clearly inconsistent with positions

16   Facebook has taken in other cases like the SCA case that we

17   talked about the last hearing.  So, but I think it's obviously

18   wrong.  And so the actual disclosures are extremely important.

19        And we talked a bit about this at the last hearing as

20   well, but it's worth just mentioning.  And as you have

21   indicated in a lot of your questions, it's obviously a very

22   factual issue.  It's generally not decided on motions to

23   dismiss.  It's not the least bit uncommon for --

24        THE COURT:  Well, a fair number of courts do decide

25   them on a motion to dismiss, but they don't -- it seems like

1  they often do so without inquiring whether it's appropriate to

2  decide them on a motion to dismiss.

3       I mean, they kind of just look at the language, and they

4  say that was disclosed, and they move on without inquiring

5  whether there are other plausible interpretations of the

6  language and whether it's appropriate for them to be making

7  these rulings at a 12(b)(6) stage as opposed to a later stage.

8       **MR. LOESER:**  Yeah.  I think, fortunately, in this

9  district, where you had a lot of social media cases, cases

10  against Facebook, Google, Yahoo, the courts have been extremely

11  thorough in their analysis, have looked at what the disclosures

12  really say.

13       The *Opperman* case, which we talked about last time,

14  Judge Tigar really indicated what the standard was very

15  clearly.  He indicated why it's not appropriate to decide.

16  Where you have language that people can interpret in different

17  ways, it is not appropriate.

18       So there are cases -- Facebook likes to talk about the

19  *Smith v. Facebook* case in which the Ninth Circuit ruled as a

20  matter of law.  That really stands in stark contrast to this

21  case.  There, the case was about whether Facebook breached its

22  duties or its promises when it monitored website browsing.  And

23  they disclosed precisely that, that they monitor website

24  browsing.  That's the kind of circumstance where the Court can

25  say, "Look, there's no dispute.  There's nobody even disputing

 1    it."  The plaintiffs didn't even dispute that the terms were

 2    binding on them, unlike this case.  So that's the rare

 3    circumstance.

 4        The much more common circumstance is in the litany of

 5    cases that we've cited in our briefs and which Judge Koh and

 6    Judge Tigar and others go through and very clearly indicate,

 7    when you have two competing interpretations, it's not

 8    appropriate for a motion to dismiss.

 9        So, first, the threshold issue is --

10        **THE COURT:**  So on that issue, let me ask you.  What

11    would you expect -- so the idea behind not ruling on an issue

12    like this as a matter of law at the motion to dismiss stage is

13    that there will be something that will help you, at a

14    subsequent stage in the litigation, figure out what the true

15    answer is.  Right?

16        And so what is that in this case?  I mean, what

17    information -- let's say we got to the summary judgment stage.

18    What information would I be able to bring to bear on this

19    interpretation question that I can't bring to bear now?

20        **MR. LOESER:**  Well, first of all, Your Honor, just --

21    and this is, again, not the least bit unusual.  We have an

22    interpretation of these documents, and they have a different

23    interpretation.  So that just, by its nature, means there's a

24    disputed issue of fact, subject to you or a jury then decides

25    whose interpretation is more reasonable.

PROCEEDINGS

1          **THE COURT:**  Well, it depends how plausible your

2    interpretation is.   But let's assume we get past the motion to

3    dismiss stage.

4         Contract interpretation is a question of law; right?   I

5    mean, if it is a contract, would it be a jury question --

6          **MR. LOESER:**  It would.

7          **THE COURT:**  -- as to what this disclosure disclosed?

8          **MR. LOESER:**  When there are two plausible

9    interpretations of a contract, I think it's a question of fact.

10   The jury decides what the reasonable interpretation is.

11         **THE COURT:**  I always thought it was like -- I thought

12   California law was pretty clear that contract interpretation is

13   a question of law for the judge to decide.

14         **MR. LOESER:**  Well, here's how Judge Tigar looked at

15   the issue in the *Opperman* case.   And it's a bit of a long

16   quote; so I'll try and skip to the end but frame it.   And this

17   is 205 F.Supp.3d at 1077.   The Court is looking at exactly what

18   you're looking at.   They say the contract and the terms means

19   this.   The plaintiff says it means that.   The plaintiff said

20   they didn't disclose --

21         **THE COURT:**  And it's for the jury.

22         **MR. LOESER:**  Yeah, for the jury.   And the judge --

23         **THE COURT:**  Judge Seeborg has -- I think it's a

24   Facebook case, where he says the same thing.   But I just --

25         **MR. LOESER:**  Well, I'll just read the end, the last --

1      **THE COURT:**  Is there any analysis of California

2  contract law in those cases and any engagement on the question

3  of whether it should be a judge or a jury question?

4      **MR. LOESER:**  Well, I believe so.  And I'd have to flip

5  open *Opperman* to see if he's citing other Ninth Circuit or

6  federal cases or California cases.  I believe he does dip into

7  state cases, but I'll check that.

8      But the last line of the quotation I was going to read, he

9  writes:

10          "It remains to be seen whether these expectations

11      were objectively reasonable, but that is a question

12      for the jury, not this Court."

13      And there are other cases that we've cited in which

14  the courts indicate that the Court would have some discomfort

15  substituting its own views for that of the jury when deciding

16  these disputed issues of fact.

17      So I think the other thing, you're asking what would we

18  show later?  Well, discovery would occur.  And in addition to

19  just the contractual terms, I think it's also important to

20  hear --

21      **THE COURT:**  But what discovery would be relevant to

22  the question of how a reasonable Facebook user in 2012 would

23  interpret this language?

24      **MR. LOESER:**  Well, we could certainly ask questions

25  about why -- what does the language mean to Facebook?  What do

1    they think the theory is?

2         For example, there were things said today about how nobody

3    that uses Facebook and shares anything would ever believe

4    anything is private.  Well, I'm pretty sure that's not the view

5    of executives at Facebook.  They would strongly disagree with

6    that statement.  I know they would, because they've said just

7    the opposite in courts and they've said just the opposite

8    publicly.

9         So there's all kinds of testimony we could elicit about

10   the surrounding circumstances of the disclosures and the

11   reasonable expectations of Facebook and people utilizing

12   Facebook.

13        **THE COURT:**  I assume you would ask for all documents

14   that reflect Facebook's decision for what language to adopt in

15   its terms of service or in the section in its terms of service

16   on apps.

17        **MR. LOESER:**  Right.

18        **THE COURT:**  Third-party apps.

19        **MR. LOESER:**  There would be all kinds of questions.

20        **MS. WEAVER:**  It's funny you should raise this because

21   one of the points that we were talking about is that in our --

22   we issued a set of very narrow requests for production, and our

23   RFP Number 5 sought, actually, the disclosures that Mr. Snyder

24   was referring to; i.e., please produce to us all documents that

25   reflect notice to users when you change your terms of service.

**PROCEEDINGS**

```
 1        And we received nothing from them that directly
 2   communicated to users, "We are changing terms of service."  So
 3   maybe that's just incomplete discovery.  We haven't had the
 4   opportunity to pursue it.  But certainly, that notice issue, in
 5   the terms of reasonableness and context, is important.
 6        MR. LOESER:  If you look through the cases that decide
 7   the issue of what the disclosures mean on summary judgment and
 8   other stages, invariably they're referring to deposition
 9   testimony of the plaintiffs; they're referring to deposition
10   testimony of the executives about what was intended.
11        THE COURT:  But the test is a reasonable Facebook
12   user; right?  It's not -- it sounds like from the way the
13   courts treat it and it sounds like -- it sounds like both sides
14   agree that it's the reasonable Facebook user at the time.  And
15   so it sounds like an objective inquiry, not a subjective one,
16   where the actual -- where the actual views of the plaintiff
17   would be dispositive, which is weird because it's a contract
18   and we're --
19        MR. LOESER:  Right.
20        THE COURT:  -- inquiring about whether there was a
21   meeting of the minds.
22        MR. LOESER:  Well, and I think that the -- like, the
23   allegations in the Complaint by the plaintiffs we would say are
24   reasonable interpretations of the contract.  And so it bears
25   upon whether the language is reasonable, that you have a bunch
```

1    of people who read it that way and they reasonably concluded

2    that that's what it means.

3         You know, I can -- there's a variety -- if discovery were

4    to go forward here, we would ask for all kinds of information

5    that I think would fill out the question for you about:  Whose

6    interpretation is more reasonable?  What is it based on?  What

7    did Facebook executives believe?  What do they think these

8    things mean?  And how did people like the plaintiffs react to

9    them and take them into account when deciding what to do?

10        **THE COURT:**  You were going to say, other than that

11   sort of discovery.  I think I interrupted you before you were

12   about to say that there's some other type of information that

13   could be brought to bear.

14        **MR. LOESER:**  Right.  I would just refer the Court to

15   the fact that there are a number of regulatory agencies that

16   have investigated Facebook, investigated their conduct, their

17   disclosure, the terms of service, data policy, all of these

18   documents they took into account.

19        In England, the DCMS collected a huge amount of

20   information, evaluated Facebook's conduct, and came to

21   conclusions.  And those conclusions were that Facebook had not

22   obtained lawful consent and Facebook had not been clear.

23        And, you know, the FTC, back in 2011, looked at these same

24   disclosures, evaluated them.  At the time, the issue was --

25   which is still an issue pertinent to today, which is:  Was it

**PROCEEDINGS**

1    clear to people that their privacy settings didn't actually

2    control who got to see their information?  The FTC said, based

3    upon its collection of evidence, "No, it's not clear.  These

4    disclosures are not adequate."

5          And so that kind of evidence was gathered by these

6    regulators, and they came to a determination which --

7                THE COURT:  Are you talking about the current FTC

8    investigation?

9                MR. LOESER:  In 2011 -- they're sort of joined.  In

10   2011, the FTC told Facebook, "Your disclosures are not

11   adequate.  You are not making it clear to people that your

12   privacy settings don't actually control who sees this stuff."

13               THE COURT:  Right.  I was confused.  I thought you

14   were talking about -- because what the FTC is investigating now

15   is whether Facebook violated the terms of the consent decree --

16               MR. LOESER:  Right.

17               THE COURT:  -- by not adequately disclosing --

18               MR. LOESER:  Right.

19               THE COURT:  -- what it was doing with this

20   information.

21               MR. LOESER:  Right.  Because what Facebook agreed in

22   2011 was that if they were going to disclose information in a

23   way that exceeded people's privacy expectations or privacy

24   settings, they would have to get express informed consent to do

25   that.

