Pages 1 - 56

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

```
                              )
                              )
IN RE:  FACEBOOK, INC.        )   NO. 18-MD-02843 VC
        CONSUMER PRIVACY USER )
        PROFILE LITIGATION.   )
                              )
_____)
```

San Francisco, California
Monday, November 4, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

          KELLER ROHRBACK LLP
          1201 Third Avenue - Suite 3200
          Seattle, Washington  98101
    BY:  **DEREK W. LOESER, ESQ.**
        **CARI C. LAUFENBERG, ESQ.**

          BLEICHMAR, FONTI & AULD LLP
          555 12th Street, Suite 1600
          Oakland, California  94607
    BY:  **LESLEY E. WEAVER, ESQ.**
        **JOSHUA D. SAMRA, ESQ.**
        **ANNE K. DAVIS, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ruth Levine Ekhaus, RDR, FCRR
              Official Reporter, CSR No. 12219

**APPEARANCES**:   (CONTINUED)

For Defendant:

                    GIBSON, DUNN & CRUTCHER LLP
                    200 Park Avenue
                    New York, New York  10166-0193
            BY:  **ORIN SNYDER, ESQ.**

                    GIBSON, DUNN & CRUTCHER LLP
                    555 Mission Street
                    San Francisco, California 94105
            BY:  **JOSHUA S. LIPSHUTZ, ESQ.**
                 **KATHERINE WARREN, ESQ.**

                    GIBSON, DUNN & CRUTCHER LLP
                    1881 Page Mill Road
                    Palo Alto, California 94304
            BY:  **MARTIE KUTSCHER CLARK, ESQ.**


ALSO PRESENT:  Anjeza Hassan, Plaintiff Pro Se

<u>**Monday - November 4, 2019**</u>                                    <u>**1:59 p.m.**</u>

                    P R O C E E D I N G S

                      ---o0o---

        **THE CLERK:**  Please be seated.  Calling case

number 18-MD-2843, In Re:  Facebook, Inc. Consumer Privacy User

Profile Litigation.

     Counsel, please step forward and state your appearances

for the record.

        **MR. LOESER:**  Good afternoon, Your Honor.  Derek Loeser

from Keller Rohrback for the plaintiffs.  With me today --

        **MS. WEAVER:**  Good morning, Your Honor, Lesley Weaver

from Bleichmar, Fonti & Auld.

        **THE COURT:**  Hello.

        **MS. LAUFENBERG:**  Good morning, Your Honor, Cari

Laufenberg from Keller Rohrback.

        **THE COURT:**  Is it really morning still?  I hope not.

        **MS. LAUFENBERG:**  It just feels that way.

        **MR. SNYDER:**  Good afternoon, Your Honor, Orin Snyder

for the defendants.  With me is Josh Lipshutz, Martie Kutscher,

and Katherine Warren Martin.

        **THE COURT:**  Hi.

        **MS. WEAVER:**  And, my apologies, Josh Samra.  And also

pro se plaintiff, Anjeza Hassan.

        **THE COURT:**  Hello.  Okay.

     So, I mean, I have a list of things to discuss.  You may

**PROCEEDINGS**

 1    have additional things you want to discuss.  Maybe we could

 2    start by discussing the scope of discovery, the questions that

 3    I asked about.

 4         And I really think the last question that I asked you is

 5    the most important, which is:  Is Facebook able to go into its

 6    records and figure out which apps had access to which users'

 7    information through the users' friends?

 8              **MR. SNYDER:**  Yes, Your Honor.

 9         The answer is yes.  And that is one category of discovery

10    in what we have proposed as a Phase 1 discovery process that we

11    would produce.  We can, both, produce a list of every app that

12    each named plaintiff authorized to access that plaintiff's

13    Facebook data.  We can provide a list --

14              **THE COURT:**  Wait a minute.  We can provide a list of

15    every app that that named plaintiff authorized to access

16    that --

17              **MR. SNYDER:**  That plaintiff's data.

18              **THE COURT:**  The question is:  Can you figure out --

19    are you able to figure out, let's say, you have a named

20    plaintiff and apps accessed information about the named

21    plaintiff through their friends.  And the question is:  Can you

22    determine which apps accessed information about a named

23    plaintiff through the named plaintiff's friends?

24              **MR. SNYDER:**  That's more difficult, Your Honor.

25              **THE COURT:**  That's what this case is about.

1          **MR. SNYDER:**  Let me say what we can do and what I

2    don't think we can do without creating, not only an undue

3    burden, but potentially an impossible burden.

4          So we can go through each of the 32 named plaintiffs, each

5    of whom allege, obviously, claims and various harm.  And we

6    can, both, say what apps were authorized to access their data,

7    one.

8          We can provide the plaintiffs with the all the data fields

9    that --

10          **THE COURT:**  When you say, "what apps were authorized

11    to access their data," authorized by whom?

12          **MR. SNYDER:**  The user.

13          **THE COURT:**  By okay -- so in other words, I'm -- I

14    have a Facebook account and I interact with some third-party

15    app.  And through my interaction with the third party app, I

16    authorize them to access my data?

17          **MR. SNYDER:**  Right.  Spotify, Uber, anyone else.

18          **THE COURT:**  Okay.

19          **MR. SNYDER:**  That's one.

20          The second category is:  All data feeds that those apps

21    had permission to access.  So, you know, Uber might want to

22    know, for example, Lyft might want to know what your hometown

23    is.  Whatever data that you, as the user, are authorizing Uber

24    to access from your Facebook platform.

25          And so we can give the plaintiffs all the data fields that

**PROCEEDINGS**

1  were accessible by the third-party apps.

2      What we cannot produce -- because it's simply not

3  recorded, it's not the way our platform is constructed -- is

4  what data was actually shared, physically through the tunnel

5  between Facebook and the third-party app.  The magnitude of

6  that data is 2.5 billion times however many apps each of those

7  2.5 billion people have, times every time you ping Uber and it

8  pings Facebook back.  And we're talking about -- I don't have

9  the number, but it's -- it would be in the trillions of data

10  bits.

11         THE COURT:  But it sounds like what you're saying --

12  and I want to make sure I'm not misunderstanding you.

13         MR. SNYDER:  Sure.

14         THE COURT:  It sounds like what you're saying is that

15  what we cannot do is reconstruct -- let's take the scenario

16  where an app is obtaining my information through my friend.

17  Right?

18         MR. SNYDER:  Correct.

19         THE COURT:  Through interactions with my friend.

20      We cannot determine which of my information the app

21  obtained.  There is just --

22         MR. SNYDER:  Through the friend.

23         THE COURT:  Through the friend.

24         MR. SNYDER:  That would -- right.  Right.

25         THE COURT:  But, can we determine -- and so you're

**PROCEEDINGS**

 1   saying we can't determine that.

 2        Can we determine which apps obtained information from me

 3   through my friends, even if we don't know what the information

 4   was?

 5             **MR. SNYDER:**  The answer is no.

 6             **THE COURT:**  Okay.

 7             **MR. SNYDER:**  But I will respectfully submit, Your

 8   Honor, that what we can produce to them is consistent with and

 9   responsive -- would be responsive to whatever discovery

10   requests were properly propounded by these 32 plaintiffs based

11   on the claims they have in the case.

12        Meaning to say, the information we can give to the

13   plaintiffs, and then that we can all present to the Court, is

14   the exact information that the Court will need to determine

15   whether these 32 plaintiffs both have standing and/or causes of

16   action.

17        Because what we're talking about now in terms of what

18   has -- is in the case, as Your Honor knows, is the whitelisted

19   apps.  And so one of the things we can, for example, do is

20   disclose which of these apps with which the 32 had, call it a

21   "relationship," had whitelisted permissions, which one of the

22   apps were integration partners.  So we're going to get to the

23   plaintiffs, and to the Court eventually, all of the information

24   that is needed to assess the whitelisted app claim, the

25   business partner integration partner claim.

**PROCEEDINGS**

1          What's left are two categories of claims.  We have what

2      I'll call the "2009 issue" which can be easily addressed by us

3      producing, which we are proposing to do in Stage 1, all of what

4      I'll call the "2009 privacy consent documents" which we think,

5      when the Court has, that issue would be ripe for summary

6      adjudication because it will show that all users, and I assume

7      the 32 plaintiffs, affirmatively consented, that is the

8      pre-2009 plaintiffs -- plaintiffs who were users before 2009 --

9      in 2009 consented on a go-forward basis to the activity

10     complained of.

11          And so we think that claim can be dismissed or addressed

12     just on the basis of those documents, which we will produce.

