# EXHIBIT 4

```
1  XAVIER BECERRA (SBN 118517)
   Attorney General of California
2  NICKLAS A. AKERS (SBN 211222)
   Senior Assistant Attorney General
3  STACEY D. SCHESSER (SBN 245735)
   Supervising Deputy Attorney General
4  LISA B. KIM (SBN 229369)
   SUSAN SAYLOR (SBN 154592)
5  MICAH C.E. OSGOOD (SBN 255239)
   MANEESH SHARMA (SBN 280084)
6  Deputy Attorneys General
     300 South Spring Street, Suite 1702
7    Los Angeles, CA  90013
     Telephone: (213) 269-6369
8    lisa.kim@doj.ca.gov
```

BEFORE THE DEPARTMENT OF JUSTICE

OFFICE OF THE ATTORNEY GENERAL

STATE OF CALIFORNIA

| In the Matter of the Investigation of: | **INVESTIGATIVE SUBPOENA FOR DOCUMENTS [SET TWO]** |
|---|---|
| **FACEBOOK, INC.** | GOV. CODE § 11180, ET SEQ. |

NOTICE to Benjamin A. Powell, Esq.: You are hereby served on behalf of Facebook, Inc. pursuant to your agreement to accept service on your client's behalf.

Pursuant to the powers conferred by Article 2 of Chapter 2 of Division 3 of Title 2 of the Government Code of California (Cal. Gov. Code, § 11180 et seq.) on the Attorney General, as head of the California Department of Justice, which powers and authority to conduct the above entitled investigation have been delegated to the undersigned, an officer of that Department,

**FACEBOOK, INC.**

(hereinafter "FACEBOOK") IS HEREBY COMMANDED to produce the documents, books, records, papers and other items (collectively "Items") described in Attachment A to this Investigative Subpoena which are in FACEBOOK's custody, possession or control, or the custody, possession or control of FACEBOOK's subsidiaries, affiliates, parents, predecessors, successors, employees, partners, officers, agents or representatives, whether or not the present location of any of the Items designated is in California, at the California Department of Justice, Office of the Attorney General, 1300 "I" Street, Sacramento, CA 95814-2919, ATTN: Deputy Attorney General Lisa B. Kim, within thirty days of service hereof.

## INSTRUCTIONS FOR COMPLIANCE

1. If FACEBOOK claims that an item or a portion of an item is privileged and FACEBOOK withholds it from production for that reason, FACEBOOK must create and submit a privilege log which lists: (1) the authors and their capacities; (2) the recipients (including cc's and bcc's) and their capacities; (3) other individuals with access to the document and their capacities; (4) the type of document; (5) the subject matter of the document; (6) the purpose(s) for the creation of the document; (7) the date on the document; and (8) a detailed explanation setting forth the factual and legal basis for your claim that the document is privileged or otherwise immune from production.

2. To the extent responsive items exist in an electronic or computerized format, please contact the officer issuing this subpoena to discuss the manner and format in which the items are to be produced so as to facilitate the production of full and complete copies in a usable format. In the absence of an agreement regarding the manner and format of production, the following instructions shall apply:

a. The information shall be provided in accordance with the California Attorney General's Office Production Format as outlined in Attachment B below.

b. The response shall include all DOCUMENTS and computer programs necessary to the accurate conversion, analysis, and review of the electronic data, including but not limited to operating instructions, manuals and user guides, keys, legends, and codes for systems, programs, files, and data fields.

3. This Investigative Subpoena has been issued in connection with an investigation within the scope of section 131 of the California Penal Code.

4. No item requested herein shall be destroyed or discarded by FACEBOOK until the Attorney General has made a written determination that the item in question is not necessary for furtherance of this investigation.

5. When producing items, identify by number the request(s) to which the Item is responsive.

6. As used herein, the past tense includes the present and future tenses, the present tense includes the past and future tenses, and the future tense includes the past and present tenses; tenses must be construed in the manner that would include, rather than exclude, information.

