# EXHIBIT 5

1  XAVIER BECERRA (SBN 118517)
   Attorney General of California
2  NICKLAS A. AKERS (SBN 211222)
   Senior Assistant Attorney General
3  STACEY D. SCHESSER (SBN 245735)
   Supervising Deputy Attorney General
4  LISA B. KIM (SBN 229369)
   SUSAN SAYLOR (SBN 154592)
5  MICAH C.E. OSGOOD (SBN 255239)
   MANEESH SHARMA (SBN 280084)
6  Deputy Attorneys General
    300 South Spring Street, Suite 1702
7  Los Angeles, CA  90013
   Telephone:  (213) 269-6369
8  Lisa.Kim@doj.ca.gov

9

10                    BEFORE THE DEPARTMENT OF JUSTICE

11                    OFFICE OF THE ATTORNEY GENERAL

12                           STATE OF CALIFORNIA

13

14  In the Matter of the Investigation of:          **INVESTIGATIVE INTERROGATORIES
                                                     [SET TWO]**
15  **FACEBOOK, INC.**
                                                     GOV. CODE § 11180 ET SEQ.
16

17

18

19

20       To Benjamin A. Powell, Esq.:   You are hereby served on behalf of Facebook, Inc. pursuant

21  to your agreement to accept service on your client's behalf.

22

23

24

25

26

27

28

                                             1

FACEBOOK, INC.                                INVESTIGATIVE INTERROGATORIES [SET TWO]

1  Pursuant to the powers conferred by Article 2 of Chapter 2 of Division 3 of Title 2 of the

2  Government Code of California (Cal. Gov. Code, § 11180 et seq.) on the Attorney General, as

3  head of the California Department of Justice, which powers and authority to conduct the above

4  entitled investigation have been delegated to the undersigned, an officer of that Department,

5

6  **FACEBOOK, INC.**

7

8  **IS HEREBY COMMANDED** to answer separately and fully in writing, under oath, within thirty

9  days of service hereof, each of the following interrogatories.

10  **INSTRUCTIONS FOR COMPLIANCE**

11      1.    The RELEVANT PERIOD for these investigatory interrogatories is January 1,

12  2013 through December 31, 2018, unless otherwise expressly stated herein.

13      2.    Each answer must be as complete and straightforward as the information

14  reasonably available to Facebook, Inc. (hereafter "FACEBOOK"), including the information

15  possessed by FACEBOOK's attorneys or agents, permits.  If an interrogatory cannot be answered

16  completely, answer it to the extent possible, specifying the reasons for FACEBOOK's inability to

17  answer the remainder of the interrogatory and stating whatever information, knowledge, or belief

18  that FACEBOOK has concerning the unanswered portion thereof.

19      3.    As used herein, the past tense includes the present and future tenses, the present

20  tense includes the past and future tenses, and the future tense includes the past and present tenses;

21  tenses must be construed in the manner that would include, rather than exclude, information.

22      4.    As used herein, the singular includes the plural and the plural includes the singular,

23  and must be construed in the manner that would include, rather than exclude, information.

24      5.    If FACEBOOK is asserting a privilege or making an objection to an interrogatory,

25  FACEBOOK must specifically assert the privilege or state the objection in FACEBOOK's

26  written response, and set forth in detail the basis for FACEBOOK's objection or assertion of the

27  privilege.  If an objection pertains to only a portion of an interrogatory, or a word, phrase, or

28  clause contained in it, FACEBOOK must respond to the remainder of the Interrogatory.

2

6.     These Investigative Interrogatories have been issued in connection with an investigation within the scope of section 131 of the California Penal Code.

7.     FACEBOOK's written responses shall be delivered to the California Department of Justice, Office of the Attorney General, 1300 "I" Street, Sacramento, CA 95814-2919, ATTN: Deputy Attorney General Lisa B. Kim.

## DEFINITIONS

For purposes of this set of investigatory interrogatories, the terms set forth below are defined as follows:

8.     "APIs" has the same meaning used at https://developers.facebook.com/docs/apis-and-sdks/ and liked webpages, and the similar software that existed in the past.

