Pages 1 - 52

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, MAGISTRATE

```
IN RE:  FACEBOOK, INC. CONSUMER     )
PRIVACY USER PROFILE LITIGATION     )
                                    )  No. 18-MD-2843 VC (JSC)
                                    )
                                    )  San Francisco, California
                                    )  Friday
                                    )  May 1, 2020
_____)  9:30 a.m.
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**            BLEICHMAR FONTI & AULD LLP
                               555 12th Street
                               Suite 1600
                               Oakland, California 94607
                        BY:    **LESLIE ELIZABETH WEAVER, ESQ.**
                               **ANNE KATHLEEN DAVIS, ESQ.**
                               **MATT MONTGOMERY,ESQ.**
                               **ANGELICA ORNELAS, ESQ.**


                               KELLER ROHRBACK LLP
                               1201 Third Avenue
                               Suite 3200
                               Seattle, Washington 98101
                        BY:    **DEREK WILLIAM LOESER, ESQ.**
                               **CARI CAMPEN LAUFENBERG, ESQ.**
                               **DAVID J. KO, ESQ.**
                               **BENJAMIN BLYSTAD GOULD, ESQ.**


                    **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*    *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

```
 1  APPEARANCES:   (CONTINUED)

 2  For Plaintiffs:          KELLER ROHRBACK LLP
                             3101 North Central Avenue
 3                           Suite 1400
                             Phoenix, Arizona 85012
 4                    BY:  ERIC JASON FIERRO, ESQ.

 5

 6  For Defendants:          GIBSON DUNN AND CRUTCHER LLP
                             200 Park Avenue
 7                           New York, New York 10166
                      BY:  ORIN SNYDER, ESQ.
 8

 9                           GIBSON DUNN AND CRUTCHER LLP
                             333 South Grand Avenue
10                           Los Angeles, California 90071
                      BY:  DEBORAH LYNN STEIN, ESQ.
11

12                           GIBSON DUNN AND CRUTCHER LLP
                             555 Mission Street.
13                           Suite 3000
                             San Francisco, California 94105
14                    BY:  JOSHUA SETH LIPSHUTZ, ESQ.

15

16                           GIBSON DUNN AND CRUTCHER LLP
                             1881 Page Mill Road
                             Palo Alto, California 94304
17                    BY:  MARTIE P. KUTSCHER, ESQ.

18

19                           GIBSON DUNN AND CRUTCHER LLP
                             200 Park Avenue
                             New York, New York 10166
20                    BY:  LAURA C. MUMM, ESQ.

21

22                           GIBSON DUNN AND CRUTCHER LLP
                             2100 McKinney Avenue.
                             Suite 1100
23                           Dallas, Texas 75201
                      BY:  RUSSELL HARRIS FALCONER, ESQ.

24

25                        —   —   —
```

<pre>
 1   <u>**Friday - May 1, 2020**</u>                              <u>**9:31 a.m.**</u>

 2                      **P R O C E E D I N G S**

 3                           ---oOo---

 4        **THE CLERK:**  Calling Civil Action 18-MD-2843, In Re

 5   Facebook, Inc. Consumer Privacy User Profile Litigation.  The

 6   Honorable Jacqueline Scott Corley presiding.

 7        Counsel, starting with plaintiffs, can you please make

 8   your appearance for the record.

 9        **MS. WEAVER:**  Yes.  Good morning, Your Honor.  Leslie

10   Weaver on behalf of plaintiffs, with my co-lead counsel, Derek

11   Loeser.

12        Today we have a team of talented lawyers to give you

13   specific answers to questions you might have today.  From

14   Bleichmar Fonti we have Anne Davis, Matt Montgomery and

15   Angelica Ornelas.

16        And from Keller Rohrback, Cari Laufenberg, David Ko and

17   Ben Gould, as well as our ESI liaison Eric Fierro.

18        **THE COURT:**  Good morning.

19        **MS. WEAVER:**  Good morning.

20        **MS. ORNELAS:**  Good morning.

21        **MR. SNYDER:**  Good morning, Your Honor.  Nice to see

22   you again.  Orin Snyder for Facebook.

23        With me are my colleagues, Josh Lipshutz, Deborah Stein,

24   Martie Kutscher, Laura Mumm and Russ Falconer.

25        **THE COURT:**  All right.  Good morning.
</pre>

1          Okay.  So thank you for your submissions.  Let's get some

2    things decided, get some deadlines and a new schedule for what

3    will need to be done before we meet again on May 15th.

4          First, with respect to the 502(b) order.  So as I read

5    Rule 26(b)(2)(v)(B), I really see it as -- what it does is it

6    sort of puts the parties in place as if the document had not

7    been produced and had simply been identified on a privilege

8    log, with one exception.  The rule does say that it then maybe

9    promptly present the information to the Court under seal for

10   determination.  So I don't think someone needs to ask for

11   permission for me to get it under seal.

12         The truth of the matter is whenever I resolve a privilege

13   issue, I always review the docket -- document in camera.  And

14   particularly when we're talking about a clawback situation,

15   which is the party who is claiming it as not privileged has

16   actually seen it.

17         You're all very competent attorneys.  I'm confident that

18   if you're going to actually bring the issue to my attention,

19   there is at least a good faith argument that it's not

20   privileged.

21         So the way I want it to work is, according to the rule

22   let's say defendant produces a document that they then claw

23   back.  Plaintiffs return it to the defense with all its copies.

24   The parties then briefed me -- and it's a legal brief; right?

25   It's a legal argument.  It is not filed under seal.  So

 1    everyone is on exactly the same plane.  One side isn't talking

 2    about the contents of the document while the other side can't.

 3    Nobody is, because the briefs aren't filed under seal.  They

 4    are simply legal arguments as to why the document is or is not

 5    privileged.

 6         And when you submit those briefs, you submit it with the

 7    document itself for my in camera review.  Because one step,

 8    it's all presented.

 9         This is how I resolve privilege all the time.  I did one

10    just last week with regard whether some documents --

11    communications that involve lawyers and, also, a public

12    relations firm, whether those were privileged.  The briefs

13    themselves were not under seal, and I actually reviewed the

14    documents in camera.

15         Now, of course, plaintiffs though in terms of use, they

16    know what they know and so how you frame your argument is going

17    to be shaped by what you saw, which is defendants said in their

18    letter, you don't have to undo.  You saw it.  They saw it.  So

19    everyone actually is more on an even playing field than you

20    normally have when you're simply making an argument based on

21    all you have is the privilege log itself.

22         So that's my view on that one.  Okay?  All right.

23         So then what I want you to do is submit the 502(b)

24    stipulation by Monday is.

25              **MS. WEAVER:**  Will do, Your Honor.

1              **MR. SNYDER:**  Thank you, Judge.

2              **THE COURT:**  All right.

3         Now let's go to custodians, because we need to get that

4    wrapped up.  And I'm a little confused, and I know it's a

5    moving target and that might be why, and stuff was happening

6    while the joint submission was being prepared, which is why we

7    have those deadlines.  Things tend to really move as we get

8    closer to the deadline.

9         But as I understand it, the defense has provided now a

10   list of their 65 proposed custodians.  And then I'm not clear,

11   but I think from plaintiffs, they have an additional 59 names,

12   which they are now proposing to narrow based on what they

13   recently just learned; is that correct?

14        Ms. Weaver, you were nodding your head, but whoever on

15   your side wants to speak.

16             **MS. WEAVER:**  Yes, Your Honor.  I think Derek Loeser

17   will be addressing that, but I did want to say just at the

18   outset that I think Your Honor achieved what you might have

19   intended by asking us to meet by Zoom every 48 hours for two

20   hours on Monday, Wednesday and Friday, which is, with our

21   animals and babies running around in the background, we have

22   recognized humanity in each other, even though we are sparring

23   advocates.

24        So we have reached some agreement, and we hope to reach

25   agreement on custodians.

