# EXHIBIT 2

**BLEICHMAR FONTI & AULD LLP**
555 12th Street, Suite 1600
Oakland, CA 94607

**GIBSON DUNN & CRUTCHER, LLP**
555 Mission Street
San Francisco, CA 94105

**KELLER ROHRBACK LLP**
1201 Third Avenue, Suite 3200
Seattle, WA 98101

May 14, 2020

**VIA ELECTRONIC FILING**
Honorable Jacqueline Scott Corley
United States District Court
San Francisco Courthouse, Courtroom E
450 Golden Gate Avenue
San Francisco, CA 94102

Re:     *In re Facebook, Inc. Consumer Privacy User Profile*,
        Northern District of California, Case No. 3:18-md-02843-VC

Dear Judge Corley:

The parties submit this joint letter brief pursuant to this Court's Discovery Order No. 2 dated May 1, 2020. Dkt. No. 420. The parties have been unable to reach full agreement on document custodians and submit this letter asking the Court to resolve the dispute.

## I.     PLAINTIFFS' OPENING POSITION

There are two categories of custodians presently at issue: (1) the proposed custodians identified by Plaintiffs; and (2) the custodians interviewed by PwC for its audits of Facebook privacy practices. The first category has been the subject of the parties' extensive negotiations, as discussed in detail below. The second category cannot yet be meaningfully discussed since Plaintiffs are still waiting for Facebook to identify particular persons interviewed by PwC that appear most important for this case.

With regard to the first category, following the parties' arduous meet and confer sessions, Plaintiffs now seek the addition of nine custodians to fill topical and temporal gaps in the custodian list Facebook has offered.[1] Despite Plaintiffs significant efforts to narrow the custodians in dispute from 66, to 40, down to just nine, the parties have not reached full agreement. Plaintiffs ask that the Court order Facebook to include the below-listed individuals as custodians, pending the parties' discussions of the potential PwC custodian pool. Plaintiffs' proposal of nine custodians is also made in reliance on Facebook's repeated assurances to the Court and to Plaintiffs in various meet and confers that Facebook is amenable to adding new custodians in the event Plaintiffs identify information justifying such inclusion.

---

[1] This list excludes additional custodians interviewed by PricewaterhouseCoopers, for as Plaintiffs will explain in the discovery conference status report, the parties' discussions about those custodians are in a relatively early stage.

## A. Brief Overview of Plaintiffs' Winnowing Process

On April 24, 2020, Facebook provided Plaintiffs, for the first time, the job titles for its proposed custodians.  Using that information, and informed by their ongoing document review, Plaintiffs pared their previous list of 66 proposed custodians down to 40 and timely sent that list to Facebook. Exh. A. Over the next two meet and confers about custodians, rather than share information as the Court envisioned, Facebook demanded that Plaintiffs alone explain why each of the 40 filled "gaps." Plaintiffs provided explanations for each of the 40, providing specific citations to documents and articles. On the morning of May 12, just hours before this brief was due, Facebook first explained to Plaintiffs why Facebook views all but 35 of the proposed custodians as duplicative.[2] Facebook was still unwilling to describe the core job functions of most of the remaining 35.

In addition to Plaintiffs' efforts to identify individuals--recognizing the informational asymmetry between the parties--Plaintiffs have repeatedly asked Facebook to identify custodians with knowledge about Facebook's business decision to monetize users' data, through the use of video services and a Facebook data repository called the Hive. This information is largely outside the scope of the FTC and other regulatory investigations from which the April 1 production is drawn. It is critical that custodians be added who provide substantial coverage for these subjects. Plaintiffs have considered, and do not agree, with Facebook's arguments that the individuals below overlap simply because they have similar titles. Each of the proposed custodians below has unique and important information directly relevant to Plaintiffs' claims.

## B. These Custodians Possess Relevant, Non-Duplicative Information Directly Relevant to Plaintiffs' Sustained Claims.

A party "may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). In complex litigation, hundreds of custodians may be proportional to the needs of the case. *See Oracle USA, Inc. v. SAP AG*, 264 F.R.D. 541, 543 (N.D. Cal. 2009) ("the parties have agreed to a limit of 140 custodians"). Indeed, in the *Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation* in this district, main defendant FCA voluntarily proffered 149 custodians. Dkt. No. 392. In this case, the class period extends from January 1, 2007 to the present. Further, Facebook has over 44,000 employees. More important, as set forth below, each custodian Plaintiffs propose has unique access to information important to Plaintiffs' claims.

Judge Chhabria sustained claims against Facebook regarding four general categories of misconduct: "(i) Facebook allowed app developers to access sensitive information, not merely of users they interacted with, but of the users' friends; (ii) even after Facebook announced it would no longer give app developers access to information of users' friends, it secretly continued to give 'whitelisted apps' access to information of users' friends; (iii) through some separate arrangement and by some separate means, Facebook shared sensitive user information with its business partners; and (iv) although Facebook ostensibly had a policy of sharply limiting the use

---

[2] Facebook did offer to include five more custodians from Plaintiffs' proposed list of custodians, an offer Plaintiffs have accepted.

of the sensitive information it gave to third parties, in fact Facebook imposed no limits whatsoever." Dkt. No. 298 at 24-25. Each of the custodians below possesses information directly related to at least one, if not all, of these key issues and is not duplicated by the individuals Facebook has proposed as to knowledge, time period, and core job functions.

Justin Osofsky ("Osofsky")

Osofsky was vice president or head of Facebook's Global Operations from May 2008 through July of 2019. Facebook's Operations Department created in part and enforced the formal policies Facebook applied to app developers throughout the Class Period. In order to address concerns about app quality, Osofsky wrote an email on January 15, 2013, proposing to ███████████████ [3] FB-CA-MDL-00185089. Had Facebook done so, misconduct categories (i) and (ii) would not even have been possible. Regarding enforcement, Osofsky wrote on November 20, 2012, "██████████████████████████████████████████████ ██████████████████████████████████████████████         FA-CA-MDL-0183314.

Although Facebook has proposed a number of custodians who worked in Operations in various capacities, the majority are managers or analysts. As the Head of Operations, one would expect the documents in Osofsky's files to contain a breadth of information that the files of lower level employees could not match. Further, only one of the custodians from Operations that Facebook has proposed worked at the Company before 2010. Having started in May of 2008, Osofsky is thus unique due both to his high position in Operations and his tenure.

Chamath Palihapitiya ("Palihapitiya") and Javier Olivan ("Olivan")

Facebook popularized the idea of "growth" teams: "hybrid practices of technical marketers, engineers, analysts, and product designers working together to create multiplier forces on their business."[4] In this case, Facebook's Growth Department strategized about how to attract users and also how to monetize user data by selling access to it.[5] The goals of the Growth teams were in many ways at direct odds with user privacy, and information from custodians on the Growth team is likely to reveal this tension.

