Pages 1 - 42

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Magistrate Judge

IN RE FACEBOOK, INC., CONSUMER )
PRIVACY USER PROFILE            )
LITIGATION.                     )
                                )   NO. 18-MD-02843  VC (JSC)
                                )
_____)

                    San Francisco, California
                    Friday, May 15, 2020

        **TRANSCRIPT OF PROCEEDINGS BY ZOOM**

**APPEARANCES BY ZOOM:**

For Plaintiffs:
                    KELLER ROHRBACK LLP
                    1201 Third Avenue - Suite 3200
                    Seattle, Washington  98101
              BY:   **DEREK W. LOESER, ATTORNEY AT LAW**
                    **DAVID J. KO, ATTORNEY AT LAW**
                    **CARI C. LAUFENBERG, ATTORNEY AT LAW**

                    KELLER ROHRBACK LLP
                    300 Lakeside Drive - Suite 1000
                    Oakland, California  94612
              BY:   **BENJAMIN B. GOULD, ATTORNEY AT LAW**
                    **MATTHEW P. MONTGOMERY, ATTORNEY AT LAW**
                    **ANNE K. DAVIS, ATTORNEY AT LAW**

                    KELLER ROHRBACK LLP
                    3101 North Central Avenue  - Suite 1400
                    Phoenix, Arizona  85012
              BY:   **ERIC J. FIERRO, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

```
 1   APPEARANCES:   (CONTINUED)

 2   For Plaintiffs:
                          BLEICHMAR, FONTI & AULD LLP
 3                        555 12th Street - Suite 1600
                          Oakland, California  94607
 4                   BY:  LESLEY E. WEAVER, ATTORNEY AT LAW

 5                        GIRARD SHARP LLP
                          601 California Street - Suite 1400
 6                        San Francisco, California  94108
                     BY:  ANGELICA M. ORNELAS, ATTORNEY AT LAW
 7
     For Defendants:
 8                        GIBSON, DUNN & CRUTCHER LLP
                          200 Park Avenue
 9                        New York, New York  10166
                     BY:  ORIN SNYDER, ATTORNEY AT LAW
10
                          GIBSON, DUNN & CRUTCHER LLP
11                        1881 Page Mill Road
                          Palo Alto, California  94304
12                   BY:  MARTIE P. KUTSCHER, ATTORNEY AT LAW

13                        GIBSON, DUNN & CRUTCHER LLP
                          2100 McKinney Avenue - Suite 1100
14                        Dallas, Texas  75201
                     BY:  RUSSELL H. FALCONER, ATTORNEY AT LAW
15
                          GIBSON, DUNN & CRUTCHER LLP
16                        555 Mission Street - Suite 3000
                          San Francisco, California  94105
17                   BY:  JOSHUA S. LIPSHUTZ, ATTORNEY AT LAW

18

19

20

21

22

23

24

25
```

**Friday - May 15, 2020**                              **9:00 a.m.**

**P R O C E E D I N G S**

**---000---**

    **THE CLERK:**  Calling Civil action 18-md-2843, In Re
Facebook, Inc., Consumer Privacy User Profile Litigation.  The
Honorable Jacqueline Scott Corley presiding.

    Counsel, starting with plaintiffs, please make your
appearance for the record.

    **MR. LOESER:**  Good morning, Your Honor.  Derek Loeser
for the plaintiffs.

    **THE COURT:**  Good morning.

    **MS. WEAVER:**  Good morning, Your Honor.  Leslie Weaver
for the plaintiffs as well.

    **THE COURT:**  Good morning.

    **MR. KO:**  Good morning, Your Honor.  David Ko, Keller
Rohrback, on behalf of the plaintiffs.

    **THE COURT:**  Good morning.

    **MR. GOULD:**  Ben Gould with Keller Rohrback for the
plaintiffs.

    **THE COURT:**  Good morning.

    **MS. LAUFENBERG:**  Good morning, Your Honor.
Cari Laufenberg, Keller Rohrback, on behalf of the plaintiffs.

    **THE COURT:**  Good morning.

    **MR. MONTGOMERY:**  Good morning, Your Honor.  Matt
Montgomery on behalf of plaintiffs.

 1                    **THE COURT:**  Good morning.

 2                    **MS. DAVIS:**  And Anne Davis on behalf of plaintiffs.

 3                    **THE COURT:**  Good morning.

 4                    **MS. ORNELAS:**  And Angelica Ornelas on behalf of

 5      plaintiffs.

 6                    **THE COURT:**  All right.  Good morning.

 7                    **MR. FIERRO:**  And Eric Fierro on behalf of plaintiffs.

 8                    **THE COURT:**  Good morning.

 9           And for Facebook.  Oop, Mr. Snyder, you're on mute.

10                    **MR. SNYDER:**  Sorry.  Good morning and Happy Friday,

11      Your Honor.  It's Orin Snyder joined by Martie Kutscher and

12      Russ Falconer -- I forgot who was on -- for Facebook.

13                    **THE COURT:**  All right.  Good morning.

14                    **MR. SNYDER:**  Nice to see you-all.

15                    **THE COURT:**  Okay.  So thanks very much for your

16      statement, and I was pleased to see that the parties made a lot

17      of progress on the custodians.

18           So let me see just if I understand just in terms of

19      numbers.  Facebook has now agreed to search is it 72 custodians

20      and plaintiffs want 81?

21                    **MR. SNYDER:**  Yes, Your Honor.

22                    **THE COURT:**  Okay.  All right.  We're just going to go

23      with the 81.

24           So let's now talk about the Price Waterhouse thing.  As I

25      understand it, Facebook now says that they produced e-mails

that identify the persons whom PWC asked to interview; is that

right?

         **MR. LOESER:**  Your Honor --

         **MR. SNYDER:**  Ms. Kutscher?

         **MS. KUTSCHER:**  Yes, Your Honor.  What we -- we have

not been able to locate an exact list of who was interviewed,

but we've identified to plaintiffs that the production we made

about six weeks ago has about 1500 e-mails that discuss the

audits, including who was going to be interviewed, who the

control owners were, who were on the privacy XFN team, those

types of details.

         **THE COURT:**  Okay.  All right.  And so, Plaintiffs, now

you're starting to review those e-mails?

         **MR. KO:**  That's correct, Your Honor.  This is David Ko

on behalf of plaintiffs.

