Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*
*Additional counsel listed on signature page*

Orin Snyder (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.4000
Fax: 212.351.4035
osnyder@gibsondunn.com

Joshua S. Lipshutz (SBN 242557)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel.: 202.955.8500
Fax: 202.467.0539
jlipshutz@gibsondunn.com

*Attorneys for Defendant Facebook, Inc.*
*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **JOINT STATUS UPDATE**<br><br>Judges: Hon. Vince Chhabria and Hon. Jacqueline Scott Corley<br>Courtroom: VIA VIDEOCONFERENCE<br>Hearing Date: July 13, 2020<br>Hearing Time: 8:30 a.m. |

The parties respectfully submit this Joint Status Update in advance of the Court's discovery conference scheduled for July 13, 2020 at 8:30 a.m.

## PLAINTIFFS' STATEMENT

### 1.  Issues the Parties Have Addressed Since the Last Discovery Conference

Pursuant to the June 18, 2020 Joint Status Update, the parties' agenda items since the last conference were: 1) Plaintiffs' document production, 2) documents concerning Facebook's App Developer Investigation ("ADI"), and 3) defining the scope of remaining issues. The parties' progress on these issues has been as follows:

**a. Plaintiffs' Document Production:** Facebook served its first set of Requests for Production to the Named Plaintiffs on April 3, 2020. Plaintiffs timely served responses and objections to these 21 requests on May 18. The parties first met and conferred regarding the requests and responses on June 24 and have since conferred twice more. Plaintiffs have confirmed that they do not intend to produce Facebook user accounts and archives or, of course, any privileged material. Plaintiffs are, however, searching ESI such as email, IMs, and e-docs for responsive materials (including offensive advertising, suspicious friend requests, and phishing records), with the exception of RFP No. 14, which seeks documents relating to medical treatment and therapy. While Plaintiffs do not believe the parties have exhausted the meet-and-confer process, the parties may require the Court's guidance in the future.

Other than what has just been mentioned, Plaintiffs do not anticipate withholding documents on the basis of objections, and have so informed Facebook. They have also confirmed that if they do identify materials they intend to withhold based on an objection, they will notify Facebook. On July 7, Plaintiffs made an initial production of over 4,000 pages of responsive documents, just two weeks after the parties' first conference. Counsel have conducted extensive custodial interviews with the Named Plaintiffs (and with the proposed plaintiffs in the pending motion to amend) and anticipate completing document collection in the coming weeks.

**b. ADI:** Plaintiffs have requested that Facebook produce documents identifying third parties whom it has investigated for improper use of users' private information. A number of disputes related to those requests have arisen, including the dispute over Facebook's "App Developer Investigation," or ADI, touched upon in the last hearing. The ADI—announced in the

wake of the Cambridge Analytica scandal to assuage users' privacy concerns—has investigated third-party abuse of users' private information. The relevance of the ADI materials is not disputed; whether all documents are privileged is. In the parties' discussions, Facebook has contended that the entire investigation is privileged since it was lawyer-driven and involved legal analyses from Gibson Dunn. Some responsive documents may be privileged, but it is inconceivable that all of them are.[1]

The Attorneys General of Massachusetts and the District of Columbia are, in proceedings in their respective jurisdictions, seeking subsets of the ADI documents Plaintiffs seek here.[2] For various reasons, including COVID-19 delays and appeals, it appears that those proceedings may now be moving at a slower pace than this action. Thus, to the extent Facebook has not produced documents in those actions and resolution of privilege and scope issues may be further delayed, there may be no efficiencies gained by waiting for resolution in those actions.

At the last discovery conference, Plaintiffs understood the Court to instruct Facebook to inform Plaintiffs by June 22 whether the company is taking the same positions regarding discoverability as it has in Massachusetts. Instead of stating a position, Facebook informed Plaintiffs that, to the extent it produces any documents in Massachusetts that are responsive to Plaintiffs' document requests and that Facebook deems relevant here, it will produce them at some undetermined point in time. Since that may not happen for months and the documents sought in Massachusetts are subsets of what Plaintiffs seek, Facebook's approach seems inefficient. In any event, after numerous meet-and-confers, the ADI issue is ripe for briefing.

