Pages 1 - 64

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, MAGISTRATE JUDGE

IN RE: FACEBOOK, INC. CONSUMER      )
PRIVACY USER PROFILE LITIGATION.    )  NO. 18-MD-2843 VC (JSC)
                                       San Francisco, California
                                       Monday, July 13, 2020

**TRANSCRIPT OF ZOOM VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                   BLEICHMAR FONTI & AULD LLP
                   555 12th Street
                   Suite 1600
                   Oakland, California  94607
          BY:  **LESLEY E. WEAVER, ESQ.**
               **ANNE K. DAVIS, ESQ.**
               **MATTHEW MONTGOMERY, ESQ.**

                   KELLER RORHBACK, LLP
                   1201 Third Avenue
                   Suite 3200
                   Seattle, Washington  98101
          BY:  **DEREK W. LOESER, ESQ.**
               **DAVID J. KO, ESQ.**
               **CARI C. LAUFENBERG, ESQ.**

                   GIRARD SHARP LLP
                   601 California Street
                   Suite 1400
                   San Francisco, California  94108
          BY:  **ANGELICA M. ORNELAS, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court

     (Appearances continued, next page)

**<u>APPEARANCES, CONTINUED</u>:**

For Defendants:

                GIBSON DUNN & CRUTCHER LLP
                200 Park Avenue
                New York, New York  10166
        BY:  **ORIN SNYDER, ESQ.**

                GIBSON DUNN & CRUTCHER LLP
                1881 Page Mill Road
                Palo Alto, California  94304
        BY:  **MARTIE P. KUTSCHER CLARK, ESQ.**

                GIBSON DUNN & CRUTCHER LLP
                2100 McKinney Avenue
                Suite 1100
                Dallas, Texas  75201
        BY:  **RUSSELL H. FALCONER, ESQ.**

                GIBSON DUNN & CRUTCHER LLP
                333 South Grand Avenue
                Los Angeles, CA 90071-3197
        BY:  **DEBORAH L. STEIN, ESQ.**

**<u>Monday - July 13, 2020</u>**                                    **<u>8:32 a.m.</u>**

**P R O C E E D I N G S**

    **THE COURT:**  Calling Civil Action 18-2842, In Re
Facebook.  Counsel, starting with plaintiff, please state your
appearances.

    **MR. LOESER:**  Good morning.  It's Derek Loeser for
plaintiffs.

    **THE COURT:**  Good morning.

    **MS. WEAVER:**  Good morning, Your Honor. Leslie Weaver
with BFA.  Anne Davis and Angelica Ornelas are with me.

    **THE COURT:**  Good morning.

    **MR. KO:**  Good morning, Your Honor.  David Ko, Keller
Rohrback, also on behalf of plaintiffs.

    **MS. LAUFENBERG:**  And good morning, Your Honor. Cari
Laufenberg on behalf of plaintiffs.

    **THE COURT:**  Good morning.  So, for Facebook?

    **MS. STEIN:**  Good morning, Your Honor. I saw Orin
Snyder's name up a moment ago, but it looks like he's no
longer on this screen.

    **THE CLERK:**  I promoted him, and I don't see him.

    **MS. STEIN:**  I'm getting text messages saying there is
a little bit of a technical error, but I think he'll be on
momentarily.

    **THE CLERK:**  Okay.

    **MS. STEIN:**  Yeah.  He says it says "Waiting."

 1          And, this is Deborah Stein for Facebook.  And I'm here

 2     with Martie Kutscher Clark.  And hopefully Orin Snyder will be

 3     here in a moment.  I'm not sure; maybe he should disconnect and

 4     try again.

 5          Do you think that's the best thing, for him to hang up and

 6     try again?

 7               THE CLERK:  Sure.  I mean, as soon as I see his name,

 8     I will promote him to a panelist.

 9               THE COURT:  No apologies needed.

10          (Off-the-Record discussion)

11          (A pause in the proceedings)

12               MR. SNYDER:  (Inaudible)

13               THE COURT:  Can't hear you, Mr. Snyder.

14               MR. SNYDER:  Okay.  I apologize.  My iPad was not

15     allowing me to connect, so now I'm on my iPhone.

16               THE COURT:  We can see you now.

17               MR. SNYDER:  Okay.  Great.  Thank you so much.  I

18     apologize.  I don't know why.

19               THE COURT:  Not a problem.  Not a problem.  Why don't

20     you go ahead and make your appearance; everyone else has.

21               MR. SNYDER:  Okay.  Orin Snyder for defendants, from

22     Gibson Dunn.  Thank Your Honor.

23               THE COURT:  We do have a court reporter this morning,

24     taking down the transcript.

25          All right.  So thank you very much, everyone, for your

1    statements.  I thought we should just discuss them, the issues,

2    in the order the parties presented them.

3         First, with respect to plaintiffs' document production.

4    Not really sure, plaintiffs say they're not withholding

5    anything.

6         The only thing I guess that Facebook raised was some

7    potential dispute regarding the production of documents versus,

8    maybe, interrogatories.  But I didn't understand plaintiffs'

9    statement to say that they were refusing to produce those

10   documents.

11        I don't know if anyone from the plaintiffs wants to

12   respond.

13             MS. WEAVER:  Angelica Ornelas will be addressing this

14    for us, Your Honor.

15             MS. ORNELAS:  Thank Your Honor.

16        So I think what we've tried to do here is explain that we

17   are searching for responsive materials, to the extent that they

18   are in plaintiffs' possession.

19        What we are excluding from the search are materials from

20   the user account and user archive, itself, for a couple of

21   different reasons.  One is as to the offensive ads that

22   Facebook is seeking, it's not clear that that content is

23   located within those sources, to begin with.  There does appear

24   to be identification of advertisers that sent content to the

25   users.  But the ads, themselves, do not appear to be in the

1    archive.

2        So that is one of the reasons why we don't think that

3    should be is encompassed within our search.  If that helps.

4        **THE COURT:**  Well, what you're saying is that you

5    can't produce them.  That you don't -- you don't have the

6    ability to produce them.

7        **MS. ORNELAS:**  From the Facebook user account and

8    archive.

9        But otherwise, if the plaintiffs do have standalone

10   records of things like the offensive ads that Facebook is

11   seeking, we are searching and collecting those items.

12       **MS. KUTSCHER CLARK:**  Your Honor, if I could respond

13   to that for a minute, I'd appreciate it.

14       **THE COURT:**  Go ahead.

15       **MS. KUTSCHER CLARK:**  The issue here isn't limited to

16   advertisements.

17       And I just want to start by saying we're not seeking

18   discovery from the there was here to abuse the plaintiffs, or

19   to harass them.  It's because we think this case should have

20   been dismissed on standing grounds at the motion-to-dismiss

21   stage, and Judge Chhabria held that we would have an

22   opportunity to seek discovery from the plaintiffs regarding

23   their allegations, and an opportunity to move to dismiss

24   individual plaintiffs on standing grounds.

25       And to that end, the plaintiffs have a lot of allegations

in their complaint, not just about the advertisements, to the effect that because of conduct Facebook engaged in, they experienced certain activity on the Facebook platform.

That includes that the plaintiffs received what they call highly offensive advertisements; that they received friend requests from people they call "trolls" who they didn't actually know; that they experienced third-party interference with their accounts, so someone who was not them was posting on their accounts.  We have requested information from plaintiffs regarding those allegations.

So for instance, documents sufficient to show any highly offensive advertisements they actually received, or documents sufficient to show any friend requests they received from trolls, so people they didn't actually know.  And plaintiffs seem to have taken the categorical position that they will not produce any materials from their Facebook accounts.

And for us that's problematic, because Facebook's not in a position to identify that information.  We don't know if a particular friend request came from someone the plaintiffs knew or did not know, whether a post on their account was a post a particular plaintiff actually made, or whether a third party gained access to an account mained that post.

So we're just requesting materials to show that type of information.

THE COURT:  But I don't understand -- I don't hear

1   them saying that they're refusing to identify that.  Of

2   course, that's relevant.  That's not what I heard.

3      I guess what I heard is they don't -- they don't know how

4   they could necessarily access and show that to Facebook, but

5   they could identify for it.  The allegation was made in the

6   complaint, so obviously, they have to be able to identify it.

7      Is that what you're saying, Ms. Ornelas?

8      **MS. ORNELAS:**  Your Honor, to the extent that the

9   plaintiffs do have those records in their possession, custody,

10   or control, they're going to be produced.  However, to the

11   extent that Facebook is asking us to search through the

12   Facebook user platform and archive, the records that they are

13   requesting don't appear to be contained in those sources.

14      So we are agreeing to search and collect materials, to the

15   extent they exist.  But for -- for right now, it doesn't appear

16   like those materials are within the platform and the archive,

17   which is why we are anticipating carving them out of our

18   search.

19      **THE COURT:**  And just to -- how would they identify --

20   how would they go about and find to produce to Facebook an ad

21   that they found, that they believed was offensive?

22      **MS. KUTSCHER CLARK:**  Sure.  So there's a lot of ways

23   that they could do this.  And we've actually discussed this

24   previously, so I'm a little surprised to hear the response

25   today, because previously the response has been:  If you want,

1   we can look.

2       So for instance, on Facebook plaintiffs have a feature

3   called:  Download your information.  And you can download there

4   sort of a history of all of your activity on Facebook, and

5   pretty much everything you've ever done on Facebook.  And they

6   would be able to find a lot of this information there.

