Pages 1 - 31

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA, JUDGE

IN RE: FACEBOOK, INC. CONSUMER        )
PRIVACY USER PROFILE LITIGATION.      )  NO. 18-MD-2843 VC
                                         San Francisco, California
                                         Wednesday, July 15, 2020

**TRANSCRIPT OF ZOOM VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**: (Via Zoom)

For Plaintiffs:
                        BLEICHMAR FONTI & AULD LLP
                        555 12th Street, Suite 1600
                        Oakland, California  94607
                  BY:   **LESLEY E. WEAVER, ESQ.**
                        **ANNE K. DAVIS, ESQ.**

                        KELLER RORHBACK, LLP
                        1201 Third Avenue, Suite 3200
                        Seattle, Washington  98101
                  BY:   **DEREK W. LOESER, ESQ.**
                        **DAVID J. KO, ESQ.**
                        **BENJAMIN GOULD, ESQ.**

                        GIRARD SHARP LLP
                        601 California Street, Suite 1400
                        San Francisco, California  94108
                  BY:   **ANGELICA M. ORNELAS, ESQ.**


(Appearances continued, next page)




Reported By:  KATHERINE POWELL SULLIVAN, CSR 5812, CRR, RMR
              Official Reporter, U.S. District Court

**<u>APPEARANCES, CONTINUED</u>:**

For Defendants:

                    GIBSON DUNN & CRUTCHER LLP
                    200 Park Avenue
                    New York, New York  10166
          BY:  **ORIN SNYDER, ESQ.**

                    GIBSON, DUNN & CRUTCHER LLP
                    1050 Connecticut Avenue, N.W.
                    Washington, DC 20036-5306
          BY:  **JOSHUA S. LIPSHUTZ, ESQ.**

                    GIBSON DUNN & CRUTCHER LLP
                    1881 Page Mill Road
                    Palo Alto, California  94304
          BY:  **MARTIE P. KUTSCHER CLARK, ESQ.**

                    GIBSON DUNN & CRUTCHER LLP
                    2100 McKinney Avenue, Suite 1100
                    Dallas, Texas  75201
          BY:  **RUSSELL H. FALCONER, ESQ.**

                    GIBSON DUNN & CRUTCHER LLP
                    333 South Grand Avenue
                    Los Angeles, California 90071-3197
          BY:  **DEBORAH L. STEIN, ESQ.**

**P R O C E E D I N G S**

<u>Wednesday, July 15, 2020</u>                          <u>9:03 a.m.</u>

---oOo---

**THE CLERK:**  Calling Case Number 18-md-2843, In Re Facebook, Inc., Consumer Privacy User Profile Litigation.

Counsel for the plaintiff, please state your appearances for the record.

**MR. LOESER:**  Good morning, Your Honor.  Derek Loeser, from Keller Rohrback, for the plaintiffs.

**THE COURT:**  Good morning.

**MS. WEAVER:**  Good morning, Your Honor.  Lesley Weaver, of Bleichmar Fonti, for plaintiffs.  And with me is Anne Davis and Angelica Ornelas.

