GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
 osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
 klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
 mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
 dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
 jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20**<br><br>Judge: Hons. Vince Chhabria and Jacqueline Scott Corley<br>Courtroom 4, 17th Floor |

Gibson, Dunn & Crutcher LLP

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................................ 1

BACKGROUND .......................................................................................................................... 2

    I.     Initial proceedings before this Court ................................................................................ 2

    II.    Pretrial Order No. 20 allows four theories of potential liability relating to "sensitive user information" that users shared with a "limited audience" on Facebook. ......................................................................................................................... 3

    III.   Facebook undertakes an expansive discovery effort ....................................................... 5

    IV.   Facebook produces in discovery all data associated with the Named Plaintiffs' accounts ............................................................................................................................ 5

    V.    Plaintiffs continue to seek broad discovery on stayed and dismissed claims ................ 7

ARGUMENT ................................................................................................................................ 8

    I.     The Court should enforce the stay articulated in Pretrial Order 20 ............................... 8

    II.    The additional user data Plaintiffs demand relates only to stayed or unpled theories and cannot realistically be collected and produced ....................................... 10

          A.     Off-Facebook Activity does not relate to any live theory, and any information associated with Plaintiffs' accounts has been produced .............. 11

          B.     Facebook's business analytics do not relate to any live theory. ..................... 13

CONCLUSION ........................................................................................................................... 15

Gibson, Dunn & Crutcher LLP

i

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ashworth, Inc. Sec. Litig.*,
 2002 WL 33009225 (S.D. Cal. May 10, 2002) ................................................................. 9

*Brown v. Stroud*,
 2010 WL 3339524 (N.D. Cal. Aug. 24, 2010) ................................................................ 10

*DPR Constr., Inc. v. Anka (Cortez Hill) LLC*,
 2006 WL 8455253 (S.D. Cal. Oct. 27, 2006) ................................................................. 14

*Feigel v. F.D.I.C.*,
 935 F. Supp. 1090 (S.D. Cal. 1996) ............................................................................... 14

*Gilead Scis., Inc. v. Merck & Co*,
 2016 WL 146574 (N.D. Cal. Jan. 13, 2016) ................................................................... 12

*InteraXon Inc. v. NeuroTek, LLC*,
 2017 WL 24721 (N.D. Cal. Jan. 3, 2017) ......................................................................... 9

*In re iPhone/iPad Application Consumer Privacy Litig.*,
 2012 WL 5897351 (N.D. Cal. Nov. 21, 2012) ............................................................... 10

*Marlo v. United Parcel Serv., Inc.*,
 639 F.3d 942 (9th Cir. 2011) .......................................................................................... 13

*Meyers v. Cty. of Sacramento*,
 2020 WL 207213 (E.D. Cal. Jan. 14, 2020) ..................................................................... 9

*OMG Fid. Inc. v. Sirius Tech., Inc.*,
 2007 WL 1994230 (N.D. Cal. July 5, 2007) .................................................................. 10

*Rembrandt Diagnostics, LP v. Innovacon, Inc.*,
 2018 WL 692259 (S.D. Cal. Feb. 2, 2018) .................................................................... 10

*Shuckett v. Dialamerica Mktg., Inc.*,
 2018 WL 4350123 (S.D. Cal. Sept. 10, 2018) ............................................................... 10

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
 2017 WL 4680242 (N.D. Cal. Oct. 18, 2017) ................................................................ 15

**Rules**

Fed. R. Civ. P. 26(b)(1) .......................................................................................................... 9, 12

Gibson, Dunn &
Crutcher LLP

ii
DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

# INTRODUCTION

This brief concerns the proper scope of discovery in this case. On September 9, 2019, Judge Chhabria issued a comprehensive ruling (Pretrial Order 20) (the "Order") making clear that this litigation—which arises out of the Cambridge Analytica events—concerns "Facebook's practice of sharing its users' personal information with third parties." Pretrial Order 20, Dkt. 298 at 1. The ruling limits Plaintiffs to four theories of relief, all of which pertain to *Facebook* allegedly allowing third parties to access information that *users themselves* posted on Facebook. They are:

- **Friend sharing**: "[W]hen users accessed apps on the Facebook Platform, the app developers were not merely able to obtain information about the users they were interacting with; [but] were also able to obtain any information about the users' Facebook friends that the users themselves had access to."

- **Whitelisting**: After announcing it had ended friend sharing in 2014, Facebook allegedly "continued to allow a preferred list of app developers to access the information of users' friends."

- **Integration Partner Agreements**: Facebook allegedly "[s]har[ed] sensitive user information with business partners," through a list of "integration partnerships," under which Facebook allegedly "outsourced … the time, labor, and money required to build Facebook's Platform on different devices and operating systems."

- **Enforcement Efforts**: "In addition to complaining about Facebook's dissemination of private user information to app developers, whitelisted apps, and business partners, the plaintiffs allege that Facebook did nothing to prevent these third parties from misusing the information Facebook allowed them to access."

*Id*. at 6-10. Except for certain dismissed causes of action, *id*. at 30, the Order stayed all claims and theories not falling into those four categories, and Judge Chhabria made clear that this case would not proceed as an open-ended investigation into Facebook's business, *id.* at 6.

But for the past year, Plaintiffs at every turn have ignored Judge Chhabria's directive—attempting to elasticize the four theories identified in the order into an ever-expanding probe of the Facebook Platform and Facebook's business. This case is not about the extraneous topics Plaintiffs are now chasing in discovery, such as targeted advertising; "cookies" and off-Facebook activity; or the analytics Facebook conducts on user data. Those topics are the subject of *separate litigations* brought by *different plaintiffs* before *different judges.* And Plaintiffs cannot use the discovery process to hunt for new claims and theories. The Court should issue an order conforming discovery to Judge Chhabria's ruling and the four theories he identified, in accordance with FRCP 26.

Gibson, Dunn & Crutcher LLP

1
DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

## BACKGROUND

This case stems from the Cambridge Analytica events, and while it is broad in scope, Plaintiffs' "core factual allegations" all relate to "Facebook's handling of sensitive user information"—specifically, allegations that Facebook gave third parties access to "sensitive user information" that Facebook users shared with their friends on the Facebook platform. Pretrial Order 20, Dkt. 298 at 6.

In March 2018, *The Guardian* and *The New York Times* each reported that Cambridge Analytica—a data analytics company that had worked with the Trump campaign—had improperly purchased data regarding millions of Facebook users from a developer named Aleksandr Kogan who, along with his company GSR, created an app called this is "thisisyourdigitallife."[1] SACC, Dkt. 491 ¶¶ 397, 486, 531. Kogan had obtained data from users who authorized (*i.e.*, used and consented to share data with) the app. As with other developers that offer apps on Facebook's platform, he also obtained some limited data about those users' friends through "friend sharing," so long as those friends "had their privacy settings set to allow it." SACC, Dkt. 491 ¶¶ 397-99. Kogan then violated the Facebook policies and the terms of use to which he agreed and sold this data to Cambridge Analytica. SACC, Dkt. 491 ¶¶ 411. Following the March 2018 news reports about Kogan's sale of data to Cambridge Analytica, nearly 40 putative class actions were filed against Facebook, alleging hundreds of causes of action in jurisdictions across the country. Pretrial Order 20, Dkt. 298 at 3-4. These actions generally challenged Facebook's approach to sharing user information with third parties.

### I.    Initial proceedings before this Court

In June 2018, the Judicial Panel on Multidistrict ("JPML") consolidated these cases before this Court. *See* Dkt. 1. After the MDL was formed, Plaintiffs' counsel requested preliminary discovery "to determine the scope of potential claims" for a consolidated complaint. Mtn. for Limited Discovery, Dkt. 112 (Aug. 8, 2018) at 1. Although the Court expressed concern that Plaintiffs had presented a "moving target" and that "discovery is . . . not supposed to be a fishing expedition," Aug. 23, 2018 Hr'g Tr. at 24:4-8, 25:9-26:9, Judge Chhabria allowed preliminary discovery related to the topics described in the JPML's transfer order. *See* Dkt. 130. Within weeks, Facebook produced thousands

---

[1] None of this was news when the articles were published in 2018; like the rest of the public, "Facebook became aware that Kogan and GSR had misused data" after *The Guardian* published an article about it on December 11, 2015 and immediately "conducted an investigation." SACC ¶ 402.

2

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

Gibson, Dunn & Crutcher LLP

of documents and essay-like interrogatory responses to assist Plaintiffs in forming their claims.

The resulting complaint was nevertheless rife with defects, and the Court suggested Plaintiffs file an amended complaint. *See, e.g.*, Feb. 1, 2019 Hr'g Tr. at 101:3-11, 166:3-13. The Court made clear, however: "[I]f we . . . giv[e] you leave to amend right now, . . . I would assume that the next iteration of it would be your best shot. And that absent some extraordinary circumstances, if a particular claim is inadequate, it would be dismissed with prejudice." *Id.* at 188:23-189:4.

Plaintiffs' First Amended Consolidated Complaint ballooned to 1,442 paragraphs and 412 pages. Dkt. 257. As the Court later observed: "[I]t seems the plaintiffs sought to identify anything Facebook has ever been reported to have done wrong and then made sure to sprinkle in at least a few allegations about it." Pretrial Order 20, Dkt. 298 at 5. Facebook moved to dismiss.

**II.  Pretrial Order No. 20 allows four theories of potential liability relating to "sensitive user information" that users shared with a "limited audience" on Facebook.**

After a second round of extensive motion-to-dismiss briefing, the Court issued a 42-page order granting in part and denying in part Facebook's motion to dismiss. The very first line of that Order reads: "*This lawsuit, which stems from the Cambridge Analytica scandal, is about Facebook's practice of sharing its users' personal information with third parties. . . . [Plaintiffs'] principal allegations are that Facebook: (i) made sensitive user information available to countless companies and individuals without the consent of the users, and (ii) failed to prevent those same companies and individuals from selling or otherwise misusing the information.*" *Id.* at 1. The Order goes on to find a number of claims actionable related those alleged practices.

But the Court rejected Plaintiffs' pleading to the extent it waged a wholesale attack on Facebook's business, observing that "it seems the plaintiffs sought to identify anything Facebook has ever been reported to have done wrong . . . . [T]he presence of so many disparate and vague allegations makes it nearly impossible for Facebook to meaningfully respond to all of them, much less for the Court to effectively address them." *Id.* at 5-6.

To avoid "bogging the case down at the pleading stage for years," *id.* at 6, Judge Chhabria did not address each of Plaintiffs' improperly pleaded theories and claims. Instead, he concluded that Plaintiffs adequately pleaded "four categories" of potential wrongdoing related to "Facebook's practice of sharing its users' personal information with third parties." *Id.* at 6, 1. He then dismissed certain

Gibson, Dunn & Crutcher LLP

3

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

claims, *id.* at 30, and ***stayed all other claims and theories not falling into the four categories of alleged misconduct***. *Id*. at 6 ("All other prioritized claims not addressed by this ruling will be stayed.").

The order further held that Plaintiffs have standing only to the extent the claims are based on the allegation that "**sensitive information was disseminated to third parties.**" *Id.* at 14. It therefore explained that each of the actionable theories of alleged misconduct concerned "Facebook's handling of sensitive user information," *id.* at 6, which it described as "substantive and revealing content *that users intended only for a limited audience* [*i.e.*, their friends], such as their photographs, videos they made, videos they watched, their religious and political views, their relationship information, and the actual words contained in their messages." *Id.* at 1 (emphasis added); *see also id.* at 7, 13, 17.

Judge Chhabria described the four actionable categories of potential liability as:

1. *Friend sharing:* "Giving app developers access to <u>sensitive user information</u>." From approximately 2009-2015, "when users accessed apps on the Facebook Platform, the app developers were not merely able to obtain information about the users they were interacting with; [but] were also able to obtain any information about the users' Facebook friends that the users themselves had access to," via "friend sharing." *Id*. at 6-7.[2] "This include[d] [access to] a variety of things that your friends might have intended to share only with a limited audience . . . ." *Id.* at 7. "The Cambridge Analytica story is an example of this." *Id*.

2. *Whitelisting:* "Continued disclosure to whitelisted apps." After announcing it had ended friend sharing in 2014, Facebook allegedly "continued to allow a preferred list of app developers to access the information of users' friends." *Id*. at 7-8. "The complaint describes these preferred apps as 'whitelisted apps.'" *Id.* at 8.

3. *Integration Partner Agreements:* "Sharing <u>sensitive user information</u> with business partners*.*" Plaintiffs "allege that Facebook outsourced to business partners 'the time, labor, and money required to build Facebook's Platform on different devices and operating systems.'" *Id*. at 8. "The non-exclusive list of companies that the complaint identifies as business partners . . . came from Facebook itself, which asserted that it had 'integration partnerships' with these companies in a letter to

---

[2] Judge Chhabria also found all Facebook Users who had joined Facebook in 2009 or after had consented to this friend-sharing and so dismissed those claims as to any Facebook users who joined the Platform after 2008. *Id*. at 25-26.

Gibson, Dunn & Crutcher LLP

4

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

the Energy and Commerce Committee of the U.S. House of Representatives." *Id*. With regard to these integration partnerships, Judge Chhabria found the alleged misconduct was "relatively straightforward": Facebook had entered "data reciprocity" agreements with these integration partners pursuant to which "Facebook shared information about its users with this . . . list of business partners, and that those companies in turn shared data with Facebook." *Id.*

    4.  ***Enforcement Efforts: "Failure to restrict the use of <u>sensitive information</u>."*** "In addition to complaining about Facebook's dissemination of private user information to app developers, whitelisted apps, and business partners, the plaintiffs allege that Facebook did nothing to prevent these third parties from misusing the information Facebook allowed them to access." *Id*. at 9. "Again, the Cambridge Analytica story is an example of this." *Id*.

**III. Facebook undertakes an expansive discovery effort**

  The four theories identified in Pretrial Order 20 are wide ranging and implicate complex facts that have proven challenging for the parties and the Court to manage. The Court has already held more than 20 hearings and resolved numerous motions. The parties have already met and conferred for literally hundreds of hours. And Facebook has produced nearly **1.5 million pages**, *before the parties have even reached a search term agreement*.

  These productions include all of the Facebook documents produced in response to the FTC's document requests during its related investigations—including the FTC's 2019 investigation stemming from the Cambridge Analytica events underlying this case. Judge Chhabria expected these documents, which were sufficient for the FTC, "**would cover the vast majority of the documents that the Plaintiffs would want in this litigation**." March 5, 2020 Hr'g Tr. at 4:14-15. Facebook also produced the documents it provided the SEC, multiple state attorneys general, and other government entities in related investigations and actions to the extent they are responsive to Plaintiffs' RFPs.

**IV. Facebook produces in discovery all data associated with the Named Plaintiffs' accounts**

  Facebook also undertook to produce any data and information about the Named Plaintiffs that was within the scope of the four non-stayed theories of alleged misconduct.

  Facebook determined that the best way to ensure that it produced all information that could potentially be within the scope of the four theories Judge Chhabria identified was to produce ***all content***

Gibson, Dunn & Crutcher LLP

5

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

*and information* that Facebook associates with each of the Named Plaintiffs' Facebook accounts. This includes (but is not limited to) the "Download Your Information" ("DYI") file that Facebook makes available to users. The DYI file contains *more than 115 categories of information* about a Facebook user detailed in **Exhibit A**; all Facebook users are free to download their DYI file if they wish.[3]

Facebook has now produced the information contained in the DYI file for each of the Named Plaintiffs, plus any additional information associated with their accounts. In total, Facebook has produced more than 850,000 pages of information associated with the Named Plaintiffs' accounts.[4] ***The produced materials include everything each Name Plaintiff has ever shared or done on Facebook*** (unless the Named Plaintiffs have chosen to permanently delete that information).

By producing the full DYI file, Facebook produced some information that is outside the scope of the case in at least two respects. First, the DYI file includes more than the "sensitive user information" users shared on the platform—photographs, videos, posts, comments, messages, and religious, political, and relationship information. *See* Dkt. 298 at 1, 7, 13, 17. **It includes *all* information that each Named Plaintiff has shared on Facebook, sensitive or otherwise**.

Second, the DYI file includes data and information associated with each of the Named Plaintiffs' Facebook accounts, beyond what users shared on Facebook. Of note, it includes certain information Facebook receives about users' online activities on apps and websites *other than Facebook*, which is called off-Facebook Activity. The DYI data also includes device information, location information, and a host of information about advertisers and advertisements.

By producing the DYI file, Facebook ensured that it had produced all user data about each Named Plaintiff that could even arguably be within the scope of the four non-stayed theories.

---

[3]  Facebook's Help Center explains what is included in a user's DYI file in an article entitled *What categories of my Facebook data are available to me?*, which includes a table detailing the more than 115 categories of information that Facebook users are able to download. *See What categories of my Facebook data are available to me?*, https://www.facebook.com/help/930396167085762, Table 2, *Information you can download using the Download Your Information tool* (last visited Sept. 18, 2020). This table is reproduced as **Exhibit A**. Facebook explained to Plaintiffs during the meet-and-confer process that this information was available to them for download, but Plaintiffs insisted that Facebook produce the information in discovery. Facebook agreed to do so without conceding the relevance or discoverability of all of the information in the DYI file.

[4]  Approximately 250,000 pages of additional materials are in the queue for production for 5 Named Plaintiffs who joined the case last month, *see* SACC Dkt. 491.

6

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

Gibson, Dunn & Crutcher LLP

**Table 1: Produced User Data**

- Download Your Information file
- Information shared by users on Facebook
- Sensitive information shared by users on Facebook
- Sensitive information shared by users on Facebook and given to third parties

### V.  Plaintiffs continue to seek broad discovery on stayed and dismissed claims

By providing Plaintiffs the materials it produced to numerous government entities in related investigations and all data associated with the Named Plaintiffs, Facebook provided more than enough information for *private plaintiffs* to seek any additional targeted discovery about live claims.  That is the only discovery to which Plaintiffs are entitled.  But Plaintiffs have refused to approach discovery in a reasonable and targeted manner and continue to conduct this case as if they were a multi-district private attorney general free to careen from one factual detour to the next.

Facebook does not dispute that Plaintiffs are entitled to obtain discovery about the four actionable theories Judge Chhabria identified.  But Plaintiffs' RFPs far exceed that scope, instead seeking more than a decade of materials touching on nearly every aspect of Facebook's operations, including all materials underlying the company's financials, advertising on the Facebook platform, Facebook's efforts to curb and investigate violations of any platform policy, Facebook's internal policies, Facebook's third party agreements, and "user testing" of any kind.

Plaintiffs demand every single document, letter, and other piece of paper to have exchanged hands with any government body investigating or pursuing claims against Facebook on any topic related to privacy.  Plaintiffs similarly demand every document from or relating to any *internal* Facebook investigation or audit.  Plaintiffs have interrogated counsel repeatedly on all aspects of the

7
DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

Gibson, Dunn & Crutcher LLP

Company's advertising platform, whether and how Facebook tracks users, Facebook's source code, and Facebook's internal business analytics. Indeed, after the world went into lockdown as a result of the COVID-19 pandemic, Plaintiffs began grilling counsel about privacy on Zoom and Facebook's newly released video-conferencing product.

In the months since Facebook produced the Named Plaintiffs' data, Plaintiffs have interrogated Facebook ad nauseum about its contents, continuing to demand some other "dossier" or "data set" Plaintiffs believe Facebook maintains for each user—frequently demanding information Facebook already provided. As Facebook has repeatedly explained, there is no "dossier" or "data set"—the DYI files Facebook has produced contain the data in Facebook's possession, custody, and control that Facebook has associated with each Named Plaintiff's Facebook account. Facebook has gone to great lengths to explain this to Plaintiffs and has submitted to dozens of hours of questioning about every piece of data Plaintiffs believe Facebook tracks and collects and how that data is stored.

This approach has infected all aspects of discovery and has caused disputes to arise early and often. To manage these issues, Judge Chhabria appointed the Honorable Jaqueline Scott Corley to resolve discovery disputes. Although this appointment has substantially improved the discovery process, Plaintiffs have not relented in their efforts to hunt for new theories under the guise of discovery. As set forth below, Plaintiffs are now seeking broad categories of user data that go far outside the four actionable theories of relief.

## ARGUMENT

### I. The Court should enforce the stay articulated in Pretrial Order 20

Pretrial Order 20 and Rule 26 must guide the scope of discovery in this action. The four categories of alleged misconduct that survived the motion to dismiss all start from the same place: with a Facebook user sharing "sensitive user information." Judge Chhabria defined this term to mean "substantive and revealing content *that users intended only for a limited audience* [*i.e.*, their friends], such as their photographs, videos they made, videos they watched, their religious and political views, their relationship information, and the actual words contained in their messages." Dkt. 298 at 1 (emphasis added), *see also id.* at 7, 13, 17. Pretrial Order 20 finds Plaintiffs' claims actionable only to the extent that they relate to Facebook allegedly sharing this type of information through (i) friend

Gibson, Dunn & Crutcher LLP

8

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

sharing, (ii) whitelisting, or (iii) integration partnerships, or to (iv) Facebook's alleged failure to enforce restrictions on how third parties used the information Facebook shared with them.

**Table 2:  Actionable Theories Under Pretrial Order 20**



Pretrial Order 20 stays all claims and theories that do not fall into one of these categories.  The stay that Judge Chhabria articulated "necessarily include[s] a stay of discovery" on any stayed theories of relief.  *Meyers v. Cty. of Sacramento*, 2020 WL 207213, at *1 (E.D. Cal. Jan. 14, 2020).  When a "discovery stay [is] in place," a party "will not be permitted to seek discovery from [the opposing party]."  *InteraXon Inc. v. NeuroTek, LLC*, 2017 WL 24721, at *4 (N.D. Cal. Jan. 3, 2017).

Rule 26 also confines discovery to the four live theories articulated in Pretrial Order 20.  Under Rule 26, Plaintiffs are not entitled to seek discovery to test allegations or theories that did not survive Facebook's motion to dismiss—such as claims about "psychographic marketing" and "targeted advertising"—or to investigate new potential theories of wrongdoing.  Rule 26 was amended in 2000 to change the scope of discovery from information relevant to the "subject matter" of the case to information relevant to "claims or defenses."  Fed. R. Civ. P. 26(b)(1), Advisory Committee Notes to 2000 Amendments.  The scope of discovery must be "based on the actual claims or defenses surviving [dismissal]" and cannot go "beyond the claims that withstood [a] motion to dismiss."  *In re Ashworth,*

Gibson, Dunn & Crutcher LLP

9
DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

*Inc. Sec. Litig.*, 2002 WL 33009225, at *4 (S.D. Cal. May 10, 2002); *see also Brown v. Stroud*, 2010 WL 3339524, at *2–4 (N.D. Cal. Aug. 24, 2010) (denying plaintiff's request for "discovery beyond th[e] scope" of the claims as "indicated" in the court's motion to dismiss.)

The amendments to Rule 26 also make clear that Plaintiffs are not entitled to conduct a roving inquiry into all of Facebook's business practices to develop new theories of relief. In civil litigation, discovery must be tied to live claims. *Rembrandt Diagnostics, LP v. Innovacon, Inc.*, 2018 WL 692259, at *8 (S.D. Cal. Feb. 2, 2018) ("Plaintiff's argument that this type of information would be provided in an audit lacks merit, this is discovery, not an audit."). Federal courts regularly reject discovery requests that are not tied to specific, live factual allegations and have observed that "conclusory relevance arguments are not enough to justify an order allowing plaintiff to rummage through . . . years' worth of" corporate records. *Shuckett v. Dialamerica Mktg., Inc.*, 2018 WL 4350123, at *6 (S.D. Cal. Sept. 10, 2018). Nor may a plaintiff "bootstrap" broad discovery onto narrow allegations. *OMG Fid. Inc. v. Sirius Tech., Inc.*, 2007 WL 1994230, at *1 (N.D. Cal. July 5, 2007).

For this reason, in a privacy MDL against Apple, the Court held discovery would be limited to the types of data the plaintiffs alleged Apple wrongfully collected. *See In re iPhone/iPad Application Consumer Privacy Litig.*, 2012 WL 5897351, at *4–5, *7 (N.D. Cal. Nov. 21, 2012). In that case, "Plaintiffs allege[d] Apple's devices collected and stored only certain categories of data, such as date of birth, gender, income, education level, partners sought, and zip code." *Id.* at *5. But, like Plaintiffs here, the plaintiffs requested "all information relating to privacy and Apple's devices." *Id.* at *7. The Court rejected this request as "beyond the scope of their claims," explaining: "Plaintiffs cannot rely on their desire to explore if other types of data were collected to support their requests for discovery," or "to compile their allegations." *Id.* at *5, *7. Like the Apple plaintiffs, Plaintiffs here are only entitled to discovery targeted at live claims and defenses. The Court defined Plaintiffs' claims to concern only "sensitive user information" that *users* shared with their friends on the Facebook platform and that Facebook went on to allegedly share with third parties. That is the scope of relevant user data.

## II.   The additional user data Plaintiffs demand relates only to stayed or unpled theories and cannot realistically be collected and produced

As Facebook understands, in addition to the 850,000 pages of user data already produced, Plaintiffs demand (i) additional information about the Named Plaintiffs' activities off of Facebook, and

Gibson, Dunn & Crutcher LLP

10
DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

(ii) all internal business analytics that include or draw from data points originating from the Named Plaintiffs. Any such information falls well outside the scope of Pretrial Order 20 and Rule 26.

### A. Off-Facebook Activity does not relate to any live theory, and any information associated with Plaintiffs' accounts has been produced.

As discussed, Facebook produced the full set of data associated with each Named Plaintiffs' account, including any information about the Named Plaintiffs' online activities on apps and websites other than the Facebook Platform, which is called "off-Facebook Activity." Facebook had no obligation to produce Plaintiffs' off-Facebook Activity but did so anyway. Plaintiffs now demand that Facebook produce even more data related to activities off of the Facebook Platform.

Off-Facebook Activity is information about users' online activities away from Facebook, which third-party apps and websites provide to Facebook. For example, when a user visits a news app, that app might report to Facebook the fact that the user opened the app, logged into the app with Facebook Login, viewed content, searched for an item, added an item to a shopping cart, made a purchase, or made a donation.[5] None of this information has any relevance to this case, which concerns "sensitive user information" that users intended to share with a limited audience *on Facebook*. Off-Facebook Activity is information provided by a third party concerning users' online activities *away from the Facebook Platform*, which—by definition—is not information shared by a user *on the Platform*.

Off-Facebook Activity also is not the type of information Judge Chhabria found "sensitive." Judge Chhabria described sensitive information as "substantive and revealing content *that users intended only for a limited audience* [*i.e.*, their friends], such as their photographs, videos they made, videos they watched, their religious and political views, their relationship information, and the actual words contained in their messages." Pretrial Order 20, Dkt. 298 at 1 (emphasis added); *see also id.* at 7, 13, 17. In contrast, off-Facebook Activity concerns logging in and out of apps, visiting web pages, viewing online content, and potentially making purchases or adding items to shopping carts. That information is fundamentally different from photos and private messages and is commonly collected

---

[5] *See What is off-Facebook activity?*, https://www.facebook.com/help/2207256696182627 (last visited Sept. 18, 2020). Users' accounts include an off-Facebook Activity section, where they are able to view a summary of their interactions with these third parties. *Id.* Users' DYI files—which have been produced for each Named Plaintiff—include additional details about these interactions. *Id.*

11
DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

and tracked through cookies.[6]

Plaintiffs say they demand this information because it relates to targeted advertising or tracking users. *See* Joint Status Update, Dkt. 495 (Aug. 13, 2020) at 2-3, 9; July 30 Joint Statement, Dkt. 484, at 3. But this case is not about targeted advertising—it is about Facebook's alleged practice of sharing with third parties "sensitive user information" through friend sharing, whitelisting, or integration partner agreements. Indeed, Judge Chhabria explicitly rejected Plaintiffs' targeted advertising allegations, noting that Plaintiffs concede targeted advertising is "perfectly legitimate." Pretrial Order 20, Dkt. 298 at 6; *see also* Consolidated Compl., Dkt. 148 ¶ 110 (conceding "[t]here is nothing wrong with targeted advertising"). The case also is not about tracking. Judge Chhabria rejected Plaintiffs' tracking allegations and there is a separate MDL pending against Facebook in this district regarding user tracking. *See In re Facebook Internet Tracking Litig.*, No. 12-md-2314 (N.D. Cal.).

Even if off-Facebook Activity were relevant, the burdens of locating the additional information Plaintiffs seek would far exceed the needs of the case. *See* Fed. R. Civ. Proc. 26(b)(1); *see also Gilead Scis., Inc. v. Merck & Co*, 2016 WL 146574, at *1 (N.D. Cal. Jan. 13, 2016). Facebook already produced the off-Facebook Activity associated with the Named Plaintiffs' accounts, because this information is included in users' DYI file. Any additional information related to a user's activities off of the Facebook Platform is not associated with a user's account and would include: (i) data Facebook received from third parties but has not linked definitively to a particular user;[7] or (ii) granular details, like the specific items a user added to a shopping cart, that are not associated with users' accounts. Facebook has more than 2 billion users and there are certain practical limitations on the volume of granular data it can maintain for each account. This more granular data is typically preserved only temporarily in a machine readable format and is not associated with the user's account.

Facebook cannot reasonably locate either type of information. Rather than being indexed and searchable by user, any additional user information provided by third parties is organized by the party who provided the information. To provide a visual: Imagine Facebook is a library and each book in

---

[6] This is why your Internet browser frequently displays adds for items you have viewed online.

[7] This could occur if the information was gathered from a user who was not logged into Facebook, or if the information was gathered from a user who was using a device from which she had not previously logged into Facebook. *See supra*, note 5, https://www.facebook.com/help/2207256696182627.

Gibson, Dunn & Crutcher LLP

12

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

that library contains the information provided by a single third-party. There is no way to search all of the books at once. Instead, Facebook must open and read each book individually and assess whether any data in those books could have originated with one of the Named Plaintiffs. This would be a monumental and largely unsuccessful undertaking, particularly given that Facebook already determined it cannot link much of this data with certainty to any particular user's account, which is why it was not provided in the first instance.

Even if Facebook undertook this effort and managed to dig up a few additional data points or details about a Named Plaintiff's activities on third party apps or websites, it is not clear how that information could possibly move the needle. The materials Facebook produced already show in tremendous detail the third parties from which Facebook receives information and the types of information provided. Any additional data points Facebook could locate (for instance, a login to the same site from a different computer) would be more of the same. Even if off-Facebook Activity were relevant to a live theory—and again it is not—Plaintiffs already have the information they need to understand the third parties from which Facebook received this data and the types of data at issue.

To the extent Plaintiffs believe they require granular details about individual users' activities on third party apps and websites to prove their claims, this case should not move forward as a putative class action. The issues around Facebook users' off-Facebook Activity are inherently individualized. Each Facebook user visits different websites and installs different apps, and each website and app implements different custom events (actions a user can take on the website or in the app), records different types of data about those events, and makes different choices about what types of data to transmit to Facebook. If granular, individualized details about each Named Plaintiff's off-Facebook Activity are essential to Plaintiffs' case, they will never be able satisfy the predominance requirement of FRCP 23(b)(3). *See, e.g.*, *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 948–49 (9th Cir. 2011).

### B.  Facebook's business analytics do not relate to any live theory.

Plaintiffs similarly demand that Facebook produce all of its business analytics dating back to 2007 to the extent they include or draw from even a single data point relating to one of the Named Plaintiffs' accounts. This request seeks *millions* of data tables—many of which contain multiple terabytes or even petabytes of data—having nothing to do with this case.

Gibson, Dunn & Crutcher LLP

13
DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

Facebook has more than 2 billion users, and many billions—if not trillions—of data points flow through its systems every day. Facebook employs thousands of data scientists and engineers who run analyses of this data as part of their job duties. For instance, Facebook uses aggregated user data to track how many users log onto Facebook each day, which is essential to scoping Facebook's infrastructure needs. The Company also analyzes user data to identify bugs, test new products, detect and prevent spam, and promote safety and security. Facebook has millions of data tables, and most (if not all) have nothing to do with any live claim. Yet, Plaintiffs demand data from all of these tables to the extent they draw on even a single data point originating from a Named Plaintiffs' account.

Facebook has asked Plaintiffs repeatedly if there are particular types of analyses they believe are relevant to live claims and not duplicative of the information already produced. Plaintiffs have not identified any such materials and instead continue to demand that Facebook throw open its doors to allow Plaintiffs to evaluate every data point Facebook maintains and what it does with that data.

Plaintiffs "have no entitlement to discovery to develop new claims … not already identified in the pleadings." *DPR Constr., Inc. v. Anka (Cortez Hill) LLC*, 2006 WL 8455253, at *2 (S.D. Cal. Oct. 27, 2006); *accord Feigel v. F.D.I.C.*, 935 F. Supp. 1090, 1101 n.7 (S.D. Cal. 1996) ("discovery should be used to flesh out claims, not search for new ones"). And yet Plaintiffs' justifications for demanding production of vast swaths of Facebook data and analytics are entirely untethered from the four theories of liability under Pretrial Order 20.

For example, Facebook recently asked Plaintiffs if they would, at minimum, agree that if Facebook hypothetically possessed a database that had the ability to receive data, *but no ability to output (i.e., share) data*, that database would be out of scope. Plaintiffs refused to agree, arguing that the hypothetical database could theoretically create "inferences" from user data that Facebook could use to target users. But targeted advertising is outside the scope of the four theories of alleged misconduct that remain alive in this case.

Plaintiffs similarly maintain that Facebook should produce any analyses related to user logins—even if used only to scope infrastructure needs—because the data ***could*** theoretically be used to measure user engagement and therefore to track and target users. Along the same lines, Plaintiffs claim that any data regarding the movement of a user's cursor on their computer screen—which is used to

14
DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

Gibson, Dunn &
Crutcher LLP

detect bots on the Platform—should be produced because it too *could* be used for "tracking." Plaintiffs also seek "detailed information" about "who clicks on" specific ads, Aug. 13 Joint Statement, Dkt. 495 at 9, and data regarding how users "engaged with . . . content and how they reacted, information which third parties use to target and trigger responses in users," *id*. at 2-3. Here again, allegations about "tracking" of users are irrelevant to the four theories that survived the motion-to-dismiss ruling.

Plaintiffs are not entitled to scour more than a decade of sensitive business information in a speculative effort to pursue claims based on tracking, targeted advertising, or some new theory of liability they did not plead in their live complaint. As this Court has acknowledged: "[I]t would almost always be more efficient for a defendant to open up [its] document repositories for the opposing side to rifle through. But such a practice would expand the scope of discovery beyond that allowed by the Federal Rules." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 4680242, at *1 (N.D. Cal. Oct. 18, 2017) (Corley, M.J.).

What is more, it would be nearly impossible for Facebook to identify all data points contained within its business analyses that may have originated from Plaintiffs. The tables Plaintiffs demand are not centrally indexed and the data in them is disassociated from the user's ID within 90 days. So to find the data Plaintiffs seek, Facebook would need to identify every single internal analysis that uses platform data—again, Facebook would need to read every book in the library—and then perform multiple operations on each of those internal analyses (none of which would be guaranteed to succeed) to try to determine whether any data in the analysis originated from a Named Plaintiff. Even a large team of engineers working full time for several years likely could not accomplish such a task.

If Plaintiffs are able to articulate specific types of data analyses they seek that relate to live theories, Facebook will search for that information in good faith. But the Court should reject Plaintiffs' ongoing effort to conduct a boundless and directionless audit of more than a decade of *internal* business analyses, merely because they may include a single data point originating from a Named Plaintiff.

## CONCLUSION

The Court should enforce the stay that Judge Chhabria imposed, allow discovery to move forward only on the four theories of relief detailed in Pretrial Order 20, and hold that the additional user data Plaintiffs demand relates only to stayed or unpled theories.

15
DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

Gibson, Dunn & Crutcher LLP

| | |
|---|---|
| DATE:  September 18, 2020 | Respectfully submitted,<br><br>**GIBSON, DUNN & CRUTCHER, LLP**<br><br>By:  *Orin Snyder*<br>Orin Snyder (*pro hac vice*)<br>osnyder@gibsondunn.com<br>GIBSON, DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, NY 10166-0193<br>Telephone:  212.351.4000<br>Facsimile:  212.351.4035<br><br>Deborah Stein (SBN 224570)<br>dstein@gibsondunn.com<br>GIBSON, DUNN & CRUTCHER LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071-3197<br>Telephone:  213.229.7000<br>Facsimile:  213.229.7520<br><br>Joshua S. Lipshutz (SBN 242557)<br>jlipshutz@gibsondunn.com<br>GIBSON, DUNN & CRUTCHER LLP<br>1050 Connecticut Avenue, N.W.<br>Washington, DC 20036-5306<br>Telephone:  202.955.8500<br>Facsimile:  202.467.0539<br><br>Kristin A. Linsley (SBN 154148)<br>klinsley@gibsondunn.com<br>Martie Kutscher (SBN 302650)<br>mkutscherclark@gibsondunn.com<br>GIBSON, DUNN & CRUTCHER LLP<br>555 Mission Street, Suite 3000<br>San Francisco, CA 94105-0921<br>Telephone:  415.393.8200<br>Facsimile:  415.393.8306<br><br>*Attorneys for Defendant Facebook, Inc.* |

Gibson, Dunn &
Crutcher LLP

16
DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20