Pages 1 - 38

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


Before The Honorable Jacqueline S. Corley, Magistrate Judge


IN RE:  FACEBOOK, INC. CONSUMER )
PRIVACY USER PROFILE LITIGATION.)  **NO. 18-MD-02843 VC (JSC)**
——————————————————————  )


San Francisco, California
Friday, September 25, 2020

**TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

**APPEARANCES**: (via Zoom)

For Plaintiffs:

        KELLER ROHRBACK LLP
        1201 Third Avenue - Suite 3200
        Seattle, Washington  98101
  BY: **DEREK LOESER, ATTORNEY AT LAW**
      **CARI LAUFENBERG, ATTORNEY AT LAW**
      **DAVID J. KO, ATTORNEY AT LAW**


  BY:

        BLEICHMAR, FONTI & AULD LLP
        555 12th Street - Suite 1600
        Oakland, California  94607
  BY: **LESLEY E. WEAVER, ATTORNEY AT LAW**
      **ANNE K. DAVIS, ATTORNEY AT LAW**
      **MATTHEW P. MONTGOMERY, ATTORNEY AT LAW**
      **ANGELICA M. ORNELAS, ATTORNEY AT LAW**


**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**


Reported By:      Marla F. Knox, RPR, CRR, RMR
            United States Official Court Reporter

```
 1   APPEARANCES:   (CONT'D)

 2   For Defendant:
                             GIBSON, DUNN & CRUTCHER LLP
 3                           1881 Page Mill Road
                             Palo Alto, California  94304
 4                  BY:  MARTIE KUTSCHER CLARK, ATTORNEY AT LAW

 5                           GIBSON, DUNN & CRUTCHER LLP
                             333 South Grand Avenue
 6                           Los Angeles, California  90071
                    BY:  DEBORAH L. STEIN, ATTORNEY AT LAW
 7
                             GIBSON, DUNN & CRUTCHER LLP
 8                           2100 McKinney Avenue - Suite 1100
                             Dallas, Texas  75201
 9                  BY:  RUSSELL H. FALCONER, ATTORNEY AT LAW

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>Friday - September 25,2020</u>                                    <u>8:30 a.m.</u>

**THE CLERK:**  Court is now in session.

Calling civil action 18-MD-2843, In Re: Facebook, Inc.

Counsel starting with Plaintiffs, can you please state your appearance?

**MS. WEAVER:**  Yes, I have been asked to be the spokesperson.  And today we have Derek Loeser, Cari Laufenberg and David Ko from Keller Rohrback.  And from my firm, Anne Davis, Matt Montgomery, Angelica Ornelas and myself, Leslie Weaver, from Bleichmar Fonti.

**THE COURT:**  Good morning.

**MS. KUTSCHER CLARK:**  Good morning.  And for Defendants you have Deborah Stein, Russ Falconer and myself, Martie Kutscher Clark, at Gibson Dunn for Facebook.

**THE COURT:**  All right.  Good morning.  All right. Thank you for your joint statement.  Let's start sort of with the easier, the ADI.  So I'm getting a stip today, Ms. Kutscher Clark?

**MS. STEIN:**  I could speak to that actually, Your Honor.

**THE COURT:**  Ms. Stein, okay.

**MS. STEIN:**  Good morning, Your Honor.  So our prior stipulation said that we would be prepared to stipulate today. We sent over a stipulation last night to Plaintiffs with our proposed timing.

1    The "prepared to stipulate" language in the prior

2    stipulation was purposeful because we received the names of the

3    six apps last week.  So we have used the past week to come up

4    with the number of documents to figure out how much time we are

5    going to need.

6    So we are hopeful Plaintiffs will be okay with our

7    proposed timing, which I'm happy to share with Your Honor; but

8    I don't know if the stipulation will actually get filed today

9    or next week.

10    **THE COURT:**  Ms. Weaver, have you even had a chance to

11    look at it and talk it over with your colleagues?

12    **MS. WEAVER:**  Thank you, Your Honor.  We have reviewed

13    it.  I think Mr. Ko wants to address this issue.  Is that

14    right?

15    **MR. KO:**  Yeah.  Hello, Your Honor.  Yes, this is David

16    Ko of Keller Rohrback.  So we did receive it late last night,

17    and we actually haven't had a chance to thoroughly vet it.  So

18    we obviously want to take this afternoon and this morning to do

19    so.

20    But our initial reaction -- and this is something that we

21    alluded to in our statement -- that, you know, we understand

22    that it's going to take some time for Facebook to review this

23    material.  But we also are cognizant of the fact that

24    Your Honor kind of initiated this process in mid July.

25    And so, you know, there needs to be some sort of concrete

 1   deadlines to this.  And whether or not it is in this stip or

 2   some time soon, we do think that we need to set some clear

 3   deadlines about when we will have briefing to Your Honor.

 4        **THE COURT:**  No, no, no.  I agree.  I do want --

 5   deadlines are magical.  So I do want deadlines.  All right.

 6   Ms. Stein?

 7        **MS. STEIN:**  Yes, Your Honor.  So the way we have the

 8   stipulation that we drafted framed is we've actually tried to

 9   keep the timing pretty tight with an estimated 30 days to

10   finish collecting and reviewing the documents.

11        They are not even done -- we haven't started a review yet

12   because we just got the names of the apps last week.  So 30

13   days to review the documents; 45 days to log them.

14        We are talking about thousands and thousands and thousands

15   of documents, Your Honor.  So 45 days is consistent with the

16   privilege log protocol that the parties previously negotiated

17   in a case.  And that's the active protocol in the case.

18        So 45 days to log.  That privilege log protocol has timing

19   for privilege log challenges, for the meet-and-confer

20   associated with it, and then a reference to then meeting and

21   conferring about how to brief it and once the parties know what

22   is being briefed.

23        So we are trying to keep things pretty fast, Your Honor.

24   We just -- so we don't propose actual briefing deadlines

25   because we don't know what the topics are to be briefed.

**THE COURT:**  Well, it sounds like, though, we should plan on briefing it in January; right.  We don't want anyone briefing it over the holidays, such as they are.

So let's really work on thinking -- at least get the briefing started in January.

**MS. STEIN:**  I think that's probably where it would land, Your Honor.  I think that it's probably a 30-day -- depending on how the challenge process works, the protocol contemplates, I think, giving Plaintiffs 30 days to identify their challenges and then a meet-and-confer process concerning that.

So it may spill into February before there is briefing, but it can be faster if the Plaintiffs are faster -- do you understand the sort of --

**THE COURT:**  Yeah, yeah, yeah.  But I guess -- I mean, this is a little bit different in the sense that we sort of know already what the objections are.

I mean, the issue is there.  It is just that I said I want to do it in context.  I want some actual documents.  I don't think the meet-and-confer should take that long.

I mean, I think they are expecting you to say "no."  They will be pleasantly surprised if you say "yes."  So I don't know that it will take the full 30 days.

**MS. STEIN:**  It may not, Your Honor.  I think the question is probably whether the challenges are to specific

1    documents or whether they are more categorical.  So that's sort

2    of where there is a bit of uncertainty.

3          THE COURT:  Yeah.  I mean, we are doing this whole

4    exercise because there was sort of a categorical objection to

5    production.  And I wanted to have actually something in front

6    of me so that it wasn't just a hypothetical ruling.

7          So, anyway, I would like you to at least set your sights

8    on getting the briefing going in January.

9          MS. STEIN:  Sounds good, Your Honor, thank you.

10         THE COURT:  All right.  Anything further, Mr. Ko?

11         MR. KO:  No.  That's fine, Your Honor.

12         THE COURT:  Okay.  All right.  So now, let's go to the

13   search terms.  So this is what I'm going to do -- we just have

14   to do something to bring this to an end.  What I want to do --

15   and this is just because it's the only way to make it even

16   manageable for me -- by Monday at Noon I want Plaintiffs to

17   identify -- let me ask you this:  The proposal that Plaintiffs

18   sent on, I think, September 19th -- is that the proposal that

19   has been exchanged?  Ms. Weaver --

20         MS. WEAVER:  Yes, Your Honor.

21         THE COURT:  -- are you speaking on this one?  Okay.

22   How many string searches were there?

23         MS. WEAVER:  We count 195.  Their initial proposal was

24   13 line items.  That was 78.  And we are at about 195 right

25   now.

1            **THE COURT:**  Okay.  All right.  What I want you to do

2    is by Noon on Monday identify your top 75.  They are just all

3    not equally important.  Your top 75.

4            And then by Wednesday I want Facebook to prepare to

5    respond.  This is going to be the meet-and-confer.  Be in

6    writing.  But it has to be in person, you know, video as well;

7    and have your discussion, your meet and confer.  That's the

8    30th.

9            By the 2nd I want you to -- each to share your final

10   positions.  So I'm pushing it a little bit because otherwise

11   I'm going to get something on the 2nd that is not useful.  And

12   then we are done with the meet and conferring, and you have all

13   laid down your gauntlet.  This is it.  This is what I'm going

14   to Judge Corley with.

15           By the 2nd, though, you would have shared everything you

16   are going to share with me including if you are going to attach

17   as an exhibit -- for example, the Plaintiffs if they are going

18   to attach a document that has been produced that they are

19   saying:  This is why we need this search string because this is

20   how it was used here -- you have to have shared that with

21   Facebook.

22           Same thing.  Facebook, if you are going to show me this

23   is -- look, Judge, look at this ridiculous document that comes

24   up with their search string.  And we are going to get hundreds

25   of these.  You have to have shared it with the Plaintiffs.

1    Nothing can be argued to me or shared or attached that has

2    not -- that's why I'm giving you more time.  I'm giving you

3    next week to really focus your arguments and share.

4    And then your submissions will be filed with me on that

5    Wednesday the 7th.  And this is what the submissions should

6    address -- oh, and then the submissions itself -- while

7    Plaintiffs would have given you your top 75 -- no more than 50

8    strings.  I'm not saying you are limited to 50 for the case.

9    I'm just saying with this round, I want your top, right; your

10   best; your most yield; what you need most.

11   And then we will deal with it later because, again, it's

12   the only way to be manageable and for me to get my hands around

13   this and to actually get this production going.

14   Facebook, you don't have to have 50.  They would be

15   thrilled if you had 50.  You can have fewer.  But whatever.  No

16   more than.

17   And then your submissions, I think the way to do it would

18   be:  Here is the request for production.  And these are the

19   strings.

20   Now, there may be strings that overlap that apply to more

21   than one request for production.  So organize it any way you

22   want.  But what I want to know is what documents in response to

23   what requests are these strings searching for and also for the

24   request for production -- to the extent you think it's

25   important or there is a dispute -- what claim or defense will

these documents tend to prove.  What custodians they are for.

I know -- and it could be by group, however.

And, yeah, so -- and why these documents are needed or not needed.  And so what gap -- for example, in this case unlike many cases you do have the -- have now had and reviewed what was produced to regulators.

And so what gap are these documents or these requests, string search, going to fill -- or what you saw that leads you to believe there is stuff there and from Facebook why they don't.

So do it that way.

**MS. WEAVER:**  Your Honor, a point of clarification. These are the disputed terms; is that correct?

**THE COURT:**  Yeah, yeah, exactly.

**MS. WEAVER:**  Just wanted to make sure.

**THE COURT:**  If you agree, I don't care.

**MS. WEAVER:**  Okay.  Good.  Thank you.

**THE COURT:**  Oh, and thank you for reminding me that there is some agreement.

(Laughter)

**MS. STEIN:**  We were just going to put in all the ones that everyone agreed upon, Your Honor.

**MS. WEAVER:**  Right.  We feel like we are agreeing; but then these statements come out, and it really hurts our feelings, Deb.

1          **MS. STEIN:**  Your Honor --

2          **THE COURT:**  That makes me feel much better,

3    Ms. Weaver.  Thank you.

4          **MS. STEIN:**  We have a policy on our calls, Your Honor,

5    that when we (audio cut out) we all eat chocolate chip cookies.

6          **THE COURT:**  That's awesome.  I wish you could send me

7    some.

8          **MR. LOESER:**  I think we might have run out of cookies

9    for the last few calls.

10                        (Laughter)

11         **THE COURT:**  Well, I'm just trying to give you

12   guidelines and structures to help bring it together.

13         **MS. WEAVER:**  That's helpful, Your Honor.

14         **MR. FALCONER:**  Your Honor, this is Russ Falconer for

15   Facebook.  Can I ask one clarifying question?

16         **THE COURT:**  Yes.

17         **MR. FALCONER:**  With the 75 terms we are going to get

18   from Plaintiffs on Monday, are those to be picked from the list

19   that they sent us on Saturday the 19th or --

20         **THE COURT:**  Yeah, yes, because we have been doing this

21   process for a while.  Of the 195, their top 75 that are most

22   important.  And maybe you will agree to 50 of them, and that

23   all that then needs to be -- well, then there we are -- well,

24   let me think about this.

25                    (Pause in proceedings.)

1          **THE COURT:**  So I have been -- I appreciate that,

2     Ms. Weaver.  I had been thinking more that -- no more than 50

3     submitted to me, but then that -- that then sort of -- not that

4     they would do this, but that gives Facebook an incentive not to

5     agree.  And I don't want to do -- I don't want to do that.

6                         (Pause in proceedings.)

7          **THE COURT:**  Let's -- and I'm sorry if this is

8     arbitrary.  I'm just trying to help figure it out.

9          No more than 75 search strings, period, can be Plaintiffs'

10    final demand.  And then -- yeah.  And then however many

11    Facebook agrees to, they agree to.

12         I assume whatever is presented to me will be less than 50

13    because they are going to agree to more than 25 and then --

14         **MS. WEAVER:**  Okay.

15         **THE COURT:**  That's what I'm thinking.

16         **MS. WEAVER:**  Just another --

17         **THE COURT:**  Sorry.  Go ahead.

18         **MS. WEAVER:**  So Facebook has proposed some terms to

19    us, and we proposed some edits to them; but we didn't reject

20    them.  That's not in this pile.  That is sort of what we would

21    call "agreed" already.  Because I would hate to unwind that.

22         **THE COURT:**  Yeah, I don't want to unwind anything.

23         **MS. KUTSCHER CLARK:**  Could I comment on that,

24    Your Honor?

25         **THE COURT:**  Of course.

1          **MS. KUTSCHER CLARK:**  In the joint statement you saw an

2   example of that where the revisions frequently take one of our

3   terms and multiply it by three or four times to be

4   significantly larger and significantly broader.

5          So in our view many of those revisions really are terms

6   that are in dispute at this point.

7          **THE COURT:**  This is -- okay.  This is what I'm going

8   to do:  I don't want no more than 50 strings can be presented

9   to me in dispute.  That's all.  I'm going to put that limit

10   there.

11          **MR. LOESER:**  Now I want to make sure I understand.

12          So there is a population of agreed terms.  It sounds like

13   there might be some disagreement as to what is agreed.  So the

14   first thing we have to do with Facebook is figure out what is

15   that population of agreed terms.  We will devote ourselves,

16   hopefully today, to sorting that out.

17          Then there is the population of terms that is disputed.

18   And we are going to have a meet-and-confer with Facebook.  We

19   will identify -- is it 75 terms that we still want -- and then

20   from that, the parties will then ultimately --

21          **THE COURT:**  We are talking about strings.  I'm trying

22   to figure out --

23          **MR. LOESER:**  Strings.

24          **THE COURT:**  -- the proposal on September 19th, did

25   that include strings that have already been agreed to or was

```
 1   that in addition to?
 2          MS. DAVIS:  Your Honor, Anne Davis.  I can speak to
 3   that.
 4      So our proposal on the 19th included, you know, a set of
 5   proposed revisions to Facebook's terms which included revisions
 6   to RFP coverage, custodians and the terms themselves.
 7      There is a small subgroup of terms, generally very simple
 8   terms, where the parties are in agreement.  And then there is
 9   the set of additional terms that Plaintiffs have proposed
10   because we believe, you know, they are filling gaps in
11   Facebook's base proposal.
12      So, you know, I think from our perspective, the set of
13   terms where we have proposed revisions is a distinct group that
14   I think we can, you know, decide to handle fairly quickly.
15      And then, you know, Plaintiffs have this additional set of
16   terms that, you know, are -- you know, we think gap filling and
17   I think we need your guidance in terms of do you mean 75 terms
18   from that set or, you know, 75 terms including revisions to
19   Facebook's proposal?
20          THE COURT:  The latter.
21          MS. DAVIS:  Okay.
22          THE COURT:  The latter; right.  And I'm talking about
23   search strings, I guess, not terms, right, because terms would
24   be --
25          MS. DAVIS:  Yes.
```

1          **THE COURT:**  -- you would be out -- you would meet your

2     quota with just two strings.

3          **MS. KUTSCHER CLARK:**  We would be happy to have 75

4     strings.

5          **THE COURT:**  No, no, no.

6          **MR. LOESER:**  Let me ask you one more process question,

7     Your Honor, because I think you are sensitive to Facebook -- an

8     issue of we want to be able to avoid being able to game this

9     process.

10          Now that there is this process, we could take a look at

11    the terms where we have proposed revisions to their terms; and

12    we could remove -- we will have to go through and look.  We

13    could see if there is additional terms that would just move to

14    the agreed list so that we don't consume the entirety of our

15    numbers on bickering over terms that all we were trying to do

16    is modify them to make them better.

17          **MS. STEIN:**  Strings --

18          **THE COURT:**  I'm not -- so if it's custodian -- I'm

19    not -- you don't have to -- if it is a dispute over which RFPs

20    it covers or custodians, that I'm not talking about.

21          What I'm talking about is really the scope of the search

22    string.  So, you know, additional terms and those kinds of

23    things within the search string, not custodian, you know,

24    disputes or things like that.  I think.  I don't know.  I'm

25    open to --

1        **MS. WEAVER:**  See, Your Honor --

2        **THE COURT:**  Yes.

3        **MS. WEAVER:**  If we set the disputed terms aside -- the

4   ones where they proposed and we have made counter revisions --

5   if we could set those aside -- I don't want to -- we could

6   reach agreement on those possibly.  There is at least a kernel

7   of something -- and really just focus on the new terms that we

8   had proposed that they had blanketly said no to, then we could

9   at least get through those.

10       **THE COURT:**  Well, let me --

11       **MS. WEAVER:**  Yeah.

12       **THE COURT:**  In the statement they give examples

13  what -- on page 6 of the joint statement.  Like to me that is a

14  big dispute that I'm going to have to decide if you can't come

15  to an agreement.

16    So I want you to identify whether they are new, whether

17  they are revisions, whatever -- it doesn't matter -- your top

18  75.

19       **MS. WEAVER:**  Seventy-five then should we -- should be

20  the number, Your Honor?  Because otherwise we are -- we are

21  unwinding some of the work that we have done.  We are afraid

22  that the incentives aren't cutting the right way.

23       **THE COURT:**  So you have already agreed to 75 search

24  terms?

25       **MS. WEAVER:**  No, no.  We are negotiating.  And what

1   will happen now is we won't reach agreement on anything so that

2   there is a bigger pool that we have to choose from.

3       So we would like a little more latitude, Your Honor.  We

4   won't want to put more work on Your Honor's shoulders, but this

5   ruling could --

6          **THE COURT:**  Well, what do you propose?  I'm not

7   saying -- it is not forever.  And Facebook, given their

8   position, can't complain later on that they have to go back and

9   do search again if it turns out something really relevant was

10  cut off.

11         **MR. LOESER:**  Yeah, Your Honor, this is what I was

12  trying to get at and I was being not very articulate about it.

13      There is a population of terms that they propose that we

14  have offered revisions to.  It would be nice if for this

15  process of determining the 75, we could go back; look at that

16  and eliminate dispute as to many of them as we can because we

17  could live with some of what we have done.  So that we don't

18  end up using all of our 75 on terms of which there is kind of a

19  base agreement as to those terms.  It is just that we proposed

20  some revisions.

21      So since we are resetting this process, I think what we

22  would like to be able to do is say:  Okay, really what we are

23  trying to do here is not undo the work where there is agreement

24  or close to agreement, but find a path forward for dealing with

25  the disputed terms.

1    So we would like to be able to take a look at the

2  proposals we made to revise their proposal, and we will

3  eliminate from dispute as many of those as we can by accepting

4  their strings.

5    That will then remove the incentive that exists otherwise

6  for Facebook to disagree with everything and for us to have to

7  sort of bid against ourselves on getting to 75.

8    So we will take that -- the population of terms where they

9  made a proposal and we made a revision -- we will take another

10  look at those, and we will try to eliminate every dispute we

11  can and accept as many terms as we can.

12        **THE COURT:**  Okay.

13        **MR. LOESER:**  That shouldn't count against the 75.  If

14  it does, it just creates incentives in the wrong direction.

15    Then we will go to the really disputed terms.  Work on the

16  75.  And all the process you described would apply to that.  I

17  think that would be a more effective way of getting to where

18  you want to go without undoing work that has been done already.

19        **THE COURT:**  Okay.  So you want to start with their --

20  you are going to go back and look at your revisions to their

21  last proposal?

22        **MR. LOESER:**  Right.  So that we can eliminate, to the

23  extent possible, any disputes.  There will still be disputes.

24  There will be some of those we need to revise because they were

25  inadequate and they can't be fixed.

1          THE COURT:  Yes.

2          MR. LOESER:  There will be some now that you have hit

3  us over a head with the hammer --

4                      (Laughter)

5          MR. LOESER:  -- we will come around to accept it.

6          THE COURT:  That's exactly what I wanted to do.  You

7  know, it is just like time limits in trial.  It makes you just

8  really figure out what is the most important.

9       That's fine.  When do you think you could do that by?

10         MR. LOESER:  I think we should try to do it, frankly,

11  today and just --

12         MS. WEAVER:  I don't know if we can do it.

13         MR. LOESER:  I use the "we" very broadly on that one.

14         THE COURT:  Yeah.  If it is not Mr. Loeser, it is

15  somebody else.

16         MS. DAVIS:  To that end, I think we can fairly quickly

17  go through and -- you know, Facebook's terms.  And certainly I

18  think by Noon on Monday we could, you know, identify our 75

19  additional terms, you know, or those terms where we feel that

20  the revisions to Facebook's terms are incredibly important or

21  simply, you know, decide on which terms we can accept

22  Facebook's most recent proposal.

23         MR. LOESER:  Again, I think to be clear on the

24  process, what would happen on Monday -- and Ms. Davis can

25  correct me if I'm running off the rails -- the first thing we

1    will do is look at the revisions that we offered to Facebook's

2    terms, and we will try to remove from dispute as many as we

3    can.  That's A.

4        B, we will choose our 75 strings that will then become the

5    subject of the ongoing meet-and-confers.

6        **THE COURT:**  Okay.  So by Noon Monday you would have

7    done both those things or just by Noon Monday you will advise

8    Facebook of which ones you have sort of --

9        **MS. WEAVER:**  I think we might need a little bit more

10   time.  So by Noon Monday we identify the disputed.  Maybe by

11   Wednesday we pick our 75.

12       **THE COURT:**  No, no, no.  By Noon Monday you identify

13   the undisputed.

14       **MS. WEAVER:**  Undisputed, right.

15       **MS. DAVIS:**  We will accept Facebook's revisions --

16       **MR. LOESER:**  And, right, by --

17       **MS. DAVIS:**  -- from their last proposal, which we

18   received on September 11.

19       **MR. LOESER:**  Then, perhaps, by Wednesday -- now we are

20   all just thinking out loud --

21       **MS. WEAVER:**  Does that work, Anne, by Wednesday, can

22   we pick our winners, 75?

23       **MS. DAVIS:**  Yes.

24       **MS. KUTSCHER CLARK:**  Your Honor --

25       **MR. LOESER:**  We are on teams, Your Honor.

1          **MS. KUTSCHER CLARK:**  If that's going to be the

2    process, which is fine, I just want to flag, it is quite time

3    consuming for us to run hit counts on all of these terms.

4          **THE COURT:**  Yes.

5          **MS. KUTSCHER CLARK:**  Which tend to be very important

6    for the negotiation.  So if we are not getting the proposal

7    until Wednesday --

8          **THE COURT:**  Yeah, we got to spread it out.  Yeah, we

9    got to spread it out.

10          **MS. KUTSCHER CLARK:**  Yeah, I would guess we could

11    realistically have the hit counts done by the following Monday,

12    but I don't know that we could have them by Friday.

13          **THE COURT:**  Okay.  Well, you know what the experience

14    has been; and you have been sharing those hit counts.  I can

15    tell.  So that's good.

16          **MR. LOESER:**  And, Your Honor, I will just second that

17    the hit counts are very important.  And if we need to add a few

18    days to this process to get them, we fully endorse that.

19          **THE COURT:**  Yeah, me too.  I just want to have

20    something that is as pithy and on point as we can get.

21          All right.  So then that would be by -- so by Wednesday

22    you will provide -- by Monday at Noon you will say:  Okay,

23    Judge Corley made us bid us against ourselves.  We are

24    accepting these revisions.

25          By Wednesday you will identify your top 75 of what is left

1    in dispute.

2        And then by Monday, the 5th, is when you will be able to

3    share the hit counts and be able to meet and confer robustly.

4        And then -- and then what day -- should I give you the

5    week -- and so by Friday will be where each side has to have --

6    present their sort of final position and have shared every

7    piece of paper that they may present to me?

8            **MR. LOESER:**  As long as that's Halloween.

9            **MS. KUTSCHER CLARK:**  So that's just --

10           **MS. WEAVER:**  It is a little early.

11           **THE COURT:**  There is no Halloween this year.

12           **MS. KUTSCHER CLARK:**  Friday, the 9th, would be the day

13   to exchange with each other those final submissions?

14           **THE COURT:**  Yeah, exactly.  And so by the 9th --

15           **MS. KUTSCHER CLARK:**  Okay.

16           **THE COURT:**  I mean, I anticipate the meet-and-confer

17   should be going on that week; right.  You will have hit counts

18   on Monday.  You will be going back and forth eating your

19   cookies; sharing, whatever.  And then by Friday, though, that's

20   where -- that's it.

21       It is our final position.  We have now showed you,

22   Plaintiffs, all these are relevant documents.  Plaintiffs, we

23   have now showed you these hot docs that you are going to be

24   missing.

25       And then you will submit to me your -- with whatever is

1    left.  And maybe hopefully there won't be that much left in

2    dispute by the following Wednesday.  Is that enough time?

3              **MS. WEAVER:**  Yes, Your Honor.

4         **MR. KO:**  Your Honor, as long as we are speaking out

5    loud about ideas, in terms of hit reports being due on Monday,

6    October 5th, totally understand that it takes some time.  But

7    that would mean that we have to finalize our list and our final

8    ask in five days or less, right, today and then next Wednesday.

9    And then they would have just five days to turn around a hit

10   report.

11        I think we could -- if we are going to set this schedule

12   and push things back, I would ask -- and I think folks on my

13   side would agree -- that what we identify as being our top 75

14   be pushed back a little later next week, possibly Thursday or

15   Friday.  Because I think the hit report usually -- Martie, you

16   can correct me if I'm wrong -- takes 24 to 48 hours to turn

17   around.

18             **MS. KUTSCHER CLARK:**  No, no.  It takes many more days

19   than that.

20             **THE COURT:**  No, no, no.  The thing is, Mr. Ko, I think

21   you should know your top 75 as we sit here today; right?  You

22   have been living with these things.  I mean, right.  But you

23   would have until next Wednesday.  Like what is it?  You should

24   know what you are getting at and what is important.

25        You are not getting a hit report from them to do that;

1    right?  You are doing it based on what you know now.

2         **MR. LOESER:**  But the hit reports allow us to adjust,

3    modify, abandon, whatever the terms.  If we have a string that

4    doesn't produce any hits, then we don't need that string.  If

5    we have a string that produces 9 million hits, then we are

6    going to want to do something about it.

7         **MS. KUTSCHER CLARK:**  Well, you already have the hit

8    counts from the last round; and you are working off of what had

9    been proposed on the last round.  So you should already know if

10   something hits on nothing or 9 million.

11        **THE COURT:**  Right.  The 195 or so that you proposed on

12   the 19th, that was based on response --

13        **MS. WEAVER:**  Yes.

14        **THE COURT:**  -- to something you had already gotten;

15   right.  So, no --

16        **MS. WEAVER:**  I do think, Your Honor, if we could have

17   the date -- I received a text -- if we could have until

18   October 16th instead of October 14th to brief Your Honor.

19        **THE COURT:**  That's fine, yeah.

20        **MS. WEAVER:**  Okay.

21        **THE COURT:**  I mean, I think I told you guys before

22   whatever you came up with, but you weren't able to come up with

23   something.  But that's fine.

24        **MS. STEIN:**  Your Honor, so I have one more sort of --

25   I'm sure -- I'm sure this is going to lead to more questions

 1   but -- so everyone has been talking about Facebook's incentives

 2   to disagree.

 3       I think it would be important to have a cap here on the

 4   total number of agreed and disagreed strings that we are

 5   dealing with because what ends up happening is there are

 6   incentives on both sides, Your Honor, frankly.

 7       And so Plaintiffs, if there is no total cap, will just

 8   agree to as many of ours as possible and then move the

 9   duplicative ones into other strings so that then there is still

10   a massive number of strings that we are dealing with.

11       **THE COURT:**  No, no, no.  So my original thing of no

12   more than 50 strings could be submitted to me I think still

13   applies.  Mr. Loeser's proposal was that if they are going to

14   agree to some now, we are taking that out.  So it is not

15   included within that 75.

16       **MS. STEIN:**  Okay.

17       **THE COURT:**  That 50 cap of what is presented to me is

18   still there.  That is just a, you know, manageability --

19       **MS. STEIN:**  Thank you, Your Honor.

20       **THE COURT:**  Not for -- not necessarily forever.

21       **MS. STEIN:**  I understand, Your Honor.  And then in

22   the -- what we can expect from Plaintiffs in terms of the gap

23   fillers, that will be also one string against another.

24       So to explain:  If we have, say, you know, good news, we

25   have 50 agreed strings.  And there is still another 75 that

1   Plaintiffs want, it is their obligation to show why the 50

2   agreed ones have gaps as it relates to the other additional

3   strings that they want.

4        THE COURT:  Well, I don't know they necessarily need

5   to -- I mean, however they want to explain it as to why they

6   need them; what RFPs they are responsive to.  And then you can

7   respond and say:  No, that is duplicative.  You are already

8   going to get this.  But, yeah, I don't --

9        MS. STEIN:  Thank you, Your Honor.

10       MS. WEAVER:  I would just say that we don't really

11  have an incentive to create more strings that are going to pull

12  documents that are irrelevant.  I don't like paying people to

13  review irrelevant documents.

14       THE COURT:  That is true.

15       MR. LOESER:  And if I can push back a little bit on

16  what Ms. Stein just said, I think if we cap at 50 -- and that

17  cap agrees both agreed terms and terms that aren't --

18       THE COURT:  No, no, it doesn't.  It's -- 50 is what is

19  presented to me as disputed.  That's the cap.  No, no, no.  The

20  agreed terms are -- we have pulled them.

21       MR. LOESER:  Okay.

22       THE COURT:  They are not in your 75, and they are not

23  in the 50.

24       MR. LOESER:  Okay.

25       MS. STEIN:  Ms. Weaver should be happy to --

1          **MR. LOESER:**  I think we all understand.

2          **MS. STEIN:**  -- to know that we won't produce

3   irrelevant documents, but it's our team who will have to be the

4   ones reviewing the irrelevant documents.

5          **THE COURT:**  Yes.

6          **MS. WEAVER:**  Yes, fair enough.  Point taken.

7          **MR. KO:**  I'm a little slow this morning.  I'm just

8   asking one more thing about the hit reports.  I'm just playing

9   a little catch-up.  Can I ask one more question of

10  clarification?

11         And Martie reminded us that the hit reports we already

12  have.  So if we are identifying terms -- 75 terms, for example,

13  on Wednesday that we want -- and we already know what the hit

14  reports are -- then what is the purpose of the five days that

15  they have to turn around a hit report because we already have

16  that information?

17         **MS. KUTSCHER CLARK:**  I think we would need to rerun

18  them because one of the important data points is whether things

19  hit on unique -- unique documents or whether they are covered

20  by other searches.  And to get the total de-duped number, we

21  would need to rerun everything with just the searches that you

22  are proposing.

23         **THE COURT:**  I don't think they have run hit reports on

24  your proposal of September 19th.

25         **MR. KO:**  They have.

1          **THE COURT:**  Oh, they have.

2          **MS. KUTSCHER CLARK:**  We have.

3          **THE COURT:**  Oh, maybe that is -- they already have it.

4     So they are just identifying from that.  So I think that's

5     right.  They don't need to wait for the hit reports.

6          **MR. KO:**  Right.

7          **THE COURT:**  Because you have already done them.

8          **MR. KO:**  That's why I was just saying -- just to take

9     a step back, if we have five days -- you know, we have two

10    deadlines to limit our terms.  And then we turn around and wait

11    five days for them to produce hit reports that we already have,

12    I just --

13         **THE COURT:**  Right, right, right.  I get what you are

14    saying.  By Monday, instead of giving them hit reports, why

15    can't you respond to their top 75 because you already have the

16    hit reports for those.

17         **MR. KO:**  I think that would be a good --

18         **MS. KUTSCHER CLARK:**  I don't think that's right

19    actually because what we need to be able to see is the total

20    number of de-duped documents.  And right now we have a total

21    number for all of the search strings in the September 19th

22    proposal.

23         But once that gets culled down to a smaller universe, the

24    whole thing needs to get rerun so that we can see the total

25    number, and we can see where the unique hits are going to be.

1   So it really does need to be rerun.

2          **MR. LOESER:**  So those hit report numbers you are

3   saying are inflated because they aren't de-duped?

4          **MS. KUTSCHER CLARK:**  No.

5                        (Laughter)

6          **MS. KUTSCHER CLARK:**  No.  They are based on what you

7   proposed on the 19th.  But once we -- once you narrow it --

8   like, hypothetically speaking, if one -- if some of your search

9   strings are totally duplicative of each other, it is possible

10  that you could remove some search strings but the de-duped hits

11  would look similar or there could be a different universe where

12  you remove a search string that hit on a very large number of

13  unique documents.  So it does have a big effect on the total.

14      So we do need to rerun once we call this to a different

15  set of searches so we are able to see how it affects the

16  numbers.

17         **MS. WEAVER:**  I would say this:  I don't think we

18  completely agree -- and I'm probably going to get yelled at by

19  my team -- we concede.  You can have that time.

20         **THE COURT:**  You are not going to get yelled at.  As I

21  often tell newer lawyers, to concede is one of the most

22  powerful things you can do as a litigator in front of a judge,

23  quite honestly.

24         **MS. WEAVER:**  I concede, Your Honor.

25         **MR. LOESER:**  In California.  As an out-of-state

```
1    lawyer, I'm often asked by judges if I submit.  And I have
2    always found that to be extremely disturbing.  When you were
3    fighting, submitting was the last thing you wanted to do.
4            THE COURT:  So this is what I want you to do is next
5    week or -- so by next week we are identifying.  And then the
6    following week you are just going to be meeting and conferring.
7    And still we are coming up on -- I think we said the 9th;
8    right?  That's the final day, your final and best offer and you
9    have shared all your evidence.
10       And then we are submitting by -- to me by the 16th.  I
11   want to give you limitations on the submissions and a page per
12   string.
13           MR. LOESER:  Does that include the string?
14                     (Laughter)
15           THE COURT:  Yes, yes.  Yes.
16           MS. STEIN:  To incentivize us to keep the string
17   short.
18           THE COURT:  Exactly.
19           MR. LOESER:  Do you have a font size recommendation
20   for that page?
21           THE COURT:  Whatever is in the local rule.  I think it
22   can be no smaller than 12, but it can be single spaced.
23       And I'm trying to figure out how we do that.  So a page
24   per string -- so --
25           MS. WEAVER:  Your Honor --
```

1          **THE COURT:**  A way to figure this out because they are

2     going to have a competing proposal to your proposal.  What do

3     you think?

4          **MS. WEAVER:**  We have prepared these nifty charts,

5     Your Honor, that both sides have become very facile with that

6     have sort of a history of the proposals, the reasons.

7          And what we could do is -- you know, they actually have

8     the whole history, the initial search term.  Its Excel heaven,

9     Your Honor.  And what we can do is do some form with that and

10    cut that down and submit probably a joint submission that just

11    at least just identifies the string; what Facebook's

12    counterproposal is.  And in a sound byte could give a reason in

13    the chart.  And then if we could have a page of pros to

14    explain --

15         **THE COURT:**  That's all I want to say is each side gets

16    no more than a page of narrative.

17         **MS. WEAVER:**  Okay.  We can do that.

18         **MR. LOESER:**  That's more fair to the long strings,

19    Your Honor.

20         **THE COURT:**  What?

21         **MR. LOESER:**  That's more fair to the long strings.

22         **MS. STEIN:**  I must confess.  I'm now thoroughly

23    confused.

24         **THE COURT:**  Well, I mean, there will be some where

25    Facebook doesn't have a counterproposal; right.  They are going

1    to say that string is not necessary at all.  Maybe not.  Maybe

2    not.

3         But in either case, each side gets a page of narrative to

4    explain their position.  That includes all those things I want

5    to -- you know, mostly I need in the end, you know, what claim

6    or defense is it relevant to and why is it proportional.

7              MS. STEIN:  So one page per search string, Your Honor,

8    was that --

9              THE COURT:  Yes, per disputed search string.

10             MS. DAVIS:  Of description.

11             THE COURT:  Of narrative, right, right, of narrative.

12             MS. DAVIS:  Narrative.

13             MS. STEIN:  I wasn't sure if I understood whether

14   Your Honor -- this Excel spreadsheet is, I really don't think,

15   anything anyone would ever want to see.

16             MR. FALCONER:  It is not user friendly.

17             MR. LOESER:  I will show it to you right now.

18             MS. STEIN:  I don't like opening it up in the morning,

19   Your Honor.  I'm not sure if that is something you would

20   really -- I think we all have an interest in presenting this to

21   you and --

22             THE COURT:  Yeah, just present it to me.

23             MS. WEAVER:  I think we can narrow it down.  I'm

24   proposing that we eliminate the history and just leave our

25   disputed terms and then, you know, a short -- so, like, a

1    four-column Excel spreadsheet.

2         **THE COURT:**  That is a good point.  I actually don't

3    care about the history.  It is not going to be who is more

4    reasonable then this.  I just want to know what your final

5    positions were on the 9th and why I should, you know, pick one

6    side or the other's position by the 16th.

7         **MS. DAVIS:**  Your Honor, I hesitate to add more

8    complexity to the hit report.  But we do have a difference in

9    terms of the custodians.  We propose to run these terms across.

10        And it would be tremendously helpful, you know, to have

11   that comparison for the different custodian groupings and that

12   granular data for the custodians themselves so that we can

13   actually take a look and prepare the proposals.  And, you know,

14   informed by that, remove custodians or otherwise, you know,

15   make those compromises.

16        So, you know, I think we had hoped when Facebook is

17   running these reports, we would like to receive that

18   comparative data.

19        **MS. KUTSCHER CLARK:**  We can do that.  Again, it is

20   just another thing that takes a little more time.  And the only

21   reason we didn't do it on the last round was there simply

22   wasn't enough time to do it.

23        So we will endeavor to do our best.  Our vendor has been

24   working through the night every day running hit reports.  They

25   are e-mailing me at 3:00 o'clock in the morning frequently

1    about this.

2         **THE COURT:**  Hopefully you are not reading their

3    e-mails at 3:00 o'clock in the morning on that.

4         **MS. KUTSCHER CLARK:**  Well, I won't comment on that.

5         We are going to get as many data points as we possibly

6    can.  I just can't promise something that I don't know if we

7    have bandwidth to achieve.

8         **MS. WEAVER:**  The reason that that is important,

9    Your Honor, is that it actually affects hit counts and opening

10   of documents --

11        **THE COURT:**  Of course.

12        **MS. WEAVER:**  So if they are complaining that it's too

13   large but we are in agreement of which custodians it will --

14   but I'm sure that we can explain that in our narratives.

15        **THE COURT:**  Yeah, yeah, yeah.  That should be part of

16   the meet-and-confer; right.  Here, this -- for this particular

17   person, it hit, you know, how many irrelevant documents.  Let's

18   just eliminate this custodian.  It is just not enough yield

19   there -- potential yield there.  And that will save a lot.

20   Something like that.  That should be part of your

21   back-and-forth, I guess.

22        Okay.  All right.  So we have that.  That's going to take

23   a lot of time, and we are just going to get this done.

24        **MS. KUTSCHER CLARK:**  Your Honor, I'm sorry.  Could I

25   ask one more clarifying question?

1      So now that we are talking about the custodians, we spent

2  two hours yesterday -- all of us who are here -- talking

3  through the custodian groupings for these terms.  And it took a

4  very long time and was very complicated.

5      Are we considering the disputes about which custodians

6  these terms should be run against to be part of the disputes we

7  are teeing up for the Court on the 16th?

8      **THE COURT:**  Well, it is not part of the 50.  That is

9  just the search strings.  But it does seem to me it is sort of

10  completely intertwined; right?

11      **MS. KUTSCHER CLARK:**  Yeah.

12      **THE COURT:**  If we are talking about burden, then that

13  has to be included in there.

14      **MS. KUTSCHER CLARK:**  Yeah.  Okay.  Okay.  I'm just

15  flagging that because it is another layer of complexity when we

16  are talking about how we are briefing this and the hit counts

17  and all of that going back and forth on which custodians

18  everyone of these searches will be run against is a very

19  complicated aspect of this process.

20      **THE COURT:**  Can't get more complicated I think.  I

21  don't know.  I mean, I'm not there with you.  I don't know.  I

22  don't want to make things more difficult.  I'm just trying to

23  provide some deadlines or structure maybe that will help kind

24  of finally bring this to an end.

25      **MR. LOESER:**  That seems pretty important.

1          **MS. WEAVER:**  So are we going to get the unique hits

2    across the whole collection -- because that seems to be

3    relevant -- on the 9th?  The total number of responsive unique

4    documents.

5          **MS. KUTSCHER CLARK:**  Well --

6          **MS. WEAVER:**  The date that you are providing the hit

7    reports, are you going to be providing a hit count across the

8    entire collection?

9          **MS. KUTSCHER CLARK:**  We are providing the hit counts

10   on the custodians for whom the terms have been proposed.

11         **MS. WEAVER:**  But I thought the whole point -- sorry --

12   I thought the point that you needed to rerun was to focus on

13   this specific set so that we can say this is the total impact

14   of these proposed terms.

15       So can we get a hit, a unique hit count across the

16   collection?  Meaning so that you are de-duping between

17   custodians.

18         **MS. KUTSCHER CLARK:**  I just don't -- I'm sorry.  I'm

19   honestly just confused.  When you say "across the whole

20   collection," what do you mean?

21         **MS. WEAVER:**  I mean the 75 that you are going to run

22   hit counts for.

23         **MS. KUTSCHER CLARK:**  Yes, yes.  I'm sorry.  I thought

24   you meant something a little different.

25         **MS. WEAVER:**  Okay.

1          **MS. KUTSCHER CLARK:**  We always provide that.

2          **MS. DAVIS:**  Your Honor, I think a little of the

3    complexity here is, you know, unlike in a typical case where we

4    would propose a set of search terms that would run across the

5    custodian population and be able to truly evaluate duplication

6    here, because there is so many, you know, different custodian

7    groupings, it is very actually, you know, difficult to say that

8    because one term covers one set, another term for different

9    custodians isn't going to -- you know, is actually going to be

10   duplicative.

11         So I think that's part of what Ms. Weaver is trying to

12   address in the -- because, you know, of the desire to do very

13   targeted custodian groupings, you know, I think all the parties

14   have had great difficulty in assessing duplication.

15         And that was one reason our initial proposal was to, you

16   know, simply apply this across custodians so that we could

17   actually, you know, analyze that duplication.

18         **THE COURT:**  Okay.  All right.  So I will issue an

19   order that tries to set some of this -- tries to record sort of

20   what we have decided, at least the deadlines.

21         If you get it and it makes no sense or you come up with

22   something else better in the meantime, just submit a stip.  I'm

23   just trying to help you.  You guys know much more than I do

24   about what you are doing.  So don't hesitate to submit a

25   different stip if it works better -- it works better for you.

```
 1        And then our next gathering -- I'm actually going to be in

 2   virtual trial, bench trial, starting the 19th.  So maybe -- it

 3   should be the 30th.  I think I will probably be done by then.

 4   Again at 8:30.

 5        MR. MONTGOMERY:  Your Honor, speaking of your orders

 6   and setting deadlines, the last discovery order that you issued

 7   had a briefing schedule for us.  And it's -- it had Plaintiff

 8   reply on October 18th which is actually a Sunday.

 9        THE COURT:  Okay.

10        MR. MONTGOMERY:  Can we just clarify that we can file

11   it the next day, on a Monday?

12        THE COURT:  Of course.  That was an error.  You know

13   me.  I would never make you do that ever, ever.

14        MR. MONTGOMERY:  I don't want to presume but I'm

15   willing to concede.

16        THE COURT:  Oh, no, for me you should presume that.  I

17   would never do that.  That would be awful.

18        Okay.  All right.  I will do my best with that order.

19   But, again, feel free to modify it as appropriate.

20        MS. STEIN:  Thank you, Your Honor.

21        MS. WEAVER:  Thank you very much, Your Honor.

22        MS. KUTSCHER CLARK:  Thank you, Your Honor.

23        MR. LOESER:  Thank you.

24             (Proceedings adjourned at 9:16 a.m.)

25
```

**CERTIFICATE OF REPORTER**

         We certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


DATE:   Saturday, September 26, 2020




_____

              Marla F. Knox, RPR, CRR, RMR
                  U.S. Court Reporter