# EXHIBIT 2

**Redacted Version of Plaintiffs' Submission Regarding Disputed Search Strings and Exhibits A-O thereto**

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' SUBMISSION REGARDING DISPUTED SEARCH TERMS**<br><br>**UNREDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED.**<br><br>Judges: Hon. Vince Chhabria and Hon. Jacqueline Scott Corley<br>Courtroom: VIA VIDEO CONFERENCE |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

    Facebook's Search String FB-12.......................................................................................3

    Facebook's Search String FB-20.......................................................................................5

    Plaintiffs' Search String 41 ...............................................................................................7

    Plaintiffs' Search String 117 .............................................................................................9

    Plaintiffs' Search String 118 ...........................................................................................11

    Plaintiffs' Search String 194 ...........................................................................................13

    Plaintiffs' Search String 216 ...........................................................................................15

    Plaintiffs' Search String 223 ...........................................................................................17

    Plaintiffs' Search String 224 ...........................................................................................19

    Plaintiffs' Search String 236 ...........................................................................................21

    Plaintiffs' Search String 244 ...........................................................................................23

    Plaintiffs' Search String 273 ...........................................................................................25

    Plaintiffs' Search String 290 ...........................................................................................27

    Plaintiffs' Search String 313 ...........................................................................................29

    Plaintiffs' Search String 422 ...........................................................................................31

    Plaintiffs' Search String 426 ...........................................................................................33

    Plaintiffs' Search String 466 ...........................................................................................35

    Plaintiffs' Search String 467 ...........................................................................................37

    Plaintiffs' Search String 481 ...........................................................................................39

    Plaintiffs' Search String 501 ...........................................................................................41

    Plaintiffs' Search String 524 ...........................................................................................43

    Plaintiffs' Search String 669 ...........................................................................................47

    Plaintiffs' Search String 673 ...........................................................................................49

# INTRODUCTION

This submission presents twenty-three search strings for the Court's consideration and represents Plaintiffs' best effort to submit only those strings which are crucial to their claims and likely to be highly responsive to their discovery requests. For each search string, Plaintiffs have submitted a slip sheet that identifies Plaintiffs' proposed search string, Facebook's proposed search string, a redline indicating the differences between the two, and hit counts for each, to the extent that they were provided. At the top, the slip sheets also indicate whether each search string was originally proposed by Plaintiffs or Facebook. In the same vein, the parties have adopted a naming convention such that all strings originally proposed by Facebook begin with the letters "FB." For example, one string is named "FB-20." Similarly, all strings originally proposed by Plaintiffs are referred to by number, or begin with the letters "UID."

After each slip sheet, Plaintiffs have included a one-page narrative explaining why their proposed string should be adopted. Per stipulation, Facebook has filed its narratives separately. Each of Plaintiffs' narratives contains a custodian proposal which identifies custodians by groups A through F. The names and job titles of the custodians in each group are set forth in Exhibit B. In some cases, Facebook has proposed different custodians. Where the parties propose different custodians, any difference in hit counts is both a function of the differences in the proposed strings and proposed custodians. In such instances, to the extent that the Court orders that a particular string be applied, Plaintiffs respectfully request that the Court also order it to be applied to the custodians proposed by the prevailing party or any subset thereof that the Court wishes to select. This approach will not only ensure that any hit counts relied upon by the Court will be reflected in the search strings as they are actually run, but will also spare the parties and the Court the prospect of additional, unnecessary motion practice regarding the custodians for each string and further delay in the production of documents.[1]

---

[1] The parties continue to negotiate custodians for strings that are not at issue in the present briefing, including strings already agreed upon as well as additional search strings going forward. Plaintiffs respectfully request that the Court allow those negotiations to continue without Court involvement at this time.

With regard to hit counts, Plaintiffs note that they are a blunt tool that indicate only the volume of documents identified by a particular search string, not whether those documents are relevant or responsive. For example, Facebook has proposed search strings with hit counts as low as ten and twenty-two. *E.g.*, Plaintiffs' Proposed Strings 236 and 273. If all, or nearly all, of the documents identified by those strings were highly relevant, it might suggest that broader versions of those strings would be appropriate. For that reason, Plaintiffs have repeatedly asked Facebook to sample documents identified by certain disputed strings. Facebook has declined to do so, depriving the parties and the Court of valuable information regarding the quality of the strings at issue. *See Finisar Corp. v. Nistica, Inc.*, No. 13-CV-03345-BLF-JSC, 2014 WL 12887160, at *3 (N.D. Cal. Dec. 12, 2014) ("The Court expects that if a party insists that a search term results in too many hits, the party will have run the search and will be able to provide the opposing party with the number of hits and specific examples of irrelevant documents captured by the search.") In other words, Facebook has not identified a single irrelevant document captured by applying any of the proposed search strings.

One thing the hit counts do show is the tremendous progress Plaintiffs have made in crafting their search string and custodian proposals. After exchanging final positions on October 9, Plaintiffs received hit counts yesterday evening, on October 15. Those hit counts indicate that Plaintiffs' October 9 proposal returns approximately 5 million documents with family, down from the approximately 10 million documents with family returned by their September 19 proposal. In contrast, FB's proposal on September 11 resulted in a hit count of approximately 1.5 million documents with family while FB's final proposal on October 9 results in a total hit count of 1.54 million documents with family.

As set forth at length in the narratives, based on the proposed search strings and the care taken to craft them, Plaintiffs believe that a large proportion of the documents identified by these strings are likely relevant to Plaintiffs' claims and responsive to their document requests. As such, Plaintiffs submit that the search strings and custodians they have proposed are proportional to the needs of this case and respectfully request that the Court order them to be adopted.

| Facebook's Search String FB-12 |
| --- |



\* This search string was divided into subparts when the document hit counts were calculated by FB's vendor. Although unique document hit counts were provided for each subpart of the string, no actual unique document hit count was provided for the string itself. The number provided here is the sum total of the unique document hit counts for all of the subparts of this string, which Plaintiffs understand may be lower than the actual unique document hit count for the string itself.

This search string targets FB's monetization of user content and information pertaining to third parties' access to users' and friends' data, as well as documents relating to assessing the monetary or retail value of user data to users themselves (as distinct from the value to FB). The parties' sole dispute regarding this string is that FB's restrictive limiting terms— ████████ and ████████ —exclude responsive documents that hit on the terms ████████ and "████" as well as instances where related terms are used. FB's restrictive limiting terms would exclude from production clearly relevant documents like FB-CA-MDL-00203234, a presentation titled ████████████ (**Exhibit C** at 4) ████████████████████████████████. Further, FB's proposed search string will not identify responsive documents concerning the friends' data that is a crucial component of Plaintiffs' case.

**These Documents and Information Are Necessary to Prove Plaintiffs' Claims.**
Plaintiffs' revisions to FB's string are likely to identify documents relevant to Plaintiffs' claim for Negligence and Gross Negligence. Documents regarding third parties' access to user data may show that FB breached its duty of care by allowing third parties unfettered access to user data. Plaintiffs' proposed string is also likely to identify responsive information relevant to Plaintiffs' claims for Invasion of Privacy, Deceit by Concealment of Omission, Breach of Contract, Breach of Implied Covenant of Good Faith, Unjust Enrichment, as well as their claims under the SCA, because responsive documents may show that FB shared sensitive information with its business partners and various third-parties through whitelisted access or other agreed-upon arrangements that ran contrary to its stated policy of sharply limiting the use of the sensitive information.

**The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.**
This string will identify documents responsive to **RFPs 14–17**, which seek documents concerning the monetary or retail value of named Plaintiffs' and users' data. (**Exhibit B**). Plaintiffs' custodian proposal targets individuals in **Group F**, which consists of individuals who are likely to be involved in communications regarding the monetary or retail value of user data to FB and the transmission of related documents.

**Facebook's Reason for Rejecting this Search String Is Improper.**
Plaintiffs have made every effort within reason to narrow this search string, resulting in a reduction in document hits from 133,841/492,432 with family to 44,069/174,288 with family. During the meet and confer process, Plaintiffs agreed to remove the term ████████ ████████████████████ and replace them with ████████ ████████████████████████████████████ respectively. Plaintiffs have also ████████████████████████. FB speculates that Plaintiffs' revisions to this string will identify nonresponsive documents, but FB has not identified even one nonresponsive document that the string hits. Likewise, FB does not explain why Plaintiffs' proposed custodians for this string—all of whom FB has either identified as knowledgeable regarding the topic or who are in roles or possess documents supporting their knowledge—would have a disproportionate number of nonresponsive documents.

| Facebook's Search String FB-20 |
|---|



\* This search string was divided into subparts when the document hit counts were calculated by FB's vendor. Although unique document hit counts were provided for each subpart of the string, no actual unique document hit count was provided for the string itself. The number provided here is the sum total of the unique document hit counts for all of the subparts of this string, which Plaintiffs understand may be lower than the actual unique document hit count for the string itself.

This string seeks to identify documents concerning agreements between FB and third parties about access to user data. There is only one significant dispute relating to this string: on October 9, FB introduced additional limiting words which significantly reduced hit counts from 45,260 documents/263,592 with family to 1,757 documents/3,781 with family. The newly-proposed limiting ████████████████████████████████████████████—exclude documents relating to third party access to user data and information that would be captured by the terms ████████████████████ as well as instances where ████████ is replaced by related terms or otherwise implied. For example, contracts with third parties such as ████████ ████████████████████████████████████████████████████████ ████████████████████████ would be excluded if FB's limiter were applied.

### Facebook Does Not Dispute That This Search String Is Relevant to Plaintiffs' Claims.

This search string was proposed by FB, conceding relevance. The string targets FB's contracts with third parties as well as documents relating to such contracts. FB has not identified any nonresponsive documents recalled by Plaintiffs' proposed string.

### These Documents and Information Are Necessary to Prove Plaintiffs' Claims.

Plaintiffs' string is likely to identify documents relevant to Plaintiffs' claim for Negligence and Gross Negligence. For example, documents like the one referenced above may show that FB breached its duty of care by allowing third parties unfettered access to sensitive user data. Plaintiffs' proposed string is also likely to identify responsive information relevant to Plaintiffs' claims for Invasion of Privacy, Deceit by Concealment or Omission, Breach of Contract, Breach of Implied Covenant of Good Faith, Unjust Enrichment, as well as their claims under the SCA, because responsive documents may show that FB shared sensitive information with its business partners and various third-parties through agreements that ran contrary to its stated policy of sharply limiting the use of the sensitive information.

### The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.

This string will identify documents responsive to **RFPs 14–17**, which seek documents— including the agreements with third parties targeted by this string—concerning the monetary or retail value of named Plaintiffs' and users' data. (**Exhibit B**). Plaintiffs' custodian proposal targets individuals in **Group F** who are likely to be involved in communications regarding arrangements with third parties as they pertain to the monetary or retail value of user data.

### Facebook's Reason for Additional limiting this Search String Is Improper.

In an effort to reach agreement as to this search string, Plaintiffs accepted FB's reasonable proposals for more narrowly targeting, including deleting the term ████████ and ████████ ████████████████████████████████████ With these revisions, the strings exchanged on October 9 are identical, with the exception of FB's limiting clause. Plaintiffs oppose FB's further limiting of its previous proposal, as set forth above, which appears to have been proposed simply to reduce the number of responsive documents recalled by the string. Plaintiffs respectfully request that the Court order that Plaintiffs' version of this string be implemented.

| Plaintiffs' Search String 41 |
| --- |



This search string targets documents and communications relating to FB's Onavo Project, which paid users for their content and information beginning as early as 2013. Shelby Brown, "Facebook axes its Onavo VPN app over data collection," CNet, February 22, 2019, https://www.cnet.com/news/facebook-axes-its-onavo-vpn-app/. In connection with this project, FB paid users, including teenagers, $20 per month plus referral fees for access to their phone and web activity. *Id.* This string also seeks documents ███████████████████ : ███████ ████████████████████████████████████████ *See* Josh Constine, "Facebook pays teens to install VPN that spies on them," CNet, January 29, 2019, https://techcrunch.com/2019/01/29/facebook-project-atlas/ ("It's unclear exactly what data Facebook is concerned with, but it gets nearly limitless access to a user's device once they install the app.").

**These Documents and Information Are Necessary to Prove Plaintiffs' Claims.**
Because FB's Onavo-related apps involved FB paying users for their data, documents about them can assist Plaintiffs in assessing the economic value of users' content and information. Accordingly, such documents are relevant to calculating and proving the damages associated with Plaintiffs' claims for California privacy torts, Negligence and Gross Negligence, Deceit by Concealment or Omission, Breach of Contract, Breach of Implied Covenant of Good Faith, and Unjust Enrichment. Notably, the monetary value of users' data was not a focus of the FTC's investigation, such that the documents produced in conjunction with that investigation do not address the issue to a substantial extent.

**None of Facebook's Search Strings Identify These Documents and Information.**
FB has not proposed a search string that addresses the value of user data to the users themselves, including payments FB made to users through its Onavo-related apps and services, nor has it produced documents from targeted searches on this subject. As such, this string is necessary to ensure that relevant and responsive documents are produced.

**The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.**
This string will identify document likely responsive to **RFP 17** which seeks documents concerning FB's assessment of the monetary or retail value of users' data to users, "including but not limited to users compensated in connection with the Onavo Research app." (**Exhibit B**). Plaintiffs' custodian proposal targets individuals in **Group F** who are likely to be involved in generating information relating to assessment of the monetary or retail value of users' data to users. FB has not made a custodian counterproposal.

**Facebook's Reason for Rejecting this Search String Is Improper.**
During the meet and confer process, Plaintiffs reduced their original proposal's proximity limiter of ████ to ███ and removed the terms ██████████ – the name of one of the apps used to collect users' content and information – and "██████████ from the string. These revisions resulted in a 53.5% decrease in the total number of document hits and 52,174 unique hits. The result is a string proportional to the needs of this action.

| Plaintiffs' Search String 117 |
| --- |



This search string identifies information regarding FB's internal evaluations of trustworthy and untrustworthy third-party developers to whom it granted access to users' data. For example, this string would capture FB-CA-MDL-00281783, where an employee asks "███████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ This string also targets discussions of the impact on user trust of FB's compliance and enforcement efforts. Documents have shown that FB often employs "trust"-related language when addressing such issues. *See, e.g,* FB-CA-MDL-00202269 ██████████████████████████████████████ ███████████████████████████████████████████); FB-CA-MDL-00193925 ███ ███████████████████████████).

### These Documents and Information Are Necessary to Prove Plaintiffs' Claims.

The information identified by this string is necessary to prove Plaintiffs' claim for Negligence and Gross Negligence. For example, such documents may show that FB breached its duty of care by giving third parties it deemed untrustworthy access to user data. To the extent that the documents show that FB continued to allow third parties it did not trust to access user data – despite public representations to the contrary – they would also help establish the fraudulent intent required by Plaintiffs' claim for Deceit by Concealment or Omission.

### None of Facebook's Search Strings Identify These Documents and Information.

FB has not proposed a search string that addresses the issue of its internal evaluations of third-parties' trustworthiness or user trust and has not pointed to any other string as duplicative. This string is thus necessary to ensure that responsive, relevant documents are produced.

### The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.

This string will identify documents responsive to **RFP 31**, which seeks documents relating to FB's investigations, audits, controls, and enforcement of its policies against third parties regarding their access to or use of users' content and information. (**Exhibit B**). This string will also identify documents responsive to other enforcement, controls, and monitoring-focused RFPs, including 32 and 63, because such topics are likely to arise in those contexts as well. Plaintiffs' custodian proposal targets individuals in **Group B** who are likely to be involved in communications investigation, audits, controls, and enforcement of its policies as to third parties. FB has not made an alternative custodian proposal.

### Facebook's Reason for Rejecting Plaintiffs' Proposed Search String Is Improper.

FB has taken no steps to determine whether and to what extent Plaintiffs' proposed string actually identifies nonresponsive or nonrelevant materials, which could have included identifying nonresponsive documents captured by this string.

| Plaintiffs' Search String 118 |
| --- |
|  |

This search string identifies information regarding FB's handling of security risks related to whitelisted APIs.

**These Documents and Information Are Necessary to Prove Plaintiffs' Claims.**

The information identified by this string is necessary to prove Plaintiffs' claims, including for Breach of Contract and Negligence, because documents and information regarding FB's handling of security risks related to specific APIs or whitelists will establish that FB knowingly disclosed user content and information that posed security risks to users and in contravention of its users' settings.

The first Boolean in this string, ██████████████████████████████████████ ████████████████ is intended restrict this search to return documents relating to mitigation of or compliance with security issues, regulatory issues, vulnerabilities, risks, or public relations issues. The second Boolean in this string ensures that all documents relate to whitelisting or user data, the main issues in this case. It is Plaintiffs' understanding that FB permitted third parties access to sensitive user information via whitelisted APIs, and that conversations relating to security risks or compliance with regulators relating to these whitelisted APIs are likely to be directly relevant to sensitive user data.

**None of Facebook's Search Strings Identify These Documents and Information.**

FB has not proposed a search string that addresses its handling of security risks related to whitelisted APIs. In this regard, the search strings proposed by FB are inadequate to identify information regarding its enforcement of policies regarding user data. Similarly, FB's compliance with regulation after the time of the FTC investigation will not have been produced as part of the FTC investigation, and therefore the documents produced in conjunction with that investigation are insufficient to prove Plaintiffs' claims.

**The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.**

In particular, this search string identifies information responsive to **RFP 30**, which seeks documents regarding "measures and controls, including proposed measures or controls," put in place by FB to prevent third parties from violation FB's policies. (**Exhibit B**). In this regard, this search string identifies information regarding the handling of risks and compliance with FB policies, including the enforcement with regard to whitelisted apps and APIs. Plaintiffs' custodian proposal targets individuals in **Group B**, who are likely to be involved in communications regarding third party partners' access to whitelists and enforcement of FB policies for whitelisted apps and APIs.

**Facebook's Reason for Rejecting this Search String Is Improper.**

FB claims that this search is duplicative of FB-24, FB-25, FB-26, FB-33, FB-34, and FB-35, and has refused to consider this search string on those grounds. However, none of those strings include ██████████████████████████████████████████████████ and as such are not likely to capture documents that will be captured by this search string. FB did not explain why they believe that this string is duplicative, nor did they offer documents captured by this string that would also be captured by the strings they suggest encompass Plaintiffs' suggested string.

**Plaintiffs' Search String 194**



This string is designed to identify documents pertaining to third parties scraping user data, which is a technique computer programs use to extract data. Although the term has a more general meaning, FB employees used the term "scraping" to describe third parties who were caching FB user data received from FB, ostensibly in violation of FB's policies. *See* FB-CA-MDL-00314229 (████████████████████████████████████████████████); FB-CA-MDL-01163788 (████████████████████████████████████████████████); FB-CA-MDL-00153567 ████████████████████████████████████████ ).

The first Boolean of this search string is intended to limit the second Boolean, resulting in this search pulling only those documents that relate to scraping of user data. The second Boolean string is intended to target different types of third parties that may have used access granted by FB to scrape user data.

### These Documents and Information Are Necessary to Prove Plaintiffs' Claims.
This string will identify documents likely to relevant to Plaintiffs' claims for Negligence and Gross Negligence. Such documents may show that FB breached its duty of care by allowing third parties to collect ("scrape") user data received through FB's channels and then misuse that data.

### None of Facebook's Search Strings Identify These Documents and Information.
FB has not proposed a search string that includes scraping. This string is not duplicative of FB-47, FB 56, FB-57, FB-59, FB-61, FB-63, or FB-65, which are limited to collection or sharing of data by specific third parties, nor is it duplicative of FB-56, FB-57, FB-59, FB-61, FB-63, and FB-65, which are limited to specific types of business partners. Accordingly, this search string is likely to capture information that would not be captured by FB's proposed search strings.

### The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.
This string will identify documents likely to be responsive to **RFPs 31** and **32**, which seek documents about investigations into misuse of user data and violations of FB's policies regarding access to user data. (**Exhibit B**). This string is also likely to capture documents responsive to RFP 55 concerning the steps taken by FB to implement and maintain controls related to how third parties accessed user content and information. Plaintiffs' custodian proposal targets individuals in **Group B** who are likely to be involved in communications regarding violations of FB's policies prohibiting scraping and the resulting misuse of user data. FB has not made a custodian counterproposal.

### Facebook's Reason for Rejecting this Search String is Improper.
FB speculates that this string will hit nonresponsive documents but has not identified a single such document. During the meet and confer process, Plaintiffs made every effort within reason to narrow this search string, reducing proximity from ██████████ and striking the word ████████ from the string, reducing the hits by more than 1/3, from 44,811 documents/ 87,508 with family/17,145 unique documents to 15,304 documents/33,533 with family/5,481 unique documents.

**Plaintiffs' Search String 216**



This search string identifies information regarding third party collection, use, or transfer of friend data.

**These Documents and Information Are Necessary to Prove Plaintiffs' Claims.**

This information identified by this string is necessary to prove Plaintiffs' claims, including for Breach of Contract and Negligence, because documents and information regarding third parties' collection, use, or transfer of friend data will establish that FB permitted, either explicitly or implicitly, valuable third parties access to friend data. It is Plaintiffs' understanding that FB permitted third parties access to friend data if those third parties were perceived as valuable to FB leadership.

The first Boolean in this string relates to different entities that may have been given access to friend data by FB. For example, ███████████ partners are those partners that FB perceived as being important, and it is Plaintiffs' understanding that those partners or a subset of partners who were permitted access to friend data. The second Boolean in this string is intended to limit the search to return documents related to the collection, disclosure, or transfer of friend data.

**None of Facebook's Search Strings Identify These Documents and Information.**

FB has not proposed a search string that addresses its enforcement of policies regarding friend data. In this regard, the search strings proposed by FB are inadequate to identify information regarding enforcement of FB policies and monitoring of third parties.

FB rejects this string on the grounds that it is duplicative of FB-47, FB-56, FB-57, FB-59, FB-61, FB-63, and FB-65. However, each of these strings contains ████████████████████ ██████ which are insufficient to capture documents related to use of friend data. Plaintiffs have seen in numerous documents, including in FB-CA-MDL-00196396 ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████)—which FB's 10/9 proposed search strings fail to identify—████████████████████████████████ ██████████████████████████

**The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.**

In particular, this search string identifies information responsive to **RFP 31**, which seeks documents related to FB's monitoring and enforcement actions towards third parties regarding compliance with provisions of FB policies regarding the access, use, transmission, receipt, collection, and analysis of user data and information. (**Exhibit B**). This search string identifies information specifically related to users' friends' data, which it is Plaintiffs' understanding that FB permitted some third parties to collect. Plaintiffs' custodian proposal targets individuals in **Group B**, who are likely to be involved in communications regarding third parties' access to users' friends' data.

**Facebook's Reason for Rejecting this Search String Is Improper.**

Plaintiffs have modified this string in an attempt to reach agreement with FB, reducing the returned documents from close to 150,000 to less than 27,000. This string additionally captures close to 15,000 unique documents, further indicating to Plaintiffs that this string is not duplicative.

| Plaintiffs' Search String 223 |
| --- |



This string seeks documents concerning FB's approval process for third parties to gain access to FB's application programming interface (API) and capabilities. Documents from PwC's privacy audits show that FB has such documents. PwC  CPUP  FB00022290 ██████████████████████████████████████████████████████); PwC  CPUP  FB00022563 ██████████████████████████████████████████████████

### These Documents and Information Are Necessary to Prove Plaintiffs' Claims.

This string is likely to identify documents showing that FB approved third parties' use of APIs and capabilities that allowed them to access private user data. Such documents are relevant to Plaintiffs' Contract claims. PTO No. 20 at 38 ("Facebook breached [its] promise when it disclosed user information to whitelisted apps and business partners without permission."). They are also relevant to Plaintiffs' privacy claims. *Id*. at 30 ("the defendant must disclose a private fact about the plaintiff").

### None of Facebook's Search Strings Identify These Documents and Information.

FB has not proposed a search with ████████████████████████████ As a result, this string is not duplicative of FB-44, FB-55, and FB-68 because none of those strings contain ████████ in any form. Indeed, FB's proposal would fail to capture documents such as a ████████████████████████████████████████ *See, e.g.*, FB-CA-MDL-00230638 ██████████████. Accordingly, this string is likely to capture responsive information not identified by FB's proposed search strings.

### The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.

This search string identifies information responsive to **RFP 22**, which seeks documents about PwC's privacy audits. (**Exhibit B**). Indeed, as noted above, documents produced by PwC demonstrate that the approval process was a focus of those audits. In addition, this string is likely to identify documents responsive to RFPs 31 and 32 which seek information regarding enforcement and compliance of third-party access to user data, as the same language concerning approval of APIs and capabilities is commonly found in such documents. FB-CA-MDL-01163677 at 5 (████████████████████████████████████████). Plaintiffs' custodian proposal targets individuals in **Group D**, which consists of individuals involved in PwC's audits and FB's privacy program. Plaintiffs have presented evidence to FB establishing that each of these individuals played key roles in the program and FB has thus far offered no reason why they should be excluded. FB has not made a custodian counterproposal.

### Facebook's Reason for Rejecting this Search String Is Improper.

This search string is narrowly tailored to identify responsive documents and its terms are connected with narrow limiters so as to identify a review population of documents that is likely to be as responsive as possible to Plaintiffs' RFPs.

| Plaintiffs' Search String 224 |
|---|
|  |

This search string identifies key information regarding representations made by FB in its Privacy Program. This Program was created in 2012 as a result of the consent decree FB entered into with the FTC, which required FB to establish and maintain a comprehensive privacy program to address privacy risks and protect the privacy and confidentiality of user information. FB retained PwC to audit the Program, which it did from 2012–2019.

**These Documents and Information Are Necessary to Prove Plaintiffs' Claims.**
The information identified by this string is necessary to prove Plaintiffs' claims, including but not limited to Plaintiffs' Common Law Privacy claims and Statutory Claims under the VPPA and SCA. In particular, the string seeks information about representations FB made with respect to its Privacy Program.

Since 2012, FB claims to have enacted certain privacy measures to protect user information in connection with this program. FB broadly characterizes these measures as "Assertions." *See, e.g.*, 2013 PwC Report, FB-CA-MDL-00149131 (**Exhibit D**). These "Assertions" include representations made by FB regarding, for example, how it identifies privacy risks, how it provides notice of its privacy policies and procedures to users, how it discloses user information to third parties, and its ongoing monitoring of its Privacy Program. 2013 PwC Report, FB-CA-MDL-00149131 (**Exhibit D** at 77–78). The remaining PwC reports all identify all "assertions" made by FB in connection with its Privacy Program. *See* 2015 PwC Report, FB-CA-MDL-00149213 (**Exhibit E** at 58–59); 2017 PwC Report, FB-CA-MDL-00149274 (**Exhibit F** at 52–53); 2019 PwC Report, FB-CA-MDL-00405233 (**Exhibit G** at 6–7). Thus, the relevance of these "Assertions" cannot be disputed.

The string is specifically tailored to capture information about assertions FB actually made. For instance, assertions FB makes with respect to privacy, consent, notice, and third-party access have all been captured by limiters to ensure the string returns documents about FB's Privacy Program.

**The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.**
This search string identifies information responsive to **RFPs 22, 31, 32, 52, 53, and 56.** (**Exhibit B**). These requests seek all information related to PwC's audits of FB's Privacy Program. There is simply no credible reason for FB to withhold information about this Program which is of central relevance to this case. Furthermore, Plaintiffs' custodian proposal targets individuals in **Group D** who were involved in the Privacy Program. Plaintiffs have presented evidence to FB establishing that each of these individuals played key roles in the program, but FB has thus far offered no reason why they should be excluded.

**Facebook's Reason for Rejecting this Search String Is Improper.**
FB does not provide a counter-proposal to this string nor has it proposed a *single string* that captures the titles FB gave to its "Assertions" about its Privacy Program. On this basis alone, the Court can accept Plaintiffs' proposal. To the extent FB suggests Plaintiffs have already received discovery about PwC's audits, this string seeks FB's *own internal documents*—not PwC's evaluations—of the "Assertions" it made with respect to its Privacy Program. Plaintiffs are obviously entitled to not only discovery about PwC's audits, but also to discovery of FB's own establishment and ongoing maintenance of its Privacy Program.

| Plaintiffs' Search String 236 |
| --- |
|  |

This search string identifies key information regarding representations made by FB in its Privacy Program. This Program was created in 2012 as a result of the consent decree FB entered into with the FTC, which required FB to establish and maintain a comprehensive privacy program to address privacy risks and protect the privacy and confidentiality of user information. FB retained PwC to audit the Program, which it did from 2012–2019.

**These Documents and Information Are Necessary to Prove Plaintiffs' Claims.**

The information identified by this string is necessary to prove Plaintiffs' claims, including but not limited to Plaintiffs' Common Law Privacy claims and Statutory Claims under the VPPA and SCA. Similar to Plaintiffs' proposed string 224, this string seeks information about specific representations FB made with respect to its Privacy Program.

Since 2012, FB claims to have enacted certain privacy measures to protect user information in connection with this program. FB broadly characterizes these measures as "Assertions." *See, e.g.*, 2013 PwC Report, FB-CA-MDL-00149131 (**Exhibit D**). These "Assertions" include representations made by FB regarding, for example, how it identifies privacy risks, how it provides notice of its privacy policies and procedures to users, how it discloses user information to third parties, and its ongoing monitoring of its Privacy Program. (**Exhibit D** at 77–78). The "Assertions" each contain "corresponding controls" (**Exhibit D** at 77), which are essentially subparts to the governing representation made by FB regarding its Program. (**Exhibit D** at 65) (example of a FB control activity related to Granular Data Permissions that is part of the broader Assertion related to Third-Party Developers). As a result, much like the relevance of "Assertions"—the relevance of the corresponding "controls" cannot be disputed.

Because there are hundreds of different controls in any given year for the FB Privacy Program, rather than connecting the control to specific terms from the title of a control, Plaintiffs have proposed connectors that capture any issues with respect to the control or how the control was tested and evaluated. It is therefore no surprise that this highly relevant string returns a meaningful number of documents.

**The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.**

This search string identifies information responsive to **RFPs 22, 31, 32, 52, 53, and 56**. (**Exhibit B**). These requests seek all information related to FB's Privacy Program and PwC's audits thereto. There is no credible reason for FB to withhold this information. Plaintiffs' custodian proposal also targets individuals in **Group D** who were involved in the Privacy Program, including control owners. *See, e.g.*, PwC_CPUP_FB00000932 (**Exhibit H**) ▮▮▮▮▮▮▮▮▮▮▮▮. Plaintiffs have presented evidence to FB establishing that each of these individuals played key roles in the program and were control owners, and FB offers no justification for their exclusion.

**Facebook's Proposed Search String Is Insufficient.**

FB provides a counter-proposal to this string that returns *one document*. Thus, FB's proposal on its face proves its proposal should not be adopted. To the extent FB suggests Plaintiffs already have discovery about PwC's audits, this string seeks FB discovery—not PwC's evaluations—of the underlying "controls" and representations it purportedly made and effectuated with respect to its Privacy Program.

| Plaintiffs' Search String 244 |
| --- |
|  |

This search string identifies key information regarding representations made by FB in its Privacy Program. This Program was created in 2012 as a result of the consent decree FB entered into with the FTC, which required FB to establish and maintain a comprehensive privacy program to address privacy risks and protect the privacy and confidentiality of user information. FB retained PwC to audit the Program, which it did from 2012–2019.

**These Documents and Information Are Necessary to Prove Plaintiffs' Claims and Fill Gaps That Other Search Strings Do Not Address.**

Like Plaintiffs' proposed terms 224 and 236, this string seeks information about FB's representations regarding its Privacy Program, specifically with respect to user consent. In particular, one of the privacy measures FB enacted in connection with its Program relates to obtaining user consent after purportedly providing sufficient notice and a choice to its users about the disclosure of user information. Assertion D specifically indicates that:

> Facebook provides notice about its privacy policies and procedures and terms of service to users which identifies the purposes for which personal information is collected and used, describes the choices available to users, *obtains implicit or explicit consent*, collects personal information only for the purposes identified in the notices and provides users with access to their personal information for review and update.

*See, e.g.*, 2013 PwC Report, FB-CA-MDL-00149131 (**Exhibit D** at 77) (emphasis added). This specific "Assertion" regarding obtaining implicit or explicit consent was a key feature of FB's Privacy Program for the 2015 and 2017 PwC audits as well. *See* 2015 PwC Report, FB-CA-MDL-00149213 (**Exhibit E** at 58); 2017 PwC Report, FB-CA-MDL-00149274 (**Exhibit F** at 52–53). The relevance of this specific string cannot be disputed. The string has also been tailored to capture information regarding user consent in connection with the Privacy Program or PwC's audits thereto by adding appropriate limiter terms. Given the ubiquitous nature of the term ███████████ Plaintiffs added a limiter—███████████████████—to ensure only documents discussing implicit or explicit consent in the context of the Program or PwC's audits of this Assertion are retrieved.

**The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.**

This search string identifies information responsive to **RFPs 22, 31, 32, 52, 53, and 56**. (**Exhibit B**). These requests seek all information related to FB's Privacy Program and to PwC's audits thereto. No other RFPs capture this information. Plaintiffs' custodian proposal also targets individuals in **Group D** who were involved in the Privacy Program. Plaintiffs have presented evidence to FB establishing that each of these individuals played key roles in the program, but FB has thus far offered no reason why they should be excluded.

**Facebook's Reason for Rejecting this Search String Is Improper.**

FB did not even provide a counter-proposal to this string. And to the extent FB suggests Plaintiffs have already received discovery about PwC's audits, this string seeks FB's *own internal documents*—not PwC's evaluations—of FB's purported representation that it obtained user consent, both implicitly and explicitly to share user information. Discovery regarding consent is essential to Plaintiffs' allegations that they did not consent to the disclosure of certain user information.

| Plaintiffs' Search String 273 |
|---|
|  |

This search string identifies key information related to FB's Privacy Program. This Program was created in 2012 as a result of the consent decree FB entered into with the FTC, which required FB to establish and maintain a comprehensive privacy program to address privacy risks and protect the privacy and confidentiality of user information. FB retained PwC to audit the Program, which it did from 2012–2019.

### These Documents and Information Are Necessary to Prove Plaintiffs' Claims.

This search string specifically identifies internal tools and jargon related to privacy issues, and FB's monitoring of these issues. Each tool was the subject of examination by PwC in its audits of the FB Privacy Program.

In particular, ██████████████████████████████████████████████ ██████████████ *See* PwC_CPUP_FB00000831 (**Exhibit I**). ████████████████ █████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████ *Id.* Furthermore, the additional terms in this string, including ███████████████ ████████████ are additional tools and terms of art at FB related to ██████████ intended to capture privacy-related issues covered by FB's Privacy Program. Publicly-available information also reveals the importance of ██████████. Consistent with internal documents, this tool was available to FB's product managers and was a "tool for keeping track of everything that's happening at Facebook in order to avoid surprises." *The guy standing between Facebook and its next privacy disaster*, available at: https://splinternews.com/the-guy-standing-between-facebook-and-its-next-privacy-1793844996. These projects were privacy-related projects that contained "over a thousand Facebook projects in the tool, which is essentially a spreadsheet with columns for keeping track of who's seen what, which problems were raised, and how they were resolved." *Id.*

The strings have also been specifically tailored to capture information regarding discussion of these tools within the context of privacy and risk. Thus, to the extent any of these tools captured discussion of non-privacy related matters, this string would not return those documents. Given the importance of this tool and the related privacy terms used by FB employees, it is no surprise that they return a meaningful number of hits.

### The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.

This search string identifies information responsive to **RFPs 22, 31, 32, 52, 53, and 56.** (**Exhibit B**). These requests seek all information related to FB's Privacy Program and PwC's audits thereto. No other RFPs capture this information. Plaintiffs' custodian proposal also targets individuals in **Group D** who were involved in the Privacy Program. Plaintiffs have presented evidence to FB establishing that each of these individuals played key roles in the program, but FB has thus far offered no reason why they should be excluded.

### Facebook's Proposed String Is Insufficient.

FB does not dispute the relevance of Plaintiffs' proposed string, accepting all of Plaintiffs' proposed string but adding an extremely narrow limiter to its proposed string. This results in just 22 documents, proving that FB's proposal should be rejected. ████████████████—as proposed by Plaintiffs—are appropriate limiters to ensure this string returns relevant and responsive documents.

**Plaintiffs' Search String 290**



This string seeks documents that discuss unauthorized access to data in the context of the privacy program FB initiated pursuant to its 2012 consent decree with the FTC or the privacy audits that PwC conducted of that program. *E.g.*, FB-CA-MDL-00187742 ███████████████ ████████████████████████████████████████████████████████████████ ); FB-CA-MDL-00189453 ████████████████████████████████ ███████████████████████████████████ ).

## Facebook Acknowledges That Portions of This Search String Are Relevant.

On October 9, FB proposed a revised string that changed ████████████████████ ████████████████████████████████████████ ” This limitation is unnecessary since Plaintiffs' proposal is already limited to documents that mention FB's Privacy Program or PwC's audits of the program. Indeed, Plaintiffs' proposed string results in only 1,495 unique hits. In contrast, FB's edits reduce the review population to only 34 documents and should be rejected.

## These Documents and Information Are Necessary to Prove Plaintiffs' Claims.

The information identified by this string is necessary to prove Plaintiffs' claims, including for Negligence and Gross Negligence. For example, such documents may establish that FB breached its duty of care and did not have the proper controls in place to protect user data from unauthorized access. They may also show that FB intentionally concealed from users that it did not have the proper controls to prevent third parties' unauthorized access to their data, which would help establish the fraudulent intent required by Plaintiffs' claims for Deceit by Concealment or Omission.

## The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.

This search string identifies information responsive to **RFP 22**, which seeks documents concerning FB's privacy program and PwC's privacy audits and assessment reports. (**Exhibit B**). This string is also likely to return documents responsive to RFPs 52 and 56, which seek information on monitoring controls and audit processes in operation to detect misuse of the FB Platform, and FB's ongoing monitoring of its Privacy Program. Plaintiffs' custodian proposal appropriately targets individuals in **Group D** who were involved in the Privacy Program. Plaintiffs have presented evidence to FB establishing that each of these individuals played key roles in the program and FB has thus far offered no reason why they should be excluded.

## Facebook's Reason for Rejecting this Search String Is Improper.

FB speculates that this string will hit a nonresponsive topic but has not identified a single nonresponsive document. During the meet and confer process, Plaintiffs added ████████ ████████████████████ limiters to the search to further target the documents. This revision resulted in a 93.5% decrease in the total number of document hits—from 25,554 hits (96,816 hits including family) to 1,648 hits (6,583 hits including family). The result is a narrowly targeted string proportional to the needs of this action.

| Plaintiffs' Search String 313 |
| --- |
|  |

This search string identifies information regarding user consent for FB's data sharing practices, including friend sharing, as well as user consent for the practices of third parties with whom FB shared user data.

**These Documents and Information Are Necessary to Prove Plaintiffs' Claims.**
The information identified by this string is necessary to prove Plaintiffs' claims, including for Breach of Contract, because documents and information regarding the consent that users gave for FB's data sharing practices will establish the limits of Plaintiffs' contracts with FB, as well as for Deceit by Concealment or Omission, because these documents and this information will reveal whether Plaintiffs were on notice of FB's sharing practices. In addition, the information identified by this string is necessary to rebut FB's affirmative defense of consent.

The first part of this string tightly connects ███████████. The second part of the string lists three concepts at the core of this case: whether Plaintiffs gave explicit consent for FB's sharing practices, as Plaintiffs contend was required; whether Plaintiffs consented to FB's friend sharing practices; and finally, whether Plaintiffs consented to FB's use of their data.

**None of FB's Search Strings Identify These Documents and Information.**
FB has not proposed a search string that addresses consent for FB's data sharing practices. In this regard, the search strings proposed by FB are inadequate to identify information regarding the limits of Plaintiffs' awareness of, control over, and consent for FB's practices. Similarly, although the FTC investigation looked into user consent, it did not employ these search terms nor all of these custodians, and investigated a narrower time frame; therefore, the documents produced in conjunction with that investigation are insufficient to prove Plaintiffs' claims.

**The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.**
In particular, this search string identifies information responsive to **RFP 35**, which seeks documents relating to the manner in which a FB user could control how his or her data was shared, as well as RFP 36, which seeks documents relating to FB's testing, evaluation, and analysis of those controls. (**Exhibit B**). In this regard, this search string identifies information regarding how a user could give consent for FB's various sharing practices; how FB understood user's consent; and what control FB gave users over the sharing of their data. This string is also likely to identify documents responsive to other RFPs, including those relating to the consent FB required third parties to obtain from users for access to and use of their data. Plaintiffs' custodian proposal targets individuals in **Group C,** who are likely to be involved in communications regarding user's consent for and control over FB's and app's data sharing and use practices. FB has not proposed custodians for this string.

**FB's Reason for Rejecting this Search String Is Improper.**
FB has refused to consider this search string in good faith and has rejected it outright. FB has not identified any nonresponsive topics or documents that this string targets or hits on. This search string is narrowly tailored to identify responsive documents and information, and its terms are connected with a narrow limiter so as to identify a review population of documents that is likely to be as responsive as possible to Plaintiffs RFPs.

| Plaintiffs' Search String 422 |
| --- |
|  |

This search string identifies information regarding FB's internal discussions concerning risks surrounding giving third parties access to or permissions to access user data, listed with various avenues through which FB provided access and permissions, in the second half of the string.

**These Documents and Information Are Necessary to Prove Plaintiffs' Claims.**
The information identified by this string is necessary to prove Plaintiffs' claims, including the negligence and Stored Communications Act claims, because FB's recognition of concerns or risks with these avenues of user data will establish FB's intent and the unreasonableness of its actions. For example, this string identifies FB-CA-MDL-00203273 (**Exhibit J** at 1)—which FB's 10/9 proposal search strings fail to identify—a ████████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████

The first half of this string is limited to ██████████████████████████████████ ████████████████████████████████████████████████████████. The second half of this string, ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████

**None of Facebook's Search Strings Identify These Documents and Information.**
FB has not proposed a search string that targets its level of intent or recognition of concerns with the private whitelists. Thus, the search strings proposed by FB are inadequate to identify instances where FB employees recognized that sharing user data in these unauthorized channels was problematic, for various reasons. Although this string is derived from one used in the FTC investigation, it was not applied to the databases of the same custodians, whom Plaintiffs have identified as having relevant information on this point. To that end, it is unsurprising that this term hits on unique documents outside of the FTC production.

**The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.**
In particular, this search string identifies information responsive to **RFP 11**, which seeks, among other things, documents that show how FB allowed third parties to access Plaintiffs' content and information. (**Exhibit B**). This search string identifies information pertaining to the ways FB employees may have attempted to limit the private whitelist program in response to risk or concerns. This string is also likely to identify documents responsive to other RFPs, including RFP 26, which seeks documents relating to the channels of user data to third partner partners, and 31, which seeks documents relating to investigations of third parties' compliance with FB's policies governing use of user data. Plaintiffs' custodian proposal targets individuals in the **Group A**, who are likely to be involved in communications regarding concerns or risks about FB's avenues of user data to third parties.

**Facebook's Reason for Rejecting this Search String Is Improper.**
FB has refused to consider this search string in good faith and has rejected it outright. FB has not identified any nonresponsive topics or documents that this string targets or hits on. This search string is narrowly tailored, using only two of many words that could be used to express concern about this practice, to identify responsive documents and information, and its terms are connected with a ██████████████████████ so as to exclude documents that use these terms with less of an immediate connection.

| Plaintiffs' Search String 426 |
| --- |



This search string identifies key information related to FB's Privacy Program and specifically how third parties obtained user information and what information they accessed. The Program was created in 2012 as a result of the consent decree FB entered into with the FTC, which required FB to establish and maintain a comprehensive privacy program to address privacy risks and protect the privacy and confidentiality of user information. FB retained PwC to audit the Program, which it did from 2012–2019.

**These Documents and Information Are Necessary to Prove Plaintiffs' Claims and Fill Gaps That Other Search Strings Do Not Address.**

The information identified by this string is necessary to prove Plaintiffs' claims, including but not limited to Plaintiffs' common law privacy claims and statutory claims under the VPPA and SCA. In particular, the string seeks information about what specific information third parties were able to obtain and how they were able to obtain it—this was a key feature of FB's Privacy Program and PwC's audits thereto. *See, e.g.*, 2019 PwC Report, FB-CA-MDL-00405233 (**Exhibit G** at 15–16).

The strings have also been specifically tailored to capture information about how third parties accessed certain information. For example, FB claimed in its Privacy Program that it "discloses covered information to third-party developers only for the purposes identified in the notices . . . ." 2019 PwC Report, FB-CA-MDL-00405233 (**Exhibit G** at 15). These third parties had to obtain consent and permission to obtain this information, which is why Plaintiffs incorporated these limiters into the string. In addition, in connection with this "Assertion," FB identifies the different types of ways in which third party developers can access this information, including through non-public or private APIs, which Plaintiffs have incorporated into the string as well. 2019 PwC Report, FB-CA-MDL-00405233 (**Exhibit G** at 15). Furthermore, members of the XFN team played a key role in determining the level of third-party access, thereby justifying the inclusion of that connector in this string. *See, e.g.*, 2013 PwC Report, FB-CA-MDL-00149131 (**Exhibit D** at 8).

**The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.**

This search string identifies information responsive to **RFPs 22, 31, 32, 52, 53, and 56**. (**Exhibit B**). These requests seek information related to FB's Privacy Program and PwC's audits thereto. Plaintiffs' custodian proposal also targets individuals in **Group D** who were involved in the Privacy Program, including members of the Privacy Governance Team, the Privacy XFN Team, and control owners of controls related to third-party access. Plaintiffs have presented evidence to FB establishing that each of these individuals played key roles in the program, but FB has thus far offered no reason why they should be excluded.

**Facebook's Proposed String Is Insufficient.**

FB does not dispute the relevance of Plaintiffs' proposed string, but proposes adding narrow limiters and eliminating several key terms reflected in the PwC audits. This results in FB's proposed string only returning 67 documents, proving that FB's proposal should be rejected. In addition, Plaintiffs' string is not duplicative of FB-44, FB-55, and FB-68 as FB suggests because (1) those strings clearly do not cover the terms contemplated here, and (2) the proposed custodians that these terms apply to are different than the strings those terms apply to.

| Plaintiffs' Search String 466 |
| --- |
|  |

This search string identifies information regarding ███████████████—FB friends of the user of a given app who do not also use the app themselves.

**Facebook Acknowledges That Portions of This Search String Are Relevant.**

FB has proposed revisions to this search string, acknowledging the relevance of the term ███ █████████████ and its synonyms to Plaintiffs' claims. However, FB's edits are improperly designed to reduce the number of responsive documents to close to zero and should be rejected.

**These Documents and Information Are Necessary to Prove Plaintiffs' Claims.**

The information identified by this string is necessary to prove Plaintiffs' claims, including for Breach of Contract and Unjust Enrichment, because documents and information regarding FB's practices with respect to ████████████ will establish that FB knowingly disclosed the content and information of ████████████ to third parties for its own monetary benefit in contravention of its users settings, as it did in the Cambridge Analytica Scandal. For example, this string identifies FB-CA-MDL-00183521 (**Exhibit L** at 1)—which FB's 10/9 proposed search strings fail to identify—a highly relevant message ████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████

The first Boolean in this string relates to different ways that FB references ████████ ██████. The second Boolean in this string relates to the disclosure of the content and information of ████████████ including to apps, developers, business partners, and other third parties. The third Boolean in this string relates to actions pertaining to the disclosure of the content and information of ████████████ including different ways through which third parties accessed or obtained such content and information from FB.

**The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.**

In particular, this search string identifies information responsive to **RFP 11**, which seeks documents regarding FB's provision of access to third parties of Plaintiffs' content and information, "what categories of Content and Information FB granted access to," and how such access was granted. (**Exhibit B**). This string is also likely to identify documents responsive to other RFPs relating to the sharing of users' content and information with third parties, such as RFPs 12, 24, 25, and 26. Plaintiffs' custodian proposal targets individuals in **Group A**, who are likely to be involved in communications regarding third party sharing, disclosure, and other actions with respect to user content and information.

**Facebook's Reason for Rejecting Plaintiffs' Version of This Search String Is Improper.**

As set forth above in Plaintiffs' Introductory Statement, FB's primary motivation for rejecting Plaintiffs' version of this search string is to reduce the number of documents produced to Plaintiffs, regardless of whether this version would identify responsive documents or information. FB has taken no steps to determine whether and to what extent responsive information will be withheld as a result of its overly narrow limiters. Moreover, FB's attempt to withhold as much responsive information as possible may be seen in the effect of its proposed edits, which reduce the number of responsive documents as close as possible to zero. In this regard, FB's attempt to withhold responsive information is improper and should be rejected.

| Plaintiffs' Search String 467 |
|---|



This search string identifies information regarding specific third parties with whom FB had data-sharing agreements.

In documents FB has produced, ███████████████████████████████████████████████. *See, e.g.*, FB-CA-MDL-00151541 (**Exhibit M** at 3-4) (████████████████████████████████████ ██████████); *see also* FB-CA-MDL-00170337 ████████████████████████ ███████████████████████████████████████); FB-CA-MDL-00165207 ███████████████████████████████████████████). This string seeks additional documents that use the terms ██████████████ in connection with permissions that involve access to sensitive user and friend content and information or that apps that had that access. Thus, ████████████████ seem to be part of the FB vernacular.

### These Documents and Information Are Necessary to Prove Plaintiffs' Claims.

Documents discussing scary and sketchy permissions are relevant to Plaintiffs' common law privacy claims which require that Plaintiffs prove, among other things, that the Defendant violated their "reasonable expectations of privacy." PTO No. 20 at 32. Internal documents that characterize third party access to FB users' private data as ████████ or ████████ would help to prove that third parties' access to their data was, in fact, unreasonable. Such documents would also be relevant to Plaintiffs' claims for Negligence and Gross Negligence insofar as they show that FB did not act reasonably to protect user data, but instead granted scary permissions to sketchy apps.

### None of Facebook's Search Strings Identify These Documents and Information.

FB has not proposed a search string that includes the terms ████████████████ Nonetheless, FB argues that this string is duplicative of other strings which target FB's granting partners access to user content and information or related enforcement efforts. In fact, this string generates 8,316 unique hits not identified by FB's proposed strings. As such, Plaintiffs believe that this string is highly likely to identify relevant and responsive documents that would otherwise be overlooked.

### The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.

This string will identify documents likely relevant to **RFPs 24** which seeks documents regarding FB's provision of "access to Users' Content and Information FB generally available through Platform pursuant to partnerships or agreements between Facebook and those Third Parties." (**Exhibit B**). This string is also likely to identify documents responsive to other RFPs relating to third parties that obtained private, special, or other preferential access to user content and information, such as RFPs 11, 12, 25, and 26. Such documents would also be responsive to RFPs 31 and 32 which seeks documents concerning the misuse of user data. *Id*. at 17. Plaintiffs' custodian proposal targets individuals in the **Group A**, which includes individuals across departments likely to be knowledgeable concerning agreements and partnerships with third parties that accessed user private data, and involved in communications regarding third party sharing, disclosure, and other actions with respect to user content and information. FB has not made an alternative custodian proposal.

| Plaintiffs' Search String 481 |
| --- |



This search string identifies information regarding FB's sharing or granting access to user content or information automatically or by default, which is one of the ways through which FB gave business partners, whitelisted apps, and other third parties access to user content and information in contravention of its users' settings.

### These Documents and Information Are Necessary to Prove Plaintiffs' Claims.
The information identified by this string is necessary to prove Plaintiffs' claims, including for Breach of Contract and Unjust Enrichment, because documents and information regarding FB's granting access to user content and information automatically or by default will establish that FB knowingly disclosed user content and information to third parties for its own monetary benefit in contravention of users' settings. For example, this string identifies FB-CA-MDL-00243881, ███

█████████████████████████████████████████████████████████████

Collectively, the first and second Booleans in this string relates to the different ways through which FB granted access to user content and information, including sharing by default and automatically granting permissions. The third Boolean narrowly targets the string to documents where the specific terms ███████████████ are present.

### None of Facebook's Search Strings Identify These Documents and Information.
FB has not proposed a search string that includes either the term ███████████. Further, none of the other strings under consideration include the term ████████ and the only other string that includes ██████ in any form is Plaintiffs' Search String 524, which includes this term in the context of API capabilities such as "█████████████████████████████. In this regard, the search strings proposed by FB are inadequate to identify information regarding its sharing or granting access to user content or information automatically or by default.

### The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.
In particular, this search string identifies information responsive to **RFP 11**, which seeks documents regarding FB's provision of access to third parties of Plaintiffs' content and information, "what categories of Content and Information FB granted access to," and how such access was granted. (**Exhibit B**).This string is also likely to identify documents responsive to other RFPs relating to the sharing of users' content and information with third parties, such as RFPs 12, 24, 25, and 26. Plaintiffs' custodian proposal targets individuals in the **Group A**, who are likely to be involved in communications regarding third party sharing, disclosure, and other actions with respect to user content and information.

### Facebook's Reason for Rejecting this Search String Is Improper.
As set forth above in Plaintiffs' Introductory Statement, FB's primary motivation for rejecting this search string is to reduce the number of documents produced to Plaintiffs, regardless of whether this string would identify responsive documents or information. Plaintiffs have made every effort within reason to narrow this search string, including by adding a third Boolean to narrowly target the string to documents where the specific terms ███████████████ are present. FB has taken no steps to determine whether and to what extent responsive information will be withheld as a result of its overly narrow limiters, and tacitly concedes that this is so. In this regard, FB's attempt to withhold responsive information is improper and should be rejected.

| Plaintiffs' Search String 501 |
| --- |



This search string identifies information regarding FB's granting certain app developers, whitelisted apps, and business partners "special" access to user content and information.

**Facebook Acknowledges That Portions of This Search String Are Relevant.**
FB has proposed revisions to this search string, acknowledging the relevance of the term █████ █████ to Plaintiffs' claims. However, FB's edits are improperly designed to reduce the number of responsive documents and should be rejected.

**These Documents and Information Are Necessary to Prove Plaintiffs' Claims.**
The information identified by this string is necessary to prove Plaintiffs' claims, including Breach of Contract and Unjust Enrichment, because documents and information regarding FB's granting special access to user content and information that was not made available to other developers and third parties, including to "whitelisted" apps and business partners, will establish that FB knowingly disclosed user content and information to third parties for its own monetary benefit in contravention of its users settings. For example, this string identifies FB-CA-MDL-0066531 (**Exhibit N**)—which FB's 10/9 search strings fail to identify—█████████████ ████ ████████████████████████████████████████.

The first Boolean in this string relates to FB's extension of ████████ to third parties, and the second Boolean relates to terms for the third parties to which such access was provided, including preferred developers, "whitelisted" third party partners, and business partners. The second Boolean also references ████████, an alternate vehicle FB used to provide partners and developers with access to user content and information, namely—specifically, access to a user's FB contacts. In this regard, third party partners who received such ████████ to user content and information are more likely to have received a lower standard of enforcement because of monetary and other value FB unlawfully obtained from such third parties.

**None of Facebook's Search Strings Identify These Documents and Information.**
FB has not proposed a search string that includes the term ██████  In this regard, the search strings proposed by FB will not capture relevant and responsive documents that include this term which FB commonly used in referencing the ████████ to user content and information FB granted to whitelisted apps, business partners, and other third parties.

**The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.**
In particular, this search string identifies information responsive to **RFP 11**, which seeks documents regarding FB's provision of access to third parties of Plaintiffs' content and information, "what categories of Content and Information FB granted access to," and how such access was granted. (**Exhibit B**). This string is also likely to identify documents responsive to other RFPs relating to the sharing of users' content and information with third parties, such as RFPs 12, 24, 25, and 26. Plaintiffs' custodian proposal targets individuals in **Group A**, who are likely to be involved in communications regarding third party sharing, disclosure, and other actions with respect to user content and information.

| Plaintiffs' Search String 524 |
| --- |



**Plaintiffs' Search String 524**



\* This search string was divided into subparts when the document hit counts were calculated by FB's vendor. Although unique document hit counts were provided for each subpart of the string, no actual unique document hit count was provided for the string itself. The number provided here is the sum total of the unique document hit counts for all of the subparts of this string, which Plaintiffs understand may be lower than the actual unique document hit count for the string itself.

This search string is intended to capture information regarding the specific application programming interface (API) capabilities through which FB granted access to third parties including app developers, whitelisted apps, and business partners.

**Facebook Acknowledges That Portions of This Search String Are Relevant.**
FB has proposed revisions to this search string, acknowledging its relevance to Plaintiffs' claims. However, FB's edits are improperly designed to reduce the number of responsive documents and should be rejected.

**These Documents and Information Are Necessary to Prove Plaintiffs' Claims.**
The information identified by this string is necessary to prove Plaintiffs' claims, including Breach of Contract and Unjust Enrichment, because documents and information regarding FB's granting access to user content and information through specific APIs will establish that FB knowingly disclosed user content and information to third parties for its own monetary benefit in contravention of its users' settings.

The first Boolean references ███████████████████████, through which FB gave third parties access to user content and information. Plaintiffs have made every effort to narrow this search string, including by deleting many APIs identified by FB through the meet and confer process. The second Boolean narrowly targets the string to identifying information regarding specific actions taken with regard to these specific API capabilities, including granting or authorizing access to such capabilities, deleting or removing such access, or raising any concerns regarding risks such as privacy-related risks of granting such access.

**None of Facebook's Search Strings Identify These Documents and Information.**
While the parties have agreed to other search strings that ███████████████████ (FB-44, UID 424), Plaintiffs edited this string in their 9/30 proposal ████████████ ██████████████████ and through its 10/9 proposal FB has acknowledged ███████ ██████████████████. Moreover, FB's counter proposal would ████████████████████████████████████. In this regard, FB-44 and UID 424 will not capture relevant and responsive documents that include ████████████ ████████ Given the number of unique hits that this search string generates, Plaintiffs believe it is likely to identify responsive documents. In contrast, FB's counter proposal deletes a large number of relevant terms from the second Boolean, which drastically reduces the number of documents hits.

**The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.**
In particular, this search string identifies information responsive to **RFP 11**, which seeks documents regarding FB's provision of access to third parties of Plaintiffs' content and information, "what categories of Content and Information FB granted access to," and how such access was granted. (**Exhibit B**). This string is also likely to identify documents responsive to other RFPs relating to the sharing of users' content and information with third parties, such as RFPs 12, 24, 25, and 26. Plaintiffs' custodian proposal targets individuals in **Group A**, who are likely to be involved in communications regarding third party sharing, disclosure, and other actions with respect to user content and information.

| Plaintiffs' Search String 669 |
|---|



This search string targets documents relating to FB's use of Return on Investment (ROI) and Return on Advertising Spend (ROAS) metrics concerning the valuation of user data. FB uses metrics like ROI and ROAS to demonstrate and measure the value of its features and services to business partners and other third parties. *E.g.*, FB-CA-MDL-00271626 at 12 █████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ ).

### Facebook Acknowledges That Portions of This Search String Are Relevant.

FB has proposed revisions to this search string, conceding its relevance. However, FB has proposed removing the term '███████ as well as terms referring to users and data. Further, rather than including variants of ████████████ as just another search term, FB has proposed using ██████████████ as a limiter, such that the string will only identify documents that specifically mention ████████████. As a result, FB's proposed revision returns only 10 documents. In contrast, Plaintiffs' proposed string returns 3,066 unique hits. As such, this string is likely to identify relevant documents that would otherwise be missed.

### These Documents and Information Are Necessary to Prove Plaintiffs' Claims.

This string identifies documents that will help Plaintiffs assess the value of user data. Such documents are thus relevant to calculating Plaintiffs' damages under California privacy torts, Negligence and Gross Negligence, Deceit by Concealment or Omission, Breach of Contract, Breach of Implied Covenant of Good Faith, and Unjust Enrichment. These documents are also relevant to FB's motive to deprecate concerns about users' privacy.

### None of Facebook's Search Strings Identify These Documents and Information.

FB has not proposed a search string that addresses its use of ████████████████ in connection with the value of user data, nor has it produced documents sufficient to show its internal measures of the monetary value of user data.

### The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.

This string will identify documents likely responsive to **RFP 16**, which seeks documents sufficient to show the monetary value of user data. (**Exhibit B**). It is also likely to identify documents responsive to RFPs 14 and 34, which seek documents sufficient to show the value of named plaintiffs' data and documents about payments or exchanges for access to user data, respectively. Plaintiffs' custodian proposal targets individuals in **Group F** who are likely to be recipients of or involved in generating information relating to financial metrics concerning the valuation of user data.

### Facebook's Reason for Rejecting this Search String Is Improper.

FB claims that a string combining terms such as ████████████████████████████ is too broad, but this string returns only 7,528 documents/45,786 hits with family/3,066 unique hits. In any event, FB has taken no steps to determine whether and to what extent responsive information will be excluded as a result of its overly narrow limiters, nor has it identified any documents that demonstrate overbreadth. As such, FB's attempt to withhold responsive information is improper and should be rejected.

| Plaintiffs' Search String 673 |
| --- |



\* This search string was divided into subparts when the document hit counts were calculated by FB's vendor. Although unique document hit counts were provided for each subpart of the string, no actual unique document hit count was provided for the string itself. The number provided here is the sum total of the unique document hit counts for all of the subparts of this string, which Plaintiffs understand may be lower than the actual unique document hit count for the string itself.

In nearly every case, "hot" documents often contain expletives and seasoned practitioners will attest to the fact that such terms are usually included in the first search string they run. This string identifies documents in which crude language was used in the context of inquiries and investigations relating to privacy, sharing, or data and third parties. Documents produced by FB show that its employees tend to use such language when discussing third party misbehavior. *See* FB-CA-MDL-00172517 (**Exhibit O** at 1.) ███████████████████████

███████████████████████████████████████████████████████

## These Documents and Information Are Necessary to Prove Plaintiffs' Claims.

The information identified by this string is relevant to Plaintiffs' claim for Negligence and Gross Negligence. Such documents may show that FB breached its duty of care to users by failing to protect user data from third parties. Such documents could also be relevant to Plaintiffs' Public Disclosure of Private Acts and Invasion of Privacy claims if they show that FB knew or should have known that it was disclosing private facts about users to third parties. This string could also identify documents relevant to Plaintiffs' claims for Deceit by Concealment or Omissions if they show that FB continued to allow certain third parties access to user content and information without users' knowledge.

## None of Facebook's Search Strings Identify These Documents and Information.

FB has not proposed a search string that addresses variants of crude language commonly used by FB employees when expressing concern, irritation, anger and reactions in the context of third-party misbehavior. As such, this search term is likely to capture information that is highly relevant to Plaintiffs' claims that would not be captured by FB's proposed search terms. FB has made no showing that the approximately 34,431 unique documents (a figure derived by summing the unique hit counts for the term components FB used to generate hit counts) are not relevant. Indeed, FB has not identified a single irrelevant or nonresponsive document identified by this string. FB also has not proposed alternative limiters to reduce the number of document hits

## The Search String and Custodians Are Narrowly Tailored to Plaintiffs' RFPs.

This search string identifies information responsive to **RFPs 31** and **32**, which seek documents concerning inquiries of policy violations involving third party access to user data and documents concerning the misuse of user data, respectively. (**Exhibit B**). Plaintiffs' custodian proposal targets individuals in the **Group B** who are likely to be involved in communications involving inquiries of policy violations involving third party access to user data and documents concerning the misuse of user data, respectively. FB has not made an alternative proposal.

## Facebook's Reason for Rejecting this Search String Is Improper.

During the meet and confer process, Plaintiffs' revised this string by striking numerous commonly used expletives. This resulted in a reduction in hit counts from 237,433 documents/834,857 with family to 106,242/382,977 with family.

Dated: October 16, 2020                                 Respectfully submitted,

KELLER ROHRBACK L.L.P.                                  BLEICHMAR FONTI & AULD LLP

By:   */s/ Derek W. Loeser*                            By:   */s/ Lesley E. Weaver*
      Derek W. Loeser                                         Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)              Lesley E. Weaver (SBN 191305)
Lynn Lincoln Sarko (admitted *pro hac vice*)           Anne K. Davis (SBN 267909)
Gretchen Freeman Cappio (admitted *pro hac vice*)      Joshua D. Samra (SBN 313050)
Cari Campen Laufenberg (admitted *pro hac vice*)       Matthew P. Montgomery (SBN 180196)
David Ko (admitted *pro hac vice*)                     Angelica M. Ornelas (SBN 285929)
Adele A. Daniel (admitted *pro hac vice*)              555 12th Street, Suite 1600
Benjamin Gould (SBN 250630)                            Oakland, CA 94607
1201 Third Avenue, Suite 3200                          Tel.: (415) 445-4003
Seattle, WA 98101                                      Fax: (415) 445-4020
Tel.: (206) 623-1900                                   lweaver@bfalaw.com
Fax: (206) 623-3384                                    adavis@bfalaw.com
dloeser@kellerrohrback.com                             jsamra@bfalaw.com
lsarko@kellerrohrback.com                              mmontgomery@bfalaw.com
gcappio@kellerrohrback.com                             aornelas@bfalaw.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com
bgould@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

I, Derek W. Loeser, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of October, 2020, at Seattle, Washington.

/s/ Derek W. Loeser
Derek W. Loeser

## CERTIFICATE OF SERVICE

I, Sarah Skaggs, hereby certify that on October 16, 2020, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

**In addition, the following were served via email:**

Paven Malhotra
Bryn Anderson Williams
pmalhotra@keker.com
bwilliams@kvn.com

Anjeza Hassan
annie.sara@yahoo.com

/s/ *Sarah Skaggs*
Sarah Skaggs

# EXHIBIT A

Unredacted Version Of Document Sought to be Sealed

**Overview of Plaintiffs' Proposed Custodian Groups**



**Plaintiffs Proposed**
**Group A Custodians**



**Plaintiffs Proposed**
**Group B Custodians**



**Plaintiffs Proposed**
**Group C Custodians**



**Plaintiffs Proposed**
**Group D Custodians**



**Plaintiffs Proposed**
**Group E Custodians**



**Plaintiffs Proposed**
**Group F Custodians**



# EXHIBIT B

Unredacted Version Of Document Sought to be Sealed

**Relevant Requests for Production of Documents**

| Set | RFP # | RFP Text |
|---|---|---|
| 1 | 1 | All documents relating to the relationship between Facebook and either Aleksandr Kogan or his app, thisisyourdigitallife. |
| 1 | 2 | All documents relating to the type and amount of user data that Aleksandr Kogan or his app, thisisyourdigitallife obtained (with or without Facebook's permission) as a result of the relationship between Facebook and either Aleksandr Kogan or his app, thisisyourdigitallife. |
| 1 | 3 | All documents relating to any restrictions Facebook imposed on Aleksandr Kogan or his app, thisisyourdigitallife regarding the use or dissemination of user data. |
| 1 | 4 | All documents relating to any efforts Facebook made to enforce restrictions Facebook against Aleksandr Kogan or his app, thisisyourdigitallife regarding the use or dissemination of user data. |
| 2 | 11 | Documents sufficient to identify all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information, what categories of Content and Information Facebook granted access to, how Facebook allowed these Third Parties to access the Named Plaintiffs' Content and Information, and the business purpose of all such access. |
| 2 | 12 | Documents relating to any partnerships or agreements Facebook entered into with Third Parties for access to Named Plaintiffs' Content and Information. |
| 2 | 13 | For all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information, Documents sufficient to show any use by Third Parties of such Content and Information not in connection with the User that granted the permission to the Third Party or inconsistent with Facebook's agreement with that Third Party. |
| 2 | 14 | Documents sufficient to show the monetary or retail value of each named Plaintiff's Content and Information to Facebook, updated to reflect whenever Facebook's terms of service changed, including the calculation of revenue earned by Facebook for each Named Plaintiff based upon bartering or selling access to such Named Plaintiff's Content and Information. |
| 2 | 15 | Documents sufficient to show the money or any other thing of value, including but not limited to money or any other thing of value paid in exchange for targeted advertising, that Facebook received in exchange for each Named Plaintiff's Content and Information, which entities paid Facebook, and when such payments were made. |
| 2 | 16 | Documents sufficient to show the monetary or retail value of Users' Content and Information to Facebook, including all monthly, quarterly, and annual financial reporting relating to same, and including but not limited to the calculation of average revenue per user, any changes to such monetary or retail value relating to changes to Facebook's terms of service, and any financial reporting of Content and Information as an asset. |
| 2 | 17 | All Documents relating to Facebook's assessment of the monetary or retail value of Users' Content and Information to Users (as distinct from value to Facebook), including analyses for providing compensation to Users for their Content and Information, including but not limited to Users compensated in connection with the Onavo or Research app. |

Relevant Requests for Production of Documents

| 2 | 22 | All "Privacy Risk Assessment[s]," and notes or agenda relating to Facebook's "focused subject-matter-specific meetings," "focused subject-matter-specific discussions," "weekly intra- and inter-team meetings," and "Privacy Summit[s]," as detailed in "Facebook's Privacy Program Overview" included in any PricewaterhouseCoopers LLP ("PwC") assessment report prepared pursuant to the FTC Consent Order. |
|---|----|----|
| 2 | 23 | RFP 23: PWC reports and documents: Unredacted versions and Documents in support of the assessment reports, including the Initial Assessment Report and Biennial Reports, prepared by PwC pursuant to the FTC Consent Order. |
| 2 | 24 | Documents sufficient to identify all Third Parties to which Facebook granted access to Users' Content and Information not generally available through Platform pursuant to partnerships or agreements between Facebook and those Third Parties. |
| 2 | 25 | All Documents relating to agreements or partnerships described in Request No. 24. |
| 2 | 26 | For each of the Third Parties that Facebook entered into partnerships or agreements with as described in Request No. 24, Documents sufficient to identify:<br>• The fields, kinds, or categories of Content and Information that were accessed or<br>• obtained by such Third Parties;<br>• How each such Third Party accessed or obtained the Content and Information of Users;<br>• How each such Third Party used the Content and Information accessed or obtained;<br>• Where the Content and Information obtained by such Third Parties currently resides and who has access to it. |
| 2 | 27 | Documents sufficient to show all forms and formats in which Facebook transmitted to Third Parties information concerning Users' liking, viewing, retrieving, or otherwise requesting or obtaining videos on, using, or by means of the Facebook Platform. |
| 2 | 28 | RFP 28: All Documents relating to Internal Policies by Facebook on the monitoring of Third Parties' compliance with Facebook's Platform Policy, Data Policy, or SRR. |
| 2 | 29 | All Documents relating to Internal Policies by Facebook on the enforcement of Facebook's Platform Policy, Data Policy, or SRR against Third Parties. |
| 2 | 30 | All Documents relating to measures and controls, including proposed measures and controls, put in place by Facebook to prevent Third Parties from violating Facebook's Platform Policy, Data Policy, or SRR. |
| 2 | 31 | All Documents relating to Facebook's audits, inquiries, and investigations of Third Parties investigating compliance with any provisions of Facebook's Platform Policy, Data Policy, or SRR regarding the access, use, transmission, receipt, collection and analysis of Users' Content and Information on and off the Platform. |
| 2 | 32 | All Documents Concerning Misuse of Data, including investigations, examinations, inquiries, or audits-or Communications regarding such investigations, examinations, inquiries, or audits-regarding Misuse of Data prior to the deprecation of Graph API v.1.0. |

| 2 | 33 | Documents sufficient to show the notice that Facebook provided to Users regarding modifications to Facebook's SRR or Data Policy, and all Communications related thereto |
|---|----|---|
| 2 | 34 | All Documents relating to the conditioning of Third Parties' access to Users' Content and Information on the purchase of Mobile App Install Ads, payment of Content and Information in kind (referred internally as Reciprocity or Data Reciprocity), or other payment. |
| 2 | 35 | Documents relating to the manner in which a Facebook User could control how his or her data was shared through their Privacy Controls and App Settings throughout the Relevant Time Period, including but not limited to screenshots of the Facebook website and the Facebook mobile application. |
| 2 | 36 | All Documents concerning User testing, evaluation and analysis of Facebook's Privacy Controls and App Settings during the Relevant Time Period, including but not limited to design documents, correspondence, analyses, and reports. |
| 3 | 52 | All Documents regarding all monitoring controls and audit processes in operation to detect misuse of the Facebook Platform throughout the Class Period. |
| 3 | 53 | All Documents regarding privacy decisions made by the Privacy Governance Team and the Privacy Cross-Functional Team related to Facebook's Privacy Program. |
| 3 | 55 | All Documents regarding all steps taken by Facebook to establish, implement, and maintain controls related to how Third Parties accessed Content and Information, including the approval process Facebook utilized to grant such access. |
| 3 | 56 | All Documents regarding Facebook's ongoing monitoring of its Privacy Program, including how Privacy Program controls were reviewed and updated, what methodologies Facebook utilized to test these controls, and how Facebook designed and implemented intake, detection, handling, response, remediation, and reporting of all privacy incidents such as misuse of user data by Third Parties. |
| 4 | 62 | All Documents concerning any changes or drafts that were considered or proposed but not ultimately adopted to Your Statements of Rights and Responsibilities, Data Use Policies, Platform Policies, or Privacy Policies concerning third party access to Users' Content and Information. |
| 4 | 63 | All Documents relating to Your enforcement of Facebook's Platform Policy, Data Policy, Privacy Policy or SRR against Third Parties regarding their access to or use of the Content and Information of Users, including, but not limited to, documents concerning any decisions not to enforce Your policies, any failures to enforce Your policies, and any decisions that enforcement was not appropriate. |

# EXHIBIT C

Unredacted Version Of Document Sought to be Sealed

Highly Confidential - Attorneys' Eyes Only

FB-CA-MDL-00203234

Highly Confidential - Attorneys' Eyes Only

Highly Confidential - Attorneys' Eyes Only

Highly Confidential - Attorneys' Eyes Only

Highly Confidential - Attorneys' Eyes Only

FB-CA-MDL-00203238

Highly Confidential - Attorneys' Eyes Only

Highly Confidential - Attorneys' Eyes Only

FB-CA-MDL-00203240

Highly Confidential - Attorneys' Eyes Only

**Highly Confidential - Attorneys' Eyes Only**

# EXHIBIT D

Unredacted Version Of Document Sought to be Sealed



# *Independent Assessor's Report on Facebook's Privacy Program*

Initial Assessment Report

For the period August 15, 2012 to February 11, 2013

The contents of this document, including the Report of Independent Accountants, contain PricewaterhouseCoopers LLP proprietary information that shall be protected from disclosure outside of the U.S. Government in accordance with the U.S. Trade Secrets Act and Exemption 4 of the U.S. Freedom of Information Act (FOIA).  The document constitutes and reflects work performed or information obtained by PricewaterhouseCoopers LLP, in our capacity as independent assessor for Facebook, Inc. for the purpose of the Facebook, Inc.'s Order.  The document contains proprietary information, trade secrets and confidential commercial information of our firm and Facebook, Inc. that is privileged and confidential, and we expressly reserve all rights with respect to disclosures to third parties.  Accordingly, we request confidential treatment under FOIA, the U.S. Trade Secrets Act or similar laws and regulations when requests are made for the report or information contained therein or any documents created by the FTC containing information derived from the report.  We further request that written notice be given to PwC and Facebook, Inc. before distribution of the information in the report (or copies thereof) to others, including other governmental agencies, to afford our firm and Facebook, Inc. with the right to assert objections and defenses to the release of the information as permitted under FOIA or other similar applicable law or regulation, except when such distribution is already required by law or regulation.  This report is intended solely for the information and use of the management of Facebook, Inc. and the U.S. Federal Trade Commission and is not intended to be and should not be used by anyone other than these specified parties.

**HIGHLY CONFIDENTIAL**



Use or disclosure of data contained on this page is subject to the restriction on the title page of this report.
**HIGHLY CONFIDENTIAL**
Page 65 of 79



## Management's Assertion

The management of Facebook represents that as of and for the 180 days ended February 11, 2013 ("the Reporting Period"), in accordance with Parts IV and V of the Agreement Containing Consent Order ("The Order"), with a service date of August 15, 2012, between Facebook, Inc. ("the Company") and the United States of America, acting upon notification and authorization by the Federal Trade Commission ("FTC"), the Company had established and implemented a comprehensive Privacy Program, ("the Facebook Privacy Program"), based on Company specific criteria (described in paragraph two of this assertion); and the privacy controls were operating with sufficient effectiveness to provide reasonable assurance to protect the privacy of covered information and that the controls have so operated throughout the Reporting Period.

The company specific criteria ("assertions") used as the basis for Facebook's Privacy Program are described below. The below assertions have corresponding controls on pages 21-76.

**Assertion A - Responsibility for the Facebook Privacy Program**, which is "Facebook has designated an employee or employees to coordinate and be responsible for the privacy program."

**Assertion B - Privacy Risk Assessment**, which is "Facebook has identified reasonably foreseeable, material risks, both internal and external, that could result in Facebook's unauthorized collection, use, or disclosure of covered information and an assessment of the sufficiency of any safeguards in place to control these risks. This privacy risk assessment includes consideration of risks in areas of relevant operations, including, but not limited to: (1) employee training and management, including training on the requirements of this order, and (2) product design, development, and research."

**Assertion C - Privacy and Security Awareness**, which is "Facebook has a privacy and security for privacy awareness program in place which is defined and documented in privacy and security for privacy policies. The extent of communications to employees is based on their role and responsibility and may include internal communications through various channels, training, and the Privacy Cross-Functional ("XFN") team process."

**Assertion D - Notice, Choice, Consent, Collection and Access**, which is "Facebook provides notice about its privacy policies and procedures and terms of service to users which identifies the purposes for which personal information is collected and used, describes the choices available to users, obtains implicit or explicit consent, collects personal information only for the purposes identified in the notices and provides users with access to their personal information for review and update."

**Assertion E - Use, Retention, Deletion and Quality**, which is "Facebook limits the use of personal information to the purposes identified in the notice and for which the individual has provided implicit or explicit consent. Facebook retains personal information for as long as necessary to provide services or fulfil the stated purposes or as required by law or regulations and thereafter appropriately disposes of such information. Facebook maintains accurate, complete, and relevant personal information for the purposes identified in the notice."

1601 Willow Road, Menlo Park, California 94025
650.543.4800 – tel 650.543.4801 – fax

Use or disclosure of data contained on this page is subject to the restriction on the title page of this report.
Page 77 of 79                                                                          **HIGHLY CONFIDENTIAL**



**Assertion F - Security for Privacy**, which is "Facebook protects personal information of users against unauthorized access."

**Assertion G - Third-party developers**, which is "Facebook discloses personal information to third-party developers only for the purposes identified in the notice and with the implicit or explicit consent of the individual."

**Assertion H - Service Providers**, which is "Facebook has developed and used reasonable steps to select and retain service providers capable of appropriately protecting the privacy of covered information they receive from the Company and requiring service providers, by contract, to implement and maintain appropriate privacy protections for such covered information."

**Assertion I - On-going Monitoring of the Privacy Program**, which is "Facebook evaluates and adjusts the Company's privacy program in light of the results of monitoring activities, any material changes to the Company's operations or business arrangements, or any other circumstances that the Company knows or has reason to know may have a material impact on the effectiveness of its privacy program."

Facebook, Inc.

By: _____

    Edward Palmieri

    Associate General Counsel, Privacy

    Facebook, Inc.

By: _____

    Daniel Li

    Product Counsel

    Facebook, Inc.

1601 Willow Road, Menlo Park, California 94025
650.543.4800 – tel 650.543.4801 – fax

# Exhibit E



# *Independent Assessor's Report on Facebook's Privacy Program*

Biennial Report

For the period February 12, 2013 to February 11, 2015

The contents of this document, including the Report of Independent Accountants, contain PricewaterhouseCoopers LLP proprietary information that shall be protected from disclosure outside of the U.S. Government in accordance with the U.S. Trade Secrets Act and Exemption 4 of the U.S. Freedom of Information Act (FOIA). The document constitutes and reflects work performed or information obtained by PricewaterhouseCoopers LLP, in our capacity as independent assessor for Facebook, Inc. for the purpose of Facebook, Inc.'s Order. The document contains proprietary information, trade secrets and confidential commercial information of our firm and Facebook, Inc. that is privileged and confidential, and we expressly reserve all rights with respect to disclosures to third parties. Accordingly, we request confidential treatment under FOIA, the U.S. Trade Secrets Act or similar laws and regulations when requests are made for the report or information contained therein or any documents created by the FTC containing information derived from the report. We further request that written notice be given to PwC and Facebook Inc. before distribution of the information in the report (or copies thereof) to others, including other governmental agencies, to afford our firm and Facebook Inc. with the right to assert objections and defenses to the release of the information as permitted under FOIA or other similar applicable law or regulation, except when such distribution is already required by law or regulation. This report is intended solely for the information and use of the management of Facebook Inc. and the U.S. Federal Trade Commission and is not intended to be and should not be used by anyone other than these specified parties.

**HIGHLY CONFIDENTIAL**



# Management's Assertion

The management of Facebook represents that as of and for the two years ended February 11, 2015 ("the Reporting Period"), in accordance with Parts IV and V of the Agreement Containing Consent Order ("The Order"), with a service date of August 15, 2012, between Facebook, Inc. ("the Company") and the United States of America, acting upon notification and authorization by the Federal Trade Commission ("FTC"), the Company had established and implemented a comprehensive Privacy Program ("the Facebook Privacy Program"), based on Company specific criteria (described in paragraph two of this assertion); and the privacy controls were operating with sufficient effectiveness to provide reasonable assurance to protect the privacy of covered information and that the controls have so operated throughout the Reporting Period. Note that during the Reporting Period, Facebook made acquisitions. As part of its acquisition process, the Company assesses whether the operations and technology of an acquired entity will be integrated with the Company or if it will remain independently operated. As the scope of the Order requires a comprehensive privacy program for Facebook, Inc., any independently operated affiliates were not included in the assessment of the Facebook Privacy Program. The products and services of Facebook, Inc., subject to the scope and assessment, are those generally available through Facebook's websites, facebook.com or m.facebook.com and/or Facebook's mobile applications.

The company specific criteria ("assertions") used as the basis for Facebook's Privacy Program are described below.  The below assertions have corresponding controls on pages 22-57.

**Assertion A - Responsibility for the Facebook Privacy Program**, which is "Facebook has designated an employee or employees to coordinate and be responsible for the privacy program."

**Assertion B - Privacy Risk Assessment**, which is "Facebook has identified reasonably foreseeable, material risks, both internal and external, that could result in Facebook's unauthorized collection, use, or disclosure of covered information and an assessment of the sufficiency of any safeguards in place to control these risks. This privacy risk assessment includes consideration of risks in areas of relevant operations, including, but not limited to: (1) employee training and management, including training on the requirements of this order, and (2) product design, development, and research."

**Assertion C - Privacy and Security (for Privacy) Awareness**, which is "Facebook has a privacy and security for privacy awareness program in place which is defined and documented in privacy and security for privacy policies.  The extent of communications to employees is based on their role and responsibility and may include internal communications through various channels, training, and the Privacy Cross-Functional ("XFN") team process."

**Assertion D - Notice, Choice, Consent, Collection and Access**, which is "Facebook provides notice about its privacy policies and procedures and terms of service to users which identifies the purposes for which personal information is collected and used, describes the choices available to users, obtains implicit or explicit consent, collects personal information only for the purposes identified in the notices and provides users with access to their personal information for review and update."

1601 Willow Road, Menlo Park, California 94025
650.543.4800 – tel 650.543.4801 – fax



**Assertion E - Use, Retention, Deletion and Quality**, which is "Facebook limits the use of personal information to the purposes identified in the notice and for which the individual has provided implicit or explicit consent. Facebook retains personal information for as long as necessary to provide services or fulfil the stated purposes or as required by law or regulations and thereafter appropriately disposes of such information. Facebook maintains accurate, complete, and relevant personal information for the purposes identified in the notice."

**Assertion F - Security for Privacy**, which is "Facebook protects personal information of users against unauthorized access."

**Assertion G - Third-party developers**, which is "Facebook discloses personal information to third-party developers only for the purposes identified in the notice and with the implicit or explicit consent of the individual."

**Assertion H - Service Providers**, which is "Facebook has developed and used reasonable steps to select and retain service providers capable of appropriately protecting the privacy of covered information they receive from the Company and requiring service providers, by contract, to implement and maintain appropriate privacy protections for such covered information."

**Assertion I - On-going Monitoring of the Privacy Program**, which is "Facebook evaluates and adjusts the Company's privacy program in light of the results of monitoring activities, any material changes to the Company's operations or business arrangements, or any other circumstances that the Company knows or has reason to know may have a material impact on the effectiveness of its privacy program."

Furthermore, the Company represents that for the Reporting Period, Facebook's Privacy Program contains controls and procedures appropriate to its size and complexity, the nature and scope of its activities, and the sensitivity of the covered information.

Facebook, Inc.

By: _____

Edward Palmieri

Director, Associate General Counsel – Privacy & Regulatory

Facebook, Inc.

1601 Willow Road, Menlo Park, California 94025
650.543.4800 – tel 650.543.4801 – fax

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**                    FB-CA-MDL-00149271

# EXHIBIT F

Unredacted Version Of Document Sought to be Sealed



# *Independent Assessor's Report on Facebook's Privacy Program*

Biennial Report

For the period February 12, 2015 to February 11, 2017

The contents of this document, including the Report of Independent Accountants, contain PricewaterhouseCoopers LLP proprietary information that shall be protected from disclosure outside of the U.S. Government in accordance with the U.S. Trade Secrets Act and Exemption 4 of the U.S. Freedom of Information Act (FOIA). The document constitutes and reflects work performed or information obtained by PricewaterhouseCoopers LLP, in our capacity as independent assessor for Facebook, Inc. for the purpose of Facebook, Inc.'s Order. The document contains proprietary information, trade secrets and confidential commercial information of our firm and Facebook, Inc. that is privileged and confidential, and we expressly reserve all rights with respect to disclosures to third parties. Accordingly, we request confidential treatment under FOIA, the U.S. Trade Secrets Act or similar laws and regulations when requests are made for the report or information contained therein or any documents created by the Federal Trade Commission containing information derived from the report. We further request that written notice be given to PwC and Facebook, Inc. before distribution of the information in the report (or copies thereof) to others, including other governmental agencies, to afford our firm and Facebook, Inc. with the right to assert objections and defenses to the release of the information as permitted under FOIA or other similar applicable law or regulation, except when such distribution is already required by law or regulation. This report is intended solely for the information and use of the management of Facebook, Inc. and the U.S. Federal Trade Commission and is not intended to be and should not be used by anyone other than these specified parties.

**HIGHLY CONFIDENTIAL**



# Management's Assertion

The management of Facebook represents that for the two years ended February 11, 2017 ("the Reporting Period"), in accordance with Parts IV and V of the Agreement Containing Consent Order ("The Order"), with a service date of August 15, 2012, between Facebook, Inc. ("the Company") and the United States of America, acting upon notification and authorization by the Federal Trade Commission ("FTC"), the Company had established and implemented a comprehensive Privacy Program ("the Facebook Privacy Program"), based on Company specific criteria (described in paragraph two of this assertion); and the privacy controls were operating with sufficient effectiveness to provide reasonable assurance to protect the privacy of covered information and that the controls have so operated throughout the Reporting Period.



The company specific criteria ("assertions") used as the basis for Facebook's Privacy Program are described below. The below assertions have corresponding controls on pages 22-51.

> **Assertion A - Responsibility for the Facebook Privacy Program**, which is "Facebook has designated an employee or employees to coordinate and be responsible for the privacy program."

> **Assertion B - Privacy Risk Assessment**, which is "Facebook has identified reasonably foreseeable, material risks, both internal and external, that could result in Facebook's unauthorized collection, use, or disclosure of covered information and an assessment of the sufficiency of any safeguards in place to control these risks. This privacy risk assessment includes consideration of risks in areas of relevant operations, including, but not limited to: (1) employee training and management, including training on the requirements of this order, and (2) product design, development, and research."

> **Assertion C - Privacy and Security Awareness**, which is "Facebook has a privacy and security awareness program in place which is defined and documented in privacy and security for privacy policies. The extent of communications to employees is based on their role and responsibility and may include internal communications through various channels and training."

> **Assertion D – Transparency, Consent, Access, Use, and Deletion**, which is "Facebook provides notices and other informational materials about its privacy policies and procedures, and about its terms of service. These materials explain the purposes for which covered information is collected, used, and deleted and describe the choices available to users.

1601 Willow Road, Menlo Park, California 94025
650.543.4800 – tel 650.543.4801 – fax

Use or disclosure of data contained on this page is subject to the restriction on the title page of this report.
**HIGHLY CONFIDENTIAL**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**                                FB-CA-MDL-00149325



Facebook obtains consent for such practices.  Facebook has implemented controls, including a Privacy Cross-Functional ("XFN") process, to ensure that it only collects and uses covered information for the purposes identified in the notices and provides users with access to their covered information for review and update. Facebook retains covered information for as long as necessary to provide services or fulfil the stated purposes, or as required by law or regulations, and thereafter appropriately disposes of such information."

**Assertion E - Security for Privacy**, which is "Facebook protects covered information of users against unauthorized access."

**Assertion F - Third-Party Developers**, which is "Facebook discloses covered information to third-party developers only for the purposes identified in the notices and with the implicit or explicit consent of the individual."

**Assertion G - Service Providers**, which is "Facebook has developed and used reasonable steps to select and retain service providers capable of appropriately protecting the privacy of covered information they receive from the Company and requiring service providers, by contract, to implement and maintain appropriate privacy protections for such covered information."

**Assertion H - Ongoing Monitoring of the Privacy Program**, which is "Facebook evaluates and adjusts the Company's privacy program in light of the results of monitoring activities, any material changes to the Company's operations or business arrangements, or any other circumstances that the Company knows or has reason to know may have a material impact on the effectiveness of its privacy program."

Furthermore, the Company represents that for the Reporting Period, Facebook's Privacy Program contains controls and procedures appropriate to its size and complexity, the nature and scope of its activities, and the sensitivity of the covered information.

Facebook, Inc.

By: _____

Edward Palmieri

Director and Associate General Counsel, Privacy

Facebook, Inc.

1601 Willow Road, Menlo Park, California 94025
650.543.4800 – tel 650.543.4801 – fax

Use or disclosure of data contained on this page is subject to the restriction on the title page of this report.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**                                    **FB-CA-MDL-00149326**

# EXHIBIT G

Unredacted Version Of Document Sought to be Sealed



# *Independent Assessor's Report on Facebook's Privacy Program*

Biennial Report

For the period February 12, 2017 to February 11, 2019

The contents of this document, including the Report of Independent Accountants, contain PricewaterhouseCoopers LLP proprietary information that shall be protected from disclosure outside of the U.S. Government in accordance with the U.S. Trade Secrets Act and Exemption 4 of the U.S. Freedom of Information Act (FOIA). The document constitutes and reflects work performed or information obtained by PricewaterhouseCoopers LLP, in our capacity as independent assessor for Facebook, Inc. for the purpose of Facebook, Inc.'s Order. The document contains proprietary information, trade secrets and confidential commercial information of our firm and Facebook, Inc. that is privileged and confidential, and we expressly reserve all rights with respect to disclosures to third parties. Accordingly, we request confidential treatment under FOIA, the U.S. Trade Secrets Act or similar laws and regulations when requests are made for the report or information contained therein or any documents created by the Federal Trade Commission containing information derived from the report. We further request that written notice be given to PwC and Facebook, Inc. before distribution of the information in the report (or copies thereof) to others, including other governmental agencies, to afford our firm and Facebook, Inc. with the right to assert objections and defenses to the release of the information as permitted under FOIA or other similar applicable law or regulation, except when such distribution is already required by law or regulation. This report is intended solely for the information and use of the management of Facebook, Inc. and the U.S. Federal Trade Commission and is not intended to be and should not be used by anyone other than these specified parties.

**HIGHLY CONFIDENTIAL**



*Matters Identified During the Engagement*

Although we were unable to complete our examination, professional standards require that our report include exceptions identified in the course of our work that cause the subject matter to be materially misstated, which we describe below. Had we been able to complete our examination, the existence of these exceptions would have resulted in an adverse opinion, concluding that Facebook's privacy controls were not operating with sufficient effectiveness to provide reasonable assurance to protect the privacy of covered information, in all material respects for the period February 12, 2017 to February 11, 2019, based upon the Facebook Privacy Program set forth in Attachment I.

- Assertion C - Privacy and Security Awareness

    - Control C-6 - Management's control to monitor the completion of Privacy and Security Awareness Training for new employees relied on inaccurate and incomplete data from Facebook's Learning Management System.
    - Control C-7 - Management's control to monitor the timely completion of Privacy and Security Awareness Training for new contingent workers lacked effective enforcement procedures.

- Assertion D – Transparency, Consent, Access, Use, and Deletion

    - Control D-2 - Reviews by the Privacy Cross-functional ("XFN") team were not completed prior to launch for two sampled privacy-related changes to products and features launched.
    - Control D-6/H-7 - Management did not have a formalized methodology or approach for: (1) determining the scope of products and platforms to perform privacy-related feature testing; and (2) the extent of testing to be performed.
    - Control D-7 - Management did not appropriately set the expiration date for one sampled civil legal hold involving user data.
    - Control D-9-Instagram (IG) - The Deletion Framework was not implemented for one online data store containing Instagram user data.
    - Control D-12 and D-12-Instagram (IG) - The ability to push changes to the production environments was not appropriately restricted and/or reviewed. These exceptions could impact the consistent operation and effectiveness of automated controls and system-generated data or reports supporting the Privacy Program.
    - Control D-13 - Management could not provide evidence of controls over user inquiries received and related responses for certain apps that were active, but then sunset (i.e., shutdown), during the Reporting Period.

- Assertion F - Third-Party Developers

    - Control F-4 - Management did not implement a control to ensure all partner (i.e., private or non-public) Application Programming Interfaces (APIs) were approved by an authorized Facebook employee.

FB-CA-MDL-00405238



- ○ Control F-6 - Management could not provide evidence that an investigation was completed for two sampled potential violations related to misuse of non-public user data by third parties using Facebook's public APIs. Management did not implement a control to conduct investigations, and take related enforcement actions, of misuse of non-public personal information by third party developers and/or partners using Facebook's partner APIs.

- Assertion G - Service Providers

  - ○ Control G-3 - Management could not provide evidence of its analysis and conclusions as to whether security reviews were required for certain service providers who potentially accessed or handled user data. Management did not complete security reviews for certain relevant service providers.

- Assertion H - Ongoing Monitoring of the Privacy Program

  - ○ Control H-3 - Some Privacy Program controls were not effectively reviewed and updated.
  - ○ Control H-7/D-6 - Management did not have a formalized methodology or approach for: (1) determining the scope of products and platforms to perform privacy-related feature testing; and (2) the extent of testing to be performed.
  - ○ Control H-10 - Management's control was not appropriately designed and implemented to address intake, detection, handling, response, remediation, and reporting (as applicable) for all privacy incidents (e.g., misuse of user data by service providers or other third party misuse).

*Disclaimer of Opinion*

Because of the significance of the limitations on the scope of our examination discussed in the "Basis for Disclaimer of Opinion" section above, we have not been able to obtain sufficient appropriate evidence to provide a basis for an examination opinion. Accordingly, we do not express an opinion on whether Facebook's privacy controls operated with sufficient effectiveness to provide reasonable assurance to protect the privacy of covered information for the period February 12, 2017 to February 11, 2019, based upon the criteria set forth in Attachment I, in all material respects.

*Restriction of Use*

This report is intended solely for the information and use of the management of Facebook, Inc. and the Federal Trade Commission and is not intended to be and should not be used by anyone other than these specified parties.

*PricewaterhouseCoopers LLP*

San Jose, California
June 6, 2019

FB-CA-MDL-00405239

# EXHIBIT H

Unredacted Version Of Document Sought to be Sealed

Request List



PwC_CPUP_FB00000932.xlsx
Request List



PwC_CPUP_FB00000932.xlsx
Request List

PwC_CPUP_FB00000932.xlsx
Request List



PwC_CPUP_FB00000932.xlsx
Request List

# EXHIBIT I

Unredacted Version Of Document Sought to be Sealed





PwC_CPUP_FB00000831.xlsx
Interim Testing Summary

# EXHIBIT J

Unredacted Version Of Document Sought to be Sealed



Confidential

# EXHIBIT K

Unredacted Version Of Document Sought to be Sealed



# *Independent Assessor's Report on Facebook's Privacy Program*

Biennial Report

For the period February 12, 2017 to February 11, 2019

The contents of this document, including the Report of Independent Accountants, contain PricewaterhouseCoopers LLP proprietary information that shall be protected from disclosure outside of the U.S. Government in accordance with the U.S. Trade Secrets Act and Exemption 4 of the U.S. Freedom of Information Act (FOIA). The document constitutes and reflects work performed or information obtained by PricewaterhouseCoopers LLP, in our capacity as independent assessor for Facebook, Inc. for the purpose of Facebook, Inc.'s Order. The document contains proprietary information, trade secrets and confidential commercial information of our firm and Facebook, Inc. that is privileged and confidential, and we expressly reserve all rights with respect to disclosures to third parties. Accordingly, we request confidential treatment under FOIA, the U.S. Trade Secrets Act or similar laws and regulations when requests are made for the report or information contained therein or any documents created by the Federal Trade Commission containing information derived from the report. We further request that written notice be given to PwC and Facebook, Inc. before distribution of the information in the report (or copies thereof) to others, including other governmental agencies, to afford our firm and Facebook, Inc. with the right to assert objections and defenses to the release of the information as permitted under FOIA or other similar applicable law or regulation, except when such distribution is already required by law or regulation. This report is intended solely for the information and use of the management of Facebook, Inc. and the U.S. Federal Trade Commission and is not intended to be and should not be used by anyone other than these specified parties.

**HIGHLY CONFIDENTIAL**

FB-CA-MDL-00405233



- E-6 - A formal data destruction policy is in place for storage devices. Storage devices containing unencrypted user data do not leave Facebook's custody without being wiped and verified. Once wiped and verified, a Certificate of Data Destruction (per serial number) is issued or a separate vendor validation is provided. Any drive that fails the wipe and verification process is physically crushed, then shredded, and a Certificate of Data Destruction is obtained.

- E-7 - Laptops are wiped or destroyed prior to leaving Facebook's custody. Full-disk encryption and Password Complexity standards are implemented to prevent unauthorized access to data stored on Facebook devices and accessed via the network.

**Assertion F - Third-Party Developers**, which is "Facebook discloses covered information to third-party developers only for the purposes identified in the notices and with the implicit or explicit consent of the individual."

- F-1 - Facebook has defined and documented the following types of relevant formal policies to make sure that personal information is disclosed only to developers who have agreements with Facebook to protect personal information in a manner consistent with Facebook's privacy program:
  - Data Policy
  - Terms of Service / Terms of Use ("Terms")
  - Platform Policy

- F-2 - Facebook requires developers who access public APIs to agree to Facebook's Data Policy, Terms, and Platform Policy, which include consideration of privacy-related requirements such as:
  - Purpose of Use
  - Restrictions on Use
  - Deletion of Data
  - No Transfer
  - Updates of Data
  - Storage

- F-2-IG* - For the period 7/14/2018 – 2/11/2019: Developers who access public APIs agree to Data Policy, Terms of Use, and IG Platform Policy, which include consideration of privacy-related requirements such as:
  - Purpose of Use
  - Restrictions on Use
  - Deletion of Data
  - Restrictions on Transfer
  - Updates of Data
  - Storage

- F-3 - Management has implemented mechanisms to ensure that Facebook obtains consent from users prior to disclosing non-public personal information to third-party developers. Third party developers are limited to accessing user data based on an appropriate permission list consented to by the user.

FB-CA-MDL-00405247



- F-3-IG* - For the period 7/14/2018 – 2/11/2019: Instagram Legacy API platform only discloses non-public user data, which exceeds the restrictions imposed by a user's privacy settings, to third-party developers with prior consent from that user.

- F-4 - Facebook requires developers who access partner (i.e., private or non-public) APIs to agree to Facebook's Data Policy, Terms, and Platform Policies, which include privacy-related requirements such as:
  - Purpose of use
  - Restrictions on use
  - Deletion of data
  - Transfer
  - Storage

  In addition, each partner API request must be specifically approved by an authorized Facebook employee.

- F-5* - Apps are reviewed and approved by Facebook's DevOps team through the Login Review process before third party developers can request new or additional permissions to any user data via public-APIs beyond basic profile information and email address.

- F-6* - Investigations are conducted on an ongoing basis by DevOps/Policy/Legal to review potential violations related to misuse of non-public user data by third-party developers of our public platforms. In doing so, enforcement actions can include, but are not limited to, app suspensions and terminations.

**Assertion G - Service Providers**, which is "Facebook has developed and used reasonable steps to select and retain service providers capable of appropriately protecting the privacy of covered information they receive from the Company and requiring service providers, by contract, to implement and maintain appropriate privacy protections for such covered information."

- G-1 - Facebook's Data Policy contains a section that informs users that the information Facebook receives may be shared with service organizations when a user signs up for a Facebook account.

- G-2 - Contracts with all third-parties are reviewed and approved in accordance with Facebook's Contract Policy and Approval Authority Matrix. Any deviations from pre-approved templates must undergo additional legal review. Any service providers with new contracts that involve the handling of user data must consent to Facebook's Terms, consent to confidentiality terms (i.e., NDA) and consent to only use and collect information necessary to provide services for users. Facebook may also require that third parties, who share data with Facebook, have a privacy policy and represent that the information being sent to Facebook was obtained lawfully.

- G-3 - Facebook conducts security (logical, network and physical) reviews, ensures Service Providers follow Facebook security guidelines and sets application and personnel security as key Service Provider contractual obligations.

**FB-CA-MDL-00405248**

# EXHIBIT L

Unredacted Version Of Document Sought to be Sealed



Highly Confidential - Attorneys' Eyes Only



2

Highly Confidential - Attorneys' Eyes Only

FB-CA-MDL-00183522

# EXHIBIT M

Unredacted Version Of Document Sought to be Sealed



Confidential



Confidential



Confidential



4

FB-CA-MDL-00151544

# Exhibit N



1

CONFIDENTIAL TREATMENT REQUESTED

Highly Confidential - Attorneys' Eyes Only

SPAR0022723

FB-CA-MDL-00166531

# EXHIBIT O

Unredacted Version Of Document Sought to be Sealed



Confidential



Confidential

FB-CA-MDL-00172518



Confidential



4