Pages 1 - 53

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline S. Corley, Magistrate Judge

IN RE:  FACEBOOK, INC. CONSUMER )
PRIVACY USER PROFILE LITIGATION.)   **NO. 18-MD-02843 VC (JSC)**
─────────────────────────────   )

San Francisco, California
Wednesday, December 9, 2020

**<u>TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS</u>**

**<u>APPEARANCES VIA ZOOM:</u>**

For Plaintiffs:

                KELLER ROHRBACK LLP
                1201 Third Avenue - Suite 3200
                Seattle, Washington  98101
      BY: **DEREK LOESER, ATTORNEY AT LAW**
           **CARI LAUFENBERG, ATTORNEY AT LAW**
           **DAVID J. KO, ATTORNEY AT LAW**

                BLEICHMAR, FONTI & AULD LLP
                555 12th Street - Suite 1600
                Oakland, California  94607
      BY: **LESLEY E. WEAVER, ATTORNEY AT LAW**
           **ANNE K. DAVIS, ATTORNEY AT LAW**
           **MATTHEW P. MONTGOMERY, ATTORNEY AT LAW**
           **ANGELICA M. ORNELAS, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Reported By:        Marla F. Knox, RPR, CRR, RMR
                   United States Official Court Reporter

 1 | **APPEARANCES VIA ZOOM:   (CONT'D)**

 2 | For Defendant:
   |                          GIBSON, DUNN & CRUTCHER LLP
 3 |                          1881 Page Mill Road
   |                          Palo Alto, California  94304
 4 |                   BY:  **MARTIE KUTSCHER CLARK, ATTORNEY AT LAW**

 5 |                          GIBSON, DUNN & CRUTCHER LLP
   |                          333 South Grand Avenue
 6 |                          Los Angeles, California  90071
   |                   BY:  **DEBORAH L. STEIN, ATTORNEY AT LAW**
 7 |
   |                          GIBSON, DUNN & CRUTCHER LLP
 8 |                          2100 McKinney Avenue - Suite 1100
   |                          Dallas, Texas  75201
 9 |                   BY:  **RUSSELL H. FALCONER, ATTORNEY AT LAW**

<u>Wednesday - December 9, 2020</u>                    <u>10:00 a.m.</u>

**P R O C E E D I N G S**

**---oOo---**

THE CLERK:  Court is now in session.  The Honorable

Jacqueline Scott Corley is presiding.

Calling civil action 18-md-2843, In Re: Facebook Inc.

Go ahead and start.

THE COURT:  All right.  Good morning, everyone.  You

don't have to make your appearances.  And thank you for your

status update.

Let's just go through and talk through the things and see

where we are at and what we can do.

So the first issue is search terms for the 5 through 8

group.  And I'm not sure if there is anything to discuss here.

I think the Plaintiffs said they were hopeful the parties could

work out the schedule, and I don't believe Facebook said

anything about it.

So, Ms. Weaver, or whoever from the Plaintiff wants to

address that.  Is there anything to discuss?

MS. WEAVER:  Not from our perspective, Your Honor.

MS. DAVIS:  No.

THE COURT:  Okay.  Great.  We will just knock that

off.

Now, the second thing was RFPs 14 to 17, Plaintiffs' RFPs.

And Facebook seemed to suggest that the search terms had

1  been agreed to for those, but Plaintiffs seem to suggest that

2  they had not.  So I don't know where we are with that.

3          **MS. WEAVER:**  Mr. Ko will address that.

4          **MR. KO:**  This is David Ko on behalf of Plaintiffs.

5      So really the reason why we identified that issue in our

6  statement -- two reasons -- I mean, I think this is likely

7  coming at a head such that we will brief this to you shortly.

8      To answer your question, the reason why these RFPs are not

9  actually covered by the -- or this dispute, more specifically,

10  is not covered by the RFPs and the search strings is that we

11  are seeking a targeted search and a certain -- and a specific

12  group of materials that we believe Facebook should produce

13  pursuant to a targeted search.

14      And that is separate from the documents that they may

15  potentially produce that are, you know, possibly responsive to

16  these RFPs.

17      And just to add some color to that, you know, the search

18  strings that we agreed to -- and, quite frankly, that you

19  ordered in Discovery Order Number 8, I believe -- there are

20  actually only one search string that specifically relates to

21  these -- that solely relates to these RFPs.

22      And so -- and in this next round of negotiations, I think

23  there are only about three or four strings that the parties are

24  actually negotiating such that these strings may produce

25  potentially relevant information.

1    So what we are asking for is something different than I

2  think what Facebook is saying.  We are just saying:  Look,

3  there are these five categories of information that are

4  responsive to these RFPs; and we believe that they can produce

5  this information pursuant to targeted searches.

6    And that is, again, distinct from any of the search string

7  negotiations.

8         **THE COURT:**  Why is it distinct?

9         **MR. KO:**  Well, this has a pretty long and tortured

10  history.  We have been going back and forth with Facebook on

11  this since January.

12    Actually, we engaged in an extensive letter writing

13  campaign from February to April; and we have gone back and

14  forth with them.

15    And they said clearly that:  A, this information is

16  actually irrelevant.  B, that they don't have any responsive

17  documents anyways.  And C, even if they did, that they would be

18  highly confidential and protected.

19    So, you know, we found that hard to believe because these

20  by -- just to provide some context, these RFPs seek documents

21  related to how Facebook values, quantifies and monetizes the

22  user content information at issue in this case.

23    And they said:  Look, we don't have anything responsive to

24  those requests.

25    We found that hard to believe; right.  I mean, they are a

1  company -- this is a company that last year alone generated

2  $70 billion in revenue, you know, 98 percent of which came from

3  third parties.

4      So they said -- we said let's try to provide some

5  clarification so here are -- so this dispute matured to a point

6  where we said:  Here are five specific categories that we

7  believe will be responsive to this request.

8      Can you please run targeted searches on them?  And they

9  said no.

10     And they said:  Why don't we do -- why don't we go with

11  the search string negotiations and see if we can actually come

12  up with some documents that may potentially be responsive to

13  the requests.

14     And we gave that a shot.  And we thought that maybe that

15  they would run targeted searches in connection with that

16  negotiation process, but what has become evident is that they

17  do not want to.  And so I think, you know, at this point --

18          **THE COURT:**  Well, did you propose them as part of the

19  search string submission?

20          **MR. KO:**  We proposed one string -- two strings, excuse

21  me, that relates solely to 1417.  But, remember, we had a

22  finite number of strings we could negotiate and propose.

23     And so we took those somewhat off the table, right,

24  because there were other strings that we were negotiating that

25  we believe were responsive to other discovery requests because

we didn't have -- in the normal course we would say:  Look, here are, you know, 10 or 15 strings that could have been responsive to these requests.

     And they said -- well, you know, we only could propose a few to, Your Honor.  Obviously we ended up proposing only 29 or 27 for you to rule on.  And so that -- that is one response to your question.

     The other response --

     **THE COURT:**  I guess I don't really understand.  I mean, the limit was there to require to prioritize.  It wasn't so that you could -- that is just sort of a different matter.

     I mean, it seems like the nub of it -- from what I understand -- is Facebook says they don't really have what you are looking for, and you say that they do.

     And maybe what you need to do is take that 30(b)(6), and you will identify it; and then they will have to produce it, as opposed to in a way you are kind of shooting in the dark.

     **MR. KO:**  Well, that's one way of doing it, but I think -- two responses to that.

     One, the documents that will be produced here are not pursuant -- are really not the type of documents that will be produced pursuant to custodial searches.

     These are financial documents that relate to, for example, marketing and business brands, financial documents that underlie their 10Ks and 10Qs.

```
 1        So these aren't -- you know, it's not, you know, Cari

 2   Laufenberg, let's find all her documents that talk about this.

 3   It is actually a non-custodial search in the relevant

 4   department where we pull that material.

 5        And I think -- it identifies --

 6             THE COURT:  What would it be?  What would it be?

 7             MS. WEAVER:  Your Honor, let me give an example

 8   because I think we do want the e-mails.  But accounting

 9   documents where Facebook is assessing the value of the data

10   that its getting, we know that, for example, in their

11   accounting documents it will be there.  And that is a targeted

12   search.  And those documents aren't targeted by the search

13   terms.

14        The search terms right now are only being applied to a

15   selected number of --

16             THE COURT:  I understand that.  For e-mails and things

17   like that, it wouldn't be an accounting document.  So that --

18             MS. WEAVER:  Exactly.

19             THE COURT:  -- I understand.

20             MS. KUTSCHER CLARK:  Your Honor --

21             MS. WEAVER:  -- take the 30(b)(6), I think that is a

22   good idea.  Apologies.

23             THE COURT:  Yeah.  Was that Ms. Kutscher?

24             MS. KUTSCHER CLARK:  Yes, Your Honor, thank you.

25        The issue we are having here is that the RFPs at issue
```

1  seek valuation documents about very particular types of

2  valuations.

3       They are asking about documents how Facebook values

4  individual pieces of user data; how Facebook values the named

5  Plaintiffs' data.

6       What we have been telling Plaintiffs -- and we have

7  investigated this extensively -- is that Facebook simply

8  doesn't value information that way.  So to the best of our

9  knowledge there wouldn't be responsive materials.

10      The other issue here is that the RFPs ask for documents

11  sufficient to show this type of information.

12      So we are running the search strings because typically

13  when you don't think there are documents about something

14  specific and you are asking for documents specific --

15  sufficient to show that information, you run search strings.

16  So you figure out if they are there.

17      And that's what we are trying to do; run the search

18  strings.  Figure out if there are any documents that show the

19  extensive valuation.  We don't think there are.

20      From our perspective, we think the first step here is to

21  run the search strings.  See if they return anything seeking

22  the type of information Plaintiffs are seeking, and then we can

23  take it from there.

24      The other issue we are having is that after Plaintiffs

25  sought that type of information, they did send us the letter

1    that Mr. Ko is describing.  And the letter asks for these very

2    five very broad categories of documents.  It asks for

3    Facebook's marketing plans, Facebook's business plans.

4        And Plaintiffs now seem to be taking the position that

5    Facebook should produce all documents responsive to their

6    letter, so all of its marketing plans, all of its business

7    plans, even if they don't show the type of information sought

8    in the RFPs.

9        So one of the issues that the parties started discussing

10   yesterday is:  Is Facebook required to produce documents

11   responsive to the RFPs or is Facebook required to produce

12   information responsive to this letter that really strays pretty

13   far from what the RFPs ask for?

14       **THE COURT:**  Well, this is what I would say:  What you

15   are required to produce is -- obviously the valuation of this

16   data is at issue.  That is relevant to a claim in the case.

17       And so what you need to do is figure out how you get

18   there.  There must be something.  And it may not be it's at the

19   micro level that the Plaintiffs were wondering.  So maybe it is

20   a more macro level.  Maybe it is simply:  How much money does

21   Facebook make in a year, in a month, in a week, in a day from

22   selling this information; right?  That's one way of evaluating

23   it.

24       Now, maybe that's not precisely called for by the RFP.  So

25   what?

1    What the RFP calls for -- you know what they want; right?

2  And so the RFPs are kind of like a starting point.  And now

3  have a discussion and try to narrow it and get out what it is

4  they are trying to do.

5    I don't think you would dispute that any financial

6  document -- like the financial documents are going to be one

7  way of valuing it.  Maybe not every marketing plan,

8  obviously -- obviously.  Facebook must have a million marketing

9  plans.  But specific marketing plans.  And you have a

10  discussion.

11    So the RFPs are a starting point.  I wouldn't get too

12  caught up in that.  We all agree that how Facebook values this

13  data, some way, is relevant.  And so let's figure out a way of

14  getting those.  That's what I would say on that.

15    **MR. LOESER:**  Your Honor, if I may just very briefly --

16    **MS. STEIN:**  Your Honor, I think the fundamental

17  disconnect is that Facebook doesn't sell user data, so Facebook

18  doesn't value user data in the way that Plaintiffs would like

19  it to exist.

20    It just -- it is not something that is part of Facebook's

21  business model.  So I think we have been talking past each

22  other.

23    And we are happy to meet and confer with them to see if

24  there is something else that Facebook does value, but it

25  doesn't -- because it doesn't sell user information and user

data, it's literally just not something that goes into their
valuations.

        **THE COURT:**  Or they trade it or whatever it is.  Or
maybe as Ms. Weaver said, the 30(b)(6) -- did we lose -- oh,
no, there she is.  She just moved on me.

        **MS. WEAVER:**  We just moved.  You moved too,
Your Honor.

        **THE COURT:**  Did I?  I don't know.  Apparently we have
a new thing of Zoom that you can move the screens, but that
doesn't seem to be working.  Anyway -- and figure it out.

    But I guess I would say is that I hear what you are
saying, Ms. Stein.  So that's what you should be discussing.
Like, there is going to be some way -- it has some value,
somehow or another because of (inaudible) -- and for some
purpose, whatever it is.  And then, you know, if -- it is not
going to be a line item, obviously, that puts a value on it.

    And so that just sort of should be what the discussions
should be about.  I can see that is going to be different from
search terms.  If it is coming from financial documents, that
is something different.  Okay.

        **MR. LOESER:**  Sorry to interrupt.  I guess, just by way
of making it clear and so that we all understand what you are
saying, there is search strings; and that will get certain
information, e-mail, other things.

    And then there is all this other information that is not

even -- it is not even possible that it would be unearthed by those search strings.  That is the targeted search information.

That is what we will be meeting and conferring and negotiating more with Facebook.  I mean, it hasn't been going on a long, long time.

I am very happy to hear you describe the process where, you know, we start with RFPs and then we engage in these very lengthy and substantive conversations about how to clarify them, and that's what the letters often have to do with.

So I do think that that process that you described is what has happened here, and I think it is important that we continue to utilize that process so that requests can be clarified in letters and so on.

THE COURT:  And narrowed.  Always narrowed.

MR. LOESER:  Or narrowed.  Or if they are really unclear -- as Facebook often claims they are -- then whether it is narrowed or just made more clear, one way or another it becomes evident what it is we are searching for.

THE COURT:  Yeah.  I always like to say is sort of when -- obviously not in a bigger complex -- but when I have disputes, I will say to one side:  What is it that you want? Just describe to me -- not -- when somebody starts reading to me their document requests, I stop them.  No.  No.  Just tell me in plain English what is it that you want.  And then have the other side respond.  Do you have that or what do you have;

1    right?  That's what it should be.

2        I do want to go back, though, to the -- what is little A

3    in the Plaintiffs' statement, the search terms and the

4    schedule, because the final proposals are due December 24th.

5        And were you able to work something out with that or --

6            **MS. KUTSCHER CLARK:**  We are --

7            **MS. WEAVER:**  We are still negotiating that, I believe.

8    Go ahead, Martie.  My apologies.

9            **MS. KUTSCHER CLARK:**  No, no, no.  I was just going to

10   say the parties met and conferred about it yesterday, and we

11   are working through some proposals.

12       One thing the parties have started discussing is whether

13   there should be a little bit of a detente around the holidays

14   this year.

15           **THE COURT:**  Oh, that's exactly what I wanted to do.  I

16   actually wanted to impose one.

17                           (Laughter)

18           **THE COURT:**  I did it in one of my other cases in Juul

19   over Thanksgiving.  I forbid the parties from communicating

20   with each other from Thursday, Friday, Saturday and Sunday.

21   And I would like to do the same thing in here.

22           **MR. LOESER:**  Just like the Battle of the Bulge,

23   Your Honor.

24           **MS. WEAVER:**  That's right.  That's exactly right.

25           **THE COURT:**  So I will let you figure out what it is;

1    but you need, I would say, five business days.  That would be

2    my proposal.  Really the case will move along; go along.  Five

3    business days, no communications between the two sides for

4    those five days in a row and you figure out what they are.

5         So important.  So important.  So important especially -- I

6    mean, you know, people are not going to be -- I mean, it's a

7    stressful time right now.  It is a stressful time, and we all

8    need a break and to be able to just chill and focus on the most

9    important things -- this case is important -- but the most

10   important things.  So I would like you to agree to a five-day

11   detente.  It can be longer if you want but at least five days.

12            **MS. WEAVER:**  Agreed.

13            **MR. MONTGOMERY:**  Your Honor, can you impose no

14   communication within our firm as well?

15            **THE COURT:**  Mr. Montgomery, yeah --

16                    (Laughter)

17            **MS. KUTSCHER CLARK:**  The challenges.

18            **MS. STEIN:**  I do rely on opposing counsel for Netflix

19   recommendations so --

20                    (Laughter)

21            **MS. WEAVER:**  We can make an exception.

22            **THE COURT:**  The Queens Gambit, have you guys watched

23   that?  I finished that last night.

24            **MR. LOESER:**  Excellent.  That is -- a very good

25   recommendation, if you haven't seen it, which we have now

```
 1   enjoyed is Ted Lasso.

 2            THE COURT:  Ted Lasso, okay.  I don't know that one.

 3            MR. LOESER:  Your Honor, this might be testing the

 4   limits of your judicial authority; but if you could turn off

 5   social media for five days --

 6            THE COURT:  For the entire country?

 7            MS. WEAVER:  Yes.

 8                          (Laughter)

 9            THE COURT:  Perhaps.

10            MS. KUTSCHER CLARK:  I think our client would be

11   opposed to that.

12            MS. WEAVER:  Yes, we understand the difficult position

13   you are in.

14                          (Laughter)

15            THE COURT:  All right.  So, Mr. Montgomery, I will

16   strongly recommend that -- internally as well to the extent it

17   can be done -- and really, you know, no judges should be

18   imposing deadlines for whatever between Christmas and New

19   Year's; right.  So you should be able to check out for that

20   time.

21       Okay.  Great.

22            MS. WEAVER:  Just to be clear, it was in our proposal

23   to end it on December 24th.  So we are fine with the

24   moratorium.

25            THE COURT:  It sounds like everyone is which is good.
```

1    Okay.

2              **MS. WEAVER:**  Yep.

3              **THE COURT:**  So the next issue is the named Plaintiffs'

4    data.  And here I actually am kind of confused because Facebook

5    suggested that there may not be any data other than what they

6    have already produced.  And then I don't understand why (video

7    freeze interruption.)

8              **MS. KUTSCHER CLARK:**  Right, Your Honor.

9         So, as we noted in our submission, we learned for the

10   first time in Plaintiffs' sur-reply brief on the named

11   Plaintiffs' data that what they are really seeking is only data

12   about the named Plaintiffs that was shared with third parties.

13        And for us seeing that in the sur-reply brief was a really

14   big aha moment because we had spent literally hundreds of hours

15   meeting and conferring about data that is never shared outside

16   of Facebook.

17        So now that we understand what they are really seeking is

18   the type of data that is actually shared or made accessible to

19   third parties, we have been taking a much closer look at what

20   would be responsive to that.  And as we currently understand,

21   what has been produced really does cover that universe.

22        But we obviously want to be a hundred percent sure that

23   that is correct, and we are talking about a 13-year period, so

24   it is a very long time.

25        So we have been conducting a very careful investigation

1   within the company to be a hundred percent sure that the

2   materials produced to date reflect the full scope of any data

3   that could have been shared or made accessible to third parties

4   about the named Plaintiffs since 2007.

5        And if we do come across anything additional, we will

6   obviously report that to Plaintiffs and discuss a production

7   format with them, but to date we have not come across anything

8   that has not been produced already that could have even

9   potentially been shared with third parties.

10       **MR. LOESER:**  Your Honor, if I may, I think there will

11  probably be multiple comments in response to that statement.

12  That makes no sense to us at all.

13       First of all, the question of their brief, which they

14  quote in their statement, talks about information, in fact,

15  shared.  And what our brief said in our reply was information

16  shared or made accessible.

17       And we were very careful to use that language, "made

18  accessible," because Facebook has said for a long time that it

19  doesn't keep records of what it actually shares, which seemed

20  hard to believe to us.

21       But in order to avoid a semantic game, we also included

22  the reference to "made accessible" because whether it was

23  shared, whether they have records of it, if it was put in a

24  place or utilized in a way where third parties had access to

25  it, that substantially expands the universe of potential

1   information.

2        Also, as, Your Honor --

3        **THE COURT:**  That's what I heard Facebook just say.

4   They agree.

5        **MS. KUTSCHER CLARK:**  Yeah.

6        **THE COURT:**  It is made accessible, not just shared.

7        **MS. KUTSCHER CLARK:**  Yes.

8        **MR. LOESER:**  Then, perhaps, we need some clarification

9   on what they interpret "made accessible" to mean because it

10  doesn't mean the same thing as actually shared.

11       And so if we could hear clearly from Facebook that they

12  agree with that, that would be helpful.

13       Second, the nature of the information that Facebook was

14  ordered to produce is such that it is impossible to believe

15  that there isn't information that exists.

16       We are talking about entirely distinct categories of

17  information from what they have produced.  They have produced

18  the information that users post.  As Your Honor well knows,

19  what they didn't produce was all the information collected

20  from -- off platform activities and inferred from and about on

21  and off platform activity.

22       And it is, frankly, just impossible for us to believe that

23  while the universe of potential discoverable information was

24  expanded threefold, actually, there isn't anything that fits

25  those categories, categories which were derived from our review

1    of Facebook's production to see what else do they do and what

2    else do they do with it.

3        So it just -- it just seems baffling to me that after all

4    of this fighting and all their effort to keep us from getting

5    this information, they are now coming back and claiming it

6    doesn't really exist.

7            **MS. KUTSCHER CLARK:**  Your Honor --

8            **MS. STEIN:**  So, Your Honor, respectfully, we are not

9    doing anything to prevent Plaintiffs from getting information.

10       We spent months dealing with Plaintiffs taking the

11   position that even if the data was in a black box that was

12   inaccessible to anyone, that they would want to know what was

13   in that black box.  So they did a complete 180 in their

14   sur-reply brief.

15       Leaving that aside, we are trying to figure out whether

16   there is anything else to be produced.  The inferences that

17   Mr. Loeser just mentioned -- Facebook does not share or make

18   accessible inferences with third parties, period, full stop.

19       Those inferences are the way that Facebook has its

20   business model.  It uses those inferences to run its business.

21   It does not sell those inferences.  It doesn't share those

22   inferences.  It does not make them accessible.

23       That is why companies come to Facebook and ask Facebook to

24   help with targeted advertising because we, Facebook, will not

25   share those inferences with anyone.  That would destroy

1    Facebook's business model.

2         **MS. WEAVER:**  So, if I may, we have received no

3    production of data Facebook receives from third parties.

4         We have received no inferred data.  And this is the

5    semantic game that Facebook has played since the beginning that

6    analysts and governments have challenged.

7         Facebook says:  We do not sell your data.  And it may be

8    true that they don't put it in a box and hand the data over the

9    way you do a widget.  They do sell inferences.

10        And what we need to know is how our clients were targeted

11   based on the amalgamation and analysis of all the data that

12   Facebook is pulling from everywhere.  So we want the inferred

13   data.

14        I want to know if I have been targeted as a 50-year-old

15   woman in Oakland as having a higher insurance risk or a

16   different financial risk.

17        That is how Facebook makes its money, and they have

18   refused to be transparent about this all around the world.  But

19   we are in this lawsuit.  They keep telling us they don't

20   make -- and this ties back to the revenue argument.

21        Let us see how they make their money.  Maybe they are

22   right.  But all we have been doing is fighting with the

23   lawyers.  It is time for evidence.

24        We would love a 30(b)(6).  We would love documents.  We

25   would love data.  All we have been getting right now is sitting

in Facebook Zoom meet-and-confers and positions.  And we are
ready for the evidence.

      **MS. KUTSCHER CLARK:**  Your Honor, I have two quick
responses.

      **MR. KO:**  Your Honor --

      **THE COURT:**  Let's let Ms. Kutscher go.

      **MR. KO:**  Okay, Martie.

      **THE COURT:**  We can't hear you -- at least I can't hear
her.

      **MS. KUTSCHER CLARK:**  Can you hear me now?  I'm
speaking more loudly.  Okay.

    First of all, this case is not about targeted advertising.
Judge Chhabria said very clearly in his Motion To Dismiss order
that the case is not about targeted advertising.  Plaintiffs
conceded that the case is not about targeted advertising in the
briefing on this issue.

    In terms of the inferences, the off-Facebook activity, it
is not correct that none of that information has been produced.

    The information we produced previously includes thousands
and thousands of pages of users off-platform activity.  It also
includes massive lists of user's interests that Facebook has
derived from their activity on and off the platform.

    During the briefing Plaintiffs were asking for more of
that information.  They were asking for information the
Plaintiffs are not able to see themselves that Facebook might

1   have in those categories.

2        What we have been doing is trying to find out -- and we

3   have conducted extensive, extensive investigations at Facebook

4   to understand whether there is any additional information in

5   any of those categories that could have potentially been made

6   available to a third party in any way, shape or form.

7        And the answer we are repeatedly getting is no.  What has

8   been produced represents the universe of what could have been

9   made available in any way to a third party.

10        But, again, we are continuing to conduct this

11   investigation because we want to be a hundred percent sure, and

12   that is what we are working on.  But, in the meantime, we have

13   not come across any type of information that is ever made

14   accessible; has ever been made accessible that is outside what

15   has already been produced.

16        **MS. WEAVER:**  Your Honor, we view this as them trying

17   to re-litigate an order that you already issued in Discovery

18   Order Number 9.

19        The scope of the case is whether private information sent

20   in voice -- let's say Facebook Messenger was used and

21   amalgamated with our information to target the Plaintiffs and

22   either --

23        **THE COURT:**  No, no, no, no.  I don't think so.  I

24   don't think so; right.  This is -- this came from Cambridge

25   Analytica and that they had access to information.

1            MS. WEAVER:  Right.

2            THE COURT:  Right.

3            MS. WEAVER:  Right.  And they used it to -- they

4    targeted lazy liberals to stay home and not vote in the

5    election.  This is exactly Cambridge Analytica.  They drew

6    inferences about people and crafted messages to them to get

7    them to stay home.

8        Or it recently came out that 3.5 million African Americans

9    were targeted with message to influence their voting behavior.

10   This is squarely within Cambridge Analytica, and this is

11   exactly the case.

12       So people need to understand how they are being --

13           THE COURT:  What did you mean in your sur-reply by

14   "shared"?  I guess that's the question.

15           MS. WEAVER:  Or reasonable made accessible.  Yeah, I

16   mean, that's -- the issue is --

17           THE COURT:  What is -- to the point, what does "made

18   accessible" mean?

19           MS. WEAVER:  Right.  So I -- I'm Cambridge Analytica,

20   and I want information so that I can target individuals who I

21   think will respond to my messaging in an election.  And our

22   nine named Plaintiffs, many of them feel they were targeted in

23   this way.

24       So Facebook ran its algorithm based on all of the data

25   that it had, and it didn't separate the private and the

1    public -- at least Facebook has never even taken that position

2    in this case -- and said:   Here are the people.

3        So they are targeting, and we want to see --

4        **THE COURT:**   Have they provided the named -- the names

5    of those people?

6        **MS. WEAVER:**   No.   They just allowed the messages to go

7    through to them, so they are targeted.

8        **THE COURT:**   So Cambridge Analytica didn't have that

9    information then?

10       **MS. WEAVER:**   Cambridge Analytica also got data but

11   also targeted them.   It's both.

12       **THE COURT:**   Okay.   And so it is the data that

13   Cambridge Analytica then got?

14       **MS. WEAVER:**   That's a piece of it, and it is also how

15   they are targeted going forward.

16       What we don't know is what the business partners and --

17   that is a separate -- Cambridge Analytica got it through an

18   app, through Kogan's app.

19       But what is also going on is the data sharing -- which the

20   business partners and the white listed apps -- and we are not

21   getting the data that they have on the Plaintiffs.   We don't

22   have one shred of data.   All we have is this, you know, the

23   actual platform activity.

24       So we need -- what we would really like is to take some

25   evidence on this, Your Honor, because --

1          **THE COURT:**  You mean the 30(b)(6)?

2          **MS. WEAVER:**  That would be great.

3          **THE COURT:**  Well, I think that is probably where we

4    are at now.  I think --

5          **MS. WEAVER:**  That would be great.

6          **THE COURT:**  I think there is this disconnect, right,

7    or disbelief -- I guess I should say more than disconnect -- as

8    to how Facebook operates.  And so we just need somebody under

9    oath saying:  No, this is how it operates.

10         **MR. KO:**  Your Honor, just one last thing on this --

11   not to belabor the point -- I wish I could share my screen

12   right now.  I'm looking at Facebook's data use policy right now

13   in the section that says "information that we share."

14       And included in that category are sharing with third-party

15   partners, and that includes partners who use Analytica

16   services, measurement partners, partners offering goods and

17   services in our products, advertisers, vendors and service

18   providers, researchers and academics, law enforcement or

19   pursuant to legal request.

20       So they, by their own admission in public and pursuant to

21   their data use policy, talk about the information that they

22   share --

23         **MS. WEAVER:**  Share.

24         **MR. KO:**  -- with third parties.  So I know Ms. Stein

25   said full stop, they don't share anything.  That's --

1              **THE COURT:**  No, no, no, that's not what she said.

2     What she said is they produced what they shared, not that they

3     don't share anything.

4              **MS. WEAVER:**  But that's not --

5              **MS. STEIN:**  I said that we don't share inferences.

6              **MS. WEAVER:**  All we had was a subset of user's

7     platform activity.  I'm sorry, Deb.

8              **MS. STEIN:**  I said we don't share inferences.  That is

9     what I said.

10             **MS. KUTSCHER CLARK:**  Your Honor, I think a big piece

11    of what is getting lost here is third parties frequently draw

12    their own inferences, and that might have been what happened in

13    Cambridge Analytica.  We know that happens in other settings.

14       So Facebook shares various categories of information, and

15    third parties might use that information in different ways.

16    They might combine that with information they have.  We don't

17    have visibility into that.

18       But once the information is shared, third parties might

19    use it to form their own conclusions; but that's not

20    information we would have.

21             **MS. WEAVER:**  But we don't even have the data that

22    Cambridge Analytica got; right?

23             **THE COURT:**  I don't know.  Is that true?

24             **MS. KUTSCHER CLARK:**  I believe you do because

25    Cambridge Analytica only received data that Kogan was able to

1  access through his app and what --

2          MS. WEAVER:  Can you identify to us by Bates number

3  which documents those are because I don't believe we have that.

4          MS. KUTSCHER CLARK:  That's not the way the materials

5  have been produced.

6      What we have produced is the universe of data that could

7  have been made accessible to third parties.

8      We did not produce nor was there a request specifically

9  for information requested by Kogan.

10         MR. LOESER:  So, Your Honor, just -- this is an

11 interesting discussion, and I think Your Honor has rightly

12 identified that the parties, frankly, are just -- these are

13 lawyers talking about things that -- we need evidence.  A

14 30(b)(6) is an excellent idea.

15     We just don't believe how -- their description of what is

16 or is not shared or made accessible.  We need to put somebody

17 under oath and have them testify about that.

18     The documents that we have seen in their production that

19 describe their practices talk about sharing; talk about

20 absorbing off-platform activity; talk about sharing inferences.

21     The ADI investigation where they sent their own

22 questionnaires out to apps asked the apps to identify any

23 information that was obtained from Facebook and inferences

24 drawn from it.

25     And so there is a huge disconnect between what we think is

1    going on and the way they are describing.  The real virtue of

2    someone under oath testifying is that we can get through the

3    semantics and just figure out really what happened.  So I do

4    think that you are right; that it is time to do that.

5         Facebook can read your order.  They know what they are

6    supposed to do.  I assume they are going to go out and comply

7    in good faith with that order.  And the sure test to whether

8    that happens or not is when we get somebody under oath and they

9    testify about what exists and what doesn't exist.

10           **THE COURT:**  Why shouldn't we do that?

11           **MS. KUTSCHER CLARK:**  Your Honor, I would respectfully

12   request that before we move into a deposition, that we have the

13   opportunity to complete our investigation because we are

14   working through that right now because, again, we want to make

15   sure that what we understand is correct.

16        And obviously to even prepare a 30(b)(6) deponent, we

17   would need to complete that sort of investigation.  And I think

18   it is going to take some more time.

19        Again, we are talking about a 13-year period, and data was

20   shared in different ways with different source of third parties

21   over that period.  And this is a pretty large historical

22   exercise to look into.

23           **THE COURT:**  Right.  But I don't know why we can't -- I

24   mean, you are doing that -- but get something on calendar and

25   the Plaintiffs can draw up their questions, right, because that

1    is going to take some while, no doubt --

2                        (Laughter)

3          **THE COURT:**  -- to negotiate.  And this isn't

4    everything.  This is just, like, let's just figure it out.

5    Like, this is a big -- this is another big issue in the case.

6    We have this disconnect.

7          Let's just figure out:  How do they use this data?  How is

8    it shared?  What do they mean by "made accessible?"

9          Maybe you limit it to a time period, so you don't need to

10   complete the whole thing; right.  I mean, the time period that

11   we are most interested in -- or at least the first one -- is

12   the Cambridge Analytica.  That is how the whole case got here.

13         So what you do is start with a limited time period, and

14   that would probably --

15         **MS. WEAVER:**  We could do that, Your Honor, 2012 to

16   2016 or 2017.

17         **THE COURT:**  Much easier to prepare your witness on.

18   You can then focus your investigation on that.  We are just

19   going to take it in chunks, I guess, in a way.

20         Let's do that because I think we are -- yeah, I keep

21   hearing arguments.  Let's get -- let's get a witness in there.

22         So what I would like you to do is:  Plaintiffs, you should

23   work on that notice.  It is not an everything, all, whatever.

24   This is -- let's just figure out --

25         **MS. WEAVER:**  Targeted.

```
 1              THE COURT:  Targeted disagreement, limited period of

 2    time.

 3              MS. WEAVER:  We propose maybe Thursday, January 14th,

 4    or Friday, January 15th, for the data, 30(b)(6) and --

 5              THE COURT:  I don't want to talk to you guys -- I

 6    don't want to do that right now.  You guys do that.

 7              MS. WEAVER:  Okay.  We will work it out.

 8              MS. STEIN:  I also really -- respectfully to

 9    Ms. Weaver's point of getting something on calendar -- we need

10    to know what the topics are.  We need to agree on the notice

11    and the subject --

12              THE COURT:  I agree with that.  I was thinking early

13    February especially since we have that five days in there.

14              MS. WEAVER:  Fine.

15              THE COURT:  You need to give them notice first.

16              MS. WEAVER:  Fine.  We will do that.

17              MR. LOESER:  I think we should maybe have a schedule

18    for when the notice should be completed or else I can see this

19    dragging out forever.

20              THE COURT:  So that's up to you.  What would you like

21    your deadline to be?

22              MR. LOESER:  Why don't we take, folks, seven days

23    enough to draft our notice?

24              MS. WEAVER:  Yes.

25              THE COURT:  And, perhaps, Facebook can respond within
```

seven days with adjustments if this falls on New Year's Eve,
which it probably does.  So maybe add a few more days there.
But I think that's plenty of time to negotiate this targeted
notice.

       **MS. KUTSCHER CLARK:**  Your Honor, I'm just looking at
the calendar quickly.  If Plaintiff took seven days to give the
notice, that means Facebook would have to respond over the
holidays even if we had two weeks to respond.

       **THE COURT:**  So extend that.

       **MS. KUTSCHER CLARK:**  So I think we would need until at
least early January, probably the second week in January, to
respond if we are not going to interfere with people's
holidays.

       **MS. WEAVER:**  So maybe January 11th, Martie?

       **THE COURT:**  That's what I was going to suggest.
January 11th.

       **MS. KUTSCHER CLARK:**  So we would get the notice on the
16th?

       **THE COURT:**  By the 16th.

       **MS. KUTSCHER CLARK:**  And respond by the 11th?

       **THE COURT:**  Yeah.

       **MR. KO:**  Well, why don't we -- maybe I'm speaking out
of turn on my side -- but why don't we give ourselves a little
more time to put together the notice then if -- you know, one
week from today, we could -- I'm thinking maybe Friday, the

1    Monday after that?

2            **MR. LOESER:**  Why don't we take ten days, and then it

3    balances out a little bit.  That's fine.

4            **THE COURT:**  Well, let's see.  So if you gave it to

5    them by the 18th.

6            **MR. KO:**  The 18th.

7            **THE COURT:**  Right.  Then we have two weeks of the

8    holidays.  One week is going to be a non-working week, and

9    there are five days in there.

10       Does the 11th still work for that with Facebook or how

11   about until the 13th?

12           **MS. KUTSCHER CLARK:**  Yeah.

13           **THE COURT:**  This is your initial response, right, your

14   initial response.  So I think the 11th.  That gives you the

15   entire week of the 4th.

16           **MS. KUTSCHER CLARK:**  Okay.  I think it would be

17   helpful to have a little bit of guidance on the scope of this

18   and what the topics would be, which would hopefully help to

19   limit the number of disputes that might arise.

20       As we understand, the topics should be limited to the

21   sharing or accessibility of user data during the 2012 to 2016

22   time period; is that right?

23           **THE COURT:**  Yeah.  The topic is -- we went through

24   this long motion on this production and the off-platform and

25   what was covered by Judge Chhabria.  Issued the order.  And now

it is like we already produced everything, whatever.  It is to

figure out that question.  It is to figure out that question.

        **MS. WEAVER:**  We would view it as what is responsive to

Discovery Order Number 9, Your Honor.  That is how we would

frame --

        **THE COURT:**  That's that order; right?

        **MS. WEAVER:**  Exactly.

        **MR. KO:**  The three categories they identified, Judge

Corley --

        **THE COURT:**  Discovery Order Number 9, perfect.

        **MS. WEAVER:**  Exactly.

        **THE COURT:**  Limited to discovery --

        **MS. KUTSCHER CLARK:**  Could I just ask a clarifying

question because I think the parties have had a little bit of a

disconnect here.

    We read Discovery Order Number 9, particularly in light of

Plaintiffs' briefing, to relate only to data that was shared or

otherwise made accessible, as Mr. Loeser puts it, to third

parties and is not generally about all of the data in those

categories that Facebook has ever collected.  It is about what

was shared.

        **THE COURT:**  This is a 30(b)(6) to figure out what

Facebook does.  So now no doubt the deponent will talk about

information that they collect but don't share; right.

    And then we will talk about whether that is responsive or

1    not.  This is so the Plaintiffs can figure out this is what

2    Facebook does.

3         This is to sort of to verify the representation that yes,

4    we collect this information -- inferential data, but it is not

5    made accessible to third parties.

6         So they would have to talk about it; right?  They would

7    have to talk about that.  And if it is not made accessible,

8    then what do they do with it?

9         **MR. LOESER:**  Your Honor, we really need a

10   clarification because I think it does avoid another huge

11   semantic game over what "made accessible" means.

12        And so I think that is the right way to go.  I think that

13   will allow us to understand what is the information and what

14   did you do with it.  That's --

15        **THE COURT:**  Okay.  All right.  So the next topic was

16   the privacy settings data.  I don't know what to do -- to say

17   about that.

18        **MS. WEAVER:**  Your Honor, Leslie Weaver on behalf of

19   the Plaintiffs.

20        So we -- this is the issue.  What has been produced to us

21   is not the way the data exists on the platform.  And so when

22   there is a post, normally I can restrict it to my friends Deb

23   and Martie, and you can see that.

24        And they have asked us to identify what, you know, we

25   contend is really at the heart of the case, which to us is what

was intended for restricted audiences.

And we can't do that in the format that they produced it. This is again the Facebook platform activity. They produced it without consulting us as to format, and we just need to get -- we just need that information. It is obviously at the heart of the case.

We are doing the best that we can to respond to their interrogatories with our own information. Like, we can see Facebook Messenger messages are restricted, so we have identified those; and we are talking extensively with the named Plaintiffs. They have been doing a lot of work, but we can't identify the posts right now because we can't see how they were restricted. It's that simple.

**THE COURT:** I guess one question I have for Facebook, I thought one potential argument you had was that the Plaintiffs did not restrict their data. You know, so it wasn't private data. Is that right?

**MS. KUTSCHER CLARK:** Your Honor, that might be true of certain data. The bigger issue for us is that Plaintiffs are suing Facebook alleging that Facebook shared their, quote-unquote, sensitive information.

And we have asked them to tell us what information they think is sensitive.

They have told us they can't do that unless we produce a version of their accounts that shows next to each item on their

1   account what the privacy setting was.

2       We have looked into this extensively, and Facebook

3   accounts are not made for production in litigation and simply

4   can't be produced in that format.

5       As I understand, to produce a Facebook account in the

6   format Plaintiffs are asking for it, we would actually need to

7   have engineers write new code.

8       To locate the privacy settings for individual items on an

9   account, someone actually has to manually click on every single

10  item and follow a link which will then display the privacy

11  setting.  It is not metadata.  It is not something that can

12  just be displayed next to the item.

13      Plaintiffs have access to their accounts, and they are

14  able to do that.  They can log into their accounts.  They can

15  look at the posts they are concerned about.  They can look at

16  any information on their account they are concerned about.

17  Click the link and see what the privacy setting is.

18      What they want is for one of us or for someone at Facebook

19  to click through every single item on their account -- and

20  there are hundreds of thousands of pages, many of which might

21  have 20, 30 items on them -- and then follow the link.

22  Screen-shot the pages and produce them back to them.

23      Again, this is something Plaintiffs can do.  We have

24  suggested that there might be a way to make it easier if

25  Plaintiffs would look at their accounts and tell us what

1    information they are concerned about.

2        The accounts include all sorts of stuff.  They include

3    restaurant reviews, newspaper articles, cartoons, stuff that is

4    not conceivably sensitive.

5        If they would tell us what information they think is

6    sensitive -- and this was one of their interrogatories -- we

7    could maybe take this limited list or a more targeted list of

8    posts and pull it for them, and we would be willing to do that.

9        But what doesn't make sense is to have Facebook have an

10   engineer or someone else click through hundreds and hundreds of

11   thousands of pages of every single thing on the named

12   Plaintiffs' profiles to then follow links to the privacy

13   settlings when presumably Plaintiffs have a sense of what they

14   thought was sensitive when they alleged that Facebook shared

15   their sensitive information.

16       **MS. WEAVER:**  I can respond to this, Your Honor.

17       **THE COURT:**  Yes.

18       **MS. WEAVER:**  We have identified categories.  What it

19   seems Facebook wants us to do and what their interrogatories

20   asked was us to identify by Bates number in what they produced

21   what is sensitive by actual -- each post.

22       So we have begun the process of going through that, but

23   here is the disconnect:  They produced a snapshot in time of

24   Facebook activity.  They want us now to go to evidence -- you

25   know, the Facebook -- users have not produced their own

1   Facebook platform to Facebook because Facebook has it.

2        I don't know how we would produce it to Facebook.  I can

3   go with a Plaintiff and look right now at a post and find what

4   is restricted there post-by-post.  And, of course, this would

5   be millions or, perhaps, billions of posts.  But that's fine.

6   This case is a lot of work.

7        But that privacy restriction today may not be the same

8   privacy restriction that is in the snapshot in time that they

9   produced.

10       So we have given them examples.  And I don't even know how

11  to get that into evidence because that privacy restriction that

12  they are looking at online hasn't been produced at all.  This

13  is -- this is the conundrum.

14       We have given them examples, examples of health and

15  medical information, private information about families.

16       They will depose these people.  These people will explain

17  what they thought was private.  And we will do whatever work

18  Your Honor tells us to do, and we are engaging in this subset

19  of a subset review right now to honor that.

20       But at the end of the day, that is not going to be the

21  basis of our claims.  That is not the evidence we are going to

22  present at trial, and it's convoluted.

23       I would just say:  Let's wait until they -- we can see

24  everything.  And the other thing is, this response will also be

25  informed once we get all the data on the nine named Plaintiffs

1 in Discovery Order Number 9.

2  We have given them interim responses but it will change.

3 Once these Plaintiffs understand everything that Facebook has

4 collected about them, their responses to these questions are

5 going to look very different.

6    **MR. LOESER:**  Your Honor --

7    **MS. STEIN:**  May I respond to that, Your Honor?

8    **THE COURT:**  Yes.  Go ahead, Ms. Stein.

9    **MS. STEIN:**  So respectfully, you know, Plaintiffs have

10 discovery obligations too.  Facebook has been working its tail

11 off.  We have provided almost 500 pages in interrogatory

12 responses.  We are reviewing millions of documents here.

13  When we originally served RFPs, you may recall Plaintiff

14 said:  We don't want to do this as RFPs.  Serve

15 interrogatories.

16  We served interrogatories.  We gave them lots of extra

17 time.  We literally got one page of substantive responses back

18 to our interrogatories.  What we are asking about is

19 information about Plaintiffs' allegations.  What is the

20 sensitive information?

21  Plaintiffs have all of this at their -- in -- in their

22 possession, custody and control.  They know in their heads --

23 we can't figure out what they thought was sensitive; what they

24 alleged to be was sensitive.  That is exclusively in Plaintiffs

25 custody and control.

1      And what we need to know here -- and what Plaintiffs have

2   an obligation to do -- is to sort through their information,

3   tell us what was sensitive.  They didn't want to do this by

4   producing.  We produced everything for them that was in their

5   accounts.

6      They now want us to click through news articles, other

7   things that they are posting and provide every privacy setting.

8   We are not asking about the privacy setting.  That's not what

9   we asked.

10      We asked what was the sensitive information, and

11   Plaintiffs said:  We don't know what was sensitive.  It depends

12   on whether it was marked private.  That's not true.  What was

13   sensitive would be a subset of it.

14      Not everything that is marked private is sensitive.

15   People repost other people's posts.  They put up restaurant

16   reviews, newspaper articles.  That may be all marked private,

17   but that's not the sensitive information that matters here.

18      It is critically important that Plaintiffs do their

19   obligation in discovery and not keep pushing everything onto

20   Facebook to do.

21      **MR. LOESER:**  Your Honor, just very briefly, I think

22   again, we are just kind of having a practical problem; and a

23   30(b)(6) may be helpful here as well.

24      The practical problem is Facebook maintains data.  They

25   have a platform for users to post things, and they produced a

bunch of information but not in the format in which it is kept.

The practical problem is:  Is it possible for them to produce the information in the format in which it is kept as a result of which the Plaintiffs can easily respond to their discovery requests.

THE COURT:  Well, can I just ask you first, though, why do the Plaintiffs need -- I mean, if the answer to the interrogatory is anything that was marked private or was restricted in some way is sensitive, then say that.

MS. WEAVER:  We have, Your Honor.

MS. LAUFENBERG:  Your Honor --

MS. WEAVER:  Go ahead, Cari.

THE COURT:  Then that's one answer.  And then another answer is -- and then you go through what the person identified, regardless of what the privacy settings are; right.

Now, it may turn out that you identified something as sensitive; but you didn't -- your client didn't use any privacy setting.  Okay.

MS. WEAVER:  Here is the problem -- yeah, here is the problem with that -- I mean, we will do whatever you order. And if you want us to do that with this subset of information, which, by the way, is not everything they have ever posted.

THE COURT:  I understand.  You can only do it on what has been produced.  I understand.

MS. WEAVER:  Here is the issue:  I am an individual.

1   These are humans in the middle of a pandemic with jobs, and we

2   are asking them to go back and look through every post they

3   ever made on Facebook.  And we are going to have to ask them to

4   do that again which we will do.  That is what this case is

5   demanding.

6       I can't remember what I posted in 2007 or 2009.  And when

7   I look at the post, I can't remember if it was private to me

8   then or not.  If I looked and saw that I only shared it with

9   Cari, I would know oh, that is sensitive.  But they would be

10  guessing to say -- and we have given them examples of

11  categories.  Like I said, medical information, we can give them

12  categorical examples.

13      And for these Plaintiffs -- for some of them it is

14  political stuff.  Some of it is not.  They have different

15  comfort zones with what they shared.  We can go back and view

16  this, but --

17          **THE COURT:**  Are the examples tethered to the specific

18  posts?

19          **MS. WEAVER:**  Yes.  And we can --

20          **THE COURT:**  Ms. Stein is shaking her head no.

21          **MS. WEAVER:**  So we have given them categories of

22  messages, and we have told them we will give them examples and

23  we are amending further.

24          **THE COURT:**  So that's what you need to do.

25          **MS. WEAVER:**  Okay.

1          **THE COURT:**  You need to -- like if you are -- you

2    can't just say medical and health information.  What does that

3    mean?

4          **MS. WEAVER:**  Fine.  We can find examples.

5          **THE COURT:**  Give them an example; right?

6          **MS. WEAVER:**  Yes.

7          **THE COURT:**  If it is the fact that I visited this or,

8    you know, shared with my friend this website about this drug;

9    right.  I mean, that is different; right.

10        So you need to tether it to examples.  And they just need

11   to answer to the extent they can.  That's all it is, is to the

12   extent they can do, based on what they have now.

13        What you have said is you can't figure out what the

14   privacy setting was in 2007.  Well, then, Facebook can't demand

15   that you base your answer based on that if you don't know what

16   it is.

17        **MS. WEAVER:**  Right.  Okay.

18        **MS. STEIN:**  And, Your Honor --

19        **MS. WEAVER:**  Thank you, Your Honor.  We will do that.

20        **MS. STEIN:**  We have never taken the position that

21   their answer should be tethered to privacy settings.  What we

22   have asked is what Plaintiffs in their allegations considered

23   to be sensitive and to identify the posts.

24        Now, back in 2007 you couldn't click -- you couldn't

25   individually identify individual posts by privacy setting.  It

1  was more -- more of a default for how you posted generally.

2  There weren't individual options when you posted something.

3        So, you know, respectfully having Plaintiffs just say:

4  Anything we marked private was also sensitive, I, frankly,

5  don't think is a good-faith answer to an interrogatory

6  response.  It is just saying everything -- if everything was

7  marked private in 2007, '08, '09 and so on, that includes, you

8  know, public information that they were posting or reposting

9  someone else's public post and it happened to be marked

10 private, that doesn't make it sensitive.

11       And I think that Plaintiffs have more of an obligation to

12 do an investigation in responding to interrogatories just the

13 way Facebook did; right.

14       I mean, Facebook when we drafted our 500-page response, we

15 spent hundreds, if not thousands of hours, you know, working on

16 those responses and conducting investigations.

17       Now, maybe we did too much.  And if we did too much, then,

18 you know, shame on us; and we will know that going forward.

19 But, you know, I do think that Plaintiffs have an obligation to

20 tell us what is sensitive and not just say:  It was under our

21 privacy setting; ergo it was sensitive.

22            **THE COURT:**  It would obviously have to be more

23 specific.  Look, they are going to amend their responses.  They

24 will be as robust as they can.  I don't think you can expect

25 them to identify every single one that is on there, but it

1   should be pretty robust, right, and tethered to actual posts;

2   right.

3        Like political posts, that is what Cambridge Analytica is

4   about, sensitive information.  Here is examples of posts that I

5   never expected would be made accessible to third parties.

6        **MS. LAUFENBERG:**  Can I offer -- this is Cari

7   Laufenberg on behalf of Plaintiffs.  Can I offer one additional

8   informative overlay, which is:  The way that this information

9   has been produced, it is completely uncontextual.

10       So, in other words, you get information by category.  And

11  so what we see are a long laundry list of posts that our

12  clients made, but you don't see what they are made in response

13  to.

14       So, again, that is making our jobs very difficult here.

15  We are being incredibly diligent.  We have produced hundreds of

16  pages in response to these interrogatories.  We are continuing

17  to work.  We will amend.

18       We can only work with what we have been given, and what we

19  have been given is incredibly limited and makes it a tortuous

20  task for our clients.

21       So we need to have contextual information in order to

22  assess the sensitive -- whether this is sensitive information.

23       **MS. WEAVER:**  We are not sure that the responses will

24  be accurate because -- and that puts us in an impossible

25  situation.  It is not that we are not willing to do the work.

1   It is that we don't know how to get the answers right.

2        **MS. STEIN:**  Yeah.  We would certainly be open, if

3   Plaintiffs wanted to, you know, reprint something, you know, if

4   they don't like the format.

5        And, by the way, we reproduced their accounts in response

6   to requests that we provide things in a different format.  We

7   already went through that exercise once.  But if it is easier

8   for Plaintiffs to print things out, you know, from their own

9   account and do it that way, we are totally open to Plaintiffs

10  using it that way instead of pointing to documents that have

11  already been produced by us.

12       **MS. WEAVER:**  Maybe we can make some progress, Deb.

13  Can I ask this:  Does Facebook maintain the limited audience

14  information on the nine Plaintiffs' posts and activity?  And if

15  so, can you produce that to us?

16       **MS. KUTSCHER CLARK:**  The only way to do it is to go to

17  the live website and on the live website click each individual

18  post and follow a link to see the setting.

19       And that's what we have been trying to convey.  The only

20  other way we could even produce the account information --

21  I believe we have discussed this previously -- is to produce

22  back to you guys a live link of the Facebook accounts which is

23  what your clients already have.

24       **MS. WEAVER:**  So how did Facebook --

25       **MS. KUTSCHER CLARK:**  And none of that would be Bates

1    numbered.

2         **MS. WEAVER:**  Let me just ask --

3         **THE COURT:**  I'm going to have to stop you.  I have to

4    go at 11:00.  We have, like, two minutes.  So we can't do this.

5    You guys just have to figure this out.  So there is a couple of

6    others things --

7         **MS. WEAVER:**  We will.

8         **THE COURT:**  -- I want to address.  On the additional

9    custodians, Mr. Zuckerberg, Ms. Sandberg, I think you should

10   wait until all the documents are produced.  Those will be very

11   targeted once -- so I don't see any problem waiting for that.

12       On the voluntary dismissal of the named Plaintiffs, it is

13   without prejudice; and they don't have to agree.  Well, look,

14   it happens all the time that a judge will deny class cert based

15   on the adequacy of the named Plaintiff.

16       And if the Judge gives the named Plaintiff the opportunity

17   to put forth a new named Plaintiff, then they have that

18   opportunity.  We are not cutting that off now.

19       It is not depriving Facebook of any discovery because if

20   those people are put up later, then they get the discovery as

21   to those named Plaintiffs.

22        **MS. STEIN:**  Your Honor, our issue in the

23   stipulation -- and I think, frankly, we worked through some of

24   this with Plaintiffs yesterday.

25        **THE COURT:**  Okay.

1       **MS. STEIN:**  We -- we are fine stipulating to the

2    dismissal of certain named Plaintiffs without prejudice to

3    their being in the class.  We don't want to waive any right in

4    there, and I think Plaintiffs said that they are fine; that we

5    don't need to.

6       What we were struggling with is that we don't -- if any

7    Plaintiff wants to drop, that's fine.  But they need to fish or

8    cut bait but that specific named Plaintiff because it's -- you

9    know, otherwise they should stay in case and, you know,

10   proceed; but they are supposed to be representatives here.

11      **THE COURT:**  No, no, no, I don't understand.  I think

12   that's where I disagree with you.

13      I think to get through the burden arguments and all that

14   and to make -- they narrowed the class reps they were putting

15   forward on the motion.

16      Should Judge Chhabria deny the motion and should he give

17   them the opportunity -- he may or may not.  He may not do it.

18   It is going to be up to Judge Chhabria to put forth different

19   class reps; right.  It could be these people.  It could be

20   somebody else.  I mean, presumably the ten they put up they

21   think are their ten best anyway.

22      No.  I don't think they have to -- I disagree with you.  I

23   don't think that's the case.

24      **MS. STEIN:**  Well, Facebook wants to preserve its

25   objections as to their being able to come back as named

1   representatives.

2       **THE COURT:**  Of course.  You can preserve -- what I'm

3   saying is nobody has to give away anything.  You can make that

4   argument.  What I'm saying is we are not going to hold this up

5   so that they agree with your argument.  You can preserve your

6   argument.  They can preserve their argument.

7       **MS. WEAVER:**  To be clear, a lot of these Plaintiffs

8   are disappointed, Deb.  I'm not kidding.  They want to be

9   deposed by you.  So --

10      **MS. STEIN:**  You know --

11      **THE COURT:**  Well --

12      **MS. STEIN:**  We can arrange that, Leslie.

13      **THE COURT:**  No, no, no, Ms. Weaver.

14      **MS. WEAVER:**  Yes.

15      **THE COURT:**  Right.  When we get to our sort of absent

16  class member discovery -- I've had this come up in a few

17  cases -- they put forth, right, because the Defendants often

18  want to go beyond the named Plaintiffs and take a few -- the

19  first person they point to is -- they say:  This person was a

20  named Plaintiff.  It is not too burdensome on them.  I'm sure

21  Facebook would be happy to depose them.  So --

22      **MS. WEAVER:**  My co-Counsel is going to be mad at me.

23      **MR. LOESER:**  Your Honor, in the ten seconds that is

24  left, I do want to just make a point that is something that has

25  been pervasive which is a lot of arguments we have heard from

1    Facebook can be addressed by our better understanding of how

2    data is maintained.

3         So, for example, this whole issue of how they produced the

4    on-platform activity comes down to:  How does Facebook maintain

5    this data and can they produce it in a way that is in a native

6    format where we can answer their questions easily by looking at

7    the data instead of this sort of weird treasure hunt we have to

8    go on through live Facebook pages to try and match up with

9    their Bates productions?

10        I would suggest that of the 30(b)(6) topics that are

11   really critical here is one that is just focused on how data is

12   maintained for these various subjects.  We could avoid a lot of

13   fighting if we just had a better understanding of how the data

14   is maintained for these different areas that we keep arguing

15   about.

16        **THE COURT:**  And we tried getting experts together

17   months ago, months ago.  If you want to do it, put it in your

18   30(b)(6) and we will see --

19        **MS. STEIN:**  Well --

20        **MS. WEAVER:**  We tried that, Your Honor.

21        **MS. STEIN:**  We would strenuously object to that

22   because we went through months and months of informal ESI

23   discussions.  We have been down this road.  We have had all

24   these meet-and-confers.

25        The bottom line is Plaintiffs just don't believe us.  And

1   we do all of this work as counsel to provide this information

2   informally, and they just don't believe us.

3        MR. LOESER:  Sometimes it is because our experts are

4   telling us something very different.  We like you very much.

5   It is not anything personal, Deb.  It is just when our experts

6   tell us:  That is impossible that Facebook doesn't maintain

7   this in a way that they can use it and easily access it.

8        We just need -- it is no offense intended to anyone.  We

9   just need evidence.  (Inaudible) can only go so far.

10       MS. WEAVER:  If you give us the verifications to the

11  interrogatories, we will know who at least is giving you the

12  information.  We can just depose them, but we have got to start

13  taking evidence.

14       THE COURT:  On the privilege log, can you submit a

15  stipulation by the 18th that was on the briefing, on the ADI?

16       MS. WEAVER:  Yes.

17       MR. KO:  Yes, Your Honor.

18       THE COURT:  I know that was Plaintiffs' proposal, so

19  I'm really asking Facebook.

20       MS. STEIN:  I think Martie --

21       MS. KUTSCHER CLARK:  What is the question, Your Honor,

22  about briefing?

23       THE COURT:  The briefing schedule on the ADI

24  privilege.  By the 18th, just stipulate to the briefing

25  schedule.

1          **MS. KUTSCHER CLARK:**  Your Honor, I don't think we will

2    be in a position to agree to a briefing schedule until we

3    receive Plaintiffs' challenges to the privilege log.  And this

4    is something we discussed extensively previously; that we need

5    to see what the challenges are.

6        We are going to need to meet and confer with them about

7    the challenges so that we understand the scope and nature of

8    what is being briefed before we set a schedule on it.

9          **THE COURT:**  Okay.  I have to go.  I have got the call.

10   So sorry.  I'm out of time.  I can't resolve that.  When is our

11   next conference, January what?  It is not going to be this

12   year.

13                        (Laughter)

14          **MR. LOESER:**  I'm guessing it is not the 1st.

15          **THE COURT:**  That is correct.

16          **MS. WEAVER:**  The 8th?

17          **THE COURT:**  The 8th?

18          **MS. STEIN:**  If we can make it the 15th, that would be

19   better on our end.

20          **THE COURT:**  The 15th at 8:30.

21          **MS. WEAVER:**  Works for us, Your Honor.

22          **THE COURT:**  Okay.  I will see you then.  I will do the

23   best I can after today.

24          **MR. LOESER:**  Thank you, Your Honor.

25               (Proceedings adjourned at 11:04 a.m.)

---oOo---


**<u>CERTIFICATE OF REPORTER</u>**

    We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Thursday, December 10, 2020


_____

          Marla F. Knox, RPR, CRR
           U.S. Court Reporter