# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **JOINT STATUS UPDATE**<br><br>Judge:  Hon. Vince Chhabria and<br>Hon. Jacqueline Scott Corley<br>Courtroom:  VIA VIDEO CONFERENCE<br>Hearing Date: January 15, 2021<br>Hearing Time: 8:30 a.m. |

The parties respectfully submit this Joint Status Update in advance of the Court's discovery conference scheduled for January 15, 2021 at 8:30 a.m.

## I.        PLAINTIFFS' STATEMENT

### 1.        Issues the Parties Have Addressed Since the Last Discovery Conference

**a.        Facebook's Document Production**:  Document production following the agreement on search terms is not proceeding at the pace envisioned by the parties' joint stipulation. The protocol agreed upon by the parties provided that Facebook would produce documents on a rolling basis 30 days after agreement upon terms, or by December 7, 2020. On that day, however, Facebook produced fewer than 500 search term documents. Facebook promised to produce its next installment of documents on January 11. On that day, Facebook produced just 1,561 documents. These numbers do not square with Facebook's earlier representations that the search terms ordered and agreed upon, as applied to Groups 1-4, would hit on roughly 3 million documents. Plaintiffs seek firm deadlines by which Facebook will commence and conclude meaningful document productions arising out of the search terms that the parties have negotiated for nine months, as well as transparency into why document production is proceeding so slowly.

**b.        Search Terms:** Unfortunately, the cooperation the parties have engaged in the past did not continue following the last discovery conference. Pursuant to the parties' stipulated Search Terms Protocol (Dkt. 573) Facebook delivered a proposal on November 13, which was narrowed from the Court's earlier rulings. Facebook withdrew two previously proposed search strings as well as custodians previously proposed for thirty-one search strings, and added just six search strings. Facebook's initial proposal identified 839,789 documents. Plaintiffs delivered their counterproposal on November 23, proposing additional custodians for 111 strings, revisions to six strings, and 35 additional terms. Plaintiffs' counterproposal identified 2,446,701 documents, adding 1,606,912 documents. On December 3, Facebook delivered initial hit reports that were inaccurate in many ways. Following Plaintiffs' identification of numerous deficiencies,

Facebook delivered corrected reports on December 14 and December 18. Also on December 14, Facebook delivered its response, which rejected Plaintiffs' counterproposal in its entirety. The parties met and conferred regarding the competing proposals between December 15 and 22, before breaking for the holidays. The parties exchanged "best and final offers" on January 8, and Facebook now has an additional ten days to deliver hit reports on those proposals. Three business days after hit reports are circulated, on January 21, the parties will identify remaining custodian and string disputes for submission to the Court and may identify a limited number of strings for sampling.

Despite the opportunity these exchanges presented, the parties reached little substantive agreement so far. At the outset, Facebook took an uncompromising position—entirely rejecting each one of Plaintiffs' proposals (including additional custodians and strings), without seeking to discuss them in the twenty-day period prior to the deadline for its response. Moreover, Facebook's response was unreasonable—for example, it proposed custodians with zero hits 250 times across 29 strings. Indeed, Facebook has proposed and re-proposed custodians with no document hits, despite its representations that it is carefully considering and narrowly tailoring its proposed custodians to each search string. Facebook's failure to engage meaningfully by substantively discussing the parties' proposals over the course of the past month means that the parties now have an extremely limited opportunity to make substantive counterproposals before submission of their disputes to the Court. Had Facebook provided even a portion of the January 8 proposal in December, the parties would be much farther along. Still, Plaintiffs remain hopeful that the parties will be able to resolve a significant number of the remaining disputes following review of updated hit counts.

c.      **30(b)(6) Witnesses:** The Court's Discovery Order No. 11, entered on December 11, 2020, required Facebook to provide a 30(b)(6) witness regarding user data as articulated by Discovery Order No. 9 and another 30(b)(6) witness regarding how Facebook monetizes – directly or indirectly – and values user data.  Plaintiffs issued a narrow, targeted and specific deposition notice on December 18, 2020 limited to the topics identified by the Court, and did so

specifically to avoid dispute at the deposition about the scope of testimony set forth in the notice. *See* attached.  Facebook has objected to this notice on numerous grounds, set forth in a nine page, single-spaced letter received at 11:00 pm last night, including that Plaintiffs' topics do not adhere to Discovery Order No. 9.  Plaintiffs believe the more specific notice that we served is appropriate and will prevent scope disputes at the deposition regarding the designated topics; however, Plaintiffs are not interested in engaging in a lengthy dispute with Facebook regarding the language of the deposition notice and believe the Parties' time is better spent on the deposition itself. Accordingly, if and to the extent deemed appropriate by the Court, Plaintiffs propose, in the alternative, the three topics set forth in the Order for the time period 2012-2017: (1) identification of what data Facebook collects and obtains from a user's on-platform and off-platform activity, and how Facebook maintains and uses it, including data inferred from that activity and data; (2) how Facebook shares or makes accessible to which third parties all data described in Topic 1; (3) how Facebook monetizes—directly or indirectly—and thus values user data described in Topic 1. Plaintiffs ask that these depositions proceed remotely no later than the second week of February.

      **d.**      **Discovery of Named Plaintiffs:** Plaintiffs produced an additional 3,224 documents, totaling 5,364 pages, since the last discovery conference on December 9, 2020, and continue to review documents for future rolling productions. Consistent with Facebook's preference, Plaintiffs are providing supplemental interrogatory responses on a rolling basis. Further supplemental information will be served on or before January 22, 2021.  As discussed with Facebook, Plaintiffs will also prepare a superseding, omnibus set of responses to the pending interrogatories once all supplemental responses are complete.

      **e.**      **Privilege Log Issues:** To date, Facebook has provided privilege logs corresponding solely to productions completed by September 18, 2020.  Plaintiffs challenged 1,599 of Facebook's 4,432 initial privilege log entries on October 2, 2020. Facebook responded on December 2, 2020, providing a revised privilege log on December 7, 2020. The parties continue to discuss remaining challenges. Plaintiffs have identified to Facebook the following

two categories of documents as a starting point for substantive discussions: 1) 152 documents for which the withheld information was disclosed to email distribution lists whose individual recipients are not identified, and 2) 459 documents listed for which no attorney is identified on the log, no attorneys are visible on the face of the documents, and the withheld information does not appear to seek, contain, or provide legal advice. Plaintiffs believe that substantive discussion on these topics will aid in narrowing the remaining privilege log disputes.

   **f.**  **ADI:** Pursuant to the order this Court entered on October 6, 2020, Facebook produced on December 10, 2020 privilege logs for six exemplar apps that were investigated as part of ADI.  Other than correspondence with app developers consisting of 65 pages of documents, Facebook asserted attorney client privilege over every email, chart, table, slide, diagram, agenda, task list, chart, and spreadsheet associated with the company's investigation of these six apps.  It is Plaintiffs' understanding that the Court wishes to view examples of purportedly privileged documents to assess the privilege claims.  July 13 Tr. 36:16-19 ("Because the way I'm going to be able to adjudicate this is to take some exemplars, and rule, and then the parties then can use that and apply it.")  Plaintiffs identified to Facebook 400 documents where the logs show that no attorney was an author or recipient.  In light of Discovery Order No. 7, which "anticipates that briefing on the privilege dispute will commence no later than some time in January 2021[,]" Plaintiffs proposed a briefing schedule to Facebook on December 22, 2020, but Facebook believes any such briefing is premature. Plaintiffs therefore propose that they provide a subset of these documents for an *in camera* review along with an opening brief by January 29, 2021. Plaintiffs seek guidance from the Court on the total number of documents it would like to review.

   For its part, Facebook has asked that the parties engage in another months-long, drawn-out meet and confer regarding each of the thousands of privilege log entries.  Plaintiffs do not believe that this is what the Court contemplated and ask for submission deadlines to bring these issues to a close.

   **g.**  **Confidentiality of Documents in the Public Domain:** Facebook has asked the

Court to further maintain a document under seal, claiming confidentiality despite the fact that the document can be found on several public websites. Plaintiffs have been willing to submit the matter to the Court based upon the briefs already on file but, in the spirit of compromise, have agreed to Facebook's request for an extended briefing schedule which will be submitted as a stipulation for Court approval.

      **h.**      **Facebook's Responses and Objections to Plaintiffs' Fourth Set of Interrogatories:** Facebook served its Responses and Objections to Plaintiffs' Fourth Set of Interrogatories on November 20, 2020. Plaintiffs have since identified several deficiencies in Facebook's responses that remain unresolved and sought to discuss them. For example, Plaintiffs have asked Facebook to answer interrogatories about the company's "business partners" as Judge Chhabria defined them in his order on the motion to dismiss. PTO No. 20 at 8. Facebook has insisted upon limiting its responses to integration partners, which are a narrower group of companies than the business partners described by Judge Chhabria. Plaintiffs expect to file a motion to compel in accordance with the Court's order on briefing matters but would appreciate any guidance the Court wishes to provide.

      Facebook has also not verified its substantive interrogatory responses. The identities of those who verify the interrogatories on behalf of Facebook are relevant to ongoing custodian and deposition discussions. As such, Plaintiffs ask that Facebook provide these verifications no later than January 22, 2021, more than two months after responses were provided.

      **i.**      **Sworn Testimony and Written Discovery Responses in Related Actions:** Plaintiffs have requested the deposition transcripts and written discovery responses from the ten governmental and regulatory actions the company has identified as related to this action. Facebook has produced documents from those actions but to date has not produced relevant evidence from the same actions in the form of testimony or sworn responses. Plaintiffs request guidance from the Court on a deadline by which these materials will be produced.

## FACEBOOK'S STATEMENT

Facebook addresses the work completed since the December 9 conference, provides an update on the ordered 30(b)(6) deposition, and responds to the issues Plaintiffs raise.

## I.      Progress since the December conference

*Facebook's document production and review continues*.  Facebook's primary focus has been its ongoing document review, including review of the **3.1 million documents** (including families) that hit on the final search strings for the 38 custodians in Groups 1 to 4.  Facebook produced nearly 14,000 documents since December 7 (not 2,000, as Plaintiffs say).

*Search string negotiations are ongoing*.  Substantial resources continue to be dedicated to search string negotiations.  Facebook made a search string proposal for the 43 custodians in Groups 5 to 8, which proposed adding **more than 1.5 million documents to the 3.1 million documents** it is reviewing currently.  Plaintiffs' counter-proposal demanded more than **2,600** changes that would have added **nearly 7 million documents** to Facebook's review.  Facebook invested hundreds of hours to evaluate and provide written responses to all 2,600 proposed changes.[1]  The parties met and conferred before the holidays and exchanged final proposals on January 8.  The parties will continue negotiations in accordance with their stipulation.  Dkt. 573.

*Facebook logged 6,100 privileged documents*.  Facebook served 6 privilege logs, which log approximately 6,100 documents, under the parties' sampling protocol to log exemplar materials from Facebook's attorney-driven App Developer Investigation (Dkt. 518).

*Facebook responded to Plaintiffs' 30(b)(6) deposition notice*.  Facebook provided its initial response to Plaintiffs' 30(b)(6) deposition notice on January 13 (attached as **FB Exhibit A**) and is prepared to meet and confer with Plaintiffs on the topics for the deposition.

*The parties negotiated two stipulations*.  The parties negotiated and agreed to an Expert Stipulation.  They also agreed to a schedule to brief the confidentiality of leaked materials.

---

[1]  The hits Plaintiffs cite for the parties' proposals do not include families, and their statement that Facebook "withdrew" previously proposed strings/custodian combinations is inaccurate. Facebook *replaced* certain strings with strings the Court ordered for Groups 1-4, which the parties' stipulation requires.  *See* Dkt. 573 ¶ 2.

*Plaintiffs did not amend their interrogatory responses*.  Facebook continues to await substantive answers to the interrogatories it served in August that ask Plaintiffs to identify the "sensitive" information they believe this case to be about, as Discovery Order No. 11 directs.

## II.    Upcoming 30(b)(6) Deposition

Despite the Court's instructions, the proposed 30(b)(6) deposition notice Plaintiffs served is not narrowly tailored to the two areas of inquiry the Court identified in Discovery Order No 11.  Instead, it purports to notice a deposition for Feb. 5 on **12** sweeping, generalized topics that concern nearly every aspect of Facebook's business.  The notice's breadth, number of subject areas, and lack of specificity make it impossible for Facebook to meaningfully prepare a witness—much less on a prompt timetable.  To move the ball forward, on Wednesday Facebook sent Plaintiffs a letter describing with reasonable particularity the topics on which it is able to prepare a deponent to address the issues the Court identified.  *See* **FB Exhibit A**.  Facebook is hopeful that its efforts to specify these areas of inquiry will help the parties reach agreement on appropriate topics, allow Facebook to prepare a witness, and avoid unnecessary disputes during the deposition.  Once the topics are settled, the parties should agree on a date for the deposition.

## III.    Additional Issues Raised by Plaintiffs

Plaintiffs' portion of the joint update continues a concerning trend of asking the Court for rulings on issues that have not been raised to Facebook or about which the parties are actively meeting and conferring.  The meet-and-confer process is supposed to be a genuine effort to reach negotiated resolution without Court intervention, not a perfunctory box to be checked on the path to motion practice (which should not be considered inevitable).  By using their status updates to seek rulings on unripe issues, Plaintiffs are undermining the meet-and-confer process, forcing Facebook to brief significant issues in fewer than 24 hours and in an artificially confined space, and imposing on the Court to issue premature and potentially unnecessary rulings.

*Plaintiffs have not raised challenges to Facebook's ADI privilege logs*.  Plaintiffs' submission assumes it is a foregone conclusion that the Court will engage in *in camera* review of ADI documents, jumping straight to the question of how many documents the Court will review.

But Plaintiffs have not made a showing that *in camera* review is necessary or appropriate.

Facebook served 6 ADI privilege logs on Dec. 10—one related to each app selected for the sampling exercise to show the universe of materials related to each investigation.  Under the parties' stipulation, Plaintiffs were required, within 30 days, to "identify in writing any particular privilege log entries that it asserts are not privileged" and explain its challenges "with reasonable specificity . . . as to each privilege log entry"—to be followed by a response and meet and confer process.  Dkt. 462 ¶¶ D(1)-(4).  Plaintiffs have not served *any* challenges to the logs, much less particularized objections.  Instead, Plaintiffs sent an email telling Facebook they intend to brief and seek *in camera* review of **every single entry** on Facebook's logs that does not include the name of an attorney.  They attached to their email a list of these entries, which account for 400 of the 6100 documents Facebook logged, but refuse to identify the bases for their challenges.

This unrestrained approach sweeps in hundreds of highly detailed entries that indicate clearly the logged documents reveal legal advice from Gibson Dunn and other attorneys and make a prima facie showing of privilege.  *See, e.g., United States v. ChevronTexaco*, 241 F. Supp. 2d 1065, 1077 (N.D. Cal. 2002) (communications between non-lawyers revealing counsel's advice are privileged).  Plaintiffs' list even includes entries for attachments to privileged emails, disclosing the attachment was produced independently or is a blank .htm file. It appears Plaintiffs identified 400 documents to challenge by simply running a search for entries where no attorney appears, without even reading Facebook's detailed entries for each document.

"Once a party has made a *prima facie* showing that a document is privileged," it is incumbent upon the challenging party to "show a factual basis sufficient to support a reasonable, good faith belief that *in camera* inspection may reveal evidence that information in the materials is not privileged."  *Rembrandt v. Apple*, 2016 WL 427363, *3 (N.D. Cal. Feb. 4, 2016).  If Plaintiffs wish to challenge Facebook's logs, they must articulate a legally and factually sufficient challenge "as to each . . . entry," allow Facebook to respond, and meet and confer in good faith.  Dkt. 462 ¶¶ D(1)-(4).  Plaintiffs repeatedly take shortcuts—creating enormous volumes of unnecessary work for Facebook.  Now they are asking the Court to review extensive

briefing and large swaths of documents to check Facebook's work, when they have not even conducted a sufficiently careful review to raise targeted and particularized challenges.

*The additional privilege issues Plaintiffs raise are not ripe*.  At the outset of discovery, Plaintiffs demanded Facebook produce materials it produced to government entities in related investigations/actions.  Facebook produced these materials as they were produced to the government—maintaining any redactions.  Facebook served a Privilege Log for nearly 4,500 of these documents, the majority of which relate to narrow preexisting redactions.

Plaintiffs have no basis to challenge this log; they received what they requested—cloned productions from government actions.  But Plaintiffs sent Facebook a letter listing 10 categorical bases on which they purport to challenge 1,599 redactions made in other matters.  The vague list includes "no counsel is present," "the document does not appear to contain the solicitation or provision of legal advice," and "the document does not appear to have been created in anticipation of litigation."  Plaintiffs list hundreds of documents purportedly falling into each category, with no other detail.  Even if Plaintiffs were entitled to challenge redactions from cloned productions (they are not), this is not an appropriate way to raise challenges.  Plaintiffs must detail "with reasonable specificity" specific factual and legal bases for challenging "each . . . individually logged document," Dkt. 462 ¶ D(2), so Facebook can meaningfully assess them.

*Plaintiffs' request that Facebook produce an arbitrary number of documents each month is unworkable*.  Facebook has dozens of attorneys reviewing documents and will continue to make productions every four weeks.  But Facebook cannot guarantee a certain production volume each month, no matter how many documents it reviews, because the number of documents produced depends on how many reviewed documents are responsive/non-privileged.  To date, the review set generated by the search strings has had a very low responsiveness rate, further confirming that Plaintiffs already received the documents most relevant to this case in the materials produced to regulators and that Plaintiffs' proposed searches are wildly overbroad.

*Plaintiffs seek to brief unripe issues about FB's interrogatory responses*.  Facebook served **more than 500 pages** of interrogatory responses in November.  Plaintiffs now say they

identified "several deficiencies" they wish to brief, but only discussed one with Facebook: the meaning of "business partners."   The parties are meeting-and-conferring on that issue on Friday afternoon, so it is concerning that Plaintiffs predetermined they will "file a motion to compel."

In any event, Facebook answered the interrogatories consistent with Plaintiffs' own definitions.  Plaintiffs' interrogatories defined "Business Partners" as "the third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems," citing a list of "integration partners" Facebook provided to Congress.  This tracks Plaintiffs' Complaint, which raises allegations about this same list of "integration partners" (SACC, Dkt. 491, ¶¶ 430-440), and the Motion to Dismiss Order, which recognizes that the "non-exclusive list of companies that the complaint identifies as business partners . . . came from . . .  [Facebook's list of] 'integration partnerships' . . . in a letter to . . . the House of Representatives" (Pretrial Order 20, Dkt. 298 at 9).  Facebook will be amending its interrogatory responses within the next two weeks, and will serve its verifications with those amendments.

_Plaintiffs are not entitled to confidential materials from government investigations_. Facebook agreed to kick-start discovery by re-producing responsive documents it produced in 10 related government investigations/actions.  Plaintiffs now demand written discovery and deposition transcripts from those matters.  There is a general presumption _against_ this type of "cloned discovery."  _In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods Liability Lit._, 2017 WL 4680242, at *1-2 (N.D. Cal., Oct. 18, 2017).  That presumption is even stronger here, given Plaintiffs seek materials that would reveal confidential aspects of 10 government investigations, many of which are governed by confidentiality agreements that would not even allow production of the materials.[2]  If the Court is inclined consider Plaintiffs' request to compel production of these documents, Facebook respectfully requests full briefing.

---

[2]  Nor would it be efficient for Facebook's counsel to coordinate with the law firms that handled these 10 related actions to locate, analyze, and redact the materials Plaintiffs seek. Plaintiffs can ask their own interrogatories, and producing deposition transcripts will not reduce the number of depositions in this action, as Plaintiffs will not agree to forgo deposing a given witness if prior testimony from the witness is produced.  They seek transcripts as impeachment material.  _See In re TFT-LCD Antitrust Litig._, 2013 WL 12171856, at *3 (N.D. Cal. May 29, 2013) (rejecting "side excursion[s] into . . . []other lawsuit[s] . . . to gauge . . . credibility.")

Dated: January 14, 2021

Respectfully submitted,

KELLER ROHRBACK L.L.P.

BLEICHMAR FONTI & AULD LLP

By:    */s/ Derek W. Loeser*
        Derek W. Loeser

By:    */s/ Lesley E. Weaver*
        Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David J. Ko (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Adele Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

GIBSON, DUNN, & CRUTCHER LLP

By: */s/ Orin Snyder*
Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000

Facsimile:  212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

I, Lesley E. Weaver, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of January, 2021, at Oakland, Washington.

/s/ *Lesley E. Weaver*
Lesley E. Weaver

**CERTIFICATE OF SERVICE**

I, Lesley E. Weaver, hereby certify that on January 14, 2021, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

/s/ *Lesley E. Weaver*

# PLAINTIFFS'
# EXHIBIT A

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' NOTICE OF DEPOSITION OF DEFENDANT FACEBOOK, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)** |

**TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** under Federal Rules of Civil Procedure 26 and 30(b)(6), Plaintiffs, by their counsel, will take the deposition of Defendant Facebook, Inc. ("Facebook") at 9:00 a.m. on February 5, 2021 via remote audio-video conference and through a remote platform deposition service mutually agreed upon by the parties. The deposition will be taken before a person authorized by law to administer oaths under Federal Rules of Civil Procedure 28(a) and shall continue from one day to the next, excluding Sundays and holidays, until the examination is completed.

Pursuant to Rule 30(b)(6) and the Court's Discovery Order No. 11 (Dkt. No. 588), Defendant is hereby notified of its duty to designate one or more officers, directors, managing agents or other persons most knowledgeable or qualified to testify on its behalf concerning the

matters set forth below in Topics 1-12. Each such designee produced to testify has an affirmative duty to have first reviewed all Documents, reports, and other matters known or reasonably known or available to Facebook and to familiarize himself or herself with all potential witnesses known or reasonably available to provide informed, binding answers at the deposition. Defendant Facebook shall inform Plaintiffs of such designations(s) at a reasonable time prior to the deposition(s), but no later than 7 days before the deposition(s), by setting forth the identity of the person(s) designated to testify with respect to the matters specified below in Topics 1-12. The deposition will continue on the day noticed and for additional days, if necessary, excluding Sundays and holidays until completed.

Plaintiffs issue this notice pursuant to Discovery Order No. 11 and reserve the right to notice and conduct additional Rule 30(b)(6) depositions of Defendant on separate, non-duplicative topics.

Dated: December 18, 2020

KELLER ROHRBACK L.L.P.

By:    */s/ Derek W. Loeser*
          Derek W. Loeser

Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David J. Ko (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Adele Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301

BLEICHMAR FONTI & AULD LLP

By:    */s/ Lesley E. Weaver*
          Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a true and correct copy of:

- **PLAINTIFFS' NOTICE OF DEPOSITION OF DEFENDANT FACEBOOK, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)**

via Email on this 18th day of December, 2020 to the person(s) set forth below:

Joshua Seth Lipshutz
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Ave NW
Washington, D.C.
jlipshutz@gibsondunn.com

Kristin A. Linsley
Brian Michael Lutz
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street
Suite 3000
San Francisco, CA 94105
KLinsley@gibsondunn.com
BLutz@gibsondunn.com

Orin Snyder
Laura Mumm
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166
osnyder@gibsondunn.com
lmumm@gibsondunn.com

Martie Kutscher-Clark
**GIBSON, DUNN & CRUTCHER LLP**
1881 Page Mill Road
Palo Alto, CA
MKutscherClark@gibsondunn.com

Russell Falconer
**GIBSON, DUNN & CRUTCHER LLP**
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
rfalconer@gibsondunn.com

Deborah Stein
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
dstein@gibsondunn.com

Colin B. Davis
**GIBSON, DUNN & CRUTCHER LLP**
3161 Michelson Drive
Irvine, CA 92612-4412
cdavis@gibsondunn.com

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed at Seattle, Washington, on December 18, 2020.

/s/ Sarah Skaggs
Sarah Skaggs

## SCHEDULE A

### I.   DEFINITIONS AND RULES OF CONSTRUCTION

In the event of any conflict or ambiguity between the following definitions, common usage and reference to any cited rules, statutes, or regulations should be used to provide the broadest interpretation of the term in question.

1.      "Business Plan" means any plan created or prepared by Facebook regarding Facebook's historical and future business strategy, including but not limited to Facebook's historical and future operations, and Facebook's historical and future financial positions.

2.      "Computer System" or "Computer Systems" include(s), but is not limited to, any server (whether physical or virtual), desktop computer, tablet computer, point of sale system, smart phone, cellular telephone, networking equipment, internet site, intranet site, and the software programs, applications, scripts, operating systems, or databases used to control, access, store, add, delete, or modify any information stored on any of the foregoing non-exclusive list.

3.      "Content and Information" refers to the definition in footnote 2 of the First Amended Complaint ("FAC"), referring to "content" and "information" as Facebook's Statements of Rights and Responsibilities have defined those terms. In brief, Facebook has generally used "information" to mean facts and other information about Users, including the actions they take, and "content" to mean anything Users post on Facebook that would not be included in the definition of "information." Content and Information also includes both personally identifiable content and information and anonymized content and information that is capable of being de-anonymized. *See* FAC ¶¶ 223-224. Content and Information includes data that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular User, such as:

a.  Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

b.  Characteristics of protected classifications under California or federal law.

c.  Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

d.  Biometric information.

e.  Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an Internet Web site, application, or advertisement.

f.  Geolocation data.

g.  Audio, electronic, visual, thermal, olfactory, or similar information.

h.  Professional or employment-related information.

i.  Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. section 1232g, 34 C.F.R. Part 99).

j.  Inferences drawn from any of the information identified in this paragraph to create a profile, dossier, or similar collection of information about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

4.      "Discovery Order No. 9" refers to the Court's October 29, 2020 Order (Dkt. No. 557), in which held, *inter alia*, that the discoverable data at issue in this case includes "Data collected from a user's on-platform activity; Data obtained from third parties regarding a user's off-platform activities; and Data inferred from a user's on or off-platform activity."

5.      "Data Warehouse" refers to refers to the open source, peta-byte (and potentially larger) scale data warehousing framework based on Hadoop that was developed by the Data Infrastructure Team at Facebook, also known as the "Hive."

6.      "Discovery Order No. 11" refers to the Court's December 11, 2020 Order (Dkt. No. 588), in which it ordered, *inter alia*, Defendant Facebook "to provide a 30(b)(6) witness regarding the discoverable user data as articulated by Discovery Order No. 9. (Dkt. No. 557.) Facebook shall also provide a 30(b)(6) witness on how it monetizes—directly or indirectly—and thus values user data."

7.      "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term pursuant to Fed. R. Civ. P. 34(a)(1)(A), and includes, without limitation, any writing, drawing, graph, chart, photography, phonorecord, Electronically-Stored Information (as defined herein) or digitally encoded data, database, graphic, and/or other data compilations from which information can be obtained, translated if necessary, by the respondent through detection devices into reasonably usable form, or other information, including originals, translations and drafts thereof, and all copies bearing notations and marks not found on the original. The term "Document" further means any document now or at any time in the possession, custody, or control of the entity to whom this document request is directed (together with any predecessors, successors, affiliates, subsidiaries, or divisions thereof, and their officers, directors, employees, agents and attorneys), including drafts. Without limiting the term "control" as used in the

preceding sentence, a Person is deemed to be in control of a document if the Person has the right or ability to secure the document or a copy thereof from another Person having actual possession thereof, including, but not limited to, work product contracted by You from others. Documents that are identical but in the possession of more than one Person or entity are separate documents within the meaning of this term. Also, a draft or non-identical copy is a separate document within the meaning of this term.

8.    "Electronically-Stored Information" or "ESI" includes, but is not limited to, the following:

   a.  all items covered by Fed. R. Civ. P. 34(a)(1)(A);

   b.  information or data that is generated, received, processed, and recorded by computers and other electronic devices, including metadata (*e.g.*, author, recipient, file creation date, file modification date, etc.);

   c.  internal or external web sites, intranets and extranets;

   d.  output resulting from the use of any software program, including, without limitation, word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, texts, Facebook Messenger, WhatsApp, AOL Instant Messenger (or similar programs), bulletin board programs, screenshots/screengrabs, screen sharing recordings, webcasts, screencasts, operating systems, source code, PRF files, PRC files, batch files, ASCII files, and all miscellaneous media on which they reside regardless of whether said electronic data exists in an active file, a deleted file, or file fragment; and

   e.  activity listings of electronic mail receipts and/or transmittals; and any and all items stored on computer memories, hard disks, floppy disks, CDROM, magnetic

tape, microfiche, or on any other media for digital data storage, or transmittal, such as, but not limited to, personal digital assistants (*e.g.*, iPhones), hand-held wireless devices (*e.g.*, BlackBerrys), or similar devices, and file folder tabs, or containers and labels appended to, or relating to, any physical storage device associated with each original or copy of all documents requested herein.

9.      "Hive" refers to the open source, peta-byte (or potentially larger) scale data warehousing framework based on Hadoop that was developed by the Data Infrastructure Team at Facebook, also known as the Data Warehouse.

10.     "Including" means "including but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify the request, definition, or instruction but not to limit the topic.

11.     "Policies and Procedures" mean any formal or informal policy, procedure, rule, guideline, internal manuals, collaborative document, directive, instruction, or practice, whether written or unwritten, that You expect Your employees to follow in performing their jobs.

12.     "Marketing Plan" means any plan created or prepared by Facebook regarding Facebook's historical and future marketing or advertising strategy.

13.     "User Data" or "Data" refers to the categories of Content and Information referenced by the Court in Discovery Order No. 9 (Dkt. No. 557), including "Data collected from a user's on-platform activity; Data obtained from third parties regarding a user's off-platform activities; and Data inferred from a user's on or off-platform activity."

14.     "You" or "your" or "Facebook" or "Defendant" means Defendant Facebook, Inc., together with your predecessors, successors, parents, subsidiaries, divisions or affiliates (foreign or domestic), and their respective current and former officers, directors, agents, attorneys,

accountants, employees, partners, managers, members or other persons occupying similar positions or performing similar functions, and all persons acting or purporting to act on its behalf.

15.     Words used in the plural include the singular, and words used in the singular include the plural.

## II.     RELEVANT TIME PERIOD

Unless otherwise specified or agreed upon by the parties, consistent with Discovery Order No. 11, the relevant time period for purposes of this Notice is January 1, 2012 through December 31, 2017.

## III.     MATTERS FOR TESTIMONY

1.     The format, nature, and location of User Data as set forth in Discovery Order No. 9, including how and why such Data is collected, obtained, or inferred, and how it is maintained.

2.     The name, location, and function of all of Facebook's electronic or database systems that contain User Data, including but not limited to Hive and Data Warehouse, whether stored on an individual user level or in another form.

3.     The identity, nature and location at Facebook of all the metadata associated with User Data, including but not limited to nodes, edges, and fields, as set forth in https://developers.facebook.com/docs/graph-api/overview/.

4.     How User Data is or can be associated or linked to specific Facebook users—such as User IDs or other unique identifiers such as e-mail addresses and RIDs, as set forth in PwC_CPUP_FB00030737-38—and the identity, nature, and location of all such associations, including but not limited to nodes, edges, and fields, as set forth in https://developers.facebook.com/docs/graph-api/overview/.

6.      Identification of the types of third parties to which Facebook makes User Data accessible or with which Facebook shares User Data.

7.      For each type of third party identified in Topic 6, identify what kinds of User Data Facebook shares or makes accessible; for what general purposes it is shared or made accessible; and how Facebook ensures it is used for those purposes.

8.      The Policies and Procedures applicable to how User Data is collected, obtained, inferred, created, and maintened, and how it is shared or made accessible to third parties, including any data deletion and retention policies related to User Data, and the impact of the litigation hold placed in this case to such Policies and Procedures.

9.      For each type of third party identified in Topic 6, identify how Facebook shares or makes User Data accessible, including the format of such data, the metadata shared or made accessible, and the nodes, edges, and fields as set forth in https://developers.facebook.com/docs/graph-api/overview/.

10.      How Facebook monetizes—directly or indirectly—and values User Data.

11.      The identity, location, and retention of Documents related to how Facebook monetizes—directly or indirectly—and values User Data, including but not limited to:

   a.   All such Marketing Plans and Business Plans created or prepared by Facebook;

   b.   All such Documents, including drafts and correspondence, created or prepared by Facebook to share with third parties, including but not limited to institutional and individual investors, venture capitalists, and/or private equity firms;

   c.   All such Documents created in connection with preparing Facebook's quarterly and annual reports and/or any other of Facebook's publicly available filings to the SEC related to how Facebook generates revenue, and materials regarding the key

metrics identified by Facebook in these reports such as Daily Active Users (DAU), Monthly Active Users (MAU), and Average Revenue Per User (ARPU).

12.   The identity of all third parties that helped Facebook create or prepare any of the Documents described in Topic 11 above.

# EXHIBIT A

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' NOTICE OF DEPOSITION OF DEFENDANT FACEBOOK, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)** |

**TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** under Federal Rules of Civil Procedure 26 and

30(b)(6), Plaintiffs, by their counsel, will take the deposition of Defendant Facebook, Inc.

("Facebook") at 9:00 a.m. on February 5, 2021 via remote audio-video conference and through a

remote platform deposition service mutually agreed upon by the parties. The deposition will be

taken before a person authorized by law to administer oaths under Federal Rules of Civil

Procedure 28(a) and shall continue from one day to the next, excluding Sundays and holidays,

until the examination is completed.

Pursuant to Rule 30(b)(6) and the Court's Discovery Order No. 11 (Dkt. No. 588),

Defendant is hereby notified of its duty to designate one or more officers, directors, managing

agents or other persons most knowledgeable or qualified to testify on its behalf concerning the

matters set forth below in Topics 1-12. Each such designee produced to testify has an affirmative duty to have first reviewed all Documents, reports, and other matters known or reasonably known or available to Facebook and to familiarize himself or herself with all potential witnesses known or reasonably available to provide informed, binding answers at the deposition. Defendant Facebook shall inform Plaintiffs of such designations(s) at a reasonable time prior to the deposition(s), but no later than 7 days before the deposition(s), by setting forth the identity of the person(s) designated to testify with respect to the matters specified below in Topics 1-12. The deposition will continue on the day noticed and for additional days, if necessary, excluding Sundays and holidays until completed.

Plaintiffs issue this notice pursuant to Discovery Order No. 11 and reserve the right to notice and conduct additional Rule 30(b)(6) depositions of Defendant on separate, non-duplicative topics.

Dated: December 18, 2020

KELLER ROHRBACK L.L.P.

By:   */s/ Derek W. Loeser*
      Derek W. Loeser

Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David J. Ko (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Adele Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301

BLEICHMAR FONTI & AULD LLP

By:   */s/ Lesley E. Weaver*
      Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a true and correct copy of:

- **PLAINTIFFS' NOTICE OF DEPOSITION OF DEFENDANT FACEBOOK, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)**

via Email on this 18th day of December, 2020 to the person(s) set forth below:

Joshua Seth Lipshutz
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Ave NW
Washington, D.C.
jlipshutz@gibsondunn.com

Kristin A. Linsley
Brian Michael Lutz
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street
Suite 3000
San Francisco, CA 94105
KLinsley@gibsondunn.com
BLutz@gibsondunn.com

Orin Snyder
Laura Mumm
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166
osnyder@gibsondunn.com
lmumm@gibsondunn.com

Martie Kutscher-Clark
**GIBSON, DUNN & CRUTCHER LLP**
1881 Page Mill Road
Palo Alto, CA
MKutscherClark@gibsondunn.com

Russell Falconer
**GIBSON, DUNN & CRUTCHER LLP**
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
rfalconer@gibsondunn.com

Deborah Stein
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
dstein@gibsondunn.com

Colin B. Davis
**GIBSON, DUNN & CRUTCHER LLP**
3161 Michelson Drive
Irvine, CA 92612-4412
cdavis@gibsondunn.com

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed at Seattle, Washington, on December 18, 2020.

*/s/ Sarah Skaggs*
Sarah Skaggs

## SCHEDULE A

**I.    DEFINITIONS AND RULES OF CONSTRUCTION**

In the event of any conflict or ambiguity between the following definitions, common usage and reference to any cited rules, statutes, or regulations should be used to provide the broadest interpretation of the term in question.

1.      "Business Plan" means any plan created or prepared by Facebook regarding Facebook's historical and future business strategy, including but not limited to Facebook's historical and future operations, and Facebook's historical and future financial positions.

2.      "Computer System" or "Computer Systems" include(s), but is not limited to, any server (whether physical or virtual), desktop computer, tablet computer, point of sale system, smart phone, cellular telephone, networking equipment, internet site, intranet site, and the software programs, applications, scripts, operating systems, or databases used to control, access, store, add, delete, or modify any information stored on any of the foregoing non-exclusive list.

3.      "Content and Information" refers to the definition in footnote 2 of the First Amended Complaint ("FAC"), referring to "content" and "information" as Facebook's Statements of Rights and Responsibilities have defined those terms. In brief, Facebook has generally used "information" to mean facts and other information about Users, including the actions they take, and "content" to mean anything Users post on Facebook that would not be included in the definition of "information." Content and Information also includes both personally identifiable content and information and anonymized content and information that is capable of being de-anonymized. *See* FAC ¶¶ 223-224. Content and Information includes data that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular User, such as:

a.   Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

b.   Characteristics of protected classifications under California or federal law.

c.   Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

d.   Biometric information.

e.   Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an Internet Web site, application, or advertisement.

f.   Geolocation data.

g.   Audio, electronic, visual, thermal, olfactory, or similar information.

h.   Professional or employment-related information.

i.   Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. section 1232g, 34 C.F.R. Part 99).

j.   Inferences drawn from any of the information identified in this paragraph to create a profile, dossier, or similar collection of information about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

4.      "Discovery Order No. 9" refers to the Court's October 29, 2020 Order (Dkt. No. 557), in which held, *inter alia*, that the discoverable data at issue in this case includes "Data collected from a user's on-platform activity; Data obtained from third parties regarding a user's off-platform activities; and Data inferred from a user's on or off-platform activity."

5.      "Data Warehouse" refers to refers to the open source, peta-byte (and potentially larger) scale data warehousing framework based on Hadoop that was developed by the Data Infrastructure Team at Facebook, also known as the "Hive."

6.      "Discovery Order No. 11" refers to the Court's December 11, 2020 Order (Dkt. No. 588), in which it ordered, *inter alia*, Defendant Facebook "to provide a 30(b)(6) witness regarding the discoverable user data as articulated by Discovery Order No. 9. (Dkt. No. 557.) Facebook shall also provide a 30(b)(6) witness on how it monetizes—directly or indirectly—and thus values user data."

7.      "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term pursuant to Fed. R. Civ. P. 34(a)(1)(A), and includes, without limitation, any writing, drawing, graph, chart, photography, phonorecord, Electronically-Stored Information (as defined herein) or digitally encoded data, database, graphic, and/or other data compilations from which information can be obtained, translated if necessary, by the respondent through detection devices into reasonably usable form, or other information, including originals, translations and drafts thereof, and all copies bearing notations and marks not found on the original. The term "Document" further means any document now or at any time in the possession, custody, or control of the entity to whom this document request is directed (together with any predecessors, successors, affiliates, subsidiaries, or divisions thereof, and their officers, directors, employees, agents and attorneys), including drafts. Without limiting the term "control" as used in the

preceding sentence, a Person is deemed to be in control of a document if the Person has the right or ability to secure the document or a copy thereof from another Person having actual possession thereof, including, but not limited to, work product contracted by You from others. Documents that are identical but in the possession of more than one Person or entity are separate documents within the meaning of this term. Also, a draft or non-identical copy is a separate document within the meaning of this term.

       8.      "Electronically-Stored Information" or "ESI" includes, but is not limited to, the following:

    a.  all items covered by Fed. R. Civ. P. 34(a)(1)(A);

    b.  information or data that is generated, received, processed, and recorded by computers and other electronic devices, including metadata (*e.g.*, author, recipient, file creation date, file modification date, etc.);

    c.  internal or external web sites, intranets and extranets;

    d.  output resulting from the use of any software program, including, without limitation, word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, texts, Facebook Messenger, WhatsApp, AOL Instant Messenger (or similar programs), bulletin board programs, screenshots/screengrabs, screen sharing recordings, webcasts, screencasts, operating systems, source code, PRF files, PRC files, batch files, ASCII files, and all miscellaneous media on which they reside regardless of whether said electronic data exists in an active file, a deleted file, or file fragment; and

    e.  activity listings of electronic mail receipts and/or transmittals; and any and all items stored on computer memories, hard disks, floppy disks, CDROM, magnetic

tape, microfiche, or on any other media for digital data storage, or transmittal, such as, but not limited to, personal digital assistants (*e.g.*, iPhones), hand-held wireless devices (*e.g.*, BlackBerrys), or similar devices, and file folder tabs, or containers and labels appended to, or relating to, any physical storage device associated with each original or copy of all documents requested herein.

9.     "Hive" refers to the open source, peta-byte (or potentially larger) scale data warehousing framework based on Hadoop that was developed by the Data Infrastructure Team at Facebook, also known as the Data Warehouse.

10.     "Including" means "including but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify the request, definition, or instruction but not to limit the topic.

11.     "Policies and Procedures" mean any formal or informal policy, procedure, rule, guideline, internal manuals, collaborative document, directive, instruction, or practice, whether written or unwritten, that You expect Your employees to follow in performing their jobs.

12.     "Marketing Plan" means any plan created or prepared by Facebook regarding Facebook's historical and future marketing or advertising strategy.

13.     "User Data" or "Data" refers to the categories of Content and Information referenced by the Court in Discovery Order No. 9 (Dkt. No. 557), including "Data collected from a user's on-platform activity; Data obtained from third parties regarding a user's off-platform activities; and Data inferred from a user's on or off-platform activity."

14.     "You" or "your" or "Facebook" or "Defendant" means Defendant Facebook, Inc., together with your predecessors, successors, parents, subsidiaries, divisions or affiliates (foreign or domestic), and their respective current and former officers, directors, agents, attorneys,

accountants, employees, partners, managers, members or other persons occupying similar positions or performing similar functions, and all persons acting or purporting to act on its behalf.

15.     Words used in the plural include the singular, and words used in the singular include the plural.

## II.     RELEVANT TIME PERIOD

Unless otherwise specified or agreed upon by the parties, consistent with Discovery Order No. 11, the relevant time period for purposes of this Notice is January 1, 2012 through December 31, 2017.

## III.     MATTERS FOR TESTIMONY

1.     The format, nature, and location of User Data as set forth in Discovery Order No. 9, including how and why such Data is collected, obtained, or inferred, and how it is maintained.

2.     The name, location, and function of all of Facebook's electronic or database systems that contain User Data, including but not limited to Hive and Data Warehouse, whether stored on an individual user level or in another form.

3.     The identity, nature and location at Facebook of all the metadata associated with User Data, including but not limited to nodes, edges, and fields, as set forth in https://developers.facebook.com/docs/graph-api/overview/.

4.     How User Data is or can be associated or linked to specific Facebook users—such as User IDs or other unique identifiers such as e-mail addresses and RIDs, as set forth in PwC_CPUP_FB00030737-38—and the identity, nature, and location of all such associations, including but not limited to nodes, edges, and fields, as set forth in https://developers.facebook.com/docs/graph-api/overview/.

6.     Identification of the types of third parties to which Facebook makes User Data accessible or with which Facebook shares User Data.

7.     For each type of third party identified in Topic 6, identify what kinds of User Data Facebook shares or makes accessible; for what general purposes it is shared or made accessible; and how Facebook ensures it is used for those purposes.

8.     The Policies and Procedures applicable to how User Data is collected, obtained, inferred, created, and maintened, and how it is shared or made accessible to third parties, including any data deletion and retention policies related to User Data, and the impact of the litigation hold placed in this case to such Policies and Procedures.

9.     For each type of third party identified in Topic 6, identify how Facebook shares or makes User Data accessible, including the format of such data, the metadata shared or made accessible, and the nodes, edges, and fields as set forth in https://developers.facebook.com/docs/graph-api/overview/.

10.     How Facebook monetizes—directly or indirectly—and values User Data.

11.     The identity, location, and retention of Documents related to how Facebook monetizes—directly or indirectly—and values User Data, including but not limited to:

    a.   All such Marketing Plans and Business Plans created or prepared by Facebook;

    b.   All such Documents, including drafts and correspondence, created or prepared by Facebook to share with third parties, including but not limited to institutional and individual investors, venture capitalists, and/or private equity firms;

    c.   All such Documents created in connection with preparing Facebook's quarterly and annual reports and/or any other of Facebook's publicly available filings to the SEC related to how Facebook generates revenue, and materials regarding the key

metrics identified by Facebook in these reports such as Daily Active Users (DAU), Monthly Active Users (MAU), and Average Revenue Per User (ARPU).

12.    The identity of all third parties that helped Facebook create or prepare any of the Documents described in Topic 11 above.

# FB Exhibit A

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel 213.229.7000
www.gibsondunn.com

Deborah L. Stein
Direct: +1 213.229.7164
Fax: +1 213.229.6164
DStein@gibsondunn.com

January 13, 2021

VIA E-MAIL

Derek W. Loeser
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101

Lesley E. Weaver
Bleichmar Fonti & Auld LLP
555 12th Street, Suite 1600
Oakland, CA 94607

Re:    *In re Facebook, Inc. Consumer Privacy User Profile Litigation*

Counsel:

We write in response to Plaintiffs' December 18, 2020 30(b)(6) deposition notice (the "Notice"), which purports to notice a deposition for February 5 on twelve sweeping topics—entirely untethered from the Discovery Order authorizing the Notice—without conferring with Facebook on scheduling as Local Rule 30-1 requires.  Given Judge Corley's clear instructions regarding the purpose of this deposition and the topics it should cover, we are disappointed that the Notice continues Plaintiffs' pattern of misusing civil discovery in pursuit of a roving investigation into all aspects of Facebook's business.

We will work with Plaintiffs to tailor the scope of the Notice consistent with Discovery Order No. 11 so that Facebook can meaningfully prepare its designee(s).  We will also cooperate with Plaintiffs on finding a mutually agreeable date for the deposition that allows Facebook sufficient time to prepare its designee(s) after the topics are finalized.  However, the Notice as drafted neither is "narrowly tailored" to two areas of inquiry as Judge Corley instructed nor particularizes topics with the "painstaking specificity" required to prepare a corporate designee on "particular subject areas . . . that are relevant to the issues in dispute."  *Uschold v. Carriage Servs., Inc.*, No. 4:17-cv-4424, 2019 WL 8298261, at *3 (N.D. Cal. Jan. 22, 2019).[1]

---

[1]    As per Judge Corley's direction, this letter serves as Facebook's initial response to Plaintiffs' proposed notice.  *See* Dkt. 588 at 2.  Facebook reserves its right to serve formal objections at a later date (including to any amended or supplemental notice that Plaintiffs might serve).

# GIBSON DUNN

Derek W. Loeser
Lesley E. Weaver
January 13, 2021
Page 2

## I.      The court ordered a deposition on two narrowly tailored areas of inquiry.

Judge Corley ordered an early 30(b)(6) deposition on two specific areas of inquiry: (i) the scope of "discoverable user data" and (ii) how Facebook "monetizes … and thus values user data." (Discovery Order No. 11, Dkt. 588 at 1–2). She further instructed, "[t]he 30(b)(6) topics shall be narrowly tailored to assist Plaintiffs with identifying relevant discovery in the above two areas." (*Id.* at 2).

### A.      The scope of "discoverable user data."

The deposition is intended to identify any additional document collections that may be needed to satisfy Discovery Order 9. That Order identifies three categories of data that are discoverable to the extent they are shared with (or accessible by) third parties: "(i) data collected from a user's on-platform activity; (ii) data obtained from third parties regarding a user's off-platform activities; and (iii) data inferred from a user's on or off-platform activity." Dkt. 557 at 2. Judge Corley instructed that the deposition should address whether information in each of these three categories was shared with or made accessible to third parties between 2012 and 2017, and whether any additional shared data should be produced under Discovery Order 9. Dkt. 588 at 1–2. As Facebook has explained, its investigation to date indicates that the "Download Your Information" ("DYI") file that Facebook makes available to users and produced to Plaintiffs includes all discoverable user data under Discovery Order 9.

Consistent with Judge Corley's order, Facebook is prepared to offer one or more 30(b)(6) deponents to testify on the following narrowly tailored topics regarding the use of user data between 2012 and 2017. For the purposes of the deposition, Facebook will consider data to have been shared with or made accessible to third parties to the extent it was transmitted to a third party or the third party was able to directly access or view the information. Facebook will not consider data to have been shared with or made accessible to a third party to the extent Facebook used the data only internally, including to provide a service to a third party.

#### Topic 1:  Data collected from a user's on-platform activity

Collected data.  Facebook's designee will be prepared to testify about whether Facebook collects the following types of information from users' on-platform activity, depending on how a user used Facebook's products:  (i) information and content the user provided, (ii) the user's networks and connections on Facebook's products, (iii) the user's usage of Facebook's products, (iv) information about transactions the user made on Facebook's products, and (v) things others did and

# GIBSON DUNN

Derek W. Loeser
Lesley E. Weaver
January 13, 2021
Page 3

information they provided about the user while using Facebook's products.  Facebook intends to offer this testimony to identify the categories of information Facebook may have collected from a user's on-platform activity.  Facebook does not intend for the designee to provide details about the categories of information Facebook may have collected from a user's on-platform activity, except as described below.

<u>Shared and produced data</u>.  Facebook's designee will be prepared to testify about whether the types of information the Company maintains from a user's on-platform activity are included in the user's DYI file, and whether, as a result, the DYI file includes all available information from the user's on-platform activity that may have been shared with or made available to third parties.

To the extent the designee identifies any categories of on-platform activity that are not included in the DYI file, the designee will be prepared to testify about whether that data was shared with third parties, and—if it was not—whether it was used for a different purpose.

**Topic 2:  Data obtained from third parties regarding a user's off-platform activities**

<u>Collected data</u>.  Facebook's designee will be prepared to testify about whether advertisers, app developers, and publishers could send Facebook information about a user's activities off Facebook through Facebook Business Tools—including information about the user's device, websites the user visited, purchases the user made, the ads the user saw, and how the user used their services.  Facebook's designee will further be prepared to testify about whether Facebook may have received information about a user's online and offline actions and purchases from third-party data providers who had the rights to provide Facebook with that information.  Facebook intends to offer this testimony to identify the categories of information Facebook may have received from third parties.  Facebook does not intend for its designee to provide details regarding the categories of information it may have received from third parties, except as described below.

<u>Shared data</u>.  Facebook's designee will be prepared to testify about whether Facebook shared or otherwise made accessible to third parties the categories of information it received from other third parties.

# GIBSON DUNN

Derek W. Loeser
Lesley E. Weaver
January 13, 2021
Page 4

To the extent the designee identifies any categories of information from third parties regarding users' off-platform activity that may have been shared, the designee will testify about whether that category of data appears in the DYI file.

Data that was not shared or made accessible.  Facebook's designee will be prepared to testify about whether Facebook used information obtained from third parties about a user's off-platform activities for any purpose other than the following purposes, none of which involved sharing data obtained from third parties with other third parties: (i) to provide, personalize, and improve its products; (ii) to provide measurement, analytics, and other business services; (iii) to promote safety, integrity, and security; (iv) to communicate with users, and (v) to research or innovate for social good.  Facebook intends to offer this testimony to confirm that data obtained from third parties served a different purpose.

**Topic 3:  Data inferred from a user's on or off-platform activity**

Collected data.  Facebook's designee will be prepared to testify about Facebook's ability to draw certain inferences from data it obtains from users and/or third parties.  The purpose of this testimony is to confirm that Facebook has this ability.  Facebook does not intend for its designee to provide details regarding Facebook's technology during the relevant period or the nature of the inferences that Facebook's tools may have drawn, except as described below.

Shared data.  Facebook's designee will be prepared to testify about whether Facebook shared or otherwise made accessible to third parties any category of information it inferred about users.

To the extent the designee identifies any categories of inferred data that may have been shared or made accessible to third parties, the designee will testify about whether that category of data appears in the DYI file.

Data that was not shared or made accessible. Facebook's designee will be prepared to testify about whether Facebook used data inferred from a user's on or off-platform activity for any purpose other than the following purposes, none of which involve sharing data obtained from third parties with other third parties: (i) to provide, personalize, and improve its products; (ii) to provide measurement, analytics, and other business services; (iii) to

**GIBSON DUNN**

Derek W. Loeser
Lesley E. Weaver
January 13, 2021
Page 5

promote safety, integrity, and security; (iv) to communicate with users, and (v) to research or innovate for social good. The purpose of this testimony is to confirm that data Facebook did not share or make accessible to third parties served a different purpose.

**B.      How Facebook "monetizes … and thus values user data**."

This area of inquiry is intended to help Plaintiffs understand how Facebook makes use of user data to earn revenue, so that Plaintiffs are able to issue document requests targeting financial data that is relevant to the issues in this case. To that end, the deposition should address at a high level how Facebook makes use of user data to sell targeted advertising on the platform (revenues from which account for the majority of Facebook's revenue and are outside the scope of discovery in this case), and how (if at all) Facebook otherwise monetizes user data.

Consistent with Judge Corley's order, Facebook is prepared to offer one or more 30(b)(6) deponents to testify on the following narrowly tailored topics regarding how user data was monetized between 2012 and 2017.

**Topic 4:  How Facebook monetized user data.**

Data was not sold. Facebook's designee will be prepared to testify that Facebook did not sell any user information to anyone during the relevant time period and will explain that selling user data would undermine Facebook's business model, which relies on user data to place advertisements.

Advertising revenue. Facebook's designee will be prepared to testify about Facebook's use of user data to target advertisements, which accounted for between 84% and 98% of Facebook's revenue each year during the relevant time period, and about whether Facebook shared user data with, or otherwise made it accessible to, third parties as part of its targeted advertising business. Because targeted advertising is not at issue in this case, Facebook's deponent will provide a general overview of Facebook's advertising platform and confirm that user data was not shared or otherwise made accessible to third parties through targeted advertising. Facebook does not intend for its deponent to provide testimony regarding the details or mechanics of Facebook's advertising platform or Facebook's relationships with third parties whose advertisements Facebook places.

**GIBSON DUNN**

Derek W. Loeser
Lesley E. Weaver
January 13, 2021
Page 6

Other sources of revenue.  Facebook's designee will be prepared to testify about Facebook's sources of revenue other than advertising and whether user data was shared or otherwise made accessible to third parties in connection with those other sources of revenue.  Because the purpose of this testimony is to allow Plaintiffs to identify any relevant revenue source(s) so that they can make appropriate discovery requests, Facebook does not intend for its deponent to provide additional details regarding its revenue sources.

Valuation materials.  Facebook's designee will be prepared to testify about whether the Company, in its regular course of business from 2012 to 2017, calculated the retail value of its users' data.  To the extent the deponent testifies that Facebook did calculate the retail value of its users' data in the regular course of its business, the deponent will identify the form of any such valuations.  Because the purpose of this testimony is to assist Plaintiffs to request relevant materials, Facebook does not intend for the deponent to provide testimony regarding specific materials or the contents of any such materials.

II.     **The Notice is untethered from the Court's Order, fails to provide the specificity needed to prepare a 30(b)(6) deponent, and violates various procedural rules.**

Rather than narrowly tailor the Notice to the topics above, the Notice seeks a boundless inquisition into nearly every aspect of Facebook's business, without regard for the Court's instructions or the live theories of the case.  Compounding this problem, the noticed topics are exceedingly vague and overbroad, making it impossible for Facebook to prepare its corporate designee(s), and it suffers from numerous procedural defects.  Facebook summarizes each of these issues below, which it reserves the right to address in more detail in formal Responses and Objections to the Notice.

A.     **The Notice is entirely untethered from the ordered areas of inquiry.**

The Notice veers away from the two areas of inquiry the Court authorized for an early 30(b)(6) deposition—discoverable user data and how Facebook monetizes user data.  The Notice also makes no effort to "narrowly tailor" its topics "to assist Plaintiffs with identifying relevant discovery in [those] two areas."  Dkt. 588 at 1-2.

On the issue of discoverable user data, the Court made clear that the primary purpose of the deposition is to identify what categories of user data are shared with third parties and whether any shared data remains unproduced.  The notice does not even address these issues.

# GIBSON DUNN

Derek W. Loeser
Lesley E. Weaver
January 13, 2021
Page 7

The notice instead seeks testimony on **all** of the Company's "**Policies and Procedures**" relating to how user data is "collected, obtained, inferred, created, and maintained, and how it is shared or made accessible to third parties."  (Topic 8).  It asks Facebook to prepare a witness to **identify the third parties** who access data.  (Topic 6).  On the issue of third parties, the Notice then asks for testimony regarding "**the format**" including "the nodes, edges, and fields" of the data provided to each third party (Topic 9), **why** the data is shared with each third party (Topic 7), and "how Facebook ensures" that third parties use the data for proper purposes (Topic 7).

The Notice goes on to request an ESI deposition regarding "**the format, nature, and location**" at Facebook of all user data (Topic 1), how user data "is maintained" (Topic 1), and the "identity, nature, and location of **all the metadata** associated with user data" (Topic 3).  The notice doesn't stop there.  It also asks for testimony about "**all of Facebook's electronic or database systems** that contain user data," how data is stored in each database (Topic 2), and technical details regarding how data "is or can be associated or linked" to users and "the identity, nature, and location of all such associations, including but not limited to nodes, edges, and fields" (Topic 4).  These topics are far afield from the limited inquiry the Court ordered for this early 30(b)(6) deposition.

The same issues plague the requests concerning monetization.  The purpose of this deposition is to help Plaintiffs better understand how user data fits into Facebook's business model so that they can request relevant financial discovery.  The only noticed topic that even attempts to address this issue is Topic 10 ("How Facebook monetizes—directly or indirectly—and values user data.")  But Topic 10 merely parrots the general area of testimony the Court ordered without following her instruction to propose "narrowly tailored" topics on that issue.  The Notice then proposes several additional topics that fall far outside the area of inquiry the Court ordered.  It asks for testimony regarding "**the identity, location, and retention" of all documents regarding how the Company monetizes data**, including all of the Company's marketing and business plans, all materials prepared for and correspondence with investors, and all documents underlying the company's public financial filings.  (Topic 11).  The notice goes on to demand testimony regarding **all of the third parties** who assisted Facebook to create *any* document relating to monetization (Topic 12).

These topics have virtually nothing to do with the narrow areas of inquiry the Court ordered or any live issue in the case.  Instead, a number of Plaintiffs' proposed topics seek testimony only about Facebook's electronic databases, how Facebook stores and maintains ESI, the structure of Facebook's ESI, the location of Facebook's ESI, and Facebook's document retention policies.  The Court has already rejected Plaintiffs' request to conduct an ESI deposition of this nature, and many of Plaintiffs proposed topics appear to be lifted

**GIBSON DUNN**

Derek W. Loeser
Lesley E. Weaver
January 13, 2021
Page 8

directly from this previously rejected notice.  *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF
No. 436 at 1.

> ### B.    Facebook cannot meaningfully prepare a witness on the noticed topics.

Even if the noticed topics were within the ordered areas of inquiry, the Notice does
not allow Facebook to meaningfully prepare one or more witnesses.  As an initial matter, the
sheer breadth of the notice and number of subject areas would likely require Facebook to
prepare a dozen or more witnesses on virtually hundreds of different issues.  This would not
be reasonable or practical under normal circumstances and certainly is not practical within
the timeframe in which the Court expects this deposition to take place.

Even putting aside the number and breadth of the topics raised, the Notice fails to
"provide fair warning" of the topics Plaintiffs seek to address.  *Uschold v. Carriage Servs.*,
Inc., No. 4:17-cv-4424, 2019 WL 8298261, at *3 (N.D. Cal. Jan. 22, 2019).  In order to
provide a fair opportunity to prepare a corporate designee, Rule 30(b)(6) requires "the
requesting party . . . to designate, with painstaking specificity, the particular subject areas
that are intended to be questioned, and that are relevant to the issues in dispute."  *Id*.

The Notice fails woefully short of satisfying Rule 30(b)(6)'s particularity
requirement.  For example, a number of noticed topics use the phrase "including but not
limited to" to describe their subject matter.  This approach has been rejected by courts as
failing Rule 30(b)(6)'s "reasonable particularity requirement" because it "defeats the purpose
of requiring the noticing party to delineate categories at all."  *Tri-State Hosp. Supply Corp. v.
United States*, 226 F.R.D. 118, 125 (D.D.C. 2005); *see also Trustees of Bos. Univ. v.
Everlight Elecs. Co.*, 2014 WL 5786492, at *3 (D. Mass. Sept. 24, 2014).  One topic includes
a demand for testimony on all of the Company's data policies and procedures (Topic 8) and
another seeks testimony regarding how Facebook "ensures" third parties use data for proper
purposes (Topic 7).  These topics fail to provide Facebook with any guidance as to what
specific information Plaintiffs will be seeking regarding the Company's data policies and
enforcement measures, and they appear to seek testimony regarding hundreds of issues
across numerous departments.   Plaintiffs' remaining topics suffer from similar flaws.

Even if they had been properly framed, many of Plaintiffs' topics simply are not
suitable for deposition testimony—much less the limited 30(b)(6) deposition ordered in this
case.  Plaintiffs ask Facebook to prepare a 30(b)(6) deponent on ESI topics, including the
location and format of extraordinarily vast amounts of data.  The Notice asks for testimony
regarding "**the format, nature, and location**" at Facebook of any document Facebook
possesses that includes or draws upon a single piece of information relating to any user
(Topic 1) and the "identity, nature, and location of **all the metadata** associated with" such

# GIBSON DUNN

Derek W. Loeser
Lesley E. Weaver
January 13, 2021
Page 9

documents (Topic 3).  The Notice also asks for testimony about how data "is or can be associated or linked" to users and "the identity, nature, and location of all such associations, including but not limited to notes, edges, and fields" (Topic 4).  It is not practical or efficient to prepare a 30(b)(6) deponent on the locations of such vast amounts of data—much of which is not even within the scope of relevant discovery.  This is particularly true given that the parties have already spent hundreds of hours exchanging correspondence and meeting and conferring on the nature and locations of Facebook's ESI.

Facebook similarly cannot reasonably prepare a deponent on Topic 11, which demands that Facebook prepare a deponent to identify and testify to the location of all of the Company's marketing and business plans, all materials prepared for and correspondence with investors, and all documents underlying the company's publicly financial filings.  The operative terms in Topic 11 are defined so broadly that it is impossible for Facebook to understand, much less cabin, what Plaintiffs intend to capture.  Whatever that might be, it would require preparation of a designee on an enormous volume of documents with no meaningful connection to the issues in this case, and the testimony would not serve to limit or focus Plaintiffs' request for discovery into an essentially unlimited set of financial documents.

Many of Plaintiffs' topics are also inappropriate because they are duplicative of discovery Facebook already provided through more appropriate discovery mechanisms.  For instance, Topic 7 asks Facebook to identify the types of data it shares with third parties and for what purpose each type of data is shared.  This Topic is largely redundant of several of Plaintiffs' Interrogatories, to which Facebook provided approximately 500 pages of written responses.  *See* Facebook's R&Os to Interrogatory Nos. 9, 10, 11, 13, 14, 15, 27, & 34.  Similarly, Topic 2 requests "the name, location, and function of all of Facebook's electronic or database systems that contain User Data."  Facebook already provided Plaintiffs extensive informal and formal written discovery about its databases.

Facebook wishes to effectively prepare its designee(s) to testify.  It also wishes to avoid unnecessary disruptions and the need to engage the Court to resolve objections during this deposition.  Plaintiffs' failure to draft appropriate, narrowly tailored, and specific topics invites an unproductive deposition that is unlikely to satisfy the parties' or the Court's goals.

## C.    Additional Defects

The Notice also suffers from numerous procedural defects.

**Plaintiffs improperly noticed the deposition for February 5.**  Plaintiffs purport to notice the Deposition for February 5, 2021, but did not meet and confer with Facebook about

# GIBSON DUNN

Derek W. Loeser
Lesley E. Weaver
January 13, 2021
Page 10

this date, as the Local Rules require.  See Civil L.R. 30-1.  Regardless, it is premature to set a deposition date, as the parties have not yet agreed on topics, which will dictate the time Facebook needs to sufficiently prepare a witness.  Facebook suggests the parties meet and confer regarding a reasonable date after the parties have agreed on (or the Court has ordered) the deposition topics.

**Plaintiffs improperly demand that the deposition continue indefinitely.**  Absent a Court order or an agreement between the parties, a deposition in no event may a deposition exceed "1 day of 7 hours."  Fed. R. Civ. P. 30(d)(1).  Ignoring this limitation, Plaintiffs' notice twice directs that the "deposition . . . shall continue from one day to the next, excluding Sundays and holidays, until the examination is completed," suggesting that Plaintiffs intend to question Facebook's corporate designee(s) indefinitely.  This direction is contrary to Rule 30(d)(1).  And under the circumstances here, given that Judge Corley ordered a narrowly tailored deposition on discrete topics within the two identified areas of inquiry, the deposition should be limited to five hours.

**Plaintiffs improperly demand that Facebook disclose its corporate designee(s) in advance of the deposition.**  Plaintiffs' notice purports to require Facebook to identify "the person(s) designated to testify with respect to the matters specified" in each topic at least seven days before the deposition.  There is no such requirement in the Federal Rules or the Local Civil Rules.  Because a 30(b)(6) deposition is limited to information known or reasonably available to Facebook—and not any witness's personal knowledge—the identity of the corporate designee(s) should not affect Plaintiffs' preparation.

Facebook is prepared to meet and confer with Plaintiffs regarding each of these issues and Facebook's proposed topics at Plaintiffs' earliest convenience.

Sincerely,

Deborah L. Stein