Pages 1 – 31

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, MAGISTRATE JUDGE

IN RE: FACEBOOK, INC. CONSUMER     )
PRIVACY USER PROFILE LITIGATION.   )   NO. 18-MD-2843 VC (JSC)
                                       San Francisco, California
                                       Thursday, March 4, 2021

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:  (By Zoom Videoconference)

For Plaintiffs:

                    BLEICHMAR FONTI & AULD LLP
                    555 12th Street
                    Suite 1600
                    Oakland, California  94607
            BY:  **LESLEY E. WEAVER, ESQ.**
                 **ANNE K. DAVIS, ESQ.**
                 **MATTHEW MONTGOMERY, ESQ.**

                    KELLER RORHBACK, LLP
                    1201 Third Avenue
                    Suite 3200
                    Seattle, Washington  98101
            BY:  **DEREK W. LOESER, ESQ.**
                 **DAVID J. KO, ESQ.**
                 **CARI C. LAUFENBERG, ESQ.**

                    ROBBINS GELLER RUDMAN & DOWD LLP
                    One Montgomery Street
                    Suite 1800
                    San Francisco, California  94104
            BY:  **MATTHEW S. MELAMED, ESQ.**

                    KELLER RORHBACK, LLP
                    801 Garden Street
                    Santa Barbara, California  93101
            BY:  **CHRISTOPHER L. SPRINGER, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
                 Official Reporter, U.S. District Court

        (Appearances continued, next page)

**<u>APPEARANCES, CONTINUED</u>:**


For Defendants:

                    GIBSON DUNN & CRUTCHER LLP
                    200 Park Avenue
                    New York, New York  10166
          **BY:  ORIN SNYDER, ESQ.**

                    GIBSON DUNN & CRUTCHER LLP
                    1881 Page Mill Road
                    Palo Alto, California  94304
          **BY:  MARTIE P. KUTSCHER CLARK, ESQ.**

                    GIBSON DUNN & CRUTCHER LLP
                    2100 McKinney Avenue
                    Suite 1100
                    Dallas, Texas  75201
          **BY:  RUSSELL H. FALCONER, ESQ.**

                    GIBSON DUNN & CRUTCHER LLP
                    333 South Grand Avenue
                    Los Angeles, CA 90071-3197
          **BY:  DEBORAH L. STEIN, ESQ.**

```
 1   Thursday, March 4, 2021                          11:23 a.m.

 2                     P R O C E E D I N G S

 3           THE COURTROOM DEPUTY:  Okay, calling Civil Action

 4   3:18-md-02843, In Re Facebook Inc. Consumer Privacy User

 5   Profile Litigation.

 6       Counsel starting with plaintiffs, can you please state

 7   your appearances.

 8           MS. WEAVER:  Good morning, Your Honor.  Lesley

 9   Weaver, Bleichmar Fonti & Auld, for the plaintiffs.

10           MR. LOESER:  Good morning, Your Honor.  Derek Loeser

11   from Keller, Rohrback for the plaintiffs.

12           MR. MONTGOMERY:  Good morning, Your Honor.  Matthew

13   Montgomery with Bleichmar Fonti & Auld, for the plaintiffs.

14           MS. DAVIS:  Good morning, Your Honor.  Anne Davis

15   with Bleichmar Fonti & Auld, with plaintiffs.

16           MR. MELAMED:  Good morning, Your Honor.  Matt

17   Melamed, Bleichmar Fonti & Auld, for plaintiffs.

18           THE COURT:  Good morning.  Welcome.

19           MS. LAUFENBERG:  Good morning, Your Honor.  Cari

20   Laufenberg with Keller Rohrback, for plaintiffs.

21           MR. KO:  Good morning, Your Honor.  David Ko from

22   Keller Rohrback, also on behalf of plaintiffs.

23           THE COURT:  Good morning.

24           MR. SPRINGER:  Good morning, Your Honor.  Chris

25   Springer of Keller Rohrback for plaintiffs.
```

1          **THE COURT:**  All right, good morning.

2          **MR. SNYDER:**  Good morning, Your Honor.  It's Orin

3     Snyder from Gibson Dunn for Facebook.  With me is Martie

4     Kutscher Clark, Deborah Stein, and Russ Falconer.

5          **THE COURT:**  All right, good morning.

6          **MR. SNYDER:**  Good morning.

7          **THE COURT:**  All right.  So the privilege issue is

8     submitted.  I can get to it, but we are not going to need any

9     argument on that.

10        I do want to talk about Document No. 619 and -- to figure

11    out what to do about that.  And I guess my first question for

12    Facebook is how many deposition transcripts we're talking about

13    from these ten matters.  I mean, I don't know, I don't -- but

14    it seems to me it's probably not that many, but I could be

15    wrong about that.

16        So, whoever wants to take that.

17         **MR. FALCONER:**  Good morning, Your Honor.  Just to

18    make sure I'm answering the right question, this is

19    plaintiffs' request for deposition transcripts from the

20    regulatory matters?

21         **THE COURT:**  Correct.

22         **MR. FALCONER:**  At this point we believe it's two

23    matters where depositions have been taken.  Ballpark, the

24    number of transcripts, like 15 or 20.  Again, that's not a

25    final determination, but that's what -- that's our best

1   understanding right now.

2        THE COURT:  Okay, 15 to 20.  All right.  And what

3   matter -- or maybe let me ask this.  So you raised a number of

4   things that you wanted to brief.  For example, deliberative

5   process privilege.  I can't for the life of me figure out how

6   that would apply to a deposition transcript.

7        MR. FALCONER:  At the time that we had submitted our

8   brief, Your Honor, we had an agreement in place with the

9   California Attorney General's office that prohibited us from

10  publicly disclosing any of the deposition transcripts we had

11  received in that action.  I am, I would say, 95 to 98 percent

12  sure at this point that the California AG is going to release

13  us from that agreement.  I don't -- I don't want to say

14  definitively at this point, but it's very much looking that

15  way.

16       THE COURT:  Okay, all right.  That's different from

17  deliberative process privilege, right?  Deliberative process

18  privilege, actually, the Supreme Court issued an opinion just

19  this morning on it, under FOIA.

20     Right?  If they had -- something they shared with you

21  can't be their deliberative process.  But I understand about

22  the confidentiality.

23     All right.  So if that's the case, then, is that going to

24  take care of it with respect to those deposition transcripts?

25       MR. FALCONER:  With respect to the deposition

1    transcripts, Your Honor, I think the other issue that we would

2    like to either resolve with the plaintiffs or present to the

3    Court is how to handle the portions of the transcript that

4    don't overlap with the subject matter of this case.  If there

5    is testimony that touches on the issues and the subject matter

6    of this action, I don't -- that's one thing.  There is

7    testimony, as we understand it, in these deposition

8    transcripts that is on issues not related to the issues in

9    this case.  And whether it's redacting those portions of the

10   transcript or otherwise, we'd like to come up with some

11   procedure where we're limiting the production of the

12   deposition transcripts to the relevant portions for folks who

13   are going to be deposed in this case.

14        You know, whether that's some set amount of time, you

15   know, the deposition's noticed and we agree, okay, 30 days

16   before the deposition if we have a transcript from that person

17   that touches on relevant stuff we'll produce it with the

18   non-responsive stuff redacted, something like that. I think we

19   can hammer out the specifics of that through an agreement with

20   the plaintiffs, with the Court's blessing.

21        **THE COURT:**  But what is the harm in producing --

22   like, normally, right, you don't -- to produce a document, for

23   example, you don't redact.  You just get the whole document.

24   You just get it.  Now, if we were only talking about one page

25   of a long deposition, that might be a different matter.  But

1  these, as I understand it, were investigations into the

2  *Cambridge Analytica* matter.

3       So, I'm trying to figure out, you know, there might be

4  this or that, but why we would go through the delay or the

5  trouble or the expense of redacting it.  Apart from it being

6  privileged.

7            **MR. FALCONER:**  Sure.  There's two pieces on that,

8  Your Honor.  One is that some of these investigations touch on

9  issues not related to *Cambridge Analytica* so there's just no

10  overlap at all.  And the company, you know, has an interest in

11  preserving -- all that stuff was submitted under FOIA

12  confidentiality, understandings with the government, so it's

13  not been publicly disclosed.  The company has business

14  interests in keeping it that way.  The other portion -- so

15  that's one piece on kind of lack of overlap.

16       The other piece is that some of these *Cambridge Analytica*

17  proceedings touched on aspects of *Cambridge Analytica* not at

18  issue here.  The SEC investigation is a really good example,

19  where they were looking there about timing of public

20  disclosures.  What did Facebook know, when did it know it, what

21  statements did it make in its investor disclosures, were those

22  timely and accurately made.

23       That kind of disclosure focus on *Cambridge Analytica*

24  doesn't really touch on what we're doing here.

25            **THE COURT:**  I don't disagree with that.

1          **MS. WEAVER:**  Your Honor, may I address some of this?

2          **THE COURT:**  Sure.

3          **MS. WEAVER:**  All ten of these proceedings Facebook

4     already identified in this action as relevant to this action.

5     So they've already said that these are relevant.

6          **THE COURT:**  Yes.

7          **MS. WEAVER:**  And our concern is the delay,

8     Your Honor.  We've been asking for these for over a year and a

9     half.

10         **THE COURT:**  That's what I was going to get to.  So

11    what I was going to say, what's the harm?  Like if it's

12    talking about a disclosure, what's the harm?

13         If something is confidential, that's a different -- that's

14    a different matter.

15         **MR. SNYDER:**  Your Honor, it's the same harm that

16    always exists when relevance determinations are made in civil

17    litigation like this.  And there won't be undue delay.  We can

18    redact that which is irrelevant outside the scope of any

19    conceivable relevance in this case, and there's not going to

20    be undue delay.  What really --

21         **THE COURT:**  So how quickly?  When can those

22    deposition transcripts be produced?

23         **MR. SNYDER:**  Mr. Falconer?

24         **MR. FALCONER:**  So Your Honor, our understanding had

25    been that the process would be that once folks are noticed for

1  deposition -- just based on what Your Honor said last time

2  about deponents in the case, that if somebody -- Mr. Jones is

3  noticed for deposition, in this case we've got a prior

4  transcript from him, we would negotiate a timetable.  And

5  we're open to any timetable.  If -- and that was kind of the

6  understanding we had.  If we're looking at --

7          THE COURT:  I don't know if that's the case.  Let me

8  ask Ms. Weaver.  I think they want them now.

9          MS. WEAVER:  We do want them now, because actually,

10  that will help us determine who we want to depose and where to

11  go in the case.  It's already been done; it's the most

12  efficient thing to do.  Normally we get these at the outset.

13          THE COURT:  Then you may not need to redepose that

14  person, actually --

15          MS. WEAVER:  Maybe.

16          THE COURT:  -- because you might be able to come to

17  an agreement to use it.

18          MR. FALCONER:  I have a suggestion.  We have no

19  interest in delay.  We have an interest in protecting against

20  the disclosure of irrelevant information.  So why don't we

21  look at the transcripts, and we will report back to the

22  plaintiffs immediately, or promptly, within 48 hours, what we

23  think the timing will be.  And I'm sure we'll come to an

24  agreement.  Again, I assure Your Honor, our goal is not to

25  delay anything.  Our goal, again, is to protect against the

1    disclosure of irrelevant and business-sensitive information.

2        So we'll meet and confer, and I'm confident we'll get them

3    in a timeframe that they are very comfortable with, since our

4    goal is to get stuff out the door and not to delay.

5        **MR. LOESER:**  Your Honor, may I be heard very briefly

6     on this?

7        **THE COURT:**  Yes.

8        **MR. LOESER:**  This one issue of relevance, as Your

9     Honor well knows, the parties have had very significant fights

10    over what is and is not relevant.  We've seen over and over

11    again Facebook take positions on relevance which were unduly

12    narrow, and ended up not being accurate.

13        And so before opening the door for Facebook to go through

14    all these transcripts, which, again, are taken by regulators

15    investigating very similar things.  Even the example of SEC

16    disclosures, what Facebook knew and when is highly relevant to

17    our case.  What their disclosures say, that's public.

18        So it just -- I think that if we invite Facebook to go

19    through 20 transcripts with its own definition of relevance

20    we're going to get Swiss cheese, and it's not going to be

21    helpful.

22        **MR. SNYDER:**  Your Honor, we will, as officers of the

23     court and as faithful adherents to the orders in this case and

24     civil -- federal civil procedure, do what we do, whenever we

25     review and produce documents.  Which is to act scrupulously

1    and honestly in producing relevant and withholding not

2    relevant information.

3          **THE COURT:**  No, actually, that's not true.  We don't

4    redact for relevance.  The general presumption is that you

5    produce a document.  You don't -- you don't produce

6    non-responsive documents, but you don't redact paragraphs that

7    are non-responsive, unless they're privileged or confidential.

8          **MR. SNYDER:**  I'm likening this to looking at 15

9    documents, and producing 12, and not producing three because

10   three are outside the scope of the case.  And that's what

11   we'll do here.  We're well aware of Judge Chhabria's order

12   making clear what the case is about.  We understand that --

13   what the confines of relevance are.  We will liberally

14   construe it.  We are not looking to play any games here, nor

15   have we played a single game, to date, on relevance.

16      To the contrary, we have given lots of latitude to the

17   plaintiffs --

18         **THE COURT:**  Here's the direction I'm going to give

19   you.  You can redact as non-responsive if it's also

20   confidential or privileged.  But if it's in your belief not

21   relevant, but it's not privileged or confidential, just leave

22   it in there.

23         **MS. WEAVER:**  Your Honor, if I may, this actually

24   touches on an issue that has already bubbled up in the case.

25   We are concerned about Facebook's confidentiality

1   designations.  They designated the depositions that we took in

2   entirety just now attorneys' eyes only.  So we can't even

3   discuss them in this hearing, unless we go into a sealing.

4        So I am deeply concerned that if we allow a

5   confidentiality designation when we have a protective order

6   that can handle this, it will -- we will be -- I'm afraid we'll

7   be in front of you again on this issue.

8             **THE COURT:**  Well, it's not just confidentiality.  It

9   has to be, like, not in any way even close possibility.

10  You'll get one, you'll give it to me.  If it's wrong, then all

11  bets are off.  Or something like that.  I mean --

12            **MR. SNYDER:**  Your Honor --

13            **THE COURT:**  -- it should be like almost nothing.  It

14  should be --

15            **MR. SNYDER:**  Your Honor --

16            **THE COURT:**  -- almost nothing.

17            **MR. SNYDER:**  Well, Your Honor, if they're asking

18  about topics that have nothing to do with Cambridge Analytica,

19  that is confidential to us, because it's not public.  But the

20  idea, the narrative that we are somehow hiding things is just

21  wrong, Your Honor.

22            **THE COURT:**  I don't want any of this.  I don't want

23  any of this.  I read your statement.  And frankly, I was ready

24  just to give up on you and tell Judge Chhabria he should take

25  the case back, and manage discovery in his own case.  I just

1    want to put that out there right now.

2            **MR. SNYDER:**  Right, but --

3            **THE COURT:**  So I have a plan and a path for how we're

4    going to deal with this now, because I'm flummoxed.  And I

5    just don't know --

6            **MR. SNYDER:**  Your Honor, we are, too.

7            **THE COURT:**  I know.  I got that from your statement,

8    Mr. Snyder.  I got that.  And so I have some ideas about that.

9            **MR. SNYDER:**  Yes.  Thank you.

10           **THE COURT:**  So the one is you can have 48 hours.

11   You're going to tell them when to produce it.  We're not going

12   to wait and do it with depositions; you're just going to

13   produce it.  It's not burdensome.  They're depos, that they're

14   there.

15           **MR. SNYDER:**  That's fine, Judge.

16           **THE COURT:**  You have to figure out, Mr. Falconer, if

17   you got that approval or not.

18           **MS. WEAVER:**  Your Honor, may I be heard on that?

19       I have been in contact with the California Attorney

20   General's office.  And they have informed us in writing that

21   they take no position on whether or not these deposition

22   transcripts are produced here.  Meaning they are not objecting.

23   They are well aware of this action.  We have told Facebook

24   that.

25           So there's no reason to wait on the California Attorney

1  General.  And if you want, I can submit what they sent to me in

2  writing to the Court.

3          **THE COURT:**  We're not going to do that.  So let me

4  just cut to the chase.

5      This is what you guys need to do.  You have two choices

6  here.  One, you can hire a discovery mediator, a neutral who

7  will help you guys work out these things.  Like, not a special

8  master, which we shouldn't even call them that.  Special person

9  (Indicating quotation marks).  A discovery mediator, right?

10 Who you can go to with your laments and complaints, and maybe

11 this is -- and who will help you work it through.  Because I

12 don't have the time to do it.

13     Or, your final meet-and-confers on -- everything is just

14 going to have to be presented to me by letter brief, and your

15 final meet-and-confers are going to have to be recorded with a

16 transcript, and I'll have the transcript.  So then I know what

17 people have actually said and offered.

18     I much prefer the former.  I think it's more efficient.  I

19 think it's helpful.  I've seen it work in cases.  Because a lot

20 of it is just helping you sort of negotiate these things,

21 right?

22     So you tell me this Ms. Weaver.  What am I supposed to do

23 with all this?  Right?

24          **MS. WEAVER:**  Right.  We hear you, Your Honor.

25          **THE COURT:**  But if you had a neutral, not a

1   decider -- because what I don't want to do is create layers of

2   appeal, right?  That person decides something, and then you

3   appeal to me, and then you appeal to Judge Chhabria.  I don't

4   want to increase burden.  I want to decrease burden.

5       But it's something that will help you talk through and

6   might say:  You know, Ms. Weaver, I think you're being a little

7   unreasonable here; have you thought about that?  Or:

8   Mr. Snyder, I think you're being unreasonable here, what about

9   that?

10      Right?  Don't have to accept it, but often, I've found

11  they can be useful.  And you can come up with -- the case is

12  big enough; I know you can afford it.  That would really be --

13  I think that would help everybody.

14      And then, when Facebook believes, like, the deposition has

15  gone off track, well, you have some person there who could say

16  to you:  You know, yeah, maybe it has, maybe you are here.  Or:

17  No, I think not.  And you just do what you want with it.  But

18  it's a neutral person.  No dog in the fight.

19          **MR. SNYDER:**  Your Honor, the definition of insanity

20  of course is doing the same thing over, and expecting a

21  different result.  We share your frustration.

22      If Your Honor thinks that is the's right approach, then we

23  will agree to that approach.  We want to not burden this Court

24  with this.  We wish we didn't have to.  We're beyond

25  frustrated, as you've seen.

1          If Your Honor thinks a neutral mediator is the way to go

2     we're happy to try that because our goal is to work through

3     this nonsense and get to the other end, somehow.  And this

4     process is not working, obviously.  So we are happy --

5          **THE COURT:**  Well, I don't know if it's obvious or

6     not.  That's why I want somebody else.

7          **MR. SNYDER:**  Well, it's obvious to us, Your Honor,

8     because --

9          **THE COURT:**  All right, just stop there, Mr. Snyder.

10     Mr. Loeser, did you want to say something?

11          **MR. LOESER:**  Yeah.  I think -- we'd welcome that,

12     Your Honor.  I also will say that your involvement in this has

13     been critical.  There's been a number of discovery disputes.

14     I don't believe this is nonsense in any way.  We've had

15     discovery disputes; Your Honor has been extraordinarily

16     helpful in resolving them.  We will continue to have them.  We

17     look forward --

18          **THE COURT:**  No, I'm not getting out of here.  Like I

19     said --

20          **MR. LOESER:**  I hear that.  I'm just saying --

21          **THE COURT:**  We'll still have our status hearings.

22     But it's sort of that in-between stuff to help somebody,

23     right, because I just can't, you know, get --

24          **MR. LOESER:**  I think it's a terrific idea, and

25     hopefully it will resolve some of these issues.  And for those

1    that aren't resolved, I think the briefing format we have with

2    you has worked very well, it's efficient, and your input has

3    been critical.

4           **THE COURT:**  Okay, we'll keep all that.  So an

5    example, and this was a case -- was in *Waymo versus Uber*, and

6    I'm -- it's terrible of me that I'm blanking on his name at

7    Farella.  And I'm not suggesting any person, I'm not

8    suggesting any person.  Although if you want a suggestion, I

9    can give suggestions.

10          **MS. WEAVER:**  I think that would be good, Your Honor.

11   We would love your suggestions.

12          **THE COURT:**  You want one?

13          **MS. WEAVER:**  Yes.

14          **THE COURT:**  So the other person I was thinking about

15   and really what I'm talking about as a mediator would be our

16   former -- and I haven't spoken to him, because this actually

17   only occurred to me late last night when I was trying to

18   figure out what I could possibly do.  Our former director of

19   ADR, Howard Herman, right?  So he's a master mediator lawyer.

20   I did get a call from someone that they were thinking about

21   hiring him as kind of a special master.  So it might be

22   something he'd be willing to do.  I don't know if he's

23   available.  Like I said, I have nothing.  I don't know that at

24   all.

25          But you could come up with anybody -- some lawyer who's

 1  not quite so busy, because I imagine it's going to take a lot

 2  of time, but who you all trust.  Right?  Just like if you were

 3  selecting a mediator, who you all trust, that if they said:  I

 4  think you're being a bit unreasonable here, that would have

 5  some sway, that you would believe.  Or at least would take that

 6  into account, for both sides.

 7       So what I want to do is give you a week to try to come up

 8  with somebody.  And a week from today, let me know who you've

 9  hired.  Or if you can't agree on who to hire, who your three

10  choices are, I guess I would say.

11       And then -- I don't even know if I have the power to do

12  it, so I'll have to talk to Judge Chhabria about it.  But --

13  because it's a little unique, I know.

14            MS. WEAVER:  Actually, Your Honor, have you worked

15   with Rebecca Westerfield?  Because Judge Davila brought her in

16   in the Apple throttling consumer class action, and I heard

17   from both sides she was very effective.

18            THE COURT:  I haven't, but I don't care who you work

19   with.  Yeah, I'll work with anyone.  My preference would be

20   you guys come up with someone, because I think that's the best

21   person, if both sides have faith in that person.

22            MS. WEAVER:  Uh-huh.

23            THE COURT:  Yeah.  So I have no preference,

24   whatsoever.  But see if you can really come up with someone,

25   and a week from today, let me know who it is.

1        You guys have to work out whatever the compensation is.  I

2   don't get involved with that at all.  I have no supervision of

3   that at all.  It's a private mediator.  But it's a private

4   mediator with a little bit different goal, which is to help the

5   parties work through.

6        But I've often thought this, that a lot of discovery is

7   really mediation.  That's why I have the informal process as

8   well.  Because it's a lot like just mediation.  And so I've

9   often thought that hiring mediators to help, especially big

10  contentious cases, could be very productive.  Because they're

11  good at getting at:  Well what do you really want?  What are

12  your interests?  Here's an alternative way of looking at it and

13  thinking about it.  Or, telling people when they are being

14  unreasonable.

15       All right.  Well, good.  And I don't think even think you

16  need an order from Judge Chhabria to do that among yourselves.

17  And I'm not ordering it; I'm suggesting it.

18       All right.  So, and then this whole issue with these

19  depos, this is a classic example, I think, of where a mediator

20  could help the parties with that negotiation, and work it out,

21  and could also to the extent the plaintiffs think, you know --

22  creating all these problems redacting all this stuff, you can

23  give one exemplar to them, and they could tell you, right?  You

24  don't have to live with it, but I would bet if you both trust

25  this person, you would agree to do with it.  And it would be so

1   much faster; it'll save time.  I just -- I can't micro-manage

2   the discovery in the case.  It's not efficient and it's not

3   effective.  And I don't feel like I'm doing a good job with

4   that.

5        Okay.  So that's -- so that's what we are going to do with

6   that.  A week from today, you let me know since everyone agreed

7   they'd like to try that, who you have.

8        And it sounds like the depo -- and then the same thing I

9   think -- so the two buckets I wanted to talk about were the

10  written discovery responses, as well.  I think that,

11  Mr. Falconer, you should tell the plaintiffs what is the volume

12  that we're talking about.

13        I mean, do you know, as you sit here today?

14        MR. FALCONER:  To an order of magnitude yes.  And

15   it's much, much larger, because there were not formal

16   discovery responses in these regulatory proceedings.  It's

17   done almost all by lawyer-to-lawyer correspondence.  Lots of

18   different lawyers across lots of different law firms.  We

19   don't know exactly how many letters there are, but it's

20   certainly in the hundreds, possibly in the thousands.

21        And those informal responses, the burden issues are

22   obviously much greater than deposition transcripts.  But I

23   think the relevance problem is also much stronger, in that the

24   only thing that's unique in those letters is the questions that

25   the government asked to Facebook.  Anything that Facebook

1    provided back through its lawyers came from the folks who they

2    are going to depose, who -- you know, the documents they're

3    going to see in this case.

4         So none of that -- Your Honor likened it last time to

5    Jencks Act material, right?  But prior statements from a

6    potential witness, those need to be disclosed.  These lawyer

7    letters are not from potential witnesses, so the relevance is

8    much less clear.

9         But going across all these law firms, you know, collecting

10   from email files, collecting from shared networks, it would be

11   a very significant undertaking which, to our view, would have

12   very little payoff in terms of any kind of relevant or

13   discoverable material.

14             **MS. WEAVER:**  May I be heard on that, Your Honor?

15             **THE COURT:**  Yeah.

16             **MS. WEAVER:**  So an example -- and I wish actually I

17    had one in front of me, but I don't.  But, the Federal Trade

18    Commission wrote numerous letters to Facebook that essentially

19    are interrogatories.  They say:  We have the following

20    questions, and please provide a sworn response, under oath, to

21    us in a letter.

22        So we actually have the letters from the FTC.  And the FTC

23   has again confirmed they have, in this case, in writing, they

24   have no objection -- and actually emailed Mr. Snyder, saying:

25   We have no objection to plaintiffs getting the responses.

1          So we just don't have Facebook's answers.  And that's what

2   we want.

3          THE COURT:  Well, I thought there wasn't any dispute

4   as to the oath, versus under oath.

5          MR. FALCONER:  That's correct, Your Honor.  The

6   request did come over saying:  We'd like these answers

7   provided under oath.  It was negotiated with the FTC that it

8   would be handled through correspondence with the lawyers, and

9   the answers were not sworn or verified.

10         And again, this is --

11         MS. WEAVER:  That's fine.  That's fine.  The point is

12  we know what the FTC was asking.

13         THE COURT:  Yeah.

14         MS. WEAVER:  And it's directly on point here.

15         THE COURT:  Well, so for the FTC, at least, you have

16  all their letters.  Right?

17         MS. WEAVER:  Yes.  We just don't have Facebook's

18  responses.

19         THE COURT:  So you could easily provide them with the

20  Bates number of those letters, and say:  Provide us with the

21  responses to those letters.

22         MS. WEAVER:  We could do that for part of -- I don't

23  know that we have all the letters.  We have some, for sure.

24  We can identify them.

25         THE COURT:  Yeah.  You could start there.  You could

 1    start there, anyway.

 2              **MS. WEAVER:**  Uh-huh.

 3              **MR. FALCONER:**  Yeah.  And again, Your Honor, I want

 4    to -- do want to be heard on the burden point of that, that --

 5    I mean, I don't know the exact number of law firms who are

 6    involved with this, the number of lawyers at the law firms,

 7    but it is in the dozens, as well as dozens of in-house lawyers

 8    at Facebook.  And these responses are not collected in a

 9    single centralized place.

10        So the task of going out to gather all that stuff, and if

11    there are questions that plaintiffs feel like they need answers

12    to -- Your Honor has gotten rid of the interrogatory limit.

13    They're about to take depositions.  They have alternate paths

14    to getting -- if they're interested in the answers to those

15    questions, they can ask them at depositions; they can put

16    interrogatories out about them.

17        But this is really, I think -- we've talked before about,

18    you know, clone discovery or discovery about discovery.  The

19    deposition transcripts are one thing.  To the point where

20    they're getting discovery into unsworn correspondence from

21    attorneys in prior proceedings, you know, without any request

22    or showing of subject matter overlap, I think the

23    proportionality scale tips in our favor.

24              **THE COURT:**  So this is exactly why, like, I can't

25    rule on this.  Right?  What I want your discovery mediator to

do is to help you tee things up.  Get them narrowed.  Figure

out -- make sure the parties actually, like, share stuff.

See -- Ms. Weaver will show you:  Here are these letters; this

is why we want the responses to this, or anything similar.

And that you're not to just say:  Well, we don't -- I

mean, you don't know what the burden is.  For all you know,

whatever --

**MS. WEAVER:**  Well, for example, if I may, Your Honor,

Sean Royall of Gibson Dunn was the lawyer responding to the

FTC.  So the letters from the FTC which they produced to us, I

mean, we got those from Mr. Falconer's law firm in this case.

And they said it was responsive.  And so we just want

Facebook's response, whether it's written by Mr. Royall or

somebody else at Gibson Dunn.  But those should be very easy

for them to find.

**THE COURT:**  Yeah, I think Mr. Falconer was speaking

more broadly, more than specifically.  But that's sort of why

I didn't want to just let you brief things like what you asked

for a protective order, because it wasn't going to be

targeted.  Right?  I want to get targeted.  All right.

So these, in particular.  Not every piece of

correspondence.  It sounds like plaintiffs are asking for is

particular, when they did particular questions.  Right?

And I don't know about the other -- I know there are other

investigations that they may not be able to.  That's why I want

1   you to sit down with your neutral, and really figure out what

2   you can agree to, you can't, and then you present it to me in a

3   format, in writing, that I can then just decide.

4          **MR. FALCONER:**  Your Honor, we appreciate that.

5    That's a much more manageable request for us.

6      Like:  Here are some specific questions that we're looking

7   for answers for, as opposed to:  We're putting the onus on

8   Facebook to go look through every piece of paper that you sent

9   to the government --

10         **THE COURT:**  I know.  This is why I want you to have

11   this neutral, to help you get to those places, and to do that.

12   All right?  So that I don't have to do that with you.

13      So then, so then I guess Facebook's proposal with respect

14   to the production of documents was sort of to negotiate this

15   schedule and that kind of thing.  Again, I just think the way

16   to do this is to get this neutral who's going to get deep in up

17   with on everything and help you.  And then there'll still be

18   disputes.  You present it to me with your last best offer on

19   either side, and then I can decide.  But, so that I'm not

20   involved in sort of this.  That I just -- just don't know

21   enough that -- I feel like -- I don't want to make decisions

22   that just feel arbitrary.

23      Because obviously, the pace of production has to pick up.

24   Right?  And, and Facebook needs to tell the plaintiffs:  This

25   is what we're doing.

1          Or -- you know, I'm not going to ask you.  The mediator:

2     How many people do you have reviewing?  Right?  I assume that

3     you, Gibson Dunn, could be helping with the legal job shortage.

4     Or Facebook --

5               MR. SNYDER:  Well, we have over 70 right now.

6               THE COURT:  You do, all right.  That's fair.  That's

7      fair.  I didn't know.

8               MR. SNYDER:  Seventy.  And they're working around the

9      clock.  And we're going to get it done, like we always do.

10               THE COURT:  That's fair.  So the plaintiffs need to

11      -- like, some definite dates.  Some definite dates.  That's

12      what they need.  And it has to speed up.  Or.  Or Facebook

13      will have been -- you know, the -- what was the other thing?

14      It was before Facebook, that no one -- Myspace.  Facebook will

15      be Myspace before we get this case resolved.

16          And then that won't be any good, because then there won't

17     be any money to --

18               MR. SNYDER:  I can assure Your Honor, for the record,

19      that will not happen.

20               THE COURT:  I don't know.

21               MR. LOESER:  Well, Your Honor, we certainly agree

22      that it needs to speed up.  And so whatever it is -- I mean,

23      Facebook's producing about 5,000 documents a month, and

24      there's millions of them.  So --

25               THE COURT:  Yeah, no, no. we -- they --

1          **MR. LOESER:**  (Inaudible)

2          **THE COURT:**  That's not going to work.  They said that

3    they -- they will speed it up, they'll give you a schedule,

4    they'll give you an idea.

5         I'm just not confident that whatever discussions you guys

6    have been having -- and I know that you're doing your best,

7    right, and actually, personally, you kind of like each other.

8    This is not working here.

9         So let's just bring a new manager in, who can really be

10   talking to you every day, every day, if needed, to really help

11   you work through things.

12         **MR. SNYDER:**  I'm not sure any of them like me, Judge.

13   I think they like my colleagues.

14         **THE COURT:**  Well, whatever.

15         **MS. STEIN:**  I think Martie did want to quickly

16   address the document review and production issue.

17         **MS. KUTSCHER CLARK:**  Right.  And I don't want to drag

18   the Court into the weeds, or get into a he-said/she-said.  I

19   do want to assure you, though, that the review is actually

20   quite far along.  There are a lot of inaccuracies in the

21   statement which we didn't have a chance to address.

22         As Mr. Snyder said, we have more than 70 reviewers working

23   on this, most of whom are reviewing documents all day, every

24   day.  We are quite far along.  We have produced tens of

25   thousands of documents -- not 5,000 -- that hit on search

terms.  There's some nuance there.  A lot of these documents were produced before the search terms were even agreed to.  We are continuing to review as quickly as we possibly can.  We are finding the responsiveness rate is low.

But the other issue we're running into is there's a lot of junk in the productions.  And we have raised this with plaintiffs.  So we're finding, for instance, tons of out-of-office messages, like automated out-of-office responses. Tons of resumes.

We raised the issue to plaintiffs that it is very time-consuming to go through these materials, and they insisted -- made us insist -- or they insisted that we lay eyes on every one of those documents.  That we don't batch tag them, that we don't use any sort of TAR.

There are a lot of ways we could increase the efficiency, if plaintiffs would be --

**THE COURT:**  Okay, all right, yeah.  This is exactly what I don't -- this is exactly -- right?  Because they're going to deny that.  So this is -- so no one needs to respond to that.  This is exactly why I want you to get some mediator. Right?  Who can do that.  Because there's -- you should be able to figure it out.

So a week from today, give me your name, hopefully, and that person's agreed to come on.  And then let's see let's set something for -- how about if that person comes on and you

1   start working with them, and hopefully get things resolved,

2   what if we were to meet again on March 23?  And then that

3   person should join us as well.  And then we could also talk

4   about what their role -- what you agree to their role,

5   vis-à-vis me.

6       So we could have them be just completely like a separate

7   private mediator, they never have any discussions with me or

8   say anything here; they just observe.  You could agree to more.

9   I'm not going to order anything.  Right?  Whatever you guys

10  think, because it sounds -- everyone's a bit frustrated with

11  how it's working.  So, whatever you get together and think

12  would work best.

13      But at a minimum, you just have a mediator who will be

14  involved and help you to narrow disputes so that when they get

15  to me, they're really as narrow as possible (indicating).  And,

16  they're not -- all these disputes about what people said or the

17  positions that they took, or that kind of thing.  Which, it's

18  just impossible.  It's just impossible.  I just don't know what

19  to do with that.

20      You know, I'm very Pollyanna-ish.  I agree everybody

21  operate in good faith.  I like everybody, and I like all of

22  you.  And so frankly, I just don't even want to do it.  I don't

23  want to have to do that kind of thing.  Let the med- -- I do

24  enough of that when I do settlement conferences.  So I'll let

25  the mediator do that.

1      And I'll just decide.  I'm happy to decide, I'm happy to

2  continue to have our statuses, and move things around.  I just

3  think having somebody work with you all to work through this

4  would probably be productive.

5      So with that, I don't think there's really anything else I

6  want to decide today.  I think that's sort of my major

7  decision, is I need some help.

8          **MR. SNYDER:**  Your Honor, could we do the 24th or the

9  25th?  I have a big appeal I'm arguing on the 23rd.

10          **THE COURT:**  We can do the 24th at 9:00 a.m.

11          **MR. SNYDER:**  Perfect.  For me, at least.

12          **THE COURT:**  Does that work for everybody else?

13          **MS. WEAVER:**  That's fine, Your Honor.

14          **MR. LOESER:**  It's so much easier now since we never

15  have to leave our houses.  we just walk from room to the next.

16          **THE COURT:**  Yeah.  Well, hopefully, things are --

17  things are looking up.  I did a *Daubert* and summary judgment

18  in a case this morning, in which we -- there's a decent chance

19  we're going to go to trial in May.  Not a guarantee at all,

20  but there's a decent chance.  So, hopefully.

21      Is anyone here from Texas?  That's my only worry.  But

22  you're not in Texas, Mr. Falconer.

23          **MR. FALCONER:**  I am, I am.  It's just --

24          **THE COURT:**  I might have to say you can't step into

25  my courtroom.

1      (Laughter)

2          **MR. FALCONER:**  Uh, he does not speak for all of us,

3    believe me.

4          **THE COURT:**  I know.  I know.  I know.  Good.  Good.

5    I know.  Stay safe.  All right.

6          **MR. FALCONER:**  All right.

7          **THE COURT:**  Good.  All right.  So, work together.

8    See if you can come up -- believe me, it is in your interest

9    to pick a name that the other person wants.  Right?  Because

10   they'll listen to them.

11     All right.  Thank you.

12         **MS. WEAVER:**  Fair enough.

13         **THE COURT:**  Thank you.

14         **MR. SNYDER:**  Thank you, Your Honor.

15         **MR. FALCONER:**  Thank you, Your Honor.

16     (Proceedings concluded)

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States

Court, Northern District of California, hereby certify that the

foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Friday, March 5, 2021