Pages 1 - 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Magistrate Judge

IN RE FACEBOOK, INC., CONSUMER )
PRIVACY USER PROFILE            )
LITIGATION.                     )
                                )   **NO. 18-md-02843 VC (JSC)**
                                )
_____ )

San Francisco, California
Tuesday, April 6, 2021

**TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**


**APPEARANCES BY ZOOM WEBINAR:**

For Plaintiffs:
                    KELLER ROHRBACK LLP
                    1201 Third Avenue - Suite 3200
                    Seattle, Washington  98101
              BY:   **DEREK W. LOESER, ATTORNEY AT LAW**
                    **CARI C. LAUFENBERG, ATTORNEY AT LAW**
                    **DAVID J. KO, ATTORNEY AT LAW**

                    KELLER ROHRBACK LLP
                    801 Garden Street
                    Santa Barbara, California  93101
              BY:   **CHRISTOPHER L. SPRINGER, ATTORNEY AT LAW**


              **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**




REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

```
 1    APPEARANCES BY ZOOM WEBINAR:   (CONTINUED)

 2    For Plaintiffs:
                        BLEICHMAR, FONTI & AULD LLP
 3                      555 12th Street - Suite 1600
                        Oakland, California  94607
 4               BY:    LESLEY E. WEAVER, ATTORNEY AT LAW
                        MATTHEW S. MELAMED, ATTORNEY AT LAW
 5                      ANNE K. DAVIS, ATTORNEY AT LAW

 6    For Defendant:
                        GIBSON, DUNN & CRUTCHER LLP
 7                      200 Park Avenue
                        New York, New York  10166
 8               BY:    ORIN SNYDER, ATTORNEY AT LAW

 9                      GIBSON, DUNN & CRUTCHER LLP
                        555 Mission Street - Suite 3000
10                      San Francisco, California  94105
                 BY:    MARTIE P. KUTSCHER CLARK, ATTORNEY AT LAW
11
                        GIBSON, DUNN & CRUTCHER LLP
12                      2100 McKinney Avenue - Suite 1100
                        Dallas, Texas  75201
13               BY:    RUSSELL H. FALCONER, ATTORNEY AT LAW

14                      GIBSON, DUNN & CRUTCHER LLP
                        333 South Grand Avenue
15                      Los Angeles, California  90071
                 BY:    DEBORAH L. STEIN, ATTORNEY AT LAW
16
      Also Present:     Judge Gail Andler, JAMS
17                      Discovery Mediator

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **Tuesday - April 6, 2021**                    **9:00 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---000---** |
| 4 | **THE CLERK:**  Court is now in session.  The Honorable |
| 5 | Jacqueline Scott Corley presiding. |
| 6 | Calling Civil action 3:18-md-2843, In Re Facebook, Inc., |
| 7 | Consumer Privacy User Profile Litigation. |
| 8 | And you can start. |
| 9 | **MR. LOESER:**  Good morning, Your Honor.  Derek Loeser |
| 10 | from Keller Rohrback with Cari Laufenberg, David Ko, and Chris |
| 11 | Springer also from Keller Rohrback. |
| 12 | **THE COURT:**  Good morning. |
| 13 | **MS. WEAVER:**  Good morning, Your Honor.  Leslie Weaver |
| 14 | of Bleichmar, Fonti & Auld with Matt Melamed and Anne Davis. |
| 15 | **THE COURT:**  Good morning. |
| 16 | **MR. SNYDER:**  Good morning, Your Honor, and good |
| 17 | morning, Judge Andler.  This is Orin Snyder from Gibson Dunn. |
| 18 | With me on the Zoom conference are Deborah Stein, Russell |
| 19 | Falconer, and Martie Kutscher Clark.  I think that's it for our |
| 20 | group. |
| 21 | **THE COURT:**  Yes.  That's all I see.  Good morning. |
| 22 | **MR. SNYDER:**  Good morning. |
| 23 | **JUDGE ANDLER:**  Good morning, Your Honor.  Gail Andler |
| 24 | from JAMS. |
| 25 | **THE COURT:**  Good morning, Judge Andler. |

1       All right.  So I understand, Judge Andler, you have agreed

2   to assist the parties with mediating their discovery issues,

3   and so thank you everyone for your statement.

4       Let me give you sort of my thoughts as sort of when I

5   threw out there this somewhat novel idea of a discovery

6   mediator -- maybe not so novel; maybe you've done that before,

7   Judge -- what I envisioned.

8       So I didn't appoint a special master.  I sort of see

9   Judge Andler's role more akin to when the parties choose

10  private mediation -- right? -- you choose a private mediator to

11  help you resolve the entire case.  Instead, here the parties

12  have selected a private mediator to help you resolve all those

13  little battles in the bigger case; right?  So the discovery

14  dispute is sort of a small battle in there.

15      So I don't -- I want us to keep those roles the same so I

16  don't want recommendations from Judge Andler or anything like

17  that.  I think that actually in some ways would make it harder

18  for her to do her job because then the parties would be sort of

19  posturing to get a recommendation out of her as well as

20  everyone having confidential, very candid, open communications

21  allowing her to use her experience to help you sort of come up

22  with a resolution.

23      And then in addition, the request about setting the rules.

24  So when parties choose private mediation, the judges, we're not

25  involved in any way other than we try to make sure the parties

have the discovery that they need to have a meaningful
mediation; right?  So I leave that to Judge Andler.  If she's
going to say to a party, "You need to have such and such here,"
I assume you will follow that because you-all retained her
because you actually want to move the discovery process
forward; but I really just view it just like a private mediator
except that she's mediating the discovery disputes.

     And to that end, then, I would also think that just like
when I serve as a settlement judge, I don't have any
communications with the trial judge about the case unless I
have the parties' consent.  So I would assume she may have
communications with me, but it would be with the parties'
consent.

     And it could be something -- I would expect it would be
things like, "Judge Corley, the parties are going to -- we
weren't able to resolve this dispute.  We narrowed it.  It's
going to be presented to you in this format.  What do you think
about that?"  Maybe or not.  It's completely sort of up to all
of you and Judge Andler how to do that, but that is also
another role is when you're unable and you're still at impasse
on something, she can then help you figure out -- because we
often have a lot of discussions just how it's going to be
presented, that she can help you figure out how to present it:
Timing, page length, all those kinds of things.

     And as you know, I've signed every stipulation you've

submitted to me.  If you submit me a stip, I will sign it.  If
you come to agreement with her, I'll sign it, unless it's,
like -- it's going to be 50 pages.  Well, I might sign it, but
I probably won't read it all.

So that's sort of how I see that.  And I thought what
might be helpful now is to go through the parties' statement,
and there are a couple things I think I need to rule on but
then sort of give you examples of how I think Judge Andler may
help you address those things so that I don't have to then
rule.

And one reason why is it will be much faster that way, and
also it will be more accurate because you-all know your case
and what's going on so much better than I do, and Judge Andler
is going to know it as well because she's going to have the
privilege of spending more time with you.

So, anyway, does anyone have any just thoughts?  So that's
sort of my thoughts.  You wanted some guidance.  Those are my
thoughts.

**MR. LOESER:**  Sure.  Thank you, Your Honor.  We
appreciate the guidance.  I think it's helpful for the parties.

I will say from the plaintiffs' perspective, the requests,
and some of which you went through, were made based on the
notion that we want to make sure that Judge Andler has the
authority and the tools that are helpful and necessary to move
disputes forward because what we really don't want to have

1  happen is to end up sort of stimied at this turn or stimied at

2  that turn; and if Judge Andler simply had some other tool that

3  she could utilize to move the parties forward, that that would

4  be provided.

5      So, for example, requiring the parties to have someone

6  with authority attend, if what you're saying is that's really

7  up to Judge Andler, if that's something she wants to request,

8  she can, then I think that that's helpful.

9      Similarly, if Judge Andler finds herself in the midst --

10  and I'm sorry for speaking as if you're not there --

11         **JUDGE ANDLER:**  That's all right.

12         **MR. LOESER:**  -- obviously you are, Judge Andler -- in

13  the midst of a dispute that's highly technical, she may find it

14  useful to have someone with some technical expertise come on

15  board to help get through that dispute.

16      And so really what we're saying is if it's okay for

17  Judge Andler in her role as discovery mediator to utilize to

18  ask the parties "Please do this and please do that," and that

19  that can be brought to bear, I think that would be very helpful

20  in moving disputes past everyone's just disagreeing to actually

21  getting to resolution.

22         **THE COURT:**  Yeah.  I mean, I assume you-all, when I

23  threw out that idea, you-all actually pretty readily agreed to

24  it of a discovery mediator because you want the process to

25  work.

1    But it is a voluntary process just like private mediation.

2    It's a voluntary process, but you-all selected Judge Andler

3    because of her, because I looked, her tremendous expertise and

4    knowledge; that, you know, I assume that if she asks for

5    something, you'll do it because that's why you selected her

6    because you actually want to try to move things forward a

7    little faster and more smoothly than I'm able to help you do.

8        **MR. SNYDER:**  Thank you, Judge Corley.

9    Nice to meet you, Judge Andler.  This is Orin Snyder from

10   Gibson Dunn.

11   Lawyers always say we're delighted to have you help us

12   reach agreement on discovery disputes, but in this case it is

13   heartfelt and sincere because I can say, and Judge Corley would

14   attest, this has not been the finest moment in efficient

15   discovery process, and so we truly do welcome your involvement.

16   And our goal is to resolve every discovery dispute without

17   having to hopefully bother Judge Corley again.  She's been

18   incredibly patient, and both parties understand why she made

19   the suggestion.  This is a case that taxes the federal

20   judiciary in a way that's not fair to other litigants and other

21   parties.  So having a voluntary mediator like you is really the

22   best outcome that we can imagine here so we're looking forward

23   to it.

24   And we also agree that you should work with us to develop

25   the most flexible, efficient, fluid, fair, reasonable,

1   pragmatic approach to get us there; and so we're in your hands

2   to help us figure that out but, you know, we want to roll up

3   our sleeves and get discovery done.  It's very costly.  We have

4   a hundred people reviewing documents as we speak.  We want to

5   get to the finish line so we can get to the next stage of the

6   litigation; and with your help, we're confident that we'll do

7   that so we look forward to that.

8         **THE COURT:**  So if we can go through some of the

9   issues, and then I'll just sort of suggest where I think -- and

10  it's completely up to you guys and Judge Andler, but where she

11  might be able to assist.

12        So one of the issues is the document production.  I

13  understand that Facebook proposed a schedule I think very

14  recently.  But, again, that's something she can set up a

15  discovery mediation with the parties to sit down, and really I

16  think setting some deadlines would be very useful, and can talk

17  to you about what's realistic and how to get it done and

18  priorities and those kinds of things and hopefully work out

19  some schedule.

20        And even Facebook raised an issue of there being a lot of

21  nonresponsive hits that may also be something that she could

22  work with all the parties in coming up with something that

23  maybe reduces that that everyone's comfortable with.

24        The great thing about having a neutral that you trust --

25  right? -- is the neutral can sort of look under the hood and if

1    the neutral tells one side or the other something, you have

2    confidence in her that it's -- you don't just have to rely on

3    the other side; right?  That's the nice thing about a neutral.

4    So I'm hoping that we can work out some deadlines there so we

5    can really get that discovery completed.

6         The same thing with respect to, you know, the 30(b)(6)

7    depositions.  So what I envision is -- again, these are just

8    suggestions, I'm not ordering anything, which is, you know,

9    you'll have these regularly scheduled discovery mediations and

10   you'll have these agendas.  One is the 30(b)(6).  I think what

11   plaintiffs say and Facebook says sort of didn't meet in your

12   statement about what each side's position is; but, again, she

13   can sit there with you and help you get it out, get whatever

14   documents you want or not and if it's not, then get it

15   presented to me some way.

16        Let's see, a couple other things that I think maybe.  One

17   is the testimony -- sworn testimony and written discovery from

18   the regulatory action.  So let me ask Facebook.  With respect

19   to the transcripts that you've agreed to produce, have you

20   identified for plaintiffs who those are that you have the

21   deposition or sworn transcripts?

22        **MR. FALCONER:**  I'm not sure that we have, Your Honor,

23   but we'd be happy to.

24        **THE COURT:**  Yeah.  So I think you should do that

25   within the week as well as identify those that you're

1    witholding; right?

2          **MR. FALCONER:**  From the noncustodians?

3          **THE COURT:**  Yeah.  I mean, I don't -- I'll just tell

4    you my view, which is if they gave testimony that's relevant to

5    the issues in this case, then it would be discoverable absent

6    there being some other reason why.  It would be relevant.  And

7    I don't know -- I know it's not deliberative process privilege

8    so we already went through that before.

9          But at a minimum within a week identify who you're

10   producing when and identify who you're not producing.  And,

11   again, that can go on your agenda, and I've given you some

12   guidance with respect to that.

13         I don't know with respect to the -- yeah.

14         Then there's the issue of the letters.  And I don't

15   know -- I don't know, like, what the plaintiffs mean by

16   "discovery responses"; right?  So they've already produced the

17   documents, for example, that were produced to the FTC.  So by

18   "discovery responses," what is it that the plaintiff is

19   referring to?

20         **MS. WEAVER:**  Good morning, Your Honor.  Lesley Weaver

21   for plaintiffs.

22         We discussed this a little bit at the last hearing.

23   Instead of propounding formal written interrogatories, the FTC

24   asked questions, substantive questions, and requested in their

25   letters sworn responses; and we then -- in the last hearing you

1  told us to identify those letters and Facebook should produce

2  the responses.  So we've identified the letters, but we have

3  not received the responses.

4        **THE COURT:**  Okay.

5     All right.  And what is Facebook's position on that?

6        **MR. FALCONER:**  So we received plaintiffs' requests.

7  We don't have an exact number, but it's 100 to 200 questions

8  that they've asked for responses for.  It's taking us some time

9  to gather the responses and then assess them for the same kinds

10 of issues that we talked about at the hearing last time with

11 Your Honor.  So we are in the process of doing that and happy

12 to confer with plaintiffs once we've completed -- just once we

13 have our arms around what did they ask for, what do the

14 responses look like, how much of it is responsive or

15 nonresponsive.

16     And, again, you know, we understood the Court to say

17 "Let's get kind of a narrowed request from plaintiffs and then

18 the parties can meet and confer about what should be produced

19 and what shouldn't"; and we think that's the kind of thing that

20 we could perhaps hopefully work through with Judge Andler on

21 some of the questions go outside the bounds of the case, some

22 of them are within; you know, what's a fair kind of reasonable

23 proportional scope of production kind of balancing relevancy

24 and burden concerns.

25        **THE COURT:**  Well, I don't know that there's going to

1    be a great deal of burden if we're only talking about 100 or

2    200 questions and the answers; right?  So I don't know that

3    there's burden.

4        You had raised before confidentiality issues or things.  I

5    don't know that that applies either.  I think it might be

6    Facebook's confidentiality in which case then it can be

7    produced subject to a protective order.  So I think we need

8    something a little bit more definitive in terms of timing.

9        When did they provide you with the questions that they

10   wanted Facebook's responses to?

11       **MR. FALCONER:**  My memory is maybe it was March 22nd,

12   but I'm going by memory so don't quote me on that.

13       **THE COURT:**  Oh, all right.  Does that seem about

14   right?

15       **MS. WEAVER:**  Yes, Your Honor.

16       **THE COURT:**  Okay.  All right.  So not tremendously

17   long ago.

18       All right.  Put that on your agenda then.

19       **MR. LOESER:**  Your Honor, if I may, just very briefly,

20   as you well know, we keep having arguments about relevancy and

21   scope; and so I would just ask if with that example of these

22   letters and everything else, if Facebook is going to be

23   withholding based upon some scope or relevancy contention, that

24   they tell us what it is so that if it's problematic, we can

25   bring that to Judge Andler or to you if it is a problematic --

1          **THE COURT:**  You identified the questions, the 100 to

2    200 questions, that you want whatever Facebook's response was

3    to the FTC.  So they need to tell you "We're producing these

4    responses"; and if there's some that they're not, they have to

5    identify specifically "We're not" and for what reason.

6          **MR. LOESER:**  Okay.  Thank you.

7          **THE COURT:**  That's what you mean; right?  Yeah.  No,

8    they have to do that.

9          **MR. KO:**  Your Honor, David Ko.

10       Just to follow-up on that, does your guidance at the

11   previous hearing with respect to the related deposition

12   transcripts in which you suggested that really they should only

13   be redacting for confidentiality and privilege grounds, does

14   that same guidance apply with respect to these written

15   responses as well?

16         **THE COURT:**  Yes.  I mean, right, there's going to be a

17   protective order.  You can only use it for purposes of this

18   litigation and all those kinds of things, they can be produced

19   to that; but, yes, just like regular -- that's just what we do.

20   We don't redact for relevance.

21         **MR. KO:**  Thank you, Your Honor.

22         **THE COURT:**  All right.  I guess, let's see, another

23   issue that I think would be terrific or might be helpful for

24   you to work with Judge Andler is there's the issue as to

25   whether Facebook has responded completely to the question of

1    identifying all companies that Facebook agreed to exchange

2    information with, and there's a dispute arising out of what was

3    testified to at the 30(b)(6).

4         That, to me, seems like an issue that -- right? -- you can

5    show Judge Andler, "Here's their deposition -- here's

6    Judge Corley's ruling, here's the deposition testimony, and

7    here's sort of" -- then the parties can just say what their

8    position is and she can help you work through it; right?

9         I mean, my hope is, like with all mediators, that you take

10   to heart -- when they have a view of something, that you take

11   it to heart and your position -- you may disagree or disagree,

12   but it may help shape your position somewhat and she may have

13   compromises or things in mind and creative things.

14        Okay.  And then you agreed on all the search terms.  Thank

15   you.

16        Just so you think, Judge Andler, they don't agree on

17   anything, they do, and actually have worked quite hard.

18             **JUDGE ANDLER:**  Excellent.

19        **MR. LOESER:**  And we agreed on Judge Andler,

20   Judge Corley.

21             **THE COURT:**  And Judge Andler, yes.

22             **JUDGE ANDLER:**  Thank you.

23        **MS. WEAVER:**  In less than a year.

24        **THE COURT:**  Yeah.  That actually was pretty quick.

25        So now I'd actually like to talk to you about, unless

1    there's anything else, about the ADI documents, the app

2    developer investigation documents.

3         And sort of let me tell you what my thinking is about

4    that, and I did review the Massachusetts Supreme -- the Supreme

5    Judicial Court -- I can't remember -- the highest court of

6    Massachusetts decision; and my view is -- and also I think I

7    have the benefit, which they didn't have, at looking at some

8    documents in camera -- my view is, and this is what I'm going

9    to tell you my tentative view is, is that certainly the

10   investigation was done in anticipation of litigation, but also

11   I can't conceive of how it wouldn't have been done otherwise as

12   well; right?

13        I mean, Facebook wasn't going to let -- well, because they

14   said it.  When they said to the public and to their users

15   "We're doing this to protect you," they didn't say "But our

16   primary purpose was to protect our shareholders"; right?

17        I mean, if they were immune from liability, they still

18   would have gone and looked back even though the platform had

19   changed; right?  There are some apps that were suspended

20   because they were -- or you considered them to be bad actors or

21   concerned about that, and I think that would have been done.

22        All that's to say, though, there certainly are going to be

23   documents in there that are, A, attorney-client privilege; or,

24   B, attorney work product.  For example, if Gibson Dunn made

25   edits to requests for information or those kinds of things,

1   that's classic work product that's not going to be

2   discoverable.  Any advice that was given is not going to be

3   discoverable.

4        But in terms of the ADI team, at least from what I've

5   seen, it looks like a lot of that was just generated there

6   separate that may have then been reviewed but would have been

7   done anyway.

8        But also the way I was looking at it in looking through

9   and looking at those documents is that a lot of it I don't

10  think is relevant at all, and so what I wanted to know from

11  plaintiffs -- and this I sort of was thinking about it after

12  reading the Massachusetts case where the AG did much more

13  targeted discovery, and sort of get a sense from the plaintiffs

14  because I think this will be helpful.

15       Because I'm afraid I'm just going to rule on these 20

16  documents and then we're going to be back here with every

17  single document.  I don't think plaintiffs need every single

18  document.  There's certain information, like you say, that you

19  need and maybe it's not even going to be privilege.  There's

20  going to be other information that may be privilege and I

21  actually think you don't even need.

22       So what is it precisely that the plaintiffs need from that

23  investigation?

24       **MR. KO:**  Your Honor, this is David Ko.  I can speak to

25  that first.

1       I think to directly answer that question, what we need and

2  what we've asked for and what we've identified in our brief are

3  the facts underlying the investigation that relate to our

4  claims, and in particular which apps were in violation or in

5  potential violation of which Facebook policies and over what

6  period of time these entities were in violation of these

7  policies and the specific conduct that caused them to be in

8  violation.  And that's obviously relevant to our claims

9  regarding whether or not Facebook allowed third parties to

10  access user information and whether Facebook properly monitored

11  the disclosure of this information as they claim they did.

12      And so that really relates big picture, you know, our

13  argument that the facts underlying these communications are

14  what we're really seeking.  That really I think responds to

15  your question most directly.

16      **THE COURT:**  Right.  So you don't need to know -- you

17  don't need to know, like, when a request for information was

18  sent.  I know you've been provided responses to those so I

19  don't think I'm saying anything.  You don't even know when it

20  was sent or re-sent or when the response was received or any of

21  those kinds of things.  You want -- well, you have been

22  provided with the responses -- right? -- and the actual

23  requests that went out.

24      **MR. KO:**  Correct.

25      **THE COURT:**  And -- okay.

1      All right.  So let me hear from Facebook.  With that in

2  mind in terms of your privilege log, how does that change that

3  or does it, or maybe you already understood that?

4      **MS. KUTSCHER CLARK:**  Your Honor, it's a little bit

5  difficult because this is the first time we're hearing this

6  request.  To date we have never received an information

7  request.  We just received a request for all of the ADI

8  documents.  So I think this is definitely something we would

9  need to think about a little bit more.

10      I think what might make sense is if plaintiffs want to

11  issue a request, then we can look at it in context; but what

12  was a little bit tricky in the briefing was we were dealing

13  with a request for all of the ADI documents and then plaintiffs

14  said, "Well, give us the underlying facts," but we had never

15  received a specific request for specific facts.

16      **MR. KO:**  Your Honor, I think that's a

17  mischaracterization.  I think we've asked repeatedly about this

18  information.  You know, we've conferred about ADI, as you know,

19  for well -- almost over a year now and we presented these

20  issues to Your Honor last June.  You know, you accurately

21  ordered this privilege log to make sure that you had the proper

22  context.

23      And throughout those discussions, we have asked over and

24  over again that we obtain the actual facts underlying this

25  investigation; and if there's any doubt about this, this is

1   obviously included in our briefing.  We made it clear that

2   that's what we wanted in our briefing and, in fact, we put it

3   in our proposed order.  So I'm a bit surprised that

4   Ms. Kutscher Clark believes that this is the first time that --

5            **THE COURT:**  All right.  This is good because it's

6   giving Judge Andler a hint of why I thought a discovery

7   mediator would be useful.

8       So let me ask you this:  Do you need information, then,

9   about apps that were investigated but Facebook in the end took

10  no action against?

11           **MR. KO:**  Yeah.  That's why I was very precise in

12  saying that there could have been a potential violation.  We

13  need to know that -- we need to know the thought process, if

14  you will.  I mean, not the privileged information but to the

15  extent there was an escalation but not an enforcement, that is

16  still relevant because that relates to whether or not they're

17  actually and accurately monitoring the disclosure of this

18  information as they suggest.

19           **THE COURT:**  Okay.

20           **MS. KUTSCHER CLARK:**  Your Honor, I think we need an

21  actual discovery request.  I hear everything Mr. Ko is saying,

22  and of course we've discussed this extensively, but we do not

23  have any interrogatories asking for information like this.

24  Right now what I'm hearing is "We want all of the facts

25  underlying ADI," and that's a difficult thing to respond to.

1    So I think this needs to start with an actual request in

2    writing that we can look at and evaluate, and then we can

3    narrow it from there.  But, you know, a request for any

4    information underlying ADI or, for instance, Mr. Ko is saying

5    any violation of a Facebook policy, Facebook has a lot of

6    policies.  Some of those policies might be relevant here, some

7    of them might not be.  So I think we need to see an actual

8    request that we can evaluate.

9         **MR. SNYDER:**  Martie, can I jump in here?

10    Judge, we agree that a narrowing makes a lot of sense and

11    we're asking for a discovery request not to have form over

12    substance or to delay but to facilitate and hopefully we can

13    cut through all this because I think what you said makes

14    absolute sense.

15    For example, we've already given them the suspensions

16    list.  That, they have.  Escalations -- you know, a lot of the

17    escalations involved my firm and legal advice; some did, some

18    didn't.  So if we see -- you know, "all the facts" is very

19    vague.  We don't know what that means because we have thousands

20    of facts -- millions of facts, because we had investigators

21    looking at all myriad of things.  So as precise a request as

22    they can make, then we can hopefully cut through a lot of this

23    and give them the nonprivilege stuff that is responsive and

24    relevant.

25    I mean, we really want to get through this ADI piece, but

1   right now we're kind of shooting in the dark because all facts

2   underlying the investigation, having been involved in that

3   investigation, I don't know what that means.  I really don't.

4          **THE COURT:**  That's not what they're -- I understand

5   that.

6          So then my next question is, because you had suggested,

7   I'm prepared then to rule on the motion but Facebook had

8   said -- and, as I said, my tentative view is I don't

9   necessarily agree with the Massachusetts -- well, I think we

10  all agree about the dual purpose doctrine and what the

11  Ninth Circuit rule is with respect to that.  The Massachusetts

12  court kind of -- kind of applied the same rule.  I mean, they

13  at one point did use the same rule, and without really any

14  analysis sort of came to the conclusion that it was -- well,

15  I'm not sure what it was.  I'm not sure they were applying the

16  same rule as the Ninth Circuit.

17         So I'm prepared to issue a ruling, but I wanted to ask

18  Facebook about what they're -- I don't know what more you would

19  say, but I want to make sure it's fair because I understand --

20  it's clear that this investigation was set up with the intent

21  to make it privileged.  That's clear.  That's not dispositive,

22  but that's clear.  So given that, I do want to make sure that

23  they are able to fairly present it, and so that's why --

24         **MR. SNYDER:**  Because I would respectfully disagree

25  with the following:  I think that because when it was set up,

1    it was set up for the reason you said because we wanted to

2    assure our users that the platform, you know, was safe and had

3    been safe in the past, but it was not set up so that we can --

4    so that we can shroud it in a privilege.  It was set up -- it

5    was set up in a privilege way because we understood that to the

6    extent we have to take enforcement action, it would require,

7    you know, legal advice and the lawyers were embedded in and

8    involved in, you know, hundreds and hundreds of decisions on a

9    weekly, daily basis about escalation, about all manner of the

10   investigation.

11       So it wasn't just that lawyers were put in to make it

12   privilege.  Lawyers were embedded in.  In fact, we set up the

13   investigation because it required legal advice at every turn.

14           **THE COURT:**  That may be what you're saying.  I don't

15   know that I have seen -- I don't know that I have --

16           **MR. SNYDER:**  I can --

17           **THE COURT:**  I don't know that I've seen that.  That's

18   why I want to ask:  Is there anything else that you want to

19   present in an admissible format as opposed to the attorney --

20           **MR. SNYDER:**  Yes.  What I would like to do,

21   Your Honor, because my partner Alex Southwell was literally

22   living in Palo Alto with a number of my partners and associates

23   for weeks if not months, in the guts of this investigation,

24   again, not as a fig leaf but as lawyers practicing law and

25   advising the client, I think it would be helpful for the Court

in its determination for us to put in an affidavit where we can
outline in a nonprivilege way the extent to which legal advice
was involved at every step in the investigation.

    That might even be helpful to the plaintiffs in then
identifying what it is they want to know because, as I said,
all of the -- all -- I don't know what percentage but a
substantial number of the decisions made by the investigators
on the field were made sitting next to lawyers, texting,
e-mailing with lawyers, at every turn.  Hundreds -- I haven't
seen our privilege log, but it must be tens if not hundreds of
thousands of entries of iterative discussions between my team
and the investigators because they were living together for
months and months and months doing this investigation hand in
glove, hand in hand, shoulder to shoulder.

    **THE COURT:**  Yeah, but don't forget what the test is in
the Ninth Circuit is dual purpose and would the investigation
have occurred anyway; and it's inconceivable to me that if
Facebook had been immune from liability, that they wouldn't
have gone in and investigated the apps to see if there were any
other bad actors there.

    That's just -- that's just inconceivable to me that, of
course, they would have gone in and investigated those apps;
and, therefore, my view is that those facts discovered, the
facts, not the advice given, the facts would be discoverable.
So I'm just saying that's what my view is, but I will allow you

```
 1    to submit an affidavit.

 2         And I know before I said no affidavits, but now having

 3    looked at it all, I think that that would be a mistake --

 4              MR. SNYDER:  Thank you.

 5              THE COURT:  -- an error on my part to rule

 6    definitively on that without doing that.  And then, of course,

 7    I'll let -- but, as you said, a nonprivileged affidavit.

 8              MR. SNYDER:  Yes, Your Honor.

 9              MR. KO:  And, Your Honor, will we be allowed to

10    respond to that affidavit?

11              THE COURT:  Yes.  You're going to get to see it and

12    then you're going to get to respond.

13              MR. KO:  Because I think just to preview what -- you

14    know, Mr. Snyder, what I hear him saying is simply because of

15    the volume, that somehow this is all privilege.  But as you

16    correctly pointed out, both the dual purpose and the facts

17    underlying the investigation is what we are entitled to.

18         And it's clear -- I mean, I get -- I understand that it

19    was a massive investigation, but just the sheer fact that it

20    involved lots of communications does not take away from the

21    fact that we would be entitled to the underlying facts

22    regarding the escalation of these apps and the subsequent

23    enforcement to the extent that was done.  And so that's what we

24    are seeking and I think it's pretty clear what we would be

25    entitled to here.
```

1      **MS. WEAVER:**  Your Honor, if I can --

2      **THE COURT:**  That will shorten the privilege log if you

3    only did the sample privilege log for six apps greatly; right?

4    None of those e-mails about "Are you available for this

5    meeting?" or "Can we move it?" or "Should you change the weekly

6    report so that it has this information?"

7      **MR. SNYDER:**  No.

8      **THE COURT:**  You don't need any of that; right?  You

9    just want the facts.  You just want what's in the report.

10      **MR. LOESER:**  Your Honor, I'm going to raise my hand,

11    and I have a question about this affidavit.

12      And if the notion is that Facebook is going to submit the

13    affidavit of a lawyer, I'm wondering how that works in this

14    case.  That would appear to, then, be a witness.

15      And one of the central claims is a failure to monitor, and

16    I'm a little -- I guess I'm confused as to how a lawyer

17    testifying in this action about the work that that lawyer did,

18    some of which would be privilege, some would not, wouldn't be a

19    waiver of the attorney-client privilege or at least introduce a

20    lawyer as a witness.  And I'm just throwing that question out

21    there wondering how that works.

22      **THE COURT:**  I don't know.  This is a perfect thing I

23    think for you-all to discuss with Judge Andler; right?  So --

24    and I appreciate, Mr. Loeser, you being very candid about that.

25    Essentially you're, like, warning them, "Just because we're

1    sitting here doesn't mean if you submit some affidavit, that
2    we're not going to argue there's some waiver."  And I
3    appreciate you being transparent about that, and Facebook will
4    have to think about that -- have to think about that.

5         And of course, then, there is the issue in Massachusetts
6    the court did hold that it was work product but that, you know,
7    the fact work product was discoverable in any event.  And so
8    maybe this is a way of working through that as well and getting
9    that information.  And you could, for example, show
10   Judge Andler a lot of those documents.

11        **MS. WEAVER:**  Your Honor, and on a related note, you
12   know, to the extent that Facebook is raising as a defense in
13   this action to the negligence claims and the invasion of
14   privacy that they investigated and maintained users privacy,
15   we're entitled to discovery.  So it's akin to the waiver
16   argument but it exists whether or not they put in a declaration
17   by a lawyer.  If Facebook is going to rely on the investigation
18   as a defense, we should get discovery of it.

19        **THE COURT:**  Well, that is -- sure.  Of course.  But I
20   don't know if that's the case.  They'll have to make that
21   decision.  Yeah, they'll have to make that decision.

22        Okay.  So there we are.  I've punted everything I think
23   except that within a week Facebook has to tell you which
24   deposition transcripts they're producing and which ones they
25   are not.

```
 1          And, Judge Andler, it would be great if you were able to

 2    join us on all of these hearings.  I think that would be

 3    useful.

 4          JUDGE ANDLER:  I'd be happy to.  I just have to have

 5    notice so that my case manager can let the counsel in my

 6    arbitrations and mediations that are scheduled through 2022

 7    know that we will have a later start in those sessions.  So it

 8    will be pretty easy for Matt to do that.  So if counsel just

 9    give enough notice, I'm happy to do that.

10          THE COURT:  And we'll be by video.

11          JUDGE ANDLER:  Great.

12          THE COURT:  For as long as the Administrative Office

13    of the U.S. Courts allow us to be by video, we will be by

14    video.

15          JUDGE ANDLER:  Thank you.

16          THE COURT:  So I'm hoping that will be permanent.

17          JUDGE ANDLER:  Thank you.

18          THE COURT:  So why --

19          MR. LOESER:  A lot of people agree with you,

20    Your Honor.

21          THE COURT:  Yeah.  No, I know.  Yeah.  I have a lot of

22    these cases right now that I'm managing that have attorneys

23    from all across the country and it just makes so much sense,

24    unless you're an airline.

25          So shall we meet again in, say, three weeks you think?
```

1              **MR. SNYDER:**  Sounds good.

2              **THE COURT:**  Yeah.  How about April 27th?  And is

3    8:30 better?

4        Let me ask Judge Andler.  We can start earlier at 8:30 if

5    that's better.

6              **JUDGE ANDLER:**  That's usually much better for me if

7    it's not inconvenient for counsel and the Court.

8              **THE COURT:**  I think we've done that.  Why don't we do

9    April 27th, then, at 8:30 a.m.  And I expect between now and

10   then you will meet and mediate your little cases.

11       All right.  Great.  Thanks, everyone.  I hope you have a

12   vaccine plan if you don't already have a vaccine.  Soon it will

13   be open to everyone.

14             **ALL:**  Thank you, Your Honor.

15             **JUDGE ANDLER:**  Thank you, Counsel, and we will be in

16   touch so we can set something up.

17                  (Proceedings adjourned at 9:37 a.m.)

18                           ---oOo---

19

20

21

22

23

24

25

1

2

3                        **CERTIFICATE OF REPORTER**

4              I certify that the foregoing is a correct transcript

5      from the record of proceedings in the above-entitled matter.

6

7      DATE:   Wednesday, April 7, 2021

8

9

10

11      _____

12           Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                       U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25