# EXHIBIT 2

# FB EXHIBIT A
# TO THE JULY 2, 2021 JOINT LETTER RE: ADI

Confidential Under Protective Order

*In re Facebook*
**Facebook's Proposed Protocol to Resolve ADI Privilege Dispute**

**I.     Background**

The purpose of this document is to outline Facebook's proposal for resolving through a negotiated agreement the Parties' privilege dispute with respect to Facebook's App Developer Investigation ("ADI"). Facebook provides a brief background here for context but does not attempt to repeat the lengthy history of this dispute or the Parties' positions.

Plaintiffs served discovery requests that seek documents and information from ADI. Specifically, Plaintiffs' RFP 19 requests: "All Documents supporting the escalation of those Apps escalated to Phase Two of ADI for Enhanced Examination and/or Phase Three of ADI for Enforcement." Plaintiffs have also taken the position that they seek all documents from, about, or related to ADI through their RFP 32, which requests: "All Documents Concerning Misuse of Data, including investigations, examinations, inquiries, or audits—or Communications regarding such investigations, examinations, inquiries, or audits—regarding Misuse of Data prior to the deprecation of Graph API v.1.0."

Facebook maintains that ADI was a privileged investigation and that most ADI materials are subject to the attorney-client privilege and work-product protections.[1] Notwithstanding its claim of privilege, Facebook has produced non-privileged materials from ADI. These include:

1. A list of the apps suspended by the investigation.
2. Communications with the investigated apps/developers, including:
    a. Requests for information sent to app developers;
    b. Developers' responses to requests for information and the information provided;
    c. Follow-up requests for information sent to app developers;
    d. Developers' responses to follow-up requests for information and the information provided;
    e. Requests for interviews sent to app developers;
    f. Responses from developers regarding interviews and setting up interviews;
    g. Requests for audits sent to app developers;
    h. Responses from developers regarding audits and setting up audits;
    i. Requests for data deletion certifications;
    j. Responses from developers regarding data deletion certifications and the certifications themselves;
    k. Questions regarding the Investigation from developers;
    l. Responses to questions from developers regarding the Investigation;
    m. Questions regarding requests for information from developers;
    n. Responses to questions from developers regarding requests for information;
    o. Requests from developers for extensions of time to respond and responses to those requests;
    p. Communications to developers regarding late responses;
    q. Warnings to developers that they *may* be suspended for failure to respond;
    r. Warnings to developers indicating that they will be suspended, and why;
    s. Communications to developers suspending them, and why;
    t. Requests from developers for reinstatement of their apps;
    u. Responses to developers regarding the terms of reinstatement;

---

[1]     Facebook has raised a number of other objections to these requests, including (but not limited to) relevance objections.

Confidential Under Protective Order

      v.    Responses from developers with information requested for reinstatement.

Facebook separately agreed to produce, and is continuing to produce on an ongoing basis, materials related to Facebook's regular Platform enforcement efforts.

The parties previously designed an ADI sampling protocol in an effort to resolve or narrow their ADI privilege dispute, under which Facebook reviewed ADI documents related to six exemplar apps to which the Parties agreed. *See* Dkt. 518, 518-A. Facebook then produced non-privileged materials relating to those apps and logged privileged documents. After Plaintiffs challenged all entries on Facebook's privilege logs that did not include the names of attorneys, Judge Corley allowed Plaintiffs to identify 20 entries for briefing. Dkt. 602 ¶ A.

After reviewing the Parties' briefing, Judge Corley indicated at a discovery hearing that any ruling she could provide on the 20 entries the Parties briefed likely would not resolve the parties' dispute: "I'm afraid I'm just going to rule on these 20 documents and then we're going to be back here with every single document. I don't think Plaintiffs need every single document. There's certain information, like you say, that you need and maybe it's not even going to be privilege[d]. There's going to be other information that may be privileged and I actually think you don't even need." 04/06/2021 Trans. at 17:15-21. The Court asked: "So what is it precisely that the plaintiffs need from that investigation?" *Id*. at 17:22-23. Plaintiffs responded that they need "the facts underlying the investigation that relate to [their] claims." *Id*. at 18:1-4.

## II.     Mediation

The parties agreed to endeavor to resolve their ADI privilege dispute through mediation. *See* Dkt. 662 ¶ 3.

Although Plaintiffs' discovery requests do not specifically request this information, Plaintiffs have clarified that the underlying facts they seek from ADI are certain data points about apps that were suspended as a result of ADI and were not suspended purely for non-responsiveness/non-cooperation with the investigation. In response, on May 5, 2021, Facebook provided Plaintiffs a version of the ADI suspensions list it produced to Plaintiffs previously that removed apps that were suspended purely for non-responsiveness/non-cooperation with ADI. ███████████████ .

Plaintiffs then requested 9 data points ██████████████ . Facebook analyzed the requested data-points and concluded that it would be able and willing to provide certain information as part of a negotiated protocol to resolve the ADI dispute. It also concluded that much of the specific information requested is information Facebook does not maintain, that would be extraordinarily burdensome for Facebook to locate for thousands of apps, or that is categorically privileged. To that end, Facebook identified similar information that it can provide Plaintiffs.

## III.    Proposal

Facebook proposes that the parties resolve their ADI privilege dispute under the following terms:

    1. For each of ███████████████████ Facebook will provide the following data-points.[2]

---

[2] Due to product changes, some data fields are only available as of April 28, 2019. Due to product changes, technical issues, and data access limitations, there may be other important caveats about these data fields.

Confidential Under Protective Order

      a. **App ID**:  Each App's unique app identifier.

      b. **App Name**:  The name of each app.

      c. **App Creation Date**:  The date on which the app was created on the Facebook Platform.[3]

      d. **Ever Installed Users**:  The number of Facebook users that have ever installed the app on Facebook as of April 28, 2019.[4]

      e. **Developer(s)**:  A list of all developer accounts, including user name and user ID, associated with the app, which includes users listed as having the following roles: administrator, creator, developer, and disabled.[5]

      f. **Business(es)**:  A list of all businesses identified as being an "Owner" of the app in Facebook's records as of April 28, 2019.  This is a data field the developer has the option of including.[6]

      g. **API Call Information**:

          i. A list of the API call permissions granted for each app by users.  This is a list reflecting both historical permissions that were deprecated as of April 28, 2019, and extant permissions that have not been overwritten.

          ii. The total number of users that granted the app each permission to access data through the API as of April 28, 2019.[7]

2. Upon a showing of good cause to the mediators, Plaintiffs may request additional information for up to 20 apps, which Facebook will consider providing, to the extent it is reasonably available, relevant to a live claim or defense, and not privileged and/or subject to the work-product protection.

3. Facebook will identify all apps Facebook suspended, banned, or otherwise took enforcement action against through ADI for misuse of user data.

---

[3]  App Creation Date is not necessarily the same date the app was released to the public.  Once an app is created, developers must link to the app, integrate the app into another service already made available to users, or otherwise publicize the app, for the public to use it.  The developer decides when to first release the app to the public, and Facebook does not have this information.  In addition, there may be a delay between an app's creation date and when it is publicly released.  Some developers, for example, will test and change an app before making it available to the public.  Also note, some apps are created but never released to the public.

[4]  This number tends to be under-inclusive for various reasons.  For example, when a Facebook user uninstalled an app prior to October 15, 2013, the history of that user having installed the app was likewise deleted by Facebook.  In addition, when a Facebook user deletes their account, data associated with that account is deleted by Facebook, including app installation records.

[5]  For deleted developer accounts, only the user ID is available.

[6]  Lack of an associated business ID does not indicate that the app was/is not affiliated with a business.

[7]  The number of users that granted specific permissions may be under-inclusive, for various reasons.  For example, when a Facebook user uninstalls an app, records of the permissions granted by the user are deleted.  In addition, when a Facebook user deletes their account, data associated with that account is deleted by Facebook, including app installation records.

Confidential Under Protective Order

4. The parties will enter a Rule 502(d) stipulation confirming that Facebook's agreement to provide this information does not constitute a waiver of its claim of privilege or the work-product protection.

5. The agreement will resolve all disputes and satisfy all demands with respect to ADI materials, including, but not limited to, the parties' privilege dispute with respect to materials from or related to ADI.

6. The agreement will be subject to mediation confidentiality, except for the fact that the parties have reached an agreement in mediation to fully and finally resolve their ADI privilege dispute, subject to a Rule 502(d) stipulation.