**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DECLARATION OF ALEXANDER H. SOUTHWELL IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF REGARDING ADI PRIVILEGE DISPUTE** |

Gibson, Dunn & Crutcher LLP

Southwell Declaration In Support Of Facebook's Position in the Parties' July 2, 2021 Letter Brief
Case No. 3:18-MD-02843-VC

I, Alexander H. Southwell, hereby declare as follows:

1. I am an attorney licensed to practice law in the State of New York. I am a partner with the law firm of Gibson, Dunn & Crutcher LLP. I submit this declaration in support of Facebook's position in the parties' July 2, 2021 letter brief regarding their ADI privilege dispute (Dkt. 699). This declaration is submitted pursuant to the Court's instructions in its July 26, 2021 Order (Dkt. 711) and to provide the facts necessary for the Court to consider Facebook's claim of privilege. Nothing contained herein should be construed as a waiver of any protection from disclosure, including without limitation the attorney-client communication privilege and work product doctrine and Facebook reserves all such rights and protections. I make this declaration based on my own knowledge, and I would testify to the matters stated herein under oath if called upon to do so.

## The App Developer Investigation

2. Facebook initiated the Application Developer Investigation ("ADI" or the "Investigation") because, in the wake of the reporting of data misuse by Cambridge Analytica in March 2018, Facebook anticipated that it would have to respond to known and expected legal challenges in connection with applications and developers that may have had access to certain data because they were active before Facebook placed additional, significant limitations on the amount and type of data developers could request from users through the Facebook Platform in 2014.

3. Facebook retained outside counsel (Gibson, Dunn & Crutcher LLP) experienced with cybersecurity and data privacy internal investigations to design and direct a new investigation that could, among other things, gather the facts necessary for providing legal advice to Facebook about litigation, compliance, regulatory inquiries, and other legal risks facing the company resulting from potential data misuse and activities by third-party app developers operating on the prior version of Facebook's platform.

4. I led the Gibson Dunn team engaged to develop and conduct the Investigation. I am a former federal prosecutor and have more than two decades of experience with large-scale, corporate investigations, including fluency in privilege law and its application to conducting internal

Gibson, Dunn & Crutcher LLP

1

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

investigations, as well as technology, data privacy, and cybersecurity investigations, which I brought to bear in leading the ADI.

5. As described in the Declaration of Stacy Chen, attached as Exhibit A, a legal-led investigation is not Facebook's usual response when the company determines that violations of its Platform policies may have occurred. Unlike in the typical case, an attorney-led investigation was necessary here because the internal Facebook teams that address potential Platform policy violations neither had the capacity nor were they set up to: (i) address the company's legal risks with respect to the historical Platform; (ii) address compliance risks with applicable laws regarding the historical Platform; or (iii) assess Facebook's position in pending or anticipated litigation or regulatory inquiries. Moreover, given the historical focus of the investigation's inquiry, significant investigation was required to develop the framework and baseline data that would form the foundation of the investigation. Unlike Facebook's other enforcement efforts, the ADI is in essence an historical investigation to try to identify any misuse of data in violation of Facebook's policies and associated legal liabilities, in connection with the first version of the Platform.

6. As Ms. Chen explained, in setting up the legally-driven ADI, Facebook anticipated that it would have to respond to known and expected legal challenges in connection with apps and developers that may have had access to certain data because they were active before Facebook placed additional, significant limitations on the amount and type of data developers could request from users through the Facebook Platform in 2014. From the outset, the company contemplated a review of potentially millions of apps that would inform the company's legal strategy.

7. Facebook anticipated such legal challenges in part because the extensive media attention surrounding the Cambridge Analytica events almost immediately triggered litigation and regulatory inquiries, including, for example:

- legal matters related to apps and developers that, like Dr. Aleksandr Kogan and his App, thisisyourdigitallife, may have misused information from the time period before Facebook placed additional limitations on developers;
- legal matters involving Facebook and its directors and officers alleging, *inter alia*, violations of the U.S. securities laws and breach of fiduciary duties;

Gibson, Dunn & Crutcher LLP

- legal matters alleging, *inter alia*, violations of consumer protection statutes and common law claims for breach of contract and fraud; and
- investigations and potential enforcement actions against the company at both the state and federal levels and from international regulators.

8. Exhibit A of the Chen Declaration includes a list of all pending domestic and international litigation relating to the Cambridge Analytica events and the misuse of user data by third-party apps as of October 2019, when the declaration was executed. This multitude of threatened and pending litigation was and is the backdrop of the ADI and, as such, has been the primary driving force behind the decisions made by Gibson Dunn and Facebook counsel throughout the ADI process.

9. I led our Gibson Dunn team, and we worked with Facebook's in-house attorneys and members of Facebook's Partnerships, Data Policy, and DevOps teams on the ADI. I and my team at Gibson Dunn also led the recruitment and retention of technical experts and investigators for the ADI, including two leading forensic consulting firms with expertise in assisting with technology-focused internal investigations. These firms operated as an extension of the Gibson Dunn team to support our provision of legal advice to Facebook, and the investigators worked under the direction of Gibson Dunn and Facebook Legal. The "ADI team," as used herein, is comprised of Gibson Dunn lawyers and paralegals, our experts from the two leading forensic consulting firms, and Facebook in-house counsel and internal partners including subject matter experts, all of whom operated at the direction of counsel. At its largest, the ADI team consisted of over 300 members. Gibson Dunn's confidential engagement letters with the two leading forensic consulting firms are attached, and filed under seal, as Exhibits B, C and D.

10. Gibson Dunn and in-house counsel needed to partner with the outside expert consulting firms and Facebook personnel to effectively advise Facebook of legal risk. The ADI team worked at the direction of counsel, relied on counsel's input and guidance, and played a necessary role in facilitating legal advice by counsel and implementing that advice by the company. The ADI was an iterative process through which ADI team members, including counsel and subject matter experts, were able to learn as the investigation progressed. As such, documents initially drafted by members of the ADI team were generally prepared by or at the direction of counsel, and counsel

3
Southwell Declaration In Support Of Facebook's Position in the Parties' July 2, 2021 Letter Brief
Case No. 3:18-MD-02843-VC

Gibson, Dunn & Crutcher LLP

edited or otherwise helped shape their contents to ensure they were serving the legal purpose for which they were created.

11. Gibson Dunn and in-house counsel took steps to ensure that communications by and among the ADI team remained confidential and privileged, including by instructing the team to limit communications about ADI and access to investigatory documents to only employees, consultants, and counsel who needed access to them for purpose of facilitating legal advice. In addition, materials created in the course of the ADI were stored securely, with access limited to those necessary to the investigation.

12. The three investigative steps of the ADI are laid out in the Chen Declaration at paragraphs 11-20.

**Plaintiffs' Requests for Documents**

13. I understand that Plaintiffs have sought certain categories of documents and information about ADI. Because Facebook has received multiple articulations of these requests, *see* Exhibit E, I address the requests as articulated in the July 26, 2021 Order issued by Judge Jacqueline Scott Corley [Dkt. No. 711] (the "Order").

14. As described by the Court's order, the first category of documents Plaintiffs seek are those "documents (not created by lawyers) from the 'Enhanced Examination phase' that involve background and technical investigations to identify the potential for data misuse." Order at 2 (citing Dkt. No. 699 at 5). Although this category is not entirely clear, as I understand it, this request seeks all ADI-related documents and communications generated by a non-attorney in connection with any app specifically examined by one or more background or technical investigation reports.

15. As described by the Court's order, the second category of documents Plaintiffs seek are those "documents from the 'Enforcement phase,' including Facebook conducted audits and interviews." Order at 2 (citing Dkt. No. 699 at 5). Although this request is also not entirely clear, I understand it to seek all documents and communications regarding potential and actual enforcement against apps or developers, including audits and interviews, regardless of whether such documents and communications were actually conveyed to third parties and regardless of author.

4

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

Gibson, Dunn & Crutcher LLP

**The Enhanced Examination Phase**

16. In the Enhanced Examination phase, apps were selected for further review by counsel through proprietary risk-based approaches based on counsel's assessment of where and how the greatest legal risk to the company might arise to provide legal advice to Facebook regarding potential risks and active and potential litigation.

17. Once an app or developer had been identified for further review based on criteria that my team had devised, Gibson Dunn and in-house counsel directed our forensic consultants to conduct intensive background and technical investigations, collect and compile specific evidence that counsel believed particularly salient to their legal analyses, and report their findings to counsel (*i.e.*, the Enhanced Examination process). A report for a single developer could include extensive technical and other details and these reports were specifically tailored by counsel, in substance and format, so that counsel could evaluate the potential for data misuse and associated legal risks. Reports varied tremendously based on counsel's instructions and what counsel determined was needed to provide legal advice and many were hundreds of pages long.

18. Enhanced Examination also included application of a proprietary model (called the Risk-Prioritization Formula) developed under the guidance and with the advice of counsel that assisted in assessing the risks related to access to data, and the associated legal risks to Facebook, based in part on the permissions granted to apps and the number of users that authorized specific permissions. The Risk-Prioritization Formula was used exclusively in the ADI to prioritize apps for review during the Enhanced Examination phase.

19. Facebook has already produced tens of thousands of pages of communications with developers regarding apps that were reviewed in the ADI through December 2019 because these communications with third parties are not privileged, regardless of whether the communications were created by lawyers or non-lawyers. From these communications, Plaintiffs know the app names, app IDs, and contact information for the developers associated with many of the apps that the ADI team assessed through the Enhanced Examination phase.

20. Beyond those communications with external developers, there are numerous communications and documents created at the direction of counsel to assist counsel in the provision

5

Southwell Declaration In Support Of Facebook's Position in the Parties' July 2, 2021 Letter Brief
Case No. 3:18-MD-02843-VC

Gibson, Dunn &
Crutcher LLP

of legal advice and that contain or reveal the mental impressions and advice of counsel. Facebook has not produced these documents because they are privileged. As noted above, Gibson Dunn worked directly with the rest of the ADI team to design ADI-specific investigation reports to contain information relevant to counsel's evaluation of the potential for data misuse and associated legal risk.

a. **Background reports**. Counsel designed the background reports to capture information counsel deemed relevant to assessing the risk of data misuse and legal risk to Facebook. These reports varied in content depending on the particulars of the investigation, as directed by counsel. For example, Gibson Dunn and Facebook's in-house legal team often sought different information from different types of developers (e.g., corporate vs. individual), when providing legal advice.

b. **Technical reports**. Counsel devoted substantial time with the rest of the ADI team, to work through the technical information available about apps and developers on Facebook's platform, understand the significance of that data, and weigh the value of various technical details to our legal risk analysis. With our ADI consulting experts, we identified which details were most relevant to our legal risk analysis for inclusion in the reports. When we needed a more nuanced understanding about the data to render our legal advice to Facebook, working with our technical experts, we designed proprietary analytics (that had not before existed at Facebook and were used exclusively in ADI) in order to score, rank, and better understand the available data. Because our counsel team consistently had questions about certain data points to assist in the rendering of legal advice, over time, those questions were built into the structure of the reports, so that counsel would have the answer at their fingertips to streamline their legal decision-making process.

c. To facilitate our attorney review at scale, we instructed the ADI team regarding the criteria and information that were important to us in rendering our opinion on legal risk, and requested that they, based on these attorney-selected criteria, include preliminary recommendations in their reports to facilitate Gibson Dunn's legal advice about the risk of data misuse.

Gibson, Dunn & Crutcher LLP

6

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

d. In connection with preparation and review of the background and technical investigation reports, there were extensive internal communications with counsel and at the direction of counsel regarding apps or developers in the Enhanced Examination phase between and among both attorney and non-attorney members of the ADI team, all of whom worked together to obtain the information required by Gibson Dunn for the provision of legal advice to Facebook. Such communications were sent for the purpose of analyzing the legal risk posed by an app or developer, including whether such legal risk warranted further investigation or enforcement.

21. Although counsel may not have drafted each of these documents directly, the documents created as part of the Enhanced Examination phase were created at the direction of counsel, reflect attorney advice and mental impressions regarding the evidence counsel deemed important in rendering legal advice, and were directly used by counsel to provide legal advice to Facebook.

### The Enforcement Phase of the ADI

22. The "Enforcement phase" refers to the final phase of ADI, in which counsel reviewed the results of the investigations prepared at our direction (as explained in paras. 16-21, *supra*), recommended next steps to Facebook in-house counsel for approval, and drafted requests for information or other follow-up sent to developers. If we determined that an information request response was inadequate, we may have attempted various additional methods of engagement with the developer, including conducting interviews or requesting audits of data security or storage infrastructure.

23. In consultation with the rest of the ADI team, the Gibson Dunn team also determined on a case-by-case basis if any additional enforcement action was appropriate, such as suspending the developer and/or the app. We made recommendations about whether Facebook should take legal steps, including sending cease and desist letters, or engaging in litigation against developers.

24. As previously noted, Plaintiffs already have tens of thousands of pages of communications with developers, many of which refer or relate to the Enforcement phase, including

Gibson, Dunn & Crutcher LLP

7

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

audits and interviews specifically, because these communications with third parties are not privileged. These include the RFIs Facebook sent developers and their responses.

25. Beyond the external documents, there are a large volume of internal ADI documents, related to the "Enforcement phase" of ADI. These documents were created by or at the direction of counsel to facilitate legal advice, and they contain or reveal the mental impressions and advice of counsel related to enforcement options.

a. **Written Memoranda and Recommendations**. Following our review of the materials created during the Enhanced Examination phase, Gibson Dunn drafted individualized recommendations containing advice and legal analysis for Facebook in-house counsel regarding whether to pursue various enforcement methods—including interviews and audits as well as litigation—and why. Our recommendations often highlighted the information and open questions most relevant to our team's legal analysis of the risk of data misuse in detail, and offered a recommended method of either pursuing further engagement to address our concerns or taking legal measures, as discussed above. Our recommendations also may have weighed various, competing options for enforcement, along with the strengths and weaknesses of each.

b. **Draft Internal Documents**. In connection with these recommendations, my team at Gibson Dunn worked with the other internal and external ADI team members to draft other documents that would guide further engagement or legal action. For example, when assisting counsel to evaluate the potential for further enforcement and associated legal risk, the ADI team frequently prepared memoranda analyzing the adequacy or implication of developer responses to prior enforcement actions and created other internal documents in support of such analysis, like notes and impressions from conversations or other interactions with developers. At the direction of counsel, the ADI team also often iterated on the content of potential follow-up communications to developers, the precise points to cover in a potential interview, or allegations that would be stated in a complaint. This work was conducted to provide legal advice to Facebook.

Gibson, Dunn & Crutcher LLP

8

Southwell Declaration In Support Of Facebook's Position in the Parties' July 2, 2021 Letter Brief
Case No. 3:18-MD-02843-VC

    c. In connection with the drafting of these documents and the provision of the legal advice contained therein, there were extensive internal communications at the direction of counsel among and between both attorney and non-attorney members of the ADI team, all of whom worked together for Gibson Dunn to provide legal advice to Facebook. These communications were often sent for the purpose of discussing these recommendations, and draft internal documents composed in connection with those recommendations, like draft complaints and interview outlines, were all necessary for the provision of legal advice.

26. I am aware that at various times the Plaintiffs have emphasized to the Court that they seek "the facts underlying the investigation," April 6. Hearing Tr. 18:3 [Dkt. No. 657], and "not legal advice," Order at 2 (citing *id.*). Indeed, at mediation sessions in which I participated over the course of four months, Plaintiffs suggested that Facebook could satisfy their requests for "facts underlying the investigation" by producing specific data points Plaintiffs sought about certain apps addressed through ADI. Facebook offered to produce data for a list of apps already requested by and produced to Plaintiffs, as well as other information, subject to a non-waiver agreement. At the final mediation on this issue, Plaintiffs presented a materially different request that also sought large volumes of internal ADI emails and documents. *See* Dkt. 699-2. Facebook continues to be willing to provide the data it previously offered to provide Plaintiffs so long as producing that information will not be construed to waive Facebook's claim of privilege or the work-product protection with respect to ADI.

27. Attached as Exhibit E is a document laying out three steps that would need to occur for Facebook to execute any order requiring Facebook, over its objection, to comply with Plaintiffs' additional ADI requests. As noted above and in Exhibit E, the scope of Plaintiffs' requests is not clear, and may reach many millions of documents. To the extent Plaintiffs seek underlying information about apps relevant to their claims (as Plaintiffs repeatedly indicated they sought throughout the parties' mediations), it remains far more efficient for Facebook to produce that factual information directly in response to an appropriately scoped discovery request than it would be to collect and review millions of pieces of ADI-related communications and documents to determine if they contain any factual information that can somehow be extracted from the accompanying

Gibson, Dunn & Crutcher LLP

9

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

privileged discussions—an exercise that would be extremely burdensome and would likely take many months (if not more) to complete.

*   *   *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 2, 2021 in New York, New York.

_____
Alexander H. Southwell

Gibson, Dunn & Crutcher LLP

10

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC