# EXHIBIT A

29

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
NO. 1984CV02597-BLS-1

| | |
|---|---|
| ATTORNEY GENERAL MAURA HEALEY | |
| Petitioner, | |
| v. | |
| FACEBOOK, INC., | |
| Respondent. | |

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

2019 OCT -1 P 3: 11

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE

### DECLARATION OF STACY CHEN IN SUPPORT OF RESPONDENT'S OPPOSITION TO THE ATTORNEY GENERAL'S PETITION

I, Stacy Chen, hereby attest to the following facts based on my personal knowledge and on information gathered under my supervision and direction. If sworn as a witness to testify in this matter, I would testify to the facts set forth herein.

1. I am Associate General Counsel at Facebook, Inc., and a member of Facebook's Platform Litigation Enforcement team. I have served in this capacity since April 2018. In this capacity, I have overseen the App Developer Investigation with a core investigative team that I lead at the company. I have worked at Facebook since December 2014.

### Background and The App Developer Investigation

2. In November 2013, a Cambridge University researcher named Aleksandr Kogan created a personality app (the "App") on the Facebook Platform. In December 2015, news outlets reported that Dr. Kogan violated Facebook's Platform Policies by sharing and selling data collected through the App with others, including Cambridge Analytica and Christopher Wylie of Eunoia Technologies, Inc. When Facebook learned of this

1

violation in 2015, Facebook removed the App from Facebook and demanded certifications from Kogan and all parties to whom he had given data that the information had been destroyed.  Cambridge Analytica, Kogan, and Wylie all certified that they had destroyed the data.

3.  In March 2018, the New York Times and the Guardian of London reported that the data collected and shared by Dr. Kogan in violation of Facebook's policies may not have actually been deleted.  These reports triggered extensive media attention surrounding the Cambridge Analytica events and almost immediately triggered litigation and regulatory inquiries, including, for example:

- legal matters related to apps and developers that, like Dr. Kogan and his App, may have misused information from the time period before Facebook placed additional, significant limitations on the amount and type of data developers could request from users through the Facebook Platform;

- legal matters involving Facebook and its directors and officers alleging, *inter alia*, violations of the U.S. securities laws and breach of fiduciary duties;

- legal matters alleging, *inter alia*, violations of consumer protection statutes and common law claims for breach of contract and fraud; and

- investigations and potential enforcement actions against the company at both the state and federal levels and from international regulators.

4.  Facebook anticipated that it would have to respond to known and expected legal challenges in connection with apps and developers that, like Dr. Kogan and his App, may have had access to large amounts of user data because they were active before Facebook placed additional, significant limitations on the amount and type of data developers could

request from users through the Facebook Platform in 2014. Further, light of the nature of the inquiries and matters described above, Facebook determined that an attorney-led investigation was necessary to evaluate the legal risks associated with third-party developer access to and use of data prior to the changes implemented by the company in 2014. From the outset, the company contemplated a review of potentially millions of apps that would inform the company's legal strategy.

5. For context, a legal-led investigation is not Facebook's typical response when the company determines that violations of its Platform policies may have occurred. Rather, the Developer Operations ("DevOps") team, along with the policy team managing Facebook's Platform Policy, have historically been the front lines to address potential violations of Platform policies and subsequent enforcement efforts. Escalations regarding non-cooperative developers could be escalated by legal should a cease and desist letter or more aggressive legal enforcement be warranted. The DevOps team is a team internal to Facebook that operates under the direction of Facebook employees. Unlike in the typical case, however, an attorney-led investigation was necessary here because, though they had investigative personnel, DevOps and the Platform Policy team neither had the capacity nor were they set up to: (i) address the company's legal risks with respect to the historical Platform; (ii) address compliance risks with applicable laws regarding the historical Platform; or (iii) assess Facebook's position in pending or anticipated litigation or regulatory inquiries. Moreover, given the historical focus of the investigation's inquiry, significant investigation was required to develop the framework and baseline data that would form the foundation of the investigation.

6. At Facebook management's request, Facebook's in-house legal team retained outside counsel (Gibson Dunn & Crutcher LLP) experienced with cybersecurity and data privacy internal investigations to design and direct a new investigation that could, among other things, gather the facts necessary for providing legal advice to Facebook about litigation, compliance, regulatory inquiries, and other legal risks facing the company resulting from potential data misuse and activities by third-party app developers operating on the prior version of the Platform.  Facebook in-house attorneys including myself, along with a core investigative team including members of the Partnerships, Data Policy, and DevOps teams, collaborated with Gibson Dunn to build out what became more formally known as the "App Developer Investigation," or the "ADI."

7. Unlike Facebook's other enforcement efforts, the ADI is in essence a historical investigation to determine whether there has been misuse of data in violation of Facebook's policies and associated legal liabilities, in connection with the first version of the Platform.

8. From the beginning, Gibson Dunn and Facebook's in-house counsel have designed, managed, and overseen all stages of the ADI, with the input of subject matter experts across the company.  The ADI was developed distinctly from the processes and investigative methodologies previously used to assess third parties' compliance with Facebook policies.  ADI's mandates include assessing the legal risks to Facebook of data misuse by conducting a legally-driven and scaled lookback analysis of apps that had access to large amounts of user data before the 2014 Platform changes, and providing legal advice to Facebook about litigation, regulatory inquiries, and other legal risks facing the company resulting from potential data misuse from earlier versions of the platform.

There is no industry standard for how to conduct such an investigation.  Rather, under Gibson Dunn's and in-house counsel's leadership, the ADI investigative team devised and tailored the ADI's methods, protocols, and strategies to address the specific risks posed by these legal challenges.

9. Gibson Dunn led the recruitment and retention of technical experts and investigators, including two leading forensic consulting firms with expertise in assisting with technology-focused internal investigations, for the ADI.  The scope of engagement for each of these consulting firms was to operate as an extension of Facebook counsel and support counsel's provision of legal advice.  Together, these teams developed an investigative framework that reflected counsel's assessment of risky app and developer profiles, how Facebook should prioritize its review, and when Facebook should pursue further enforcement action, including litigation.

10. Gibson Dunn and in-house counsel have taken steps to ensure that communications by and among the ADI investigatory team remain confidential and privileged, including by instructing the team to limit communications about ADI and access to investigatory documents to only employees, consultants, and counsel who needed access to them.  In addition, materials created in the course of the ADI are stored securely, with access limited to those necessary to the investigation.

11. Gibson Dunn and in-house counsel, with the assistance of the expert investigative consultants, developed a process that involved three investigative phases: (1) Detection and Identification; (2) Enhanced Examination; and (3) Enforcement.

12. Phase One: Detection and Identification.  At the direction of Gibson Dunn and in-house counsel, the ADI investigatory team (consisting of the Gibson Dunn team, Facebook

5

employees, and the forensic consultants retained for ADI), worked to develop, test, and refine methodologies and selection criteria to identify apps posing legal risk that would warrant escalation for further investigation.  Based on this information, the team developed four risk-based approaches to conduct the investigation based on an assessment of where and how the greatest legal risk to the company might arise. Identification by one of these methods only meant that an app warranted further inquiry, not necessarily that the app misused data.

13. The first risk-assessment methodology designed by counsel is the **User Impact Method**, in which counsel prioritized individual apps for review based on their having a large number of users, which would suggest a larger user impact should data misuse be found. Importantly, however, this method did not only focus on apps with the largest overall number of users; it also focused on apps with permissions to access a certain volume and type of sensitive data—thresholds which counsel developed with input from internal subject matter experts at Facebook.

14. The second risk-assessment methodology designed by counsel is the **Categorical Method**.  This methodology was developed by counsel working with the forensic consultants and internal experts.  Through this methodology, categories of apps and developers believed to present elevated risk of potential policy violations (and accordingly, greater legal risks) were developed.

15. The third risk-assessment methodology designed by counsel is the **Escalations Method**. Under this methodology, counsel worked to identify the types of ad-hoc escalations that merited further investigation by the ADI team (as compared with a different Facebook

6

team), recognizing the legal risk associated with apps flagged throughout the company through various ad hoc methods.

16. The fourth risk-assessment methodology is the **Low-Impact Method.** Counsel, assisted by the forensic consultants, developed a risk-based, data-driven approach to deprioritize apps for review that did not pose as much legal risk as others. This included methodologies for identifying apps that neither obtained access to large amounts of user data nor held sensitive permissions for a significant number of users.

17. <u>Phase Two: Enhanced Examination.</u> Under Enhanced Examination, after an app or developer has been identified for further review based on the criteria outlined above, counsel directs the ADI forensic team to conduct intensive background and technical investigations, and the ADI forensic team reports their findings to counsel. A report for a single developer can include extensive technical and other details and are specifically tailored, in substance and format, for outside counsel to evaluate the potential for data misuse. Some reports may cover a single app; others may cover many apps of a single developer.

18. Enhanced Examination may also include application of a model (called the Risk-Prioritization Formula) developed under the guidance of counsel that assists in assessing the data-access risk based in part on the permissions granted to apps and the number of users that authorized specific permissions. The Risk-Prioritization Formula is used to prioritize apps for review during the Enhanced Examination phase.

19. <u>Phase Three: Enforcement.</u> In the final phase of ADI, outside counsel review the results of these investigations, recommend next steps to Facebook in-house counsel for approval, and draft requests for information or other follow-up sent to developers. If outside

counsel determine that an information request response was inadequate, counsel may attempt various additional engagement with the developer, including conducting interviews or requesting audits of data security or storage infrastructure.

20. At this stage, outside counsel, in consultation with the ADI team and a number of internal Facebook teams, determine on a case-by-case basis if any additional enforcement action is appropriate, such as suspending the developer and/or the app.  Outside counsel also make recommendations about whether Facebook should take legal measures, including sending cease and desist letters, or engaging in litigation against developers.

21. A partnership with the outside expert consulting firms and Facebook personnel from various teams that comprise the ADI investigatory team was necessary for Gibson Dunn and in-house counsel to effectively advise Facebook as its legal counsel for a variety of reasons, including to provide compliance advice regarding Facebook's operations, to develop legal strategy for active and anticipated litigation matters and regulatory inquiries, and to evaluate potential legal exposure.  The ADI investigatory team works at the direction of counsel, relies on counsel's input and guidance, and has played a pivotal, necessary role in facilitating legal advice by counsel and implementing that advice by the company.

22. Gibson Dunn and in-house counsel structured the ADI in view of its core purpose: to enable counsel to obtain the information needed to provide effective legal advice to Facebook.  As the ADI has progressed, Facebook outside and in-house counsel have used information uncovered through it to advise the company on how best to protect Facebook's legal rights and mitigate the company's risks in the face of threatened and pending litigation and regulatory inquiries centering on the misuse of user data by third-

party apps, including in connection with securities class actions, derivative actions, books-and-records actions, consumer class actions, various suits by developers (including from Dr. Kogan, who has sued Facebook in the Southern District of New York, and other actions by developers in the United Kingdom and Italy), and inquiries from numerous domestic and international regulators, including Congress, the Federal Trade Commission, state attorneys general, the Office of the Privacy Commissioner of Canada, the United Kingdom Information Commissioner's Office, and other foreign regulatory agencies.

23. Gibson Dunn and in-house counsel have also used information uncovered through the ADI to develop strategy for and pursue offensive litigation. For example, the ADI investigated whether a South Korean app developer, Rankwave Co., Ltd. ("Rankwave"), used Facebook user data to provide marketing and advertising services in violation of Facebook policies. Following that investigation, on the advice of counsel, Facebook sent Rankwave a request for information ("RFI"). When Rankwave failed to respond to the RFI, Gibson Dunn sent Rankwave a cease-and-desist letter and communicated with Rankwave to get more information about its data practices. Ultimately, when Rankwave refused to cooperate, Facebook filed suit against Rankwave in California. The lawsuit is ongoing.

24. Attached hereto as **Exhibit 1** is a list of all pending domestic and international litigation relating to the Cambridge Analytica events and the misuse of user data by third-party apps as of the date of this declaration. This multitude of threatened and pending litigation was and is the backdrop of the ADI and, as such, has been a significant driving force behind the decisions made by Facebook counsel throughout the ADI process.

9

## Documents and Information Sought by the Petition

25. I have reviewed the categories of documents and information sought by the Attorney General's third CID and Petition.

26. The Petition seeks the Court to order Facebook to "comply in full with requests 1-3 and 6" of the third Civil Investigative Demand ("CID") with respect to the following subsets of apps: (a) approximately 6,000 apps with a large number of installing users; (b) apps that Facebook identified for review based on "past investigative experience"; (c) apps that were reported to Facebook from outside of the ADI process; (d) apps for which Facebook has conducted a detailed background check; and (e) apps for which Facebook has conducted a technical review.

27. **CID Request No. 1.** I understand this Request seek a list of all apps that the ADI team identified in the Detection and Identification (Phase One) aspect of the ADI. As detailed in paragraphs 11 to 15, counsel selected apps for Phase One review via: (i) the User Impact Method; (ii) the Categorical Method; and (iii) the Escalations Method. Construed in conjunction with Petition Prayers for Relief 2(a), 2(b), and 2(c), this Request calls for three separate lists of attorney-selected and compiled apps, which total approximately two million apps.

28. Facebook has not made productions responsive to Request No. 1 because, as Facebook has previously explained to the Attorney General, this Request seeks information prepared at the direction of counsel in furtherance of the ADI and in anticipation of litigation.

29. Prior to identification and compilation by Facebook counsel, the attorney-created lists of apps associated with the User-Impact Method, Escalation Method, Categorical Method

did not exist as raw data that counsel could simply turn over to the Attorney General. Rather, the data compilations identifying the apps at issue in Request No. 1 were prepared at the direction of Facebook counsel pursuant to the ADI and done to assist Facebook counsel with providing legal advice to Facebook, minimizing the company's litigation risk, and preparing for litigation against the company.

30. **CID Request No. 2.**  I understand that this Request is seeking detailed information regarding the ADI team's review of the roughly two million apps from Request 1, as well as the following: (a) the app's developer; (b) whether the app is a test app or was released to the public; (c) when the app was first released to the public; (d) the date Facebook first reviewed the app's privacy policy and a description of the nature of that review; (e) the basis for investigation of the app; (f) the app's permissions; (g) the number of users who installed or downloaded the app; and (h) the number of users whose information was accessed or obtained by the app who did not download or install the app.

31. Facebook has not made productions responsive to this request because, as Facebook has previously explained to the Attorney General, much of the information and data sought by Request No. 2 does not exist as business records and, to the extent that responsive information exists as records, it is largely composed of data compilations or selections that were prepared at the direction of counsel in furtherance of the ADI.  To the extent that responsive information does not exist, it would require attorney synthesis and generation to create or compile.

32. In particular, prior to compilation by Facebook counsel, the data identifying the apps at issue in Request No. 2(a), and (f)-(g) did not exist as raw data that counsel could turn over to the Attorney General.  Rather, each were prepared at the direction of Facebook

counsel pursuant to the ADI and done to assist Facebook counsel with providing legal advice to Facebook about potential risks and active and potential litigation.

33. Facebook does not maintain information responsive to Request No. 2(b)-(e) or (h) in the ordinary course of business.  It would be extremely difficult to create a compilation of the information sought by these Requests for the roughly two million apps at issue.  More importantly, these Requests ask Facebook to divulge information about counsel's strategy and thought processes in developing the ADI investigative framework, including by providing "a description of the nature" of the ADI's review of the app's privacy policy and the "basis" and "initial source(s)" of concerns of data misuse.

34. **CID Request No. 3.**  I understand this Request to seek identification of apps falling into nine separate categories that have been escalated to Phase Two of ADI for Enhanced Examination and/or Phase Three of ADI for Enforcement, including: (a) each app that received an in-depth review; (b) each app for which a Background Information investigation was conducted; (c) each app for which a Technical Investigation was conducted; (d) each app to which a request for information was sent; (e) each app for which an interview was sought with the developer; (f) each app for which a remote or onsite audit was requested to be conducted; (g) each app for which actual misuse was found and identification of that misuse; (h) each app that was banned for actual misuse; and (i) each app that was banned for failing to cooperate with Facebook's investigation.  I understand Prayers for Relief 2(d) and 2(e) correspond to CID Requests Nos. 3(b) and 3(c), i.e., applications that have undergone a background investigation or technical review.

35. Six of the nine categories (Requests 3(d)-(i)) call for information which is not privileged, which Facebook has already produced.  Facebook has also provided lists of apps that are the subject of external—and thus non-privileged—actions or communications with third parties, including the growing list of applications it has suspended as part of the Investigation, whether because of policy violations or because of their refusal to cooperate with Facebook's investigation.  The most recent version of this list, from July 23, 2019, includes nearly 69,000 apps.

36. Of the remaining three categories (Requests 3(a)-(c) of the third CID), the Request seeks the identity of apps that the ADI selected for an "in-depth review," background investigations, and technical investigations.  Facebook has not produced this information because it is privileged.  Counsel selected each of these groups of apps by developing customized risk-based approaches based on counsel's assessment of where and how the greatest legal risk to the company might arise.  The data compilations identifying the apps at issue in Request No. 3(a) – (c) were prepared at the direction of Facebook counsel pursuant to the ADI and done to assist Facebook counsel with providing legal advice to Facebook regarding potential risks and active and potential litigation.

37. **CID Request No. 6.**  I understand that this Request seeks *all* internal Facebook and ADI communications related to the apps reviewed in the ADI.  The communications and correspondence responsive to Request No. 6 as to the millions of apps at issue are communications between and among Facebook in-house counsel, Gibson Dunn, and internal and outside experts and investigators.  Facebook has not made productions of correspondence responsive to this Request because, as Facebook counsel notified the Attorney General on numerous occasions, these communications concerning the ADI

13

involve counsel acting in their legal capacity or were undertaken by expert consultants or Facebook employees acting at the direction of Facebook counsel, and as an extension of counsel, including for purposes of gathering facts necessary to conduct their legal analysis and to assist them with providing legal advice to Facebook.   Facebook has, however, produced to the Attorney General substantial non-privileged ADI-related communications between Facebook and developers.

Executed on this 7th day of October 2019.

Stacy Chen
Associate General Counsel
Facebook, Inc.

14

## CERTIFICATE OF SERVICE

I hereby certify that I will serve a true copy of the foregoing document upon counsel of

record as follows:

> Maura Healey
> Attorney General of the
> Commonwealth of Massachusetts
>
> Sara Cable, BBO #667084
> Assistant Attorney General
> Director, Data Privacy & Security Unit
> sara.cable@mass.gov
>
> Jared Rinehimer, BBO #684701
> Assistant Attorney General
> jared.rinehimer@mass.gov
>
> Peter Downing, BBO #675969
> Assistant Attorney General
> peter.downing@mass.gov
>
> Consumer Protection Division
> Office of Attorney General Maura Healey
> One Ashburton Place
> Boston, MA 02108
> (617) 727-2200

Felicia H. Ellsworth

Dated: October 7, 2019

15

2019-2597 B4

# Exhibit 1

## Representative Litigation Relating To Cambridge Analytica Events

| No. | Case/Matter Name | Case Number | Date Filed | Jurisdiction[1] |
|-----|------------------|-------------|------------|-----------------|
| **Securities Class Action Litigation** | | | | |
| 1. | In re Facebook, Inc. Securities Litigation | No. 5:18-cv-01725-EJD | 03/20/2018 | Northern District of California |
| 2. | Helms v. Facebook, Inc. | No. 1:18-cv-06774-RJS | 07/27/2018 | Southern District of New York |
| 3. | Kacouris v. Facebook, Inc. | No. 1:18-cv-06765-RJS | 07/27/2018 | Southern District of New York |
| 4. | Casey v. Facebook Inc. | No. 5:18-cv-01780-EJD | 03/22/2018 | Northern District of California |
| 5. | Ernestine v. Facebook, Inc. | No. 3:18-CV-01868-EJD | 03/27/2018 | Northern District of California |
| **Derivative Litigation** | | | | |
| 6. | Feuer v. Zuckerberg et al. | No. 2019-0324 | 05/01/2019 | Delaware Chancery Court |
| 7. | Hallisey v. Zuckerberg | No. 4:18-cv-01792-HSG | 03/22/2018 | Northern District of California |
| 8. | Martin v. Zuckerberg | No. 4:18-cv-01834-HSG | 03/23/2018 | Northern District of California |
| 9. | Ocegueda v. Zuckerberg | No. 4:18-cv-01893-HSG | 03/27/2018 | Northern District of California |
| 10. | Karon v. Facebook, Inc. | No. 4:18-cv-01929-HSG | 03/29/2018 | Northern District of California |
| 11. | Gloria Stricklin Trust v. Zuckerberg | No. 4:18-cv-02011-HSG | 04/02/2018 | Northern District of California |
| 12. | Sbriglio v. Zuckerberg, et al. | No. 2018-0307-JRS | 04/25/2018 | Delaware Chancery Court |
| 13. | In re Facebook, Inc. Shareholder Derivative Privacy Litigation | No. 4:18-cv-01792-HSG | 03/22/2018 | Northern District of California |
| 14. | O'Connor v. Zuckerberg, et al. | No. 19-CIV-03759 | 06/28/2019 | San Mateo Superior Court |
| 15. | Chase v. Zuckerberg, et al. | No. 4:18-CV-03710-HSG | 04/18/2018 | Northern District of California |
| 16. | Leagre v. Zuckerberg, et al. | No. 2018-0675-JRS | 09/13/2018 | Delaware Chancery Court |

[1] This field represents the court of original filing or the court where the case has been consolidated and is now pending. For example, the consumer-based lawsuits were filed in courts across the country, and many have been consolidated in a multidistrict litigation pending in the U.S. District Court for the Northern District of California.

## Representative Litigation Relating To Cambridge Analytica Events

| | | | | |
|---|---|---|---|---|
| **Books-and-Records Litigation** | | | | |
| 17. | In re Facebook Inc. Section 220 Litigation | C.A. No. 2018-0661 | 09/06/2018 | Delaware Chancery Court |
| 18. | Ocegueda v. Facebook, Inc. | No. 18-CIV-04936 | 09/14/2018 | San Mateo Superior Court |
| 19. | City of Birmingham Relief and Retirement System v. Facebook, Inc. | No. 2018-0532 | 07/23/2018 | Delaware Chancery Court |
| 20. | Levy v. Facebook, Inc. | No. 2018-0705 | 09/28/2018 | Delaware Chancery Court |
| **Consumer-Based Litigation** | | | | |
| 21. | Price v. Facebook, Inc. | No. 3:18-cv-01732-VC | 03/20/2018 | Northern District of California |
| 22. | Rubin v. Facebook, Inc. | No. 3:18-cv-01852-VC | 03/26/2018 | Northern District of California |
| 23. | O'Kelly v. Facebook, Inc. | No. 3-18-cv-01915-VC | 03/28/2018 | Northern District of California |
| 24. | Beiner et al. v. Facebook, Inc. | No. 3:18-cv-01953-VC | 03/29/2018 | Northern District of California |
| 25. | Gennock et al. v. Facebook, Inc. | No. 3:18-cv-01891-VC | 03/27/2017 | Northern District of California |
| 26. | Haslinger v. Facebook, Inc. | No. 3:18-cv-01984-VC | 03/30/2018 | Northern District of California |
| 27. | Kooser et al. v. Facebook, Inc. | No. 3:18-cv-02009-VC | 04/02/2018 | Northern District of California |
| 28. | Picha v. Facebook, Inc. | No: 3:18-cv-02090-VC | 04/05/2018 | Northern District of California |
| 29. | Labajo v. Facebook, Inc. | No. 3:18-cv-02093-VC | 04/05/2018 | Northern District of California |
| 30. | Iron Wing et al. v. Facebook, Inc. | No. 3:18-cv-02122-VC | 04/06/2018 | Northern District of California |
| 31. | Johnson et al v. Facebook, Inc. | No. 3:18-cv-02127-VC | 04/09/2018 | Northern District of California |
| 32. | Buckles v. Facebook, Inc. | No. 3:18-cv-02189-VC | 04/12/2018 | Northern District of California |
| 33. | Gerena v. Facebook, Inc. | No. 3:18-cv-02201-VC | 04/12/2018 | Northern District of California |
| 34. | King v. Facebook, Inc. | No. 3:18-cv-02276-VC | 04/16/2018 | Northern District of California |

- 2 -

**Representative Litigation Relating To Cambridge Analytica Events**

| | | | | |
|---|---|---|---|---|
| 35. | Diaz Sanchez v. Facebook, Inc. | No. 3:18-cv-02381-VC | 04/20/2018 | Northern District of California |
| 36. | Schinder v. Facebook, Inc. | No. 3:18-cv-02571-VC | 05/01/2018 | Northern District of California |
| 37. | Pelc v. Facebook, Inc. | No. 3:18-cv-02948-VC | 05/18/2018 | Northern District of California |
| 38. | Malskoff et al. v. Facebook, Inc. | No. 3:18-cv-03393-VC | 03/27/2018 | Northern District of California |
| 39. | Burk et al. v. Facebook, Inc. | No. 3:18-cv-02504-VC | 04/26/2018 | Northern District of California |
| 40. | Comforte et al. v. Facebook, Inc. | No. 3:18-cv-03394-VC | 03/22/2018 | Northern District of California |
| 41. | Hassan et al v. Facebook, Inc. | No. 3:19-cv-01003-VC | 02/22/2019 | Northern District of California |
| 42. | Lodowski v. Facebook, Inc. | No. 3:18-cv-03484-VC | 03/23/2018 | Northern District of California |
| 43. | Burton v. Facebook et al. | No. 3:18-cv-03643-VC | 04/12/2018 | Northern District of California |
| 44. | Redmond et al. v. Facebook, Inc. | No. 3:18-cv-03642-VC | 04/10/2018 | Northern District of California |
| 45. | Williams v. Facebook, Inc. | No. 3:18-cv-03676-VC | 04/04/2018 | Northern District of California |
| 46. | O'Hara et al. v. Facebook, Inc. | No. 3:18-cv-03709-VC | 04/04/2018 | Northern District of California |
| 47. | Vance-Guerbe v. Facebook, Inc. | No. 3:18-cv-02987-VC | 05/21/2018 | Northern District of California |
| 48. | Bouillon v. Facebook, Inc. | No. 3:18-cv-02565-VC | 05/01/2018 | Northern District of California |
| 49. | Skotnicki v. Facebook, Inc. | No. 3:18-cv-03790-VC | 04/30/2018 | Northern District of California |
| 50. | Reninger v. Facebook, Inc. | No. 3:18-cv-04089-VC | 06/21/2018 | Northern District of California |
| 51. | Kopecky v. Facebook, Inc. | No. 3:18-cv-04125-VC | 06/19/2018 | Northern District of California |
| 52. | Akins et al. v. Facebook, Inc. | No. 3:18-cv-05714-VC | 09/18/2018 | Northern District of California |
| 53. | Kmieciak et al. v. Facebook, Inc. | No. 3:18-cv-05752-VC | 09/19/2018 | Northern District of California |
| 54. | Staggs et al. v. Facebook, Inc. | No. 3:18-cv-05754-VC | 09/19/2018 | Northern District of California |

## Representative Litigation Relating To Cambridge Analytica Events

| | | | | |
|---|---|---|---|---|
| 55. | Miller et al. v. Facebook, Inc. | No. 3:18-cv-05770-VC | 09/20/2018 | Northern District of California |
| 56. | McDonnell et al. v. Facebook, Inc. | No. 3:18-cv-05811-VC | 09/21/2018 | Northern District of California |
| 57. | Rankins v. Facebook, Inc. | No. 3:18-cv-05380-VC | 08/31/2018 | Northern District of California |
| 58. | Hwang v. Facebook, Inc. | No. 3:18-cv-05357-VC | 08/30/2018 | Northern District of California |
| 59. | Ballejos et al. v. Facebook, Inc. | No. 18-CIV-03607 | 07/11/2018 | San Mateo Superior Court |
| 60. | Zimmerman et al. v. Facebook, Inc. | No. 19-04591 | 08/07/2019 | Northern District of California |
| 61. | People of the State of Illinois v. Facebook, Inc. | No. 18-CH-03868 | 03/23/2018 | Cook County Circuit Court |
| **Offensive Litigation Involving Developers** | | | | |
| 62. | Facebook, Inc. v. Rankwave Co. | No. 4:19-cv-03738-JST | 05/10/2019 | Northern District of California |
| **Defensive Litigation Involving Developers** | | | | |
| 63. | Six4three, LLC v. Facebook, Inc. | No. 3:17-cv-00359-WHA | 04/10/2015 | Northern District of California |
| 64. | Aleksandr Kogan v. Facebook, Inc. | No. 19-cv-2560 (PAE) | 03/15/2019 | Southern District of New York |
| **Regulatory Litigation** | | | | |
| 65. | District of Columbia v. Facebook, Inc. | 2018 CA 008715 B | 12/19/2018 | Superior Court of the District of Columbia |

- 4 -