# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br> This document relates to: <br><br> ALL ACTIONS | MDL No. 2843 <br> Case No: 18-MD-2843 VC (JSC) (N.D. Cal) <br><br> Hon. Vince Chhabria <br> Courtroom 4 – 17th Floor <br> Special Master: Daniel Garrie, Esq. <br><br> **ORDER REGARDING MOTION TO COMPEL MARK ZUCKERBERG NOTEBOOKS – ORDER NO. 3** <br><br> JAMS REF. NO: 1200058674 |

## BACKGROUND

1.      On August 18, 2021, Special Master Daniel Garrie ("Special Master Garrie") and Hon. Gail Andler (Ret.) declared impasse on the issue of whether Facebook should be compelled to locate and produce any of Mark Zuckerberg's hard copy work related notebooks that exist ("Zuckerberg Notebooks").

2.      Pursuant to the Protocol for Resolving Discovery Disputes, Plaintiffs submitted their opening brief regarding the Zuckerberg Notebooks on September 1, 2021. Plaintiffs argue that Facebook should be compelled to locate, search, and produce the Zuckerberg Notebooks because they are relevant to the claims in this matter and responsive to Plaintiffs' discovery requests. Plaintiffs base their claim that the Zuckerberg Notebooks are relevant primarily on Steven Levy's book *Facebook: The Inside Story*, which discusses a seventeen page extract from the Zuckerberg Notebooks. "For instance, Levy writes that Zuckerberg 'outlined ideas about privacy' in the notebook excerpt, and that Facebook team members were 'guided by copied pages from the Book of Change' notebook in developing core features of the Facebook Platform, including Open Registration, News Feed, and Privacy Controls." See Exhibit A (Plaintiffs' Motion to Compel Production of Zuckerberg Notebooks), at 5.

3.      Facebook submitted their Opposition to Plaintiffs' Motion to Compel Production of Zuckerberg Notebooks on September 14, 2021. Facebook argues that (a) "notebooks from Facebook's early history are not relevant to Plaintiffs' claims, which involve features of Facebook, such as friend-sharing, that did not exist in 2006"; (b) Plaintiffs should not be permitted to "embark on a fishing expedition through the personal files of Facebook's CEO for documents that they can only speculate (1) exist, (2) date the relevant time period, and (3) contain relevant infor-

mation"; (c) "Plaintiffs pursue the notebooks for the improper purpose of harassing Mr. Zuckerberg"; and (d) "none of the four RFPs Plaintiffs identified in connection with the Motion seek Mr. Zuckerberg's notebooks. Rather, they are limited by their terms to documents from 2007 and later and cannot be stretched to encompass the notebooks." See Exhibit B (Opposition to Plaintiffs' Motion to Compel Production of Zuckerberg Notebooks) at 4-5.

4.     Plaintiffs argue in the their Reply ISO Motion to Compel Production of Zuckerberg Notebooks that (a) Plaintiffs have met their burden of demonstrating the relevancy of their request; (b) Plaintiffs' RFPs encompass the Zuckerberg Notebooks; (c) the relevant time period of Plaintiffs' RFPs encompasses all of the Zuckerberg Notebooks, including those going back to 2006; and (d) Facebook's production obligations are not limited to custodial sources. See Exhibit C (Reply ISO Motion to Compel Production of Zuckerberg Notebooks).

### FINDINGS

5.     Special Master Garrie finds that Plaintiffs have met their burden of demonstrating the relevancy of their request for the Zuckerberg Notebooks. Levy's book indicates that "use[d] those notebooks to convey a detailed version of his product vision' to others". See Exhibit C, at 2 citing Steven Levy, *Facebook: The Inside Story* 118 (2020). According to Levy, this product vision included "a privacy 'mixer' that let users control who would see an item about them" See Exhibit C, at 2 citing Steven Levy, *Facebook: The Inside Story* 118 (2020). This request is relevant to at least one of the core allegations Facebook identifies in its Opposition: "[g]iving app developers access to sensitive user information" by enabling them "to obtain any information about the users' Facebook friends that the users themselves had access to" (i.e., friend-sharing) "from roughly 2009 to 2015". See Exhibit B, at 4. Facebook claims, without reviewing the note-

books themselves, that the Zuckerberg Notebooks are not relevant because Plaintiffs' claims "involve features of Facebook, such as friend-sharing, that did not exist in 2006". See Exhibit B, at 4. Facebook's argument fails, however, because application features such as those at issue in this matter often take years to develop and it is possible information related to the design of future Facebook features exists in notebooks from 2006, if not notebooks from later years. In any event, Facebook is not able to assert that the Zuckerberg Notebooks are in fact not relevant without reviewing them.

6.      Special Master Garrie finds that Plaintiffs' RFPs encompass the Zuckerberg Notebooks as the Zuckerberg Notebooks are responsive to RFPs 57, 35, and 38. See Exhibit C, at 4-5.

7.      Special Master Garrie finds that the relevant time period of Plaintiffs' RFPs encompasses all of the Zuckerberg Notebooks, including those going back to 2006. See Exhibit C, at 6, citing Decl. of Alexander P. Swanson in Supp. of Opp. to Pls.' Mot. to Compel Ex. 8 at 10 ("Each Document Request shall be interpreted to include all documents and information that relate to the Relevant Time Period or otherwise-specified period, even if such documents or information was prepared or published outside of the Relevant Time Period or otherwise-specified period.").

8.      Special Master Garrie finds that Facebook's production obligations are not limited to custodial sources. The ESI Protocol agreed to by the parties does not limit Facebook's discovery obligations to only the identified custodians. Rather the ESI Protocol states "[i]n addition to identifying documents pursuant to an agreed upon search protocol, the parties recognize that ***they are obligated to produce relevant, responsive, non-privileged documents of which they are aware***, regardless of whether such documents contain any of the agreed upon or additional

search terms." See Exhibit D (ESI Protocol), at 4. Facebook provides to no evidence that searching and producing responsive documents from the Zuckerberg Notebooks is inconsistent with the ESI Protocol.

## ORDER

9.　No later than November 15, 2021, Facebook is to locate and collect any Zuckerberg Notebooks that exist and complete a preliminary responsiveness review of a sample of the notebooks as set out in paragraph 10 below.

10.　After collecting the Zuckerberg Notebooks, Facebook is to estimate and report to Special Master Garrie the total number of pages of information contained therein. Facebook is to make a good faith effort to manually review a random sample of approximately 10% of the estimated total pages and report to Special Master Garrie the number of pages identified as responsive. Special Master Garrie will issue an order setting out next steps based on the information provided by Facebook.

**IT IS SO ORDERED.**

September 29, 2021

_____
Daniel Garrie
Discovery Special Master

**ORDER REGARDING MOTION TO COMPEL MARK ZUCKERBERG NOTEBOOKS – ORDER NO. 3**

# EXHIBIT A

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

Additional counsel listed on signature page

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF ZUCKERBERG NOTEBOOKS**<br><br>Discovery Special Master: Daniel Garrie, Esq. |

## I.    INTRODUCTION

Plaintiffs move to compel Facebook to search for and produce the notebooks of CEO Mark Zuckerberg that touch upon Facebook's approach to privacy and Facebook's monetization. The notebooks are responsive to Plaintiffs' discovery requests and contain evidence that is directly relevant to the claims at issue in this litigation.[1]

The seventeen-page excerpt of the Zuckerberg notebooks discussed in journalist Steven Levy's book *Facebook: The Inside Story*, as well as an article adapted from this book that was published in *Wired* magazine on February 12, 2020, makes clear that even the 2006 entries address issues that lie at the core of this case: did Facebook, at Mark Zuckerberg's direction, subvert its privacy promises to users in order to monetize the data they provided? The article and book suggest yes. According to Levy, Zuckerberg "seemed at least as concerned about the *perception* of privacy as about privacy itself," asking himself "'[w]hat makes this seem secure, whether or not it actually is?"

Such thoughts are not academic here. Zuckerberg has been at the forefront of the campaign to assure users that Facebook cares about privacy. As set forth in Plaintiffs' Second Amended Complaint ("SAC"), Dkt. No. 491, Zuckerberg has publicly stated:

- "Privacy is very important to us." SAC ¶ 668.

- "I founded Facebook on the idea that people want to share and connect with people in their lives, but to do this everyone needs complete control over who they share with at all times. This idea has been the core of Facebook since day one. . . ." *Id.* ¶ 669.

- "As a matter of fact, privacy is so deeply embedded in all of the development we do that every day . . . These privacy principles are written very deeply into our code." *Id.* ¶ 670.

There is no question that a factfinder would find compelling CEO Zuckerberg's thoughts

---

[1] Plaintiffs are mindful that Facebook has not yet produced the custodial files of Mr. Zuckerberg and would be amenable to deferring this issue pending the production of his files.

and internal messaging to Facebook employees about privacy at the same time that he is publicly assuring users and the public that Facebook values privacy. Tellingly, despite multiple discussions spanning a year over this issue, Facebook has not even searched for and reviewed the notebooks.

The notebooks are highly relevant evidence of the wide gap between Facebook's internal and public-facing statements regarding user privacy. Facebook has refused to search for and produce these materials in this action, even when specifically asked to do so over a year ago. It must do so now.

## II.      BACKGROUND

### A.      Plaintiffs Learned of the Zuckerberg Notebooks Through Media Reports

Zuckerberg kept notebooks at least as far back as 2006. *See id.* It is unclear when Zuckerberg stopped keeping notebooks—Levy states that "[i]n later years, Zuckerberg would be less enthusiastic about logging things." *Id.* But earlier, "you would have seen him in the Palo Alto office, head down, scrawling on an unruled journal in his crabbed, compact script, sketching out product ideas, diagramming coding approaches, and slipping in bits of his philosophy." *The Inside Story* at 118. These notebooks were extensive—visitors to his apartment "might spot a stack of completed notebooks." Zuckerberg "use[d] those notebooks to convey a detailed version of his product vision" to others, and Facebook engineers and designers "would sometimes find a few photocopied pages sketching out a design for a front end or a list of signals for a ranking algorithm." *Id.*

According to Levy, Zuckerberg stated that he had destroyed his notebooks, explaining that "Facebook's lawyers identified his cherished notebooks as potential evidence in future intellectual-property lawsuits, and so he destroyed them." *Id.* at 118-19. If the notebooks were actually destroyed, it is unclear when they were destroyed or which law firm proposed their destruction.

Notwithstanding this report, some or all of the notebooks may exist—so Plaintiffs ask the Special Master to order Facebook to search for and review all portions of these notebooks in its

possession.

Further, even if Zuckerberg did in fact destroy most of the notebooks, they "aren't totally lost," and "[s]nippets left behind, presumably those he copied and shared, present a revealing window into his thinking at the time." *Id.* at 119. For instance, Mr. Levy "managed to get a seventeen-page chunk from what might be the most significant of his journals in terms of Facebook's evolution," called the "'Book of Change.'" *Id.* Facebook has not indicated whether it possesses those 17 pages.

In an excerpt from the Book of Change, Zuckerberg reveals his plans for the News Feed, which took information from friends' profiles and delivered it to users as "a continuous stream of news, flowing up [the] screen in reverse chronological order." *Id.* at 123. In planning the News Feed, Zuckerberg "outlined ideas of privacy," designed "a 'Mini-Feed' that would track activities of and about individual users," and set forth "a host of other ideas." *Id.* at 129. According to Levy, the News Feed team was "guided by copied pages from the Book of Change." *Id.* at 127.

When the News Feed launched, it was met with public outcry on account of privacy concerns—"[w]hat Facebook simply hadn't realized about the News Feed was that pushing information to people was qualitatively different from publishing it on someone's home page." *Id.* at 141. In response to this public outcry, Zuckerberg publicly promised "to add privacy controls to address the complaints," and the News Feed team "gin[ned] up the protections that should have been in the product to begin with, including a privacy 'mixer' that let users control who would see an item about them." *Id.* at 143. The Complaint specifically identifies the outcry over Beacon, the news feed algorithm which revealed users' activity, to friends. SAC ¶ 468.

## B.    Procedural History

Plaintiffs referenced the Zuckerberg notebooks in their April 3, 2020 Rule 30(b)(6) deposition notice to Facebook. *See* Decl. of Christopher Springer in Supp. of Pls.' Mot. to Compel Production of Zuckerberg Notebooks ("Springer Decl.") Ex. 1.

Since then, Plaintiffs have repeatedly raised the issue of whether Facebook would search

for and produce the Zuckerberg notebooks, including in a December 17, 2020 email, multiple meet and confer sessions in January of this year, and in the context of discovery mediation, as set forth in Plaintiffs' Separate Statement in Support of Plaintiffs' Motion to Compel Production of Zuckerberg Notebooks ("Separate Statement"). Most recently, at the August 18, 2021 discovery mediation, Facebook repeated its earlier refusal to search for and produce the Zuckerberg notebooks, arguing that the notebooks are not responsive to any of Plaintiffs' discovery requests, that the notebooks are from 2006 and are therefore outside the time period of the case, and that the notebooks are not relevant. Springer Decl. ¶ 4.

## LEGAL STANDARD

Federal Rule of Civil Procedure 26(b)(1) states that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Relevant information need not be admissible to be discoverable," and "[c]ourts generally recognize that relevancy for purposes of discovery is broader than relevancy for purposes of trial." *In re Subpoena to PayPal Holdings, Inc.*, No. 18CV937CFCMPTDDEL, 2020 WL 3073221, at *2 (N.D. Cal. June 10, 2020). In this regard, "[r]elevancy, for the purposes of discovery, is defined broadly, although it is not without ultimate and necessary boundaries." *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 679-80 (N.D. Cal. 2006).

"The party seeking to compel discovery bears the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1)," and "the party opposing discovery has the burden of showing that discovery should not be allowed, and also has the burden of clarifying, explaining and supporting its objections with competent evidence." *Harris v. Best Buy Stores, L.P.*, No. 315CV00657HSGKAW, 2016 WL 6024556, at *1 (N.D. Cal. Oct. 14, 2016).

## III.    ARGUMENT

The Zuckerberg notebooks are relevant to Plaintiffs' claims, responsive to Plaintiffs' discovery requests, and should be produced.

**A.      The Zuckerberg Notebooks Are Relevant to Core Issues in this Litigation.**

Facebook's conclusory assertion that the Zuckerberg notebooks are not relevant to this litigation should be rejected. Facebook has not even searched for or reviewed any portions of the Zuckerberg notebooks in its possession, so it does not know what material is contained within those notebooks and cannot make any credible representations regarding the relevance of that material. Before its assertion of irrelevance can be considered, Facebook should at least be required to search for and review the documents it claims are irrelevant.[2]

The seventeen-page extract discussed in the Levy book contains information relevant to this litigation, including Facebook's approach to privacy. For instance, Levy writes that Zuckerberg "outlined ideas about privacy" in the notebook excerpt, and that Facebook team members were "guided by copied pages from the Book of Change" notebook in developing core features of the Facebook Platform, including Open Registration, News Feed, and Privacy Controls. *Id.* at 119-44.

The notebooks appear to be especially relevant to the questions whether Facebook's conduct has been willful and intentional so as to support the imposition of punitive damages. The notebook excerpt in Levy's book indicates that Zuckerberg "seemed at least as concerned about the *perception* of privacy as about privacy itself," asking himself "'[w]hat makes this seem secure, whether or not it actually is?" *Id.* at 122-23. By bearing on users' expectations of privacy, this evidence is also relevant to Plaintiffs' claims for invasion of privacy and breach of the implied covenant of good faith and fair dealing.

The excerpt also includes plans for creating "personal profiles about people who *weren't* on Facebook," which Zuckerberg recognized could be perceived as raising privacy concerns and being "'creepy.'" *Id.* at 129. That Facebook appears to have implemented these plans at least in part despite conscious awareness of such privacy concerns suggests that Facebook intentionally and willfully violated user privacy. *See id.* at 130.

---

[2] If Facebook presents new facts in its opposition, Plaintiffs reserve the right to seek discovery about those facts and/or respond.

**B.      Facebook's Argument About the Time Period of Discovery is Meritless.**

The Court has already ruled that discovery dating back to January 1, 2007 may be relevant, stating that "[i]t is highly plausible that documents dating back to 2007 could be probative of Facebook's intent regarding the future handling of users' private information." Pretrial Order No. 36, Dkt. No. 381 (submitted as Springer Decl. Ex. 2).

Facebook's assertion that the Zuckerberg notebooks are categorically outside the scope of discovery because they were written in 2006 should be rejected. Although the Levy book indicates that the seventeen-page excerpt from one of Zuckerberg's notebooks was dated in 2006, this book also indicates that Zuckerberg had "a stack of completed notebooks," and Facebook makes no representation regarding the dates of those other notebooks. *See The Inside Story* at 118. Excerpts of Zuckerberg's notebooks were copied and distributed to Facebook employees, and Facebook has failed to determine when these copies were distributed. Accordingly, some or all of the notebooks in Facebook's possession may be dated 2007 or later, or distributed to employees in 2007 or later, which Facebook does not dispute is within the scope of discovery.

Just as important, the 2006 excerpt is relevant to Plaintiffs' claims. They are about the privacy settings that form the heart of Plaintiffs' breach of contract, invasion of privacy, and breach of the covenant of good faith and fair dealing claims. Any information shedding light on whether statements made during the class period were false or misled users is relevant, even if the information is contained in documents created before that period. *In re U.S. Aggregates, Inc.. Sec. Litig.*, 235 F. Supp. 2d 1063, 1068 (N.D. Cal. 2002) (citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001)); *see also Lee v. Hertz Corp.*, 2019 WL 6219742, at *1-2 (N.D. Cal. Nov. 19, 2019) (ordering the production of documents created before the class period that provide information about allegedly discriminatory policies that remained in place during the class period).

**C.      Facebook Has Refused to Even Search for and Review the Notebooks.**

Facebook asserts that the Zuckerberg notebooks are not relevant or responsive. What

undermines this assertion is the fact that it has failed even to search for and review any existing copies of these notebooks. As a result, Facebook cannot answer any of the following questions—questions that must be answered before its assertions of irrelevance and unresponsiveness can be taken seriously.

1.  **What is the time period covered by the notebooks?** Although the excerpt discussed in the Levy book and article—which apparently constitute everything that counsel for Facebook has reviewed in conjunction with Plaintiffs' request—discuss an excerpt from a journal dated in 2006, it is unclear when the first and last notebooks were written? In this regard, Levy states that "[i]n later years, Zuckerberg would be less enthusiastic about logging things," suggesting that he continued to write notebooks for years after 2006. *See The Inside Story* at 118.

2.  **Did Zuckerberg in fact destroy his notebooks?** Although the Levy book indicates that Zuckerberg destroyed his notebooks at the advice of counsel, this falls far short of a sworn statement to this effect. *See id.* at 118-19. If Zuckerberg did in fact destroy these notebooks, when did this destruction occur? Did he destroy all of his notebooks or just some of them? Did he retain copies of any of his notebooks or parts thereof?

3.  **Does Facebook possess copies of any of the notebooks or parts thereof?** Even if Zuckerberg completely destroyed his notebooks, the Levy book states that "the notebooks aren't totally lost," and "[s]nippets [were] left behind, presumably those he copied and shared," including "a seventeen-page chunk" obtained by Levy. *Id.* at 119. Insofar as Zuckerberg copied pages from his notebooks and gave them to Facebook engineers and designers "to convey a detailed version of his product vision" to others, it appears likely that such copies exist. *See id.* at 118.

4.  **On what dates were the copies of the notebooks shared or made accessible?** Facebook asserts that the notebooks are from 2006 and are therefore outside the time period of the case. Putting aside the weakness of this argument, which is addressed below, Facebook fails to make any statement or showing regarding when any copies of the notebooks or portions thereof were shared or made accessible, which may have occurred from 2007 onward, a period that Facebook does not dispute is within the scope of discovery.

5.  **What are the contents of the notebooks?** Based on counsel for Facebook's representations, including its refusal to search for and review these notebooks, Facebook doesn't know any more about these notebooks than what has been publicly reported. Without searching for and reviewing the Zuckerberg notebooks, Facebook cannot make any credible representations or arguments regarding the responsiveness or relevance of the contents of these notebooks.

## IV.    CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request that the Special Master grant their motion to compel production of Mark Zuckerberg's notebooks.

Dated: August 30, 2021                                    Respectfully submitted,


KELLER ROHRBACK L.L.P.                          BLEICHMAR FONTI & AULD LLP

By:   */s/ Derek W. Loeser*                        By:   */s/ Lesley E. Weaver*
      Derek W. Loeser                                     Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)          Lesley E. Weaver (SBN 191305)
Cari Campen Laufenberg (admitted *pro hac vice*)   Anne K. Davis (SBN 267909)
David Ko (admitted *pro hac vice*)                 Matthew S. Melamed (SBN 260272)
Adele A. Daniel (admitted *pro hac vice*)          Angelica M. Ornelas (SBN 285929)
Benjamin Gould (SBN 250630)                        Joshua D. Samra (SBN 313050)
1201 Third Avenue, Suite 3200                      555 12th Street, Suite 1600
Seattle, WA 98101                                  Oakland, CA 94607
Tel.: (206) 623-1900                               Tel.: (415) 445-4003
Fax: (206) 623-3384                                Fax: (415) 445-4020
dloeser@kellerrohrback.com                         lweaver@bfalaw.com
claufenberg@kellerrohrback.com                     adavis@bfalaw.com
dko@kellerrohrback.com                             mmelamed@bfalaw.com
adaniel@kellerrohrback.com                         aornelas@bfalaw.com
bgould@kellerrohrback.com                          jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

4846-0322-9433, v. 2

# EXHIBIT B

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
    osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Kristin A. Linsley (SBN 154148)
    klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
    mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
    dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
    jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Facebook, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:19-CV-04591-VC<br><br>**FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF ZUCKERBERG NOTEBOOKS**<br><br>Discovery Special Master: Daniel Garrie, Esq. |

1

**TABLE OF CONTENTS**

2    I.      INTRODUCTION.................................................................................................. 1

3    II.     FACTUAL AND PROCEDURAL BACKGROUND .......................................... 2

4         A.     The Notebooks In Context of Facebook's History .................................... 2

5         B.     The Scope of Plaintiffs Active Claims ...................................................... 3

6    III.    ARGUMENT ...................................................................................................... 4

7         A.     Mark Zuckerberg's notebook from 2006 is not relevant to the claims and
defenses in this action. .............................................................................. 5

8

9         B.     Facebook has no obligation to search for unidentified notebooks from
after 2006 that may not exist. .................................................................... 7

10        C.     Plaintiffs' demand for the notebooks is an improper attempt to harass and
embarrass Facebook's CEO. ..................................................................... 9

11

12        D.     Mr. Zuckerberg's notebooks are not responsive to Plaintiffs' requests for
production. ................................................................................................ 11

13    IV.    CONCLUSION................................................................................................ 13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

## Cases

Page(s)

*BankDirect Cap. Finance, LLC v. Cap. Premium Financing, Inc.*,
   No. 15 C 10340, 2018 WL 946396 (N.D. Ill. Feb. 20, 2018) ............................................5

*Bermudez v. Duenas*,
   936 F.2d 1064 (9th Cir. 1991) ......................................................................................11

*BlackBerry Ltd. v. Facebook, Inc.*,
   No. CV 18-1844-GW, 2019 WL 4544425 (C.D. Cal. Aug. 19, 2019) .........................10

*Blackmond v. UT Med. Grp., Inc.*,
   No. 02-2890 MAV, 2004 WL 3142214 (W.D. Tenn. Nov. 2, 2004) ............................11

*Bresk v. Unimerica Ins. Co.*,
   No. CV 16-8893 ODW (SSX), 2017 WL 10439831 (C.D. Cal. Nov. 16, 2017).............8

*Children's Health Def. v. Facebook Inc.*,
   No. 20-CV-05787-SI, 2021 WL 2662064 (N.D. Cal. June 29, 2021) ..........................10

*Haggarty v. Wells Fargo Bank, N.A.*,
   No. 10-2416 CRB (JSC), 2012 WL 3939321 (N.D. Cal. Sept. 4, 2012) ........................6

*Harris v. Best Buy Stores, L.P.*,
   No. 3:15-cv-00657-HSG (KAW), 2016 WL 6024556 (N.D. Cal. Oct. 14, 2016)......................5, 8

*Harris v. Union Pacific Railroad Co.*,
   Case No. 8:16CV381, 2018 WL 2729131 (D. Neb. June 6, 2018)................................10

*Hickman v. Taylor*,
   329 U.S. 495 (1947) ......................................................................................................9

*Lane v. Facebook, Inc.*,
   5:08-cv-03845 (N.D. Cal.) ..............................................................................................4

*Lauris v. Novarits AG*,
   No. 1:16-cv-0393-LIO-SAB, 2016 WL 7178602 (E.D. Cal. Dec. 8, 2016) ..................5

*Lutzeier v. Citigroup Inc.*,
   No. 4:14-cv-00183-RLW, 2015 WL 430196 (E.D. Mo. Feb. 2, 2015) ..........................9

*Tulip Computers Int'l BV v. Dell Computer Corp.*,
   Case No. CIV.A. 00-981-RRM, 2002 WL 818061 (D. Del. Apr. 30, 2002) .................10

*United States v. Celgene Corp.*,
   No. CV 10-3165 GHK (SS), 2015 WL 9661172 (C.D. Cal. Oct. 16, 2015) ...................9

Gibson, Dunn &
Crutcher LLP

1

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Youngevity Int'l, Inc. v. Smith*,
  No. 16-CV-704 BTM (JLB), 2017 WL 2692928 (S.D. Cal. June 22, 2017)..................................9

**Rules**

Fed. R. Civ. P. 26(b)(1)...................................................................................................5, 6

Fed. R. Civ. P. 26(c)(1)........................................................................................................9

Fed. R. Civ. P. 34(b)(2)(A)................................................................................................11

Fed. R. Civ. P. 37(a)(3)(B).................................................................................................11

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF ZUCKERBERG
NOTEBOOKS
CASE NO. 3:18-MD-02843-VC

## I.      INTRODUCTION

Plaintiffs move to compel production of the "scrawlings," "sketches," and "juvenile jottings" appearing in personal notebooks handwritten by Facebook's founder and CEO, Mark Zuckerberg, in Facebook's early days, more than 15 years ago.  Assuming they even exist, Mr. Zuckerberg's early, private writings are neither relevant to Plaintiffs' claims nor responsive to the discovery requests identified in their motion, and Plaintiffs know it.  The true purpose of their motion is not to obtain evidence that is material to this litigation.  Instead, it is another attempt to open a discovery free-for-all and exert pressure on Facebook by harassing and embarrassing its CEO, who is not a party, or even a document custodian, in this action.

Plaintiffs' newfound interest in Mr. Zuckerberg's notebooks derives from the same source that so many of their out-of-bounds discovery requests emanate: a media report.  A February 2020 article by journalist Steven Levy in *Wired Magazine*,[1] adapted from Levy's book, *Facebook: The Inside Story*, discusses "a 17-page chunk" of a notebook Mr. Zuckerberg kept in 2006, when he was 22 years old and Facebook was 2 years old.  According to Levy, these pages contain "outlines" of Mr. Zuckerberg's early plans for "Open Registration"—opening Facebook to the general public, where before it had mostly been limited to students; and for "Feed"—the now familiar News Feed feature.  Levy also claims that Mr. Zuckerberg "mused about privacy" in the notebook, posing some philosophical questions to himself about potential ramifications of opening Facebook beyond students, which would greatly expand Facebook's user base.

Plaintiffs attempt to seize on these purported "mus[ings]" to argue, in essence, that Mr. Zuckerberg's notebooks are relevant because they contain his early thoughts about privacy, and Plaintiffs' case also involves privacy.  This is not just a stretch.  It is absurd.  Plaintiffs' case is not about "privacy" writ large, and it is certainly not about Mr. Zuckerberg's nascent thoughts about privacy 15 years ago. Plaintiffs' claims arise out of the Cambridge Analytica events that occurred 10 years after the notebook in question was supposedly written.   Judge Chhabria has allowed the case to move forward with respect to four specific theories about how Facebook allegedly shared data with app developers and certain partners of Facebook.  But "apps" could not be used on Facebook until Facebook

---

[1]      https://www.wired.com/story/facebook-mark-zuckerberg-lost-notebook/

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF ZUCKERBERG NOTEBOOKS

introduced its "Platform" in 2007, and the feature that enabled app developers to access a user's friends' data did not exist until 2010.  The notebooks Plaintiffs seek were written long before the data-sharing practices at issue in this case were even a glimmer (or potentially foreseeable).

Even if Mr. Zuckerberg had somehow presciently foreseen these developments in 2006, his musings from this irrelevant time period would not be probative of the *actual* policies and practices Facebook implemented many years later, let alone of Plaintiffs' claims in this action.   More fundamentally, the scope of discovery is circumscribed by Federal Rule of Civil Procedure 26(b)(1) to material "relevant to any party's claim or defense and proportional to the needs of the case.  None of the live claims or defenses here relate to "privacy" in the abstract.  Mr. Zuckerberg's private sketches are miles and miles beyond the bounds of relevance under the Federal Rules of Civil Procedure.

Plaintiffs' Motion must fail for the additional reason that it does not identify any request for production to which Mr. Zuckerberg's notebooks are responsive, which Plaintiffs effectively conceded by serving a request for production that does seek Mr. Zuckerberg's notebooks on the same day they filed the Motion.  Plaintiffs limited all the requests at issue in this Motion to documents from 2007 and later, consistent with the Court's decision that the relevant time period for discovery begins in 2007, thereby excluding the 2006 notebook mentioned in the *Wired* article.  Even setting aside the relevant time period, none of the RFPs listed in the Motion can be stretched to encompass Mr. Zuckerberg's notebooks.  Instead, Plaintiffs' requests generally seek information about Facebook's specific practices and policies relating to data access, disclosures, and enforcement of data use policies during the relevant time period.  This does not include personal notebooks from Facebook's early days that have no bearing on the actual material issues in this case.

For these reasons, and as discussed below, Plaintiffs' motion to compel should be denied.

## II.       FACTUAL AND PROCEDURAL BACKGROUND

### A.       The Notebooks In Context of Facebook's History

Plaintiffs seek Mark Zuckerberg's personal notebooks from a very early period in Facebook's history.  When "TheFacebook" launched in 2004, it was limited to college students.  Many of the features that characterize today's user experience had not even been conceived.  The *Wired* article discusses plans in Mr. Zuckerberg's 2006 notebook for opening Facebook to the general public and

2

launching News Feed.   Declaration of A. Swanson, Ex. 1 at 7–8.   These were relatively early developments, both debuting in September 2006. *See id.*   , Ex. 2 at 140.   The features at issue in Plaintiffs' lawsuit were still years away.

Plaintiffs' claims are based on alleged disclosure of user data in connection with development of "apps"—applications that users can download to their phones—for use on or in conjunction with Facebook. *See* Dkt. 298 at 6-9. But apps were not available on Facebook until it launched the "Platform" in May 2007, which gave users access to a small number of apps on the Facebook website. *See* SACC ¶ 230.  Also in 2007, Facebook began working directly with operating systems, device makers, and some other partners to create Facebook-like apps for their devices.

The method by which app developers allegedly gained access to some Facebook users' data through their friends' app permissions did not exist until 2010, when Facebook launched a platform that allowed apps to connect with Facebook through an Application Programming Interface ("API") called Graph API V1.[2]  A user could grant an app permission to retrieve information on their public profiles—such as their names,profile pictures, and other data that user had chosen to make publicly available—by "calling" Graph API.  An app could also request access to the same or similar categories of information about that user's friends—if their friends' privacy settings allowed it.  This process was called "friend-sharing" and it underpins the Cambridge Analytica events central to this case, which did not begin until November 2013, when Cambridge University researcher Aleksandr Kogan created a personality quiz app using Graph API V1.

The only events in Facebook's history that could reasonably be related to the allegations of misconduct that Judge Chhabria allowed to move forward occurred long after Mr. Zuckerberg, writing in his personal notebook in 2006, "mused about privacy" in connection with much earlier, and completely unrelated, features of the early Facebook platform.

**B.    The Scope of Plaintiffs Active Claims**

As Judge Chhabria found, Plaintiffs attempted to cram "anything Facebook has ever been reported to have done wrong" into a complaint that "runs 414 pages and includes 1,442 paragraphs,"[3]

---

[2]    https://developers.facebook.com/docs/graph-api/changelog/versions/

[3]    The operative Second Amended Consolidated Complaint ("SACC") is 355 pages and 1,388

Gibson, Dunn & Crutcher LLP

which contained "so many disparate and vague allegations" that it was "nearly impossible for Facebook to meaningfully respond to all of them, much less for the Court to effectively address them." Dkt. 298 at 5-6.

To impose a semblance of manageability on the litigation, and recognizing that Plaintiffs' lawsuit "stems from the Cambridge Analytica scandal" in 2016, the Court limited Plaintiffs' active claims to four core allegations: (1) "[g]iving app developers access to sensitive user information" by enabling them "to obtain any information about the users' Facebook friends that the users themselves had access to" (i.e., friend-sharing) "from roughly 2009 to 2015"; (2) "[c]ontinued disclosure [via friend-sharing] to whitelisted apps" after 2014; (3) "[s]haring sensitive user information with business partners," to which "Facebook [allegedly] outsourced . . . 'the time, labor, and money required to build Facebook's Platform on different devices and operating systems,'" (4) "[f]ailure to restrict [third parties'] use of sensitive information" accessed in these ways.  Dkt. 298 at 1, 6-9.

Plaintiffs' live claims *do not* encompass all alleged or conceivable wrongdoing at Facebook regarding confidentiality of user data.  Plaintiffs' live claims concern four specific theories of alleged conduct that Judge Chhabria laid out.  Plaintiffs have nevertheless pursued the same kitchen sink and elastic strategy in discovery that the Court rejected at the pleading stage.  Plaintiffs' attempts to make this case about "plans for creating 'personal profiles about people who *weren't* on Facebook,'" or "the outcry over Beacon" (launched in November 2007 and the subject of a different class action lawsuit[4]), among other irrelevant issues, are just the latest examples.  Mot. at 3, 5.  Plaintiffs should not be allowed discovery beyond the defined scope of alleged liability.

### III.     ARGUMENT

Plaintiffs' Motion fails for four reasons.  First, Mr. Zuckerberg's notebooks from Facebook's early history are not relevant to Plaintiffs' claims, which involve features of Facebook, such as friend-sharing, that did not exist in 2006.  Second, to the extent other notebooks or portions thereof exist, Plaintiffs should not be permitted to take a description in a news article about "juvenile jottings" in a 2006 notebook, expand their interest to all notebooks, and embark on a fishing

_____

paragraphs.  Dkt. 491.

[4]     *Lane v. Facebook, Inc.*, 5:08-cv-03845 (N.D. Cal.).

Gibson, Dunn &
Crutcher LLP

expedition through the personal files of Facebook's CEO for documents that they can only speculate (1) exist, (2) date the relevant time period, and (3) contain relevant information.  Third, ignoring the vast quantity of documents Facebook has produced on the features of Facebook at issue in this case, Plaintiffs pursue the notebooks for the improper purpose of harassing Mr. Zuckerberg.  Fourth, none of the four RFPs Plaintiffs identified in connection with the Motion seek Mr. Zuckerberg's notebooks.  Rather, they are limited by their terms to documents from 2007 and later and cannot be stretched to encompass the notebooks.

## A.  Mark Zuckerberg's notebook from 2006 is not relevant to the claims and defenses in this action.

Plaintiffs' Motion should be denied because they fail to carry their burden to show that Mr. Zuckerberg's "jottings" in a notebook 15 years ago are relevant to the issues to be litigated in this case.  As Plaintiffs acknowledge, "[t]he party seeking to compel discovery bears the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1)."  Mot. at 4 (quoting *Harris v. Best Buy Stores, L.P.*, No. 3:15-cv-00657-HSG (KAW), 2016 WL 6024556, at *1 (N.D. Cal. Oct. 14, 2016)).

Nonprivileged information is discoverable only if it is "relevant to any party's claim or defense and proportional to the needs of the case, considering" factors including "the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  "[T]he right to even plainly relevant discovery," unlike the notebooks in question here, "is not limitless."  *Lauris v. Novarits AG*, No. 1:16-cv-0393-LIO-SAB, 2016 WL 7178602, at *4 (E.D. Cal. Dec. 8, 2016).  Thus, litigants may not treat discovery as "a ticket to an unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest." *BankDirect Cap. Finance, LLC v. Cap. Premium Financing, Inc.*, No. 15 C 10340, 2018 WL 946396, at *3 (N.D. Ill. Feb. 20, 2018).

To the contrary, the Court specifically admonished Plaintiffs that "discovery is . . . not supposed to be a fishing expedition" when Plaintiffs sought "vastly overbroad" discovery into the "evolving landscape of . . . what Facebook is doing."  Swanson Decl., Ex. [8/23/18 Hrg. Tr.] at 25:9-26:14 *see also Haggarty v. Wells Fargo Bank, N.A.*, No. 10-2416 CRB (JSC), 2012 WL 3939321, at *1 (N.D.

Gibson, Dunn &
Crutcher LLP

Cal. Sept. 4, 2012) ("[D]iscovery may not be used as a fishing expedition." (citations and quotation marks omitted)).

Mr. Zuckerberg's nascent ideas from Facebook's earliest days are not relevant to the "four core categories of misconduct" to which this case is limited.  Dkt. 298 at 9.  Theoretical privacy questions Mr. Zuckerberg apparently posed to himself in 2006 have no bearing on Facebook's actual conduct years later (willful, intentional, or otherwise) involving features of Facebook, such as friend-sharing, at issue in this case—features that did not exist, and could not have been contemplated, when Mr. Zuckerberg allegedly wrote those words.  Indeed, the Cambridge Analytica events centered on friend-sharing via Graph API V1, which Facebook introduced in 2010.  Even "apps" as Facebook users know them were not available on Facebook until May 2007.  And not until 2007 did Facebook begin working directly with the so-called "business partners" Plaintiffs describe in their complaint to create Facebook-like functionalities on their platforms and devices.  Any remarks about privacy in a notebook from 2006 could not possibly be probative of the manner in which, years later, Facebook enabled friend-sharing through apps and worked with partners to build Facebook functionalities.

Plaintiffs fail to meet their burden to show relevance, instead only offering four nebulous arguments that fail to articulate any concrete relationship between Mr. Zuckerberg's notebook and the claims at issue.

First, Plaintiffs vaguely proclaim that any musings Mr. Zuckerberg had about privacy suggest "Facebook's conduct has been willful and intentional," worthy of "the imposition of punitive damages."  Mot. at 5.  Plaintiffs fail to identify this "conduct," explain how it supports their claims, or tie Mr. Zuckerberg's musings to it.[5]

Second, Plaintiffs argue that the 2006 notebook "is relevant to this litigation, including Facebook's approach to privacy" because "Zuckerberg 'outlined ideas about privacy' in the notebook."  Mot. at 5.  Plaintiffs are incorrect.  To be relevant to this litigation, the notebook must relate to the claims and theories at issue here.  Fed. R. Civ. P. 26(b)(1).  Yet Plaintiffs fail to identify any such relevance—nor could they, since the claims and issues in this case relate to features that did not exist

[5] If Plaintiffs clarify their position in their reply or advance new arguments, Facebook requests an opportunity to respond.

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF ZUCKERBERG NOTEBOOKS
CASE NO. 3:18-MD-02843-VC

when the notebook was written.  Again, privacy in general is not at issue here, so the notebook is not relevant simply because it may loosely relate to general attitudes or ideas about privacy.

Third, attempting to manufacture some connection between the 2006 notebook and this action, Plaintiffs claim that Levy wrote that Facebook team members were "guided" by the 2006 notebook "in developing core features of the Facebook Platform, including Open Registration, News Feed, and *Privacy Controls*."  Mot. at 5 (emphasis added).  Neither Open Registration nor News Feed involve data sharing with third parties.  With respect to Privacy Controls, Plaintiffs misrepresent Levy's hearsay commentary.  Nowhere in his book or the *Wired* article does Levy write that Mr. Zuckerberg's notebooks guided development of "Privacy Controls" that could relate to data sharing with third parties.  To the contrary, Levy writes that the Facebook team scrambled to implement "privacy controls" for News Feed *after* public backlash against the new feature, meaning that, to the extent the 2006 notebook guided development of News Feed, it did *not* contain directions for "Privacy Controls."  Swanson Decl., Ex. 2 at 143.  In any event, the advent of News Feed did not involve data sharing with third parties,[6] so neither did any "Privacy Controls" implemented in response to a backlash.

Finally, Plaintiffs contend that simply by "bearing on users' expectations of privacy," the 2006 notebook is "relevant to Plaintiffs' claims for invasion of privacy and breach of the implied covenant of good faith and fair dealing."  Mot. at 5.  Plaintiffs fail to explain how the private "mus[ings]" of a 22-year-old Mark Zuckerberg in 2006 could have informed users' expectations of privacy, when the musings were Zuckerberg's private, personal writings, not a public announcement.  Rather, user expectations—to the extent they are relevant—would have been informed by Facebook's actual practices and existing features and settings.  Whether such conduct is informed by or consistent with the musings of Facebook's founder years earlier has no bearing on Plaintiffs' claims.

**B.      Facebook has no obligation to search for unidentified notebooks from after 2006 that may not exist.**

Plaintiffs do not confine their Motion to the 2006 notebook fragment discussed in the *Wired* article.  Instead, based on untethered speculation that other notebooks, or at least "snippets" thereof,

---

[6] News Feed curated information about users' Facebook friends to which they already had access. Swanson Decl., Ex. 2 at 139-41.  This is completely unrelated to Plaintiffs' claims.

Gibson, Dunn & Crutcher LLP

"may exist," Plaintiffs also demand that Facebook "search for and review all portions of these notebooks in its possession." Mot. at 2-3. Plaintiffs argue that because Facebook has not yet tried to search for these hypothetical snippets, it cannot prove that they are not relevant. Mot. at 5. Plaintiffs' position is meritless.

It is Plaintiffs' burden to establish the relevance of unidentified and potentially nonexistent notebooks, not Facebook's. *See* Mot. at 4 (quoting *Harris v. Best Buy Stores, L.P.*, No. 3:15-cv-00657-HSG (KAW), 2016 WL 6024556, at *1 (N.D. Cal. Oct. 14, 2016)). Plaintiffs offer nothing to show that additional notebooks written after the 2006 notebook discussed in the article even exist, let alone contain relevant information. In the *Wired* article, Levy alludes to the possible existence of a "stack of completed journals" in Mr. Zuckerberg's apartment in *2006* when Levy first interviewed Zuckerberg, but as discussed above, notebooks from this time period, if any exist, are *not* relevant. Swanson Decl., Ex. 1 at 6. Levy states that Mr. Zuckerberg stopped recording his thoughts at some point and destroyed the notebooks "for privacy reasons," but provides no specific time frame for when Mr. Zuckerberg ceased keeping notebooks. *Id.* at 7.

With no reason to believe additional notebooks from the relevant time period exist or are relevant, Plaintiffs' demand that Facebook search for unknown fragments of Zuckerberg's personal papers is an improper fishing expedition. *Bresk v. Unimerica Ins. Co.*, No. CV 16-8893 ODW (SSX), 2017 WL 10439831, at *5 (C.D. Cal. Nov. 16, 2017) ("A plaintiff's mere suspicion that additional documents must exist is an insufficient basis to grant a motion to compel."). The parties painstakingly negotiated a detailed protocol for production of ESI and hard copy documents. Dkt. 416. According to the protocol, the parties are to settle on specific custodians and apply search terms to their files. *See id.* at 4, 7. The parties already agreed to *82* custodians likely to possess discoverable information. Swanson Decl., ¶ 2. Facebook is currently deep into the extremely burdensome document review process, and has already produced more than 1.9 million pages. *Id.* ¶ 3.

Plaintiffs' concession that "Facebook has not yet produced the custodial files of Mr. Zuckerberg" is misleading insofar as it implies that Mr. Zuckerberg is one of these custodians. Mot. at 1 n.1. He is not. Nor is he likely to become a custodian during the present phase of discovery.

Consistent with courts' approach to discovery from apex personnel (see Section III.C, below), Judge Corley expressly rejected Plaintiffs' earlier attempts to make Mr. Zuckerberg a custodian. Swanson Decl., Ex. 3 at 48:8-11. According to Judge Corley, if Mr. Zuckerberg ever becomes a custodian, it will be after Facebook's document productions are otherwise complete, and his role will be narrow. *Id.* Until then, Facebook has no obligation to scour the files of its founder and CEO for hypothetical documents of dubious relevance. *See United States v. Celgene Corp.*, No. CV 10-3165 GHK (SS), 2015 WL 9661172, at *2 (C.D. Cal. Oct. 16, 2015) (denying relator's motion to compel production of documents where the defendant corporation had "already produced millions of pages of documents," the individual whose documents relator sought "was not a custodian," and relator failed to show "how additional documents from [the non-custodian's] files [were] necessary to establish her claims").

## C.   Plaintiffs' demand for the notebooks is an improper attempt to harass and embarrass Facebook's CEO.

Courts restrict discovery "conducted in bad faith or in such a manner as to annoy, embarrass, or oppress the person subject to the inquiry." *Hickman v. Taylor*, 329 U.S. 495, 507–08 (1947); Fed. R. Civ. P. 26(c)(1). These limitations are especially appropriate, where, as here, a party attempts to expose sensitive personal information from a high-profile CEO based on a far-fetched theory of relevance. *See Youngevity Int'l, Inc. v. Smith*, No. 16-CV-704 BTM (JLB), 2017 WL 2692928 (S.D. Cal. June 22, 2017).

Mr. Zuckerberg is not a party to this lawsuit. Indeed, Plaintiffs' initial complaint named Mr. Zuckerberg as a non-prioritized defendant, but Plaintiffs dropped him as a party altogether in the Second Amended Consolidated Complaint—confirming that this case is not about Mr. Zuckerberg's personal conduct. *Compare* Dkt. 148 at 49 (identifying Mr. Zuckerberg as a defendant) to Dkt. 491 at 94 (identifying Mr. Zuckerberg as an "interested party"). As explained, Mr. Zuckerberg is not even a custodian. In the event he ever becomes a custodian, the Court has made clear that access to his files will be strictly limited, and for good reason. Plaintiffs would have an unfair advantage in litigation against large companies if they could personally expose the CEO to the constant pressure of document discovery. Accordingly, courts commonly preclude document collection from apex personnel where relevant and responsive documents are available from other sources. *See, e.g., Lutzeier v. Citigroup*

9

Gibson, Dunn & Crutcher LLP

*Inc.*, No. 4:14-cv-00183-RLW, 2015 WL 430196, at *6–7 (E.D. Mo. Feb. 2, 2015) (denying request to add high level executives to a custodial list because "[a]t this stage of the litigation, Plaintiff has not satisfied his burden to show that these high level executives have unique or personal knowledge of the subject matter that warrants their information"); *Harris v. Union Pacific Railroad Co.*, Case No. 8:16CV381, 2018 WL 2729131, at *1 (D. Neb. June 6, 2018) (denying motion to compel production of CEO's documents, finding there was not "a sufficient showing that this information is necessary and not cumulative of other materials"); *Tulip Computers Int'l BV v. Dell Computer Corp.*, Case No. CIV.A. 00-981-RRM, 2002 WL 818061, at *7 (D. Del. Apr. 30, 2002) (finding it "unclear to the court that a search of Dell CEO Michael Dell's e-mails will produce responsive discovery in this case").

Indeed, courts have repeatedly prevented plaintiffs from chasing their hunches through Mark Zuckerberg's personal files. *See*, *e.g.*, *BlackBerry Ltd. v. Facebook, Inc.*, No. CV 18-1844-GW (KSx), 2019 WL 4544425, at *6–7 (C.D. Cal. Aug. 19, 2019) (rejecting plaintiff's attempt to search Mr. Zuckerberg's files for documents related to a newspaper editorial he wrote because nothing in the editorial suggested that Mr. Zuckerberg had personal knowledge relevant to the plaintiff's claims); *Children's Health Def. v. Facebook Inc.*, No. 20-CV-05787-SI, 2021 WL 2662064, at *23 (N.D. Cal. June 29, 2021) (denying plaintiff's demand for Facebook to produce an email between Mr. Zuckerberg and Dr. Anthony Fauci related to a COVID information hub as irrelevant to plaintiff's claims regarding their Facebook page).

This situation is no different.  Facebook has already produced hundreds of thousands of pages related to privacy issues, including documents related to Facebook's privacy policy implementation and monitoring, and privacy audits and enforcement.  Swanson Decl., ¶ 4.  Plaintiffs fail to meet their requisite burden to show  that Mr. Zuckerberg's abstract musings about privacy in contexts far removed from the conduct and claims at issue in the case would add anything to this tremendous volume of already-produced information about Facebook's policies and conduct related to data sharing with third parties during the relevant time period.

The potential for abuse is even greater in this case given the intimate nature of the notebooks.  Swanson Decl., Exs. 1 at 4; 2 at 118.  Plaintiffs' demand thus imposes not only on Mr. Zuckerberg's

time and attention, but also his privacy interests in materials unrelated to this lawsuit.  That is not a valid basis for discovery.  *See Blackmond v. UT Med. Grp., Inc.*, No. 02-2890 MAV, 2004 WL 3142214, at *2 (W.D. Tenn. Nov. 2, 2004) (denying plaintiff's motion to compel production of personnel records because plaintiff "does not set forth any compelling reason why these files should be produced[, but] merely states that the files 'may' contain information that is relevant to her claim[, which] indicates to the court that [plaintiff] is engaging in nothing more than a fishing expedition into an area where privacy concerns are high and relevant material may or may not exist").

**D.    Mr. Zuckerberg's notebooks are not responsive to Plaintiffs' requests for production.**

Plaintiffs' effort to compel production of Mr. Zuckerberg's personal notebooks fails for an additional, separate, and simple reason:  the notebooks are not responsive to any of the requests for production on which Plaintiffs' motion is based (Pls.' RFP Nos. 36, 37, 41 and 57).  Fed. R. Civ. P. 37(a)(3)(B) ("A party seeking discovery may move for an order compelling an answer . . . if . . . a party fails to produce documents or fails to respond that inspection will be permitted—or fails to permit inspection—as requested under Rule 34"); *Bermudez v. Duenas*, 936 F.2d 1064, 1068 (9th Cir. 1991) (affirming denial of motion to compel as premature where movant "had made no request for discovery pursuant to Rule 34").  Plaintiffs effectively conceded this point by serving a new request for production, not at issue here, on the same day the filed their Motion, that does expressly seek production of Mr. Zuckerberg's notebooks.[7]

As an initial matter, Mr. Zuckerberg's 2006 notebook predates the relevant time period for discovery in this case.  Plaintiffs' requests *all* seek documents from 2007 "to present" (i.e. as of the date of their requests).  Swanson Decl., Exs. 5 at "Instructions" ¶ 1 (requesting "responsive documents created, modified or reviewed *on or after November 1, 2009*."); 6; 7; 8.  Indeed, the Court has

---

[7]  Plaintiffs' RFP No. 71, served on August 30, 2021, seeks "All handwritten journals, diaries, notebooks, or notes written by Mark Zuckerberg or Sheryl Sandberg relating to Facebook's policies or practices, whether enacted or not, regarding safeguarding user privacy, including but not limited to the Zuckerberg notebooks, as referenced in Steven Levy's article, Inside Mark Zuckerberg's Lost Notebook, Wired (Feb. 12, 20201) https://www.wired.com/story/facebook-mark-zuckerberg-lost-notebook/, and Chapter Six of Levy's book, Facebook: The Inside Story (Penguin ed. 2020)."  Facebook's deadline to respond to this request is September 29, 2021.  Fed. R. Civ. P. 34(b)(2)(A) ("The party to whom the request is directed must respond in writing within 30 days after being served").

11

specifically ruled, and Plaintiffs' concede that the relevant time period for discovery *begins* in 2007. Dkt. No. 381, 3/3/2020 Discovery Order No. 36 at 1; Mot. at 7.  Plaintiffs' contention that notebooks from before 2007 could be relevant, Mot. at 6, is beside the point; their RFPs at issue here do not seek pre-2007 documents, let alone Mr. Zuckerberg's personal notebooks from that time.

Further, Plaintiffs make no effort to explain how Mr. Zuckerberg's personal notebooks from *any* time period fall within the reasonable scope of the four requests associated with their Motion. Plaintiffs' brief does not even mention the RFPs at issue, and the accompanying Separate Statement simply asserts without explanation that "[t]he notebooks are relevant and responsive" to the listed requests.  They are not.  Plaintiffs' RFP Nos. 36, 37, 41, and 57 instead concern applications and technologies that did not exist in 2006, along with attributes of Facebook's platform, privacy controls and application settings, detailed backend technical data concerning third parties' actual calls for Facebook user data, analytics data, research reports, tests, and customer service inquiries.  The requests on which Plaintiffs purportedly based their motion thus concern actual features of Facebook's platform implemented no earlier than 2007, and alleged conduct related to such features.  The requests plainly do not relate to Mr. Zuckerberg's concepts for the future written in his personal notebooks. Specifically:

**Request 36** seeks documents concerning "User testing, evaluation and analysis of Facebook's Privacy Controls and App Settings during the Relevant Time Period, including . . . design documents, correspondence, analyses, and reports."  Swanson Decl., Ex. 6.  There is no reason to believe Mr. Zuckerberg's notebooks would be responsive to this request for Facebook's technical evaluations of existing privacy controls and settings.

**Request 37** seeks "records or logs of API Calls made by Third Parties for" user content "of Friends of Installing Users."  This RFP has nothing to do with Mr. Zuckerberg's personal thoughts in a handwritten notebook.  Instead, it asks for massive amounts of backend technical data about actual API calls made to Facebook's platform by third parties for user data.  Mr. Zuckerberg's "musings" and "juvenile jottings" in his personal notebook are obviously not petabytes of specific technical "records" or "call logs" of millions of API calls made by third parties.

Gibson, Dunn &
Crutcher LLP

**Request 41** seeks documents related "to the deletion, loss, destruction or spoliation of" documents that are "responsive" to Plaintiffs' RFPs.  As established above, Mr. Zuckerberg's personal notebooks are not responsive to any of Plaintiffs' RFPs asserted in their motion, or any other RFPs to which Facebook is presently obligated to respond.  Moreover, even if Mr. Zuckerberg's personal notebooks were lost or destroyed at some point, the notebooks themselves are still not responsive to Request 41.  The request seeks documents related to the loss or destruction, which could not logically include the lost or destroyed documents themselves.  And if the notebooks did exist, they would likewise not be responsive to this request.

**Request 57** seeks "[d]iscussions, analytics data, reports, surveys, tests, studies, task forces, projects . . . Platform changes, customer service inquiries, or User complaints" relating to "Users' expectations of privacy" in Facebook information.  This request calls for actual reports, surveys, "data science projects, research projects, and academic research projects" about users' privacy expectations and does not contemplate Zuckerberg's personal thoughts about features that did not yet exist.  Indeed, Plaintiffs' August 18, 2020 letter seeking to memorialize the parties' meet and confer discussions provides the following example of what Plaintiffs consider to be "covered by this request": "*studies of user engagement flow to determine whether the perception of privacy chilled or encouraged user engagement.*"  Swanson Decl., Ex. 9.  Mr. Zuckerberg's notebooks are not studies on users' privacy.

## IV.    CONCLUSION

Plaintiffs' motion reflects their general approach to discovery in this case.  They believe they can overwhelm Facebook and pressure its CEO by seeking discovery of anything that touches on "privacy" during Facebook's history, including any privacy-related thoughts that Mark Zuckerberg "mused about" in his private papers more than a decade ago.  Plaintiffs are mistaken.  Mr. Zuckerberg's notebooks are not relevant to the live claims, which the Court has limited to "four core categories of misconduct" involving aspects of the Facebook Platform that did not exist in 2006.  Nor should Plaintiffs be permitted to force Facebook to undertake an aimless search through the files of its CEO, who is not a custodian, for additional notebooks based on nothing more than speculation that they might exist, might date to the relevant time period, and might contain relevant information.  Finally, Plaintiffs'

failure to first propound a request for production to which the notebooks are responsive is fatal to their motion regardless of the notebooks' relevance.  Facebook respectfully requests that the Special Master deny Plaintiffs' motion to compel production of Mr. Zuckerberg's notebooks.

Dated:  September 14, 2021                    **GIBSON, DUNN & CRUTCHER, LLP**

By: */s/ Orin Snyder*
Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF ZUCKERBERG
NOTEBOOKS
CASE NO. 3:18-MD-02843-VC

Gibson, Dunn &
Crutcher LLP

# EXHIBIT C

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF ZUCKERBERG NOTEBOOKS**<br><br>Judge: Hon. Vince Chhabria<br>Hon. Jacqueline Scott Corley<br>Special Master Daniel Garrie, Esq.<br>Courtroom: 4, 17th Floor<br><br>JAMS Ref. No.: 1200058674 |

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................1

II.  ARGUMENT ....................................................................................................1

    A.  The Notebooks Are Uniquely Probative of Zuckerberg's and Facebook's Intentions and Are Highly Relevant to Claims at Issue in This Litigation. ...........1

    B.  Plaintiffs' Burden Is to Demonstrate the Relevance of Their Requests, Not to Prove the Contents of Documents that Facebook Refuses to Produce. .............2

    C.  Plaintiffs' RFPs Clearly Encompass the Notebooks, and Plaintiffs Have Directly Identified the Notebooks in Subsequent Communications.......................4

    D.  The Relevant Time Period of Plaintiffs' RFPs Encompasses All of Zuckerberg's Notebooks, Including Those from 2006. ........................................6

    E.  Facebook's Production Obligations Are Not Limited to Custodial Sources...........6

    F.  Facebook Misrepresents Its Inapposite Authorities. ...............................................7

III.  CONCLUSION .................................................................................................8

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bresk v. Unimerica Ins. Co.*,
  No. CV 16-8893 ODW (SSX), 2017 WL 10439831 (C.D. Cal. Nov. 16, 2017) ....................7

*Harris v. Best Buy Stores, L.P.*,
  No. 315CV00657HSGKAW, 2016 WL 6024556 (N.D. Cal. Oct. 14, 2016) ................. 1, 3, 6

*Lutzeier v. Citigroup Inc.*,
  No. 4:14-CV-00183-RLW, 2015 WL 430196 (E.D. Mo. Feb. 2, 2015)..................................8

*Reinsdorf v. Skechers U.S.A., Inc.*,
  296 F.R.D. 604 (C.D. Cal. 2013) .......................................................................................3

*Strategic Partners, Inc. v. FIGS, Inc.*,
  No. CV 19-2286-GW (KSX), 2020 WL 2527056 (C.D. Cal. Feb. 6, 2020)...........................3

*Tulip Computers Int'l B.V. v. Dell Computer Corp.*,
  No. CIV.A. 00-981-RRM, 2002 WL 818061 (D. Del. Apr. 30, 2002) ...................................8

**Other Authorities**

Fed. R. Civ. P. 26(a)(1)(A)...........................................................................................................7

Fed. R. Civ. P. 26(b)(1)............................................................................................................ 1, 3

Steven Levy, *Facebook: The Inside Story* (2020) ......................................................... 2, 3, 5, 6

# I.   INTRODUCTION

Plaintiffs request production of the relevant and responsive portions of Mark Zuckerberg's notebooks. The notebooks, far from being private, were copied and shared with Facebook engineers, who used them as blueprints for Facebook's features. They were instrumental in guiding the team that developed Facebook's privacy controls, which are directly at issue in this litigation. They also reflect Zuckerberg's approach to privacy—specifically, his efforts to make Facebook *appear* private to its users, while not actually providing privacy—which is also directly at issue in this litigation. Plaintiffs have met their burden of establishing that their request is relevant, in accordance with Rule 26(b)(1), but Facebook's opposition fails to meet its burdens of "showing that discovery should not be allowed" and "clarifying, explaining and supporting its objections with competent evidence." *See Harris v. Best Buy Stores, L.P.*, No. 315CV00657HSGKAW, 2016 WL 6024556, at *1 (N.D. Cal. Oct. 14, 2016). The Zuckerberg notebooks should be collected, reviewed for relevance, and produced.[1]

# II.   ARGUMENT

## A.   The Notebooks Are Uniquely Probative of Zuckerberg's and Facebook's Intentions and Are Highly Relevant to Claims at Issue in This Litigation.

Plaintiffs have met their burden of demonstrating that their request for the Zuckerberg notebooks is relevant in accordance with Rule 26(b)(1). The Court has already ruled that documents originating at the inception of Facebook's business model "could be probative of Facebook's intent regarding the future handling of users' private information." PTO No. 36, Dkt. No. 381 ("It is highly plausible that documents dating back to 2007 could be probative of Facebook's intent regarding the future handling of users' private information.").

According to Steven Levy, the author of *Facebook: The Inside Story*, who met with

---

[1] Plaintiffs incorporate by reference the arguments in Plaintiffs' Motion To Compel Mark Zuckerberg And Sheryl Sandberg As Document Custodians with respect to the central role that Zuckerberg played in key decisions at the core of this litigation. To the extent that the notebooks are present in Zuckerberg's custodial files, they are a subset of the materials that should be produced.

Zuckerberg on multiple occasions, the notebooks contain sketches of "product ideas" and diagrams of "coding approaches." Steven Levy, *Facebook: The Inside Story* 118 (2020) ("*The Inside Story*"). Zuckerberg "use[d] those notebooks to convey a detailed version of his product vision" to others, and Facebook engineers and designers "would sometimes find a few photocopied pages sketching out a design for a front end or a list of signals for a ranking algorithm." *Id.* These were not "'scrawlings,' 'sketches,' and 'juvenile jottings,'" or "private, personal writings." *Cf.* Opp. at 1, 7. Rather, these notebooks constituted blueprints for Facebook's design that were publicly shared and posted within the company.

Facebook's lawyers argue that the notebooks are not relevant—without even searching for or reviewing the notebooks. It is evident, however, that the notebooks are highly relevant to Plaintiffs' claims. Discovery of the intent driving Facebook's development—including Zuckerberg's intentions regarding users' privacy interests in the context of Facebook's design and growth—is central to this case. For instance, the team that developed the first iteration of Facebook's privacy controls—"including a privacy 'mixer' that let users control who would see an item about them"—was "guided by copied pages from the Book of Change," one of Zuckerberg's many notebooks. *The Inside Story*, *supra*, at 127, 143. In addition, the notebooks expressly discuss Facebook's duplicitous approach to privacy, reflecting the tension between Facebook's growth and users' concerns about privacy and control of their information. For example, in considering a new Facebook feature, Zuckerberg "seemed at least as concerned about the *perception* of privacy as about privacy itself," asking himself "'What makes this seem secure, whether or not it actually is?'" *Id.* at 122-23.

## B.    Plaintiffs' Burden Is to Demonstrate the Relevance of Their Requests, Not to Prove the Contents of Documents that Facebook Refuses to Produce.

Facebook seeks to turn its discovery obligations on their head, asserting that it is somehow Plaintiffs' burden to demonstrate that the contents of the Zuckerberg notebooks are relevant to this litigation. *See* Opp. at 5 ("Plaintiffs' Motion should be denied because they fail to carry their burden to show that Mr. Zuckerberg's 'jottings' in a notebook 15 years ago are

relevant to the issues to be litigated in this case.") Of course, this would be impossible, as Plaintiffs have not reviewed and do not know the entirety of the contents of the Zuckerberg notebooks—they only know what has been publicly reported about them by a journalist who reviewed a seventeen-page excerpt of one of Zuckerberg's "stack" of notebooks. *See The Inside Story*, *supra*, at 118. In contrast, the Federal Rules of Civil Procedure provide that "[t]he party seeking to compel discovery bears the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1)." *Harris*, 2016 WL 6024556, at *1. Thus, Plaintiffs' burden here is limited to articulating the relevance of the ***request***—not to proving that the materials they have requested but have not yet seen are relevant—an impossible burden not imposed by the Federal Rules. Plaintiffs have more than met their burden.

In fact, it is Facebook that has failed to meet its "burden of showing that discovery should not be allowed," as well as its "burden of clarifying, explaining and supporting its objections with competent evidence." *See id.* Far from providing "competent evidence" in support of its objections, Facebook has produced no evidence whatsoever regarding its relevance and responsiveness objections, and instead has flatly refused to even search for and review the Zuckerberg notebooks for relevance or responsiveness. Facebook has thus violated its discovery obligations. *See, e.g.*, *Strategic Partners, Inc. v. FIGS, Inc.*, No. CV 19-2286-GW (KSX), 2020 WL 2527056, at *7 (C.D. Cal. Feb. 6, 2020) (granting motion to compel where the defendant "makes clear that it has not undertaken any effort to find out whether such information exists or not," and stating that, "[i]n order to fulfill its discovery obligations," the defendant "must confirm that it conducted a thorough search—not just a convenient one—with due diligence"); *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 615 (C.D. Cal. 2013) ("[P]arties must impose a reasonable construction on discovery requests and conduct a reasonable search when responding to the requests," and "the discovery process relies upon the good faith and professional obligations of counsel to reasonably and diligently search for and produce responsive documents.").

**C.      Plaintiffs' RFPs Clearly Encompass the Notebooks, and Plaintiffs Have Directly Identified the Notebooks in Subsequent Communications.**

Facebook also incorrectly claims that the notebooks are not responsive to Plaintiffs' discovery requests. In fact, the notebooks are directly responsive to previous discovery requests, which were first identified to Facebook in January 2020, as well as to RFP 71, which Plaintiffs propounded in response to Facebook's insistence that the notebooks were not responsive to outstanding requests. Even Facebook acknowledges that RFP 71 encompasses the notebooks. *See* Opp. at 11, 11 n.7. Oddly, Facebook argues that RFP 71 is "not at issue here," which can only be the case if Facebook either withdraws its responsiveness objection or is seeking to delay resolution of this issue until after its response to this RFP is due on September 29, 2021.

For the avoidance of doubt, it is necessary to set forth the history of the parties' negotiations regarding the notebooks. Plaintiffs first identified the notebooks as a topic of discovery in April 2020. Pls.' Separate Statement in Supp. of Mot. to Compel Prod. of Zuckerberg Notebooks. Plaintiffs then requested production of the notebooks in December 2020. *Id.* In January 2021, the parties met and conferred about Plaintiffs' request for production of the notebooks, in the context of which Plaintiffs identified numerous RFPs to which the notebooks are responsive.[2] *See id.* These include RFP 57, which seeks:

> All Documents concerning any discussions, analytics data, reports, surveys, tests, studies, task forces, projects (including data science projects, research projects, and academic research projects or partnerships), Platform changes, customer service inquiries or User complaints relating to Users' expectations of privacy in Content and Information they created, shared or posted on the Facebook User Interface or data derived therefrom, including but not limited to User Interface or User Engagement Flow testing, qualitative User research reports, User surveys, studies or polls conducted by You or third-party consultants related to those topics.

The notebooks clearly "concern[] any discussions . . . [or] Platform changes . . . relating to

---

[2] Facebook falsely represents that, prior to August 13, 2021, "Plaintiffs had not stated that their request for Mr. Zuckerberg's notebooks was tied to any RFP, and the parties, therefore, never discussed this." Facebook's Separate Statement in Supp. of Its Opp. to Pls.' Mot. to Compel Prod. of Zuckerberg Notebooks 1-2.

Users' expectations of privacy in Content and Information they created." For example, in considering Open Registration—a planned Facebook Platform change—Zuckerberg asked himself, "'What makes this seem secure, whether or not it actually is?" *The Inside Story* at 122-23. Zuckerberg "seemed at least as concerned about the *perception* of privacy as about privacy itself." *Id.* As such, the notebooks "concern[] any discussions, . . . [and] Platform changes . . . relating to Users' expectations of privacy" and are therefore responsive to RFP 57.

Plaintiffs have also identified other requests for production to which the notebooks are responsive, including RFP 35 and RFP 38, the text of which is set forth below.

> **REQUEST FOR PRODUCTION NO. 35**
> Documents relating to the manner in which a Facebook User could control how his or her data was shared through their Privacy Controls and App Settings throughout the Relevant Time Period, including but not limited to screenshots of the Facebook website and the Facebook mobile application.
>
> **REQUEST FOR PRODUCTION NO. 38**
> All Documents concerning privacy settings, sharing controls, and deletion capabilities (including permanent deletion) available to any Facebook employee, officer, or director using the Platform that were not available to all Facebook Users.

Moreover, Judge Corley has cautioned Facebook not to "get too caught up" in its interpretation of the text of a given RFP, stating that "the RFPs are kind of like a starting point," and that the parties should then "have a discussion and try to narrow it and get out what it is they are trying to do." Tr. of Proceedings 10:14-11:14 Dec. 9, 2020. Judge Corley noted that, when she hears discovery disputes, she asks: "What is it that you want? . . . [W]hen somebody starts reading to me their document requests, I stop them. . . . Just tell me in plain English what is it that you want. And then have the other side respond. . . . That's what it should be." *Id.* at 13:19-14:5. Here, not only are the Zuckerberg notebooks clearly encompassed by specific RFPs, but Plaintiffs have also advised Facebook in plain English on multiple occasions that they are requesting the notebooks. In any event, RFP 71 resolves Facebook's objection.

**D.   The Relevant Time Period of Plaintiffs' RFPs Encompasses All of Zuckerberg's Notebooks, Including Those from 2006.**

Plaintiffs are entitled to discovery regarding the development of the Facebook platform and Facebook's intentions regarding user privacy. Facebook's argument that the Zuckerberg notebooks date back to 2006, and are therefore not encompassed by Plaintiffs' RFPs, is without merit. Plaintiffs' RFPs define the relevant period for this action is defined as follows.

> The relevant time period for each Document Request is January 1, 2007 through the present (the "Relevant Time Period"), unless otherwise specifically indicated, or portion thereof. ***Each Document Request shall be interpreted to include all documents and information that relate to the Relevant Time Period or otherwise-specified period, even if such documents or information was prepared or published outside of the Relevant Time Period or otherwise-specified period.*** If a document prepared before or after this period is necessary for a correct or complete understanding of any document covered by a request, you must produce the earlier or subsequent document as well. If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the production request.

Decl. of Alexander P. Swanson in Supp. of Opp. to Pls.' Mot. to Compel ("Swanson Decl."), Ex. 8, at 10 (emphasis added). The notebooks dating from 2006 are encompassed by Plaintiffs' discovery requests insofar as they "relate to the Relevant Time Period," even though they were "prepared or published outside of the Relevant Time Period." *See id.*

Further, Facebook's time period objection is inapplicable to any notebooks prepared on or after January 1, 2007. Levy states that "[i]n later years, Zuckerberg would be less enthusiastic about logging things," which implies that he continued to keep notebooks in subsequent years. *The Inside Story* at 118. Facebook has not stated that no notebooks prepared in or after 2007 exist, only that it refuses to search for these notebooks. As such, Facebook has failed to meet its burden of "supporting its objections" regarding the time period "with competent evidence." *See Harris*, 2016 WL 6024556, at *1.

**E.   Facebook's Production Obligations Are Not Limited to Custodial Sources.**

Facebook falsely represents that its document review and production obligations are limited to documents identified through the application of search terms to the files of specific

document custodians. Citing to the Stipulation and Order Governing the Production of Electronically Stored Information and Hard Copy Documents ("ESI Protocol"), Dkt. No. 416, Facebook states that "[t]he parties painstakingly negotiated a detailed protocol for production of ESI and hard copy documents," and "[a]ccording to the protocol, the parties are to settle on specific custodians and apply search terms for their files." Opp. at 8.

Facebook misrepresents the ESI protocol in two ways. First, the ESI protocol encompasses both custodial and non-custodial documents, providing, for example, that the parties are to meet and confer regarding "the custodial and non-custodial sources" of ESI to be preserved, and that the parties "shall agree to add or remove custodians and non-custodial sources to be preserved as reasonably necessary." ESI Protocol at 4. As such, Facebook ignores and misrepresents its obligation to search non-custodial sources of ESI. Second, the ESI protocol specifically provides that, "[i]n addition to identifying documents pursuant to an agreed upon search protocol, the parties recognize that *they are obligated to produce relevant, responsive, non-privileged documents of which they are aware*, regardless of whether such documents contain any of the agreed upon or additional search terms." *Id.* at 6 (emphasis added). Similarly, "ESI that is known to a party to be responsive to a discovery request or subject to disclosure under Fed. R. Civ. P. 26(a)(1)(A) may not be withheld on the grounds that it was not identified as responsive by the protocol described in, or developed in accordance with, this Order." *Id.* at 8.

As such, Facebook's attempt to use the ESI Protocol to justify its refusal to review and produce the Zuckerberg notebooks is improper and should not be credited.

## F.    Facebook Misrepresents Its Inapposite Authorities.

Facebooks misrepresents the few authorities it cites to support its position. For instance, it cites *Bresk v. Unimerica Ins. Co.,* No. CV 16-8893 ODW (SSX), 2017 WL 10439831, at *5 (C.D. Cal. Nov. 16, 2017), for the proposition that "[a] plaintiff's mere suspicion that additional documents must exist is an insufficient basis to grant a motion to compel." Opp. at 8. However, in that case the plaintiff's motion to compel production was granted in part, and the court stated that "the moving party must have a colorable basis for its belief that relevant, responsive

documents exist and are being improperly withheld." *Id.* Here, Plaintiffs have likewise provided a colorable basis for their belief that the notebooks are relevant, based on public reporting of the contents of the notebooks.

Similarly, Facebook cites the patent litigation decision *Tulip Computers Int'l B.V. v. Dell Computer Corp.*, No. CIV.A. 00-981-RRM, 2002 WL 818061, at *7 (D. Del. Apr. 30, 2002), for the proposition that "courts commonly preclude document collection from apex personnel where relevant and responsive documents are available from other sources." Opp. at 9-10. However, in that case, the court actually granted the plaintiff's motion to compel production of documents "for all of the identified executives, except Michael Dell," because Mr. Dell did not appear to have detailed "involvement in the alleged incorporation of the patented device" at issue in the litigation. Likewise, in *Lutzeier v. Citigroup Inc.*, No. 4:14-CV-00183-RLW, 2015 WL 430196, at *6 (E.D. Mo. Feb. 2, 2015), another case on which Facebook relies, the court actually granted in part several of the plaintiff's targeted requests for production of documents by and regarding the defendant's former executives, denying only the plaintiff's request to add several executives as custodians. Far from helping Facebook, these authorities support production of the notebooks.

## III.   CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request that the Special Master grant their motion to compel production of Mark Zuckerberg's notebooks.

Dated: September 22, 2021

Respectfully submitted,

KELLER ROHRBACK L.L.P.

By:   */s/ Derek W. Loeser*
       Derek W. Loeser

Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Adele A. Daniel (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)

BLEICHMAR FONTI & AULD LLP

By:   */s/ Lesley E. Weaver*
       Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew S. Melamed (SBN 260272)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)

1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com
bgould@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmelamed@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

# EXHIBIT D

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

Derek W. Loeser (admitted pro hac vice)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Orin Snyder (admitted pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel: 212.351.4000
Fax: 212.351.4035
osnyder@gibsondunn.com

*Counsel for Defendant Facebook, Inc.*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **STIPULATION AND [~~PROPOSED~~] ORDER GOVERNING THE PRODUCTION OF ELECTRONICALLY STORED INFORMATION AND HARD COPY DOCUMENTS**<br><br>Judge: Hon. Jacqueline Scott Corley |

## A. PURPOSE

This Order will govern discovery of electronically stored information ("**ESI**") and hard copy documents (collectively, "**Document**" or "**Documents**") in the above-captioned matter and all actions that are later consolidated with this matter (collectively, "**Litigation**"), as a supplement to the Federal Rules of Civil Procedure, this Court's Guidelines for the Discovery of Electronically Stored Information ("**ESI Guidelines**"), and any other applicable orders and rules.

1

Nothing in this Order establishes any agreement as to either the temporal or subject matter scope of discovery in the Litigation, or whether a party has made a reasonable and diligent search for Documents. Nothing in this Order establishes any agreement to any search protocol, including which sources shall be searched. Such procedures or criteria are to be separately agreed upon.

This Order is subject to amendment or supplementation based upon the results of anticipated future meet and confers and by later agreement of the parties, if necessary, in light of further developments, including, the parties' engagement of document hosting vendors and associated technical requirements. References are made to the Federal Rules of Civil Procedure for ease of reference.

## B.   COOPERATION AND PROPORTIONALITY

The parties are aware of the importance this Court places on cooperation in discovery, consistent with this Court's Guidelines for the Discovery of ESI.  The parties acknowledge that cooperation in  reasonably limiting ESI discovery requests and in reasonably responding to ESI discovery requests tends to reduce litigation costs and delay and commit to cooperation in good faith on issues relating to the preservation, collection, search, review, and production of ESI.

The parties acknowledge that the proportionality standard described in Guideline 1.03 and set forth in Fed. R. Civ. P. 26(b)(1) applies to the discovery of ESI in this action.  To further the application of the proportionality standard, the parties agree that the factors set forth in Guideline 1.03 shall be considered, and that all discovery requests for production of ESI and related responses should and will be reasonably targeted, clear, and as specific as practicable.

## C.   E-DISCOVERY LIAISONS

The parties will rely on one or more e-discovery liaisons, as needed, to confer about ESI and to help resolve disputes without court intervention. Each e-discovery liaison will be, or have access to those who are:

1.      knowledgeable about the respective party's e-discovery efforts;

2.      familiar with the respective party's electronic systems and capabilities in order to explain those systems and answer relevant questions; and

2

3.     knowledgeable about the technical aspects of e-discovery, including the nature, location, storage, accessibility, format, collection, search methodologies, and production of ESI in this matter.

Plaintiffs have previously identified an ESI liaison. Defendant will identify an ESI liaison or liaisons within ten days of the entry of the order adopting of this Stipulation. In the interim, Defendant's counsel will be prepared to discuss any ESI issues within a reasonable time after notice by Plaintiffs' counsel. Each party will notify the other of any changes of its designated e-discovery liaison or liaisons.

## D.     PRESERVATION

The parties and their counsel acknowledge that they have an obligation to take reasonable and proportional steps to preserve discoverable information in the party's possession, custody, or control consistent with the Federal Rules. In accordance with ESI Guideline 2.01(d), the parties will continue to meet and confer over their respective ESI preservation efforts and obligations.  If the parties are unable to resolve a preservation issue and one party wishes to raise the issue with the Court, that party shall do so promptly, consistent with the Court's order on Discovery Dispute Resolution Procedures (Dkt. No. 393).

The parties have discussed their preservation obligations and needs and agree that preservation of potentially relevant ESI will be reasonable, proportionate, and within the scope of production under FRCP 26(b)(1) and 26(b)(2)(B). To reduce the costs and burdens of preservation and to ensure discoverable ESI is preserved, the parties agree that:

(a)     ESI created, modified, or received since January 1, 2007, will be preserved;

(b)     Each party is responsible for taking reasonable and proportionate steps to preserve non-duplicative discoverable information currently in their possession, custody or control. However, parties shall not be required to modify, on a going-forward basis, the procedures used by them in the usual course of business to back up and archive data not subject to a litigation hold.

(c)     Subject to and without waiving any protection described above, the parties agree that:

3

(1)     The parties will meet and confer regarding the types of ESI they believe should be preserved, the custodians or general job titles or descriptions of custodians for whom they believe ESI should be preserved, and the custodial and non-custodial sources to be preserved.  Nothing in this Order waives or modifies the attorney–client-privilege that attaches to custodial interviews.

(2)     The parties shall agree to add or remove custodians and non-custodial sources to be preserved as reasonably necessary. Such requests must be made in good faith.

(3)     The parties will meet and confer as fact discovery proceeds on whether an extension of time for fact discovery may be necessary.

(d)     The parties agree that ESI from the following data sources is not reasonably accessible because of undue burden or cost and therefore that under Fed. 26(b)(2)(B) Facebook need not provide discovery of ESI from these sources (ESI from these sources will be preserved in accordance with Facebook's standard business practices but will not be searched, reviewed, or produced unless ordered by the Court):

(1)     backup systems and/or tapes used for disaster recovery; and

(2)     systems that are no longer in use and cannot be accessed.

(e)     The parties agree, based on mutual representation of the parties' counsel, that the following sources of data are not reasonably accessible and need not be preserved, collected, processed, reviewed and/or produced:

(1)     Deleted, slack, fragmented, or unallocated data generated on individual workstations, and only accessible by forensics;

(2)     Random access memory (RAM), temporary files, or other ephemeral data generated on individual workstations and that are difficult to preserve without disabling the operating system;

(3)     On-line data from the individual work stations of the employees of the producing party using internet browsers, such as temporary internet files, history, cache, cookies, and the like;

4

      (4)     Data in the following metadata fields, which are frequently updated automatically without end user intervention: last opened dates and times, last printed dates and times, last modified dates and times, and last modified by; and

      (5)     Information created or copied during the routine, good-faith performance of processes for the deployment, maintenance, retirement, and/or disposition of computer equipment by the party and belonging to a custodian, to the extent such information is duplicative of information that resides in a reasonably accessible data source.

(f)     The parties agree that the burden and expense of preservation of the following sources of data for all agreed custodians is not proportionate to the needs of the case and therefore agree (i) to conduct custodial interviews and to determine in those interviews whether any of the following sources is likely to contain relevant data from that custodian; (ii) that if a custodian identifies any of the following sources as likely containing relevant data, that source will be preserved and collected; and (iii) that if a custodian does not identify any of the following sources as likely containing relevant data, these sources will not be preserved or collected:

      (1)     Voicemails and other voice messages;

      (2)     Sound recordings, including without limitation .mp3 and .wav files;

      (3)     Information contained on a mobile device that is not duplicative of information that resides in an another, more easily accessible data source;

      (4)     Instant messages and chats that are not chronicled to an email archive system; and

      (5)     Mobile device activity logs for the Producing Party's devices or the Producing Party's employees' devices.

## E.    SEARCH AND REVIEW

The parties agree to meet and confer concerning search methodologies, including without

limitation, the use of keyword search terms and/or the use of technology assisted review ("**TAR**").[1]

The parties recognize that even though a document contains one or more of the search terms identified in accordance with the procedures listed below, such document may not be responsive to any document request. In such cases, the Producing Party is not required to produce such documents. If a document contains one or more of the search terms in accordance with the procedures listed below, and part but not all of the document is responsive to any document request, the Producing Party should produce the entire document without redacting the nonresponsive portions of the document, unless the nonresponsive portions of the document contain information (1) that would be redacted from a court filing under Fed. R. Civ. P. 5.2(a) or (2) the disclosure of which would threaten serious competitive harm to the Producing Party.  If either of those conditions is met, the parties will meet and confer to discuss the redaction of such information prior to the production of any redacted documents.  If the parties reach agreement regarding the redaction of such information and any portion of a document is subsequently produced in redacted form, this will be noted in the Redaction field, included in Table 1 of Appendix A, and, within 20 days of the production of such documents, the document(s) will be recorded on a cumulative log identifying the reason for the redaction (i.e. condition (1) or condition (2)) and the date upon which the parties reached agreement regarding the redaction.  If the parties are unable to reach agreement regarding redaction, the document should either be promptly produced without redaction, or the Producing Party shall promptly raise the issue with the Court, consistent with the Court's order on Discovery Dispute Resolution Procedures (Dkt. No. 393).

In addition to identifying documents pursuant to an agreed upon search protocol, the parties recognize that they are obligated to produce relevant, responsive, non-privileged documents of which they are aware, regardless of whether such documents contain any of the agreed upon or additional search terms.

The parties agree that in responding to an initial Fed. R. Civ. P. 34 request, or earlier if appropriate, they will meet and confer about methods to search ESI in order to identify ESI that is

---

[1] The producing party will disclose to the receiving party if they intend to use Technology Assisted Review ("TAR") (including predictive coding or any other form of machine learning) to filter out non-responsive documents. The parties will meet and confer at that time to negotiate a suitable TAR protocol.

subject to production in discovery and filter out ESI that is not subject to discovery.

The parties understand the cost and complexity of reviewing and producing ESI and seek to engage in a cooperative, iterative process to limit costs but ensure relevant, responsive documents are likely discovered in any ESI search. As such, the parties will cooperate regarding the disclosure and formulation of appropriate search terms for use in the responsiveness review and production of ESI. The parties are not required to exchange privileged search terms.

The parties will each disclose a list of the most likely custodians of relevant documents, including the general job titles or descriptions of each custodian and will meet and confer regarding custodians, including how the relevant ESI is maintained and where, consistent with Discovery Order No. 1 (Dkt. No.404) and any subsequent orders entered by the Court.

The parties will meet-and-confer in good faith regarding search terms and custodians. As part of the meet-and-confer process to select search terms and custodians, the Producing Party will provide a hit report for proposed search terms if requested by the Requesting Party. If the Requesting Party objects to the sufficiency of the Producing Party's proposed search terms, the Requesting Party may propose modifications to the Producing Party's terms, or a list of additional terms, subject to the paragraph regarding Additional Terms for Good Cause below.  Any disputes over additional custodians or terms that cannot be resolved between the parties during meet and confer may be presented to the Court.

**Disputed Search Terms:** If the Producing Party contends that terms proposed by the Requesting Party would recall an excessive number of documents ("**Disputed Search Terms**"), the Producing Party will provide a Disputed Search Term hit list or hit report after global de-duplication. The list or report should include the number of documents that hit on each term, the number of unique documents that hit on each Disputed Term (documents that hit on a particular term and no other term on the list), and the total number of documents that would be returned by using the proposed search term list (including families). With respect to any search term for which the Producing Party believes there exists a modification that will reduce the number of irrelevant documents returned by the search term, the Producing Party will meet and confer with the Requesting Party to discuss in good faith any such modification. For any terms that a Producing Party believes are burdensome, overly broad, and/or

objectionable and for which there does not appear to be any modification that would resolve such issues, the Producing Party will meet and confer with the Requesting Party to discuss in good faith its objections to such search terms. As part of that process, the Producing Party will, upon request, provide the Requesting Party with the quantitative information discussed above.  In the event that a dispute remains after quantitative information is evaluated, the Requesting Party may ask for (and the Producing Party will not unreasonably withhold) qualitative information about the disputed search term(s).  The Producing Party agrees to consider a reasonable number of good faith requests from the Requesting Party to review a random sample of documents and their family members with unique hits that hit on the disputed search terms and to discuss the results of that review with the Requesting Party. For any random sample that is reviewed, the parties will, in good faith, attempt to reach agreement on the appropriate sample size.

**Additional Terms for Good Cause**: Once a search term list is finalized (either though agreement of the parties or Order of the Court) and all iterative searches for a custodian are complete, the Requesting Party may propose additional search terms for a Producing Party to consider, but the Producing Party will have no obligation to re-search the custodian's electronic data using such additional search terms without agreement or a court order. The Requesting Party must show good cause for any additional proposed search terms, such as, for example, that the proposed term, or the significance of the proposed term, was unknown to them as of the time the original list was formulated; provided, however, that this provision does not relieve a Producing Party of any obligation that may arise, pursuant to the Federal Rules of Civil Procedure or applicable case law, to conduct additional searches in the course of the litigation. If a Producing Party cannot meet any applicable deadlines for the production of documents as a result of this provision, the parties will negotiate in good faith a reasonable timeline for production or seek an order from the Court.

**Known Responsive ESI:** ESI that is known to a party to be responsive to a discovery request or subject to disclosure under Fed. R. Civ. P. 26(a)(1)A) may not be withheld on the grounds that it was not identified as responsive by the protocol described in, or developed in accordance with, this Order.

Discrete folders or collections of Documents that are identified by a custodian as likely to be responsive will be collected and preserved pursuant to standard business practices and processes that

are reasonably designed to ensure all potentially responsive documents are identified and collected.

The parties will continue to meet and confer regarding any search process issues as necessary and appropriate. This ESI protocol does not address or resolve any other objection to the scope of the parties' respective discovery requests.

Nothing in this Order shall be construed or interpreted as precluding a producing party from performing a responsiveness review to determine if documents captured by search terms are in fact relevant to the requesting party's request. Further, nothing in this Order shall be construed or interpreted as requiring the production of all documents captured by any search term if that document is in good faith and reasonably deemed not relevant to the requesting party's request or is privileged.

## F.   PRODUCTION FORMATS

Appendix A sets forth the technical specifications that the parties propose to govern the form of production of documents in this litigation, absent agreement by the parties or order by the Court.

The parties have agreed to specifications identifying the file formats under which Documents will be produced, as described in Appendix A. To the extent a party believes that a Document that has been produced should be produced in a different or alternative format, or a party raises any questions or concerns regarding a produced Document, the parties will meet and confer on the issue.

ESI will be deduplicated globally across all custodians using industry standard deduplication methods and software as set forth in Appendix A.

Each party will use its best efforts to filter out common system files and application executable files by using a commercially reasonably hash identification process. Hash values that may be filtered out during this process are located in the National Software Reference Library ("NSRL") NIST hash set list. System and program files defined on the NIST list need not be processed, reviewed, or produced. The parties may suppress container files (.ZIP, .PST, .RAR) that do not reflect substantive information prior to production, but must produce the remainder of those responsive, non-privileged document families found within the container file, including any emails to which that container file is attached. Similarly, the parties may suppress any non-substantive images extracted from email documents (e.g., logs, icons) prior to production).

E-mail thread analysis may be used to reduce the volume of emails reviewed and produced,

provided the Producing Party discloses that it is using e-mail thread analysis. "E-mail thread analysis" means that where multiple email messages are part of a single chain or "thread," a party is only required to produce the most inclusive message ("Last In Time E-Mail") and need not separately produce earlier, less inclusive e-mail messages or "thread members" that are fully contained within the Last In Time E-mail.  An earlier e-mail is fully contained in the Last In Time E-mail only if the Last In Time E-mail includes all previous emails, including attachments and identical senders and recipients, on the thread. Only email messages for which the parent document and all attachments are contained in the Last In Time Email will be considered less inclusive email messages.  For avoidance of doubt, if a thread member contains any additional data that is not contained in the Last In Time E-mail (including without limitation attachments or BCC recipients), it is not a less-inclusive e-mail and must be separately produced.  Where a Last In Time E-Mail is produced, the producing party will include metadata corresponding to the following metadata fields for each of the earlier thread members fully contained within the Last In Time E-mail:  Sent Date, Sender, Recipient, CC, BCC, and Subject.

If a receiving party raises an issue regarding the usability or format of a produced Document, the parties the parties will meet and confer regarding whether an alternative form of production is necessary or appropriate and seek Court intervention only if necessary.

The parties recognize that certain information to be produced in discovery may reside in proprietary systems and formats. The producing party will take reasonable steps to produce documents from such sources in a reasonably usable format with appropriate metadata in line with how the information is kept in the usual course of business. If after reviewing the produced Documents a receiving party raises a specific issue or concern about a produced Document or data, the parties will meet and confer regarding whether an alternative form of production or additional metadata is necessary or appropriate.

## G.    DOCUMENTS PROTECTED FROM DISCOVERY

The provisions and protections of a Fed. R. Evid. 502 stipulation are being separately negotiated.  The parties will submit a proposed 502(d) stipulation in accordance with the Court's order (Dkt. No. 404).

## H.     PRIVILEGE LOGS

Where a document is withheld from production entirely or in part by redaction on the basis of the attorney-client privilege or work product doctrine, the Producing Party will produce a privilege log in Microsoft Excel format.  The parties will meet and confer to determine a separate protocol for the production of privilege logs.

Nothing in this Order shall be interpreted to require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or immunity.  The parties do not waive any objections to the production, discoverability, admissibility, or confidentiality of documents and ESI.

## I.     OBJECTIONS PRESERVED

Except as provided expressly herein, the parties do not waive any objections as to the production, discoverability, authenticity, admissibility, or confidentiality of Documents. Nothing in this Order waives the right of any party to petition the Court for an order modifying its terms upon sufficient demonstration that compliance with such terms is unreasonably burdensome or infeasible or that the production of particular Documents in a different format or with different metadata fields is reasonably necessary, provided, however that counsel for such party must first meet and confer with the counsel for the opposing parties and the parties shall use reasonable best efforts to negotiate an exception from or modification to this Order prior to seeking relief from the Court.

## J.     RETENTION OF ORIGINAL DOCUMENTS

Each party agrees to retain native electronic source documents for all ESI produced in this litigation unless another manner is mutually agreed upon by the parties. Each party agrees to use reasonable measures to maintain the original native source documents in a manner so as to preserve the metadata associated with these electronic materials at the time of collection.

## K.     MODIFICATIONS

This Stipulated Order may be modified by agreement of the parties memorialized in a Stipulated Order of the parties or by the Court.

## L.     TIMING AND PHASING OF PRODUCTIONS

When a party propounds discovery requests pursuant to Fed. R. Civ. P. 34, the parties agree to

phase the production of ESI by producing documents on a rolling basis. Following the initial

production, the parties will continue to meet and confer to prioritize the order of subsequent

productions. Production in the Litigation is anticipated to be conducted with the parties making

reasonable efforts to expedite the process.

## M.    EFFECTIVE DATE

The provisions of this ESI Protocol will take effect upon the entry of an order of the Court

approving and adopting this ESI Protocol.

**IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.**

Dated: April 27, 2020                                     Respectfully submitted,


KELLER ROHRBACK L.L.P.                            BLEICHMAR FONTI & AULD LLP

By:    */s/ Derek W. Loeser*                      By:    */s/ Lesley E. Weaver*
       Derek W. Loeser                                     Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)         Lesley E. Weaver (SBN 191305)
Lynn Lincoln Sarko (admitted *pro hac vice*)      Anne K. Davis (SBN 267909)
Gretchen Freeman Cappio (admitted *pro hac vice*) Joshua D. Samra (SBN 313050)
Cari Campen Laufenberg (admitted *pro hac vice*)  Matthew P. Montgomery (SBN 180196)
David Ko (admitted *pro hac vice*)                Angelica M. Ornelas (SBN 285929)
Adele A. Daniel (admitted *pro hac vice)*         555 12th Street, Suite 1600
1201 Third Avenue, Suite 3200                     Oakland, CA 94607
Seattle, WA 98101                                 Tel.: (415) 445-4003
Tel.: (206) 623-1900                              Fax: (415) 445-4020
Fax: (206) 623-3384                               lweaver@bfalaw.com
dloeser@kellerrohrback.com                        adavis@bfalaw.com
lsarko@kellerrohrback.com                         jsamra@bfalaw.com
gcappio@kellerrohrback.com                        mmontgomery@bfalaw.com
claufenberg@kellerrohrback.com                    aornelas@bfalaw.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

12

GIBSON, DUNN, & CRUTCHER LLP
By: */s/ Orin Snyder*
Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

Russell H. Falconer (*pro hac vice pending*)
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone: 214.698.3170
Facsimile:  214.571.2900

*Attorneys for Defendant Facebook, Inc.*

**IT IS SO ORDERED.**

Dated:  April 30 , 2020

The Honorable Jacqueline Scott Corley
United States Magistrate Judge

13

## APPENDIX A

**I      Production Format**

All ESI is to be produced in an imaged file format with the corresponding metadata, appropriate load files, searchable text, and, where specified, native format files.  The parties agree that certain file types should be produced in their native file format.  Where ESI exists in databases or as structured data, production in an alternative format may be preferred and the parties agree to meet and confer to determine an appropriate format.  To the extent that any party made a document production before the entry of this ESI protocol that included ESI that was produced in a format that differs from the agreed upon format described below, the parties agree that, where feasible, that ESI will be reproduced in the agreed-upon format described below. Where reproduction in that format is not feasible, the parties will meet and confer regarding a feasible production format.

**A.      TIFF Image Files**.  The parties agree that all Documents will be produced as single-page, 1-BIT, black and white Group, IV TIFF image files of at least 300 dpi resolution, except as provided in section I.C.  Page size shall be 8.5 x 11 inches unless otherwise agreed.  Each image file will use the Bates number of the page as its unique file name.  Bates numbers and confidentiality designations shall be branded on each produced image.  Original document orientation as displayed in the native file should be maintained in the produced image (i.e., portrait to portrait and landscape to landscape).  Where feasible, documents which contain hidden content, tracked changes, comments, deletions, or revision marks (including, where available, the identity of the person making the comment, deletion, or revision and the date and time thereof), speaker notes, or other user-entered data that the source application can display to the user shall be processed such that all such data is visible (or marked as redacted for privilege or pursuant to the procedure described in Section E of the ESI Protocol) in the produced image.

Where the TIFF image is unreadable or has materially degraded the quality of the original, or where the Requesting Party obtains through discovery a file or Document that it believes is not adequately represented in an image file format, the Producing Party will, upon reasonable request, re-produce the image in another feasible format (such as a reimaged TIFF, near-native reproduction, native format, or other reasonably usable format).

**B.      Text Files**.  Each Document produced under this Order shall be accompanied by a single, multipage text file containing all of the text for that item, not one text file per page.  Each text

file shall be named to use the Bates number of the first page of the corresponding production item.

1. <u>OCR</u>:  The text for each hard copy document shall be generated by applying optical character recognition ("**OCR**") technology to the scanned image of the document.  The parties will endeavor to generate accurate OCR and will utilize quality OCR processes and technology.  OCR text files should indicate page breaks where possible.

2. <u>Text Files</u>:  The text of each ESI item shall be extracted directly from the ESI native file unless technologically infeasible.  Extracted text shall include available comments, revisions, tracked changes, speaker notes, and hidden content (including, worksheets, slides, columns, rows, notes).  To the extent it is not technically feasible to extract text directly from the native file the text for each ESI item shall be generated by applying OCR to the native file under the provision above.  Text files will not contain the redacted portions of documents.

3. <u>Foreign Language Text</u>:  In the event that discoverable ESI includes foreign language text and is produced in a way that it is otherwise unusable, the receiving party will raise the issue and the parties will meet and confer regarding an appropriate manner to reproduce the materials in a usable format.

**C.**    **Production of ESI in Native Format**.  The parties agree that the following types of files will be produced in native format:  presentation-application files (e.g. MS PowerPoint); spreadsheet-application files (e.g., MS Excel, Google Sheets); and multimedia audio/visual files such as voice and video recordings, if any (e.g., wav, .mpeg, and .avi).  Media files shall be produced in the native format in which they are maintained unless the parties discuss and agree to an alternative format in advance.

The Producing Party shall produce a single-page TIFF slip-sheet for each native file, indicating that a native item was produced.  The corresponding load file shall include NativeLink information for each native file that is produced.  If a Document to be produced in native format contains privileged or information redacted pursuant to the procedure set forth in Section E, the Document will be produced in TIFF format with redactions and OCR text to remove the privileged material from the searchable text.

**D.**   **Bates Numbering**.  Each TIFF image produced under this Order must be assigned a unique Bates number that must always:  be unique across the entire Document production; maintain a constant  length of the numeric digits (including 0-padding) across the entire production; contain only  alphanumeric characters, no special characters or embedded spaces; and be sequential within a given Document.

Attachments to Documents and embedded objects extracted from or attached to Documents or e-mails will be assigned Bates numbers that directly follow the Bates numbers on the Documents to which they are attached.  Parent-child relationships for all groups of hard copy documents as specified in section III.C.5, and all embedded ESI as specified in section I.F, will be indicated by applying sequential Bates numbers to all items within the parent-child group, and identified by Bates numbers in the relevant ESI metadata fields specified in  section II.  For example, if a party is producing an e-mail with attachments, the attachments will be processed and assigned Bates numbers in sequential order, following consecutively behind the parent e-mail.

Each TIFF image will have its assigned Bates number electronically "burned" onto the image.  The Producing Party will brand all TIFF images in the lower right-hand corner with its corresponding Bates number.  If the placement in the lower right-hand corner will result in obscuring the underlying image, the Producing Party will attempt to adjust the Bates number as near to that position as possible while preserving the underlying image.  If a Bates number or set of Bates numbers is skipped, the skipped numbers or set of numbers will be noted.

**E.**   **Attachments**.  The parties agree that if any part of an e-mail or its attachments is responsive, the entire e-mail and attachments will be considered responsive.  The parties acknowledge that if any part of an e-mail or its attachments is privileged, that email and/or attachment may be withheld or redacted for privilege.

**F.**   **Embedded Files**.  The parties agree to take reasonable steps to ensure that embedded ESI (e.g., a spreadsheet embedded within a word processing document, multimedia and other word processing files embedded in PowerPoint) shall be produced as independent document records and that the parent-child relationship is indicated by assigning sequential Bates numbers as set forth in section D.

**G.**   **Color**.  The parties may submit reasonable requests for reproduction of documents in color where color is necessary to accurately interpret the document.  The production of such

Documents in color shall be made in JPEG format.  If either party deems the quality of the Document produced in JPEG format to be insufficient, the Producing Party may produce the color image in TIFF or another reasonably usable format.  All requirements for productions stated in this Order regarding production in TIFF black and white format apply to any production of Documents in color JPEG or TIFF format.

**H.**     **Confidentiality Designations**.  If a particular Document has a confidentiality designation, the designation shall be stamped on the face of all TIFF images pertaining to such Document, in the lower left-hand corner of the Document.  Each responsive document produced in native format will have its confidentiality designation indicated on its corresponding TIFF placeholder.  The confidentiality designation should also be reflected in the Confidentiality metadata field specified in section II.

**I.**     **Redaction**.  The parties agree that where non-Excel-type spreadsheet ESI items need to be redacted, they shall be produced solely in TIFF with each redaction clearly indicated on the Document.  Any unaffected data fields specified in section II shall be provided.

The text file corresponding to a redacted Document may be generated by applying OCR in accordance with section I.B for all unredacted portions of the Document.  The Document must be marked as such in the accompanying redaction metadata field as specified in section II.

Documents redacted or withheld for privilege will be logged.

Where Excel-type spreadsheets need to be redacted, the Producing Party may choose whether to redact in the native file or in a TIFF format so long as such redactions do not affect the operation of the file.  Formulas may be "flattened" and replaced with actual value.  The party shall maintain the original Excel-type spreadsheet before redactions are applied as to maintain the original metadata fields.

If the items redacted and partially withheld from production are PowerPoint type presentation decks or Excel-type spreadsheets, and the native items are also withheld, the entire ESI item will be produced in TIFF format and the Producing Party will make reasonable efforts to produce all unprivileged pages, hidden fields and other information that does not print when opened as last saved by the custodian or end-user.  For PowerPoint-type presentation decks, this shall include, but is not limited to, any speaker notes.  For Excel-type spreadsheets, this shall include, but is not limited to, hidden rows and columns, all cell values, annotations and notes. The Producing Party shall also make reasonable efforts to ensure that any spreadsheets produced

only as TIFF images are formatted so as to be legible.  For example, column widths should be formatted so that the numbers in the column will display rather than "#########."

If the items redacted and partially withheld from production are audio/visual files, the Producing Party shall provide the unprivileged portions of the content.  If the content is a voice recording, the parties shall meet and confer to discuss the appropriate manner for the Producing Party to produce the unprivileged portion of the content.

**J.**      **Encryption**.  To the extent practicable, before the application of search terms to a database of Documents, the searching party shall use reasonable efforts to de-encrypt encrypted Documents in the database if otherwise, without de-encryption, the search terms will not pick up hits in the encrypted Documents.

The parties will make reasonable efforts to ensure that all encrypted or password-protected Documents are successfully processed for review and production under the requirements of this Order, including all automated mechanisms presently offered by the party's document vendor and approaching the custodian for any relevant passwords, if the custodian is accessible, and if produced in Native format, the decrypted Document is produced.  To the extent encrypted or password-protected Documents are successfully processed according to the requirements of this Order, the parties have no duty to identify the prior encrypted status of such Documents but will produce such processed Documents in accordance with the specifications of this Order.  The parties will consider reasonable requests for information regarding the number, custodians, and/or locations of encrypted documents that are not able to be de-encrypted using reasonable means.


**K.**      **Database Records and Structured Data**.  To the extent that any party requests information that is stored in a database, or database management system, or proprietary system, the Producing Party will identify the database and platform to the Requesting Party, and will meet and confer in good faith in an attempt to reach agreement on the data to be produced and the form of the production to ensure that any information produced is reasonably usable by the Requesting Party and that its production does not impose an undue burden on the Producing Party, by, for example, requiring development of reports and/or software code to extract the information.  The Producing Party will provide information about the database reasonably necessary to facilitate that discussion.

To avoid doubt, information will be considered reasonably usable when produced in CSV format, tab-delimited text format, Microsoft Excel format, or Microsoft Access format.  To the extent a party is constrained from producing responsive ESI because of a third party license or because software necessary to view the ESI is hardware-dependent, the parties shall meet and confer to reach an agreement on alternative methods to enable the Requesting Party to view the ESI.

L.      **Deduplication**.  The Producing Party need only produce a single copy of a particular ESI item, and may deduplicate ESI vertically by custodian, or horizontally (globally) across the population of records.  The parties agree to the following:

1.      Duplicates shall be identified by using industry standard MD5 or SHA-1 algorithms only to create and compare hash values for exact matches only.  The resulting hash value for each item shall be reflected in the HASH field specified in section II.

2.      Deduplication shall be performed only at the Document family level so that attachments are not de-duplicated against identical stand-alone versions of such Documents and vice versa, although each family member shall be hashed separately for purposes of populating the HASH field in section II.

3.      An email that includes content in the BCC or other blind copy field should not be treated as a duplicate of an email that does not include content in those fields, even if all remaining content in the email is identical.  Deduplication may be applied across the entire collection (*i.e.*, global level), in which case the custodian, filepath, and filename metadata fields should list the primary custodian, filepath, and filename, as a source of the primary copy of the document, while deduplicated custodians will be listed in the  Duplicate Custodian, Duplicate Filepath field and separated by semicolons if there are multiple values.  In the event that the Producing Party becomes aware that Duplicate Custodian, Duplicate Filepath metadata has become outdated due to rolling productions, the Producing Party will produce within a reasonable time an overlay file providing all of the custodians, and filepaths for the affected documents.

**M.** **Metadata Fields and Processing**.  ESI items shall be processed in a manner that preserves the source native file and all metadata without modification, to the extent reasonably and technically possible, including their existing time, date and time-zone metadata consistent with the requirements provided in this Order.  ESI items shall be produced with all of the metadata and coding fields set forth in section II.

1. Time Zone.  ESI items shall be processed to reflect the date and time standardized to a single time zone for all productions by a party, that time zone shall be Pacific Standard Time (PST).  The parties understand and acknowledge that such standardization affects only dynamic fields and metadata values and does not affect, among other things, dates and times that are hardcoded text within a file.  Dates and times that are hard-coded text within a file (for example, in an e-mail thread, dates  and times of earlier messages that were converted to body text when subsequently replied to or forwarded; and in any file type, dates and times that are typed as such by users) will be produced as part of the document text in accordance with the formats set forth in section I.

2. Hidden Content.  ESI items shall be processed in a manner that preserves hidden columns or rows, hidden text or worksheets, speaker notes, tracked changes, comments, and other rich data (including, but not limited to strikethrough text, etc.) as displayed in the Document to the extent reasonably and technically possible.

3. Manual Population.  The parties are not obligated to manually populate any of the fields in section II if such fields cannot be extracted from the native file or created using an automated process with the exception of the following fields, if available:  (1) BegBates; (2) EndBates; (3) BegAttach; (4) EndAttach; (5) Custodian; (6) Redacted (Y/N); (7) Confidentiality; (8) HashValue[1]; (9) DeDuped_Custodian; (10) NativeFile; and (11) TextPath.

---

[1]   In the case of Documents that were scanned from hard copy, the HashValue field is not required.

**N.** **Hard Copy Documents**.

    1. <u>Coding Fields</u>:  All coding information defined in section II as applicable to "Paper," shall be produced in the data load file accompanying production of hard copy documents.

    2. <u>Unitization of Hard Copy Documents</u>:  The parties will make reasonable efforts to ensure that hard copy documents are logically unitized for production.  The parties will make their best efforts to unitize parent-child groups correctly.

    3. <u>Identification</u>:  Where a document or a document group – such as folder, clipped bundle, or binder – has an identifiable and accessible identification spine, "Post-It Note" or any other label,  the information on the label shall be scanned and produced as the first page of the document or grouping if doing so would be reasonable and proportional to the needs of the case.

**O.** **Load Files**:  All productions will be provided with data load files and image load file as detailed in section III.B & III.C.  Each party will designate its preferred load file format.  The image load file must reference each TIFF file in the corresponding production, and the total number of TIFF files referenced in the load file must match the total number of image files in the production.  The total number of Documents referenced in a production's data load file should match the total number of designated Document breaks in the corresponding image load file for that production.

**II** **Production Metadata Fields**

    Parties shall produce extracted metadata for all Documents and include the following fields to the extent available and subject to other limitations above, except that if the field contains privileged information, that privileged information may be redacted.  If burden or technological difficulty is claimed by the Producing Party, it must be disclosed to the Requesting Party.  Any redactions for privilege reasons shall be recorded on a privilege log.  The parties reserve the right to request that additional metadata fields set forth or provided for certain specified electronic documents upon review of the other party's production.  The parties also reserve their respective rights to object to any such request.

| Table A. | | |
|---|---|---|
| **FIELD NAME** | **FIELD DESCRIPTION** | **APPLICABLE FILE TYPE(S)** |
| BEGBATES | Beginning production number for a given file/document | E-mail, E-Doc, Paper, and Other[2] |
| ENDBATES | Ending production number for a given file/document | E-mail, E-Doc, Paper, and Other |
| BEGATTACH | Production number of first page of attachment | E-mail, E-Doc and Other |
| ENDATTACH | Production number of last page of last attachment | E-mail, E-Doc, and Other |
| CUSTODIAN | Person, shared file or other source from whom files were collected | E-mail, E-Doc, Paper, and Other |
| FILESIZE | The original file size of the produced document | E-mail, E-Doc, and Other |
| PRODVOLUME | The production volume associated with the produced file | E-mail, E-Doc, Paper, and Other |
| DEDUPED CUSTODIAN | To identify other custodians whose files contained a particular document that was eliminated through exact match HASH value de-duplication | E-mail, E-Doc, and Other |
| DUPLICATE FILEPATH | Folder locations of documents held by other custodians whose copy of the document was not produced based on exact match HASH value de-duplication. Folder names shall be delimited by semicolons | E-mail, E-Doc, and Other |
| HASH | MD5 Hash Value | E-mail and E-Doc |

---

[2] Other is defined as Documents for which internal metadata is not exchanged, including but not limited to, scanned Documents and Documents obtained from the internet.

| | Table A. | |
|---|---|---|
| **FIELD NAME** | **FIELD DESCRIPTION** | **APPLICABLE FILE TYPE(S)** |
| ATTACHNAME | The file name(s) of attachments to a parent documents (separated by a semicolon) | E-mail and E-Doc |
| EMAILSUBJECT | E-mail Subject line | E-mail |
| FROM | E-mail Sender | E-mail |
| TO | E-mail Recipient | E-mail |
| CC | E-mail Copyee | E-mail |
| BCC | E-mail Blind Copyee | E-mail |
| DATESENT | Date Sent & Time (MM/DD/YYYY HH:MM) | E-mail and Other |
| DATERECEIVED | Date Received & Time (MM/DD/YYYY HH:MM) | E-mail and Other |
| DATELASTMOD | Date modified & Time (MM/DD/YYYY HH:MM) | E-Doc |
| DATECREATED | Date created & Time (MM/DD/YYYY HH:MM) | E-Doc |
| TIMEZONEPROCESSED | The originating time zone of the Document | E-mail, E-Doc, and Other |
| TITLE | Any value populated in the Title field of the document properties | E-Doc |
| SUBJECT | Any value populated in the Subject field of the document properties | E-Doc |
| AUTHOR | Any value populated in the Author field of the document properties | E-Doc |

| Table A. | | |
|---|---|---|
| **FIELD NAME** | **FIELD DESCRIPTION** | **APPLICABLE FILE TYPE(S)** |
| LASTMODIFIEDBY | Any value populated in the last modified by field of the document properties | E-Doc |
| ITEMTYPE | Identifies whether the file is an e-mail, attachment to e-mail, or loose e-doc | E-mail and E-Doc |
| REDACTION | Identifies whether the file was redacted and the reason | E-mail, E-Doc, Paper, and Other |
| PAGECOUNT | The number of pages of the Document, excluding the pages of documents in the same family | E-mail, E-Doc, Paper, and Other |
| ATTACHCOUNT | Number of attached files | E-mail |
| CONFIDENTIAL | Identifies whether the file is designated confidential | E-mail, E-Doc, Paper, and Other |
| FILENAME | Original file name | E-Doc |
| FILEPATH | Original file path to the file or e-mailbox folder structure | E-mail and E-Doc |
| FILEEXTENSION | Indicates file extension of source native file (e.g., .msg, .doc, .xls, etc.) | E-mail, E-Doc, and Other |
| NATIVEFILEPATH | Path to native file as produced | Native |
| TEXTFILEPATH | Path to OCR or extracted text file | E-mail, E-Doc, Paper, and Other |
| CONVERSATION INDEX | The Identifer Value assigned by a Program to group communication/message conversations together | E-mail, Other |
| HAS HIDDEN DATA | Indication of the existence of hidden data such as hidden text, columns, rows, worksheets, comments, or notes | E-Doc, Other |
| PST/OST/NSF filename | PST/OST/NSF filename. | E-mail |
| FOLDER | Folder location of the e-mail within the PST/OST/NSF | E-mail |

| Table A. | | |
|---|---|---|
| **FIELD NAME** | **FIELD DESCRIPTION** | **APPLICABLE FILE TYPE(S)** |
| MESSAGE ID | The Unique Identifier assigned by a program to a Message/Communication | E-mail |
| APPLICATION | Indicates software application that generated the ESI item | E-mail, E-Doc, Other |
| DOCUMENT TYPE | Descriptor for the type of document: "E-Doc" for electronic documents not attached to e-mails; "E-mail" for all e-mails; "E-attachment" for files that were attachments to e-mails; and "Physical" for hard copy physical documents that have been scanned and converted to an electronic image | E-mail, E-Doc, Paper, and Other |

**III     Production Delivery Requirements**

**A.     General Instructions**

1.      All productions must be made by secure file transfer, if practical, to agreed-upon e-mail addresses.  In the event the Producing Party deems it is not practical to upload a voluminous production to secure file transfer site, it shall be sent to the receiving parties by overnight mail on CD-ROM, DVD, external hard drive (with standard PC-compatible interface), or such other readily accessible computer or electronic media.

2.      Each production shall be accompanied by a cover letter that includes the production date, production volume identifier, confidentiality designation for the production, and the Bates number range.

3.      Each media volume must have its own unique name and a consistent naming convention (for example ZZZ001 or SMITH001) and be labeled with the following:

      a.      Case number;

      b.      Production date;

      c.      Bates range;

> d.      Disk number (1 of X, 2 of X, etc.), if applicable.

4.      The Producing Party shall encrypt the production data using WinRAR or 7-Zip (or similar AES-256 bit) encryption, and the Producing Party shall forward the password to decrypt the production data separately from the CD, DVD, external drive or FTP to which the production data is saved.

5.      Any data produced by the Producing Party must be protected in transit, in use, and at rest by all in receipt of such data.  Parties will use best efforts to avoid the unnecessary copying or transmittal of produced documents.  Any copies made of produced data must be kept on media or hardware employing whole-disk or folder level encryption or otherwise secured on information systems and networks in a manner consistent with the best practices for data protection.  If questions arise, Parties will meet and confer to ensure security concerns are addressed prior to the exchange of any documents.

**B.      <u>Image Load Files</u>**

1.      Image load (cross-reference) files should be produced in format that can be loaded into commercially acceptable production software, such as Concordance Image (Opticon) format.

2.      The name of the image load file should mirror the name of the delivery volume, and should have the appropriate extension (e.g., ABC001.OPT).

3.      The volume names should be consecutive (e.g., ABC001, ABC002, et seq.).

4.      There should be one row in the load file for every TIFF image in the production.

5.      Every image in the delivery volume should be cross-referenced in the image load file.

6.      The imageID key should be named the same as the Bates number of the page.

7.      Load files should not span across media (e.g., CDs, DVDs, hard drives, etc.), i.e., a separate volume should be created for each piece of media delivered.

8.      Files that are the first page of a logical document should include a "Y" where appropriate.  Subsequent pages of all documents (regular document, e-mail, or attachment) should include a blank in the appropriate position.

9.      TIFF images should be provided in a separate folder and the numbe of TIFF files per folder should be limited to 1,000 files.

- 13 -

Sample Concordance Image (Opticon) Load File:

> MSC000001,MSC001,D:\IMAGES\001\MSC000001.TIF,Y,,,3
>
> MSC000002,MSC001,D:\IMAGES\001\MSC000002.TIF,,,,,
>
> MSC000003,MSC001,D:\IMAGES\001\MSC000003.TIF,,,,,
>
> MSC000004,MSC001,D:\IMAGES\001\MSC000004.TIF,Y,,,2
>
> MSC000005,MSC001,D:\IMAGES\001\MSC000005.TIF,,,,,

**C.**   **Data Load Files**:

1.   Data load files should be produced in .DAT format.

2.   The data load file should use standard delimiters:

  a)   Comma - ¶ (ASCII 20);

  b)   Quote - þ (ASCII 254);

  c)   Newline - ® (ASCII174).

3.   The first line of the .DAT file should contain the field names arranged in the same order as the data is arranged in subsequent lines.

4.   All date fields should be produced in mm/dd/yyyy format.

5.   All attachments should sequentially follow the parent document/e-mail.

6.   Use carriage-return to indicate the start of the next record.

7.   Load files should not span across media (e.g., CDs, DVDs, hard drives, etc.); a separate volume should be created for each piece of media delivered.

8.   The name of the data load file should mirror the name of the delivery volume, and should have a .DAT extension (e.g., ABC001.DAT).

9.   The volume names should be consecutive (e.g., ABC001, ABC002, et seq.).

10.   Sample .DAT Load File:

þBegBatesþ¶þEndBatesþ¶þBegAttachþ¶þEndAttachþ¶þPgCountþ¶þCustodianþ

**D.**   **OCR/Extracted Text Files**

1.   OCR or Extracted Text files shall be provided in a \TEXT\ directory containing Document level text files.

2.   Document level OCR text for redacted documents or Extracted text for ESI not containing redaction are to be located in the same directory as its image file.

3.     The text file name shall be the same name of the first image page for the document set, followed by .txt.

4.     An OCR or Extracted text file containing the produced document's content will be provided for all documents whether it is produced as an image file or natively.

5.     An OCR file may be provided for ESI when privilege redactions are required or where extracted text isn't otherwise available

**E.     <u>Native Files</u>**

1.     Native files shall be provided in a separate NATIVES\ directory containing the Native file referenced in the NativeFilePath field of the .DAT file.

2.     The Native file name shall be the same name as the first image page for the document.