# EXHIBIT A
# REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br><br> This document relates to: <br><br> ALL ACTIONS | **MDL NO. 2843** <br> CASE NO. 3:18-MD-02843-VC-JSC <br><br> Hon. Vince Chhabria <br> Courtroom 4 – 17th Floor <br> Special Master: Daniel Garrie, Esq. <br><br> **ORDER RE:  BUSINESS PARTNERS** <br><br> **JAMS REF. NO: 1200058674** |

## INTRODUCTION

1.    Pending before Special Master Garrie is Plaintiffs' Motion to Compel Facebook to Comply with Discovery Obligations Related to "Business Partners".

## BACKGROUND

2.    Plaintiffs originally filed a 400-page complaint in this matter that contained a wide range of allegations against Facebook. Subsequently, Facebook filed a motion to dismiss Plaintiffs' complaint. On September 9, 2019, Judge Chhabria issued Pretrial Order No. 20, which addressed Facebook's motion to dismiss. See Exhibit A (Pretrial Order No. 20).

3.    Pretrial Order No. 20, discusses several topics in connection with Facebook's motion to dismiss and notes that "the presence of so many disparate and vague allegations makes it nearly impossible for Facebook to respond to all of them meaningfully." See Exhibit A at 5–6. To focus the case, the order defines four categories of "core allegations" from Plaintiffs' complaint regarding Facebook's handling of sensitive user information that Judge Chhabria allowed to move forward: friend sharing, whitelisting, "business partners," and enforcement. See Exhibit A at 6 ("Claims based on these core factual allegations will largely survive the motion to dismiss. All other prioritized claims not addressed by this ruling will be stayed (effectively, relegated to non-prioritized status) and adjudicated, if necessary, at a later stage in the proceedings with the other non-prioritized claims.").

4.    Judge Chhabria described the "business partner" category as "somewhat vague" and cited multiple portions of Plaintiffs' complaint to identify the relevant allegations:

> Moreover, the plaintiffs allege that Facebook outsourced to business partners "the time, labor, and money required to build Facebook's Platform on different devices and operating systems," but that doesn't seem to describe all the "business partners" listed in the complaint. […] The complaint alleges that Facebook shared information about its users with this non-exclusive list of business partners, and that those companies in turn shared data with Facebook. "These partnerships," the

complaint alleges, "were built in part on 'data reciprocity.' Facebook and its partners agreed to exchange information about users' activities with each other." <u>See</u> Exhibit A at 8.

5.      On November 25, 2019, Plaintiffs filed and served their Second Set of Requests for Production. Request for Production 24 requested "[d]ocuments sufficient to identify all Third Parties to which Facebook granted access to Users' Content and Information not generally available through Platform pursuant to partnerships or agreements between Facebook and those Third Parties." <u>See</u> Exhibit B (Second Set of Requests for Production). Plaintiffs defined "Third Parties" to include "Apps, App Developers, Whitelisted Apps, and **Business Partners**, as those terms are used in the FAC [first amended complaint]." <u>See</u> Exhibit B at 10 (emphasis added). Facebook in its response that it would produce "final agreements with integration partners and device manufacturers responsive to this Request." <u>See</u> Exhibit C (Responses and Objections to Second Set of Requests for Production).

6.      On May 6, 2020, Plaintiffs served their Third Set of Requests for Production, which also asked for documents about "business partners" and defined them as "the third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems." <u>See</u> Exhibit D (Third Set of Requests for Production).

7.      Then, in July 2020, Plaintiffs served their Fourth Set of Interrogatories. Interrogatories 14 and 15 asked for additional information about certain "Business Partners," which Plaintiffs defined to mean "the third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems." <u>See</u> Exhibit E (Fourth Set of Interrogatories). Interrogatory 14 asked Facebook to identify a subset of "Business Partners"— ones that "had the ability to access the Not Generally Available Content and Information of Facebook Users even if such Facebook Users had not downloaded an App from that Business

Partner." See Exhibit E at 8. Interrogatory 15 asked for additional information about the same entities. See Exhibit E at 8. Facebook stated in its responses that it would "construe 'Business Partners' as referring to the integration partners and/or device manufacturers with whom Facebook has entered into agreements that have been and/or will be produced in response to [RFP] 24." See Exhibit F (Responses and Objections to Fourth Set of Interrogatories).

8.      Plaintiffs disagreed with Facebook's definition of the term "business partners" and requested that the court order Facebook to amend its interrogatory responses. See Exhibit G (Plaintiffs' January 22, 2021 Letter to Judge Corley). Plaintiffs argued that "business partners" were not limited to "integration partners and/or device manufacturers with whom Facebook has entered into agreements [produced in response to Request for Production 24]" but rather "Facebook should identify the companies with which it shared user data and that in turn shared data with Facebook." See Exhibit G.

9.      Judge Corley heard arguments from both parties on this issue and ruled that "[i]n response to the interrogatory request, Facebook shall identify all companies with which Facebook agreed to exchange information about users' activities with each other, regardless of whether such company is an 'integration partner.'"[1] See Exhibit H (Judge Corley's Order Re: Business Partner Dispute).

10.      In September of 2021, Special Master Daniel Garrie ("Special Master Garrie") and Judge Gail Andler declared impasse on the issue of whether Facebook should be compelled to amend its responses to interrogatories 14 and 15 and provide additional discovery related to Facebook's "business partners."

---

[1] The MDL was assigned to Magistrate Judge Corley for management of discovery.

11.     On September 28, 2021, Plaintiffs submitted their opening brief to Special Master Garrie on this issue. Plaintiffs argue, among other things, that the definition set out in Judge Corley's order should be read in plain language terms to mean any company with which Facebook had some form of user activity data reciprocity arrangement, which Plaintiffs claim would include more companies than Facebook included in its interrogatory response. See Exhibit I (Plaintiffs Opening Brief Re: Business Partners). Plaintiffs claim that other documents produced to date suggest that Facebook exchanged user activity data with entities such as data brokers and advertisers which Facebook did not disclose in its response. See Exhibit I.

12.     Facebook submitted their opposition on October 14, 2021. Facebook argues that Judge Corley's definition should be read as limited to companies Facebook worked with to "develop and integrate Facebook's User Platform on multiple devices and operating systems." See Exhibit J (Facebook's Opposition Re: Business Partners). Facebook claims this must be the correct interpretation because it is consistent Judge Chhabria's Pretrial Order No. 20 which, according to Facebook's interpretation, limits business partners to this discrete category of entities. See Exhibit J. Facebook argues that Plaintiffs' interpretation expands the definition beyond the scope of the case set by Judge Chhabria and that Judge Corley's order was meant to clarify that companies that fit Judge Chhabria's definition must be included regardless of whether Facebook identifies them as an "integration partner." See Exhibit J.

13.     Plaintiffs submitted their reply on October 19, 2021. Plaintiffs argue that the scope of their requests is aligned with the allegations in the complaint and the Court's orders and identify multiple categories of entities that Facebook should be compelled to add to their responses, including data brokers, advertisers, and app developers. See Exhibit K (Plaintiffs' Reply Re: Business Partners).

## FINDINGS

14.     Judge Corley was appointed as magistrate judge by the district court for the management of discovery. As such, Judge Corley has the authority to rule on discovery related issues. Special Master Garrie in turn was appointed as Discovery Special Master under Judge Corley and as such Judge Corley's rulings are binding on Special Master Garrie.

15.     Special Master Garrie finds that, based on Judge Corley's order, the definition of business partners in the context of Interrogatories 14 and 15 is to include "all companies with which Facebook agreed to exchange information about users' activities with each other, regardless of whether such company is an 'integration partner.'" See Exhibit H at 2. Special Master Garrie finds that the definition of business partners is not to be limited, as Facebook argues, to "integration partners and/or device manufacturers with whom Facebook has entered into agreements that have been and/or will be produced in response to Request for Production No. 24." Id. Instead, Special Master Garrie finds that Judge Corley construed Judge Chhabria's order to include partners with whom Facebook "agreed to exchange information about users' activities with each other" in the definition of business partners. Id; see also Exhibit A at 8.

16.     However, Special Master Garrie finds that Judge Corley's ruling was made in the context of a discovery dispute regarding Facebook's responses to Interrogatories 14 and 15 and should not be read to expand the scope of the claims that Judge Chhabria allowed to move forward. Accordingly, Special Master Garrie further finds that Facebook's responses to Interrogatories 14 and 15 should include entities such as data brokers, advertisers, and others asserted by Plaintiffs provided that those entities exchanged user activity data with Facebook.

17.     Special Master Garrie finds that this interpretation of Judge Corley's order does not expand the scope of the business partners category set by Judge Chhabria in Pretrial Order No. 20.

18.     Special Master Garrie finds that Judge Corley's definition is within the scope of Judge Chhabria's order regarding business partners, which includes data reciprocity as part of the business partner category definition. See Exhibit A at 8 ("'These partnerships,' the complaint alleges, 'were built in part on data reciprocity.'")

19.     These findings are without prejudice to Facebook providing an evidentiary showing that proportionality principles support appropriate limitations on production obligations with respect to business partners. Facebook would bear the burden as to any such showing.

//

//

//

//

//

//

//

//

//

//

//

//

//

# ORDER

20.     No later than November 30, 2021, Facebook is to provide responses to Interrogatory 14 consistent with Corley's definition of business partners.

21.     No later than December 10, 2021, the Parties are to meet and confer regarding the scope of entities identified in Interrogatory 14 that are to be included in responses to Interrogatory 15, based on proportionality arguments.

22.     No later than December 10, 2021, the Parties are to meet and confer regarding the scope of entities identified in Interrogatory 14 that are to be included in responses to Plaintiffs' RFPs related to business partners, based on proportionality arguments.

23.     If the parties are unable to agree, they each are to submit a proposed protocol for Interrogatory 15 and RFP responses that they believe is proportional to Special Master Garrie on or before December 17, 2021. Special Master Garrie may hold hearings as appropriate to resolve the dispute

**IT IS SO ORDERED.**

Daniel Garrie
Discovery Special Master

**ORDER RE: BUSINESS PARTNERS**

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC., CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PRETRIAL ORDER NO. 20: GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS FIRST AMENDED COMPLAINT** |

This lawsuit, which stems from the Cambridge Analytica scandal, is about Facebook's practice of sharing its users' personal information with third parties. The plaintiffs are current and former Facebook users who believe that their information was compromised by the company. Their principal allegations are that Facebook: (i) made sensitive user information available to countless companies and individuals without the consent of the users; and (ii) failed to prevent those same companies and individuals from selling or otherwise misusing the information. The plaintiffs do not merely allege that Facebook shared what we often describe as "data" – basic facts such as gender, age, address, and the like. They allege that Facebook shared far more substantive and revealing content that users intended only for a limited audience, such as their photographs, videos they made, videos they watched, their religious and political views, their relationship information, and the actual words contained in their messages.

Facebook has filed a motion to dismiss the lawsuit. Although the company makes many different arguments, there are three main ones. First, Facebook argues that people have no legitimate privacy interest in any information they make available to their friends on social media. This means, according to Facebook, that if people use social media to communicate

sensitive information with a limited number of friends, they have no right to complain of a privacy violation if the social media company turns around and shares that information with a virtually unlimited audience. As explained in Section II of this ruling, Facebook's argument could not be more wrong. When you share sensitive information with a limited audience (especially when you've made clear that you intend your audience to be limited), you retain privacy rights and can sue someone for violating them.

Second, Facebook argues that even if its users had a privacy interest in the information they made available only to friends, there is no standing to sue in federal court because there were no tangible negative consequences from the dissemination of this information. That too is wrong. As explained in Section III, the law has long recognized that a privacy invasion is itself the kind of injury that can be redressed in federal court, even if the invasion does not lead to some secondary economic injury like identity theft.

Facebook's third main argument is that even if users retained a privacy interest in the information that was disclosed, and even if a "bare" privacy invasion confers standing to sue in federal court, this lawsuit must be dismissed because Facebook users consented, in fine print, to the wide dissemination of their sensitive information. As discussed in Section IV, this question is more difficult than the first two. California law requires the Court to assume as a legal matter (even if it's not true as a factual matter) that users reviewed, understood, and agreed to all of Facebook's contractual terms when they signed up for their accounts. These terms included a description of at least some of Facebook's information-sharing practices, for at least a portion of the time period covered by this lawsuit. In particular, from roughly 2009 to 2015, Facebook disclosed its practice of allowing app developers to obtain, through a user's Facebook friends, any information about the user that the friends had access to.

That single disclosure, however, is relatively inconsequential for this motion to dismiss. The complaint adequately alleges that users who established their Facebook accounts prior to roughly 2009 never consented to this practice. Plaintiffs in this category may pursue claims based on information-sharing with app developers. Moreover, the complaint adequately alleges

that no users ever consented to Facebook's other information-sharing practices – specifically, sharing with certain "whitelisted apps" starting in 2015, and sharing with certain "business partners" during much of the relevant time period. Finally, the complaint adequately alleges that users never consented to Facebook's widespread practice of allowing companies to sell and otherwise misuse sensitive user information, as opposed to restricting the use of this information as Facebook promised it would. Therefore, even though Facebook's arguments regarding user consent have some legal force and will somewhat limit the scope of the lawsuit, they cannot defeat the lawsuit entirely, at least at the pleading stage.

Accordingly, as set forth in Section V (which discusses the specific legal claims asserted by the plaintiffs), although Facebook's motion to dismiss will be granted for a few of the claims, most claims survive.

## I. BACKGROUND

Cambridge Analytica, a British political consulting firm, used personal information from millions of Facebook accounts to send targeted political messages during the 2016 presidential campaign. The firm obtained this information from Aleksandr Kogan, a researcher who had acquired it through his app, which Facebook had allowed him to deploy on its platform. The Cambridge Analytica incident began receiving significant press coverage in 2018, which in turn generated increased scrutiny of Facebook's information-sharing practices. In the months that followed, reports emerged suggesting that the ability of people like Kogan and entities like Cambridge Analytica to obtain sensitive Facebook user information was the norm rather than the exception. Broadly speaking, this case is about whether Facebook acted unlawfully in making user information widely available to third parties. It's also about whether Facebook acted unlawfully in failing to do anything meaningful to prevent third parties from misusing the information they obtained.

Following the Cambridge Analytica outcry, dozens of lawsuits were filed against Facebook in various courts around the country. The lawsuits were mostly in federal court, and they were mostly proposed class actions by individual Facebook users who contended that

Facebook disseminated their sensitive personal information to Kogan without their consent and failed to prevent him from transferring it to Cambridge Analytica. One of the first of these lawsuits was filed in the Northern District of California and randomly assigned to this Court.

When multiple, similar federal lawsuits are filed around the country, there is a process within the federal judiciary for handling them. Congress has created the Judicial Panel on Multidistrict Litigation, which considers whether to transfer similar cases to a single federal judge for pretrial proceedings. The purpose is to promote the orderly adjudication of multiple similar cases, avoiding conflicting rulings from different judges and alleviating the strain on the system that would result from many judges adjudicating the same complicated pretrial issues. The multidistrict litigation process contemplates that once the assigned judge adjudicates those issues, the individual cases are sent back for trial to the courts where they originated. In these cases against Facebook, the panel concluded that assignment to a single judge was warranted, and assigned the lawsuits to this Court.

This Court subsequently appointed two attorneys to serve as lead plaintiffs' counsel. Thereafter, lead counsel, representing roughly three dozen individual Facebook users, filed a consolidated class action complaint. The plaintiffs propose to represent a class consisting of all Facebook users in the United States and the United Kingdom whose personal information was improperly disseminated and/or inadequately protected by Facebook from 2007 to the present. The practical effect of the proposed class action is that this one consolidated complaint could potentially resolve all claims by private parties against Facebook arising from the company's practices of disseminating user information during this period. In other words, this proceeding has effectively become one large proposed class action, as opposed to a group of several dozen separate lawsuits.[1]

Facebook filed a motion to dismiss, and a lengthy hearing took place during which the

---

[1] Other lawsuits which are not part of this multidistrict litigation have been filed against Facebook by law enforcement entities from states or localities. Although Facebook attempted to fold one such lawsuit into this proceeding, the Court rejected that attempt. *See Illinois, ex rel. Kimberly M. Foxx v. Facebook*, 354 F. Supp. 3d 1122 (N.D. Cal. 2019).

parties and the Court discussed many potential deficiencies in the complaint. The hearing ended with the Court giving the plaintiffs permission to file an amended complaint to address any such deficiencies.

The amended complaint, which is the subject of the current motion to dismiss, runs 414 pages and includes 1,442 paragraphs. It appears to include all the claims that were asserted in the cases that were transferred here by the multidistrict litigation panel, and more. But for manageability purposes, the complaint is divided into "prioritized claims" and "nonprioritized claims." The idea is that the prioritized claims (which presumably reflect lead counsel's judgment about their relative strength or importance) will be adjudicated first, and the nonprioritized claims should be stayed and addressed later if necessary. The complaint names multiple defendants (for example, CEO Mark Zuckerberg, in addition to Facebook itself), but again divides those defendants into the "prioritized" and "non-prioritized" categories. Facebook is the only prioritized defendant.

It's worth noting that the case has expanded in scope. While the initial lawsuits focused largely on Facebook's conduct that was the subject of the Cambridge Analytica scandal, the case now includes allegations stemming from the subsequent revelations about Facebook's wider information-sharing practices. Moreover, although the complaint purports to assert 12 prioritized "claims," most of those purported claims actually consist of multiple distinct legal claims, based on distinct factual allegations. For example, the section entitled "Breach of Contract" appears to contain roughly half a dozen distinct claims for breach of contract, based on distinct acts of alleged wrongdoing. Indeed, at times it seems the plaintiffs sought to identify anything Facebook has ever been reported to have done wrong and then made sure to sprinkle in at least a few allegations about it.

This strategy interferes significantly with the clarity and effectiveness of the plaintiffs' presentation. Some of the allegations are quite vague. For example, the plaintiffs make an allegation, the significance of which the Court has not been able to understand, about Facebook stripping metadata from users' photos before allowing third parties to access them. Also

scattered throughout the complaint are allegations about something the plaintiffs call "psychographic marketing," without any meaningful explanation of the legal or factual difference between psychographic marketing and targeted advertising (the latter of which the plaintiffs appear to concede is perfectly legitimate).

Overall, the presence of so many disparate and vague allegations makes it nearly impossible for Facebook to meaningfully respond to all of them, much less for the Court to effectively address them. The conventional approach in a situation like this might be to sift through the complaint to try to identify each distinct claim, then dismiss with leave to amend all claims that are not adequately articulated. But that approach would likely result in many more rounds of motions to dismiss, bogging the case down at the pleading stage for years. In the interest of preventing that from happening to this multidistrict litigation, this ruling focuses on what the Court understands to be the plaintiffs' core allegations about Facebook's handling of sensitive user information. Claims based on these core factual allegations will largely survive the motion to dismiss. All other prioritized claims not addressed by this ruling will be stayed (effectively, relegated to non-prioritized status) and adjudicated, if necessary, at a later stage in the proceedings with the other non-prioritized claims.

The core allegations in the complaint describe four categories of wrongdoing by Facebook. In adjudicating Facebook's motion to dismiss, the Court is required to assume the truth of these allegations, so long as they are adequately articulated and not contradicted by any documents that the complaint explicitly relies on.

1. Giving app developers access to sensitive user information. Since roughly 2007, Facebook users have been able to access applications, or apps, directly from the Facebook platform to do things like play video games, read news content, or stream videos. According to the plaintiffs, this interaction among Facebook, its users, and third-party apps is one of the primary means by which Facebook has disseminated user information to third parties. The complaint alleges that when users accessed apps on the Facebook platform, the app developers were not merely able to obtain information about the users they were interacting with; they were

also able to obtain any information about the users' Facebook friends that the users themselves had access to. So, for example, if you decided to use an app on the Facebook platform to play a video game, the video game company would be able to access not only your information but also any information about your friends that you could obtain yourself. This includes a variety of things that your friends might have intended to share only with a limited audience, such as photographs, videos they made, videos they watched, religious preferences, posts, and even sometimes private one-on-one messages sent through Facebook. And since most people have dozens or hundreds of Facebook friends, each interaction with an app represents the disclosure of a great deal of information about dozens or hundreds of people.

The Cambridge Analytica story is an example of this. In 2013, Aleksandr Kogan created an app called "MyDigitalLife." Facebook allowed Kogan to market and operate this app on the Facebook platform. The app invited Facebook users to answer a series of questions to help them better understand themselves – a personality test of sorts. But when a user took the test, Kogan was not merely able to collect information about that user; he was able to collect information on the user's Facebook friends. This allowed Kogan to compile a database with information on roughly 87 million Facebook users, even though his app was only downloaded by around 300,000 people.

The plaintiffs allege that from roughly 2009 to 2015, tens of thousands of app developers like Kogan, operating on the Facebook platform, were able to interact with users to obtain this type of information about users' friends. The plaintiffs further allege that Facebook failed to adequately disclose that even if users adjusted their privacy settings to specify that only their friends would be allowed to see their information, this would not prevent app developers from getting it.

2. Continued disclosure to whitelisted apps. In 2014, in response to criticism of its information-sharing practices, Facebook announced it would restrict app developers so they would have access only to the information of the users the apps were interacting with (and not to information of the users' friends). But the plaintiffs allege that Facebook, despite its public

promises to restrict access, continued to allow a preferred list of app developers to access the information of users' friends. The complaint describes these preferred app developers as "whitelisted apps," and alleges that Facebook secretly continued to give these apps "special access" to friends' information because of the amount of revenue these apps generated for Facebook. Thousands of companies were allegedly on this list, including Airbnb, Netflix, UPS, Hot or Not, Salesforce, Lyft, Telescope, and Spotify.

3. Sharing sensitive user information with business partners. Meanwhile, Facebook has maintained a separate information-sharing program with companies that the plaintiffs describe as "business partners." The complaint's allegations about these business partners are somewhat more difficult to pin down than the allegations about app developers. Indeed, there may be some overlap between companies in the "app" category and the "business partner" category. Moreover, the plaintiffs allege that Facebook outsourced to business partners "the time, labor, and money required to build Facebook's Platform on different devices and operating systems," but that doesn't seem to describe all the "business partners" listed in the complaint. The non-exclusive list of companies that the complaint identifies as business partners includes device manufacturers, such as Blackberry and Samsung. It includes websites such as Yahoo, and the Russian search engine Yandex. And it includes companies such as Amazon, Microsoft, and Sony. This list came from Facebook itself, which asserted that it had "integration partnerships" with these companies in a letter to the Energy and Commerce Committee of the U.S. House of Representatives.

Although the category is somewhat vague, the alleged misconduct is relatively straightforward. The complaint alleges that Facebook shared information about its users with this non-exclusive list of business partners, and that those companies in turn shared data with Facebook. "These partnerships," the complaint alleges, "were built in part on 'data reciprocity.' Facebook and its partners agreed to exchange information about users' activities with each other." And as with app developers, Facebook allegedly would give a business partner access not only to information of the user with whom the business partner interacted, but also to

information of that user's friends. The plaintiffs allege that, for most of the period covered by the lawsuit, Facebook never disclosed that it was sharing user information with business partners in this fashion.

      4. Failure to restrict the use of sensitive information. In addition to complaining about Facebook's dissemination of private user information to app developers, whitelisted apps, and business partners, the plaintiffs allege that Facebook did nothing to prevent these third parties from misusing the information Facebook allowed them to access. Specifically, the plaintiffs allege that: (i) Facebook purported to have a policy preventing app developers from using information for any purpose other than enhancing the interaction between the app and the person who was using the app on the Facebook platform; but (ii) Facebook did nothing to enforce this policy, thus giving users the impression that their information was protected, while in reality countless app developers were using it for other purposes.

      Again, the Cambridge Analytica story is an example of this. According to the plaintiffs, if Facebook was truly enforcing a policy of limiting the use of user information by app developers, Kogan would have been precluded from extracting all that sensitive information about users' friends to employ for his own research, and he would certainly have been precluded from selling it to Cambridge Analytica. The plaintiffs allege that this was the norm with the tens of thousands of app developers who interacted with users on the Facebook platform – that any policy Facebook purported to have restricting the use of information by third parties was nonexistent in reality, because Facebook was intent solely on generating revenue from the access it was providing.

      Based on the four core categories of misconduct described above, the plaintiffs assert a variety of legal claims. They bring a privacy-based tort claim under California law for the unauthorized disclosure of private facts. They assert another privacy-based tort claim for intrusion into private affairs, along with a similar claim based on the right to privacy enshrined in the California Constitution. They bring two claims based on federal statutes: the Stored Communications Act (which prohibits the unauthorized disclosure of information from

computers) and the Video Privacy Protection Act (which prohibits disclosure of a person's video viewing habits). And the plaintiffs bring a variety of other California law claims that don't relate as directly to privacy but are nonetheless based on assertions that Facebook failed to protect their privacy. Such claims include breach of contract (for allowing third parties to obtain sensitive user information despite promising to protect it), deceit (for tricking users about the degree to which their information could be accessed), and negligence (for failing to prevent third parties from misusing sensitive information despite Facebook's duty to protect that information). As mentioned earlier, many of these purported claims actually have multiple distinct claims built into them. Facebook has moved to dismiss all the claims, both for lack of standing and on the merits.

## II. EXPECTATION OF PRIVACY

Facebook's motion to dismiss is littered with assumptions about the degree to which social media users can reasonably expect their personal information and communications to remain private. Because Facebook's view of this issue pervades so many of its individual legal arguments – and because Facebook's view is so wrong – it is addressed at the outset.

Facebook's view is that once you make information available to your friends on social media, you completely relinquish any privacy interest in that information. For this reason, Facebook insists, it does not matter whether Facebook users consented to the company's information-sharing practices. Facebook asserts that even if users didn't consent, and even if users intended to restrict access to friends only, and even if Facebook had explicitly promised not to share their information with anyone else, the users would have no right to complain that their privacy was invaded by the disclosure or misuse of their sensitive information. Although this argument was implicit in Facebook's papers, it became explicit at the hearing on the motion to dismiss. Dkt. No. 287 at 7 (hearing transcript).[2]

---

[2] Facebook appears to contend that this issue relates both to standing and to the merits of any claims in which the plaintiffs assert an expectation of privacy (such as the privacy claims brought under California tort law or the California Constitution). As discussed in Section IV with respect to consent, the issue of whether users have a reasonable expectation of privacy in

The problem with Facebook's argument is that it treats privacy as an all-or-nothing proposition – either you retain a full privacy interest by not sharing information with anyone, or you have no privacy interest whatsoever by virtue of sharing it even in a limited fashion. In reality, there can be "degrees and nuances to societal recognition of our expectations of privacy: the fact that the privacy one expects in a given setting is not complete or absolute does not render the expectation unreasonable as a matter of law." *Sanders v. American Broadcasting Companies, Inc.*, 20 Cal. 4th 907, 915 (1999); *see also Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 991-93 (N.D. Cal. 2015). Thus, as the U.S. Supreme Court has explained, "information may be classified as private if it is intended for or restricted to the use of a particular person *or group or class of persons*" rather than being "freely available to the public." *U.S. Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) (emphasis added) (quoting Webster's Third New International Dictionary 1804 (1976)); *see also id.* at 763 ("Thus the extent of the protection accorded a privacy right at common law rested in part on the *degree* of dissemination of the allegedly private fact . . . ."). So, for example, if you are diagnosed with a medical condition, you can expect to conceal it completely only if you keep it between you and your doctor. But it does not follow that if you send an email to selected colleagues and friends explaining why you'll be out of commission for a while, you've relinquished any privacy interest in your medical condition, such that the email provider could disseminate your diagnosis to anyone who might be interested in your health status. Similarly, social media users can have their privacy invaded if sensitive information meant only for a few dozen friends is shared more widely.[3]

Although Facebook refuses in this case to acknowledge its users' privacy interests, it has done so in other court cases. For example, in a brief filed with the California Supreme Court, for

---

information they share with their social media friends is best understood as relating to the merits, not standing. *See, e.g.*, *American Farm Bureau Federation v. U.S. Environmental Protection Agency*, 836 F.3d 963, 968 (8th Cir. 2016).

[3] It seems quite possible that a user whose settings allow information to be shared not only with friends, but friends of friends, loses any expectation of privacy, although that issue is not squarely presented by this motion to dismiss.

a case where Facebook fought against the compelled disclosure of a user's posts, Facebook compared information kept on social media to information kept on a smartphone: "The data on a smartphone – like the data maintained in a social media account – can reveal an individual's private interests and concerns and where a person has been, which in turn reflects a wealth of detail about a person's familial, political, professional, religious, and sexual associations." Answer Brief on the Merits, *Facebook, Inc. v. Superior Court*, 2016 WL 684072 (Cal.), at *29 (brackets and internal quotations omitted) (quoting *Riley v. California*, 573 U.S. 373, 396 (2014)). For this reason, Facebook continued, "communications content of the kind maintained by [social media] providers" carries with it such a significant expectation of privacy that even law enforcement must get a warrant before accessing it from those providers. *Id*. In a different California Supreme Court brief, Facebook took pains to juxtapose users who share communications with the general public against users who share communications only with friends: "These settings cannot be overridden by others; if a post is set to be viewable only by a certain audience, it may not then be shared or forwarded through the Facebook platform to someone outside that audience." Answering Brief on the Merits, *Facebook, Inc. v. Superior Court*, 2018 WL 2060039 (Cal.), at *16. Facebook added that even if users designate their communications to be viewed by the general public, they can later "regain" their expectation of privacy in that information by switching their settings back to a more restricted audience. *See id.* at *28 n.4.

Perhaps Facebook's argument that social media accounts are like smartphones is an exaggeration in the other direction. But it's closer to the truth than the company's assertions in this case. Sharing information with your social media friends does not categorically eliminate your privacy interest in that information, and the plaintiffs' claims in this lawsuit must be analyzed against that backdrop, rather than the backdrop Facebook attempts to paint in its motion to dismiss.

### III. STANDING

To bring their claims in federal court, the plaintiffs must adequately allege (and eventually prove) that they have "standing" under Article III of the United States Constitution. This means, among other things, that the plaintiffs must allege they suffered an actual injury from Facebook's conduct that is both "concrete" and "particularized." *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1545 (2016).

The plaintiffs allege three kinds of injury. First, they allege a simple "privacy injury" – that is, injury from Facebook's widespread disclosure of their sensitive information, including their photographs, videos they made, videos they watched, religious preferences, posts, and even private one-on-one messages sent through Facebook. Second, the plaintiffs allege they were injured because Facebook's dissemination of their personal information increased the risk that they would become victims of identity theft. Third, the plaintiffs allege they were deprived the economic value of their personal information as a result of its dissemination, the theory apparently being that if their information had remained private, they could have sold that information to advertisers or data brokers themselves.

The second and third alleged injuries do not confer Article III standing. Regarding the risk of identity theft, this is not a case involving, say, hackers, and it is not a case about the theft of, say, social security or credit card numbers. Although the risk of identity theft is admittedly greater than if Facebook had not made the plaintiffs' personal information available, the risk is too speculative to confer standing. *Compare In re Zappos.com, Inc.*, 888 F.3d 1020, 1024-29 (9th Cir. 2018). Regarding loss of value, although it's true that each user's information is worth a certain amount of money to Facebook and the companies Facebook gave it to, it does not follow that the same information, when not disclosed, has independent economic value to an individual user. The plaintiffs do not plausibly allege that they intended to sell their non-disclosed personal information to someone else. Nor, in any event, do they plausibly allege that someone else would have bought it as a stand-alone product. The plaintiffs' economic-loss theory is therefore purely hypothetical and does not give rise to standing. *See In re Facebook Internet Tracking Litigation*,

140 F. Supp. 3d 922, 931-32 (N.D. Cal. 2015); *Opperman v. Path, Inc*., 87 F. Supp. 3d 1018, 1057 (N.D. Cal. 2014); *Yunker v. Pandora Media, Inc.*, 2013 WL 1282980, at *4 (N.D. Cal. Mar. 26, 2013); *Low v. LinkedIn Corp*., 2011 WL 5509848, at *4-5 (N.D. Cal. Nov. 11, 2011).[4]

But the first alleged injury – that the plaintiffs' sensitive information was disseminated to third parties in violation of their privacy – is sufficient to confer standing. Facebook argues that a "bare" privacy violation, without "credible risk of real-world harm" such as identity theft or other economic consequences, cannot rise to the level of an Article III injury. But it's black-letter law that an injury need not be "tangible" to be cognizable in federal court. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) ("Although tangible injuries are perhaps easier to recognize, we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete."). And courts have often held that this particular type of intangible injury – disclosure of sensitive private information, even without further consequence – gives rise to Article III standing.

Indeed, the Ninth Circuit has repeatedly explained that intangible privacy injuries can be redressed in the federal courts. This issue has tended to come up recently in cases where a plaintiff alleges standing based on the violation of a statute whose purpose is to protect privacy. In such cases, the alleged violation of the statute does not automatically give rise to standing. For a statutory violation to create standing, the statute must protect against a concrete and particularized injury that's cognizable within the meaning of Article III.

Most recently on this issue, the Ninth Circuit handed down an opinion in a different case against Facebook – a case involving Facebook's use of facial recognition technology in alleged violation of an Illinois statute. The Court held that "the development of a face template using facial recognition technology without consent (as alleged here) invades an individual's private affairs and concrete interests." *Patel v. Facebook, Inc.*, 2019 WL 3727424, at *5 (9th Cir. Aug.

---

[4] *But see In re Facebook Privacy Litigation*, 572 F. App'x 494, 494 (9th Cir. 2014); *Williams v. Facebook, Inc.*, No. 18-cv-01881-RS, Dkt. No. 128 at 11-13 (N.D. Cal. Aug. 29, 2019); *Svenson v. Google Inc.*, 2015 WL 1503429, at *5 (N.D. Cal. Apr. 1, 2015).

8, 2019). Earlier, in *Eichenberger v. ESPN*, the Ninth Circuit held that an alleged violation of the Video Privacy Protection Act creates standing, explaining that the statute "protects privacy interests . . . generally by ensuring that consumers retain control over their personal information," and emphasizing that "privacy torts do not always require additional consequences to be actionable." 876 F.3d 979, 983 (9th Cir. 2017). And in *Van Patten v. Vertical Fitness Group, LLC*, the Ninth Circuit concluded that alleged violations of the Telephone Consumer Protection Act, which creates a cause of action to remedy the injury of receiving annoying telemarketing text messages, give rise to standing because such messages, "by their nature, invade the privacy and disturb the solitude of their recipients." 847 F.3d 1037, 1043 (9th Cir. 2017). The *Van Patten* court emphasized that a lawsuit alleging this type of intrusion under the statute may proceed in federal court even if no additional, tangible harm is alleged. *Id*.

There are many similar cases involving common law claims. For example, Judge Seeborg recently held that a lawsuit asserting common law privacy claims against Facebook based on the collection and disclosure of users' Android data could proceed in federal court despite the absence of any alleged economic injury. *Williams v. Facebook, Inc*., 384 F. Supp. 3d 1043, 1050 (N.D. Cal. 2018) ("The complaint need not include economic injury to establish standing for the intrusion upon seclusion, invasion of privacy, or unjust enrichment claims."). In reaching this conclusion, Judge Seeborg quoted another decision involving Facebook – this one by Judge Davila – which held: "a plaintiff need not show actual loss to establish standing for common-law claims of invasion of privacy and intrusion upon seclusion." *In re Facebook Internet Tracking Litigation*, 263 F. Supp. 3d 836, 843 (N.D. Cal. 2017); *see also In re Google Inc. Cookie Placement Consumer Privacy Litigation*, 806 F.3d 125, 134-35 (3d Cir. 2015) (holding that the plaintiffs had standing to assert federal statutory and California common law privacy claims based on allegations that the defendants implanted tracking cookies on their personal computers); *id*. at 134 ("For purposes of injury in fact, the defendants' emphasis on economic loss is misplaced."); *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1057 (N.D. Cal. 2014).

To be sure, Facebook cites a few cases that lean in the other direction. For example, in a

2012 case, Judge Grewal rejected the argument that the "loss of personal information, even in the absence of any cognizable economic harm, was sufficient to confer Article III standing." *In re Google, Inc. Privacy Policy Litigation*, 2012 WL 6738343, at *5 (N.D. Cal. Dec. 28, 2012). But Judge Grewal's ruling seems to *assume* that economic harm is required rather than examining whether it's required. This appears equally true of the earlier district court cases on which he relied. *See LaCourt v. Specific Media, Inc.*, 2011 WL 1661532, at *4 (C.D. Cal. Apr. 28, 2011); *In re iPhone Application Litigation*, 2011 WL 4403963, at *5 (N.D. Cal. Sept. 20, 2011). Ultimately, the only reason Judge Grewal gave for his ruling was that "nothing in the precedent of the Ninth Circuit or other appellate courts confers standing on a party that has brought statutory or common law claims based on nothing more than the unauthorized disclosure of personal information . . . ." *In re Google, Inc. Privacy Policy Litigation*, 2012 WL 6738343, at *5. Whether or not he was right about precedent at the time, the cases cited above provide ample support for the conclusion that this type of privacy invasion alone creates standing.

And those cases are right. To say that a "mere" privacy invasion is not capable of inflicting an "actual injury" serious enough to warrant the attention of the federal courts is to disregard the importance of privacy in our society, not to mention the historic role of the federal judiciary in protecting it. "In a democratic society privacy of communication is essential if citizens are to think and act creatively and constructively." *Bartnicki v. Vopper*, 532 U.S. 514, 533 (2001) (quoting President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 202 (1967)). For this reason, our country has countless federal laws on the books designed to protect our privacy – laws that the federal courts are charged with enforcing.[5] Perhaps the most prominent of these is the Wiretap Act, colloquially

---

[5] *See, e.g.*, Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. No. 104-191, 110 Stat. 1936; Children's Online Privacy Protection Act of 1998, 15 U.S.C. §§ 6501-6506 (2012); Driver's Privacy Protection Act of 1994, 18 U.S.C. §§ 2721-2775 (2012); Electronic Communications Privacy Act of 1986, Pub. L. No. 99-508, 100 Stat. 1848; Privacy Protection Act of 1980, Pub. L. No. 96-440, 94 Stat. 1879; Right to Financial Privacy Act of 1978, 12 U.S.C. §§ 3401-3422 (2012); Privacy Act of 1974, 5 U.S.C. § 552a (2012).

known as "Title III," a bedrock privacy protection which makes it unlawful for either the government or a private party to intercept someone's "wire, oral, or electronic communication" without consent. 18 U.S.C. § 2511. Would Facebook really argue that a violation of this statute inflicts no "actual injury" on the participants in the conversation unless interception of the communication ends up visiting a more tangible, secondary harm on the participants?

Of course, a plaintiff cannot get into court by simply intoning that she suffered an intangible privacy injury. But once it is understood that an intangible privacy injury *can* be enough, it becomes easy to conclude that the alleged privacy injury here *is* enough. The alleged injury is "concrete" largely for the reasons already discussed – if you use a company's social media platform to share sensitive information with only your friends, then you suffer a concrete injury when the company disseminates that information widely. And the alleged injury is "particularized," at least for most of the plaintiffs. To be particularized, the injury must have been suffered directly by the individual plaintiff, and it must be distinct from the more general type of objection that members of the public at large might have to a defendant's unlawful conduct. *See Spokeo*, 136 S. Ct. at 1548. The plaintiffs allege that Facebook violated their privacy rights (and other rights) because: (i) they engaged in sensitive communications that included photographs, videos they made, videos they watched, Facebook posts, likes, and private one-on-one messages; (ii) they intended to share these communications only with a particular person or a group of people; (iii) Facebook made those communications widely available to third parties in a variety of ways; and (iv) as a result, third parties were able to develop detailed dossiers on the plaintiffs including information about their locations, their religious and political preferences, their video-watching habits, and other sensitive matters.[6]

Facebook makes one argument regarding particularity that, if successful, would merely

---

[6] It's possible that a few of the named plaintiffs have not adequately alleged a privacy injury based on their own Facebook experience. However, Facebook does not single out any particular named plaintiff in its motion, and most of the plaintiffs have adequately alleged standing. Facebook will be given an opportunity to attempt to knock out individual named plaintiffs on standing grounds at a later stage.

narrow the scope of this case rather than ending it entirely. Recall that this lawsuit arose from the Cambridge Analytica scandal, with the plaintiffs originally alleging that Facebook gave Aleksandr Kogan access to their information (with Kogan, in turn, giving it to Cambridge Analytica). The plaintiffs initially alleged, plausibly and with specificity, that Kogan likely accessed their own information. But the plaintiffs now allege that Facebook disseminated sensitive user information far more widely, to tens of thousands of app developers and business partners. Facebook argues that because the complaint lacks specific allegations about which app developers or business partners obtained which plaintiffs' private information, the plaintiffs have not alleged an injury particular to them, at least beyond the injury from the disclosure to Kogan.

This argument puts too great a burden on the plaintiffs, at least at the pleading stage (and probably at any stage). If, as alleged in the complaint, Facebook made users' "friends only" information readily available to such a broad swath of companies (Apple, Samsung, AT&T, Sprint, T-Mobile, Verizon, Google, Huawei, Microsoft, Mozilla, LG, and Amazon, to name just a few), it is virtually inevitable that some of these companies obtained information on the named plaintiffs. *Cf. Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1021 (N.D. Cal. 2012). This type of privacy invasion is no less an Article III injury simply because the plaintiffs are left to guess precisely which companies (other than Facebook) were involved.

Accordingly, for all the claims addressed by this ruling, Facebook cannot obtain dismissal for lack of Article III standing.

## IV. CONSENT

There is one more global issue to discuss before proceeding to a claim-by-claim analysis of the complaint. Facebook contends that the plaintiffs agreed, when they signed up for their accounts, that Facebook could disseminate their "friends only" information in the way it has done. If the complaint and any judicially noticeable materials were to establish that Facebook users consented to the alleged misconduct, this would indeed require dismissal of virtually the entire case. However, the complaint adequately alleges that some users did not consent to any of Facebook's practices. And although Facebook is correct as a matter of law that some users

consented to the first category of conduct (sharing information with app developers), the complaint adequately alleges that those users did not consent to the other three categories (sharing information with whitelisted apps starting in 2015, sharing information with business partners, and failing to protect user information from misuse).

### A.

As an initial matter, Facebook asserts that consent is actually a standing issue. It contends that there is no true Article III injury on the facts of this case because the plaintiffs cannot be injured by something they allowed Facebook to do.

But the whole point of Article III standing is that some claims don't belong in federal court even if the plaintiff would win on the merits. Therefore, the standing inquiry in this case is: assuming the plaintiffs could win on the merits, should their claims nonetheless be dismissed for lack of standing because the injury they allegedly suffered is not cognizable in federal court? The plaintiffs allege they did not consent – and this is an allegation they would need to prevail on if they are to succeed on the merits. Thus, the Court must assume, for purposes of the standing inquiry, that the plaintiffs did not consent. "A party need not prove that the action it attacks is unlawful in order to have standing to level that attack . . . . Rather, in determining whether plaintiffs have standing, we must assume that on the merits they would be successful in their claims." *Muir v. Navy Federal Credit Union*, 529 F.3d 1100, 1106 (D.C. Cir. 2008) (alterations omitted).

This rule holds even when the standing question overlaps substantially with the question of whether a plaintiff has stated a claim. "As a general rule, when the question of jurisdiction and the merits of the action are intertwined, dismissal for lack of subject matter jurisdiction is improper." *Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold & Easement in the Cloverly Subterranean Geological Formation*, 524 F.3d 1090, 1094 (9th Cir. 2008) (internal quotations and alterations omitted); *see also Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1040 (9th Cir. 2004) ("The district court erred in characterizing its dismissal of Safe Air's complaint under Rule 12(b)(1) because the jurisdictional issue and substantive issues in

this case are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits.").

In privacy cases, the standing and merits inquiries will often be intertwined. For example, the extent to which you have a reasonable expectation of privacy relates not only to whether you've stated a claim for invasion of privacy but whether you were injured by the invasion in the first place. And this will often be true of consent – if you agree to the disclosure of your personal information, it may be difficult to argue that you've been "injured" in a legal sense by the disclosure you permitted. But in virtually every privacy case, consent will be part of the merits inquiry. Because courts presume success on the merits when evaluating standing, these are not standing issues in privacy cases.[7]

A good illustration of this is *Van Patten v. Vertical Fitness Group*, *LLC*, 847 F.3d 1037 (9th Cir. 2017). In that case, which was in a summary judgment posture, the Ninth Circuit held that the plaintiffs established standing to sue based on the receipt of allegedly unwanted text solicitations. But in the same opinion, the Court held that the plaintiffs must lose on the merits, because they consented to receive those texts. *Id.* at 1044. Although courts occasionally conflate standing with the merits in privacy cases, they generally recognize the need to keep them separate. *See, e.g.*, *American Farm Bureau Federation v. U.S. Environmental Protection Agency*, 836 F.3d 963, 968 (8th Cir. 2016) ("The EPA reasons that because the disputed information was publicly available on the Internet or available for public review, further distribution of the information could not establish any injury. That conclusion, however, assesses the merits of the asserted privacy interest under FOIA rather than whether the associations' members had a legally cognizable interest in preventing the agency's release of their personal information."); *In re Vizio, Inc., Consumer Privacy Litigation*, 238 F. Supp. 3d 1204, 1216 (C.D. Cal. 2017)

---

[7] It's possible that a federal court confronted with truly frivolous privacy claims might reasonably consider intertwined issues as a matter of standing – for example, if the absence of a reasonable privacy expectation, or the presence of consent, were obviously and totally indisputable. *Cf. Williston Basin Interstate Pipeline*, 524 F.3d at 1094. But even in a rare case like that, it still probably makes more sense for the court to dismiss the claims on the merits (which, after all, is just as easy to do, and also gives the defendant the benefit of preclusion).

(rejecting, in a privacy case, a standing argument that "improperly conflates the merits of Plaintiffs' claims with their standing to bring suit"); *id.* ("Taken to its logical conclusion, Defendants' argument absurdly implies that a court could never enter judgment against a plaintiff on a VPPA claim if it found that the disclosed information was not within the statutory definition of personally identifiable information; instead, it would have to remand or dismiss for lack of jurisdiction."); *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1020 (N.D. Cal. 2012) (explaining that whether a plaintiff adequately alleges standing to assert privacy claims "in no way depends on the merits" of those claims (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975))).

## B.

Whether the plaintiffs consented to Facebook's information-sharing practices is thus a merits inquiry. And the parties actually agree on several aspects of that inquiry. First, they agree that, for virtually all claims, the question of whether Facebook users consented to the alleged conduct is one of contract interpretation governed by California law.[8] Second, the parties agree that California law requires the Court to pretend that users actually read Facebook's contractual language before clicking their acceptance, even though we all know virtually none of them did. Constrained by this fiction, the Court must analyze the relevant contractual language to assess whether the users "agreed" to allow Facebook to disseminate their sensitive information in the ways described in the lawsuit. Third, the parties agree that if the contract language at issue is reasonably susceptible to more than one interpretation, with one of those interpretations suggesting consent and another belying it, the Court cannot decide the consent issue in Facebook's favor at the motion to dismiss stage. And fourth, they agree that the contract language must be assessed objectively, from the perspective of a reasonable Facebook user. The

---

[8] For the claim under the federal Video Privacy Protection Act, consent is governed by the terms of the statute itself. This issue is discussed in the portion of Section V dealing with that claim. The federal Stored Communications Act precludes information-sharing by computer service providers without "lawful" consent; this is presumably a reference to state law, and the parties don't suggest otherwise, so this ruling assumes that California law applies to the consent issue relating to that claim.

upshot, at this early stage of the case, is that if a reasonable Facebook user could plausibly have interpreted the contract language as *not* disclosing that Facebook would engage in particular conduct, then Facebook cannot obtain dismissal of a claim about that conduct (at least not based on the issue of consent).[9]

One difficulty with the consent question is that the lawsuit covers a nearly 13-year period – from 2007 to the present. Obviously, Facebook said different things to its users over that period, and its practices changed as well. And it would be impossible at this stage to analyze which disclosures apply to which plaintiffs, because the parties have not presented the information necessary to conduct that inquiry. The analysis in this ruling will primarily focus on the documents presented to users who signed up for accounts in the middle of 2012. At least with respect to the four categories of alleged misconduct addressed in this ruling, these mid-2012 documents provide a good exemplar of what Facebook users agreed to during much of the period covered by this lawsuit; indeed, users agreed to substantially similar language between roughly 2009 and 2015. Thus, these documents allow the Court to assess consent as a general matter, even if the analysis might not apply to every single plaintiff.[10]

---

[9] The parties disagree about whether consent should be treated as an element of the plaintiffs' claims or as an affirmative defense to those claims. The answer is likely that consent is an element for some claims and an affirmative defense for others. But at least for purposes of this motion it does not matter, because in either case the question is whether the allegations in the complaint and any judicially noticeable materials definitively establish that the plaintiffs consented to the conduct. If the answer is yes, the Court must dismiss the claims regardless of whether consent is an element or a defense. *See, e.g., Rivera v. Peri & Sons Farms, Inc*., 735 F.3d 892, 902 (9th Cir. 2013) ("When an affirmative defense is obvious on the face of a complaint . . . a defendant can raise that defense in a motion to dismiss."); *see also Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980).

[10] Incidentally, the fact that the plaintiffs seek to represent a class of people who used Facebook any time between 2007 and the present raises the possibility that some aspects of this lawsuit are time-barred, and Facebook presses this issue in its motion to dismiss. For example, Facebook notes that it was the subject of a consent order by the Federal Trade Commission in 2012, based on similar information-sharing practices. That consent order may have put the plaintiffs on notice of Facebook's conduct prior to the entry of the order (although presumably it would not have put them on notice of any misconduct by Facebook following entry of the consent order). Facebook also invokes a single news article from 2015 (which this Court may consider on a motion to dismiss because the article is incorporated by reference into the complaint). That article discusses the company's information-sharing practices, and Facebook asserts that this should have put

People who signed up for accounts in mid-2012 were required to accept Facebook's "Statement of Rights and Responsibilities," or "SRR." The SRR itself contains some statements about privacy and information-sharing. But it also references, and contains links to, several other policies, including the "Data Use Policy."[11] Although both sides agree that the language in the SRR is contractual, they dispute whether the Data Use Policy is part of that contract. This dispute matters because the Data Use Policy more explicitly discusses sharing information with third parties, and it contains the language Facebook primarily relies on to contend that its users consented to much of the alleged misconduct. The SRR is attached as Appendix A to this ruling, and the Data Use Policy is attached as Appendix B.[12]

The first section of the SRR, entitled "Privacy," calls out the Data Use Policy in the second sentence, provides a link to it, and encourages the user to read it. This first section of the SRR states in full: "Your privacy is very important to us. We designed our <u>Data Use Policy</u> to make important disclosures about how you can use Facebook to share with others and how we collect and can use your content and information. We encourage you to read the Data Use Policy, and to use it it to help you make informed decisions." Appendix A at 2. Later on the same page, the SRR tells users to read the Data Use Policy to learn about "how you can control what information other people may share with applications." *Id.* And at the end, the SRR provides a

_____

everyone on notice of its conduct. This seems more dubious than the argument about the FTC's 2012 consent order. But in any event, statutes of limitations provide an affirmative defense, which normally must be raised at summary judgment rather than on a motion to dismiss. *U.S. ex rel. Air Control Technologies, Inc. v. Pre Con Industries, Inc.*, 720 F.3d 1174, 1178 (9th Cir. 2013). The only exception is when it is absolutely clear from the allegations in the complaint and judicially noticeable material that a claim is untimely and no tolling doctrine could apply. That cannot be said here – at best Facebook has raised a significant possibility that claims relating to pre-2012 conduct may be time-barred, a defense that will need to be decided on summary judgment or at trial.
[11] Earlier versions of the "Statements of Rights and Responsibilities" were called "Terms of Service." Earlier versions of the "Data Use Policy" were called the "Privacy Policy."
[12] The request to consider these documents, which are exhibits 23 and 44 to Facebook's request for judicial notice at Docket Number 187, is granted because they are incorporated by reference into the complaint. The request to consider exhibits 14, 19, 26, 39, 40, 43, 46, and 47 is granted for the same reason. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). All other requests, beyond those granted in this footnote and in Footnote 10, are denied, although in any event they would not affect the outcome of this motion. *See id.*

list of additional documents the user "may also want to review," including the Data Use Policy, which "contains information to help you understand how we collect and use information." *Id.* at 11. This final section again includes a link to the Data Use Policy (along with several other documents that are described as governing the relationship between Facebook and its users).

This is sufficient to incorporate the Data Use Policy into the contractual agreement between Facebook and its users. Indeed, California case law makes it quite easy to incorporate a document by reference. "The contract need not recite that it incorporates another document, so long as it guides the reader to the incorporated document." *Shaw v. Regents of University of California*, 58 Cal. App. 4th 44, 54 (1997) (quotations omitted). What's needed is simply that the reference to the document be unequivocal, that the document be called to the attention of the contracting parties, and that the terms of the document be easily available to the contracting parties. *Id.*; *see also Wolschlager v. Fidelity National Title Insurance Co.*, 111 Cal. App. 4th 784, 790-91 (2003); *In re Anthem, Inc. Data Breach Litigation*, 2016 WL 3029783, at *8 (N.D. Cal. May 27, 2016); *Koffler Electrical Mechanical Apparatus Repair, Inc. v. Wartsila North America, Inc.*, 2011 WL 1086035, at *4-5 (N.D. Cal. Mar. 24, 2011). One could argue that the California appellate courts have been too quick to find incorporation by reference and that more explicit language should be required, particularly in the context of consumer contracts of adhesion. But this Court must apply California case law, which militates in favor of the conclusion that the Data Use Policy is incorporated into the SRR.

Thus, the true legal question is whether, by "agreeing" to the SRR and Data Use Policy, Facebook users consented to the alleged misconduct. In analyzing this question, it's important to reiterate the precise conduct at issue. Recall that the plaintiffs allege four categories of misconduct: (i) Facebook allowed app developers to access sensitive information, not merely of users they interacted with, but of the users' friends; (ii) even after Facebook announced it would no longer give app developers access to information of users' friends, it secretly continued to give "whitelisted apps" access; (iii) through some separate arrangement and by some separate means, Facebook shared sensitive user information with its business partners; and (iv) although

Facebook ostensibly had a policy of sharply limiting the use of the sensitive information it gave to third parties, in fact Facebook imposed no limits whatsoever.

It's easy to conclude, at the pleading stage, that the second category of conduct was not disclosed. In fact, Facebook does not even argue that its users assented to this practice. The same goes for the third category: although Facebook points to a section in its Data Use Policy entitled "Service Providers" which says "we give your information to the people and companies that help us provide, understand, and improve the services we offer," that statement does not come close to disclosing the massive information-sharing program with business partners that the plaintiffs allege in the complaint. Thus, for the claims based on sharing with whitelisted apps and business partners, Facebook cannot prevail on consent, at least at this stage.

In contrast, the first category of conduct – allowing the Aleksandr Kogans of the world to interact with users and obtain information of the users' friends through those interactions – was disclosed in the terms agreed to by Facebook users, at least for a portion of the period covered by this lawsuit. To begin, the SRR told users: "You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings." Appendix A at 2. As mentioned previously, the SRR also flagged for users the possibility that other people "may share" their information "with applications," and instructed users to read the Data Use Policy to learn more about this. *Id.* In turn, the Data Use Policy said that "if you share something on Facebook anyone who can see it can share it with others, including the games, applications, and websites they use." Appendix B at 10. And it instructed: "If you want to completely block applications from getting your information when your friends and others use them, you will need to turn off all Platform applications. This means you will no longer be able to use any third-party Facebook-integrated games, applications, or websites." *Id.*

Thus, contrary to the plaintiffs' argument, the language of these disclosures cannot be interpreted as misleading users into believing that they merely needed to adjust their privacy settings to "friends only" to protect their sensitive information from being disseminated to app developers. Users were told that they needed to adjust their application settings too. To be sure,

for the rare person who actually read the contractual language, it would have been difficult to isolate and understand the pertinent language among all of Facebook's complicated disclosures. Thus, in reality, virtually no one "consented" in a layperson's sense to Facebook's dissemination of this information to app developers. But under California law, users must be deemed to have agreed to the language quoted in the preceding paragraph, which means that users who did not properly adjust their application settings are deemed to have agreed that app developers could access their information.[13]

But there is a caveat. One inference from the complaint and the judicially noticeable materials is that Facebook began to disclose this practice of giving app developers access to friends' information only around 2009. Thus, users who established Facebook accounts before this time did not, at least based on the allegations in the complaint, agree to these terms when they signed up. Facebook contends this does not matter, because those users agreed to be bound by the SRR and Data Use Policy going forward, even when the terms changed. There appears to be some disagreement in the courts about whether a unilateral modification provision of this sort is permissible under California contract law, at least in circumstances where the party against whom it is being asserted did not receive adequate notice of the modification. *Compare Campos v. JPMorgan Chase Bank, NA*, 2019 WL 827634, at *10 (N.D. Cal. Feb. 21, 2019), *with Rodman*

---

[13] Incidentally, there is a pending case in which the Federal Trade Commission proposes a $5 billion civil penalty against Facebook, along with a 20-year consent decree. Stipulated Order for Civil Penalty, Monetary Judgment, and Injunctive Relief, *USA v. Facebook, Inc.*, No. 19-cv-2184 (D.D.C. July 24, 2019). The lawsuit filed on behalf of the FTC accuses Facebook of, among other things, failing to adequately disclose the practice of allowing app developers to access user information through users' friends. At first glance, this ruling's conclusions regarding consent might appear inconsistent with some of the allegations in the FTC lawsuit. That lawsuit curiously neglects to mention the language that Facebook used in its Data Use Policy, and therefore does not paint a complete picture of the communications between Facebook and its users, at least with respect to users who signed up after 2009. But even considering the disclosures in the Data Use Policy, the FTC's position is not necessarily inconsistent with this ruling. The FTC's claims against Facebook are not based on California law; they are based on alleged violations of the Federal Trade Commission Act and the earlier FTC consent order from 2012. While California law, for better or worse, allows Facebook to bury a disclosure of its information-sharing practices in the fine print of its contractual language, the FTC consent order required Facebook to disclose such practices prominently, in a way that would likely come to the attention of Facebook users. More broadly, the consent order precluded Facebook from explicitly or implicitly misrepresenting the extent to which the company protects user privacy.

*v. Safeway Inc.*, 2015 WL 604985, at *9-10 (N.D. Cal. Feb. 12, 2015), *aff'd*, 694 F. App'x 612 (9th Cir. 2017). But assuming for argument's sake the general validity of Facebook's unilateral modification provision, it does not automatically follow that users consented to the particular terms that Facebook subsequently added about sharing information with app developers. Even the cases upholding unilateral modification provisions recognize that any authority to modify the contract is constrained by the covenant of good faith and fair dealing. *See, e.g.*, *Campos*, 2019 WL 827634, at *9. This means that a Facebook user, when consenting to the unilateral modification provision, was consenting only to future modifications made in good faith. According to the plaintiffs, Facebook made a massive change in its contract without directly notifying its users, effectively adding a disclosure that "we will make your information readily available to tens of thousands of app developers unless you take complicated measures to prevent it." If that's true, it could very well constitute a breach of the covenant of good faith and fair dealing, which would mean that the users didn't consent to it.

And users who did not agree to the practice in their contracts could have been kept further in the dark about it by specific features of the Facebook platform. According to the complaint, in 2009 Facebook added a feature for users to select their audience for specific posts, choosing among "public," "friends," or a "custom" audience. Users were not informed, as part of this selection process, that designation of a limited audience would not prevent app developers from being part of that audience.

Thus, at this stage, the Court cannot conclude as a matter of law that early Facebook users consented to the later-announced information-sharing policy. This means that any plaintiff who signed up before roughly 2009 may pursue claims based on this conduct (assuming they can adequately allege the other elements of their claims).[14]

The fourth category of alleged misconduct – failing to limit how third parties could use

---

[14] As previously mentioned, neither side has attempted to specify which plaintiffs may pursue which claims, and it is unclear precisely when the disclosures changed on this issue; the parties will have an opportunity to parse this out at a subsequent phase in the case.

the sensitive information they accessed – is also somewhat complicated. The Data Use Policy, after explaining to users that applications could obtain their information from their friends, stated as follows: "If an application asks permission from someone else to access your information, the application will be allowed to use that information only in connection with the person that gave the permission and no one else." Appendix B at 10. The Policy gives an example of this: "one of your friends might want to use a music application that allows them to see what their friends are listening to. To get the full benefit of that application, your friend would want to give the application her friend list – which includes your User ID – so the application knows which of her friends is also using it." *Id.* From this example, it seems clear that the phrase "the application will be allowed to use that information only in connection with the person that gave the permission" means that if an app developer accesses your information through interaction with one of your Facebook friends, it may use your information only as part of its interaction with that friend. It therefore may not sell your information, or use it to develop a digital dossier on you for future targeted advertising.

Less clear is what Facebook is promising to do to protect users. Facebook interprets the disclosure to mean, in essence, "we tell app developers that they can only use your information to facilitate their interactions with your friends, but you can't really be sure they'll honor that." Perhaps a reasonable Facebook user could interpret the disclosure that way, which would mean that the user, upon agreeing to the Data Use Policy, assumed the risk that app developers would misuse the information. In other words, on this interpretation, users consented to an arrangement whereby app developers could end up obtaining their sensitive information for any purpose. But recall that in the context of this motion to dismiss the plaintiffs may be deemed to have consented to this arrangement only if that is the only plausible interpretation. It is not – there are at least two others. One equally plausible interpretation of the disclosure is that it assures users that Facebook is actively policing the activities of app developers on its platform, and thereby successfully preventing sensitive information from being misappropriated. Another plausible interpretation is that the word "allowed" references a technological block of sorts – that is,

perhaps a user could conclude that the Facebook platform has the ability to physically prevent app developers from being able to "see" friend information outside the context of their interactions with users. A user who has tried to access a fantasy football website at work, only to see a message on his screen that he's not "allowed" to access the site from that computer, might interpret the disclosure this way. Indeed, the Data Use Policy elsewhere uses the word "allowed" in a similar fashion, to connote a technological block. For example, it states: "If someone clicks on a link to another person's timeline, they'll only see the things that they are allowed to see." Appendix B at 8. Thus, there are at least three plausible interpretations of the contract language, two of which would lead to a conclusion that users did not consent but were misled, because Facebook allegedly did nothing to enforce its purported policy against tens of thousands of app developers who were freely making off with sensitive user information.[15]

The bottom line on the issue of consent is this: the complaint plausibly alleges that some users (and some plaintiffs) did not consent to the arrangement whereby app developers could access their sensitive information simply by interacting with their friends. For the remaining three categories of misconduct – sharing with whitelisted apps, sharing with business partners, and failing to prevent misuse of information by third parties – the complaint plausibly alleges that none of the users consented. The issue of consent therefore does not require dismissal in full of any of the prioritized claims in this lawsuit.[16]

---

[15] Incidentally, with respect to the allegation that Facebook failed to restrict the use of information by business partners (as opposed to app developers, to the extent those two categories don't overlap), it's unclear whether this contract language applies at all. If it does not apply, that would further weaken Facebook's argument that users were on notice that the company imposed no meaningful restriction on the use of information by business partners (although it could also undermine the plaintiffs' argument that Facebook committed a breach of contract by failing to prevent business partners from misusing information). Whether this language applies to restrictions on business partners, however, is not capable of firm resolution at this stage.

[16] Facebook makes an additional argument that even if the plaintiffs didn't explicitly consent to the alleged conduct in contractual language, they did so implicitly because they were put on notice of the conduct by Facebook's non-contractual disclosures. That issue cannot be resolved at the pleading stage in this case. *See, e.g.*, *In re Google Inc. Gmail Litigation*, 2014 WL 1102660, at *16 (N.D. Cal. Mar. 18, 2014) ("Implied consent is an intensely factual question that requires consideration of the circumstances . . . .").

## V. INDIVIDUAL CLAIMS

The various global issues having been addressed (and the complaint having been narrowed, for now, to claims based on the plaintiffs' core allegations), it becomes less difficult to sift through the individual claims asserted by the plaintiffs. Most of the claims will survive. The specific outcome for each claim is as follows:

- Facebook's motion to dismiss is granted in part and denied in part for the three privacy-based torts asserted under California law (public disclosure of private facts, intrusion into private affairs, and violation of the constitutional right to privacy).

- The motion is granted in part and denied in part for the claim based on the federal Stored Communications Act.

- The motion is denied in full for the federal Video Privacy Protection Act claim.

- The motion is denied in full for the California claim based on negligence and gross negligence.

- For the California claims based on deceit by concealment, breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment, the motion is granted in part and denied in part.

- The motion is granted in full for violation of the right of publicity and the Unfair Competition Law.

Public disclosure of private facts. For this tort to give rise to liability, the following must occur: (i) the defendant must disclose a private fact about the plaintiff; (ii) the private fact must not be a matter of public concern; (iii) the disclosure must be to the public; and (iv) the disclosure must be offensive and objectionable to a reasonable person. *See Doe v. Gangland Productions., Inc.*, 730 F.3d 946, 958 (9th Cir. 2013). The plaintiffs have adequately alleged that Facebook engaged in this conduct.

Facebook argues that the information about users that it disclosed to app developers was not "private" because users had allowed their Facebook friends to access that information. But as discussed in Section II, your sensitive information does not lose the label "private" simply because your friends know about it. Your privacy interest in that information may diminish

because you've shared it with your friends, but it does not necessarily disappear. For example, the plaintiffs allege that app developers accessed information about their religious preferences and political views. Your friends may know about your religious and political views, but the widespread dissemination of them can still invade your privacy. The plaintiffs also allege that some of the information app developers received would allow them to discern a user's location (for example, a post saying "Check out where I'm staying in June!"). If you've told your friends where you'll be at a particular time, that does not preclude a lawsuit based on the widespread, nonconsensual distribution of that information.

Facebook also argues that the user information was not disseminated to "the public." This is based on the erroneous assumption, already rejected in Section III, that the plaintiffs have failed to allege with sufficient particularity that their information was disclosed to anyone other than Aleksandr Kogan. And dissemination of your private information to tens of thousands of individuals and companies is generally going to be equivalent to making that information "public." Perhaps Facebook could have made a better argument, which is that there's a difference between publicizing your sensitive information for actual human beings to scrutinize (like, in a newspaper) and allowing your information to be added to the vast sea of "big data" that computers rather than humans analyze for the purpose of sending targeted advertising on behalf of companies. Perhaps there is an argument that the former is the "public disclosure" of information within the meaning of California law while the latter is not. But that is not an issue that can be resolved at this stage of the litigation: Facebook does not pursue this argument, and in any event the plaintiffs do not allege that their information was merely subject to relatively anonymous computer analysis.

Finally, Facebook contends that its disclosure of sensitive user information to app developers and business partners would not be offensive to a reasonable person. Facebook makes a similar argument for the next two claims discussed below (intrusion into private affairs and the constitutional right to privacy), because those claims also require the plaintiff to allege (and eventually prove) that the privacy violation was a serious breach of social norms. "Sharing is the

social norm undergirding Facebook," the company argues, "and Facebook did not breach that social norm by sharing user data consistent with users' preferences." Motion to Dismiss at 41, Dkt. No. 261-1. There are a number of problems with this assertion. First, it again erroneously assumes a "norm" that there is no privacy interest in the information kept on social media. The social norm Facebook created with its product is purposefully sharing with one's friends, not having one's information shared by Facebook with unknown companies and individuals. Second, it assumes that users consented to the widespread disclosure of their sensitive information, but the plaintiffs have adequately alleged that they didn't. Thus, at this stage of the case, the plaintiffs have adequately alleged that Facebook's conduct was offensive and an egregious breach of social norms: it disclosed to tens of thousands of app developers and business partners sensitive information about them without their consent, including their photos, religious preferences, video-watching habits, relationships, and information that could reveal location. It even allegedly disclosed the contents of communications between two people on Facebook's ostensibly private messenger system.[17]

The motion to dismiss this claim is granted with respect to the first category of conduct for plaintiffs who consented to this conduct, as discussed in Section IV. It is denied in all other respects.[18]

<u>Intrusion on private affairs and violation of the constitutional right to privacy.</u> The analysis for these two tort claims is functionally identical, even though each claim is described somewhat differently in the case law. "When both claims are present, courts conduct a combined inquiry that considers (1) the nature of any intrusion upon reasonable expectations of privacy, and (2) the offensiveness or seriousness of the intrusion, including any justification or other relevant interests." *In re Facebook Internet Tracking Litigation*, 263 F. Supp. 3d 836, 846 (N.D.

---

[17] The "big data" concept referenced in the preceding paragraph may also have relevance to whether the privacy invasion is "offensive or serious," but not at this stage.

[18] Unless stated otherwise, dismissal is without leave to amend because the Court cannot conceive of a way the plaintiffs could successfully amend the claim based on the particular factual theory involved.

Cal. 2017) (internal quotations omitted). Under California law, courts must be reluctant to reach a conclusion at the pleading stage about how offensive or serious the privacy intrusion is. *Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1054 (N.D. Cal. 2018) (Whether conduct rises to the level of highly offensive "is indeed a factual question best left for a jury." (internal quotations omitted)); *Opperman v. Path, Inc*., 205 F. Supp. 3d 1064, 1080 (N.D. Cal. 2016) ("A judge should be cautious before substituting his or her judgment for that of the community."). For the reasons already discussed, the plaintiffs have adequately alleged that they suffered an egregious invasion of their privacy when Facebook gave app developers and business partners their sensitive information on a widespread basis.

The motion to dismiss this claim is granted with respect to the first category of conduct for plaintiffs who consented to this conduct, as discussed in Section IV. It is denied in all other respects.

Stored Communications Act. The Stored Communications Act ("SCA") is a federal law that restricts when a computer service provider like Facebook may share the contents of a communication with someone who is not party to that communication. *See* 18 U.S.C. § 2702. The plaintiffs have plausibly alleged that Facebook violated the SCA.

Facebook notes that there is an exception to SCA liability when one of the parties to the communication consents to its disclosure by the computer service provider. 18 U.S.C. § 2702(b)(3). In the social media context, this means that whenever people make information available to one another, there is no SCA violation if one of those people consents to the disclosure of the information. Facebook contends that this exception applies here, because even if a user didn't directly consent to Facebook's disclosure of information to app developers, the user's friend consented when that friend interacted with the app.

There are two problems with this argument, at least at the pleading stage. First, it does not respond to the allegations about Facebook's decision to share user information with whitelisted apps starting in 2015 or with business partners – nothing in the complaint or the judicially noticeable material would permit a conclusion that either a plaintiff or a plaintiff's

Facebook friend permitted disclosure to those entities. Second, as to the typical app developer, as discussed in Section IV, plaintiffs who signed up for Facebook before 2009 did not (if the allegations of the complaint are to be believed) authorize Facebook to share information through their friends with app developers. Nor is there a basis to conclude as a matter of law that their friends authorized the app developers to receive this information. Neither side describes with any specificity the dialogue that would have taken place between the friend and the app developer that resulted in the app developer's acquisition of communications that would otherwise be protected by the SCA.

The motion to dismiss this claim is granted with respect to the first category of conduct for plaintiffs who consented to this conduct, as discussed in Section IV. It is denied in all other respects.

Video Privacy Protection Act. The Video Privacy Protection Act ("VPPA") was passed by Congress after a newspaper published a Supreme Court nominee's video rental history. The statute prohibits knowing disclosure of "personally identifiable information" by a "video tape service provider." 18 U.S.C. § 2710. The plaintiffs have adequately alleged that Facebook violated the VPPA.

Facebook first contends that the user information it shared with app developers, whitelisted apps, and business partners is not "personally identifiable information." But the VPPA defines this broadly as "information which identifies a person as having requested or obtained specific video materials or services. . . ." 18 U.S.C. § 2710(a)(3). Or as the Ninth Circuit has put it, "information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *Eichenberger*, 876 F.3d 979, 985 (9th Cir. 2017) (quotations omitted). The plaintiffs adequately allege that Facebook regularly shared information about the videos that users received in their private messages and about videos they "liked." Complaint ¶¶ 424, 867, 868. And it is reasonable to infer, at least at the pleading stage, that when a user receives a video or likes a video, he watches the video, such that this information sheds significant light on his video-watching behavior.

Facebook also contends it is not a "video tape service provider" within the meaning of the VPPA, but that too cannot be decided in Facebook's favor on this motion to dismiss. The statute defines a video tape service provider as anyone "engaged in the business . . . of rental, sale, *or delivery* of prerecorded video cassette tapes or similar audio visual materials . . . ." 18 U.S.C. § 2710(a)(4) (emphasis added).[19] The plaintiffs allege that Facebook "regularly delivers" video content to users and maintains a cache of videos and visual materials, including from content providers like Netflix, for their delivery to users. Complaint ¶¶ 862, 864. Although one could imagine a different conclusion at summary judgment once the evidence is examined, it is plausible to conclude from these and related allegations that Facebook engages in the business of delivering audio visual materials, and that its business is "significantly tailored to serve that purpose." *See, e.g.*, *In re Vizio, Inc., Consumer Privacy Litigation*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017).

Facebook also did not obtain the type of consent necessary to authorize the sharing of this information. The VPPA outlines specific requirements for consent in the context of sharing video-information, including that it be set out in a separate form. *See* 18 U.S.C. § 2710(b)(2)(B). Facebook does not argue that it obtained this type of consent from its users. Therefore, even beyond the reasons discussed in Section IV relating to consent more generally, the plaintiffs adequately allege that they did not consent within the meaning of the VPPA, and this applies to all the information-sharing, for all time periods, discussed in this ruling.

The motion to dismiss this claim is denied.

Negligence and Gross Negligence. Negligence has four elements under California law: duty, breach, causation, and injury. See *Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077, 1083 (2017). The plaintiffs' negligence claim is based on the fourth category of conduct, and it adequately alleges each of the required elements as to that conduct. As discussed at length above,

---

[19] There is no dispute in this motion that at least some video files that get distributed on Facebook's platform qualify as "similar audio visual materials." 18 U.S.C. § 2710(a)(4).

the plaintiffs have alleged present and non-speculative privacy injuries.[20] The plaintiffs have also plausibly alleged that Facebook breached a duty to them. Facebook had a responsibility to handle its users' sensitive information with care. *See Bass v. Facebook, Inc.*, 2019 WL 2568799, at *10 (N.D. Cal. June 21, 2019). And contrary to Facebook's argument, the plaintiffs do not seek to hold Facebook liable for the conduct of the app developers and business partners; they seek to hold the company liable for its own misconduct with respect to their information. Specifically, the plaintiffs allege that they entrusted Facebook with their sensitive information, and that Facebook failed to use reasonable care to safeguard that information, giving third parties access to it without taking any precautions to constrain that access to protect the plaintiffs' privacy, despite assurances it would do so. This lawsuit is first and foremost about how Facebook handled its users' information, not about what third parties did once they got hold of it.

The various exculpatory clauses in Facebook's terms also do not require dismissing the negligence claim. While such clauses can successfully waive liability for ordinary negligence, California law forbids limiting liability for gross negligence. *City of Santa Barbara v. Superior Court*, 41 Cal. 4th 747, 777 (2007) ("[P]ublic policy generally precludes enforcement of an agreement that would remove an obligation to adhere to even a minimal standard of care."). The complaint plausibly alleges gross negligence, since it contends that Facebook did essentially nothing to safeguard users' information – conduct that might well be characterized as lacking "even scant care." *Id*. at 754. Ordinary and gross negligence are not separate causes of action in California. *See Nypl v. Crisis Prevention Institute*, 2018 WL 4488760, at *9 n.6 (N.D. Cal. Sept. 17, 2018). Thus, the applicability of the waiver will turn at least in part on the degree of negligence (if any) that the plaintiffs can ultimately prove.

The motion to dismiss this claim is denied.

---

[20] The parties' briefs focus on the economic loss rule, which governs the availability of recovery for purely economic losses in a tort action. But as previously discussed, the plaintiffs' allegations of various sorts of economic injury are too speculative to support either standing or substantive legal claims. The economic loss rule is therefore irrelevant. There perhaps remains a question whether the plaintiffs can recover for their intangible injuries on a negligence theory, but the parties haven't briefed this issue, and its resolution may require further factual development.

Case 3:18-md-02843-VC Document 623 Filed 11/30/21 Page 37 of 73

 <u>Deceit by concealment or omission.</u> For a defendant to be liable for deceit by concealment under California law, a variety of things must have occurred. *See* Cal. Civ. Code §§ 1709-1710. First, the defendant must have: (i) had a duty to disclose a material fact to the plaintiff; and (ii) intentionally concealed that fact with intent to defraud the plaintiff. *Tae Youn Shim v. Lawler,* 2019 WL 2996443, at *17 (N.D. Cal. July 9, 2019). In addition, the plaintiff must have: (iii) been unaware of that fact (and would have acted differently if he were aware), and (iv) sustained some damage as a result. *See id*; *see also* Cal. Civ. Code § 1710(3). Because this claim sounds in fraud, the plaintiffs are subject to a heightened pleading standard, which means that they "must state with particularity the circumstances constituting fraud . . . ." *See* Federal Rules of Civil Procedure 9(b).

 With respect to the allegations that Facebook improperly shared information with standard app developers and failed to prevent third parties from improperly using sensitive information, the plaintiffs have not satisfied the heightened pleading requirements necessary to state a claim for deceit by concealment.[21] However, if the plaintiffs' allegations are true, Facebook's conduct with respect to whitelisted apps and business partners crosses into the realm of fraudulent conduct. As discussed earlier, the plaintiffs have sufficiently alleged that their privacy interests were harmed through the disclosure of their information to these entities. The plaintiffs have also adequately alleged that Facebook intended to defraud its users regarding this conduct: the plaintiffs contrast Facebook's public-facing statements about protecting privacy and restricting information-sharing with the reality of Facebook's alleged practices, and that contrast is a sufficient basis from which to infer fraudulent intent at the pleading stage.

 As with the negligence claim, Facebook is wrong to assert that its exculpatory clause relieves it from liability for this claim. Under California law, Facebook's exculpatory clause does not apply to a claim sounding in fraud such as deceit by concealment. *See* Cal. Civ. Code § 1668

---

[21] Of course, dismissal of a subset of claims with prejudice does not preclude a plaintiff from seeking revival if discovery reveals a factual basis that justifies reconsideration of this order. *See* Fed. R. Civ. P. 54(b); *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1059 (9th Cir. 2011), *abrogated on other grounds by Lorenzo v. SEC*, 139 S. Ct. 1094 (2019).

("All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."); *see also, e.g.*, *Manderville v. PCG&S Group, Inc.*, 146 Cal. App. 4th 1486, 1500 (2007) ("It is well-established in California that a party to a contract is precluded under section 1668 from contracting away his or her liability for fraud or deceit based on intentional misrepresentation.").

The motion to dismiss is granted with respect to the first and fourth categories of conduct, and denied with respect to the second and third categories of conduct.

<u>Breach of contract.</u> The elements for breach of contract under California law are: (i) the existence of a contract; (ii) the plaintiff's performance or excuse for nonperformance of its side of the agreement; (iii) the defendant's breach; and (iv) resulting damage to the plaintiff. *See Buschman v. Anesthesia Bus. Consultants LLC*, 42 F. Supp. 3d 1244, 1250 (N.D. Cal. 2014).

As discussed in Section IV, the contract between Facebook and its users does not merely consist of the SRR, as the plaintiffs contend. It also includes the Data Use Policy. This makes it somewhat challenging to discern whether the plaintiffs have adequately alleged claims for breach of contract, because the plaintiffs' arguments are largely based on the assumption that the Data Use Policy is not part of the contract. Nonetheless, once it's understood that the Policy is part of the contract, it becomes clear that the second, third, and fourth categories of alleged wrongdoing addressed in this ruling give rise to claims for breach of contract. *See Johnson v. City of Shelby*, 574 U.S. 10, 10 (2014) (per curiam) ("Federal pleading rules . . .  do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."); *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) ("[U]nder the Federal Rules of Civil Procedure, a complaint need not pin plaintiff's claim for relief to a precise legal theory."). The SRR states: "You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings." Appendix A at 2. The plaintiffs have adequately alleged that Facebook breached this promise when it disclosed user information to whitelisted apps and business partners without permission, and without giving the plaintiffs the

ability to prevent this disclosure. In addition, for the allegations that Facebook allowed companies to misuse the information, the complaint sufficiently alleges that Facebook did not fulfill its promise in the Data Use Policy that apps would be allowed to use information "only in connection with" that user's friends. Complaint ¶ 569; Appendix B at 10.

In contrast, the plaintiffs have not adequately alleged a breach of contract based on the first category of wrongdoing: allowing standard app developers to obtain user information through users' friends. As discussed in Section IV, Facebook began disclosing this practice in its contractual language starting in roughly 2009, which means that this conduct does not give rise to a breach of contract claim for users who established their Facebook accounts after that time. For users who established their accounts beforehand, the complaint plausibly alleges that the practice wasn't disclosed. But simple failure to disclose a practice doesn't constitute a breach of contract. And although it's certainly conceivable that the practice violated provisions of Facebook's earlier contractual language, the plaintiffs do not identify or rely on any such language in their complaint. Therefore, for all plaintiffs, the complaint does not articulate a breach of contract theory based on the disclosure of sensitive user information to standard app developers, even though the complaint alleges that some users didn't consent to it.

Facebook argues that the plaintiffs have not adequately alleged that they were damaged by any breaches. But that is wrong. The plaintiffs can seek damages for "the detriment caused by the breach." *Stephens v. City of Vista*, 994 F.2d 650, 657 (9th Cir. 1993). As discussed in Sections II and III, the detriment the plaintiffs suffered was an invasion of their privacy. Perhaps some of the individual plaintiffs suffered a harm from this privacy invasion that can be measured by compensatory damages. *See*, *e.g.*, *Windeler v. Scheers Jewelers*, 8 Cal. App. 3d 844, 850-52 (Cal. Ct. App. 1970); *Leavy v. Cooney*, 214 Cal. App. 2d 496, 501-02 (Cal. Ct. App. 1963). Perhaps others did not, but under California law even those plaintiffs may recover nominal damages. Judicial Council of California Civil Jury Instruction 360; *In re Facebook Privacy Litigation*, 192 F. Supp. 3d 1053, 1062 (N.D. Cal. 2016).

The motion to dismiss this claim is granted with respect to the first category of

wrongdoing. Because it is possible that the complaint could be amended to allege a breach of contract claim for plaintiffs who established their accounts before Facebook disclosed the practice, dismissal is with leave to amend for these plaintiffs only. The motion to dismiss this claim is denied in all other respects.

Breach of the implied covenant of good faith and fair dealing. In addition to explicit promises, every contract includes an implicit promise not to take an action that would deprive the other contracting party of the benefits of their agreement. *See Rockridge Trust v. Wells Fargo, N.A.*, 985 F. Supp. 2d 1110, 1156 (N.D. Cal. 2013). This obligation is known as the "implied covenant of good faith and fair dealing," and it protects the parties' "reasonable expectations . . . based on their mutual promises." *Digerati Holdings, LLC v. Young Money Entertainment, LLC*, 194 Cal. App. 4th 873, 885 (2011). To state a claim for breach of this implied promise, "a plaintiff must identify the specific contractual provision that was frustrated" by the defendant's conduct. *Perez v. Wells Fargo Bank, N.A.*, 2011 WL 3809808, at *18 (N.D. Cal. Aug. 29, 2011). This doctrine cannot, however, "impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Guz v. Bechtel National Inc.*, 24 Cal. 4th 317, 350 (2000).

Just as they've stated claims for breach of contract with respect to the second, third, and fourth categories of conduct, the plaintiffs have stated claims for breach of the implied covenant of good faith and fair dealing for that conduct. Indeed, the case for breach of the implied covenant is stronger, because even if Facebook were, at a later stage in the litigation, able to identify a technical argument for why it did not *quite* violate the literal terms of its contract with its users, it would be difficult to conclude (if the factual allegations in the complaint are true) that Facebook did not frustrate the purposes of the contract, and intentionally so. But for the first category of conduct, the plaintiffs have not offered sufficient information about the earlier contractual language to assess whether the conduct frustrated the purpose of Facebook's contract with its users.

Accordingly, with respect to the first category of conduct, this claim for breach of the

implied covenant is, along with the parallel claim for breach of contract, dismissed. Dismissal is with leave to amend for plaintiffs who signed up before the information-sharing practice was included in the contractual language, and without leave to amend for those who signed up after it was disclosed.[22]

Unjust Enrichment. The plaintiffs also state a claim for unjust enrichment. Specifically, they allege that even if they have no remedy for breach of contract, they should be able to recover amounts that Facebook gained by improperly disseminating their information. The plaintiffs are permitted to plead claims for breach of contract and unjust enrichment in the alternative. *Bruton v. Gerber Production Co.*, 703 F. App'x 468 (9th Cir. 2017); *In re Vizio, Inc., Consumer Privacy Litigation*, 238 F. Supp. 3d 1204, 1233 (C.D. Cal. 2017); *Hartford Casualty Insurance Co. v. J.R. Marketing., L.L.C.*, 61 Cal. 4th 988, 998 (2015). And even if the plaintiffs suffered no economic loss from the disclosure of their information, they may proceed at this stage on a claim for unjust enrichment to recover the gains that Facebook realized from its allegedly improper conduct. *See Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1113 (N.D. Cal. 2018).[23] The motion to dismiss this claim is granted as to the plaintiffs who consented as discussed in Section IV, but otherwise denied.

Right of Publicity. California's common law right of publicity makes unlawful the appropriation of someone's name or likeness without his consent when it both (1) injures that person and (2) is used to the defendant's advantage. *See Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1214 (N.D. Cal. 2014).

Facebook's motion to dismiss this claim is granted. The allegations about how Facebook shared the plaintiffs' information with third parties is categorically different from the type of

---

[22] The Court will likely stay, along with the other non-prioritized claims, the claims that this ruling dismisses with leave to amend, although the Court will discuss this matter with the parties at the next case management conference.

[23] The complaint, in articulating the unjust enrichment claim, frequently uses the term "quantum meruit." It appears that the complaint uses this term incorrectly; no true theory of quantum meruit recovery has been articulated by the plaintiffs. *See Maglica v. Maglica*, 66 Cal. App. 4th 442, 449 (Cal. Ct. App. 1998) (describing quantum meruit as recovery of "the reasonable value of the services rendered provided they were of direct benefit to the defendant.").

conduct made unlawful by this tort, such as using a plaintiff's face or name to promote a product or service. *See Comedy III Productions., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 399 (2001) ("The right of publicity, like copyright, protects a form of intellectual property that society deems to have some social utility. Often considerable money, time and energy are needed to develop one's prominence in a particular field. Years of labor may be required before one's skill, reputation, notoriety or virtues are sufficiently developed to permit an economic return through some medium of commercial promotion." (internal quotations omitted))*; see also Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 415 (9th Cir. 1996); *cf. Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1217 (N.D. Cal. 2014). Because the Court cannot conceive of a way that the plaintiffs could successfully allege this claim, dismissal is without leave to amend.

California's Unfair Competition Law. California's Unfair Competition Law ("UCL") prohibits business practices that are unlawful, unfair, or fraudulent. *See* Cal. Bus. & Prof. Code § 17200, *et seq*. To have standing under California law to pursue this claim (a standard that is different from Article III standing), the plaintiffs must show that they "lost money or property" because of Facebook's conduct. *See* Cal. Bus. & Prof. Code § 17204; *see also Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 317 (2011). The plaintiffs' UCL claim fails because they have not adequately alleged lost money or property. As discussed in Section III, the plaintiffs' theory of economic loss is purely hypothetical. It's true, as discussed in connection with the unjust enrichment claim, that Facebook may have gained money through its sharing or use of the plaintiffs' information, but that's different from saying the plaintiffs lost money. Further, the plaintiffs here do not allege that they paid any premiums (or any money at all) to Facebook to potentially give rise to standing under California law. *Compare In re Anthem, Inc. Data Breach Litigation,* 2016 WL 3029783, at *30 (N.D. Cal. May 27, 2016). This claim is also dismissed without leave to amend.

## VI. CONCLUSION

The motion to dismiss is granted in part and denied in part. The deadline for Facebook to file an answer to the complaint, along with all other scheduling matters, will be discussed at a

case management conference on October 1, 2019 at 2:00 p.m. The parties should file a joint case management statement by September 24, 2019.

**IT IS SO ORDERED.**

Dated: September 9, 2019

VINCE CHHABRIA
United States District Judge

# EXHIBIT B

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bflaw.com

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION TO DEFENDANT FACEBOOK, INC.**<br><br>Judge:  Hon. Vince Chhabria<br>Courtroom:  4, 17th Floor |

PROPOUNDING PARTY:      Plaintiffs

RESPONDING PARTY:       Facebook

SET NUMBER:             Two (2)

Plaintiffs hereby propound the following requests for production of documents to Defendant Facebook, Inc. ("Facebook"), pursuant to Federal Rules of Civil Procedure 26 and 34, and request that Facebook produce the documents and electronically-stored information set forth herein within thirty (30) days of service of these requests, at Bleichmar Fonti & Auld LLP, 555 12th Street, Suite 1600, Oakland, CA 94607.

## **INSTRUCTIONS**

1.      You shall respond to these requests for the production of documents in a manner consistent with the Federal Rules of Civil Procedure and the following instructions:

2.      In responding to each document request, furnish all responsive documents available at the time of production, including documents in your possession, custody or control, and in the possession, custody or control of your agents, employees, partners, representatives, subsidiaries, affiliates, investigators, or by your attorneys or their agents, employees or investigators.

3.      If any otherwise responsive document was, but is no longer, in existence or in your possession, custody or control, identify the type of information contained in the document, its current or last known custodian, the location/address of such document, the identity of all persons having knowledge or who had knowledge of the document and describe in full the circumstances surrounding its disposition from your possession or control.

4.      This is a continuing request for the production of documents and requires supplemental responses as provided for in the Federal Rules of Civil Procedure. If, after making your initial production, you (or any other persons acting on your behalf) obtain or become aware

of any further documents responsive to any document request, you are required to produce such additional documents to plaintiffs. Each supplemental response shall be served on plaintiffs no later than thirty days after the discovery of the further information.

5.    You shall produce the original of each document described below or, if the original is not in your custody, then a copy thereof, and in any event, all non-identical copies which differ from the original or from the other copies produced for any reason, including, without limitation, the making of notes thereon.

6.    Documents shall be produced as kept in the regular course of business together with the original folders, binders, boxes or other containers in which they were maintained.

7.    All documents or things that respond in whole or in part to any portion of these requests are to be produced in their entirety, including attachments and their enclosures.

8.    Documents attached to each other should not be separated.

9.    Documents not otherwise responsive to any particular document request shall be produced if such documents mention, discuss, refer to, or explain the documents called for by any document request, or if such documents are attached to documents called for by any document request.

10.    Documents shall be produced in such fashion as to identify the custodian of each document.

11.    Identify the source of each document produced, by identifying: (a) all of the person(s) who possessed the document; (b) the positions or titles of any such individuals; and (c) all of the divisions and departments where each document was located. If you are unable to determine the individual(s) who possessed the document, identify the department and division where the document was located when produced.

12.     If you claim any form of privilege, whether based on statute or otherwise, as a ground for not producing any document, state the following:

      a.   The date of the document;

      b.   The name, the present or last known home and business address, the telephone numbers, the title (or position), and the occupation of those individuals who prepared, produced, reproduced or who were recipients of said document;

      c.   A description of the document sufficient to identify it without revealing the information for which the privilege is claimed;

      d.   The nature of the privilege asserted;

      e.   The factual basis upon which you claim any such privilege;

      f.   The location of the document; and

      g.   The custodian of the document.

13.     To the extent you object to any document request, you must provide specific responses as to what portion of the request you object to and state expressly why you will not respond to such request in sufficient detail to permit the Court to determine the validity of the objection. Responsive documents to which your objection does not apply should be produced.

14.     If you claim that all or any part of any document request, the Definitions, or Instructions is vague or ambiguous, please identify the specific language you consider vague or ambiguous and state the interpretation of the language in question you used to frame your response.

15.     Each document requested herein is to be produced in its entirety and without deletion or excision, regardless of whether you consider the entire document to be relevant or responsive to any document request. If you have removed, excised or deleted any portion of a

document, stamp the word "REDACTED" on each page of the document that you have redacted. Redactions should be included on the privilege log described in Instruction No. 13, above.

16.      One copy of each document should be produced. A document that varies in any way from the original or from any other copy, including drafts or a document with handwritten notations or deletions constitutes a separate document and must be produced, whether or not the original is in your possession, custody or control. Color (*i.e.*, not black and white) originals should be produced in color. If any identical copy cannot be produced for any reason (*e.g.*, faint writing, erasures, etc.), produce the original.

17.      Indicate the origin of each document and number each document with consecutive Bates numbers.

## **DEFINITIONS**

Unless otherwise stated, the terms set forth below are defined as follows and shall be used in construing the meaning of these requests for the production of documents.

1.      The use of the singular shall be deemed to include the plural, and the use of one gender shall include all others, as appropriate, in the context.

2.      The present tense of a verb includes its past tense, and vice versa.

3.      "And" and "or" are to be construed conjunctively and disjunctively, as necessary, to bring within the scope of this request for production all responses that might otherwise be construed to be outside its scope.

4.      "Any" and "all" mean each and every.

5.      "App" means an interactive software application developed to utilize the core technologies of the Facebook social networking platform.

6.      "App Developer Investigation" or "ADI" means (as described in paragraph seven of the Chen Declaration) Facebook's investigation to determine "whether there has been misuse

of data in violation of Facebook's policies and associated legal liabilities, in connection with the first version of the [Facebook] Platform."

7.      "Apps Others Use" means the setting used to prevent the disclosure of personal information to third party App Developers through Facebook's API, as described in paragraphs 366 to 368 of the FAC.

8.      "App Settings" means settings that a User can alter or accept to limit Third Parties from accessing or obtaining Users' Content and Information, including Apps Others Use, Granular Data Permissions, Platform Opt Out, and the like.

9.      "Chen Declaration" means the Declaration of Stacy Chen in Support of Respondent's Opposition to the Attorney General's Petition, *Attorney General Maura Healy v. Facebook, Inc.*, No. 1984CV02597-BFS-1 (Mass. Super Ct., Suffolk Cty.).

10.     "Communication" means the transmittal (in the form of facts, ideas, thoughts, opinions, data, inquiries or otherwise) and includes, but is not limited to, correspondence, memoranda, reports, presentations, face-to-face conversations, telephone conversations, text messages, instant messages, messages sent on Facebook Messenger, voice messages, negotiations, agreements, inquiries, understandings, meetings, letters, notes, telegrams, mail, electronic mail or email, and postings of any type.

11.     "Computer System" or "Computer Systems" include(s), but is not limited to, any server (whether physical or virtual), desktop computer, tablet computer, point of sale system, smart phone, cellular telephone, networking equipment, internet site, intranet site, and the software programs, applications, scripts, operating systems, or databases used to control, access, store, add, delete, or modify any information stored on any of the foregoing non-exclusive list.

12.     "Content and Information" refers to the definition in footnote 2 of the FAC, referring to "content" and "information" as Facebook's Statements of Rights and

Responsibilities have defined those terms. In brief, Facebook has generally used "information" to mean facts and other information about Users, including the actions they take, and "content" to mean anything Users post on Facebook that would not be included in the definition of "information." Content and Information also includes both personally identifiable content and information and anonymized content and information that is capable of being de-anonymized. *See* FAC ¶¶ 223-224. Content and Information includes data that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular User, including:

a. Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

b. Characteristics of protected classifications under California or federal law.

c. Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

d. Biometric information.

e. Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an Internet Web site, application, or advertisement.

f. Geolocation data.

g. Audio, electronic, visual, thermal, olfactory, or similar information.

h. Professional or employment-related information.

    i.    Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. section 1232g, 34 C.F.R. Part 99).

    j.    Inferences drawn from any of the information identified in this paragraph to create a profile, dossier, or similar collection of information about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

13.    "Document" or "Documents" is defined to include any Document, ESI, or Electronic Media stored in any medium, and is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a)(1)(A), including, but not limited to, electronic or computerized data compilations, Communications, electronic chats, instant messaging, documents created through Workplace by Facebook, encrypted or self-destructing messages, messages sent via Facebook messenger, email Communications, other electronically stored information from Personal computers, sound recordings, photographs, and hard copy Documents maintained in your Personal files.

14.    "Electronic Media" means any magnetic, optical, or other storage media device used to record ESI including but not limited to computer memory, hard disks, floppy disks, flash memory devices, CDs, DVDs, Blu-ray discs, cloud storage (*e.g.*, DropBox, Box, OneDrive, or SharePoint), tablet computers (*e.g.*, iPad, Kindle, Nook, or Samsung Galaxy), cellular or smart phones (*e.g.*, BlackBerry, iPhone, or Samsung Galaxy), personal digital assistants, magnetic tapes of all types, or any other means for digital storage and/or transmittal.

15.    "Electronically Stored Information" or "ESI" means information that is stored in Electronic Media, regardless of the media or whether it is in the original format in which it was created, and that is retrievable in perceivable form and includes, but is not limited to, metadata,

system data, deleted data, fragmented data, data pertaining to or maintained in Apps, database contents, and computer code.

16.     "FAC" refers to the First Amended Consolidated Complaint filed February 22, 2019, ECF No. 257.

17.     "Facebook," "Defendant," "You," or "Your" shall mean Facebook, Inc. and any of its executives, directors, officers, employees, partners, members, representatives, agents (including attorneys, accountants, consultants, investment advisors or bankers), and any other Person purporting to act on its behalf. In the case of business entities, these defined terms include parents, subsidiaries, affiliates, predecessor entities, successor entities, these defined terms include parents, subsidiaries, affiliates, predecessor entities, successor entities, divisions, departments, groups, acquired entities and/or related entities or any other entity acting or purporting to act on its behalf.

18.     "FTC Consent Order" shall refer to the July 27, 2012 Federal Trade Commission Consent Order in *In the Matter of Facebook, Inc.*, No. C-4365.

19.     "Granular Data Permissions" means the setting through which the User accessing an App may limit the categories of Content and Information an App Developer may collect.

20.     "Identify," with respect to Documents, means to give, to the extent known, the (a) type of Document; (b) general subject matter; (c) date of the Document; (d) author(s); (e) addressee(s); and (f) recipient(s).

21.     "Including" means "including but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify the request, definition or instruction but not to limit the request.

22.     "Internal Policy" or "Internal Policies" mean any formal or informal policy, procedure, rule, guideline, collaborative document, directive, instruction, or practice, whether written or unwritten, that You expect Your employees to follow in performing their jobs.

23.     "Misuse of Data," when used as a capitalized phrase, means the use by an App of a User's Content or Information that was broader or different than the use of that content or information only in connection with the person that gave the permission to the App to access such User's Content or Information.

24.     "Named Plaintiffs" means Steven Akins, Jason Ariciu, Samuel Armstrong, Anthony Bell, Bridgett Burk, Brendan Carr, John Doe, Terry Fischer, Shelly Forman, Paige Grays, Mary Beth Grisi, Tabielle Holsinger, Taunna Lee Johnson, Olivia Johnston, Tyler King, Ashley Kmieciak, William Lloyd, Gretchen Maxwell, Scott McDonnell, Ian Miller, Jordan O'Hara, Bridget Peters, Kimberly Robertson, Scott Schinder, Cheryl Senko, Dustin Short, Tonya Smith, Mitchell Staggs, Charnae Tutt, Barbara Vance-Guerbe, and Juliana Watson.

25.     "Person" or "Persons" means any natural Person or any business, legal or governmental entity or association.

26.     "Platform" refers to the services, tools, and products provided by Facebook to third parties to create their own applications and services that access data in Facebook.

27.     "Platform Opt Out" means the setting a User may access to choose that his or her Content and information is not accessed or obtained by any Apps or websites on Facebook's Platform.

28.     "Privacy Controls" means the audience selectors that control what information in a User's profile can be viewed by other Users, and includes Profile Privacy Settings, Profile Privacy Controls, Publisher Privacy Controls, and the like.

29.     "Relating to," "relate to," "referring to," "refer to," "reflecting," "reflect," "concerning," or "concern" means all Documents which comprise, explicitly or implicitly refer to, were reviewed in conjunction with, or were created, generated or maintained as a result of the subject matter of the request, including, but not limited to, all Documents which reflect, record, memorialize, embody, discuss, evaluate, consider, review or report on the subject matter of the request.

30.     "Third Parties" include the following:

   a.   Apps, App Developers, Whitelisted Apps, and Business Partners, as those terms are used in the FAC;

   b.   Any person that develops an application, software experience, game, or website that accesses Content and Information from Facebook's API or other Facebook software; and

   c.   Any person with which Facebook has or had an integration partnership.

31.     "User(s)" means individuals who maintain a Facebook account and can generally access the typical Facebook experience through website or mobile applications.

32.     Capitalized terms and acronyms not specifically defined herein have the same definition as in the FAC.

<u>**RELEVANT TIME PERIOD**</u>

The relevant time period for each Document Request is January 1, 2007 through the present (the "Relevant Time Period"), unless otherwise specifically indicated. Each Document Request shall be interpreted to include all documents and information that relate to the Relevant Time Period or otherwise specified period, even if such documents or information were prepared or published outside of the Relevant Time Period or otherwise specified period. If a document prepared before or after this period is necessary for a correct or complete understanding of any

document covered by a request, you must produce the earlier or subsequent document as well. If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the production request.

## DOCUMENT REQUESTS

**REQUEST FOR PRODUCTION NO. 6**

All Documents provided to or received from any governmental entity or regulator in the United States and United Kingdom in response to any formal or informal inquiry or investigation relating to whether Users' Content and Information was accessed or obtained by any Third Parties without proper consent or authorization, including but not limited to all inquiries or investigations arising out of the Cambridge Analytica Scandal, the FTC Consent Order, and any inquiry or investigation related to the settlement agreement with the FTC announced on July 24, 2019.

**REQUEST FOR PRODUCTION NO. 7**

All organizational charts, personnel directories, or other documents sufficient to show Your organizational structure, including:

(a)     the identity of subsidiaries, affiliates, and joint ventures, and your ownership interest, control of, or participation in any subsidiary or affiliate or joint venture related to agreements, engineering, access, use, transmission, receipt, collection or analysis of Facebook Users' Content and Information by Third Parties;

(b)     the organization of any division, department, unit or subdivision of your company that has responsibilities relating to agreements, engineering, access, use, transmission, receipt, collection or analysis of Users' Content and Information by Third Parties; and

(c)     the names, titles, job descriptions, and employment periods for your present and former employees who has or had responsibilities relating to agreements, engineering, access,

use, transmission, receipt, collection or analysis of Users' Content and Information by Third

Parties; and

(d)      the names, titles, job descriptions, and employment periods of Your present or

former directors, officers, or senior managers, as well as any secretaries or administrative

assistants assigned to these directors, officers, or senior managers.

**REQUEST FOR PRODUCTION NO. 8**

All versions (including each updated or amended version thereof) of Facebook's

"Platform Policies," which have been called the "Developer Principles and Policies," the

"Platform Guidelines," or the "Developer Terms of Service" (collectively, the "Platform

Policies").

**REQUEST FOR PRODUCTION NO. 9**

All Documents relating to each of the Named Plaintiffs, including but not limited to all

Content and Information collected about each of them or gained from business relationships or

any other source.

**REQUEST FOR PRODUCTION NO. 10**

For each of the Named Plaintiffs, Documents sufficient to show the categories of Content

and Information Facebook collects, tracks, and maintains about them.

**REQUEST FOR PRODUCTION NO. 11**

Documents sufficient to identify all Third Parties to which Facebook granted access to

Named Plaintiffs' Content and Information, what categories of Content and Information

Facebook granted access to, how Facebook allowed these Third Parties to access the Named

Plaintiffs' Content and Information, and the business purpose of all such access.

**REQUEST FOR PRODUCTION NO. 12**

Documents relating to any partnerships or agreements Facebook entered into with Third Parties for access to Named Plaintiffs' Content and Information.

**REQUEST FOR PRODUCTION NO. 13**

For all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information, Documents sufficient to show any use by Third Parties of such Content and Information not in connection with the User that granted the permission to the Third Party or inconsistent with Facebook's agreement with that Third Party.

**REQUEST FOR PRODUCTION NO. 14**

Documents sufficient to show the monetary or retail value of each named Plaintiff's Content and Information to Facebook, updated to reflect whenever Facebook's terms of service changed, including the calculation of revenue earned by Facebook for each Named Plaintiff based upon bartering or selling access to such Named Plaintiff's Content and Information.

**REQUEST FOR PRODUCTION NO. 15**

Documents sufficient to show the money or any other thing of value, including but not limited to money or any other thing of value paid in exchange for targeted advertising, that Facebook received in exchange for each Named Plaintiff's Content and Information, which entities paid Facebook, and when such payments were made.

**REQUEST FOR PRODUCTION NO. 16**

Documents sufficient to show the monetary or retail value of Users' Content and Information to Facebook, including all monthly, quarterly, and annual financial reporting relating to same, and including but not limited to the calculation of average revenue per user, any changes to such monetary or retail value relating to changes to Facebook's terms of service, and any financial reporting of Content and Information as an asset.

**REQUEST FOR PRODUCTION NO. 17**

All Documents relating to Facebook's assessment of the monetary or retail value of Users' Content and Information to Users (as distinct from value to Facebook), including analyses for providing compensation to Users for their Content and Information, including but not limited to Users compensated in connection with the Onavo or Research app.

**REQUEST FOR PRODUCTION NO. 18**

All Documents that have been transmitted to Users by Facebook relating to whether Users' Content and Information was accessed or obtained by Third Parties.

**REQUEST FOR PRODUCTION NO. 19**

All Documents supporting the escalation of those Apps escalated to Phase Two of ADI for Enhanced Examination and/or Phase Three of ADI for Enforcement and designated as follows in the Chen Declaration ¶ 34:

> (d) each [A]pp to which a request for information was sent; (e) each [A]pp for which an interview was sought with the developer; (f) each [A]pp for which a remote or onsite audit was requested to be conducted; (g) each [A]pp for which actual misuse was found and identification of that misuse; (h) each [A]pp that was banned for actual misuse; and (i) each [A]pp that was banned for failing to cooperate with Facebook's investigation.

Facebook has described identification of these Apps as non-privileged and has already produced it to the Massachusetts Attorney General's Office. *See* Chen Declaration ¶ 35.

**REQUEST FOR PRODUCTION NO. 20**

The list of Apps that Facebook provided to the Massachusetts Attorney General's Office and that the Chen Declaration ¶ 35 describes as "the subject of external actions or

communications with third parties, including the growing list of Apps Facebook has suspended as part of the [ADI], whether because of policy violations or because of their refusal to cooperate with Facebook's investigation."

**REQUEST FOR PRODUCTION NO. 21**

Communications between Facebook and Third Parties relating to the ADI, including but not limited to Communications that Facebook provided to the Massachusetts Attorney General's Office. *See* Chen Declaration ¶ 37.

**REQUEST FOR PRODUCTION NO. 22**

All "Privacy Risk Assessment[s]," and notes or agenda relating to Facebook's "focused subject-matter-specific meetings," "focused subject-matter-specific discussions," "weekly intra-and inter-team meetings," and "Privacy Summit[s]," as detailed in "Facebook's Privacy Program Overview" included in any PricewaterhouseCoopers LLP ("PwC") assessment report prepared pursuant to the FTC Consent Order.

**REQUEST FOR PRODUCTION NO. 23**

Unredacted versions and Documents in support of the assessment reports, including the Initial Assessment Report and Biennial Reports, prepared by PwC pursuant to the FTC Consent Order.

**REQUEST FOR PRODUCTION NO. 24**

Documents sufficient to identify all Third Parties to which Facebook granted access to Users' Content and Information not generally available through Platform pursuant to partnerships or agreements between Facebook and those Third Parties.

**REQUEST FOR PRODUCTION NO. 25**

All Documents relating to agreements or partnerships described in Request No. 24.

**REQUEST FOR PRODUCTION NO. 26**

For each of the Third Parties that Facebook entered into partnerships or agreements with as described in Request No. 24, Documents sufficient to identify:

- The fields, kinds, or categories of Content and Information that were accessed or obtained by such Third Parties;

- How each such Third Party accessed or obtained the Content and Information of Users;

- How each such Third Party used the Content and Information accessed or obtained;

- Where the Content and Information obtained by such Third Parties currently resides and who has access to it.

**REQUEST FOR PRODUCTION NO. 27**

Documents sufficient to show all forms and formats in which Facebook transmitted to Third Parties information concerning Users' liking, viewing, retrieving, or otherwise requesting or obtaining videos on, using, or by means of the Facebook Platform.

**REQUEST FOR PRODUCTION NO. 28**

All Documents relating to Internal Policies by Facebook on the monitoring of Third Parties' compliance with Facebook's Platform Policy, Data Policy, or SRR.

**REQUEST FOR PRODUCTION NO. 29**

All Documents relating to Internal Policies by Facebook on the enforcement of Facebook's Platform Policy, Data Policy, or SRR against Third Parties.

**REQUEST FOR PRODUCTION NO. 30**

All Documents relating to measures and controls, including proposed measures and controls, put in place by Facebook to prevent Third Parties from violating Facebook's Platform Policy, Data Policy, or SRR.

**REQUEST FOR PRODUCTION NO. 31**

All Documents relating to Facebook's audits, inquiries, and investigations of Third Parties investigating compliance with any provisions of Facebook's Platform Policy, Data Policy, or SRR regarding the access, use, transmission, receipt, collection and analysis of Users' Content and Information on and off the Platform.

**REQUEST FOR PRODUCTION NO. 32**

All Documents Concerning Misuse of Data, including investigations, examinations, inquiries, or audits—or Communications regarding such investigations, examinations, inquiries, or audits—regarding Misuse of Data prior to the deprecation of Graph API v.1.0.

**REQUEST FOR PRODUCTION NO. 33**

Documents sufficient to show the notice that Facebook provided to Users regarding modifications to Facebook's SRR or Data Policy, and all Communications related thereto.

**REQUEST FOR PRODUCTION NO. 34**

All Documents relating to the conditioning of Third Parties' access to Users' Content and Information on the purchase of Mobile App Install Ads, payment of Content and Information in-kind (referred internally as Reciprocity or Data Reciprocity), or other payment.

**REQUEST FOR PRODUCTION NO. 35**

Documents relating to the manner in which a Facebook User could control how his or her data was shared through their Privacy Controls and App Settings throughout the Relevant Time Period, including but not limited to screenshots of the Facebook website and the Facebook mobile application.

**REQUEST FOR PRODUCTION NO. 36**

All Documents concerning User testing, evaluation and analysis of Facebook's Privacy

Controls and App Settings during the Relevant Time Period, including but not limited to design

documents, correspondence, analyses, and reports.

Dated: November 25, 2019

Respectfully submitted,

KELLER ROHRBACK L.L.P.

BLEICHMAR FONTI & AULD LLP

By:    */s/ Derek W. Loeser*_____
         Derek W. Loeser

By:    */s/ Lesley E. Weaver*_____
         Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)
Lynn Lincoln Sarko (admitted *pro hac vice*)
Gretchen Freeman Cappio (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
bgould@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

# EXHIBIT C

Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
  klinsley@gibsondunn.com
Brian M. Lutz (SBN 255976)
  blutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DEFENDANT FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION** |

11.      Facebook objects to each Request to the extent that it calls for the production of "each," "every," "any," or "all" documents in cases where such a demand is overly broad and/or causes undue burden and expense.

## OBJECTIONS TO DEFINITIONS

1.      Facebook incorporates by references the responses and objections to Definitions and Instructions contained in its Responses and Objections to Plaintiffs' First Set of Requests for Production of Documents.

2.      Facebook generally objects to any definitions or terms defined by reference to capitalized terms and acronyms relied upon in Plaintiffs' First Amended Complaint, which themselves may be vague, ambiguous, unduly broad, or unduly burdensome.

3.      Facebook objects to Plaintiffs' definition of "App" as vague, ambiguous, overbroad, and unduly burdensome on the ground that it includes any "application developed to utilize the core technologies of the Facebook social networking platform" without identifying or defining what the "core," rather than peripheral, technologies of the Facebook are or were at any given time.  Facebook further objects to this definition as vague and ambiguous on the ground that Facebook cannot identify what any online applications are or were "developed to" do or presume the intent of any third parties that Facebook does not control.

4.      Facebook objects to Plaintiffs' definitions of "App Developer Investigation" and "ADI" as overly broad and unduly burdensome on the ground that these definitions include investigations into persons, entities, applications, and/or developers that are not relevant to Plaintiffs' remaining claims.  Facebook further objects to these definitions to the extent they seek documents or information protected by the attorney-client privilege and/or the work product doctrine.

5.      Facebook objects to Plaintiffs' definition of "Apps Others Use" as vague and ambiguous on the ground that it is defined by reference to other vague, ambiguous, and/or undefined terms, including "App," "App Developers," and "API."  Facebook further objects to

4

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-md-02843-VC

include "any natural person or any business, legal or governmental entity or association" over which Facebook exercises no control.

13.     Facebook objects to Plaintiffs' definitions of "[i]dentify," "[i]ncluding," "[r]elating to," "relate to," "referring to," "refer to," "reflecting," "reflect," "[c]oncerning," and "concern" on the ground that the definitions make the Requests overly broad and unduly burdensome and impose obligations that go beyond the requirements of the Federal and Local Rules.  Facebook shall construe these terms as commonly and ordinarily understood.

14.     Facebook objects to Plaintiffs' definition of "Platform Opt Out" as vague and ambiguous on the ground that it is defined by reference to other vague, ambiguous, and/or undefined terms, including "App," "User," and "Content and [I]nformation."  Facebook further objects to this definition as overly broad and unduly burdensome on the ground that the applicable account settings available to Facebook members have changed over time and this definition is not limited to a particular time period or particular settings

15.     Facebook objects to Plaintiffs' definition of "Privacy Controls" as vague, ambiguous, overly broad, and unduly burdensome on the ground that the applicable account settings available to Facebook members have changed over time and this definition is not limited to a particular time period or particular settings.

16.     Facebook objects to Plaintiffs' definition of "Privacy Controls" as vague, ambiguous, overly broad, and unduly burdensome to the extent the terms are meant to include applications, application developers, and/or "[a]ny person that develops an application, software experience, game, or website that accesses Content and Information from Facebook's API or other Facebook software," and to the extent it encompasses individuals or entities outside of Facebook's knowledge and/or who may not be relevant to this litigation.

17.     Facebook objects to Plaintiffs' "Relevant Time Period," which dates back to January 1, 2007, as overly broad, unduly burdensome, and disproportionate to the needs of the litigation.  In response to Plaintiffs' requests, Facebook will produce the following categories of documents dating back to January 1, 2007:  (i) documents reflecting Facebook's platform

7

## SPECIFIC RESPONSES AND OBJECTIONS

**REQUEST FOR PRODUCTION NO. 6:**

All Documents provided to or received from any governmental entity or regulator in the United States and United Kingdom in response to any formal or informal inquiry or investigation relating to whether Users' Content and Information was accessed or obtained by any Third Parties without proper consent or authorization, including but not limited to all inquiries or investigations arising out of the Cambridge Analytica Scandal, the FTC Consent Order, and any inquiry or investigation related to the settlement agreement with the FTC announced on July 24, 2019.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all documents provided to or received from any governmental entities or regulators in broad categories of "inquir[ies]" and investigation[s]" without regard for whether such information relates to Plaintiffs' claims.

(D) Facebook objects to this Request as overbroad as to time to the extent it seeks document predating March 20, 2012.

Subject to and without waiving the foregoing objections, Facebook will produce documents in response to this Request to the extent that those documents are responsive to Plaintiffs' other Requests, identified by a reasonable, good-faith search, and by December 26, 2019, Facebook will produce all document demand letters from the FTC associated with its 2018-2019 investigation into Facebook along with correspondence regarding the scope of those demands.

**REQUEST FOR PRODUCTION NO. 7:**

All organizational charts, personnel directories, or other documents sufficient to show Your organizational structure, including:

(a)     the identity of subsidiaries, affiliates, and joint ventures, and your ownership interest, control of, or participation in any subsidiary or affiliate or joint venture related to agreements, engineering, access, use, transmission, receipt, collection or analysis of Facebook Users' Content and Information by Third Parties;

(b)     the organization of any division, department, unit or subdivision of your company that has responsibilities relating to agreements, engineering, access, use, transmission, receipt, collection or analysis of Users' Content and Information by Third Parties; and

(c)     the names, titles, job descriptions, and employment periods for your present and former employees who has or had responsibilities relating to agreements, engineering, access, use, transmission, receipt, collection or analysis of Users' Content and Information by Third Parties; and

(d)     the names, titles, job descriptions, and employment periods of Your present or former directors, officers, or senior managers, as well as any secretaries or administrative assistants assigned to these directors, officers, or senior managers.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

10

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-md-02843-VC

Plaintiffs, including, for example, Content and Information that Facebook did not share with any third parties and that does not relate to any issue in this Action.

(D) Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Request 9.

(E) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

Subject to and without waiving the foregoing objections, Facebook will produce documents that are responsive to this Request and which are uniquely associated with Content and Information related to the Named Plaintiffs' accounts, identified by a reasonable, good-faith search of documents that are in Facebook's possession, custody, or control, to the extent the Named Plaintiffs have provided information sufficient to identify their accounts.

**REQUEST FOR PRODUCTION NO. 11:**

Documents sufficient to identify all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information, what categories of Content and Information Facebook granted access to, how Facebook allowed these Third Parties to access the Named Plaintiffs' Content and Information, and the business purpose of all such access.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks Documents sufficient to identify all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information and other information relating to such information sharing, including Third Parties who were granted access to such Content and Information other than in connection with the allegations in Plaintiffs' Complaint.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have documents in its possession, custody, or control responsive to this Request.  Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

## REQUEST FOR PRODUCTION NO. 12:

Documents relating to any partnerships or agreements Facebook entered into with Third Parties for access to Named Plaintiffs' Content and Information.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 12:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it broadly seeks all Documents "relating" to any partnerships or agreements Facebook entered into with Third Parties for access to Named Plaintiffs' Content and Information, including those which may have no bearing on any issues in this Action, and including those that are outside of Facebook's possession, custody, or control.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have documents in its possession, custody, or control responsive to this Request.  Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

## REQUEST FOR PRODUCTION NO. 13:

For all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information, Documents sufficient to show any use by Third Parties of such Content and Information not in connection with the User that granted the permission to the Third Party or inconsistent with Facebook's agreement with that Third Party.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 13:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it broadly seeks Documents regarding "all Third Parties" who obtained access to certain content and information, including Third Parties who were granted access to such Content and Information other than in connection with the allegations in Plaintiffs' Complaint.

(D) Facebook further objects to this Request on the ground, and to the extent, that it seeks information that is outside of Facebook's possession, custody, or control because it seeks information regarding Third Parties' use of Named Plaintiffs' Content and Information.

Subject to and without waiving the foregoing objections, Facebook will produce cease-and-desist letters sent to app developers identified as having access to Facebook users' Content and Information during the Relevant Time Period relating to policy violations involving potential misuse of user data.

## REQUEST FOR PRODUCTION NO. 14:

Documents sufficient to show the monetary or retail value of each named Plaintiff's Content and Information to Facebook, updated to reflect whenever Facebook's terms of service changed, including the calculation of revenue earned by Facebook for each Named Plaintiff based upon bartering or selling access to such Named Plaintiff's Content and Information.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 14:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users who are not parties to the Action.

(D) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, to the extent, that the Request seeks all Documents "relating to" Facebook's assessment of the monetary or retail value of Users' Content and Information to Users and information relating to compensation for data and/or information not related to Plaintiffs' claims

(E) Facebook further objects to this Request on the grounds that "monetary or retail value of Users' Content and Information to Users" is ambiguous and vague.

(F)  Facebook further objects to this Request as misleading to the extent that it suggests any compensation offered for information in connection with the Onavo or Research app reflects the value of any information for which Plaintiffs seek compensation in this Action.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have any documents in its possession, custody, or control responsive to this Request.

**REQUEST FOR PRODUCTION NO. 18:**

All Documents that have been transmitted to Users by Facebook relating to whether Users' Content and Information was accessed or obtained by Third Parties.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(B) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks Documents transmitted to Users who are not parties to the Action.

(C) Facebook further objects to the Request on the ground that the Request seeks documents that are already in Plaintiffs' possession, custody, or control.

Subject to and without waiving the foregoing objections, Facebook will produce Facebook's communications to users regarding the Cambridge Analytica events.

**REQUEST FOR PRODUCTION NO. 19:**

All Documents supporting the escalation of those Apps escalated to Phase Two of ADI for Enhanced Examination and/or Phase Three of ADI for Enforcement and designated as follows in the Chen Declaration ¶ 34:

(d) each [A]pp to which a request for information was sent; (e) each [A]pp for which an interview was sought with the developer; (f) each [A]pp for which a remote or onsite audit was requested to be conducted; (g) each [A]pp for which actual misuse was found and identification of that misuse; (h) each [A]pp that was banned for actual misuse; and (i) each [A]pp that was banned for failing to cooperate with Facebook's investigation.

Facebook has described identification of these Apps as non-privileged and has already produced it to the Massachusetts Attorney General's Office.  *See* Chen Declaration ¶ 35.

23

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-md-02843-VC

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that the Request seeks all Documents supporting the escalation of certain Apps, including escalations not relevant to the claims or defenses in this Action.

Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 20:**

The list of Apps that Facebook provided to the Massachusetts Attorney General's Office and that the Chen Declaration ¶ 35 describes as "the subject of external actions or communications with third parties, including the growing list of Apps Facebook has suspended as part of the [ADI], whether because of policy violations or because of their refusal to cooperate with Facebook's investigation."

24

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.   Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

Subject to and without waiving the foregoing objections, Facebook will produce relevant lists of Apps that Facebook provided to the Massachusetts Attorney General's Office.

**REQUEST FOR PRODUCTION NO. 21:**

Communications between Facebook and Third Parties relating to the ADI, including but not limited to Communications that Facebook provided to the Massachusetts Attorney General's Office.  *See* Chen Declaration ¶ 37.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.   Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that the Request seeks all Communications between Facebook and Third Parties "relating" to the ADI, including communications unrelated to Plaintiffs' claims.

Subject to and without waiving the foregoing objections, to the extent non-privileged, responsive documents are identified by a reasonable, good-faith search, Facebook will produce Communications between Facebook's ADI team and third-party app developers relating to ADI.

**REQUEST FOR PRODUCTION NO. 22:**

All "Privacy Risk Assessment[s]," and notes or agenda relating to Facebook's "focused subject-matter-specific meetings," "focused subject-matter-specific discussions," "weekly intra- and inter-team meetings," and "Privacy Summit[s]," as detailed in "Facebook's Privacy Program Overview" included in any PricewaterhouseCoopers LLP ("PwC") assessment report prepared pursuant to the FTC Consent Order.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that the Request seeks

**REQUEST FOR PRODUCTION NO. 24:**

Documents sufficient to identify all Third Parties to which Facebook granted access to Users' Content and Information not generally available through Platform pursuant to partnerships or agreements between Facebook and those Third Parties.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks Documents sufficient to identify all Third Parties to which Facebook granted access to Users' Content and Information not generally available through Platform pursuant to partnerships or agreements between Facebook and those Third Parties, including Third Parties who were granted access to such Content and Information other than in connection with the allegations in Plaintiffs' Complaint.

Subject to and without waiving the foregoing objections, Facebook will produce final agreements with integration partners and device manufacturers responsive to this Request.

**REQUEST FOR PRODUCTION NO. 25:**

All Documents relating to agreements or partnerships described in Request No. 24.

28

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-md-02843-VC

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "relating" to the subject agreements or partnerships, including those which are not relevant to the subject matter of the Action.

(D) Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Request 24.

Subject to and without waiving the foregoing objections, Facebook will produce agreements with its integration partners and device manufacturers responsive to this Request.

**REQUEST FOR PRODUCTION NO. 26:**

For each of the Third Parties that Facebook entered into partnerships or agreements with as described in Request No. 24, Documents sufficient to identify:

- The fields, kinds, or categories of Content and Information that were accessed or obtained by such Third Parties;

- How each such Third Party accessed or obtained the Content and Information of Users;

- How each such Third Party used the Content and Information accessed or obtained;

- Where the Content and Information obtained by such Third Parties currently resides and who has access to it.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 26:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to the Request to the extent that the Request seeks Documents that are not in Facebook's possession, custody, or control because the Request relates to the conduct of Third Parties.

(E) Facebook further objects to this Request as seeking information outside of Facebook's knowledge regarding the actions and knowledge of third parties.

(D) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users that are not parties to the Action.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have documents in its possession, custody, or control responsive to Request No. 26.

**REQUEST FOR PRODUCTION NO. 27:**

Documents sufficient to show all forms and formats in which Facebook transmitted to Third Parties information concerning Users' liking, viewing, retrieving, or otherwise requesting or obtaining videos on, using, or by means of the Facebook Platform.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(B) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users not a party to the Action.

(C) Facebook further objects to this Request on the grounds that the term "transmitted" is ambiguous and vague in that it could refer to any and all forms of conveying information, including passively making information available to a third party by hosting and displaying the information a User chooses to include on his or her Facebook profile page.

Subject to and without waiving the foregoing objections, Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 28:**

All Documents relating to Internal Policies by Facebook on the monitoring of Third Parties' compliance with Facebook's Platform Policy, Data Policy, or SRR.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 28:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "Relating" to the subject Internal Policies, including Policies unrelated to Plaintiffs' claims.

Subject to and without waiving the foregoing objections, to the extent non-privileged, responsive documents are identified by a reasonable, good-faith search, Facebook will produce final, formal, written Policies that governed access to Facebook consumer data by third-party Applications during the Relevant Time Period.

**REQUEST FOR PRODUCTION NO. 29:**

All Documents relating to Internal Policies by Facebook on the enforcement of Facebook's Platform Policy, Data Policy, or SRR against Third Parties.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other

32

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

applicable privilege, doctrine, or protection.   Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "relating" to the subject Internal Policies, including Policies unrelated to Plaintiffs' claims.

(D)  Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Request 28.

Subject to and without waiving the foregoing objections, Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 30:**

All Documents relating to measures and controls, including proposed measures and controls, put in place by Facebook to prevent Third Parties from violating Facebook's Platform Policy, Data Policy, or SRR.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.   Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "Relating" to the subject measures and controls, including measures and controls unrelated to Plaintiffs' claims.

(D) Facebook further objects to this Request on the grounds that the phrases "measures and controls" and "proposed measures and controls" are ambiguous and vague and undefined.

(F) Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Requests 28 and 29.

Subject to and without waiving the foregoing objections, to the extent non-privileged, responsive documents are identified by a reasonable, good-faith search, Facebook will produce final, formal, written Policies that governed access to Facebook consumer data by third-party Applications during the Relevant Time Period.

**REQUEST FOR PRODUCTION NO. 31:**

All Documents relating to Facebook's audits, inquiries, and investigations of Third Parties investigating compliance with any provisions of Facebook's Platform Policy, Data Policy, or SRR regarding the access, use, transmission, receipt, collection and analysis of Users' Content and Information on and off the Platform.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 31:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other

applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "relating" to the subject audits, inquiries, and investigations, including audits, inquires, and investigations unrelated to Plaintiffs' claims.

Subject to and without waiving the foregoing objections, Facebook will produce cease-and-desist letters sent to app developers during the Relevant Time Period relating to policy violations involving the use of User data.  Facebook is willing to meet and confer with Plaintiffs regarding any other documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

## REQUEST FOR PRODUCTION NO. 32:

All Documents Concerning Misuse of Data, including investigations, examinations, inquiries, or audits-or Communications regarding such investigations, examinations, inquiries, or audits-regarding Misuse of Data prior to the deprecation of Graph API v.1.0.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 32:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action and/or disproportionate to the needs of the case on the grounds that it seeks all Communications "related" to the subject notice.

(D) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users who are not parties to the Action.

Subject to and without waiving the foregoing objections, Facebook will produce final, exemplar versions of notifications that Facebook made to users regarding material changes to its Data Use Policy and Statement of Rights and Responsibilities dating back to January 1, 2007.

**REQUEST FOR PRODUCTION NO. 34:**

All Documents relating to the conditioning of Third Parties' access to Users' Content and Information on the purchase of Mobile App Install Ads, payment of Content and Information in-kind (referred internally as Reciprocity or Data Reciprocity), or other payment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 34:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that it seeks all Documents "relating" to certain subjects, including Documents unrelated to Plaintiffs' claims and documents that are not within Facebook's possession, custody, or control.

(D)  Facebook further objects to this Request to the extent it is based on the false and incorrect premise that Facebook "condition[ed]" or "condition[s]" access to information on certain purchases and/or payments.

Subject to and without waiving the foregoing objections, Facebook will produce final, formal, written Policies and agreements that governed access to Facebook consumer data by third-party Applications, integration partners, and mobile phone manufacturers during the Relevant Time Period.

## REQUEST FOR PRODUCTION NO. 35:

Documents relating to the manner in which a Facebook User could control how his or her data was shared through their Privacy Controls and App Settings throughout the Relevant Time Period, including but not limited to screenshots of the Facebook website and the Facebook mobile application.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 35:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

DATE:  December 26, 2019

Respectfully submitted,

**GIBSON, DUNN & CRUTCHER, LLP**

By:  /s/ *Joshua S. Lipshutz*
Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Brian M. Lutz (SBN 255976)
blutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

# EXHIBIT D

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' THIRD SET OF REQUESTS FOR PRODUCTION TO DEFENDANT FACEBOOK, INC.**<br><br>Judge:  Hon. Vince Chhabria<br>Courtroom:  4, 17th Floor |

PROPOUNDING PARTY:   Plaintiffs

RESPONDING PARTY:    Facebook

SET NUMBER:          Third (3)

Plaintiffs hereby propound the following requests for production of documents to Defendant Facebook, Inc. ("Facebook"), pursuant to Federal Rules of Civil Procedure 26 and 34, and request that Facebook produce the documents and electronically-stored information set forth herein within thirty (30) days of service of these requests, at Bleichmar Fonti & Auld LLP, 555 12th Street, Suite 1600, Oakland, CA 94607.

## INSTRUCTIONS

1.      You shall respond to these requests for the production of documents in a manner consistent with the Federal Rules of Civil Procedure and the following instructions:

2.      In responding to each document request, furnish all responsive documents available at the time of production, including documents in your possession, custody or control, and in the possession, custody or control of your agents, employees, partners, representatives, subsidiaries, affiliates, investigators, or by your attorneys or their agents, employees or investigators.

3.      If any otherwise responsive document was, but is no longer, in existence or in your possession, custody or control, identify the type of information contained in the document, its current or last known custodian, the location/address of such document, the identity of all persons having knowledge or who had knowledge of the document and describe in full the circumstances surrounding its disposition from your possession or control.

4.      This is a continuing request for the production of documents and requires supplemental responses as provided for in the Federal Rules of Civil Procedure. If, after making your initial production, you (or any other persons acting on your behalf) obtain or become aware

of any further documents responsive to any document request, you are required to produce such additional documents to plaintiffs. Each supplemental response shall be served on plaintiffs no later than thirty days after the discovery of the further information.

5.      You shall produce the original of each document described below or, if the original is not in your custody, then a copy thereof, and in any event, all non-identical copies which differ from the original or from the other copies produced for any reason, including, without limitation, the making of notes thereon.

6.      Documents shall be produced as kept in the regular course of business together with the original folders, binders, boxes or other containers in which they were maintained.

7.      All documents or things that respond in whole or in part to any portion of these requests are to be produced in their entirety, including attachments and their enclosures.

8.      Documents attached to each other should not be separated.

9.      Documents not otherwise responsive to any particular document request shall be produced if such documents mention, discuss, refer to, or explain the documents called for by any document request, or if such documents are attached to documents called for by any document request.

10.     Documents shall be produced in such fashion as to identify the custodian of each document.

11.     Identify the source of each document produced, by identifying: (a) all of the person(s) who possessed the document; (b) the positions or titles of any such individuals; and (c) all of the divisions and departments where each document was located. If you are unable to determine the individual(s) who possessed the document, identify the department and division where the document was located when produced.

12. If you claim any form of privilege, whether based on statute or otherwise, as a ground for not producing any document, state the following:

    a. The date of the document;

    b. The name, the present or last known home and business address, the telephone numbers, the title (or position), and the occupation of those individuals who prepared, produced, reproduced or who were recipients of said document;

    c. A description of the document sufficient to identify it without revealing the information for which the privilege is claimed;

    d. The nature of the privilege asserted;

    e. The factual basis upon which you claim any such privilege;

    f. The location of the document; and

    g. The custodian of the document.

13. To the extent you object to any document request, you must provide specific responses as to what portion of the request you object to and state expressly why you will not respond to such request in sufficient detail to permit the Court to determine the validity of the objection. Responsive documents to which your objection does not apply should be produced.

14. If you claim that all or any part of any document request, the Definitions, or Instructions is vague or ambiguous, please identify the specific language you consider vague or ambiguous and state the interpretation of the language in question you used to frame your response.

15. Each document requested herein is to be produced in its entirety and without deletion or excision, regardless of whether you consider the entire document to be relevant or responsive to any document request. If you have removed, excised or deleted any portion of a

document, stamp the word "REDACTED" on each page of the document that you have redacted. Redactions should be included on the privilege log described in Instruction No. 13, above.

16.     One copy of each document should be produced. A document that varies in any way from the original or from any other copy, including drafts or a document with handwritten notations or deletions constitutes a separate document and must be produced, whether or not the original is in your possession, custody or control. Color (i.e., not black and white) originals should be produced in color. If any identical copy cannot be produced for any reason (e.g., faint writing, erasures, etc.), produce the original.

17.     Indicate the origin of each document and number each document with consecutive Bates numbers.

## **DEFINITIONS**

Unless otherwise stated, the terms set forth below are defined as follows and shall be used in construing the meaning of these requests for the production of documents.

1.     The use of the singular shall be deemed to include the plural, and the use of one gender shall include all others, as appropriate, in the context.

2.     The present tense of a verb includes its past tense, and vice versa.

3.     "And" and "or" are to be construed conjunctively and disjunctively, as necessary, to bring within the scope of this request for production all responses that might otherwise be construed to be outside its scope.

4.     "Any" and "all" mean each and every.

5.     "App" means an interactive software application developed to utilize the core technologies of the Facebook social networking platform.

6.      "Business Partners" refers to the third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems, including, but not

limited to, the third parties listed in paragraph 484 of Plaintiffs' First Amended Consolidated Complaint.

7.  "Call" means an automated call or other data-retrieval request delivered to or through the Facebook Platform, including through the Graph.

8.  "Content and Information" refers to the definition in footnote 2 of the FAC, referring to "content" and "information" as Facebook's Statements of Rights and Responsibilities have defined those terms. In brief, Facebook has generally used "information" to mean facts and other information about Facebook Users, including the actions they take, and "content" to mean anything Facebook Users post on Facebook that would not be included in the definition of "information." Content and Information also includes both personally identifiable content and information and anonymized content and information that is capable of being de-anonymized. *See* FAC ¶¶ 223-224. Content and Information includes data that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular Facebook User, including:

a.  Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

b.  Characteristics of protected classifications under California or federal law.

c.  Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

d.  Biometric information.

e.  Internet or other electronic network activity information, including, but not

limited to, browsing history, search history, and information regarding a consumer's interaction with an Internet Web site, application, or advertisement.

f.  Geolocation data.

g.  Audio, electronic, visual, thermal, olfactory, or similar information.

h.  Professional or employment-related information.

i.  Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. section 1232g, 34 C.F.R. Part 99).

j.  Inferences drawn from any of the information identified in this paragraph to create a profile, dossier, or similar collection of information about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

9.     "Data Warehouse" refers to any warehousing framework developed by the Data Infrastructure Team at Facebook and may also be known as the "Hive."

10.    "Database" refers to any organized collection of information that is stored electronically.

11.    "Document" or "Documents" is defined to include any document, ESI, or Electronic Media stored in any medium, and is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a)(1)(A), including, but not limited to programming source code, electronic or computerized data compilations, Communications, electronic chats, instant messaging, documents created through Workplace by Facebook, encrypted or self-destructing messages, messages sent via Facebook messenger, email

Communications, other electronically stored information from Personal computers, sound recordings, photographs, and hard copy Documents maintained in your Personal files.

12.     "Facebook," "Defendant," "You," or "Your" shall mean Facebook, Inc. and any of its executives, directors, officers, employees, partners, members, representatives, agents (including attorneys, accountants, consultants, investment advisors or bankers), and any other Person purporting to act on its behalf. In the case of business entities, these defined terms include parents, subsidiaries, affiliates, predecessor entities, successor entities, these defined terms include parents, subsidiaries, affiliates, predecessor entities, successor entities, divisions, departments, groups, acquired entities and/or related entities or any other entity acting or purporting to act on its behalf.

13.     "Facebook Platform" means a set of APIs and services provided by Facebook that enable websites and applications to (a) retrieve Content and Information relating to Facebook Users made available by Facebook, (b) retrieve authorized Content and Information relating to Facebook Users from other applications or websites, and (c) provide Content and Information relating to Facebook Users to Facebook.

14.     "Facebook User" means persons who maintain a Facebook account.

15.     "Friends of Installing User" refers to Facebook Users who did not install a particular App, but whose Content and Information became accessible to that App because they were Facebook friends with an Installing User.

16.     "Hive" refers to the open source, peta-byte scale data warehousing framework based on Hadoop that was developed by the Data Infrastructure Team at Facebook, also known as the Data Warehouse.

17.     "Including" means "including but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify a request, definition, or instruction but not to limit it.

18.     "Installing User" refers to the Facebook User who installed a particular App via his or her Facebook account.

19.     "Platform" refers to the services, tools, and products provided by Facebook to third parties to create their own applications and services that access data in Facebook.

20.     "Privacy Controls" means the audience selectors that control what information in a Facebook User's profile can be viewed by other Facebook Users, and includes Profile Privacy Settings, Profile Privacy Controls, Publisher Privacy Controls, and the like.

21.     "Privacy Cross-Functional Team" means the team of employees working on Facebook's Privacy Program to regularly assess risks and controls on an ongoing basis of the Privacy Program.

22.     "Privacy Governance Team" means the designated team of employees directly responsible for the Facebook Privacy Program.

23.     "Privacy Program" means the program established, implemented, and maintained by Facebook pursuant to the 2012 Consent Order between Facebook and the Federal Trade Commission.

24.     "Relating to," "relate to," "referring to," "refer to," "reflecting," "reflect," "concerning," or "concern" means all Documents which comprise, explicitly or implicitly refer to, were reviewed in conjunction with, or were created, generated or maintained as a result of the subject matter of the request, including, but not limited to, all Documents which reflect, record, memorialize, embody, discuss, evaluate, consider, review or report on the subject matter of the request.

25.     "Third Parties" include the following:

    a.  Apps, App Developers, Whitelisted Apps, and Business Partners, as those terms are used in the FAC;

    b.  Any person that develops an application, software experience, game, or website that accesses Content and Information from Facebook's API or other Facebook software; and

    c.  Any person with which Facebook has or had an integration partnership.

26.     "Version" refers to both major version and minor version of an API (*e.g.*, Version 2.0 is different from Version 2.1).

27.     Capitalized terms and acronyms not specifically defined herein have the same definition as in the FAC.

## RELEVANT TIME PERIOD

The relevant time period for each Document Request is January 1, 2007 through the present (the "Relevant Time Period"), unless otherwise specifically indicated, or portion thereof. Each Document Request shall be interpreted to include all documents and information that relate to the Relevant Time Period or otherwise-specified period, even if such documents or information was prepared or published outside of the Relevant Time Period or otherwise-specified period. If a document prepared before or after this period is necessary for a correct or complete understanding of any document covered by a request, you must produce the earlier or subsequent document as well. If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the production request.

## DOCUMENT REQUESTS

### REQUEST FOR PRODUCTION NO. 37

All records or logs of API Calls made by Third Parties for the Content and Information of Friends of Installing Users, including:

    a.  For each Version of each API, Calls for Facebook Users' and Friends' Content and Information;

    b.  For each Call, information about the endpoint that originated the Call, including the endpoint's IP (Internet Protocol) address and whether the endpoint is a user device or a Third Party's server;

    c.  The response status of those Calls (*e.g.* success or reason for failure);

    d.  The Content and Information delivered to Third Parties on each API in response to these Calls; and

    e.  For each Version of each API, the format in which such Content and Information was delivered to Third Parties and whether it was stored.

### REQUEST FOR PRODUCTION NO. 38

All Documents concerning privacy settings, sharing controls, and deletion capabilities (including permanent deletion) available to any Facebook employee, officer, or director using the Platform that were not available to all Facebook Users.

### REQUEST FOR PRODUCTION NO. 39

For each Database containing information about Facebook Users—including, but not limited to, those based on the Hive and/or any Data Warehouse—all manuals, schematics, and other Documents describing the content, structure, or organization of each such Database.

## REQUEST FOR PRODUCTION NO. 40

Documents sufficient to identify all Databases or Data Warehouses which contain information about Facebook Users.

## REQUEST FOR PRODUCTION NO. 41

All Documents relating to the deletion, loss, destruction or spoliation of any Documents or data responsive to any request for production propounded in this action.

## REQUEST FOR PRODUCTION NO. 42

All Documents You relied upon in answering any interrogatory Plaintiffs propound in this action.

## REQUEST FOR PRODUCTION NO. 43

All privilege logs, interrogatory responses, written reports, correspondence and deposition transcripts from any formal or informal inquiry or investigation by a governmental entity or regulator in the United States or United Kingdom relating to whether Facebook Users' Content and Information was accessed or obtained by any Third Parties without proper consent or authorization, including but not limited to all inquiries or investigations arising out of the Cambridge Analytica Scandal, the FTC Consent Order, and any inquiry or investigation related to the settlement agreement with the FTC announced on July 24, 2019.

## REQUEST FOR PRODUCTION NO. 44

Documents sufficient to show all payments You received from all Third Party Apps or App developers who had access to the Content and Information of Friends of Installing Users in the United States or United Kingdom.

**REQUEST FOR PRODUCTION NO. 45**

Documents sufficient to show the value of any data You received from all Third Party Apps or App developers who had access to the Content and Information of Friends of Installing Users in the United States or United Kingdom, including any estimates of value that You made.

**REQUEST FOR PRODUCTION NO. 46**

Documents sufficient to show all costs associated with Facebook granting Third Party Apps or App developers access to the Content and Information of Friends of Installing Users in the United States or United Kingdom.

**REQUEST FOR PRODUCTION NO. 47**

Documents sufficient to show all payments You received from all Business Partners who Facebook granted access to the Content and Information of Facebook Users in the United States or United Kingdom.

**REQUEST FOR PRODUCTION NO. 48**

Documents sufficient to show the value of any data You received from all Business Partners who Facebook granted access to the Content and Information of Facebook Users in the United States or United Kingdom, including any estimates of value that You made.

**REQUEST FOR PRODUCTION NO. 49**

Documents sufficient to show all costs associated with Facebook granting Business Partners access to the Content and Information of Facebook Users in the United States or United Kingdom.

**REQUEST FOR PRODUCTION NO. 50**

All Documents regarding Your assessment of the financial impact of changes to user data practices and product changes that restrict developer access to certain user data identified in Your 2018 Form 10-K at pages 9 and 24.

**REQUEST FOR PRODUCTION NO. 51**

Documents sufficient to show the costs You incurred to enforce policies regarding Third Party access to and use of Your Facebook Users' Content and Information.

**REQUEST FOR PRODUCTION NO. 52**

All Documents regarding all monitoring controls and audit processes in operation to detect misuse of the Facebook Platform throughout the Class Period.

**REQUEST FOR PRODUCTION NO. 53**

All Documents regarding privacy decisions made by the Privacy Governance Team and the Privacy Cross-Functional Team related to Facebook's Privacy Program.

**REQUEST FOR PRODUCTION NO. 54**

All Documents regarding all enhanced privacy features established, implemented, and maintained by Facebook and how Facebook established, implemented, and maintained such features.

**REQUEST FOR PRODUCTION NO. 55**

All Documents regarding all steps taken by Facebook to establish, implement, and maintain controls related to how Third Parties accessed Content and Information, including the approval process Facebook utilized to grant such access.

**REQUEST FOR PRODUCTION NO. 56**

All Documents regarding Facebook's ongoing monitoring of its Privacy Program, including how Privacy Program controls were reviewed and updated, what methodologies Facebook utilized to test these controls, and how Facebook designed and implemented intake, detection, handling, response, remediation, and reporting of all privacy incidents such as misuse of user data by Third Parties.

Dated: May 6, 2020                               Respectfully submitted,

KELLER ROHRBACK L.L.P.                           BLEICHMAR FONTI & AULD LLP

By:     */s/ Derek W. Loeser*                    By:     */s/ Lesley E. Weaver*
        Derek W. Loeser                                  Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)        Lesley E. Weaver (SBN 191305)
Lynn Lincoln Sarko (admitted *pro hac vice*)     Anne K. Davis (SBN 267909)
Gretchen Freeman Cappio (admitted *pro hac vice*) Joshua D. Samra (SBN 313050)
Cari Campen Laufenberg (admitted *pro hac vice*) Matthew P. Montgomery (SBN 180196)
David Ko (admitted *pro hac vice*)               Angelica M. Ornelas (SBN 285929)
Adele A. Daniel (admitted *pro hac vice*)        555 12th Street, Suite 1600
Benjamin Gould (SBN 250630)                      Oakland, CA 94607
1201 Third Avenue, Suite 3200                    Tel.: (415) 445-4003
Seattle, WA 98101                                Fax: (415) 445-4020
Tel.: (206) 623-1900                             lweaver@bfalaw.com
Fax: (206) 623-3384                              adavis@bfalaw.com
dloeser@kellerrohrback.com                       jsamra@bfalaw.com
lsarko@kellerrohrback.com                        mmontgomery@bfalaw.com
gcappio@kellerrohrback.com                       aornelas@bfalaw.com
claufenberg@kellerrohrback.com
bgould@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

# EXHIBIT E

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' FOURTH SET OF INTERROGATORIES TO DEFENDANT FACEBOOK, INC.** |

PROPOUNDING PARTY:    Plaintiffs

RESPONDING PARTY:    Defendant Facebook, Inc.

SET NUMBER:    Four (4)

Plaintiffs hereby propound the following interrogatories to Defendant Facebook, Inc. ("Facebook"), pursuant to Federal Rules of Civil Procedure 26 and 33, and request that Facebook respond to the interrogatories below within thirty (30) days of service of these requests at Keller Rohrback L.L.P., 1201 Third Avenue, Suite 3200, Seattle, WA 98101.

## INSTRUCTIONS

1.    You shall respond to these interrogatories in a manner consistent with the Federal Rules of Civil Procedure and the following instructions:

2.    In responding to these Interrogatories, you must answer the Interrogatories in writing and under oath pursuant to Rule 33(b)(5).

3.      If you object to an Interrogatory on the grounds that it calls for disclosure of information which you claim is privileged, then answer such Interrogatory as follows: (a) furnish all information and facts called for by such Interrogatory for which you do not assert a claim of privilege; and (b) for each communication, recommendation, fact, or advice which you claim is privileged, state the basis for your claim of privilege and all the facts that substantiate that basis, including each of the participants in the allegedly privileged communication.

4.      If you object to any portion of an Interrogatory, provide all information responsive to any portion of the Interrogatory to which you do not object.

5.      Unless otherwise stated, there are no time limits applicable to any interrogatory. When a time limit is specified in a discovery request, this time limit does not alter your obligations under the Federal Rules of Civil Procedure to supplement your responses.

6.      Seasonable and timely supplementation is required. Accordingly, if any additional information relating in any way to these discovery requests are acquired or discovered subsequent to the date of your response, this information shall be furnished to Plaintiffs' counsel promptly after such information is discovered.

7.      In answering these Interrogatories, furnish all knowledge and information available to you or subject to your reasonable inquiry, access or control, however obtained including hearsay. This includes, but is not limited to, information in the actual or constructive possession of your attorneys and anyone else acting on your behalf.

8.      Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition except where such words have a specific custom and usage definition in your trade or industry, in which case they shall be interpreted in accordance with such usual custom and usage definition of which you are aware. In construing the interrogatories and requests herein: (i) the singular shall include the plural and the plural shall include the singular; (ii) a masculine, feminine, or neuter pronoun shall not exclude the other genders; (iii) the terms "any" and "all" shall be understood to mean "any and all"; and (iv) the words "and" and "or" shall be read in the conjunctive or disjunctive or

both, as the case may be, all to the end that the interpretation applied results in the more expansive interpretation.

## DEFINITIONS

Unless otherwise stated, the terms set forth below are defined as follows and shall be used in construing the meaning of these interrogatories.

1.      The use of the singular shall be deemed to include the plural, and the use of one gender shall include all others, as appropriate, in the context.

2.      The present tense of a verb includes its past tense and vice versa.

3.      "2012 Consent Decree" means the Decision and Order entered by the Federal Trade Commission (FTC) in 2012 in *In the Matter of Facebook, Inc.*, No. C-4365, pursuant to an agreement between the FTC and Facebook.

4.       "And" and "or" are to be construed both conjunctively and disjunctively, as necessary, to bring within the scope of this request for production all responses that might otherwise be construed to be outside its scope.

5.      The words "all" and "any" means each and every.

6.      The phrase "describe in detail" or "detailed description" includes a request for a complete description and explanation of the facts, circumstances, analysis, opinion, and other information relating to the subject matter of a specific interrogatory.

7.      "Facebook," "Defendant," "you," and "your" shall mean Facebook, Inc. and any of its executives, directors, officers, employees, partners, members, representatives, agents (including attorneys, accountants, consultants, investment advisors or bankers), and any other Person purporting to act on its behalf. In the case of business entities, these defined terms include parents, subsidiaries, affiliates, predecessor entities, successor entities, divisions, departments, groups, acquired entities and/or related entities or any other entity acting or purporting to act on its behalf.

8.      "Action" means this case captioned *In re: Facebook, Inc. Consumer Privacy User Profile Litigation*, Case No. 18-md-02843-VC and each of the constituent Actions transferred to and/or consolidated therein.

9.      "API" refers to an application programming interface.

10.     "App" means an interactive software application developed to utilize the core technologies of the Facebook social networking platform.

11.      "Business Partners" refers to the third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems, including, but not limited to, the third parties listed in paragraph 484 of Plaintiffs' First Amended Consolidated Complaint.

12.     "Content and Information" refers to the definition in footnote 2 of the First Amended Consolidated Complaint, referring to "content" and "information" as Facebook's Statements of Rights and Responsibilities have defined those terms. In brief, Facebook has generally used "information" to mean facts and other information about Facebook Users, including the actions they take, and "content" to mean anything Facebook Users post on Facebook that would not be included in the definition of "information." Content and Information also includes both personally identifiable content and information and anonymized content and information that is capable of being de-anonymized. *See* First Am. Consol. Compl. ("FAC") ¶¶ 223-224. Content and Information includes data that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular Facebook User, including:

A.      Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

B.      Characteristics of protected classifications under California or federal law.

C.      Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

D.      Biometric information.

E.      Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an Internet Web site, application, or advertisement.

F.      Geolocation data.

G.      Audio, electronic, visual, thermal, olfactory, or similar information.

H.      Professional or employment-related information.

I.      Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. § 1232g, 34 C.F.R. pt. 99).

J.      Inferences drawn from any of the information identified in this paragraph to create a profile, dossier, or similar collection of information about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

13.     "Data Analytics Infrastructure" refers to the services, applications, utilities and systems that are used for either preparing data for modeling, estimating models, validating models, business intelligence, scoring data, or related activities, including but not limited to databases and data warehouses, statistical and data mining systems, and scoring engines.

14.     "Database" refers to any organized collection of information that is stored electronically.

15.     "Facebook Archive" means the archived activity of the Named Plaintiffs You produced in this action.

16.     "Facebook User" means a person who maintains or has maintained a Facebook account.

17.     "Friends of Installing Users" refers to Facebook Users:

      A.     who did not install a particular App, but whose Content and Information became accessible to that App because they were Facebook friends with an Installing User; or

      B.     whose Content and Information became accessible to a Business Partner because they were Facebook friends with an Installing User.

18.     "Including" means "including but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify a request, definition, or instruction but not to limit it.

19.      "Installing User" refers to a Facebook User who installed a particular App via his or her Facebook account or who used the services or products of a Business Partner in connection with his or her Facebook account.

20.     "Not Generally Available," when used as an adjective to modify Content and Information, refers to a Facebook User's Content and Information to which that Facebook User has restricted access such that the only Facebook Users who may access that Content and Information are the Facebook User's Friends or another limited audience.

21.     "Platform" refers to the services, tools, and products provided by Facebook to third parties to create their own applications and services that access data in Facebook.

22.     "Third Parties" include the following:

      A.     Apps, App Developers, Whitelisted Apps, and Business Partners, as those terms are used in the FAC;

      B.     Any person that develops an application, software experience, game, or website that accesses Content and Information from Facebook's API or other Facebook software; and

      C.     Any person with which Facebook has or had an integration partnership.

23.     Capitalized terms and acronyms not specifically defined herein have the same definition as in the First Amended Consolidated Complaint.

## INTERROGATORIES

**INTERROGATORY NO. 8:**

Identify by name and time period in operation each Facebook Database and Data Analytics Infrastructure that contains Facebook Users' Content and Information.

**INTERROGATORY NO. 9:**

For each Database and Data Analytics Infrastructure identified in your answer to Interrogatory No. 8, identify the corresponding query interfaces (e.g., including graphical interfaces, command-oriented interfaces, and APIs) that have called or accessed data from such Database to respond to either internal or external queries.

**INTERROGATORY NO.  10:**

For each query interface identified in your answer to Interrogatory No. 9, identify whether such query interface is or has been used to respond to internal queries, external queries, or both.

**INTERROGATORY NO. 11:**

For each query interface identified in your answer to Interrogatory No. 10 as being or having been used to respond to external queries, identify the complete list of fields or query parameters available for queries by a Third Party via such query interfaces. For each of the fields or query parameters, describe in detail the acceptable ranges and formats of their values and identify which parameters are optional for queries and which are required.

**INTERROGATORY NO.  12:**

For each Database and Data Analytics Infrastructure identified in your answer to Interrogatory No. 8, describe in detail the system architectures of, and types of data contained by, such system.

**INTERROGATORY NO. 13:**

For every API by means of which Third Parties could access the Not Generally Available Content and Information of Friends of Installing Users, list the name of the API, a description of its function, the data fields of Not Generally Available Content and Information of Friends of Installing Users to which it allowed access, the number of calls it received each month, the volume of data it returned each month, the number of Friends of Installing Users whose Content and Information was accessed, the name of every Third Party that Facebook allowed to use that API, and the period during which each Third Party was allowed to use the API.

**INTERROGATORY NO. 14:**

Identify every Business Partner that had the ability to access the Not Generally Available Content and Information of Facebook Users even if such Facebook Users had not downloaded an App from that Business Partner and time period during which each such Business Partner had that ability.

**INTERROGATORY NO. 15:**

For each Business Partner identified in your answer to Interrogatory No. 14, provide:

a)  The name of each API or other data transfer mechanism by means of which the Business Partner accessed the Not Generally Available Content and Information of Facebook Users when such Facebook Users had not downloaded an App from that Business Partner;

b)  a detailed description of the function of each such API or other data transfer mechanism;

c)  the elements of Not Generally Available Content and Information that each such API or other data transfer mechanism allowed access to;

d)  the number of calls the Business Partner made to each such API or other data transfer mechanism each month;

e)  the volume of data transferred from each such API or other data transfer mechanism to

each Business Partner each month;

f) the number of Friends of Installing Users whose Content and Information was so accessed by each Business Partner; and

g) any filters or access restrictions that limited the set of Facebook Users about whom each Business Partner could access Not Generally Available Content and Information.

**INTERROGATORY NO. 16:**

For each Named Plaintiff, identify all Third Parties who had the ability to access such Named Plaintiff's Not Generally Available Content and Information by virtue of the fact that the Named Plaintiff was a Friend of an Installing User, the date and time of each request for such access, and the specific Content and Information that was accessed.

**INTERROGATORY NO. 17:**

For each Named Plaintiff, identify each Facebook Business Partner that had the ability to access the Named Plaintiff's Not Generally Available Content and Information, even if the Named Plaintiff had not downloaded an App from that Business Partner, the date and time of each request for such access, and the specific Content and Information that was accessed.

**INTERROGATORY NO. 18:**

Identify by Bates number every document You provided or made available to PwC related to any investigation, audit or assessment related to the subject matter of the Complaint.

**INTERROGATORY NO. 19:**

Identify all members of Facebook's senior management team involved in the review and oversight of Facebook's Privacy Program instituted pursuant to the 2012 Consent Decree.

**INTERROGATORY NO. 20:**

Identify all members of the Board of Directors involved in the review and oversight of Facebook's Privacy Program instituted pursuant to the 2012 Consent Decree.

**INTERROGATORY NO. 21:**

For each such individual identified above in Interrogatories 19 and 20, describe in detail their duties and responsibilities relating thereto.

**INTERROGATORY NO.  22:**

Describe in detail the facts and circumstances relied upon by Facebook in assessing and agreeing to pay a $5 billion fine to the Federal Trade Commission.

**INTERROGATORY NO.  23:**

Identify every person involved in the decision to pay the $5 billion fine to the Federal Trade Commission.

**INTERROGATORY NO.  24:**

Identify every noncustodial source of ESI on which is stored information (in any form) sufficient to determine (1) whether Third Parties accessed the Not Generally Available Content and Information of Facebook Users by virtue of their being Friends of Installing Users; (2) which Third Parties accessed such Content and Information; and (3) which Facebook Users, by virtue of their being Friends of Installing Users, had their Not Generally Available Content and Information accessed by Third Parties.

**INTERROGATORY NO.  25:**

Identify every noncustodial source of ESI on which is stored information (in any form) sufficient to determine (1) whether any Business Partners accessed the Not Generally Available

Content and Information of Facebook Users even if such Users did had not downloaded an App from those Business Partners; (2) which Business Partners accessed such Content and Information; and/or (3) which Facebook Users had their Not Generally Available Content and Information accessed in that manner.

**INTERROGATORY NO. 26:**

Identify by name and time period all Third Parties that obtained Facebook Users' Content and Information through friend permissions prior to 2009.

**INTERROGATORY NO. 27:**

Identify by name and time period all Third Parties to whom Facebook granted whitelisted access, the time period of the grant of whitelisted access, and the Third Parties for which such access was granted.

**INTERROGATORY NO. 28:**

Describe the criteria Facebook used to determine which Third Parties would be granted whitelisted access.

**INTERROGATORY NO. 29:**

Identify by name and time period all Third Parties that were Business Partners of Facebook and were granted access to Facebook Users' Content and Information.

**INTERROGATORY NO. 30:**

Identify all categories of Content and Information available to a Facebook User through the "Access Your Information" or "Download Your Information" tools, such as users' public and private posts, Facebook messenger messages, and any attached content.

**INTERROGATORY NO. 31:**

Identify all categories of Content and Information Facebook collects, tracks, and maintains about Facebook Users that are excluded from the Access Your Information or Download Your Information tools, such as advertisements served to a Facebook User, likes, audience selector information, reports of offensive content, or support communications.

**INTERROGATORY NO. 32:**

For each Named Plaintiff, identify each category of Content and Information Facebook collects, tracks, and maintains about them and for each category, indicate (1) whether each category has been produced in this action and the Bates Range associated with each category of produced Content and Information; (2) whether each category of Content and Information is available to Facebook Users through the "Access Your Information" or "Download Your Information" tools; and (3) for each category of Content and Information that has not been produced in this action, its location, and the reason it has not been produced.

**INTERROGATORY NO. 33:**

For all documents produced in this action relating to the Named Plaintiffs' Content and Information, describe any associated data that reflects whether the Content and Information was publicly or privately shared.

**INTERROGATORY NO. 34:**

Identify by name, time period and type of data accessed all Third Parties Facebook has removed or banned from the Platform for violating Facebook Users' privacy or for failure to comply with Facebook's privacy policies.

Dated: July 16, 2020

KELLER ROHRBACK L.L.P.

By:      */s/ Derek W. Loeser*
         Derek W. Loeser

Derek W. Loeser (admitted *pro hac vice*)
Lynn Lincoln Sarko (admitted *pro hac vice*)
Gretchen Freeman Cappio (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Adele A. Daniel (admitted *pro hac vice)*
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

Respectfully submitted,

BLEICHMAR FONTI & AULD LLP

By:      */s/ Lesley E. Weaver*
         Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

# EXHIBIT F

CERTAIN PAGES MARKED CONFIDENTIAL OR
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
    osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Kristin A. Linsley (SBN 154148)
    klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
    mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
    dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
    jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Facebook, Inc.,*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DEFENDANT FACEBOOK, INC.'S AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES** |

the subparts should be construed as independent interrogatories, and that, in total, would cause Plaintiffs to exceed the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories.  ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1).

2.     Facebook objects to the Interrogatories to the extent they exceed the maximum number of permissible Interrogatories under Discovery Order No. 6 and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22. Notwithstanding and without waiving this Objection, Facebook has made a good faith effort to respond to the Interrogatories, in whole or in part, to the extent it is able.

## OBJECTIONS TO DEFINITIONS

1.     Facebook incorporates by reference the responses and objections to Definitions and Instructions contained in its Responses and Objections to Plaintiffs' First, Second, and Third Sets of Interrogatories.

2.     Facebook objects to Plaintiffs' definitions of "and" and "or" as unreasonable, inconsistent with the Federal Rules of Civil Procedure, vague, and grammatically incoherent. Facebook will interpret "and" and "or" in accordance with their ordinary, everyday meaning, which includes interpreting disjunctive terms disjunctively and conjunctive terms conjunctively.

3.     Facebook objects to Plaintiffs' definition of "describe in detail" or "detailed description" on the ground that the definition makes the Interrogatories overly broad and unduly burdensome and imposes obligations that go beyond the requirements of the Federal and Local Rules.  Facebook shall construe these terms as commonly and ordinarily understood.  Facebook further objects to this definition to the extent it seeks information beyond relevant facts,

including Facebook's analyses or opinions, which are appropriately sought through contention interrogatories, which are not appropriate or justified at this early stage.

4.      Facebook objects to Plaintiffs' definition of "App" as vague, ambiguous, overbroad, and unduly burdensome on the ground that it includes any "application developed to utilize the core technologies of the Facebook social networking platform" without identifying or defining what the "core," rather than peripheral, technologies of Facebook's platform are or were at any given time.  Facebook further objects to this definition as vague and ambiguous on the ground that Facebook cannot identify what any online applications are or were "developed to" do or presume the intent of any third parties that Facebook does not control.

5.      Facebook objects to Plaintiffs' definition of "Business Partners" as vague, ambiguous, and overly broad to the extent it refers to entities with which Facebook "partnered" to "develop and integrate" Facebook "on a variety of devices and operating systems" without defining any of those terms.  Facebook will construe "Business Partners" as referring to the integration partners and/or device manufacturers with whom Facebook has entered into agreements that have been and/or will be produced in response to Request for Production No. 24. During the parties' meet and confer discussions, beginning on or about August 27, 2020, Plaintiffs took the position that "Business Partners" refers to a broader set of entities than the integration partners and/or device manufacturers described in Facebook's August 14 Objection because Plaintiffs understood the Court to describe a broader set of "Business Partners" than the set of entities Facebook describes (hereinafter referred to as Facebook's "Integration Partners") in Pretrial Order 20.  Via email on September 11, 2020, Plaintiffs clarified that they understood the Court had adopted a "conduct-based definition" for "Business Partners" under which the term "Business Partners" described entities with whom "Facebook shared information about its

users . . . and those companies in turn shared data with Facebook."  Plaintiffs thus contend that "Business Partners" include any and all entities with whom Facebook exchanged user data in any form.  Having considered Plaintiffs' arguments, Facebook maintains its Objection to Plaintiffs' definition of "Business Partners" and will continue to construe this term as pertaining to Facebook's Integration Partners.  *First*, Plaintiffs have not re-issued their Fourth Set of Interrogatories with a revised definition of "Business Partners" that follows the definition adopted in their September 11 email.  The definition of "Business Partners" in Plaintiffs' Fourth Set of Interrogatories refers to entities with whom "Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems" and does not mention sharing user data. Plaintiffs' proposed post-hoc revision of the term "Business Partners" is inconsistent with the discovery requests Facebook is responding to.  *Second*, Plaintiffs' proposed revision to "Business Partners" is inconsistent with the allegations in Plaintiffs' Second Amended Consolidated Complaint ("SACC").  Apart from conclusory allegations regarding data sharing without user consent, Plaintiffs allege Facebook's "Business Partners" were entities with whom Facebook partnered to "develop and integrate Facebook's User Platform on multiple devices and operating systems," SACC, ECF No. 491, ¶ 430, and that these partnerships "allowed Facebook to expand its reach by outsourcing . . . the time, labor, and money required to build Facebook's Platform on different devices," *id.* ¶ 433, which required Facebook and the Business Partners to "exchange information about users' activities with each other," *id.* ¶ 434.  The SACC includes a partial list of "Business Partners," which Facebook had provided to Congress in June 2018.  *Id.* ¶ 431.  As the letter to Congress that Plaintiffs cite to makes clear, this list is of Facebook's Integration Partners.  Plaintiffs also concede that certain of the other entities they reference as being "Business Partners"—including Airbnb, Lyft, and Netflix—are actually "whitelisted apps," and

therefore relate to a separate category of allegations in the SACC.  *Id.* ¶ 457.  As a result, the only set of "Business Partners" about which Plaintiffs' SACC asserts non-conclusory allegations are Facebook's Integration Partners.  *Third*, the Court's Order on Facebook's Motion to Dismiss does not—and cannot—broaden the set of relevant entities.  Rather, the Court describes Plaintiffs' allegations as being "difficult to pin down" but describes the relevant entities as being a set of Facebook's "integration partner[s]," as identified in Facebook's letter to Congress, with whom Facebook had "data reciprocity" agreements.  MTD Order, ECF No. 298, at 8.  Moreover, while the Court can narrow a plaintiff's claim on a motion to dismiss, it cannot rewrite the complaint to broaden them.  *E.g.*, *Gregory Vill. Partners, L.P. v. Chevron U.S.A., Inc.*, 805 F. Supp. 2d 888, 895 (N.D. Cal. 2011) ("A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. . . .  Review is limited to the contents of the complaint." (internal citations omitted)).  *Fourth*, the Court recently affirmed that discovery is stayed as to all of Plaintiffs' stayed claims.  ECF No. 557 at 9.  Accordingly, Plaintiffs are not entitled to discovery as to entities about which they have articulated no particularized claims, much less stayed ones.  Facebook thus stands on its original objection to Plaintiffs' definition of "Business Partners" and declines to adopt Plaintiffs' later-adopted definition.

6.     Facebook objects to Plaintiffs' definition of "Content and Information" as vague, ambiguous, overly broad, and unduly burdensome.  While purporting to cite Facebook's Statements of Rights and Responsibilities, Plaintiffs have expanded the scope of "Content and Information" to include 10 subcategories of information—including "thermal [and] olfactory" information—that are not derived from that definition.  Facebook objects to this definition to the extent it purports to seek documents or information that is not relevant to Plaintiffs' non-stayed claims and bears no relation to third-party application developers being granted access to

Moreover, all "services, applications, utilities and systems" used by Facebook includes processes and mechanisms that do not support any of the functions at issue, to wit, the sharing of user content and information with third parties. Facebook further objects to this definition to the extent it seeks information relating to "modeling, estimating models, validating models, business intelligence, scoring data, or related activities, including but not limited to databases and data warehouses, statistical and data mining systems, and scoring engines," which bear no relevance to Plaintiffs' live claims. *See* MTD Order, ECF No. 298, at 6-10. Facebook will construe this term as relating to any internal electronic databases that may contain content or information relevant to Plaintiffs' claims.

9. Facebook objects to Plaintiffs' definition of "Facebook Archive" as vague, ambiguous, and inaccurate. Facebook has produced several categories of information relating to each of the Named Plaintiffs in this action, none of which is appropriately characterized as having been drawn from an "archive" as commonly understood. Facebook further objects to this definition on the basis that this term does not appear in the Interrogatories.

10. Facebook objects to Plaintiffs' definition of "Not Generally Available" on the ground that the term "access" is vague and ambiguous. Facebook will construe this term as referring to content posted on the Facebook Platform by a user for which that user has limited the audience of other Facebook users who may view, interact with, or share a particular item of content.

11. Facebook objects to Plaintiffs' definition of "Third Parties" to the extent it relies on other undefined terms, including "Whitelisted Apps," or other vague and ambiguous terms including "Business Partners." Facebook will construe this term as referring to individuals or entities other than Facebook or individual Facebook users.

With regard to Plaintiffs' request for over 10 years of monthly data regarding the number of calls certain APIs received, the volume of data returned, and the numbers of users whose data was accessed, Facebook continues to investigate what information it can produce in response to this request.  Facebook is willing to meet and confer with Plaintiffs regarding what information is being sought by this Interrogatory, its relevance to Plaintiffs' claims (if any), and what relevant and probative information is reasonably available to Facebook such that it is appropriate for discovery in this case.

**INTERROGATORY NO. 14:**

Identify every Business Partner that had the ability to access the Not Generally Available Content and Information of Facebook Users even if such Facebook Users had not downloaded an App from that Business Partner and time period during which each such Business Partner had that ability.

**RESPONSE TO INTERROGATORY NO. 14 – CONFIDENTIAL:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook further objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as an improper compound interrogatory that also embeds multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each such Business Partner."  *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009).  During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46

(C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, each of dozens of different "Business Partners" that have separate relationships and/or contracts with Facebook.  Facebook therefore considers Plaintiffs' inquiries into "each" Business Partner as separate Interrogatories.  *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

(B)      Facebook objects to this Interrogatory on the ground that the definition of "Not Generally Available" data is vague, ambiguous, overly broad, and unduly burdensome. Facebook will construe this term as described in its objections to its Definition.

(C)      Facebook objects to this Interrogatory on the ground that the definition of "Business Partners" is vague, ambiguous, overly broad, and unduly burdensome.  Facebook will construe this term as described in its objections to its Definition.

(D)      Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case.  Specifically, Facebook

objects to this Interrogatory to the extent it seeks information relating to Business Partners

unrelated to application developers being granted access to "sensitive user information" via

friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted"

applications, the sharing of "sensitive user information" with integration partners pursuant to

"data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one

of these three manners as a result of Facebook's alleged failure to adopt effective policies or

enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD

Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-

Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user

information as being that "Facebook shared with or made accessible to third parties").

      (E)    Facebook objects to this Interrogatory on the basis that it is cumulative and

duplicative of prior requests, including RFPs 12 and 24.

      (F)    Facebook objects to this Interrogatory on the basis that the information sought is

more appropriately pursued through another means of discovery, such as a request for the

production of documents.

      (G)    Facebook objects to this Interrogatory on the basis that it seeks a compilation of

information that is not reasonably available at this stage in the case and that would be unduly

burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary

to investigate as weighed against Plaintiffs' need for the information.  Responding fully to

Plaintiffs' Interrogatory would require Facebook to conduct a broad investigation—including

conducting witness interviews and analyzing a large number of documents that have not yet been

identified and produced—to identify all Business Partners who were permitted to access to

information through a large number of APIs (many of which are unrelated to any live claim or defense) over the course of at least thirteen years.

(H)    Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 77**:

"Business Partners" is not a term of art used within Facebook used to describe third parties to whom "Facebook outsourced . . . 'the time, labor, and money required to build Facebook's Platform on different devices and operating systems,'" pursuant to "integration partnerships."  MTD Order, ECF No. 298, at 8 (quoting FACC ¶ 486).  To avoid confusion, Facebook will refer to these entities as "Integration Partners."  Facebook's Integration Partners are companies Facebook engaged to build integrations for a variety of devices, operating systems, and other products where Facebook and its partners wanted to offer people a way to receive Facebook or Facebook experiences.  These integrations were built by Facebook partners, for Facebook users, but approved by Facebook.  They included, for example:

CONFIDENTIAL
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 14



CONFIDENTIAL
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 14**

██████████████████████  ████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████  ████████████████████████

████████████████████████████████████████████████████████

██████████████████████

     Below is a list of Facebook's Integration Partners during the Relevant Time Period asserted by Plaintiffs . For information relating to the period during which each integration was active, Facebook directs Plaintiffs to Facebook's responses to Interrogatory No. 15. The lack of an access revocation date does not signify that such access was never revoked or otherwise terminated.

- ██████
- ████
- ██████
- ████
- ██████████
- ██████[5]
- ████████
- A██████████
- ██████
- ██████
- ████████

---

[5] ████████████████████████████████████████████████████████████████

CONFIDENTIAL
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 14**

- █████████
- ███
- ███
- █████████
- ██████
- ██████
- ████████████
- ██████
- ███████
- ███
- ██████
- ███
- ███████
- ██████
- ██
- ████████████
- ████████████
- ██████
- ██████████████
- ███████
- █████████████
- ██████
- ██████

65

CONFIDENTIAL
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 14**

- ██████
- ██████
- ████████
- ██████
- ████
- ██
- ████████████
- ████
- █████
- ██████
- █████
- ██████████████
- ████████
- ████████
- ███████
- ███████
- ████
- █████████
- ████
- ██████
- ████████
- ███
- ███████

CONFIDENTIAL
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 14**

- █████
- ██████
- ██████
- ██████
- ████████
- ███████
- ████████
- █████████
- █████
- ██████
- ███████

This list is comprehensive to the best of Facebook's ability, as explained in the June 29, 2018 Facebook letter that is cited in paragraph 432 of the SACC.

**INTERROGATORY NO. 15:**

For each Business Partner identified in your answer to Interrogatory No. 14, provide:

a) The name of each API or other data transfer mechanism by means of which the Business Partner accessed the Not Generally Available Content and Information of Facebook Users when such Facebook Users had not downloaded an App from that Business Partner;

b) a detailed description of the function of each such API or other data transfer mechanism;

c) the elements of Not Generally Available Content and Information that each such API or other data transfer mechanism allowed access to;

d) the number of calls the Business Partner made to each such API or other data transfer mechanism each month;

e) the volume of data transferred from each such API or other data transfer mechanism to each

Business Partner each month;

f) the number of Friends of Installing Users whose Content and Information was so accessed by

each Business Partner; and

g) any filters or access restrictions that limited the set of Facebook Users about whom each

Business Partner could access Not Generally Available Content and Information.

## RESPONSE TO INTERROGATORY NO. 15 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:

(A)      Facebook objects to this Interrogatory as embedding multiple discrete sub-parts

that count against the number of interrogatories permitted under Fed. R. Civ. P. 33.  Not only

does the Interrogatory ask for separate information about "each" Business Partner identified in

Facebook's answer to Interrogatory No. 14, *see, e.g.*, *New Amsterdam Project Mgmt.*

*Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal.

Jan. 14, 2009), the Interrogatory demands a list of 7 different types of information about each.

Each of those inquiries is itself a subpart to be counted against the Interrogatory limit.  During

the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that

Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D.

441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state

facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or

separate" from each other "should be viewed as containing a subpart" for each separate subject

matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to

the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod.*

*& Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020)

(internal quotation marks and citations omitted), but instead seeks information about separate

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 15**

and distinct subjects, to wit, each of dozens of different "Business Partners" that have separate relationships and/or contracts with Facebook.  Facebook will therefore treat Plaintiffs' inquiry into "each" Business Partner as an individual Interrogatory.  *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).  Although Facebook has provided a single table of data points relevant to each Integration Partner for ease of review, Facebook considers this Interrogatory to pose a separate Interrogatory about ███████████████████████████████████████████████████████████ ███████████████████ .

(B)     Facebook objects to this Interrogatory on the ground that the definition of "Not Generally Available" data is vague, ambiguous, overly broad, and unduly burdensome. Facebook will construe this term as described in its objections to its Definition.

(C)     Facebook objects to this Interrogatory on the ground that the definition of "Business Partners" is vague, ambiguous, overly broad, and unduly burdensome.  Facebook will construe this term as described in its objections to its Definition.

(D)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, and/or disproportionate to the needs of the case.  Specifically, Facebook objects to this Interrogatory on the basis that it seeks an overly broad and unduly burdensome volume of data, which presents not only practical limitations as to its analysis, delivery, and use, but is largely irrelevant.  The burdens of compiling such information outweigh the utility of the information.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 15**

(E)      Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information.  Responding fully to Plaintiffs' Interrogatory would require Facebook to conduct a broad investigation—including analyzing a large number of documents that have not yet been identified and produced and that may or may not be in Facebook's possession, custody, and control—to identify all Business Partners who were permitted to access information through a large number of APIs (many of which are unrelated to any live claim or defense) over the course of at least thirteen years and then provide detailed historical information about each of those APIs and how they were utilized.

(F)      Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to API calls, applications, and user data unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 15**

(G)     Facebook further objects to this Interrogatory on the ground that the Interrogatory seeks information not in Facebook's possession, custody, or control.

(H)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 78**:

With regard to the APIs Facebook's Integration Partners had access to, Facebook has provided a table below identifying, by Integration Partner, ███████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████. ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 15

With regard to Plaintiffs' request for over 10 years of monthly data regarding the number of API calls made, the volume of data returned, and the numbers of users whose data was accessed, Facebook continues to investigate what information it can produce in response to this request. Facebook is willing to meet and confer with Plaintiffs regarding what information is being sought by this Interrogatory, its relevance to Plaintiffs' claims (if any), and what relevant

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 15

and probative information is reasonably available to Facebook such that it is appropriate for

discovery in this case.

# EXHIBIT G

**BLEICHMAR FONTI & AULD LLP**
555 12th Street, Suite 1600
Oakland, CA 94607

**KELLER ROHRBACK LLP**
1201 Third Avenue
Seattle, WA 98101

January 22, 2021

VIA ECF
Hon. Jacqueline Scott Corley
United States District Court
Courtroom E – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

**UNREDACTED VERSION OF DOCUMENT
SOUGHT TO BE SEALED**

Re:     *In re Facebook, Inc. Consumer Privacy User Profile Litigation*,
        Northern District of California Case No. 3:18-md-02843-VC-JSC

Dear Judge Corley:

Plaintiffs submit this letter pursuant to the April 1, 2020 Stipulation and Order on Discovery Dispute Resolution Procedures asking the Court to order defendant Facebook, Inc. ("Facebook") to amend its responses to Plaintiffs' Fourth Set of Interrogatories. Specifically, Plaintiffs ask the Court to order Facebook to amend its responses concerning the company's "Business Partners" consistent with Judge Chabria's Order on the Motion to Dismiss ("Order") and this Court's Discovery Order No. 9.[1]

In his Order, Judge Chhabria identified four categories of actionable misconduct, the third of which was Facebook's practice of sharing user data with its Business Partners. Order at 24. On July 16, Plaintiffs issued their fourth set of interrogatories, which included interrogatories seeking the identities of the Business Partners with whom Facebook shared user data and information about the data shared. Montgomery Decl., Ex. A at 8 (Interrogatory Nos. 14 and 15). Facebook served its objections and responses on August 17, 2020. The parties then met and conferred regarding the definition of "Business Partners" and Plaintiffs clarified that its definition of "Business Partners" is meant to capture third parties with whom Facebook engaged in the third category of conduct Judge Chhabria found actionable. Ex. B. On November 20, 2020, Facebook amended its responses and objections, but in doing so construed "Business Partners" as limited to "integration partners and/or device manufacturers with whom Facebook has entered into agreements that have been and/or will be produced in response to Request for Production No. 24." Ex. C at 3. Plaintiffs sent Facebook a letter on December 7, 2020 requesting to meet and confer on the issue. The parties have since met and conferred a number of times but were unable to reach agreement. This motion follows.

Facebook should answer Plaintiffs' interrogatories consistent with Judge' Chhabria's Order, which states: "the alleged misconduct is relatively straightforward. The complaint alleges that Facebook shared information about its users with [a] non-exclusive list of business

---

[1] The parties also have unresolved disputes regarding two other definitions in Plaintiffs' interrogatories, but Plaintiffs could not address three separate disputes in a two-page letter brief. If the Court would like all three disputes presented at one time or in a different format, Plaintiffs will do as instructed.

partners, and that those companies in turn shared data with Facebook." Order at 8.  Consistent with this ruling, Facebook should identify the companies with which it shared user data and that in turn shared data with Facebook.  That would also comport with this Court's ruling that "[d]ata obtained from third parties regarding a user's off-platform activities" is relevant to Plaintiffs' claims.  Discovery Order No. 9 at 2.  If the data Facebook obtained from third parties is relevant, the identities of those third parties are relevant as well.

Facebook nonetheless resists this reasonable discovery. First, Facebook argues that Plaintiffs' definition of Business Partners in its initial interrogatories excluded third parties who engaged in data reciprocity with Facebook. Ex. C at 4.  In fact, Plaintiffs' initial interrogatories defined Business Partners as "third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems . . ." Ex. A at 4.  As Plaintiffs explained during the meet and confer process, the integration of Facebook refers to the reciprocal sharing of data as described in Judge Chhabria's Order on the Motion to Dismiss.  Ex. B.  Such clarification is one of the primary purposes of the meet and confer process.  *See Dairy v. Harry Shelton Livestock, LLC*, No. 18-CV-06357-RMI, 2020 WL 6269541, at *1 (N.D. Cal. Oct. 23, 2020) ("[T]he purpose of a meet and confer requirement is for the parties to engage in a meaningful dialogue about their respective positions on disputed issues to see whether they can resolve (or at least refine) the disputes without court intervention . . . .").  In any event, no reasonable interpretation of Plaintiffs' interrogatories or the Court's order would entitle Facebook to restrict its response to "integration partners and/or device manufacturers with whom Facebook has entered into agreements" as it has done.  Ex. C at 3.  Facebook cannot simply rewrite Plaintiffs' interrogatories to suit its purposes.

Facebook next argues that Plaintiffs' definition of Business Partners is inconsistent with the allegations in the Second Amended Consolidated Complaint ("SACC").  Ex. C at 4.  In fact, the SACC alleges in part, "Facebook formed Business Partnerships as early as 2007.  These partnerships were built in part on 'data reciprocity.'  Facebook and its partners agreed to exchange information about users' activities with each other.  This was not disclosed to users." SACC at ¶¶ 433-34.  These allegations are entirely consistent with Judge Chhabria's conduct-based description of Business Partners that Plaintiffs ask the Court to adopt here.[2]

After meeting and conferring with Facebook several times, Plaintiffs are still unsure what third parties Facebook seeks to exclude by restricting its responses to integration partners.  For their part, apps are excluded by the terms of the interrogatories. Ex. A at 8.  With regard to other third parties, the documents produced thus far show that Facebook worked with integration partners, device manufacturers, platform partners, mobile partners, messaging partners, marketing partners, agency partners, media partners, gaming partners, community partners, measurement partners, research partners, contact partners, strategic partners, managed partners, unmanaged partners, data partners, and API partners among others.  What is unclear is whether Facebook engaged with these or other third parties in the sort of data reciprocity that Judge Chhabria found actionable.  Plaintiffs respectfully request that the Court order Facebook to provide that information by amending its interrogatory responses to define Business Partners in accordance with Judge Chhabria's Order: third parties with whom Facebook shared information about its users such that those third parties in turn shared data with Facebook.

---

[2] The SACC also includes a list of Facebook's Business Partners which Facebook provided to Congress.  SACC at ¶ 431.  However, as Judge Chhabria noted, this list is "non-exclusive." Order at 8.  Plaintiffs' seek the identities of all of Facebook's Business Partners.

Dated: January 22, 2021                          Respectfully submitted,

KELLER ROHRBACK L.L.P.                           BLEICHMAR FONTI & AULD LLP

By:     */s/ Derek W. Loeser*                    By:     */s/ Lesley E. Weaver*
        Derek W. Loeser                                   Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)        Lesley E. Weaver (SBN 191305)
Cari Campen Laufenberg (admitted *pro hac vice*) Anne K. Davis (SBN 267909)
David Ko (admitted *pro hac vice*)               Matthew P. Montgomery (SBN
Benjamin Gould (SBN 250630)                      180196)
Adele A. Daniel (admitted *pro hac vice*)        Angelica M. Ornelas (SBN 285929)
1201 Third Avenue, Suite 3200                    Joshua D. Samra (SBN 313050)
Seattle, WA 98101                                555 12th Street, Suite 1600
Tel.: (206) 623-1900                             Oakland, CA 94607
Fax: (206) 623-3384                              Tel.: (415) 445-4003
dloeser@kellerrohrback.com                       Fax: (415) 445-4020
claufenberg@kellerrohrback.com                   lweaver@bfalaw.com
dko@kellerrohrback.com                           adavis@bfalaw.com
bgould@kellerrohrback.com                        mmontgomery@bfalaw.com
adaniel@kellerrohrback.com                       aornelas@bfalaw.com
                                                 jsamra@bfalaw.com
Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

# EXHIBIT H

1

2

3            UNITED STATES DISTRICT COURT

4          NORTHERN DISTRICT OF CALIFORNIA

5

6    IN RE: FACEBOOK, INC. CONSUMER            MDL No. 2843
                                               Case No.  18-md-02843-VC (JSC)
7    PRIVACY USER PROFILE LITIGATION

8                                              **ORDER RE: BUSINESS PARTNERS
                                               DISCOVERY DISPUTE**
9
                                               Dkt. Nos. 606, 607
10

11

12          This MDL matter has been assigned to this Court for management of discovery.  Now

13    pending before the Court are the Parties' letter briefs concerning the proper scope of discovery

14    related to one of the four actionable categories of potential liability in Judge Chhabria's Pretrial

15    Order No. 20.  (Dkt. No. 298.)  In brief, Judge Chhabria's Order identified the third of four

16    actionable categories of potential liability as: sharing sensitive user information with business

17    partners.  (*Id.* at 8.)  The Order adopted a conduct-based definition for these business partners and

18    included all third parties that Facebook shared information about its users with, so long as those

19    same third parties in turn shared user data with Facebook.  (*Id.*)  Discovery Order No. 9 also

20    clarified that the discoverable user data at issue included data Facebook obtained from third parties

21    regarding a user's off-Facebook activity.  (Dkt. No. 557.)

22          Plaintiffs now contend that Facebook is improperly narrowing the definition of business

23    partners in its response to Plaintiffs' interrogatories and ask the Court to order Facebook to amend

24    its responses to Plaintiffs' fourth set of interrogatory requests.  The interrogatories at issue request

25    Facebook "[i]dentify every Business Partner that had the ability to access the Not Generally

26    Available Content and Information of Facebook Users even if such Facebook Users had not

27    downloaded an App from that Business Partner and time period during which each such Business

28    Partner had that ability."  (Dkt. No. 606-2 at 4.)

United States District Court
Northern District of California

United States District Court
Northern District of California

Facebook served initial responses and objections on August 17, 2020, and thereafter, the Parties met and conferred, seeking a mutually agreed upon definition of business partners, which Plaintiffs originally defined in their interrogatory request as third parties with whom "Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems" and does not mention sharing user data. At the meet and confer meetings, Plaintiffs clarified that the integration of Facebook referenced in their interrogatory request referred to the reciprocal sharing of data between a third party and Facebook.

On November 20, 2020, Facebook amended its responses and objections, but in so doing, defined the business partners at issue as limited to "integration partners and/or device manufacturers with whom Facebook has entered into agreements that have been and/or will be produced in response to Request for Production No. 24." Facebook makes two arguments in support of its definition of the term business partners. First, Facebook confirms in its letter brief that its definition is "intended to capture all entities falling into the category of alleged misconduct described by [Judge Chhabria's] Order, and it is not withholding responsive information on the basis of some other, or narrower, definition." (Dkt. No. 607.) Second, Facebook contends there is no meaningful difference between its definition of business partners and Plaintiffs' original definition included in their first interrogatory request.

To resolve this issue, Facebook proposes the Court order the definition of business partners to be: "the entities described in the third category of business partner conduct identified in Pretrial Order 20, at pages 8–9." Plaintiffs propose the Court order the definition of business partners to be: "third parties with whom Facebook shared information about its users such that those third parties in turn shared data with Facebook." The Court fails to see any material difference between the Parties' definitions.

In response to the interrogatory request, Facebook shall identify all companies with which Facebook agreed to exchange information about users' activities with each other, regardless of whether such company is an "integration partner." If, as Facebook contends, it has already identified all such companies in response to the interrogatory request, then it shall so state to Plaintiffs in writing on or before February 4, 2021.

1    This Order disposes of Docket Nos. 606 and 607.

2    **IT IS SO ORDERED.**

3    Dated: February 1, 2021

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California

# EXHIBIT I

1    Derek W. Loeser (admitted *pro hac vice*)     Lesley Weaver (Cal. Bar No.191305)
     KELLER ROHRBACK L.L.P.                        BLEICHMAR FONTI & AULD LLP
2    1201 Third Avenue, Suite 3200                 555 12th Street, Suite 1600
     Seattle, WA 98101                             Oakland, CA 94607
3    Tel.: (206) 623-1900                          Tel.: (415) 445-4003
     Fax: (206) 623-3384                           Fax: (415) 445-4020
4    dloeser@kellerrohrback.com                    lweaver@bfalaw.com

5

6    *Plaintiffs' Co-Lead Counsel*

7    *Additional counsel listed on signature page*

8
                     **UNITED STATES DISTRICT COURT**
9                   **NORTHERN DISTRICT OF CALIFORNIA**
                       **SAN FRANCISCO DIVISION**
10

11
     IN RE: FACEBOOK, INC. CONSUMER              MDL No. 2843
12   PRIVACY USER PROFILE LITIGATION             Case No. 18-md-02843-VC-JSC

13
                                                 **MOTION TO COMPEL FACEBOOK TO**
14   This document relates to:                   **COMPLY WITH DISCOVERY**
                                                 **OBLIGATIONS RELATED TO**
     ALL ACTIONS                                 **"BUSINESS PARTNERS"**
15

16                                               Judge: Hon. Vince Chhabria
                                                 Hon. Jacqueline Scott Corley
17                                               Special Master Daniel Garrie
                                                 Courtroom: 4, 17th Floor
18
                                                 JAMS Ref. No.: 1200058674
19
                                                 ORAL ARGUMENT REQUESTED
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      PLAINTIFFS' SEPARATE STATEMENT ......................................................................1

II.     INTRODUCTION ........................................................................................................1

III.    RELEVANT BACKGROUND ........................................................................................1

IV.     ARGUMENT ...............................................................................................................5

    A.  The Evidence Demonstrates Facebook Is in Violation of the Order to Identify All Business Partners in Response to Interrogatories No. 14 and 15...................................5

    B.  Facebook's Failure to Fully Answer Interrogatories No. 14 and 15 Implicates Numerous Requests for Production .................................................................................7

    C.  Facebook Contends Judge Corley's Definition Is Incorrect but Did Not Move for Relief....................................................................................................................................8

V.      CONCLUSION ............................................................................................................9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.     PLAINTIFFS' SEPARATE STATEMENT

Pursuant to ¶ 6 of the Protocol for Resolving Discovery Disputes—Order No. 1, ECF No. 733, Plaintiffs' Separate Statement In Support of the Motion to Compel Facebook to Comply With Discovery Obligations related to "Business Partners" is provided at Attachment A.

## II.     INTRODUCTION

In his order resolving Facebook's motion to dismiss, Judge Chhabria credited Plaintiffs' allegations that "Facebook shared information about its users with [a] non-exclusive list of business partners, and that these companies in turn shared data with Facebook. 'These partnerships,' the complaint alleges, 'were built on data reciprocity.' Facebook and its partners agreed to exchange information about users' activities with each other." Dkt. No. 298 at 8.

On February 1, 2021, Judge Corley resolved the question of whether Facebook could unilaterally narrow the scope of discovery into Facebook's business partners to just integration partners and device manufacturers. She held that it could not. Instead, Judge Corley ordered Facebook to identify "all companies with which Facebook agreed to exchange information about users' activities with each other." And she ordered Facebook to tell Plaintiffs in writing if it had identified all companies within that category. On February 4, 2021, Facebook stood on its verified interrogatory responses, stating it had identified all such partners. It had not.

Facebook's discovery responses on this issue do not square with the evidence procured to date. Facebook's corporate designees named specific companies and categories of partners that Facebook did not identify. Despite multiple conversations, Facebook's lawyers stand firm on the limitation they have imposed.

Facebook should be required to immediately amend its interrogatory responses to comply with the Court's order, and to produce documents responsive to discovery that were not produced because Facebook applied a different definition than the Court's.

## III.     RELEVANT BACKGROUND

Judge Chhabria upheld ten claims related to Facebook's sharing of user information with "business partners," which he characterized as being "'built in part on 'data reciprocity.'" *See* Dkt. No. 298 at 8-9 (summarizing business partner allegations), 30-32 (public disclosure of

private facts), 32-33 (intrusion on private affairs and violation of the constitutional right to privacy), 33-34 (Stored Communications Act), 34-35 (Video Privacy Protection Act), 35-36 (negligence and gross negligence), 37-38 (deceit by concealment or omission), 38-40 (breach of contract), 40-41 (breach of the implied covenant of good faith and fair dealing), 41 (unjust enrichment).

Plaintiffs served discovery seeking to identify, as a threshold matter, Facebook's business partners and the information it provided them. Interrogatory No. 14 requests that Facebook identify each business partner that could access certain defined categories of data from users who had not downloaded the business partner's app. Ex. A. Interrogatory No. 15 requests that, for each business partner identified in Interrogatory No. 14, Facebook provide specific details about APIs or other data transfer tools by which the business partner accessed those categories of data. *Id.* Plaintiffs' Requests for Production Nos. 47-49, 68 seek the production of documents specifically concerning "Business Partners." Ex. B. And Plaintiffs' Requests for Production Nos. 6-7, 11-13, 18, 20-21, 24, 26-31, 34, 37, 43, 55-56, 63-64, and 72-73 request information related to "Third Parties," which is defined to include "Business Partners." Ex. C.

The parties have a long-standing dispute regarding the definition of business partners that applies to Plaintiffs' interrogatories and document requests. Plaintiffs served Interrogatories No. 14 and 15 on July 16, 2020. Facebook served its responses and objections on August 17, 2020, including responses and objections to Interrogatories No. 14 and 15. Ex. A; *see* Ex. D (excerpt of Facebook's Responses and Objections to Plaintiffs' Third Set of Requests for Production, similarly limiting the definition of business partners). The parties conferred twice weekly over the several few months about a series of disputes related to Facebook's responses and objections, including Facebook's narrowing of the definition of the term business partners. The issue reached impasse.

On January 22, 2021, Plaintiffs filed a discovery dispute letter moving the Court to order Facebook to answer Plaintiffs' Interrogatories No. 14 and 15 consistent with Judge Chhabria's motion to dismiss order: "'The complaint alleges that Facebook shared information about its users

1  with [a] non-exclusive list of business partners, and that those companies in turn shared data with

2  Facebook.'" Ex. E  at 1-2 (quoting Dkt. No. 298 at 8). On January 27, 2021, Facebook filed its

3  opposition to Plaintiffs' motion, in which it contended the proper definition was "'the third parties

4  with whom Facebook partnered to develop and integrate Facebook on a variety of devices and

5  operating systems.'" Ex. F at 1.

6      On February 1, 2021, the Court issued an order resolving the dispute over the definition of

7  business partners. Judge Corley held that business partners shall be construed to mean "all

8  companies with which Facebook agreed to exchange information about users' activities with each

9  other, regardless of whether such company is an 'integration partner.'" Ex. G at 2. She further

10  ordered that if Facebook's response to Interrogatory No. 14 already identifies all such companies,

11  it shall confirm the response as complete in writing by February 4, 2021. *Id.* On February 4, 2021,

12  Facebook stated that Facebook had identified all such companies.

13      On February 23 and 24, 2021, Plaintiffs deposed Facebook's corporate designees on a

14  limited set of topics pursuant to separate orders issued by Judge Corley. One of the designees

15  testified that Facebook's data partners, also known as data brokers, provided data to and received

16  data from Facebook. Specifically, she testified that:

17  • ███████████████████████████████, Ex. H at 183:23-184:16;

18  • ███████████████████████████████████████████████████

19    *id.* at 200:14-16;

20  • ███████████████████████████████, *id.* at 201:12-24;

21  • █████████████████████████████████████, *id.* at 203:3-207:13; and

22  • ██████████████████████████████████████████████████

23    ████████, *id.* at 183:23-184:5.

24  █████████████████████████████████████████████

25  █████████████████. *See* Ex. A..

26      The other designee also testified ███████████████████████

27  █████████████████████████████████████████████████████

28

1

2

3

4                                                        Ex. I at 25:14-26:16.

5           On March 4, 2021, Plaintiffs wrote to Facebook and asked that it amend its responses to

6   Interrogatories No. 14 and 15 to conform to Judge Corley's definition of business partners by

7   identifying "*all* responsive entities from whom Facebook received and provided user information,

8   regardless whether they are specifically identified or fall into one of the categories" identified by

9   its designees' testimony or other documents, which were cited in the letter. Ex. J; *see* Ex. K

10

11

12                                                                                      The letter

13  noted, "Because the examples are not exhaustive, you should not read them to somehow limit

14  your response to the entities identified in the documents and testimony referenced herein." Ex. J

15  at n.2. On March 29, 2021, Plaintiffs wrote to Facebook asking for a response to their March 4,

16  2021 letter. Ex M.

17          On April 1, 2021, Facebook refused to conform its discovery responses, setting aside the

18  testimony of its own corporate designees. Ex. N at 6-9. It asserted that Judge Corley's order was

19  not "intended to open the door to such wide-ranging and irrelevant inquiries." *Id.* at 10. And it

20  reasserted that the responses it provided *before* Judge Corley resolved the parties' dispute over

21  the definition of business partners were nevertheless complete "to the best of our knowledge and

22  consistent with Judge Corley's Discovery Order with Respect to Business Partners." *Id.* Plaintiffs

23  raised the dispute numerous times during the parties' discovery mediation efforts. On September

24  17, 2021, the Special Master declared that the parties were at impasse.

25

26

27

28

1

## IV.    ARGUMENT

2

### A.    The Evidence Demonstrates Facebook Is in Violation of the Order to Identify All Business Partners in Response to Interrogatories No. 14 and 15

3    Judge Corley ordered that the definition of business partners include "Facebook shall

4    identify all companies with which Facebook agreed to exchange information about users'

5    activities with each other, regardless of whether such company is an "integration partner." Ex. G

6    at 2. Documents and testimony demonstrate that Facebook's response to Interrogatory No. 14

7    remains incomplete. Because Interrogatory No. 15 asks for detailed information about each entity

8    identified in response to Interrogatory No. 14, Facebook's response to Interrogatory No. 15 also

9    remains incomplete.

10    Interrogatory No. 14 asks Facebook to "[i]dentify every Business Partner that had the

11    ability to access the Not Generally Available Content and Information of Facebook Users even if

12    such Facebook Users had not downloaded an App from that Business Partner and the time Period

13    during which each such Business Partner had that ability." Ex. O. ("Not Generally Available

14    Content and Information" referred to any content and information to which a user had limited

15    access. *Id.* at 6.) There are three problems with Facebook's response to this Interrogatory.

16    First, Facebook's response omits data brokers. The designee's sworn testimony provides

17    that ████████████████████████████████████████████████████████████

18    ████████████████████████████████████████████████. *Supra*, § III. In

19    its April 1, 2021 letter, Facebook criticized Plaintiffs' "selective quoting" of its designee's

20    testimony. Ex. N at 9 n.9. Specifically, while Facebook acknowledges it purchased user data from

21    data brokers, it denies Plaintiffs' understanding of the testimony that it also provided user data to

22    them. But Plaintiffs' understanding of the testimony is supported by other evidence.

23    For example, ████████████████████████████████████████████

24    ████████████████████████████████████████

25    ████████████████████████████████████████████████

26    ████████████████. *E.g.*, Ex. L. Further, ████████████████

27    ████████████████████████████████████████

28

1    ██████████████████████████████. *See* Ex. Qat 11 ████████████████████████████

2    ████████████████████████████████████ This evidence supports the conclusion that

3    Facebook did not just receive user information from data brokers, but also it to them. Yet

4    Facebook's response to Interrogatory No. 14 does not identify any data brokers.

5         Second, evidence demonstrates that Facebook exchanged not generally available user

6    information with many other third parties. For example, ████████████████████████████

7    ████████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████████

14   ██ Ex. R at 4292-4293 (emphasis added). This statement necessarily implies that ████████

15   ████████████████████████████████████████████.

16        Similarly, a November 2012 email string explained that ████████████████████

17   ████████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████

19   ██████ Ex. S at 3305. The email continues: ██████████████████████████████

20   ████████████████████████████████████████████████████████████████████

21   ██████████████████████ *Id.* (emphasis added). Once again, this statement indicates that

22   ████████████████████████████████████████████████. These partners are

23   therefore within Judge Corley's definition of business partners.

24        If such information included information about users who had not downloaded the ████████

25   ████████ apps, those apps must be identified in response to Interrogatory No. 14. For example,

26   if ████████████████ could access the content and information about Facebook users

27   who had not downloaded their apps, they fit the business partner definition. Since many ████████

28

1   ████████   users interacted with the listed entities only via internet browsers, and hence had not

2   actually downloaded apps from those entities, Facebook almost certainly provided the ████████

3   ████████   with information for Facebook users that had not downloaded the app. And other of

4   Facebook's interrogatory responses demonstrate that ████████████████████████████

5   ████████████████████████████████████████████████████████████████

6   ████████████   *See* Ex. T at 378 ████████████████████████████████████

7   ████████████████████████████████████.

8          Third, other documents reveal still other types of business partners. A 2014 document

9   ████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████

11  ████████████████████████████████████   Ex. U at 3433-3434. This is the behavior that

12  Judge Corley identified as defining a business partner. Again, if Facebook provided any such

13  apps with not generally available content and information about users who did not download the

14  app, those apps should be identified in response to Interrogatory No. 14.

15         To be clear, the documents above are mere examples. It is not Plaintiffs' duty to answer

16  the interrogatories they served on Facebook. These examples and Facebook's testimony

17  demonstrate that it still has not responded fully to Interrogatories No. 14 and 15. The Special

18  Master should order it to do so.

      **B.**    **Facebook's Failure to Fully Answer Interrogatories No. 14 and 15 Implicates**
19                  **Numerous Requests for Production**

20
       Plaintiffs' requests for production, like their interrogatories, use the term business
21
partners. There is no reason for the term to be defined differently in the two contexts. Facebook's
22
failure to comply with Judge Corley's order by amending its responses to Interrogatories No. 14
23
and 15 therefore indicates that Facebook's production in response to Plaintiffs' requests for
24
production may be similarly incomplete.
25
       Requests for Production No. 7-49, 68 seek the production of documents specifically
26
related to "Business Partners." Requests for Production No. 6-7, 11-13, 18, 20-21, 24, 26-31, 34,
27
37, 43, 55-56, 63-64, and 72-73 requesting information related to "Third Parties," which is
28

1  defined in the introduction to the requests to include "Business Partners." As the Special Master

2  is aware, Plaintiffs are concerned that Facebook's limited view of relevance has improperly

3  narrowed its document production. In this specific dispute, Plaintiffs are concerned that Facebook

4  has used an improperly narrow definition of business partners and that, as a result, documents that

5  should have been produced were culled as not relevant. The Special Master should order

6  Facebook to supplement its document production with any documents not produced due to

7  Facebook's improperly narrow definition of business partners.

8        **C.**    **Facebook Contends Judge Corley's Definition Is Incorrect but Did Not Move for Relief**

9

10        Plaintiffs' understanding of Facebook's position on Judge Corley's definition of business

11  partners is drawn from a letter it sent on April 1, 2021. In that letter, Facebook asserted that

12  Plaintiffs sought to unwind more than three years of litigation, multiple court orders, and

13  Plaintiffs' own allegations and discovery requests. Ex. N at 6-7. Plaintiffs have no such intent.

14  Rather, their intent is to procure discovery responses consistent with the definition provided in an

15  order entered by a U.S. Magistrate Judge.

16        If Facebook believed Judge Corley's definition to be wrong, the proper recourse would

17  have been to file an objection pursuant to Federal. Rule of Civil Procedure 72(a), 28 U.S.C.

18

19  § 636(b)(1)(A), and Civil Local Rule 72-2. Rule 72(a) requires a party file any such objection

20  within 14 days after it is served with a copy of a written order stating the decision and "'[a] party

21  may not assign as error a defect in the order not timely objected to.'" *In re Application of AIS*

22  *GmbH Aachen Innovative Solutions & Abiomed Europe GmbH*, 2017 WL 3115228, at *4 (N.D.

23  Cal. July 21, 2017). Judge Corley's order issued February 1, 2021. Ex. G. More than 14 days

24  have passed. Facebook's time to object has long-since expired.

25

26

27

28

1

**V.    CONCLUSION**

2

Plaintiffs ask the Special Master to compel Facebook to provide discovery responses that

3

comply with Judge Corley's order defining business partners as "all companies with which

4

Facebook agreed to exchange information about users' activities with each other."

5

6

Dated: September 27, 2021                              Respectfully submitted,

7

KELLER ROHRBACK L.L.P.                                 BLEICHMAR FONTI & AULD LLP

8

By:      */s/ Derek W. Loeser*                         By:     */s/ Lesley E. Weaver*
        Derek W. Loeser                                    Lesley E. Weaver

9

10

Derek W. Loeser (admitted *pro hac vice*)              Lesley E. Weaver (SBN 191305)
Cari Campen Laufenberg (admitted *pro hac vice*)       Anne K. Davis (SBN 267909)
David Ko (admitted *pro hac vice*)                     Matthew S. Melamed (SBN 260272)

11

Adele A. Daniel (admitted *pro hac vice*)              Angelica M. Ornelas (SBN 285929)
Benjamin Gould (SBN 250630)                            Joshua D. Samra (SBN 313050)

12

1201 Third Avenue, Suite 3200                          555 12th Street, Suite 1600
Seattle, WA 98101                                      Oakland, CA 94607

13

Tel.: (206) 623-1900                                   Tel.: (415) 445-4003
Fax: (206) 623-3384                                    Fax: (415) 445-4020

14

dloeser@kellerrohrback.com                             lweaver@bfalaw.com
claufenberg@kellerrohrback.com                         adavis@bfalaw.com

15

dko@kellerrohrback.com                                 mmelamed@bfalaw.com
adaniel@kellerrohrback.com                             aornelas@bfalaw.com

16

bgould@kellerrohrback.com                              jsamra@bfalaw.com

17

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301

18

Santa Barbara, CA 93101
Tel.: (805) 456-1496

19

Fax: (805) 456-1497
cspringer@kellerrohrback.com

20

21

*Plaintiffs' Co-Lead Counsel*

22

23

24

25

26

27

28

# ATTACHMENT A

**PLAINTIFFS' SEPARATE STATEMENT**
**ISO MOTION TO COMPEL FACEBOOK TO COMPLY WITH DISCOVERY OBLIGATIONS RELATED TO**
**"BUSINESS PARTNERS"**

| Written Discovery | Discovery Response | Relevant History | Opposition | Executive Summary |
|---|---|---|---|---|
| Interrogatory No. 14 requests that Facebook identify each business partner that could access certain defined categories of data from users who had not downloaded the business partner's app. Weaver Decl., Ex. O.<br><br>Interrogatory No. 15 requests that, for each business partner identified in Interrogatory No. 14, Facebook provide specific details about APIs or other data transfer tools by which the business partner accessed those categories of data. Weaver Decl., Ex. A.<br><br>Requests for Production No. 47-49 and 68 seek the production of | Facebook served its responses and objections on 8/17/20, including responses and objections to Interrogatory No. 14 and responses to Interrogatory No. 15 based on the response to Interrogatory No. 14. Weaver Decl., Ex. A.<br><br>Facebook also served responses and objections to Plaintiffs' Requests for Production similarly limiting the definition of business partners. *E.g.*, Weaver Decl., Ex. D.<br><br>On 2/4/21, Facebook stood on its verified interrogatory responses. | 8/18/2020 and thereafter: The parties met and conferred repeatedly regarding Facebook's responses and objections, including Facebook's narrowing of the definition of the term business partners.<br><br>1/22/21: Plaintiffs moved the Court to order Facebook to answer Plaintiffs' Interrogatories No. 14 and 15 consistent with Judge Chhabria's motion to dismiss order.<br><br>1/27/21: Facebook opposed Plaintiffs' motion.<br><br>2/1/21: The Court issued an Order re: Business Partners | From correspondence and statement of Facebook's counsel, Plaintiffs' understand that Facebook contends its interrogatory responses (and production of documents responsive to requests related to business partners) are complete.<br><br>Plaintiffs also understand that Facebook contends that its corporate designees' testimony does not support Plaintiffs assertion that Facebook has failed to identify all of its business partners pursuant to the Court's 2/1/21 Order.<br><br>Plaintiffs also understand that Facebook contends the | Judge Corley ordered "Facebook shall identify all companies with which Facebook agreed to exchange information about users' activities with each other, regardless of whether such company is an "integration partner." Dkt. No. 608 at 2.<br><br>Facebook's discovery responses omit business partners identified in the evidence procured to date. Facebook's corporate designees named specific companies and categories of partners that Facebook did not identify. Facebook has also produced documents identifying other third parties with which Facebook exchanged user |

| Written Discovery | Discovery Response | Relevant History | Opposition | Executive Summary |
|---|---|---|---|---|
| documents concerning business partners. Weaver Decl., Ex. B.

Requests for Production No. 6-7, 11-13, 18, 20-21, 24, 26-31, 34, 37, 43, 55-56, 63-64, and 72-73 request information related to "Third Parties," which is defined to include business partners. Weaver Decl., Exs. C. | | Discovery Dispute, Dkt. No. 608.

2/23/21-2/24/21: Plaintiffs deposed Facebook's corporate designees, during which Facebook's designees testified regarding categories of partners.

3/4/21: Plaintiffs asked Facebook to amend its responses to Interrogatories No. 14 and 15 to conform to Judge Corley's definition of business partners.

4/1/21: Facebook reasserted that the responses it provided before Judge Corley resolved the parties' dispute over the definition of business partners were nevertheless complete "to the best of our knowledge and consistent with Judge | Court's definition improperly expands the scope of discoverable information. | information that are omitted from the discovery responses.

Despite multiple conversations, Facebook stands firm on its incomplete responses. On one hand, it asserts that the responses are complete. On the other, it asserts that the plain language of the Court's definition would improperly expand the scope of discovery.

Facebook should be required to immediately amend its interrogatory responses to comply with the Court's order, and to produce documents responsive to discovery that were not produced because Facebook applied a different definition than the Court's. |

| Written Discovery | Discovery Response | Relevant History | Opposition | Executive Summary |
|---|---|---|---|---|
| | | Corley's Discovery Order with Respect to Business Partners." | | |
| | | Plaintiffs raised the dispute numerous times during the parties' discovery mediation efforts. | | |
| | | 9/17/21: The Discovery Mediators declare impasse. | | |

# EXHIBIT J

1

2   GIBSON, DUNN & CRUTCHER LLP          GIBSON, DUNN & CRUTCHER LLP
    Orin Snyder (*pro hac vice*)          Deborah Stein (SBN 224570)
3      osnyder@gibsondunn.com                dstein@gibsondunn.com
    200 Park Avenue                      333 South Grand Avenue
4   New York, NY 10166-0193              Los Angeles, CA 90071-3197
    Telephone:  212.351.4000             Telephone:  213.229.7000
5   Facsimile:  212.351.4035             Facsimile:  213.229.7520

6   Kristin A. Linsley (SBN 154148)      Joshua S. Lipshutz (SBN 242557)
       klinsley@gibsondunn.com              jlipshutz@gibsondunn.com
7   Martie Kutscher (SBN 302650)         1050 Connecticut Avenue, N.W.
       mkutscherclark@gibsondunn.com     Washington, DC 20036-5306
8   555 Mission Street, Suite 3000       Telephone:  202.955.8500
    San Francisco, CA 94105-0921         Facsimile:  202.467.0539
9   Telephone:  415.393.8200
    Facsimile:  415.393.8306

10  *Attorneys for Defendant Facebook, Inc.*

11

12                      **UNITED STATES DISTRICT COURT**
                      **NORTHERN DISTRICT OF CALIFORNIA**
13                         **SAN FRANCISCO DIVISION**

14

15  IN RE: FACEBOOK, INC. CONSUMER          MDL NO. 2843
    PRIVACY USER PROFILE LITIGATION         CASE NO. 3:18-MD-02843-VC-JSC
16
                                            **FACEBOOK'S OPPOSITION TO**
17  This document relates to:               **PLAINTIFFS' MOTION TO COMPEL**
                                            **DISCOVERY RELATED TO "BUSINESS**
    ALL ACTIONS                             **PARTNERS"**
18
                                            Judge: Hon. Vince Chhabria
19                                          Hon. Jacqueline Scott Corley
                                            Special Master Daniel Garrie
20                                          Courtroom: 4, 17th Floor

21                                          JAMS Ref. No.: 1200058674

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2
<u>PAGE</u>

3  I.  INTRODUCTION ..................................................................................................... 1

4  II.  BACKGROUND ...................................................................................................... 2

5  a.  Plaintiffs serve discovery seeking information about "business partners." ................. 2

6  b.  Plaintiffs disagree with Facebook's definition of "business partners." ....................... 4

7  c.  Plaintiffs seek to expand the definition of "business partners." .................................. 5

8  III.  ARGUMENT ........................................................................................................... 5

9  a.  Facebook complied with Plaintiffs' interrogatories. ................................................... 6

10  b.  The entities Plaintiffs describe are not responsive to their requests. .......................... 6

11  c.  Facebook could not truthfully amend its responses as Plaintiffs demand. .................. 9

12  d.  Plaintiffs' new take on "business partners" cannot be reconciled with the complaint or Judge Chhabria's motion-to-dismiss order. ........................................... 10

13

14  e.  The information Plaintiffs now seek is inconsistent with the complaint. ................... 11

15  f.  Judge Chhabria confined the case to four specific categories of allegations. ............ 12

16  g.  Judge Corley did not and could not expand the scope of the case. ............................ 13

17  h.  Plaintiffs' remaining arguments are not properly before the Special Master. ........... 14

18  IV.  CONCLUSION ....................................................................................................... 15

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn & Crutcher LLP

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**CASES**

4

*In re Ashworth, Inc. Sec. Litig.*,
2002 WL 33009225 (S.D. Cal. May 10, 2002) ............................................13

5

*Barnes v. Harling*,
2017 WL 4157383 (W.D.N.Y. Sept. 18, 2017) ...........................................9

6

7

*Brown v. Stroud*,
2010 WL 3339524 (N.D. Cal. Aug. 24, 2010) ...........................................13

8

*FootBalance Sys. Inc. v. Zero Gravity Inside, Inc.*,
2018 WL 722834 (S.D. Cal. Feb. 5, 2018) ...............................................9

9

10

*Gorrell v. Sneath*,
292 F.R.D. 629 (E.D. Cal. 2013) .............................................................6

11

*Guth v. Minnesota Min. & Mfg. Co.*,
72 F.2d 385 (7th Cir. 1934) ...................................................................9

12

13

*Hasan v. Johnson*,
2012 WL 569370 (E.D. Cal. Feb. 21, 2012) ..............................................6

14

*Heilman v. Silva*,
2015 WL 1632693 (S.D. Cal. Apr. 13, 2015) ...........................................6

15

16

*Hupp v. San Diego Cnty.*,
2014 WL 1404510 (S.D. Cal. Apr. 10, 2014) ...........................................6

17

18

*Lunn v. Smith*,
2019 WL 569828 (D. Mass. Feb. 12, 2019) ..............................................9

19

*Noble v. Adams*,
2006 WL 3028543 (E.D. Cal. Oct. 24, 2006) ...........................................9

20

21

*OMG Fid. Inc. v. Sirius Tech*.
2007 WL 1994230 (N.D. Cal. July 5, 2007) .............................................13

22

23

*In re Remec, Inc. Sec. Litig.*,
2008 WL 11338404 (S.D. Cal. Oct. 24, 2008) ..........................................9

24

*Rund v. Charter Commc'ns, Inc.*,
319 F. App'x 465 (9th Cir. 2008) ...........................................................14

25

26

*Scheffler v. Molin*,
2012 WL 3292894 (D. Minn. Aug. 10, 2012) .........................................9, 10

27

28

Gibson, Dunn &
Crutcher LLP

*Shuckett v. Dialamerica Mktg.*,
  2018 WL 4350123 (S.D. Cal. Sept. 10, 2018) .................................................................13

*Tapia v. Huntington Park Police Dep't*,
  2010 WL 11549657 (C.D. Cal. May 5, 2010) .................................................................9

*Thompson v. City of Shasta Lake*,
  314 F. Supp. 2d 1017 (E.D. Cal. 2004).........................................................................14

*United Nat. Ins. Co. v. Spectrum Worldwide, Inc.*,
  555 F.3d 772 (9th Cir. 2009)............................................................................................8

**RULES**

Local Rule 37-2 ................................................................................................................6

Gibson, Dunn &
Crutcher LLP

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY RELATED TO "BUSINESS PARTNERS"
CASE NO. 3:18-MD-02843-VC-JSC

## I.     INTRODUCTION

Plaintiffs' motion presents a classic bait-and-switch.   In July 2020, Plaintiffs served interrogatories seeking information about certain "Business Partners," which they defined as "the third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems."  This tracked with the narrow theory in their complaint that Facebook failed to disclose "business partners" with which it worked to make Facebook available on early smartphones and other platforms.  Facebook provided that discovery in verified responses that span nearly 200 pages.  Facebook's responses include everything from mobile device manufacturers to car companies, and even makers of accessibility software and fitness trackers.  Facebook has repeatedly confirmed that it is not withholding any information responsive to Plaintiffs' requests.

Plaintiffs now demand *additional* information that is plainly nonresponsive to their interrogatories.  They ask the Special Master to compel Facebook to amend its responses to include entities that are not at issue, including "data brokers," "advertisers," and numerous other entities.  As a threshold matter, this case is not about Facebook's business relationships writ large, and certainly is not about "data brokers," "advertisers," or the like.  This is why Plaintiffs' interrogatories originally did not seek information about these parties, none of which partnered with Facebook "to develop and integrate Facebook on . . . devices [or] operating systems"—the only types of partnerships that are relevant to this case.  Ex. L at 4.[1]  Courts routinely hold that parties can only be ordered to answer interrogatories—not to provide the answers an adversary wants.  Indeed, it would be impossible for Facebook to verify the sort of responses Plaintiffs seek, because Facebook cannot truthfully attest that the entities Plaintiffs now seek information about are responsive to what their requests asked for.

At any point in the 16 months since Plaintiffs served the requests at issue, they could have served new ones requesting the information they now seek.  They did not, and the reason is obvious.  Plaintiffs' new gloss on "business partners" sweeps far beyond the scope of the case Judge Chhabria allowed and even beyond the complaint—both of which make clear that the "business partners" at issue in this case are entities to which Facebook outsourced "the time, labor, and money required to build Facebook's Platform on different devices and operating systems."  Ex. F at 8 (quoting FACC ¶ 486).

---

[1]  Unless otherwise noted, exhibit citations refer to the exhibits to the accompanying Declaration of Martie Kutscher.

"Data brokers," "advertisers," and the other entities Plaintiffs now demand are in another galaxy; they do not remotely fit that description.  In fact, Plaintiffs made *different* allegations relating to these entities, and Judge Chhabria did not allow those allegations to move forward.  *See, e.g.*, Ex. F at 5–6 (rejecting allegations about "targeted advertising" and "psychographic marketing").

To justify their attempt to obtain information they did not and could not request, Plaintiffs take the mystifying position that a 3-page discovery order—in which Judge Corley saw no daylight between the parties' definitions of "business partners"—expanded Plaintiffs' interrogatories.  This reading is implausible on its face and becomes even less believable upon closer inspection.  Nor do Plaintiffs stop with their transformation of the interrogatories.  Swinging for the fences, Plaintiffs seek to parlay Judge Corley's 3-page order about two interrogatories into an expansion of the entire case, serving up belated objections to materials Facebook agreed to produce *years ago* in response to more than 20 requests for production that also used the term "business partners" or the more general term "third parties."

Plaintiffs' motion should be seen for what it is: a naked and opportunistic attempt to mischaracterize a routine discovery order in a way that will "expand the case" and reach areas Plaintiffs have long sought—unsuccessfully—to reach.  The motion should be denied.

## II.    BACKGROUND

### a.   Plaintiffs serve discovery seeking information about "business partners."

Judge Chhabria's order on Facebook's motion to dismiss defines the scope of this case.  Faced with Plaintiffs' 400-page, kitchen-sink complaint, Judge Chhabria rejected their attempt to "identify anything Facebook has ever been reported to have done wrong."  Ex. F at 5.  He wrote, "the presence of so many disparate and vague allegations makes it nearly impossible for Facebook to meaningfully respond to all of them."  *Id.* at 5–6.  Plaintiffs' allegations about so-called "psychographic marketing," for example, were "scattered throughout the complaint . . . without any meaningful explanation of the legal or factual difference between psychographic marketing and targeted advertising (the latter of which the plaintiffs appear to concede is perfectly legitimate)."  *Id.*  To focus this case, avoid "many more rounds of motions to dismiss," and provide certainty as to the allegations Facebook must defend, Judge Chhabria winnowed the case to "four categories" of allegations: friend sharing, whitelisting, "business partners," and enforcement.  *See id.* at 6–9.  Only those four categories would move forward;

Gibson, Dunn & Crutcher LLP

2

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY RELATED TO "BUSINESS PARTNERS"
CASE NO. 3:18-MD-02843-VC-JSC

all of the other allegations "sprinkle[d]" throughout Plaintiffs' complaint, including allegations about "psychographic marketing" and "targeted advertising," were dismissed or stayed. *Id.* at 5–6. Those boundaries also define the bounds of discovery. *See* Dkt. 557 (discovery on stayed claims is stayed).

Plaintiffs' motion to compel concerns the third category of allegations, "business partners," which Judge Chhabria described by reference to Plaintiffs' own allegations: "plaintiffs allege that Facebook outsourced to business partners 'the time, labor, and money required to build Facebook's Platform on different devices and operating systems.'" Ex. F at 8. As examples, he pointed to a list of companies that "came from Facebook itself, which asserted that it had 'integration partnerships' with these companies in a letter to the Energy and Commerce Committee of the U.S. House of Representatives." *Id.*; *see also* Ex. C at 18–22. These now-defunct partnerships came from Facebook's early days when it was trying to expand its availability across devices and platforms.

Immediately after discovery opened in November 2019, Plaintiffs served their Second Set of Requests for Production.[2] Request for Production 24 requested "[d]ocuments sufficient to identify all Third Parties to which Facebook granted access to Users' Content and Information not generally available through Platform pursuant to partnerships or agreements between Facebook and those Third Parties." Ex. G at 15. Plaintiffs defined "Third Parties" to include "Business Partners . . . as th[e] term[ is] used in the [complaint]." *Id.* at 10. Consistent with Plaintiffs' allegations and the limitations imposed by Judge Chhabria, Facebook said it would produce "final agreements with integration partners and device manufacturers responsive to this Request." Ex. H at 28. Plaintiffs did not object.

Six months later, Plaintiffs served their Third Set of Requests for Production, which also asked for documents about "business partners" and defined them as "the third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems." Ex. I at 4.

Then, in July 2020, Plaintiffs served their Fourth Set of Interrogatories. Interrogatories 14 and 15 asked for additional information about certain "Business Partners," which Plaintiffs *again* defined to mean "the third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems." Ex. L at 4, 8–9. Interrogatory 14 asked Facebook to identify

---

[2] Judge Chhabria allowed Plaintiffs to serve an initial set of requests for production before discovery formally opened to assist in crafting their consolidated complaint.

a subset of "Business Partners"—ones that "had the ability to access the Not Generally Available Content and Information of Facebook Users even if such Facebook Users had not downloaded an App from that Business Partner." *Id.* at 8. "Not Generally Available Content and Information," in turn, was defined to mean "a Facebook User's Content and Information to which that Facebook User has restricted access such that the only Facebook Users who may access that Content and Information are the Facebook User's Friends or another limited audience." *Id.* at 6. Interrogatory 15 asked for additional information about the same entities. *Id.* at 8.

To avoid any ambiguity as to the partners Facebook was identifying in its sworn responses, Facebook clarified that it would "construe 'Business Partners' as referring to the integration partners and/or device manufacturers with whom Facebook has entered into agreements that have been and/or will be produced in response to [RFP] 24." Ex. N at 2–3. Facebook did not expect this to be controversial, given that the parties had long been operating under this definition without issue.

**b. Plaintiffs disagree with Facebook's definition of "business partners."**

In discussions with Facebook and then in a letter brief to Judge Corley, Plaintiffs disagreed with Facebook's clarification of the term "business partners" in its interrogatory responses. Plaintiffs argued that "business partners" were not limited to "integration partners and/or device manufacturers with whom Facebook has entered into agreements [produced in response to Request for Production 24]." Later, in a two-page letter brief to Judge Corley, Plaintiffs stated that they were "unsure what third parties Facebook seeks to exclude by restricting its responses to integration partners." Ex. Q at 2.

Plaintiffs also stated in their brief that Facebook "should answer Plaintiffs' interrogatories consistent with Judge' [sic] Chhabria's Order" on the motion to dismiss. *Id.* at 1. Given that acknowledgment, Facebook noted that the issue "could have been easily resolved through a simple conversation" because "[t]here is no meaningful daylight between the 'Business Partners' definition in Plaintiffs' Interrogatories and the definition in Facebook's response," which was simply intended to add clarity. Ex. R at 1 (citation omitted). In fact, "[h]ad Plaintiffs asked before filing their letter brief, Facebook would have confirmed the definition Facebook provided [wa]s intended to track and capture all entities falling into the third category of business partner conduct described in [Judge Chhabria's order] and that it is not withholding any relevant or responsive information based on its definition." *Id.*

4

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY RELATED TO "BUSINESS PARTNERS"
CASE NO. 3:18-MD-02843-VC-JSC

Gibson, Dunn &
Crutcher LLP

Judge Corley agreed in a short order.  She "fail[ed] to see any material difference between the Parties' definitions."  Ex. S at 2.  But given Plaintiffs' confusion over the term "integration partners," she made clear that Judge Chhabria's "conduct-based definition" from the motion-to-dismiss order governed, *id.* at 1, not the label "integration partners."  Judge Corley therefore reiterated that Facebook should provide all information responsive to Interrogatories 14 and 15 with respect to "companies with which Facebook agreed to exchange information about users' activities with each other, regardless of whether such company is an 'integration partner,'" or else "state to Plaintiffs in writing" that it had already done so.  *Id.* at 2.  On February 4, 2021, Facebook confirmed to Plaintiffs that it had already identified all such entities "responsive to Interrogatories 14 and 15 of which it is aware."  Ex. T.

### c.   Plaintiffs seek to expand the definition of "business partners."

One month later, Plaintiffs wrote a letter to Facebook requesting updated responses "in light of recent 30(b)(6) testimony and documents" discussing ███████████████████████████ ████████████████████.  Ex. U at 1–2; *see also id.* at 2 n.2 ("the examples are not exhaustive").  In response, Facebook reminded Plaintiffs of their own (narrower) definition of "business partners," corrected Plaintiffs' mischaracterizations of the deposition testimony, and confirmed again that its responses to Plaintiffs' interrogatories were complete.  Ex. V at 6–7, 10.  Despite repeated prodding, Plaintiffs never responded to Facebook's letter.  Instead, they have argued—both in meet-and-confer sessions with Facebook and to third parties that Plaintiffs have subpoenaed—that Judge Corley's order "expanded the case" beyond the limits set by Judge Chhabria.

## III.   ARGUMENT

Plaintiffs' motion should be summarily denied.  On its own terms, the motion seeks information Plaintiffs' discovery requests never asked for.  If Plaintiffs are now dissatisfied with their requests, they should have served new ones—not moved to compel nonresponsive information.  But even if Plaintiffs had served new requests, they would not be entitled to the information they now seek, because it goes far beyond their own claims in the complaint and the limitations Judge Chhabria set.  Plaintiffs' attempt to overcome these problems—by misreading a routine, 3-page discovery order to stealthily "expand the case" (and their own interrogatories) to reach topics that Plaintiffs never asked about and that Judge Chhabria placed off-limits—is as transparently desperate as it is implausible.

Gibson, Dunn &
Crutcher LLP

5

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY RELATED TO "BUSINESS PARTNERS"
CASE NO. 3:18-MD-02843-VC-JSC

### a. Facebook complied with Plaintiffs' interrogatories.

Plaintiffs' motion runs headlong into a threshold problem: Plaintiffs cannot show that Facebook failed to provide information their interrogatories requested.  That alone is fatal to Plaintiffs' motion. It is "the moving party's burden to establish that an [interrogatory response] is evasive or incomplete." *Heilman v. Silva*, 2015 WL 1632693, at *2 (S.D. Cal. Apr. 13, 2015); *see also* Local Rule 37-2.[3]

Interrogatory 14 asked Facebook to identify "every Business Partner that had the ability to access the Not Generally Available Content and Information of Facebook Users even if such Facebook Users had not downloaded an App from that Business Partner and the time period during which each such Business Partner had that ability."  Ex. L at 8.  Plaintiffs defined "Business Partners" to mean "the third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems."  *Id.* at 4.  They defined "Not Generally Available Content and Information" to mean "a Facebook User's Content and Information to which that Facebook User has restricted access such that the only Facebook Users who may access that Content and Information are the Facebook User's Friends or another limited audience."  *Id.* at 6.  Read together, Interrogatory 14 asks Facebook to identify (1) "third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems" that (2) had access to "Content and Information" a user had restricted to a "limited audience" (*i.e.*, information over which the user could control audience settings), (3) even in cases where a Facebook user "had not downloaded an App from that [third party]." Interrogatory 15 sought additional information about these same parties.

### b. The entities Plaintiffs describe are not responsive to their requests.

Plaintiffs say that Facebook's voluminous responses to Interrogatories 14 and 15 are deficient. They are not.  Facebook's responses to these two interrogatories alone span almost 200 pages, consisting mostly of tables in size 7 font. The responses disclose ███████ entities and take a broad view of "third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems," which is what Plaintiffs asked Facebook to disclose.  The parties

---

[3] *See also, e.g.*, *Hupp v. San Diego Cnty.*, 2014 WL 1404510, at *2 (S.D. Cal. Apr. 10, 2014) (the "moving party . . . carries the burden of informing the court of . . . why the responses are deficient"); *Gorrell v. Sneath*, 292 F.R.D. 629, 634–35 (E.D. Cal. 2013) (denying requests to compel further interrogatory responses because "Plaintiff has not shown these responses are insufficient or incomplete"); *Hasan v. Johnson*, 2012 WL 569370, at *5 (E.D. Cal. Feb. 21, 2012) ("The only basis for Plaintiff's argument appears to be that Defendant did not respond as anticipated.").

Facebook disclosed run the gamut and include ███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

   Plaintiffs do not identify, as they must, any missing entities that are responsive to their requests. Instead, they mischaracterize the evidence to create the false impression that Facebook exchanges data in various *other* ways that are not responsive or at issue in this case.  To take just a few examples:

   **Ms. Lee's Testimony.**  Ms. Lee did not, as Plaintiffs say, testify that Facebook had agreements to exchange data with data brokers.  She testified that ████████████████████████████

████████████ ; this is perfectly legal and completely irrelevant.  Specifically, Ms. Lee testified that

████████████████████████████████████████████████████████████████

██████████████████████████████████████████ Plaintiffs' Ex. H at 203:25–204:4.  Instead, she said ███████████████████████████████████ *Id.* at 200:21–201:5.  Ms. Lee also testified that ██████████████████████████████████

██████████████████████████████████ . *Id.* at 203:5–13.  █████████████████████

████████████████████████████████████████████████████████████████

████████████████  In any case, there are no allegations about ██████████████ in the Complaint, likely because Facebook has disclosed that it shares data for █████████████████ since at least 2012.[4]  Nothing about Ms. Lee's testimony suggests Facebook' interrogatory responses are incomplete.

   **Mr. Papamiltiadis's Testimony.**  Nor did Mr. Papamiltiadis identify any undisclosed partners responsive to Plaintiffs' interrogatories.  The first two categories of entities Mr. Papamiltiadis listed, █████████████████████████████████████████████████████████████, are already included in Facebook's responses.  Plaintiffs' Ex. I at 25:16–20, 25:21–25.  The next two categories— ██████████████████████████████████████████████████—have no relationship to user data, Plaintiffs' interrogatories, or even the data-sharing at issue.  *Id.* at 26:1–16.  Mr. Papamiltiadis



---

[4] *See, e.g.*, Ex. A at 4.

7

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY RELATED TO "BUSINESS PARTNERS"
CASE NO. 3:18-MD-02843-VC-JSC

Gibson, Dunn &
Crutcher LLP

identified ███████████████████████████████████████████████████████.

*Id.* Mr. Papamiltiadis's testimony does not support Plaintiffs' position either.

**Custom Audiences.**  Plaintiffs say their Exhibit K shows advertisers are responsive business partners because "an exchange of information occurred" in connection with Facebook's advertising to "Custom Audiences."  Mot. at 4.  Far from it.  Plaintiffs' Exhibit K confirms that █████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████ In any case, Judge Chhabria did not allow Plaintiffs' advertising claims to move forward.  Ex. F at 6.  Plaintiffs did not and could not seek information about advertisers in their interrogatories, and this Exhibit does not show any deficiencies in Facebook's responses.  And, of course, all this begs the question: why are Plaintiffs asking about advertising in this case that has nothing to do with advertising?

**Action Importers.**  Plaintiffs also claim Facebook failed to disclose "action importer" apps described in their Exhibits R and S.  But in their motion to Judge Corley, Plaintiffs argued that "**apps are excluded by the terms of the interrogatories.**"  Ex. Q at 2.  Plaintiffs are judicially estopped from now arguing the opposite.  *United Nat. Ins. v. Spectrum Worldwide*, 555 F.3d 772, 779 (9th Cir. 2009).  Plaintiffs also do not argue that Facebook outsourced "the time, labor, and money required to build Facebook's Platform on different devices and operating systems" through action importers.  They simply say Facebook must disclose apps as business partners if they had access to data about the friends of app users.  Mot. at 6.  That is not what Plaintiffs' interrogatories ask for, and it is far afield from the business-partners theory in the complaint and described by Judge Chhabria.  Plaintiffs also suggest action importers show certain apps are responsive because their Exhibit R contains stray references to ████████████████████████████████.  ████████████ discussed in this document refers to ███████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████  ████████████ was disclosed in Facebook's data-use policies, and it has nothing to do with Interrogatories 14 and 15 or the business-partners theory alleged in the complaint.[5]

---

[5] "Reciprocity and Facebook core functionality: (a) Reciprocity: Facebook Platform enables developers to build personalized, social experiences via the Graph API and related APIs.  If you use any Facebook APIs to build personalized or social experiences, you must also enable people to easily share their experiences back with people on Facebook."  Ex. B.

Gibson, Dunn &
Crutcher LLP

It is not possible in this short brief to respond in detail to each and every mischaracterization of the testimony and documents in Plaintiffs' motion.  If the Special Master believes that additional context surrounding any or all of the documents would be helpful, Facebook is happy to provide it.

### c.  Facebook could not truthfully amend its responses as Plaintiffs demand.

Plaintiffs' descriptions of the testimony and documents reveal, at best, a basic lack of understanding of the nature of the data at issue in this case—and, at worst, deliberate obfuscation.  But more fundamentally, it would not even be possible for Facebook to amend its interrogatory responses in the way Plaintiffs request.  Data brokers, advertisers, and the other entities Plaintiffs say are missing from Facebook's interrogatory responses are ***not*** (1) "third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems" that (2) had access to information that Facebook users restricted to a limited audience, even (3) in cases where a user had not downloaded an app from that entity.  Ex. L at 4.

Courts have long recognized as "elementary that a court cannot compel one to make a false affidavit . . . [or] compel one to assign the verification of a document which contain[s] facts the truth of which [the] affiant dispute[s]."  *Guth v. Minn. Mining & Mfg. Co.*, 72 F.2d 385, 390–91 (7th Cir. 1934); *Noble v. Adams*, 2006 WL 3028543, at *4 (E.D. Cal. Oct. 24, 2006) (denying motion to compel where defendants objected "on the grounds that the interrogatories presume facts as true which Defendants have denied as being true").  For this reason, a court "can only order a party to answer an interrogatory; it cannot compel a party to give the answer that the moving party wants.  A party cannot be compelled to submit a different answer to a question simply because the opposing party was hoping to receive a different answer."  *Tapia v. Huntington Park Police Dep't*, 2010 WL 11549657, at *1 (C.D. Cal. May 5, 2010) (citation omitted); *FootBalance Sys. Inc. v. Zero Gravity Inside, Inc.*, 2018 WL 722834, at *4 (S.D. Cal. Feb. 5, 2018) ("[T]his Court cannot compel Defendants to provide different responses, after that party fully answered the interrogatory.").  Nor can a party be compelled to provide information in response to an interrogatory "that w[as] not requested in the interrogatory initially."  *In re Remec, Inc. Sec. Litig.*, 2008 WL 11338404, at *7 (S.D. Cal. Oct. 24, 2008).[6]  Judge

---

[6] *See also, e.g., Barnes v. Harling*, 2017 WL 4157383, at *2 (W.D.N.Y. Sept. 18, 2017) (a court "cannot compel [a party] to answer questions . . . interrogatories do not pose"); *Lunn v. Smith*, 2019 WL 569828, at *7 (D. Mass. Feb. 12, 2019) (a court "cannot compel a response to an interrogatory that was not properly requested"); *Scheffler v. Molin*, 2012 WL

9

Gibson, Dunn &
Crutcher LLP

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY RELATED TO "BUSINESS PARTNERS"
CASE NO. 3:18-MD-02843-VC-JSC

1   Corley has observed this same limitation, noting that the meet-and-confer process must "[a]lways

2   narrow[]" discovery requests, not expand them.  Ex. P at 13:14.

3        Consistent with their claims and Judge Chhabria's motion-to-dismiss order, Plaintiffs'

4   interrogatories ask Facebook to identify a specific set of "third parties with whom Facebook partnered

5   to develop and integrate Facebook on a variety of devices and operating systems."  Facebook has, and

6   confirms again that its responses are complete to the best of its knowledge; Facebook has not withheld

7   information on the basis that it does not label a responsive entity an "integration partner" or on any

8   other basis.  Plaintiffs' motion can and should be denied for this reason alone.

9        **d.  Plaintiffs' new take on "business partners" cannot be reconciled with the**

10            **complaint or Judge Chhabria's motion-to-dismiss order.**

11       If Plaintiffs are dissatisfied with the information they requested in their interrogatories, the

12   proper course of action would have been to amend their interrogatories or serve new ones—not to move

13   to compel nonresponsive and untruthful responses.  Plaintiffs never served new or amended

14   interrogatories, and the reason is clear:  the information they now seek is objectionable on numerous

15   grounds and far outside the scope of this litigation.

16       It is difficult to overstate the breadth of Plaintiffs' new demand, which would require Facebook

17   to identify any entity that has ever received information relating to people who use Facebook, if at any

18   point, that entity reported any information to anyone at Facebook that has anything to do with Facebook

19   users.  Plaintiffs' request would rope in countless business relationships having nothing to do with this

20   case, such as law-enforcement agencies that subpoenaed user-related information from Facebook.  It

21   would also reach trivial interactions—for instance, if a Facebook employee and an employee of another

22   social network discussed the number of users on each platform.  Any interrogatory that actually made

23   a request like that would be wildly outside the scope of this case and objectionable on numerous

24   grounds, and Facebook would have moved for a protective order. Such a request would effectively

25   require Facebook to catalogue and audit every interaction any of its employees have had with millions

26   and millions of third parties over more than a decade.  The very notion is absurd, as is Plaintiffs' effort

27

28   _____
     3292894, at *7 (D. Minn. Aug. 10, 2012) ("The Court cannot compel Defendants to amend their answer [as requested].
     That is plainly not the question [Plaintiff] asked.").

Gibson, Dunn &
Crutcher LLP

10

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY RELATED TO "BUSINESS PARTNERS"
CASE NO. 3:18-MD-02843-VC-JSC

to seek discovery into these millions and millions of business relationships.

### e.    The information Plaintiffs now seek is inconsistent with the complaint.

Facebook is an enormous company, and this case is not about all of Facebook's business relationships.  As relevant here, it concerns a specific and narrow type of now-defunct "business partner" described in Plaintiffs' complaint.  Facebook encourages the Special Master to review the "business partners" allegations in the complaint.  *See* Exhibit D.  The complaint alleges that Facebook entered into "data reciprocity" agreements with "Business Partners" so that they could "develop and integrate Facebook's User Platform on multiple devices and operating systems," and that "[a]s part of these agreements, Facebook gave Business Partners access to users' content and information."  Dkt. 491 ¶¶ 430, 434.  The complaint then notes that "Facebook has identified 53 Business Partners" and lists each of them.  *Id.* ¶ 431 (listing Blackberry, Nokia, Samsung, and others).  As Plaintiffs themselves explain, that list came from Facebook's letter to Congress identifying entities that Facebook partnered with to build its Platform and Facebook-like experiences.  *Id.* ¶¶ 431–32; *see also* Ex. C at 18–22; Ex. F at 8.  Facebook's "Business Partnerships," the complaint alleges, "allowed Facebook to expand its reach by outsourcing . . . the time, labor and money required to build Facebook's Platform on different devices and operating systems."  Dkt. 491 ¶ 433.  The complaint describes Facebook's business-partner relationships as based on "custom deals" involving "private APIs."  *Id.* ¶¶ 430, 449.

These references to "Business Partners" address a specific, finite, and knowable set of entities that helped build Facebook on different devices and operating systems, not an undifferentiated mass encompassing all of Facebook's business relationships.  In fact, Plaintiffs' complaint repeatedly distinguishes "business partners" from other entities like "advertisers," "data brokers," and "third-party Apps"—all of which would fall under Plaintiffs' newly minted definition.[7]

Further, while the complaint describes business partners in the terms quoted above, it describes "data brokers"—including ███████████████████, which Plaintiffs focus on in their motion—as parties with which Facebook worked to collect data about users for "psychographic marketing" and "targeted advertising."  *Compare* Ex. D at ¶ 433 (business partners), *with* Ex. E at

---

[7] *See, e.g.*, Dkt. 491 ¶ 10 (alleging "access by third-party Apps, websites, and Business Partners to users' information"); *id.* ¶ 31 (alleging disclosure of "content and information to: (a) Apps used by [a plaintiff's] friends; (b) 'Business Partners' such as Apple, Amazon, and Samsung; and (c) advertisers").

11

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY RELATED TO "BUSINESS PARTNERS"
CASE NO. 3:18-MD-02843-VC-JSC

¶¶ 263–69 (data brokers).  This case is not about "psychographic marketing" or "targeted advertising."  Judge Chhabria held those allegations were "scattered throughout the complaint . . . without any meaningful explanation of the legal or factual difference between" them, and he did not allow them to proceed.  Ex. F at 5–6.  And while Plaintiffs included a long, bulleted list of "Business Partners" in their complaint, they left off of that list the "data brokers" which they list elsewhere and now redenominate "business partners."  Other entities Plaintiffs now conjure up are not mentioned in the complaint at all.

### f.  Judge Chhabria confined the case to four specific categories of allegations.

Judge Chhabria's motion-to-dismiss order also forecloses Plaintiffs' bait-and-switch.  In allowing the "business partners" theory to move forward, Judge Chhabria used the term as it was used in the complaint.  He quoted Plaintiffs' allegations about "data reciprocity" and outsourcing "the time, labor, and money required to build Facebook's Platform on different devices and operating systems."  Ex. F at 8 (quoting FACC ¶¶ 486–87).[8]  And he invoked Facebook's list of "integration partnerships" contained in Facebook's letter to Congress.  *Id.*

The notion that Judge Chhabria *expanded* Plaintiffs' allegations or created some sort of catch-all category of potential liability relating to all of Facebook's millions of business relationships is absurd and obviously impossible to reconcile with his order.  *See, e.g.*, Ex. F at 5–6 (emphasizing the need to *limit* the scope of the case); *see also infra* at 13–15 (courts cannot expand a case beyond the allegations in the complaint).  Judge Chhabria expressly forbade Plaintiffs from litigating the kaleidoscope of allegations "sprinkle[d]" throughout their complaint, *id.* at 5, and instead limited the case to four theories, *see id.* at 6–9.  Plaintiffs' boundless expansion of the "business partners" category to cover all of Facebook's business relationships would render this case an open-ended and opaque mess, impermissibly obliterating the sound limitations Judge Chhabria put on the case.

Rule 26 also confines discovery to the four live theories articulated in Judge Chhabria's motion-to-dismiss ruling.  Under Rule 26, Plaintiffs are not entitled to seek discovery to test allegations or theories that did not survive dismissal—such as claims about "psychographic marketing" and "targeted

---

[8]  Judge Chhabria had the *first* amended consolidated complaint before him on Facebook's motion to dismiss.  Plaintiffs have since filed a *second* amended consolidated complaint for the purpose of subbing in new named plaintiffs; the allegations that Judge Chhabria quoted are identical in both complaints.  *Compare* First Amended Consolidated Complaint ¶¶ 486–87, *with* Second Amended Consolidated Complaint ¶¶ 433–34.

12

advertising"—or to investigate new potential theories.  Rule 26 confines discovery to information relevant to "the actual claims or defenses surviving [dismissal]," and discovery cannot go "beyond the claims that withstood [a] motion to dismiss."  *In re Ashworth, Inc. Sec. Litig.*, 2002 WL 33009225, at *4 (S.D. Cal. May 10, 2002); *Brown v. Stroud*, 2010 WL 3339524, at *2–4 (N.D. Cal. Aug. 24, 2010) (denying request for "discovery beyond" th[e scope]" of the claims as "indicated" in the court's motion to dismiss). Federal courts regularly reject discovery not tied to specific, live allegations and have observed that "conclusory relevance arguments are not enough to justify an order allowing plaintiff to rummage through . . . years' worth of" corporate records.  *Shuckett v. Dialamerica Mktg.*, 2018 WL 4350123, at *6 (S.D. Cal. Sept. 10, 2018).  Nor may a plaintiff "bootstrap" broad discovery onto narrow allegations.  *OMG Fid. Inc. v. Sirius Tech*. 2007 WL 1994230, at *1 (N.D. Cal. July 5, 2007).

### g.  Judge Corley did not and could not expand the scope of the case.

Because Plaintiffs did not and could not request the information they now demand, they say that—after years of litigation and a hard-fought motion to dismiss that set the bounds of this case— Judge Corley, through a 3-page discovery order that asked Facebook to confirm that its interrogatory responses were complete, expanded Plaintiffs' discovery requests and the entire case.  Since Judge Corley issued her order, Plaintiffs have gleefully waved it in front of Facebook (as well as third-party subpoena recipients) and claimed the order has dramatically "expanded the case" to include undefined claims about virtually all of Facebook's third-party business relationships over the past 15 years.

Plaintiffs arrive at this mystifying conclusion by citing in isolation Judge Corley's instruction that, in response to Interrogatories 14 and 15, "Facebook shall identify all companies with which Facebook agreed to exchange information about users' activities with each other, regardless of whether such company is an 'integration partner.'"  Ex. S at 2.  But Judge Corley did not issue that instruction in a vacuum.  Read in context, her order is clear as day and flatly contradicts Plaintiffs' position.

*First*, the briefing underlying Judge Corley's order and the order itself confirm that the parties and Judge Corley were using the term "business partners" to refer only to the third category of allegations Judge Chhabria allowed to move forward.  Both parties said so explicitly in their letter briefs to Judge Corley.  *See* Ex. Q at 1; Ex. R at 1.  Judge Corley likewise confined her analysis to "the third of four actionable categories of potential liability" from Judge Chhabria's order.  Ex. S at 1.  Her

order merely explained that the definition from Judge Chabbria's order (which came from the complaint) governed, "regardless of whether" Facebook labeled a company an "integration partner." *Id.* at 2.  Judge Corley was clearly instructing Facebook not to parse words; she was not "expanding" this case to all of Facebook's business relationships.

*Second*, Judge Corley's order does not purport to and could not possibly have "expanded the case."  A discovery order is not a procedurally proper path to alter a motion-to-dismiss order entered years earlier.  Courts may not deviate from the allegations in the complaint, especially when doing so would expose a defendant to wide-ranging theories of liability without adequate notice of what allegations are at issue.  *See, e.g.*, *Rund v. Charter Commc'ns, Inc.*, 319 F. App'x 465, 468 (9th Cir. 2008) (a "new theory cannot be asserted at this stage in the litigation without contravening Fed. R. Civ. P. 8"); *Thompson v. City of Shasta Lake*, 314 F. Supp. 2d 1017, 1021 n.3 (E.D. Cal. 2004) (noting that "the court is not free to rewrite plaintiff's complaint").

*Third*, Judge Corley could not have plausibly ordered Facebook to provide responses to Plaintiffs' interrogatories that were not requested by the interrogatories, because courts cannot order parties to provide nonresponsive or inaccurate information.  *See supra* at 9–10.  Judge Corley's order says nothing to suggest she was departing from this rule, nor would it be reasonable to assume she had. Judge Corley in particular has stated that the meet-and-confer process should "[a]lways narrow[]"— not expand—the parties' discovery requests.  Ex. P at 13:14.

Judge Corley's order did not silently and massively transform this case; if it had, Facebook would have appealed.  It did something much more modest and innocuous: require Facebook to confirm that it had disclosed all information responsive to Interrogatories 14 and 15, regardless of whether Facebook deemed certain entities "integration partners."  In other words, Judge Corley reaffirmed that the definition in Plaintiffs' interrogatories governed, and sought confirmation that Facebook had not relied on labels to withhold information.  Facebook confirmed it had not.  Judge Corley's order is clear in this respect.  This is also the only reading of Judge Corley's order that is consistent with the complaint, Judge Chhabria's motion-to-dismiss order, Plaintiffs' interrogatories, and Judge Corley's rule that the meet-and-confer process must "[a]lways narrow[]" outstanding discovery requests.

**h.  Plaintiffs' remaining arguments are not properly before the Special Master.**

Gibson, Dunn & Crutcher LLP

14

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY RELATED TO "BUSINESS PARTNERS"
CASE NO. 3:18-MD-02843-VC-JSC

Finally, Plaintiffs contend that Facebook's responses to Interrogatories 14 and 15 "implicate[] numerous requests for production."  Mot. at 7–8 (capitalization omitted); *see also id.* at 2.  These issues are not properly before the Special Master.  Plaintiffs did not previously raise this issue to Facebook, nor did the parties meet and confer about or mediate it.

In any case, any objections to Facebook's responses to years-old requests for production concerning "business partners" and "third parties" fail for the same reasons that Plaintiffs' interrogatory objections fail.  As Plaintiffs concede, "[t]here is no reason for the term [business partners] to be defined differently in the two contexts."  *Id.* at 7.  And Plaintiffs' newly expanded view of "business partners" would swallow their definition of "third parties," which included not only business partners but numerous other entities that would be redundant if "business partners" were as broad as Plaintiffs say.  Plaintiffs are also foreclosed from raising these arguments.  Each of Plaintiffs' sets of requests for production either define the term "business partners" "as [it is] used in the [First Amended Complaint]" or as "the third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems"—the same definition used in Plaintiffs' interrogatories.  *See, e.g.*, Ex. G at 10; Ex. I at 4.  Facebook has disclosed since December 2019 that it interprets requests for production seeking documents about "business partners" to refer to the "integration partners and device manufacturers" with whom Facebook partnered to develop and integrate Facebook on devices and operating systems.  Ex. H at 28.  Until now, Plaintiffs have never objected, despite nearly two years of negotiations about Plaintiffs' requests for production.  Plaintiffs' belated arguments, spurred by an opportunistic and misleading reading of a routine discovery order, cannot be heard now.  Nor can Plaintiffs credibly argue that Facebook's responses to their recent (fifth set of) requests are somehow deficient when Facebook has not yet even served its responses and objections to those requests.

## IV.   CONCLUSION

Facebook confirms, again, that it has identified all entities of which it is aware that are responsive to Interrogatories 14 and 15, and that it has not withheld any responsive information based on its use of the term "integration partners" or otherwise.  Facebook's responses are complete to the best of its knowledge, and Facebook will supplement its responses if it becomes aware of any other responsive information.  Plaintiffs' motion should be denied.

Gibson, Dunn &
Crutcher LLP

Dated:  October 13, 2021

**GIBSON, DUNN & CRUTCHER, LLP**

By: */s/ Orin Snyder*
Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Russell H. Falconer
rfalconer@gibsondunn.com
2001 Ross Avenue Suite 2100
Dallas, TX 75201
Telephone:  214.698.3170

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

Gibson, Dunn &
Crutcher LLP

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY RELATED TO "BUSINESS PARTNERS"
CASE NO. 3:18-MD-02843-VC-JSC

**FACEBOOK'S SEPARATE STATEMENT
IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL FACEBOOK TO COMPLY
WITH DISCOVERY OBLIGATIONS RELATED TO BUSINESS PARTNERS**

| Written Discovery | Discovery Response | Plaintiffs' Response | Relevant History | Executive Summary |
|---|---|---|---|---|
| **Plaintiffs' Second Set of Requests for Production**<br><br>On November 25, 2019, Plaintiffs served their Second Set of Requests for Production.<br><br>Various RFPs requested documents relating to "Third Parties." Plaintiffs defined "Third Parties" to include "Business Partners . . . as th[e] term[ is] used in the [complaint]," which describes business partners as "a diverse set of companies including device makers . . . and other types of internet companies" that "Facebook partnered with" "to building Facebook's Platform on | Consistent with Plaintiffs' allegations, in response to RFP 24 Facebook agreed to produce "final agreements with integration partners and device manufacturers responsive to this Request." | Plaintiffs did not seek a broader set of materials or move to compel materials about a different set of entities. | None.  The parties have not met and conferred about or mediated Plaintiffs' current position that Facebook's responses to these RFPs are insufficient with respect to the relevant "Business Partners." | Plaintiffs' belated complaint to Facebook's response is untimely and the information Plaintiffs demand is: (i) not responsive to their requests, (ii) outside of the scope of their allegations, and (iii) outside of the theories of relief Judge Chhabria allowed to move forward.  Judge Corley's discovery order is clear and it does not, and does not purport to, expand the scope of Plaintiffs' requests or the scope of this case. |

| Written Discovery | Discovery Response | Plaintiffs' Response | Relevant History | Executive Summary |
|---|---|---|---|---|
| different devices and operating systems." <br><br> Request for Production 24 specifically requested "[d]ocuments sufficient to identify all Third Parties to which Facebook granted access to Users' Content and Information not generally available through Platform pursuant to partnership agreements between Facebook and those Third Parties." | | | | |
| **Plaintiffs' Third Set of Requests for Production** <br><br> On May 6, 2020, Plaintiffs served their Third Set of Requests for Production. <br><br> Requests for Production 47, 48, 49 asked for documents about "business partners" and defined them as "the | In its responses to Plaintiffs' Third Set of RFPs, Facebook clarified that it would define Business Partners "as referring to the integration partners and/or device manufacturers with whom Facebook has | Plaintiffs did not challenge Facebook's definition or move to compel materials about a broader set of entities. | None.  The parties have not met and conferred about or mediated Plaintiffs' current position that Facebook's responses to these RFPs are insufficient with respect to the relevant "Business Partners." | Plaintiffs' belated complaint to Facebook's response is untimely and the information Plaintiffs demand is: (i) not responsive to their requests, (ii) outside of the scope of their allegations, and (iii) outside of the theories |

| Written Discovery | Discovery Response | Plaintiffs' Response | Relevant History | Executive Summary |
|---|---|---|---|---|
| third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems."<br><br>Requests for Production 37, 43, 55–56 requested additional documents regarding "Third Parties," and defined them as "Business Partners . . . as th[e] term[ is] used in the [complaint]," which describes business partners as "a diverse set of companies including device makers . . and other types of internet companies" that "Facebook partnered with" "to build Facebook's Platform on different devices and operating systems." | entered into agreements that have been and/or will be produced in response to Request No. 24." | | | of relief Judge Chhabria allowed to move forward.  Judge Corley's discovery order is clear and it does not, and does not purport to, expand the scope of Plaintiffs' requests or the scope of this case. |

| Written Discovery | Discovery Response | Plaintiffs' Response | Relevant History | Executive Summary |
|---|---|---|---|---|
| **Plaintiffs' Fourth Set of Interrogatories**<br><br>On July 16, 2020, Plaintiffs served their Fourth Set of Interrogatories.<br><br>Interrogatories 14 and 15 asked for additional information regarding certain "Business Partners," which Plaintiffs *again* defined to mean "the third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems."<br><br>Interrogatory 14 asked Facebook to identify a subset of "Business Partners"—ones that "had the ability to access the Not Generally Available Content and Information of Facebook Users even if such Facebook Users | On August 17, 2020, Facebook served its initial responses to Plaintiffs Fourth Set of Interrogatories. Facebook clarified that it would "construe 'Business Partners' to refer to the integration partners and/or device manufacturers with whom Facebook has entered into agreements that have been and/or will be produced in response to RFP 24."<br><br>In its August 17 responses, Facebook did not substantively respond to Interrogatories 14 and 15 because Plaintiffs had exceeded the allowed number of interrogatories (including subparts). | Following Fakebook's Amended Response to Plaintiffs' Fourth Set of Interrogatories, the parties met and conferred extensively about Facebook's interrogatory responses.<br><br>On December 7, 2020, Plaintiffs wrote to Facebook to complain Facebook had construed the term "Business Partners" too narrowly in light of the Court's Discovery Order No. 9 [regarding Named Plaintiffs' data], which they argued "changed the contours of the case."<br><br>The parties briefly discussed this issue on a meet and confer on December 15, 2020. Facebook told Plaintiffs that they should issue a | On January 22, 2021, Plaintiffs filed a letter motion to compel. Unlike the definition they had advanced during their meet and confers with Facebook, Plaintiffs asked Judge Corley to order Facebook "to amend its responses concerning the company's 'Business Partners' consistent with Judge Chhabria's Order on the Motion to Dismiss," which describes business partners as companies to which Facebook "outsourced . . . 'the time, labor, and money required to build Facebook's Platform on different devices and operating systems.'" Plaintiffs stated that they were "unsure what third parties Facebook seeks to exclude by | Plaintiffs' belated complaint to Facebook's response is untimely and the information Plaintiffs demand is: (i) not responsive to their requests, (ii) outside of the scope of their allegations, and (iii) outside of the theories of relief Judge Chhabria allowed to move forward.  Judge Corley's discovery order is clear and it does not, and does not purport to, expand the scope of Plaintiffs' requests or the scope of this case. |

| Written Discovery | Discovery Response | Plaintiffs' Response | Relevant History | Executive Summary |
|---|---|---|---|---|
| had not downloaded an App from that Business Partner." "Not Generally Available Content and Information," in turn, was defined to mean "a Facebook User's Content and Information to which that Facebook User has restricted access such that the only Facebook Users who may access that Content and Information are the Facebook User's Friends or another limited audience."<br><br>Interrogatory 15 asked for additional information about "each Business Partner identified in [Facebook's] response to Interrogatory No. 14." | On November 20, 2020 Facebook amended its responses to Plaintiffs' Fourth Set of Interrogatories, after Judge Corley expanded the number of interrogatories each party would be allowed.<br><br>Facebook again clarified that it would "construe 'Business Partners' to refer to the integration partners and/or device manufacturers with whom Facebook has entered into agreements that have been and/or will be produced in response to RFP 24." Facebook's responses to these two interrogatories alone span 197 pages, consisting mostly of tables in size 7 font. The responses disclose ▇▇▇▇▇ entities. | new interrogatory if they were seeking information that was not responsive to the interrogatories as written. The parties did not discuss the substance of Facebook's response.<br><br>During a meet-and-confer on January 5, 2021, Plaintiffs purported to declare an impasse about the Business Partners definition. Facebook objected that Plaintiffs had never engaged substantively on the issue with Facebook.<br><br>The parties held a meet and confer on January 15, 2022, during which Facebook asked Plaintiffs to provide a more specific definition of the types of partners they wanted Facebook to add to its interrogatory responses, | restricting its responses to integration partners"<br><br>In opposition to Plaintiffs' letter motion to compel, Facebook responded that "[t]here is no meaningful daylight between the 'Business Partners' definition in Plaintiffs' Interrogatories and the definition in Facebook's response." Facebook confirmed: "the definition Facebook provided [wa]s intended to track and capture all entities falling into the third category of business partner conduct described in [Judge Chhabria's order] and that it is not withholding any relevant or responsive information based on its definition."<br><br>Judge Corley issued a three-page order. She explained that, like Facebook, she "fail[ed] | |

| Written Discovery | Discovery Response | Plaintiffs' Response | Relevant History | Executive Summary |
|---|---|---|---|---|
| | | as Facebook did not understand what Plaintiffs were seeking to add.  Plaintiffs responded, "Facebook is a large company with lots of partners" and conceded they were not aware of additional, relevant data-sharing relationships. | to see any material difference between the Parties' definitions" of "business partners." But given Plaintiffs' confusion over the term "integration partners," Judge Corley made clear that Judge Chhabria's "conduct-based definition" from the motion-to-dismiss order governed, rather than the label "integration partners." Judge Corley therefore reiterated that Facebook should provide all information responsive to Interrogatories 14 and 15 with respect to "companies with which Facebook agreed to exchange information about users' activities with each other, regardless of whether such company is an 'integration partner,'" or else "stat[e] to Plaintiffs in writing" that it had already done so. | |

| Written Discovery | Discovery Response | Plaintiffs' Response | Relevant History | Executive Summary |
|---|---|---|---|---|
| | | | On February 4, 2021, Facebook confirmed to Plaintiffs that it had already identified all such entities "responsive to Interrogatories 14 and 15 of which it is aware."<br><br>On March 4, 2021, Plaintiffs wrote a letter to Facebook requesting updated responses "in light of recent 30(b)(6) testimony and documents" discussing ██████████████████████.<br><br>In response, Facebook reminded Plaintiffs of their own (narrower) definition of "business partners," corrected Plaintiffs' mischaracterizations of the deposition testimony, and confirmed again that its responses to Plaintiffs' | |

| Written Discovery | Discovery Response | Plaintiffs' Response | Relevant History | Executive Summary |
|---|---|---|---|---|
| | | | interrogatories were complete.<br><br>On February 11, 2021, Facebook served its Second Amended Responses and Objections to Plaintiffs' Fourth Set of Interrogatories. The amendments did not affect the entities listed in response to Interrogatories 14 or 15. | |
| **Plaintiffs' Fourth Set of Requests for Production**<br><br>On June 12, 2020, Plaintiffs served their Fourth Set of Requests for Production.<br><br>**Request for Production 63 requested "All Documents relating to Your enforcement of Facebook's Platform Policy, Data Policy, Privacy Policy or SRR against Third Parties** | On June 27, 2020, Facebook served its Responses and Objections to Plaintiffs' Fourth Set of Requests for Production.<br><br>Facebook clarified that it construed Request for Production No. 63 to be limited to the four categories of allegations Judge Chhabria allowed | Plaintiffs did not seek a broader set of materials or move to compel materials about a different set of entities | None.  The parties have not met and conferred about or mediated Plaintiffs' current position that Facebook's responses to these RFPs are insufficient with respect to the relevant "Business Partners." | Plaintiffs' belated complaint to Facebook's response is untimely and the information Plaintiffs demand is: (i) not responsive to their requests, (ii) outside of the scope of their allegations, and (iii) outside of the theories of relief Judge Chhabria allowed to move forward.  Judge |

| Written Discovery | Discovery Response | Plaintiffs' Response | Relevant History | Executive Summary |
|---|---|---|---|---|
| regarding their access to or use of the Content and Information of Users, including, but not limited to, documents concerning any decisions not to enforce Your policies, any failures to enforce Your policies, and any decisions that enforcement was not appropriate."<br><br>Plaintiffs defined "Third Parties" to include "Business Partners . . . as th[e] term[ is] used in the [complaint]," which describes business partners as "a diverse set of companies including device makers . . and other types of internet companies" that "Facebook partnered with" "to build Facebook's Platform on different devices and operating systems." | to move forward at pages 6–10 of Pretrial Order No. 20, including that any information about business partners would be limited to Judge Chhabria's description of business partners on pages 8–9. | | | Corley's discovery order is clear and it does not, and does not purport to, expand the scope of Plaintiffs' requests or the scope of this case. |

FACEBOOK'S SEPARATE STATEMENT IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL RE "BUSINESS PARTNERS"

| Written Discovery | Discovery Response | Plaintiffs' Response | Relevant History | Executive Summary |
|---|---|---|---|---|
| **Plaintiffs' Fifth Set of Requests for Production**<br><br>On August 30, 2021, Plaintiffs served their Fifth Set of Requests for Production.<br><br>Request for Production 68 requests "Documents sufficient to identify and describe Facebook's Databases and systems for documenting Facebook's partnerships and agreements with Third Parties, including Business Partners and Whitelisted Apps, and what access each such Third Parties had to Users' Content and Information."<br><br>Plaintiffs defined "Third Parties" to include "Business Partners . . . as th[e] term[ is] used in the [complaint]," which describes business partners as: "a diverse | Facebook's responses and objections to these requests are due on October 20, 2021. | None. | None. | Plaintiffs' complaint is unripe—Facebook has not yet responded to Plaintiffs' requests.  In any event, the information Plaintiffs demand is: (i) not responsive to their requests, (ii) outside of the scope of their allegations, and (iii) outside of the theories of relief Judge Chhabria allowed to move forward.  Judge Corley's discovery order is clear and it does not, and does not purport to, expand the scope of Plaintiffs' requests or the scope of this case. |

FACEBOOK'S SEPARATE STATEMENT IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL RE "BUSINESS PARTNERS"

| Written Discovery | Discovery Response | Plaintiffs' Response | Relevant History | Executive Summary |
|---|---|---|---|---|
| set of companies including device makers . . and other types of internet companies" that "Facebook partnered with" "to build Facebook's Platform on different devices and operating systems."<br><br>Requests for Production 64, 72–73 requested additional documents regarding "Third Parties." | | | | |

FACEBOOK'S SEPARATE STATEMENT IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL RE "BUSINESS PARTNERS"

# EXHIBIT K

1    Derek W. Loeser (admitted *pro hac vice*)      Lesley Weaver (Cal. Bar No.191305)
     KELLER ROHRBACK L.L.P.                         BLEICHMAR FONTI & AULD LLP
2    1201 Third Avenue, Suite 3200                  555 12th Street, Suite 1600
     Seattle, WA 98101                              Oakland, CA 94607
3    Tel.: (206) 623-1900                           Tel.: (415) 445-4003
     Fax: (206) 623-3384                            Fax: (415) 445-4020
4    dloeser@kellerrohrback.com                     lweaver@bfalaw.com

5

6    *Plaintiffs' Co-Lead Counsel*

7    *Additional counsel listed on signature page*

8
                          UNITED STATES DISTRICT COURT
9                        NORTHERN DISTRICT OF CALIFORNIA
                             SAN FRANCISCO DIVISION
10

11
     IN RE: FACEBOOK, INC. CONSUMER              MDL No. 2843
12   PRIVACY USER PROFILE LITIGATION            Case No. 18-md-02843-VC-JSC

13
     _____     **REPLY IN SUPPORT OF PLAINTIFFS'**
14   This document relates to:                  **MOTION TO COMPEL FACEBOOK TO**
                                                 **COMPLY WITH DISCOVERY**
     ALL ACTIONS                                 **OBLIGATIONS RELATED TO**
15                                               **"BUSINESS PARTNERS"**

16                                               Judge: Hon. Vince Chhabra
                                                 Hon. Jacqueline Scott Corley
17                                               Special Master Daniel Garrie
                                                 Courtroom: 4, 17th Floor
18
                                                 JAMS Ref. No.: 1200058674
19
                                                 ORAL ARGUMENT REQUESTED
20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.      INTRODUCTION ...........................................................................................................1

II.     ARGUMENT ................................................................................................................2

   A.  The Scope of Plaintiffs' Requests Are Aligned with Their Allegations In the
       Complaint and The Court's Orders ..................................................................... 2

   B.  Facebook Should Be Compelled To Amend Its Interrogatory Responses and Identify
       the Entities With Which Facebook Agreed To Exchange Information About User
       Activity.................................................................................................................. 4

      1.  Facebook Exchanged User Information With Data Brokers ................................... 4

      2.  Facebook Exchanged Information About Users' Activities With App Developers
          and Other Entities It Has Not Identified ..................................................... 4

      3.  Plaintiffs Are Not Judicially Estopped From Arguing That Facebook's Business
          Partnerships Include App Developers......................................................... 5

   C.  Facebook Fails to Demonstrate Undue Burden ........................................... 6

   D.  Serving New Discovery Requests Would Erase Months of Negotiation and Motion
       Practice ............................................................................................................. 7

III.    CONCLUSION...............................................................................................................8

1

## I.     INTRODUCTION

2

This motion concerns Plaintiffs' straightforward allegation that Facebook and its partners

3

"agreed to exchange information about users' activities with each other," (SACC at ¶ 434; Dkt. No.

4

298 at 8; Ex G at 2), and a simple discovery request asking Facebook to identify all such third

5

parties. This reciprocal exchange of information is core to Plaintiffs' claims regarding Facebook's

6

business partnerships. SACC at ¶ 434.

7

Facebook tries to resuscitate an argument it already lost—business partners only include a

8

limited list of "integration partners" and "device manufacturers." Opp. at 15. This would allow

9

Facebook to limit its production to data sharing that is necessary for the "use case," meaning data

10

sharing without which a third party's app could not function. Facebook could then withhold from

11

discovery the identity of partners with whom it shared information for other, more troubling

12

reasons, including, among others, data brokers and other businesses with whom Facebook shared

13

user information without appropriate disclosure or consent. Facebook cannot credibly contend that

14

sharing with these other partners did not occur. Indeed, discovery to date shows that it did. *See* Ex.

15

H at 183:23-184:5; Ex. K at 2362; and Ex. R at 4292-4293.[1]

16

Rather than any serious effort to dispute that it shared user information with other types of

17

partners, Facebook claims that production would require Facebook to "catalogue and audit" every

18

interaction by its employees with "millions and millions of third parties." Opp. at 10. Facebook's

19

hyperbole is refuted by the fact that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20

▮▮▮▮. *See e.g.* Ex. V at 9730 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21

▮▮▮▮▮▮▮▮▮▮▮▮▮. Producing a list of partners with whom Facebook shared

22

sensitive user information would not be unduly burdensome.

23

Finally, Facebook's attempt to limit this dispute to the definition of "business partners"

24

included in Plaintiffs' original discovery request is a ploy previously rejected by Judge Corley, who

25

26

[1] All exhibit references are to the Declaration of Lesley E. Weaver in Support of Plaintiffs'
Motion to Compel Facebook to Comply With Discovery Obligations Related to "Business

27

Partners" or the Declaration of Lesley E. Weaver in Support of Reply Regarding Plaintiffs'
Motion to Compel Facebook to Comply With Discovery Obligations Related to "Business

28

Partners".

has told Facebook several times that the original request does not control the issue where the request has evolved through the parties meet and confer negotiations. *E.g.*, Dec. 9, 2020 Discovery Conf. Tr. at 10:24-11:12.

Ultimately, Facebook elevates form over substance in claiming that it need not identify third parties that it shared user information with. This position has already been rejected by Judge Corley: "In response to [Plaintiffs' Interrogatory No. 14]," she held, "Facebook shall identify all companies with which Facebook agreed to exchange information about users' activities with each other, regardless of whether such company is an 'integration partner.'" Ex. G at 2.

## II.      ARGUMENT

### A.      The Scope of Plaintiffs' Requests Are Aligned with Their Allegations In the Complaint and The Court's Orders

Facebook sees Plaintiffs' efforts to enforce the Court-ordered definition of "business partners" as an attempt to shoehorn additional allegations into their operative complaint. But Plaintiffs' allegations remain unchanged: Facebook's business partnerships are built on "data reciprocity," through which "Facebook and its partners agreed to exchange information about users' activities with each other." SACC at ¶ 434; *see also id.* at ¶ 745 ("Facebook engages in an extensive transactional market of data reciprocity with its Business Partners"). Plaintiffs' allegations specifically encompass those entities "with which Facebook agreed to exchange information about users' activities with each other." Ex. G at 2.

In his Order on the Motion to Dismiss, Judge Chhabria affirmed these allegations: "Facebook shared information about its users with this non-exclusive list of business partners, and that those companies in turn shared data with Facebook." Dkt. No. 298 at 8. Judge Chhabria noted that these partnerships "'were built in part on 'data reciprocity'" whereby "'Facebook and its partners agreed to exchange information about users' activities with each other,'" and upheld all claims relating to them. *Id. See* Opening Brief at 1.

Like Freddy Krueger, Facebook's dead arguments reappear for the sequel. Facebook *again* says the case is limited to "integration partners and device manufactures." Opp. at 15. Not so. Judge Chhabria recognized that the list of partners that Facebook provided to Congress was "non-

1    exclusive" and stated that it "doesn't seem to describe all the 'business partners' listed in the

2    complaint." Dkt. No. 298 at 8. Facebook omits this portion of Judge Chhabria's order despite its

3    clear explanation that Plaintiffs' business partner allegations include more than just the list of

4    "integration partners" and "device manufacturers" Facebook provided to Congress.

5        Facebook's argument also conflicts with Judge Chhabria's conclusion that "the case now

6    includes allegations stemming from the subsequent revelations about Facebook's wider

7    information-sharing practices." *Id.* at 5. And it ignores Judge Chhabria's summary of Plaintiffs'

8    "principal allegations" as "Facebook: (i) made sensitive user information available to countless

9    companies and individuals without the consent of the users; and (ii) failed to prevent those same

10    companies and individuals from selling or otherwise misusing the information." *Id.* at 1.

11        Based on this ruling—and defying Facebook's tired "integration partners" mantra—Judge

12    Corley adopted a functional definition and found that business partners include "all companies with

13    which Facebook agreed to exchange information about users' activities with each other, regardless

14    of whether such company is an 'integration partner.'" Ex. G at 2. Facebook's claim that seeking

15    discovery aligned with that definition "expand[s] the scope" is simply wrong. Opp. at 13.

16        The authority Facebook cites is inapt. *Rund v. Charter Commc'ns, Inc.*, 319 F. App'x 465,

17    468 (9th Cir. 2008) holds that a party cannot assert a "new theory" on appeal. That has nothing to

18    do with the present circumstances. Plaintiffs' effort to require Facebook to identify partners with

19    whom Facebook shared user information (as now required by a court order) is anything but new.

20        Facebook also argues that Judge Corley's order "flatly contradicts Plaintiffs' position."

21    Opp. at 13. But this argument makes no sense. Plaintiffs' brief to Judge Corley stated: "Facebook

22    should identify the companies with which it shared user data and that in turn shared data with

23    Facebook." Ex. E at 2. Judge Corley then ordered Facebook to respond to Plaintiffs' discovery

24    requests without regard to whether the third party was an "integration partner." Plaintiffs simply

25    seek enforcement of that order.

26

27

28

**B.**     **Facebook Should Be Compelled To Amend Its Interrogatory Responses and Identify the Entities With Which Facebook Agreed To Exchange Information About User Activity**

Facebook has not complied with Judge Corley's order. Indeed, following Judge Corley's February 1, 2021 order, Facebook doubled-down on its position and claimed that all business partners had been identified. Ex. N at 10. But documents show that ███████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ (Ex. I at 25:14-26:16), ███████████████ (Ex. H at 204:5-13), ███████████████ (Ex. S).

**1.**     **Facebook Exchanged User Information With Data Brokers**

Facebook contracted with business partners to exchange collected user data. *E.g.* Ex. L ████████████████████████████████████████████████████████████████████████████ ████████████████. In a ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████. Ex. K at 3262. ███████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ *Id.* Facebook's assertion that this document shows ███████████████████████████████ ███████████ (Opp. at 8), is untrue. Indeed, ███████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████ Ex. Q at Slide 5 (emphasis added)—███████████████████████ ███. Facebook should identify these data brokers and other entities with which Facebook exchanged user data as required by Judge Corley's Order.

**2.**     **Facebook Exchanged Information About Users' Activities With App Developers and Other Entities It Has Not Identified**

Facebook contends that reciprocity with app developers is not a business partnership because it relates to █████████████████████████████████████████████████████ ████████████████████████████████████████████████ Opp. at 8. But Facebook's documents show that

1   ███████████████████████████████████████████. *See* Ex. S at 3305 ████

2   ██████████████████████████████████████████████████████████████████

3   ██████████████████████████████████████; Ex. R at 4293 █████████████

4   ██████████████████████████████████████████████████████████████████

5   ████████████████████████████████ (emphasis added). Put another way, these are

6   "companies with which [Facebook] shared user data and that in turn shared data with Facebook."

7   Ex. E at 2. Thus, Judge Corley's Order requires Facebook to identify these third parties, which

8   include ██████████████████████████████.

9          Facebook argues that "[t]his reciprocity was disclosed in Facebook's data use policies,"

10  pointing to a description of "[r]eciprocity and Facebook core functionality" from Facebook's

11  Platform Policy. Opp. at 8, n. 5 (citing to Kutcher Decl. Ex. B). This has nothing to do with whether

12  Judge Corley's Order requires the identification of these partners with whom Facebook admittedly

13  exchanged user information. At any rate, the data use policy Facebook refers to is intended for

14  Facebook's developers, not its users. Facebook's data use policies for users never included this

15  description of data reciprocity. *See, e.g.,* Kutcher Decl., Ex. A. Judge Chhabria recognized as much:

16  "although Facebook points to a section in its Data Use Policy entitled 'Service Providers' which

17  says 'we give your information to the people and companies that help us provide, understand, and

18  improve the services we offer,' that statement does not come close to disclosing the massive

19  information-sharing program with business partners that the plaintiffs allege in the complaint." Dkt.

20  No. 298 at 25.

21                    **3.      Plaintiffs Are Not Judicially Estopped From Arguing That Facebook's
                               Business Partnerships Include App Developers**
22

23         Facebook asserts that Plaintiffs should be judicially estopped from seeking disclosure of

24  certain app developers who had reciprocal relationships with Facebook based on Plaintiffs' prior

25  statements. This is nonsense.

26         In determining whether judicial estoppel applies, courts consider the following factors: "(1)

27  whether a party's later position is 'clearly inconsistent' with its original position; (2) whether the

28  party has successfully persuaded the court of the earlier position; and (3) whether allowing the

1  inconsistent position would allow the party to 'derive an unfair advantage or impose an unfair

2  detriment on the opposing party.'" *United States v. Ibrahim*, 522 F.3d 1003, 1009 (9th Cir. 2008)

3  (citation omitted). The party arguing for judicial estoppel carries the burden to establish these

4  factors. *Marin All. For Med. Marijuana v. Holder*, 866 F. Supp. 2d 1142, 1153 (N.D. Cal. 2011)

5  (declining to find "[d]efendants were subject to judicial estoppel" where plaintiffs "failed to

6  establish that the relevant factors justify its application[.]").

7       Facebook cannot meet any of these requirements. Plaintiffs have never argued, and the

8  Court has never adopted, the position that an entity who agreed to exchange information about

9  users' activities with Facebook would not be a business partner simply because that entity may

10  have also created an app. Such a distinction makes no sense, as even Facebook's admitted

11  integration partners (*e.g.* Blackberry and Apple) have apps. Facebook has no reasonable basis for

12  contending it is at an "unfair disadvantage" based on an argument Plaintiffs never made and that

13  the Court never adopted.

14       **C.**    **Facebook Fails to Demonstrate Undue Burden**

15       Facebook argues that it cannot identify and provide information about the companies with

16  which it shared user data and that in turn shared data with Facebook because such a requirement

17  "would effectively require Facebook to catalogue and audit every interaction any of its employees

18  have had with millions and millions of third parties over more than a decade." Opp. at 10. This also

19  is nonsense. Facebook maintains records of its partnerships. *See, e.g.* Ex. A at 26:7-11 ▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21  ▮▮▮▮▮▮▮; Ex. R at 4293 (showing a ▮▮▮▮▮▮▮▮▮▮▮; Ex. K at 3262 (identifying

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. To the extent

23  Facebook does not track these relationships, that is a significant admission.

24       Documents show that Facebook uses ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮ Ex V at 9730. For example, ▮▮▮▮▮▮▮▮▮▮

26  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28

REPLY ISO MOT. TO COMPEL RE       6       MDL NO. 2843
"BUSINESS PARTNERS"               CASE NO. 18-md-02843-VC-JSC
                               JAMS REF. NO.: 1200058674

1

2 ███████████████████████████████████████ Ex. W at 8793; *see also*

3 Ex. X at Slides 78-79 ████████████████████████████████████████

4 ████████████████████████████████████. Evidence also shows that

5 ████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████

7 Ex. Y. To the extent these documents provide information responsive to Interrogatories 14 and 15,

8 Facebook should produce these documents and reference the documents in its responses pursuant

9 to Federal Rule of Civil Procedure 33(d).

10      **D.      Serving New Discovery Requests Would Erase Months of Negotiation and Motion Practice**

11
12          Facebook's assertion that Plaintiffs are attempting to shoehorn new allegations into the case

13 via an expanded definition of "business partners" in their interrogatories (Opp. at 9) lacks

14 credibility given the well-documented history of the parties' negotiations and motion practice as

15 well as the previous guidance from the Court. The parties engaged in months of negotiating about

16 Interrogatories 14 and 15 before finally presenting the issue to Judge Corley. In it briefing to Judge

17 Corley, Facebook set forth many of the same positions it has done here. Ex. F at 1. But Judge Corley

18 ultimately opted to use Plaintiffs' definition of business partners—a clear acknowledgment that

19 business partners were not limited to integration partners. Ex. G at 2. Facebook's unreasonable and

20 overly-formalistic position would undue almost a year of negotiation, briefing, and a Court order.

21          And even if the Special Master were to give Facebook's position any credence, Judge

22 Corley's previous guidance undermines Facebook's suggestion that Plaintiffs are required to re-

23 issue their discovery requests. In another discovery dispute regarding Plaintiffs' request for

24 Facebook's marketing materials, Facebook raised a similar argument that Plaintiffs' request was

25 not encompassed by their requests for production. There, Judge Corley admonished Facebook

26 stating: "Now, maybe that's not precisely called for by the RFP. So what? … So the RFPs are a

27 starting point. I wouldn't get too caught up in that." Dec. 9, 2020 Discovery Conf. Tr. at 10:24-

28 11:12. Not only has Facebook's hyper-technical argument already been rejected by the Court's

1  functional definition of third parties that it exchanges information with, but the parties and the Court

2  have expended too much effort to require Plaintiffs to restart this process—particularly in light of

3  looming discovery deadlines.

4  **III.    CONCLUSION**

5          Facebook must provide discovery responses consistent with Judge Corley's direction that it

6  "shall identify all companies with which Facebook agreed to exchange information about users'

7  activities with each other, regardless of whether such company is an 'integration partner.'" Ex. G at

8  2. The limitation Facebook seeks—that business partners is limited to "integration partners" and

9  "device manufacturers"— directly contradicts Judge Corley's direction, is inconsistent with Judge

10 Chhabria's motion to dismiss order, and improperly ignores relevant allegations from Plaintiffs'

11 complaint.

12 Dated: October 18, 2021                              Respectfully submitted,

13 KELLER ROHRBACK L.L.P.                               BLEICHMAR FONTI & AULD LLP

14 By:     */s/ Derek W. Loeser*                        By:     */s/ Lesley E. Weaver*
15         Derek W. Loeser                                      Lesley E. Weaver

16 Derek W. Loeser (admitted *pro hac vice*)           Lesley E. Weaver (SBN 191305)
   Cari Campen Laufenberg (admitted *pro hac vice*)    Anne K. Davis (SBN 267909)
17 David Ko (admitted *pro hac vice*)                  Matthew S. Melamed (SBN 260272)
   Adele A. Daniel (admitted *pro hac vice*)           Angelica M. Ornelas (SBN 285929)
18 Benjamin Gould (SBN 250630)                         Joshua D. Samra (SBN 313050)
   1201 Third Avenue, Suite 3200                       555 12th Street, Suite 1600
19 Seattle, WA 98101                                   Oakland, CA 94607
   Tel.: (206) 623-1900                                Tel.: (415) 445-4003
20 Fax: (206) 623-3384                                 Fax: (415) 445-4020
   dloeser@kellerrohrback.com                          lweaver@bfalaw.com
21 claufenberg@kellerrohrback.com                      adavis@bfalaw.com
   dko@kellerrohrback.com                              mmelamed@bfalaw.com
22 adaniel@kellerrohrback.com                          aornelas@bfalaw.com
   bgould@kellerrohrback.com                           jsamra@bfalaw.com

23
   Christopher Springer (SBN 291180)
24 801 Garden Street, Suite 301
   Santa Barbara, CA 93101
25 Tel.: (805) 456-1496
   Fax: (805) 456-1497
26 cspringer@kellerrohrback.com

27
   *Plaintiffs' Co-Lead Counsel*
28

<u>**PROOF OF SERVICE BY E-Mail**</u>

Re: In re: Facebook, Inc. Consumer Privacy User Profile Litigation (Special Master)
Reference No. 1200058674

I, Anne Lieu, not a party to the within action, hereby declare that on  November   , 2021, I served the

attached Order re: Business Partners on the parties in the within action by electronic mail at El Monte,

CALIFORNIA, addressed as follows:

Martie P. Kutscher Clark Esq.
Gibson Dunn & Crutcher
1881 Page Mill Rd.
Palo Alto, CA   94304-1125
Phone: 650-849-5300
mkutscher@gibsondunn.com
    Parties Represented:
    Facebook, Inc.

Deborah L. Stein Esq.
Alexander P. Swanson Esq.
Gibson Dunn & Crutcher
333 S. Grand Ave.
52nd Floor
Los Angeles, CA   90071-3197
Phone: 213-229-7000
dstein@gibsondunn.com
aswanson@gibsondunn.com
    Parties Represented:
    Facebook, Inc.

David J. Ko Esq.
Derek W. Loeser Esq.
Cari C. Laufenberg Esq.
Keller Rohrback LLP
1201 Third Ave.
Suite 3200
Seattle, WA   98101-3052
Phone: 206-623-1900
dko@kellerrohrback.com
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
    Parties Represented:
    Bridgett Burk
    Cheryl Senko
    Jason Ariciu
    Jordan O'Hara
    Rev. Anthony Bell
    Samuel Armstrong
    Steven Akins
    Terry Fischer
    Tyler King

Chris Springer Esq.
Keller Rohrback LLP
801 Garden St.
Suite 301
Santa Barbara, CA   93101
Phone: 805-456-1496
cspringer@kellerrohrback.com
    Parties Represented:
    Bridgett Burk
    Cheryl Senko
    Jason Ariciu
    Jordan O'Hara
    Rev. Anthony Bell
    Samuel Armstrong
    Steven Akins
    Terry Fischer
    Tyler King

Lesley E. Weaver Esq.
Ms. Anne Davis
Matthew Montgomery Esq.
Bleichmar Fonti & Auld LLP
555 12th St.
Suite 1600
Oakland, CA   94607-3616
Phone: 415-445-4003
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
   Parties Represented:
   Bridgett Burk
   Cheryl Senko
   Jason Ariciu
   Jordan O'Hara
   Rev. Anthony Bell
   Samuel Armstrong
   Steven Akins
   Terry Fischer
   Tyler King

Matthew S. Melamed Esq.
Angelica M. Ornelas Esq.
Joshua D. Samra Esq.
Bleichmar Fonti & Auld LLP
555 12th St.
Suite 1600
Oakland, CA   94607-3616
Phone: 415-445-4003
mmelamed@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com
   Parties Represented:
   Bridgett Burk
   Cheryl Senko
   Jason Ariciu
   Jordan O'Hara
   Rev. Anthony Bell
   Samuel Armstrong
   Steven Akins
   Terry Fischer
   Tyler King

Orin S. Snyder Esq.
Gibson Dunn & Crutcher
200 Park Ave.
47th Floor
New York, NY   10166-0193
Phone: 212-351-4000
osnyder@gibsondunn.com
   Parties Represented:
   Facebook, Inc.

Joshua S. Lipshutz Esq.
Gibson Dunn & Crutcher
1050 Connecticut Ave NW
Washington, DC   20036
Phone: 202-9558500
JLipshutz@gibsondunn.com
   Parties Represented:
   Facebook, Inc.

Russell H. Falconer Esq.
Gibson Dunn & Crutcher
2001 Ross Ave.
Suite 2100
Dallas, TX   75201
Phone: 214-698-3100
rfalconer@gibsondunn.com
   Parties Represented:
   Facebook, Inc.

Colin B. Davis Esq.
Gibson Dunn & Crutcher
3161 Michelson Dr.
Irvine, CA   92612-4412
Phone: 949-451-3800
cdavis@gibsondunn.com
   Parties Represented:
   Facebook, Inc.

Ms. Laura C. Mumm
Gibson Dunn & Crutcher
200 Park Ave.

New York, NY   10166
Phone: 212-351-4000
LMumm@gibsondunn.com
    Parties Represented:
    Facebook, Inc.

      I declare under penalty of perjury the foregoing to be true and correct. Executed at El Monte,

CALIFORNIA on

/s/ Anne Lieu
Anne Lieu
JAMS
alieu@jamsadr.com