# EXHIBIT C
# REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, | **MDL NO. 2843** |
| | CASE NO. 3:18-MD-02843-VC-JSC |
| This document relates to: | HON. VINCE CHHABRIA |
| | HON. JACQUELINE SCOTT CORLEY |
| ALL ACTIONS | COURTROOM 4 – 17TH FLOOR |
| | SPECIAL MASTER, DANIEL GARRIE, ESQ. |
| | **AMENDED ORDER REGARDING PRODUCTION OF ADI RELATED DOCUMENTS** |

## BACKGROUND

1.    On September 8, 2021, Judge Corley issued an order granting Plaintiffs' motion

to compel the production of materials in connection with Facebook's app developer investigation

("ADI") that involved a review of all "apps that had access to large amounts of data before [Fa-

cebook] changed [its] platform policies in 2014." See https://about.fb.com/news/2019/09/an-up-

date-on-our-app-developer-investigation/.

2.    Pursuant to the order:

> In light of Facebook's unchallenged public proclamations as to the business
> purpose of the ADI, the Court finds that the ADI served a dual purpose and
> that, as a general matter, documents generated as part of that investigation
> were not created because of litigation. On or before September 21, 2021, Fa-
> cebook shall produce the background and technical reports, audits and devel-
> oper interviews of the six exemplar apps chosen by the parties as Facebook
> has offered no special reasons why those particular documents are privileged
> other than what has been addressed. The parties shall work with the Special
> Master regarding production of additional materials consistent with the guid-
> ance offered by this Order. See Exhibit A (Order Granting Motion to Compel
> ADI Materials).

3.    According to Judge Corley's order, Facebook produced 11 documents related to

the ADI. Following this production, Plaintiffs raised multiple issues in connection with Face-

book's ADI production and requested "all memoranda prepared by ▮▮▮▮▮ and/or ▮▮▮

▮▮▮ related to ADI of all apps it investigated or investigated at Facebook's direction, the

background and technical reports, audits, and developer interviews, and internal Facebook com-

munications regarding these materials (including those pertaining to the six exemplar apps)." See

Exhibit B (Plaintiffs' Email of September 24, 2021).

4.    The parties subsequently met and conferred regarding Facebook's ADI produc-

tion, but were unable to resolve the outstanding issues.

5.     On October 26, 2021, Special Master Garrie issued Order Regarding Outstanding ADI Issues which ordered the parties to provide summaries of the outstanding ADI issues and the parties' respective positions.

6.     On October 22, 2021, Plaintiffs submitted their initial statement. Plaintiffs argue that pursuant to Judge Corley's order, Facebook should produce the following in connection with the ADI: (1) all memoranda prepared by ▮▮▮▮ or ▮▮▮▮ (2) all background reports, technical reports, audits, and developer interviews; (3) all internal Facebook communications relating to items 1 and 2; (4) all communications with ▮▮▮▮ or ▮▮▮▮ related to items 1 and 2; and (5) all communications with third-party app developers. See Exhibit C (Plaintiffs' Statement Concerning ADI Issues in Advance of Hearing). Plaintiffs also argued that Facebook's production of 11 reports relating to the six exemplar apps pursuant to Judge Corley's order was incomplete because Facebook's privilege logs include references to additional reports relating to these apps that were not provided. Id.

7.     On October 22, 2021, Facebook submitted its initial statement. Facebook argues, among other things, that (1) Facebook produced all documents ordered by Judge Corley; and (2) the five categories of ADI-related documents Plaintiffs request go beyond the scope of Judge Corley's order. See Exhibit D (Facebook's Supplemental Submission Re: ADI).

8.     On November 4, 2021, Plaintiffs submitted their response. Plaintiffs argue, among other things that (1) Facebook should produce additional reports regarding the six exemplar apps because additional reports were identified in Facebook's privilege logs; and (2) Facebook failed to show how the five categories of ADI-related documents Plaintiffs request are not "consistent with the guidance offered by" Judge Corley's order. See Exhibit E (Plaintiffs' Response Re: ADI).

9.     On November 4, 2021, Facebook submitted its response. Facebook argues, among other things that (1) Facebook's production pursuant to Judge Corley's order is complete; (2) Plaintiffs' requests for all reports and memoranda for all apps or developers investigated in phases two or three of the ADI and beyond the scope of Judge Corley's order; and (3) there is no basis for Plaintiffs to request ADI related communications because Judge Corley previously reviewed these communications *in camera* and did not order the production of such communications. See Exhibit F (Facebook's Response Re: ADI).

10.     A hearing was held on December 4, 2021, regarding the parties' submissions and other information related to the ADI issues.

11.     On December 8, 2021, Special Master Garrie issued an Order Regarding the Production of ADI Documents.

12.     On December 15, 2021, Facebook submitted a Motion for Reconsideration of Special Master's Order Regarding the Production of ADI Documents.

## FINDINGS

13.     Special Master Garrie finds that Plaintiffs' requests for all memoranda prepared by                    or                    and all background reports, technical reports, audits, and developer interviews in connection with the ADI are within the scope of Judge Corley's order as the order explicitly includes these categories of documents. See Exhibit A ("Facebook shall produce the background and technical reports, audits and developer interviews of the six exemplar apps chosen by the parties").

14.     Special Master Garrie finds that Judge Corley's order does not exclude non-attorney internal Facebook communications, communications with                    or

or communications with third party app developers from the scope of ADI documents to be

**AMENDED ORDER REGARDING PRODUCTION OF ADI RELATED DOCUMENTS**

Case 3:18-md-02843-VC   Document 788-5   Filed 01/04/22   Page 6 of 649

produced, but rather only addresses reports, audits, and interviews. Id. at 6 ("The documents dis-

cussed in this Order—background and technical reports, audits, and interviews prepared and con-

ducted by non-attorneys—are work product, not attorney-client privilege material."). As a result,

Special Master Garrie finds that additional information regarding the relevance of such commu-

nications is necessary to determine whether such communications should be produced.

## ORDER

15.    Facebook is to produce, on a rolling weekly basis, all memoranda prepared by

           or          and all background reports, technical reports, audits, and non-

attorney developer interviews in connection with the ADI.[1] Such production is to begin with the

reports for which related audits and non-attorney interviews are available.

16.    No later than December 24, 2021, Facebook is to provide to Special Master Gar-

rie for *in camera* review, all ADI related communications pertaining to the six exemplar applica-

tions.

17.    Facebook's request to stay this order is denied.


**IT IS SO ORDERED.**


December 20, 2021

Daniel Garrie
Discovery Special Master

---

[1] Facebook is to update any applicable privilege logs as appropriate pursuant to the Privilege Protocol.

4

**AMENDED ORDER REGARDING PRODUCTION OF ADI RELATED DOCUMENTS**

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: FACEBOOK, INC. CONSUMER
PRIVACY USER PROFILE LITIGATION

Case No. 18-md-02843-VC (JSC)

**ORDER GRANTING MOTION TO
COMPEL ADI MATERIALS**

Re: Dkt. Nos. 611, 612, 699, 711, 719, 720,
721, 727, 729

In early 2018, the public learned that "Cambridge Analytica, a British political consulting firm, used personal information from millions of Facebook accounts to send targeted political messages during the 2016 presidential election." *In re Facebook, Inc. Consumer Privacy User Profile* Litigation, 402 F.Supp.3d 767, 777 (N.D. Cal. Sep. 9, 2019). "In the months that followed, reports emerged suggesting that the ability of . . . entities like Cambridge Analytica to obtain sensitive Facebook user information was the norm rather than the exception." *Id.* Following the disclosure, Facebook initiated an app developer investigation (ADI) that involved a review of all "apps that had access to large amounts of data before [Facebook] changed [its] platform policies in 2014." *See* https://about.fb.com/news/2019/09/an-update-on-our-app-developer-investigation/. As the ADI, or, more precisely, the information the ADI uncovered, is directly relevant to Plaintiffs' claims in this MDL action, Plaintiffs seek information learned from and generated by the ADI. While Facebook has agreed to produce some data, it resists disclosure of reports, audits and interviews created or conducted by non-attorneys on the grounds that such documents are protected by attorney-work product or the attorney-client privilege. After several rounds of briefing and attempts among the parties to resolve, or at least narrow, the dispute, the issue is now ripe for decision.

1

United States District Court
Northern District of California

**DOCUMENTS AT ISSUE**

2          Facebook's ADI consisted of three phases: (1) Detection and Identification of offending

3    apps, (2) Enhanced Examination, and (3) Enforcement. In the Enhanced Examination Phase, the

4    ADI forensic team conducted intensive background and technical investigations of the identified

5    apps that, among other things, might identify the potential for data misuse. (Dkt. No. 699-5 ¶ 17.)

6    In the Enforcement phase, to assist Facebook with deciding whether to take action against an app,

7    additional investigation might be conducted including interviews or audits of data security or

8    storage infrastructure.  (*Id.* ¶ 19.).  Plaintiffs seek material from the second and third phases that

9    does not involve communications with lawyers or content created by lawyers.  While Facebook

10   has agreed to produce some information (Dkt. No. 699-1 at 4), it refuses on privilege grounds to

11   produce the reports, audits and interviews, and non-attorney communications related to the same.

12                                              **ANALYSIS**

13         The parties agree that federal law governs this dispute. (Dkt. Nos. 611-2 at 16, 612-2 at 12,

14   699 at 4, 727 at 5 n.1) (applying federal law.)  "The work product doctrine protects from

15   discovery documents and tangible things prepared by a party or his representative in anticipation

16   of litigation." *United States v. Richey*, 632 F.3d 559, 567 (9th Cir. 2011).  "To qualify for work-

17   product protection, documents must: (1) be 'prepared in anticipation of litigation or for trial' and

18   (2) be prepared 'by or for another party or by or for that other party's representative.'"  *In re*

19   *Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt*, 357 F.3d 900, 907 (9th Cir. 2004).  A finding

20   that a document was prepared in anticipation of litigation, however, does not always end the

21   inquiry.

22                    In circumstances where a document serves a dual purpose, that is,
                      where it was not prepared exclusively for litigation, then the "because
23                    of" test is used.   Dual purpose documents are deemed prepared
                      because of litigation if in light of the nature of the document and the
24                    factual situation in a particular case, the document can be fairly said
                      to have been prepared or obtained because of the prospect of
25                    litigation.  In applying the because of standard, courts must consider
                      the totality of the circumstances and determine whether the document
26                    was created because of anticipated litigation, *and would not have been*
                      *created in substantially similar form but for the prospect of litigation.*
27

28   *Richey*, 632 F.3d at 567-68 (emphasis added). The party resisting production of material based on

1  the work product privilege bears the burden of proving that the privilege applies. *See Hernandez v.*

2  *Tanninen*, 604 F.3d 1095, 1102 (9th Cir. 2010).

3       Facebook has met its burden of proving that the documents were prepared in anticipation

4  of litigation. Shortly before Facebook initiated the ADI, a nationwide consumer class action was

5  filed against Facebook in this Court. (Dkt. No. 1). Within weeks, more than 40 actions were filed

6  which were consolidated into this Multi-District Litigation. Facebook offers evidence that the

7  ADI was launched in part to address potential regulatory and litigation risks posed by apps that

8  had been on the Facebook platform since before Facebook changed in policies in 2014. (Dkt. No.

9  699-5, Dkt. No. 720.)

10       Facebook's own public pronouncements about the ADI, however, demonstrate that the

11  documents were not created exclusively in anticipation of litigation and that, in fact, Facebook

12  would have conducted the ADI in substantially similar form even in the absence of potential

13  litigation. *See Richey*, 632 F.3d at 568.

14       On March 21, 2018, Mark Zuckerberg, Facebook's CEO, publicly posted:

15          I want to share an update on the Cambridge Analytica situation—
16          including the steps we've already taken and our next steps to address
        this important issue.

17

18          We have a responsibility to protect your data, and if we can't then
        we don't deserve to serve you. I've been working to understand
19          exactly what happened and how to make sure this doesn't happen
        again.

20
        [W]e already took the most important steps a few years ago in 2014
21          to prevent bad actors from accessing people's information in this
        way. But there's more we need to do and I'll outline those steps
22          here:

23
        First, we will investigate all apps that had access to large amounts of
24          information before we changed our platform to dramatically reduce
        data access in 2014, and we will conduct a full audit of any app with
25          suspicious activity. We will ban any developer from out platform
        that does not agree to a thorough audit. And if we find developers
26          that misused personally identifiable information, we will ban them
        and tell everyone affected by those apps.
27

28  Mr. Zuckerberg concluded:

3

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5

> I started Facebook, and at the end of the day I'm responsible for
> what happens on our platform. I'm serious about doing what it takes
> to protect our community. While this specific issue involving
> Cambridge Analytica should no longer happen with new apps today,
> that doesn't change what happened in the past. We will learn from
> this experience to secure our platform further and make our
> community safer for everyone going forward.

6   https://www.facebook.com/zuck/posts/1010471203790007. This statement specifically identifies

7   the purpose of the ADI as serving Facebook's business goal of protecting Facebook's customers'

8   data by figuring out what happened, how it happened, and removing apps that misused customers'

9   data so that Facebook could "secure our platform further and make our community safer for

10  everyone going forward." *Id.*

11      Two months later, Facebook updated the public on the "app investigation and audit" Mr.

12  Zuckerberg promised on March 21, 2018.

13
14
15
16
17

> The investigation process is in full swing, and it has two phases.
> First, a comprehensive review to identify every app that had access
> to this amount of Facebook data. And second, where we have
> concerns, we will conduct interviews, make requests for information
> (RFI)—which ask a series of detailed question about the app and the
> data it had access to—and perform audits that may include on-site
> inspections.

18
19
20
21
22
23

> We have large teams of internal and external experts working hard
> to investigate these apps as quickly as possible. To date thousands
> of apps have been investigated and around 200 have been
> suspended—pending a thorough investigation into whether they did
> in fact misuse any data. Where we find evidence that these or other
> apps did misuse data, we will ban them and notify people via this
> website. It will show people if they or their friends installed an app
> that misused data before 2015—just as we did for Cambridge
> Analytica.

24
25
26

> There is a lot more work to be done to find all the apps that may
> have misused people's Facebook data—and it will take time. We are
> investing heavily to make sure this investigation is as thorough as
> possible. We will keep you updated on our progress.

27  https://fb.com/new/2018/05/update-on-app-audit/. This statement again demonstrates that a "core

28  purpose" of the ADI was a business rather than legal purpose: to assure its customers that it was

4

1    conducting a thorough investigation to remove bad apps and advise customers if their data may

2    have been misused. And the ADI was being conducted "as quickly as possible," —not because of

3    fast-tracked litigation, as the pace of this MDL surely demonstrates—but because of the need to

4    weed out the bad apps to protect Facebook's consumers, its good will, and its business.

5         Facebook provided a further update on "our ongoing App Developer Investigation" on

6    September 20, 2019. Facebook explained that its investigation

7            has involved hundreds of people: attorneys, external investigators,
     data scientists, engineers, policy specialists, platform partners and
8            other teams across the company. Our review helps us to better
     understand patterns of abuse in order to root out bad actors among
9            developers.

10   Facebook explained further

11           that where it has concerns, it "conduct[s] a more intensive
     examination. This includes background investigation of the developer
12           and a technical analysis of the app's activity on the platform.
     Depending on the results, a range of actions could be taken from
13           requiring developers to submit to in-depth questioning, to conducting
     inspections or banning an app from the platform.
14

15   https://about.fb.com/news/2019/an-update-on-our-app-developer-investigation/. Facebook told

16   the public about its investigation, including the background and technical analysis it now claims is

17   privileged work product, to assure the public that Facebook was cleaning up its platform and thus

18   generate trust in its site—a classic business purpose. The ADI team members Facebook identified

19   were enlisted to help Facebook "better understand patterns of abuse in order to root out bad

20   actors."

21        In light of Facebook's own statements, the Court finds that Facebook would have

22   conducted the ADI in substantially the same form even in the absence of potential litigation; that

23   is, that Facebook did not initiate the ADI because of the prospect of litigation. *See Phoenix Techs.*

24   *Ltd. v. VMware, Inc.*, 195 F. Supp. 3d 1096, 1105 (N.D. Cal. 2016) (holding that dual purpose

25   documents were not protected work product because they served a business purpose independent

26   of litigation). Facebook's assertion that the ADI served *only* a litigation purpose (Dkt. No. 727 at

27   3) is patently implausible in light of Facebook's public pronouncements. It is inconceivable that

28   Facebook would not have initiated a speedy, large-scale-subject matter specialist investigation into

United States District Court
Northern District of California

5

app data misuse in the absence of potential litigation. Such assertion could only be true if the Court found that Facebook was lying to the public when it stated that the purpose of the ADI was to root out bad apps and secure Facebook's platform so that consumers could have faith in the company. Facebook, unsurprisingly, does not offer any evidence to support such a finding. Indeed, after asking the Court for the opportunity to submit additional evidence, it provided a declaration from outside counsel which does not even acknowledge these statements. There is no evidence from anyone at Facebook that addresses the repeated public proclamations as to the obvious business purpose of the ADI.

Facebook's suggestion that these materials may also be protected by the attorney-client privilege is unpersuasive given that Plaintiffs are not seeking documents created by counsel, counsel's edits, or any communications with counsel. Facebook has not explained how a non-attorney's interview or audit of a developer would be protected from discovery by the attorney-client privilege under federal law. At best such material would be attorney work product. For the reasons explained above, it is not under the totality of the circumstances here given Facebook's public exhortations of the business purpose behind its ADI.

## MOTION TO STRIKE

Facebook moves to strike Plaintiffs' response to Facebook's supplemental declaration. (Dkt. No. 727.) For the most part the response addresses the declaration and thus is unobjectionable. The new argument as to the attorney-client privilege "primary purpose" test is stricken and, in any event, is moot as the Court is not addressing the application of the attorney-client privilege. The documents discussed in this Order—background and technical reports, audits, and interviews prepared and conducted by non-attorneys—are work product, not attorney-client privilege material. The Court has nonetheless reviewed Facebook's motion to strike's substantive arguments, including the cases buried in footnote 1, and none persuade the Court otherwise.

## CONCLUSION

In light of Facebook's unchallenged public proclamations as to the business purpose of the ADI, the Court finds that the ADI served a dual purpose and that, as a general matter, documents

6

1    generated as part of that investigation were not created because of litigation. On or before

2    September 21, 2021, Facebook shall produce the background and technical reports, audits and

3    developer interviews of the six exemplar apps chosen by the parties as Facebook has offered no

4    special reasons why those particular documents are privileged other than what has been addressed.

5    The parties shall work with the Special Master regarding production of additional materials

6    consistent with the guidance offered by this Order.

7         This Order disposes of Docket Nos. 611, 612, 699, 720, 727.

8         **IT IS SO ORDERED.**

9    Dated:  September 8, 2021

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

7

# EXHIBIT B

Thanks,
Martie

**Martie Kutscher Clark**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1881 Page Mill Road, Palo Alto, CA 94304-1211
Tel +1 650.849.5348 • Fax +1 650.849.5048
MKutscherClark@gibsondunn.com • www.gibsondunn.com

---

**From:** David Ko <dko@KellerRohrback.com>
**Date:** Friday, September 24, 2021 at 7:49 PM
**To:** "Snyder, Orin" <OSnyder@gibsondunn.com>, "Stein, Deborah L."
<DStein@gibsondunn.com>, "Falconer, Russ" <RFalconer@gibsondunn.com>, "Kutscher Clark,
Martie" <MKutscherClark@gibsondunn.com>, "Mumm, Laura C."
<LMumm@gibsondunn.com>
**Cc:** Derek Loeser <dloeser@KellerRohrback.com>, Cari Laufenberg
<claufenberg@KellerRohrback.com>, Benjamin Gould <bgould@KellerRohrback.com>, Chris
Springer <cspringer@KellerRohrback.com>, Lesley Weaver <lweaver@bfalaw.com>, Matt
Melamed <mmelamed@bfalaw.com>, Anne Davis <adavis@bfalaw.com>, Daniel Garrie
<DGarrie@jamsadr.com>, "Gail Andler (judgeandler@icloud.com)"
<judgeandler@icloud.com>
**Subject:** ADI

**[WARNING: External Email]**

We write to follow up on our prior correspondence regarding ADI on September 11, and your
production of 11 documents earlier this week in response to Judge Corley's September 9 order
granting Plaintiffs' motion to compel ADI materials. Doc. 736.

We first note that of the 11 documents you produced, two are letters to third-party app developers.
This is surprising to us since you previously represented several times that you already produced all
such communications. *See e.g.*, June 19, 2020 Hr'g T. 14:23-15:2 (Mr. Snyder: "[W]e did identify
third parties with respect to which we took certain enforcement measures. We sent them letters.
We terminated them. In a few cases, we sued them. All of Facebook's communications with those
third parties are fair game. We're going to produce those."); Facebook's Brief in Opposition to
Plaintiff's Request for ADI Materials, Doc. 612 at 5 ("Facebook further agreed to collect and produce
non-privileged materials relating to the Investigation and already produced more than 30,000 pages
of non-privileged materials from the Investigation, which are communications with third parties
about the Investigation."); Joint Discovery Dispute Letter to J. Corley, Doc. 699-1 ("Facebook has

produced a wealth of information: ... Facebook's requests to and communications with the developers."). Contrary to these representations, you clearly have not produced all communications with third parties seeking your enforcement measures in light of your production of these two letters. Please produce all such communications immediately. We reserve all rights with respect to your prior inaccurate representations to Plaintiffs and the Court with regard to these communications.

Second, Judge Corley's Sept. 9 Order required Facebook to produce "background and technical reports, audits and developer interviews ..." Doc. 736 at 7. The 11 documents you produced consisted of 9 memoranda from ▆▆▆▆▆▆ and ▆▆▆▆▆▆ – Facebook's outside consultants for ADI – and two cease and desist letters as noted above. Please confirm that you have not withheld any other documents pertaining to the six exemplar apps referenced in the Sept. 9 Order. If you have withheld any materials, please immediately provide the basis for doing so.

Third, as required by Judge Corley's order to work with Special Master Garrie regarding the production of additional materials related to ADI and our prior request to meet and confer after review of your production, we request all memoranda prepared by ▆▆▆▆▆▆ and/or ▆▆▆▆ related to ADI of all apps it investigated or investigated at Facebook's direction, the background and technical reports, audits, and developer interviews, and internal Facebook communications regarding these materials (including those pertaining to the six exemplar apps).

We are available to confer next week on these issues if necessary.  Thank you.

---------------------------
David Ko
Attorney - Complex Litigation
Keller Rohrback L.L.P.

Phone: (206) 428-0562
Email: dko@kellerrohrback.com
http://www.krcomplexlit.com

CONFIDENTIALITY NOTE: This e-mail contains information belonging to the law firm of Keller Rohrback L.L.P., which may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual entity named above. If you think that you have received this message in error, please e-mail the sender. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

This message may contain confidential and privileged information for the sole use of the intended

recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

# EXHIBIT C

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley Weaver (Cal. Bar No.191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaint₍ᵢ₎fs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' STATEMENT CONCERNING THE ADI ISSUES IN ADVANCE OF HEARING**<br><br>Judge: Hon. Vince Chhabra<br>Hon. Jacqueline Scott Corley<br>Special Master Daniel Garrie<br>Courtroom: 4, 17th Floor<br><br>JAMS Ref. No.: 1200058674<br><br>ORAL ARGUMENT REQUESTED |

Pursuant to the Special Master's October 15, 2021 email Order, Plaintiffs submit the following preliminary statement concerning the ADI issues.

## I.    ISSUE

Judge Corley has held that "the ADI served a dual purpose and that, as a general matter, documents generated as part of that investigation were not created because of litigation." Dkt. No. 736 at 6-7. She directed Plaintiffs to work with Facebook and the Special Master regarding production of additional ADI materials consistent with the Order. The issue now before the Special Master is what additional ADI materials should Facebook produce?

## II.    EXAMPLE OF ISSUE

While Plaintiffs believe the Order justifies the production of a broader scope of documents, as an interim step and to expedite production, Plaintiffs request that Facebook produce the following related to phases two and three of the ADI:[1]

1.  All memoranda prepared by ▇▇▇▇▇▇ or ▇▇▇▇▇▇

2.  All background reports, technical reports, audits, and developer interviews;

3.  All internal Facebook communications relating to items 1 and 2;

4.  All communications with ▇▇▇▇▇▇ or ▇▇▇▇▇▇ related to items 1 and 2; and

5.  All communications with third-party app developers.[2]

The parties met and conferred about Plaintiffs' requests on October 12. Facebook failed to offer a proposal for how it planned to comply with Judge Corley's Order, including its guidance to produce "additional [ADI] materials consistent with the guidance offered by this Order." Dkt. No. 736 at 2.

---

[1] ADI consisted of three phases: (1) Detection and Identification of offending apps, (2) Enhanced Examination, and (3) Enforcement. *See* Dkt. No. 736 at 2.

[2] *See* June 19, 2020 Hr'g T. 14:23-15:2 (Facebook's counsel: "[W]e did identify third parties with respect to which we took certain enforcement measures. We sent them letters. We terminated them. In a few cases, we sued them. All of Facebook's communications with those third parties are fair game. We're going to produce those.")

### III.  PLAINTIFFS' POSITION

Under the dual-purpose doctrine and pursuant to Judge Corley's Order, Dkt. No. 736, Plaintiffs are entitled to production of the materials requested above. The Order granted Plaintiffs' motion to compel Facebook to produce "material from the second and third phases" of the ADI. *Id.* at 2. The second phase concerned "Enhanced Examination"; the third, "Enforcement." *Id.* The Court explained that, because "Facebook would have conducted the ADI in substantially the same form even in the absence of potential litigation," the materials Plaintiffs moved to compel are not protected from production. *Id.* at 6; *see United States v. Richey*, 632 F. 3d 559, 568 (9th Cir. 2011) (where a document was not prepared exclusively for litigation, it qualifies for work-product protection only if it ""would not have been created in substantially similar form but for the prospect of litigation""") (citations omitted); *see also In re Grand Jury*, 13 F.4th 710 (9th Cir. 2021) (dual-purpose attorney-client communications are protected only where the primary purpose concerns legal advice that may not have been provided absent the privilege).

As a first step, the Court ordered Facebook to "produce the background and technical reports, audits and developer interviews" of six exemplar apps previously identified by the parties for the purpose of briefing. *Id.* at 6-7. In response, Facebook produced 11 documents. Nine were memoranda prepared by            or            two external consultants Facebook retained to assist with ADI. These memoranda contain a wealth of relevant information about why these apps were being investigated and what user data they collected. On October 12, Facebook asserted its production relating to the six exemplar apps was complete. However, Facebook's privilege logs concerning those apps identify numerous reports, including 99 reports without counsel listed, which are not or are exceedingly unlikely to be privileged. Facebook should complete its production for the six exemplar apps. Facebook should also produce all such memoranda for any apps or developers investigated in phases two or three of the ADI, all other additional or related "background reports, technical reports, audits, and developer interviews" for all apps or developers investigated in phases two or three of the ADI, and any internal Facebook communications regarding the ADI--in particular, apps investigated during phases two or three of

1   the ADI. In addition, Facebook should produce all communications with ▮▮▮▮▮▮ or ▮

2   regarding the ADI. The Order provides Facebook no basis for withholding any of these

3   communications. Finally, Facebook should produce all third-party communications related to ADI;

4   despite earlier representations it would produce all such documents, it recently produced two

5   additional letters, and conceded that it has not.

6

7   Dated: October 22, 2021

                                   Respectfully submitted,

8   KELLER ROHRBACK L.L.P.                   BLEICHMAR FONTI & AULD LLP

9

10   By:    */s/ Derek W. Loeser*           By:    */s/ Lesley E. Weaver*
             Derek W. Loeser                    Lesley E. Weaver

11   Derek W. Loeser (admitted *pro hac vice*)   Lesley E. Weaver (SBN 191305)
    Cari Campen Laufenberg (admitted *pro hac vice*)   Anne K. Davis (SBN 267909)

12   David Ko (admitted *pro hac vice*)         Matthew S. Melamed (SBN 260272)
    Adele A. Daniel (admitted *pro hac vice*)   Angelica M. Ornelas (SBN 285929)

13   Benjamin Gould (SBN 250630)         Joshua D. Samra (SBN 313050)
    1201 Third Avenue, Suite 3200        555 12th Street, Suite 1600

14   Seattle, WA 98101                 Oakland, CA 94607
    Tel.: (206) 623-1900              Tel.: (415) 445-4003

15   Fax: (206) 623-3384              Fax: (415) 445-4020
    dloeser@kellerrohrback.com          lweaver@bfalaw.com

16   claufenberg@kellerrohrback.com       adavis@bfalaw.com
    dko@kellerrohrback.com            mmelamed@bfalaw.com

17   adaniel@kellerrohrback.com          aornelas@bfalaw.com
    bgould@kellerrohrback.com         jsamra@bfalaw.com

18
    Christopher Springer (SBN 291180)

19   801 Garden Street, Suite 301
    Santa Barbara, CA 93101

20   Tel.: (805) 456-1496
    Fax: (805) 456-1497

21   cspringer@kellerrohrback.com

22   *Plaintiffs' Co-Lead Counsel*

23

24

25

26

27

28

# EXHIBIT D

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
  klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
  mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
  dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION<br><br>This document relates to:<br><br>ALL ACTIONS | MDL NO. 2843<br>CASE NO. 3:18-MD-02843-VC-JSC<br><br>**FACEBOOK'S SUPPLEMENTAL SUBMISSION RE ADI**<br><br>Judge: Hon. Vince Chhabria<br>Hon. Jacqueline Scott Corley<br>Special Master Daniel Garrie<br>Courtroom: 4, 17th Floor<br><br>JAMS Ref. No.: 1200058674 |

1    In response to the Special Master's Order dated October 15, 2021 regarding ADI, Facebook
2    states as follows:

3    **Issue #1:** Plaintiffs identify two letters to the developer ▓▓▓▓▓▓▓▓▓ that
4    Facebook included in its September 21 production of ADI materials pursuant to Judge Corley's ADI
5    Order. Plaintiffs say these letters were not produced previously, which they believe conflicts with
6    Facebook's prior representations about its productions. Plaintiffs say Facebook previously
7    represented that it had produced all correspondence with developers in connection with ADI.

8    **Example:** Plaintiffs identify two letters (i) a letter from Alexander H. Southwell of Gibson
9    Dunn to ▓▓▓▓▓▓▓▓ dated March 30, 2018; and (ii) a letter from Mr. Southwell to
10   ▓▓▓▓▓▓▓ dated March 13, 2019.

11   **Facebook's Position:** Plaintiffs' representations are wrong. The March 30, 2018 letter from
12   Alexander H. Southwell to ▓▓▓▓▓ was produced to Plaintiffs on July 8, 2020 as
13   Bates Number FB-CA-MDL-01159181. It is incorrect that Facebook produced this letter for the first
14   time last month; Plaintiffs have had this letter for over 15 months. Mr. Southwell's second, March
15   13, 2019, letter was not produced previously. This is because it was not within the set of materials
16   the parties agreed would be collected and produced in response to Plaintiffs' RFP 21, which requests:
17   "Communications between Facebook and Third Parties relating to the ADI, including but not limited
18   to Communications that Facebook provided to the Massachusetts Attorney General's Office."

19   For each of Plaintiffs' RFPs, the parties either agreed to a targeted collection or custodians
20   and search strings that would be used to identify potentially responsive materials. In May 2020, the
21   parties agreed Facebook would conduct a targeted collection for RFP 21, and that they would not
22   negotiate custodians and search strings. The parties specifically agreed Facebook would collect and
23   produce developer correspondence from the email account typically used to communicate with
24   developers about ADI (Facebook's ▓▓▓▓▓▓ account). Facebook produced these
25   materials, which amounted to more than 30,000 pages of communications with third parties. Mr.
26   Southwell's March 13, 2019 letter was not previously collected and produced because the ▓▓▓▓
27   ▓▓▓ account was not copied as a recipient on the transmittal email for this particular letter. This
28   does not conflict with Facebook's prior representations. Facebook represented that it was not

1  asserting privilege over its ADI communications with developers, and it produced the materials the

2  parties agreed Facebook would collect and produce. *See, e.g.*, June 19, 2020 Hr'g Tr. 15:1–2

3  ("Facebook's communications with those third parties are fair game."); Dkt. 612 at 5 ("Facebook

4  further agreed to collect and produce non-privileged materials relating to the Investigation and

5  already produced more than 30,000 pages of non-privileged materials from the Investigation, which

6  are communications with third parties about the Investigation."); *see also Reinsdorf v. Skechers*

7  *U.S.A., Inc.*, 296 F.R.D. 604, 615 (C.D. Cal. 2013) ("[W]hile parties must impose a reasonable

8  construction on discovery requests and conduct a reasonable search when responding to the requests,

9  the Federal Rules do not demand perfection.").

10  **Issue #2:**  Facebook's September 21 production of documents in response to Judge Corley's

11  ADI Order includes eleven documents, which amount to 379 pages.  Plaintiffs assert, without basis,

12  that the production must be incomplete because Plaintiffs expected Facebook to produce more

13  documents.

14  **Example:**  Plaintiffs provide no example of materials missing from Facebook's September 21

15  production, and Facebook is aware of none.

16  **Facebook's Position:**  Facebook has produced all materials Judge Corley ordered Facebook

17  to produce by September 21.  Judge Corley ordered Facebook to produce "background and technical

18  reports, audits and developer interviews of the six exemplar apps chosen by the parties" previously

19  for a sampling exercise designed to identify examples of privileged ADI documents. Dkt. 736 at 7.

20  Facebook produced nine background and technical reports for the six apps, as well as two cease-and-

21  desist letters demanding audits.  ADI ultimately did not conduct forensic audits or developer

22  interviews for any of the six apps, so there are no more documents to produce with respect to the six

23  apps.

24  **Issue #3:**  Plaintiffs demand that Facebook produce five broad categories of ADI materials:

25  (a) background and technical reports for every app addressed by ADI; (b) audits for every app

26  addressed by ADI; (c) developer interviews for every app addressed by ADI; (d) all memoranda

27  prepared by expert consultants retained by Gibson Dunn related to ADI; and (e) communications

28  regarding the previous four categories of materials.

1

**Example:**  Not applicable.

2

**Facebook's Position:**  Facebook informed Plaintiffs that:  (i) Facebook is evaluating what

3   materials it maintains in the categories Judge Corley described as potentially discoverable in her

4   September 9, 2021 Order; (ii) Plaintiffs' requests appear to go far beyond Judge Corley's order,

5   includes requests Judge Corley has already rejected, and should be confined to the categories of

6   materials Judge Corley described as potentially discoverable; and (iii) it was premature for Facebook

7   to identify what non-privileged materials it may be able to produce, and Facebook would provide a

8   preliminary position the week of October 25.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2      Dated:  October 22, 2021              **GIBSON, DUNN & CRUTCHER, LLP**

3                                            By:  _/s/ Orin Snyder_
                                             Orin Snyder (*pro hac vice*)
4                                            osnyder@gibsondunn.com
                                             200 Park Avenue
5                                            New York, NY 10166-0193
                                             Telephone:  212.351.4000
6                                            Facsimile:  212.351.4035

7                                            Deborah Stein (SBN 224570)
                                             dstein@gibsondunn.com
8                                            333 South Grand Avenue
                                             Los Angeles, CA 90071-3197
9                                            Telephone:  213.229.7000
                                             Facsimile:  213.229.7520
10

11                                           Joshua S. Lipshutz (SBN 242557)
                                             jlipshutz@gibsondunn.com
12                                           1050 Connecticut Avenue, N.W.
                                             Washington, DC 20036-5306
13                                           Telephone:  202.955.8500
                                             Facsimile:  202.467.0539

14                                           Russell H. Falconer
                                             rfalconer@gibsondunn.com
15                                           2001 Ross Avenue Suite 2100
                                             Dallas, TX 75201
16                                           Telephone:  214.698.3170

17                                           Kristin A. Linsley (SBN 154148)
                                             klinsley@gibsondunn.com
18                                           Martie Kutscher (SBN 302650)
                                             mkutscherclark@gibsondunn.com
19                                           555 Mission Street, Suite 3000
                                             San Francisco, CA 94105-0921
20                                           Telephone:  415.393.8200
                                             Facsimile:  415.393.8306
21

22                                           *Attorneys for Defendant Facebook, Inc.*

23

24

25

26

27

28

# EXHIBIT E

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaint.,fs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' RESPONSE TO FACEBOOK'S SUPPLEMENTAL SUBMISSION RE ADI**<br><br>Judge: Hon. Vince Chhabria<br>Hon. Jacqueline Scott Corley<br>Special Master Daniel Garrie<br><br>JAMS Ref. No.: 1200058674 |

Pursuant to Special Master Daniel Garrie's order regarding ADI, Plaintiffs submit

responses to each issue Facebook raises in its October 22, 2021 submission.

**Facebook's Issue #1:** Plaintiffs identify two letters to the developer ▮▮▮▮▮
▮▮▮▮▮ that Facebook included in its September 21 production of ADI
materials pursuant to Judge Corley's ADI Order. Plaintiffs say these letters were
not produced previously, which they believe conflicts with Facebook's prior
representations about its productions. Plaintiffs say Facebook previously
represented that it had produced all correspondence with developers in connection
with ADI.

**Response to Issue #1:**  More than a year ago, Facebook's counsel represented that it

would produce all correspondence with third parties regarding ADI: "[W]e did identify third

parties with respect to which we took certain enforcement measures…. All of Facebook's communications with those third parties are fair game. *We're going to produce those.*" June 19, 2020 Hr'g Tr. at 14:23–15:2 (emphasis added). However, correspondence with one third-party app developer, ▮▮▮▮▮▮▮▮▮▮▮▮▮ was produced for the first time in September 2021, after Judge Corley's Order. Facebook asserts that the correspondence was not produced earlier because the sender failed to copy the email address that Facebook represented would capture such correspondence for its production. The ADI involves an investigation of "millions of apps," as Facebook publicly proclaims. Facebook's failure to produce this document earlier, coupled with the likelihood that numerous additional communications with apps investigated during phases 2 or 3 exist, raises the question of whether all such ADI-related correspondence has been produced. Facebook should be required to produce *all* such third-party communications immediately.

> **Facebook's Issue #2:** Facebook's September 21 production of documents in response to Judge Corley's ADI Order includes eleven documents, which amount to 379 pages. Plaintiffs assert, without basis, that the production must be incomplete because Plaintiffs expected Facebook to produce more documents.

**Response to Issue #2:** Judge Corley's ADI Order required Facebook to produce "background and technical reports, audits and developer interviews of the six exemplar apps chosen by the parties." Dkt. 736 at 7. In response to this Order, Facebook produced only (a) nine memoranda prepared by either ▮▮ or ▮▮ the two external consultants Facebook retained to assist with ADI, and (b) two letters to third-party app developers. Facebook's submission states that it has no other materials to provide. Facebook is asserting that ▮▮ and ▮▮ somehow prepared nine lengthy memoranda (one is 223 pages) without the benefit of any other background reports, audits, or interviews. Facebook's privilege logs refute that assertion. In the privilege logs concerning the six exemplar apps that Facebook provided to Plaintiffs last year, there are 99 references to reports. Plaintiffs request an order requiring Facebook to produce all withheld background documents on the six exemplar apps, including technical reports and developer interviews, and to explain how it is construing each of the categories in Judge Corley's

ADI order. Plaintiffs made the latter request in the parties' original meet and confer on October 13. Facebook has ignored the request—just as it has ignored its October 22 promise that, by the week of October 25, it would provide Plaintiffs with its "preliminary position" on materials it "may be able to produce."

> **Facebook's Issue #3:** Plaintiffs demand that Facebook produce five broad categories of ADI materials: (a) background and technical reports for every app addressed by ADI; (b) audits for every app addressed by ADI; (c) developer interviews for every app addressed by ADI; (d) all memoranda prepared by expert consultants retained by Gibson Dunn related to ADI; and (e) communications regarding the previous four categories of materials.

**Response to Issue #3:** Facebook does not explain why Plaintiffs' requests are not "consistent with the guidance offered by" the ADI Order. Dkt. No. 736 at 7. Plaintiffs seek production of **(1)** all memoranda prepared by ███████ or ███████ and **(2)** all background reports, technical reports, audits, and developer interviews. These are precisely what Judge Corley ordered for the six exemplar apps and are therefore explicitly "consistent with the guidance offered by" the Order. For similar reasons, Plaintiffs should receive **(3)** all internal Facebook communications relating to documents in categories one and two; and **(4)** all communications with ███████ or ███████ related to documents in categories one or two. Facebook's own discussions of the results of the ADI are evidence critical to Plaintiffs' negligence and breach of contract claims, among other issues. Plaintiffs also request **(5)** all communications with third-party app developers. This request merely seeks what Facebook's counsel told Plaintiffs and the Court more than a year ago would be produced. *Supra* at 2. Finally, Plaintiffs emphasize that these requests are limited to documents from ADI phases two and three.

Dated: November 4, 2021

Respectfully submitted,

KELLER ROHRBACK L.L.P.

BLEICHMAR FONTI & AULD LLP

By:   */s/ Derek W. Loeser*
     Derek W. Loeser

By:   */s/ Lesley E. Weaver*
     Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Adele A. Daniel (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com
bgould@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew S. Melamed (SBN 260272)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmelamed@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

Pages 1 - 20

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, MAGISTRATE JUDGE

IN RE: FACEBOOK, INC. CONSUMER     )
PRIVACY USER PROFILE LITIGATION.   )  NO. 18-MD-2843 VC (JSC)
                                      San Francisco, California
                                      Friday, June 19, 2020

**TRANSCRIPT OF ZOOM VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                        BLEICHMAR FONTI & AULD LLP
                        555 12th Street
                        Suite 1600
                        Oakland, California  94607
                   BY:  **LESLEY E. WEAVER, ESQ.**
                        **ANNE K. DAVIS, ESQ.**
                        **MATTHEW MONTGOMERY, ESQ.**


                        KELLER RORHBACK, LLP
                        1201 Third Avenue
                        Suite 3200
                        Seattle, Washington  98101
                   BY:  **DEREK W. LOESER, ESQ.**
                        **DAVID J. KO, ESQ.**
                        **CARI C. LAUFENBERG, ESQ.**

For Defendants:
                        GIBSON DUNN & CRUTCHER LLP
                        200 Park Avenue
                        New York, New York  10166
                   BY:  **ORIN SNYDER, ESQ.**


Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court


        (Appearances continued, next page)

**<u>APPEARANCES, CONTINUED</u>:**

For Defendants:

                    GIBSON DUNN & CRUTCHER LLP
                    1881 Page Mill Road
                    Palo Alto, California  94304
          **BY:  MARTIE P. KUTSCHER, ESQ.**


                    GIBSON DUNN & CRUTCHER LLP
                    2100 McKinney Avenue
                    Suite 1100
                    Dallas, Texas  75201
          **BY:  RUSSELL H. FALCONER, ESQ.**

about that specific request, there are a whole set of other requests that clearly, it's material.

So the bottom line is we want to get this process started of getting these documents related to this ADI investigation, which is fundamentally relevant to all our claims.  Right?  Because it's about the enforcement of Facebook's policies against third parties that are taking data from Facebook's platform.

**MR. SNYDER:**  Your Honor, this is Mr. Snyder.  I'm going to defer to Ms. Stein for a moment.

I just want to frame the issue just very briefly, which is that the app developer investigation was an internal legal investigation.

My law firm actually supervised it, at the direction of in-house counsel at Facebook.  And it's the privileged documents that we are objecting to.

We are going to -- what happened was we conducted an internal investigation of -- retrospectively, Your Honor, of all third-party apps on the Facebook platform, to go back in time and see if there were any Cambridge Analytica-like incidents.  It turned out there were none.

But as a result of that searching retrospective internal examination, we did identify third parties with respect to which we took certain enforcement measures.  We sent them letters.  We terminated them.  In a few cases, we sued them.

1          All of Facebook's communications with those third parties

2     are fair game.  We're going to produce those.  And so they're

3     going to get a substantial amount of information relating to

4     all enforcement actions we took with third parties as a result

5     of our privileged internal review.

6          Much of the information has already been produced.  Some

7     of it is in the queue for production right now.

8          And so there's going to be a lot of information they're

9     going to get about our enforcement measures.

10         And what we're objecting to producing is the information

11    that Facebook's counsel generated, which is my law firm working

12    with in-house lawyers at Facebook.

13         And that's what is the ADI, or the app developer

14    investigation.  That's separate and apart from, then,

15    enforcement actions that we took.  And that is, to the extent

16    responsive -- and I think most it is, if not all of it -- we're

17    going to be producing that.

18         The extent to which those investigative matters are

19    privileged is the subject of a pending appeal in Massachusetts.

20    And the Massachusetts Supreme Court recently granted

21    extraordinary review of an order that required us to produce

22    what we said was privileged materials.

23         But even the order in that case, Your Honor, recognizes

24    that many of the materials that the plaintiffs here are asking

25    for are protected by the attorney/client privilege.

1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

7 IN RE: FACEBOOK, INC. CONSUMER | Case No. 18-md-02843-VC  (JSC)

8 PRIVACY USER PROFILE LITIGATION

9 **ORDER GRANTING MOTION TO COMPEL ADI MATERIALS**

10 Re: Dkt. Nos. 611, 612, 699, 711, 719, 720,

11 721, 727, 729

12

13 In early 2018, the public learned that "Cambridge Analytica, a British political consulting

14 firm, used personal information from millions of Facebook accounts to send targeted political

15 messages during the 2016 presidential election." *In re Facebook, Inc. Consumer Privacy User*

16 *Profile* Litigation, 402 F.Supp.3d 767, 777 (N.D. Cal. Sep. 9, 2019). "In the months that followed,

17 reports emerged suggesting that the ability of . . . entities like Cambridge Analytica to obtain

18 sensitive Facebook user information was the norm rather than the exception." *Id.* Following the

19 disclosure, Facebook initiated an app developer investigation (ADI) that involved a review of all

20 "apps that had access to large amounts of data before [Facebook] changed [its] platform policies in

21 2014." *See* https://about.fb.com/news/2019/09/an-update-on-our-app-developer-investigation/.

22 As the ADI, or, more precisely, the information the ADI uncovered, is directly relevant to

23 Plaintiffs' claims in this MDL action, Plaintiffs seek information learned from and generated by

24 the ADI. While Facebook has agreed to produce some data, it resists disclosure of reports, audits

25 and interviews created or conducted by non-attorneys on the grounds that such documents are

26 protected by attorney-work product or the attorney-client privilege. After several rounds of

27 briefing and attempts among the parties to resolve, or at least narrow, the dispute, the issue is now

28 ripe for decision.

**DOCUMENTS AT ISSUE**

Facebook's ADI consisted of three phases: (1) Detection and Identification of offending apps, (2) Enhanced Examination, and (3) Enforcement. In the Enhanced Examination Phase, the ADI forensic team conducted intensive background and technical investigations of the identified apps that, among other things, might identify the potential for data misuse. (Dkt. No. 699-5 ¶ 17.) In the Enforcement phase, to assist Facebook with deciding whether to take action against an app, additional investigation might be conducted including interviews or audits of data security or storage infrastructure. (*Id.* ¶ 19.). Plaintiffs seek material from the second and third phases that does not involve communications with lawyers or content created by lawyers. While Facebook has agreed to produce some information (Dkt. No. 699-1 at 4), it refuses on privilege grounds to produce the reports, audits and interviews, and non-attorney communications related to the same.

**ANALYSIS**

The parties agree that federal law governs this dispute. (Dkt. Nos. 611-2 at 16, 612-2 at 12, 699 at 4, 727 at 5 n.1) (applying federal law).) "The work product doctrine protects from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *United States v. Richey*, 632 F.3d 559, 567 (9th Cir. 2011). "To qualify for work-product protection, documents must: (1) be 'prepared in anticipation of litigation or for trial' and (2) be prepared 'by or for another party or by or for that other party's representative.'" *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt*, 357 F.3d 900, 907 (9th Cir. 2004). A finding that a document was prepared in anticipation of litigation, however, does not always end the inquiry.

> In circumstances where a document serves a dual purpose, that is, where it was not prepared exclusively for litigation, then the "because of" test is used. Dual purpose documents are deemed prepared because of litigation if in light of the nature of the document and the factual situation in a particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation. In applying the because of standard, courts must consider the totality of the circumstances and determine whether the document was created because of anticipated litigation, *and would not have been created in substantially similar form but for the prospect of litigation*.

*Richey*, 632 F.3d at 567-68 (emphasis added). The party resisting production of material based on

United States District Court
Northern District of California

1    the work product privilege bears the burden of proving that the privilege applies. *See Hernandez v.*

2    *Tanninen*, 604 F.3d 1095, 1102 (9th Cir. 2010).

3    Facebook has met its burden of proving that the documents were prepared in anticipation

4    of litigation. Shortly before Facebook initiated the ADI, a nationwide consumer class action was

5    filed against Facebook in this Court. (Dkt. No. 1). Within weeks, more than 40 actions were filed

6    which were consolidated into this Multi-District Litigation. Facebook offers evidence that the

7    ADI was launched in part to address potential regulatory and litigation risks posed by apps that

8    had been on the Facebook platform since before Facebook changed in policies in 2014. (Dkt. No.

9    699-5, Dkt. No. 720.)

10   Facebook's own public pronouncements about the ADI, however, demonstrate that the

11   documents were not created exclusively in anticipation of litigation and that, in fact, Facebook

12   would have conducted the ADI in substantially similar form even in the absence of potential

13   litigation. *See Richey*, 632 F.3d at 568.

14   On March 21, 2018, Mark Zuckerberg, Facebook's CEO, publicly posted:

15   I want to share an update on the Cambridge Analytica situation—
16   including the steps we've already taken and our next steps to address
     this important issue.
17
18   We have a responsibility to protect your data, and if we can't then
     we don't deserve to serve you. I've been working to understand
19   exactly what happened and how to make sure this doesn't happen
     again.
20
21   [W]e already took the most important steps a few years ago in 2014
     to prevent bad actors from accessing people's information in this
22   way. But there's more we need to do and I'll outline those steps
     here:
23
24   First, we will investigate all apps that had access to large amounts of
     information before we changed our platform to dramatically reduce
25   data access in 2014, and we will conduct a full audit of any app with
     suspicious activity. We will ban any developer from out platform
26   that does not agree to a thorough audit. And if we find developers
     that misused personally identifiable information, we will ban them
27   and tell everyone affected by those apps.

28   Mr. Zuckerberg concluded:

                                              3

United States District Court
Northern District of California

1

2      I started Facebook, and at the end of the day I'm responsible for
what happens on our platform. I'm serious about doing what it takes

3      to protect our community. While this specific issue involving
Cambridge Analytica should no longer happen with new apps today,

4      that doesn't change what happened in the past. We will learn from
this experience to secure our platform further and make our

5      community safer for everyone going forward.

6      https://www.facebook.com/zuck/posts/1010471203790007. This statement specifically identifies

7 the purpose of the ADI as serving Facebook's business goal of protecting Facebook's customers'

8 data by figuring out what happened, how it happened, and removing apps that misused customers'

9 data so that Facebook could "secure our platform further and make our community safer for

10 everyone going forward." *Id*.

11      Two months later, Facebook updated the public on the "app investigation and audit" Mr.

12 Zuckerberg promised on March 21, 2018.

13      The investigation process is in full swing, and it has two phases.

14      First, a comprehensive review to identify every app that had access
to this amount of Facebook data. And second, where we have

15      concerns, we will conduct interviews, make requests for information
(RFI)—which ask a series of detailed question about the app and the

16      data it had access to—and perform audits that may include on-site
inspections.

17

18      We have large teams of internal and external experts working hard
to investigate these apps as quickly as possible. To date thousands

19      of apps have been investigated and around 200 have been
suspended—pending a thorough investigation into whether they did

20      in fact misuse any data. Where we find evidence that these or other
apps did misuse data, we will ban them and notify people via this

21      website. It will show people if they or their friends installed an app
that misused data before 2015—just as we did for Cambridge

22      Analytica.

23

24      There is a lot more work to be done to find all the apps that may
have misused people's Facebook data—and it will take time. We are

25      investing heavily to make sure this investigation is as thorough as
possible. We will keep you updated on our progress.

26

27 https://fb.com/new/2018/05/update-on-app-audit/. This statement again demonstrates that a "core

28 purpose" of the ADI was a business rather than legal purpose: to assure its customers that it was

1  conducting a thorough investigation to remove bad apps and advise customers if their data may

2  have been misused. And the ADI was being conducted "as quickly as possible," —not because of

3  fast-tracked litigation, as the pace of this MDL surely demonstrates—but because of the need to

4  weed out the bad apps to protect Facebook's consumers, its good will, and its business.

5      Facebook provided a further update on "our ongoing App Developer Investigation" on

6  September 20, 2019. Facebook explained that its investigation

7          has involved hundreds of people: attorneys, external investigators,
           data scientists, engineers, policy specialists, platform partners and
8          other teams across the company. Our review helps us to better
           understand patterns of abuse in order to root out bad actors among
9          developers.

10  Facebook explained further

11          that where it has concerns, it "conduct[s] a more intensive
            examination. This includes background investigation of the developer
12          and a technical analysis of the app's activity on the platform.
            Depending on the results, a range of actions could be taken from
13          requiring developers to submit to in-depth questioning, to conducting
            inspections or banning an app from the platform.
14

15  https://about.fb.com/news/2019/an-update-on-our-app-developer-investigation/. Facebook told

16  the public about its investigation, including the background and technical analysis it now claims is

17  privileged work product, to assure the public that Facebook was cleaning up its platform and thus

18  generate trust in its site—a classic business purpose. The ADI team members Facebook identified

19  were enlisted to help Facebook "better understand patterns of abuse in order to root out bad

20  actors."

21      In light of Facebook's own statements, the Court finds that Facebook would have

22  conducted the ADI in substantially the same form even in the absence of potential litigation; that

23  is, that Facebook did not initiate the ADI because of the prospect of litigation. *See Phoenix Techs.

24  Ltd. v. VMware, Inc.*, 195 F. Supp. 3d 1096, 1105 (N.D. Cal. 2016) (holding that dual purpose

25  documents were not protected work product because they served a business purpose independent

26  of litigation). Facebook's assertion that the ADI served *only* a litigation purpose (Dkt. No. 727 at

27  3) is patently implausible in light of Facebook's public pronouncements. It is inconceivable that

28  Facebook would not have initiated a speedy, large-scale-subject matter specialist investigation into

United States District Court
Northern District of California

5

United States District Court
Northern District of California

1    app data misuse in the absence of potential litigation. Such assertion could only be true if the

2    Court found that Facebook was lying to the public when it stated that the purpose of the ADI was

3    to root out bad apps and secure Facebook's platform so that consumers could have faith in the

4    company. Facebook, unsurprisingly, does not offer any evidence to support such a finding.

5    Indeed, after asking the Court for the opportunity to submit additional evidence, it provided a

6    declaration from outside counsel which does not even acknowledge these statements. There is no

7    evidence from anyone at Facebook that addresses the repeated public proclamations as to the

8    obvious business purpose of the ADI.

9            Facebook's suggestion that these materials may also be protected by the attorney-client

10   privilege is unpersuasive given that Plaintiffs are not seeking documents created by counsel,

11   counsel's edits, or any communications with counsel. Facebook has not explained how a non-

12   attorney's interview or audit of a developer would be protected from discovery by the attorney-

13   client privilege under federal law. At best such material would be attorney work product. For the

14   reasons explained above, it is not under the totality of the circumstances here given Facebook's

15   public exhortations of the business purpose behind its ADI.

16                                   **MOTION TO STRIKE**

17           Facebook moves to strike Plaintiffs' response to Facebook's supplemental declaration.

18   (Dkt. No. 727.) For the most part the response addresses the declaration and thus is

19   unobjectionable. The new argument as to the attorney-client privilege "primary purpose" test is

20   stricken and, in any event, is moot as the Court is not addressing the application of the attorney-

21   client privilege. The documents discussed in this Order—background and technical reports,

22   audits, and interviews prepared and conducted by non-attorneys—are work product, not attorney-

23   client privilege material. The Court has nonetheless reviewed Facebook's motion to strike's

24   substantive arguments, including the cases buried in footnote 1, and none persuade the Court

25   otherwise.

26                                     **CONCLUSION**

27           In light of Facebook's unchallenged public proclamations as to the business purpose of the

28   ADI, the Court finds that the ADI served a dual purpose and that, as a general matter, documents

                                              6

1    generated as part of that investigation were not created because of litigation.  On or before

2    September 21, 2021, Facebook shall produce the background and technical reports, audits and

3    developer interviews of the six exemplar apps chosen by the parties as Facebook has offered no

4    special reasons why those particular documents are privileged other than what has been addressed.

5    The parties shall work with the Special Master regarding production of additional materials

6    consistent with the guidance offered by this Order.

7            This Order disposes of Docket Nos. 611, 612, 699, 720, 727.

8            **IT IS SO ORDERED.**

9    Dated:  September 8, 2021

10

11

12                                                      JACQUELINE SCOTT CORLEY
                                                        United States Magistrate Judge

13

United States District Court
Northern District of California

Case 3:18-md-02843-VC   Document 788-5   Filed 01/04/22   Page 182 of 649

Case 3:18-md-02843-VC   Document 788-5   Filed 01/04/22   Page 310 of 649

# EXHIBIT F

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
  klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
  mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
  dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL NO. 2843<br>CASE NO. 3:18-MD-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **FACEBOOK'S RESPONSE TO PLAINTIFFS' STATEMENT CONCERNING THE ADI ISSUES IN ADVANCE OF THE HEARING**<br><br>Judge: Hon. Vince Chhabria<br>Hon. Jacqueline Scott Corley<br>Special Master Daniel Garrie<br>Courtroom: 4, 17th Floor<br><br>JAMS Ref. No.: 1200058674 |

Gibson, Dunn & Crutcher LLP

FACEBOOK'S RESPONSE TO PLAINTIFFS' STATEMENT CONCERNING THE ADI ISSUES IN ADVANCE OF THE HEARING
CASE NO. 3:18-MD-02843-VC-JSC

1    Pursuant to the Special Master's October 15, 2021 Order, Facebook respectfully submits this

2    response to Plaintiffs' description of pending ADI issues.  The Special Master allowed each party one

3    paragraph to respond to each issue raised by the other party.  Because Plaintiffs combined many issues

4    under a single issue heading—likely in an effort to limit Facebook's response on a number of

5    complicated issues to a single paragraph—Facebook responds to each separate issue raised by Plaintiffs

6    individually:

7    **Issue #1:**  Plaintiffs assert: "Facebook should produce all third-party communications related

8    to ADI; despite earlier representations it would produce all such documents, it recently produced two

9    additional letters, and conceded that it did not." Ex. M at 3.

10    **Facebook's Response:**  As discussed in Facebook's opening submission to the Special Master,

11    Ex. N, Facebook's production in response to RFP 21 (Exhibit A) is complete.  Facebook produced the

12    third-party communications related to ADI that the parties **agreed** Facebook would collect and

13    produce; one of the documents Plaintiffs claim was improperly withheld was actually produced in July

14    2020 and the other is outside the scope of the materials the Parties agreed Facebook would produce in

15    response to this request.  The Parties agreed in May 2020 that Facebook would collect and produce

16    materials responsive to RFP 21 by collecting third-party correspondence from its ▮▮▮▮▮▮▮▮▮

17    email account.  Facebook did.  To provide a bit more detail, Plaintiffs continue to falsely claim that

18    Facebook's September 21, 2021 production under Judge Corley's ADI Order included two letters with

19    third parties that Facebook previously withheld improperly.  Facebook has corrected Plaintiffs several

20    times. *See* Ex. L.  One of the letters Plaintiffs say Facebook improperly withheld until September 2021

21    (from Alexander H. Southwell of Gibson Dunn to ▮▮▮▮▮▮▮▮▮ was, in fact, produced in

22    July 2020 as Bates Number FB-CA-MDL-01159181.  Even though Facebook has pointed Plaintiffs to

23    the Bates Number associated with its prior production of this letter, Plaintiffs continue to make this

24    false accusation.  Similarly, as Facebook explained, the other letter Plaintiffs say was withheld

25    improperly (also from Mr. Southwell to ▮▮▮▮▮▮▮▮▮ was not produced previously

26    because the ▮▮▮▮▮▮▮ email account was not copied as a recipient on the transmittal email

27    for this particular letter, and the parties agreed that Facebook would collect materials responsive to

28    RFP 21 through a targeted collection from Facebook's ▮▮▮▮▮▮▮ email account.  The Parties

Gibson, Dunn &
Crutcher LLP

1

FACEBOOK'S RESPONSE TO PLAINTIFFS' STATEMENT CONCERNING THE ADI ISSUES IN ADVANCE OF THE HEARING
CASE NO. 3:18-MD-02843-VC-JSC

1   spent more than one year negotiating how Facebook would collect materials potentially responsive to
2   each of Plaintiffs' requests for production, and the Special Master should reject Plaintiffs' efforts to
3   unwind and expand past agreements now.

4       **Issue #2:**  Plaintiffs assert that Facebook's production of "'background and technical reports,
5   audits and developer interviews' of six exemplar apps previously identified by the parties for the
6   purpose of briefing" is incomplete under Judge Corley's ADI Order, because "Facebook's privilege
7   logs concerning those apps identify numerous reports, including 99 reports without counsel listed,
8   which are not or are exceedingly unlikely to be privileged." Ex. M at 2.

9       **Facebook's Response:**  Facebook produced the background and technical reports Judge Corley
10  ordered Facebook to produce for six specific apps; the additional "reports" Plaintiffs now seek are
11  beyond the scope of Judge Corley's order and Plaintiffs' own requests.  In demanding additional
12  materials beyond the scope of Judge Corley's Order, Plaintiffs deliberately conflate ADI-related **emails
13  and attachments** Facebook logged in late 2020 with the **underlying factual materials** Judge Corley
14  ordered Facebook to produce in September 2021.  The parties already litigated whether emails and
15  attachments Facebook logged previously were discoverable, Judge Corley conducted an *in-camera*
16  review, **and Judge Corley did not order a single one of these communications produced.**  By way
17  of background, Plaintiffs initially demanded all ADI-related *documents and communications*.
18  Facebook objected to that request on privilege grounds, and Judge Corley asked the parties to identify
19  a sample of materials to work through privilege issues. Ex. C at 44:23–48:8.  To do this, the parties
20  agreed to six exemplar apps; Facebook then logged responsive **emails** (and their families) hitting on
21  those Apps' names or IDs from certain custodians' files.  Exs. D, E.  Under the Parties' ESI and
22  Privilege Protocols, Facebook logged full families, so long as any document in the family was ADI-
23  related and any document in the family hit on one of the six exemplar apps' names or IDs.  While
24  Plaintiffs have not clarified which privilege-log entries they claim should be produced, materials
25  labeled "reports" could have been logged for a variety of reasons if they happened to be attached to a
26  document family that was logged.  After Facebook logged these emails and attachments, Plaintiffs
27  moved to compel their production, Ex. F, and Judge Corley conducted an *in camera* review.  After
28  conducting this review, Judge Corley expressed concerns about the ADI emails and attachments that

Gibson, Dunn &
Crutcher LLP

2

FACEBOOK'S RESPONSE TO PLAINTIFFS' STATEMENT CONCERNING THE ADI ISSUES IN ADVANCE OF THE HEARING
CASE NO. 3:18-MD-02843-VC-JSC

1    Plaintiffs demanded: "a lot of it I don't think is relevant at all"—some materials are "privilege[d] and

2    I actually think you don't even need." Ex. G 17:8–21. Judge Corley then pressed Plaintiffs on "what . . .

3    precisely [it is] that the plaintiffs need from th[e] investigation." *Id.* at 17:22–23. Plaintiffs clarified

4    they did **not** seek the materials that Facebook had logged:    "[T]he facts underlying these

5    communications are what we're really seeking." *Id.* at 18:13–15; *id.* at 18:1–4 (Mr. Ko). After the

6    parties were not able to successfully negotiate the "underlying facts" Facebook would produce,

7    Plaintiffs moved to compel an entirely different set of materials. Judge Corley explained:

8           Plaintiffs seek documents (not created by lawyers) from the 'Enhanced Examination
            phase' that involve background and technical investigations to identify the potential for
9           data misuse. (Dkt. No. 699 at 5.) They also seek documents from the 'Enforcement
            phase,' including Facebook conducted audits and interviews. (*Id.*).

10   Ex. I at 2–3 (citing Ex. H at 5). She further clarified: "None of these documents were part of the *in*

11   *camera* review the Court earlier conducted [of materials Facebook logged]." *Id.* at 3. Judge Corley

12   ultimately ordered Facebook to produce "the background and technical reports, audits and developer

13   interviews of the six exemplar apps [previously] chosen by the parties." Ex. K at 7. Judge Corley

14   ordered Facebook to produce *specific* reports Plaintiffs requested and the Parties briefed on July 2,

15   2021, *see* Ex. I at 2–3; Ex. J at ¶¶ 14–15, 20, 25, and she did not order Facebook to produce any of the

16   emails and attachments Facebook logged many months earlier, which had been part of her *in camera*

17   review in February 2021 and are separate and distinct from the specific reports she later ordered

18   produced. Facebook complied with these instructions.

19          **Issue #3:**   Plaintiffs assert that in addition to the 99 reports or memoranda identified on

20   Facebook's privilege logs for the six exemplar apps that were not produced, "Facebook should also

21   produce all such memoranda for any apps or developers investigated in phases two or three of the

22   ADI." Ex. M at 2.

23          **Facebook's Response:**   Like Plaintiffs' request for unspecified "reports," Plaintiffs' broad

24   request for all ADI-related memoranda was not part of Plaintiffs' narrowed request for facts underlying

25   ADI or among the materials addressed in Judge Corley's ADI Order. Such a wide-ranging and new

26   request is beyond the scope of Judge Corley's Order, demands materials protected by the attorney-

27   client privilege and work-product doctrine, seeks materials Plaintiffs have conceded they are not

28   seeking, *see supra* Issue #2, and should be rejected.

Gibson, Dunn &
Crutcher LLP

3

FACEBOOK'S RESPONSE TO PLAINTIFFS' STATEMENT CONCERNING THE ADI ISSUES IN ADVANCE OF THE HEARING
CASE NO. 3:18-MD-02843-VC-JSC

1    **Issue #4:**  Plaintiffs assert that "Facebook should also produce . . . any internal Facebook

2    communications regarding the ADI—in particular, apps investigated during phases two or three of the

3    ADI." Ex. M at 2–3.  Plaintiffs also assert that "Facebook should produce all communications" with

4    its technical experts "regarding the ADI." *Id.* at 3.

5    **Facebook's Response:**  Plaintiffs' request for all internal ADI communications and all

6    communications with Facebook's consulting experts relating to ADI seeks to relitigate a request Judge

7    Corley rejected and Plaintiffs previously abandoned.  As discussed above, in February 2021 Plaintiffs

8    moved to compel all communications regarding ADI, and Judge Corley reviewed *in camera* twenty

9    communications of Plaintiffs' choosing.  Ex. F.  Plaintiffs later abandoned their request for ADI

10   communications, stating, "the facts underlying these communications are what we're really seeking."

11   Ex. G at 17:22–23, 18:1–4, 13–15 (Mr. Ko).  This concession led to months of mediation regarding the

12   "facts" Plaintiffs sought.  Judge Corley's ADI Order describes her understanding of the underlying

13   facts Plaintiffs sought:

14   > Plaintiffs seek documents (not created by lawyers) from the 'Enhanced Examination
     > phase' that involve background and technical investigations to identify the potential for
15   > data misuse.  (Dkt. No. 699 at 5.)  They also seek documents from the 'Enforcement
     > phase,' including Facebook conducted audits and interviews.  (*Id.*).

16   Ex. I at 2–3 (citing Ex. H at 5).  Judge Corley further clarified that "[n]one of these documents

17   [Plaintiffs now request] were part of the *in camera* review [of ADI emails] the Court earlier conducted."

18   *Id.* at 3.  Judge Corley's September 8 ADI Order resolved both Plaintiffs' new request for "underlying

19   facts" about ADI and their prior motion to compel ADI correspondence.  *See* Ex. K at 7 ("This Order

20   disposes of Docket No[.] 611 [Plaintiffs' Motion to Compel Production of Documents Related to

21   Facebook's App Developer Investigation]").  In doing so, Judge Corley did not order production of

22   **any** documents she reviewed *in camera* or any other internal ADI communications.  There is no basis

23   for Plaintiffs to demand these materials now.  Nor is there any basis for Plaintiffs to demand ADI-

24   related communications with counsel, which are protected by the attorney-client privilege.  Plaintiffs

25   explicitly assured Judge Corley that they were "not interested in the legal advice and legal

26   communications."  Ex. C at 35:16–17; *see also id.* at 34:19–22.  Judge Corley repeated this

27   understanding in her ADI Order, stating:  "Plaintiffs are not seeking documents created by counsel,

28   counsel's edits, or any communications with counsel."  Ex. K at 6.  Judge Corley, the Parties, and the

Gibson, Dunn &
Crutcher LLP

4

FACEBOOK'S RESPONSE TO PLAINTIFFS' STATEMENT CONCERNING THE ADI ISSUES IN ADVANCE OF THE HEARING
CASE NO. 3:18-MD-02843-VC-JSC

1    mediators have spent nearly two years narrowing Plaintiffs' ADI document requests, and Judge

2    Corley's instruction to work with the Special Master on additional productions consistent with her

3    order was not an invitation for Plaintiffs to rewrite earlier proceedings or to renege on past promises.

4        **Issue #5:**  Plaintiffs assert that "Facebook should also produce . . . all other additional or

5    related" background reports and technical reports "for all apps or developers investigated in phases two

6    or three of the ADI."  Ex. M at 2.

7        **Facebook's Response:**  Plaintiffs' demand for immediate production of all background and

8    technical reports is premature and inconsistent with Judge Corley's and Judge Chhabria's repeated

9    instructions.  Over its objection, Facebook has produced all of the background and technical reports

10   Judge Corley ordered Facebook to produce.  Judge Corley's ADI Order specifically required

11   production of "background and technical reports" related to six exemplar apps, and Facebook produced

12   these materials.  To the extent the Special Master is inclined to compel Facebook to produce additional

13   privileged background and technical reports over its objection, Facebook must be provided an

14   opportunity to review these materials for document-specific privilege issues within them, such as

15   attorney-client communications, attorney work product (e.g., attorney edits), or other privileged

16   information (e.g., trade secrets, personally-identifiable information).  Facebook presented evidence to

17   Judge Corley that background and technical reports from ADI are not uniform in nature, Ex. J ¶¶ 17,

18   20–21, and Judge Corley recognized that ADI materials are likely to include privileged information

19   and attorney work product.  Specifically, Judge Corley advised that "facts" underlying ADI would be

20   discoverable but that Facebook would not be required to produce any information that is "(a) attorney-

21   client privilege[d]; or (b) attorney work product," noting that things such as attorney "edits" and "any

22   advice that was given" would not be discoverable.  Ex. G at 16:22–25, 17:1–3.  To that end, Judge

23   Corley's ADI Order did not require production of "communications with lawyers or content created by

24   lawyers," Ex. K at 2, and did "not address[] the application of attorney-client privilege," *id.* at 6.  Judge

25   Corley's order plainly provides Facebook an opportunity to review for individualized privilege issues

26   any additional materials it is ordered to produce over its objection.  Such a review is also consistent

27   with Judge Chhabria's repeated instructions that "it would [not] be appropriate . . . to order" Facebook

28   to produce documents without reviewing them.  *See, e.g.*, Ex. B at 8:10–9:10.  Should Facebook be

Gibson, Dunn &
Crutcher LLP

5

FACEBOOK'S RESPONSE TO PLAINTIFFS' STATEMENT CONCERNING THE ADI ISSUES IN ADVANCE OF THE HEARING
CASE NO. 3:18-MD-02843-VC-JSC

1  ordered to produce additional background and technical reports, any such production will also be

2  contingent on Plaintiffs' agreement that they will be produced on a Highly Confidential—Attorneys'

3  Eyes Only basis. These reports contain highly sensitive business information about Facebook and the

4  third parties investigated. They also contain unconfirmed information regarding third parties. The

5  background and technical reports were intended to identify potential concerns about third-parties for

6  counsel to investigate further; in many cases these potential concerns were not confirmed or were later

7  proven to be inaccurate based on additional evidence gathered by the ADI team.

8  **Issue #6:** Plaintiffs assert that "Facebook should also produce . . . all other additional or

9  related . . . audits[] and developer interviews for all apps or developers investigated in phases two or

10  three of the ADI." Ex. M at 2 (internal quotation marks omitted).

11  **Facebook's Response:** Judge Corley ordered Facebook to produce "audits and developer

12  interviews of the six exemplar apps chosen by the parties." Ex. K at 7. She reasoned: "Plaintiffs are

13  not seeking documents created by counsel, counsel's edits, or any communications with counsel.

14  Facebook has not explained how a non-attorney's interview or audit of a developer would be protected

15  from discovery by the attorney-client privilege." *Id.* at 6. Facebook did not conduct audits or

16  interviews of any of the six example apps. To the extent the Special Master is inclined to order

17  production of the materials Judge Corley described for other apps, Facebook will investigate what, if

18  any, "non-attorney's interview[s] or audit[s]" of developers exist for other apps investigated by ADI.

19

20

21

22

23

24

25

26

27

28

6

1    Dated:  November 4, 2021          **GIBSON, DUNN & CRUTCHER, LLP**

2                                       By:  _/s/ Orin Snyder_
                                        Orin Snyder (*pro hac vice*)
3                                       osnyder@gibsondunn.com
                                        200 Park Avenue
4                                       New York, NY 10166-0193
                                        Telephone:  212.351.4000
5                                       Facsimile:  212.351.4035

6                                       Deborah Stein (SBN 224570)
                                        dstein@gibsondunn.com
7                                       333 South Grand Avenue
                                        Los Angeles, CA 90071-3197
8                                       Telephone:  213.229.7000
                                        Facsimile:  213.229.7520
9
                                        Joshua S. Lipshutz (SBN 242557)
10                                      jlipshutz@gibsondunn.com
                                        1050 Connecticut Avenue, N.W.
11                                      Washington, DC 20036-5306
                                        Telephone:  202.955.8500
12                                      Facsimile:  202.467.0539

13                                      Russell H. Falconer
                                        rfalconer@gibsondunn.com
14                                      2001 Ross Avenue Suite 2100
                                        Dallas, TX 75201
15                                      Telephone:  214.698.3170

16                                      Kristin A. Linsley (SBN 154148)
                                        klinsley@gibsondunn.com
17                                      Martie Kutscher (SBN 302650)
                                        mkutscherclark@gibsondunn.com
18                                      555 Mission Street, Suite 3000
                                        San Francisco, CA 94105-0921
19                                      Telephone:  415.393.8200
                                        Facsimile:  415.393.8306
20

21                                      *Attorneys for Defendant Facebook, Inc.*

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

FACEBOOK'S RESPONSE TO PLAINTIFFS' STATEMENT CONCERNING THE ADI ISSUES IN ADVANCE OF THE HEARING
CASE NO. 3:18-MD-02843-VC-JSC

# EXHIBIT A

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843 <br> Case No. 18-md-02843-VC |
| This document relates to: <br><br> ALL ACTIONS | **PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION TO DEFENDANT FACEBOOK, INC.** <br><br> Judge:  Hon. Vince Chhabria <br> Courtroom:  4, 17th Floor |

communications with third parties, including the growing list of Apps Facebook has suspended as part of the [ADI], whether because of policy violations or because of their refusal to cooperate with Facebook's investigation."

**REQUEST FOR PRODUCTION NO. 21**

Communications between Facebook and Third Parties relating to the ADI, including but not limited to Communications that Facebook provided to the Massachusetts Attorney General's Office. *See* Chen Declaration ¶ 37.

**REQUEST FOR PRODUCTION NO. 22**

All "Privacy Risk Assessment[s]," and notes or agenda relating to Facebook's "focused subject-matter-specific meetings," "focused subject-matter-specific discussions," "weekly intra- and inter-team meetings," and "Privacy Summit[s]," as detailed in "Facebook's Privacy Program Overview" included in any PricewaterhouseCoopers LLP ("PwC") assessment report prepared pursuant to the FTC Consent Order.

**REQUEST FOR PRODUCTION NO. 23**

Unredacted versions and Documents in support of the assessment reports, including the Initial Assessment Report and Biennial Reports, prepared by PwC pursuant to the FTC Consent Order.

**REQUEST FOR PRODUCTION NO. 24**

Documents sufficient to identify all Third Parties to which Facebook granted access to Users' Content and Information not generally available through Platform pursuant to partnerships or agreements between Facebook and those Third Parties.

**REQUEST FOR PRODUCTION NO. 25**

All Documents relating to agreements or partnerships described in Request No. 24.

# EXHIBIT B

Pages 1 - 20

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

IN RE: FACEBOOK, INC., CONSUMER )
PRIVACY USER PROFILE LITIGATION.) **NO. 18-md-02843 VC**
_____ )

                              San Francisco, California
                              Wednesday, January 8, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:          KELLER ROHRBACK LLP
                        1201 Third Avenue - Suite 3200
                        Seattle, Washington  98101
                   BY:  **DEREK W. LOESER, ATTORNEY AT LAW**
                        **CARI C. LAUFENBERG, ATTORNEY AT LAW**

                        BLEICHMAR FONTI & AULD LLP
                        555 12th Street - Suite 1600
                        Oakland, California  94607
                   BY:  **LESLEY E. WEAVER, ATTORNEY AT LAW**
                        **ANNE K. DAVIS, ATTORNEY AT LAW**
                        **JOSHUA D. SAMRA, ATTORNEY AT LAW**

For Defendant Facebook:

                        GIBSON, DUNN & CRUTCHER LLP
                        555 Mission Street - Suite 3000
                        San Francisco, California  94105
                   BY:  **JOSHUA S. LIPSHUTZ, ATTORNEY AT LAW**

                        GIBSON, DUNN & CRUTCHER LLP
                        1881 Page Mill Road
                        Palo Alto, California  94304
                   BY:  **MARTIE P. KUTSCHER, ATTORNEY AT LAW**

Also Present:  Katherine Martin, Facebook

        **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Reported By:        Marla F. Knox, RPR, CRR, Official Reporter

**APPEARANCES:** **(CONT'D)**

For Defendant Aleksandr Kogan:

                  BECKAGE PLLC
                  420 Main Street - Suite 1110
                  Buffalo, New York  14202
      **BY:** **JENNIFER A. BECKAGE, ATTORNEY AT LAW**
      **BY:** **MYRIAH JAWORSKI, ATTORNEY AT LAW**

```
 1   Wednesday - January 8, 2020                    2:14 p.m.

 2                        P R O C E E D I N G S

 3                            ---000---

 4        THE CLERK:  Calling Case Number 18-MD-2843, In Re:

 5   Facebook, Inc., Consumer Privacy User Profile Litigation.

 6       Counsel, please step forward to the podiums and state your

 7   appearances for the record.

 8        MR. LOESER:  Derek Loeser for Plaintiffs.  Happy New

 9   Year, Your Honor.

10        THE COURT:  Hello.

11        MS. WEAVER:  Lesley Weaver for Plaintiffs.

12        THE COURT:  Hello.

13        MS. LAUFENBERG:  Good afternoon, Your Honor, Cari

14   Laufenberg for Plaintiffs.

15        THE COURT:  Hello.

16        MS. DAVIS:  Anne Davis for Plaintiffs.

17        THE COURT:  Hello.

18        MR. SAMRA:  Josh Samra for Plaintiffs.

19        THE COURT:  It seems like your team is growing.

20   I guess that makes sense.  And your team is --

21        MR. LIPSHUTZ:  Ours is shrinking, Your Honor.

22        MR. LOESER:  This is a good trend.  We grow and they

23   shrink.

24        MR. LIPSHUTZ:  Good afternoon, Your Honor, Josh

25   Lipshutz for Facebook.
```

```
 1              THE COURT:  I guess if you don't have Mr. Snyder here,
 2    you have already shrunk.
 3              MR. LIPSHUTZ:  In some elements, yes, Your Honor.
 4              MR. LOESER:  And we were wondering how to make fun of
 5    him in his absence, Your Honor.
 6              THE COURT:  We will find a way.  Sorry.
 7              MS. KUTSCHER:  Martie Kutscher --
 8              THE COURT:  Sorry.
 9              MS. KUTSCHER:  -- for Defendants.
10              THE COURT:  Sorry.  What was your name?
11              MS. KUTSCHER:  Martie Kutscher.
12              MS. MARTIN:  And Katherine Martin for Facebook.
13              THE COURT:  Okay.  And --
14              THE CLERK:  Hold on.  And Defense on the phone?
15              MS. BECKAGE:  Hi, good afternoon, Your Honor, Jennifer
16    Beckage of Beckage PLLC for non-prioritized Defendant Aleksandr
17    Kogan.
18              MS. JAWORKSI:  Your Honor, this is Myriah Jaworski
19    also on behalf of non-prioritized Defendant Aleksandr Kogan.
20              THE COURT:  So do you-all have anything on the agenda
21    or are you just here to kind of monitor it?
22              MS. BECKAGE:  Thank you, Your Honor.  This is Jennifer
23    Beckage.  Yes, we wanted to be available to the extent any
24    discussions may impact our clients.
25              THE COURT:  Okay.  Just chime in any time you need to
```

 1   I just figured if you had anything in particular you wanted to

 2   discuss, we would get that out of the way first.

 3          **MS. BECKAGE:**  Not at this time.  Thank you,

 4   Your Honor.

 5          **THE COURT:**  So as you can see, you-all are not the

 6   most interesting case I have today.

 7                         (Laughter)

 8          **MR. LOESER:**  We can see that.

 9          **THE COURT:**  So I did read your case management

10   statement last night.  It sounds like you have some relatively

11   inconsequential beefs that maybe you have resolved by now about

12   how to proceed with discovery.  But what do you want to talk

13   about?

14          **MR. LOESER:**  I think we can start there, Your Honor,

15   and -- first of all, Happy New Year.

16          **THE COURT:**  You too.

17          **MR. LOESER:**  We are here and ready to move this case.

18       Discovery is going very, very slowly.  I think you

19   probably get a sense of that from the letters that we have been

20   bothering you with and Facebook as well.  And the disputes that

21   exist there in some sense they should be easy to resolve.  You

22   know, whether Facebook gives us the rest of the FTC letters,

23   that shouldn't be complicated.  Obviously that earlier

24   investigation is relevant to our case; but they signal to us

25   kind of a huge gap between Facebook's general understanding of

 1  what discovery it should be producing and our view of what we

 2  need to advance this case.

 3      And so every one of the disputes we are having kind of

 4  keep coming back to the same thing.  We are getting very, very

 5  little.  We have been at this case for a while.  We have 47

 6  pages of correspondence from the first FTC production, a

 7  smattering of materials that were produced in the preliminary

 8  discovery packet before the Motion To Dismiss.  And then we

 9  were going to get what was described as a substantial

10  production before this conference.  What we got was about 500

11  pages of information, much of which we didn't request.  They

12  sent us five different copies of their articles of

13  incorporation.

14      And the really big issues, the things that we have been

15  talking about that Your Honor featured at the last conference,

16  the general discovery about who they share with, who gets

17  access, who accessed the Plaintiffs' information generally or

18  specifically, we have none of that.

19      And so where we started last time was talking about

20  Government productions.  It has always seemed to us that if

21  Facebook has already produced something, you can make this a

22  lot more efficient for them; and they can make it more

23  efficient for themselves by starting with those productions.

24      Even there, we thought we were clear with Facebook that we

25  wanted the documents that show what they gave the FTC for all

1    of the documents they have given the FTC.  And what we found

2    out late in December was, in fact, they were only giving us the

3    documents for the later things.

4        So -- and we are just talking about the documents that

5    describe --

6            **THE COURT:**  What they said, if I recall correctly -- I

7    remember dealing with this on like, I don't know, January 2nd

8    or something like that -- they have said that they want to give

9    you all of the FTC document requests and correspondence with

10   the FTC about those document requests from 2012 forward.  They

11   have already given you the 2018/2019 stuff.  They just don't

12   think you should get the pre-2012 stuff.  Am I remembering that

13   accurately?

14           **MR. LIPSHUTZ:**  That's correct.

15           **MR. LOESER:**  That's correct.  And, frankly --

16           **THE COURT:**  And my inclination on that is that I don't

17   think it was important for you to get the pre-2018 stuff on an

18   expedited basis.

19           **MR. LOESER:**  Right.

20           **THE COURT:**  I don't think it is important for you to

21   get the pre-2012 stuff on an expedited stuff.  I also don't see

22   any reason you shouldn't get the 2012 -- pre-2012 stuff.  I

23   understand there is a lower likelihood that that stuff will be

24   relevant or lead to the -- lead to the discovery of material

25   that is relevant now, but it's -- there seems like enough of a

1  possibility that it is worth ordering them to provide it, and

2  it is not burdensome enough to be worried about it too much.

3      So I'm going to order Facebook to provide the pre-2012

4  stuff too, but I don't think it needs to be on an expedited

5  basis.

6          **MR. LIPSHUTZ:**  And to be clear, Your Honor, we never

7  said we wouldn't.  We said we would review those materials as

8  part of the ordinary process of responding to their discovery

9  request.  It was just a question of --

10          **THE COURT:**  Well, just to be clear, you are ordered to

11  provide the pre-2012 stuff as well in that category.

12      On the question of whether Facebook should be required

13  without doing any further review to turn over exactly what it

14  turned over to the Government, I don't think it would be

15  appropriate for me to order that.

16      If Facebook wants to go through the expense of reviewing

17  all that stuff again -- I mean, this is one although I have

18  relatively little experience as a lawyer or a judge, for that

19  matter, in discovery matters, one thing I do have experience in

20  is -- from back in the day -- is turning stuff over to the

21  Government.  And when you turn stuff over to the Government,

22  you worry -- you do worry less about relevance.  You do worry

23  less about privilege.  You do worry less about turning over

24  something that might not be subject to discovery because it is

25  not relevant at all but would be embarrassing because you are

1  dealing with the Government and you are trying to -- you know,
2  it is a different calculus.

3      So if Facebook wants to review all that stuff again, I
4  think it is helpful to have the requests from the FTC and maybe
5  other agencies too.

6      I don't know.  And it is helpful to have the dialogue that
7  occurred between the agency and Facebook about those requests.
8  If Facebook wants to review the stuff again, you know, and
9  wants to spend the time and money on that, I don't think I can
10 order them not to do that; to turn it over before doing that.

11     **MR. LIPSHUTZ:**  Again, Your Honor, we are in the
12 process of doing that and we are responding -- the very first
13 document request that we were obligated to respond to were due
14 on December 26th.  The responses were due on December 26th.  We
15 responded to those.  We turned over actually 3,200 pages of
16 documents, not 500 pages.

17     **THE COURT:**  Okay.  So that's -- that issue is now
18 resolved.

19     **MR. LOESER:**  With one caveat, Your Honor, that is
20 probably worth noting.  I certainly understand the idea that
21 Facebook if it wants to re-review things should.  There are
22 certain things in the Ninth Circuit the attorney-client
23 privilege is waived for documents produced to the Government.

24     So if what they are doing is reviewing for privilege, that
25 would seem unnecessary.  If they are reviewing for relevance,

1  that was the purpose of getting these letters so that --

2          **THE COURT:**  Well, but I'm assuming -- I don't know but

3  I'm assuming that you can have these -- you know, there could

4  still be an inadvertent production that wouldn't waive the

5  privilege, and they would want to be maybe more careful about

6  not making an inadvertent production to you, not the

7  Government.  I don't know.

8          **MR. LOESER:**  That's fine.  I guess our concern -- and

9  this will be the concern that goes through all of the

10  discussion we have today -- is how much time.  And we are --

11  you know, Your Honor entered a schedule that we are obviously

12  very aware of.  The substantial completion date is in October.

13  There is a tremendous amount we need to get from Facebook and

14  review and analyze.  So if we can have -- and maybe this is

15  something that Mr. Lipshutz and I should have discussed -- but

16  a timeframe for when this production review would occur would

17  be very helpful, not just for the later FTC production but the

18  earlier one as well.

19          **THE COURT:**  I trust that you-all are not going to do

20  what unfortunately I see in a lot of civil cases and that is,

21  wait until the eleventh hour and then start doing discovery.  I

22  assume you are not going to allow that to happen, and you are

23  going to come to me well in advance if you are concerned that

24  it is happening.  And I -- I'm hopeful that Facebook knows me

25  well enough not to try that.  So --

```
 1          MR. LIPSHUTZ:  We do, Your Honor.  And we are well

 2    underway.  We actually have three different meet-and-confers

 3    set up for next week alone.  The process is underway.  We

 4    suggested even cancelling this conference, and they wanted it

 5    but everything is underway.

 6          THE COURT:  Okay.  So in terms of -- you mentioned

 7    that there is -- that we forgot to impose a due date for the

 8    Answer.  When do you want to file your Answer?  I mean, it

 9    shouldn't take long.

10          MR. LIPSHUTZ:  No.  We --

11          THE COURT:  The Complaint is not that long.

12                          (Laughter)

13          MR. LIPSHUTZ:  I sense the humor in your remarks.  It

14    won't come through on the transcript unless someone points it

15    out.

16        We would ask for thirty days, Your Honor.  And we would

17    ask we only have to respond to the prioritized claims.  We

18    haven't obviously moved on the non-prioritized claims yet.

19          THE COURT:  Any objection to that?

20          MR. LOESER:  Not really.  I guess I would like to see

21    an Answer to the whole Complaint; but if they want to parse it

22    that way, that's --

23          THE COURT:  Twenty-eight days from today and only

24    the -- only the prioritized claims.

25          MR. LIPSHUTZ:  Thank you, Your Honor.
```

 1          **MR. LOESER:**  If --

 2          **THE COURT:**  When in doubt -- I mean, there could be a

 3   little ambiguity from my ruling about what is going forward and

 4   what is not.  If there is any doubt, you answer it.

 5          **MR. LIPSHUTZ:**  Understood, Your Honor.  To be clear, I

 6   was only referring to the claims at the end.  We will respond

 7   to the factual allegations but the claims at the end --

 8          **THE COURT:**  All right.  Okay.  Sounds good.

 9       And then I think there was one other thing that was maybe

10   hanging.

11          **MR. LIPSHUTZ:**  I don't know if this was it,

12   Your Honor, but we wanted to just raise, Your Honor, the

13   possibility of filing an early Summary Judgment Motion on the

14   2009 consent issue.  If you recall your Motion To Dismiss, Your

15   Honor expressed questions of whether the pre-2009 consents

16   consented to the post-2009 privacy policies.  That was

17   important because everybody post-2009 was found to have

18   consented to friend sharing.

19       We think we can resolve that issue pretty quickly in a

20   Summary Judgment Motion.  And it would basically mean that

21   everybody in this case will have consented to friend sharing

22   which will substantially narrow the issues at stake in this

23   case.

24          **THE COURT:**  Well, I mean, I think that's -- that's

25   probably a premature request because we -- we are going to do

 1    all -- we are not going to have a Summary Judgment Motion on

 2    that without doing all the discovery that we are contemplating

 3    that relates to that issue.

 4         So if you want to come back after you can establish that

 5    you have turned over everything relating to those claims,

 6    then --

 7              **MR. LIPSHUTZ:**  Yes.

 8              **THE COURT:**  -- we can talk about that.

 9              **MR. LIPSHUTZ:**  Thank you, Your Honor.  That works

10    fine.

11              **MR. LOESER:**  And there is some irony in the request in

12    that it is the pre-2012 information that they seem particularly

13    unhappy about producing so --

14              **MR. LIPSHUTZ:**  No.  Actually, we agreed we would turn

15    over everything pre-2012 related to the issue I just mentioned.

16              **MR. LOESER:**  Right.  And that is another issue here is

17    that -- we received their responses to our second production

18    request.  And, you know, they really highlight the significant

19    issues we are going to have on the scope of discovery.

20         And just one issue to flag is that Facebook has decided

21    that -- with the limited exception of some pre-2012 policies

22    and information -- they are not interested in producing

23    documents, information, that are dated prior to 2012.  That is

24    clearly something we will be meeting and conferring on this

25    week.

 1          In light of the Court's order and in reference to the

 2     claims that predate that time period, we obviously need

 3     discovery that predates that.

 4          **THE COURT:**  Yeah, I mean, I certainly do and -- you

 5     know, I'm not casting any judgment at this early stage on

 6     either side in the way they are handling this; but, you know,

 7     the only other comment I will make is it has seemed like I have

 8     had to really pound into Facebook's head that there is going to

 9     be discovery on the general practices relating to, you know,

10     friend sharing and all of that, right.  And hopefully I won't

11     have to continue doing that pounding.  I'm -- my sense is that

12     I probably won't.  And you should be in a position where you

13     can plow ahead.

14          **MR. LIPSHUTZ:**  Yeah.

15          **THE COURT:**  Oh, I remembered the other thing was

16     something about org charts.  Facebook really doesn't have any

17     org charts?  No org charts in the entire organization?

18          **MR. LIPSHUTZ:**  That is correct, Your Honor.  We faced

19     this issue in other litigations as well; but yes, that is

20     correct.

21          **THE COURT:**  Is there a philosophy behind that?

22          **MR. LOESER:**  Chaos.

23                         (Laughter)

24          **MR. LIPSHUTZ:**  I don't know, Your Honor.

25          **THE COURT:**  Chaos?  Disrupting?  An org chart would be

 1   too contrary to constantly disrupting --

 2        **MR. LIPSHUTZ:**  I don't know the answer.  We did offer

 3   to meet and confer and try to provide information to substitute

 4   for that, but we don't have those.

 5        **THE COURT:**  Okay.  Anything else?

 6        **MR. LOESER:**  A few other housekeeping things,

 7   Your Honor, and I will go through them pretty quickly because I

 8   know you have had a long day.

 9        One of the issues that we need a little guidance on:  A

10   number of the Plaintiffs -- the named Plaintiffs in the

11   Complaint -- have other counsel who represent them.  To date in

12   this case based upon Your Honor's instructions, we have not

13   involved any other firms or any other counsel.  We would like

14   to be able to authorize the firms that represent those folks to

15   be involved in representing their clients in discovery, so for

16   depositions and producing documents, things of that sort that

17   relate specifically to their representation.

18        **THE COURT:**  Does that mean you wouldn't be involved in

19   it?

20        **MR. LOESER:**  No.

21        **THE COURT:**  Does that mean that you wouldn't be

22   jointly representing those Plaintiffs in their depositions and

23   whatnot?

24        **MR. LOESER:**  No.  We would absolutely be there, but it

25   is generally speaking folks that have counsel that they have

```
 1    hired to be involved in the case; want to have their counsel
 2    there and those counsel want to be there.  We will -- we
 3    understand the Court's concern about this issue generally and
 4    an issue that has been raised in this district.  So we will be
 5    very careful to make sure that the tasks that these folks are
 6    authorized to do are limited specifically to as-needed tasks to
 7    represent their clients.
 8          THE COURT:  Any -- you seem like you want to say
 9    something.
10          MR. LIPSHUTZ:  It is the first I'm hearing of this,
11    Your Honor.  I suppose if their own -- if they want separate
12    lawyers to be present for their depositions in addition to
13    Counsel here, that seems unobjectionable.  I guess, I would
14    object if their own lawyers start propounding discovery.  I
15    think that would be problematic.
16          MR. LOESER:  That won't be happening.
17          MR. LIPSHUTZ:  I think it's okay.
18          THE COURT:  Okay.  So I will authorize that, but could
19    I ask you to draft and submit a proposed order on that?
20          MR. LOESER:  Sure.
21          THE COURT:  And maybe it's worth creating some
22    parameters on this issue or some other issue that I haven't
23    thought about.
24          MR. LOESER:  Yeah.
25          MR. LIPSHUTZ:  We can add that to our meet-and-confer.
```

 1          MR. LOESER:  That's a good idea.

 2          THE COURT:  Yeah.

 3          MR. LOESER:  And then another matter, Your Honor, we

 4   do think these conferences are extremely helpful.  We think it

 5   probably makes sense in this case to have them at some regular

 6   interval.  We thought perhaps six weeks, telephonically or in

 7   person.  I know people are obviously coming from different

 8   places.  There certainly will be some that probably can be

 9   cancelled because we have worked out all of our issues.  I

10   think it would be helpful to move things along if we have

11   something regular like that schedule.

12          THE COURT:  Sounds fine.

13          MR. LIPSHUTZ:  Always happy to see you, Your Honor.

14          THE COURT:  Always happy to see you guys.

15      I actually don't really want to do them telephonically.  I

16   think that this case is significant enough and the parties are

17   well resourced enough that we should have you in the courtroom.

18          DEFENSE COUNSEL:  Six weeks seems a little frequent to

19   me.

20          THE COURT:  Eight weeks?

21          MR. LIPSHUTZ:  That's fine.

22          MR. LOESER:  That's good.

23          THE COURT:  Okay.  Sounds good.  Let's plan on that

24   and let's schedule the next one.  Should be roughly mid-March,

25   early to mid-March.

```
 1              THE CLERK:  It is working out to be like the first

 2    week of March unless you want it the second week.

 3              THE COURT:  Super Tuesday?

 4                        (Laughter)

 5              MR. LOESER:  What happens on Super Tuesday?

 6              THE COURT:  California Primary.

 7              MR. LOESER:  Does that matter?

 8                        (Laughter)

 9              THE COURT:  It matters in the primary.

10              MR. LOESER:  Sounds like a good day.

11              THE COURT:  Let's not do Super Tuesday because I have

12    other stuff -- well, actually Super Tuesday in the afternoon

13    would be fine or Wednesday afternoon, the 4th.

14              MR. LIPSHUTZ:  Your Honor, would it be possible to

15    propose -- I know we always get into these issues with these

16    conferences.  Since Mr. Snyder isn't here, can we just propose

17    some dates with Your Honor and work with your court staff to

18    set something up in the timeframe?

19              THE COURT:  Well, part of the problem is that you guys

20    have been kind of a pain in the-you-know-what on the issue of

21    scheduling.

22                        (Laughter)

23              MR. LOESER:  If you can look squarely at him when you

24    say that.

25              MR. LIPSHUTZ:  That's not fair.
```

```
 1              THE COURT:  I actually don't remember who.  I wouldn't
 2     be surprised if it was both of you, but a little bit too "I'm
 3     not available for this.  I'm not available for that" and it is
 4     starting to get a little time consuming for us to keep
 5     searching for dates.
 6              MR. LOESER:  We agree.
 7              THE COURT:  So I think that we are going to schedule
 8     something now.
 9              MR. LIPSHUTZ:  That's fine, Your Honor.
10              THE COURT:  If Mr. Snyder can't make it, then you or
11     some subset of you can come.  Somebody -- just as long as
12     somebody is authorized to make decisions.
13                      (Discussion held off the record.)
14              THE COURT:  So Thursday, March 5th in the afternoon.
15     Is afternoons -- is afternoon or morning better or does it
16     matter in terms of just general travel schedule?
17              MR. LIPSHUTZ:  For me the main issue is trying to
18     catch the 4:30 flight back east.  So as long as we get out of
19     here by 3:00 o'clock, that's fine.
20              THE COURT:  Okay.  Why don't we do, like, 1:00 o'clock
21     on the 5th of March.
22              MR. LOESER:  Okay.  You know, Your Honor, we are going
23     to walk out of here and meet and confer, and one of the topics
24     will be these FTC productions.  Just for the sake of clarity,
25     Facebook will be providing the letters that pertain to the
```

1   earlier production and -- but as to the production itself, I
2   assume that the point of the meet-and-confer will be for us to
3   confer on whether the earlier produced materials, as described
4   in these letters, is relevant to this action.  For matters that
5   the parties agree they are relevant, Facebook will be producing
6   those materials following some review; and that there may be
7   some dispute for the Court to resolve as to other matters that
8   we think are relevant but perhaps they don't think are
9   relevant.

10          THE COURT:  I think the way you have described it is
11  fine.  I mean, I was thinking of it on maybe one higher level
12  of generality which is that the prior requests from FTC and
13  dialogue that occurred about that would help inform the
14  documents that you want to request of Facebook.  Maybe that is:
15  Hey, I want all that stuff that they asked for as modified by
16  this subsequent exchange of letters that they had or whatever.

17          MR. LOESER:  Okay.

18          THE COURT:  So I think we are on the same page.

19          MR. LOESER:  I think we are.  That's helpful.  Thank
20  you.

21          THE COURT:  Anything else?

22          MR. LIPSHUTZ:  No, Your Honor.

23          MR. LOESER:  No.

24          THE COURT:  Thank you.

25              (Proceedings adjourned at 2:35 p.m.)

1

2                    **CERTIFICATE OF REPORTER**

3            I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:    Monday, January, 13, 2020

7

8

9

10   _____

11                  Marla F. Knox, RPR, CRR
                    U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

                                        Pages 1 - 64

                        UNITED STATES DISTRICT COURT

                      NORTHERN DISTRICT OF CALIFORNIA

       BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, MAGISTRATE JUDGE

       IN RE: FACEBOOK, INC. CONSUMER      )
       PRIVACY USER PROFILE LITIGATION.    )  NO. 18-MD-2843 VC (JSC)
                                              San Francisco, California
                                              Monday, July 13, 2020

               **TRANSCRIPT OF ZOOM VIDEOCONFERENCE PROCEEDINGS**

       **APPEARANCES**:

       For Plaintiffs:
                            BLEICHMAR FONTI & AULD LLP
                            555 12th Street
                            Suite 1600
                            Oakland, California  94607
                      BY:  **LESLEY E. WEAVER, ESQ.**
                           **ANNE K. DAVIS, ESQ.**
                           **MATTHEW MONTGOMERY, ESQ.**

                            KELLER RORHBACK, LLP
                            1201 Third Avenue
                            Suite 3200
                            Seattle, Washington  98101
                      BY:  **DEREK W. LOESER, ESQ.**
                           **DAVID J. KO, ESQ.**
                           **CARI C. LAUFENBERG, ESQ.**

                            GIRARD SHARP LLP
                            601 California Street
                            Suite 1400
                            San Francisco, California  94108
                      BY:  **ANGELICA M. ORNELAS, ESQ.**

       Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
                      Official Reporter, U.S. District Court

            (Appearances continued, next page)

**APPEARANCES, CONTINUED**:

For Defendants:

GIBSON DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166
**BY:  ORIN SNYDER, ESQ.**


GIBSON DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, California  94304
**BY:  MARTIE P. KUTSCHER CLARK, ESQ.**

GIBSON DUNN & CRUTCHER LLP
2100 McKinney Avenue
Suite 1100
Dallas, Texas  75201
**BY:  RUSSELL H. FALCONER, ESQ.**

GIBSON DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
**BY:  DEBORAH L. STEIN, ESQ.**

<u>**Monday - July 13, 2020**</u>                                              **8:32 a.m.**

## P R O C E E D I N G S

**THE COURT:**  Calling Civil Action 18-2842, In Re
Facebook.  Counsel, starting with plaintiff, please state your
appearances.

**MR. LOESER:**  Good morning.  It's Derek Loeser for
plaintiffs.

**THE COURT:**  Good morning.

**MS. WEAVER:**  Good morning, Your Honor. Leslie Weaver
with BFA.  Anne Davis and Angelica Ornelas are with me.

**THE COURT:**  Good morning.

**MR. KO:**  Good morning, Your Honor.  David Ko, Keller
Rohrback, also on behalf of plaintiffs.

**MS. LAUFENBERG:**  And good morning, Your Honor. Cari
Laufenberg on behalf of plaintiffs.

**THE COURT:**  Good morning.  So, for Facebook?

**MS. STEIN:**  Good morning, Your Honor. I saw Orin
Snyder's name up a moment ago, but it looks like he's no
longer on this screen.

**THE CLERK:**  I promoted him, and I don't see him.

**MS. STEIN:**  I'm getting text messages saying there is
a little bit of a technical error, but I think he'll be on
momentarily.

**THE CLERK:**  Okay.

**MS. STEIN:**  Yeah.  He says it says "Waiting."

 1          And, this is Deborah Stein for Facebook.  And I'm here

 2     with Martie Kutscher Clark.  And hopefully Orin Snyder will be

 3     here in a moment.  I'm not sure; maybe he should disconnect and

 4     try again.

 5          Do you think that's the best thing, for him to hang up and

 6     try again?

 7               THE CLERK:  Sure.  I mean, as soon as I see his name,

 8     I will promote him to a panelist.

 9               THE COURT:  No apologies needed.

10     (Off-the-Record discussion)

11     (A pause in the proceedings)

12          MR. SNYDER:  (Inaudible)

13          THE COURT:  Can't hear you, Mr. Snyder.

14          MR. SNYDER:  Okay.  I apologize.  My iPad was not

15     allowing me to connect, so now I'm on my iPhone.

16          THE COURT:  We can see you now.

17          MR. SNYDER:  Okay.  Great.  Thank you so much.  I

18     apologize.  I don't know why.

19          THE COURT:  Not a problem.  Not a problem.  Why don't

20     you go ahead and make your appearance; everyone else has.

21          MR. SNYDER:  Okay.  Orin Snyder for defendants, from

22     Gibson Dunn.  Thank Your Honor.

23          THE COURT:  We do have a court reporter this morning,

24     taking down the transcript.

25          All right.  So thank you very much, everyone, for your

1   statements.  I thought we should just discuss them, the issues,

2   in the order the parties presented them.

3      First, with respect to plaintiffs' document production.

4   Not really sure, plaintiffs say they're not withholding

5   anything.

6      The only thing I guess that Facebook raised was some

7   potential dispute regarding the production of documents versus,

8   maybe, interrogatories.  But I didn't understand plaintiffs'

9   statement to say that they were refusing to produce those

10  documents.

11     I don't know if anyone from the plaintiffs wants to

12  respond.

13          **MS. WEAVER:**  Angelica Ornelas will be addressing this

14   for us, Your Honor.

15          **MS. ORNELAS:**  Thank Your Honor.

16     So I think what we've tried to do here is explain that we

17  are searching for responsive materials, to the extent that they

18  are in plaintiffs' possession.

19     What we are excluding from the search are materials from

20  the user account and user archive, itself, for a couple of

21  different reasons.  One is as to the offensive ads that

22  Facebook is seeking, it's not clear that that content is

23  located within those sources, to begin with.  There does appear

24  to be identification of advertisers that sent content to the

25  users.  But the ads, themselves, do not appear to be in the

1   archive.

2       So that is one of the reasons why we don't think that

3   should be is encompassed within our search.  If that helps.

4           **THE COURT:**  Well, what you're saying is that you

5   can't produce them.  That you don't -- you don't have the

6   ability to produce them.

7           **MS. ORNELAS:**  From the Facebook user account and

8   archive.

9       But otherwise, if the plaintiffs do have standalone

10  records of things like the offensive ads that Facebook is

11  seeking, we are searching and collecting those items.

12          **MS. KUTSCHER CLARK:**  Your Honor, if I could respond

13  to that for a minute, I'd appreciate it.

14          **THE COURT:**  Go ahead.

15          **MS. KUTSCHER CLARK:**  The issue here isn't limited to

16  advertisements.

17      And I just want to start by saying we're not seeking

18  discovery from the there was here to abuse the plaintiffs, or

19  to harass them.  It's because we think this case should have

20  been dismissed on standing grounds at the motion-to-dismiss

21  stage, and Judge Chhabria held that we would have an

22  opportunity to seek discovery from the plaintiffs regarding

23  their allegations, and an opportunity to move to dismiss

24  individual plaintiffs on standing grounds.

25      And to that end, the plaintiffs have a lot of allegations

1   in their complaint, not just about the advertisements, to the

2   effect that because of conduct Facebook engaged in, they

3   experienced certain activity on the Facebook platform.

4        That includes that the plaintiffs received what they call

5   highly offensive advertisements; that they received friend

6   requests from people they call "trolls" who they didn't

7   actually know; that they experienced third-party interference

8   with their accounts, so someone who was not them was posting on

9   their accounts.  We have requested information from plaintiffs

10  regarding those allegations.

11       So for instance, documents sufficient to show any highly

12  offensive advertisements they actually received, or documents

13  sufficient to show any friend requests they received from

14  trolls, so people they didn't actually know.  And plaintiffs

15  seem to have taken the categorical position that they will not

16  produce any materials from their Facebook accounts.

17       And for us that's problematic, because Facebook's not in a

18  position to identify that information.  We don't know if a

19  particular friend request came from someone the plaintiffs knew

20  or did not know, whether a post on their account was a post a

21  particular plaintiff actually made, or whether a third party

22  gained access to an account mained that post.

23       So we're just requesting materials to show that type of

24  information.

25            THE COURT:  But I don't understand -- I don't hear

them saying that they're refusing to identify that.  Of
course, that's relevant.  That's not what I heard.

I guess what I heard is they don't -- they don't know how
they could necessarily access and show that to Facebook, but
they could identify for it.  The allegation was made in the
complaint, so obviously, they have to be able to identify it.

Is that what you're saying, Ms. Ornelas?

**MS. ORNELAS:**  Your Honor, to the extent that the
plaintiffs do have those records in their possession, custody,
or control, they're going to be produced.  However, to the
extent that Facebook is asking us to search through the
Facebook user platform and archive, the records that they are
requesting don't appear to be contained in those sources.

So we are agreeing to search and collect materials, to the
extent they exist.  But for -- for right now, it doesn't appear
like those materials are within the platform and the archive,
which is why we are anticipating carving them out of our
search.

**THE COURT:**  And just to -- how would they identify --
how would they go about and find to produce to Facebook an ad
that they found, that they believed was offensive?

**MS. KUTSCHER CLARK:**  Sure.  So there's a lot of ways
that they could do this.  And we've actually discussed this
previously, so I'm a little surprised to hear the response
today, because previously the response has been:  If you want,

1    we can look.

2        So for instance, on Facebook plaintiffs have a feature

3    called:  Download your information.  And you can download there

4    sort of a history of all of your activity on Facebook, and

5    pretty much everything you've ever done on Facebook.  And they

6    would be able to find a lot of this information there.

7        Many Facebook users --

8            **THE COURT:**  Would it show ads?

9            **MS. KUTSCHER CLARK:**  I don't know, off the top of my

10    head, if it would show every ad, but I believe certain

11    advertising information would be reflected there.

12        A lot of this information also comes across through

13    emails.  So a lot of users have their accounts set up to send

14    information to them by email, as well, so users would receive

15    emails.

16        And I do just want to clarify, we're not just talking

17    about advertisements.  You know, some of this is about friend

18    requests people received.  And they --

19            **THE COURT:**  I'm just taking -- I'm just taking it --

20    I'm taking it one at a time.  Because you said that they

21    refused, I -- I'm just not hearing that.  I'm just trying to

22    figure out.

23        How would they -- I know they could describe to you an ad

24    that they recall seeing that they found was offensive.  I'm

25    trying to figure out, because this is a dispute about a

1   document production, how -- how are you saying they should

2   actually produce to you that ad?

3       What is the search that they're supposed do?  What -- at

4   least for the ads, I don't think you know.

5       Okay.  So now as to --

6       **MS. KUTSCHER CLARK:**  No.  For their ads, I see three

7   ways they could find the information.  First, they could go

8   through their download-their-information file, and any ads

9   that are contained within it they could produce the relevant

10  pages of their download-their-information file or, you know,

11  screenshot it and produce it.

12      To the extent any ads were received from Facebook by

13  email, they could produce those as emails.  To the extent any

14  ads are currently on their Facebook news feed, they could

15  produce those materials by, again, either screenshotting or

16  PDFing the pages.

17      **THE COURT:**  Okay.  So, Ms. Ornelas, are you

18  downloading the information files for your clients?

19      **MS. ORNELAS:**  Sure, Your Honor.  So when we -- we

20  have downloaded that information.  And that's what I was

21  referring to earlier, where it appears that within that file,

22  there is some limited advertiser information.  The ads,

23  themselves, do not appear to be located within that file.

24      With respect to, you know, stand-alone emails or

25  screenshots, that is something that we are searching for, and

 1   collecting, and reviewing.

 2       The issue is to the extent that Facebook believes the ads,

 3   themselves, are within the download file that Ms. Kutscher just

 4   described, that's where I think the disconnect is here.

 5           **MS. WEAVER:**  Your Honor, if I may just explain, the

 6    archive that we're talking about is a select subset of users'

 7    platform activity that Facebook designates and allows users to

 8    download.  Ordinarily, users don't that.  And that's --

 9    Facebook produced that to us, already.  So when Ms. Ornelas

10    says that they excluded advertisement, that's because it is

11    not the entire world of Facebook activity.

12       And I think it's exactly right that, really, the

13   information that Facebook wants is better suited to a

14   contention interrogatory or a deposition.  It's really not a

15   document request that's proportional to the needs here, because

16   we can communicate that.  And the second piece is --

17           **THE COURT:**  Well, why -- I don't hear -- I don't hear

18    that it's proportionality.  I hear that you don't have it.

19           **MS. WEAVER:**  That's true, as well.  I guess the

20    question is, yes, could we go through the archives and maybe

21    identify some reference to an ad?  I don't know.

22       But these are, you know, highly -- these are -- they're

23   not sorted that way.  There's no section that says:  Here are

24   the advertising.  We're not aware that we have it.  If Facebook

25   produced it to us, maybe that would help.  But we don't have

1  them right now.

2      And Facebook knows what advertisements it serves to these

3  plaintiffs.  Right?  They know what agreements they have, and

4  who's been allowed to advertise on the platform.

5      But, you know, for example, to come at this another way,

6  let me just say that our allegations aren't -- really, the

7  heart of the case is not about specific individual

8  advertisements.  Although, each of our plaintiffs received

9  notice that Cambridge Analytica obtained their data, so

10  Facebook knows that already.

11      But the heart of our case is that it's the volume of data

12  and advertisements that people got because Facebook was

13  funneling all of this information out.

14      And we still don't even have from Facebook documents

15  sufficient to show which third parties accessed their data.  If

16  Facebook produced that to us, which they still haven't, we

17  could go to our plaintiffs and say: Of these millions of apps,

18  which do you find offensive that were advertising to you?

19      But it's kind of asking us to answer from information that

20  Facebook exclusively has.  And that's -- that's one of our

21  issues.

22          **THE COURT:**  Well, it's kind of a chicken -- it's a

23   chicken-and-egg thing, I think.  I don't know about that.  But

24   -- I don't know if I necessarily agree with that.

25      But it does sound like the way to approach this is, first,

1    perhaps to do it as interrogatories.  And then the plaintiffs

2    will identify, you know:  These are the ads...

3        Whatever the question is, whatever your question is about

4    standing, ask that.  And then perhaps then go to the documents.

5            **MS. STEIN:**  Your Honor, if I may, to that point, I

6    think our issue here is as we were meeting and conferring, we

7    were repeatedly told by plaintiffs that they wouldn't search

8    for these various things like troll requests, and -- and these

9    were things that were specifically pled.  We did not hear from

10   plaintiffs that they did not have access to this information.

11       Obviously, if they don't have it, they don't have it.  But

12   for some of these -- and Martie, I think, was going to go on

13   into detail which ones they were.  For some of these

14   categories, plaintiffs have it.  They can say -- if there's

15   something on their Facebook -- in their Facebook history that

16   shows activity that weren't their (audio interference) post,

17   they should produce those to us.  They've been telling us they

18   won't even search.

19       And, you know, the suggestion that there's some

20   proportionality issue here, I mean, that's the first time we've

21   heard that this case has some sort of proportionality problem.

22   I mean, we've been working night and day on production on our

23   end.  We keep getting told about how huge this case is from

24   plaintiffs' perspective.

25       So I think having them do some searching of the accounts

1    to produce a very discrete number of documents is not a lot to

2    ask.

3         And our fear that is going down the interrogatory path,

4    we're then going to be told that a contention 'rog is

5    premature, and they don't have the information.  We're just --

6         **THE COURT:**  No, no, no.  No, because I'm telling you

7    now, I'm saying, they're suggesting do that first.  They made

8    the allegations in their complaint.  So, what is the

9    information that they had that those allegations were based

10   on?  Right?  That's what you want to know first.

11        And then -- I mean, to the extent there is some friend

12   requests, for example, they say that they got that they weren't

13   aware of or that they believe was a troll, that they should be

14   -- is there any reason, Ms. Ornelas, you can't identify that?

15        **MS. ORNELAS:**  Your Honor, this goes back to the way

16   that the information is provided in the download file.  There

17   are certain lists of different types of friend requests, for

18   example accepted friends, removed friends, rejected friends.

19   There is, you know, no list within the download file of, you

20   know, particularly suspicious friend requests.

21        So to the extent there are suspicious friend requests

22   captured within those different lists, that would be something

23   that, of course, we could respond to an interrogatory asking us

24   to identify which of the requests appearing on these different

25   lists were considered suspicious.

1              **MS. KUTSCHER CLARK:**  Well, --

2              **MR. LOESER:**  Your Honor, Derek Loeser --

3              **MS. KUTSCHER CLARK:**  -- if I can respond to that, I

4     think the concern is we're not asking for plaintiffs to look

5     at their file and send us a specified list by Facebook of

6     suspicious friend requests.  We can see who requested them to

7     be friends.

8         We need them to identify for us:  Which were the friend

9     requests that you thought were from trolls?  Who were the

10    people you don't actually know in real life?  And we have no

11    way to do that.

12        So I think what Ms. Ornelas is saying is they are able to

13    look at the file and, you know, it might not be captured in one

14    particular area, they might have to do some work, but they're

15    able to see a record of who requested their clients to be

16    friends.

17        And we would like them to produce the pages of the file

18    that show friend requests from people they did not actually

19    know, who they believed to have been trolls.

20             **THE COURT:**  All right.  But the first half of that

21    sounded like an interrogatory.  You want them to identify

22    those friend requests.  But I mean -- maybe it goes hand in

23    hand, because they identify it by looking at the page, and

24    seeing it.

25        Mr. Loeser, you wanted to say something?

1              **MR. LOESER:**  Yeah.  I think, Your Honor, you're on --

2       I think you've sort of figured out exactly what the problem

3       is, and your suggestion is a good one, and one that -- it's

4       working talking about for a minute.

5              Certainly, a contention 'rog asking them to explain the

6       basis for allegations in the complaint, that does -- that's

7       always seemed to us like what this request was really after.

8       Because they're not asking for information; they've all the

9       information.  They're asking us to characterize the

10      information.  And that's exactly what a contention 'rog is.

11             And obviously, if we receive that 'rog, we'll answer it

12      with the information we have.  But I think it is also very

13      true, we don't yet have from Facebook the most critical

14      information in this case, which is who did they give our

15      plaintiffs' data to or sell access to, and what information did

16      they provide.

17             Once we have that information, we can completely answer

18      the contention interrogatory.  But at present, we can only

19      answer with what limited information we have.

20             **THE COURT:**  You can answer it, based on the

21      allegations that you made in the complaint.  I mean, that's

22      the whole -- it's a chicken-and-egg thing, right?

23             Because their argument as to standing that Judge Chhabria

24      will have to decide is if you didn't know that you were

25      receiving a friend request from someone suspicious, how you

1    were harmed by it.  Right?

2           **MR. LOESER:**  Right.

3           **THE COURT:**  Right?  So that's sort of a chicken and

4    egg.  So to say:  Well, until we know who sent it -- no.  You

5    made allegations in the complaint of some injury, thus far.

6        And they want to know, what is that based upon.

7           **MR. LOESER:**  Right.  I would --

8           **THE COURT:**  Sounds like -- I don't know --

9           **MR. LOESER:**  Yeah, I guess --

10          **THE COURT:**  I don't know if I'd call it a contention

11   interrogatory so much as like:  Identify for us, you alleged

12   X.  Okay, who is -- who did the friend request come from?

13          **MR. LOESER:**  Right.  I guess I would describe it as

14   part of a chicken and an egg.  Because they've focused on this

15   one aspect of the case which is, you know, ads that people

16   received that they found offensive.

17       But the heart of the case is they took information, user

18   data, and they shared it with third parties.  That then led to

19   a variety of things.  One of those things was ads that people

20   found offensive.

21       But the basis of the case is that they took data, and they

22   shared it without consent.

23       But I hear what you are saying.

24          **THE COURT:**  Well, that's your argument to Judge

25   Chhabria.  And I get it.

1          Like, you may think okay, you can whack that away, but

2     you're not going to win your standing argument, anyway.

3          Okay, but they're still entitled to do their discovery on

4     what they believe their argument is, to make their argument.  I

5     mean, I -- I hear what you're saying.  But that doesn't mean

6     they don't get the discovery on those allegations.

7               **MR. LOESER:**  Right.

8               **THE COURT:**  It may ultimately not prevail.  But this

9      is just discovery.

10         Okay.  So --

11              **MR. LOESER:**  To be clear, though -- I'm sorry,

12     Your Honor.  But to be clear on what we would be able to do if

13      we received a contention interrogatory today, we would be able

14      to answer with regard to the information we have at present.

15         But as discovery unfolds and we get the information we're

16     waiting for, then obviously, that would be supplemented with a

17     lot more information.

18              **THE COURT:**  Right.  But what I understand

19      Ms. Kutscher saying is you made certain allegations in the

20      complaint, and they want to know the basis for them now.

21         And to the extent, then -- for example, if your clients

22     had in mind particular friend requests, if they did, then, you

23     know, look at that file and -- or -- I don't know how you would

24     do it or if you can do it -- identify that friend request.

25              **MS. WEAVER:**  Your Honor, we will do that.  And we

1    have always said we would search for everything off the

2    platform, which is what we had when we filed.

3         I mean, the other piece, of course, and the proof problem

4    in the case at a specific level is that Facebook, itself, has

5    said they can't identify how our individual plaintiffs were

6    harmed.

7         And certainly, the friends of friends, when friends gave

8    permission so that third parties I didn't know about because

9    they downloaded those apps, that's what we need to try to

10   understand from Facebook how those systems work.

11        Because I -- this is one of those odd cases where the

12   plaintiffs don't know specifically how they were harmed.  They

13   just know the vol- -- that's not sweeping.  But in some sense,

14   there's two pieces.  There's the narrow, kind of, what happened

15   to me specifically, and what offensive ads.

16        And then there is the larger portion of the case, which

17   is:  I didn't understand that when I was sending a private

18   message and attaching a photo to one friend, that that data and

19   information was being sent to literally so many third parties,

20   Facebook tells us they can't identify them all.

21        And so we're still working on that second piece.  And

22   that's why we keep hearing it as sort of a contention

23   interrogatory.

24        But we will give them the information we currently

25   possess, and identify and respond to a 'rog based on what we

```
 1   now know, but we're just conditioning that on there's a lot

 2   that we have yet to learn.

 3            THE COURT:  No, no, no, I understand.  And that's an

 4   argument for Judge Chhabria in terms of what the --

 5            MS. WEAVER:  Got it.

 6            THE COURT:  -- was, and the standing, as to

 7   discovery.

 8            MS. KUTSCHER CLARK:  And I do want to be clear if I

 9   may, for a second, I think that the argument that Ms. Weaver

10   is making might apply to certain types of requests, and we

11   don't need to dig into those right now.

12       But the specific ones that we're talking about, for

13   instance, friend requests from trolls, there's no information

14   that plaintiffs would need from Facebook to identify friend

15   requests from people they don't know.  The plaintiffs either

16   knew the people, or didn't know the people.  I don't think

17   there's something they would need from Facebook to identify

18   that.

19       Another one of the requests has to do with interference on

20   their Facebook accounts.  So one of the things we want to know

21   is:  Were there posts on your account?  Did something appear on

22   your wall that you didn't do, yourself?

23       The plaintiffs don't need information from Facebook to

24   say:  This post on my wall this day wasn't from me.  Someone

25   else did it.
```

1          That's the type of stuff we're seeking right now, because

2     there are allegations about those things in the complaint.  So

3     I don't think there should be any delay answering questions

4     like that.

5          **MS. WEAVER:**  We will answer with what --

6          **THE COURT:**  What they need to do is review the

7      downloaded file from the user activity.  And it may or may not

8      be in there.  I just don't know how complete it is.

9          Like, somebody sitting here today probably can't remember

10    the name, exactly, or anything like that.  Right?  So they need

11    to review the file.  And maybe it's in there, maybe it's not.

12         But, I guess I don't hear the plaintiffs saying that their

13    clients aren't going to be reviewing that downloaded file.

14         **MS. ORNELAS:**  Well, Your Honor, that file, when

15     taking into account the volume that it measures to date, we're

16     talking about 116,000 documents that total, you know,

17     somewhere in the ballpark of 46 gigabytes of data.

18         So that is a significant volume to be searching, which is

19    why our initial position was carving that voluminous source

20    out, and instead, focusing on the documents that plaintiffs

21    have, things like screenshots or emails, things like that.

22    Because what we do know is, for example, when there is a

23    suspicious log-in attempt, a user is notified by Facebook, at

24    least that's my understanding.  And they get an email that

25    says:  Hey, was this you?  You have logged in from halfway

1    across the globe.

2        So things like that, you know, we are searching for.  But

3    to the extent that, you know, Facebook thinks it's proportional

4    to have us search through that volume of data without knowing

5    whether that kind of content is in the download file itself, we

6    just don't think that that is, you know, proportional at this

7    time.

8        Particularly when --

9        **THE COURT:**  I guess I don't -- I don't understand.

10       So either -- like, either it shows friend requests, or it

11   doesn't.  And if it doesn't, it doesn't.  You can figure that

12   out.

13       **MS. KUTSCHER CLARK:**  It does, yes.

14       **THE COURT:**  All I will say is this:  The plaintiff

15    certainly can't argue standing based on some friend requests

16    that they then didn't search for within their file.  That's

17    all.

18       I mean, you'll produce whatever evidence you produce,

19   right?  And then that's it.  You're held to it.

20       So that's -- that's the direction I'm going to give.

21   That's all.  I mean, I don't really quite --

22       **MS. WEAVER:**  I understand Your Honor.

23       **THE COURT:**  Yes, it will take the plaintiff some time

24    to cull through their files.  Okay.  They're the named

25    plaintiffs.

1           **MS. WEAVER:**  Yeah.  We will do that, Your Honor.

2       I think the other point, though, is that there is -- there

3   remains -- for example, if Facebook has a list of trolls and

4   had a list of suspicious apps and we can show them to our

5   plaintiffs, they may remember.

6       But I hear your point.  We'll give the specific

7   information we have now.  And later on, we will be -- we'll be

8   amending any 'rog responses, once discovery is complete.  And

9   then a judge can make a ruling on standing.

10          **THE COURT:**  Okay.  Okay.  All right.

11      Let's see.  So the next area was the app developer

12  investigation.  And so --

13          **MR. SNYDER:**  Your Honor, may I be heard on that one?

14          **THE COURT:**  Yes.

15          **MR. SNYDER:**  So Your Honor, thank you.  This is both

16   not right, and also not accurately described by the plaintiffs

17   in the submission.

18      Let me be very brief.  The so-called "app developer

19  investigation" is an internal investigation conducted by my law

20  firm, Gibson Dunn, in the wake of the Cambridge Analytica

21  events, commenced in 2018.

22      And the purpose of this internal investigation that my

23  partner Al Southwell is leading was to advise Facebook about

24  legal risks and exposures, including in this lawsuit

25  (Indicating), relating to apps on the Facebook platform prior

1   to 2015.  It's been ongoing since that time.

2       And first, plaintiffs wanted every single document

3   relating to that internal investigation, including my law

4   firm's files.  That was obviously overbroad.

5       To be clear, we are producing documents relating to this

6   investigation.  What I mean by that, Your Honor, is when my law

7   firm, working with Facebook and outside consultants, discovered

8   activity prior to 2015 involving third-party apps that it

9   wanted to follow up with, and communicated with those

10  third-party apps, those communications are not privileged.

11  Those communications we are producing, and have produced.  In

12  fact, we have already produced 16,000 documents related to the

13  investigation.  And as we continue our production, we will

14  continue to produce thousands of documents relating to the

15  investigation.

16      What we are objecting to, and only objecting to, is core

17  attorney/client and work-product communications, such as my law

18  firm's internal analysis.  Such as communications between my

19  law firm and counsel at Facebook concerning the investigation.

20      What we propose makes sense here is that we conclude our

21  production relating to this internal investigation.  And once

22  plaintiffs have reviewed these materials and identified apps

23  that they believe to be relevant, or want -- or -- or want

24  additional documents, they can issue more tailored requests for

25  information specific to particular apps.

1        For example, let's assume hypothetically in 2012 there was

2   some app that did something that the investigation uncovered.

3   We then, as part of our investigative protocol, communicated

4   with that app.  Call it App X.  We wrote them a letter.  That

5   letter will be produced  and they will then have the name of

6   that app.  And any communications with that app.

7        In one or two instances, only, we actually -- I think one,

8   maybe, we filed a lawsuit against a company.  That is all

9   public.

10       After they review those documents, we can take -- we can

11  then meet and confer, and there can be a live dispute.  Right

12  now, there is no live dispute other than they say they want

13  everything.  And they are focusing on a Massachusetts Superior

14  Court ruling.  And as we told the Court -- which -- which --

15  which was a motion to compel by the Massachusetts Attorney

16  General regarding a completely different -- substantially

17  different document requests than plaintiffs.

18       We objected to that request in Massachusetts because, as

19  framed, it did invade attorney/client privilege, work product,

20  and the like.  The Superior Court ruled against us.

21       But Facebook took that up to the Supreme Judicial Court in

22  Massachusetts, and they granted the extraordinary review of the

23  Superior Court's work product determination.  That is in

24  litigation.  And so nothing that's happening in Massachusetts

25  should either bind or control here.

1          This is not right.  When they get the tens of thousands of

2     documents they will see that there are -- I'm making it up --

3     ten, 20, 30, 40, 50 different apps -- maybe more, I don't know

4     the number -- maybe Martie does -- with which we communicated

5     as a result of our investigation.  They'll know the names of

6     those apps.  They can then follow up and ask questions about

7     those apps.  We're going to turn over all those documents.

8          What we're not turning over is our law firm's files, and

9     our communications with our client that were all pursuant to

10    this privileged investigation.

11              **THE COURT:**  When is that production going to be

12     complete?

13              **MR. SNYDER:**  Martie?

14              **MS. KUTSCHER CLARK:**  So we made a production on

15     Wednesday that included about 10,000 additional pages of

16     materials with the third parties.  We're continuing to review

17     them.  The volume is extraordinarily high, because it includes

18     every communication with apps about this investigation.

19          I think it would probably take us another several weeks to

20    work through the rest of the documents.  I think it's in the

21    range of tens of thousands of additional documents to review.

22    And we're actively working on that.

23          But again, these include every letter that went to an app

24    saying they were suspended, and why.  So once the production is

25    complete, plaintiffs will have the ability to identify any apps

1    that were suspended for reasons they're concerned about, or

2    that are actually relevant to the case.

3         And as Mr. Snyder said, then they could request additional

4    information about those apps, and we'd have something narrower

5    and more tailored that we can focus on.

6              **MR. KO:**  Your Honor, this is David --

7              **MR. SNYDER:**  Let me make one more point, Your Honor,

8     because -- so there's nothing -- there's no sort of nefarious

9     suggestion.

10        As it turns out, the vast majority of apps that were

11   suspended were suspended because we wrote them, saying:  "Dear

12   Mr. or Mrs. App, we have these questions for you," and they

13   never wrote back.  Probably out of business, or didn't care.

14        We then suspended them for non-compliance with our

15   platform rules because they simply ignored our initial inquiry.

16        So I think a high majority, if not in the nineties, high

17   nineties of the so-called suspended apps (Indicating quotation

18   marks) are just apps about which we had questions and followup.

19        And then they never wrote back to us, and we said "You're

20   suspended because you're a scofflaw, you didn't respond to us."

21             **MR. KO:**  This is David Ko on behalf of plaintiffs.

22   May I respond?

23             **THE COURT:**  Yes.

24             **MR. KO:**  So I'm a bit surprised, first of all, that

25    Mr. Snyder says this issue is premature.  We have been going

1    back and forth on this.

2        And as you know, in last hearing, you did direct Facebook

3    to try and get to a final position on this issue so that we

4    could actually brief it.  We thought we came to some sort of

5    final position, as you can tell from what Mr. Snyder is saying.

6    He refuses to actually have a final position on this.

7        And on the communications in particular that they are

8    claiming they will produce to suggest that we should narrow our

9    subsequently -- subsequently narrow our request, that doesn't

10    make sense to us for a variety of reasons.  Including, most

11    notably, the fact what they are offering to produce here are

12    internal communications with third parties.  That has nothing

13    to do and has no bearing on the relevance of the internal

14    documents and communications that we are entitled to.

15        I understand what Mr. Snyder is saying, that there is a

16    certain degree of those communications that could be

17    privileged.  But it is inconceivable that all of them are.  And

18    all you have to do is take one look at the statement that we

19    attached or the exhibit that we attached to our statement that

20    shows their publicly-available announcement about this ADI in

21    which they claim -- Facebook claims -- that this is something

22    that involved hundreds of people.  Not just attorneys.  Right?

23        They don't say it's an employer-driven investigation.

24    They say this involved external investigators.  They say it

25    involved policy groups at Facebook.  They say it involved

1   engineers, hundreds of people that were involved in this

2   investigation.  Platform operations folks.  Developer

3   operations.

4        This resulted -- this investigation -- which is ongoing,

5   by the way -- has resulted in thousands, tens of thousands of

6   apps being suspended.

7        So even if Mr. Snyder is correct in saying that the vast

8   majority of them relate to some sort of investigation in which

9   third parties did not respond, you still have a substantial

10  amount of third parties that are potentially in violation of

11  Facebook's (Inaudible).

12       So --

13       **MR. SNYDER:**  And -- and plaintiffs will get the names

14  of any -- plaintiffs will get any communications that we had

15  with any third-party app which puts them on notice of either a

16  perceived, suspected or actual violation.  They will have,

17  chapter and verse, the names, serial numbers, addresses of

18  those apps.

19       **MR. KO:**  Yeah.

20       **MR. SNYDER:**  And the fact is, yes -- the fact is this

21  was a large investigation, because the company committed to

22  conduct a retrospective investigation to see if there was a,

23  quote, "another Cambridge Analytica out there," close quote.

24  Turns out there wasn't.

25       Having said that, it takes a lot of engineers and a lot of

people at the company, and a lot of lawyers, I might say.  It
wasn't just Mr. Southwell.  We had a big team of lawyers
working with a big team at Facebook to look prior to 2015 at
every single third-party app to determine which ones complied,
and which ones didn't.

     And the plaintiffs are going to have a cornucopia of
information about third-party apps.  And I just would
respectfully suggest that they be a little patient.

     As Martie said, we're going to complete the production.
And I assume they'll have a lot of questions to ask about those
apps, and a lot of work to do to follow up.  And we will follow
up with respect to any third-party communications with those
apps.

     So --

     **MR. KO:**  The fundamental disconnect is, so,
Mr. Snyder is basically suggesting that we just received this
information, right, about external communications that they
had with third parties, and a potential list of these apps.

     We are entitled to much more.  This is discovery related
to our case that is fundamentally about Facebook allowing
third-party app developers to misuse and abuse it.  Information
of user content information.

     External communications with third party developers is one
tranche of that.  Right?  Internal documents and communications
related to their analysis from non-attorneys that are not

 1  privileged are obviously relevant and responsive to our

 2  requests regarding their enforcement policies.  And so that's

 3  what we're asking.

 4       And that's what the disconnect is here, Your Honor.

 5            **THE COURT:**  So is it Facebook's position that, for

 6  example, any communications among engineers that didn't

 7  involve attorneys, because they all come under the umbrella of

 8  this lawyer-directed investigation, they're privileged?

 9            **MR. SNYDER:**  Your Honor, the engineers were all

10  working.  There were internal legal teams, external legal

11  teams.  And everything that was done within the rubric of this

12  investigation is at the direction of counsel.

13       Let me make another point though, Your Honor, just to be

14  clear --

15            **THE COURT:**  So that's --

16            **MR. SNYDER:**  Yes.  Yes.

17            **THE COURT:**  I just want know if that's a yes.

18            **MR. SNYDER:**  Yes, yes.

19            **THE COURT:**  All right.  So --

20            **MR. SNYDER:**  But Your Honor, here's what plaintiffs

21  have failed to mention.

22       This so-called "ADI," which is really an internal legal

23  investigation, is separate and apart from Facebook's normal and

24  regular enforcement activities.

25       Facebook has an enforcement team.  And all it does is

1    enforce the rules and regulations and policies on the platform.

2    That enforcement team works with engineers on a regular basis,

3    and -- and is not done at the -- in the ordinary course, under

4    the direction of counsel.

5         And we have produced and will produce numerous documents,

6    because plaintiffs have asked for them, concerning our ordinary

7    enforcement activities which do involve engineers and policy

8    people.  And that stands in sharp contrast to the legal

9    investigation that my firm conducted.

10        And so -- and Martie, I don't know what the volume of

11   those documents are, but they are fairly voluminous.

12             **THE COURT:**  Okay.  But what I guess I don't

13   understand, at some point you're going to have to produce a

14   privilege log.  Because just because you say they're

15   privileged doesn't mean that the plaintiffs have to accept

16   that.

17        So I'm trying -- so when -- when do you intend to do that?

18             **MS. KUTSCHER CLARK:**  If I could respond briefly,

19   because I think there's a little bit of a misunderstanding

20   here.

21        The concern we're having at the moment is the requests

22   we're receiving from plaintiffs keeps changing.  When we came

23   before the Court last time, we were under the impression that

24   the plaintiffs were seeking the materials that the

25   Massachusetts AG'd requested.  So we went back and we talked to

1   the plaintiffs about our position as to those materials.

2       During that discussion, the plaintiffs told us for the

3   first time -- or at least we understood for the first time --

4   that they are seeking every single document from the

5   investigation, about the investigation, related to the

6   investigation.  That's a really different request, and it's

7   extraordinarily broad.

8       And our position with respect to privilege and whether and

9   to what extent we could prepare a privilege log is very

10  difficult to analyze when we're talking about every single

11  document.  It would be a privilege log with millions and

12  millions of entries.  So what we're suggesting right now is

13  that we finish producing the letters that show who was

14  suspended, and why, so that the plaintiffs can make a more

15  tailored request.

16      And at that point, we're not necessarily objecting to

17  producing any of the underlying information.  So for instance,

18  what we understand the plaintiffs ultimately want is underlying

19  data showing platform violations, or showing what an app did

20  with users' data.

21      To the extent that we can uncover that underlying data,

22  we're not objecting to digging up that data and providing it to

23  plaintiffs so that they can do their own analysis.  What we're

24  objecting to doing is taking our attorney files and the work

25  that our attorneys and attorney-led team did to look at that

1  data, and analyze it, and make decisions about that data, and

2  simply handing it over to the plaintiffs.

3          MR. LOESER:  Your Honor, if I may, just briefly.

4  Because again, I think your question went right to the heart

5  of the matter.

6      If we have two engineers talking about Facebook's data

7  policies in connection and then fallout from Cambridge

8  Analytica, can that possibly be privileged.  And I think the

9  reason why we feel like this controversy is ready to be

10  briefed, the parties are taking positions that are directly

11  contrary on a large body of information that we believe is

12  directly relevant.

13     If you go to the exhibit we provided, which is Facebook's

14  public announcement of the ADI investigation, this does not say

15  Gibson Dunn lawyers are conducting an internal investigation

16  for the purpose of legal advice.

17     And I'll just read what it says, because I think it should

18  give a pretty good idea --

19          THE COURT:  No, I understand.  But you're not

20  seeking, are you, like, memos among Gibson Dunn attorneys.

21          MR. LOESER:  No.  No.  We are not seeking privileged

22  information.  We're seeking --

23          THE COURT:  Okay.

24          MR. LOESER:  Yeah.  We want the information -- like,

25  for example, one of the categories of people involved, from

1    their announcement, they say:  Among the people involved in

2    this are policy specialists.

3        They say (As read):

4            "We promised that we would review all of the apps

5            that had access to large amounts of information

6            before we changed our platform policies in 2014.  It

7            has involved hundreds of people: attorneys, external

8            investigators, data scientists, engineers, policy

9            specialists, platform partners and other teams across

10           the country."

11       And the next line is really critical for this.

12           "Our review helps us to better understand patterns of

13           abuse in order to root out bad actors among

14           developers."

15       That is a business activity, and it is a critical business

16   activity for this case.  We are not interested in the legal

17   advice and the legal communications.  We want the business

18   activity information that would be produced because it's

19   directly relevant and responsive.  If they want to withhold it,

20   they need to log it.  But it's certainly not going to be

21   privileged.

22           MR. SNYDER:  Well, we strongly, respectfully

23    disagree, because my law firm was involved in every decision.

24           THE COURT:  Okay, but we're not going to adjudicate

25    that now.

```
 1        MR. SNYDER:  Right.

 2        THE COURT:  The question, though, because it's not --

 3   so they're not seeking the stuff that's clearly privileged, so

 4   you don't have to worry about that.  And I don't even think

 5   that ever really even needs to be logged, because that would

 6   be a waste of time.

 7        But with respect to the other stuff, there's arguments

 8   there.  Both ways.  Privilege is not clear, and there's

 9   arguments both ways.

10        And so the question is then, how, how -- I certainly --

11   it's not -- I can't adjudicate that right now, like just

12   generally out there.  It has to be done in context.  Right?

13        So maybe the thing to do -- I do, I have to say, I just

14   think, Mr. Loeser, I understand, but we're not in a great rush,

15   you noticed, so -- is start reviewing those documents, and then

16   see -- we can take a subset.  Because the way I'm going to be

17   able to adjudicate this is take some exemplars, and rule, and

18   then the parties then can use that and apply it.  Right?  You

19   don't need the log of every single document.

20        So maybe what you do is you take a particular app, or you

21   get some names or something, right, and we focus on that

22   subset, and I adjudicate that.  That's not going to resolve the

23   privilege for everything, but it will be a roadmap that the

24   parties can then apply.  But I think we are going to need a

25   certain set -- I want it to be in context of a particular
```

1  document.  So the question is:  How do we get there.

2      And I don't think we necessarily need to wait until all

3  the production is done.  I don't think that is the case.  The

4  parties should get together and decide on, you know -- I don't

5  know what it is that the plaintiffs think necessarily are

6  there.  Maybe Facebook can come up with -- I don't know -- a

7  hundred documents that you're going to log.

8          MR. SNYDER:  We can also be helpful, Your Honor.

9   And, and -- because the vast majority -- I think it's

10   99 percent, but that's just from what my partner, you know,

11   has allowed to.

12      Since the vast majority are people we wrote to and

13  suspended because they didn't write back to us, you know, maybe

14  we can highlight a couple of ones where we had further

15  activity, they wrote back to us, we engage with them.

16      And then we can go behind the curtain, so to speak, on

17  your exemplar idea, and we can take a look at what our work

18  product and attorney/client activity was behind the contain,

19  look at what engineers were doing, and then figure out how to

20  tee up a privilege exemplar for handful of apps.

21          THE COURT:  Well, and for example, Mr. Loeser brought

22   up like policy (audio interference), things like that.  That's

23   not going to be particular to an app.

24      But maybe plaintiffs can point out, you know, because

25  what's --

1           **MR. LOESER:**  Your Honor, you're breaking up on us.

2      (Off-the-Record discussion)

3      (A pause in the proceedings)

4           **THE COURT:**  I'm back.

5           **MR. LOESER:**  We lost you right when you started

6  talking about policy specialists.

7           **THE COURT:**  I came to the courthouse so I'd have good

8  internet.  I got the Court give me an upgraded laptop, and

9  it's, like, worse than ever.  I'm actually at the courthouse,

10  where there's very few people here.

11      In any event.  So, you know, I think, you know,

12  plaintiffs -- maybe starting with this -- identify some

13  documents that you think that you would be entitled to.  Like

14  discussions among the policymakers that Facebook was referring

15  to.

16      Facebook then, you know, look at them, and just say: Oh,

17  no, yeah, I can produce those now.

18      But I think we're just going to have to do it sort of in

19  tranches.  But I agree with the plaintiffs, I don't think we

20  need to wait until the end because I don't think it is

21  necessarily specific to particular apps.

22      I think this suggests there's broader things going on that

23  would be relevant, and that may very well not be privileged.

24  But I don't think there's anything right now.  I --

25           **MR. SNYDER:**  The reason that makes sense, Your Honor,

1   is that, you know, without reviewing attorney/client

2   privileges, we did have an internal protocol for this internal

3   investigation.  Sort of an escalation protocol.  And so things

4   did follow a particular prescribed course in the investigation

5   of an app.  And it was a massive undertaking, because the

6   company had to literally evaluate every app prior to 2015.

7   And so there is an established protocol that governs

8   escalation of these app investigations.  And policy was

9   involved in some of those.

10      But I think we -- we can work with plaintiffs, I think,

11   and identify our own protocol for how to frame the privilege

12   inquiry, and then key it up for Your Honor when it's ripe.

13           **MR. LOESER:**  Well, Your Honor, for the exemplar

14   approach to work, it would need to be -- let's take policy

15   specialists, for example.  We would say:  Look, we want -- and

16   I don't know if there's a way for us to connect it to some

17   particular app or not; it depends on what other discovery we

18   got.  But we want all the conversations and discussions that

19   relate to -- in which policy specialists were involved.

20      For the exemplar to work, Facebook would then need to

21   provide that, or produce a log that identifies everything that

22   they're not providing.  It can't be some cherrypicked set of a

23   couple of documents here and there that try to somehow prove

24   the point that Orin's trying to make.  It needs to provide the

25   parties with the full ambit of the information, so that we can

1  then meaningfully brief the dispute.

2          **THE COURT:**  So of the --

3          **MS. STEIN:**  It sounds like we have our work cut out

4  for us on a meet-and-confer, Your Honor.  I mean, this is one

5  of the issues that we've been trying to focus plaintiffs on,

6  which is the over-breadth of the request.  And we've been

7  trying to discuss:  What do you actually want?

8          And so I think this will help give us some structure for a

9  meet-and-confer process, so that we can get a better sense as

10  to what plaintiffs are looking for.

11         **THE COURT:**  Well, they actually do want everything.

12  They do want everything.

13         **MR. SNYDER:**  Yes.

14         **THE COURT:**  They recognize there are certain things

15  that they can't get, because of privilege.  But the thing is

16  that there's a fine line in these types of things, what is

17  privileged and what's not privileged.  And so, yeah.  So what

18  they want is everything.  That is true.  But they recognize

19  there's some things they can't get.

20         But maybe it's to take it off in chunks.  Maybe, you know,

21  start with the policy stuff.  But that's going to take some

22  work, then, reviewing it, saying:  Well, maybe we can't really

23  defend privilege here.

24         Or if you're going to log it all, then log it all, and

25  we'll make a decision.  I think you probably can approach it

1   that way.

2          **MR. KO:**  Your Honor, David Ko --

3          **MR. SNYDER:**  Yeah, the problem --

4          **MR. KO:**  Just one -- one more point to make in

5    response to what both Mr. Snyder and Mr. Stein have been

6    saying.

7          So, the exemplar approach and the sample documents.

8    Again, all that they are offering to produce to us are external

9    communications and (audio interference) with third parties.

10          As Mr. Loeser was indicating, there are a whole swath of

11   documents related to internal documents and communications

12   regarding their analysis, right, that may not have escalated to

13   the point of notifying a third party regarding this escalation

14   protocol that Mr. Snyder alludes to.  Right?

15          And so there are a wide range of categories of documents

16   that we are entitled to, based on our discovery requests.

17          **THE COURT:**  No, Mr. Ko, I understand.  I'm not

18    limiting it.  What I'm saying is, there's no way I can resolve

19    this, just on a general thing.  It has to be specific.  Some

20    things may be privileged, and some things not.

21          I'm trying to figure out -- if there are millions of

22    things, I'm just saying let's just take it in pieces.

23          **MR. KO:**  Sure.

24          **THE COURT:**  So start with what you want, most

25    important, what you think is the most yield, or what you think

 1    would be the best exemplar for me to rule on.  What area.

 2    Like --

 3              MR. KO:  Yeah, and here's an example of --

 4              THE COURT:  Not waiving your right to get everything

 5    else.

 6              MR. KO:  Sure.  And I understand that, Your Honor.

 7         And here is an example for why this issue is, to a certain

 8    extent, ripe.  You know, in addition to the policy specialists

 9    that Mr. Loeser alluded to, the app -- the ADI very clearly

10    involved external investigators.  So there are documents that,

11    by their own very nature, they've presumably waived the

12    privilege.

13         So communications --

14              THE COURT:  Well, that's -- I don't accept that

15    statement, at all.  That is way too simplistic.

16              MR. SNYDER:  Our law firm --

17              THE COURT:  Uh-uh, I don't need to do that.  That is

18    not a correct statement of the law, Mr. Ko, that just because

19    an external -- if the external investigator was hired by

20    Gibson & Dunn, it may very well be privileged.

21         So anyway --

22              MR. KO:  That's fair, you are absolutely correct.

23    All I'm saying is, in response to that statement, they're

24    identifying a categorical privilege and assertion over all

25    these documents, excluding this narrow category of documents

1     that they claim they're going to produce regarding

2     communications with third-party app developers.  So it kind of

3     runs both ways is all I'm saying, Your Honor.

4              MS. WEAVER:  Your Honor, if I may, I think we heard

5     an offer from Mr. Snyder that we had not previously heard.

6     And we actually started this discussion months ago by asking

7     about the escalation process.  So, if we got a deadline for

8     Facebook to send to us the documents sufficient to describe

9     the escalation process, we might be able to identify

10    categories.

11             We're a little constrained, because we don't know, really,

12    what to ask for.  We would only be working off experience in

13    other cases about how investigations were run, and we know that

14    Facebook is really specialized.  So we don't have a lot of

15    insight, really, into how it was run.  Certainly prior to, you

16    know, 2018.  We know about their communications with third

17    parties because we've seen them, both in the public domain and

18    documents that we've received here.

19             But I think getting a description from Facebook about:

20    These are the teams, this is who did what, something like that

21    by a certain date within a reasonable amount of time, then we

22    can dig in and make a proposal about:  These are the test

23    categories we want.  If that's the direction Your Honor wants

24    to go in.

25             MR. SNYDER:  Your Honor, that is all privileged,

1    which is why I say, without waiving privilege, I was simply

2    saying that we can't -- we had engineers, we had outside

3    consultants, we had lawyers, we had policy people all working

4    together to investigate every app on the platform prior to

5    2015.

6        And you know, if we meet and confer and they asked us

7    about those consultants, I would say Gibson Dunn hired them.

8    And they all were Covelled (phonetic), and they're all working

9    within -- at the direction of counsel.  But --

10       **MS. WEAVER:**  Well, if I may, this is where we begin

11   to get confused.  Because if they are categorically saying

12   everything is privileged, then maybe we should brief that.

13   That can't be right.

14       So I don't know what we have to do to --

15       **THE COURT:**  I agree.

16       **MS. WEAVER:**  Yeah.

17       **THE COURT:**  I doubt that that's correct.  But a lot

18   of it may be, and a lot of it may not.  So to brief it gets us

19   nowhere, unless we do it in context.  That's all.

20       **MS. WEAVER:**  So how can we develop an understanding?

21   As plaintiffs, to understand how these things are reviewed,

22   I'm a bit stymied.

23       **THE COURT:**  Well, I think we start with something.

24   Like, we start with something.

25       **MR. SNYDER:**  I think the judge had a great idea.

```
 1              THE COURT:  Focus on something.  They produce a log,
 2    and then, and then we -- we -- we -- I rule on that.  Right?
 3    So we start with --
 4              MS. WEAVER:  But I'm concerned, Your Honor, that
 5    they'll cherry-pick only privileges communications between
 6    lawyers and --
 7              MR. SNYDER:  No.  No, we have an obligation --
 8              MS. WEAVER:  -- get to the heart of the issue --
 9              MR. SNYDER:  We have an ob- --
10        (Reporter interruption)
11              MR. SNYDER:  Your Honor --
12              MS. WEAVER:  My apologies.
13              THE COURT:  So this is what you do.  You start
14    with -- ask for communications among policy people, that no
15    lawyers were on.  Just start with that.  You ask for that.
16    Right?
17              MR. SNYDER:  Or another --
18              THE COURT:  Or ask for communications among the
19    external investigators, which no lawyers were on.
20        In other words, that's, right, going to be your Backs
21    (phonetic) case.  So start by asking for those.
22              MR. SNYDER:  I thought, Judge, you had an excellent
23    idea.  Let's say there's App X that we had correspondence
24    with, and it's in those 16,000 pages.  And we have back and
25    forth with an app about some platform violation.
```

1          They can then ask us with respect to that particular app

2     and -- and engagement with that app, what is behind the

3     curtain?  You know, who else communicated at Facebook before

4     you sent that?  And we can look at those documents, and

5     determine what's privileged and what's not.

6          And if we make a categorical privilege claim with respect

7     to everything so-called "behind the curtain," that could be

8     teed up for Your Honor because that would be illustrative of an

9     approach to a particular app enforcement that grows out of the

10    legal investigation.

11          **MR. LOESER:**  And Your Honor, I think, again, for this

12     to work -- and this is Derek Loeser speaking -- we will come

13     up with a couple categories that we will choose.

14          They may not be the categories that Mr. Snyder would like

15    us to choose, but they will be the categories that we think

16    will show as best we can, when we don't have the information

17    when we are making the choices, why there is a problem with the

18    approach that they're taking.

19          **MR. SNYDER:**  And I just want to warn everyone or

20     caution everyone, this was a massive investigation because the

21     CEO committed to Congress and the public that he was going to

22     direct this investigation.

23          So if you ask, just as a caution -- narrate, no -- for

24    every communication between consultants and among consultants,

25    that will be probably tens of millions of communications.

1   Because every time we told a consultant to do something with

2   respect to an app, and it was always a legal direction, the --

3   the consultants didn't direct the investigation, I imagine that

4   the consultants then went off into consultant-land and

5   exchanged 10 million emails before they came back with the work

6   product, brought it to counsel, and then a decision was made.

7        So the volume here is -- we should look at the volume.  My

8   guess is we're talking about many tens of millions of

9   documents.

10        **MR. LOESER:**  Well, Your Honor, we haven't received

11   many millions of anything.  But I think a lot of what

12   Mr. Snyder just said sort of highlights the problems and the

13   reasons why I think this will result in briefing.

14        For one, maybe we'll start as a category the

15   communications between the CEO and the data policy people.  And

16   this is -- I mean, everything you'll read about this from their

17   public statements, this is a very public activity that Facebook

18   has done.  And it's very important, clearly, to get this

19   information about this investigation to its users.  That's why

20   they keep posting about it.

21        We can come up with some categories that we think will

22   make clear to the Court what the problem is and where the

23   limits of privilege are.

24        As you've, I think, rightly noted, we do not want access

25   to and understand that we don't get access to privileged

1   communications.  But there's a lot here that's not privileged.

2   And we know that because of the public things that Facebook has

3   said, including what the CEO has said.

4       And we'll figure out some categories that try and bring

5   this into focus for the Court.

6           **THE COURT:**  I think that's the way to do it.  And I

7   guess on Wednesday, you did get some -- about 10,000 pages,

8   and you can look at that and see if that helps.

9       But I do want to -- I don't think necessarily we should

10  wait to adjudicate it, but I do want to adjudicate it in a

11  context.  And it'll be just one small piece, and that then

12  will, I think -- I've found, at least, that'll help with the

13  other, the other side.  Okay, so that will be on your agenda to

14  discuss.

15      Okay.  I do have a settlement at 9:30 so we have to -- I'm

16  going to be late for.

17      Let's see.  Oh, the search terms.  So the stipulation that

18  the parties signed said that Facebook was going to provide

19  search terms for a broad spectrum of custodians.

20      So tell me how Facebook has come up with that broad

21  spectrum of custodians that they will provide on July 21st.

22          **MS. KUTSCHER CLARK:**  Sure, Your Honor.  And, I think

23  the issue that was raised in the statement was a bit of a

24  misunderstanding.  So I think we can resolve that easily.

25      The search term protocol provides a deadline to propose

1    search terms for each custodian.  We divided the custodians

2    into eight groups.  And what we said is we would propose a

3    comprehensive set of search terms by the 21st.  But the

4    deadline to propose search terms for the first four groups is

5    also the 21st, with future deadlines for other groups.

6        The way we understood that is we'll be providing a

7    comprehensive set of search terms that will apply broadly next

8    week, but we're not proposing any terms that are specific to

9    custodians we have not yet interviewed, until the deadlines for

10   those custodians.

11       So the idea is there will be a comprehensive set of terms

12   for the first four groups that will include terms that are

13   specific to the custodians within those groups.  So we talk to

14   those people, we learn jargon, we learned code names.  We'll

15   include that sort of information.  To the extent groups of

16   custodians were not interviewed, we're not going to have

17   specific terms for those people yet because we're still talking

18   to them.

19            THE COURT:  But they will be included in the broader

20   search terms.

21            MS. KUTSCHER CLARK:  I'm sorry; I just didn't

22   understand some of --

23            THE COURT:  Sorry.  But what you're saying is --

24   but -- but is the broader search terms will apply to them.

25   You just won't have the specific search terms.

1          **MS. KUTSCHER CLARK:**  Yes, exactly.

2       And the one thing I do want to clarify, just to make sure

3    we're all on the same page, is there is one RFP, a single RFP

4    that is not covered by the first four groups of custodians.

5       So because we will not yet have spoken to any of the

6    custodians about the issues with that RFP, we did not intend to

7    propose a comprehensive set of search terms for that one

8    specific RFP.  But otherwise, they will all be covered, in

9    addition to the specific terms for the first four groups.

10         **MS. WEAVER:**  Which RFP is that?

11         **MS. KUTSCHER CLARK:**  Don't hold me to this; off the

12   top of my head, I think it's 22.  But I would need to look

13   again at my notes.

14         **MS. WEAVER:**  Okay.  This is the first we're learning

15   of it.  But we're fine with that, Your Honor.  The statement

16   did read as though they were limiting it to 41.  We

17   understand, and I think you will understand the point.

18         **MS. KUTSCHER CLARK:**  Yeah.  I think it was just a

19   misunderstanding.  We're happy to talk more about it.

20           **THE COURT:**  Okay, great.  What else should we talk

21   about?

22         **MS. WEAVER:**  Your Honor, very briefly, just

23   43(b)(2)(C), I think you've seen kind of an example of the

24   crossing of ships in the night.

25       For example, you know, with regard to ADI, it has been

1   very hard for us to get our arms around what Facebook is

2   withholding.  And we, for example, have told Facebook that we

3   will tell them if we are withholding anything, any categories

4   of documents that are responsive.  And things got a little

5   flipped around.

6        I think we originally framed it as:  Let us know if you

7   categorically object to any RFP.  And they -- initially they

8   said yes, then they said -- the final response was only 19,

9   which is ADI.

10       But then when we dug in, and we started meeting and

11  conferring, it became unclear to us whether Facebook is taking

12  a position with regard to certain categories of documents that

13  are responsive.  Meaning we're not objecting categorically to

14  an RFP, but are they withholding some small subset that is

15  responsive that they haven't identified to us because they're

16  saying no, that's not relevant?  And the whole point of

17  34(b)(2)(C) is to make that transparent, so the parties can

18  engage.

19       And, and this is what we understand now, Facebook is

20  saying: Well, for search term documents, we're not ready yet.

21  And we understand that, and we will wait.

22       But we want to know now for categories of RFPs where

23  search terms are not required, has Facebook decided that there

24  are responsive materials which are not relevant?  And we heard

25  some of it today.  Some of it came out in their statement.  But

1    that's the conversation that we want to have.  And we think

2    we're entitled to that.

3              **MR. SNYDER:**  Your Honor, just briefly, they raised

4    the same issue with Judge Chhabria with regard to our FTC

5    production.  And Judge Chhabria ruled, clearly consistent with

6    the federal rules, that defendants, like all parties, are

7    presumed to conduct their relevance review in good faith and

8    are not required to make such disclosures which are not

9    required.  That is to say, there's no requirement that we

10   identify irrelevant documents in advance.

11        We are going to.  We've produced 1,200,000 pages of

12   documents, including, I think, 40- or 60,000 that are internal

13   Facebook documents, already.  We will continue to produce

14   responsive relevant documents.  The rules require that.  We've

15   done it.  And we don't have an obligation to say what is

16   irrelevant and not being produced.  That's just backwards.

17   It's been rejected by Judge Chhabria.  And really, we think,

18   you know, it makes no sense whatsoever.

19             **MS. WEAVER:**  Well, we don't see -- go ahead.

20             **THE COURT:**  I guess what -- for example, something

21   that's been produced are documents that were produced to the

22   FTC.  Right?

23        And so --

24             **MR. SNYDER:**  Yes.

25             **THE COURT:**  -- one question is:  Did you withhold

1    anything that's not relevant?

2         **MR. SNYDER:**  That was asked of us.  And Judge

3    Chhabria said we did not have to -- I don't know the answer to

4    that, but --

5         **MS. KUTSCHER CLARK:**  No, we didn't.  He didn't

6    withhold anything on relevance grounds, no.

7         **MR. SNYDER:**  We did not.

8         **THE COURT:**  Okay.  You did not.  Okay.  All right.

9         So, Ms. Weaver, what is -- what is the -- the search

10   terms, I get, were not -- they can't know until they've

11   searched.

12        So what is -- with respect to what's been done so far,

13   what is the concern?

14        **MS. WEAVER:**  Other regulatory documents, so they

15   produced to the ICO and DCMS in the UK.  Those are regulatory

16   bodies.  Did they categorically decide that there were

17   portions of those inquiry not relevant to our case?

18        For example, this has arisen -- this is in a slightly

19   different context -- with regard to PwC documents.  They have

20   said PwC was looking at things not relevant to the case.  But

21   we don't know what those are, even generally, by topic.  And if

22   they told us, we might agree.  But they're just making the

23   decision, without sharing it with us.

24        They have said at different points:  We're only producing

25   certain kinds of materials relating to advertising.  We don't

1   know where they're drawing that line.  This has arisen in the

2   context of the financial documents, the RFPs that seek

3   information about their finances.  So, how are they drawing the

4   line been between what they think is relevant, and what they

5   think isn't?

6        These are all things where we need them to take a

7   position, and frankly, some of these things, it would be

8   helpful if they did it in writing.  Because when we have these

9   conversations, it's circular for us.  And we -- there's

10  misunderstanding.  And if they put it on paper, we can see it,

11  and it's helpful.

12       **MS. STEIN:**  Your Honor, we have not taken a

13  categorical position on anything that we're withholding.

14  We're doing this, as plaintiffs do in every case.  Which is we

15  meet and confer -- I mean, we've had a gazillion

16  meet-and-confers on plaintiffs' RFPs, to use a technical

17  estimation of the time.  And then, our reviewing and producing

18  documents for relevance the way -- and responsiveness the way

19  parties do in every case.

20       There's no category of documents that we're sort of

21  secretly setting aside.  Documents are either responsive and

22  relevant, or they're not.  Most of this it's very hard to argue

23  about in a vacuum, which is what we've repeatedly said to

24  plaintiffs.  But these are why the -- the search term ones, as

25  Ms. Weaver has noted, you know, it's fighting about it in a

vacuum about what the scope is going to be.

**THE COURT:** We're not --

**MS. STEIN:** Right. For the specific RFPs, we've had very detailed conversations about what's getting produced. There's been no categorical objection to some sort of -- I mean, this use of the term "categorical," there's no bucket of documents that we're setting aside as irrelevant. We look at documents on a document-by-document basis, as they populate. And, you know, a reviewer will look at them for whether they're responsive or not. But, I mean, it's no different than any other case.

    And it's just really been very challenging for us because we keep getting asked about categorical, you know, objections. We don't have a categorical, you know, bucket that we're refusing to produce.

**MR. LOESER:** Your Honor, if I can --

**THE COURT:** For the PwC documents, were there documents that were withheld as non-responsive -- as -- yeah, as not relevant?

**MS. KUTSCHER CLARK:** Your Honor, that's a difficult question to answer because plaintiffs' (audio interference) the PwC documents, it's a much more complicated request, where they asked for the documents referenced in particular PwC reports. Ands the issue there is more about the fact that it's very difficult for us to identify what PwC, as a third

1    party, relied on.  So there have not been relevance objections

2    to those documents.  Some of them haven't been produced

3    because we're having difficulties identifying them.

4         But for all other materials, what we have consistently

5    told plaintiffs is we are determining relevance based on the

6    four theories of liability that Judge Chhabria laid out in his

7    motion-to-dismiss order.  Judge Chhabria said these are the

8    four theories that are in play in the case.  And we are making

9    every relevance determination, based on those four theories.

10   And that's what we have consistently told the plaintiffs.

11        **THE COURT:**  But, so, but I do think, I do think that

12   you do have an obligation to, as part of the meet-and-confer,

13   explain -- give examples.  For example:  This is a document

14   that is responsive to your requests but that we decided was

15   irrelevant.  Just explain that.

16        **MR. KO:**  Your Honor, this is David Ko again.  And

17   just -- I completely agree, that's what we've been asking and

18   in the context of this specific example of PwC that we're

19   discussing is exactly where it's come up.

20        I'm a bit surprised that Ms. Kutcher Clark is saying that

21   they are not withholding on relevance grounds due to some

22   technical misunderstanding of our requests.  They have made it

23   clear in their meet-and-confers to us that they believe that

24   both the Facebook privacy program and PwC (inaudible) contains

25   large amounts of information they believe are not relevant to

1    this case.

2         And so we asked them to identify what those are, because

3    our view of those reports by PwC and the underlying Facebook

4    privacy program is that we believe most of it is relevant.  And

5    we have provided them with examples why.  They have refused to

6    give us examples in response for what is not relevant.

7         So you --

8              **MS. KUTSCHER CLARK:**  May I respond to those?

9         (Reporter interruption)

10             **MR. SNYDER:**  Sorry, my phone keeps on falling down.

11    That's what's happening.  I'm muting it; I apologize.

12             **MS. KUTSCHER CLARK:**  The issue with the PwC

13    documents, Mr. Ko is correct in that we don't believe

14    everything PwC looked into over a ten-year period is

15    necessarily relevant to this case.  However, we haven't

16    provided had a detailed analysis of that, because those

17    materials haven't actually been requested.  And we've talked

18    about those, ad nauseam.

19         The plaintiffs did not serve a document request for all of

20    the documents between Facebook and PwC.  They served a very

21    different request.  So we have been talking about that request.

22    And at this point it would be premature to do the type of work

23    Mr. Ko is describing, because we don't have it a request for

24    that information.

25             **THE COURT:**  Okay.  All right.  So the only guidance

1    I'm going to give here is that if -- if responsive documents
2    are being withheld on the ground that you decided they're not
3    relevant, I do think, and I -- I -- that you should -- as part
4    of the meet-and-confer, you explain why, and you give an
5    example.   That that's part of the meet-and-confer process.
6    If -- if it's being withheld on relevance grounds.   If it's
7    not, then there's not.   But if it is, then you should sort of
8    give the other side an explanation as to how you're drawing
9    that line.
10          **MR. LOESER:**   Your Honor, this is Derek Loeser.   That
11   would be very helpful.
12          **MR. SNYDER:**   Judge, I'm having -- I know Your Honor's
13   late.
14      Are you suggesting that every time a reviewer -- I'm not
15   being facetious.   Every time a reviewer takes a document and
16   asks whether it's relevant, we have to make a notation so that
17   we can explain?
18          **THE COURT:**   No, of course I'm not suggesting that at
19   all, Mr. Snyder, and I don't.   What I said is as part of the
20   meet-and-confer process, generally when you've made decisions
21   as to what's relevant, what -- they say somewhat
22   categorically, but sort of give -- just give an explanation:
23   This is the direction that we gave our reviewers.   Right?
24   This is where we draw, where we drew the line.
25      That's what I'm saying.   Like, generally --

1            **MR. SNYDER:**  Understood.

2            **THE COURT:**  -- drew the line.  And they can say:

3      Okay, I understand that, I agree.  We don't want those

4      documents.  We already have a lot of documents --

5            **MR. SNYDER:**  We've done that; we've done that

6      already, and I've even done that on earlier meet-and-confers.

7      We will do it again, and we will do it with force and clarity

8      again.  But we will make that clear.

9         Thank you.

10           **THE COURT:**  Okay.

11           **MR. LOESER:**  Your Honor, I do think that would be

12     helpful.  An example would be the conversation we had about

13     ADI.  Clearly, they made the decision that all information

14     that was internal would be withheld.  But when you look at

15     their offer for what they're producing, they talk about all

16     these communications with third parties, but they're not --

17     they haven't 'fessed up to what they actually were doing, was

18     eliminating from what they intended to produce everything that

19     was internal to Facebook.

20        So that kind of conversation would allow the parties to

21     quickly realize where the disconnects are.

22           **MS. STEIN:**  ADI is completely --

23           **THE COURT:**  As I understand the ADI, they believe,

24     their position is that everything that was done as part of

25     their -- the investigation, and whether they were outside

1   investigators or internal Facebook people, is privileged.

2   What they've agreed to produce are the communications like

3   with the app developers, because clearly they're not part of

4   Facebook.  They weren't hired at the direction of the

5   attorneys.

6           MR. LOESER:  Right.

7           THE COURT:  But I understand it's a broad privilege.

8   So -- okay.

9       When shall we have -- is it two weeks?

10          MS. WEAVER:  Yes, Your Honor, that would be fine.

11          THE CLERK:  (Inaudible)

12          MS. WEAVER:  That's Friday the 31st?

13          THE COURT:  Go back to Friday.

14          MS. WEAVER:  I'm sorry; this is Monday, isn't it?  My

15   fault.

16          THE COURT:  We were meeting on Fridays, so that's

17   fine.

18      Ms. Means, how does Friday the 31st look?

19          THE CLERK:  Oh, the 31st is fine.  Do you want 9:00

20   or 8:30?

21          THE COURT:  Can we do 8:30 again?

22          THE CLERK:  Yes.

23          THE COURT:  Okay.  All right.  We'll have the

24   statement due whatever the schedule is that I set.  That seems

25   to be working well.

1    **MS. STEIN:**  Your Honor, on the schedule, if -- if we

2    could build in a little bit more time between when can we

3    get -- sort of do the initial exchange, and then when we do

4    the final exchange, I think that would be helpful.

5    It's just -- the schedule has proven a little bit tight as

6    we have to sort of work through issues, often with our client,

7    and get approvals.  It would -- right now, we typically have a

8    24-hour turnaround.

9        **THE COURT:**  So what would you propose?

10       **MS. STEIN:**  I think 48 hours would be better, or at

11   least 36 hours.

12       **THE COURT:**  Ms. Weaver, can you work something out

13   with them?

14       **MS. WEAVER:**  Yes, of course.  That's no problem.

15       **THE COURT:**  Okay.  Whatever you guys work out is fine

16   with me.

17       **MS. STEIN:**  Thank you.

18       **MS. KUTSCHER CLARK:**  Your Honor, one more timing

19   request.

20   We're starting to find that during our meet-and-confers,

21   we're sort of returning a little bit to the game of

22   whack-a-mole we were all playing before we started meeting with

23   you.  And we're finding that we're having a little bit of

24   difficulty focusing and making progress, due to the sheer

25   number of issues that are on meet-and-confer agendas, and being

1    discussed.

2         And we're just hoping that perhaps we could have a little

3    bit of guidance limiting the number of issues, or at least

4    focusing the number of issues, so that we can make sure we are

5    moving forward with those things, and not spinning our wheels

6    on 15 things instead of making progress on five.

7              **MS. WEAVER:**  May I respond to that, Your Honor?

8              **THE COURT:**  Yes.

9              **MS. WEAVER:**  We believe that it has been very narrow.

10   We haven't raised any pressures of issues that we haven't

11   previously -- like ADI, there are a number of issues that we

12   have, in fact, been sitting on.

13        We understand -- we worked would with them to give them

14   six weeks to do this first set of search terms.  But certainly,

15   there are all kinds of issues -- deposition protocols, all

16   kinds of things -- that we have been waiting on.  So I'm really

17   kind of baffled by that.  And I don't know what issues we have

18   been raising.

19        I do think it's true that Facebook asks us to send them a

20   detailed email before each meet-and-confer on the topics we

21   wish to discuss, which we have been doing.

22        So this is a little bit out of left field to me, but we

23   are really trying to work with the system here.

24              **THE COURT:**  Okay.  I don't know what I can do, sort

25   of out of context.

1           **MS. STEIN:**  Yeah, I don't think -- I don't think

2    Ms. Kutscher Clark meant it in any way to suggest that there

3    was a lack of cooperation on either side.  I think we're just

4    all dealing with a lot of issues, and thought we were making

5    more progress when it was sort of tailored in advance as to

6    what we should specifically be discussing.

7           **MS. KUTSCHER CLARK:**  Exactly.

8           **THE COURT:**  I see.  I think what you have to discuss

9    is the ADI.  Right?  You're going to get the search terms on

10   July 21st.

11          **MS. KUTSCHER CLARK:**  (Nods head)

12          **THE COURT:**  You have the plaintiffs' production,

13   because now you have to discuss how you're going to get that

14   information.  And you have the defendant's ongoing production.

15          **MS. WEAVER:**  And the 34(b)(2)(C) issues, if they are

16   withholding.

17          **THE COURT:**  Well, yeah.  That's related to their

18   production and if they're withholding anything.  So I think

19   those are the topics.  It's a lot.

20      Sounds like things are moving forward.

21          **MS. WEAVER:**  We are, in fact, meeting and conferring

22   slightly less than we were doing it three times a week which,

23   although that was productive, that was a little intense.

24          **THE COURT:**  That was intense.

25          **MR. LOESER:**  Well, and Your Honor, at the beginning

```
 1   of every meet-and-confer we have ten minutes of generally

 2   getting along really well.

 3              MS. WEAVER:  That's true.

 4        THE COURT:  You're all getting along just fine.  You

 5   know, these are very trying times.

 6              MS. STEIN:  We've all learned a lot about each other.

 7        THE COURT:  Yeah.  Yeah.

 8        MR. SNYDER:  Judge, that's because I stopped

 9   attending them.

10        MR. LOESER:  That was a huge advantage for all of us,

11   that's true.

12      (Laughter)

13              MR. KO:  At least now you freely admit it, Orin.

14        THE COURT:  All right.  I will see you, then, on the

15   31st at 8:30 a.m.

16        MR. LOESER:  Thank Your Honor.

17        MR. SNYDER:  Thank Your Honor.

18        THE CLERK:  Court is adjourned.  Thank you, everyone.

19      (Proceedings concluded)

20

21

22

23

24

25
```

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Belle Ball*

_____/s/ Belle Ball_____

Belle Ball, CSR 8785, CRR, RDR

Tuesday, July 14, 2020

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, | CASE NO. 3:18-MD-02843-VC |
| This document relates to: | **STIPULATION AND [PROPOSED] ORDER REGARDING PROCESS TO LOG EXEMPLAR MATERIALS FROM FACEBOOK'S APP DEVELOPER INVESTIGATION** |
| ALL ACTIONS | |

By and through their undersigned counsel, the parties hereby stipulate and agree as follows:

1. Whereas, on July 13, 2020, the Court ordered the parties to develop a methodology for Facebook to log a sample set of materials from its App Developer Investigation ("ADI") over which Facebook asserts a claim of privilege;

2. Whereas, the parties have met and conferred extensively and exchanged numerous proposals to develop such a methodology;

3. Whereas, on July 22, Plaintiffs provided Facebook with a detailed written proposal to identify a subset of documents related to Facebook's ADI;

4. Whereas, on August 31, after additional meet and confers, Facebook provided Plaintiffs a detailed written proposal outlining a comprehensive plan for Facebook to log exemplar materials;

5. Whereas, on September 3, Plaintiffs provided Facebook a counterproposal;

6. Whereas, on September 8, the Court issued a written order requiring the parties to enter a stipulation by September 11, 2020, detailing the process for addressing the privileged materials that Plaintiffs seek from Facebook's ADI;

7. Whereas, on September 9, Facebook provided Plaintiffs a revised proposal in response to Plaintiffs' counterproposal;

8. Whereas on September 11, following an additional meet and confer, Facebook provided Plaintiffs a further revised proposal;

9. Whereas, on September 11, Plaintiffs accepted the process outlined in Facebook's further revised proposal, the agreed-upon portions of which are attached as **Exhibit A.**

### THE PARTIES THEREFORE STIPULATE AND AGREE AS FOLLOWS:

1. By September 16, 2020, Plaintiffs will identify five apps from the lists of apps set forth on **Exhibit A**, consistent with the process identified in **Exhibit A**.

1

     2.      Facebook will thereafter begin collecting and searching for responsive documents, consistent with the process identified in **Exhibit A.**

     3.      Because Facebook will not know the volume of documents that will be collected and logged until after Plaintiffs identify exemplar apps, the parties agree that they will be prepared to stipulate by September 25, 2020 (the next Discovery Conference) to a timetable for the production of logs of ADI materials related to the apps identified by Plaintiffs. The parties will thereafter work cooperatively to develop a reasonable timetable for privilege challenges and potential briefing to the Court.

Dated: September 11, 2020

**KELLER ROHRBACK LLP**

By: _/s/ Derek W. Loeser_
     Derek W. Loeser

Derek W. Loeser (admitted *pro hac vice*)
Lynn Lincoln Sarko (admitted *pro hac vice*)
Gretchen Freeman Cappio (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David J. Ko (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Adele Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496

Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

By: _/s/ Lesley E. Weaver_
     Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com

Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Co-Lead Counsel for Plaintiffs*

DATED: September 11, 2020                    Respectfully submitted,

                                             **GIBSON, DUNN & CRUTCHER, LLP**

                                             By:    */s/ Orin Snyder*
Deborah Stein (SBN 224570)                   Orin Snyder (*pro hac vice*)
dstein@gibsondunn.com                        osnyder@gibsondunn.com
333 South Grand Avenue                       GIBSON, DUNN & CRUTCHER LLP
Los Angeles, CA 90071-3197                   200 Park Avenue
Telephone: 213.229.7000                      New York, NY 10166-0193
Facsimile: 213.229.7520                      Telephone: 212.351.4000
                                             Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com                      Joshua S. Lipshutz (SBN 242557)
Martie Kutscher (SBN 302650)                 jlipshutz@gibsondunn.com
mkutscherclark@gibsondunn.com                GIBSON, DUNN & CRUTCHER LLP
GIBSON, DUNN & CRUTCHER LLP                  1050 Connecticut Avenue, N.W.
555 Mission Street, Suite 3000               Washington, DC 20036-5306
San Francisco, CA 94105-0921                 Telephone: 202.955.8500
Telephone: 415.393.8200                      Facsimile: 202.467.0539
Facsimile: 415.393.8306

*Attorneys for Defendant Facebook, Inc.*


**PURSUANT TO STIPULATION, IT IS SO ORDERED.**



DATE: _____          _____


                              United States Magistrate Judge Jacqueline Corley

## SIGNATURE ATTESTATION

Pursuant to Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained.

DATED: September 11, 2020                    By:  ___*/s/ Deborah Stein*_____
                                                  Deborah Stein

**CERTIFICATE OF SERVICE**

I, Deborah Stein, hereby certify that on September 11, 2020, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

By: ___/s/ Deborah Stein___
Deborah Stein

# EXHIBIT A

FILED UNDER SEAL

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, | CASE NO. 3:18-MD-02843-VC |
| | **STIPULATION AND [PROPOSED] ORDER REGARDING PROCESS TO LOG EXEMPLAR MATERIALS FROM FACEBOOK'S APP DEVELOPER INVESTIGATION** |
| This document relates to: | |
| ALL ACTIONS | |

By and through their undersigned counsel, the parties hereby stipulate and agree as follows:

1.      Whereas, on July 13, 2020, the Court ordered the parties to develop a methodology for Facebook to log a sample set of materials from its App Developer Investigation ("ADI") over which Facebook asserts a claim of privilege;

2.      Whereas, the parties have met and conferred extensively and exchanged numerous proposals to develop such a methodology;

3.      Whereas, on July 22, Plaintiffs provided Facebook with a detailed written proposal to identify a subset of documents related to Facebook's ADI;

4.      Whereas, on August 31, after additional meet and confers, Facebook provided Plaintiffs a detailed written proposal outlining a comprehensive plan for Facebook to log exemplar materials;

5.      Whereas, on September 3, Plaintiffs provided Facebook a counterproposal;

6.      Whereas, on September 8, the Court issued a written order requiring the parties to enter a stipulation by September 11, 2020, detailing the process for addressing the privileged materials that Plaintiffs seek from Facebook's ADI;

7.      Whereas, on September 9, Facebook provided Plaintiffs a revised proposal in response to Plaintiffs' counterproposal;

8.      Whereas on September 11, following an additional meet and confer, Facebook provided Plaintiffs a further revised proposal;

9.      Whereas, on September 11, Plaintiffs accepted the process outlined in Facebook's further revised proposal, the agreed-upon portions of which are attached as **Exhibit A.**

### THE PARTIES THEREFORE STIPULATE AND AGREE AS FOLLOWS:

1.      By September 16, 2020, Plaintiffs will identify five apps from the lists of apps set forth on **Exhibit A**, consistent with the process identified in **Exhibit A**.

2. Facebook will thereafter begin collecting and searching for responsive documents, consistent with the process identified in **Exhibit A.**

3. Because Facebook will not know the volume of documents that will be collected and logged until after Plaintiffs identify exemplar apps, the parties agree that they will be prepared to stipulate by September 25, 2020 (the next Discovery Conference) to a timetable for the production of logs of ADI materials related to the apps identified by Plaintiffs. The parties will thereafter work cooperatively to develop a reasonable timetable for privilege challenges and potential briefing to the Court.

Dated: September 11, 2020

**KELLER ROHRBACK LLP**

By: _/s/ Derek W. Loeser_
    Derek W. Loeser

Derek W. Loeser (admitted *pro hac vice*)
Lynn Lincoln Sarko (admitted *pro hac vice*)
Gretchen Freeman Cappio (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David J. Ko (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Adele Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496

Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

By: _/s/ Lesley E. Weaver_
    Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com

STIPULATION AND [~~PROPOSED~~] ORDER REGARDING PROCESS TO LOG EXEMPLAR MATERIALS
FROM FACEBOOK'S APP DEVELOPER INVESTIGATION
CASE NO. 3:18-MD-02843-VC

Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Co-Lead Counsel for Plaintiffs*

DATED: September 11, 2020

Respectfully submitted,

**GIBSON, DUNN & CRUTCHER, LLP**

By: ___*/s/ Orin Snyder*___

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Facebook, Inc.*

**PURSUANT TO STIPULATION, IT IS SO ORDERED.**

DATE: ___September 24, 2020___

GRANTED
Jacqueline Scott Corley
Judge Jacqueline Scott Corley

United States _____ ey

4

# EXHIBIT F
# UNREDACTED VERSION
# OF DOCUMENT SEALED
# BY THE COURT

Dkt. No. 611

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaint,,fs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS RELATED TO FACEBOOK'S APP DEVELOPER INVESTIGATION**<br><br>Judge:  Hon. Jacqueline Scott Corley<br>Courtroom:  4, 17th Floor |

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................1

II.  STATEMENT OF FACTS ...................................................................................4

     A.   Facebook's Enforcement Efforts ...............................................................4

     B.   Plaintiffs' Requests for the ADI Materials................................................7

     C.   Status of the Massachusetts Attorney General Action..............................9

III. ARGUMENT .....................................................................................................10

     A.   The ADI Materials Are Not Protected by the Work Product Doctrine................10

          1.   Applicable Standard .......................................................................10

          2.   The ADI Materials Were Prepared to Assure the Public that
               Facebook Cared About User Privacy ...........................................10

          3.   Even if Facebook Had Conducted the ADI Partially in Anticipation
               of Litigation, the ADI Materials Would Still Not Be Protected ..............11

          4.   Plaintiffs Have a Substantial Need for the ADI Materials and Cannot
               Obtain Their Substantial Equivalent by Other Means.............................13

     B.   The ADI Materials Are Not Protected by the Attorney-Client Privilege..............14

          1.   Applicable Standard .......................................................................14

          2.   The Underlying Facts and Information Part of the ADI Are Not
               Privileged .......................................................................................15

          3.   Because the Attorney Client Privilege Does Not Protect
               Communications Made Primarily for Business Purposes, Facebook
               Cannot Claim Privilege Over All the ADI Materials. ...............................16

          4.   Even if Facebook's Claim of Privilege is Accepted, Should
               Facebook Rely on the ADI as a Defense, the Privilege Is Waived..........19

IV.  CONCLUSION ..................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Marsh,*
312 F.R.D. 584 (E.D. Cal. 2015) ........................................................12

*Attorney General v. Facebook, Inc.,*
No. SJC-12946 (Dec. 4, 2019),
https://boston.suffolk.edu/sjc/pop.php?csnum=SJC_12946.................10

*In re Capital One Consumer Data Sec. Breach Litig.,*
No. 1:19MD2915, 2020 WL 2731238 (E.D. Va. May 26, 2020), *aff'd*, 2020
WL 3470261 (E.D. Va. June 25, 2020)................................................12

*Chevron Corp. v. Pennzoil Co.,*
974 F.2d 1156 (9th Cir. 1992) ...........................................................19

*Connolly Data Sys., Inc. v. Victor Techs., Inc.,*
114 F.R.D. 89 (S.D. Cal. 1987)..........................................................10

*In re CV Therapeutics, Inc. Sec. Litig.,*
No. C-03-3709 ..................................................................................17

*Datel Holdings Ltd. v. Microsoft Corp.,*
No. 09-cv-05535, 2011 WL 866993 (N.D. Cal. Mar. 11, 2011) ...........18

*District of Columbia v. Facebook, Inc.,*
No. 2018-CA-008715-B (D.C. Super. Ct. 2018) .................................10

*Dolby Labs. Licensing Corp. v. Adobe Inc.,*
402 F. Supp. 3d 855 (N.D. Cal. 2019)..................................... 14, 16, 18

*F.D.I.C. v. Fid. & Deposit Co. of Md.,*
196 F.R.D. 375 (S.D. Cal. 2000).........................................................10

*Fourth Age Ltd. v. Warner Bros. Dig. Distrib., Inc.,*
No. CV 12-09912 AB (SHX), 2015 WL 12720324 (C.D. Cal. Aug. 6, 2015).....................16

*Healey v. Facebook, Inc.,*
Suffolk Superior Court Action No. 1984CV02597-BLS-1 (Jan. 17, 2020),
https://newenglandinhouse.com/files/2020/01/Short-Form-Decision-and-
Order-Regarding-AGs-Petition-to-Compel-Compliance-with-CID-Facebook-
Jan.-2020.pdf............................................................................ 5, 9, 10

*LightGuard Sys., Inc. v. Spot Devices, Inc.,*
281 F.R.D. 593 (D. Nev. 2012)...........................................................17

*Marceau v. IBEW*,
    246 F.R.D. 610 (D. Ariz. 2007) ................................................................16

*MediaTek Inc. v. Freescale Semiconductor, Inc.*,
    No. 4:11–cv–05341 YGR (JSC), 2013 WL 5594474 (N.D. Cal. Oct. 10, 2013) .................18

*Neuder v Battelle Pac. Nw. Nat'l Lab.*,
    194 F.R.D. 289 (D.D.C. 2000)................................................................17

*Newport Pac. Inc. v. Cty. of San Diego*,
    200 F.R.D. 628 (S.D. Cal. 2001)..............................................................10

*SanDisk Corp. v. Round Rock Research LLC*,
    No. 11-CV-05243-RS (JSC), 2014 WL 691565 (N.D. Cal. Feb. 21, 2014)...........................16

*Shopfy Inc. v. Express Mobile, Inc.*,
    No. 20-MC-80091-JSC, 2020 WL 4732334 (N.D. Cal. Aug. 14, 2020) ........................17, 18

*Sky Valley Ltd. P'ship v. ATX Sky Valley, Ltd.*,
    150 F.R.D. 648 (N.D. Cal. 1993) ............................................................15

*Stevens v. Corelogic, Inc.*,
    No. 14-cv-1158-BAS(JLB), 2016 WL 397936 (S.D. Cal. Feb. 2, 2016).............................17

*Thompson v. C & H Sugar Co.*,
    No. 12-CV-00391 NC, 2014 WL 595911 (N.D. Cal. Feb. 14, 2014)................................13

*United Coal Cos. v. Powell Constr. Co.*,
    839 F.2d 958 (3d Cir. 1988) ................................................................10

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991)................................................................19

*United States v. Christensen*,
    828 F.3d 763 (9th Cir. 2015) ...............................................................17

*United States v. Martin*,
    278 F.3d 988 (9th Cir. 2002) ...............................................................14

*United States v. Richey*,
    632 F.3d 559 (9th Cir. 2011) ....................................................3, 11, 12, 14

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981) ........................................................................15

*Vallabharapu v. Burger King Corp.*,
    276 F.R.D. 611 (N.D. Cal. 2011)............................................................14

*Waymo LLC v. Uber Techs., Inc.*,
   No. 17CV00939WHAJSC, 2017 WL 2485382 (N.D. Cal. June 8, 2017) ............................13

**Other Authorities**

Facebook's Use and Protection of User Data: Hearing Before the H. Energy and
   Commerce Comm. ("Zuckerberg Statement"), 2018 WL 1757479 (Apr. 11,
   2018) ............................................................................................................... 7, 11, 12

Fed.R.Civ.P. 26(b)(3) ........................................................................................... 10, 13

LOCAL RULE 5-1(i)(3) ..................................................................................................22

## I.    INTRODUCTION

In 2018, the world learned that Cambridge Analytica's app on the Facebook platform had misused a substantial and alarming amount of Facebook users' private information. In the wake of this scandal, Facebook publicly announced the App Developer Investigation ("ADI"), described as an effort to investigate whether other apps may have similarly misused users' information. Facebook said the ADI would review every app on the platform "that had access to large amounts of information," and that it would involve hundreds of people, including not just attorneys, but also "external investigators, data scientists, engineers, policy specialists, platform partners and other teams across the company."[1] The ongoing ADI has thus far resulted in the suspension of tens of thousands of apps for reasons including "inappropriately sharing data obtained from [Facebook], making data publicly available without protecting people's identity or something else that was in clear violation of [Facebook's] policies."[2]

Facebook has characterized the ADI as a new and distinct endeavor that was *entirely* lawyer-driven, and thus entirely privileged. In reality, the ADI was a continuation of Facebook's longstanding if lackluster investigative and enforcement efforts. Long before the ADI began, Facebook's DevOps team attempted—unsuccessfully—to enforce policies designed to prevent third party apps from misusing user information. Dressed up with a new name and trumpeted with repeated press releases, the stated purpose of the ADI was the same as FB's existing program: to protect users' data from misuse by third-party apps.

Given the clear relevance of the ADI to Plaintiffs' claims, Plaintiffs seek discovery related to the ADI that does not explicitly contain legal advice. But to date, Facebook has refused to produce virtually all documents generated or uncovered by the ADI ("the ADI Materials"), claiming that they are shielded from production by work product or attorney client privilege. Pursuant to this Court's instructions and the parties' agreement, Facebook has now produced

---

[1] *An Update on Our App Developer Investigation*, Facebook (Sept. 20, 2019), https://about.fb.com/news/2019/09/an-update-on-our-app-developer-investigation/
[2] *Id.*

privilege logs for six apps investigated as part of the ADI, containing over 6,000 entries.[3] These logs show that, other than correspondence with the app developers related to the Requests for Information ("RFIs") sent by Facebook, the Company is claiming work-product protection and attorney-client privilege over every email, chart, table, slide, image, diagram, agenda, task list, chart, and spreadsheet associated with the investigation. Facebook has asserted that every one of those documents in the logs is privileged in full and has withheld each of them in their entirety.

From these sample logs, Plaintiffs identified 400 entries that fail to identify an attorney as an author or recipient. From these 400, pursuant to Discovery Order No. 12, ECF No. 602, Plaintiffs selected 20 for *in camera* review.[4] Following that review, informed by the Court's review of the 20 documents as well as the arguments below, Plaintiffs respectfully ask the Court to rule that the ADI is not categorically work product or privileged. Importantly, Plaintiffs rely in this motion solely upon items in the public record, cognizant of this Court's admonition against declarations and evidentiary submissions.[5]

First, Facebook's blanket work-product claims fail both because the ADI was not conducted in anticipation of litigation and because the logs do not identify any such litigation. Rather, Facebook repeatedly and publicly stated that the purpose of ADI was not to prepare for litigation but to "make sure that people can continue to enjoy engaging social experiences on Facebook while knowing their data will remain safe."[6] Because the stated purpose of the ADI

---

[3] Joint Status Update at 4, ECF No. 599 (Jan. 24, 2021). These six are the apps the parties agreed upon as a sampling of the more than 100,000 apps Facebook identified as part of the ADI. *See* Facebook, Inc.'s Administrative Mot. to File Under Seal, ECF No. 514; *see also* Stipulation & Order re Process to Log Exemplar Materials from Facebook's App Developer Investigation, ECF No. 518; Further Stipulation & Order re Process to Log Exemplar Materials from Facebook's App Developer Investigation, ECF No. 533.

[4] Joint Status Update at 4. In addition, the electronic versions of the logs containing the 400 entries without an attorney and the 20 selected by Plaintiffs for *in camera* review were provided to the Court in connection with the parties' stipulation that the Court entered on the day of this filing, February 5, 2020. *See* ECF No. 610, ¶ 3.

[5] *See* Hr'g Tr. 11:2-16 (Jan. 15, 2021) ("*I don't want declarations. I don't want declarations … No declarations.*") (emphasis added). To the extent Facebook relies on declarations in its brief, Plaintiffs respectfully request the Court strike and ignore them.

[6] *An Update on Our App Developer Investigation*, *supra* note 1.

was to reassure users that Facebook would protect user data, not to prepare for litigation, it is not entitled to work-product protection.

Second, even if Facebook had an unstated litigation-related motive for conducting the ADI, the law is clear that to claim work-product protection over such dual-purpose documents, Facebook must establish that the documents at issue would not have been produced in substantially similar form absent the prospect of litigation. *United States v. Richey*, 632 F.3d 559, 567–68 (9th Cir. 2011). Here, Facebook has repeatedly claimed that it had been investigating third-party misuse of Facebook users' information since at least 2012. App reviews were business as usual and would have been performed whether litigation was anticipated or not. They are thus not work product.

Third, the ADI Materials are not categorically protected by the attorney-client privilege. The privilege does not apply to the underlying facts and information regarding the ADI, including the information Plaintiffs seek, including which third-party apps violated which policies over what period of time, and what user data and information these third parties obtained and ultimately misused. Plaintiffs are entitled to this information given the central relevance of the ADI to Plaintiffs' claims—and in particular to the fourth category of misconduct upheld by Judge Chhabria regarding Facebook's failure to monitor (*see* Pretrial Order No. 20 at 9-10, ECF No. 298).

Finally, the ADI Materials are not protected by the attorney-client privilege because the privilege does not protect communications made primarily for business purposes. The mere presence of attorneys does not change that fact, particularly where, as Facebook itself admits, the investigation involved hundreds of non-attorneys—many of whom were engaged in the effort before it was rebranded "the ADI." And where *no attorneys are present*, as is the case with respect to the entries submitted here, Facebook's argument is even weaker.

Thus, Plaintiffs respectfully request that, in addition to any guidance the Court sees fit to provide, the Court order that (1) the 20 documents selected for *in camera* review should be produced, (2) Facebook is not entitled to a categorical claim of privilege over the entirety of the

ADI, and (3) Facebook produce, at a minimum, all of the underlying facts and information regarding the ADI, including which third-party apps violated which Facebook policies over what period of time and what user information they obtained and misused.

Significantly, at 4:02 p.m. on the day this brief was due to be filed, Facebook sent Plaintiffs a letter (attached hereto as Exhibit A), stating that one of the 20 documents Plaintiffs selected for *in camera* review is not in fact privileged and seeming to suggest that the procedure agreed to by the parties and ordered by the Court should somehow be altered accordingly. This letter came on the day of filing even though Plaintiffs identified the document at issue to Facebook more than two weeks ago, on January 21, 2021, and Facebook had several weeks to review and log these documents. The letter itself demonstrates that there is little or no distinction between ADI and Facebook's other enforcement efforts. In any event, Plaintiffs insist that Facebook submit this document for *in camera* review along with the remaining selected entries in accordance with the parties' stipulation governing this process.[7]

## II.     STATEMENT OF FACTS

### A.     *Facebook's Enforcement Efforts*

Long before Facebook first announced the ADI, Facebook's purported promise to enforce privacy protections were critical to users and a key business strategy for the company. It had policies in place to attempt to enforce third-party app developers from misappropriating user data and information. For example, from at least 2010 to 2014, the Platform Policy, which governed the conduct of apps on the platform, stated that Facebook "can take enforcement action against you and any or all of your applications if we determine in our sole judgment that you or your application violates Facebook Platform Terms and Policies."[8] From 2014 to at least 2018, the Platform Policy stated that Facebook "may enforce against your app or website if we conclude

---

[7] *See* ECF No. 514, *supra* note 3.
[8] *Facebook Platform Policies* (Apr. 25, 2012), https://web.archive.org/web/20120501025801/http://developers.facebook.com/policy/ (last visited Feb. 5, 2021).

that your app violates our terms or is negatively impacting the Platform."[9] The Platform Policy
also indicated that "[e]nforcement is both automated and manual, and can include disabling your
app, restricting you and your app's access to platform functionality, requiring that you delete
data, terminating our agreements with you and any other action that we deem appropriate."[10]
Facebook's Statement of Rights and Responsibilities ("SRR")—governing Facebook's
relationship with users—affirmed this promise of enforcement, stating from at least August 2009
to April 2018 that Facebook would "require applications to respect your privacy, and your
agreement with that application will control how the application can use, store, and transfer that
content and information."[11] The SRR further stated that application developers must meet or
comply with the requirements set out in Facebook's Platform Policies.[12]

Indeed, in 2012 Facebook claimed that it had "put in place an enforcement program to
prevent and respond to potential developer misuse of user information" (the "Enforcement
Program").[13] According to Facebook, its internal "Development Operations" or "DevOps" team
"has consistently played a central role in enforcing Facebook's [P]olicies and protecting user
data and Facebook's Platform."[14] This ongoing enforcement program included the "regular and
proactive monitoring of apps" and investigations into "potential app violations."[15]  Facebook

---

[9] *Facebook Platform Policy* (Mar. 25, 2015),
https://web.archive.org/web/20160412175450/https://developers.facebook.com/policy/ (last
visited Feb. 5, 2021).

[10] *Id.*

[11] *Second Amended Consolidated Complaint* ¶ 559, ECF No. 491 (citing *Statement of Rights and
Responsibilities*, Facebook (June 18, 2010),
https://web.archive.org/web/20100618224059/http://www.facebook.com/terms.php (last visited
Feb. 5, 2021).

[12] *Id.*

[13] Decision & Order re Attorney General's Petition to Compel Compliance with Civil
Investigative Demand Pursuant to G.L. c. 93A, § 7 ("*Healey* Order") at 3 (citing the Petition to
Compel Compliance with Civil Investigative Demand Pursuant to G.L. c. 93A, § 7 (the
"Petition") ¶ 27), *Healey v. Facebook, Inc.*, Suffolk Superior Court Action No. 1984CV02597-
BLS-1 (Jan. 17, 2020), https://newenglandinhouse.com/files/2020/01/Short-Form-Decision-
and-Order-Regarding-AGs-Petition-to-Compel-Compliance-with-CID-Facebook-Jan.-
2020.pdf.

[14] *Id.* (citing Petition ¶ 28).

[15] Letter from Facebook, Inc. to Chairman Chuck Grassley, Ranking Member Dianne Feinstein,
U.S. Senate Committee on the Judiciary, *Facebook's Response to U.S. Senate Committee on*

also stated, "we regularly take enforcement action against apps.  For example, in 2017, we took action against about 370,000 apps, ranging from imposing certain restrictions to removal of the app from the platform."[16]

Thus, at least since 2012, Facebook has claimed that it was investigating, evaluating, and taking action against app developers that were violating its policies. Of course none of this was effective. Indeed, in the wake of the Cambridge Analytica scandal and the vast amounts of data being misused by this particular app, Facebook rechristened its enforcement efforts as the "ADI" and issued press releases seeking to reassure users that it was protecting their data. The first such press release, in March 2018, stated that the ADI involved a "review all of the apps that had large amounts of information."[17] Facebook touted the breadth of the effort, saying that:

> It has involved hundreds of people: attorneys, external investigators, data scientists, engineers, policy specialists, platform partners and other teams across the company. *Our review helps us to better understand patterns of abuse in order to root out bad actors among developers.*
>
> We initially identified apps for investigation based on how many users they had and how much data they could access. Now, we also identify apps based on signals associated with an app's potential to abuse our policies. *Where we have concerns, we conduct a more intensive examination. This includes a background investigation of the developer and a technical analysis of the app's activity on the platform.* Depending on the results, a range of actions could be taken from requiring developers to submit to in-depth questioning, to conducting inspections or banning an app from the platform.[18]

In September 2019, Facebook claimed that the ADI had investigated millions of apps, suspended tens of thousands, and that the ADI was "not yet complete" as Facebook continued to investigate and suspend apps.[19]

Facebook also launched a public-relations campaign led by CEO Mark Zuckerberg. Zuckerberg made public posts to users describing Facebook's ongoing efforts and

---

the Judiciary Questions for the Record at 121-22 ("Facebook's Response") (June 8, 2018), https://www.judiciary.senate.gov/imo/media/doc/Zuckerberg%20Responses%20to%20Judiciary%20Committee%20QFRs.pdf.

[16] *Id.* at 6.

[17] *An Update on Our App Developer Investigation*, *supra* note 1.

[18] *Id.* (emphasis added).

[19] *Id.*

acknowledging their continuation, noting that the Company took "important steps a few years ago in 2014 to prevent bad actors from accessing people's information . . . But there's more we need to do and I'll outline those steps here: First, we will investigate all apps that had access to large amounts of information before we changed our platform to dramatically reduce data access in 2014, and we will conduct a full audit of any app with suspicious activity."[20] In April 2018, Zuckerberg testified to Congress that "[w]e're now investigating every single app that had access to a large amount of people's information on Facebook in the past. And if we find someone that improperly used data, we're going to ban them from our Platform and tell everyone affected."[21] He admitted "that we didn't do enough" to protect users' data. "We didn't take a broad enough view of our responsibility," he said, "and that was a big mistake, and it was my mistake, and I'm sorry. I started Facebook, I run it, and I'm responsible for what happens here."[22]  Such public proclamations do not portray a confidential, lawyer-driven inquiry conducted for litigation purposes only.

B.      **Plaintiffs' Requests for the ADI Materials**

In November 2019, Plaintiffs issued document requests for information related to the ADI, and, in particular, documents related to two phases of the ADI: Enhanced Examination and Enforcement. These phases, under which suspicious apps were "escalated" for special investigation or action, were disclosed in a declaration that Facebook submitted in the Massachusetts Attorney General's action against it. After meeting and conferring over this request for over four months, Facebook told Plaintiffs and the Court that the ADI was *categorically privileged* except for a limited set of documents related to RFIs that Facebook had sent to third-party app developers and to the apps' responses to those RFIs.  Plaintiffs then sought guidance from the Court in June and July 2020, asking to brief these issues.

The Court initiated the process that led to this briefing. The parties spent the next several

---

[20] Mark Zuckerberg ("Zuckerberg Post"), Facebook (Mar. 21, 2018), https://www.facebook.com/zuck/posts/10104712037900071
[21] *Facebook's Use and Protection of User Data: Hearing Before the H. Energy and Commerce Comm.* ("Zuckerberg Statement", 2018 WL 1757479 at 10 (Apr. 11, 2018).
[22] *Id.* at 9.

weeks negotiating a protocol to select apps for which Facebook could conduct a review, producing non-privileged documents and logging the rest. The parties selected six apps from three different categories: apps that were investigated but not suspended in the ADI; apps that were suspended for non-cooperation; and apps that were suspended for some reason other than non-cooperation.[23] The parties also agreed on a set of custodians for Facebook to review.[24]

Ultimately, in December 2020, Facebook produced six different privilege logs (one for each app) totaling over 6,000 entries.[25] Every single document identified in these logs is being withheld in its entirety. The entries included not just emails but excel files, agendas, chats, slides, images, tables, task trackers, diagrams, and reports.[26] And, despite Facebook's promise that Plaintiffs would receive a "cornucopia" of information about the six apps,[27] Facebook has produced only 65 pages of material reflecting Facebook's RFIs from these apps, and in some instances, the apps developers' RFI responses.

In reviewing Facebook's logs, Plaintiffs identified 400 entries that reflect no attorneys.[28] The attorney-free entries include a handful of emails conclusively stating that they reflect the sharing of legal advice, and also attachments such as agendas, images, tables, slides, diagrams, excel files, data files, graphics, task trackers, chat messages, and charts.[29] For instance, one of these entries indicates that it is an

[30]

---

[23] *See* Decl. of Martie Kutscher in Supp. of Facebook, Inc.'s Administrative Mot. to File Under Seal, ECF No. 514-1 at Ex. A(1)(B).

[24] *Id.*

[25] Joint Status Update at 4.

[26] *Id.*

[27] *See* Hr'g Tr. 30:6-8 (July 13, 2020) (Mr. Snyder: "And the plaintiffs are going to have a cornucopia of information about third-party apps. And I just respectfully suggest that they be a little patient.").

[28] Joint Status Update at 4.

[29] *Id.*

[30] *See* Plaintiffs' selections to Facebook Exemplar ADI-Related Privilege Logs ("Entry Log"), line 8 of 20 (FB-ADI-0000003177-3178). The electronic version of this log was provided to the

Another indicates that it is a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[31] Yet another indicates that is a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[32] Notably, the attachments also include transmissions to and from third party ▮▮▮▮▮▮▮▮ and a file that was created in September 2014, years before the ADI was started.[33]

Consistent with Discovery Order No. 12, Plaintiffs selected 20 of the 400 entries for an *in camera* review and notified Facebook of its selections on January 21, 2020. ECF No. 602 at 1.

## C.    Status of the Massachusetts Attorney General Action

Facebook's categorical claim of privilege over the ADI has already been considered and rejected by another court. In *Healey*, the Massachusetts Attorney General is investigating access and use of Facebook user data by third-party app developers and through that action seeks documents regarding the ADI.[34] The trial court in *Healey* rejected Facebook's work-product claim in its entirety and confined the attorney-client privilege to a small subset of documents (for which Facebook would produce a privilege log).[35] The *Healey* court specifically concluded that "Facebook's ADI is fairly described as 'business as usual.'"[36] The court continued, "[t]he record shows that Facebook, as part of its normal business operations, has been engaged in a continuous review of Platform apps for possible violations of its Policies since 2012, and that the ADI is just another iteration of that program . . The Court therefore concludes that Facebook's ADI is not being conducted 'in anticipation of litigation or for trial,' and would have been undertaken by the Company 'irrespective of the prospect of litigation.'"[37]

Facebook appealed this decision to the Massachusetts Supreme Court. The Court held

---

Court in connection with the parties' stipulation that the Court entered on the day of this filing, February 5, 2020. *See* ECF No. 610, ¶ 3.

[31] *See* Entry Log, line 9 of 20 (FB-ADI-0000004847-4850).

[32] *See* Entry Log, line 11 of 20 (FB-ADI-0000003217-3218).

[33] *See* Entry Log, line 14 of 20 (FB-ADI-0000002536-2537).

[34] *Healey* Order at 7-9.

[35] *Id.* at 16-18.

[36] *Id.* at 14.

[37] *Id.* at 14-15.

oral argument on December 4, 2020, and its decision is currently pending.[38] Notably, the Court inquired whether this Court had ruled on the ADI privilege issues. Facebook's counsel incorrectly suggested that "they may well be waiting for this Court."[39] The parties here are not and have never been waiting for any other court to rule on these issues.[40]

## III.   ARGUMENT

### A.   The ADI Materials Are Not Protected by the Work Product Doctrine

#### 1.   Applicable Standard

Federal law provides the governing law on the scope and extent of the attorney work-product doctrine in federal court. *Connolly Data Sys., Inc. v. Victor Techs., Inc.,* 114 F.R.D. 89, 95 (S.D. Cal. 1987*); F.D.I.C. v. Fid. & Deposit Co. of Md.*, 196 F.R.D. 375, 381 (S.D. Cal. 2000); *United Coal Cos. v. Powell Constr. Co.,* 839 F.2d 958, 966 (3d Cir. 1988) ("the work-product privilege is governed, even in diversity cases, by a uniform federal standard embodied in Fed.R.Civ.P. 26(b)(3) . . ."). Under federal law, Federal Rule of Civil Procedure ("FRCP") 26(b)(3)(A) provides that, "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial . . ." Fed. R. Civ. P. 26(b)(3)(A). Further, "[t]he party seeking to invoke the work-product doctrine bears the burden of establishing that any documents claimed as work product were prepared in anticipation of litigation." *Newport Pac. Inc. v. Cty. of San Diego*, 200 F.R.D. 628, 632 (S.D. Cal. 2001). As set forth below, Facebook has failed to meet its burden here.

#### 2.   The ADI Materials Were Prepared to Assure the Public that Facebook Cared About User Privacy

Facebook and its representatives have repeatedly and publicly stated that the ADI was conducted to protect user privacy *as promised to users*.  For example, Facebook announced the

---

[38] Oral Argument, *Attorney General v. Facebook, Inc.*, No. SJC-12946 (Dec. 4, 2019), https://boston.suffolk.edu/sjc/pop.php?csnum=SJC_12946.

[39] *Id.* at 16:50.

[40] In addition to the Massachusetts Attorney General action, the District of Columbia Attorney General has an action against Facebook and has also sought to compel production of materials associated with the ADI. *See District of Columbia v. Facebook, Inc.*, No. 2018-CA-008715-B (D.C. Super. Ct. 2018).

ADI to the public, in a press release which stated in part, "[w]e have a responsibility to everyone who uses Facebook to make sure their privacy is protected. ***That's why*** we're making changes to prevent abuse."[41]  A subsequent public press release stated that reviewing apps as part of the ADI "helps us to better understand patterns of abuse ***in order to root out bad actors among developers.***"[42]  That press release continued, "our goal is to bring problems to light so we can address them quickly, stay ahead of bad actors and make sure that people can continue to enjoy engaging in social experiences on Facebook while knowing their data will remain safe."[43] Indeed, on April 10, 2018, Mark Zuckerberg, Facebook's CEO, testified to the U.S. House of Representatives that "to make sure no other app developers are out there misusing data, we're now investigating every single app that had access to a large amount of people's information on Facebook in the past."[44]  By these repeated public statements Facebook made very clear that the purpose of the ADI was to root out misbehaving apps and protect user information, not litigation. As such, the ADI Materials are not protected work product.

> ### 3. Even if Facebook Had Conducted the ADI Partially in Anticipation of Litigation, the ADI Materials Would Still Not Be Protected

Even if the ADI was initiated in part due to litigation—and there is no evidence in the public record that it was—there can be no doubt that any litigation purpose was, at most, in addition to the stated purpose of protecting user data.  Under the law of the Ninth Circuit, "where a document serves a dual purpose, that is, where it was not prepared exclusively for litigation, then the 'because of' test is used." *Richey*, 632 F.3d at 567–68(citation omitted).  "In applying the 'because of' standard, courts must consider the totality of the circumstances and determine whether the 'document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of litigation.'" *Id*. at 568 (citation omitted). The question, then, is whether Facebook can establish that the ADI Materials would

---

[41] *Cracking Down on Platform Abuse*, Facebook (Mar. 21, 2018),
  https://about.fb.com/news/2018/03/cracking-down-on-platform-abuse/ (emphasis added).
[42] *An Update on Our App Developer Investigation*, *supra* note 1 (emphasis added).
[43] *Id.*
[44] Zuckerberg Statement, 2018 WL 1757479 at 10.

not have been created in substantially similar form absent the prospect of litigation. It cannot.

The record shows that Facebook had been claiming to enforce its policies for years before the ADI began, albeit weakly and ineffectively, and these public relations campaigns were just the precursor to the widely-touted ADI. As established above, on April 11, 2018, Zuckerberg testified before the U.S. House of Representatives, stating that "[w]e've had a review process for apps for years. We've reviewed tens of thousands of apps a year and taken action against a number of them."[45] Facebook told the Senate Judiciary Committee that in 2017 alone, the year before the Cambridge Analytica scandal came to light, that it had taken enforcement action "against about 370,000 apps, ranging from imposing certain restrictions to removal of the app from the platform."[46]

This evidence makes clear that Facebook was claiming to investigate apps for potential violations of its privacy policies for public relations purposes long before such efforts were christened the "ADI." Facebook cannot establish that the ADI Materials would not have been created in substantially similar form absent the prospect of litigation. *See Richey*, 632 F.3d at 568 (appraisal report held not to be work product because there was no "evidence in the record that Richey would have prepared the appraisal work file differently in the absence of prospective litigation"); *Anderson v. Marsh*, 312 F.R.D. 584, 593 (E.D. Cal. 2015) (police department investigative report of a shooting incident held not to be work product because "these documents would have been created in substantially similar form regardless of the prospect of litigation"); *In re Capital One Consumer Data Sec. Breach Litig.*, No. 1:19MD2915, 2020 WL 2731238, at *4 (E.D. Va. May 26, 2020), *aff'd*, 2020 WL 3470261 (E.D. Va. June 25, 2020) ("[T]he fact that the investigation was done at the direction of outside counsel and the results were initially

---

[45] Zuckerberg Statement, 2018 WL 1757479 at 43; *see also* Facebook's Answer to Pls.' First Am. Consolidated Compl. ¶ 564, ECF No. 373 ("Facebook admits that it implemented a comprehensive privacy program following its 2012 Consent Decree with the FTC.").

[46] Facebook's Response, *supra* note 15 at 6.

provided to outside counsel, does not satisfy the 'but for' formulation.").[47] The ADI Materials are thus not protected work product.

### 4.   Plaintiffs Have a Substantial Need for the ADI Materials and Cannot Obtain Their Substantial Equivalent by Other Means.

Even if the ADI Materials were protected work product, Plaintiffs have sufficient need of them to overcome such protection for any fact work product involved. A party may obtain discovery of fact work product materials if "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). The fourth category of misconduct recognized by Judge Chhabria in his order on the motion to dismiss was Facebook's failure to properly enforce its policy prohibiting third party apps from using information about Facebook users for any purpose other than enhancing the interaction between the apps and the user. PTO No. 20 at 9-10, ECF No. 298. Such data misuse by third parties was precisely the focus of the ADI.[48] Thus, Plaintiffs have substantial need for the ADI Materials and cannot obtain them elsewhere. *Thompson v. C & H Sugar Co.*, No. 12-CV-00391 NC, 2014 WL 595911, at *4 (N.D. Cal. Feb. 14, 2014) (finding plaintiffs had demonstrated a substantial need for investigation documents where the investigation were relevant to the litigation and plaintiffs could not obtain the fact underlying the investigation from other sources); *Waymo LLC v. Uber Techs., Inc.*, No. 17CV00939WHAJSC, 2017 WL 2485382, at *13 (N.D. Cal. June 8, 2017) (M.J. Corley) (finding in dicta that plaintiff had "met its burden of showing a substantial need" for documents related to investigation by Stroz Friedberg hired by defendant).

Plaintiffs also cannot obtain these materials by other means without undue hardship. According to Facebook, the ADI "involved hundreds of people: attorneys, external investigators, data scientists, engineers, policy specialists, platform partners and other teams across the company" and that the "investigation has addressed millions of apps.  Of those, tens of thousands

---

[47] Facebook has sought to distinguish the ADI from its earlier investigative and enforcement efforts by asserting that the ADI was "retrospective," but all investigations and enforcement actions are retrospective by nature.

[48] *Cracking Down on Platform Abuse*, *supra* note 41.

have been suspended . . ."[49] Conducting such an investigation without Facebook's unique insider knowledge would essentially be impossible and is clearly constitutes undue hardship.

*Vallabhapurapu v. Burger King Corp.*, 276 F.R.D. 611, 618 (N.D. Cal. 2011) (M.J. Corley) (finding that plaintiffs had a right to the survey information performed by defendant where plaintiffs would incur significant cost and time to compile the information themselves and the surveys presented the only present source of the information.). Even if Plaintiffs could duplicate Facebook's investigation and issue thousands of third-party subpoenas, many of the app developers are now defunct. Accordingly, Plaintiffs either cannot obtain the ADI Materials by other means at all or cannot do so without undue hardship. Any fact work product in the ADI Materials is therefore discoverable.

## B.    The ADI Materials Are Not Protected by the Attorney-Client Privilege

### 1.    Applicable Standard

The attorney-client privilege protects "confidential communications between attorneys and clients," if they "are made for the purpose of giving legal advice." *Richey*, 632 F.3d at 566 (citation omitted). When (1) legal advice is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived. *See id.*

The federal courts apply the privilege strictly: "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) (quoting *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981)). As a corollary, "the party asserting" the attorney-client privilege "bears the burden of proving that it applies." *Dolby Labs. Licensing Corp. v. Adobe Inc.*, 402 F. Supp. 3d 855, 863 (N.D. Cal. 2019) (citation omitted).  Facebook has failed to meet this burden here.

---

[49] *An Update on Our App Developer Investigation*, *supra* note 1.

### 2.     The Underlying Facts and Information Part of the ADI Are Not Privileged

It is axiomatic that "the privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney[.]" *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981); *see also Sky Valley Ltd. P'ship v. ATX Sky Valley, Ltd.*, 150 F.R.D. 648, 663 (N.D. Cal. 1993) ("[T]he privilege . . . blocks access only to communications, not to underlying information, data, or documents."). A party invoking the privilege can only "prevent access to confidential communications, not to underlying evidence or facts, even if privileged communications alluded to such evidence or facts." *Sky Valley*, 150 F.R.D. at 663–64. Indeed, Gibson Dunn has authored articles about the attorney-client privilege in which it acknowledges that the privilege "protects the communication but not the underlying information."[50] As such, Plaintiffs are entitled to all of the underlying facts and information regarding the ADI, including which third-party app developers violated which Facebook policies over what period of time, and the information that these third parties obtained without user consent.

Nevertheless, Facebook has sought to cloak the entirety of the ADI under a claim of privilege excepting only a smattering of documents between Facebook and third parties related to RFIs sent by Facebook. This attempt to limit production to only communications with third parties is untenable. As a result of the ADI, Facebook has banned aps from its platform for "reasons including inappropriately sharing data obtained from us, making data publicly available without protecting people's identity or something else that was in clear violation of our policies."[51] These reasons represent the underlying facts and information that are not protected by the privilege. Documents concerning them should be produced.

Furthermore, Facebook's claims that Plaintiffs are in fact obtaining this discovery is belied by the record. For these six apps alone, Facebook produced just 65 pages of documents

---

[50] F. Joseph Warren, Daniel P. Chung & A. Syarief, *Privilege – United States* at 2, Gibson, Dunn & Crutcher (Nov. 2018), https://www.gibsondunn.com/wp-content/uploads/documents/publications/Warin-Chung-Know-how-US-Privilege-GIR-November-2016.pdf.

[51] *An Update on Our App Developer Investigation*, *supra* note 1.

consisting of RFIs sent by Facebook and to four of the six apps, and their responses to the RFIs. No information in these documents reflect what policies were violated, what specific data was obtained, or any of the reasons behind the action taken or not taken against these apps. On the other hand, Facebook seeks to withhold more than 6,000 documents for *just these six apps alone*. Thus, Facebook is attempting to protect the clear and overwhelming majority of these documents pursuant to the attorney-client privilege and Plaintiffs have no other source for that information.

    **3.**    **Because the Attorney Client Privilege Does Not Protect Communications Made Primarily for Business Purposes, Facebook Cannot Claim Privilege Over All the ADI Materials.**

"[T]he attorney-client privilege does not protect business communications and advice." *SanDisk Corp. v. Round Rock Research LLC*, No. 11-CV-05243-RS (JSC), 2014 WL 691565, at *3 (N.D. Cal. Feb. 21, 2014). "When a communication may relate to both legal and business advice, the proponent of the privilege must make a clear showing that the primary purpose of the communication was securing legal advice." *Dolby Labs.*, 402 F. Supp. 3d at 873 (citation omitted); *see also SanDisk*, 2014 WL 691565, at *3 (when communications "serve both legal and business purposes, there is general agreement that the privilege applies where the *primary or predominant purpose* of the attorney-client consultation is to seek legal advice or assistance") (citation omitted).

As set forth above, since at least 2012, Facebook has engaged in an effort—albeit unsuccessfully—to monitor third-party apps and enforce its policies against them. This is a textbook example of a business purpose. As a further effort in the same vein, the ADI has as one of its goals "the business purpose of addressing issues of continuing concern to management." *Marceau v. IBEW*, 246 F.R.D. 610, 613 (D. Ariz. 2007).

Facebook has also failed to make the required clear showing that every ADI document has as its "primary or predominant purpose" the provision or seeking of legal advice or assistance. As many courts have recognized, determining "[t]he predominant purpose of a particular document" generally requires "document-by-document analysis to decide what information, document, or line the attorney client privilege applies to." *Fourth Age Ltd. v.*

*Warner Bros. Dig. Distrib., Inc.*, No. CV 12-09912 AB (SHX), 2015 WL 12720324, at *7 (C.D. Cal. Aug. 6, 2015) (citing *In re Cty. of Erie*, 473 F.3d 413, 420–21 (2d Cir. 2007)). For that reason, a "claim of privilege must be made and sustained on a question-by-question or document-by-document basis; a blanket claim of privilege is unacceptable. The scope of the privilege should be strictly confined within the narrowest possible limits." *United States v. Christensen*, 828 F.3d 763, 803 (9th Cir. 2015) (citation omitted); *see also LightGuard Sys., Inc. v. Spot Devices, Inc.*, 281 F.R.D. 593, 600 (D. Nev. 2012) ("When determining whether a document seeks legal advice, courts have examined the *nature*, *content*, and *context* in which the document was prepared.") (citing *AT&T Corp. v. Microsoft Corp.*, No. 02-0164 MHP (JL), 2003 WL 21212614, at *3 (N.D. Cal. Apr. 18, 2003)).

Facebook's blanket claim of privilege is justified by none of the reasons Facebook has advanced. It is not enough that the ADI involved the violation of Facebook's policies, because the policies are not themselves privileged. *See, e.g.*, *Stevens v. Corelogic, Inc.*, No. 14-cv-1158-BAS(JLB), 2016 WL 397936, at *5 (S.D. Cal. Feb. 2, 2016) (holding that corporation's legal compliance policies were not privileged). Nor is it enough that attorneys were involved in the ADI. *See, e.g.*, *In re CV Therapeutics, Inc. Sec. Litig.*, No. C-03-3709 SI(EMC), 2006 WL 1699536, at *4 (N.D. Cal. June 16, 2006) ("The mere fact that a document was sent to an attorney does not make it a privileged communication."), *as clarified on reconsideration*, No. C-03-3709 SI (EMC), 2006 WL 2585038 (N.D. Cal. Aug. 30, 2006); *Shopify Inc. v. Express Mobile, Inc.*, No. 20-MC-80091-JSC, 2020 WL 4732334, at *3 (N.D. Cal. Aug. 14, 2020) (M.J. Corley) ("[T]he inclusion of an attorney on the communication does not itself bring a document within the privilege's ambit.").

Furthermore, the privilege does not apply if the legal advice is incidental. *See Neuder v Battelle Pac. Nw. Nat'l Lab.*, 194 F.R.D. 289, 293 (D.D.C. 2000). Here, Facebook has repeatedly claimed that primary purpose of the ADI was to assess its prior risk and bring litigation against third party apps violating the Company's policies. But of the millions of apps and app developers it has reviewed and the tens of thousands it has suspended, Facebook has filed just two lawsuits

against three companies.[52] The statistics simply do not support Facebook's claim that the entire investigation was solely for a legal purpose. Instead, the primary purpose of the ADI is exactly what Facebook has publicly stated: to root out misuse of user data and enforce its data use policies. That purpose is a business one.

Especially dubious is Facebook's blanket claim of privilege over even those ADI communications or documents exchanged solely among non-attorneys. For example, a technical discussion among software engineers, even if prompted by a request from an attorney, is not itself privileged. *See Dolby Labs.*, 402 F. Supp. 3d at 867 (discussing *Datel Holdings Ltd. v. Microsoft Corp.*, No. 09-cv-05535, 2011 WL 866993 (N.D. Cal. Mar. 11, 2011)). Similarly, if there is no evidence that a document is received or reviewed by counsel, the document is not privileged—again, even if the document was created at counsel's request. *See MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 4:11–cv–05341 YGR (JSC), 2013 WL 5594474, at *4 (N.D. Cal. Oct. 10, 2013); *see also Shopify Inc.*, 2020 WL 4732334, at *3 (declining to find documents were entitled to attorney-client privilege where they were prepared for simultaneous review by legal and non-legal attorney). To claim privilege over communications between non-attorneys, Facebook must clearly show that in them "the employees discuss or transmit legal advice given by counsel," or "an employee discusses her intent to seek legal advice about a particular issue." *Dolby Labs.*, 402 F. Supp. 3d at 866 (citation omitted). "A vague declaration that states only that the document reflects an attorney's advice is insufficient to demonstrate that the document should be found privileged." *Id.* (citation omitted). The entries here fall in that category, as Facebook's descriptions of those that Plaintiffs selected for *in camera* review simply reflect that legal information was conveyed, shared, or relayed, without any further specificity, including

---

[52] *An Update on Our App Developer Investigation*, *supra* note 1 ("We've also taken legal action when necessary. In May, we filed a lawsuit in California against Rankwave, a South Korean data analytics company that failed to cooperate with our investigation. We've also taken legal action against developers in other contexts. For example, we filed an action against LionMobi and JediMobi, two companies that used their apps to infect users' phones with malware in a profit-generating scheme.").

with respect to the attachments that were selected for review.[53]

### 4.   Even if Facebook's Claim of Privilege is Accepted, Should Facebook Rely on the ADI as a Defense, the Privilege Is Waived

Finally, to the extent that the attorney-client privilege is found to apply to the ADI, any effort by Facebook to rely on the ADI as a defense in this case in the future would waive the privilege. "The privilege which protects attorney-client communications may not be used both as a sword and a shield." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (citation omitted). Thus, when a party—through an affirmative act, such as a defense—puts privileged information at issue, such that "fairness requires disclosure of the protected communication" to the other party, the privilege is implicitly waived. *Id.*; *see also, e.g.*, *United States v. Bilzerian*, 926 F.2d 1285, 1292–93 (2d Cir. 1991).

In its public statements, Facebook has often pointed to the ADI as evidence of how seriously it takes its users' privacy.[54] Should Facebook try to use the ADI as a legal defense—for example, to support its affirmative defense that it exercised reasonable efforts, Answer to Pls.' First Am. Consolidated Compl. at 128, ECF No. 373—Plaintiffs must in fairness be given an opportunity to probe what the ADI has done or failed to do. Facebook "cannot invoke the attorney-client privilege to deny [Plaintiffs] access to the very information that [they] must refute" to defeat a defense to liability. *Chevron*, 974 F.2d at 1163.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that, in addition to any guidance the Court may provide, the Court grant Plaintiffs' Motion to Compel, and order that (1) the 20 documents selected for *in camera* review be produced in their entirety, (2) Facebook is not entitled to a categorical claim of privilege over the entirety of the ADI, and (3) Facebook produce all of the underlying facts and information regarding the ADI, including which third party apps violated which Facebook policies over what period of time and what Facebook user information they obtained and misused.

---

[53] ECF No. 602 at 1.

[54] *An Update on Our App Developer Investigation*, supra note 1.

Dated: February 5, 2021

Respectfully submitted,

KELLER ROHRBACK L.L.P.

BLEICHMAR FONTI & AULD LLP

By:    /s/ Derek W. Loeser
      Derek W. Loeser

By:    /s/ Lesley E. Weaver
      Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Adele A. Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Derek W. Loeser, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this day of February, 2021, at Seattle, Washington.

/s/ Derek W. Loeser
Derek W. Loeser

## CERTIFICATE OF SERVICE

I, Sarah Skaggs, hereby certify that on February 5, 2021, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

**In addition, the following were served via email:**

Anjeza Hassan
annie.sara@yahoo.com

/s/ *Sarah Skaggs*
Sarah Skaggs

# EXHIBIT G

Pages 1 - 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Magistrate Judge

IN RE FACEBOOK, INC., CONSUMER )
PRIVACY USER PROFILE           )
LITIGATION.                    )
                               )      **NO. 18-md-02843 VC (JSC)**
                               )
_____)

San Francisco, California
Tuesday, April 6, 2021

**TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**

**APPEARANCES BY ZOOM WEBINAR:**

For Plaintiffs:
                    KELLER ROHRBACK LLP
                    1201 Third Avenue - Suite 3200
                    Seattle, Washington  98101
             BY:    **DEREK W. LOESER, ATTORNEY AT LAW**
                    **CARI C. LAUFENBERG, ATTORNEY AT LAW**
                    **DAVID J. KO, ATTORNEY AT LAW**

                    KELLER ROHRBACK LLP
                    801 Garden Street
                    Santa Barbara, California  93101
             BY:    **CHRISTOPHER L. SPRINGER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

```
 1   APPEARANCES BY ZOOM WEBINAR:  (CONTINUED)

 2   For Plaintiffs:
                         BLEICHMAR, FONTI & AULD LLP
 3                       555 12th Street - Suite 1600
                         Oakland, California  94607
 4                 BY:   LESLEY E. WEAVER, ATTORNEY AT LAW
                         MATTHEW S. MELAMED, ATTORNEY AT LAW
 5                       ANNE K. DAVIS, ATTORNEY AT LAW

 6   For Defendant:
                         GIBSON, DUNN & CRUTCHER LLP
 7                       200 Park Avenue
                         New York, New York  10166
 8                 BY:   ORIN SNYDER, ATTORNEY AT LAW

 9                       GIBSON, DUNN & CRUTCHER LLP
                         555 Mission Street - Suite 3000
10                       San Francisco, California  94105
                   BY:   MARTIE P. KUTSCHER CLARK, ATTORNEY AT LAW
11
                         GIBSON, DUNN & CRUTCHER LLP
12                       2100 McKinney Avenue - Suite 1100
                         Dallas, Texas  75201
13                 BY:   RUSSELL H. FALCONER, ATTORNEY AT LAW

14                       GIBSON, DUNN & CRUTCHER LLP
                         333 South Grand Avenue
15                       Los Angeles, California  90071
                   BY:   DEBORAH L. STEIN, ATTORNEY AT LAW
16
     Also Present:       Judge Gail Andler, JAMS
17                       Discovery Mediator

18

19

20

21

22

23

24

25
```

|    |
|----|

1   **Tuesday - April 6, 2021**              **9:00 a.m.**

2               **P R O C E E D I N G S**

3                  **---000---**

4      **THE CLERK:**  Court is now in session.  The Honorable

5  Jacqueline Scott Corley presiding.

6     Calling Civil action 3:18-md-2843, In Re Facebook, Inc.,

7  Consumer Privacy User Profile Litigation.

8     And you can start.

9      **MR. LOESER:**  Good morning, Your Honor.  Derek Loeser

10  from Keller Rohrback with Cari Laufenberg, David Ko, and Chris

11  Springer also from Keller Rohrback.

12      **THE COURT:**  Good morning.

13      **MS. WEAVER:**  Good morning, Your Honor.  Leslie Weaver

14  of Bleichmar, Fonti & Auld with Matt Melamed and Anne Davis.

15      **THE COURT:**  Good morning.

16      **MR. SNYDER:**  Good morning, Your Honor, and good

17  morning, Judge Andler.  This is Orin Snyder from Gibson Dunn.

18  With me on the Zoom conference are Deborah Stein, Russell

19  Falconer, and Martie Kutscher Clark.  I think that's it for our

20  group.

21      **THE COURT:**  Yes.  That's all I see.  Good morning.

22      **MR. SNYDER:**  Good morning.

23      **JUDGE ANDLER:**  Good morning, Your Honor.  Gail Andler

24  from JAMS.

25      **THE COURT:**  Good morning, Judge Andler.

1        All right.  So I understand, Judge Andler, you have agreed

2   to assist the parties with mediating their discovery issues,

3   and so thank you everyone for your statement.

4        Let me give you sort of my thoughts as sort of when I

5   threw out there this somewhat novel idea of a discovery

6   mediator -- maybe not so novel; maybe you've done that before,

7   Judge -- what I envisioned.

8        So I didn't appoint a special master.  I sort of see

9   Judge Andler's role more akin to when the parties choose

10  private mediation -- right? -- you choose a private mediator to

11  help you resolve the entire case.  Instead, here the parties

12  have selected a private mediator to help you resolve all those

13  little battles in the bigger case; right?  So the discovery

14  dispute is sort of a small battle in there.

15       So I don't -- I want us to keep those roles the same so I

16  don't want recommendations from Judge Andler or anything like

17  that.  I think that actually in some ways would make it harder

18  for her to do her job because then the parties would be sort of

19  posturing to get a recommendation out of her as well as

20  everyone having confidential, very candid, open communications

21  allowing her to use her experience to help you sort of come up

22  with a resolution.

23       And then in addition, the request about setting the rules.

24  So when parties choose private mediation, the judges, we're not

25  involved in any way other than we try to make sure the parties

1   have the discovery that they need to have a meaningful

2   mediation; right?  So I leave that to Judge Andler.  If she's

3   going to say to a party, "You need to have such and such here,"

4   I assume you will follow that because you-all retained her

5   because you actually want to move the discovery process

6   forward; but I really just view it just like a private mediator

7   except that she's mediating the discovery disputes.

8        And to that end, then, I would also think that just like

9   when I serve as a settlement judge, I don't have any

10  communications with the trial judge about the case unless I

11  have the parties' consent.  So I would assume she may have

12  communications with me, but it would be with the parties'

13  consent.

14       And it could be something -- I would expect it would be

15  things like, "Judge Corley, the parties are going to -- we

16  weren't able to resolve this dispute.  We narrowed it.  It's

17  going to be presented to you in this format.  What do you think

18  about that?"  Maybe or not.  It's completely sort of up to all

19  of you and Judge Andler how to do that, but that is also

20  another role is when you're unable and you're still at impasse

21  on something, she can then help you figure out -- because we

22  often have a lot of discussions just how it's going to be

23  presented, that she can help you figure out how to present it:

24  Timing, page length, all those kinds of things.

25       And as you know, I've signed every stipulation you've

1   submitted to me.  If you submit me a stip, I will sign it.  If

2   you come to agreement with her, I'll sign it, unless it's,

3   like -- it's going to be 50 pages.  Well, I might sign it, but

4   I probably won't read it all.

5        So that's sort of how I see that.  And I thought what

6   might be helpful now is to go through the parties' statement,

7   and there are a couple things I think I need to rule on but

8   then sort of give you examples of how I think Judge Andler may

9   help you address those things so that I don't have to then

10  rule.

11       And one reason why is it will be much faster that way, and

12  also it will be more accurate because you-all know your case

13  and what's going on so much better than I do, and Judge Andler

14  is going to know it as well because she's going to have the

15  privilege of spending more time with you.

16       So, anyway, does anyone have any just thoughts?  So that's

17  sort of my thoughts.  You wanted some guidance.  Those are my

18  thoughts.

19            **MR. LOESER:**  Sure.  Thank you, Your Honor.  We

20  appreciate the guidance.  I think it's helpful for the parties.

21       I will say from the plaintiffs' perspective, the requests,

22  and some of which you went through, were made based on the

23  notion that we want to make sure that Judge Andler has the

24  authority and the tools that are helpful and necessary to move

25  disputes forward because what we really don't want to have

1    happen is to end up sort of stimied at this turn or stimied at

2    that turn; and if Judge Andler simply had some other tool that

3    she could utilize to move the parties forward, that that would

4    be provided.

5        So, for example, requiring the parties to have someone

6    with authority attend, if what you're saying is that's really

7    up to Judge Andler, if that's something she wants to request,

8    she can, then I think that that's helpful.

9        Similarly, if Judge Andler finds herself in the midst --

10   and I'm sorry for speaking as if you're not there --

11              **JUDGE ANDLER:**  That's all right.

12              **MR. LOESER:**  -- obviously you are, Judge Andler -- in

13   the midst of a dispute that's highly technical, she may find it

14   useful to have someone with some technical expertise come on

15   board to help get through that dispute.

16       And so really what we're saying is if it's okay for

17   Judge Andler in her role as discovery mediator to utilize to

18   ask the parties "Please do this and please do that," and that

19   that can be brought to bear, I think that would be very helpful

20   in moving disputes past everyone's just disagreeing to actually

21   getting to resolution.

22              **THE COURT:**  Yeah.  I mean, I assume you-all, when I

23   threw out that idea, you-all actually pretty readily agreed to

24   it of a discovery mediator because you want the process to

25   work.

1          But it is a voluntary process just like private mediation.

2     It's a voluntary process, but you-all selected Judge Andler

3     because of her, because I looked, her tremendous expertise and

4     knowledge; that, you know, I assume that if she asks for

5     something, you'll do it because that's why you selected her

6     because you actually want to try to move things forward a

7     little faster and more smoothly than I'm able to help you do.

8          **MR. SNYDER:**  Thank you, Judge Corley.

9          Nice to meet you, Judge Andler.  This is Orin Snyder from

10    Gibson Dunn.

11         Lawyers always say we're delighted to have you help us

12    reach agreement on discovery disputes, but in this case it is

13    heartfelt and sincere because I can say, and Judge Corley would

14    attest, this has not been the finest moment in efficient

15    discovery process, and so we truly do welcome your involvement.

16         And our goal is to resolve every discovery dispute without

17    having to hopefully bother Judge Corley again.  She's been

18    incredibly patient, and both parties understand why she made

19    the suggestion.  This is a case that taxes the federal

20    judiciary in a way that's not fair to other litigants and other

21    parties.  So having a voluntary mediator like you is really the

22    best outcome that we can imagine here so we're looking forward

23    to it.

24         And we also agree that you should work with us to develop

25    the most flexible, efficient, fluid, fair, reasonable,

1  pragmatic approach to get us there; and so we're in your hands

2  to help us figure that out but, you know, we want to roll up

3  our sleeves and get discovery done.  It's very costly.  We have

4  a hundred people reviewing documents as we speak.  We want to

5  get to the finish line so we can get to the next stage of the

6  litigation; and with your help, we're confident that we'll do

7  that so we look forward to that.

8       **THE COURT:**  So if we can go through some of the

9  issues, and then I'll just sort of suggest where I think -- and

10  it's completely up to you guys and Judge Andler, but where she

11  might be able to assist.

12      So one of the issues is the document production.  I

13  understand that Facebook proposed a schedule I think very

14  recently.  But, again, that's something she can set up a

15  discovery mediation with the parties to sit down, and really I

16  think setting some deadlines would be very useful, and can talk

17  to you about what's realistic and how to get it done and

18  priorities and those kinds of things and hopefully work out

19  some schedule.

20      And even Facebook raised an issue of there being a lot of

21  nonresponsive hits that may also be something that she could

22  work with all the parties in coming up with something that

23  maybe reduces that that everyone's comfortable with.

24      The great thing about having a neutral that you trust --

25  right? -- is the neutral can sort of look under the hood and if

 1   the neutral tells one side or the other something, you have

 2   confidence in her that it's -- you don't just have to rely on

 3   the other side; right?  That's the nice thing about a neutral.

 4   So I'm hoping that we can work out some deadlines there so we

 5   can really get that discovery completed.

 6       The same thing with respect to, you know, the 30(b)(6)

 7   depositions.  So what I envision is -- again, these are just

 8   suggestions, I'm not ordering anything, which is, you know,

 9   you'll have these regularly scheduled discovery mediations and

10   you'll have these agendas.  One is the 30(b)(6).  I think what

11   plaintiffs say and Facebook says sort of didn't meet in your

12   statement about what each side's position is; but, again, she

13   can sit there with you and help you get it out, get whatever

14   documents you want or not and if it's not, then get it

15   presented to me some way.

16       Let's see, a couple other things that I think maybe.  One

17   is the testimony -- sworn testimony and written discovery from

18   the regulatory action.  So let me ask Facebook.  With respect

19   to the transcripts that you've agreed to produce, have you

20   identified for plaintiffs who those are that you have the

21   deposition or sworn transcripts?

22           MR. FALCONER:  I'm not sure that we have, Your Honor,

23   but we'd be happy to.

24           THE COURT:  Yeah.  So I think you should do that

25   within the week as well as identify those that you're

1   withholding; right?

2         **MR. FALCONER:**  From the noncustodians?

3         **THE COURT:**  Yeah.  I mean, I don't -- I'll just tell

4   you my view, which is if they gave testimony that's relevant to

5   the issues in this case, then it would be discoverable absent

6   there being some other reason why.  It would be relevant.  And

7   I don't know -- I know it's not deliberative process privilege

8   so we already went through that before.

9         But at a minimum within a week identify who you're

10  producing when and identify who you're not producing.  And,

11  again, that can go on your agenda, and I've given you some

12  guidance with respect to that.

13        I don't know with respect to the -- yeah.

14        Then there's the issue of the letters.  And I don't

15  know -- I don't know, like, what the plaintiffs mean by

16  "discovery responses"; right?  So they've already produced the

17  documents, for example, that were produced to the FTC.  So by

18  "discovery responses," what is it that the plaintiff is

19  referring to?

20        **MS. WEAVER:**  Good morning, Your Honor.  Lesley Weaver

21  for plaintiffs.

22        We discussed this a little bit at the last hearing.

23  Instead of propounding formal written interrogatories, the FTC

24  asked questions, substantive questions, and requested in their

25  letters sworn responses; and we then -- in the last hearing you

```
 1   told us to identify those letters and Facebook should produce

 2   the responses.  So we've identified the letters, but we have

 3   not received the responses.

 4             THE COURT:  Okay.

 5        All right.  And what is Facebook's position on that?

 6             MR. FALCONER:  So we received plaintiffs' requests.

 7   We don't have an exact number, but it's 100 to 200 questions

 8   that they've asked for responses for.  It's taking us some time

 9   to gather the responses and then assess them for the same kinds

10   of issues that we talked about at the hearing last time with

11   Your Honor.  So we are in the process of doing that and happy

12   to confer with plaintiffs once we've completed -- just once we

13   have our arms around what did they ask for, what do the

14   responses look like, how much of it is responsive or

15   nonresponsive.

16        And, again, you know, we understood the Court to say

17   "Let's get kind of a narrowed request from plaintiffs and then

18   the parties can meet and confer about what should be produced

19   and what shouldn't"; and we think that's the kind of thing that

20   we could perhaps hopefully work through with Judge Andler on

21   some of the questions go outside the bounds of the case, some

22   of them are within; you know, what's a fair kind of reasonable

23   proportional scope of production kind of balancing relevancy

24   and burden concerns.

25             THE COURT:  Well, I don't know that there's going to
```

1   be a great deal of burden if we're only talking about 100 or

2   200 questions and the answers; right?  So I don't know that

3   there's burden.

4        You had raised before confidentiality issues or things.  I

5   don't know that that applies either.  I think it might be

6   Facebook's confidentiality in which case then it can be

7   produced subject to a protective order.  So I think we need

8   something a little bit more definitive in terms of timing.

9        When did they provide you with the questions that they

10  wanted Facebook's responses to?

11          MR. FALCONER:  My memory is maybe it was March 22nd,

12  but I'm going by memory so don't quote me on that.

13          THE COURT:  Oh, all right.  Does that seem about

14  right?

15          MS. WEAVER:  Yes, Your Honor.

16          THE COURT:  Okay.  All right.  So not tremendously

17  long ago.

18        All right.  Put that on your agenda then.

19          MR. LOESER:  Your Honor, if I may, just very briefly,

20  as you well know, we keep having arguments about relevancy and

21  scope; and so I would just ask if with that example of these

22  letters and everything else, if Facebook is going to be

23  withholding based upon some scope or relevancy contention, that

24  they tell us what it is so that if it's problematic, we can

25  bring that to Judge Andler or to you if it is a problematic --

1          **THE COURT:**  You identified the questions, the 100 to

2     200 questions, that you want whatever Facebook's response was

3     to the FTC.  So they need to tell you "We're producing these

4     responses"; and if there's some that they're not, they have to

5     identify specifically "We're not" and for what reason.

6          **MR. LOESER:**  Okay.  Thank you.

7          **THE COURT:**  That's what you mean; right?  Yeah.  No,

8     they have to do that.

9          **MR. KO:**  Your Honor, David Ko.

10         Just to follow-up on that, does your guidance at the

11    previous hearing with respect to the related deposition

12    transcripts in which you suggested that really they should only

13    be redacting for confidentiality and privilege grounds, does

14    that same guidance apply with respect to these written

15    responses as well?

16         **THE COURT:**  Yes.  I mean, right, there's going to be a

17    protective order.  You can only use it for purposes of this

18    litigation and all those kinds of things, they can be produced

19    to that; but, yes, just like regular -- that's just what we do.

20    We don't redact for relevance.

21         **MR. KO:**  Thank you, Your Honor.

22         **THE COURT:**  All right.  I guess, let's see, another

23    issue that I think would be terrific or might be helpful for

24    you to work with Judge Andler is there's the issue as to

25    whether Facebook has responded completely to the question of

```
 1   identifying all companies that Facebook agreed to exchange

 2   information with, and there's a dispute arising out of what was

 3   testified to at the 30(b)(6).

 4        That, to me, seems like an issue that -- right? -- you can

 5   show Judge Andler, "Here's their deposition -- here's

 6   Judge Corley's ruling, here's the deposition testimony, and

 7   here's sort of" -- then the parties can just say what their

 8   position is and she can help you work through it; right?

 9        I mean, my hope is, like with all mediators, that you take

10   to heart -- when they have a view of something, that you take

11   it to heart and your position -- you may disagree or disagree,

12   but it may help shape your position somewhat and she may have

13   compromises or things in mind and creative things.

14        Okay.  And then you agreed on all the search terms.  Thank

15   you.

16        Just so you think, Judge Andler, they don't agree on

17   anything, they do, and actually have worked quite hard.

18             JUDGE ANDLER:  Excellent.

19             MR. LOESER:  And we agreed on Judge Andler,

20   Judge Corley.

21             THE COURT:  And Judge Andler, yes.

22             JUDGE ANDLER:  Thank you.

23             MS. WEAVER:  In less than a year.

24             THE COURT:  Yeah.  That actually was pretty quick.

25        So now I'd actually like to talk to you about, unless
```

1   there's anything else, about the ADI documents, the app

2   developer investigation documents.

3        And sort of let me tell you what my thinking is about

4   that, and I did review the Massachusetts Supreme -- the Supreme

5   Judicial Court -- I can't remember -- the highest court of

6   Massachusetts decision; and my view is -- and also I think I

7   have the benefit, which they didn't have, at looking at some

8   documents in camera -- my view is, and this is what I'm going

9   to tell you my tentative view is, is that certainly the

10  investigation was done in anticipation of litigation, but also

11  I can't conceive of how it wouldn't have been done otherwise as

12  well; right?

13       I mean, Facebook wasn't going to let -- well, because they

14  said it.  When they said to the public and to their users

15  "We're doing this to protect you," they didn't say "But our

16  primary purpose was to protect our shareholders"; right?

17       I mean, if they were immune from liability, they still

18  would have gone and looked back even though the platform had

19  changed; right?  There are some apps that were suspended

20  because they were -- or you considered them to be bad actors or

21  concerned about that, and I think that would have been done.

22       All that's to say, though, there certainly are going to be

23  documents in there that are, A, attorney-client privilege; or,

24  B, attorney work product.  For example, if Gibson Dunn made

25  edits to requests for information or those kinds of things,

1  that's classic work product that's not going to be

2  discoverable.  Any advice that was given is not going to be

3  discoverable.

4       But in terms of the ADI team, at least from what I've

5  seen, it looks like a lot of that was just generated there

6  separate that may have then been reviewed but would have been

7  done anyway.

8       But also the way I was looking at it in looking through

9  and looking at those documents is that a lot of it I don't

10 think is relevant at all, and so what I wanted to know from

11 plaintiffs -- and this I sort of was thinking about it after

12 reading the Massachusetts case where the AG did much more

13 targeted discovery, and sort of get a sense from the plaintiffs

14 because I think this will be helpful.

15      Because I'm afraid I'm just going to rule on these 20

16 documents and then we're going to be back here with every

17 single document.  I don't think plaintiffs need every single

18 document.  There's certain information, like you say, that you

19 need and maybe it's not even going to be privilege.  There's

20 going to be other information that may be privilege and I

21 actually think you don't even need.

22      So what is it precisely that the plaintiffs need from that

23 investigation?

24          MR. KO:  Your Honor, this is David Ko.  I can speak to

25 that first.

1      I think to directly answer that question, what we need and

2   what we've asked for and what we've identified in our brief are

3   the facts underlying the investigation that relate to our

4   claims, and in particular which apps were in violation or in

5   potential violation of which Facebook policies and over what

6   period of time these entities were in violation of these

7   policies and the specific conduct that caused them to be in

8   violation.  And that's obviously relevant to our claims

9   regarding whether or not Facebook allowed third parties to

10   access user information and whether Facebook properly monitored

11   the disclosure of this information as they claim they did.

12      And so that really relates big picture, you know, our

13   argument that the facts underlying these communications are

14   what we're really seeking.  That really I think responds to

15   your question most directly.

16          THE COURT:  Right.  So you don't need to know -- you

17   don't need to know, like, when a request for information was

18   sent.  I know you've been provided responses to those so I

19   don't think I'm saying anything.  You don't even know when it

20   was sent or re-sent or when the response was received or any of

21   those kinds of things.  You want -- well, you have been

22   provided with the responses -- right? -- and the actual

23   requests that went out.

24          MR. KO:  Correct.

25          THE COURT:  And -- okay.

1        All right.  So let me hear from Facebook.  With that in

2   mind in terms of your privilege log, how does that change that

3   or does it, or maybe you already understood that?

4        **MS. KUTSCHER CLARK:**  Your Honor, it's a little bit

5   difficult because this is the first time we're hearing this

6   request.  To date we have never received an information

7   request.  We just received a request for all of the ADI

8   documents.  So I think this is definitely something we would

9   need to think about a little bit more.

10       I think what might make sense is if plaintiffs want to

11  issue a request, then we can look at it in context; but what

12  was a little bit tricky in the briefing was we were dealing

13  with a request for all of the ADI documents and then plaintiffs

14  said, "Well, give us the underlying facts," but we had never

15  received a specific request for specific facts.

16       **MR. KO:**  Your Honor, I think that's a

17  mischaracterization.  I think we've asked repeatedly about this

18  information.  You know, we've conferred about ADI, as you know,

19  for well -- almost over a year now and we presented these

20  issues to Your Honor last June.  You know, you accurately

21  ordered this privilege log to make sure that you had the proper

22  context.

23       And throughout those discussions, we have asked over and

24  over again that we obtain the actual facts underlying this

25  investigation; and if there's any doubt about this, this is

1  obviously included in our briefing.  We made it clear that

2  that's what we wanted in our briefing and, in fact, we put it

3  in our proposed order.  So I'm a bit surprised that

4  Ms. Kutscher Clark believes that this is the first time that --

5       **THE COURT:**  All right.  This is good because it's

6  giving Judge Andler a hint of why I thought a discovery

7  mediator would be useful.

8      So let me ask you this:  Do you need information, then,

9  about apps that were investigated but Facebook in the end took

10  no action against?

11       **MR. KO:**  Yeah.  That's why I was very precise in

12  saying that there could have been a potential violation.  We

13  need to know that -- we need to know the thought process, if

14  you will.  I mean, not the privileged information but to the

15  extent there was an escalation but not an enforcement, that is

16  still relevant because that relates to whether or not they're

17  actually and accurately monitoring the disclosure of this

18  information as they suggest.

19       **THE COURT:**  Okay.

20       **MS. KUTSCHER CLARK:**  Your Honor, I think we need an

21  actual discovery request.  I hear everything Mr. Ko is saying,

22  and of course we've discussed this extensively, but we do not

23  have any interrogatories asking for information like this.

24  Right now what I'm hearing is "We want all of the facts

25  underlying ADI," and that's a difficult thing to respond to.

1      So I think this needs to start with an actual request in

2  writing that we can look at and evaluate, and then we can

3  narrow it from there.  But, you know, a request for any

4  information underlying ADI or, for instance, Mr. Ko is saying

5  any violation of a Facebook policy, Facebook has a lot of

6  policies.  Some of those policies might be relevant here, some

7  of them might not be.  So I think we need to see an actual

8  request that we can evaluate.

9          **MR. SNYDER:**  Martie, can I jump in here?

10      Judge, we agree that a narrowing makes a lot of sense and

11  we're asking for a discovery request not to have form over

12  substance or to delay but to facilitate and hopefully we can

13  cut through all this because I think what you said makes

14  absolute sense.

15      For example, we've already given them the suspensions

16  list.  That, they have.  Escalations -- you know, a lot of the

17  escalations involved my firm and legal advice; some did, some

18  didn't.  So if we see -- you know, "all the facts" is very

19  vague.  We don't know what that means because we have thousands

20  of facts -- millions of facts, because we had investigators

21  looking at all myriad of things.  So as precise a request as

22  they can make, then we can hopefully cut through a lot of this

23  and give them the nonprivilege stuff that is responsive and

24  relevant.

25      I mean, we really want to get through this ADI piece, but

```
 1   right now we're kind of shooting in the dark because all facts

 2   underlying the investigation, having been involved in that

 3   investigation, I don't know what that means.  I really don't.

 4            THE COURT:  That's not what they're -- I understand

 5   that.

 6        So then my next question is, because you had suggested,

 7   I'm prepared then to rule on the motion but Facebook had

 8   said -- and, as I said, my tentative view is I don't

 9   necessarily agree with the Massachusetts -- well, I think we

10   all agree about the dual purpose doctrine and what the

11   Ninth Circuit rule is with respect to that.  The Massachusetts

12   court kind of -- kind of applied the same rule.  I mean, they

13   at one point did use the same rule, and without really any

14   analysis sort of came to the conclusion that it was -- well,

15   I'm not sure what it was.  I'm not sure they were applying the

16   same rule as the Ninth Circuit.

17        So I'm prepared to issue a ruling, but I wanted to ask

18   Facebook about what they're -- I don't know what more you would

19   say, but I want to make sure it's fair because I understand --

20   it's clear that this investigation was set up with the intent

21   to make it privileged.  That's clear.  That's not dispositive,

22   but that's clear.  So given that, I do want to make sure that

23   they are able to fairly present it, and so that's why --

24            MR. SNYDER:  Because I would respectfully disagree

25   with the following:  I think that because when it was set up,
```

1   it was set up for the reason you said because we wanted to

2   assure our users that the platform, you know, was safe and had

3   been safe in the past, but it was not set up so that we can --

4   so that we can shroud it in a privilege.  It was set up -- it

5   was set up in a privilege way because we understood that to the

6   extent we have to take enforcement action, it would require,

7   you know, legal advice and the lawyers were embedded in and

8   involved in, you know, hundreds and hundreds of decisions on a

9   weekly, daily basis about escalation, about all manner of the

10  investigation.

11      So it wasn't just that lawyers were put in to make it

12  privilege.  Lawyers were embedded in.  In fact, we set up the

13  investigation because it required legal advice at every turn.

14          **THE COURT:**  That may be what you're saying.  I don't

15  know that I have seen -- I don't know that I have --

16          **MR. SNYDER:**  I can --

17          **THE COURT:**  I don't know that I've seen that.  That's

18  why I want to ask:  Is there anything else that you want to

19  present in an admissible format as opposed to the attorney --

20          **MR. SNYDER:**  Yes.  What I would like to do,

21  Your Honor, because my partner Alex Southwell was literally

22  living in Palo Alto with a number of my partners and associates

23  for weeks if not months, in the guts of this investigation,

24  again, not as a fig leaf but as lawyers practicing law and

25  advising the client, I think it would be helpful for the Court

1  in its determination for us to put in an affidavit where we can
2  outline in a nonprivilege way the extent to which legal advice
3  was involved at every step in the investigation.

4      That might even be helpful to the plaintiffs in then
5  identifying what it is they want to know because, as I said,
6  all of the -- all -- I don't know what percentage but a
7  substantial number of the decisions made by the investigators
8  on the field were made sitting next to lawyers, texting,
9  e-mailing with lawyers, at every turn.  Hundreds -- I haven't
10 seen our privilege log, but it must be tens if not hundreds of
11 thousands of entries of iterative discussions between my team
12 and the investigators because they were living together for
13 months and months and months doing this investigation hand in
14 glove, hand in hand, shoulder to shoulder.

15      **THE COURT:**  Yeah, but don't forget what the test is in
16 the Ninth Circuit is dual purpose and would the investigation
17 have occurred anyway; and it's inconceivable to me that if
18 Facebook had been immune from liability, that they wouldn't
19 have gone in and investigated the apps to see if there were any
20 other bad actors there.

21      That's just -- that's just inconceivable to me that, of
22 course, they would have gone in and investigated those apps;
23 and, therefore, my view is that those facts discovered, the
24 facts, not the advice given, the facts would be discoverable.
25 So I'm just saying that's what my view is, but I will allow you

1   to submit an affidavit.

2       And I know before I said no affidavits, but now having

3   looked at it all, I think that that would be a mistake --

4           **MR. SNYDER:**  Thank you.

5           **THE COURT:**  -- an error on my part to rule

6   definitively on that without doing that.  And then, of course,

7   I'll let -- but, as you said, a nonprivileged affidavit.

8           **MR. SNYDER:**  Yes, Your Honor.

9           **MR. KO:**  And, Your Honor, will we be allowed to

10  respond to that affidavit?

11          **THE COURT:**  Yes.  You're going to get to see it and

12  then you're going to get to respond.

13          **MR. KO:**  Because I think just to preview what -- you

14  know, Mr. Snyder, what I hear him saying is simply because of

15  the volume, that somehow this is all privilege.  But as you

16  correctly pointed out, both the dual purpose and the facts

17  underlying the investigation is what we are entitled to.

18      And it's clear -- I mean, I get -- I understand that it

19  was a massive investigation, but just the sheer fact that it

20  involved lots of communications does not take away from the

21  fact that we would be entitled to the underlying facts

22  regarding the escalation of these apps and the subsequent

23  enforcement to the extent that was done.  And so that's what we

24  are seeking and I think it's pretty clear what we would be

25  entitled to here.

1        **MS. WEAVER:**  Your Honor, if I can --

2        **THE COURT:**  That will shorten the privilege log if you

3   only did the sample privilege log for six apps greatly; right?

4   None of those e-mails about "Are you available for this

5   meeting?" or "Can we move it?" or "Should you change the weekly

6   report so that it has this information?"

7        **MR. SNYDER:**  No.

8        **THE COURT:**  You don't need any of that; right?  You

9   just want the facts.  You just want what's in the report.

10       **MR. LOESER:**  Your Honor, I'm going to raise my hand,

11   and I have a question about this affidavit.

12       And if the notion is that Facebook is going to submit the

13   affidavit of a lawyer, I'm wondering how that works in this

14   case.  That would appear to, then, be a witness.

15       And one of the central claims is a failure to monitor, and

16   I'm a little -- I guess I'm confused as to how a lawyer

17   testifying in this action about the work that that lawyer did,

18   some of which would be privilege, some would not, wouldn't be a

19   waiver of the attorney-client privilege or at least introduce a

20   lawyer as a witness.  And I'm just throwing that question out

21   there wondering how that works.

22       **THE COURT:**  I don't know.  This is a perfect thing I

23   think for you-all to discuss with Judge Andler; right?  So --

24   and I appreciate, Mr. Loeser, you being very candid about that.

25   Essentially you're, like, warning them, "Just because we're

1  sitting here doesn't mean if you submit some affidavit, that

2  we're not going to argue there's some waiver."  And I

3  appreciate you being transparent about that, and Facebook will

4  have to think about that -- have to think about that.

5       And of course, then, there is the issue in Massachusetts

6  the court did hold that it was work product but that, you know,

7  the fact work product was discoverable in any event.  And so

8  maybe this is a way of working through that as well and getting

9  that information.  And you could, for example, show

10 Judge Andler a lot of those documents.

11          MS. WEAVER:  Your Honor, and on a related note, you

12 know, to the extent that Facebook is raising as a defense in

13 this action to the negligence claims and the invasion of

14 privacy that they investigated and maintained users privacy,

15 we're entitled to discovery.  So it's akin to the waiver

16 argument but it exists whether or not they put in a declaration

17 by a lawyer.  If Facebook is going to rely on the investigation

18 as a defense, we should get discovery of it.

19          THE COURT:  Well, that is -- sure.  Of course.  But I

20 don't know if that's the case.  They'll have to make that

21 decision.  Yeah, they'll have to make that decision.

22       Okay.  So there we are.  I've punted everything I think

23 except that within a week Facebook has to tell you which

24 deposition transcripts they're producing and which ones they

25 are not.

```
 1        And, Judge Andler, it would be great if you were able to
 2   join us on all of these hearings.  I think that would be
 3   useful.
 4        JUDGE ANDLER:  I'd be happy to.  I just have to have
 5   notice so that my case manager can let the counsel in my
 6   arbitrations and mediations that are scheduled through 2022
 7   know that we will have a later start in those sessions.  So it
 8   will be pretty easy for Matt to do that.  So if counsel just
 9   give enough notice, I'm happy to do that.
10        THE COURT:  And we'll be by video.
11        JUDGE ANDLER:  Great.
12        THE COURT:  For as long as the Administrative Office
13   of the U.S. Courts allow us to be by video, we will be by
14   video.
15        JUDGE ANDLER:  Thank you.
16        THE COURT:  So I'm hoping that will be permanent.
17        JUDGE ANDLER:  Thank you.
18        THE COURT:  So why --
19        MR. LOESER:  A lot of people agree with you,
20   Your Honor.
21        THE COURT:  Yeah.  No, I know.  Yeah.  I have a lot of
22   these cases right now that I'm managing that have attorneys
23   from all across the country and it just makes so much sense,
24   unless you're an airline.
25        So shall we meet again in, say, three weeks you think?
```

1          **MR. SNYDER:**  Sounds good.

2          **THE COURT:**  Yeah.  How about April 27th?  And is

3     8:30 better?

4          Let me ask Judge Andler.  We can start earlier at 8:30 if

5     that's better.

6          **JUDGE ANDLER:**  That's usually much better for me if

7     it's not inconvenient for counsel and the Court.

8          **THE COURT:**  I think we've done that.  Why don't we do

9     April 27th, then, at 8:30 a.m.  And I expect between now and

10    then you will meet and mediate your little cases.

11         All right.  Great.  Thanks, everyone.  I hope you have a

12    vaccine plan if you don't already have a vaccine.  Soon it will

13    be open to everyone.

14         **ALL:**  Thank you, Your Honor.

15         **JUDGE ANDLER:**  Thank you, Counsel, and we will be in

16    touch so we can set something up.

17              (Proceedings adjourned at 9:37 a.m.)

18                       ---oOo---

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4              I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Wednesday, April 7, 2021

8

9

10

11    _____

12        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT H

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Orin Snyder (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.4000
Fax: 212.351.4035
osnyder@gibsondunn.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

Deborah Stein (SBN 224570)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: 213.229.7000
Fax: 213.229.7520
dstein@gibsondunn.com

*Plaintiffs' Co-Lead Counsel*
*Additional counsel listed on signature page*

*Attorneys for Defendant Facebook, Inc.*
*Additional counsel listed on signature page*

July 2, 2021

## VIA ELECTRONIC FILING

Honorable Jacqueline Scott Corley
United States District Court
San Francisco Courthouse
450 Golden Gate Avenue
San Francisco, CA 94102

> Re:     *In re Facebook, Inc. Consumer Privacy User Profile*,
> Northern District of California Case No. 3:18-md-02843-VC

Dear Judge Corley:

The Parties respectfully submit this letter in response to the Court's order that the parties "file a stipulation regarding Facebook's production of App Developer Investigation (ADI) documents by July 2, 2021" and "if the parties are not in agreement, then by that same date they shall file a discovery dispute joint letter which identifies the documents Facebook has agreed to produce and which additional documents Plaintiffs believe should be produced." Dkt. 693 ¶ 2.

## I.    Facebook's Position

### a.    Facebook agreed to provide Plaintiffs "underlying facts" about ADI.

Facebook offered to provide Plaintiffs the "underlying facts" Plaintiffs said would resolve this dispute. But, after months of negotiations, Plaintiffs rejected Facebook's offer; demanded massive volumes of data that are the focus of unrelated discovery requests that the parties are separately mediating; resurrected their demand for nearly all ADI communications; and demanded a reservation of rights to seek any additional ADI materials they may want in the future. This request ignores the Court's instructions and unwinds more than one year of forward progress.

The parties have been discussing Plaintiffs' demands for ADI materials since March 2020. During that time, Facebook's goal has been to provide as much information as it can without intruding on or waiving privilege. It has produced a wealth of information: a list of **all** apps suspended as a result of ADI (with details about each); a list of apps suspended for reasons other than non-cooperation with ADI; Facebook's requests to and communications with the developers it investigated; and all information Facebook received from developers, including audit responses.

Plaintiffs initially insisted they also need every document relating to ADI. This demand was hopelessly overbroad. It also targeted privileged materials, given that ADI was directed by Gibson Dunn and in-house attorneys to advise Facebook on litigation risks and strategy.

The parties first attempted to narrow Plaintiffs' request through a sampling exercise—Facebook reviewed all ADI documents relating to six apps, produced non-privileged documents, and logged privileged documents. Plaintiffs challenged every entry that did not include an attorney, and the Court allowed them to select 20 for briefing. After the parties briefed the 20 documents, the Court indicated that even if it ruled on the 20 documents, any ruling likely would not resolve the dispute and the parties would be back before the Court on "every single document." 04/06/2021 Trans. at 17:15-21; *ir.fra* at 3. The Court explained such an exercise would be wasteful: "I don't think Plaintiffs need every single document. There's certain information, like you say, that you need and maybe it's not even . . . privilege[d]. There's going to be other information that may be privileged and I actually think you don't even need." *Id.*

The Court asked: "So what is it precisely that the plaintiffs need from that investigation?" *Id.* at 17:22-23. Plaintiffs clarified they do not seek emails among Facebook employees. "[T]he facts underlying these communications are what we're really seeking." *Id*. at 18:13-15; *id.* at 18:1-4. Plaintiffs had taken a similar position in their brief: "[t]he privilege does not apply to the underlying facts and information regarding ADI." Dkt. 611 at 3. Plaintiffs told Facebook the facts they need are data points about approximately 3,700 suspended apps. FB Ex. A, at 2.

Facebook offered to resolve this dispute by providing data about these 3,700 apps and made a robust proposal, attached as **FB Exhibit A**. The list of information Facebook offered, in addition to the materials it already produced, is extensive, spans multiple pages (*id.*), and offers what Plaintiffs said they need. Plaintiffs said they seek "[u]nderlying facts and information regarding the ADI," and specifically wish to know which apps misused user data and what data they may have been able to access. *See* Dkt. 611 at 15. Facebook offered that exact information.

Facebook offered to identify every type of data each of the 3,700 apps was able to access ("permissions"). It offered to identify how many users used each app, and how many gave each app access to each type of data. It offered to identify when each app was created and suspended and whether each was suspended for non-cooperation with ADI or otherwise. It also offered to identify the developers and businesses associated with each app, and other technical data. **Ex. A**.

On top of all of this, Facebook offered to "**identify all apps Facebook suspended, banned, or otherwise took enforcement action against through ADI for misuse of user data**." It even offered that Plaintiffs could request additional information about 20 apps of their choosing.

Plaintiffs' most recent proposal (**FB Exhibit B**),[1] asks for three more data points for the 3,700 apps. Facebook already produced one; for another Facebook agreed to provide the closest available proxy.[2] As for the Application Programing Interface ("API") call data Plaintiffs request, Facebook offered two types of available API information for the 3700 apps. Plaintiffs also ask Facebook to investigate and provide the number of data requests per year by each of the 3700 apps, for each API permission, going back to 2007 and regardless of whether requests for data were granted. This API call data does not "relate to" ADI simply because Plaintiffs demanded it as a condition to reach an agreement about already overbroad ADI RFPs. Plaintiffs have a separate RFP (unrelated to ADI) that seeks massive volumes of API call data—that are orders of magnitude larger than the data Relativity hosts for every litigation in the U.S. combined. Much of the information Plaintiffs seek relating to API calls does not exist. But even for data that does exist, little would be reasonably accessible, much less probative of any live issue in this case. The parties are separately mediating what types of relevant API call data could reasonably be provided. If the parties cannot resolve the dispute over the API call data RFP, Facebook intends to seek a protective order.

### b. Plaintiffs continue to demand nearly all ADI-related communications.

Rather than identify additional "underlying facts" and why they need them, late in the day during Monday's mediation, Plaintiffs demanded all "internal and external communications" related to ADI either (1) "involving employees in Facebook's Developer Operations and Platform Operations Teams, regarding [each] categor[y] [of communications with app developers]," or (2) "related to Phase 2 and Phase 3 of the ADI process," including "communications with counsel that are discoverable as business advice or [] pursuant to the dual-purpose doctrine."[3]

Plaintiffs seem to be reviving their demand that Facebook produce all, or substantially all, documents relating to Facebook's privileged legal investigation, including communications to and from attorneys. In other words, after representing that they are "really seeking" "the facts underlying these [ADI-related] communications," not the communications themselves (04/06/21 Tr. at 18:13-15)—and mediating for months the data Facebook could provide for 3,700 apps—Plaintiffs no longer want only "underlying facts," rendering months' of negotiations over data wasted. Plaintiffs have not provided any justification for going back on their representations.

The Court advised Plaintiffs that their sweeping demand for ADI-related communications is unworkable and targets irrelevant materials. *See* supra at 1. What Plaintiffs are requesting would also waste significant resources and delay this case—it would likely lead to custodian/search string negotiations, review/logging of large volumes of documents not factored into the proposed substantial completion deadline, and a mountain of privilege disputes that could require an in camera review of unprecedented scale. *See* infra at 3. For context, during the parties' sampling exercise, Facebook logged as privileged 6,200 entries for 6 apps. ADI addressed *millions* of apps. The volume of privileged ADI documents is why the Court suggested a sampling exercise in the first place and then told Plaintiffs to narrow their request.

Rather than narrow, Plaintiffs now demand the underlying facts Facebook offered, API data the parties are negotiating for unrelated RFPs, nearly all ADI communications, and a reservation of rights to seek more ADI materials—effectively continuing this dispute indefinitely

---

[1] Facebook has not seen Plaintiffs' letter. If they request something different, Facebook has not seen it.

[2] Facebook already provided the date each app was suspended. Facebook apps do not have "publishers" (the most similar piece of information is the app's "developer," which Facebook offered to provide).

[3] Confidentiality and privilege protocols around ADI did not allow ADI team members to engage in external communications relating to ADI other than communications with app developers (which have been produced), outside counsel, and experts retained by Gibson Dunn to assist it in providing legal advice. Facebook is not aware of any violations of these confidentiality protocols.

and rendering any agreement the parties could have reached illusory. Facebook made a meaningful and sincere effort to resolve this dispute by offering the information Plaintiffs said they need. Plaintiffs have not conveyed how this data is inadequate. And it is difficult to imagine what else they require—particularly given that this lawsuit is *not* about how ADI was conducted.

### c. Alternatively, Facebook requests an opportunity to provide a full record.

If the Court is inclined to order production of additional ADI communications, Facebook requests an opportunity to brief why ADI was a privileged investigation and provide a full evidentiary record. Plaintiffs are wrong in saying the parties' positions on ADI were already fully briefed. The Court instructed the parties that their prior briefs should address 20 documents Plaintiffs identified, not all of ADI. 1/15/2021 Trans. at 4:15-11:19; *id.* at 12:13-15 ("one page per document"). The briefing was expedited and simultaneous and the Court did not allow evidence. *Id.* at 11:9-19 ("I don't want declarations." "If we need more [later] we can get it at that time"). Plaintiffs improperly used their brief to wage a wholesale attack on Facebook's claim of privilege over ADI. *See* Dkt. 611. Facebook has had no opportunity to submit evidence or address Plaintiffs' arguments—including with respect to waiver, the dual-purpose doctrine, and whether Plaintiffs have shown a "substantial need" for any fact work-product.

The Court also recognized that the briefs on the 20 documents could not resolve the broader ADI dispute: "I know before I said no affidavits, but now having looked at it all, I think that would be a mistake – an error on my part." 04/06/21 Tr. at 25:2-7. The Court also recognized it cannot make a categorical ruling about ADI based on the 20 documents the Court reviewed in camera. *See* supra at 1; *U.S. v. Richey*, 632 F.3d 559, 568 (9th Cir. 2011) (the "dual-purpose doctrine," which Plaintiffs urge the Court to apply, requires a document-by-document analysis).

If the Court is inclined to order Facebook to turn over additional ADI communications, Facebook respectfully requests an opportunity to create the record that the Court needs to fairly address the dispute; to sustain its burden of proof with respect to privilege;[4] and that will be needed should there be an appeal. Due process requires an opportunity for Facebook to respond to any new arguments Plaintiffs raise. **Exhibit C** proposes a briefing schedule.

## II. Plaintiffs' Position

After countless meet and confers, a four-month-long exemplar logging process, extensive briefing, and an attempted resolution by two experienced mediators, the parties are largely in the same position as they were when Plaintiffs first served their ADI-related discovery requests more than nineteen months ago: Facebook refuses to produce nearly all of the relevant and responsive materials pursuant to its initial position that ADI is categorically privileged. This sweeping and meritless assertion improperly cloaks millions of documents in connection with ADI, and is impeding the progress of this case. Plaintiffs are clearly entitled to more than what Facebook proposes for the reasons set forth below.

*1. Attorney-client privilege.* The attorney-client privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney[.]" *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981); *accord Attorney Gen. v. Facebook, Inc.*, 164 N.E.3d 873, 886-87 (Mass. 2021). From the start, Plaintiffs have sought the relevant underlying facts about ADI—including, for example, which apps were in violation or in potential violation of which Facebook policies, over what period of time these violations occurred, and the specific conduct that constituted the violations. *See* Dkt. No. 611, Plaintiffs' ADI Brief at 3, 15-16; April 6 Hr'g Tr. 18:1-15; 19:16-20:18.

---

[4] The parties agreed not to prepare ADI submissions while they mediated this dispute, *see* Dkt. 662 ¶ 3.

Plaintiffs specifically seek a targeted production of underlying facts regarding ADI, an investigation that was a continuation of Facebook's attempt to purportedly identify data misuse on its platform since at least 2012. Dkt. No. 611 at 4-7 The investigative process consisted of three phases: (1) Detection and Identification, (2) Enhanced Examination, and (3) Enforcement. From the beginning, Plaintiffs sought documents related to Phases 2 and 3, which are plainly factual inquiries. *See* Plaintiffs' Request for Production No. 19 (attached as Ex. A). In the Enhanced Examination phase, technical experts and investigators—including two external forensic consulting firms that worked with, among others, Facebook's Developer Operations (DevOps) team—conducted intensive background and technical investigations and created reports that identified the potential for data misuse. *See* Stacy Chen Declaration, ¶¶ 17-18 (attached as Ex. B). In the Enforcement phase, Facebook determined whether to take additional enforcement action against an app, including conducting interviews or requesting audits of data security or storage infrastructure. *Id.*, ¶¶ 19-20. The facts underlying Phases 2 and 3 of ADI are relevant to Plaintiffs' claims, including whether Facebook breached the duty of care it owed users to safeguard their information. *See* Dkt. No. 298 at 36. These facts are not privileged.

*2. Work product.* Under Ninth Circuit law, "where a document serves a dual purpose, that is, where it was not prepared exclusively for litigation," courts must "determine whether the 'document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of litigation.'" *United States v. Richey*, 632 F.3d 559, 567-68 (9th Cir. 2011) (citation omitted) (citations omitted). Under this standard, as the Court has already noted, it is inconceivable that all ADI documents could be privileged, as Facebook would have undertaken this investigation in the absence of any potential litigation.[5]

Facebook's counsel agrees: "I think that because when [the ADI] was set up, it was set up for the reason you said because we wanted to assure our users that the platform, you know, was safe and had been safe in the past." April 6 Hr'g. Tr. 22:25-23:3. So does its CEO. In a lengthy post "shar[ing] an update of the Cambridge Analytica situation," Mark Zuckerberg framed the ADI as being a response to the company's "responsibility to protect your data." This well-publicized user-relations initiative was and is driven by business concerns.[6]

Nevertheless, Facebook refuses to produce the communications and documents related to ADI, including communications involving the DevOps Team and the two consulting firms Facebook retained as part of the process. Instead, Facebook proposes that it simply produce a

---

[5] *See* April 6 Hr'g. Tr. 24:15-24 ("THE COURT: Yeah, but don't forget what the test is in the Ninth Circuit is dual purpose and would the investigation have occurred anyway; and it's inconceivable to me that if Facebook had been immune from liability, that they wouldn't have gone in and investigated the apps to see if there were any other bad actors there. That's just – that's just inconceivable to me that, of course, they would have gone in and investigated those apps; and, therefore, my view is that those facts discovered, the facts, not the advice given, the facts would be discoverable.").

[6] *See* https://www.facebook.com/zuck/posts/10104712037900071 (posted Mar. 21, 2018). Though this post does not mention ADI by name, subsequent posts addressing ADI make clear that is what Zuckerberg was discussing. *See* https://about.fb.com/news/2018/05/update-on-app-audit/ (posted May 14, 2018) ("Here is an update on the app investigation and audit that Mark Zuckerberg promised on March 21.").

list of information regarding 3,734 apps and *some* responsive API call data. And it stresses that it has already produced communications with third parties regarding ADI, generating a long list of categories to describe this production.

The app information list and the API call data Facebook proposes to produce are of little utility to Plaintiffs without proper context, including the discussions and actions taken in response to this gathered information. For example, the reports prepared by Facebook's outside consultants in Phase 2 of the ADI process summarize and contextualize the data Facebook proposes to produce. And communications and documents related to whether Facebook pursued enforcement action against certain apps further contextualize this data. Facebook provides no justification for withholding these reports and communications, beyond a blanket assertion of work product protection. But under the dual-purpose doctrine, it is clear these summary reports and communications must be produced.

Facebook's production is also plainly insufficient. This purportedly "robust" production only consists of 26,000 pages, nearly all of which are initial Requests for Information (RFIs) sent by Facebook asking for background and preliminary information to third party app developers. The RFIs do not reveal Facebook's internal knowledge and deliberations regarding the obvious threats those third parties posed to users' privacy or the extent to which Facebook already knew about those threats. The RFIs also do not show which app developers violated or potentially violated which Facebook policies over what period of time. Nor do they show the underlying facts that led to escalation or enforcement.

Furthermore, these 26,000 pages of documents are a fraction of the millions of documents and communications Facebook previously represented have been generated as part of the ADI. *See* July 13, 2020 Hr'g Tr. 46:19-25 (Mr. Snyder: "And I just want to warn everyone or caution everyone, this was a massive investigation … that will probably be tens of millions of communications."). During the exemplar logging process last fall, approximately 12,000 documents totaling tens of thousands of pages were identified for six apps alone.

*3. Conclusion.* Facebook contends that all it needs to produce are a small sample of data related to ADI. But Plaintiffs are entitled to communications and documents reflecting the facts underlying the ADI investigation. Plaintiffs seek an order requiring production of communications and documents related to Phases 2 and 3 of the investigative process, including communications involving the DevOps team at Facebook and the forensic consultants retained by Facebook, as well as the summary reports these consultants and/or the DevOps team created. Facebook previously mentioned it wanted to provide an affidavit in support of its position. While Plaintiffs believe no further briefing or affidavit is needed, Facebook should have until July 9 to do so, and Plaintiffs should be allowed to respond to the affidavit by July 16. No further briefs should be permitted. The parties' positions are clear and the dispute has dragged on for too long. The issue is ripe for a ruling.

Dated: July 2, 2021

Respectfully submitted,

KELLER ROHRBACK L.L.P.

By:     /s/ Derek W. Loeser
        Derek W. Loeser

Derek W. Loeser (admitted *pro hac vice*)
Lynn Lincoln Sarko (admitted *pro hac vice*)
Gretchen Freeman Cappio (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David J. Ko (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Adele Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

BLEICHMAR FONTI & AULD LLP

By:     /s/ Lesley E. Weaver
        Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com

6

GIBSON, DUNN, & CRUTCHER LLP

By:     */s/ Orin Snyder*
        Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant Facebook, Inc.*

7

# EXHIBIT I

1

2

3

4          UNITED STATES DISTRICT COURT

5          NORTHERN DISTRICT OF CALIFORNIA

6

7  IN RE: FACEBOOK, INC. CONSUMER          Case No. 18-md-02843-VC (JSC)

8  PRIVACY USER PROFILE LITIGATION
                                           **FURTHER ORDER RE: ADI**
9                                          **PRIVILEGE DISPUTE**

10                                         Re: Dkt. No. 699

11

12

13          In March 2018, in response to the disclosure of the Cambridge Analytical data-sharing

14  incident, Facebook initiated an app developer investigation (ADI) that involved a review of all

15  "apps that had access to large amounts of data before [Facebook] changed [its] platform policies in

16  2014." *See* https://about.fb.com/news/2019/09/an-update-on-our-app-developer-investigation/.

17  Facebook told the public that its investigation

18                  has involved hundreds of people: attorneys, external investigators,
                    data scientists, engineers, policy specialists, platform partners and
19                  other teams across the company. Our review helps us to better
                    understand patterns of abuse in order to root out bad actors among
20                  developers.

21  *Id.* Facebook nonetheless argues in this litigation that *all* documents and communications

22  generated in connection with the ADI are protected from discovery under the attorney-client and

23  work product privileges. (Dkt. No. 612.)

24          The parties thereafter submitted briefs on the issue (Dkt Nos. 611, 612), and Facebook

25  submitted certain of the withheld documents for *in camera* review. At the discovery conference

26  on April 6, 2021, the Court expressed her view that much of the ADI documentation is

27  discoverable. While outside counsel's edits and advice might not be discoverable, the underlying

28  facts are discoverable since Facebook would have conducted the investigation regardless of any

United States District Court
Northern District of California

1    potential legal liability. (Dkt. No. 657 at 16-17.) In response Plaintiffs stated that they, in fact, are

2    only seeking the underlying facts and not legal advice. In particular, Plaintiffs explained they are

3    seeking :

4    > which apps were in violation or in potential violation of which
     > Facebook policies and over what period of time these entities were in
     > violation of these policies and the specific conduct that caused them

5    > to be in violation. And that's obviously relevant to our claims
     > regarding whether or not Facebook allowed third parties to access

6    > user information and whether Facebook properly monitored the
     > disclosure of this information as they claim they did.

7
     (*Id.* at 18.) The Court therefore ordered the parties to meet and confer to see if they could agree on

8    a production. (Dkt. No. 655.)

9
             By the time of the June 23, 2021 status conference, the parties had not reached agreement.

10   Accordingly, the Court ordered the parties to submit a further discovery dispute joint letter brief

11   by July 2, 2021. (Dkt. No. 693.) They have now done so. (Dkt. No. 699.) Facebook proposes that

12   it produce the following information as to each App that it suspended as a result of the

13   investigation:

14           a. **App ID**: Each App's unique app identifier.

15           b. **App Name**: The name of each app.
             c. **App Creation Date**: The date on which the app was created on the Facebook

16   Platform.
             d. **Ever Installed Users**: The number of Facebook users that have ever installed the

17   app on Facebook as of April 28, 2019.
             e. **Developer(s)**: A list of all developer accounts, including user name and user ID,

18   associated with the app, which includes users listed as having the following roles:

19   administrator, creator, developer, and disabled.
             f. **Business(es)**: A list of all businesses identified as being an "Owner" of the app in

20   Facebook's records as of April 28, 2019. This is a data field the developer has the

21   option of including.
             g. **API Call Information**:

22           i. A list of the API call permissions granted for each app by users.

23           ii. The total number of users that granted the app each permission to access

24           data through the API as of April 28, 2019.

25   (Dkt. No. 699-1 at 4 (footnotes omitted).)

26           Plaintiffs contend that this information omits critical, relevant information. In particular,

27   Plaintiffs seek documents (not created by lawyers) from the "Enhanced Examination phase" that

28   involve background and technical investigations to identify the potential for data misuse.  (Dkt.

No. 699 at 5.) They also seek documents from the "Enforcement phase," including Facebook conducted audits and interviews. (*Id.*)  As the Court understands, Facebook has not offered to produce any of this information.  None of these documents were part of the *in camera* review the Court earlier conducted.

Although the Court has before it the declaration in support of privilege that Facebook submitted in the Massachusetts Attorney General action (Dkt. No. 699-5), on or before August 2, 2021 Facebook may submit a further declaration with supporting exhibits in support of its assertion that these investigatory materials are privileged from discovery.  Plaintiffs may respond *to the declaration and any attached exhibits* on or before August 9, 2021.  No further briefing is required.  Facebook already submitted a 25 page brief in support of its privilege assertion.

**IT IS SO ORDERED.**

Dated:  July 26, 2021

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California

3

# EXHIBIT J

1

2

3

4

5

6

7

8

9

10

11

12

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

13

14

15

16

17

IN RE: FACEBOOK, INC. CONSUMER
PRIVACY USER PROFILE LITIGATION,

This document relates to:

ALL ACTIONS

CASE NO. 3:18-MD-02843-VC

**DECLARATION OF ALEXANDER H.**
**SOUTHWELL IN SUPPORT OF**
**FACEBOOK'S POSITION IN THE**
**PARTIES' JULY 2, 2021 LETTER BRIEF**
**REGARDING ADI PRIVILEGE DISPUTE**

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

I, Alexander H. Southwell, hereby declare as follows:

1.      I am an attorney licensed to practice law in the State of New York. I am a partner with the law firm of Gibson, Dunn & Crutcher LLP. I submit this declaration in support of Facebook's position in the parties' July 2, 2021 letter brief regarding their ADI privilege dispute (Dkt. 699). This declaration is submitted pursuant to the Court's instructions in its July 26, 2021 Order (Dkt. 711) and to provide the facts necessary for the Court to consider Facebook's claim of privilege. Nothing contained herein should be construed as a waiver of any protection from disclosure, including without limitation the attorney-client communication privilege and work product doctrine and Facebook reserves all such rights and protections. I make this declaration based on my own knowledge, and I would testify to the matters stated herein under oath if called upon to do so.

## The App Developer Investigation

2.      Facebook initiated the Application Developer Investigation ("ADI" or the "Investigation") because, in the wake of the reporting of data misuse by Cambridge Analytica in March 2018, Facebook anticipated that it would have to respond to known and expected legal challenges in connection with applications and developers that may have had access to certain data because they were active before Facebook placed additional, significant limitations on the amount and type of data developers could request from users through the Facebook Platform in 2014.

3.      Facebook retained outside counsel (Gibson, Dunn & Crutcher LLP) experienced with cybersecurity and data privacy internal investigations to design and direct a new investigation that could, among other things, gather the facts necessary for providing legal advice to Facebook about litigation, compliance, regulatory inquiries, and other legal risks facing the company resulting from potential data misuse and activities by third-party app developers operating on the prior version of Facebook's platform.

4.      I led the Gibson Dunn team engaged to develop and conduct the Investigation. I am a former federal prosecutor and have more than two decades of experience with large-scale, corporate investigations, including fluency in privilege law and its application to conducting internal

1

Gibson, Dunn & Crutcher LLP

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

1  investigations, as well as technology, data privacy, and cybersecurity investigations, which I brought
2  to bear in leading the ADI.

3      5.     As described in the Declaration of Stacy Chen, attached as Exhibit A, a legal-led
4  investigation is not Facebook's usual response when the company determines that violations of its
5  Platform policies may have occurred. Unlike in the typical case, an attorney-led investigation was
6  necessary here because the internal Facebook teams that address potential Platform policy violations
7  neither had the capacity nor were they set up to: (i) address the company's legal risks with respect to
8  the historical Platform; (ii) address compliance risks with applicable laws regarding the historical
9  Platform; or (iii) assess Facebook's position in pending or anticipated litigation or regulatory
10 inquiries. Moreover, given the historical focus of the investigation's inquiry, significant investigation
11 was required to develop the framework and baseline data that would form the foundation of the
12 investigation. Unlike Facebook's other enforcement efforts, the ADI is in essence an historical
13 investigation to try to identify any misuse of data in violation of Facebook's policies and associated
14 legal liabilities, in connection with the first version of the Platform.

15     6.     As Ms. Chen explained, in setting up the legally-driven ADI, Facebook anticipated
16 that it would have to respond to known and expected legal challenges in connection with apps and
17 developers that may have had access to certain data because they were active before Facebook placed
18 additional, significant limitations on the amount and type of data developers could request from users
19 through the Facebook Platform in 2014. From the outset, the company contemplated a review of
20 potentially millions of apps that would inform the company's legal strategy.

21     7.     Facebook anticipated such legal challenges in part because the extensive media
22 attention surrounding the Cambridge Analytica events almost immediately triggered litigation and
23 regulatory inquiries, including, for example:

24     •   legal matters related to apps and developers that, like Dr. Aleksandr Kogan and his App,
25        thisisyourdigitallife, may have misused information from the time period before Facebook
26        placed additional limitations on developers;

27     •   legal matters involving Facebook and its directors and officers alleging, *inter alia*, violations
28        of the U.S. securities laws and breach of fiduciary duties;

Gibson, Dunn &
Crutcher LLP

2

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

1

2

- legal matters alleging, *inter alia*, violations of consumer protection statutes and common law claims for breach of contract and fraud; and

3

4

- investigations and potential enforcement actions against the company at both the state and federal levels and from international regulators.

5

6

7

8

9

8.      Exhibit A of the Chen Declaration includes a list of all pending domestic and international litigation relating to the Cambridge Analytica events and the misuse of user data by third-party apps as of October 2019, when the declaration was executed. This multitude of threatened and pending litigation was and is the backdrop of the ADI and, as such, has been the primary driving force behind the decisions made by Gibson Dunn and Facebook counsel throughout the ADI process.

10

11

12

13

14

15

16

17

18

19

20

21

9.      I led our Gibson Dunn team, and we worked with Facebook's in-house attorneys and members of Facebook's Partnerships, Data Policy, and DevOps teams on the ADI. I and my team at Gibson Dunn also led the recruitment and retention of technical experts and investigators for the ADI, including two leading forensic consulting firms with expertise in assisting with technology-focused internal investigations. These firms operated as an extension of the Gibson Dunn team to support our provision of legal advice to Facebook, and the investigators worked under the direction of Gibson Dunn and Facebook Legal. The "ADI team," as used herein, is comprised of Gibson Dunn lawyers and paralegals, our experts from the two leading forensic consulting firms, and Facebook in-house counsel and internal partners including subject matter experts, all of whom operated at the direction of counsel. At its largest, the ADI team consisted of over 300 members. Gibson Dunn's confidential engagement letters with the two leading forensic consulting firms are attached, and filed under seal, as Exhibits B, C and D.

22

23

24

25

26

27

28

10.      Gibson Dunn and in-house counsel needed to partner with the outside expert consulting firms and Facebook personnel to effectively advise Facebook of legal risk. The ADI team worked at the direction of counsel, relied on counsel's input and guidance, and played a necessary role in facilitating legal advice by counsel and implementing that advice by the company. The ADI was an iterative process through which ADI team members, including counsel and subject matter experts, were able to learn as the investigation progressed. As such, documents initially drafted by members of the ADI team were generally prepared by or at the direction of counsel, and counsel

Gibson, Dunn & Crutcher LLP

3

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

1    edited or otherwise helped shape their contents to ensure they were serving the legal purpose for
2    which they were created.

3        11.     Gibson Dunn and in-house counsel took steps to ensure that communications by and
4    among the ADI team remained confidential and privileged, including by instructing the team to limit
5    communications about ADI and access to investigatory documents to only employees, consultants,
6    and counsel who needed access to them for purpose of facilitating legal advice. In addition, materials
7    created in the course of the ADI were stored securely, with access limited to those necessary to the
8    investigation.

9        12.     The three investigative steps of the ADI are laid out in the Chen Declaration at
10   paragraphs 11-20.

11                         **Plaintiffs' Requests for Documents**

12       13.     I understand that Plaintiffs have sought certain categories of documents and
13   information about ADI. Because Facebook has received multiple articulations of these requests, *see*
14   Exhibit E, I address the requests as articulated in the July 26, 2021 Order issued by Judge Jacqueline
15   Scott Corley [Dkt. No. 711] (the "Order").

16       14.     As described by the Court's order, the first category of documents Plaintiffs seek are
17   those "documents (not created by lawyers) from the 'Enhanced Examination phase' that involve
18   background and technical investigations to identify the potential for data misuse." Order at 2 (citing
19   Dkt. No. 699 at 5). Although this category is not entirely clear, as I understand it, this request seeks
20   all ADI-related documents and communications generated by a non-attorney in connection with any
21   app specifically examined by one or more background or technical investigation reports.

22       15.     As described by the Court's order, the second category of documents Plaintiffs seek
23   are those "documents from the 'Enforcement phase,' including Facebook conducted audits and
24   interviews." Order at 2 (citing Dkt. No. 699 at 5). Although this request is also not entirely clear, I
25   understand it to seek all documents and communications regarding potential and actual enforcement
26   against apps or developers, including audits and interviews, regardless of whether such documents
27   and communications were actually conveyed to third parties and regardless of author.

28

Gibson, Dunn &
Crutcher LLP

4

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

**The Enhanced Examination Phase**

16.     In the Enhanced Examination phase, apps were selected for further review by counsel through proprietary risk-based approaches based on counsel's assessment of where and how the greatest legal risk to the company might arise to provide legal advice to Facebook regarding potential risks and active and potential litigation.

17.     Once an app or developer had been identified for further review based on criteria that my team had devised, Gibson Dunn and in-house counsel directed our forensic consultants to conduct intensive background and technical investigations, collect and compile specific evidence that counsel believed particularly salient to their legal analyses, and report their findings to counsel (*i.e.*, the Enhanced Examination process). A report for a single developer could include extensive technical and other details and these reports were specifically tailored by counsel, in substance and format, so that counsel could evaluate the potential for data misuse and associated legal risks. Reports varied tremendously based on counsel's instructions and what counsel determined was needed to provide legal advice and many were hundreds of pages long.

18.     Enhanced Examination also included application of a proprietary model (called the Risk-Prioritization Formula) developed under the guidance and with the advice of counsel that assisted in assessing the risks related to access to data, and the associated legal risks to Facebook, based in part on the permissions granted to apps and the number of users that authorized specific permissions. The Risk-Prioritization Formula was used exclusively in the ADI to prioritize apps for review during the Enhanced Examination phase.

19.     Facebook has already produced tens of thousands of pages of communications with developers regarding apps that were reviewed in the ADI through December 2019 because these communications with third parties are not privileged, regardless of whether the communications were created by lawyers or non-lawyers. From these communications, Plaintiffs know the app names, app IDs, and contact information for the developers associated with many of the apps that the ADI team assessed through the Enhanced Examination phase.

20.     Beyond those communications with external developers, there are numerous communications and documents created at the direction of counsel to assist counsel in the provision

Gibson, Dunn & Crutcher LLP

5

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

1     of legal advice and that contain or reveal the mental impressions and advice of counsel. Facebook

2     has not produced these documents because they are privileged. As noted above, Gibson Dunn

3     worked directly with the rest of the ADI team to design ADI-specific investigation reports to contain

4     information relevant to counsel's evaluation of the potential for data misuse and associated legal risk.

5          a.   **Background reports**. Counsel designed the background reports to capture information

6               counsel deemed relevant to assessing the risk of data misuse and legal risk to Facebook.

7               These reports varied in content depending on the particulars of the investigation, as directed

8               by counsel. For example, Gibson Dunn and Facebook's in-house legal team often sought

9               different information from different types of developers (e.g., corporate vs. individual), when

10              providing legal advice.

11         b.   **Technical reports**. Counsel devoted substantial time with the rest of the ADI team, to work

12              through the technical information available about apps and developers on Facebook's

13              platform, understand the significance of that data, and weigh the value of various technical

14              details to our legal risk analysis. With our ADI consulting experts, we identified which

15              details were most relevant to our legal risk analysis for inclusion in the reports. When we

16              needed a more nuanced understanding about the data to render our legal advice to Facebook,

17              working with our technical experts, we designed proprietary analytics (that had not before

18              existed at Facebook and were used exclusively in ADI) in order to score, rank, and better

19              understand the available data. Because our counsel team consistently had questions about

20              certain data points to assist in the rendering of legal advice, over time, those questions were

21              built into the structure of the reports, so that counsel would have the answer at their fingertips

22              to streamline their legal decision-making process.

23         c.   To facilitate our attorney review at scale, we instructed the ADI team regarding the criteria

24              and information that were important to us in rendering our opinion on legal risk, and

25              requested that they, based on these attorney-selected criteria, include preliminary

26              recommendations in their reports to facilitate Gibson Dunn's legal advice about the risk of

27              data misuse.

28

Gibson, Dunn &
Crutcher LLP

6

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

1
2
3
4
5
6
7
8

     d.   In connection with preparation and review of the background and technical investigation reports, there were extensive internal communications with counsel and at the direction of counsel regarding apps or developers in the Enhanced Examination phase between and among both attorney and non-attorney members of the ADI team, all of whom worked together to obtain the information required by Gibson Dunn for the provision of legal advice to Facebook.  Such communications were sent for the purpose of analyzing the legal risk posed by an app or developer, including whether such legal risk warranted further investigation or enforcement.

9
10
11
12
13

    21.    Although counsel may not have drafted each of these documents directly, the documents created as part of the Enhanced Examination phase were created at the direction of counsel, reflect attorney advice and mental impressions regarding the evidence counsel deemed important in rendering legal advice, and were directly used by counsel to provide legal advice to Facebook.

14

### The Enforcement Phase of the ADI

15
16
17
18
19
20
21

    22.    The "Enforcement phase" refers to the final phase of ADI, in which counsel reviewed the results of the investigations prepared at our direction (as explained in paras. 16-21, *supra*), recommended next steps to Facebook in-house counsel for approval, and drafted requests for information or other follow-up sent to developers.  If we determined that an information request response was inadequate, we may have attempted various additional methods of engagement with the developer, including conducting interviews or requesting audits of data security or storage infrastructure.

22
23
24
25

    23.    In consultation with the rest of the ADI team, the Gibson Dunn team also determined on a case-by-case basis if any additional enforcement action was appropriate, such as suspending the developer and/or the app.  We made recommendations about whether Facebook should take legal steps, including sending cease and desist letters, or engaging in litigation against developers.

26
27

    24.    As previously noted, Plaintiffs already have tens of thousands of pages of communications with developers, many of which refer or relate to the Enforcement phase, including

28

Gibson, Dunn &
Crutcher LLP

7

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

1    audits and interviews specifically, because these communications with third parties are not

2    privileged. These include the RFIs Facebook sent developers and their responses.

3         25.    Beyond the external documents, there are a large volume of internal ADI documents,

4    related to the "Enforcement phase" of ADI. These documents were created by or at the direction of

5    counsel to facilitate legal advice, and they contain or reveal the mental impressions and advice of

6    counsel related to enforcement options.

7         a.  **Written Memoranda and Recommendations**. Following our review of the materials

8             created during the Enhanced Examination phase, Gibson Dunn drafted individualized

9             recommendations containing advice and legal analysis for Facebook in-house counsel

10            regarding whether to pursue various enforcement methods—including interviews and audits

11            as well as litigation—and why. Our recommendations often highlighted the information and

12            open questions most relevant to our team's legal analysis of the risk of data misuse in detail,

13            and offered a recommended method of either pursuing further engagement to address our

14            concerns or taking legal measures, as discussed above. Our recommendations also may have

15            weighed various, competing options for enforcement, along with the strengths and

16            weaknesses of each.

17        b.  **Draft Internal Documents**. In connection with these recommendations, my team at Gibson

18            Dunn worked with the other internal and external ADI team members to draft other

19            documents that would guide further engagement or legal action. For example, when assisting

20            counsel to evaluate the potential for further enforcement and associated legal risk, the ADI

21            team frequently prepared memoranda analyzing the adequacy or implication of developer

22            responses to prior enforcement actions and created other internal documents in support of

23            such analysis, like notes and impressions from conversations or other interactions with

24            developers. At the direction of counsel, the ADI team also often iterated on the content of

25            potential follow-up communications to developers, the precise points to cover in a potential

26            interview, or allegations that would be stated in a complaint. This work was conducted to

27            provide legal advice to Facebook.

28

Gibson, Dunn &
Crutcher LLP

8

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

c. In connection with the drafting of these documents and the provision of the legal advice contained therein, there were extensive internal communications at the direction of counsel among and between both attorney and non-attorney members of the ADI team, all of whom worked together for Gibson Dunn to provide legal advice to Facebook. These communications were often sent for the purpose of discussing these recommendations, and draft internal documents composed in connection with those recommendations, like draft complaints and interview outlines, were all necessary for the provision of legal advice.

26. I am aware that at various times the Plaintiffs have emphasized to the Court that they seek "the facts underlying the investigation," April 6. Hearing Tr. 18:3 [Dkt. No. 657], and "not legal advice," Order at 2 (citing *id.*). Indeed, at mediation sessions in which I participated over the course of four months, Plaintiffs suggested that Facebook could satisfy their requests for "facts underlying the investigation" by producing specific data points Plaintiffs sought about certain apps addressed through ADI. Facebook offered to produce data for a list of apps already requested by and produced to Plaintiffs, as well as other information, subject to a non-waiver agreement. At the final mediation on this issue, Plaintiffs presented a materially different request that also sought large volumes of internal ADI emails and documents. *See* Dkt. 699-2. Facebook continues to be willing to provide the data it previously offered to provide Plaintiffs so long as producing that information will not be construed to waive Facebook's claim of privilege or the work-product protection with respect to ADI.

27. Attached as Exhibit E is a document laying out three steps that would need to occur for Facebook to execute any order requiring Facebook, over its objection, to comply with Plaintiffs' additional ADI requests. As noted above and in Exhibit E, the scope of Plaintiffs' requests is not clear, and may reach many millions of documents. To the extent Plaintiffs seek underlying information about apps relevant to their claims (as Plaintiffs repeatedly indicated they sought throughout the parties' mediations), it remains far more efficient for Facebook to produce that factual information directly in response to an appropriately scoped discovery request than it would be to collect and review millions of pieces of ADI-related communications and documents to determine if they contain any factual information that can somehow be extracted from the accompanying

Gibson, Dunn &
Crutcher LLP

9

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

privileged discussions—an exercise that would be extremely burdensome and would likely take many months (if not more) to complete.

*    *    *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 2, 2021 in New York, New York.

Alexander H. Southwell

10

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

Gibson, Dunn &
Crutcher LLP

# EXHIBIT K

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: FACEBOOK, INC. CONSUMER
PRIVACY USER PROFILE LITIGATION

Case No. 18-md-02843-VC  (JSC)

**ORDER GRANTING MOTION TO
COMPEL ADI MATERIALS**

Re: Dkt. Nos. 611, 612, 699, 711, 719, 720,
721, 727, 729

In early 2018, the public learned that "Cambridge Analytica, a British political consulting firm, used personal information from millions of Facebook accounts to send targeted political messages during the 2016 presidential election." *In re Facebook, Inc. Consumer Privacy User Profile* Litigation, 402 F.Supp.3d 767, 777 (N.D. Cal. Sep. 9, 2019). "In the months that followed, reports emerged suggesting that the ability of . . . entities like Cambridge Analytica to obtain sensitive Facebook user information was the norm rather than the exception." *Id.* Following the disclosure, Facebook initiated an app developer investigation (ADI) that involved a review of all "apps that had access to large amounts of data before [Facebook] changed [its] platform policies in 2014." *See* https://about.fb.com/news/2019/09/an-update-on-our-app-developer-investigation/. As the ADI, or, more precisely, the information the ADI uncovered, is directly relevant to Plaintiffs' claims in this MDL action, Plaintiffs seek information learned from and generated by the ADI. While Facebook has agreed to produce some data, it resists disclosure of reports, audits and interviews created or conducted by non-attorneys on the grounds that such documents are protected by attorney-work product or the attorney-client privilege. After several rounds of briefing and attempts among the parties to resolve, or at least narrow, the dispute, the issue is now ripe for decision.

United States District Court
Northern District of California

United States District Court
Northern District of California

**DOCUMENTS AT ISSUE**

Facebook's ADI consisted of three phases: (1) Detection and Identification of offending apps, (2) Enhanced Examination, and (3) Enforcement. In the Enhanced Examination Phase, the ADI forensic team conducted intensive background and technical investigations of the identified apps that, among other things, might identify the potential for data misuse. (Dkt. No. 699-5 ¶ 17.) In the Enforcement phase, to assist Facebook with deciding whether to take action against an app, additional investigation might be conducted including interviews or audits of data security or storage infrastructure. (*Id.* ¶ 19.) Plaintiffs seek material from the second and third phases that does not involve communications with lawyers or content created by lawyers. While Facebook has agreed to produce some information (Dkt. No. 699-1 at 4), it refuses on privilege grounds to produce the reports, audits and interviews, and non-attorney communications related to the same.

**ANALYSIS**

The parties agree that federal law governs this dispute. (Dkt. Nos. 611-2 at 16, 612-2 at 12, 699 at 4, 727 at 5 n.1) (applying federal law).) "The work product doctrine protects from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *United States v. Richey*, 632 F.3d 559, 567 (9th Cir. 2011). "To qualify for work-product protection, documents must: (1) be 'prepared in anticipation of litigation or for trial' and (2) be prepared 'by or for another party or by or for that other party's representative.'" *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt*, 357 F.3d 900, 907 (9th Cir. 2004). A finding that a document was prepared in anticipation of litigation, however, does not always end the inquiry.

> In circumstances where a document serves a dual purpose, that is, where it was not prepared exclusively for litigation, then the "because of" test is used. Dual purpose documents are deemed prepared because of litigation if in light of the nature of the document and the factual situation in a particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation. In applying the because of standard, courts must consider the totality of the circumstances and determine whether the document was created because of anticipated litigation, *and would not have been created in substantially similar form but for the prospect of litigation*.

*Richey*, 632 F.3d at 567-68 (emphasis added). The party resisting production of material based on

1    the work product privilege bears the burden of proving that the privilege applies. *See Hernandez v.*

2    *Tanninen*, 604 F.3d 1095, 1102 (9th Cir. 2010).

3    Facebook has met its burden of proving that the documents were prepared in anticipation

4    of litigation. Shortly before Facebook initiated the ADI, a nationwide consumer class action was

5    filed against Facebook in this Court. (Dkt. No. 1). Within weeks, more than 40 actions were filed

6    which were consolidated into this Multi-District Litigation. Facebook offers evidence that the

7    ADI was launched in part to address potential regulatory and litigation risks posed by apps that

8    had been on the Facebook platform since before Facebook changed in policies in 2014. (Dkt. No.

9    699-5, Dkt. No. 720.)

10   Facebook's own public pronouncements about the ADI, however, demonstrate that the

11   documents were not created exclusively in anticipation of litigation and that, in fact, Facebook

12   would have conducted the ADI in substantially similar form even in the absence of potential

13   litigation. *See Richey*, 632 F.3d at 568.

14   On March 21, 2018, Mark Zuckerberg, Facebook's CEO, publicly posted:

15       I want to share an update on the Cambridge Analytica situation—
16       including the steps we've already taken and our next steps to address
         this important issue.
17
18       We have a responsibility to protect your data, and if we can't then
         we don't deserve to serve you. I've been working to understand
19       exactly what happened and how to make sure this doesn't happen
         again.
20
         [W]e already took the most important steps a few years ago in 2014
21       to prevent bad actors from accessing people's information in this
         way. But there's more we need to do and I'll outline those steps
22       here:

23       First, we will investigate all apps that had access to large amounts of
24       information before we changed our platform to dramatically reduce
         data access in 2014, and we will conduct a full audit of any app with
25       suspicious activity. We will ban any developer from out platform
         that does not agree to a thorough audit. And if we find developers
26       that misused personally identifiable information, we will ban them
         and tell everyone affected by those apps.
27

28   Mr. Zuckerberg concluded:

3

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5

> I started Facebook, and at the end of the day I'm responsible for
> what happens on our platform. I'm serious about doing what it takes
> to protect our community. While this specific issue involving
> Cambridge Analytica should no longer happen with new apps today,
> that doesn't change what happened in the past. We will learn from
> this experience to secure our platform further and make our
> community safer for everyone going forward.

6   https://www.facebook.com/zuck/posts/1010471203790007. This statement specifically identifies

7   the purpose of the ADI as serving Facebook's business goal of protecting Facebook's customers'

8   data by figuring out what happened, how it happened, and removing apps that misused customers'

9   data so that Facebook could "secure our platform further and make our community safer for

10  everyone going forward." *Id.*

11          Two months later, Facebook updated the public on the "app investigation and audit" Mr.

12  Zuckerberg promised on March 21, 2018.

13
14
15
16
17

> The investigation process is in full swing, and it has two phases.
> First, a comprehensive review to identify every app that had access
> to this amount of Facebook data. And second, where we have
> concerns, we will conduct interviews, make requests for information
> (RFI)—which ask a series of detailed question about the app and the
> data it had access to—and perform audits that may include on-site
> inspections.

18
19
20
21
22
23

> We have large teams of internal and external experts working hard
> to investigate these apps as quickly as possible. To date thousands
> of apps have been investigated and around 200 have been
> suspended—pending a thorough investigation into whether they did
> in fact misuse any data. Where we find evidence that these or other
> apps did misuse data, we will ban them and notify people via this
> website. It will show people if they or their friends installed an app
> that misused data before 2015—just as we did for Cambridge
> Analytica.

24
25
26

> There is a lot more work to be done to find all the apps that may
> have misused people's Facebook data—and it will take time. We are
> investing heavily to make sure this investigation is as thorough as
> possible. We will keep you updated on our progress.

27  https://fb.com/new/2018/05/update-on-app-audit/. This statement again demonstrates that a "core

28  purpose" of the ADI was a business rather than legal purpose: to assure its customers that it was

4

United States District Court
Northern District of California

1   conducting a thorough investigation to remove bad apps and advise customers if their data may

2   have been misused.  And the ADI was being conducted "as quickly as possible," —not because of

3   fast-tracked litigation, as the pace of this MDL surely demonstrates—but because of the need to

4   weed out the bad apps to protect Facebook's consumers, its good will, and its business.

5       Facebook provided a further update on "our ongoing App Developer Investigation" on

6   September 20, 2019. Facebook explained that its investigation

7           has involved hundreds of people: attorneys, external investigators,
            data scientists, engineers, policy specialists, platform partners and
8           other teams across the company. Our review helps us to better
            understand patterns of abuse in order to root out bad actors among
9           developers.

10  Facebook explained further

11          that where it has concerns, it "conduct[s] a more intensive
            examination. This includes background investigation of the developer
12          and a technical analysis of the app's activity on the platform.
            Depending on the results, a range of actions could be taken from
13          requiring developers to submit to in-depth questioning, to conducting
            inspections or banning an app from the platform.
14

15  https://about.fb.com/news/2019/an-update-on-our-app-developer-investigation/.  Facebook told

16  the public about its investigation, including the background and technical analysis it now claims is

17  privileged work product, to assure the public that Facebook was cleaning up its platform and thus

18  generate trust in its site—a classic business purpose.  The ADI team members Facebook identified

19  were enlisted to help Facebook "better understand patterns of abuse in order to root out bad

20  actors."

21      In light of Facebook's own statements, the Court finds that Facebook would have

22  conducted the ADI in substantially the same form even in the absence of potential litigation; that

23  is, that Facebook did not initiate the ADI because of the prospect of litigation.  *See Phoenix Techs.*

24  *Ltd. v. VMware, Inc.*, 195 F. Supp. 3d 1096, 1105 (N.D. Cal. 2016) (holding that dual purpose

25  documents were not protected work product because they served a business purpose independent

26  of litigation).  Facebook's assertion that the ADI served *only* a litigation purpose (Dkt. No. 727 at

27  3) is patently implausible in light of Facebook's public pronouncements.  It is inconceivable that

28  Facebook would not have initiated a speedy, large-scale-subject matter specialist investigation into

United States District Court
Northern District of California

1   app data misuse in the absence of potential litigation. Such assertion could only be true if the

2   Court found that Facebook was lying to the public when it stated that the purpose of the ADI was

3   to root out bad apps and secure Facebook's platform so that consumers could have faith in the

4   company. Facebook, unsurprisingly, does not offer any evidence to support such a finding.

5   Indeed, after asking the Court for the opportunity to submit additional evidence, it provided a

6   declaration from outside counsel which does not even acknowledge these statements. There is no

7   evidence from anyone at Facebook that addresses the repeated public proclamations as to the

8   obvious business purpose of the ADI.

9        Facebook's suggestion that these materials may also be protected by the attorney-client

10  privilege is unpersuasive given that Plaintiffs are not seeking documents created by counsel,

11  counsel's edits, or any communications with counsel. Facebook has not explained how a non-

12  attorney's interview or audit of a developer would be protected from discovery by the attorney-

13  client privilege under federal law. At best such material would be attorney work product. For the

14  reasons explained above, it is not under the totality of the circumstances here given Facebook's

15  public exhortations of the business purpose behind its ADI.

**MOTION TO STRIKE**

17       Facebook moves to strike Plaintiffs' response to Facebook's supplemental declaration.

18  (Dkt. No. 727.) For the most part the response addresses the declaration and thus is

19  unobjectionable. The new argument as to the attorney-client privilege "primary purpose" test is

20  stricken and, in any event, is moot as the Court is not addressing the application of the attorney-

21  client privilege. The documents discussed in this Order—background and technical reports,

22  audits, and interviews prepared and conducted by non-attorneys—are work product, not attorney-

23  client privilege material. The Court has nonetheless reviewed Facebook's motion to strike's

24  substantive arguments, including the cases buried in footnote 1, and none persuade the Court

25  otherwise.

**CONCLUSION**

27       In light of Facebook's unchallenged public proclamations as to the business purpose of the

28  ADI, the Court finds that the ADI served a dual purpose and that, as a general matter, documents

6

generated as part of that investigation were not created because of litigation.  On or before

September 21, 2021, Facebook shall produce the background and technical reports, audits and

developer interviews of the six exemplar apps chosen by the parties as Facebook has offered no

special reasons why those particular documents are privileged other than what has been addressed.

The parties shall work with the Special Master regarding production of additional materials

consistent with the guidance offered by this Order.

This Order disposes of Docket Nos. 611, 612, 699, 720, 727.

**IT IS SO ORDERED.**

Dated:  September 8, 2021

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California

7

# EXHIBIT L

| From: | Kutscher Clark, Martie |
|-------|------------------------|
| Sent: | October 8, 2021 1:52 AM |
| To: | David Ko; Snyder, Orin; Stein, Deborah L.; Falconer, Russ; Mumm, Laura C. |
| Cc: | Derek Loeser; Cari Laufenberg; Benjamin Gould; Chris Springer; Lesley Weaver; Matt Melamed; Anne Davis; Daniel Garrie; Gail Andler (judgeandler@icloud.com) |
| Subject: | Re: ADI |

David,

There are many inaccuracies in your email below.

First, Facebook produced the letter from Mr. Southwell to ▮▮▮▮ dated March 30, 2018 on July 8, 2020.  Plaintiffs have had this letter for more than 18 months.

The letter from Mr. Southwell dated March 13, 2019 was not previously produced because it appears Facebook's ▮▮▮▮▮▮▮▮▮ email account was not copied on the transmission of this particular letter.  Of course we did not represent that we had located and produced every single communication any agent of Facebook ever had with a third party relating to ADI.  Facebook represented that it was not asserting privilege over third party communications responsive to RFP 21.  As you know, the parties agreed in May 2020 that Facebook would conduct a targeted collection in response to this RFP, and we discussed at that time that Facebook would do so by collecting materials from an email account it used in connection with ADI (the ▮▮▮▮▮▮▮ account).  As we discussed, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

Second, you suggest Facebook has not produced all of the documents Judge Corley ordered Facebook to produce on September 9.  Facebook has.  Our September 21 production includes background and technical reports associated with each of the six exemplar apps, as well as two Cease & Desist letters to ▮▮▮▮▮▮▮▮ which each separately demand an audit in the bolded paragraph on the first page of the letters. To be clear, although Facebook made this audit demand to ▮▮▮▮▮▮▮ ADI did not conduct audits or developer interviews for any of these apps.

We are happy to meet and confer about next steps under Judge Coley's order.  As you know, this week has been difficult to schedule as we have been focused on mediation efforts.  We suggest it would be most productive to meet and confer next week when everyone on our team and at our client can focus more on this issue.  Please let us know what days you are available.

Finally, you suggest we have been unduly delayed in taking a few days to look into your questions and respond to them.  As you know this case has many moving parts, and we appreciate everyone's professional courtesy as we work through issues.  We note that we currently have numerous outstanding inquiries to Plaintiffs, some of which have been pending for six months.  We are awaiting responses on at least the following items:

- Ms. Mumm's September 15 email regarding the date ranges for certain of Plaintiffs' discovery requests

- Ms. Mumm's September 16 email regarding Plaintiffs' request for further information relating to the Named Plaintiffs

- Ms. Stein's September 21 letter regarding the Named Plaintiffs' depositions

- Mr. Swanson's September 24 email regarding search terms for the Named Plaintiffs' documents

1

- Ms. Stein's April 1 letter regarding the Named Plaintiffs' Data, Business Partners, and other items.

- Ms. Herbert's August 18 email regarding Named Plaintiffs' responses to Facebook's Interrogatory No. 1. While Plaintiffs' have provided certain information concerning Ms. Burk they have yet to provide information concerning the balance of Ms. Herbert's email.

- Ms. Stein's October 7 letter regarding deposition dates.

Thank you,
Martie

**Martie Kutscher Clark**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1881 Page Mill Road, Palo Alto, CA 94304-1211
Tel +1 650.849.5348 • Fax +1 650.849.5048
MKutscherClark@gibsondunn.com • www.gibsondunn.com

**From:** David Ko <dko@KellerRohrback.com>
**Date:** Wednesday, October 6, 2021 at 10:00 AM
**To:** "Kutscher Clark, Martie" <MKutscherClark@gibsondunn.com>, "Snyder, Orin" <OSnyder@gibsondunn.com>, "Stein, Deborah L." <DStein@gibsondunn.com>, "Falconer, Russ" <RFalconer@gibsondunn.com>, "Mumm, Laura C." <LMumm@gibsondunn.com>
**Cc:** Derek Loeser <dloeser@KellerRohrback.com>, Cari Laufenberg <claufenberg@KellerRohrback.com>, Benjamin Gould <bgould@KellerRohrback.com>, Chris Springer <cspringer@KellerRohrback.com>, Lesley Weaver <lweaver@bfalaw.com>, Matt Melamed <mmelamed@bfalaw.com>, Anne Davis <adavis@bfalaw.com>, Daniel Garrie <DGarrie@jamsadr.com>, "Gail Andler (judgeandler@icloud.com)" <judgeandler@icloud.com>
**Subject:** RE: ADI

[WARNING: External Email]

Counsel,

We are also following up on the below and our request to meet and confer regarding ADI. On September 24, we specifically identified additional materials Facebook should produce consistent with Judge Corley's order and asked for a date you could meet and confer. On September 29, you said you were considering our request and proposed conferring on Thursday, October 7. We responded on September 30 asking for an earlier time to talk. You didn't respond.

Please let us know when you're available to meet and confer before Friday. In the alternative, please provide a response to our request in writing before Friday. If you don't provide a time to meet and confer or provide a written response to our request before Friday, we will ask Special Master Garrie to conduct a hearing regarding Facebook's additional production of ADI materials. Thank you.

-----------------------------
David Ko
Attorney - Complex Litigation
Keller Rohrback L.L.P.

Phone: (206) 428-0562
Email: dko@kellerrohrback.com
http://www.krcomplexlit.com

CONFIDENTIALITY NOTE: This e-mail contains information belonging to the law firm of Keller Rohrback L.L.P., which may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual entity named above. If you think that you have received this message in error, please e-mail the sender. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited.

---

**From:** David Ko
**Sent:** Thursday, September 30, 2021 10:25 AM
**To:** Kutscher Clark, Martie <MKutscherClark@gibsondunn.com>; Snyder, Orin <OSnyder@gibsondunn.com>; Stein, Deborah L. <DStein@gibsondunn.com>; Falconer, Russ <RFalconer@gibsondunn.com>; Mumm, Laura C. <LMumm@gibsondunn.com>
**Cc:** Derek Loeser <dloeser@KellerRohrback.com>; Cari Laufenberg <claufenberg@KellerRohrback.com>; Benjamin Gould <bgould@KellerRohrback.com>; Chris Springer <cspringer@KellerRohrback.com>; Lesley Weaver <lweaver@bfalaw.com>; Matt Melamed <mmelamed@bfalaw.com>; Anne Davis <adavis@bfalaw.com>; Daniel Garrie <DGarrie@jamsadr.com>; Gail Andler (judgeandler@icloud.com) <judgeandler@icloud.com>
**Subject:** RE: ADI

Martie – are you available to confer earlier on either Monday 10/4 or Tuesday 10/5? Next Friday is out given the all-day mediation w/ Judge Gahndi. We are happy to discuss just the third item while you look into the first two so we can make progress. We can be available on Monday between 11-1 and Tuesday afternoon any time after 3. Thank you.

-----------------------------
David Ko
Attorney - Complex Litigation
Keller Rohrback L.L.P.

Phone: (206) 428-0562
Email: dko@kellerrohrback.com
http://www.krcomplexlit.com

CONFIDENTIALITY NOTE: This e-mail contains information belonging to the law firm of Keller Rohrback L.L.P., which may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual entity named above. If you think that you have received this message in error, please e-mail the sender. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited.

---

**From:** Kutscher Clark, Martie <MKutscherClark@gibsondunn.com>
**Sent:** Wednesday, September 29, 2021 11:12 AM
**To:** David Ko <dko@KellerRohrback.com>; Snyder, Orin <OSnyder@gibsondunn.com>; Stein, Deborah L. <DStein@gibsondunn.com>; Falconer, Russ <RFalconer@gibsondunn.com>; Mumm, Laura C. <LMumm@gibsondunn.com>
**Cc:** Derek Loeser <dloeser@KellerRohrback.com>; Cari Laufenberg <claufenberg@KellerRohrback.com>; Benjamin Gould <bgould@KellerRohrback.com>; Chris Springer <cspringer@KellerRohrback.com>; Lesley Weaver <lweaver@bfalaw.com>; Matt Melamed <mmelamed@bfalaw.com>; Anne Davis <adavis@bfalaw.com>; Daniel Garrie <DGarrie@jamsadr.com>; Gail Andler (judgeandler@icloud.com) <judgeandler@icloud.com>
**Subject:** Re: ADI

Hi David,

We are looking into the questions you raise below and we are happy to discuss next week. Why don't we plan to meet and confer next Thursday or Friday, after the mediation with Judge Gandhi. Please let us know what times you have available those days.

Thanks,
Martie

**Martie Kutscher Clark**

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1881 Page Mill Road, Palo Alto, CA 94304-1211
Tel +1 650.849.5348 · Fax +1 650.849.5048
MKutscherClark@gibsondunn.com · www.gibsondunn.com

---

**From:** David Ko <dko@KellerRohrback.com>

**Date:** Friday, September 24, 2021 at 7:49 PM

**To:** "Snyder, Orin" <OSnyder@gibsondunn.com>, "Stein, Deborah L." <DStein@gibsondunn.com>, "Falconer, Russ" <RFalconer@gibsondunn.com>, "Kutscher Clark, Martie" <MKutscherClark@gibsondunn.com>, "Mumm, Laura C." <LMumm@gibsondunn.com>

**Cc:** Derek Loeser <dloeser@KellerRohrback.com>, Cari Laufenberg <claufenberg@KellerRohrback.com>, Benjamin Gould <bgould@KellerRohrback.com>, Chris Springer <cspringer@KellerRohrback.com>, Lesley Weaver <lweaver@bfalaw.com>, Matt Melamed <mmelamed@bfalaw.com>, Anne Davis <adavis@bfalaw.com>, Daniel Garrie <DGarrie@jamsadr.com>, "Gail Andler (judgeandler@icloud.com)" <judgeandler@icloud.com>

**Subject:** ADI

**[WARNING: External Email]**

Counsel,

We write to follow up on our prior correspondence regarding ADI on September 11, and your production of 11 documents earlier this week in response to Judge Corley's September 9 order granting Plaintiffs' motion to compel ADI materials. Doc. 736.

We first note that of the 11 documents you produced, two are letters to third-party app developers. This is surprising to us since you previously represented several times that you already produced all such communications. *See e.g.*, June 19, 2020 Hr'g T. 14:23-15:2 (Mr. Snyder: "[W]e did identify third parties with respect to which we took certain enforcement measures. We sent them letters. We terminated them. In a few cases, we sued them. All of Facebook's communications with those third parties are fair game. We're going to produce those."); Facebook's Brief in Opposition to Plaintiff's Request for ADI Materials, Doc. 612 at 5 ("Facebook further agreed to collect and produce non-privileged materials relating to the Investigation and already produced more than 30,000 pages of non-privileged materials from the Investigation, which are communications with third parties about the Investigation."); Joint Discovery Dispute Letter to J. Corley, Doc. 699-1 ("Facebook has produced a wealth of information: ... Facebook's requests to and communications with the developers."). Contrary to these representations, you clearly have not produced all communications with third parties seeking your enforcement measures in light of your production of these two letters. Please produce all such communications immediately. We reserve all rights with respect to your prior inaccurate representations to Plaintiffs and the Court with regard to these communications.

Second, Judge Corley's Sept. 9 Order required Facebook to produce "background and technical reports, audits and developer interviews ..." Doc. 736 at 7. The 11 documents you produced consisted of 9 memoranda from ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮ – Facebook's outside consultants for ADI – and two cease and desist letters as noted above. Please confirm that you have not withheld any other documents pertaining to the six exemplar apps referenced in the Sept. 9 Order. If you have withheld any materials, please immediately provide the basis for doing so.

4

Third, as required by Judge Corley's order to work with Special Master Garrie regarding the production of additional materials related to ADI and our prior request to meet and confer after review of your production, we request all memoranda prepared by ▮▮▮▮▮▮▮▮▮ and/or ▮▮▮▮▮▮▮▮▮ related to ADI of all apps it investigated or investigated at Facebook's direction, the background and technical reports, audits, and developer interviews, and internal Facebook communications regarding these materials (including those pertaining to the six exemplar apps).

We are available to confer next week on these issues if necessary.  Thank you.

----------------------------
David Ko
Attorney - Complex Litigation
Keller Rohrback L.L.P.

Phone: (206) 428-0562
Email: dko@kellerrohrback.com
http://www.krcomplexlit.com

CONFIDENTIALITY NOTE: This e-mail contains information belonging to the law firm of Keller Rohrback L.L.P., which may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual entity named above. If you think that you have received this message in error, please e-mail the sender. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

# EXHIBIT M

1  Derek W. Loeser (admitted *pro hac vice*)    Lesley Weaver (Cal. Bar No.191305)
   KELLER ROHRBACK L.L.P.                       BLEICHMAR FONTI & AULD LLP
2  1201 Third Avenue, Suite 3200               555 12th Street, Suite 1600
   Seattle, WA 98101                            Oakland, CA 94607
3  Tel.: (206) 623-1900                         Tel.: (415) 445-4003
   Fax: (206) 623-3384                          Fax: (415) 445-4020
4  dloeser@kellerrohrback.com                   lweaver@bfalaw.com

5

6  *Plaintiffs' Co-Lead Counsel*

7  *Additional counsel listed on signature page*

8
                   **UNITED STATES DISTRICT COURT**
9                **NORTHERN DISTRICT OF CALIFORNIA**
                     **SAN FRANCISCO DIVISION**
10

11
   IN RE: FACEBOOK, INC. CONSUMER        MDL No. 2843
12 PRIVACY USER PROFILE LITIGATION       Case No. 18-md-02843-VC-JSC

13                                        **PLAINTIFFS' STATEMENT**
   This document relates to:             **CONCERNING THE ADI ISSUES IN**
14                                        **ADVANCE OF HEARING**
   ALL ACTIONS
15                                        Judge: Hon. Vince Chhabra
                                          Hon. Jacqueline Scott Corley
16                                        Special Master Daniel Garrie
                                          Courtroom: 4, 17th Floor
17
                                          JAMS Ref. No.: 1200058674
18
                                          ORAL ARGUMENT REQUESTED
19

20

21

22

23

24

25

26

27

28

1    Pursuant to the Special Master's October 15, 2021 email Order, Plaintiffs submit the
2    following preliminary statement concerning the ADI issues.

3    **I.    ISSUE**

4    Judge Corley has held that "the ADI served a dual purpose and that, as a general matter,
5    documents generated as part of that investigation were not created because of litigation." Dkt. No.
6    736 at 6-7. She directed Plaintiffs to work with Facebook and the Special Master regarding
7    production of additional ADI materials consistent with the Order. The issue now before the Special
8    Master is what additional ADI materials should Facebook produce?

9
10   **II.    EXAMPLE OF ISSUE**

11   While Plaintiffs believe the Order justifies the production of a broader scope of documents,
     as an interim step and to expedite production, Plaintiffs request that Facebook produce the
12   following related to phases two and three of the ADI:[1]

13        1.  All memoranda prepared by ██████████████ or ██████████████
14
15        2.  All background reports, technical reports, audits, and developer interviews;

16        3.  All internal Facebook communications relating to items 1 and 2;

17        4.  All communications with ██████████ o ██████████ related to items 1 and
18            2; and

19        5.  All communications with third-party app developers.[2]

20   The parties met and conferred about Plaintiffs' requests on October 12. Facebook failed to
     offer a proposal for how it planned to comply with Judge Corley's Order, including its guidance to
21   produce "additional [ADI] materials consistent with the guidance offered by this Order." Dkt. No.
22   736 at 2.

23
24
_____
25   [1] ADI consisted of three phases: (1) Detection and Identification of offending apps, (2) Enhanced
26   Examination, and (3) Enforcement. *See* Dkt. No. 736 at 2.
     [2] *See* June 19, 2020 Hr'g T. 14:23-15:2 (Facebook's counsel: "[W]e did identify third parties with
27   respect to which we took certain enforcement measures. We sent them letters. We terminated
     them. In a few cases, we sued them. All of Facebook's communications with those third parties
28   are fair game. We're going to produce those.")

1

### III.    PLAINTIFFS' POSITION

2        Under the dual-purpose doctrine and pursuant to Judge Corley's Order, Dkt. No. 736,

3    Plaintiffs are entitled to production of the materials requested above. The Order granted Plaintiffs'

4    motion to compel Facebook to produce "material from the second and third phases" of the ADI. *Id.*

5    at 2. The second phase concerned "Enhanced Examination"; the third, "Enforcement." *Id.* The

6    Court explained that, because "Facebook would have conducted the ADI in substantially the same

7    form even in the absence of potential litigation," the materials Plaintiffs moved to compel are not

8    protected from production. *Id.* at 6; *see United States v. Richey*, 632 F. 3d 559, 568 (9th Cir. 2011)

9    (where a document was not prepared exclusively for litigation, it qualifies for work-product

10   protection only if it "'"would not have been created in substantially similar form but for the prospect

11   of litigation"'") (citations omitted); *see also In re Grand Jury*, 13 F.4th 710 (9th Cir. 2021) (dual-

12   purpose attorney-client communications are protected only where the primary purpose concerns

13   legal advice that may not have been provided absent the privilege).

14       As a first step, the Court ordered Facebook to "produce the background and technical

15   reports, audits and developer interviews" of six exemplar apps previously identified by the parties

16   for the purpose of briefing. *Id.* at 6-7. In response, Facebook produced 11 documents. Nine were

17   memoranda prepared by ▉▉▉▉▉▉▉ or ▉▉▉▉▉▉▉, two external consultants Facebook

18   retained to assist with ADI. These memoranda contain a wealth of relevant information about why

19   these apps were being investigated and what user data they collected. On October 12, Facebook

20   asserted its production relating to the six exemplar apps was complete. However, Facebook's

21   privilege logs concerning those apps identify numerous reports, including 99 reports without

22   counsel listed, which are not or are exceedingly unlikely to be privileged. Facebook should

23   complete its production for the six exemplar apps. Facebook should also produce all such

24   memoranda for any apps or developers investigated in phases two or three of the ADI, all other

25   additional or related "background reports, technical reports, audits, and developer interviews" for

26   all apps or developers investigated in phases two or three of the ADI, and any internal Facebook

27   communications regarding the ADI--in particular, apps investigated during phases two or three of

28

1   the ADI. In addition, Facebook should produce all communications with [redacted] or [redacted]

2   regarding the ADI. The Order provides Facebook no basis for withholding any of these

3   communications. Finally, Facebook should produce all third-party communications related to ADI;

4   despite earlier representations it would produce all such documents, it recently produced two

5   additional letters, and conceded that it has not.

6

7   Dated: October 22, 2021

    Respectfully submitted,

8   KELLER ROHRBACK L.L.P.                    BLEICHMAR FONTI & AULD LLP

9   By:    /s/ Derek W. Loeser               By:    /s/ Lesley E. Weaver
10         Derek W. Loeser                           Lesley E. Weaver

11  Derek W. Loeser (admitted *pro hac vice*)     Lesley E. Weaver (SBN 191305)
    Cari Campen Laufenberg (admitted *pro hac vice*)   Anne K. Davis (SBN 267909)
12  David Ko (admitted *pro hac vice*)            Matthew S. Melamed (SBN 260272)
    Adele A. Daniel (admitted *pro hac vice*)     Angelica M. Ornelas (SBN 285929)
13  Benjamin Gould (SBN 250630)                   Joshua D. Samra (SBN 313050)
    1201 Third Avenue, Suite 3200                 555 12th Street, Suite 1600
14  Seattle, WA 98101                             Oakland, CA 94607
    Tel.: (206) 623-1900                          Tel.: (415) 445-4003
15  Fax: (206) 623-3384                           Fax: (415) 445-4020
    dloeser@kellerrohrback.com                    lweaver@bfalaw.com
16  claufenberg@kellerrohrback.com                adavis@bfalaw.com
    dko@kellerrohrback.com                        mmelamed@bfalaw.com
17  adaniel@kellerrohrback.com                    aornelas@bfalaw.com
    bgould@kellerrohrback.com                     jsamra@bfalaw.com

18
    Christopher Springer (SBN 291180)
19  801 Garden Street, Suite 301
    Santa Barbara, CA 93101
20  Tel.: (805) 456-1496
    Fax: (805) 456-1497
21  cspringer@kellerrohrback.com

22  *Plaintiffs' Co-Lead Counsel*

23

24

25

26

27

28

# EXHIBIT N

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
   osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
   klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
   mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
   dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
   jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION<br><br>This document relates to:<br><br>ALL ACTIONS | MDL NO. 2843<br>CASE NO. 3:18-MD-02843-VC-JSC<br><br>**FACEBOOK'S SUPPLEMENTAL SUBMISSION RE ADI**<br><br>Judge: Hon. Vince Chhabria<br>Hon. Jacqueline Scott Corley<br>Special Master Daniel Garrie<br>Courtroom: 4, 17th Floor<br><br>JAMS Ref. No.: 1200058674 |

1  In response to the Special Master's Order dated October 15, 2021 regarding ADI, Facebook
2  states as follows:

3  **Issue #1:**  Plaintiffs identify two letters to the developer ▮▮▮▮▮▮▮▮▮▮▮ that
4  Facebook included in its September 21 production of ADI materials pursuant to Judge Corley's ADI
5  Order.  Plaintiffs say these letters were not produced previously, which they believe conflicts with
6  Facebook's prior representations about its productions.  Plaintiffs say Facebook previously
7  represented that it had produced all correspondence with developers in connection with ADI.

8  **Example:**  Plaintiffs identify two letters (i) a letter from Alexander H. Southwell of Gibson
9  Dunn to ▮▮▮▮▮▮▮▮▮▮ dated March 30, 2018; and (ii) a letter from Mr. Southwell to
10 ▮▮▮▮▮▮▮▮▮▮ dated March 13, 2019.

11 **Facebook's Position:**  Plaintiffs' representations are wrong.  The March 30, 2018 letter from
12 Alexander H. Southwell to ▮▮▮▮▮▮▮▮ was produced to Plaintiffs on July 8, 2020 as
13 Bates Number FB-CA-MDL-01159181.  It is incorrect that Facebook produced this letter for the first
14 time last month; Plaintiffs have had this letter for over 15 months.  Mr. Southwell's second, March
15 13, 2019, letter was not produced previously.  This is because it was not within the set of materials
16 the parties agreed would be collected and produced in response to Plaintiffs' RFP 21, which requests:
17 "Communications between Facebook and Third Parties relating to the ADI, including but not limited
18 to Communications that Facebook provided to the Massachusetts Attorney General's Office."

19 For each of Plaintiffs' RFPs, the parties either agreed to a targeted collection or custodians
20 and search strings that would be used to identify potentially responsive materials.  In May 2020, the
21 parties agreed Facebook would conduct a targeted collection for RFP 21, and that they would not
22 negotiate custodians and search strings.  The parties specifically agreed Facebook would collect and
23 produce developer correspondence from the email account typically used to communicate with
24 developers about ADI (Facebook's ▮▮▮▮▮▮▮▮ account).  Facebook produced these
25 materials, which amounted to more than 30,000 pages of communications with third parties.  Mr.
26 Southwell's March 13, 2019 letter was not previously collected and produced because the ▮▮▮▮▮
27 ▮▮▮▮ account was not copied as a recipient on the transmittal email for this particular letter.  This
28 does not conflict with Facebook's prior representations.  Facebook represented that it was not

1   asserting privilege over its ADI communications with developers, and it produced the materials the

2   parties agreed Facebook would collect and produce. *See, e.g.*, June 19, 2020 Hr'g Tr. 15:1–2

3   ("Facebook's communications with those third parties are fair game."); Dkt. 612 at 5 ("Facebook

4   further agreed to collect and produce non-privileged materials relating to the Investigation and

5   already produced more than 30,000 pages of non-privileged materials from the Investigation, which

6   are communications with third parties about the Investigation."); *see also Reinsdorf v. Skechers*

7   *U.S.A., Inc.*, 296 F.R.D. 604, 615 (C.D. Cal. 2013) ("[W]hile parties must impose a reasonable

8   construction on discovery requests and conduct a reasonable search when responding to the requests,

9   the Federal Rules do not demand perfection.").

10   **Issue #2:**  Facebook's September 21 production of documents in response to Judge Corley's

11   ADI Order includes eleven documents, which amount to 379 pages.  Plaintiffs assert, without basis,

12   that the production must be incomplete because Plaintiffs expected Facebook to produce more

13   documents.

14   **Example:**  Plaintiffs provide no example of materials missing from Facebook's September 21

15   production, and Facebook is aware of none.

16   **Facebook's Position:**  Facebook has produced all materials Judge Corley ordered Facebook

17   to produce by September 21.  Judge Corley ordered Facebook to produce "background and technical

18   reports, audits and developer interviews of the six exemplar apps chosen by the parties" previously

19   for a sampling exercise designed to identify examples of privileged ADI documents.  Dkt. 736 at 7.

20   Facebook produced nine background and technical reports for the six apps, as well as two cease-and-

21   desist letters demanding audits.  ADI ultimately did not conduct forensic audits or developer

22   interviews for any of the six apps, so there are no more documents to produce with respect to the six

23   apps.

24   **Issue #3:**  Plaintiffs demand that Facebook produce five broad categories of ADI materials:

25   (a) background and technical reports for every app addressed by ADI; (b) audits for every app

26   addressed by ADI; (c) developer interviews for every app addressed by ADI; (d) all memoranda

27   prepared by expert consultants retained by Gibson Dunn related to ADI; and (e) communications

28   regarding the previous four categories of materials.

**Example:**  Not applicable.

**Facebook's Position:**  Facebook informed Plaintiffs that:  (i) Facebook is evaluating what materials it maintains in the categories Judge Corley described as potentially discoverable in her September 9, 2021 Order; (ii) Plaintiffs' requests appear to go far beyond Judge Corley's order, includes requests Judge Corley has already rejected, and should be confined to the categories of materials Judge Corley described as potentially discoverable; and (iii) it was premature for Facebook to identify what non-privileged materials it may be able to produce, and Facebook would provide a preliminary position the week of October 25.

Gibson, Dunn &
Crutcher LLP

1

2    Dated: October 22, 2021          **GIBSON, DUNN & CRUTCHER, LLP**

3                                     By:  _/s/ Orin Snyder_
                                       Orin Snyder (*pro hac vice*)
4                                      osnyder@gibsondunn.com
                                       200 Park Avenue
5                                      New York, NY 10166-0193
                                       Telephone: 212.351.4000
6                                      Facsimile: 212.351.4035

7                                      Deborah Stein (SBN 224570)
                                       dstein@gibsondunn.com
8                                      333 South Grand Avenue
                                       Los Angeles, CA 90071-3197
9                                      Telephone: 213.229.7000
                                       Facsimile: 213.229.7520
10
                                       Joshua S. Lipshutz (SBN 242557)
11                                     jlipshutz@gibsondunn.com
                                       1050 Connecticut Avenue, N.W.
12                                     Washington, DC 20036-5306
                                       Telephone: 202.955.8500
13                                     Facsimile: 202.467.0539

14                                     Russell H. Falconer
                                       rfalconer@gibsondunn.com
15                                     2001 Ross Avenue Suite 2100
                                       Dallas, TX 75201
16                                     Telephone: 214.698.3170

17                                     Kristin A. Linsley (SBN 154148)
                                       klinsley@gibsondunn.com
18                                     Martie Kutscher (SBN 302650)
                                       mkutscherclark@gibsondunn.com
19                                     555 Mission Street, Suite 3000
                                       San Francisco, CA 94105-0921
20                                     Telephone: 415.393.8200
                                       Facsimile: 415.393.8306
21

22                                     *Attorneys for Defendant Facebook, Inc.*

23

24

25

26

27

28

## PROOF OF SERVICE BY E-Mail

Re: In re: Facebook, Inc. Consumer Privacy User Profile Litigation (Special Master)
Reference No. 1200058674

I, Anne Lieu, not a party to the within action, hereby declare that on December 20, 2021, I served the attached Amended Order Regarding Production of ADI Related Documents on the parties in the within action by electronic mail at El Monte, CALIFORNIA, addressed as follows:

Martie P. Kutscher Clark Esq.
Gibson Dunn & Crutcher
1881 Page Mill Rd.
Palo Alto, CA  94304-1125
Phone: 650-849-5300
mkutscher@gibsondunn.com
    Parties Represented:
    Facebook, Inc.

Deborah L. Stein Esq.
Alexander P. Swanson Esq.
Gibson Dunn & Crutcher
333 S. Grand Ave.
52nd Floor
Los Angeles, CA  90071-3197
Phone: 213-229-7000
dstein@gibsondunn.com
aswanson@gibsondunn.com
    Parties Represented:
    Facebook, Inc.

David J. Ko Esq.
Derek W. Loeser Esq.
Cari C. Laufenberg Esq.
Keller Rohrback LLP
1201 Third Ave.
Suite 3200
Seattle, WA  98101-3052
Phone: 206-623-1900
dko@kellerrohrback.com
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
    Parties Represented:
    Bridgett Burk
    Cheryl Senko
    Jason Ariciu
    Jordan O'Hara
    Rev. Anthony Bell
    Samuel Armstrong
    Steven Akins
    Terry Fischer
    Tyler King

Chris Springer Esq.
Keller Rohrback LLP
801 Garden St.
Suite 301
Santa Barbara, CA  93101
Phone: 805-456-1496
cspringer@kellerrohrback.com
    Parties Represented:
    Bridgett Burk
    Cheryl Senko
    Jason Ariciu
    Jordan O'Hara
    Rev. Anthony Bell
    Samuel Armstrong
    Steven Akins
    Terry Fischer
    Tyler King

Lesley E. Weaver Esq.
Ms. Anne Davis
Matthew Montgomery Esq.
Bleichmar Fonti & Auld LLP
555 12th St.
Suite 1600
Oakland, CA   94607-3616
Phone: 415-445-4003
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
    Parties Represented:
    Bridgett Burk
    Cheryl Senko
    Jason Ariciu
    Jordan O'Hara
    Rev. Anthony Bell
    Samuel Armstrong
    Steven Akins
    Terry Fischer
    Tyler King

Orin S. Snyder Esq.
Gibson Dunn & Crutcher
200 Park Ave.
47th Floor
New York, NY   10166-0193
Phone: 212-351-4000
osnyder@gibsondunn.com
    Parties Represented:
    Facebook, Inc.

Russell H. Falconer Esq.
Gibson Dunn & Crutcher
2001 Ross Ave.
Suite 2100
Dallas, TX   75201
Phone: 214-698-3100
rfalconer@gibsondunn.com
    Parties Represented:
    Facebook, Inc.

Ms. Laura C. Mumm
Gibson Dunn & Crutcher
200 Park Ave.

Matthew S. Melamed Esq.
Angelica M. Ornelas Esq.
Joshua D. Samra Esq.
Bleichmar Fonti & Auld LLP
555 12th St.
Suite 1600
Oakland, CA   94607-3616
Phone: 415-445-4003
mmelamed@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com
    Parties Represented:
    Bridgett Burk
    Cheryl Senko
    Jason Ariciu
    Jordan O'Hara
    Rev. Anthony Bell
    Samuel Armstrong
    Steven Akins
    Terry Fischer
    Tyler King

Joshua S. Lipshutz Esq.
Gibson Dunn & Crutcher
1050 Connecticut Ave NW
Washington, DC   20036
Phone: 202-9558500
JLipshutz@gibsondunn.com
    Parties Represented:
    Facebook, Inc.

Colin B. Davis Esq.
Gibson Dunn & Crutcher
3161 Michelson Dr.
Irvine, CA   92612-4412
Phone: 949-451-3800
cdavis@gibsondunn.com
    Parties Represented:
    Facebook, Inc.

Benjamin Gould Esq.
Keller Rohrback LLP
1201 Third Ave.

New York, NY   10166
Phone: 212-351-4000
LMumm@gibsondunn.com
    Parties Represented:
    Facebook, Inc.

Suite 3200
Seattle, WA   98101-3052
Phone: 206-623-1900
bgould@kellerrohrback.com
    Parties Represented:
    Bridgett Burk
    Cheryl Senko
    Jason Ariciu
    Jordan O'Hara
    Rev. Anthony Bell
    Samuel Armstrong
    Steven Akins
    Terry Fischer
    Tyler King

      I declare under penalty of perjury the foregoing to be true and correct. Executed at El Monte,

CALIFORNIA on  December 20, 2021.

/s/ Anne Lieu
Anne Lieu
JAMS
alieu@jamsadr.com