# EXHIBIT A
# VOLUME ONE
# OF REDACTED VERSION OF DOCUMENT
# SOUGHT TO BE FILED UNDER SEAL

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
   osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Kristin A. Linsley (SBN 154148)
   klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
   mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
   dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
   jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**APPELLATE RECORD FOR FACEBOOK, INC.'S APPEAL OF SPECIAL MASTER'S AMENDED ORDER RE: PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF PLAINTIFF DATA** |

# TABLE OF CONTENTS

**Special Master's Amended Order Re: Plaintiffs' Motion To Compel Production Of Plaintiff Data (Dec. 17, 2021)** ................................................................... **0001**

**Facebook's Motion For Reconsideration Of Special Master's Order Regarding Named Plaintiff Data (Dec. 10, 2021)** ................................................................. **0009**

Ex. A - Declaration Of Martie Kutscher In Support Of Motion For Reconsideration ....... 0017

Ex. B - Declaration Of David Pope In Support Of Motion For Reconsideration ............... 0021

    Ex. A to Pope Declaration ......................................................................... 0026

Ex. C - Declaration Of Mengge Ji In Support Of Motion For Reconsideration ................. 0030

Ex. D - Declaration Of Ben Mitchell In Support Of Opposition To Plaintiffs' Motion To Compel Named Plaintiff Data ......................................................... 0042

Ex. E - Declaration Of Karandeep Anand In Support Of Opposition To Plaintiffs' Motion To Compel Named Plaintiff Data ................................................... 0047

Ex. F - December 9, 2020 Hearing Transcript ................................................... 0052

Ex. G - Special Master's Order Re: Plaintiffs' Motion To Compel Production Of Plaintiff Data ........................................................................... 0108

Ex. H - Plaintiffs' Reply In Support Of Motion To Compel Production Of Named Plaintiffs' Content And Information ..................................................... 0116

Ex. I - Discovery Order No. 9 ................................................................... 0130

Ex. J - Plaintiffs' Response In Reply To Facebook's Request To Enforce Partial Stay of Discovery And Cross-Motion To Compel ........................................... 0133

Ex. K - Discovery Order No. 11 ................................................................ 0147

**Special Master's Order Re: Plaintiffs' Motion To Compel Production Of Plaintiff Data (Nov. 29, 2021)** ......................................................................... **0150**

Ex. A - Plaintiffs' Second Set of Requests For Production To Facebook ..................... 0157

Ex. B - Categories of DYI Information .......................................................... 0178

Ex. C - August 14, 2020 Hearing Transcript .................................................... 0187

Ex. D – Plaintiffs' Opposition To Facebook's Request To Enforce Partial Stay Of Discovery And Cross-Motion To Compel ................................................ 0211

Ex. E - Facebook's Reply In Support Of Request To Enforce Partial Stay Of Discovery .......................................................................................... 0284

Ex. F - Discovery Order No. 9 ................................................................... 0299

Ex. G - Discovery Order No. 11 ................................................................. 0302

Ex. H - Plaintiffs' Motion To Compel Production Of Named Plaintiffs' Content And Information ............................................................................... 0305

Ex. I - Facebook's Opposition To Plaintiffs' Motion To Compel Production Of Named Plaintiffs' Content And Information .................................. 0322

Ex. J - Plaintiffs' Reply In Support Of Motion To Compel Production Of Named Plaintiffs' Content And Information .................................. 0342

Ex. K – Facebook's Response To Objection Regarding Named Plaintiffs' Data Briefing .................................................................. 0356

Ex. L - Bates No. FB-CA-MDL-00213424 ........................... 0364

**Facebook's Response To Objection Regarding Named Plaintiffs' Data Briefing (Nov. 15, 2021) .................................................. 0384**

**Corrected Declaration Of Derek Loeser In Support Of Plaintiffs' Reply In Support Of Motion To Compel Production Of Named Plaintiffs' Content And Information (Nov. 9, 2021) .................................................. 0391**

**Plaintiffs' Reply In Support Of Motion To Compel Production Of Named Plaintiffs' Content And Information (Nov. 2, 2021) .................. 0394**

**Declaration of Derek Loeser In Support Of Reply In Support Of Motion To Compel Production Of Named Plaintiffs' Content And Information (Nov. 2, 2021) .............. 0407**

Ex. A - January 15, 2021 Hearing Transcript ........................ 0410

Ex. B - Bates No. FB-CA-MDL-00203262 ........................... 0414

Ex. C - Barnes Deposition Transcript ................................. 0417

Ex. D - Bates No. FB-CA-MDL-01191149 ........................... 0423

Ex. E - Bates No. FB-CA-MDL-01744596 ........................... 0439

Ex. F - Comparison of Apps Identified for Plaintiff Ariciu .......... 2614

Ex. G - Papamiltiadis Deposition Transcript ......................... 2619

Ex. H - Bates No. FB-CA-MDL-00252922 ........................... 2623

Ex. I - February 26, 2020 CCPA Request ............................. 2635

Ex. J - April 10, 2020 CCPA Request Response ...................... 2639

**Facebook's Opposition To Plaintiffs' Motion To Compel Production Of Named Plaintiffs' Content And Information (Oct. 28, 2021) .................. 2641**

**Declaration of Martie Kutscher In Support Of Facebook's Opposition (Oct. 28, 2021) .................................................. 2660**

Ex. A - DYI Data Provided Via Share File ............................ 2665

Ex. B - Categories of DYI Information ................................ 2666

Ex. C - Declaration of Ben Mitchell In Support Of Opposition To Plaintiffs' Motion To Compel Named Plaintiff Data .................. 2675

Ex. D - Declaration Of Sukhesh Miryala In Support Of Opposition To Plaintiffs' Motion To Compel Named Plaintiff Data ................................................................ 2679

Ex. E - Declaration Of Karandeep Anand Declaration In Support Of Opposition To Plaintiffs' Motion To Compel Named Plaintiff Data ................................. 2684

Ex. F - Pretrial Order No. 20 ................................................................................. 2688

Ex. G - Plaintiffs' Second Set Of Requests For Production To Facebook ................. 2760

Ex. H – Plaintiffs' Notice of Non-Party Subpoena to Zynga Inc ........................ 2781

Ex. I - ESI Protocol ............................................................................................... 2798

Ex. J - May 15, 2020 Hearing Transcript ............................................................. 2827

Ex. K - Plaintiffs' Fourth Set of Interrogatories to Facebook ............................... 2870

Ex. L - Facebook's Request to Enforce Partial Stay of Discovery ........................ 2884

Ex. M - Plaintiffs' Opposition To Facebook's Request To Enforce Partial Stay Of Discovery And Cross-Motion To Compel .................................................... 2904

Ex. N – Facebook's Reply In Support Of Request To Enforce Partial Stay Of Discovery ............................................................................................................. 2926

Ex. O - Plaintiffs' Sur-Reply to Facebook's Request to Enforce Partial Stay of Discovery ............................................................................................................. 2941

Ex. P - Discovery Order No. 9 ............................................................................... 2955

Ex. Q - December 8, 2020 Joint Status Update .................................................... 2974

Ex. R - December 9, 2020 Hearing Transcript ..................................................... 2974

Ex. S – Plaintiffs Notice of Rule 30(b)(6) Deposition Of Facebook ................... 3029

Ex. T - January 15, 2021 Hearing Transcript ....................................................... 3042

Ex. U - Facebook's Second Amended Responses And Objections to Plaintiffs' Fourth Set of Interrogatories ......................................................................................... 3076

Ex. V - Papamiltiadis Deposition Transcript ........................................................ 3425

Ex. W - March 1, 2021 Correspondence ............................................................... 3549

Ex. X - April 1, 2021 Correspondence .................................................................. 3552

Ex. Y - September 10, 2021 Correspondence ........................................................ 3567

Ex. Z - September 16, 2021 Correspondence ........................................................ 3596

Ex. AA - Volume 46 Of Facebook Production Provided Via Share File ................ 3602

Ex. AB - Plaintiff Ariciu Location History Data .................................................. 3603

**Plaintiffs' Motion To Compel Production Of Named Plaintiffs' Content And Information (Oct. 18, 2021) ............................................................................ 3632**

**Declaration Of Derek W. Loeser In Support Of Plaintiffs' Motion To Compel (Oct. 18, 2021)** ..................................................................................................... **3648**

Ex. 01 - Plaintiffs' Second Set of Requests For Production to Facebook ......................... 3651

Ex. 02 - Plaintiffs' Fourth Set of Interrogatories to Facebook ........................................... 3672

Ex. 03 - Facebook's Reply In Support of Request To Enforce Partial Stay Of Discovery ......................................................................................................................... 3688

Ex. 04 - Plaintiffs' Opposition To Facebook's Request To Enforce Partial Stay Of Discovery And Cross-Motion To Compel ................................................................. 3703

Ex. 05 - Discovery Order No. 9 ............................................................................................... 3776

Ex. 06 - Discovery Order No. 11 ............................................................................................. 3779

Ex. 07 - Discovery Order No. 12 ............................................................................................. 3782

Ex. 08 - April 1, 2021 Correspondence .................................................................................. 3785

Ex. 09 - Facebook's Second Amended Responses And Objections to Plaintiffs' Fourth Set Of Interrogatories .................................................................................... 3800

Ex. 10 - August 14, 2020 Hearing Transcript ....................................................................... 4318

Ex. 11 - Bates No. FB-CA-MDL-00213424 ............................................................................ 4342

Ex. 12 - Bates No. FB-CA-MDL-00149613 ............................................................................ 4359

Ex. 13 - Bates No. FB-CA-MDL-00203262 ............................................................................ 4367

Ex. 14 - United States Patent Application Publication No. US 2017/0195435 .................. 4370

Ex. 15 - July 9, 2021 Correspondence .................................................................................... 4393

Ex. 16 - September 10, 2021 Correspondence ....................................................................... 4395

Ex. 17 - December 9, 2020 Hearing Transcript ..................................................................... 4424

Ex. 18 - Bates No. FB-1370841 from *Six4Three, LLC v. Facebook, Inc.* ........................... 4431

Ex. 19 - Bates No. FB-CA-MDL-01952478 ............................................................................ 4439

Ex. 20 – November 4, 2019 Hearing Transcript .................................................................... 4441

Ex. 21 - Bates No. FB-CA-MDL-01938268 ............................................................................ 4445

Ex. 22 - March 5, 2020 Hearing Transcript ........................................................................... 4450

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br> This document relates to: <br><br> ALL ACTIONS | **MDL NO. 2843** <br><br> CASE NO. 3:18-MD-02843-VC-JSC <br><br> HON. VINCE CHHABRIA <br> HON. JACQUELINE SCOTT CORLEY <br> COURTROOM 4 – 17TH FLOOR <br> SPECIAL MASTER, DANIEL GARRIE, ESQ. <br><br> **AMENDED ORDER RE: PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF PLAINTIFF DATA** |

# INTRODUCTION

1.      Pending before Special Master Garrie is Plaintiffs' Motion to Compel Production of Named Plaintiffs' Content and Information.

# BACKGROUND

2.      On November 25, 2019, Plaintiffs' served Requests for Production Nos. 9-13, which seek documents relating to the named Plaintiffs in this matter ("Named Plaintiffs").[1] See Plaintiffs' Motion to Compel Production of Named Plaintiffs' Content and Information, Exhibit 1. In brief, Request No. 9 seeks all documents relating to each of the Named Plaintiffs; Request No. 10 seeks documents sufficient to show the categories of content and information Facebook collects, tracks, and maintains about them; and Requests Nos. 11-13 seek documents identifying third parties that were able to access information about the Named Plaintiffs. Id.

3.      In response to Requests for Production Nos. 9-13, Facebook produced more than one million pages of individual user data it maintained relating to the Named Plaintiffs, most of which was obtained from the "Download Your Information" tool ("DYI Tool").[2] The data obtained from the DYI Tool is mostly limited to information pertaining to users' on platform Facebook activity. See Facebook's Opposition to Plaintiffs' Motion to Compel Production of Named Plaintiffs' Content and Information, Exhibit B.

4.      Statements by Facebook's counsel during an August 14, 2020 discovery hearing indicated that Facebook maintained additional data related to the Named Plaintiffs that was not produced. See 8/14/2020 Discovery Hearing Transcript at 8:10-13 ("There is other – there's

---

[1] There were originally 30 named Plaintiffs, but this has been reduced to nine named Plaintiffs.

[2] The DYI Tool is a tool by which Facebook users can download certain pieces of information related to the user's Facebook activity and related data. A list of the types of information that can be downloaded via the DYI Tool is provided in Exhibit B.

**AMENDED ORDER RE: PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF PLAINTIFF DATA**

Facebook-generated information, information generated by third parties, information received from third parties. We have not represented that that is comprehensively included in our production.").

5.     Plaintiffs filed a motion last September to compel additional discovery related to Requests for Production Nos. 9-13. <u>See</u> Plaintiffs' Motion to Compel Production of Named Plaintiffs' Content and Information, Exhibit 4. Plaintiffs asked the Court to compel production of sensitive information Facebook derives and collects from business partners, app developers, apps, and other sources. This request included "native, appended and behavioral data" and purportedly anonymized data that could be connected to the Named Plaintiffs. <u>Id.</u> at 7-11.

6.     On October 8, 2020, Facebook responded to Plaintiffs' motion to compel. <u>See</u> Plaintiffs' Motion to Compel Production of Named Plaintiffs' Content and Information, Exhibit 3. Facebook contended that all information related to the Named Plaintiffs that they did not themselves share on Facebook was outside the scope of the case; that all information not shared through one of the four theories of the case was not within the scope of the case; that Plaintiffs were not entitled to all data collected from third parties about the Named Plaintiffs; that the Stored Communications Act and Video Protection Privacy Act claims did not require the production of additional data Facebook had collected about the Named Plaintiffs; and that Facebook could not reasonably collect any of the additional information Plaintiffs sought. <u>Id.</u> at 6-10.

7.     On October 29, 2020, Judge Corley issued Discovery Order No. 9, ruling "that discovery is not as limited as Facebook contends" and "the discoverable user data at issue includes: [1] Data collected from a user's on-platform activity; [2] Data obtained from third

parties regarding a user's off-platform activities; and [3] Data inferred from a user's on or off-platform activity." <u>See</u> Discovery Order No. 9 at 2.

8.      In Discovery Order No. 11, Judge Corley provided further clarification on the discoverable user data intended to be included under Discovery Order No. 9:

> It also contended that Plaintiffs conceded that user data not shared with or accessible to third parties is not relevant, (Dkt.No. 548 at 10), and because Facebook does not share inferred user data, the inferred user data Facebook maintains is not relevant. Facebook both collects and uses data about its users as part of its business model, including data derived from third parties. How it specifically uses this data is an open question, but if the Court were to accept Facebook's arguments about the scope of production, it would eliminate Discovery Order No. 9's third category of discovery: data inferred from a user's on or off-platform activity. What is needed now is more detail about Facebook's collection and use of user data so future discovery requests can be tailored to Plaintiffs' better understanding of the internal operations of Facebook as well the terminology it uses for describing data that is potentially responsive to Plaintiffs' discovery requests. <u>See</u> Discovery Order No. 11 at 1.

9.      Following Judge Corley's orders, Facebook did not produce additional documents in response to Requests for Production Nos. 9-13.

10.      On October 6, 2021, Special Master Garrie and Judge Andler declared impasse on the issue of whether Facebook should be compelled to produce additional documents related to the Named Plaintiffs pursuant to Discovery Order No. 9.

11.      On October 18, 2021, Plaintiffs submitted their opening brief to Special Master Garrie on this issue. <u>See</u> Plaintiffs' Motion to Compel Production of Named Plaintiffs' Content and Information. Plaintiffs argue that (a) the court has already determined the information Plaintiffs seek is relevant—whether or not Facebook claims that it has been shared; (b) whether the Named Plaintiffs' information was shared is a contested question on which Plaintiffs are entitled to evidence; (c) Facebook has failed to substantiate a disproportionate burden in

**AMENDED ORDER RE: PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF PLAINTIFF DATA**

identifying the data it possesses relating to nine people; and (d) Plaintiffs have made proposals to reduce the burden of production on Facebook. Id.

12.    On October 28, 2021, Facebook submitted its Opposition to Plaintiffs' Motion to Compel Production of Named Plaintiffs' Content and Information. See Opposition to Plaintiffs' Motion to Compel Production of Named Plaintiffs' Content and Information. Facebook argues, among other things, that (a) the scope of discovery is limited to information Facebook shared with third parties; (b) Plaintiffs are judicially estopped from seeking information that was not shared; and (c) the information Plaintiffs now seek is nonresponsive and otherwise unavailable. Id.

13.    On November 2, 2021, Plaintiffs submitted their Reply in which they argue, among other things, (a) Judge Corley's orders entitle Plaintiffs to the discovery they seek; (b) Plaintiffs are entitled to probe Facebook's assertion that it has already produced all the content and information it has shared or made accessible to third parties; (c) Plaintiffs are entitled to answers to Interrogatories 16 and 17; and (d) the relief Plaintiffs are requesting is intended to lighten Facebook's burden. See Reply in Support of Plaintiffs' Motion to Compel Production of Named Plaintiffs' Content and Information.

14.    Facebook subsequently objected to Plaintiffs reply claiming that Plaintiffs introduced new arguments and evidence for the first time, in violation of the Discovery Protocol. See Facebook's Response to Plaintiffs' Objection Regarding Named Plaintiffs' Data Briefing ("Plaintiffs sought **new relief** and introduced **twelve new documents** that Plaintiffs suddenly claim show gaps in Facebook's productions.").

15.    On November 29, 2021, Special Master Garrie issued an Order Re: Plaintiff's Motion to Compel Plaintiff Data.

16.     On December 10, 2021, Facebook submitted a Motion for Reconsideration of the Order Re: Plaintiff's Motion to Compel Plaintiff Data.

**FINDINGS**

17.     Special Master Garrie finds that Discovery Order No. 9 does not limit the scope of discoverable data related to the Named Plaintiffs to data that was shared with third parties, as Facebook contends, because Judge Corley's ruling contains no language indicating such a limitation: "Accordingly, the court rules the discoverable user data at issue includes: [1] Data collected from a user's on-platform activity; [2] Data obtained from third parties regarding a user's off-platform activities; and [3] Data inferred from a user's on or off-platform activity." See Discovery Order No. 9 at 2.

18.     Moreover, Judge Corley clarified that Facebook's interpretation of Discovery Order No. 9 is not what Judge Corley intended: "How [Facebook] specifically uses this data is an open question, but if the Court were to accept Facebook's arguments about the scope of production, it would eliminate Discovery Order No. 9's third category of discovery: data inferred from a user's on or off-platform activity." See Discovery Order No. 11, at 1.

19.     Special Master Garrie finds that Facebook appears to maintain data related to the Named Plaintiffs that was not produced in response Requests for Production Nos. 9-13. See 8/14/2020 Discovery Hearing Transcript at 8:10-13 ("There is other – there's Facebook-generated information, information generated by third parties, information received from third parties. We have not represented that that is comprehensively included in our production."). For example, documents produced by Facebook indicate that Facebook collects data referred to as "Appended Data," including public records, auto registration data, retail purchases, and credit card purchases, all of which fall into the second category of data from Discovery Order No. 9. See Plaintiffs'

**AMENDED ORDER RE: PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF PLAINTIFF DATA**

Motion to Compel Production of Named Plaintiffs' Content and Information, Exhibit 11 (FB-CA-MDL-00213424). However, Facebook has not produced this data as it is not available via the DYI Tool. <u>See</u> Facebook's Opposition to Plaintiffs' Motion to Compel Production of Named Plaintiffs' Content and Information, Exhibit B.[3]

20.    Special Master Garrie finds that Plaintiffs requested new relief (answers to Interrogatories 16-17) and introduced new evidence (exhibits C, D, E, F, H, I, and J to Plaintiffs' Reply) in their Reply brief in violation of the Discovery Protocol. Accordingly, Special Master Garrie did not consider this request for new relief or the new evidence items in reaching the findings herein.

//

//

//

//

//

//

//

//

//

//

//

---

[3] Facebook also appears to maintain data relating to the Named Plaintiffs' on-platform activity that has not been provided, such as inferred interest and behavior data. <u>See</u> Exhibit L.

**AMENDED ORDER RE: PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF PLAINTIFF DATA**

# ORDER

21.     No later than December 28, 2021, Facebook is to provide the following information for each of the data sources listed in Exhibit A to the Declaration of David Pope, submitted with Facebook's Motion for Reconsideration of the Order Re: Plaintiff's Motion to Compel Plaintiff Data: (1) a high level description of the most common functions and purposes of the system; and (2) the business units, divisions, or groups that use the system.

22.     No later than January 5, 2022, Plaintiffs are to submit a list of systems from which Plaintiffs believe Facebook should produce data relating to the named Plaintiffs, explaining for each system why they believe the data should be produced. Special Master Garrie will subsequently issue a ruling on the systems from which Facebook is to produce named Plaintiff data.

**IT IS SO ORDERED.**

Friday, December 17, 2021

Daniel Garrie
Discovery Special Master

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
  klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
  mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
  dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br> This document relates to: <br><br> ALL ACTIONS | CASE NO. 3:18-MD-02843-VC <br><br> **MOTION FOR RECONSIDERATION OF SPECIAL MASTER'S ORDER REGARDING NAMED PLAINTIFF DATA** |

I.    **Introduction**

        Facebook respectfully seeks reconsideration of the Special Master's November 29, 2021 Order re: Plaintiffs' Motion to Compel Production of Plaintiff Data (the "tentative order"). The tentative order, if it became final, would require Facebook ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ When Facebook initially raised this infeasibility to Judge Corley, Plaintiffs *insisted* that they were not seeking user data relating to Named Plaintiffs *__unless it was shared or made accessible__* to third parties, and they assured the Court that this limitation would *__narrow the information Facebook had to produce__*. The focus then turned to whether Facebook had produced the three categories of user data that Judge Corley found potentially relevant, with the understanding that it could be relevant only if it met the "shared or made accessible" test that Plaintiffs themselves advanced.

        The Special Master's tentative order threatens to undo this forward progress and send the parties back to square one. Facebook thus seeks reconsideration of the tentative order (1) to the extent that it unwinds more than one year of negotiations, litigation, and the parties' agreement by expanding relevant Named Plaintiff data *beyond* data that was shared or made accessible, and (2) because compliance with the tentative order as written, particularly within the specified timeframe, is not feasible, as set forth in the accompanying declarations of Mengge Ji and David Pope.

II.    **Facebook seeks reconsideration of the Special Master's finding that data relating to the Named Plaintiffs is discoverable even if not shared.**

        Facebook seeks reconsideration of the Special Master's finding that "Discovery Order No. 9 does not limit the scope of discoverable data related to the Named Plaintiffs to data that was shared with third parties . . . because Judge Corley's ruling contains no language indicating such a limitation." Order ¶ 15 (Exhibit G).

        1.    Discovery Order No. 9 *does* state that the user data relevant to this case is limited to shared data. But Discovery Order No. 9 largely addressed a separate issue. In the briefs underlying Discovery Order No. 9, Facebook argued that relevant user data is data that users posted *on Facebook*. Judge Corley rejected this position on the basis that relevant data includes all data that Facebook **shares** with third parties (whether posted on Facebook or not). Judge Corley wrote: "Plaintiffs correctly argue

that Facebook's restrictive view of relevant discovery would exclude an enormous amount of information that Facebook collects and **shares** with third parties about Facebook's users.  The district court's order (Dkt. No. 298) did not limit Plaintiffs' claims to only challenging the **sharing** of data Facebook collects from a user's on-platform activity; the claims also challenge Facebook's **sharing** of user data and alleged failure to monitor how third parties used such **shared** information."  Dkt. 557 at 1–2 (emphases added) (Exhibit I).  Judge Corley went on to describe three categories of discoverable data that included both on-Facebook and off-Facebook activities.  *Id.* at 2.  Her description of these categories of data did not reverse her prior language clarifying that the scope of Plaintiffs' live claims— and therefore the scope of relevant discovery—concerns "Facebook's sharing of user data."  *Id.*

2.  Discovery Order No. 9 did not dedicate significant space to clarifying that the scope of discoverable user data is data that Facebook shared with third parties because *__the parties agreed__* on this point.  In the briefing underlying Discovery Order No. 9, Plaintiffs stated: "Plaintiffs seek only a holding that the sensitive data Facebook collected about *ten Named Plaintiffs* and *shared* with third parties is relevant."  Dkt. 547-3 at 9 (emphasis in original) (Exhibit J).[1]  Plaintiffs explicitly represented that their narrowed request would narrow the scope of discovery:  "Plaintiffs do not contend that information that was not shared is relevant, *__which substantially narrows the information Facebook would be required to produce in this case__*."  *Id.* (emphasis added).  In particular, Plaintiffs told Judge Corley that they did "not demand . . . 'that Facebook search *millions* of disaggregated data sets for any data to have ever crossed Facebook's systems relating to a Named Plaintiff and any derivative materials drawing on that data.'"  *Id.* (quoting Facebook's opposition brief).  The Special Master's tentative order, however, would require exactly that.

3.  At the December 9, 2020 hearing before Judge Corley on this subject, counsel for Plaintiffs reiterated that the information that they sought about Named Plaintiffs was "information

---

[1] Plaintiffs repeated this position numerous times in their briefing. *See* Dkt. 547-3 at 1 ("This discovery dispute concerns sensitive user information that Facebook has shared with third parties without users' consent."); *id.* at 2 ("[S]ensitive user information is relevant if Facebook shared it without users' consent."); *id.* at 4 ("[T]he legal theories upheld at the pleading stage" turn on "whether Facebook shared [sensitive information] with third parties."); *id.* at 5 ("Plaintiffs have standing . . . because their sensitive information was disseminated to third parties in violation of their privacy." (quotation marks and citation omitted)); *id.* at 9 ("Plaintiffs seek an order holding that all sensitive data about the ten Named Plaintiffs that Facebook shared with or made accessible to third parties is relevant to this action.").

MOTION FOR RECONSIDERATION OF SPECIAL MASTER'S ORDER REGARDING NAMED PLAINTIFF DATA
CASE NO. 3:18-MD-02843-VC

1   shared or made accessible." Opp. Ex. R at 18:15–16 (Exhibit F) (argument by Counsel Loeser to Judge

2   Corley).

3         4.      In briefing before the Special Master, Plaintiffs again conceded: "Plaintiffs have always

4   sought, and continue to seek, content and information that has been shared with or made accessible to

5   third parties. And they are not arguing that content and information is relevant if Facebook did not

6   share it with or make it accessible to third parties." Plaintiffs' Reply at 1 (Exhibit H).

7         5.      By declining to "limit the scope of discoverable data related to the Named Plaintiffs to

8   data that was shared with third parties," Order ¶ 15, the Special Master's tentative order could inject

9   the extremely burdensome discovery that the parties and Judge Corley have already recognized is not

10   at issue. To the extent the Special Master meant only that discoverable information included

11   information "shared *or made accessible*"—which would be consistent with Plaintiffs' statements and

12   Judge Corley's orders—Facebook respectfully requests that the tentative order be clarified to say so.

13         6.      The Special Master's order also cites Discovery Order No. 11 as evidence that "Judge

14   Corley clarified that Facebook's interpretation of Discovery Order No. 9 is not what Judge Corley

15   intended." Order ¶ 16. Judge Corley did not issue Discovery Order No. 11 in order to clarify or expand

16   her prior order. Judge Corley issued Discovery Order No. 11 to describe the scope of a 30(b)(6)

17   deposition that she authorized at a December 9, 2020 discovery hearing. Dkt. 588 at 1 (Exhibit K).

18   The purpose of that deposition was to allow Plaintiffs to explore whether any data Facebook shares

19   with third parties had not been produced for the Named Plaintiffs. Facebook had already explained

20   that it does not share inferences about users with third parties. *See* Opp. Ex. R. at 20:15–18.[2] But

21   Plaintiffs expressed "disbelief" in Facebook's representations about what data was shared with third

22   parties, and demanded a deposition to verify those representations: "We just don't believe . . . their

23   description **of what is or is not shared or made accessible**. We need to put somebody under oath and

24   have them testify about that." *Id.* at 26:7–9, 28:15–17 (emphasis added). Judge Corley therefore

25

26   [2] This is for a basic technological reason. When a third party—such as an app developer or business
27   partner—obtains user-related data, it accesses it through an "application programming interface," or
    "API." Opp. Ex. E ¶¶ 3–7 (Exhibit E). The APIs at issue pulled information from Facebook's "Social
28   Graph," not data warehouses like Hive. *See id.* A user's DYI file, which Facebook produced for all
    Named Plaintiffs, contains the most complete current set of data about that user that is in the Social
    Graph (and more). *See* Opp. Ex. C ¶ 5 (Exhibit D).

0012

allowed Plaintiffs to conduct a 30(b)(6) deposition for that purpose: "to verify the representation that yes, we collect this information—inferential data, but it is not made accessible to third parties." *Id.* at 35:3–5.

7.       Discovery Order No. 11 describes the scope of the deposition Judge Corley authorized; it does not alter Discovery Order No. 9. The statement from Discovery Order No. 11 that the Special Master quoted in his order confirms this: "How [Facebook] specifically uses this data is an open question, but if the Court were to accept Facebook's arguments about the scope of production, it would eliminate Discovery Order No. 9's third category of discovery: data inferred from a user's on or off-platform activity." Order ¶ 16 (quoting Discovery Order No. 11). That statement confirms that *if Facebook did not share inferred data*—the question that the 30(b)(6) deposition was meant to verify— then *the third category of data would not be discoverable*. Respectfully, the Special Master's reading of this statement to mean that non-shared data is discoverable is incorrect and contrary to Discovery Order No. 9, the briefing underlying it, Discovery Order No. 11, and the entire purpose of the 30(b)(6) deposition that Judge Corley authorized.

**III.    In any event, Facebook seeks reconsideration of the Special Master's order regarding what information Facebook must produce.**

Even if the Special Master does not reconsider his finding that "Discovery Order No. 9 does not limit the scope of discoverable data related to the Named Plaintiffs to data that was shared with third parties," Order ¶ 15, Facebook respectfully requests reconsideration of the portion of the Special Master's tentative order regarding the information Facebook must produce at this time. Facebook is prepared to "provide a list of data sources that may," to the best of Facebook's current knowledge, "contain information related to" Facebook users, which may include "the Named Plaintiffs." Order ¶ 19. But complying with the other aspects of the Special Master's order is not feasible, particularly within the proposed timeframe. Facebook has good cause to raise each of these issues in a motion for reconsideration because (i) Facebook understood that the parties and Court were in agreement that information that was not "shared or made accessible" to third parties was not discoverable, *see* Ex. A (Kutcher Decl.) ¶¶ 1-6, and (ii) the Special Master's Order requires Facebook to provide information Plaintiffs did not request in their Motion to Compel, *id* at ¶ 7.

8. *First*, Facebook requests reconsideration of the Special Master's order that it provide "the name of [all] database[s] or data log[s]" that "may contain information related to the Named Plaintiffs," Order ¶ 19, as Facebook does not presently have a full list of these sources and is unable to prepare one within a reasonable time period. ██████████████████████████████████████

████████████████████████████████████████████████████████████████████ *See* Ex. B ¶ 3 (Pope Decl.). ████████████████████████████████████████████████████████████

████████████████████████████████ *See id.* ¶ 10. Facebook is providing with this motion a list of the data systems it has identified to date as storing or interacting with user data (without accounting for whether that data is aggregated or de-identified from a user's account), but this project is not yet complete and Facebook cannot yet identify all of the "data logs" within each of the data systems identified. *See id.* ¶¶ 3–4, 6; *id.* Ex. A.

9. *Second*, Facebook requests reconsideration of the Special Master's order that it provide "a description of [each] data source's purpose and function." Order ¶ 19. ████████████████████

████████████████████████████████████████████████████████████████████ *See* Ex. B ¶ 7 (Pope Decl.). ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ *See id.* ¶ 9.

10. *Third*, for the same reasons, Facebook requests reconsideration of the Special Master's order that it provide "a description of the types of Named Plaintiff data contained in the data source." Order ¶ 19. ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ *See* Ex. B ¶¶ 8–9 (Pope Decl.).

11. *Fourth*, Facebook requests reconsideration of the Special Master's order that the parties submit "a proposed protocol for the production of Named Plaintiffs' data from the data sources identified by Facebook." Order ¶ 20. ████████████████████████████████████████████████

Gibson, Dunn &
Crutcher LLP

0014

1

2                                                                                                    *See*

3   Ex. C ¶¶ 10–31 (Ji Decl.).

4

5

6

7                                                    *See* Ex. B ¶¶ 10–11 (Pope Decl.).  Moreover, any data ultimately

8   retrieved as a result of these massive efforts would likely be irrelevant and unusable,

9                                                    *See* Ex. C ¶¶ 10, 23 (Ji Decl.).

10  **IV.     Conclusion**

11          Facebook respectfully asks the Special Master to reconsider his finding that data relating to the

12  Named Plaintiffs is discoverable even if not shared.  Even if the Special Master does not reconsider

13  that finding, Facebook respectfully requests that the Special Master reconsider what information

14  Facebook must produce.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Dated:  December 10, 2021          **GIBSON, DUNN & CRUTCHER, LLP**

2                                        By: */s/ Deborah Stein*
                                         Orin Snyder (*pro hac vice*)
3                                        osnyder@gibsondunn.com
                                         200 Park Avenue
4                                        New York, NY 10166-0193
                                         Telephone:  212.351.4000
5                                        Facsimile:  212.351.4035

6                                        Deborah Stein (SBN 224570)
                                         dstein@gibsondunn.com
7                                        333 South Grand Avenue
                                         Los Angeles, CA 90071-3197
8                                        Telephone:  213.229.7000
                                         Facsimile:  213.229.7520

9
                                         Joshua S. Lipshutz (SBN 242557)
10                                       jlipshutz@gibsondunn.com
                                         1050 Connecticut Avenue, N.W.
11                                       Washington, DC 20036-5306
                                         Telephone:  202.955.8500
12                                       Facsimile:  202.467.0539

13                                       Kristin A. Linsley (SBN 154148)
                                         klinsley@gibsondunn.com
14                                       Martie Kutscher (SBN 302650)
                                         mkutscherclark@gibsondunn.com
15                                       555 Mission Street, Suite 3000
                                         San Francisco, CA 94105-0921
16                                       Telephone:  415.393.8200
                                         Facsimile:  415.393.8306

17

18                                       *Attorneys for Defendant Facebook, Inc.*

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

MOTION FOR RECONSIDERATION OF SPECIAL MASTER'S ORDER REGARDING NAMED PLAINTIFF DATA
CASE NO. 3:18-MD-02843-VC

0016

# EXHIBIT A

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
    osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
    klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
    mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
    dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
    jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DECLARATION OF MARTIE KUTSCHER IN SUPPORT OF FACEBOOK, INC.'S MOTION FOR RECONSIDERATION OF SPECIAL MASTER'S ORDER REGARDING NAMED PLAINTIFF DATA** |

DECLARATION OF MARTIE KUTSCHER IN SUPPORT OF FACEBOOK, INC.'S MOTION FOR RECONSIDERATION OF SPECIAL MASTER'S ORDER REGARDING NAMED PLAINTIFF DATA
CASE NO. 3:18-MD-02843-VC

0018

I, Martie Kutscher, hereby declare as follows:

1.    I am an associate at the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for Facebook, Inc. ("Facebook") in the above-captioned matter. I am a member in good standing of the State Bars of California, New Jersey, and New York. I submit this declaration in support of Facebook's Motion for Reconsideration of the Special Master's Order Regarding Named Plaintiff Data. I make this declaration on my own knowledge, and I would testify to the matters stated herein under oath if called upon to do so.

2.    In briefing before Judge Corley in October 2020, Plaintiffs wrote: "Plaintiffs seek only a holding that the sensitive data Facebook collected about *ten Named Plaintiffs* and *shared* with third parties is relevant. Plaintiffs do not contend that information that was not shared is relevant, which substantially narrows the information Facebook would be required to produce in this case." Dkt. 547-3 at 9 (emphasis in original). Plaintiffs also stated that they did "not demand . . . 'that Facebook search *millions* of disaggregated data sets for any data to have ever crossed Facebook's systems relating to a Named Plaintiff and any derivative materials drawing on that data—such as data sets tracking hours of peak user activity to monitor strains on Facebook's system.'" *Id.* (quoting Facebook's opposition brief).

3.    Plaintiffs also stated at a hearing before Judge Corley that the information they sought about Named Plaintiffs was "information shared or made accessible" to third parties. Opp. Ex. Q at 18:15–16.

4.    Judge Corley's order similarly reflected the parties' agreement that discoverable information was limited to information that was shared or made accessible to third parties. *See* Opp. Ex. P ("The district court's order (Dkt. No. 298) did not limit Plaintiffs' claims to only challenging the **sharing** of data Facebook collects from a user's on-platform activity; the claims also challenge Facebook's **sharing** of user data and alleged failure to monitor how third parties used such **shared** information.") (Discovery Order No. 9) (emphases added); *see also, e.g.*, Opp. Ex. R at 35:3–5 (stating that the purpose of the Rule 30(b)(6) deposition she authorized was "to verify the representation that yes, we collect this information—inferential data, but it is not made accessible to third parties") (Dec. 9, 2020 hearing).

1

DECLARATION OF MARTIE KUTSCHER IN SUPPORT OF FACEBOOK, INC.'S MOTION FOR RECONSIDERATION OF SPECIAL MASTER'S ORDER REGARDING NAMED PLAINTIFF DATA
CASE NO. 3:18-MD-02843-VC

0019

5.     Based on these and other similar statements from Plaintiffs and Judge Corley, Facebook understood that the parties and Court were in agreement that information that was not "shared or made accessible" to third parties was not discoverable.

6.     Because Facebook understood the parties to agree on this point, Facebook's initial briefing before the Special Master did not detail the extremely burdensome nature or impossibility of identifying and producing **all** data related to the Named Plaintiffs.  In light of the Special Master's tentative order, Facebook provides greater detail on those issues in its motion for reconsideration and accompanying declarations.

7.     The Special Master's tentative order also requires Facebook to provide "a description of the types of Named Plaintiff data contained in [each] data source."  Order ¶ 19.  Plaintiffs did not request such a description in their motion to compel, so Facebook did not discuss the burden of providing such a description in its initial briefing before the Special Master.  In light of the Special Master's tentative order, Facebook provides greater detail on this issue in its motion for reconsideration and accompanying declarations.

8.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 10, 2021 in Palo Alto, California.

_Martie Kutscher Clark_

Martie Kutscher

2

DECLARATION OF MARTIE KUTSCHER IN SUPPORT OF FACEBOOK, INC.'S MOTION FOR RECONSIDERATION OF SPECIAL MASTER'S ORDER REGARDING NAMED PLAINTIFF DATA
CASE NO. 3:18-MD-02843-VC

0020

# EXHIBIT B

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
    osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Kristin A. Linsley (SBN 154148)
    klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
    mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
    dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz  (SBN 242557)
    jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington,  DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DECLARATION OF DAVID POPE IN SUPPORT OF FACEBOOK, INC.'S MOTION FOR RECONSIDERATION OF THE SPECIAL MASTER'S ORDER RE PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF PLAINTIFF DATA**<br><br>Discovery Special Master Daniel Garrie, Esq. |

**DECLARATION OF DAVID POPE IN SUPPORT OF FACEBOOK, INC.'S MOTION FOR RECONSIDERATION OF THE SPECIAL MASTER'S ORDER RE PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF PLAINTIFF DATA**

I, David Pope, declare:

1. I am a Group Technical Program Manager on the Core Infra Team at Meta, Inc. f/k/a Facebook, Inc. (hereinafter "Facebook"). I make this declaration on my own knowledge, and I would testify to the matters stated herein under oath if called upon to do so.

2. In my role as a Group Technical Program Manager, I am responsible for supporting the Core Infra Engineering teams. Through my work at Facebook, I am familiar with Facebook's efforts to inventory its data systems and the data assets (*i.e.*, individual logs, data sets, or other units of data) within them.

3. My team and others have been working to inventory all of the data systems (*i.e.*, data storage or analysis tools) within Facebook and understand which of them retain user data.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████

4. A list of the data systems we have identified as storing or interacting with user data is attached hereto as **Exhibit A**.

5. I understand that the Special Master in this matter has requested that Facebook produce "a list of data sources that may contain" user data and for each source provide (1) "the name of the data source or data log"; (2) "a description of the data source's purpose and function"; and (3) "a description of the types of [user data] . . . contained in the data source."

6. The inventory my team has compiled does not include all "data logs" within each of the data systems identified.

7.     My team also has not compiled a comprehensive description of every data system's "purpose and function." Rather, the "purpose and function" of a data system may vary depending on the team that is using it. Many data systems are used by multiple teams.

8.     Last, my team has not analyzed the "types of user data" within each data system, which can also vary depending on the team using the system.

9.     Based on my experience, gathering these additional data points about each of the 149 data systems we have identified as containing user data would likely require us to repeat the same process we implemented to compile this inventory, ███████████████████████████████ ████████████████████████████████████████████

10.    My team and others have separately begun a process of inventorying specific data assets (*e.g.*, specific data sets or logs). ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████

11.    ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████

I declare under penalty of perjury that the foregoing is true and correct, and that I executed this Declaration on December 10, 2021, in Belmont, California.


_____

David Pope

**Exhibit A to Pope Declaration**

**Data Systems That May Store or Interact With User Data**





2

0027



3



4

# EXHIBIT C

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
  klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
  mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
  dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DECLARATION OF MENGGE JI IN SUPPORT OF FACEBOOK, INC.'S MOTION FOR RECONSIDERATION OF THE SPECIAL MASTER'S ORDER RE PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF PLAINTIFF DATA**<br><br>Discovery Special Master Daniel Garrie, Esq. |

**DECLARATION OF MENGGE JI IN SUPPORT OF FACEBOOK, INC.'S MOTION FOR RECONSIDERATION OF THE SPECIAL MASTER'S ORDER RE PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF PLAINTIFF DATA**

I, Mengge Ji, declare as follows:

1.     I am a Data Scientist at Meta, Inc. f/k/a Facebook, Inc. ("Facebook"). My job responsibilities include, among other things, understanding and working with Facebook's data systems, writing queries and conducting analyses of these data, researching Facebook's data and related technologies, and locating, analyzing, and exporting data for production in litigation and other legal matters. I submit this declaration in support of Facebook's motion for reconsideration of the Special Master's Order re Plaintiffs' Motion to Compel Production of Plaintiff Data. Unless otherwise stated, I have personal knowledge of the facts set forth herein, and, if called as a witness, I could and would competently testify thereto.

2.     In my role as Data Scientist at Facebook, I am familiar with the general categories of user information Facebook maintains, where that data might be stored, and how they can potentially be accessed.

## Data Contained in Facebook's Social Graph Related to Users' Activities on Facebook

3.     Facebook users directly provide Facebook with data or information when using the Facebook platform. For instance, a user can upload a photo directly to her Facebook profile, which Facebook retains in order to display when that profile is accessed (if the user's privacy settings allow it). If the user "tags" a friend in that photo, Facebook also retains a record of which other Facebook user has been identified as appearing in that photo. In essence, the entire Facebook product that users interact with is a web of data points and relationships between data points that Facebook's systems present in a user-friendly format.

4.     Facebook uses the term the "Social Graph" to describe this complex web of people, places, things, actions, and connections on the Facebook platform. As Facebook users navigate through Facebook and interact with it—including, for example, by commenting on

posts made by other users, watching videos, posting photos, and sending messages—the users create new relationships and connections between themselves and the content they are able to see. The activities a user takes on the Facebook platform, including posting pictures to their profiles, tagging friends in photos, and commenting on friends' timelines, are reflected in the Social Graph.

5. The Facebook product that users see is powered by a series of databases that work in tandem to provide Facebook users a seamless experience.[1] The key databases Facebook uses to support the Facebook product, which store the user content and information presently accessible via the Social Graph, are:



---

[1] Facebook's Social Graph is not powered by a single database. Rather, Facebook is powered by an extraordinarily complex information architecture that stores information in various databases. The information in these databases is generally not human-readable and instead is intended to be processed for human consumption through Facebook's production environment.

**[REDACTED]**

**[REDACTED]**

**[REDACTED]** [2]

6.     Between them, these databases contain trillions of data points provided to Facebook by its more than 2 billion users, many of which need to be readily accessible at all times so that users can view them as they use the Facebook product. As a result, the data infrastructure underlying the Social Graph is not only extraordinarily complex, but has also been specifically designed to serve the needs of the Facebook product.

7.     One of the functions of the Facebook product is to be able to specifically identify user profiles or other sets of information associated with specific users. **[REDACTED]**

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**

8.     **[REDACTED]**

**[REDACTED]**

**[REDACTED]** **[REDACTED]**

**[REDACTED]**

**[REDACTED]**

9.     I understand that Facebook's "Download Your Information" or "DYI" tool retrieves data from and allows users to download a copy of data Facebook associates with their

---

[2]     The Everstore database is in the process of being deprecated. The data contained in Everstore is being transitioned to Manifold.

Facebook account, including data associated with their account in the Social Graph. In order to compile this information, the DYI tool runs a set of searches that have been engineered by the DYI product team in order to pull data associated with that user from the Social Graph. The resulting data is presented in a user-readable format, rather than as code or strings of data.

**Analytics Data Stored in Facebook's Data Warehouse ("Hive")**

10.     Facebook also stores data sets that it uses for internal analytics, product development, and other business functions. ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

11.     Facebook's internal analytics data is primarily stored in a data warehouse called Hive, which exists separately from the Social Graph. ████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████ █

████████████████████████████████████████████████████████

█████████████████████████████████████████████

12.     The Hive data warehouse is contained across a decentralized set of data centers, spread across the world. ██████████████████████████████████████████

████████████████████████████████████

13.     In addition to the Social Graph and Hive, I am aware of several other databases that contain data related to Facebook users, including data that is anonymized. ████████████

████████████████████████████████████████████████████

14. I have also consulted with other members of the Data Science team regarding this question. ██████████████████████████████████████

██████████████████████████████████████

15. ██████████████████████████████████████

██████████████████████████████████████████████████

██████

*Searching Within Hive*

16. ██████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████

17. ██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

18.     ████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

19.     ████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████   ██████████████████████

20.     ████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

21.   ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████

22.   ██████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████   ███████████████████████

███████████████████████████████████████████████

███████   █████████████████████████████████████

██████████

23.   ████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████   ███

████████████████████████████   ████████████████

███████████████████████████████████████████████

████████████████████

*Exporting Data from Hive*

24. ██████████████████████████████████████

████████████████████████████████████████████████

████ ██████████████████████████████████████████████

█████████████████████████████████

25. ██████████████████████████████████████

████████████████████████████████████ ██████████

██████████████████████████████████████████████████

█████ ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███

26. ████████████████████████████████████████████

██████████████████

27. ██████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████

28. ████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████

29.     Preparing any productions also requires substantial additional resources from senior members of the eDiscovery data scientist team to prepare for and manage the coding and export prcject. Moreover, after the initial exported files have been created, it would take additional time for a review team to validate the queries and data and perform additional quality control, or longer if there are issues that require remediation.

30.     ███████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████ The Facebook eDiscovery team, which is responsible for assisting Facebook in-house and outside counsel in active litigations and other legal matters, in addition to building and maintaining internal infrastructure crucial to the management and preservation of data on legal hold, does not have the time and resources required to search for, access, analyze, and export the data in millions of Hive tables in the manner described above.

31.     Facebook cannot materially shorten this timeline by hiring new employees ███████████████████████████████████████████████ █████████████████████████████████████████ ███████████████████████████████ For the same reason, Facebook cannot simply engage third party consultants or temporary employees to handle this data export. Nor would adding more servers—which would require diverting them from their use in the ordinary course of business—necessarily reduce the estimated timeline in a linear fashion, ████ ███████████████████████████████████████████████ █████████████████████ All of these options—hiring new employees, hiring contractors, and adding servers—would also be extremely costly.

I declare under penalty of perjury that the foregoing is true and correct, and that I executed this Declaration on December 10, 2021, in Sausalito, California.

_____

Mengge Ji

# EXHIBIT D

# FACEBOOK OPPOSITION
# EXHIBIT C

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br> This document relates to: <br><br> ALL ACTIONS | CASE NO. 3:18-MD-02843-VC-JS <br><br> **DECLARATION OF BEN MITCHELL IN SUPPORT OF FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL NAMED PLAINTIFF DATA** |

I, Ben Mitchell, declare:

1.      I am Director of Product Management at Defendant Facebook, Inc. (hereinafter "Facebook"). I make this declaration on my own knowledge, and I would testify to the matters stated herein under oath if called upon to do so.

2.      In my role as Director of Product Management, my responsibilities include providing support for Facebook's "Download Your Information" or "DYI" tool. Through my role, I am familiar with the DYI tool, the data that it includes, and where that data is stored.

3.      Facebook uses the term the "Social Graph" to describe the complex web of people, places, things, actions, and connections on the Facebook platform. The Facebook product that users see is powered by a series of databases that work in tandem to provide Facebook users a seamless experience. As Facebook users navigate through Facebook and interact with it—including, for example, by commenting on posts made by other users, watching videos, posting photos, and sending messages—the users create new relationships and connections between themselves and the content they are able to see.[1] This web of people, places, things, actions, and connections is referred to as the "Social Graph."

4.      The DYI tool allows a user to download a copy of data Facebook associates with their Facebook account, including data associated with their account in the Social Graph.

5.      The DYI file for each individual user represents the most complete and best compilation of data Facebook maintains associated with that user, and the best available

---

[1] █████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████ I am generally aware that several databases collectively store the information that underlies the Social Graph and the names of these databases, but I am not knowledgeable about the technical details and functions of each underlying database.

compilation of the data about that user in the Social Graph, in a human-readable and producible form.

6.      Exhibit B to the Declaration of Martie Kutscher lists categories of data contained in a user's DYI file, unless data in a given category does not exist for the user or the user deleted it. The DYI file does not include data such as (i) data a user has deleted from their own profiles (*e.g.*, photos that have been removed), (ii) any other data Facebook does not maintain; (iii) data associated only with a different user's account, or (iv) Facebook's trade secrets.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 28, 2021 at Felton, California.

*Ben Mitchell*
_____

Ben Mitchell

0046

# EXHIBIT E

# FACEBOOK OPPOSITION
# EXHIBIT E

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

IN RE: FACEBOOK, INC. CONSUMER
PRIVACY USER PROFILE LITIGATION,


This document relates to:

ALL ACTIONS

CASE NO. 3:18-MD-02843-VC-JS

**DECLARATION OF
KARANDEEP ANAND IN SUPPORT OF
FACEBOOK'S OPPOSITION TO
PLAINTIFFS' MOTION TO COMPEL
NAMED PLAINTIFF DATA**

I, Karandeep Anand, declare:

1.      I am Vice President, Business Products at Defendant Facebook, Inc. (hereinafter "Facebook"). I make this declaration on my own knowledge, and I would testify to the matters stated herein under oath if called upon to do so.

2.      In my role as Vice President, Business Products, I am familiar with how Facebook shares or makes data available to third parties, including application developers and partners. I am also generally familiar with how Facebook's platform operates, how data about particular users can be accessed, and how that data is shared with third parties.

3.      Facebook makes individualized data about Facebook users available to third parties—including app developers and partners—through application programming interfaces ("APIs"). These APIs pull data exclusively from Facebook's Social Graph.

4.      Facebook uses the term the "Social Graph" to describe the complex web of peoples, places, things, actions, and connections on the Facebook platform. The Facebook product that users see is powered by a series of databases that work in tandem to provide Facebook users a seamless experience. As Facebook users navigate through Facebook and interact with it—including, for example, by commenting on posts made by other users, watching videos, posting photos, and sending messages—the users create new relationships and connections between themselves and the content they are able to see.[1] This web of people, places, things, actions, and connections is referred to as the "Social Graph." The activities a user takes on the Facebook Platform, including posting pictures to their profiles, liking photos, and

---

[1] ███████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████████ I am generally aware that several databases collectively store the information that underlies the Social Graph and the names of these databases, but I am not knowledgeable about the technical details and functions of each underlying database.

commenting on friends' timelines, and certain activities a user takes off of the Facebook Platform, are reflected in the Social Graph.

5. APIs are a standard industry programming tool and they allow applications to access data and features of other applications, services, or operating systems. APIs can provide access to a defined set of User Data (e.g., a user's name or Facebook ID) or other information the developer is authorized to access, (e.g., photos a user has shared with the developer).

6. APIs Facebook has made available to third parties—including app developers and partners—that allow access to user-identifiable information query the Social Graph only. This was also true during the period from 2007 to present and is true of all of the APIs identified in Facebook's response to Plaintiffs' Fourth Set of Interrogatories. Users' privacy settings and the permission they specifically grant the applications they access or download control what non-public data third parties are able to access about them, as described in Facebook's Data Policy.

7. Facebook also maintains a data warehouse called Hive, which is separate from the Social Graph. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████ Facebook does not provide any APIs that allow third parties to retrieve data from Hive and third parties are not able to access Hive directly.

███████████████████████████████████████████████████████

█████████████████████████

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 28, 2021 at Seattle, Washington.

*Karandeep Anand*
_____
Karandeep Anand

0051

# EXHIBIT F

# FACEBOOK OPPOSITION
# EXHIBIT R

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline S. Corley, Magistrate Judge

IN RE:  FACEBOOK, INC. CONSUMER )
PRIVACY USER PROFILE LITIGATION.)  **NO. 18-MD-02843 VC (JSC)**
_____  )

San Francisco, California
Wednesday, December 9, 2020

**TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:

KELLER ROHRBACK LLP
1201 Third Avenue - Suite 3200
Seattle, Washington  98101
BY: **DEREK LOESER, ATTORNEY AT LAW**
**CARI LAUFENBERG, ATTORNEY AT LAW**
**DAVID J. KO, ATTORNEY AT LAW**

BLEICHMAR, FONTI & AULD LLP
555 12th Street - Suite 1600
Oakland, California  94607
BY: **LESLEY E. WEAVER, ATTORNEY AT LAW**
**ANNE K. DAVIS, ATTORNEY AT LAW**
**MATTHEW P. MONTGOMERY, ATTORNEY AT LAW**
**ANGELICA M. ORNELAS, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Reported By:          Marla F. Knox, RPR, CRR, RMR
United States Official Court Reporter

<u>**APPEARANCES VIA ZOOM:**</u>  **(CONT'D)**

For Defendant:

                  GIBSON, DUNN & CRUTCHER LLP
                  1881 Page Mill Road
                  Palo Alto, California  94304
        BY:  **MARTIE KUTSCHER CLARK, ATTORNEY AT LAW**

                  GIBSON, DUNN & CRUTCHER LLP
                  333 South Grand Avenue
                  Los Angeles, California  90071
        BY:  **DEBORAH L. STEIN, ATTORNEY AT LAW**

                  GIBSON, DUNN & CRUTCHER LLP
                  2100 McKinney Avenue - Suite 1100
                  Dallas, Texas  75201
        BY:  **RUSSELL H. FALCONER, ATTORNEY AT LAW**

| | |
|---|---|
| 1 | <u>Wednesday - December 9, 2020</u> <u>10:00 a.m.</u> |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:** Court is now in session. The Honorable |
| 5 | Jacqueline Scott Corley is presiding. |
| 6 | Calling civil action 18-md-2843, In Re: Facebook Inc. |
| 7 | Go ahead and start. |
| 8 | **THE COURT:** All right. Good morning, everyone. You |
| 9 | don't have to make your appearances. And thank you for your |
| 10 | status update. |
| 11 | Let's just go through and talk through the things and see |
| 12 | where we are at and what we can do. |
| 13 | So the first issue is search terms for the 5 through 8 |
| 14 | group. And I'm not sure if there is anything to discuss here. |
| 15 | I think the Plaintiffs said they were hopeful the parties could |
| 16 | work out the schedule, and I don't believe Facebook said |
| 17 | anything about it. |
| 18 | So, Ms. Weaver, or whoever from the Plaintiff wants to |
| 19 | address that. Is there anything to discuss? |
| 20 | **MS. WEAVER:** Not from our perspective, Your Honor. |
| 21 | **MS. DAVIS:** No. |
| 22 | **THE COURT:** Okay. Great. We will just knock that |
| 23 | off. |
| 24 | Now, the second thing was RFPs 14 to 17, Plaintiffs' RFPs. |
| 25 | And Facebook seemed to suggest that the search terms had |

1   been agreed to for those, but Plaintiffs seem to suggest that

2   they had not.  So I don't know where we are with that.

3            MS. WEAVER:  Mr. Ko will address that.

4        MR. KO:  This is David Ko on behalf of Plaintiffs.

5        So really the reason why we identified that issue in our

6   statement -- two reasons -- I mean, I think this is likely

7   coming at a head such that we will brief this to you shortly.

8        To answer your question, the reason why these RFPs are not

9   actually covered by the -- or this dispute, more specifically,

10  is not covered by the RFPs and the search strings is that we

11  are seeking a targeted search and a certain -- and a specific

12  group of materials that we believe Facebook should produce

13  pursuant to a targeted search.

14       And that is separate from the documents that they may

15  potentially produce that are, you know, possibly responsive to

16  these RFPs.

17       And just to add some color to that, you know, the search

18  strings that we agreed to -- and, quite frankly, that you

19  ordered in Discovery Order Number 8, I believe -- there are

20  actually only one search string that specifically relates to

21  these -- that solely relates to these RFPs.

22       And so -- and in this next round of negotiations, I think

23  there are only about three or four strings that the parties are

24  actually negotiating such that these strings may produce

25  potentially relevant information.

1    So what we are asking for is something different than I

2    think what Facebook is saying.  We are just saying:  Look,

3    there are these five categories of information that are

4    responsive to these RFPs; and we believe that they can produce

5    this information pursuant to targeted searches.

6    And that is, again, distinct from any of the search string

7    negotiations.

8         **THE COURT:**  Why is it distinct?

9         **MR. KO:**  Well, this has a pretty long and tortured

10   history.  We have been going back and forth with Facebook on

11   this since January.

12   Actually, we engaged in an extensive letter writing

13   campaign from February to April; and we have gone back and

14   forth with them.

15   And they said clearly that:  A, this information is

16   actually irrelevant.  B, that they don't have any responsive

17   documents anyways.  And C, even if they did, that they would be

18   highly confidential and protected.

19   So, you know, we found that hard to believe because these

20   by -- just to provide some context, these RFPs seek documents

21   related to how Facebook values, quantifies and monetizes the

22   user content information at issue in this case.

23   And they said:  Look, we don't have anything responsive to

24   those requests.

25   We found that hard to believe; right.  I mean, they are a

1    company -- this is a company that last year alone generated

2    $70 billion in revenue, you know, 98 percent of which came from

3    third parties.

4         So they said -- we said let's try to provide some

5    clarification so here are -- so this dispute matured to a point

6    where we said:  Here are five specific categories that we

7    believe will be responsive to this request.

8         Can you please run targeted searches on them?  And they

9    said no.

10        And they said:  Why don't we do -- why don't we go with

11   the search string negotiations and see if we can actually come

12   up with some documents that may potentially be responsive to

13   the requests.

14        And we gave that a shot.  And we thought that maybe that

15   they would run targeted searches in connection with that

16   negotiation process, but what has become evident is that they

17   do not want to.  And so I think, you know, at this point --

18        **THE COURT:**  Well, did you propose them as part of the

19   search string submission?

20        **MR. KO:**  We proposed one string -- two strings, excuse

21   me, that relates solely to 1417.  But, remember, we had a

22   finite number of strings we could negotiate and propose.

23        And so we took those somewhat off the table, right,

24   because there were other strings that we were negotiating that

25   we believe were responsive to other discovery requests because

1    we didn't have -- in the normal course we would say:  Look,

2    here are, you know, 10 or 15 strings that could have been

3    responsive to these requests.

4        And they said -- well, you know, we only could propose a

5    few to, Your Honor.  Obviously we ended up proposing only 29 or

6    27 for you to rule on.  And so that -- that is one response to

7    your question.

8        The other response --

9        **THE COURT:**  I guess I don't really understand.  I

10   mean, the limit was there to require to prioritize.  It wasn't

11   so that you could -- that is just sort of a different matter.

12       I mean, it seems like the nub of it -- from what I

13   understand -- is Facebook says they don't really have what you

14   are looking for, and you say that they do.

15       And maybe what you need to do is take that 30(b)(6), and

16   you will identify it; and then they will have to produce it, as

17   opposed to in a way you are kind of shooting in the dark.

18       **MR. KO:**  Well, that's one way of doing it, but I

19   think -- two responses to that.

20       One, the documents that will be produced here are not

21   pursuant -- are really not the type of documents that will be

22   produced pursuant to custodial searches.

23       These are financial documents that relate to, for example,

24   marketing and business brands, financial documents that

25   underlie their 10Ks and 10Qs.

1      So these aren't -- you know, it's not, you know, Cari

2   Laufenberg, let's find all her documents that talk about this.

3   It is actually a non-custodial search in the relevant

4   department where we pull that material.

5      And I think -- it identifies --

6         **THE COURT:**  What would it be?  What would it be?

7         **MS. WEAVER:**  Your Honor, let me give an example

8   because I think we do want the e-mails.  But accounting

9   documents where Facebook is assessing the value of the data

10  that its getting, we know that, for example, in their

11  accounting documents it will be there.  And that is a targeted

12  search.  And those documents aren't targeted by the search

13  terms.

14     The search terms right now are only being applied to a

15  selected number of --

16        **THE COURT:**  I understand that.  For e-mails and things

17  like that, it wouldn't be an accounting document.  So that --

18        **MS. WEAVER:**  Exactly.

19        **THE COURT:**  -- I understand.

20        **MS. KUTSCHER CLARK:**  Your Honor --

21        **MS. WEAVER:**  -- take the 30(b)(6), I think that is a

22  good idea.  Apologies.

23        **THE COURT:**  Yeah.  Was that Ms. Kutscher?

24        **MS. KUTSCHER CLARK:**  Yes, Your Honor, thank you.

25     The issue we are having here is that the RFPs at issue

seek valuation documents about very particular types of valuations.

They are asking about documents how Facebook values individual pieces of user data; how Facebook values the named Plaintiffs' data.

What we have been telling Plaintiffs -- and we have investigated this extensively -- is that Facebook simply doesn't value information that way. So to the best of our knowledge there wouldn't be responsive materials.

The other issue here is that the RFPs ask for documents sufficient to show this type of information.

So we are running the search strings because typically when you don't think there are documents about something specific and you are asking for documents specific -- sufficient to show that information, you run search strings. So you figure out if they are there.

And that's what we are trying to do; run the search strings. Figure out if there are any documents that show the extensive valuation. We don't think there are.

From our perspective, we think the first step here is to run the search strings. See if they return anything seeking the type of information Plaintiffs are seeking, and then we can take it from there.

The other issue we are having is that after Plaintiffs sought that type of information, they did send us the letter

1    that Mr. Ko is describing.  And the letter asks for these very

2    five very broad categories of documents.  It asks for

3    Facebook's marketing plans, Facebook's business plans.

4        And Plaintiffs now seem to be taking the position that

5    Facebook should produce all documents responsive to their

6    letter, so all of its marketing plans, all of its business

7    plans, even if they don't show the type of information sought

8    in the RFPs.

9        So one of the issues that the parties started discussing

10   yesterday is:  Is Facebook required to produce documents

11   responsive to the RFPs or is Facebook required to produce

12   information responsive to this letter that really strays pretty

13   far from what the RFPs ask for?

14       **THE COURT:**  Well, this is what I would say:  What you

15   are required to produce is -- obviously the valuation of this

16   data is at issue.  That is relevant to a claim in the case.

17       And so what you need to do is figure out how you get

18   there.  There must be something.  And it may not be it's at the

19   micro level that the Plaintiffs were wondering.  So maybe it is

20   a more macro level.  Maybe it is simply:  How much money does

21   Facebook make in a year, in a month, in a week, in a day from

22   selling this information; right?  That's one way of evaluating

23   it.

24       Now, maybe that's not precisely called for by the RFP.  So

25   what?

1    What the RFP calls for -- you know what they want; right?

2  And so the RFPs are kind of like a starting point.  And now

3  have a discussion and try to narrow it and get out what it is

4  they are trying to do.

5    I don't think you would dispute that any financial

6  document -- like the financial documents are going to be one

7  way of valuing it.  Maybe not every marketing plan,

8  obviously -- obviously.  Facebook must have a million marketing

9  plans.  But specific marketing plans.  And you have a

10  discussion.

11    So the RFPs are a starting point.  I wouldn't get too

12  caught up in that.  We all agree that how Facebook values this

13  data, some way, is relevant.  And so let's figure out a way of

14  getting those.  That's what I would say on that.

15    **MR. LOESER:**  Your Honor, if I may just very briefly --

16    **MS. STEIN:**  Your Honor, I think the fundamental

17  disconnect is that Facebook doesn't sell user data, so Facebook

18  doesn't value user data in the way that Plaintiffs would like

19  it to exist.

20    It just -- it is not something that is part of Facebook's

21  business model.  So I think we have been talking past each

22  other.

23    And we are happy to meet and confer with them to see if

24  there is something else that Facebook does value, but it

25  doesn't -- because it doesn't sell user information and user

1  data, it's literally just not something that goes into their

2  valuations.

3        **THE COURT:**  Or they trade it or whatever it is.  Or

4  maybe as Ms. Weaver said, the 30(b)(6) -- did we lose -- oh,

5  no, there she is.  She just moved on me.

6        **MS. WEAVER:**  We just moved.  You moved too,

7  Your Honor.

8        **THE COURT:**  Did I?  I don't know.  Apparently we have

9  a new thing of Zoom that you can move the screens, but that

10 doesn't seem to be working.  Anyway -- and figure it out.

11       But I guess I would say is that I hear what you are

12 saying, Ms. Stein.  So that's what you should be discussing.

13 Like, there is going to be some way -- it has some value,

14 somehow or another because of (inaudible) -- and for some

15 purpose, whatever it is.  And then, you know, if -- it is not

16 going to be a line item, obviously, that puts a value on it.

17       And so that just sort of should be what the discussions

18 should be about.  I can see that is going to be different from

19 search terms.  If it is coming from financial documents, that

20 is something different.  Okay.

21       **MR. LOESER:**  Sorry to interrupt.  I guess, just by way

22 of making it clear and so that we all understand what you are

23 saying, there is search strings; and that will get certain

24 information, e-mail, other things.

25       And then there is all this other information that is not

even -- it is not even possible that it would be unearthed by those search strings. That is the targeted search information.

That is what we will be meeting and conferring and negotiating more with Facebook. I mean, it hasn't been going on a long, long time.

I am very happy to hear you describe the process where, you know, we start with RFPs and then we engage in these very lengthy and substantive conversations about how to clarify them, and that's what the letters often have to do with.

So I do think that that process that you described is what has happened here, and I think it is important that we continue to utilize that process so that requests can be clarified in letters and so on.

**THE COURT:** And narrowed. Always narrowed.

**MR. LOESER:** Or narrowed. Or if they are really unclear -- as Facebook often claims they are -- then whether it is narrowed or just made more clear, one way or another it becomes evident what it is we are searching for.

**THE COURT:** Yeah. I always like to say is sort of when -- obviously not in a bigger complex -- but when I have disputes, I will say to one side: What is it that you want? Just describe to me -- not -- when somebody starts reading to me their document requests, I stop them. No. No. Just tell me in plain English what is it that you want. And then have the other side respond. Do you have that or what do you have;

right?  That's what it should be.

I do want to go back, though, to the -- what is little A in the Plaintiffs' statement, the search terms and the schedule, because the final proposals are due December 24th.

And were you able to work something out with that or --

**MS. KUTSCHER CLARK:**  We are --

**MS. WEAVER:**  We are still negotiating that, I believe. Go ahead, Martie.  My apologies.

**MS. KUTSCHER CLARK:**  No, no, no.  I was just going to say the parties met and conferred about it yesterday, and we are working through some proposals.

One thing the parties have started discussing is whether there should be a little bit of a detente around the holidays this year.

**THE COURT:**  Oh, that's exactly what I wanted to do.  I actually wanted to impose one.

(Laughter)

**THE COURT:**  I did it in one of my other cases in Juul over Thanksgiving.  I forbid the parties from communicating with each other from Thursday, Friday, Saturday and Sunday. And I would like to do the same thing in here.

**MR. LOESER:**  Just like the Battle of the Bulge, Your Honor.

**MS. WEAVER:**  That's right.  That's exactly right.

**THE COURT:**  So I will let you figure out what it is;

but you need, I would say, five business days.  That would be

my proposal.  Really the case will move along; go along.  Five

business days, no communications between the two sides for

those five days in a row and you figure out what they are.

So important.  So important.  So important especially -- I

mean, you know, people are not going to be -- I mean, it's a

stressful time right now.  It is a stressful time, and we all

need a break and to be able to just chill and focus on the most

important things -- this case is important -- but the most

important things.  So I would like you to agree to a five-day

detente.  It can be longer if you want but at least five days.

**MS. WEAVER:**  Agreed.

**MR. MONTGOMERY:**  Your Honor, can you impose no

communication within our firm as well?

**THE COURT:**  Mr. Montgomery, yeah --

(Laughter)

**MS. KUTSCHER CLARK:**  The challenges.

**MS. STEIN:**  I do rely on opposing counsel for Netflix

recommendations so --

(Laughter)

**MS. WEAVER:**  We can make an exception.

**THE COURT:**  The Queens Gambit, have you guys watched

that?  I finished that last night.

**MR. LOESER:**  Excellent.  That is -- a very good

recommendation, if you haven't seen it, which we have now

1   enjoyed is Ted Lasso.

2           **THE COURT:**  Ted Lasso, okay.  I don't know that one.

3           **MR. LOESER:**  Your Honor, this might be testing the

4   limits of your judicial authority; but if you could turn off

5   social media for five days --

6           **THE COURT:**  For the entire country?

7           **MS. WEAVER:**  Yes.

8                           (Laughter)

9           **THE COURT:**  Perhaps.

10          **MS. KUTSCHER CLARK:**  I think our client would be

11  opposed to that.

12          **MS. WEAVER:**  Yes, we understand the difficult position

13  you are in.

14                          (Laughter)

15          **THE COURT:**  All right.  So, Mr. Montgomery, I will

16  strongly recommend that -- internally as well to the extent it

17  can be done -- and really, you know, no judges should be

18  imposing deadlines for whatever between Christmas and New

19  Year's; right.  So you should be able to check out for that

20  time.

21      Okay.  Great.

22          **MS. WEAVER:**  Just to be clear, it was in our proposal

23  to end it on December 24th.  So we are fine with the

24  moratorium.

25          **THE COURT:**  It sounds like everyone is which is good.

1   Okay.

2           **MS. WEAVER:**  Yep.

3           **THE COURT:**  So the next issue is the named Plaintiffs'

4   data.  And here I actually am kind of confused because Facebook

5   suggested that there may not be any data other than what they

6   have already produced.  And then I don't understand why (video

7   freeze interruption.)

8           **MS. KUTSCHER CLARK:**  Right, Your Honor.

9       So, as we noted in our submission, we learned for the

10  first time in Plaintiffs' sur-reply brief on the named

11  Plaintiffs' data that what they are really seeking is only data

12  about the named Plaintiffs that was shared with third parties.

13      And for us seeing that in the sur-reply brief was a really

14  big aha moment because we had spent literally hundreds of hours

15  meeting and conferring about data that is never shared outside

16  of Facebook.

17      So now that we understand what they are really seeking is

18  the type of data that is actually shared or made accessible to

19  third parties, we have been taking a much closer look at what

20  would be responsive to that.  And as we currently understand,

21  what has been produced really does cover that universe.

22      But we obviously want to be a hundred percent sure that

23  that is correct, and we are talking about a 13-year period, so

24  it is a very long time.

25      So we have been conducting a very careful investigation

1 within the company to be a hundred percent sure that the

2 materials produced to date reflect the full scope of any data

3 that could have been shared or made accessible to third parties

4 about the named Plaintiffs since 2007.

5 And if we do come across anything additional, we will

6 obviously report that to Plaintiffs and discuss a production

7 format with them, but to date we have not come across anything

8 that has not been produced already that could have even

9 potentially been shared with third parties.

10 **MR. LOESER:** Your Honor, if I may, I think there will

11 probably be multiple comments in response to that statement.

12 That makes no sense to us at all.

13 First of all, the question of their brief, which they

14 quote in their statement, talks about information, in fact,

15 shared. And what our brief said in our reply was information

16 shared or made accessible.

17 And we were very careful to use that language, "made

18 accessible," because Facebook has said for a long time that it

19 doesn't keep records of what it actually shares, which seemed

20 hard to believe to us.

21 But in order to avoid a semantic game, we also included

22 the reference to "made accessible" because whether it was

23 shared, whether they have records of it, if it was put in a

24 place or utilized in a way where third parties had access to

25 it, that substantially expands the universe of potential

1    information.

2        Also, as, Your Honor --

3        **THE COURT:** That's what I heard Facebook just say.

4    They agree.

5        **MS. KUTSCHER CLARK:** Yeah.

6        **THE COURT:** It is made accessible, not just shared.

7        **MS. KUTSCHER CLARK:** Yes.

8        **MR. LOESER:** Then, perhaps, we need some clarification

9    on what they interpret "made accessible" to mean because it

10   doesn't mean the same thing as actually shared.

11       And so if we could hear clearly from Facebook that they

12   agree with that, that would be helpful.

13       Second, the nature of the information that Facebook was

14   ordered to produce is such that it is impossible to believe

15   that there isn't information that exists.

16       We are talking about entirely distinct categories of

17   information from what they have produced.  They have produced

18   the information that users post.  As Your Honor well knows,

19   what they didn't produce was all the information collected

20   from -- off platform activities and inferred from and about on

21   and off platform activity.

22       And it is, frankly, just impossible for us to believe that

23   while the universe of potential discoverable information was

24   expanded threefold, actually, there isn't anything that fits

25   those categories, categories which were derived from our review

1   of Facebook's production to see what else do they do and what

2   else do they do with it.

3       So it just -- it just seems baffling to me that after all

4   of this fighting and all their effort to keep us from getting

5   this information, they are now coming back and claiming it

6   doesn't really exist.

7           **MS. KUTSCHER CLARK:**  Your Honor --

8           **MS. STEIN:**  So, Your Honor, respectfully, we are not

9   doing anything to prevent Plaintiffs from getting information.

10      We spent months dealing with Plaintiffs taking the

11  position that even if the data was in a black box that was

12  inaccessible to anyone, that they would want to know what was

13  in that black box.  So they did a complete 180 in their

14  sur-reply brief.

15      Leaving that aside, we are trying to figure out whether

16  there is anything else to be produced.  The inferences that

17  Mr. Loeser just mentioned -- Facebook does not share or make

18  accessible inferences with third parties, period, full stop.

19      Those inferences are the way that Facebook has its

20  business model.  It uses those inferences to run its business.

21  It does not sell those inferences.  It doesn't share those

22  inferences.  It does not make them accessible.

23      That is why companies come to Facebook and ask Facebook to

24  help with targeted advertising because we, Facebook, will not

25  share those inferences with anyone.  That would destroy

Facebook's business model.

**MS. WEAVER:** So, if I may, we have received no production of data Facebook receives from third parties.

We have received no inferred data. And this is the semantic game that Facebook has played since the beginning that analysts and governments have challenged.

Facebook says: We do not sell your data. And it may be true that they don't put it in a box and hand the data over the way you do a widget. They do sell inferences.

And what we need to know is how our clients were targeted based on the amalgamation and analysis of all the data that Facebook is pulling from everywhere. So we want the inferred data.

I want to know if I have been targeted as a 50-year-old woman in Oakland as having a higher insurance risk or a different financial risk.

That is how Facebook makes its money, and they have refused to be transparent about this all around the world. But we are in this lawsuit. They keep telling us they don't make -- and this ties back to the revenue argument.

Let us see how they make their money. Maybe they are right. But all we have been doing is fighting with the lawyers. It is time for evidence.

We would love a 30(b)(6). We would love documents. We would love data. All we have been getting right now is sitting

1  in Facebook Zoom meet-and-confers and positions.  And we are

2  ready for the evidence.

3       **MS. KUTSCHER CLARK:**  Your Honor, I have two quick

4  responses.

5       **MR. KO:**  Your Honor --

6       **THE COURT:**  Let's let Ms. Kutscher go.

7       **MR. KO:**  Okay, Martie.

8       **THE COURT:**  We can't hear you -- at least I can't hear

9  her.

10       **MS. KUTSCHER CLARK:**  Can you hear me now?  I'm

11  speaking more loudly.  Okay.

12       First of all, this case is not about targeted advertising.

13  Judge Chhabria said very clearly in his Motion To Dismiss order

14  that the case is not about targeted advertising.  Plaintiffs

15  conceded that the case is not about targeted advertising in the

16  briefing on this issue.

17       In terms of the inferences, the off-Facebook activity, it

18  is not correct that none of that information has been produced.

19       The information we produced previously includes thousands

20  and thousands of pages of users off-platform activity.  It also

21  includes massive lists of user's interests that Facebook has

22  derived from their activity on and off the platform.

23       During the briefing Plaintiffs were asking for more of

24  that information.  They were asking for information the

25  Plaintiffs are not able to see themselves that Facebook might

have in those categories.

What we have been doing is trying to find out -- and we have conducted extensive, extensive investigations at Facebook to understand whether there is any additional information in any of those categories that could have potentially been made available to a third party in any way, shape or form.

And the answer we are repeatedly getting is no. What has been produced represents the universe of what could have been made available in any way to a third party.

But, again, we are continuing to conduct this investigation because we want to be a hundred percent sure, and that is what we are working on. But, in the meantime, we have not come across any type of information that is ever made accessible; has ever been made accessible that is outside what has already been produced.

**MS. WEAVER:** Your Honor, we view this as them trying to re-litigate an order that you already issued in Discovery Order Number 9.

The scope of the case is whether private information sent in voice -- let's say Facebook Messenger was used and amalgamated with our information to target the Plaintiffs and either --

**THE COURT:** No, no, no, no. I don't think so. I don't think so; right. This is -- this came from Cambridge Analytica and that they had access to information.

1        **MS. WEAVER:**  Right.

2        **THE COURT:**  Right.

3        **MS. WEAVER:**  Right.  And they used it to -- they

4    targeted lazy liberals to stay home and not vote in the

5    election.  This is exactly Cambridge Analytica.  They drew

6    inferences about people and crafted messages to them to get

7    them to stay home.

8        Or it recently came out that 3.5 million African Americans

9    were targeted with message to influence their voting behavior.

10   This is squarely within Cambridge Analytica, and this is

11   exactly the case.

12       So people need to understand how they are being --

13       **THE COURT:**  What did you mean in your sur-reply by

14   "shared"?  I guess that's the question.

15       **MS. WEAVER:**  Or reasonable made accessible.  Yeah, I

16   mean, that's -- the issue is --

17       **THE COURT:**  What is -- to the point, what does "made

18   accessible" mean?

19       **MS. WEAVER:**  Right.  So I -- I'm Cambridge Analytica,

20   and I want information so that I can target individuals who I

21   think will respond to my messaging in an election.  And our

22   nine named Plaintiffs, many of them feel they were targeted in

23   this way.

24       So Facebook ran its algorithm based on all of the data

25   that it had, and it didn't separate the private and the

1  public -- at least Facebook has never even taken that position

2  in this case -- and said:  Here are the people.

3      So they are targeting, and we want to see --

4      **THE COURT:**  Have they provided the named -- the names

5  of those people?

6      **MS. WEAVER:**  No.  They just allowed the messages to go

7  through to them, so they are targeted.

8      **THE COURT:**  So Cambridge Analytica didn't have that

9  information then?

10     **MS. WEAVER:**  Cambridge Analytica also got data but

11  also targeted them.  It's both.

12     **THE COURT:**  Okay.  And so it is the data that

13  Cambridge Analytica then got?

14     **MS. WEAVER:**  That's a piece of it, and it is also how

15  they are targeted going forward.

16     What we don't know is what the business partners and --

17  that is a separate -- Cambridge Analytica got it through an

18  app, through Kogan's app.

19     But what is also going on is the data sharing -- which the

20  business partners and the white listed apps -- and we are not

21  getting the data that they have on the Plaintiffs.  We don't

22  have one shred of data.  All we have is this, you know, the

23  actual platform activity.

24     So we need -- what we would really like is to take some

25  evidence on this, Your Honor, because --

1          **THE COURT:**  You mean the 30(b)(6)?

2          **MS. WEAVER:**  That would be great.

3          **THE COURT:**  Well, I think that is probably where we

4     are at now.  I think --

5          **MS. WEAVER:**  That would be great.

6          **THE COURT:**  I think there is this disconnect, right,

7     or disbelief -- I guess I should say more than disconnect -- as

8     to how Facebook operates.  And so we just need somebody under

9     oath saying:  No, this is how it operates.

10         **MR. KO:**  Your Honor, just one last thing on this --

11    not to belabor the point -- I wish I could share my screen

12    right now.  I'm looking at Facebook's data use policy right now

13    in the section that says "information that we share."

14         And included in that category are sharing with third-party

15    partners, and that includes partners who use Analytica

16    services, measurement partners, partners offering goods and

17    services in our products, advertisers, vendors and service

18    providers, researchers and academics, law enforcement or

19    pursuant to legal request.

20         So they, by their own admission in public and pursuant to

21    their data use policy, talk about the information that they

22    share --

23         **MS. WEAVER:**  Share.

24         **MR. KO:**  -- with third parties.  So I know Ms. Stein

25    said full stop, they don't share anything.  That's --

            **THE COURT:**  No, no, no, that's not what she said.
What she said is they produced what they shared, not that they
don't share anything.

            **MS. WEAVER:**  But that's not --

            **MS. STEIN:**  I said that we don't share inferences.

            **MS. WEAVER:**  All we had was a subset of user's
platform activity.  I'm sorry, Deb.

            **MS. STEIN:**  I said we don't share inferences.  That is
what I said.

            **MS. KUTSCHER CLARK:**  Your Honor, I think a big piece
of what is getting lost here is third parties frequently draw
their own inferences, and that might have been what happened in
Cambridge Analytica.  We know that happens in other settings.

    So Facebook shares various categories of information, and
third parties might use that information in different ways.
They might combine that with information they have.  We don't
have visibility into that.

    But once the information is shared, third parties might
use it to form their own conclusions; but that's not
information we would have.

            **MS. WEAVER:**  But we don't even have the data that
Cambridge Analytica got; right?

            **THE COURT:**  I don't know.  Is that true?

            **MS. KUTSCHER CLARK:**  I believe you do because
Cambridge Analytica only received data that Kogan was able to

1 access through his app and what --

2       **MS. WEAVER:**  Can you identify to us by Bates number

3 which documents those are because I don't believe we have that.

4       **MS. KUTSCHER CLARK:**  That's not the way the materials

5 have been produced.

6     What we have produced is the universe of data that could

7 have been made accessible to third parties.

8     We did not produce nor was there a request specifically

9 for information requested by Kogan.

10       **MR. LOESER:**  So, Your Honor, just -- this is an

11 interesting discussion, and I think Your Honor has rightly

12 identified that the parties, frankly, are just -- these are

13 lawyers talking about things that -- we need evidence.  A

14 30(b)(6) is an excellent idea.

15     We just don't believe how -- their description of what is

16 or is not shared or made accessible.  We need to put somebody

17 under oath and have them testify about that.

18     The documents that we have seen in their production that

19 describe their practices talk about sharing; talk about

20 absorbing off-platform activity; talk about sharing inferences.

21     The ADI investigation where they sent their own

22 questionnaires out to apps asked the apps to identify any

23 information that was obtained from Facebook and inferences

24 drawn from it.

25     And so there is a huge disconnect between what we think is

1    going on and the way they are describing.  The real virtue of

2    someone under oath testifying is that we can get through the

3    semantics and just figure out really what happened.  So I do

4    think that you are right; that it is time to do that.

5        Facebook can read your order.  They know what they are

6    supposed to do.  I assume they are going to go out and comply

7    in good faith with that order.  And the sure test to whether

8    that happens or not is when we get somebody under oath and they

9    testify about what exists and what doesn't exist.

10        **THE COURT:**  Why shouldn't we do that?

11        **MS. KUTSCHER CLARK:**  Your Honor, I would respectfully

12   request that before we move into a deposition, that we have the

13   opportunity to complete our investigation because we are

14   working through that right now because, again, we want to make

15   sure that what we understand is correct.

16        And obviously to even prepare a 30(b)(6) deponent, we

17   would need to complete that sort of investigation.  And I think

18   it is going to take some more time.

19        Again, we are talking about a 13-year period, and data was

20   shared in different ways with different source of third parties

21   over that period.  And this is a pretty large historical

22   exercise to look into.

23        **THE COURT:**  Right.  But I don't know why we can't -- I

24   mean, you are doing that -- but get something on calendar and

25   the Plaintiffs can draw up their questions, right, because that

1   is going to take some while, no doubt --

2                    (Laughter)

3        **THE COURT:**  -- to negotiate.  And this isn't

4   everything.  This is just, like, let's just figure it out.

5   Like, this is a big -- this is another big issue in the case.

6   We have this disconnect.

7        Let's just figure out:  How do they use this data?  How is

8   it shared?  What do they mean by "made accessible?"

9        Maybe you limit it to a time period, so you don't need to

10  complete the whole thing; right.  I mean, the time period that

11  we are most interested in -- or at least the first one -- is

12  the Cambridge Analytica.  That is how the whole case got here.

13       So what you do is start with a limited time period, and

14  that would probably --

15       **MS. WEAVER:**  We could do that, Your Honor, 2012 to

16  2016 or 2017.

17       **THE COURT:**  Much easier to prepare your witness on.

18  You can then focus your investigation on that.  We are just

19  going to take it in chunks, I guess, in a way.

20       Let's do that because I think we are -- yeah, I keep

21  hearing arguments.  Let's get -- let's get a witness in there.

22       So what I would like you to do is:  Plaintiffs, you should

23  work on that notice.  It is not an everything, all, whatever.

24  This is -- let's just figure out --

25       **MS. WEAVER:**  Targeted.

1          THE COURT:  Targeted disagreement, limited period of

2     time.

3          MS. WEAVER:  We propose maybe Thursday, January 14th,

4     or Friday, January 15th, for the data, 30(b)(6) and --

5          THE COURT:  I don't want to talk to you guys -- I

6     don't want to do that right now.  You guys do that.

7          MS. WEAVER:  Okay.  We will work it out.

8          MS. STEIN:  I also really -- respectfully to

9     Ms. Weaver's point of getting something on calendar -- we need

10    to know what the topics are.  We need to agree on the notice

11    and the subject --

12         THE COURT:  I agree with that.  I was thinking early

13    February especially since we have that five days in there.

14         MS. WEAVER:  Fine.

15         THE COURT:  You need to give them notice first.

16         MS. WEAVER:  Fine.  We will do that.

17         MR. LOESER:  I think we should maybe have a schedule

18    for when the notice should be completed or else I can see this

19    dragging out forever.

20         THE COURT:  So that's up to you.  What would you like

21    your deadline to be?

22         MR. LOESER:  Why don't we take, folks, seven days

23    enough to draft our notice?

24         MS. WEAVER:  Yes.

25         THE COURT:  And, perhaps, Facebook can respond within

1  seven days with adjustments if this falls on New Year's Eve,

2  which it probably does.  So maybe add a few more days there.

3  But I think that's plenty of time to negotiate this targeted

4  notice.

5       **MS. KUTSCHER CLARK:**  Your Honor, I'm just looking at

6  the calendar quickly.  If Plaintiff took seven days to give the

7  notice, that means Facebook would have to respond over the

8  holidays even if we had two weeks to respond.

9       **THE COURT:**  So extend that.

10      **MS. KUTSCHER CLARK:**  So I think we would need until at

11  least early January, probably the second week in January, to

12  respond if we are not going to interfere with people's

13  holidays.

14      **MS. WEAVER:**  So maybe January 11th, Martie?

15      **THE COURT:**  That's what I was going to suggest.

16  January 11th.

17      **MS. KUTSCHER CLARK:**  So we would get the notice on the

18  16th?

19      **THE COURT:**  By the 16th.

20      **MS. KUTSCHER CLARK:**  And respond by the 11th?

21      **THE COURT:**  Yeah.

22      **MR. KO:**  Well, why don't we -- maybe I'm speaking out

23  of turn on my side -- but why don't we give ourselves a little

24  more time to put together the notice then if -- you know, one

25  week from today, we could -- I'm thinking maybe Friday, the

1    Monday after that?

2        **MR. LOESER:**  Why don't we take ten days, and then it

3    balances out a little bit.  That's fine.

4        **THE COURT:**  Well, let's see.  So if you gave it to

5    them by the 18th.

6        **MR. KO:**  The 18th.

7        **THE COURT:**  Right.  Then we have two weeks of the

8    holidays.  One week is going to be a non-working week, and

9    there are five days in there.

10    Does the 11th still work for that with Facebook or how

11    about until the 13th?

12        **MS. KUTSCHER CLARK:**  Yeah.

13        **THE COURT:**  This is your initial response, right, your

14    initial response.  So I think the 11th.  That gives you the

15    entire week of the 4th.

16        **MS. KUTSCHER CLARK:**  Okay.  I think it would be

17    helpful to have a little bit of guidance on the scope of this

18    and what the topics would be, which would hopefully help to

19    limit the number of disputes that might arise.

20    As we understand, the topics should be limited to the

21    sharing or accessibility of user data during the 2012 to 2016

22    time period; is that right?

23        **THE COURT:**  Yeah.  The topic is -- we went through

24    this long motion on this production and the off-platform and

25    what was covered by Judge Chhabria.  Issued the order.  And now

1    it is like we already produced everything, whatever.  It is to

2    figure out that question.  It is to figure out that question.

3         **MS. WEAVER:**  We would view it as what is responsive to

4    Discovery Order Number 9, Your Honor.  That is how we would

5    frame --

6         **THE COURT:**  That's that order; right?

7         **MS. WEAVER:**  Exactly.

8         **MR. KO:**  The three categories they identified, Judge

9    Corley --

10        **THE COURT:**  Discovery Order Number 9, perfect.

11        **MS. WEAVER:**  Exactly.

12        **THE COURT:**  Limited to discovery --

13        **MS. KUTSCHER CLARK:**  Could I just ask a clarifying

14   question because I think the parties have had a little bit of a

15   disconnect here.

16       We read Discovery Order Number 9, particularly in light of

17   Plaintiffs' briefing, to relate only to data that was shared or

18   otherwise made accessible, as Mr. Loeser puts it, to third

19   parties and is not generally about all of the data in those

20   categories that Facebook has ever collected.  It is about what

21   was shared.

22        **THE COURT:**  This is a 30(b)(6) to figure out what

23   Facebook does.  So now no doubt the deponent will talk about

24   information that they collect but don't share; right.

25       And then we will talk about whether that is responsive or

1  not.  This is so the Plaintiffs can figure out this is what

2  Facebook does.

3      This is to sort of to verify the representation that yes,

4  we collect this information -- inferential data, but it is not

5  made accessible to third parties.

6      So they would have to talk about it; right?  They would

7  have to talk about that.  And if it is not made accessible,

8  then what do they do with it?

9      **MR. LOESER:**  Your Honor, we really need a

10  clarification because I think it does avoid another huge

11  semantic game over what "made accessible" means.

12      And so I think that is the right way to go.  I think that

13  will allow us to understand what is the information and what

14  did you do with it.  That's --

15      **THE COURT:**  Okay.  All right.  So the next topic was

16  the privacy settings data.  I don't know what to do -- to say

17  about that.

18      **MS. WEAVER:**  Your Honor, Leslie Weaver on behalf of

19  the Plaintiffs.

20      So we -- this is the issue.  What has been produced to us

21  is not the way the data exists on the platform.  And so when

22  there is a post, normally I can restrict it to my friends Deb

23  and Martie, and you can see that.

24      And they have asked us to identify what, you know, we

25  contend is really at the heart of the case, which to us is what

1   was intended for restricted audiences.

2       And we can't do that in the format that they produced it.

3   This is again the Facebook platform activity.  They produced it

4   without consulting us as to format, and we just need to get --

5   we just need that information.  It is obviously at the heart of

6   the case.

7       We are doing the best that we can to respond to their

8   interrogatories with our own information.  Like, we can see

9   Facebook Messenger messages are restricted, so we have

10  identified those; and we are talking extensively with the named

11  Plaintiffs.  They have been doing a lot of work, but we can't

12  identify the posts right now because we can't see how they were

13  restricted.  It's that simple.

14      **THE COURT:**  I guess one question I have for Facebook,

15  I thought one potential argument you had was that the

16  Plaintiffs did not restrict their data.  You know, so it wasn't

17  private data.  Is that right?

18      **MS. KUTSCHER CLARK:**  Your Honor, that might be true of

19  certain data.  The bigger issue for us is that Plaintiffs are

20  suing Facebook alleging that Facebook shared their,

21  quote-unquote, sensitive information.

22      And we have asked them to tell us what information they

23  think is sensitive.

24      They have told us they can't do that unless we produce a

25  version of their accounts that shows next to each item on their

1   account what the privacy setting was.

2       We have looked into this extensively, and Facebook

3   accounts are not made for production in litigation and simply

4   can't be produced in that format.

5       As I understand, to produce a Facebook account in the

6   format Plaintiffs are asking for it, we would actually need to

7   have engineers write new code.

8       To locate the privacy settings for individual items on an

9   account, someone actually has to manually click on every single

10  item and follow a link which will then display the privacy

11  setting.  It is not metadata.  It is not something that can

12  just be displayed next to the item.

13      Plaintiffs have access to their accounts, and they are

14  able to do that.  They can log into their accounts.  They can

15  look at the posts they are concerned about.  They can look at

16  any information on their account they are concerned about.

17  Click the link and see what the privacy setting is.

18      What they want is for one of us or for someone at Facebook

19  to click through every single item on their account -- and

20  there are hundreds of thousands of pages, many of which might

21  have 20, 30 items on them -- and then follow the link.

22  Screen-shot the pages and produce them back to them.

23      Again, this is something Plaintiffs can do.  We have

24  suggested that there might be a way to make it easier if

25  Plaintiffs would look at their accounts and tell us what

information they are concerned about.

The accounts include all sorts of stuff.  They include restaurant reviews, newspaper articles, cartoons, stuff that is not conceivably sensitive.

If they would tell us what information they think is sensitive -- and this was one of their interrogatories -- we could maybe take this limited list or a more targeted list of posts and pull it for them, and we would be willing to do that.

But what doesn't make sense is to have Facebook have an engineer or someone else click through hundreds and hundreds of thousands of pages of every single thing on the named Plaintiffs' profiles to then follow links to the privacy settings when presumably Plaintiffs have a sense of what they thought was sensitive when they alleged that Facebook shared their sensitive information.

**MS. WEAVER:**  I can respond to this, Your Honor.

**THE COURT:**  Yes.

**MS. WEAVER:**  We have identified categories.  What it seems Facebook wants us to do and what their interrogatories asked was us to identify by Bates number in what they produced what is sensitive by actual -- each post.

So we have begun the process of going through that, but here is the disconnect:  They produced a snapshot in time of Facebook activity.  They want us now to go to evidence -- you know, the Facebook -- users have not produced their own

1    Facebook platform to Facebook because Facebook has it.

2        I don't know how we would produce it to Facebook.  I can

3    go with a Plaintiff and look right now at a post and find what

4    is restricted there post-by-post.  And, of course, this would

5    be millions or, perhaps, billions of posts.  But that's fine.

6    This case is a lot of work.

7        But that privacy restriction today may not be the same

8    privacy restriction that is in the snapshot in time that they

9    produced.

10       So we have given them examples.  And I don't even know how

11   to get that into evidence because that privacy restriction that

12   they are looking at online hasn't been produced at all.  This

13   is -- this is the conundrum.

14       We have given them examples, examples of health and

15   medical information, private information about families.

16       They will depose these people.  These people will explain

17   what they thought was private.  And we will do whatever work

18   Your Honor tells us to do, and we are engaging in this subset

19   of a subset review right now to honor that.

20       But at the end of the day, that is not going to be the

21   basis of our claims.  That is not the evidence we are going to

22   present at trial, and it's convoluted.

23       I would just say:  Let's wait until they -- we can see

24   everything.  And the other thing is, this response will also be

25   informed once we get all the data on the nine named Plaintiffs

1    in Discovery Order Number 9.

2       We have given them interim responses but it will change.

3    Once these Plaintiffs understand everything that Facebook has

4    collected about them, their responses to these questions are

5    going to look very different.

6             **MR. LOESER:**  Your Honor --

7             **MS. STEIN:**  May I respond to that, Your Honor?

8             **THE COURT:**  Yes.  Go ahead, Ms. Stein.

9             **MS. STEIN:**  So respectfully, you know, Plaintiffs have

10   discovery obligations too.  Facebook has been working its tail

11   off.  We have provided almost 500 pages in interrogatory

12   responses.  We are reviewing millions of documents here.

13      When we originally served RFPs, you may recall Plaintiff

14   said:  We don't want to do this as RFPs.  Serve

15   interrogatories.

16      We served interrogatories.  We gave them lots of extra

17   time.  We literally got one page of substantive responses back

18   to our interrogatories.  What we are asking about is

19   information about Plaintiffs' allegations.  What is the

20   sensitive information?

21      Plaintiffs have all of this at their -- in -- in their

22   possession, custody and control.  They know in their heads --

23   we can't figure out what they thought was sensitive; what they

24   alleged to be was sensitive.  That is exclusively in Plaintiffs

25   custody and control.

1     And what we need to know here -- and what Plaintiffs have

2  an obligation to do -- is to sort through their information,

3  tell us what was sensitive.  They didn't want to do this by

4  producing.  We produced everything for them that was in their

5  accounts.

6     They now want us to click through news articles, other

7  things that they are posting and provide every privacy setting.

8  We are not asking about the privacy setting.  That's not what

9  we asked.

10    We asked what was the sensitive information, and

11  Plaintiffs said:  We don't know what was sensitive.  It depends

12  on whether it was marked private.  That's not true.  What was

13  sensitive would be a subset of it.

14    Not everything that is marked private is sensitive.

15  People repost other people's posts.  They put up restaurant

16  reviews, newspaper articles.  That may be all marked private,

17  but that's not the sensitive information that matters here.

18    It is critically important that Plaintiffs do their

19  obligation in discovery and not keep pushing everything onto

20  Facebook to do.

21    **MR. LOESER:**  Your Honor, just very briefly, I think

22  again, we are just kind of having a practical problem; and a

23  30(b)(6) may be helpful here as well.

24    The practical problem is Facebook maintains data.  They

25  have a platform for users to post things, and they produced a

1    bunch of information but not in the format in which it is kept.

2         The practical problem is:  Is it possible for them to

3    produce the information in the format in which it is kept as a

4    result of which the Plaintiffs can easily respond to their

5    discovery requests.

6         **THE COURT:**  Well, can I just ask you first, though,

7    why do the Plaintiffs need -- I mean, if the answer to the

8    interrogatory is anything that was marked private or was

9    restricted in some way is sensitive, then say that.

10        **MS. WEAVER:**  We have, Your Honor.

11        **MS. LAUFENBERG:**  Your Honor --

12        **MS. WEAVER:**  Go ahead, Cari.

13        **THE COURT:**  Then that's one answer.  And then another

14   answer is -- and then you go through what the person

15   identified, regardless of what the privacy settings are; right.

16        Now, it may turn out that you identified something as

17   sensitive; but you didn't -- your client didn't use any privacy

18   setting.  Okay.

19        **MS. WEAVER:**  Here is the problem -- yeah, here is the

20   problem with that -- I mean, we will do whatever you order.

21   And if you want us to do that with this subset of information,

22   which, by the way, is not everything they have ever posted.

23        **THE COURT:**  I understand.  You can only do it on what

24   has been produced.  I understand.

25        **MS. WEAVER:**  Here is the issue:  I am an individual.

These are humans in the middle of a pandemic with jobs, and we are asking them to go back and look through every post they ever made on Facebook. And we are going to have to ask them to do that again which we will do. That is what this case is demanding.

I can't remember what I posted in 2007 or 2009. And when I look at the post, I can't remember if it was private to me then or not. If I looked and saw that I only shared it with Cari, I would know oh, that is sensitive. But they would be guessing to say -- and we have given them examples of categories. Like I said, medical information, we can give them categorical examples.

And for these Plaintiffs -- for some of them it is political stuff. Some of it is not. They have different comfort zones with what they shared. We can go back and view this, but --

THE COURT: Are the examples tethered to the specific posts?

MS. WEAVER: Yes. And we can --

THE COURT: Ms. Stein is shaking her head no.

MS. WEAVER: So we have given them categories of messages, and we have told them we will give them examples and we are amending further.

THE COURT: So that's what you need to do.

MS. WEAVER: Okay.

1    **THE COURT:**  You need to -- like if you are -- you

2    can't just say medical and health information.  What does that

3    mean?

4           **MS. WEAVER:**  Fine.  We can find examples.

5           **THE COURT:**  Give them an example; right?

6           **MS. WEAVER:**  Yes.

7           **THE COURT:**  If it is the fact that I visited this or,

8    you know, shared with my friend this website about this drug;

9    right.  I mean, that is different; right.

10   So you need to tether it to examples.  And they just need

11   to answer to the extent they can.  That's all it is, is to the

12   extent they can do, based on what they have now.

13   What you have said is you can't figure out what the

14   privacy setting was in 2007.  Well, then, Facebook can't demand

15   that you base your answer based on that if you don't know what

16   it is.

17          **MS. WEAVER:**  Right.  Okay.

18          **MS. STEIN:**  And, Your Honor --

19          **MS. WEAVER:**  Thank you, Your Honor.  We will do that.

20          **MS. STEIN:**  We have never taken the position that

21   their answer should be tethered to privacy settings.  What we

22   have asked is what Plaintiffs in their allegations considered

23   to be sensitive and to identify the posts.

24   Now, back in 2007 you couldn't click -- you couldn't

25   individually identify individual posts by privacy setting.  It

1   was more -- more of a default for how you posted generally.

2   There weren't individual options when you posted something.

3       So, you know, respectfully having Plaintiffs just say:

4   Anything we marked private was also sensitive, I, frankly,

5   don't think is a good-faith answer to an interrogatory

6   response.  It is just saying everything -- if everything was

7   marked private in 2007, '08, '09 and so on, that includes, you

8   know, public information that they were posting or reposting

9   someone else's public post and it happened to be marked

10  private, that doesn't make it sensitive.

11      And I think that Plaintiffs have more of an obligation to

12  do an investigation in responding to interrogatories just the

13  way Facebook did; right.

14      I mean, Facebook when we drafted our 500-page response, we

15  spent hundreds, if not thousands of hours, you know, working on

16  those responses and conducting investigations.

17      Now, maybe we did too much.  And if we did too much, then,

18  you know, shame on us; and we will know that going forward.

19  But, you know, I do think that Plaintiffs have an obligation to

20  tell us what is sensitive and not just say:  It was under our

21  privacy setting; ergo it was sensitive.

22          **THE COURT:**  It would obviously have to be more

23  specific.  Look, they are going to amend their responses.  They

24  will be as robust as they can.  I don't think you can expect

25  them to identify every single one that is on there, but it

1  should be pretty robust, right, and tethered to actual posts;

2  right.

3     Like political posts, that is what Cambridge Analytica is

4  about, sensitive information.  Here is examples of posts that I

5  never expected would be made accessible to third parties.

6     **MS. LAUFENBERG:**  Can I offer -- this is Cari

7  Laufenberg on behalf of Plaintiffs.  Can I offer one additional

8  informative overlay, which is:  The way that this information

9  has been produced, it is completely uncontextual.

10     So, in other words, you get information by category.  And

11  so what we see are a long laundry list of posts that our

12  clients made, but you don't see what they are made in response

13  to.

14     So, again, that is making our jobs very difficult here.

15  We are being incredibly diligent.  We have produced hundreds of

16  pages in response to these interrogatories.  We are continuing

17  to work.  We will amend.

18     We can only work with what we have been given, and what we

19  have been given is incredibly limited and makes it a tortuous

20  task for our clients.

21     So we need to have contextual information in order to

22  assess the sensitive -- whether this is sensitive information.

23     **MS. WEAVER:**  We are not sure that the responses will

24  be accurate because -- and that puts us in an impossible

25  situation.  It is not that we are not willing to do the work.

1    It is that we don't know how to get the answers right.

2          **MS. STEIN:**  Yeah.  We would certainly be open, if

3    Plaintiffs wanted to, you know, reprint something, you know, if

4    they don't like the format.

5          And, by the way, we reproduced their accounts in response

6    to requests that we provide things in a different format.  We

7    already went through that exercise once.  But if it is easier

8    for Plaintiffs to print things out, you know, from their own

9    account and do it that way, we are totally open to Plaintiffs

10   using it that way instead of pointing to documents that have

11   already been produced by us.

12         **MS. WEAVER:**  Maybe we can make some progress, Deb.

13   Can I ask this:  Does Facebook maintain the limited audience

14   information on the nine Plaintiffs' posts and activity?  And if

15   so, can you produce that to us?

16         **MS. KUTSCHER CLARK:**  The only way to do it is to go to

17   the live website and on the live website click each individual

18   post and follow a link to see the setting.

19         And that's what we have been trying to convey.  The only

20   other way we could even produce the account information --

21   I believe we have discussed this previously -- is to produce

22   back to you guys a live link of the Facebook accounts which is

23   what your clients already have.

24         **MS. WEAVER:**  So how did Facebook --

25         **MS. KUTSCHER CLARK:**  And none of that would be Bates

1  numbered.

2          **MS. WEAVER:**  Let me just ask --

3          **THE COURT:**  I'm going to have to stop you.  I have to

4  go at 11:00.  We have, like, two minutes.  So we can't do this.

5  You guys just have to figure this out.  So there is a couple of

6  others things --

7          **MS. WEAVER:**  We will.

8          **THE COURT:**  -- I want to address.  On the additional

9  custodians, Mr. Zuckerberg, Ms. Sandberg, I think you should

10 wait until all the documents are produced.  Those will be very

11 targeted once -- so I don't see any problem waiting for that.

12     On the voluntary dismissal of the named Plaintiffs, it is

13 without prejudice; and they don't have to agree.  Well, look,

14 it happens all the time that a judge will deny class cert based

15 on the adequacy of the named Plaintiff.

16     And if the Judge gives the named Plaintiff the opportunity

17 to put forth a new named Plaintiff, then they have that

18 opportunity.  We are not cutting that off now.

19     It is not depriving Facebook of any discovery because if

20 those people are put up later, then they get the discovery as

21 to those named Plaintiffs.

22         **MS. STEIN:**  Your Honor, our issue in the

23 stipulation -- and I think, frankly, we worked through some of

24 this with Plaintiffs yesterday.

25         **THE COURT:**  Okay.

1    **MS. STEIN:** We -- we are fine stipulating to the

2  dismissal of certain named Plaintiffs without prejudice to

3  their being in the class.  We don't want to waive any right in

4  there, and I think Plaintiffs said that they are fine; that we

5  don't need to.

6    What we were struggling with is that we don't -- if any

7  Plaintiff wants to drop, that's fine.  But they need to fish or

8  cut bait but that specific named Plaintiff because it's -- you

9  know, otherwise they should stay in case and, you know,

10  proceed; but they are supposed to be representatives here.

11    **THE COURT:** No, no, no, I don't understand.  I think

12  that's where I disagree with you.

13    I think to get through the burden arguments and all that

14  and to make -- they narrowed the class reps they were putting

15  forward on the motion.

16    Should Judge Chhabria deny the motion and should he give

17  them the opportunity -- he may or may not.  He may not do it.

18  It is going to be up to Judge Chhabria to put forth different

19  class reps; right.  It could be these people.  It could be

20  somebody else.  I mean, presumably the ten they put up they

21  think are their ten best anyway.

22    No.  I don't think they have to -- I disagree with you.  I

23  don't think that's the case.

24    **MS. STEIN:** Well, Facebook wants to preserve its

25  objections as to their being able to come back as named

1    representatives.

2          **THE COURT:**  Of course.  You can preserve -- what I'm

3    saying is nobody has to give away anything.  You can make that

4    argument.  What I'm saying is we are not going to hold this up

5    so that they agree with your argument.  You can preserve your

6    argument.  They can preserve their argument.

7          **MS. WEAVER:**  To be clear, a lot of these Plaintiffs

8    are disappointed, Deb.  I'm not kidding.  They want to be

9    deposed by you.  So --

10          **MS. STEIN:**  You know --

11          **THE COURT:**  Well --

12          **MS. STEIN:**  We can arrange that, Leslie.

13          **THE COURT:**  No, no, no, Ms. Weaver.

14          **MS. WEAVER:**  Yes.

15          **THE COURT:**  Right.  When we get to our sort of absent

16    class member discovery -- I've had this come up in a few

17    cases -- they put forth, right, because the Defendants often

18    want to go beyond the named Plaintiffs and take a few -- the

19    first person they point to is -- they say:  This person was a

20    named Plaintiff.  It is not too burdensome on them.  I'm sure

21    Facebook would be happy to depose them.  So --

22          **MS. WEAVER:**  My co-Counsel is going to be mad at me.

23          **MR. LOESER:**  Your Honor, in the ten seconds that is

24    left, I do want to just make a point that is something that has

25    been pervasive which is a lot of arguments we have heard from

1  Facebook can be addressed by our better understanding of how

2  data is maintained.

3      So, for example, this whole issue of how they produced the

4  on-platform activity comes down to:  How does Facebook maintain

5  this data and can they produce it in a way that is in a native

6  format where we can answer their questions easily by looking at

7  the data instead of this sort of weird treasure hunt we have to

8  go on through live Facebook pages to try and match up with

9  their Bates productions?

10      I would suggest that of the 30(b)(6) topics that are

11  really critical here is one that is just focused on how data is

12  maintained for these various subjects.  We could avoid a lot of

13  fighting if we just had a better understanding of how the data

14  is maintained for these different areas that we keep arguing

15  about.

16      **THE COURT:**  And we tried getting experts together

17  months ago, months ago.  If you want to do it, put it in your

18  30(b)(6) and we will see --

19      **MS. STEIN:**  Well --

20      **MS. WEAVER:**  We tried that, Your Honor.

21      **MS. STEIN:**  We would strenuously object to that

22  because we went through months and months of informal ESI

23  discussions.  We have been down this road.  We have had all

24  these meet-and-confers.

25      The bottom line is Plaintiffs just don't believe us.  And

1  we do all of this work as counsel to provide this information

2  informally, and they just don't believe us.

3      MR. LOESER:  Sometimes it is because our experts are

4  telling us something very different.  We like you very much.

5  It is not anything personal, Deb.  It is just when our experts

6  tell us:  That is impossible that Facebook doesn't maintain

7  this in a way that they can use it and easily access it.

8      We just need -- it is no offense intended to anyone.  We

9  just need evidence.  (Inaudible) can only go so far.

10     MS. WEAVER:  If you give us the verifications to the

11 interrogatories, we will know who at least is giving you the

12 information.  We can just depose them, but we have got to start

13 taking evidence.

14     THE COURT:  On the privilege log, can you submit a

15 stipulation by the 18th that was on the briefing, on the ADI?

16     MS. WEAVER:  Yes.

17     MR. KO:  Yes, Your Honor.

18     THE COURT:  I know that was Plaintiffs' proposal, so

19 I'm really asking Facebook.

20     MS. STEIN:  I think Martie --

21     MS. KUTSCHER CLARK:  What is the question, Your Honor,

22 about briefing?

23     THE COURT:  The briefing schedule on the ADI

24 privilege.  By the 18th, just stipulate to the briefing

25 schedule.

1     **MS. KUTSCHER CLARK:**  Your Honor, I don't think we will

2  be in a position to agree to a briefing schedule until we

3  receive Plaintiffs' challenges to the privilege log.  And this

4  is something we discussed extensively previously; that we need

5  to see what the challenges are.

6     We are going to need to meet and confer with them about

7  the challenges so that we understand the scope and nature of

8  what is being briefed before we set a schedule on it.

9     **THE COURT:**  Okay.  I have to go.  I have got the call.

10  So sorry.  I'm out of time.  I can't resolve that.  When is our

11  next conference, January what?  It is not going to be this

12  year.

13                              (Laughter)

14     **MR. LOESER:**  I'm guessing it is not the 1st.

15     **THE COURT:**  That is correct.

16     **MS. WEAVER:**  The 8th?

17     **THE COURT:**  The 8th?

18     **MS. STEIN:**  If we can make it the 15th, that would be

19  better on our end.

20     **THE COURT:**  The 15th at 8:30.

21     **MS. WEAVER:**  Works for us, Your Honor.

22     **THE COURT:**  Okay.  I will see you then.  I will do the

23  best I can after today.

24     **MR. LOESER:**  Thank you, Your Honor.

25                (Proceedings adjourned at 11:04 a.m.)

1          ---oOo---

2

3          **CERTIFICATE OF REPORTER**

4          We certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:   Thursday, December 10, 2020

8

9

10

11   _____

12            Marla F. Knox, RPR, CRR
             U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT G

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br><br> This document relates to: <br><br> ALL ACTIONS | **MDL NO. 2843** <br><br> CASE NO. 3:18-MD-02843-VC-JSC <br><br> HON. VINCE CHHABRIA <br> COURTROOM 4 – 17TH FLOOR <br> SPECIAL MASTER, DANIEL GARRIE, ESQ. <br><br> **ORDER RE: PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF PLAINTIFF DATA** |

## INTRODUCTION

1.      Pending before Special Master Garrie is Plaintiffs' Motion to Compel Production of Named Plaintiffs' Content and Information.

## BACKGROUND

2.      On November 25, 2019, Plaintiffs' served Requests for Production Nos. 9-13, which seek documents relating to the named Plaintiffs in this matter ("Named Plaintiffs").[1] See Exhibit A. In brief, Request No. 9 seeks all documents relating to each of the Named Plaintiffs; Request No. 10 seeks documents sufficient to show the categories of content and information Facebook collects, tracks, and maintains about them; and Requests Nos. 11-13 seek documents identifying third parties that were able to access information about the Named Plaintiffs. Id.

3.      In response to Requests for Production Nos. 9-13, Facebook produced more than one million pages of individual user data it maintained relating to the Named Plaintiffs, most of which was obtained from the "Download Your Information" tool ("DYI Tool").[2] The data obtained from the DYI Tool is mostly limited to information pertaining to users' on platform Facebook activity. See Exhibit B (List of DYI Tool Data Fields).

4.      Statements by Facebook's counsel during an August 14, 2020 discovery hearing indicated that Facebook maintained additional data related to the Named Plaintiffs that was not produced. See Exhibit C (8/14/2020 Discovery Hearing Transcript) at 8:10-13 ("There is other – there's Facebook-generated information, information generated by third parties, information

---

[1] There were originally 30 named Plaintiffs, but this has been reduced to nine named Plaintiffs.

[2] The DYI Tool is a tool by which Facebook users can download certain pieces of information related to the user's Facebook activity and related data. A list of the types of information that can be downloaded via the DYI Tool is provided in Exhibit B.

**ORDER RE: PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF PLAINTIFF DATA**

received from third parties. We have not represented that that is comprehensively included in our production.").

5.    Plaintiffs filed a motion last September to compel additional discovery related to Requests for Production Nos. 9-13. See Exhibit D (9/28/2020 Motion to Compel). Plaintiffs asked the Court to compel production of sensitive information Facebook derives and collects from business partners, app developers, apps, and other sources. This request included "native, appended and behavioral data" and purportedly anonymized data that could be connected to the Named Plaintiffs. Id. at 7-11.

6.    On October 8, 2020, Facebook responded to Plaintiffs' motion to compel. See Exhibit E (Facebook Opposition to Plaintiffs' 9/28/2020 Motion to Compel). Facebook contended that all information related to the Named Plaintiffs that they did not themselves share on Facebook was outside the scope of the case; that all information not shared through one of the four theories of the case was not within the scope of the case; that Plaintiffs were not entitled to all data collected from third parties about the Named Plaintiffs; that the Stored Communications Act and Video Protection Privacy Act claims did not require the production of additional data Facebook had collected about the Named Plaintiffs; and that Facebook could not reasonably collect any of the additional information Plaintiffs sought. Id. at 6-10.

7.    On October 29, 2020, Judge Corley issued Discovery Order No. 9, ruling "that discovery is not as limited as Facebook contends" and "the discoverable user data at issue includes: [1] Data collected from a user's on-platform activity; [2] Data obtained from third parties regarding a user's off-platform activities; and [3] Data inferred from a user's on or off-platform activity." See Exhibit F (Discovery Order No. 9) at 2.

8.      In Discovery Order No. 11, Judge Corley provided further clarification on the discoverable user data intended to be included under Discovery Order No. 9:

> It also contended that Plaintiffs conceded that user data not shared with or accessible to third parties is not relevant, (Dkt.No. 548 at 10), and because Facebook does not share inferred user data, the inferred user data Facebook maintains is not relevant. Facebook both collects and uses data about its users as part of its business model, including data derived from third parties. How it specifically uses this data is an open question, but if the Court were to accept Facebook's arguments about the scope of production, it would eliminate Discovery Order No. 9's third category of discovery: data inferred from a user's on or off-platform activity. What is needed now is more detail about Facebook's collection and use of user data so future discovery requests can be tailored to Plaintiffs' better understanding of the internal operations of Facebook as well the terminology it uses for describing data that is potentially responsive to Plaintiffs' discovery requests. See Exhibit G (Discovery Order No. 11) at 1.

9.      Following Judge Corley's orders, Facebook did not produce additional documents in response to Requests for Production Nos. 9-13.

10.      On October 6, 2021, Special Master Garrie and Judge Andler declared impasse on the issue of whether Facebook should be compelled to produce additional documents related to the Named Plaintiffs pursuant to Discovery Order No. 9.

11.      On October 18, 2021, Plaintiffs submitted their opening brief to Special Master Garrie on this issue. See Exhibit H. Plaintiffs argue that (a) the court has already determined the information Plaintiffs seek is relevant—whether or not Facebook claims that it has been shared; (b) whether the Named Plaintiffs' information was shared is a contested question on which Plaintiffs are entitled to evidence; (c) Facebook has failed to substantiate a disproportionate burden in identifying the data it possesses relating to nine people; and (d) Plaintiffs have made proposals to reduce the burden of production on Facebook. Id.

12.      On October 28, 2021, Facebook submitted its Opposition to Plaintiffs' Motion to Compel Production of Named Plaintiffs' Content and Information. See Exhibit I. Facebook argues,

**ORDER RE: PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF PLAINTIFF DATA**

among other things, that (a) the scope of discovery is limited to information Facebook shared with third parties; (b) Plaintiffs are judicially estopped from seeking information that was not shared; and (c) the information Plaintiffs now seek is nonresponsive and otherwise unavailable. Id.

13.     On November 2, 2021, Plaintiffs submitted their Reply in which they argue, among other things, (a) Judge Corley's orders entitle Plaintiffs to the discovery they seek; (b) Plaintiffs are entitled to probe Facebook's assertion that it has already produced all the content and information it has shared or made accessible to third parties; (c) Plaintiffs are entitled to answers to Interrogatories 16 and 17; and (d) the relief Plaintiffs are requesting is intended to lighten Facebook's burden. See Exhibit J.

14.     Facebook subsequently objected to Plaintiffs reply claiming that Plaintiffs introduced new arguments and evidence for the first time, in violation of the Discovery Protocol. See Exhibit K (Facebook's Response to Plaintiffs' Objection Regarding Named Plaintiffs' Data Briefing) ("Plaintiffs sought **new relief** and introduced **twelve new documents** that Plaintiffs suddenly claim show gaps in Facebook's productions.").

## FINDINGS

15.     Special Master Garrie finds that Discovery Order No. 9 does not limit the scope of discoverable data related to the Named Plaintiffs to data that was shared with third parties, as Facebook contends, because Judge Corley's ruling contains no language indicating such a limitation: "Accordingly, the court rules the discoverable user data at issue includes: [1] Data collected from a user's on-platform activity; [2] Data obtained from third parties regarding a user's off-platform activities; and [3] Data inferred from a user's on or off-platform activity." See Exhibit F at 2.

16.    Moreover, Judge Corley clarified that Facebook's interpretation of Discovery Order No. 9 is not what Judge Corley intended: "How [Facebook] specifically uses this data is an open question, but if the Court were to accept Facebook's arguments about the scope of production, it would eliminate Discovery Order No. 9's third category of discovery: data inferred from a user's on or off-platform activity." See Exhibit G at 1.

17.    Special Master Garrie finds that Facebook appears to maintain data related to the Named Plaintiffs that was not produced in response Requests for Production Nos. 9-13. See Exhibit C at 8:10-13 ("There is other – there's Facebook-generated information, information generated by third parties, information received from third parties. We have not represented that that is comprehensively included in our production."). For example, documents produced by Facebook indicate that Facebook collects data referred to as "Appended Data," including public records, auto registration data, retail purchases, and credit card purchases, all of which fall into the second category of data from Discovery Order No. 9. See Exhibit L (FB-CA-MDL-00213424). However, Facebook has not produced this data as it is not available via the DYI Tool. See Exhibit B.[3]

18.    Special Master Garrie finds that Plaintiffs requested new relief (answers to Interrogatories 16-17) and introduced new evidence (exhibits C, D, E, F, H, I, and J to Plaintiffs' Reply) in their Reply brief in violation of the Discovery Protocol. Accordingly, Special Master Garrie did not consider this request for new relief or the new evidence items in reaching the findings herein.

//

---

[3] Facebook also appears to maintain data relating to the Named Plaintiffs' on-platform activity that has not been provided, such as inferred interest and behavior data. See Exhibit L.

**ORDER RE: PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF PLAINTIFF DATA**

# ORDER

19.    No later than December 3, 2021, Facebook is to provide a list of data sources that may contain information related to the Named Plaintiffs pursuant to Discovery Order No. 9. The list of data sources is to include: (1) the name of the database or data log; (2) a description of the data source's purpose and function; and (3) a description of the types of Named Plaintiff data contained in the data source.

20.    No later than December 10, 2021, the parties are to meet and confer and each submit to Special Master Garrie a proposed protocol for the production of Named Plaintiffs' data from the data sources identified by Facebook.

**IT IS SO ORDERED.**

Monday, November 29, 2021

Daniel Garrie
Discovery Special Master

# EXHIBIT H

1  Derek W. Loeser (admitted *pro hac vice*)    Lesley Weaver (Cal. Bar No.191305)
   KELLER ROHRBACK L.L.P.                        BLEICHMAR FONTI & AULD LLP
2  1201 Third Avenue, Suite 3200                 555 12th Street, Suite 1600
   Seattle, WA 98101                             Oakland, CA 94607
3  Tel.: (206) 623-1900                          Tel.: (415) 445-4003
   Fax: (206) 623-3384                           Fax: (415) 445-4020
4  dloeser@kellerrohrback.com                    lweaver@bfalaw.com

5

6  *Plaintiffs' Co-Lead Counsel*

7  *Additional counsel listed on signature page*

8
                    **UNITED STATES DISTRICT COURT**
9                  **NORTHERN DISTRICT OF CALIFORNIA**
                      **SAN FRANCISCO DIVISION**
10

11
   IN RE: FACEBOOK, INC. CONSUMER          MDL No. 2843
12 PRIVACY USER PROFILE LITIGATION          Case No. 18-md-02843-VC-JSC

13                                          **REPLY IN SUPPORT OF PLAINTIFFS'**
                                            **MOTION TO COMPEL PRODUCTION OF**
14 This document relates to:                **NAMED PLAINTIFFS' CONTENT AND**
                                            **INFORMATION**
   ALL ACTIONS
15                                          Judge: Hon. Vince Chhabra
16                                          Hon. Jacqueline Scott Corley
                                            Special Master Daniel Garrie
17                                          Courtroom: 4, 17th Floor

18                                          JAMS Ref. No.: 1200058674

19                                          ORAL ARGUMENT REQUESTED

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................... 1

II.   Argument ............................................................................................... 2

      A. Judge Corley's Orders Entitle Plaintiffs to the Discovery They Seek. ........................ 2

      B. Plaintiffs Are Entitled to Probe Facebook's Assertion That It Has Already
         Produced All the Content and Information It Has Shared with or Made Accessible
         to Third Parties. ........................................................................................... 4

         1.  Ample Evidence Casts Doubt on Facebook's Assertion. ..................................... 4

         2.  Facebook Cannot Limit Its Discovery by Reference to Its Own View of
             Disputed Merits Issues, Since the Whole Point of Discovery Is to Help Resolve
             Such Issues. ........................................................................................... 7

         3.  The Cases on Which Facebook Relies Have No Relevance Here. ......................... 8

      C. As Facebook's Silence Confirms, Plaintiffs Are Entitled to Answers to
         Interrogatories Numbers 16 and 17. ............................................................... 9

      D. The Relief Plaintiffs Are Requesting Is Intended to Lighten Facebook's Burden. ....... 9

III.  CONCLUSION .................................................................................... 10

# I.  INTRODUCTION

Plaintiffs' argument in support of its to compel the production of Plaintiffs' data and information is straightforward. All user data that has been shared or made accessible to third parties, from whatever source collected or inferred, is relevant and discoverable. There is concrete and compelling evidence that Facebook has not produced all such data for the Named Plaintiffs. Plaintiffs are not required to accept Facebook's contrary assertion, since what has been shared or made accessible is a disputed merits issue that Plaintiffs are entitled to probe. And Facebook has consistently refused to provide any transparency into what Facebook collects about users and for what purpose, let alone what Facebook possesses about the Named Plaintiffs.

Facebook's response to this straightforward argument is part and parcel of its abusive approach to discovery as a whole: deny, attack, and reverse the victim and the offender. Facebook denies the plain language of Judge Corley's orders and that its production is incomplete, and attacks Plaintiffs for having the temerity to seek the discovery they should have received a year ago. Instead, Facebook insists, Plaintiffs are the ones abusing the legal process, since (it says) they are taking a position contrary to the one they took in front of Judge Corley.

Facebook's attacks are unfounded and misleading. Plaintiffs have always sought, and continue to seek, content and information that has been shared with or made accessible to third parties. And they are not arguing that content and information is relevant if Facebook did not share it with or make it accessible to third parties. They are simply arguing that Facebook has not produced all of that relevant content and information, and that Facebook can't be the judge of what it means to share content and information or make it accessible to third parties. Plaintiffs are entitled to discover the information Judge Corley already has decided is relevant because the information will shed light on Facebook's misuse of user information on which the four categories of misconduct at the heart of this case are based.

Similarly meritless is the argument that Plaintiffs have no right to question Facebook's assertions. Plaintiffs have come forward with compelling evidence that Facebook has not produced all the content and information that has been shared with or made accessible to third

parties. Facebook fails to counter that evidence. And the notion that Plaintiffs must simply accept Facebook's version of events—which is what Facebook's position amounts to—runs against the whole purpose of discovery, which is to define and resolve disputed merits issues. Plaintiffs need not accept Facebook's position on those merits issues in discovery.

For these reasons and the others laid out below, Plaintiffs' motion should be granted.

## II.    ARGUMENT

### A.    Judge Corley's Orders Entitle Plaintiffs to the Discovery They Seek.

In their motion, Plaintiffs explained why Judge Corley's orders entitle Plaintiffs to all the content and information that Facebook collects, appends, and infers about the Named Plaintiffs, regardless of whether Facebook *admits* that it is shared with or made accessible to third parties. Mot. to Compel Production of Named Plaintiffs' Content and Information ("Mot.") at 8–9. Facebook, however, takes the position that Judge Corley has affirmatively *foreclosed* Plaintiffs' ability to receive the discovery they now seek. This extravagant position, whether framed as judicial estoppel or as any other theory, should be rejected.

*First*, the position Plaintiffs have taken in front of Judge Corley is not inconsistent, let alone "clearly inconsistent," with the position they take here. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quotation and citation omitted). In front of Judge Corley, Plaintiffs argued that when users' content and information was shared with or made accessible to third parties, it was relevant, regardless of the source of the content and information. They reaffirm that position. Plaintiffs are arguing not that content and information is relevant if Facebook did not share it with or make it accessible to third parties, but rather that (1) Facebook *has not produced* all the content and information that it has shared with or made accessible to third parties; and (2) Facebook is *not allowed to be the judge* of what it did or did not share with or make accessible to third parties, because that is a disputed merits issue. *See Hossaini v. W. Mo. Med. Ctr.*, 140 F.3d 1140, 1143 (8th Cir. 1998) (judicial estoppel did not apply because party's "underlying assertion" did not change). And Facebook's refusal even to identify what it has collected, appended, or inferred about the Named Plaintiffs—including their profiles, *see infra* § B.1—is a serious gap in

1  Facebook's production that prejudices Plaintiffs' ability to demonstrate the full scope of

2  Facebook's misuse of user information.

3      *Second*, Judge Corley nowhere ruled, or even suggested, that Plaintiffs may not probe

4  Facebook's assertions about what it did or did not share with or make accessible to third parties.

5  Quite the opposite. Allowing Plaintiffs to probe such assertions was one of the purposes of

6  Discovery Order No. 11, which recognized that what information was shared with or made

7  accessible to third parties was "an open question." Decl. of Derek W. Loeser in Supp. of Mot. to

8  Compel Production of Named Plaintiffs' Content and Information ("Loeser Decl."), Ex. 6 at 1

9  (filed originally as Dkt. No. 588). Discovery Order No. 12 makes it even clearer that Plaintiffs are

10  entitled to probe Facebook's assertions, stating about the then-imminent depositions that

11  "whether particular user data is not shared, not admissible, or not monetized, is not a valid reason

12  to object to a particular deposition question." Loeser Decl., Ex. 7 at 1–2 (filed originally as Dkt.

13  No. 602).

14      *Third*, Facebook fails to explain how granting this motion would give Plaintiffs an "unfair

15  advantage" or impose on Facebook an "unfair detriment." Opp'n to Pls.' Mot. to Compel

16  Production of Named Plaintiffs' Content and Information ("Opp'n") at 12 (quotation and citation

17  omitted). Again: at no point did Judge Corley suggest that Plaintiffs were not entitled to discovery

18  to test Facebook's assertions about what it made accessible to or shared with third parties. When

19  Plaintiffs expressed doubt that Facebook's production was complete, Judge Corley allowed

20  Plaintiffs a 30(b)(6) deposition to inquire about how Facebook used the information it collected.

21  And, crucially, she did not suggest that that deposition was the only inquiry that Plaintiffs could

22  make: "And if you don't get what I think you should get, no one's going anywhere; we can come

23  back and do it again. This is just to try to break through that logjam and *get started*." Decl. of

24  Derek W. Loeser in Supp. of Reply in Supp. of Mot. to Compel Production of Named Plaintiffs'

25  Content and Information ("Loeser Reply Decl."), Ex. A at 20 (emphasis added). The 30(b)(6)

26  deposition, then, was merely the start of the process. Plaintiffs seek here to follow through on the

27  critical inquiry that the deposition began. And, make no mistake about it, the question of what

28

information about the Named Plaintiffs was shared with or made accessible to third parties by Facebook is a core issue in this litigation. Discovery Order No. 9 settled the question of whether the full scope of information about the Named Plaintiffs collected or inferred by Facebook is relevant. Facebook should not be allowed to circumvent that Order through the ruse of its untested determination that none of the information it is withholding fits its self-serving definition of sharing.

**B.** **Plaintiffs Are Entitled to Probe Facebook's Assertion That It Has Already Produced All the Content and Information It Has Shared with or Made Accessible to Third Parties.**

Facebook takes the position that the Court must simply take its word that it has already produced all the content and information that has been shared with or made accessible to third parties. This position should be rejected. First, there is ample concrete evidence that the content and information that Facebook shares or makes accessible goes well beyond the content and information that it has thus far produced. Second, Facebook cannot resist discovery simply by relying on its own view of a disputed merits issue—here, what it means to share or make accessible—since the whole point of discovery is to *resolve* such disputes.

**1.** **Ample Evidence Casts Doubt on Facebook's Assertion.**

In their motion, Plaintiffs pointed to considerable evidence that Facebook's production thus far does not capture all the user content and information that Facebook shares or makes accessible to third parties. Mot. at 6–7, 9–10. Facebook's response to this evidence is limited and unsatisfactory. It says that one of the documents cited is "hypothetical," but does not explain *why* the discussion in that document—which certainly appears to be talking about real rather than hypothetical capabilities—should be interpreted as hypothetical. Opp'n at 10. And it is utterly silent about its patents and patent applications, *see* Mot. at 7,[1] which, along with other public

[1] *See also* U.S. Patent No. 9,740,752 (Aug. 22, 2017) ("A social networking system obtains linguistic data from a user's text communications on the social networking system. . . . *The inferred personality characteristics are stored in connection with the user's profile*, and may be used for targeting, ranking, selecting versions of products, and *various other purposes*." (emphasis added)); U.S. Patent Application Pub. No. US 2012/0016817 A1 (Jan. 19, 2012) ("[T]he system inputs the user data to the prediction algorithm to retrieve a Publication

information, verify the existence of a "user profile" that Facebook conceals from users but makes accessible to third parties such as advertisers. *See* U.K. House of Commons, Digital, Culture, Media and Sport Comm., *Disinformation and 'Fake News': Final Report* ¶ 41 at 17 (Feb. 14, 2019) ("[T]he advertising profile that Facebook builds up about users cannot be accessed, controlled or deleted by those users. It is difficult to reconcile this fact with [Mark Zuckerberg's] assertion that users own all 'the content' they upload.").

      The evidence also contradicts Facebook's claim that APIs provided the only conduits for user content and information that was shared with or made accessible to third parties. *Cf.* Opp'n at 5. ███████████████████████████████████████████████████████████ ██████████ *See* Loeser Reply Decl., Ex. B at FB-CA-MDL-00203262 (Mar. 3, 2014 email from Aldo King, senior member of Facebook's Privacy Program); *id.*, Ex. C at 129:3-130:13 (James Barnes testimony regarding ████████████████████████████████ ████████████████████████████ *see also id.*, Ex. D at Slide 5 ████████████████ ████████████████████████████████████

      Facebook's other response to Plaintiffs' showing is to tout its DYI tool, which it calls "the most complete compilation of data Facebook maintains relating to any user." Opp'n at 2–3. However, the DYI tool lacks not only information that Facebook infers about Plaintiffs or that it collects about their off-platform activity, but also certain information about Plaintiffs' *on-pla.form* activity (*i.e.*, the first of Judge Corley's three categories of relevant discovery). For example, Facebook produced an attorney-created spreadsheet that show the apps that five (but not all nine) of the Named Plaintiffs used on the Facebook platform, as well as the corresponding API permissions granted those apps. *See* Loeser Reply Decl., Ex. E. Many of the apps listed on the spreadsheet are missing from the DYI file and vice versa. *See id.*, Ex. F. Furthermore, the DYI contains no information regarding API permissions granted apps. This gap indicates that the DYI file, contrary to Facebook's claims, is not actually complete, even as to on-platform activity. And

---

Classification prediction of whether the user will undergo one or more life change events. *The system updates the user's profile to indicate the life change event and provides advertisements to the user responsive to the prediction* of one or more life change events." (emphasis added)).

when it comes to off-platform activity, Facebook concedes its DYI file is not complete. █
████████████████████████████████████████████████████████████
████████████████████████████████████████ *See, e.g.*, *id.*, Ex. G at 98:21-24 (█
████████████████████████████████████ ).

Nor, crucially, does the DYI file include information about all the "custom audiences" that Facebook put the Named Plaintiffs into. This "custom audiences" feature, as Facebook client solutions manager James Barnes has testified, made available information about users that third parties obtained from Facebook and that Facebook shared with other third-party advertisers. "Custom audiences" makes this information available in several different ways, including by matching hashed emails provided by advertisers and identifying Facebook users to the advertiser based on the match; ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████ *Id.*, Ex. C at 129:3-130:13. Moreover, Barnes testified that "[c]ustom audiences can also be shared from one advertiser to another." *Id.* at 137:5-24. Facebook has not produced custom audiences documents containing the information about Named Plaintiffs that third parties obtained from Facebook or that Facebook shared with or made available to other third-party advertisers through these means.

Other evidence also shows that Facebook both collects and shares information that is not included in the DIY file. For example, a marketing document from Facebook's political advertising group identifies ████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████ *Id.*, Ex. H, at FB-CA-MDL-

00252922. ████████ the description continues, ███████████████
████████████████████████████████████████████████████████████

██████ *Id.* This information is not included in the DIY file for the Named Plaintiffs,

notwithstanding marketing documents indicating that the information was shared with third

parties.

    **2.**     **Facebook Cannot Limit Its Discovery by Reference to Its Own View of Disputed Merits Issues, Since the Whole Point of Discovery Is to Help Resolve Such Issues.**

According to Facebook, Plaintiffs must accept its claim that the only content and

information that was shared with or made accessible to third parties has already been produced.

What data was shared with or made accessible to third parties is a central and disputed merits

issue, however. A party may not use its own view of a merits issue—here, what it means to share

or make accessible—to define the permissible limits of discovery. None of the cases that

Facebook cites suggests that a party may do so. Indeed, if parties were required to accept another

party's view on the scope of appropriate discovery, there would be no role for a motion to compel

under Rule 26(b).

Discovery is not the appropriate stage to resolve "disputed legal and factual issues on the

merits." *Fauceglia v. Univ. of S. California*, No. CV1904738FMOJEMX, 2020 WL 12048986, at

*1 (C.D. Cal. Oct. 5, 2020); *see also Karnoski v. Trump*, No. C17-1297 MJP, 2020 WL 2800609,

at *1 (W.D. Wash. May 29, 2020) (ruling on defendants' motion for protective order, noting that

defendants had "confused the evidentiary standard at trial with the broader discovery standard,

which allows parties to obtain discovery regarding any nonprivileged matter that is relevant to

any party's claim or defense"). This should not be a controversial proposition, since discovery is

meant to be a way of clarifying and defining the disputed issues. *See, e.g., Bolling v. Dendreon

Corp.*, No. C13-0872JLR, 2015 WL 11233202, at *2 (W.D. Wash. June 19, 2015) (discovery's

purpose is to provide "litigants with the information essential to resolving disputed facts in an

expeditious manner" (citing *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993)). It would short

circuit the whole process if one party can resolve disputed issues on its own, and in advance of

discovery. And, indeed, Facebook has so far stymied the ordinary course of discovery by refusing to produce information already deemed relevant by Judge Corley—information that Plaintiffs have been seeking for several years.

### 3. The Cases on Which Facebook Relies Have No Relevance Here.

Facebook cites several cases to support its opposition. Its reliance on these cases demonstrates just how far Facebook strays from the relevant legal issues.

For example, Facebook cites *Bresk v. Unimerica Ins. Co.*, No. CV 16-8893 ODW (SSx), 2017 WL 10439831 (C.D. Cal. Nov. 16, 2017), for the proposition that "[a] plaintiff's mere suspicion that additional documents must exist is an insufficient basis to grant a motion to compel." *Id.* at *5. But Facebook does not dispute that the documents Plaintiffs seek *exist*; it does not deny that it has collected or inferred additional content and information about the Named Plaintiffs. The dispute is simply whether the documents that Plaintiffs seek have certain properties—i.e., they have been shared with or made accessible to third parties. And on that issue, Plaintiffs are entitled to see for themselves and not take Facebook's word for it, especially since they have considerable evidence that Facebook has not produced all the content and information that has been shared with or made accessible to third parties. As *Bresk* notes, if a moving party has "a colorable basis for its belief that relevant, responsive documents exist and are being improperly withheld," the party's motion should be granted. *Id.*; *see also id.* at *5–6 (granting motion to compel because there was no denial that documents sought did not exist).

The other cases that Facebook cites are about "discovery on discovery"—"discovery into another party's discovery process"—and state that such discovery will not be allowed without the identification of a specific deficiency in a production or response. *Uschold v. Carriage Servs., Inc.*, 2019 WL 8298261, at *4 (N.D. Cal. Jan. 22, 2019); *accord Brewer v. BNSF Railway*, 2018 WL 1756432, at *4 (D. Mont. Jan. 11, 2018); *Han v. Futurewei Techs., Inc.*, 2011 WL 4344301, at *5 (S.D. Cal. Sept. 15, 2011). But Plaintiffs do not want to inquire into Facebook's discovery process. To the extent they seek information on potential sources of discovery, they seek it not to audit past discovery, but to minimize future burden. *See infra* § D. And, at any rate, Plaintiffs

*have* identified substantial deficiencies in Facebook's production. *See supra* § B.1; Mot. at 6–7, 9–10.

### C. As Facebook's Silence Confirms, Plaintiffs Are Entitled to Answers to Interrogatories Numbers 16 and 17.

Facebook maintains total silence about two major discovery requests encompassed by Plaintiffs' motion: interrogatories numbers 16 and 17. *See* Mot. at 2, 6; Pls.' Separate Statement at 3–4. These interrogatories asked Facebook to identify the third parties that were given access to the Named Plaintiffs' content and information, and to identify the content and information to which they had access. Facebook does not even attempt to explain why it should not answer these interrogatories. It should be ordered to do so.

### D. The Relief Plaintiffs Are Requesting Is Intended to Lighten Facebook's Burden.

No good deed goes unpunished. In crafting their requested relief, Plaintiffs sought to lighten the burden on Facebook and, to the extent possible, to forestall the production of content and information that was not shared with or made accessible to third parties. Facebook now accuses Plaintiffs of sidestepping discovery mediation. But Plaintiffs' requested relief is consistent with the relief they previously requested and with the Federal Rules.

Indeed, Plaintiffs have repeatedly asked Facebook to provide information that would enable them to help identify relevant information and reduce Facebook's burden. *See* Mot. 7–8. Plaintiffs have even invoked the California Consumer Privacy Act to try get more information—a request that was refused. Loeser Reply Decl., Ex. I; *id.*, Ex. J; *see also* Cal. Civ. Code § 1798.100(a) ("A consumer shall have the right to request that a business that collects a consumer's personal information disclose to that consumer the categories and specific pieces of personal information the business has collected.").

Through discovery mediation, Plaintiffs have also continually sought other information that would help narrow the production, including data models, schemas, snapshots, relevant API and SDK calls, the parties that were permitted to make such calls against Named Plaintiffs' data,

and more. Mot. at 13; Loeser Decl., Ex. 15. Again, Facebook has refused to respond. Plaintiffs' requested relief dovetails with these prior efforts. The contention that Plaintiffs are evading discovery mediation and shifting their position is disingenuous. Disclosure of what Facebook possesses about the Named Plaintiffs is a reasonable next step toward resolution of this issue.

The Federal Rules of Civil Procedure independently entitle Plaintiffs to the information they seek on data sources, precisely because it will allow them to determine what has been withheld. That is the purpose of Rule 34(b)(2)(C), which requires an objecting party to "state whether any responsive materials are being withheld on the basis of that objection." It cannot be too much to ask Facebook to comply with the Rules. For this reason, at this stage of the litigation, Plaintiffs have requested that Facebook identify the relevant data sources, their purpose for collection, retention periods, the full profiles of the Named Plaintiffs, and other information relevant to crafting an efficient discovery plan, both as to the Named Plaintiffs and on a classwide basis.

## III.    CONCLUSION

For the reasons laid out above and in their October 18 submission, Plaintiffs' motion should be granted.

Dated: November _2, 2021

Respectfully submitted,

KELLER ROHRBACK L.L.P.

By:      */s/ Derek W. Loeser*
      Derek W. Loeser

Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Adele A. Daniel (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com
bgould@kellerrohrback.com

BLEICHMAR FONTI & AULD LLP

By:      */s/ Lesley E. Weaver*
      Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew S. Melamed (SBN 260272)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmelamed@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com


*Plaintiffs' Co-Lead Counsel*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT I

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: FACEBOOK, INC. CONSUMER
PRIVACY USER PROFILE LITIGATION

MDL No. 2843

Case No.  18-md-02843-VC (JSC)

**DISCOVERY ORDER NO. 9**

(Dkt. Nos. 515, 526, 537, 548)

This MDL matter has been assigned to the undersigned for management of discovery.
Now pending before the Court are the Parties' briefs concerning the proper scope of discovery
related to the data Facebook accumulates about the named Plaintiffs.  (Dkt. Nos. 515, 526, 537,
548.)  In brief, Facebook contends that the district court's order specifically defined the data at
issue as "substantive and revealing content that users intended only for a limited audience."  (Dkt.
No. 298.)  Based on this definition, Facebook argues that for any named Plaintiff data to be
relevant and discoverable, it must meet two criteria.  First, the discoverable data must have arisen
from user activity occurring on the Facebook platform, such as Facebook posts and sent messages.
Second, the named Plaintiff must have then overtly shared such data with a limited audience, such
as their friends.  Facebook submits that this is the only plausible reading of the district court's
order limiting Plaintiffs to four actionable categories of potential liability.  Plaintiffs respond that
the universe of discoverable data Facebook collects for each user is much larger and necessarily
includes: (1) user activity occurring off the Facebook platform; and (2) user data that can be
inferred from user activity occurring on or off the Facebook platform.  A second question
presented by the briefs is whether discovery may proceed on the claims the district court stayed.

After carefully considering the papers submitted by the Parties, and consulting with the
district court, the Court rules that discovery is not as limited as Facebook contends.  Plaintiffs
correctly argue that Facebook's restrictive view of relevant discovery would exclude an enormous

United States District Court
Northern District of California

United States District Court
Northern District of California

1   amount of information that Facebook collects and shares with third parties about Facebook's

2   users.  The district court's order (Dkt. No. 298) did not limit Plaintiffs' claims to only challenging

3   the sharing of data Facebook collects from a user's on-platform activity; the claims also challenge

4   Facebook's sharing of user data and alleged failure to monitor how third parties used such shared

5   information.

6          Accordingly, the Court rules the discoverable user data at issue includes:

7   - Data collected from a user's on-platform activity;

8   - Data obtained from third parties regarding a user's off-platform activities; and

9   - Data inferred from a user's on or off-platform activity.

10          As for the stayed claims, and again after consulting with the district court, the Court rules

11   that discovery is stayed as to the stayed claims.  Of course, if a particular discovery request is

12   relevant to both a stayed and non-stayed claim, then discovery is not stayed merely because the

13   discovery request is also relevant to a stayed claim.

14          **IT IS SO ORDERED.**

15   Dated: October 29, 2020

16

17

18   JACQUELINE SCOTT CORLEY
     United States Magistrate Judge

19

20

21

22

23

24

25

26

27

28

0132

**EXHIBIT J**
**UNREDACTED VERSION SEALED**
**BY THE COURT**

**Highlighted text reflects Plaintiffs'**
**proposed redactions under Civil**
**Local Rule 79-5(d)(1)(D).**

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaint₍₎fs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843 <br> Case No. 18-md-02843-VC-JSC |
| This document relates to: <br><br> ALL ACTIONS | **PLAINTIFFS' RESPONSE IN REPLY TO DEFENDANT FACEBOOK, INC.'S REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20 AND IN SUPPORT OF CROSS-MOTION TO COMPEL** <br><br> Judges: Hon. Vince Chhabria and Hon. Jacqueline S. Corley <br> Hearing Date: TBD <br> Hearing Time: TBD |

# I. INTRODUCTION

This discovery dispute concerns sensitive user information that Facebook has shared with third parties without users' consent. The dispute is important but narrow now that Facebook has disclaimed any argument about undue burden. Dkt. 537 ("FB Reply") at 10 ("To be clear, Facebook is not—as Plaintiffs suggest—urging the Court to issue a ruling regarding the scope of discovery based on undue burden."). The legal question is whether the information Plaintiffs seek is relevant to any party's claim or defense.

The answer to this question is a straightforward "yes." As Judge Chhabria described in Pretrial Order No. 20, Dkt. 298 (the "Order"), this case is about whether Facebook acted unlawfully in making sensitive user information available to third parties and in failing to do anything meaningful to prevent third parties from misusing the information they obtained. Dkt. 298 ("Order") at 3. While it is true that the focus of the Order was sensitive information posted by users and then wrongfully shared by Facebook, the Court's reasoning applies equally to other forms of information about users wrongfully disclosed by Facebook to third parties, including information obtained by Facebook through its data sharing agreements with off-platform entities.

Documents that Facebook has produced show that there are at least three distinct categories of improperly shared sensitive information that Facebook shares with third parties without users' consent: native, appended, and behavioral. Dkt. 526 ("Opp'n"), Ex. B at FB-CA-MDL-00213424. This data derives from multiple sources, including (1) what a user posts and the user's activity on Facebook; (2) information about users originally generated off the Facebook platform but obtained by Facebook; and (3) information derived by Facebook from a user's activity on and off Facebook. *Id.* All of these sources include sensitive information about users that Facebook shared with third parties, yet Facebook has taken upon itself to exclude the second and third sources from discovery. This does not make sense. Information derived from a user's activity is relevant because if a user restricted access to private content, like a message about a medical condition, then it logically follows that information derived from that content—like the existence of a disease—was also meant to be private and not shared indiscriminately with third

parties. Equally relevant is sensitive information originally generated off-platform and then shared with or made available to third parties. Facebook cannot share such information without users' consent. Such improper sharing is thus actionable for precisely the same reasons as the sharing or making available of users' on-platform activity.

Discovery has shown that Facebook ==shared user information with third parties regardless of where the information was originally generated.== Opp'n Ex. C at 2. Plaintiffs' request for this information, therefore, is entirely consistent with the four categories of wrongdoing recognized by the Court. Regardless of the source or how Facebook acquired it, sensitive user information is relevant if Facebook shared it without users' consent.

Seeking to make simple issues complicated, Facebook dramatically overstates what Plaintiffs seek. To be clear, Plaintiffs are not interested in every piece of data Facebook collected from and about them. Instead, for just ten Named Plaintiffs, Plaintiffs respectfully request that the Court rule that the sensitive information from and about them that Facebook shared with or made accessible to third parties is relevant to this action.

## II. ARGUMENT

### A. The discovery sought by Plaintiffs is directly relevant to their claims.

According to Facebook, whether it collects and then wrongfully shares Plaintiffs' off-platform information or information that it derives from their on- and off-platform activity is categorically irrelevant to this case. At this juncture, the question before the Court is not whether certain discovery is disproportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1); *see also* FB Reply at 10 (noting that Facebook is not advancing an "undue burden" argument). Rather, the question is simply whether the discovery that Plaintiffs seek "is relevant to any party's claim or defense." *Id.*

With regard to off-platform activity, as Plaintiffs explained in their prior brief, the nature of their claims and the reasoning under which they were upheld make it relevant whether Facebook improperly shared Plaintiffs' off-platform information with third parties. Opp'n at 2-5. In short, the Order upheld claims not because of where information came from, whether on- or

off-platform, but because of the nature of the information and what Facebook did with it. *Id.* at 4. Facebook's arguments to the contrary hang on a very narrow and legally incorrect reading of the Court's Order.

**1. The claimed discovery stay.** Facebook argues that Plaintiffs are trying to get around a discovery stay that the Order imposed when it stayed certain claims. But this argument assumes that Plaintiffs are seeking discovery relevant to *stayed claims*, and Facebook does not point to any stayed claims that Plaintiffs are trying to revive. The suggestion that Plaintiffs are seeking "discovery on hundreds of allegations that did not survive dismissal," Reply at 3, is similarly without merit; Facebook does not point to any dismissed allegations that Plaintiffs are trying to revive. And contrary to Facebook's arguments, the discovery Plaintiffs seek—exactly what information about these ten plaintiffs Facebook possesses and shared with third parties—will help establish (1) the threshold fact of sharing that sensitive data, which establishes the elements of the breach of contract and good faith and fair dealing claims, as well as statutory and privacy claims; (2) the scope of the harm inflicted upon the Plaintiffs, which also addresses elements of Plaintiffs' privacy claims; and (3) damages and unjust enrichment. All of these claims were sustained. Facebook's argument concerning the purported discovery stay is thus a red herring.

**2. The Order's discussion of on-platform activity.** Next, Facebook says that in describing Facebook's wrongdoing, the Order confines itself to the improper sharing of what users did on the Facebook platform. Facebook considerably overstates its case. When discussing the sharing of information with business partners, for example, the Order referred simply to "information about [Facebook's] users" and "information about users' activity."[1] Order at 8. These phrases do not discriminate between on- and off-platform activity, and do not define "sensitive information" to encompass only information shared on Facebook's platform.

The question, then, is whether the discovery is "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). And here, as Plaintiffs have explained, Facebook's improper sharing of

---

[1] Rather than citing the Order's specific discussion of information-sharing with business partners, Facebook quotes the Order's general description of Facebook's misconduct from the introductory paragraph. Reply at 4 (quoting Order at 1).

user information, whether that information was derived from on- and off-platform activity or obtained from off the platform, is relevant to the legal theories upheld at the pleading stage, which turn not on how or where the information was originally generated, but on what kind of information it was and whether Facebook shared it with third parties. Opp'n at 2-5. Indeed, Facebook itself is seeking discovery from Plaintiffs about their activity on other social media sites, taking the position that users' off-platform activity is relevant to the claims and defenses here. Def. Facebook, Inc.'s 2d Set of Interrogs. to Pl. T. King Nos. 4-5. (No. 4, "Identify all Social Media Platforms other than Facebook that You have used to share personal family photographs or videos."; No. 5 "Identify all Social Media Platforms other than Facebook that You have used to share personal perspectives regarding politics, religion, relationships, work, or family.) As Facebook's own discovery requests demonstrate, Facebook believes information originally generated off platform is relevant here.

The most that can be said of the Order is that it does not focus on the sharing of information derived from off-platform activity. Discovery, however, has shown that the native, appended, and behavioral data that Facebook collects and shares about its users include information generated from and about both on-platform and off-platform activity. Opp'n Ex. B at FB-CA-MDL-00213424; Opp'n Ex. C, FB-CA-MDL-00178908 at 2. That such discovery should shape Plaintiffs' claims is entirely appropriate. *See Vallabhapurapu v. Burger King Corp.*, 276 F.R.D. 611, 615 (N.D. Cal. 2011) ("Consistently with the notice-pleading system established by the Rules, discovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues.") (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). Accordingly, any sensitive information that Facebook shared with or made accessible to third parties is relevant here, regardless of its source.

*3. Legal questions.* Facebook argues that its sharing of off-platform user information is irrelevant because it would raise legal questions that the Order did not consider. This argument is incorrect in several different respects. For one thing, Facebook does not justify the premise of the argument—it does not explain why off-platform activity is irrelevant to or not part of Plaintiffs'

claims merely because it may raise (some) distinct legal issues.

There are other flaws in Facebook's argument as well. While it asserts that off-platform activity raises hitherto unaddressed questions about a reasonable expectation of privacy, it forgets that a reasonable expectation of privacy is not even relevant to some of Plaintiffs' claims (for example, their claims under the VPPA, SCA, or their claim for breach of contract). Even for the claims that do involve a reasonable expectation of privacy, such as the invasion-of-privacy torts under California law, Plaintiffs do not claim that *all* off-platform information is relevant. Information would be relevant if—like Plaintiffs' on-platform activity—it was shared only with a "limited audience." Order at 1. Such sharing would be improper under the Order's reasoning without raising any new issues.

For similar reasons, the Court should reject Facebook's argument that off-platform information raises new issues about standing. Plaintiffs have standing, the Order concluded, not because of issues peculiar to Facebook posts, but for a more general reason: because their "sensitive information was disseminated to third parties in violation of their privacy." *Id.* at 14. That rationale applies equally to sensitive information generated off the Facebook platform that Facebook improperly shared with third parties.

Facebook also contends that the improper sharing of off-platform information would raise distinct legal issues about consent. This argument does not make sense. The Order's rulings about consent turned on what Facebook told its users about how their "information" could and could not be shared. *See* Order at 25-29. And Facebook's definition of information—"facts and other information about you, including actions taken by users and non-users who interact with Facebook," Order, App. A at 10—is capacious enough to include information generated off the platform. To show that data was shared beyond the scope of users' consent, Plaintiffs need to understand *what* was shared. Indeed, at trial, how can Plaintiffs point to data that was shared without their consent if Facebook has not produced it? Even with regard to the one source of data Facebook has produced—users' on-platform activity—Facebook has refused to produce discovery showing what it shared with third parties. Thus, Facebook's claim that it has shared all

user data that is relevant to Plaintiffs' claims is not remotely accurate.

   *4. Information derived by Facebook.*  Finally, Plaintiffs note that one of the sources of discovery they seek—information derived by Facebook from both on- and off-platform activity and then improperly shared with third parties—goes mostly unaddressed in Facebook's reply. And Facebook is similarly almost wholly silent about information derived from *on-platform* activity—it simply fails to explain why discovery about such information is not fairly included in this case. It is easy to see why this information is relevant. If it was improper for Facebook to share a user's sensitive post, it was equally wrong for Facebook to share inferences and other information it derived from that post.

## B.   Discovery and publicly available information confirm Facebook has not produced information it collects and shares about the ten Named Plaintiffs.

   Facebook contends that Plaintiffs were not permitted to submit any evidence in support of their opposition brief. *See* FB Reply at 6, n. 5; 9, n. 9;10 (citing 9/4/2020 Tr. at 5:8-10; 18-22). In fact, the Court did not prohibit either party from submitting discovery that would aid the Court's resolution of this issue. Rather, it rejected Facebook's argument that a four-month briefing schedule was necessary because of the purported need to obtain client declarations. Tr. at 5:7-22. Documents produced reflecting the types of data Facebook collects (native, appended, and behavioral) from multiple sources (user activity, information derived from on- and off-platform user activity, and information obtained from third parties) and shares with third parties is obviously helpful to the Court in making its determination of whether Plaintiffs are entitled to such data. The Court asked Plaintiffs what data they are seeking, and the exhibits submitted by Plaintiffs help answer that question.

   In any event, Facebook relies heavily on numerous factual assertions about what data it collects, how it does so, its volume, how it is used and conclusory statements about its relevance. But it provides no support for those assertions and few specifics. That is, Facebook concedes that it possesses data relevant to the Named Plaintiffs, but it has never even categorically described or given examples of that data, contrary to Fed. R. Civ. Proc. 34(b)(2)(C). It is thus left to Plaintiffs to piece together what Facebook is withholding, using both publicly available documents and

what Facebook has produced.



Opp'n Ex. C at 2 (emphasis added). The email also ▮▮▮▮▮▮▮▮▮

*Id.*

Facebook's response to Exhibit C is that the email discussion is "hypothetical." FB Reply at 8. But a reasonable reading of this document is that it describes Facebook's then-existing data collection capabilities. And even if Facebook were correct, Plaintiffs would still be entitled to discovery to determine whether Facebook effectuated its supposedly hypothetical plan. Facebook's position is also contradicted by information in the public record. Specifically, in 2013 Facebook began to allow third parties to access user data only upon the condition that they send valuable *user data* back to Facebook.[2] This concept, known as data reciprocity, is a key component of Plaintiffs' claims. Facebook claims in its Reply that data reciprocity is an exchange of data only between users, but that is belied by its own documents. A document dated March 14, 2014 reports ▮▮▮▮▮▮▮▮▮ Ex. F, FB-CA-MDL-00203262. Facebook's characterization of data reciprocity as an exchange between

---

[2] *"Facebook Earns $132.80 From Your Data per Year: But it's valuable in other ways, too"*; available at: https://slate.com/technology/2019/11/facebook-six4three-pikinis-lawsuit-emails-data.html; *see also "Facebook leaks: Zuckerberg turned data into dollars in ruthless battle with competitors*; available at: https://www.computerweekly.com/news/252461895/Facebook-leaks-Zuckerberg-turned-data-into-dollars-in-ruthless-battle-with-competitors (detailing, among other things, Facebook employee complaints that "customer data and their own data was visible to others, after they had opted to keep it private").

users is also at odds with the Court's formulation of the issue. Order at 8 ("Facebook shared information about its users with this non-exclusive list of business partners and [] those companies in turn shared data with Facebook.") In fact, Facebook concedes that user data received from "integration partners" through data reciprocity is potentially relevant, thereby confirming that the discovery sought by Plaintiffs here for just ten Named Plaintiffs should be produced. FB Reply at 8. ("[E]ven if some other data from integration partners existed, only data received from those partners could even possibly be relevant…"). In short, it is relevant to the case what information about the ten Named Plaintiffs Facebook possesses, even if it received that data through its data reciprocity agreements.

Discovery also reveals that Facebook sent Requests for Information ("RFIs") to third party app developers as part of its App Developer Investigation ("ADI")



These RFIs ask

Furthermore, app developers

. E.g., FB-CA-MDL-01119012 at FB-CA-MDL-01119021. It is telling that while conducting the ADI investigation, Facebook asked

Facebook also claims that the discovery Plaintiffs seek "cannot even be reasonably collected," identifying numerous purported difficulties in collecting this discovery, even though it is just for ten individuals. FB Reply at 9. These unsupported assertions do not rebut the relevancy of the discovery Plaintiffs seek, and do not meet the required evidentiary showing to establish burden. See *Harris v. Best Buy Stores, L.P.*, No. 315CV00657-HSG-KAW, 2016 WL 6024556, at *1 (N.D. Cal. Oct. 14, 2016) (" … [T]he party opposing discovery has the burden of showing that discovery should not be allowed, and also has the burden of clarifying, explaining and supporting its objections with competent evidence.") (quoting *La. Pac. Corp. v. Money Mkt.*

*1 Inst'l Inv. Dealer*, 285 F.R.D. 481, 485 (N.D. Cal. 2012)). Indeed, the Court did not solicit briefing on burden, but only relevance. And in any event, Facebook expressly disclaimed its request to have the Court rule on burden. FB Reply at 10. The Court should ignore Facebook's unsupported claims that it would be too burdensome to search for this material when it has itself asked the Court not to rule on burden.

Facebook's sweeping and generalized statement also ignores huge pockets of data that Facebook can identify. For example, ███████████████████████████ ██████████████████████ And surely Facebook can identify what data it shared with its business partners and white-listed apps through its data reciprocity agreements. Furthermore, to the extent that Facebook did not stop disassociating data regarding the Named Plaintiffs in this action, thereby making it more difficult to re-associate, that is a problem of its own making. Again, these are factual issues, not legal ones, and should be the subject of discovery.

Plaintiffs do not demand, as Facebook repeatedly claims, "that Facebook search *millions* of disaggregated data sets for any data to have ever crossed Facebook's systems relating to a Named Plaintiff and any derivative materials drawing on that data - such as data sets tracking hours of peak user activity to monitor strains on Facebook's system." Opp'n at 6. To the contrary, Plaintiffs seek only a holding that the sensitive data Facebook collected about *ten Named Plaintiffs* and *shared* with third parties is relevant. Plaintiffs do not contend that information that was not shared is relevant, which substantially narrows the information Facebook would be required to produce in this case.

### III.    CONCLUSION

For the foregoing reasons, Plaintiffs seek an order holding that all sensitive data about the ten Named Plaintiffs that Facebook shared with or made accessible to third parties is relevant to this action.

Dated: October 19, 2020                           Respectfully submitted,

KELLER ROHRBACK L.L.P.                     BLEICHMAR FONTI & AULD LLP

By:    /s/ Derek W. Loeser
         Derek W. Loeser
Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Adele A. Daniel (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com
bgould@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

By:    /s/ Lesley E. Weaver
         Lesley E. Weaver
Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)

555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Lesley E. Weaver, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of October, 2020, at Oakland, California.

/s/ *Lesley E. Weaver*
Lesley E. Weaver

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2020, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to all counsel of record registered in the CM/ECF system. In accordance with Civil L.R. 5-1(h) and Civil L.R. 79-5(e), I also caused a copy of the under seal documents to be served via email on counsel of record for all parties. An electronic copy of the public redacted filings was also provided via email to the parties noted below:

Anjeza Hassan
annie.sara@yahoo.com

*/s/ Lesley E. Weaver*
Lesley E. Weaver

# EXHIBIT K

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: FACEBOOK, INC. CONSUMER
PRIVACY USER PROFILE LITIGATION

MDL No. 2843
Case No.  18-md-02843-VC (JSC)

**DISCOVERY ORDER NO. 11**

This MDL matter has been assigned to this Court for management of discovery.  The Court held a discovery status conference on December 9, 2020 and this Order memorializes the decisions made at the hearing.

**A.  30(b)(6) Witness**.  At the hearing, Facebook insisted it does not have any documents reflecting its valuation of the user data it collects.  It also contended that Plaintiffs conceded that user data not shared with or accessible to third parties is not relevant, (Dkt. No. 548 at 10), and because Facebook does not share inferred user data, the inferred user data Facebook maintains is not relevant.  Facebook both collects and uses data about its users as part of its business model, including data derived from third parties.  How it specifically uses this data is an open question, but if the Court were to accept Facebook's arguments about the scope of production, it would eliminate Discovery Order No. 9's third category of discovery: data inferred from a user's on or off-platform activity.  What is needed now is more detail about Facebook's collection and use of user data so future discovery requests can be tailored to Plaintiffs' better understanding of the internal operations of Facebook as well the terminology it uses for describing data that is potentially responsive to Plaintiffs' discovery requests.

The Court accordingly orders Facebook to provide a 30(b)(6) witness regarding the discoverable user data as articulated by Discovery Order No. 9.  (Dkt. No. 557.)  Facebook shall also provide a 30(b)(6) witness on how it monetizes—directly or indirectly—and thus

United States District Court
Northern District of California

0148

values user data.  Plaintiffs shall provide Facebook with their 30(b)(6) Notice on or before December 18, 2020 and Facebook will have until January 13, 2021 to submit an initial response.  The 30(b)(6) topics shall be narrowly tailored to assist Plaintiffs with identifying relevant discovery in the above two areas.  The deposition will be limited to the time period of 2012 through 2017 to reduce burden and given its investigatory purpose.

**B. Search Terms.**  The Parties shall continue to meet and confer the week of December 14-18 regarding their competing proposals.  Given the deadline for submission of final proposals—Christmas Eve—the Parties shall submit a stipulation by December 18, 2020, agreeing to a new deadline for final proposals.

**C. Five-Day Détente.**  The Parties shall meet and confer to choose five consecutive business days during the upcoming holidays where no communications will take place between the Parties regarding the case.  Communications on other topics are encouraged.

**D. Plaintiffs' Interrogatory Responses and Privacy Settings Data.**  Plaintiffs shall supplement their interrogatory responses regarding what they characterize as their sensitive information with specific examples rather than general categories.

**E. Additional Proposed Custodians.**  The addition of further custodians for discovery purposes is premature at this time.

**F. Dismissal of Named Plaintiffs.**  The parties shall file a stipulation regarding the dismissal of certain named plaintiffs in accordance with what was discussed at the hearing no later than December 18, 2020.

**G. Next Status Conference.**  The next video status conference shall be January 15, 2021 at 8:30 a.m.  The Parties shall submit a joint status update by January 14, 2021 at 12:00 p.m.

**IT IS SO ORDERED.**

Dated: December 11, 2020

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California

2

0149

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | **MDL NO. 2843**<br><br>CASE NO. 3:18-MD-02843-VC-JSC<br><br>HON. VINCE CHHABRIA<br>COURTROOM 4 – 17TH FLOOR<br>SPECIAL MASTER, DANIEL GARRIE, ESQ.<br><br>**ORDER RE: PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF PLAINTIFF DATA** |

# INTRODUCTION

1.     Pending before Special Master Garrie is Plaintiffs' Motion to Compel Production of Named Plaintiffs' Content and Information.

# BACKGROUND

2.     On November 25, 2019, Plaintiffs' served Requests for Production Nos. 9-13, which seek documents relating to the named Plaintiffs in this matter ("Named Plaintiffs").[1] See Exhibit A. In brief, Request No. 9 seeks all documents relating to each of the Named Plaintiffs; Request No. 10 seeks documents sufficient to show the categories of content and information Facebook collects, tracks, and maintains about them; and Requests Nos. 11-13 seek documents identifying third parties that were able to access information about the Named Plaintiffs. Id.

3.     In response to Requests for Production Nos. 9-13, Facebook produced more than one million pages of individual user data it maintained relating to the Named Plaintiffs, most of which was obtained from the "Download Your Information" tool ("DYI Tool").[2] The data obtained from the DYI Tool is mostly limited to information pertaining to users' on platform Facebook activity. See Exhibit B (List of DYI Tool Data Fields).

4.     Statements by Facebook's counsel during an August 14, 2020 discovery hearing indicated that Facebook maintained additional data related to the Named Plaintiffs that was not produced. See Exhibit C (8/14/2020 Discovery Hearing Transcript) at 8:10-13 ("There is other – there's Facebook-generated information, information generated by third parties, information

---

[1] There were originally 30 named Plaintiffs, but this has been reduced to nine named Plaintiffs.

[2] The DYI Tool is a tool by which Facebook users can download certain pieces of information related to the user's Facebook activity and related data. A list of the types of information that can be downloaded via the DYI Tool is provided in Exhibit B.

**ORDER RE: PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF PLAINTIFF DATA**

0151

received from third parties. We have not represented that that is comprehensively included in our production.").

5.     Plaintiffs filed a motion last September to compel additional discovery related to Requests for Production Nos. 9-13. See Exhibit D (9/28/2020 Motion to Compel). Plaintiffs asked the Court to compel production of sensitive information Facebook derives and collects from business partners, app developers, apps, and other sources. This request included "native, appended and behavioral data" and purportedly anonymized data that could be connected to the Named Plaintiffs. Id. at 7-11.

6.     On October 8, 2020, Facebook responded to Plaintiffs' motion to compel. See Exhibit E (Facebook Opposition to Plaintiffs' 9/28/2020 Motion to Compel). Facebook contended that all information related to the Named Plaintiffs that they did not themselves share on Facebook was outside the scope of the case; that all information not shared through one of the four theories of the case was not within the scope of the case; that Plaintiffs were not entitled to all data collected from third parties about the Named Plaintiffs; that the Stored Communications Act and Video Protection Privacy Act claims did not require the production of additional data Facebook had collected about the Named Plaintiffs; and that Facebook could not reasonably collect any of the additional information Plaintiffs sought. Id. at 6-10.

7.     On October 29, 2020, Judge Corley issued Discovery Order No. 9, ruling "that discovery is not as limited as Facebook contends" and "the discoverable user data at issue includes: [1] Data collected from a user's on-platform activity; [2] Data obtained from third parties regarding a user's off-platform activities; and [3] Data inferred from a user's on or off-platform activity." See Exhibit F (Discovery Order No. 9) at 2.

8.     In Discovery Order No. 11, Judge Corley provided further clarification on the discoverable user data intended to be included under Discovery Order No. 9:

> It also contended that Plaintiffs conceded that user data not shared with or accessible to third parties is not relevant, (Dkt.No. 548 at 10), and because Facebook does not share inferred user data, the inferred user data Facebook maintains is not relevant. Facebook both collects and uses data about its users as part of its business model, including data derived from third parties. How it specifically uses this data is an open question, but if the Court were to accept Facebook's arguments about the scope of production, it would eliminate Discovery Order No. 9's third category of discovery: data inferred from a user's on or off-platform activity. What is needed now is more detail about Facebook's collection and use of user data so future discovery requests can be tailored to Plaintiffs' better understanding of the internal operations of Facebook as well the terminology it uses for describing data that is potentially responsive to Plaintiffs' discovery requests. See Exhibit G (Discovery Order No. 11) at 1.

9.     Following Judge Corley's orders, Facebook did not produce additional documents in response to Requests for Production Nos. 9-13.

10.     On October 6, 2021, Special Master Garrie and Judge Andler declared impasse on the issue of whether Facebook should be compelled to produce additional documents related to the Named Plaintiffs pursuant to Discovery Order No. 9.

11.     On October 18, 2021, Plaintiffs submitted their opening brief to Special Master Garrie on this issue. See Exhibit H. Plaintiffs argue that (a) the court has already determined the information Plaintiffs seek is relevant—whether or not Facebook claims that it has been shared; (b) whether the Named Plaintiffs' information was shared is a contested question on which Plaintiffs are entitled to evidence; (c) Facebook has failed to substantiate a disproportionate burden in identifying the data it possesses relating to nine people; and (d) Plaintiffs have made proposals to reduce the burden of production on Facebook. Id.

12.     On October 28, 2021, Facebook submitted its Opposition to Plaintiffs' Motion to Compel Production of Named Plaintiffs' Content and Information. See Exhibit I. Facebook argues,

among other things, that (a) the scope of discovery is limited to information Facebook shared with third parties; (b) Plaintiffs are judicially estopped from seeking information that was not shared; and (c) the information Plaintiffs now seek is nonresponsive and otherwise unavailable. Id.

13.   On November 2, 2021, Plaintiffs submitted their Reply in which they argue, among other things, (a) Judge Corley's orders entitle Plaintiffs to the discovery they seek; (b) Plaintiffs are entitled to probe Facebook's assertion that it has already produced all the content and information it has shared or made accessible to third parties; (c) Plaintiffs are entitled to answers to Interrogatories 16 and 17; and (d) the relief Plaintiffs are requesting is intended to lighten Facebook's burden. See Exhibit J.

14.   Facebook subsequently objected to Plaintiffs reply claiming that Plaintiffs introduced new arguments and evidence for the first time, in violation of the Discovery Protocol. See Exhibit K (Facebook's Response to Plaintiffs' Objection Regarding Named Plaintiffs' Data Briefing) ("Plaintiffs sought **new relief** and introduced **twelve new documents** that Plaintiffs suddenly claim show gaps in Facebook's productions.").

## FINDINGS

15.   Special Master Garrie finds that Discovery Order No. 9 does not limit the scope of discoverable data related to the Named Plaintiffs to data that was shared with third parties, as Facebook contends, because Judge Corley's ruling contains no language indicating such a limitation: "Accordingly, the court rules the discoverable user data at issue includes: [1] Data collected from a user's on-platform activity; [2] Data obtained from third parties regarding a user's off-platform activities; and [3] Data inferred from a user's on or off-platform activity." See Exhibit F at 2.

16.    Moreover, Judge Corley clarified that Facebook's interpretation of Discovery Order No. 9 is not what Judge Corley intended: "How [Facebook] specifically uses this data is an open question, but if the Court were to accept Facebook's arguments about the scope of production, it would eliminate Discovery Order No. 9's third category of discovery: data inferred from a user's on or off-platform activity." See Exhibit G at 1.

17.    Special Master Garrie finds that Facebook appears to maintain data related to the Named Plaintiffs that was not produced in response Requests for Production Nos. 9-13. See Exhibit C at 8:10-13 ("There is other – there's Facebook-generated information, information generated by third parties, information received from third parties. We have not represented that that is comprehensively included in our production."). For example, documents produced by Facebook indicate that Facebook collects data referred to as "Appended Data," including public records, auto registration data, retail purchases, and credit card purchases, all of which fall into the second category of data from Discovery Order No. 9. See Exhibit L (FB-CA-MDL-00213424). However, Facebook has not produced this data as it is not available via the DYI Tool. See Exhibit B.[3]

18.    Special Master Garrie finds that Plaintiffs requested new relief (answers to Interrogatories 16-17) and introduced new evidence (exhibits C, D, E, F, H, I, and J to Plaintiffs' Reply) in their Reply brief in violation of the Discovery Protocol. Accordingly, Special Master Garrie did not consider this request for new relief or the new evidence items in reaching the findings herein.

//

---

[3] Facebook also appears to maintain data relating to the Named Plaintiffs' on-platform activity that has not been provided, such as inferred interest and behavior data. See Exhibit L.

0155

# ORDER

19.     No later than December 3, 2021, Facebook is to provide a list of data sources that may contain information related to the Named Plaintiffs pursuant to Discovery Order No. 9. The list of data sources is to include: (1) the name of the database or data log; (2) a description of the data source's purpose and function; and (3) a description of the types of Named Plaintiff data contained in the data source.

20.     No later than December 10, 2021, the parties are to meet and confer and each submit to Special Master Garrie a proposed protocol for the production of Named Plaintiffs' data from the data sources identified by Facebook.

**IT IS SO ORDERED.**

Monday, November 29, 2021

_____
Daniel Garrie
Discovery Special Master

# Exhibit A

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

*Plaint.,fs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION TO DEFENDANT FACEBOOK, INC.**<br><br>Judge: Hon. Vince Chhabria<br>Courtroom: 4, 17th Floor |

PROPOUNDING PARTY:     Plaintiffs

RESPONDING PARTY:     Facebook

SET NUMBER:     Two (2)

Plaintiffs hereby propound the following requests for production of documents to

Defendant Facebook, Inc. ("Facebook"), pursuant to Federal Rules of Civil Procedure 26 and 34,

and request that Facebook produce the documents and electronically-stored information set forth

herein within thirty (30) days of service of these requests, at Bleichmar Fonti & Auld LLP, 555

12th Street, Suite 1600, Oakland, CA 94607.

## **INSTRUCTIONS**

1.     You shall respond to these requests for the production of documents in a manner

consistent with the Federal Rules of Civil Procedure and the following instructions:

2.     In responding to each document request, furnish all responsive documents

available at the time of production, including documents in your possession, custody or control,

and in the possession, custody or control of your agents, employees, partners, representatives,

subsidiaries, affiliates, investigators, or by your attorneys or their agents, employees or

investigators.

3.     If any otherwise responsive document was, but is no longer, in existence or in

your possession, custody or control, identify the type of information contained in the document,

its current or last known custodian, the location/address of such document, the identity of all

persons having knowledge or who had knowledge of the document and describe in full the

circumstances surrounding its disposition from your possession or control.

4.     This is a continuing request for the production of documents and requires

supplemental responses as provided for in the Federal Rules of Civil Procedure. If, after making

your initial production, you (or any other persons acting on your behalf) obtain or become aware

of any further documents responsive to any document request, you are required to produce such additional documents to plaintiffs. Each supplemental response shall be served on plaintiffs no later than thirty days after the discovery of the further information.

5. You shall produce the original of each document described below or, if the original is not in your custody, then a copy thereof, and in any event, all non-identical copies which differ from the original or from the other copies produced for any reason, including, without limitation, the making of notes thereon.

6. Documents shall be produced as kept in the regular course of business together with the original folders, binders, boxes or other containers in which they were maintained.

7. All documents or things that respond in whole or in part to any portion of these requests are to be produced in their entirety, including attachments and their enclosures.

8. Documents attached to each other should not be separated.

9. Documents not otherwise responsive to any particular document request shall be produced if such documents mention, discuss, refer to, or explain the documents called for by any document request, or if such documents are attached to documents called for by any document request.

10. Documents shall be produced in such fashion as to identify the custodian of each document.

11. Identify the source of each document produced, by identifying: (a) all of the person(s) who possessed the document; (b) the positions or titles of any such individuals; and (c) all of the divisions and departments where each document was located. If you are unable to determine the individual(s) who possessed the document, identify the department and division where the document was located when produced.

12. If you claim any form of privilege, whether based on statute or otherwise, as a ground for not producing any document, state the following:

    a. The date of the document;

    b. The name, the present or last known home and business address, the telephone numbers, the title (or position), and the occupation of those individuals who prepared, produced, reproduced or who were recipients of said document;

    c. A description of the document sufficient to identify it without revealing the information for which the privilege is claimed;

    d. The nature of the privilege asserted;

    e. The factual basis upon which you claim any such privilege;

    f. The location of the document; and

    g. The custodian of the document.

13. To the extent you object to any document request, you must provide specific responses as to what portion of the request you object to and state expressly why you will not respond to such request in sufficient detail to permit the Court to determine the validity of the objection. Responsive documents to which your objection does not apply should be produced.

14. If you claim that all or any part of any document request, the Definitions, or Instructions is vague or ambiguous, please identify the specific language you consider vague or ambiguous and state the interpretation of the language in question you used to frame your response.

15. Each document requested herein is to be produced in its entirety and without deletion or excision, regardless of whether you consider the entire document to be relevant or responsive to any document request. If you have removed, excised or deleted any portion of a

document, stamp the word "REDACTED" on each page of the document that you have redacted. Redactions should be included on the privilege log described in Instruction No. 13, above.

16.     One copy of each document should be produced. A document that varies in any way from the original or from any other copy, including drafts or a document with handwritten notations or deletions constitutes a separate document and must be produced, whether or not the original is in your possession, custody or control. Color (*i.e.*, not black and white) originals should be produced in color. If any identical copy cannot be produced for any reason (*e.g.*, faint writing, erasures, etc.), produce the original.

17.     Indicate the origin of each document and number each document with consecutive Bates numbers.

## **DEFINITIONS**

Unless otherwise stated, the terms set forth below are defined as follows and shall be used in construing the meaning of these requests for the production of documents.

1.     The use of the singular shall be deemed to include the plural, and the use of one gender shall include all others, as appropriate, in the context.

2.     The present tense of a verb includes its past tense, and vice versa.

3.     "And" and "or" are to be construed conjunctively and disjunctively, as necessary, to bring within the scope of this request for production all responses that might otherwise be construed to be outside its scope.

4.     "Any" and "all" mean each and every.

5.     "App" means an interactive software application developed to utilize the core technologies of the Facebook social networking platform.

6.     "App Developer Investigation" or "ADI" means (as described in paragraph seven of the Chen Declaration) Facebook's investigation to determine "whether there has been misuse

of data in violation of Facebook's policies and associated legal liabilities, in connection with the first version of the [Facebook] Platform."

7.      "Apps Others Use" means the setting used to prevent the disclosure of personal information to third party App Developers through Facebook's API, as described in paragraphs 366 to 368 of the FAC.

8.      "App Settings" means settings that a User can alter or accept to limit Third Parties from accessing or obtaining Users' Content and Information, including Apps Others Use, Granular Data Permissions, Platform Opt Out, and the like.

9.      "Chen Declaration" means the Declaration of Stacy Chen in Support of Respondent's Opposition to the Attorney General's Petition, *Attorney General Maura Healy v. Facebook, Inc.*, No. 1984CV02597-BFS-1 (Mass. Super Ct., Suffolk Cty.).

10.     "Communication" means the transmittal (in the form of facts, ideas, thoughts, opinions, data, inquiries or otherwise) and includes, but is not limited to, correspondence, memoranda, reports, presentations, face-to-face conversations, telephone conversations, text messages, instant messages, messages sent on Facebook Messenger, voice messages, negotiations, agreements, inquiries, understandings, meetings, letters, notes, telegrams, mail, electronic mail or email, and postings of any type.

11.     "Computer System" or "Computer Systems" include(s), but is not limited to, any server (whether physical or virtual), desktop computer, tablet computer, point of sale system, smart phone, cellular telephone, networking equipment, internet site, intranet site, and the software programs, applications, scripts, operating systems, or databases used to control, access, store, add, delete, or modify any information stored on any of the foregoing non-exclusive list.

12.     "Content and Information" refers to the definition in footnote 2 of the FAC, referring to "content" and "information" as Facebook's Statements of Rights and

Responsibilities have defined those terms. In brief, Facebook has generally used "information" to mean facts and other information about Users, including the actions they take, and "content" to mean anything Users post on Facebook that would not be included in the definition of "information." Content and Information also includes both personally identifiable content and information and anonymized content and information that is capable of being de-anonymized. *See* FAC ¶¶ 223-224. Content and Information includes data that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular User, including:

a. Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

b. Characteristics of protected classifications under California or federal law.

c. Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

d. Biometric information.

e. Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an Internet Web site, application, or advertisement.

f. Geolocation data.

g. Audio, electronic, visual, thermal, olfactory, or similar information.

h. Professional or employment-related information.

i. Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. section 1232g, 34 C.F.R. Part 99).

j. Inferences drawn from any of the information identified in this paragraph to create a profile, dossier, or similar collection of information about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

13.     "Document" or "Documents" is defined to include any Document, ESI, or Electronic Media stored in any medium, and is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a)(1)(A), including, but not limited to, electronic or computerized data compilations, Communications, electronic chats, instant messaging, documents created through Workplace by Facebook, encrypted or self-destructing messages, messages sent via Facebook messenger, email Communications, other electronically stored information from Personal computers, sound recordings, photographs, and hard copy Documents maintained in your Personal files.

14.     "Electronic Media" means any magnetic, optical, or other storage media device used to record ESI including but not limited to computer memory, hard disks, floppy disks, flash memory devices, CDs, DVDs, Blu-ray discs, cloud storage (*e.g.*, DropBox, Box, OneDrive, or SharePoint), tablet computers (*e.g.*, iPad, Kindle, Nook, or Samsung Galaxy), cellular or smart phones (*e.g.*, BlackBerry, iPhone, or Samsung Galaxy), personal digital assistants, magnetic tapes of all types, or any other means for digital storage and/or transmittal.

15.     "Electronically Stored Information" or "ESI" means information that is stored in Electronic Media, regardless of the media or whether it is in the original format in which it was created, and that is retrievable in perceivable form and includes, but is not limited to, metadata,

system data, deleted data, fragmented data, data pertaining to or maintained in Apps, database contents, and computer code.

16.     "FAC" refers to the First Amended Consolidated Complaint filed February 22, 2019, ECF No. 257.

17.     "Facebook," "Defendant," "You," or "Your" shall mean Facebook, Inc. and any of its executives, directors, officers, employees, partners, members, representatives, agents (including attorneys, accountants, consultants, investment advisors or bankers), and any other Person purporting to act on its behalf. In the case of business entities, these defined terms include parents, subsidiaries, affiliates, predecessor entities, successor entities, these defined terms include parents, subsidiaries, affiliates, predecessor entities, successor entities, divisions, departments, groups, acquired entities and/or related entities or any other entity acting or purporting to act on its behalf.

18.     "FTC Consent Order" shall refer to the July 27, 2012 Federal Trade Commission Consent Order in *In the Matter of Facebook, Inc.*, No. C-4365.

19.     "Granular Data Permissions" means the setting through which the User accessing an App may limit the categories of Content and Information an App Developer may collect.

20.     "Identify," with respect to Documents, means to give, to the extent known, the (a) type of Document; (b) general subject matter; (c) date of the Document; (d) author(s); (e) addressee(s); and (f) recipient(s).

21.     "Including" means "including but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify the request, definition or instruction but not to limit the request.

22.     "Internal Policy" or "Internal Policies" mean any formal or informal policy, procedure, rule, guideline, collaborative document, directive, instruction, or practice, whether written or unwritten, that You expect Your employees to follow in performing their jobs.

23.     "Misuse of Data," when used as a capitalized phrase, means the use by an App of a User's Content or Information that was broader or different than the use of that content or information only in connection with the person that gave the permission to the App to access such User's Content or Information.

24.     "Named Plaintiffs" means Steven Akins, Jason Ariciu, Samuel Armstrong, Anthony Bell, Bridgett Burk, Brendan Carr, John Doe, Terry Fischer, Shelly Forman, Paige Grays, Mary Beth Grisi, Tabielle Holsinger, Taunna Lee Johnson, Olivia Johnston, Tyler King, Ashley Kmieciak, William Lloyd, Gretchen Maxwell, Scott McDonnell, Ian Miller, Jordan O'Hara, Bridget Peters, Kimberly Robertson, Scott Schinder, Cheryl Senko, Dustin Short, Tonya Smith, Mitchell Staggs, Charnae Tutt, Barbara Vance-Guerbe, and Juliana Watson.

25.     "Person" or "Persons" means any natural Person or any business, legal or governmental entity or association.

26.     "Platform" refers to the services, tools, and products provided by Facebook to third parties to create their own applications and services that access data in Facebook.

27.     "Platform Opt Out" means the setting a User may access to choose that his or her Content and information is not accessed or obtained by any Apps or websites on Facebook's Platform.

28.     "Privacy Controls" means the audience selectors that control what information in a User's profile can be viewed by other Users, and includes Profile Privacy Settings, Profile Privacy Controls, Publisher Privacy Controls, and the like.

29. "Relating to," "relate to," "referring to," "refer to," "reflecting," "reflect," "concerning," or "concern" means all Documents which comprise, explicitly or implicitly refer to, were reviewed in conjunction with, or were created, generated or maintained as a result of the subject matter of the request, including, but not limited to, all Documents which reflect, record, memorialize, embody, discuss, evaluate, consider, review or report on the subject matter of the request.

30. "Third Parties" include the following:

    a. Apps, App Developers, Whitelisted Apps, and Business Partners, as those terms are used in the FAC;

    b. Any person that develops an application, software experience, game, or website that accesses Content and Information from Facebook's API or other Facebook software; and

    c. Any person with which Facebook has or had an integration partnership.

31. "User(s)" means individuals who maintain a Facebook account and can generally access the typical Facebook experience through website or mobile applications.

32. Capitalized terms and acronyms not specifically defined herein have the same definition as in the FAC.

## RELEVANT TIME PERIOD

The relevant time period for each Document Request is January 1, 2007 through the present (the "Relevant Time Period"), unless otherwise specifically indicated. Each Document Request shall be interpreted to include all documents and information that relate to the Relevant Time Period or otherwise specified period, even if such documents or information were prepared or published outside of the Relevant Time Period or otherwise specified period. If a document prepared before or after this period is necessary for a correct or complete understanding of any

document covered by a request, you must produce the earlier or subsequent document as well. If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the production request.

## DOCUMENT REQUESTS

### REQUEST FOR PRODUCTION NO. 6

All Documents provided to or received from any governmental entity or regulator in the United States and United Kingdom in response to any formal or informal inquiry or investigation relating to whether Users' Content and Information was accessed or obtained by any Third Parties without proper consent or authorization, including but not limited to all inquiries or investigations arising out of the Cambridge Analytica Scandal, the FTC Consent Order, and any inquiry or investigation related to the settlement agreement with the FTC announced on July 24, 2019.

### REQUEST FOR PRODUCTION NO. 7

All organizational charts, personnel directories, or other documents sufficient to show Your organizational structure, including:

(a)     the identity of subsidiaries, affiliates, and joint ventures, and your ownership interest, control of, or participation in any subsidiary or affiliate or joint venture related to agreements, engineering, access, use, transmission, receipt, collection or analysis of Facebook Users' Content and Information by Third Parties;

(b)     the organization of any division, department, unit or subdivision of your company that has responsibilities relating to agreements, engineering, access, use, transmission, receipt, collection or analysis of Users' Content and Information by Third Parties; and

(c)     the names, titles, job descriptions, and employment periods for your present and former employees who has or had responsibilities relating to agreements, engineering, access,

use, transmission, receipt, collection or analysis of Users' Content and Information by Third Parties; and

(d)    the names, titles, job descriptions, and employment periods of Your present or former directors, officers, or senior managers, as well as any secretaries or administrative assistants assigned to these directors, officers, or senior managers.

## REQUEST FOR PRODUCTION NO. 8

All versions (including each updated or amended version thereof) of Facebook's "Platform Policies," which have been called the "Developer Principles and Policies," the "Platform Guidelines," or the "Developer Terms of Service" (collectively, the "Platform Policies").

## REQUEST FOR PRODUCTION NO. 9

All Documents relating to each of the Named Plaintiffs, including but not limited to all Content and Information collected about each of them or gained from business relationships or any other source.

## REQUEST FOR PRODUCTION NO. 10

For each of the Named Plaintiffs, Documents sufficient to show the categories of Content and Information Facebook collects, tracks, and maintains about them.

## REQUEST FOR PRODUCTION NO. 11

Documents sufficient to identify all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information, what categories of Content and Information Facebook granted access to, how Facebook allowed these Third Parties to access the Named Plaintiffs' Content and Information, and the business purpose of all such access.

**REQUEST FOR PRODUCTION NO. 12**

Documents relating to any partnerships or agreements Facebook entered into with Third Parties for access to Named Plaintiffs' Content and Information.

**REQUEST FOR PRODUCTION NO. 13**

For all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information, Documents sufficient to show any use by Third Parties of such Content and Information not in connection with the User that granted the permission to the Third Party or inconsistent with Facebook's agreement with that Third Party.

**REQUEST FOR PRODUCTION NO. 14**

Documents sufficient to show the monetary or retail value of each named Plaintiff's Content and Information to Facebook, updated to reflect whenever Facebook's terms of service changed, including the calculation of revenue earned by Facebook for each Named Plaintiff based upon bartering or selling access to such Named Plaintiff's Content and Information.

**REQUEST FOR PRODUCTION NO. 15**

Documents sufficient to show the money or any other thing of value, including but not limited to money or any other thing of value paid in exchange for targeted advertising, that Facebook received in exchange for each Named Plaintiff's Content and Information, which entities paid Facebook, and when such payments were made.

**REQUEST FOR PRODUCTION NO. 16**

Documents sufficient to show the monetary or retail value of Users' Content and Information to Facebook, including all monthly, quarterly, and annual financial reporting relating to same, and including but not limited to the calculation of average revenue per user, any changes to such monetary or retail value relating to changes to Facebook's terms of service, and any financial reporting of Content and Information as an asset.

**REQUEST FOR PRODUCTION NO. 17**

All Documents relating to Facebook's assessment of the monetary or retail value of Users' Content and Information to Users (as distinct from value to Facebook), including analyses for providing compensation to Users for their Content and Information, including but not limited to Users compensated in connection with the Onavo or Research app.

**REQUEST FOR PRODUCTION NO. 18**

All Documents that have been transmitted to Users by Facebook relating to whether Users' Content and Information was accessed or obtained by Third Parties.

**REQUEST FOR PRODUCTION NO. 19**

All Documents supporting the escalation of those Apps escalated to Phase Two of ADI for Enhanced Examination and/or Phase Three of ADI for Enforcement and designated as follows in the Chen Declaration ¶ 34:

(d) each [A]pp to which a request for information was sent; (e) each [A]pp for which an interview was sought with the developer; (f) each [A]pp for which a remote or onsite audit was requested to be conducted; (g) each [A]pp for which actual misuse was found and identification of that misuse; (h) each [A]pp that was banned for actual misuse; and (i) each [A]pp that was banned for failing to cooperate with Facebook's investigation.

Facebook has described identification of these Apps as non-privileged and has already produced it to the Massachusetts Attorney General's Office. *See* Chen Declaration ¶ 35.

**REQUEST FOR PRODUCTION NO. 20**

The list of Apps that Facebook provided to the Massachusetts Attorney General's Office and that the Chen Declaration ¶ 35 describes as "the subject of external actions or

communications with third parties, including the growing list of Apps Facebook has suspended as part of the [ADI], whether because of policy violations or because of their refusal to cooperate with Facebook's investigation."

**REQUEST FOR PRODUCTION NO. 21**

Communications between Facebook and Third Parties relating to the ADI, including but not limited to Communications that Facebook provided to the Massachusetts Attorney General's Office. *See* Chen Declaration ¶ 37.

**REQUEST FOR PRODUCTION NO. 22**

All "Privacy Risk Assessment[s]," and notes or agenda relating to Facebook's "focused subject-matter-specific meetings," "focused subject-matter-specific discussions," "weekly intra- and inter-team meetings," and "Privacy Summit[s]," as detailed in "Facebook's Privacy Program Overview" included in any PricewaterhouseCoopers LLP ("PwC") assessment report prepared pursuant to the FTC Consent Order.

**REQUEST FOR PRODUCTION NO. 23**

Unredacted versions and Documents in support of the assessment reports, including the Initial Assessment Report and Biennial Reports, prepared by PwC pursuant to the FTC Consent Order.

**REQUEST FOR PRODUCTION NO. 24**

Documents sufficient to identify all Third Parties to which Facebook granted access to Users' Content and Information not generally available through Platform pursuant to partnerships or agreements between Facebook and those Third Parties.

**REQUEST FOR PRODUCTION NO. 25**

All Documents relating to agreements or partnerships described in Request No. 24.

**REQUEST FOR PRODUCTION NO. 26**

For each of the Third Parties that Facebook entered into partnerships or agreements with as described in Request No. 24, Documents sufficient to identify:

- The fields, kinds, or categories of Content and Information that were accessed or obtained by such Third Parties;

- How each such Third Party accessed or obtained the Content and Information of Users;

- How each such Third Party used the Content and Information accessed or obtained;

- Where the Content and Information obtained by such Third Parties currently resides and who has access to it.

**REQUEST FOR PRODUCTION NO. 27**

Documents sufficient to show all forms and formats in which Facebook transmitted to Third Parties information concerning Users' liking, viewing, retrieving, or otherwise requesting or obtaining videos on, using, or by means of the Facebook Platform.

**REQUEST FOR PRODUCTION NO. 28**

All Documents relating to Internal Policies by Facebook on the monitoring of Third Parties' compliance with Facebook's Platform Policy, Data Policy, or SRR.

**REQUEST FOR PRODUCTION NO. 29**

All Documents relating to Internal Policies by Facebook on the enforcement of Facebook's Platform Policy, Data Policy, or SRR against Third Parties.

**REQUEST FOR PRODUCTION NO. 30**

All Documents relating to measures and controls, including proposed measures and controls, put in place by Facebook to prevent Third Parties from violating Facebook's Platform Policy, Data Policy, or SRR.

**REQUEST FOR PRODUCTION NO. 31**

All Documents relating to Facebook's audits, inquiries, and investigations of Third Parties investigating compliance with any provisions of Facebook's Platform Policy, Data Policy, or SRR regarding the access, use, transmission, receipt, collection and analysis of Users' Content and Information on and off the Platform.

**REQUEST FOR PRODUCTION NO. 32**

All Documents Concerning Misuse of Data, including investigations, examinations, inquiries, or audits—or Communications regarding such investigations, examinations, inquiries, or audits—regarding Misuse of Data prior to the deprecation of Graph API v.1.0.

**REQUEST FOR PRODUCTION NO. 33**

Documents sufficient to show the notice that Facebook provided to Users regarding modifications to Facebook's SRR or Data Policy, and all Communications related thereto.

**REQUEST FOR PRODUCTION NO. 34**

All Documents relating to the conditioning of Third Parties' access to Users' Content and Information on the purchase of Mobile App Install Ads, payment of Content and Information in-kind (referred internally as Reciprocity or Data Reciprocity), or other payment.

**REQUEST FOR PRODUCTION NO. 35**

Documents relating to the manner in which a Facebook User could control how his or her data was shared through their Privacy Controls and App Settings throughout the Relevant Time Period, including but not limited to screenshots of the Facebook website and the Facebook mobile application.

**REQUEST FOR PRODUCTION NO. 36**

All Documents concerning User testing, evaluation and analysis of Facebook's Privacy Controls and App Settings during the Relevant Time Period, including but not limited to design documents, correspondence, analyses, and reports.

Dated: November 25, 2019

Respectfully submitted,

KELLER ROHRBACK L.L.P.

BLEICHMAR FONTI & AULD LLP

By:  _/s/ Derek W. Loeser_____
     Derek W. Loeser

By:  _/s/ Lesley E. Weaver_____
     Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)
Lynn Lincoln Sarko (admitted *pro hac vice*)
Gretchen Freeman Cappio (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
bgould@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

# Exhibit B

# Exhibit A

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| About Me | Information you added to the **About** section of your timeline like relationships, work, education, where you live and more. It includes any updates or changes you made in the past and what is currently in the **About** section of your timeline. | Downloaded Info |
| Account Status History | The dates when your account was reactivated, deactivated, disabled or deleted. | Downloaded Info |
| Active Sessions | All stored active sessions, including date, time, device, IP address, machine cookie and browser information. | Downloaded Info |
| Address | Your current address or any past addresses you had on your account. | Downloaded Info |
| Ads | Ads you've recently viewed. | Downloaded Info |
| Ads Clicked | Dates, times and titles of ads clicked (limited retention period). | Downloaded Info |
| Ad Topics | A list of topics that you may be targeted against based on your stated likes, interests and other data you put in your timeline. | Downloaded Info |
| Advertising ID | The unique advertising identification numbers provided by your mobile device. These numbers are used to show you ads on the apps you use on your device. | Downloaded Info |
| Alternate Name | Any alternate names you have on your account (example: a maiden name or a nickname). | Downloaded Info |
| Apps | All of the apps you have added. | Downloaded Info |
| Articles | Articles you've recently read. | Downloaded Info |
| Autofill Information | Information you've provided, such as your address, that is used to pre-fill messages when you contact a business through Messenger. | Downloaded Info |
| Chat | A history of the conversations you've had on Facebook Chat (a complete history is available directly from your messages inbox). | Downloaded Info |

Source: *What categories of my Facebook data are available to me?*,
https://www.facebook.com/help/930396167085762, Table 2, *Information you can download
using the Download Your Information tool* (last visited Sept. 18, 2020).

| Chat Rules | Chat Rules you've accepted. | Downloaded Info |
|---|---|---|
| Check-ins | The places you've checked into. | Downloaded Info |
| Currency | Your preferred currency on Facebook. If you use Facebook Payments, this will be used to display prices and charge your credit cards. | Downloaded Info |
| Current City | The city you added to the **About** section of your timeline. | Downloaded Info |
| Date of Birth | The date you added to Birthday in the **About** section of your timeline. | Downloaded Info |
| Dating | The number of times you've recently visited the Dating section of Facebook. | Downloaded Info |
| Device ID | The unique identification numbers provided by the devices you use to log into Facebook. | Downloaded Info |
| Device Locale | The country and language from which you're accessing Facebook as determined by the devices you're using. | Downloaded Info |
| Education | Any information you added to Education field in the About section of your timeline. | Downloaded Info |
| Emails | Email addresses added to your account (even those you may have removed). | Downloaded Info |
| Email Address Verifications | A history of when you've verified your email address. | Downloaded Info |
| Events | Events you've joined or been invited to. | Downloaded Info |
| Event Contacts You've Blocked | People you've blocked from inviting you to events. | Downloaded Info |
| Event Interactions | The number of times you've recently visited the Events section of Facebook. | Downloaded Info |
| Events Visited | Event pages you've recently visited. | Downloaded Info |
| Facebook Live Videos | Live videos you've recently watched. | Downloaded Info |
| Facebook Watch Topics for Recommendations | A collection of topics that is used to show you relevant videos in the Facebook Watch tab. The topics are | Downloaded Info |

0180

| | based on your previous interaction history with things like links, videos, photos and Pages you've liked. | |
|---|---|---|
| Facial Recognition Data | A unique number based on a comparison of the photos you're tagged in. We use this data to help others tag you in photos. | Downloaded Info |
| Family | Friends you've indicated are family members. | Downloaded Info |
| Favorite Quotes | Information you've added to the Favorite Quotes section of the **About** section of your timeline. | Downloaded Info |
| Followers | A list of people who follow you. | Downloaded Info |
| Friends | A list of your friends. | Downloaded Info |
| Friend Requests | Pending, sent and received friend requests. | Downloaded Info |
| Friends You See Less | Friends whose activity you've chosen to see less of on Facebook. | Downloaded Info |
| Fundraisers | Fundraisers you've recently viewed. | Downloaded Info |
| Gender | The gender you added to the **About** section of your timeline. | Downloaded Info |
| Groups | A list of groups you belong to on Facebook. | Downloaded Info |
| Group Interactions | The number of times you've interacted with Groups on Facebook. | Downloaded Info |
| Groups Visited | Groups you've recently visited. | Downloaded Info |
| Hometown | The place you added to hometown in the **About** section of your timeline. | Downloaded Info |
| ID | A copy of the ID you submitted to confirm your identity and to help improve our automated systems for detecting fake IDs and related abuse. | Personal Data Request |
| Instant Games | Instant Games you've played. | Downloaded Info |
| IP Address Activity | Your recent activity from specific IP addresses. | Downloaded Info |

0181

| IP Address Message Activity | Your recent message activity from specific IP addresses. | Downloaded Info |
|---|---|---|
| IP Address Payment Activity | Your recent payment activity from specific IP addresses. | Downloaded Info |
| Language Settings | Your preferred language settings. | Downloaded Info |
| Last Location | Your most recent location determined by your device. | Downloaded Info |
| Linked Accounts | Accounts you've linked to your Portal. | Downloaded Info |
| Live Video Subscriptions | Scheduled Live videos you've subscribed to. | Downloaded Info |
| Logins | IP address, date and time associated with logins to your Facebook account. | Downloaded Info |
| Logouts | IP address, date and time associated with logouts from your Facebook account. | Downloaded Info |
| Marketplace Categories | Categories you've recently viewed. | Downloaded Info |
| Marketplace Interactions | Your recent interactions on Marketplace. | Downloaded Info |
| Marketplace Items | Items you've recently viewed. | Downloaded Info |
| Marketplace Services | Services you've recently viewed. | Downloaded Info |
| Matched Contacts | Contact information that may be associated with your account. | Personal Data Request |
| Menu Items | Areas of Facebook you've recently accessed through the main menu. | Downloaded Info |
| Messages | Messages you've sent and received on Facebook. Note, if you've deleted a message it won't be included in your download as it has been deleted from your account. | Downloaded Info |
| Messenger Contacts You've Blocked | Contacts you've blocked on Messenger. | Downloaded Info |
| Milestone Notifications | Notifications about your activity milestones, such as the number of reactions on a post, you've received and dismissed. | Downloaded Info |

4

0182

| Mobile Service Provider and Country Code | The service provider and country code associated with your phone number. | Downloaded Info |
|---|---|---|
| Name | The name on your Facebook account. | Downloaded Info |
| Name Changes | Any changes you've made to the original name you used when you signed up for Facebook. | Downloaded Info |
| News Feed Topics for Recommendations | A collection of topics that is used to show you relevant public posts in parts of your News Feed. The topics are based on your previous interaction history with things like links, videos, photos and Pages you've liked. | Downloaded Info |
| News Topics for Recommendations | A collection of topics that is used to show you relevant articles in the News tab. The topics are based on your previous interaction history with things like posts, videos, photos and Pages you've liked. | Downloaded Info |
| Notification ID | The identification numbers that we use to send you Facebook notifications on your device. | Downloaded Info |
| Page Notifications | Chat notifications you've dismissed from Pages you visit. | Downloaded Info |
| Page Visits | Pages you've recently visited. | Downloaded Info |
| Page Transparency Notices | A list of pages that you've received and dismissed notices from. | Downloaded Info |
| Pages You Admin | A list of pages you admin. | Downloaded Info |
| Pages You've Recommended | Pages you've recommended to others. | Downloaded Info |
| Pending Friend Requests | Pending, sent and received friend requests. | Downloaded Info |
| People | People and friends you've interacted with recently, including comments and reactions. | Downloaded Info |
| People Viewed | People you've recently viewed when new friends were suggested to you. | Downloaded Info |
| Phone Numbers | Mobile phone numbers you've added to your account, including verified mobile numbers you've added for security purposes. | Downloaded Info |

0183

| Photos | Photos you've uploaded to your account. | Downloaded Info |
|---|---|---|
| Photo Effects | A list of the photo effects you've used. | Downloaded Info |
| Photos Metadata | Any metadata that is transmitted with your uploaded photos. | Downloaded Info |
| Platforms | Platforms you've used to log into Facebook, such as the Facebook app or a browser. | Downloaded Info |
| Pokes | A list of who's poked you and who you've poked. Poke content from our mobile poke app is not included because it's only available for a brief period of time. After the recipient has viewed the content it's permanently deleted from our systems. | Downloaded Info |
| Political Views | Any information you added to Political Views in the About section of timeline. | Downloaded Info |
| Preferred Language for Videos | The preferred language for videos as determined by videos you've previously viewed. | Downloaded Info |
| Previously Removed Contacts | Friends you've recently removed but added back. | Downloaded Info |
| Primary Location | Your primary location is determined by information we use to support Facebook Products, such as the current city you entered on your profile and your device connection information. | Downloaded Info |
| Profile Visits | People whose profiles you've recently visited. | Downloaded Info |
| Recent Activities | Actions you've taken and interactions you've recently had. | Downloaded Info |
| Recently Visited | Videos and shows you've recently visited. | Downloaded Info |
| Record Details | Details included in some administrative records. | Downloaded Info |
| Registration Date | The date you joined Facebook. | Downloaded Info |
| Religious Views | The current information you added to Religious Views in the **About** section of your timeline. | Downloaded Info |
| Removed Friends | People you've removed as friends. | Downloaded Info |

0184

| | | |
|---|---|---|
| Saved Post Reminders | Reminders you've received after you've saved a post. | Downloaded Info |
| Screen Names | The screen names you've added to your account, and the service they're associated with. You can also see if they're hidden or visible on your account. | Downloaded Info |
| Secret Conversations | A list of the times you've used Secret Conversations in Messenger. | Downloaded Info |
| Secret Conversations You've Reported | A list of the secret conversations you've reported to Facebook. | Downloaded Info |
| See First | Profiles and Pages you've recently chosen to see first in your News Feed. | Downloaded Info |
| See Less | Profiles and Pages you've recently chosen to see less of in your News Feed. | Downloaded Info |
| Selected Language | The language you've selected to use Facebook in. | Downloaded Info |
| Session Type | Your current active session types. | Downloaded Info |
| Show Pages | A list of the Show Pages you've viewed and the videos you've watched from them. | Downloaded Info |
| Shows | A list of the individual videos you've watched. | Downloaded Info |
| Spoken Languages | The languages you added to Spoken Languages in the **About** section of your timeline. | Downloaded Info |
| Status Updates | Any status updates you've posted. | Downloaded Info |
| Time Spent | The amount of time you've spent watching videos from a Show Page. | Downloaded Info |
| Time Viewed | The amount of an individual video you've watched. | Downloaded Info |
| Timezone | The timezone you've selected. | Downloaded Info |
| Work | Any current information you've added to Work in the **About** section of your timeline. | Downloaded Info |
| Videos | Videos you've posted to your timeline. | Downloaded Info |

0185

| Video Creator Pages | Video creator Pages you've recently viewed. | Downloaded Info |
|---|---|---|
| Videos You've Removed | Videos you've removed from your Watch list. | Downloaded Info |
| Your Facebook Activity | A history of when you've accessed Facebook. | Downloaded Info |
| Your Pinned Posts | Posts you've pinned on your timeline. | Downloaded Info |

0186

# Exhibit C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Magistrate Judge

IN RE FACEBOOK, INC. CONSUMER )
PRIVACY USER PROFILE )
LITIGATION. ) **NO. 18-MD-02843 VC (JSC)**
_____ )

San Francisco, California
Friday, August 14, 2020

**TRANSCRIPT OF REMOTE VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:

      KELLER ROHRBACK LLP
      1201 Third Avenue, Suite 3200
      Seattle, Washington  98101
  BY: **DEREK W. LOESER, ATTORNEY AT LAW**
      **DAVID J. KO, ATTORNEY AT LAW**


      BLEICHMAR, FONTI & AULD LLP
      555 - 12th Street, Suite 1600
      Oakland, California  94607
  BY: **LESLEY E. WEAVER, ATTORNEY AT LAW**
      **ANNE K. DAVIS, ATTORNEY AT LAW**
      **ANGELICA M. ORNELAS, ATTORNEY AT LAW**
      **MATTHEW P. MONTGOMERY, ATTORNEY AT LAW**

For Defendants:

      GIBSON, DUNN & CRUTCHER LLP
      200 Park Avenue
      New York, New York  10166-0193
  BY: **ORIN SNYDER, ATTORNEY AT LAW**


    **(APPEARANCES VIA ZOOM CONTINUED ON FOLLOWING PAGE)**


Reported Remotely By:  Ana M. Dub, RDR, CRR, CCRR, CRG, CCG
                     Official Reporter, CSR No. 7445

**APPEARANCES VIA ZOOM:** (CONTINUED)

For Defendants:

        GIBSON, DUNN & CRUTCHER LLP
        Trammell Crow Center
        2001 Ross Avenue, Suite 2100
        Dallas, Texas 75201
    BY: **RUSSELL H. FALCONER, ATTORNEY AT LAW**

        GIBSON, DUNN & CRUTCHER LLP
        333 S. Grand Avenue
        Los Angeles, California 90071
    BY: **DEBORAH L. STEIN, ATTORNEY AT LAW**

        GIBSON, DUNN & CRUTCHER LLP
        1881 Page Mill Road
        Palo Alto, California 94304
    BY: **MARTIE KUTSCHER CLARK, ATTORNEY AT LAW**

<u>**Friday - August 14, 2020**</u>                                    <u>**8:27 a.m.**</u>

                              P R O C E E D I N G S

                                 ---o0o---

        **THE CLERK:**  We're a minute early, but court is now in

session.  Let's see.  Calling Civil Action 18-MD-2843, In Re

Facebook, Inc. Consumer Privacy User Profile Litigation.

     Counsel, starting with plaintiff, can you please state

your appearance.

        **MS. WEAVER:**  Sure.  This is Lesley Weaver of Blakemar

Fonti & Auld.  With me is Anne Davis and Angelica Ornelas.

     And I see that Matt Montgomery actually is not -- he

should be with us.  So he should probably be elevated.  I

apologize.  I missed him before.  Don't tell him.

        **MR. LOESER:**  Good morning.  You have Derek Loeser from

Keller Rohrback.

        **THE COURT:**  Good morning.

        **MR. KO:**  Good morning, Your Honor.  Nice to see you

again.  David Ko, Keller Rohrback, also on behalf of

plaintiffs.

        **THE COURT:**  Good morning.

     And here comes Mr. Montgomery.  He's here.

     All right.  And for Facebook?

        **MR. SNYDER:**  Good morning, Judge.  It's Orin Snyder

from Gibson Dunn with my colleagues, Deb Stein, Martie Kutscher

Clark, and Russ Falconer.

**THE COURT:**  Good morning.

Okay.  Thank you for your statement.

Let's see.  It sounds like there are not too many things to discuss.  Let's just start.

The search terms you're working on, I will just make this observation.  I do think it would be unreasonable to insist that all terms apply to all custodians.  That just can't be right.  People have different positions.  So I give you that guidance in working on that.

Now, with respect to the data about plaintiffs, let's go through.  And why don't plaintiffs tell us what is the data that you're missing that you think is relevant.  So one thing you've identified is the data about what data about the plaintiffs was shared with advertisers.  Is that correct?

**MS. WEAVER:**  That is correct in general terms, Your Honor.  Basically, what has been produced to us is user-facing data through an Access Your Account tool, for the most part.

Now, I want you to know that we have reviewed all of the plaintiffs' data with more than one pass-through.  We've done targeted searches.  We've had 18 people, and more at times, going through the documents.  So we're pretty familiar with what's there.

There are two problems that we have.  The first is that Your Honor ordered us last -- two weeks ago to discuss

precisely what has been produced and precisely what is the data
that is being withheld.

And we -- in the course of our meet-and-confer sessions,
Facebook did not identify the examples that they put in their
statement.  We didn't discuss those.  So once again, we are
getting information the first time in the statement.

And it would have been better if we had discussed it,
because when we look at those documents -- we've looked at them
before -- they are not what we're seeking.  And the reason that
they're not -- and if you look, there's an example of one of
them they gave us.  The content is missing.  So there's an
event that says one of the users went to a website, but the
content of what they did on the site is stripped away.

And our experts say, you know, what did you put in your
shopping cart?  What did you access?  How long were you on it?

And that data is also married to GPS data --

            THE COURT:  Okay.  I have the statement --

            MS. WEAVER:  Yeah.

            THE COURT:  -- in front of me.

            MS. WEAVER:  Yes.

            THE COURT:  Can you put me to the page and the Bates
number?

            MS. WEAVER:  The Bates number of the document -- hang
on.

            THE COURT:  Well, first, the page of the statement so

1    I know where to go.

2         MS. WEAVER:  That is going to be harder for me.

3    I think it's page 6.  The Bates number -- and I'm going to

4    ask -- Anne, if you can help me, it's 01037245.

5         THE COURT:  Don't see that.  It's redacted

6    information?

7         MS. WEAVER:  Some of the information was redacted,

8    yes.  But this information we can discuss in the hearing, if

9    that is --

10        THE COURT:  No, no.  I understand.  We can -- I'm not

11   worried --

12        MS. WEAVER:  Yeah.

13        THE COURT:  -- about that.

14       I'm just trying to find it.  I don't see it.

15        MS. WEAVER:  Yeah.  Hang on just a moment.

16        THE COURT:  Maybe the sentence at the first page of

17   the --

18        MS. WEAVER:  Yeah, I'm actually looking -- I

19   apologize.  I'm looking for the actual statement.  I have too

20   many things open on my laptop.

21       But for all of the documents that they've identified,

22   Your Honor, these are PDFs that reflect some activity.

23        THE COURT:  I just want to start with -- I want to

24   start with --

25        MS. WEAVER:  Fine.  Okay.  So if you go to page 5 of

1    the statement and if we look at, for example, where it says

2    "Ms. Tutt reviewed content on Amtrak.com," it doesn't tell us

3    what the content is or it doesn't tell us --

4            **THE COURT:**  Okay.  Or the --

5            **MS. WEAVER:**  -- what they did.

6            **THE COURT:**  -- other one, that Ms. Tutt viewed content

7    on a news site and --

8            **MS. WEAVER:**  Right.  And it doesn't --

9            **THE COURT:**  -- tell you what the content is.

10            **MS. WEAVER:**  -- tell us what they do.

11            **THE COURT:**  Let me ask Facebook.

12        Do you have that content?

13            **MR. SNYDER:**  Mr. Falconer, I think, will address this.

14            **MR. FALCONER:**  Good morning, Your Honor.  Russ

15    Falconer for Facebook.

16        Our understanding is there is some machine-readable data

17    in some cases that might reflect the off-Facebook activity that

18    Ms. Weaver is describing in a kind of raw, disaggregated way.

19    That information is not associated with the plaintiff's account

20    in the way that the user-created, user-shared content and

21    information is associated with a user account.

22        And so I hear -- I don't know -- confusion and frustration

23    from Ms. Weaver that they feel like they don't understand what

24    we've produced.

25        The Court ordered us to, you know, be as clear as we can

on named plaintiffs' data, what has been produced and what has

been withheld.  And what we've tried to do is say that we've

produced all content information that the plaintiffs share on

Facebook and then some of the other categories of information

that we identified in our statement; so device information,

geolocation information, certain other information that is

associated with their account.  And we have been -- I think

we've tried to be clear; and if we failed in this, we

apologize.

There is other -- there's Facebook-generated information,

information generated by third parties, information received

from third parties.  We have not represented that that is

comprehensively included in our production.

What we have produced are Facebook analytics, third-party

data, off-Facebook activity, anything like that that is

associated with a user's account.

And so that's -- I think the point of departure between

the parties right now is maybe the level of generality with

which we have described what we have not produced.  But

that's -- we've tried to be as clear about the, sort of, large

buckets that are not included in the named plaintiff data we've

produced to date.

**THE COURT:**  So, for example, when you say Ms. Weaver

said, as you said, that the plaintiff viewed content on

Amtrak.com, are you saying you don't have any way of

1  identifying what that content is that she viewed at that

2  particular time, even though you were able to say she viewed

3  that website at that time?

4       MR. FALCONER:  I think for an individual plaintiff on

5  an individual website, if it was just that question -- could we

6  tell for one of the named plaintiffs what specific content she

7  viewed on the Amtrak website? -- if it was, you know, ten years

8  ago or seven years ago, probably not.  If it was a year ago,

9  maybe.  That data may or may not have been associated with --

10      THE COURT:  Well, if it was this year --

11      MR. FALCONER:  Yeah.

12      THE COURT:  -- with that particular --

13      MR. FALCONER:  Sure.

14      THE COURT:  -- data this year.

15      MR. FALCONER:  The answer is it's possible.  There may

16 be some website-specific data about that named plaintiff; there

17 may not be.  There's some --

18      THE COURT:  Okay.  And so you haven't searched for it,

19 or you're withholding it, or -- I guess, why hasn't it been

20 produced?

21      MR. FALCONER:  So as we understood the Court's

22 mandate or, sort of, the Court's --

23      THE COURT:  No, no, no.  I'm just asking.

24      MR. FALCONER:  Oh.

25      THE COURT:  I'm just asking.

**MR. FALCONER:** Because the reason for that is that just to find it for one named plaintiff would be like a multiweek endeavor, if not longer. And the reason for that is that -- let's take the Amtrak example.

With this off-Facebook activity data, the tables and the database where the data is stored, you know, they've been explained to us like each one of them is a book. And the book is organized by topic. The topic that the book is organized by is the advertiser. It's Amtrak; it's not the named plaintiff.

So for every Facebook advertiser there's a book. Right? There's a table that has some data for advertisement, website activity, that kind of thing.

So to gather the information for one named plaintiff on Amtrak, that, we could probably do. To gather the data for one named plaintiff on every advertiser on every off-Facebook activity that has ever happened, just for one named plaintiff, we have to go into each of those books individually and look for that one named plaintiff, and then we'd have to do it for each of the other 23 named plaintiffs.

So that's the reason why we have not undergone that to date.

**THE COURT:** I understand that. So have you identified every instance that you have that the plaintiff viewed content on some website, whatever it is?

**MR. FALCONER:** Every instance where Facebook has been

1    able to associate that off-Facebook activity with a named

2    plaintiff's account.  Sometimes they can't make the connection.

3    But where it's connected, we've identified it.  That's included

4    in the production.

5         **THE COURT:**  I assume that for this privacy case --

6    right? -- some content is obviously more private than other

7    content and the plaintiffs may not necessarily need or want.

8    They need exemplars.  Right?  And there is a standing argument

9    that you guys are maintaining that they have to defeat and

10   damages and all that.  There are particular instances.  Right?

11   So there may be particular instances where you then have to go

12   do that.

13        In other words, if it's the data that was shared, which is

14   sort of at the heart of the case, you're probably going to have

15   to do some work on that.  Whether it's every instance, probably

16   not; but certainly certain instances.

17        Now, plaintiffs, it sounds like, have a template of where

18   to start.  It may not be Amtrak, but it may be the next one

19   there.  Right?

20        **MR. FALCONER:**  Your Honor, could I be heard on that?

21        **MS. WEAVER:**  Well, may I --

22        **MR. FALCONER:**  Or, go ahead.

23        **MS. WEAVER:**  I would like to respond.

24        So what we're talking about right now and what they've

25   produced is, there's a tool so users can download data.  And

even in what they're downloading, there is content missing.

But there's another whole bucket of data that they haven't identified to us that is responsive, and that's the first step. We need the identification of the fields of the data that they collect through their third-party relationships, whether it's apps or websites, et cetera. And it is this database that Facebook searches using algorithms to target the users.

What they've given us is sort of the window dressing of the platform activity, and I've identified for you that something is missing even from that.

But there is -- and, Your Honor, we've talked to our experts; and maybe it's better to have experts talk or put in a declaration because I can tell you, their position will be that this is, quote/unquote, not associated with the users but that doesn't make sense.

There is an event ID, because the reason Facebook is collecting it in the first place is to target people with the data. So there is a way to go back and find -- and I agree with Mr. Falconer that this data set will be immense. And that is the scope of the case. And that's why we said only for the 24 because --

**THE COURT:** I'm just going to --

**MS. WEAVER:** Yeah.

**THE COURT:** -- tell you guys, I think maybe you need to think about a special master.

1    There's just no --

2         MS. WEAVER:  Yes.

3         THE COURT:  I don't have the time or the patience or

4    the expertise to wade through any of this, like the nuance that

5    you're getting into.  So I don't know what to do.

6         MS. STEIN:  Your Honor, may I be heard for a moment?

7         So I think the good news on, sort of, your reaction to

8    this is that this exercise was really about, sort of,

9    identifying categories so that we could have a conversation

10   about what's required in this case, because there is a whole

11   lot of information being sought here that has absolutely

12   nothing to do with the issues that are being litigated in this

13   case.

14        THE COURT:  No.  I understand that argument.  I don't

15   even know how to figure out what it is that we're even talking

16   about.

17        MS. STEIN:  Right.

18        MS. WEAVER:  So Facebook --

19        MS. STEIN:  So, Your Honor, what's being --

20        MS. WEAVER:  Could I --

21        MS. STEIN:  -- talked about right now is what's called

22   off-Facebook activity.  And that off-Facebook activity has no

23   relationship to the issues that the dismissal order said are

24   viable right now and that are not stayed.  The order of

25   dismissal --

 1          THE COURT:  No.  I read that.  I read it.  I

 2   understand.

 3          MS. STEIN:  Okay.  Good.

 4          THE COURT:  So this --

 5          MS. STEIN:  And so the off-Facebook activity --

 6          THE COURT:  -- this has been previewed -- just, can I

 7   finish?

 8          MS. STEIN:  I'm sorry, Your Honor.

 9          THE COURT:  Because I'm really losing patience with

10   this case.

11      This has been previewed for a while.  So what I was hoping

12   to do is you guys could just tee up what that data is so I can

13   rule if it's discoverable or not.

14      I don't even know how to get to that point.

15          MR. SNYDER:  Your Honor, I think there's a very

16   easy --

17          MS. WEAVER:  If I could, I was waiting.

18      Your Honor, we would like them to identify what they're

19   withholding.  That's it.

20          THE COURT:  But that's a chicken-and-egg problem.

21   That's a chicken-and-egg problem.  And I'm not sure -- and see,

22   this is the problem I'm having.  You said you've now reviewed

23   it all.  What is missing?  You've identified --

24          MS. WEAVER:  So I'll give you examples.  There are no

25   examples --

1       **THE COURT:**  You did.

2       **MS. WEAVER:**  Okay.

3       **THE COURT:**  No.  I'm going to let Mr. Snyder talk.

4       **MS. WEAVER:**  Fine.

5       **MR. SNYDER:**  Your Honor, I share your frustration, and

6   I think this is very easy.

7       For example, on advertisement, we have gone, I think as

8   indicated in our statement, above and beyond the call of duty

9   because we didn't really want to just say, "We're not giving

10  you what advertisements you reviewed or ads that you've clicked

11  on, even though it's outside the scope of the case."

12      This case --

13      **THE COURT:**  No, no.  That's an argument.  Please,

14  let's try not to argue.

15      **MR. SNYDER:**  Right.

16      **THE COURT:**  I'm going to decide that at some point.

17      **MR. SNYDER:**  Okay.  So what I would --

18      **THE COURT:**  Just --

19                      (Simultaneous cross-talk.)

20      **THE COURT:**  -- that.

21      **MR. SNYDER:**  What I would respectfully suggest is, we

22  can, Your Honor, tee it up for you in a very simple way,

23  because Judge Chhabria's order is very clear about what's in

24  and what's out.  And then each side can succinctly,

25  efficiently, and clearly make their arguments about what is in

1    and what's out.  And it's not going to be difficult,

2    Your Honor.  I think it's pretty clear.

3        I agree, on this call, people using terminology --

4    "on-platform," "off-platform" -- it all sounds like

5    gobbledegook.  I think there's a very clear, efficient, and

6    efficacious way for us to tee this up in a short statement to

7    Your Honor; and Your Honor can rule on it, if Your Honor wants

8    more argument on it, without us having these dueling

9    Zoom/Hollywood Squares, you know, arguments about what's in and

10   what's out that's not going to really lead to any fair ruling.

11           **THE COURT:**  This is what I need to ask Ms. Weaver, is:

12   Do you know what it is that you want or that you believe exists

13   that you don't have?

14           **MS. WEAVER:**  Yes.

15           **THE COURT:**  You do.  Okay.

16           **MS. WEAVER:**  More or less.  We don't know what form

17   they keep it in or how they keep it.  It is this data set that

18   they mine, yes.

19           **THE COURT:**  Okay.  So is there any reason why, then,

20   we can't adjudicate that dispute as discoverability?

21           **MS. WEAVER:**  We can --

22           **MR. SNYDER:**  I think we can --

23           **MS. WEAVER:**  -- adjudicate that, Your Honor.

24           **THE COURT:**  We can?  Okay.

25           **MR. SNYDER:**  We can and we should.

1          **THE COURT:**  All right.

2          **MR. SNYDER:**  And I think we can do it very simply

3     without a lot of drama or complication.

4          **THE COURT:**  So that's what --

5          **MR. FALCONER:**  Your Honor --

6          **THE COURT:**  -- I want you to do, then, on this,

7     I think.

8          And, I mean, it doesn't have to be the joint letter brief,

9     whatever.  I mean, it's a big issue.  It kind of goes to the

10    heart of the case.  So I want you to have the ability.  You're

11    going to probably need your experts to some extent -- at least

12    plaintiffs -- to be involved with it.

13         And I probably want four briefs.  Right?  Whoever goes

14    first, second, first, second, so that there's -- my guess is

15    it's not till we get to the second two briefs that we'll really

16    be able to meet there.  That just seems to be the process that

17    we need to do.

18         So you guys work it out, how that's going to be presented.

19    I'm not giving you any limits at all.  You only have the limit

20    of my time and attention span.  So just keep that in mind.

21                          (Laughter.)

22         **MS. WEAVER:**  And how much time, Your Honor, would you

23    like between briefs and the hearing?  What kind of timing --

24         **THE COURT:**  We'll put a hearing.  I'll figure it out.

25         **MS. WEAVER:**  Okay.

1    **THE COURT:**  I mean, to be honest, I'm just swamped at
2  the moment.

3    **MS. WEAVER:**  I know.

4    **THE COURT:**  So, but you get it to us.  We'll get
5  through it.  And we will set it for hearing.  I think it's
6  important to have an oral --

7    **MR. LOESER:**  And, Your Honor, if I could be heard for
8  one quick minute on one --

9    **THE COURT:**  Yes.

10    **MR. LOESER:**  This is Derek Loeser.

11    -- just, process point.

12    Where we stand right now, we generally think we know
13  what's missing, and we can describe it in our briefs.

14    Facebook obviously has specific knowledge about what's
15  missing.  And so because they haven't identified specifically
16  what they're withholding, I really think it would be improper
17  for them to argue in their brief that we haven't been specific
18  enough with what we're seeking.  If that is going to be their
19  argument in their brief, then they should comply with your last
20  order, which was to identify specifically what they're
21  withholding.

22    But that's the only --

23    **THE COURT:**  Yeah.  No, I understood.  So that's why
24  I'm doing four briefs.

25    And in the meantime, you should be talking and really

 1   trying to narrow.  It is in both sides' interest to have it

 2   teed up as accurately as possible for me to decide.  Otherwise,

 3   I'm going to make a wrong decision one way or the other because

 4   I won't understand.

 5           MR. SNYDER:  And, Your Honor, it's in everyone's

 6   interest to have you not be frustrated with us, which I

 7   understand and I think your frustration is well-placed, one.

 8       Two, we want Your Honor to continue to preside over

 9   discovery; and we would, I think, lose a lot if we had to start

10   fresh with a special master.

11       And mindful of that, we're going to work to narrow the

12   issues.  Maybe we can even eliminate them.  And we have a lot

13   of other work to do in the meantime.  So however long

14   Your Honor needs, we're going to obviously abide and respect

15   that, and we're not going to, you know, ask you to turn around

16   a ruling.

17       There's a lot we have to do on search terms and privilege

18   logs and ADI protocols.  So there's a ton of work for us to do

19   while Your Honor takes -- you know, takes the time necessary to

20   adjudicate this issue, which is ripe now.

21           THE COURT:  Yeah.  Just don't put a hearing date.

22   I'll pick it.  So that's not a problem.

23           MR. LOESER:  The only thing I would add to that,

24   Your Honor, is that we would like you to be very frustrated

25   with Orin all the time, but not with us.

1              (Laughter.)

2         **THE COURT:**  Well, this week has not been -- I've been

3    frustrated a lot, and I apologize for that.

4         **MR. SNYDER:**  Don't apologize.

5         **MS. WEAVER:**  It's tough times.

6         **THE COURT:**  There's a lot.  There's just a lot,

7    scheduling.

8         **MR. SNYDER:**  Yes, Your Honor.

9         **THE COURT:**  Okay.  So, which leads me to my next

10   point, which is the joint statement -- okay? -- which is, you

11   all are extremely talented, experienced lawyers.  If you can't

12   figure out a way, a process for this statement to work -- it's

13   really, actually, for you.  Right?  The statement is a great

14   way of assessing where we are, what our disputes are,

15   crystallizing it.  It's for you more than me, quite honestly.

16   And if you guys can't figure out together a way to do that,

17   then we've got to go back to zero and start over.  I mean, this

18   should be the easy part.

19        So I'm not going to tell you how to do that joint

20   statement.  The only thing I'm going to tell you is I want it

21   however -- what is -- just even one day, I give you, right,

22   before this?  I take it upon myself; I will make time to read

23   it the night before or early the morning before.  That's my

24   only deadline.  You guys work it out.  Whatever works best for

25   you and gets it.  But the point is, it should really try to

1  crystallize it.

2      My own view is -- and with other cases -- is that -- at

3  least with discovery disputes, is if you do time for a reply as

4  opposed to changing what you've already said, that tends to

5  work better.  But I'm not ruling at all.  I want you guys to

6  come up with it.  It's, frankly, below my pay grade to have to

7  tell you how to do it.

8                      (Laughter.)

9      MR. LOESER:  We hear that loud and clear, Your Honor,

10  and we will keep talking to Facebook about it.

11      We just think that it would be really useful for everyone

12  here, including for you, if people talk about things that they

13  put in their statements before it's submitted to the Court.

14  And so that's our mission in trying to come up with a better

15  way to do this.  That's what we're trying to accomplish.

16      THE COURT:  Maybe you could do a statement, a draft,

17  and then you talk about what's in the draft.  Right?  So then

18  you know what's in there before you -- I don't know, but that

19  would --

20      MR. LOESER:  Yeah.  We'll figure it out.

21      THE COURT:  Yes.  I know you guys can figure it out

22  because you're all outstanding lawyers.  That's why you're on

23  this case.

24      Okay.  So then we need to pick our next date.  How about

25  we push it out three weeks, to September 3rd?

1      **MR. LOESER:** I think that's the 749th day of March;

2  so, sounds great.

3                          (Laughter.)

4      **MS. WEAVER:** That's fine, Your Honor.

5      **MR. SNYDER:** And two months before Election Day,

6  assuming the post offices --

7      **MS. WEAVER:** There is one.

8      **MR. SNYDER:** -- assuming the post offices and the

9  polling places aren't shut down permanently.

10     **THE COURT:** All right. Okay.

11     **MR. LOESER:** Don't depress us, Orin.

12     **THE COURT:** I apologize for having to lecture a little

13  bit, but to be honest, you guys can do better. I know you can.

14  I know you can. I have tremendous respect for all of you.

15     Okay. Great. I look forward to our next conference.

16  It'll be September 3rd at 8:30 a.m.

17     **MR. SNYDER:** Thank you, Judge.

18     **MS. WEAVER:** Thank you, Your Honor.

19     **MR. SNYDER:** Thank you for everything you're doing.

20  Appreciate it.

21     **THE CLERK:** Court's adjourned.

22                  (Proceedings adjourned at 8:51 a.m.)

23                          ---o0o---

24

25

<u>**CERTIFICATE OF REPORTER**</u>

        I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.


DATE:  Saturday, August 15, 2020



_____

Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
        Official Reporter, U.S. District Court

# Exhibit D

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' OPPOSITION TO DEFENDANT FACEBOOK, INC.'S REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20 AND CROSS-MOTION TO COMPEL DISCOVERY RELATED TO REQUESTS FOR PRODUCTION NOS. 9 THROUGH 13**<br><br>Judges:  Hon. Vince Chhabria<br>Hon. Jacqueline S. Corley<br>Courtroom:  4, 17th Floor |

# TABLE OF CONTENTS

I.     INTRODUCTION ....................................................................................................1

II.    ARGUMENT ..........................................................................................................2

       A.    The Order does not limit discovery to users' platform activity. ............................2

       B.    The discovery requests at issue and Facebook's response .....................................6

       C.    Relevant sensitive information is not limited to platform activity, but also
             includes sensitive information Facebook derives and collects from business
             partners, app developers, apps, and other sources. ................................................7

             1.    User data includes, in Facebook's words, "native, appended and
                   behavioral data" that Facebook collects from business partners, apps
                   and other activity. ........................................................................................8

             2.    Internal documents confirm that Facebook's description of data
                   "associated" with users is misleading......................................................11

       D.    Facebook has not established that the burden of producing the data relating
             to ten Plaintiffs is disproportional to the needs of this case. ...............................12

III.   CONCLUSION .....................................................................................................14

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Doe v. Gangland Prods., Inc.*,
  730 F.3d 946 (9th Cir. 2013) ............................................................10

*Harris v. Best Buy Stores, L.P.*,
  No. 3:15-cv-00657-HSG (KAW), 2016 WL 6024556 (N.D. Cal. Oct. 14, 2016).................13

*Polaris Innovations Ltd. v. Kingston Tech. Co.*,
  No. CV1600300CJCRAOX, 2017 WL 3275615 (C.D. Cal. Feb. 14, 2017)..........................14

*Shulman v. Grp. W. Prods., Inc.*,
  18 Cal.4th 200 (1998)........................................................................10

*SPS Techs., LLC v. Briles Aerospace, Inc.*,
  No. CV 18-9536 MWF, 2020 WL 4341717 (C.D. Cal. June 25, 2020) ...............................14

*Sullivan v. Personalized Media Commc'ns, LLC*,
  No. 16-MC-80183-MEJ, 2016 WL 5109994 (N.D. Cal. Sept. 21, 2016) ..............................14

**Statutes**

18 U.S.C. § 2702(a) ............................................................................ 3, 4, 5, 10

18 U.S.C. § 2710(b)(2)........................................................................ 3, 4, 5, 10

**Other Authorities**

Fed. R. Civ. P. 26(b)(1)...........................................................................13

Local Rule 5-1(i)(3) ................................................................................16

## I.   INTRODUCTION

Facebook does not want Plaintiffs to obtain discovery showing the full breadth of its wrongful disclosure of its users' sensitive information. Accordingly, Facebook seeks to limit discovery in this case to a single category of improperly shared information: users' activity on the Facebook platform. The sensitive information that Facebook collects and shares with third parties is much more extensive than this. It collects users' sensitive information from a variety of sources—including from third parties—then pools the information with user-posted activity and generates additional information from the full data set it accumulates. It then shares this information about users and their friends with third parties. All of this information, including who has access to it and how it is used, is relevant to Plaintiffs' claims.

As a result, there are at least three compelling reasons that Facebook's motion should be denied and Plaintiffs' cross-motion to compel production of documents responsive to Requests for Production ("RFPs") Nos. 9 through 13[1] should be granted.

*First*, contrary to Facebook's tortured reading of Pretrial Order No. 20 ("Order" or "PTO 20"), Dkt. No. 298, the Court did not limit discovery in this case only to information regarding user activity on Facebook. While that information—and Facebook's subsequent disclosure of it—is of course relevant, that is not the only type of sensitive information relevant to Plaintiffs' claims or the four categories of wrongdoing recognized by the Order.

*Second*, the universe of data Facebook collects and shares about users is also not limited to user activity on Facebook, but instead consists of a sea of information obtained from a wide variety of sources, including from business partners, app developers, apps, and other third parties. Indeed, as Facebook's own documents show, it collects information about users far beyond what Facebook has produced in this case. And discovery produced to date further confirms that Facebook not only collects this information, but links it to users and shares it with third parties—putting to rest Facebook's nonsensical suggestions that Plaintiffs have failed to articulate what additional evidence exists or that Facebook cannot "associate" certain data with a

---

[1] For details on these RFPs, see *infra* § II.B.

user.

*Third*, there is no justification for Facebook's claims of undue burden. Such an argument should be accorded minimal weight in a case of this size and complexity involving a company whose business model is premised upon the collection and production of electronic information about billions of users. Facebook has come nowhere near meeting its burden of demonstrating why data regarding solely Named Plaintiffs—relative to the hundreds of millions of potential class members whose information is ultimately at issue in this case—is not proportional to the needs of the case. In fact, pursuant to the Court's recent guidance regarding streamlining Plaintiffs' discovery, Plaintiffs have reduced the number of individuals who will be class representatives to ten, down from the twenty-three. Plaintiffs only seek the discovery at issue here related to these ten Plaintiffs (for purposes of this motion, the "Named Plaintiffs.")

## II.    ARGUMENT

### A.    The Order does not limit discovery to users' platform activity.

PTO 20 does not directly address the question raised by Facebook in its motion—whether this case is limited to user activity on the Facebook platform or includes all the sensitive information about users that Facebook improperly shared with third parties. But the Order nowhere expressly limits the case to user activity. *Cf.* Mot.[2] at 1. Nor does it make sense to read the Order that way. That sort of limitation would conflict not only with claims and theories that the Order upheld, but also with the grounds on which they were allowed to proceed to discovery.

Facebook, under the guise of enforcing a discovery stay that was never issued in the first place, spends many pages straining to read the Order to limit discovery to data relating only to users' on-platform activity. This provides a misleading picture of what the Order says and inaccurately ascribes to the Court a set of internally inconsistent views.

*1. The Order.*  The Order summarizes its understanding of Plaintiffs' claims in a two-sentence précis near the beginning: "Broadly speaking, this case is about whether Facebook

---

[2] Def. Facebook, Inc,'s Opening Brief in Supp. of Its Req. to Enforce the Partial Stay of Discovery in Pretrial Order No. 20 ("Mot."), Dkt. No. 515.

acted unlawfully in making user information widely available to third parties. It's also about whether Facebook acted unlawfully in failing to do anything meaningful to prevent third parties from misusing the information they obtained." Order at 3. This description focuses on *Facebook's* unlawful disclosure of information about users and their friends to third parties—not on whether that information was originally posted, shared, or generated by users on the Facebook platform.

The Order then discusses the four categories of Facebook's wrongdoing. These categories are: (1) "[g]iving app developers access to sensitive user information"; (2) "[c]ontinued disclosure to whitelisted apps"; (3) "[s]haring sensitive user information with business partners"; and (4) "[f]ailure to restrict the use of sensitive information." Order at 6-9. These categories line up neatly with the earlier description of the action as alleging that "Facebook acted unlawfully in making user information widely available to third parties" (the first three categories) and that Facebook "fail[ed] to do anything meaningful to prevent third parties from misusing the information they obtained" (the fourth category). *Id.* at 3.

Using these four categories of wrongdoing as a framework, the Order analyzed whether Plaintiffs had standing to bring their claims and whether they stated valid claims. It ruled that Plaintiffs had standing because they alleged that their "sensitive information was disseminated to third parties in violation of their privacy." *Id.* at 14. It upheld nearly all of Plaintiffs' claims (e.g., three privacy-based tort claims under California law, a claim under the Stored Communications Act ("SCA"), a claim for breach of contract, and a claim for unjust enrichment) except to the extent they were based on the first category of wrongdoing, the disclosure of user information to app developers. *Id.* at 30-34, 38-41. It upheld in its entirety Plaintiffs' claim under the Video Privacy Protection Act ("VPPA"). *Id.* at 34-35. And it upheld Plaintiffs' claim for negligence, which was based on the fourth category of wrongdoing. *Id* at 35-36.

**2. *The Order's rationale.*** Why did the Order conclude that Plaintiffs had standing and had stated valid claims? On these points, the Order is clear. Plaintiffs had standing because "their "sensitive information was disseminated to third parties in violation of their privacy." *Id.* at 14.

This reasoning focuses not on *where* the user information was originally generated—whether on the Facebook platform or off it—but on its nature ("sensitive") and on what Facebook did with it ("disseminated" it "to third parties").

Similarly, when discussing the claims, the Order focused not on the original provenance of the information about users, but on its nature and on what Facebook did with it. So, for example, the Order ruled that:

- Plaintiffs had stated valid privacy torts because Facebook had disseminated information that was "sensitive" and as to which Plaintiffs had a reasonable expectation of privacy. *Id.* at 30-33.

- Plaintiffs had stated a claim under the Stored Communications Act because Facebook had disseminated the content of their electronic communications and had not gained their consent to do so. *Id.* at 33-34.

- Plaintiffs had stated a claim under the Video Privacy Protection Act because Facebook had disseminated "information which identifies a person as having requested or obtained specific video materials or services," *id.* at 34 (citation omitted), and Facebook qualified as a "video tape services provider" under the statute, *id.* at 35.

### 3. *"Sensitive information" is not defined by where Facebook collects that information.*

The Order repeatedly notes that Facebook shares "sensitive" user information without consent. Facebook pins its argument to this one word, maintaining that the Order "defined" sensitive user information to mean only information about what users post on Facebook, Mot. at 1, or users' platform activity, Mot. at 8. But the common-sense meaning of "sensitive information" encompasses more than just what users did on the platform. Consider, for example, a Facebook user's Amazon.com order for an over-the-counter contraceptive or another user's entry of "alcoholic support group in Tower District, Fresno" into a search engine. "Sensitive information" also includes information that Facebook can infer from on-platform information—a category of information it has not produced. (Think of the inferences that Facebook can draw from weekly photographs of a user taken at M.D. Anderson Cancer Center.) Facebook's objection that such information is categorically not "sensitive" is false.

It is true that when the Order gave examples of sensitive user information, the examples it

used concerned information generated on the Facebook platform. *E.g.*, Order at 1, 17. Nowhere, however, did the Order *define* or *limit* sensitive information to users' platform activity only. And the Order's reasoning certainly is not limited to such information. Rather, as noted above, Plaintiffs' standing to bring their claims, and the validity of many of those claims, depends on the nature rather than the provenance of the information, and on whether Facebook shared that information with third parties. And, as Plaintiffs have learned through discovery, the sensitive information about users that Facebook collects and shares with business partners and app developers includes both information originally generated outside the Facebook platform and information derived from on- and off-platform activity.

It also is farfetched for Facebook to argue that the Order rules that *all* of Plaintiffs' claims—including their federal statutory claims—rise or fall depending on whether the information that Facebook shared is "sensitive" in the sense of being embarrassing or deeply intimate. The validity of Plaintiffs' claim under the SCA, for example, does not turn on how embarrassing or intimate the information is that Facebook shared, but on whether the shared information includes the contents of an electronic communication. 18 U.S.C. § 2702(a)(1). Similarly, Plaintiffs VPPA claim turns on whether the information that Facebook shared includes "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3). If, for example, Facebook collected and shared a user's video-watching queue from a different platform, that would constitute a VPPA violation.

In sum, while the Order does not explicitly address the issue posed by Facebook's motion, it certainly does not limit discovery in this case to on-platform user activity and reading it that way is inconsistent with the Court's reasoning. It is also inconsistent with statements by the Court during the motion to dismiss hearing about the breadth of user data that is relevant to Plaintiffs' claims:

> For example, if – I'm a Facebook user.  And, you know, I'm trying to assess the likelihood that my sensitive information got into the hands of third parties and, if so, how many third parties and, if so, what kinds of third parties.  If I have a full

> understanding of the third parties that had access to the information, and a full
> understanding of what type of information they had access to, and a full
> understanding of who they were, and what they – and what restrictions were
> placed on them, we then have a better understanding of what was likely to have
> happened to me.

Nov. 4, 2019 Tr. at 15:20-16:4. It is the "full understanding" referred to by the Court that

Plaintiffs seek, and that Facebook refuses to allow.

Finally, this reading prevents Named Plaintiffs from discovering even the general policies

and practices of Facebook governing the sharing of their sensitive information, policies and

practices that are critical for this case. *See* Pretrial Order No. 30 at 2, Dkt. No. 347 ("[T]he best

way to assess the merits and to determine whether class certification is appropriate is almost

certainly to conduct discovery on Facebook's general practices."). Plaintiffs submit that

Facebook's exclusion of this information from discovery is not what the Order intended.

*4. The Order stayed claims, not discovery.*  Plaintiffs organized their claims into three

categories: prioritized claims, prioritized consumer protection act claims alleged in the

alternative, and non-prioritized claims. First Am. Consolidated Compl. ("FACC") at 317-411,

Dkt. No. 257. The Order made the simple observation that "[a]ll other prioritized claims not

addressed by this ruling will be stayed (effectively, relegated to non-prioritized status) and

adjudicated, if necessary, at a later state in the proceedings with the other non-prioritized

claims." Order at 6.  Facebook's claim that this holding somehow imposed a stay of *discovery* is

baffling.  The Order does not, and does not purport to, stay discovery in any fashion.[3]

**B.     The discovery requests at issue and Facebook's response**

The present dispute arises from five discovery requests, each of which asks for data that

Facebook possesses about Named Plaintiffs, the third parties that Facebook disclosed this data

to, and the types of information that was disclosed to them. *See* Ex. A, Def. Facebook, Inc.'s

Resps. & Objs. to Pls.' Second Set of Reqs. for Produc. In particular, RFP No. 9 requests "[a]ll

---

[3] Even if it were, the Order observed that "[o]f course, dismissal of a subset of claims with
prejudice does not preclude a plaintiff from seeking revival if discovery reveals a factual basis
that justifies reconsideration[.]" Order at 37 n.21 (citations omitted).

Documents relating to each of the Named Plaintiffs, including but not limited to all Content and Information collected about each of them or gained from business relationships or any other source."[4] *Id.* RFP No. 10 asks Facebook to produce, "[f]or each of the Named Plaintiffs, Documents sufficient to show the categories of Content and Information Facebook collects, tracks, and maintains about them." *Id.* RFP Nos. 11-13 then request documents requesting Facebook to identify the third parties that were able to access this information, including the categories of data that were disclosed to them and how they accessed it. *Id.* Plaintiffs propounded these requests nearly one year ago in November 2019.

In response to these requests, Facebook produced information collected by the DYI ("Download Your Information") tool. This limited tool allows downloads of some, but not all, information relating to users' activity on the platform. And Facebook freely acknowledges that Plaintiffs can access this information themselves. *Id.* ("[A]ll Facebook users are free to download their DYI file if they wish."). In addition to the DYI production, Facebook has produced an undefined category of "additional information associated with [users'] accounts" for each Plaintiff. Mot. at 6. But Facebook does not describe what the "additional information" is, likely because it is extremely limited—it consists solely of information users can access through their account in the form of their privacy settings and information reflecting user activity on Facebook. Critically, the form of production also obscures whether some of the activity was public or private. Thus, virtually all of Facebook's 850,000-page production relating to the original Named Plaintiffs in this case was already accessible to Plaintiffs and tells only part of the story.

C.      **Relevant sensitive information is not limited to platform activity, but also includes sensitive information Facebook derives and collects from business partners, app developers, apps, and other sources.**

Facebook acknowledges that it collects and shares substantial amounts of additional sensitive information about users beyond their platform activity. *See, e.g.*, Aug. 14, 2020 Hr'g

---

[4] The requests use the definition of "Content and Information" from Facebook's Statement of Rights of Responsibilities—a definition that is not limited to on-platform data.

Tr. 8:10-13 ("[T]here's Facebook-generated information, information generated by third parties, information received from third parties. We have not represented that that is comprehensively included in our production."); *see also* Mot. at 10-15 (describing off-platform activity and internal analytics it has not produced).  However, Facebook contends that this other information is not relevant to this case. This is false.

> **1.    User data includes, in Facebook's words, "native, appended and behavioral data" that Facebook collects from business partners, apps and other activity.**



*See* Ex. B, FB-CA-MDL-00213424-439.



██████████████—the only type of data Facebook has partially produced about users so

far—is important for this case, so too is ████████████████████████████

████████████████████ Moreover, ██████████████████████████

████████████████████████████████████████████████

██████████ *See* Ex. B, FB-CA-MDL-00213424-439 ████████████████████

████████████████████████████████████████████████████

█████ "██████████████"); *id.* at FB-CA-MDL-00213424 (█████████████ ██

████████ ████████████ ██████████████████████████

████████████████████).

Critically—and contrary to Facebook's suggestion that this data is irrelevant and

duplicative of information it has already produced (Mot. at 14)—discovery confirms that

Facebook shares this data with third parties. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ *Id..*

Another internal document, ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ These

documents make clear that Facebook collects sensitive user information in a variety of different

ways and discloses it to third parties.

Facebook's insistence that it need only produce on-platform Native Data makes even less

sense when considering Plaintiffs' claims. Plaintiffs' statutory and common law claims are not

limited to information generated from users' activities on Facebook. For example, under the

VPPA, Plaintiffs must prove that Facebook disclosed "personally identifiable information

concerning any consumer" to "any person" absent written or informed consent. 18 U.S.C. §

2710(b)(2). Under the SCA, Plaintiffs must prove that Facebook "knowingly divulge[d] to any

person or entity the contents of any communication" users did not intend for Facebook to

divulge. 18 U.S.C. § 2702(a). The source of the information—that is, whether it was the result of

on- or off- platform activity, gleaned directly from users' posts, or inferred from them—is

irrelevant. Disclosure of any of this information without consent is actionable.

Similarly, Plaintiffs' Public Disclosure of Private Acts claim requires Plaintiffs to prove

that Facebook disclosed a private fact about the plaintiff that is objectionable and offensive to a

reasonable person. *Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 958 (9th Cir. 2013). Likewise,

Plaintiffs' Intrusion into Private Affairs claim requires Plaintiffs to prove an intrusion by

Facebook into a private matter that is highly offensive to a reasonable person. *Shulman v. Grp.*

*W. Prods., Inc.*, 18 Cal.4th 200, 231 (1998). In order to prove these claims, Plaintiffs must

ascertain the private facts about them that Facebook is collecting and disclosing, whether they originate from platform activity or not.

Across many claims, the Order sustained Plaintiffs' allegations about Facebook's undisclosed data reciprocity programs with business partners. Plaintiffs are thus entitled to know what sensitive user data, of any type or source, Facebook shared with its business partners. Plaintiffs are further entitled to any data that Facebook received from its business partners in return, since the value of that data constitutes the benefit Facebook received in the transaction, a benefit that Plaintiffs are entitled to recover under, *inter alia*, the unjust enrichment claim that the Court sustained. Order at 41;[5] *see also* Order at 8 (noting the allegation that "Facebook and its [business] partners agreed to exchange information about users' activities with each other").

Facebook notes repeatedly that targeted advertising and psychographic marketing are not part of this case. *See, e.g.*, Mot. at 9. This argument misses the point. The question is not whether Facebook should or should not have engaged in targeted advertising and psychographic marketing. The question is whether, when doing so, Facebook shared sensitive user and friend information without consent. Plaintiffs are entitled to obtain the discovery necessary to substantiate the allegation that improper sharing has occurred in the context of these activities.

2.  **Internal documents confirm that Facebook's description of data "associated" with users is misleading.**

Facebook claims it has produced all data it possesses that is "associated" with Named Plaintiffs. That is, while it generated and collected reams of data about Named Plaintiffs, Facebook claims that most of that data, including Appended and Behavioral Data, is anonymized and cannot be connected to Named Plaintiffs. This is false.

Facebook explains that Appended and Behavioral Data cannot be associated with Plaintiffs' Facebook accounts because such data is "disassociated from the user's ID within 90

---

[5] Facebook's position blocking discovery of what it possesses and shares is in tension with Facebook's own discovery requests to Named Plaintiffs. Facebook's Interrogatory No. 8 asks Plaintiffs to "Identify all entities other than Cambridge Analytica that You believe have 'misused sensitive information from Your Facebook Account." But Facebook itself will not identify with whom it shared that sensitive information, let alone what information it possesses.

0225

days" (Mot. at 15). But, as confirmed by internal documents, what actually happens is that



Indeed, the very purpose of collecting all of this data in the first place is to use it to target users and their friends. ████████████████

████████████████████████████████████

████████████████████████████████  *Cf.* Mot. at 15.

Similarly, ████████████████████████████

████████████  *See* Ex. B. "Hashed data matching" is the process of matching different data sets through the hash values of unique identifiers. For instance, when an advertiser uploads a spreadsheet of Custom Audience data including hashed email addresses, Facebook can match this data to its users through the hashed email address field.

Thus, it simply is untrue that it would be "nearly impossible" to produce the "disassociated" data in this case for Named Plaintiffs. Mot. at 15. Facebook clearly has the ability to connect Named Plaintiffs' user information through RIDs and hashed data matching, and should be ordered to do so in response to RFP Nos. 9-13.

D.   **Facebook has not established that the burden of producing the data relating to ten Plaintiffs is disproportional to the needs of this case.**

Facebook also suggests that "the burdens of locating the additional information Plaintiffs seek would far exceed the needs of the case." Mot. at 12. But the burden associated with producing the requested information is not undue; it is proportional to the needs of this complex

---

[6] Ex. E, PwC_CPUP_FB00030737-738.
[7] *Id.* at PwC_CPUP_FB00030738 ███████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████.

case. In assessing proportionality, Federal Rule of Civil Procedure 26 directs consideration of "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Helpfully, Judge Chhabria provided further guidance at the March 5, 2020 Case Management Conference, stating:

> I am concerned that Facebook has, you know, often made statements reflecting an unduly narrow view of what should be turned over to the Plaintiffs. And, you know, this is a big case. I mean, there is often a lot of talk about proportionality and whatnot. This is a big case. It is a significant issue. You know, and there is -- this is not the type of case where we are going to be saying: Well, that might end up -- that effort might end up uncovering some relevant information; but, you know, it is just too expensive or difficult, and so we are not going to make Facebook do it. This is really not one of those cases where that is very -- that type of argument is likely to carry the day. You know, and, as I have said a number of times, you know, the best way to figure out what happened as it relates to the claims that are going forward now is to -- for Facebook to produce all information, all documents about the practices associated with giving third parties access to friends' information and friends' of friends information.

Tr. at 28:25-29:18. Judge Chhabria's observations regarding the size of this case remain on point. The proposed class period extends from 2007 to the present, the potential class members number in the hundreds of millions, and the third parties with whom Facebook shared user data appear to number in the tens of thousands. In that context, Plaintiffs' request for the data concerning ten individual users seems not only proportional to the needs of the case but modest.

Furthermore, Facebook's claims of burden are unsupported. "[T]he party opposing discovery has the burden of showing that discovery should not be allowed, and also has the burden of clarifying, explaining and supporting its objections with competent evidence." *Harris v. Best Buy Stores, L.P.*, No. 3:15-cv-00657-HSG (KAW), 2016 WL 6024556, at *1 (N.D. Cal. Oct. 14, 2016) (quoting *La. Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*, 285 F.R.D. 481, 485 (N.D. Cal. 2012)). A party claiming undue burden or expense "ordinarily has far better information—perhaps the only information—with respect to that part of the determination." Fed. R. Civ. P. 26(b)(1) advisory committee's note (2015). Therefore, the "party claiming that

discovery imposes an undue burden must 'allege specific facts which indicate the nature and extent of the burden, usually by affidavit or other reliable evidence.'" *Sullivan v. Personalized Media Commc'ns, LLC*, No. 16-MC-80183-MEJ, 2016 WL 5109994, at *3 (N.D. Cal. Sept. 21, 2016) (quoting *Nationstar Mortg., LLC v. Flamingo Trails No. 7 Landscape Maint. Ass'n*, No. 2:15-cv-01268-RFB-NJK, 2016 WL 4071988, at *4 (D. Nev. July 28, 2016)).[8] Facebook has furnished no evidentiary support for its objections of undue burden and its objections should be overruled.

Plaintiffs emphasize that they are seeking discovery about *ten Named Plaintiffs*—not millions, not thousands, and not hundreds of users. Based on the information Plaintiffs obtain about themselves, and about Facebook's general practices and procedures, they will seek to prove their class claims. Facebook's contention that Plaintiffs are not even entitled to obtain in discovery the evidence necessary to show what Facebook collects about them, and with whom it shares the information is impossible to square with Facebook's basic discovery obligations under the Federal Rules.

## III.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Facebook's motion to impose a discovery stay and grant Plaintiffs' motion to compel discovery responsive to Requests for Production Nos. 9 through 13.

---

[8] *See also SPS Techs., LLC v. Briles Aerospace, Inc.*, No. CV 18-9536 MWF (ASx), 2020 WL 4341717, at *2-3 (C.D. Cal. June 25, 2020) (overruling objection to requests for production of documents and noting that the party resisting discovery must describe "in specific detail, how each Request is overly broad and unduly burdensome by submitting affidavits or other evidence describing the nature of the burden"); *Polaris Innovations Ltd. v. Kingston Tech. Co.*, No. CV1600300CJCRAOX, 2017 WL 3275615, at *6 (C.D. Cal. Feb. 14, 2017) (court grants motion to compel production of documents by defendant Kingston in part because "[r]egarding its assertion that the requests are overly burdensome, Kingston has not submitted any evidentiary declaration to support this objection.").

Dated: September 28, 2020

Respectfully submitted,

KELLER ROHRBACK L.L.P.

BLEICHMAR FONTI & AULD LLP

By: _/s/ Derek W. Loeser_

Derek W. Loeser

By: _/s/ Lesley E. Weaver_

Lesley E. Weaver

Derek W. Loeser (admitted _pro hac vice_)
Lynn Lincoln Sarko (admitted _pro hac vice_)
Gretchen Freeman Cappio (admitted _pro hac vice_)
Cari Campen Laufenberg (admitted _pro hac vice_)
David Ko (admitted _pro hac vice_)
Benjamin Gould (SBN 250630)
Adele A. Daniel (admitted _pro hac vice_)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted _pro hac vice_)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

_Plaintiffs' Co-Lead Counsel_

# ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

I, Derek W. Loeser, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of September, 2020, at Seattle, Washington.

/s/ Derek W. Loeser
Derek W. Loeser

## CERTIFICATE OF SERVICE

I, Sarah Skaggs, hereby certify that on September 28, 2020, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

**In addition, the following were served via email:**

Paven Malhotra
Matan Shacham
Bryn Anderson Williams
pmalhotra@keker.com
bwilliams@kvn.com
bwilliams@kvn.com

Anjeza Hassan
annie.sara@yahoo.com

/s/ *Sarah Skaggs*
Sarah Skaggs

# Plaintiffs' Exhibit A

Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
  klinsley@gibsondunn.com
Brian M. Lutz (SBN 255976)
  blutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DEFENDANT FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION** |

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

0233

Defendant Facebook, Inc. ("Defendant" or "Facebook"), by and through its attorneys, and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the Local Civil Rules of the U.S. District Court for the Northern District of California, the Court orders in this action, and the parties' agreements and conferences among counsel, provides the following responses and objections to Plaintiffs' Second Set of Requests for Production (the "Requests").

## PRELIMINARY STATEMENT

1.      Facebook's responses to the Requests are made to the best of Facebook's current knowledge, information, belief, and understanding of Plaintiffs' requests.  Facebook's factual and legal investigation of this matter is ongoing.  Facebook reserves the right to supplement or amend any responses should future investigation indicate that such supplementation or amendment is necessary.

2.      Facebook's responses to the Requests are made solely for the purpose of and in relation to this action.  Each response is given subject to all appropriate objections (including, but not limited to, objections concerning privilege, competency, relevancy, materiality, propriety, and admissibility).  All objections are reserved and may be interposed at any time.

3.      Facebook's responses are premised on its understanding that Plaintiffs seek only that information that is within Facebook's possession, custody, and control.

4.      Facebook incorporates by reference each and every general objection set forth below into each and every specific response.  From time to time, a specific response may repeat a general objection for emphasis or some other reason.  The failure to include any general objection in any specific response shall not be interpreted as a waiver of any general objection to that response.

5.      Nothing contained in these Responses and Objections or provided in response to the Requests consists of, or should be construed as, an admission relating to the accuracy, relevance, existence, or nonexistence of any alleged facts or information referenced in any Request.

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

0234

## GENERAL OBJECTIONS

1.      Facebook objects to each Request, including the Definitions and Instructions, to the extent that it purports to impose obligations beyond those imposed by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Civil Rules of the U.S. District Court for the Northern District of California, and any agreements between the parties.

2.      Facebook objects to each Request to the extent it seeks information unrelated or irrelevant to the claims or defenses in this litigation.  In particular, the Court has held that individuals who joined Facebook in or after 2009 consented to data sharing policies described in Facebook's "Statement of Rights and Responsibilities" and "Data Use Policy," and dismissed Plaintiffs' claims to the extent they are based on data-sharing practices disclosed in these documents.  Facebook will not produce documents relevant only to dismissed claims or theories of relief.  Nor will Facebook produce documents related only to individuals who are not parties to this case.

3.      Facebook objects to each and every Request to the extent that the Request seeks information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence.

4.      Facebook objects to each Request as overly broad and unduly burdensome, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information.  For example, many of the Requests seek "all documents" regarding particular subject matters, which would require Facebook to conduct searches broader than a reasonable and diligent search of reasonably accessible files (including electronic files) where responsive documents reasonably would be expected to be found.  Such Requests are not proportional to the needs of the case.

5.      Facebook objects to each Request to the extent it purports to request the identification and disclosure of information or documents that were prepared in anticipation of litigation, constitute attorney work product, reveal privileged attorney-client communications, or are otherwise protected from disclosure under any applicable privileges, laws, or rules.

0235

Facebook hereby asserts all such applicable privileges and protections, and excludes privileged and protected information from its responses to each Request. *See generally* Fed. R. Evid. 502; Cal. Code Evid. § 954. Inadvertent production of any information or documents that are privileged or otherwise immune from discovery shall not constitute a waiver of any privilege or of any other ground for objecting to the discovery with respect to such information or documents or the subject matter thereof, or the right of Facebook to object to the use of any such information or documents or the subject matter thereof during these or any other proceedings. In the event of inadvertent disclosure of any information or inadvertent production or identification of documents or communications that are privileged or otherwise immune from discovery, Plaintiffs will return the information and documents to Facebook and will be precluded from disclosing or relying upon such information or documents in any way.

6. Facebook objects to each and every Request to the extent it is argumentative, lacks foundation, or incorporates allegations and assertions that are disputed or erroneous. In furnishing the responses herein, Facebook does not concede the truth of any factual assertion or implication contained in any Request, Definition, or Instruction. The production of documents in response to any Request shall not be construed as adopting a legal position.

7. Facebook objects to each and every Request to the extent that the information sought is more appropriately pursued through another means of discovery, such as responses to interrogatories.

8. Facebook objects to each and every Request, Definition, and Instruction to the extent that it seeks information outside of Facebook's possession, custody, and control.

9. Facebook objects to each Request to the extent that it requests information protected by the right of privacy of Facebook and/or third parties, or information that is confidential, proprietary, or competitively sensitive.

10. Facebook objects to each Request to the extent that it seeks documents or information already in Plaintiffs' possession or available in the public domain. Such information is equally available to Plaintiffs.

11.     Facebook objects to each Request to the extent that it calls for the production of "each," "every," "any," or "all" documents in cases where such a demand is overly broad and/or causes undue burden and expense.

## OBJECTIONS TO DEFINITIONS

1.     Facebook incorporates by references the responses and objections to Definitions and Instructions contained in its Responses and Objections to Plaintiffs' First Set of Requests for Production of Documents.

2.     Facebook generally objects to any definitions or terms defined by reference to capitalized terms and acronyms relied upon in Plaintiffs' First Amended Complaint, which themselves may be vague, ambiguous, unduly broad, or unduly burdensome.

3.     Facebook objects to Plaintiffs' definition of "App" as vague, ambiguous, overbroad, and unduly burdensome on the ground that it includes any "application developed to utilize the core technologies of the Facebook social networking platform" without identifying or defining what the "core," rather than peripheral, technologies of the Facebook are or were at any given time.  Facebook further objects to this definition as vague and ambiguous on the ground that Facebook cannot identify what any online applications are or were "developed to" do or presume the intent of any third parties that Facebook does not control.

4.     Facebook objects to Plaintiffs' definitions of "App Developer Investigation" and "ADI" as overly broad and unduly burdensome on the ground that these definitions include investigations into persons, entities, applications, and/or developers that are not relevant to Plaintiffs' remaining claims.  Facebook further objects to these definitions to the extent they seek documents or information protected by the attorney-client privilege and/or the work product doctrine.

5.     Facebook objects to Plaintiffs' definition of "Apps Others Use" as vague and ambiguous on the ground that it is defined by reference to other vague, ambiguous, and/or undefined terms, including "App," "App Developers," and "API."  Facebook further objects to

this definition as overly broad and unduly burdensome on the ground that the applicable account settings available to Facebook members have changed over time and this definition is not limited to a particular time period or particular settings.

6.      Facebook objects to Plaintiffs' definition of "App Settings" as vague and ambiguous on the ground that it is defined by reference to other vague, ambiguous, and/or undefined terms, including "App," "User," "Content and Information," "Apps Others Use," "Granular Data Permissions," and "Platform Opt Out."  Facebook further objects to this definition as overly broad and unduly burdensome on the ground that the applicable account settings available to Facebook members have changed over time and this definition is not limited to a particular time period or particular settings.

7.      Facebook generally objects to Plaintiffs' definitions of "Communication," "Computer System," "Content and Information," "Document(s)," "Electronic Media," "ESI," "Electronically Stored Information," and "Identify" to the extent that Plaintiffs purport to use these defined terms to request the identification and disclosure of documents or information that: (a) were prepared in anticipation of litigation; (b) constitute attorney work product; (c) reveal privileged attorney-client communications; or (d) are otherwise protected from disclosure under any applicable privileges, laws, and/or rules.  Facebook further objects to the extent that these definitions purport to impose obligations that go beyond the requirements of the Federal and Local Rules.

8.      Facebook objects to Plaintiffs' definition and use of the terms "You," "Your," or "Facebook" as vague, ambiguous, overly broad, and unduly burdensome to the extent the terms are meant to include "directors, officers, employees, partners, members, representatives, agents (including attorneys, accountants, consultants, investment advisors or bankers), and any other Person purporting to act on [Facebook, Inc.'s] behalf. . . . parents, subsidiaries, affiliates, predecessor entities, successor entities, divisions, departments, groups, acquired entities and/or related entities or any other entity acting or purporting to act on its behalf" over which Facebook

5

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

0238

exercises no control, and to the extent that Plaintiffs purport to use these terms to impose obligations that go beyond the requirements of the Federal and Local Rules.

9.      Facebook objects to Plaintiffs' definition of "Granular Data Permissions" as vague and ambiguous on the ground that it is defined by reference to other vague, ambiguous, and/or undefined terms, including "App," "User," "Content and Information," and "App Developer."  Facebook further objects to this definition as overly broad and unduly burdensome on the ground that the applicable account settings available to Facebook members have changed over time and this definition is not limited to a particular time period or particular settings.

10.      Facebook objects to Plaintiffs' definitions of "Internal Policy" or "Internal Policies" as overly broad and unduly burdensome to the extent that Plaintiffs purport to seek the identification and disclosure of documents or information that: (a) was prepared in anticipation of litigation; (b) constitute attorney work product; (c) reveal privileged attorney-client communications; or (d) are otherwise protected from disclosure under any applicable privileges, laws, and/or rules.  Facebook further objects to these definitions as unduly broad and unduly burdensome to the extent they seek statements or directives which are implicit, informal, unwritten, or unofficial.  For the purposes of these Responses and Objections, Facebook will interpret and use "Internal Policy" or "Internal Policies" as referring to the final, written, non-privileged version of any relevant policy, procedure, or directive provided to Facebook employees that is relevant to this litigation.

11.      Facebook objects to Plaintiffs' definition of "Misuse of Data" as vague and ambiguous on the ground that it is defined by reference to other vague, ambiguous, and/or undefined terms, including "App," "User," and "Content [or] Information," and "App Developer."  Facebook further objects to this definition to the extent it assumes disputed facts or legal conclusions, particularly that Facebook members' data was "misused."

12.      Facebook objects to Plaintiffs' definitions of "Person" as vague, ambiguous, overly broad, and unduly burdensome to the extent that Plaintiffs intend to use the terms to

include "any natural person or any business, legal or governmental entity or association" over which Facebook exercises no control.

13.     Facebook objects to Plaintiffs' definitions of "[i]dentify," "[i]ncluding," "[r]elating to," "relate to," "referring to," "refer to," "reflecting," "reflect," "[c]oncerning," and "concern" on the ground that the definitions make the Requests overly broad and unduly burdensome and impose obligations that go beyond the requirements of the Federal and Local Rules.  Facebook shall construe these terms as commonly and ordinarily understood.

14.     Facebook objects to Plaintiffs' definition of "Platform Opt Out" as vague and ambiguous on the ground that it is defined by reference to other vague, ambiguous, and/or undefined terms, including "App," "User," and "Content and [I]nformation."  Facebook further objects to this definition as overly broad and unduly burdensome on the ground that the applicable account settings available to Facebook members have changed over time and this definition is not limited to a particular time period or particular settings

15.     Facebook objects to Plaintiffs' definition of "Privacy Controls" as vague, ambiguous, overly broad, and unduly burdensome on the ground that the applicable account settings available to Facebook members have changed over time and this definition is not limited to a particular time period or particular settings.

16.     Facebook objects to Plaintiffs' definition of "Privacy Controls" as vague, ambiguous, overly broad, and unduly burdensome to the extent the terms are meant to include applications, application developers, and/or "[a]ny person that develops an application, software experience, game, or website that accesses Content and Information from Facebook's API or other Facebook software," and to the extent it encompasses individuals or entities outside of Facebook's knowledge and/or who may not be relevant to this litigation.

17.     Facebook objects to Plaintiffs' "Relevant Time Period," which dates back to January 1, 2007, as overly broad, unduly burdensome, and disproportionate to the needs of the litigation.  In response to Plaintiffs' requests, Facebook will produce the following categories of documents dating back to January 1, 2007:  (i) documents reflecting Facebook's platform

7

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

0240

policies and user terms, (ii) Facebook's 2009 revisions to its user terms, and (iii) Documents reflecting privacy-related disclosures, communications, and other materials provided to users relating to Facebook's pre-2009 user terms and 2009 revisions to those terms.  For all other categories of materials, Facebook will produce documents dating back to March 20, 2012 in response to Plaintiffs' requests.

## OBJECTIONS TO INSTRUCTIONS

1.      Facebook objects to Plaintiffs' Instructions to the extent that they impose obligations that go beyond the requirements of the Federal and Local Rules.

2.      Facebook objects to Plaintiffs' Instruction No. 2 as ambiguous as to the meaning of "available."  Facebook further objects to the Instruction to the extent it exceeds the requirements of the Federal Local Rules.

3.      Facebook objects to Plaintiffs' Instruction No. 3 as unduly burdensome to the extent it requires Facebook to describe detailed information about documents which are no longer in existence or in Facebook's possession, custody, or control, which likely amounts to an extremely large volume of documents given the scope of Plaintiffs' claims and document requests.  Facebook will comply with Instruction No. 3 only to the extent it can ascertain the requested information about the subject documents through reasonable, good-faith investigation and inquiry.

4.      Facebook objects to Plaintiffs' Instruction No. 7 to the extent that it imposes obligations that go beyond the requirements of the Federal and Local Rules.

5.      Facebook objects to Plaintiffs' Instruction No. 12 as ambiguous and unduly burdensome.  Facebook further objects to the Instruction to the extent it exceeds the requirements of the Federal and Local Rules.

0241

## SPECIFIC RESPONSES AND OBJECTIONS

**REQUEST FOR PRODUCTION NO. 6:**

All Documents provided to or received from any governmental entity or regulator in the United States and United Kingdom in response to any formal or informal inquiry or investigation relating to whether Users' Content and Information was accessed or obtained by any Third Parties without proper consent or authorization, including but not limited to all inquiries or investigations arising out of the Cambridge Analytica Scandal, the FTC Consent Order, and any inquiry or investigation related to the settlement agreement with the FTC announced on July 24, 2019.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all documents provided to or received from any governmental entities or regulators in broad categories of "inquir[ies]" and investigation[s]" without regard for whether such information relates to Plaintiffs' claims.

(D) Facebook objects to this Request as overbroad as to time to the extent it seeks document predating March 20, 2012.

Subject to and without waiving the foregoing objections, Facebook will produce documents in response to this Request to the extent that those documents are responsive to Plaintiffs' other Requests, identified by a reasonable, good-faith search, and by December 26, 2019, Facebook will produce all document demand letters from the FTC associated with its 2018-2019 investigation into Facebook along with correspondence regarding the scope of those demands.

## REQUEST FOR PRODUCTION NO. 7:

All organizational charts, personnel directories, or other documents sufficient to show Your organizational structure, including:

  (a)  the identity of subsidiaries, affiliates, and joint ventures, and your ownership interest, control of, or participation in any subsidiary or affiliate or joint venture related to agreements, engineering, access, use, transmission, receipt, collection or analysis of Facebook Users' Content and Information by Third Parties;

  (b)  the organization of any division, department, unit or subdivision of your company that has responsibilities relating to agreements, engineering, access, use, transmission, receipt, collection or analysis of Users' Content and Information by Third Parties; and

  (c)  the names, titles, job descriptions, and employment periods for your present and former employees who has or had responsibilities relating to agreements, engineering, access, use, transmission, receipt, collection or analysis of Users' Content and Information by Third Parties; and

  (d)  the names, titles, job descriptions, and employment periods of Your present or former directors, officers, or senior managers, as well as any secretaries or administrative assistants assigned to these directors, officers, or senior managers.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 7:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks "all" organizational charts, personnel directories, or other documents sufficient to show Facebook's organizational structure, including the categories of entities, divisions, or individuals described in the Request, which are merely "related" or "relating" to agreements, engineering, access, use, transmission, receipt, collection or analysis of Facebook Users' Content and Information by Third Parties, including those which may have no bearing on any issues in this Action and the names, titles, job descriptions, and employment periods of all present or former Facebook directors, officers, or senior managers, as well as any secretaries or administrative assistants assigned to these directors, officers, or senior managers, including those which may have no involvement with or knowledge of issues in this Action.

(D) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have any documents in its possession, custody, or control responsive to this Request. Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 8:**

All versions (including each updated or amended version thereof) of Facebook's "Platform Policies," which have been called the "Developer Principles and Policies," the "Platform Guidelines," or the "Developer Terms of Service" (collectively, the "Platform Policies").

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks "all" versions of certain documents without any limitation as to the relevant time period or whether the versions sought are in final form.

(D) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

(E) Facebook further objects to this Request to the extent that the Request seeks materials that are cumulative or duplicate of materials produced to Plaintiffs previously.

Subject to and without waiving the foregoing objections, Facebook will produce the final, written versions of Facebook's Platform Policies issued to users dating back to January 1, 2007, to the extent that those policies have not been produced to Plaintiffs previously.

12

0245

**REQUEST FOR PRODUCTION NO. 9:**

All Documents relating to each of the Named Plaintiffs, including but not limited to all Content and Information collected about each of them or gained from business relationships or any other source.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents merely "relating" to each of the Named Plaintiffs, including all Content and Information collected about each of them from any business relationship or any other source, including those which may have no bearing on any issues in this Action, and including those that are outside of Facebook's possession, custody, or control.

(D) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks "all" Content and Information "collected about each" Named Plaintiffs, which could include automated logs of actions taken, transaction-level date, and high-level summary documents used only for technical purposes, including those which may have no bearing on any issues in this Action.

(E) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

Subject to and without waiving the foregoing objections, Facebook will produce documents that are responsive to this Request and which are uniquely associated with Content and Information related to the Named Plaintiffs' accounts or specifically relate to the sharing of the Named Plaintiffs' Content and Information with third-parties, identified by a reasonable, good-faith search of documents that are in Facebook's possession, custody, or control, to the extent the Named Plaintiffs have provided information sufficient to identify their accounts.

**REQUEST FOR PRODUCTION NO. 10:**

For each of the Named Plaintiffs, Documents sufficient to show the categories of Content and Information Facebook collects, tracks, and maintains about them.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks Documents sufficient to show all categories of Content and Information Facebook collects, tracks, and maintains about each of the Named

Plaintiffs, including, for example, Content and Information that Facebook did not share with any third parties and that does not relate to any issue in this Action.

(D) Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Request 9.

(E) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

Subject to and without waiving the foregoing objections, Facebook will produce documents that are responsive to this Request and which are uniquely associated with Content and Information related to the Named Plaintiffs' accounts, identified by a reasonable, good-faith search of documents that are in Facebook's possession, custody, or control, to the extent the Named Plaintiffs have provided information sufficient to identify their accounts.

**REQUEST FOR PRODUCTION NO. 11:**

Documents sufficient to identify all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information, what categories of Content and Information Facebook granted access to, how Facebook allowed these Third Parties to access the Named Plaintiffs' Content and Information, and the business purpose of all such access.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks Documents sufficient to identify all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information and other information relating to such information sharing, including Third Parties who were granted access to such Content and Information other than in connection with the allegations in Plaintiffs' Complaint.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have documents in its possession, custody, or control responsive to this Request.  Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 12:**

Documents relating to any partnerships or agreements Facebook entered into with Third Parties for access to Named Plaintiffs' Content and Information.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it broadly seeks all Documents "relating" to any partnerships or agreements Facebook entered into with Third Parties for access to Named Plaintiffs' Content and Information, including those which may have no bearing on any issues in this Action, and including those that are outside of Facebook's possession, custody, or control.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have documents in its possession, custody, or control responsive to this Request.  Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 13:**

For all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information, Documents sufficient to show any use by Third Parties of such Content and Information not in connection with the User that granted the permission to the Third Party or inconsistent with Facebook's agreement with that Third Party.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it broadly seeks Documents regarding "all Third Parties" who obtained access to certain content and information, including Third Parties who were granted access to such Content and Information other than in connection with the allegations in Plaintiffs' Complaint.

(D) Facebook further objects to this Request on the ground, and to the extent, that it seeks information that is outside of Facebook's possession, custody, or control because it seeks information regarding Third Parties' use of Named Plaintiffs' Content and Information.

Subject to and without waiving the foregoing objections, Facebook will produce cease-and-desist letters sent to app developers identified as having access to Facebook users' Content and Information during the Relevant Time Period relating to policy violations involving potential misuse of user data.

**REQUEST FOR PRODUCTION NO. 14:**

Documents sufficient to show the monetary or retail value of each named Plaintiff's Content and Information to Facebook, updated to reflect whenever Facebook's terms of service changed, including the calculation of revenue earned by Facebook for each Named Plaintiff based upon bartering or selling access to such Named Plaintiff's Content and Information.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request on the grounds that "monetary or retail value of each named Plaintiff's Content and Information to Facebook" and "calculation of revenue earned by Facebook for each Named Plaintiff" are ambiguous and vague.

(D) Facebook further objects to this Request on the grounds that it assumes disputed facts or legal conclusions, particularly that Facebook "barter[s]" or "sell[s]" access to the "Named Plaintiff[s'] Content and Information" to any Third Parties.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have any documents in its possession, custody, or control responsive to this Request.

## REQUEST FOR PRODUCTION NO. 15:

Documents sufficient to show the money or any other thing of value, including but not limited to money or any other thing of value paid in exchange for targeted advertising, that Facebook received in exchange for each Named Plaintiff's Content and Information, which entities paid Facebook, and when such payments were made.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 15:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks Documents regarding all entities who provided money or any other thing of value to Facebook other than in connection with the allegations in Plaintiffs' Complaint.

(D) Facebook further objects to this Request on the grounds that "money or any other thing of value . . . that Facebook received in exchange for each Named Plaintiff's Content and Information" is ambiguous and vague.

(E) Facebook further objects to this Request on the grounds that it assumes disputed facts or legal conclusions, particularly that Facebook received "money or any other thing of value" from Third Parties in exchange for the "Named Plaintiff[s'] Content and Information."

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have any documents in its possession, custody, or control responsive to this Request.

## REQUEST FOR PRODUCTION NO. 16:

Documents sufficient to show the monetary or retail value of Users' Content and Information to Facebook, including all monthly, quarterly, and annual financial reporting relating to same, and including but not limited to the calculation of average revenue per user, any changes to such monetary or retail value relating to changes to Facebook's terms of service, and any financial reporting of Content and Information as an asset.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 16:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other

applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users who are not parties to the Action and financial information unrelated to Plaintiffs' claims.

(D) Facebook further objects to this Request on the grounds that "monetary or retail value of Users' Content and Information to Facebook" is ambiguous and vague.

(E)  Facebook further objects to this Request as misleading to the extent that it suggests that Facebook's per-user revenues reflect the value of any information for which Plaintiffs seek compensation in this Action.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have any documents in its possession, custody, or control responsive to this Request.

**REQUEST FOR PRODUCTION NO. 17:**

All Documents relating to Facebook's assessment of the monetary or retail value of Users' Content and Information to Users (as distinct from value to Facebook), including analyses for providing compensation to Users for their Content and Information, including but not limited to Users compensated in connection with the Onavo or Research app.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users who are not parties to the Action.

(D) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, to the extent, that the Request seeks all Documents "relating to" Facebook's assessment of the monetary or retail value of Users' Content and Information to Users and information relating to compensation for data and/or information not related to Plaintiffs' claims

(E) Facebook further objects to this Request on the grounds that "monetary or retail value of Users' Content and Information to Users" is ambiguous and vague.

(F)  Facebook further objects to this Request as misleading to the extent that it suggests any compensation offered for information in connection with the Onavo or Research app reflects the value of any information for which Plaintiffs seek compensation in this Action.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have any documents in its possession, custody, or control responsive to this Request.

**REQUEST FOR PRODUCTION NO. 18:**

All Documents that have been transmitted to Users by Facebook relating to whether Users' Content and Information was accessed or obtained by Third Parties.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(B) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks Documents transmitted to Users who are not parties to the Action.

(C) Facebook further objects to the Request on the ground that the Request seeks documents that are already in Plaintiffs' possession, custody, or control.

Subject to and without waiving the foregoing objections, Facebook will produce Facebook's communications to users regarding the Cambridge Analytica events.

**REQUEST FOR PRODUCTION NO. 19:**

All Documents supporting the escalation of those Apps escalated to Phase Two of ADI for Enhanced Examination and/or Phase Three of ADI for Enforcement and designated as follows in the Chen Declaration ¶ 34:

> (d) each [A]pp to which a request for information was sent; (e) each [A]pp for which an interview was sought with the developer; (f) each [A]pp for which a remote or onsite audit was requested to be conducted; (g) each [A]pp for which actual misuse was found and identification of that misuse; (h) each [A]pp that was banned for actual misuse; and (i) each [A]pp that was banned for failing to cooperate with Facebook's investigation.

Facebook has described identification of these Apps as non-privileged and has already produced it to the Massachusetts Attorney General's Office.  *See* Chen Declaration ¶ 35.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that the Request seeks all Documents supporting the escalation of certain Apps, including escalations not relevant to the claims or defenses in this Action.

Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 20:**

The list of Apps that Facebook provided to the Massachusetts Attorney General's Office and that the Chen Declaration ¶ 35 describes as "the subject of external actions or communications with third parties, including the growing list of Apps Facebook has suspended as part of the [ADI], whether because of policy violations or because of their refusal to cooperate with Facebook's investigation."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.   Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

Subject to and without waiving the foregoing objections, Facebook will produce relevant lists of Apps that Facebook provided to the Massachusetts Attorney General's Office.

**REQUEST FOR PRODUCTION NO. 21:**

Communications between Facebook and Third Parties relating to the ADI, including but not limited to Communications that Facebook provided to the Massachusetts Attorney General's Office.  *See* Chen Declaration ¶ 37.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.   Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that the Request seeks all Communications between Facebook and Third Parties "relating" to the ADI, including communications unrelated to Plaintiffs' claims.

Subject to and without waiving the foregoing objections, to the extent non-privileged, responsive documents are identified by a reasonable, good-faith search, Facebook will produce Communications between Facebook's ADI team and third-party app developers relating to ADI.

**REQUEST FOR PRODUCTION NO. 22:**

All "Privacy Risk Assessment[s]," and notes or agenda relating to Facebook's "focused subject-matter-specific meetings," "focused subject-matter-specific discussions," "weekly intra- and inter-team meetings," and "Privacy Summit[s]," as detailed in "Facebook's Privacy Program Overview" included in any PricewaterhouseCoopers LLP ("PwC") assessment report prepared pursuant to the FTC Consent Order.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that the Request seeks

all notes and agenda regarding various topics, including notes and agenda unrelated to Plaintiffs' claims.

Facebook stands on its objections.

**REQUEST FOR PRODUCTION NO. 23:**

Unredacted versions and Documents in support of the assessment reports, including the Initial Assessment Report and Biennial Reports, prepared by PwC pursuant to the FTC Consent Order.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request as seeking information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects that the term "assessment reports" is ambiguous and vague. Facebook will construe this term to mean the "Privacy Risk Assessments" referenced in Request No. 22.

(D) Facebook further objects to the Request to the extent that the Request seeks documents that are not in Facebook's possession, custody, or control because the Request seeks documents that support assessment reports prepared by another entity.

(E) Facebook further objects to the Request as Facebook lacks sufficient knowledge to identify with certainty documents relied upon by another entity.

Facebook stands on its objections.

**REQUEST FOR PRODUCTION NO. 24:**

Documents sufficient to identify all Third Parties to which Facebook granted access to Users' Content and Information not generally available through Platform pursuant to partnerships or agreements between Facebook and those Third Parties.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks Documents sufficient to identify all Third Parties to which Facebook granted access to Users' Content and Information not generally available through Platform pursuant to partnerships or agreements between Facebook and those Third Parties, including Third Parties who were granted access to such Content and Information other than in connection with the allegations in Plaintiffs' Complaint.

Subject to and without waiving the foregoing objections, Facebook will produce final agreements with integration partners and device manufacturers responsive to this Request.

**REQUEST FOR PRODUCTION NO. 25:**

All Documents relating to agreements or partnerships described in Request No. 24.

0261

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "relating" to the subject agreements or partnerships, including those which are not relevant to the subject matter of the Action.

(D) Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Request 24.

Subject to and without waiving the foregoing objections, Facebook will produce agreements with its integration partners and device manufacturers responsive to this Request.

**REQUEST FOR PRODUCTION NO. 26:**

For each of the Third Parties that Facebook entered into partnerships or agreements with as described in Request No. 24, Documents sufficient to identify:

- The fields, kinds, or categories of Content and Information that were accessed or obtained by such Third Parties;
- How each such Third Party accessed or obtained the Content and Information of Users;
- How each such Third Party used the Content and Information accessed or obtained;

29

0262

- Where the Content and Information obtained by such Third Parties currently resides and who has access to it.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 26:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to the Request to the extent that the Request seeks Documents that are not in Facebook's possession, custody, or control because the Request relates to the conduct of Third Parties.

(E)  Facebook further objects to this Request as seeking information outside of Facebook's knowledge regarding the actions and knowledge of third parties.

(D) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users that are not parties to the Action.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have documents in its possession, custody, or control responsive to Request No. 26.

0263

**REQUEST FOR PRODUCTION NO. 27:**

Documents sufficient to show all forms and formats in which Facebook transmitted to Third Parties information concerning Users' liking, viewing, retrieving, or otherwise requesting or obtaining videos on, using, or by means of the Facebook Platform.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(B) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users not a party to the Action.

(C) Facebook further objects to this Request on the grounds that the term "transmitted" is ambiguous and vague in that it could refer to any and all forms of conveying information, including passively making information available to a third party by hosting and displaying the information a User chooses to include on his or her Facebook profile page.

Subject to and without waiving the foregoing objections, Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 28:**

All Documents relating to Internal Policies by Facebook on the monitoring of Third Parties' compliance with Facebook's Platform Policy, Data Policy, or SRR.

0264

**RESPONSE TO REQUEST FOR PRODUCTION NO. 28:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "Relating" to the subject Internal Policies, including Policies unrelated to Plaintiffs' claims.

Subject to and without waiving the foregoing objections, to the extent non-privileged, responsive documents are identified by a reasonable, good-faith search, Facebook will produce final, formal, written Policies that governed access to Facebook consumer data by third-party Applications during the Relevant Time Period.

**REQUEST FOR PRODUCTION NO. 29:**

All Documents relating to Internal Policies by Facebook on the enforcement of Facebook's Platform Policy, Data Policy, or SRR against Third Parties.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other

32

applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "relating" to the subject Internal Policies, including Policies unrelated to Plaintiffs' claims.

(D)  Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Request 28.

Subject to and without waiving the foregoing objections, Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 30:**

All Documents relating to measures and controls, including proposed measures and controls, put in place by Facebook to prevent Third Parties from violating Facebook's Platform Policy, Data Policy, or SRR.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "Relating" to the subject measures and controls, including measures and controls unrelated to Plaintiffs' claims.

(D) Facebook further objects to this Request on the grounds that the phrases "measures and controls" and "proposed measures and controls" are ambiguous and vague and undefined.

(F) Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Requests 28 and 29.

Subject to and without waiving the foregoing objections, to the extent non-privileged, responsive documents are identified by a reasonable, good-faith search, Facebook will produce final, formal, written Policies that governed access to Facebook consumer data by third-party Applications during the Relevant Time Period.

**REQUEST FOR PRODUCTION NO. 31:**

All Documents relating to Facebook's audits, inquiries, and investigations of Third Parties investigating compliance with any provisions of Facebook's Platform Policy, Data Policy, or SRR regarding the access, use, transmission, receipt, collection and analysis of Users' Content and Information on and off the Platform.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 31:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other

applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "relating" to the subject audits, inquiries, and investigations, including audits, inquires, and investigations unrelated to Plaintiffs' claims.

Subject to and without waiving the foregoing objections, Facebook will produce cease-and-desist letters sent to app developers during the Relevant Time Period relating to policy violations involving the use of User data.  Facebook is willing to meet and confer with Plaintiffs regarding any other documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 32:**

All Documents Concerning Misuse of Data, including investigations, examinations, inquiries, or audits-or Communications regarding such investigations, examinations, inquiries, or audits-regarding Misuse of Data prior to the deprecation of Graph API v.1.0.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 32:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "Concerning" Misuse of Data.

(D) Facebook further objects that the phrase "prior to the deprecation of Graph API v.1.0" is ambiguous and vague and undefined.  Facebook will construe this phrase to mean prior to April 30, 2015.

(E)  Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Requests 31.

Subject to and without waiving the foregoing objections, Facebook will produce cease-and-desist letters sent to app developers during the Relevant Time Period relating to policy violations involving the use of User data.  Facebook is willing to meet and confer with Plaintiffs regarding any other documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 33:**

Documents sufficient to show the notice that Facebook provided to Users regarding modifications to Facebook's SRR or Data Policy, and all Communications related thereto.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 33:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other

0269

applicable privilege, doctrine, or protection.   Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action and/or disproportionate to the needs of the case on the grounds that it seeks all Communications "related" to the subject notice.

(D) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users who are not parties to the Action.

Subject to and without waiving the foregoing objections, Facebook will produce final, exemplar versions of notifications that Facebook made to users regarding material changes to its Data Use Policy and Statement of Rights and Responsibilities dating back to January 1, 2007.

**REQUEST FOR PRODUCTION NO. 34:**

All Documents relating to the conditioning of Third Parties' access to Users' Content and Information on the purchase of Mobile App Install Ads, payment of Content and Information in-kind (referred internally as Reciprocity or Data Reciprocity), or other payment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 34:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.   Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that it seeks all Documents "relating" to certain subjects, including Documents unrelated to Plaintiffs' claims and documents that are not within Facebook's possession, custody, or control.

(D)  Facebook further objects to this Request to the extent it is based on the false and incorrect premise that Facebook "condition[ed]" or "condition[s]" access to information on certain purchases and/or payments.

Subject to and without waiving the foregoing objections, Facebook will produce final, formal, written Policies and agreements that governed access to Facebook consumer data by third-party Applications, integration partners, and mobile phone manufacturers during the Relevant Time Period.

## REQUEST FOR PRODUCTION NO. 35:

Documents relating to the manner in which a Facebook User could control how his or her data was shared through their Privacy Controls and App Settings throughout the Relevant Time Period, including but not limited to screenshots of the Facebook website and the Facebook mobile application.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 35:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that it seeks all Documents "relating" to the subject manner of control, including Documents that are not within Facebook's possession, custody, or control.

(D) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users that are not parties to the Action.

(E) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

Subject to and without waiving the foregoing objections, to the extent non-privileged documents are identified by a reasonable, good-faith search, Facebook will produce its user terms dating back to January 1, 2007, to the extent they have not been produced to Plaintiffs' previously, and screen shots sufficient to show how a user could control how data was shared with third-party applications.

**REQUEST FOR PRODUCTION NO. 36:**

All Documents concerning User testing, evaluation and analysis of Facebook's Privacy Controls and App Settings during the Relevant Time Period, including but not limited to design documents, correspondence, analyses, and reports.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 36:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as ambiguous and confusing on the grounds that the phrase "User testing, evaluation and analysis of Facebook's Privacy Controls and App Settings" is ambiguous and vague and not defined.

(D) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that it seeks all Documents "concerning" the subject User testing, evaluation and analysis, including Documents which are not within Facebook's possession, custody, or control.

(E) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users that are not parties to the Action.

(F) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

Subject to and without waiving the foregoing objections, Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

DATE:  December 26, 2019          Respectfully submitted,

**GIBSON, DUNN & CRUTCHER, LLP**

By:  /s/ *Joshua S. Lipshutz*
Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Brian M. Lutz (SBN 255976)
blutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

41

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

0274

# Plaintiffs' Exhibit C

# Plaintiffs' Exhibit D

# Redacted in its Entirety

# Plaintiffs' Exhibit E

# Redacted in its Entirety

# Exhibit E

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
  klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
  mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
  dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br> This document relates to: <br><br> ALL ACTIONS | CASE NO. 3:18-MD-02843-VC <br><br> **DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20** <br><br> Judge: Hons. Vince Chhabria and Jacqueline Scott Corley <br> Courtroom 4, 17th Floor |

Gibson, Dunn & Crutcher LLP

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

0285

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

    I.    The stay imposed by Pretrial Order 20 includes a discovery stay. ............................. 2

    II.    This case is about information users share with their friends on Facebook. ............... 3

        A.    The four live theories all concern data users shared with their Facebook friends. ............................................................................................................ 3

        B.    The threshold "global issues" addressed in the Order show that the actionable claims relate only to information users shared on Facebook. ........... 4

    III.    Facebook produced all data Plaintiffs shared on Facebook; no other user data is relevant. ............................................................................................................. 6

    IV.    The Court should deny Plaintiffs' "Cross-Motion to Compel." ............................... 10

CONCLUSION ............................................................................................................... 10

Gibson, Dunn &
Crutcher LLP

i

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

0286

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Meyers v. Cty. of Sacramento*,
  2020 WL 207213 (E.D. Cal. Jan. 14, 2020)......................................................................2

*Mujica v. AirScan, Inc.*,
  771 F.3d 580 (9th Cir. 2014)............................................................................................3

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
  655 F.3d 1039 (9th Cir. 2011)..........................................................................................2

Gibson, Dunn &
Crutcher LLP

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

0287

## INTRODUCTION

The lawsuit Plaintiffs describe is not this case. This case is about *information sharing*. Specifically, it concerns sensitive information *that users shared with their Facebook friends* and that third parties allegedly accessed as a result of friend sharing, whitelisting, and integration partner agreements. Pretrial Order 20 is clear on this point, and Plaintiffs do not identify a single line in Judge Chhabria's comprehensive order, much less in their own allegations, that supports their description of the case that survived dismissal.

The Order explains on its first page: "This lawsuit . . . is about Facebook's practice of *sharing* its users' personal information with third parties." Dkt. 298 ("Order") at 1 (emphasis added). It then says that each of the four live theories concerns "*substantive and revealing content that users intended only for a limited audience* [*i.e.*, their Facebook friends], such as their photographs, videos they made, videos they watched, their religious and political views, their relationship information, and the actual words contained in their messages." *Id.*; *see also id.* at 7, 13, 17. The user data relevant to those theories consists of "*information [users] make available to their friends on [Facebook]*. *Id.* at 1.

Plaintiffs do not dispute that Facebook produced all of the information the Named Plaintiffs ever shared on Facebook. These productions consist of *more than one million pages of data* and necessarily include any data Facebook shared under the live theories. But, Plaintiffs insist they are entitled to any other data that has ever crossed Facebook's servers that relates in any way to any Named Plaintiff and all derivative materials drawing on this data. Plaintiffs seek these materials even if the underlying data is not associated with any user and even if they were never shared with any third party. Plaintiffs do not even attempt to explain why they would need such data in a case concerning information *they shared on the Facebook platform* and that Facebook allegedly shared beyond the audience Plaintiffs intended. Instead, Plaintiffs openly admit that they seek these extraneous materials not to pursue live claims, but to resuscitate stayed and dismissed theories or to search for new ones.

Plaintiffs largely avoid the Court's instruction to brief "what the scope of discovery is based on the claims in Judge Chhabria's ruling [Pretrial Order 20]." 9/4/2020 Hr'g Tr. at 5:8-10. Instead, Plaintiffs devote the majority of their brief to side issues and seek to compel Facebook to produce all documents responsive to five RFPs that are not before the Court. The Court should disregard these diversions, conform discovery to the four operative theories, and deny Plaintiffs' motion to compel.

0288

## ARGUMENT

### I. The stay imposed by Pretrial Order 20 includes a discovery stay.

Plaintiffs take the surprising position that Pretrial Order 20 sets virtually no bounds on the scope of discovery in this case and allows them to explore theories Judge Chhabria stayed or dismissed.[1]

Plaintiffs' position makes no sense. When a stay is in place, it "include[s] a stay of discovery." *Meyers v. Cty. of Sacramento*, 2020 WL 207213, at *1 (E.D. Cal. Jan. 14, 2020). Judge Chhabria stayed all but Plaintiffs' core theories because Plaintiffs filed a 1,440-paragraph pleading. As he explained, "it seems the plaintiffs sought to identify anything Facebook has ever been reported to have done wrong . . . [and] the presence of so many disparate and vague allegations ma[de] it nearly impossible for Facebook to meaningfully respond to all of them, much less for the Court to effectively address them." Order at 5-6. In order to avoid "bogging the case down at the pleading stage for years," *id.* at 6, Judge Chhabria therefore issued an opinion regarding Plaintiffs' core allegations, without addressing most of their improperly pleaded theories, which he stayed, *id.* Judge Chhabria surely did not intend to allow discovery on hundreds of "disparate and vague allegations" that did not satisfy Rule 8. The very point of the stay was to focus this case—not to allow Plaintiffs to explore "anything Facebook has ever been reported to have done wrong" without stating cognizable claims.

Plaintiffs even suggest Pretrial Order 20 allows discovery to "reviv[e]" claims dismissed with prejudice. Opp'n at 6 n.3. To support this curious position, Plaintiffs cite a footnote in Judge Chhabria's analysis of Plaintiffs' deceit by concealment claim. *Id.* (citing Order at 37 n.21). Judge Chhabria held that Plaintiffs stated a plausible claim arising from Facebook's alleged practices concerning whitelisting and integration partners. But he held the claim did not satisfy Rule 9(b)'s heightened pleading standard with respect to friend sharing and Facebook's enforcement measures. He then said in a footnote that dismissal of a subset of the claim would not "preclude . . . plaintiff[s] from seeking revival if discovery reveals a factual basis that justified reconsideration." Order at 37 n.21. Judge Chhabria cited *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1059 (9th Cir. 2011), which holds a plaintiff who fails to satisfy the PLRA's heightened pleading standard may potentially seek revival if other case-related discovery later allows the plaintiff to satisfy the

---

[1] In addition to the discovery Plaintiffs seek from Facebook, Plaintiffs have served overbroad sub-poenas on 27 third parties. These parties also require clear guidance as to the scope of discovery.

Gibson, Dunn &
Crutcher LLP

2

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

0289

PLRA's heightened pleading standard. Judge Chhabria certainly did not intend this footnote to create a gaping hole allowing discovery on hundreds of allegations that did not survive dismissal. *See Mujica v. AirScan Inc.*, 771 F.3d 580, 593 n.7 (9th Cir. 2014) ("To the extent [earlier cases] suggest[] that courts retain discretion to permit discovery whenever a plaintiff has failed to satisfy Rule 8's plausibility standard, it is simply incompatible with *Iqbal* and *Twombly*.").

Pretrial Order 20 plainly defines the scope of discovery in defining the scope of the case.

## II.     This case is about information users share with their friends on Facebook.

A plain reading of Pretrial Order 20 explains the scope of the case Judge Chhabria allowed to move forward.[2] Plaintiffs say the Order describes this case as concerning any data Facebook receives or infers about users and how that data may be used to target them. To support this position Plaintiffs quote vague passages from the Order stating the case concerns "sensitive information." Plaintiffs then say Judge Chhabria did not define "sensitive" and ask the Court to interpret the term to include any data Plaintiffs believe to be personal—including information they provide to third parties, information third parties collect through cookies, public records, and even inferences Facebook draws. Opp'n at 4.

Plaintiffs disregard what Pretrial Order 20 actually says. It describes "sensitive information" to be "substantive and revealing content that users intended only for a limited audience," and clarifies that this data is "**information [users] make available to their friends on [Facebook]**." Order at 1. To read the ruling otherwise would expand the case far beyond what Judge Chhabria considered and would also raise a host of thorny legal questions his Order does not address.

### A.     The four live theories all concern data users shared with their Facebook friends.

As discussed, Pretrial Order 20 allows four theories of relief to move forward. Each theory concerns information users shared with their Facebook friends.

***Friend sharing***. Friend sharing was a capability through which users could share with apps information their friends posted and made available to their Facebook friends. Plaintiffs do not dispute

---

[2]     Plaintiffs disingenuously argue that Facebook takes an "unduly narrow" view of discovery, citing a comment Judge Chhabria made before discovery began advising Facebook to produce materials regarding "friends' information and friends' of friends information." Opp'n at 13. Facebook has now produced nearly 1.5 million pages of documents, before the parties have even reached a search term agreement, including all information the Named Plaintiffs shared with their friends and friends of their friends. Those productions also include all of the Facebook documents produced to the FTC in response to its document requests in two related investigations. They also include documents produced to a host of other government actors in related actions responsive to Plaintiffs' RFPs. In addition to these materials, Facebook proposed search terms hitting on millions of additional documents.

3

0290

this.  Friend sharing underlies the Cambridge Analytica events, it has been hotly litigated, and there is no dispute as to what it is about.  The Order explains: "[W]hen users accessed apps on the Facebook Platform, the app developers were not merely able to obtain information about the users they were interacting with; [but] were also able to obtain any information about the users' Facebook friends that the users themselves had access to," "such as photographs, videos they watched, religious preferences, posts, and even sometimes private one-on-one messages sent through Facebook."  *Id.* at 6-7.

*Whitelisting*.  Whitelisting is an extension of friend sharing and is about the same data. *Id*. at 8.

*Integration Partner Agreements.*  Facebook allegedly "[s]har[ed] sensitive user information with business partners," through a list of "integration partnerships," to integrate Facebook with devices, websites, and social-media platforms.  *Id.* at 8-9.  As with the other theories, the "sensitive user information" at issue is "substantive and revealing content that users intended only for a limited audience [i.e. their Facebook friends]."  *Id*. at 1.  The purpose of these agreements was to allow users to integrate their Facebook activities *that they shared* on Facebook with other platforms and sites.

Plaintiffs say the Order allows claims relating to integration partners to proceed as to some broader set of "sensitive information" that they find personal in nature.  Opp'n at 7.  Plaintiffs provide no support for this assertion; the Order describes this theory as involving the same "sensitive user data" underlying the other theories of relief.  And it must.  As discussed below, the Order holds that Plaintiffs demonstrated standing, a reasonable expectation of privacy, and a lack of consent only with respect to Facebook's alleged practice of sharing information users shared with their Facebook friends.

*Enforcement*.  This theory relates to how Facebook enforced its data-use policies with respect to data third parties obtained through friend sharing, whitelisting, and integration partner agreements, and it concerns the same data that users shared with their Facebook friends.  Order at 9.

**B.      The threshold "global issues" addressed in the Order show that the actionable claims relate only to information users shared on Facebook.**

Pretrial Order 20 addressed various "global issues" and holds Plaintiffs demonstrated a reasonable expectation of privacy, standing, and lack of consent only with respect to Facebook's alleged practice of sharing with third parties information users shared with their friends on Facebook.

*Expectation of privacy*.  Pretrial Order 20 addresses Facebook's argument that Plaintiffs were not injured, and therefore lack standing, because they did not have a reasonable expectation of privacy

Gibson, Dunn &
Crutcher LLP

4

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

0291

over information they share with their Facebook friends. *Id*. at 1 ("Facebook argues that people have no legitimate privacy interest in information they make available to their friends on social media."). With respect to users' privacy expectations, Pretrial Order 20 holds: "the issue of whether users have a reasonable expectation of privacy *in information they share with their social media friends* is best understood as relating to the merits, not standing." *Id*. at 10-11 n.2 (emphasis added). On the merits, the Order holds that "[w]hen you share sensitive information with a limited audience . . . you retain privacy rights and can sue someone for violating them." *Id.* at 2. It then analyzes whether users retain a reasonable expectation of privacy over information *they share with their friends*, *see id*. at 10-12, and concludes: "social media users can have their privacy invaded if sensitive information *meant only for a few dozen friends* is shared more widely," *id*. at 11.

Pretrial Order 20 is so clear that this case concerns information that users shared with their Facebook friends that it goes out of its way to say *sua sponte*: "It seems quite possible that a user whose settings allow information to be shared not only with their friends, but friends of friends, loses any expectation of privacy." *Id*. at 11 n.3. Nowhere does Pretrial Order 20 consider whether users maintain a reasonable expectation of privacy over information beyond what users share on Facebook (as Plaintiffs wrongly suggest) such as information users provide third parties, public records, information third parties obtain through cookies, or information Facebook "infers" about users.

**Standing.** With respect to standing, Pretrial Order 20 holds: "The alleged injury is 'concrete' largely for the reasons already discussed – if you use a company's social media platform *to share sensitive information with only your friends*, then you suffer a concrete injury when the company disseminates that information widely." *Id*. at 17. The Order goes on to say that Plaintiffs' injuries are sufficiently particularized with respect to which third parties allegedly received their data because, "[i]f, as alleged in the complaint, *Facebook made users' friends only' information readily available* to such a broad swath of companies . . . it is virtually inevitable that some of these companies obtained information on the named plaintiffs." *Id*. at 18. The Order did not hold—or even consider—whether Plaintiffs have standing to sue Facebook with respect to information users did not share on Facebook.

**Consent.** On the issue of consent, the Court addressed whether Plaintiffs consented to the conduct underlying their claims because they "agreed, when they signed up for their accounts, that

Gibson, Dunn &
Crutcher LLP

5

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

0292

Facebook could disseminate their 'friends only' information in the way it has done." *Id.* at 18. Pretrial Order 20 holds that judicially noticeable materials demonstrate that a subset of users consented to sharing their "friends only" information through friend sharing, but do not establish at the pleading stage that all users consented to sharing friends-only information through friend sharing, whitelisting, and integration agreements. *Id.* at 18-29. The Order did not consider whether Plaintiffs consented to sharing information they did not share on Facebook.

The Order is clear that this case is about sensitive information users made available to their friends on Facebook and third parties allegedly accessed. Discovery must conform to these theories.

## III. Facebook produced all data Plaintiffs shared on Facebook; no other user data is relevant.

Facebook produced *more than one million pages of content and information* related to the Named Plaintiffs.[3] *Those materials include everything each Named Plaintiff ever shared on Facebook* (unless they deleted it). This includes, but is not limited to, the "Download Your Information" ("DYI") file that Facebook makes available to users,[4] plus *additional* information.

Plaintiffs do not dispute that the produced materials include any data users shared with their Facebook friends (sensitive or otherwise). Yet, Plaintiffs demand that Facebook search *millions* of disaggregated data sets for any data to have ever crossed Facebook's systems relating to a Named Plaintiff and any derivative materials drawing on that data—such as data sets tracking hours of peak user activity to monitor strains on Facebook's system. They demand such materials without regard for whether they were *shared* with any third party, much less under a live theory. To support this position, Plaintiffs misinterpret a handful of Facebook documents,[5] but their argument boils down to the following: Facebook has documents drawing on data relating to users; therefore, Facebook must search

---

[3] Since filing its opening brief, Facebook produced approximately 250,000 additional pages of information related to Named Plaintiffs who were added to the case in August.

[4] Plaintiffs assert that the DYI data is not useful because it does not display on an item-by-item basis the audience that Plaintiffs set for each of their posts. Facebook agreed to investigate whether it could produce this data for relevant posts—bearing in mind that the request involves granular data for *more than a million pages* of activity. Facebook also reminded Plaintiffs that their accounts display this information. If Plaintiffs believe the audience set to a particular post is critical evidence for their case, they could screen-shot that information from their accounts and produce it. They could also identify particular posts to Facebook so that Facebook can produce the relevant information.

[5] Because the Court ordered the parties not to submit declarations or evidence, 9/4/2020 Hr'g Tr. at 5:8-10, 18-22, Facebook does not here submit declarations or documents to dispute Plaintiffs' characterization of the materials they cite. If the Court is inclined to issue a ruling relying on the exhibits Plaintiffs submitted, Facebook respectfully requests permission to do so.

Gibson, Dunn & Crutcher LLP

6

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

0293

for and produce any materials drawing upon any data it has ever collected or created that relates in any way to a Named Plaintiff. The Court should reject this position, which largely asks Facebook to search for materials that are out of scope and consist largely of data already produced in other formats.

**Data the Named Plaintiffs did not share on Facebook is out of scope,** including public records, data Plaintiffs shared with third parties, and information created by Facebook. Facebook produced all of the information the Named Plaintiffs shared on Facebook (sensitive or otherwise). These productions necessarily include any information shared under the live theories.[6]

Plaintiffs say the case is about data Facebook creates and that third parties share with Facebook that is used to draw "inferences" about users. For instance, Plaintiffs may allow websites to collect data about their shopping habits through cookies. Those sites then might share this data with other parties (including Facebook) to better place the site's advertisements. As discussed above, nothing in Pretrial Order 20 supports Plaintiffs' argument that this type of data is part of this lawsuit. This would be a very different case if—as Plaintiffs say—it were about Facebook sharing information that third parties passed on to Facebook. To establish this sort of "third party data" claim, Plaintiffs would have had to allege (and prove) the nature of each of their relationships with the specific third parties at issue, the circumstances under which those third parties obtained their data, whether each individual user consented to that third party sharing data with Facebook, the circumstances under which the data was provided to Facebook, and so on. None of that is at issue here and nothing in Pretrial Order 20 suggests it is. Nor could Plaintiffs conceivably establish facts of this nature on a class-wide basis.

Plaintiffs seem to concede they demand these materials because "the very purpose of collecting all of this data . . . is to use it to target users." Opp'n at 12. As Plaintiffs admit, Pretrial Order 20 dismisses their targeted advertising theory.[7] To the extent any advertisers received sensitive user data through friend sharing, whitelisting, or integration agreements, that user data was already produced.

---

[6] To describe the data Plaintiffs believe Facebook maintains, Plaintiffs cite their Exhibit B at page 9, which was prepared by an employee in 2014 and regards Facebook's ads platform. The document does not reflect Facebook's standard terminology, nor does Facebook agree with Plaintiffs' characterization of the document. In any case, Facebook does not dispute that it receives data from third parties in connection with its ads platform and maintains internal analyses which rely on user data.

[7] Plaintiffs walk back their position that they need discovery to pursue their dismissed "targeted advertising" and "psychographic marketing" theories. Opp'n at 11. But Plaintiffs have been arguing for a year that these theories justify their demands for every piece of information Facebook collects and infers about users and took this position in the recent joint status updates that prompted this briefing. *See* 8/13/2020 *Status Update* at 2-3, 9, Dkt. 495; 7/30/2020 Status Update at 3, Dkt. 484.

Gibson, Dunn & Crutcher LLP

7

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

0294

In any case, as discussed in its opening brief and below, Facebook actually produced the majority of data it receives from third parties in the off-Facebook Activity portion of the DYI materials.

**Data not shared through one of the four theories is out of scope.** Plaintiffs say they provide evidence that Facebook shares data beyond what users share on Facebook. Opp'n at 9-10. Even if that were true, it is not relevant to this lawsuit. The live theories concern data users shared with their Facebook friends that third parties accessed via friend sharing, whitelisting, or integration agreements.

In any case, the documents Plaintiffs cite describe Facebook's data *sources*; they say nothing about whether or how Facebook *shares* information. Of note, Plaintiffs claim their Exhibit C "confirms that Facebook shares [the data they seek] with third parties." Opp'n at 9. Exhibit C is an email outlining *hypothetical* platform capabilities—it does not discuss what data Facebook actually shared.

**The integration partner theory does not entitle Plaintiffs to all data from third parties.** Plaintiffs suggest Facebook must locate and produce all data points it has ever received from any third party regarding a Named Plaintiff because Facebook's integration partner agreements were built in part on "data reciprocity." Opp'n at 11. This argument is a red herring and misrepresents what "data reciprocity" means. Facebook did not, as Plaintiffs suggest, have agreements with integration partners to trade user data. Data reciprocity arrangements allowed users to post their Facebook activities to third-party platforms if the third-party platform also allowed its users to post their activities to Facebook. Plaintiffs acknowledge this. *See* SACC ¶ 657(g) ("'Reciprocity' agreements . . . requir[ed] Apps that used data from Facebook to <u>allow their users</u> to share their data back to Facebook"); *see also id.* ¶¶ 239, 745. Any user data relating to that type of sharing was produced. Again, Facebook produced everything the Plaintiffs shared on Facebook. This includes any Facebook activities Plaintiffs *elected* to share on other platforms and any off-Facebook activities Plaintiffs *elected* to share on Facebook. In any event, even if some other data from integration partners existed, only data received from *those partners* could even possibly be relevant—not data from thousands of other third parties.[8]

**Plaintiffs' SCA and VPPA claims do not require additional data.** Plaintiffs contend this case concerns data beyond what they shared on Facebook because Pretrial Order 20 did not dismiss

---

[8] Plaintiffs concede they seek any such data to prove damages. If the Court is inclined to require broad discovery to support damages, Facebook respectfully requests the opportunity to submit briefing regarding why any such discovery should be bifurcated from liability-related discovery.

Gibson, Dunn & Crutcher LLP

8

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

0295

their claims under the Stored Communications Act ("SCA") and Video Privacy Protection Act ("VPPA"). Opp'n at 4-5. Plaintiffs highlight that their SCA claim turns, in part, on "whether the shared information includes the contents of an electronic communication." *Id*. at 5. But the sensitive data at issue includes "private one-on-one messages" sent on Facebook. Order at 17; *see id*. at 1, 32. Similarly, Plaintiffs' VPPA claim survived dismissal on the basis that Facebook shared "information about the videos that users received in their private [Facebook] messages and about videos they 'liked.'" *Id*. at 34. Plaintiffs' messages and any videos they shared or liked were produced.

**The additional data Plaintiffs seek cannot even be reasonably collected.**[9]  Facebook understands Plaintiffs seek two forms of data: (i) any additional data regarding users' off-Facebook Activity provided by third parties, and (ii) any derivative materials that draw from user data. Again, these materials are not relevant to any live theory. Facebook also cannot reasonably identify them.

With respect to off-Facebook Activity, as Facebook explained in its opening brief, the produced DYI materials include the vast majority of data Facebook receives from third parties. It is not clear what else Plaintiffs seek or how it could be relevant. Any off-Facebook Activity provided by third parties that is *not* included in the DYI materials is data Facebook has not linked to a particular user or data that is so granular that it is preserved only temporarily. There is no centralized way to search for either type of data. To the extent it exists, it is organized by the third parties who provided it. Facebook would therefore need to review every data set it has received from thousands of third parties and then attempt to link to the Named Plaintiffs data points it previously did not associate with any user. Such an exercise is unlikely to be fruitful or at all useful, particularly on a class-wide basis.

Facebook also explained that, within 90 days, any user data not included in the DYI materials is disassociated from the user's ID, anonymized entirely, or deleted (depending on the nature of the data and any business reasons for retaining it). Plaintiffs argue that Facebook should *still* be able to find any derivative materials drawing from data relating to any Named Plaintiff because data disassociated from a user's ID can sometimes be linked back to the user's account. Plaintiffs' explanation of this process is oversimplified, incorrect, and ignores that much of the data they demand

---

[9]  Plaintiffs say Facebook did not prove undue burden because it did not submit declarations or evidence. The Court instructed the parties not to submit such materials. 9/4/2020 Tr. at 5:8-10, 18-22.

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

is fully anonymized or not retained at all.[10] The argument also misses the point. There is no way for Facebook to run a centralized search for a user's ID, random ID, or any "hashed data" identifiers across millions of data sets, which are largely used for business analytics (like scoping infrastructure needs). The only way to search these tables is to open all of them and search each to find any data relating to a particular user, whether by user ID or otherwise. The issue is opening and searching each table.[11]

To be clear, Facebook is not—as Plaintiffs suggest—urging the Court to issue a ruling regarding the scope of discovery based on undue burden. Facebook is highlighting that this is not a situation in which there are marginally relevant materials that are easy to sweep into an ongoing collection. The user data Plaintiffs seek has nothing to do with the four operative theories, most of it was actually produced, and any additional data would be virtually impossible to locate. If Plaintiffs are able to identify some specific type of data about user activity that is relevant to the case, Facebook will search for that data. But Plaintiffs' position that Facebook must search the entire company for every document including any data relating to a Named Plaintiff is simply not reasonable.

## IV.     The Court should deny Plaintiffs' "Cross-Motion to Compel."

Plaintiffs style their brief as a "cross-motion to compel" compliance with five RFPs and criticize Facebook for not submitting declarations and evidence about these requests. The Court should disregard this diversion, which puts the cart before the horse. The Court directed the parties to submit "no declarations," as this briefing is "just a legal question as to what the scope of discovery is based on the claims in Judge Chhabria's ruling." 9/4/2020 Tr. at 5:8-10, 18-22. Facebook told Plaintiffs it will produce materials responsive to the RFPs they identify that are in Facebook's possession and relate to the operative theories. The Court must resolve this threshold legal issue before it can consider (on a full evidentiary record) whether Facebook produced the relevant evidence responsive to specific RFPs.

## CONCLUSION

The Court should enforce the stay Judge Chhabria imposed, allow discovery only on the four operative theories of relief detailed in Pretrial Order 20, and deny Plaintiffs' cross-motion to compel.

---

[10] Plaintiffs' Exhibit B, which they cite on page 12 of their brief, describes the ability to reidentify data points that remain live on a user's Facebook page. This live data has already been produced.

[11] Plaintiffs did not ease the burden of searching millions of data sets by identifying 10 Named Plaintiffs they *intend* to identify as class representatives. In any case, the other 14 Named Plaintiffs have not withdrawn their claims and have reserved their rights to proceed as class representatives.

Gibson, Dunn & Crutcher LLP

10

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

0297

DATE:  October 8, 2020                    Respectfully submitted,

**GIBSON, DUNN & CRUTCHER, LLP**

By:  *Orin Snyder*
Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

11

# Exhibit F

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: FACEBOOK, INC. CONSUMER
PRIVACY USER PROFILE LITIGATION

MDL No. 2843

Case No.  18-md-02843-VC (JSC)

**DISCOVERY ORDER NO. 9**

(Dkt. Nos. 515, 526, 537, 548)

This MDL matter has been assigned to the undersigned for management of discovery. Now pending before the Court are the Parties' briefs concerning the proper scope of discovery related to the data Facebook accumulates about the named Plaintiffs.  (Dkt. Nos. 515, 526, 537, 548.)  In brief, Facebook contends that the district court's order specifically defined the data at issue as "substantive and revealing content that users intended only for a limited audience."  (Dkt. No. 298.)  Based on this definition, Facebook argues that for any named Plaintiff data to be relevant and discoverable, it must meet two criteria.  First, the discoverable data must have arisen from user activity occurring on the Facebook platform, such as Facebook posts and sent messages. Second, the named Plaintiff must have then overtly shared such data with a limited audience, such as their friends.  Facebook submits that this is the only plausible reading of the district court's order limiting Plaintiffs to four actionable categories of potential liability.  Plaintiffs respond that the universe of discoverable data Facebook collects for each user is much larger and necessarily includes: (1) user activity occurring off the Facebook platform; and (2) user data that can be inferred from user activity occurring on or off the Facebook platform.  A second question presented by the briefs is whether discovery may proceed on the claims the district court stayed.

After carefully considering the papers submitted by the Parties, and consulting with the district court, the Court rules that discovery is not as limited as Facebook contends.  Plaintiffs correctly argue that Facebook's restrictive view of relevant discovery would exclude an enormous

United States District Court
Northern District of California

amount of information that Facebook collects and shares with third parties about Facebook's users.  The district court's order (Dkt. No. 298) did not limit Plaintiffs' claims to only challenging the sharing of data Facebook collects from a user's on-platform activity; the claims also challenge Facebook's sharing of user data and alleged failure to monitor how third parties used such shared information.

Accordingly, the Court rules the discoverable user data at issue includes:

- Data collected from a user's on-platform activity;
- Data obtained from third parties regarding a user's off-platform activities; and
- Data inferred from a user's on or off-platform activity.

As for the stayed claims, and again after consulting with the district court, the Court rules that discovery is stayed as to the stayed claims.  Of course, if a particular discovery request is relevant to both a stayed and non-stayed claim, then discovery is not stayed merely because the discovery request is also relevant to a stayed claim.

**IT IS SO ORDERED.**

Dated: October 29, 2020

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

2

0301

# Exhibit G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: FACEBOOK, INC. CONSUMER
PRIVACY USER PROFILE LITIGATION

MDL No. 2843

Case No.  18-md-02843-VC (JSC)

**DISCOVERY ORDER NO. 11**

This MDL matter has been assigned to this Court for management of discovery.  The Court held a discovery status conference on December 9, 2020 and this Order memorializes the decisions made at the hearing.

**A.  30(b)(6) Witness**.  At the hearing, Facebook insisted it does not have any documents reflecting its valuation of the user data it collects.  It also contended that Plaintiffs conceded that user data not shared with or accessible to third parties is not relevant, (Dkt. No. 548 at 10), and because Facebook does not share inferred user data, the inferred user data Facebook maintains is not relevant.  Facebook both collects and uses data about its users as part of its business model, including data derived from third parties.  How it specifically uses this data is an open question, but if the Court were to accept Facebook's arguments about the scope of production, it would eliminate Discovery Order No. 9's third category of discovery: data inferred from a user's on or off-platform activity.  What is needed now is more detail about Facebook's collection and use of user data so future discovery requests can be tailored to Plaintiffs' better understanding of the internal operations of Facebook as well the terminology it uses for describing data that is potentially responsive to Plaintiffs' discovery requests.

The Court accordingly orders Facebook to provide a 30(b)(6) witness regarding the discoverable user data as articulated by Discovery Order No. 9.  (Dkt. No. 557.)  Facebook shall also provide a 30(b)(6) witness on how it monetizes—directly or indirectly—and thus

United States District Court
Northern District of California

United States District Court
Northern District of California

1   values user data.  Plaintiffs shall provide Facebook with their 30(b)(6) Notice on or before

2   December 18, 2020 and Facebook will have until January 13, 2021 to submit an initial

3   response.  The 30(b)(6) topics shall be narrowly tailored to assist Plaintiffs with identifying

4   relevant discovery in the above two areas.  The deposition will be limited to the time

5   period of 2012 through 2017 to reduce burden and given its investigatory purpose.

6   **B.  Search Terms**.  The Parties shall continue to meet and confer the week of December 14-

7   18 regarding their competing proposals.  Given the deadline for submission of final

8   proposals—Christmas Eve—the Parties shall submit a stipulation by December 18, 2020,

9   agreeing to a new deadline for final proposals.

10  **C.  Five-Day Détente**.  The Parties shall meet and confer to choose five consecutive business

11  days during the upcoming holidays where no communications will take place between the

12  Parties regarding the case.  Communications on other topics are encouraged.

13  **D.  Plaintiffs' Interrogatory Responses and Privacy Settings Data**.  Plaintiffs shall

14  supplement their interrogatory responses regarding what they characterize as their sensitive

15  information with specific examples rather than general categories.

16  **E.  Additional Proposed Custodians**.  The addition of further custodians for discovery

17  purposes is premature at this time.

18  **F.  Dismissal of Named Plaintiffs**.  The parties shall file a stipulation regarding the dismissal

19  of certain named plaintiffs in accordance with what was discussed at the hearing no later

20  than December 18, 2020.

21  **G.  Next Status Conference**.  The next video status conference shall be January 15, 2021 at

22  8:30 a.m.  The Parties shall submit a joint status update by January 14, 2021 at 12:00 p.m.

23  **IT IS SO ORDERED.**

24  Dated: December 11, 2020

25

26

27  JACQUELINE SCOTT CORLEY
    United States Magistrate Judge

28

2

# Exhibit H

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley Weaver (Cal. Bar No.191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaint₍ᵢ₎fs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION**<br><br>Judge: Hon. Vince Chhabria<br>Hon. Jacqueline Scott Corley<br>Special Master Daniel Garrie<br>Courtroom: 4, 17th Floor<br><br>JAMS Ref. No.: 1200058674<br><br>ORAL ARGUMENT REQUESTED |

**TABLE OF CONTENTS**

I.      PLAINTIFFS' SEPARATE STATEMENT .................................................. 1

II.     INTRODUCTION ............................................................................ 1

III.    RELEVANT BACKGROUND ............................................................. 3

        A.  The Discovery Requests .......................................................... 3

        B.  Facebook's Response .............................................................. 3

        C.  The Resulting Briefing and Orders ............................................ 4

        D.  Facebook's Deficient Response to Judge Corley's Orders.............. 5

        E.  Facebook Has Discoverable Information That It Has Declined to Produce ................ 6

        F.  Plaintiffs' Unsuccessful Attempts to Mediate This Issue ................. 7

IV.     ARGUMENT ................................................................................. 8

        A.  The Court Has Already Determined the Information Plaintiffs Seek Is Relevant—
            Whether or Not Facebook Claims That It Has Been Shared. ..................... 8

        B.  Whether the Named Plaintiffs' Information Was Shared Is a Contested Question on
            Which Plaintiffs Are Entitled to Evidence, Not Assertion ..................... 9

        C.  Facebook Has Failed to Substantiate a Disproportionate Burden in Identifying the
            Data It Possesses Relating to Nine People ................................... 11

        D.  Plaintiffs Have Made Proposals to Reduce the Burden of Production on Facebook ... 13

V.      CONCLUSION ............................................................................. 13

## I.    PLAINTIFFS' SEPARATE STATEMENT

Pursuant to ¶ 6 of the Protocol for Resolving Discovery Disputes—Order No. 1, Dkt. No. 733, Plaintiffs' Separate Statement is provided as Attachment A to this Motion to Compel.

## II.    INTRODUCTION

There are no questions more central to this litigation than what information Facebook has collected about users, what it does with that information, and specifically what it shares or makes accessible to third parties. Plaintiffs have sought to learn from the outset of discovery what Facebook has collected, analyzed and how it is used. Decl. of Derek W. Loeser, Ex. 1.[1] In 2019, Plaintiffs asked Facebook to identify the data sources containing information about the Named Plaintiffs (at the time there were thirty). Finally, last year Plaintiffs brought a motion to compel, limiting the request to just nine Named Plaintiffs. After consulting with Judge Chhabria, Judge Corley ruled on "the proper scope of discovery related to the data Facebook accumulates about the named Plaintiffs." Discovery Order No. 9 at 1. She found the following types of user-related information to be relevant:

- Data collected from a user's on-platform activity;
- Data obtained from third parties regarding a user's off-platform activities; and
- Data inferred from a user's on or off-platform activity.

*Id.* at 1-2.

Notwithstanding the Court's Order, Facebook continues to improperly impose its narrow view of relevance on the scope of discovery, producing almost no information that falls into the second and third categories that Judge Corley enumerated. In fact, it has failed to produce any new documents with the Named Plaintiffs' information since Discovery Order No. 9 issued.

Instead, Facebook limited its production to the first category—and almost exclusively from Facebook's "Download Your Information" ("DYI") tool. This tool, which did not operate until 2010, allows users to access and review some of their own platform activity, for a portion of

---

[1] Further references to "Ex. ___" will be to Exhibits to the Declaration of Derek W. Loeser.

the Class Period.[2] The DYI tool excludes significant other information collected and inferred by Facebook about users, including information collected from off-platform activity and information inferred from data Facebook collects about the users.

Facebook has asserted repeatedly that Plaintiffs have conceded that they are entitled only to information that has been shared with third parties. But Plaintiffs are not required to accept Facebook's own position on what was or was not shared or made accessible. That would allow Facebook to determine unilaterally what sharing or made accessible means in this highly technical context, and then, based on its own interpretation, determine what information should be discovered and presented to the jury. These are ultimate issues of fact that a factfinder, not Facebook, must decide. Plaintiffs are not required to take Facebook's answers on trust, and, as Plaintiffs will explain in detail, they have good reasons not to do so.

Discovery Order No. 9 is not limited to "shared" information. Judge Corley refused to limit Plaintiffs' 30(b)(6) deposition to questions about shared information, Ex. 6, and expressly held that "whether particular user data is not shared, not admissible, or not monetized, is not a valid reason to object to a particular deposition question," Ex. 7.

In correspondence and other papers, Facebook has suggested that it would be unduly burdensome to produce all of the information required by Judge Corley's order. These suggestions have vaguely gestured in the direction of a burden argument rather than expressly claiming or demonstrating that one actually exists. The first step in understanding if there is a burden is identifying the data sources for all data, however collected, relating to the Named Plaintiffs, including inferred data. Plaintiffs ask that Facebook be ordered to identify the following aspects of those data sources: (1) the name of the database or data log; (2) a description of the data source's purpose and function; (3) information about the default retention status of the data source (at a minimum, whether it is retained and for how long); (4) information about the current retention status of the data source (at a minimum, whether it is retained and for how long);

---

[2] Plaintiffs have been only been able to find categories of information included in DYI from 2012 to present. Thus, there are arbitrary, temporal limitations in this data collection in addition to substantive.

and (5) where the current retention status differs from default retention status, the date the change was implemented. Following the identification of these data sources, Plaintiffs will work with Facebook and the Special Master to develop an efficient discovery plan to produce the relevant information associated with the Named Plaintiffs, sufficient to establish, on a classwide basis, Facebook's common practices throughout the Class Period. It will then be for the factfinder to determine if Facebook's use of that data, including sharing, selling, or making it available to third parties, was consistent with the promises Facebook made to Class member.[3]

## III. RELEVANT BACKGROUND

### A. The Discovery Requests

On November 25, 2019, Plaintiffs' served Requests for Production Nos. 9-13, which seek documents relating to the Named Plaintiffs.[4] Ex. 1 at 12-13. In brief, Request No. 9 seeks all documents relating to each of the Named Plaintiffs; Request No. 10 seeks documents sufficient to show the categories of content and information Facebook collects, tracks, and maintains about them; and Requests Nos. 11-13 seek documents identifying third parties that were able to access information about the Named Plaintiffs. On July 16, 2020, Plaintiffs also served Interrogatories 16-17, which sought the identify of all third parties and business partners that had access to Named Plaintiffs' content and information, as well the specific content and information that was accessed. Ex. 2.

### B. Facebook's Response

In response to these requests, Facebook produced more than one million pages of individual user data it maintained relating to the Named Plaintiffs from the DYI tool. *E.g.*, Ex. 3 at 1. Facebook acknowledges that its production is entirely limited to the information the Named Plaintiffs themselves shared on Facebook. *Id.* Virtually all of it is available in the DYI Tool. Facebook produced no other information about the Named Plaintiffs, even though during the

---

[3] Plaintiffs reserve the right to address on reply relevant facts disclosed for the first time in conjunction with Facebook's Motion for a Protective Order Against Production of API Call Logs, filed the same day as this brief.

[4] The requests define "documents" broadly, consistent with its usage in Federal Rule of Civil Procedure 34(a)(1)(A). *Id.* at 8.

months of negotiations over this issue, Facebook informed Plaintiffs and acknowledged to the Court that it has substantial amounts of data about the Named Plaintiffs Ex. 10 at 8:10-13 ("There is other – there's Facebook-generated information, information generated by third parties, information received from third parties. We have not represented that that is comprehensively included in our production."); *see also id.* at 10:1-21 (Facebook explaining to Court that producing all the data and tables associated with a Named Plaintiff would be a "multiweek endeavor").

## C.     The Resulting Briefing and Orders

Because Facebook improperly limited its production in response to Plaintiffs' RFPs 9-13 to information from the DYI tool, Plaintiffs filed a motion last September to compel discovery related to these requests. Ex. 4. Plaintiffs asked the Court to compel production of sensitive information Facebook derives and collects from business partners, app developers, apps, and other sources. This request included "native, appended and behavioral data" and purportedly anonymized data that could be connected to the Named Plaintiffs. *Id.* at 7-11.

On October 8, 2020, Facebook responded to Plaintiffs' cross-motion. Ex. 3 (Dkt. No. 537). Facebook conceded that its production was limited to information derived from the Named Plaintiffs' activity on the platform. Facebook contended that all information related to the Named Plaintiffs that they did not themselves share on Facebook was outside the scope of the case; that all information not shared through one of the four theories of the case was not within the scope of the case; that Plaintiffs were not entitled to all data collected from third parties about the Named Plaintiffs; that the Stored Communications Act and Video Protection Privacy Act claims did not require the production of additional data Facebook had collected about the Named Plaintiffs; and that Facebook could not reasonably collect any of the additional information Plaintiffs sought. *Id.* at 6-10.

On October 29, 2020, Judge Corley issued Discovery Order No. 9, resolving the dispute by rejecting Facebook's contentions. Ex. 5 (Dkt. No. 557). Notably, Judge Corley "consult[ed] with the district court" before ruling "that discovery is not as limited as Facebook contends." *Id.*

at 1. Judge Corley held that "the discoverable user data at issue includes" three categories of information: "[1] Data collected from a user's on-platform activity; [2] Data obtained from third parties regarding a user's off-platform activities; and [3] Data inferred from a user's on or off-platform activity." *Id.* at 2.

On December 11, 2020, Judge Corley issued Discovery Order No. 11, further clarifying the scope of discoverable user data at issue. Ex. 6 (Dkt. No. 588). In advance of upcoming testimony from its corporate designee, Facebook sought a ruling that "user data not shared with or accessible to third parties is not relevant" and that "because Facebook does not share inferred user data, the inferred user data Facebook maintains is not relevant." *Id.* at 1. In response, Judge Corley recognized that how Facebook "specifically uses this data is an open question," provided that "[w]hat is needed now is more detail about Facebook's collection and use of user data," and ordered Facebook to provide a corporate designee to testify "regarding the discoverable user data as articulated by Discovery Order No. 9." *Id.*

On January 15, 2021, Judge Corley issued Discovery Order No. 12, providing more guidance about the scope of the upcoming corporate testimony. Ex. 7 (Dkt. No. 602). In light of continued disagreement about the scope of the testimony about user data, Judge Corley held that "whether particular user data is not shared, not admissible, or not monetized, is not a valid reason to object to a particular deposition question." *Id.* at 1-2.[5]

### D. Facebook's Deficient Response to Judge Corley's Orders

Judge Corley's orders have not so far resulted in production of additional documents responsive to Requests for Production Nos. 9-13, and it does not appear that such productions are forthcoming. In fact, Facebook's most recent position, provided in an April 1, 2021 letter, Ex. 8, repeats the positions it took before Discovery Order No. 9 was issued. In the letter, Facebook

---

[5] Judge Corley also provided that, "[i]f the deponent is unable or unprepared to answer particular questions, that can be addressed with further, more targeted, 30(b)(6) depositions if needed." *Id.* at 2. Facebook's designees, Konstantinos Papamiltiadis and Amy Lee, were unable or unprepared to answer numerous questions about the specific issues on which Judge Corley ordered testimony: discoverable user data as defined by Discovery Order No. 9 "and how Facebook monetizes—directly or indirectly—and thus values user data." *Id.* at 1. Consistent with Discovery Order No. 12, Plaintiffs will seek additional corporate testimony on these topics.

again contended that data collected but not shared is irrelevant. *Id.* at 3. It also again conceded that Facebook's production related to the Named Plaintiffs largely reflected information collected from their on-platform activity, and that virtually all of it was available to the Named Plaintiffs themselves through the DYI tool. *Id.* at 2.

Facebook also misleadingly asserted that Plaintiffs conceded information not shared is not relevant, *id.* at 4, neglecting to note that the parties have long disputed the factual and legal question of what information is shared. Relatedly, Facebook misleadingly paraphrased Discovery Order No. 9 to limit discoverable information related to the Named Plaintiffs to information that was shared with third parties, *id.*, ignoring Judge Corley's conclusion that "[h]ow [Facebook] specifically uses this data is an open question," Ex. 6 (Dkt. No. 588) at 1. Finally, Facebook stated that Facebook had completed its production of discoverable user data before Discovery Order No. 9. *Id.* at 4-5.

Similarly, Facebook has objected to Plaintiffs' Interrogatories 16-17, which asks Facebook to identify the content and information accessed by which third parties. Ex. 2. Facebook has claimed that it was investigating what information it could produce in response to these Interrogatories, but thus far has produced none.

**E.    Facebook Has Discoverable Information That It Has Declined to Produce**

Facebook *does* have plenty of information on the Named Plaintiffs that falls into Judge Corley's second and third categories. Facebook told the Court as much last year. Ex. 10 at 8, 10. And ████████████████████████████████████████████████████████ ████████████████████████████████████████████ *See* Ex. 11 (FB-CA-MDL-00213424-439). ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████

████████████████████████  ██████████████████████████

██████████████████████  ████████████████████████

████████████████████

What's more, Facebook connects and integrates information generated from on-platform activity with information about users that it has obtained from third parties and off-platform activity. This is clear not only from internal documents, *see* Ex. 11 (FB-CA-MDL-00213424); Ex. 12 (FB-CA-MDL-00149613); Ex. 13 (FB-CA-MDL-00203262), but also from patent applications and publicly reported information. One application published on July 6, 2017 plainly shows how Facebook can associate its own profile of a user with media consumption data generated off-platform. Ex. 14. Indeed, Plaintiffs have learned from investigative journalists—not Facebook—that Facebook creates internal categories queried by third parties who pay Facebook for the privilege of accessing users based on them. ProPublica identified some of these categories in 2016, which include Dissociative identity disorder, Specific social phobia, Becet's disease, Fetal alcohol spectrum disorder, and Why Did I Get Married?, among more than 50,000 others.[6]

None of this information has been produced for the Named Plaintiffs.

**F.      Plaintiffs' Unsuccessful Attempts to Mediate This Issue**

Plaintiffs have attempted to resolve this issue repeatedly, including through mediation. During the mediation sessions, and in related communications, Facebook's asserted that production of all information that could be associated with the Named Plaintiffs was untenable. In response, Plaintiffs repeatedly asked for information that would assist the parties in limiting the burden of production on Facebook. Plaintiffs' requests included, but are not limited to:

- On July 9, 2021, Plaintiffs asked Facebook for a data model for the Named Plaintiffs' data, a list of the APIs and SDK calls used to access the data model for the Named Plaintiffs, a list of third parties permitted to make the API and SDK calls against the Named Plaintiffs' data. Ex. 15. Facebook did not respond.

- On July 18, 2021, Plaintiffs provided further clarification regarding the information

---

[6] Information available for download at [Facebook Ad Categories (propublica.org)](https://propublica.org) (Row 378: Dissociative identity disorder; Row 436: Specific social phobia; Row 592: Becet's disease; Row 669: Fetal alcohol spectrum disorder; Row 1000: Why Did I Get Married?).

requested in their July 9, 2021 communication. *Id.* Facebook did not respond.

- On September 10, 2021, Plaintiffs asked for the complete production of information Facebook has collected about the Named Plaintiffs or an explanation of what specific information it is withholding. Ex. 16. Facebook did not respond.

Finally, on October 6, 2021, the Special Master declared impasse on the issue of "Production of Named Plaintiffs' data in compliance with Dkt. No. 557."

## IV. ARGUMENT

### A. The Court Has Already Determined the Information Plaintiffs Seek Is Relevant—Whether or Not Facebook Claims That It Has Been Shared.

About a year ago, after several months of negotiations, the parties submitted briefs to Judge Corley on whether the information about users' activities on the Facebook platform was the only kind of relevant information. On this issue, Judge Corley sided with Plaintiffs, "rul[ing]" that "the discoverable user data at issue includes" not only (1) "[d]ata collected from a user's on-platform activity," but also (2) "[d]ata obtained from third parties regarding a user's off-platform activities," and (3) "[d]ata inferred from a user's on or off-platform activity." Discovery Order No. 9 at 2. Facebook has produced almost no discovery in the second or third categories encompassed by Judge Corley's order.

Facebook, pointing largely to the parties' briefs, has argued that information within the second and third categories listed by Judge Corley is relevant only if it has been shared with a third party. This argument is erroneous for several independently sufficient reasons.

*First*, this argument contradicts the plain language of Discovery Order No. 9. In listing the three categories of discoverable user information, Judge Corley did not require the information to have been shared with a third party. Facebook should not be allowed to read such a requirement into the order, particularly in light of the fact - recognized by Judge Corley – that how Facebook uses information is an "open issue."

*Second*, Facebook's argument ignores what happened in the immediate aftermath of Discovery Order No. 9. After the order was issued, Facebook told Plaintiffs that it had already produced all the information related to the Named Plaintiffs that had been shared with third parties. *See* Ex. 17 (Hr'g Tr. 17-18 (Dec. 9, 2020)). Plaintiffs suggested that a 30(b)(6) deposition

on users' information would be appropriate. *See id.* at 28-29. The Court agreed. *See id.* at 29-30; Discovery Order No. 11 at 1-2.

Then, when the parties were not able to agree on the topics for the 30(b)(6) deposition, Judge Corley issued Discovery Order No. 12 on January 15, 2021. There, she stated that one of the topics was "discoverable user data as defined by Discovery Order No. 9." Discovery Order No. 12 at 1. And she noted that "whether particular user data *is not shared*, not admissible, or not monetized, *is not a valid reason to object to a particular deposition question*." *Id.* at 1-2 (emphasis added).

Thus, when Facebook asserted that it had already turned over all the discoverable information defined by Discovery Order No. 9, Corley did not allow Facebook to limit discovery to what it claimed had been shared. Rather, she recognized that Plaintiffs were entitled to test Facebook's claims about how users' information was shared, used, and monetized. That is precisely what Plaintiffs are requesting through this motion.

**B.      Whether the Named Plaintiffs' Information Was Shared Is a Contested Question on Which Plaintiffs Are Entitled to Evidence, Not Assertion**

Plaintiffs are not required to accept Facebook's contention that other information was not shared. This is so for several reasons.

*First*, there is evidence that Facebook shared information in Judge Corley's other two categories—information inferred about a user and information about a user's off-platform activities—with third parties. An email exchange between two directors at Facebook touches on about what ██████████████████████████████████████████████████ Ex. 18. The exchange identifies that information: (1) ██████████████████████ (2) ██████████████████████████████████████████ ████████████████████████ and (3) ██████████████ ████████████████████████████████████████████████ *Id.* Note that the second and third kinds of information fall neatly into Judge Corley's second and third categories. While Facebook has called this email discussion "hypothetical," it seems best read—and at the very least it is *reasonable* to read it—as describing Facebook's actual practices.

Moreover, in connection with its ADI, Facebook asked app developers ███████████████ ████████████████████████████████████████████████████████████ ████████████████ Ex. 23 (FB-CA-MDL-00377690, question 18) (emphasis added). This question strongly suggests that Facebook was shared inferred data with app developers. Finally, there is location-related metadata associated with posts made by Named Plaintiffs that is accessible to third parties but that has not been produced and is not available through Facebook's DYI tool.[7]

     *Second*, internal documents demonstrate that Facebook itself does not know what information may have been shared with third parties. ████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████ Ex. 19 (FB-CA-MDL-0195247); *see also* Ex. 20 at 6:2-4 ("What we cannot produce -- because it's simply not recorded, it's not the way our platform is constructed – is what data was actually shared . . . .") (statement of Mr. Snyder). Indeed, Facebook had to launch its ADI to determine which third parties are taking what content and information about its users. *See generally* Ex. 23 (FB_CA-MDL-00377690). ████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████ (*see id.*, Question 10), and ███████████ █████████████████████████████████ (*id.*, Question 11). ███████████ ███████████████████████████████████████████████ (*id.*, Question 12), and ████████████████████████ ████████████████████████ (*id.*, Question 13). As a result, Facebook is trying to identify for itself what user information was shared and through what channels. It is difficult to credit Facebook's

---

[7] Documents produced by reveal that third-party applications could obtain this metadata about users. *See* Ex. 21 (FB-CA-MDL-01938268). Such sharing with applications also extended to data and metadata about users' friends. *Id.*

assertion that it has produced all shared information when it is still in the midst of an elaborate

investigation seeking to determine what information what information it shared with third parties.

*Third*, the question of what information Facebook shared is *the* central issue in this case.

For instance, one of Plaintiffs' claims—and indeed the fourth category of misconduct recognized

by Judge Chhabria—is whether Facebook properly monitored user content and information, and

in particular whether it had sufficient safeguards in place to ensure that user content and

information would not be disclosed without consent. Foundational to that claim is determining

what information was made accessible to third parties in the first place.

*Fourth*, requiring Plaintiffs to defer to Facebook's own account of its practices contradicts

the whole point of discovery. *See, e.g.*, *Stein v. Farmers Ins. Co. of Ariz.*, No.

319CV00410DMSAHG, 2020 WL 7240318, at *3 (S.D. Cal. Dec. 8, 2020) (declining to require

policy holder to depend only on "the statements and testimony of the insurer's employees as to

the evaluations and motivations of the insurer"); *Fed. Indus., Inc. v. Cameron Techs. US, Inc.*,

No. CV 07-1098-VBF(CTX), 2008 WL 11343314, at *3 (C.D. Cal. Oct. 16, 2008) (party was

"entitled to probe the veracity of and support for [the other's] claim" of damages and causation).

If Facebook is so confident that this information was in fact not shared or made accessible, then it

should have no problem disclosing this information to defend its position.

*Fifth*, Facebook's claim about what it did and did not share or make accessible raises the

question what sharing information means. From the beginning of this case, the parties have

disputed what it means to share information. The definition of what it means to share users'

information in the context of this case—where the sharing does not include anything physical,

and where information can be provided to third parties without ever leaving Facebook's

systems—is likely to remain contested through summary judgment, if not trial, and will be

informed by the discovery Plaintiffs seek here.

### C.   Facebook Has Failed to Substantiate a Disproportionate Burden in Identifying the Data It Possesses Relating to Nine People.

Once a party seeking discovery has established that the discovery is relevant, the party

resisting discovery bears the burden of showing "why the discovery is irrelevant, overly broad, or

unduly burdensome or oppressive, and thus should not be permitted." *Proofpoint, Inc. v. Vade Secure, Inc.*, No. 19CV04238MMCRMI, 2020 WL 7398791, at *3 (N.D. Cal. Dec. 17, 2020) (citing *Proofpoint, Inc. v. Vade Secure, Inc.*, No. 19-cv-04238-MMC (RMI), 2020 WL 6591210, at *4 (N.D. Cal. Nov. 11, 2020); *Colaco v. ASIC Advantage Simplified Pension Plan*, 301 F.R.D. 431, 434 (N.D. Cal. 2014); *Dominguez v. Schwarzenegger*, No. C 09-2306 CW (JL), 2010 WL 3341038, at *3 (N.D. Cal. Aug. 25, 2010)). This is a "heavy burden." *Dairy v. Harry Shelton Livestock, LLC*, No. 18-CV-06357-RMI, 2021 WL 4476778, at *1 (N.D. Cal. Sept. 30, 2021). The party resisting discovery cannot rest on an assertion of burden, but "must actually demonstrate the nature of the burden" with affidavits or other evidence. *Dish Network, LLC. v. Jadoo TV, Inc.*, No. CV 18-9768-FMO (KSX), 2020 WL 2070990, at *3 (C.D. Cal. Feb. 28, 2020).

Here, Facebook asserts that producing all the information that could be associated with the Named Plaintiffs is disproportionately burdensome, but in more than a year of conferring, it has not provided any evidence for that assertion. Moreover, if there really is a burden associated with Plaintiffs' request, it is because ███████████████████████████████████ ████████████████████████████████████████████████████ ███████ Plaintiffs, who are merely seeking the information Facebook has that can be associated with the Named Plaintiffs, should not be worse off because of Facebook's own data architecture decisions. *See, e.g.*, *Lou v. Ma Labs., Inc.*, No. 12-CV-05409 WHA (NC), 2013 WL 12328278, at *2 (N.D. Cal. Mar. 28, 2013) ("The Court finds that the burden defendants claim excuses them from producing such documents is of their own making, and thus not compelling. . . . [D]efendants are the master of their own record keeping."), *clarified on denial of reconsideration*, No. 12-CV-05409 WHA NC, 2013 WL 1615785 (N.D. Cal. Apr. 15, 2013).

Judge Chhabria's early admonition to Facebook about burden is relevant here: "[T]here is often a lot of talk about proportionality and whatnot. This is a big case. It is a significant issue. . . . [T]his is not the type of case where we are going to be saying: Well, that might end up—that effort might end up uncovering some relevant information; but, you know, it is just too expensive

or difficult, and so we are not going to make Facebook do it." Ex. 22 at 29:3-10.

**D.     Plaintiffs Have Made Proposals to Reduce the Burden of Production on Facebook**

Nevertheless, Plaintiffs have identified a series of ways Facebook could provide preliminary information that would enable the parties to meaningfully confer regarding the possibility of agreeing on a less burdensome production. Specifically, Plaintiffs have asked for production of a data model for the Named Plaintiffs' information. Ex. 15. Plaintiffs have asked Facebook to provide a list of the APIs and SDK calls used to access the Named Plaintiffs' data model. *Id.* Plaintiffs have asked for a list of third parties permitted to make such API and SDK calls against the Named Plaintiffs' data. *Id.* Plaintiffs have asked for schemas identifying how the Named Plaintiffs' information is received, stored, and shared. *Id.* Plaintiffs have asked for snapshots in time of all information Facebook had that is capable of being associated with the Named Plaintiffs on three specific dates: December 17, 2019; May 20, 2021; and August 18, 2021. Plaintiffs have even asked Facebook to simply identify the information it can associate with the Named Plaintiffs that it is not producing, so that the parties' dispute can be defined by a common understanding of the information at issue. Ex. 16.

Although Facebook has responded to these proposals with silence, Plaintiffs believe there is still a productive path forward. To understand the burden associated with the information Plaintiffs are requesting, Facebook should be ordered to identify all data sources that may contain information relating to the Named Plaintiffs.

**V.     CONCLUSION**

For the foregoing reasons, Plaintiffs move to compel Facebook to identify all data sources that may contain information relating to the Named Plaintiffs, including but not limited to their profiles and identifiers. Specifically, Plaintiffs request that Facebook provide: (1) the name of the database or data log; (2) a description of the data source's purpose and function; (3) information about the default retention status of the data source (at a minimum, whether it is retained and for how long); (4) information about the current retention status of the data source (at a minimum, whether it is retained and for how long); and (5) where current retention status differs from

default retention status, the date the change was implemented. For each data source, Facebook should provide, at a minimum: (1) the data schema; (2) definitions and descriptions of each field; (3) tool(s) which Facebook use to search each data source; and (4) instruction sets and manuals for all tools identified as being used by Facebook to search any data source identified in this step. With the Special Master's assistance, the parties can use this information to develop an efficient discovery plan going forward.

Dated: October 18, 2021

Respectfully submitted,

KELLER ROHRBACK L.L.P.

BLEICHMAR FONTI & AULD LLP

By: _/s/ Derek W. Loeser_
　　　Derek W. Loeser

By: _/s/ Lesley E. Weaver_
　　　Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Adele A. Daniel (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com
bgould@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew S. Melamed (SBN 260272)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmelamed@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

# Exhibit I

1   GIBSON, DUNN & CRUTCHER LLP            GIBSON, DUNN & CRUTCHER LLP
    Orin Snyder (*pro hac vice*)          Deborah Stein (SBN 224570)
2     osnyder@gibsondunn.com                dstein@gibsondunn.com
    200 Park Avenue                       333 South Grand Avenue
3   New York, NY 10166-0193               Los Angeles, CA 90071-3197
    Telephone: 212.351.4000               Telephone: 213.229.7000
4   Facsimile: 212.351.4035               Facsimile: 213.229.7520

5   Kristin A. Linsley (SBN 154148)       Joshua S. Lipshutz (SBN 242557)
      klinsley@gibsondunn.com               jlipshutz@gibsondunn.com
6   Martie Kutscher (SBN 302650)          1050 Connecticut Avenue, N.W.
      mkutscherclark@gibsondunn.com       Washington, DC 20036-5306
7   555 Mission Street, Suite 3000        Telephone: 202.955.8500
    San Francisco, CA 94105-0921          Facsimile: 202.467.0539
8   Telephone: 415.393.8200
    Facsimile: 415.393.8306
9
    *Attorneys for Defendant Facebook, Inc.*
10

11                          UNITED STATES DISTRICT COURT
                          NORTHERN DISTRICT OF CALIFORNIA
12                              SAN FRANCISCO DIVISION

13

14   IN RE: FACEBOOK, INC. CONSUMER          MDL NO. 2843
     PRIVACY USER PROFILE LITIGATION         CASE NO. 3:18-MD-02843-VC-JSC
15
                                             **FACEBOOK'S OPPOSITION TO**
16   This document relates to:               **PLAINTIFFS' MOTION TO COMPEL**
                                             **PRODUCTION OF NAMED**
17   ALL ACTIONS                             **PLAINTIFFS' CONTENT AND**
                                             **INFORMATION**
18
                                             Judge: Hon. Vince Chhabria
19                                           Hon. Jacqueline Scott Corley
                                             Special Master Daniel Garrie
20                                           Courtroom: 4, 17th Floor

21                                           JAMS Ref. No.: 1200058674

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND
INFORMATION
CASE NO. 3:18-MD-02843-VC-JSC

0323

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND ................................................................................................ 2

    A. Plaintiffs initially demanded all data related to Named Plaintiffs. ....................... 2

    B. Plaintiffs conceded that only data that was shared with third parties is relevant. ................. 3

    C. Judge Corley allowed Plaintiffs to conduct a Rule 30(b)(6) deposition. .............................. 5

    D. Plaintiffs reverted to their initial demands for all data relating to Named Plaintiffs. ............ 6

III. ARGUMENT .................................................................................................... 6

    A. Facebook's productions under Discovery Order 9 are complete. ......................... 7

        1. The scope of discovery is limited to data that was shared with third parties. ............... 7

        2. Plaintiffs have not identified any deficiencies in Facebook's productions. .................. 8

    B. Plaintiffs' distrust does not entitle them to "discovery on discovery." ................................ 9

    C. Plaintiffs are judicially estopped from seeking information that was not shared. ............... 12

    D. The information Plaintiffs now seek is nonresponsive and otherwise unavailable. ............ 13

IV. CONCLUSION ................................................................................................ 15

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND
INFORMATION
CASE NO. 3:18-MD-02843-VC-JSC

0324

# TABLE OF AUTHORITIES

*Bresk v. Unimerica Ins. Co.*
  2017 WL 10439831 (C.D. Cal. Nov. 16, 2017).............................................................10

*Brewer v. BNSF Railway Co.,*
  2018 WL 1756432 (D. Mont. Jan. 11, 2018).............................................................10

*Han v. Futurewei Techs., Inc.,*
  2011 WL 4344301 (S.D. Cal. Sept. 15, 2011).............................................................11

*MAO-MSO Recovery, LLC v. Mercury Gen.,*
  2019 WL 1423772 (C.D. Cal. Feb. 19, 2019).............................................................15

*United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.,*
  555 F.3d 772 (9th Cir. 2009).............................................................11

*United States v. Ibrahim,*
  522 F.3d 1003 (9th Cir. 2008).............................................................12

*Uschold v. Carriage Servs., Inc.,*
  2019 WL 8298261 (N.D. Cal. Jan. 22, 2019).............................................................10

Gibson, Dunn &
Crutcher LLP

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND
INFORMATION
CASE NO. 3:18-MD-02843-VC-JSC

0325

## I.    INTRODUCTION

Plaintiffs' motion to compel seeks to revive a boundless demand that Plaintiffs conceded long ago—in court—sought data well beyond what Plaintiffs would be entitled to in this case. One year ago, Plaintiffs represented to Judge Corley:

> Plaintiffs seek only a holding that the sensitive data Facebook collected about *ten Named Plaint.,fs* and *shared* with third parties is relevant.  Plaintiffs do not contend that information that was not shared is relevant, which substantially narrows the information Facebook would be required to produce in this case.

Based on Plaintiffs' representations, Judge Corley issued a ruling that discoverable user data is data Facebook **shared** relating to the Named Plaintiffs, including any shared data in three categories Plaintiffs had requested.  After Facebook reported its productions were complete, Plaintiffs told Judge Corley "[w]e just don't believe [that]," and they demanded a Rule 30(b)(6) deposition to test it.  But once they got into the deposition, Plaintiffs tactically avoided that topic and instead asked about a host of issues having nothing to do with this case.

Now, seeking to capitalize on the presence of a new decider, Plaintiffs attempt to rewrite that history.  Plaintiffs disown their concessions that "information that was not shared" is not relevant and say they are entitled to all data relating to the Named Plaintiffs—shared or not.  They mischaracterize hearings before Judge Corley.  And they conflate Judge Corley's instructions about the scope of their squandered deposition with the scope of the data she found discoverable.

Making matters worse, Plaintiffs' motion is itself a moving target.  Throughout the motion, Plaintiffs flip-flop between saying the discoverable data in this case is *not* limited to shared data and arguing that the real issue is that Facebook has not yet produced all shared data.  Then, after spinning in circles with arguments they have either abandoned or cannot support, Plaintiffs—out of nowhere— demand extensive discovery about Facebook's data infrastructure (not data about Named Plaintiffs).

Plaintiffs' motion crashes into a long list of roadblocks.  *First*, Plaintiffs point to no actual deficiencies in Facebook's productions.  After saying for more than one year that Facebook's productions are incomplete, rather than point to any evidence to support that false accusation, Plaintiffs

1

Gibson, Dunn &
Crutcher LLP

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND
INFORMATION
CASE NO. 3:18-MD-02843-VC-JSC

0326

1    request invasive discovery to prove it. *Second,* Plaintiffs are not entitled to "discovery on discovery"

2    because they do not believe Facebook's productions are complete. Judge Chhabria, Judge Corley, and

3    the Special Master have previously rejected Plaintiffs' efforts to audit Facebook's discovery process,

4    and the Special Master should do so again here. *Third*, Plaintiffs are judicially estopped from

5    demanding user data that was not shared with third parties after arguing to Judge Corley that this data

6    is not relevant. Plaintiffs secured relief based on this concession to Judge Corley, and must be bound

7    by it before the Special Master. *Fourth*, the list of demands in Plaintiffs' motion—which seeks

8    information about Facebook's "data sources" that Plaintiffs say they will use "to develop an efficient

9    discovery plan"—is not properly before the Special Master. This is not the topic on which the

10   mediators declared impasse, Judge Corley has repeatedly rejected this request, and it largely concerns

11   materials that Facebook provided in an effort to advance the parties' negotiations and that Plaintiffs

12   apparently have not bothered to review.

13          Moving discovery disputes from Judge Corley to the Special Master was not meant to be an

14   opportunity to ditch past concessions or to put a new face on old arguments. The Special Master should

15   see this motion for what it is: an opportunistic, wasteful, and abusive attempt to erase the proceedings

16   before Judge Corley, gain access to information Plaintiffs have conceded is irrelevant, and hunt for

17   *anything* to stall this case before it finally reaches the merits. The motion should be denied.

18   **II.    BACKGROUND**

19          **A. Plaintiffs initially demanded all data related to Named Plaintiffs.**

20          In November 2019, Plaintiffs served RFP 9, which requests "[a]ll Documents relating to each

21   of the Named Plaintiffs." Ex. G at 12; *see also id.* at 12–13 (RFPs 10–13); Ex. K at 9 (Interrogatories

22   16-17). At first blush that request may seem reasonable. But taken literally, it would require collection,

23   review, and analysis of millions of documents and tables to determine whether any information within

24   them—including information derived from aggregated and anonymized data—might relate back to a

25   particular user. In response to this and similar requests, Facebook agreed to produce the content and

26   information that Facebook associates with each Named Plaintiff's account. This information is

27   contained in the "Download Your Information" ("DYI") file that Facebook makes available to users.

28          Facebook's DYI tool reflects, in human-readable and producible form, the most complete

2

Gibson, Dunn &
Crutcher LLP

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND
INFORMATION
CASE NO. 3:18-MD-02843-VC-JSC

0327

compilation of data Facebook maintains relating to any user. Ex. C ¶ 5.  Beginning in February 2020, Facebook produced the information contained in the DYI file for each Named Plaintiff, plus additional information (such as a spreadsheet tracking how Plaintiffs adjusted their Facebook privacy settings). In total, Facebook produced approximately **one million pages** of user data relating to Named Plaintiffs.

Plaintiffs belittle the DYI file, claiming it is merely a record of what users post to Facebook. That is false.  Most of the DYI files Facebook produced are tens of thousands of pages each; they average 32,493 pages each and range from 226 pages to a whopping <u>**272,110 pages**</u> (depending on how active a particular user is and what data they may have deleted).

Exhibit A is an average-size DYI file produced in this case, which—due to its size—Facebook provides via share file.  Exhibit B is a list of categories of data contained in each user's DYI file (unless data in a given category does not exist or the user deleted it).  *See also* Ex. C ¶ 6.  Categories of information in users' DYI file include biographical information, ads viewed, friend lists, games played, location, logins and logouts, messages, page visits, photos, profile visits, religious and political views, status updates, and much more.  Ex. B.  **All told, the DYI files contain more than 100 categories of information that go well beyond a user's "platform activity."**  Facebook produced all of this despite repeatedly noting that much of it is not shared or relevant to any issue in this privacy litigation.

After Facebook completed these productions, Plaintiffs insisted that Facebook also locate and produce any other data that might, in any way, relate to any Named Plaintiff, and any materials derived from that data.  They focused on a data warehouse called Hive and demanded that Facebook produce any information in Hive that might be derived, in full or in part, from data about the Named Plaintiffs. Facebook explained this would not be possible because

Ex. L at 12–15; *see also* Ex. E ¶ 7.  Instead, each of                              would need to be searched individually for any information relating back in any way to a Named Plaintiff, which would be nearly impossible, given both the volume of Hive data and the fact that much of the data in Hive is anonymized.  *See id.*  Facebook further explained there would be no reason to take on such an undertaking because third parties do not have access to Hive tables.  *See id.*

**B.  Plaintiffs conceded that only data that was shared with third parties is relevant.**

Gibson, Dunn &
Crutcher LLP

0328

After nearly one full year of negotiations, the parties briefed the issue to Judge Corley. In that briefing, Facebook argued that Judge Chhabria's motion-to-dismiss order limits this case to data that users themselves share *on Facebook*—all of which had been produced. *See* Ex. L at 10–15. Plaintiffs disagreed, arguing that the "sensitive information that Facebook collects and shares with third parties is much more extensive." Ex. M at 1. Plaintiffs specifically demanded that Facebook also produce materials reflecting users' off-platform activity and what they called "derived" information.

After four rounds of briefing, Plaintiffs shifted gears in a sur-reply. They assured Judge Corley that their request for "[a]ll Documents relating to each of the Named Plaintiffs" was narrowly tailored, emphasizing that they sought "only a holding that the sensitive data Facebook collected about *ten Named Plaint₍₎fs* and *shared* with third parties is relevant." Ex. O at 9 (emphasis in original). They even argued that Judge Chhabria's holding that Plaintiffs had standing was *based on* the fact that certain information about them had been shared. *Id.* at 5. Plaintiffs clarified:

Plaintiffs do not demand, as Facebook repeatedly claims, that "Facebook search *millions* of disaggregated data sets for any data to have ever crossed Facebook's systems relating to a Named Plaintiff and any derivative materials drawing on that data – such as data sets tracking hours of peak user activity to monitor strains on Facebook's systems." Opp'n at 6. To the contrary, Plaintiffs seek only a holding that the sensitive data Facebook collected about *ten Named Plaint₍₎fs* and *shared* with third parties is relevant. Plaintiffs do not contend that information that was not shared is relevant, which substantially narrows the information Facebook would be required to produce in this case.

*Id.* at 9 (emphasis in original). Plaintiffs repeated this refrain throughout their brief:

- "This discovery dispute concerns sensitive user information that Facebook has shared with third parties without users' consent." *Id.* at 1.

- "[S]ensitive user information is relevant if Facebook shared it without users' consent." *Id.* at 2.

- "[T]he legal theories upheld at the pleading stage" turn on "whether Facebook shared [sensitive information] with third parties." *Id.* at 4.

- "Plaintiffs have standing . . . because their sensitive information was disseminated to third parties in violation of their privacy." *Id.* at 5 (quotation marks and citation omitted).

- "Plaintiffs seek an order holding that all sensitive data about the ten Named Plaintiffs that Facebook shared with or made accessible to third parties is relevant to this action." *Id.* at 9.

4

Gibson, Dunn &
Crutcher LLP

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND
INFORMATION
CASE NO. 3:18-MD-02843-VC-JSC

0329

Judge Corley then issued a short order (Ex. P) largely adopting Plaintiffs' sur-reply position:

> Plaintiffs correctly argue that Facebook's restrictive view of relevant discovery would exclude an enormous amount of information that Facebook collects and shares with third parties about Facebook's users. The district court's order (Dkt. No. 298) did not limit Plaintiffs' claims to only challenging the sharing of data Facebook collects from a user's on-platform activity; the claims also challenge Facebook's sharing of user data and alleged failure to monitor how third parties used such shared information.

To comply with Judge Corley's order, Facebook looked for any categories of individual user data that could have been shared but had not been produced. For a basic technological reason, Facebook found none. When a third party—such as an app developer or business partner—obtains user-related data, it accesses it through an "application programming interface," or "API." Ex. E ¶¶ 3–7. These APIs pull information exclusively from Facebook's "Social Graph," not data warehouses like Hive. *See id.* A user's DYI file, which Facebook produced for all Named Plaintiffs, contains the most complete current set of data about that user that is in the Social Graph (and more). *See* Ex. C ¶ 5.

### C. Judge Corley allowed Plaintiffs to conduct a Rule 30(b)(6) deposition.

In a December 2020 joint status report, Plaintiffs again demanded that Facebook produce additional information regarding the Named Plaintiffs. *See* Ex. Q at 1–2. Facebook explained that it was conducting an investigation but "[t]o Facebook's knowledge, the materials it produced reflect the information related to the Named Plaintiffs that could have been shared with third parties." *Id.* at 9.

Plaintiffs told Judge Corley that they found it "impossible to believe" there was no more discoverable "information that exists." Ex. R at 19:14–15; *id.* at 19:22 (Facebook's representation is "just impossible for us to believe"); *id.* at 28:15–16 ("We just don't believe . . . their description of what is or is not shared or made accessible."). When pressed, Plaintiffs gestured at "information [used] to target [ads to] the Plaintiffs," and Judge Corley redirected them back to *shared* information: "No, no, no, no. I don't think so. . . . This is—this came from Cambridge Analytica and that they had access to information." *Id.* at 23:21–25. When Plaintiffs pushed ahead, Judge Corley again focused back on shared information: "What did you mean in your sur-reply by 'shared'?" *Id.* at 24:13–14. Plaintiffs

5

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION
CASE NO. 3:18-MD-02843-VC-JSC

0330

Gibson, Dunn & Crutcher LLP

1  were unable to provide any clear answer. We suggest the Special Master review this transcript.

2  To address Plaintiffs' "disbelief . . . as to how Facebook operates," Judge Corley determined
3  "we just need somebody under oath saying: No, this is how it operates." *Id.* at 26:7–9. Judge Corley
4  allowed Plaintiffs to conduct a Rule 30(b)(6) deposition "to verify the representation that yes, we
5  collect this information—inferential data, but it is not made accessible to third parties." *Id.* at 35:3–5.

6  Plaintiffs deliberately squandered that opportunity. They issued a deposition notice on 12 broad
7  topics, many having nothing to do with the case. Ex. S. Judge Corley effectively quashed this notice,
8  stating: "That was way beyond what I had in mind. So I don't want to talk about your notice." Ex. T
9  at 17:15–16. Judge Corley *again* explained that the deposition was intended to allow Plaintiffs to
10  explore whether shared data had not been produced, noting "this is pretty basic stuff." Ex. T at 19:21–
11  22. But Plaintiffs ignored those instructions and used the deposition to explore a host of unrelated
12  issues, including using nearly two hours to ask questions about how Facebook places ads. *See* Ex. V.
13  Plaintiffs declined to ask even basic questions to test their professed disbelief about what user-related
14  data Facebook makes accessible to third parties. *Id.* Plaintiffs never even asked, "Are you aware of
15  any types of individual user data Facebook shares that are not in the DYI data Facebook produced?"

16  **D. Plaintiffs reverted to their initial demands for all data relating to Named Plaintiffs.**

17  After the deposition, Plaintiffs reverted to their initial demand for "all data and information
18  relating to the Named Plaintiffs," even if never shared. Ex. W. Facebook responded on April 1, 2021,
19  noting this "directly contradict[ed] the representations Plaintiffs made to the Court in their prior
20  briefing," and confirmed it had not identified shared user data beyond what it had produced. Ex. X at
21  2. Facebook explained again that "[t]hird parties who are able to access individualized user data access
22  that data through APIs that pull from Facebook's Social Graph only, and the DYI files Facebook
23  produced reflect[] a human-readable version of the data relating to each Named Plaintiff in Facebook's
24  Social Graph." *Id.* at 6. Plaintiffs never responded and refused to address whether they were changing
25  their position. *See* Ex. Z. Instead, they filed this motion, arguing Judge Corley's order "is not limited
26  to 'shared' information." Mot. at 2. Plaintiffs never once articulated that position over the prior year.

27  **III.   ARGUMENT**

28  The Special Master should deny Plaintiffs' motion.

6

Gibson, Dunn &
Crutcher LLP

0331

## A. Facebook's productions under Discovery Order 9 are complete.

Facebook has confirmed repeatedly that its productions of potentially shared data relating to the Named Plaintiffs are complete.[1]  Plaintiffs identify no shared data missing from those productions. Instead, they say they are entitled to *all* data relating in any way to the Named Plaintiffs.  But as Plaintiffs have admitted, there is no genuine dispute that this case is about *shared* data.

### 1.   The scope of discovery is limited to data that was shared with third parties.

The complaint, Judge Chhabria's motion-to-dismiss order, Plaintiffs' briefing, Judge Corley's discovery order, and the hearings before Judge Corley all make crystal clear that the only user data at issue in this *privacy* class action is data *that was shared with or made accessible to third parties*.  As Judge Chhabria put it in the very first sentence of his motion-to-dismiss order: "This lawsuit, which stems from the Cambridge Analytica scandal, is about Facebook's practice of sharing its users' personal information with third parties."  Ex. F at 1.  Much to Plaintiffs' chagrin, the case is *not* about "targeted advertising" or "psychographic marketing" (which Plaintiffs avoid mentioning by name but cannot resist bringing up more subtly, *see* Mot. at 7).  While not relevant, Facebook has confirmed repeatedly that it does not share individual user data with advertisers when it places ads.  *See also* Ex. D.  Nor is this case about all of the ways in which Facebook collects, maintains, and uses data.

With their feet to the fire in briefing before Judge Corley, Plaintiffs admitted this.  They told Judge Corley Facebook did *not* need to "search millions of disaggregated data sets for any data to have ever crossed Facebook's systems relating to a Named Plaintiff and any derivative materials drawing on that data."  Ex. O at 9 (quotation marks and emphasis omitted).  Instead, they sought "only a holding that the sensitive data Facebook collected about *ten Named Plaintiffs* and *shared* with third parties is relevant."  *Id.* (emphasis in original).  And they promised that they did "**not contend that information that was not shared is relevant**."  *Id.* (emphasis added).  In reliance on those promises, Judge Corley held that discoverable user data is data that was shared with third parties, including any shared data in specific categories Plaintiffs requested.  Ex. P at 2.

At hearings that took place after Judge Corley issued her order, Plaintiffs again acknowledged

---

[1]   Plaintiffs recently disclosed information identifying additional Facebook accounts for certain Named Plaintiffs.  Facebook is collecting and will produce the information associated with these accounts.

0332

that what they "said in [their] reply was information shared or made accessible [is relevant]," which they said meant "if it was put in a place or utilized in a way where third parties had access to it." Ex. R at 18:15–16, 23–25. Judge Corley emphasized that the parties were both discussing information that was "shared" or "made accessible." *Id.* at 19:6; *see also id.* at 19:3–4. One month later, Judge Corley reiterated that "[t]he question is what did they gather, and then what was shared." Ex. T at 21:13–14.

### 2. Plaintiffs have not identified any deficiencies in Facebook's productions.

Facebook has repeatedly confirmed that it has not identified user data that could have been shared with third parties beyond what is reflected in the Named Plaintiffs' DYI files. Plaintiffs have done nothing to rebut that confirmation.

The best way to understand the nature and extent of a user's DYI file is to view one. Exhibit A (provided via share file) is the DYI file for Terry Fischer (a Named Plaintiff).

*See* Ex. A at FB-CA-MDL-00405315–5336.

*See id.* Plaintiffs also say DYI files exclude "information collected from off-platform activity," Mot. at 2, but Ms. Fischer's file includes                                   *see* Ex. A at FB-CA-MDL-00405489–5860,

*see id.* at FB-CA-MDL-5476–5488.

*see id.* at FB-CA-MDL-00405558;

*see id.* at FB-CA-MDL-00405513–5514;                                             *see id.* at FB-CA-MDL-00405641–5643;

*see id.* at FB-CA-MDL-00405758–5772. The information contained in a user's DYI file is the most complete set of data

8

Gibson, Dunn & Crutcher LLP

0333

1   Facebook maintains about any user and the best representation of the data about a user in the Social

2   Graph, from which the APIs that share data pull. *See* Ex. C; Ex. E.

3       In arguing that Facebook's voluminous productions may be incomplete, Plaintiffs pretend not

4   to understand how Facebook shared user-related data with third parties. They insinuate that user data

5   is shared in various complex ways that Plaintiffs and the Special Master may not comprehend. *See*

6   Mot. at 6–7. And, three-and-a-half years after filing a lawsuit alleging that Facebook wrongfully shared

7   their data, Plaintiffs wax philosophical over "what sharing information means." *Id.* at 11.

8       Those arguments are decoys. Plaintiffs know—as their prior briefing and discovery requests

9   indicate—that the data sharing at issue in this case takes place through APIs. Plaintiffs' interrogatories

10  ask Facebook to identify specific categories of APIs it uses to share data, Ex. K; in response Facebook

11  has disclosed expansive lists of APIs and the data they pull spanning more than 300 pages, Ex. U.

12  Plaintiffs have also subpoenaed numerous third parties asking them to disclose the APIs through which

13  they accessed user data. *E.g.*, Ex. H at 8 ("identify each of Facebook's application programming

14  interfaces ('APIs') [it] used to access or obtain" user data).[2] And in the same sur-reply in which they

15  conceded the only user data relevant to this case is shared data, Plaintiffs also conceded:

16      Ex. O at 9. Plaintiffs' sudden attempt

17  to throw up smoke about "what sharing information means" is as disingenuous as it is unsupported.

18      **B.  Plaintiffs' distrust does not entitle them to "discovery on discovery."**

19      Unable to identify any categories of shared data that are not reflected in the Named Plaintiffs'

20  DYI files, Plaintiffs return to their usual refrain that they do not believe Facebook's representations

21  and need more discovery to test them. Plaintiffs have already squandered an opportunity Judge Corley

22  gave them to do so, and the Special Master should reject this recycled argument.

23      **Plaintiffs are not entitled to check Facebook's homework**. "A plaintiff's mere suspicion that

---

24  [2]  *See* 3/3/20 Subpoena to Brayola Fitting Technologies; 3/3/20 Subpoena to Bumble Trading, Inc.; 3/3/20

25  Subpoena to Coffee Meets Bagel, Inc.; 3/3/20 Subpoena to DNP Imagingcomm America Corporation; 3/3/20
    Subpoena to Flo Health, Inc.; 3/3/20 Subpoena to Netflix, Inc.; 3/3/20 Subpoena to On the Rebound, Inc.; 3/3/20

26  Subpoena to Spotify USA, Inc.; 3/3/20 Subpoena to Tinder, Inc.; 3/3/20 Subpoena to United Parcel Service,
    Inc.; 3/3/20 Subpoena to Walgreens Company; 3/3/20 Subpoena to Warner Brothers Entertainment, Inc.; 3/3/20

27  Subpoena to Yahoo!, Inc.; 3/3/20 Subpoena to Zoosk, Inc.; 5/21/20 Subpoena to Six4Three LLC; 7/16/20
    Subpoena to 3DNA Corp. (DBA NationBuilder); 7/16/20 Subpoena to CubeYou, Inc.; 7/16/20 Subpoena to

28  FullContact, Inc.; 8/7/20 Subpoena to DigitalStakeout, Inc.; 8/7/20 Subpoena to X1 Discovery, Inc. Facebook
    can provide these subpoenas upon request if the Special Master would like them.

0334

additional documents must exist is an insufficient basis to grant a motion to compel." *Bresk v. Unimerica Ins. Co.*, 2017 WL 10439831, at *5 (C.D. Cal. Nov. 16, 2017). For this reason, "'discovery on discovery' is disfavored and, to be both relevant and proportional to the needs of the case, a party seeking it must show a specific deficiency in the other party's production." *Uschold v. Carriage Servs., Inc.*, 2019 WL 8298261, at *4 (N.D. Cal. Jan. 22, 2019) (quotation marks and citation omitted); *see also, Brewer v. BNSF Railway*, 2018 WL 1756432, at *4 (D. Mont. Jan. 11, 2018) ("a court must guard against excessive probing into a party's meta-discovery in order to prevent belabored discovery.").

Plaintiffs have not identified anything beyond their own speculation to show a deficiency in Facebook's productions of potentially shared information, much less a "specific deficiency." Plaintiffs' cursory attempt to do so adopts their usual strategy of plucking isolated lines out of context. They rely on a document that Facebook has repeatedly told them outlines *hypothetical* capabilities— not actual practices—and this is clear on the face of the document. Mot. at 9. Plaintiffs similarly cite a document entitled "Ads and Measurement" and deliberately conflate data the document indicates was available to place ads with data Facebook *shared* with app developers. *Id*. at 7; Ex. D ¶ 3. Plaintiffs also bizarrely cite a question Facebook asked app developers that has nothing to do with data sharing, Mot. at 10; misconstrue a document where employees discuss *how to classify data as UII* to be something sinister, *id.*; and cite various documents discussing data Facebook maintains without making any effort to show that data is shared, *id*. at 7. Finally, Plaintiffs claim shared information has not been produced because the DYI file does not include "location-related metadata." Mot. at 10. But the DYI file includes location information, *e.g.*, Ex. A at FB-CA-MDL-00417382, and—where a user allowed it—extensive lists of the user's GPS coordinates.[3]   None of Plaintiffs' cherry-picked quotes demonstrates a "specific deficiency" in Facebook's productions.

**Facebook has disclosed the types of data it shares**. *See, e.g.*, Ex. U. Plaintiffs suggest the typical rules of discovery do not apply here because "the question of what information Facebook shared is *the* central issue in this case." Mot. at 11. That is nonsense. Facebook has already disclosed the relevant APIs at issue in response to Plaintiffs' requests. Ex. U. What Plaintiffs apparently mean is

---

[3] Ms. Fischer's DYI file does not include this data, likely because her settings did not allow it to be collected. Ex. AB includes 27 pages from separate DYI file Facebook produced for Plaintiff Jason Ariciu, listing hundreds of latitudes and longitudes where Facebook estimates he logged into Facebook over a 6-month period.

10

Gibson, Dunn & Crutcher LLP

0335

1    that they now want to audit *all* of Facebook's information so that *they* can decide what was shared (and

2    thus relevant). That is a nonstarter: a "requesting party . . . must rely on the representations of the

3    producing party or its representative that it is producing all responsive, relevant, and non-privileged

4    discovery." *Han v. Futurewei Techs., Inc.*, 2011 WL 4344301, at *5 (S.D. Cal. Sept. 15, 2011). And

5    even if Facebook did produce all of the information relating to the Named Plaintiffs, Plaintiffs would

6    still have to rely on Facebook to determine which categories of information could have been shared.

7    **Plaintiffs already had an opportunity to probe Facebook's representations, and they**

8    **squandered it.** Judge Corley previously allowed Plaintiffs to conduct a Rule 30(b)(6) deposition to

9    address their "disbelief . . . as to how Facebook operates." Ex. R at 26:7–8. Facebook made its then-

10   VP of Platform Partnerships, Konstantinos Papamiltiadis, available. Mr. Papamiltiadis had more than

11   eight years of experience at Facebook and more than 120 reports, and he spent almost 20 hours

12   preparing. Plaintiffs deliberately wasted that opportunity and tactically avoided asking *any* questions

13   to confirm whether Mr. Papamiltiadis was aware of types of shared data that Facebook had not already

14   produced. *See supra* at 6. Facebook urges the Special Master to review the deposition transcript.

15   Plaintiffs' failure to use the Rule 30(b)(6) deposition for its intended purpose does not entitle

16   them to admittedly irrelevant information. The biggest tell in Plaintiffs' motion is that it never—not

17   once—cites to Mr. Papamiltiadis's deposition. In a motion to compel documents that are ostensibly

18   for Plaintiffs to verify Facebook's representations that its productions are complete, one would expect

19   the centerpiece to be the deposition Judge Corley authorized for that very purpose. Its absence is

20   nothing short of extraordinary, and it would be astonishing if the true explanation were not so obvious:

21   Plaintiffs do not want verification that they have all categories of potentially shared user data. Instead,

22   as discovery nears its end,[4] Plaintiffs are desperate for *anything* that will breathe new life into their

23   dying case. That is why they spent their Rule 30(b)(6) deposition exploring *new* potential avenues of

24   litigation instead of verifying that the productions relating to *this* case were complete. That is why,

25   years into a case about data sharing, they raise questions about "what sharing information means"

26

27   [4] Even now, Plaintiffs do not demand all of the information they will eventually seek; they demand a list of
     information that they intend to later "use . . . to develop an efficient discovery plan." Mot. at 14. Plaintiffs'
28   endless discovery campaign, if successful, guarantees that discovery will blow far beyond the substantial
     completion deadline.

11

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND
INFORMATION
CASE NO. 3:18-MD-02843-VC-JSC

Gibson, Dunn &
Crutcher LLP

0336

1   without even attempting to supply an answer. Mot. at 11. And that is why they claim (baselessly) that

2   "Facebook itself does not know what information may have been shared with third parties," *id.* at 10—

3   conflating questions about *what particular data may have been shared about a specific user* (which

4   Facebook cannot identify) with *what categories of data could be shared* (which Facebook has identified

5   and produced). *See id.* at 10–11. Years into this case, as the discovery deadline approaches and after

6   throwing away their opportunity to test Facebook's production, Plaintiffs are entitled to nothing more.

7   **Plaintiffs conflate the scope of the *deposition* Judge Corley allowed with the scope of data**

8   **she found discoverable**. In authorizing a Rule 30(b)(6) deposition, Judge Corley allowed Plaintiffs to

9   *ask questions* about information Facebook maintains that may not have been shared—with the goal of

10   identifying which types of information *were* shared. *See* Ex. T at 21:13–14 ("The question is what did

11   they gather, and then what was shared."). Judge Corley did *not* order Facebook to produce data that

12   was never shared—if she had, there would have been no need for the deposition. Plaintiffs pluck

13   isolated statements from the hearings to tell a different story, but the transcripts—just like the parties'

14   underlying briefing on this issue—speak for themselves. Facebook encourages the Special Master to

15   read these materials in full. *See* Exs. R, T (transcripts); *see also* Exs. L, M, N, O (underlying briefs).

16   **C. Plaintiffs are judicially estopped from seeking information that was not shared.**

17   Even if Plaintiffs could otherwise seek "all" information related to the Named Plaintiffs, they

18   are judicially estopped from doing so here based on their unequivocal representations to Judge Corley.

19   "The doctrine of judicial estoppel is an equitable doctrine a court may invoke to protect the

20   integrity of the judicial process," and it was "developed to prevent litigants from 'playing fast and

21   loose' with the courts by taking one position, gaining advantage from that position, then seeking a

22   second advantage by later taking an incompatible position." *United Nat'l Ins. Co. v. Spectrum*

23   *Worldwide, Inc.*, 555 F.3d 772, 778 (9th Cir. 2009). "In determining whether to apply the doctrine," a

24   court will "typically consider (1) whether a party's later position is 'clearly inconsistent' with its

25   original position; (2) whether the party has successfully persuaded the court of the earlier position, and

26   (3) whether allowing the inconsistent position would allow the party to 'derive an unfair advantage or

27   impose an unfair detriment on the opposing party.'" *United States v. Ibrahim*, 522 F.3d 1003, 1009

28   (9th Cir. 2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001)).

12

Gibson, Dunn &
Crutcher LLP

0337

1   There could not be a more apt description of Plaintiffs' conduct. Their present position is flatly

2   contrary to their position before Judge Corley. *Compare* Ex. O at 9 ("Plaintiffs do not contend that

3   information that was not shared is relevant"), *with* Plaintiffs' Mot. at 2 ("Discovery Order No. 9 is not

4   limited to 'shared' information."). Plaintiffs persuaded Judge Corley of their earlier position—that

5   relevant information is limited to data Facebook shares—and obtained a favorable discovery order as

6   a result. Plaintiffs cannot now take back their concessions and demand new discovery on the eve of

7   substantial completion, when they already conceded it is not relevant, the Court issued a ruling based

8   on that representation, and the parties agreed to a substantial completion deadline based, in part, on

9   Facebook's understanding that this issue had been put to bed.

10  **D. The information Plaintiffs now seek is nonresponsive and otherwise unavailable.**

11  Following a familiar pattern, after asserting Facebook's productions are incomplete, Plaintiffs

12  shift gears. Rather than demand user data they believe was not produced, they abruptly demand

13  extensive discovery about Facebook's sources of electronically stored information ("ESI").[5]

14  Plaintiffs' list of demands is not the issue at impasse. The Special Master declared impasse

15  regarding Facebook's "[p]roduction of Named Plaintiffs' data in compliance with [Judge Corley's

16  Order]," 2021.10.06 Email from D. Garrie, after Plaintiffs complained Facebook had not made "a

17  complete production of all data it has collected about [the Named Plaintiffs]," Ex. Y at 4. When forced

18  to put pen to paper, Plaintiffs find no support for that request, so they pull out a familiar trick: They

19  raise a different issue that itself has a complicated history. Making matters worse, none of the discovery

20  requests Plaintiffs move on seek the materials they now demand. The Special Master instructed the

21  parties they may brief only the impasse topic, and should deny Plaintiffs' request for this reason.[6]

22  Judge Corley has also repeatedly rejected Plaintiffs' demands for discovery about Facebook's

---

[5] Plaintiffs seek to "compel Facebook to identify all data sources that may contain information relating to the Named Plaintiffs," which they define in the final paragraph of their motion to mean "(1) the name of the database or data log; (2) a description of the data source's purpose and function; (3) information about the default retention status of the data source (at a minimum, whether it is retained and for how long); (4) information about the current retention status of the data source (at a minimum, whether it is retained and for how long); and (5) where current retention status differs from default retention status, the date the change was implemented." Mot. at 13–14. They further demand, "at a minimum," "(1) the data schema; (2) definitions and descriptions of each field; (3) tool(s) which Facebook use to search each data source; and (4) instruction sets and manuals for all tools identified as being used by Facebook to search any data source identified in this step." *Id.* at 14.

[6] *See* Protocol for Resolving Discovery Disputes ¶ 2. The Special Master separately advised the parties that he intends to "redline" any portions of the parties' briefing that strays beyond the impasse topic.

13

Gibson, Dunn &
Crutcher LLP

0338

1  sources of ESI. The parties invested nearly six months negotiating an ESI protocol that Judge Corley

2  entered. Notably, that protocol does *not* require written ESI disclosures. Ex. I. After agreeing to this

3  protocol, Plaintiffs sought to side-step the parties' agreement and asked Judge Corley to order "written

4  ESI disclosures" or a 30(b)(6) ESI deposition. Dkt. 428 at 5. Judge Corley rejected this request: "On

5  the ESI discussions, I'm not going to require any more—I'm not going to do what the plaintiffs

6  proposed. . . . I'm not satisfied there's anything more in particular that you need." Ex. J at 6:16–21.

7  One year later, Plaintiffs tried again. When Judge Corley authorized a deposition for Plaintiffs

8  to explore whether any shared data about the Named Plaintiffs had not been produced, Plaintiffs issued

9  a 30(b)(6) notice that again sought detailed testimony about Facebook's data sources. The first three

10  topics in Plaintiffs' notice ask for the same information Plaintiffs sought previously and now seek here:

11
    1. The format, nature, and location of User Data as set forth in Discovery Order No. 9, including
       how and why such Data is collected, obtained, or inferred, and how it is maintained.
12

13  2. The name, location, and function of all of Facebook's electronic or database systems that
       contain User Data, including but not limited to Hive and Data Warehouse, whether stored on
14     an individual user level or in another form.

15  3. The identity, nature and location at Facebook of all the metadata associated with User Data . . .

16  Ex. S at 6. Judge Corley quashed that deposition notice. *See supra* at 6. Plaintiffs' requests for

    document discovery on the same topics should meet the same fate.
17

18  Even though Judge Corley rejected Plaintiffs' requests for ESI discovery, in mediation

19  Facebook voluntarily produced much of the information Plaintiffs demand, *see* Ex. AA (share file),

20  because Plaintiffs assured the mediators this information would advance the parties' discussion about

    user data. Plaintiffs do not even acknowledge that production; they simply ask for more.
21

22  Had Plaintiffs reviewed the materials Facebook provided, they would have learned a

23  tremendous amount about how Facebook stores data. The documents include two training videos

24  intended to educate viewers as to how Facebook stores and queries data in the Social Graph. *E.g.*, *id.*

25  at FB-CA-MDL-01959889, FB-CA-MDL-01960073. Facebook also produced detailed technical

    publications regarding its data infrastructure, *e.g.*, *id.* at FB-CA-MDL-01959810, FB-CA-MDL-
26
    01959826 (academic articles regarding the consistency and functioning of Facebook's TAO system
27
    and describing Facebook's horizontally shared, geo-replicated relational database management
28

14

Gibson, Dunn &
Crutcher LLP

0339

1  system), as well as internal instructional guides discussing Facebook's data storage systems (including
2  descriptions of individual databases, their functions, data schema employed, and tools used to query
3  databases), *e.g.*, *id.* at FB-CA-MDL-01960039 (instructional overview of the Graph API), FB-CA-
4  MDL-01960137 (instructional wiki entry providing descriptions of data tools), FB-CA-MDL-
5  01960080 (instructional guide on storage options in the Social Graph), FB-CA-MDL-01960128
6  (instructional guide on data tools), FB-CA-MDL-01960067 (instructional guide on searching with
7  GraphQL).   Facebook also produced dozens of articles and blog posts discussing its data
8  infrastructure, *e.g.*, *id.* at FB-CA-MDL-01959804 (blog post describing Facebook's top open data
9  problems, including a description of its data stores and the tools used to query them), FB-CA-MDL-
10  01959641 (article discussing the role of the MySQL database in supporting the social graph).

11         Given Facebook's extensive voluntary production of materials Judge Corley held Plaintiffs
12  were not entitled to, Plaintiffs' claim that they are left in the dark falls flat.  And Facebook has already
13  told Plaintiffs that most of the additional materials they seek do not exist or do not exist in the form
14  Plaintiffs have requested—such as a data map, a list of sources containing data about specific individual
15  users, or an instruction manual explaining the workings of Facebook's engineering infrastructure to
16  laypersons.  And Facebook has answered interrogatories asking it to identify databases that house user
17  data.  Ex. U.  It is not clear what other information Plaintiffs' vague and broad list is even asking for.

18         These are issues that can and should be resolved informally through discussion during the RFP
19  meet-and-confer process, during which the parties can refine their requests, address any
20  misunderstandings, and raise objections if needed.  None of that happened here, likely for an obvious
21  tactical reason: Plaintiffs know that if their current demands were properly teed up, negotiated, and
22  mediated, they would be dead on arrival.  The multiple problems with Plaintiffs' list of demands simply
23  highlight the soundness of the rule that a "motion to compel may not be used to enforce an 'informal'
24  request for documents or information." *MAO-MSO Recovery, LLC v. Mercury Gen.*, 2019 WL
25  1423772, at *3 (C.D. Cal. Feb. 19, 2019).  As a result, even aside from all of the other problems with
26  Plaintiffs' motion to compel, it is unripe.

27  **IV.   CONCLUSION**

28         Plaintiffs' motion should be denied.

0340

Dated:  October 28, 2021

**GIBSON, DUNN & CRUTCHER, LLP**

By: ___ */s/ Deborah Stein*___

Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Russell H. Falconer
rfalconer@gibsondunn.com
2001 Ross Avenue Suite 2100
Dallas, TX 75201
Telephone:  214.698.3170

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

Gibson, Dunn &
Crutcher LLP

0341

# Exhibit J

1   Derek W. Loeser (admitted *pro hac vice*)      Lesley Weaver (Cal. Bar No.191305)
    KELLER ROHRBACK L.L.P.                          BLEICHMAR FONTI & AULD LLP
2   1201 Third Avenue, Suite 3200                   555 12th Street, Suite 1600
    Seattle, WA 98101                               Oakland, CA 94607
3   Tel.: (206) 623-1900                            Tel.: (415) 445-4003
    Fax: (206) 623-3384                             Fax: (415) 445-4020
4   dloeser@kellerrohrback.com                      lweaver@bfalaw.com

5

6   *Plaint;ifs' Co-Lead Counsel*

7   *Additional counsel listed on signature page*

8
                        **UNITED STATES DISTRICT COURT**
9                      **NORTHERN DISTRICT OF CALIFORNIA**
                          **SAN FRANCISCO DIVISION**
10

11
    IN RE: FACEBOOK, INC. CONSUMER                  MDL No. 2843
12  PRIVACY USER PROFILE LITIGATION                 Case No. 18-md-02843-VC-JSC

13  ────────────────────────────────               **REPLY IN SUPPORT OF PLAINTIFFS'**
                                                    **MOTION TO COMPEL PRODUCTION OF**
14  This document relates to:                       **NAMED PLAINTIFFS' CONTENT AND**
                                                    **INFORMATION**
15  ALL ACTIONS
                                                    Judge: Hon. Vince Chhabra
16                                                  Hon. Jacqueline Scott Corley
                                                    Special Master Daniel Garrie
17                                                  Courtroom: 4, 17th Floor

18                                                  JAMS Ref. No.: 1200058674

19                                                  ORAL ARGUMENT REQUESTED

20

21

22

23

24

25

26

27

28

0343

1

**TABLE OF CONTENTS**

2

I.      INTRODUCTION ...................................................................................................... 1

II.     Argument ................................................................................................................... 2

        A. Judge Corley's Orders Entitle Plaintiffs to the Discovery They Seek. ........................ 2

        B. Plaintiffs Are Entitled to Probe Facebook's Assertion That It Has Already
           Produced All the Content and Information It Has Shared with or Made Accessible
           to Third Parties. ......................................................................................................... 4

             1.  Ample Evidence Casts Doubt on Facebook's Assertion. ..................................... 4

             2.  Facebook Cannot Limit Its Discovery by Reference to Its Own View of
                 Disputed Merits Issues, Since the Whole Point of Discovery Is to Help Resolve
                 Such Issues. ................................................................................................................... 7

             3.  The Cases on Which Facebook Relies Have No Relevance Here. ........................ 8

        C. As Facebook's Silence Confirms, Plaintiffs Are Entitled to Answers to
           Interrogatories Numbers 16 and 17. ............................................................................. 9

        D. The Relief Plaintiffs Are Requesting Is Intended to Lighten Facebook's Burden. ...... 9

III.    CONCLUSION ......................................................................................................... 10

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## I.    INTRODUCTION

2      Plaintiffs' argument in support of its to compel the production of Plaintiffs' data and

3 information is straightforward. All user data that has been shared or made accessible to third

4 parties, from whatever source collected or inferred, is relevant and discoverable. There is concrete

5 and compelling evidence that Facebook has not produced all such data for the Named Plaintiffs.

6 Plaintiffs are not required to accept Facebook's contrary assertion, since what has been shared or

7 made accessible is a disputed merits issue that Plaintiffs are entitled to probe. And Facebook has

8 consistently refused to provide any transparency into what Facebook collects about users and for

9 what purpose, let alone what Facebook possesses about the Named Plaintiffs.

10      Facebook's response to this straightforward argument is part and parcel of its abusive

11 approach to discovery as a whole: deny, attack, and reverse the victim and the offender. Facebook

12 denies the plain language of Judge Corley's orders and that its production is incomplete, and

13 attacks Plaintiffs for having the temerity to seek the discovery they should have received a year

14 ago. Instead, Facebook insists, Plaintiffs are the ones abusing the legal process, since (it says)

15 they are taking a position contrary to the one they took in front of Judge Corley.

16      Facebook's attacks are unfounded and misleading. Plaintiffs have always sought, and

17 continue to seek, content and information that has been shared with or made accessible to third

18 parties. And they are not arguing that content and information is relevant if Facebook did not

19 share it with or make it accessible to third parties. They are simply arguing that Facebook has not

20 produced all of that relevant content and information, and that Facebook can't be the judge of

21 what it means to share content and information or make it accessible to third parties. Plaintiffs are

22 entitled to discover the information Judge Corley already has decided is relevant because the

23 information will shed light on Facebook's misuse of user information on which the four

24 categories of misconduct at the heart of this case are based.

25      Similarly meritless is the argument that Plaintiffs have no right to question Facebook's

26 assertions. Plaintiffs have come forward with compelling evidence that Facebook has not

27 produced all the content and information that has been shared with or made accessible to third

28

1  parties. Facebook fails to counter that evidence. And the notion that Plaintiffs must simply accept

2  Facebook's version of events—which is what Facebook's position amounts to—runs against the

3  whole purpose of discovery, which is to define and resolve disputed merits issues. Plaintiffs need

4  not accept Facebook's position on those merits issues in discovery.

5       For these reasons and the others laid out below, Plaintiffs' motion should be granted.

6  **II.  ARGUMENT**

7       **A.  Judge Corley's Orders Entitle Plaintiffs to the Discovery They Seek.**

8       In their motion, Plaintiffs explained why Judge Corley's orders entitle Plaintiffs to all the

9  content and information that Facebook collects, appends, and infers about the Named Plaintiffs,

10  regardless of whether Facebook *admits* that it is shared with or made accessible to third parties.

11  Mot. to Compel Production of Named Plaintiffs' Content and Information ("Mot.") at 8–9.

12  Facebook, however, takes the position that Judge Corley has affirmatively *foreclosed* Plaintiffs'

13  ability to receive the discovery they now seek. This extravagant position, whether framed as

14  judicial estoppel or as any other theory, should be rejected.

15       *First*, the position Plaintiffs have taken in front of Judge Corley is not inconsistent, let

16  alone "clearly inconsistent," with the position they take here. *New Hampshire v. Maine*, 532 U.S.

17  742, 750 (2001) (quotation and citation omitted). In front of Judge Corley, Plaintiffs argued that

18  when users' content and information was shared with or made accessible to third parties, it was

19  relevant, regardless of the source of the content and information. They reaffirm that position.

20  Plaintiffs are arguing not that content and information is relevant if Facebook did not share it with

21  or make it accessible to third parties, but rather that (1) Facebook *has not produced* all the content

22  and information that it has shared with or made accessible to third parties; and (2) Facebook is *not*

23  *allowed to be the judge* of what it did or did not share with or make accessible to third parties,

24  because that is a disputed merits issue. *See Hossaini v. W. Mo. Med. Ctr.*, 140 F.3d 1140, 1143

25  (8th Cir. 1998) (judicial estoppel did not apply because party's "underlying assertion" did not

26  change).  And Facebook's refusal even to identify what it has collected, appended, or inferred

27  about the Named Plaintiffs—including their profiles, *see infra* § B.1—is a serious gap in

28

1  Facebook's production that prejudices Plaintiffs' ability to demonstrate the full scope of

2  Facebook's misuse of user information.

3    *Second*, Judge Corley nowhere ruled, or even suggested, that Plaintiffs may not probe

4  Facebook's assertions about what it did or did not share with or make accessible to third parties.

5  Quite the opposite. Allowing Plaintiffs to probe such assertions was one of the purposes of

6  Discovery Order No. 11, which recognized that what information was shared with or made

7  accessible to third parties was "an open question." Decl. of Derek W. Loeser in Supp. of Mot. to

8  Compel Production of Named Plaintiffs' Content and Information ("Loeser Decl."), Ex. 6 at 1

9  (filed originally as Dkt. No. 588). Discovery Order No. 12 makes it even clearer that Plaintiffs are

10  entitled to probe Facebook's assertions, stating about the then-imminent depositions that

11  "whether particular user data is not shared, not admissible, or not monetized, is not a valid reason

12  to object to a particular deposition question." Loeser Decl., Ex. 7 at 1–2 (filed originally as Dkt.

13  No. 602).

14    *Third*, Facebook fails to explain how granting this motion would give Plaintiffs an "unfair

15  advantage" or impose on Facebook an "unfair detriment." Opp'n to Pls.' Mot. to Compel

16  Production of Named Plaintiffs' Content and Information ("Opp'n") at 12 (quotation and citation

17  omitted). Again: at no point did Judge Corley suggest that Plaintiffs were not entitled to discovery

18  to test Facebook's assertions about what it made accessible to or shared with third parties. When

19  Plaintiffs expressed doubt that Facebook's production was complete, Judge Corley allowed

20  Plaintiffs a 30(b)(6) deposition to inquire about how Facebook used the information it collected.

21  And, crucially, she did not suggest that that deposition was the only inquiry that Plaintiffs could

22  make: "And if you don't get what I think you should get, no one's going anywhere; we can come

23  back and do it again. This is just to try to break through that logjam and *get started*." Decl. of

24  Derek W. Loeser in Supp. of Reply in Supp. of Mot. to Compel Production of Named Plaintiffs'

25  Content and Information ("Loeser Reply Decl."), Ex. A at 20 (emphasis added). The 30(b)(6)

26  deposition, then, was merely the start of the process. Plaintiffs seek here to follow through on the

27  critical inquiry that the deposition began. And, make no mistake about it, the question of what

28

1   information about the Named Plaintiffs was shared with or made accessible to third parties by

2   Facebook is a core issue in this litigation. Discovery Order No. 9 settled the question of whether

3   the full scope of information about the Named Plaintiffs collected or inferred by Facebook is

4   relevant. Facebook should not be allowed to circumvent that Order through the ruse of its

5   untested determination that none of the information it is withholding fits its self-serving definition

6   of sharing.

7         **B.**     **Plaintiffs Are Entitled to Probe Facebook's Assertion That It Has Already Produced All the Content and Information It Has Shared with or Made**

8                **Accessible to Third Parties.**

9        Facebook takes the position that the Court must simply take its word that it has already

10  produced all the content and information that has been shared with or made accessible to third

11  parties. This position should be rejected. First, there is ample concrete evidence that the content

12  and information that Facebook shares or makes accessible goes well beyond the content and

13  information that it has thus far produced. Second, Facebook cannot resist discovery simply by

14  relying on its own view of a disputed merits issue—here, what it means to share or make

15  accessible—since the whole point of discovery is to *resolve* such disputes.

16            **1.**    **Ample Evidence Casts Doubt on Facebook's Assertion.**

17       In their motion, Plaintiffs pointed to considerable evidence that Facebook's production

18  thus far does not capture all the user content and information that Facebook shares or makes

19  accessible to third parties. Mot. at 6–7, 9–10. Facebook's response to this evidence is limited and

20  unsatisfactory. It says that one of the documents cited is "hypothetical," but does not explain *why*

21  the discussion in that document—which certainly appears to be talking about real rather than

22  hypothetical capabilities—should be interpreted as hypothetical. Opp'n at 10. And it is utterly

23  silent about its patents and patent applications, *see* Mot. at 7,[1] which, along with other public

---

[1] *See also* U.S. Patent No. 9,740,752 (Aug. 22, 2017) ("A social networking system obtains linguistic data from a user's text communications on the social networking system. . . . *The inferred personality characteristics are stored in connection with the user's profile*, and may be used for targeting, ranking, selecting versions of products, and *various other purposes*." (emphasis added)); U.S. Patent Application Pub. No. US 2012/0016817 A1 (Jan. 19, 2012) ("[T]he system inputs the user data to the prediction algorithm to retrieve a Publication

1    information, verify the existence of a "user profile" that Facebook conceals from users but makes

2    accessible to third parties such as advertisers. *See* U.K. House of Commons, Digital, Culture,

3    Media and Sport Comm., *Disinformation and 'Fake News': Final Report* ¶ 41 at 17 (Feb. 14,

4    2019) ("[T]he advertising profile that Facebook builds up about users cannot be accessed,

5    controlled or deleted by those users. It is difficult to reconcile this fact with [Mark Zuckerberg's]

6    assertion that users own all 'the content' they upload.").

7        The evidence also contradicts Facebook's claim that APIs provided the only conduits for

8    user content and information that was shared with or made accessible to third parties. *Cf.* Opp'n

9    at 5.

10          *See* Loeser Reply Decl., Ex. B at FB-CA-MDL-00203262 (Mar. 3, 2014 email

11    from Aldo King, senior member of Facebook's Privacy Program); *id.*, Ex. C at 129:3-130:13

12    (James Barnes testimony regarding

13                             *see also id.*, Ex. D at Slide 5

14

15        Facebook's other response to Plaintiffs' showing is to tout its DYI tool, which it calls "the

16    most complete compilation of data Facebook maintains relating to any user." Opp'n at 2–3.

17    However, the DYI tool lacks not only information that Facebook infers about Plaintiffs or that it

18    collects about their off-platform activity, but also certain information about Plaintiffs' *on-*

19    *platform* activity (*i.e.*, the first of Judge Corley's three categories of relevant discovery). For

20    example, Facebook produced an attorney-created spreadsheet that show the apps that five (but not

21    all nine) of the Named Plaintiffs used on the Facebook platform, as well as the corresponding API

22    permissions granted those apps. *See* Loeser Reply Decl., Ex. E. Many of the apps listed on the

23    spreadsheet are missing from the DYI file and vice versa. *See id.*, Ex. F. Furthermore, the DYI

24    contains no information regarding API permissions granted apps. This gap indicates that the DYI

25    file, contrary to Facebook's claims, is not actually complete, even as to on-platform activity. And

26

27    Classification prediction of whether the user will undergo one or more life change events. *The*
*system updates the user's profile to indicate the life change event and provides advertisements to*

28    *the user responsive to the prediction* of one or more life change events." (emphasis added)).

when it comes to off-platform activity, Facebook concedes its DYI file is not complete.

*See, e.g., id.*, Ex. G at 98:21-24

Nor, crucially, does the DYI file include information about all the "custom audiences" that Facebook put the Named Plaintiffs into. This "custom audiences" feature, as Facebook client solutions manager James Barnes has testified, made available information about users that third parties obtained from Facebook and that Facebook shared with other third-party advertisers. "Custom audiences" makes this information available in several different ways, including by matching hashed emails provided by advertisers and identifying Facebook users to the advertiser based on the match;

*Id.*, Ex. C at 129:3-130:13. Moreover, Barnes testified that "[c]ustom audiences can also be shared from one advertiser to another." *Id.* at 137:5-24. Facebook has not produced custom audiences documents containing the information about Named Plaintiffs that third parties obtained from Facebook or that Facebook shared with or made available to other third-party advertisers through these means.

Other evidence also shows that Facebook both collects and shares information that is not included in the DIY file. For example, a marketing document from Facebook's political advertising group identifies

*Id.*, Ex. H, at FB-CA-MDL-

00252922, ▮▮▮▮▮▮ the description continues ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮ *Id.* This information is not included in the DIY file for the Named Plaintiffs, notwithstanding marketing documents indicating that the information was shared with third parties.

> **2.** **Facebook Cannot Limit Its Discovery by Reference to Its Own View of Disputed Merits Issues, Since the Whole Point of Discovery Is to Help Resolve Such Issues.**

According to Facebook, Plaintiffs must accept its claim that the only content and information that was shared with or made accessible to third parties has already been produced. What data was shared with or made accessible to third parties is a central and disputed merits issue, however. A party may not use its own view of a merits issue—here, what it means to share or make accessible—to define the permissible limits of discovery. None of the cases that Facebook cites suggests that a party may do so. Indeed, if parties were required to accept another party's view on the scope of appropriate discovery, there would be no role for a motion to compel under Rule 26(b).

Discovery is not the appropriate stage to resolve "disputed legal and factual issues on the merits." *Fauceglia v. Univ. of S. California*, No. CV1904738FMOJEMX, 2020 WL 12048986, at *1 (C.D. Cal. Oct. 5, 2020); *see also Karnoski v. Trump*, No. C17-1297 MJP, 2020 WL 2800609, at *1 (W.D. Wash. May 29, 2020) (ruling on defendants' motion for protective order, noting that defendants had "confused the evidentiary standard at trial with the broader discovery standard, which allows parties to obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense"). This should not be a controversial proposition, since discovery is meant to be a way of clarifying and defining the disputed issues. *See, e.g.*, *Bolling v. Dendreon Corp.*, No. C13-0872JLR, 2015 WL 11233202, at *2 (W.D. Wash. June 19, 2015) (discovery's purpose is to provide "litigants with the information essential to resolving disputed facts in an expeditious manner" (citing *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993)). It would short circuit the whole process if one party can resolve disputed issues on its own, and in advance of

1   discovery. And, indeed, Facebook has so far stymied the ordinary course of discovery by refusing

2   to produce information already deemed relevant by Judge Corley—information that Plaintiffs

3   have been seeking for several years.

4           **3.**        **The Cases on Which Facebook Relies Have No Relevance Here.**

5          Facebook cites several cases to support its opposition. Its reliance on these cases

6   demonstrates just how far Facebook strays from the relevant legal issues.

7          For example, Facebook cites *Bresk v. Unimerica Ins. Co.*, No. CV 16-8893 ODW (SSx),

8   2017 WL 10439831 (C.D. Cal. Nov. 16, 2017), for the proposition that "[a] plaintiff's mere

9   suspicion that additional documents must exist is an insufficient basis to grant a motion to

10  compel." *Id.* at *5. But Facebook does not dispute that the documents Plaintiffs seek *exist*; it does

11  not deny that it has collected or inferred additional content and information about the Named

12  Plaintiffs. The dispute is simply whether the documents that Plaintiffs seek have certain

13  properties—i.e., they have been shared with or made accessible to third parties. And on that issue,

14  Plaintiffs are entitled to see for themselves and not take Facebook's word for it, especially since

15  they have considerable evidence that Facebook has not produced all the content and information

16  that has been shared with or made accessible to third parties. As *Bresk* notes, if a moving party

17  has "a colorable basis for its belief that relevant, responsive documents exist and are being

18  improperly withheld," the party's motion should be granted. *Id.*; *see also id.* at *5–6 (granting

19  motion to compel because there was no denial that documents sought did not exist).

20         The other cases that Facebook cites are about "discovery on discovery"—"discovery into

21  another party's discovery process"—and state that such discovery will not be allowed without the

22  identification of a specific deficiency in a production or response. *Uschold v. Carriage Servs.,*

23  *Inc.*, 2019 WL 8298261, at *4 (N.D. Cal. Jan. 22, 2019); *accord Brewer v. BNSF Railway*, 2018

24  WL 1756432, at *4 (D. Mont. Jan. 11, 2018); *Han v. Futurewei Techs., Inc.*, 2011 WL 4344301,

25  at *5 (S.D. Cal. Sept. 15, 2011). But Plaintiffs do not want to inquire into Facebook's discovery

26  process. To the extent they seek information on potential sources of discovery, they seek it not to

27  audit past discovery, but to minimize future burden. *See infra* § D. And, at any rate, Plaintiffs

28

1    *have* identified substantial deficiencies in Facebook's production. *See supra* § B.1; Mot. at 6–7,

2    9–10.

3    **C.    As Facebook's Silence Confirms, Plaintiffs Are Entitled to Answers to
4           Interrogatories Numbers 16 and 17.**

5    Facebook maintains total silence about two major discovery requests encompassed by

6    Plaintiffs' motion: interrogatories numbers 16 and 17. *See* Mot. at 2, 6; Pls.' Separate Statement

7    at 3–4. These interrogatories asked Facebook to identify the third parties that were given access to

8    the Named Plaintiffs' content and information, and to identify the content and information to

9    which they had access. Facebook does not even attempt to explain why it should not answer these

10   interrogatories. It should be ordered to do so.

11   **D.    The Relief Plaintiffs Are Requesting Is Intended to Lighten Facebook's
12          Burden.**

13   No good deed goes unpunished. In crafting their requested relief, Plaintiffs sought to

14   lighten the burden on Facebook and, to the extent possible, to forestall the production of content

15   and information that was not shared with or made accessible to third parties. Facebook now

16   accuses Plaintiffs of sidestepping discovery mediation. But Plaintiffs' requested relief is

17   consistent with the relief they previously requested and with the Federal Rules.

18   Indeed, Plaintiffs have repeatedly asked Facebook to provide information that would

19   enable them to help identify relevant information and reduce Facebook's burden. *See* Mot. 7–8.

20   Plaintiffs have even invoked the California Consumer Privacy Act to try get more information—a

21   request that was refused. Loeser Reply Decl., Ex. I; *id.*, Ex. J; *see also* Cal. Civ. Code §

22   1798.100(a) ("A consumer shall have the right to request that a business that collects a

23   consumer's personal information disclose to that consumer the categories and specific pieces of

24   personal information the business has collected.").

25   Through discovery mediation, Plaintiffs have also continually sought other information

26   that would help narrow the production, including data models, schemas, snapshots, relevant API

27   and SDK calls, the parties that were permitted to make such calls against Named Plaintiffs' data,

28

REPLY ISO MOT. TO COMPEL                          9                          MDL No. 2843
                                                                    CASE No. 18-MD-02843-VC-JSC
                                                                    JAMS REF. No.: 1200058674
                                                                                          0353

1   and more. Mot. at 13; Loeser Decl., Ex. 15. Again, Facebook has refused to respond. Plaintiffs'

2   requested relief dovetails with these prior efforts. The contention that Plaintiffs are evading

3   discovery mediation and shifting their position is disingenuous. Disclosure of what Facebook

4   possesses about the Named Plaintiffs is a reasonable next step toward resolution of this issue.

5          The Federal Rules of Civil Procedure independently entitle Plaintiffs to the information

6   they seek on data sources, precisely because it will allow them to determine what has been

7   withheld. That is the purpose of Rule 34(b)(2)(C), which requires an objecting party to "state

8   whether any responsive materials are being withheld on the basis of that objection." It cannot be

9   too much to ask Facebook to comply with the Rules. For this reason, at this stage of the litigation,

10  Plaintiffs have requested that Facebook identify the relevant data sources, their purpose for

11  collection, retention periods, the full profiles of the Named Plaintiffs, and other information

12  relevant to crafting an efficient discovery plan, both as to the Named Plaintiffs and on a classwide

13  basis.

14  **III.    CONCLUSION**

15         For the reasons laid out above and in their October 18 submission, Plaintiffs' motion

16  should be granted.

17  Dated: November _2, 2021                          Respectfully submitted,

18  KELLER ROHRBACK L.L.P.                            BLEICHMAR FONTI & AULD LLP

19  By:    /s/ Derek W. Loeser                        By:    /s/ Lesley E. Weaver
20         Derek W. Loeser                                   Lesley E. Weaver

21  Derek W. Loeser (admitted *pro hac vice*)         Lesley E. Weaver (SBN 191305)
    Cari Campen Laufenberg (admitted *pro hac vice*)  Anne K. Davis (SBN 267909)
22  David Ko (admitted *pro hac vice*)                Matthew S. Melamed (SBN 260272)
    Adele A. Daniel (admitted *pro hac vice*)         Angelica M. Ornelas (SBN 285929)
23  Benjamin Gould (SBN 250630)                       Joshua D. Samra (SBN 313050)
    1201 Third Avenue, Suite 3200                     555 12th Street, Suite 1600
24  Seattle, WA 98101                                 Oakland, CA 94607
    Tel.: (206) 623-1900                              Tel.: (415) 445-4003
25  Fax: (206) 623-3384                               Fax: (415) 445-4020
    dloeser@kellerrohrback.com                        lweaver@bfalaw.com
26  claufenberg@kellerrohrback.com                    adavis@bfalaw.com
    dko@kellerrohrback.com                            mmelamed@bfalaw.com
27  adaniel@kellerrohrback.com                        aornelas@bfalaw.com
    bgould@kellerrohrback.com                         jsamra@bfalaw.com

28

1  Christopher Springer (SBN 291180)
   801 Garden Street, Suite 301
2  Santa Barbara, CA 93101
   Tel.: (805) 456-1496
3  Fax: (805) 456-1497
   cspringer@kellerrohrback.com

4

5  *Plaintiffs' Co-Lead Counsel*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit K

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
   osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
   klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
   mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
   dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
   jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION <br><br> This document relates to: <br><br> ALL ACTIONS | MDL NO. 2843 <br> CASE NO. 3:18-MD-02843-VC-JSC <br><br> **FACEBOOK'S RESPONSE TO OBJECTION REGARDING NAMED PLAINTIFFS' DATA BRIEFING** <br><br> Judge: Hon. Vince Chhabria <br> Hon. Jacqueline Scott Corley <br> Special Master Daniel Garrie <br> Courtroom: 4, 17th Floor <br><br> JAMS Ref. No.: 1200058674 |

## I.    INTRODUCTION[1]

Plaintiffs' reply in support of their motion to compel data relating to the Named Plaintiffs is littered with new evidence and arguments in violation of the Special Master's rule that "[n]either party is permitted to submit new evidence in a Reply." JAMS Dkt. 1 ¶ 3. Under the Special Master's Protocol, these new documents and arguments should be stricken automatically. Yet Plaintiffs claim they properly **sought new relief** and introduced **twelve new documents** in a reply brief because, in response to Plaintiffs' motion arguing that Facebook's productions of data relating to the Named Plaintiffs are deficient, Facebook demonstrated that its productions are in fact complete.

Plaintiffs' submission demonstrates why the Special Master's prohibition on introducing new evidence and arguments in a reply is necessary and should be consistently enforced. The parties have been disputing the issues raised in Plaintiffs' motion for more than one year. During that time, Facebook explained repeatedly that the Download Your Information ("DYI") files it produced satisfied its production obligations under Discovery Order 9 and the technical reasons why this is so. If Plaintiffs believed they had evidence demonstrating that Facebook's productions were incomplete, that evidence belonged in Plaintiffs' opening brief. But rather than introduce any such evidence in their opening brief, Plaintiffs asked the Special Master to compel invasive discovery about Facebook's databases because Plaintiffs claimed not to believe Facebook's counsel's representations about its productions.

After Facebook demonstrated that Plaintiffs did not come close to meeting their burden on a motion to compel, Plaintiffs switched tunes in their reply brief. Once Facebook no longer had an opportunity to respond, Plaintiffs sought **new relief** and introduced **twelve new documents** that Plaintiffs suddenly claim show gaps in Facebook's productions.[2] It is clear why Plaintiffs did not introduce these documents earlier. Plaintiffs' reply plucks random statements out of context, and none of the documents they cite actually identifies data Facebook shared with third parties (the only data at issue), much less shared data that is missing from the nearly one million pages of DYI files produced.

The Special Master's Protocol is clear that this type of gamesmanship is not permitted.

---

[1] Because the Special Master instructed Facebook not to attach any evidence to this submission, the citations in this submission do not have hyperlinks. Facebook will submit a hyperlinked version at the Special Master's request.

[2] Each of the Facebook documents Plaintiffs introduced in their reply brief were produced many months before Plaintiffs filed their opening brief; some were produced more than one year ago.

Facebook respectfully requests that the Special Master invoke Paragraph 3 of his Protocol and strike each of Plaintiffs' new documents and arguments from Plaintiffs' reply brief.

## II.   ARGUMENT

### a.   Plaintiffs' new evidence does not respond to arguments they could not anticipate.

As Plaintiffs concede and Discovery Order 9 confirms, the only discoverable user data is user data that Facebook **shares or makes accessible** to third parties. Since Judge Corley issued Discovery Order 9, the parties have repeatedly discussed Plaintiffs' unsupported position that the DYI files Facebook produced do not include all **shared** data Judge Corley found discoverable. Plaintiffs have never identified any shared data missing from Facebook's productions, and they did not do so in their opening brief. Instead, they demanded discovery **to look for** missing data.

Plaintiffs claim they introduced new evidence in their reply because they did not anticipate Facebook's argument that its production of DYI files for each Named Plaintiff satisfied its production obligations under Discovery Order 9. This position is preposterous. For more than one year, Facebook assured Plaintiffs that it has not identified user data associated with the Named Plaintiffs that could have been shared with third parties beyond what is reflected in the DYI files. *See* Opp. Ex. X at 2, 4. Facebook also explained why. *Id.* at 4–5. When a third party—such as an app developer or business partner—obtains user-related data, it accesses that data through an API. *Id.* & n.6. These APIs pull information exclusively from Facebook's "Social Graph." *See id.* And a user's DYI file contains a human-readable download of the most complete set of data about that user in the Social Graph (and more). *Id.* at 5; *see also* Opp. Ex. B (explaining the comprehensive nature of the data, ranging from inferred interests, to photos, logins, IP addresses, GPS coordinates, and activity on other websites).

Facebook explained all of this in meet-and-confer sessions, mediation sessions, court hearings, and letters. Indeed, Facebook sent a letter on April 1, 2021—more than six months before Facebook filed its opposition brief—laying out the exact arguments Facebook later made in opposition to Plaintiffs' motion to compel. This letter is Exhibit X to Facebook's opposition brief. Facebook wrote:

- "Facebook's current DYI tool reflects, in human-readable form, the most complete compilation of data Facebook maintains relating to any user, including any individual user data that third parties might have been able to access." Opp. Ex. X at 2.

- "[T]he DYI file is *overinclusive* of the universe of discoverable user data under Pretrial Order

20 and Discovery Order 9." *Id.* at 4.

- "Third parties who are permitted access to individualized data about Facebook users access that data through application programming interfaces . . . . All APIs Facebook has made available to third parties query Facebook's Social Graph." *Id.* at 4–5.

- "Third parties who are able to access individualized user data access that data through APIs that pull from Facebook's Social Graph only, and the DYI files Facebook produced reflect[] a human-readable version of the data relating to each Named Plaintiff in Facebook's Social Graph—including, but not limited to, the data that could have potentially been accessed by third parties." *Id.* at 6.

It is simply not true that Plaintiffs could not anticipate the arguments Facebook made in its opposition.

### b. The Special Master should strike Plaintiffs' new evidence.

It was Plaintiffs' burden in their motion to compel to identify a specific deficiency in Facebook's productions. If Plaintiffs believed they had evidence rebutting Facebook's assurances that its productions were complete, Plaintiffs should have introduced that evidence in their opening brief. But, unable to identify any **shared data that is not reflected in the DYI files** (the only data at issue), Plaintiffs argued they did not believe Facebook's representations and demanded discovery to test them.

In support of its opposition brief, Facebook submitted declarations from **three** company witnesses confirming the representations it made repeatedly and Plaintiffs claimed not to believe.

- Ben Mitchell testified: "The DYI file for each individual user represents the most complete and best compilation of data Facebook maintains associated with that user, and the best available compilation of the data about that user in the Social Graph, in a human-readable and producible form." Opp. Ex. C ¶ 5; *see also* Opp. Ex. X at 2, 5 & n.6.

- Karandeep Anand testified: "Facebook makes individualized data about Facebook users available to third parties—including app developers and partners—through application programing interfaces ('APIs')," and "[t]hese APIs pull data exclusively from Facebook's Social Graph." Opp. Ex. E ¶ 3; *see also* Opp. Ex. X at 4–5 & n.6.

- Sukhesh Miryala testified: "At no point in th[e] ads delivery process are data about users' off-Platform activities, or inferences derived from users' on-platform or off-platform activities sold to or otherwise shared with advertisers." Opp. Ex. D ¶ 8.[3]

Plaintiffs' reply brief does not even acknowledge this testimony, likely because it puts to rest Plaintiffs' claim that they need invasive discovery because they do not trust representations from Facebook's counsel. So with their feet to the fire—and Facebook no longer having an opportunity to respond—Plaintiffs larded up their reply with new arguments, materials, and requests, in what appears to be an ill-conceived effort to create confusion and distract from the issue before the Special Master.

---

[3] This testimony responded to Plaintiffs' argument that the DYI files do not include all "off-Platform activity" and "inferred data," which Plaintiffs argue Facebook uses in connection with placing advertisements.

Gibson, Dunn & Crutcher LLP

0360

Plaintiffs' motion concerns their accusation that Facebook has not produced all discoverable data relating to the Named Plaintiffs—which Judge Corley defined as data **shared** with third parties. Opp. Ex. P at 1–2. Plaintiffs filled their reply with new arguments and documents that Plaintiffs claim show Facebook **maintains** user data that is not included in the DYI files. Reply at 4–7. **But Plaintiffs did not argue that any of this data was ever shared and thus responsive; data that Facebook maintains without sharing is not responsive or relevant here**. Plaintiffs cite:

- Patents explaining that Facebook uses inferences to place advertisement (Reply at 4 n.1);

- A U.K. House of Commons Report that, without citation, speculates that Facebook maintains "advertising profiles" (Reply at 5);

- A spreadsheet Facebook created for Plaintiffs (new Exhibit E) showing apps the Named Plaintiffs used and those Apps' API permissions (Reply at 5);

- A spreadsheet Plaintiffs created (new Exhibit F), which they claim shows apps they used that are not listed in their DYI files (Reply at 6);

- Testimony that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ new Exhibit G) (Reply at 6);

- An internal email among Facebook employees (new Exhibit H) describing advertising targeting categories (Reply at 6–7)[4]; and

- Testimony from another case about "custom audiences" (new Exhibit C), which allows advertisers to provide an anonymized list of people for Facebook to serve an ad (Reply at 7). Plaintiffs say the DYI file does not have a list of custom audiences for each user,[5] and that advertisers might share their audiences with each other (not that Facebook shared them). *Id.*

Plaintiffs did not argue—much less demonstrate—that any of this information was ever **shared or made accessible** by Facebook to third parties. This approach is deliberately misleading and entirely inexcusable. Judge Corley allowed Plaintiffs a 30(b)(6) deposition specifically to ask whether any other data Facebook maintains was shared with third parties. Plaintiffs strategically avoided asking the most basic questions at the deposition about what data is shared. Indeed, even though Plaintiffs claim in their reply that Facebook has not produced all "appended data" and lists of "custom audiences," they spoke with Facebook's 30(b)(6) deponent at length about "appended data" and custom audiences, and

---

[4] Plaintiffs state that marketing materials show information about these categories was shared with third parties. But Plaintiffs conspicuously decline to cite any such materials—likely because the materials only show that Facebook shared with third parties the targeting *categories* that were available to place ads, and not which users fell into which categories. Plaintiffs' bald statement does not satisfy their burden.

[5] Plaintiffs say without citation that Facebook maintains lists of custom audiences associated with each user. It does not. Even if Facebook did, such information would not be relevant. Custom Audiences allows advertisers to *provide Facebook* anonymized user information to serve adds; the tool does not involve Facebook sharing user data with the advertiser.

Gibson, Dunn &
Crutcher LLP

did not ask him **any questions** about whether Facebook shares "appended data" outside of the Company or whether it shares individual user data with advertisers through its custom-audiences product. Opp. Ex. V at 73:17–80:10; 150:3–151:25; 193:2–194:9; 227:17–228:3 (custom audiences); *id.* at 58:24–59:20; 71:11–72:12; 80:11–81:4 (appended data). Plaintiffs' reply merely points to data Plaintiffs say Facebook *maintains*, after they tactically avoided asking whether that data was *shared*.

Plaintiffs' reply also argues that Facebook shares data with third parties through various mechanisms other than APIs, citing their new Exhibits C and D. Reply at 5. **These documents do not name a single mechanism through which data is transferred to third parties**, nor do they identify any data that Facebook has shared that is not in the DYI files.

Most bizarre, Plaintiffs claim that they properly requested and teed up the relief they sought in their opening brief—discovery regarding Facebook's databases—before they filed their motion, even though this information is not requested in any of the discovery requests they cited. Reply at 9. But the new exhibits Plaintiffs cite to support this position are a CCPA request seeking the data Facebook associates with the Named Plaintiffs (new Exhibit I) and Facebook's response, noting the request was not properly submitted and directing Plaintiffs to their DYI files (new Exhibit J). These materials have nothing to do with Plaintiffs' sudden demand for discovery about Facebook's data storage systems.

### c.   The Special Master should strike Plaintiffs' request for new relief.

Plaintiffs' abuse of their reply submission does not stop with new arguments and new evidence. They also requested new relief: answers to two interrogatories about third parties who may have received user data. Reply at 9. Plaintiffs' opening brief demanded technical details and background documents about Facebook's databases, and it mentioned these interrogatories (among other random discovery requests) only in passing. Mot. at 2–3, 13–14. As Facebook explained in its Separate Statement, the parties have never discussed Facebook's responses to these interrogatories, much less mediated them to impasse. The Special Master has made clear that he will strike from the parties' submissions arguments that stray beyond the impasse topic. Given that Plaintiffs' request was made for the first time in a reply brief, that rule should apply with even greater force here.

### III.   Conclusion

The Special Master should strike Plaintiffs' new arguments, evidence, and requests.

Gibson, Dunn &
Crutcher LLP

Dated: November 15, 2021

**GIBSON, DUNN & CRUTCHER, LLP**

By: */s/ Deborah Stein*

Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

Russell H. Falconer
rfalconer@gibsondunn.com
2001 Ross Avenue Suite 2100
Dallas, TX 75201
Telephone: 214.698.3170

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant Facebook, Inc.*

# Exhibit L

## PROOF OF SERVICE BY E-Mail

Re: In re: Facebook, Inc. Consumer Privacy User Profile Litigation (Special Master)
Reference No. 1200058674

I, Anne Lieu, not a party to the within action, hereby declare that on  November 29, 2021, I served

the attached ORDER RE: PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF PLAINTIFF DATA on

the parties in the within action by electronic mail at El Monte, CALIFORNIA, addressed as follows:

Martie P. Kutscher Clark Esq.
Gibson Dunn & Crutcher
1881 Page Mill Rd.
Palo Alto, CA   94304-1125
Phone: 650-849-5300
mkutscher@gibsondunn.com
    Parties Represented:
    Facebook, Inc.

Deborah L. Stein Esq.
Alexander P. Swanson Esq.
Gibson Dunn & Crutcher
333 S. Grand Ave.
52nd Floor
Los Angeles, CA   90071-3197
Phone: 213-229-7000
dstein@gibsondunn.com
aswanson@gibsondunn.com
    Parties Represented:
    Facebook, Inc.

David J. Ko Esq.
Derek W. Loeser Esq.
Cari C. Laufenberg Esq.
Keller Rohrback LLP
1201 Third Ave.
Suite 3200
Seattle, WA   98101-3052
Phone: 206-623-1900
dko@kellerrohrback.com
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
    Parties Represented:
    Bridgett Burk
    Cheryl Senko
    Jason Ariciu
    Jordan O'Hara
    Rev. Anthony Bell
    Samuel Armstrong
    Steven Akins
    Terry Fischer
    Tyler King

Chris Springer Esq.
Keller Rohrback LLP
801 Garden St.
Suite 301
Santa Barbara, CA   93101
Phone: 805-456-1496
cspringer@kellerrohrback.com
    Parties Represented:
    Bridgett Burk
    Cheryl Senko
    Jason Ariciu
    Jordan O'Hara
    Rev. Anthony Bell
    Samuel Armstrong
    Steven Akins
    Terry Fischer
    Tyler King

Lesley E. Weaver Esq.
Ms. Anne Davis
Matthew Montgomery Esq.
Bleichmar Fonti & Auld LLP
555 12th St.
Suite 1600
Oakland, CA   94607-3616
Phone: 415-445-4003
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
    Parties Represented:
    Bridgett Burk
    Cheryl Senko
    Jason Ariciu
    Jordan O'Hara
    Rev. Anthony Bell
    Samuel Armstrong
    Steven Akins
    Terry Fischer
    Tyler King

Matthew S. Melamed Esq.
Angelica M. Ornelas Esq.
Joshua D. Samra Esq.
Bleichmar Fonti & Auld LLP
555 12th St.
Suite 1600
Oakland, CA   94607-3616
Phone: 415-445-4003
mmelamed@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com
    Parties Represented:
    Bridgett Burk
    Cheryl Senko
    Jason Ariciu
    Jordan O'Hara
    Rev. Anthony Bell
    Samuel Armstrong
    Steven Akins
    Terry Fischer
    Tyler King

Orin S. Snyder Esq.
Gibson Dunn & Crutcher
200 Park Ave.
47th Floor
New York, NY   10166-0193
Phone: 212-351-4000
osnyder@gibsondunn.com
    Parties Represented:
    Facebook, Inc.

Joshua S. Lipshutz Esq.
Gibson Dunn & Crutcher
1050 Connecticut Ave NW
Washington, DC   20036
Phone: 202-9558500
JLipshutz@gibsondunn.com
    Parties Represented:
    Facebook, Inc.

Russell H. Falconer Esq.
Gibson Dunn & Crutcher
2001 Ross Ave.
Suite 2100
Dallas, TX   75201
Phone: 214-698-3100
rfalconer@gibsondunn.com
    Parties Represented:
    Facebook, Inc.

Colin B. Davis Esq.
Gibson Dunn & Crutcher
3161 Michelson Dr.
Irvine, CA   92612-4412
Phone: 949-451-3800
cdavis@gibsondunn.com
    Parties Represented:
    Facebook, Inc.

Ms. Laura C. Mumm
Gibson Dunn & Crutcher
200 Park Ave.

Benjamin Gould Esq.
Keller Rohrback LLP
1201 Third Ave.

New York, NY   10166
Phone: 212-351-4000
LMumm@gibsondunn.com
   Parties Represented:
   Facebook, Inc.

Suite 3200
Seattle, WA   98101-3052
Phone: 206-623-1900
bgould@kellerrohrback.com
   Parties Represented:
   Bridgett Burk
   Cheryl Senko
   Jason Ariciu
   Jordan O'Hara
   Rev. Anthony Bell
   Samuel Armstrong
   Steven Akins
   Terry Fischer
   Tyler King

      I declare under penalty of perjury the foregoing to be true and correct. Executed at El Monte,

CALIFORNIA on  November 29, 2021.


/s/ Anne Lieu
Anne Lieu
JAMS
alieu@jamsadr.com

0383

1    GIBSON, DUNN & CRUTCHER LLP          GIBSON, DUNN & CRUTCHER LLP
     Orin Snyder (*pro hac vice*)              Deborah Stein (SBN 224570)
2       osnyder@gibsondunn.com                  dstein@gibsondunn.com
     200 Park Avenue                          333 South Grand Avenue
3    New York, NY 10166-0193                  Los Angeles, CA 90071-3197
     Telephone: 212.351.4000                  Telephone: 213.229.7000
4    Facsimile: 212.351.4035                  Facsimile: 213.229.7520

5    Kristin A. Linsley (SBN 154148)          Joshua S. Lipshutz (SBN 242557)
        klinsley@gibsondunn.com                  jlipshutz@gibsondunn.com
6    Martie Kutscher (SBN 302650)             1050 Connecticut Avenue, N.W.
        mkutscherclark@gibsondunn.com         Washington, DC 20036-5306
7    555 Mission Street, Suite 3000           Telephone: 202.955.8500
     San Francisco, CA 94105-0921             Facsimile: 202.467.0539
8    Telephone: 415.393.8200
     Facsimile: 415.393.8306
9
     *Attorneys for Defendant Facebook, Inc.*
10

11                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
12                       SAN FRANCISCO DIVISION

13

14   IN RE: FACEBOOK, INC. CONSUMER          MDL NO. 2843
     PRIVACY USER PROFILE LITIGATION         CASE NO. 3:18-MD-02843-VC-JSC
15
                                             **FACEBOOK'S RESPONSE TO**
16   This document relates to:               **OBJECTION REGARDING NAMED**
                                             **PLAINTIFFS' DATA BRIEFING**
17   ALL ACTIONS
                                             Judge: Hon. Vince Chhabria
18                                           Hon. Jacqueline Scott Corley
                                             Special Master Daniel Garrie
19                                           Courtroom: 4, 17th Floor

20                                           JAMS Ref. No.: 1200058674

21

22

23

24

25

26

27

28

## I.    INTRODUCTION[1]

Plaintiffs' reply in support of their motion to compel data relating to the Named Plaintiffs is littered with new evidence and arguments in violation of the Special Master's rule that "[n]either party is permitted to submit new evidence in a Reply." JAMS Dkt. 1 ¶ 3. Under the Special Master's Protocol, these new documents and arguments should be stricken automatically. Yet Plaintiffs claim they properly **sought new relief** and introduced **twelve new documents** in a reply brief because, in response to Plaintiffs' motion arguing that Facebook's productions of data relating to the Named Plaintiffs are deficient, Facebook demonstrated that its productions are in fact complete.

Plaintiffs' submission demonstrates why the Special Master's prohibition on introducing new evidence and arguments in a reply is necessary and should be consistently enforced. The parties have been disputing the issues raised in Plaintiffs' motion for more than one year. During that time, Facebook explained repeatedly that the Download Your Information ("DYI") files it produced satisfied its production obligations under Discovery Order 9 and the technical reasons why this is so. If Plaintiffs believed they had evidence demonstrating that Facebook's productions were incomplete, that evidence belonged in Plaintiffs' opening brief. But rather than introduce any such evidence in their opening brief, Plaintiffs asked the Special Master to compel invasive discovery about Facebook's databases because Plaintiffs claimed not to believe Facebook's counsel's representations about its productions.

After Facebook demonstrated that Plaintiffs did not come close to meeting their burden on a motion to compel, Plaintiffs switched tunes in their reply brief. Once Facebook no longer had an opportunity to respond, Plaintiffs sought **new relief** and introduced **twelve new documents** that Plaintiffs suddenly claim show gaps in Facebook's productions.[2] It is clear why Plaintiffs did not introduce these documents earlier. Plaintiffs' reply plucks random statements out of context, and none of the documents they cite actually identifies data Facebook shared with third parties (the only data at issue), much less shared data that is missing from the nearly one million pages of DYI files produced.

The Special Master's Protocol is clear that this type of gamesmanship is not permitted.

---

[1] Because the Special Master instructed Facebook not to attach any evidence to this submission, the citations in this submission do not have hyperlinks. Facebook will submit a hyperlinked version at the Special Master's request.

[2] Each of the Facebook documents Plaintiffs introduced in their reply brief were produced many months before Plaintiffs filed their opening brief; some were produced more than one year ago.

1  Facebook respectfully requests that the Special Master invoke Paragraph 3 of his Protocol and strike

2  each of Plaintiffs' new documents and arguments from Plaintiffs' reply brief.

3  **II.  ARGUMENT**

4  **a.  Plaintiffs' new evidence does not respond to arguments they could not anticipate.**

5  As Plaintiffs concede and Discovery Order 9 confirms, the only discoverable user data is user

6  data that Facebook **shares or makes accessible** to third parties.  Since Judge Corley issued Discovery

7  Order 9, the parties have repeatedly discussed Plaintiffs' unsupported position that the DYI files

8  Facebook produced do not include all **shared** data Judge Corley found discoverable.  Plaintiffs have

9  never identified any shared data missing from Facebook's productions, and they did not do so in their

10  opening brief.  Instead, they demanded discovery **to look for** missing data.

11  Plaintiffs claim they introduced new evidence in their reply because they did not anticipate

12  Facebook's argument that its production of DYI files for each Named Plaintiff satisfied its production

13  obligations under Discovery Order 9.  This position is preposterous.  For more than one year, Facebook

14  assured Plaintiffs that it has not identified user data associated with the Named Plaintiffs that could

15  have been shared with third parties beyond what is reflected in the DYI files.  *See* Opp. Ex. X at 2, 4.

16  Facebook also explained why.  *Id.* at 4–5.  When a third party—such as an app developer or business

17  partner—obtains user-related data, it accesses that data through an API.  *Id.* & n.6.  These APIs pull

18  information exclusively from Facebook's "Social Graph."  *See id.*  And a user's DYI file contains a

19  human-readable download of the most complete set of data about that user in the Social Graph (and

20  more).  *Id.* at 5; *see also* Opp. Ex. B (explaining the comprehensive nature of the data, ranging from

21  inferred interests, to photos, logins, IP addresses, GPS coordinates, and activity on other websites).

22  Facebook explained all of this in meet-and-confer sessions, mediation sessions, court hearings,

23  and letters.  Indeed, Facebook sent a letter on April 1, 2021—more than six months before Facebook

24  filed its opposition brief—laying out the exact arguments Facebook later made in opposition to

25  Plaintiffs' motion to compel.  This letter is Exhibit X to Facebook's opposition brief.  Facebook wrote:

26  • "Facebook's current DYI tool reflects, in human-readable form, the most complete compilation
     of data Facebook maintains relating to any user, including any individual user data that third

27  parties might have been able to access."  Opp. Ex. X at 2.

28  • "[T]he DYI file is *overinclusive* of the universe of discoverable user data under Pretrial Order

20 and Discovery Order 9." *Id.* at 4.

- "Third parties who are permitted access to individualized data about Facebook users access that data through application programming interfaces . . . . All APIs Facebook has made available to third parties query Facebook's Social Graph." *Id.* at 4–5.

- "Third parties who are able to access individualized user data access that data through APIs that pull from Facebook's Social Graph only, and the DYI files Facebook produced reflect[] a human-readable version of the data relating to each Named Plaintiff in Facebook's Social Graph—including, but not limited to, the data that could have potentially been accessed by third parties." *Id.* at 6.

It is simply not true that Plaintiffs could not anticipate the arguments Facebook made in its opposition.

### b. The Special Master should strike Plaintiffs' new evidence.

It was Plaintiffs' burden in their motion to compel to identify a specific deficiency in Facebook's productions. If Plaintiffs believed they had evidence rebutting Facebook's assurances that its productions were complete, Plaintiffs should have introduced that evidence in their opening brief. But, unable to identify any **shared data that is not reflected in the DYI files** (the only data at issue), Plaintiffs argued they did not believe Facebook's representations and demanded discovery to test them.

In support of its opposition brief, Facebook submitted declarations from **three** company witnesses confirming the representations it made repeatedly and Plaintiffs claimed not to believe.

- Ben Mitchell testified: "The DYI file for each individual user represents the most complete and best compilation of data Facebook maintains associated with that user, and the best available compilation of the data about that user in the Social Graph, in a human-readable and producible form." Opp. Ex. C ¶ 5; *see also* Opp. Ex. X at 2, 5 & n.6.

- Karandeep Anand testified: "Facebook makes individualized data about Facebook users available to third parties—including app developers and partners—through application programing interfaces ('APIs')," and "[t]hese APIs pull data exclusively from Facebook's Social Graph." Opp. Ex. E ¶ 3; *see also* Opp. Ex. X at 4–5 & n.6.

- Sukhesh Miryala testified: "At no point in th[e] ads delivery process are data about users' off-Platform activities, or inferences derived from users' on-platform or off-platform activities sold to or otherwise shared with advertisers." Opp. Ex. D ¶ 8.[3]

Plaintiffs' reply brief does not even acknowledge this testimony, likely because it puts to rest Plaintiffs' claim that they need invasive discovery because they do not trust representations from Facebook's counsel. So with their feet to the fire—and Facebook no longer having an opportunity to respond—Plaintiffs larded up their reply with new arguments, materials, and requests, in what appears to be an ill-conceived effort to create confusion and distract from the issue before the Special Master.

---

[3] This testimony responded to Plaintiffs' argument that the DYI files do not include all "off-Platform activity" and "inferred data," which Plaintiffs argue Facebook uses in connection with placing advertisements.

1    Plaintiffs' motion concerns their accusation that Facebook has not produced all discoverable

2    data relating to the Named Plaintiffs—which Judge Corley defined as data **shared** with third parties.

3    Opp. Ex. P at 1–2. Plaintiffs filled their reply with new arguments and documents that Plaintiffs claim

4    show Facebook **maintains** user data that is not included in the DYI files. Reply at 4–7. **But Plaintiffs**

5    **did not argue that any of this data was ever shared and thus responsive; data that Facebook**

6    **maintains without sharing is not responsive or relevant here**. Plaintiffs cite:

7    - Patents explaining that Facebook uses inferences to place advertisement (Reply at 4 n.1);

8    - A U.K. House of Commons Report that, without citation, speculates that Facebook maintains
9      "advertising profiles" (Reply at 5);

     - A spreadsheet Facebook created for Plaintiffs (new Exhibit E) showing apps the Named
10     Plaintiffs used and those Apps' API permissions (Reply at 5);

11   - A spreadsheet Plaintiffs created (new Exhibit F), which they claim shows apps they used that
       are not listed in their DYI files (Reply at 6);

12
     - Testimony that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ new Exhibit G) (Reply at 6);
13

14   - An internal email among Facebook employees (new Exhibit H) describing advertising targeting
       categories (Reply at 6–7)[4]; and

15   - Testimony from another case about "custom audiences" (new Exhibit C), which allows
16     advertisers to provide an anonymized list of people for Facebook to serve an ad (Reply at 7).
       Plaintiffs say the DYI file does not have a list of custom audiences for each user,[5] and that
17     advertisers might share their audiences with each other (not that Facebook shared them). *Id.*

     Plaintiffs did not argue—much less demonstrate—that any of this information was ever **shared**
18
     **or made accessible** by Facebook to third parties. This approach is deliberately misleading and entirely
19
     inexcusable. Judge Corley allowed Plaintiffs a 30(b)(6) deposition specifically to ask whether any
20
     other data Facebook maintains was shared with third parties. Plaintiffs strategically avoided asking the
21
     most basic questions at the deposition about what data is shared. Indeed, even though Plaintiffs claim
22
     in their reply that Facebook has not produced all "appended data" and lists of "custom audiences," they
23
     spoke with Facebook's 30(b)(6) deponent at length about "appended data" and custom audiences, and
24

25   _____
     [4] Plaintiffs state that marketing materials show information about these categories was shared with third parties. But
26   Plaintiffs conspicuously decline to cite any such materials—likely because the materials only show that Facebook shared
     with third parties the targeting *categories* that were available to place ads, and not which users fell into which categories.
27   Plaintiffs' bald statement does not satisfy their burden.

     [5] Plaintiffs say without citation that Facebook maintains lists of custom audiences associated with each user. It does not.
28   Even if Facebook did, such information would not be relevant. Custom Audiences allows advertisers to *provide Facebook*
     anonymized user information to serve adds; the tool does not involve Facebook sharing user data with the advertiser.

did not ask him **any questions** about whether Facebook shares "appended data" outside of the Company or whether it shares individual user data with advertisers through its custom-audiences product. Opp. Ex. V at 73:17–80:10; 150:3–151:25; 193:2–194:9; 227:17–228:3 (custom audiences); *id.* at 58:24–59:20; 71:11–72:12; 80:11–81:4 (appended data). Plaintiffs' reply merely points to data Plaintiffs say Facebook *maintains*, after they tactically avoided asking whether that data was *shared*.

Plaintiffs' reply also argues that Facebook shares data with third parties through various mechanisms other than APIs, citing their new Exhibits C and D. Reply at 5. **These documents do not name a single mechanism through which data is transferred to third parties**, nor do they identify any data that Facebook has shared that is not in the DYI files.

Most bizarre, Plaintiffs claim that they properly requested and teed up the relief they sought in their opening brief—discovery regarding Facebook's databases—before they filed their motion, even though this information is not requested in any of the discovery requests they cited. Reply at 9. But the new exhibits Plaintiffs cite to support this position are a CCPA request seeking the data Facebook associates with the Named Plaintiffs (new Exhibit I) and Facebook's response, noting the request was not properly submitted and directing Plaintiffs to their DYI files (new Exhibit J). These materials have nothing to do with Plaintiffs' sudden demand for discovery about Facebook's data storage systems.

### c.   The Special Master should strike Plaintiffs' request for new relief.

Plaintiffs' abuse of their reply submission does not stop with new arguments and new evidence. They also requested new relief: answers to two interrogatories about third parties who may have received user data. Reply at 9. Plaintiffs' opening brief demanded technical details and background documents about Facebook's databases, and it mentioned these interrogatories (among other random discovery requests) only in passing. Mot. at 2–3, 13–14. As Facebook explained in its Separate Statement, the parties have never discussed Facebook's responses to these interrogatories, much less mediated them to impasse. The Special Master has made clear that he will strike from the parties' submissions arguments that stray beyond the impasse topic. Given that Plaintiffs' request was made for the first time in a reply brief, that rule should apply with even greater force here.

### III.   Conclusion

The Special Master should strike Plaintiffs' new arguments, evidence, and requests.

Dated:  November 15, 2021

**GIBSON, DUNN & CRUTCHER, LLP**

By: */s/ Deborah Stein*

Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Russell H. Falconer
rfalconer@gibsondunn.com
2001 Ross Avenue Suite 2100
Dallas, TX 75201
Telephone:  214.698.3170

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

1   Derek W. Loeser (admitted *pro hac vice*)      Lesley Weaver (Cal. Bar No.191305)
    KELLER ROHRBACK L.L.P.                         BLEICHMAR FONTI & AULD LLP
2   1201 Third Avenue, Suite 3200                  555 12th Street, Suite 1600
    Seattle, WA 98101                              Oakland, CA 94607
3   Tel.: (206) 623-1900                           Tel.: (415) 445-4003
    Fax: (206) 623-3384                            Fax: (415) 445-4020
4   dloeser@kellerrohrback.com                     lweaver@bfalaw.com

5

6   *Plaint.ₐfs' Co-Lead Counsel*

7   *Additional counsel listed on signature page*

8
                    **UNITED STATES DISTRICT COURT**
9                  **NORTHERN DISTRICT OF CALIFORNIA**
                      **SAN FRANCISCO DIVISION**
10

11
    IN RE: FACEBOOK, INC. CONSUMER          MDL No. 2843
12  PRIVACY USER PROFILE LITIGATION         Case No. 18-md-02843-VC-JSC

13  ────────────────────────────────        **CORRECTED DECLARATION OF**
                                            **DEREK LOESER IN SUPPORT OF**
14  This document relates to:               **REPLY IN SUPPORT OF PLAINTIFFS'**
                                            **MOTION TO COMPEL PRODUCTION OF**
15  ALL ACTIONS                             **NAMED PLAINTIFFS' CONTENT AND**
                                            **INFORMATION**
16
                                            Judge: Hon. Vince Chhabra
17                                          Hon. Jacqueline Scott Corley
                                            Special Master Daniel Garrie
18                                          Courtroom: 4, 17th Floor

19                                          JAMS Ref. No.: 1200058674

20                                          ORAL ARGUMENT REQUESTED

21
22
23
24
25
26
27
28

0391

1    I, Derek W. Loeser, declare and state as follows:

2        1.       I am a partner at the law firm of Keller Rohrback L.L.P. and am Co-Lead Counsel

3    for Plaintiffs in the above-captioned matter.

4        2.       I have personal knowledge of the facts set forth herein and, if called as a witness,

5    could and would testify competently to them.

6        3.       The following is offered solely for the purpose of responding to Facebook's

7    affirmative representations of fact in its Opposition to Plaintiffs' Motion to Compel Production of

8    Named Plaintiffs' Content and Information.

9        4.       Attached hereto as Exhibit A is a true and correct copy of a transcript of a case

10   management conference held on January 15, 2021 in this action.

11       5.       Attached hereto as Exhibit B is a true and correct copy of a document produced in

12   discovery in this action with Bates Number FB-CA-MDL-00203262.

13       6.       Attached hereto as Exhibit C is a true and correct copy of an excerpt from

14   deposition testimony by James L. Barnes, III on November 15, 2008 produced in discovery in this

15   action with Bates Number FB-CA-MDL-01841516.

16       7.       Attached hereto as Exhibit D is a true and correct copy of a document produced in

17   discovery in this action with Bates Number FB-CA-MDL-01191149-50 and attachment

18   presentation thereto.

19       8.       Attached hereto as Exhibit E is a true and correct copy of an excerpt of a

20   spreadsheet created by Facebook on March 18, 2021 and produced to Plaintiffs with Bates

21   Number FB-CA-MDL-01744596 which contains the names of applications associated with the

22   UIDs for the following Named Plaintiffs: Jason Ariciu            Sam Armstrong

23            Bridgett Burk            Jordan O'Hara            and Cheryl

24   Senko            . The excerpt contains the applications identified for Plaintiff Ariciu only.

25   Also included in the spreadsheet is information regarding the apps including

26                                     whether the apps remain installed by the Plaintiff

27                      and if the Plaintiff remains an active user of the app

28

1                   Various permissions associated with each app are also included:

2

3

4       9.      Plaintiffs conducted a thorough search of all documents produced by Facebook

5 and have not identified analogous information for the four other Named Plaintiffs.

6       10.     Attached hereto as Exhibit F is a true and correct copy of a spreadsheet created by

7 Plaintiffs reflecting a comparison of the apps identified in Exhibit E (Column B) versus the apps

8 identified in the DYI file produced by Facebook for Named Plaintiff Jason Ariciu ("Ariciu DYI

9 file") (INSERT BATES NUMBER). Listed in Column C are apps that appear in both Exhibit E

10 and the Ariciu DYI file. Listed in Column D are apps that are only identified in the Ariciu DYI

11 file.

12       11.     Attached hereto as Exhibit G is a true and correct copy of an excerpt from

13 deposition testimony by Konstantinos Papamiltiadis on February 23, 2021 in this action.

14       12.     Attached hereto as Exhibit H is a true and correct copy of documents produced in

15 discovery in this action with Bates Number FB-CA-MDL-00252922, FB-CA-MDL-00252923

16 and FB-CA-MDL-00252932.

17       13.     Attached hereto as Exhibit I is a true and correct copy of correspondence dated

18 February 26, 2020 sent from Plaintiffs' counsel to Defendant.

19       14.     Attached hereto as Exhibit J is a true and correct copy of correspondence dated

20 April 10, 2020 from Defendant to Plaintiffs' counsel.

21       I declare under penalty of perjury under the laws of the United States that the foregoing is

22 true and correct and to the best of my knowledge.

23

      Dated November 9, 2021.

24

25

26                                By: _____

27                                   Derek W. Loeser
                                  4881-4074-9058, v. 2

28

1    Derek W. Loeser (admitted *pro hac vice*)      Lesley Weaver (Cal. Bar No.191305)
     KELLER ROHRBACK L.L.P.                         BLEICHMAR FONTI & AULD LLP
2    1201 Third Avenue, Suite 3200                  555 12th Street, Suite 1600
     Seattle, WA 98101                              Oakland, CA 94607
3    Tel.: (206) 623-1900                           Tel.: (415) 445-4003
     Fax: (206) 623-3384                            Fax: (415) 445-4020
4    dloeser@kellerrohrback.com                     lweaver@bfalaw.com

5

6    *Plaintiffs' Co-Lead Counsel*

7    *Additional counsel listed on signature page*

8
                        UNITED STATES DISTRICT COURT
9                      NORTHERN DISTRICT OF CALIFORNIA
                          SAN FRANCISCO DIVISION
10

11
     IN RE: FACEBOOK, INC. CONSUMER          MDL No. 2843
12   PRIVACY USER PROFILE LITIGATION         Case No. 18-md-02843-VC-JSC

13                                           **REPLY IN SUPPORT OF PLAINTIFFS'**
     This document relates to:               **MOTION TO COMPEL PRODUCTION OF**
14                                           **NAMED PLAINTIFFS' CONTENT AND**
     ALL ACTIONS                             **INFORMATION**
15
                                             Judge: Hon. Vince Chhabra
16                                           Hon. Jacqueline Scott Corley
                                             Special Master Daniel Garrie
17                                           Courtroom: 4, 17th Floor

18                                           JAMS Ref. No.: 1200058674

19                                           ORAL ARGUMENT REQUESTED

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

I. INTRODUCTION ...................................................................................................... 1

3

II. Argument ................................................................................................................... 2

4

 A. Judge Corley's Orders Entitle Plaintiffs to the Discovery They Seek. ........................ 2

5

 B. Plaintiffs Are Entitled to Probe Facebook's Assertion That It Has Already
  Produced All the Content and Information It Has Shared with or Made Accessible

6

  to Third Parties. ............................................................................................................. 4

7

  1. Ample Evidence Casts Doubt on Facebook's Assertion. ..................................... 4

8

  2. Facebook Cannot Limit Its Discovery by Reference to Its Own View of
  Disputed Merits Issues, Since the Whole Point of Discovery Is to Help Resolve

9

  Such Issues. ............................................................................................................ 7

  3. The Cases on Which Facebook Relies Have No Relevance Here. ........................ 8

10

 C. As Facebook's Silence Confirms, Plaintiffs Are Entitled to Answers to

11

  Interrogatories Numbers 16 and 17. ............................................................................. 9

12

 D. The Relief Plaintiffs Are Requesting Is Intended to Lighten Facebook's Burden. ...... 9

13

III. CONCLUSION ......................................................................................................... 10

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

0395

# I.     INTRODUCTION

Plaintiffs' argument in support of its to compel the production of Plaintiffs' data and information is straightforward. All user data that has been shared or made accessible to third parties, from whatever source collected or inferred, is relevant and discoverable. There is concrete and compelling evidence that Facebook has not produced all such data for the Named Plaintiffs. Plaintiffs are not required to accept Facebook's contrary assertion, since what has been shared or made accessible is a disputed merits issue that Plaintiffs are entitled to probe. And Facebook has consistently refused to provide any transparency into what Facebook collects about users and for what purpose, let alone what Facebook possesses about the Named Plaintiffs.

Facebook's response to this straightforward argument is part and parcel of its abusive approach to discovery as a whole: deny, attack, and reverse the victim and the offender. Facebook denies the plain language of Judge Corley's orders and that its production is incomplete, and attacks Plaintiffs for having the temerity to seek the discovery they should have received a year ago. Instead, Facebook insists, Plaintiffs are the ones abusing the legal process, since (it says) they are taking a position contrary to the one they took in front of Judge Corley.

Facebook's attacks are unfounded and misleading. Plaintiffs have always sought, and continue to seek, content and information that has been shared with or made accessible to third parties. And they are not arguing that content and information is relevant if Facebook did not share it with or make it accessible to third parties. They are simply arguing that Facebook has not produced all of that relevant content and information, and that Facebook can't be the judge of what it means to share content and information or make it accessible to third parties. Plaintiffs are entitled to discover the information Judge Corley already has decided is relevant because the information will shed light on Facebook's misuse of user information on which the four categories of misconduct at the heart of this case are based.

Similarly meritless is the argument that Plaintiffs have no right to question Facebook's assertions. Plaintiffs have come forward with compelling evidence that Facebook has not produced all the content and information that has been shared with or made accessible to third

1  parties. Facebook fails to counter that evidence. And the notion that Plaintiffs must simply accept

2  Facebook's version of events—which is what Facebook's position amounts to—runs against the

3  whole purpose of discovery, which is to define and resolve disputed merits issues. Plaintiffs need

4  not accept Facebook's position on those merits issues in discovery.

5       For these reasons and the others laid out below, Plaintiffs' motion should be granted.

6  **II.    ARGUMENT**

7       **A.    Judge Corley's Orders Entitle Plaintiffs to the Discovery They Seek.**

8       In their motion, Plaintiffs explained why Judge Corley's orders entitle Plaintiffs to all the

9  content and information that Facebook collects, appends, and infers about the Named Plaintiffs,

10  regardless of whether Facebook *admits* that it is shared with or made accessible to third parties.

11  Mot. to Compel Production of Named Plaintiffs' Content and Information ("Mot.") at 8–9.

12  Facebook, however, takes the position that Judge Corley has affirmatively *foreclosed* Plaintiffs'

13  ability to receive the discovery they now seek. This extravagant position, whether framed as

14  judicial estoppel or as any other theory, should be rejected.

15       *First*, the position Plaintiffs have taken in front of Judge Corley is not inconsistent, let

16  alone "clearly inconsistent," with the position they take here. *New Hampshire v. Maine*, 532 U.S.

17  742, 750 (2001) (quotation and citation omitted). In front of Judge Corley, Plaintiffs argued that

18  when users' content and information was shared with or made accessible to third parties, it was

19  relevant, regardless of the source of the content and information. They reaffirm that position.

20  Plaintiffs are arguing not that content and information is relevant if Facebook did not share it with

21  or make it accessible to third parties, but rather that (1) Facebook *has not produced* all the content

22  and information that it has shared with or made accessible to third parties; and (2) Facebook is *not*

23  *allowed to be the judge* of what it did or did not share with or make accessible to third parties,

24  because that is a disputed merits issue. *See Hossaini v. W. Mo. Med. Ctr.*, 140 F.3d 1140, 1143

25  (8th Cir. 1998) (judicial estoppel did not apply because party's "underlying assertion" did not

26  change).  And Facebook's refusal even to identify what it has collected, appended, or inferred

27  about the Named Plaintiffs—including their profiles, *see infra* § B.1—is a serious gap in

28

1 | Facebook's production that prejudices Plaintiffs' ability to demonstrate the full scope of
2 | Facebook's misuse of user information.

3 | *Second*, Judge Corley nowhere ruled, or even suggested, that Plaintiffs may not probe
4 | Facebook's assertions about what it did or did not share with or make accessible to third parties.
5 | Quite the opposite. Allowing Plaintiffs to probe such assertions was one of the purposes of
6 | Discovery Order No. 11, which recognized that what information was shared with or made
7 | accessible to third parties was "an open question." Decl. of Derek W. Loeser in Supp. of Mot. to
8 | Compel Production of Named Plaintiffs' Content and Information ("Loeser Decl."), Ex. 6 at 1
9 | (filed originally as Dkt. No. 588). Discovery Order No. 12 makes it even clearer that Plaintiffs are
10 | entitled to probe Facebook's assertions, stating about the then-imminent depositions that
11 | "whether particular user data is not shared, not admissible, or not monetized, is not a valid reason
12 | to object to a particular deposition question." Loeser Decl., Ex. 7 at 1–2 (filed originally as Dkt.
13 | No. 602).

14 | *Third*, Facebook fails to explain how granting this motion would give Plaintiffs an "unfair
15 | advantage" or impose on Facebook an "unfair detriment." Opp'n to Pls.' Mot. to Compel
16 | Production of Named Plaintiffs' Content and Information ("Opp'n") at 12 (quotation and citation
17 | omitted). Again: at no point did Judge Corley suggest that Plaintiffs were not entitled to discovery
18 | to test Facebook's assertions about what it made accessible to or shared with third parties. When
19 | Plaintiffs expressed doubt that Facebook's production was complete, Judge Corley allowed
20 | Plaintiffs a 30(b)(6) deposition to inquire about how Facebook used the information it collected.
21 | And, crucially, she did not suggest that that deposition was the only inquiry that Plaintiffs could
22 | make: "And if you don't get what I think you should get, no one's going anywhere; we can come
23 | back and do it again. This is just to try to break through that logjam and *get started*." Decl. of
24 | Derek W. Loeser in Supp. of Reply in Supp. of Mot. to Compel Production of Named Plaintiffs'
25 | Content and Information ("Loeser Reply Decl."), Ex. A at 20 (emphasis added). The 30(b)(6)
26 | deposition, then, was merely the start of the process. Plaintiffs seek here to follow through on the
27 | critical inquiry that the deposition began. And, make no mistake about it, the question of what

28 |

1    information about the Named Plaintiffs was shared with or made accessible to third parties by

2    Facebook is a core issue in this litigation. Discovery Order No. 9 settled the question of whether

3    the full scope of information about the Named Plaintiffs collected or inferred by Facebook is

4    relevant. Facebook should not be allowed to circumvent that Order through the ruse of its

5    untested determination that none of the information it is withholding fits its self-serving definition

6    of sharing.

7         **B.    Plaintiffs Are Entitled to Probe Facebook's Assertion That It Has Already
              Produced All the Content and Information It Has Shared with or Made
8             Accessible to Third Parties.**

9         Facebook takes the position that the Court must simply take its word that it has already

10   produced all the content and information that has been shared with or made accessible to third

11   parties. This position should be rejected. First, there is ample concrete evidence that the content

12   and information that Facebook shares or makes accessible goes well beyond the content and

13   information that it has thus far produced. Second, Facebook cannot resist discovery simply by

14   relying on its own view of a disputed merits issue—here, what it means to share or make

15   accessible—since the whole point of discovery is to *resolve* such disputes.

16        **1.    Ample Evidence Casts Doubt on Facebook's Assertion.**

17        In their motion, Plaintiffs pointed to considerable evidence that Facebook's production

18   thus far does not capture all the user content and information that Facebook shares or makes

19   accessible to third parties. Mot. at 6–7, 9–10. Facebook's response to this evidence is limited and

20   unsatisfactory. It says that one of the documents cited is "hypothetical," but does not explain *why*

21   the discussion in that document—which certainly appears to be talking about real rather than

22   hypothetical capabilities—should be interpreted as hypothetical. Opp'n at 10. And it is utterly

23   silent about its patents and patent applications, *see* Mot. at 7,[1] which, along with other public

---

[1] *See also* U.S. Patent No. 9,740,752 (Aug. 22, 2017) ("A social networking system obtains
linguistic data from a user's text communications on the social networking system. . . . *The
inferred personality characteristics are stored in connection with the user's profile*, and may be
used for targeting, ranking, selecting versions of products, and *various other purposes*."
(emphasis added)); U.S. Patent Application Pub. No. US 2012/0016817 A1 (Jan. 19, 2012)
("[T]he system inputs the user data to the prediction algorithm to retrieve a Publication

information, verify the existence of a "user profile" that Facebook conceals from users but makes accessible to third parties such as advertisers. *See* U.K. House of Commons, Digital, Culture, Media and Sport Comm., *Disinformation and 'Fake News': Final Report* ¶ 41 at 17 (Feb. 14, 2019) ("[T]he advertising profile that Facebook builds up about users cannot be accessed, controlled or deleted by those users. It is difficult to reconcile this fact with [Mark Zuckerberg's] assertion that users own all 'the content' they upload.").

The evidence also contradicts Facebook's claim that APIs provided the only conduits for user content and information that was shared with or made accessible to third parties. *Cf.* Opp'n at 5.

_See_ Loeser Reply Decl., Ex. B at FB-CA-MDL-00203262 (Mar. 3, 2014 email from Aldo King, senior member of Facebook's Privacy Program); *id.*, Ex. C at 129:3-130:13 (James Barnes testimony regarding

*see also id.*, Ex. D at Slide 5

Facebook's other response to Plaintiffs' showing is to tout its DYI tool, which it calls "the most complete compilation of data Facebook maintains relating to any user." Opp'n at 2–3. However, the DYI tool lacks not only information that Facebook infers about Plaintiffs or that it collects about their off-platform activity, but also certain information about Plaintiffs' *on-platform* activity (*i.e.*, the first of Judge Corley's three categories of relevant discovery). For example, Facebook produced an attorney-created spreadsheet that show the apps that five (but not all nine) of the Named Plaintiffs used on the Facebook platform, as well as the corresponding API permissions granted those apps. *See* Loeser Reply Decl., Ex. E. Many of the apps listed on the spreadsheet are missing from the DYI file and vice versa. *See id.*, Ex. F. Furthermore, the DYI contains no information regarding API permissions granted apps. This gap indicates that the DYI file, contrary to Facebook's claims, is not actually complete, even as to on-platform activity. And

---

Classification prediction of whether the user will undergo one or more life change events. *The system updates the user's profile to indicate the life change event and provides advertisements to the user responsive to the prediction of one or more life change events.*" (emphasis added)).

1   when it comes to off-platform activity, Facebook concedes its DYI file is not complete.

2

3                                                              *See, e.g.*, *id.*, Ex. G at 98:21-24

4

5          Nor, crucially, does the DYI file include information about all the "custom audiences" that

6   Facebook put the Named Plaintiffs into. This "custom audiences" feature, as Facebook client

7   solutions manager James Barnes has testified, made available information about users that third

8   parties obtained from Facebook and that Facebook shared with other third-party advertisers.

9   "Custom audiences" makes this information available in several different ways, including by

10  matching hashed emails provided by advertisers and identifying Facebook users to the advertiser

11  based on the match;

12

13

14

15

16          *Id.*, Ex. C at 129:3-130:13. Moreover, Barnes testified that "[c]ustom audiences can also

17  be shared from one advertiser to another." *Id.* at 137:5-24. Facebook has not produced custom

18  audiences documents containing the information about Named Plaintiffs that third parties

19  obtained from Facebook or that Facebook shared with or made available to other third-party

20  advertisers through these means.

21          Other evidence also shows that Facebook both collects and shares information that is not

22  included in the DIY file. For example, a marketing document from Facebook's political

23  advertising group identifies

24

25

26

27                                                              *Id.*, Ex. H, at FB-CA-MDL-

28

1   00252922, ███████ the description continues, ████████

2 ████████████████████████████████████████████████████

3   ████ *Id.* This information is not included in the DIY file for the Named Plaintiffs,

4 notwithstanding marketing documents indicating that the information was shared with third

5 parties.

6                **2.**    **Facebook Cannot Limit Its Discovery by Reference to Its Own View of**

7                     **Disputed Merits Issues, Since the Whole Point of Discovery Is to Help Resolve Such Issues.**

8       According to Facebook, Plaintiffs must accept its claim that the only content and

9 information that was shared with or made accessible to third parties has already been produced.

10 What data was shared with or made accessible to third parties is a central and disputed merits

11 issue, however. A party may not use its own view of a merits issue—here, what it means to share

12 or make accessible—to define the permissible limits of discovery. None of the cases that

13 Facebook cites suggests that a party may do so. Indeed, if parties were required to accept another

14 party's view on the scope of appropriate discovery, there would be no role for a motion to compel

15 under Rule 26(b).

16       Discovery is not the appropriate stage to resolve "disputed legal and factual issues on the

17 merits." *Fauceglia v. Univ. of S. California*, No. CV1904738FMOJEMX, 2020 WL 12048986, at

18 *1 (C.D. Cal. Oct. 5, 2020); *see also Karnoski v. Trump*, No. C17-1297 MJP, 2020 WL 2800609,

19 at *1 (W.D. Wash. May 29, 2020) (ruling on defendants' motion for protective order, noting that

20 defendants had "confused the evidentiary standard at trial with the broader discovery standard,

21 which allows parties to obtain discovery regarding any nonprivileged matter that is relevant to

22 any party's claim or defense"). This should not be a controversial proposition, since discovery is

23 meant to be a way of clarifying and defining the disputed issues. *See, e.g.*, *Bolling v. Dendreon*

24 *Corp.*, No. C13-0872JLR, 2015 WL 11233202, at *2 (W.D. Wash. June 19, 2015) (discovery's

25 purpose is to provide "litigants with the information essential to resolving disputed facts in an

26 expeditious manner" (citing *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993)). It would short

27 circuit the whole process if one party can resolve disputed issues on its own, and in advance of

28

1    discovery. And, indeed, Facebook has so far stymied the ordinary course of discovery by refusing

2    to produce information already deemed relevant by Judge Corley—information that Plaintiffs

3    have been seeking for several years.

4              **3.    The Cases on Which Facebook Relies Have No Relevance Here.**

5              Facebook cites several cases to support its opposition. Its reliance on these cases

6    demonstrates just how far Facebook strays from the relevant legal issues.

7              For example, Facebook cites *Bresk v. Unimerica Ins. Co.*, No. CV 16-8893 ODW (SSx),

8    2017 WL 10439831 (C.D. Cal. Nov. 16, 2017), for the proposition that "[a] plaintiff's mere

9    suspicion that additional documents must exist is an insufficient basis to grant a motion to

10   compel." *Id.* at *5. But Facebook does not dispute that the documents Plaintiffs seek *exist*; it does

11   not deny that it has collected or inferred additional content and information about the Named

12   Plaintiffs. The dispute is simply whether the documents that Plaintiffs seek have certain

13   properties—i.e., they have been shared with or made accessible to third parties. And on that issue,

14   Plaintiffs are entitled to see for themselves and not take Facebook's word for it, especially since

15   they have considerable evidence that Facebook has not produced all the content and information

16   that has been shared with or made accessible to third parties. As *Bresk* notes, if a moving party

17   has "a colorable basis for its belief that relevant, responsive documents exist and are being

18   improperly withheld," the party's motion should be granted. *Id.*; *see also id.* at *5–6 (granting

19   motion to compel because there was no denial that documents sought did not exist).

20             The other cases that Facebook cites are about "discovery on discovery"—"discovery into

21   another party's discovery process"—and state that such discovery will not be allowed without the

22   identification of a specific deficiency in a production or response. *Uschold v. Carriage Servs.,*

23   *Inc.*, 2019 WL 8298261, at *4 (N.D. Cal. Jan. 22, 2019); *accord Brewer v. BNSF Railway*, 2018

24   WL 1756432, at *4 (D. Mont. Jan. 11, 2018); *Han v. Futurewei Techs., Inc.*, 2011 WL 4344301,

25   at *5 (S.D. Cal. Sept. 15, 2011). But Plaintiffs do not want to inquire into Facebook's discovery

26   process. To the extent they seek information on potential sources of discovery, they seek it not to

27   audit past discovery, but to minimize future burden. *See infra* § D. And, at any rate, Plaintiffs

28

1  *have* identified substantial deficiencies in Facebook's production. *See supra* § B.1; Mot. at 6–7,
2  9–10.

3
4
    **C.**    **As Facebook's Silence Confirms, Plaintiffs Are Entitled to Answers to Interrogatories Numbers 16 and 17.**

5      Facebook maintains total silence about two major discovery requests encompassed by
6  Plaintiffs' motion: interrogatories numbers 16 and 17. *See* Mot. at 2, 6; Pls.' Separate Statement
7  at 3–4. These interrogatories asked Facebook to identify the third parties that were given access to
8  the Named Plaintiffs' content and information, and to identify the content and information to
9  which they had access. Facebook does not even attempt to explain why it should not answer these
10  interrogatories. It should be ordered to do so.

11
12
    **D.**    **The Relief Plaintiffs Are Requesting Is Intended to Lighten Facebook's Burden.**

13      No good deed goes unpunished. In crafting their requested relief, Plaintiffs sought to
14  lighten the burden on Facebook and, to the extent possible, to forestall the production of content
15  and information that was not shared with or made accessible to third parties. Facebook now
16  accuses Plaintiffs of sidestepping discovery mediation. But Plaintiffs' requested relief is
17  consistent with the relief they previously requested and with the Federal Rules.

18      Indeed, Plaintiffs have repeatedly asked Facebook to provide information that would
19  enable them to help identify relevant information and reduce Facebook's burden. *See* Mot. 7–8.
20  Plaintiffs have even invoked the California Consumer Privacy Act to try get more information—a
21  request that was refused. Loeser Reply Decl., Ex. I; *id.*, Ex. J; *see also* Cal. Civ. Code §
22  1798.100(a) ("A consumer shall have the right to request that a business that collects a
23  consumer's personal information disclose to that consumer the categories and specific pieces of
24  personal information the business has collected.").

25      Through discovery mediation, Plaintiffs have also continually sought other information
26  that would help narrow the production, including data models, schemas, snapshots, relevant API
27  and SDK calls, the parties that were permitted to make such calls against Named Plaintiffs' data,

28

and more. Mot. at 13; Loeser Decl., Ex. 15. Again, Facebook has refused to respond. Plaintiffs'

requested relief dovetails with these prior efforts. The contention that Plaintiffs are evading

discovery mediation and shifting their position is disingenuous. Disclosure of what Facebook

possesses about the Named Plaintiffs is a reasonable next step toward resolution of this issue.

The Federal Rules of Civil Procedure independently entitle Plaintiffs to the information

they seek on data sources, precisely because it will allow them to determine what has been

withheld. That is the purpose of Rule 34(b)(2)(C), which requires an objecting party to "state

whether any responsive materials are being withheld on the basis of that objection." It cannot be

too much to ask Facebook to comply with the Rules. For this reason, at this stage of the litigation,

Plaintiffs have requested that Facebook identify the relevant data sources, their purpose for

collection, retention periods, the full profiles of the Named Plaintiffs, and other information

relevant to crafting an efficient discovery plan, both as to the Named Plaintiffs and on a classwide

basis.

## III.    CONCLUSION

For the reasons laid out above and in their October 18 submission, Plaintiffs' motion

should be granted.

Dated: November _2, 2021                          Respectfully submitted,

KELLER ROHRBACK L.L.P.                            BLEICHMAR FONTI & AULD LLP

By:    */s/ Derek W. Loeser*                      By:    */s/ Lesley E. Weaver*
       Derek W. Loeser                                   Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)         Lesley E. Weaver (SBN 191305)
Cari Campen Laufenberg (admitted *pro hac vice*)  Anne K. Davis (SBN 267909)
David Ko (admitted *pro hac vice*)                Matthew S. Melamed (SBN 260272)
Adele A. Daniel (admitted *pro hac vice*)         Angelica M. Ornelas (SBN 285929)
Benjamin Gould (SBN 250630)                       Joshua D. Samra (SBN 313050)
1201 Third Avenue, Suite 3200                     555 12th Street, Suite 1600
Seattle, WA 98101                                 Oakland, CA 94607
Tel.: (206) 623-1900                              Tel.: (415) 445-4003
Fax: (206) 623-3384                               Fax: (415) 445-4020
dloeser@kellerrohrback.com                        lweaver@bfalaw.com
claufenberg@kellerrohrback.com                    adavis@bfalaw.com
dko@kellerrohrback.com                            mmelamed@bfalaw.com
adaniel@kellerrohrback.com                        aornelas@bfalaw.com
bgould@kellerrohrback.com                         jsamra@bfalaw.com

0405

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com


*Plaintiffs' Co-Lead Counsel*

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley Weaver (Cal. Bar No.191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaint,ifs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **DECLARATION OF DEREK LOESER IN SUPPORT OF REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION**<br><br>Judge: Hon. Vince Chhabra<br>Hon. Jacqueline Scott Corley<br>Special Master Daniel Garrie<br>Courtroom: 4, 17th Floor<br><br>JAMS Ref. No.: 1200058674<br><br>ORAL ARGUMENT REQUESTED |

I, Derek W. Loeser, declare and state as follows:

1. I am a partner at the law firm of Keller Rohrback L.L.P. and am Co-Lead Counsel for Plaintiffs in the above-captioned matter.

2. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently to them.

3. The following is offered solely for the purpose of responding to Facebook's affirmative representations of fact in its Opposition to Plaintiffs' Motion to Compel Production of Named Plaintiffs' Content and Information.

4. Attached hereto as Exhibit A is a true and correct copy of a transcript of a case management conference held on January 15, 2021 in this action.

5. Attached hereto as Exhibit B is a true and correct copy of a document produced in discovery in this action with Bates Number FB-CA-MDL-00203262.

6. Attached hereto as Exhibit C is a true and correct copy of an excerpt from deposition testimony by James L. Barnes, III on November 15, 2008 produced in discovery in this action with Bates Number FB-CA-MDL-01841516.

7. Attached hereto as Exhibit D is a true and correct copy of a document produced in discovery in this action with Bates Number FB-CA-MDL-01191149-50 and attachment presentation thereto.

8. Attached hereto as Exhibit E is a true and correct copy of a spreadsheet created by Facebook on March 18, 2021 and produced to Plaintiffs with Bates Number FB-CA-MDL-01744596 which contains the names of applications associated with the UIDs for the following Named Plaintiffs: Jason Ariciu ████████████ ), Sam Armstrong ████████████ Bridgett Burk ████████████ Jordan O'Hara ████████████ and Cheryl Senko (████████████ Also included in the spreadsheet is information regarding the apps including ████████████ ████████████ whether the apps remain installed by the Plaintiff ████████████ and if the Plaintiff remains an active user of the app ████████████ Various permissions associated with each app are also included:

████████████████████████████████████

████████████████████████

9. Plaintiffs conducted a thorough search of all documents produced by Facebook and have not identified analogous information for the four other Named Plaintiffs.

10. Attached hereto as Exhibit F is a true and correct copy of a spreadsheet created by Plaintiffs reflecting a comparison of the apps identified in Exhibit _ (Column B) versus the apps identified in the DYI file produced by Facebook for Named Plaintiff Jason Ariciu ("Ariciu DYI file") (INSERT BATES NUMBER). Listed in Column C are apps that appear in both Exhibit _ and the Ariciu DYI file. Listed in Column D are apps that are only identified in the Ariciu DYI file.

11. Attached hereto as Exhibit G is a true and correct copy of an excerpt from deposition testimony by Konstantinos Papamiltiadis on February 23, 2021 in this action.

12. Attached hereto as Exhibit H is a true and correct copy of documents produced in discovery in this action with Bates Number FB-CA-MDL-00252922, FB-CA-MDL-00252923 and FB-CA-MDL-00252932.

13. Attached hereto as Exhibit I is a true and correct copy of correspondence dated February 26, 2020 sent from Plaintiffs' counsel to Defendant.

14. Attached hereto as Exhibit J is a true and correct copy of correspondence dated April 10, 2020 from Defendant to Plaintiffs' counsel.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and to the best of my knowledge.

Dated November 2, 2021.

By: _____
Derek W. Loeser

# Exhibit A

0410

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Magistrate Judge

```
                              )
IN RE:  FACEBOOK, INC.        )  NO. 18-MD-02843 VC (JSC)
        CONSUMER PRIVACY USER )
        PROFILE LITIGATION.   )
                              )
_____)
```

San Francisco, California
Friday, January 15, 2021

**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:

KELLER ROHRBACK LLP
1201 Third Avenue, Suite 3200
Seattle, Washington  98101
BY: **DEREK W. LOESER, ATTORNEY AT LAW**
**CARI C. LAUFENBERG, ATTORNEY AT LAW**
**DAVID KO, ATTORNEY AT LAW**
**CHRIS SPRINGER, ATTORNEY AT LAW**

BLEICHMAR, FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, California  94607
BY: **LESLEY E. WEAVER, ATTORNEY AT LAW**
**MATTHEW MONTGOMERY, ATTORNEY AT LAW**
**ANGELICA M. ORNELAS, ATTORNEY AT LAW**
**ANNE K. DAVIS, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported Remotely By: Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official U.S. Reporter

1   **APPEARANCES VIA ZOOM:**   (CONTINUED)

2   For Defendant:

3                           GIBSON, DUNN & CRUTCHER LLP
                            333 South Grand Avenue
                            Los Angeles, California 90017
4             BY:   **DEBORAH L. STEIN, ATTORNEY AT LAW**

5                           GIBSON, DUNN & CRUTCHER LLP
                            2001 Ross Avenue, Suite 2100
6                           Dallas, Texas 75201
              BY:   **RUSSELL H. FALCONER, ATTORNEY AT LAW**

7
8                           GIBSON, DUNN & CRUTCHER LLP
                            1050 Connecticut Avenue, NW
                            Washington, D.C.  20036
9             BY:   **JOSHUA S. LIPSHUTZ, ATTORNEY AT LAW**

10                          GIBSON, DUNN & CRUTCHER LLP
                            555 Mission Street, Suite 3000
11                          San Francisco, California  94105
              BY:   **MARTIE P. KUTSCHER CLARK**
12                        **ATTORNEY AT LAW**

13

14

15

16

17

18

19

20

21

22

23

24

25

And so there have been representations that have been made that the stuff that's been produced is all. So there are people there.

So, Facebook, identify to plaintiffs who's going to be the deponent. Right?

That'll then let you know somewhat what that person knows or doesn't know. And then the same thing with the monetization.

I think that's a start, and then you go and we'll see what we get. And if you don't get what I think you should get, no one's going anywhere; we can come back and do it again. This is just to try to break through that logjam and get started.

MR. LOESER: I hear that, Your Honor, and I appreciate that. And obviously, we will jump right in and try and do that. I think Facebook obviously understands that this is a witness that's supposed to be prepared to testify, and so hopefully the witness comes prepared to testify about the full range of topics that these issues relate to.

THE COURT: Well, that's what Ms. Stein said. That's why she sent the letter, because they understand that they have to prepare the witness to testify.

MR. LOESER: But --

MS. STEIN: That's exactly --

MR. LOESER: -- I mean, I don't want to bore -- you know, I'm sorry to -- we can move on; but what the letter says

# Exhibit B

.

| | |
|---|---|
| **From:** | Scott Renfro </O=THEFACEBOOK/OU=EXTERNAL (FYDIBOHF25SPDLT)/CN=RECIPIENTS/CN=EC939C23AC4348C6B7F2B4AE6DE65518> |
| **Sent:** | Tuesday, March 04, 2014 2:33 PM |
| **To:** | Maritza Johnson; Rob Sherman; Erin Egan |
| **Subject:** | FW: 3rd party ads data |

On 3/3/14, 2:26 PM, "Aldo King" <aiking@fb.com> wrote:

+ Ed, Shirine, and Mark for reference

Here are most of the places where 3rd party data connects into or out of the ads system:

█████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████

### Custom Audiences
We allow advertisers to upload lists of their customers to have ads shown to them on Facebook.  We create custom audiences today based on email addresses, phone numbers, FB user id's, and Apple iOS IDFAs.  We also allow mobile app developers to create custom audiences based on information that they have provided to Facebook via the FB mobile SDKs (below).

### FB Mobile SDKs
Developers can choose to send information about how their users interact with their apps to Facebook.  Developers can set up "custom app events" within their app using the FB Mobile SDKs.  When a user does a pre-defined action, developers can have the FB SDK send each activity to Facebook.  We log that information to count app installs and aggregate them for app analytics. By default, the SDK is set to report installs only (through the developer can turn this off).  ████████████████████████

### Conversion Tracking
Websites can implement a Facebook pixel that is triggered when users land on specific pages.  The pixel sends information from the user's FR cookie to Facebook and we attribute the conversion with a specific ad.

### Website Custom Audiences
Websites can implement a Facebook pixel (different from conversion tracking) that is triggered when users land on specific pages.  The pixel sends information from the user's FR cookie to Facebook.  Facebook resolves that info back to a specific user and Facebook places that user into a custom audience for that advertiser.  Users can opt-out of this process through a cookie-based opt-out accessible from the Ads privacy settings page on Facebook.

### Partner Categories
Facebook partners with select data partners and allows that to create custom audiences based on their own data.  These custom audiences (called "Partner Categories") are then available for use by any advertiser on Facebook.  ███████████████████

███████████████████████████████████

████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

1



On 3/3/14, 6:40 AM, "Scott Renfro" <srenfro@fb.com> wrote:

Can you give me a quick summary of our use of 3rd party data for ads? Feel free to cc relevant folks from ads.

I'm in DC this week for discussions about big data and privacy and ads seems to be the main place we're leveraging non-FB data directly or indirectly.

**Highly Confidential - Attorneys' Eyes Only**

0416
FB-CA-MDL-00203263

# Exhibit C

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of:               )

                                ) File No. SF-04223-A

FACEBOOK, INC.                  )


WITNESS:  James L. Barnes, III

PAGES:    1 through 238

PLACE:    Securities and Exchange Commission

          44 Montgomery Street, Suite 2800

          San Francisco, CA  94104

DATE:     Friday, November 16, 2018


    The above-entitled matter came on for hearing,

pursuant to notice, at 9:05 a.m.


Diversified Reporting Services, Inc.

(202)467-9200

Highly Confidential - Attorneys' Eyes Only

1    APPEARANCES:

2

3    On behalf of the Securities and Exchange Commission:

4        MATTHEW G. MEYERHOFER, ESQ.

5        ROBERT TASHJIAN, ESQ.

6        TRACY DAVIS, ESQ.

7        Securities and Exchange Commission

8        Division of Enforcement

9        44 Montgomery Street, 28th Floor

10       San Francisco, California 94104

11       (415) 705-2487

12       meyerhoferm@sec.gov

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Attorneys' Eyes Only

FB-CA-MDL-01841517

1  list are also using Facebook and then to target those

2  people with advertising.

3      Q    And there are different ways to create these

4  custom audiences, I take it?

5      A    Correct.

6      Q    So one way would be through emails?

7      A    Correct.

8      Q    So if you had a list of emails you could upload

9  that list in a hashed form to the Facebook platform, and

10  Facebook would do the matching and find that Facebook

11  user who matches that email?

12      A    Correct.

13      Q    What are the other kinds of custom audiences?

14      A    So website custom audiences come from a piece

15  of code called the Facebook pixel the advertisers can

16  place on their website that check to see if a Facebook

17  cookie is on someone's machine, and if so, then

18  communicates back this person has been to the website,

19  which is something you will also hear referred to as

20  remarketing.  So that's website custom audiences.

21          We have mobile app custom audiences which are

22  gained from mobile app identifiers.



Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only

FB-CA-MDL-01841645

[REDACTED]

10    **Q    Uh-huh.**

11    A    And so as I mentioned, there are lots of

12    different sources of custom audiences.  Custom audiences

13    can also be shared from one advertiser to another.

14          Annie says, "I mean" -- she mentioned ▮▮▮▮ at

15    the top, and she says, "I mean, you can basically assume

16    that most offline audiences are SCL, too, even if not

17    labeled."

18          I think -- you know, I don't have a

19    recollection of this conversation.  But based off of the

20    context here and based off of what I know about how

21    custom audiences work, I think the FB like-issue is more

22    likely to refer to the offline audiences that Annie

23    refers to than the email custom audiences that I refer

24    to.

25                    FURTHER EXAMINATION

Highly Confidential - Attorneys' Eyes Only

# Exhibit D

# Exhibit E

# Exhibit F

# Exhibit G

1  UNITED STATES DISTRICT COURT

2  NORTHERN DISTRICT OF CALIFORNIA

3

4  IN RE: FACEBOOK, INC. CONSUMER ) MDL No. 2843

5  PRIVACY USER PROFILE LITIGATION) Case No.

6  _____ ) 18-md-02843-VC

7  This document relates to:      )

8  ALL ACTIONS                    )

9  _____)

10

11

12

13  *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

14

15

16  REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

17  FACEBOOK INC. REPRESENTATIVE,

18  KONSTANTINOS PAPAMILTIADIS

19  TUESDAY, FEBRUARY 23, 2021

20

21

22

23

24

25

Page 1

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE: FACEBOOK, INC. CONSUMER ) MDL No. 2843

5    PRIVACY USER PROFILE LITIGATION) Case No.

6    _____) 18-md-02843-VC

7    This document relates to:      )

8    ALL ACTIONS                    )

9    _____)

10

11

12

13

14

15

16    Videotaped deposition of FACEBOOK, INC.

17    REPRESENTATIVE, KONSTANTINOS PAPAMILTIADIS taken via

18    virtual Zoom, commencing at 9:10 a.m. and ending at

19    3:58 p.m., on Tuesday, February 23, 2021, before Ashala

20    Tylor, CSR No. 2436, RPR, CRR, CLR.

21

22

23

24

25

Page 2

| | | |
|---|---|---|
| 1 | information that Facebook has for you. | 11:03 |
| 2 | Q. Okay. And going back to the activity log, | 11:03 |
| 3 | it's a list of every single action you have taken on | 11:03 |
| 4 | Facebook. Do you mean on the platform? | 11:03 |
| 5 | A. I believe it's on the platform, yes. | 11:03 |
| 6 | Q. Okay. So is it limited to only the | 11:03 |
| 7 | activity on the platform? | 11:03 |
| 8 | A. The Facebook activity log, yes. | 11:04 |
| 9 | Q. Okay. And back to the DYI. You say it's | 11:04 |
| 10 | all the information that Facebook has for you; is | 11:04 |
| 11 | that correct? | 11:04 |
| 12 | A. Yes. | 11:04 |
| 13 | Q. What do you mean by that? | 11:04 |
| 14 | A. It includes from things from like the | 11:04 |
| 15 | information you submitted when you created your | 11:04 |
| 16 | account, to the photos that you may have uploaded, | 11:04 |
| 17 | to the pixels of your friends you may have liked, to | 11:04 |
| 18 | the ads you may have seen, the videos you may have | 11:04 |
| 19 | watched. It's a -- it's a very lengthy, you know, | 11:04 |
| 20 | like document with different things. | 11:04 |
| 21 | | 11:04 |
| 22 | | 11:04 |
| 23 | | 11:04 |
| 24 | | 11:04 |
| 25 | | 11:04 |

Page 98

# Exhibit H

# Exhibit I




February 26, 2020

**VIA ELECTRONIC MAIL**

Facebook, Inc.
1 Hacker Way
Menlo Park, California 94025
Privacynotice-facebook@support.facebook.com

Re:     Request pursuant to CCPA § 1798.100 *et seq*., for identification of information and data collected

Dear Facebook, Inc:

We write on behalf of the below-listed Facebook users:

- Steven Akins (thaturmoil@gmail.com; steven.t.akins.3@facebook.com; stevenakins@hotmail.com)
- Jason Ariciu (jariciu@gmail.com; jariciu@att.net; jasedwa@facebook.com)
- Samuel Armstrong (armstrong9692@gmail.com; loveecheese@facebook.com)
- Anthony Bell (whfcmembers@verizon.net; newbellbackup@gmail.com)
- Bridgett Burk (missourichick@gmail.com; deletedsoul@gmail.com)
- Brendan Carr (brendan.m.carr3@gmail.com; bman03@sbcglobal.net; bcarr333@facebook.com)
- Terry Fischer (tlfischer975@yahoo.com)
- Shelly Forman (forman4227@gmail.com)
- Mary Beth Grisi (MaryBeth.grisi@gmail.com; marybeth.cheslock@gmail.com; marybeth.cheslock@facebook.com)
- Tabielle Holsinger (https://www.facebook.com/Belle.Holsinger; belle123abc@gmail.com; belle.holsinger@facebook.com; tabielleholsinger@boisestate.edu; holsinger4clerk@gmail.com)
- Taunna Lee Johnson (briefspace@hotmail.com; taunnaj@facebook.com; taunna2008@yahoo.com; taunna@mail.com)
- Olivia Johnston (Ojohnston00@gmail.com; johns364@csusm.edu)
- Tyler King (damendesigns@aol.com; contact.tylerking@gmail.com)
- Ashley Kmieciak (ashleypierce1991@gmail.com; ashpierce24@facebook.com)
- William Lloyd (will.1@juno.com; 100008249950332@facebook.com)
- Ian Miller (rev.ianmiller@yahoo.com)
- Jordan O'Hara (zapj080@aa.edu; ohara@uoregon.edu; jordan.ohara11@gmail.com; cavalierofcarnage@gmail.com; jordan.ohara.92@facebook.com)

- Kimberly Robertson (kimee98@comcast.net; kimberly.robertson.129@facebook.com)
- Scott Schinder (scottschinder@gmail.com; scottschinder@facebook.com; sschinder@nyc.rr.com; scottschinder@aol.com)
- Cheryl Senko (cherylsenko@att.net; cheryl@mayfieldcollisioncenter.com; cheryl.senko@facebook.com)
- Dustin Short (short109290@gmail.com; dustinshort82185@yahoo.com)
- Tonya Smith (tonyasmith_74@yahoo.com; tonyaranismith@facebook.com)
- Charnae Tutt (idontcharba@gmail.com; ctuttking@gmail.com; mrstuttmccladdie@gmail.com; king_lukemccladdie@live.com)
- Juliana Watson (juliana0404@hotmail.com)

Pursuant to Facebook, Inc.'s own privacy policy[1] and the California Consumer Privacy Act, Cal Civ. Code § 1798.100 *et seq.*, we hereby request that the following data be delivered to them care of this law firm:

1. All categories and specific pieces of personal information about them collected by Facebook, Inc., to include:
   a. The categories of personal information Facebook, Inc. has collected about them.
   b. The categories of sources from which their personal information is collected.
   c. The business or commercial purpose for collecting their personal information.
   d. The categories of third parties with whom Facebook, Inc. shares personal information.
   e. The specific pieces of personal information Facebook, Inc. has collected about them.
2. All categories and specific pieces of personal information about them sold by Facebook, Inc. or disclosed for a business purpose by Facebook, Inc., to include:
   a. The categories of personal information that Facebook, Inc. collected about them.
   b. The categories of personal information that Facebook, Inc. sold about them.
   c. The categories of third parties to whom my personal information was sold, by category or categories of personal information for each third party to whom their personal information was sold.
   d. The business or commercial purpose for selling my personal information.
   e. The categories of personal information that Facebook, Inc. disclosed about them for a business purpose.

Further, on behalf of these clients, we direct Facebook, Inc. to cease selling their personal information. They also exercise their right to opt out of the selling of their personal information by Facebook, Inc.

---

[1] Geoffrey A. Fowler, *Don't Sell My Data! We Finally Have a Law for That*, Washington Post, Feb. 6, 2020, https://www.washingtonpost.com/technology/2020/02/06/ccpa-faq/?arc404=true.

2637

Should Facebook need additional information to verify this request, please contact us directly as their counsel.

Sincerely,

Derek W. Loeser
dloeser@kellerrohrback.com

Lesley E. Weaver
lweaver@bfalaw.com

cc: Joshua Lipshutz, Gibson, Dunn & Crutcher, LLP (via email)
Martie Kutscher Clark, Gibson, Dunn & Crutcher, LLP (via email)

# Exhibit J

**Chris Springer**

| | |
|---|---|
| **From:** | Facebook <case++aazq6umbdkixn2@support.facebook.com> |
| **Sent:** | Friday, April 10, 2020 11:39 AM |
| **To:** | Kelsey Robertson |
| **Subject:** | Request pursuant to CCPA § 1798.100 |

Hi,

Thank you for your inquiry.

Based on the information that you have provided to us, we are unable to verify whether the consumers you list have provided you authorization to submit CCPA requests on their behalf as required by the law.

In order for us to verify the identities of the consumers who have made the requests, the consumers must log into their Facebook accounts where they can use the self-service tools that allow them to access and download specific information we have about them. They can access specific information about their activity on Facebook, including their posts, photos, reactions, comments and messages, as well as other information, through the Access Your Information tool:
https://www.facebook.com/your_information/?ref=cr

They can also download a copy of information they've provided to Facebook using the Download Your Information tool:
https://www.facebook.com/settings?tab=your_facebook_information

They can also learn more about how we collect, use, and share information by reading our Data Policy (https://www.facebook.com/policy.php) and California Privacy Notice (https://www.facebook.com/legal/policy/ccpa).

Thanks,

The Facebook Team


>On Wed Feb 26, 2020 11:30:09, Kelsey Robertson wrote:
>Good afternoon,
>Please find attached a request pursuant to CCPA § 1798.100 and Facebook's privacy policies, sent on behalf of the Facebook users identified.
>Best,
>Kelsey Robertson
>Bleichmar Fonti & Auld LLP
>555 12th Street, Suite 1600
>Oakland, CA 94607
>415-445-4009 | krobertson@bfalaw.com
>

2640

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
  dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Kristin A. Linsley (SBN 154148)
  klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
  mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION<br><br>This document relates to:<br><br>ALL ACTIONS | MDL NO. 2843<br>CASE NO. 3:18-MD-02843-VC-JSC<br><br>**FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION**<br><br>Judge: Hon. Vince Chhabria<br>Hon. Jacqueline Scott Corley<br>Special Master Daniel Garrie<br>Courtroom: 4, 17th Floor<br><br>JAMS Ref. No.: 1200058674 |

Gibson, Dunn & Crutcher LLP

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION
CASE NO. 3:18-MD-02843-VC-JSC

2641

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ......................................................................................... 1

II.  BACKGROUND ........................................................................................... 2

   A.  Plaintiffs initially demanded all data related to Named Plaintiffs. ........................................ 2

   B.  Plaintiffs conceded that only data that was shared with third parties is relevant. ................. 3

   C.  Judge Corley allowed Plaintiffs to conduct a Rule 30(b)(6) deposition. .............................. 5

   D.  Plaintiffs reverted to their initial demands for all data relating to Named Plaintiffs. ............ 6

III. ARGUMENT ................................................................................................ 6

   A.  Facebook's productions under Discovery Order 9 are complete. ........................................ 7

       1.   The scope of discovery is limited to data that was shared with third parties. ............... 7

       2.   Plaintiffs have not identified any deficiencies in Facebook's productions. .................. 8

   B.  Plaintiffs' distrust does not entitle them to "discovery on discovery." ................................ 9

   C.  Plaintiffs are judicially estopped from seeking information that was not shared. ............... 12

   D.  The information Plaintiffs now seek is nonresponsive and otherwise unavailable. ............ 13

IV.  CONCLUSION ............................................................................................ 15

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND
INFORMATION
CASE NO. 3:18-MD-02843-VC-JSC

2642

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

*Bresk v. Unimerica Ins. Co.*
    2017 WL 10439831 (C.D. Cal. Nov. 16, 2017).................................................................10

*Brewer v. BNSF Railway Co.*,
    2018 WL 1756432 (D. Mont. Jan. 11, 2018)................................................................10

*Han v. Futurewei Techs., Inc.*,
    2011 WL 4344301 (S.D. Cal. Sept. 15, 2011)..............................................................11

*MAO-MSO Recovery, LLC v. Mercury Gen.*,
    2019 WL 1423772 (C.D. Cal. Feb. 19, 2019)...............................................................15

*United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*,
    555 F.3d 772 (9th Cir. 2009)........................................................................................11

*United States v. Ibrahim*,
    522 F.3d 1003 (9th Cir. 2008)......................................................................................12

*Uschold v. Carriage Servs., Inc.*,
    2019 WL 8298261 (N.D. Cal. Jan. 22, 2019)..............................................................10

Gibson, Dunn &
Crutcher LLP

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND
INFORMATION
CASE NO. 3:18-MD-02843-VC-JSC

2643

## I. INTRODUCTION

Plaintiffs' motion to compel seeks to revive a boundless demand that Plaintiffs conceded long ago—in court—sought data well beyond what Plaintiffs would be entitled to in this case. One year ago, Plaintiffs represented to Judge Corley:

> Plaintiffs seek only a holding that the sensitive data Facebook collected about *ten Named Plaint_ij fs* and *shared* with third parties is relevant. Plaintiffs do not contend that information that was not shared is relevant, which substantially narrows the information Facebook would be required to produce in this case.

Based on Plaintiffs' representations, Judge Corley issued a ruling that discoverable user data is data Facebook **shared** relating to the Named Plaintiffs, including any shared data in three categories Plaintiffs had requested. After Facebook reported its productions were complete, Plaintiffs told Judge Corley "[w]e just don't believe [that]," and they demanded a Rule 30(b)(6) deposition to test it. But once they got into the deposition, Plaintiffs tactically avoided that topic and instead asked about a host of issues having nothing to do with this case.

Now, seeking to capitalize on the presence of a new decider, Plaintiffs attempt to rewrite that history. Plaintiffs disown their concessions that "information that was not shared" is not relevant and say they are entitled to all data relating to the Named Plaintiffs—shared or not. They mischaracterize hearings before Judge Corley. And they conflate Judge Corley's instructions about the scope of their squandered deposition with the scope of the data she found discoverable.

Making matters worse, Plaintiffs' motion is itself a moving target. Throughout the motion, Plaintiffs flip-flop between saying the discoverable data in this case is *not* limited to shared data and arguing that the real issue is that Facebook has not yet produced all shared data. Then, after spinning in circles with arguments they have either abandoned or cannot support, Plaintiffs—out of nowhere—demand extensive discovery about Facebook's data infrastructure (not data about Named Plaintiffs).

Plaintiffs' motion crashes into a long list of roadblocks. *First*, Plaintiffs point to no actual deficiencies in Facebook's productions. After saying for more than one year that Facebook's productions are incomplete, rather than point to any evidence to support that false accusation, Plaintiffs

1

2644

request invasive discovery to prove it. *Second,* Plaintiffs are not entitled to "discovery on discovery" because they do not believe Facebook's productions are complete. Judge Chhabria, Judge Corley, and the Special Master have previously rejected Plaintiffs' efforts to audit Facebook's discovery process, and the Special Master should do so again here. *Third*, Plaintiffs are judicially estopped from demanding user data that was not shared with third parties after arguing to Judge Corley that this data is not relevant. Plaintiffs secured relief based on this concession to Judge Corley, and must be bound by it before the Special Master. *Fourth*, the list of demands in Plaintiffs' motion—which seeks information about Facebook's "data sources" that Plaintiffs say they will use "to develop an efficient discovery plan"—is not properly before the Special Master. This is not the topic on which the mediators declared impasse, Judge Corley has repeatedly rejected this request, and it largely concerns materials that Facebook provided in an effort to advance the parties' negotiations and that Plaintiffs apparently have not bothered to review.

Moving discovery disputes from Judge Corley to the Special Master was not meant to be an opportunity to ditch past concessions or to put a new face on old arguments. The Special Master should see this motion for what it is: an opportunistic, wasteful, and abusive attempt to erase the proceedings before Judge Corley, gain access to information Plaintiffs have conceded is irrelevant, and hunt for *anything* to stall this case before it finally reaches the merits. The motion should be denied.

## II.  BACKGROUND

### A.  Plaintiffs initially demanded all data related to Named Plaintiffs.

In November 2019, Plaintiffs served RFP 9, which requests "[a]ll Documents relating to each of the Named Plaintiffs." Ex. G at 12; *see also id.* at 12–13 (RFPs 10–13); Ex. K at 9 (Interrogatories 16-17). At first blush that request may seem reasonable. But taken literally, it would require collection, review, and analysis of millions of documents and tables to determine whether any information within them—including information derived from aggregated and anonymized data—might relate back to a particular user. In response to this and similar requests, Facebook agreed to produce the content and information that Facebook associates with each Named Plaintiff's account. This information is contained in the "Download Your Information" ("DYI") file that Facebook makes available to users.

Facebook's DYI tool reflects, in human-readable and producible form, the most complete

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION
CASE NO. 3:18-MD-02843-VC-JSC

2645

compilation of data Facebook maintains relating to any user. Ex. C ¶ 5. Beginning in February 2020, Facebook produced the information contained in the DYI file for each Named Plaintiff, plus additional information (such as a spreadsheet tracking how Plaintiffs adjusted their Facebook privacy settings). In total, Facebook produced approximately **one million pages** of user data relating to Named Plaintiffs.

Plaintiffs belittle the DYI file, claiming it is merely a record of what users post to Facebook. That is false. Most of the DYI files Facebook produced are tens of thousands of pages each; they average 32,493 pages each and range from 226 pages to a whopping **272,110 pages** (depending on how active a particular user is and what data they may have deleted).

Exhibit A is an average-size DYI file produced in this case, which—due to its size—Facebook provides via share file. Exhibit B is a list of categories of data contained in each user's DYI file (unless data in a given category does not exist or the user deleted it). *See also* Ex. C ¶ 6. Categories of information in users' DYI file include biographical information, ads viewed, friend lists, games played, location, logins and logouts, messages, page visits, photos, profile visits, religious and political views, status updates, and much more. Ex. B. **All told, the DYI files contain more than 100 categories of information that go well beyond a user's "platform activity."** Facebook produced all of this despite repeatedly noting that much of it is not shared or relevant to any issue in this privacy litigation.

After Facebook completed these productions, Plaintiffs insisted that Facebook also locate and produce any other data that might, in any way, relate to any Named Plaintiff, and any materials derived from that data. They focused on a data warehouse called Hive and demanded that Facebook produce any information in Hive that might be derived, in full or in part, from data about the Named Plaintiffs. Facebook explained this would not be possible because Hive stores more than 12 million database tables and is not indexed by user, so there is no way to search across all tables at once for an individual user's ID. Ex. L at 12–15; *see also* Ex. E ¶ 7. Instead, each of Hive's 12 million tables would need to be searched individually for any information relating back in any way to a Named Plaintiff, which would be nearly impossible, given both the volume of Hive data and the fact that much of the data in Hive is anonymized. *See id.* Facebook further explained there would be no reason to take on such an undertaking because third parties do not have access to Hive tables. *See id.*

**B. Plaintiffs conceded that only data that was shared with third parties is relevant.**

3

2646

After nearly one full year of negotiations, the parties briefed the issue to Judge Corley. In that briefing, Facebook argued that Judge Chhabria's motion-to-dismiss order limits this case to data that users themselves share *on Facebook*—all of which had been produced. *See* Ex. L at 10–15. Plaintiffs disagreed, arguing that the "sensitive information that Facebook collects and shares with third parties is much more extensive." Ex. M at 1. Plaintiffs specifically demanded that Facebook also produce materials reflecting users' off-platform activity and what they called "derived" information.

After four rounds of briefing, Plaintiffs shifted gears in a sur-reply. They assured Judge Corley that their request for "[a]ll Documents relating to each of the Named Plaintiffs" was narrowly tailored, emphasizing that they sought "only a holding that the sensitive data Facebook collected about *ten Named Plaintiffs* and *shared* with third parties is relevant." Ex. O at 9 (emphasis in original). They even argued that Judge Chhabria's holding that Plaintiffs had standing was *based on* the fact that certain information about them had been shared. *Id.* at 5. Plaintiffs clarified:

> Plaintiffs do not demand, as Facebook repeatedly claims, that "Facebook search *millions* of disaggregated data sets for any data to have ever crossed Facebook's systems relating to a Named Plaintiff and any derivative materials drawing on that data – such as data sets tracking hours of peak user activity to monitor strains on Facebook's systems." Opp'n at 6. To the contrary, Plaintiffs seek only a holding that the sensitive data Facebook collected about *ten Named Plaintiffs* and *shared* with third parties is relevant. Plaintiffs do not contend that information that was not shared is relevant, which substantially narrows the information Facebook would be required to produce in this case.

*Id.* at 9 (emphasis in original). Plaintiffs repeated this refrain throughout their brief:

- "This discovery dispute concerns sensitive user information that Facebook has shared with third parties without users' consent." *Id.* at 1.

- "[S]ensitive user information is relevant if Facebook shared it without users' consent." *Id.* at 2.

- "[T]he legal theories upheld at the pleading stage" turn on "whether Facebook shared [sensitive information] with third parties." *Id.* at 4.

- "Plaintiffs have standing . . . because their sensitive information was disseminated to third parties in violation of their privacy." *Id.* at 5 (quotation marks and citation omitted).

- "Plaintiffs seek an order holding that all sensitive data about the ten Named Plaintiffs that Facebook shared with or made accessible to third parties is relevant to this action." *Id.* at 9.

4

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION
CASE NO. 3:18-MD-02843-VC-JSC

2647

Gibson, Dunn & Crutcher LLP

Judge Corley then issued a short order (Ex. P) largely adopting Plaintiffs' sur-reply position:

> Plaintiffs correctly argue that Facebook's restrictive view of relevant discovery would exclude an enormous amount of information that Facebook collects and shares with third parties about Facebook's users. The district court's order (Dkt. No. 298) did not limit Plaintiffs' claims to only challenging the sharing of data Facebook collects from a user's on-platform activity; the claims also challenge Facebook's sharing of user data and alleged failure to monitor how third parties used such shared information.

To comply with Judge Corley's order, Facebook looked for any categories of individual user data that could have been shared but had not been produced. For a basic technological reason, Facebook found none. When a third party—such as an app developer or business partner—obtains user-related data, it accesses it through an "application programming interface," or "API." Ex. E ¶¶ 3–7. These APIs pull information exclusively from Facebook's "Social Graph," not data warehouses like Hive. *See id.* A user's DYI file, which Facebook produced for all Named Plaintiffs, contains the most complete current set of data about that user that is in the Social Graph (and more). *See* Ex. C ¶ 5.

### C. Judge Corley allowed Plaintiffs to conduct a Rule 30(b)(6) deposition.

In a December 2020 joint status report, Plaintiffs again demanded that Facebook produce additional information regarding the Named Plaintiffs. *See* Ex. Q at 1–2. Facebook explained that it was conducting an investigation but "[t]o Facebook's knowledge, the materials it produced reflect the information related to the Named Plaintiffs that could have been shared with third parties." *Id.* at 9.

Plaintiffs told Judge Corley that they found it "impossible to believe" there was no more discoverable "information that exists." Ex. R at 19:14–15; *id.* at 19:22 (Facebook's representation is "just impossible for us to believe"); *id.* at 28:15–16 ("We just don't believe . . . their description of what is or is not shared or made accessible."). When pressed, Plaintiffs gestured at "information [used] to target [ads to] the Plaintiffs," and Judge Corley redirected them back to *shared* information: "No, no, no, no. I don't think so. . . . This is—this came from Cambridge Analytica and that they had access to information." *Id.* at 23:21–25. When Plaintiffs pushed ahead, Judge Corley again focused back on shared information: "What did you mean in your sur-reply by 'shared'?" *Id.* at 24:13–14. Plaintiffs

2648

were unable to provide any clear answer. We suggest the Special Master review this transcript.

To address Plaintiffs' "disbelief . . . as to how Facebook operates," Judge Corley determined "we just need somebody under oath saying: No, this is how it operates." *Id.* at 26:7–9. Judge Corley allowed Plaintiffs to conduct a Rule 30(b)(6) deposition "to verify the representation that yes, we collect this information—inferential data, but it is not made accessible to third parties." *Id.* at 35:3–5.

Plaintiffs deliberately squandered that opportunity. They issued a deposition notice on 12 broad topics, many having nothing to do with the case. Ex. S. Judge Corley effectively quashed this notice, stating: "That was way beyond what I had in mind. So I don't want to talk about your notice." Ex. T at 17:15–16. Judge Corley *again* explained that the deposition was intended to allow Plaintiffs to explore whether shared data had not been produced, noting "this is pretty basic stuff." Ex. T at 19:21–22. But Plaintiffs ignored those instructions and used the deposition to explore a host of unrelated issues, including using nearly two hours to ask questions about how Facebook places ads. *See* Ex. V. Plaintiffs declined to ask even basic questions to test their professed disbelief about what user-related data Facebook makes accessible to third parties. *Id.* Plaintiffs never even asked, "Are you aware of any types of individual user data Facebook shares that are not in the DYI data Facebook produced?"

### D. Plaintiffs reverted to their initial demands for all data relating to Named Plaintiffs.

After the deposition, Plaintiffs reverted to their initial demand for "all data and information relating to the Named Plaintiffs," even if never shared. Ex. W. Facebook responded on April 1, 2021, noting this "directly contradict[ed] the representations Plaintiffs made to the Court in their prior briefing," and confirmed it had not identified shared user data beyond what it had produced. Ex. X at 2. Facebook explained again that "[t]hird parties who are able to access individualized user data access that data through APIs that pull from Facebook's Social Graph only, and the DYI files Facebook produced reflect[] a human-readable version of the data relating to each Named Plaintiff in Facebook's Social Graph." *Id.* at 6. Plaintiffs never responded and refused to address whether they were changing their position. *See* Ex. Z. Instead, they filed this motion, arguing Judge Corley's order "is not limited to 'shared' information." Mot. at 2. Plaintiffs never once articulated that position over the prior year.

### III. ARGUMENT

The Special Master should deny Plaintiffs' motion.

6

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION
CASE NO. 3:18-MD-02843-VC-JSC

2649

## A. Facebook's productions under Discovery Order 9 are complete.

Facebook has confirmed repeatedly that its productions of potentially shared data relating to the Named Plaintiffs are complete.[1]  Plaintiffs identify no shared data missing from those productions. Instead, they say they are entitled to *all* data relating in any way to the Named Plaintiffs.  But as Plaintiffs have admitted, there is no genuine dispute that this case is about *shared* data.

### 1.  The scope of discovery is limited to data that was shared with third parties.

The complaint, Judge Chhabria's motion-to-dismiss order, Plaintiffs' briefing, Judge Corley's discovery order, and the hearings before Judge Corley all make crystal clear that the only user data at issue in this *privacy* class action is data *that was shared with or made accessible to third parties*.  As Judge Chhabria put it in the very first sentence of his motion-to-dismiss order:  "This lawsuit, which stems from the Cambridge Analytica scandal, is about Facebook's practice of sharing its users' personal information with third parties."  Ex. F at 1.  Much to Plaintiffs' chagrin, the case is *not* about "targeted advertising" or "psychographic marketing" (which Plaintiffs avoid mentioning by name but cannot resist bringing up more subtly, *see* Mot. at 7).  While not relevant, Facebook has confirmed repeatedly that it does not share individual user data with advertisers when it places ads.  *See also* Ex. D.  Nor is this case about all of the ways in which Facebook collects, maintains, and uses data.

With their feet to the fire in briefing before Judge Corley, Plaintiffs admitted this.  They told Judge Corley Facebook did *not* need to "search millions of disaggregated data sets for any data to have ever crossed Facebook's systems relating to a Named Plaintiff and any derivative materials drawing on that data."  Ex. O at 9 (quotation marks and emphasis omitted).  Instead, they sought "only a holding that the sensitive data Facebook collected about *ten Named Plaintiffs* and *shared* with third parties is relevant."  *Id.* (emphasis in original).  And they promised that they did "**not contend that information that was not shared is relevant**."  *Id.* (emphasis added).  In reliance on those promises, Judge Corley held that discoverable user data is data that was shared with third parties, including any shared data in specific categories Plaintiffs requested.  Ex. P at 2.

At hearings that took place after Judge Corley issued her order, Plaintiffs again acknowledged

---

[1]  Plaintiffs recently disclosed information identifying additional Facebook accounts for certain Named Plaintiffs.  Facebook is collecting and will produce the information associated with these accounts.

that what they "said in [their] reply was information shared or made accessible [is relevant]," which they said meant "if it was put in a place or utilized in a way where third parties had access to it." Ex. R at 18:15–16, 23–25. Judge Corley emphasized that the parties were both discussing information that was "shared" or "made accessible." *Id.* at 19:6; *see also id.* at 19:3–4. One month later, Judge Corley reiterated that "[t]he question is what did they gather, and then what was shared." Ex. T at 21:13–14.

### 2. Plaintiffs have not identified any deficiencies in Facebook's productions.

Facebook has repeatedly confirmed that it has not identified user data that could have been shared with third parties beyond what is reflected in the Named Plaintiffs' DYI files. Plaintiffs have done nothing to rebut that confirmation.

The best way to understand the nature and extent of a user's DYI file is to view one. Exhibit A (provided via share file) is the DYI file for Terry Fischer (a Named Plaintiff). ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

*See* Ex. A at FB-CA-MDL-00405315–5336. ████████████████

████████████████████████████████████████████

████████████████████████████████ *See id.* Plaintiffs also say DYI files exclude "information collected from off-platform activity," Mot. at 2, but Ms. Fischer's file includes ████████████████, *see* Ex. A at FB-CA-MDL-00405489–5860, ████

████████████████████████████ *see id.* at FB-CA-MDL-00405476– 5488. ████████████████████████████████████████

████████████████████ *see id.* at FB-CA-MDL-00405558; ████████

████████████████████████████ *see id.* at FB-CA-MDL-00405513– 5514; ████████████████████████████████ *see id.* at FB- CA-MDL-00405641–5643; ████████████████████████████

████████████████████████ *see id.* at FB-CA-MDL- 00405758–5772. The information contained in a user's DYI file is the most complete set of data

8

Gibson, Dunn & Crutcher LLP

2651

Facebook maintains about any user and the best representation of the data about a user in the Social Graph, from which the APIs that share data pull. *See* Ex. C; Ex. E.

In arguing that Facebook's voluminous productions may be incomplete, Plaintiffs pretend not to understand how Facebook shared user-related data with third parties. They insinuate that user data is shared in various complex ways that Plaintiffs and the Special Master may not comprehend. *See* Mot. at 6–7. And, three-and-a-half years after filing a lawsuit alleging that Facebook wrongfully shared their data, Plaintiffs wax philosophical over "what sharing information means." *Id.* at 11.

Those arguments are decoys. Plaintiffs know—as their prior briefing and discovery requests indicate—that the data sharing at issue in this case takes place through APIs. Plaintiffs' interrogatories ask Facebook to identify specific categories of APIs it uses to share data, Ex. K; in response Facebook has disclosed expansive lists of APIs and the data they pull spanning more than 300 pages, Ex. U. Plaintiffs have also subpoenaed numerous third parties asking them to disclose the APIs through which they accessed user data. *E.g.*, Ex. H at 8 ("identify each of Facebook's application programming interfaces ('APIs') [it] used to access or obtain" user data).[2] And in the same sur-reply in which they conceded the only user data relevant to this case is shared data, Plaintiffs also conceded ▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Ex. O at 9. Plaintiffs' sudden attempt to throw up smoke about "what sharing information means" is as disingenuous as it is unsupported.

## B. Plaintiffs' distrust does not entitle them to "discovery on discovery."

Unable to identify any categories of shared data that are not reflected in the Named Plaintiffs' DYI files, Plaintiffs return to their usual refrain that they do not believe Facebook's representations and need more discovery to test them. Plaintiffs have already squandered an opportunity Judge Corley gave them to do so, and the Special Master should reject this recycled argument.

**Plaintiffs are not entitled to check Facebook's homework**. "A plaintiff's mere suspicion that

---

[2] *See* 3/3/20 Subpoena to Brayola Fitting Technologies; 3/3/20 Subpoena to Bumble Trading, Inc.; 3/3/20 Subpoena to Coffee Meets Bagel, Inc.; 3/3/20 Subpoena to DNP Imagingcomm America Corporation; 3/3/20 Subpoena to Flo Health, Inc.; 3/3/20 Subpoena to Netflix, Inc.; 3/3/20 Subpoena to On the Rebound, Inc.; 3/3/20 Subpoena to Spotify USA, Inc.; 3/3/20 Subpoena to Tinder, Inc.; 3/3/20 Subpoena to United Parcel Service, Inc.; 3/3/20 Subpoena to Walgreens Company; 3/3/20 Subpoena to Warner Brothers Entertainment, Inc.; 3/3/20 Subpoena to Yahoo!, Inc.; 3/3/20 Subpoena to Zoosk, Inc.; 5/21/20 Subpoena to Six4Three LLC; 7/16/20 Subpoena to 3DNA Corp. (DBA NationBuilder); 7/16/20 Subpoena to CubeYou, Inc.; 7/16/20 Subpoena to FullContact, Inc.; 8/7/20 Subpoena to DigitalStakeout, Inc.; 8/7/20 Subpoena to X1 Discovery, Inc. Facebook can provide these subpoenas upon request if the Special Master would like them.

9

Gibson, Dunn & Crutcher LLP

1  additional documents must exist is an insufficient basis to grant a motion to compel." *Bresk v.*

2  *Unimerica Ins. Co.*, 2017 WL 10439831, at *5 (C.D. Cal. Nov. 16, 2017). For this reason, "'discovery

3  on discovery' is disfavored and, to be both relevant and proportional to the needs of the case, a party

4  seeking it must show a specific deficiency in the other party's production." *Uschold v. Carriage Servs.,*

5  *Inc.*, 2019 WL 8298261, at *4 (N.D. Cal. Jan. 22, 2019) (quotation marks and citation omitted); *see*

6  *also, Brewer v. BNSF Railway*, 2018 WL 1756432, at *4 (D. Mont. Jan. 11, 2018) ("a court must guard

7  against excessive probing into a party's meta-discovery in order to prevent belabored discovery.").

8       Plaintiffs have not identified anything beyond their own speculation to show a deficiency in

9  Facebook's productions of potentially shared information, much less a "specific deficiency."

10  Plaintiffs' cursory attempt to do so adopts their usual strategy of plucking isolated lines out of context.

11  They rely on a document that Facebook has repeatedly told them outlines *hypothetical* capabilities—

12  not actual practices—and this is clear on the face of the document. Mot. at 9. Plaintiffs similarly cite

13  a document entitled "Ads and Measurement" and deliberately conflate data the document indicates was

14  available to place ads with data Facebook *shared* with app developers. *Id.* at 7; Ex. D ¶ 3. Plaintiffs

15  also bizarrely cite a question Facebook asked app developers that has nothing to do with data sharing,

16  Mot. at 10; misconstrue a document where employees discuss *how to classify data as UII* to be

17  something sinister, *id.*; and cite various documents discussing data Facebook maintains without making

18  any effort to show that data is shared, *id.* at 7. Finally, Plaintiffs claim shared information has not been

19  produced because the DYI file does not include "location-related metadata." Mot. at 10. But the DYI

20  file includes location information, *e.g.*, Ex. A at FB-CA-MDL-00417382, and—where a user allowed

21  it—extensive lists of the user's GPS coordinates.[3] None of Plaintiffs' cherry-picked quotes

22  demonstrates a "specific deficiency" in Facebook's productions.

23       **Facebook has disclosed the types of data it shares**. *See, e.g.*, Ex. U. Plaintiffs suggest the

24  typical rules of discovery do not apply here because "the question of what information Facebook shared

25  is *the* central issue in this case." Mot. at 11. That is nonsense. Facebook has already disclosed the

26  relevant APIs at issue in response to Plaintiffs' requests. Ex. U. What Plaintiffs apparently mean is

27
28  ---
[3] Ms. Fischer's DYI file does not include this data, likely because her settings did not allow it to be collected. Ex. AB includes 27 pages from separate DYI file Facebook produced for Plaintiff Jason Ariciu, listing hundreds of latitudes and longitudes where Facebook estimates he logged into Facebook over a 6-month period.

10

Gibson, Dunn & Crutcher LLP

2653

1 | that they now want to audit *all* of Facebook's information so that *they* can decide what was shared (and

2 | thus relevant). That is a nonstarter: a "requesting party . . . must rely on the representations of the

3 | producing party or its representative that it is producing all responsive, relevant, and non-privileged

4 | discovery." *Han v. Futurewei Techs., Inc.*, 2011 WL 4344301, at *5 (S.D. Cal. Sept. 15, 2011). And

5 | even if Facebook did produce all of the information relating to the Named Plaintiffs, Plaintiffs would

6 | still have to rely on Facebook to determine which categories of information could have been shared.

7 | **Plaintiffs already had an opportunity to probe Facebook's representations, and they**

8 | **squandered it.** Judge Corley previously allowed Plaintiffs to conduct a Rule 30(b)(6) deposition to

9 | address their "disbelief . . . as to how Facebook operates." Ex. R at 26:7–8. Facebook made its then-

10 | VP of Platform Partnerships, Konstantinos Papamiltiadis, available. Mr. Papamiltiadis had more than

11 | eight years of experience at Facebook and more than 120 reports, and he spent almost 20 hours

12 | preparing. Plaintiffs deliberately wasted that opportunity and tactically avoided asking *any* questions

13 | to confirm whether Mr. Papamiltiadis was aware of types of shared data that Facebook had not already

14 | produced. *See supra* at 6. Facebook urges the Special Master to review the deposition transcript.

15 | Plaintiffs' failure to use the Rule 30(b)(6) deposition for its intended purpose does not entitle

16 | them to admittedly irrelevant information. The biggest tell in Plaintiffs' motion is that it never—not

17 | once—cites to Mr. Papamiltiadis's deposition. In a motion to compel documents that are ostensibly

18 | for Plaintiffs to verify Facebook's representations that its productions are complete, one would expect

19 | the centerpiece to be the deposition Judge Corley authorized for that very purpose. Its absence is

20 | nothing short of extraordinary, and it would be astonishing if the true explanation were not so obvious:

21 | Plaintiffs do not want verification that they have all categories of potentially shared user data. Instead,

22 | as discovery nears its end,[4] Plaintiffs are desperate for *anything* that will breathe new life into their

23 | dying case. That is why they spent their Rule 30(b)(6) deposition exploring *new* potential avenues of

24 | litigation instead of verifying that the productions relating to *this* case were complete. That is why,

25 | years into a case about data sharing, they raise questions about "what sharing information means"

26 |

27 | [4] Even now, Plaintiffs do not demand all of the information they will eventually seek; they demand a list of

28 | information that they intend to later "use . . . to develop an efficient discovery plan." Mot. at 14. Plaintiffs' endless discovery campaign, if successful, guarantees that discovery will blow far beyond the substantial completion deadline.

Gibson, Dunn & Crutcher LLP

11

2654

without even attempting to supply an answer. Mot. at 11. And that is why they claim (baselessly) that "Facebook itself does not know what information may have been shared with third parties," *id.* at 10—conflating questions about *what particular data may have been shared about a specific user* (which Facebook cannot identify) with *what categories of data could be shared* (which Facebook has identified and produced). *See id.* at 10–11. Years into this case, as the discovery deadline approaches and after throwing away their opportunity to test Facebook's production, Plaintiffs are entitled to nothing more.

**Plaintiffs conflate the scope of the *deposition* Judge Corley allowed with the scope of data she found discoverable**. In authorizing a Rule 30(b)(6) deposition, Judge Corley allowed Plaintiffs to *ask questions* about information Facebook maintains that may not have been shared—with the goal of identifying which types of information *were* shared. *See* Ex. T at 21:13–14 ("The question is what did they gather, and then what was shared."). Judge Corley did *not* order Facebook to produce data that was never shared—if she had, there would have been no need for the deposition. Plaintiffs pluck isolated statements from the hearings to tell a different story, but the transcripts—just like the parties' underlying briefing on this issue—speak for themselves. Facebook encourages the Special Master to read these materials in full. *See* Exs. R, T (transcripts); *see also* Exs. L, M, N, O (underlying briefs).

### C. Plaintiffs are judicially estopped from seeking information that was not shared.

Even if Plaintiffs could otherwise seek "all" information related to the Named Plaintiffs, they are judicially estopped from doing so here based on their unequivocal representations to Judge Corley.

"The doctrine of judicial estoppel is an equitable doctrine a court may invoke to protect the integrity of the judicial process," and it was "developed to prevent litigants from 'playing fast and loose' with the courts by taking one position, gaining advantage from that position, then seeking a second advantage by later taking an incompatible position." *United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 778 (9th Cir. 2009). "In determining whether to apply the doctrine," a court will "typically consider (1) whether a party's later position is 'clearly inconsistent' with its original position; (2) whether the party has successfully persuaded the court of the earlier position, and (3) whether allowing the inconsistent position would allow the party to 'derive an unfair advantage or impose an unfair detriment on the opposing party.'" *United States v. Ibrahim*, 522 F.3d 1003, 1009 (9th Cir. 2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001)).

12

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION
CASE NO. 3:18-MD-02843-VC-JSC

2655

Gibson, Dunn & Crutcher LLP

There could not be a more apt description of Plaintiffs' conduct. Their present position is flatly contrary to their position before Judge Corley. *Compare* Ex. O at 9 ("Plaintiffs do not contend that information that was not shared is relevant"), *with* Plaintiffs' Mot. at 2 ("Discovery Order No. 9 is not limited to 'shared' information."). Plaintiffs persuaded Judge Corley of their earlier position—that relevant information is limited to data Facebook shares—and obtained a favorable discovery order as a result. Plaintiffs cannot now take back their concessions and demand new discovery on the eve of substantial completion, when they already conceded it is not relevant, the Court issued a ruling based on that representation, and the parties agreed to a substantial completion deadline based, in part, on Facebook's understanding that this issue had been put to bed.

### D. The information Plaintiffs now seek is nonresponsive and otherwise unavailable.

Following a familiar pattern, after asserting Facebook's productions are incomplete, Plaintiffs shift gears. Rather than demand user data they believe was not produced, they abruptly demand extensive discovery about Facebook's sources of electronically stored information ("ESI").[5]

Plaintiffs' list of demands is not the issue at impasse. The Special Master declared impasse regarding Facebook's "[p]roduction of Named Plaintiffs' data in compliance with [Judge Corley's] Order]," 2021.10.06 Email from D. Garrie, after Plaintiffs complained Facebook had not made "a complete production of all data it has collected about [the Named Plaintiffs]," Ex. Y at 4. When forced to put pen to paper, Plaintiffs find no support for that request, so they pull out a familiar trick: They raise a different issue that itself has a complicated history. Making matters worse, none of the discovery requests Plaintiffs move on seek the materials they now demand. The Special Master instructed the parties they may brief only the impasse topic, and should deny Plaintiffs' request for this reason.[6]

Judge Corley has also repeatedly rejected Plaintiffs' demands for discovery about Facebook's

---

[5] Plaintiffs seek to "compel Facebook to identify all data sources that may contain information relating to the Named Plaintiffs," which they define in the final paragraph of their motion to mean "(1) the name of the database or data log; (2) a description of the data source's purpose and function; (3) information about the default retention status of the data source (at a minimum, whether it is retained and for how long); (4) information about the current retention status of the data source (at a minimum, whether it is retained and for how long); and (5) where current retention status differs from default retention status, the date the change was implemented." Mot. at 13–14. They further demand, "at a minimum," "(1) the data schema; (2) definitions and descriptions of each field; (3) tool(s) which Facebook use to search each data source; and (4) instruction sets and manuals for all tools identified as being used by Facebook to search any data source identified in this step." *Id.* at 14.

[6] *See* Protocol for Resolving Discovery Disputes ¶ 2. The Special Master separately advised the parties that he intends to "redline" any portions of the parties' briefing that strays beyond the impasse topic.

13

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION
CASE NO. 3:18-MD-02843-VC-JSC

2656

Gibson, Dunn &
Crutcher LLP

sources of ESI. The parties invested nearly six months negotiating an ESI protocol that Judge Corley entered. Notably, that protocol does *not* require written ESI disclosures. Ex. I. After agreeing to this protocol, Plaintiffs sought to side-step the parties' agreement and asked Judge Corley to order "written ESI disclosures" or a 30(b)(6) ESI deposition. Dkt. 428 at 5. Judge Corley rejected this request: "On the ESI discussions, I'm not going to require any more—I'm not going to do what the plaintiffs proposed. . . . I'm not satisfied there's anything more in particular that you need." Ex. J at 6:16–21.

One year later, Plaintiffs tried again. When Judge Corley authorized a deposition for Plaintiffs to explore whether any shared data about the Named Plaintiffs had not been produced, Plaintiffs issued a 30(b)(6) notice that again sought detailed testimony about Facebook's data sources. The first three topics in Plaintiffs' notice ask for the same information Plaintiffs sought previously and now seek here:

1. The format, nature, and location of User Data as set forth in Discovery Order No. 9, including how and why such Data is collected, obtained, or inferred, and how it is maintained.

2. The name, location, and function of all of Facebook's electronic or database systems that contain User Data, including but not limited to Hive and Data Warehouse, whether stored on an individual user level or in another form.

3. The identity, nature and location at Facebook of all the metadata associated with User Data . . .

Ex. S at 6. Judge Corley quashed that deposition notice. *See supra* at 6. Plaintiffs' requests for document discovery on the same topics should meet the same fate.

Even though Judge Corley rejected Plaintiffs' requests for ESI discovery, in mediation Facebook voluntarily produced much of the information Plaintiffs demand, *see* Ex. AA (share file), because Plaintiffs assured the mediators this information would advance the parties' discussion about user data. Plaintiffs do not even acknowledge that production; they simply ask for more.

Had Plaintiffs reviewed the materials Facebook provided, they would have learned a tremendous amount about how Facebook stores data. The documents include two training videos intended to educate viewers as to how Facebook stores and queries data in the Social Graph. *E.g.*, *id.* at FB-CA-MDL-01959889, FB-CA-MDL-01960073. Facebook also produced detailed technical publications regarding its data infrastructure, *e.g.*, *id.* at FB-CA-MDL-01959810, FB-CA-MDL-01959826 (academic articles regarding the consistency and functioning of Facebook's TAO system and describing Facebook's horizontally shared, geo-replicated relational database management

14

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION
CASE NO. 3:18-MD-02843-VC-JSC

2657

Gibson, Dunn & Crutcher LLP

1    system), as well as internal instructional guides discussing Facebook's data storage systems (including

2    descriptions of individual databases, their functions, data schema employed, and tools used to query

3    databases), *e.g.*, *id.* at FB-CA-MDL-01960039 (instructional overview of the Graph API), FB-CA-

4    MDL-01960137 (instructional wiki entry providing descriptions of data tools), FB-CA-MDL-

5    01960080 (instructional guide on storage options in the Social Graph), FB-CA-MDL-01960128

6    (instructional guide on data tools), FB-CA-MDL-01960067 (instructional guide on searching with

7    GraphQL). Facebook also produced dozens of articles and blog posts discussing its data

8    infrastructure, *e.g.*, *id.* at FB-CA-MDL-01959804 (blog post describing Facebook's top open data

9    problems, including a description of its data stores and the tools used to query them), FB-CA-MDL-

10   01959641 (article discussing the role of the MySQL database in supporting the social graph).

11       Given Facebook's extensive voluntary production of materials Judge Corley held Plaintiffs

12   were not entitled to, Plaintiffs' claim that they are left in the dark falls flat. And Facebook has already

13   told Plaintiffs that most of the additional materials they seek do not exist or do not exist in the form

14   Plaintiffs have requested—such as a data map, a list of sources containing data about specific individual

15   users, or an instruction manual explaining the workings of Facebook's engineering infrastructure to

16   laypersons. And Facebook has answered interrogatories asking it to identify databases that house user

17   data. Ex. U. It is not clear what other information Plaintiffs' vague and broad list is even asking for.

18       These are issues that can and should be resolved informally through discussion during the RFP

19   meet-and-confer process, during which the parties can refine their requests, address any

20   misunderstandings, and raise objections if needed. None of that happened here, likely for an obvious

21   tactical reason: Plaintiffs know that if their current demands were properly teed up, negotiated, and

22   mediated, they would be dead on arrival. The multiple problems with Plaintiffs' list of demands simply

23   highlight the soundness of the rule that a "motion to compel may not be used to enforce an 'informal'

24   request for documents or information." *MAO-MSO Recovery, LLC v. Mercury Gen.*, 2019 WL

25   1423772, at *3 (C.D. Cal. Feb. 19, 2019). As a result, even aside from all of the other problems with

26   Plaintiffs' motion to compel, it is unripe.

27   **IV.    CONCLUSION**

28       Plaintiffs' motion should be denied.

15

Gibson, Dunn &
Crutcher LLP

2658

Dated: October 28, 2021

**GIBSON, DUNN & CRUTCHER, LLP**

By: ___*/s/ Deborah Stein*___

Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

Russell H. Falconer
rfalconer@gibsondunn.com
2001 Ross Avenue Suite 2100
Dallas, TX 75201
Telephone: 214.698.3170

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant Facebook, Inc.*

Facebook's Opposition to Plaintiffs' Motion to Compel Production of Named Plaintiffs' Content and Information
Case No. 3:18-MD-02843-VC-JSC

Gibson, Dunn &
Crutcher LLP

2659

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
    osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
    klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
    mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
    dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
    jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br> This document relates to: <br><br> ALL ACTIONS | CASE NO. 3:18-MD-02843-VC <br><br> **DECLARATION OF MARTIE KUTSCHER IN SUPPORT OF FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION** |

DECLARATION OF MARTIE KUTSCHER IN SUPPORT OF FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL
PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION
CASE NO. 3:18-MD-02843-VC

2660

I, Martie Kutscher, hereby declare as follows:

1.     I am an associate at the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for Facebook, Inc. ("Facebook") in the above-captioned matter.  I am a member in good standing of the State Bars of California, New Jersey, and New York.  I submit this declaration in support of Facebook's Opposition To Plaintiffs' Motion To Compel Production Of Named Plaintiffs' Content And Information.  I make this declaration on my own knowledge, and I would testify to the matters stated herein under oath if called upon to do so.

2.     **Exhibit A** is a true and correct copy of a sample Download Your Information ("DYI") file that Facebook produced in this case relating to Named Plaintiff Terry Fischer.  I am separately emailing the Special Master and Plaintiffs Exhibit A as a share file due to its large size.  Plaintiffs have requested that Facebook treat this document as Confidential.

3.     Attached as **Exhibit B** is a true and correct list of categories of information available through Facebook's DYI tool.  This was previously filed as Exhibit A to Facebook's Opening Brief In Support Of Its Request To Enforce The Partial Stay Of Discovery In Pretrial Order No. 20 (Dkt. 515-1) (September 18, 2020), which is Exhibit L, below.

4.     Three Facebook employees provide factual declarations in support of Facebook's Motion.  Attached as **Exhibit C** is a true and correct copy of the Declaration of Ben Mitchell.  Attached as **Exhibit D** is a true and correct copy of the Declaration of Sukhesh Miryala.  Attached as **Exhibit E** is a true and correct copy of the Declaration of Karandeep Anand.

5.     Attached as **Exhibit F** is a true and correct copy of Judge Chhabria's Motion to Dismiss Order, Pretrial Order No. 20 (Dkt. 298) (September 9, 2019).

6.     Attached as **Exhibit G** is a true and correct copy of Plaintiffs' Second Set of Requests for Production (November 25, 2019).

7.     Attached as **Exhibit H** is a true and correct copy of Plaintiffs' Notice of Non-Party Subpoena to Zynga Inc. (March 3, 2020).  Plaintiffs have served similar subpoenas seeking similar materials on numerous third parties, including Brayola Fitting Technologies; Bumble Trading, Inc.; Coffee Meets Bagel, Inc.; DNP Imagingcomm American Corporation; Flo Health, Inc.; Netflix, Inc.; On the Rebound, Inc.; Spotify USA, Inc.; Tinder, Inc.; United Parcel Service, Inc.; Walgreens

1

DECLARATION OF MARTIE KUTSCHER IN SUPPORT OF FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL
PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION
CASE NO. 3:18-MD-02843-VC

2661

Company; Warner Brothers Entertainment, Inc.; Yahoo!, Inc.; Zoosk, Inc.; Six4Three LLC; 3DNA Corp. (DBA NationBuilder); CubeYou, Inc.; FullContact, Inc.; Digital Stakeout, Inc.; and X1 Discovery, Inc. Facebook will provide these additional subpoenas at the Special Master's request.

8.      Attached as **Exhibit I** is a true and correct copy of the Stipulation and Order Governing The Production Of Electronically Stored Information And Hard Copy Documents ("ESI Protocol") (Dkt. 416) (April 30, 2020).

9.      Attached as **Exhibit J** is a true and correct copy of the transcript of a discovery conference held before Judge Corley on May 15, 2020.

10.     Attached as **Exhibit K** is a true and correct copy of Plaintiffs' Fourth Set of Interrogatories (July 16, 2020).

11.     The parties briefed the issue currently before the Special Master in September and October 2020. Exhibits L through O reflect that underlying briefing. Specifically, attached as **Exhibit L** is a true and correct copy of Facebook's Opening Brief In Support Of Its Request To Enforce The Partial Stay Of Discovery In Pretrial Order No. 20 (Dkt. 515) (September 18, 2020).

12.     Attached as **Exhibit M** is a true and correct copy of Plaintiffs' Opposition to Facebook's Request To Enforce The Partial Stay Of Discovery In Pretrial Order No. 20 And Cross-Motion To Compel Discovery Related To Requests For Production Nos. 9 Through 13 (Dkt. 527-3) (September 28, 2020). This document is an unredacted version that has been sealed by the Court.

13.     Attached as **Exhibit N** is a true and correct copy of Facebook's Reply Brief In Support Of Its Request To Enforce The Partial Stay Of Discovery In Pretrial Order No. 20 (Dkt. 537) (October 8, 2020).

14.     Attached as **Exhibit O** is a true and correct copy of Plaintiffs' Response in Reply To Defendant Facebook's Request To Enforce The Partial Stay Of Discovery In Pretrial Order No. 20 And In Support Of Cross-Motion To Compel (Dkt. 547-3) (October 19, 2020). This document is an unredacted version that has been sealed by the Court. The highlighted text reflects Plaintiffs' proposed redactions under Civil Local Rule 79-5(d)(1)(D), which were approved by Judge Corley.

2

DECLARATION OF MARTIE KUTSCHER IN SUPPORT OF FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL
PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION
CASE NO. 3:18-MD-02843-VC

2662

15.    On October 29, 2020, Judge Corley issued an Order resolving the dispute in the parties' briefing in Exhibits L–O.  Attached as **Exhibit P** is a true and correct copy of this Order, Discovery Order No. 9 (Dkt. 557).

16.    Plaintiffs raised the sufficiency of Facebook's production under Discovery Order No. 9 in a Joint Status Update on December 8, 2020.  Attached as **Exhibit Q** is a true and correct copy of that Joint Status Update (Dkt. 583).

17.    The next day, on December 9, 2020, Judge Corley held a discovery conference. Attached as **Exhibit R** is a true and correct copy of the transcript of that conference, during which Judge Corley authorized Plaintiffs to notice a 30(b)(6) deposition to explore whether categories of user data shared with third parties had been excluded from Facebook's productions.

18.    Attached as **Exhibit S** is a true and correct copy of Plaintiffs' Notice Of Deposition Of Facebook Pursuant To Federal Rule Of Civil Procedure 30(b)(6) (December 18, 2020).

19.    On January 15, 2021, Judge Corley held another discovery conference.  Attached as **Exhibit T** is a true and correct copy of the transcript of that conference, during which Judge Corley clarified the scope of the deposition she authorized and effectively quashed Plaintiffs' deposition notice.

20.    Attached as **Exhibit U** is a true and correct copy of relevant excerpts of Facebook's Second Amended Responses And Objections To Plaintiffs' Fourth Set of Interrogatories (February 11, 2021), concerning databases that house user data and relevant APIs.

21.    On February 23, 2021, Plaintiffs conducted a 30(b)(6) deposition of Facebook corporate designee Konstantinos Papamiltiadis.  Attached as **Exhibit V** is a true and correct copy of the transcript of this deposition.

22.    Attached as **Exhibit W** is a true and correct copy of a Letter from Plaintiffs' Counsel to Facebook's Counsel regarding Named Plaintiffs' content and information (March 1, 2021).

23.    Attached as **Exhibit X** is a true and correct copy of a Letter from Deborah Stein to Plaintiffs' Counsel regarding, *inter alia*, Named Plaintiffs' content and information (April 1, 2021).

24.    Attached as **Exhibit Y** is a true and correct copy of a Letter from Plaintiffs' Counsel to Facebook's Counsel regarding Named Plaintiffs' content and information (September 10, 2021).

25.     Attached as **Exhibit Z** is a true and correct copy of an Email from Facebook's Counsel to Plaintiffs' Counsel regarding Named Plaintiffs' content and information (September 16, 2021).

26.     **Exhibit AA** is a true and correct copy of Volume 46 of Facebook's production of documents to Plaintiffs.  I am separately emailing the Special Master and Plaintiffs Exhibit AA as a share file due to its large size.

27.     Attached as **Exhibit AB** is a true and correct copy of the location_history of Named Plaintiff Jason Ariciu, produced from his DYI file at FB-CA-MDL-00381770 through FB-CA-MDL-00381797.  Plaintiffs have requested that Facebook treat this document as Confidential.

28.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 28, 2021 in Palo Alto, California.

/s/ *Martie Kutscher*
Martie Kutscher

2664

**EXHIBIT A**
**PROVIDED VIA SHARE FILE**

# EXHIBIT B

# Exhibit A

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| About Me | Information you added to the **About** section of your timeline like relationships, work, education, where you live and more. It includes any updates or changes you made in the past and what is currently in the **About** section of your timeline. | Downloaded Info |
| Account Status History | The dates when your account was reactivated, deactivated, disabled or deleted. | Downloaded Info |
| Active Sessions | All stored active sessions, including date, time, device, IP address, machine cookie and browser information. | Downloaded Info |
| Address | Your current address or any past addresses you had on your account. | Downloaded Info |
| Ads | Ads you've recently viewed. | Downloaded Info |
| Ads Clicked | Dates, times and titles of ads clicked (limited retention period). | Downloaded Info |
| Ad Topics | A list of topics that you may be targeted against based on your stated likes, interests and other data you put in your timeline. | Downloaded Info |
| Advertising ID | The unique advertising identification numbers provided by your mobile device. These numbers are used to show you ads on the apps you use on your device. | Downloaded Info |
| Alternate Name | Any alternate names you have on your account (example: a maiden name or a nickname). | Downloaded Info |
| Apps | All of the apps you have added. | Downloaded Info |
| Articles | Articles you've recently read. | Downloaded Info |
| Autofill Information | Information you've provided, such as your address, that is used to pre-fill messages when you contact a business through Messenger. | Downloaded Info |
| Chat | A history of the conversations you've had on Facebook Chat (a complete history is available directly from your messages inbox). | Downloaded Info |

Source: *What categories of my Facebook data are available to me?*,
https://www.facebook.com/help/930396167085762, Table 2, *Information you can download using the Download Your Information tool* (last visited Sept. 18, 2020).

| | | |
|---|---|---|
| Chat Rules | Chat Rules you've accepted. | Downloaded Info |
| Check-ins | The places you've checked into. | Downloaded Info |
| Currency | Your preferred currency on Facebook. If you use Facebook Payments, this will be used to display prices and charge your credit cards. | Downloaded Info |
| Current City | The city you added to the **About** section of your timeline. | Downloaded Info |
| Date of Birth | The date you added to Birthday in the **About** section of your timeline. | Downloaded Info |
| Dating | The number of times you've recently visited the Dating section of Facebook. | Downloaded Info |
| Device ID | The unique identification numbers provided by the devices you use to log into Facebook. | Downloaded Info |
| Device Locale | The country and language from which you're accessing Facebook as determined by the devices you're using. | Downloaded Info |
| Education | Any information you added to Education field in the About section of your timeline. | Downloaded Info |
| Emails | Email addresses added to your account (even those you may have removed). | Downloaded Info |
| Email Address Verifications | A history of when you've verified your email address. | Downloaded Info |
| Events | Events you've joined or been invited to. | Downloaded Info |
| Event Contacts You've Blocked | People you've blocked from inviting you to events. | Downloaded Info |
| Event Interactions | The number of times you've recently visited the Events section of Facebook. | Downloaded Info |
| Events Visited | Event pages you've recently visited. | Downloaded Info |
| Facebook Live Videos | Live videos you've recently watched. | Downloaded Info |
| Facebook Watch Topics for Recommendations | A collection of topics that is used to show you relevant videos in the Facebook Watch tab. The topics are | Downloaded Info |

2

2668

| | based on your previous interaction history with things like links, videos, photos and Pages you've liked. | |
|---|---|---|
| Facial Recognition Data | A unique number based on a comparison of the photos you're tagged in. We use this data to help others tag you in photos. | Downloaded Info |
| Family | Friends you've indicated are family members. | Downloaded Info |
| Favorite Quotes | Information you've added to the Favorite Quotes section of the **About** section of your timeline. | Downloaded Info |
| Followers | A list of people who follow you. | Downloaded Info |
| Friends | A list of your friends. | Downloaded Info |
| Friend Requests | Pending, sent and received friend requests. | Downloaded Info |
| Friends You See Less | Friends whose activity you've chosen to see less of on Facebook. | Downloaded Info |
| Fundraisers | Fundraisers you've recently viewed. | Downloaded Info |
| Gender | The gender you added to the **About** section of your timeline. | Downloaded Info |
| Groups | A list of groups you belong to on Facebook. | Downloaded Info |
| Group Interactions | The number of times you've interacted with Groups on Facebook. | Downloaded Info |
| Groups Visited | Groups you've recently visited. | Downloaded Info |
| Hometown | The place you added to hometown in the **About** section of your timeline. | Downloaded Info |
| ID | A copy of the ID you submitted to confirm your identity and to help improve our automated systems for detecting fake IDs and related abuse. | Personal Data Request |
| Instant Games | Instant Games you've played. | Downloaded Info |
| IP Address Activity | Your recent activity from specific IP addresses. | Downloaded Info |

2669

| IP Address Message Activity | Your recent message activity from specific IP addresses. | Downloaded Info |
|---|---|---|
| IP Address Payment Activity | Your recent payment activity from specific IP addresses. | Downloaded Info |
| Language Settings | Your preferred language settings. | Downloaded Info |
| Last Location | Your most recent location determined by your device. | Downloaded Info |
| Linked Accounts | Accounts you've linked to your Portal. | Downloaded Info |
| Live Video Subscriptions | Scheduled Live videos you've subscribed to. | Downloaded Info |
| Logins | IP address, date and time associated with logins to your Facebook account. | Downloaded Info |
| Logouts | IP address, date and time associated with logouts from your Facebook account. | Downloaded Info |
| Marketplace Categories | Categories you've recently viewed. | Downloaded Info |
| Marketplace Interactions | Your recent interactions on Marketplace. | Downloaded Info |
| Marketplace Items | Items you've recently viewed. | Downloaded Info |
| Marketplace Services | Services you've recently viewed. | Downloaded Info |
| Matched Contacts | Contact information that may be associated with your account. | Personal Data Request |
| Menu Items | Areas of Facebook you've recently accessed through the main menu. | Downloaded Info |
| Messages | Messages you've sent and received on Facebook. Note, if you've deleted a message it won't be included in your download as it has been deleted from your account. | Downloaded Info |
| Messenger Contacts You've Blocked | Contacts you've blocked on Messenger. | Downloaded Info |
| Milestone Notifications | Notifications about your activity milestones, such as the number of reactions on a post, you've received and dismissed. | Downloaded Info |

2670

| Mobile Service Provider and Country Code | The service provider and country code associated with your phone number. | Downloaded Info |
|---|---|---|
| Name | The name on your Facebook account. | Downloaded Info |
| Name Changes | Any changes you've made to the original name you used when you signed up for Facebook. | Downloaded Info |
| News Feed Topics for Recommendations | A collection of topics that is used to show you relevant public posts in parts of your News Feed. The topics are based on your previous interaction history with things like links, videos, photos and Pages you've liked. | Downloaded Info |
| News Topics for Recommendations | A collection of topics that is used to show you relevant articles in the News tab. The topics are based on your previous interaction history with things like posts, videos, photos and Pages you've liked. | Downloaded Info |
| Notification ID | The identification numbers that we use to send you Facebook notifications on your device. | Downloaded Info |
| Page Notifications | Chat notifications you've dismissed from Pages you visit. | Downloaded Info |
| Page Visits | Pages you've recently visited. | Downloaded Info |
| Page Transparency Notices | A list of pages that you've received and dismissed notices from. | Downloaded Info |
| Pages You Admin | A list of pages you admin. | Downloaded Info |
| Pages You've Recommended | Pages you've recommended to others. | Downloaded Info |
| Pending Friend Requests | Pending, sent and received friend requests. | Downloaded Info |
| People | People and friends you've interacted with recently, including comments and reactions. | Downloaded Info |
| People Viewed | People you've recently viewed when new friends were suggested to you. | Downloaded Info |
| Phone Numbers | Mobile phone numbers you've added to your account, including verified mobile numbers you've added for security purposes. | Downloaded Info |

2671

| Photos | Photos you've uploaded to your account. | Downloaded Info |
|---|---|---|
| Photo Effects | A list of the photo effects you've used. | Downloaded Info |
| Photos Metadata | Any metadata that is transmitted with your uploaded photos. | Downloaded Info |
| Platforms | Platforms you've used to log into Facebook, such as the Facebook app or a browser. | Downloaded Info |
| Pokes | A list of who's poked you and who you've poked. Poke content from our mobile poke app is not included because it's only available for a brief period of time. After the recipient has viewed the content it's permanently deleted from our systems. | Downloaded Info |
| Political Views | Any information you added to Political Views in the About section of timeline. | Downloaded Info |
| Preferred Language for Videos | The preferred language for videos as determined by videos you've previously viewed. | Downloaded Info |
| Previously Removed Contacts | Friends you've recently removed but added back. | Downloaded Info |
| Primary Location | Your primary location is determined by information we use to support Facebook Products, such as the current city you entered on your profile and your device connection information. | Downloaded Info |
| Profile Visits | People whose profiles you've recently visited. | Downloaded Info |
| Recent Activities | Actions you've taken and interactions you've recently had. | Downloaded Info |
| Recently Visited | Videos and shows you've recently visited. | Downloaded Info |
| Record Details | Details included in some administrative records. | Downloaded Info |
| Registration Date | The date you joined Facebook. | Downloaded Info |
| Religious Views | The current information you added to Religious Views in the **About** section of your timeline. | Downloaded Info |
| Removed Friends | People you've removed as friends. | Downloaded Info |

2672

| | | |
|---|---|---|
| Saved Post Reminders | Reminders you've received after you've saved a post. | Downloaded Info |
| Screen Names | The screen names you've added to your account, and the service they're associated with. You can also see if they're hidden or visible on your account. | Downloaded Info |
| Secret Conversations | A list of the times you've used Secret Conversations in Messenger. | Downloaded Info |
| Secret Conversations You've Reported | A list of the secret conversations you've reported to Facebook. | Downloaded Info |
| See First | Profiles and Pages you've recently chosen to see first in your News Feed. | Downloaded Info |
| See Less | Profiles and Pages you've recently chosen to see less of in your News Feed. | Downloaded Info |
| Selected Language | The language you've selected to use Facebook in. | Downloaded Info |
| Session Type | Your current active session types. | Downloaded Info |
| Show Pages | A list of the Show Pages you've viewed and the videos you've watched from them. | Downloaded Info |
| Shows | A list of the individual videos you've watched. | Downloaded Info |
| Spoken Languages | The languages you added to Spoken Languages in the **About** section of your timeline. | Downloaded Info |
| Status Updates | Any status updates you've posted. | Downloaded Info |
| Time Spent | The amount of time you've spent watching videos from a Show Page. | Downloaded Info |
| Time Viewed | The amount of an individual video you've watched. | Downloaded Info |
| Timezone | The timezone you've selected. | Downloaded Info |
| Work | Any current information you've added to Work in the **About** section of your timeline. | Downloaded Info |
| Videos | Videos you've posted to your timeline. | Downloaded Info |

2673

| Video Creator Pages | Video creator Pages you've recently viewed. | Downloaded Info |
|---|---|---|
| Videos You've Removed | Videos you've removed from your Watch list. | Downloaded Info |
| Your Facebook Activity | A history of when you've accessed Facebook. | Downloaded Info |
| Your Pinned Posts | Posts you've pinned on your timeline. | Downloaded Info |

2674

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

IN RE: FACEBOOK, INC. CONSUMER
PRIVACY USER PROFILE LITIGATION,


This document relates to:

ALL ACTIONS

CASE NO. 3:18-MD-02843-VC-JS

**DECLARATION OF
BEN MITCHELL IN SUPPORT OF
FACEBOOK'S OPPOSITION TO
PLAINTIFFS' MOTION TO COMPEL
NAMED PLAINTIFF DATA**

I, Ben Mitchell, declare:

1.     I am Director of Product Management at Defendant Facebook, Inc. (hereinafter "Facebook"). I make this declaration on my own knowledge, and I would testify to the matters stated herein under oath if called upon to do so.

2.     In my role as Director of Product Management, my responsibilities include providing support for Facebook's "Download Your Information" or "DYI" tool. Through my role, I am familiar with the DYI tool, the data that it includes, and where that data is stored.

3.     Facebook uses the term the "Social Graph" to describe the complex web of people, places, things, actions, and connections on the Facebook platform. The Facebook product that users see is powered by a series of databases that work in tandem to provide Facebook users a seamless experience. As Facebook users navigate through Facebook and interact with it—including, for example, by commenting on posts made by other users, watching videos, posting photos, and sending messages—the users create new relationships and connections between themselves and the content they are able to see.[1] This web of people, places, things, actions, and connections is referred to as the "Social Graph."

4.     The DYI tool allows a user to download a copy of data Facebook associates with their Facebook account, including data associated with their account in the Social Graph.

5.     The DYI file for each individual user represents the most complete and best compilation of data Facebook maintains associated with that user, and the best available

---

[1]  ██████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████ I am generally aware that several databases collectively store the information that underlies the Social Graph and the names of these databases, but I am not knowledgeable about the technical details and functions of each underlying database.

compilation of the data about that user in the Social Graph, in a human-readable and producible form.

6.    Exhibit B to the Declaration of Martie Kutscher lists categories of data contained in a user's DYI file, unless data in a given category does not exist for the user or the user deleted it.  The DYI file does not include data such as (i) data a user has deleted from their own profiles (*e.g.*, photos that have been removed), (ii) any other data Facebook does not maintain; (iii) data associated only with a different user's account, or (iv) Facebook's trade secrets.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on October 28, 2021 at Felton, California.

*Ben Mitchell*

Ben Mitchell

2678

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

IN RE: FACEBOOK, INC. CONSUMER
PRIVACY USER PROFILE LITIGATION,


This document relates to:

ALL ACTIONS

CASE NO. 3:18-MD-02843-VC-JS


**DECLARATION OF**
**SUKHESH MIRYALA IN SUPPORT OF**
**FACEBOOK'S OPPOSITION TO**
**PLAINTIFFS' MOTION TO COMPEL**
**NAMED PLAINTIFF DATA**

I, Sukhesh Miryala, declare as follows:

1.      I am a Director of Product Management at Facebook, Inc. ("Facebook").  My job responsibilities include, among other things, developing and testing advertising products for Facebook.  I submit this declaration in support of Facebook's opposition to Plaintiffs' motion to compel production of named plaintiffs' content and information.  Unless otherwise stated, I have personal knowledge of the facts set forth herein, and, if called as a witness, I could and would competently testify thereto.

2.      My understanding is that Plaintiffs in this matter have requested that Facebook identify all data sources that may contain information related to the named plaintiffs, including data obtained from third parties regarding users' off-platform activities and data inferred from users' on or off-platform activities.

3.      I also understand that Plaintiffs rely on a document entitled Ads and Measurement and beginning with the Bates Stamp FB-CA-MDL-00213424 (Plaintiffs' Exhibit 11).  I have reviewed that document, including its metadata.  ███████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████

4.      Facebook's advertising platform enables advertisers to target and measure the effectiveness of ads.  ██████████████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████. Facebook uses this data to create audience options for advertisers.

5.     To deliver ads on Facebook, an advertiser selects an "audience" for an ad based on characteristics of the audience the advertiser wishes to reach—like age, location, and other details.

6.     ████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████

7.     ██████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████

8.     At no point in this ad delivery process are data about users' off-platform activities, or inferences derived from users' on-platform or off-platform activities sold to or otherwise shared with advertisers.  To the contrary, Facebook considers this data proprietary.  If Facebook sold or otherwise shared this data to advertisers, that would be detrimental to Facebook's ability to generate revenue from advertisers.

9.     Facebook provides advertisers with aggregated and anonymized reports about the audience seeing their ads and how their ads are performing, but Facebook does not share

information that personally identifies a user. Facebook also confirms which ads led users to make a purchase or take an action with an advertiser. At no point in this measurement process are data obtained from third parties about users' off-platform activities, or inferences derived from users' on-platform or off-platform activities sold to or otherwise shared with advertisers.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 28, 2021 at Oakland, California.

Sukhesh Miryala

Sukhesh Miryala

2683

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

IN RE: FACEBOOK, INC. CONSUMER
PRIVACY USER PROFILE LITIGATION,


This document relates to:

ALL ACTIONS

CASE NO. 3:18-MD-02843-VC-JS

**DECLARATION OF
KARANDEEP ANAND IN SUPPORT OF
FACEBOOK'S OPPOSITION TO
PLAINTIFFS' MOTION TO COMPEL
NAMED PLAINTIFF DATA**

I, Karandeep Anand, declare:

1.      I am Vice President, Business Products at Defendant Facebook, Inc. (hereinafter "Facebook"). I make this declaration on my own knowledge, and I would testify to the matters stated herein under oath if called upon to do so.

2.      In my role as Vice President, Business Products, I am familiar with how Facebook shares or makes data available to third parties, including application developers and partners. I am also generally familiar with how Facebook's platform operates, how data about particular users can be accessed, and how that data is shared with third parties.

3.      Facebook makes individualized data about Facebook users available to third parties—including app developers and partners—through application programming interfaces ("APIs"). These APIs pull data exclusively from Facebook's Social Graph.

4.      Facebook uses the term the "Social Graph" to describe the complex web of peoples, places, things, actions, and connections on the Facebook platform. The Facebook product that users see is powered by a series of databases that work in tandem to provide Facebook users a seamless experience. As Facebook users navigate through Facebook and interact with it—including, for example, by commenting on posts made by other users, watching videos, posting photos, and sending messages—the users create new relationships and connections between themselves and the content they are able to see.[1] This web of people, places, things, actions, and connections is referred to as the "Social Graph." The activities a user takes on the Facebook Platform, including posting pictures to their profiles, liking photos, and

---

[1]  ███████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████ I am generally aware that several databases collectively store the information that underlies the Social Graph and the names of these databases, but I am not knowledgeable about the technical details and functions of each underlying database.

commenting on friends' timelines, and certain activities a user takes off of the Facebook Platform, are reflected in the Social Graph.

5.      APIs are a standard industry programming tool and they allow applications to access data and features of other applications, services, or operating systems. APIs can provide access to a defined set of User Data (e.g., a user's name or Facebook ID) or other information the developer is authorized to access, (e.g., photos a user has shared with the developer).

6.      APIs Facebook has made available to third parties—including app developers and partners—that allow access to user-identifiable information query the Social Graph only. This was also true during the period from 2007 to present and is true of all of the APIs identified in Facebook's response to Plaintiffs' Fourth Set of Interrogatories. Users' privacy settings and the permission they specifically grant the applications they access or download control what non-public data third parties are able to access about them, as described in Facebook's Data Policy.

7.      Facebook also maintains a data warehouse called Hive, which is separate from the Social Graph. ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████ Facebook does not provide any APIs that allow third parties to retrieve data from Hive and third parties are not able to access Hive directly.

████████████████████████████████████████████ ████████████████████

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 28, 2021 at Seattle, Washington.

*Karandeep Anand*
_____

Karandeep Anand

2687

# EXHIBIT F

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC., CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PRETRIAL ORDER NO. 20:<br>GRANTING IN PART AND DENYING<br>IN PART MOTION TO DISMISS<br>FIRST AMENDED COMPLAINT** |

This lawsuit, which stems from the Cambridge Analytica scandal, is about Facebook's practice of sharing its users' personal information with third parties. The plaintiffs are current and former Facebook users who believe that their information was compromised by the company. Their principal allegations are that Facebook: (i) made sensitive user information available to countless companies and individuals without the consent of the users; and (ii) failed to prevent those same companies and individuals from selling or otherwise misusing the information. The plaintiffs do not merely allege that Facebook shared what we often describe as "data" – basic facts such as gender, age, address, and the like. They allege that Facebook shared far more substantive and revealing content that users intended only for a limited audience, such as their photographs, videos they made, videos they watched, their religious and political views, their relationship information, and the actual words contained in their messages.

Facebook has filed a motion to dismiss the lawsuit. Although the company makes many different arguments, there are three main ones. First, Facebook argues that people have no legitimate privacy interest in any information they make available to their friends on social media. This means, according to Facebook, that if people use social media to communicate

sensitive information with a limited number of friends, they have no right to complain of a privacy violation if the social media company turns around and shares that information with a virtually unlimited audience. As explained in Section II of this ruling, Facebook's argument could not be more wrong. When you share sensitive information with a limited audience (especially when you've made clear that you intend your audience to be limited), you retain privacy rights and can sue someone for violating them.

Second, Facebook argues that even if its users had a privacy interest in the information they made available only to friends, there is no standing to sue in federal court because there were no tangible negative consequences from the dissemination of this information. That too is wrong. As explained in Section III, the law has long recognized that a privacy invasion is itself the kind of injury that can be redressed in federal court, even if the invasion does not lead to some secondary economic injury like identity theft.

Facebook's third main argument is that even if users retained a privacy interest in the information that was disclosed, and even if a "bare" privacy invasion confers standing to sue in federal court, this lawsuit must be dismissed because Facebook users consented, in fine print, to the wide dissemination of their sensitive information. As discussed in Section IV, this question is more difficult than the first two. California law requires the Court to assume as a legal matter (even if it's not true as a factual matter) that users reviewed, understood, and agreed to all of Facebook's contractual terms when they signed up for their accounts. These terms included a description of at least some of Facebook's information-sharing practices, for at least a portion of the time period covered by this lawsuit. In particular, from roughly 2009 to 2015, Facebook disclosed its practice of allowing app developers to obtain, through a user's Facebook friends, any information about the user that the friends had access to.

That single disclosure, however, is relatively inconsequential for this motion to dismiss. The complaint adequately alleges that users who established their Facebook accounts prior to roughly 2009 never consented to this practice. Plaintiffs in this category may pursue claims based on information-sharing with app developers. Moreover, the complaint adequately alleges

2

that no users ever consented to Facebook's other information-sharing practices – specifically, sharing with certain "whitelisted apps" starting in 2015, and sharing with certain "business partners" during much of the relevant time period. Finally, the complaint adequately alleges that users never consented to Facebook's widespread practice of allowing companies to sell and otherwise misuse sensitive user information, as opposed to restricting the use of this information as Facebook promised it would. Therefore, even though Facebook's arguments regarding user consent have some legal force and will somewhat limit the scope of the lawsuit, they cannot defeat the lawsuit entirely, at least at the pleading stage.

Accordingly, as set forth in Section V (which discusses the specific legal claims asserted by the plaintiffs), although Facebook's motion to dismiss will be granted for a few of the claims, most claims survive.

## I. BACKGROUND

Cambridge Analytica, a British political consulting firm, used personal information from millions of Facebook accounts to send targeted political messages during the 2016 presidential campaign. The firm obtained this information from Aleksandr Kogan, a researcher who had acquired it through his app, which Facebook had allowed him to deploy on its platform. The Cambridge Analytica incident began receiving significant press coverage in 2018, which in turn generated increased scrutiny of Facebook's information-sharing practices. In the months that followed, reports emerged suggesting that the ability of people like Kogan and entities like Cambridge Analytica to obtain sensitive Facebook user information was the norm rather than the exception. Broadly speaking, this case is about whether Facebook acted unlawfully in making user information widely available to third parties. It's also about whether Facebook acted unlawfully in failing to do anything meaningful to prevent third parties from misusing the information they obtained.

Following the Cambridge Analytica outcry, dozens of lawsuits were filed against Facebook in various courts around the country. The lawsuits were mostly in federal court, and they were mostly proposed class actions by individual Facebook users who contended that

Facebook disseminated their sensitive personal information to Kogan without their consent and failed to prevent him from transferring it to Cambridge Analytica. One of the first of these lawsuits was filed in the Northern District of California and randomly assigned to this Court.

When multiple, similar federal lawsuits are filed around the country, there is a process within the federal judiciary for handling them. Congress has created the Judicial Panel on Multidistrict Litigation, which considers whether to transfer similar cases to a single federal judge for pretrial proceedings. The purpose is to promote the orderly adjudication of multiple similar cases, avoiding conflicting rulings from different judges and alleviating the strain on the system that would result from many judges adjudicating the same complicated pretrial issues. The multidistrict litigation process contemplates that once the assigned judge adjudicates those issues, the individual cases are sent back for trial to the courts where they originated. In these cases against Facebook, the panel concluded that assignment to a single judge was warranted, and assigned the lawsuits to this Court.

This Court subsequently appointed two attorneys to serve as lead plaintiffs' counsel. Thereafter, lead counsel, representing roughly three dozen individual Facebook users, filed a consolidated class action complaint. The plaintiffs propose to represent a class consisting of all Facebook users in the United States and the United Kingdom whose personal information was improperly disseminated and/or inadequately protected by Facebook from 2007 to the present. The practical effect of the proposed class action is that this one consolidated complaint could potentially resolve all claims by private parties against Facebook arising from the company's practices of disseminating user information during this period. In other words, this proceeding has effectively become one large proposed class action, as opposed to a group of several dozen separate lawsuits.[1]

Facebook filed a motion to dismiss, and a lengthy hearing took place during which the

---

[1] Other lawsuits which are not part of this multidistrict litigation have been filed against Facebook by law enforcement entities from states or localities. Although Facebook attempted to fold one such lawsuit into this proceeding, the Court rejected that attempt. *See Illinois, ex rel. Kimberly M. Foxx v. Facebook*, 354 F. Supp. 3d 1122 (N.D. Cal. 2019).

2692

parties and the Court discussed many potential deficiencies in the complaint. The hearing ended with the Court giving the plaintiffs permission to file an amended complaint to address any such deficiencies.

The amended complaint, which is the subject of the current motion to dismiss, runs 414 pages and includes 1,442 paragraphs. It appears to include all the claims that were asserted in the cases that were transferred here by the multidistrict litigation panel, and more. But for manageability purposes, the complaint is divided into "prioritized claims" and "nonprioritized claims." The idea is that the prioritized claims (which presumably reflect lead counsel's judgment about their relative strength or importance) will be adjudicated first, and the nonprioritized claims should be stayed and addressed later if necessary. The complaint names multiple defendants (for example, CEO Mark Zuckerberg, in addition to Facebook itself), but again divides those defendants into the "prioritized" and "non-prioritized" categories. Facebook is the only prioritized defendant.

It's worth noting that the case has expanded in scope. While the initial lawsuits focused largely on Facebook's conduct that was the subject of the Cambridge Analytica scandal, the case now includes allegations stemming from the subsequent revelations about Facebook's wider information-sharing practices. Moreover, although the complaint purports to assert 12 prioritized "claims," most of those purported claims actually consist of multiple distinct legal claims, based on distinct factual allegations. For example, the section entitled "Breach of Contract" appears to contain roughly half a dozen distinct claims for breach of contract, based on distinct acts of alleged wrongdoing. Indeed, at times it seems the plaintiffs sought to identify anything Facebook has ever been reported to have done wrong and then made sure to sprinkle in at least a few allegations about it.

This strategy interferes significantly with the clarity and effectiveness of the plaintiffs' presentation. Some of the allegations are quite vague. For example, the plaintiffs make an allegation, the significance of which the Court has not been able to understand, about Facebook stripping metadata from users' photos before allowing third parties to access them. Also

5

scattered throughout the complaint are allegations about something the plaintiffs call "psychographic marketing," without any meaningful explanation of the legal or factual difference between psychographic marketing and targeted advertising (the latter of which the plaintiffs appear to concede is perfectly legitimate).

Overall, the presence of so many disparate and vague allegations makes it nearly impossible for Facebook to meaningfully respond to all of them, much less for the Court to effectively address them. The conventional approach in a situation like this might be to sift through the complaint to try to identify each distinct claim, then dismiss with leave to amend all claims that are not adequately articulated. But that approach would likely result in many more rounds of motions to dismiss, bogging the case down at the pleading stage for years. In the interest of preventing that from happening to this multidistrict litigation, this ruling focuses on what the Court understands to be the plaintiffs' core allegations about Facebook's handling of sensitive user information. Claims based on these core factual allegations will largely survive the motion to dismiss. All other prioritized claims not addressed by this ruling will be stayed (effectively, relegated to non-prioritized status) and adjudicated, if necessary, at a later stage in the proceedings with the other non-prioritized claims.

The core allegations in the complaint describe four categories of wrongdoing by Facebook. In adjudicating Facebook's motion to dismiss, the Court is required to assume the truth of these allegations, so long as they are adequately articulated and not contradicted by any documents that the complaint explicitly relies on.

1. Giving app developers access to sensitive user information. Since roughly 2007, Facebook users have been able to access applications, or apps, directly from the Facebook platform to do things like play video games, read news content, or stream videos. According to the plaintiffs, this interaction among Facebook, its users, and third-party apps is one of the primary means by which Facebook has disseminated user information to third parties. The complaint alleges that when users accessed apps on the Facebook platform, the app developers were not merely able to obtain information about the users they were interacting with; they were

also able to obtain any information about the users' Facebook friends that the users themselves had access to. So, for example, if you decided to use an app on the Facebook platform to play a video game, the video game company would be able to access not only your information but also any information about your friends that you could obtain yourself. This includes a variety of things that your friends might have intended to share only with a limited audience, such as photographs, videos they made, videos they watched, religious preferences, posts, and even sometimes private one-on-one messages sent through Facebook. And since most people have dozens or hundreds of Facebook friends, each interaction with an app represents the disclosure of a great deal of information about dozens or hundreds of people.

The Cambridge Analytica story is an example of this. In 2013, Aleksandr Kogan created an app called "MyDigitalLife." Facebook allowed Kogan to market and operate this app on the Facebook platform. The app invited Facebook users to answer a series of questions to help them better understand themselves – a personality test of sorts. But when a user took the test, Kogan was not merely able to collect information about that user; he was able to collect information on the user's Facebook friends. This allowed Kogan to compile a database with information on roughly 87 million Facebook users, even though his app was only downloaded by around 300,000 people.

The plaintiffs allege that from roughly 2009 to 2015, tens of thousands of app developers like Kogan, operating on the Facebook platform, were able to interact with users to obtain this type of information about users' friends. The plaintiffs further allege that Facebook failed to adequately disclose that even if users adjusted their privacy settings to specify that only their friends would be allowed to see their information, this would not prevent app developers from getting it.

2. Continued disclosure to whitelisted apps. In 2014, in response to criticism of its information-sharing practices, Facebook announced it would restrict app developers so they would have access only to the information of the users the apps were interacting with (and not to information of the users' friends). But the plaintiffs allege that Facebook, despite its public

promises to restrict access, continued to allow a preferred list of app developers to access the information of users' friends. The complaint describes these preferred app developers as "whitelisted apps," and alleges that Facebook secretly continued to give these apps "special access" to friends' information because of the amount of revenue these apps generated for Facebook. Thousands of companies were allegedly on this list, including Airbnb, Netflix, UPS, Hot or Not, Salesforce, Lyft, Telescope, and Spotify.

3. Sharing sensitive user information with business partners. Meanwhile, Facebook has maintained a separate information-sharing program with companies that the plaintiffs describe as "business partners." The complaint's allegations about these business partners are somewhat more difficult to pin down than the allegations about app developers. Indeed, there may be some overlap between companies in the "app" category and the "business partner" category. Moreover, the plaintiffs allege that Facebook outsourced to business partners "the time, labor, and money required to build Facebook's Platform on different devices and operating systems," but that doesn't seem to describe all the "business partners" listed in the complaint. The non-exclusive list of companies that the complaint identifies as business partners includes device manufacturers, such as Blackberry and Samsung. It includes websites such as Yahoo, and the Russian search engine Yandex. And it includes companies such as Amazon, Microsoft, and Sony. This list came from Facebook itself, which asserted that it had "integration partnerships" with these companies in a letter to the Energy and Commerce Committee of the U.S. House of Representatives.

Although the category is somewhat vague, the alleged misconduct is relatively straightforward. The complaint alleges that Facebook shared information about its users with this non-exclusive list of business partners, and that those companies in turn shared data with Facebook. "These partnerships," the complaint alleges, "were built in part on 'data reciprocity.' Facebook and its partners agreed to exchange information about users' activities with each other." And as with app developers, Facebook allegedly would give a business partner access not only to information of the user with whom the business partner interacted, but also to

information of that user's friends. The plaintiffs allege that, for most of the period covered by the lawsuit, Facebook never disclosed that it was sharing user information with business partners in this fashion.

_4. Failure to restrict the use of sensitive information._ In addition to complaining about Facebook's dissemination of private user information to app developers, whitelisted apps, and business partners, the plaintiffs allege that Facebook did nothing to prevent these third parties from misusing the information Facebook allowed them to access. Specifically, the plaintiffs allege that: (i) Facebook purported to have a policy preventing app developers from using information for any purpose other than enhancing the interaction between the app and the person who was using the app on the Facebook platform; but (ii) Facebook did nothing to enforce this policy, thus giving users the impression that their information was protected, while in reality countless app developers were using it for other purposes.

Again, the Cambridge Analytica story is an example of this. According to the plaintiffs, if Facebook was truly enforcing a policy of limiting the use of user information by app developers, Kogan would have been precluded from extracting all that sensitive information about users' friends to employ for his own research, and he would certainly have been precluded from selling it to Cambridge Analytica. The plaintiffs allege that this was the norm with the tens of thousands of app developers who interacted with users on the Facebook platform – that any policy Facebook purported to have restricting the use of information by third parties was nonexistent in reality, because Facebook was intent solely on generating revenue from the access it was providing.

Based on the four core categories of misconduct described above, the plaintiffs assert a variety of legal claims. They bring a privacy-based tort claim under California law for the unauthorized disclosure of private facts. They assert another privacy-based tort claim for intrusion into private affairs, along with a similar claim based on the right to privacy enshrined in the California Constitution. They bring two claims based on federal statutes: the Stored Communications Act (which prohibits the unauthorized disclosure of information from

computers) and the Video Privacy Protection Act (which prohibits disclosure of a person's video viewing habits). And the plaintiffs bring a variety of other California law claims that don't relate as directly to privacy but are nonetheless based on assertions that Facebook failed to protect their privacy. Such claims include breach of contract (for allowing third parties to obtain sensitive user information despite promising to protect it), deceit (for tricking users about the degree to which their information could be accessed), and negligence (for failing to prevent third parties from misusing sensitive information despite Facebook's duty to protect that information). As mentioned earlier, many of these purported claims actually have multiple distinct claims built into them. Facebook has moved to dismiss all the claims, both for lack of standing and on the merits.

## II. EXPECTATION OF PRIVACY

Facebook's motion to dismiss is littered with assumptions about the degree to which social media users can reasonably expect their personal information and communications to remain private. Because Facebook's view of this issue pervades so many of its individual legal arguments – and because Facebook's view is so wrong – it is addressed at the outset.

Facebook's view is that once you make information available to your friends on social media, you completely relinquish any privacy interest in that information. For this reason, Facebook insists, it does not matter whether Facebook users consented to the company's information-sharing practices. Facebook asserts that even if users didn't consent, and even if users intended to restrict access to friends only, and even if Facebook had explicitly promised not to share their information with anyone else, the users would have no right to complain that their privacy was invaded by the disclosure or misuse of their sensitive information. Although this argument was implicit in Facebook's papers, it became explicit at the hearing on the motion to dismiss. Dkt. No. 287 at 7 (hearing transcript).[2]

---

[2] Facebook appears to contend that this issue relates both to standing and to the merits of any claims in which the plaintiffs assert an expectation of privacy (such as the privacy claims brought under California tort law or the California Constitution). As discussed in Section IV with respect to consent, the issue of whether users have a reasonable expectation of privacy in

The problem with Facebook's argument is that it treats privacy as an all-or-nothing proposition – either you retain a full privacy interest by not sharing information with anyone, or you have no privacy interest whatsoever by virtue of sharing it even in a limited fashion. In reality, there can be "degrees and nuances to societal recognition of our expectations of privacy: the fact that the privacy one expects in a given setting is not complete or absolute does not render the expectation unreasonable as a matter of law." *Sanders v. American Broadcasting Companies, Inc.*, 20 Cal. 4th 907, 915 (1999); *see also Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 991-93 (N.D. Cal. 2015). Thus, as the U.S. Supreme Court has explained, "information may be classified as private if it is intended for or restricted to the use of a particular person *or group or class of persons*" rather than being "freely available to the public." *U.S. Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) (emphasis added) (quoting Webster's Third New International Dictionary 1804 (1976)); *see also id.* at 763 ("Thus the extent of the protection accorded a privacy right at common law rested in part on the *degree* of dissemination of the allegedly private fact . . . ."). So, for example, if you are diagnosed with a medical condition, you can expect to conceal it completely only if you keep it between you and your doctor. But it does not follow that if you send an email to selected colleagues and friends explaining why you'll be out of commission for a while, you've relinquished any privacy interest in your medical condition, such that the email provider could disseminate your diagnosis to anyone who might be interested in your health status. Similarly, social media users can have their privacy invaded if sensitive information meant only for a few dozen friends is shared more widely.[3]

Although Facebook refuses in this case to acknowledge its users' privacy interests, it has done so in other court cases. For example, in a brief filed with the California Supreme Court, for

---

information they share with their social media friends is best understood as relating to the merits, not standing. *See, e.g.*, *American Farm Bureau Federation v. U.S. Environmental Protection Agency*, 836 F.3d 963, 968 (8th Cir. 2016).

[3] It seems quite possible that a user whose settings allow information to be shared not only with friends, but friends of friends, loses any expectation of privacy, although that issue is not squarely presented by this motion to dismiss.

2699

a case where Facebook fought against the compelled disclosure of a user's posts, Facebook compared information kept on social media to information kept on a smartphone: "The data on a smartphone – like the data maintained in a social media account – can reveal an individual's private interests and concerns and where a person has been, which in turn reflects a wealth of detail about a person's familial, political, professional, religious, and sexual associations." Answer Brief on the Merits, *Facebook, Inc. v. Superior Court*, 2016 WL 684072 (Cal.), at *29 (brackets and internal quotations omitted) (quoting *Riley v. California*, 573 U.S. 373, 396 (2014)). For this reason, Facebook continued, "communications content of the kind maintained by [social media] providers" carries with it such a significant expectation of privacy that even law enforcement must get a warrant before accessing it from those providers. *Id*. In a different California Supreme Court brief, Facebook took pains to juxtapose users who share communications with the general public against users who share communications only with friends: "These settings cannot be overridden by others; if a post is set to be viewable only by a certain audience, it may not then be shared or forwarded through the Facebook platform to someone outside that audience." Answering Brief on the Merits, *Facebook, Inc. v. Superior Court*, 2018 WL 2060039 (Cal.), at *16. Facebook added that even if users designate their communications to be viewed by the general public, they can later "regain" their expectation of privacy in that information by switching their settings back to a more restricted audience. *See id.* at *28 n.4.

Perhaps Facebook's argument that social media accounts are like smartphones is an exaggeration in the other direction. But it's closer to the truth than the company's assertions in this case. Sharing information with your social media friends does not categorically eliminate your privacy interest in that information, and the plaintiffs' claims in this lawsuit must be analyzed against that backdrop, rather than the backdrop Facebook attempts to paint in its motion to dismiss.

2700

III. STANDING

To bring their claims in federal court, the plaintiffs must adequately allege (and eventually prove) that they have "standing" under Article III of the United States Constitution. This means, among other things, that the plaintiffs must allege they suffered an actual injury from Facebook's conduct that is both "concrete" and "particularized." *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1545 (2016).

The plaintiffs allege three kinds of injury. First, they allege a simple "privacy injury" – that is, injury from Facebook's widespread disclosure of their sensitive information, including their photographs, videos they made, videos they watched, religious preferences, posts, and even private one-on-one messages sent through Facebook. Second, the plaintiffs allege they were injured because Facebook's dissemination of their personal information increased the risk that they would become victims of identity theft. Third, the plaintiffs allege they were deprived the economic value of their personal information as a result of its dissemination, the theory apparently being that if their information had remained private, they could have sold that information to advertisers or data brokers themselves.

The second and third alleged injuries do not confer Article III standing. Regarding the risk of identity theft, this is not a case involving, say, hackers, and it is not a case about the theft of, say, social security or credit card numbers. Although the risk of identity theft is admittedly greater than if Facebook had not made the plaintiffs' personal information available, the risk is too speculative to confer standing. *Compare In re Zappos.com, Inc.*, 888 F.3d 1020, 1024-29 (9th Cir. 2018). Regarding loss of value, although it's true that each user's information is worth a certain amount of money to Facebook and the companies Facebook gave it to, it does not follow that the same information, when not disclosed, has independent economic value to an individual user. The plaintiffs do not plausibly allege that they intended to sell their non-disclosed personal information to someone else. Nor, in any event, do they plausibly allege that someone else would have bought it as a stand-alone product. The plaintiffs' economic-loss theory is therefore purely hypothetical and does not give rise to standing. *See In re Facebook Internet Tracking Litigation*,

13

140 F. Supp. 3d 922, 931-32 (N.D. Cal. 2015); *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1057 (N.D. Cal. 2014); *Yunker v. Pandora Media, Inc.*, 2013 WL 1282980, at *4 (N.D. Cal. Mar. 26, 2013); *Low v. LinkedIn Corp.*, 2011 WL 5509848, at *4-5 (N.D. Cal. Nov. 11, 2011).[4]

But the first alleged injury – that the plaintiffs' sensitive information was disseminated to third parties in violation of their privacy – is sufficient to confer standing. Facebook argues that a "bare" privacy violation, without "credible risk of real-world harm" such as identity theft or other economic consequences, cannot rise to the level of an Article III injury. But it's black-letter law that an injury need not be "tangible" to be cognizable in federal court. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) ("Although tangible injuries are perhaps easier to recognize, we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete."). And courts have often held that this particular type of intangible injury – disclosure of sensitive private information, even without further consequence – gives rise to Article III standing.

Indeed, the Ninth Circuit has repeatedly explained that intangible privacy injuries can be redressed in the federal courts. This issue has tended to come up recently in cases where a plaintiff alleges standing based on the violation of a statute whose purpose is to protect privacy. In such cases, the alleged violation of the statute does not automatically give rise to standing. For a statutory violation to create standing, the statute must protect against a concrete and particularized injury that's cognizable within the meaning of Article III.

Most recently on this issue, the Ninth Circuit handed down an opinion in a different case against Facebook – a case involving Facebook's use of facial recognition technology in alleged violation of an Illinois statute. The Court held that "the development of a face template using facial recognition technology without consent (as alleged here) invades an individual's private affairs and concrete interests." *Patel v. Facebook, Inc.*, 2019 WL 3727424, at *5 (9th Cir. Aug.

---

[4] *But see In re Facebook Privacy Litigation*, 572 F. App'x 494, 494 (9th Cir. 2014); *Williams v. Facebook, Inc.*, No. 18-cv-01881-RS, Dkt. No. 128 at 11-13 (N.D. Cal. Aug. 29, 2019); *Svenson v. Google Inc.*, 2015 WL 1503429, at *5 (N.D. Cal. Apr. 1, 2015).

8, 2019). Earlier, in *Eichenberger v. ESPN*, the Ninth Circuit held that an alleged violation of the Video Privacy Protection Act creates standing, explaining that the statute "protects privacy interests . . . generally by ensuring that consumers retain control over their personal information," and emphasizing that "privacy torts do not always require additional consequences to be actionable." 876 F.3d 979, 983 (9th Cir. 2017). And in *Van Patten v. Vertical Fitness Group, LLC*, the Ninth Circuit concluded that alleged violations of the Telephone Consumer Protection Act, which creates a cause of action to remedy the injury of receiving annoying telemarketing text messages, give rise to standing because such messages, "by their nature, invade the privacy and disturb the solitude of their recipients." 847 F.3d 1037, 1043 (9th Cir. 2017). The *Van Patten* court emphasized that a lawsuit alleging this type of intrusion under the statute may proceed in federal court even if no additional, tangible harm is alleged. *Id.*

There are many similar cases involving common law claims. For example, Judge Seeborg recently held that a lawsuit asserting common law privacy claims against Facebook based on the collection and disclosure of users' Android data could proceed in federal court despite the absence of any alleged economic injury. *Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1050 (N.D. Cal. 2018) ("The complaint need not include economic injury to establish standing for the intrusion upon seclusion, invasion of privacy, or unjust enrichment claims."). In reaching this conclusion, Judge Seeborg quoted another decision involving Facebook – this one by Judge Davila – which held: "a plaintiff need not show actual loss to establish standing for common-law claims of invasion of privacy and intrusion upon seclusion." *In re Facebook Internet Tracking Litigation*, 263 F. Supp. 3d 836, 843 (N.D. Cal. 2017); *see also In re Google Inc. Cookie Placement Consumer Privacy Litigation*, 806 F.3d 125, 134-35 (3d Cir. 2015) (holding that the plaintiffs had standing to assert federal statutory and California common law privacy claims based on allegations that the defendants implanted tracking cookies on their personal computers); *id.* at 134 ("For purposes of injury in fact, the defendants' emphasis on economic loss is misplaced."); *Cᴇperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1057 (N.D. Cal. 2014).

To be sure, Facebook cites a few cases that lean in the other direction. For example, in a

2703

2012 case, Judge Grewal rejected the argument that the "loss of personal information, even in the absence of any cognizable economic harm, was sufficient to confer Article III standing." *In re Google, Inc. Privacy Policy Litigation*, 2012 WL 6738343, at *5 (N.D. Cal. Dec. 28, 2012). But Judge Grewal's ruling seems to *assume* that economic harm is required rather than examining whether it's required. This appears equally true of the earlier district court cases on which he relied. *See LaCourt v. Specific Media, Inc.*, 2011 WL 1661532, at *4 (C.D. Cal. Apr. 28, 2011); *In re iPhone Application Litigation*, 2011 WL 4403963, at *5 (N.D. Cal. Sept. 20, 2011). Ultimately, the only reason Judge Grewal gave for his ruling was that "nothing in the precedent of the Ninth Circuit or other appellate courts confers standing on a party that has brought statutory or common law claims based on nothing more than the unauthorized disclosure of personal information . . . ." *In re Google, Inc. Privacy Policy Litigation*, 2012 WL 6738343, at *5. Whether or not he was right about precedent at the time, the cases cited above provide ample support for the conclusion that this type of privacy invasion alone creates standing.

And those cases are right. To say that a "mere" privacy invasion is not capable of inflicting an "actual injury" serious enough to warrant the attention of the federal courts is to disregard the importance of privacy in our society, not to mention the historic role of the federal judiciary in protecting it. "In a democratic society privacy of communication is essential if citizens are to think and act creatively and constructively." *Bartnicki v. Vopper*, 532 U.S. 514, 533 (2001) (quoting President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 202 (1967)). For this reason, our country has countless federal laws on the books designed to protect our privacy – laws that the federal courts are charged with enforcing.[5] Perhaps the most prominent of these is the Wiretap Act, colloquially

---

[5] *See, e.g.*, Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. No. 104-191, 110 Stat. 1936; Children's Online Privacy Protection Act of 1998, 15 U.S.C. §§ 6501-6506 (2012); Driver's Privacy Protection Act of 1994, 18 U.S.C. §§ 2721-2775 (2012); Electronic Communications Privacy Act of 1986, Pub. L. No. 99-508, 100 Stat. 1848; Privacy Protection Act of 1980, Pub. L. No. 96-440, 94 Stat. 1879; Right to Financial Privacy Act of 1978, 12 U.S.C. §§ 3401-3422 (2012); Privacy Act of 1974, 5 U.S.C. § 552a (2012).

known as "Title III," a bedrock privacy protection which makes it unlawful for either the government or a private party to intercept someone's "wire, oral, or electronic communication" without consent. 18 U.S.C. § 2511. Would Facebook really argue that a violation of this statute inflicts no "actual injury" on the participants in the conversation unless interception of the communication ends up visiting a more tangible, secondary harm on the participants?

Of course, a plaintiff cannot get into court by simply intoning that she suffered an intangible privacy injury. But once it is understood that an intangible privacy injury *can* be enough, it becomes easy to conclude that the alleged privacy injury here *is* enough. The alleged injury is "concrete" largely for the reasons already discussed – if you use a company's social media platform to share sensitive information with only your friends, then you suffer a concrete injury when the company disseminates that information widely. And the alleged injury is "particularized," at least for most of the plaintiffs. To be particularized, the injury must have been suffered directly by the individual plaintiff, and it must be distinct from the more general type of objection that members of the public at large might have to a defendant's unlawful conduct. *See Spokeo*, 136 S. Ct. at 1548. The plaintiffs allege that Facebook violated their privacy rights (and other rights) because: (i) they engaged in sensitive communications that included photographs, videos they made, videos they watched, Facebook posts, likes, and private one-on-one messages; (ii) they intended to share these communications only with a particular person or a group of people; (iii) Facebook made those communications widely available to third parties in a variety of ways; and (iv) as a result, third parties were able to develop detailed dossiers on the plaintiffs including information about their locations, their religious and political preferences, their video-watching habits, and other sensitive matters.[6]

Facebook makes one argument regarding particularity that, if successful, would merely

---

[6] It's possible that a few of the named plaintiffs have not adequately alleged a privacy injury based on their own Facebook experience. However, Facebook does not single out any particular named plaintiff in its motion, and most of the plaintiffs have adequately alleged standing. Facebook will be given an opportunity to attempt to knock out individual named plaintiffs on standing grounds at a later stage.

2705

narrow the scope of this case rather than ending it entirely. Recall that this lawsuit arose from the Cambridge Analytica scandal, with the plaintiffs originally alleging that Facebook gave Aleksandr Kogan access to their information (with Kogan, in turn, giving it to Cambridge Analytica). The plaintiffs initially alleged, plausibly and with specificity, that Kogan likely accessed their own information. But the plaintiffs now allege that Facebook disseminated sensitive user information far more widely, to tens of thousands of app developers and business partners. Facebook argues that because the complaint lacks specific allegations about which app developers or business partners obtained which plaintiffs' private information, the plaintiffs have not alleged an injury particular to them, at least beyond the injury from the disclosure to Kogan.

This argument puts too great a burden on the plaintiffs, at least at the pleading stage (and probably at any stage). If, as alleged in the complaint, Facebook made users' "friends only" information readily available to such a broad swath of companies (Apple, Samsung, AT&T, Sprint, T-Mobile, Verizon, Google, Huawei, Microsoft, Mozilla, LG, and Amazon, to name just a few), it is virtually inevitable that some of these companies obtained information on the named plaintiffs. *Cf. Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1021 (N.D. Cal. 2012). This type of privacy invasion is no less an Article III injury simply because the plaintiffs are left to guess precisely which companies (other than Facebook) were involved.

Accordingly, for all the claims addressed by this ruling, Facebook cannot obtain dismissal for lack of Article III standing.

## IV. CONSENT

There is one more global issue to discuss before proceeding to a claim-by-claim analysis of the complaint. Facebook contends that the plaintiffs agreed, when they signed up for their accounts, that Facebook could disseminate their "friends only" information in the way it has done. If the complaint and any judicially noticeable materials were to establish that Facebook users consented to the alleged misconduct, this would indeed require dismissal of virtually the entire case. However, the complaint adequately alleges that some users did not consent to any of Facebook's practices. And although Facebook is correct as a matter of law that some users

consented to the first category of conduct (sharing information with app developers), the
complaint adequately alleges that those users did not consent to the other three categories
(sharing information with whitelisted apps starting in 2015, sharing information with business
partners, and failing to protect user information from misuse).

<div align="center">A.</div>

As an initial matter, Facebook asserts that consent is actually a standing issue. It contends
that there is no true Article III injury on the facts of this case because the plaintiffs cannot be
injured by something they allowed Facebook to do.

But the whole point of Article III standing is that some claims don't belong in federal
court even if the plaintiff would win on the merits. Therefore, the standing inquiry in this case is:
assuming the plaintiffs could win on the merits, should their claims nonetheless be dismissed for
lack of standing because the injury they allegedly suffered is not cognizable in federal court? The
plaintiffs allege they did not consent – and this is an allegation they would need to prevail on if
they are to succeed on the merits. Thus, the Court must assume, for purposes of the standing
inquiry, that the plaintiffs did not consent. "A party need not prove that the action it attacks is
unlawful in order to have standing to level that attack . . . . Rather, in determining whether
plaintiffs have standing, we must assume that on the merits they would be successful in their
claims." *Muir v. Navy Federal Credit Union*, 529 F.3d 1100, 1106 (D.C. Cir. 2008) (alterations
omitted).

This rule holds even when the standing question overlaps substantially with the question
of whether a plaintiff has stated a claim. "As a general rule, when the question of jurisdiction and
the merits of the action are intertwined, dismissal for lack of subject matter jurisdiction is
improper." *Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold &
Easement in the Cloverly Subterranean Geological Formation*, 524 F.3d 1090, 1094 (9th Cir.
2008) (internal quotations and alterations omitted); *see also Safe Air for Everyone v. Meyer*, 373
F.3d 1035, 1040 (9th Cir. 2004) ("The district court erred in characterizing its dismissal of Safe
Air's complaint under Rule 12(b)(1) because the jurisdictional issue and substantive issues in

<div align="center">19</div>

2707

this case are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits.").

In privacy cases, the standing and merits inquiries will often be intertwined. For example, the extent to which you have a reasonable expectation of privacy relates not only to whether you've stated a claim for invasion of privacy but whether you were injured by the invasion in the first place. And this will often be true of consent – if you agree to the disclosure of your personal information, it may be difficult to argue that you've been "injured" in a legal sense by the disclosure you permitted. But in virtually every privacy case, consent will be part of the merits inquiry. Because courts presume success on the merits when evaluating standing, these are not standing issues in privacy cases.[7]

A good illustration of this is *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037 (9th Cir. 2017). In that case, which was in a summary judgment posture, the Ninth Circuit held that the plaintiffs established standing to sue based on the receipt of allegedly unwanted text solicitations. But in the same opinion, the Court held that the plaintiffs must lose on the merits, because they consented to receive those texts. *Id.* at 1044. Although courts occasionally conflate standing with the merits in privacy cases, they generally recognize the need to keep them separate. *See, e.g.*, *American Farm Bureau Federation v. U.S. Environmental Protection Agency*, 836 F.3d 963, 968 (8th Cir. 2016) ("The EPA reasons that because the disputed information was publicly available on the Internet or available for public review, further distribution of the information could not establish any injury. That conclusion, however, assesses the merits of the asserted privacy interest under FOIA rather than whether the associations' members had a legally cognizable interest in preventing the agency's release of their personal information."); *In re Vizio, Inc., Consumer Privacy Litigation*, 238 F. Supp. 3d 1204, 1216 (C.D. Cal. 2017)

---

[7] It's possible that a federal court confronted with truly frivolous privacy claims might reasonably consider intertwined issues as a matter of standing – for example, if the absence of a reasonable privacy expectation, or the presence of consent, were obviously and totally indisputable. *Cf. Williston Basin Interstate Pipeline*, 524 F.3d at 1094. But even in a rare case like that, it still probably makes more sense for the court to dismiss the claims on the merits (which, after all, is just as easy to do, and also gives the defendant the benefit of preclusion).

2708

(rejecting, in a privacy case, a standing argument that "improperly conflates the merits of Plaintiffs' claims with their standing to bring suit"); *id.* ("Taken to its logical conclusion, Defendants' argument absurdly implies that a court could never enter judgment against a plaintiff on a VPPA claim if it found that the disclosed information was not within the statutory definition of personally identifiable information; instead, it would have to remand or dismiss for lack of jurisdiction."); *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1020 (N.D. Cal. 2012) (explaining that whether a plaintiff adequately alleges standing to assert privacy claims "in no way depends on the merits" of those claims (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975))).

<div align="center">B.</div>

Whether the plaintiffs consented to Facebook's information-sharing practices is thus a merits inquiry. And the parties actually agree on several aspects of that inquiry. First, they agree that, for virtually all claims, the question of whether Facebook users consented to the alleged conduct is one of contract interpretation governed by California law.[8] Second, the parties agree that California law requires the Court to pretend that users actually read Facebook's contractual language before clicking their acceptance, even though we all know virtually none of them did. Constrained by this fiction, the Court must analyze the relevant contractual language to assess whether the users "agreed" to allow Facebook to disseminate their sensitive information in the ways described in the lawsuit. Third, the parties agree that if the contract language at issue is reasonably susceptible to more than one interpretation, with one of those interpretations suggesting consent and another belying it, the Court cannot decide the consent issue in Facebook's favor at the motion to dismiss stage. And fourth, they agree that the contract language must be assessed objectively, from the perspective of a reasonable Facebook user. The

---

[8] For the claim under the federal Video Privacy Protection Act, consent is governed by the terms of the statute itself. This issue is discussed in the portion of Section V dealing with that claim. The federal Stored Communications Act precludes information-sharing by computer service providers without "lawful" consent; this is presumably a reference to state law, and the parties don't suggest otherwise, so this ruling assumes that California law applies to the consent issue relating to that claim.

upshot, at this early stage of the case, is that if a reasonable Facebook user could plausibly have interpreted the contract language as *not* disclosing that Facebook would engage in particular conduct, then Facebook cannot obtain dismissal of a claim about that conduct (at least not based on the issue of consent).[9]

One difficulty with the consent question is that the lawsuit covers a nearly 13-year period – from 2007 to the present. Obviously, Facebook said different things to its users over that period, and its practices changed as well. And it would be impossible at this stage to analyze which disclosures apply to which plaintiffs, because the parties have not presented the information necessary to conduct that inquiry. The analysis in this ruling will primarily focus on the documents presented to users who signed up for accounts in the middle of 2012. At least with respect to the four categories of alleged misconduct addressed in this ruling, these mid-2012 documents provide a good exemplar of what Facebook users agreed to during much of the period covered by this lawsuit; indeed, users agreed to substantially similar language between roughly 2009 and 2015. Thus, these documents allow the Court to assess consent as a general matter, even if the analysis might not apply to every single plaintiff.[10]

---

[9] The parties disagree about whether consent should be treated as an element of the plaintiffs' claims or as an affirmative defense to those claims. The answer is likely that consent is an element for some claims and an affirmative defense for others. But at least for purposes of this motion it does not matter, because in either case the question is whether the allegations in the complaint and any judicially noticeable materials definitively establish that the plaintiffs consented to the conduct. If the answer is yes, the Court must dismiss the claims regardless of whether consent is an element or a defense. *See, e.g.*, *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013) ("When an affirmative defense is obvious on the face of a complaint . . . a defendant can raise that defense in a motion to dismiss."); *see also Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980).

[10] Incidentally, the fact that the plaintiffs seek to represent a class of people who used Facebook any time between 2007 and the present raises the possibility that some aspects of this lawsuit are time-barred, and Facebook presses this issue in its motion to dismiss. For example, Facebook notes that it was the subject of a consent order by the Federal Trade Commission in 2012, based on similar information-sharing practices. That consent order may have put the plaintiffs on notice of Facebook's conduct prior to the entry of the order (although presumably it would not have put them on notice of any misconduct by Facebook following entry of the consent order). Facebook also invokes a single news article from 2015 (which this Court may consider on a motion to dismiss because the article is incorporated by reference into the complaint). That article discusses the company's information-sharing practices, and Facebook asserts that this should have put

People who signed up for accounts in mid-2012 were required to accept Facebook's "Statement of Rights and Responsibilities," or "SRR." The SRR itself contains some statements about privacy and information-sharing. But it also references, and contains links to, several other policies, including the "Data Use Policy."[11] Although both sides agree that the language in the SRR is contractual, they dispute whether the Data Use Policy is part of that contract. This dispute matters because the Data Use Policy more explicitly discusses sharing information with third parties, and it contains the language Facebook primarily relies on to contend that its users consented to much of the alleged misconduct. The SRR is attached as Appendix A to this ruling, and the Data Use Policy is attached as Appendix B.[12]

The first section of the SRR, entitled "Privacy," calls out the Data Use Policy in the second sentence, provides a link to it, and encourages the user to read it. This first section of the SRR states in full: "Your privacy is very important to us. We designed our <u>Data Use Policy</u> to make important disclosures about how you can use Facebook to share with others and how we collect and can use your content and information. We encourage you to read the Data Use Policy, and to use it it to help you make informed decisions." Appendix A at 2. Later on the same page, the SRR tells users to read the Data Use Policy to learn about "how you can control what information other people may share with applications." *Id.* And at the end, the SRR provides a

---

everyone on notice of its conduct. This seems more dubious than the argument about the FTC's 2012 consent order. But in any event, statutes of limitations provide an affirmative defense, which normally must be raised at summary judgment rather than on a motion to dismiss. *U.S. ex rel. Air Control Technologies, Inc. v. Pre Con Industries, Inc.*, 720 F.3d 1174, 1178 (9th Cir. 2013). The only exception is when it is absolutely clear from the allegations in the complaint and judicially noticeable material that a claim is untimely and no tolling doctrine could apply. That cannot be said here – at best Facebook has raised a significant possibility that claims relating to pre-2012 conduct may be time-barred, a defense that will need to be decided on summary judgment or at trial.

[11] Earlier versions of the "Statements of Rights and Responsibilities" were called "Terms of Service." Earlier versions of the "Data Use Policy" were called the "Privacy Policy."

[12] The request to consider these documents, which are exhibits 23 and 44 to Facebook's request for judicial notice at Docket Number 187, is granted because they are incorporated by reference into the complaint. The request to consider exhibits 14, 19, 26, 39, 40, 43, 46, and 47 is granted for the same reason. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). All other requests, beyond those granted in this footnote and in Footnote 10, are denied, although in any event they would not affect the outcome of this motion. *See id.*

list of additional documents the user "may also want to review," including the Data Use Policy, which "contains information to help you understand how we collect and use information." *Id.* at 11. This final section again includes a link to the Data Use Policy (along with several other documents that are described as governing the relationship between Facebook and its users).

This is sufficient to incorporate the Data Use Policy into the contractual agreement between Facebook and its users. Indeed, California case law makes it quite easy to incorporate a document by reference. "The contract need not recite that it incorporates another document, so long as it guides the reader to the incorporated document." *Shaw v. Regents of University of California*, 58 Cal. App. 4th 44, 54 (1997) (quotations omitted). What's needed is simply that the reference to the document be unequivocal, that the document be called to the attention of the contracting parties, and that the terms of the document be easily available to the contracting parties. *Id.*; *see also Wolschlager v. Fidelity National Title Insurance Co.*, 111 Cal. App. 4th 784, 790-91 (2003); *In re Anthem, Inc. Data Breach Litigation*, 2016 WL 3029783, at *8 (N.D. Cal. May 27, 2016); *Kofler Electrical Mechanical Apparatus Repair, Inc. v. Wartsila North America, Inc.*, 2011 WL 1086035, at *4-5 (N.D. Cal. Mar. 24, 2011). One could argue that the California appellate courts have been too quick to find incorporation by reference and that more explicit language should be required, particularly in the context of consumer contracts of adhesion. But this Court must apply California case law, which militates in favor of the conclusion that the Data Use Policy is incorporated into the SRR.

Thus, the true legal question is whether, by "agreeing" to the SRR and Data Use Policy, Facebook users consented to the alleged misconduct. In analyzing this question, it's important to reiterate the precise conduct at issue. Recall that the plaintiffs allege four categories of misconduct: (i) Facebook allowed app developers to access sensitive information, not merely of users they interacted with, but of the users' friends; (ii) even after Facebook announced it would no longer give app developers access to information of users' friends, it secretly continued to give "whitelisted apps" access; (iii) through some separate arrangement and by some separate means, Facebook shared sensitive user information with its business partners; and (iv) although

24

Facebook ostensibly had a policy of sharply limiting the use of the sensitive information it gave to third parties, in fact Facebook imposed no limits whatsoever.

It's easy to conclude, at the pleading stage, that the second category of conduct was not disclosed. In fact, Facebook does not even argue that its users assented to this practice. The same goes for the third category: although Facebook points to a section in its Data Use Policy entitled "Service Providers" which says "we give your information to the people and companies that help us provide, understand, and improve the services we offer," that statement does not come close to disclosing the massive information-sharing program with business partners that the plaintiffs allege in the complaint. Thus, for the claims based on sharing with whitelisted apps and business partners, Facebook cannot prevail on consent, at least at this stage.

In contrast, the first category of conduct – allowing the Aleksandr Kogans of the world to interact with users and obtain information of the users' friends through those interactions – was disclosed in the terms agreed to by Facebook users, at least for a portion of the period covered by this lawsuit. To begin, the SRR told users: "You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings." Appendix A at 2. As mentioned previously, the SRR also flagged for users the possibility that other people "may share" their information "with applications," and instructed users to read the Data Use Policy to learn more about this. *Id.* In turn, the Data Use Policy said that "if you share something on Facebook anyone who can see it can share it with others, including the games, applications, and websites they use." Appendix B at 10. And it instructed: "If you want to completely block applications from getting your information when your friends and others use them, you will need to turn off all Platform applications. This means you will no longer be able to use any third-party Facebook-integrated games, applications, or websites." *Id.*

Thus, contrary to the plaintiffs' argument, the language of these disclosures cannot be interpreted as misleading users into believing that they merely needed to adjust their privacy settings to "friends only" to protect their sensitive information from being disseminated to app developers. Users were told that they needed to adjust their application settings too. To be sure,

for the rare person who actually read the contractual language, it would have been difficult to isolate and understand the pertinent language among all of Facebook's complicated disclosures. Thus, in reality, virtually no one "consented" in a layperson's sense to Facebook's dissemination of this information to app developers. But under California law, users must be deemed to have agreed to the language quoted in the preceding paragraph, which means that users who did not properly adjust their application settings are deemed to have agreed that app developers could access their information.[13]

But there is a caveat. One inference from the complaint and the judicially noticeable materials is that Facebook began to disclose this practice of giving app developers access to friends' information only around 2009. Thus, users who established Facebook accounts before this time did not, at least based on the allegations in the complaint, agree to these terms when they signed up. Facebook contends this does not matter, because those users agreed to be bound by the SRR and Data Use Policy going forward, even when the terms changed. There appears to be some disagreement in the courts about whether a unilateral modification provision of this sort is permissible under California contract law, at least in circumstances where the party against whom it is being asserted did not receive adequate notice of the modification. *Compare Campos v. JPMorgan Chase Bank, NA*, 2019 WL 827634, at *10 (N.D. Cal. Feb. 21, 2019), *with Rodman*

---

[13] Incidentally, there is a pending case in which the Federal Trade Commission proposes a $5 billion civil penalty against Facebook, along with a 20-year consent decree. Stipulated Order for Civil Penalty, Monetary Judgment, and Injunctive Relief, *USA v. Facebook, Inc.*, No. 19-cv-2184 (D.D.C. July 24, 2019). The lawsuit filed on behalf of the FTC accuses Facebook of, among other things, failing to adequately disclose the practice of allowing app developers to access user information through users' friends. At first glance, this ruling's conclusions regarding consent might appear inconsistent with some of the allegations in the FTC lawsuit. That lawsuit curiously neglects to mention the language that Facebook used in its Data Use Policy, and therefore does not paint a complete picture of the communications between Facebook and its users, at least with respect to users who signed up after 2009. But even considering the disclosures in the Data Use Policy, the FTC's position is not necessarily inconsistent with this ruling. The FTC's claims against Facebook are not based on California law; they are based on alleged violations of the Federal Trade Commission Act and the earlier FTC consent order from 2012. While California law, for better or worse, allows Facebook to bury a disclosure of its information-sharing practices in the fine print of its contractual language, the FTC consent order required Facebook to disclose such practices prominently, in a way that would likely come to the attention of Facebook users. More broadly, the consent order precluded Facebook from explicitly or implicitly misrepresenting the extent to which the company protects user privacy.

2714

*v. Safeway Inc.*, 2015 WL 604985, at *9-10 (N.D. Cal. Feb. 12, 2015), *aff'd*, 694 F. App'x 612 (9th Cir. 2017). But assuming for argument's sake the general validity of Facebook's unilateral modification provision, it does not automatically follow that users consented to the particular terms that Facebook subsequently added about sharing information with app developers. Even the cases upholding unilateral modification provisions recognize that any authority to modify the contract is constrained by the covenant of good faith and fair dealing. *See, e.g.*, *Campos*, 2019 WL 827634, at *9. This means that a Facebook user, when consenting to the unilateral modification provision, was consenting only to future modifications made in good faith. According to the plaintiffs, Facebook made a massive change in its contract without directly notifying its users, effectively adding a disclosure that "we will make your information readily available to tens of thousands of app developers unless you take complicated measures to prevent it." If that's true, it could very well constitute a breach of the covenant of good faith and fair dealing, which would mean that the users didn't consent to it.

And users who did not agree to the practice in their contracts could have been kept further in the dark about it by specific features of the Facebook platform. According to the complaint, in 2009 Facebook added a feature for users to select their audience for specific posts, choosing among "public," "friends," or a "custom" audience. Users were not informed, as part of this selection process, that designation of a limited audience would not prevent app developers from being part of that audience.

Thus, at this stage, the Court cannot conclude as a matter of law that early Facebook users consented to the later-announced information-sharing policy. This means that any plaintiff who signed up before roughly 2009 may pursue claims based on this conduct (assuming they can adequately allege the other elements of their claims).[14]

The fourth category of alleged misconduct – failing to limit how third parties could use

---

[14] As previously mentioned, neither side has attempted to specify which plaintiffs may pursue which claims, and it is unclear precisely when the disclosures changed on this issue; the parties will have an opportunity to parse this out at a subsequent phase in the case.

the sensitive information they accessed – is also somewhat complicated. The Data Use Policy, after explaining to users that applications could obtain their information from their friends, stated as follows: "If an application asks permission from someone else to access your information, the application will be allowed to use that information only in connection with the person that gave the permission and no one else." Appendix B at 10. The Policy gives an example of this: "one of your friends might want to use a music application that allows them to see what their friends are listening to. To get the full benefit of that application, your friend would want to give the application her friend list – which includes your User ID – so the application knows which of her friends is also using it." *Id.* From this example, it seems clear that the phrase "the application will be allowed to use that information only in connection with the person that gave the permission" means that if an app developer accesses your information through interaction with one of your Facebook friends, it may use your information only as part of its interaction with that friend. It therefore may not sell your information, or use it to develop a digital dossier on you for future targeted advertising.

Less clear is what Facebook is promising to do to protect users. Facebook interprets the disclosure to mean, in essence, "we tell app developers that they can only use your information to facilitate their interactions with your friends, but you can't really be sure they'll honor that." Perhaps a reasonable Facebook user could interpret the disclosure that way, which would mean that the user, upon agreeing to the Data Use Policy, assumed the risk that app developers would misuse the information. In other words, on this interpretation, users consented to an arrangement whereby app developers could end up obtaining their sensitive information for any purpose. But recall that in the context of this motion to dismiss the plaintiffs may be deemed to have consented to this arrangement only if that is the only plausible interpretation. It is not – there are at least two others. One equally plausible interpretation of the disclosure is that it assures users that Facebook is actively policing the activities of app developers on its platform, and thereby successfully preventing sensitive information from being misappropriated. Another plausible interpretation is that the word "allowed" references a technological block of sorts – that is,

perhaps a user could conclude that the Facebook platform has the ability to physically prevent app developers from being able to "see" friend information outside the context of their interactions with users. A user who has tried to access a fantasy football website at work, only to see a message on his screen that he's not "allowed" to access the site from that computer, might interpret the disclosure this way. Indeed, the Data Use Policy elsewhere uses the word "allowed" in a similar fashion, to connote a technological block. For example, it states: "If someone clicks on a link to another person's timeline, they'll only see the things that they are allowed to see." Appendix B at 8. Thus, there are at least three plausible interpretations of the contract language, two of which would lead to a conclusion that users did not consent but were misled, because Facebook allegedly did nothing to enforce its purported policy against tens of thousands of app developers who were freely making off with sensitive user information.[15]

The bottom line on the issue of consent is this: the complaint plausibly alleges that some users (and some plaintiffs) did not consent to the arrangement whereby app developers could access their sensitive information simply by interacting with their friends. For the remaining three categories of misconduct – sharing with whitelisted apps, sharing with business partners, and failing to prevent misuse of information by third parties – the complaint plausibly alleges that none of the users consented. The issue of consent therefore does not require dismissal in full of any of the prioritized claims in this lawsuit.[16]

---

[15] Incidentally, with respect to the allegation that Facebook failed to restrict the use of information by business partners (as opposed to app developers, to the extent those two categories don't overlap), it's unclear whether this contract language applies at all. If it does not apply, that would further weaken Facebook's argument that users were on notice that the company imposed no meaningful restriction on the use of information by business partners (although it could also undermine the plaintiffs' argument that Facebook committed a breach of contract by failing to prevent business partners from misusing information). Whether this language applies to restrictions on business partners, however, is not capable of firm resolution at this stage.

[16] Facebook makes an additional argument that even if the plaintiffs didn't explicitly consent to the alleged conduct in contractual language, they did so implicitly because they were put on notice of the conduct by Facebook's non-contractual disclosures. That issue cannot be resolved at the pleading stage in this case. *See, e.g.*, *In re Google Inc. Gmail Litigation*, 2014 WL 1102660, at *16 (N.D. Cal. Mar. 18, 2014) ("Implied consent is an intensely factual question that requires consideration of the circumstances . . . .").

## V. INDIVIDUAL CLAIMS

The various global issues having been addressed (and the complaint having been narrowed, for now, to claims based on the plaintiffs' core allegations), it becomes less difficult to sift through the individual claims asserted by the plaintiffs. Most of the claims will survive. The specific outcome for each claim is as follows:

- Facebook's motion to dismiss is granted in part and denied in part for the three privacy-based torts asserted under California law (public disclosure of private facts, intrusion into private affairs, and violation of the constitutional right to privacy).

- The motion is granted in part and denied in part for the claim based on the federal Stored Communications Act.

- The motion is denied in full for the federal Video Privacy Protection Act claim.

- The motion is denied in full for the California claim based on negligence and gross negligence.

- For the California claims based on deceit by concealment, breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment, the motion is granted in part and denied in part.

- The motion is granted in full for violation of the right of publicity and the Unfair Competition Law.

Public disclosure of private facts. For this tort to give rise to liability, the following must occur: (i) the defendant must disclose a private fact about the plaintiff; (ii) the private fact must not be a matter of public concern; (iii) the disclosure must be to the public; and (iv) the disclosure must be offensive and objectionable to a reasonable person. *See Doe v. Gangland Productions., Inc.*, 730 F.3d 946, 958 (9th Cir. 2013). The plaintiffs have adequately alleged that Facebook engaged in this conduct.

Facebook argues that the information about users that it disclosed to app developers was not "private" because users had allowed their Facebook friends to access that information. But as discussed in Section II, your sensitive information does not lose the label "private" simply because your friends know about it. Your privacy interest in that information may diminish

2718

because you've shared it with your friends, but it does not necessarily disappear. For example, the plaintiffs allege that app developers accessed information about their religious preferences and political views. Your friends may know about your religious and political views, but the widespread dissemination of them can still invade your privacy. The plaintiffs also allege that some of the information app developers received would allow them to discern a user's location (for example, a post saying "Check out where I'm staying in June!"). If you've told your friends where you'll be at a particular time, that does not preclude a lawsuit based on the widespread, nonconsensual distribution of that information.

Facebook also argues that the user information was not disseminated to "the public." This is based on the erroneous assumption, already rejected in Section III, that the plaintiffs have failed to allege with sufficient particularity that their information was disclosed to anyone other than Aleksandr Kogan. And dissemination of your private information to tens of thousands of individuals and companies is generally going to be equivalent to making that information "public." Perhaps Facebook could have made a better argument, which is that there's a difference between publicizing your sensitive information for actual human beings to scrutinize (like, in a newspaper) and allowing your information to be added to the vast sea of "big data" that computers rather than humans analyze for the purpose of sending targeted advertising on behalf of companies. Perhaps there is an argument that the former is the "public disclosure" of information within the meaning of California law while the latter is not. But that is not an issue that can be resolved at this stage of the litigation: Facebook does not pursue this argument, and in any event the plaintiffs do not allege that their information was merely subject to relatively anonymous computer analysis.

Finally, Facebook contends that its disclosure of sensitive user information to app developers and business partners would not be offensive to a reasonable person. Facebook makes a similar argument for the next two claims discussed below (intrusion into private affairs and the constitutional right to privacy), because those claims also require the plaintiff to allege (and eventually prove) that the privacy violation was a serious breach of social norms. "Sharing is the

social norm undergirding Facebook," the company argues, "and Facebook did not breach that social norm by sharing user data consistent with users' preferences." Motion to Dismiss at 41, Dkt. No. 261-1. There are a number of problems with this assertion. First, it again erroneously assumes a "norm" that there is no privacy interest in the information kept on social media. The social norm Facebook created with its product is purposefully sharing with one's friends, not having one's information shared by Facebook with unknown companies and individuals. Second, it assumes that users consented to the widespread disclosure of their sensitive information, but the plaintiffs have adequately alleged that they didn't. Thus, at this stage of the case, the plaintiffs have adequately alleged that Facebook's conduct was offensive and an egregious breach of social norms: it disclosed to tens of thousands of app developers and business partners sensitive information about them without their consent, including their photos, religious preferences, video-watching habits, relationships, and information that could reveal location. It even allegedly disclosed the contents of communications between two people on Facebook's ostensibly private messenger system.[17]

The motion to dismiss this claim is granted with respect to the first category of conduct for plaintiffs who consented to this conduct, as discussed in Section IV. It is denied in all other respects.[18]

Intrusion on private affairs and violation of the constitutional right to privacy. The analysis for these two tort claims is functionally identical, even though each claim is described somewhat differently in the case law. "When both claims are present, courts conduct a combined inquiry that considers (1) the nature of any intrusion upon reasonable expectations of privacy, and (2) the offensiveness or seriousness of the intrusion, including any justification or other relevant interests." *In re Facebook Internet Tracking Litigation*, 263 F. Supp. 3d 836, 846 (N.D.

---

[17] The "big data" concept referenced in the preceding paragraph may also have relevance to whether the privacy invasion is "offensive or serious," but not at this stage.

[18] Unless stated otherwise, dismissal is without leave to amend because the Court cannot conceive of a way the plaintiffs could successfully amend the claim based on the particular factual theory involved.

Cal. 2017) (internal quotations omitted). Under California law, courts must be reluctant to reach a conclusion at the pleading stage about how offensive or serious the privacy intrusion is. *Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1054 (N.D. Cal. 2018) (Whether conduct rises to the level of highly offensive "is indeed a factual question best left for a jury." (internal quotations omitted)); *Opperman v. Path, Inc.*, 205 F. Supp. 3d 1064, 1080 (N.D. Cal. 2016) ("A judge should be cautious before substituting his or her judgment for that of the community."). For the reasons already discussed, the plaintiffs have adequately alleged that they suffered an egregious invasion of their privacy when Facebook gave app developers and business partners their sensitive information on a widespread basis.

The motion to dismiss this claim is granted with respect to the first category of conduct for plaintiffs who consented to this conduct, as discussed in Section IV. It is denied in all other respects.

Stored Communications Act. The Stored Communications Act ("SCA") is a federal law that restricts when a computer service provider like Facebook may share the contents of a communication with someone who is not party to that communication. *See* 18 U.S.C. § 2702. The plaintiffs have plausibly alleged that Facebook violated the SCA.

Facebook notes that there is an exception to SCA liability when one of the parties to the communication consents to its disclosure by the computer service provider. 18 U.S.C. § 2702(b)(3). In the social media context, this means that whenever people make information available to one another, there is no SCA violation if one of those people consents to the disclosure of the information. Facebook contends that this exception applies here, because even if a user didn't directly consent to Facebook's disclosure of information to app developers, the user's friend consented when that friend interacted with the app.

There are two problems with this argument, at least at the pleading stage. First, it does not respond to the allegations about Facebook's decision to share user information with whitelisted apps starting in 2015 or with business partners – nothing in the complaint or the judicially noticeable material would permit a conclusion that either a plaintiff or a plaintiff's

Facebook friend permitted disclosure to those entities. Second, as to the typical app developer, as discussed in Section IV, plaintiffs who signed up for Facebook before 2009 did not (if the allegations of the complaint are to be believed) authorize Facebook to share information through their friends with app developers. Nor is there a basis to conclude as a matter of law that their friends authorized the app developers to receive this information. Neither side describes with any specificity the dialogue that would have taken place between the friend and the app developer that resulted in the app developer's acquisition of communications that would otherwise be protected by the SCA.

The motion to dismiss this claim is granted with respect to the first category of conduct for plaintiffs who consented to this conduct, as discussed in Section IV. It is denied in all other respects.

Video Privacy Protection Act. The Video Privacy Protection Act ("VPPA") was passed by Congress after a newspaper published a Supreme Court nominee's video rental history. The statute prohibits knowing disclosure of "personally identifiable information" by a "video tape service provider." 18 U.S.C. § 2710. The plaintiffs have adequately alleged that Facebook violated the VPPA.

Facebook first contends that the user information it shared with app developers, whitelisted apps, and business partners is not "personally identifiable information." But the VPPA defines this broadly as "information which identifies a person as having requested or obtained specific video materials or services. . . ." 18 U.S.C. § 2710(a)(3). Or as the Ninth Circuit has put it, "information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *Eichenberger*, 876 F.3d 979, 985 (9th Cir. 2017) (quotations omitted). The plaintiffs adequately allege that Facebook regularly shared information about the videos that users received in their private messages and about videos they "liked." Complaint ¶¶ 424, 867, 868. And it is reasonable to infer, at least at the pleading stage, that when a user receives a video or likes a video, he watches the video, such that this information sheds significant light on his video-watching behavior.

Facebook also contends it is not a "video tape service provider" within the meaning of the VPPA, but that too cannot be decided in Facebook's favor on this motion to dismiss. The statute defines a video tape service provider as anyone "engaged in the business . . . of rental, sale, *or delivery* of prerecorded video cassette tapes or similar audio visual materials . . . ." 18 U.S.C. § 2710(a)(4) (emphasis added).[19] The plaintiffs allege that Facebook "regularly delivers" video content to users and maintains a cache of videos and visual materials, including from content providers like Netflix, for their delivery to users. Complaint ¶¶ 862, 864. Although one could imagine a different conclusion at summary judgment once the evidence is examined, it is plausible to conclude from these and related allegations that Facebook engages in the business of delivering audio visual materials, and that its business is "significantly tailored to serve that purpose." *See, e.g.*, *In re Vizio, Inc., Consumer Privacy Litigation*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017).

Facebook also did not obtain the type of consent necessary to authorize the sharing of this information. The VPPA outlines specific requirements for consent in the context of sharing video-information, including that it be set out in a separate form. *See* 18 U.S.C. § 2710(b)(2)(B). Facebook does not argue that it obtained this type of consent from its users. Therefore, even beyond the reasons discussed in Section IV relating to consent more generally, the plaintiffs adequately allege that they did not consent within the meaning of the VPPA, and this applies to all the information-sharing, for all time periods, discussed in this ruling.

The motion to dismiss this claim is denied.

Negligence and Gross Negligence. Negligence has four elements under California law: duty, breach, causation, and injury. See *Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077, 1083 (2017). The plaintiffs' negligence claim is based on the fourth category of conduct, and it adequately alleges each of the required elements as to that conduct. As discussed at length above,

---

[19] There is no dispute in this motion that at least some video files that get distributed on Facebook's platform qualify as "similar audio visual materials." 18 U.S.C. § 2710(a)(4).

the plaintiffs have alleged present and non-speculative privacy injuries.[20] The plaintiffs have also plausibly alleged that Facebook breached a duty to them. Facebook had a responsibility to handle its users' sensitive information with care. *See Bass v. Facebook, Inc.*, 2019 WL 2568799, at *10 (N.D. Cal. June 21, 2019). And contrary to Facebook's argument, the plaintiffs do not seek to hold Facebook liable for the conduct of the app developers and business partners; they seek to hold the company liable for its own misconduct with respect to their information. Specifically, the plaintiffs allege that they entrusted Facebook with their sensitive information, and that Facebook failed to use reasonable care to safeguard that information, giving third parties access to it without taking any precautions to constrain that access to protect the plaintiffs' privacy, despite assurances it would do so. This lawsuit is first and foremost about how Facebook handled its users' information, not about what third parties did once they got hold of it.

The various exculpatory clauses in Facebook's terms also do not require dismissing the negligence claim. While such clauses can successfully waive liability for ordinary negligence, California law forbids limiting liability for gross negligence. *City of Santa Barbara v. Superior Court*, 41 Cal. 4th 747, 777 (2007) ("[P]ublic policy generally precludes enforcement of an agreement that would remove an obligation to adhere to even a minimal standard of care."). The complaint plausibly alleges gross negligence, since it contends that Facebook did essentially nothing to safeguard users' information – conduct that might well be characterized as lacking "even scant care." *Id*. at 754. Ordinary and gross negligence are not separate causes of action in California. *See Nypl v. Crisis Prevention Institute*, 2018 WL 4488760, at *9 n.6 (N.D. Cal. Sept. 17, 2018). Thus, the applicability of the waiver will turn at least in part on the degree of negligence (if any) that the plaintiffs can ultimately prove.

The motion to dismiss this claim is denied.

---

[20] The parties' briefs focus on the economic loss rule, which governs the availability of recovery for purely economic losses in a tort action. But as previously discussed, the plaintiffs' allegations of various sorts of economic injury are too speculative to support either standing or substantive legal claims. The economic loss rule is therefore irrelevant. There perhaps remains a question whether the plaintiffs can recover for their intangible injuries on a negligence theory, but the parties haven't briefed this issue, and its resolution may require further factual development.

2724

<u>Deceit by concealment or omission.</u> For a defendant to be liable for deceit by concealment under California law, a variety of things must have occurred. *See* Cal. Civ. Code §§ 1709-1710. First, the defendant must have: (i) had a duty to disclose a material fact to the plaintiff; and (ii) intentionally concealed that fact with intent to defraud the plaintiff. *Tae Youn Shim v. Lawler,* 2019 WL 2996443, at *17 (N.D. Cal. July 9, 2019). In addition, the plaintiff must have: (iii) been unaware of that fact (and would have acted differently if he were aware), and (iv) sustained some damage as a result. *See id*; *see also* Cal. Civ. Code § 1710(3). Because this claim sounds in fraud, the plaintiffs are subject to a heightened pleading standard, which means that they "must state with particularity the circumstances constituting fraud . . . ." *See* Federal Rules of Civil Procedure 9(b).

With respect to the allegations that Facebook improperly shared information with standard app developers and failed to prevent third parties from improperly using sensitive information, the plaintiffs have not satisfied the heightened pleading requirements necessary to state a claim for deceit by concealment.[21] However, if the plaintiffs' allegations are true, Facebook's conduct with respect to whitelisted apps and business partners crosses into the realm of fraudulent conduct. As discussed earlier, the plaintiffs have sufficiently alleged that their privacy interests were harmed through the disclosure of their information to these entities. The plaintiffs have also adequately alleged that Facebook intended to defraud its users regarding this conduct: the plaintiffs contrast Facebook's public-facing statements about protecting privacy and restricting information-sharing with the reality of Facebook's alleged practices, and that contrast is a sufficient basis from which to infer fraudulent intent at the pleading stage.

As with the negligence claim, Facebook is wrong to assert that its exculpatory clause relieves it from liability for this claim. Under California law, Facebook's exculpatory clause does not apply to a claim sounding in fraud such as deceit by concealment. *See* Cal. Civ. Code § 1668

---

[21] Of course, dismissal of a subset of claims with prejudice does not preclude a plaintiff from seeking revival if discovery reveals a factual basis that justifies reconsideration of this order. *See* Fed. R. Civ. P. 54(b); *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1059 (9th Cir. 2011), *abrogated on other grounds by Lorenzo v. SEC*, 139 S. Ct. 1094 (2019).

("All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."); *see also, e.g.*, *Manderville v. PCG&S Group, Inc.*, 146 Cal. App. 4th 1486, 1500 (2007) ("It is well-established in California that a party to a contract is precluded under section 1668 from contracting away his or her liability for fraud or deceit based on intentional misrepresentation.").

The motion to dismiss is granted with respect to the first and fourth categories of conduct, and denied with respect to the second and third categories of conduct.

<u>Breach of contract.</u> The elements for breach of contract under California law are: (i) the existence of a contract; (ii) the plaintiff's performance or excuse for nonperformance of its side of the agreement; (iii) the defendant's breach; and (iv) resulting damage to the plaintiff. *See Buschman v. Anesthesia Bus. Consultants LLC*, 42 F. Supp. 3d 1244, 1250 (N.D. Cal. 2014).

As discussed in Section IV, the contract between Facebook and its users does not merely consist of the SRR, as the plaintiffs contend. It also includes the Data Use Policy. This makes it somewhat challenging to discern whether the plaintiffs have adequately alleged claims for breach of contract, because the plaintiffs' arguments are largely based on the assumption that the Data Use Policy is not part of the contract. Nonetheless, once it's understood that the Policy is part of the contract, it becomes clear that the second, third, and fourth categories of alleged wrongdoing addressed in this ruling give rise to claims for breach of contract. *See Johnson v. City of Shelby*, 574 U.S. 10, 10 (2014) (per curiam) ("Federal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."); *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) ("[U]nder the Federal Rules of Civil Procedure, a complaint need not pin plaintiff's claim for relief to a precise legal theory."). The SRR states: "You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings." Appendix A at 2. The plaintiffs have adequately alleged that Facebook breached this promise when it disclosed user information to whitelisted apps and business partners without permission, and without giving the plaintiffs the

ability to prevent this disclosure. In addition, for the allegations that Facebook allowed companies to misuse the information, the complaint sufficiently alleges that Facebook did not fulfill its promise in the Data Use Policy that apps would be allowed to use information "only in connection with" that user's friends. Complaint ¶ 569; Appendix B at 10.

In contrast, the plaintiffs have not adequately alleged a breach of contract based on the first category of wrongdoing: allowing standard app developers to obtain user information through users' friends. As discussed in Section IV, Facebook began disclosing this practice in its contractual language starting in roughly 2009, which means that this conduct does not give rise to a breach of contract claim for users who established their Facebook accounts after that time. For users who established their accounts beforehand, the complaint plausibly alleges that the practice wasn't disclosed. But simple failure to disclose a practice doesn't constitute a breach of contract. And although it's certainly conceivable that the practice violated provisions of Facebook's earlier contractual language, the plaintiffs do not identify or rely on any such language in their complaint. Therefore, for all plaintiffs, the complaint does not articulate a breach of contract theory based on the disclosure of sensitive user information to standard app developers, even though the complaint alleges that some users didn't consent to it.

Facebook argues that the plaintiffs have not adequately alleged that they were damaged by any breaches. But that is wrong. The plaintiffs can seek damages for "the detriment caused by the breach." *Stephens v. City of Vista*, 994 F.2d 650, 657 (9th Cir. 1993). As discussed in Sections II and III, the detriment the plaintiffs suffered was an invasion of their privacy. Perhaps some of the individual plaintiffs suffered a harm from this privacy invasion that can be measured by compensatory damages. *See*, *e.g.*, *Windeler v. Scheers Jewelers*, 8 Cal. App. 3d 844, 850-52 (Cal. Ct. App. 1970); *Leavy v. Cooney*, 214 Cal. App. 2d 496, 501-02 (Cal. Ct. App. 1963). Perhaps others did not, but under California law even those plaintiffs may recover nominal damages. Judicial Council of California Civil Jury Instruction 360; *In re Facebook Privacy Litigation*, 192 F. Supp. 3d 1053, 1062 (N.D. Cal. 2016).

The motion to dismiss this claim is granted with respect to the first category of

wrongdoing. Because it is possible that the complaint could be amended to allege a breach of contract claim for plaintiffs who established their accounts before Facebook disclosed the practice, dismissal is with leave to amend for these plaintiffs only. The motion to dismiss this claim is denied in all other respects.

<u>Breach of the implied covenant of good faith and fair dealing.</u> In addition to explicit promises, every contract includes an implicit promise not to take an action that would deprive the other contracting party of the benefits of their agreement. *See Rockridge Trust v. Wells Fargo, N.A.*, 985 F. Supp. 2d 1110, 1156 (N.D. Cal. 2013). This obligation is known as the "implied covenant of good faith and fair dealing," and it protects the parties' "reasonable expectations . . . based on their mutual promises." *Digerati Holdings, LLC v. Young Money Entertainment, LLC*, 194 Cal. App. 4th 873, 885 (2011). To state a claim for breach of this implied promise, "a plaintiff must identify the specific contractual provision that was frustrated" by the defendant's conduct. *Perez v. Wells Fargo Bank, N.A.*, 2011 WL 3809808, at *18 (N.D. Cal. Aug. 29, 2011). This doctrine cannot, however, "impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Guz v. Bechtel National Inc.*, 24 Cal. 4th 317, 350 (2000).

Just as they've stated claims for breach of contract with respect to the second, third, and fourth categories of conduct, the plaintiffs have stated claims for breach of the implied covenant of good faith and fair dealing for that conduct. Indeed, the case for breach of the implied covenant is stronger, because even if Facebook were, at a later stage in the litigation, able to identify a technical argument for why it did not *quite* violate the literal terms of its contract with its users, it would be difficult to conclude (if the factual allegations in the complaint are true) that Facebook did not frustrate the purposes of the contract, and intentionally so. But for the first category of conduct, the plaintiffs have not offered sufficient information about the earlier contractual language to assess whether the conduct frustrated the purpose of Facebook's contract with its users.

Accordingly, with respect to the first category of conduct, this claim for breach of the

implied covenant is, along with the parallel claim for breach of contract, dismissed. Dismissal is with leave to amend for plaintiffs who signed up before the information-sharing practice was included in the contractual language, and without leave to amend for those who signed up after it was disclosed.[22]

Unjust Enrichment. The plaintiffs also state a claim for unjust enrichment. Specifically, they allege that even if they have no remedy for breach of contract, they should be able to recover amounts that Facebook gained by improperly disseminating their information. The plaintiffs are permitted to plead claims for breach of contract and unjust enrichment in the alternative. *Bruton v. Gerber Production Co.*, 703 F. App'x 468 (9th Cir. 2017); *In re Vizio, Inc., Consumer Privacy Litigation*, 238 F. Supp. 3d 1204, 1233 (C.D. Cal. 2017); *Hartford Casualty Insurance Co. v. J.R. Marketing., L.L.C.*, 61 Cal. 4th 988, 998 (2015). And even if the plaintiffs suffered no economic loss from the disclosure of their information, they may proceed at this stage on a claim for unjust enrichment to recover the gains that Facebook realized from its allegedly improper conduct. *See Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1113 (N.D. Cal. 2018).[23] The motion to dismiss this claim is granted as to the plaintiffs who consented as discussed in Section IV, but otherwise denied.

Right of Publicity. California's common law right of publicity makes unlawful the appropriation of someone's name or likeness without his consent when it both (1) injures that person and (2) is used to the defendant's advantage. *See Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1214 (N.D. Cal. 2014).

Facebook's motion to dismiss this claim is granted. The allegations about how Facebook shared the plaintiffs' information with third parties is categorically different from the type of

---

[22] The Court will likely stay, along with the other non-prioritized claims, the claims that this ruling dismisses with leave to amend, although the Court will discuss this matter with the parties at the next case management conference.

[23] The complaint, in articulating the unjust enrichment claim, frequently uses the term "quantum meruit." It appears that the complaint uses this term incorrectly; no true theory of quantum meruit recovery has been articulated by the plaintiffs. *See Maglica v. Maglica*, 66 Cal. App. 4th 442, 449 (Cal. Ct. App. 1998) (describing quantum meruit as recovery of "the reasonable value of the services rendered provided they were of direct benefit to the defendant.").

2729

conduct made unlawful by this tort, such as using a plaintiff's face or name to promote a product or service. *See Comedy III Productions., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 399 (2001) ("The right of publicity, like copyright, protects a form of intellectual property that society deems to have some social utility. Often considerable money, time and energy are needed to develop one's prominence in a particular field. Years of labor may be required before one's skill, reputation, notoriety or virtues are sufficiently developed to permit an economic return through some medium of commercial promotion." (internal quotations omitted)); *see also Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 415 (9th Cir. 1996); *cf. Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1217 (N.D. Cal. 2014). Because the Court cannot conceive of a way that the plaintiffs could successfully allege this claim, dismissal is without leave to amend.

California's Unfair Competition Law. California's Unfair Competition Law ("UCL") prohibits business practices that are unlawful, unfair, or fraudulent. *See* Cal. Bus. & Prof. Code § 17200, *et seq.* To have standing under California law to pursue this claim (a standard that is different from Article III standing), the plaintiffs must show that they "lost money or property" because of Facebook's conduct. *See* Cal. Bus. & Prof. Code § 17204; *see also Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 317 (2011). The plaintiffs' UCL claim fails because they have not adequately alleged lost money or property. As discussed in Section III, the plaintiffs' theory of economic loss is purely hypothetical. It's true, as discussed in connection with the unjust enrichment claim, that Facebook may have gained money through its sharing or use of the plaintiffs' information, but that's different from saying the plaintiffs lost money. Further, the plaintiffs here do not allege that they paid any premiums (or any money at all) to Facebook to potentially give rise to standing under California law. *Compare In re Anthem, Inc. Data Breach Litigation,* 2016 WL 3029783, at *30 (N.D. Cal. May 27, 2016). This claim is also dismissed without leave to amend.

## VI. CONCLUSION

The motion to dismiss is granted in part and denied in part. The deadline for Facebook to file an answer to the complaint, along with all other scheduling matters, will be discussed at a

2730

case management conference on October 1, 2019 at 2:00 p.m. The parties should file a joint case management statement by September 24, 2019.

**IT IS SO ORDERED.**

Dated: September 9, 2019

_____
VINCE CHHABRIA
United States District Judge

2731

# Appendix A

This agreement was written in English (US). To the extent any translated version of this agreement conflicts with the English version, the English version controls.  Please note that Section 16 contains certain changes to the general terms for users outside the United States.

Date of Last Revision: June 8, 2012.

**Statement of Rights and Responsibilities**

This Statement of Rights and Responsibilities ("Statement," "Terms," or "SRR") derives from the Facebook Principles, and is our terms of service that governs our relationship with users and others who interact with Facebook. By using or accessing Facebook, you agree to this Statement, as updated from time to time in accordance with Section 14 below. Additionally, you will find resources at the end of this document that help you understand how Facebook works.

1. **Privacy**

   Your privacy is very important to us. We designed our Data Use Policy to make important disclosures about how you can use Facebook to share with others and how we collect and can use your content and information.  We encourage you to read the Data Use Policy, and to use it to help you make informed decisions.

2. **Sharing Your Content and Information**

   You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings. In addition:
   1. For content that is covered by intellectual property rights, like photos and videos (IP content), you specifically give us the following permission, subject to your privacy and application settings: you grant us a non-exclusive, transferable, sub-licensable, royalty-free, worldwide license to use any IP content that you post on or in connection with Facebook (IP License). This IP License ends when you delete your IP content or your account unless your content has been shared with others, and they have not deleted it.
   2. When you delete IP content, it is deleted in a manner similar to emptying the recycle bin on a computer. However, you understand that removed content may persist in backup copies for a reasonable period of time (but will not be available to others).
   3. When you use an application, the application may ask for your permission to access your content and information as well as content and information that others have shared with you.  We require applications to respect your privacy, and your agreement with that application will control how the application can use, store, and transfer that content and information.  (To learn more about Platform, including how you can control what information other people may share with applications, read our Data Use Policy and Platform Page.)
   4. When you publish content or information using the Public setting, it means that you are allowing everyone, including people off of Facebook, to access and use that information,

2

and to associate it with you (i.e., your name and profile picture).

5. We always appreciate your feedback or other suggestions about Facebook, but you understand that we may use them without any obligation to compensate you for them (just as you have no obligation to offer them).

## 3. Safety

We do our best to keep Facebook safe, but we cannot guarantee it. We need your help to keep Facebook safe, which includes the following commitments by you:

1. You will not post unauthorized commercial communications (such as spam) on Facebook.
2. You will not collect users' content or information, or otherwise access Facebook, using automated means (such as harvesting bots, robots, spiders, or scrapers) without our prior permission.
3. You will not engage in unlawful multi-level marketing, such as a pyramid scheme, on Facebook.
4. You will not upload viruses or other malicious code.
5. You will not solicit login information or access an account belonging to someone else.
6. You will not bully, intimidate, or harass any user.
7. You will not post content that: is hate speech, threatening, or pornographic; incites violence; or contains nudity or graphic or gratuitous violence.
8. You will not develop or operate a third-party application containing alcohol-related, dating or other mature content (including advertisements) without appropriate age-based restrictions.
9. You will follow our Promotions Guidelines and all applicable laws if you publicize or offer any contest, giveaway, or sweepstakes ("promotion") on Facebook.
10. You will not use Facebook to do anything unlawful, misleading, malicious, or discriminatory.
11. You will not do anything that could disable, overburden, or impair the proper working or appearance of Facebook, such as a denial of service attack or interference with page rendering or other Facebook functionality.
12. You will not facilitate or encourage any violations of this Statement or our policies.

## 4. Registration and Account Security

Facebook users provide their real names and information, and we need your help to keep it that way. Here are some commitments you make to us relating to registering and maintaining the security of your account:

1. You will not provide any false personal information on Facebook, or create an account for anyone other than yourself without permission.
2. You will not create more than one personal account.
3. If we disable your account, you will not create another one without our permission.
4. You will not use your personal timeline for your own commercial gain (such as selling your status update to an advertiser).

3

2734

5. You will not use Facebook if you are under 13.
6. You will not use Facebook if you are a convicted sex offender.
7. You will keep your contact information accurate and up-to-date.
8. You will not share your password (or in the case of developers, your secret key), let anyone else access your account, or do anything else that might jeopardize the security of your account.
9. You will not transfer your account (including any Page or application you administer) to anyone without first getting our written permission.
10. If you select a username or similar identifier for your account or Page, we reserve the right to remove or reclaim it if we believe it is appropriate (such as when a trademark owner complains about a username that does not closely relate to a user's actual name).

### 5. **Protecting Other People's Rights**

We respect other people's rights, and expect you to do the same.
1. You will not post content or take any action on Facebook that infringes or violates someone else's rights or otherwise violates the law.
2. We can remove any content or information you post on Facebook if we believe that it violates this Statement or our policies.
3. We provide you with tools to help you protect your intellectual property rights. To learn more, visit our How to Report Claims of Intellectual Property Infringement page.
4. If we remove your content for infringing someone else's copyright, and you believe we removed it by mistake, we will provide you with an opportunity to appeal.
5. If you repeatedly infringe other people's intellectual property rights, we will disable your account when appropriate.
6. You will not use our copyrights or trademarks (including Facebook, the Facebook and F Logos, FB, Face, Poke, Book and Wall), or any confusingly similar marks, except as expressly permitted by our Brand Usage Guidelines or with our prior written permission.
7. If you collect information from users, you will: obtain their consent, make it clear you (and not Facebook) are the one collecting their information, and post a privacy policy explaining what information you collect and how you will use it.
8. You will not post anyone's identification documents or sensitive financial information on Facebook.
9. You will not tag users or send email invitations to non-users without their consent. Facebook offers social reporting tools to enable users to provide feedback about tagging.

### 6. **Mobile and Other Devices**

1. We currently provide our mobile services for free, but please be aware that your carrier's normal rates and fees, such as text messaging fees, will still apply.
2. In the event you change or deactivate your mobile telephone number, you will update your account information on Facebook within 48 hours to ensure that your messages are

**4**

not sent to the person who acquires your old number.

   3.  You provide consent and all rights necessary to enable users to sync (including through an application) their devices with any information that is visible to them on Facebook.

### 7. Payments

If you make a payment on Facebook or use Facebook Credits, you agree to our Payments Terms.

### 8. Special Provisions Applicable to Social Plugins

If you include our Social Plugins, such as the Share or Like buttons on your website, the following additional terms apply to you:

   1.  We give you permission to use Facebook's Social Plugins so that users can post links or content from your website on Facebook.

   2.  You give us permission to use and allow others to use such links and content on Facebook.

   3.  You will not place a Social Plugin on any page containing content that would violate this Statement if posted on Facebook.

### 9. Special Provisions Applicable to Developers/Operators of Applications and Websites

If you are a developer or operator of a Platform application or website, the following additional terms apply to you:

   1.  You are responsible for your application and its content and all uses you make of Platform. This includes ensuring your application or use of Platform meets our Facebook Platform Policies and our Advertising Guidelines.

   2.  Your access to and use of data you receive from Facebook, will be limited as follows:

      1.  You will only request data you need to operate your application.

      2.  You will have a privacy policy that tells users what user data you are going to use and how you will use, display, share, or transfer that data and you will include your privacy policy URL in the Developer Application.

      3.  You will not use, display, share, or transfer a user's data in a manner inconsistent with your privacy policy.

      4.  You will delete all data you receive from us concerning a user if the user asks you to do so, and will provide a mechanism for users to make such a request.

      5.  You will not include data you receive from us concerning a user in any advertising creative.

      6.  You will not directly or indirectly transfer any data you receive from us to (or use such data in connection with) any ad network, ad exchange, data broker, or other advertising related toolset, even if a user consents to that transfer or use.

      7.  You will not sell user data.  If you are acquired by or merge with a third party, you can continue to use user data within your application, but you cannot transfer user data outside of your application.

      8.  We can require you to delete user data if you use it in a

way that we determine is inconsistent with users' expectations.

9. We can limit your access to data.
10. You will comply with all other restrictions contained in our Facebook Platform Policies.

3. You will not give us information that you independently collect from a user or a user's content without that user's consent.
4. You will make it easy for users to remove or disconnect from your application.
5. You will make it easy for users to contact you. We can also share your email address with users and others claiming that you have infringed or otherwise violated their rights.
6. You will provide customer support for your application.
7. You will not show third party ads or web search boxes on www.facebook.com.
8. We give you all rights necessary to use the code, APIs, data, and tools you receive from us.
9. You will not sell, transfer, or sublicense our code, APIs, or tools to anyone.
10. You will not misrepresent your relationship with Facebook to others.
11. You may use the logos we make available to developers or issue a press release or other public statement so long as you follow our Facebook Platform Policies.
12. We can issue a press release describing our relationship with you.
13. You will comply with all applicable laws. In particular you will (if applicable):
    1. have a policy for removing infringing content and terminating repeat infringers that complies with the Digital Millennium Copyright Act.
    2. comply with the Video Privacy Protection Act (VPPA), and obtain any opt-in consent necessary from users so that user data subject to the VPPA may be shared on Facebook.  You represent that any disclosure to us will not be incidental to the ordinary course of your business.
14. We do not guarantee that Platform will always be free.
15. You give us all rights necessary to enable your application to work with Facebook, including the right to incorporate content and information you provide to us into streams, timelines, and user action stories.
16. You give us the right to link to or frame your application, and place content, including ads, around your application.
17. We can analyze your application, content, and data for any purpose, including commercial (such as for targeting the delivery of advertisements and indexing content for search).
18. To ensure your application is safe for users, we can audit it.
19. We can create applications that offer similar features and services to, or otherwise compete with, your application.

10. **About Advertisements and Other Commercial Content Served or Enhanced by Facebook**

Our goal is to deliver ads and commercial content that are valuable to our users and advertisers. In order to help us do that, you agree to the following:

1. You can use your privacy settings to limit how your name and

profile picture may be associated with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us. You give us permission to use your name and profile picture in connection with that content, subject to the limits you place.

2. We do not give your content or information to advertisers without your consent.

3. You understand that we may not always identify paid services and communications as such.

11. **Special Provisions Applicable to Advertisers**

You can target your desired audience by buying ads on Facebook or our publisher network. The following additional terms apply to you if you place an order through our online advertising portal (Order):

1. When you place an Order, you will tell us the type of advertising you want to buy, the amount you want to spend, and your bid. If we accept your Order, we will deliver your ads as inventory becomes available. When serving your ad, we do our best to deliver the ads to the audience you specify, although we cannot guarantee in every instance that your ad will reach its intended target.

2. In instances where we believe doing so will enhance the effectiveness of your advertising campaign, we may broaden the targeting criteria you specify.

3. You will pay for your Orders in accordance with our Payments Terms. The amount you owe will be calculated based on our tracking mechanisms.

4. Your ads will comply with our Advertising Guidelines.

5. We will determine the size, placement, and positioning of your ads.

6. We do not guarantee the activity that your ads will receive, such as the number of clicks your ads will get.

7. We cannot control how clicks are generated on your ads. We have systems that attempt to detect and filter certain click activity, but we are not responsible for click fraud, technological issues, or other potentially invalid click activity that may affect the cost of running ads.

8. You can cancel your Order at any time through our online portal, but it may take up to 24 hours before the ad stops running.  You are responsible for paying for all ads that run.

9. Our license to run your ad will end when we have completed your Order. You understand, however, that if users have interacted with your ad, your ad may remain until the users delete it.

10. We can use your ads and related content and information for marketing or promotional purposes.

11. You will not issue any press release or make public statements about your relationship with Facebook without our prior written permission.

12. We may reject or remove any ad for any reason.

13. If you are placing ads on someone else's behalf, you must have permission to place those ads, including the following:

    1. You warrant that you have the legal authority to bind the advertiser to this Statement.

    2. You agree that if the advertiser you represent violates this Statement, we may hold you responsible for that violation.

7

12. **Special Provisions Applicable to Pages**

If you create or administer a Page on Facebook, you agree to our Pages Terms.

13. **Special Provisions Applicable to Software**

1. If you download our software, such as a stand-alone software product or a browser plugin, you agree that from time to time, the software may download upgrades, updates and additional features from us in order to improve, enhance and further develop the software.
2. You will not modify, create derivative works of, decompile or otherwise attempt to extract source code from us, unless you are expressly permitted to do so under an open source license or we give you express written permission.

14. **Amendments**

1. We can change this Statement if we provide you notice (by posting the change on the Facebook Site Governance Page) and an opportunity to comment.  To get notice of any future changes to this Statement, visit our Facebook Site Governance Page and "like" the Page.
2. For changes to sections 7, 8, 9, and 11 (sections relating to payments, application developers, website operators, and advertisers), we will give you a minimum of three days notice. For all other changes we will give you a minimum of seven days notice. Comments to proposed changes will be made on the Facebook Site Governance Page.
3. If more than 7,000 users post a substantive comment on a particular proposed change, we will also give you the opportunity to participate in a vote in which you will be provided alternatives. The vote shall be binding on us if more than 30% of all active registered users as of the date of the notice vote.
4. If we make changes to policies referenced in or incorporated by this Statement, we may provide notice on the Site Governance Page.
5. We can make changes for legal or administrative reasons, or to correct an inaccurate statement, upon notice without opportunity to comment.
6. Your continued use of Facebook following changes to our terms constitutes your acceptance of our amended terms.

15. **Termination**

If you violate the letter or spirit of this Statement, or otherwise create risk or possible legal exposure for us, we can stop providing all or part of Facebook to you. We will notify you by email or at the next time you attempt to access your account. You may also delete your account or disable your application at any time. In all such cases, this Statement shall terminate, but the following provisions will still apply: 2.2, 2.4, 3-5, 8.2, 9.1-9.3, 9.9, 9.10, 9.13, 9.15, 9.18, 10.3, 11.2, 11.5, 11.6, 11.9, 11.12, 11.13, and 15-19.

16. **Disputes**

1. You will resolve any claim, cause of action or dispute (claim) you have with us arising out of or relating to this Statement or Facebook exclusively in a state or federal court located in Santa Clara County. The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions. You agree to submit to the personal jurisdiction of the courts located in Santa Clara County, California for the purpose of litigating all such claims.

2. If anyone brings a claim against us related to your actions, content or information on Facebook, you will indemnify and hold us harmless from and against all damages, losses, and expenses of any kind (including reasonable legal fees and costs) related to such claim. Although we provide rules for user conduct, we do not control or direct users' actions on Facebook and are not responsible for the content or information users transmit or share on Facebook. We are not responsible for any offensive, inappropriate, obscene, unlawful or otherwise objectionable content or information you may encounter on Facebook. We are not responsible for the conduct, whether online or offline, or any user of Facebook.

3. WE TRY TO KEEP FACEBOOK UP, BUG-FREE, AND SAFE, BUT YOU USE IT AT YOUR OWN RISK. WE ARE PROVIDING FACEBOOK AS IS WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. WE DO NOT GUARANTEE THAT FACEBOOK WILL ALWAYS BE SAFE, SECURE OR ERROR-FREE OR THAT FACEBOOK WILL ALWAYS FUNCTION WITHOUT DISRUPTIONS, DELAYS OR IMPERFECTIONS. FACEBOOK IS NOT RESPONSIBLE FOR THE ACTIONS, CONTENT, INFORMATION, OR DATA OF THIRD PARTIES, AND YOU RELEASE US, OUR DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS FROM ANY CLAIMS AND DAMAGES, KNOWN AND UNKNOWN, ARISING OUT OF OR IN ANY WAY CONNECTED WITH ANY CLAIM YOU HAVE AGAINST ANY SUCH THIRD PARTIES. IF YOU ARE A CALIFORNIA RESIDENT, YOU WAIVE CALIFORNIA CIVIL CODE §1542, WHICH SAYS: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR. WE WILL NOT BE LIABLE TO YOU FOR ANY LOST PROFITS OR OTHER CONSEQUENTIAL, SPECIAL, INDIRECT, OR INCIDENTAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS STATEMENT OR FACEBOOK, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. OUR AGGREGATE LIABILITY ARISING OUT OF THIS STATEMENT OR FACEBOOK WILL NOT EXCEED THE GREATER OF ONE HUNDRED DOLLARS ($100) OR THE AMOUNT YOU HAVE PAID US IN THE PAST

9

TWELVE MONTHS. APPLICABLE LAW MAY NOT ALLOW THE LIMITATION OR EXCLUSION OF LIABILITY OR INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU. IN SUCH CASES, FACEBOOK'S LIABILITY WILL BE LIMITED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

## 17. Special Provisions Applicable to Users Outside the United States

We strive to create a global community with consistent standards for everyone, but we also strive to respect local laws. The following provisions apply to users and non-users who interact with Facebook outside the United States:

1. You consent to having your personal data transferred to and processed in the United States.
2. If you are located in a country embargoed by the United States, or are on the U.S. Treasury Department's list of Specially Designated Nationals you will not engage in commercial activities on Facebook (such as advertising or payments) or operate a Platform application or website.
3. Certain specific terms that apply only for German users are available here.

## 18. Definitions

1. By "Facebook" we mean the features and services we make available, including through (a) our website at www.facebook.com and any other Facebook branded or co-branded websites (including sub-domains, international versions, widgets, and mobile versions); (b) our Platform; (c) social plugins such as the Like button, the Share button and other similar offerings and (d) other media, software (such as a toolbar), devices, or networks now existing or later developed.
2. By "Platform" we mean a set of APIs and services (such as content) that enable others, including application developers and website operators, to retrieve data from Facebook or provide data to us.
3. By "information" we mean facts and other information about you, including actions taken by users and non-users who interact with Facebook.
4. By "content" we mean anything you or other users post on Facebook that would not be included in the definition of information.
5. By "data" or "user data" or "user's data" we mean any data, including a user's content or information that you or third parties can retrieve from Facebook or provide to Facebook through Platform.
6. By "post" we mean post on Facebook or otherwise make available by using Facebook.
7. By "use" we mean use, copy, publicly perform or display, distribute, modify, translate, and create derivative works of.
8. By "active registered user" we mean a user who has logged into Facebook at least once in the previous 30 days.
9. By "application" we mean any application or website that uses or accesses Platform, as well as anything else that receives or has received data from us.  If you no longer access Platform

10

but have not deleted all data from us, the term application will
apply until you delete the data.

19. **Other**

1. If you are a resident of or have your principal place of business
   in the US or Canada, this Statement is an agreement between
   you and Facebook, Inc.  Otherwise, this Statement is an
   agreement between you and Facebook Ireland Limited.
   References to "us," "we," and "our" mean either Facebook,
   Inc. or Facebook Ireland Limited, as appropriate.
2. This Statement makes up the entire agreement between the
   parties regarding Facebook, and supersedes any prior
   agreements.
3. If any portion of this Statement is found to be unenforceable,
   the remaining portion will remain in full force and effect.
4. If we fail to enforce any of this Statement, it will not be
   considered a waiver.
5. Any amendment to or waiver of this Statement must be made
   in writing and signed by us.
6. You will not transfer any of your rights or obligations under
   this Statement to anyone else without our consent.
7. All of our rights and obligations under this Statement are
   freely assignable by us in connection with a merger,
   acquisition, or sale of assets, or by operation of law or
   otherwise.
8. Nothing in this Statement shall prevent us from complying
   with the law.
9. This Statement does not confer any third party beneficiary
   rights.
10. We reserve all rights not expressly granted to you.
11. You will comply with all applicable laws when using or
    accessing Facebook.

**You may also want to review the following documents, which provide
additional information about your use of Facebook:**

- Data Use Policy: The Data Use Policy contains information to help
  you understand how we collect and use information.
- Payment Terms: These additional terms apply to all payments made
  on or through Facebook.
- Platform Page: This page helps you better understand what happens
  when you add a third-party application or use Facebook Connect,
  including how they may access and use your data.
- Facebook Platform Policies: These guidelines outline the policies
  that apply to applications, including Connect sites.
- Advertising Guidelines: These guidelines outline the policies that
  apply to advertisements placed on Facebook.
- Promotions Guidelines: These guidelines outline the policies that
  apply if you offer contests, sweepstakes, and other types of
  promotions on Facebook.
- Brand Permissions Center: These guidelines outline the policies that
  apply to use of Facebook trademarks, logos and screenshots.
- How to Report Claims of Intellectual Property Infringement
- Pages Terms: These guidelines apply to your use of Facebook Pages.
- Community Standards: These guidelines outline our expectations
  regarding the content you post to Facebook and your activity on
  Facebook.

11

To access the Statement of Rights and Responsibilities in several different languages, change the language setting for your Facebook session by clicking on the language link in the left corner of most pages.  If the Statement is not available in the language you select, we will default to the English version.

# Appendix B

**Data Use Policy**

Date of Last Revision: June 8, 2012

Information we receive and how it is used

- Information we receive about you

- Public information

- Usernames and User IDs

- How we use the information we receive

- Deleting and deactivating your account

Sharing and finding you on Facebook

- Control each time you post

- Control over your timeline

- Finding you on Facebook

- Access on phones and other devices

- Activity log

- What your friends share about you

- About Pages

Other websites and applications

- About Facebook Platform

- Controlling what information you share with applications

- Controlling what is shared when the people you share with use applications

- Logging in to another site using Facebook

- About social plugins

- About instant personalization

- Public search engines

How advertising and Sponsored Stories work

- Personalized ads

- Ads + social context

- Sponsored stories

- Facebook content

2

Cookies, pixels and other similar technologies
Some other things you need to know

## I. Information we receive and how it is used

### Information we receive about you

We receive a number of different types of information about you, including:

### Your information
Your information is the information that's required when you sign up for the site, as well as the information you choose to share.

- **Registration information**: When you sign up for Facebook, you are required to provide your name, email address, birthday, and gender.

- **Information you choose to share**: Your information also includes the information you choose to share on Facebook, such as when you post a status update, upload a photo, or comment on a friend's story.

It also includes the information you choose to share when you take an action, such as when you add a friend, like a Page or a website, add a place to your story, find friends using our contact importers, or indicate you are in a relationship.

Your name, profile pictures, cover photos, gender, networks, username and User ID are treated just like information you choose to make public.
Your birthday allows us to do things like show you age-appropriate content and advertisements.

### Information others share about you
We receive information about you from your friends and others, such as when they upload your contact information, post a photo of you, tag you in a photo or status update, or at a location, or add you to a group.

When people use Facebook, they may store and share information about you and others that they have, such as when they upload and manage their invites and contacts.

### Other information we receive about you
We also receive other types of information about you:

- We receive data about you whenever you interact with Facebook, such as when you look at another person's timeline, send or receive a message, search for a friend or a Page, click on, view or otherwise interact with things, use a Facebook mobile app, or purchase Facebook Credits or make other purchases through Facebook.
- When you post things like photos or videos on Facebook, we may receive additional related data (or metadata), such as the time, date, and place you took the photo or video.
- We receive data from the computer, mobile phone or other device you use to access Facebook, including when multiple users log in from the same device. This may include your IP address and other information about things like your internet service, location, the type (including identifiers) of browser you use, or the pages you visit. For example, we may get your GPS or other location information so we can tell you if any of your friends are nearby.
- We receive data whenever you visit a game, application, or website that uses Facebook Platform or visit a site with a Facebook feature (such as a social plugin), sometimes through cookies. This may include the date and time you visit the site; the web address, or URL, you're on; technical information about the IP address, browser and the operating system you use; and, if you are logged in to Facebook, your User ID.
- Sometimes we get data from our advertising partners, customers and other third parties that helps us (or them) deliver ads, understand online activity, and generally make Facebook better. For example, an advertiser may tell us information about you (like how you responded to an ad on Facebook or on another site) in order to measure the effectiveness of - and improve the quality of - ads.

3

We also put together data from the information we already have about you and your friends. For example, we may put together data about you to determine which friends we should show you in your News Feed or suggest you tag in the photos you post. We may put together your current city with GPS and other location information we have about you to, for example, tell you and your friends about people or events nearby, or offer deals to you that you might be interested in. We may also put together data about you to serve you ads that might be more relevant to you.

When we get your GPS location, we put it together with other location information we have about you (like your current city). But we only keep it until it is no longer useful to provide you services, like keeping your last GPS coordinates to send you relevant notifications.

We only provide data to our advertising partners or customers after we have removed your name or any other personally identifying information from it, or have combined it with other people's data in a way that it is no longer associated with you.

## **Public information**

When we use the phrase "public information" (which we sometimes refer to as "Everyone information"), we mean the information you choose to make public, as well as information that is always publicly available.

### **Information you choose to make public**

Choosing to make your information public is exactly what it sounds like: **anyone**, including people off of Facebook, will be able to see it.

Choosing to make your information public also means that this information:

- can be associated with you (i.e., your name, profile pictures, cover photos, timeline, User ID, username, etc.) even off Facebook;
- can show up when someone does a search on Facebook or on a public search engine;
- will be accessible to the Facebook-integrated games, applications, and websites you and your friends use; and
- will be accessible to anyone who uses our APIs such as our Graph API.

Sometimes you will not be able to select an audience when you post something (like when you write on a Page's wall or comment on a news article that uses our comments plugin). This is because some types of stories are always public stories. As a general rule, you should assume that if you do not see a sharing icon, the information will be publicly available.

When others share information about you, they can also choose to make it public.

### **Information that is always publicly available**

The types of information listed below are always publicly available, and are treated just like information you decided to make public.

- **Name**: This helps your friends and family find you. If you are uncomfortable sharing your real name, you can always delete your account.

- **Profile Pictures and Cover Photos**: These help your friends and family recognize you. If you are uncomfortable making any of these photos public, you can always delete it. Unless you delete them, when you add a new profile picture or cover photo, the previous photo will remain public in your profile picture or cover photo album.

- **Network**: This helps you see whom you will be sharing information with before you choose "Friends and Networks" as a custom audience. If you are uncomfortable making your network public, you can leave the network.

- **Gender**: This allows us to refer to you properly.

- **Username and User ID**: These allow you to give out a custom link to your timeline or Page, receive email at your Facebook email address, and help make Facebook Platform possible.

4

**Usernames and User IDs**

A Username (or Facebook URL) is a custom link to your timeline that you can give out to people or post on external websites. Usernames appear in the URL on your timeline. We also use your User ID to identify your Facebook account.

If someone has your Username or User ID, they can use it to access information about you through the facebook.com website. For example, if someone has your Username, they can type facebook.com/Username into their browser and see your public information as well as anything else you've let them see. Similarly, someone with your Username or User ID can access information about you through our APIs, such as our Graph API. Specifically, they can access your public information, along with your age range, language and country.

If you do not want your information to be accessible to Platform applications, you can turn off all Platform applications from your Privacy Settings. If you turn off Platform you will no longer be able to use any games or other applications until you turn Platform back on. For more information about the information that apps receive when you visit them, see Other websites and applications.

If you want to see information available about you through our Graph API, just type **https://graph.facebook.com/[User ID or Username]?metadata=1** into your browser.
Your Facebook email address includes your public username like so: username@facebook.com. You can control who can start a message thread with you using your "How You Connect" settings. If they include others on that message, the others can reply too.

**How we use the information we receive**

We use the information we receive about you in connection with the services and features we provide to you and other users like your friends, our partners, the advertisers that purchase ads on the site, and the developers that build the games, applications, and websites you use. For example, we may use the information we receive about you:

- as part of our efforts to keep Facebook products, services and integrations safe and secure;
- to protect Facebook's or others' rights or property;
- to provide you with location features and services, like telling you and your friends when something is going on nearby;
- to measure or understand the effectiveness of ads you and others see, including to deliver relevant ads to you;
- to make suggestions to you and other users on Facebook, such as: suggesting that your friend use our contact importer because you found friends using it, suggesting that another user add you as a friend because the user imported the same email address as you did, or suggesting that your friend tag you in a picture they have uploaded with you in it; and
- for internal operations, including troubleshooting, data analysis, testing, research and service improvement.

Granting us this permission not only allows us to provide Facebook as it exists today, but it also allows us to provide you with innovative features and services we develop in the future that use the information we receive about you in new ways.

While you are allowing us to use the information we receive about you, you always own all of your information. Your trust is important to us, which is why we don't share information we receive about you with others unless we have:

- received your permission;
- given you notice, such as by telling you about it in this policy; or
- removed your name or any other personally identifying information from it.

Of course, for information others share about you, they control how it is shared.

We store data for as long as it is necessary to provide products and services to you and others, including those described above. Typically, information associated with your account will be kept until your account is deleted. For certain categories of data, we may also tell you about specific data retention practices.

5

We are able to suggest that your friend tag you in a picture by scanning and comparing your friend's pictures to information we've put together from the other photos you've been tagged in. This allows us to make these suggestions. You can control whether we suggest that another user tag you in a photo using the "How Tags work" settings. Learn more at: https://www.facebook.com/help/tag-suggestions

## Deleting and deactivating your account

If you want to stop using your account, you can either **deactivate** or **delete** it.

### Deactivate

Deactivating your account puts your account on hold. Other users will no longer see your timeline, but we do not delete any of your information. Deactivating an account is the same as you telling us not to delete any information because you might want to reactivate your account at some point in the future. You can deactivate your account at: https://www.facebook.com/editaccount.php
Your friends will still see you listed in their list of friends while your account is deactivated.

### Deletion

When you delete an account, it is permanently deleted from Facebook. It typically takes about one month to delete an account, but some information may remain in backup copies and logs for up to 90 days. You should only delete your account if you are sure you never want to reactivate it. You can delete your account at: https://www.facebook.com/help/contact.php?show_form=delete_account
Learn more at: https://www.facebook.com/help/?faq=356107851084108

Certain information is needed to provide you with services, so we only delete this information after you delete your account. Some of the things you do on Facebook aren't stored in your account, like posting to a group or sending someone a message (where your friend may still have a message you sent, even after you delete your account). That information remains after you delete your account.

## II. Sharing and finding you on Facebook

## Control each time you post

Whenever you post content (like a status update, photo or check-in), you can select a specific audience, or even customize your audience. To do this, simply click on the sharing icon and choose who can see it.

Choose this icon if you want to make something **Public**. Choosing to make something public is exactly what it sounds like. It means that anyone, including people off of Facebook, will be able to see or access it.
Choose this icon if you want to share with your Facebook **Friends**.
Choose this icon if you want to **Customize** your audience. You can also use this to hide your story from specific people.

If you tag someone, that person and their friends can see your story no matter what audience you selected. The same is true when you approve a tag someone else adds to your story.

Always think before you post. Just like anything else you post on the web or send in an email, information you share on Facebook can be copied or re-shared by anyone who can see it.

Although you choose with whom you share, there may be ways for others to determine information about you. For example, if you hide your birthday so no one can see it on your timeline, but friends post "happy birthday!" on your timeline, people may determine your birthday.
When you comment on or "like" someone else's story, or write on their timeline, that person gets to select the audience. For example, if a friend posts a Public story and you comment on it, your comment will be Public. Often, you can see the audience someone selected for their story before you post a comment; however, the person who posted the story may later change their audience.

2749

You can control who can see the Facebook Pages you've "liked" by visiting your timeline, clicking on the Likes box on your timeline, and then clicking "Edit."

Sometimes you will not see a sharing icon when you post something (like when you write on a Page's wall or comment on a news article that uses our comments plugin). This is because some types of stories are always public stories. As a general rule, you should assume that if you do not see a sharing icon, the information will be publicly available.

## Control over your timeline

Whenever you add things to your timeline you can select a specific audience, or even customize your audience. To do this, simply click on the sharing icon and choose who can see it.

Choose this icon if you want to make something **Public**. Choosing to make something public is exactly what it sounds like. It means that anyone, including people off of Facebook, will be able to see or access it.

Choose this icon if you want to share with your Facebook **Friends**.

Choose this icon if you want to **Customize** your audience. You can also use this to hide the item on your timeline from specific people.

When you select an audience for your friend list, you are only controlling who can see the entire list of your friends on your timeline. We call this a timeline visibility control. This is because your friend list is always available to the games, applications and websites you use, and your friendships may be visible elsewhere (such as on your friends' timelines or in searches). For example, if you select "Only Me" as the audience for your friend list, but your friend sets her friend list to "Public," anyone will be able to see your connection on your friend's timeline.

Similarly, if you choose to hide your gender, it only hides it on your timeline. This is because we, just like the applications you and your friends use, need to use your gender to refer to you properly on the site.

When someone tags you in a story (such as a photo, status update or check-in), you can choose whether you want that story to appear on your timeline. You can either approve each story individually or approve all stories by your friends. If you approve a story and later change your mind, you can remove it from your timeline.

People on Facebook may be able to see mutual friends, even if they cannot see your entire list of friends.

Some things (like your name, profile pictures and cover photos) do not have sharing icons because they are always publicly available. As a general rule, you should assume that if you do not see a sharing icon, the information will be publicly available.

## Finding you on Facebook

To make it easier for your friends to find you, we allow anyone with your contact information (such as email address or telephone number) to find you through the Facebook search bar at the top of most pages, as well as other tools we provide, such as contact importers - even if you have not shared your contact information with them on Facebook.

You can choose who can look up your timeline using the email address or telephone number you added to your timeline through your privacy settings. But remember, if you choose Friends, only your current Facebook friends will be able to find you this way.

Your "How You Connect" settings do not control whether people can find you or a link to your timeline when they search for content they have permission to see, like a photo or other story you've been tagged in.

## Access on phones and other devices

Once you share information with your friends and others, they may be able to sync it with or access it via their mobile phones and other devices. For example, if you share a photo on Facebook, someone viewing that photo could save it using Facebook tools or by other methods offered by their device or browser. Similarly, if you share your contact information with someone or invite someone to an event, they may be able to use Facebook or third party applications or devices to sync that information. Or, if one of your friends has a Facebook application on one of their devices, your

information (such as the things you post or photos you share) may be stored on or accessed by their device.

You should only share information with people you trust because they will be able to save it or re-share it with others, including when they sync the information to a device.

## Activity log

Your activity log is a place where you can go to view most of your information on Facebook, including things you've hidden from your timeline. You can use this log to manage your content. For example, you can do things like delete stories, change the audience of your stories or stop an application from publishing to your timeline on your behalf.

When you hide something from your timeline, you are not deleting it. This means that the story may be visible elsewhere, like in your friends' News Feed. If you want to delete a story you posted, choose the delete option.

## What your friends share about you

### Links and Tags

Anyone can add a link to a story. Links are references to something on the Internet; anything from a website to a Page or timeline on Facebook. For example, if you are writing a story, you might include a link to a blog you are referencing or a link to the blogger's Facebook timeline. If someone clicks on a link to another person's timeline, they'll only see the things that they are allowed to see.

A tag is a special type of link to someone's timeline that suggests that the tagged person add your story to their timeline. In cases where the tagged person isn't included in the audience of the story, it will add them so they can see it. Anyone can tag you in anything. Once you are tagged, you and your friends will be able to see it (such as in News Feed or in search).

You can choose whether a story you've been tagged in appears on your timeline. You can either approve each story individually or approve all stories by your friends. If you approve a story and later change your mind, you can always remove it from your timeline.

If you do not want someone to tag you, we encourage you to reach out to them and give them that feedback. If that does not work, you can block them. This will prevent them from tagging you going forward.

If you are tagged in a private space (such as a message or a group) only the people who can see the private space can see the tag. Similarly, it you are tagged in a comment, only the people who can see the comment can see the tag.

### Groups

Once you are in a Group, anyone in that Group can add you to a subgroup. When someone adds you to a Group, you will be listed as "invited" until you visit the Group. You can always leave a Group, which will prevent others from adding you to it again.

## About Pages

Facebook Pages are public pages. Companies use Pages to share information about their products. Celebrities use Pages to talk about their latest projects. And communities use pages to discuss topics of interest, everything from baseball to the opera.

Because Pages are public, information you share with a Page is public information. This means, for example, that if you post a comment on a Page, that comment may be used by the Page owner off Facebook, and anyone can see it.

When you "like" a Page, you create a connection to that Page. The connection is added to your timeline and your friends may see it in their News Feeds. You may be contacted by or receive updates from the Page, such as in your News Feed and your messages. You can remove the Pages you've "liked" through your timeline or on the Page.

8

Some Pages contain content that comes directly from the Page owner. Page owners can do this through online plugins, such as an iframe, and it works just like the games and other applications you use through Facebook. Because this content comes directly from the Page owner, that Page may be able to collect information about you, just like any website.

Page administrators may have access to insights data, which will tell them generally about the people that visit their Page (as opposed to information about specific people). They may also know when you've made a connection to their Page because you've liked their Page or posted a comment.

## III. Other websites and applications

### About Facebook Platform

Facebook Platform (or simply Platform) refers to the way we help you share your information with the games, applications, and websites you and your friends use. Facebook Platform also lets you bring your friends with you, so you can connect with them off of Facebook. In these two ways, Facebook Platform helps you make your experiences on the web more personalized and social.

Remember that these games, applications and websites are created and maintained by other businesses and developers who are not part of Facebook, so you should always make sure to read their terms of service and privacy policies.

### Controlling what information you share with applications

When you connect with a game, application or website - such as by going to a game, logging in to a website using your Facebook account, or adding an app to your timeline - we give the game, application, or website (sometimes referred to as just "Applications" or "Apps") your basic info, which includes your User ID, as well your friends' User IDs (or your friend list) and your public information.

Your friend list helps the application make your experience more social because it lets you find your friends on that application. Your User ID helps the application personalize your experience because it can connect your account on that application with your Facebook account, and it can access your basic info, which includes your public information and friend list. This includes the information you choose to make public, as well as information that is always publicly available. If the application needs additional information, such as your stories, photos or likes, it will have to ask you for specific permission.

The "Apps you use" setting lets you control the applications you use. You can see the permissions you have given these applications, the last time an application accessed your information, and the audience on Facebook for your timeline stories and activity the application posts on your behalf. You can also remove applications you no longer want, or turn off all Platform applications. When you turn all Platform applications off, your User ID is no longer given to applications, even when your friends use those applications. But you will no longer be able to use any games, applications or websites through Facebook.

When you first visit an app, Facebook lets the app know your language, your country, and whether you are under 18, between 18-20, or 21 and over. Age range lets apps provide you with age-appropriate content. If you install the app, it can access, store and update the information you've shared. Apps you've installed can update their records of your basic info, age range, language and country. If you haven't used an app in a while, it won't be able to continue to update the additional information you've given them permission to access. Learn more at: https://www.facebook.com/help/how-apps-work
Sometimes a game console, mobile phone, or other device might ask for permission to share specific information with the games and applications you use on that device. If you say okay, those applications will not be able to access any other information about you without asking specific permission from you or your friends.
Sites and apps that use Instant Personalization receive your User ID and friend list when you visit them.
You always can remove apps you've installed by using your app settings at: https://www.facebook.com/settings/?tab=applications. But remember, apps may still be able to access your information when the people you share with use them. And, if you've removed an application and want them to delete the information you've already shared with them,

9

you should contact the application and ask them to delete it. Visit the application's page on Facebook or their own website to learn more about the app.

## Controlling what is shared when the people you share with use applications

Just like when you share information by email or elsewhere on the web, information you share on Facebook can be re-shared. This means that if you share something on Facebook, anyone who can see it can share it with others, including the games, applications, and websites they use.

Your friends and the other people you share information with often want to share your information with applications to make their experiences on those applications more personalized and social. For example, one of your friends might want to use a music application that allows them to see what their friends are listening to. To get the full benefit of that application, your friend would want to give the application her friend list – which includes your User ID – so the application knows which of her friends is also using it. Your friend might also want to share the music you "like" on Facebook. If you have made that information public, then the application can access it just like anyone else. But if you've shared your likes with just your friends, the application could ask your friend for permission to share them.

You can control most of the information other people can share with applications they use from the "Ads, Apps and Websites" settings page. But these controls do not let you limit access to your public information and friend list.

If you want to completely block applications from getting your information when your friends and others use them, you will need to turn off all Platform applications. This means that you will no longer be able to use any third-party Facebook-integrated games, applications or websites.

If an application asks permission from someone else to access your information, the application will be allowed to use that information only in connection with the person that gave the permission and no one else.

## Logging in to another site using Facebook

Facebook Platform lets you log into other applications and websites using your Facebook account. When you log in using Facebook, we give the site your User ID (just like when you connect with any other application), but we do not share your email address or password with that website through this process.

If you already have an account on that website, the site may also be able to connect that account with your Facebook account. Sometimes it does this using what is called an "email hash", which is similar to searching for someone on Facebook using an email address. Only the email addresses in this case are hashed so no email addresses are actually shared between Facebook and the website.

### How it works
The website sends over a hashed version of your email address, and we match it with a database of email addresses that we have also hashed. If there is a match, then we tell the website the User ID associated with the email address. This way, when you log into the website using Facebook, the website can link your Facebook account to your account on that website.

## About social plugins

Social plugins are buttons, boxes, and stories (such as the Like button) that other websites can use to present Facebook content to you and create more social and personal experiences for you. While you view these buttons, boxes, and stories on other sites, the content comes directly from Facebook.

Sometimes plugins act just like applications. You can spot one of these plugins because it will ask you for permission to access your information or to publish information back to Facebook. For example, if you use a registration plugin on a website, the plugin will ask your permission to share your basic info with the website to make it easier for you to register for the website. Similarly, if you use an Add To Timeline plugin, the plugin will ask your permission to publish stories about your activities on that website to Facebook.

10

If you make something public using a plugin, such as posting a public comment on a newspaper's website, then that website can access your comment (along with your User ID) just like everyone else.

If you post something using a social plugin and you do not see a sharing icon, you should assume that story is Public. For example, if you post a comment through a Facebook comment plugin on a site, your story is Public and everyone, including the website, can see your story.
Websites that use social plugins can sometimes tell that you have engaged with the social plugin. For example, they may know that you clicked on a Like button in a social plugin.
We receive data when you visit a site with a social plugin. We keep this data for a maximum of 90 days. After that, we remove your name or any other personally identifying information from the data, or combine it with other people's data in a way that it is no longer associated with you. Learn more at: https://www.facebook.com/help/social-plugins

## About instant personalization

Instant personalization is a way for Facebook to help partners (such as Bing and Rotten Tomatoes) on and off Facebook create a more personalized and social experience for logged in users than a social plugin can offer. When you visit a site or app using instant personalization, it will know some information about you and your friends the moment you arrive. This is because sites and apps using instant personalization can access your User ID, your friend list, and your public information.

The first time you visit a site or app using instant personalization, you will see a notification letting you know that the site or app has partnered with Facebook to provide a personalized experience.

The notification will give you the ability to disable or turn off instant personalization for that site or app. If you do that, that site or app is required to delete all of the information about you it received from Facebook as part of the instant personalization program. In addition, we will prevent that site from accessing your information in the future, even when your friends use that site.

If you decide that you do not want to experience instant personalization for all partner sites and apps, you can disable instant personalization from the "Ads, Apps and Websites" settings page.

If you turn off instant personalization, partner third party sites and apps will not be able to access your public information, even when your friends visit those sites.

If you turn off an instant personalization site or app after you have been using it or visited it a few times (or after you have given it specific permission to access your data), it will not automatically delete your data received through Facebook. But the site is contractually required to delete your data if you ask it to.

## How it works

To join the instant personalization program, a potential partner must enter into an agreement with us designed to protect your privacy. For example, this agreement requires that the partner delete your data if you turn off instant personalization when you first visit the site or app. It also prevents the partner from accessing any information about you until you or your friends visit its site.

Instant personalization partners sometimes use an email hash process to see if any of their users are on Facebook and get those users' User IDs. This process is similar to searching for someone on Facebook using an email address, except in this case the email addresses are hashed so no actual email addresses are exchanged. The partner is also contractually required not to use your User ID for any purpose (other than associating it with your account) until you or your friends visit the site.

When you visit a site or app using instant personalization, we provide the site or app with your User ID and your friend list (as well as your age range, locale, and gender). The site or app can then connect your account with that partner with your friends' accounts to make the site or app instantly social. The site can also access public information associated with any of the User IDs it receives, which it can use to make them instantly personalized. For example, if the site is a

music site, it can access your music interests to suggest songs you may like, and access your friends' music interests to let you know what they are listening to. Of course it can only access your or your friends' music interests if they are public. If the site or app wants any additional information, it will have to get your specific permission.

**Public search engines**

Your public search setting controls whether people who enter your name on a public search engine may see your public timeline (including in sponsored results). You can find your public search setting on the "Ads, Apps and Websites" settings page.

This setting does not apply to search engines that access your information as an application using Facebook Platform. If you turn your public search setting off and then search for yourself on a public search engine, you may still see a preview of your timeline. This is because some search engines cache information for a period of time. You can learn more about how to request a search engine to remove you from cached information at:
 https://www.facebook.com/help/?faq=13323

## IV. How advertising and Sponsored Stories work

**Personalized ads**

We do not share any of your information with advertisers (unless, of course, you give us permission). As described in this policy, we may share your information when we have removed from it anything that personally identifies you or combined it with other information so that it no longer personally identifies you.

We use the information we receive to deliver ads and to make them more relevant to you. This includes all of the things you share and do on Facebook, such as the Pages you like or key words from your stories, and the things we infer from your use of Facebook. Learn more at: https://www.facebook.com/help/?page=226611954016283

When an advertiser creates an ad, they are given the opportunity to choose their audience by location, demographics, likes, keywords, and any other information we receive or can tell about you and other users. For example, an advertiser can choose to target 18 to 35 year-old women who live in the United States and like basketball. An advertiser could also choose to target certain topics or keywords, like "music" or even people who like a particular song or artist.

Try this tool yourself to see one of the ways advertisers target ads and what information they see at:
 https://www.facebook.com/ads/create/

If the advertiser chooses to run the ad (also known as placing the order), we serve the ad to people who meet the criteria the advertiser selected, but we do not tell the advertiser who any of those people are. So, for example, if a person views or otherwise interacts with the ad, the advertiser might infer that the person is an 18-to-35-year-old woman who lives in the U.S. and likes basketball. But we would not tell the advertiser who that person is.

After the ad runs, we provide advertisers with reports on how their ads performed. For example we give advertisers reports telling them how many users saw or clicked on their ads. But these reports are anonymous. We do not tell advertisers who saw or clicked on their ads.

Advertisers sometimes place cookies on your computer in order to make their ads more effective. Learn more about cookies, pixels and other system technologies.
Sometimes we allow advertisers to target a category of user, like a "moviegoer" or a "sci-fi fan." We do this by bundling characteristics that we believe are related to the category. For example, if a person "likes" the "Star Trek" Page and mentions "Star Wars" when they check into a movie theater, we may conclude that this person is likely to be a sci-fi fan. Advertisers of sci-fi movies, for example, could ask us to target "sci-fi fans" and we would target that group, which may include you. Or if you "like" Pages that are car-related and mention a particular car brand in a post, we might put you in the "potential car buyer" category and let a car brand target to that group, which would include you.

**Ads + social context**

Facebook Ads are sometimes paired with social actions your friends have taken. For example, an ad for a sushi restaurant may be paired with a news story that one of your friends likes that restaurant's Facebook page.

This is the same type of news story that could show up in your News Feed, only we place it next to a paid advertisement to make that ad more relevant and interesting.

When you show up in one of these news stories, we will only pair it with ads shown to your friends. If you do not want to appear in stories paired with Facebook Ads, you can opt out using your "Edit social ads" setting.

Learn what happens when you click "Like" on an advertisement or an advertiser's Facebook Page at:
https://www.facebook.com/help/?faq=19399
We may serve ads, including those with social context (or serve just social context), on other sites. These work just like the ads we serve on Facebook - the advertisers do not receive any of your information. Only people that could see the Facebook action (like on your timeline) would see it paired in this way.
Your "Show my social actions in Facebook Ads" setting only controls ads with social context. It does not control Sponsored Stories, ads or information about Facebook's services and features, or other Facebook content.
Games, applications and websites can serve ads directly to you or help us serve ads to you or others if they have information like your User ID or email address.

## Sponsored stories

Many of the things you do on Facebook (like "liking" a Page) are posted to your timeline and shared in News Feed. But there's a lot to read in News Feed. That's why we allow people to "sponsor" your stories to make sure your friends see them. For example, if you RSVP to an event hosted by a local restaurant, that restaurant may want to make sure your friends see it so they can come too.

If they do sponsor a story, that story will appear in the same place ads usually do or in your News Feed under the heading "Sponsored" or something similar. Only people that could originally see the story can see the sponsored story, and no personal information about you (or your friends) is shared with the sponsor.

Your "Show my social actions in Facebook Ads" setting only controls ads with social context. It does not control Sponsored Stories, ads or information about Facebook's services and features, or other Facebook content.

## Facebook content

We like to tell you about some of the features and tools your friends and others use on Facebook, to help you have a better experience. For example, if your friend uses our friend finder tool to find more friends on Facebook, we may tell you about it to encourage you to use it as well. This of course means your friend may similarly see suggestions based on the things you do. But we will try to only show it to friends that could benefit from your experience.

Your "Show my social actions in Facebook Ads" setting only controls ads with social context. It does not control Sponsored Stories, ads or information about Facebook's services and features, or other Facebook content.

## V. Cookies, pixels and other similar technologies

Cookies are small pieces of data that are stored on your computer, mobile phone or other device. Pixels are small blocks of code on webpages that do things like allow another server to measure viewing of a webpage and often are used in connection with cookies.

We use technologies like cookies, pixels, and local storage (like on your browser or device, which is similar to a cookie but holds more information) to provide and understand a range of products and services. Learn more at:
https://www.facebook.com/help/cookies

We use these technologies to do things like:

13

- make Facebook easier or faster to use;
- enable features and store information about you (including on your device or in your browser cache) and your use of Facebook;
- deliver, understand and improve advertising;
- monitor and understand the use of our products and services; and
- to protect you, others and Facebook.

For example, we may use them to know you are logged in to Facebook, to help you use social plugins and share buttons, or to know when you are interacting with our advertising or Platform partners.

We may ask advertisers or other partners to serve ads or services to computers, mobile phones or other devices, which may use a cookie, pixel or other similar technology placed by Facebook or the third party (although we would not share any other information that identifies you with an advertiser).

Most companies on the web use cookies (or other similar technological tools), including our advertising and Platform partners. For example, our Platform partners, advertisers or Page administrators may use cookies or similar technologies when you access their apps, ads, Pages or other content.

Cookies and things like local storage help make Facebook work, like allowing pages to load faster because certain content is stored on your browser or by helping us authenticate you to deliver personalized content.
To learn more about how advertisers generally use cookies and the choices advertisers provide, visit the Network Advertising Initiative at http://www.networkadvertising.org/managing/opt_out.asp, the Digital Advertising Alliance at http://www.aboutads.info/, the Internet Advertising Bureau (US) at http://www.iab.net or the Internet Advertising Bureau (EU) at http://youronlinechoices.eu/.
You can remove or block cookies or other similar technologies or block or remove other data stored on your computer or device (such as by using the various settings in your browser), but it may affect your ability to use Facebook or other websites and apps.

## VI. Some other things you need to know

### Safe harbor

Facebook complies with the EU Safe Harbor framework as set forth by the Department of Commerce regarding the collection, use, and retention of data from the European Union. To view our certification, visit the U.S. Department of Commerce's Safe Harbor website at: https://safeharbor.export.gov/list.aspx. As part of our participation in the Safe Harbor program, we agree to resolve disputes you have with us in connection with our policies and practices through TRUSTe. If you would like to contact TRUSTe, visit:https://feedback-form.truste.com/watchdog/request

### Contact us with questions or disputes

If you have questions or complaints regarding our Data Use Policy or practices, please contact us by mail at 1601 Willow Road, Menlo Park, CA 94025 if you reside in the U.S. or Canada, or at Facebook Ireland Ltd., Hanover Reach, 5-7 Hanover Quay, Dublin 2 Ireland if you live outside the U.S. or Canada. Anyone may also contact us through this help page: https://www.facebook.com/help/contact_us.php?id=173545232710000

### Responding to legal requests and preventing harm

We may access, preserve and share your information in response to a legal request (like a search warrant, court order or subpoena) if we have a good faith belief that the law requires us to do so. This may include responding to legal requests from jurisdictions outside of the United States where we have a good faith belief that the response is required by law in that jurisdiction, affects users in that jurisdiction, and is consistent with internationally recognized standards. We may also access, preserve and share information when we have a good faith belief it is necessary to: detect, prevent and address fraud and other illegal activity; to protect ourselves, you and others, including as part of investigations; and to prevent death or imminent bodily harm. Information we receive about you, including financial transaction data related to purchases made with Facebook Credits, may be accessed, processed and retained for an extended period of time when it is the subject of a legal request or obligation, governmental investigation, or investigations concerning possible violations of our terms or policies, or otherwise to prevent harm.

14

**Access requests**

You can access and correct most of your personal data stored by Facebook by logging into your account and viewing your timeline and activity log. You can also download a copy of your personal data by visiting your "Account Settings", clicking on "Download a copy of your Facebook data" and then clicking on the link for your expanded archive. Learn more at: https://www.facebook.com/help/?faq=226281544049399

**Notifications and Other Messages**

We may send you notifications and other messages using the contact information we have for you, like your email address. You can control most of the notifications you receive, including ones from Pages you like and applications you use, using your "Notifications" settings.

**Friend finder**

We offer tools to help you upload your friends' contact information so that you and others can find friends on Facebook, and invite friends who do not use Facebook to join. If you do not want us to store this information, visit this help page at: https://www.facebook.com/contact_importer/remove_uploads.php

If you give us your password, we will delete it after you upload your friends' contact information.

**Invitations**

When you invite a friend to join Facebook, we send a message on your behalf using your name, and up to two reminders. We may also include names and pictures of other people your friend might know on Facebook. The invitation will also give your friend the opportunity to opt out of receiving other invitations to join Facebook.

**Memorializing accounts**

We may memorialize the account of a deceased person. When we memorialize an account, we keep the timeline on Facebook, but limit access and some features. You can report a deceased person's timeline at: https://www.facebook.com/help/contact.php?show_form=deceased

We also may close an account if we receive a formal request that satisfies certain criteria.

**Service Providers**

We give your information to the people and companies that help us provide, understand and improve the services we offer. For example, we may use outside vendors to help host our website, serve photos and videos, process payments, analyze data, measure the effectiveness of ads, or provide search results. In some cases we provide the service jointly with another company, such as the Facebook Marketplace. In all of these cases our partners must agree to only use your information consistent with the agreement we enter into with them, as well as this Data Use Policy.

**Security and bugs**

We do our best to keep your information secure, but we need your help. For more detailed information about staying safe on Facebook, visit the Facebook Security Page. We try to keep Facebook up, bug-free and safe, but can't make guarantees about any part of our services or products.

**Change of Control**

If the ownership of our business changes, we may transfer your information to the new owner so they can continue to operate the service. But they will still have to honor the commitments we have made in this Data Use Policy.

**Notice of Changes**

If we make changes to this Data Use Policy we will notify you by publication here and on the Facebook Site Governance Page. If the changes are material, we will provide you additional, prominent notice as appropriate under the circumstances. You can make sure that you receive notice directly by liking the Facebook Site Governance Page.

**Opportunity to comment and vote**

Unless we make a change for legal or administrative reasons, or to correct an inaccurate statement, we will give you seven (7) days to provide us with comments on the change. If we receive more than 7000 comments concerning a particular change, we will put the change up for a vote. The vote will be binding on us if more than 30% of all active

registered users as of the date of the notice vote.

**Information for users outside of the United States and Canada**
Company Information: The website under www.facebook.com and the services on these pages are being offered to users outside of the U.S. and Canada by Facebook Ireland Ltd., Hanover Reach, 5-7 Hanover Quay, Dublin 2 Ireland. The company Facebook Ireland Ltd. has been established and registered in Ireland as a private limited company, Company Number: 462932, and is the data controller responsible for your personal information.
Directors: Cipora Herman (American), Theodore Ullyot (American).

**Your California privacy rights**
California law permits residents of California to request certain details about what personal information a company shares with third parties for the third parties' direct marketing purposes. Facebook does not share your information with third parties for the third parties' own and independent direct marketing purposes unless we receive your permission. Learn more about the information we receive and how it is used and other websites and applications. If you have questions about our sharing practices or your rights under California law, please write us at 1601 Willow Road, Menlo Park, CA 94025 or contact us through this help page: https://www.facebook.com/help/contact_us.php?id=173545232710000

16

# EXHIBIT G

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

*Plaint₍ᵢ₎fs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION TO DEFENDANT FACEBOOK, INC.**<br><br>Judge: Hon. Vince Chhabria<br>Courtroom: 4, 17th Floor |

PROPOUNDING PARTY:     Plaintiffs

RESPONDING PARTY:      Facebook

SET NUMBER:            Two (2)

Plaintiffs hereby propound the following requests for production of documents to

Defendant Facebook, Inc. ("Facebook"), pursuant to Federal Rules of Civil Procedure 26 and 34,

and request that Facebook produce the documents and electronically-stored information set forth

herein within thirty (30) days of service of these requests, at Bleichmar Fonti & Auld LLP, 555

12th Street, Suite 1600, Oakland, CA 94607.

## INSTRUCTIONS

1.      You shall respond to these requests for the production of documents in a manner

consistent with the Federal Rules of Civil Procedure and the following instructions:

2.      In responding to each document request, furnish all responsive documents

available at the time of production, including documents in your possession, custody or control,

and in the possession, custody or control of your agents, employees, partners, representatives,

subsidiaries, affiliates, investigators, or by your attorneys or their agents, employees or

investigators.

3.      If any otherwise responsive document was, but is no longer, in existence or in

your possession, custody or control, identify the type of information contained in the document,

its current or last known custodian, the location/address of such document, the identity of all

persons having knowledge or who had knowledge of the document and describe in full the

circumstances surrounding its disposition from your possession or control.

4.      This is a continuing request for the production of documents and requires

supplemental responses as provided for in the Federal Rules of Civil Procedure. If, after making

your initial production, you (or any other persons acting on your behalf) obtain or become aware

of any further documents responsive to any document request, you are required to produce such additional documents to plaintiffs. Each supplemental response shall be served on plaintiffs no later than thirty days after the discovery of the further information.

5. You shall produce the original of each document described below or, if the original is not in your custody, then a copy thereof, and in any event, all non-identical copies which differ from the original or from the other copies produced for any reason, including, without limitation, the making of notes thereon.

6. Documents shall be produced as kept in the regular course of business together with the original folders, binders, boxes or other containers in which they were maintained.

7. All documents or things that respond in whole or in part to any portion of these requests are to be produced in their entirety, including attachments and their enclosures.

8. Documents attached to each other should not be separated.

9. Documents not otherwise responsive to any particular document request shall be produced if such documents mention, discuss, refer to, or explain the documents called for by any document request, or if such documents are attached to documents called for by any document request.

10. Documents shall be produced in such fashion as to identify the custodian of each document.

11. Identify the source of each document produced, by identifying: (a) all of the person(s) who possessed the document; (b) the positions or titles of any such individuals; and (c) all of the divisions and departments where each document was located. If you are unable to determine the individual(s) who possessed the document, identify the department and division where the document was located when produced.

12.     If you claim any form of privilege, whether based on statute or otherwise, as a ground for not producing any document, state the following:

    a.   The date of the document;

    b.   The name, the present or last known home and business address, the telephone numbers, the title (or position), and the occupation of those individuals who prepared, produced, reproduced or who were recipients of said document;

    c.   A description of the document sufficient to identify it without revealing the information for which the privilege is claimed;

    d.   The nature of the privilege asserted;

    e.   The factual basis upon which you claim any such privilege;

    f.   The location of the document; and

    g.   The custodian of the document.

13.     To the extent you object to any document request, you must provide specific responses as to what portion of the request you object to and state expressly why you will not respond to such request in sufficient detail to permit the Court to determine the validity of the objection. Responsive documents to which your objection does not apply should be produced.

14.     If you claim that all or any part of any document request, the Definitions, or Instructions is vague or ambiguous, please identify the specific language you consider vague or ambiguous and state the interpretation of the language in question you used to frame your response.

15.     Each document requested herein is to be produced in its entirety and without deletion or excision, regardless of whether you consider the entire document to be relevant or responsive to any document request. If you have removed, excised or deleted any portion of a

document, stamp the word "REDACTED" on each page of the document that you have redacted. Redactions should be included on the privilege log described in Instruction No. 13, above.

16.     One copy of each document should be produced. A document that varies in any way from the original or from any other copy, including drafts or a document with handwritten notations or deletions constitutes a separate document and must be produced, whether or not the original is in your possession, custody or control. Color (*i.e.*, not black and white) originals should be produced in color. If any identical copy cannot be produced for any reason (*e.g.*, faint writing, erasures, etc.), produce the original.

17.     Indicate the origin of each document and number each document with consecutive Bates numbers.

## **DEFINITIONS**

Unless otherwise stated, the terms set forth below are defined as follows and shall be used in construing the meaning of these requests for the production of documents.

1.      The use of the singular shall be deemed to include the plural, and the use of one gender shall include all others, as appropriate, in the context.

2.      The present tense of a verb includes its past tense, and vice versa.

3.      "And" and "or" are to be construed conjunctively and disjunctively, as necessary, to bring within the scope of this request for production all responses that might otherwise be construed to be outside its scope.

4.      "Any" and "all" mean each and every.

5.      "App" means an interactive software application developed to utilize the core technologies of the Facebook social networking platform.

6.      "App Developer Investigation" or "ADI" means (as described in paragraph seven of the Chen Declaration) Facebook's investigation to determine "whether there has been misuse

of data in violation of Facebook's policies and associated legal liabilities, in connection with the first version of the [Facebook] Platform."

7.      "Apps Others Use" means the setting used to prevent the disclosure of personal information to third party App Developers through Facebook's API, as described in paragraphs 366 to 368 of the FAC.

8.      "App Settings" means settings that a User can alter or accept to limit Third Parties from accessing or obtaining Users' Content and Information, including Apps Others Use, Granular Data Permissions, Platform Opt Out, and the like.

9.      "Chen Declaration" means the Declaration of Stacy Chen in Support of Respondent's Opposition to the Attorney General's Petition, *Attorney General Maura Healy v. Facebook, Inc.*, No. 1984CV02597-BFS-1 (Mass. Super Ct., Suffolk Cty.).

10.     "Communication" means the transmittal (in the form of facts, ideas, thoughts, opinions, data, inquiries or otherwise) and includes, but is not limited to, correspondence, memoranda, reports, presentations, face-to-face conversations, telephone conversations, text messages, instant messages, messages sent on Facebook Messenger, voice messages, negotiations, agreements, inquiries, understandings, meetings, letters, notes, telegrams, mail, electronic mail or email, and postings of any type.

11.     "Computer System" or "Computer Systems" include(s), but is not limited to, any server (whether physical or virtual), desktop computer, tablet computer, point of sale system, smart phone, cellular telephone, networking equipment, internet site, intranet site, and the software programs, applications, scripts, operating systems, or databases used to control, access, store, add, delete, or modify any information stored on any of the foregoing non-exclusive list.

12.     "Content and Information" refers to the definition in footnote 2 of the FAC, referring to "content" and "information" as Facebook's Statements of Rights and

Responsibilities have defined those terms. In brief, Facebook has generally used "information" to mean facts and other information about Users, including the actions they take, and "content" to mean anything Users post on Facebook that would not be included in the definition of "information." Content and Information also includes both personally identifiable content and information and anonymized content and information that is capable of being de-anonymized. *See* FAC ¶¶ 223-224. Content and Information includes data that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular User, including:

    a. Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

    b. Characteristics of protected classifications under California or federal law.

    c. Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

    d. Biometric information.

    e. Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an Internet Web site, application, or advertisement.

    f. Geolocation data.

    g. Audio, electronic, visual, thermal, olfactory, or similar information.

    h. Professional or employment-related information.

i. Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. section 1232g, 34 C.F.R. Part 99).

j. Inferences drawn from any of the information identified in this paragraph to create a profile, dossier, or similar collection of information about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

13. "Document" or "Documents" is defined to include any Document, ESI, or Electronic Media stored in any medium, and is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a)(1)(A), including, but not limited to, electronic or computerized data compilations, Communications, electronic chats, instant messaging, documents created through Workplace by Facebook, encrypted or self-destructing messages, messages sent via Facebook messenger, email Communications, other electronically stored information from Personal computers, sound recordings, photographs, and hard copy Documents maintained in your Personal files.

14. "Electronic Media" means any magnetic, optical, or other storage media device used to record ESI including but not limited to computer memory, hard disks, floppy disks, flash memory devices, CDs, DVDs, Blu-ray discs, cloud storage (*e.g.*, DropBox, Box, OneDrive, or SharePoint), tablet computers (*e.g.*, iPad, Kindle, Nook, or Samsung Galaxy), cellular or smart phones (*e.g.*, BlackBerry, iPhone, or Samsung Galaxy), personal digital assistants, magnetic tapes of all types, or any other means for digital storage and/or transmittal.

15. "Electronically Stored Information" or "ESI" means information that is stored in Electronic Media, regardless of the media or whether it is in the original format in which it was created, and that is retrievable in perceivable form and includes, but is not limited to, metadata,

system data, deleted data, fragmented data, data pertaining to or maintained in Apps, database contents, and computer code.

16.     "FAC" refers to the First Amended Consolidated Complaint filed February 22, 2019, ECF No. 257.

17.     "Facebook," "Defendant," "You," or "Your" shall mean Facebook, Inc. and any of its executives, directors, officers, employees, partners, members, representatives, agents (including attorneys, accountants, consultants, investment advisors or bankers), and any other Person purporting to act on its behalf. In the case of business entities, these defined terms include parents, subsidiaries, affiliates, predecessor entities, successor entities, these defined terms include parents, subsidiaries, affiliates, predecessor entities, successor entities, divisions, departments, groups, acquired entities and/or related entities or any other entity acting or purporting to act on its behalf.

18.     "FTC Consent Order" shall refer to the July 27, 2012 Federal Trade Commission Consent Order in *In the Matter of Facebook, Inc.*, No. C-4365.

19.     "Granular Data Permissions" means the setting through which the User accessing an App may limit the categories of Content and Information an App Developer may collect.

20.     "Identify," with respect to Documents, means to give, to the extent known, the (a) type of Document; (b) general subject matter; (c) date of the Document; (d) author(s); (e) addressee(s); and (f) recipient(s).

21.     "Including" means "including but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify the request, definition or instruction but not to limit the request.

22.     "Internal Policy" or "Internal Policies" mean any formal or informal policy, procedure, rule, guideline, collaborative document, directive, instruction, or practice, whether written or unwritten, that You expect Your employees to follow in performing their jobs.

23.     "Misuse of Data," when used as a capitalized phrase, means the use by an App of a User's Content or Information that was broader or different than the use of that content or information only in connection with the person that gave the permission to the App to access such User's Content or Information.

24.     "Named Plaintiffs" means Steven Akins, Jason Ariciu, Samuel Armstrong, Anthony Bell, Bridgett Burk, Brendan Carr, John Doe, Terry Fischer, Shelly Forman, Paige Grays, Mary Beth Grisi, Tabielle Holsinger, Taunna Lee Johnson, Olivia Johnston, Tyler King, Ashley Kmieciak, William Lloyd, Gretchen Maxwell, Scott McDonnell, Ian Miller, Jordan O'Hara, Bridget Peters, Kimberly Robertson, Scott Schinder, Cheryl Senko, Dustin Short, Tonya Smith, Mitchell Staggs, Charnae Tutt, Barbara Vance-Guerbe, and Juliana Watson.

25.     "Person" or "Persons" means any natural Person or any business, legal or governmental entity or association.

26.     "Platform" refers to the services, tools, and products provided by Facebook to third parties to create their own applications and services that access data in Facebook.

27.     "Platform Opt Out" means the setting a User may access to choose that his or her Content and information is not accessed or obtained by any Apps or websites on Facebook's Platform.

28.     "Privacy Controls" means the audience selectors that control what information in a User's profile can be viewed by other Users, and includes Profile Privacy Settings, Profile Privacy Controls, Publisher Privacy Controls, and the like.

29.     "Relating to," "relate to," "referring to," "refer to," "reflecting," "reflect," "concerning," or "concern" means all Documents which comprise, explicitly or implicitly refer to, were reviewed in conjunction with, or were created, generated or maintained as a result of the subject matter of the request, including, but not limited to, all Documents which reflect, record, memorialize, embody, discuss, evaluate, consider, review or report on the subject matter of the request.

30.     "Third Parties" include the following:

a.     Apps, App Developers, Whitelisted Apps, and Business Partners, as those terms are used in the FAC;

b.     Any person that develops an application, software experience, game, or website that accesses Content and Information from Facebook's API or other Facebook software; and

c.     Any person with which Facebook has or had an integration partnership.

31.     "User(s)" means individuals who maintain a Facebook account and can generally access the typical Facebook experience through website or mobile applications.

32.     Capitalized terms and acronyms not specifically defined herein have the same definition as in the FAC.

## RELEVANT TIME PERIOD

The relevant time period for each Document Request is January 1, 2007 through the present (the "Relevant Time Period"), unless otherwise specifically indicated. Each Document Request shall be interpreted to include all documents and information that relate to the Relevant Time Period or otherwise specified period, even if such documents or information were prepared or published outside of the Relevant Time Period or otherwise specified period. If a document prepared before or after this period is necessary for a correct or complete understanding of any

document covered by a request, you must produce the earlier or subsequent document as well. If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the production request.

## **DOCUMENT REQUESTS**

### **REQUEST FOR PRODUCTION NO. 6**

All Documents provided to or received from any governmental entity or regulator in the United States and United Kingdom in response to any formal or informal inquiry or investigation relating to whether Users' Content and Information was accessed or obtained by any Third Parties without proper consent or authorization, including but not limited to all inquiries or investigations arising out of the Cambridge Analytica Scandal, the FTC Consent Order, and any inquiry or investigation related to the settlement agreement with the FTC announced on July 24, 2019.

### **REQUEST FOR PRODUCTION NO. 7**

All organizational charts, personnel directories, or other documents sufficient to show Your organizational structure, including:

(a)     the identity of subsidiaries, affiliates, and joint ventures, and your ownership interest, control of, or participation in any subsidiary or affiliate or joint venture related to agreements, engineering, access, use, transmission, receipt, collection or analysis of Facebook Users' Content and Information by Third Parties;

(b)     the organization of any division, department, unit or subdivision of your company that has responsibilities relating to agreements, engineering, access, use, transmission, receipt, collection or analysis of Users' Content and Information by Third Parties; and

(c)     the names, titles, job descriptions, and employment periods for your present and former employees who has or had responsibilities relating to agreements, engineering, access,

use, transmission, receipt, collection or analysis of Users' Content and Information by Third Parties; and

(d) the names, titles, job descriptions, and employment periods of Your present or former directors, officers, or senior managers, as well as any secretaries or administrative assistants assigned to these directors, officers, or senior managers.

**REQUEST FOR PRODUCTION NO. 8**

All versions (including each updated or amended version thereof) of Facebook's "Platform Policies," which have been called the "Developer Principles and Policies," the "Platform Guidelines," or the "Developer Terms of Service" (collectively, the "Platform Policies").

**REQUEST FOR PRODUCTION NO. 9**

All Documents relating to each of the Named Plaintiffs, including but not limited to all Content and Information collected about each of them or gained from business relationships or any other source.

**REQUEST FOR PRODUCTION NO. 10**

For each of the Named Plaintiffs, Documents sufficient to show the categories of Content and Information Facebook collects, tracks, and maintains about them.

**REQUEST FOR PRODUCTION NO. 11**

Documents sufficient to identify all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information, what categories of Content and Information Facebook granted access to, how Facebook allowed these Third Parties to access the Named Plaintiffs' Content and Information, and the business purpose of all such access.

**REQUEST FOR PRODUCTION NO. 12**

Documents relating to any partnerships or agreements Facebook entered into with Third Parties for access to Named Plaintiffs' Content and Information.

**REQUEST FOR PRODUCTION NO. 13**

For all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information, Documents sufficient to show any use by Third Parties of such Content and Information not in connection with the User that granted the permission to the Third Party or inconsistent with Facebook's agreement with that Third Party.

**REQUEST FOR PRODUCTION NO. 14**

Documents sufficient to show the monetary or retail value of each named Plaintiff's Content and Information to Facebook, updated to reflect whenever Facebook's terms of service changed, including the calculation of revenue earned by Facebook for each Named Plaintiff based upon bartering or selling access to such Named Plaintiff's Content and Information.

**REQUEST FOR PRODUCTION NO. 15**

Documents sufficient to show the money or any other thing of value, including but not limited to money or any other thing of value paid in exchange for targeted advertising, that Facebook received in exchange for each Named Plaintiff's Content and Information, which entities paid Facebook, and when such payments were made.

**REQUEST FOR PRODUCTION NO. 16**

Documents sufficient to show the monetary or retail value of Users' Content and Information to Facebook, including all monthly, quarterly, and annual financial reporting relating to same, and including but not limited to the calculation of average revenue per user, any changes to such monetary or retail value relating to changes to Facebook's terms of service, and any financial reporting of Content and Information as an asset.

## REQUEST FOR PRODUCTION NO. 17

All Documents relating to Facebook's assessment of the monetary or retail value of Users' Content and Information to Users (as distinct from value to Facebook), including analyses for providing compensation to Users for their Content and Information, including but not limited to Users compensated in connection with the Onavo or Research app.

## REQUEST FOR PRODUCTION NO. 18

All Documents that have been transmitted to Users by Facebook relating to whether Users' Content and Information was accessed or obtained by Third Parties.

## REQUEST FOR PRODUCTION NO. 19

All Documents supporting the escalation of those Apps escalated to Phase Two of ADI for Enhanced Examination and/or Phase Three of ADI for Enforcement and designated as follows in the Chen Declaration ¶ 34:

> (d) each [A]pp to which a request for information was sent; (e) each [A]pp for which an interview was sought with the developer; (f) each [A]pp for which a remote or onsite audit was requested to be conducted; (g) each [A]pp for which actual misuse was found and identification of that misuse; (h) each [A]pp that was banned for actual misuse; and (i) each [A]pp that was banned for failing to cooperate with Facebook's investigation.

Facebook has described identification of these Apps as non-privileged and has already produced it to the Massachusetts Attorney General's Office. *See* Chen Declaration ¶ 35.

## REQUEST FOR PRODUCTION NO. 20

The list of Apps that Facebook provided to the Massachusetts Attorney General's Office and that the Chen Declaration ¶ 35 describes as "the subject of external actions or

communications with third parties, including the growing list of Apps Facebook has suspended as part of the [ADI], whether because of policy violations or because of their refusal to cooperate with Facebook's investigation."

**REQUEST FOR PRODUCTION NO. 21**

Communications between Facebook and Third Parties relating to the ADI, including but not limited to Communications that Facebook provided to the Massachusetts Attorney General's Office. *See* Chen Declaration ¶ 37.

**REQUEST FOR PRODUCTION NO. 22**

All "Privacy Risk Assessment[s]," and notes or agenda relating to Facebook's "focused subject-matter-specific meetings," "focused subject-matter-specific discussions," "weekly intra- and inter-team meetings," and "Privacy Summit[s]," as detailed in "Facebook's Privacy Program Overview" included in any PricewaterhouseCoopers LLP ("PwC") assessment report prepared pursuant to the FTC Consent Order.

**REQUEST FOR PRODUCTION NO. 23**

Unredacted versions and Documents in support of the assessment reports, including the Initial Assessment Report and Biennial Reports, prepared by PwC pursuant to the FTC Consent Order.

**REQUEST FOR PRODUCTION NO. 24**

Documents sufficient to identify all Third Parties to which Facebook granted access to Users' Content and Information not generally available through Platform pursuant to partnerships or agreements between Facebook and those Third Parties.

**REQUEST FOR PRODUCTION NO. 25**

All Documents relating to agreements or partnerships described in Request No. 24.

**REQUEST FOR PRODUCTION NO. 26**

For each of the Third Parties that Facebook entered into partnerships or agreements with as described in Request No. 24, Documents sufficient to identify:

- The fields, kinds, or categories of Content and Information that were accessed or obtained by such Third Parties;

- How each such Third Party accessed or obtained the Content and Information of Users;

- How each such Third Party used the Content and Information accessed or obtained;

- Where the Content and Information obtained by such Third Parties currently resides and who has access to it.

**REQUEST FOR PRODUCTION NO. 27**

Documents sufficient to show all forms and formats in which Facebook transmitted to Third Parties information concerning Users' liking, viewing, retrieving, or otherwise requesting or obtaining videos on, using, or by means of the Facebook Platform.

**REQUEST FOR PRODUCTION NO. 28**

All Documents relating to Internal Policies by Facebook on the monitoring of Third Parties' compliance with Facebook's Platform Policy, Data Policy, or SRR.

**REQUEST FOR PRODUCTION NO. 29**

All Documents relating to Internal Policies by Facebook on the enforcement of Facebook's Platform Policy, Data Policy, or SRR against Third Parties.

**REQUEST FOR PRODUCTION NO. 30**

All Documents relating to measures and controls, including proposed measures and controls, put in place by Facebook to prevent Third Parties from violating Facebook's Platform Policy, Data Policy, or SRR.

**REQUEST FOR PRODUCTION NO. 31**

All Documents relating to Facebook's audits, inquiries, and investigations of Third

Parties investigating compliance with any provisions of Facebook's Platform Policy, Data

Policy, or SRR regarding the access, use, transmission, receipt, collection and analysis of Users'

Content and Information on and off the Platform.

**REQUEST FOR PRODUCTION NO. 32**

All Documents Concerning Misuse of Data, including investigations, examinations,

inquiries, or audits—or Communications regarding such investigations, examinations, inquiries,

or audits—regarding Misuse of Data prior to the deprecation of Graph API v.1.0.

**REQUEST FOR PRODUCTION NO. 33**

Documents sufficient to show the notice that Facebook provided to Users regarding

modifications to Facebook's SRR or Data Policy, and all Communications related thereto.

**REQUEST FOR PRODUCTION NO. 34**

All Documents relating to the conditioning of Third Parties' access to Users' Content and

Information on the purchase of Mobile App Install Ads, payment of Content and Information in-

kind (referred internally as Reciprocity or Data Reciprocity), or other payment.

**REQUEST FOR PRODUCTION NO. 35**

Documents relating to the manner in which a Facebook User could control how his or her

data was shared through their Privacy Controls and App Settings throughout the Relevant Time

Period, including but not limited to screenshots of the Facebook website and the Facebook

mobile application.

**REQUEST FOR PRODUCTION NO. 36**

All Documents concerning User testing, evaluation and analysis of Facebook's Privacy Controls and App Settings during the Relevant Time Period, including but not limited to design documents, correspondence, analyses, and reports.

Dated: November 25, 2019

Respectfully submitted,

KELLER ROHRBACK L.L.P.

BLEICHMAR FONTI & AULD LLP

By:    /s/ Derek W. Loeser
       Derek W. Loeser

By:    /s/ Lesley E. Weaver
       Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)
Lynn Lincoln Sarko (admitted *pro hac vice*)
Gretchen Freeman Cappio (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
bgould@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

# EXHIBIT H

1  Lesley E. Weaver (SBN 191305)   Derek W. Loeser(admitted pro hac vice)
   **BLEICHMAR FONTI & AULD LLP**   **KELLER ROHRBACK L.L.P.**
2  555 12th Street, Suite 1600      1201 Third Avenue, Suite 3200
   Oakland, CA 94607                Seattle, WA 98101
3  Telephone: (415) 445-4003        Telephone: (206) 623-1900
   Facsimile: (415) 445-4020        Facsimile: (206) 623-3384
4  lweaver@bfalaw.com               dloeser@kellerrohrback.com

5

6

7  *Plaintiff's Co-Lead Counsel*

8           **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF CALIFORNIA**
9

10 | IN RE: FACEBOOK, INC. CONSUMER | MDL No. 2843 |
11 | PRIVACY USER PROFILE LITIGATION | Case No. 18-md-02843-VC |

12

13 | This document relates to: | **PLAINTIFFS' NOTICE OF NON-PARTY SUBPOENA TO ZYNGA INC.** |
14 | ALL ACTIONS | |
15 | | Judge: Hon. Vince Chhabria
     Courtroom: 4, 17th Floor |

16

17        **PLAINTIFFS' NOTICE OF NON-PARTY SUBPOENA**

18       PLEASE TAKE NOTICE that, pursuant to Rules 26, 34, and 45 of the

19 Federal Rules of Civil Procedure, on March 10, 2020, Plaintiffs will cause the

20 attached subpoena to be served on Zynga Inc., requesting the production to

21 Plaintiffs of the documents described in the attached Schedule A, at Bleichmar

22 Fonti & Auld, LLP, 555 12th Street, Suite 1600, Oakland, CA 94607 at 5:00 p.m.

23

24 Dated: March 3, 2020

25

26

27

28
                                  1
            **PLAINTIFFS' NOTICE OF NON-PARTY SUBPOENA**

2782

Respectfully submitted,

**KELLER ROHRBACK L.L.P.**

By: */s/ Derek W. Loeser*
      Derek W. Loeser

Derek W. Loeser (admitted pro hac vice)
Lynn Lincoln Sarko (admitted pro hac vice)
Gretchen Freeman Cappio (admitted pro hac vice)
Cari Campen Laufenberg (admitted pro hac vice)
Benjamin Gould (SBN 250630)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
bgould@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

**BLEICHMAR FONTI & AULD LLP**

By: */s/ Lesley E. Weaver*
      Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Matthew P. Montgomery (SBN 180196)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
mmontgomery@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

for the

Northern District of California

IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION

|  |  |  |
|---|---|---|
| *Plaintiff* | ) | |
| v. | ) ) | Civil Action No. 3:18-md-02843-VC |
| *Defendant* | ) ) ) ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Zynga, Inc. - Corporation Service Company - 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833-3505

*(Name of person to whom this subpoena is directed)*

✓ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedule A

| Place: BLEICHMAR FONTI & AULD LLP 555 12th Street, Suite 1600 Oakland, CA 94607 P: (415) 445-4003 | Date and Time: 03/31/2020 5:00 p.m. |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 03/10/2020

|  |  |  |
|---|---|---|
| *CLERK OF COURT* | | |
| | OR | |
| _____ | | /s/ Lesley E. Weaver |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____ Consolidated Plaintiffs _____, who issues or requests this subpoena, are:

Lesley E. Weaver, 555 12th Street, Suite 1600, Oakland, CA 94607 - lweaver@bfalaw.com, Tel: (415) 445-4003

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No.  3:18-md-02843-VC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

2785

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

**(i)** is a party or a party's officer; or

**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:

**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## DEFINITIONS

The following definitions shall apply to these Requests for Production ("Requests"). In the event of any ambiguity in one or more of the following definitions, common usage should be used to provide the broadest interpretation of the term in question:

1.      The use of the singular shall be deemed to include the plural, and the use of one gender shall include all others, as appropriate, in the context.

2.      The present tense of a verb includes its past tense and vice versa.

3.      "And" and "or" are terms of inclusion and not of exclusion and are to be construed to bring within the scope of these Requests any documents or responses that might otherwise be considered outside their scope.

4.      The words "any" and "all" mean "each" and "every."

5.      "Communication" means the transmittal (in the form of facts, ideas, thoughts, opinions, data, inquiries or otherwise) and includes, but is not limited to, correspondence, memoranda, reports, presentations, face-to-face conversations, telephone conversations, text messages, instant messages, messages sent on Facebook Messenger, voice messages, negotiations, agreements, inquiries, understandings, meetings, letters, notes, telegrams, mail, electronic mail or email, and postings of any type.

6.      "Content and Information" refers to "content" and "information" as Facebook's Statements of Rights and Responsibilities have defined those terms. In brief, Facebook has generally used "information" to mean facts and other information about users, including the actions they take, and "content" to mean anything users post on Facebook that would not be included in the definition of "information." Content and Information also includes both personally identifiable content and information and anonymized content and information that is

1

capable of being de-anonymized. Content and Information includes data that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular user, including:

a. Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

b. Characteristics of protected classifications under California or federal law.

c. Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

d. Biometric information.

e. Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an Internet Web site, application, or advertisement.

f. Geolocation data.

g. Audio, electronic, visual, thermal, olfactory, or similar information.

h. Professional or employment-related information.

i. Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. § 1232g, 34 C.F.R. Part 99).

j. Inferences drawn from any of the information identified in this paragraph to create a profile, dossier, or similar collection of information about a consumer

2788

reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

7.    "Document" is coextensive with the meaning of the terms "documents" and "tangible things" in the Federal Rules of Civil Procedure, and shall have the broadest possible meaning and interpretation ascribed to the terms "documents" and "tangible things" under the Federal Rules of Civil Procedure. "Document" is defined to include any document and ESI stored in any medium, and is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a)(l)(A), including Communications as defined herein, electronic or computerized data compilations, electronic chats, instant messaging, documents created through Workplace by Facebook, encrypted or self-destructing messages, messages sent via Facebook messenger, email, other ESI from personal computers, sound recordings, photographs, and hard copy documents maintained in Your personal files.

8.    "Electronic Media" means any magnetic, optical, or other storage media device used to record ESI including computer memory, hard disks, floppy disks, flash memory devices, CDs, DVDs, Blu-ray discs, cloud storage (e.g., DropBox, Box, OneDrive, or SharePoint), tablet computers (e.g., iPad, Kindle, Nook, or Samsung Galaxy), cellular or smart phones (e.g., BlackBerry, iPhone, or Samsung Galaxy), personal digital assistants, magnetic tapes of all types, or any other means for digital storage or transmittal.

9.    "Electronically Stored Information" or "ESI" means information that is stored in Electronic Media, regardless of the media or whether it is in the original format in which it was created, and that is retrievable in perceivable form and includes metadata, system data, deleted data, and fragmented data.

10.    "Facebook" means Facebook, Inc.

11.    "Friend" means a Facebook user who is connected to another Facebook user on Facebook.

12.    "Identify" with respect to Documents, means to give, to the extent known, the (a) type of Document; (b) general subject matter; (c) date of the Document; (d) author(s); (e) addressee(s); and (f) recipient(s).

13.    "Including" means "including but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify the Request, definition, or instruction but not to limit the Request.

14.    "Person" includes natural persons, religious organizations, firms, partnerships, associations, joint ventures, corporations, and any other form of religious or business organization or arrangement (whether formally incorporated or not), as well as officers, directors, shareholders, employees, agents, and contractors of any religious or business organization or arrangement.

15.    "Privacy Settings" means the audience selectors on Facebook that allowed Facebook users to control what information in a Facebook users' profiles can be viewed by other Facebook users.

16.    "Relating to," "relate to," "referring to," "refer to," "reflecting," "reflect," "concerning," or "concern" mean evidencing, regarding, concerning, discussing, embodying, describing, summarizing, containing, constituting, showing, mentioning, reflecting, pertaining to, dealing with, relating to, referring to in any way or manner, or in any way logically or factually, connecting with the matter described in that paragraph of these demands, including documents attached to or used in the preparation of or concerning the preparation of the documents.

2790

17. "You" or "Your" means the entire corporate family to which these Requests are sent, and includes current and former employees, and all other persons acting on behalf of, or at the direction of, such entity.

18. Words used in the plural include the singular, and words used in the singular include the plural.

## **INSTRUCTIONS**

1. You are requested to produce all Documents in Your possession, custody, care or control that are described below. In so doing, please furnish Documents that are in the possession of Your partners, officers, employees, attorneys, accountants, representatives, or agents, or that are otherwise subject to Your custody, care or control.

2. Unless otherwise indicated, the Documents to be produced include all Documents prepared, sent, dated or received, or those that otherwise came into existence any time during the time period described herein.

3. The production by one person, party, or entity of a Document does not relieve another person, party, or entity from the obligation to produce his, her, or its own copy of that Document, even if the two Documents are identical.

4. In producing Documents, You are requested to produce a copy of each original Document together with a copy of all non-identical copies and drafts of that Document. If the original of any Document cannot be located, a copy shall be provided in lieu thereof, and shall be legible and bound or stapled in the same manner as the original.

5. Reasonable efforts must be used to produce images of hard copy Documents unitized as they were maintained in the producing party's files with attachments following

parents. Documents stored in a binder, folder, or similar container (each a "container") may be produced in the same order as they appear in the container. The front cover of the container shall be produced immediately before the first Document in the container. The back cover of the container shall be produced immediately after the last Document in the container. Similarly, pages that are stapled, clipped, collected in folders, or otherwise bound in any manner shall be produced as a single Document and not multiple one-page Documents.

6. Documents not otherwise responsive to these Requests shall be produced if such Documents mention, discuss, refer to, or explain the Documents which are called for by the Request(s), or if such Documents are attached to or with Documents called for by the Request(s).

7. Each Document requested herein is requested to be produced in its entirety and without deletion, redactions, or excisions (except as provided for under Instruction No. 8), regardless of whether You consider the entire Document to be relevant or responsive to these Requests. If You have redacted any portion of a Document pursuant to Instruction No. 8, stamp the word "redacted" on each page of the Document that You have redacted.

8. If You assert an objection to any Request, You must nonetheless respond and produce any responsive Documents or ESI that are not subject to the stated objection. If You object to part of a Request or category, You must specify the portion of the Request to which You object, and must produce Documents responsive to the remaining parts of the Request. To the extent You object to any Request, You must provide specific responses (not general objections or pat responses) as to what portion of the Request You object to and state expressly why You will not respond to such Request.

2792

9.      Notwithstanding a claim that a Document is protected from disclosure, any Document so withheld must be produced with the portion claimed to be protected redacted, and the Document must be logged in accordance with Instruction No. 8.

10.     If any Document or ESI is known to have existed but no longer exists, has been destroyed, or is otherwise unavailable, You must identify the Document or ESI, the reason for its loss, destruction or unavailability, the name of each person known or reasonably believed by You to have present possession, custody, or control of the original and any copy thereof (if applicable), and a description of the disposition of each copy of the Document or ESI.

11.     If no Document or ESI responsive to a Request exists, please state that no responsive Document or ESI exists.

12.     These Requests shall be deemed continuing so as to require reasonable supplemental responses as You or Your attorneys obtain further information or materials following the receipt of this subpoena until the time of trial. Plaintiffs reserve the right to propound additional discovery requests.

## **RELEVANT TIME PERIOD**

Unless otherwise stated, the relevant time period for each Request is January 2009 through the present (the "Relevant Time Period") and shall include all Documents that relate to such period, even though prepared or published outside of the Relevant Time Period. If a Document prepared before or after the Relevant Time Period is necessary for a correct or complete understanding of any Document included in a Request, You must produce the earlier or subsequent Document as well. If any Document is undated and the date of its preparation cannot be determined, the Document shall be produced if otherwise responsive to the production request.

2793

# REQUESTS FOR PRODUCTION

**Request No. 1**

Documents sufficient to show by category Facebook users' Content and Information that You accessed or obtained, including Facebook users' Content and Information You accessed or obtained through Friends' Facebook accounts.

**Request No. 2**

Documents sufficient to show how You accessed or obtained such Content and Information identified in Request No. 1, including but not limited to Documents sufficient to identify each of Facebook's application programing interfaces ("APIs") You used to access or obtain such Content and Information.

**Request No. 3**

Documents sufficient to show any technical limitations Facebook placed on Your use of Facebook users' Content and Information that You accessed or obtained.

**Request No. 4**

Documents sufficient to show how any Privacy Settings associated with Facebook users' Content and Information was transmitted to You when You accessed or obtained such Content and Information from Facebook, including but not limited to metadata or any other information identifying the context of how the information was used on Facebook's platform.

**Request No. 5**

Documents sufficient to show any agreements You had with Facebook and Facebook users to access or obtain users' Content and Information.

2794

**Request No. 6**

All Documents relating to the implementation of all agreements between You and Facebook that allowed You to access or obtain Facebook users' Content and Information.

**Request No. 7**

Documents sufficient to show the amount, volume, and categories of Facebook users' Content and Information You possess.

**Request No. 8**

All Documents concerning Your access or use of Facebook users' Content and Information in a manner inconsistent with Your agreements with Facebook, Your agreements or policies with users, or in ways users did not expect, including but not limited to complaints as kept in any customer service department, and any audits, assessments, or reports You performed concerning such use.

**Request No. 9**

All Documents relating to Your assessment of the value of Facebook users' Content and Information, including but not limited to all Documents relating to the fair value determination of Content and Information transferred in any commercial exchange between You, Facebook or users themselves, and any internal marketing and business plans relating to the value of Facebook users' Content and Information.

**Request No. 10**

Documents sufficient to show all money, data, content or items of value You provided Facebook in exchange for access to Facebook users' Content and Information.

**Request No. 11**

All Documents relating to Your analyses of Facebook's policies—including Facebook's Statement of Rights and Responsibilities, Data Use Policy and Platform Policy—concerning Your access and use of Facebook users' Content and Information.

**Request No. 12**

Your Document and ESI retention policies and practices for the Relevant Time Period, including any litigation holds issued and enforced from January 1, 2018 to the present, that may have or did impact the retention of any Documents of ESI identified in Request Nos. 1-11, including Documents relating to any spoliation or Document destruction issues.

2796

# PROOF OF SERVICE

I am employed in the County of Alameda, State of California.  I am a citizen of the United States, over the age of 18 years, and not a party to the within cause.  My business address is Bleichmar Fonti & Auld LLP, 555 12th Street, Suite 1600, Oakland, CA 94607.

On March 3, 2020, I served the following document(s):

## PLAINTIFFS' NOTICE OF NON-PARTY SUBPOENA
## TO ZYNGA, INC.

via electronic mail on the parties below:

Joshua Lipshutz
**Gibson, Dunn & Crutcher LLP**
1050 Connecticut Ave NW
Washington, DC 20036
jlipshutz@gibsondunn.com

Orin Snyder
**Gibson, Dunn & Crutcher LLP**
200 Park Avenue
New York, NY 10166
osnyder@gibsondunn.com

Kristin A. Linsley
Brian M. Lutz
**Gibson, Dunn & Crutcher LLP**
555 Mission Street
Suite 3000
San Francisco, CA 94105
klinsley@gibsondunn.com
blutz@gibsondunn.com

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.  This proof of service was executed by me on March 3, 2020, in Oakland, California.

_____*/s/ William Nervis*_____

William Nervis

# EXHIBIT I

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.:  (415) 445-4003
Fax:  (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

Derek W. Loeser (admitted pro hac vice)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.:  (206) 623-1900
Fax:  (206) 623-3384
dloeser@kellerrohrback.com

Orin Snyder (admitted pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel:  212.351.4000
Fax:  212.351.4035
osnyder@gibsondunn.com

*Counsel for Defendant Facebook, Inc.*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:  FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843 Case No. 18-md-02843-VC-JSC |
| This document relates to: ALL ACTIONS | **STIPULATION AND [~~PROPOSED~~] ORDER GOVERNING THE PRODUCTION OF ELECTRONICALLY STORED INFORMATION AND HARD COPY DOCUMENTS** |
| | Judge:      Hon. Jacqueline Scott Corley |

### A.      PURPOSE

This Order will govern discovery of electronically stored information ("**ESI**") and hard copy

documents (collectively, "**Document**" or "**Documents**") in the above-captioned matter and all actions

that are later consolidated with this matter (collectively, "**Litigation**"), as a supplement to the Federal

Rules of Civil Procedure, this Court's Guidelines for the Discovery of Electronically Stored

Information ("**ESI Guidelines**"), and any other applicable orders and rules.

1

Nothing in this Order establishes any agreement as to either the temporal or subject matter scope of discovery in the Litigation, or whether a party has made a reasonable and diligent search for Documents. Nothing in this Order establishes any agreement to any search protocol, including which sources shall be searched. Such procedures or criteria are to be separately agreed upon.

This Order is subject to amendment or supplementation based upon the results of anticipated future meet and confers and by later agreement of the parties, if necessary, in light of further developments, including, the parties' engagement of document hosting vendors and associated technical requirements. References are made to the Federal Rules of Civil Procedure for ease of reference.

## B.       COOPERATION AND PROPORTIONALITY

The parties are aware of the importance this Court places on cooperation in discovery, consistent with this Court's Guidelines for the Discovery of ESI.  The parties acknowledge that cooperation in  reasonably limiting ESI discovery requests and in reasonably responding to ESI discovery requests tends to reduce litigation costs and delay and commit to cooperation in good faith on issues relating to the preservation, collection, search, review, and production of ESI.

The parties acknowledge that the proportionality standard described in Guideline 1.03 and set forth in Fed. R. Civ. P. 26(b)(1) applies to the discovery of ESI in this action.  To further the application of the proportionality standard, the parties agree that the factors set forth in Guideline 1.03 shall be considered, and that all discovery requests for production of ESI and related responses should and will be reasonably targeted, clear, and as specific as practicable.

## C.       E-DISCOVERY LIAISONS

The parties will rely on one or more e-discovery liaisons, as needed, to confer about ESI and to help resolve disputes without court intervention. Each e-discovery liaison will be, or have access to those who are:

1.       knowledgeable about the respective party's e-discovery efforts;

2.       familiar with the respective party's electronic systems and capabilities in order to explain those systems and answer relevant questions; and

3.      knowledgeable about the technical aspects of e-discovery, including the nature, location, storage, accessibility, format, collection, search methodologies, and production of ESI in this matter.

Plaintiffs have previously identified an ESI liaison. Defendant will identify an ESI liaison or liaisons within ten days of the entry of the order adopting of this Stipulation. In the interim, Defendant's counsel will be prepared to discuss any ESI issues within a reasonable time after notice by Plaintiffs' counsel. Each party will notify the other of any changes of its designated e-discovery liaison or liaisons.

## D.      PRESERVATION

The parties and their counsel acknowledge that they have an obligation to take reasonable and proportional steps to preserve discoverable information in the party's possession, custody, or control consistent with the Federal Rules. In accordance with ESI Guideline 2.01(d), the parties will continue to meet and confer over their respective ESI preservation efforts and obligations.  If the parties are unable to resolve a preservation issue and one party wishes to raise the issue with the Court, that party shall do so promptly, consistent with the Court's order on Discovery Dispute Resolution Procedures (Dkt. No. 393).

The parties have discussed their preservation obligations and needs and agree that preservation of potentially relevant ESI will be reasonable, proportionate, and within the scope of production under FRCP 26(b)(1) and 26(b)(2)(B). To reduce the costs and burdens of preservation and to ensure discoverable ESI is preserved, the parties agree that:

(a)      ESI created, modified, or received since January 1, 2007, will be preserved;

(b)      Each party is responsible for taking reasonable and proportionate steps to preserve non-duplicative discoverable information currently in their possession, custody or control. However, parties shall not be required to modify, on a going-forward basis, the procedures used by them in the usual course of business to back up and archive data not subject to a litigation hold.

(c)      Subject to and without waiving any protection described above, the parties agree that:

(1)     The parties will meet and confer regarding the types of ESI they believe should be preserved, the custodians or general job titles or descriptions of custodians for whom they believe ESI should be preserved, and the custodial and non-custodial sources to be preserved.  Nothing in this Order waives or modifies the attorney–client-privilege that attaches to custodial interviews.

(2)     The parties shall agree to add or remove custodians and non-custodial sources to be preserved as reasonably necessary. Such requests must be made in good faith.

(3)     The parties will meet and confer as fact discovery proceeds on whether an extension of time for fact discovery may be necessary.

(d)     The parties agree that ESI from the following data sources is not reasonably accessible because of undue burden or cost and therefore that under Fed. 26(b)(2)(B) Facebook need not provide discovery of ESI from these sources (ESI from these sources will be preserved in accordance with Facebook's standard business practices but will not be searched, reviewed, or produced unless ordered by the Court):

(1)     backup systems and/or tapes used for disaster recovery; and

(2)     systems that are no longer in use and cannot be accessed.

(e)     The parties agree, based on mutual representation of the parties' counsel, that the following sources of data are not reasonably accessible and need not be preserved, collected, processed, reviewed and/or produced:

(1)     Deleted, slack, fragmented, or unallocated data generated on individual workstations, and only accessible by forensics;

(2)     Random access memory (RAM), temporary files, or other ephemeral data generated on individual workstations and that are difficult to preserve without disabling the operating system;

(3)     On-line data from the individual work stations of the employees of the producing party using internet browsers, such as temporary internet files, history, cache, cookies, and the like;

(4)    Data in the following metadata fields, which are frequently updated automatically without end user intervention: last opened dates and times, last printed dates and times, last modified dates and times, and last modified by; and

(5)    Information created or copied during the routine, good-faith performance of processes for the deployment, maintenance, retirement, and/or disposition of computer equipment by the party and belonging to a custodian, to the extent such information is duplicative of information that resides in a reasonably accessible data source.

(f)    The parties agree that the burden and expense of preservation of the following sources of data for all agreed custodians is not proportionate to the needs of the case and therefore agree (i) to conduct custodial interviews and to determine in those interviews whether any of the following sources is likely to contain relevant data from that custodian; (ii) that if a custodian identifies any of the following sources as likely containing relevant data, that source will be preserved and collected; and (iii) that if a custodian does not identify any of the following sources as likely containing relevant data, these sources will not be preserved or collected:

(1)    Voicemails and other voice messages;

(2)    Sound recordings, including without limitation .mp3 and .wav files;

(3)    Information contained on a mobile device that is not duplicative of information that resides in an another, more easily accessible data source;

(4)    Instant messages and chats that are not chronicled to an email archive system; and

(5)    Mobile device activity logs for the Producing Party's devices or the Producing Party's employees' devices.

## E.    SEARCH AND REVIEW

The parties agree to meet and confer concerning search methodologies, including without

limitation, the use of keyword search terms and/or the use of technology assisted review ("**TAR**").[1]

The parties recognize that even though a document contains one or more of the search terms identified in accordance with the procedures listed below, such document may not be responsive to any document request. In such cases, the Producing Party is not required to produce such documents. If a document contains one or more of the search terms in accordance with the procedures listed below, and part but not all of the document is responsive to any document request, the Producing Party should produce the entire document without redacting the nonresponsive portions of the document, unless the nonresponsive portions of the document contain information (1) that would be redacted from a court filing under Fed. R. Civ. P. 5.2(a) or (2) the disclosure of which would threaten serious competitive harm to the Producing Party.  If either of those conditions is met, the parties will meet and confer to discuss the redaction of such information prior to the production of any redacted documents.  If the parties reach agreement regarding the redaction of such information and any portion of a document is subsequently produced in redacted form, this will be noted in the Redaction field, included in Table 1 of Appendix A, and, within 20 days of the production of such documents, the document(s) will be recorded on a cumulative log identifying the reason for the redaction (i.e. condition (1) or condition (2)) and the date upon which the parties reached agreement regarding the redaction.  If the parties are unable to reach agreement regarding redaction, the document should either be promptly produced without redaction, or the Producing Party shall promptly raise the issue with the Court, consistent with the Court's order on Discovery Dispute Resolution Procedures (Dkt. No. 393).

In addition to identifying documents pursuant to an agreed upon search protocol, the parties recognize that they are obligated to produce relevant, responsive, non-privileged documents of which they are aware, regardless of whether such documents contain any of the agreed upon or additional search terms.

The parties agree that in responding to an initial Fed. R. Civ. P. 34 request, or earlier if appropriate, they will meet and confer about methods to search ESI in order to identify ESI that is

---

[1] The producing party will disclose to the receiving party if they intend to use Technology Assisted Review ("TAR") (including predictive coding or any other form of machine learning) to filter out non-responsive documents. The parties will meet and confer at that time to negotiate a suitable TAR protocol.

2804

subject to production in discovery and filter out ESI that is not subject to discovery.

The parties understand the cost and complexity of reviewing and producing ESI and seek to engage in a cooperative, iterative process to limit costs but ensure relevant, responsive documents are likely discovered in any ESI search. As such, the parties will cooperate regarding the disclosure and formulation of appropriate search terms for use in the responsiveness review and production of ESI. The parties are not required to exchange privileged search terms.

The parties will each disclose a list of the most likely custodians of relevant documents, including the general job titles or descriptions of each custodian and will meet and confer regarding custodians, including how the relevant ESI is maintained and where, consistent with Discovery Order No. 1 (Dkt. No.404) and any subsequent orders entered by the Court.

The parties will meet-and-confer in good faith regarding search terms and custodians. As part of the meet-and-confer process to select search terms and custodians, the Producing Party will provide a hit report for proposed search terms if requested by the Requesting Party. If the Requesting Party objects to the sufficiency of the Producing Party's proposed search terms, the Requesting Party may propose modifications to the Producing Party's terms, or a list of additional terms, subject to the paragraph regarding Additional Terms for Good Cause below.  Any disputes over additional custodians or terms that cannot be resolved between the parties during meet and confer may be presented to the Court.

**Disputed Search Terms:** If the Producing Party contends that terms proposed by the Requesting Party would recall an excessive number of documents ("**Disputed Search Terms**"), the Producing Party will provide a Disputed Search Term hit list or hit report after global de-duplication. The list or report should include the number of documents that hit on each term, the number of unique documents that hit on each Disputed Term (documents that hit on a particular term and no other term on the list), and the total number of documents that would be returned by using the proposed search term list (including families). With respect to any search term for which the Producing Party believes there exists a modification that will reduce the number of irrelevant documents returned by the search term, the Producing Party will meet and confer with the Requesting Party to discuss in good faith any such modification. For any terms that a Producing Party believes are burdensome, overly broad, and/or

objectionable and for which there does not appear to be any modification that would resolve such issues, the Producing Party will meet and confer with the Requesting Party to discuss in good faith its objections to such search terms. As part of that process, the Producing Party will, upon request, provide the Requesting Party with the quantitative information discussed above.  In the event that a dispute remains after quantitative information is evaluated, the Requesting Party may ask for (and the Producing Party will not unreasonably withhold) qualitative information about the disputed search term(s).  The Producing Party agrees to consider a reasonable number of good faith requests from the Requesting Party to review a random sample of documents and their family members with unique hits that hit on the disputed search terms and to discuss the results of that review with the Requesting Party. For any random sample that is reviewed, the parties will, in good faith, attempt to reach agreement on the appropriate sample size.

**Additional Terms for Good Cause**: Once a search term list is finalized (either though agreement of the parties or Order of the Court) and all iterative searches for a custodian are complete, the Requesting Party may propose additional search terms for a Producing Party to consider, but the Producing Party will have no obligation to re-search the custodian's electronic data using such additional search terms without agreement or a court order. The Requesting Party must show good cause for any additional proposed search terms, such as, for example, that the proposed term, or the significance of the proposed term, was unknown to them as of the time the original list was formulated; provided, however, that this provision does not relieve a Producing Party of any obligation that may arise, pursuant to the Federal Rules of Civil Procedure or applicable case law, to conduct additional searches in the course of the litigation. If a Producing Party cannot meet any applicable deadlines for the production of documents as a result of this provision, the parties will negotiate in good faith a reasonable timeline for production or seek an order from the Court.

**Known Responsive ESI**: ESI that is known to a party to be responsive to a discovery request or subject to disclosure under Fed. R. Civ. P. 26(a)(1)A) may not be withheld on the grounds that it was not identified as responsive by the protocol described in, or developed in accordance with, this Order.

Discrete folders or collections of Documents that are identified by a custodian as likely to be responsive will be collected and preserved pursuant to standard business practices and processes that

are reasonably designed to ensure all potentially responsive documents are identified and collected.

The parties will continue to meet and confer regarding any search process issues as necessary and appropriate. This ESI protocol does not address or resolve any other objection to the scope of the parties' respective discovery requests.

Nothing in this Order shall be construed or interpreted as precluding a producing party from performing a responsiveness review to determine if documents captured by search terms are in fact relevant to the requesting party's request. Further, nothing in this Order shall be construed or interpreted as requiring the production of all documents captured by any search term if that document is in good faith and reasonably deemed not relevant to the requesting party's request or is privileged.

## F.    PRODUCTION FORMATS

Appendix A sets forth the technical specifications that the parties propose to govern the form of production of documents in this litigation, absent agreement by the parties or order by the Court.

The parties have agreed to specifications identifying the file formats under which Documents will be produced, as described in Appendix A. To the extent a party believes that a Document that has been produced should be produced in a different or alternative format, or a party raises any questions or concerns regarding a produced Document, the parties will meet and confer on the issue.

ESI will be deduplicated globally across all custodians using industry standard deduplication methods and software as set forth in Appendix A.

Each party will use its best efforts to filter out common system files and application executable files by using a commercially reasonably hash identification process. Hash values that may be filtered out during this process are located in the National Software Reference Library ("NSRL") NIST hash set list. System and program files defined on the NIST list need not be processed, reviewed, or produced. The parties may suppress container files (.ZIP, .PST, .RAR) that do not reflect substantive information prior to production, but must produce the remainder of those responsive, non-privileged document families found within the container file, including any emails to which that container file is attached. Similarly, the parties may suppress any non-substantive images extracted from email documents (e.g., logs, icons) prior to production).

E-mail thread analysis may be used to reduce the volume of emails reviewed and produced,

2807

provided the Producing Party discloses that it is using e-mail thread analysis. "E-mail thread analysis" means that where multiple email messages are part of a single chain or "thread," a party is only required to produce the most inclusive message ("Last In Time E-Mail") and need not separately produce earlier, less inclusive e-mail messages or "thread members" that are fully contained within the Last In Time E-mail.  An earlier e-mail is fully contained in the Last In Time E-mail only if the Last In Time E-mail includes all previous emails, including attachments and identical senders and recipients, on the thread. Only email messages for which the parent document and all attachments are contained in the Last In Time Email will be considered less inclusive email messages.  For avoidance of doubt, if a thread member contains any additional data that is not contained in the Last In Time E-mail (including without limitation attachments or BCC recipients), it is not a less-inclusive e-mail and must be separately produced.  Where a Last In Time E-Mail is produced, the producing party will include metadata corresponding to the following metadata fields for each of the earlier thread members fully contained within the Last In Time E-mail:  Sent Date, Sender, Recipient, CC, BCC, and Subject.

If a receiving party raises an issue regarding the usability or format of a produced Document, the parties the parties will meet and confer regarding whether an alternative form of production is necessary or appropriate and seek Court intervention only if necessary.

The parties recognize that certain information to be produced in discovery may reside in proprietary systems and formats. The producing party will take reasonable steps to produce documents from such sources in a reasonably usable format with appropriate metadata in line with how the information is kept in the usual course of business. If after reviewing the produced Documents a receiving party raises a specific issue or concern about a produced Document or data, the parties will meet and confer regarding whether an alternative form of production or additional metadata is necessary or appropriate.

## G.    DOCUMENTS PROTECTED FROM DISCOVERY

The provisions and protections of a Fed. R. Evid. 502 stipulation are being separately negotiated.  The parties will submit a proposed 502(d) stipulation in accordance with the Court's order (Dkt. No. 404).

2808

### H.     PRIVILEGE LOGS

Where a document is withheld from production entirely or in part by redaction on the basis of the attorney-client privilege or work product doctrine, the Producing Party will produce a privilege log in Microsoft Excel format.  The parties will meet and confer to determine a separate protocol for the production of privilege logs.

Nothing in this Order shall be interpreted to require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or immunity.  The parties do not waive any objections to the production, discoverability, admissibility, or confidentiality of documents and ESI.

### I.     OBJECTIONS PRESERVED

Except as provided expressly herein, the parties do not waive any objections as to the production, discoverability, authenticity, admissibility, or confidentiality of Documents. Nothing in this Order waives the right of any party to petition the Court for an order modifying its terms upon sufficient demonstration that compliance with such terms is unreasonably burdensome or infeasible or that the production of particular Documents in a different format or with different metadata fields is reasonably necessary, provided, however that counsel for such party must first meet and confer with the counsel for the opposing parties and the parties shall use reasonable best efforts to negotiate an exception from or modification to this Order prior to seeking relief from the Court.

### J.     RETENTION OF ORIGINAL DOCUMENTS

Each party agrees to retain native electronic source documents for all ESI produced in this litigation unless another manner is mutually agreed upon by the parties. Each party agrees to use reasonable measures to maintain the original native source documents in a manner so as to preserve the metadata associated with these electronic materials at the time of collection.

### K.     MODIFICATIONS

This Stipulated Order may be modified by agreement of the parties memorialized in a Stipulated Order of the parties or by the Court.

### L.     TIMING AND PHASING OF PRODUCTIONS

When a party propounds discovery requests pursuant to Fed. R. Civ. P. 34, the parties agree to

phase the production of ESI by producing documents on a rolling basis. Following the initial production, the parties will continue to meet and confer to prioritize the order of subsequent productions. Production in the Litigation is anticipated to be conducted with the parties making reasonable efforts to expedite the process.

## M.   EFFECTIVE DATE

The provisions of this ESI Protocol will take effect upon the entry of an order of the Court approving and adopting this ESI Protocol.

### IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

Dated: April 27, 2020

Respectfully submitted,

KELLER ROHRBACK L.L.P.

By:   */s/ Derek W. Loeser*
        Derek W. Loeser

Derek W. Loeser (admitted *pro hac vice*)
Lynn Lincoln Sarko (admitted *pro hac vice*)
Gretchen Freeman Cappio (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Adele A. Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

BLEICHMAR FONTI & AULD LLP

By:   */s/ Lesley E. Weaver*
        Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com

2810

GIBSON, DUNN, & CRUTCHER LLP
By: */s/ Orin Snyder*
Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

Russell H. Falconer (*pro hac vice pending*)
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone:  214.698.3170
Facsimile:  214.571.2900

*Attorneys for Defendant Facebook, Inc.*

**IT IS SO ORDERED.**

Dated:  ___April 30___, 2020

_____
The Honorable Jacqueline Scott Corley
United States Magistrate Judge

13

2811

# APPENDIX A

**I**     <u>**Production Format**</u>

All ESI is to be produced in an imaged file format with the corresponding metadata, appropriate load files, searchable text, and, where specified, native format files.  The parties agree that certain file types should be produced in their native file format.  Where ESI exists in databases or as structured data, production in an alternative format may be preferred and the parties agree to meet and confer to determine an appropriate format.  To the extent that any party made a document production before the entry of this ESI protocol that included ESI that was produced in a format that differs from the agreed upon format described below, the parties agree that, where feasible, that ESI will be reproduced in the agreed-upon format described below. Where reproduction in that format is not feasible, the parties will meet and confer regarding a feasible production format.

**A.**     <u>**TIFF Image Files**</u>.  The parties agree that all Documents will be produced as single-page, 1-BIT, black and white Group, IV TIFF image files of at least 300 dpi resolution, except as provided in section I.C.  Page size shall be 8.5 x 11 inches unless otherwise agreed.  Each image file will use the Bates number of the page as its unique file name.  Bates numbers and confidentiality designations shall be branded on each produced image.  Original document orientation as displayed in the native file should be maintained in the produced image (i.e., portrait to portrait and landscape to landscape).  Where feasible, documents which contain hidden content, tracked changes, comments, deletions, or revision marks (including, where available, the identity of the person making the comment, deletion, or revision and the date and time thereof), speaker notes, or other user-entered data that the source application can display to the user shall be processed such that all such data is visible (or marked as redacted for privilege or pursuant to the procedure described in Section E of the ESI Protocol) in the produced image.

Where the TIFF image is unreadable or has materially degraded the quality of the original, or where the Requesting Party obtains through discovery a file or Document that it believes is not adequately represented in an image file format, the Producing Party will, upon reasonable request, re-produce the image in another feasible format (such as a reimaged TIFF, near-native reproduction, native format, or other reasonably usable format).

**B.**     <u>**Text Files**</u>.  Each Document produced under this Order shall be accompanied by a single, multipage text file containing all of the text for that item, not one text file per page.  Each text

2812

file shall be named to use the Bates number of the first page of the corresponding production item.

1. <u>OCR</u>:  The text for each hard copy document shall be generated by applying optical character recognition ("**OCR**") technology to the scanned image of the document.  The parties will endeavor to generate accurate OCR and will utilize quality OCR processes and technology.  OCR text files should indicate page breaks where possible.

2. <u>Text Files</u>:  The text of each ESI item shall be extracted directly from the ESI native file unless technologically infeasible.  Extracted text shall include available comments, revisions, tracked changes, speaker notes, and hidden content (including, worksheets, slides, columns, rows, notes).  To the extent it is not technically feasible to extract text directly from the native file the text for each ESI item shall be generated by applying OCR to the native file under the provision above.  Text files will not contain the redacted portions of documents.

3. <u>Foreign Language Text</u>:  In the event that discoverable ESI includes foreign language text and is produced in a way that it is otherwise unusable, the receiving party will raise the issue and the parties will meet and confer regarding an appropriate manner to reproduce the materials in a usable format.

**C.** **<u>Production of ESI in Native Format</u>.**  The parties agree that the following types of files will be produced in native format:  presentation-application files (e.g. MS PowerPoint); spreadsheet-application files (e.g., MS Excel, Google Sheets); and multimedia audio/visual files such as voice and video recordings, if any (e.g., wav, .mpeg, and .avi).  Media files shall be produced in the native format in which they are maintained unless the parties discuss and agree to an alternative format in advance.

The Producing Party shall produce a single-page TIFF slip-sheet for each native file, indicating that a native item was produced.  The corresponding load file shall include NativeLink information for each native file that is produced.  If a Document to be produced in native format contains privileged or information redacted pursuant to the procedure set forth in Section E, the Document will be produced in TIFF format with redactions and OCR text to remove the privileged material from the searchable text.

**D.**     **Bates Numbering**.  Each TIFF image produced under this Order must be assigned a unique Bates number that must always:  be unique across the entire Document production; maintain a constant  length of the numeric digits (including 0-padding) across the entire production; contain only  alphanumeric characters, no special characters or embedded spaces; and be sequential within a given Document.

Attachments to Documents and embedded objects extracted from or attached to Documents or e-mails will be assigned Bates numbers that directly follow the Bates numbers on the Documents to which they are attached.  Parent-child relationships for all groups of hard copy documents as specified in section III.C.5, and all embedded ESI as specified in section I.F, will be indicated by applying sequential Bates numbers to all items within the parent-child group, and identified by Bates numbers in the relevant ESI metadata fields specified in  section II.  For example, if a party is producing an e-mail with attachments, the attachments will be processed and assigned Bates numbers in sequential order, following consecutively behind the parent e-mail.

Each TIFF image will have its assigned Bates number electronically "burned" onto the image.  The Producing Party will brand all TIFF images in the lower right-hand corner with its corresponding Bates number.  If the placement in the lower right-hand corner will result in obscuring the underlying image, the Producing Party will attempt to adjust the Bates number as near to that position as possible while preserving the underlying image.  If a Bates number or set of Bates numbers is skipped, the skipped numbers or set of numbers will be noted.

**E.**     **Attachments**.  The parties agree that if any part of an e-mail or its attachments is responsive, the entire e-mail and attachments will be considered responsive.  The parties acknowledge that if any part of an e-mail or its attachments is privileged, that email and/or attachment may be withheld or redacted for privilege.

**F.**     **Embedded Files**.  The parties agree to take reasonable steps to ensure that embedded ESI (e.g., a spreadsheet embedded within a word processing document, multimedia and other word processing files embedded in PowerPoint) shall be produced as independent document records and that the parent-child relationship is indicated by assigning sequential Bates numbers as set forth in section D.

**G.**     **Color**.  The parties may submit reasonable requests for reproduction of documents in color where color is necessary to accurately interpret the document.  The production of such

Documents in color shall be made in JPEG format.  If either party deems the quality of the Document produced in JPEG format to be insufficient, the Producing Party may produce the color image in TIFF or another reasonably usable format.  All requirements for productions stated in this Order regarding production in TIFF black and white format apply to any production of Documents in color JPEG or TIFF format.

**H.**     **Confidentiality Designations**.  If a particular Document has a confidentiality designation, the designation shall be stamped on the face of all TIFF images pertaining to such Document, in the lower left-hand corner of the Document.  Each responsive document produced in native format will have its confidentiality designation indicated on its corresponding TIFF placeholder.  The confidentiality designation should also be reflected in the Confidentiality metadata field specified in section II.

**I.**     **Redaction**.  The parties agree that where non-Excel-type spreadsheet ESI items need to be redacted, they shall be produced solely in TIFF with each redaction clearly indicated on the Document.  Any unaffected data fields specified in section II shall be provided.

The text file corresponding to a redacted Document may be generated by applying OCR in accordance with section I.B for all unredacted portions of the Document.  The Document must be marked as such in the accompanying redaction metadata field as specified in section II.

Documents redacted or withheld for privilege will be logged.

Where Excel-type spreadsheets need to be redacted, the Producing Party may choose whether to redact in the native file or in a TIFF format so long as such redactions do not affect the operation of the file.  Formulas may be "flattened" and replaced with actual value.  The party shall maintain the original Excel-type spreadsheet before redactions are applied as to maintain the original metadata fields.

If the items redacted and partially withheld from production are PowerPoint type presentation decks or Excel-type spreadsheets, and the native items are also withheld, the entire ESI item will be produced in TIFF format and the Producing Party will make reasonable efforts to produce all unprivileged pages, hidden fields and other information that does not print when opened as last saved by the custodian or end-user.  For PowerPoint-type presentation decks, this shall include, but is not limited to, any speaker notes.  For Excel-type spreadsheets, this shall include, but is not limited to, hidden rows and columns, all cell values, annotations and notes. The Producing Party shall also make reasonable efforts to ensure that any spreadsheets produced

only as TIFF images are formatted so as to be legible.  For example, column widths should be formatted so that the numbers in the column will display rather than "##########."

If the items redacted and partially withheld from production are audio/visual files, the Producing Party shall provide the unprivileged portions of the content.  If the content is a voice recording, the parties shall meet and confer to discuss the appropriate manner for the Producing Party to produce the unprivileged portion of the content.

**J.**     **Encryption**.  To the extent practicable, before the application of search terms to a database of Documents, the searching party shall use reasonable efforts to de-encrypt encrypted Documents in the database if otherwise, without de-encryption, the search terms will not pick up hits in the encrypted Documents.

The parties will make reasonable efforts to ensure that all encrypted or password-protected Documents are successfully processed for review and production under the requirements of this Order, including all automated mechanisms presently offered by the party's document vendor and approaching the custodian for any relevant passwords, if the custodian is accessible, and if produced in Native format, the decrypted Document is produced.  To the extent encrypted or password-protected Documents are successfully processed according to the requirements of this Order, the parties have no duty to identify the prior encrypted status of such Documents but will produce such processed Documents in accordance with the specifications of this Order.  The parties will consider reasonable requests for information regarding the number, custodians, and/or locations of encrypted documents that are not able to be de-encrypted using reasonable means.


**K.**     **Database Records and Structured Data**.  To the extent that any party requests information that is stored in a database, or database management system, or proprietary system, the Producing Party will identify the database and platform to the Requesting Party, and will meet and confer in good faith in an attempt to reach agreement on the data to be produced and the form of the production to ensure that any information produced is reasonably usable by the Requesting Party and that its production does not impose an undue burden on the Producing Party, by, for example, requiring development of reports and/or software code to extract the information.  The Producing Party will provide information about the database reasonably necessary to facilitate that discussion.

To avoid doubt, information will be considered reasonably usable when produced in CSV format, tab-delimited text format, Microsoft Excel format, or Microsoft Access format.  To the extent a party is constrained from producing responsive ESI because of a third party license or because software necessary to view the ESI is hardware-dependent, the parties shall meet and confer to reach an agreement on alternative methods to enable the Requesting Party to view the ESI.

L.      **Deduplication**.  The Producing Party need only produce a single copy of a particular ESI item, and may deduplicate ESI vertically by custodian, or horizontally (globally) across the population of records.  The parties agree to the following:

1.      Duplicates shall be identified by using industry standard MD5 or SHA-1 algorithms only to create and compare hash values for exact matches only.  The resulting hash value for each item shall be reflected in the HASH field specified in section II.

2.      Deduplication shall be performed only at the Document family level so that attachments are not de-duplicated against identical stand-alone versions of such Documents and vice versa, although each family member shall be hashed separately for purposes of populating the HASH field in section II.

3.      An email that includes content in the BCC or other blind copy field should not be treated as a duplicate of an email that does not include content in those fields, even if all remaining content in the email is identical.  Deduplication may be applied across the entire collection (*i.e.*, global level), in which case the custodian, filepath, and filename metadata fields should list the primary custodian, filepath, and filename, as a source of the primary copy of the document, while deduplicated custodians will be listed in the  Duplicate Custodian, Duplicate Filepath field and separated by semicolons if there are multiple values.  In the event that the Producing Party becomes aware that Duplicate Custodian, Duplicate Filepath metadata has become outdated due to rolling productions, the Producing Party will produce within a reasonable time an overlay file providing all of the custodians, and filepaths for the affected documents.

**M.** **Metadata Fields and Processing**.  ESI items shall be processed in a manner that preserves the source native file and all metadata without modification, to the extent reasonably and technically possible, including their existing time, date and time-zone metadata consistent with the requirements provided in this Order.  ESI items shall be produced with all of the metadata and coding fields set forth in section II.

1.  <u>Time Zone</u>.  ESI items shall be processed to reflect the date and time standardized to a single time zone for all productions by a party, that time zone shall be Pacific Standard Time (PST).  The parties understand and acknowledge that such standardization affects only dynamic fields and metadata values and does not affect, among other things, dates and times that are hardcoded text within a file.  Dates and times that are hard-coded text within a file (for example, in an e-mail thread, dates  and times of earlier messages that were converted to body text when subsequently replied to or forwarded; and in any file type, dates and times that are typed as such by users) will be produced as part of the document text in accordance with the formats set forth in section I.

2.  <u>Hidden Content</u>.  ESI items shall be processed in a manner that preserves hidden columns or rows, hidden text or worksheets, speaker notes, tracked changes, comments, and other rich data (including, but not limited to strikethrough text, etc.) as displayed in the Document to the extent reasonably and technically possible.

3.  <u>Manual Population</u>.  The parties are not obligated to manually populate any of the fields in section II if such fields cannot be extracted from the native file or created using an automated process with the exception of the following fields, if available:  (1) BegBates; (2) EndBates; (3) BegAttach; (4) EndAttach; (5) Custodian; (6) Redacted (Y/N); (7) Confidentiality; (8) HashValue[1]; (9) DeDuped_Custodian; (10) NativeFile; and (11) TextPath.

---

[1]   In the case of Documents that were scanned from hard copy, the HashValue field is not required.

N.   **Hard Copy Documents**.

    1.   <u>Coding Fields</u>:  All coding information defined in section II as applicable to "Paper," shall be produced in the data load file accompanying production of hard copy documents.

    2.   <u>Unitization of Hard Copy Documents</u>:  The parties will make reasonable efforts to ensure that hard copy documents are logically unitized for production.  The parties will make their best efforts to unitize parent-child groups correctly.

    3.   <u>Identification</u>:  Where a document or a document group – such as folder, clipped bundle, or binder – has an identifiable and accessible identification spine, "Post-It Note" or any other label,  the information on the label shall be scanned and produced as the first page of the document or grouping if doing so would be reasonable and proportional to the needs of the case.

O.   **Load Files**:  All productions will be provided with data load files and image load file as detailed in section III.B & III.C.  Each party will designate its preferred load file format.  The image load file must reference each TIFF file in the corresponding production, and the total number of TIFF files referenced in the load file must match the total number of image files in the production.  The total number of Documents referenced in a production's data load file should match the total number of designated Document breaks in the corresponding image load file for that production.

II   **Production Metadata Fields**

    Parties shall produce extracted metadata for all Documents and include the following fields to the extent available and subject to other limitations above, except that if the field contains privileged information, that privileged information may be redacted.  If burden or technological difficulty is claimed by the Producing Party, it must be disclosed to the Requesting Party.  Any redactions for privilege reasons shall be recorded on a privilege log.  The parties reserve the right to request that additional metadata fields set forth or provided for certain specified electronic documents upon review of the other party's production.  The parties also reserve their respective rights to object to any such request.

| Table A. | | |
|---|---|---|
| **FIELD NAME** | **FIELD DESCRIPTION** | **APPLICABLE FILE TYPE(S)** |
| BEGBATES | Beginning production number for a given file/document | E-mail, E-Doc, Paper, and Other[2] |
| ENDBATES | Ending production number for a given file/document | E-mail, E-Doc, Paper, and Other |
| BEGATTACH | Production number of first page of attachment | E-mail, E-Doc and Other |
| ENDATTACH | Production number of last page of last attachment | E-mail, E-Doc, and Other |
| CUSTODIAN | Person, shared file or other source from whom files were collected | E-mail, E-Doc, Paper, and Other |
| FILESIZE | The original file size of the produced document | E-mail, E-Doc, and Other |
| PRODVOLUME | The production volume associated with the produced file | E-mail, E-Doc, Paper, and Other |
| DEDUPED CUSTODIAN | To identify other custodians whose files contained a particular document that was eliminated through exact match HASH value de-duplication | E-mail, E-Doc, and Other |
| DUPLICATE FILEPATH | Folder locations of documents held by other custodians whose copy of the document was not produced based on exact match HASH value de-duplication. Folder names shall be delimited by semicolons | E-mail, E-Doc, and Other |
| HASH | MD5 Hash Value | E-mail and E-Doc |

---

[2]  Other is defined as Documents for which internal metadata is not exchanged, including but not limited to, scanned Documents and Documents obtained from the internet.

2820

| | Table A. | |
|---|---|---|
| **FIELD NAME** | **FIELD DESCRIPTION** | **APPLICABLE FILE TYPE(S)** |
| ATTACHNAME | The file name(s) of attachments to a parent documents (separated by a semicolon) | E-mail and E-Doc |
| EMAILSUBJECT | E-mail Subject line | E-mail |
| FROM | E-mail Sender | E-mail |
| TO | E-mail Recipient | E-mail |
| CC | E-mail Copyee | E-mail |
| BCC | E-mail Blind Copyee | E-mail |
| DATESENT | Date Sent & Time (MM/DD/YYYY HH:MM) | E-mail and Other |
| DATERECEIVED | Date Received & Time (MM/DD/YYYY HH:MM) | E-mail and Other |
| DATELASTMOD | Date modified & Time (MM/DD/YYYY HH:MM) | E-Doc |
| DATECREATED | Date created & Time (MM/DD/YYYY HH:MM) | E-Doc |
| TIMEZONEPROCESSED | The originating time zone of the Document | E-mail, E-Doc, and Other |
| TITLE | Any value populated in the Title field of the document properties | E-Doc |
| SUBJECT | Any value populated in the Subject field of the document properties | E-Doc |
| AUTHOR | Any value populated in the Author field of the document properties | E-Doc |

| Table A. | | |
|---|---|---|
| **FIELD NAME** | **FIELD DESCRIPTION** | **APPLICABLE FILE TYPE(S)** |
| LASTMODIFIEDBY | Any value populated in the last modified by field of the document properties | E-Doc |
| ITEMTYPE | Identifies whether the file is an e-mail, attachment to e-mail, or loose e-doc | E-mail and E-Doc |
| REDACTION | Identifies whether the file was redacted and the reason | E-mail, E-Doc, Paper, and Other |
| PAGECOUNT | The number of pages of the Document, excluding the pages of documents in the same family | E-mail, E-Doc, Paper, and Other |
| ATTACHCOUNT | Number of attached files | E-mail |
| CONFIDENTIAL | Identifies whether the file is designated confidential | E-mail, E-Doc, Paper, and Other |
| FILENAME | Original file name | E-Doc |
| FILEPATH | Original file path to the file or e-mailbox folder structure | E-mail and E-Doc |
| FILEEXTENSION | Indicates file extension of source native file (e.g., .msg, .doc, .xls, etc.) | E-mail, E-Doc, and Other |
| NATIVEFILEPATH | Path to native file as produced | Native |
| TEXTFILEPATH | Path to OCR or extracted text file | E-mail, E-Doc, Paper, and Other |
| CONVERSATION INDEX | The Identifer Value assigned by a Program to group communication/message conversations together | E-mail, Other |
| HAS HIDDEN DATA | Indication of the existence of hidden data such as hidden text, columns, rows, worksheets, comments, or notes | E-Doc, Other |
| PST/OST/NSF filename | PST/OST/NSF filename. | E-mail |
| FOLDER | Folder location of the e-mail within the PST/OST/NSF | E-mail |

- 11 -

2822

| Table A. | | |
|---|---|---|
| **FIELD NAME** | **FIELD DESCRIPTION** | **APPLICABLE FILE TYPE(S)** |
| MESSAGE ID | The Unique Identifier assigned by a program to a Message/Communication | E-mail |
| APPLICATION | Indicates software application that generated the ESI item | E-mail, E-Doc, Other |
| DOCUMENT TYPE | Descriptor for the type of document: "E-Doc" for electronic documents not attached to e-mails; "E-mail" for all e-mails; "E-attachment" for files that were attachments to e-mails; and "Physical" for hard copy physical documents that have been scanned and converted to an electronic image | E-mail, E-Doc, Paper, and Other |

**III     Production Delivery Requirements**

**A.     General Instructions**

1.     All productions must be made by secure file transfer, if practical, to agreed-upon e-mail addresses.  In the event the Producing Party deems it is not practical to upload a voluminous production to secure file transfer site, it shall be sent to the receiving parties by overnight mail on CD-ROM, DVD, external hard drive (with standard PC-compatible interface), or such other readily accessible computer or electronic media.

2.     Each production shall be accompanied by a cover letter that includes the production date, production volume identifier, confidentiality designation for the production, and the Bates number range.

3.     Each media volume must have its own unique name and a consistent naming convention (for example ZZZ001 or SMITH001) and be labeled with the following:

      a.     Case number;

      b.     Production date;

      c.     Bates range;

d.     Disk number (1 of X, 2 of X, etc.), if applicable.

4.     The Producing Party shall encrypt the production data using WinRAR or 7-Zip (or similar AES-256 bit) encryption, and the Producing Party shall forward the password to decrypt the production data separately from the CD, DVD, external drive or FTP to which the production data is saved.

5.     Any data produced by the Producing Party must be protected in transit, in use, and at rest by all in receipt of such data.  Parties will use best efforts to avoid the unnecessary copying or transmittal of produced documents.  Any copies made of produced data must be kept on media or hardware employing whole-disk or folder level encryption or otherwise secured on information systems and networks in a manner consistent with the best practices for data protection.  If questions arise, Parties will meet and confer to ensure security concerns are addressed prior to the exchange of any documents.

**B.      Image Load Files**

1.     Image load (cross-reference) files should be produced in format that can be loaded into commercially acceptable production software, such as Concordance Image (Opticon) format.

2.     The name of the image load file should mirror the name of the delivery volume, and should have the appropriate extension (e.g., ABC001.OPT).

3.     The volume names should be consecutive (e.g., ABC001, ABC002, et seq.).

4.     There should be one row in the load file for every TIFF image in the production.

5.     Every image in the delivery volume should be cross-referenced in the image load file.

6.     The imageID key should be named the same as the Bates number of the page.

7.     Load files should not span across media (e.g., CDs, DVDs, hard drives, etc.), i.e., a separate volume should be created for each piece of media delivered.

8.     Files that are the first page of a logical document should include a "Y" where appropriate.  Subsequent pages of all documents (regular document, e-mail, or attachment) should include a blank in the appropriate position.

9.     TIFF images should be provided in a separate folder and the numbe of TIFF files per folder should be limited to 1,000 files.

Sample Concordance Image (Opticon) Load File:

        MSC000001,MSC001,D:\IMAGES\001\MSC000001.TIF,Y,,,3

        MSC000002,MSC001,D:\IMAGES\001\MSC000002.TIF,,,,,

        MSC000003,MSC001,D:\IMAGES\001\MSC000003.TIF,,,,,

        MSC000004,MSC001,D:\IMAGES\001\MSC000004.TIF,Y,,,2

        MSC000005,MSC001,D:\IMAGES\001\MSC000005.TIF,,,,,

**C.**     **Data Load Files**:

    1.    Data load files should be produced in .DAT format.

    2.    The data load file should use standard delimiters:

        a)    Comma - ¶ (ASCII 20);

        b)    Quote - þ (ASCII 254);

        c)    Newline - ® (ASCII174).

    3.    The first line of the .DAT file should contain the field names arranged in the same order as the data is arranged in subsequent lines.

    4.    All date fields should be produced in mm/dd/yyyy format.

    5.    All attachments should sequentially follow the parent document/e-mail.

    6.    Use carriage-return to indicate the start of the next record.

    7.    Load files should not span across media (e.g., CDs, DVDs, hard drives, etc.); a separate volume should be created for each piece of media delivered.

    8.    The name of the data load file should mirror the name of the delivery volume, and should have a .DAT extension (e.g., ABC001.DAT).

    9.    The volume names should be consecutive (e.g., ABC001, ABC002, et seq.).

    10.    Sample .DAT Load File:

þBegBatesþ¶þEndBatesþ¶þBegAttachþ¶þEndAttachþ¶þPgCountþ¶þCustodianþ

**D.**     **OCR/Extracted Text Files**

    1.    OCR or Extracted Text files shall be provided in a \TEXT\ directory containing Document level text files.

    2.    Document level OCR text for redacted documents or Extracted text for ESI not containing redaction are to be located in the same directory as its image file.

3.      The text file name shall be the same name of the first image page for the document set, followed by .txt.

4.      An OCR or Extracted text file containing the produced document's content will be provided for all documents whether it is produced as an image file or natively.

5.      An OCR file may be provided for ESI when privilege redactions are required or where extracted text isn't otherwise available

**E.**    <u>**Native Files**</u>

1.      Native files shall be provided in a separate NATIVES\ directory containing the Native file referenced in the NativeFilePath field of the .DAT file.

2.      The Native file name shall be the same name as the first image page for the document.

# EXHIBIT J

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Magistrate Judge

IN RE FACEBOOK, INC., CONSUMER )
PRIVACY USER PROFILE            )
LITIGATION.                     )
                                )    **NO. 18-MD-02843  VC (JSC)**
                                )
_____)

San Francisco, California
Friday, May 15, 2020

**TRANSCRIPT OF PROCEEDINGS BY ZOOM**

**APPEARANCES BY ZOOM:**

For Plaintiffs:

<div style="margin-left:2em">

KELLER ROHRBACK LLP
1201 Third Avenue - Suite 3200
Seattle, Washington  98101
BY: **DEREK W. LOESER, ATTORNEY AT LAW**
    **DAVID J. KO, ATTORNEY AT LAW**
    **CARI C. LAUFENBERG, ATTORNEY AT LAW**

KELLER ROHRBACK LLP
300 Lakeside Drive - Suite 1000
Oakland, California  94612
BY: **BENJAMIN B. GOULD, ATTORNEY AT LAW**
    **MATTHEW P. MONTGOMERY, ATTORNEY AT LAW**
    **ANNE K. DAVIS, ATTORNEY AT LAW**

KELLER ROHRBACK LLP
3101 North Central Avenue  - Suite 1400
Phoenix, Arizona  85012
BY: **ERIC J. FIERRO, ATTORNEY AT LAW**

</div>

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

**APPEARANCES**:   (CONTINUED)

For Plaintiffs:

                    BLEICHMAR, FONTI & AULD LLP
                    555 12th Street - Suite 1600
                    Oakland, California  94607
          BY:  **LESLEY E. WEAVER, ATTORNEY AT LAW**

                    GIRARD SHARP LLP
                    601 California Street - Suite 1400
                    San Francisco, California  94108
          BY:  **ANGELICA M. ORNELAS, ATTORNEY AT LAW**

For Defendants:

                    GIBSON, DUNN & CRUTCHER LLP
                    200 Park Avenue
                    New York, New York  10166
          BY:  **ORIN SNYDER, ATTORNEY AT LAW**

                    GIBSON, DUNN & CRUTCHER LLP
                    1881 Page Mill Road
                    Palo Alto, California  94304
          BY:  **MARTIE P. KUTSCHER, ATTORNEY AT LAW**

                    GIBSON, DUNN & CRUTCHER LLP
                    2100 McKinney Avenue - Suite 1100
                    Dallas, Texas  75201
          BY:  **RUSSELL H. FALCONER, ATTORNEY AT LAW**

                    GIBSON, DUNN & CRUTCHER LLP
                    555 Mission Street - Suite 3000
                    San Francisco, California  94105
          BY:  **JOSHUA S. LIPSHUTZ, ATTORNEY AT LAW**

| | |
|---|---|
| 1 | <u>**Friday - May 15, 2020**</u>               <u>**9:00 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---oOo--- |
| 4 |     **THE CLERK:** Calling Civil action 18-md-2843, In Re |
| 5 | Facebook, Inc., Consumer Privacy User Profile Litigation. The |
| 6 | Honorable Jacqueline Scott Corley presiding. |
| 7 |    Counsel, starting with plaintiffs, please make your |
| 8 | appearance for the record. |
| 9 |     **MR. LOESER:** Good morning, Your Honor. Derek Loeser |
| 10 | for the plaintiffs. |
| 11 |     **THE COURT:** Good morning. |
| 12 |     **MS. WEAVER:** Good morning, Your Honor. Leslie Weaver |
| 13 | for the plaintiffs as well. |
| 14 |     **THE COURT:** Good morning. |
| 15 |     **MR. KO:** Good morning, Your Honor. David Ko, Keller |
| 16 | Rohrback, on behalf of the plaintiffs. |
| 17 |     **THE COURT:** Good morning. |
| 18 |     **MR. GOULD:** Ben Gould with Keller Rohrback for the |
| 19 | plaintiffs. |
| 20 |     **THE COURT:** Good morning. |
| 21 |     **MS. LAUFENBERG:** Good morning, Your Honor. |
| 22 | Cari Laufenberg, Keller Rohrback, on behalf of the plaintiffs. |
| 23 |     **THE COURT:** Good morning. |
| 24 |     **MR. MONTGOMERY:** Good morning, Your Honor. Matt |
| 25 | Montgomery on behalf of plaintiffs. |

1          THE COURT:  Good morning.

2          MS. DAVIS:  And Anne Davis on behalf of plaintiffs.

3          THE COURT:  Good morning.

4          MS. ORNELAS:  And Angelica Ornelas on behalf of

5     plaintiffs.

6          THE COURT:  All right.  Good morning.

7          MR. FIERRO:  And Eric Fierro on behalf of plaintiffs.

8          THE COURT:  Good morning.

9      And for Facebook.  Oop, Mr. Snyder, you're on mute.

10          MR. SNYDER:  Sorry.  Good morning and Happy Friday,

11     Your Honor.  It's Orin Snyder joined by Martie Kutscher and

12     Russ Falconer -- I forgot who was on -- for Facebook.

13          THE COURT:  All right.  Good morning.

14          MR. SNYDER:  Nice to see you-all.

15          THE COURT:  Okay.  So thanks very much for your

16     statement, and I was pleased to see that the parties made a lot

17     of progress on the custodians.

18      So let me see just if I understand just in terms of

19     numbers.  Facebook has now agreed to search is it 72 custodians

20     and plaintiffs want 81?

21          MR. SNYDER:  Yes, Your Honor.

22          THE COURT:  Okay.  All right.  We're just going to go

23     with the 81.

24      So let's now talk about the Price Waterhouse thing.  As I

25     understand it, Facebook now says that they produced e-mails

that identify the persons whom PWC asked to interview; is that right?

MR. LOESER:  Your Honor --

MR. SNYDER:  Ms. Kutscher?

MS. KUTSCHER:  Yes, Your Honor.  What we -- we have not been able to locate an exact list of who was interviewed, but we've identified to plaintiffs that the production we made about six weeks ago has about 1500 e-mails that discuss the audits, including who was going to be interviewed, who the control owners were, who were on the privacy XFN team, those types of details.

THE COURT:  Okay.  All right.  And so, Plaintiffs, now you're starting to review those e-mails?

MR. KO:  That's correct, Your Honor.  This is David Ko on behalf of plaintiffs.

Facebook has directed us to approximately 1600 documents last Saturday, some of which we have obviously gone through the process of reviewing before they identified them, but we are reviewing them and we're reviewing them as fast as we can.  And it's been a very fruitful process to identify some of the relevant people that had knowledge about Facebook's privacy controls, and so we believe that we can look at these documents in short order and identify who we think are the relevant people.

THE COURT:  Well, this is what I think I want to do.

1    I think we have these 81 now, and I think we should just get
2    started.  And Facebook had said before, "Look, if something
3    comes up in discovery and you identify somebody with relevant
4    information we didn't search, then we can do that then."  So I
5    want you to review those documents.
6        I also want you to review all the regulatory -- you know,
7    the stuff that's already been produced, which, you know,
8    presumably should be quite -- and then let's talk about more
9    than the 81 but not until then.  Okay?
10       So after you do all that, if you can identify somebody who
11   there's a missing gap, then we do that, but I don't see how we
12   know if there's a gap missing until you review those.  So
13   there's no rush I guess I would say on that.
14       All right.  On the -- so we have our 81 and we'll move
15   forward on that.
16       On the ESI discussions, I'm not going to require any
17   more -- I'm not going to do what the plaintiffs proposed.  If
18   there is something in particular in context that you can show
19   me you need, I'll address it then; but I just think we need to
20   move past that right now.  I'm not satisfied there's anything
21   more in particular that you need.  You just need to get started
22   on this ESI production.
23       So now with respect to the search terms -- and I need to
24   hear from Facebook -- I do not understand this custodial
25   interview.  I've been doing this for nine years now.  This is

1  the first time anyone said that to me.

2      So why don't we first start with plaintiffs and what their

3  proposal is as how we get these search term negotiations going,

4  and then I'll hear from what Facebook's proposal is.

5      **MS. WEAVER:**  Good morning, Your Honor.  Unless -- I'll

6  defer to my -- Derek, do you want to address this or shall I

7  just jump in?

8      **MR. LOESER:**  You know, you should probably start only

9  because there's a printer sitting next to my computer and

10  somebody in my house is printing something.

11      **MS. WEAVER:**  No problem.  I'm happy to do it.

12      Well, so we're cutting to the chase pretty quickly,

13  Your Honor, and, honestly, we hadn't really dug in on the next

14  phase other than to propose, you know, the regular process I

15  know Your Honor is familiar with, which is now that we have

16  custodians and if we can identify what search terms would apply

17  to what custodians.  We've actually begun that process on the

18  plaintiffs' side.

19      We do need a little more information about jargon and how

20  certain sources of documents should be searched.  Specifically

21  we just learned that the Hive, which is the data -- one of the

22  databases that maintains user content and data, can be searched

23  through SQL.  So we think it would be really helpful to have an

24  ESI specialist who knows about SQL searching, and we have one

25  that we can bring to meet and confer.

1    And if Facebook could bring somebody who can explain in

2    detail, and I don't mean, honestly, a lawyer.  I mean somebody

3    who understands how the database works and how they do -- like

4    a data scientist.  I know that Facebook has been talking to

5    them.

6    If we could actually have a meet and confer of the people

7    who really understand this stuff, that would be helpful in

8    terms of how to search that because it's a little bit out of

9    the norm.  It's not -- so there's search terms that will work

10   in e-mail -- right? -- and correspondence, and we understand

11   that and we lawyers can do that.

12   The second question of how to get our arms around getting

13   access to the data maintained in this database -- and we don't

14   want to do it inefficiently either.  We don't want to be dumped

15   with, you know, massive amounts of data that we can't do

16   anything with.  So that's where kind of we're stuck on the ESI

17   piece.

18   But we proposed deadlines.  You know, if Facebook can now

19   they -- now that they have custodians, they can make a proposal

20   to us with search terms, we will respond within a week.  They

21   can run them, give us hit reports.  We can look at them.  That

22   was the schedule that we basically were thinking about for

23   search terms, and I think we said by June 2nd --

24        **THE COURT:**  Yeah.

25        **MS. WEAVER:**  -- by June 9th.

1          THE COURT:  Maybe, Ms. Weaver, we should break it down

2     by custodians because it sounds like you are agreeing to some

3     extent they're going to need to know the jargon and things like

4     that.

5          MS. WEAVER:  Right.

6          THE COURT:  So maybe we should break it into groups --

7     right -- so we'll start with these groups.  Because it sounds

8     like what you're envisioning that the search terms will vary,

9     which makes sense, depending on the custodians -- right? -- and

10    what area.  So maybe you should start with identifying -- well,

11    let's start with -- then I would -- you know, you start however

12    you want.  I think you'd want to start with the most important.

13         Let's start with these people that are relevant to these

14    claims -- this claim because the search terms will then match,

15    and then Facebook can do what -- as opposed to doing all of

16    them or waiting to do all of them at once.  It doesn't seem to

17    make any sense.

18         MS. WEAVER:  We could do that.  I would say rather

19    than claim, it's probably going to be department.  Like

20    engineers talk to each other a certain way, and then people in

21    marketing and communications may use other language.  I'm

22    guessing.  But maybe Facebook is going to come back and say

23    they all speak the same language and they all do the same

24    thing.  We don't know.  We're open to suggestion.

25         THE COURT:  All right.  Let's hear what Facebook

1    proposes.

2          **MR. SNYDER:**  Yeah.  Your Honor, thank you.  I'm going

3    to let Mr. Falconer address the details; but at a high level,

4    what we're proposing is a process that enables us to

5    efficiently and then effectively run the right search terms on

6    the right documents in the right way.

7       And the reason we have raised this custodial point is it's

8    not just a case where we're going to apply search terms to

9    e-mails.  It's a much more complex process; and if we don't

10    front load it with what is our now diligence process that we

11    need to do, which will be -- have some -- which will be

12    privileged, it's going to make the meet and confers ineffective

13    and the plaintiffs aren't going to get what they want.

14       So Mr. Falconer can go through in specifics why what we're

15    proposing is not designed to delay but, rather, expedite and

16    facilitate getting the plaintiffs the documents they want in

17    the most timely fashion.

18          **THE COURT:**  I want to know why we can't do it like --

19    I don't see why we have to wait; right?  Why we can't do it as

20    an iterative process.  That's what sort of struck me is you

21    say, "Well, 30 to 60 days and then we can start," but I didn't

22    like that so --

23          **MR. SNYDER:**  Okay.

24          **THE COURT:**  Go ahead, Mr. Falconer.

25          **MR. FALCONER:**  Thank you, Your Honor.

 1     I think we're certainly happy to think about how we could

 2  implement an iterative process like Your Honor has described.

 3  You know, what we need to do now, we've got at this point 81

 4  custodians who we're going to be working with, we need to talk

 5  to those folks about some of the stuff that Ms. Weaver has

 6  described, what kind of jargon or specialized terminology or

 7  shorthand to you and people on your team and people in your

 8  department use.  We're going to use that information to help

 9  design, you know, effective search terms that are not overbroad

10  and not underinclusive.

11     We also need to talk to those folks about where we need to

12  be running those search terms.  You know, we have a general

13  sense of -- we've done preservation interviews of what -- just

14  what are the data sources you use in your work so we can

15  preserve them all.  We need to go back in now, talk to those

16  folks about, "Okay.  Here's what we're looking for.  You know,

17  where shall we be collecting from?  What types of data and what

18  sources of data shall we be running these research terms

19  against?"

20     So the number of custodians here, you know, with 81

21  custodians, if we were able to do five of those custodial

22  interviews a day, which is a pretty ambitious schedule given

23  for a variety of reasons, I mean, that's still a multiweek,

24  more than a month process.

25     So I think Your Honor's suggestion makes sense that we can

try to work with plaintiffs to prioritize subgroups of those
custodians and put together a group.  You know, once we've
talked to a handful of people, we can start running search
terms against some of their data if we think that would be, you
know, a more effective way to do it.

But, you know, because there's some different kinds of ESI
in this case and in a typical case it would just be e-mails,
PowerPoints, and Word documents, you know, as Mr. Snyder said,
we just need to be more thoughtful on the front end so nobody
wants too little and nobody wants too much.  You know,
there's --

MR. SNYDER:  And maybe you can address the so-called
Hive -- H-I-V-E -- tables as illustrative of the challenges
that we face in getting the plaintiffs what they need.

MR. FALCONER:  Sure.  I don't know if Ms. Kutscher
wanted to address that or I'm happy to.  Either one.

MS. KUTSCHER:  Sure.  You know, one of the things
we've been talking about a lot with plaintiffs is data that
exists in a database called Hive, and one of the things we've
been talking about is the database itself is not index
searchable.  It includes many millions of tables that they're
interested in.

So one of the things we really want to be able to do is
talk to the custodians to identify which tables would be the
relevant tables that we can start looking at, otherwise we're

 1  dealing with an unindexed set of many millions of tables that
 2  would be many, many petrabytes of data.  So we really need to
 3  talk to these folks to know which ones to start with.
 4        THE COURT:  Okay.  But, Ms. Weaver, do you have a
 5  proposal?  Like, you'll tell them by X date "This is the
 6  department people we want to start with so we can develop some
 7  sort of schedule"?
 8        MS. WEAVER:  Yes, we can do that.  This is a new idea
 9  to us so I think we need to think about it.
10     I have two clarifying questions.  One is, we had talked
11  earlier about CEO Zuckerberg and Sheryl Sandberg as custodians
12  too.  We do think that they are integral to this.  You tell us
13  when you think they should fall; but obviously even in the
14  e-mail that we gave you, Your Honor, attached to our statement,
15  Mr. Zuckerberg is e-mailing directly with one of these
16  custodians.  We can wait or defer.  So that's a question for
17  you.
18        THE COURT:  I think we can wait.  I mean --
19        MS. WEAVER:  Okay.  That's fine.
20        THE COURT:  -- we can get him, but it's not -- I think
21  that we don't -- you don't want everything at once.
22        MS. WEAVER:  That's fine.  So, yes, let us think about
23  how to do that.
24     And I guess I would add again that it would be really
25  helpful if when Facebook gets this information about the Hive,

1    if we can have our expert talk to their people about -- because

2    otherwise it's going to get very complicated.

3        I'm not sure -- other than getting direct access to

4    experts with source code, I don't think we've ever dealt with

5    this before.  I mean, this is of a magnitude and scope that is

6    highly unusual, and we really need to get information and be

7    strategic about it.  I mean, Facebook is going to say that too.

8        Martie, I keep forgetting, but what's the volume of data

9    in the Hives?

10            **MR. SNYDER:**  42 million.  There are 42 million tables.

11            **MS. WEAVER:**  So we need -- we don't want all

12    42 million tables either.  We want the right ones.

13        **THE COURT:**  What about that?  I mean, that seems to

14    me -- I know you didn't want to bring your data scientist to

15    every single meeting, but you referred to the data scientist,

16    or somebody you've been speaking to, in your statement.  Why

17    not just have that person talk to their expert so that when you

18    have conversations, the plaintiffs then are just more informed

19    and that will be a more meaningful conversation?

20        **MS. KUTSCHER:**  One of the things we've been trying to

21    convey to the plaintiffs, perhaps not effectively so I'll try

22    again, is that there's no single person at Facebook and no data

23    scientist who knows all of the tables in the Hive.  The Hive is

24    a place where individual teams conduct work, they run their own

25    analytics in the Hive, and it's not really organized in a way

1   that anyone at the company would be able to identify where the

2   materials they're looking for are.

3       So what we're actually doing and what we hope to continue

4   to do in custodial interviews is speak with each of the data

5   scientists on the particular teams at issue who would know

6   where the right tables are so there isn't one person we can

7   bring to the discussion; and when we're working with our

8   client, we can't even identify one person to talk to.  We're

9   talking to many people across the company.

10      **THE COURT:**  Okay.  But if we're starting with

11  particular custodians in a particular department, then there

12  will be a particular data scientist.  He might not know

13  everything; right?  But -- I don't understand the resistance.

14  I don't understand it.

15      **MR. SNYDER:**  Your Honor, let me try this.  There's no

16  resistance, and I'm sorry that Your Honor has that impression.

17  It's the opposite.

18      We want to do the work necessary, and my team literally,

19  Your Honor, is working around the clock to get everything done

20  that needs to get done, literally around the clock; and the

21  notion that we're delaying or resisting is just, respectfully,

22  not correct.

23      What we want to do is do the investigation necessary so

24  that we can then help them sort out where on the 42 million,

25  whatever the noun is, let's call them 42 million, you know --

what is it?  Levels?  Rows?  I don't know what it is.

        **MS. WEAVER:**  Tables.

        **MR. SNYDER:**  -- tables, that we're going to do the hard work for them.  It would be herky-jerky and, frankly, completely ineffective if we had to bring 15 different people onto meet and confers.  And, frankly, we're going to want to have some privilege conversations with them as well, and so --

        **THE COURT:**  But that's not what I'm -- that's not what I'm saying at all, and please don't exaggerate what I said.

    What I said is there's -- what I said is the plaintiffs have candidly expressed a lack of knowledge as to how the Hive works and a desire to work with you and to not make unnecessary work.

    What they're saying is "We have an expert.  We hired an expert.  Our expert doesn't work at Facebook obviously, and we would like our -- to -- our expert to have as good as understanding as she can have so when we're working with a particular department and after you've done all your work and all that, that's fine, do all that what you need to do, then if your data scientist who you worked with, just one of them, best most knowledgeable, can talk to our data scientist.  It can even be offline.  You guys don't even have to be there.  So our data scientist can explain to us in plain English, not waste your time, just how it works so that we feel comfortable."  That's all.

1          **MR. SNYDER:**  My resistance --

2          **THE COURT:**  You don't have to bring them to every meet

3    and confer or anything like that.

4          **MR. SNYDER:**  My resistance is that it's not going to

5    be effective and what will be effective, Your Honor, is if we

6    come to the meet and confers, as we've done every time we

7    promised that we would, we will come with a silver platter and

8    explain it to their data scientists, explain it to the lawyers

9    in an effective, clear, transparent way.  But if we have to do

10   it in a piecemeal where there are 15 or 20 different people

11   from the company showing up to ask -- answer questions, it's

12   not going to be efficient or effective.

13         May I suggest this.  We will do the work.  We will present

14   it to the plaintiffs and whatever experts they have; and if

15   they still have questions, then what we're going to do is go

16   back to the ranch and talk to as many people as we need to to

17   answer those questions.

18         And that's what we've been doing, Your Honor, and I think

19   our track record proves that every time the plaintiffs have

20   questions, we have answered them.  We go back and we answer

21   them.

22         What I'm trying to explain is that there is no unitary or

23   easy process to just produce someone at a meet and confer who

24   can answer all the questions.  That's the function that Russ is

25   playing working, you know, around the clock to try to go to

1   every portal in the company to aggregate the information and

2   then present it to the plaintiffs.

3        And it doesn't work as Your Honor suggested,

4   unfortunately.  If it did, it would be easy.  We would just get

5   an ESI person on the phone, they'd explain everything, and we'd

6   be done; but that's not the way it works unfortunately.

7             **THE COURT:**  And that's not what I'm saying at all.

8   Nearly every case I have the technical people get on the phone

9   with each other at some point.  I'm not even talking -- we can

10  do it with no lawyers.  Maybe you don't want to do that.

11  That's fine.  I'm not even talking about --

12            **MS. WEAVER:**  That would be better.

13            **THE COURT:**  It probably would be better.

14       And, look, I'm not saying do it all the time.  We'll try

15  it once.  Let's see.  That's all.  I'm just saying let's see,

16  let's see, so that every conference that I have I don't keep

17  hearing the same thing.  Let's just see.  Okay?  We're going to

18  give it a shot.  Whatever, but I'm not persuaded.  Okay.

19            **MS. KUTSCHER:**  If I could make a suggestion.  If we're

20  going to have a conversation like that, it would be really

21  helpful to receive the questions in advance that the plaintiffs

22  are interested in so that we could make sure we can identify an

23  appropriate person --

24            **THE COURT:**  Yes.

25            **MS. KUTSCHER:**  -- because one of the problems we've

```
 1  been having is the conversations sort of spiral into other
 2  areas, and then we would need different people to answer.
 3        THE COURT:  We're not even there yet because, first,
 4  the plaintiffs need to identify the custodians, the department
 5  they want you to start with.  Then you need to go back to that
 6  department and do whatever, you know, your investigation,
 7  figure out the jargon, talk to whoever they need to do; right?
 8        This is sort of then whenever you sort of produce or talk
 9  about or do your search terms -- I mean, what do you actually
10  propose in terms of -- you do that and then what?
11        MS. WEAVER:  So, Your Honor, one of our experts who's
12  been texting me and says that, in fact, tables have fields and
13  what we need to know are the fields and what data is in the
14  fields, and she's saying that she can tell us what to ask for.
15  And she actually said this isn't the first time that Hive data
16  has been implicated in a class action.
17        So I think maybe we can get some specific questions.  The
18  one caveat I would say -- and I think Your Honor is
19  experiencing kind of why we asked for it in writing, because we
20  actually thought that might be easier because there seems to
21  have been resistance from Facebook because they say we have to
22  talk to all these people, and I know that we're all trying, but
23  we don't feel like we're getting the answers we need.
24        So why don't we do a list of questions but we'd like to be
25  able to say as we're discussing something and Facebook says "We
```

1    don't know," we need to be able to follow up and get those

2    answers.  And, you know, normally we would do that in writing

3    and send a follow-up letter and then they could write back, but

4    that's the one part that's been hard for us, is the circling

5    back and kind of following up on the details.

6        So we could maybe have two -- one meeting -- we'll send

7    them a list of questions -- we'll identify custodians.  We send

8    the list of questions.  Maybe that can even happen at the same

9    time.  We have a meeting with the ESI liaisons and we chat.  We

10   have a follow-up meeting to see where we are and then we could

11   report to you.  Something like that.

12       **THE COURT:**  I think it's probably helpful for Facebook

13   to know what your --

14       **MS. WEAVER:**  Yeah.

15       **THE COURT:**  -- ESI consultant believes and will be

16   telling you and what advice you'll be getting from them.  Not

17   advice.  Obviously that's privileged, but you know what I'm

18   saying.

19       **MS. WEAVER:**  Yes.

20       **THE COURT:**  So send the list so Facebook will have

21   that in mind when they're then doing whatever it is they're

22   doing, their custodial investigation with their data scientist.

23       And then -- I guess my question was to Facebook, then what

24   do you propose?  So you know what the plaintiffs' questions

25   are.  You'll have that in mind when you go talk to your data

1    scientists, and then what?

2         **MR. SNYDER:**  Your Honor, Mr. Falconer will answer

3    that, but I just want to make clear one thing first, which is

4    that each table on the so-called Hive has to be searched

5    individually.  We can't search across all tables like you can a

6    server with e-mails.

7         And so identifying -- the plaintiffs need to identify the

8    right tables.  That's the key thing that we need in order to

9    then search the tables because there are 42 million of them,

10   and you can't just search across the whole platform

11   unfortunately.

12        **MS. WEAVER:**  I'm hearing that --

13        **THE COURT:**  How are the plaintiffs going to identify

14   the tables?

15        **MS. WEAVER:**  We apparently could get a list that we

16   can load into Relativity.  If Facebook identifies the tables,

17   we can take a look at them.

18        And if the data scientists talk directly, we'll lose -- we

19   don't have to have all this back and forth.  They can just say

20   in whatever language that is.  We know that it's searchable in

21   a language called SQL -- it's S-Q-L -- but if they just give us

22   a list of the tables in a format that we can load into

23   Relativity, then we're good to go, and that actually would save

24   the back and forth.

25        **MS. KUTSCHER:**  If I may, Your Honor.  What plaintiffs

1  are asking for is a list of 42 million tables, which would

2  encompass every table that shows any analytic that Facebook has

3  ever run as a company, which would obviously not be an

4  appropriate thing to produce in this case.  It would show every

5  single thing the company has ever looked at data-wise, and

6  obviously that would then start a negotiation about 42 million

7  different tables and which ones are relevant here, which I'm

8  not -- I don't believe would be the most efficient way to move

9  forward.

10      So what we have proposed is that we talk to our custodians

11  and ask the custodians to identify the tables that they use,

12  and that we could then use that as the universe of tables that

13  we start looking at.

14      **MR. LOESER:**  Your Honor, if I may just very briefly.

15  The Hive from what we can tell is an inordinately complex and

16  important database for Facebook.  I would be very surprised if

17  there were not people at Facebook who were experts specifically

18  on the Hive.  That's the kind of person -- that's probably not

19  one of the custodians.  Maybe that person should be.  But that

20  person is the one who can answer questions.

21      I'm sure all the time people at Facebook are asking about

22  how to extract data for one purpose or another from the Hive,

23  and there's probably a person at Facebook who helps direct that

24  effort.  That would seem to be a very important person to talk

25  to and for our experts to talk to.  Because, yes, we are not

1    interested in 42 million tables or the universe of information

2    in the Hive.  We are looking for specific information that

3    relates to our case.

4        To go back to where this started, one of the things

5    Facebook has said to Judge Chhabria all along is they lack an

6    ability to identify who saw user data information, who they

7    shared it with.  And so one of the things we want to figure out

8    from the Hive is:  Is that a table that can be run?  Is that

9    information that can be gathered?

10        And it's specific things like that that we're looking for.

11   So there must be some way that we can describe the kinds of

12   things that we want and for an expert at Facebook who works and

13   lives in the Hive to help direct where that information would

14   be.  It should not have to be in a very complex and functional

15   database like this.  It should not be a needle in a haystack.

16   It should be a search function that is possible.

17        **MR. SNYDER:**  Your Honor, may I respond?  And I

18   apologize for belaboring this.

19        The reason the custodian interviews are critical is that

20   we are going to ask these 81 individuals:  Where -- when you

21   were dealing with A, B, C, D, E, F, and G issues, where did you

22   store discoverable information?  Then we will be able to know

23   where in the 42 million Hive sources the information is.

24        There's no expert who knows that.  The people who know it

25   are the 81 Facebook employees who, yes, they send e-mails and

1  those will be produced because those are searchable.  But what

2  else do they do?  Where else do they store their data, their

3  work, their knowledge?  And it's only by talking to those 81

4  people, which we're prepared to do with alacrity, will we know

5  where they put the information, on which shelf at the

6  company -- at the 42 million shelves we need to look at.

7       And, Russ, maybe you can elaborate more technically about

8  it.

9       But this really is truly, Your Honor, our effort to get

10 them what they want and not have it a needle in a haystack.

11      Russ, you've been spending time on this.  Maybe you can

12 elaborate even further.

13      **MR. FALCONER:**  Sure.

14      And that's, I think, to Mr. Loeser's hypothetical, is

15 there a Hive table that has a particular kind of data in it,

16 there's no -- no one person at the company who knows what's in

17 all 42 million of those tables.

18      So as Mr. Snyder said, the trick is finding the right

19 tables.  Once we find the tables, as Ms. Weaver has been

20 saying, their expert and any entry-level engineer knows how to

21 run a SQL query and look at the information in the table.  So

22 working with the data once they have it is not a challenge.

23 The challenge is getting them the right data.  The best way to

24 do that, really the only way to do that, is for us to talk to

25 our custodians and say "Do you have Hive tables on X, Y, Z

topics?"

So I do think it would be helpful to that effort, as Your Honor has suggested, if we had a list from the plaintiffs of "Here is what we're looking for in the Hive tables."  That would let us focus our search, you know, guide our custodian interviews, and make sure that we're getting them what they're interested in; and if it's not out there, we can tell them that too.

**MR. LOESER:**  Your Honor, the one thing --

**MS. WEAVER:**  And, actually --

**MR. LOESER:**  -- and I think that is some helpful information, I just find it very hard to believe that there are not people at Facebook who are experts in the Hive.  So going and talking to these subject matter custodians is one thing, but going and finding the people who actually manage this beast that is the Hive seems like another very important thing that needs to happen here.

**THE COURT:**  Why don't we just do it in context?  Like, let's do it.  Why don't you pick 10 custodians to start with, 10.  Let them go interview, whatever, tell you what you want, have your expert look at it, and then your expert and their data scientist can then talk about it in terms of what they've given you.  So it's not sort of just general out there.  Now you have specifics and then your expert can have a specific conversation with their data scientist, nonlawyer person about

1    it and we'll use that as an example; or if we need to go more

2    quickly, we can even make it smaller, or something like that.

3              MR. SNYDER:  I think that's a great idea, Judge.

4              MS. WEAVER:  We can do that.  If I could be heard.

5         I think -- I want to go back to the tables in the Hive

6    because the point is, in general, this is a case where the ESI

7    discovery is both merits and functional.  Like normally when

8    we're doing this, it's functional and how do we get documents,

9    but it's also a merits issue here.  And, you know, the very

10   fact that it's 42 million tables of data, that's just the scope

11   of the case.  That's how much data is collected about users and

12   made available.

13        So we need two things.  We actually need discovery of what

14   is in those tables, and getting us the list of the tables,

15   that's the case because we don't -- I think those tables are

16   relevant because what's happening is the data lives in the Hive

17   and then queries are constructed by data scientists and then

18   that's made available.

19        Well, Martie is shaking her head no, but this is why I'm

20   saying what we need is to have the people -- the experts talk

21   to each other before we can -- before we can guess in the dark

22   about what exactly we want.

23        And let me -- two things on these custodial conversations.

24   It is baffling to us because they should have happened earlier.

25   A lot of these 81 are former custodians or former employees.

1    So I don't know if they're imagining talking to them.

2        But if Facebook really went through a proper preservation

3    process, why don't they know this?  Shouldn't they have had

4    this conversation a while ago?  And we kind of have gotten

5    conflicting information about whether they've already had these

6    conversations or not, but it's a little unclear to us what's

7    happening in that process and why it would cause a further

8    delay.

9            **THE COURT:**  Okay.  So this is what I want you to

10   identify.  How many do you want to do to start with?  We're

11   going to do it in context.  I just --

12           **MS. WEAVER:**  We could do --

13           **MR. SNYDER:**  I think we should start with five,

14   Your Honor, because we don't know how long it's going to take;

15   and if it's 10, it could be -- I think five is --

16           **THE COURT:**  Well, somebody said five interviews a day

17   so --

18           **MS. WEAVER:**  So we could identify 40.  I don't know.

19           **THE COURT:**  No.  That's too many.

20           **MS. WEAVER:**  That's half.  That's too many?  Okay.

21   20.  20.  I don't care.

22           **THE COURT:**  10.  We'll do 10.

23           **MS. WEAVER:**  Okay.

24           **THE COURT:**  We'll do 10.  Yeah, we're going to do 10.

25       So -- I mean, or department.  Around 10; right?  If it's

1    11 or if it's 9 or whatever, don't make it artificial.

2            MS. WEAVER:  I'm wondering if actually it would be

3    better to pick one from each department.

4            THE COURT:  No.  That's not what I want to do.

5            MS. WEAVER:  Okay.

6            THE COURT:  No.

7            MS. WEAVER:  Okay.

8            THE COURT:  No.  No.

9            MS. WEAVER:  All right.

10           THE COURT:  You guys could do it if you could, agree

11   but you can't agree so you're leaving it up to me.

12           MS. WEAVER:  Okay.

13           THE COURT:  I prefer that you-all agree, I really

14   would -- because I don't really know what I'm doing, I'm doing

15   the best I can -- but apparently you can't so this is how we're

16   going to have to do it.

17       So pick 10.  Pick 10 and -- or around 10 -- right? -- a

18   department, whatever it is; and you go, Facebook, do your

19   custodial searches.  Today is Friday and by -- by what?  By --

20   what are you going to give them in response to that?

21           MR. SNYDER:  I'm sorry.  You're asking me, Your Honor?

22           THE COURT:  No.  Mr. Falconer.  What are you going to

23   give them?  They've now done 10.  You're going to do your

24   custodial interviews, and then you're going to do what?

25           MR. FALCONER:  I think my understanding and if what

1    Your Honor is ordering is that the plaintiffs will provide us

2    with a list of I don't know if it's just Hive tables or if it's

3    all the data they're interested in or if we should use the RFPs

4    to guide that process, but that we --

5         **THE COURT:**  It's people.  It's people.  Your statement

6    said, "We have to go do these custodial interviews."  That's

7    what you told me.

8         **MR. FALCONER:**  Yes, Your Honor.

9         **THE COURT:**  I'm saying go do them, and then you're

10   going to do what?

11        **MR. SNYDER:**  Your Honor, then we're going to talk --

12   we're going to find out how much Hive -- where in the Hive they

13   have put data that is responsive to either the RFPs or

14   responsive to the areas they're inquiring about, and then we

15   will know -- then we will figure out how to search those areas.

16        So it will be -- it will basically be segregating where in

17   the Hive data is likely to be, and that then will inform our

18   ability to see, well, how much is there there -- right? -- so

19   that when we start running target search terms on those

20   specific Hive folders, we know what the volume of data is.

21        So it's all designed to ultimately, you know, make

22   efficient and effective our retrieval and production of

23   documents.  So if they give us 10 names, we're going to

24   interview those people, figure out where on the Hive they store

25   information, then assess how much is there.  And then once we

1    get to the search terms, we can figure out, you know, how much

2    stuff is there and whether the search terms are over- or

3    underinclusive.  It's not --

4         THE COURT:  Right.  What are you going to do?  What

5    are you going to tell the plaintiffs?  You do that and you're

6    going to tell the plaintiffs then what?

7         MR. SNYDER:  I think that we've identified where on

8    the Hive the data lives that is responsive; and then I think

9    when we start talking about search terms, we can start applying

10   those search terms to those sources.

11        THE COURT:  How are you going to come up with the

12   search terms?

13        MR. SNYDER:  Well, that's going to be the negotiation

14   that has to occur.

15        THE COURT:  Okay.  So you're going to tell the

16   plaintiffs where on the Hive what you believe the relevant data

17   is and why.  And are you then going to propose the first -- and

18   the volume.

19        And I think in the context, Ms. Weaver, when you give them

20   the 10 or whatever, approximately, the department names, if

21   your expert has particular things they should be looking for,

22   you should give them that as well.

23        MS. WEAVER:  Okay.  And, by the way, she thinks your

24   idea is actually a really good one so it might really help us

25   get at this.

1      So what I wanted to clarify is search terms, as we lawyers

2  understand them, will be run on regular ESI that we normally

3  work with -- chat rooms, e-mail -- and we will put that in the

4  list what we want for each person, and then separately the

5  request is what tables or data in the Hive relates to this

6  custodian.

7      And those are basically the questions, but we'll put them

8  in writing for all of them; and if there are any unique ones

9  for custodians, we'll put them in writing, and I think we can

10  probably do it by Monday or Tuesday.

11      **THE COURT:**  So you're saying you'll provide them the

12  name of the custodians, the search --

13      **MS. WEAVER:**  Yes.

14      **THE COURT:**  -- you propose for traditional ESI we'll

15  call it?

16      **MS. WEAVER:**  We don't yet have full-blown search terms

17  for each person yet.

18      **THE COURT:**  Okay.  All right.  I misunderstood.

19      **MS. WEAVER:**  I think it would be easier to let them

20  start because, you know, the example I always use is Chewbacca

21  in Enron, that is the name of a specific entity, and we would

22  never have thought to use "Chewbacca" as a search term because

23  we didn't know.

24      So I think what we could do is say "These are what we

25  think should be searched for these custodians."  They could

1   propose search terms back to us, we could look at them, make

2   tweaks, and then they would run the searches and give us hit

3   reports.  That usually -- that we propose -- we did propose an

4   agenda or a schedule, and what we proposed was -- you can tweak

5   it, of course, but it should take about a month I think to go

6   back and forth on search terms.  Maybe less.

7           MR. LOESER:  Your Honor, if I could just --

8           THE COURT:  We narrowed it, but we're doing a subset

9   so --

10          MS. WEAVER:  That's true.

11          MR. LOESER:  Your Honor, if I may, if I could just

12  flag -- this is Derek Loeser speaking -- one issue on search

13  terms that I just want to make sure we don't lose sight of; and

14  that is that among the parties various disagreements, one of

15  them is "What is the proper subject of this litigation?"  And

16  so Facebook has taken the position that certain categories of

17  information that we're seeking should not be produced; and,

18  therefore, I suspect that when search term discussions occur,

19  they're going to want to eliminate the search terms that relate

20  to those subjects.

21      And I just -- I'm not sure where in this process we sort

22  that out, but that is certainly something that's going to have

23  to get sorted out in this search term discussion.

24          THE COURT:  I assume --

25          MR. SNYDER:  I think that's an excellent point that

1  Derek raises.

2      And why don't we talk about it, Derek, when we think and

3  how we think it's best to tee that up for the Court.

4      But there's definitely a respectful disagreement.  And,

5  Your Honor, you may think that we don't agree on everything,

6  but we do get along and mostly like one another.  You know,

7  with this many grids, everyone can't like everyone.

8      **THE COURT:**  You definitely like one another.

9      **MR. SNYDER:**  No, Judge.  Most of them hate me, but

10  it's okay.  That's my job.  My job is to be the bad cop.

11      But, in all seriousness --

12      **THE COURT:**  No, it's nobody's job.

13      **MR. SNYDER:**  I'm teasing.

14      **THE COURT:**  It's nobody's job.

15      **MR. SNYDER:**  I'm teasing.

16      **THE COURT:**  Yeah.  And what's everyone's job is to put

17  everything in perspective.

18      **MR. SNYDER:**  Yes, Your Honor.

19      **THE COURT:**  You know, we'll move this along, but we

20  learned today that one-third of our criminal pretrial

21  detainees, one-third are in quarantine at the jail.  All your

22  judges are dealing every day spending hours dealing with this

23  kind of stuff, and that stuff takes priority.

24      **MR. SNYDER:**  For sure.

25      **THE COURT:**  I just want you to all keep that in mind.

1    Okay?

2          MR. SNYDER:  And I know --

3          THE COURT:  It's important, but there is, like --

4    people are, like, trying to figure out if their business is

5    going to last, if they're going to have food on their table

6    next week, or those kinds of things.  So let's just keep --

7          MR. SNYDER:  And I can assure Your Honor that both the

8    plaintiffs' counsel and we, in addition to representing our

9    clients here, have been trying to do our best, you know, in the

10   public sector and in the *pro bono* to help those folks.  So we

11   keep this in perspective, and we appreciate how much time

12   Your Honor is spending on this.

13        And I'm -- just to wrap the point that Derek made, there

14   is going to be a disagreement about what's relevant and not

15   based on Judge Chhabria's ruling.  So perhaps we can discuss

16   how to present that to Your Honor in an efficient way at some

17   point.

18        THE COURT:  Yeah.  And maybe we'll even present it to

19   Judge Chhabria; right?

20        MR. SNYDER:  Right.

21        THE COURT:  Because he's the one that ruled on the

22   motion to dismiss.

23        MR. SNYDER:  Yes.

24        THE COURT:  So that's something we can figure out as

25   well or, you know, we'll figure that out.

1          **MR. SNYDER:**  Good.  Thank you.

2          **THE COURT:**  But first we have to, like, move it along

3   and get it.

4      So you said you can provide your 10 names.

5          **MS. WEAVER:**  Yes.

6          **THE COURT:**  It's around; right?

7          **MR. LOESER:**  Yes.

8          **THE COURT:**  It's a department.  It shouldn't be 15.

9          **MS. WEAVER:**  It will not.

10         **THE COURT:**  Okay.  And you're going to go do your

11  custodial investigations and then you're going to come back.

12  And with that you're going to identify I guess two things that

13  your expert tells you, or whatever it is, identify what

14  particular the information you want to know about that.  And

15  then you'll do your meet and confer to hopefully begin your

16  negotiations on the search terms.

17      And then when we meet on the 29th, then I want an update,

18  and I hope you've moved quite far and that we can use this as a

19  template and adjust for the other 70 or so; right?  So this is

20  sort of our -- we'll try it out with this one, and then we'll

21  adjust as we see.

22         **MR. KO:**  Your Honor, one important and specific point

23  about the Hive that I just want to raise and preview for

24  Your Honor and folks.  So one thing that they've been

25  explaining to us about the Hive is that, you know, it's not

1    indexed, it's not searchable.  It's, you know, petrabytes of

2    data, 42 million tables, and that a table only exists to the

3    extent someone requests a table to be made.

4         And so I think during these 10 or so custodial interviews

5    that take place in the near term, I think it's very important

6    for all the parties to understand the process by which these

7    requests are made.  And so I think I'm just flagging that as

8    something that's very important for us to understand, and I

9    think that will streamline the ability for all the parties to

10   identify what the tables are.

11        **THE COURT:**  All right.  You got that, Mr. Falconer?

12   You seem to be the Hive expert on that team.

13        **MR. FALCONER:**  I'm not sure if I'm up to that weighty

14   mantle but, yes, Your Honor, I understand Mr. Ko's question.

15        **MS. KUTSCHER:**  Yeah.  And just to contextualize, and I

16   think the point Mr. Ko just raised really helps to explain some

17   of the disconnect here, you know, the Hive isn't just a place

18   where Facebook dumps data or stores data.  It's really an

19   internal tool that the company uses to run any analytics they

20   need, and tables exist to the extent that someone at Facebook

21   creates a table to look at something.  So, for instance, if the

22   company wants to know how many people are logging onto Facebook

23   every day, someone will just create a table in the Hive to pull

24   that data to find out.

25        So, you know, tables exist for a whole lot of reasons.

1  People make them every day just to look at particular data

2  points, and the real challenge is just figuring out what are

3  the right ones, which ones should we be looking at.

4      **MR. LOESER:**  And more broadly -- this is Derek

5  speaking -- you know, what data is in the Hive.  That is

6  important because of this sort of threshold question of

7  Facebook's statement in this case that it doesn't track who

8  sees user data.  And so if there's a way to figure that out

9  from the Hive, that's really important for this case.

10      **MS. WEAVER:**  So, Your Honor, just for clarity, you can

11  give us a date by which we will make our ask.  And then is

12  there a date for them to respond and/or -- I don't know how

13  you're feeling about having a data scientist available after

14  that so that people who know can talk to each other after we do

15  that initial.

16      **THE COURT:**  If your data scientist, if she wants to

17  talk after -- after -- I mean, they have to provide you --

18  right? -- they have to give you the response --

19      **MS. WEAVER:**  Right.

20      **THE COURT:**  -- and provide you "This is what we know

21  and dah, dah, dah," and she should be in on those calls.  And

22  if after having that she still has questions that haven't been

23  answered that she'd rather speak to somebody who speaks her

24  language, then I think they should just do a call.

25      **MS. WEAVER:**  Okay.

1          THE COURT:  The data scientists.  That happens all the

2     time.

3          MS. WEAVER:  Yes.  Great.

4          THE COURT:  I think it would be best if the lawyers

5     weren't on it but, of course, I'm not going to order that.  And

6     I understand why lawyers don't want to do that, and that's fine

7     but, you know, that might be more productive.

8          MR. LOESER:  Your Honor, it's Derek Loeser again.

9     Can I address one specific thing about the PWC issue?

10    And, again, this may be just a comment that needs to be made

11    for what comes down the road.

12         But, you know, we really do need to make sure that when

13    Facebook says if there are other custodians that are unearthed

14    through this process, that they in fact can be added and we're

15    not going to create some insurmountable, you know, standard

16    that Facebook designs for itself that would prevent the

17    addition of additional custodians.

18         THE COURT:  Well, fortunately for you I'm the judge,

19    not Facebook so --

20         MR. LOESER:  I'm very -- that is very fortunate for

21    us, Your Honor.

22         THE COURT:  Or unfortunately.  I don't know.

23         MR. LOESER:  You can say that and make us all --

24         THE COURT:  One way or the other, but Mr. Snyder said

25    that in our very first status conference.  He's nodding

vigorously.

MR. SNYDER: We said we will in good faith consider any additional custodians, and we understand that the judge will rule and we will take responsible and appropriate positions, and I'm sure we'll agree to add some and I'm sure we'll say we don't want to add some.

MR. LOESER: Right. And the reason why I bring that up again with PWC is that from the information that we have gleaned from the documents that we reviewed, you know, when PWC went out and did these audits, it went to look for the people, and I'm sure Facebook provided them with the people that would be most knowledgeable about the subject matter. And from what we can tell, like, for 2013 by itself, 72 percent of the people that PWC talked to are not custodians in this case.

We're just worried that through that process when PWC did its assessment and concluded, for example, 2019 that Facebook's controls were deficient, we just want to make sure that the custodians include the people on which that determination was made. And that's the kind of thing that I think we'll be looping back to because we already can tell that a lot of those people are not custodians, and we just want to make sure that we have the opportunity to include them for that particular purpose.

THE COURT: You have the opportunity certainly to make the argument they should be included.

1          **MR. LOESER:**  Okay.  Thank you, Your Honor.

2          **THE COURT:**  But when I'd like it to be done is when

3     you've reviewed everything --

4          **MR. LOESER:**  Correct.

5          **THE COURT:**  -- that you have so that we really know

6     that we're filling gaps that need to be filled.

7          **MR. LOESER:**  Understood.  Thank you.

8          **THE COURT:**  Okay.

9          **MS. WEAVER:**  I actually suspect -- this sampling idea

10    is very interesting because I suspect as we go through, we're

11    going to learn more about what we want and don't want anyway,

12    and so it may be a growing process.  Even as we walk through

13    it, we find people or maybe we are, like, not sure about these

14    other people.  So I think it could be very constructive.

15         **THE COURT:**  Well, I'm hoping it actually will be a

16    shrinking process, not a growing one.

17         **MR. LOESER:**  I'm just hoping Mr. Snyder stays in the

18    great mood that he's in right now.

19         **THE COURT:**  He's always in that mood.

20         **MR. SNYDER:**  I am.

21         And, Judge, I know we all thank you for your service in

22    helping those in dire circumstances, and it is a tragedy what's

23    happening in our jails and it's just -- it's just unfathomable.

24    You know, I forgot who said "You can judge a country by how it

25    treats its inmates."

**THE COURT:** I don't mean -- I just mean to say that the court here is super busy. Not that it's service. It's our job. It's what we signed up for, but there are certain -- it's very busy; and I know these cases are important to you, as they should be, and your clients are all lucky to have you, but there just is a certain priority of things that are being dealt with and just to sort of -- and just to try to keep it in mind; right? I just think everything looks different now and probably will for a long time.

**MR. SNYDER:** Yes, Your Honor.

**MR. LOESER:** Your Honor, you've either got a great background or new background.

**THE COURT:** I'm in chambers.

**MS. WEAVER:** What are those things behind you?

**THE COURT:** They're books.

**MR. LOESER:** What?

**THE COURT:** They're F.3ds and it's a little bit easier to do it from my conference room. I am the only person here. I'm in my chambers. I close the door. I see nobody all day. My staff does not come in.

**MR. SNYDER:** It sounds delightful.

**MS. WEAVER:** Well, Your Honor, we hear what you say and I think we're all kind of walking through this together, you know, as a country; but we will do our best to stay out of your hair so you can focus.

1          THE COURT:  I'm going to see you-all on May 29th.

2          MS. WEAVER:  Okay.

3          MR. SNYDER:  Can't wait.

4          THE COURT:  All right.  Thank you.  I'll issue an

5     order.

6          MR. LOESER:  Thank you, Your Honor.

7          MS. WEAVER:  Thank you, Your Honor.

8          THE COURT:  Thank you.

9               (Proceedings adjourned at 9:49 a.m.)

10                    ---oOo---

11

12

13               CERTIFICATE OF REPORTER

14          I certify that the foregoing is a correct transcript

15     from the record of proceedings in the above-entitled matter.

16

17     DATE:  Wednesday, May 20, 2020

18

19

20

21     _____

22          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter

23

24

25

# EXHIBIT K

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaint.,fs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843 Case No. 18-md-02843-VC-JSC |
| This document relates to: ALL ACTIONS | **PLAINTIFFS' FOURTH SET OF INTERROGATORIES TO DEFENDANT FACEBOOK, INC.** |

PROPOUNDING PARTY:   Plaintiffs

RESPONDING PARTY:   Defendant Facebook, Inc.

SET NUMBER:   Four (4)

Plaintiffs hereby propound the following interrogatories to Defendant Facebook, Inc. ("Facebook"), pursuant to Federal Rules of Civil Procedure 26 and 33, and request that Facebook respond to the interrogatories below within thirty (30) days of service of these requests at Keller Rohrback L.L.P., 1201 Third Avenue, Suite 3200, Seattle, WA 98101.

### INSTRUCTIONS

1.    You shall respond to these interrogatories in a manner consistent with the Federal Rules of Civil Procedure and the following instructions:

2.    In responding to these Interrogatories, you must answer the Interrogatories in writing and under oath pursuant to Rule 33(b)(5).

2871

3.     If you object to an Interrogatory on the grounds that it calls for disclosure of information which you claim is privileged, then answer such Interrogatory as follows: (a) furnish all information and facts called for by such Interrogatory for which you do not assert a claim of privilege; and (b) for each communication, recommendation, fact, or advice which you claim is privileged, state the basis for your claim of privilege and all the facts that substantiate that basis, including each of the participants in the allegedly privileged communication.

4.     If you object to any portion of an Interrogatory, provide all information responsive to any portion of the Interrogatory to which you do not object.

5.     Unless otherwise stated, there are no time limits applicable to any interrogatory. When a time limit is specified in a discovery request, this time limit does not alter your obligations under the Federal Rules of Civil Procedure to supplement your responses.

6.     Seasonable and timely supplementation is required. Accordingly, if any additional information relating in any way to these discovery requests are acquired or discovered subsequent to the date of your response, this information shall be furnished to Plaintiffs' counsel promptly after such information is discovered.

7.     In answering these Interrogatories, furnish all knowledge and information available to you or subject to your reasonable inquiry, access or control, however obtained including hearsay. This includes, but is not limited to, information in the actual or constructive possession of your attorneys and anyone else acting on your behalf.

8.     Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition except where such words have a specific custom and usage definition in your trade or industry, in which case they shall be interpreted in accordance with such usual custom and usage definition of which you are aware. In construing the interrogatories and requests herein: (i) the singular shall include the plural and the plural shall include the singular; (ii) a masculine, feminine, or neuter pronoun shall not exclude the other genders; (iii) the terms "any" and "all" shall be understood to mean "any and all"; and (iv) the words "and" and "or" shall be read in the conjunctive or disjunctive or

both, as the case may be, all to the end that the interpretation applied results in the more expansive interpretation.

## DEFINITIONS

Unless otherwise stated, the terms set forth below are defined as follows and shall be used in construing the meaning of these interrogatories.

1. The use of the singular shall be deemed to include the plural, and the use of one gender shall include all others, as appropriate, in the context.

2. The present tense of a verb includes its past tense and vice versa.

3. "2012 Consent Decree" means the Decision and Order entered by the Federal Trade Commission (FTC) in 2012 in *In the Matter of Facebook, Inc.*, No. C-4365, pursuant to an agreement between the FTC and Facebook.

4. "And" and "or" are to be construed both conjunctively and disjunctively, as necessary, to bring within the scope of this request for production all responses that might otherwise be construed to be outside its scope.

5. The words "all" and "any" means each and every.

6. The phrase "describe in detail" or "detailed description" includes a request for a complete description and explanation of the facts, circumstances, analysis, opinion, and other information relating to the subject matter of a specific interrogatory.

7. "Facebook," "Defendant," "you," and "your" shall mean Facebook, Inc. and any of its executives, directors, officers, employees, partners, members, representatives, agents (including attorneys, accountants, consultants, investment advisors or bankers), and any other Person purporting to act on its behalf. In the case of business entities, these defined terms include parents, subsidiaries, affiliates, predecessor entities, successor entities, divisions, departments, groups, acquired entities and/or related entities or any other entity acting or purporting to act on its behalf.

8.     "Action" means this case captioned *In re: Facebook, Inc. Consumer Privacy User Profile Litigation*, Case No. 18-md-02843-VC and each of the constituent Actions transferred to and/or consolidated therein.

9.     "API" refers to an application programming interface.

10.     "App" means an interactive software application developed to utilize the core technologies of the Facebook social networking platform.

11.     "Business Partners" refers to the third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems, including, but not limited to, the third parties listed in paragraph 484 of Plaintiffs' First Amended Consolidated Complaint.

12.     "Content and Information" refers to the definition in footnote 2 of the First Amended Consolidated Complaint, referring to "content" and "information" as Facebook's Statements of Rights and Responsibilities have defined those terms. In brief, Facebook has generally used "information" to mean facts and other information about Facebook Users, including the actions they take, and "content" to mean anything Facebook Users post on Facebook that would not be included in the definition of "information." Content and Information also includes both personally identifiable content and information and anonymized content and information that is capable of being de-anonymized. *See* First Am. Consol. Compl. ("FAC") ¶¶ 223-224. Content and Information includes data that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular Facebook User, including:

A.     Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

B.     Characteristics of protected classifications under California or federal law.

C. Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

D. Biometric information.

E. Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an Internet Web site, application, or advertisement.

F. Geolocation data.

G. Audio, electronic, visual, thermal, olfactory, or similar information.

H. Professional or employment-related information.

I. Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. § 1232g, 34 C.F.R. pt. 99).

J. Inferences drawn from any of the information identified in this paragraph to create a profile, dossier, or similar collection of information about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

13. "Data Analytics Infrastructure" refers to the services, applications, utilities and systems that are used for either preparing data for modeling, estimating models, validating models, business intelligence, scoring data, or related activities, including but not limited to databases and data warehouses, statistical and data mining systems, and scoring engines.

14. "Database" refers to any organized collection of information that is stored electronically.

15. "Facebook Archive" means the archived activity of the Named Plaintiffs You produced in this action.

16. "Facebook User" means a person who maintains or has maintained a Facebook account.

17.     "Friends of Installing Users" refers to Facebook Users:

    A.     who did not install a particular App, but whose Content and Information became accessible to that App because they were Facebook friends with an Installing User; or

    B.     whose Content and Information became accessible to a Business Partner because they were Facebook friends with an Installing User.

18.     "Including" means "including but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify a request, definition, or instruction but not to limit it.

19.     "Installing User" refers to a Facebook User who installed a particular App via his or her Facebook account or who used the services or products of a Business Partner in connection with his or her Facebook account.

20.     "Not Generally Available," when used as an adjective to modify Content and Information, refers to a Facebook User's Content and Information to which that Facebook User has restricted access such that the only Facebook Users who may access that Content and Information are the Facebook User's Friends or another limited audience.

21.     "Platform" refers to the services, tools, and products provided by Facebook to third parties to create their own applications and services that access data in Facebook.

22.     "Third Parties" include the following:

    A.     Apps, App Developers, Whitelisted Apps, and Business Partners, as those terms are used in the FAC;

    B.     Any person that develops an application, software experience, game, or website that accesses Content and Information from Facebook's API or other Facebook software; and

    C.     Any person with which Facebook has or had an integration partnership.

23.     Capitalized terms and acronyms not specifically defined herein have the same definition as in the First Amended Consolidated Complaint.

# INTERROGATORIES

## INTERROGATORY NO. 8:

Identify by name and time period in operation each Facebook Database and Data Analytics Infrastructure that contains Facebook Users' Content and Information.

## INTERROGATORY NO. 9:

For each Database and Data Analytics Infrastructure identified in your answer to Interrogatory No. 8, identify the corresponding query interfaces (e.g., including graphical interfaces, command-oriented interfaces, and APIs) that have called or accessed data from such Database to respond to either internal or external queries.

## INTERROGATORY NO. 10:

For each query interface identified in your answer to Interrogatory No. 9, identify whether such query interface is or has been used to respond to internal queries, external queries, or both.

## INTERROGATORY NO. 11:

For each query interface identified in your answer to Interrogatory No. 10 as being or having been used to respond to external queries, identify the complete list of fields or query parameters available for queries by a Third Party via such query interfaces. For each of the fields or query parameters, describe in detail the acceptable ranges and formats of their values and identify which parameters are optional for queries and which are required.

## INTERROGATORY NO. 12:

For each Database and Data Analytics Infrastructure identified in your answer to Interrogatory No. 8, describe in detail the system architectures of, and types of data contained by, such system.

## INTERROGATORY NO. 13:

For every API by means of which Third Parties could access the Not Generally Available Content and Information of Friends of Installing Users, list the name of the API, a description of its function, the data fields of Not Generally Available Content and Information of Friends of Installing Users to which it allowed access, the number of calls it received each month, the volume of data it returned each month, the number of Friends of Installing Users whose Content and Information was accessed, the name of every Third Party that Facebook allowed to use that API, and the period during which each Third Party was allowed to use the API.

## INTERROGATORY NO. 14:

Identify every Business Partner that had the ability to access the Not Generally Available Content and Information of Facebook Users even if such Facebook Users had not downloaded an App from that Business Partner and time period during which each such Business Partner had that ability.

## INTERROGATORY NO. 15:

For each Business Partner identified in your answer to Interrogatory No. 14, provide:

a) The name of each API or other data transfer mechanism by means of which the Business Partner accessed the Not Generally Available Content and Information of Facebook Users when such Facebook Users had not downloaded an App from that Business Partner;

b) a detailed description of the function of each such API or other data transfer mechanism;

c) the elements of Not Generally Available Content and Information that each such API or other data transfer mechanism allowed access to;

d) the number of calls the Business Partner made to each such API or other data transfer mechanism each month;

e) the volume of data transferred from each such API or other data transfer mechanism to

each Business Partner each month;

    f)   the number of Friends of Installing Users whose Content and Information was so accessed by each Business Partner; and

    g)   any filters or access restrictions that limited the set of Facebook Users about whom each Business Partner could access Not Generally Available Content and Information.

## INTERROGATORY NO. 16:

For each Named Plaintiff, identify all Third Parties who had the ability to access such Named Plaintiff's Not Generally Available Content and Information by virtue of the fact that the Named Plaintiff was a Friend of an Installing User, the date and time of each request for such access, and the specific Content and Information that was accessed.

## INTERROGATORY NO. 17:

For each Named Plaintiff, identify each Facebook Business Partner that had the ability to access the Named Plaintiff's Not Generally Available Content and Information, even if the Named Plaintiff had not downloaded an App from that Business Partner, the date and time of each request for such access, and the specific Content and Information that was accessed.

## INTERROGATORY NO. 18:

Identify by Bates number every document You provided or made available to PwC related to any investigation, audit or assessment related to the subject matter of the Complaint.

## INTERROGATORY NO. 19:

Identify all members of Facebook's senior management team involved in the review and oversight of Facebook's Privacy Program instituted pursuant to the 2012 Consent Decree.

**INTERROGATORY NO. 20:**

Identify all members of the Board of Directors involved in the review and oversight of Facebook's Privacy Program instituted pursuant to the 2012 Consent Decree.


**INTERROGATORY NO. 21:**

For each such individual identified above in Interrogatories 19 and 20, describe in detail their duties and responsibilities relating thereto.


**INTERROGATORY NO. 22:**

Describe in detail the facts and circumstances relied upon by Facebook in assessing and agreeing to pay a $5 billion fine to the Federal Trade Commission.


**INTERROGATORY NO. 23:**

Identify every person involved in the decision to pay the $5 billion fine to the Federal Trade Commission.


**INTERROGATORY NO. 24:**

Identify every noncustodial source of ESI on which is stored information (in any form) sufficient to determine (1) whether Third Parties accessed the Not Generally Available Content and Information of Facebook Users by virtue of their being Friends of Installing Users; (2) which Third Parties accessed such Content and Information; and (3) which Facebook Users, by virtue of their being Friends of Installing Users, had their Not Generally Available Content and Information accessed by Third Parties.


**INTERROGATORY NO. 25:**

Identify every noncustodial source of ESI on which is stored information (in any form) sufficient to determine (1) whether any Business Partners accessed the Not Generally Available

Content and Information of Facebook Users even if such Users did had not downloaded an App from those Business Partners; (2) which Business Partners accessed such Content and Information; and/or (3) which Facebook Users had their Not Generally Available Content and Information accessed in that manner.

## INTERROGATORY NO. 26:

Identify by name and time period all Third Parties that obtained Facebook Users' Content and Information through friend permissions prior to 2009.

## INTERROGATORY NO. 27:

Identify by name and time period all Third Parties to whom Facebook granted whitelisted access, the time period of the grant of whitelisted access, and the Third Parties for which such access was granted.

## INTERROGATORY NO. 28:

Describe the criteria Facebook used to determine which Third Parties would be granted whitelisted access.

## INTERROGATORY NO. 29:

Identify by name and time period all Third Parties that were Business Partners of Facebook and were granted access to Facebook Users' Content and Information.

## INTERROGATORY NO. 30:

Identify all categories of Content and Information available to a Facebook User through the "Access Your Information" or "Download Your Information" tools, such as users' public and private posts, Facebook messenger messages, and any attached content.

**INTERROGATORY NO. 31:**

Identify all categories of Content and Information Facebook collects, tracks, and maintains about Facebook Users that are excluded from the Access Your Information or Download Your Information tools, such as advertisements served to a Facebook User, likes, audience selector information, reports of offensive content, or support communications.

**INTERROGATORY NO. 32:**

For each Named Plaintiff, identify each category of Content and Information Facebook collects, tracks, and maintains about them and for each category, indicate (1) whether each category has been produced in this action and the Bates Range associated with each category of produced Content and Information; (2) whether each category of Content and Information is available to Facebook Users through the "Access Your Information" or "Download Your Information" tools; and (3) for each category of Content and Information that has not been produced in this action, its location, and the reason it has not been produced.

**INTERROGATORY NO. 33:**

For all documents produced in this action relating to the Named Plaintiffs' Content and Information, describe any associated data that reflects whether the Content and Information was publicly or privately shared.

**INTERROGATORY NO. 34:**

Identify by name, time period and type of data accessed all Third Parties Facebook has removed or banned from the Platform for violating Facebook Users' privacy or for failure to comply with Facebook's privacy policies.

Dated: July 16, 2020

Respectfully submitted,

KELLER ROHRBACK L.L.P.

BLEICHMAR FONTI & AULD LLP

By:  /s/ Derek W. Loeser
     Derek W. Loeser

By:  /s/ Lesley E. Weaver
     Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)
Lynn Lincoln Sarko (admitted *pro hac vice*)
Gretchen Freeman Cappio (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Adele A. Daniel (admitted *pro hac vice)*
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

*Plaintijfs' Co-Lead Counsel*

# EXHIBIT L

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
    osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Kristin A. Linsley (SBN 154148)
    klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
    mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
    dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
    jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Facebook, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20**<br><br>Judge:  Hons. Vince Chhabria and Jacqueline Scott Corley<br>Courtroom 4, 17th Floor |

Gibson, Dunn &
Crutcher LLP

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

2885

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

    I.      Initial proceedings before this Court.............................................................. 2

    II.     Pretrial Order No. 20 allows four theories of potential liability relating to "sensitive user information" that users shared with a "limited audience" on Facebook. ................................................................................................... 3

    III.    Facebook undertakes an expansive discovery effort.................................... 5

    IV.    Facebook produces in discovery all data associated with the Named Plaintiffs' accounts........................................................................................ 5

    V.     Plaintiffs continue to seek broad discovery on stayed and dismissed claims .............. 7

ARGUMENT .......................................................................................................................... 8

    I.      The Court should enforce the stay articulated in Pretrial Order 20 ............................. 8

    II.     The additional user data Plaintiffs demand relates only to stayed or unpled theories and cannot realistically be collected and produced ...................................... 10

           A.     Off-Facebook Activity does not relate to any live theory, and any information associated with Plaintiffs' accounts has been produced.............. 11

           B.     Facebook's business analytics do not relate to any live theory. .................... 13

CONCLUSION ...................................................................................................................... 15

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

Gibson, Dunn &
Crutcher LLP

2886

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ashworth, Inc. Sec. Litig.,*
2002 WL 33009225 (S.D. Cal. May 10, 2002)................................................................9

*Brown v. Stroud,*
2010 WL 3339524 (N.D. Cal. Aug. 24, 2010)................................................................10

*DPR Constr., Inc. v. Anka (Cortez Hill) LLC,*
2006 WL 8455253 (S.D. Cal. Oct. 27, 2006)................................................................14

*Feigel v. F.D.I.C.,*
935 F. Supp. 1090 (S.D. Cal. 1996)................................................................14

*Gilead Scis., Inc. v. Merck & Co,*
2016 WL 146574 (N.D. Cal. Jan. 13, 2016)................................................................12

*InteraXon Inc. v. NeuroTek, LLC,*
2017 WL 24721 (N.D. Cal. Jan. 3, 2017)................................................................9

*In re iPhone/iPad Application Consumer Privacy Litig.,*
2012 WL 5897351 (N.D. Cal. Nov. 21, 2012)................................................................10

*Marlo v. United Parcel Serv., Inc.,*
639 F.3d 942 (9th Cir. 2011)................................................................13

*Meyers v. Cty. of Sacramento,*
2020 WL 207213 (E.D. Cal. Jan. 14, 2020)................................................................9

*OMG Fid. Inc. v. Sirius Tech., Inc.,*
2007 WL 1994230 (N.D. Cal. July 5, 2007)................................................................10

*Rembrandt Diagnostics, LP v. Innovacon, Inc.,*
2018 WL 692259 (S.D. Cal. Feb. 2, 2018)................................................................10

*Shuckett v. Dialamerica Mktg., Inc.,*
2018 WL 4350123 (S.D. Cal. Sept. 10, 2018)................................................................10

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.,*
2017 WL 4680242 (N.D. Cal. Oct. 18, 2017)................................................................15

**Rules**

Fed. R. Civ. P. 26(b)(1)................................................................9, 12

Gibson, Dunn & Crutcher LLP

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

2887

# INTRODUCTION

This brief concerns the proper scope of discovery in this case.  On September 9, 2019, Judge Chhabria issued a comprehensive ruling (Pretrial Order 20) (the "Order") making clear that this litigation—which arises out of the Cambridge Analytica events—concerns "Facebook's practice of sharing its users' personal information with third parties."  Pretrial Order 20, Dkt. 298 at 1.  The ruling limits Plaintiffs to four theories of relief, all of which pertain to *Facebook* allegedly allowing third parties to access information that *users themselves* posted on Facebook.  They are:

- **Friend sharing**: "[W]hen users accessed apps on the Facebook Platform, the app developers were not merely able to obtain information about the users they were interacting with; [but] were also able to obtain any information about the users' Facebook friends that the users themselves had access to."

- **Whitelisting**: After announcing it had ended friend sharing in 2014, Facebook allegedly "continued to allow a preferred list of app developers to access the information of users' friends."

- **Integration Partner Agreements**: Facebook allegedly "[s]har[ed] sensitive user information with business partners," through a list of "integration partnerships," under which Facebook allegedly "outsourced … the time, labor, and money required to build Facebook's Platform on different devices and operating systems."

- **Enforcement Efforts**: "In addition to complaining about Facebook's dissemination of private user information to app developers, whitelisted apps, and business partners, the plaintiffs allege that Facebook did nothing to prevent these third parties from misusing the information Facebook allowed them to access."

*Id*. at 6-10.  Except for certain dismissed causes of action, *id*. at 30, the Order stayed all claims and theories not falling into those four categories, and Judge Chhabria made clear that this case would not proceed as an open-ended investigation into Facebook's business, *id.* at 6.

But for the past year, Plaintiffs at every turn have ignored Judge Chhabria's directive—attempting to elasticize the four theories identified in the order into an ever-expanding probe of the Facebook Platform and Facebook's business.  This case is not about the extraneous topics Plaintiffs are now chasing in discovery, such as targeted advertising; "cookies" and off-Facebook activity; or the analytics Facebook conducts on user data.  Those topics are the subject of *separate litigations* brought by *different plaintiffs* before *different judges.*  And Plaintiffs cannot use the discovery process to hunt for new claims and theories.  The Court should issue an order conforming discovery to Judge Chhabria's ruling and the four theories he identified, in accordance with FRCP 26.

## BACKGROUND

This case stems from the Cambridge Analytica events, and while it is broad in scope, Plaintiffs' "core factual allegations" all relate to "Facebook's handling of sensitive user information"—specifically, allegations that Facebook gave third parties access to "sensitive user information" that Facebook users shared with their friends on the Facebook platform.  Pretrial Order 20, Dkt. 298 at 6.

In March 2018, *The Guardian* and *The New York Times* each reported that Cambridge Analytica—a data analytics company that had worked with the Trump campaign—had improperly purchased data regarding millions of Facebook users from a developer named Aleksandr Kogan who, along with his company GSR, created an app called this is "thisisyourdigitallife."[1]  SACC, Dkt. 491 ¶¶ 397, 486, 531.  Kogan had obtained data from users who authorized (*i.e.*, used and consented to share data with) the app.  As with other developers that offer apps on Facebook's platform, he also obtained some limited data about those users' friends through "friend sharing," so long as those friends "had their privacy settings set to allow it."  SACC, Dkt. 491 ¶¶ 397-99.  Kogan then violated the Facebook policies and the terms of use to which he agreed and sold this data to Cambridge Analytica.  SACC, Dkt. 491 ¶¶ 411.  Following the March 2018 news reports about Kogan's sale of data to Cambridge Analytica, nearly 40 putative class actions were filed against Facebook, alleging hundreds of causes of action in jurisdictions across the country.  Pretrial Order 20, Dkt. 298 at 3-4.  These actions generally challenged Facebook's approach to sharing user information with third parties.

## I.    Initial proceedings before this Court

In June 2018, the Judicial Panel on Multidistrict ("JPML") consolidated these cases before this Court.  *See* Dkt. 1.  After the MDL was formed, Plaintiffs' counsel requested preliminary discovery "to determine the scope of potential claims" for a consolidated complaint.  Mtn. for Limited Discovery, Dkt. 112 (Aug. 8, 2018) at 1.  Although the Court expressed concern that Plaintiffs had presented a "moving target" and that "discovery is . . . not supposed to be a fishing expedition," Aug. 23, 2018 Hr'g Tr. at 24:4-8, 25:9-26:9, Judge Chhabria allowed preliminary discovery related to the topics described in the JPML's transfer order.  *See* Dkt. 130.  Within weeks, Facebook produced thousands

---

[1]   None of this was news when the articles were published in 2018; like the rest of the public, "Facebook became aware that Kogan and GSR had misused data" after *The Guardian* published an article about it on December 11, 2015 and immediately "conducted an investigation."  SACC ¶ 402.

Gibson, Dunn & Crutcher LLP

2

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

2889

of documents and essay-like interrogatory responses to assist Plaintiffs in forming their claims.

The resulting complaint was nevertheless rife with defects, and the Court suggested Plaintiffs file an amended complaint. *See, e.g.*, Feb. 1, 2019 Hr'g Tr. at 101:3-11, 166:3-13. The Court made clear, however: "[I]f we . . . giv[e] you leave to amend right now, . . . I would assume that the next iteration of it would be your best shot. And that absent some extraordinary circumstances, if a particular claim is inadequate, it would be dismissed with prejudice." *Id.* at 188:23-189:4.

Plaintiffs' First Amended Consolidated Complaint ballooned to 1,442 paragraphs and 412 pages. Dkt. 257. As the Court later observed: "[I]t seems the plaintiffs sought to identify anything Facebook has ever been reported to have done wrong and then made sure to sprinkle in at least a few allegations about it." Pretrial Order 20, Dkt. 298 at 5. Facebook moved to dismiss.

## II. Pretrial Order No. 20 allows four theories of potential liability relating to "sensitive user information" that users shared with a "limited audience" on Facebook.

After a second round of extensive motion-to-dismiss briefing, the Court issued a 42-page order granting in part and denying in part Facebook's motion to dismiss. The very first line of that Order reads: "*This lawsuit, which stems from the Cambridge Analytica scandal, is about Facebook's practice of sharing its users' personal information with third parties. . . . [Plaintiffs'] principal allegations are that Facebook: (i) made sensitive user information available to countless companies and individuals without the consent of the users, and (ii) failed to prevent those same companies and individuals from selling or otherwise misusing the information.*" *Id.* at 1. The Order goes on to find a number of claims actionable related those alleged practices.

But the Court rejected Plaintiffs' pleading to the extent it waged a wholesale attack on Facebook's business, observing that "it seems the plaintiffs sought to identify anything Facebook has ever been reported to have done wrong . . . . [T]he presence of so many disparate and vague allegations makes it nearly impossible for Facebook to meaningfully respond to all of them, much less for the Court to effectively address them." *Id.* at 5-6.

To avoid "bogging the case down at the pleading stage for years," *id.* at 6, Judge Chhabria did not address each of Plaintiffs' improperly pleaded theories and claims. Instead, he concluded that Plaintiffs adequately pleaded "four categories" of potential wrongdoing related to "Facebook's practice of sharing its users' personal information with third parties." *Id.* at 6, 1. He then dismissed certain

Gibson, Dunn & Crutcher LLP

3

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

2890

claims, *id.* at 30, and ***stayed all other claims and theories not falling into the four categories of alleged misconduct****.*  *Id*. at 6 ("All other prioritized claims not addressed by this ruling will be stayed.").

The order further held that Plaintiffs have standing only to the extent the claims are based on the allegation that "**sensitive information was disseminated to third parties.**"  *Id.* at 14.  It therefore explained that each of the actionable theories of alleged misconduct concerned "Facebook's handling of sensitive user information," *id.* at 6, which it described as "substantive and revealing content *that users intended only for a limited audience* [*i.e.*, their friends], such as their photographs, videos they made, videos they watched, their religious and political views, their relationship information, and the actual words contained in their messages."  *Id.* at 1 (emphasis added); *see also id.* at 7, 13, 17.

Judge Chhabria described the four actionable categories of potential liability as:

1.       ***Friend sharing:  "Giving app developers access to*** *<u>sensitive user information</u>.*"  From approximately 2009-2015, "when users accessed apps on the Facebook Platform, the app developers were not merely able to obtain information about the users they were interacting with; [but] were also able to obtain any information about the users' Facebook friends that the users themselves had access to," via "friend sharing."  *Id*. at 6-7.[2]  "This include[d] [access to] a variety of things that your friends might have intended to share only with a limited audience . . . ."  *Id.* at 7.  "The Cambridge Analytica story is an example of this."  *Id.*

2.       ***Whitelisting:  "Continued disclosure to whitelisted apps."***  After announcing it had ended friend sharing in 2014, Facebook allegedly "continued to allow a preferred list of app developers to access the information of users' friends."  *Id*. at 7-8.  "The complaint describes these preferred apps as 'whitelisted apps.'"  *Id.* at 8.

3.       ***Integration Partner Agreements:  "Sharing*** *<u>sensitive user information</u>* **with business partners**."  Plaintiffs "allege that Facebook outsourced to business partners 'the time, labor, and money required to build Facebook's Platform on different devices and operating systems.'"  *Id*. at 8.  "The non-exclusive list of companies that the complaint identifies as business partners . . . came from Facebook itself, which asserted that it had 'integration partnerships' with these companies in a letter to

---

[2]   Judge Chhabria also found all Facebook Users who had joined Facebook in 2009 or after had consented to this friend-sharing and so dismissed those claims as to any Facebook users who joined the Platform after 2008.  *Id*. at 25-26.

Gibson, Dunn &
Crutcher LLP

2891

the Energy and Commerce Committee of the U.S. House of Representatives." *Id*.  With regard to these integration partnerships, Judge Chhabria found the alleged misconduct was "relatively straightforward":  Facebook had entered "data reciprocity" agreements with these integration partners pursuant to which "Facebook shared information about its users with this . . . list of business partners, and that those companies in turn shared data with Facebook." *Id.*

4.      ***Enforcement Efforts:  "Failure to restrict the use of <u>sensitive information</u>.***"  "In addition to complaining about Facebook's dissemination of private user information to app developers, whitelisted apps, and business partners, the plaintiffs allege that Facebook did nothing to prevent these third parties from misusing the information Facebook allowed them to access." *Id*. at 9.  "Again, the Cambridge Analytica story is an example of this." *Id.*

## III.    Facebook undertakes an expansive discovery effort

The four theories identified in Pretrial Order 20 are wide ranging and implicate complex facts that have proven challenging for the parties and the Court to manage.  The Court has already held more than 20 hearings and resolved numerous motions.  The parties have already met and conferred for literally hundreds of hours.  And Facebook has produced nearly **1.5 million pages**, *before the parties have even reached a search term agreement*.

These productions include all of the Facebook documents produced in response to the FTC's document requests during its related investigations—including the FTC's 2019 investigation stemming from the Cambridge Analytica events underlying this case.  Judge Chhabria expected these documents, which were sufficient for the FTC, "**would cover the vast majority of the documents that the Plaintiffs would want in this litigation**."  March 5, 2020 Hr'g Tr. at 4:14-15.  Facebook also produced the documents it provided the SEC, multiple state attorneys general, and other government entities in related investigations and actions to the extent they are responsive to Plaintiffs' RFPs.

## IV.    Facebook produces in discovery all data associated with the Named Plaintiffs' accounts

Facebook also undertook to produce any data and information about the Named Plaintiffs that was within the scope of the four non-stayed theories of alleged misconduct.

Facebook determined that the best way to ensure that it produced all information that could potentially be within the scope of the four theories Judge Chhabria identified was to produce ***all content***

Gibson, Dunn & Crutcher LLP

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

2892

*and information* that Facebook associates with each of the Named Plaintiffs' Facebook accounts. This includes (but is not limited to) the "Download Your Information" ("DYI") file that Facebook makes available to users. The DYI file contains *more than 115 categories of information* about a Facebook user detailed in **Exhibit A**; all Facebook users are free to download their DYI file if they wish.[3]

Facebook has now produced the information contained in the DYI file for each of the Named Plaintiffs, plus any additional information associated with their accounts. In total, Facebook has produced more than 850,000 pages of information associated with the Named Plaintiffs' accounts.[4] *The produced materials include everything each Name Plaintiff has ever shared or done on Facebook* (unless the Named Plaintiffs have chosen to permanently delete that information).

By producing the full DYI file, Facebook produced some information that is outside the scope of the case in at least two respects. First, the DYI file includes more than the "sensitive user information" users shared on the platform—photographs, videos, posts, comments, messages, and religious, political, and relationship information. *See* Dkt. 298 at 1, 7, 13, 17. **It includes _all_ information that each Named Plaintiff has shared on Facebook, sensitive or otherwise**.

Second, the DYI file includes data and information associated with each of the Named Plaintiffs' Facebook accounts, beyond what users shared on Facebook. Of note, it includes certain information Facebook receives about users' online activities on apps and websites *other than Facebook*, which is called off-Facebook Activity. The DYI data also includes device information, location information, and a host of information about advertisers and advertisements.

By producing the DYI file, Facebook ensured that it had produced all user data about each Named Plaintiff that could even arguably be within the scope of the four non-stayed theories.

---

[3]   Facebook's Help Center explains what is included in a user's DYI file in an article entitled *What categories of my Facebook data are available to me?*, which includes a table detailing the more than 115 categories of information that Facebook users are able to download. *See What categories of my Facebook data are available to me?*, https://www.facebook.com/help/930396167085762, Table 2, *Information you can download using the Download Your Information tool* (last visited Sept. 18, 2020). This table is reproduced as **Exhibit A**. Facebook explained to Plaintiffs during the meet-and-confer process that this information was available to them for download, but Plaintiffs insisted that Facebook produce the information in discovery. Facebook agreed to do so without conceding the relevance or discoverability of all of the information in the DYI file.

[4]   Approximately 250,000 pages of additional materials are in the queue for production for 5 Named Plaintiffs who joined the case last month, *see* SACC Dkt. 491.

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

## Table 1: Produced User Data

### V.    Plaintiffs continue to seek broad discovery on stayed and dismissed claims

By providing Plaintiffs the materials it produced to numerous government entities in related investigations and all data associated with the Named Plaintiffs, Facebook provided more than enough information for *private plaint₃ifs* to seek any additional targeted discovery about live claims.  That is the only discovery to which Plaintiffs are entitled.  But Plaintiffs have refused to approach discovery in a reasonable and targeted manner and continue to conduct this case as if they were a multi-district private attorney general free to careen from one factual detour to the next.

Facebook does not dispute that Plaintiffs are entitled to obtain discovery about the four actionable theories Judge Chhabria identified.  But Plaintiffs' RFPs far exceed that scope, instead seeking more than a decade of materials touching on nearly every aspect of Facebook's operations, including all materials underlying the company's financials, advertising on the Facebook platform, Facebook's efforts to curb and investigate violations of any platform policy, Facebook's internal policies, Facebook's third party agreements, and "user testing" of any kind.

Plaintiffs demand every single document, letter, and other piece of paper to have exchanged hands with any government body investigating or pursuing claims against Facebook on any topic related to privacy.  Plaintiffs similarly demand every document from or relating to any *internal* Facebook investigation or audit.  Plaintiffs have interrogated counsel repeatedly on all aspects of the

7

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

2894

Company's advertising platform, whether and how Facebook tracks users, Facebook's source code, and Facebook's internal business analytics.  Indeed, after the world went into lockdown as a result of the COVID-19 pandemic, Plaintiffs began grilling counsel about privacy on Zoom and Facebook's newly released video-conferencing product.

In the months since Facebook produced the Named Plaintiffs' data, Plaintiffs have interrogated Facebook ad nauseum about its contents, continuing to demand some other "dossier" or "data set" Plaintiffs believe Facebook maintains for each user—frequently demanding information Facebook already provided.  As Facebook has repeatedly explained, there is no "dossier" or "data set"—the DYI files Facebook has produced contain the data in Facebook's possession, custody, and control that Facebook has associated with each Named Plaintiff's Facebook account.  Facebook has gone to great lengths to explain this to Plaintiffs and has submitted to dozens of hours of questioning about every piece of data Plaintiffs believe Facebook tracks and collects and how that data is stored.

This approach has infected all aspects of discovery and has caused disputes to arise early and often.  To manage these issues, Judge Chhabria appointed the Honorable Jaqueline Scott Corley to resolve discovery disputes.  Although this appointment has substantially improved the discovery process, Plaintiffs have not relented in their efforts to hunt for new theories under the guise of discovery.  As set forth below, Plaintiffs are now seeking broad categories of user data that go far outside the four actionable theories of relief.

## ARGUMENT

### I.  The Court should enforce the stay articulated in Pretrial Order 20

Pretrial Order 20 and Rule 26 must guide the scope of discovery in this action.  The four categories of alleged misconduct that survived the motion to dismiss all start from the same place:  with a Facebook user sharing "sensitive user information."  Judge Chhabria defined this term to mean "substantive and revealing content *that users intended only for a limited audience* [*i.e.*, their friends], such as their photographs, videos they made, videos they watched, their religious and political views, their relationship information, and the actual words contained in their messages."  Dkt. 298 at 1 (emphasis added), *see also id.* at 7, 13, 17.  Pretrial Order 20 finds Plaintiffs' claims actionable only to the extent that they relate to Facebook allegedly sharing this type of information through (i) friend

Gibson, Dunn &
Crutcher LLP

8

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

2895

sharing, (ii) whitelisting, or (iii) integration partnerships, or to (iv) Facebook's alleged failure to enforce restrictions on how third parties used the information Facebook shared with them.

### Table 2:  Actionable Theories Under Pretrial Order 20



Pretrial Order 20 stays all claims and theories that do not fall into one of these categories.  The stay that Judge Chhabria articulated "necessarily include[s] a stay of discovery" on any stayed theories of relief.  *Meyers v. Cty. of Sacramento*, 2020 WL 207213, at *1 (E.D. Cal. Jan. 14, 2020).  When a "discovery stay [is] in place," a party "will not be permitted to seek discovery from [the opposing party]."  *InteraXon Inc. v. NeuroTek, LLC*, 2017 WL 24721, at *4 (N.D. Cal. Jan. 3, 2017).

Rule 26 also confines discovery to the four live theories articulated in Pretrial Order 20.  Under Rule 26, Plaintiffs are not entitled to seek discovery to test allegations or theories that did not survive Facebook's motion to dismiss—such as claims about "psychographic marketing" and "targeted advertising"—or to investigate new potential theories of wrongdoing.  Rule 26 was amended in 2000 to change the scope of discovery from information relevant to the "subject matter" of the case to information relevant to "claims or defenses."  Fed. R. Civ. P. 26(b)(1), Advisory Committee Notes to 2000 Amendments.  The scope of discovery must be "based on the actual claims or defenses surviving [dismissal]" and cannot go "beyond the claims that withstood [a] motion to dismiss."  *In re Ashworth,*

Gibson, Dunn &
Crutcher LLP

9

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

2896

*Inc. Sec. Litig.*, 2002 WL 33009225, at *4 (S.D. Cal. May 10, 2002); *see also Brown v. Stroud*, 2010 WL 3339524, at *2–4 (N.D. Cal. Aug. 24, 2010) (denying plaintiff's request for "discovery beyond th[e] scope" of the claims as "indicated" in the court's motion to dismiss.)

The amendments to Rule 26 also make clear that Plaintiffs are not entitled to conduct a roving inquiry into all of Facebook's business practices to develop new theories of relief. In civil litigation, discovery must be tied to live claims. *Rembrandt Diagnostics, LP v. Innovacon, Inc.*, 2018 WL 692259, at *8 (S.D. Cal. Feb. 2, 2018) ("Plaintiff's argument that this type of information would be provided in an audit lacks merit, this is discovery, not an audit."). Federal courts regularly reject discovery requests that are not tied to specific, live factual allegations and have observed that "conclusory relevance arguments are not enough to justify an order allowing plaintiff to rummage through . . . years' worth of" corporate records. *Shuckett v. Dialamerica Mktg., Inc.*, 2018 WL 4350123, at *6 (S.D. Cal. Sept. 10, 2018). Nor may a plaintiff "bootstrap" broad discovery onto narrow allegations. *OMG Fid. Inc. v. Sirius Tech., Inc.*, 2007 WL 1994230, at *1 (N.D. Cal. July 5, 2007).

For this reason, in a privacy MDL against Apple, the Court held discovery would be limited to the types of data the plaintiffs alleged Apple wrongfully collected. *See In re iPhone/iPad Application Consumer Privacy Litig.*, 2012 WL 5897351, at *4–5, *7 (N.D. Cal. Nov. 21, 2012). In that case, "Plaintiffs allege[d] Apple's devices collected and stored only certain categories of data, such as date of birth, gender, income, education level, partners sought, and zip code." *Id.* at *5. But, like Plaintiffs here, the plaintiffs requested "all information relating to privacy and Apple's device." *Id.* at *7. The Court rejected this request as "beyond the scope of their claims," explaining: "Plaintiffs cannot rely on their desire to explore if other types of data were collected to support their requests for discovery," or "to compile their allegations." *Id.* at *5, *7. Like the Apple plaintiffs, Plaintiffs here are only entitled to discovery targeted at live claims and defenses. The Court defined Plaintiffs' claims to concern only "sensitive user information" that *users* shared with their friends on the Facebook platform and that Facebook went on to allegedly share with third parties. That is the scope of relevant user data.

## II. The additional user data Plaintiffs demand relates only to stayed or unpled theories and cannot realistically be collected and produced

As Facebook understands, in addition to the 850,000 pages of user data already produced, Plaintiffs demand (i) additional information about the Named Plaintiffs' activities off of Facebook, and

(ii) all internal business analytics that include or draw from data points originating from the Named Plaintiffs. Any such information falls well outside the scope of Pretrial Order 20 and Rule 26.

### A. Off-Facebook Activity does not relate to any live theory, and any information associated with Plaintiffs' accounts has been produced.

As discussed, Facebook produced the full set of data associated with each Named Plaintiffs' account, including any information about the Named Plaintiffs' online activities on apps and websites other than the Facebook Platform, which is called "off-Facebook Activity." Facebook had no obligation to produce Plaintiffs' off-Facebook Activity but did so anyway. Plaintiffs now demand that Facebook produce even more data related to activities off of the Facebook Platform.

Off-Facebook Activity is information about users' online activities away from Facebook, which third-party apps and websites provide to Facebook. For example, when a user visits a news app, that app might report to Facebook the fact that the user opened the app, logged into the app with Facebook Login, viewed content, searched for an item, added an item to a shopping cart, made a purchase, or made a donation.[5] None of this information has any relevance to this case, which concerns "sensitive user information" that users intended to share with a limited audience *on Facebook*. Off-Facebook Activity is information provided by a third party concerning users' online activities *away from the Facebook Platform*, which—by definition—is not information shared by a user *on the Platform*.

Off-Facebook Activity also is not the type of information Judge Chhabria found "sensitive." Judge Chhabria described sensitive information as "substantive and revealing content *that users intended only for a limited audience* [*i.e.*, their friends], such as their photographs, videos they made, videos they watched, their religious and political views, their relationship information, and the actual words contained in their messages." Pretrial Order 20, Dkt. 298 at 1 (emphasis added); *see also id.* at 7, 13, 17. In contrast, off-Facebook Activity concerns logging in and out of apps, visiting web pages, viewing online content, and potentially making purchases or adding items to shopping carts. That information is fundamentally different from photos and private messages and is commonly collected

---

[5]  *See What is off-Facebook activity?*, https://www.facebook.com/help/2207256696182627 (last visited Sept. 18, 2020). Users' accounts include an off-Facebook Activity section, where they are able to view a summary of their interactions with these third parties. *Id.* Users' DYI files—which have been produced for each Named Plaintiff—include additional details about these interactions. *Id.*

DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

and tracked through cookies.[6]

Plaintiffs say they demand this information because it relates to targeted advertising or tracking users. *See* Joint Status Update, Dkt. 495 (Aug. 13, 2020) at 2-3, 9; July 30 Joint Statement, Dkt. 484, at 3.  But this case is not about targeted advertising—it is about Facebook's alleged practice of sharing with third parties "sensitive user information" through friend sharing, whitelisting, or integration partner agreements.  Indeed, Judge Chhabria explicitly rejected Plaintiffs' targeted advertising allegations, noting that Plaintiffs concede targeted advertising is "perfectly legitimate."  Pretrial Order 20, Dkt. 298 at 6; *see also* Consolidated Compl., Dkt. 148 ¶ 110 (conceding "[t]here is nothing wrong with targeted advertising").  The case also is not about tracking.  Judge Chhabria rejected Plaintiffs' tracking allegations and there is a separate MDL pending against Facebook in this district regarding user tracking.  *See In re Facebook Internet Tracking Litig.*, No. 12-md-2314 (N.D. Cal.).

Even if off-Facebook Activity were relevant, the burdens of locating the additional information Plaintiffs seek would far exceed the needs of the case.  *See* Fed. R. Civ. Proc. 26(b)(1); *see also Gilead Scis., Inc. v. Merck & Co*, 2016 WL 146574, at *1 (N.D. Cal. Jan. 13, 2016).  Facebook already produced the off-Facebook Activity associated with the Named Plaintiffs' accounts, because this information is included in users' DYI file.  Any additional information related to a user's activities off of the Facebook Platform is not associated with a user's account and would include:  (i) data Facebook received from third parties but has not linked definitively to a particular user;[7] or (ii) granular details, like the specific items a user added to a shopping cart, that are not associated with users' accounts.  Facebook has more than 2 billion users and there are certain practical limitations on the volume of granular data it can maintain for each account.  This more granular data is typically preserved only temporarily in a machine readable format and is not associated with the user's account.

Facebook cannot reasonably locate either type of information.  Rather than being indexed and searchable by user, any additional user information provided by third parties is organized by the party who provided the information.  To provide a visual:  Imagine Facebook is a library and each book in

---

6   This is why your Internet browser frequently displays adds for items you have viewed online.

7   This could occur if the information was gathered from a user who was not logged into Facebook, or if the information was gathered from a user who was using a device from which she had not previously logged into Facebook.  *See supra*, note 5, https://www.facebook.com/help/2207256696182627.

2899

that library contains the information provided by a single third-party.  There is no way to search all of the books at once.  Instead, Facebook must open and read each book individually and assess whether any data in those books could have originated with one of the Named Plaintiffs.  This would be a monumental and largely unsuccessful undertaking, particularly given that Facebook already determined it cannot link much of this data with certainty to any particular user's account, which is why it was not provided in the first instance.

Even if Facebook undertook this effort and managed to dig up a few additional data points or details about a Named Plaintiff's activities on third party apps or websites, it is not clear how that information could possibly move the needle.  The materials Facebook produced already show in tremendous detail the third parties from which Facebook receives information and the types of information provided.  Any additional data points Facebook could locate (for instance, a login to the same site from a different computer) would be more of the same.  Even if off-Facebook Activity were relevant to a live theory—and again it is not—Plaintiffs already have the information they need to understand the third parties from which Facebook received this data and the types of data at issue.

To the extent Plaintiffs believe they require granular details about individual users' activities on third party apps and websites to prove their claims, this case should not move forward as a putative class action.  The issues around Facebook users' off-Facebook Activity are inherently individualized. Each Facebook user visits different websites and installs different apps, and each website and app implements different custom events (actions a user can take on the website or in the app), records different types of data about those events, and makes different choices about what types of data to transmit to Facebook.  If granular, individualized details about each Named Plaintiff's off-Facebook Activity are essential to Plaintiffs' case, they will never be able satisfy the predominance requirement of FRCP 23(b)(3).  *See, e.g.*, *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 948–49 (9th Cir. 2011).

**B.    Facebook's business analytics do not relate to any live theory.**

Plaintiffs similarly demand that Facebook produce all of its business analytics dating back to 2007 to the extent they include or draw from even a single data point relating to one of the Named Plaintiffs' accounts.  This request seeks *millions* of data tables—many of which contain multiple terabytes or even petabytes of data—having nothing to do with this case.

Facebook has more than 2 billion users, and many billions—if not trillions—of data points flow through its systems every day.  Facebook employs thousands of data scientists and engineers who run analyses of this data as part of their job duties.  For instance, Facebook uses aggregated user data to track how many users log onto Facebook each day, which is essential to scoping Facebook's infrastructure needs.  The Company also analyzes user data to identify bugs, test new products, detect and prevent spam, and promote safety and security.  Facebook has millions of data tables, and most (if not all) have nothing to do with any live claim.  Yet, Plaintiffs demand data from all of these tables to the extent they draw on even a single data point originating from a Named Plaintiffs' account.

Facebook has asked Plaintiffs repeatedly if there are particular types of analyses they believe are relevant to live claims and not duplicative of the information already produced.  Plaintiffs have not identified any such materials and instead continue to demand that Facebook throw open its doors to allow Plaintiffs to evaluate every data point Facebook maintains and what it does with that data.

Plaintiffs "have no entitlement to discovery to develop new claims … not already identified in the pleadings." *DPR Constr., Inc. v. Anka (Cortez Hill) LLC*, 2006 WL 8455253, at *2 (S.D. Cal. Oct. 27, 2006); *accord Feigel v. F.D.I.C.*, 935 F. Supp. 1090, 1101 n.7 (S.D. Cal. 1996) ("discovery should be used to flesh out claims, not search for new ones").  And yet Plaintiffs' justifications for demanding production of vast swaths of Facebook data and analytics are entirely untethered from the four theories of liability under Pretrial Order 20.

For example, Facebook recently asked Plaintiffs if they would, at minimum, agree that if Facebook hypothetically possessed a database that had the ability to receive data, *but no ability to output (i.e., share) data*, that database would be out of scope.  Plaintiffs refused to agree, arguing that the hypothetical database could theoretically create "inferences" from user data that Facebook could use to target users.  But targeted advertising is outside the scope of the four theories of alleged misconduct that remain alive in this case.

Plaintiffs similarly maintain that Facebook should produce any analyses related to user logins— even if used only to scope infrastructure needs—because the data **could** theoretically be used to measure user engagement and therefore to track and target users.  Along the same lines, Plaintiffs claim that any data regarding the movement of a user's cursor on their computer screen—which is used to

detect bots on the Platform—should be produced because it too ***could*** be used for "tracking." Plaintiffs also seek "detailed information" about "who clicks on" specific ads, Aug. 13 Joint Statement, Dkt. 495 at 9, and data regarding how users "engaged with . . . content and how they reacted, information which third parties use to target and trigger responses in users," *id*. at 2-3. Here again, allegations about "tracking" of users are irrelevant to the four theories that survived the motion-to-dismiss ruling.

Plaintiffs are not entitled to scour more than a decade of sensitive business information in a speculative effort to pursue claims based on tracking, targeted advertising, or some new theory of liability they did not plead in their live complaint. As this Court has acknowledged: "[I]t would almost always be more efficient for a defendant to open up [its] document repositories for the opposing side to rifle through. But such a practice would expand the scope of discovery beyond that allowed by the Federal Rules." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 4680242, at *1 (N.D. Cal. Oct. 18, 2017) (Corley, M.J.).

What is more, it would be nearly impossible for Facebook to identify all data points contained within its business analyses that may have originated from Plaintiffs. The tables Plaintiffs demand are not centrally indexed and the data in them is disassociated from the user's ID within 90 days. So to find the data Plaintiffs seek, Facebook would need to identify every single internal analysis that uses platform data—again, Facebook would need to read every book in the library—and then perform multiple operations on each of those internal analyses (none of which would be guaranteed to succeed) to try to determine whether any data in the analysis originated from a Named Plaintiff. Even a large team of engineers working full time for several years likely could not accomplish such a task.

If Plaintiffs are able to articulate specific types of data analyses they seek that relate to live theories, Facebook will search for that information in good faith. But the Court should reject Plaintiffs' ongoing effort to conduct a boundless and directionless audit of more than a decade of ***internal*** business analyses, merely because they may include a single data point originating from a Named Plaintiff.

## CONCLUSION

The Court should enforce the stay that Judge Chhabria imposed, allow discovery to move forward only on the four theories of relief detailed in Pretrial Order 20, and hold that the additional user data Plaintiffs demand relates only to stayed or unpled theories.

DATE:  September 18, 2020      Respectfully submitted,

**GIBSON, DUNN & CRUTCHER, LLP**

By:  *Orin Snyder*
Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

Gibson, Dunn &
Crutcher LLP

16
DEFENDANT FACEBOOK, INC.'S OPENING BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

2903

**EXHIBIT M**
**UNREDACTED VERSION**
**SEALED BY THE COURT**

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

*Plaint,,fs' Co-Lead Counsel*

*Additional counsel listed on signature page*

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' OPPOSITION TO DEFENDANT FACEBOOK, INC.'S REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20 AND CROSS-MOTION TO COMPEL DISCOVERY RELATED TO REQUESTS FOR PRODUCTION NOS. 9 THROUGH 13**<br><br>Judges: Hon. Vince Chhabria<br>Hon. Jacqueline S. Corley<br>Courtroom: 4, 17th Floor |

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    ARGUMENT ...................................................................................................... 2

    A.    The Order does not limit discovery to users' platform activity. ............................ 2

    B.    The discovery requests at issue and Facebook's response ..................................... 6

    C.    Relevant sensitive information is not limited to platform activity, but also includes sensitive information Facebook derives and collects from business partners, app developers, apps, and other sources. ............................................... 7

        1.    User data includes, in Facebook's words, "native, appended and behavioral data" that Facebook collects from business partners, apps and other activity. ................................................................................ 8

        2.    Internal documents confirm that Facebook's description of data "associated" with users is misleading. .................................................... 11

    D.    Facebook has not established that the burden of producing the data relating to ten Plaintiffs is disproportional to the needs of this case. ............................... 12

III.    CONCLUSION ................................................................................................ 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Doe v. Gangland Prods., Inc.*,
730 F.3d 946 (9th Cir. 2013) ............................................................................10

*Harris v. Best Buy Stores, L.P.*,
No. 3:15-cv-00657-HSG (KAW), 2016 WL 6024556 (N.D. Cal. Oct. 14, 2016).................13

*Polaris Innovations Ltd. v. Kingston Tech. Co.*,
No. CV1600300CJCRAOX, 2017 WL 3275615 (C.D. Cal. Feb. 14, 2017).........................14

*Shulman v. Grp. W. Prods., Inc.*,
18 Cal.4th 200 (1998)............................................................................10

*SPS Techs., LLC v. Briles Aerospace, Inc.*,
No. CV 18-9536 MWF, 2020 WL 4341717 (C.D. Cal. June 25, 2020) ...............................14

*Sullivan v. Personalized Media Commc'ns, LLC*,
No. 16-MC-80183-MEJ, 2016 WL 5109994 (N.D. Cal. Sept. 21, 2016) ...............................14

**Statutes**

18 U.S.C. § 2702(a) ............................................................................ 3, 4, 5, 10

18 U.S.C. § 2710(b)(2)............................................................................ 3, 4, 5, 10

**Other Authorities**

Fed. R. Civ. P. 26(b)(1)............................................................................13

Local Rule 5-1(i)(3) ............................................................................16

# I. INTRODUCTION

Facebook does not want Plaintiffs to obtain discovery showing the full breadth of its wrongful disclosure of its users' sensitive information. Accordingly, Facebook seeks to limit discovery in this case to a single category of improperly shared information: users' activity on the Facebook platform. The sensitive information that Facebook collects and shares with third parties is much more extensive than this. It collects users' sensitive information from a variety of sources—including from third parties—then pools the information with user-posted activity and generates additional information from the full data set it accumulates. It then shares this information about users and their friends with third parties. All of this information, including who has access to it and how it is used, is relevant to Plaintiffs' claims.

As a result, there are at least three compelling reasons that Facebook's motion should be denied and Plaintiffs' cross-motion to compel production of documents responsive to Requests for Production ("RFPs") Nos. 9 through 13[1] should be granted.

*First*, contrary to Facebook's tortured reading of Pretrial Order No. 20 ("Order" or "PTO 20"), Dkt. No. 298, the Court did not limit discovery in this case only to information regarding user activity on Facebook. While that information—and Facebook's subsequent disclosure of it—is of course relevant, that is not the only type of sensitive information relevant to Plaintiffs' claims or the four categories of wrongdoing recognized by the Order.

*Second*, the universe of data Facebook collects and shares about users is also not limited to user activity on Facebook, but instead consists of a sea of information obtained from a wide variety of sources, including from business partners, app developers, apps, and other third parties. Indeed, as Facebook's own documents show, it collects information about users far beyond what Facebook has produced in this case. And discovery produced to date further confirms that Facebook not only collects this information, but links it to users and shares it with third parties—putting to rest Facebook's nonsensical suggestions that Plaintiffs have failed to articulate what additional evidence exists or that Facebook cannot "associate" certain data with a

---

[1] For details on these RFPs, see *infra* § II.B.

user.

Third, there is no justification for Facebook's claims of undue burden. Such an argument should be accorded minimal weight in a case of this size and complexity involving a company whose business model is premised upon the collection and production of electronic information about billions of users. Facebook has come nowhere near meeting its burden of demonstrating why data regarding solely Named Plaintiffs—relative to the hundreds of millions of potential class members whose information is ultimately at issue in this case—is not proportional to the needs of the case. In fact, pursuant to the Court's recent guidance regarding streamlining Plaintiffs' discovery, Plaintiffs have reduced the number of individuals who will be class representatives to ten, down from the twenty-three. Plaintiffs only seek the discovery at issue here related to these ten Plaintiffs (for purposes of this motion, the "Named Plaintiffs.")

## II. ARGUMENT

### A. The Order does not limit discovery to users' platform activity.

PTO 20 does not directly address the question raised by Facebook in its motion—whether this case is limited to user activity on the Facebook platform or includes all the sensitive information about users that Facebook improperly shared with third parties. But the Order nowhere expressly limits the case to user activity. *Cf.* Mot.[2] at 1. Nor does it make sense to read the Order that way. That sort of limitation would conflict not only with claims and theories that the Order upheld, but also with the grounds on which they were allowed to proceed to discovery.

Facebook, under the guise of enforcing a discovery stay that was never issued in the first place, spends many pages straining to read the Order to limit discovery to data relating only to users' on-platform activity. This provides a misleading picture of what the Order says and inaccurately ascribes to the Court a set of internally inconsistent views.

*1. The Order.* The Order summarizes its understanding of Plaintiffs' claims in a two-sentence précis near the beginning: "Broadly speaking, this case is about whether Facebook

---

[2] Def. Facebook, Inc,'s Opening Brief in Supp. of Its Req. to Enforce the Partial Stay of Discovery in Pretrial Order No. 20 ("Mot."), Dkt. No. 515.

acted unlawfully in making user information widely available to third parties. It's also about whether Facebook acted unlawfully in failing to do anything meaningful to prevent third parties from misusing the information they obtained." Order at 3. This description focuses on *Facebook's* unlawful disclosure of information about users and their friends to third parties—not on whether that information was originally posted, shared, or generated by users on the Facebook platform.

The Order then discusses the four categories of Facebook's wrongdoing. These categories are: (1) "[g]iving app developers access to sensitive user information"; (2) "[c]ontinued disclosure to whitelisted apps"; (3) "[s]haring sensitive user information with business partners"; and (4) "[f]ailure to restrict the use of sensitive information." Order at 6-9. These categories line up neatly with the earlier description of the action as alleging that "Facebook acted unlawfully in making user information widely available to third parties" (the first three categories) and that Facebook "fail[ed] to do anything meaningful to prevent third parties from misusing the information they obtained" (the fourth category). *Id.* at 3.

Using these four categories of wrongdoing as a framework, the Order analyzed whether Plaintiffs had standing to bring their claims and whether they stated valid claims. It ruled that Plaintiffs had standing because they alleged that their "sensitive information was disseminated to third parties in violation of their privacy." *Id.* at 14. It upheld nearly all of Plaintiffs' claims (e.g., three privacy-based tort claims under California law, a claim under the Stored Communications Act ("SCA"), a claim for breach of contract, and a claim for unjust enrichment) except to the extent they were based on the first category of wrongdoing, the disclosure of user information to app developers. *Id.* at 30-34, 38-41. It upheld in its entirety Plaintiffs' claim under the Video Privacy Protection Act ("VPPA"). *Id.* at 34-35. And it upheld Plaintiffs' claim for negligence, which was based on the fourth category of wrongdoing. *Id* at 35-36.

**2. *The Order's rationale.*** Why did the Order conclude that Plaintiffs had standing and had stated valid claims? On these points, the Order is clear. Plaintiffs had standing because "their "sensitive information was disseminated to third parties in violation of their privacy." *Id.* at 14.

This reasoning focuses not on *where* the user information was originally generated—whether on the Facebook platform or off it—but on its nature ("sensitive") and on what Facebook did with it ("disseminated" it "to third parties").

Similarly, when discussing the claims, the Order focused not on the original provenance of the information about users, but on its nature and on what Facebook did with it. So, for example, the Order ruled that:

- Plaintiffs had stated valid privacy torts because Facebook had disseminated information that was "sensitive" and as to which Plaintiffs had a reasonable expectation of privacy. *Id.* at 30-33.

- Plaintiffs had stated a claim under the Stored Communications Act because Facebook had disseminated the content of their electronic communications and had not gained their consent to do so. *Id.* at 33-34.

- Plaintiffs had stated a claim under the Video Privacy Protection Act because Facebook had disseminated "information which identifies a person as having requested or obtained specific video materials or services," *id.* at 34 (citation omitted), and Facebook qualified as a "video tape services provider" under the statute, *id.* at 35.

### 3. *"Sensitive information" is not defined by where Facebook collects that information.*

The Order repeatedly notes that Facebook shares "sensitive" user information without consent. Facebook pins its argument to this one word, maintaining that the Order "defined" sensitive user information to mean only information about what users post on Facebook, Mot. at 1, or users' platform activity, Mot. at 8. But the common-sense meaning of "sensitive information" encompasses more than just what users did on the platform. Consider, for example, a Facebook user's Amazon.com order for an over-the-counter contraceptive or another user's entry of "alcoholic support group in Tower District, Fresno" into a search engine. "Sensitive information" also includes information that Facebook can infer from on-platform information—a category of information it has not produced. (Think of the inferences that Facebook can draw from weekly photographs of a user taken at M.D. Anderson Cancer Center.) Facebook's objection that such information is categorically not "sensitive" is false.

It is true that when the Order gave examples of sensitive user information, the examples it

used concerned information generated on the Facebook platform. *E.g.*, Order at 1, 17. Nowhere, however, did the Order *define* or *limit* sensitive information to users' platform activity only. And the Order's reasoning certainly is not limited to such information. Rather, as noted above, Plaintiffs' standing to bring their claims, and the validity of many of those claims, depends on the nature rather than the provenance of the information, and on whether Facebook shared that information with third parties. And, as Plaintiffs have learned through discovery, the sensitive information about users that Facebook collects and shares with business partners and app developers includes both information originally generated outside the Facebook platform and information derived from on- and off-platform activity.

It also is farfetched for Facebook to argue that the Order rules that *all* of Plaintiffs' claims—including their federal statutory claims—rise or fall depending on whether the information that Facebook shared is "sensitive" in the sense of being embarrassing or deeply intimate. The validity of Plaintiffs' claim under the SCA, for example, does not turn on how embarrassing or intimate the information is that Facebook shared, but on whether the shared information includes the contents of an electronic communication. 18 U.S.C. § 2702(a)(1). Similarly, Plaintiffs VPPA claim turns on whether the information that Facebook shared includes "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3). If, for example, Facebook collected and shared a user's video-watching queue from a different platform, that would constitute a VPPA violation.

In sum, while the Order does not explicitly address the issue posed by Facebook's motion, it certainly does not limit discovery in this case to on-platform user activity and reading it that way is inconsistent with the Court's reasoning. It is also inconsistent with statements by the Court during the motion to dismiss hearing about the breadth of user data that is relevant to Plaintiffs' claims:

> For example, if – I'm a Facebook user. And, you know, I'm trying to assess the likelihood that my sensitive information got into the hands of third parties and, if so, how many third parties and, if so, what kinds of third parties. If I have a full

understanding of the third parties that had access to the information, and a full understanding of what type of information they had access to, and a full understanding of who they were, and what they – and what restrictions were placed on them, we then have a better understanding of what was likely to have happened to me.

Nov. 4, 2019 Tr. at 15:20-16:4. It is the "full understanding" referred to by the Court that Plaintiffs seek, and that Facebook refuses to allow.

Finally, this reading prevents Named Plaintiffs from discovering even the general policies and practices of Facebook governing the sharing of their sensitive information, policies and practices that are critical for this case. *See* Pretrial Order No. 30 at 2, Dkt. No. 347 ("[T]he best way to assess the merits and to determine whether class certification is appropriate is almost certainly to conduct discovery on Facebook's general practices."). Plaintiffs submit that Facebook's exclusion of this information from discovery is not what the Order intended.

*4. The Order stayed claims, not discovery.* Plaintiffs organized their claims into three categories: prioritized claims, prioritized consumer protection act claims alleged in the alternative, and non-prioritized claims. First Am. Consolidated Compl. ("FACC") at 317-411, Dkt. No. 257. The Order made the simple observation that "[a]ll other prioritized claims not addressed by this ruling will be stayed (effectively, relegated to non-prioritized status) and adjudicated, if necessary, at a later state in the proceedings with the other non-prioritized claims." Order at 6. Facebook's claim that this holding somehow imposed a stay of *discovery* is baffling. The Order does not, and does not purport to, stay discovery in any fashion.[3]

B.    **The discovery requests at issue and Facebook's response**

The present dispute arises from five discovery requests, each of which asks for data that Facebook possesses about Named Plaintiffs, the third parties that Facebook disclosed this data to, and the types of information that was disclosed to them. *See* Ex. A, Def. Facebook, Inc.'s Resps. & Objs. to Pls.' Second Set of Reqs. for Produc. In particular, RFP No. 9 requests "[a]ll

---

[3] Even if it were, the Order observed that "[o]f course, dismissal of a subset of claims with prejudice does not preclude a plaintiff from seeking revival if discovery reveals a factual basis that justifies reconsideration[.]" Order at 37 n.21 (citations omitted).

2913

Documents relating to each of the Named Plaintiffs, including but not limited to all Content and Information collected about each of them or gained from business relationships or any other source."[4] *Id.* RFP No. 10 asks Facebook to produce, "[f]or each of the Named Plaintiffs, Documents sufficient to show the categories of Content and Information Facebook collects, tracks, and maintains about them." *Id.* RFP Nos. 11-13 then request documents requesting Facebook to identify the third parties that were able to access this information, including the categories of data that were disclosed to them and how they accessed it. *Id.* Plaintiffs propounded these requests nearly one year ago in November 2019.

In response to these requests, Facebook produced information collected by the DYI ("Download Your Information") tool. This limited tool allows downloads of some, but not all, information relating to users' activity on the platform. And Facebook freely acknowledges that Plaintiffs can access this information themselves. *Id.* ("[A]ll Facebook users are free to download their DYI file if they wish."). In addition to the DYI production, Facebook has produced an undefined category of "additional information associated with [users'] accounts" for each Plaintiff. Mot. at 6. But Facebook does not describe what the "additional information" is, likely because it is extremely limited—it consists solely of information users can access through their account in the form of their privacy settings and information reflecting user activity on Facebook. Critically, the form of production also obscures whether some of the activity was public or private. Thus, virtually all of Facebook's 850,000-page production relating to the original Named Plaintiffs in this case was already accessible to Plaintiffs and tells only part of the story.

C.      **Relevant sensitive information is not limited to platform activity, but also includes sensitive information Facebook derives and collects from business partners, app developers, apps, and other sources.**

Facebook acknowledges that it collects and shares substantial amounts of additional sensitive information about users beyond their platform activity. *See, e.g.*, Aug. 14, 2020 Hr'g

---

[4] The requests use the definition of "Content and Information" from Facebook's Statement of Rights of Responsibilities—a definition that is not limited to on-platform data.

Tr. 8:10-13 ("[T]here's Facebook-generated information, information generated by third parties. We have not represented that that is comprehensively included in our production."); *see also* Mot. at 10-15 (describing off-platform activity and internal analytics it has not produced). However, Facebook contends that this other information is not relevant to this case. This is false.

**1. User data includes, in Facebook's words, "native, appended and behavioral data" that Facebook collects from business partners, apps and other activity.**

████████████████████████████████████████████████████

███████████████████████████████████████ *See* Ex. B, FB-CA-MDL-00213424-
439. ██████████████████████████████████████

███████████████████████████████████████████████████

██████████ *Id.* ████████████████████████████████

█████████████████████████████████ *Id.* ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████ *Id.* ████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████ *Id.* ███████████████████████████████

████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

██████████████████—the only type of data Facebook has partially produced about users so far—is important for this case, so too is ████████████████████████████ ████████████████████████ Moreover, ████████████████████████ ████████████████████████████████████████████ ████████ *See* Ex. B, FB-CA-MDL-00213424-439 (████████████████████ ████████████████████████████████████████████████████ ████████████████████████); *id.* at FB-CA-MDL-00213424 ████████ ████████████████████████████████████████████████ ████████████████████████

Critically—and contrary to Facebook's suggestion that this data is irrelevant and duplicative of information it has already produced (Mot. at 14)—discovery confirms that Facebook shares this data with third parties. ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████



*Id.*.

Another internal document, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ These
documents make clear that Facebook collects sensitive user information in a variety of different
ways and discloses it to third parties.

Facebook's insistence that it need only produce on-platform Native Data makes even less
sense when considering Plaintiffs' claims. Plaintiffs' statutory and common law claims are not
limited to information generated from users' activities on Facebook. For example, under the
VPPA, Plaintiffs must prove that Facebook disclosed "personally identifiable information
concerning any consumer" to "any person" absent written or informed consent. 18 U.S.C. §
2710(b)(2). Under the SCA, Plaintiffs must prove that Facebook "knowingly divulge[d] to any
person or entity the contents of any communication" users did not intend for Facebook to
divulge. 18 U.S.C. § 2702(a). The source of the information—that is, whether it was the result of
on- or off- platform activity, gleaned directly from users' posts, or inferred from them—is
irrelevant. Disclosure of any of this information without consent is actionable.

Similarly, Plaintiffs' Public Disclosure of Private Acts claim requires Plaintiffs to prove
that Facebook disclosed a private fact about the plaintiff that is objectionable and offensive to a
reasonable person. *Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 958 (9th Cir. 2013). Likewise,
Plaintiffs' Intrusion into Private Affairs claim requires Plaintiffs to prove an intrusion by
Facebook into a private matter that is highly offensive to a reasonable person. *Shulman v. Grp.
W. Prods., Inc.*, 18 Cal.4th 200, 231 (1998). In order to prove these claims, Plaintiffs must

ascertain the private facts about them that Facebook is collecting and disclosing, whether they originate from platform activity or not.

Across many claims, the Order sustained Plaintiffs' allegations about Facebook's undisclosed data reciprocity programs with business partners. Plaintiffs are thus entitled to know what sensitive user data, of any type or source, Facebook shared with its business partners. Plaintiffs are further entitled to any data that Facebook received from its business partners in return, since the value of that data constitutes the benefit Facebook received in the transaction, a benefit that Plaintiffs are entitled to recover under, *inter alia*, the unjust enrichment claim that the Court sustained. Order at 41;[5] *see also* Order at 8 (noting the allegation that "Facebook and its [business] partners agreed to exchange information about users' activities with each other").

Facebook notes repeatedly that targeted advertising and psychographic marketing are not part of this case. *See, e.g.*, Mot. at 9. This argument misses the point. The question is not whether Facebook should or should not have engaged in targeted advertising and psychographic marketing. The question is whether, when doing so, Facebook shared sensitive user and friend information without consent. Plaintiffs are entitled to obtain the discovery necessary to substantiate the allegation that improper sharing has occurred in the context of these activities.

### 2. Internal documents confirm that Facebook's description of data "associated" with users is misleading.

Facebook claims it has produced all data it possesses that is "associated" with Named Plaintiffs. That is, while it generated and collected reams of data about Named Plaintiffs, Facebook claims that most of that data, including Appended and Behavioral Data, is anonymized and cannot be connected to Named Plaintiffs. This is false.

Facebook explains that Appended and Behavioral Data cannot be associated with Plaintiffs' Facebook accounts because such data is "disassociated from the user's ID within 90

---

[5] Facebook's position blocking discovery of what it possesses and shares is in tension with Facebook's own discovery requests to Named Plaintiffs. Facebook's Interrogatory No. 8 asks Plaintiffs to "Identify all entities other than Cambridge Analytica that You believe have "misused sensitive information from Your Facebook Account." But Facebook itself will not identify with whom it shared that sensitive information, let alone what information it possesses.

days" (Mot. at 15). But, as confirmed by internal documents, what actually happens is that



█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████ Indeed, the very purpose of collecting all of this data in the

first place is to use it to target users and their friends. ██████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████ *Cf.* Mot. at 15.

Similarly, ████████████████████████████████████████████████

█████████████████████████ *See* Ex. B. "Hashed data matching" is the process of matching

different data sets through the hash values of unique identifiers. For instance, when an advertiser

uploads a spreadsheet of Custom Audience data including hashed email addresses, Facebook can

match this data to its users through the hashed email address field.

Thus, it simply is untrue that it would be "nearly impossible" to produce the

"disassociated" data in this case for Named Plaintiffs. Mot. at 15. Facebook clearly has the

ability to connect Named Plaintiffs' user information through RIDs and hashed data matching,

and should be ordered to do so in response to RFP Nos. 9-13.

D.     **Facebook has not established that the burden of producing the data relating to ten Plaintiffs is disproportional to the needs of this case.**

Facebook also suggests that "the burdens of locating the additional information Plaintiffs

seek would far exceed the needs of the case." Mot. at 12. But the burden associated with

producing the requested information is not undue; it is proportional to the needs of this complex

---

[6] Ex. E, PwC_CPUP_FB00030737-738.
[7] *Id.* at PwC_CPUP_FB00030738 ████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████

case. In assessing proportionality, Federal Rule of Civil Procedure 26 directs consideration of "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Helpfully, Judge Chhabria provided further guidance at the March 5, 2020 Case Management Conference, stating:

> I am concerned that Facebook has, you know, often made statements reflecting an unduly narrow view of what should be turned over to the Plaintiffs. And, you know, this is a big case. I mean, there is often a lot of talk about proportionality and whatnot. This is a big case. It is a significant issue. You know, and there is -- this is not the type of case where we are going to be saying: Well, that might end up -- that effort might end up uncovering some relevant information; but, you know, it is just too expensive or difficult, and so we are not going to make Facebook do it. This is really not one of those cases where that is very -- that type of argument is likely to carry the day. You know, and, as I have said a number of times, you know, the best way to figure out what happened as it relates to the claims that are going forward now is to -- for Facebook to produce all information, all documents about the practices associated with giving third parties access to friends' information and friends' of friends information.

Tr. at 28:25-29:18. Judge Chhabria's observations regarding the size of this case remain on point. The proposed class period extends from 2007 to the present, the potential class members number in the hundreds of millions, and the third parties with whom Facebook shared user data appear to number in the tens of thousands. In that context, Plaintiffs' request for the data concerning ten individual users seems not only proportional to the needs of the case but modest.

Furthermore, Facebook's claims of burden are unsupported. "[T]he party opposing discovery has the burden of showing that discovery should not be allowed, and also has the burden of clarifying, explaining and supporting its objections with competent evidence." *Harris v. Best Buy Stores, L.P.*, No. 3:15-cv-00657-HSG (KAW), 2016 WL 6024556, at *1 (N.D. Cal. Oct. 14, 2016) (quoting *La. Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*, 285 F.R.D. 481, 485 (N.D. Cal. 2012)). A party claiming undue burden or expense "ordinarily has far better information—perhaps the only information—with respect to that part of the determination." Fed. R. Civ. P. 26(b)(1) advisory committee's note (2015). Therefore, the "party claiming that

discovery imposes an undue burden must 'allege specific facts which indicate the nature and extent of the burden, usually by affidavit or other reliable evidence.'" *Sullivan v. Personalized Media Commc'ns, LLC*, No. 16-MC-80183-MEJ, 2016 WL 5109994, at *3 (N.D. Cal. Sept. 21, 2016) (quoting *Nationstar Mortg., LLC v. Flamingo Trails No. 7 Landscape Maint. Ass'n*, No. 2:15-cv-01268-RFB-NJK, 2016 WL 4071988, at *4 (D. Nev. July 28, 2016)).[8] Facebook has furnished no evidentiary support for its objections of undue burden and its objections should be overruled.

Plaintiffs emphasize that they are seeking discovery about *ten Named Plaint,jfs*—not millions, not thousands, and not hundreds of users. Based on the information Plaintiffs obtain about themselves, and about Facebook's general practices and procedures, they will seek to prove their class claims. Facebook's contention that Plaintiffs are not even entitled to obtain in discovery the evidence necessary to show what Facebook collects about them, and with whom it shares the information is impossible to square with Facebook's basic discovery obligations under the Federal Rules.

### III.   CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Facebook's motion to impose a discovery stay and grant Plaintiffs' motion to compel discovery responsive to Requests for Production Nos. 9 through 13.

---

[8] *See also SPS Techs., LLC v. Briles Aerospace, Inc.*, No. CV 18-9536 MWF (ASx), 2020 WL 4341717, at *2-3 (C.D. Cal. June 25, 2020) (overruling objection to requests for production of documents and noting that the party resisting discovery must describe "in specific detail, how each Request is overly broad and unduly burdensome by submitting affidavits or other evidence describing the nature of the burden"); *Polaris Innovations Ltd. v. Kingston Tech. Co.*, No. CV1600300CJCRAOX, 2017 WL 3275615, at *6 (C.D. Cal. Feb. 14, 2017) (court grants motion to compel production of documents by defendant Kingston in part because "[r]egarding its assertion that the requests are overly burdensome, Kingston has not submitted any evidentiary declaration to support this objection.").

Dated: September 28, 2020

Respectfully submitted,

KELLER ROHRBACK L.L.P.

BLEICHMAR FONTI & AULD LLP

By:  */s/ Derek W. Loeser*
     Derek W. Loeser

By:  */s/ Lesley E. Weaver*
     Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)
Lynn Lincoln Sarko (admitted *pro hac vice*)
Gretchen Freeman Cappio (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Adele A. Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

# ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

I, Derek W. Loeser, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of September, 2020, at Seattle, Washington.

/s/ Derek W. Loeser
Derek W. Loeser

# CERTIFICATE OF SERVICE

I, Sarah Skaggs, hereby certify that on September 28, 2020, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

**In addition, the following were served via email:**

Paven Malhotra
Matan Shacham
Bryn Anderson Williams
pmalhotra@keker.com
bwilliams@kvn.com
bwilliams@kvn.com

Anjeza Hassan
annie.sara@yahoo.com

/s/ *Sarah Skaggs*
Sarah Skaggs

# EXHIBIT N

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
    osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Kristin A. Linsley (SBN 154148)
    klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
    mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
    dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
    jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Facebook, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br> This document relates to: <br><br> ALL ACTIONS | CASE NO. 3:18-MD-02843-VC <br><br> **DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20** <br><br> Judge:  Hons. Vince Chhabria and Jacqueline Scott Corley <br> Courtroom 4, 17th Floor |

Gibson, Dunn &
Crutcher LLP

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

2927

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

    I.    The stay imposed by Pretrial Order 20 includes a discovery stay. ............................... 2

    II.    This case is about information users share with their friends on Facebook.................. 3

        A.    The four live theories all concern data users shared with their Facebook friends.................................................................................................................. 3

        B.    The threshold "global issues" addressed in the Order show that the actionable claims relate only to information users shared on Facebook.......... 4

    III.    Facebook produced all data Plaintiffs shared on Facebook; no other user data is relevant..................................................................................................................... 6

    IV.    The Court should deny Plaintiffs' "Cross-Motion to Compel." ................................ 10

CONCLUSION .................................................................................................................. 10

Gibson, Dunn &
Crutcher LLP

i

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

2928

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Meyers v. Cty. of Sacramento*,
    2020 WL 207213 (E.D. Cal. Jan. 14, 2020)........................................................................2

*Mujica v. AirScan, Inc.*,
    771 F.3d 580 (9th Cir. 2014)..........................................................................................3

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
    655 F.3d 1039 (9th Cir. 2011)........................................................................................2

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

Gibson, Dunn &
Crutcher LLP

2929

## INTRODUCTION

The lawsuit Plaintiffs describe is not this case.  This case is about ***information sharing***.  Specifically, it concerns sensitive information ***that users shared with their Facebook friends*** and that third parties allegedly accessed as a result of friend sharing, whitelisting, and integration partner agreements.  Pretrial Order 20 is clear on this point, and Plaintiffs do not identify a single line in Judge Chhabria's comprehensive order, much less in their own allegations, that supports their description of the case that survived dismissal.

The Order explains on its first page: "This lawsuit . . . is about Facebook's practice of ***sharing*** its users' personal information with third parties."  Dkt. 298 ("Order") at 1 (emphasis added).  It then says that each of the four live theories concerns "***substantive and revealing content that users intended only for a limited audience*** [*i.e.*, their Facebook friends], such as their photographs, videos they made, videos they watched, their religious and political views, their relationship information, and the actual words contained in their messages."  *Id.*; *see also id.* at 7, 13, 17.  The user data relevant to those theories consists of "***information [users] make available to their friends on [Facebook]***.  *Id.* at 1.

Plaintiffs do not dispute that Facebook produced all of the information the Named Plaintiffs ever shared on Facebook.  These productions consist of ***more than one million pages of data*** and necessarily include any data Facebook shared under the live theories.  But, Plaintiffs insist they are entitled to any other data that has ever crossed Facebook's servers that relates in any way to any Named Plaintiff and all derivative materials drawing on this data.  Plaintiffs seek these materials even if the underlying data is not associated with any user and even if they were never shared with any third party.  Plaintiffs do not even attempt to explain why they would need such data in a case concerning information ***they shared on the Facebook platform*** and that Facebook allegedly shared beyond the audience Plaintiffs intended.  Instead, Plaintiffs openly admit that they seek these extraneous materials not to pursue live claims, but to resuscitate stayed and dismissed theories or to search for new ones.

Plaintiffs largely avoid the Court's instruction to brief "what the scope of discovery is based on the claims in Judge Chhabria's ruling [Pretrial Order 20]."  9/4/2020 Hr'g Tr. at 5:8-10.  Instead, Plaintiffs devote the majority of their brief to side issues and seek to compel Facebook to produce all documents responsive to five RFPs that are not before the Court.  The Court should disregard these diversions, conform discovery to the four operative theories, and deny Plaintiffs' motion to compel.

## ARGUMENT

### I.  The stay imposed by Pretrial Order 20 includes a discovery stay.

Plaintiffs take the surprising position that Pretrial Order 20 sets virtually no bounds on the scope of discovery in this case and allows them to explore theories Judge Chhabria stayed or dismissed.[1]

Plaintiffs' position makes no sense.  When a stay is in place, it "include[s] a stay of discovery." *Meyers v. Cty. of Sacramento*, 2020 WL 207213, at *1 (E.D. Cal. Jan. 14, 2020).  Judge Chhabria stayed all but Plaintiffs' core theories because Plaintiffs filed a 1,440-paragraph pleading.  As he explained, "it seems the plaintiffs sought to identify anything Facebook has ever been reported to have done wrong . . . [and] the presence of so many disparate and vague allegations ma[de] it nearly impossible for Facebook to meaningfully respond to all of them, much less for the Court to effectively address them."  Order at 5-6.  In order to avoid "bogging the case down at the pleading stage for years," *id.* at 6, Judge Chhabria therefore issued an opinion regarding Plaintiffs' core allegations, without addressing most of their improperly pleaded theories, which he stayed, *id.*  Judge Chhabria surely did not intend to allow discovery on hundreds of "disparate and vague allegations" that did not satisfy Rule 8.  The very point of the stay was to focus this case—not to allow Plaintiffs to explore "anything Facebook has ever been reported to have done wrong" without stating cognizable claims.

Plaintiffs even suggest Pretrial Order 20 allows discovery to "reviv[e]" claims dismissed with prejudice.  Opp'n at 6 n.3.  To support this curious position, Plaintiffs cite a footnote in Judge Chhabria's analysis of Plaintiffs' deceit by concealment claim.  *Id.* (citing Order at 37 n.21).  Judge Chhabria held that Plaintiffs stated a plausible claim arising from Facebook's alleged practices concerning whitelisting and integration partners.  But he held the claim did not satisfy Rule 9(b)'s heightened pleading standard with respect to friend sharing and Facebook's enforcement measures.  He then said in a footnote that dismissal of a subset of the claim would not "preclude . . . plaintiff[s] from seeking revival if discovery reveals a factual basis that justified reconsideration."  Order at 37 n.21.  Judge Chhabria cited *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1059 (9th Cir. 2011), which holds a plaintiff who fails to satisfy the PLRA's heightened pleading standard may potentially seek revival if other case-related discovery later allows the plaintiff to satisfy the

---

[1]   In addition to the discovery Plaintiffs seek from Facebook, Plaintiffs have served overbroad subpoenas on 27 third parties.  These parties also require clear guidance as to the scope of discovery.

2

Gibson, Dunn & Crutcher LLP

2931

PLRA's heightened pleading standard. Judge Chhabria certainly did not intend this footnote to create a gaping hole allowing discovery on hundreds of allegations that did not survive dismissal. *See Mujica v. AirScan Inc.*, 771 F.3d 580, 593 n.7 (9th Cir. 2014) ("To the extent [earlier cases] suggest[] that courts retain discretion to permit discovery whenever a plaintiff has failed to satisfy Rule 8's plausibility standard, it is simply incompatible with *Iqbal* and *Twombly*.").

Pretrial Order 20 plainly defines the scope of discovery in defining the scope of the case.

## II.    This case is about information users share with their friends on Facebook.

A plain reading of Pretrial Order 20 explains the scope of the case Judge Chhabria allowed to move forward.[2] Plaintiffs say the Order describes this case as concerning any data Facebook receives or infers about users and how that data may be used to target them. To support this position Plaintiffs quote vague passages from the Order stating the case concerns "sensitive information." Plaintiffs then say Judge Chhabria did not define "sensitive" and ask the Court to interpret the term to include any data Plaintiffs believe to be personal—including information they provide to third parties, information third parties collect through cookies, public records, and even inferences Facebook draws. Opp'n at 4.

Plaintiffs disregard what Pretrial Order 20 actually says. It describes "sensitive information" to be "substantive and revealing content that users intended only for a limited audience," and clarifies that this data is "**information [users] make available to their friends on [Facebook]**." Order at 1. To read the ruling otherwise would expand the case far beyond what Judge Chhabria considered and would also raise a host of thorny legal questions his Order does not address.

### A.    The four live theories all concern data users shared with their Facebook friends.

As discussed, Pretrial Order 20 allows four theories of relief to move forward. Each theory concerns information users shared with their Facebook friends.

***Friend sharing***. Friend sharing was a capability through which users could share with apps information their friends posted and made available to their Facebook friends. Plaintiffs do not dispute

---

[2]   Plaintiffs disingenuously argue that Facebook takes an "unduly narrow" view of discovery, citing a comment Judge Chhabria made before discovery began advising Facebook to produce materials regarding "friends' information and friends' of friends information." Opp'n at 13. Facebook has now produced nearly 1.5 million pages of documents, before the parties have even reached a search term agreement, including all information the Named Plaintiffs shared with their friends and friends of their friends. Those productions also include all of the Facebook documents produced to the FTC in response to its document requests in two related investigations. They also include documents produced to a host of other government actors in related actions responsive to Plaintiffs' RFPs. In addition to these materials, Facebook proposed search terms hitting on millions of additional documents.

Gibson, Dunn & Crutcher LLP

this.  Friend sharing underlies the Cambridge Analytica events, it has been hotly litigated, and there is no dispute as to what it is about.  The Order explains: "[W]hen users accessed apps on the Facebook Platform, the app developers were not merely able to obtain information about the users they were interacting with; [but] were also able to obtain any information about the users' Facebook friends that the users themselves had access to," "such as photographs, videos they watched, religious preferences, posts, and even sometimes private one-on-one messages sent through Facebook." *Id*. at 6-7.

**Whitelisting**.  Whitelisting is an extension of friend sharing and is about the same data. *Id*. at 8.

**Integration Partner Agreements.**  Facebook allegedly "[s]har[ed] sensitive user information with business partners," through a list of "integration partnerships," to integrate Facebook with devices, websites, and social-media platforms. *Id*. at 8-9.  As with the other theories, the "sensitive user information" at issue is "substantive and revealing content that users intended only for a limited audience [i.e. their Facebook friends]." *Id*. at 1.  The purpose of these agreements was to allow users to integrate their Facebook activities *that they shared* on Facebook with other platforms and sites.

Plaintiffs say the Order allows claims relating to integration partners to proceed as to some broader set of "sensitive information" that they find personal in nature.  Opp'n at 7.  Plaintiffs provide no support for this assertion; the Order describes this theory as involving the same "sensitive user data" underlying the other theories of relief.  And it must.  As discussed below, the Order holds that Plaintiffs demonstrated standing, a reasonable expectation of privacy, and a lack of consent only with respect to Facebook's alleged practice of sharing information users shared with their Facebook friends.

**Enforcement**.  This theory relates to how Facebook enforced its data-use policies with respect to data third parties obtained through friend sharing, whitelisting, and integration partner agreements, and it concerns the same data that users shared with their Facebook friends.  Order at 9.

**B.     The threshold "global issues" addressed in the Order show that the actionable claims relate only to information users shared on Facebook.**

Pretrial Order 20 addressed various "global issues" and holds Plaintiffs demonstrated a reasonable expectation of privacy, standing, and lack of consent only with respect to Facebook's alleged practice of sharing with third parties information users shared with their friends on Facebook.

**Expectation of privacy**.  Pretrial Order 20 addresses Facebook's argument that Plaintiffs were not injured, and therefore lack standing, because they did not have a reasonable expectation of privacy

4

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

2933

Gibson, Dunn &
Crutcher LLP

over information they share with their Facebook friends.  *Id*. at 1 ("Facebook argues that people have no legitimate privacy interest in information they make available to their friends on social media."). With respect to users' privacy expectations, Pretrial Order 20 holds: "the issue of whether users have a reasonable expectation of privacy ***in information they share with their social media friends*** is best understood as relating to the merits, not standing."  *Id*. at 10-11 n.2 (emphasis added).  On the merits, the Order holds that "[w]hen you share sensitive information with a limited audience . . . you retain privacy rights and can sue someone for violating them."  *Id.* at 2.  It then analyzes whether users retain a reasonable expectation of privacy over information ***they share with their friends***, *see id*. at 10-12, and concludes:  "social media users can have their privacy invaded if sensitive information ***meant only for a few dozen friends*** is shared more widely," *id*. at 11.

Pretrial Order 20 is so clear that this case concerns information that users shared with their Facebook friends that it goes out of its way to say *sua sponte*:  "It seems quite possible that a user whose settings allow information to be shared not only with their friends, but friends of friends, loses any expectation of privacy."  *Id*. at 11 n.3.  Nowhere does Pretrial Order 20 consider whether users maintain a reasonable expectation of privacy over information beyond what users share on Facebook (as Plaintiffs wrongly suggest) such as information users provide third parties, public records, information third parties obtain through cookies, or information Facebook "infers" about users.

***Standing.***  With respect to standing, Pretrial Order 20 holds:  "The alleged injury is 'concrete' largely for the reasons already discussed – if you use a company's social media platform ***to share sensitive information with only your friends***, then you suffer a concrete injury when the company disseminates that information widely."  *Id*. at 17.  The Order goes on to say that Plaintiffs' injuries are sufficiently particularized with respect to which third parties allegedly received their data because, "[i]f, as alleged in the complaint, ***Facebook made users' 'friends only' information readily available*** to such a broad swath of companies . . . it is virtually inevitable that some of these companies obtained information on the named plaintiffs."  *Id*. at 18.  The Order did not hold—or even consider—whether Plaintiffs have standing to sue Facebook with respect to information users did not share on Facebook.

***Consent***.  On the issue of consent, the Court addressed whether Plaintiffs consented to the conduct underlying their claims because they "agreed, when they signed up for their accounts, that

2934

Facebook could disseminate their 'friends only' information in the way it has done." *Id.* at 18. Pretrial Order 20 holds that judicially noticeable materials demonstrate that a subset of users consented to sharing their "friends only" information through friend sharing, but do not establish at the pleading stage that all users consented to sharing friends-only information through friend sharing, whitelisting, and integration agreements. *Id.* at 18-29. The Order did not consider whether Plaintiffs consented to sharing information they did not share on Facebook.

The Order is clear that this case is about sensitive information users made available to their friends on Facebook and third parties allegedly accessed. Discovery must conform to these theories.

### III. Facebook produced all data Plaintiffs shared on Facebook; no other user data is relevant.

Facebook produced ***more than one million pages of content and information*** related to the Named Plaintiffs.[3] ***Those materials include everything each Named Plaintiff ever shared on Facebook*** (unless they deleted it). This includes, but is not limited to, the "Download Your Information" ("DYI") file that Facebook makes available to users,[4] plus *additional* information.

Plaintiffs do not dispute that the produced materials include any data users shared with their Facebook friends (sensitive or otherwise). Yet, Plaintiffs demand that Facebook search *millions* of disaggregated data sets for any data to have ever crossed Facebook's systems relating to a Named Plaintiff and any derivative materials drawing on that data—such as data sets tracking hours of peak user activity to monitor strains on Facebook's system. They demand such materials without regard for whether they were ***<u>shared</u>*** with any third party, much less under a live theory. To support this position, Plaintiffs misinterpret a handful of Facebook documents,[5] but their argument boils down to the following: Facebook has documents drawing on data relating to users; therefore, Facebook must search

---

[3]   Since filing its opening brief, Facebook produced approximately 250,000 additional pages of information related to Named Plaintiffs who were added to the case in August.

[4]   Plaintiffs assert that the DYI data is not useful because it does not display on an item-by-item basis the audience that Plaintiffs set for each of their posts. Facebook agreed to investigate whether it could produce this data for relevant posts—bearing in mind that the request involves granular data for *more than a million pages* of activity. Facebook also reminded Plaintiffs that their accounts display this information. If Plaintiffs believe the audience set to a particular post is critical evidence for their case, they could screen-shot that information from their accounts and produce it. They could also identify particular posts to Facebook so that Facebook can produce the relevant information.

[5]   Because the Court ordered the parties not to submit declarations or evidence, 9/4/2020 Hr'g Tr. at 5:8-10, 18-22, Facebook does not here submit declarations or documents to dispute Plaintiffs' characterization of the materials they cite. If the Court is inclined to issue a ruling relying on the exhibits Plaintiffs submitted, Facebook respectfully requests permission to do so.

Gibson, Dunn &
Crutcher LLP

2935

for and produce any materials drawing upon any data it has ever collected or created that relates in any way to a Named Plaintiff. The Court should reject this position, which largely asks Facebook to search for materials that are out of scope and consist largely of data already produced in other formats.

**Data the Named Plaintiffs did not share on Facebook is out of scope,** including public records, data Plaintiffs shared with third parties, and information created by Facebook. Facebook produced all of the information the Named Plaintiffs shared on Facebook (sensitive or otherwise). These productions necessarily include any information shared under the live theories.[6]

Plaintiffs say the case is about data Facebook creates and that third parties share with Facebook that is used to draw "inferences" about users. For instance, Plaintiffs may allow websites to collect data about their shopping habits through cookies. Those sites then might share this data with other parties (including Facebook) to better place the site's advertisements. As discussed above, nothing in Pretrial Order 20 supports Plaintiffs' argument that this type of data is part of this lawsuit. This would be a very different case if—as Plaintiffs say—it were about Facebook sharing information that third parties passed on to Facebook. To establish this sort of "third party data" claim, Plaintiffs would have had to allege (and prove) the nature of each of their relationships with the specific third parties at issue, the circumstances under which those third parties obtained their data, whether each individual user consented to that third party sharing data with Facebook, the circumstances under which the data was provided to Facebook, and so on. None of that is at issue here and nothing in Pretrial Order 20 suggests it is. Nor could Plaintiffs conceivably establish facts of this nature on a class-wide basis.

Plaintiffs seem to concede they demand these materials because "the very purpose of collecting all of this data . . . is to use it to target users." Opp'n at 12. As Plaintiffs admit, Pretrial Order 20 dismisses their targeted advertising theory.[7] To the extent any advertisers received sensitive user data through friend sharing, whitelisting, or integration agreements, that user data was already produced.

---

[6] To describe the data Plaintiffs believe Facebook maintains, Plaintiffs cite their Exhibit B at page 9, which was prepared by an employee in 2014 and regards Facebook's ads platform. The document does not reflect Facebook's standard terminology, nor does Facebook agree with Plaintiffs' characterization of the document. In any case, Facebook does not dispute that it receives data from third parties in connection with its ads platform and maintains internal analyses which rely on user data.

[7] Plaintiffs walk back their position that they need discovery to pursue their dismissed "targeted advertising" and "psychographic marketing" theories. Opp'n at 11. But Plaintiffs have been arguing for a year that these theories justify their demands for every piece of information Facebook collects and infers about users and took this position in the recent joint status updates that prompted this briefing. *See* 8/13/2020 Status Update at 2-3, 9, Dkt. 495; 7/30/2020 Status Update at 3, Dkt. 484.

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

In any case, as discussed in its opening brief and below, Facebook actually produced the majority of data it receives from third parties in the off-Facebook Activity portion of the DYI materials.

**Data not shared through one of the four theories is out of scope.**  Plaintiffs say they provide evidence that Facebook shares data beyond what users share on Facebook.  Opp'n at 9-10.  Even if that were true, it is not relevant to this lawsuit.  The live theories concern data users shared with their Facebook friends that third parties accessed via friend sharing, whitelisting, or integration agreements.

In any case, the documents Plaintiffs cite describe Facebook's data *sources*; they say nothing about whether or how Facebook *shares* information.  Of note, Plaintiffs claim their Exhibit C "confirms that Facebook shares [the data they seek] with third parties." Opp'n at 9.  Exhibit C is an email outlining *hypothetical* platform capabilities—it does not discuss what data Facebook actually shared.

**The integration partner theory does not entitle Plaintiffs to all data from third parties.**  Plaintiffs suggest Facebook must locate and produce all data points it has ever received from any third party regarding a Named Plaintiff because Facebook's integration partner agreements were built in part on "data reciprocity."  Opp'n at 11.  This argument is a red herring and misrepresents what "data reciprocity" means.  Facebook did not, as Plaintiffs suggest, have agreements with integration partners to trade user data.  Data reciprocity arrangements allowed users to post their Facebook activities to third-party platforms if the third-party platform also allowed its users to post their activities to Facebook.  Plaintiffs acknowledge this.  *See* SACC ¶ 657(g) ("'Reciprocity' agreements . . . requir[ed] Apps that used data from Facebook to <u>allow their users</u> to share their data back to Facebook"); *see also id.* ¶¶ 239, 745.  Any user data relating to that type of sharing was produced.  Again, Facebook produced everything the Plaintiffs shared on Facebook.  This includes any Facebook activities Plaintiffs *elected* to share on other platforms and any off-Facebook activities Plaintiffs *elected* to share on Facebook.  In any event, even if some other data from integration partners existed, only data received from *those partners* could even possibly be relevant—not data from thousands of other third parties.[8]

**Plaintiffs' SCA and VPPA claims do not require additional data.**  Plaintiffs contend this case concerns data beyond what they shared on Facebook because Pretrial Order 20 did not dismiss

---

[8]  Plaintiffs concede they seek any such data to prove damages.  If the Court is inclined to require broad discovery to support damages, Facebook respectfully requests the opportunity to submit briefing regarding why any such discovery should be bifurcated from liability-related discovery.

Gibson, Dunn &
Crutcher LLP

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

their claims under the Stored Communications Act ("SCA") and Video Privacy Protection Act ("VPPA"). Opp'n at 4-5. Plaintiffs highlight that their SCA claim turns, in part, on "whether the shared information includes the contents of an electronic communication." *Id*. at 5. But the sensitive data at issue includes "private one-on-one messages" sent on Facebook. Order at 17; *see id*. at 1, 32. Similarly, Plaintiffs' VPPA claim survived dismissal on the basis that Facebook shared "information about the videos that users received in their private [Facebook] messages and about videos they 'liked.'" *Id*. at 34. Plaintiffs' messages and any videos they shared or liked were produced.

**The additional data Plaintiffs seek cannot even be reasonably collected**.[9] Facebook understands Plaintiffs seek two forms of data: (i) any additional data regarding users' off-Facebook Activity provided by third parties, and (ii) any derivative materials that draw from user data. Again, these materials are not relevant to any live theory. Facebook also cannot reasonably identify them.

With respect to off-Facebook Activity, as Facebook explained in its opening brief, the produced DYI materials include the vast majority of data Facebook receives from third parties. It is not clear what else Plaintiffs seek or how it could be relevant. Any off-Facebook Activity provided by third parties that is *not* included in the DYI materials is data Facebook has not linked to a particular user or data that is so granular that it is preserved only temporarily. There is no centralized way to search for either type of data. To the extent it exists, it is organized by the third parties who provided it. Facebook would therefore need to review every data set it has received from thousands of third parties and then attempt to link to the Named Plaintiffs data points it previously did not associate with any user. Such an exercise is unlikely to be fruitful or at all useful, particularly on a class-wide basis.

Facebook also explained that, within 90 days, any user data not included in the DYI materials is disassociated from the user's ID, anonymized entirely, or deleted (depending on the nature of the data and any business reasons for retaining it). Plaintiffs argue that Facebook should *still* be able to find any derivative materials drawing from data relating to any Named Plaintiff because data disassociated from a user's ID can sometimes be linked back to the user's account. Plaintiffs' explanation of this process is oversimplified, incorrect, and ignores that much of the data they demand

---

[9] Plaintiffs say Facebook did not prove undue burden because it did not submit declarations or evidence. The Court instructed the parties not to submit such materials. 9/4/2020 Tr. at 5:8-10, 18-22.

Gibson, Dunn & Crutcher LLP

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

is fully anonymized or not retained at all.[10]  The argument also misses the point.  There is no way for Facebook to run a centralized search for a user's ID, random ID, or any "hashed data" identifiers across millions of data sets, which are largely used for business analytics (like scoping infrastructure needs). The only way to search these tables is to open all of them and search each to find any data relating to a particular user, whether by user ID or otherwise.  The issue is opening and searching each table.[11]

To be clear, Facebook is not—as Plaintiffs suggest—urging the Court to issue a ruling regarding the scope of discovery based on undue burden.  Facebook is highlighting that this is not a situation in which there are marginally relevant materials that are easy to sweep into an ongoing collection.  The user data Plaintiffs seek has nothing to do with the four operative theories, most of it was actually produced, and any additional data would be virtually impossible to locate.  If Plaintiffs are able to identify some specific type of data about user activity that is relevant to the case, Facebook will search for that data.  But Plaintiffs' position that Facebook must search the entire company for every document including any data relating to a Named Plaintiff is simply not reasonable.

## IV.    The Court should deny Plaintiffs' "Cross-Motion to Compel."

Plaintiffs style their brief as a "cross-motion to compel" compliance with five RFPs and criticize Facebook for not submitting declarations and evidence about these requests.  The Court should disregard this diversion, which puts the cart before the horse.  The Court directed the parties to submit "no declarations," as this briefing is "just a legal question as to what the scope of discovery is based on the claims in Judge Chhabria's ruling."  9/4/2020 Tr. at 5:8-10, 18-22.  Facebook told Plaintiffs it will produce materials responsive to the RFPs they identify that are in Facebook's possession and relate to the operative theories.  The Court must resolve this threshold legal issue before it can consider (on a full evidentiary record) whether Facebook produced the relevant evidence responsive to specific RFPs.

## CONCLUSION

The Court should enforce the stay Judge Chhabria imposed, allow discovery only on the four operative theories of relief detailed in Pretrial Order 20, and deny Plaintiffs' cross-motion to compel.

---

[10]  Plaintiffs' Exhibit B, which they cite on page 12 of their brief, describes the ability to reidentify data points that remain live on a user's Facebook page.  This live data has already been produced.

[11]  Plaintiffs did not ease the burden of searching millions of data sets by identifying 10 Named Plaintiffs they *intend* to identify as class representatives.  In any case, the other 14 Named Plaintiffs have not withdrawn their claims and have reserved their rights to proceed as class representatives.

DATE:  October 8, 2020

Respectfully submitted,

**GIBSON, DUNN & CRUTCHER, LLP**

By: _Orin Snyder_
Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

Gibson, Dunn &
Crutcher LLP

11

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

2940

**EXHIBIT O**
**UNREDACTED VERSION**
**SEALED BY THE COURT**

**Highlighted text reflects Plaintiffs'
proposed redactions under Civil Local
Rule 79-5(d)(1)(D).**

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

*Plaint₍₎fs' Co-Lead Counsel*

*Additional counsel listed on signature page*

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' RESPONSE IN REPLY TO DEFENDANT FACEBOOK, INC.'S REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20 AND IN SUPPORT OF CROSS-MOTION TO COMPEL**<br><br>Judges: Hon. Vince Chhabria and Hon. Jacqueline S. Corley<br>Hearing Date: TBD<br>Hearing Time: TBD |

# I. INTRODUCTION

This discovery dispute concerns sensitive user information that Facebook has shared with third parties without users' consent. The dispute is important but narrow now that Facebook has disclaimed any argument about undue burden. Dkt. 537 ("FB Reply") at 10 ("To be clear, Facebook is not—as Plaintiffs suggest—urging the Court to issue a ruling regarding the scope of discovery based on undue burden."). The legal question is whether the information Plaintiffs seek is relevant to any party's claim or defense.

The answer to this question is a straightforward "yes." As Judge Chhabria described in Pretrial Order No. 20, Dkt. 298 (the "Order"), this case is about whether Facebook acted unlawfully in making sensitive user information available to third parties and in failing to do anything meaningful to prevent third parties from misusing the information they obtained. Dkt. 298 ("Order") at 3. While it is true that the focus of the Order was sensitive information posted by users and then wrongfully shared by Facebook, the Court's reasoning applies equally to other forms of information about users wrongfully disclosed by Facebook to third parties, including information obtained by Facebook through its data sharing agreements with off-platform entities.

Documents that Facebook has produced show that there are at least three distinct categories of improperly shared sensitive information that Facebook shares with third parties without users' consent: native, appended, and behavioral. Dkt. 526 ("Opp'n"), Ex. B at FB-CA-MDL-00213424. This data derives from multiple sources, including (1) what a user posts and the user's activity on Facebook; (2) information about users originally generated off the Facebook platform but obtained by Facebook; and (3) information derived by Facebook from a user's activity on and off Facebook. *Id.* All of these sources include sensitive information about users that Facebook shared with third parties, yet Facebook has taken upon itself to exclude the second and third sources from discovery. This does not make sense. Information derived from a user's activity is relevant because if a user restricted access to private content, like a message about a medical condition, then it logically follows that information derived from that content—like the existence of a disease—was also meant to be private and not shared indiscriminately with third

parties. Equally relevant is sensitive information originally generated off-platform and then shared with or made available to third parties. Facebook cannot share such information without users' consent. Such improper sharing is thus actionable for precisely the same reasons as the sharing or making available of users' on-platform activity.

Discovery has shown that Facebook ==shared user information with third parties regardless of where the information was originally generated.== Opp'n Ex. C at 2. Plaintiffs' request for this information, therefore, is entirely consistent with the four categories of wrongdoing recognized by the Court. Regardless of the source or how Facebook acquired it, sensitive user information is relevant if Facebook shared it without users' consent.

Seeking to make simple issues complicated, Facebook dramatically overstates what Plaintiffs seek. To be clear, Plaintiffs are not interested in every piece of data Facebook collected from and about them. Instead, for just ten Named Plaintiffs, Plaintiffs respectfully request that the Court rule that the sensitive information from and about them that Facebook shared with or made accessible to third parties is relevant to this action.

## II. ARGUMENT

### A. The discovery sought by Plaintiffs is directly relevant to their claims.

According to Facebook, whether it collects and then wrongfully shares Plaintiffs' off-platform information or information that it derives from their on- and off-platform activity is categorically irrelevant to this case. At this juncture, the question before the Court is not whether certain discovery is disproportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1); *see also* FB Reply at 10 (noting that Facebook is not advancing an "undue burden" argument). Rather, the question is simply whether the discovery that Plaintiffs seek "is relevant to any party's claim or defense." *Id.*

With regard to off-platform activity, as Plaintiffs explained in their prior brief, the nature of their claims and the reasoning under which they were upheld make it relevant whether Facebook improperly shared Plaintiffs' off-platform information with third parties. Opp'n at 2-5. In short, the Order upheld claims not because of where information came from, whether on- or

off-platform, but because of the nature of the information and what Facebook did with it. *Id.* at 4. Facebook's arguments to the contrary hang on a very narrow and legally incorrect reading of the Court's Order.

**1. The claimed discovery stay.** Facebook argues that Plaintiffs are trying to get around a discovery stay that the Order imposed when it stayed certain claims. But this argument assumes that Plaintiffs are seeking discovery relevant to *stayed claims*, and Facebook does not point to any stayed claims that Plaintiffs are trying to revive. The suggestion that Plaintiffs are seeking "discovery on hundreds of allegations that did not survive dismissal," Reply at 3, is similarly without merit; Facebook does not point to any dismissed allegations that Plaintiffs are trying to revive. And contrary to Facebook's arguments, the discovery Plaintiffs seek—exactly what information about these ten plaintiffs Facebook possesses and shared with third parties—will help establish (1) the threshold fact of sharing that sensitive data, which establishes the elements of the breach of contract and good faith and fair dealing claims, as well as statutory and privacy claims; (2) the scope of the harm inflicted upon the Plaintiffs, which also addresses elements of Plaintiffs' privacy claims; and (3) damages and unjust enrichment. All of these claims were sustained. Facebook's argument concerning the purported discovery stay is thus a red herring.

**2. The Order's discussion of on-platform activity.** Next, Facebook says that in describing Facebook's wrongdoing, the Order confines itself to the improper sharing of what users did on the Facebook platform. Facebook considerably overstates its case. When discussing the sharing of information with business partners, for example, the Order referred simply to "information about [Facebook's] users" and "information about users' activity."[1] Order at 8. These phrases do not discriminate between on- and off-platform activity, and do not define "sensitive information" to encompass only information shared on Facebook's platform.

The question, then, is whether the discovery is "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). And here, as Plaintiffs have explained, Facebook's improper sharing of

---

[1] Rather than citing the Order's specific discussion of information-sharing with business partners, Facebook quotes the Order's general description of Facebook's misconduct from the introductory paragraph. Reply at 4 (quoting Order at 1).

user information, whether that information was derived from on- and off-platform activity or obtained from off the platform, is relevant to the legal theories upheld at the pleading stage, which turn not on how or where the information was originally generated, but on what kind of information it was and whether Facebook shared it with third parties. Opp'n at 2-5. Indeed, Facebook itself is seeking discovery from Plaintiffs about their activity on other social media sites, taking the position that users' off-platform activity is relevant to the claims and defenses here. Def. Facebook, Inc.'s 2d Set of Interrogs. to Pl. T. King Nos. 4-5. (No. 4, "Identify all Social Media Platforms other than Facebook that You have used to share personal family photographs or videos."; No. 5 "Identify all Social Media Platforms other than Facebook that You have used to share personal perspectives regarding politics, religion, relationships, work, or family.) As Facebook's own discovery requests demonstrate, Facebook believes information originally generated off platform is relevant here.

The most that can be said of the Order is that it does not focus on the sharing of information derived from off-platform activity. Discovery, however, has shown that the native, appended, and behavioral data that Facebook collects and shares about its users include information generated from and about both on-platform and off-platform activity. Opp'n Ex. B at FB-CA-MDL-00213424; Opp'n Ex. C, FB-CA-MDL-00178908 at 2. That such discovery should shape Plaintiffs' claims is entirely appropriate. *See Vallabhapurapu v. Burger King Corp.*, 276 F.R.D. 611, 615 (N.D. Cal. 2011) ("Consistently with the notice-pleading system established by the Rules, discovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues.") (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). Accordingly, any sensitive information that Facebook shared with or made accessible to third parties is relevant here, regardless of its source.

*3. Legal questions.* Facebook argues that its sharing of off-platform user information is irrelevant because it would raise legal questions that the Order did not consider. This argument is incorrect in several different respects. For one thing, Facebook does not justify the premise of the argument—it does not explain why off-platform activity is irrelevant to or not part of Plaintiffs'

claims merely because it may raise (some) distinct legal issues.

There are other flaws in Facebook's argument as well. While it asserts that off-platform activity raises hitherto unaddressed questions about a reasonable expectation of privacy, it forgets that a reasonable expectation of privacy is not even relevant to some of Plaintiffs' claims (for example, their claims under the VPPA, SCA, or their claim for breach of contract). Even for the claims that do involve a reasonable expectation of privacy, such as the invasion-of-privacy torts under California law, Plaintiffs do not claim that *all* off-platform information is relevant. Information would be relevant if—like Plaintiffs' on-platform activity—it was shared only with a "limited audience." Order at 1. Such sharing would be improper under the Order's reasoning without raising any new issues.

For similar reasons, the Court should reject Facebook's argument that off-platform information raises new issues about standing. Plaintiffs have standing, the Order concluded, not because of issues peculiar to Facebook posts, but for a more general reason: because their "sensitive information was disseminated to third parties in violation of their privacy." *Id.* at 14. That rationale applies equally to sensitive information generated off the Facebook platform that Facebook improperly shared with third parties.

Facebook also contends that the improper sharing of off-platform information would raise distinct legal issues about consent. This argument does not make sense. The Order's rulings about consent turned on what Facebook told its users about how their "information" could and could not be shared. *See* Order at 25-29. And Facebook's definition of information—"facts and other information about you, including actions taken by users and non-users who interact with Facebook," Order, App. A at 10—is capacious enough to include information generated off the platform. To show that data was shared beyond the scope of users' consent, Plaintiffs need to understand *what* was shared. Indeed, at trial, how can Plaintiffs point to data that was shared without their consent if Facebook has not produced it? Even with regard to the one source of data Facebook has produced—users' on-platform activity—Facebook has refused to produce discovery showing what it shared with third parties. Thus, Facebook's claim that it has shared all

user data that is relevant to Plaintiffs' claims is not remotely accurate.

**4. Information derived by Facebook.** Finally, Plaintiffs note that one of the sources of discovery they seek—information derived by Facebook from both on- and off-platform activity and then improperly shared with third parties—goes mostly unaddressed in Facebook's reply. And Facebook is similarly almost wholly silent about information derived from *on-platform* activity—it simply fails to explain why discovery about such information is not fairly included in this case. It is easy to see why this information is relevant. If it was improper for Facebook to share a user's sensitive post, it was equally wrong for Facebook to share inferences and other information it derived from that post.

**B.    Discovery and publicly available information confirm Facebook has not produced information it collects and shares about the ten Named Plaintiffs.**

Facebook contends that Plaintiffs were not permitted to submit any evidence in support of their opposition brief. *See* FB Reply at 6, n. 5; 9, n. 9;10 (citing 9/4/2020 Tr. at 5:8-10; 18-22). In fact, the Court did not prohibit either party from submitting discovery that would aid the Court's resolution of this issue. Rather, it rejected Facebook's argument that a four-month briefing schedule was necessary because of the purported need to obtain client declarations. Tr. at 5:7-22. Documents produced reflecting the types of data Facebook collects (native, appended, and behavioral) from multiple sources (user activity, information derived from on- and off-platform user activity, and information obtained from third parties) and shares with third parties is obviously helpful to the Court in making its determination of whether Plaintiffs are entitled to such data. The Court asked Plaintiffs what data they are seeking, and the exhibits submitted by Plaintiffs help answer that question.

In any event, Facebook relies heavily on numerous factual assertions about what data it collects, how it does so, its volume, how it is used and conclusory statements about its relevance. But it provides no support for those assertions and few specifics. That is, Facebook concedes that it possesses data relevant to the Named Plaintiffs, but it has never even categorically described or given examples of that data, contrary to Fed. R. Civ. Proc. 34(b)(2)(C). It is thus left to Plaintiffs to piece together what Facebook is withholding, using both publicly available documents and

what Facebook has produced.



Opp'n Ex. C at 2 (emphasis added). The email also

*Id.*

Facebook's response to Exhibit C is that the email discussion is "hypothetical." FB Reply at 8. But a reasonable reading of this document is that it describes Facebook's then-existing data collection capabilities. And even if Facebook were correct, Plaintiffs would still be entitled to discovery to determine whether Facebook effectuated its supposedly hypothetical plan. Facebook's position is also contradicted by information in the public record. Specifically, in 2013 Facebook began to allow third parties to access user data only upon the condition that they send valuable *user data* back to Facebook.[2] This concept, known as data reciprocity, is a key component of Plaintiffs' claims. Facebook claims in its Reply that data reciprocity is an exchange of data only between users, but that is belied by its own documents. A document dated March 14, 2014 reports



Ex. F, FB-CA-MDL-00203262. Facebook's characterization of data reciprocity as an exchange between

---

[2] *"Facebook Earns $132.80 From Your Data per Year: But it's valuable in other ways, too"*; available at: https://slate.com/technology/2019/11/facebook-six4three-pikinis-lawsuit-emails-data.html; *see also "Facebook leaks: Zuckerberg turned data into dollars in ruthless battle with competitors*; available at: https://www.computerweekly.com/news/252461895/Facebook-leaks-Zuckerberg-turned-data-into-dollars-in-ruthless-battle-with-competitors (detailing, among other things, Facebook employee complaints that "customer data and their own data was visible to others, after they had opted to keep it private").

users is also at odds with the Court's formulation of the issue. Order at 8 ("Facebook shared information about its users with this non-exclusive list of business partners and [] those companies in turn shared data with Facebook.") In fact, Facebook concedes that user data received from "integration partners" through data reciprocity is potentially relevant, thereby confirming that the discovery sought by Plaintiffs here for just ten Named Plaintiffs should be produced. FB Reply at 8. ("[E]ven if some other data from integration partners existed, only data received from those partners could even possibly be relevant..."). In short, it is relevant to the case what information about the ten Named Plaintiffs Facebook possesses, even if it received that data through its data reciprocity agreements.

Discovery also reveals that Facebook sent Requests for Information ("RFIs") to third party app developers as part of its App Developer Investigation ("ADI")  These RFIs ask Furthermore, app developers E.g., FB-CA-MDL-01119012 at FB-CA-MDL-01119021. It is telling that while conducting the ADI investigation, Facebook asked

Facebook also claims that the discovery Plaintiffs seek "cannot even be reasonably collected," identifying numerous purported difficulties in collecting this discovery, even though it is just for ten individuals. FB Reply at 9. These unsupported assertions do not rebut the relevancy of the discovery Plaintiffs seek, and do not meet the required evidentiary showing to establish burden. See *Harris v. Best Buy Stores, L.P.*, No. 315CV00657-HSG-KAW, 2016 WL 6024556, at *1 (N.D. Cal. Oct. 14, 2016) (" ... [T]he party opposing discovery has the burden of showing that discovery should not be allowed, and also has the burden of clarifying, explaining and supporting its objections with competent evidence.") (quoting *La. Pac. Corp. v. Money Mkt.*

*1 Inst'l Inv. Dealer*, 285 F.R.D. 481, 485 (N.D. Cal. 2012)). Indeed, the Court did not solicit briefing on burden, but only relevance. And in any event, Facebook expressly disclaimed its request to have the Court rule on burden. FB Reply at 10. The Court should ignore Facebook's unsupported claims that it would be too burdensome to search for this material when it has itself asked the Court not to rule on burden.

Facebook's sweeping and generalized statement also ignores huge pockets of data that Facebook can identify. For example, ████████████████████████████████████ ██████████████████ And surely Facebook can identify what data it shared with its business partners and white-listed apps through its data reciprocity agreements. Furthermore, to the extent that Facebook did not stop disassociating data regarding the Named Plaintiffs in this action, thereby making it more difficult to re-associate, that is a problem of its own making. Again, these are factual issues, not legal ones, and should be the subject of discovery.

Plaintiffs do not demand, as Facebook repeatedly claims, "that Facebook search *millions* of disaggregated data sets for any data to have ever crossed Facebook's systems relating to a Named Plaintiff and any derivative materials drawing on that data - such as data sets tracking hours of peak user activity to monitor strains on Facebook's system." Opp'n at 6. To the contrary, Plaintiffs seek only a holding that the sensitive data Facebook collected about *ten Named Plaintiffs* and *shared* with third parties is relevant. Plaintiffs do not contend that information that was not shared is relevant, which substantially narrows the information Facebook would be required to produce in this case.

### III.   CONCLUSION

For the foregoing reasons, Plaintiffs seek an order holding that all sensitive data about the ten Named Plaintiffs that Facebook shared with or made accessible to third parties is relevant to this action.

Dated: October 19, 2020                                Respectfully submitted,

KELLER ROHRBACK L.L.P.                    BLEICHMAR FONTI & AULD LLP

By:    /s/ Derek W. Loeser
          Derek W. Loeser
Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Adele A. Daniel (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com
bgould@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

By:    /s/ Lesley E. Weaver
          Lesley E. Weaver
Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)

555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

I, Lesley E. Weaver, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of October, 2020, at Oakland, California.

*/s/ Lesley E. Weaver*
Lesley E. Weaver

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2020, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to all counsel of record registered in the CM/ECF system. In accordance with Civil L.R. 5-1(h) and Civil L.R. 79-5(e), I also caused a copy of the under seal documents to be served via email on counsel of record for all parties. An electronic copy of the public redacted filings was also provided via email to the parties noted below:

Anjeza Hassan
annie.sara@yahoo.com

/s/ Lesley E. Weaver
Lesley E. Weaver

# EXHIBIT P

1

2 UNITED STATES DISTRICT COURT

3 NORTHERN DISTRICT OF CALIFORNIA

4

5 IN RE: FACEBOOK, INC. CONSUMER
PRIVACY USER PROFILE LITIGATION

6

7

8

9

10

MDL No. 2843

Case No.  18-md-02843-VC (JSC)


**DISCOVERY ORDER NO. 9**

(Dkt. Nos. 515, 526, 537, 548)

11      This MDL matter has been assigned to the undersigned for management of discovery.

12 Now pending before the Court are the Parties' briefs concerning the proper scope of discovery

13 related to the data Facebook accumulates about the named Plaintiffs.  (Dkt. Nos. 515, 526, 537,

14 548.)  In brief, Facebook contends that the district court's order specifically defined the data at

15 issue as "substantive and revealing content that users intended only for a limited audience."  (Dkt.

16 No. 298.)  Based on this definition, Facebook argues that for any named Plaintiff data to be

17 relevant and discoverable, it must meet two criteria.  First, the discoverable data must have arisen

18 from user activity occurring on the Facebook platform, such as Facebook posts and sent messages.

19 Second, the named Plaintiff must have then overtly shared such data with a limited audience, such

20 as their friends.  Facebook submits that this is the only plausible reading of the district court's

21 order limiting Plaintiffs to four actionable categories of potential liability.  Plaintiffs respond that

22 the universe of discoverable data Facebook collects for each user is much larger and necessarily

23 includes: (1) user activity occurring off the Facebook platform; and (2) user data that can be

24 inferred from user activity occurring on or off the Facebook platform.  A second question

25 presented by the briefs is whether discovery may proceed on the claims the district court stayed.

26      After carefully considering the papers submitted by the Parties, and consulting with the

27 district court, the Court rules that discovery is not as limited as Facebook contends.  Plaintiffs

28 correctly argue that Facebook's restrictive view of relevant discovery would exclude an enormous

United States District Court
Northern District of California

amount of information that Facebook collects and shares with third parties about Facebook's users.  The district court's order (Dkt. No. 298) did not limit Plaintiffs' claims to only challenging the sharing of data Facebook collects from a user's on-platform activity; the claims also challenge Facebook's sharing of user data and alleged failure to monitor how third parties used such shared information.

Accordingly, the Court rules the discoverable user data at issue includes:

- Data collected from a user's on-platform activity;
- Data obtained from third parties regarding a user's off-platform activities; and
- Data inferred from a user's on or off-platform activity.

As for the stayed claims, and again after consulting with the district court, the Court rules that discovery is stayed as to the stayed claims.  Of course, if a particular discovery request is relevant to both a stayed and non-stayed claim, then discovery is not stayed merely because the discovery request is also relevant to a stayed claim.

**IT IS SO ORDERED.**

Dated: October 29, 2020

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California

2957

# EXHIBIT Q

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*
*Additional counsel listed on signature page*

Orin Snyder (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212.351.4000
Fax: 212.351.4035
osnyder@gibsondunn.com

Deborah Stein (SBN 224570)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.:  213.229.7000
Fax:  213.229.7520
dstein@gibsondunn.com

*Attorneys for Defendant Facebook, Inc.*
*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **JOINT STATUS UPDATE**<br><br>Judges: Hon. Vince Chhabria and<br>Hon. Jacqueline Scott Corley<br>Courtroom: VIA VIDEOCONFERENCE<br>Hearing Date: December 9, 2020<br>Hearing Time: 10:00 a.m. |

The parties respectfully submit this Joint Status Update in advance of the Court's discovery conference scheduled for December 9, 2020 at 10:00 a.m.

## I.     PLAINTIFFS' STATEMENT

### 1.     Issues the Parties Have Addressed Since the Last Discovery Conference

**a.     Search Terms:** Plaintiffs provided their counterproposal for the search strings to be applied to the email and messages associated with the Groups 5-8 custodians. Facebook delivered hit reports on December 3, 2020. Facebook's response to Plaintiffs' counterproposal is due no later than December 13, 2020, and, after meeting and conferring the week of December 14-18, final proposals are due December 24. Given this timing, Plaintiffs intend to confer with Facebook about a reasonable alteration to this schedule.

**b.     Requests for Production ("RFPs") Still in Dispute:** The parties continue to meet and confer regarding RFPs 14-17. These RFPs seek production of documents relating to and sufficient to show how Facebook valued and accounted for users' data – straightforward discovery that Facebook has thus far refused to produce. Facebook originally told Plaintiffs there were no responsive documents but that position has changed substantially. While it is apparent that both targeted collections and collections using search terms are appropriate to satisfy these requests, Facebook is now taking the position that it will not do both, threatening to withdraw the extensively-negotiated search terms to be applied to correspondence if Plaintiffs also pursue targeted collections from ESI sources to which terms will not even be applied. This is a step backwards. Nonetheless, Plaintiffs are hopeful that the parties resolve this issue.

**c.     Named Plaintiffs' Data:** Discovery Order No. 9 identified the following categories of user data as discoverable: "(1) Data collected from a user's on- platform activity; (2) Data obtained from third parties regarding a user's off-platform activities; and (3) Data inferred from a user's on or off-platform activity." Dkt. 557 at 2. On November 12, 2020, Plaintiffs sent Facebook a detailed letter asking Facebook to identify materials responsive to Order No. 9, including the format in which they reside in the ordinary course of business, so that the parties could confer as to whether production should be narrowed and efficiencies in the

format or manner of production. This letter also proposed ways to identify potentially relevant and responsive data, including a list of the different types of data Facebook collects from apps in connection with its enforcement efforts. To date, Facebook has not provided any substantive response on these issues. Plaintiffs believe that a deadline for Facebook to provide threshold information in written format, and beginning and end dates for production of these materials would be of great assistance in moving discovery forward.

The need for a deadline and written response is particularly compelling as Facebook has had months to conduct this investigation. On July 31, 2020, the Court ordered Facebook to identify "what precisely has been produced and precisely what is the data that is being withheld or not reasonably available." Discovery Order No. 5, Dkt. 478. In response to this directive, Facebook made certain representations about what data it had and what could not be produced. *See*, *e.g.*, Aug. 14 Hr'g Tr. at 7:14-22; 10:1-21 (explaining the various types of information related to users collected by Facebook). Yet, Facebook claims it is only now conducting investigations into the types of user data that could have potentially been shared with or made accessible to third parties, putting into question its prior representations about what data it did or did not possess or that it could or could not access. Plaintiffs propose Facebook should respond in writing to Plaintiffs' November 12 correspondence by December 18, and that beginning and end dates for production should be set.

d.     **Plaintiffs' Fourth Set of Interrogatories:** Plaintiffs issued their fourth set of interrogatories on July 16, 2020. Facebook provided responses and objections on August 17, 2020 and amended those responses and objections twelve weeks later on November 20, 2020. The parties will continue to meet and confer regarding these amended responses and objections.

e.     **Privacy Settings Data:** Facebook has produced many thousands of pages purporting to reflect Plaintiffs' activity on the Facebook platform, but did not consult with Plaintiffs regarding the production format, which is markedly different than how that activity occurs on the platform. Unfortunately, as produced, the documents fail to reflect Plaintiffs' privacy settings, including, for example, the identification of limited audiences selected by

2961

Plaintiffs, despite that the original posts did so. Plaintiffs first sought a supplemental production of this information starting in February 2020. Facebook has refused based on the purported burden, suggesting instead that Plaintiffs review their active accounts online to establish this information for themselves on a post by post basis, and then cross-check each post against the documents Facebook has produced to identify those documents by Bates number. This is a highly impractical position. For example, for the underlying evidence to be admissible, it would require Plaintiffs to re-produce their own Facebook accounts in the format in which it exists, which is precisely what Facebook should have done and which Plaintiffs have no practical way to do without consulting Facebook. Plaintiffs have nonetheless begun reviewing Facebook's production and identified examples in response to Facebook's interrogatories, but the underlying problem persists. Plaintiffs are hopeful the parties can reach a reasonable accommodation.

      **f.**     **Additional Proposed Custodians:** In keeping with the Court's prior guidance regarding the early identification of any additional custodians pursuant to Discovery Order No. 3, Plaintiffs proposed four additional custodians: Mark Zuckerberg, Sheryl Sandberg, as well as two Facebook employees with relevant and unique responsibilities over the Privacy Program audited by PricewaterhouseCoopers LLP. In response, Facebook has asserted categorically that any addition of custodians is premature. From Plaintiffs' perspective, it seems appropriate to run searches across these additional four custodians at the same time that other custodial documents are being searched, de-duplicated and reviewed for privilege. The parties continue to discuss.

      **g.**     **Discovery of Named Plaintiffs:** Plaintiffs' review of documents responsive to Facebook's document requests to Plaintiffs is ongoing, and Plaintiffs will continue to produce non-privileged, responsive documents on a rolling basis. One impediment to this process is that Plaintiffs await Facebook's response to the search terms to be applied to Plaintiffs' email, which Plaintiffs proposed on August 14. Similarly, Plaintiffs are actively engaged in reviewing and responding to Facebook's interrogatories to Plaintiffs. To honor Facebook's request for rolling productions and amendments, and despite Plaintiffs' objections regarding the limited audience-information Facebook has produced, Plaintiffs served supplemental responses on Monday,

December 7, 2020. Plaintiffs anticipate further amendments as additional information becomes available, including the information referred to above. Plaintiffs understand that discovery is a two-way street, and have reviewed the extensive document productions for each of the Plaintiffs and provided substantive responses to the best of their ability at this time. Contrary to Facebook's characterization that it has been awaiting responses for 14 weeks, initial responses were provided on a timely basis and supplemented in response to issues raised by Facebook and discussed by the parties on the parties' regularly-scheduled meet and confers.

h.       **Voluntary Dismissal of Named Plaintiffs:** At this Court's suggestion, Plaintiffs narrowed the issues relating to class certification by reducing the number of Named Plaintiffs. Plaintiffs sent Facebook a proposed stipulation on December 4 that would voluntarily dismiss all but the nine Named Plaintiffs who will be proposed as class representatives. The parties will negotiate and submit a proposed stipulation shortly.

i.       **Privilege Log Issues:** Plaintiffs challenged 1,599 of Facebook's 4,432 initial privilege log entries on October 2, 2020. Facebook responded by letter dated December 2, 2020, and provided its revised privilege log on December 7, 2020. Plaintiffs have proposed that the parties begin to meet and confer regarding Facebook's amended privilege log. In addition, Facebook has represented to the Court in its statement that it has already prepared a privilege log regarding ADI materials (which Plaintiffs have not yet received). Consistent with the Court's directive in Discovery Order No. 7 instructing the parties to commence briefing in January 2021, Plaintiffs will confer with Facebook to set a briefing schedule. Plaintiffs request that the parties submit a stipulation or competing proposals by no later than December 18, 2020.

2.       **Additional Responses to Facebook's Statement**

Unfortunately, Facebook confuses Plaintiffs' obligation to litigate this massive and complex case on behalf of a class of more than 223 million U.S. Facebook users with "counterproductive distractions." But, as is normally the case and in fact expected in an MDL of this size, Plaintiffs have diligently identified and raised issues that need Facebook's attention in hopes that such issues can be resolved without the Court's attention. Most frequently, Plaintiffs

2963

are met with stonewalling and delay.

In addition to being self-serving, Facebook's attack on Plaintiffs' efforts to litigate this case is misleading. For example, Facebook claims Plaintiffs have "bombarded" Facebook with twenty letters and emails since the parties' last discovery conference on November 5. Putting aside the fact that twenty communications over one month should be expected here, only four of these communications (two letters and two emails) contained substantive requests for information or meet and confers—two of which are requests that must be made in writing pursuant to the parties' agreed upon Discovery Dispute Resolution Protocol. Dkt. 393, ¶¶ 1-2. As far as Plaintiffs can tell, the remaining sixteen emails consisted of agenda requests for the parties' ongoing meet and confers (one of which was unilaterally cancelled by Facebook), scheduling requests, and follow-up emails to agenda items identified by the parties. Plaintiffs' substantive communications pertain to discoverable information and Facebook does not claim otherwise. Counting letters and emails is a frivolous distraction from the work the parties need to accomplish and a rather silly exercise for experienced lawyers.

The growing list of unresolved issues is also a direct byproduct of Facebook's refusal to provide timely information. For example, Facebook still has not cured the deficiencies in its production of Plaintiffs' documents that Plaintiffs identified in February. The parties' proposed expert stipulation has been pending since June, with only minimal edits proposed by Facebook since that time. A revised privilege log related to third-party PwC's production of documents (comprised of only eight documents) was requested in July. These are just some of the examples of discovery issues Plaintiffs must continually raise with Facebook to push them forward.

This is part of the normal course of complex litigation, particularly in a case of this scale. Plaintiffs are identifying discovery disputes, following up on the parties' negotiations, and seeking resolution either through agreement or with the Court's assistance through the parties' dispute resolution protocol, which Facebook itself agreed to. As a result, there is no basis for Facebook's request that the only discovery issues the parties can discuss are those that it selects. Facebook's motion for a discovery stay—which is what it effectively seeks—should be denied.

## FACEBOOK'S STATEMENT

Facebook appreciates the Court's continued assistance focusing the parties' discovery efforts. Below, Facebook details the work it has completed since the November 5 conference and respectfully requests that the Court order Plaintiffs to: (i) stick to the agendas the Court sets between hearings; (ii) commit to the set of Named Plaintiffs who are prosecuting this case; and (iii) respond in full within 30 days to Facebook's interrogatories—which have been pending for 14 weeks and seek basic information about Plaintiffs' allegations. Finally, Facebook identifies six agenda items that should be the parties' focus until the next hearing.

## I.     Facebook's Progress Since the November 5 Status Conference

Facebook has completed a tremendous amount of work since the last status conference.

*Discovery Responses*. Facebook served **480 pages of interrogatory responses** on topics spanning a 13-year period. This project alone took hundreds of hours. Facebook also set up a review of the nearly **3 million documents** hitting on search strings for the first 38 custodians and made an initial production. Facebook proposed search strings for the remaining 43 custodians.

*Privileged Materials*. Facebook prepared a privilege log (to be served on Dec. 10) of **6,000** documents from Facebook's App Developer Investigation, under the parties' Sampling Protocol (Dkt. 518). Facebook also responded to a letter from Plaintiffs, raising **1600** vague and boilerplate privilege challenges, which created hundreds of hours of unnecessary work.

*Named Plaintiff Data*. Facebook commenced an investigation to identify the materials potentially responsive to Discovery Order 9, regarding the Named Plaintiffs' data.

*Additional Items*. Since the November conference, Facebook also answered Plaintiffs' Second Amended Consolidated Complaint, successfully argued a motion to dismiss the two UK Plaintiffs, and investigated the contents of its productions to numerous government entities.

In additional to these items, the parties negotiated a slew of open discovery issues.

## II.     The Counterproductive Distractions

Plaintiffs have reverted to a strategy of burying Facebook in a constant barrage of demands that take little effort to churn out but create an enormous amount of unnecessary work.

Since the November conference, Plaintiffs have sent Facebook more than 25 letters and emails raising dozens of informal demands.  One letter insists that counsel answer *18* different inquiries regarding the data Facebook collects from users.  Another letter demands that counsel respond to *21* substantive questions regarding specific documents in Facebook's productions.

Plaintiffs wrote to Facebook demanding it add more custodians to the case—even though the Court ordered the parties to move forward with these negotiations and not backtrack. Plaintiffs threatened to set off fire-drill briefing the week of Thanksgiving if Facebook did not immediately conduct targeted collections of materials they previously demanded Facebook identify through search strings.  After Facebook served 480 pages of interrogatory responses, yesterday Plaintiffs sent a letter raising pages of questions about Facebook's substantive responses and threatening expedited briefing if Facebook did not answer within days.

In the last month, Plaintiffs served 10 third-party subpoenas (they have served more than 40 to date).  After one party told Plaintiffs he provided Facebook his materials in connection with government subpoenas, Plaintiffs demanded Facebook immediately investigate the materials it produced to government entities and confirm Plaintiffs received the same documents. After Facebook did, Plaintiffs followed up with additional demands the next day.

The parties continue to meet and confer twice each week.  Rather than stick to the agenda set at the prior hearing, the night before each meet and confer, Plaintiffs raise as many as 10-15 arbitrary topics that Facebook must prepare to discuss.  Plaintiffs' harassing and scattershot approach is severely impacting the efficiency and speed at which normal discovery can proceed.

## III.   Plaintiffs Must Participate in Discovery or Withdraw as Named Plaintiffs

While Facebook is working around the clock to complete massive discovery efforts, Plaintiffs ask to be excused from discovery obligations and do not complete even minimal tasks.

Plaintiffs represented in September that they were streamlining discovery by having only 10 of 23 plaintiffs move forward as Named Plaintiffs.[1]  It is now clear that Plaintiffs actually

---

[1]     Plaintiffs informed the Court on September 28: "Plaintiffs have reduced the number of individuals who will be class representatives to ten, down from the twenty-three." Dkt. 526.

seek a one-sided discovery stay.  Rather than dismiss the claims of 13 plaintiffs, Plaintiffs sent a proposal to "deprioritize" 13 Named Plaintiffs, who would reserve the right to be "re-prioritized" at any time, *while being excused from responding to any discovery*.  Facebook rejected this proposal.  In response, Plaintiffs promised to stipulate to the voluntary dismissal of at least 13 Named Plaintiffs, without prejudice to their participating in the putative class.[2]  Six weeks later, Plaintiffs finally provided their stipulation, and it has hardly changed from their original proposal.  Under the proposed stipulation, 13 Named Plaintiffs would dismiss their claims *without prejudice to becoming Named Plaintiffs again later in the case*, and Facebook would have to waive its right to seek any type of discovery whatsoever of those individuals.  Plaintiffs need to make a decision and not demand that Facebook bear the risks of Plaintiffs' vacillation.

In the meantime, Plaintiffs refuse to comply with basic discovery requests.  The ***only*** discovery Facebook has served in the last 6 months is a set of interrogatories that asks 10 identical questions of each Named Plaintiff regarding the basis of their allegations and privacy expectations.  Plaintiffs asked for 10 weeks to respond—representing they needed that time to coordinate with ***all 23*** of their clients.  Ten weeks later, Plaintiffs responded on behalf of only 10 plaintiffs, and the responses were grossly deficient.  They consisted of boilerplate objections along with a handful of single sentence responses.[3]  Facebook attempted to meet and confer with Plaintiffs for weeks regarding these deficiencies.  Plaintiffs would not substantively engage. Instead, they repeatedly assured Facebook that they planned to amend but that it would be many weeks before they could even discuss a potential deadline or the nature of the amendments.  Yet, as soon as Facebook advised Plaintiffs it planned to ask the Court to order Plaintiffs to amend their responses within 30 days, Plaintiffs suddenly whipped together and served "amended

---

[2]      Plaintiffs said they would send a stipulation for "the voluntary dismissal of those named plaintiffs that are not expected to be put forth as class representatives," and dismissal "would be without prejudice."  10/27/2020 Letter from M. Montgomery.  Facebook asked whether:  "dismissal would be without prejudice to those plaintiffs participating in the putative class, or . . . without prejudice to those plaintiffs becoming Named Plaintiffs again later in the case?"  10/27/2020 Email from M. Kutscher Clark.  Plaintiffs confirmed:  "the concept is that dismissal would be without prejudice to those plaintiffs participating in the putative class."  10/27/2020 Email from M. Montgomery.

[3]      Notably, after Facebook sent a deficiency letter with respect to the 13 plaintiffs who did not respond, Plaintiffs were able to serve objections and responses for those plaintiffs the next day.

responses" yesterday.  Facebook is continuing to evaluate the responses, but they appear to offer little more than the original responses and to be targeted at evading a real deadline, rather than providing substantive information.  Facebook asks the Court to order Plaintiffs to provide the fulsome amended responses Plaintiffs have been promising Facebook within **30 days**.

## IV.    Agenda Items

Until the next conference, the parties should strictly focus on the following items:

1.    *Search Strings*.  The parties should complete their search string negotiations for the remaining 43 custodians.  Plaintiffs responded to Facebook's proposal with a counter-proposal that adds more than **2600** search string/custodian pairs—all of which require responses.

2.    *Document Review*.  Facebook is continuing to review the nearly 3 million documents and 12 million pages that hit on the search strings for the first 38 custodians.

3.    *Interrogatories*.  Plaintiffs should fully answer the 10 rogs served 14 weeks ago.

4.    *Plaintiffs' Productions*.  The parties should complete negotiations over how materials will be collected from the Named Plaintiffs so those materials can finally be produced.

5.    *Confidentiality Briefing*.  The parties are entering a stipulation to brief the confidentiality of materials leaked by another plaintiff in violation of a protective order.

6.    *Named Plaintiff Data*.  Facebook is conducting an investigation to confirm the universe of data responsive to Discovery Order 9, relating to the Named Plaintiffs.  Facebook notes that, in seeking Discovery Order 9, Plaintiffs stated for the first time in their sur-reply brief that they seek a far more limited set of data than they had demanded previously.  Plaintiffs wrote:

> Plaintiffs seek only a holding that the sensitive data Facebook collected about ten Named Plaintiffs and shared with third parties is relevant. Plaintiffs do not contend that information that was not shared is relevant, which substantially narrows the information Facebook would be required to produce. Dkt. 548 at 9.

To Facebook's knowledge, the materials it produced reflect the information related to the Named Plaintiffs that could have been shared with third parties.  Because this case covers a 13-year period, Facebook is conducting an investigation to confirm that understanding.  If Facebook identifies other data relating to Plaintiffs that could have even potentially been made available to third parties, it will produce it, and—before doing so—discuss the format with Plaintiffs.

## V.     Response to Additional Issues Raised by Plaintiffs

*Plaintiffs seek targeted collections of materials the Court ordered Facebook to locate through search strings.*  RFPs 14-17 seek materials "sufficient to show" the value of individual types of data, the Named Plaintiffs' data, and data to users.  Facebook informed Plaintiffs that it has never valued data in this manner and, to its knowledge, does not have responsive materials.  During the parties' search string negotiations, Plaintiffs nevertheless insisted on search strings for RFPs 14-17.  Dkt. 545, Ex. 1 at 4, 6.  The Court granted this request.  To the extent the materials Plaintiffs seek exist, the search strings should identify them.

*Plaintiffs have equal access to the privacy settings they seek.*  The issue Plaintiffs raise is not about production format.  It is about who should do the work to identify the data Plaintiffs claim is sensitive.  Plaintiffs say they can't identify what information from their accounts they believe is sensitive unless Facebook produces a version of their account information that shows the privacy settings they selected for each item or post (e.g. "friends only" or "friends of friends").  Facebook accounts cannot be produced in this manner.  To locate the privacy settings Plaintiffs seek, someone must click on each item and follow a link to view the privacy setting.  Plaintiffs have access to their accounts and can do this but apparently determined this process would be too burdensome and that Facebook should do it for them.  Facebook suggested Plaintiffs identify the account activity they believe is sensitive, so Facebook can assess whether it can produce the settings for a targeted set of items (Plaintiffs' account information spans more than 900,000 pages).  One of Facebook's interrogatories asks this precise question, but Plaintiffs refuse to provide a real answer and instead seek to push the burden back to Facebook.[4]

*There is no basis to add additional custodians now.*  Plaintiffs' request for four more custodians is premature.  Facebook is reviewing millions of documents from 81 custodians.  If, after Plaintiffs review the documents to be identified through search terms, they identify a gap in Facebook's productions, the parties can discuss whether additional custodians are needed.

---

[4]     In the meantime, Facebook produced the privacy settings data it has available, including Plaintiffs' current privacy settings, historical privacy settings, and the best available information about any intervening changes Plaintiffs have made, including to individual posts.

2969

Dated: December 8, 2020

Respectfully submitted,

KELLER ROHRBACK L.L.P.

BLEICHMAR FONTI & AULD LLP

By:   /s/ Derek W. Loeser
      Derek W. Loeser

By:   /s/ Lesley E. Weaver
      Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David J. Ko (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Adele Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

GIBSON, DUNN, & CRUTCHER LLP

By: /s/ Orin Snyder
Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com

2970

333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

2971

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

I, Derek W. Loeser, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of December, 2020, at Seattle, Washington.

/s/ Derek W. Loeser
Derek W. Loeser

2972

**CERTIFICATE OF SERVICE**

I, Sarah Skaggs, hereby certify that on December 8, 2020, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

**In addition, the following were served via email:**

Anjeza Hassan
annie.sara@yahoo.com

/s/ *Sarah Skaggs*
Sarah Skaggs

# EXHIBIT R

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


Before The Honorable Jacqueline S. Corley, Magistrate Judge


IN RE:  FACEBOOK, INC. CONSUMER )
PRIVACY USER PROFILE LITIGATION.)  **NO. 18-MD-02843 VC (JSC)**
_____  )

San Francisco, California
Wednesday, December 9, 2020

**TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**


**APPEARANCES VIA ZOOM:**

For Plaintiffs:

>           KELLER ROHRBACK LLP
>           1201 Third Avenue - Suite 3200
>           Seattle, Washington  98101
>     BY:   **DEREK LOESER, ATTORNEY AT LAW**
>           **CARI LAUFENBERG, ATTORNEY AT LAW**
>           **DAVID J. KO, ATTORNEY AT LAW**
>
>           BLEICHMAR, FONTI & AULD LLP
>           555 12th Street - Suite 1600
>           Oakland, California  94607
>     BY:   **LESLEY E. WEAVER, ATTORNEY AT LAW**
>           **ANNE K. DAVIS, ATTORNEY AT LAW**
>           **MATTHEW P. MONTGOMERY, ATTORNEY AT LAW**
>           **ANGELICA M. ORNELAS, ATTORNEY AT LAW**


**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**


Reported By:          Marla F. Knox, RPR, CRR, RMR
                      United States Official Court Reporter

1    <u>**APPEARANCES VIA ZOOM:**</u>  **(CONT'D)**

2    For Defendant:

                     GIBSON, DUNN & CRUTCHER LLP
3                    1881 Page Mill Road
                     Palo Alto, California  94304
4             BY:  **MARTIE KUTSCHER CLARK, ATTORNEY AT LAW**

5                    GIBSON, DUNN & CRUTCHER LLP
                     333 South Grand Avenue
6                    Los Angeles, California  90071
              BY:  **DEBORAH L. STEIN, ATTORNEY AT LAW**
7
                     GIBSON, DUNN & CRUTCHER LLP
8                    2100 McKinney Avenue - Suite 1100
                     Dallas, Texas  75201
9             BY:  **RUSSELL H. FALCONER, ATTORNEY AT LAW**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>Wednesday - December 9, 2020</u>                    <u>10:00 a.m.</u>

<center>**P R O C E E D I N G S**</center>

<center>---oOo---</center>

**THE CLERK:**  Court is now in session.  The Honorable

Jacqueline Scott Corley is presiding.

Calling civil action 18-md-2843, In Re: Facebook Inc.

Go ahead and start.

**THE COURT:**  All right.  Good morning, everyone.  You

don't have to make your appearances.  And thank you for your

status update.

Let's just go through and talk through the things and see

where we are at and what we can do.

So the first issue is search terms for the 5 through 8

group.  And I'm not sure if there is anything to discuss here.

I think the Plaintiffs said they were hopeful the parties could

work out the schedule, and I don't believe Facebook said

anything about it.

So, Ms. Weaver, or whoever from the Plaintiff wants to

address that.  Is there anything to discuss?

**MS. WEAVER:**  Not from our perspective, Your Honor.

**MS. DAVIS:**  No.

**THE COURT:**  Okay.  Great.  We will just knock that

off.

Now, the second thing was RFPs 14 to 17, Plaintiffs' RFPs.

And Facebook seemed to suggest that the search terms had

1   been agreed to for those, but Plaintiffs seem to suggest that

2   they had not.  So I don't know where we are with that.

3           **MS. WEAVER:**  Mr. Ko will address that.

4        **MR. KO:**  This is David Ko on behalf of Plaintiffs.

5        So really the reason why we identified that issue in our

6   statement -- two reasons -- I mean, I think this is likely

7   coming at a head such that we will brief this to you shortly.

8        To answer your question, the reason why these RFPs are not

9   actually covered by the -- or this dispute, more specifically,

10  is not covered by the RFPs and the search strings is that we

11  are seeking a targeted search and a certain -- and a specific

12  group of materials that we believe Facebook should produce

13  pursuant to a targeted search.

14       And that is separate from the documents that they may

15  potentially produce that are, you know, possibly responsive to

16  these RFPs.

17       And just to add some color to that, you know, the search

18  strings that we agreed to -- and, quite frankly, that you

19  ordered in Discovery Order Number 8, I believe -- there are

20  actually only one search string that specifically relates to

21  these -- that solely relates to these RFPs.

22       And so -- and in this next round of negotiations, I think

23  there are only about three or four strings that the parties are

24  actually negotiating such that these strings may produce

25  potentially relevant information.

1    So what we are asking for is something different than I

2    think what Facebook is saying.  We are just saying:  Look,

3    there are these five categories of information that are

4    responsive to these RFPs; and we believe that they can produce

5    this information pursuant to targeted searches.

6        And that is, again, distinct from any of the search string

7    negotiations.

8        **THE COURT:**  Why is it distinct?

9        **MR. KO:**  Well, this has a pretty long and tortured

10   history.  We have been going back and forth with Facebook on

11   this since January.

12       Actually, we engaged in an extensive letter writing

13   campaign from February to April; and we have gone back and

14   forth with them.

15       And they said clearly that:  A, this information is

16   actually irrelevant.  B, that they don't have any responsive

17   documents anyways.  And C, even if they did, that they would be

18   highly confidential and protected.

19       So, you know, we found that hard to believe because these

20   by -- just to provide some context, these RFPs seek documents

21   related to how Facebook values, quantifies and monetizes the

22   user content information at issue in this case.

23       And they said:  Look, we don't have anything responsive to

24   those requests.

25       We found that hard to believe; right.  I mean, they are a

1  company -- this is a company that last year alone generated

2  $70 billion in revenue, you know, 98 percent of which came from

3  third parties.

4      So they said -- we said let's try to provide some

5  clarification so here are -- so this dispute matured to a point

6  where we said:  Here are five specific categories that we

7  believe will be responsive to this request.

8      Can you please run targeted searches on them?  And they

9  said no.

10     And they said:  Why don't we do -- why don't we go with

11 the search string negotiations and see if we can actually come

12 up with some documents that may potentially be responsive to

13 the requests.

14     And we gave that a shot.  And we thought that maybe that

15 they would run targeted searches in connection with that

16 negotiation process, but what has become evident is that they

17 do not want to.  And so I think, you know, at this point --

18     **THE COURT:**  Well, did you propose them as part of the

19 search string submission?

20     **MR. KO:**  We proposed one string -- two strings, excuse

21 me, that relates solely to 1417.  But, remember, we had a

22 finite number of strings we could negotiate and propose.

23     And so we took those somewhat off the table, right,

24 because there were other strings that we were negotiating that

25 we believe were responsive to other discovery requests because

1   we didn't have -- in the normal course we would say:  Look,

2   here are, you know, 10 or 15 strings that could have been

3   responsive to these requests.

4        And they said -- well, you know, we only could propose a

5   few to, Your Honor.  Obviously we ended up proposing only 29 or

6   27 for you to rule on.  And so that -- that is one response to

7   your question.

8        The other response --

9        **THE COURT:**  I guess I don't really understand.  I

10  mean, the limit was there to require to prioritize.  It wasn't

11  so that you could -- that is just sort of a different matter.

12       I mean, it seems like the nub of it -- from what I

13  understand -- is Facebook says they don't really have what you

14  are looking for, and you say that they do.

15       And maybe what you need to do is take that 30(b)(6), and

16  you will identify it; and then they will have to produce it, as

17  opposed to in a way you are kind of shooting in the dark.

18       **MR. KO:**  Well, that's one way of doing it, but I

19  think -- two responses to that.

20       One, the documents that will be produced here are not

21  pursuant -- are really not the type of documents that will be

22  produced pursuant to custodial searches.

23       These are financial documents that relate to, for example,

24  marketing and business brands, financial documents that

25  underlie their 10Ks and 10Qs.

1    So these aren't -- you know, it's not, you know, Cari

2    Laufenberg, let's find all her documents that talk about this.

3    It is actually a non-custodial search in the relevant

4    department where we pull that material.

5        And I think -- it identifies --

6            **THE COURT:**  What would it be?  What would it be?

7            **MS. WEAVER:**  Your Honor, let me give an example

8    because I think we do want the e-mails.  But accounting

9    documents where Facebook is assessing the value of the data

10   that its getting, we know that, for example, in their

11   accounting documents it will be there.  And that is a targeted

12   search.  And those documents aren't targeted by the search

13   terms.

14       The search terms right now are only being applied to a

15   selected number of --

16           **THE COURT:**  I understand that.  For e-mails and things

17   like that, it wouldn't be an accounting document.  So that --

18           **MS. WEAVER:**  Exactly.

19           **THE COURT:**  -- I understand.

20           **MS. KUTSCHER CLARK:**  Your Honor --

21           **MS. WEAVER:**  -- take the 30(b)(6), I think that is a

22   good idea.  Apologies.

23           **THE COURT:**  Yeah.  Was that Ms. Kutscher?

24           **MS. KUTSCHER CLARK:**  Yes, Your Honor, thank you.

25       The issue we are having here is that the RFPs at issue

seek valuation documents about very particular types of valuations.

They are asking about documents how Facebook values individual pieces of user data; how Facebook values the named Plaintiffs' data.

What we have been telling Plaintiffs -- and we have investigated this extensively -- is that Facebook simply doesn't value information that way. So to the best of our knowledge there wouldn't be responsive materials.

The other issue here is that the RFPs ask for documents sufficient to show this type of information.

So we are running the search strings because typically when you don't think there are documents about something specific and you are asking for documents specific -- sufficient to show that information, you run search strings. So you figure out if they are there.

And that's what we are trying to do; run the search strings. Figure out if there are any documents that show the extensive valuation. We don't think there are.

From our perspective, we think the first step here is to run the search strings. See if they return anything seeking the type of information Plaintiffs are seeking, and then we can take it from there.

The other issue we are having is that after Plaintiffs sought that type of information, they did send us the letter

that Mr. Ko is describing.  And the letter asks for these very five very broad categories of documents.  It asks for Facebook's marketing plans, Facebook's business plans.

And Plaintiffs now seem to be taking the position that Facebook should produce all documents responsive to their letter, so all of its marketing plans, all of its business plans, even if they don't show the type of information sought in the RFPs.

So one of the issues that the parties started discussing yesterday is:  Is Facebook required to produce documents responsive to the RFPs or is Facebook required to produce information responsive to this letter that really strays pretty far from what the RFPs ask for?

**THE COURT:**  Well, this is what I would say:  What you are required to produce is -- obviously the valuation of this data is at issue.  That is relevant to a claim in the case.

And so what you need to do is figure out how you get there.  There must be something.  And it may not be it's at the micro level that the Plaintiffs were wondering.  So maybe it is a more macro level.  Maybe it is simply:  How much money does Facebook make in a year, in a month, in a week, in a day from selling this information; right?  That's one way of evaluating it.

Now, maybe that's not precisely called for by the RFP.  So what?

1    What the RFP calls for -- you know what they want; right?

2  And so the RFPs are kind of like a starting point.  And now

3  have a discussion and try to narrow it and get out what it is

4  they are trying to do.

5    I don't think you would dispute that any financial

6  document -- like the financial documents are going to be one

7  way of valuing it.  Maybe not every marketing plan,

8  obviously -- obviously.  Facebook must have a million marketing

9  plans.  But specific marketing plans.  And you have a

10 discussion.

11    So the RFPs are a starting point.  I wouldn't get too

12 caught up in that.  We all agree that how Facebook values this

13 data, some way, is relevant.  And so let's figure out a way of

14 getting those.  That's what I would say on that.

15        **MR. LOESER:**  Your Honor, if I may just very briefly --

16        **MS. STEIN:**  Your Honor, I think the fundamental

17 disconnect is that Facebook doesn't sell user data, so Facebook

18 doesn't value user data in the way that Plaintiffs would like

19 it to exist.

20    It just -- it is not something that is part of Facebook's

21 business model.  So I think we have been talking past each

22 other.

23    And we are happy to meet and confer with them to see if

24 there is something else that Facebook does value, but it

25 doesn't -- because it doesn't sell user information and user

1  data, it's literally just not something that goes into their

2  valuations.

3      **THE COURT:**  Or they trade it or whatever it is.  Or

4  maybe as Ms. Weaver said, the 30(b)(6) -- did we lose -- oh,

5  no, there she is.  She just moved on me.

6      **MS. WEAVER:**  We just moved.  You moved too,

7  Your Honor.

8      **THE COURT:**  Did I?  I don't know.  Apparently we have

9  a new thing of Zoom that you can move the screens, but that

10  doesn't seem to be working.  Anyway -- and figure it out.

11      But I guess I would say is that I hear what you are

12  saying, Ms. Stein.  So that's what you should be discussing.

13  Like, there is going to be some way -- it has some value,

14  somehow or another because of (inaudible) -- and for some

15  purpose, whatever it is.  And then, you know, if -- it is not

16  going to be a line item, obviously, that puts a value on it.

17      And so that just sort of should be what the discussions

18  should be about.  I can see that is going to be different from

19  search terms.  If it is coming from financial documents, that

20  is something different.  Okay.

21      **MR. LOESER:**  Sorry to interrupt.  I guess, just by way

22  of making it clear and so that we all understand what you are

23  saying, there is search strings; and that will get certain

24  information, e-mail, other things.

25      And then there is all this other information that is not

1   even -- it is not even possible that it would be unearthed by

2   those search strings.  That is the targeted search information.

3        That is what we will be meeting and conferring and

4   negotiating more with Facebook.  I mean, it hasn't been going

5   on a long, long time.

6        I am very happy to hear you describe the process where,

7   you know, we start with RFPs and then we engage in these very

8   lengthy and substantive conversations about how to clarify

9   them, and that's what the letters often have to do with.

10       So I do think that that process that you described is what

11  has happened here, and I think it is important that we continue

12  to utilize that process so that requests can be clarified in

13  letters and so on.

14           THE COURT:  And narrowed.  Always narrowed.

15           MR. LOESER:  Or narrowed.  Or if they are really

16  unclear -- as Facebook often claims they are -- then whether it

17  is narrowed or just made more clear, one way or another it

18  becomes evident what it is we are searching for.

19           THE COURT:  Yeah.  I always like to say is sort of

20  when -- obviously not in a bigger complex -- but when I have

21  disputes, I will say to one side:  What is it that you want?

22  Just describe to me -- not -- when somebody starts reading to

23  me their document requests, I stop them.  No.  No.  Just tell

24  me in plain English what is it that you want.  And then have

25  the other side respond.  Do you have that or what do you have;

right?  That's what it should be.

I do want to go back, though, to the -- what is little A in the Plaintiffs' statement, the search terms and the schedule, because the final proposals are due December 24th.

And were you able to work something out with that or --

**MS. KUTSCHER CLARK:**  We are --

**MS. WEAVER:**  We are still negotiating that, I believe. Go ahead, Martie.  My apologies.

**MS. KUTSCHER CLARK:**  No, no, no.  I was just going to say the parties met and conferred about it yesterday, and we are working through some proposals.

One thing the parties have started discussing is whether there should be a little bit of a detente around the holidays this year.

**THE COURT:**  Oh, that's exactly what I wanted to do.  I actually wanted to impose one.

(Laughter)

**THE COURT:**  I did it in one of my other cases in Juul over Thanksgiving.  I forbid the parties from communicating with each other from Thursday, Friday, Saturday and Sunday. And I would like to do the same thing in here.

**MR. LOESER:**  Just like the Battle of the Bulge, Your Honor.

**MS. WEAVER:**  That's right.  That's exactly right.

**THE COURT:**  So I will let you figure out what it is;

but you need, I would say, five business days.  That would be

my proposal.  Really the case will move along; go along.  Five

business days, no communications between the two sides for

those five days in a row and you figure out what they are.

So important.  So important.  So important especially -- I

mean, you know, people are not going to be -- I mean, it's a

stressful time right now.  It is a stressful time, and we all

need a break and to be able to just chill and focus on the most

important things -- this case is important -- but the most

important things.  So I would like you to agree to a five-day

detente.  It can be longer if you want but at least five days.

> **MS. WEAVER:**  Agreed.

> **MR. MONTGOMERY:**  Your Honor, can you impose no

communication within our firm as well?

> **THE COURT:**  Mr. Montgomery, yeah --

> (Laughter)

> **MS. KUTSCHER CLARK:**  The challenges.

> **MS. STEIN:**  I do rely on opposing counsel for Netflix

recommendations so --

> (Laughter)

> **MS. WEAVER:**  We can make an exception.

> **THE COURT:**  The Queens Gambit, have you guys watched

that?  I finished that last night.

> **MR. LOESER:**  Excellent.  That is -- a very good

recommendation, if you haven't seen it, which we have now

1    enjoyed is Ted Lasso.

2              **THE COURT:**  Ted Lasso, okay.  I don't know that one.

3              **MR. LOESER:**  Your Honor, this might be testing the

4    limits of your judicial authority; but if you could turn off

5    social media for five days --

6              **THE COURT:**  For the entire country?

7              **MS. WEAVER:**  Yes.

8                              (Laughter)

9              **THE COURT:**  Perhaps.

10             **MS. KUTSCHER CLARK:**  I think our client would be

11   opposed to that.

12             **MS. WEAVER:**  Yes, we understand the difficult position

13   you are in.

14                              (Laughter)

15             **THE COURT:**  All right.  So, Mr. Montgomery, I will

16   strongly recommend that -- internally as well to the extent it

17   can be done -- and really, you know, no judges should be

18   imposing deadlines for whatever between Christmas and New

19   Year's; right.  So you should be able to check out for that

20   time.

21      Okay.  Great.

22             **MS. WEAVER:**  Just to be clear, it was in our proposal

23   to end it on December 24th.  So we are fine with the

24   moratorium.

25             **THE COURT:**  It sounds like everyone is which is good.

1  Okay.

2  **MS. WEAVER:**  Yep.

3  **THE COURT:**  So the next issue is the named Plaintiffs'

4  data.  And here I actually am kind of confused because Facebook

5  suggested that there may not be any data other than what they

6  have already produced.  And then I don't understand why (video

7  freeze interruption.)

8  **MS. KUTSCHER CLARK:**  Right, Your Honor.

9  So, as we noted in our submission, we learned for the

10  first time in Plaintiffs' sur-reply brief on the named

11  Plaintiffs' data that what they are really seeking is only data

12  about the named Plaintiffs that was shared with third parties.

13  And for us seeing that in the sur-reply brief was a really

14  big aha moment because we had spent literally hundreds of hours

15  meeting and conferring about data that is never shared outside

16  of Facebook.

17  So now that we understand what they are really seeking is

18  the type of data that is actually shared or made accessible to

19  third parties, we have been taking a much closer look at what

20  would be responsive to that.  And as we currently understand,

21  what has been produced really does cover that universe.

22  But we obviously want to be a hundred percent sure that

23  that is correct, and we are talking about a 13-year period, so

24  it is a very long time.

25  So we have been conducting a very careful investigation

1    within the company to be a hundred percent sure that the

2    materials produced to date reflect the full scope of any data

3    that could have been shared or made accessible to third parties

4    about the named Plaintiffs since 2007.

5        And if we do come across anything additional, we will

6    obviously report that to Plaintiffs and discuss a production

7    format with them, but to date we have not come across anything

8    that has not been produced already that could have even

9    potentially been shared with third parties.

10        **MR. LOESER:**  Your Honor, if I may, I think there will

11   probably be multiple comments in response to that statement.

12   That makes no sense to us at all.

13        First of all, the question of their brief, which they

14   quote in their statement, talks about information, in fact,

15   shared.  And what our brief said in our reply was information

16   shared or made accessible.

17        And we were very careful to use that language, "made

18   accessible," because Facebook has said for a long time that it

19   doesn't keep records of what it actually shares, which seemed

20   hard to believe to us.

21        But in order to avoid a semantic game, we also included

22   the reference to "made accessible" because whether it was

23   shared, whether they have records of it, if it was put in a

24   place or utilized in a way where third parties had access to

25   it, that substantially expands the universe of potential

1  information.

2      Also, as, Your Honor --

3          **THE COURT:**  That's what I heard Facebook just say.

4  They agree.

5          **MS. KUTSCHER CLARK:**  Yeah.

6          **THE COURT:**  It is made accessible, not just shared.

7          **MS. KUTSCHER CLARK:**  Yes.

8          **MR. LOESER:**  Then, perhaps, we need some clarification

9  on what they interpret "made accessible" to mean because it

10  doesn't mean the same thing as actually shared.

11      And so if we could hear clearly from Facebook that they

12  agree with that, that would be helpful.

13      Second, the nature of the information that Facebook was

14  ordered to produce is such that it is impossible to believe

15  that there isn't information that exists.

16      We are talking about entirely distinct categories of

17  information from what they have produced.  They have produced

18  the information that users post.  As Your Honor well knows,

19  what they didn't produce was all the information collected

20  from -- off platform activities and inferred from and about on

21  and off platform activity.

22      And it is, frankly, just impossible for us to believe that

23  while the universe of potential discoverable information was

24  expanded threefold, actually, there isn't anything that fits

25  those categories, categories which were derived from our review

1    of Facebook's production to see what else do they do and what

2    else do they do with it.

3        So it just -- it just seems baffling to me that after all

4    of this fighting and all their effort to keep us from getting

5    this information, they are now coming back and claiming it

6    doesn't really exist.

7        **MS. KUTSCHER CLARK:**  Your Honor --

8        **MS. STEIN:**  So, Your Honor, respectfully, we are not

9    doing anything to prevent Plaintiffs from getting information.

10       We spent months dealing with Plaintiffs taking the

11   position that even if the data was in a black box that was

12   inaccessible to anyone, that they would want to know what was

13   in that black box.  So they did a complete 180 in their

14   sur-reply brief.

15       Leaving that aside, we are trying to figure out whether

16   there is anything else to be produced.  The inferences that

17   Mr. Loeser just mentioned -- Facebook does not share or make

18   accessible inferences with third parties, period, full stop.

19       Those inferences are the way that Facebook has its

20   business model.  It uses those inferences to run its business.

21   It does not sell those inferences.  It doesn't share those

22   inferences.  It does not make them accessible.

23       That is why companies come to Facebook and ask Facebook to

24   help with targeted advertising because we, Facebook, will not

25   share those inferences with anyone.  That would destroy

Facebook's business model.

**MS. WEAVER:** So, if I may, we have received no production of data Facebook receives from third parties.

We have received no inferred data. And this is the semantic game that Facebook has played since the beginning that analysts and governments have challenged.

Facebook says: We do not sell your data. And it may be true that they don't put it in a box and hand the data over the way you do a widget. They do sell inferences.

And what we need to know is how our clients were targeted based on the amalgamation and analysis of all the data that Facebook is pulling from everywhere. So we want the inferred data.

I want to know if I have been targeted as a 50-year-old woman in Oakland as having a higher insurance risk or a different financial risk.

That is how Facebook makes its money, and they have refused to be transparent about this all around the world. But we are in this lawsuit. They keep telling us they don't make -- and this ties back to the revenue argument.

Let us see how they make their money. Maybe they are right. But all we have been doing is fighting with the lawyers. It is time for evidence.

We would love a 30(b)(6). We would love documents. We would love data. All we have been getting right now is sitting

1   in Facebook Zoom meet-and-confers and positions.  And we are

2   ready for the evidence.

3          **MS. KUTSCHER CLARK:**  Your Honor, I have two quick

4   responses.

5          **MR. KO:**  Your Honor --

6          **THE COURT:**  Let's let Ms. Kutscher go.

7          **MR. KO:**  Okay, Martie.

8          **THE COURT:**  We can't hear you -- at least I can't hear

9   her.

10          **MS. KUTSCHER CLARK:**  Can you hear me now?  I'm

11  speaking more loudly.  Okay.

12          First of all, this case is not about targeted advertising.

13  Judge Chhabria said very clearly in his Motion To Dismiss order

14  that the case is not about targeted advertising.  Plaintiffs

15  conceded that the case is not about targeted advertising in the

16  briefing on this issue.

17          In terms of the inferences, the off-Facebook activity, it

18  is not correct that none of that information has been produced.

19          The information we produced previously includes thousands

20  and thousands of pages of users off-platform activity.  It also

21  includes massive lists of user's interests that Facebook has

22  derived from their activity on and off the platform.

23          During the briefing Plaintiffs were asking for more of

24  that information.  They were asking for information the

25  Plaintiffs are not able to see themselves that Facebook might

1    have in those categories.

2        What we have been doing is trying to find out -- and we

3    have conducted extensive, extensive investigations at Facebook

4    to understand whether there is any additional information in

5    any of those categories that could have potentially been made

6    available to a third party in any way, shape or form.

7        And the answer we are repeatedly getting is no.  What has

8    been produced represents the universe of what could have been

9    made available in any way to a third party.

10       But, again, we are continuing to conduct this

11   investigation because we want to be a hundred percent sure, and

12   that is what we are working on.  But, in the meantime, we have

13   not come across any type of information that is ever made

14   accessible; has ever been made accessible that is outside what

15   has already been produced.

16       **MS. WEAVER:**  Your Honor, we view this as them trying

17   to re-litigate an order that you already issued in Discovery

18   Order Number 9.

19       The scope of the case is whether private information sent

20   in voice -- let's say Facebook Messenger was used and

21   amalgamated with our information to target the Plaintiffs and

22   either --

23       **THE COURT:**  No, no, no, no.  I don't think so.  I

24   don't think so; right.  This is -- this came from Cambridge

25   Analytica and that they had access to information.

1          **MS. WEAVER:**  Right.

2          **THE COURT:**  Right.

3          **MS. WEAVER:**  Right.  And they used it to -- they

4     targeted lazy liberals to stay home and not vote in the

5     election.  This is exactly Cambridge Analytica.  They drew

6     inferences about people and crafted messages to them to get

7     them to stay home.

8          Or it recently came out that 3.5 million African Americans

9     were targeted with message to influence their voting behavior.

10    This is squarely within Cambridge Analytica, and this is

11    exactly the case.

12         So people need to understand how they are being --

13         **THE COURT:**  What did you mean in your sur-reply by

14    "shared"?  I guess that's the question.

15         **MS. WEAVER:**  Or reasonable made accessible.  Yeah, I

16    mean, that's -- the issue is --

17         **THE COURT:**  What is -- to the point, what does "made

18    accessible" mean?

19         **MS. WEAVER:**  Right.  So I -- I'm Cambridge Analytica,

20    and I want information so that I can target individuals who I

21    think will respond to my messaging in an election.  And our

22    nine named Plaintiffs, many of them feel they were targeted in

23    this way.

24         So Facebook ran its algorithm based on all of the data

25    that it had, and it didn't separate the private and the

1  public -- at least Facebook has never even taken that position

2  in this case -- and said:  Here are the people.

3       So they are targeting, and we want to see --

4       **THE COURT:**  Have they provided the named -- the names

5  of those people?

6       **MS. WEAVER:**  No.  They just allowed the messages to go

7  through to them, so they are targeted.

8       **THE COURT:**  So Cambridge Analytica didn't have that

9  information then?

10      **MS. WEAVER:**  Cambridge Analytica also got data but

11 also targeted them.  It's both.

12      **THE COURT:**  Okay.  And so it is the data that

13 Cambridge Analytica then got?

14      **MS. WEAVER:**  That's a piece of it, and it is also how

15 they are targeted going forward.

16      What we don't know is what the business partners and --

17 that is a separate -- Cambridge Analytica got it through an

18 app, through Kogan's app.

19      But what is also going on is the data sharing -- which the

20 business partners and the white listed apps -- and we are not

21 getting the data that they have on the Plaintiffs.  We don't

22 have one shred of data.  All we have is this, you know, the

23 actual platform activity.

24      So we need -- what we would really like is to take some

25 evidence on this, Your Honor, because --

1          **THE COURT:** You mean the 30(b)(6)?

2          **MS. WEAVER:** That would be great.

3          **THE COURT:** Well, I think that is probably where we

4    are at now.  I think --

5          **MS. WEAVER:** That would be great.

6          **THE COURT:** I think there is this disconnect, right,

7    or disbelief -- I guess I should say more than disconnect -- as

8    to how Facebook operates.  And so we just need somebody under

9    oath saying:  No, this is how it operates.

10         **MR. KO:** Your Honor, just one last thing on this --

11   not to belabor the point -- I wish I could share my screen

12   right now.  I'm looking at Facebook's data use policy right now

13   in the section that says "information that we share."

14        And included in that category are sharing with third-party

15   partners, and that includes partners who use Analytica

16   services, measurement partners, partners offering goods and

17   services in our products, advertisers, vendors and service

18   providers, researchers and academics, law enforcement or

19   pursuant to legal request.

20        So they, by their own admission in public and pursuant to

21   their data use policy, talk about the information that they

22   share --

23         **MS. WEAVER:** Share.

24         **MR. KO:** -- with third parties.  So I know Ms. Stein

25   said full stop, they don't share anything.  That's --

1          **THE COURT:**  No, no, no, that's not what she said.

2     What she said is they produced what they shared, not that they

3     don't share anything.

4          **MS. WEAVER:**  But that's not --

5          **MS. STEIN:**  I said that we don't share inferences.

6          **MS. WEAVER:**  All we had was a subset of user's

7     platform activity.  I'm sorry, Deb.

8          **MS. STEIN:**  I said we don't share inferences.  That is

9     what I said.

10         **MS. KUTSCHER CLARK:**  Your Honor, I think a big piece

11    of what is getting lost here is third parties frequently draw

12    their own inferences, and that might have been what happened in

13    Cambridge Analytica.  We know that happens in other settings.

14        So Facebook shares various categories of information, and

15    third parties might use that information in different ways.

16    They might combine that with information they have.  We don't

17    have visibility into that.

18        But once the information is shared, third parties might

19    use it to form their own conclusions; but that's not

20    information we would have.

21         **MS. WEAVER:**  But we don't even have the data that

22    Cambridge Analytica got; right?

23         **THE COURT:**  I don't know.  Is that true?

24         **MS. KUTSCHER CLARK:**  I believe you do because

25    Cambridge Analytica only received data that Kogan was able to

1   access through his app and what --

2         MS. WEAVER:  Can you identify to us by Bates number

3   which documents those are because I don't believe we have that.

4         MS. KUTSCHER CLARK:  That's not the way the materials

5   have been produced.

6      What we have produced is the universe of data that could

7   have been made accessible to third parties.

8      We did not produce nor was there a request specifically

9   for information requested by Kogan.

10        MR. LOESER:  So, Your Honor, just -- this is an

11  interesting discussion, and I think Your Honor has rightly

12  identified that the parties, frankly, are just -- these are

13  lawyers talking about things that -- we need evidence.  A

14  30(b)(6) is an excellent idea.

15     We just don't believe how -- their description of what is

16  or is not shared or made accessible.  We need to put somebody

17  under oath and have them testify about that.

18     The documents that we have seen in their production that

19  describe their practices talk about sharing; talk about

20  absorbing off-platform activity; talk about sharing inferences.

21     The ADI investigation where they sent their own

22  questionnaires out to apps asked the apps to identify any

23  information that was obtained from Facebook and inferences

24  drawn from it.

25     And so there is a huge disconnect between what we think is

going on and the way they are describing.  The real virtue of someone under oath testifying is that we can get through the semantics and just figure out really what happened.  So I do think that you are right; that it is time to do that.

Facebook can read your order.  They know what they are supposed to do.  I assume they are going to go out and comply in good faith with that order.  And the sure test to whether that happens or not is when we get somebody under oath and they testify about what exists and what doesn't exist.

THE COURT:  Why shouldn't we do that?

MS. KUTSCHER CLARK:  Your Honor, I would respectfully request that before we move into a deposition, that we have the opportunity to complete our investigation because we are working through that right now because, again, we want to make sure that what we understand is correct.

And obviously to even prepare a 30(b)(6) deponent, we would need to complete that sort of investigation.  And I think it is going to take some more time.

Again, we are talking about a 13-year period, and data was shared in different ways with different source of third parties over that period.  And this is a pretty large historical exercise to look into.

THE COURT:  Right.  But I don't know why we can't -- I mean, you are doing that -- but get something on calendar and the Plaintiffs can draw up their questions, right, because that

1  is going to take some while, no doubt --

2  (Laughter)

3  **THE COURT:** -- to negotiate.  And this isn't

4  everything.  This is just, like, let's just figure it out.

5  Like, this is a big -- this is another big issue in the case.

6  We have this disconnect.

7  Let's just figure out:  How do they use this data?  How is

8  it shared?  What do they mean by "made accessible?"

9  Maybe you limit it to a time period, so you don't need to

10  complete the whole thing; right.  I mean, the time period that

11  we are most interested in -- or at least the first one -- is

12  the Cambridge Analytica.  That is how the whole case got here.

13  So what you do is start with a limited time period, and

14  that would probably --

15  **MS. WEAVER:**  We could do that, Your Honor, 2012 to

16  2016 or 2017.

17  **THE COURT:**  Much easier to prepare your witness on.

18  You can then focus your investigation on that.  We are just

19  going to take it in chunks, I guess, in a way.

20  Let's do that because I think we are -- yeah, I keep

21  hearing arguments.  Let's get -- let's get a witness in there.

22  So what I would like you to do is:  Plaintiffs, you should

23  work on that notice.  It is not an everything, all, whatever.

24  This is -- let's just figure out --

25  **MS. WEAVER:**  Targeted.

1          THE COURT:  Targeted disagreement, limited period of

2     time.

3          MS. WEAVER:  We propose maybe Thursday, January 14th,

4     or Friday, January 15th, for the data, 30(b)(6) and --

5          THE COURT:  I don't want to talk to you guys -- I

6     don't want to do that right now.  You guys do that.

7          MS. WEAVER:  Okay.  We will work it out.

8          MS. STEIN:  I also really -- respectfully to

9     Ms. Weaver's point of getting something on calendar -- we need

10    to know what the topics are.  We need to agree on the notice

11    and the subject --

12         THE COURT:  I agree with that.  I was thinking early

13    February especially since we have that five days in there.

14         MS. WEAVER:  Fine.

15         THE COURT:  You need to give them notice first.

16         MS. WEAVER:  Fine.  We will do that.

17         MR. LOESER:  I think we should maybe have a schedule

18    for when the notice should be completed or else I can see this

19    dragging out forever.

20         THE COURT:  So that's up to you.  What would you like

21    your deadline to be?

22         MR. LOESER:  Why don't we take, folks, seven days

23    enough to draft our notice?

24         MS. WEAVER:  Yes.

25         THE COURT:  And, perhaps, Facebook can respond within

1   seven days with adjustments if this falls on New Year's Eve,

2   which it probably does.  So maybe add a few more days there.

3   But I think that's plenty of time to negotiate this targeted

4   notice.

5            MS. KUTSCHER CLARK:  Your Honor, I'm just looking at

6   the calendar quickly.  If Plaintiff took seven days to give the

7   notice, that means Facebook would have to respond over the

8   holidays even if we had two weeks to respond.

9            THE COURT:  So extend that.

10           MS. KUTSCHER CLARK:  So I think we would need until at

11  least early January, probably the second week in January, to

12  respond if we are not going to interfere with people's

13  holidays.

14           MS. WEAVER:  So maybe January 11th, Martie?

15           THE COURT:  That's what I was going to suggest.

16  January 11th.

17           MS. KUTSCHER CLARK:  So we would get the notice on the

18  16th?

19           THE COURT:  By the 16th.

20           MS. KUTSCHER CLARK:  And respond by the 11th?

21           THE COURT:  Yeah.

22           MR. KO:  Well, why don't we -- maybe I'm speaking out

23  of turn on my side -- but why don't we give ourselves a little

24  more time to put together the notice then if -- you know, one

25  week from today, we could -- I'm thinking maybe Friday, the

1    Monday after that?

2         **MR. LOESER:**  Why don't we take ten days, and then it

3    balances out a little bit.  That's fine.

4         **THE COURT:**  Well, let's see.  So if you gave it to

5    them by the 18th.

6         **MR. KO:**  The 18th.

7         **THE COURT:**  Right.  Then we have two weeks of the

8    holidays.  One week is going to be a non-working week, and

9    there are five days in there.

10        Does the 11th still work for that with Facebook or how

11   about until the 13th?

12        **MS. KUTSCHER CLARK:**  Yeah.

13        **THE COURT:**  This is your initial response, right, your

14   initial response.  So I think the 11th.  That gives you the

15   entire week of the 4th.

16        **MS. KUTSCHER CLARK:**  Okay.  I think it would be

17   helpful to have a little bit of guidance on the scope of this

18   and what the topics would be, which would hopefully help to

19   limit the number of disputes that might arise.

20        As we understand, the topics should be limited to the

21   sharing or accessibility of user data during the 2012 to 2016

22   time period; is that right?

23        **THE COURT:**  Yeah.  The topic is -- we went through

24   this long motion on this production and the off-platform and

25   what was covered by Judge Chhabria.  Issued the order.  And now

1    it is like we already produced everything, whatever.  It is to

2    figure out that question.  It is to figure out that question.

3            MS. WEAVER:  We would view it as what is responsive to

4    Discovery Order Number 9, Your Honor.  That is how we would

5    frame --

6            THE COURT:  That's that order; right?

7            MS. WEAVER:  Exactly.

8            MR. KO:  The three categories they identified, Judge

9    Corley --

10           THE COURT:  Discovery Order Number 9, perfect.

11           MS. WEAVER:  Exactly.

12           THE COURT:  Limited to discovery --

13           MS. KUTSCHER CLARK:  Could I just ask a clarifying

14   question because I think the parties have had a little bit of a

15   disconnect here.

16       We read Discovery Order Number 9, particularly in light of

17   Plaintiffs' briefing, to relate only to data that was shared or

18   otherwise made accessible, as Mr. Loeser puts it, to third

19   parties and is not generally about all of the data in those

20   categories that Facebook has ever collected.  It is about what

21   was shared.

22           THE COURT:  This is a 30(b)(6) to figure out what

23   Facebook does.  So now no doubt the deponent will talk about

24   information that they collect but don't share; right.

25       And then we will talk about whether that is responsive or

1    not.  This is so the Plaintiffs can figure out this is what

2    Facebook does.

3        This is to sort of to verify the representation that yes,

4    we collect this information -- inferential data, but it is not

5    made accessible to third parties.

6        So they would have to talk about it; right?  They would

7    have to talk about that.  And if it is not made accessible,

8    then what do they do with it?

9        MR. LOESER:  Your Honor, we really need a

10   clarification because I think it does avoid another huge

11   semantic game over what "made accessible" means.

12       And so I think that is the right way to go.  I think that

13   will allow us to understand what is the information and what

14   did you do with it.  That's --

15       THE COURT:  Okay.  All right.  So the next topic was

16   the privacy settings data.  I don't know what to do -- to say

17   about that.

18       MS. WEAVER:  Your Honor, Leslie Weaver on behalf of

19   the Plaintiffs.

20       So we -- this is the issue.  What has been produced to us

21   is not the way the data exists on the platform.  And so when

22   there is a post, normally I can restrict it to my friends Deb

23   and Martie, and you can see that.

24       And they have asked us to identify what, you know, we

25   contend is really at the heart of the case, which to us is what

1    was intended for restricted audiences.

2         And we can't do that in the format that they produced it.

3    This is again the Facebook platform activity.  They produced it

4    without consulting us as to format, and we just need to get --

5    we just need that information.  It is obviously at the heart of

6    the case.

7         We are doing the best that we can to respond to their

8    interrogatories with our own information.  Like, we can see

9    Facebook Messenger messages are restricted, so we have

10   identified those; and we are talking extensively with the named

11   Plaintiffs.  They have been doing a lot of work, but we can't

12   identify the posts right now because we can't see how they were

13   restricted.  It's that simple.

14        **THE COURT:**  I guess one question I have for Facebook,

15   I thought one potential argument you had was that the

16   Plaintiffs did not restrict their data.  You know, so it wasn't

17   private data.  Is that right?

18        **MS. KUTSCHER CLARK:**  Your Honor, that might be true of

19   certain data.  The bigger issue for us is that Plaintiffs are

20   suing Facebook alleging that Facebook shared their,

21   quote-unquote, sensitive information.

22        And we have asked them to tell us what information they

23   think is sensitive.

24        They have told us they can't do that unless we produce a

25   version of their accounts that shows next to each item on their

1    account what the privacy setting was.

2        We have looked into this extensively, and Facebook

3    accounts are not made for production in litigation and simply

4    can't be produced in that format.

5        As I understand, to produce a Facebook account in the

6    format Plaintiffs are asking for it, we would actually need to

7    have engineers write new code.

8        To locate the privacy settings for individual items on an

9    account, someone actually has to manually click on every single

10   item and follow a link which will then display the privacy

11   setting.  It is not metadata.  It is not something that can

12   just be displayed next to the item.

13       Plaintiffs have access to their accounts, and they are

14   able to do that.  They can log into their accounts.  They can

15   look at the posts they are concerned about.  They can look at

16   any information on their account they are concerned about.

17   Click the link and see what the privacy setting is.

18       What they want is for one of us or for someone at Facebook

19   to click through every single item on their account -- and

20   there are hundreds of thousands of pages, many of which might

21   have 20, 30 items on them -- and then follow the link.

22   Screen-shot the pages and produce them back to them.

23       Again, this is something Plaintiffs can do.  We have

24   suggested that there might be a way to make it easier if

25   Plaintiffs would look at their accounts and tell us what

1   information they are concerned about.

2       The accounts include all sorts of stuff.  They include

3   restaurant reviews, newspaper articles, cartoons, stuff that is

4   not conceivably sensitive.

5       If they would tell us what information they think is

6   sensitive -- and this was one of their interrogatories -- we

7   could maybe take this limited list or a more targeted list of

8   posts and pull it for them, and we would be willing to do that.

9       But what doesn't make sense is to have Facebook have an

10  engineer or someone else click through hundreds and hundreds of

11  thousands of pages of every single thing on the named

12  Plaintiffs' profiles to then follow links to the privacy

13  settlings when presumably Plaintiffs have a sense of what they

14  thought was sensitive when they alleged that Facebook shared

15  their sensitive information.

16          **MS. WEAVER:**  I can respond to this, Your Honor.

17          **THE COURT:**  Yes.

18          **MS. WEAVER:**  We have identified categories.  What it

19  seems Facebook wants us to do and what their interrogatories

20  asked was us to identify by Bates number in what they produced

21  what is sensitive by actual -- each post.

22      So we have begun the process of going through that, but

23  here is the disconnect:  They produced a snapshot in time of

24  Facebook activity.  They want us now to go to evidence -- you

25  know, the Facebook -- users have not produced their own

1   Facebook platform to Facebook because Facebook has it.

2        I don't know how we would produce it to Facebook.  I can

3   go with a Plaintiff and look right now at a post and find what

4   is restricted there post-by-post.  And, of course, this would

5   be millions or, perhaps, billions of posts.  But that's fine.

6   This case is a lot of work.

7        But that privacy restriction today may not be the same

8   privacy restriction that is in the snapshot in time that they

9   produced.

10       So we have given them examples.  And I don't even know how

11  to get that into evidence because that privacy restriction that

12  they are looking at online hasn't been produced at all.  This

13  is -- this is the conundrum.

14       We have given them examples, examples of health and

15  medical information, private information about families.

16       They will depose these people.  These people will explain

17  what they thought was private.  And we will do whatever work

18  Your Honor tells us to do, and we are engaging in this subset

19  of a subset review right now to honor that.

20       But at the end of the day, that is not going to be the

21  basis of our claims.  That is not the evidence we are going to

22  present at trial, and it's convoluted.

23       I would just say:  Let's wait until they -- we can see

24  everything.  And the other thing is, this response will also be

25  informed once we get all the data on the nine named Plaintiffs

1  in Discovery Order Number 9.

2      We have given them interim responses but it will change.

3  Once these Plaintiffs understand everything that Facebook has

4  collected about them, their responses to these questions are

5  going to look very different.

6          **MR. LOESER:**  Your Honor --

7          **MS. STEIN:**  May I respond to that, Your Honor?

8          **THE COURT:**  Yes.  Go ahead, Ms. Stein.

9          **MS. STEIN:**  So respectfully, you know, Plaintiffs have

10  discovery obligations too.  Facebook has been working its tail

11  off.  We have provided almost 500 pages in interrogatory

12  responses.  We are reviewing millions of documents here.

13      When we originally served RFPs, you may recall Plaintiff

14  said:  We don't want to do this as RFPs.  Serve

15  interrogatories.

16      We served interrogatories.  We gave them lots of extra

17  time.  We literally got one page of substantive responses back

18  to our interrogatories.  What we are asking about is

19  information about Plaintiffs' allegations.  What is the

20  sensitive information?

21      Plaintiffs have all of this at their -- in -- in their

22  possession, custody and control.  They know in their heads --

23  we can't figure out what they thought was sensitive; what they

24  alleged to be was sensitive.  That is exclusively in Plaintiffs

25  custody and control.

And what we need to know here -- and what Plaintiffs have an obligation to do -- is to sort through their information, tell us what was sensitive. They didn't want to do this by producing. We produced everything for them that was in their accounts.

They now want us to click through news articles, other things that they are posting and provide every privacy setting. We are not asking about the privacy setting. That's not what we asked.

We asked what was the sensitive information, and Plaintiffs said: We don't know what was sensitive. It depends on whether it was marked private. That's not true. What was sensitive would be a subset of it.

Not everything that is marked private is sensitive. People repost other people's posts. They put up restaurant reviews, newspaper articles. That may be all marked private, but that's not the sensitive information that matters here.

It is critically important that Plaintiffs do their obligation in discovery and not keep pushing everything onto Facebook to do.

**MR. LOESER:** Your Honor, just very briefly, I think again, we are just kind of having a practical problem; and a 30(b)(6) may be helpful here as well.

The practical problem is Facebook maintains data. They have a platform for users to post things, and they produced a

1    bunch of information but not in the format in which it is kept.

2        The practical problem is:  Is it possible for them to

3    produce the information in the format in which it is kept as a

4    result of which the Plaintiffs can easily respond to their

5    discovery requests.

6        **THE COURT:**  Well, can I just ask you first, though,

7    why do the Plaintiffs need -- I mean, if the answer to the

8    interrogatory is anything that was marked private or was

9    restricted in some way is sensitive, then say that.

10        **MS. WEAVER:**  We have, Your Honor.

11        **MS. LAUFENBERG:**  Your Honor --

12        **MS. WEAVER:**  Go ahead, Cari.

13        **THE COURT:**  Then that's one answer.  And then another

14    answer is -- and then you go through what the person

15    identified, regardless of what the privacy settings are; right.

16        Now, it may turn out that you identified something as

17    sensitive; but you didn't -- your client didn't use any privacy

18    setting.  Okay.

19        **MS. WEAVER:**  Here is the problem -- yeah, here is the

20    problem with that -- I mean, we will do whatever you order.

21    And if you want us to do that with this subset of information,

22    which, by the way, is not everything they have ever posted.

23        **THE COURT:**  I understand.  You can only do it on what

24    has been produced.  I understand.

25        **MS. WEAVER:**  Here is the issue:  I am an individual.

These are humans in the middle of a pandemic with jobs, and we are asking them to go back and look through every post they ever made on Facebook. And we are going to have to ask them to do that again which we will do. That is what this case is demanding.

I can't remember what I posted in 2007 or 2009. And when I look at the post, I can't remember if it was private to me then or not. If I looked and saw that I only shared it with Cari, I would know oh, that is sensitive. But they would be guessing to say -- and we have given them examples of categories. Like I said, medical information, we can give them categorical examples.

And for these Plaintiffs -- for some of them it is political stuff. Some of it is not. They have different comfort zones with what they shared. We can go back and view this, but --

THE COURT: Are the examples tethered to the specific posts?

MS. WEAVER: Yes. And we can --

THE COURT: Ms. Stein is shaking her head no.

MS. WEAVER: So we have given them categories of messages, and we have told them we will give them examples and we are amending further.

THE COURT: So that's what you need to do.

MS. WEAVER: Okay.

1       **THE COURT:** You need to -- like if you are -- you

2 can't just say medical and health information. What does that

3 mean?

4       **MS. WEAVER:** Fine. We can find examples.

5       **THE COURT:** Give them an example; right?

6       **MS. WEAVER:** Yes.

7       **THE COURT:** If it is the fact that I visited this or,

8 you know, shared with my friend this website about this drug;

9 right. I mean, that is different; right.

10    So you need to tether it to examples. And they just need

11 to answer to the extent they can. That's all it is, is to the

12 extent they can do, based on what they have now.

13    What you have said is you can't figure out what the

14 privacy setting was in 2007. Well, then, Facebook can't demand

15 that you base your answer based on that if you don't know what

16 it is.

17       **MS. WEAVER:** Right. Okay.

18       **MS. STEIN:** And, Your Honor --

19       **MS. WEAVER:** Thank you, Your Honor. We will do that.

20       **MS. STEIN:** We have never taken the position that

21 their answer should be tethered to privacy settings. What we

22 have asked is what Plaintiffs in their allegations considered

23 to be sensitive and to identify the posts.

24    Now, back in 2007 you couldn't click -- you couldn't

25 individually identify individual posts by privacy setting. It

1   was more -- more of a default for how you posted generally.

2   There weren't individual options when you posted something.

3       So, you know, respectfully having Plaintiffs just say:

4   Anything we marked private was also sensitive, I, frankly,

5   don't think is a good-faith answer to an interrogatory

6   response.  It is just saying everything -- if everything was

7   marked private in 2007, '08, '09 and so on, that includes, you

8   know, public information that they were posting or reposting

9   someone else's public post and it happened to be marked

10  private, that doesn't make it sensitive.

11      And I think that Plaintiffs have more of an obligation to

12  do an investigation in responding to interrogatories just the

13  way Facebook did; right.

14      I mean, Facebook when we drafted our 500-page response, we

15  spent hundreds, if not thousands of hours, you know, working on

16  those responses and conducting investigations.

17      Now, maybe we did too much.  And if we did too much, then,

18  you know, shame on us; and we will know that going forward.

19  But, you know, I do think that Plaintiffs have an obligation to

20  tell us what is sensitive and not just say:  It was under our

21  privacy setting; ergo it was sensitive.

22          **THE COURT:**  It would obviously have to be more

23  specific.  Look, they are going to amend their responses.  They

24  will be as robust as they can.  I don't think you can expect

25  them to identify every single one that is on there, but it

1 should be pretty robust, right, and tethered to actual posts;

2 right.

3     Like political posts, that is what Cambridge Analytica is

4 about, sensitive information.  Here is examples of posts that I

5 never expected would be made accessible to third parties.

6     **MS. LAUFENBERG:**  Can I offer -- this is Cari

7 Laufenberg on behalf of Plaintiffs.  Can I offer one additional

8 informative overlay, which is:  The way that this information

9 has been produced, it is completely uncontextual.

10     So, in other words, you get information by category.  And

11 so what we see are a long laundry list of posts that our

12 clients made, but you don't see what they are made in response

13 to.

14     So, again, that is making our jobs very difficult here.

15 We are being incredibly diligent.  We have produced hundreds of

16 pages in response to these interrogatories.  We are continuing

17 to work.  We will amend.

18     We can only work with what we have been given, and what we

19 have been given is incredibly limited and makes it a tortuous

20 task for our clients.

21     So we need to have contextual information in order to

22 assess the sensitive -- whether this is sensitive information.

23     **MS. WEAVER:**  We are not sure that the responses will

24 be accurate because -- and that puts us in an impossible

25 situation.  It is not that we are not willing to do the work.

1    It is that we don't know how to get the answers right.

2         **MS. STEIN:**  Yeah.  We would certainly be open, if

3    Plaintiffs wanted to, you know, reprint something, you know, if

4    they don't like the format.

5         And, by the way, we reproduced their accounts in response

6    to requests that we provide things in a different format.  We

7    already went through that exercise once.  But if it is easier

8    for Plaintiffs to print things out, you know, from their own

9    account and do it that way, we are totally open to Plaintiffs

10   using it that way instead of pointing to documents that have

11   already been produced by us.

12        **MS. WEAVER:**  Maybe we can make some progress, Deb.

13   Can I ask this:  Does Facebook maintain the limited audience

14   information on the nine Plaintiffs' posts and activity?  And if

15   so, can you produce that to us?

16        **MS. KUTSCHER CLARK:**  The only way to do it is to go to

17   the live website and on the live website click each individual

18   post and follow a link to see the setting.

19        And that's what we have been trying to convey.  The only

20   other way we could even produce the account information --

21   I believe we have discussed this previously -- is to produce

22   back to you guys a live link of the Facebook accounts which is

23   what your clients already have.

24        **MS. WEAVER:**  So how did Facebook --

25        **MS. KUTSCHER CLARK:**  And none of that would be Bates

1   numbered.

2           **MS. WEAVER:** Let me just ask --

3           **THE COURT:** I'm going to have to stop you. I have to

4   go at 11:00. We have, like, two minutes. So we can't do this.

5   You guys just have to figure this out. So there is a couple of

6   others things --

7           **MS. WEAVER:** We will.

8           **THE COURT:** -- I want to address. On the additional

9   custodians, Mr. Zuckerberg, Ms. Sandberg, I think you should

10  wait until all the documents are produced. Those will be very

11  targeted once -- so I don't see any problem waiting for that.

12      On the voluntary dismissal of the named Plaintiffs, it is

13  without prejudice; and they don't have to agree. Well, look,

14  it happens all the time that a judge will deny class cert based

15  on the adequacy of the named Plaintiff.

16      And if the Judge gives the named Plaintiff the opportunity

17  to put forth a new named Plaintiff, then they have that

18  opportunity. We are not cutting that off now.

19      It is not depriving Facebook of any discovery because if

20  those people are put up later, then they get the discovery as

21  to those named Plaintiffs.

22          **MS. STEIN:** Your Honor, our issue in the

23  stipulation -- and I think, frankly, we worked through some of

24  this with Plaintiffs yesterday.

25          **THE COURT:** Okay.

1    **MS. STEIN:** We -- we are fine stipulating to the

2    dismissal of certain named Plaintiffs without prejudice to

3    their being in the class. We don't want to waive any right in

4    there, and I think Plaintiffs said that they are fine; that we

5    don't need to.

6        What we were struggling with is that we don't -- if any

7    Plaintiff wants to drop, that's fine. But they need to fish or

8    cut bait but that specific named Plaintiff because it's -- you

9    know, otherwise they should stay in case and, you know,

10   proceed; but they are supposed to be representatives here.

11       **THE COURT:** No, no, no, I don't understand. I think

12   that's where I disagree with you.

13       I think to get through the burden arguments and all that

14   and to make -- they narrowed the class reps they were putting

15   forward on the motion.

16       Should Judge Chhabria deny the motion and should he give

17   them the opportunity -- he may or may not. He may not do it.

18   It is going to be up to Judge Chhabria to put forth different

19   class reps; right. It could be these people. It could be

20   somebody else. I mean, presumably the ten they put up they

21   think are their ten best anyway.

22       No. I don't think they have to -- I disagree with you. I

23   don't think that's the case.

24       **MS. STEIN:** Well, Facebook wants to preserve its

25   objections as to their being able to come back as named

```
 1   representatives.
 2           THE COURT:  Of course.  You can preserve -- what I'm
 3   saying is nobody has to give away anything.  You can make that
 4   argument.  What I'm saying is we are not going to hold this up
 5   so that they agree with your argument.  You can preserve your
 6   argument.  They can preserve their argument.
 7           MS. WEAVER:  To be clear, a lot of these Plaintiffs
 8   are disappointed, Deb.  I'm not kidding.  They want to be
 9   deposed by you.  So --
10           MS. STEIN:  You know --
11           THE COURT:  Well --
12           MS. STEIN:  We can arrange that, Leslie.
13           THE COURT:  No, no, no, Ms. Weaver.
14           MS. WEAVER:  Yes.
15           THE COURT:  Right.  When we get to our sort of absent
16   class member discovery -- I've had this come up in a few
17   cases -- they put forth, right, because the Defendants often
18   want to go beyond the named Plaintiffs and take a few -- the
19   first person they point to is -- they say:  This person was a
20   named Plaintiff.  It is not too burdensome on them.  I'm sure
21   Facebook would be happy to depose them.  So --
22           MS. WEAVER:  My co-Counsel is going to be mad at me.
23           MR. LOESER:  Your Honor, in the ten seconds that is
24   left, I do want to just make a point that is something that has
25   been pervasive which is a lot of arguments we have heard from
```

1   Facebook can be addressed by our better understanding of how

2   data is maintained.

3       So, for example, this whole issue of how they produced the

4   on-platform activity comes down to:  How does Facebook maintain

5   this data and can they produce it in a way that is in a native

6   format where we can answer their questions easily by looking at

7   the data instead of this sort of weird treasure hunt we have to

8   go on through live Facebook pages to try and match up with

9   their Bates productions?

10      I would suggest that of the 30(b)(6) topics that are

11  really critical here is one that is just focused on how data is

12  maintained for these various subjects.  We could avoid a lot of

13  fighting if we just had a better understanding of how the data

14  is maintained for these different areas that we keep arguing

15  about.

16      **THE COURT:**  And we tried getting experts together

17  months ago, months ago.  If you want to do it, put it in your

18  30(b)(6) and we will see --

19      **MS. STEIN:**  Well --

20      **MS. WEAVER:**  We tried that, Your Honor.

21      **MS. STEIN:**  We would strenuously object to that

22  because we went through months and months of informal ESI

23  discussions.  We have been down this road.  We have had all

24  these meet-and-confers.

25      The bottom line is Plaintiffs just don't believe us.  And

1  we do all of this work as counsel to provide this information

2  informally, and they just don't believe us.

3      MR. LOESER:  Sometimes it is because our experts are

4  telling us something very different.  We like you very much.

5  It is not anything personal, Deb.  It is just when our experts

6  tell us:  That is impossible that Facebook doesn't maintain

7  this in a way that they can use it and easily access it.

8      We just need -- it is no offense intended to anyone.  We

9  just need evidence.  (Inaudible) can only go so far.

10      MS. WEAVER:  If you give us the verifications to the

11  interrogatories, we will know who at least is giving you the

12  information.  We can just depose them, but we have got to start

13  taking evidence.

14      THE COURT:  On the privilege log, can you submit a

15  stipulation by the 18th that was on the briefing, on the ADI?

16      MS. WEAVER:  Yes.

17      MR. KO:  Yes, Your Honor.

18      THE COURT:  I know that was Plaintiffs' proposal, so

19  I'm really asking Facebook.

20      MS. STEIN:  I think Martie --

21      MS. KUTSCHER CLARK:  What is the question, Your Honor,

22  about briefing?

23      THE COURT:  The briefing schedule on the ADI

24  privilege.  By the 18th, just stipulate to the briefing

25  schedule.

1          **MS. KUTSCHER CLARK:**  Your Honor, I don't think we will

2     be in a position to agree to a briefing schedule until we

3     receive Plaintiffs' challenges to the privilege log.  And this

4     is something we discussed extensively previously; that we need

5     to see what the challenges are.

6          We are going to need to meet and confer with them about

7     the challenges so that we understand the scope and nature of

8     what is being briefed before we set a schedule on it.

9          **THE COURT:**  Okay.  I have to go.  I have got the call.

10    So sorry.  I'm out of time.  I can't resolve that.  When is our

11    next conference, January what?  It is not going to be this

12    year.

13                         (Laughter)

14         **MR. LOESER:**  I'm guessing it is not the 1st.

15         **THE COURT:**  That is correct.

16         **MS. WEAVER:**  The 8th?

17         **THE COURT:**  The 8th?

18         **MS. STEIN:**  If we can make it the 15th, that would be

19    better on our end.

20         **THE COURT:**  The 15th at 8:30.

21         **MS. WEAVER:**  Works for us, Your Honor.

22         **THE COURT:**  Okay.  I will see you then.  I will do the

23    best I can after today.

24         **MR. LOESER:**  Thank you, Your Honor.

25                    (Proceedings adjourned at 11:04 a.m.)

1                           ---oOo---

2

3                   **CERTIFICATE OF REPORTER**

4           We certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:   Thursday, December 10, 2020

8

9

10

11     _____

12                 Marla F. Knox, RPR, CRR
                    U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT S

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaint₍₎fs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' NOTICE OF DEPOSITION OF DEFENDANT FACEBOOK, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)** |

**TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** under Federal Rules of Civil Procedure 26 and 30(b)(6), Plaintiffs, by their counsel, will take the deposition of Defendant Facebook, Inc. ("Facebook") at 9:00 a.m. on February 5, 2021 via remote audio-video conference and through a remote platform deposition service mutually agreed upon by the parties. The deposition will be taken before a person authorized by law to administer oaths under Federal Rules of Civil Procedure 28(a) and shall continue from one day to the next, excluding Sundays and holidays, until the examination is completed.

Pursuant to Rule 30(b)(6) and the Court's Discovery Order No. 11 (Dkt. No. 588), Defendant is hereby notified of its duty to designate one or more officers, directors, managing agents or other persons most knowledgeable or qualified to testify on its behalf concerning the

3030

matters set forth below in Topics 1-12. Each such designee produced to testify has an affirmative duty to have first reviewed all Documents, reports, and other matters known or reasonably known or available to Facebook and to familiarize himself or herself with all potential witnesses known or reasonably available to provide informed, binding answers at the deposition.

Defendant Facebook shall inform Plaintiffs of such designations(s) at a reasonable time prior to the deposition(s), but no later than 7 days before the deposition(s), by setting forth the identity of the person(s) designated to testify with respect to the matters specified below in Topics 1-12. The deposition will continue on the day noticed and for additional days, if necessary, excluding Sundays and holidays until completed.

Plaintiffs issue this notice pursuant to Discovery Order No. 11 and reserve the right to notice and conduct additional Rule 30(b)(6) depositions of Defendant on separate, non-duplicative topics.

Dated: December 18, 2020

KELLER ROHRBACK L.L.P.

By: _/s/ Derek W. Loeser_
　　　Derek W. Loeser

Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David J. Ko (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Adele Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301

BLEICHMAR FONTI & AULD LLP

By: _/s/ Lesley E. Weaver_
　　　Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

3031

Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

3032

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have served a true and correct copy of:

- **PLAINTIFFS' NOTICE OF DEPOSITION OF DEFENDANT FACEBOOK, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)**

via Email on this 18th day of December, 2020 to the person(s) set forth below:

Joshua Seth Lipshutz
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Ave NW
Washington, D.C.
jlipshutz@gibsondunn.com

Kristin A. Linsley
Brian Michael Lutz
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street
Suite 3000
San Francisco, CA 94105
KLinsley@gibsondunn.com
BLutz@gibsondunn.com

Orin Snyder
Laura Mumm
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166
osnyder@gibsondunn.com
lmumm@gibsondunn.com

Martie Kutscher-Clark
**GIBSON, DUNN & CRUTCHER LLP**
1881 Page Mill Road
Palo Alto, CA
MKutscherClark@gibsondunn.com

Russell Falconer
**GIBSON, DUNN & CRUTCHER LLP**
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
rfalconer@gibsondunn.com

Deborah Stein
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
dstein@gibsondunn.com

Colin B. Davis
**GIBSON, DUNN & CRUTCHER LLP**
3161 Michelson Drive
Irvine, CA 92612-4412
cdavis@gibsondunn.com

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed at Seattle, Washington, on December 18, 2020.

*/s/ Sarah Skaggs*
Sarah Skaggs

3033

# SCHEDULE A

## I.  DEFINITIONS AND RULES OF CONSTRUCTION

In the event of any conflict or ambiguity between the following definitions, common usage and reference to any cited rules, statutes, or regulations should be used to provide the broadest interpretation of the term in question.

1.  "Business Plan" means any plan created or prepared by Facebook regarding Facebook's historical and future business strategy, including but not limited to Facebook's historical and future operations, and Facebook's historical and future financial positions.

2.  "Computer System" or "Computer Systems" include(s), but is not limited to, any server (whether physical or virtual), desktop computer, tablet computer, point of sale system, smart phone, cellular telephone, networking equipment, internet site, intranet site, and the software programs, applications, scripts, operating systems, or databases used to control, access, store, add, delete, or modify any information stored on any of the foregoing non-exclusive list.

3.  "Content and Information" refers to the definition in footnote 2 of the First Amended Complaint ("FAC"), referring to "content" and "information" as Facebook's Statements of Rights and Responsibilities have defined those terms. In brief, Facebook has generally used "information" to mean facts and other information about Users, including the actions they take, and "content" to mean anything Users post on Facebook that would not be included in the definition of "information." Content and Information also includes both personally identifiable content and information and anonymized content and information that is capable of being de-anonymized. *See* FAC ¶¶ 223-224. Content and Information includes data that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular User, such as:

a. Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

b. Characteristics of protected classifications under California or federal law.

c. Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

d. Biometric information.

e. Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an Internet Web site, application, or advertisement.

f. Geolocation data.

g. Audio, electronic, visual, thermal, olfactory, or similar information.

h. Professional or employment-related information.

i. Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. section 1232g, 34 C.F.R. Part 99).

j. Inferences drawn from any of the information identified in this paragraph to create a profile, dossier, or similar collection of information about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

4.  "Discovery Order No. 9" refers to the Court's October 29, 2020 Order (Dkt. No. 557), in which held, *inter alia*, that the discoverable data at issue in this case includes "Data collected from a user's on-platform activity; Data obtained from third parties regarding a user's off-platform activities; and Data inferred from a user's on or off-platform activity."

5.  "Data Warehouse" refers to refers to the open source, peta-byte (and potentially larger) scale data warehousing framework based on Hadoop that was developed by the Data Infrastructure Team at Facebook, also known as the "Hive."

6.  "Discovery Order No. 11" refers to the Court's December 11, 2020 Order (Dkt. No. 588), in which it ordered, *inter alia*, Defendant Facebook "to provide a 30(b)(6) witness regarding the discoverable user data as articulated by Discovery Order No. 9. (Dkt. No. 557.) Facebook shall also provide a 30(b)(6) witness on how it monetizes—directly or indirectly—and thus values user data."

7.  "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term pursuant to Fed. R. Civ. P. 34(a)(1)(A), and includes, without limitation, any writing, drawing, graph, chart, photography, phonorecord, Electronically-Stored Information (as defined herein) or digitally encoded data, database, graphic, and/or other data compilations from which information can be obtained, translated if necessary, by the respondent through detection devices into reasonably usable form, or other information, including originals, translations and drafts thereof, and all copies bearing notations and marks not found on the original. The term "Document" further means any document now or at any time in the possession, custody, or control of the entity to whom this document request is directed (together with any predecessors, successors, affiliates, subsidiaries, or divisions thereof, and their officers, directors, employees, agents and attorneys), including drafts. Without limiting the term "control" as used in the

3036

preceding sentence, a Person is deemed to be in control of a document if the Person has the right or ability to secure the document or a copy thereof from another Person having actual possession thereof, including, but not limited to, work product contracted by You from others. Documents that are identical but in the possession of more than one Person or entity are separate documents within the meaning of this term. Also, a draft or non-identical copy is a separate document within the meaning of this term.

8.    "Electronically-Stored Information" or "ESI" includes, but is not limited to, the following:

   a.   all items covered by Fed. R. Civ. P. 34(a)(1)(A);

   b.   information or data that is generated, received, processed, and recorded by computers and other electronic devices, including metadata (*e.g.*, author, recipient, file creation date, file modification date, etc.);

   c.   internal or external web sites, intranets and extranets;

   d.   output resulting from the use of any software program, including, without limitation, word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, texts, Facebook Messenger, WhatsApp, AOL Instant Messenger (or similar programs), bulletin board programs, screenshots/screengrabs, screen sharing recordings, webcasts, screencasts, operating systems, source code, PRF files, PRC files, batch files, ASCII files, and all miscellaneous media on which they reside regardless of whether said electronic data exists in an active file, a deleted file, or file fragment; and

   e.   activity listings of electronic mail receipts and/or transmittals; and any and all items stored on computer memories, hard disks, floppy disks, CDROM, magnetic

tape, microfiche, or on any other media for digital data storage, or transmittal, such as, but not limited to, personal digital assistants (*e.g.*, iPhones), hand-held wireless devices (*e.g.*, BlackBerrys), or similar devices, and file folder tabs, or containers and labels appended to, or relating to, any physical storage device associated with each original or copy of all documents requested herein.

9. "Hive" refers to the open source, peta-byte (or potentially larger) scale data warehousing framework based on Hadoop that was developed by the Data Infrastructure Team at Facebook, also known as the Data Warehouse.

10. "Including" means "including but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify the request, definition, or instruction but not to limit the topic.

11. "Policies and Procedures" mean any formal or informal policy, procedure, rule, guideline, internal manuals, collaborative document, directive, instruction, or practice, whether written or unwritten, that You expect Your employees to follow in performing their jobs.

12. "Marketing Plan" means any plan created or prepared by Facebook regarding Facebook's historical and future marketing or advertising strategy.

13. "User Data" or "Data" refers to the categories of Content and Information referenced by the Court in Discovery Order No. 9 (Dkt. No. 557), including "Data collected from a user's on-platform activity; Data obtained from third parties regarding a user's off-platform activities; and Data inferred from a user's on or off-platform activity."

14. "You" or "your" or "Facebook" or "Defendant" means Defendant Facebook, Inc., together with your predecessors, successors, parents, subsidiaries, divisions or affiliates (foreign or domestic), and their respective current and former officers, directors, agents, attorneys,

accountants, employees, partners, managers, members or other persons occupying similar positions or performing similar functions, and all persons acting or purporting to act on its behalf.

15.     Words used in the plural include the singular, and words used in the singular include the plural.

## II.     RELEVANT TIME PERIOD

Unless otherwise specified or agreed upon by the parties, consistent with Discovery Order No. 11, the relevant time period for purposes of this Notice is January 1, 2012 through December 31, 2017.

## III.     MATTERS FOR TESTIMONY

1.      The format, nature, and location of User Data as set forth in Discovery Order No. 9, including how and why such Data is collected, obtained, or inferred, and how it is maintained.

2.      The name, location, and function of all of Facebook's electronic or database systems that contain User Data, including but not limited to Hive and Data Warehouse, whether stored on an individual user level or in another form.

3.      The identity, nature and location at Facebook of all the metadata associated with User Data, including but not limited to nodes, edges, and fields, as set forth in https://developers.facebook.com/docs/graph-api/overview/.

4.      How User Data is or can be associated or linked to specific Facebook users—such as User IDs or other unique identifiers such as e-mail addresses and RIDs, as set forth in PwC_CPUP_FB00030737-38—and the identity, nature, and location of all such associations, including but not limited to nodes, edges, and fields, as set forth in https://developers.facebook.com/docs/graph-api/overview/.

3039

6.      Identification of the types of third parties to which Facebook makes User Data accessible or with which Facebook shares User Data.

7.      For each type of third party identified in Topic 6, identify what kinds of User Data Facebook shares or makes accessible; for what general purposes it is shared or made accessible; and how Facebook ensures it is used for those purposes.

8.      The Policies and Procedures applicable to how User Data is collected, obtained, inferred, created, and maintained, and how it is shared or made accessible to third parties, including any data deletion and retention policies related to User Data, and the impact of the litigation hold placed in this case to such Policies and Procedures.

9.      For each type of third party identified in Topic 6, identify how Facebook shares or makes User Data accessible, including the format of such data, the metadata shared or made accessible, and the nodes, edges, and fields as set forth in https://developers.facebook.com/docs/graph-api/overview/.

10.      How Facebook monetizes—directly or indirectly—and values User Data.

11.      The identity, location, and retention of Documents related to how Facebook monetizes—directly or indirectly—and values User Data, including but not limited to:

a.   All such Marketing Plans and Business Plans created or prepared by Facebook;

b.   All such Documents, including drafts and correspondence, created or prepared by Facebook to share with third parties, including but not limited to institutional and individual investors, venture capitalists, and/or private equity firms;

c.   All such Documents created in connection with preparing Facebook's quarterly and annual reports and/or any other of Facebook's publicly available filings to the SEC related to how Facebook generates revenue, and materials regarding the key

3040

metrics identified by Facebook in these reports such as Daily Active Users (DAU), Monthly Active Users (MAU), and Average Revenue Per User (ARPU).

12.    The identity of all third parties that helped Facebook create or prepare any of the Documents described in Topic 11 above.

# EXHIBIT T

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Magistrate Judge

```
                             )
IN RE:  FACEBOOK, INC.       )  NO. 18-MD-02843 VC (JSC)
        CONSUMER PRIVACY USER )
        PROFILE LITIGATION.   )
                             )
_____)
```

San Francisco, California
Friday, January 15, 2021

**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:

KELLER ROHRBACK LLP
1201 Third Avenue, Suite 3200
Seattle, Washington  98101
BY:  **DEREK W. LOESER, ATTORNEY AT LAW**
**CARI C. LAUFENBERG, ATTORNEY AT LAW**
**DAVID KO, ATTORNEY AT LAW**
**CHRIS SPRINGER, ATTORNEY AT LAW**

BLEICHMAR, FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, California  94607
BY:  **LESLEY E. WEAVER, ATTORNEY AT LAW**
**MATTHEW MONTGOMERY, ATTORNEY AT LAW**
**ANGELICA M. ORNELAS, ATTORNEY AT LAW**
**ANNE K. DAVIS, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported Remotely By:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official U.S. Reporter

```
 1    APPEARANCES VIA ZOOM:   (CONTINUED)

 2    For Defendant:
                              GIBSON, DUNN & CRUTCHER LLP
 3                            333 South Grand Avenue
                              Los Angeles, California 90017
 4                 BY:  DEBORAH L. STEIN, ATTORNEY AT LAW

 5                            GIBSON, DUNN & CRUTCHER LLP
                              2001 Ross Avenue, Suite 2100
 6                            Dallas, Texas 75201
                   BY:  RUSSELL H. FALCONER, ATTORNEY AT LAW
 7
                              GIBSON, DUNN & CRUTCHER LLP
 8                            1050 Connecticut Avenue, NW
                              Washington, D.C.  20036
 9                 BY:  JOSHUA S. LIPSHUTZ, ATTORNEY AT LAW

10                            GIBSON, DUNN & CRUTCHER LLP
                              555 Mission Street, Suite 3000
11                            San Francisco, California  94105
                   BY:  MARTIE P. KUTSCHER CLARK
12                       ATTORNEY AT LAW

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **Friday, January 15, 2021**                     **8:30 a.m.** |

1  **Friday, January 15, 2021**                                    **8:30 a.m.**

2                        P R O C E E D I N G S

3                           ---o0o---

4      **THE CLERK:**  Court is now in session.  The Honorable

5  Jacqueline Scott Corley presiding.

6      Calling Civil Action 18-MD-2843, In Re:  Facebook, Inc.

7  Consumer Privacy User Profile.

8      Counsel, starting with plaintiffs, can you please state

9  your appearance.

10      **MS. WEAVER:**  Good morning.  It's Lesley Weaver of

11  Bleichmar, Fonti & Auld.  And today with me I have Anne Davis,

12  Matt Montgomery, and Angelica Ornelas.

13      **MR. LOESER:**  Good morning, Your Honor.  Derek Loeser

14  from Keller Rohrback with Cari Laufenberg and David Ko and

15  Chris Springer, also from Keller Rohrback.

16      **MS. STEIN:**  Good morning, Your Honor.  Deborah Stein

17  for Facebook from Gibson Dunn.  I'm here with Josh Lipshutz,

18  Russ Falconer, and Martie Kutscher.

19      **THE COURT:**  Good morning.

20      Okay.  Just so you know, I have a criminal matter at 9:00;

21  so we're going to hit sort of the high points.

22      Let's start with the ADI because, as I understood it, this

23  was sort of different from the other privilege log because

24  Facebook has taken the position that because all these

25  documents, interviews -- I don't know what the ADI is -- were

1  created as part of a lawyer-directed investigation, they're

2  privileged.

3      So I don't -- I don't think it's premature in the sense

4  now that you've gone through the stip, the process that the

5  parties agreed to, you were able to narrow it down.  I think

6  now is the time to -- and plaintiffs have focused on, I guess,

7  their e-mails or memos, or whatever it would be, in which

8  there's no attorney on the string, on that.  And so I think

9  that's ripe to go forward.

10     I don't know what meeting and conferring will do.  As you

11 explained, you put very detailed explanations of why it's

12 privileged.  Either they don't believe you or, what's often the

13 case, they want confirmation.  Right?  So that's why we'll do

14 some samples.

15     So what I was going to suggest -- sometimes when we do

16 these, if the parties need guidance, including the party

17 claiming they're privileged, I let each side pick any number.

18 I don't see why Facebook should maybe pick any.  It really

19 should be I just think plaintiff.  I was going to say pick 20.

20     And then let's just get simultaneous briefs because, while

21 I do this all the time, I know with respect to investigations,

22 it'd be nice to bring me up to speed on the state of the law

23 with respect to that and privilege.  And then I'll review them.

24     So that would be my proposal.

25         **MS. STEIN:**  All right.  Thank you, Your Honor.

1    I think the issue here is that while this exercise started

2  as, you know, what I think was intended by plaintiffs to be

3  some sort of categorical challenge to investigate -- to an

4  investigation, the way this has played out in the privilege log

5  is that we've logged about 6,000 entries.  Plaintiffs have said

6  they want to challenge anything that doesn't have a lawyer on

7  it.  But the logs look very much like you would expect an

8  ordinary privilege log to look like, where the entries that

9  they're challenging facially say things like, you know, "E-mail

10  revealing advice from Gibson Dunn concerning the structure of a

11  legal investigation," you know, things like that; "E-mail

12  summarizing advice from Gibson Dunn" or from someone from

13  Facebook in-house counsel.  So it's not necessarily something

14  that is any different than you would ordinarily see.

15    And we feel that plaintiffs haven't -- are just saying:

16  We want to challenge everything.  But there really isn't a

17  rhyme or reason that connects it to how this started out as a

18  challenge to whether this investigation was privileged.

19    **THE COURT:**  Well, they've now challenged 400 out of

20  6,000.  So that's good.  That's narrowed -- right? --

21  considerably.

22    And I think whenever there's not a lawyer on it --

23  right? -- that's always more on the edges.  That's more on the

24  edges.  So I think that the showing sufficient to allow the

25  *in camera* review is there.  I feel more comfortable when I have

1   it in context and I can see it.  That's why I say just do a

2   sample, and then that should be the end of the matter.

3        **MS. KUTSCHER CLARK:**  Your Honor, if I can add to that,

4   I think a concern we have about jumping directly into briefing,

5   particularly if the briefing is going to be simultaneous, is we

6   don't actually really know what we're briefing at this point.

7   We don't know what plaintiffs' position is.  We don't know why

8   they think these particular documents are not privileged.

9        Each one of these documents, the way they're logged --

10  and, you know, we've looked at them carefully -- they're

11  summarizing legal advice; they're conveying legal advice.  This

12  isn't -- you know, we're not standing on a work

13  product assertion.

14       **THE COURT:**  No, no.  But it's your burden.  It's your

15  burden; so you know what to brief.  Whatever it is that meets

16  your burden.  Right?  It's your burden.  It's not their burden.

17  It's your burden to show that they're privileged.  So --

18       **MS. STEIN:**  Yes, Your Honor.  And --

19       **THE COURT:**  -- whatever the case law is, whatever it

20  is that says just because an attorney isn't -- which you did a

21  little bit -- isn't on the string doesn't mean, if it's

22  conveying legal advice -- it shouldn't be very long.

23       **MS. STEIN:**  So just for clarity, Your Honor, is what

24  you're asking for for briefing where plaintiffs challenge

25  certain entries, they pick certain entries that they want to

1  challenge; we respond why we believe our log has made the

2  showing that we're entitled to show; and then Your Honor will

3  decide who's right on the law and decide which ones, if any,

4  you're going to review *in camera*?

5      **THE COURT:**  Well, I think I'll just review them all

6  *in camera* with the briefs and then decide:  Yes, the privilege

7  was appropriately invoked.

8      And then that should be the end of the matter.  Right?  I

9  don't then expect -- if, let's say, all 20 I believe were

10  properly invoked, that should be the end of the matter because

11  plaintiff should really be picking the 20 out of the 400 that

12  they feel most strongly might not be privileged.  Right?  So

13  it's sort of an exemplar in that state.

14      If I don't agree, well, then it becomes more complicated.

15  Right?

16      **MS. STEIN:**  Right.  I guess sort of a parallel

17  question is that, because this is in the context of an

18  investigation, I suspect we may want to provide supporting

19  information.  You may not be able to tell, Your Honor, from the

20  face -- some of the documents, I think you will be able to see

21  that it's revealing direct attorney communications or whatnot.

22  Others may be something that was at the direction of counsel

23  which may require context.

24      **THE COURT:**  But isn't that on the log that you already

25  provided to them, or did you just say -- I don't think you

1   attached -- did you just say "Direction of counsel" with

2   identifying the counsel or...

3       **MS. STEIN:**  I think it depends on the entry,

4   Your Honor.  But given that this was an attorney-driven

5   investigation, I would -- I just don't know what kind of

6   additional information Your Honor might want for us to support

7   that aspect.

8       **THE COURT:**  Whatever you think meets your burden,

9   that's all.

10       **MS. STEIN:**  Thank you.

11       **THE COURT:**  Whatever you think you need, or maybe more

12   than you think you need, to meet your burden.  Right?

13       **MR. KO:**  Your Honor, this is David Ko on behalf of

14   plaintiffs.

15      And thank you for that.  I think that's what we've been

16   wanting to do, quite frankly, since last spring and summer, to

17   give you --

18       **THE COURT:**  I'm going to stop you, Mr. Ko.

19       **MR. KO:**  Okay.

20       **THE COURT:**  You should retract the last thing you

21   said.  Not productive.  Not helpful.  Okay?

22       **MR. KO:**  Sounds good.  Scratch that from the record.

23   I fulfill my New Year's resolution.

24      But let me ask for some context -- or some clarification

25   on the 20, because with respect to the 400 entries that we have

1    identified to Facebook, those include both parent documents and

2    attachments.

3        So our assumption would be the 20 -- the 20, you know,

4    exemplars that we propose to you would be both -- you know, one

5    document or one communication would be both the parent and the

6    attachment or attachments.  So --

7            THE COURT:  Yeah.  There were 400 entries.  So 20

8    entries.

9            MR. KO:  Well, I guess that's what I was hoping to get

10   clarification on, Your Honor, because the 400 comprises

11   documents that reflect both the parent and the underlying

12   attachments.

13           THE COURT:  You mean a single entry would comprise

14   both?

15           MR. KO:  Well, no.  There would -- for example, there

16   could be seven entries that relate to one document.

17       So the way that Facebook has logged these materials, they

18   include -- for example, if there's an e-mail and then a

19   diagram, you know, they claim that there's a diagram that was

20   attached to the e-mail that is also privileged.  And then

21   there's also another attachment -- because oftentimes in

22   e-mails we attach one or more attachments -- and then there's a

23   spreadsheet.  So what they've done is they've separately logged

24   those.  So --

25           THE COURT:  That's okay.  20 entries.

1     And look, if it turns out one of the entries involving an

2  e-mail, I say, "Oh, not privileged," well, then you're going to

3  have a discussion anyway; and maybe something then that was

4  attached, if it's not in your 20, we'll have a discussion

5  about.

6     Just 20 entries.

7          **MR. KO:**  Understood.  Thank you, Your Honor.

8          **MR. MONTGOMERY:**  Okay.  Your Honor, before we move on,

9  quick question.

10     How long do you want the briefs?

11          **THE COURT:**  I don't think they should be long.  I

12  mean, I'm thinking, like, ten pages.  But you tell me because

13  it's -- I don't know.

14          **MS. WEAVER:**  Ten pages is fine.  We can do that.  And

15  when would you --

16          **THE COURT:**  Well, let me ask Facebook because it is

17  their burden.

18          **MS. STEIN:**  Thank you, Your Honor.

19     I think it's -- because we don't necessarily know what's

20  being challenged, it's a little bit up in the air.  I think

21  we'll probably need more than ten pages for 20 documents

22  because we may need to provide --

23          **THE COURT:**  Okay.  So one page -- no more than one

24  page per document.  I don't mean -- just 20 total.  Right?  You

25  can divide it up any way you want among the 20 entries, but 20

1  total.

2      **MS. WEAVER:**  Your Honor, the one thing I would ask --

3      **THE COURT:**  Yeah.

4      **MS. WEAVER:**  -- is that if we are -- if they are

5  putting in declarations that we're seeing for the first time,

6  plaintiffs would like an opportunity to respond to any new

7  information that's provided.

8      I mean, to your point --

9      **THE COURT:**  I don't want declarations.  I don't want

10  declarations.

11      **MS. WEAVER:**  Okay.

12      **THE COURT:**  I want the log of the entries.  I want

13  what was logged for the entries.  And then I want briefs, like

14  the argument.

15      **MS. WEAVER:**  Okay.

16      **THE COURT:**  No declarations.

17      **MR. MONTGOMERY:**  Okay.

18      **THE COURT:**  I want to make this simple.  If we need

19  more, then we can get more at the time.

20      **MR. MONTGOMERY:**  Last question, I promise, on ADI.

21      We proposed filing our brief on January 29th.  Is that

22  still a deadline the Court wants us to hold to?

23      **THE COURT:**  Well, that seems a little soon.  I don't

24  know.  When are you going to identify -- when are the

25  plaintiffs going to identify the 20?

1          MR. MONTGOMERY:  We could do it within seven days; so

2     by next Friday.

3          THE COURT:  Okay.  So that would be the 22nd.  So

4     I think a brief by the 29th might be a little -- how about the

5     5th?  Does that work, Ms. Stein?

6          MS. STEIN:  For plaintiffs to submit an opening brief

7     on the 5th?

8          THE COURT:  No.  I thought we were just going to have

9     simultaneous briefs.

10          MS. STEIN:  I think that's going to be a little bit

11     fast for us, Your Honor, if we've just found out what the

12     entries are.

13          THE COURT:  That's two weeks.  Well, no, because you

14     already logged them.  Right?  It's merely putting down into

15     more paper the analysis that's already been done because

16     they've already been logged.

17          I mean, and also, I thought this was going on in other

18     cases and this is not new or -- ADI.  I mean, we've known this

19     is at issue.  You know.  You have your argument as to why

20     they're privileged.  I assume somewhere in a file, virtual,

21     there's a memo, quite thorough, with all the law and anything.

22     It just needs to be turned into a brief.

23          So I think the 5th would be fine.  That's two weeks.

24          But if you can identify, Mr. Montgomery, before the 22nd,

25     that would be helpful.

1          **MR. MONTGOMERY:**  We will try to do so, Your Honor.

2          **THE COURT:**  I mean, same thing.  It shouldn't take --

3    I mean, you've had those.  You've analyzed them.  It's the 400

4    to the 20.

5          Okay.  All right.  So that takes care of the ADI.

6          And then I'll have argument if I need it.  If I need

7    something more, I will.  I promise.  I don't want to make a

8    decision that I'm not comfortable with.

9          Okay.  So the 30(b)(6) deponent, so I did read the notice

10   and Facebook's letter.  And then now plaintiff has another

11   proposal -- I guess you're -- I don't know, Ms. Stein, you seem

12   to be the lead today -- just more generally.

13         I mean, the idea was -- right?  We went through this whole

14   exercise about the scope of discovery.  Long, long months.  And

15   then Facebook was saying:  Well, actually, we've already

16   produced everything within that scope.  And so that's sort of

17   like, let's just cut to it.  Right?

18         And so what about plaintiffs' proposal in the statement

19   now, just those three topics, which is essentially the topic:

20   What is it that you -- what information do you gather about

21   users?  What do you do with it?

22         **MS. STEIN:**  Well, Your Honor --

23         **THE COURT:**  And how do you monetize it?

24         **MS. STEIN:**  -- that's what we endeavored to do in the

25   letter that we sent plaintiffs, was to take those three topics

1    and put some more meat on the bones of what we would be

2    preparing a witness on, because the topics, as Your Honor

3    proposed, which really is exactly what our letter fleshes

4    out --

5         **THE COURT:**  Well, except this.  I don't mean to

6    interrupt you, because we're done at 9:00.  Except that your

7    letter is more like a topic and a directive.  Right?  "Data was

8    not sold."  It's sort of almost like a directive to the witness

9    will testify.

10        No.  The witness will testify as to what the witness

11   knows.  And that may be what you believe, but that's not the

12   topic, that data was not sold.  The topic is:  How do they

13   monetize it? wherever that may lead.  It may lead that the data

14   was not sold.  Right?

15        But the problem I had with the letter was it jumped to the

16   conclusion as to -- not the topic, as to what it was going to

17   be, almost like a directive.

18        But if you take what plaintiff says and yours and you take

19   out the directives, then I think that's -- then you are on the

20   same page.

21        **MS. STEIN:**  Yes.  Your Honor, I don't think we were

22   intending to direct a witness on anything.  I think what we

23   were trying to do was explain, you know, more -- in more

24   particularity what a witness -- the subjects within this that a

25   witness was going to be focused on, because we obviously need

1   to be able to prepare witnesses -- one or more witnesses to

2   meaningfully testify.

3       And the topics, just the three big categories could go in

4   a lot of different places.  And I think the fact that

5   plaintiffs' notice looks different from what we thought this

6   was is a good reason for that.

7       So, I mean, we certainly didn't intend to be suggesting

8   that we were directing a witness to testify --

9       **THE COURT:**  Well, I'm just looking at Topic 4, how

10  Facebook monetized user data.  First, data was not sold.

11      No, that's not the topic.  That's not what their question

12  is.  Their question is:  How did they monetize it? wherever it

13  may lead.

14      And a lot of this is coming from because you guys have

15  made representations, all in good faith, all what you've been

16  told.  Right?  And so now it's like, okay, where is it coming

17  from?

18      So I don't even know, actually -- this is just sort of a

19  preliminary initial "Let's get started," because we seem to

20  be -- like, I just couldn't figure out how to break through all

21  this stuff.

22      **MS. STEIN:**  Sure.

23      **THE COURT:**  So I don't even know that the -- and if

24  the witness is asked something they can't answer, then they

25  can't answer.  Right?  That's okay.  Then we know.  Like, it's

1    exploratory in that sense.  So --

2         **MS. STEIN:**  Right.  We --

3         **MR. LOESER:**  Your Honor --

4         **MS. STEIN:**  -- just wanted -- we just wanted to make

5    sure, Your Honor, what we were trying to avoid for any

6    30(b)(6).  We have an obligation to prepare, and we want to

7    make sure that everyone's on the same page and we get there and

8    we don't spend the day fighting about the scope of the

9    deposition.

10        So what we were trying to do in our letter was really just

11   say:  Hey, here's what we're prepping the witness on, the

12   subjects.  Here's how we understand it.  You know, if there's

13   some disagreement on this, if we're missing something, let us

14   know.

15        We do not expect -- we don't want this to be a directive,

16   Your Honor.  You know, that's not the intention.  It was sort

17   of more of a blueprint of how we were going to be focusing,

18   you know, with our client on what questions needed to be

19   answered, but, you know, certainly not a directive.

20        **MR. LOESER:**  Your Honor?

21        **THE COURT:**  Yes.

22        **MR. LOESER:**  Derek Loeser.  If I could be heard for a

23   moment.

24        This topic -- you know, there's no sense talking about the

25   past.  I know Your Honor isn't interested in it.  So I'll just

try and be practical here.

We have an order. The order indicates what the subjects are. You issued another order indicating that there needed to be a 30(b)(6) notice. We took the three topics that were the subject of Discovery Order Number 9 and we reduced them to very concrete, very specific topics. They track directly to the order.

THE COURT: You mean, you're talking about your notice, or are you talking about what's in your CMC statement?

MR. LOESER: I'm talking about our notice and why we --

THE COURT: Okay. I don't want to talk about your notice. That was way beyond what I had in mind too.

MR. LOESER: Okay.

THE COURT: That was way beyond what I had in mind. So I don't want to talk about your notice.

Because you put something in your CMC statement. I want to talk about that --

MR. LOESER: Okay. What we put in our --

THE COURT: -- what you put in your CMC statement.

MR. LOESER: Right. What we put in our statement was: We're happy to go back to just having a deposition that is defined by those three topics. But what we'd like to avoid is having a deposition in which most of the deposition is spent fighting with Facebook about whether we get to ask all of the

1  questions we want to about those three topics.  And so --

2       **THE COURT:**  You can ask.  They may not be able to

3  answer.  So it would be best to spend your time on what the

4  witness is able to answer.

5       **MR. LOESER:**  And --

6       **THE COURT:**  This is not -- it doesn't come up against

7  anything or anything like that.  It's like an exploratory --

8  frankly, I wish I could be there and ask the questions because

9  I want to know.

10      **MR. LOESER:**  Well, Your Honor, you are --

11      **MS. WEAVER:**  We wouldn't mind, Your Honor.

12      **MR. LOESER:**  -- invited.

13      THE COURT:  I'm not.  But I will --

14      **MR. LOESER:**  You are welcome.

15      **THE COURT:**   I'm not.  You can hire a special master

16  for that, if you want.

17      **MR. LOESER:**  I guess here's what I'm trying --

18      **MS. KUTSCHER CLARK:**  Your Honor, I --

19      **MR. LOESER:**  We have a letter from them, which is like

20  a bit of a maze, and it says what is and is not going to be the

21  subject of this testimony.

22      I disagree and we all on the plaintiff side wholeheartedly

23  disagree with the various and many and confusing limitations

24  their letter describes.

25      If what that letter indicates is that when we go to the

1    deposition, those are the objections that they're going to make

2    and they're going to follow the roadmap that they have put in

3    their letter about what they're not going to allow the witness

4    to testify to, I think that that would be -- it's highly

5    inefficient.  Also, it would just be completely inappropriate,

6    given the scope of the -- just the general three topics that

7    the witness is supposed to be testifying about.  That's kind of

8    the practical problem that we see.

9        And we're happy to go ahead and go take the deposition,

10   but I fear that what we're going to get is, where they've set

11   forth in this detailed letter this path, this narrow path that

12   they want this witness to travel, it's just going to be a huge

13   problem because the path has nothing to do with the areas that

14   we're entitled to take discovery.

15       **THE COURT:**  The problem is, we're never going to get

16   to that depo if I leave it to you all just to negotiate the

17   scope.  We're never.  It'll be five months from now until it

18   gets there.  It just needs to get started and get there.

19       I mean, maybe -- I think the place to start, actually, is

20   for Facebook to identify:  Here's the general topics.

21       I mean, they're not -- it shouldn't -- it's not -- this is

22   pretty basic stuff in some sense.  Right?  This is to get at

23   the basic.  Like, one of the main questions is user data, what

24   is collected and what is done with it.  Right?  That's it.

25   That's it.

1    And so there have been representations that have been made

2    that the stuff that's been produced is all.  So there are

3    people there.

4    So, Facebook, identify to plaintiffs who's going to be the

5    deponent.  Right?

6    That'll then let you know somewhat what that person knows

7    or doesn't know.  And then the same thing with the

8    monetization.

9    I think that's a start, and then you go and we'll see what

10   we get.  And if you don't get what I think you should get, no

11   one's going anywhere; we can come back and do it again.  This

12   is just to try to break through that logjam and get started.

13       MR. LOESER:  I hear that, Your Honor, and I appreciate

14   that.  And obviously, we will jump right in and try and do

15   that.  I think Facebook obviously understands that this is a

16   witness that's supposed to be prepared to testify, and so

17   hopefully the witness comes prepared to testify about the full

18   range of topics that these issues relate to.

19       THE COURT:  Well, that's what Ms. Stein said.  That's

20   why she sent the letter, because they understand that they have

21   to prepare the witness to testify.

22       MR. LOESER:  But --

23       MS. STEIN:  That's exactly --

24       MR. LOESER:  -- I mean, I don't want to bore -- you

25   know, I'm sorry to -- we can move on; but what the letter says

1    is what they're going to prepare the witness to testify about.

2         THE COURT:  That's what I said.  Isn't that what I

3    said at the beginning?  That's what I said.  They heard it.

4    I'm confident that they heard it, that that's not going -- that

5    that's not going to happen.

6         For example, it can't be -- I'll give you an example.

7         Well, did you gather this type of -- did you gather this

8    type of information about users?

9         No.  The witness can't answer that because that

10   information wasn't shared.

11        Right?

12        MR. LOESER:  Okay.

13        THE COURT:  That's a different question.  The question

14   is what did they gather, and then what was shared.

15        MS. STEIN:  Right.

16        THE COURT:  Whether it was shared or not.  Right?

17        Ms. Stein is shaking --

18        MS. STEIN:  Right.

19        THE COURT:  -- her head "yes."

20        We're all --

21        MS. STEIN:  Right.

22        THE COURT:  -- on the same --

23        MR. LOESER:  Right.  And so --

24        MS. STEIN:  We understand --

25        MR. LOESER:  -- by the same --

1    **MS. STEIN:** -- that, and that was what our letter was

2    intended to communicate, that they would get to ask questions

3    about the scope of what was collected and then they would

4    narrow it down to find out what was shared or accessed.

5    But Mr. Loeser identified our concern, Your Honor, is that

6    they're primed to say that our witness isn't prepared.  And we

7    really -- we take this seriously.  It's important.  We know

8    it's binding on the company.  And so we want to do the best

9    that we can to, you know, make everyone happy here.

10    You know, we will take Your Honor's topics.  Our letter

11    should not be viewed as a directive.  If there's something that

12    plaintiffs looked at and think is missing, you know, we should

13    discuss that before the depositions so that we know and we can

14    make sure the witness is prepared.

15    But we were trying to cover the -- in doing this letter,

16    we were trying to cover the landscape of everything.  And,

17    you know, I'm sorry some of it sounded like a directive.  We

18    were just really trying to flesh out what we thought this

19    meant.  And the categories of things that we listed of what was

20    collected, we think that's everything.  So we were just really

21    trying to be comprehensive here so that we were all on the same

22    page.

23    **THE COURT:**  So, Mr. Loeser, if you look at the topics

24    from their letter, as opposed to what's underneath, does that

25    cover -- I think that covers everything.

1          **MS. WEAVER:**  I think, Your Honor --

2          **MR. LOESER:**  Well, not really.  I mean, the topics

3    identify the categories that are indicated in the Court's

4    orders; but then there's this complicated roadmap about what is

5    and isn't going to be testified about.

6          **THE COURT:**  That's why I said if you just look at the

7    topics, that covers everything -- right? -- the topics.

8          **MR. LOESER:**  Well, I believe that the topics identify

9    the categories that are set forth in the order.  So --

10         **THE COURT:**  Okay.

11         **MR. LOESER:**  -- yes, those are the topics.

12         **THE COURT:**  There we are.  So that's the guidance.

13   That's what the witness should be prepared to testify to.

14         And as I said, and Facebook said they understand.  That

15   Facebook believes something wasn't shared or that the purpose

16   ultimately wouldn't be admissible is not a reason not to answer

17   the question.  Right?

18         **MR. LOESER:**  Okay.  And so we're not --

19         **THE COURT:**  It's discovery --

20         **MR. LOESER:**  -- doing things --

21         **THE COURT:**  -- as to what user was -- what information

22   was collected, what did they do with it, how, why.

23         And then, where that leads to, what the consequence of

24   that is, who knows?

25         **MR. LOESER:**  So let me just --

1    **THE COURT:**  Great.

2    **MR. LOESER:**  Not to beat a dead horse, to use a bad

3  metaphor here, but the -- I'll just read a statement in their

4  letter, and I think that this will provide clarification on

5  what will happen with that.

6    Page 3 of their letter, at the bottom of the page, there's

7  a statement (reading):

8         "Facebook does not intend for its designee to

9         provide details regarding the categories of

10         information it may have received from third parties,

11         except as described below."

12    Well, we're not going to limit our questioning to the

13  narrow scope that this letter seems to suggest the witness will

14  be testifying about.

15    And I think what Your Honor is saying is we're just

16  focused on the main topics; we don't need to worry about the

17  limitations set forth in this letter because the witness will

18  be prepared to testify about the full topic; and it's

19  testimony -- Facebook will not have made the decision not to

20  prepare the witness to testify to this limitation that's set

21  forth in this letter.

22    **THE COURT:**  Well, I guess the question is "details."

23  Right?  Details, I don't know what that means, "details,"

24  versus sort of categories or things like that.  If we're going

25  to go into details about all those, then you're going to run

```
 1   out of time.  So -- right?

 2       It's sort of a high-level:  Genesis of it was, again, that

 3   Facebook's representation, after we went through all this

 4   briefing about the scope of discovery as to plaintiffs' user

 5   information, that they had, in fact, produced all of

 6   plaintiffs' user information.  So, that is shared.

 7       So let's now find out what is it that they collect about

 8   users.

 9           MR. LOESER:  Okay.  I hear Your Honor.

10           THE COURT:  Whether it be from a third party, whether

11   it be from their own -- whatever it is.  Whatever it is.  What

12   is it?

13       And categories.  Right?  If there's a particular detail,

14   they're not going to be able to go into details about -- I

15   don't know -- which apps or this or that or that.  Right?  This

16   is just --

17           MR. LOESER:  No.  I hear that.

18           THE COURT:  -- high level.

19           MR. LOESER:  And I agree with you.

20           MS. WEAVER:  Your Honor --

21           MS. KUTSCHER CLARK:  And, Your Honor --

22           MR. LOESER:  All I'm talking --

23           MS. WEAVER:  You're right.  Let's get started.  We'd

24   love a date, and we will take this deposition according to your

25   direction.
```

1    And so if Ms. Stein wants to identify who they'll be

2  producing, we're ready, you know, early February to take this

3  deposition.

4        THE COURT:  Well, I don't know about -- in February.

5    But, Ms. Kutscher Clark, you were trying to say something.

6        MS. KUTSCHER CLARK:  Oh.  I just wanted to assure

7  the Court that the type of language surrounding the type of

8  detail that would be testified to is really intended to zoom in

9  on what's relevant here.

10    The idea was, to the extent the deponent, for instance,

11  testifies that particular data is used only for a security

12  feature, you know, to make sure that there isn't a security

13  breach on the platform, they don't then need to go into detail,

14  for instance, about how that security feature operates.

15    That's all we're intending to convey there.  Let's get to

16  the types of data and the types of uses that are actually

17  relevant here, and, of course, we'll provide testimony about

18  that.  But if it's clearly outside the scope of what we're

19  talking about in this case, a high-level explanation should be

20  sufficient.

21        THE COURT:  Okay.  I don't think Mr. Loeser disagrees

22  with that.

23        MR. MONTGOMERY:  Before Your Honor has to leave us,

24  can I just clarify that we're talking about, really, two

25  depositions:  one deposition about the monetization and one

1  deposition about data?

2  **THE COURT:** Yeah. I mean, I don't know. It seems

3  like the data would be the longer deposition. Right?

4  **MR. MONTGOMERY:** I think we're anticipating, you know,

5  a full day for each, if that's permissible by the Court.

6  **MS. STEIN:** That sounds -- for, you know, a 30(b)(6)

7  and when -- on two topics, when you often get seven hours for

8  one 30(b)(6), like, we understand these are important topics,

9  but, you know, I think two full days is, you know, a little bit

10  of overkill here. I think, you know, a few hours --

11  **THE COURT:** Ten hours.

12  **MS. STEIN:** -- each for an --

13  **THE COURT:** Ten hours. Ten hours. And I would think

14  that plaintiffs would want most of it to go to the user

15  information. I mean, that -- I mean, seven hours for that

16  I think you could do easily. I don't know. Maybe not. I

17  don't know.

18  Ten hours.

19  **MS. WEAVER:** We will take the deposition, and we will

20  report back.

21  **THE COURT:** But not in -- ten hours over two days,

22  though -- right? -- not one day. Or even more. However you

23  want to do it.

24  Okay. Excellent.

25  **MS. STEIN:** And, Your Honor, just for clarification,

 1  you know, I understand that plaintiffs want the identities of

 2  these witnesses.  I don't know them yet.  I don't know who --

 3          **THE COURT:**  Oh, no, no, no.  I understand you don't.

 4  No, no.  They didn't -- I actually brought that up.

 5      I just thought, when you tell them, then that gives them

 6  comfort -- right? -- that you're not taking the engineer from

 7  wherever.  Right?  You're actually -- there are people within

 8  Facebook who actually know this information -- right? -- that

 9  they're high enough up that they have the big picture.

10          **MS. STEIN:**  Right.

11          **THE COURT:**  So my thinking was that when you share

12  that name, that'll give them some comfort that the person will

13  be -- when you say "be prepared" -- right? -- it's like you

14  can't tell them what -- you can prepare them in the sense of

15  what they should prepare to testify.  They're going to have to

16  know or do the gathering to know.

17          **MS. STEIN:**  Correct, Your Honor.

18      One thing that I would just appreciate some clarification

19  on.  These witnesses are not being deposed in their personal

20  capacity right now.  So I just want to make sure that we're not

21  going to be -- you know, by giving them the names in advance,

22  we're not going to be seeing e-mails that these people are

23  being shown and impeached and whatnot; that this is a

24  deposition to get information from them, but not to start a

25  whole cross-examination of them in their personal capacity.

1    **MS. WEAVER:**  Deb, we agree with that, except to the

2    extent if it relates to the topic of the deposition, we may

3    introduce -- obviously, we'll be introducing exhibits and if a

4    deponent's name has to be on it.

5        But we agree, not personal capacity.  This is a

6    corporate deposition, both of them.

7        **THE COURT:**  There may be e-mails.  Right?  There's

8    documents they reviewed that lead them to believe that there

9    was other user information that was collected about users.

10   Right?  So they will probably show the deponent one of those

11   e-mails and say:  Well, doesn't this mean this?  Right?

12       **MS. STEIN:**  Yes, Your Honor.

13       **THE COURT:**  That would be the objective.

14       **MS. STEIN:**  I normally -- unless someone is also being

15   deposed in their personal capacity, I normally don't share the

16   name of a 30(b)(6) deponent in advance of a deposition.  So I

17   just don't want this to sort of get turned into something that

18   is not a 30(b)(6) deposition.

19       **THE COURT:**  Okay.  It won't.  All right?  And there'll

20   be a record.  So no worries.

21       **MS. WEAVER:**  And is Your Honor planning on providing

22   dates for the depositions?

23       **THE COURT:**  No.  I said it needs to happen by -- in

24   February.

25       **MS. WEAVER:**  Okay.  Is this a leap year?

1           (Laughter.)

2           **THE COURT:**  I don't think so.

3           **MS. WEAVER:**  I think not.

4           **MS. STEIN:**  It's an odd year; so I don't think so.

5           **MS. WEAVER:**  Sorry, Deb.  No February 29th.

6           **THE COURT:**  Okay.  I have a change of plea.

7       Just let me give some guidance as to deposition

8   transcripts or written discovery.  I mean, clearly, anything

9   that Facebook has said under oath about relevant topics is

10  relevant.  And I would think discovery, unless there's some

11  privilege I'm not aware of -- right?  So if they did an

12  interrogatory answer on a relevant topic, that's discoverable.

13          **MS. STEIN:**  Your Honor, this is a very serious issue

14  for us, especially because this is in the context of government

15  investigations.  And we're dealing with government entities who

16  often don't even want us to get the transcript because it's

17  their investigation.  So, you know, having this clone discovery

18  issue about what's going on in government investigations is a

19  very significant issue, and respectfully --

20          **THE COURT:**  Well, that's different than -- that's

21  different than an interview.  I thought what was in the letter

22  was depositions.

23          **MS. WEAVER:**  Your Honor, it's both depositions and the

24  FTC, who has unequivocally stated in this proceeding that they

25  do not object to us receiving information.  We have the FTC's

written letters that ask for sworn responses to substantive
answers.

    **THE COURT:** So, okay. Let me just, because I'm --

    **MS. WEAVER:** We just want --

    **THE COURT:** I'm just giving guidance. I'm not ruling.
I'm just giving guidance because it's not ripe and presented to
me.

 My guidance is, for example, if -- it's almost like Jencks
material. Right?

    **MS. WEAVER:** Right.

    **THE COURT:** If a witness made statements on the
topics, if they're going to be a witness in the case, if
they're going to be deposed, then I think it's certainly
relevant what they said under oath in another case on the same
topics. Right? Not if it was unrelated. And the same thing
with interrogatory responses. And then I gave a caveat, which
is, unless there's some privilege of which I'm not aware.

 That's all. That's just the guidance that I'm giving.

    **MS. WEAVER:** Okay. We will bring it before you if we
can't resolve it.

    **THE COURT:** Okay. I guess we need a next date. What
is today? Today is the 15th.

 How about February 24th at 8:30? Maybe you'll have taken
that depo, and I'm sure there'll be lots to discuss.

        (Laughter.)

1          MS. WEAVER:  That's fine here.

2          MS. STEIN:  That's fine, Your Honor.

3          MR. LOESER:  We will all be so knowledgeable by then,

4     Your Honor.

5                         (Laughter.)

6          THE COURT:  It's true.  I wish I could take the depo.

7     I would.

8          MR. LOESER:  You really are invited.  We'll send

9     you --

10         MS. WEAVER:  You know, some judges have done things

11    like that.

12         THE COURT:  Yeah.  I wish I had time, but no time.

13        All right.  Thank you very much.

14         MS. STEIN:  Thank you, Your Honor.

15         MS. WEAVER:  Thank you, Your Honor.

16         MR. LOESER:  Thank you, Your Honor.

17               (Proceedings adjourned at 9:05 a.m.)

18                        ---o0o---

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

         I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


DATE:  Monday, January 18, 2021

_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
          Official Reporter, U.S. District Court

3075

# EXHIBIT U

**CERTAIN PAGES MARKED CONFIDENTIAL OR
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
    osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035


Kristin A. Linsley (SBN 154148)
    klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
    mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
    dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520


Joshua S. Lipshutz (SBN 242557)
    jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Facebook, Inc.,*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DEFENDANT FACEBOOK, INC.'S SECOND AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES** |

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3077

12.     Facebook objects to the portion of Plaintiffs' definition of the term "Facebook," "Defendant," "you," and "your" that defines Facebook to include its "executives, directors, officers, employees, partners, members, representatives, agents (including attorneys, accountants, consultants, investment advisors or bankers), and any other Person purporting to act on [Facebook, Inc.'s] behalf . . . includ[ing] parents, subsidiaries, affiliates, predecessor entities, successor entities, divisions, departments, groups, acquired entities and/or related entities or any other entity acting or purporting to act on its behalf."  This portion of the definition is vague, ambiguous, overly broad, unduly burdensome, and inconsistent with basic principles of corporate separateness.  Facebook's response to the Interrogatory (if any) will use a definition of "Facebook" that encompasses only Facebook, Inc.

## OBJECTIONS TO INSTRUCTIONS

1.      Facebook objects to Plaintiffs' "Instructions" to the extent that they impose obligations that go beyond the requirements of the Federal and Local Rules.

2.      With respect to Plaintiffs' Instruction 5, which requests that Facebook answer discovery requests for a continuing time period, for consistency, the time period reflected in Facebook's responses to these Interrogatories is consistent with Facebook's responses to Plaintiffs' other discovery requests, unless a specific time period is identified in a particular request and/or Facebook's response to a particular request.

## SPECIFIC OBJECTIONS

## INTERROGATORY NO. 8:

Identify by name and time period in operation each Facebook Database and Data Analytics Infrastructure that contains Facebook Users' Content and Information.

3078

## RESPONSE TO INTERROGATORY NO. 8 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Interrogatory on the following grounds:

(A)    Facebook objects to this Interrogatory on the ground that the definitions of "Content and Information," "Database," and "Data Analytics Infrastructure" are vague, ambiguous, overly broad, and unduly burdensome. Facebook will construe these terms as described in its objections to their Definitions.

(B)    Facebook objects to this Interrogatory on the ground that it seeks only irrelevant information, as the structure and organization of Facebook's databases have no possible relation to or bearing on Plaintiffs' live claims or Facebook's defenses.

(C)    Facebook objects to this Interrogatory as seeking information duplicative of information provided previously through the parties' extensive letter exchange and meet and confer discussions regarding sources of ESI and as otherwise outside the scope of additional ESI information the Court has allowed Plaintiffs to seek. *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

(D)    Facebook objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed. Thus, the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

(E)    Facebook objects to this Interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, and/or disproportionate to the needs of the case in

that it seeks information relating to "each" Facebook Database and Data Analytics Infrastructure, without regard for whether the "Database or Data Analytics Infrastructure" has any bearing on Plaintiffs' live claims or Facebook's defenses. Specifically, Facebook objects to this Interrogatory to the extent it seeks information related to the content, structure, or organization of "Databases or Data Analytics Infrastructures" unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 8**:

Users make their Content and Information available on the Facebook Platform by uploading it directly to the Platform. The Facebook Platform is powered by a series of databases that Facebook relies upon for production purposes and which work in tandem to provide Facebook users a seamless experience as they access different categories and types of content posted on the Platform, by themselves or other users. As Facebook users navigate through the Facebook Platform and interact with objects on the Platform by, among other things, liking posts

made by other users, watching videos, posting photos, and sending messages, they actively change the content and information available on the Facebook Platform. The array of relationships between users, objects, and actions is referred to as the Social Graph, which is a model of the relationships between users, objects, and actions. These databases described below constitute the primary infrastructure that maintains the Facebook Platform, and, thus, contain the content and information that makes up the Social Graph. As relevant here, Plaintiffs have been provided with the content and information from the Social Graph—and therefore from the below databases—that was uniquely associated with their Facebook profiles as of the date(s) each set was pulled. Additionally, through their Facebook profiles, Plaintiffs have access to the content or information they have posted to the Platform and not deleted since those productions were made.

The key databases Facebook uses to support the Facebook Platform, all of which were in use during the Relevant Time Period asserted by Plaintiffs and which store all of the content and information users post to Facebook and therefore contain all of the historical user content and information presently accessible via the Social Graph, are:



FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3081



**INTERROGATORY NO. 9:**

For each Database and Data Analytics Infrastructure identified in your answer to Interrogatory No. 8, identify the corresponding query interfaces (e.g., including graphical interfaces, command-oriented interfaces, and APIs) that have called or accessed data from such Database to respond to either internal or external queries.

**RESPONSE TO INTERROGATORY NO. 9 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Interrogatory on the following grounds:

(A) Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each" Database and Data Analytics Infrastructure that Facebook identified in its answer to Interrogatory No. 8. *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, 2009 WL 102816, at *5 (N.D. Cal. Jan. 14, 2009) ). During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 9

separate" from each other "should be viewed as containing a subpart" for each separate subject matter. Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at \*5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, several individual databases that contain different information and operate differently. Facebook will therefore treat Plaintiffs' inquiry into "each" Database and Data Infrastructure as an individual Interrogatory. *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

(B)     Facebook objects to this Interrogatory on the ground that the definitions of "Content and Information," "Database," and "Data Analytics Infrastructure" are vague, ambiguous, overly broad, and unduly burdensome. Facebook will construe these terms as described in its objections to their Definitions.

(C)     Facebook objects to this Interrogatory on the ground that the term "corresponding query interfaces" is vague, ambiguous, and undefined. Facebook will construe this term as referring to the manner by which data from each database is accessed or queried.

(D)     Facebook objects to this Interrogatory on the ground that it seeks information relating to "internal . . . queries" within Facebook. Plaintiffs' claims relate to allegedly improper access to user content and information by third parties, not Facebook or its personnel. Facebook will construe this Interrogatory as relating only to external queries.

(E)     Facebook objects to this Interrogatory on the ground that it seeks only irrelevant information, as the structure and organization of Facebook's "Databases and Data Analytics Infrastructure" have no possible relation to or bearing on to Plaintiffs' live claims or Facebook's defenses.

(F)     Facebook objects to this Interrogatory as seeking information duplicative of information provided previously through the parties' extensive letter exchange and meet and confer discussions regarding sources of ESI and as otherwise outside the scope of additional ESI information the Court has allowed Plaintiffs to seek. *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

(G)     Facebook further objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed. Thus, the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

(H)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, and/or disproportionate to the needs of the case in that it seeks information relating to "query interfaces" for "each" Facebook Database and Data Analytics Infrastructure, without regard for whether the "query interface" or "Database or Data Analytics Infrastructure" has any bearing on Plaintiffs' live claims or Facebook's defenses. Specifically, Facebook objects to this Interrogatory to the extent it seeks information related to "query interfaces" or "Databases" or "Data Analytics Infrastructures" unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of

14

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 9**

"sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

### Response No. 9:

Application Programming Interfaces ("APIs") are standard computing protocols used throughout the digital world. Each time a user visits or uses an app, the user necessarily interacts through an API. And every company that allows third parties to communicate with their servers uses APIs. As just one example, e-mail programs like Outlook or Mail on iOS communicate with the user's e-mail provider (Yahoo, Gmail, etc.) through APIs to obtain the user's messages. Facebook has a series of public APIs that are published on its developer website (https://developers.facebook.com/), and any app developer can use them or request to use them to send or receive information from the Facebook Platform.

To the extent third parties are able to access user content and information, it is primarily through Graph API, which is the API Facebook has made broadly available to all app developers on its Platform and queries the Facebook Platform. There have been several iterations of the Graph API including, among others, Graph API v.1 (most recent version from 2010 to April 2014 and accessible to April 2015), Graph API v.2 (most recent version from April 2014 to May

2018 and accessible to May 2020), and Graph API v.3 (most recent version from May 2018 to July 2020 and accessible to August 2021). A changelog detailing changes made to the Graph API when a new version is introduced is available on Facebook's developer website (https://developers.facebook.com/docs/graph-api/changelog/).

Individuals or business entities, including third party developers of apps connected to the Facebook Platform, may request access to endpoints that are not publicly available through the Graph API when they are necessary to enhance user experience on their app or product. To receive approval to access these endpoints associated with non-public data, a third party is required to go through the App Review process, which may include having its identity verified by Facebook. In that process, Third Parties are required to specify the types of data their apps will be requesting from users and describe how that data will be used.

As relevant here, the APIs a third party may be granted access to after being approved through the App Review process and which may allow that third party to request access to some forms of user data include:

- Groups API, which allows a developer to read and create Facebook Group data on behalf of group members;

- Live Video API, which enables video encoders, cameras, web, and desktop applications to stream live video directly to Facebook user profiles, pages, and groups; and,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 9

- Pages API, which, among other things, allows apps to update a Facebook Page's settings and content, create and get Posts, get Comments on Page owned content, get Page insights, and update actions that users are able to perform on a Page.

Facebook, like virtually all online companies, also uses other APIs that are not generally available to all app developers. Among other things, these other APIs can be used to provide third parties access to certain capabilities that are not accessible through any of the public APIs and for which the third party has demonstrated a need. These are commonly referred to a "private" APIs. The vast majority of private APIs do not enable third-party apps to access user content and information.

As used here, the term "capability" describes a group of functionalities that are provided to a particular app or third party and give that app or third party the ability to access certain data through one or more APIs. An app cannot access a capability associated with a private API unless a Facebook employee has approved it to do so.

After an extensive investigation,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 9



18

3088



19

3089

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 9**



This list is the result of extensive investigation by Facebook's engineers, who, among other things, manually reviewed the code of each capability to determine which capabilities granted access to user's friends' data and, if so, to identify the specific data fields accessible through the capability.  Capabilities associated with Facebook's first-party apps (*i.e.*, internal Facebook programs developed to enable Facebook's own products that do not involve sharing user information with third parties) are excluded from this list.

## INTERROGATORY NO. 10:

For each query interface identified in your answer to Interrogatory No. 9, identify whether such query interface is or has been used to respond to internal queries, external queries, or both.

## RESPONSE TO INTERROGATORY NO. 10 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts

that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for

separate information about "each" query interface that Facebook identified in its answer to

Interrogatory No. 9. *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v.

Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009).  During

the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that

Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D.

441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state

facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or

separate" from each other "should be viewed as containing a subpart" for each separate subject

matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to

the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod.

& Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020)

(internal quotation marks and citations omitted), but instead seeks information about separate

and distinct subjects, to wit, several individual query interfaces that operate differently.

Facebook will therefore treat Plaintiffs' inquiry into "each" query interface as an individual

Interrogatory.  *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal.

2004) (holding interrogatories asking for information about each of "26 different products" each

had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on

interrogatories] by asking questions about *distinct subjects*, but numbering the questions as

subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).  Facebook considers this

Interrogatory to include at least five subparts and therefore the below Response to constitute Facebook's Responses Nos. 10 to 14.

(B)     Facebook objects to this Interrogatory on the ground that the term "query interface" is vague, ambiguous, and undefined. Facebook will construe this term as referring to the manner by which data from each database is accessed or queried.

(C)     Facebook objects to this Interrogatory on the ground that it seeks only irrelevant information, as the structure and organization of Facebook's databases have no possible relation to or bearing on to Plaintiffs' live claims or Facebook's defenses.

(D)     Facebook objects to this Interrogatory on the ground that it seeks information relating to "internal queries" within Facebook. Plaintiffs' claims relate to allegedly improper access to user content and information by third parties, not Facebook or its personnel. Facebook will construe this Interrogatory as relating only to external queries.

(E)     Facebook objects to this Interrogatory as seeking information duplicative of information provided previously through the parties' extensive letter exchange and meet and confer discussions regarding sources of ESI and as otherwise outside the scope of additional ESI information the Court has allowed Plaintiffs to seek. *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

(F)     Facebook further objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed. Thus, the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

(G)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, and/or disproportionate to the needs of the case in that it seeks information relating to "query interfaces," without regard for whether the "query interface" has any bearing on Plaintiffs' live claims or Facebook's defenses. Specifically, Facebook objects to this Interrogatory to the extent it seeks information related to "query interfaces" unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 10**: Graph API is available to third parties external to Facebook. Third parties seeking to access more than basic public data (public profile and email address) must undergo the App Review process to receive additional access to permissions.

**Response No. 11**: Groups API is available to third parties external to Facebook upon approval through the App Review process.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 10**

**Response No. 12**: Live Video API is available to third parties external to Facebook upon approval through the App Review process.

**Response No. 13**: Pages API is available to third parties external to Facebook upon approval through the App Review process.

**Response No. 14**: During the relevant time period, the following capabilities associated with private APIs may have been available to third parties external to Facebook only upon approval by Facebook:



24



25



**INTERROGATORY NO. 11:**

For each query interface identified in your answer to Interrogatory No. 10 as being or having been used to respond to external queries, identify the complete list of fields or query parameters available for queries by a Third Party via such query interfaces. For each of the

fields or query parameters, describe in detail the acceptable ranges and formats of their values and identify which parameters are optional for queries and which are required.

## RESPONSE TO INTERROGATORY NO. 11 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each" query interface that Facebook identified in its answer to Interrogatory No. 10. Not only does the Interrogatory embed subparts by asking for information about "each" query interface, the Interrogatory demands separate information about "each" field or query parameter identified. Each of those inquiries is itself a subpart to be counted against the interrogatory limit. *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009). During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter. Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate

27

and distinct subjects, to wit, several individual query interfaces that operate differently and are associated with different data end points, among other things. Facebook will therefore treat Plaintiffs' inquiry into "each" query interface as an individual Interrogatory. *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2]). Facebook considers this Interrogatory to include at least 60 subparts and therefore the below Response to constitute Facebook's Responses Nos. 15 to 75.

(B)  Facebook objects to this Interrogatory as vague, ambiguous, and confusing. As drafted, Facebook does not sufficiently understand the Interrogatory to provide a meaningful response.

(C)  Facebook objects to this Interrogatory on the ground that the term "query interface" is vague, ambiguous, and undefined. Facebook will construe this term as referring to the manner by which data from each database is accessed or queried.

(D)  Facebook objects to this Interrogatory on the ground that it seeks only irrelevant information, as the structure and organization of Facebook's databases have no possible relation to or bearing on Plaintiffs' live claims or Facebook's defenses.

(E)  Facebook objects to this Interrogatory as seeking information duplicative of information provided previously through the parties' extensive letter exchange and meet and confer discussions regarding sources of ESI and as otherwise outside the scope of additional ESI information the Court has allowed Plaintiffs to seek. *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

(F)     Facebook further objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed.  Thus, the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

(G)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, and/or disproportionate to the needs of the case in that it seeks information relating to "each" query interface, without respect for whether the query interface has any bearing on Plaintiffs' live claims or Facebook's defenses.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information related to the "query interfaces" unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(H)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1);

Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit. Sept. 4 Hr'g Tr. at 14:17-22. Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 15**: The list of permissions an app developer may be granted approval to access through Graph API, and therefore which data endpoints that app developer may potentially access through the Graph API, are publicly available on Facebook's Developer site.[1] In order to access non-public user data[2] associated with a specific permission through Graph API, an app developer needs approval from Facebook and the user. First, in order to gain access to a particular permission, an app developer needs to have that permission approved through App Review. Second, when users log onto the developer's app, they receive a request to grant the developer's app permission to access that category of their data (*i.e.*, the specific data associated with the approved permission). Users can grant or deny the requested permissions or any subset of them. The below list[3] includes permissions and/or data points available through Facebook's public APIs, including Graph API, that could provide—subject to relevant privacy controls and user settings, and the user's choices in the Granular Data Permissions dialog—user information

---

[1]   The Facebook Developers site is located here: https://developers.facebook.com/docs/permissions/reference.

[2]   The Facebook Data Policy defines "public information" as information that "can be seen by anyone, on or off our Products, including if they don't have an account. This includes your Instagram username; any information you share with a public audience; information in your public profile on Facebook; and content you share on a Facebook Page, public Instagram account or any other public forum, such as Facebook Marketplace."

[3]   This list is based on readily available records and represents this information to the best of Facebook's present knowledge.

to third-party consumer apps during the period between 2010-2018 (though few were available during the entire period).[4] The permissions and/or data points included on the list below were published on Facebook's publicly available website for developers, which also explained the functionalities of and various restrictions on these permissions over time.

- age_range
- basic_info
- context
- cover
- currency
- default
- devices
- email
- first_name
- friends_about_me
- friends_activities
- friends_birthday
- friends_education_history
- friends_events
- friends_groups
- friends_hometown
- friends_interests

---

[4] In particular, any permission beginning with "friends_" was deprecated with the transition to Graph API v.2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

- friends_likes

- friends_location

- friends_photos

- friends_questions

- friends_relationship_details

- friends_relationships

- friends_religion_politics

- friends_status

- friends_subscriptions

- friends_website

- friends_work_history

- gender

- id

- last_name

- link

- locale

- middle_name

- name

- name_format

- picture

- public_profile

- read_custom_friendlists

- read_friendlists

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

- read_mailbox

- read_page_mailboxes

- read_requests

- read_stream

- short_name

- timezone

- updated_time

- user_about_me

- user_actions.books

- user_actions.fitness

- user_actions.music

- user_actions.news

- user_actions.video

- user_actions:APP_NAMESPACE

- user_activities

- user_age_range

- user_birthday

- user_education_history

- user_events

- user_friends

- user_games_activity

- user_gender

- user_groups

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3103

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

- user_hometown

- user_interests

- user_likes

- user_link

- user_location

- user_managed_groups

- user_online_presence

- user_photos

- user_posts

- user_questions

- user_relationship_details

- user_relationships

- user_religion_politics

- user_status

- user_subscriptions

- user_tagged_places

- user_videos

- user_website

- user_work_history

- username

- verified

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

**Response No. 16**: As noted, there are a handful of additional APIs that a developer may request access to if necessary for the operation of their app. Each of these APIs has its own unique set of permissions and/or endpoints associated with that API. Information regarding these APIs and their associated permissions and/or endpoints are available on the Facebook Developers page.

As relevant here, the endpoints a developer presently may access through the Groups API after having been approved by Facebook include:

- /{application-id}/app_installed_groups
- /{group-id}/albums
- /{group-id}/docs
- /{group-id}/events
- /{group-id}/feed
- /{group-id}/files
- /{group-id}/live_videos
- /{group-id}/opted_in_members
- /{group-id}/photos
- /{group-id}/videos
- /{user-id}/groups

**Response No. 17**: The endpoints a developer presently may access through the Live Video API after having been approved by Facebook include:

- DELETE /{live_video_id}
- GET /{event-id}/live_videos
- GET /{group-id}/live_videos

- GET /{live-video-id}

- GET /{live-video-id}/comments

- GET /{live-video-id}/crosspost_shared_pages

- GET /{live-video-id}/likes

- GET /{live-video-id}/polls

- GET /{live-video-id}/reactions

- GET /{page-id}/live_videos

- GET /{user-id}/live_videos

- POST /{event-id}/live_videos

- POST /{group-id}/live_videos

- POST /{live_video_id}

- POST /{live_video_id}/input_streams

- POST /{live_video_id}/polls

- POST /{page-id}/live_videos

- POST /{user-id}/live_videos

- GET /{live-video-input-stream-id}

- POST /{live_video_id}/input_streams

- GET /{live-video-id}/polls

- GET /{video-poll-id}

- POST /{live_video_id}/polls

- POST /{video_poll_id}

**Response No. 18**: The data fields that may be accessed through the Pages API after

having been approved by Facebook include:

36

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

- id

- about

- access_token

- ad_campaign

- affiliation

- app_id

- artists_we_like

- attire

- awards

- band_interests

- band_members

- best_page

- bio

- birthday

- booking_agent

- built

- business

- can_checkin

- can_post

- category

- category_list

- checkins

- company_overview

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

- connected_instagram_account

- contact_address

- copyright_attribution_insights

- copyright_whitelisted_ig_partners

**Response No. 19**:

**Response No. 20**:

**Response No. 21**:

**Response No. 22**:



3108

**Response No. 23**:

**Response No. 24**:

**Response No. 25**:

**Response No. 26**:

**Response No. 27**:

**Response No. 28**:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

**Response No. 29**: ████████████████████

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

**Response No. 30**: ████████████████████

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

**Response No. 31**: ████████████████████

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

**Response No. 32**: ████████████████████

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

**Response No. 33**: ████████████████████

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

**Response No. 34**:

**Response No. 35**:

**Response No. 36**:

**Response No. 37**:

**Response No. 38**:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

**Response No. 39**:

**Response No. 40**:

**Response No. 41**:

**Response No. 42**:

**Response No. 43**:

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3112

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

**Response No. 44:**

**Response No. 45:**

**Response No. 46:**

**Response No. 47:**

**Response No. 48:**

---

[5]  In contrast to other permissions that grant access to a user's friend list, the "auto_granted_read_friendlists" capability returns custom lists or groups of friends curated by the user, which could reflect or otherwise include all of a user's friends.

43

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3113

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

**Response No. 49:**

███████████████████████████████████████████

**Response No. 50:**

███████████████████████████████████████████

**Response No. 51:**

███████████████████████████████████████████

**Response No. 52:**

███████████████████████████████████████████

**Response No. 53:**

███████████████████████████████████████████

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3114

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

**Response No. 54**:



**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**



**Response No. 55**: For the private API associated with the capability friends_of_anyone,

the associated data fields a third party may have been able to access upon approval by Facebook

are:

- friend lists visible to the app user

**Response No. 56**: For the private API associated with the capability

graph_api, the associated data fields a third party may have been able to access upon approval by

Facebook are:

3116

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**



**Response No. 57**:

**Response No. 58**:

47

3117

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

**Response No. 59**:

**Response No. 60**:

**Response No. 61**:

**Response No. 62**:

**Response No. 63**:

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

**Response No. 64**:

**Response No. 65**:

**Response No. 66**:

**Response No. 67**:

---

[6] The types of possible social context are whether an app user's nearby friend is currently traveling, near the app user, or in the app user's neighborhood; whether it is the nearby friend's birthday or some other celebration day; what song they are listening to; and what game they are playing.

49

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3119

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

**Response No. 68**:

**Response No. 69**:

**Response No. 70**:

**Response No. 71**:

50

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

**Response No. 72**:

**Response No. 73**:

**Response No. 74**:

**Response No. 75**:

**INTERROGATORY NO. 12:**

For each Database and Data Analytics Infrastructure identified in your answer to

Interrogatory No. 8, describe in detail the system architectures of, and types of data contained by,

such system.

## INTERROGATORY NO. 14:

Identify every Business Partner that had the ability to access the Not Generally Available
Content and Information of Facebook Users even if such Facebook Users had not downloaded an
App from that Business Partner and time period during which each such Business Partner had
that ability.

## RESPONSE TO INTERROGATORY NO. 14 – CONFIDENTIAL:

Facebook restates and incorporates its Preliminary Statement, General Objections,
Objections to Definitions, and Objections to Instructions as though fully set forth in this
Response. Facebook further objects to this Interrogatory on the following grounds:

(A)      Facebook objects to this Interrogatory as an improper compound interrogatory
that also embeds multiple discrete sub-parts that count against the number of interrogatories
permitted under Fed. R. Civ. P. 33 by asking for separate information about "each such Business
Partner." *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-
00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009). During the parties' meet
and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's
objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46
(C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts,
identify witnesses, or identify documents" regarding subject matters that are "discrete or
separate" from each other "should be viewed as containing a subpart" for each separate subject
matter. Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to
the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod.
& Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020)
(internal quotation marks and citations omitted), but instead seeks information about separate

60

and distinct subjects, to wit, each of dozens of different "Business Partners" that have separate relationships and/or contracts with Facebook. Facebook therefore considers Plaintiffs' inquiries into "each" Business Partner as separate Interrogatories. *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

    (B)    Facebook objects to this Interrogatory on the ground that the definition of "Not Generally Available" data is vague, ambiguous, overly broad, and unduly burdensome. Facebook will construe this term as described in its objections to its Definition.

    (C)    Facebook objects to this Interrogatory on the ground that the definition of "Business Partners" is vague, ambiguous, overly broad, and unduly burdensome. Facebook will construe this term as described in its objections to its Definition.

    (D)    Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case. Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to Business Partners unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD

Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(E)     Facebook objects to this Interrogatory on the basis that it is cumulative and duplicative of prior requests, including RFPs 12 and 24.

(F)     Facebook objects to this Interrogatory on the basis that the information sought is more appropriately pursued through another means of discovery, such as a request for the production of documents.

(G)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information. Responding fully to Plaintiffs' Interrogatory would require Facebook to conduct a broad investigation—including conducting witness interviews and analyzing a large number of documents that have not yet been identified and produced—to identify all Business Partners who were permitted to access to information through a large number of APIs (many of which are unrelated to any live claim or defense) over the course of at least thirteen years.

(H)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it

62

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

would enforce a 75 Interrogatory limit. Sept. 4 Hr'g Tr. at 14:17-22. Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

### Response No. 77:

"Business Partners" is not a term of art used within Facebook used to describe third parties to whom "Facebook outsourced . . . 'the time, labor, and money required to build Facebook's Platform on different devices and operating systems,'" pursuant to "integration partnerships." MTD Order, ECF No. 298, at 8 (quoting FACC ¶ 486). To avoid confusion, Facebook will refer to these entities as "Integration Partners." Facebook's Integration Partners are companies Facebook engaged to build integrations for a variety of devices, operating systems, and other products where Facebook and its partners wanted to offer people a way to receive Facebook or Facebook experiences. These integrations were built by Facebook partners, for Facebook users, but approved by Facebook. They included, for example:

- *Facebook-branded apps*: Some partners built versions of Facebook for their device or operating system that had all or substantially all of the features that Facebook built directly on the Facebook website and in Facebook's mobile apps.

- *Social Networking Service Hubs*: Some partners built "hubs" into their products, where people could see notifications from their friends or the people they followed on Facebook, MySpace, Twitter, Google and other services. People could often also use these integrations to post on these social networking services.

CONFIDENTIAL
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 14**

- *Syncing Integrations*: Some partners enabled people to sync their Facebook data (*e.g.*, photos, contacts, events, and videos) with their device in order to integrate Facebook features on their device. This allowed people to, for example, easily upload pictures to Facebook and to download their Facebook pictures to their phones, or to integrate their Facebook contacts into their device address book.

- *USSD Services*: Some partners developed USSD services, which are services that provided Facebook notifications and content via text message. This was useful for feature phones that did not have the ability to connect to the Internet; it particularly helped Facebook bring its service to people in the developing world.

To provide these experiences, Facebook permitted partners to use certain Facebook APIs. In general, partners were licensed to use the APIs solely for providing specific integrations approved by Facebook to Facebook users who requested these services on the partners' products. These integrations were reviewed by Facebook, which had to approve implementations of these APIs. Typically, these apps were reviewed and "certified" by members of Facebook's partnerships and engineering teams. In these and other ways, these partnerships differed significantly from third-party app developers' use of published APIs to build apps for consumers on Facebook's developer platform. Among other things, third-party app developers use the information they receive in order to build their own experiences, not to build Facebook-approved applications for purposes designated by Facebook. Integration Partners were not permitted to use data received through Facebook APIs for independent purposes unrelated to the approved integration without user consent.

Below is a list of Facebook's Integration Partners during the Relevant Time Period asserted by Plaintiffs . For information relating to the period during which each integration was

CONFIDENTIAL
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 14**

active, Facebook directs Plaintiffs to Facebook's responses to Interrogatory No. 15. The lack of

an access revocation date does not signify that such access was never revoked or otherwise

terminated.

- Accedo

- Acer



- Airtel

- Alcatel/TCL

- Alibaba[7]

- Amazon



- Apple

- AT&T

- Blackberry



- Dell

- DNP

- Docomo

- Garmin

- Gemalto

---

[7]  Alibaba only had APIs that allows it to query endpoints _not_ associated with user's friends' data fields during the
relevant time period, but is included on this list for completeness.

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

███████████

- HP/Palm

- HTC

- Huawei

- INQ

███████████

- Kodak

- LG

- MediaTek/Mstar

███████████████

- Microsoft

- Miyowa/Hape Esia

███████████

- Motorola/Lenovo

- Mozilla

███████████

- Myriad

- Nexian

███████████

- Nuance

- Nokia

- O2

- Opentech ENG

3128

- Opera

- OPPO

- Orange

- Pantech



- Qualcomm



- Samsung

- Sony



- Sprint



- TIM

- T-Mobile

- Tobii

- U2topia

- Verisign

- Verizon

- Virgin Mobile

- Vodafone

- Warner Bros.

- Western Digital

- Yahoo



- Zing Mobile

This list is comprehensive to the best of Facebook's ability, as explained in the June 29, 2018 Facebook letter that is cited in paragraph 432 of the SACC.

## INTERROGATORY NO. 15:

For each Business Partner identified in your answer to Interrogatory No. 14, provide:

a) The name of each API or other data transfer mechanism by means of which the Business Partner accessed the Not Generally Available Content and Information of Facebook Users when such Facebook Users had not downloaded an App from that Business Partner;

b) a detailed description of the function of each such API or other data transfer mechanism;

c) the elements of Not Generally Available Content and Information that each such API or other data transfer mechanism allowed access to;

d) the number of calls the Business Partner made to each such API or other data transfer mechanism each month;

e) the volume of data transferred from each such API or other data transfer mechanism to each Business Partner each month;

f) the number of Friends of Installing Users whose Content and Information was so accessed by each Business Partner; and

g) any filters or access restrictions that limited the set of Facebook Users about whom each Business Partner could access Not Generally Available Content and Information.

## RESPONSE TO INTERROGATORY NO. 15 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33. Not only does the Interrogatory ask for separate information about "each" Business Partner identified in Facebook's answer to Interrogatory No. 14, *see, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009), the Interrogatory demands a list of 7 different types of information about each. Each of those inquiries is itself a subpart to be counted against the Interrogatory limit. During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter. Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, each of dozens of different "Business Partners" that have separate relationships and/or contracts with Facebook. Facebook will therefore treat Plaintiffs' inquiry into "each" Business Partner as an individual Interrogatory. *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct*

69

*subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])). Although Facebook has provided a single table of data points relevant to each Integration Partner for ease of review, Facebook considers this Interrogatory to pose a separate Interrogatory about 67 different entities, and therefore the below Response to constitute at least 67 discrete Responses.

(B)     Facebook objects to this Interrogatory on the ground that the definition of "Not Generally Available" data is vague, ambiguous, overly broad, and unduly burdensome. Facebook will construe this term as described in its objections to its Definition.

(C)     Facebook objects to this Interrogatory on the ground that the definition of "Business Partners" is vague, ambiguous, overly broad, and unduly burdensome. Facebook will construe this term as described in its objections to its Definition.

(D)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, and/or disproportionate to the needs of the case. Specifically, Facebook objects to this Interrogatory on the basis that it seeks an overly broad and unduly burdensome volume of data, which presents not only practical limitations as to its analysis, delivery, and use, but is largely irrelevant. The burdens of compiling such information outweigh the utility of the information.

(E)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information. Responding fully to Plaintiffs' Interrogatory would require Facebook to conduct a broad investigation—including analyzing a large number of documents that have not yet been identified and produced and that may or may not be in Facebook's possession, custody, and control—to identify all Business

Partners who were permitted to access information through a large number of APIs (many of which are unrelated to any live claim or defense) over the course of at least thirteen years and then provide detailed historical information about each of those APIs and how they were utilized.

(F)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to API calls, applications, and user data unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(G)     Facebook further objects to this Interrogatory on the ground that the Interrogatory seeks information not in Facebook's possession, custody, or control.

(H)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it

71

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

### Response No. 78:

With regard to the APIs Facebook's Integration Partners had access to, Facebook has provided a table below identifying, by Integration Partner, the APIs that may have allowed each Integration Partner to query (but would not have necessarily returned) endpoints associated with user's friends' data fields during the relevant time period, their associated apps, the date ranges during which they were active, and the data fields associated with the APIs they had access to. Note that the lack of an access revocation date does not signify that such access was never revoked or otherwise terminated.

However, it is important to note that the Integration Partner's—or any third party's—ability to query an API does not automatically translate into the ability to access or receive user data,



**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 15**



Accordingly, an Integration Partner's or third-party's ability to query an API does not mean they are necessarily able to access particular data or end points from particular users.

With regard to Plaintiffs' request for over 10 years of monthly data regarding the number of API calls made, the volume of data returned, and the numbers of users whose data was accessed, Facebook continues to investigate what information it can produce in response to this request. Facebook is willing to meet and confer with Plaintiffs regarding what information is being sought by this Interrogatory, its relevance to Plaintiffs' claims (if any), and what relevant and probative information is reasonably available to Facebook such that it is appropriate for discovery in this case.

(H)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 86**:

Facebook has conducted an investigation into the information Plaintiffs seek and presently understands that it is not possible to create the data set requested.

## INTERROGATORY NO. 27:

Identify by name and time period all Third Parties to whom Facebook granted whitelisted access, the time period of the grant of whitelisted access, and the Third Parties for which such access was granted.

## RESPONSE TO INTERROGATORY NO. 27 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as containing multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33.  Although Facebook has provided two tables of data points relevant to each of the third-party applications for ease of review, Facebook considers this Interrogatory—in conjunction with Interrogatory No.

13—to pose a separate Interrogatory about over 600 different entities, and therefore the below Response to constitute over 600 discrete Responses.

(B)     Facebook objects to this Interrogatory on the ground that the term "whitelisted" is vague, ambiguous, and undefined. For the purposes of this Interrogatory, Facebook will construe the term "whitelisted" consistent with the Court's Order on Facebook's Motion to Dismiss, ECF No. 298, to mean applications that were allowed continued access to users' friends' data for a period of time after Facebook transitioned to Graph API v.2.0, either because they were granted temporary extension of access to friends permissions under Graph API v. 1.0 or because they were otherwise approved for access to private APIs that allowed them to to query endpoints associated with data fields that may have been associated with a user's friends after the transition to Graph API v. 1.0.

(C)     Facebook objects to this Interrogatory to the extent it seeks information both as to "all Third Parties to whom Facebook granted whitelisted access" and "the Third Parties for which such access was granted," as both clauses appear to seek the same information. Facebook will construe the Interrogatory as seeking only "all Third Parties to whom Facebook granted whitelisted access."

(D)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case. Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to "whitelisted access" unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one

356

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3319

of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(E)     Facebook objects to this Interrogatory to the extent it is cumulative and duplicative of prior Interrogatories, including Interrogatory No. 13.

(F)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information. Responding fully to Plaintiffs' Interrogatory would require Facebook first to analyze a large number of documents that have not yet been identified and produced and that may or may not be in Facebook's possession, custody, and control.

(G)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit. Sept. 4 Hr'g Tr. at 14:17-22. Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 27

### Response No. 87:

After an extensive investigation, Facebook has identified the lists of third-party applications below.

The first list below consists of apps that requested and were given permission by the app user to access friend permissions at some point during the apps' existence, and were given a one-time extension allowing them to continue to access the fields available through Graph API V1 (potentially including friend data) after the deprecation of Graph API V1 in May 2015. These extensions were for less than six months, with the exception of one company, which received an extension until January 2016. The list below provides the name of each third-party application that received a short-term extension, the date the app was created, the date the app's extension to the deprecation of Graph API V1 expired (which was the last date on which the app could have accessed non-public information from the app user's friends), and the app's requested and obtained permissions for friend data.[12]

Three limitations apply to this list.

---

[12]  Facebook has provided information about all known permissions for friend-related data fields sought and granted at any time. Note that the data field names are listed as they appear in Facebook's internal database.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 27



*Third*, this list is comprehensive to the best of Facebook's ability, as explained in the June 29, 2018 Facebook letter that is cited in paragraph 432 of the SACC.

The interaction of these apps with the app installers' friends' privacy settings occurred in the same manner that these settings governed all third-party apps calling the Graph API in the V1 time period, as described in Facebook's Response No. 77 to Interrogatory No. 14.