1      And the FTC is investigating whether, when they gave the

2  information -- I think, based upon public disclosures and

3  articles -- when they gave information to whitelisted apps and

4  to business partners and Cambridge Analytica, were they, in

5  fact, exceeding the users' privacy settings, which is what we

6  allege in this case, and the FTC is evaluating whether that

7  occurred.

8      Now, at the motion to dismiss stage, I think it's fair to

9  look at that.  You don't have to --

10      **THE COURT:**  But is the FTC inquiring into whether,

11  like, a reasonable Facebook user would understand these

12  disclosures to mean what Facebook says they mean?  Or are they

13  engaging in a somewhat different inquiry; namely, whether

14  Facebook violated its agreement with the FTC, the consent

15  decree with the FTC?

16      **MR. LOESER:**  I'm not in the room, Your Honor, but I'm

17  sure that both of these things are being discussed.

18      I would think that if they're saying to Facebook -- and

19  Facebook's counsel, who I think is involved in that

20  investigation, could probably get up and explain this better

21  than me.  But if the allegation is they violated the consent

22  decree -- and the consent decree required that they get express

23  consent if they were going to exceed privacy settings -- then

24  what Facebook, I'm sure, is telling them is that "We didn't

25  exceed privacy settings, and here are our disclosures."  The

1    FTC, I would think, would be evaluating those disclosures.

2         **THE COURT:**  I mean, I think about, like, the food

3    labeling cases, where there's something on the label of

4    vitamins or something and the plaintiff comes in and argues

5    that it's misleading.  And there's a battle of experts.  And

6    the experts conduct surveys, and they offer opinions about what

7    the ordinary consumer would interpret this disclosure on the

8    label to mean.

9         I mean, when you hear "reasonable Facebook user" and "What

10   would a reasonable Facebook user understand these words to

11   mean?" you think about those surveys.  But, again, it seems

12   sort of weird in the context of a contract between, you know,

13   Facebook and individual users to conduct that sort of inquiry.

14        So anyway, I was curious if you thought that that sort of

15   thing would be relevant to answering the question.

16        **MR. LOESER:**  Go ahead.

17        **MS. WEAVER:**  Well, yes.  I mean, I think, certainly,

18   the user experience in this particular case --

19        **THE COURT:**  I'm sorry.  I'm enjoying the contrast

20   between what he's brought up to the podium and what you've

21   brought up to the podium.

22        **MS. WEAVER:**  It's a little -- uh, yeah.  What can I

23   say?

24        **THE COURT:**  Sorry.  Go ahead.

25        **MS. WEAVER:**  But I do think you're right, Your Honor,

 1  that the user experience, if we got to trial in this case, we

 2  would want to actually replicate what the platform looked like

 3  in 2007.  I mean, we have plaintiffs who joined in 2005, before

 4  there were any policies.

 5      So the question is:  What did it look like?  How did they

 6  change it?  Is it reasonable to understand that you would go

 7  back -- and as they added -- I mean, for example, the app

 8  setting was not added until December 2009.  And what -- you

 9  know, somebody who signed up, as you noted previously, might

10  have a very different experience trying to hunt for that when

11  they thought that they knew already how the platform worked,

12  especially if they aren't getting a notice saying, "This is

13  where you need to go."

14      **THE COURT:**  But in any of these other cases, like you

15  mentioned Judge Tigar's case -- that was the *Safeway* case;

16  right?  And he said this is a question for a jury.  Was there a

17  battle of experts in that case?  Or was it a question about

18  what the individual plaintiffs in that case understood the

19  language to mean?

20      **MR. LOESER:**  I'm just looking at the decision,

21  Your Honor, to see if there's any reference to the actual --

22      **THE COURT:**  I think in the decision, he's just looking

23  at the language and saying -- I didn't see any reference to,

24  like, a battle of the experts or anything.  I was curious if

25  there was one at trial or if there even was a trial.  I don't

1   even know if there was a trial.

2         MR. LOESER:  Yeah.  All I can say, just looking at

3   this quickly, is the Court was considering the evidence that

4   the plaintiffs presented, which included their own testimony

5   about what they believed the service was supposed to be, based

6   upon the disclosures that were given to them.

7         MS. WEAVER:  But here, also at issue is the conduct.

8   I mean, there are a lot of questions of fact around what --

9   and, in fact, you know, even in the defendant's presentation,

10  there's a citation here to a paragraph 485, when we were

11  discussing business partners.  And, you know, we've quoted:

12        "Facebook notes that this list is 'comprehensive

13        to the best of our ability.'"

14        But it stated:

15        ". . . it is possible we have not been able to

16        identify some integrations . . . ," et cetera.

17        So there's a lot of unknowables out there.  We've tried to

18  plead a very particularized complaint, but we don't actually

19  know -- to be truthful, we don't know all of the facts about

20  business partners.  We at least know about some of the apps

21  because early on, there were more disclosures.  There have been

22  fewer public disclosures.

23        THE COURT:  Yeah.  But you don't go past the 12(b)(6)

24  stage because we need to find stuff out.  The question I'm

25  asking is:  What type of information would I use that I'm not

1   capable of using now at the 12(b)(6) stage to resolve this

2   interpretation question?  Which seems like -- it seems like

3   it's a hybrid contract interpretation question/disclosure

4   interpretation question.

5          MR. LOESER:  Well, and I think -- and I apologize that

6   we're going back and forth; but, again, we'll do it until you

7   tell us we can't.

8       But the point you made earlier about changing expectations

9   about how social media works, for example, I could see the

10  value of an expert who would talk about that, who would talk

11  about what people reasonably expected based upon how apps were

12  used and a new technology and the fact that -- it could look at

13  language that Facebook uses now, for example, and contrast it

14  to what it was using before to make the point that people

15  reasonably -- their interpretation -- the plaintiffs'

16  interpretation that they provided in the Complaint is a

17  reasonable one.

18      So, sure --

19         THE COURT:  But you probably could have done that;

20  right?  I mean, that could have been something that we

21  considered at the 12(b)(6) stage -- right? -- the language that

22  Facebook uses now compared to the language it used before?

23         MR. LOESER:  Correct, and we have cited that.

24      I'm suggesting that there would be a role of an expert

25  witness to talk about reasonable expectations.

**PROCEEDINGS**

1        Also, I don't want to rule out the relevance of actually

2    taking depositions of Facebook people.  You know,

3    Mr. Zuckerberg talks a lot publicly about how important privacy

4    settings are and what they intended to communicate with their

5    disclosures and what mistakes were made and what needs to be

6    made more clear.

7        Well, a deposition in which we get into those topics,

8    I think, would be highly useful for determining ultimately

9    whether the plaintiffs' interpretation is reasonable.  So

10   I think there's discovery of Facebook people who were involved

11   in running the company, given how important they say privacy is

12   to people's experience.

13       And I think that's a point that's worth stepping back and

14   making.  Then I really do want to get into the specific

15   disclosures.

16       And that's the nature of Facebook.  I think we all should

17   have a lot of concern and take pause when Mr. Snyder tells

18   everyone that there is no expectation of privacy when people

19   use Facebook.  And the case law, I think, is really important

20   to consider when it talks about what happens when a company

21   creates the reasonable expectation of privacy and induces

22   people to share.  And that really is the currency of the realm

23   for Facebook, is they need people to share data.  That's how

24   they make money.  That's how they made $55 billion last year.

25       And this notion that you can create this reasonable

**PROCEEDINGS**

1    expectation of privacy to induce people to share but then come

2    into court and say that it's completely unreasonable, as a

3    matter of law, for people to have any expectation of privacy

4    I think is really concerning.  And particularly on a motion to

5    dismiss, it really shouldn't help Facebook.

6         But more broadly, I think it's a very concerning point

7    that they're making here, given how much they've done to create

8    this Facebook experience that gets people comfortable sharing.

9         So, but getting into disclosures themselves, you know,

10   there are -- and the briefing has gone through and the

11   Complaint goes through in some detail the different disclosures

12   Facebook made.  Your Honor, I think, rightly noted, when

13   Mr. Snyder was referring to our discussion of those disclosures

14   as somehow admissions that people were given information,

15   obviously, those were not admissions.

16        In fact, usually, the paragraph -- like he raised

17   paragraph 599 which talks about a disclosure.  The very next

18   paragraph, 600, says contrary to that disclosure.

19        So we have gone through all these things.  I think there's

20   a reason why we listed them in the Complaint.  We do want

21   the Court to consider them.

22        And in our briefing, we've gone through and we've put

23   these disclosures and the misconduct into different buckets.

24   I think that, just for the sake of time, we won't go through

25   all of the categories; but Your Honor is aware there's business

**PROCEEDINGS**

1  partner disclosures that we think are misleading; there's

2  whitelisted apps; there's disclosures to advertisers.  They

3  said they wouldn't disclose your information -- personal

4  information to advertisers, but it was misleading because a lot

5  of the business partners are advertisers.  And then there's

6  these disclosures about third-party apps.

7         And so what we'll talk about now, I think, are business

8  partners and third-party apps --

9                **THE COURT:**  Okay.

10               **MR. LOESER:**  -- and websites.

11        So -- and we talked about business partners in some detail

12  before; so perhaps that's a shorter conversation.

13        But what Facebook told people was:  We may provide

14  information to service providers to help us bring you the

15  services we offer.

16        And we've listed these disclosures on page 26.  We learned

17  from the last hearing.  We have paragraph references on most of

18  these slides.  Here, some of these disclosures were provided in

19  a declaration, and we refer to the declaration.

20               **THE COURT:**  But what I want to -- I understand the

21  disclosure.  I understand that the description of who is being

22  given information in that disclosure seems different from the

23  list of companies that you've included on

24  paragraph 400-something of your Complaint.

25        But what I guess I'm still struggling with a little bit

1   with respect to business partners is, putting aside the device

2   manufacturers, how did Facebook -- I mean, they say that:  Oh,

3   those are just -- those other ones are just third-party apps.

4        And I guess my response to that is, I look through your

5   Complaint and I'm not really sure who those people are or what

6   bucket they should fit in.  I think I get the device

7   manufacture point.  I think it's kind of a weak point for you

8   because I think it's pretty obvious that if I'm using Facebook

9   on my iPhone, iPhone is going to have access to my data.  Maybe

10  less obvious in 2012, but probably still fairly obvious.

11       But, so that's why I asked you, pick a couple of these

12  companies and explain to me a -- couple of these business

13  partners and explain to me what the complaint alleges about

14  what happened with respect to those companies that was not

15  disclosed.  I just don't -- I still don't quite understand.

16       **MR. LOESER:**  Right.  And Ms. Weaver is going to

17  address that.  But I will make the point, just before you move

18  on to that, I think it is important to look at the specific

19  language of the disclosures themselves.  And where terms such

20  as "service providers" or "vendors" are used, that's the

21  analysis that you have to do and that Judge Tigar did and

22  Judge Koh did when looking at the particular disclosures.

23       **THE COURT:**  I totally get that point.

24       **MR. LOESER:**  Yeah.  And so if there's --

25       **THE COURT:**  I get that point.

PROCEEDINGS

1          MR. LOESER:  Right.

2          THE COURT:  But the part that I don't quite get from

3    your Complaint is, what were the circum- -- what did Facebook

4    do with this information?  Did Facebook just say, "Yahoo, here,

5    have all this information"?  Or what was the arrangement

6    between Facebook and these business partners that resulted in

7    the business partners getting the data?  And was it through

8    friends?  You know, was it through my friends that these

9    business partners got my data, or was it through me, or was it

10   directly from Facebook?  All of that is a little bit fuzzy.

11         MR. LOESER:  Right.

12         MS. WEAVER:  So those allegations, Your Honor, are in

13   489 and 490, for example.  The three that we picked included

14   Yahoo, which you just referenced.

15         THE COURT:  Okay.  Wait.  Hold on.  Hold on.

16         MS. WEAVER:  No problem.

17         THE COURT:  Let me go to those.  Sorry.  You're --

18         MS. WEAVER:  Yes.  So 484, you're right, was the

19   paragraph that lists the 53 business partners that Facebook has

20   currently identified.

21         And just to circle back to the point I made earlier, on

22   the issue of determining at a motion to dismiss whether these

23   particular disclosures are adequate, you might want to know if

24   there are other entities out there that are not on this list.

25         And Facebook is saying here that there may well be others.

**PROCEEDINGS**

1   So, of course, I understand our burden at the pleading stage,

2   but it's a little bit of a Catch-22.

3        What we know is at 486, the business partnerships were

4   formed as early as 2007.  We know that, for example, with

5   Yahoo, if you go to 489:

6        ". . . Yahoo, was [sic] able to read the streams of

7        users' and users' Friends posts, while others, like

8        Sony, Microsoft and Amazon, were able to obtain . . .

9        e-mails."

10       And so the question arises, if, as Mr. Loeser says --

11            **THE COURT:**  So what do we know about how?  Like, was

12   this --

13            **MS. WEAVER:**  We know that they used --

14            **THE COURT:**  Were they obtaining this stuff through my

15   friends, or were they obtaining it through some interaction

16   with me or, sort of, through some separate partnership or

17   arrangement with Facebook?

18            **MS. WEAVER:**  So the technical answer is that they were

19   obtaining content and information through a Graph API.  That's

20   not exactly what you are asking, but I wanted to give you that

21   information as well.  So it's through a platform that Facebook

22   sets up so that they can obtain it.

23       And, yes, it's our understanding that what they are

24   getting is the world.  And, in fact, I believe -- maybe it was

25   Netflix.  It wasn't just friends.  It was friends of friends.

**PROCEEDINGS**

1   So that's an even larger community.  And, again, no disclosure,

2   we would argue, applies to this.

3        THE COURT:  But is it as a result of my friend

4   interacting with Netflix?

5        MS. WEAVER:  Yes.

6        THE COURT:  With the Netflix app?

7        MS. WEAVER:  Yes.

8        THE COURT:  So it is the same -- there is really an

9   overlap between your list of business partners and third-party

10  apps?

11       MS. WEAVER:  Right.  And -- exactly.  And I'm not

12  really sure -- we're not sure -- there's been -- there are

13  three groups; right?  There's apps before 2015.  And then the

14  FTC and Facebook agreed that those apps would be disconnected.

15  And then it was only later revealed that there were these

16  whitelisted apps that includes Netflix and, for some reason,

17  Airbnb and Alibaba.  And, you know, there's a -- and,

18  frankly --

19       THE COURT:  Right.  But the way -- it sounds like what

20  you're saying -- but I want to make sure I understand -- is

21  that the way these companies, like Netflix, Alibaba, whoever,

22  got my data -- I'm using me hypothetically; I'm not on Facebook

23  but -- the way they got my data is by interacting with my

24  friend, and I had not adjusted my app settings to prevent the

25  apps from getting my data from my friend.

**PROCEEDINGS**

1    So it's basically the same analysis for these business

2    partners as it is -- with the possible exception of the device

3    manufacturers, it's basically the same analysis for these

4    business partners, in terms of disclosure, as what you're

5    calling third-party apps.

6         **MS. WEAVER:**  That is true, but with an important

7    exception.  Facebook actually disabled the app setting that

8    turned off app sharing in, I believe, 2015, and they told users

9    that.  And yet, after that date, they gave data to whitelisted

10   apps.

11        **THE COURT:**  Right.  Okay.

12        **MS. WEAVER:**  And so there's no mechanism there.  Like,

13   our understanding is that it is somehow through friends of

14   friends, but there's no consent and there's no ability of the

15   user to turn it off anymore.

16        **THE COURT:**  So then what is the point of creating this

17   category of business partners in your complaint?  I mean, it

18   seems like kind of an artificial category of entities receiving

19   my data.

20        **MS. WEAVER:**  Well, I agree with that.

21        **THE COURT:**  Seems like half of them or more should

22   just -- they fall in the same category as what you're

23   describing as third-party app sharing, and the same analysis is

24   to be conducted.

25        **MS. WEAVER:**  Yeah, I don't disagree.  I think,

1    honestly, part of it is a function of timing.

2         We filed this case.  It was about Cambridge Analytica and

3    apps.  And then this other story broke.  And if you'll recall,

4    complaints were filed, and we said, "No, this is actually

5    related.  It's all about third-party data," and we brought it

6    in.  And we have a different body of information about business

7    partners and apps.

8         And so the truth is, we don't know exactly.  I mean, we

9    know that Facebook makes some facial argument that it was

10   device makers in the beginning and that that was how they were

11   accessing.  But there's a lot that remains unknown, beyond the

12   fact that we know, for example, a New York attorney general is

13   now investigating Facebook, focusing specifically on the issue

14   of business partners.

15        So, you know, I think in some broad sense you are right.

16   What we have alleged.

17        THE COURT:  So it sounds like -- I mean, it almost

18   sounds like what you're saying is that there was this second

19   *New York Times* article which did not reflect a proper

20   understanding of what was happening, and you sued on that

21   *New York Times* article that didn't reflect a proper

22   understanding of what was happening.

23        MS. WEAVER:  You sound like Mr. Snyder.  No, that's

24   not true.  I mean, let's start at this premise.

25        THE COURT:  Don't ever say that to me again.

PROCEEDINGS

 1          **MS. WEAVER:**  I'm so sorry.

 2          **MR. SNYDER:**  Oh, God.  You hurt my feelings.

 3          **MS. WEAVER:**  We've retained experts.  We've analyzed

 4    how the --

 5          **THE COURT:**  It sounds like *The New York Times* article

 6    sort of categorized them -- put them in two separate buckets

 7    and you just adopted that for the purpose of drafting your

 8    Complaint, but it's wrong.

 9          **MS. WEAVER:**  That's not true.

10       So what I would just say there is, our understanding is

11    there are technical differences.  So the early apps got --

12    obtained the data through Graph API Version 1.0.  That was then

13    turned off at one point and turned into Graph API Version 2.0.

14    And then, at some point in time, these apps developed their own

15    APIs.

16       It's just a way to access data.  And frankly, our first

17    Complaint had a lot more detail about this, but it seemed very

18    confusing, and so we took some of that out to clean it up here

19    and keep it at a high level.

20       At a high level, what is happening is sharing without user

21    consent, without disclosure.  And that's where we are.  So --

22          **MR. LOESER:**  Well, and I just think from a disclosure

23    point, Your Honor, there is a distinction, as you've noted,

24    between device manufacturers and these other businesses.  And I

25    don't think you can read the disclosures that they provided

1   about service providers and vendors and the like and have

2   that -- and say that it's not a plausible interpretation to say

3   that what they did exceeded that; that these business partners,

4   however you want to describe them, whatever they are, don't fit

5   the categories that they've described.

6          THE COURT:  Well, I think that -- I think that that is

7   true, but -- so you look at this list of business partners, and

8   you say, well, this disclosure about service providers --

9   right? -- seems quite a bit narrower than the list of business

10  partners that you've included in the Complaint.

11         But the problem is, we now have established that many of

12  these companies that you list as business partners obtained my

13  data as third-party apps through my friends.

14         MS. WEAVER:  But they're not apps --

15         MR. LOESER:  Frankly, Your Honor --

16         MS. WEAVER:  -- if I may.

17         MR. LOESER:  -- that may be true for some, and it may

18  not be true for others.

19         I think that it's important to consider that this idea

20  that these business partners are just apps is a new idea from

21  Mr. Snyder.

22         The fact of the matter is, they had different disclosures.

23  And previously, they talked about disclosures with regard to

24  apps, and then they pointed you to these disclosures with

25  regard to service providers as a different disclosure.  Not the

**PROCEEDINGS**

1  app disclosure.  That was not what applied here.

2      They said, "No, no, Your Honor.  What applies are these

3  disclosures regarding service providers and vendors."  And they

4  said, "Those are the disclosures that we want you to evaluate

5  when deciding that we did, in fact, give people information

6  that would indicate that content and information was shared

7  with these entities that we're referring to as business

8  partners."

9          **THE COURT:**  So maybe what I need to look at to have a

10  better understanding of this is -- you're saying, well,

11  Mr. Snyder is now calling them apps, but there is a -- it looks

12  like you have cited in your Complaint a letter from Facebook to

13  the Energy and Commerce Committee, sort of talking about these

14  business partners, and I should go read that letter to develop

15  a better understanding of --

16          **MR. LOESER:**  Right.

17          **THE COURT:**  -- the business partners.

18          **MS. WEAVER:**  If I may, just to correct the record, so

19  business partners are not apps.  If you look at the list at

20  484, Acer is not an app; Samsung is not an app.  The examples

21  that we were looking at as well, Yandex is a Russian search

22  engine; it's not an app.  Amazon has an app.

23          **THE COURT:**  But if you --

24          **MS. WEAVER:**  But app developers --

25          **THE COURT:**  But I assume that if you -- Yandex, the

 1  Russian search engine, I assume -- I mean, again, it's hard --

 2          MS. WEAVER:  So -- so --

 3          THE COURT:  -- to understand from the allegations, but

 4  I assume that the idea is, you use the Russian search engine

 5  through Facebook, and so it's an app that you're using --

 6          MS. WEAVER:  I don't --

 7          THE COURT:  -- on Facebook.

 8          MS. WEAVER:  I don't know that that's true,

 9  Your Honor.  And, in fact, if you read our allegations, from

10  488 through 4- -- we move into the whitelisting, but at 493,

11  just for the business partners, they are giving business

12  partners special access to Facebook identifiers, including, for

13  example, at 48- -- give me a moment here.

14      If you look at 496, for example, we start talking about

15  whitelisted companies who are apps.

16          THE COURT:  Well, before we get to --

17          MS. WEAVER:  Okay.  Fine.

18          THE COURT:  I want to not get bogged down in

19  whitelisted apps.  I want to understand --

20          MS. WEAVER:  Fine.

21          THE COURT:  -- first, the distinction between business

22  partners and apps.

23          MS. WEAVER:  Right.  And what I can say is, a business

24  partner -- so it's not apps.  It's app developers.  Right?

25      So Cambridge Analytica and that sort of -- that first

**PROCEEDINGS**

1   category is about app developers.  Business partners are app

2   partners who are, among other things, advertising on the site.

3       And so if you look, there are allegations at

4   paragraph 710, where we have e-mails from Mr. CEO Zuckerberg

5   talking about developing relationships with business partners.

6   And what he's talking about, some of those are apps and some of

7   them are not.  And those relationships, some of them were

8   bartering, and some of them are allowing offset for advertising

9   costs with these businesses.

10      So we don't have the agreements.  They haven't been

11  public.  But I guess I would say that these are businesses who

12  may have apps but they are not app developers.

13      The agreements that Facebook had with the app developers

14  was a barter transaction where they gave access to user content

15  and data so app developers could develop an app.

16      **THE COURT:**  But the thing I'm struggling with is,

17  you're drawing that distinction; but in looking at Facebook's

18  disclosures --

19      **MS. WEAVER:**  Right.

20      **THE COURT:**  Right?

21      -- what Facebook says is that if your friend interacts

22  with an app, the app can get all -- I mean, it doesn't say it

23  this clearly but -- the app can get all of your information --

24  right? -- unless you change your app settings.

25      **MS. WEAVER:**  Right.

**PROCEEDINGS**

1        THE COURT:  And so --

2        MS. WEAVER:  Those app settings didn't apply to

3    business partners.

4        THE COURT:  Okay.  Where does the Complaint explain

5    that, that those app settings did not apply to business

6    partners?

7        MS. WEAVER:  Yeah.  That's 710?

8        MS. LAUFENBERG:  602.

9        MS. WEAVER:  602.

10       THE COURT:  Paragraph 602?

11       MS. WEAVER:  Yes.  That's page 229.

12       THE COURT:  And is there anything that you -- I mean,

13   I'm not saying that you necessarily have to, but I'm just

14   curious for helping -- in terms of helping me understand it.

15   Is there anything that you cite for that?  You have a lot of

16   citations to reports and articles and --

17       MS. WEAVER:  Right.

18       THE COURT:  -- letters and things like that.

19       MS. WEAVER:  Right.

20       THE COURT:  Do you cite anything in your Complaint for

21   that?

22       MS. WEAVER:  Sure.  I mean, we have -- we cite

23   extensively the DCMS report, which is the body of the U.K.

24   House.  And the report -- is it --

25       MS. LAUFENBERG:  710.

PROCEEDINGS

1          MS. WEAVER:  Paragraph 710.

2          THE COURT:  Okay.

3          MS. LAUFENBERG:  (C).

4          MS. WEAVER:  "The fact that Apps including

5     Whitelisted Apps and Business Partners 'were able to

6     circumvent users' privacy of platform settings and

7     access friends' information, even when the user

8     disabled the Platform,' is 'an example of Facebook's

9     business model driving privacy violations.'"

10    This is from the report itself.

11         THE COURT:  Okay.  I will admit that I have not read

12    that report yet.  Okay.

13         MS. WEAVER:  There are a few out there.

14         THE COURT:  Okay.

15         MS. WEAVER:  So if you're ready to talk about

16    whitelisted apps, then the difference there gets even more

17    confusing because, here, Facebook has told users "We are

18    cutting off app access"; and then, if you look at

19    paragraph 497, the DCMS committee says that this whitelisting

20    was driven primarily by revenue and economics.

21         And it is supported by other e-mails, which we cite, which

22    have come out, basically saying Facebook was giving

23    preferential treatment to companies that it should have

24    rightfully been cutting off.  And these included Lyft, Airbnb,

25    and Netflix.  So --

**PROCEEDINGS**

1          **THE COURT:**  You mean should have been cutting off --

2     so, in other words, this was in 2015 when Facebook said, "We're

3     going to stop allowing third-party apps to grab your

4     information through your friends," and they identified a date

5     by which they would do that.  And there's this subset of apps

6     that you're calling whitelisted apps that continue to have the

7     ability to grab my information through my friends.

8          **MS. WEAVER:**  And -- yes, exactly.  And the app

9     controls were cut off so users couldn't change that.  That,

10    Your Honor, is at 499.

11         **THE COURT:**  The what were cut off?  Sorry?

12         **MS. WEAVER:**  Sorry.  The app settings were cut off.

13    So at this point, they didn't exist on the platform for users

14    to cut off apps.

15         **THE COURT:**  Okay.  Where is that?

16         **MS. WEAVER:**  I'll get that to you in a second.

17        But if you look at paragraph 499, there is your date.

18        ". . . failed to state that tens of companies were

19        given special whitelist access beyond May 2015."

20        And then what later comes out, you know, there's another

21    report at paragraph 502 that Facebook is striking deals with

22    RBC, Nissan Motor Company, et cetera.

23        And so they are continuing -- and I have to be honest.

24    You're right.  At some point, when are these business partners

25    and when are these whitelisted apps?  I don't know.  I take

**PROCEEDINGS**

1    your point well that maybe it doesn't matter to some extent,

2    because these are all adhering to the same theme, that these

3    are in violation of, what we would say, users' reasonable

4    expectations that their privacy controls could prevent this

5    kind of sharing and that their publishing controls, for

6    example, would prevent that kind of sharing.

7            THE COURT:  Okay.  So what about --

8            MS. WEAVER:  Paragraph 375 is the app setting removal

9    in 2015.

10           THE COURT:  Sorry.  What?

11           MS. WEAVER:  Paragraph 375 answers your question about

12   the removal of the app settings, the ability to turn off apps.

13           MR. LOESER:  So, Your Honor, why don't we jump to

14   third-party apps because Mr. Snyder spent a good deal of time

15   trying to explain to you why the disclosures regarding

16   third-party apps meant that everything that happened here that

17   was bad was consented to by Facebook users.  And I think he's

18   wildly wrong in that regard.

19           THE COURT:  I'll let you get to that, but just, I want

20   to read that paragraph that Ms. Weaver pointed me to.

21       Was it 375?

22           MS. WEAVER:  Yes.

23           MS. LAUFENBERG:  Correct.

24           MS. WEAVER:  So:

25            "The 'Apps others use' control panel" --

1              **THE COURT:**  All right.  Let me just read it.

2          **MS. WEAVER:**  Sure.

3          **THE COURT:**  Okay.

4          **MS. WEAVER:**  And paragraph 600 reiterates that.

5          **MS. LAUFENBERG:**  And 601 as well.

6          **MS. WEAVER:**  Again, citing the DCMS report.

7          **THE COURT:**  Okay.  All right.  Thank you.

8      Go ahead.

9          **MR. LOESER:**  Okay.  So here's the deal.  Facebook

10  creates a platform that they say provides everybody with

11  everything they need to know to control what happens to their

12  information.  They say that a lot.  You control exactly what

13  happens to your information.

14      And the DCMS report, which Ms. Weaver just mentioned,

15  after their exhaustive study, determined there's very little

16  the user can do to prevent their information from being

17  accessed.  And Cambridge Analytica is a good example of users

18  were told you can indicate what your privacy wishes are by

19  using your privacy settings.  You set to friends only, and, lo

20  and behold, Cambridge Analytica gets the information.

21      So where, I think, their argument falls apart is when you

22  look at paragraph 596 through 598, which we have on Slide 38

23  here for just ease of reference, and that's this "only in

24  connection with your friends" language.

25      So the very same disclosure that Mr. Snyder put up and

 1  tried to explain to you "This is it.  This tells you everything

 2  you need to know," if you go down in that disclosure, there's

 3  the rest of the paragraph.  And that paragraph says (reading):

 4          "If your friend grants specific permission to the

 5      application or website, it will generally only be able

 6      to access content and information about you that your

 7      friend can access.  In addition, it will only be

 8      allowed to use the content and information in

 9      connection with that friend."

10  And they have further explanation of what that means.

11  They say (reading):

12          "For example, if a friend gives an application

13      access to a photo you only shared with your friends,

14      that application could allow your friend to view or

15      print the photo, but it cannot show that photo to

16      anyone else."

17  And that language changed a bit.  And it's another issue,

18  hopefully on summary judgment or at trial, when we're going

19  through the data policy, which we don't think is a contract,

20  we'll see the different ways that they said this.  But they

21  always had this restriction that it would only be used with

22  your friends.

23          Now --

24          **THE COURT:**  I wanted to go back and look at the

25  provision that you just read me about photographs.

PROCEEDINGS

```
 1          MR. LOESER:  Yeah.

 2          THE COURT:  That they cannot share that with anybody

 3   else.  Where is that?

 4          MS. WEAVER:  Paragraphs 596 and 597.

 5          THE COURT:  No.  I want to look at the actual

 6   disclosure language.

 7          MS. WEAVER:  Oh, I'm sorry.

 8          THE COURT:  Can we use Exhibit 45?  That's what we've

 9   been using.

10          MS. LAUFENBERG:  Exhibit 40.

11          THE COURT:  Exhibit 40.  So that's the --

12          MR. SAMRA:  43.

13          MS. LAUFENBERG:  43.

14          THE COURT:  Oh, sorry.  43.  So September 7th, 2011.

15   And where is this?  On, like, page --

16        What page of that exhibit?

17          MS. WEAVER:  I thought it was page 9.  Is that right?

18   9 or 10.

19          MS. LAUFENBERG:  10, I think.

20          THE COURT:  Exhibit 43 or 45?

21          MR. SAMRA:  Your Honor, I have page 5 on Exhibit 43.

22          THE COURT:  Page 5 on Exhibit 43.  Okay.

23           "Controlling what is shared when the people you

24        share with use applications."

25          MS. WEAVER:  Right.  And if you go to the last
```

**PROCEEDINGS**

 1  paragraph there, that's where the language is.

 2       ". . . the application will be allowed to use that

 3       information only in connection" --

 4            **THE COURT:**  Right.  But where's the language that

 5  Mr. Loeser was reading to me about --

 6       Is it "LOE Ser" or "LAW Ser"?

 7            **MR. LOESER:**  "LOE Sher."

 8            **THE COURT:**  Loeser.  Sorry about that.

 9            **MR. LOESER:**  There's so many ways to say it wrong, and

10  either one of those are preferable to the other one.

11            **THE COURT:**  Mr. Loeser was reading to me some language

12  about sharing pictures, sharing photos.  Where is that?

13            **MR. LOESER:**  The language is very clearly stated in my

14  outline.

15            **MS. WEAVER:**  But he said paragraphs 596 to 597.

16            **MR. LOESER:**  Yeah, but I don't see it in 596.

17            **MS. LAUFENBERG:**  I think it's Exhibit 40, Josh.

18  That's what I have.

19            **MS. WEAVER:**  What?  Exhibit 40?

20                      (Co-counsel confer.)

21            **MS. WEAVER:**  So give us just a moment, Your Honor.

22  Sorry.

23                      (Co-counsel confer.)

24            **MS. LAUFENBERG:**  Page 4 of Exhibit 40.

25            **MR. LOESER:**  Okay.  We found it.

PROCEEDINGS

1        **THE COURT:**  "For example, if a friend gives an

2    application access to a photo you only shared with

3    your friends, that application could allow your friend

4    to view or print the photo, but it cannot show that

5    photo to anyone else."

6    Okay.

7        **MR. LOESER:**  Okay.  So this is an important

8    disclosure.

9        And Your Honor raised the possibility and there was

10    another question about whether this was a technological

11    limitation or something else.  And frankly, I don't think it

12    matters what it is and if there are multiple interpretations,

13    because as you noted, what matters for a motion to dismiss is,

14    is the plaintiffs' interpretation a plausible one?

15        Mr. Snyder may have a different interpretation.  And I'm

16    not even sure what's better, if it's a technological limitation

17    or merely authority.  But the fact of the matter is, the

18    allegation in the Complaint and the plaintiffs' reasonable

19    interpretation of that provision is entitled to be credited.

20    And on a motion to dismiss, it's a plausible one.  So that's --

21        **THE COURT:**  But the interpretation that you have put

22    forward is that this disclosure implies that Facebook is

23    actually doing something to limit the way third-party apps can

24    use this data; and, in fact, Facebook is not doing anything to

25    limit the way that third-party apps are using this data; and so

1    the disclosure is inaccurate in that sense.  That's what you've

2    put forward.

3         **MR. LOESER:**  Correct.  And that, again, if you look at

4    the language and put yourself in the shoes of a Facebook user,

5    when they read a statement that the information that their

6    friend gives about them will only be used in regard with that

7    friend, that seems like a plausible interpretation.  It's kind

8    of, it means exactly what it says.

9         Now --

10        **THE COURT:**  Well, but -- and their response to that

11   is, "Well, those were, in fact, the restrictions we imposed on

12   third-party apps."

13        And you say, "But they didn't enforce those restrictions."

14   Or do you say, "No, they actually didn't impose those

15   restrictions, in the first place, on third-party apps"?

16        **MS. WEAVER:**  So, first, with the first category, app

17   developers like Cambridge Analytica, there are plenty of

18   allegations in this Complaint, largely from --

19        **THE COURT:**  Well, they didn't share the information

20   with Cambridge Analytica.

21        **MS. WEAVER:**  No.  They shared it with Kogan.  That's

22   right.  But they didn't audit --

23        **THE COURT:**  So are you saying app developers like

24   Kogan?

25        **MS. WEAVER:**  Yes.

1          **THE COURT:**  Okay.

2          **MS. WEAVER:**  Kogan was an app developer, and they

3     didn't audit any of these.  The DCMS report said they didn't

4     find one instance --

5          **THE COURT:**  I understand your argument that they

6     didn't audit; that, basically, they said, to use an analogy

7     that my law clerk gave me this morning, they said that the

8     curfew is 10 o'clock, but they never checked to see if anybody

9     was home at 10 o'clock.

10         **MS. WEAVER:**  Not a bad analogy.

11         **THE COURT:**  But what I'm asking is:  Do you agree that

12    the curfew existed?  Even if it wasn't enforced, do you agree

13    that the curfew existed, or do you allege that there never was

14    a curfew to begin with?

15         **MS. WEAVER:**  So here's where it gets complicated.  If

16    you're talking about allowing, just the rule -- and let's set

17    aside that the definition of "allow" may mean "to restrain or

18    not permit," which is a -- but let's set that aside.  Let's

19    take their interpretation.  "Allowing" means we had a rule that

20    we didn't enforce.

21         Yes, I mean, I think that they said that there was a rule.

22    I think that they didn't enforce it.

23         **THE COURT:**  And by saying "allowed," in context, it

24    contains with it an implication that they're going to do

25    something --

**PROCEEDINGS**

1          **MS. WEAVER:**  Right.

2          **THE COURT:**  -- to enforce the curfew.

3          **MS. WEAVER:**  Right.

4          **THE COURT:**  I understand that argument.

5          **MS. WEAVER:**  Hang on.

6          **THE COURT:**  I understand that argument.  I'm just

7    asking, like, do you agree with -- because what they say is:

8    We did, in fact, impose a curfew.  They may not have followed

9    the curfew, but we did, in fact, impose a curfew, however

10   toothless.

11        Do you agree that -- do you accept that they imposed a

12   curfew?

13          **MS. WEAVER:**  So --

14          **THE COURT:**  Because I couldn't find anything in the

15   papers to suggest -- to indicate that they actually did impose

16   a curfew.  In other words --

17          **MS. WEAVER:**  Oh, there --

18          **THE COURT:**  -- I couldn't find anything in the papers.

19        Like, we don't have their agreements with the third-party

20   apps; right?  And so they say, "We had a policy restricting

21   third-party use of this data," and they point to something in

22   the Data Use Policy that doesn't seem to say that.

23        And so I'm trying to understand if you -- are you alleging

24   that they had no curfew, or are you merely alleging that they

25   had a curfew that was toothless?

PROCEEDINGS

```
 1              MS. WEAVER:  Both.

 2              THE COURT:  Okay.  Where --

 3              MS. WEAVER:  So --

 4              THE COURT:  -- do you allege that they had --

 5              MS. WEAVER:  So --

 6              THE COURT:  -- no curfew?

 7              MS. WEAVER:  Right.  So the whitelisted apps had no

 8    curfew.

 9              THE COURT:  I'm talking about regular third-party --

10              MS. WEAVER:  Okay.

11              THE COURT:  -- apps.

12              MS. WEAVER:  But I don't want to let that go because

13    that is a huge violation.

14              THE COURT:  I get that.

15              MS. WEAVER:  Business partners had no curfew.

16              THE COURT:  I get that.

17              MS. WEAVER:  So then we come to this point that we

18    discussed in the last hearing which is the metadata stripping.

19    They are saying --

20              THE COURT:  Let's hold on.

21              MS. WEAVER:  Well, because it disabled the ability of

22    the app developers to comply with user privacy settings.

23              THE COURT:  But I don't understand your metadata

24    stripping --

25              MS. WEAVER:  Okay.
```

**PROCEEDINGS**

1    **THE COURT:**  -- allegations at all; so I would like to

2  put those --

3    **MS. WEAVER:**  Fine.

4    **THE COURT:**  -- aside for a second and just try to get

5  an answer to my question.

6    Do you allege in this Complaint that Facebook told users

7  in its app settings they're only allowed to use your

8  information in connection with your friends but that, in fact,

9  Facebook did not impose that restriction?  That there was --

10    **MR. LOESER:**  Yes.

11    **THE COURT:**  -- no such curfew; there was no such

12  restriction?

13    **MR. LOESER:**  Cambridge Analytica is the best example

14  of it, and it makes sense to start with that since that's where

15  the case started.

16    But Kogan got the information.  300,000 people downloaded

17  the app.  And from that, he parleyed that into 87 million

18  people.

19    **THE COURT:**  And you're saying -- here's what I'm

20  asking.

21    **MR. LOESER:**  Yeah.

22    **THE COURT:**  Are you alleging that he had permission to

23  do that or that he was not told that he could not do that?

24  Because they say --

25    **MR. LOESER:**  Yeah, I understand what you're saying.

1          **THE COURT:**  They say, "We told Kogan, we told these

2     other third-party apps that they're not allowed to do that."

3          **MR. LOESER:**  Right.

4          **THE COURT:**  Right?

5       And we have a separate discussion of whether that curfew

6     had any teeth.  But --

7          **MR. LOESER:**  Right.

8          **THE COURT:**  -- did they say, "We told Kogan, we told

9     the other third-party apps they're not allowed to do that with

10    your data"?

11         And I don't see anything that proves -- or I don't see any

12    evidence that they, in fact, told Kogan and other third-party

13    apps "You're not allowed to do that with the data."  And so I'm

14    wondering what your position is on that.

15         **MR. LOESER:**  I think the best way to put it,

16    Your Honor, is that we are evaluating these disclosures to

17    decide if a user had a reasonable expectation of privacy or a

18    reasonable expectation that something would not happen.

19         However -- whatever this means in terms of the power that

20    an app had to do or not do something, when a user reads that

21    disclosure, the reasonable interpretation of the user is

22    something was not going to happen.  And that thing that was not

23    going to happen was that information was not going to be used

24    for purposes other than in connection with their friend.  So

25    it's a thing that they were told was not going to happen that

PROCEEDINGS

1    did happen.

2         Now, I don't --

3              MS. WEAVER:  Kogan --

4         MR. LOESER:  I don't really know if that means -- I

5    don't know, did Facebook tell Kogan "You're not supposed to use

6    this information for persons other than friends"?  I don't know

7    if they said that or not.  We'd have to look at the agreement

8    between Facebook and Kogan.

9         But from the standpoint of these plaintiffs and the value

10   and relevance of this disclosure, it's that they were told

11   something was not going to happen and that's exactly what

12   happened.

13        Now, Facebook, in their brief, talks about -- draws a

14   somewhat different distinction here.

15             THE COURT:  Well, but don't you think there's a

16   difference between, like -- okay.  One scenario is that

17   Facebook doesn't say anything to the third-party apps about --

18   in an effort to limit their use of the data.  That's one

19   scenario.

20        The second scenario is Facebook tells the third-party

21   apps, in its contracts or whatever, "You're not allowed to use

22   third-party data except in connection with friends."

23             MR. LOESER:  Right.

24             THE COURT:  And then the third scenario -- oh, and

25   then in that second scenario, Facebook does nothing to enforce

PROCEEDINGS

1    that.

2          **MR. LOESER:**  Which is true.  So we can put that aside

3    because that happened.

4          **THE COURT:**  And then the third scenario is that

5    Facebook tells people that they can only use data in connection

6    with their friends and then does something to enforce that,

7    Facebook being the --

8          **MR. LOESER:**  Right.

9          **THE COURT:**  -- behemoth that it is.

10       And so it seems to me that all three of those scenarios

11   are different, and I'm trying to figure out whether you're

12   alleging the first scenario.

13         **MS. WEAVER:**  So what we allege, actually, at pages 537

14   through 539 --

15         **MS. LAUFENBERG:**  Paragraphs.

16         **MS. WEAVER:**  Paragraphs.  Sorry.

17       -- is that, in fact, Facebook --

18         **THE COURT:**  Sorry.  What?  537 and --

19         **MS. WEAVER:**  To 539.

20       So there were a number of, sort of, Cambridge Analytica

21   whistleblowers.  Right?  And Sandy Parakilas is one of them.

22       And he has stated and been interviewed by various

23   regulatory agencies.  He has testified.

24         **THE COURT:**  This is the "better not to know" quote?

25         **MS. WEAVER:**  Yes, exactly.

**PROCEEDINGS**

1    But what he's reporting is violation of the Data Use

2    Policy and specifically what you're asking about and, also, at

3    paragraph 470.

4    Now, you may or may not find Dr. Kogan credible, but it's

5    a disputed fact, at paragraph 470, that he says the ability to

6    gather people's Facebook friends' data without their permission

7    was a Facebook core feature.

8         **THE COURT:**  But where in Facebook's Data Use Policy

9    does it say that developers violate the policy if they use it?

10   Is it just that same disclosure that we're talking about?

11        **MS. WEAVER:**  They do say, at iterative points in time,

12   that "App developers will comply with your privacy settings."

13   Is that what you're asking?

14        **THE COURT:**  Maybe.  I don't know.  I mean, I couldn't

15   find any language that directed app developers to limit their

16   use of my data.

17        **MR. LOESER:**  Here's what I'm struggling with,

18   Your Honor.  I can't figure out which of those three things you

19   think is better for the plaintiff.

20        **THE COURT:**  Well, the third is the worst.

21        **MR. LOESER:**  Because to me, all those roads seem to

22   lead to Rome.

23        **THE COURT:**  I think the third is bad for you.  Right?

24   If they said developers are only allowed to do this with your

25   data and it were not the case that they did nothing to make

 1  sure that that promise was kept but developers went around

 2  that, I think you would have a tougher claim.

 3        **MR. LOESER:**  So I'm glad I asked.

 4      But I think, taking that right there, we know from the

 5  Cambridge Analytica reporting -- and, again, we don't have

 6  discovery in this case but -- from reporting, that Facebook did

 7  nothing to monitor.  So we know they didn't do anything.

 8  And I'm just not sure what difference it makes when you're

 9  evaluating the disclosure.  The fact that they didn't do

10  anything means that we probably have a good negligence claim.

11      And -- but the disclosure, they're putting that disclosure

12  in front of you, saying that based on this disclosure, users

13  consented to every single thing that was given to apps.

14      And we're saying to you, well, wait a second.  We know

15  from Cambridge Analytica that this wasn't used just in

16  connection with the friends.  So the disclosure is an

17  inadequate basis on which to find consent.

18      And so I think that discovery will enable us to figure out

19  which of your three options really apply.  And some of those

20  options may be better or worse, frankly, for Facebook,

21  particularly for a variety of the claims that we've asserted.

22      But from the standpoint of the questions you've asked us,

23  which is "Let's talk about consent and these disclosures," it

24  seems to me that any of those three options don't really make a

25  difference, because the fact of the matter is, the disclosure

 1   is -- at the very least, you can look at that disclosure and

 2   say there's different ways of interpreting it.  And given that

 3   and given Ninth Circuit case law --

 4        THE COURT:  Well, what do you think about -- I mean,

 5   there was an interpretation that you didn't put forward that I

 6   asked about, which is whether you could interpret that language

 7   as imposing some sort of technological restriction on the apps.

 8   What's your view of that?

 9        MR. LOESER:  Yeah.  I guess I have the same view.  I'm

10   just not sure what difference it makes.  If you can -- you can

11   parse the language and come to different understandings of what

12   it means.

13        THE COURT:  Well, I think it makes a difference

14   because if they're using the word "allowed" in the sense

15   that -- I don't know if it makes a difference for this motion,

16   but I could see it making a difference at the end of the day,

17   because if you interpret "allowed" in the way that they want --

18   that they and, I think, you have interpreted it in your

19   papers -- and, in fact, they engaged in meaningful efforts to

20   enforce those restrictions but it simply didn't work on

21   occasion or simply didn't work sometimes, then I think you

22   lose, probably.

23        MR. LOESER:  Well, we relish that fight, because one

24   of the things we learned in discovery, in the limited discovery

25   that we got, was they didn't actually evaluate the terms of use

**PROCEEDINGS**

1  of any of the apps, the thousands and thousands of apps.  Maybe

2  it was physically impossible for them to do so because there

3  are so many apps.

4      But we know that they didn't monitor what Kogan did, and

5  we know that they didn't read these policies that supposedly

6  dictated the terms vis-à-vis users and the app.

7      So I think we're going to be in a pretty good spot when it

8  comes down to trying to sort out, based on discovery, well,

9  what did Facebook really do to try and put some teeth into

10  these disclosures that it made to people?  They create an

11  expectation of privacy.  They create an expectation of conduct.

12  Did they do anything to enforce that?

13      And I think that, frankly, it is an issue for another day,

14  but I think it's an interesting issue for another day.

15          MS. WEAVER:  And I would --

16          THE COURT:  But do you think that -- it sounds like

17  you may not think that that's a plausible interpretation of the

18  language, that "We impose technological restrictions on

19  third-party apps so that they can only use it in connection

20  with your friends."

21          MR. LOESER:  Frankly, Your Honor, I don't understand

22  technology well enough to know if they could or couldn't do

23  that.  But I can read, and I can try and look at a disclosure

24  and say:  Does this assure people that something's not going to

25  happen?  And it seems like it did assure people, whether it was

**PROCEEDINGS**

 1    a technological limitation or a permission, whatever it was.

 2         THE COURT:  Yeah, but you seem to be assuming that if

 3    it happened, then they didn't adequately disclose.  I mean,

 4    even if one out of a thousand app developers misused

 5    information, that means this disclosure was inadequate.

 6         MS. WEAVER:  The facts that we allege are actually

 7    very different -- right? -- which is that they --

 8         THE COURT:  No, I know.

 9         MS. WEAVER:  Okay.

10         THE COURT:  I know.

11         MS. WEAVER:  Fine.

12         THE COURT:  I'm just trying to --

13         MR. LOESER:  We have kind of an N of one, which is

14    Cambridge Analytica.  Maybe it was an extremely unique

15    circumstance, which I really don't think so.

16         MS. WEAVER:  No.  There are 400 other apps that they

17    discontinued from the cite.

18         THE COURT:  You guys are now arguing with each other?

19         MR. LOESER:  Yeah, we're arguing with each other.

20         And Ms. Weaver will talk about the *Rankwave* case, which is

21    a case that Mr. Snyder just recently filed against an app

22    developer for, kind of looks like, doing what Cambridge

23    Analytica or Kogan did, anyway.

24         And so it does seem like -- anyway, it's a factual issue.

25    It's an interesting question.  But I don't think it changes how

1    we interpret these disclosures.

2         **THE COURT:**  Okay.

3         **MR. LOESER:**  Let me run through a few other things on

4    the problem with what they did vis-à-vis apps.  And then I do

5    want to jump to some of these legal questions that I think it's

6    worth giving you some information.

7         **THE COURT:**  I want to let people go soon, because

8    we've blown through lunchtime.  And so, anyway, why don't you

9    take another ten minutes.

10        **MR. LOESER:**  Okay.  Well, I'll quickly deal with

11   third-party apps.

12       So one of the things that you heard Mr. Snyder say -- and

13   he said a lot -- and their briefs say, is that it's really

14   clear to people how to control what apps get.

15       And I think that it's important to step back again and

16   look at what the FTC said in 2011 about how these settings

17   operated and how, in the privacy settings -- which people

18   naturally believed would determine who could see their

19   information, because that's what the settings say -- the

20   privacy settings didn't refer to these app settings.

21       And it's very easy for Mr. Snyder to say now, in

22   hindsight, "That's kind of ridiculous.  Of course everyone knew

23   you control apps with app settings and privacy with privacy

24   settings," but that's exactly what the FTC said was not clear.

25       Now, in their brief, they explained --

**PROCEEDINGS**

1    **THE COURT:**  And then they entered a consent decree,

2   and than Facebook changed its disclosures.

3       **MR. LOESER:**  I don't think they changed their

4   disclosures so much as they supposedly changed their conduct.

5   But they didn't.

6       So I also think it's important to note that the Statement

7   of Rights and Responsibilities indicates -- there's some

8   language about how people can control who sees their

9   information through their privacy settings and app settings.

10  And you've heard an interpretation that "Of course that means

11  that you need to do both things."  Okay?

12      And, again, when we're looking at plausible

13  interpretations on a motion to dismiss, maybe that's what

14  Mr. Snyder or Facebook thinks is a plausible interpretation,

15  but the FTC came to a different conclusion.  So there must be

16  another plausible interpretation.

17      **THE COURT:**  The FTC came to a different conclusion

18  about that particular language?

19      **MR. LOESER:**  They came to a different conclusion about

20  the fact that when you go into the privacy settings and you

21  think you're determining who can see your information, you're

22  not actually controlling who can see your information because

23  there's something else called these app settings.

24      Facebook has taken the position --

25      **THE COURT:**  But I thought that that disclosure, I

1  thought that sentence in the terms came after the FTC came down

2  on Facebook.  Am I misremembering that?  I thought that was a

3  change in the disclosure language that emanated from the FTC

4  proceedings.  Am I wrong about that?

5         **MS. WEAVER:**  Which language?

6         **MR. LOESER:**  The SRR language about you control -- I'm

7  not sure.  I'll check.

8      But I think the point is, when Mr. Snyder looks at that

9  language and says the statement that says you control through

10  your app settings and your privacy settings, he says to you,

11  "Well, that means you" -- and it's very clearly put in their

12  brief -- "That tells users you absolutely have to go do both

13  things in order to determine who can see your information."

14      And all I'll say on that is that if they wanted it to say

15  that, they should have written that.  "You need to be aware you

16  need to set both of these things in order to control who sees

17  your information."  And that's not, not what they said.

18         **THE COURT:**  I'm not sure I buy that argument, but

19  okay.  What else?  What else should we make sure --

20         **MS. WEAVER:**  Your Honor, I'd like to be heard on

21  the --

22         **THE COURT:**  -- we talk about?

23         **MS. WEAVER:**  -- economic harm issue.

24         **THE COURT:**  What?

25         **MS. WEAVER:**  I would like to be heard on the economic

**PROCEEDINGS**

1   harm issue.

2           **THE COURT:**  Okay.  Yeah, very briefly.

3           **MS. WEAVER:**  Okay.  Great.

4       The question of whether to recognize a claim for economic

5   harm comes down to whether the Court agrees that there must be

6   value in the content and some loss by the plaintiffs.

7       And is it enough for us to allege --

8           **THE COURT:**  What's the loss by the plaintiffs?

9           **MS. WEAVER:**  Sorry?  So the loss -- let me start with

10  this, first of all, the value.

11      And Mr. Loeser just referenced a complaint.  We have a

12  copy here for the Court.  This was filed on May 10th in

13  Santa Clara County by Facebook against Rankwave, which is an

14  app.  And the Rankwave complaint asserts a breach of contract

15  claim and a claim under Section 17200, just as we do here.

16      The heart of the claim is that Rankwave took users'

17  content generated on Facebook, such as public comments and

18  likes -- that's paragraph 22 -- as well as the level of

19  interaction other users had with the app users' Facebook

20  profile -- that's paragraph 23 -- and then they allege at

21  paragraph 25, that the Facebook data associated with Rankwave's

22  various apps received a valuation of $9.8 million.

23          **THE COURT:**  Okay.  But that's -- I mean, the question

24  is:  What loss did an individual plaintiff experience from this

25  data being taken?

1              MS. WEAVER:  Right.  Well, the first -- the economic

2       loss --

3              THE COURT:  I view everything you just said to be

4       irrelevant to your economic harm theory --

5              MS. WEAVER:  So the first --

6              THE COURT:  -- because the question is:  What loss did

7       a plaintiff experience?

8              MS. WEAVER:  Okay.  Then the second thing is that

9       plaintiff -- or that Facebook itself describes in its

10      disclosures with plaintiffs that their photos and videos could

11      constitute intellectual property.  And that's the concept here,

12      that if plaintiffs -- let me find the --

13          Can we hand up the --

14             MS. LAUFENBERG:  Yeah.

15             THE COURT:  Well, is there any allegation that any

16      particular plaintiff had their intellectual property rights

17      damaged by these disclosures?

18             MS. WEAVER:  Well, Your Honor --

19             THE COURT:  I don't remember you arguing that in your

20      brief.

21             MS. WEAVER:  It's true.  This is Exhibit 27 to the

22      Duffey declaration.  And when it says, "The permissions you

23      give us" --

24             THE COURT:  Okay.  I believe you that that's what it

25      says.  I'm asking, does anybody allege that their intellectual

**PROCEEDINGS**

1    property rights were harmed --

2         **MS. WEAVER:**  What we allege is that content and

3    information was taken beyond the scope of the agreement.  And

4    if some of that content and information is intellectual

5    property, you don't have to show a loss, just like a privacy

6    harm.  And they, themselves, here in this document, call it

7    "intellectual property," in the user agreement.  This is

8    effective April 2018, before we filed suit.

9         And so when I have an agreement --

10        **THE COURT:**  Did you argue this in your brief?

11        **MS. WEAVER:**  We did not, Your Honor.

12        **THE COURT:**  Okay.  Anything else you want to make sure

13   to discuss in the last five minutes?

14        **MR. LOESER:**  Yes.  One final thing, Your Honor.  Your

15   question asked about incorporation by reference, and I do think

16   it's worth jumping back to that.

17        **THE COURT:**  Yeah.

18        **MR. LOESER:**  So specifically, you asked about

19   incorporation by reference, and that assumes that the data

20   policy becomes part of the contract --

21        **THE COURT:**  Right.

22        **MR. LOESER:**  -- this SRR, frankly.

23        The other part of that question that you're not asking

24   about and I want to make sure you don't want to hear anything

25   about is whether the data policy is itself a contract.

1    And we talked about that at some length previously.  And I

2    think, frankly -- I don't think it is under *Nguyen v. Barnes &*

3    *Noble*.  It just doesn't -- they don't have -- it's not

4    conspicuous enough, and they don't use the language of assent

5    that's required.

6    So that takes us into this realm that you're talking about

7    now, which is incorporation by reference.  And our brief talks

8    about -- identifies a few cases that go through California law

9    on this, and that's the *Shaw* case and the *Wollschlaeger* case

10   and then *Anthem II* are the cases that -- frankly, that the

11   defendants --

12           **THE COURT:**  Right.

13       **MR. LOESER:**  -- point to.

14   I think that if you look at *Shaw*, what's clear about

15   incorporation by reference is that you have to indicate --

16           **THE COURT:**  That was, like, a university professor who

17   had a contract with his employer at UC Davis?

18       **MR. LOESER:**  Right, for royalties.  And the professor

19   was handed a document, that he signed, that said he was

20   entitled to, among other things, royalties on patents.  And

21   then UC Davis tried to get out of that agreement later.

22   And what the case stands for is the proposition that if

23   you want to incorporate something by reference, it's not just a

24   matter of referring to it.  You also have to provide some

25   indication of assent.  There has to be some indication that

1   your purpose in referring to that document is to make it part

2   of the contract.

3        THE COURT:  So what are your best cases on the idea

4   that the Data Use Policy is not incorporated by reference?

5        MR. LOESER:  I think, frankly, the best case is --

6   frankly, it's *Shaw*.  It's cases that found incorporation by

7   reference because they so clearly indicate in *Wollschlaeger* as

8   well and *Amtower v. Photon Dynamics*, which is 158 Cal.App.4th

9   1582, 2008 -- that's a case that interprets Wollschlaeger and

10  provides what is a rational explanation of what it means.

11       THE COURT:  What is that case called again?

12       MR. LOESER:  *Amtower v. Photon Dynamics, Inc*.

13  But the principal, I think, is what really matters.  And

14  that's:  Did the party provide some indication that they

15  intended for this document to become part of a contract?

16  You can't just refer to the document.  You have to provide

17  some indication that you intended for it to be part of a

18  contract.

19  So if you look at the language that Facebook actually uses

20  here, which I have on Slide 20, which I believe is the

21  Complaint at 243 and 244 -- and this is in 2009 -- this

22  language existed from 2009 through 2018.  And it's

23  paragraphs 651 through 652.

24       THE COURT:  Right.

25       MR. LOESER:  And this is in the Statement of Rights

1   and Responsibilities, which is the contract between the

2   parties.  It says -- and we have a blowout here on the slide

3   (reading):

4           "Your privacy is very important to us.  We

5       designed our data policy to make important disclosures

6       about how you can use Facebook to share with others

7       and how we collect and use your content and

8       information.  We encourage you to read the Data Use

9       Policy and use it to help you make informed

10      decisions."

11      So there's none of the language of assent, where they've

12  made it clear to them -- they say, "We encourage you to read

13  it."  There's nothing in here that says, "And we make this part

14  of our contract."

15      Now, if you look at the current terms, I think they

16  provide a good indication of what you would need to have in

17  order to actually provide this language of assent.  And that's

18  Slide 21, which refers to paragraph 656 in the Complaint.  They

19  have this nice bold disclosure now -- and this is, of course,

20  post Cambridge Analytica -- which states:

21          "Our Data Policy and Your Privacy Choices.  To

22      provide these services, we must collect and use your

23      personal data.  We detail our practices in the Data

24      Policy, which you must agree to in order to use our

25      Products."

**PROCEEDINGS**

1    So that is language of assent.  And they made it clear,

2  starting in April nineteen- -- 2018, that they intended this

3  document to be part of the contract.

4    So that, in a nutshell, Your Honor, is why we don't

5  believe that the data policy is incorporated by reference into

6  the contract.

7         **THE COURT:**  Okay.  Let me make sure I don't have any

8  other questions for you.

9    So like I said, just submit a letter listing cases.  No

10 argument.  No parentheticals.  Just the cases you want me to

11 read on the issue of subsequent changes to the terms of -- to

12 the contract, to the terms of service, and I will read them.

13   Okay.  Mr. Snyder, do you want to take five to seven

14 minutes to --

15        **MR. SNYDER:**  Yes.  May I just take a one-minute

16 restroom break?

17        **THE COURT:**  Oh.  Yeah, sure.

18        **MR. SNYDER:**  Sorry.  Thank you.

19        **THE CLERK:**  Court is in recess.

20             (Recess taken at 1:28 p.m.)

21            (Proceedings resumed at 1:31 p.m.)

22        **MR. SNYDER:**  Thank you, Judge.

23        **THE COURT:**  We definitely have to let people go.

24 So --

25        **MR. SNYDER:**  Yes.

1          THE COURT:  -- really, just five, seven minutes.

2          MR. SNYDER:  Yes, Your Honor.

3          THE COURT:  Whatever you think is the most important

4    thing to respond to.

5          MR. SNYDER:  Yes, Your Honor.  I'll briefly respond to

6    the contract point, the business partners point, the curfew

7    point.

8          THE COURT:  Okay.

9          MR. SNYDER:  On the contract point, this is not,

10   Your Honor, respectfully, a hybrid contract-disclosure matter.

11   This is a pure contract interpretation question.  And the

12   canons of construction tell us that we do not need experts.  We

13   don't need -- this is not a food label case, because that's not

14   a contract.  That's something very different, different bucket

15   of legal analysis.

16         THE COURT:  But there's this reasonable --

17         MR. SNYDER:  Yes.

18         THE COURT:  -- Facebook user standard.

19         MR. SNYDER:  For sure.  Like any contract

20   interpretation, what would be the reasonable reading of a

21   contract and what is a plausible reading?  There's no ambiguity

22   here.  You only need parol evidence when there's ambiguity.

23         (Court reporter interrupts for clarification.)

24         THE COURT:  P-a-r-o-l.

25         MR. SNYDER:  Sorry.  And so, as I said repeatedly, the

 1   privacy settings, the app settings, and all the other policies

 2   are clear and robust and can be interpreted and should be

 3   interpreted as a matter of law, as provided in the consent and

 4   disclosures required.

 5       On the business partners, it's frustrating, Your Honor.

 6   The reason I stood up multiple times is -- and, unfortunately,

 7   this infects a lot of the plaintiffs' argument.  It's either

 8   guesswork or just contrary to either their own pleading or, in

 9   this case, their own exhibits.

10       The reason Your Honor granted pre-motion discovery many

11   moons ago is because the plaintiffs wanted that question

12   answered.  What did we tell our app developers?

13       And not only was there a curfew, but the plaintiffs cited

14   the curfew in their submissions.  That's Exhibit 25.

15       And on Exhibit 25, there is a provision, which we provided

16   to them in discovery and which they submitted to Your Honor,

17   which makes this frustrating because --

18                        (Co-counsel confer.)

19       **MR. SNYDER:**  Oh, this is the SSR.

20       And it says, "Special Provisions Applicable to

21   Developers/Operators of Applications and Websites."

22       In a nutshell --

23       **THE COURT:**  Wait.  Hold on.  Hold on.  Hold on.  Let

24   me go there.

25       **MR. SNYDER:**  Yeah.

```
 1              THE COURT:  Okay.  All right.

 2              MR. SNYDER:  And this is --

 3              THE COURT:  This is from -- let's see.  This is the

 4     SSR from November 15th, 2013; is that right?

 5              MR. SNYDER:  It seems that way, Your Honor.

 6              THE COURT:  Okay.

 7              MR. SNYDER:  But essentially, this made clear that we

 8     have a separate set of rules of the road for our app

 9     developers, called "Facebook Platform Policies"; and those,

10     among other things, prohibit the Kogans of the world from

11     selling data.  And so there was a clear curfew.

12              THE COURT:  Where is the curfew?  What's the language

13     that reflects the curfew?  This is "Special Provisions

14     Applicable to Developers/Operators of Applications and

15     Websites."

16              MR. SNYDER:  Right.  And basically, it says to a

17     developer:

18              "You will not use" -- Number 3 -- "display,

19         share, or transfer a user's data in a manner

20         inconsistent with your privacy policy."

21         And --

22              THE COURT:  With "your" privacy policy?

23              MR. SNYDER:  Right.  This is a developer.

24              THE COURT:  So, "Developer" --

25              MR. SNYDER:  Correct.
```

1          **THE COURT:**  -- "you have to have a privacy policy, and

2     you will not use, display, share, or transfer a user's data in

3     a manner inconsistent with" --

4          **MR. SNYDER:**  Correct.

5          **THE COURT:**  -- "your privacy policy."

6          **MR. SNYDER:**  Right.

7          **THE COURT:**  And so does Facebook dictate to the

8     developers what their privacy policies are?

9          **MR. SNYDER:**  Yes.  It's in the Facebook Platform

10    Policies, which are hyperlinked in this document.  And it makes

11    clear that Kogan was not permitted to sell the data to

12    Cambridge Analytica and did so in violation of Facebook's

13    Platform Policies.

14        So there was a curfew.

15        On the question of whether --

16         **THE COURT:**  That's the thing, is I was looking --

17         **MR. SNYDER:**  Paragraph 7:

18          "You will not sell user data.  If you are

19        acquired by or merge with a third party, you can

20        continue to use user data . . . ."

21         **THE COURT:**  Yeah, but I'm asking about this

22    limitation:  You will only use user data -- that third-party

23    apps will only -- can only -- are only allowed to use your data

24    in connection with your friends.

25        And so I'm looking in this -- I've been looking in this

**PROCEEDINGS**

1     paragraph 9, because it's what you cited to --

2          **MR. SNYDER:**  Yes.

3          **THE COURT:**  -- for an indication that third-party apps

4     are only allowed to use my information in connection with my

5     friends, and I couldn't find that from this paragraph.

6          **MR. SNYDER:**  That's because we don't have the platform

7     policies in front of us.  I'm using this as a shortcut,

8     Your Honor, because I have limited time, to answer the

9     question:  Was there a curfew?

10      And the curfew Your Honor referred to was:  Did we tell

11     third-party apps that they couldn't sell and/or transfer data?

12     And we did.

13          **THE COURT:**  And I guess all I'm saying is, it seems

14     like from what has been submitted to me, it's not clear that

15     there even was a curfew.  But they are not contesting the

16     notion that there was a curfew, however toothless.  So it seems

17     to me that it's not an issue for me to grapple with.

18          **MR. SNYDER:**  Paragraph 6, just for the record, says:

19         "You will not directly or indirectly transfer any

20        data you receive from us to (or use such data in

21        connection with) . . . ."

22     So we believe that the curfew was clear.

23      And I would just take issue with the "toothless" point.

24     While the company has said publicly that it could have and

25     should have done more, the fact is, the company, a day late,

**PROCEEDINGS**

1   took action, contacted the relevant parties, sought

2   certifications.  And this lawsuit that we filed, obviously, is

3   further enforcement evidence.

4       As to business partners, Your Honor, again, very

5   frustrating because they cite to a bunch of paragraphs where

6   they engage in speculation without any factual support, but

7   what is binding on them is their admission in paragraph 4 or 8

8   of the Complaint which makes clear that, whether it's private

9   APIs or public APIs, there was no use of data by any of these

10  so-called partners in excess of or in contravention of user

11  settings designated by Facebook users.

12      App settings were never shut off.  There's no evidence.

13  There's no factual support.  To the extent that that's alleged,

14  it's wrong.  And it's based on -- it's a conclusory allegation.

15  And their own Complaint contradicts it, because it says in 408

16  that app developers only gained access with permission from the

17  app user, which is the dispositive point here.  Whether it's a

18  whitelisted app, a so-called private API, or otherwise, one,

19  never in excess of user permission; two, never was shut off

20  those permissions as paragraph 4 or 8 acknowledges, which

21  brings us to the next point, which is counsel's, you know,

22  expression of concern for a comment I made about privacy.

23      So let me be very, very clear.  Facebook scrupulously

24  honors and respects privacy on its platform, but in accordance

25  with users' privacy settings.  And that's the part they want to

1   elide over.

2        Users had the absolute right to control who saw what.  And

3   to the extent a user made that privacy designation, Facebook

4   scrupulously honored it.

5        And what's clear from this lengthy Complaint, when you

6   look at 408, is that at no time did Facebook take any action in

7   excess of those privacy settings, which brings us to the next

8   point, which is, counsel ignored, throughout their argument,

9   Facebook's specific warning that it cannot control what the

10  Kogans of the world do with user --

11       **THE COURT:**  I understand that.

12       **MR. SNYDER:**  -- information.

13       Counsel said, "What difference does it matter?"

14       It matters.

15       **THE COURT:**  I understand your argument on that point.

16       **MR. SNYDER:**  The final point is -- I don't think you

17  need anything on incorporation by reference, unless Your Honor

18  wants something there.

19       **THE COURT:**  No, no, no.  That's okay.  I just wanted

20  to see if the plaintiffs had any better cases on that.

21       **MR. SNYDER:**  And so in answer -- so counsel's first

22  answer to your question, which was "Yes, these other business

23  partners are just like all other apps," is the operative

24  admission.  It is the operative point, because nothing Facebook

25  did, as opposed to Cambridge Analytica, exceeded the app

**PROCEEDINGS**

1  settings.

2      The final point is -- I guess I'm not going to say

3  anything about standing.

4          **THE COURT:**  I think that's probably a good choice.

5          **MR. SNYDER:**  Unless Your Honor wanted me to.

6      But what happened here -- not standing.  What happened

7  here is exactly what we said could happen, and that's what,

8  again, makes counsel's arguments so disingenuous.

9      We imposed a curfew on our app developers.

10      We told our users:  If you share with friends, app

11  developers will get your information.

12      So we told Kogan:  You can't sell the information.

13      We told our users:  Kogan might get your information if

14  you give information to friends.

15      And then we told everyone:  If you don't like these rules,

16  you have so many different ways to protect your privacy.  You

17  can, of course, leave the system entirely.  You can limit who

18  sees what and who you share with.  You can look at what apps

19  and what the app policies are.

20      And so this is not the Wild West where the plaintiffs were

21  without ample protection and ability to safeguard their privacy

22  if they so chose.

23      And a number of users, Your Honor, in 2012, up to and

24  including today, elected to change their privacy settings to

25  make private what they wanted to keep private, and then to lose

 1   control of the privacy when that was their decision on this

 2   social media platform.

 3       Unless the Court has any other questions, the final thing

 4   I wanted to say, actually, is, without arguing standing at all,

 5   because I'm not going to, in the event that the Court rules, as

 6   the order suggested it might, that it finds standing based on

 7   some privacy harm, we would just respectfully request that

 8   the Court make clear which causes of action the Court finds

 9   standing exists under, because obviously there's --

10           THE COURT:  Of course.

11           MR. SNYDER:  -- a laundry list.

12       Because we may ask the Court, after reviewing the order if

13   it goes against us on that point, to certify the standing

14   question to the Circuit.

15           THE COURT:  Okay.

16           MR. SNYDER:  Thank you, Judge.

17           THE COURT:  You seem like you really want to --

18           MR. LOESER:  I just want to ask a question,

19   Your Honor.

20           THE COURT:  Good.

21           MR. LOESER:  Mr. Snyder has said repeatedly that

22   there's nothing in the Complaint in which we allege that

23   privacy settings were violated.  It's something that you asked

24   about last time, too, whether we allege they violated privacy

25   settings.

**PROCEEDINGS**

1        Why don't we submit just a document, with no argument,

2   just identifying the paragraphs of the Complaint where we

3   specifically allege that privacy settings were not complied

4   with.  Would that be useful?

5              **THE COURT:**  Sure.

6              **MR. LOESER:**  Okay.  Thank you.

7              **THE COURT:**  Why don't you do that on Friday also.

8        And thank you very much.

9              **MR. SNYDER:**  Thank you, Judge.

10             **MS. LAUFENBERG:**  Thank you.

11             **THE CLERK:**  Court is adjourned.

12                  (Proceedings adjourned at 1:44 p.m.)

13                            ---o0o---

14

15                    <u>**CERTIFICATE OF REPORTER**</u>

16        I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled matter.

18

19   DATE:   Monday, June 3, 2019

20

21

22            *Ana M. Dub*

23   _____

24       Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
              Official Reporter, U.S. District Court

25