13          What's left, in addition to the whitelisted apps and

14     business partner and integration partner claim, is the failure

15     to police or the enforcement claims.  And there, we're prepared

16     to produce and meet and confer with the plaintiffs concerning

17     what they reasonably need, the evidence concerning the 2- to

18     3 million enforcement actions that Facebook has undertaken to

19     police platform violations.

20          And what that evidence will show broadly is that the vast

21     majority, substantially all of the platform violations which

22     have been policed, had nothing to do with alleged misuses of

23     user data, but other violations of the platform rules.

24          Stated another way, what Phase 1 discovery we think should

25     address, and will be the most efficient and fair adjudication

 1   of those issues is:  Who are these 32 plaintiffs?

 2       These are 32 plaintiffs who originally got notice along

 3   with 87 million other people, minus 32, that their data may

 4   have been used in the Cambridge Analytica events.

 5       Since that time, the case has evolved and the case

 6   substantially is not focusing on Cambridge Analytica.  So we

 7   don't even know who these plaintiffs are.  We don't know their

 8   names.  Well, we know some of their names, but there are many

 9   people with that same name.  We don't know whether any of the

10   32 plaintiffs interacted with whitelisted apps, had devices

11   that are business partners or integration partners.

12       **THE COURT:**  But it sounds like we may never know if

13   any of these plaintiffs had information taken from them by

14   whitelisted apps, because that would have happened through

15   their friends, and you have said that we can't determine which

16   apps pulled the plaintiffs' information from their friends.

17       **MR. SNYDER:**  But I think we can determine in what I'll

18   call their "bilateral relationships," the one-on-one

19   relationships with apps, the primary relationship, whether any

20   of them were whitelisted, or any of them were business or

21   integration partners.

22       And if Your Honor determines that sharing information of

23   any kind with those third parties exceeded user consent or were

24   otherwise unlawful, then the plaintiffs will have evidence of

25   their individual sharing with those third-party apps.

1      So what we can produce and will produce --

2          **THE COURT:**  I just don't see -- I mean, I don't see

3    how that -- the interactions that named plaintiffs themselves

4    had with apps that might have been whitelisted apps, I don't

5    see how that advances the ball on the whitelisted app question,

6    since the practice that Facebook allegedly said it was going to

7    discontinue was -- and allegedly did not discontinue, was the

8    practice of allowing these whitelisted third-party apps to pull

9    Facebook user information from friends.

10     So how does it advance the ball in any meaningful way for

11   you to be able to inform us which whitelisted apps the user

12   themselves interacted with?

13         **MR. SNYDER:**  That's one of our questions.  My

14   understanding of the plaintiffs' claim is, it's not just friend

15   sharing, but it's also the use by whitelisted apps of their

16   data beyond their permission.

17     I'll also say just as a factual matter, it's not, maybe,

18   necessarily relevant to today's discussion.  We told

19   developers, "Get ready, change your platform, we're changing

20   our rules."  We actually never told users directly that it was

21   going to stop.  That's a different -- that's a different issue.

22     On the friend-sharing piece -- do you want to address some

23   of the technical limitations with that?

24         **MR. LIPSHUTZ:**  Well, I think the technical limitation

25   is we just don't have it.  I mean, we know who people are

**PROCEEDINGS**

1   friends with and we know for each individual user which apps

2   they authorized over the life of their relationship with

3   Facebook.  But we wouldn't be able to match them up saying, "At

4   this time you were friends with this person and at this time

5   this person was authorizing that app --"

6          **THE COURT:**  That's what I assumed.  That's why I asked

7   the question, because I want to -- I was sort of assuming that

8   the -- we wouldn't be able to figure out that information.

9          **MR. LIPSHUTZ:**  Right.  But I do think Mr. Snyder's

10  point is true which is, at least as the apps that the users

11  themselves have authorized, we would have some pretty useful

12  information.  I think that could advance the ball with respect

13  to data sharing as a general matter.  And I think we could use

14  that --

15         **THE COURT:**  But not as to -- I mean, as to the claims

16  the plaintiffs are pursuing, at least as I understand them, I

17  don't understand how it would meaningfully advance the ball.

18         **MR. SNYDER:**  I think one way it can advance the ball,

19  Your Honor, is --

20         **THE COURT:**  In other words, if I could elaborate on my

21  question for a minute.

22         **MR. SNYDER:**  Sure.

23         **THE COURT:**  Okay.  We have a plaintiff who's saying,

24  "Look, you gave these third-party apps access to my

25  information.  And they got that information, sort of, through

1   the back door, through my friends.  And the sharing of my

2   sensitive personal information with these apps, that they were

3   able to get through my friends, was damaging to me."

4       And the -- I don't see how you would be able to bring a

5   motion for summary judgment against the plaintiffs on that

6   question based only on information that apps obtained through

7   direct interaction with the plaintiffs.  I don't understand how

8   you could bring a motion -- I understand you might still -- you

9   might have motions based on consent or other, you know, other

10  things like that.  But, in terms of getting at what happened to

11  these plaintiffs --

12       **MR. SNYDER:**  I'll give you one example, Your Honor,

13  there are many.  But this is a hypothetical.

14       Let's say on a business partner sharing of information, I

15  shared my data with Blackberry in 2010.  Through the

16  deposition -- and I can establish that Plaintiff Schicks

17  authorized her data to be shared with a Facebook-like platform

18  on Blackberry.

19       I can then take the deposition of that plaintiff and ask

20  what that plaintiff's sharing habits were with respect to any

21  sensitive information they are claiming was shared and hurt

22  them on Twitter.  More generally, what their expectations of

23  privacy were, what they were thinking when they shared it.

24       And through the combination of that evidence, the

25  bilateral affirmative sharing with Blackberry, and then the

1  subjective expectations of privacy with that particular

2  individual, I think we could, on summary judgment, establish as

3  a matter of law that even if a friend shared and they

4  authorized that friend-sharing, there would be no expectation

5  of privacy in that friend-sharing.

6       So, in other words, the bilateral relationship, the facts

7  and circumstances subject to state of mind of the user around

8  that bilateral relationship, we think informed the analysis of

9  whatever happened with a third-party, even if we assumed for

10 the purpose of the argument that there was friend-sharing as

11 well.

12      **MR. LIPSHUTZ:**  If I could just add, Your Honor, the

13 other thing that we could -- that we can do is figure out which

14 of the named plaintiffs authorized their friends to share their

15 information with apps, as a general matter.

16      So that seems to me that would be pertinent information

17 because, as Your Honor found, if the authorization was done, if

18 the user authorized their friends to share information with

19 apps, then that would presumably cover a large part, if not

20 all, of the sharing that took place.

21      I would add one additional thing that we could do which

22 would be to find out, for example, that a user never uploaded a

23 video, never shared a video on the Facebook platform.  And

24 therefore, at least for that user, there is no possible VPPA

25 claim.

1      So I think there is a variety of things, depending on

2  where the data takes us, and we don't know, because we haven't

3  actually been able to view any of the named plaintiffs'

4  Facebook accounts.

5      **THE COURT:**  What we will not be able to do is come

6  away with a full picture of how Facebook's information sharing

7  practices might have affected an individual plaintiff.  There

8  is just not -- it seems to me from this discussion, that the

9  best way to develop an understanding of how Facebook's

10 information-sharing practices affected an individual plaintiff

11 is to learn as much as we can about Facebook's

12 information-sharing practices.

13     How many apps were there?  Which apps had the ability to

14 access user information through a user's friends?  What kind of

15 information did they have the ability to access?  And what

16 sorts of things, if any, did Facebook do to restrict the use of

17 that information that these apps were obtaining?

18     **MR. SNYDER:**  Your Honor, I respectfully suggest that

19 that would actually be way far afield and actually divert us

20 from what is our primary mission, which is to figure out what

21 happened with these 32 plaintiffs.  And we have enough apps,

22 just with these 32 plaintiffs, and we have enough information

23 to not engage in what would be a theoretical exercise.

24     Let's assume there are 10 million apps on the Facebook

25 platform.  I'm just making up a number.  I should know how

**PROCEEDINGS**

1    many, but I don't know the number.  Many millions.

2         To engage in a general inquiry about how those apps

3    interact with friends and users isn't going to inform our

4    analysis of these 32 plaintiffs.

5         We have a number of plaintiffs, a lot of information, a

6    lot of data that we can dig into and make a lot of sense about

7    what affected these 32 users; what information they shared on

8    their Facebook page; what information their friends, therefore,

9    could have accessed from their page; what apps -- and what apps

10   had permission and didn't have permission to view that

11   information.

12        **THE COURT:**  But, I mean, I understand what you're

13   saying, but by understanding the -- since can we can't link

14   particular apps' acquisition of information directly to a

15   particular user, at least, if it was done through a friend,

16   then, the best way to understand the nature and the likelihood

17   of the harm suffered by a plaintiff, it seems to me is to

18   understand the scope of the information-sharing practicing

19   generally.

20        For example, if -- I'm a Facebook user.  And, you know,

21   I'm trying to assess the likelihood that my sensitive

22   information got into the hands of third parties and, if so, how

23   many third parties and, if so, what kinds of third parties.  If

24   I have a full understanding of the third parties that had

25   access to the information, and a full understanding of what

1    type of information they had access to, and a full

2    understanding of who they were, and what they -- and what

3    restrictions were placed on them, we then have a better

4    understanding of what was likely to have happened to me.

5          MR. SNYDER:  I don't think so, Your Honor, because

6    we're talking about a private litigation brought by 32 named

7    plaintiffs.  There are 2-1/2 billion people on the Facebook

8    platform, with tens of millions of apps.  And if we engage

9    inquiry about tens of millions of apps and what they do

10   with 2-1/2 billion people, we're not only fair afield from this

11   claim in this case, we're also, in some ways, turning the

12   burden on its head.

13         The plaintiffs have the burden of proof here.  We're

14   prepared to give them all the information and data that we have

15   relating to these 32 plaintiffs.  We are prepared to give them

16   the enforcement documents that will enable them to either prove

17   or not prove their claim.  We are going to provide promptly the

18   2009 privacy documents that would dispose of the pre-2009 user

19   claim.

20         What we're left with are whitelisted apps, business

21   partners, or integration partners.

22         It may be that these 32 plaintiffs did not have devices,

23   did not engage with integration partners.  There may be six

24   plaintiffs left that even have an arguable or purported claim.

25         So, before Facebook is required to produce information

1   about how tens of millions of apps interact with billions of

2   people on its platform, we believe that discovery should be

3   more targeted in this private litigation to the 32 named

4   plaintiffs who, today, we don't know who they are, what they

5   did on the platform.

6       For all we know, they got a notice about

7   Cambridge Analytica and haven't used the platform other than,

8   you know, randomly.  Because, although Facebook does have

9   2-billion-plus users, those aren't daily active users.

10      Maybe the plaintiffs don't even have claims, as opposed to

11  business partners at all, or even whitelisted apps at all,

12  because it may be that they don't share with friends.

13      What we respectfully suggest, Your Honor, is we have that

14  first tier of discovery that would really tell the Court and

15  the parties who are the 32 plaintiffs; what's their

16  relationship with Facebook; what apps did they interact with;

17  how did they deal with friends; who were their friends.

18      And then determine how to either define the case or, we

19  submit, shrink it more considerably, if not end the case.

20      And to impose on Facebook a burden of laying bare its

21  entire platform, is really not the place -- with due respect --

22  for this Article III proceeding.

23      In fact, as public reports show, that's exactly what the

24  United States Government is doing now.  They are looking into,

25  according to reports, the Facebook platform.  The jurisdiction

**PROCEEDINGS**

1   of this court is limited, we respectfully submit, to the 32

2   named plaintiffs.  And they have a burden of proof.

3       And we are happy to be as open-kimono as we can on the

4   issues in the case because we think some light here shows there

5   is no ultimate harm and we did not exceed user consent ever

6   with respect to any of these apps; that is, that's we honored

7   the privacy of the users consistently --

8           **THE COURT:**  I understand all arguments.

9       So, Mr Loeser, what is your reaction to all of this?

10          **MR. LOESER:**  So, do I have reactions.  You know,

11  I guess I have been doing this for a while and this is an

12  adversarial process.  And I have no doubt that Mr. Snyder could

13  describe for you a discovery process that would maximize the

14  chances that Facebook would succeed and minimize the chances

15  that we would succeed.

16      I think the right approach, however, is to do just what

17  Your Honor is doing and ask questions about what exactly would

18  you do in the first phase to develop an understanding of what

19  actually happened.

20      And the problem, the fundamental problem with this idea of

21  just focusing on the named plaintiffs -- which is, of course,

22  what every defendant always wants to do in a class action -- is

23  that so much of the conduct is not in any way individualized to

24  the named plaintiffs, and so much of the discussion and so

25  much of the evidence that we would have to develop to litigate

 1  precertification would be evidence that just applies generally

 2  to the platform, to their policies, to their practices.

 3      And all we would end up doing if we authorize Facebook to

 4  just allow discovery that mentions the named plaintiffs --

 5  because that's really what they are saying.  In a document you

 6  have to say a named plaintiff, or have to be something the

 7  named plaintiff directly interacted with -- is you're

 8  eliminating from discovery all of the things that is really the

 9  compelling evidence that describes what they are doing.

10      **THE COURT:**  And I mean I think I agree in at least in

11  large part with what you're saying, if not entirely with what

12  you're saying.

13      But, let's assume they are not going to be able to limit

14  discovery, you know, in that way; right?

15      It seems to me, that even if we did -- if we focus on the

16  named plaintiffs first and you have seen, you know, that I have

17  in my standing order this paragraph on class actions that

18  says --

19      **MR. LOESER:**  Rule 45.

20      **THE COURT:**  Hey, a lot of times it's a good idea to

21  focus on the named plaintiffs first.

22      Is it always a good idea to focus on the named plaintiffs

23  first?  No, I don't think so.  But, I mean, it depends on the

24  case.

25      But, a lot of times it's a good idea because, you know,

1   you go through this summary judgment process that is less

2   expensive and less burdensome for both sides.  And maybe that

3   results sometimes in never having to do, you know, a contested

4   class certification proceeding; right?

5          MR. LOESER:  Yeah's.

6          THE COURT:  And so it advances the ball in a more

7   meaningful and less expensive way than getting bogged down in

8   all this class certification discovery.

9          But two things have to be true in order for that method to

10  make sense, in other words, for that approach to make sense.

11         One thing that has to be true is the defendant has to be

12  willing to live with the consequences of doing summary judgment

13  as to the named plaintiffs first.  Right?

14         And the consequence is, if you lose, if the defendant

15  loses on summary judgment as to the named plaintiffs and if the

16  named plaintiffs win on their cross-motions for summary

17  judgment, then you go to class certification proceeding.  And

18  if a class gets certified, you know, you have this one-way

19  intervention thing that courts have expressed concern about.

20  And the defendant has to waive that concern if the defendant

21  wants to proceed with summary judgment as to the named

22  plaintiffs first.

23         I gather from what Facebook is saying here that they want

24  to do that, that they are prepared to waive any objection to

25  the one-way intervention concern.

PROCEEDINGS

1              MR. LOESER:  Right.

2              THE COURT:  We'll hear from them on that.

3              MR. LOESER:  Yeah.

4              THE COURT:  The other thing that has to be true, even

5    assuming the defendant waives an objection to the one-way

6    intervention concern, is that sufficient discovery must be done

7    to ensure that we can fully understand and adjudicate the named

8    plaintiffs' claims.  And that there often will be overlap

9    between discovery that you would do to adequately adjudicate

10   the named plaintiffs' claims and the discovery you would need

11   to do to adequately adjudicate the claims of the other class

12   members.

13        And it seems to me that this may be one of those

14   situations; right?  That we need to -- we may need to have a

15   more general view of Facebook's information-sharing practices

16   to understand what is likely to have happened to the named

17   plaintiffs' sensitive information.

18        And if that is correct, you know, we can probably spend a

19   lot of time talking about the details of discovery.  But, if

20   I'm right about that, then what would be wrong with setting up

21   these proceedings to do cross-motions for summary judgment as

22   to liability with respect to the named plaintiffs first, before

23   we do class certification proceedings and before we do

24   discovery that is relevant only to whether a class can be

25   certified?

1          **MR. LOESER:**  So one thing I have learned about this

2     Court over some time is that Your Honor is very interested in

3     identifying ways that will make things work better, finding

4     aspects of the rules that can be tweaked to solve problems.

5          And, one of the things I saw in Rule 45, Your Honor has

6     expressed interest in this process of cross-motions for summary

7     judgment.  There are -- I agree with you, there are cases where

8     that does make sense, particularly when the legal issues are

9     fairly simple and fairly straightforward, and where discovery

10    can be fairly limited and can resolve those legal issues.

11         And, frankly, we have gone through every single one of

12    your cases in which you have pursued that that approach and all

13    the parties are consenting --

14         **THE COURT:**  Typically, I just give the defendant the

15    choice.  And if the defendant chooses that, that's fine.  But,

16    if the defendant objects to it, then I don't do it.

17         **MR. LOESER:**  Right.  The Ninth Circuit hasn't fully

18    resolved this question of plaintiff's motion for summary

19    judgment and the impact.

20         Certainly, it's clear in the Ninth Circuit, if the

21    defendant pursues a summary judgment precertification, then

22    they have effectively waived and consented.  And, frankly, I

23    think an express waiver would clear up any ambiguity on that.

24         But, the reason I don't think that's the right approach

25    here, this is not a case where the legal issues are simple, and

**PROCEEDINGS**

1    it's not a case where the discovery would be discrete up front.

2         So what we're going to do, if we pursue this approach --

3    and let's say Facebook wanted to move on summary judgment on

4    the VPPA claim.  Your Honor has gone through in the order and

5    identified a number of factual disputes that exist as to that

6    VPPA claim.  And I have written them all down but I will spare

7    you the run-through on them.

8         **THE COURT:**  Thank you.

9         **MR. LOESER:**  There is a stack of them.  And every

10   single one of those issues is not unique to the named

11   plaintiff.  There are a couple of -- the named plaintiff would,

12   obviously, have to show they either uploaded a video, as

13   Mr. Lipshutz said, or, frankly, liked a video.

14        **THE COURT:**  It doesn't have to be unique to the

15   named -- it's not a question of whether it's unique to the

16   named plaintiff.  My point is that if it's relevant to the

17   named plaintiff's case, then we're going to do discovery on

18   that now.

19        **MR. LOESER:**  Right.  And I hear that.  And I

20   completely agree that so much of the evidence would not be

21   unique to the named plaintiff, and to adjudicate that claim up

22   front, precertification you would have to develop all this

23   evidence that's really common evidence.

24        **THE COURT:**  Right.  And what I don't think we can do

25   or should do is sort of parse out of the named plaintiff's

**PROCEEDINGS**

1    claim; right?  I don't think it would be appropriate to allow

2    Facebook to say, "Well, we think we can beat the first named

3    plaintiff on this element, and so we want to do discovery on

4    that element of their claim.  And we think we can beat this

5    other named plaintiff on this different element, so we only

6    want to do discovery on that element for this named plaintiff."

7        That, I think, would -- I got the sense that perhaps

8    Mr. Snyder was proposing something along those lines.  To the

9    extent he is, I don't think that's appropriate.

10       But what would be wrong with just saying, "Look, all of

11   these claims that the named plaintiffs have, we're going to do

12   discovery on those claims."?

13       I mean, it sounds to me like there may not be that much

14   daylight between doing it on -- for the 32 named plaintiffs and

15   doing it for liability as to the class as a whole.

16       **MR. LOESER:**  Frankly, Your Honor, that's exactly why

17   we shouldn't do it.  Because it would be a very expensive

18   individual adjudication.  Your rule is intended to save the

19   parties time, money, effort, and make it a more efficient

20   process.  But, since there is so little daylight between

21   individual adjudication and the class adjudication here, we're

22   going to spend a fortune.  We'll have experts.  We'll have a

23   full litigation over the claims, but they will only be for

24   these individuals --

25       **THE COURT:**  You're going to spend a fortune no matter

1    what.

2             MR. LOESER:  It's so sad --

3             THE COURT:  You're not going to be able to avoid you

4    spending a fortune.

5             MR. LOESER:  Right.  But, typically, if you're going

6    to spend a fortune, you're going to do it on the certification

7    stage.  You know, it doesn't make a ton of sense to spend a

8    fortune to adjudicate an individual claim, when you can

9    basically do the same work and have presented to the Court a

10   fully briefed class motion for class adjudication.

11        Normally, my experience with most defendants --

12   particularly those as confident as Mr. Snyder about the fact

13   that they are going to win -- is that they want to win on a

14   class-wide basis.  This -- frankly, this case is unusual.  I

15   have not had a defendant --

16            THE COURT:  I don't know.  It sounds like they don't

17   care.  It sounds like they would be perfectly happy to win on

18   summary judgment as to the 32 named plaintiffs.

19            MR. LOESER:  I'm sure they would be happy to have

20   everyone spend a fortune to litigate individually have and the

21   downside risk be somewhat limited.

22        Now, an express waiver of the one-way intervention rule,

23   would mean I think a little bit more than what you said I think

24   would also mean, if we move for summary judgment and we win,

25   that has a class-wide effect for them and would mean that

1   certification is really a matter of submitting an order.

2           THE COURT:  No.  Certification is a matter of figuring

3   out whether they meet -- the class meets the requirements of

4   Rule 23.

5           MR. LOESER:  Right.  But if an individual has won its

6   claim, and we can show that that individual had a common

7   experience -- which we are quite confident we can show -- then

8   there is not much left to the adjudication.

9           THE COURT:  That's right.  But, I mean, that's always

10  the big question in the class certification is, did they have a

11  common experience.

12          MR. LOESER:  I think you're going to hear some

13  resistance from Mr. Snyder -- or maybe I am wrong -- about

14  expressly waiving the one-way intervention rule in the event

15  that plaintiffs file a motion for summary judgment.

16      But, I really think that the reason not to do it is

17  because we're going to do all this work and spend all this

18  money to have an individual adjudication; and there is so

19  little daylight between that adjudication and the class

20  adjudication, that it doesn't accomplish the purpose of your

21  rule, which was to try save money and do something that would

22  be much more modest in scope -- because that's all that's

23  necessary -- and have a conclusion that effectively identifies

24  that the case can't succeed on the merits.

25      Now, something else that I think is really important here,

**PROCEEDINGS**

1   that hasn't been discussed, and that's the discovery that

2   Facebook has already produced, again, in other matters.

3        Your Honor's rule is directed at saving money and saving

4   burden, and avoiding burden.

5             THE COURT:  You're talking about FTC and all these

6   other --

7             MR. LOESER:  FTC, they are in a big fight right now

8   with the Massachusetts AG over discovery, although they have

9   produced a lot of discovery.  The DC AG has obtained discovery.

10            THE COURT:  Let's put that aside for just a second.  I

11   do want to discuss that.  I had that on my list of things to

12   discuss.  But I want to kind of limit ourselves to, for now,

13   sort of figuring out what's the most efficient way to move

14   forward with this case.

15            MR. LOESER:  I think one of the efficient ways to is

16   direct Facebook to produce what they produced in these other

17   very related matters.

18            THE COURT:  But if that opens up a different can of

19   worms that we need to discuss which is, you know, how relevant

20   was all of that -- much of that discovery --

21            MR. LOESER:  Right, there is an easy --

22            THE COURT:  -- provided to the FTC, or whatever, to

23   these claim.

24            MR. LOESER:  There is an easy way to resolve that and

25   that's to look at the requests.  You know, they have been

**PROCEEDINGS**

1    served with requests by the Mass AG, by the DC AG, by

2    investigate bodies.  And we can look at the requests and we can

3    determine what's relevant.

4        And, frankly, I think it's helpful to have these

5    conversations in open court.  It's also helpful to meet and

6    confer and try and develop an agreement as to what -- I have a

7    feeling we can work with them, once we get past this individual

8    adjudication issue, on what would be an appropriate scope.

9        I am pretty sure we would be back in front of you seeking

10   some guidance, because we'll want more than they are willing to

11   give and they will want to give less than what we want.

12       But I do think, if you drill down and look at your cases

13   where we have had precertification summary judgment motions,

14   you compare that to here, and look at the complexity, look at

15   the overlap, look how much we would have to do that would have

16   to be done again.  It really moves towards, "Let's just go

17   forward --"

18           THE COURT:  What do you mean, "would have to be done

19   again"?  If it's done, it's done.  There is going to be a lot

20   of discovery that is relevant to both phases.

21       By the way, just small footnote, you know, Facebook was

22   proposing three stages of --

23           MR. LOESER:  Right.

24           THE COURT:  I didn't understand that.  I mean, it

25   would be Stage 1 -- potentially Stage 1 -- and then 2 and 3

1    would be combined into Stage 2 if we did phase discovery that

2    way.  And then the scope of discovery in Phase 1 may be broader

3    than what Facebook is envisioning.

4        That's just a small footnote.  What my main point is, was

5    that you don't have to do it again.  I mean, if you get

6    discovery that's relevant to both phases, in the first phase

7    you don't have to do it again in the second phase.  You have

8    already got it.

9        **MR. LOESER:**  Well, for example, expert reports which

10   we would work up an expert report that would be somewhat

11   tailored to the individual adjudication.  And that report would

12   be -- I mean, obviously, we would use what we could from the

13   first report, but it would become, sort of, an exercise of,

14   sort of, doing it again.  But, I hear what you're saying.

15       **THE COURT:**  That would be true if we did class cert

16   first and then summary judgment afterwards.  You would have to

17   work up expert reports in this connection with the summary

18   judgment motion.

19       **MR. LOESER:**  Well, typically, the class cert expert

20   reports would be somewhat different than your merits report.

21       **THE COURT:**  That's true.  But, whichever ones come

22   first, they are going to be different from the others.  I'm not

23   seeing -- I guess I'm not seeing your point about the --

24       **MR. LOESER:**  I mean, having spent the weekend reading

25   lots of interesting comments on the one-way intervention rule

**PROCEEDINGS**

 1    and reasons why it can and can't make sense, there is the

 2    observation that, because the adjudication is individual and if

 3    the defendants lose or the defendants win, there is all this

 4    other adjudication that simply has to be done again.  I think

 5    that's the point.

 6         It creates two phases instead of one, in which discovery

 7    needs to be -- obviously parties would use what they can in the

 8    first, but doesn't create more efficiency if, in the first

 9    case, it's so raw.

10         **THE COURT:**  Okay.

11         **MR. LOESER:**  I just -- one other point, Your Honor, I

12    am confused by and maybe counsel can clarify.

13         Facebook had some 300,000 people utilizing the "This is My

14    Digital Life" app, and from that they were able to

15    notify 87 million people of their data being shared without

16    permission.

17         I'm a little confused and somewhat shocked to hear this

18    claim that they can't identify which friends gave away which

19    friends' information, because it doesn't seem to square with

20    the notification that was sent in the Cambridge Analytica

21    matter.

22         And I would also note just, whenever there is a

23    conversation -- and I know counsel is trying to be helpful on

24    drawing whatever information they have to explain the technical

25    details on how this platform works.  What we need is discovery.

**PROCEEDINGS**

1    We just need to be able to ask people who actually know.

2        And it's like an ESI conversation where the lawyers are

3    always talking about what they think, you know, how it operates

4    and then eventually, the ESI experts are sitting in the room,

5    talking.  And so that kind of conversation about how this

6    platform works and what can be done and can't be done.  I

7    appreciate counsels' efforts to explain, but I think it's

8    something that goes beyond the lawyers' ability to explain.

9            THE COURT:  Okay.

10           MR. SNYDER:  I can address everything, Your Honor.

11           MR. LOESER:  I'm going to sit down, because I think

12   you'll be long.

13           MR. SNYDER:  Not so long.

14       Your Honor, we tried to be helpful in looking at this --

15           THE COURT:  Can I ask you whether you -- have you read

16   paragraph 45 of my standing order?

17           MR. SNYDER:  That says the individuals -- the part

18   that talked about individual claims versus class action?

19           THE COURT:  Yes.

20           MR. SNYDER:  Yes, we have.  We are not waiving --

21           THE COURT:  Okay.  Well, then isn't the answer that

22   we're doing class certification first?

23           MR. SNYDER:  We think, Your Honor, that the answer is

24   we don't believe that's the right approach.  I understand Your

25   Honor's position.  If I can just briefly say why.

**PROCEEDINGS**

1          Because this is not the usual putative class action that

2     comes to us where the claims are clear.  The plaintiffs, for

3     example, in the securities case are alleging that they bought

4     or sold stock within a period of time, and it's easy to check

5     whether they did or didn't.  This is a case that started out as

6     a Camridge Analytica case, and now it's morphed into a

7     different case.

8          Your Honor has identified four different areas where there

9     is potential liability.  And we have no information at all

10    about whether these individuals -- who they are and what claim

11    each does or doesn't have.

12         And I'll give you an example, Your Honor, why we think

13    these threshold questions not only predominate but should, for

14    efficiency and fairness purposes, be front-loaded.

15         What if we found out that all of the named plaintiffs

16    authorized friend-sharing?  Number one.

17         What if we found out that all of the plaintiffs turned off

18    friend-sharing?  It would waste a lot of time going forward if

19    those facts were established because, under Your Honor's order,

20    I think, and under the law, they would be out of luck on

21    whitelisting and on integration partners.

22         What if we found that half of the named plaintiffs never

23    had any sharing of data with a Blackberry or Internet TV or any

24    other so-called device?

25         So we have tried to be helpful in focusing it that way.

1    If -- it's clear the plaintiffs don't want to go that way.

2    Your Honor doesn't seem to want to go that way.  Maybe we

3    should just default to Rule 26.  They should propound their

4    discovery requests.  And we will respond in the ordinary

5    course, in good faith, and meet and confer.  And do what we

6    always do, which is act reasonably and in accordance with the

7    Federal Rules of Civil Procedure.

8         We understand Your Honor's point of view in the case.

9    We're going not going to play games.  We're going to be fair

10   and forthcoming.

11        If we think something they want is outside the bounds of

12   what's responsive or relevant.  For example, if they want to

13   know what every single one of our a 20 million apps do or don't

14   do, we'll probably object to that.  I think we can probably

15   agree on what is responsive and relevant, because we all want

16   to get to the same place.  And if Your Honor wants to schedule

17   a full schedule with class certification at the appropriate

18   time in the future, we'll just abide by that order.  We tried

19   to, I guess, bifurcate or trifurcate it in a way that we

20   thought the Court would appreciate.  But, if not, we'll default

21   to Rule 26, which seems to work well.

22             **THE COURT:**  The regular way of doing things.

23             **MR. SNYDER:**  Correct.

24             **THE COURT:**  I'm always so reluctant to do things the

25   regular way.

1        **MR. SNYDER:**  We were too, but -- and there is one more

2    point.  I just want to be clear with the Court -- and, maybe,

3    Josh, you can address the point.

4        Counsel said, "Well, how is it that we were able to tell

5    87 million users that their data was shared?"

6        **THE COURT:**  And the answer was:  You couldn't.  You

7    identified everybody who might fit be in the universe of people

8    whose data was shared.

9        **MR. LIPSHUTZ:**  That's exactly right, Your Honor.

10       **MR. SNYDER:**  And by the way, that one single app, Your

11   Honor, I cannot tell you how many resources were required just

12   to conduct that inquiry with precision as to the 87 million who

13   might have been affected.  But it was a massive amount of

14   resources for that one app.  Imagine, now, if they wanted to

15   ask questions about how all 20 million apps operated.  It would

16   literally be physically impossible.  Not enough engineers on

17   the globe to do that.

18       **THE COURT:**  The point is maybe it's more efficient to

19   conduct a higher level analysis of all the apps than it is to

20   conduct a detailed analysis of a handful of apps.

21       **MR. SNYDER:**  As I said, they will propound their

22   discovery, and we'll meet and confer and, hopefully, never come

23   before Your Honor with a dispute.

24       **THE COURT:**  Always happy to have you.

25       **MR. SNYDER:**  No more hypotheticals, though, Judge.

1     **THE COURT:** That's helpful. But let's chat now -- I

2 mean, here is what I was -- we still have this conversation

3 about the stuff that was turned over to the Government.

4     But, what I was -- I think what I would like to do, just

5 to give -- it's basically the -- you know, to give each side

6 kind of one more shot at explaining, you know, why their

7 proposed approach is better.

8     I think what I would like to do is invite Facebook to

9 provide a little bit more of a detailed filing explaining what

10 you would turn over under -- explaining what you would turn

11 over under your approach, like, sort of a detailed list of

12 everything you would propose to turn over.

13     **MR. SNYDER:** For sure.

14     **THE COURT:** And explain how it's relevant.

15     **MR. SNYDER:** Yes, Your Honor.

16     **THE COURT:** And, you know, what would be in this first

17 tier of discovery.

18     What I would like from the plaintiffs is, I would like a

19 little bit more detailed explanation from you on what you would

20 seek that relates to class certification.

21     So in other words, explain: What do you need to get your

22 class certified and tell us what you want from Facebook.

23     **MR. LOESER:** All the stuff they don't want to give us.

24     **THE COURT:** Right. Okay.

25     **MR. SNYDER:** Could we have two weeks for that?

**PROCEEDINGS**

1  Because at the last point of higher level, I want to go to the

2  client and really think through how expansive and helpful we

3  can be here, to persuade Your Honor to the tiered approach.

4         **THE COURT:**  Yeah.  Sure.  Each of you, why don't

5  you --

6         **MR. LOESER:**  Can I give him an assignment?

7         **THE COURT:**  Go ahead.

8         **MR. LOESER:**  There is a question we would really like

9  answered.

10        **THE COURT:**  Yeah.

11        **MR. LOESER:**  For the government production, since it

12 would solve so much of the burden issue, and would create so

13 much efficiency.  It's so commonly the case that, in

14 litigations like this, that government productions are turned

15 over because it saves so much time and money.  What's wrong

16 with -- or what aspects of those Government productions would

17 they be willing to turn over.

18    Because I really do think, when we go down our list of

19 things we would want that are general in nature, like platforms

20 and the processes, how their monitoring worked, our

21 understanding is that's basically what the Government has been

22 seeking.

23        **THE COURT:**  And with the FTC matter, I mean, if I

24 remember correctly from reading the recent FTC complaint, or

25 the complaint filed by DOJ on behalf of FTC, it was two things;

 1    right?  It was the stuff that you're complaining about and then

 2    I think it was the facial recognition stuff.

 3              MR. LOESER:  Right.

 4              THE COURT:  So if there were a way --

 5              MR. LOESER:  Part of that, we're not interested in.

 6         And then the AG action as like the DC or the Mass AG,

 7    I believe there was an oral argument in the Mass AG case about

 8    internal investigation that Facebook has done that I think

 9    Gibson Dunn is involved in.  And I would like to see if that

10    information was produced.  Because it also seems to relate to

11    what we're talking about.  If it's a matter of producing it

12    here, what will be or has been produced there, I just think

13    that that creates --

14              MR. SNYDER:  Three responses.  One, of course, we have

15    had this argument before.  I think one of the first times we

16    were before Your Honor.

17              THE COURT:  We have?  I have no recollection.

18              MR. SNYDER:  Yes.  And the law of the case is that

19    Your Honor denied that request before.

20              THE COURT:  Wait a minute.  But that was in the

21    context of pre-pleading.

22              MR. SNYDER:  Okay.  So it's a liberal definition of

23    "law of the case."

24         That's point one.

25         Point two is, the truth is -- because we were involved in

1   the FTC proceeding enough to know that 90 percent of what we

2   produced there has nothing to do with this case.

3       Cambridge Analytica predominated, that is the claims that

4   are no longer extant in this case.  And it also had to do with

5   app settings versus privacy settings -- no longer in this case.

6       So it really is backwards to say, "Tell us what's not

7   responsive."  Because --

8           THE COURT:  I mean, the problem that I -- the concern

9   that I have with -- I mean, I don't think it would be

10  appropriate for me to simply say, you know, "Turn over

11  everything that you have turned over to the Massachusetts

12  Attorney General," or "Turn over everything that you have

13  turned over to the FTC."

14      I don't know what you turned over to the FTC.  I mean, it

15  would be, "Turn over whatever is responsive --"

16          MR. SNYDER:  Of course.

17          THE COURT:  "-- to the discovery requests in this

18  case."

19          MR. SNYDER:  Yes.  And that built-in efficiency exists

20  and will benefit plaintiff and defendant.  Meaning to say that

21  if they propound discovery requests A, B, C, or some subset of

22  it, to a regulator, then we're going to be able to access that

23  in a database, get it, aggregate it, and produce it.

24          THE COURT:  Right.  But one question -- what would

25  make it easier is I don't know -- I'm assuming that they do not

**PROCEEDINGS**

 1  have the discovery -- the requests, the production requests,

 2  that the Government gave Facebook.

 3          **MR. SNYDER:**  They are confidential.  I wouldn't be

 4  surprised if DOJ and FTC opposed our producing those.

 5          **MR. LOESER:**  We can ask.  We can ask the state AGs as

 6  well.

 7          **MR. SNYDER:**  What we can assure the Court is that if

 8  we produced anything to regulators and they ask for it and it's

 9  responsive we will produce it to them.

10          **THE COURT:**  Right.  But there may be a way to make

11  this discovery process much more efficient than it would

12  otherwise be and that is, if nobody has any objection -- so,

13  you could imagine, let's say the FTC asked for, you know, a

14  particular category of documents.  And the plaintiffs submit a

15  request where it, like, overlaps in substantial part with what

16  the FTC asked for, but goes beyond it in substantial part.

17  Right?

18      That may be more difficult for everybody to deal with than

19  if the plaintiff knows what the FTC asked for and is able to

20  decide if that would suffice for the plaintiff.  Right?

21      In other words, if the plaintiff says, "Okay.  Here are

22  the ten categories of documents that the FTC asked you for.  We

23  would like to request the first five."

24      I mean, that would be -- wouldn't that be a lot more

25  efficient for Facebook and the plaintiffs?

1      **MR. SNYDER:**  Not for us, Your Honor, because we're

2  going to be litigating what was asked in the FTC, what was

3  responsive, what was not.

4      We will, when we get their discovery request, do what we

5  always do which is respond and comply with the rules.  And

6  produce discovery.

7      If it so happens it's prepackaged in some form because we

8  produced some category to a regulator, it would be easier for

9  us to get it to them.  But I don't think they have a right to

10  bring a lawsuit on behalf of private plaintiffs, part of a

11  putative class, and say, "Show us what every regulator has

12  asked you for, because we may want to piggyback --"

13      **THE COURT:**  Would there be anything to prevent them

14  from going straight to the regulator and asking them?

15      **MR. SNYDER:**  I think they have the rights within the

16  Federal Rules to do whatever they want to do.

17      **MR. LOESER:**  Well, frankly, we would call them and ask

18  them if they have any objection to giving us the requests.  And

19  which I'm generally, in my experience, where I have made

20  similar requests, they don't.

21      **MR. SNYDER:**  Well, I would say, ask us for them in

22  discovery, and we can talk about it.

23      **THE COURT:**  Or maybe they can just call the

24  Massachusetts AG and ask them.

25      **MR. LOESER:**  Facebook has not figured out how to make

**PROCEEDINGS**

1    my phone not work.  So I'm going to pick up the phone and call

2    and ask.

3        I think what Your Honor has described is something that

4    happens a lot.  It's not the least bit uncommon to look at

5    regulators requests and figure out what's relevant and go seek

6    those.

7            **THE COURT:**  Not reinvent the wheel and submit

8    discovery requests that are partially overlapping?

9            **MR. LOESER:**  Frankly, many times, Your Honor -- and we

10   would be willing to engage in this process.  We may look at

11   what's been produced and say, "You know what?  There is

12   something else that we kind of wanted, but we'll just take

13   that," because it is so efficient to just send that out.

14           **MR. SNYDER:**  I just want to dissuade counsel from

15   thinking that we're ever going to just turn over a cache of

16   documents without reviewing them.

17       There are different rules.  When you're dealing with a

18   regulator, you define responsiveness in a different way.  You

19   may be over-inclusive, because it may not be just what's

20   responsive and relevant; but it could be, we want to open the

21   kimono and give everything because you're the Government.

22   Whereas, here, it has to be tethered to a claim or a potential

23   claim.

24       So we're going to be, I think, in a morass if we try to

25   piggyback on disparate regulatory productions.  We have the

**PROCEEDINGS**

 1  resources and ability to respond in due course to discovery

 2  requests.  And we're not going to play games because, if we do,

 3  we will be standing here and you will not be happy.

 4       **THE COURT:**  I would like that description from both of

 5  you.

 6       **MR. SNYDER:**  Yes, Judge.

 7       **THE COURT:**  What you propose to turn over, you know,

 8  as comprehensive a list of what you propose to turn over in the

 9  first phase.

10       You know, and from you, I think the primary thing I want

11  is -- feel free to add whatever you like -- but the primary

12  thing I want is:  What discovery do you need for class

13  certification, for identifying the class, you know, for -- and

14  for, you know, what discovery do you need before we get to the

15  class certification stage.

16       **MR. LOESER:**  There once was a world where merits were

17  not really part of class certification at all, but now there is

18  more of a merits inquiry.  We'll work that in.

19       **THE COURT:**  Of course.  And let me see here --

20       **MR. LOESER:**  There are a couple of housekeeping

21  matters, Your Honor, that if we are looking for more things to

22  talk about --

23       **THE COURT:**  Go ahead.

24       **MR. LOESER:**  The cases that have been related --

25       **THE COURT:**  Yes.

PROCEEDINGS

```
 1          MR. LOESER:  Zimmerman case and the Hassan case --

 2          THE COURT:  Yes.

 3          MR. LOESER:  Hassan is a pro se action and Ms. Hassan

 4   is here and may wish to speak to the Court, which, obviously,

 5   is her prerogative.

 6       For the Zimmerman complaint -- and Hassan, by the way, we

 7   the case is quite similar --

 8          THE COURT:  There are like three or four plaintiffs in

 9   that case, right?

10          MR. LOESER:  Four.

11          THE COURT:  Okay.

12          MR. LOESER:  That's a consolidation issue which seems

13   fairly straightforward --

14          THE COURT:  Your view is that that case should be

15   treated like all the other cases in the MDL, which is that you

16   don't -- it's part of this consolidated class action that you

17   have now filed.  There is nothing further to do with the Hassan

18   case for now?

19          MR. LOESER:  We think so.  I believe Ms. Hassan is

20   perfectly entitled to speak and express her view on that.

21          THE COURT:  Of course.

22          MR. LOESER:  Zimmerman has had a lot of things that

23   overlapped.

24          THE COURT:  There is this one claim?

25          MR. LOESER:  Right.
```

1      **THE COURT:** About shutting off his Facebook -- is it a

2   he?

3      **MR. LOESER:** Yeah.

4      **THE COURT:** Shutting off his Facebook account and a

5   request to enjoin Facebook from allowing political

6   advertisements during the 22 -- can I ask you while I have you,

7   do you recommend that I enjoin Facebook from running political

8   advertisements in 2020?

9      **MR. LOESER:** I would recommend that you enjoin them to

10  stop ruining America, but that's just me.

11      But in all seriousness for Zimmerman --

12      **MR. SNYDER:** Right.

13      **THE COURT:** For the record, Mr. Snyder was not even

14  smiling.

15      **MR. SNYDER:** I was not smiling and I find nothing

16  funny about the colloquy.

17      **MR. LOESER:** So 42(a) gives you wide latitude, so if

18  you want to consolidate the part of the case that's related,

19  you can also kick back the party that's not.  We're sort of

20  agnostic as to how to handle that.  We just recognize that

21  there is part that isn't really covered.

22      **THE COURT:** I think what I would propose to Zimmerman,

23  absent any objection from anybody here, is that if you want

24  your case to go forward, you can, you know, you can dismiss

25  your overlapping claims without prejudice.  And you can go

**PROCEEDINGS**

1   forward on the claim about seeking an injunction against

2   political advertisements in 2020.  And you can go forward with

3   your claim about, you know, being improperly shut off the

4   Facebook platform, and it's your choice.

5           **MR. LOESER:**  That seems sensible to me.

6           **THE COURT:**  Any objection to that?

7           **MR. SNYDER:**  No, we agree the case should be treated

8   as counsel suggested.

9           **THE COURT:**  Okay.

10      Ms. Hassan, is there anything you want to say?  Do you

11  have any objection to treating your case the way we have

12  treated the other cases in the MDL.

13          **MS. HASSAN:**  Yes, Your Honor.  We --

14          **THE CLERK:**  Come on up to the podium.  Thank you.

15          **MS. HASSAN:**  So as a -- for plaintiff, we have put a

16  lot of work into in case.  I have -- we have initially filed

17  was February 22, 2019.  I have dealt with the counsels of

18  Facebook, Bryn Williams, back and forth.  We have kept in touch

19  and, you know, filed the appropriate documents.

20          So I know at some point our points, you know, do overlap

21  with the MDL, but we feel the MDL will not serve us justice at

22  the end, just knowing, kind of, going through all this

23  schedules and dates.  And, you know, we would like our case to

24  be treated separate.

25          Like I said, I'm not lawyer.  I do have a bachelors, but I

 1  have put a lot of times, a lot of calls, a lot of expenses on

 2  top of trying to find justice, you know, towards Facebook.

 3      We have opened our accounts, some 2007, some 2009.  Once

 4  we found out the -- Facebook's agenda what -- you know, what

 5  was the actual purpose of Facebook, you know, existing.  It's

 6  not what they claim that they will give us a connection with

 7  the world.  It's all about just draining information from us,

 8  you know, where do we live, what do we say, what do we think,

 9  what do we eat.  I think it interferes too much into our

10  personal lives.

11      And then it's like, well, you're safe here, give us

12  everything you're made of and then take everything, using it

13  for their own benefit.  I mean, now they are worth about --

14          **THE COURT:**  I guess, let me ask you --

15      **MS. HASSAN:**  Yes.

16          **THE COURT:**  If even if your case were, sort of,

17  treated separately from the other cases in the MDL, it's not

18  going to be resolved any faster.

19      **MS. HASSAN:**  I understand.

20          **THE COURT:**  It will still be in front of me.  And I

21  would never -- it would not be fair to anyone else to allow

22  your case to take a lead.  So your case is not going to be

23  resolved the any faster than any of the other lawsuits filed in

24  this MDL.

25      So the question is:  Knowing that, why wouldn't you want

**PROCEEDINGS**

1    to put the -- put your case in the hands of these capable

2    plaintiffs' lawyers?  Why would you want to do it yourself?

3        **MS. HASSAN:**  I have asked the counsels for

4    plaintiff -- like I said, at the end I'll be treated just like

5    any other individual that has put no effort, any other Facebook

6    user that has put no effort towards this case that, you know,

7    they are just going on with their lives.  I have put so much

8    time, research, and everything --

9        **THE COURT:**  But, if you're allowed to kind of

10   adjudicate -- continue to adjudicate yourself, your case

11   separately, but parallel to the MDL, you're going to be putting

12   a lot more money and time and effort into it.  And if you -- if

13   your case is folded into the MDL, like all of the other cases,

14   then these lawyers are going to putting money and time and

15   effort into it.

16       You're saying you believe that you're better off putting

17   all of your own money and time and effort into the case?

18       **MS. HASSAN:**  Here is the thing, I could put all of

19   this, but then I'm also going forwards, like, where is this

20   taking me?  Where is this taking us?

21       I'm -- if, let's say, this case can take left or right.

22   You know, left by saying it's, you know, Facebook thinks they

23   can win.  And then right, you know, the plaintiffs win.  I feel

24   like the damage that would be rewarded to us as what we're

25   currently asking now it's not -- if we go with the MDL, it's

**PROCEEDINGS**

 1    not going to be in that amount.  That's --

 2              THE COURT:  You will have the opportunity to opt out

 3    of the class action at the end of the day if you believe that

 4    your recovery is inadequate, for whatever reason.  So it's not

 5    that you will be forced -- you know, it's not as if a result

 6    will be forced upon you.

 7              MS. HASSAN:  Right.

 8              THE COURT:  Unless, of course, I rule that Facebook

 9    wins on the merits.  But, even then, you will be given an

10    opportunity to opt out of any class.  It's just that it would

11    be later, rather than now that you would --

12              MS. HASSAN:  Okay.

13              THE COURT:  -- make that -- you would make the choice

14    to spend all the time and money pursuing these claims.

15              MS. HASSAN:  Maybe opt in now.

16              THE COURT:  I'm sorry.  What were you going to say?

17              MS. HASSAN:  If, you know, opting out is an option as

18    we move forward with the MDL, we'll be okay with that.

19              THE COURT:  Okay.

20              MS. HASSAN:  Then I'll look forward to that, how that

21    will continue.

22              THE COURT:  Maybe you'll decide that it's, given the

23    results in the case, that it's not worth spending your own time

24    and money doing further -- pursuing further litigation.

25              MS. HASSAN:  Right.

**PROCEEDINGS**

 1          May I mention some other things related to the case?

 2          THE COURT:  Very briefly, yes.

 3          MS. HASSAN:  I don't know if you paid attention, the

 4   Facebook sign and location is Number 1 Hacker Way.  I feel like

 5   sometimes, couldn't they really find any other name for

 6   their --

 7          THE COURT:  I'm sorry.  This is -- we have relatively

 8   limited time in this case management conference.  That's not

 9   really relevant to any of the issues that we're adjudicating in

10   this case.  So thank you for your time and --

11          MS. HASSAN:  Thank you for giving me the chance.

12          THE COURT:  -- I'll go ahead and treat the Hassan case

13   as we're treating all of the other cases in the MDL.

14      And I'll issue an order giving Mr. Zimmerman the option of

15   having his case treated the same, or dropping all the

16   overlapping claims and pursuing his, sort of, unique claim

17   against Facebook.

18          MR. LOESER:  Okay.  Thank you, Your Honor.

19          THE COURT:  Is it appropriate to seek to represent a

20   class of UK residents?  That's something that I have been

21   scratching my head about for a while and I have not yet taken

22   the time to research it.  I haven't gotten an objection from

23   Facebook on it yet, but --

24          MR. LOESER:  I think it is because Facebook's user

25   agreements and choice of law with California law and

**PROCEEDINGS**

1    identifying California as the venue of choice for litigating

2    relating to these things.

3          THE COURT:  Are any of the -- none of the named

4    plaintiffs is a UK resident?

5          MS. WEAVER:  One is, Your Honor.

6          THE COURT:  One is.  Okay.  I don't know.  I haven't

7    given it a lot of thought --

8          MR. SNYDER:  We have the same question and I think

9    that, whether it's on merits or class, we'll be addressing that

10   issue -- issues both in terms of class cert, and also in terms

11   of extraterritoriality of California law.  So there are all

12   sorts of issues -- I think there is only a single UK plaintiff.

13         MS. WEAVER:  Yes.

14         MR. SNYDER:  You may go with 31 plaintiffs and save us

15   all -- it will be interesting.

16         MR. LOESER:  No, we're happy to brief the issue.

17         THE COURT:  I'm not expressing -- it may be that it's

18   not necessary to address that until the class certification

19   stage.

20         MR. SNYDER:  Counsel is right, we have the pre-Brexit

21   versus post-Brexit considerations.

22         MR. LOESER:  I know in the *Apple* MDL, there were

23   variety of claims over several different countries.  And I

24   think there has been litigation over it.  I haven't seen what

25   the outcome is, but that's a good place for us to start to

**PROCEEDINGS**

1  look.

2      **THE COURT:**  The other thing that I would like to

3  direct you to do before you file these briefs is:  I would like

4  you to confer and I would like two proposed schedules.  I would

5  like one proposed schedule based on the assumption that we just

6  go ahead and do it the old-fashioned way, as Mr. Snyder is -- I

7  shouldn't say proposing, because you're not proposing that.

8      But one schedule that we would adopt if we do it the

9  old-fashioned way, Rule 26, discovery, you can file your motion

10  for class certification first, whenever you're ready.  If we go

11  that route, I would like you all to propose a schedule.

12      And if we go the route of, sort of, Phase 1 and Phase 2 as

13  we have been discussing.  Again, Phase 2 is really, we're

14  taking Facebook's Phase 2 and 3 and combining them.

15      Give me a proposed schedule based on the assumption that

16  we'll go that route as well.

17      **MR. LOESER:**  Sure.  Then, I guess, really just one

18  question, and maybe this is worked out in the briefs, but on

19  this issue of express waiver of the one-way intervention rule,

20  I do think it's important to understand, obviously,

21  old-fashioned -- and I feel strange saying I prefer the

22  old-fashioned way --

23      **THE COURT:**  The normal way.

24      **MR. LOESER:**  Yeah, that may be the better way.  But,

25  you know, some things just stand the test of time.

1     But if, you know, we really are going to consider the

2   other way, I think it is really important to understand if,

3   inherent in that approach, is that there is a waiver of that

4   rule.  But, that's just something maybe --

5          MR. SNYDER:  We'll make that clear that we are not

6   prepared to waive in the submission.

7          THE COURT:  Right.  Okay.

8          MR. SNYDER:  Thank you.

9          THE COURT:  Okay.  Let me look at my notes just to

10  make sure I'm not -- and, oh, one other comment is, I did think

11  if we did the phasing, you know, if we did it kind of the way

12  you're proposing as modified by me, it did strike me that your

13  proposed schedule for getting through Phase 1 was too

14  aggressive and probably wouldn't be fair to the plaintiffs.

15         MR. SNYDER:  Too fast or to small?  Too fast or short?

16         THE COURT:  Too fast.

17         MR. SNYDER:  Oh, okay.

18         THE COURT:  That actually struck me, if we did take

19  that approach, the plaintiffs would probably -- it would be

20  fair to the plaintiffs to give them more time.

21         MR. SNYDER:  We were concerned we were taking too

22  long.  So whatever --

23         THE COURT:  Obviously, if Mr. Loeser is comfortable

24  with it, it's whatever you all propose.

25         MR. LOESER:  We want to get the class certified as

**PROCEEDINGS**

1  quickly as possible, but that probably means more time than

2  what he meant when he just wanted to adjudicate individual

3  plaintiffs.

4           **THE COURT:**  Okay.  Then initial disclosures, I think

5  you can do them either way.  You can just plow ahead on initial

6  disclosures.

7       My big question about that is:  Why wait until

8  December 10th?

9           **MR. LOESER:**  That would be fine.

10          **THE COURT:**  Why not do initial disclosures in

11 two weeks also?

12          **MR. SNYDER:**  Why not?

13          **THE COURT:**  Okay.  Initial disclosures.

14          **MR. LOESER:**  The question about that is near and dear

15 to our --

16          **THE COURT:**  Although, I'm getting heartache from --

17          **MS. LAUFENBERG:**  We have 32 plaintiffs.  Maybe we need

18 a little bit more time.

19          **MR. LOESER:**  He is the one you have to ask.

20          **MS. WEAVER:**  I think under the schedule we had

21 proposed December 10.  And Facebook said 30 dates from the

22 denial of the 1292, which would make it December 1st, which

23 makes it the 2nd under the rules.

24          **MR. SNYDER:**  Whatever you guys want is fine.  We

25 consent to whatever you guys want.

 1          THE COURT:  Early December.  December 10th is fine.

 2          MR. LOESER:  December 10th.

 3          THE COURT:  For initial disclosures.

 4          MR. LOESER:  Related to that, and something we keep

 5   annoying you with, is 26(f) conferences.  And it would be

 6   helpful to have a date.  There are things that are triggered,

 7   obviously, by that conference happening.

 8          MR. SNYDER:  We will agree on a date, by the end of

 9   business tomorrow.

10          THE COURT:  Well, I am wondering if there is value in

11   having that or at least beginning that process before you file

12   your briefs.  I mean, I wonder if it will make the briefs --

13   better inform the briefs that you filed about what you need.

14          MR. LOESER:  We certainly believe there is always

15   benefits on trying to agree on things.  So if there is portions

16   of this that will show up in both proposals because we have had

17   that conference, then we should do that.

18          MR. SNYDER:  I generally like to do the 26(f) after

19   the 26(a) so I know at least who the plaintiffs are.  But I'm

20   happy to do whatever you guys want.  It's fine.  In my

21   experience, there is not just one 26(f).

22          THE COURT:  It's a process.

23          MR. SNYDER:  It's a process.

24          MR. LOESER:  So far my experience is there has been

25   none.  I'm eager to start with one.

PROCEEDINGS

```
 1          THE COURT:  It may be that you need it to be a process

 2   and it may be that you need to have more than one meeting, but

 3   I'll go ahead to order the conference to take place within

 4   seven days.

 5          MR. SNYDER:  Thank you, Judge.

 6          MR. LOESER:  Thank you, Your Honor.

 7          THE COURT:  Anything else?

 8          MR. SNYDER:  No thanks, Judge.

 9          THE COURT:  Should we put a further case management

10   conference on calendar?  I'm not sure it's going to be

11   necessary.  And if we decide to do it the old-fashioned way, it

12   may be that there is nothing to talk about.  But, should we put

13   something on calendar for, like, four weeks from now, or

14   something?

15          MR. LOESER:  Sure.  December -- I don't know what day

16   December 4th is.

17          MR. SNYDER:  I can't do the 4th.

18          MS. WEAVER:  It's a Wednesday.

19          THE COURT:  After initial closures.

20          MR. SNYDER:  I think after initial disclosures.

21          THE COURT:  So, like, mid-December?

22          MR. LOESER:  All right.  I have turned off all the

23   electronics that would allow me to give you an actual date,

24   but --

25          THE CLERK:  Monday the 16th?
```

**PROCEEDINGS**

1      **MR. SNYDER:**  That would be perfect for me.

2      Could we do it in the morning, by chance?

3          **THE COURT:**  Yeah, because you want to spend the

4   weekend --

5          **MR. SNYDER:**  I have to be in Los Angeles in the

6   afternoon.

7          **THE COURT:**  Yeah, that's fine.  So Monday at 10:00.

8   If anybody has a -- finds a problem with that, you can circle

9   back and let us know.

10          **MR. LOESER:**  Okay.

11          **THE COURT:**  Monday at 10:00 a.m.

12          **MS. LAUFENBERG:**  Just to clarify, Your Honor, the

13   briefing that you have requested, is that due on the 18th?

14          **THE COURT:**  Fourteen days from now.

15          **MS. LAUFENBERG:**  Okay.  Thank you.

16          **THE COURT:**  Thank you.

17          **MR. LOESER:**  See you, Judge.  Thank you.

18          **THE CLERK:**  Court is adjourned.

19              (Proceedings adjourned at 3:11 p.m.)

20                  ---o0o---

21

22

23

24

25

1

2                    **CERTIFICATE OF REPORTER**

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:    Sunday, November 10th, 2019

7

8

9

10   _____

11           Ruth Levine Ekhaus, RDR, FCRR, CSR No. 12219
12              Official Reporter, U.S. District Court