7. As used herein, the singular includes the plural and the plural includes the singular, and must be construed in the manner that would include, rather than exclude, information.

**DEFINITIONS**

For purposes of this investigative subpoena, the terms set forth below are defined as follows:

1. "APPS OTHERS USE" means the setting used to limit data SHARED through FRIENDS with THIRD PARTY APPLICATIONS as set out on page 19 et seq. of the March 15, 2019 letter from Benjamin A. Powell to Stacey D. Schesser and Lisa B. Kim.

2. "COMMUNICATION(S)" means every disclosure, transfer, exchange, OR transmission of information, whether oral, written, OR electronic, and whether face-to-face, by telecommunications, telephone, computer, mail, e-mail, text message, instant message,

FACEBOOK Messenger, screenshot, picture, facsimile (fax) machine, OR otherwise, including any and all attachment(s).

3. "DATA CONTROLS" means the settings that a user can alter or accept to limit the sharing of USER INFORMATION with third parties, including audience selectors, GRANULAR DATA PERMISSIONS, PLATFORM OPT OUT, APPS OTHERS USE, and the like.

4. "DEVELOPER(S)" means any natural or corporate person that develops an application, software experience, game, or website, that accesses information from FACEBOOK's APIs or other FACEBOOK software.

5. "DOCUMENT(S)" means a "writing" as defined in section 250 of the California Evidence Code, and includes COMMUNICATIONS, e-mails, voicemails, computer files, text messages, instant messages, word processing documents, spreadsheets, databases, calendars, and all other forms of "electronically stored information" as defined in section 2016.020 of the California Code of Civil Procedure.

6. "EXTENDED API ACCESS PARTNER(S)" means the entity or entities with whom FACEBOOK partnered with for EXTENDED API ACCESS PARTNERSHIPS.

7. "EXTENDED API ACCESS PARTNERSHIP" means a partnership formed by agreement between FACEBOOK and a DEVELOPER that allowed the DEVELOPER access to certain FACEBOOK APIs on terms specified within the agreement, such as FB-CA-CAAG-0002916, and beyond those terms offered to typical THIRD PARTY APPLICATIONS on the FACEBOOK Platform. This definition includes agreements performing the same general function, even if not titled as an "Extended API Addendum."

8. "FACEBOOK PRODUCT" means the social networking online service operated by FACEBOOK, Inc. where USERS access content, including THIRD PARTY APPLICATIONS, websites, and games. For purposes of this subpoena, FACEBOOK PRODUCT means content accessed online at www.facebook.com and FACEBOOK's mobile application, but does not include acquired properties, such as Instagram and WhatsApp.

9. "FRIEND" means a USER who is connected to another USER on the FACEBOOK PRODUCT.

10. "GRANULAR DATA PERMISSIONS" refers to the setting used to limit data SHARED with THIRD PARTY APPLICATIONS as set out at page 4 *et seq.* of the March 15, 2019 letter from Benjamin A. Powell to Stacey D. Schesser and Lisa B. Kim.

11. "INSTANT PERSONALIZATION" means the product that FACEBOOK offered that used FACEBOOK USER INFORMATION to provide personalized experiences on select partners' websites, as described by FACEBOOK in its December 18, 2018 Newsroom post found online at https://newsroom.fb.com/news/2018/12/facebooks-partners/.

12. "INSTANT PERSONALIZATION PARTNER(S)" means the entity or entities with whom FACEBOOK partnered for INSTANT PERSONALIZATION.

13. "INSTANT PERSONALIZATION PARTNERSHIP" means the relationship FACEBOOK had with INSTANT PERSONALIZATION PARTNERS.

14. "INTEGRATION PARTNER(S)" means the entity or entities with whom FACEBOOK has an INTEGRATION PARTNERSHIP.

15. "INTEGRATION PARTNERSHIP(S)" means the relationship FACEBOOK has with companies that built integrations for a variety of devices, operating systems, and other products, as described by FACEBOOK in Appendix A of the July 20, 2018 letter Anjan Sahni sent to Stacey D. Schesser and Lisa B. Kim.

16. "PLATFORM OPT OUT" means the setting used to disable platform as set out at page 10 et seq. of the March 15, 2019 letter from Benjamin A. Powell to Stacey D. Schesser and Lisa B. Kim.

17. "POLICY" or "POLICIES" mean any formal or informal policy, procedure, rule, guideline, collaborative document, directive, instruction, OR practice, whether written or unwritten, that YOU expect YOUR employees to follow in performing their jobs.

18. "PROFILE CONTROLS" means the settings that control what information in a USER's profile is SHARED with other USERS through audience selectors, such as phone number, email, current city, birthday, relationship status, work, and education.

19. "SHARE" or "SHARES" or "SHARING" or "SHARED" means to provide, communicate, transfer, release, disclose, disseminate, sell, rent, trade, OR otherwise make accessible or available in writing, electronically, or by other means.

20. "THIRD PARTY APPLICATION(S)" shall have the same meaning as the terms "Platform Application(s)," "application(s)," and "app" used in FACEBOOK's policies produced to the California Attorney General bearing the Bates Labels FB-AG-00000001 through FB-CA-CAAG-00000305.

21. "USER(S)" means the individuals who maintain an account and can generally access the typical FACEBOOK experience via website or mobile application in a personal capacity.

22. "USER INFORMATION" means any information related to the FACEBOOK PRODUCT that identifies, relates to, describes, or is capable of being associated with, a particular individual, including, but not limited to, the following information: name; physical address, including street name and name of a city or town; telephone number; email address; online contact information, including a screen name, username, or social network profile that functions as online contact information; user account credentials; a persistent identifier such as a user number held in a cookie or a processor serial number; a unique device identifier or a universally unique identifier, including FBID; geolocation information, including GPS-based location information and network-based or cell-based location information; longitude and latitude data; education; employment; employment history; and any other social media content generated by OR associated with a particular individual, including status updates, likes, OR group affiliations.

23. "YOU" or "YOUR" or "FACEBOOK" means FACEBOOK, Inc. and its past or present officers, agents, employees, attorneys, predecessors, affiliates, subsidiaries, parent

///
///
///
///
///

companies, former business names, and dbas, and anyone acting on YOUR behalf or at YOUR direction.

FAILURE TO COMPLY WITH THIS SUBPOENA WILL SUBJECT YOU TO THE PROCEEDINGS AND PENALTIES PROVIDED BY LAW.

Dated:  June 17, 2019

XAVIER BECERRA
Attorney General of California
NICKLAS A. AKERS
Senior Assistant Attorney General
STACEY D. SCHESSER
Supervising Deputy Attorney General
LISA B. KIM
SUSAN SAYLOR
MICAH C.E. OSGOOD
MANEESH SHARMA
Deputy Attorneys General

LISA B. KIM
Deputy Attorney General

SF2017402454
13780166.docx

## ATTACHMENT A

18. Records tracking the USER DATA access permissions granted to DEVELOPERS pursuant to an EXTENDED API ACCESS PARTNERSHIP.

19. All YOUR internal COMMUNICATIONS from 2013 to 2018 reflecting the contemplation, planning, or performance of a general audit of DEVELOPERS' access to USER INFORMATION, including through THIRD PARTY APPLICATIONS, INTEGRATION PARTNERSHIPS, INSTANT PERSONALIZATION PARTNERSHIPS, and EXTENDED API ACCESS PARTNERSHIPS.

20. All COMMUNICATIONS concerning the negotiation of, entrance into, or termination of, an EXTENDED API ACCESS PARTNERSHIP.

21. All COMMUNICATIONS from 2012 to 2015 regarding conditioning DEVELOPERS' access to USER INFORMATION on advertising spending or other payment.

22. All DOCUMENTS that support YOUR contention that FACEBOOK "*never implemented*, let alone seriously considered" (emphasis in the original) "charging developers for access to user data," as stated on page 6 of the April 17, 2019 letter from Benjamin A. Powell to Stacey D. Schesser and Lisa B. Kim.

23. All DOCUMENTS reflecting the study, testing, or analysis of a USER'S understanding of, or reaction to, a DATA CONTROL in effect during 2013 to present, or any proposed change to a DATA CONTROLS during that time frame, including any A/B testing, or studies on user experience or usability of DATA CONTROLS.

24. All COMMUNICATIONS regarding a USER's potential reaction to or understanding of DATA CONTROLS.

25. All YOUR internal COMMUNICATIONS, involving a Director, Vice President, or above, about the development of the "privacy tour," "privacy basics," or "privacy check-up," as those terms were used by in the March 15, 2019 letter from Benjamin A. Powell to Stacey D. Schesser and Lisa B. Kim.

26. All YOUR internal COMMUNICATIONS, involving a Director, Vice President, or above, about the termination of a DEVELOPER'S access to USER INFORMATION.

FACEBOOK, INC.   INVESTIGATIVE SUBPOENA FOR DOCUMENTS [SET TWO]

27. All YOUR internal COMMUNICATIONS, involving a Director, Vice President, or above, that occurred within one week of a request for comment regarding, or the publication of, the following news reports:

- *The Guardian's* reporting on December 11, 2015, that "Ted Cruz us[ed] [a] firm that harvested data on millions of unwitting Facebook users";
- Various news outlets reporting on March 17, 2018, about Facebook and Cambridge Analytica;
- *The New York Times* reporting on June 3, 2018, that "Facebook gave device makers deep access to data on users and friends";
- *The Wall Street Journal* reporting on November 28, 2018, that "Facebook considered charging for access to user data";
- *The Washington Post* reporting on December 5, 2018, that "Facebook [allegedly] offered advertisers special access to users' data and activities"; and
- *The New York Times* reporting on December 18, 2018, that "Facebook gave some of the world's largest technology companies more intrusive access to users' personal data."

28. All YOUR internal COMMUNICATIONS, involving a Director, Vice President, or above, regarding approval of the following Facebook Newsroom items:

- Why We Disagree with the New York Times, dated June 3, 2018;
- Response to Six4Three Documents, dated December 5, 2018
- Let's Clear Up a Few Things About Facebook's Partners, dated December 18, 2018.
- Facts About Facebook's Messaging Partnerships, dated December 19, 2018;
- Cracking Down on Platform Abuse, dated March 21, 2018;

29. All YOUR internal POLICIES on the enforcement of FACEBOOK's Platform Policy, Data Policy, Terms of Service, or Statement of Rights and Responsibilities, on THIRD PARTY APPLICATIONS, INTEGRATION PARTNERSHIPS, INSTANT PERSONALIZATION PARTNERSHIPS, and EXTENDED API ACCESS PARTNERSHIPS.

30. All "Enforcement Rubric[s]" used by FACEBOOK, as that term is used on page 4 of the April 17, 2019 letter from Benjamin A. Powell to Stacey D. Schesser and Lisa B. Kim.

31. All "cease and desist letters" sent by FACEBOOK to DEVELOPERS, between January 1, 2013, and March 1, 2018, as that term is used on page 12 of the July 20, 2018 letter from Anjan Sahni to Stacey D. Schesser and Lisa B. Kim.

32. All "letter agreements" resolving an enforcement concern as that term is used on page 12 of the July 20, 2018 letter from Anjan Sahni to Stacey D. Schesser and Lisa B. Kim.

33. FACEBOOK'S logs documenting any code changes made to DATA CONTROLS, sometimes referred to as "Commit Logs."

34. All "Privacy Risk Assessment[s]," and notes or agenda relating to FACEBOOK's "focused subject-matter-specific meetings," "weekly intra- and inter-team meetings," and "Privacy Summit[s]," as detailed in "Facebook's Privacy Program Overview" at page 9 of the "Independent Assessor's Report on Facebook's Privacy Program" at FB-CA-CAAG-00131372.

35. All transcripts of deposition or other testimony by FACEBOOK former and current employees in the litigation titled, *Six4Three, LLC v. Facebook, Inc.* (Case No. CIV 533328), Superior Court of the State of California, County of San Mateo, filed on April 10, 2015.

36. FACEBOOK's discovery responses, excluding documents produced, in the litigation titled, *Six4Three, LLC v. Facebook, Inc.* (Case No. CIV 533328), Superior Court of the State of California, County of San Mateo, filed on April 10, 2015.

37. FACEBOOK's responses to any formal or informal requests for information, interrogatories, or other discovery, excluding documents produced, to the Federal Trade Commission regarding its investigation into FACEBOOK's privacy practices, after entry of the Federal Trade Commission's July 27, 2012 Decision and Order, in its action titled In the Matter of Facebook, Inc. Doc. No. 0923184.

# ATTACHMENT B

## California Attorney General's Office

## PRODUCTION FORMAT

I. PRODUCTION OF ELECTRONICALLY STORED INFORMATION (ESI)

A. Load files. Except where noted in section (K) below, all ESI is to be produced in electronic format, with file suitable for loading into a Concordance compatible litigation support review database. All productions will include both image and metadata load files, as described in Appendix A: Load File Format.

B. Metadata Fields and Processing. Each of the metadata and coding fields set forth in Appendix B that can be extracted from a document shall be produced for that document. The parties are not obligated to populate manually any of the fields in Appendix B if such fields cannot be extracted from a document.

C. System Files. Common system and program files need not be processed, reviewed or produced. The producing party shall keep an inventory of the system files not being produced and the criteria (*e.g.*, non-human readable file, etc.) for not processing the files.

D. Email. Whenever possible, email shall be collected from the producing party's email store or server (*e.g.*, MS Exchange, Lotus Notes) because this is the most reliable source from which to produce and maintain email metadata and structure. Metadata and "header fields" shall be extracted from email messages. Email messages, meeting notices, calendar items, contacts and tasks shall all be extracted from the email archives.

E. De-Duplication. Removal of duplicate documents shall only be done on exact duplicate documents (based on MD5 or SHA-1 hash values at the document level) *across all custodians* (global), and the Custodian field will list each Custodian, separated by a semicolon, who was a source of that document prior to deduplication. If a party is unable to provide such information within the Custodian field, or if global deduplication could otherwise limit the ability to provide that a particular document was possessed by a custodian, then removal of duplicate documents shall only be done on exact duplicate documents (based on MD5 or SHA-1 hash values at the document level) *within a source* (custodian).

F. TIFFs/JPGs. Single-page Group IV TIFF images shall be provided using at least 300 DPI print setting. Each image shall have a unique file name, which is the Bates number of the document. Original document orientation shall be maintained (*i.e.*, portrait to portrait and landscape to landscape). TIFFs will show any and all text and images which would be visible to the reader using the native software that created the document. Documents containing color need not be produced initially in color. However, if an original document contains color necessary to understand the meaning or content of the document, the producing party will honor reasonable requests for a color image of the document. If color images are to be produced, they will be provided in JPG format.

G. Embedded Objects. Objects embedded in Microsoft Word and .RTF documents, which have been embedded with the "Display as Icon" feature, will be extracted as separate documents and treated like attachments to the document. Other objects embedded in documents shall be produced as native files.

H. Compressed files. Compression file types (*e.g.*, .CAB, .GZ, .TAR, .Z, .ZIP) shall be decompressed in a reiterative manner to ensure that a zip within a zip is decompressed into the lowest possible compression resulting in individual folders and/or files.

I. Text Files. For each document, a single text file shall be provided along with the image files and metadata. The text file name shall be the same as the page Bates/control number of the first page of the document. File names shall not have any special characters or embedded spaces. Electronic text must be extracted directly from the native electronic file unless the document was redacted, an image file, or a physical file. In these instances a text file created using OCR will be produced in lieu of extracted text. See Section II.C for OCR requirements. Under no circumstances shall the receiving party be required to rely upon a less accurate version of the text than the producing party. For example, if the producing party has access to extracted text from electronic document files, the receiving party shall receive extracted text instead of OCR'd text generated from an image file.

J. Redaction. If a file that originates in ESI needs to be redacted before production, the file will be rendered in TIFF, and the TIFF will be redacted and produced. However, to the extent that the text is searchable in the native format, the producing party will still provide searchable text for those portions of the document that have not been redacted.

K. Spreadsheets and Presentations. Various types of files, including but not limited to MS Excel spreadsheets, MS PowerPoint presentations, media files, etc., lose significant information and meaning when produced as an image. Any native files that are produced shall be produced with a Bates-numbered TIFF image slip-sheet stating the document has been produced in native format. Any native files that are produced shall be produced with the Source File Path provided, as well as all extracted text and applicable metadata fields set forth in Appendix B.

- Spreadsheets. Excel spreadsheets shall be produced as a native document file along with the extracted text and relevant metadata identified in Appendix B for the entire spreadsheet, plus a Bates-numbered TIFF image slip-sheet stating the document has been produced in native format.

- Presentations. PowerPoint presentations shall be produced as a native document file along with the extracted text and relevant metadata identified in Appendix B for the entire presentation, plus a Bates-numbered TIFF image slip-sheet stating the document has been produced in native format.

L. Other ESI that is Impractical to Produce in Traditional Formats. The parties understand and acknowledge that certain categories of ESI are structurally complex and do not lend themselves to production as native format or other traditional formats. To the extent a response to discovery requires production of discoverable electronic information contained in a database, the producing party shall consider methods of production best providing all relevant information, including but not limited to duplication of databases or limited access for the purpose of generating reports. Parties should consider whether all relevant information may be provided by querying the database for discoverable information and generating a report in a reasonably usable and exportable electronic file (*e.g.*, Excel, CSV or SQL format). The parties agree to confer to obtain an appropriate resolution to such requests.

M. **Endorsements.** The producing party will brand all TIFF images in the lower right-hand corner with its corresponding bates number, using a consistent font type and size. The bates number must not obscure any part of the underlying data. The producing party will brand all TIFF images in the lower left-hand corner with all confidentiality designations, as needed, in accordance with confidentiality definitions as agreed to by the parties.

N. **Exception Report.** The producing party shall compile an exception report enumerating any unprocessed or unprocessable documents, their file type and the file location.

O. **Clawback procedure.** Any documents recalled due to a mutually-agreed upon clawback provision shall have a specific protocol followed to ensure all copies of each such document are appropriately removed from the review database, backup and disaster recovery systems maintained by the opposing party.

## II. PRODUCTION OF PHYSICALLY STORED INFORMATION (HARD COPY DOCUMENTS)

A. **TIFFs.** Hard copy paper documents shall be scanned as single-page, Group IV compression TIFF images using a print setting of at least 300 dots per inch (DPI). Each image shall have a unique file name, which is the Bates number of the document. Original document orientation shall be maintained (i.e., portrait to portrait and landscape to landscape).

B. **Metadata Fields.** The following information shall be produced for hard copy documents and provided in the data load file at the same time that the TIFF images and the Optical Character Recognition (OCR) acquired text files are produced. Each metadata field shall be labeled as listed below:

| Field Name | Example / Format | Description |
| --- | --- | --- |
| PARENTDOCID | ABC0000001 (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of a parent document (this field will <u>only</u> be populated in child records). |
| GROUPID | ABC0000001 (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of the parent document (in most cases, this will be data in the BEGATTACH field). |
| BEGBATES | ABC0000001 (Unique ID) | The Document ID number associated with the first page of a document. |
| ENDBATES | ABC0000003 (Unique ID) | The Document ID number associated with the last page of a document. |
| BEGATTACH | ABC0000001 (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of the parent document (if applicable). |
| ENDATTACH | ABC0000008 (Unique ID Parent-Child Relationships) | The Document ID number associated with the last page of the last attachment (if applicable). |
| PGCOUNT | 3 (Numeric) | The number of pages for a document. |
| VOLUME | VOL001 | The name of CD, DVD or Hard Drive (vendor assigns). |
| CUSTODIAN | | The custodian / source of a document. Note: If the documents are de-duped on a global level, this field will contain the name of each custodian from which the document originated. |

C. OCR Acquired Text Files. When subjecting physical documents to an OCR process, the settings of the OCR software shall maximize text quality over process speed. Any settings such as "auto-skewing", "auto-rotation" and the like should be turned on when documents are run through the process.

D. Database Load Files/Cross-Reference Files. Documents shall be provided with (a) a delimited metadata file (.dat or .txt) and (b) an image load file (.opt), as detailed in Appendix A.

F. Unitizing of Documents. In scanning paper documents, distinct documents shall not be merged into a single record, and single documents shall not be split into multiple records (e.g., paper documents should be logically unitized). In the case of an organized compilation of separate documents - for example, a binder containing several separate documents behind numbered tabs - the document behind each tab should be scanned separately, but the relationship among the documents in the binder should be reflected in proper coding of the beginning and ending document and attachment fields. The parties will make their best efforts to unitize documents correctly.

## APPENDIX A: REQUESTED LOAD FILE FORMAT FOR ESI

**1. Image File Format:** All images, paper documents scanned to images or rendered ESI, shall be produced as 300 dpi single-page, CCITT Group IV TIFF images (for black/white) or JPG images (for color). Documents should be uniquely and sequentially Bates numbered with an endorsement burned into each image.

- All TIFF/JPG image file names shall include the unique Bates number burned into the image.
- Each Bates number shall be a standard length, include leading zeros in the number and be unique for each produced page.
- All TIFF/JPG image files shall be named with a ".tif" or ".jpg" extension.
- Images should be able to be OCR'd using standard COTS products, such as LexisNexis LAW PreDiscovery, Ipro, etc.

**2. Concordance Image Cross-Reference file:** Images shall be accompanied by a Concordance Image Cross-Reference file that associates each Bates number with its corresponding single-page TIFF/JPG image file. The Cross-Reference file should also contain the image file path for each Bates numbered page.

- Image Cross-Reference Sample Format:
  ABC000001,OLS,D:\DatabaseName\Image\001\ABC000001.TIF,Y,,,
  ABC000002,OLS,D:\DatabaseName\Image\001\ABC000002.TIF,,,,
  ABC000003,OLS,D:\DatabaseName\Image\001\ABC000003.TIF,,,,
  ABC000004,OLS,D:\DatabaseName\Image\001\ABC000004.TIF,Y,,,

**3. Concordance Load File:** Images shall also be accompanied by a "text load file" containing delimited text (DAT file) that will populate fields in a searchable, flat database environment. The delimiters for the load file should be Concordance defaults.

- Comma:   ¶ ASCII character (020)
- Quote:   þ ASCII character (254)
- Newline: ® ASCII character (174)

## APPENDIX B: REQUESTED METADATA FIELDS FOR ESI

| Field Name | Example/Format | Description |
|---|---|---|
| PARENTDOCID | ABC0000001 (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of a parent document (this field will only be populated in child records). |
| GROUPID | ABC0000001 (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of the parent document (in most cases, this will be data in the BEGATTACH field). |
| BEGBATES | ABC0000001 (Unique ID) | The Document ID number associated with the first page of a document. |
| ENDBATES | ABC0000003 (Unique ID) | The Document ID number associated with the last page of a document. |
| BEGATTACH | ABC0000001 (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of the parent document. |
| ENDATTACH | ABC0000008 (Unique ID Parent-Child Relationships) | The Document ID number associated with the last page of the last attachment. |
| PGCOUNT | 3 (Numeric) | The number of pages for a document. |
| VOLUME | VOL001 | The name of CD, DVD or Hard Drive (vendor assigns). |
| SENTDATE | MM/DD/YYYY | The date the email was sent. NOTE: For attachments to e-mails, this field should be populated with the date sent of the email transmitting the attachment. |
| SENTTIME | HH:MM:SS | The time the email was sent. |
| CREATEDATE | MM/DD/YYYY | The date the document was created. |
| CREATETIME | HH:MM:SS | The time the document was created. |
| LASTMODDATE | MM/DD/YYYY | The date the document was last modified. |
| LASTMODTIME | HH:MM:SS | The time the document was last modified. |
| RECEIVEDDATE | MM/DD/YYYY | The date the document was received. |
| RECEIVEDTIME | HH:MM:SS | The time the document was received. |
| FILEPATH | i.e. Joe Smith/E-mail/Inbox<br>Joe Smith/E-mail/Deleted Items<br>Joe Smith/Loose Files/Accounting/...<br>Joe Smith/Loose Files/Documents and Settings/... | Location of the original document. The source should be the start of the full path. |
| APPLICATION | MS Word, MS Excel, etc. | Type of document by application. |
| HIDDENTYPE | Options: Track Changes, Hidden Spreadsheet, Very Hidden Spreadsheet, etc. | The type of hidden modification of the document (e.g. Track Changes, Hidden Spreadsheet, Very Hidden Spreadsheet, etc) |
| AUTHOR | jsmith | The author of a document from entered metadata. |

| Field Name | Example/Format | Description |
|---|---|---|
| FROM | Joe Smith <jsmith@email.com> | The display name and e-mail of the author of an e-mail. If only e-mail is given, then just list the e-mail address. An e-mail address should always be provided for every document. |
| TO | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and e-mail of the recipient(s) of an e-mail. If only e-mail is given, then just list the e-mail address. An e-mail address should always be provided for every document. |
| CC | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and e-mail of the copyee(s) of an e-mail. If only e-mail is given, then just list the e-mail address. An e-mail address should always be provided for every document. |
| BCC | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and e-mail of the blind copyee(s) of an e-mail. If only e-mail is given, then just list the e-mail address. An e-mail address should always be provided for every document. |
| ESUBJECT | Re: Scheduling Meet and Confer | The email subject line. |
| DOCTITLE | | The extracted document title or subject of a document. |
| CUSTODIAN | | The custodian / source of a document. Note: If the documents are de-duped on a global level, this field will contain the name of each custodian from which the document originated. |
| ATTACHCOUNT | Numeric | The number of attachments to a document. |
| FILEEXT | XLS | The file extension of a document. |
| FILENAME | Document Name.xls | The file name of a document. |
| HASH | | The MD5 or SHA-1 Hash value. |
| NATIVELINK | D:\NATIVES\ABC000001.xls | The full path to a native copy of a document. |
| FULLTEXT | D:\TEXT\ABC000001.txt | The path to the full extracted text of the document. There should be a folder on the deliverable, containing a separate Unicode text file per document. These text files should be named with their bates numbers. Note: E-mails should include header information: author, recipient, cc, bcc, date, subject, etc. If the attachment or e-file does not extract any text, then OCR for the document should be provided. |

## DECLARATION OF SERVICE BY E-MAIL

Matter Name:   In the Matter of the Investigation of: FACEBOOK, INC.

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter; my business address is 300 South Spring Street, Suite 1702, Los Angeles, CA 90013.

On June 17, 2019, I served the attached **INVESTIGATIVE SUBPOENA FOR DOCUMENTS [SET TWO]** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Los Angeles, California, addressed as follows:

Benjamin A. Powell
Maury Riggan
WilmerHale
1875 Pennsylvania Avenue NW
Washington, DC 20006
Benjamin.Powell@wilmerhale.com
Maury.Riggan@wilmerhale.com

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on June 17, 2019, at Los Angeles, California.

Carol Chow
Declarant

Signature

SF2018400570
53504639.docx