9.     "APPS OTHERS USE" means the settings used to limit data accessible to THIRD PARTY APPLICATIONS that USERS' FRIENDS installed, as set out on page 19 et seq. of the March 15, 2019 letter from Benjamin A. Powell to Stacey D. Schesser and Lisa B. Kim.

10.    "AUDIENCE SELECTOR TOOL" means the setting used to set the audience for "status updates, photos and other things you share," as explained at https://www.facebook.com/help/120939471321735.

11.    "DATA CONTROLS" means the settings that a USER can use to govern the sharing of USER INFORMATION with third parties, including AUDIENCE SELECTOR TOOLS, GRANULAR DATA PERMISSIONS, PLATFORM OPT-OUT, APPS OTHERS USE, and the like.

12.    "DEVELOPER POLICIES" means all of the POLICIES that FACEBOOK expected DEVELOPERS to abide by, including FACEBOOK's Statement of Rights and Responsibilities, Terms of Service, Date Use Policy, Platform Policy, and /or Data Policy.

13.    "DEVELOPERS" means any natural or corporate person that develops an application, game, or website, that accesses information from FACEBOOK's APIs or other software.

14.    "EXTENDED API ACCESS PARTNERSHIP" means a partnership formed by agreement between FACEBOOK and a DEVELOPER that allowed access to certain

3

1   FACEBOOK APIs on terms specified within the agreement, such as FB-CA-CAAG-0002916,
2   and beyond those terms offered to typical THIRD PARTY APPLICATIONS on the FACEBOOK
3   Platform. This definition includes agreements performing the same general function, even if not
4   titled as an "Extended API Addendum."

5       15.     "EXTENDED API ACCESS PARTNER(S)" means the entity or entities with
6   whom FACEBOOK has an EXTENDED API ACCESS PARTNERSHIP.

7       16.     "FACEBOOK PRODUCT" means the social networking online service operated
8   by FACEBOOK, Inc. where USERS access content, including through THIRD PARTY
9   APPLICATIONS, websites, and games. For purposes of these interrogatories, FACEBOOK
10  PRODUCT means content accessed online at www.facebook.com and FACEBOOK's mobile
11  application, but does not include acquired properties, such as Instagram and WhatsApp.

12      17.     "FRIEND" means a USER who is connected to another USER on the
13  FACEBOOK PRODUCT.

14      18.     "GRANULAR DATA PERMISSIONS" refers to the setting used to limit data
15  shared with THIRD PARTY APPLICATIONS as set out at page 4 *et seq.* of the March 15, 2019
16  letter from Benjamin A. Powell to Stacey D. Schesser and Lisa B. Kim.

17      19.     "INSTANT PERSONALIZATION" means the product that FACEBOOK offered
18  that used FACEBOOK USER INFORMATION to provide tailored and integrated USER
19  experiences on select partners' websites, as described by FACEBOOK in its December 18, 2018
20  Newsroom post found online at https://newsroom.fb.com/news/2018/12/facebooks-partners/.

21      20.     "INSTANT PERSONALIZATION PARTNER(S)" means the entity or entities
22  with whom FACEBOOK partnered for INSTANT PERSONALIZATION.

23      21.     "INSTANT PERSONALIZATION PARTNERSHIP" means the relationship
24  FACEBOOK had with INSTANT PERSONALIZATION PARTNERS.

25      22.     "INTEGRATION PARTNER(S)" means the entity or entities with whom
26  FACEBOOK has an INTEGRATION PARTNERSHIP.

27      23.     "INTEGRATION PARTNERSHIP(S)" means the relationship FACEBOOK has
28  with companies that built integrations for a variety of devices, operating systems, and other

products, as described by FACEBOOK in Appendix A of the July 20, 2018 letter Anjan Sahni sent to Stacey D. Schesser and Lisa B. Kim.

24.    "PLATFORM OPT-OUT" means the setting used to disable the FACEBOOK platform as set out at page 10 et seq. of the March 15, 2019 letter from Benjamin A. Powell to Stacey D. Schesser and Lisa B. Kim.

25.    "POLICY" or "POLICIES" mean any formal or informal policy, procedure, rule, guideline, collaborative document, directive, instruction, OR practice, whether written or unwritten, that YOU expect YOUR employees to follow in performing their jobs.

26.    "PROFILE CONTROLS" means the settings that control what information in a USER's profile is shared with other USERS through AUDIENCE SELECTOR TOOLS, such as phone number, email, current city, birthday, relationship status, work, and education.

27.    "SHARE" or "SHARES" or "SHARING" or "SHARED" means to provide, communicate, transfer, release, disclose, disseminate, sell, rent, trade, OR otherwise make accessible or available in writing, electronically, or by other means.

28.    "THIRD PARTY APPLICATION(S)" shall have the same meaning as the terms "Platform Application(s)," "application(s)," and "app" used in FACEBOOK's policies produced to the California Attorney General bearing the Bates Labels FB-AG-00000001 through FB-CA-CAAG-00000305.

29.    "USER(S)" means the individuals who maintain an account and can generally access the typical FACEBOOK experience via website or mobile application in a personal capacity.

30.    "USER INFORMATION" means any information related to the FACEBOOK PRODUCT that identifies, relates to, describes, or is capable of being associated with, a particular individual, including, but not limited to, the following information: name; physical address, including street name and name of a city or town; telephone number; email address; online contact information, including a screen name, username, or social network profile that functions as online contact information; user account credentials; a persistent identifier such as a user number held in a cookie or a processor serial number; a unique device identifier or a universally

5

1  unique identifier, including FBID; geolocation information, including GPS-based location

2  information and network-based or cell-based location information; longitude and latitude data;

3  education; employment; employment history; and any other social media content generated by

4  OR associated with a particular individual, including status updates, likes, OR group affiliations.

5         31.     "YOU" or "YOUR" or "FACEBOOK" means FACEBOOK, Inc. and its past or

6  present officers, agents, employees, attorneys, predecessors, affiliates, subsidiaries, parent

7  companies, former business names, and dbas, and anyone acting on YOUR behalf or at YOUR

8  direction.

9  **INTERROGATORIES**

10

11  INTERROGATORY NO. 24

12       Provide, for each year during the RELEVANT PERIOD, the number of FACEBOOK

13  USERS that indicated that they currently resided in California.

14  INTERROGATORY NO. 25

15       Provide, for each year during the RELEVANT PERIOD, the default settings for each of the

16  following DATA CONTROLS:

17         (a) AUDIENCE SELECTOR TOOL for status updates (e.g., "Who can see your

18             future posts?");

19         (b) AUDIENCE SELECTOR TOOL for birthday;

20         (c) AUDIENCE SELECTOR TOOL for friends list;

21         (d) AUDIENCE SELECTOR TOOL for email;

22         (e) AUDIENCE SELECTOR TOOL for who could search for and find a person's

23             profile by contact information;

24         (f) GRANULAR DATA PERMISSIONS;

25         (g) PLATFORM OPT OUT; and,

26         (h) APPS OTHERS USE.

27

28

6

INTERROGATORY NO. 26

Provide, for each year during the RELEVANT PERIOD, the number of FACEBOOK USERS in California, expressed as a total number and percent of total USERS (or in the United States, if California data is not available), who changed their default settings for each of the following DATA CONTROLS:

    (a) AUDIENCE SELECTOR TOOL for status updates (e.g., "Who can see your future posts?");

    (b) AUDIENCE SELECTOR TOOL for Birthday;

    (c) AUDIENCE SELECTOR TOOL for Friends List;

    (d) AUDIENCE SELECTOR TOOL for email;

    (e) AUDIENCE SELECTOR TOOL for who could look-up a person's profile by contact information;

    (f) GRANULAR DATA PERMISSIONS;

    (g) PLATFORM OPT OUT; and,

    (h) APPS OTHERS USE.

INTERROGATORY NO. 27

If a USER set their PROFILE CONTROLS to "Friends," "Friends of Friends," or "Only Me," explain what, if any, non-public USER INFORMATION the following entities could access during the RELEVANT PERIOD:

    (a) A THIRD PARTY APPLICATION;

    (b) An experience provided by an INTEGRATION PARTNERSHIP;

    (c) A website using information under an INSTANT PERSONALIZATION PARTNERSHIP;

    (d) An application subject to an EXTENDED API ACCESS PARTNERSHIP; and,

    (e) Any third party entity not covered in the responses to subparts (a) through (d).

7

FACEBOOK, INC.

INVESTIGATIVE INTERROGATORIES [SET TWO]

INTERROGATORY NO. 28

If a USER disabled FACEBOOK'S platform for THIRD PARTY APPLICATIONS by using the PLATFORM OPT-OUT setting, explain what, if any, non-public USER INFORMATION the following entities could access during the RELEVANT PERIOD:

(a) A THIRD PARTY APPLICATION;

(b) An experience provided by an INTEGRATION PARTNERSHIP;

(c) A website using information under an INSTANT PERSONALIZATION PARTNERSHIP;

(d) An application subject to an EXTENDED API ACCESS PARTNERSHIP; and,

(e) Any third party not covered in the responses to subparts (a) through (d).

INTERROGATORY NO. 29

If a USER sets their APPS OTHERS USE settings to minimize or eliminate data being shared about a USER through FRIENDS, explain what, if any, non-public USER INFORMATION the following entities could access about a USER through FRIENDS that had installed the entity's relevant app, website, game, or experience during the RELEVANT PERIOD:

(a) A THIRD PARTY APPLICATION;

(b) An experience provided by an INTEGRATION PARTNERSHIP;

(c) A website using information under an INSTANT PERSONALIZATION PARTNERSHIP;

(d) An application subject to an EXTENDED API ACCESS PARTNERSHIP; and,

(e) Any third party not covered in the responses to subparts (a) through (d).

INTERROGATORY NO. 30

If a USER implemented FACEBOOK's DATA CONTROLS to minimize the USER INFORMATION that is SHARED with others, including setting all PROFILE CONTROLS to "Friends," disabling Platform through the PLATFORM OPT-OUT, and restricting all data sharing under the APPS OTHERS USE, describe what USER INFORMATION each of the following could access during the RELEVANT PERIOD:

8

1      (a) A THIRD PARTY APPLICATION;

2      (b) An experience provided by an INTEGRATION PARTNERSHIP;

3      (c) A website using information under an INSTANT PERSONALIZATION

4         PARTNERSHIP;

5      (d) An application subject to an EXTENDED API ACCESS PARTNERSHIP; and,

6      (e) Any third party not covered in the responses to subparts (a) through (d).

7  INTERROGATORY NO. 31

8      Provide the following information about any DEVELOPERS that could access non-public

9  USER INFORMATION through the USER's FRIEND, despite the USER engaging the APPS

10  OTHERS USE control:

11      (a) Identity of the third party;

12      (b) What USER INFORMATION it could access;

13      (c) Whether the third party could access data through FRIENDS of FRIENDS;

14      (d) When the access began and ended;

15      (e) The reasons FACEBOOK allowed access to USER INFORMATION; and,

16      (f) What disclosures provided notice to USERS that their data could be shared in this

17         way.

18  INTERROGATORY NO. 32

19      Describe the process by which FACEBOOK reviewed, developed, and approved changes

20  to DATA CONTROLS during the RELEVANT PERIOD.

21  INTERROGATORY NO. 33

22      Identify, by name and team assignment, all the individuals at FACEBOOK who

23  developed and approved changes to Facebook's DATA CONTROLS during the RELEVANT

24  PERIOD.

25  INTERROGATORY NO. 34

26      Describe the review, evaluation, and testing of any new or modified DATA CONTROL

27  during the RELEVANT PERIOD, including how FACEBOOK tested or evaluated a USER's

28

FACEBOOK, INC.                INVESTIGATIVE INTERROGATORIES [SET TWO]

1   response or understanding of a new or modified DATA CONTROL through usability or A/B

2   testing.

3   INTERROGATORY NO. 35

4          Describe the "coding rules" that "automatically identify and review apps that engage in

5   acts that signal potentially abusive behavior" identified on page 11 of the July 20, 2018 letter

6   from Anjan Sahni to Stacey D. Schesser and Lisa B. Kim.

7   INTERROGATORY NO. 36

8          State the number of times that the "coding rules" identified on page 11 of the July 20,

9   2018 letter from Anjan Sahni to Stacey D. Schesser and Lisa B. Kim, detected a potential abuse

10   of FACEBOOK's DEVELOPER POLICIES during the RELEVANT PERIOD, broken down by

11   year and for each instance explain who the DEVELOPER was and what coding rule was

12   implicated.

13   INTERROGATORY NO. 37

14          For each year during the RELEVANT PERIOD, state the number of times that

15   FACEBOOK received a report of a potential violation of its DEVELOPER POLICIES by a

16   DEVELOPER from each of the following sources: (a) USERS; (b) FACEBOOK employees; (c)

17   the press; and (d) security or white-hat researchers.

18   INTERROGATORY NO. 38

19          Explain the term "shielded app," as that term is used in the document bearing the Bates

20   label FB-CA-CAAG-00037551.

21   INTERROGATORY NO. 39

22          Describe the manner in which YOU enforced DEVELOPER POLICIES on DEVELOPERS

23   of "shielded apps," as that term is used in the document bearing the Bates label FB-CA-CAAG-

24   00037551. Please identify any differences in the manner in which YOU enforced DEVELOPER

25   POLICIES, or any other applicable POLICIES, against "shielded apps" as compared to other

26   THIRD PARTY APPLICATIONS.

27

28

FACEBOOK, INC.                                    INVESTIGATIVE INTERROGATORIES [SET TWO]

1    INTERROGATORY NO. 40

2        For each year during the RELEVANT PERIOD, specify how many enforcement actions

3    YOU undertook in each of the following categories identified in the enforcement rubric set forth

4    in the document bearing the Bates label FB-CA-CAAG-00019954:

5            (a) Surface or escalate to point of contact;

6            (b) Warning (of any length);

7            (c) Moratorium;

8            (d) Removal from approved advertiser list;

9            (e) Disable credits;

10           (f) Disable; and,

11           (g) Escalate to Legal for a cease and desist letter.

12   INTERROGATORY NO. 41

13       Identify all instances when FACEBOOK deviated its response from the "recommended

14   action" for each perceived violation of DEVELOPER POLICIES, as set forth in the document

15   bearing the Bates label FB-CA-CAAG-00019954. For each instance, state the action taken, and

16   the reason why FACEBOOK deviated its response.

17   INTERROGATORY NO. 42

18       Describe what steps FACEBOOK took, if any, to ensure that applications created pursuant

19   to an INTEGRATED PARTNERSHIP or an EXTENDED API ACCESS PARTNERSHIP did

20   not access or use data for any purpose other than what was authorized by FACEBOOK's

21   agreements with the partner.

22   INTERROGATORY NO. 43

23       For each year during 2013 to 2017, state how many times FACEBOOK has suspended or

24   disabled access to USER INFORMATION by THIRD PARTY APPLICATIONS, or their

25   DEVELOPERS, for violation of the following DEVELOPER POLICIES requirements:

26       *Developers shall: only request the data needed to operate their application; only*

27       *use the data received from Facebook for their application; obtain explicit consent*

28

11

1       *from the user who provided the data to Facebook before using it for any purpose*

2       *other than displaying it back to the user;*

3       *Developers shall not: transfer any data that they receive from Facebook; sell user*

4       *data; use Facebook user IDs for any purpose outside of their applications; use a*

5       *user's friend list outside of their application; access a user's friend list when a*

6       *friend connects with that app; if a friend grants specific permission, use that*

7       *content and information other than in connection with that friend.*

8       <u>INTERROGATORY NO. 44</u>

9       Has FACEBOOK ever suspended or disabled access to USER INFORMATION by an

10   INTEGRATED PARTNER, EXTENDED API ACCESS PARTNER, or INSTANT

11   PERSONALIZATION PARTNER because the DEVELOPER appeared to have violated either

12   FACEBOOK's DEVELOPER POLICIES regarding USER INFORMATION or the parties'

13   agreement regarding USER INFORMATION?  If so, please identify the DEVELOPER, the

14   details of the suspected violation, and how FACEBOOK learned of the suspected violation.

15   <u>INTERROGATORY NO. 45</u>

16       Excluding 1) USERS, 2) INTEGRATED PARTNERS, 3) INSTANT

17   PERSONALIZATION PARTNERS, and 4) THIRD PARTY APPLICATION DEVELOPERS

18   operating under FACEBOOK's DEVELOPER POLICIES, identify any other persons or entities

19   to whom FACEBOOK granted access to USER INFORMATION, by:

20       (a) The name of the third party;

21       (b) The USER INFORMATION available to the third party;

22       (c) The reason the third party was granted access; and,

23       (d) The dates that access began and ended.

24   <u>INTERROGATORY NO. 46</u>

25       Describe the different FACEBOOK APIs that DEVELOPERS could use to access USER

26   INFORMATION during the RELEVANT PERIOD.

27

28

12

FACEBOOK, INC.                               INVESTIGATIVE INTERROGATORIES [SET TWO]

1  INTERROGATORY NO. 47

2      Identify the APIs that each of the following entities could use to access USER

3  INFORMATION during the RELEVANT PERIOD:

4          (a) A DEVELOPER of a THIRD PARTY APPLICATION;

5          (b) An INTEGRATION PARTNER;

6          (c) An INSTANT PERSONALIZATION PARTNER; and,

7          (d) An EXTENDED API ACCESS PARTNER.

8  INTERROGATORY NO. 48

9      Did FACEBOOK ever factor a DEVELOPER's advertising purchase history or amount

10  spent into the decision to enter into, continue, or terminate an EXTENDED API ACCESS

11  PARTNERSHIP? If so, please describe the circumstances.

12  INTERROGATORY NO. 49

13      Did FACEBOOK ever factor a DEVELOPER's advertising purchase history or amount

14  spent into the decisions as to what capabilities or access to USER INFORMATION to grant

15  pursuant to an EXTENDED API ACCESS PARTNERSHIP? If so, please describe the

16  circumstances.

17  INTERROGATORY NO. 50

18      Describe FACEBOOK's history of auditing the use or handling of USER INFORMATION

19  by DEVELOPERS, including whether FACEBOOK ever considered conducting audits, actually

20  conducted any audits, and, if so, what it found. Please exclude: (A) information regarding an

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

FACEBOOK, INC.                                    INVESTIGATIVE INTERROGATORIES [SET TWO]

1   individual investigation into a particular DEVELOPER'S use of data, and (B) information about

2   the ADI process previously disclosed by FACEBOOK.

4         FAILURE TO COMPLY WITH THIS SUBPOENA WILL SUBJECT YOU TO THE

5   PROCEEDINGS AND PENALTIES PROVIDED BY LAW.

8   Dated: June 17, 2019

XAVIER BECERRA
Attorney General of California
NICKLAS A. AKERS
Senior Assistant Attorney General
STACEY D. SCHESSER
Supervising Deputy Attorney General
LISA B. KIM
SUSAN SAYLOR
MICAH C.E. OSGOOD
MANEESH SHARMA
Deputy Attorneys General

LISA B. KIM
Deputy Attorney General

14

## DECLARATION OF SERVICE BY E-MAIL

Matter Name:   In the Matter of the Investigation of: FACEBOOK, INC.

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter; my business address is 300 South Spring Street, Suite 1702, Los Angeles, CA 90013.

On June 17, 2019, I served the attached **INVESTIGATIVE INTERROGATORIES [SET TWO]** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Los Angeles, California, addressed as follows:

Benjamin A. Powell
Maury Riggan
WilmerHale
1875 Pennsylvania Avenue NW
Washington, DC 20006
Benjamin.Powell@wilmerhale.com
Maury.Riggan@wilmerhale.com

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on June 17, 2019, at Los Angeles, California.

Carol Chow
Declarant

Signature

SF2018400570
53504613.docx