```
 1          I will hand it over to Mr. Loeser.

 2              THE COURT:  That's great.  And I will -- I have no

 3     ownership interest in Zoom, just so you know:

 4              MR. LOESER:  Good morning, Your Honor, Derek Loeser.

 5          The issue on custodians, I mean, obviously this is

 6     something we spent a tremendous amount of time talking about,

 7     and this is the part of these discussions that still seems to

 8     be a bit of ships passing in the night.

 9          Obviously, Facebook's desire is to have a set of

10     custodians that's not more than what they want, and we have a

11     desire to have a custodians that expands from where they are to

12     make sure we don't have gaps in production.

13          But the lay of the land is this.  We have the April 1st

14     production from Facebook.  We had been previously referring to

15     that as the FTC production.  We learned on the last call with

16     you, Your Honor, that there were some other regulator documents

17     in there as well, so we should call it the April 1st

18     production.

19          In that production we can see the number of custodians

20     that are involved, and it appears that there are 84 people and

21     something like seven or eight non- -- non-human, you know,

22     collection sources.  And that -- so you have 91 custodians

23     that's included in that.

24          Facebook's current proposal does not include all of those

25     people.  So that's problem one.
```

1          The -- we want to take that set and put it aside.  We

2     think that -- as this conversation proceeds, obviously, we

3     think all of the custodians that were included in the April 1st

4     production should be included here as well, because that --

5     those investigations overlaps substantially with this case

6     here.

7          What we've tried to do through carefully examining public

8     information, which was the only information we had when we put

9     together our list, we came up with a list of 149 potential

10    custodians.

11         Now, a lot of those individuals overlap with the

12    custodians that were in the April 1st production.  So we looked

13    at our list and identified the non-overlapping people we've

14    identified.  And the struggle we have been having with Facebook

15    is trying to get information about those non-overlapping

16    people.

17         Because as we talked about at the last hearing, the

18    April 1st or FTC plus productions do not cover entirely the

19    subject matter of our case.  There is a variety of other

20    topics, some of which we described at the last hearing, that

21    require other custodians because they are not included in that

22    FTC and other regulator production.

23         So we have been having this conversation, where

24    essentially what we're saying to Facebook is:  Here is this

25    list of 58 or 59.  We don't intend for all these people to be

1    custodians, but we need to learn about these people so we can

2    decide if they fill gaps that exist from what has already been

3    produced.

4        And that's where we're kind of passing in the night,

5    because Facebook has provided us with organizational and other

6    information for the people it has proposed, but it has not been

7    willing to provide information about the people we have

8    proposed.  And we think we could really accelerate this process

9    if we just get that information from Facebook and go about

10   trying to determine from among those 58 who really needs to be

11   here.

12       And then there is one other category, Your Honor, and

13   that's obviously we are reviewing the production Facebook has

14   made.  We're doing it as quickly as we can.  It took Facebook

15   close to five months to review that production just for what

16   they are calling relevance, and we're going through as quickly

17   as we can.  We are identifying other people in that review that

18   will add to this conversation, but we can't press pause, stop

19   doing all this until we get through all those documents, and we

20   shouldn't need to in order to advance these custodians.

21           MR. SNYDER:  Your Honor, if I can be heard on that.

22       I think if we're ships passing in the night, it's because

23   there is a fundamental disconnect, disagreement about what this

24   process of identifying custodians should look like.

25       We have given them, as Your Honor noted, a comprehensive

1  proposal of 67 custodians.  We've given them job, date of

2  employment.  You see our submission, Your Honor.  The reporting

3  line information, and we explained in detail why each and every

4  one of them was selected.

5       And, of course, we have been through this now for two

6  years, responding to regulators and private parties, and these

7  are the right custodians, nearly 70 of them.

8       To date, plaintiffs have still not given us a counter

9  proposal.  They have propounded on us in writing -- before Your

10 Honor showed mercy and directed us to stop the letter writing

11 campaign, they have propounded, both in writing and over the

12 phone, literally hundreds and hundreds of questions, which we

13 have dutifully answered about a myriad of topics that extend

14 way beyond the typical custodian discussions, and at every turn

15 we've answered them.  We still don't have a counter proposal.

16      What we do have is 188 names now that they want to ask us

17 more questions about.  And we just respectfully submit that

18 this is not the way this custodian process should work.

19      And we should by the next conference, I would respectfully

20 submit, each have proposals and Your Honor can rule up or down

21 on what you think is the most reasonable.  We're very confident

22 we're not only being reasonable.  We're being directly

23 responsive to what they want.

24      And if we're not, and through the course of their

25 production review or otherwise they come up with new

1  custodians, of course, in good faith we will consider them and

2  do what we always do in commercial litigation, add them if they

3  are a proper custodian.

4       We do not want to be in front of Your Honor saying:  You

5  can't add 68 to 81 because they are not proper custodians, if

6  they manifest they are.

7       And the problem, Your Honor, we have had is that I can go

8  through the litany of the moving target.  First, they said they

9  couldn't negotiate custodians.  This was months ago --

10          **THE COURT:**  Okay.  We don't go backwards.  So I'm --

11          **MR. SNYDER:**  Okay.

12          **THE COURT:**  I'm a little confused.  Mr. Loeser just

13  told me there were 58 names, and you told me there were 188.

14          **MR. SNYDER:**  Yes.

15          **THE COURT:**  So let me ask Mr. Loeser.  What is your

16  list right now?

17       Because as I understood your letter, the joint submission,

18  was that it was 58, but that now that you've recently -- I

19  think you said Wednesday -- got more information from Facebook,

20  that list was going to be able to be pared down.

21          **MR. LOESER:**  Yes.  That list, Your Honor, again the

22  58 was the non-overlapping people.  So you have the FTC and

23  April 1st production people.  That's 91.  And we'll circle back

24  to why that's 91, and Facebook is thinking its proposal of 67

25  plus 8 is all it needs to do.

1          But we took the non-overlapping people, so people that

2     were not already included, that was 58.  And we are paring down

3     that list based upon further review and talking to Facebook.

4     So all we want from Facebook is information on those people.

5          **THE COURT:**  Well, okay.  So we have the custodians

6     that were searched for, the FTC and other -- the April 1st

7     production custodians.  Okay.  So let's put that aside.

8          Then what you have are an additional 58.  Okay.

9          I understood from your letter, though, that now based on

10    information you received on Wednesday, you were going to pare

11    that down further, and then have a list, and then could you

12    talk to Facebook with that pared down list.

13         **MR. LOESER:**  That is the goal, Your Honor.  And,

14    frankly, we hope to pare it down even more.

15         **THE COURT:**  Right.  After you talk to Facebook.

16         So here is the question.  For those 58, when will you be

17    able to have a pared down list to give to Facebook to discuss?

18         **MR. LOESER:**  Well, some of those can be removed

19    already based on information that they have.  And so we -- I

20    don't know the exact number.  Others on the call may.  And we

21    can do that.

22         Frankly, that will just result -- let's say it becomes 51.

23    We still need them to share with us information about those 51.

24    It's not difficult for Facebook to tell us information --

25         **THE COURT:**  Wait.  I'm taking it in steps.  That's my

 1   question.

 2        What is the -- when can you pare it down without more

 3   information from Facebook?

 4        **MS. WEAVER:**  I think we can do that by Tuesday, Your

 5   Honor.  We've already -- you know, what happened on Wednesday,

 6   we only got the information verbally.  But we can see now where

 7   there are overlaps.

 8        And what we might also do by Tuesday is identify some

 9   categories where we could see now -- for example, a lot of

10   people had the title "engineer."  But we can see that there is

11   a lot of overlap in Facebook's proposed list, and then a gap.

12   Where we want engineers that really know a lot about how data

13   is extracted from the Hive or something like that.

14        So maybe what we can do, pare down the list and identify

15   some categories where we know there are gaps and see if they

16   can suggest anybody to fill those in.

17        **MR. LOESER:**  Your Honor, I'm sorry.

18        **THE COURT:**  Go ahead.

19        **MR. LOESER:**  Just to respond to Mr. Snyder.  You

20   know, he has referred a couple times now to how this -- they

21   have been at this for a couple years and this production, they

22   know where all the useful information is and that's what this

23   represents.  And I do want to reiterate, there are aspects of

24   this case that do not overlap.

25        **THE COURT:**  No, I understand that.  I'm not cutting

```
 1   you off at that number.

 2        So by Tuesday -- by Tuesday you'll provide Facebook a

 3   pared down list.  It must be fewer than 58.  Must be fewer than

 4   58 of additional people that you want more information to.  And

 5   that list should say why you're -- what you know about them and

 6   why you think they may potentially have relevant information.

 7              MR. LOESER:  Right.  And we --

 8              MS. WEAVER:  We've already provided that --

 9              MS. KUTSCHER:  The problem --

10              MS. WEAVER:  Sorry.  Go ahead.

11              MR. LOESER:  In spades.

12              MS. KUTSCHER:  Your Honor, the problem is the

13   information we have received from plaintiffs to date largely

14   consists of news articles they found on the internet.

15        So they will provide us a name, and we'll click a link.

16   And, for instance, one of them was a link about someone's

17   dating advice on Tinder.  That's, obviously, not something

18   that's helpful in helping us identify whether someone is an

19   appropriate custodian.

20        So we're just looking at lists of random names with random

21   news articles attached to them without anything helpful to tell

22   us why they might be a useful custodian or why they might

23   assist us.

24        And, you know, if this is the process plaintiffs are

25   proposing, what I'm hearing from Mr. Loeser does sound
```

 1   reasonable, but it's not what we've heard before this

 2   conference today.

 3        So previously we had received a list of 149 people.  A

 4   couple weeks later we got a list of 59 people.  And they said:

 5   These are the people we want to discuss first.

 6        **THE COURT:**  Okay.  But, again, what I'm talking about

 7   now is you're going to get a list of fewer than 58.  And now

 8   I'm talking about what that list is going to look like.  I'm

 9   not casting dispersions on anybody.  Just moving forward.  So

10   you're going to get a list on Tuesday that's fewer than 58.

11        Now, Ms. Weaver, Mr. Loeser, tell me what that list is

12   going to say, other than I think it does need to have more than

13   just a name and a link; right?

14        **MS. WEAVER:**  So what we actually provided was an

15   Excel living spreadsheet that has job titles throughout time

16   and date of employment, which we asked Facebook to confirm for

17   us.  And the hyperlinks for some of these are substantive

18   articles.

19        By the way, I know it might seem easy to toss this Tinder

20   thing out as a red herring, but it is one of the issues in the

21   case; that Facebook data shared -- data reciprocity with

22   Tinder, so people's dating activity is mapped to their activity

23   on Facebook and that is used to psychographically target

24   people.  So we actually do think it's relevant.

25        We offered to discuss them name by name with Facebook, and

1    Facebook refused to do that.  So their position has been:  We

2    will only talk about our people, and then you have to tell us

3    why your people are redundant.  But we can't -- we can't figure

4    that out if we don't know even -- they haven't confirmed their

5    employment.

6            THE COURT:  The idea is you get this list, and then

7    you have your video conference and you talk about these people,

8    and you ask them.  If you don't understand from the information

9    that -- if Facebook doesn't understand from the information

10   plaintiffs gave why you think this person is relevant or to

11   what, then you ask them and they tell you.

12           MS. WEAVER:  Good.

13           MR. LOESER:  And, Your Honor, I would say what -- you

14   know, the effort that went into creating this list is worth

15   just talking about briefly.

16       We have to remember we didn't have any organizational

17   information from Facebook, so they wouldn't give it to us.  And

18   this does happen to be a company that a lot of people leave and

19   write about it, and there is a tremendous amount of information

20   that is public.  That's what we went to to try to build out

21   this list.

22       But, again, Facebook is in a very good position, once

23   we've provided the information about who this person is and why

24   we think they are relevant, to tell us more about that person.

25   They are easy to cross off the list if the person is, as

1    Ms. Kutscher is saying, you know, irrelevant to the litigation.

2         One other thing I just wanted to mention that I think is

3    helpful for going forward is there is another category of

4    information we have been fighting with Facebook about and that

5    is the persons that the -- that PWC, which was the auditor that

6    audited Facebook's privacy practices after the original FTC

7    settlement, when it would do it's biennial audits would go out

8    and interview all of the key people involved in privacy

9    operations at Facebook.  PWC -- we have the reports.  They have

10   been produced, but the identification of who they interviewed

11   is not in the reports.

12        Now, that would be a very useful additional source of

13   information from which to identify useful custodians.  We

14   suspect some of them may overlap with that 58 or there may be

15   other names --

16        **THE COURT:**  Yeah.  We know at least eight of them are

17   on the Facebook.

18        **MR. LOESER:**  Right.  And that just seems like a very

19   easy thing to do, get those names.  We can see who these folks

20   are that the auditor itself thought were central to these key

21   operations.  And if they need to be added to the custodian

22   list, great, they will be added.  And if they replace other

23   people who seem less relevant that are marginally associated

24   with that task from our 58, great, we'll take people off of

25   that list.

1            **MR. SNYDER:**   Your Honor, if I could be heard on that?

2        It sounds reasonable as he describes it, but it actually

3    is not reasonable nor precedented in this kind of litigation.

4        PWC since 2013, meaning seven, eight years -- seven years,

5    conducted these privacy audits.  Dozens of PWC people, probably

6    in total hundreds and hundreds of Facebook people they

7    interacted with year after year after year, and we have

8    provided the main PWC custodians.  They have the PWC documents.

9        The question they are asking in connection with the

10   identification of custodians are the kind of substantive

11   discovery questions that they can ask and should ask if they

12   are interested in an interrogatory.  When they take the

13   depositions of the PWC people, they can ask them, as is

14   customary in this kind of litigation, who else was involved.

15   And if they want to seek additional documents and identify new

16   custodians, that's the way to proceed.

17       This would require us to do, really, an intensive

18   investigation.  Interview probably dozens and dozens of people,

19   review.  And it's just -- it's not anything that should -- this

20   is not how a custodian process works.

21       You know, we are entitled, as a defendant, to some

22   deference in identification of custodians, and then the

23   plaintiffs can and should fill in any gaps.

24       And under the discovery rules, you know, we have a duty to

25   supplement.  And if they identify eight other PWC people they

1    are interested in, a year from now or eight months from now

2    when they take the depositions, we will do as we always do,

3    which is seasonably supplement if it -- if it's appropriate.

4         But the process you just heard with PWC is the same

5    process the plaintiffs want to -- you know, they have

6    interrogated us about our systems, about our org charts.  And

7    these are all valid questions, but let's get to the custodians

8    so we can produce documents.

9         As I said at the end of the statement, it really is this

10   never-ending loop of wanting to conduct as much discovery as

11   they can, Your Honor, in connection with the discovery -- the

12   custodian selection so that they don't -- because it's sort of

13   a free shot at a lot of discovery.  And we have been very

14   cooperative.

15        And Ms. Kutscher, I think, wanted to add to that because

16   she has been in the belly of the beast here.

17        **MS. KUTSCHER:**  Yeah.  And another concern we have

18   about the request for the PWC custodians is that these reports

19   were really full scale audits about the company going way

20   beyond the issues in this case.

21        So to identify all of the people PWC spoke to would lead

22   to an enormous set of individuals that go way way, way, way

23   beyond this case.  Not only would it be burdensome to put that

24   list together, but it wouldn't actually lead us where we're

25   trying to get.

 1          **THE COURT:**  Well, can I ask you, is your

 2   representation then that it isn't like, with the report, PWC

 3   didn't provide a list of who they interviewed.

 4          **MR. KO:**  Well, Your Honor, this is David Ko.  I can

 5   try and address that question.

 6      So two responses to that.  One, PWC did not identify the

 7   individuals by specific name.  Instead what they did in the

 8   reports was they identified the primary job titles and teams of

 9   the individuals that they interviewed.

10      And in response -- and related to that in response to

11   Ms. Kutscher-Clark's comment about burden, it was Facebook in a

12   cover letter to the FTC attaching the report, not PWC, that

13   identified the 65 interviewees and Facebook employees that were

14   interviewed.

15      So this concept of burden, I don't know if they are just

16   not talking to the right people, but Facebook wants identified

17   who these people were.  They knew that there were 65 of them.

18   So we're simply asking who these individuals are, because that

19   would greatly facilitate the custodian discussions.

20          **MR. SNYDER:**  And, Your Honor, it was an intensive

21   effort to do that.  And when they propound an interrogatory at

22   an appropriate time, we'll either object to it as being overly

23   burdensome or we will -- we will we'll respond in due course.

24          **THE COURT:**  But is there a letter to the FTC that

25   already identifies 65 people?

1          **MR. KO:**  The letter identified the fact that 65

2    Facebook employees were interviewed.

3          **THE COURT:**  Oh.

4          **MS. KUTSCHER:**  And to be clear, this was in

5    connection with a single audit.  These audits have occurred

6    since 2013 through the present.

7          **THE COURT:**  My question actually was for Facebook,

8    which is:  Is the representation that there isn't, like, just a

9    list somewhere that has who PWC interviewed?

10          **MS. KUTSCHER:**  We are not aware of the list.  This is

11    something we could dig into.  I'm not prepared to represent

12    whether it does or does not exist, but we have been looking

13    into it for a few days.  They asked for this for the first time

14    a few days ago, and we have not yet come across a list.

15          **MR. SNYDER:**  And knowing what I know about the

16    company -- and we will get back -- I think it's highly, highly

17    unlikely that we have a list of all of the company people from

18    2013 to date PWC talked to.

19          **THE COURT:**  No, I understand.  And which company are

20    you talking about, knowing what you know about PWC or about

21    Facebook?

22          **MR. SNYDER:**  Facebook.  No, Facebook, and the nature

23    of the company.  You know, this was -- PWC folks kind of lived

24    at the company, and they were their external auditors, and

25    they --

1            **THE COURT:**  I just want you to ask.  I understand the

2    burden argument, and I'm not prepared to make you go interview

3    PWC to find out who they did that.

4         But if there is a list lying around -- I don't know.  When

5    the report is sent to Facebook, maybe there is a list, there is

6    an appendix.  I don't know.  Maybe there is, maybe there isn't.

7    I don't know.  I just want to you inquire.

8            **MR. SNYDER:**  Well, Your Honor --

9            **MS. KUTSCHER:**  We have.  We have.  And we have been

10   looking for it for a few days.  We have not yet come across

11   one.  That's where we are.

12           **MR. LOESER:**  And, Your Honor, just to be clear.  The

13   Facebook -- the PWC audit identifies people by job title.  So

14   we can look at that list.

15        And we don't want every single person PWC talked to.

16   Again, this is a custodian oriented search.  We want to make

17   sure we're capturing the most important people with the most

18   important information.

19        When PWC is auditing the very practices that are at issue

20   in this lawsuit, they have a list by job title, and a lot of

21   those people will be very, very relevant.  And I find it very

22   hard to believe that Facebook doesn't know who the key people

23   are that its auditor interviews.  My guess is --

24           **THE COURT:**  That's a different issue.  That is if you

25   can point to something in the particular audit, and you want to

say:  Who is this person?  Is this person on our list?  Why
isn't this person on our list?  That's a different question
than saying to Facebook:  Go back and give me a list of
everyone that PWC interviewed.

          **MR. LOESER:**  Right.  And, again, we're very happy to
take the PWC audit and look at the job titles that are
identified.  And we have said this, and we'll say it again:
Who are these people?

          In fact, we'll even go back to that list and try and
narrow it so that who are the key people that we can tell from
these job titles?  There is no burden associated with that.

          And, again, this is not some unrelated audit.  It's not a
general audit of all of Facebook's practices.  It's an audit of
exactly what's at issue in this case.

          So I -- I do think it would be worthwhile for us to pull
up that -- the report.  Look at those job titles, and be
specific about the following job titles at Facebook, and just
tell us who those people are.  And if -- I'll be shocked if the
word they get back from Facebook is we don't know who has those
particular job titles, then they should tell us that, but that
seems hard to believe.

          **THE COURT:**  So maybe that's the approach then we
should be taking, since it's the report.  Why don't we focus on
the report, and you point out where in the report you believe
this person would be an appropriate custodian.  Who is this

1   person?  Maybe that person will already be on the list.

2           MS. WEAVER:  And we can do that by Tuesday as well,

3   Your Honor.

4           THE COURT:  Then by Tuesday where in the report.

5   Okay.

6           MS. WEAVER:  Yeah.  We'll add that section into the

7   other piece of the custodial letter.

8           MS. KUTSCHER:  I just want to clarify that that

9   process might prove to be very tricky, because there are a lot

10  of very generic job titles that a whole lot of different people

11  at the company would have.

12      So to the extent that the report says "We spoke to

13  software engineer" or "We spoke to project manager," it is

14  going to be quite difficult to take information like that and

15  specify who it's talking about.

16          THE COURT:  Yeah.  It may be, and I think it -- some

17  of that may have to come later, but to the extent you can.  And

18  everyone is doing what they can, and I understand.

19      So from the plaintiff's point of view what you have to

20  understand is they are representing a putative class.  And

21  there are many lawyers here, but there are also many lawyers

22  out there who didn't get selected to be the lead counsel in

23  this case, and these lawyers have an obligation to do their

24  best to turn over every stone.  Obviously, that's in -- some

25  tension with us trying to find an appropriate balance on both

sides; and that's what we're going to try to do, to find an appropriate balance, but just for -- on both sides.

So everyone just keep in mind that everyone is just doing their best and what they feel like their obligation to do is. And I understand that sometimes you just need the Court to say "yes" or "no," because that sort of let's everyone off the hook. And I'm happy to do that when I have to do that.

However, you all know your case much better than I ever will. And so to the extent you can come to an agreement and compromise, that's usually better for everyone.

**THE COURT:** All right.

**MR. SNYDER:** Your Honor, I appreciate that. And I just want to assure the Court, and you're obviously going to hold me to it, that this is not -- you know, this is not sort of the last chance that the plaintiffs will have.

When we either agree on or Your Honor orders ex-custodians to be searched, of course, when inevitably plaintiffs come to us with new custodians because of their ongoing research or because of discovery, we are going to be eminently reasonable. We are not going to take unreasonable or hard line positions. If it's a relevant custodian and not repetitive or redundant or duplicative, we're going to be cooperative and we're not going to be in front of Your Honor being unreasonable.

So I don't -- I think that in the fullness of time, they are going to get everyone who they should get.

 1          **MR. LOESER:**  And, Your Honor, I'm going to print that

 2  and tape that up on my wall.

 3          **THE COURT:**  We have a court reporter, so there it is.

 4  All right.

 5          **MR. SNYDER:**  There were a lot of caveats and

 6  disclaimers in it, but go ahead.

 7          **MR. KO:**  Your Honor, one clarifying question on the

 8  PWC issue.  You heard Ms. Weaver say that we could provide this

 9  information to Facebook by Tuesday on the groups and

10  individuals and teams and the reports.

11          Could we also get some clarification, you know, to the

12  extent that this list exists of interviewees, could you -- we

13  would request that you would have Facebook provide that list to

14  us by Tuesday as well to facilitate the discussions.

15          **THE COURT:**  Well, if they can find it.  They have

16  already -- they've represented they've already started looking

17  and they will continue to look.

18          **MR. SNYDER:**  Yes, Your Honor.

19          **THE COURT:**  It is Friday and I don't make people work

20  on the weekend, even though we don't really have weekends.  We

21  have to figure out how to make us have weekends or we'll just

22  be working every day and that's not good.

23          **MR. KO:**  That's why I said Tuesday.

24          **MS. WEAVER:**  Well, actually, I thought David was

25  going to say that I shouldn't have given the Tuesday deadline.

1                   **THE COURT:**  That's what I thought he was going to

2       say, too.

3                   **MS. WEAVER:**  I'm in trouble now.

4                   **MR. LOESER:**  I think the solution is I installed this

5       mesh network in my house so that I can do things like the Zoom

6       call.  It has a button that allows me to turn off my kids'

7       computer screens.  But I think our kids should have a button

8       that just turns off all of our stuff.

9                   **THE COURT:**  That is an excellent idea.  Excellent

10      idea.

11          Okay.  Let's do this.  By Tuesday the plaintiffs will

12      provide with a pared down list -- from that list of 58, it's

13      going to get fewer.  It can't go up, fewer -- with as much

14      information as you can provide of the person.  And then when

15      you meet and have your meet-and-confer on Wednesday, just talk

16      about it.  Talk about it.  And in that sense you may be able to

17      pare it down further.  Facebook maybe will have to go back and

18      get more information for some of the people, but you start

19      talking about it on the 6th.

20          And, also, by the 5th you'll point out particular people

21      by job title and page or whatever in the report that you think

22      could possibly also be appropriate custodians, and you'll have

23      a discussion again on the 6th about that.  You'll begin the

24      discussion.

25                  **MS. KUTSCHER:**  Your Honor, if I could make a

1   suggestion?  It would be extremely helpful from our perspective

2   if, when plaintiffs provide their pared down list, they are

3   able to identify how they think each person fills a gap in our

4   proposal.  Because one of the problems we have been having is

5   we're looking at a lot of duplicative people, so it would be

6   really helpful if they could flag for us what gap the people

7   fill.

8          **MS. WEAVER:**  I think that's something we can discuss.

9   But if we have to put a big narrative in for each person before

10  that, then -- you know, Facebook hasn't done that for us.  We

11  can just talk about it.

12         **THE COURT:**  I want you to be prepared to discuss that

13  at the May 6th.

14         **MS. WEAVER:**  We will.  Yeah, we will.

15         **MR. MONTGOMERY:**  Your Honor, this is Matt Montgomery.

16      I just wanted to clarify something because I know you

17  don't like to go into the history of everything, but the whole

18  back-and-forth so far on the list of 58 is a little bit more

19  factually complicated.

20      So can we agree that it will be less than 58, but the

21  people don't have to be ones that originally appeared on the

22  list?  Because there has been a lot of back-and-forth.

23         **THE COURT:**  No.  No.  The list of 58 that you

24  referred to in the joint statement that was submitted, no, I'm

25  holding you to that.  You just need some limits.

```
 1            Now, as Mr. Snyder said, to the extent there is something
 2      that you identify -- in other words, I'm not going to have a
 3      whole new list of 58.  There was the 58 that was represented in
 4      the joint statement that was going to be pared down based on
 5      what was -- Facebook provided on Wednesday.  That's what's
 6      going to be done.  It's not over the weekend you pull some
 7      other people.
 8                  MS. WEAVER:  No, but --
 9                  MR. MONTGOMERY:  Yeah.  We --
10                  MS. WEAVER:  -- there's another 15 that we had in the
11      interim.
12                  MR. MONTGOMERY:  Let me explain.  I just didn't know
13      if you wanted all the factual back-and-forth, and I'll try and
14      make this very brief.
15            We started with 58, but we actually made some progress.
16      So 3 of our 58 are now on Facebook's list.  They looked at them
17      and said:  Yeah, those people should be on our list.  So they
18      took three of them.
19            Then four of them, they talked to us and they said:  They
20      gave us enough information that -- they us that they weren't at
21      this point good custodians.  So we took -- you know, we agreed
22      to take them off the 58.
23            At the same time we came up with -- based on the reporting
24      line of information that Facebook gave us, we came up with 15
25      new people.
```

```
 1          So I guess what I'm saying is, it's complicated.  We can
 2     give them a list based on nobody knew, that they haven't seen
 3     before that's less than 58.  It's just, they might not be --
 4          THE COURT:  It would be from that group of 66; right?
 5     51 plus the 15 --
 6          MS. WEAVER:  Yes.
 7          THE COURT:  -- right?
 8          It will be from that group of 66, but it will be fewer
 9     than 58.
10          MS. WEAVER:  Yes.
11          THE COURT:  I know it's somewhat arbitrary, but we
12     just have to draw the line somewhere.
13          MS. WEAVER:  We understand.
14          MR. LOESER:  And, Your Honor, that is -- sort of
15     shows the iterative process going on.
16          Again, it's responsive to Facebook's concern about whether
17     we're reviewing what they have produced and other information
18     we're collecting.  Yes, we are, and we're pulling information
19     out of that, and we want to introduce that information so we
20     can talk about it.
21          And I've said this to Facebook and may be worth saying to
22     the Court.  We don't have an interest in more custodians than
23     we need, and we don't have an interest in getting reams of
24     redundant information.  We actually have to review this stuff.
25          Our goal is to find the right people and to fill the gaps
```

1    and have coverage so that, as Your Honor has indicated, down

2    the road a bunch of people who aren't involved in this case

3    can't accuse us of not doing our job.

4            THE COURT:  So, but to that -- that sort of leaves me

5    with a question, as I was wondering.  Everyone seems intent on

6    getting this list of custodians settled so that Facebook -- you

7    can move to the search terms and get started on the search.

8        But if you haven't had a chance to review all these

9    documents that you got on April 1st, I'm wondering why we

10   aren't waiting and doing that all at once.

11           MR. LOESER:  Your Honor, I think it's just the

12   practical reality of needing to move forward.

13           THE COURT:  Okay.

14           MR. LOESER:  It's not -- I have been involved in a

15   lot of cases where there is a significant government production

16   up front.  That happens up front because it's easy to reproduce

17   things that have been produced before.  Sometimes it can be --

18   you know, in the Volkswagen case it was millions and millions

19   of pages.  There was no suggestion that folks should go through

20   all of those documents before you can talk about what

21   custodians should be added to what has been produced already.

22       And I think if we were to stop and wait for us to complete

23   a review of that entire production, it would just add months of

24   delay that's just completely unnecessary given the progress

25   that we can make and have been making by going through the

1  other list of people that seem to be non-overlapping

2  custodians.

3        **THE COURT:**  Okay.  Both sides seem to be on the same

4  page.  I just wanted to -- I was just wondering.

5      Okay.  All right.  So, and then you'll meet by video on

6  the 6th.  You'll meet again on the 8th.

7      What I'm hoping then is that we will then get a list, a

8  stipulation of proposed custodians -- let's see.  I had written

9  this out.  But it's on my laptop, which I'm looking at you, so

10  I can't look at it.

11      By May 13th -- wait.  I think I can look at it.  You can

12  still see me and hear me.  Let me look at it.

13        **MS. KUTSCHER:**  That's two Wednesdays from now, if

14  it's helpful.

15        **MR. LOESER:**  Formerly known as Wednesday.

16        **THE COURT:**  Yeah, let's see.  Submit your -- this

17  is...  Hmm...

18      Let me tell you this proposal and you tell me if you think

19  you can make it work.  You would submit your stipulation of

20  custodians to be searched on or before May 12th.  If you

21  cannot -- again, as Mr. Snyder said, this is not the end-all

22  be-all of all custodians.  This is from -- because from the

23  April 1st production there may be additional ones from

24  discovery.  There may be additional ones.  But in terms of the

25  plaintiff's own search of public information and from the

```
 1   whatever, the PWC audit, this will be the list that you come up
 2   with by May 12th.
 3        If you cannot agree or you have additional ones that you
 4   can't agree on, you'd submit a discovery dispute letter by noon
 5   on May 14th, with that schedule being that on or before
 6   5:00 p.m. on May 12th plaintiffs would provide defendant with
 7   their portion of the letter.  Defendants then provide
 8   plaintiffs with their response by 5:00 p.m., the 13th.  And
 9   plaintiffs filing the letter by noon on the 14th.
10        Now, so that's sort of what I -- is that doable?
11             MS. WEAVER:  That is doable.  We will do that.
12        I would flag for Your Honor that it is likely we will
13   almost certainly have a dispute unless I think Facebook has
14   changed its position, because we will be seeking to have CEO
15   Mark Zuckerberg and COO Sheryl Sandberg on a custodial list,
16   particularly in this case where they have been so involved in
17   making public statements and promises about what Facebook is
18   doing to protect privacy.
19        We could brief that later or now, but it's clearly coming
20   at us.
21             THE COURT:  Well, with them as custodians, a lot of
22   the dispute may be about what the search terms are and how
23   narrow it can be.
24             MS. WEAVER:  That's an excellent point, as long as
25   they are willing to even put them on the list, and we
```

```
 1   understand right now they won't.  We could defer it.

 2           THE COURT:  Yeah.  That seems a dispute that's

 3   premature because I can see where incredibly -- there is reams

 4   and reams and reams of unresponsive things, and so that sort

 5   of, I think, might need to be hand-in-hand probably.

 6           MS. WEAVER:  Okay.  Good.

 7           THE COURT:  Okay.  All right.  So we have a plan then

 8   forgetting the custodians at least going by the 15th.

 9           MR. MONTGOMERY:  May I ask a question about what you

10   imagine the letter briefs, if we have to do them, would look

11   like?  I just know we have -- if we wind up talking about

12   dozens of witnesses -- I'm sorry.  For the court reporter, this

13   is Matt Montgomery.

14       If there are dozens of witnesses, with the limitation of

15   the length, I'm not sure how we could talk about them all or

16   describe them all to Your Honor.  I mean, I don't know if there

17   will be that many at issue.

18           THE COURT:  I'm giving each side ten pages, but no

19   more because there shouldn't be dozens of witnesses.

20           MR. MONTGOMERY:  Yeah.  I --

21           THE COURT:  The nondisclosure said -- I mean,

22   discovery is not perfect and you just -- you just have to set

23   limits.  You just have to set limits.  So I will give you each

24   ten pages.  It is single spaced.  But remember, I'm not giving

25   me very much time to read it.  So you're really going to want
```

1    to pick the ones that mean the most to you.  But, hopefully,

2    you can come to agreement.

3         Okay.  Let's see.  Now, the other -- one other issue was

4    you agreed, and that's great, as to the productions that do not

5    require search terms, I believe.

6         And have you also agreed on the dates for those

7    productions?

8              **MS. KUTSCHER:**  Yes, Your Honor, we have.

9              **THE COURT:**  Great.  Excellent.

10             **MS. WEAVER:**  I think with a reservation that for some

11   of those categories Facebook is narrowing the production world.

12   An example is PWC documents.  They will only give us the

13   documents referenced in the reports, not the ones they gave

14   PWC.

15        So plaintiffs are always in a position of if a defendant

16   is saying "We'll produce documents," we say "Great."

17        Okay.  And so we'll say yes to this, but we want a

18   reservation of right to go back and say:  We looked at what you

19   gave us.  Obviously, some important information is missing and

20   we would like to come back.

21        So it's not a quid pro quo.  It's just, we will give you

22   what we have by this date.

23             **THE COURT:**  That's always the case; right?  I mean,

24   that's the whole thing with an iterative process; that it

25   enables us to narrow and avoid unnecessary production.

1          Okay.  I guess another issue with was the ESI liaison or

2     issue.

3          Let me ask Facebook.  Is it just outside counsel who is in

4     on these conversations, who I'm sure is very knowledgeable and

5     very -- is there anyone from within Facebook?

6               MR. SNYDER:  Russ, why don't you address that?

7               MR. FALCONER:  In terms of participating on the Zoom

8     conferences that we're having every other day, it's just been

9     outside counsel.

10         We do have inside counsel at Facebook who we're working

11    with very closely on a daily basis on the ESI issues.

12              THE COURT:  Okay.  So this is what I would like.  I'm

13    not -- I'm sure that outside counsel has learned everything up

14    and down, all around, whatever.

15         But it would give plaintiffs comfort -- that's all; right?

16    Just for that reason.  It would give plaintiffs comfort if you

17    had somebody from Facebook -- it can be in-house counsel, who I

18    assume there's people within there who their job is to know the

19    ESI all around, right -- on the calls to answer the questions.

20              MR. SNYDER:  Your Honor, may I be heard?  May I be

21    heard respectfully?

22         What happens is Mr. Falconer and the team call the

23    in-house counsel, who are enormously strapped.  There aren't as

24    many as you might think for that big a company.  There are a

25    handful in the litigation group, literally, who are working

 1    from home 14 hours a day.  A handful, literally.

 2         And Mr. Falconer and my team will call them -- her,

 3    really, one individual, and she then has to do the diligence in

 4    the company to answer our questions.

 5         So Mr. Falconer is -- and sometimes she will say:  I don't

 6    have time.  Can you call X?  Can you call Y?

 7         Mr. Falconer is actually in the best position on the

 8    ground to answer those questions because oftentimes he's the

 9    one, as the deputized investigator, who when we go to our

10    client, she says:  Russ, call this one and that one.

11         So to have -- and I represent to the Court this is as

12    accurate as I can be.  To have this person come on the phone

13    not only would be an undue burden on the client, but it would

14    be counter productive, because all that's going to happen is

15    that person is going to do exactly what Russ is going to do.

16    It's not like we have someone who knows the answers to all

17    these questions at the tips of his or her finger.

18         I have been representing Facebook now for 13 years and I

19    can assure Your Honor that the process we have going now is the

20    most effective and efficient one for the plaintiffs.

21         And, moreover, we've told our clients, after we met with

22    Your Honor two Fridays ago, we need them to be available to us

23    on a daily basis for any questions.  Not for them to answer the

24    questions, but for them to point us in the right direction in

25    the company who can answer the question, because we have the

```
 1    resources to do that and our in-house counsel doesn't.

 2        So there isn't a team of 100 lawyers --

 3            THE COURT:  They need to be available during the

 4    meet-and-confer.  They need to be available during the

 5    meet-and-confer so it's as if they are there.  So that if the

 6    question is asked and the plaintiffs aren't satisfied with the

 7    answer that they got, you can get on the phone and get that

 8    person on the phone and participate at that time.

 9            MR. SNYDER:  Yes, but I'm just -- yes, Your Honor,

10    but the problem there is that -- that we're going to have then

11    a person on the phone who can't help them as much as

12    Mr. Falconer can, because he's the one who has done all the leg

13    work.

14        And the reason I'm being so strident or aggressive about

15    this is because it's one person.  I know what she's going

16    through, and to have her have to spend ten hours -- we spent 12

17    hours on the phone.  It's just such undue burden.  And I

18    promise Your Honor, it's not going to help the process.

19            THE COURT:  I'm not saying for every discussion.  I

20    don't see why that person needs to be on the discussion about

21    the custodians; right?

22        It's when you're having that ESI discussion, at least the

23    next time you do it try it that way.  Okay?  They don't have to

24    schedule the whole thing, but they are available to be

25    consulted.
```

1        And then show the plaintiffs.  Show the plaintiffs that

2   what you're doing is the best way to do it.  Show them; right?

3   Prove it.  That's all I'm saying.  Show them.  Give them

4   comfort.

5            MR. SNYDER:  Can I push one more time respectfully?

6        Can we at least say that we'll text them the information?

7   It's just -- I can't describe, you know, what a burden it is on

8   this one individual to have her be available for two hours

9   every other day when she's paying us to do that, to do it

10  better than she can do it.

11       So can I represent to Your Honor that if they ask us a

12  question, one of us will get off the phone, call that person,

13  and get the information back so we can do it as efficiently as

14  possible?

15           THE COURT:  Isn't that what I'm suggesting?

16           MR. SNYDER:  I thought you wanted them to join the

17  Zoom.

18           THE COURT:  No, no.  What I'm saying is that they are

19  available to be consulted in realtime during the conversation.

20           MR. SNYDER:  Yes, Your Honor.  That's fine, Your

21  Honor.  Thank you.

22           MR. LOESER:  Your Honor, for whatever it's worth, you

23  know, in the many, many cases that the plaintiffs on this Zoom

24  call have had, normally we have a 30(b)6 deposition up front.

25  We get one person from the company who is very knowledgeable

1    about their information storage and data systems, and we ask

2    all the questions.  I have never encountered a situation where

3    that person wasn't incredibly knowledgeable.

4         So I'm sure if we can find that person at Facebook and

5    they were made available to answer questions as they come up,

6    as you're suggesting, I think it will be very fruitful.  I

7    would be shocked if it were not an important source of

8    information.

9         **THE COURT:**  The thing about Facebook versus some of

10   your other cases is this an incredibly large, complex

11   completely ESI company.  It is nothing but ESI.  That's all it

12   is.

13        **MR. LOESER:**  That's why those folks are so

14   knowledgeable when you talk to them.

15        **THE COURT:**  But the likelihood that one person is

16   knowledgeable on everything seems to me not likely.

17        **MR. SNYDER:**  That's right, Your Honor.  And certainly

18   our in-house counsel -- Mr. Falconer, you know, really -- let

19   me just put it this way.

20        There is no person in the Legal Department at Facebook who

21   is the repository of all this.  As Your Honor indicated, we

22   have to go far and wide oftentimes to get the information, and

23   we do.  That's our job.  And we will continue to do so.

24        **THE COURT:**  So what's --

25        **MR. LOESER:**  We've already --

1          **THE COURT:**  Let's try this.  The next ESI location

2    conversation you have, they will have the person in-house

3    available to consult, to the extent Mr. Falconer can't answer

4    your question.

5          And then to the extent after that there is just certain

6    questions you say you're not getting the answer to, then bring

7    to it my attention and we'll figure it out.

8          **MR. SNYDER:**  Thank you, Your Honor.

9          **MS. DAVIS:**  Your Honor, if I may, this is Anne Davis.

10         You know, we've also offered the alternative of, you know,

11   Facebook providing ESI disclosures.  This was a proposal that

12   was part of our ESI protocol negotiations.  And to the extent

13   that there are efficiencies in Facebook simply providing those

14   disclosures, providing the data map for relevant ESIs so we

15   don't have to have this iterative process, or at least can have

16   the foundation for that information and then use that in our

17   discussions in connection with other specific RFPs, custodial

18   sources, then that may be an alternative as well.

19         **MS. WEAVER:**  That is to say if we get something in

20   writing, which we haven't, that describes the schema, that

21   describes how the Hive operates, that describes how data is

22   extracted, they can get that from the knowledgeable people and

23   send it.

24         What's happening now is we're asking questions and we're

25   getting, "We have to check with the client," and then we don't

1   -- still don't have any answers, which is what we're trying to

2   cure.

3          **MS. STEIN:**  Your Honor, this is Deborah Stein.

4       One of the issues here, and one of my teammates can talk

5   about it in more detail, is that we have gone way beyond where

6   relevant data is located.  That information has been provided

7   to plaintiffs multiple times and in detail.

8       We are getting from them very, very nuanced technical

9   questions that go way beyond where relevant information is

10  found.  It goes into the substance.

11      I personally have been interviewing engineers about how

12  different technology works and getting a whole education about,

13  you know, technological systems that aren't proprietary to

14  Facebook.  I mean, you've heard people mention Hive, you know,

15  and we're learning all about Hive and how that works.

16      But the kinds of questions we're getting are questions

17  that are not about, you know, up-front how is ESI stored, but

18  it goes into the merits of the case.  It goes into how

19  technology that isn't even Facebook technology works.

20      And that's why we're having these issues because, you

21  know, we've given them the information that we're supposed to

22  provide in up-front ESI discussions.  We are, like, deep, deep,

23  deep in.

24          **THE COURT:**  Okay.  All right.  What else can we

25  discuss?

1          **MR. LOESER:**  Your Honor, we did briefly mention the

2    areas of production for which search terms are not necessary.

3    And I did want to flag that in our statement we referred to

4    some specific categories of information for which the parties

5    agree search terms don't appear to be necessary, but Facebook

6    is not willing to provide.  Those may be subjects that simply

7    need to be briefed to Your Honor.  But if folks want to talk

8    about those now, it might --

9          **MR. SNYDER:**  We think it's premature, Judge.  It's

10   just -- I think we should get the custodians, negotiate the

11   search terms, and continue to have our discussions about those

12   broad categories of documents.  Some of them, there will be

13   privilege disputes about.  Others, financial information that

14   we think is not relevant and should be the subject of motion

15   practice.  One is about a new product launch that has seemingly

16   nothing to do with anything in the Complaint.

17        So this has been our frustration, Your Honor.  We just

18   want to work in a logical, orderly fashion.  And what's

19   happening is we're getting a lot of substantive discovery

20   requests, kind of -- I don't want to use the word masquerading

21   as front end custodian and ESI requests.

22        And we have been incredibly accommodating on these, but

23   enough is enough and we just want to kind of move on in the

24   normal fashion, and then they can send us interrogatories

25   asking any discovery questions they want.

1          **MR. LOESER:**  Your Honor, this category that we're

2    talking about now are things that the parties agree don't

3    require search terms.

4          I'm not exactly sure what Mr. Snyder is referring to and

5    where they have been accommodating, but last time we were on

6    the call we talked about:  So we have search terms custodians.

7    Now what can be produced that doesn't require search terms?

8    That's what this is.

9          There is information that does not require search terms

10   that they don't want to provide and we want.  So I don't think

11   there is anything premature about it.  It's just a ripe dispute

12   that needs to be resolved.

13         **MS. KUTSCHER:**  Your Honor, we have agreed to provide

14   documents responsive to 11 different RFPs -- sorry, ten

15   different RFPs in the next 30 days.  We've also agreed to

16   provide all the materials responsive to another RFP within 90

17   days.  It's an enormous amount of information.

18         What has happened is during these discussions, plaintiffs

19   have raised either a substantive dispute about the scope of

20   what would be provided responsive to specific RFPs, which are

21   privilege disputes, things of that nature, and we have

22   requested that we put those more substantive disputes on hold

23   so that we can finish our custodian negotiations and get moving

24   on the documents we know we can collect and get out the door to

25   them.

1          **MS. WEAVER:**  To that point, Your Honor, RFP 19 asks

2     for documents produced to other regulators.  And on the last

3     call Mr. Snyder said Facebook would produce the documents,

4     produced a very -- two very key (audio interference).  They are

5     key because the reports that resulted from those investigations

6     led to specific findings that we cite in our Complaint,

7     paragraphs 272.  There is a whole section in the 300 paragraph

8     series about the UK DCMS report.  And then later in the 438 to

9     443, the ICO.

10         And our question is either -- what we were trying to just

11    tee up is when will Facebook produce the documents for the

12    regulatory, other regulatory actions, and are they withholding

13    anything from them.

14         You know, the ESI guidelines for the Northern District

15    clearly say that we should be discussing how they, quote,

16    filter out ESI not subject to discovery.  So if they were going

17    to say categorically, as referenced today, oh, this isn't

18    relevant, we keep hearing conclusions about things that aren't

19    relevant, but it's not specific so that we can even engage and

20    say, but we think it is.

21         So two requests.  One, when will they produce the

22    regulatory documents; and, two, will they be transparent about

23    any categorical groups of information from those that they

24    intend to withhold?

25          **MS. KUTSCHER:**  Your Honor, we have already told

1    plaintiffs that we will produce the regulatory documents by --

2    I'm pulling up the date.  By July 3rd.  We have already

3    provided them that information.

4        We also had this discussion extensively with Judge

5    Chhabria regarding how we would review the materials that were

6    produced at the FTC and how we would discuss that with the

7    plaintiffs.  Judge Chhabria already gave his guidance on that

8    issue and reminded plaintiffs that defendants are presumed to

9    review documents in good faith, just as they would in any other

10   production, just as defendants always do.  We review documents

11   for responsiveness and then we provide them to the plaintiffs.

12   And Judge Chhabria has already weighed in on that issue.  It

13   does not need to be relitigated.

14       **MS. WEAVER:**  Well, we disagree on that point.  And

15   these other regulatory documents weren't discussed at all in

16   front of Judge Chhabria.

17       And I think the experience with the FTC document

18   production is really poignant here.  Facebook, in fact, refused

19   and claimed privilege over the review and said:  We won't tell

20   you -- we will not identify categories that we will withhold.

21   We just won't do it.  You're going to get the documents.

22       And we decided, fine.  We won't litigate this.  We will

23   wait.  It then took five months to get just 253,000 pages.  And

24   although Facebook thinks that's a lot of documents --

25       **THE COURT:**  I think that's a lot of documents.

 1          **MS. WEAVER:**  Well, there are cases we're in with --

 2    you know, I have had 50 million in older cases.  So, it's

 3    just...

 4        But anyway, the point is we just want to know if they are

 5    withholding.

 6          **MS. KUTSCHER:**  It's not the --

 7          **THE COURT:**  Let's just stop.

 8        I'm going to issue an order.  We're going to have a

 9    schedule.  We're going to get this custodian thing done so that

10    we can start working on the search terms.  You've agreed to

11    those productions.

12        And the next joint statement which you'll submit, I

13    already -- my previous order sets a schedule for that.  If the

14    plaintiffs want to propose that we tee up some issue, you can

15    cite to whatever transcript from Judge Chhabria or whatever.

16    We can do that.  I don't want that to interfere with getting

17    this custodian issue done.  Like done by May 15th.  I want it

18    done.

19          **MR. SNYDER:**  Your Honor, we would invite you to join

20    us on any of these meet-and-confers so that you can end them in

21    15 minutes, because they go on forever and they are extremely

22    painful.

23          **MR. LOESER:**  Your Honor --

24          **MS. WEAVER:**  And Orin hasn't been on them.

25          **MR. SNYDER:**  Oh, yes, I have.  I was on the first

1   one.

2          **THE COURT:**  I thought he was going to bring the

3   cocktails.

4          **MS. WEAVER:**  He was drinking alone, I guess.

5          **MR. LOESER:**  There have been no cocktails.  So, Orin,

6   come on back and bring the cocktails.

7          **MS. WEAVER:**  Yeah, we'd appreciate it.

8          **MS. SNYDER:**  I may need more than cocktails if I join

9   in every one.

10          **THE COURT:**  You might be meeting-and-conferring past

11   his bedtime.

12          **MR. LOESER:**  Your Honor, I hear you loud and clear on

13   the sequencing.

14     I do just want to put a pin on the map on this issue of

15   the materials that don't require search terms that are --

16   Facebook is not interested in producing.  The one in particular

17   that will become important as we go forward is their refusal to

18   provide the financial information, the value of user data,

19   which is really a key issue in this case.

20     But let's just put that to the side for a moment.  I

21   suspect we'll have briefing on that and we'll explain to you

22   why that is very relevant to this case.

23          **THE COURT:**  And on the 15th then, yeah, we'll

24   discuss.  We made good progress in these two weeks and we want

25   to keep that progress moving.

1        Okay.  I'll issue an order which I hope summarizes what

2   we've came up with.  To the extent what I write doesn't jive

3   with what we discussed or doesn't work, if you guys agree it

4   doesn't work, you can submit a stipulation.  I will sign it.

5        MR. LOESER:  Thank you, Your Honor.

6        MS. KUTSCHER:  Your Honor, just to make sure we're

7   all on the same page in view of what Mr. Loeser just said, I

8   want to clarify the briefing that we'll be submitting on the

9   15th is related -- sorry, on the 14th is related to the

10  custodian issue, not these other topics that --

11        THE COURT:  Of course.  But in the joint statement if

12  the plaintiffs want to propose something with respect to that,

13  if they feel it's ripe, if it's the time they want to raise it,

14  then they can put it in the status update.

15        MS. KUTSCHER:  But we wouldn't substantively brief

16  that.

17        THE COURT:  You don't have to brief it substantively.

18        MS. KUTSCHER:  Wonderful.

19        MR. LOESER:  Your Honor, our eventual goal for joint

20  statements is they'll be free of all adjectives.

21        THE COURT:  I could simply bar them.  When I speak to

22  law students or young lawyers, I always say you should take

23  adjectives and adverbs out of your -- the facts should speak

24  for themselves; right.

25        MS. WEAVER:  Your Honor, may I ask a clarifying?  I

1    may have midst it.

2        So we have a deadline for the custodial issue.  We give

3    them a letter by Tuesday.  We meet-and-confer on Wednesday.

4    They are going to be able to give us information about the

5    people we identify, is that right, and then we reach agreement.

6        **THE COURT:**  The meeting-and-conferring is starting

7    next week, right, and the letter is not due til the following

8    week.  So in the meantime, you're exchanging information and

9    narrowing.

10        **MS. WEAVER:**  Okay.

11        **THE COURT:**  I just dislike how everyone is assuming

12    I'm going to get this joint dispute letter brief.

13        **MS. WEAVER:**  We're not.  We're not.  Actually,

14    honestly, it would be great if we could agree.

15        **THE COURT:**  Oh, and I think you could.  And I think

16    you could.

17        But just in these conversations, in these video sessions,

18    it should just be sharing information and -- sharing; right?

19    This is why I think this person.  This is why, you know.

20    This -- this is why we think.  This person may not be relevant.

21    Tell us.  Or, you know, he only worked there for a month.

22    Whatever it is.

23        **MR. LOESER:**  Well, not to mix things up here, but the

24    information about the key people from the PWC audits, I think,

25    will really facilitate that because they seem to be at the

 1   heart of things.

 2          **THE COURT:**  So then that's what you need to do.   On

 3   Monday, you can start with -- well, you're going to provide it

 4   to them on Tuesday.   I don't know if you're going to

 5   meet-and-confer on Monday, but maybe.

 6          **MR. LOESER:**  If we have them earlier, we will.

 7          **MR. SNYDER:**  I don't want expectations to be raised

 8   that if in a 2016 report PWC references a senior engineer, that

 9   it's going to lead to a lot of productive discussion.

10   Obviously, if we can identify the person, it's a different

11   case.

12       I've read the reports, and I'm not sure how fruitful it's

13   going to be, but hope springs eternal and maybe it will open up

14   floodgates of harmony and agreement.

15          **MR. LOESER:**  Mr. Snyder is always trying to lower my

16   expectations.

17          **MS. KUTSCHER:**  To that end, we're obviously going to

18   work as hard, as quickly, as expeditiously as we can to run

19   down information on all of the people who plaintiffs would like

20   to discuss.

21       I do just want to manage expectations accordingly.   If we

22   get a list of a lot of people on Tuesday or at some point on

23   Wednesday, it will be difficult for us to have substantive

24   information on all of those individuals within a day or two.

25          **THE COURT:**  Of course.   Yes, of course.

1          Okay.  Great.  Thanks everyone.  We'll see you in a couple

2    weeks.

3          (Proceedings adjourned.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Friday, May 8, 2020