Palihapitiya joined Facebook in 2007, first as Vice President of Platform and Monetization and later as the first Vice President of User Growth, Mobile and International from 2009 until June 2011. Unlike all but one of Facebook's proposed custodians, Palihapitiya has spoken publicly and critically about Facebook's treatment of users and manipulation of content on the platform, indicating that he feels "tremendous guilt" about way the company grew its user base and monetized their data during his tenure. Olivan was head of International Growth at Facebook from September 2007 to November of 2011, at which point he took over from Palihapitiya as Vice President of Growth for the entire company, a position he retains to this day.

---

[3] "APIs" refer to application programming interfaces that allow apps to access Facebook user data.

[4] https://venturebeat.com/2016/11/19/what-the-heck-is-a-growth-team/
[5] https://www.forbes.com/sites/quora/2014/09/15/how-the-growth-team-helped-facebook-reach-500-million-users/#2818c6ee7058

In that position, Olivan had direct decision-making authority over data obtained by third parties. For instance, discussing █████████████████████████████████████████ ██████████████████████████████ FB-CA-MDL 00153432.

While Facebook has proposed two custodians from Growth, neither worked at Facebook prior to May 2015 or were as high level as both Palihapitiya and Olivan were. Accordingly, Palihapitiya and Olivan offer the opportunity to find information from a perspective and time period otherwise lacking.

Ken Rudin ("Rudin")

Judge Chhabria sustained Plaintiffs' claims relating to Facebook's sharing of private user content with business partners and white-listed apps. The access Facebook gave to those third parties, and how Facebook allowed third parties to leverage that access, are integral to Plaintiffs' privacy harms and contract damages.

Key to the access that Facebook has provided to third parties is the Data Science Team.[6] This Team collects massive amounts of users' data in a repository called "the Hive" in order to model user behavior and sell predictions derived from those models to Facebook's business partners and white-listed apps.[7]

Facebook has proposed just one custodian from the Data Science Team who started at Facebook in January of 2017. Plaintiffs seek to add Rudin, who joined Facebook as the Head of Analytics in March of 2012. He oversaw both the burgeoning Data Science and Data Engineering teams and, according to his LinkedIn profile, directed those teams to review and analyze Facebook's vast troves of user data "to gain realtime insights into product usage, marketing effectiveness, and business performance." Plaintiffs believe Mr. Rudin's documents will reflect Facebook's metamorphosis from a user-oriented social networking organization into a data broker, monetizing user content rather than protecting it. Facebook has not offered an alternative person from Data Science.

Sam Lessin ("Lessin")

Lessin joined Facebook in October of 2010. Plaintiffs have provided what they understand to be his job titles—"Product Management and Identity Product Group" and "VP - Product Management"—but Facebook will not confirm them or describe his core job functions. Lessin's relevance is less about his title and much more about his direct involvement in urging that Facebook's business model move toward monetizing users' data. Lessin exchanged lengthy, substantive, one-on-one emails with Mark Zuckerberg regarding the structure and strategy of the company as it transitioned its business model to selling access to users' data. For example, on February 21, 2012, Lessin wrote to Zuckerberg with ████████████████████████████ ████████████, stating, ████████████████████████████████████████████

---

[6] https://research.fb.com/teams/core-data-science/
[7] https://www.facebook.com/notes/facebook-engineering/hive-a-petabyte-scale-data-warehouse-using-hadoop/89508453919

███████████████████████████████████████████████████.” Acknowledging the tension between Facebook's new model and people's natural expectations of privacy, Lessin noted that ████████████████████████████████████████████████████████████████████████████████████ FB-CA-MDL-00177965.

Lessin's knowledge is unique. For Plaintiffs' claims for public disclosure of private facts, intrusion on private affairs, and violation of the constitutional right to privacy, Plaintiffs must prove that the disclosure of their information was offensive and objectionable to a reasonable person or violated reasonable expectations of privacy. Dkt. No. 298 at 30-33. Evidence that Facebook did not allow apps to access its employees' information in the same way they did its users' data goes to directly to the question of what constitutes a reasonable expectation of privacy. Facebook has proposed no custodians from the Identity Product Group that Lessin belonged to or anyone else with information about the "hack" that protected Facebook's employees' information but not that of its users.

Andrew Bosworth ("Bosworth")

Bosworth is a longtime Facebook executive who has been with the company since 2006 and has been described as one of Mark Zuckerberg's "most trusted lieutenants" and part of "a small inner circle at Facebook."[8] Bosworth is author of an infamous leaked internal post titled "The Ugly Truth" in which he justified Facebook's relentless pursuit of growth at any cost, including questionable data collection and manipulative treatment of its users.[9] Bosworth claimed that "[a]ll the questionable contact importing practices" and "the subtle language that helps people stay searchable by friends" was "justified" because Facebook connects people and that is a "de facto" good.[10]

Apart from the obviously relevant (and troubling) perspective of Bosworth, he held many different leadership positions in the company, including heading the ads engineering team in the 2011-2012 time period to develop mobile-oriented ad products, a key area Facebook focused on to grow and attract more users. Bosworth also had unique decision-making authority regarding key aspects of Facebook's business, including advantages the company had in making data available to developers on the platform. FB-CA-MDL-00184220 (email from Bosworth identifying ███████████████████████). Bosworth is a key custodian for this case and has knowledge of all Plaintiffs' claims.

Antonio Garcia-Martinez ("Garcia-Martinez")

Garcia-Martinez was a Product Manager from March 2011 until May 2013. He worked in the Ads group and focused on the monetization of user data by making targeted user data

---

[8] *See* https://www.buzzfeednews.com/article/ryanmac/growth-at-any-cost-top-facebook-executive-defended-data#.xt4mkokxx
[9] *Id.*
[10] *Id.*

available to advertisers. For example, in 2013, Garcia-Martinez worked on specific issues related to targeted advertising, including user ID targeting, unique photo detection technology, use of email lists to create ad targeting clusters, and targeting users based on their browsing history. In 2012, Garcia-Martinez was working on a project which was attempting to determine the ███ ████████████████████████████████████████████████. FB-CA-MDL-00164737.

Garcia-Martinez's marketing of targeted user data and the valuation of that data are important to this case. Garcia-Martinez's marketing is highly relevant to Plaintiffs' claims that Facebook invaded users' privacy by enabling third-party apps to access deanonymized private user information, and that it failed to impose appropriate safeguards on the use of sensitive user data. Garcia-Martinez's work on the valuation of user data is highly relevant to Plaintiffs' request that Facebook disgorge the value of the data access it sold and by which it was unjustly enriched.

Mustafa Khan ("Khan")

Khan was a Marketing and Operations Specialist on the Platform Operations team from approximately 2009 to 2012. While Facebook has suggested that it has proposed custodians from Platform Operations—a group responsible for, among other things, understanding third-party access on the Facebook Platform—none had Khan's specific insight or knowledge into the types of information shared with third parties. For example, Khan ████████████████████████████████ ███████████████████████████████████████████████████" FB-CA-MDL-00154253. No other custodian proposed by Facebook worked on this specific project.

In another email, Khan noted that ███████████████████████████████████ ████████████████████████████████ and also questioned why Facebook was not blocking websites "███████████████████████████ FB-CA-MDL-00152179. Khan also contacted third parties to enforce Facebook's policies regarding disclosure of user information, including noting to one developer that █████████████████████████████████ ████████████████████████████████████████████████████████████ FB-CA-MDL-00152694. These communications indicate that Khan's role is uniquely relevant to Plaintiffs' claims that Facebook allowed app developers to access sensitive user information, and that it failed to impose appropriate safeguards on third parties' use of the sensitive information.

Vladimir Fedorov ("Fedorov")

Fedorov started at Facebook in April 2009 as an engineer, working on the APIs central to Plaintiffs' claims. He eventually worked his way up to Vice President of Engineering, a post he continues to hold. In 2019, it was announced that Fedorov "will lead privacy review across Facebook's Product and Engineering teams."[11] As an engineer who has developed APIs since 2009 and the head of a cross-functional privacy review in 2019, Fedorov is a unique and invaluable custodian. Facebook has proposed only one engineering custodian who started work

---

[11] Rob Price, Business Insider, Nov. 27, 2019, "16 Facebook employees leading Zuckerberg's mission to rebuild the social network and reverse its troubles in the massive 'pivot to privacy.'"

at Facebook before 2011 and none to Plaintiffs' knowledge who were involved in the 2019 privacy review.

<u>Custodians Regarding Video</u>

Judge Chhabria sustained Plaintiffs' claims under the Video Privacy Protection Act ("VPPA"), which prohibits the knowing disclosure of personally identifiable information by a video tape service provider. Dkt. # 298 at 34-35. During the meet and confer process, Plaintiffs objected that none of the custodians Facebook proposed appeared likely to be in possession of information relevant to these claims. Facebook has assured Plaintiffs that the files of custodians Ilmo van der Lowe, Joseph Chancellor, Shyam Rajaram, Laura Covington, and Liza Bales contain such information. Plaintiffs have not yet been able to confirm this and reserve their right to seek additional custodians on these claims going forward.

## II.    Facebook's Position

Facebook has provided Plaintiffs with a list of 72 custodians from whom Facebook has agreed to collect and review documents.  This is in addition to Facebook's March 31 production of all Facebook documents produced in response to the FTC's document requests and thousands of documents produced to other government entities (approximately 230,000 pages of materials). It is in addition to all documents responsive to Plaintiffs' document requests that were previously produced to government entities in related investigations and actions, which Facebook has also agreed to produce.  And it is in addition to the significant non-custodial data sources that Facebook has agreed to produce, including nearly half a million pages of noncustodial data produced to date.

Facebook's custodian proposal is more than reasonable.  The six dozen custodians Facebook has proposed span the entire time period at issue in this case (2007 to the present), and they cover each of the four theories of liability that remain in the case under Judge Chhabria's motion-to-dismiss order.

A party responding to discovery is entitled to deference in selecting custodians it deems most likely to possess responsive information, and it is the requesting party's burden to demonstrate that responding party's list of proposed custodians is incomplete or otherwise deficient.  *See* The Sedona Principles, Third Edition, 19 SEDONA CONF. J. 1, Principle 6, 118 (2018); *NuVasive, Inc. v. Alphatec Holdings, Inc.*, 2019 WL 4934477 at *2 (S.D. Cal. 2019); *Mortgage Resolution Servicing, LLC v. JP Morgan Chase Bank*, 2017 WL 2305398 at *2 (S.D.N.Y. 2017); *In re EpiPen*, 2018 WL 1440923 at *2 (D. Kan. 2018).

This deference is built into the established, customary process for negotiating custodians. Under that process, negotiations would begin with Facebook identifying custodians likely to have responsive materials and proposing those custodians to Plaintiffs.  Plaintiffs would ask questions about those custodians to make sure all of the issues in the case were adequately covered.  If Plaintiffs identified a gap, Facebook would identify additional custodians to fill it.

Plaintiffs have turned that process on its head.  Instead of accepting Facebook's proposal as a starting point and focusing their efforts on filling gaps in that proposal, Plaintiffs have generated their own list of proposed custodians and insist that Facebook must demonstrate why

the employees on Plaintiffs' list are inadequate custodians.  But Plaintiffs cobbled their list together from Google searches, LinkedIn profiles, and news articles.  It is scattershot and inaccurate.  Even after Facebook has explained to Plaintiffs why their proposed custodians are unnecessary or duplicative, Plaintiffs have continued to insist on adding the specific names on their list instead of asking Facebook to identify the custodian(s) best situated to address the substantive or temporal gaps Plaintiffs believe they have identified.

There is no legitimate reason for Plaintiffs to take such a backwards approach to custodians.  It appears that their insistence on doing so is driven by their belief that Facebook must be engaging in some kind of discovery misconduct.  During a meet-and-confer on Tuesday, Plaintiffs went so far as to ask if Facebook had already reviewed the documents from the files of Plaintiffs' proposed custodians and was refusing to agree to certain custodians so that Facebook could avoid producing harmful documents.  The premise of counsel's question is as offensive as it is unfounded.  But it is of a piece with the RFP Plaintiffs served last week that asks Facebook to produce all documents related to spoliation or destruction of evidence in this case, despite no good faith basis for propounding this request.

This is not how discovery is supposed to work.  Counsel are supposed to cooperate, not invent unfounded accusations of discovery misconduct.  A plan to raise spoliation allegations shouldn't be page one of anybody's litigation playbook.  But Plaintiffs' approach so far suggests that no matter what Facebook does in discovery—no matter how much ESI it preserves or how many custodians it agrees to, search terms it runs, or documents it produces—it is only a matter of time before Plaintiffs come to the Court to cry foul.

In the end, Facebook is in the best position to determine which of its employees are likely to possess responsive documents and ESI.  Facebook has knowledge, access, and history that Plaintiffs do not.  Indeed, given that Facebook has already produced voluminous documents to a number of regulators and other parties on the topics at issue in this case, Facebook is even better positioned than usual to identify the custodians who are most likely to possess responsive information.  Facebook's list of proposed custodians reflects its best effort to do exactly that.

The Court should reject Plaintiffs' ongoing efforts to delay finalizing a custodian list and cherry-pick additional custodians.  As Facebook recounts in section A, Plaintiffs have provided Facebook an ever-changing series of custodian proposals.  Section B explains in detail why each of the nine additional custodians Plaintiffs are now requesting is duplicative and would cover time periods and topics that are already covered by Facebook's proposed custodians.  Finally, Section C explains why Plaintiffs' inquiries concerning certain audit reports prepared by PwC are no reason to delay further in bringing the custodian process to a close.  Facebook respectfully asks the Court to adopt Facebook's proposed custodian list.

### A.  Timeline of the Parties' Negotiations on Custodians

- **April 3**: Plaintiffs identify 148 potential custodians.

- **April 7**: Facebook identifies 59 proposed custodians.

- **April 16**: Facebook creates and produces to Plaintiffs reporting-line information for each of Facebook's 59 proposed custodians (as well as 8 additional custodians that Facebook would later propose), including the custodian's job title and the names and job titles of

every Facebook employee in the custodian's reporting line.[12]

- **April 20**: Plaintiffs send Facebook a list of 56 potential custodians they wish to discuss first, including 25 people they had not previously identified, bringing their total number of potential custodians to 173.

- **April 24**: Facebook identifies 8 additional proposed custodians—3 of whom Plaintiff had proposed—bringing its total to 67.  Facebook also provides Plaintiffs with a detailed breakdown of each of its 67 proposed custodians, demonstrating which custodians have responsive information to each of Plaintiffs' RFPs and the dates through which Facebook has already produced materials from each custodian's files.  This breakdown was attached as Exhibit C to the April 30 joint status report and is available here.

- **April 27**: Plaintiffs identify 15 more potential custodians, bringing their total to 188.

- **May 1**: During a status conference with the Court, Plaintiffs represent for the first time that they have narrowed their list of proposed custodians to 58[13] (in prior discussions with Facebook, Plaintiffs' position had been that their narrowed lists merely contained the individuals they wished to discuss first and that they reserved the right to re-propose other people on their list at a later time).  Plaintiffs take the position that there are now 66 custodians still under discussion—the 58 from Plaintiffs' narrowed list, plus the 15 Plaintiffs proposed on April 27, minus three of Plaintiffs' proposed custodians that Facebook agreed to add and four custodians Plaintiffs voluntarily withdrew after receiving sufficient explanation from Facebook.

  The Court orders that by May 5, Plaintiffs must provide Facebook with a list of fewer than 58 proposed custodians, with all proposed custodians drawn from the 66 custodians discussed at the hearing, with detailed explanations for why they think each proposed custodian is necessary and fills a gap in Facebook's proposal.

- **Tuesday, May 5:** Plaintiffs provide Facebook with a list of 40 custodians for discussion (three of whom were not on the list of 66 discussed at the hearing).  But instead of offering an individualized explanation of the necessity of each custodian (as the Court had ordered), Plaintiffs simply identify what they understand to be each custodian's dates of employment and job title.[14]  Plaintiffs also send Facebook an extensive list of questions regarding individuals referenced in audits completed by PwC between 2013

---

[12] So it is not true, as Plaintiffs state, that "Facebook provided Plaintiffs, for the first time, the job titles for its proposed custodians" on "April 24, 2020." *Supra* at 1.

[13] The precise number of custodians on Plaintiffs' narrowed lists has not always been clear. Plaintiffs' status update said that "Plaintiffs narrowed focus to 59 individuals." (Dkt. 413 at 3). At the hearing, however, Plaintiffs said there were 58 custodians still in play.  (Dkt. 426 at 17:14). And Plaintiffs' spreadsheet from April 20 included 56 names.

[14] Unlike Plaintiffs' prior lists of proposed custodians, Plaintiffs' May 5 list did not contain links to the news articles or other publicly available information that Plaintiffs relied on in formulating the list.  In other words, instead of providing more information about their proposed custodians, as the Court had ordered, Plaintiffs provided less.

and 2019.

- **Wednesday, May 6**: Facebook explains to Plaintiffs that their May 5 list does not provide Facebook with any of the information Facebook needs to understand why Plaintiffs believe each of their 40 proposed custodians is non-duplicative of, and fills a gap in, the 67 custodians Facebook has proposed.  Plaintiffs agree to provide that information during the parties' next meet-and-confer.

- **Thursday, May 7**: The parties meet and confer over 15 of the 40 custodians on Plaintiffs' May 5 list.  Plaintiffs explain for the first time why they believe each of those 15 custodians is necessary, and Facebook explains why it believes that most of those 15 custodians are duplicative and unnecessary.[15]

- **Friday, May 8**: Plaintiffs explain for the first time why they believe the remaining 25 custodians on their May 5 list are necessary.  Facebook provides its position on many of these proposed custodians, but the two-hour meet-and-confer concludes before Facebook can provide its initial position on all of the custodians.

- **Saturday May 9–Monday May 11**: Having received Plaintiffs' relevancy position on 25 of their custodians for the first time on Friday afternoon, Facebook works over the weekend and all day Monday to evaluate the gaps Plaintiffs believe they have identified in Facebook's custodian proposal and gather additional information about each of Plaintiffs' proposed custodians.[16]

- **Tuesday, May 12**: Facebook agrees to five of Plaintiffs' additional proposed custodians—raising Facebook's total number of agreed custodians to 72.  Facebook explains to Plaintiffs that, unsurprisingly, much of the information Plaintiffs found on the Internet was inaccurate and unreliable and that the information Facebook has compiled on Plaintiffs' 35 other proposed custodians indicates that these custodians are unnecessary and duplicative.  Within hours, Plaintiffs drop 26 of those 35 proposed custodians.

**B.   The nine additional custodians Plaintiffs propose are duplicative and unnecessary.**

The additional nine custodians proposed by Plaintiffs are largely apex custodians who are not appropriate at this stage, custodians who are duplicative of others, or custodians who were selected by plaintiffs merely because they have spoken critically about Facebook on issues that have nothing to do with Plaintiffs' claims in this case.

The specific reason each custodian should not be added are set forth below.  But in short, the "gaps" that Plaintiffs identify simply do not exist.  Plaintiffs say more custodians are needed

---

[15] Here again, it is untrue for Plaintiffs to state that it was not until "the morning of May 12" that "Facebook first explained to Plaintiffs why Facebook views" most of Plaintiffs' proposed custodians as duplicative. *Supra* at 1.

[16] The parties agreed to reschedule their usual Monday afternoon meet-and-confer to Tuesday morning so that Facebook could complete its diligence on Plaintiffs' proposed custodians.

to fill a "gap" regarding high-level decision makers, but Facebook's proposed custodians include **a C-level executive, 15 Vice Presidents, 22 Directors, and 7 Heads**. Plaintiffs say more custodians are needed to fill gaps in certain Departments, but every *issue* in the case is covered by a sizable number of custodians: 38 custodians were involved in third party data access issues; 14 custodians were involved in third party enforcement; and 20 custodians were involved in privacy.[17] Facebook has carefully and thoroughly proposed 72 custodians that possess materials responsive to the core substantive issues in this cases—that is what Facebook is required to do, not provide duplicative custodians to satisfy Plaintiffs' Departmental quotas or speculation. Simply put, the gaps Plaintiffs cite do not exist.

　　　*(1) Justin Osofsky ("Osofsky")*:  Plaintiffs say that Osofsky is "unique due both to his high position in Operations and his tenure," having served as Vice President or Head of Facebook's Global Operations from May 2008 through July of 2019.  But Osofsky is duplicative of numerous Facebook proposed custodians.

　　　Facebook has proposed **twelve custodians involved in Platform and Developer Operations**—including **two Vice Presidents and three Directors**.  Facebook's proposed custodians thus include high-level decision makers that cover the same time period as Osofsky. For example, Facebook's proposed custodians include: Ellen Silver, Vice President, Global Developer Support and Operations, who joined the Facebook in 2008 and oversaw Developer Operations and Platform Policy aspects of Facebook's enforcement efforts; John Anderson, Director of Platform Operations who joined Facebook in 2011; and, Monica Bickert, Vice President, Public Policy, who joined Facebook in 2012 and oversees developer enforcement.

　　　Facebook has also proposed employees from other departments whose duties overlapped with Osofsky's, particularly during 2008 to 2010—namely, Dan Rose, Vice President, Partnerships, who joined Facebook in 2006, and Mike Vernal, former Vice President, Engineering, who joined Facebook in 2008.  The overlapping duties of Osofsky, Rose, and Vernal is confirmed by the emails the Plaintiffs cite:  **Osofsky sent both emails to Rose and Vernal**.  This shows Osofsky's role in Developer Operations—including his leadership role—is well covered by the high-level custodians Facebook has already proposed.

　　　*(2) & (3) Chamath Palihapitiya ("Palihapitiya") and Javier Olivan ("Olivan")*: Plaintiffs demand that Palihapitiya and Olivan, two high-level executives, serve as custodians solely because Facebook has not proposed custodians from the Growth Department prior to 2015.  But the alleged gap in the Growth Department is artificial because, during the parties meet and confers, **Plaintiffs acknowledged that the Growth Department has no independent relevance to this action**.  Rather, Plaintiffs claim that the Growth Department is relevant only to the extent that its strategy involves third parties' use of user data.  Facebook has proposed dozens of custodians that squarely address this issue, many of whom are high-level executives and served at the company prior to 2015.  These include Dan Rose, Vice President, Partnerships, who joined Facebook in 2006, and Chris Cox, former Chief Product Officer, who joined Facebook in 2005.  Moreover, Plaintiffs claim that the Growth Department is relevant to "monetization," and

---

　　[17] The numbers are even higher because this list only counts each custodian once, even though many of the proposed custodians are knowledgeable about multiple issues.

Facebook recently added another custodian that addresses this topic:  Deborah Liu, Vice President, Marketplace & Commerce, who joined Facebook in 2009.

Another reason Plaintiffs claim Palihapitiya and Olivan are relevant is the supposed "tension" between the Growth Department and Facebook's goals regarding privacy.  Yet Plaintiffs offer no reason why, if this tension exists, it would not be reflected by materials from the 20 custodians Facebook has proposed that were involved in privacy issues.  These include high-level employees such as Erin Egan, Vice President and Chief Privacy Officer, Public Policy, who joined Facebook in 2011; Rob Sherman, Vice President, Deputy Chief Privacy Officer, Policy, who joined Facebook in 2012; or Katherine Tomko, former Head of Privacy Protection Programs, who joined Facebook in 2008.

In the end, Plaintiffs admit that a "gap" in the Growth Department is not driving this request.  Instead, Plaintiffs believe that "unlike all but one of Facebook's proposed custodians," Palihapitiya has publicly criticized Facebook.  Palihapitiya's personal views on Facebook, however, are not a valid reason to include him as a custodian.

Moreover, Olivan would not be an appropriate custodian given that the Growth Department has no independent relevance to Plaintiffs' claims and Olivan is an extremely high-level executive who would be duplicative of other high-level custodians Facebook has proposed.

*(4) Ken Rudin ("Rudin")*:  Plaintiffs claim that Rudin, who worked at Facebook from 2012 to 2015 as Director, Analytics, fills a "gap" in the Data Science Team prior to 2018.  Yet again, Plaintiffs are demanding a quota of employees from specific Departments—even though other Facebook-proposed custodians cover the same issues.  At core, Plaintiffs claim that Rudin is relevant because of his involvement in "monetizing user content."  Facebook added Deborah Liu as a custodian to address this very gap:  Liu has worked at Facebook since 2009 and has been involved with these issues for her entire tenure at Facebook.  Rudin would be duplicative of Liu.

Moreover, Plaintiffs say Rudin is relevant because of the issues regarding third parties' access to user data.  But 38 custodians Facebook has proposed are involved in issues regarding third-party access to data, and Plaintiffs make no attempt to explain why these custodians would not possess substantially the same materials as Rudin.

*(5) Sam Lessin ("Lessin")*:  Plaintiffs' only reason for proposing Lessin as a custodian is that he exchanged some emails with Chief Executive Officer Mark Zuckerberg regarding the use of third party data.  Facebook has proposed myriad custodians that deal with these exact issues during the same time period, including:  Deborah Liu, Vice President, Marketplace & Commerce, who joined Facebook in 2009; Dan Rose, Vice President Partnerships, who joined Facebook in 2006; Mike Vernal, former Vice President, Engineering, who joined Facebook in 2008; and Chris Cox, former Chief Product Officer, who joined Facebook in 2005.

These proposed custodians were also involved in discussions with Mark Zuckerberg, so Plaintiffs are wrong to say that Lessin's knowledge is unique.  Indeed, an email Plaintiffs cited to Facebook during meet and confer discussions as evidence of Lessin's unique relationship with Zuckerberg was also sent to Cox, Rose, and Vernal.

***(6) Andrew Bosworth ("Bosworth")***: Plaintiffs are transparent about their reason for proposing Bosworth:  He "is the author of an infamous leaked internal post" regarding Facebook's growth strategy.  This is not a legitimate reason to add Bosworth as a custodian in this action.  The post—which Bosworth said he "didn't agree with [] even when I wrote it"[18]—is about the relationship between Facebook's growth and mission.  The post makes only a passing reference to one issue relevant to Plaintiffs' claims, Facebook's "contact importing practice."

Bosworth's disavowed personal opinion does not justify adding him as a custodian, particularly because Plaintiffs have offered no other reason why Bosworth possesses unique relevant information.  In fact, during meet and confers, Plaintiffs originally claimed that Bosworth filled a gap in mobile partnerships from 2011 to 2013.  Facebook explained that at least four proposed custodians address those same issues, including Jackie Chang, Director Product Partnerships, who joined Facebook in 2007.  **Facebook agreed to add Chang as a custodian specifically to fill the alleged "gap" in partnerships from 2011 to 2013**.  With that gap filled, Plaintiffs have no legitimate reason to add Bosworth as a custodian.

***(7) Antonio Garcia-Martinez ("Garcia-Martinez")***: Plaintiffs contend that Garcia-Martinez should be a custodian because he "focused on the monetization of user data."  But Facebook specifically added Deborah Liu, Vice President, Marketplace & Commerce, to address issues regarding monetization. Liu also covers the same time period.

Plaintiffs also say that Garcia-Martinez fills a gap regarding targeted advertising.  But the Court has recognized that Plaintiffs "appear to concede [targeted advertising] is perfectly legitimate."  (Dkt. 298).  Plaintiffs have insisted to Facebook that the issue is not targeted advertising per se but, rather, the extent to which user data was impermissibly given to third parties in connection with advertising.  That issue—third parties' access to user data—is addressed by 38 of Facebook's proposed custodians involved with that issue, including, Dan Rose, Vice President, Partnerships; Jackie Chang, Director Product Partnerships; and Ime Archibong, who previously served as the Vice President of Product Partnerships.

***(8) Mustafa Khan ("Khan")***: Facebook has proposed twelve custodians involved in Platform and Developer Operations, including two Vice Presidents and three Directors.  Khan served on the Platform Operations team and would, therefore, be duplicative of these custodians.  To show that Khan is unique, Plaintiffs cite an email that references Khan ███████████████ ████████  Plaintiffs say that "[n]o other custodian proposed by Facebook worked on this specific project," but the cited email includes Sandy Parakilas—a custodian proposed by Facebook.  To the extent this stray reference to a ████████████ has any relevance, Parakilas will have knowledge of it.  Khan is duplicative.

***(9) Vladimir Fedorov ("Fedorov")***: Plaintiffs offer two reasons that Fedorov should be a custodian.  First, they say that Fedorov is "unique and invaluable" because he served as "an engineer who has developed APIs since 2009."  But Facebook has proposed other high-level engineers who worked on API issues during this same time period, including Arturo Bejar,

---

[18]https://www.buzzfeednews.com/article/ryanmac/growth-at-any-cost-top-facebook-executive-defended-data#.xt4mkokxx.

former Director of Engineering who was at Facebook from 2009 to 2015; Mike Vernal, former Vice President, Engineering, who was at Facebook from 2008 to 2016; and Steven Elia, Manager, Engineering, who joined Facebook in August 2011.

Second, Plaintiffs cite a news article that said Fedorov would lead a privacy review in 2019.  Facebook has proposed 20 custodians involved in privacy issues, including key decision makers such as Erin Egan, Vice President and Chief Privacy Officer, Public Policy, and Rob Sherman, Vice President, Deputy Chief Privacy Officer, Policy.  These individuals would possess documents about any privacy review that Facebook conducts.

### C.  Plaintiffs have more than adequate information about the persons interviewed in connection with the PwC audits.

Plaintiffs' suggestion that custodian negotiations should continue regarding persons interviewed by PwC in connection with some of its audit work is inconsistent with the Court's order and would only prolong the custodian process.

In the course of negotiating over preliminary discovery issues, Plaintiffs have repeatedly sought substantive discovery under the guise of needing substantive information to be able to negotiate search terms and custodians.  But each time Facebook satisfies a request, Plaintiffs move the goal posts, expanding their request and continuing to claim that they are unable to negotiate on the topic at hand until Facebook provides additional information.

This whack-a-mole approach has particularly infected negotiations regarding custodians, during which Plaintiffs have presented Facebook with a continually moving target:

- Plaintiffs first said they needed certain of Facebook's correspondence with the FTC to understand why the custodians in that action were chosen.  Facebook produced over 30 pieces of correspondence with the FTC.[19]

- Plaintiffs then said they needed any organizational materials that were provided to the FTC.  These were produced.

-  Plaintiffs then said they needed the actual FTC productions before they could negotiate custodians.  Facebook spent a month reviewing these documents for production and

---

[19]  Even now, Plaintiffs continue to seek the production of certain settlement correspondence between Facebook and the FTC, even though that correspondence is wholly unrelated to the topics on which Facebook agreed to produce documents.  This, too, is symptomatic of Plaintiffs' approach:  Facebook agreed to produce certain FTC correspondence to aid negotiations regarding the production of the FTC documents, search terms, and custodians.  Now that Facebook has production of the relevant correspondence, Plaintiffs are insisting that still more documents are needed.  Plaintiffs' ever-expanding pursuit of isolated categories of documents is impeding discovery in this matter.

ultimately produced all of the FTC productions, as well as thousands of documents produced to other regulators.[20]

- Plaintiffs then demanded lists of the custodians and search terms used in the FTC investigation.  These were provided.

- Plaintiffs said that they still did not have enough information to work with, so Facebook created and produced reporting line information for its 67 proposed custodians. Facebook has also spent many hours describing in detail the positions and relevance of each of its proposed custodians.

All told, Facebook has spent several months providing Plaintiffs with substantive information regarding proposed custodians, spanning hundreds of thousands of pages and dozens of hours of attorney time.

Plaintiffs are still not satisfied.  Now, they say they cannot resolve custodians until they receive substantive information on the persons interviewed in connection with a series of audits conducted by PwC.  Even though Plaintiffs indicated during the May 1 hearing that they would provide Facebook with "specific job titles" for all of their requested custodians, on May 5 Plaintiffs sent a three-page list—which they "reserve[d] the right to revise"—that contained 11 actual job titles and two pages of vague descriptions of "control owners" and members of cross-department functional teams over nearly a decade for Facebook to identify.  Plaintiffs' list was unhelpful and counterproductive.

Facebook nevertheless spent nearly a week trying to track down this patchwork information only to discover that:

1) several of the individuals with the specific job titles identified were already on Facebook's list of proposed custodians, including Erin Egan and Edward Palmieri;

2) several of the job titles listed by PwC did not match actual job titles at Facebook, but several Facebook employees with similar titles in the relevant time periods were also already on Facebook's list of proposed custodians; and

3) the information related to "control owners" and other similar information would likely require custodial searches to uncover.

Most significantly, Facebook has already produced to Plaintiffs more than *1,500 e-mails* with PwC that address Plaintiffs' issues.  **The e-mails identify the Facebook employees PwC asked to interview, identify control owners, and identify members of the Facebook team (the Privacy XFN team) that Plaintiffs say they are particularly interested in.  Facebook produced these materials *more than six weeks ago*.**  Despite Plaintiffs' claims at the time that they needed these documents to be able to negotiate custodians, Plaintiffs did not review the

---

[20]   Plaintiffs' repeated statements that Facebook took five months to review and produce the FTC documents are disingenuous and inaccurate.  Plaintiffs served the relevant RFP in November 2019, and Facebook timely responded with its objections in December 2019.  The parties thereafter negotiated regarding the scope of Facebook's production obligations and subsequently raised the issue to the Court.  Facebook produced the FTC documents approximately one month after the Court ordered it to do so.

documents.

The Court should not allow Plaintiffs to reserve the right to reopen custodial negotiations based only on their own choice not to review the PwC materials (and the other materials Facebook has produced) before or during the custodian negotiations. If, at some point down the road, Plaintiffs suggest there is good cause for additional custodians, Facebook will consider that suggestion in good faith. But Plaintiffs have delayed the negotiations over custodians for too long already. The Court should order the parties to move forward in discovery using Facebook's list of custodians.

### III. Plaintiffs' Reply[21]

In an effort to reach agreement on custodians, Plaintiffs have substantially reduced the number of custodians they are seeking from the 66 previously discussed with the Court. Plaintiffs now seek to add just nine additional custodians, each one fully justified as set forth herein. Plaintiffs have set forth specific facts which support their inclusion which Facebook has not rebutted. That is the first dispute before the Court. The second issue before the Court is how to handle the addition of a discrete set of custodians who PwC interviewed to assess Facebook's user data and privacy practices, the issues at the heart of this case. Facebook contends that these people possess only duplicative information but this is in tension with Facebook's apparent inability to identify them. Plaintiffs propose that the parties' discussions on this topic continue so that key additional custodians can be identified, and absent agreement, presented to the Court for resolution. The size and complexity of this case, which is larger in scope than the FTC action, warrants the inclusion of both categories.

The severe informational asymmetry at play in this case heightens the importance of the parties' Rule 34 obligations. Cooperation in a transparent discovery process is the path to efficient, cost-effective litigation and achieves the purpose of the federal discovery rules: reducing "gamesmanship" and to ensuring the "forthright sharing of all parties to a case with the aim of expediting case progress, minimizing burden and expense, and removing contentiousness as much as practicable." *Burnett v. Ford Motor Co.*, No. 3:13-CV-14207, 2015 WL 4137847, at *8 (S.D.W. Va. July 8, 2015) (citing *Bd. of Regents of Univ. of Neb. v. BASF Corp.*, No. 4:04–cv–3356, 2007 WL 3342423, at *5 (D. Neb. Nov. 5, 2007).

More transparency would help here. Plaintiffs have asked the same basic questions about Facebook's proposed custodians since April 3, including requesting their core job duties and responsibilities, with little in the way of substantive responses. In response, Facebook has both invited Plaintiffs to Google information and objected to Plaintiffs' reliance on public information. That is not what Rule 34 requires. Facebook claims that it is in the best position to know which custodians are most appropriate. But Plaintiffs cannot rely on that claim when

---

[21] Plaintiffs note that Facebook did not comply with the Court's Discovery Order No. 2, Dkt. 420 which set forth specific deadlines for submission of the parties' briefing. Specifically, Facebook provided Plaintiffs with a new version of its opposition revised not just for typos but also in style and substance at 11:41 am before this 12 p.m. filing, requesting that the revised version be included. Plaintiffs have done so here, but hope to discuss a more fair process with the Court.

Facebook has not shared what it knows.[22]

Moreover, Facebook has informed Plaintiffs custodial interviews for collection purposes are needed. That fact undermines Facebook's insistence that Plaintiffs' proposed custodians duplicate those already identified by Facebook. And, in fact, for the specific reasons we have discussed with Facebook and in this submission, the nine custodians are not duplicative.

Plaintiffs do not agree with the one-sided narrative about the parties' discussions that comprises the bulk of Facebook's  opposition.[23] Instead of responding to that narrative, Plaintiffs focus instead on why each of these custodians possesses unique information and should be included, reserving our right to seek additional custodians when it becomes clear who PwC interviewed and was directly responsible for Facebook's Privacy Program.

Osofsky

Facebook does not dispute that Operations—the department Osofsky led from May of 2008 to July of 2019—is relevant to Plaintiffs' claims. Indeed, Facebook touts the number of custodians it has proposed from Operations. However, Facebook has proposed only one custodian from Operations that started before 2010 and Osofsky was senior to her. Seeking to excuse this omission, Facebook argues that the duties of two other proposed custodians, Mike Vernal, Vice President, Engineering and Dan Rose, Vice President, Partnerships, purportedly overlapped with those of Osofsky. The only support Facebook offers for this bald assertion is the fact that Osofsky sent two emails to Rose and Vernal. This is hardly sufficient to counter the common-sense proposition that highly placed executives in different departments would have different areas of responsibility. Osofsky should serve as a custodian to ensure that information from the top of the Operations department and before 2010 is not lacking from Facebook's production.

Palihapitiya and Olivan

Palihapitiya and Olivan led the Growth team at Facebook. Facebook asserts that "Plaintiffs acknowledged that the Growth Department has no independent relevance to this action" (emphasis omitted). In fact, Facebook's growth was entirely premised on enticing user engagement and enrollment by promising privacy, and monetizing users' data, and Plaintiffs have never said otherwise.[24] Facebook again argues that the duties of high-level executives from different departments were duplicative but cites no support at all for this proposition. It was the unique function of the Growth team to strategize about monetizing user data by selling access to it. In the process, that team was involved in key strategic decisions about the company, including

---

[22] As one example, it is impossible to properly evaluate the statement that "**a C-level executives [sic], 9 Vice Presidents, 21 Directors, and 7 Heads**" are included as custodians when Facebook has not identified how many individuals have held these titles from 2007 to the present.

[23] If the Court wishes to hear more about the process, Plaintiffs will be prepared to address all such concerns at the hearing on Friday, May 15, 2020.

[24]   https://marker.medium.com/the-untold-history-of-facebooks-most-controversial-growth-tool-2ea3bfeaaa66

privacy risks. These issues go straight to the heart of Plaintiffs' claims. Palihapitiya and Olivan should be custodians.

Rudin

Rudin was the Head of Analytics, which included the Data Science Team, from March of 2012 to November of 2015. The Analytics team metamorphosed Facebook's business from a social media platform to one that engaged in big data analysis to monetize the information it collected about users.[25] Citing no documents or other support, Facebook claims that the files of Deborah Liu, a Director of Product Management—Platform Monetization during that time, are sufficiently equivalent to those of Rudin, and offers no other alternative. It is self-evident that executives at very different levels of the corporate hierarchy and in different departments would have access to different information. Facebook has conceded the relevance of Analytics by proposing a low-level member of the Data Science Team that started in 2017 as one of its own custodians, but obviously Rudin—at a much higher level for a longer time period—would have had access to much more relevant information and should also serve as a custodian.

Lessin

Sam Lessin, one of very few direct reports to Mark Zuckerberg during Lessin's tenure at Facebook, played a critical role in developing Facebook's business strategy in the wake of Facebook's failed IPO, as Lessin's emails to Zuckerberg demonstrate. Although Facebook waves a hand at Lessin's general job title and claims others fulfilled similar functions, this is empty argument unsupported by documents or facts. Above, Plaintiffs identified an email solely between Lessin and Zuckerberg discussing issues critical to Plaintiffs' claims. *See* Exhibit B. That is just one example from a series of one-on-one emails between Lessin and Zuckerberg. *See also*, FB-CA-MDL-00183235-240. Facebook also asserts, without support, that a number of its proposed custodians are duplicative of Lessin even though none of them even worked in his department, the Identify Product Group. Without more, Facebook's argument is not persuasive.

Bosworth

Bosworth, or "Boz," is a senior, longtime Facebook employee with key knowledge of the decision making process in Facebook's inner circle. Indeed, Plaintiffs have identified specific documents establishing that he had central decision-making authority over various aspects of the Facebook Platform. In addition, among his various other roles as one of Mark Zuckerberg's closest confidants, he was central to growing Facebook's mobile advertising space. Facebook does not rebut these facts, but claims without specifics that he is duplicative. It is not persuasive.

Garcia-Martinez

Facebook's primary objection to the inclusion of Antonio Garcia-Martinez— notwithstanding his involvement in valuing data for third-party advertisers—is that targeted advertising is somehow not relevant to this case and that Plaintiffs have already conceded that such advertising is legitimate. But any process by which users' private data is shared without or

---

[25] https://neilpatel.com/blog/analytics-that-matter-to-facebook/

beyond consent is centrally relevant to Plaintiffs' claims, even when used for targeted advertising. Facebook also asserts that Deborah Lui is duplicative of Garcia-Martinez. But Plaintiffs have provided a specific email demonstrating Garcia-Martinez was responsible for quantifying data. Facebook has not pointed to any similar document or evidence regarding Lui's involvement. Garcia-Martinez should be a custodian.

Khan

Plaintiffs advanced three clear examples demonstrating that Mustafa Khan had unique and specialized information about what data was shared with third parties and about enforcement of Facebook's policies. Facebook claims he is duplicative of other custodians in Platform Operations, but again fails to provide any concrete evidence or emails to show that this is so. Facebook also makes these claims without noting the diverse range of responsibilities of the employees in Platform Operations. Indeed, Facebook cites the fact that Sandy Parakilas—an agreed-upon custodian—is on one of Khan's emails, but it cannot dispute that it was Khan, and not Parakilas, that was centrally responsible for creating the ███████ demonstrating what information was being shared with third parties. As the only proposed Facebook employee responsible for this task, Khan is clearly an appropriate custodian.

Fedorov

Fedorov was an engineer who developed the APIs central to Plaintiffs' case starting in 2009. Facebook argues that two other engineers, Mike Vernal and Arturo Bejar, worked on "API issues" starting in 2008. During the parties' meet and confer discussions, however, Facebook represented that it proposed Bejar as a custodian not because of his involvement in API issues, but because of his involvement in the Cambridge Analytica scandal in 2018. Further, as noted above, Fedorov led a privacy review across Facebook's Product and Engineering teams in 2019.[26] Facebook has not denied that this review took place or identified a single proposed custodian besides Fedorov that was involved in it. Instead Facebook speculates that, in general, a number of custodians it has proposed "would possess documents about any privacy review that Facebook conducts." Fedorov remains a unique custodian.

Facebook employees interviewed by PwC and centrally responsible for Facebook's Privacy Program

In the parties' Joint Status Update, Plaintiffs address the need to supplement the parties' custodian list based on identification of key Facebook employees interviewed by PwC in connection with the four reports auditing Facebook's Privacy Program. Plaintiffs also briefly respond here because Facebook devotes significant attention to these issues in its opposition. Notwithstanding Facebook's attempt to minimize these reports, they are centrally relevant to Plaintiffs' claims. The reports describe privacy procedures (called "controls") that Facebook established in connection with its Privacy Program. For each control, there was a Facebook employee responsible—the so-called "owner" of the control.

---

[26] https://www.cnbc.com/2019/07/24/facebook-nominates-privacy-chief-after-5-billion-settlement-with-ftc.html

For example, one of these controls was that ██████████████████████████ ████████████████████████████████████ FB-CA-MDL-00405248. Notably, as to this specific control, PwC concluded in its 2019 Report that ███████████████████████████████ ████████████████████████████████████████████████████████ .” FB-CA-MDL-00405239.

Facebook claims that Plaintiffs should have already reviewed Facebook's entire production, including the 1,500 documents to which it pointed less than a week ago, to identify the relevant interviewees. In fact, Facebook already reviewed all of these documents before they were produced and it still claims to be unable to identify these individuals. As such, because Facebook itself cannot provide Plaintiffs with a list of interviewees and are apparently re-reviewing the same documents as Plaintiffs to identify these employees, it is entirely reasonable for the parties to supplement the custodian list for these specific individuals as they are identified.

In the past two weeks, Plaintiffs have narrowed their list of 66 proposed custodians to these nine, working largely independently of information provided by Facebook. These nine are reasonable requests, as is the request for more time to identify the key providers of information to PwC.

Dated: May 14, 2020

Respectfully submitted,

KELLER ROHRBACK L.L.P.

By:     /s/ Derek W. Loeser
        Derek W. Loeser

Derek W. Loeser (admitted *pro hac vice*)
Lynn Lincoln Sarko (admitted *pro hac vice*)
Gretchen Freeman Cappio (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Adele A. Daniel (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
bgould@kellerrohrback.com

BLEICHMAR FONTI & AULD LLP

By:     /s/ Lesley E. Weaver
        Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com

dko@kellerrohrback.com
adaniel@kellerrohrback.com
bgould@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

GIBSON, DUNN, & CRUTCHER LLP

By: */s/ Joshua S. Lipshutz*

Joshua S. Lipshutz

Orin Snyder (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035
osnyder@gibsondunn.com

Joshua S. Lipshutz (SBN 242557)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539
jlipshutz@gibsondunn.com

Kristin A. Linsley (SBN 154148)
Brian M. Lutz (SBN 255976)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306
klinsley@gibsondunn.com
blutz@gibsondunn.com