    Facebook has directed us to approximately 1600 documents

last Saturday, some of which we have obviously gone through the

process of reviewing before they identified them, but we are

reviewing them and we're reviewing them as fast as we can.  And

it's been a very fruitful process to identify some of the

relevant people that had knowledge about Facebook's privacy

controls, and so we believe that we can look at these documents

in short order and identify who we think are the relevant

people.

         **THE COURT:**  Well, this is what I think I want to do.

1    I think we have these 81 now, and I think we should just get

2    started.  And Facebook had said before, "Look, if something

3    comes up in discovery and you identify somebody with relevant

4    information we didn't search, then we can do that then."  So I

5    want you to review those documents.

6        I also want you to review all the regulatory -- you know,

7    the stuff that's already been produced, which, you know,

8    presumably should be quite -- and then let's talk about more

9    than the 81 but not until then.  Okay?

10       So after you do all that, if you can identify somebody who

11   there's a missing gap, then we do that, but I don't see how we

12   know if there's a gap missing until you review those.  So

13   there's no rush I guess I would say on that.

14       All right.  On the -- so we have our 81 and we'll move

15   forward on that.

16       On the ESI discussions, I'm not going to require any

17   more -- I'm not going to do what the plaintiffs proposed.  If

18   there is something in particular in context that you can show

19   me you need, I'll address it then; but I just think we need to

20   move past that right now.  I'm not satisfied there's anything

21   more in particular that you need.  You just need to get started

22   on this ESI production.

23       So now with respect to the search terms -- and I need to

24   hear from Facebook -- I do not understand this custodial

25   interview.  I've been doing this for nine years now.  This is

1   the first time anyone said that to me.

2       So why don't we first start with plaintiffs and what their

3   proposal is as how we get these search term negotiations going,

4   and then I'll hear from what Facebook's proposal is.

5           **MS. WEAVER:**  Good morning, Your Honor.  Unless -- I'll

6   defer to my -- Derek, do you want to address this or shall I

7   just jump in?

8           **MR. LOESER:**  You know, you should probably start only

9   because there's a printer sitting next to my computer and

10  somebody in my house is printing something.

11          **MS. WEAVER:**  No problem.  I'm happy to do it.

12      Well, so we're cutting to the chase pretty quickly,

13  Your Honor, and, honestly, we hadn't really dug in on the next

14  phase other than to propose, you know, the regular process I

15  know Your Honor is familiar with, which is now that we have

16  custodians and if we can identify what search terms would apply

17  to what custodians.  We've actually begun that process on the

18  plaintiffs' side.

19      We do need a little more information about jargon and how

20  certain sources of documents should be searched.  Specifically

21  we just learned that the Hive, which is the data -- one of the

22  databases that maintains user content and data, can be searched

23  through SQL.  So we think it would be really helpful to have an

24  ESI specialist who knows about SQL searching, and we have one

25  that we can bring to meet and confer.

1          And if Facebook could bring somebody who can explain in

2     detail, and I don't mean, honestly, a lawyer.  I mean somebody

3     who understands how the database works and how they do -- like

4     a data scientist.  I know that Facebook has been talking to

5     them.

6          If we could actually have a meet and confer of the people

7     who really understand this stuff, that would be helpful in

8     terms of how to search that because it's a little bit out of

9     the norm.  It's not -- so there's search terms that will work

10    in e-mail -- right? -- and correspondence, and we understand

11    that and we lawyers can do that.

12         The second question of how to get our arms around getting

13    access to the data maintained in this database -- and we don't

14    want to do it inefficiently either.  We don't want to be dumped

15    with, you know, massive amounts of data that we can't do

16    anything with.  So that's where kind of we're stuck on the ESI

17    piece.

18         But we proposed deadlines.  You know, if Facebook can now

19    they -- now that they have custodians, they can make a proposal

20    to us with search terms, we will respond within a week.  They

21    can run them, give us hit reports.  We can look at them.  That

22    was the schedule that we basically were thinking about for

23    search terms, and I think we said by June 2nd --

24              **THE COURT:**  Yeah.

25              **MS. WEAVER:**  -- by June 9th.

1              **THE COURT:**  Maybe, Ms. Weaver, we should break it down

2      by custodians because it sounds like you are agreeing to some

3      extent they're going to need to know the jargon and things like

4      that.

5              **MS. WEAVER:**  Right.

6              **THE COURT:**  So maybe we should break it into groups --

7      right -- so we'll start with these groups.  Because it sounds

8      like what you're envisioning that the search terms will vary,

9      which makes sense, depending on the custodians -- right? -- and

10     what area.  So maybe you should start with identifying -- well,

11     let's start with -- then I would -- you know, you start however

12     you want.  I think you'd want to start with the most important.

13         Let's start with these people that are relevant to these

14     claims -- this claim because the search terms will then match,

15     and then Facebook can do what -- as opposed to doing all of

16     them or waiting to do all of them at once.  It doesn't seem to

17     make any sense.

18             **MS. WEAVER:**  We could do that.  I would say rather

19     than claim, it's probably going to be department.  Like

20     engineers talk to each other a certain way, and then people in

21     marketing and communications may use other language.  I'm

22     guessing.  But maybe Facebook is going to come back and say

23     they all speak the same language and they all do the same

24     thing.  We don't know.  We're open to suggestion.

25             **THE COURT:**  All right.  Let's hear what Facebook

1    proposes.

2         **MR. SNYDER:**  Yeah.  Your Honor, thank you.  I'm going

3    to let Mr. Falconer address the details; but at a high level,

4    what we're proposing is a process that enables us to

5    efficiently and then effectively run the right search terms on

6    the right documents in the right way.

7         And the reason we have raised this custodial point is it's

8    not just a case where we're going to apply search terms to

9    e-mails.  It's a much more complex process; and if we don't

10   front load it with what is our now diligence process that we

11   need to do, which will be -- have some -- which will be

12   privileged, it's going to make the meet and confers ineffective

13   and the plaintiffs aren't going to get what they want.

14        So Mr. Falconer can go through in specifics why what we're

15   proposing is not designed to delay but, rather, expedite and

16   facilitate getting the plaintiffs the documents they want in

17   the most timely fashion.

18        **THE COURT:**  I want to know why we can't do it like --

19   I don't see why we have to wait; right?  Why we can't do it as

20   an iterative process.  That's what sort of struck me is you

21   say, "Well, 30 to 60 days and then we can start," but I didn't

22   like that so --

23        **MR. SNYDER:**  Okay.

24        **THE COURT:**  Go ahead, Mr. Falconer.

25        **MR. FALCONER:**  Thank you, Your Honor.

1          I think we're certainly happy to think about how we could

2     implement an iterative process like Your Honor has described.

3     You know, what we need to do now, we've got at this point 81

4     custodians who we're going to be working with, we need to talk

5     to those folks about some of the stuff that Ms. Weaver has

6     described, what kind of jargon or specialized terminology or

7     shorthand to you and people on your team and people in your

8     department use.  We're going to use that information to help

9     design, you know, effective search terms that are not overbroad

10    and not underinclusive.

11         We also need to talk to those folks about where we need to

12    be running those search terms.  You know, we have a general

13    sense of -- we've done preservation interviews of what -- just

14    what are the data sources you use in your work so we can

15    preserve them all.  We need to go back in now, talk to those

16    folks about, "Okay.  Here's what we're looking for.  You know,

17    where shall we be collecting from?  What types of data and what

18    sources of data shall we be running these research terms

19    against?"

20         So the number of custodians here, you know, with 81

21    custodians, if we were able to do five of those custodial

22    interviews a day, which is a pretty ambitious schedule given

23    for a variety of reasons, I mean, that's still a multiweek,

24    more than a month process.

25         So I think Your Honor's suggestion makes sense that we can

1    try to work with plaintiffs to prioritize subgroups of those

2    custodians and put together a group.  You know, once we've

3    talked to a handful of people, we can start running search

4    terms against some of their data if we think that would be, you

5    know, a more effective way to do it.

6         But, you know, because there's some different kinds of ESI

7    in this case and in a typical case it would just be e-mails,

8    PowerPoints, and Word documents, you know, as Mr. Snyder said,

9    we just need to be more thoughtful on the front end so nobody

10   wants too little and nobody wants too much.  You know,

11   there's --

12        **MR. SNYDER:**  And maybe you can address the so-called

13   Hive -- H-I-V-E -- tables as illustrative of the challenges

14   that we face in getting the plaintiffs what they need.

15        **MR. FALCONER:**  Sure.  I don't know if Ms. Kutscher

16   wanted to address that or I'm happy to.  Either one.

17        **MS. KUTSCHER:**  Sure.  You know, one of the things

18   we've been talking about a lot with plaintiffs is data that

19   exists in a database called Hive, and one of the things we've

20   been talking about is the database itself is not index

21   searchable.  It includes many millions of tables that they're

22   interested in.

23        So one of the things we really want to be able to do is

24   talk to the custodians to identify which tables would be the

25   relevant tables that we can start looking at, otherwise we're

1   dealing with an unindexed set of many millions of tables that

2   would be many, many petrabytes of data.  So we really need to

3   talk to these folks to know which ones to start with.

4        THE COURT:  Okay.  But, Ms. Weaver, do you have a

5   proposal?  Like, you'll tell them by X date "This is the

6   department people we want to start with so we can develop some

7   sort of schedule"?

8        MS. WEAVER:  Yes, we can do that.  This is a new idea

9   to us so I think we need to think about it.

10       I have two clarifying questions.  One is, we had talked

11   earlier about CEO Zuckerberg and Sheryl Sandberg as custodians

12   too.  We do think that they are integral to this.  You tell us

13   when you think they should fall; but obviously even in the

14   e-mail that we gave you, Your Honor, attached to our statement,

15   Mr. Zuckerberg is e-mailing directly with one of these

16   custodians.  We can wait or defer.  So that's a question for

17   you.

18       THE COURT:  I think we can wait.  I mean --

19       MS. WEAVER:  Okay.  That's fine.

20       THE COURT:  -- we can get him, but it's not -- I think

21   that we don't -- you don't want everything at once.

22       MS. WEAVER:  That's fine.  So, yes, let us think about

23   how to do that.

24       And I guess I would add again that it would be really

25   helpful if when Facebook gets this information about the Hive,

1    if we can have our expert talk to their people about -- because

2    otherwise it's going to get very complicated.

3         I'm not sure -- other than getting direct access to

4    experts with source code, I don't think we've ever dealt with

5    this before.  I mean, this is of a magnitude and scope that is

6    highly unusual, and we really need to get information and be

7    strategic about it.  I mean, Facebook is going to say that too.

8         Martie, I keep forgetting, but what's the volume of data

9    in the Hives?

10             **MR. SNYDER:**  42 million.  There are 42 million tables.

11             **MS. WEAVER:**  So we need -- we don't want all

12   42 million tables either.  We want the right ones.

13             **THE COURT:**  What about that?  I mean, that seems to

14   me -- I know you didn't want to bring your data scientist to

15   every single meeting, but you referred to the data scientist,

16   or somebody you've been speaking to, in your statement.  Why

17   not just have that person talk to their expert so that when you

18   have conversations, the plaintiffs then are just more informed

19   and that will be a more meaningful conversation?

20             **MS. KUTSCHER:**  One of the things we've been trying to

21   convey to the plaintiffs, perhaps not effectively so I'll try

22   again, is that there's no single person at Facebook and no data

23   scientist who knows all of the tables in the Hive.  The Hive is

24   a place where individual teams conduct work, they run their own

25   analytics in the Hive, and it's not really organized in a way

1    that anyone at the company would be able to identify where the

2    materials they're looking for are.

3        So what we're actually doing and what we hope to continue

4    to do in custodial interviews is speak with each of the data

5    scientists on the particular teams at issue who would know

6    where the right tables are so there isn't one person we can

7    bring to the discussion; and when we're working with our

8    client, we can't even identify one person to talk to.  We're

9    talking to many people across the company.

10       **THE COURT:**  Okay.  But if we're starting with

11   particular custodians in a particular department, then there

12   will be a particular data scientist.  He might not know

13   everything; right?  But -- I don't understand the resistance.

14   I don't understand it.

15       **MR. SNYDER:**  Your Honor, let me try this.  There's no

16   resistance, and I'm sorry that Your Honor has that impression.

17   It's the opposite.

18       We want to do the work necessary, and my team literally,

19   Your Honor, is working around the clock to get everything done

20   that needs to get done, literally around the clock; and the

21   notion that we're delaying or resisting is just, respectfully,

22   not correct.

23       What we want to do is do the investigation necessary so

24   that we can then help them sort out where on the 42 million,

25   whatever the noun is, let's call them 42 million, you know --

what is it?  Levels?  Rows?  I don't know what it is.

        **MS. WEAVER:**  Tables.

        **MR. SNYDER:**  -- tables, that we're going to do the
hard work for them.  It would be herky-jerky and, frankly,
completely ineffective if we had to bring 15 different people
onto meet and confers.  And, frankly, we're going to want to
have some privilege conversations with them as well, and so --

        **THE COURT:**  But that's not what I'm -- that's not what
I'm saying at all, and please don't exaggerate what I said.

What I said is there's -- what I said is the plaintiffs
have candidly expressed a lack of knowledge as to how the Hive
works and a desire to work with you and to not make unnecessary
work.

What they're saying is "We have an expert.  We hired an
expert.  Our expert doesn't work at Facebook obviously, and we
would like our -- to -- our expert to have as good as
understanding as she can have so when we're working with a
particular department and after you've done all your work and
all that, that's fine, do all that what you need to do, then if
your data scientist who you worked with, just one of them, best
most knowledgeable, can talk to our data scientist.  It can
even be offline.  You guys don't even have to be there.  So our
data scientist can explain to us in plain English, not waste
your time, just how it works so that we feel comfortable."
That's all.

1          **MR. SNYDER:**  My resistance --

2          **THE COURT:**  You don't have to bring them to every meet

3    and confer or anything like that.

4          **MR. SNYDER:**  My resistance is that it's not going to

5    be effective and what will be effective, Your Honor, is if we

6    come to the meet and confers, as we've done every time we

7    promised that we would, we will come with a silver platter and

8    explain it to their data scientists, explain it to the lawyers

9    in an effective, clear, transparent way.  But if we have to do

10   it in a piecemeal where there are 15 or 20 different people

11   from the company showing up to ask -- answer questions, it's

12   not going to be efficient or effective.

13        May I suggest this.  We will do the work.  We will present

14   it to the plaintiffs and whatever experts they have; and if

15   they still have questions, then what we're going to do is go

16   back to the ranch and talk to as many people as we need to to

17   answer those questions.

18        And that's what we've been doing, Your Honor, and I think

19   our track record proves that every time the plaintiffs have

20   questions, we have answered them.  We go back and we answer

21   them.

22        What I'm trying to explain is that there is no unitary or

23   easy process to just produce someone at a meet and confer who

24   can answer all the questions.  That's the function that Russ is

25   playing working, you know, around the clock to try to go to

1   every portal in the company to aggregate the information and

2   then present it to the plaintiffs.

3        And it doesn't work as Your Honor suggested,

4   unfortunately.  If it did, it would be easy.  We would just get

5   an ESI person on the phone, they'd explain everything, and we'd

6   be done; but that's not the way it works unfortunately.

7             **THE COURT:**  And that's not what I'm saying at all.

8   Nearly every case I have the technical people get on the phone

9   with each other at some point.  I'm not even talking -- we can

10  do it with no lawyers.  Maybe you don't want to do that.

11  That's fine.  I'm not even talking about --

12            **MS. WEAVER:**  That would be better.

13            **THE COURT:**  It probably would be better.

14       And, look, I'm not saying do it all the time.  We'll try

15  it once.  Let's see.  That's all.  I'm just saying let's see,

16  let's see, so that every conference that I have I don't keep

17  hearing the same thing.  Let's just see.  Okay?  We're going to

18  give it a shot.  Whatever, but I'm not persuaded.  Okay.

19            **MS. KUTSCHER:**  If I could make a suggestion.  If we're

20  going to have a conversation like that, it would be really

21  helpful to receive the questions in advance that the plaintiffs

22  are interested in so that we could make sure we can identify an

23  appropriate person --

24            **THE COURT:**  Yes.

25            **MS. KUTSCHER:**  -- because one of the problems we've

 1  been having is the conversations sort of spiral into other

 2  areas, and then we would need different people to answer.

 3          **THE COURT:**  We're not even there yet because, first,

 4  the plaintiffs need to identify the custodians, the department

 5  they want you to start with.  Then you need to go back to that

 6  department and do whatever, you know, your investigation,

 7  figure out the jargon, talk to whoever they need to do; right?

 8          This is sort of then whenever you sort of produce or talk

 9  about or do your search terms -- I mean, what do you actually

10  propose in terms of -- you do that and then what?

11          **MS. WEAVER:**  So, Your Honor, one of our experts who's

12  been texting me and says that, in fact, tables have fields and

13  what we need to know are the fields and what data is in the

14  fields, and she's saying that she can tell us what to ask for.

15  And she actually said this isn't the first time that Hive data

16  has been implicated in a class action.

17          So I think maybe we can get some specific questions.  The

18  one caveat I would say -- and I think Your Honor is

19  experiencing kind of why we asked for it in writing, because we

20  actually thought that might be easier because there seems to

21  have been resistance from Facebook because they say we have to

22  talk to all these people, and I know that we're all trying, but

23  we don't feel like we're getting the answers we need.

24          So why don't we do a list of questions but we'd like to be

25  able to say as we're discussing something and Facebook says "We

don't know," we need to be able to follow up and get those

answers.  And, you know, normally we would do that in writing

and send a follow-up letter and then they could write back, but

that's the one part that's been hard for us, is the circling

back and kind of following up on the details.

So we could maybe have two -- one meeting -- we'll send

them a list of questions -- we'll identify custodians.  We send

the list of questions.  Maybe that can even happen at the same

time.  We have a meeting with the ESI liaisons and we chat.  We

have a follow-up meeting to see where we are and then we could

report to you.  Something like that.

THE COURT:  I think it's probably helpful for Facebook

to know what your --

MS. WEAVER:  Yeah.

THE COURT:  -- ESI consultant believes and will be

telling you and what advice you'll be getting from them.  Not

advice.  Obviously that's privileged, but you know what I'm

saying.

MS. WEAVER:  Yes.

THE COURT:  So send the list so Facebook will have

that in mind when they're then doing whatever it is they're

doing, their custodial investigation with their data scientist.

And then -- I guess my question was to Facebook, then what

do you propose?  So you know what the plaintiffs' questions

are.  You'll have that in mind when you go talk to your data

1    scientists, and then what?

2          **MR. SNYDER:**  Your Honor, Mr. Falconer will answer

3    that, but I just want to make clear one thing first, which is

4    that each table on the so-called Hive has to be searched

5    individually.  We can't search across all tables like you can a

6    server with e-mails.

7          And so identifying -- the plaintiffs need to identify the

8    right tables.  That's the key thing that we need in order to

9    then search the tables because there are 42 million of them,

10    and you can't just search across the whole platform

11    unfortunately.

12          **MS. WEAVER:**  I'm hearing that --

13          **THE COURT:**  How are the plaintiffs going to identify

14    the tables?

15          **MS. WEAVER:**  We apparently could get a list that we

16    can load into Relativity.  If Facebook identifies the tables,

17    we can take a look at them.

18          And if the data scientists talk directly, we'll lose -- we

19    don't have to have all this back and forth.  They can just say

20    in whatever language that is.  We know that it's searchable in

21    a language called SQL -- it's S-Q-L -- but if they just give us

22    a list of the tables in a format that we can load into

23    Relativity, then we're good to go, and that actually would save

24    the back and forth.

25          **MS. KUTSCHER:**  If I may, Your Honor.  What plaintiffs

are asking for is a list of 42 million tables, which would
encompass every table that shows any analytic that Facebook has
ever run as a company, which would obviously not be an
appropriate thing to produce in this case.  It would show every
single thing the company has ever looked at data-wise, and
obviously that would then start a negotiation about 42 million
different tables and which ones are relevant here, which I'm
not -- I don't believe would be the most efficient way to move
forward.

So what we have proposed is that we talk to our custodians
and ask the custodians to identify the tables that they use,
and that we could then use that as the universe of tables that
we start looking at.

**MR. LOESER:**  Your Honor, if I may just very briefly.
The Hive from what we can tell is an inordinately complex and
important database for Facebook.  I would be very surprised if
there were not people at Facebook who were experts specifically
on the Hive.  That's the kind of person -- that's probably not
one of the custodians.  Maybe that person should be.  But that
person is the one who can answer questions.

I'm sure all the time people at Facebook are asking about
how to extract data for one purpose or another from the Hive,
and there's probably a person at Facebook who helps direct that
effort.  That would seem to be a very important person to talk
to and for our experts to talk to.  Because, yes, we are not

interested in 42 million tables or the universe of information

in the Hive.  We are looking for specific information that

relates to our case.

     To go back to where this started, one of the things

Facebook has said to Judge Chhabria all along is they lack an

ability to identify who saw user data information, who they

shared it with.  And so one of the things we want to figure out

from the Hive is:  Is that a table that can be run?  Is that

information that can be gathered?

     And it's specific things like that that we're looking for.

So there must be some way that we can describe the kinds of

things that we want and for an expert at Facebook who works and

lives in the Hive to help direct where that information would

be.  It should not have to be in a very complex and functional

database like this.  It should not be a needle in a haystack.

It should be a search function that is possible.

     **MR. SNYDER:**  Your Honor, may I respond?  And I

apologize for belaboring this.

     The reason the custodian interviews are critical is that

we are going to ask these 81 individuals:  Where -- when you

were dealing with A, B, C, D, E, F, and G issues, where did you

store discoverable information?  Then we will be able to know

where in the 42 million Hive sources the information is.

     There's no expert who knows that.  The people who know it

are the 81 Facebook employees who, yes, they send e-mails and

1  those will be produced because those are searchable.  But what

2  else do they do?  Where else do they store their data, their

3  work, their knowledge?  And it's only by talking to those 81

4  people, which we're prepared to do with alacrity, will we know

5  where they put the information, on which shelf at the

6  company -- at the 42 million shelves we need to look at.

7          And, Russ, maybe you can elaborate more technically about

8  it.

9          But this really is truly, Your Honor, our effort to get

10 them what they want and not have it a needle in a haystack.

11         Russ, you've been spending time on this.  Maybe you can

12 elaborate even further.

13         **MR. FALCONER:**  Sure.

14         And that's, I think, to Mr. Loeser's hypothetical, is

15 there a Hive table that has a particular kind of data in it,

16 there's no -- no one person at the company who knows what's in

17 all 42 million of those tables.

18         So as Mr. Snyder said, the trick is finding the right

19 tables.  Once we find the tables, as Ms. Weaver has been

20 saying, their expert and any entry-level engineer knows how to

21 run a SQL query and look at the information in the table.  So

22 working with the data once they have it is not a challenge.

23 The challenge is getting them the right data.  The best way to

24 do that, really the only way to do that, is for us to talk to

25 our custodians and say "Do you have Hive tables on X, Y, Z

1   topics?"

2       So I do think it would be helpful to that effort, as

3   Your Honor has suggested, if we had a list from the plaintiffs

4   of "Here is what we're looking for in the Hive tables."  That

5   would let us focus our search, you know, guide our custodian

6   interviews, and make sure that we're getting them what they're

7   interested in; and if it's not out there, we can tell them that

8   too.

9           **MR. LOESER:**  Your Honor, the one thing --

10          **MS. WEAVER:**  And, actually --

11          **MR. LOESER:**  -- and I think that is some helpful

12  information, I just find it very hard to believe that there are

13  not people at Facebook who are experts in the Hive.  So going

14  and talking to these subject matter custodians is one thing,

15  but going and finding the people who actually manage this beast

16  that is the Hive seems like another very important thing that

17  needs to happen here.

18          **THE COURT:**  Why don't we just do it in context?  Like,

19  let's do it.  Why don't you pick 10 custodians to start with,

20  10.  Let them go interview, whatever, tell you what you want,

21  have your expert look at it, and then your expert and their

22  data scientist can then talk about it in terms of what they've

23  given you.  So it's not sort of just general out there.  Now

24  you have specifics and then your expert can have a specific

25  conversation with their data scientist, nonlawyer person about

1    it and we'll use that as an example; or if we need to go more

2    quickly, we can even make it smaller, or something like that.

3              **MR. SNYDER:**  I think that's a great idea, Judge.

4              **MS. WEAVER:**  We can do that.  If I could be heard.

5         I think -- I want to go back to the tables in the Hive

6    because the point is, in general, this is a case where the ESI

7    discovery is both merits and functional.  Like normally when

8    we're doing this, it's functional and how do we get documents,

9    but it's also a merits issue here.  And, you know, the very

10   fact that it's 42 million tables of data, that's just the scope

11   of the case.  That's how much data is collected about users and

12   made available.

13        So we need two things.  We actually need discovery of what

14   is in those tables, and getting us the list of the tables,

15   that's the case because we don't -- I think those tables are

16   relevant because what's happening is the data lives in the Hive

17   and then queries are constructed by data scientists and then

18   that's made available.

19        Well, Martie is shaking her head no, but this is why I'm

20   saying what we need is to have the people -- the experts talk

21   to each other before we can -- before we can guess in the dark

22   about what exactly we want.

23        And let me -- two things on these custodial conversations.

24   It is baffling to us because they should have happened earlier.

25   A lot of these 81 are former custodians or former employees.

 1    So I don't know if they're imagining talking to them.

 2        But if Facebook really went through a proper preservation

 3    process, why don't they know this?  Shouldn't they have had

 4    this conversation a while ago?  And we kind of have gotten

 5    conflicting information about whether they've already had these

 6    conversations or not, but it's a little unclear to us what's

 7    happening in that process and why it would cause a further

 8    delay.

 9            **THE COURT:**  Okay.  So this is what I want you to

10    identify.  How many do you want to do to start with?  We're

11    going to do it in context.  I just --

12            **MS. WEAVER:**  We could do --

13            **MR. SNYDER:**  I think we should start with five,

14    Your Honor, because we don't know how long it's going to take;

15    and if it's 10, it could be -- I think five is --

16            **THE COURT:**  Well, somebody said five interviews a day

17    so --

18            **MS. WEAVER:**  So we could identify 40.  I don't know.

19            **THE COURT:**  No.  That's too many.

20            **MS. WEAVER:**  That's half.  That's too many?  Okay.

21    20.  20.  I don't care.

22            **THE COURT:**  10.  We'll do 10.

23            **MS. WEAVER:**  Okay.

24            **THE COURT:**  We'll do 10.  Yeah, we're going to do 10.

25        So -- I mean, or department.  Around 10; right?  If it's

```
 1    11 or if it's 9 or whatever, don't make it artificial.

 2         MS. WEAVER:  I'm wondering if actually it would be

 3    better to pick one from each department.

 4         THE COURT:  No.  That's not what I want to do.

 5         MS. WEAVER:  Okay.

 6         THE COURT:  No.

 7         MS. WEAVER:  Okay.

 8         THE COURT:  No.  No.

 9         MS. WEAVER:  All right.

10         THE COURT:  You guys could do it if you could, agree

11    but you can't agree so you're leaving it up to me.

12         MS. WEAVER:  Okay.

13         THE COURT:  I prefer that you-all agree, I really

14    would -- because I don't really know what I'm doing, I'm doing

15    the best I can -- but apparently you can't so this is how we're

16    going to have to do it.

17       So pick 10.  Pick 10 and -- or around 10 -- right? -- a

18    department, whatever it is; and you go, Facebook, do your

19    custodial searches.  Today is Friday and by -- by what?  By --

20    what are you going to give them in response to that?

21         MR. SNYDER:  I'm sorry.  You're asking me, Your Honor?

22         THE COURT:  No.  Mr. Falconer.  What are you going to

23    give them?  They've now done 10.  You're going to do your

24    custodial interviews, and then you're going to do what?

25         MR. FALCONER:  I think my understanding and if what
```

1   Your Honor is ordering is that the plaintiffs will provide us

2   with a list of I don't know if it's just Hive tables or if it's

3   all the data they're interested in or if we should use the RFPs

4   to guide that process, but that we --

5          **THE COURT:**  It's people.  It's people.  Your statement

6   said, "We have to go do these custodial interviews."  That's

7   what you told me.

8          **MR. FALCONER:**  Yes, Your Honor.

9          **THE COURT:**  I'm saying go do them, and then you're

10  going to do what?

11         **MR. SNYDER:**  Your Honor, then we're going to talk --

12  we're going to find out how much Hive -- where in the Hive they

13  have put data that is responsive to either the RFPs or

14  responsive to the areas they're inquiring about, and then we

15  will know -- then we will figure out how to search those areas.

16      So it will be -- it will basically be segregating where in

17  the Hive data is likely to be, and that then will inform our

18  ability to see, well, how much is there there -- right? -- so

19  that when we start running target search terms on those

20  specific Hive folders, we know what the volume of data is.

21      So it's all designed to ultimately, you know, make

22  efficient and effective our retrieval and production of

23  documents.  So if they give us 10 names, we're going to

24  interview those people, figure out where on the Hive they store

25  information, then assess how much is there.  And then once we

1   get to the search terms, we can figure out, you know, how much

2   stuff is there and whether the search terms are over- or

3   underinclusive.  It's not --

4          THE COURT:  Right.  What are you going to do?  What

5   are you going to tell the plaintiffs?  You do that and you're

6   going to tell the plaintiffs then what?

7          MR. SNYDER:  I think that we've identified where on

8   the Hive the data lives that is responsive; and then I think

9   when we start talking about search terms, we can start applying

10   those search terms to those sources.

11          THE COURT:  How are you going to come up with the

12   search terms?

13          MR. SNYDER:  Well, that's going to be the negotiation

14   that has to occur.

15          THE COURT:  Okay.  So you're going to tell the

16   plaintiffs where on the Hive what you believe the relevant data

17   is and why.  And are you then going to propose the first -- and

18   the volume.

19      And I think in the context, Ms. Weaver, when you give them

20   the 10 or whatever, approximately, the department names, if

21   your expert has particular things they should be looking for,

22   you should give them that as well.

23          MS. WEAVER:  Okay.  And, by the way, she thinks your

24   idea is actually a really good one so it might really help us

25   get at this.

1      So what I wanted to clarify is search terms, as we lawyers

2  understand them, will be run on regular ESI that we normally

3  work with -- chat rooms, e-mail -- and we will put that in the

4  list what we want for each person, and then separately the

5  request is what tables or data in the Hive relates to this

6  custodian.

7      And those are basically the questions, but we'll put them

8  in writing for all of them; and if there are any unique ones

9  for custodians, we'll put them in writing, and I think we can

10  probably do it by Monday or Tuesday.

11      **THE COURT:**  So you're saying you'll provide them the

12  name of the custodians, the search --

13      **MS. WEAVER:**  Yes.

14      **THE COURT:**  -- you propose for traditional ESI we'll

15  call it?

16      **MS. WEAVER:**  We don't yet have full-blown search terms

17  for each person yet.

18      **THE COURT:**  Okay.  All right.  I misunderstood.

19      **MS. WEAVER:**  I think it would be easier to let them

20  start because, you know, the example I always use is Chewbacca

21  in Enron, that is the name of a specific entity, and we would

22  never have thought to use "Chewbacca" as a search term because

23  we didn't know.

24      So I think what we could do is say "These are what we

25  think should be searched for these custodians."  They could

1    propose search terms back to us, we could look at them, make

2    tweaks, and then they would run the searches and give us hit

3    reports.  That usually -- that we propose -- we did propose an

4    agenda or a schedule, and what we proposed was -- you can tweak

5    it, of course, but it should take about a month I think to go

6    back and forth on search terms.  Maybe less.

7              MR. LOESER:  Your Honor, if I could just --

8              THE COURT:  We narrowed it, but we're doing a subset

9    so --

10             MS. WEAVER:  That's true.

11             MR. LOESER:  Your Honor, if I may, if I could just

12   flag -- this is Derek Loeser speaking -- one issue on search

13   terms that I just want to make sure we don't lose sight of; and

14   that is that among the parties various disagreements, one of

15   them is "What is the proper subject of this litigation?"  And

16   so Facebook has taken the position that certain categories of

17   information that we're seeking should not be produced; and,

18   therefore, I suspect that when search term discussions occur,

19   they're going to want to eliminate the search terms that relate

20   to those subjects.

21        And I just -- I'm not sure where in this process we sort

22   that out, but that is certainly something that's going to have

23   to get sorted out in this search term discussion.

24             THE COURT:  I assume --

25             MR. SNYDER:  I think that's an excellent point that

 1   Derek raises.

 2        And why don't we talk about it, Derek, when we think and

 3   how we think it's best to tee that up for the Court.

 4        But there's definitely a respectful disagreement.  And,

 5   Your Honor, you may think that we don't agree on everything,

 6   but we do get along and mostly like one another.  You know,

 7   with this many grids, everyone can't like everyone.

 8        **THE COURT:**  You definitely like one another.

 9        **MR. SNYDER:**  No, Judge.  Most of them hate me, but

10   it's okay.  That's my job.  My job is to be the bad cop.

11        But, in all seriousness --

12        **THE COURT:**  No, it's nobody's job.

13        **MR. SNYDER:**  I'm teasing.

14        **THE COURT:**  It's nobody's job.

15        **MR. SNYDER:**  I'm teasing.

16        **THE COURT:**  Yeah.  And what's everyone's job is to put

17   everything in perspective.

18        **MR. SNYDER:**  Yes, Your Honor.

19        **THE COURT:**  You know, we'll move this along, but we

20   learned today that one-third of our criminal pretrial

21   detainees, one-third are in quarantine at the jail.  All your

22   judges are dealing every day spending hours dealing with this

23   kind of stuff, and that stuff takes priority.

24        **MR. SNYDER:**  For sure.

25        **THE COURT:**  I just want you to all keep that in mind.

1    Okay?

2              **MR. SNYDER:**  And I know --

3              **THE COURT:**  It's important, but there is, like --

4    people are, like, trying to figure out if their business is

5    going to last, if they're going to have food on their table

6    next week, or those kinds of things.  So let's just keep --

7              **MR. SNYDER:**  And I can assure Your Honor that both the

8    plaintiffs' counsel and we, in addition to representing our

9    clients here, have been trying to do our best, you know, in the

10   public sector and in the *pro bono* to help those folks.  So we

11   keep this in perspective, and we appreciate how much time

12   Your Honor is spending on this.

13      And I'm -- just to wrap the point that Derek made, there

14   is going to be a disagreement about what's relevant and not

15   based on Judge Chhabria's ruling.  So perhaps we can discuss

16   how to present that to Your Honor in an efficient way at some

17   point.

18             **THE COURT:**  Yeah.  And maybe we'll even present it to

19   Judge Chhabria; right?

20             **MR. SNYDER:**  Right.

21             **THE COURT:**  Because he's the one that ruled on the

22   motion to dismiss.

23             **MR. SNYDER:**  Yes.

24             **THE COURT:**  So that's something we can figure out as

25   well or, you know, we'll figure that out.

1      **MR. SNYDER:**  Good.   Thank you.

2      **THE COURT:**  But first we have to, like, move it along

3  and get it.

4     So you said you can provide your 10 names.

5      **MS. WEAVER:**  Yes.

6      **THE COURT:**  It's around; right?

7      **MR. LOESER:**  Yes.

8      **THE COURT:**  It's a department.  It shouldn't be 15.

9      **MS. WEAVER:**  It will not.

10      **THE COURT:**  Okay.  And you're going to go do your

11  custodial investigations and then you're going to come back.

12  And with that you're going to identify I guess two things that

13  your expert tells you, or whatever it is, identify what

14  particular the information you want to know about that.  And

15  then you'll do your meet and confer to hopefully begin your

16  negotiations on the search terms.

17     And then when we meet on the 29th, then I want an update,

18  and I hope you've moved quite far and that we can use this as a

19  template and adjust for the other 70 or so; right?  So this is

20  sort of our -- we'll try it out with this one, and then we'll

21  adjust as we see.

22      **MR. KO:**  Your Honor, one important and specific point

23  about the Hive that I just want to raise and preview for

24  Your Honor and folks.  So one thing that they've been

25  explaining to us about the Hive is that, you know, it's not

1   indexed, it's not searchable.  It's, you know, petrabytes of

2   data, 42 million tables, and that a table only exists to the

3   extent someone requests a table to be made.

4        And so I think during these 10 or so custodial interviews

5   that take place in the near term, I think it's very important

6   for all the parties to understand the process by which these

7   requests are made.  And so I think I'm just flagging that as

8   something that's very important for us to understand, and I

9   think that will streamline the ability for all the parties to

10  identify what the tables are.

11        **THE COURT:**  All right.  You got that, Mr. Falconer?

12  You seem to be the Hive expert on that team.

13        **MR. FALCONER:**  I'm not sure if I'm up to that weighty

14  mantle but, yes, Your Honor, I understand Mr. Ko's question.

15        **MS. KUTSCHER:**  Yeah.  And just to contextualize, and I

16  think the point Mr. Ko just raised really helps to explain some

17  of the disconnect here, you know, the Hive isn't just a place

18  where Facebook dumps data or stores data.  It's really an

19  internal tool that the company uses to run any analytics they

20  need, and tables exist to the extent that someone at Facebook

21  creates a table to look at something.  So, for instance, if the

22  company wants to know how many people are logging onto Facebook

23  every day, someone will just create a table in the Hive to pull

24  that data to find out.

25        So, you know, tables exist for a whole lot of reasons.

1  People make them every day just to look at particular data

2  points, and the real challenge is just figuring out what are

3  the right ones, which ones should we be looking at.

4       **MR. LOESER:**  And more broadly -- this is Derek

5  speaking -- you know, what data is in the Hive.  That is

6  important because of this sort of threshold question of

7  Facebook's statement in this case that it doesn't track who

8  sees user data.  And so if there's a way to figure that out

9  from the Hive, that's really important for this case.

10      **MS. WEAVER:**  So, Your Honor, just for clarity, you can

11  give us a date by which we will make our ask.  And then is

12  there a date for them to respond and/or -- I don't know how

13  you're feeling about having a data scientist available after

14  that so that people who know can talk to each other after we do

15  that initial.

16      **THE COURT:**  If your data scientist, if she wants to

17  talk after -- after -- I mean, they have to provide you --

18  right? -- they have to give you the response --

19      **MS. WEAVER:**  Right.

20      **THE COURT:**  -- and provide you "This is what we know

21  and dah, dah, dah," and she should be in on those calls.  And

22  if after having that she still has questions that haven't been

23  answered that she'd rather speak to somebody who speaks her

24  language, then I think they should just do a call.

25      **MS. WEAVER:**  Okay.

1          **THE COURT:**  The data scientists.  That happens all the

2    time.

3          **MS. WEAVER:**  Yes.  Great.

4          **THE COURT:**  I think it would be best if the lawyers

5    weren't on it but, of course, I'm not going to order that.  And

6    I understand why lawyers don't want to do that, and that's fine

7    but, you know, that might be more productive.

8          **MR. LOESER:**  Your Honor, it's Derek Loeser again.

9          Can I address one specific thing about the PWC issue?

10   And, again, this may be just a comment that needs to be made

11   for what comes down the road.

12         But, you know, we really do need to make sure that when

13   Facebook says if there are other custodians that are unearthed

14   through this process, that they in fact can be added and we're

15   not going to create some insurmountable, you know, standard

16   that Facebook designs for itself that would prevent the

17   addition of additional custodians.

18         **THE COURT:**  Well, fortunately for you I'm the judge,

19   not Facebook so --

20         **MR. LOESER:**  I'm very -- that is very fortunate for

21   us, Your Honor.

22         **THE COURT:**  Or unfortunately.  I don't know.

23         **MR. LOESER:**  You can say that and make us all --

24         **THE COURT:**  One way or the other, but Mr. Snyder said

25   that in our very first status conference.  He's nodding

1    vigorously.

2         **MR. SNYDER:**  We said we will in good faith consider

3    any additional custodians, and we understand that the judge

4    will rule and we will take responsible and appropriate

5    positions, and I'm sure we'll agree to add some and I'm sure

6    we'll say we don't want to add some.

7         **MR. LOESER:**  Right.  And the reason why I bring that

8    up again with PWC is that from the information that we have

9    gleaned from the documents that we reviewed, you know, when PWC

10   went out and did these audits, it went to look for the people,

11   and I'm sure Facebook provided them with the people that would

12   be most knowledgeable about the subject matter.  And from what

13   we can tell, like, for 2013 by itself, 72 percent of the people

14   that PWC talked to are not custodians in this case.

15        We're just worried that through that process when PWC did

16   its assessment and concluded, for example, 2019 that Facebook's

17   controls were deficient, we just want to make sure that the

18   custodians include the people on which that determination was

19   made.  And that's the kind of thing that I think we'll be

20   looping back to because we already can tell that a lot of those

21   people are not custodians, and we just want to make sure that

22   we have the opportunity to include them for that particular

23   purpose.

24        **THE COURT:**  You have the opportunity certainly to make

25   the argument they should be included.

1          MR. LOESER:  Okay.  Thank you, Your Honor.

2          THE COURT:  But when I'd like it to be done is when

3     you've reviewed everything --

4          MR. LOESER:  Correct.

5          THE COURT:  -- that you have so that we really know

6     that we're filling gaps that need to be filled.

7          MR. LOESER:  Understood.  Thank you.

8          THE COURT:  Okay.

9          MS. WEAVER:  I actually suspect -- this sampling idea

10    is very interesting because I suspect as we go through, we're

11    going to learn more about what we want and don't want anyway,

12    and so it may be a growing process.  Even as we walk through

13    it, we find people or maybe we are, like, not sure about these

14    other people.  So I think it could be very constructive.

15         THE COURT:  Well, I'm hoping it actually will be a

16    shrinking process, not a growing one.

17         MR. LOESER:  I'm just hoping Mr. Snyder stays in the

18    great mood that he's in right now.

19         THE COURT:  He's always in that mood.

20         MR. SNYDER:  I am.

21         And, Judge, I know we all thank you for your service in

22    helping those in dire circumstances, and it is a tragedy what's

23    happening in our jails and it's just -- it's just unfathomable.

24    You know, I forgot who said "You can judge a country by how it

25    treats its inmates."

1          **THE COURT:**  I don't mean -- I just mean to say that

2    the court here is super busy.  Not that it's service.  It's our

3    job.  It's what we signed up for, but there are certain -- it's

4    very busy; and I know these cases are important to you, as they

5    should be, and your clients are all lucky to have you, but

6    there just is a certain priority of things that are being dealt

7    with and just to sort of -- and just to try to keep it in mind;

8    right?  I just think everything looks different now and

9    probably will for a long time.

10          **MR. SNYDER:**  Yes, Your Honor.

11          **MR. LOESER:**  Your Honor, you've either got a great

12    background or new background.

13          **THE COURT:**  I'm in chambers.

14          **MS. WEAVER:**  What are those things behind you?

15          **THE COURT:**  They're books.

16          **MR. LOESER:**  What?

17          **THE COURT:**  They're F.3ds and it's a little bit easier

18    to do it from my conference room.  I am the only person here.

19    I'm in my chambers.  I close the door.  I see nobody all day.

20    My staff does not come in.

21          **MR. SNYDER:**  It sounds delightful.

22          **MS. WEAVER:**  Well, Your Honor, we hear what you say

23    and I think we're all kind of walking through this together,

24    you know, as a country; but we will do our best to stay out of

25    your hair so you can focus.

1          THE COURT:  I'm going to see you-all on May 29th.

2          MS. WEAVER:  Okay.

3          MR. SNYDER:  Can't wait.

4          THE COURT:  All right.  Thank you.  I'll issue an

5  order.

6          MR. LOESER:  Thank you, Your Honor.

7          MS. WEAVER:  Thank you, Your Honor.

8          THE COURT:  Thank you.

9              (Proceedings adjourned at 9:49 a.m.)

10                      ---oOo---

11

12

13              **CERTIFICATE OF REPORTER**

14      I certify that the foregoing is a correct transcript

15  from the record of proceedings in the above-entitled matter.

16

17  DATE:  Wednesday, May 20, 2020

18

19

20

21  _____

22      Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

23

24

25