Accordingly, Plaintiffs request that Facebook provide its final positions in writing by Friday, July 17, 2020 regarding: (1) what responsive documents concerning the ADI it will

---

[1] Facebook's public statements confirm that ADI involved not just lawyers, but "hundreds of people" including "external investigators, data scientists, engineers, policy specialists, platform partners and other teams across the company." https://about.fb.com/news/2019/09/an-update-on-our-app-developer-investigation/ (attached as Ex. A). ADI addressed "millions of apps" and resulted in the suspension of apps associated with approximately 400 developers. *Id.*

[2] "[T]he Massachusetts issues are, of course, relevant. But our requests with respect to the app developer investigation conducted by Facebook are much broader than that …" June 19, 2020 Tr. 11:14-17.

produce, (2) whether and to what extent it is asserting blanket claims of privilege or work product protection regarding ADI-related, responsive documents, and (3) whether it will produce a privilege log regarding ADI documents and, if so, when. If Facebook maintains a blanket claim of privilege, Plaintiffs propose the parties brief the issue to Your Honor.

       **c.**       **Defining the Scope of the Remaining Issues:** The parties agreed in their search term protocol that Facebook would identify by June 19, 2020, any discovery requests in Plaintiffs' First or Second Sets of Requests for Production of Documents that it categorically challenges as not relevant to the claims or defenses in this action. (Dkt. 455 at 3.) On that date, Facebook informed Plaintiffs that other than RFP 19 (relating to ADI), it does not object in full to any of the RFPs in Plaintiffs' first or second set of requests. At the same time, Facebook has informed Plaintiffs it intends to limit its production, and confirmed that the parties have "some initial differences of opinion regarding the appropriate scope of materials that should be produced in response to certain document requests." (Dkt. 467 at 2.)

       To understand Facebook's position, and consistent with Rule 34(b)(2)(C), Plaintiffs asked whether Facebook is withholding any categories of documents responsive to any RFP—as distinguished from categorically rejecting any single RFP. Specifically, Plaintiffs asked if Facebook is refusing to search for any subset of responsive materials or is aware of and withholding production of any subset of responsive materials. As to documents that can be collected without search terms, Facebook responded that it is not refusing to search for or withholding any documents at this time. As to documents retrievable by search terms, Facebook has deferred its response, claiming that any withheld documents will be revealed during the search term negotiations. Plaintiffs are concerned that these negotiations will be an inadequate vehicle for highlighting withheld categories and have asked Facebook to affirmatively identify any such categories as they become aware of them, just as Plaintiffs have committed to do. Plaintiffs anticipate seeking the Court's guidance and rulings on these issues as they develop.

       **2. Proposed Agenda**

       In addition to continuing to confer about the issues above and on Facebook's responses

and objections to Plaintiffs' Third RFPs, Plaintiffs propose that defects in Facebook's productions be included on the parties' agenda for the next two weeks. Those productions have suffered from repeated, serious flaws that impede Plaintiffs' ability to review documents and analyze metadata, including incorrect metadata (misidentified primary custodians and recycled bates numbers from prior productions), images that did not match extracted text, and poor image quality, requiring re-production. Facebook has explained that the problems arose because the latest productions consisted of documents produced in other actions. This explanation, on its own, does not identify the issues or ensure that the same problems will not occur again. Plaintiffs have asked to speak to Facebook's document vendor or someone with the expertise to address these issues so that they can be prevented in the future.

### 3. Brief Response to Facebook's Statement

Plaintiffs identify the following concerns regarding some of Facebook's statements.

- Facebook's statement that it will only propose "search terms to collect materials for half of these custodians on July 21" suggests that the search terms will be tailored to only the first half of the custodians, requiring the parties to start all over again for the second half of the custodians. The parties' protocol was intended to prevent this and this is the first Plaintiffs are hearing of this new position.[3] Receipt of a comprehensive set of terms was a key component of Plaintiffs' agreement to allow Facebook six weeks to prepare its first search-term list. Plaintiffs wish to discuss this at the next hearing.

- Facebook says that Plaintiffs have flatly refused to produce documents to substantiate certain allegations (for example, that they received highly offensive ads). This is incorrect. Plaintiffs believe that the parties should continue to meet and confer.

- Finally, Facebook says that Plaintiffs "have largely declined to engage in a conversation about [their] objections" and have refused to indicate which objections they intend to stand on. As explained above, this is simply untrue.

---

[3] "[T]he parties propose modifying the schedule to allow for Facebook to propose a comprehensive set of search terms that would apply to a broad spectrum of custodians by July 21, 2020." Stip. and Order for Search Term Negotiation, Dkt. No. 455 at 1.

## FACEBOOK'S STATEMENT

Facebook appreciates the Court's continued assistance focusing the parties' discovery efforts.  Facebook is pleased to report the following progress.

**Productions.**  Facebook has now produced approximately 1.2 million pages, including: (i) hundreds of thousands of pages produced in related government actions, (ii) documents Plaintiffs requested from their accounts, and (iv) documents not requiring custodial searches.

**Custodial Interviews.**  Facebook completed its interviews of many of the 81 individuals selected to be custodians for supplemental productions.  These interviews are ongoing.

**Plaintiffs' Objections to Facebook's RFPs**.  Facebook's RFPs seek information from Plaintiffs regarding their allegations.  The Complaint alleges that Facebook caused Plaintiffs to receive "highly offensive" advertisements, FAC at 751, 757, 759, friend requests "from trolls or imposter accounts," *id.* at 788, and "interference" with their accounts, *id.*  Facebook requested documents from Plaintiffs regarding these allegations—including documents sufficient to show (i) "any advertisements [Plaintiffs] . . . believe were 'highly offensive,'" (ii) "any 'Friend requests' that [Plaintiffs] believe to be 'from trolls or cloned or imposter accounts,'" and (iii) "any 'interference' . . . [Plaintiffs] believe [they] have experienced" with their accounts.

Plaintiffs say they will not produce *any* documents from their accounts because Facebook has those documents.  But Facebook asks for only a small set of documents it is unable to identify.  Plaintiffs have an obligation to produce these materials, which are in *their* possession, custody, and control.  Facebook is not able to determine which advertisements Plaintiffs find offensive, whether a friend request is from someone the Plaintiffs know, or whether activity on Plaintiffs' accounts is from Plaintiffs or due to third-party interference.  While Plaintiffs suggest Facebook should serve interrogatories for this information, that would cause unnecessary work and delay.  Plaintiffs have these materials at their fingertips and an obligation to produce them.

**Responsive Materials.**  Facebook is perplexed by Plaintiffs' request that it detail "categories" of documents it will not produce.  Facebook served responses and objections to Plaintiffs' primary document requests in December.  The parties then met and conferred about

those responses for dozens and dozens of hours—if not more.  They also exchanged extensive correspondence regarding Facebook's objections, negotiated custodians to collect responsive materials, and agreed to a detailed protocol to identify search terms for responsive documents.

Plaintiffs have not provided any authority requiring Facebook to speculate about what documents may be located that are not relevant (or to try to categorize them).  Facebook has told Plaintiffs it is not aware of any "categories" of responsive documents it will not produce.  Consistent with Federal Rule 24(b)(2)(C), Facebook told Plaintiffs it will not produce irrelevant documents identified by agreed-upon search terms, and committed to rely on the four potential theories of liability outlined in Judge Chhabria's motion to dismiss order as a relevancy litmus test.  (Dkt. 298.)  Without seeing the documents the search terms reveal, Facebook cannot identify every potential "category" of information they may unearth that is not relevant here.[4]

On July 21, Facebook will propose a set of search terms.  Then Plaintiffs will provide any counter proposal.  Facebook anticipates that, to the extent any disagreements arise concerning what Facebook will be searching for and producing, such disagreements will be crystallized through search term negotiations.  If Facebook later comes across a category of responsive materials during its review that Facebook reasonably believes Plaintiffs consider relevant to the case and Facebook objects to producing on relevancy grounds, it will inform Plaintiffs.

**Plaintiffs' Request for Investigatory Files.**  Facebook agreed to produce materials to Plaintiffs related to its ongoing platform enforcement efforts and has already produced thousands of documents regarding app enforcement.  Plaintiffs have also made an ever-changing set of overbroad requests regarding an investigation designed and directed by Gibson Dunn at Facebook's in-house counsel's direction, seeking to piggyback on the work and mental

---

[4]  This is not the first time Plaintiffs have raised this issue.  After Facebook agreed to produce relevant documents produced to the FTC, Plaintiffs demanded that Facebook inform Plaintiffs before its review commenced what materials would not be relevant and that Facebook log those materials.  Judge Chhabria rejected Plaintiffs' request, explaining that Facebook would be entitled to "go[] through its documents and decid[e] what . . . [t]o pull out," and "would never be required to do a log of the stuff they pulled out and determined was irrelevant or non-responsive."  March 5, 2018, Hearing Trans. at 7:23-8:10.  Plaintiffs' concerns proved unfounded.  Facebook did not withhold any FTC documents on relevancy grounds.

impressions of Facebook's lawyers.  The investigation at issue was a lawyer-driven investigation launched following the Cambridge Analytica events and the commencement of several civil lawsuits (including this one) and investigations.

This legally protected investigation is retrospective.  It focuses on investigating historic app and developer activity—on and off Facebook's platform—from before Facebook's transition to Graph API v.2.0 in 2015.  The investigation operates separately from Facebook's routine monitoring, compliance, and enforcement, and its primary purpose is to enable counsel to advise about legal risks and exposure, including how to respond to specific instances of misconduct.

Following the June 19 hearing, Plaintiffs informed Facebook that they seek every single document about or related to this lawyer-directed investigation.  This request is not only overbroad but it also seeks a very large volume of privileged information (likely millions of documents)—including Facebook's communications with Gibson Dunn, counsel's legal analysis and advice, and even counsel's analysis of how to respond to Plaintiffs' document requests.

Facebook does not categorically object to producing materials from this investigation to the extent those documents are not privileged.  Facebook agreed to produce thousands of investigatory documents, which include: (i) requests for information ("RFI") sent to app developers; (ii) responses to RFIs and the information provided; (iii) follow-up RFIs; (iv) responses to follow-up RFIs and the information provided; (v) requests for interviews sent to developers; (vi) responses from developers regarding interviews; (vii) requests for audits sent to app developers; (viii) responses from developers regarding audits; (ix) requests for data deletion certifications; (x) responses to requests for data deletion certifications; (xi) developers' questions and requests (e.g., for extensions) regarding the investigation; (xii) responses to developers' questions and requests; (xiii) warnings to developers that they *may* be suspended for failure to respond; (xiv) warnings to developers indicating that they will be suspended, and why; (xv) developers' requests for reinstatement; (xvi) responses to developers' reinstatement requests and follow-up communications; and (xvii) a list of the apps suspended by the investigation.

Facebook also does not object categorically to providing information regarding certain

relevant apps, to the extent Plaintiffs identify the apps about which they would like information. Facebook is objecting to producing attorney-client communications and documents reflecting its attorneys' strategy, mental impressions, conclusions, and legal theories.  Facebook also objects to the scope of Plaintiffs' request, which is not reasonably tailored under Rule 26(b)(1).[5]

Facebook has produced more than **16,000 pages** of communications with developers. Facebook proposes that it complete production of these materials, which include suspension communications sent to suspended apps explaining why they were suspended.  Once Plaintiffs have reviewed these materials and identified apps they believe to be relevant, Plaintiffs can issue a more tailored request for information specific to those apps.  If the Court is inclined to order additional productions at this stage, Facebook requests an opportunity for full briefing.

**Production Errors.**  As in any case where high volumes of data are produced, a small number of production errors have occurred among the nearly 1.2 million pages of documents produced, and Facebook resolved all errors quickly.  Plaintiffs' requests required Facebook to pull materials produced in numerous other actions, compiled by multiple law firms and across various databases.  Collecting and deduping those materials into a single production was complicated and led to an error affecting approximately 200 documents.  Facebook resolved the issue and implemented additional quality controls to prevent future errors.  Counsel also agreed to speak with Plaintiffs about the issue at a meet and confer on Wed., but Plaintiffs' e-discovery attorney did not attend.  Plaintiffs told Facebook they would follow up with his availability. Rather than do so, they raised the issue to the Court, unnecessarily escalating an inadvertent error Facebook has diligently resolved.  Counsel remains ready to speak with Plaintiffs.

---

[5]  Plaintiffs' focus on the MA Superior Court's ruling is a red herring.  Facebook objected to document requests served by the MA Attorney General because the requests, as framed, would require it to turn over materials reflecting communications with counsel, information generated at the direction of counsel, or information revealing its attorneys' mental impressions, conclusions, and legal theories.  While the Superior Court rejected Facebook's work-product assertion, it recognized that many of the materials may be protected by the attorney-client privilege.  The MA Supreme Judicial Court also granted direct review of the Superior Court's decision.  The D.C. Attorney General separately filed a motion to compel production of certain materials from the investigation, which was denied.

Dated: July 10, 2020

Respectfully submitted,

KELLER ROHRBACK L.L.P.

BLEICHMAR FONTI & AULD LLP

By:    */s/ Derek W. Loeser*
       Derek W. Loeser

By:    */s/ Lesley E. Weaver*
       Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)
Lynn Lincoln Sarko (admitted *pro hac vice*)
Gretchen Freeman Cappio (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David J. Ko (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Adele Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

GIBSON, DUNN, & CRUTCHER LLP

By: */s/ Orin Snyder*
Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193

Telephone:  212.351.4000
Facsimile:  212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

I, Lesley E. Weaver, attest that concurrence in the filing of this document has been obtained from the other signatories. I declare under penalty of perjury that the foregoing is true and correct.

Executed Friday, July 10, 2020, at Oakland, California.

*s/ Lesley E. Weaver*
Lesley E. Weaver

**CERTIFICATE OF SERVICE**

I, Lesley E. Weaver, hereby certify that on July 10, 2020, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

*s/ Lesley E. Weaver*
_____
Lesley E. Weaver

# Exhibit A

# FACEBOOK

Back to Newsroom

## Facebook

# An Update on Our App Developer Investigation

September 20, 2019



*By Ime Archibong, VP of Product Partnerships*

We wanted to provide an update on our ongoing App Developer Investigation, which we began in March of 2018 as part of our response to the episode involving Cambridge Analytica.

We promised then that we would review all of the apps that had access to large amounts of information before we changed our platform policies in 2014. It has involved hundreds of people: attorneys, external investigators, data scientists, engineers, policy specialists, platform partners and other teams across the company. Our review helps us to better understand patterns of abuse in order to root out bad actors among developers.

We initially identified apps for investigation based on how many users they had and how much data they could access. Now, we also identify apps based on signals associated with an app's potential to abuse our policies. Where we have concerns, we conduct a more intensive examination. This includes a background investigation of the developer and a technical analysis of the app's activity on the platform. Depending on the results, a range of actions could be taken from requiring developers to submit to in-depth questioning, to conducting inspections or banning an app from the platform.

Our App Developer Investigation is by no means finished. But there is meaningful progress to report so far. To date, this investigation has addressed millions of apps. Of those, tens of thousands have been suspended for a variety of reasons while we continue to investigate.

It is important to understand that the apps that have been suspended are associated with about 400 developers. This is not necessarily an indication that these apps were posing a threat to people. Many were not live but were still in their testing phase when we suspended them. It is not unusual for developers to have multiple test apps that never get rolled out. And in many cases, the developers did not respond to our request for information so we suspended them, honoring our commitment to take action.

In a few cases, we have banned apps completely. That can happen for any number of reasons including inappropriately sharing data obtained from us, making data publicly available without protecting people's identity or something else that was in clear violation of our policies. We have not confirmed other instances of misuse to date other than those we have already notified the public about, but our investigation is not yet complete. We have been in touch with regulators and policymakers on these

issues. We'll continue working with them as our investigation continues. One app we banned was called <u>myPersonality</u>, which shared information with researchers and companies with only limited protections in place, and then refused our request to participate in an audit.

We've also taken legal action when necessary. In May, we filed a lawsuit in California against <u>Rankwave</u>, a South Korean data analytics company that failed to cooperate with our investigation. We've also taken legal action against developers in other contexts. For example, we filed an action against <u>LionMobi and JediMobi</u>, two companies that used their apps to infect users' phones with malware in a profit-generating scheme. This lawsuit is one of the first of its kind against this practice. We detected the fraud, stopped the abuse and refunded advertisers. In another case, we sued two Ukrainian men, Gleb Sluchevsky and Andrey Gorbachov, for using quiz apps to scrape users' data off our platform.

And we are far from finished. As each month goes by, we have incorporated what we learned and reexamined the ways that developers can build using our platforms. We've also improved the ways we investigate and enforce against potential policy violations that we find.

Beyond this investigation, we've made widespread improvements to how we evaluate and set policies for all developers that build on our platforms. We've removed a number of APIs, the channels that developers use to access various types of data. We've grown our teams dedicated to investigating and enforcing against bad actors. This will allow us to, on an annual basis, review every active app with access to more than basic user information. And when we find violators, we'll take a range of enforcement actions.

We have also developed <u>new rules</u> to more strictly control a developer's access to user data. Apps that provide minimal utility for users, like personality quizzes, may not be allowed on Facebook. Apps may not request a person's data unless the developer uses it to meaningfully improve the quality of a person's experience. They must also clearly demonstrate to people how their data would be used to provide them that experience.

We have clarified that we can suspend or revoke a developer's access to any API that it has not used in the past 90 days. And we will not allow apps on Facebook that request a disproportionate amount of information from users relative to the value they provide.

**The Path Forward**

Our new <u>agreement with the FTC</u> will bring its own set of requirements for bringing oversight to app developers. It requires developers to annually certify compliance with our policies. Any developer that doesn't go along with these requirements will be held accountable.

App developers remain a vital part of the Facebook ecosystem. They help to make our world more social and more engaging. But people need to know we're protecting their privacy. And across the board, we're making progress. We won't catch everything, and some of what we do catch will be with help from others outside Facebook. Our goal is to bring problems to light so we can address them quickly, stay ahead of bad actors and make sure that people can continue to enjoy engaging social experiences on Facebook while knowing their data will remain safe.

Categories: Facebook, Integrity and Security

Like        Share        Tweet        ✉ Email

**RELATED NEWS**

<u>Facebook</u>

## Improving Data Limits for Infrequently Used Apps, Simplifying Platform Terms and Developer Policies

Our review of apps on our platform is ongoing, and we will continue to make improvements.

July 1, 2020

## Topics

Facebook

Data and Privacy

Technology and Innovation

Election Integrity

Safety and Expression

Economic Opportunity

Strengthening Communities

## Featured News

## Facebook

**Keeping People Safe and Informed About the Coronavirus**

July 2, 2020

Facebook

### Facebook Does Not Benefit from Hate

July 1, 2020

# FACEBOOK

## Company

Newsroom

Company Info

Careers

For Investors

Brand Resources

## Facebook Policies

Community Standards

Data Policy

Cookie Policy

Terms of Service

## Technologies

Facebook app

Messenger

Instagram

WhatsApp

Oculus

Workplace

Portal

Novi

## Help Center

Facebook app Help Center

Messenger Help Center

Instagram Help Center

WhatsApp Help Center

Oculus Support

Workplace Help Center

Portal Help Center

# FACEBOOK

Follow Us

United States (English) ▼                                                     Sitemap

© 2020 FACEBOOK