7       Many Facebook users --

8           **THE COURT:**  Would it show ads?

9           **MS. KUTSCHER CLARK:**  I don't know, off the top of my

10  head, if it would show every ad, but I believe certain

11  advertising information would be reflected there.

12      A lot of this information also comes across through

13  emails.  So a lot of users have their accounts set up to send

14  information to them by email, as well, so users would receive

15  emails.

16      And I do just want to clarify, we're not just talking

17  about advertisements.  You know, some of this is about friend

18  requests people received.  And they --

19          **THE COURT:**  I'm just taking -- I'm just taking it --

20  I'm taking it one at a time.  Because you said that they

21  refused, I -- I'm just not hearing that.  I'm just trying to

22  figure out.

23      How would they -- I know they could describe to you an ad

24  that they recall seeing that they found was offensive.  I'm

25  trying to figure out, because this is a dispute about a

1   document production, how -- how are you saying they should

2   actually produce to you that ad?

3       What is the search that they're supposed do?  What -- at

4   least for the ads, I don't think you know.

5       Okay.  So now as to --

6           **MS. KUTSCHER CLARK:**  No.  For their ads, I see three

7   ways they could find the information.  First, they could go

8   through their download-their-information file, and any ads

9   that are contained within it they could produce the relevant

10  pages of their download-their-information file or, you know,

11  screenshot it and produce it.

12      To the extent any ads were received from Facebook by

13  email, they could produce those as emails.  To the extent any

14  ads are currently on their Facebook news feed, they could

15  produce those materials by, again, either screenshotting or

16  PDFing the pages.

17          **THE COURT:**  Okay.  So, Ms. Ornelas, are you

18  downloading the information files for your clients?

19          **MS. ORNELAS:**  Sure, Your Honor.  So when we -- we

20  have downloaded that information.  And that's what I was

21  referring to earlier, where it appears that within that file,

22  there is some limited advertiser information.  The ads,

23  themselves, do not appear to be located within that file.

24      With respect to, you know, stand-alone emails or

25  screenshots, that is something that we are searching for, and

1   collecting, and reviewing.

2       The issue is to the extent that Facebook believes the ads,

3   themselves, are within the download file that Ms. Kutscher just

4   described, that's where I think the disconnect is here.

5           **MS. WEAVER:**  Your Honor, if I may just explain, the

6   archive that we're talking about is a select subset of users'

7   platform activity that Facebook designates and allows users to

8   download.  Ordinarily, users don't that.  And that's --

9   Facebook produced that to us, already.  So when Ms. Ornelas

10  says that they excluded advertisement, that's because it is

11  not the entire world of Facebook activity.

12      And I think it's exactly right that, really, the

13  information that Facebook wants is better suited to a

14  contention interrogatory or a deposition.  It's really not a

15  document request that's proportional to the needs here, because

16  we can communicate that.  And the second piece is --

17          **THE COURT:**  Well, why -- I don't hear -- I don't hear

18  that it's proportionality.  I hear that you don't have it.

19          **MS. WEAVER:**  That's true, as well.  I guess the

20  question is, yes, could we go through the archives and maybe

21  identify some reference to an ad?  I don't know.

22      But these are, you know, highly -- these are -- they're

23  not sorted that way.  There's no section that says:  Here are

24  the advertising.  We're not aware that we have it.  If Facebook

25  produced it to us, maybe that would help.  But we don't have

them right now.

And Facebook knows what advertisements it serves to these plaintiffs.  Right?  They know what agreements they have, and who's been allowed to advertise on the platform.

But, you know, for example, to come at this another way, let me just say that our allegations aren't -- really, the heart of the case is not about specific individual advertisements.  Although, each of our plaintiffs received notice that Cambridge Analytica obtained their data, so Facebook knows that already.

But the heart of our case is that it's the volume of data and advertisements that people got because Facebook was funneling all of this information out.

And we still don't even have from Facebook documents sufficient to show which third parties accessed their data.  If Facebook produced that to us, which they still haven't, we could go to our plaintiffs and say: Of these millions of apps, which do you find offensive that were advertising to you?

But it's kind of asking us to answer from information that Facebook exclusively has.  And that's -- that's one of our issues.

THE COURT:  Well, it's kind of a chicken -- it's a chicken-and-egg thing, I think.  I don't know about that.  But -- I don't know if I necessarily agree with that.

But it does sound like the way to approach this is, first,

1  perhaps to do it as interrogatories.  And then the plaintiffs

2  will identify, you know:  These are the ads...

3       Whatever the question is, whatever your question is about

4  standing, ask that.  And then perhaps then go to the documents.

5            **MS. STEIN:**  Your Honor, if I may, to that point, I

6  think our issue here is as we were meeting and conferring, we

7  were repeatedly told by plaintiffs that they wouldn't search

8  for these various things like troll requests, and -- and these

9  were things that were specifically pled.  We did not hear from

10  plaintiffs that they did not have access to this information.

11       Obviously, if they don't have it, they don't have it.  But

12  for some of these -- and Martie, I think, was going to go on

13  into detail which ones they were.  For some of these

14  categories, plaintiffs have it.  They can say -- if there's

15  something on their Facebook -- in their Facebook history that

16  shows activity that weren't their (audio interference) post,

17  they should produce those to us.  They've been telling us they

18  won't even search.

19       And, you know, the suggestion that there's some

20  proportionality issue here, I mean, that's the first time we've

21  heard that this case has some sort of proportionality problem.

22  I mean, we've been working night and day on production on our

23  end.  We keep getting told about how huge this case is from

24  plaintiffs' perspective.

25       So I think having them do some searching of the accounts

1   to produce a very discrete number of documents is not a lot to

2   ask.

3        And our fear that is going down the interrogatory path,

4   we're then going to be told that a contention 'rog is

5   premature, and they don't have the information.  We're just --

6            **THE COURT:**  No, no, no.  No, because I'm telling you

7    now, I'm saying, they're suggesting do that first.  They made

8    the allegations in their complaint.  So, what is the

9    information that they had that those allegations were based

10   on?  Right?  That's what you want to know first.

11       And then -- I mean, to the extent there is some friend

12   requests, for example, they say that they got that they weren't

13   aware of or that they believe was a troll, that they should be

14   -- is there any reason, Ms. Ornelas, you can't identify that?

15           **MS. ORNELAS:**  Your Honor, this goes back to the way

16    that the information is provided in the download file.  There

17    are certain lists of different types of friend requests, for

18    example accepted friends, removed friends, rejected friends.

19    There is, you know, no list within the download file of, you

20    know, particularly suspicious friend requests.

21       So to the extent there are suspicious friend requests

22   captured within those different lists, that would be something

23   that, of course, we could respond to an interrogatory asking us

24   to identify which of the requests appearing on these different

25   lists were considered suspicious.

1          **MS. KUTSCHER CLARK:**  Well, --

2          **MR. LOESER:**  Your Honor, Derek Loeser --

3          **MS. KUTSCHER CLARK:**  -- if I can respond to that, I

4    think the concern is we're not asking for plaintiffs to look

5    at their file and send us a specified list by Facebook of

6    suspicious friend requests.  We can see who requested them to

7    be friends.

8       We need them to identify for us:  Which were the friend

9    requests that you thought were from trolls?  Who were the

10   people you don't actually know in real life?  And we have no

11   way to do that.

12      So I think what Ms. Ornelas is saying is they are able to

13   look at the file and, you know, it might not be captured in one

14   particular area, they might have to do some work, but they're

15   able to see a record of who requested their clients to be

16   friends.

17      And we would like them to produce the pages of the file

18   that show friend requests from people they did not actually

19   know, who they believed to have been trolls.

20          **THE COURT:**  All right.  But the first half of that

21   sounded like an interrogatory.  You want them to identify

22   those friend requests.  But I mean -- maybe it goes hand in

23   hand, because they identify it by looking at the page, and

24   seeing it.

25      Mr. Loeser, you wanted to say something?

1        **MR. LOESER:** Yeah.  I think, Your Honor, you're on --

2   I think you've sort of figured out exactly what the problem

3   is, and your suggestion is a good one, and one that -- it's

4   working talking about for a minute.

5        Certainly, a contention 'rog asking them to explain the

6   basis for allegations in the complaint, that does -- that's

7   always seemed to us like what this request was really after.

8   Because they're not asking for information; they've all the

9   information.  They're asking us to characterize the

10  information.  And that's exactly what a contention 'rog is.

11       And obviously, if we receive that 'rog, we'll answer it

12  with the information we have.  But I think it is also very

13  true, we don't yet have from Facebook the most critical

14  information in this case, which is who did they give our

15  plaintiffs' data to or sell access to, and what information did

16  they provide.

17       Once we have that information, we can completely answer

18  the contention interrogatory.  But at present, we can only

19  answer with what limited information we have.

20       **THE COURT:** You can answer it, based on the

21  allegations that you made in the complaint.  I mean, that's

22  the whole -- it's a chicken-and-egg thing, right?

23       Because their argument as to standing that Judge Chhabria

24  will have to decide is if you didn't know that you were

25  receiving a friend request from someone suspicious, how you

1    were harmed by it.  Right?

2              **MR. LOESER:**  Right.

3              **THE COURT:**  Right?  So that's sort of a chicken and

4    egg.  So to say:  Well, until we know who sent it -- no.  You

5    made allegations in the complaint of some injury, thus far.

6         And they want to know, what is that based upon.

7              **MR. LOESER:**  Right.  I would --

8              **THE COURT:**  Sounds like -- I don't know --

9              **MR. LOESER:**  Yeah, I guess --

10             **THE COURT:**  I don't know if I'd call it a contention

11   interrogatory so much as like:  Identify for us, you alleged

12   X.  Okay, who is -- who did the friend request come from?

13             **MR. LOESER:**  Right.  I guess I would describe it as

14   part of a chicken and an egg.  Because they've focused on this

15   one aspect of the case which is, you know, ads that people

16   received that they found offensive.

17        But the heart of the case is they took information, user

18   data, and they shared it with third parties.  That then led to

19   a variety of things.  One of those things was ads that people

20   found offensive.

21        But the basis of the case is that they took data, and they

22   shared it without consent.

23        But I hear what you are saying.

24             **THE COURT:**  Well, that's your argument to Judge

25   Chhabria.  And I get it.

1          Like, you may think okay, you can whack that away, but

2     you're not going to win your standing argument, anyway.

3          Okay, but they're still entitled to do their discovery on

4     what they believe their argument is, to make their argument.  I

5     mean, I -- I hear what you're saying.  But that doesn't mean

6     they don't get the discovery on those allegations.

7               **MR. LOESER:**  Right.

8               **THE COURT:**  It may ultimately not prevail.  But this

9      is just discovery.

10         Okay.  So --

11              **MR. LOESER:**  To be clear, though -- I'm sorry,

12    Your Honor.  But to be clear on what we would be able to do if

13     we received a contention interrogatory today, we would be able

14     to answer with regard to the information we have at present.

15         But as discovery unfolds and we get the information we're

16    waiting for, then obviously, that would be supplemented with a

17    lot more information.

18              **THE COURT:**  Right.  But what I understand

19     Ms. Kutscher saying is you made certain allegations in the

20      complaint, and they want to know the basis for them now.

21         And to the extent, then -- for example, if your clients

22    had in mind particular friend requests, if they did, then, you

23    know, look at that file and -- or -- I don't know how you would

24    do it or if you can do it -- identify that friend request.

25              **MS. WEAVER:**  Your Honor, we will do that.  And we

have always said we would search for everything off the

platform, which is what we had when we filed.

I mean, the other piece, of course, and the proof problem

in the case at a specific level is that Facebook, itself, has

said they can't identify how our individual plaintiffs were

harmed.

And certainly, the friends of friends, when friends gave

permission so that third parties I didn't know about because

they downloaded those apps, that's what we need to try to

understand from Facebook how those systems work.

Because I -- this is one of those odd cases where the

plaintiffs don't know specifically how they were harmed.  They

just know the vol- -- that's not sweeping.  But in some sense,

there's two pieces.  There's the narrow, kind of, what happened

to me specifically, and what offensive ads.

And then there is the larger portion of the case, which

is:  I didn't understand that when I was sending a private

message and attaching a photo to one friend, that that data and

information was being sent to literally so many third parties,

Facebook tells us they can't identify them all.

And so we're still working on that second piece.  And

that's why we keep hearing it as sort of a contention

interrogatory.

But we will give them the information we currently

possess, and identify and respond to a 'rog based on what we

now know, but we're just conditioning that on there's a lot
that we have yet to learn.

     **THE COURT:**  No, no, no, I understand.  And that's an
argument for Judge Chhabria in terms of what the --

     **MS. WEAVER:**  Got it.

     **THE COURT:**  -- was, and the standing, as to
discovery.

     **MS. KUTSCHER CLARK:**  And I do want to be clear if I
may, for a second, I think that the argument that Ms. Weaver
is making might apply to certain types of requests, and we
don't need to dig into those right now.

     But the specific ones that we're talking about, for
instance, friend requests from trolls, there's no information
that plaintiffs would need from Facebook to identify friend
requests from people they don't know.  The plaintiffs either
knew the people, or didn't know the people.  I don't think
there's something they would need from Facebook to identify
that.

     Another one of the requests has to do with interference on
their Facebook accounts.  So one of the things we want to know
is:  Were there posts on your account?  Did something appear on
your wall that you didn't do, yourself?

     The plaintiffs don't need information from Facebook to
say:  This post on my wall this day wasn't from me.  Someone
else did it.

1          That's the type of stuff we're seeking right now, because

2     there are allegations about those things in the complaint.   So

3     I don't think there should be any delay answering questions

4     like that.

5          **MS. WEAVER:**  We will answer with what --

6          **THE COURT:**  What they need to do is review the

7      downloaded file from the user activity.  And it may or may not

8      be in there.  I just don't know how complete it is.

9          Like, somebody sitting here today probably can't remember

10    the name, exactly, or anything like that.  Right?  So they need

11    to review the file.  And maybe it's in there, maybe it's not.

12         But, I guess I don't hear the plaintiffs saying that their

13    clients aren't going to be reviewing that downloaded file.

14         **MS. ORNELAS:**  Well, Your Honor, that file, when

15     taking into account the volume that it measures to date, we're

16     talking about 116,000 documents that total, you know,

17     somewhere in the ballpark of 46 gigabytes of data.

18         So that is a significant volume to be searching, which is

19    why our initial position was carving that voluminous source

20    out, and instead, focusing on the documents that plaintiffs

21    have, things like screenshots or emails, things like that.

22    Because what we do know is, for example, when there is a

23    suspicious log-in attempt, a user is notified by Facebook, at

24    least that's my understanding.  And they get an email that

25    says:  Hey, was this you?  You have logged in from halfway

 1  across the globe.

 2      So things like that, you know, we are searching for.  But

 3  to the extent that, you know, Facebook thinks it's proportional

 4  to have us search through that volume of data without knowing

 5  whether that kind of content is in the download file itself, we

 6  just don't think that that is, you know, proportional at this

 7  time.

 8      Particularly when --

 9          **THE COURT:**  I guess I don't -- I don't understand.

10      So either -- like, either it shows friend requests, or it

11  doesn't.  And if it doesn't, it doesn't.  You can figure that

12  out.

13          **MS. KUTSCHER CLARK:**  It does, yes.

14          **THE COURT:**  All I will say is this:  The plaintiff

15   certainly can't argue standing based on some friend requests

16   that they then didn't search for within their file.  That's

17   all.

18      I mean, you'll produce whatever evidence you produce,

19  right?  And then that's it.  You're held to it.

20      So that's -- that's the direction I'm going to give.

21  That's all.  I mean, I don't really quite --

22          **MS. WEAVER:**  I understand Your Honor.

23          **THE COURT:**  Yes, it will take the plaintiff some time

24   to cull through their files.  Okay.  They're the named

25   plaintiffs.

1          **MS. WEAVER:**  Yeah.  We will do that, Your Honor.

2      I think the other point, though, is that there is -- there

3  remains -- for example, if Facebook has a list of trolls and

4  had a list of suspicious apps and we can show them to our

5  plaintiffs, they may remember.

6      But I hear your point.  We'll give the specific

7  information we have now.  And later on, we will be -- we'll be

8  amending any 'rog responses, once discovery is complete.  And

9  then a judge can make a ruling on standing.

10          **THE COURT:**  Okay.  Okay.  All right.

11      Let's see.  So the next area was the app developer

12  investigation.  And so --

13          **MR. SNYDER:**  Your Honor, may I be heard on that one?

14          **THE COURT:**  Yes.

15          **MR. SNYDER:**  So Your Honor, thank you.  This is both

16   not right, and also not accurately described by the plaintiffs

17   in the submission.

18      Let me be very brief.  The so-called "app developer

19  investigation" is an internal investigation conducted by my law

20  firm, Gibson Dunn, in the wake of the Cambridge Analytica

21  events, commenced in 2018.

22      And the purpose of this internal investigation that my

23  partner Al Southwell is leading was to advise Facebook about

24  legal risks and exposures, including in this lawsuit

25  (Indicating), relating to apps on the Facebook platform prior

1   to 2015.  It's been ongoing since that time.

2       And first, plaintiffs wanted every single document

3   relating to that internal investigation, including my law

4   firm's files.  That was obviously overbroad.

5       To be clear, we are producing documents relating to this

6   investigation.  What I mean by that, Your Honor, is when my law

7   firm, working with Facebook and outside consultants, discovered

8   activity prior to 2015 involving third-party apps that it

9   wanted to follow up with, and communicated with those

10  third-party apps, those communications are not privileged.

11  Those communications we are producing, and have produced.  In

12  fact, we have already produced 16,000 documents related to the

13  investigation.  And as we continue our production, we will

14  continue to produce thousands of documents relating to the

15  investigation.

16      What we are objecting to, and only objecting to, is core

17  attorney/client and work-product communications, such as my law

18  firm's internal analysis.  Such as communications between my

19  law firm and counsel at Facebook concerning the investigation.

20      What we propose makes sense here is that we conclude our

21  production relating to this internal investigation.  And once

22  plaintiffs have reviewed these materials and identified apps

23  that they believe to be relevant, or want -- or -- or want

24  additional documents, they can issue more tailored requests for

25  information specific to particular apps.

1          For example, let's assume hypothetically in 2012 there was

2     some app that did something that the investigation uncovered.

3     We then, as part of our investigative protocol, communicated

4     with that app.  Call it App X.  We wrote them a letter.  That

5     letter will be produced  and they will then have the name of

6     that app.  And any communications with that app.

7          In one or two instances, only, we actually -- I think one,

8     maybe, we filed a lawsuit against a company.  That is all

9     public.

10          After they review those documents, we can take -- we can

11     then meet and confer, and there can be a live dispute.  Right

12     now, there is no live dispute other than they say they want

13     everything.  And they are focusing on a Massachusetts Superior

14     Court ruling.  And as we told the Court -- which -- which --

15     which was a motion to compel by the Massachusetts Attorney

16     General regarding a completely different -- substantially

17     different document requests than plaintiffs.

18          We objected to that request in Massachusetts because, as

19     framed, it did invade attorney/client privilege, work product,

20     and the like.  The Superior Court ruled against us.

21          But Facebook took that up to the Supreme Judicial Court in

22     Massachusetts, and they granted the extraordinary review of the

23     Superior Court's work product determination.  That is in

24     litigation.  And so nothing that's happening in Massachusetts

25     should either bind or control here.

1    This is not right.  When they get the tens of thousands of

2  documents they will see that there are -- I'm making it up --

3  ten, 20, 30, 40, 50 different apps -- maybe more, I don't know

4  the number -- maybe Martie does -- with which we communicated

5  as a result of our investigation.  They'll know the names of

6  those apps.  They can then follow up and ask questions about

7  those apps.  We're going to turn over all those documents.

8    What we're not turning over is our law firm's files, and

9  our communications with our client that were all pursuant to

10  this privileged investigation.

11          **THE COURT:**  When is that production going to be

12  complete?

13          **MR. SNYDER:**  Martie?

14          **MS. KUTSCHER CLARK:**  So we made a production on

15  Wednesday that included about 10,000 additional pages of

16  materials with the third parties.  We're continuing to review

17  them.  The volume is extraordinarily high, because it includes

18  every communication with apps about this investigation.

19    I think it would probably take us another several weeks to

20  work through the rest of the documents.  I think it's in the

21  range of tens of thousands of additional documents to review.

22  And we're actively working on that.

23    But again, these include every letter that went to an app

24  saying they were suspended, and why.  So once the production is

25  complete, plaintiffs will have the ability to identify any apps

1   that were suspended for reasons they're concerned about, or

2   that are actually relevant to the case.

3       And as Mr. Snyder said, then they could request additional

4   information about those apps, and we'd have something narrower

5   and more tailored that we can focus on.

6           **MR. KO:**  Your Honor, this is David --

7           **MR. SNYDER:**  Let me make one more point, Your Honor,

8    because -- so there's nothing -- there's no sort of nefarious

9    suggestion.

10      As it turns out, the vast majority of apps that were

11  suspended were suspended because we wrote them, saying:  "Dear

12  Mr. or Mrs. App, we have these questions for you," and they

13  never wrote back.  Probably out of business, or didn't care.

14      We then suspended them for non-compliance with our

15  platform rules because they simply ignored our initial inquiry.

16      So I think a high majority, if not in the nineties, high

17  nineties of the so-called suspended apps (Indicating quotation

18  marks) are just apps about which we had questions and followup.

19      And then they never wrote back to us, and we said "You're

20  suspended because you're a scofflaw, you didn't respond to us."

21          **MR. KO:**  This is David Ko on behalf of plaintiffs.

22  May I respond?

23          **THE COURT:**  Yes.

24          **MR. KO:**  So I'm a bit surprised, first of all, that

25   Mr. Snyder says this issue is premature.  We have been going

1   back and forth on this.

2        And as you know, in last hearing, you did direct Facebook

3   to try and get to a final position on this issue so that we

4   could actually brief it.  We thought we came to some sort of

5   final position, as you can tell from what Mr. Snyder is saying.

6   He refuses to actually have a final position on this.

7        And on the communications in particular that they are

8   claiming they will produce to suggest that we should narrow our

9   subsequently -- subsequently narrow our request, that doesn't

10  make sense to us for a variety of reasons.  Including, most

11  notably, the fact what they are offering to produce here are

12  internal communications with third parties.  That has nothing

13  to do and has no bearing on the relevance of the internal

14  documents and communications that we are entitled to.

15       I understand what Mr. Snyder is saying, that there is a

16  certain degree of those communications that could be

17  privileged.  But it is inconceivable that all of them are.  And

18  all you have to do is take one look at the statement that we

19  attached or the exhibit that we attached to our statement that

20  shows their publicly-available announcement about this ADI in

21  which they claim -- Facebook claims -- that this is something

22  that involved hundreds of people.  Not just attorneys.  Right?

23       They don't say it's an employer-driven investigation.

24  They say this involved external investigators.  They say it

25  involved policy groups at Facebook.  They say it involved

1   engineers, hundreds of people that were involved in this

2   investigation.  Platform operations folks.  Developer

3   operations.

4        This resulted -- this investigation -- which is ongoing,

5   by the way -- has resulted in thousands, tens of thousands of

6   apps being suspended.

7        So even if Mr. Snyder is correct in saying that the vast

8   majority of them relate to some sort of investigation in which

9   third parties did not respond, you still have a substantial

10  amount of third parties that are potentially in violation of

11  Facebook's (Inaudible).

12       So --

13       **MR. SNYDER:**  And -- and plaintiffs will get the names

14  of any -- plaintiffs will get any communications that we had

15  with any third-party app which puts them on notice of either a

16  perceived, suspected or actual violation.  They will have,

17  chapter and verse, the names, serial numbers, addresses of

18  those apps.

19       **MR. KO:**  Yeah.

20       **MR. SNYDER:**  And the fact is, yes -- the fact is this

21  was a large investigation, because the company committed to

22  conduct a retrospective investigation to see if there was a,

23  quote, "another Cambridge Analytica out there," close quote.

24  Turns out there wasn't.

25       Having said that, it takes a lot of engineers and a lot of

1   people at the company, and a lot of lawyers, I might say.  It

2   wasn't just Mr. Southwell.  We had a big team of lawyers

3   working with a big team at Facebook to look prior to 2015 at

4   every single third-party app to determine which ones complied,

5   and which ones didn't.

6       And the plaintiffs are going to have a cornucopia of

7   information about third-party apps.  And I just would

8   respectfully suggest that they be a little patient.

9       As Martie said, we're going to complete the production.

10  And I assume they'll have a lot of questions to ask about those

11  apps, and a lot of work to do to follow up.  And we will follow

12  up with respect to any third-party communications with those

13  apps.

14      So --

15          **MR. KO:**  The fundamental disconnect is, so,

16   Mr. Snyder is basically suggesting that we just received this

17   information, right, about external communications that they

18   had with third parties, and a potential list of these apps.

19      We are entitled to much more.  This is discovery related

20  to our case that is fundamentally about Facebook allowing

21  third-party app developers to misuse and abuse it.  Information

22  of user content information.

23      External communications with third party developers is one

24  tranche of that.  Right?  Internal documents and communications

25  related to their analysis from non-attorneys that are not

1    privileged are obviously relevant and responsive to our

2    requests regarding their enforcement policies.  And so that's

3    what we're asking.

4          And that's what the disconnect is here, Your Honor.

5          **THE COURT:**  So is it Facebook's position that, for

6    example, any communications among engineers that didn't

7    involve attorneys, because they all come under the umbrella of

8    this lawyer-directed investigation, they're privileged?

9          **MR. SNYDER:**  Your Honor, the engineers were all

10   working.  There were internal legal teams, external legal

11   teams.  And everything that was done within the rubric of this

12   investigation is at the direction of counsel.

13         Let me make another point though, Your Honor, just to be

14   clear --

15         **THE COURT:**  So that's --

16         **MR. SNYDER:**  Yes.  Yes.

17         **THE COURT:**  I just want know if that's a yes.

18         **MR. SNYDER:**  Yes, yes.

19         **THE COURT:**  All right.  So --

20         **MR. SNYDER:**  But Your Honor, here's what plaintiffs

21   have failed to mention.

22         This so-called "ADI," which is really an internal legal

23   investigation, is separate and apart from Facebook's normal and

24   regular enforcement activities.

25         Facebook has an enforcement team.  And all it does is

1    enforce the rules and regulations and policies on the platform.

2    That enforcement team works with engineers on a regular basis,

3    and -- and is not done at the -- in the ordinary course, under

4    the direction of counsel.

5        And we have produced and will produce numerous documents,

6    because plaintiffs have asked for them, concerning our ordinary

7    enforcement activities which do involve engineers and policy

8    people.  And that stands in sharp contrast to the legal

9    investigation that my firm conducted.

10       And so -- and Martie, I don't know what the volume of

11   those documents are, but they are fairly voluminous.

12           **THE COURT:**  Okay.  But what I guess I don't

13   understand, at some point you're going to have to produce a

14   privilege log.  Because just because you say they're

15   privileged doesn't mean that the plaintiffs have to accept

16   that.

17       So I'm trying -- so when -- when do you intend to do that?

18           **MS. KUTSCHER CLARK:**  If I could respond briefly,

19   because I think there's a little bit of a misunderstanding

20   here.

21       The concern we're having at the moment is the requests

22   we're receiving from plaintiffs keeps changing.  When we came

23   before the Court last time, we were under the impression that

24   the plaintiffs were seeking the materials that the

25   Massachusetts AG'd requested.  So we went back and we talked to

the plaintiffs about our position as to those materials.

During that discussion, the plaintiffs told us for the first time -- or at least we understood for the first time -- that they are seeking every single document from the investigation, about the investigation, related to the investigation.  That's a really different request, and it's extraordinarily broad.

And our position with respect to privilege and whether and to what extent we could prepare a privilege log is very difficult to analyze when we're talking about every single document.  It would be a privilege log with millions and millions of entries.  So what we're suggesting right now is that we finish producing the letters that show who was suspended, and why, so that the plaintiffs can make a more tailored request.

And at that point, we're not necessarily objecting to producing any of the underlying information.  So for instance, what we understand the plaintiffs ultimately want is underlying data showing platform violations, or showing what an app did with users' data.

To the extent that we can uncover that underlying data, we're not objecting to digging up that data and providing it to plaintiffs so that they can do their own analysis.  What we're objecting to doing is taking our attorney files and the work that our attorneys and attorney-led team did to look at that

1   data, and analyze it, and make decisions about that data, and

2   simply handing it over to the plaintiffs.

3        **MR. LOESER:**  Your Honor, if I may, just briefly.

4   Because again, I think your question went right to the heart

5   of the matter.

6        If we have two engineers talking about Facebook's data

7   policies in connection and then fallout from Cambridge

8   Analytica, can that possibly be privileged.  And I think the

9   reason why we feel like this controversy is ready to be

10  briefed, the parties are taking positions that are directly

11  contrary on a large body of information that we believe is

12  directly relevant.

13       If you go to the exhibit we provided, which is Facebook's

14  public announcement of the ADI investigation, this does not say

15  Gibson Dunn lawyers are conducting an internal investigation

16  for the purpose of legal advice.

17       And I'll just read what it says, because I think it should

18  give a pretty good idea --

19       **THE COURT:**  No, I understand.  But you're not

20  seeking, are you, like, memos among Gibson Dunn attorneys.

21       **MR. LOESER:**  No.  No.  We are not seeking privileged

22  information.  We're seeking --

23       **THE COURT:**  Okay.

24       **MR. LOESER:**  Yeah.  We want the information -- like,

25  for example, one of the categories of people involved, from

their announcement, they say:  Among the people involved in
this are policy specialists.

   They say (As read):

       "We promised that we would review all of the apps
       that had access to large amounts of information
       before we changed our platform policies in 2014.  It
       has involved hundreds of people: attorneys, external
       investigators, data scientists, engineers, policy
       specialists, platform partners and other teams across
       the country."

And the next line is really critical for this.

       "Our review helps us to better understand patterns of
       abuse in order to root out bad actors among
       developers."

   That is a business activity, and it is a critical business
activity for this case.  We are not interested in the legal
advice and the legal communications.  We want the business
activity information that would be produced because it's
directly relevant and responsive.  If they want to withhold it,
they need to log it.  But it's certainly not going to be
privileged.

       **MR. SNYDER:**  Well, we strongly, respectfully
disagree, because my law firm was involved in every decision.

       **THE COURT:**  Okay, but we're not going to adjudicate
that now.

1          **MR. SNYDER:**  Right.

2          **THE COURT:**  The question, though, because it's not --

3     so they're not seeking the stuff that's clearly privileged, so

4     you don't have to worry about that.  And I don't even think

5     that ever really even needs to be logged, because that would

6     be a waste of time.

7          But with respect to the other stuff, there's arguments

8     there.  Both ways.  Privilege is not clear, and there's

9     arguments both ways.

10         And so the question is then, how, how -- I certainly --

11    it's not -- I can't adjudicate that right now, like just

12    generally out there.  It has to be done in context.  Right?

13         So maybe the thing to do -- I do, I have to say, I just

14    think, Mr. Loeser, I understand, but we're not in a great rush,

15    you noticed, so -- is start reviewing those documents, and then

16    see -- we can take a subset.  Because the way I'm going to be

17    able to adjudicate this is take some exemplars, and rule, and

18    then the parties then can use that and apply it.  Right?  You

19    don't need the log of every single document.

20         So maybe what you do is you take a particular app, or you

21    get some names or something, right, and we focus on that

22    subset, and I adjudicate that.  That's not going to resolve the

23    privilege for everything, but it will be a roadmap that the

24    parties can then apply.  But I think we are going to need a

25    certain set -- I want it to be in context of a particular

document.  So the question is:  How do we get there.

And I don't think we necessarily need to wait until all the production is done.  I don't think that is the case.  The parties should get together and decide on, you know -- I don't know what it is that the plaintiffs think necessarily are there.  Maybe Facebook can come up with -- I don't know -- a hundred documents that you're going to log.

**MR. SNYDER:**  We can also be helpful, Your Honor. And, and -- because the vast majority -- I think it's 99 percent, but that's just from what my partner, you know, has allowed to.

Since the vast majority are people we wrote to and suspended because they didn't write back to us, you know, maybe we can highlight a couple of ones where we had further activity, they wrote back to us, we engage with them.

And then we can go behind the curtain, so to speak, on your exemplar idea, and we can take a look at what our work product and attorney/client activity was behind the contain, look at what engineers were doing, and then figure out how to tee up a privilege exemplar for handful of apps.

**THE COURT:**  Well, and for example, Mr. Loeser brought up like policy (audio interference), things like that.  That's not going to be particular to an app.

But maybe plaintiffs can point out, you know, because what's --

1          **MR. LOESER:**  Your Honor, you're breaking up on us.

2      (Off-the-Record discussion)

3      (A pause in the proceedings)

4          **THE COURT:**  I'm back.

5          **MR. LOESER:**  We lost you right when you started

6   talking about policy specialists.

7          **THE COURT:**  I came to the courthouse so I'd have good

8   internet.  I got the Court give me an upgraded laptop, and

9   it's, like, worse than ever.  I'm actually at the courthouse,

10   where there's very few people here.

11      In any event.  So, you know, I think, you know,

12   plaintiffs -- maybe starting with this -- identify some

13   documents that you think that you would be entitled to.  Like

14   discussions among the policymakers that Facebook was referring

15   to.

16      Facebook then, you know, look at them, and just say: Oh,

17   no, yeah, I can produce those now.

18      But I think we're just going to have to do it sort of in

19   tranches.  But I agree with the plaintiffs, I don't think we

20   need to wait until the end because I don't think it is

21   necessarily specific to particular apps.

22      I think this suggests there's broader things going on that

23   would be relevant, and that may very well not be privileged.

24   But I don't think there's anything right now.  I --

25          **MR. SNYDER:**  The reason that makes sense, Your Honor,

1   is that, you know, without reviewing attorney/client

2   privileges, we did have an internal protocol for this internal

3   investigation.  Sort of an escalation protocol.  And so things

4   did follow a particular prescribed course in the investigation

5   of an app.  And it was a massive undertaking, because the

6   company had to literally evaluate every app prior to 2015.

7   And so there is an established protocol that governs

8   escalation of these app investigations.  And policy was

9   involved in some of those.

10      But I think we -- we can work with plaintiffs, I think,

11   and identify our own protocol for how to frame the privilege

12   inquiry, and then key it up for Your Honor when it's ripe.

13          **MR. LOESER:**  Well, Your Honor, for the exemplar

14   approach to work, it would need to be -- let's take policy

15   specialists, for example.  We would say:  Look, we want -- and

16   I don't know if there's a way for us to connect it to some

17   particular app or not; it depends on what other discovery we

18   got.  But we want all the conversations and discussions that

19   relate to -- in which policy specialists were involved.

20      For the exemplar to work, Facebook would then need to

21   provide that, or produce a log that identifies everything that

22   they're not providing.  It can't be some cherrypicked set of a

23   couple of documents here and there that try to somehow prove

24   the point that Orin's trying to make.  It needs to provide the

25   parties with the full ambit of the information, so that we can

1   then meaningfully brief the dispute.

2          **THE COURT:**  So of the --

3          **MS. STEIN:**  It sounds like we have our work cut out

4   for us on a meet-and-confer, Your Honor.  I mean, this is one

5   of the issues that we've been trying to focus plaintiffs on,

6   which is the over-breadth of the request.  And we've been

7   trying to discuss:  What do you actually want?

8          And so I think this will help give us some structure for a

9   meet-and-confer process, so that we can get a better sense as

10  to what plaintiffs are looking for.

11         **THE COURT:**  Well, they actually do want everything.

12  They do want everything.

13         **MR. SNYDER:**  Yes.

14         **THE COURT:**  They recognize there are certain things

15  that they can't get, because of privilege.  But the thing is

16  that there's a fine line in these types of things, what is

17  privileged and what's not privileged.  And so, yeah.  So what

18  they want is everything.  That is true.  But they recognize

19  there's some things they can't get.

20         But maybe it's to take it off in chunks.  Maybe, you know,

21  start with the policy stuff.  But that's going to take some

22  work, then, reviewing it, saying:  Well, maybe we can't really

23  defend privilege here.

24         Or if you're going to log it all, then log it all, and

25  we'll make a decision.  I think you probably can approach it

1    that way.

2              **MR. KO:**  Your Honor, David Ko --

3              **MR. SNYDER:**  Yeah, the problem --

4              **MR. KO:**  Just one -- one more point to make in

5     response to what both Mr. Snyder and Mr. Stein have been

6     saying.

7          So, the exemplar approach and the sample documents.

8     Again, all that they are offering to produce to us are external

9     communications and (audio interference) with third parties.

10         As Mr. Loeser was indicating, there are a whole swath of

11    documents related to internal documents and communications

12    regarding their analysis, right, that may not have escalated to

13    the point of notifying a third party regarding this escalation

14    protocol that Mr. Snyder alludes to.  Right?

15         And so there are a wide range of categories of documents

16    that we are entitled to, based on our discovery requests.

17             **THE COURT:**  No, Mr. Ko, I understand.  I'm not

18    limiting it.  What I'm saying is, there's no way I can resolve

19    this, just on a general thing.  It has to be specific.  Some

20    things may be privileged, and some things not.

21         I'm trying to figure out -- if there are millions of

22    things, I'm just saying let's just take it in pieces.

23             **MR. KO:**  Sure.

24             **THE COURT:**  So start with what you want, most

25    important, what you think is the most yield, or what you think

would be the best exemplar for me to rule on.  What area.

Like --

        **MR. KO:**  Yeah, and here's an example of --

        **THE COURT:**  Not waiving your right to get everything

else.

        **MR. KO:**  Sure.  And I understand that, Your Honor.

    And here is an example for why this issue is, to a certain

extent, ripe.  You know, in addition to the policy specialists

that Mr. Loeser alluded to, the app -- the ADI very clearly

involved external investigators.  So there are documents that,

by their own very nature, they've presumably waived the

privilege.

    So communications --

        **THE COURT:**  Well, that's -- I don't accept that

statement, at all.  That is way too simplistic.

        **MR. SNYDER:**  Our law firm --

        **THE COURT:**  Uh-uh, I don't need to do that.  That is

not a correct statement of the law, Mr. Ko, that just because

an external -- if the external investigator was hired by

Gibson & Dunn, it may very well be privileged.

    So anyway --

        **MR. KO:**  That's fair, you are absolutely correct.

All I'm saying is, in response to that statement, they're

identifying a categorical privilege and assertion over all

these documents, excluding this narrow category of documents

1    that they claim they're going to produce regarding

2    communications with third-party app developers.  So it kind of

3    runs both ways is all I'm saying, Your Honor.

4         **MS. WEAVER:**  Your Honor, if I may, I think we heard

5    an offer from Mr. Snyder that we had not previously heard.

6    And we actually started this discussion months ago by asking

7    about the escalation process.  So, if we got a deadline for

8    Facebook to send to us the documents sufficient to describe

9    the escalation process, we might be able to identify

10   categories.

11        We're a little constrained, because we don't know, really,

12   what to ask for.  We would only be working off experience in

13   other cases about how investigations were run, and we know that

14   Facebook is really specialized.  So we don't have a lot of

15   insight, really, into how it was run.  Certainly prior to, you

16   know, 2018.  We know about their communications with third

17   parties because we've seen them, both in the public domain and

18   documents that we've received here.

19        But I think getting a description from Facebook about:

20   These are the teams, this is who did what, something like that

21   by a certain date within a reasonable amount of time, then we

22   can dig in and make a proposal about:  These are the test

23   categories we want.  If that's the direction Your Honor wants

24   to go in.

25        **MR. SNYDER:**  Your Honor, that is all privileged,

1   which is why I say, without waiving privilege, I was simply

2   saying that we can't -- we had engineers, we had outside

3   consultants, we had lawyers, we had policy people all working

4   together to investigate every app on the platform prior to

5   2015.

6        And you know, if we meet and confer and they asked us

7   about those consultants, I would say Gibson Dunn hired them.

8   And they all were Covelled (phonetic), and they're all working

9   within -- at the direction of counsel.  But --

10        **MS. WEAVER:**  Well, if I may, this is where we begin

11   to get confused.  Because if they are categorically saying

12   everything is privileged, then maybe we should brief that.

13   That can't be right.

14        So I don't know what we have to do to --

15        **THE COURT:**  I agree.

16        **MS. WEAVER:**  Yeah.

17        **THE COURT:**  I doubt that that's correct.  But a lot

18   of it may be, and a lot of it may not.  So to brief it gets us

19   nowhere, unless we do it in context.  That's all.

20        **MS. WEAVER:**  So how can we develop an understanding?

21   As plaintiffs, to understand how these things are reviewed,

22   I'm a bit stymied.

23        **THE COURT:**  Well, I think we start with something.

24   Like, we start with something.

25        **MR. SNYDER:**  I think the judge had a great idea.

1      **THE COURT:**  Focus on something.  They produce a log,

2   and then, and then we -- we -- we -- I rule on that.  Right?

3   So we start with --

4      **MS. WEAVER:**  But I'm concerned, Your Honor, that

5   they'll cherry-pick only privileges communications between

6   lawyers and --

7      **MR. SNYDER:**  No.  No, we have an obligation --

8      **MS. WEAVER:**  -- get to the heart of the issue --

9      **MR. SNYDER:**  We have an ob- --

10      (Reporter interruption)

11      **MR. SNYDER:**  Your Honor --

12      **MS. WEAVER:**  My apologies.

13      **THE COURT:**  So this is what you do.  You start

14   with -- ask for communications among policy people, that no

15   lawyers were on.  Just start with that.  You ask for that.

16   Right?

17      **MR. SNYDER:**  Or another --

18      **THE COURT:**  Or ask for communications among the

19   external investigators, which no lawyers were on.

20      In other words, that's, right, going to be your Backs

21   (phonetic) case.  So start by asking for those.

22      **MR. SNYDER:**  I thought, Judge, you had an excellent

23   idea.  Let's say there's App X that we had correspondence

24   with, and it's in those 16,000 pages.  And we have back and

25   forth with an app about some platform violation.

1    They can then ask us with respect to that particular app

2    and -- and engagement with that app, what is behind the

3    curtain?  You know, who else communicated at Facebook before

4    you sent that?  And we can look at those documents, and

5    determine what's privileged and what's not.

6        And if we make a categorical privilege claim with respect

7    to everything so-called "behind the curtain," that could be

8    teed up for Your Honor because that would be illustrative of an

9    approach to a particular app enforcement that grows out of the

10   legal investigation.

11           MR. LOESER:  And Your Honor, I think, again, for this

12    to work -- and this is Derek Loeser speaking -- we will come

13    up with a couple categories that we will choose.

14       They may not be the categories that Mr. Snyder would like

15   us to choose, but they will be the categories that we think

16   will show as best we can, when we don't have the information

17   when we are making the choices, why there is a problem with the

18   approach that they're taking.

19           MR. SNYDER:  And I just want to warn everyone or

20    caution everyone, this was a massive investigation because the

21    CEO committed to Congress and the public that he was going to

22    direct this investigation.

23       So if you ask, just as a caution -- narrate, no -- for

24   every communication between consultants and among consultants,

25   that will be probably tens of millions of communications.

1    Because every time we told a consultant to do something with

2    respect to an app, and it was always a legal direction, the --

3    the consultants didn't direct the investigation, I imagine that

4    the consultants then went off into consultant-land and

5    exchanged 10 million emails before they came back with the work

6    product, brought it to counsel, and then a decision was made.

7         So the volume here is -- we should look at the volume.  My

8    guess is we're talking about many tens of millions of

9    documents.

10        **MR. LOESER:**  Well, Your Honor, we haven't received

11    many millions of anything.  But I think a lot of what

12    Mr. Snyder just said sort of highlights the problems and the

13    reasons why I think this will result in briefing.

14        For one, maybe we'll start as a category the

15    communications between the CEO and the data policy people.  And

16    this is -- I mean, everything you'll read about this from their

17    public statements, this is a very public activity that Facebook

18    has done.  And it's very important, clearly, to get this

19    information about this investigation to its users.  That's why

20    they keep posting about it.

21        We can come up with some categories that we think will

22    make clear to the Court what the problem is and where the

23    limits of privilege are.

24        As you've, I think, rightly noted, we do not want access

25    to and understand that we don't get access to privileged

1 communications.  But there's a lot here that's not privileged.

2 And we know that because of the public things that Facebook has

3 said, including what the CEO has said.

4      And we'll figure out some categories that try and bring

5 this into focus for the Court.

6           **THE COURT:**  I think that's the way to do it.  And I

7  guess on Wednesday, you did get some -- about 10,000 pages,

8  and you can look at that and see if that helps.

9      But I do want to -- I don't think necessarily we should

10 wait to adjudicate it, but I do want to adjudicate it in a

11 context.  And it'll be just one small piece, and that then

12 will, I think -- I've found, at least, that'll help with the

13 other, the other side.  Okay, so that will be on your agenda to

14 discuss.

15      Okay.  I do have a settlement at 9:30 so we have to -- I'm

16 going to be late for.

17      Let's see.  Oh, the search terms.  So the stipulation that

18 the parties signed said that Facebook was going to provide

19 search terms for a broad spectrum of custodians.

20      So tell me how Facebook has come up with that broad

21 spectrum of custodians that they will provide on July 21st.

22           **MS. KUTSCHER CLARK:**  Sure, Your Honor.  And, I think

23  the issue that was raised in the statement was a bit of a

24  misunderstanding.  So I think we can resolve that easily.

25      The search term protocol provides a deadline to propose

search terms for each custodian.  We divided the custodians
into eight groups.  And what we said is we would propose a
comprehensive set of search terms by the 21st.  But the
deadline to propose search terms for the first four groups is
also the 21st, with future deadlines for other groups.

The way we understood that is we'll be providing a
comprehensive set of search terms that will apply broadly next
week, but we're not proposing any terms that are specific to
custodians we have not yet interviewed, until the deadlines for
those custodians.

So the idea is there will be a comprehensive set of terms
for the first four groups that will include terms that are
specific to the custodians within those groups.  So we talk to
those people, we learn jargon, we learned code names.  We'll
include that sort of information.  To the extent groups of
custodians were not interviewed, we're not going to have
specific terms for those people yet because we're still talking
to them.

**THE COURT:**  But they will be included in the broader
search terms.

**MS. KUTSCHER CLARK:**  I'm sorry; I just didn't
understand some of --

**THE COURT:**  Sorry.  But what you're saying is --
but -- but is the broader search terms will apply to them.
You just won't have the specific search terms.

1          **MS. KUTSCHER CLARK:**  Yes, exactly.

2     And the one thing I do want to clarify, just to make sure

3  we're all on the same page, is there is one RFP, a single RFP

4  that is not covered by the first four groups of custodians.

5     So because we will not yet have spoken to any of the

6  custodians about the issues with that RFP, we did not intend to

7  propose a comprehensive set of search terms for that one

8  specific RFP.  But otherwise, they will all be covered, in

9  addition to the specific terms for the first four groups.

10          **MS. WEAVER:**  Which RFP is that?

11          **MS. KUTSCHER CLARK:**  Don't hold me to this; off the

12  top of my head, I think it's 22.  But I would need to look

13  again at my notes.

14          **MS. WEAVER:**  Okay.  This is the first we're learning

15  of it.  But we're fine with that, Your Honor.  The statement

16  did read as though they were limiting it to 41.  We

17  understand, and I think you will understand the point.

18          **MS. KUTSCHER CLARK:**  Yeah.  I think it was just a

19  misunderstanding.  We're happy to talk more about it.

20          **THE COURT:**  Okay, great.  What else should we talk

21  about?

22          **MS. WEAVER:**  Your Honor, very briefly, just

23  43(b)(2)(C), I think you've seen kind of an example of the

24  crossing of ships in the night.

25     For example, you know, with regard to ADI, it has been

very hard for us to get our arms around what Facebook is
withholding.  And we, for example, have told Facebook that we
will tell them if we are withholding anything, any categories
of documents that are responsive.  And things got a little
flipped around.

I think we originally framed it as:  Let us know if you
categorically object to any RFP.  And they -- initially they
said yes, then they said -- the final response was only 19,
which is ADI.

But then when we dug in, and we started meeting and
conferring, it became unclear to us whether Facebook is taking
a position with regard to certain categories of documents that
are responsive.  Meaning we're not objecting categorically to
an RFP, but are they withholding some small subset that is
responsive that they haven't identified to us because they're
saying no, that's not relevant?  And the whole point of
34(b)(2)(C) is to make that transparent, so the parties can
engage.

And, and this is what we understand now, Facebook is
saying: Well, for search term documents, we're not ready yet.
And we understand that, and we will wait.

But we want to know now for categories of RFPs where
search terms are not required, has Facebook decided that there
are responsive materials which are not relevant?  And we heard
some of it today.  Some of it came out in their statement.  But

```
 1   that's the conversation that we want to have.  And we think
 2   we're entitled to that.
 3        MR. SNYDER:  Your Honor, just briefly, they raised
 4    the same issue with Judge Chhabria with regard to our FTC
 5    production.  And Judge Chhabria ruled, clearly consistent with
 6    the federal rules, that defendants, like all parties, are
 7    presumed to conduct their relevance review in good faith and
 8    are not required to make such disclosures which are not
 9    required.  That is to say, there's no requirement that we
10    identify irrelevant documents in advance.
11        We are going to.  We've produced 1,200,000 pages of
12    documents, including, I think, 40- or 60,000 that are internal
13    Facebook documents, already.  We will continue to produce
14    responsive relevant documents.  The rules require that.  We've
15    done it.  And we don't have an obligation to say what is
16    irrelevant and not being produced.  That's just backwards.
17    It's been rejected by Judge Chhabria.  And really, we think,
18    you know, it makes no sense whatsoever.
19        MS. WEAVER:  Well, we don't see -- go ahead.
20        THE COURT:  I guess what -- for example, something
21    that's been produced are documents that were produced to the
22    FTC.  Right?
23        And so --
24        MR. SNYDER:  Yes.
25        THE COURT:  -- one question is:  Did you withhold
```

1    anything that's not relevant?

2         **MR. SNYDER:**  That was asked of us.  And Judge

3    Chhabria said we did not have to -- I don't know the answer to

4    that, but --

5         **MS. KUTSCHER CLARK:**  No, we didn't.  He didn't

6    withhold anything on relevance grounds, no.

7         **MR. SNYDER:**  We did not.

8         **THE COURT:**  Okay.  You did not.  Okay.  All right.

9    So, Ms. Weaver, what is -- what is the -- the search

10   terms, I get, were not -- they can't know until they've

11   searched.

12   So what is -- with respect to what's been done so far,

13   what is the concern?

14        **MS. WEAVER:**  Other regulatory documents, so they

15   produced to the ICO and DCMS in the UK.  Those are regulatory

16   bodies.  Did they categorically decide that there were

17   portions of those inquiry not relevant to our case?

18        For example, this has arisen -- this is in a slightly

19   different context -- with regard to PwC documents.  They have

20   said PwC was looking at things not relevant to the case.  But

21   we don't know what those are, even generally, by topic.  And if

22   they told us, we might agree.  But they're just making the

23   decision, without sharing it with us.

24        They have said at different points:  We're only producing

25   certain kinds of materials relating to advertising.  We don't

know where they're drawing that line.  This has arisen in the
context of the financial documents, the RFPs that seek
information about their finances.  So, how are they drawing the
line been between what they think is relevant, and what they
think isn't?

These are all things where we need them to take a
position, and frankly, some of these things, it would be
helpful if they did it in writing.  Because when we have these
conversations, it's circular for us.  And we -- there's
misunderstanding.  And if they put it on paper, we can see it,
and it's helpful.

**MS. STEIN:**  Your Honor, we have not taken a
categorical position on anything that we're withholding.
We're doing this, as plaintiffs do in every case.  Which is we
meet and confer -- I mean, we've had a gazillion
meet-and-confers on plaintiffs' RFPs, to use a technical
estimation of the time.  And then, our reviewing and producing
documents for relevance the way -- and responsiveness the way
parties do in every case.

There's no category of documents that we're sort of
secretly setting aside.  Documents are either responsive and
relevant, or they're not.  Most of this it's very hard to argue
about in a vacuum, which is what we've repeatedly said to
plaintiffs.  But these are why the -- the search term ones, as
Ms. Weaver has noted, you know, it's fighting about it in a

1   vacuum about what the scope is going to be.

2           **THE COURT:**  We're not --

3           **MS. STEIN:**  Right.  For the specific RFPs, we've had

4   very detailed conversations about what's getting produced.

5   There's been no categorical objection to some sort of -- I

6   mean, this use of the term "categorical," there's no bucket of

7   documents that we're setting aside as irrelevant.  We look at

8   documents on a document-by-document basis, as they populate.

9   And, you know, a reviewer will look at them for whether

10  they're responsive or not.  But, I mean, it's no different

11  than any other case.

12      And it's just really been very challenging for us because

13  we keep getting asked about categorical, you know, objections.

14  We don't have a categorical, you know, bucket that we're

15  refusing to produce.

16          **MR. LOESER:**  Your Honor, if I can --

17          **THE COURT:**  For the PwC documents, were there

18  documents that were withheld as non-responsive -- as -- yeah,

19  as not relevant?

20          **MS. KUTSCHER CLARK:**  Your Honor, that's a difficult

21  question to answer because plaintiffs' (audio interference)

22  the PwC documents, it's a much more complicated request, where

23  they asked for the documents referenced in particular PwC

24  reports.  Ands the issue there is more about the fact that

25  it's very difficult for us to identify what PwC, as a third

1    party, relied on.  So there have not been relevance objections

2    to those documents.  Some of them haven't been produced

3    because we're having difficulties identifying them.

4         But for all other materials, what we have consistently

5    told plaintiffs is we are determining relevance based on the

6    four theories of liability that Judge Chhabria laid out in his

7    motion-to-dismiss order.  Judge Chhabria said these are the

8    four theories that are in play in the case.  And we are making

9    every relevance determination, based on those four theories.

10   And that's what we have consistently told the plaintiffs.

11        **THE COURT:**  But, so, but I do think, I do think that

12   you do have an obligation to, as part of the meet-and-confer,

13   explain -- give examples.  For example:  This is a document

14   that is responsive to your requests but that we decided was

15   irrelevant.  Just explain that.

16        **MR. KO:**  Your Honor, this is David Ko again.  And

17   just -- I completely agree, that's what we've been asking and

18   in the context of this specific example of PwC that we're

19   discussing is exactly where it's come up.

20        I'm a bit surprised that Ms. Kutcher Clark is saying that

21   they are not withholding on relevance grounds due to some

22   technical misunderstanding of our requests.  They have made it

23   clear in their meet-and-confers to us that they believe that

24   both the Facebook privacy program and PwC (inaudible) contains

25   large amounts of information they believe are not relevant to

1    this case.

2        And so we asked them to identify what those are, because

3    our view of those reports by PwC and the underlying Facebook

4    privacy program is that we believe most of it is relevant.  And

5    we have provided them with examples why.  They have refused to

6    give us examples in response for what is not relevant.

7        So you --

8            **MS. KUTSCHER CLARK:**  May I respond to those?

9        (Reporter interruption)

10           **MR. SNYDER:**  Sorry, my phone keeps on falling down.

11   That's what's happening.  I'm muting it; I apologize.

12           **MS. KUTSCHER CLARK:**  The issue with the PwC

13   documents, Mr. Ko is correct in that we don't believe

14   everything PwC looked into over a ten-year period is

15   necessarily relevant to this case.  However, we haven't

16   provided had a detailed analysis of that, because those

17   materials haven't actually been requested.  And we've talked

18   about those, ad nauseam.

19       The plaintiffs did not serve a document request for all of

20   the documents between Facebook and PwC.  They served a very

21   different request.  So we have been talking about that request.

22   And at this point it would be premature to do the type of work

23   Mr. Ko is describing, because we don't have it a request for

24   that information.

25           **THE COURT:**  Okay.  All right.  So the only guidance

1    I'm going to give here is that if -- if responsive documents

2    are being withheld on the ground that you decided they're not

3    relevant, I do think, and I -- I -- that you should -- as part

4    of the meet-and-confer, you explain why, and you give an

5    example.  That that's part of the meet-and-confer process.

6    If -- if it's being withheld on relevance grounds.  If it's

7    not, then there's not.  But if it is, then you should sort of

8    give the other side an explanation as to how you're drawing

9    that line.

10        **MR. LOESER:**  Your Honor, this is Derek Loeser.  That

11   would be very helpful.

12        **MR. SNYDER:**  Judge, I'm having -- I know Your Honor's

13   late.

14       Are you suggesting that every time a reviewer -- I'm not

15   being facetious.  Every time a reviewer takes a document and

16   asks whether it's relevant, we have to make a notation so that

17   we can explain?

18        **THE COURT:**  No, of course I'm not suggesting that at

19   all, Mr. Snyder, and I don't.  What I said is as part of the

20   meet-and-confer process, generally when you've made decisions

21   as to what's relevant, what -- they say somewhat

22   categorically, but sort of give -- just give an explanation:

23   This is the direction that we gave our reviewers.  Right?

24   This is where we draw, where we drew the line.

25       That's what I'm saying.  Like, generally --

1          **MR. SNYDER:**  Understood.

2          **THE COURT:**  -- drew the line.  And they can say:

3     Okay, I understand that, I agree.  We don't want those

4     documents.  We already have a lot of documents --

5          **MR. SNYDER:**  We've done that; we've done that

6     already, and I've even done that on earlier meet-and-confers.

7     We will do it again, and we will do it with force and clarity

8     again.  But we will make that clear.

9          Thank you.

10         **THE COURT:**  Okay.

11         **MR. LOESER:**  Your Honor, I do think that would be

12    helpful.  An example would be the conversation we had about

13    ADI.  Clearly, they made the decision that all information

14    that was internal would be withheld.  But when you look at

15    their offer for what they're producing, they talk about all

16    these communications with third parties, but they're not --

17    they haven't 'fessed up to what they actually were doing, was

18    eliminating from what they intended to produce everything that

19    was internal to Facebook.

20         So that kind of conversation would allow the parties to

21    quickly realize where the disconnects are.

22         **MS. STEIN:**  ADI is completely --

23         **THE COURT:**  As I understand the ADI, they believe,

24    their position is that everything that was done as part of

25    their -- the investigation, and whether they were outside

1   investigators or internal Facebook people, is privileged.

2   What they've agreed to produce are the communications like

3   with the app developers, because clearly they're not part of

4   Facebook.  They weren't hired at the direction of the

5   attorneys.

6           MR. LOESER:  Right.

7           THE COURT:  But I understand it's a broad privilege.

8   So -- okay.

9       When shall we have -- is it two weeks?

10          MS. WEAVER:  Yes, Your Honor, that would be fine.

11          THE CLERK:  (Inaudible)

12          MS. WEAVER:  That's Friday the 31st?

13          THE COURT:  Go back to Friday.

14          MS. WEAVER:  I'm sorry; this is Monday, isn't it?  My

15   fault.

16          THE COURT:  We were meeting on Fridays, so that's

17   fine.

18      Ms. Means, how does Friday the 31st look?

19          THE CLERK:  Oh, the 31st is fine.  Do you want 9:00

20   or 8:30?

21          THE COURT:  Can we do 8:30 again?

22          THE CLERK:  Yes.

23          THE COURT:  Okay.  All right.  We'll have the

24   statement due whatever the schedule is that I set.  That seems

25   to be working well.

1          **MS. STEIN:**  Your Honor, on the schedule, if -- if we

2     could build in a little bit more time between when can we

3     get -- sort of do the initial exchange, and then when we do

4     the final exchange, I think that would be helpful.

5          It's just -- the schedule has proven a little bit tight as

6     we have to sort of work through issues, often with our client,

7     and get approvals.  It would -- right now, we typically have a

8     24-hour turnaround.

9          **THE COURT:**  So what would you propose?

10          **MS. STEIN:**  I think 48 hours would be better, or at

11     least 36 hours.

12          **THE COURT:**  Ms. Weaver, can you work something out

13     with them?

14          **MS. WEAVER:**  Yes, of course.  That's no problem.

15          **THE COURT:**  Okay.  Whatever you guys work out is fine

16     with me.

17          **MS. STEIN:**  Thank you.

18          **MS. KUTSCHER CLARK:**  Your Honor, one more timing

19     request.

20          We're starting to find that during our meet-and-confers,

21     we're sort of returning a little bit to the game of

22     whack-a-mole we were all playing before we started meeting with

23     you.  And we're finding that we're having a little bit of

24     difficulty focusing and making progress, due to the sheer

25     number of issues that are on meet-and-confer agendas, and being

1  discussed.

2      And we're just hoping that perhaps we could have a little

3  bit of guidance limiting the number of issues, or at least

4  focusing the number of issues, so that we can make sure we are

5  moving forward with those things, and not spinning our wheels

6  on 15 things instead of making progress on five.

7          **MS. WEAVER:**  May I respond to that, Your Honor?

8          **THE COURT:**  Yes.

9          **MS. WEAVER:**  We believe that it has been very narrow.

10  We haven't raised any pressures of issues that we haven't

11  previously -- like ADI, there are a number of issues that we

12  have, in fact, been sitting on.

13      We understand -- we worked would with them to give them

14  six weeks to do this first set of search terms.  But certainly,

15  there are all kinds of issues -- deposition protocols, all

16  kinds of things -- that we have been waiting on.  So I'm really

17  kind of baffled by that.  And I don't know what issues we have

18  been raising.

19      I do think it's true that Facebook asks us to send them a

20  detailed email before each meet-and-confer on the topics we

21  wish to discuss, which we have been doing.

22      So this is a little bit out of left field to me, but we

23  are really trying to work with the system here.

24          **THE COURT:**  Okay.  I don't know what I can do, sort

25  of out of context.

1          **MS. STEIN:**  Yeah, I don't think -- I don't think

2     Ms. Kutscher Clark meant it in any way to suggest that there

3     was a lack of cooperation on either side.  I think we're just

4     all dealing with a lot of issues, and thought we were making

5     more progress when it was sort of tailored in advance as to

6     what we should specifically be discussing.

7          **MS. KUTSCHER CLARK:**  Exactly.

8          **THE COURT:**  I see.  I think what you have to discuss

9     is the ADI.  Right?  You're going to get the search terms on

10    July 21st.

11         **MS. KUTSCHER CLARK:**  (Nods head)

12         **THE COURT:**  You have the plaintiffs' production,

13    because now you have to discuss how you're going to get that

14    information.  And you have the defendant's ongoing production.

15         **MS. WEAVER:**  And the 34(b)(2)(C) issues, if they are

16    withholding.

17         **THE COURT:**  Well, yeah.  That's related to their

18    production and if they're withholding anything.  So I think

19    those are the topics.  It's a lot.

20       Sounds like things are moving forward.

21         **MS. WEAVER:**  We are, in fact, meeting and conferring

22    slightly less than we were doing it three times a week which,

23    although that was productive, that was a little intense.

24         **THE COURT:**  That was intense.

25         **MR. LOESER:**  Well, and Your Honor, at the beginning

1    of every meet-and-confer we have ten minutes of generally

2    getting along really well.

3             **MS. WEAVER:**  That's true.

4             **THE COURT:**  You're all getting along just fine.  You

5    know, these are very trying times.

6             **MS. STEIN:**  We've all learned a lot about each other.

7             **THE COURT:**  Yeah.  Yeah.

8             **MR. SNYDER:**  Judge, that's because I stopped

9    attending them.

10            **MR. LOESER:**  That was a huge advantage for all of us,

11   that's true.

12        (Laughter)

13            **MR. KO:**  At least now you freely admit it, Orin.

14            **THE COURT:**  All right.  I will see you, then, on the

15   31st at 8:30 a.m.

16            **MR. LOESER:**  Thank Your Honor.

17            **MR. SNYDER:**  Thank Your Honor.

18            **THE CLERK:**  Court is adjourned.  Thank you, everyone.

19        (Proceedings concluded)

20

21

22

23

24

25

### CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_/s/ Belle Ball_

Belle Ball, CSR 8785, CRR, RDR

Tuesday, July 14, 2020