**THE COURT:**  Good morning, everyone.

**MR. KO:**  Good morning, Your Honor.  David Ko, Keller Rohrback, also on behalf of plaintiffs.

**THE COURT:**  Hello.

**MR. GOULD:**  Benjamin Gould, from Keller Rohrback, also here for plaintiffs.

**THE COURT:**  I like your fancy look up on the screen. That's smart.  That's the first time I've seen that.

**MR. LOESER:**  That's so you can't see that we're, you know, in bars and restaurants.

**THE CLERK:**  And for defendants?

**MR. SNYDER:**  Yes.  Good afternoon -- or good morning,

```
1    Your Honor.  Nice to see you all.

2        It's Gibson, Dunn for the Facebook defendants.  Orin

3    Snyder, Deborah Stein, Joshua Lipshutz, Russell Falconer, and

4    Martie Kutscher Clark.

5            THE COURT:  All right.  The gang's all here.  Big

6    group.  Sounds like Judge Corley has -- has gotten you all

7    under control, and I'm glad to hear that.

8        I'm not sure there's anything we need to discuss with

9    regard to case management.  I'm not going to get involved in

10   any -- any, you know, disputes that you may currently have

11   about discovery.  That's all for Judge Corley.

12       So I think probably the only thing to discuss is this

13   motion to amend the complaint.  And I guess I'll start with the

14   plaintiffs.  And I'm going to try to be as blunt as I can about

15   this.

16       I have a very hard time imagining that I would ever

17   conclude that it's appropriate to bring claims on behalf of all

18   Facebook users in the UK.  I have a very hard time imagining

19   that I would conclude that that's our business rather than the

20   business of the court system in the UK.

21       So, you know, to me, I think the only question is whether

22   I should be denying the motion for leave to amend the complaint

23   now on futility grounds or whether there is any further

24   development that's needed to allow me to fully consider the

25   question of where these claims should be such that I should
```

```
 1   grant the motion for leave to amend and then consider it on

 2   either a -- you know, consider this issue on either an

 3   accelerated motion to dismiss schedule or maybe it's probably a

 4   forum non conveniens motion.

 5        Maybe there needs to be a little bit of factual

 6   development first.  I'm not really sure.  But, you know, in the

 7   end maybe -- so maybe we could start with just why would it be

 8   appropriate for us to adjudicate, in a court in the

 9   United States, the question of whether Facebook violated the

10   privacy rights of all of its UK users?

11        Why would that be appropriate?

12        MR. LOESER:  Your Honor, Derek Loeser for the

13   plaintiffs.  I think that -- certainly appreciate and

14   understand the concerns that you've expressed.  I do think that

15   what's different here, and the reason why we have added UK

16   plaintiffs, is that the contract that Facebook had with its UK

17   users had a forum selection clause and a choice-of-law

18   provision for California law.

19        So, you know, another way of really looking at this issue,

20   and I think kind of where the rubber --

21             THE COURT:  Could I interrupt and ask a --

22        MR. LOESER:  Yeah.

23             THE COURT:  -- quick question about that?

24        Are you saying that the UK is the only country where

25   Facebook had a contract with its users to -- that specified
```

1  that disputes would be resolved in California courts and under

2  California law?

3          **MR. LOESER:**  No, no.

4      **THE COURT:**  Why didn't you add -- why didn't you add

5  all Facebook users in France or all Facebook users in

6  Australia?  Why didn't you add all Facebook users worldwide?

7      I mean, I'm guessing that if they had this provision in UK

8  specifying that California law applied and that the forum was

9  in California, I'm guessing, at the same time, they had that in

10 most, if not all, countries.

11     So why did you pick the UK?  Why didn't you add all

12 Facebook -- propose a class action on behalf of all Facebook

13 users worldwide?

14         **MR. LOESER:**  And, Your Honor, in *Apple*, for example,

15 that's what the plaintiffs did.  Here, on the other hand, we

16 exercised restraint and we decided to add a UK subclass because

17 of the origin of the scandal in the UK.

18     It was *The Guardian* that broke the Cambridge Analytica

19 story, and there was a whole lot of attention --

20         **THE COURT:**  Wait a minute.  You included UK Facebook

21 users because a UK publication broke the story about Cambridge

22 Analytica?

23         **MR. LOESER:**  And a lot of attention by UK users on

24 these issues, and we were contacted by UK plaintiffs who were

25 interested in pursuing these claims.  You know, people --

 1          **THE COURT:**  Okay.  Well, if it's appropriate to

 2     adjudicate -- if it's appropriate to bring a class action on

 3     behalf of UK users, then why wouldn't it be appropriate to have

 4     a worldwide class action?

 5          **MR. LOESER:**  It may well be.  And that could be

 6     something that other plaintiffs' counsel could have chosen to

 7     do.  We, however, wanted to stay focused on UK and the

 8     United States, and we felt that it was -- frankly, you know, we

 9     were trying to keep this from becoming wider than -- than it is

10     already.

11          And, frankly, if other people want to bring other cases

12     from other countries, I guess they're free to do so.  But this

13     is the complaint that we sought to pursue.  And, frankly, it's

14     hard to see how this situation would look better to Your Honor

15     if we included 50 countries instead of one other.

16          **THE COURT:**  Right.  But I'm asking the question to

17     highlight what appears to me to be the impropriety of pursuing

18     a class action on behalf of all Facebook users from a different

19     country.

20          **MR. LOESER:**  And -- right.

21          **THE COURT:**  Go ahead.

22          **MR. LOESER:**  But, Your Honor, it is the contract that

23     Facebook had with its users that identified California law and

24     a California forum.  So perhaps there should be other classes

25     from other countries, but it's hard to say that there's

something inappropriate about us using the contract that

Facebook has with its users to add a subclass from United

Kingdom.

       **THE COURT:**  So --

       **MR. LOESER:**  Maybe there should be other.

       **THE COURT:**  So if -- so but -- but your proposed

plaintiff, as I understand it, was not -- Facebook changed its

disclosure language or its contract or whatever we want to call

it, user agreement, in the UK at a certain point.

    And my understanding is that your proposed plaintiff is

covered by that new language, which specifies that -- what --

that it's -- was it that the lawsuit had to take place in

Ireland or something?

       **MR. LOESER:**  Ireland or the UK or EU member state.

It's gotten very complicated because of Brexit, but some

combination of those things.

    And I do think, Your Honor, that's -- that's the right

place to start.  And I would ask the Court to look very

carefully at the language in the new terms because -- I mean, a

little discussion of how we got here is probably useful.

    These new terms that Facebook is now relying on were not

made effective until May of 2018.  So these are terms that

Facebook came up with after this scandal broke and after these

lawsuits started.

       **THE COURT:**  Okay.

1          **MR. LOESER:**  So what they're saying to the Court is,

2     yes, it's true we had a forum selection clause that we wrote

3     that selected California law and California forum, but after

4     this scandal and after the lawsuit's filed, we put in a new

5     clause, and we're claiming now that that clause applies to

6     claims that already have accrued.  And we think that's highly

7     improper.

8          If they wanted to try and make the clause not just

9     retroactive but apply to claims that already accrued, it was

10    pretty simple for how they could do that.  They would have to

11    write it down and tell people.  But they didn't do that.

12         **THE COURT:**  But why shouldn't -- but why shouldn't the

13    UK courts decide that question?  I mean, these are -- you're

14    alleging that Facebook violated the privacy rights of all these

15    people in the UK.  And -- and -- why -- why shouldn't the UK

16    courts decide whether this -- this new provision should apply

17    to them or not?

18         I mean, isn't it way -- doesn't -- don't the UK courts and

19    doesn't the UK generally have a much greater interest in the

20    answer to that question than the United States courts and the

21    United States generally?

22         **MR. LOESER:**  I would say that Your Honor has -- it

23    would be appropriate for Your Honor to decide the question of

24    whether California law and California forum selection clause

25    applies, and that the claims that we've asserted are that

1    Facebook here in the United States misused these persons' data

2    and shared it inappropriately with third parties.  And the

3    interest of the United States, and California in particular, to

4    resolve this dispute is, in our view, the weightiest interest.

5          But I really do think that what Facebook is asking you to

6    do is ignore the forum selection clause that they created, and

7    they can only get there if, in fact, the clause applies to

8    claims that already have been accrued.

9          And I think it would be appropriate for this Court,

10   applying California law, to look at that clause and decide does

11   this apply to already accrued claims or not?

12         I think, you know, Facebook has had a practice of using

13   language that is not entirely clear, and this clause that

14   they've created after this scandal broke is another example of

15   that.

16         If they wanted retroactive application, if they wanted it

17   to apply to claims that have already been accrued -- and

18   there's sufficient and ample case law that explains how one

19   would go about trying to have a new term applied for already

20   accrued claims -- they just had to say it.  They didn't do

21   that.

22         We think this Court is the appropriate court to evaluate,

23   under California law, the forum selection clause and the

24   choice-of-law and decide this very specific question --

25              **THE COURT:**  Why would the California law -- why would

1   California law govern this, you know, agreement that -- that,

2   you know, UK Facebook users entered into with Facebook?

3          **MR. LOESER:**  Because Facebook chose California law.

4          **THE COURT:**  Only if this -- only if this new language

5   doesn't apply to the case; right?

6          And so the first question is, we have to interpret this

7   new contract between UK Facebook users and Facebook.  And we

8   have to ask whether this new contract prevents California law

9   from applying.

10         And why -- I don't understand why California law would

11  apply to that question as opposed to UK law.

12         **MR. LOESER:**  Well, I suppose they -- it seems to me

13  that California law would apply because we're arguing that the

14  clause choosing California law and choosing a California forum

15  is still operative.  And so it's that --

16         **THE COURT:**  But isn't that question begging?  I mean,

17  you have to interpret the new contract to determine whether

18  that clause is still operative; right?

19         **MR. LOESER:**  That's correct.

20         **THE COURT:**  Okay.  So, I mean, my -- I guess my -- let

21  me ask you one more general question on this -- on this topic.

22         Is it your argument that the -- I mean, I don't want to

23  put words in your mouth, but are you saying, look, Judge,

24  you're right, you're right as a general matter, if there had

25  not previously been this language in the user agreement with

1   the UK users specifying that California law applied and

2   specifying there was a California forum, if there had never

3   been such language, if there had not been any language at all

4   about -- about forum or choice of law, then obviously this is a

5   dispute that needs to be dealt with in the UK courts.

6        But it's just because we have this provision that either

7   used to apply or maybe still applies that -- that highlights

8   California law and California forum, it's for that reason that,

9   you know, this dispute belongs here in California and that you

10  should be the one to decide whether this dispute belongs in

11  California.  Is that right?

12        **MR. LOESER:**  Your Honor, I think that that is a fair

13  description with one caveat.  And what I would add to that --

14  and it's certainly true that we believe that the fact that they

15  chose California law and chose a California forum is a highly

16  important fact and the primary reason why we are where we are.

17       I think it's also true, however, that our allegations

18  relate to what we believe Facebook's parent did with user data

19  in California.  So there's a connection to this forum that goes

20  beyond simply the choice of law and the choice of the forum,

21  but also the conduct itself.

22       And it's only through discovery that we'll be able to sort

23  out if, in fact, they somehow segregated the data and none of

24  this information from UK plaintiffs was shared with third

25  parties in the United States or in California.

1          But certainly true, when you look at this issue, the

2     presence of a -- it's hard to underestimate the importance of

3     the presence of Facebook choosing California and this forum.

4          And I also think it's important to consider the timing of

5     this motion.  You know, Facebook had just rewritten these terms

6     when it filed the motion to dismiss here.  They must have been

7     fresh on its mind.  And yet, instead of raising this issue at

8     the beginning of the case, they've waited for this court to

9     issue its opinion.  And now it looks, to us, like they just

10    want to start over and get another bit at the apple under some

11    different law.

12         **THE COURT:**  Well, I'm -- I'm 90 percent sure -- I

13    mean, I haven't dug through the -- dug through the docket to

14    figure it out for sure, but I'm 90 percent sure that I early on

15    raised a question about this UK issue, expressed some

16    scepticism that -- that it was appropriate to include a UK

17    class and said we can deal with this later.

18         So I'm not -- I'm not -- if my memory is correct, I don't

19    think Facebook is to be blamed, at all, for holding off on

20    consideration of this question.

21         You know, what you -- you -- what this discussion reminds

22    me of a little bit is the discussion we had back about a year

23    and a half ago, I think it was, regarding the Illinois case.

24         And I noticed that recently the California -- all seven

25    members of the California Supreme Court disagreed with

1   Mr. Lipshutz on, you know, the sort of side issue that we were

2   debating about the authority of local public prosecutors to

3   bring actions to vindicate the interests of residents of the

4   state.

5        And -- but that's really what these cases are about;

6   right?  That's why the Illinois case, brought by the Cook

7   County prosecutor, got sent back to Illinois state court,

8   because this was an action by the prosecutor to vindicate the

9   interests of the citizens of Illinois; right?

10       And, you know, similarly, it seems here that you've

11  brought, you know, an action to vindicate the interests of the

12  citizens of the UK.  And it just seems very strange that, you

13  know, this court would decide what those interests are and

14  whether and how they should be vindicated.

15       So, I guess, my next question to you is, is there anything

16  more I need to know or need to get, that I don't have, to, you

17  know, make a definitive decision on whether, you know, it's

18  appropriate in this case to, you know, have a class action on

19  behalf of UK plaintiffs?

20            **MR. LOESER:**  Sure.  I guess one other thought, Your

21  Honor -- and, of course, I don't mean to put words into your

22  mouth either, but what I hear you saying is that we wouldn't be

23  here if not for the California choice-of-law provision and the

24  California forum selection, and that's the reason why the

25  plaintiffs have asserted this claim on behalf of UK users in

1   the United States --

2      And I guess I would say to you, what would be the

3   situation if they hadn't tried to replace these terms in 2018

4   and strip away accrued claims?

5      And I assume that where the Court would be is the Court

6   would be saying, well, Facebook chose a California forum and a

7   California choice-of-law provision, it must have done so

8   intentionally with the aim of having these claims heard in

9   California.

10      **THE COURT:**  I think that's -- you know, I haven't

11   drilled down on the language of the old forum selection and

12   choice-of-law clause, but I think you're right to say that.

13      And I think what I -- what I would say in response to that

14   is, man, it seems really strange to be, you know, adjudicating

15   these claims here in a -- in a federal court in California.

16   But that's what the parties agreed to, and so I guess we have

17   to do it.

18      **MR. LOESER:**  And I guess that's the rub for us, Your

19   Honor, is that, given that, I think the Court -- it would make

20   sense and it would be important for the Court to take a close

21   look at the mechanism Facebook is using to now rid itself of

22   the decision that it made for where it wanted its claims

23   litigated.

24      And the mechanism Facebook is using now is a piece of

25   writing that they came up with after these claims had accrued

1    that, in their view, eliminates these claims without actually

2    saying that.  And I just think that this court and California

3    and the United States does have a strong interest in making

4    sure that this type of, you know, sneakiness, frankly -- this

5    is how it looks to us -- doesn't end up defining the rights and

6    obligations of Facebook and its users.

7        Because I do think that, Your Honor, we would be in a

8    different place if this 2018 language said what some of the

9    case law -- and we've cited cases like *Trudeau v. Google*, and

10   there's some others as well -- that, you know, if you had

11   written in the language to make it express what you were trying

12   to do, okay, there might be other limitations, like the

13   covenant of good faith and fair dealing, which Your Honor

14   discussed in the motion to dismiss, but at least you would have

15   plainly notified users of what you were trying to do.

16       And, instead, what they've done here is, after the fact,

17   rewrite the language and try and strip away from the users the

18   benefit of the bargain that they created.

19       So I think that Your Honor --

20       **THE COURT:**  And it's the rights -- and it's the rights

21   of the people in the UK that we're talking about, so what --

22   what better court to consider those questions than the court in

23   the UK?

24       But -- but I guess the -- the question, though, is, is

25   there -- what more do you think I need, that I don't have, that

1   I haven't been given, if anything, to decide the -- you know,

2   the question of *forum non conveniens*, for example?

3           **MR. LOESER:**   Yeah, I think it's -- it's well covered

4   in our brief.

5           There is one other case I came across, when briefing, that

6   I thought was interesting, that might be helpful for Your

7   Honor, and that's *Eiess*, E-i-e-s-s, *v. USAA Federal Savings*

8   *Bank*, 404 F.Supp.3d 1240, at 1250 through 51.  It's a

9   Judge Chen case from the Northern District of California 2019.

10          And what I found interesting about that case is it has to

11  do with a subject that Your Honor discussed in the motion to

12  dismiss order, and that's unilateral modifications of a

13  contract.

14          And the reasoning -- while that's not entirely the exact

15  circumstance here, what the case talks about is specifically

16  the language that a company would need to utilize in order to

17  have new terms apply to accrued claims.

18          And what the case decides is that that's the kind of thing

19  that needs to be expressly done or it would be barred by the

20  covenant of good faith and fair dealing.  Here that same -- to

21  me, just as a matter of contract interpretation, it's the same

22  rationale.

23          Look, I understand what Facebook's trying to do here.

24  They should have done it expressly.  The way they've done it,

25  the way they've stripped away this forum and this Court's

1   effort or this Court's ability to review their conduct seems

2   somewhat inappropriate to us based upon how unclear and

3   ambiguous the language they used is.

4        To go back to where you started this, Your Honor, I would

5   simply say it does make sense to us, given that this is a

6   motion to amend, given the plethora of cases indicating that

7   merits decisions, substantive decisions, shouldn't happen at

8   that stage but, instead, should involve more complete briefing,

9   that it would make sense to -- if Your Honor is inclined to not

10  grant the motion, to wait for a later point in which some of

11  these factual issues, such as the meaning of this clause, can

12  be further developed.

13        **THE COURT:**  So are you suggesting -- I mean, in the

14  briefing I think it was, you know, grant our motion to amend

15  and then consider, you know, a -- consider separately, you

16  know, a motion to transfer, dismiss for *forum non conveniens*,

17  or whatever.  But now you're suggesting something different,

18  and I want to ask if there's a meaningful difference.

19        You seem to be suggesting, well, just don't rule on this

20  motion to amend until we have time to do some further factual

21  development.  And then if you conclude after that that

22  amendment would be futile, just go ahead and deny our motion

23  for leave to amend.

24        Is that what you're saying would be the preferable way to

25  approach this?

1          **MR. LOESER:**  That is -- that is not -- maybe I

2     misspoke.  That's not what I was suggesting, though, hearing

3     you say that, it's an interesting idea.

4          **THE COURT:**  Well, I'm just wondering because I

5     don't -- what I haven't looked into is, you know, what are the

6     rules about when -- if I were to grant this motion for leave to

7     amend, would that open the floodgates again, you know, in terms

8     of allowing the defendant to move to dismiss any claim in the

9     case?

10         **MR. LOESER:**  I would think not and I would hope not,

11    and I think you could condition your order so that it doesn't

12    allow that.

13         **THE COURT:**  I don't know.  I mean, I have a vague

14    recollection seeing, a few years ago, that if you grant a

15    motion for leave to amend, even if it's a, you know, on a

16    technical thing, that it gives the plaintiff -- the defendant

17    the right to make arguments they made before about why it

18    should be dismissed.

19         Now, I don't -- I don't know if that's right, but I

20    have --

21         **MR. LOESER:**  I guess I have two answers.

22         One, you have a lot of power and you can say that that's

23    not going to happen; and, two, if you think that is going to

24    happen, then your suggestion before about not ruling on this

25    motion seems like a good one.

1      We're pretty far down the track on the claims that you've

2  upheld in the discovery, and I would hate to see us have to go

3  back to what was already a very lengthy briefing process on

4  those claims.

5      **THE COURT:**  So, as a practical matter, as long as

6  you've had an opportunity to put everything in front of me on

7  the question of whether this -- you know, the UK class should

8  be in the UK or here, doesn't matter whether I deny the motion

9  for leave to amend as futile or grant it and then rule in

10  Facebook's favor on their motion -- their *non conveniens* motion

11  or whatever it's going to be.

12      **MR. LOESER:**  I guess from a -- I mean, this is just me

13  thinking out loud.  The standards for leave to amend are as

14  liberal as standards get.  And just in terms of the law and how

15  the law should work and develop, I think it would be odd to

16  deny leave to amend here based upon a *forum non conveniens*

17  motion that hasn't been filed.

18      I don't why Facebook didn't file a *forum non conveniens*

19  motion a year ago.  I don't know why they didn't say anything

20  about this defense in their answer, why they admitted in their

21  answer that California law applies and the California forum

22  applies.  I don't understand why Facebook didn't go through and

23  just file the motion a while ago, but they didn't.

24      If they want to seek to have this case transferred under

25  *forum non conveniens*, they should file that motion.  They

1   should not attempt to do that in an opposition to a motion to

2   amend.  I guess that's how I would see the sensible way for

3   this --

4        THE COURT:  Yeah, but if there's -- if there's no

5   scenario in which I would deny their *forum non conveniens*

6   motion, then, you know, that seems like that is the definition

7   of futility.  And you can -- you can deny a motion for leave to

8   amend on futility alone.

9        So, anyway, let me hear briefly from Facebook if there are

10  any burning points you all need to make.

11        MR. FALCONER:  Good morning, Your Honor.  May it

12  please the Court, Russ Falconer on behalf of Facebook.

13        I would like to start, if I could, with the suggestion

14  that the decision to amend the terms of service in the UK was

15  driven in any way by anything that was happening in this

16  litigation.  That's -- that's not true.  The terms were amended

17  in response to and in anticipation of GDPR taking effect in the

18  UK.

19        There were a variety of business and legal and regulatory

20  reasons for that change.  And it's --

21        THE COURT:  In other words, it's not all about -- it's

22  not all about them.

23        MR. FALCONER:  It's not, believe it or not.

24        And it's a funny thing.  Usually it's a fair thing, not an

25  unfair thing, for a UK plaintiff to be told, You don't have to

1   come all the way to California to sue anymore.  You can sue in

2   your own backyard.  Usually, that's a good thing, not a bad

3   thing.

4        But I'd like to address, briefly, Mr. Loeser's point that

5   this clause, this choice-of-law and forum selection clause, the

6   way it's written is not broad enough to capture claims that

7   accrued before the terms of service were agreed to between

8   Facebook and the plaintiffs.

9        There's very strong and directly on point case law under

10   California law that addresses this question.  And just to --

11        **THE COURT:**  Well, do you agree that California law

12   applies to this question?

13        **MR. FALCONER:**  We are not sure.  We don't agree that

14   it definitely does.  And our -- the 44.1 declaration that we

15   put in for Mr. Kennelly, the UK law expert, in paragraphs 77

16   and 78 of his declaration, he offers his opinion why, under UK

17   or Irish law, the clause would be read as applying to claims

18   that accrued before the parties signed the terms.

19        And the analysis is actually very similar to the analysis

20   under California law, because what the clause says is that the

21   plaintiffs agree that the choice-of-law and forum selection

22   clause applies to any claim they have that arises out of or

23   relates to these terms or the Facebook products which

24   encompasses their use of the platform and all the related

25   services.

1    And the key language in there is "any claim," not "some

2    claims."  Not just claims arising under the agreement but

3    claims that relate to it, and claims that relate to not just

4    the terms of service but their use of the products.

5    And the Second Circuit in the *TradeComet.com* case that we

6    cited in our opposition, applying California law, says those

7    are the key textural provisions that make this clause broad

8    enough in scope to apply to claims both before the clause was

9    signed and after.

10   And one of the case -- the main case that the Second

11   Circuit relied on to support that analysis was the *Verisign*

12   case from this court, again also cited in our opposition brief.

13   So, as a matter of California law, those cases both say

14   that a clause -- a broad forum clause that's worded just the

15   way this one is applies to pre-signing and post-signing claims.

16   Doesn't matter the time when they accrued.

17   The case that Mr. Loeser cited, the *Eiess versus USAA*

18   case, that's a unilateral modification case, which is, as he --

19   you know, he candidly admitted, that's not the situation here.

20   The situation we have here is contemporaneous mutual

21   assent.  And this was explained in the declaration we submitted

22   for Mr. Duffey, on behalf of Facebook, that everyone in the UK

23   who used Facebook between April and May of 2018 was required to

24   go through what they called this GDPR user engagement flow,

25   read through a bunch of screens and disclosures.  And then the

very last one said, By continuing to use Facebook, you're

agreeing to our updated terms of service.  Here's a link to

those terms.  And by -- you need to click this button that says

"Accept."  And by clicking "Accept," you agree to be bound by

these new terms.

     And Mr. Duffey explained in his declaration that after

May 25th, 2018, if you were a UK user in Facebook and you had

not clicked "Accept" to agree to those terms, you were no

longer allowed to use the service.

     In the second amended complaint -- the proposed second

amended complaint, the complaint affirmatively alleges that

both of these UK plaintiffs used Facebook before May of 2018

and continue to use it to this day, which tells us that they

necessarily had to click "Accept" and affirmatively agree to

these new terms in May or April of 2018.

     So the unilateral modification case law that he referenced

just doesn't apply, you know, on the facts that are present

here.

     The other -- the other point, Your Honor --

          **THE COURT:**  The main thing I want to hear from you on,

I think, is, is there anything to their argument that, you

know, even if I'm inclined to think that, you know, amendment

would be futile, I better -- the better approach is,

nonetheless, to grant leave to amend to -- you know, to allow

further factual development, or to hold off on, you know,

ruling on the motion for leave to amend until there has been

further development?

      **MR. FALCONER:**  No, there's no need for further factual

development here because there are no facts that need

developing.

    Everything that's relevant is in front of the Court on

the -- on the motion for leave.  And this is an important

point.  None of it's disputed.  There's no allegation in the

complaint and there's no argument in the reply brief that these

two plaintiffs didn't agree to these terms, that the

choice-of-law and forum selection clauses are invalid or not

enforceable.  It's conceded that they apply to all the claims

in this lawsuit.

    And maybe the most important point, they do not deny that

they assented and agreed to be bound by these terms.  Those are

all the facts the Court needs to enforce either or both of

these clauses and deny leave to amend under *forum non*

*conveniens* futility.

      **THE COURT:**  Do I need to -- do I need to -- do I need

to conclude that they're enforceable, or is it sufficient to

conclude that they -- they exist and -- and that the UK -- you

know, the UK court should decide whether they apply or not?

      **MR. FALCONER:**  Yeah, I think the UK court would and

should decide, in the first instance, whether they apply.

    And again, I think, as Mr. Kennelly explains in pretty

great detail in his declaration, there is a very robust data

privacy regime in the UK, under GDPR, that gets codified into

both Irish and UK law, under which those countries have a very

strong domestic interest in both enforcing the substantive

rights the GDPR creates and in giving consumer users the right

to seek redress for any violations or alleged violations of

those rights in the courts of their home forum.

So I think the fact that these terms are there and, you

know, subject to decision, I think the Court has what it needs

to conclude that these are enforceable, but it's also

absolutely a cognizable basis to deny leave to amend to say

that enforceability question, given that this is a contract

between an Irish entity and two UK citizens, it makes sense

that would be decided by a UK court.

THE COURT:  Has anybody sued Facebook for this stuff

in the UK or in Europe?

MR. FALCONER:  I -- I don't know if there are

individual plaintiff lawsuits.  I don't want to say anything

incorrect here.  There have been some regulatory investigations

through Irish and UK regulators, but I just don't -- I don't

want to give a wrong answer on whether any individual folks

have brought suit over there.

THE COURT:  Okay.

MR. FALCONER:  If I could, just briefly, the last

thing I would like to refer Your Honor to is the case -- Ninth

Circuit case that we cited in our opposition that -- it's the

in re -- sorry, not *In re Flash Memory*.  The -- apologies.  The

*Finsa Portafolios*, case where the Ninth Circuit affirmed a

District Court's decision to deny a motion for leave to amend

as futile when there was a forum selection clause that selected

an overseas forum.

So I think that's a good indicator there's no legal

barrier to the Court resolving this issue in the current

procedural posture rather than having another round of briefing

on an issue that's already fully teed up.

**THE COURT:**  Mr. Loeser, let me just ask you one final

question, which is:  Can you articulate for me what I would

need, that I don't have now, to decide whether this case --

whether the -- the UK class belongs here or in the UK?

**MR. LOESER:**  Well, Your Honor, one thing we don't have

now is discovery on whether UK users' data was misused in the

United States and that the third-party sharing that occurred

with business partners and apps didn't involve data from the

UK.  That would seem to be a critical bit of information.

**THE COURT:**  So you're saying if -- if Facebook users'

data was misused -- if UK Facebook users' data was misused in

the United States, that would change the equation.

**MR. LOESER:**  That would change the equation if the new

terms applied and applied to accrued claims.  I think that if,

in fact, the effort to have these new terms apply to approved

1   claims doesn't work for them, then I think that's less

2   important because Facebook has chosen this forum, and there

3   shouldn't be anything else that we need to discuss when

4   deciding whether to have a case here.

5            THE COURT:  Okay.  What else?  What else?

6       Other than, you know, discovery into the question of

7   whether UK Facebook user data was misused in the United States,

8   is there anything that I need, that I don't have, to decide

9   this -- the question of whether this -- you know, the UK class

10  should be here or in the UK?

11           MR. LOESER:  Well, just again thinking out loud,

12  they've submitted a declaration that has all kinds of extrinsic

13  evidence such as this GD -- whatever the initials are, process

14  for flow engagement.

15      It's interesting that they describe -- they confer from

16  people continuing to use the site that they clicked I accept.

17  I am a little puzzled why they didn't submit some evidence that

18  people actually did accept.  I, frankly, don't know the answer

19  one way or the other.  I just thought it was a little bit odd

20  in the materials that they submitted.

21      So in terms of that question, Your Honor, that's what I

22  can think of now.  You have, you know, eight other people that

23  could pipe in with other ideas.

24      I would like to just go back for one second, though, Your

25  Honor, to something that Mr. Falconer said, because I do think

1   it puts into clear focus the Court's task here.

2        Mr. Falconer was arguing to you the breadth of the 2018

3   New Terms and what they mean.  So Facebook is asking you to

4   look at those terms and adjudicate that they apply to already

5   accrued claims.  And we're asking you to do the same thing.

6        And I think that if the Court does that, the Court will

7   see that the law is not what Mr. Falconer says it is.  And,

8   instead, there's case law such as *Trudeau v. Google*, which, if

9   I could screen share, I would just put up.  But I have it on my

10  screen, so I'll just read to you.

11       That's a case involving an arbitration clause, which most

12  of the cases they cite involve arbitration clause, where there

13  is a -- already a preference for having those clauses apply

14  retroactively, which isn't the case here.

15       But in that case there was an argument that this -- these

16  new terms that imposed an arbitration agreement applied to

17  already accrued claims.  And the Court evaluated that, and the

18  reason why it found that they did was that -- and I'll just

19  read this to you at -- I should give you the cite.  It is 349

20  F.Supp.3d 869, Northern District of California 2018.

21       And at pincite 878, the Court says:

22            "At the same time, Trudeau recognizes that Section

23       13(a)(2), quote, seems to imbue Section 13(a) with

24       retroactive effect by providing that the new dispute

25       resolution clause applies to, *inter alia*, claims that

1   arose before customer or advertiser first accepted any

2   version of these terms containing an arbitration

3   provision."

4  So I do think, Your Honor, when you look at the case law

5 that Facebook has provided to you and you look at the case law

6 that we've provided to you, it's quite clear that if what

7 Facebook wants to do is have these new terms apply to already

8 accrued claims, it has to be expressly put.

9  And I think since Facebook is asking you to evaluate the

10 clause and we're asking you to evaluate the clause, and,

11 frankly, the Court needs to evaluate the clause when

12 considering the *forum non conveniens* argument, it would be

13 appropriate to consider what's missing from the language

14 Facebook has put in front of you and why they can't accomplish

15 what they're trying to accomplish here.

16  **THE COURT:**  Okay.  I'll get it -- I'll give it some

17 further thought and issue a ruling.

18  And, as I said, I'm not getting involved in any

19 discussions about discovery, but on the case management side,

20 is there anything else that anybody needs to talk about?

21  **MR. LOESER:**  Your Honor, I'll just put in one plug for

22 the great work that Magistrate Judge Corley is doing.  I think

23 the parties have made tremendous progress.  We're getting along

24 better, which is nice, and that we've learned a lot about each

25 other through this.

1        We have a lot of fights still, and a lot of disagreements

2    about the scope of discovery, but things are operating much

3    more smoothly.

4           **MR. SNYDER:**  We second that, Your Honor.  She's been

5    wonderful.  Thank you.

6           **THE COURT:**  Great.

7           **MR. LIPSHUTZ:**  I would just like to point out that you

8    accurately predicted the California Supreme Court would

9    overturn that decision, so I just want to make sure the record

10   is clear on that.

11          **THE COURT:**  Yes.  Accurately predicted they would

12   disagree with you.

13          **MR. LIPSHUTZ:**  To be fair, they also disagreed with

14   the Court of Appeals, but.

15          **MR. SNYDER:**  It was a valiant effort by Mr. Lipshutz.

16          **THE COURT:**  It certainly was.

17       Okay.  Thanks very much.  Have a good day.

18       (Counsel thank the Court.)

19       (At 9:43 a.m. the proceedings were adjourned.)

20                      - - - - -

21

22

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Tuesday, July 21, 2020

_Katherine Sullivan_

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter