# EXHIBIT B
# VOLUME TWO
# OF REDACTED VERSION OF DOCUMENT
# SOUGHT TO BE FILED UNDER SEAL

# EXHIBIT V

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE: FACEBOOK, INC. CONSUMER ) MDL No. 2843

5    PRIVACY USER PROFILE LITIGATION) Case No.

6    _____) 18-md-02843-VC

7    This document relates to:      )

8    ALL ACTIONS                    )

9    _____)

10

11

12

13     *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

14

15

16     REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

17             FACEBOOK INC. REPRESENTATIVE,

18             KONSTANTINOS PAPAMILTIADIS

19             TUESDAY, FEBRUARY 23, 2021

20

21

22   Reported by:

23   Ashala Tylor, CSR #2436, CLR, CRR, RPR

24   JOB NO. 4473154

25   PAGES 1 - 280

Page 1

1     UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF CALIFORNIA
3
4  IN RE: FACEBOOK, INC. CONSUMER ) MDL No. 2843
5  PRIVACY USER PROFILE LITIGATION) Case No.
6                         ) 18-md-02843-VC
7  This document relates to:   )
8  ALL ACTIONS              )
9  _____)
10
11
12
13
14
15
16     Videotaped deposition of FACEBOOK, INC.
17  REPRESENTATIVE, KONSTANTINOS PAPAMILTIADIS taken via
18  virtual Zoom, commencing at 9:10 a.m. and ending at
19  3:58 p.m., on Tuesday, February 23, 2021, before Ashala
20  Tylor, CSR No. 2436, RPR, CRR, CLR.
21
22
23
24
25
                              Page 2

1  APPEARANCES OF COUNSEL:
2  FOR THE PLAINTIFF:
3      BLEICHMAR FONTI & AULD LLP
4      BY: LESLEY E. WEAVER, ESQ.
5          ANNE DAVIS, ESQ.
6          MATTHEW MONTGOMERY, ESQ.
7          MATTHEW MELAMED, ESQ.
8      555 12th Street, Suite 1600
9      Oakland, California 94607
10     415.445.4003
11     lweaver@bfalaw.com
12     adavis@bfalaw.com
13     mmmontgomery@falaw.com
14     mmelamed@bfalaw.com
15
16
17
18
19
20
21
22
23
24
25
                              Page 3

1  A P P E A R A N C E S (continued)
2  FOR PLAINTIFFS:
3      KELLER ROHRBACK LLP
4      BY: DAVID KO, ESQ.
5          CARI C. LAUFENBERG, ESQ.
6          DAVID LOESER, ESQ.
7      1201 Third Avenue, Suite 3200
8      Seattle, Washington 98101-3052
9      206.623.3384
10     dko@kellerrohrback.com
11     claufenberg@kellerrohrback.com
12     dloeser@kellerrohrback.com
13
14
15
16
17
18
19
20
21
22
23
24
25
                              Page 4

1  A P P E A R A N C E S (continued)
2  FOR THE DEFENDANT FACEBOOK, INC.:
3      GIBSON, DUNN & CRUTCHER LLP
4      BY: DEBORAH STEIN, ESQ.
5          MARTIE KUTSCHER CLARK, ESQ.
6      333 S. Grand Avenue, 47th Floor
7      Los Angeles, California 90071
8      213.229.7000
9      dstein@gibsondunn.com
10     mkutscherClark@gibsondunn.com
11       - and -
12     GIBSON DUNN & CRUTCHER LLP
13     BY: LAURA MUMM, ESQ.
14     200 Park Avenue, 47th Floor
15     New York, New York 10166
16     212.351.4000
17     lmumm@gibsondunn.com
18
19  Also Present:
20     Ian Chen, In-House Facebook Counsel
21     Kimberly Decker, Videographer
22
23
24
25
                              Page 5

2 (Pages 2 - 5)

3427

**Page 6**

```
1           INDEX
2 WITNESS        EXAMINATION BY        PAGE
3 KONSTANTINOS PAPAMILTIADIS
4           Ms. Weaver          9, 171
5
6           EXHIBITS
7 NO.    DESCRIPTION              PAGE
8 Exhibit 1    Plaintiffs' Amended Notice of    10
9             Deposition of Defendant Facebook,
10            Inc. Pursuant to Federal Rule of
11            Civil Procedure 30(b)(6)
12 Exhibit 2    Discovery Order No. 9    10
13            (Dkt. Nos. 515, 526, 537, 548)
14 Exhibit 3    Email from Simone LiTrenta to    49
15            Matt Scutari and others, 5-8-14,
16            FB CA MDL 00213423 - 443
17 Exhibit 4    Email exchange, top one from    240
18            Simon Cross to Steven Elia,
19            1-29-15, FB-CA-MDL-00227697 - 699
20 Exhibit 5    Excel spreadsheet,       265
21            FB-CA-MDL-01434884.csv
22 Exhibit 6    Excel spreadsheet,       266
23            FB-CA-MDL-01434885.csv
24            Instruction Not to Answer
25            Page 91, Line 9
```

**Page 7**

```
1        Tuesday, February 23, 2021
2            9:10 a.m.
3            --o0o--
4
5        THE VIDEOGRAPHER: Good morning. We are    09:10
6 going on the record at 9:10 a.m. on February 23rd of    09:10
7 2021. All participants are attending remotely.    09:10
8        Audio and video recording will continue to    09:10
9 take place unless all parties agree to go off the    09:10
10 record.                09:10
11      This is Media Unit 1 of the recorded    09:10
12 deposition of Facebook, Inc. representative,    09:10
13 Konstantinos Papamiltiadis, taken by counsel for the    09:10
14 plaintiffs in the matter of Facebook, Inc. Consumer    09:10
15 Privacy User Profile Litigation filed in the    09:10
16 United States District Court, Northern District of    09:10
17 California, Case Number 18-md-02843-VC.    09:10
18      My name is Kimberly Decker from Veritext    09:10
19 Legal Solutions and I'm the videographer. The court    09:10
20 reporter is Ashala Tylor. I'm not related to any    09:10
21 party in this action, nor am I financially    09:11
22 interested in the outcome.        09:11
23      Counsel and all present will now state    09:11
24 their appearances and affiliations for the record.    09:11
25 If there are any objections to proceeding, please    09:11
```

**Page 8**

```
1 state them at the time of your appearance, beginning    09:11
2 with the noticing attorney.        09:11
3        MS. WEAVER: Good morning, everybody. I'm    09:11
4 Lesley Weaver, co-lead counsel for plaintiffs and    09:11
5 from Bleichmar Fonti & Auld.        09:11
6        MS. DAVIS: Good morning. Anne Davis also    09:11
7 for plaintiffs, Bleichmar Fonti & Auld.    09:11
8        MR. MONTGOMERY: Matthew Montgomery for    09:11
9 plaintiffs, Bleichmar Fonti & Auld.    09:11
10       MR. MELAMED: Matt Melamed for plaintiffs,    09:11
11 Bleichmar Fonti & Auld.        09:11
12       MS. LAUFENBERG: Cari Laufenberg for    09:11
13 plaintiffs from Keller --        09:11
14       THE REPORTER: I'm sorry, one more time,    09:11
15 please.            09:11
16       MS. LAUFENBERG: Cari Laufenberg for    09:11
17 plaintiffs from Keller Rohrback.    09:11
18       MR. KO: David Ko of Keller Rohrback also    09:11
19 on behalf of the plaintiffs. Good morning.    09:12
20       MR. LOESER: Good morning. Derek Loeser    09:12
21 from Keller Rohrback for plaintiffs.    09:12
22       MS. STEIN: Are you ready for defendant?    09:12
23       Deborah Stein from Gibson, Dunn on behalf    09:12
24 of defendant Facebook.        09:12
25       MS. CLARK: Martie Kutscher Clark from    09:12
```

**Page 9**

```
1 Gibson, Dunn also on behalf of Facebook.    09:12
2        MS. MUMM: Laura Mumm from Gibson, Dunn on    09:12
3 behalf of Facebook.        09:12
4        MR. CHEN: And this is Ian Chen. I am    09:12
5 in-house counsel for Facebook.        09:12
6        THE VIDEOGRAPHER: Would the court    09:12
7 reporter please swear in the witness.    09:12
8            09:13
9        KONSTANTINOS PAPAMILTIADIS,    09:13
10 being first duly sworn or affirmed to testify    09:13
11 to the truth, the whole truth, and nothing but    09:13
12 the truth, was examined and testified as follows:    09:13
13       THE REPORTER: Proceed, Counsel.    09:13
14       EXAMINATION        09:13
15 BY MS. WEAVER:            09:13
16   Q. Good morning. And thank you very much for    09:13
17 being here this morning and as we adjust to this new    09:13
18 process.            09:13
19       May I address you as K.P. throughout the    09:13
20 deposition or would you prefer Mr. Papamiltiadis?    09:13
21   A. I don't need to ask counsel's permission    09:13
22 to answer that question. I guess you can.    09:13
23   Q. All right. You come prepared.    09:13
24       I'm going to start by marking a couple of    09:13
25 exhibits, and I think that you've practiced with    09:13
```

3 (Pages 6 - 9)

**Page 10**

1 your counsel about how to pull those down. These 09:13
2 will be the deposition notice and Discovery Order 09:13
3 Number 9. 09:13
4 So, first, we'll mark as Exhibit 1 the 09:13
5 notice for deposition in this action. And Ms. Davis 09:13
6 is going to be marking that right now and uploading 09:13
7 it. 09:13
8 (Exhibit 1 was marked for 09:13
9 identification and attached 09:13
10 hereto.) 09:13
11 MS. WEAVER: And then as Exhibit 2 she 09:13
12 will mark Discovery Order Number 9. 09:13
13 (Exhibit 2 was marked for 09:13
14 identification and attached 09:13
15 hereto.) 09:13
16 BY MS. WEAVER: 09:13
17 Q. And I'll direct you to the portions of 09:13
18 those exhibits I'd like you to review. Just let us 09:13
19 know when you have those. 09:14
20 MS. DAVIS: They are distributed now. 09:14
21 BY MS. WEAVER: 09:14
22 Q. Are you seeing those, K.P., in your -- 09:14
23 A. Not -- yes, I can see Exhibit 2 now. 09:14
24 Q. Okay. Let's start with 1. 09:14
25 A. I don't need to refresh -- I don't need to 09:14

**Page 11**

1 refresh the browser, right? It's automatic, so... 09:14
2 MS. DAVIS: On my end it shows that 1 and 09:14
3 2 are distributing. 09:14
4 THE VIDEOGRAPHER: And you do need to 09:14
5 refresh. 09:14
6 THE WITNESS: Okay. 09:15
7 MS. WEAVER: Yeah, I'm still just seeing 09:15
8 2. 09:15
9 THE WITNESS: Yeah, I can only see 2. 09:15
10 MS. WEAVER: Do you see it now? 09:15
11 THE WITNESS: Let me refresh as well. 09:15
12 Okay. Great. Do you want me to open 09:15
13 number 1? 09:15
14 BY MS. WEAVER: 09:15
15 Q. Yes, please. Thank you. 09:15
16 Do you recognize Exhibit 1? 09:15
17 A. Can I take a look? 09:15
18 Q. Yes, please. 09:15
19 MS. WEAVER: And, for the record, 09:15
20 Exhibit 1 is Plaintiffs' Amended Notice of 09:15
21 Deposition of Defendant Facebook, Inc. Pursuant to 09:15
22 Federal Rule of Civil Procedure 30(b)(6). 09:15
23 Q. K.P., I'll direct your attention just to 09:16
24 page 2 of the document where it says "Matters for 09:16
25 Testimony." 09:16

**Page 12**

1 A. Page 2 you said? 09:16
2 Q. Yes. Have you seen Exhibit 1 before? 09:16
3 A. I believe I have seen parts of that. 09:16
4 Q. Okay. So do you recognize it as the 09:16
5 notice for the deposition today? 09:16
6 A. Yes. 09:16
7 Q. And are you here today to testify on 09:16
8 behalf of Facebook? 09:16
9 A. Yes, I am. 09:16
10 Q. Okay. And are you here to testify 09:16
11 regarding the format, nature, and location of 09:16
12 discoverable user data as defined by Discovery Order 09:16
13 Number 9 as set forth on Topic 1? 09:17
14 A. I am not really sure I understand exactly 09:17
15 what that sentence means. 09:17
16 Q. Okay. Do you understand that you are 09:17
17 testifying in response to Topic 1? 09:17
18 MS. STEIN: Objection to form. 09:17
19 THE WITNESS: Topic 1 is -- sorry, 09:17
20 scrolling through the document. 09:17
21 MS. STEIN: I'll just state for the record 09:17
22 that we lodged objections to the description of the 09:17
23 categories in this notice, but, you know, the 09:17
24 witness is free to describe his understanding as to 09:17
25 what he's going to be testifying about today. 09:17

**Page 13**

1 BY MS. WEAVER: 09:17
2 Q. So I'll restate my question, K.P. Have 09:17
3 you reviewed Topic 1 before today? 09:17
4 A. I'm sorry, I'm having a hard time locating 09:17
5 where is the Topic 1. 09:17
6 Q. Okay. It's page 2 where it says "Matters 09:17
7 for Testimony" under Roman Numeral III. 09:17
8 MS. STEIN: Lesley, I think it may be 09:17
9 further down in the document. 09:18
10 MR. KO: Yeah, there's a couple page 2s. 09:18
11 K.P., it's page 6 of the PDF. 09:18
12 THE WITNESS: Okay. Sorry. 09:18
13 BY MS. WEAVER: 09:18
14 Q. My apologies. 09:18
15 A. I was like -- I was like, what am I 09:18
16 missing here? 09:18
17 Q. I apologize for that. 09:18
18 I see. Yes, it's page 2 of the exhibit. 09:18
19 A. Wait. Now, I'm getting confused. It's 09:18
20 page 2 -- so I have page 2 under Schedule A. I 09:18
21 have -- 09:18
22 Q. Right. Go to Schedule A and page 2 of 09:18
23 Schedule A. 09:18
24 A. Okay. Matters of testimony. That's what 09:18
25 you're looking at? 09:18

4 (Pages 10 - 13)

3429

1    Q.  Exactly.                                    09:18
2    A.  Okay.                                       09:18
3    Q.  So do you see where it says "Topic 1:  The  09:18
4    format, nature, and location of 'discoverable user  09:18
5    data' as defined by Discovery Order Number 9?"  Do  09:18
6    you see that?                                   09:18
7    A.  Yes, I do see that.                         09:18
8    Q.  Are you here today to testify regarding     09:18
9    that topic?                                     09:18
10        MS. STEIN:  Objection to form.             09:18
11        THE WITNESS:  Like I said --               09:18
12   BY MS. WEAVER:                                  09:19
13   Q.  You may answer.                             09:19
14   A.  I don't know what "format" means in that    09:19
15   context, or "location," but I'm here to tell you  09:19
16   about how Facebook has access to user data and how  09:19
17   this is made available to third parties if that's  09:19
18   relevant.                                       09:19
19   Q.  Okay.  Great.  And are you here to discuss  09:19
20   data collected from a user's on-platform activity as  09:19
21   well as off-platform activity?                  09:19
22   A.  Yes.                                        09:19
23   Q.  Okay.  Great.  As well as data inferred     09:19
24   from on- or off-platform activity?              09:19
25   A.  That's correct.                            09:19

Page 14

1    Q.  Okay.  Great.                               09:19
2        What did you do to prepare for your         09:19
3    deposition today?                               09:19
4    A.  Well, part of my job is to -- you know,     09:19
5    and so my day-to-day job is to work on integrations  09:19
6    that have access to data, including user data.  I  09:19
7    have been a Facebook employee for the last eight and  09:19
8    a half years, so this is my day-to-day job to some  09:19
9    extent.  At the same time I had a number of sessions  09:19
10   with my counsels in preparation of this deposition  09:19
11   to make sure that I familiarize myself with certain  09:19
12   aspects related to this deposition.             09:20
13   Q.  Great.  And looking back at Exhibit 1, if   09:20
14   you turn to the next page, it says "Schedule B"  09:20
15   after the matters?                              09:20
16   A.  Yes.                                        09:20
17   Q.  Do you see where it says Plaintiffs'        09:20
18   request for production of certain documents?  There  09:20
19   are two categories of documents.                09:20
20   A.  Yeah.                                       09:20
21   Q.  Did you review any documents or consult     09:20
22   them to prepare for your deposition today?      09:20
23   A.  I'm not sure they all documents.  This is   09:20
24   something I can, you know, like suggest that I have  09:20
25   knowledge of.                                   09:20

Page 15

1        I reviewed certain documents, yes, but I    09:20
2    don't know if that was all of them.             09:20
3    Q.  Okay.  And what did you review?             09:20
4    A.  I reviewed this document, for example.  I   09:20
5    reviewed some data policies from the past 10 or so  09:20
6    years.  I reviewed the contents of the download  09:20
7    information files.  I reviewed developer         09:20
8    documentation.  Different things.               09:21
9    Q.  Okay.  So when you say you reviewed data    09:21
10   policies, about how many did you review?         09:21
11   A.  I can't remember.  Five or six.             09:21
12   Q.  Okay.  And you said you also reviewed        09:21
13   developer documentation; is that right?          09:21
14   A.  Yes.                                        09:21
15   Q.  And what do you mean by that?  What were     09:21
16   those documents?                                09:21
17   A.  And so any information with regards to our  09:21
18   APIs is fully documented on our website,         09:21
19   developers.facebook.com.  And so while I spent a  09:21
20   considerable amount of my time there, I wanted to  09:21
21   familiarize myself with certain aspects of the API  09:21
22   that's maybe, you know, the item of your questions  09:21
23   here.                                           09:21
24   Q.  Okay.  And how many developer documents     09:21
25   did you review?                                 09:21

Page 16

1    A.  I mean the developer website is 5,000       09:21
2    pages.  I reviewed at least, you know, documentation  09:21
3    for the basic APIs.                             09:21
4    Q.  And when you say "the basic APIs," which    09:21
5    APIs do you mean?                               09:22
6    A.  The Graph API.                              09:22
7    Q.  Which version?                              09:22
8    A.  Well, there is only one version right now.  09:22
9    Q.  You reviewed the current version?           09:22
10   A.  The current version, yes.                   09:22
11   Q.  Okay.  Did you understand that testimony    09:22
12   today was to be limited to the time period 2012 to  09:22
13   2017?                                           09:22
14   A.  Yes, I do.                                  09:22
15   Q.  Okay.  So did you review the Graph API      09:22
16   documentation for that time period?             09:22
17   A.  I don't need to.  I understand.             09:22
18   Q.  Because --                                  09:22
19   A.  Because I understand Version 1 of the API   09:22
20   as well as I do the current version.            09:22
21   Q.  And how many developer documents did you    09:22
22   say you reviewed?                               09:22
23   A.  It's hard to quantify a number of pages.    09:22
24   They're web pages, right?  So I don't know how you  09:22
25   want me to -- I may have reviewed like three or four  09:22

Page 17

5 (Pages 14 - 17)

3430

```
 1 different, you know, like web pages.            09:22
 2     Q. So you would identify those by hyperlinks;  09:22
 3 is that right?                                   09:22
 4     A. Yes.                            (9:22
 5     Q. Great. And then did you say that you      09:22
 6 reviewed a third category of documents as well?  09:22
 7     A. Yes, the contents of the downloaded       09:23
 8 information file, the fields included, more      09:23
 9 specifically.                                    09:23
10     Q. And was that a web page as well?          09:23
11     A. That was produced in the form of PDF.     09:23
12     Q. And did you review anything else?         09:23
13     A. I don't think so. That's -- that's pretty 09:23
14 much it.                                         (9:23
15         MS. WEAVER: Okay. So, Counsel, we        09:23
16 obviously already have requested production and  09:23
17 identification of those documents. If they've    09:23
18 already been produced -- we repeat the request.  09:23
19     Q. Do you have a current -- current CV?      09:23
20     A. You mean a resume?                   09:23
21     Q. Yes.                          (9:23
22     A. Yes, I do.                      09:23
23     Q. Okay. Great.                    09:23
24         MS. WEAVER: We request that as well.     09:23
25     Q. Okay. You joined Facebook in 2012; that's 09:23
                                                 09:23
                                                 Page 18
```

```
 1 right?                                  09:23
 2     A. Correct.                        09:23
 3     Q. And you're a current employee; is that    09:23
 4 right?                                  09:24
 5     A. Yes.                            (9:24
 6     Q. So I hope you'll bear with us. We're      09:24
 7 laying the foundation, and this is our first     09:24
 8 deposition in this case, and so we need to establish  09:24
 9 a few definitions that I'm sure will seem obvious to  09:24
10 you.                                     06:24
11         What is a Facebook user?             09:24
12         MS. STEIN: I'm just going to -- I'm just  09:24
13 going to, you know, object to form, and, you know,  09:24
14 the witness can testify as to his -- the         09:24
15 understanding he'll use today.                   09:24
16 BY MS. WEAVER:                                   09:24
17     Q. So that means you may answer. Go ahead.   09:24
18     So what is a Facebook user?                  09:24
19     A. So I'll give you the definition that I    09:24
20 have. I don't think it's anywhere documented. But  09:24
21 when we talk about the Facebook user, we are talking  09:24
22 about the -- the accounts that the human has created  09:24
23 that represents their presence on the Facebook   09:24
24 platform.                                09:24
25     Q. And what is a Facebook platform?         09:24
                                                 Page 19
```

```
 1     A. Historically that platform has evolved    09:25
 2 from being just facebook.com to include Instagram,  09:25
 3 Messenger, Oculus, and --                       09:25
 4     Q. And so is the platform the website upon   09:25
 5 which users engage? Is that fair to say?        09:25
 6     A. It's not just the website because you most  09:25
 7 likely use -- I don't know if you have a Facebook  09:25
 8 account, but I assume that you may have used     09:25
 9 Facebook on your Apple device or your Android    09:25
10 device. So it's not just the website. It used to  09:25
11 be just the website.                            09:25
12     Q. So Facebook now offers products and       09:25
13 services like Facebook Messenger, Facebook Watch,  09:25
14 Facebook Portal, Facebook Business Tools and     09:25
15 Facebook Payments, correct? Is that correct?    09:25
16     A. That's --                       09:25
17         MS. STEIN: Object to form.           09:25
18         THE WITNESS: I think you just listed some  09:25
19 of our products, not every single product.       09:25
20 BY MS. WEAVER:                                   09:25
21     Q. Okay. For the products that I listed, do  09:25
22 they all collect data from users?               09:25
23     A. I mean depends how you define "collect."  09:26
24     Q. What does -- what does collect mean to    09:26
25 you?                                     09:26
                                                 Page 20
```

```
 1     A. If we are talking about creating an       09:26
 2 account which requires the user to enter a username,  09:26
 3 passwords, first name, last name, I don't think  09:26
 4 that's possible in every single one of those     09:26
 5 products. I don't know that you can create an    09:26
 6 account on Portal, for example.                  09:26
 7     Q. Okay. But regardless of whether or not    09:26
 8 you create an account, do all of those services  09:26
 9 collect data about Facebook users?              09:26
10         MS. STEIN: Objection to form and object   09:26
11 to the extent that some of those products may not be  09:26
12 from the relevant time period.                   09:26
13         THE WITNESS: Yeah.                  09:26
14 BY MS. WEAVER:                                   09:26
15     Q. You may answer.                   09:26
16     A. I mean that's -- that's probably a good   09:26
17 point. The products that you're talking about have  09:26
18 not been available to users before 2017, but I'll  09:26
19 answer the question by --                       09:26
20     Q. Thank you.                       09:26
21     A. -- saying it depends. In most cases we   09:26
22 are talking about activity data and not --       09:27
23     Q. What is the primary objective of the     09:27
24 platform when it was originally created?         09:27
25     A. By "platform" you mean Facebook or the    09:27
                                                 Page 21
```

Veritext Legal Solutions
866 299-5127

3431

**Page 22**

1  Facebook developer platform?                     09:27
2     Q.  Facebook -- well, let's start with          09:27
3  Facebook and then talk about the Facebook developer  09:27
4  platform.                                         09:27
5        MS. STEIN: Objection to form and beyond      09:27
6  the scope of what this witness is authorized to    09:27
7  testify about on behalf of the company.           09:27
8        But you can testify as to your              09:27
9  understanding just for foundation.                09:27
10 BY MS. WEAVER:                                    09:27
11    Q.  I'll ask the question again.                09:27
12      What was the primary purpose of the          09:27
13 Facebook platform when it was created, the website?  09:27
14    A.  So Facebook, the -- the Facebook product,   09:27
15 which also is referred as platform, is -- or was   09:27
16 always meant to allow people to connect with each  09:27
17 other and create a more open and connected world.  09:27
18    Q.  Thank you.                                  09:27
19    A.  Which would help the value of community     09:27
20 and we build a service to basically help people    09:28
21 connect.                                           09:28
22    Q.  So it was meant to allow people to connect  09:28
23 socially as well; is that fair?                    09:28
24    A.  No, that's --                               09:28
25        MS. STEIN: Object to form.                  09:28

**Page 23**

1        THE WITNESS: I mean I don't know of any     09:28
2  other connection.                                 09:28
3  BY MS. WEAVER:                                    09:28
4     Q.  Okay. And what was the purpose of the      09:28
5  Facebook developer platform, in your understanding?  09:28
6     A.  The Facebook develop --                    09:28
7        MS. STEIN: I'm going to object here.        09:28
8  This, you know, is both outside the scope of the   09:28
9  deposition and what this witness is authorized to  09:28
10 testify about. And dating -- dating back --        09:28
11       MS. WEAVER: I understand your objection.    09:28
12 You can either instruct him not to answer or allow  09:28
13 him to answer.                                     09:28
14       MS. STEIN: I will allow him to answer to     09:28
15 his understanding.                                 09:28
16 BY MS. WEAVER:                                     09:28
17    Q.  So you referenced the Facebook developer    09:28
18 platform earlier. What's your understanding of its  09:28
19 purpose when it was created?                       09:28
20    A.  And so our mission to -- you know, to       09:28
21 connect the world and bring the whole world closer  09:28
22 together is not something that we could do on our  09:28
23 own resources, you know. So we built the platform,  09:29
24 like a lot of technology companies have done, to   09:29
25 allow third parties to build on top of our platform  09:29

**Page 24**

1  and bring capabilities and experiences for people to  09:29
2  connect on their surfaces in many ways.           09:29
3     Q.  And is it fair to say that Facebook has     09:29
4  three constituents then: Its business partners,     09:29
5  developer partners, and users?                     09:29
6        MS. STEIN: Objection to form.               09:29
7        THE WITNESS: I'm not sure I understand      09:29
8  exactly the definition of developer -- sorry,      09:29
9  business partner. Because, you know, like developer  09:29
10 partners are also businesses. So I could probably  09:29
11 put them in the same bucket.                       09:29
12 BY MS. WEAVER:                                    09:29
13    Q.  I just didn't quite understand your answer  09:29
14 there, and my --                                  09:29
15    A.  So I -- so I cannot really, you know, like  09:29
16 give a distinction between business partners and   09:29
17 developer partners. Developer partners are also    09:29
18 businesses.                                        09:30
19    Q.  Got it. So who do you understand to be      09:30
20 encompassed in the business partners?             09:30
21    A.  Probably --                                09:30
22       MS. STEIN: Objection to form.               09:30
23       THE WITNESS: Sorry.                         09:30
24 BY MS. WEAVER:                                    09:30
25    Q.  You may answer.                            09:30

**Page 25**

1     A.  A business partner is probably anybody      09:30
2  that is not a developer partner, I would imagine, in  09:30
3  that definition.                                  09:30
4     Q.  Can you think of categories of business     09:30
5  partners that would be included in that? Would it  09:30
6  include data brokers, for example?                09:30
7        MS. STEIN: Objection to form.               09:30
8        THE WITNESS: I'm not sure what you're       09:30
9  referring to, data brokers. But I can -- I can give  09:30
10 you a list of different partners in case that helps  09:30
11 answer the question.                              09:30
12 BY MS. WEAVER:                                    09:30
13    Q.  Yes, that would be helpful, please.         09:30
14    A.  So historically Facebook has engaged with   09:30
15 maybe four or five categories of so-called partners.  09:30
16 One category of them is device manufacturers and   09:30
17 mobile operators. They help us build the -- within  09:30
18 that period of time that I think you're talking     09:31
19 about, they help us build Facebook-like experiences  09:31
20 in order to reach a wider audience.               09:31
21      A second category is what we call            09:31
22 developer partners. Those are third-party software  09:31
23 companies that have access to our APIs and they    09:31
24 build experience for both consumers and other      09:31
25 businesses.                                        09:31

7 (Pages 22 - 25)

**Page 26**

1 A third category is anybody that is a 09:31
2 business that is publishing on our platform, from 09:31
3 news companies to NZOs, the UNICEFs of this world. 09:31
4 The WHO is using our platform to make sure that 09:31
5 people have accurate information about COVID; we 09:31
6 would consider them to be a partner of some sort. 09:31
7 And a fourth category would be what, I 09:31
8 think, other comments may call suppliers. 09:31
9 09:31
10 09:31
11 09:32
12 09:32
13 09:32
14 We would still call 09:32
15 them or refer to them as a business partner in that 09:32
16 sense. 09:32
17 So those broadly are the four categories 09:32
18 of partners that I can -- I'm not sure if that 09:32
19 answers your question. 09:32
20 Q. That's very helpful. No, thank you very 09:32
21 much. 09:32
22 And so, again, this is rudimentary, but 09:32
23 what do you understand "data" to mean? 09:32
24 And let me back up and say every time I 09:32
25 ask you in this deposition -- I refer to "you," 09:32

**Page 27**

1 because you're testifying on behalf of Facebook, I 09:32
2 mean Facebook. Is that fair? 09:32
3 A. (Unreportable response.) 09:32
4 Q. Do you have -- what is your general 09:32
5 understanding of what data is? 09:32
6 A. I'm waiting for my counsel. She is not 09:32
7 talking so I can answer, I guess. 09:32
8 Q. Yes, exactly. 09:32
9 A. There is a little bit of lag -- there is a 09:32
10 little bit of lag. Sorry. I just want to make sure 09:32
11 I don't talk over about you -- everybody. 09:33
12 Data is information. 09:33
13 Q. Okay. And content and code and materials 09:33
14 as well are all information. Is that all data, in 09:33
15 your understanding? 09:33
16 A. Code is not really information. 09:33
17 Information in the code, if you are an engineer, 09:33
18 yes. But not in a -- for everybody else. 09:33
19 Q. Great. Does Facebook collect information 09:33
20 about how users use Facebook's products? 09:33
21 A. It's kind of broad statement, but we do 09:33
22 have an understanding of when people use our 09:33
23 services, yes. 09:33
24 Q. Okay. So Facebook collects -- and so 09:33
25 going forward, when we say "information," we may 09:33

**Page 28**

1 also mean data and we can ask for clarification. 09:33
2 But, in general, that's the same concept for 09:33
3 purposes of this deposition; is that fair? 09:33
4 A. Yeah. I just want to make sure that, you 09:34
5 know, like we don't use those terms very loosely, 09:34
6 because sometime the information that we are talking 09:34
7 about is activity information and not necessarily 09:34
8 user data. 09:34
9 Q. I understand. So we'll just clarify so 09:34
10 that we have our meanings correctly. 09:34
11 So does Facebook collect information about 09:34
12 when users are using and have last used products, 09:34
13 for example? 09:34
14 A. Any product, no. The Facebook products, 09:34
15 yes. 09:34
16 Q. Okay. And Facebook collects information 09:34
17 about posts and videos and contents that they 09:34
18 review; is that right? 09:34
19 MS. STEIN: I'm just going -- sorry. I 09:34
20 just want to -- so -- 09:34
21 MS. WEAVER: Please don't coach the 09:34
22 witness. Just state an objection. 09:34
23 MS. STEIN: No, Lesley, this is to you 09:34
24 actually. Just so you're framing your questions in 09:34
25 the present, but the time period is 2012 to 2017. 09:34

**Page 29**

1 Do you want to have some sort of agreement so that 09:34
2 that's -- 09:34
3 MS. WEAVER: Sure. 09:34
4 MS. STEIN: You know what I'm saying? I 09:34
5 just want to have something on the record. I have a 09:35
6 feeling -- 09:35
7 MS. WEAVER: That is fair. 09:35
8 MS. STEIN: -- it might go in and out. 09:35
9 But I don't coach witnesses, so -- you know, for the 09:35
10 record. 09:35
11 MS. WEAVER: Great. 09:35
12 Q. So for purposes of this deposition, K.P., 09:35
13 we're going to be referring to the time period 2012 09:35
14 to 2017. You can assume that. If you need to 09:35
15 clarify a question, let's just clarify it. Is 09:35
16 that -- is that fair? Okay. 09:35
17 A. That's fine by me. 09:35
18 But can you repeat the question? 09:35
19 Q. Yeah, no problem. 09:35
20 A. Thanks. 09:35
21 Q. So does Facebook also log when users are 09:35
22 using and have last used Facebook's products? 09:35
23 A. Yes, we would know when you open them up 09:35
24 and when you close it. 09:35
25 Q. And also what posts, videos, and other 09:35

8 (Pages 26 - 29)

1 contents users view?                                        09:35
2     A. Yes, we would.                                        09:35
3     Q. Okay. And do you collect information          09:35
4 about how users' use features like the camera,      09:36
5 Facebook camera?                                          09:36
6     A. I don't know. I don't think so. Unless    09:36
7 it's within the app itself.                                  09:36
8     Q. Okay. Does Facebook analyze content        09:36
9 information about users?                                   09:36
10     A. I'm not sure I understand the question.    09:36
11 What do you mean "content"?                            09:36
12     Q. Well, I'm just trying to introduce a       09:36
13 couple of topics here, and I'm actually working off  09:36
14 the congressional testimony that Facebook submitted  09:36
15 in 2018.                                                     09:36
16     So it says "We also receive and analyze     09:36
17 content, communications and information that other  09:36
18 people provide when they use our products."      09:36
19     So I'm just asking you, is it true that    09:36
20 Facebook receives and analyzes content,            09:36
21 communications and information that other people   09:36
22 provide?                                                     09:36
23     A. By "other people," I guess we mean users?  09:36
24     Q. Yes.                                             09:36
25     A. Okay. I think there's definitely some   09:36
                                                        Page 30

1 truth to that statement. I mean just to give you an  09:37
2 idea, if you come to Facebook and you post something  09:37
3 that is against our policies, if -- if it's an    09:37
4 explicit, you know, something that promotes violence  09:37
5 or something like that, we have a responsibility to  09:37
6 take it down. So in that sense we do analyze that  09:37
7 content for the purposes of keeping our community  09:37
8 safe.                                                     09:37
9     Q. Okay. Is it true that Facebook collects  09:37
10 information about the computers, phones, connected  09:37
11 TVs and other web-connected devices that users use?  09:37
12     A. Throughout the -- the activity we would   09:37
13 collect the IP address. If it's connected -- or if  09:37
14 the user is connected through a mobile phone, we   09:37
15 probably collect information about the carrier. If  09:37
16 they are on a desktop, we collect information about  09:37
17 their Internet service provider, yes, the browser  09:37
18 version, things like this.                               09:37
19     Q. Okay. And does Facebook use the           09:37
20 information collected about users' use of their   09:37
21 products to better personalize the content,      09:38
22 including ads or features they see?                 09:38
23     A. Yes.                                             09:38
24     Q. Okay. And -- and so also do -- does      09:38
25 Facebook track that information across devices that  09:38
                                                        Page 31

1 users use?                                                  09:38
2     MS. STEIN: Object to the form.              09:38
3     THE WITNESS: I'm not sure I understand    09:38
4 what "tracking" means in that sense.              09:38
5 BY MS. WEAVER:                                         09:38
6     Q. So I'm just again reading to you.        09:38
7     "We use information collected about users'  09:38
8 use of our products on their phone to better     09:38
9 personalize the content they see when they use our  09:38
10 products on another device such as their laptop or  09:38
11 tablet, or to measure whether they took an action in  09:38
12 response to an ad we showed them on their phone on a  09:38
13 different device."                                       09:38
14     Is that a true statement?                    09:38
15     A. Yes, that's a true statement.           09:38
16     Q. Okay. Does that include battery level?  09:38
17     A. I don't think so.                          09:38
18     Q. Is it a true statement that Facebook    09:38
19 obtains information from these devices which     09:38
20 includes information about the operating system,  09:38
21 hardware and software versions, battery level,   09:39
22 signal strength, available storage space, browser  09:39
23 type, app and file names and types, and plug-ins?  09:39
24 Is that a true statement?                             09:39
25     A. There are certain things there that I   09:39
                                                        Page 32

1 don't think we have any access to. But there are  09:39
2 certain others like the browser version like I   09:39
3 mentioned before that we do.                         09:39
4     Q. Again, this is from Congress's           09:39
5 congressional written testimony.                   09:39
6     Does Facebook collect information about    09:39
7 operations and behaviors performed on devices such  09:39
8 as whether a window is foregrounded or backgrounded  09:39
9 or mouse movements?                                   09:39
10     MS. STEIN: Objection to form.              09:39
11     THE WITNESS: I don't know.                 09:39
12 BY MS. WEAVER:                                         09:39
13     Q. Does Facebook collect that information?  09:39
14     A. I don't know.                              09:39
15     Q. You don't know?                            09:39
16     A. I don't know.                              09:39
17     Q. Okay. Does Facebook collect identifiers  09:39
18 about users?                                             09:39
19     A. Can you explain what you mean by        09:39
20 "identifiers"?                                           09:39
21     Q. Yeah. What is an identifier? Do you     09:39
22 know?                                                     09:40
23     A. Well, I mean the users are locked in when  09:40
24 they are on Facebook, so we already have an      09:40
25 understanding of who the users are. Is that an   09:40
                                                        Page 33

9 (Pages 30 - 33)

1 identifier?                                              09:40
2    Q. Okay. Is there something called a         09:40
3 Facebook identifier?                             09:40
4    A. There's a Facebook identity.           09:40
5    Q. Do you know what a Facebook identifier is,   09:40
6 a user identifier?                          09:40
7    A. No.                               09:40
8    Q. Okay. So is this statement true:          09:40
9 Facebook collects information about unique          09:40
10 identifiers, device IDs and other identifiers, such    09:40
11 as from games, apps or accounts users use and family  09:40
12 device identifiers? Does Facebook collect that      09:40
13 information?                            09:40
14    A. I mean we have an understanding of people   09:40
15 that log in on third-party apps using the Facebook    09:40
16 identity, and we have an ID for that, yes.        09:40
17    Q. And, for example, Apple has its own      09:40
18 identifier; isn't that true?             09:40
19    A. Yes, we have an Apple ID, I guess.       09:40
20    Q. And there's an Android ID as well; is that  09:41
21 right?                            09:41
22    A. Yes.                          (9:41
23    Q. And a Google ID?                  09:41
24    A. It's probably the same as Android, yes.    09:41
25    Q. Okay. And so does Facebook use those    09:41
                                              Page 34

1 identifiers to collect information about people?   09:41
2    A. Those specific ones, no.          09:41
3    Q. Okay. Do they use -- they don't use      09:41
4 those -- are you -- are you testifying today that    09:41
5 Facebook does not use the Apple identifier to       09:41
6 collect information about people?           09:41
7    A. We don't.                    09:41
8    Q. Okay.                       )9:41
9    A. How can we?                    09:41
10    Q. Okay.                       )9:41
11    A. It's impossible.                09:41
12    Q. Does Facebook collect information about    09:41
13 Bluetooth signals and information about nearby Wi-Fi  09:41
14 access points, beacons and cell towers?       09:41
15    A. I believe we do, yes.           09:41
16    Q. Does Facebook collect data from device    09:41
17 settings, information that users allow us -- let me   09:41
18 try that. Do they collect data from device settings  09:41
19 when users turn them on, such as their GPS location,  09:41
20 camera or photos?                  09:41
21    A. Some of that would require consent, but I   09:42
22 think, broadly speaking, if there is consent, yes,   09:42
23 we do collect.                    09:42
24    Q. For these other categories that we have   09:42
25 been discussing, does Facebook collect that data    09:42
                                              Page 35

1 without consent?                        09:42
2       MS. STEIN: Object to form.          09:42
3       THE WITNESS: Sorry, I didn't hear the   09:42
4    objection.                      09:42
5 BY MS. WEAVER:                       09:42
6    Q. You said that for these kinds of data you   09:42
7 sometimes had to obtain consent. Are there -- is    09:42
8 there other kinds of data that Facebook collects    09:42
9 without consent?                     09:42
10    A. No, no, no.                   09:42
11    Q. All right.                    09:42
12    A. I should probably say that's from       09:42
13 everything. But it seems that there was an omission  09:42
14 from my part. There's no way we can collect any of   09:42
15 that data without users' consent.         09:42
16    Q. Okay. Does Facebook collect information   09:42
17 about users' connection speed and other devices that  09:42
18 are nearby?                       09:42
19    A. I don't know about the other devices, but  09:42
20 the connection speed is something that we would log,  09:42
21 yes.                            09:42
22    Q. Okay. Well, is it a true statement that   09:42
23 "Facebook collects information about other devices   09:42
24 that are nearby or on their network so we can do    09:42
25 things like help users stream a video from their    09:43
                                              Page 36

1 phone to their TV"? Is that a true statement?     09:43
2    A. Yes, that's a true statement.        09:43
3    Q. Okay. Does Facebook also collect cookie   09:43
4 data?                             09:43
5    A. We have access to certain cookies, yes.   09:43
6    Q. Okay. So it's a true statement that      09:43
7 Facebook collects data from cookies stored on a    09:43
8 users' device, including cookie IDs and settings; is  09:43
9 that right?                       09:43
10    A. Yes.                       09:43
11       MS. STEIN: Object to form.          09:43
12 BY MS. WEAVER:                       09:43
13    Q. Do you know what a Facebook pixel is?    09:43
14    A. Yes, I do.                    09:43
15    Q. What is a Facebook pixel?          09:43
16    A. How -- okay. Let me try to make it plain  09:43
17 and simple.                       09:43
18       On a third-party website there is one   09:44
19 pixel which goes back to the old days of how, you    09:44
20 know, like the computer screens used to work. This   09:44
21 Facebook owns, and whenever someone visits that    09:44
22 website, that pixel will fire an event that will    09:44
23 effectively confirm to Facebook that a user has    09:44
24 visited that website.                 09:44
25    Q. So do pixels uniquely identify users of   09:44
                                              Page 37

10 (Pages 34 - 37)

1 the platform on and off the platform?                    09:44
2        A. No.                        09:44
3        Q. What do they identify?            09:44
4        A. The pixels identify someone visiting the   09:44
5 website. It doesn't identify the user.              09:44
6        Q. So is it accurate to say that where a     09:44
7 website has embedded a Facebook pixel, Facebook      09:44
8 collects data about user actions on that website,    09:44
9 even if the user is not signed in to Facebook,       09:44
10 right?                        05:44
11       A. And so let's say you go to CNN.com -- I    09:44
12 don't know if that's your media provider of choice,  09:44
13 but for the sake of the argument -- and there is a   09:44
14 Facebook pixel embedded. That will fire an event    09:45
15 that will basically say user X has visited CNN.com.  09:45
16 And that information will come to Facebook, and      09:45
17 Facebook will actually identify whether it was K.P.  09:45
18 or Lesley.                       09:45
19       Q. And does data collected from pixels        09:45
20 include items placed in shopping carts or purchases  09:45
21 or which pages are viewed?                09:45
22       MS. STEIN: Objection to form.            09:45
23       THE WITNESS: Can we break it down? It's     09:45
24 huge. Maybe. Depends on whether the third party      09:45
25 has implemented the pixel on different pages.        09:45
                                            Page 38

1        Things added to the cart. Not the things    09:45
2 that have been added to the cart but potentially the 09:45
3 action taken. It's not relevant for -- for the       09:45
4 third party to share that information but share the  09:45
5 action.                        09:45
6        What was the third one?            09:45
7 BY MS. WEAVER:                       09:45
8        Q. I believe it was which pages are viewed.  09:45
9        A. Yes. So, like I said, if there is a pixel 09:46
10 embedded on different pages, we would have an        09:46
11 understanding that it wasn't just the home page but  09:46
12 it was, say, the landing page, or it was a product   09:46
13 page, better say, or the cart page, or something     09:46
14 like that.                      09:46
15       Q. Okay. What is the like button?          09:46
16       A. It's a plug-in.                09:46
17       Q. And what does that mean?            09:46
18       A. It's something that allows the user to    09:46
19 take action that will be shared on Facebook on a     09:46
20 third-party website.                    09:46
21       Q. And so in a sense is a like providing     09:46
22 information about whether a user approves or likes   09:46
23 an object that it is engaging with?              09:46
24       A. Yeah, if you like -- if you click on the  09:46
25 like button when you are -- again, on a third-party  09:46
                                            Page 39

1 website, and that suggests that you're probably      09:46
2 liking that story that you just read.            09:47
3        Q. Okay. So there's some content provided by 09:47
4 the like button; is that right?              09:47
5        A. Well, the content is provided by the third 09:47
6 party. The like button captures your affinity with  09:47
7 that company.                       09:47
8        Q. Understood.                  09:47
9        You mentioned APIs earlier. Could you       09:47
10 just for the record define an API and explain how it 09:47
11 works.                        09:47
12       A. An API is basically an industry-wide      09:47
13 standard that allows two applications to communicate 09:47
14 with each other. And what I mean by applications,    09:47
15 I'm talking about pieces of software.            09:47
16       Q. Okay. And what is an SDK?            09:47
17       A. An SDK is a way to, you know, access the   09:47
18 APIs without necessarily writing code that would     09:47
19 make it a little bit harder.                09:47
20       So, in other words, I guess, what I'm        09:47
21 trying to say is that the -- the SDK is a piece of   09:47
22 software that would allow a third-party developer to 09:48
23 access the Facebook APIs through the SDK, whereas in 09:48
24 the old days if you want to really access the API    09:48
25 you have to double the amount of code or maybe even  09:48
                                            Page 40

1 more to access the same AP.                09:48
2        Q. Got it. And what are Facebook business    09:48
3 tools?                        09:48
4        A. It's a very broad definition, but it      09:48
5 refers to the different tools that businesses use to 09:48
6 monitor their presence manage on the Facebook        09:48
7 platform.                       09:48
8        Q. Okay. So is it a true statement that      09:48
9 advertisers, app developers, and publishers can send 09:48
10 Facebook information through Facebook business tools 09:48
11 they use, including social plug-ins, like the like  09:48
12 button, Facebook log-in, Facebook's APIs and SDKs or 09:48
13 the Facebook pixel? Is that a true statement?        09:48
14       A. That -- that's correct.            09:48
15       Q. And you referred to partners earlier. Do  09:49
16 you recall that discussion?                09:49
17       A. Yes.                      09:49
18       Q. Okay. So going forward in the deposition  09:49
19 we'll use your definition of partners. Is that       09:49
20 fair?                         09:49
21       A. That's okay by me.                09:49
22       Q. So do partners provide information about   09:49
23 users' activities off Facebook, including          09:49
24 information about their device, websites they visit, 09:49
25 purchases they make, the ads they see and how they   09:49
                                            Page 41

11 (Pages 38 - 41)

Veritext Legal Solutions
866 299-5127

3436

1  use their services whether or not they have a          09:49
2  Facebook account or are logged in to Facebook? Is       09:49
3  that a true statement?                                  09:49
4        MS. STEIN: Objection to form.                     09:49
5        THE WITNESS: This is a very broad                 09:49
6  statement. So if you want me to answer I think we       09:49
7  need to break it down a little bit.                     09:49
8  BY MS. WEAVER:                                          09:49
9    Q. Great, go ahead. So is it true that                09:49
10 partners provide information about users activities     09:49
11 off Facebook?                                           09:49
12   A. Again --                                           09:49
13       MS. STEIN: Objection to form.                     09:49
14       THE WITNESS: Okay. Based on my                    09:49
15 definition of what a partner is, we're only talking     09:50
16 about a subset for those partners that use any of       09:50
17 the products that you just listed before. They          09:50
18 either use the pixel or the SDK or the -- to the API    09:50
19 or they advertise on Facebook.                          09:50
20       Okay. So for those four scenarios,                09:50
21 anybody, any business out there that uses any of        09:50
22 those products, they do send some information back      09:50
23 to Facebook.                                            09:50
24 BY MS. WEAVER:                                          09:50
25   Q. Okay. And that can include information             09:50
                                                           Page 42

1  about users' devices; is that right?                    09:50
2    A. I'm not sure about the pixel or the API            09:50
3  or -- the SDK, most likely, yes, in certain             09:50
4  scenarios.                                              09:50
5    Q. Okay. Do partners -- those partners in             09:50
6  general provide information about websites users'       09:50
7  visits and purchases they make?                         09:50
8        MS. STEIN: Objection to form.                     09:50
9        THE WITNESS: Okay. So that would mean             09:50
10 that they use the pixel and they would have to fire     09:50
11 an event when the user visits their website, and        09:51
12 that means that they will do that after the user has    09:51
13 probably seen an ad and they will probably -- and       09:51
14 it's up to them about how they're going to implement    09:51
15 it if the user decides to buy something.                09:51
16       But that's not necessarily how the whole          09:51
17 thing works. This is just one specific                  09:51
18 implementation.                                         09:51
19 BY MS. WEAVER:                                          09:51
20   Q. Yeah, I'm just asking at a very high               09:51
21 level. It's a pretty simple question.                   09:51
22   A. Okay. At a very high level, if you want            09:51
23 to, you know, like talk about how the systems work,     09:51
24 if you are an advertiser on Facebook, you want to       09:51
25 make sure that your dollars are well spent. And         09:51
                                                           Page 43

1  what you would do is implement the pixels because       09:51
2  you want to track the performance of your ad            09:51
3  campaigns. And how do you track the performance of      09:51
4  your ad campaigns? It's a function of what business     09:51
5  you're running.                                         09:51
6        If you're in the service provider, you            09:51
7  would probably fire a pixel when somebody makes an      09:51
8  appointment, or, you know, books a test drive. If       09:51
9  you are a product company or a commerce side and you    09:51
10 are selling products, you'll fire a pixel when          09:52
11 someone completes a purchase. And like that you can     09:52
12 track the investment that you made on your ad           09:52
13 campaign.                                               09:52
14   Q. Let's talk, for example, about a game              09:52
15 developer. If a game developer has a Facebook user      09:52
16 on it, do they use Facebook's API to tell Facebook      09:52
17 what games a user plays, for example?                   09:52
18       MS. STEIN: Objection to form.                     09:52
19       THE WITNESS: Okay. This is again a very           09:52
20 broad scenario. But let me spell it out, right?         09:52
21       So let's say I want to play Word With             09:52
22 Friends. I have options. I can log in with              09:52
23 Facebook or I can create an account directly.           09:52
24       If I log in with Facebook, then, you know,        09:52
25 the developer will request my consent to access         09:52
                                                           Page 44

1  certain pieces of my identity that will come from       09:52
2  Facebook, like my first name, like my last name,       09:52
3  like my profile picture. To the extent that I          09:52
4  provide consent to that developer, the developer       09:53
5  will have access to that information.                   09:53
6        From then on every time I log in to play         09:53
7  Words with Friends, Facebook will have to reconfirm    09:53
8  the identity of that user and make sure that the       09:53
9  user remains logged in with Words with Friends.        09:53
10 BY MS. WEAVER:                                          09:53
11   Q. Okay. So, again, this is from the                  09:53
12 congressional testimony, and I just want to            09:53
13 understand it. It says "Facebook also receives         09:53
14 information about users' online and offline actions    09:53
15 and purchaser -- purchases from third-party data       09:53
16 providers who have the rights to provide us with       09:53
17 users' information."                                    09:53
18       Do you agree with that sentence?                  09:53
19       MS. STEIN: Object to form.                        09:53
20 BY MS. WEAVER:                                          09:53
21   Q. Is that correct?                                   09:53
22   A. Well, if it's on the congressional and            09:53
23 it's validated by Facebook, I would say, yes, I       09:53
24 agree.                                                  09:53
25   Q. Okay. So do the third-party data                   09:53
                                                           Page 45

12 (Pages 42 - 45)

3437

1 providers provide Facebook information about the          09:53
2 activities on the third-parties' apps or sites at a       09:53
3 high level?                                09:54
4     A. I think -- at a high level, it would be       09:54
5 the same business that would provide information,          09:54
6 not anything Facebook.                          09:54
7     Q. Got it.                            09:54
8         MS. WEAVER: Okay. I'll mark now as        09:54
9 Exhibit 2 -- or I say I will, but I am asking my           09:54
10 colleague, Anne Davis, to do that. This is a              09:54
11 document bearing Bates numbers FB-CA-MDL-00213423          09:54
12 through 443.                              09:54
13    Q. And while we're waiting, have you been        09:54
14 deposed before?                            09:54
15    A. Yes.                              09:54
16    Q. Okay. So I'm asking partly just if you        09:54
17 know what a Bates number is.                         09:54
18        There are documents -- and there actually       09:54
19 was a man named Bates in 1899 who created a stamp          09:54
20 that he put on these documents in the lower               09:54
21 right-hand corner. So it's just a way of                  09:54
22 consecutively numbering hard copy documents that           09:54
23 would probably be obsolete in your world, but that         09:55
24 is what I just read into the record.                      09:55
25    A. Okay.                             09:55

                                        Page 46

1     Q. Have you testified on behalf of Facebook      09:55
2 before?                                 (9:55
3     A. No.                               09:55
4     Q. Okay. How many times have you been         09:55
5 deposed?                                09:55
6     A. This my fourth one.                      09:55
7     Q. And were you deposed on topics similar to    09:55
8 the topics we're discussing today?                  09:55
9         MS. STEIN: Objection to form.             09:55
10        THE WITNESS: I've been deposal and          09:55
11 discussing about various topics. I don't know where        09:55
12 this is going to head to --                   09:55
13 BY MS. WEAVER:                               09:55
14    Q. Okay.                             09:55
15    A. -- so I can answer that question at the      09:55
16 end of the day.                              09:55
17    Q. Fair enough. Were those depositions in       09:55
18 relation to your employment at Facebook?               09:55
19    A. Yes.                              (9:55
20    Q. Okay. And did they occur in the last four    09:55
21 years?                                 (9:55
22    A. I can't remember the first one, but I         09:55
23 assume it would be in the last four years, but they        09:55
24 are the last two years.                          09:55
25    Q. Okay. Do you know if any of these           09:55

                                        Page 47

1 depositions were conducted by regulators?               09:55
2     A. Yes.                               09:55
3     Q. Which regulators?                        09:56
4     A. State of California, New Jersey and        09:56
5 New York.                                09:56
6     Q. So that's three or was that one deposition   09:56
7 or is it three separate depositions?                09:56
8     A. It was a joint one.                      09:56
9     Q. So it was one deposition?                  09:56
10    A. One deposition with participation of three   09:56
11 state agencies.                              09:56
12    Q. Okay. And what were the other two           09:56
13 depositions or three depositions that you have sat        09:56
14 for?                                   09:56
15    A. So there are another two. One was a         09:56
16 private litigation in Canada. The other was a             09:56
17 private litigation in the U.S.                    09:56
18    Q. Okay. Do you recall what each of those       09:56
19 litigations were about?                          09:56
20    A. Let me think. The first one, which was --    09:56
21 I don't remember exactly when it was, three or four        09:56
22 years ago -- was around the Facebook platform and         09:56
23 access to the APIs. And the deposition in Canada          09:56
24 was around, I think, access to user data. But very        09:56
25 broadly.                                09:57

                                        Page 48

1     Q. Okay. And when did your deposition with      09:57
2 the state AGs occur?                            09:57
3     A. I think sometime in 2018, if I'm not       09:57
4 mistaken.                                09:57
5     Q. Okay. And did you look at documents in      09:57
6 that deposition?                             09:57
7     A. Produced by the state AG you mean?          09:57
8     Q. I mean in the -- you know, like -- yes,     09:57
9 exactly. Did you look at documents in that               09:57
10 deposition where they were marked to the deposition?      09:57
11    A. I believe so, yes.                       09:57
12    Q. Okay. And do you recall how many there       09:57
13 were, roughly?                              09:57
14    A. I have no idea. I'm sorry.                  09:57
15    Q. That's okay. It's not a memory test, but    09:57
16 I'm just asking in general.                       09:57
17        Did you look at any of those documents to     09:57
18 prepare for your deposition today?                  09:57
19    A. No.                               09:57
20    Q. Okay. Why don't we pull up -- is it         09:57
21 there? I need to refresh my Marked Exhibit set. I         09:57
22 have an Exhibit 3.                           09:57
23        (Exhibit 3 was marked for            09:57
24        identification and attached          09:57
25        hereto.)                        09:57

                                        Page 49

13 (Pages 46 - 49)

1 BY MS. WEAVER:                                    09:57
2    Q.  Do you have an Exhibit 3?                   09:57
3    A.  So we're going to 3?                        09:57
4    Q.  We are going to 3.                          09:58
5    A.  Okay.  I don't see it yet.                  09:58
6    Q.  I think you might need to refresh.          09:58
7       Do you have Exhibit 3 yet?                   09:58
8    A.  Yes.                                        09:58
9    Q.  Okay.                                       09:58
10       MS. WEAVER:  For the record, Exhibit 3 is   09:58
11 an email dated May 8, 2014, with some attachments.  09:58
12    Q.  Have you seen Exhibit 3 before?            09:58
13    A.  No, I haven't.                             09:58
14    Q.  Okay.  Did --                              09:58
15       MS. STEIN:  Why don't you give the witness  09:58
16 an opportunity to review the document.            09:58
17       MS. WEAVER:  Okay.  Thanks, Deb.  You were  09:58
18 about to get in trouble.                          09:58
19    Q.  So there's the cover email, K.P., but if   09:58
20 you look at the attachment, and I direct your     09:58
21 attention to the Bates number that ends with 424.  09:58
22 Remember the -- if you look at the bottom there.  09:58
23       THE WITNESS:  Yes, I've seen those pages,   09:58
24 yes.                                              09:59
25
                                                Page 50

1 BY MS. WEAVER:                                     09:59
2    Q.  Okay.  And when did you last see them?      09:59
3    A.  Either yesterday or Friday.                 09:59
4    Q.  When did you first see them?                09:59
5    A.  Maybe Friday.                               09:59
6    Q.  Okay.  You hadn't seen them before Friday?  09:59
7    A.  No.                                         09:59
8    Q.  Is that right?  Okay.                       09:59
9       Do you have an understanding as to what      09:59
10 Exhibit 3 is?                                     09:59
11    A.  I don't know the contents of the email,    09:59
12 but I think I can understand the page that you asked  09:59
13 me to look at, what it meant to be.               09:59
14    Q.  Okay.  And what is your understanding?     09:59
15    A.  It's definition of different data that     09:59
16 Facebook may have accessed.                       09:59
17    Q.  Okay.  And let me back up again.  This is  09:59
18 foundational.  Do people communicate by email at  09:59
19 Facebook?                                         09:59
20    A.  It's one of the ways to communicate, yes.  09:59
21    Q.  How else do people communicate in the      09:59
22 course of doing business at Facebook?             09:59
23    A.  We use a version of the product that is    09:59
24 designed for the business world called Workplace.  09:59
25 We use a version of our Messenger product, which is  10:00
                                                Page 51

1 also an example, a device called Workset.  We use  10:00
2 emails.  We use█████We use other                  10:00
3 videoconferencing facilities.  We use our telephones  10:00
4 to call each other.  Different ways.              10:00
5    Q.  And people text as well; is that right?    10:00
6    A.  We don't like text messaging.  We have our  10:00
7 own messaging apps.                               10:00
8    Q.  Just out of curiosity, is the Facebook     10:00
9 Messenger that people that work at Facebook use, is  10:00
10 that different than the Facebook Messenger that   10:00
11 users on the platform use, or is it the same?     10:00
12    A.  I mean I use Messenger the same way you    10:00
13 would use it.  But internally I don't use that    10:00
14 version of the product.  I use an Enterprise      10:00
15 personal product --                              10:00
16    Q.  Okay.                                      10:00
17    A.  -- which is called Workset.                10:00
18    Q.  And what's the difference functionally     10:00
19 between those two?                                10:00
20       MS. STEIN:  Objection.  This is like way    10:00
21 beyond the scope about what employees at Facebook  10:00
22 use.                                              10:01
23       MS. WEAVER:  Okay.  Fine.  It's fine.  I    10:01
24 was trying to establish a foundation, but I guess we  10:01
25 can come back to that in another deposition.      10:01
                                                Page 52

1    Q.  So, K.P., back to Exhibit 3.  Do you who    10:01
2 Simone LiTrenta is?                               10:01
3    A.  No.                                         10:01
4    Q.  Okay.  Looking at just the cover email, do  10:01
5 you recognize the names of anybody on this email as  10:01
6 individuals who work at Facebook?                 10:01
7    A.  I recognize Matt Scutari, Rob Sherman, and  10:01
8 Erin Egan.                                         10:01
9    Q.  And you understand that those are          10:01
10 employees of Facebook during the time this email was  10:01
11 written; is that right?                           10:01
12    A.  That is 2014?  Yes, I believe so.          10:01
13    Q.  Okay.  And do you believe Exhibit 3 to be  10:01
14 an email sent by employees at Facebook in the     10:01
15 regular course of business?                       10:01
16    A.  Yes, that looks like.                      10:01
17    Q.  Okay.  Do you have an understanding as to  10:01
18 what the materials that are attached to this email  10:02
19 are?                                              10:02
20    A.  I think it's a set of definitions that --  10:02
21 or slides that were meant to be presented at an   10:02
22 off-site.                                         10:02
23    Q.  Okay.  And what is -- do you know what the  10:02
24 global policy team is?                            10:02
25    A.  Yes.                                        10:02
                                                Page 53

14 (Pages 50 - 53)

3439

1  Q. What is it?                                10:02
2     A. It's a team that is responsible for our   10:02
3  relationships with governments and regulators.   10:02
4     Q. Okay. And just again by way of            10:02
5  understanding how Facebook functions, you see    10:02
6  there's a ▮▮▮▮ hyperlink here in the email?      10:02
7     A. Yes.                                       10:02
8     Q. Does Facebook also use ▮▮▮▮               10:02
9        MS. STEIN: Objection to form. This        10:02
10 isn't -- not an ESI depo and he is not testifying 10:02
11 about what Facebook uses internally. Let's focus on 10:02
12 the subjects that he's here for.                 10:02
13       MS. WEAVER: I'm trying to understand if    10:02
14 this document is complete, and that's a little bit 10:02
15 difficult to do. So are you going to instruct him 10:03
16 not to answer?                                   10:03
17       MS. STEIN: Is there a reason why you       10:03
18 think the document is not complete?              10:03
19       MS. WEAVER: Okay. Let me question.        10:03
20    Q. So is it true that Facebook -- people use  10:03
21    ▮▮▮ t Facebook to share document files?        10:03
22    A. Can I answer?                              10:03
23    Q. Yes.                                       10:03
24    A. Sorry, I was looking at the document.     10:03
25    Q. No problem.                                10:03
                                              Page 54

1     A. It's -- it's true that for files that are  10:03
2  concise that are too big to send by email we would 10:03
3  use ▮▮▮▮                                        10:03
4     Q. Okay. Is there any way to know whether or  10:03
5  not a hard copy version of a document like this was 10:03
6  everything that was contained in the hyperlink or 10:03
7  would you have to see it in native form?         10:03
8        MS. STEIN: Objection to form.             10:03
9        Lesley, next.                             10:03
10 BY MS. WEAVER:                                   10:03
11    Q. Please answer the question.                10:03
12    A. I'm not sure I understand exactly what you 10:03
13 saying. I don't even know what you have printed  10:03
14 out, so I cannot really establish whether it's a 10:03
15 complete document or not.                        10:03
16    Q. Okay. Is there -- normally -- let me ask   10:03
17 this. Does Facebook maintain document like --    10:04
18 documents like this in PDF form or are they native? 10:04
19       MS. STEIN: Objection to form.             10:04
20       Lesley, move on.                          10:04
21 BY MS. WEAVER:                                   10:04
22    Q. Please answer the question.                10:04
23       MS. STEIN: It's not an ESI deposition.    10:04
24 Move on.                                         10:04
25       MS. WEAVER: I'm trying to understand this 10:04
                                              Page 55

1  document, which we gave to you ahead of time, and 10:04
2  whether or not it's complete. So please allow him 10:04
3  to answer.                                       10:04
4        MS. STEIN: Ask him if he knows whether    10:04
5  it's complete. Don't ask him about things that have 10:04
6  nothing to do with what he's here to testify about 10:04
7  here today. He's not authorized on behalf of     10:04
8  Facebook to talk about ▮▮▮▮ email, messaging     10:04
9  that gets used internally.                       10:04
10 BY MS. WEAVER:                                   10:04
11    Q. So, K.P., can I ask you, is there any kind 10:04
12 of -- for ▮▮▮▮ s there any -- well, just -- I'll  10:04
13 move on. I'll come back to it.                   10:04
14       So looking back at Exhibit 3, and turning  10:04
15 to the first page ending at Bates number 424 --  10:04
16    A. 424, yes.                                  10:05
17    Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                     10:05
18 Do you see that?                                 10:05
19    A. Yes.                                       10:05
20    Q. And you said earlier that you know who Rob 10:05
21 Sherman is; is that right?                       10:05
22    A. Yes, I do.                                 10:05
23    Q. And who is he?                             10:05
24    A. He's the VP of privacy.                    10:05
25    Q. And he's still at Facebook; is that right? 10:05
                                              Page 56

1     A. Yes, he is.                                10:05
2     Q. Okay. And do you have an understanding as  10:05
3  to what this page represents?                    10:05
4     A. I think that's a list of things that      10:05
5  supposing Facebook receives about people.        10:05
6     Q. Okay. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                       10:05
7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                          10:05
8  ▮▮▮▮▮▮▮▮▮▮▮▮▮ Is that correct?                    10:05
9     A. Uh-huh, that's what it says, yes.          10:05
10    Q. Fair enough.                               10:05
11       So did you talk to Mr. Sherman to prepare  10:05
12 for your deposition today?                       10:05
13    A. No, I haven't spoken to him.               10:05
14    Q. Did you speak to anybody other than your   10:06
15 counsel to prepare for your deposition today?    10:06
16    A. No, I haven't.                             10:06
17    Q. And how long did you take to prepare for   10:06
18 your deposition?                                 10:06
19    A. I think I already answered that question.  10:06
20 I been preparing for this deposition for as long as 10:06
21 I have been at Facebook.                         10:06
22    Q. Fair enough.                               10:06
23    A. It's a collective -- collective knowledge  10:06
24 of my last 8 and a half years of being employed at 10:06
25 this company.                                    10:06
                                              Page 57

15 (Pages 54 - 57)



1 Q. Okay. And specifically to prepare for 10:06
2 this deposition in response to this notice, how much 10:06
3 time did you spend preparing? 10:06
4 A. I don't know. Between, you know, calls 10:06
5 with my counsels and homework that I have done for 10:06
6 myself, I would say 15-20 hours. 10:06
7 Q. Okay. Thank you. 10:06
8 And looking back now at the page that we 10:06
9 were looking at ending in Bates number 424, do you 10:06
10 see that it describes three categories of data on 10:06
11 the left? 10:06
12 A. Yes. 10:06
13 10:07
14 Do you see that? 10:07
15 A. Yes. 10:07
16 Q. Do you have an understanding as to what 10:07
17 is? 10:07
18 7
19 10:07
20
21 0:07
22
23
24 Q. Okay. And then what is 10:07
25 MS. STEIN: Object to form. 10:07

Page 58

1 THE WITNESS: Data that is -- what? 10:07
2 MS. STEIN: Objection to form. 10:07
3 BY MS. WEAVER: 10:07
4 Q. I'll repeat the question. What is 10:07
5 10:07
6 MS. STEIN: Same objection. 10:07
7 THE WITNESS: It's -- sorry. I have to 10:07
8 look at the document while you're talking. I don't 10:07
9 mean to talk over you. 10:07
10 It's okay I answer the question now? 10:07
11 BY MS. WEAVER: 10:07
12 Q. Yes. 10:07
13 0:07
14
15 0:07
16
17
18 10:08
19 10:08
20 08
21 Q. Okay. And what is 10:08
22 MS. STEIN: Objection to form. 10:08
23 THE WITNESS: Sorry, I need to switch back 10:08
24 to see -- you don't want to talk. Okay. 10:08
25 10:08

Page 59

1 10:08
2 BY MS. WEAVER: 10:08
3 Q. Okay. And as you sit here today, are 10:08
4 there any other kinds of information Facebook 10:08
5 receives about people other than these three 10:08
6 categories? 10:08
7 A. I don't think so. 10:08
8 Q. Okay. Let's return to our discussion of 10:08
9 Do you have an understanding as to why 10:08
10 the word is being used? What does that 10:08
11 mean? Is it the same as raw data? 10:09
12 MS. STEIN: Objection to form. 10:09
13 THE WITNESS: Every piece of data has a 10:09
14 degree of rawness associated with it. Depends how 10:09
15 you define raw. 10:09
16 BY MS. WEAVER: 10:09
17 Q. Okay. I just didn't quite hear. Every 10:09
18 piece of data has a particular -- 10:09
19 A. (Indecipherable). I'm joking. 10:09
20 They -- if you are talking about raw data, 10:09
21 what do you mean? 10:09
22 Q. Okay. Well, I'm trying to learn from you, 10:09
23 so let me ask you. 10:09
24 A. The IP address -- the IP address is raw 10:09
25 data. 10:09

Page 60

1 Q. Uh-huh, okay. Good. 10:09
2 A. But it comes through activity that happens 10:09
3 on a native Facebook app. The means, in my 10:09
4 mind, the way I see the definition there, as 10:09
5 10:09
6 10:09
7 10:09
8
9
10 Q. Okay. And so when we -- when this 10:09
11 document says 10:09
12 10:10
13
14 0
15
16 0
17 10:10
18 0:10
19 0:10
20 :10
21 :10
22 0:10
23 10:10
24
25 0:10

Page 61

16 (Pages 58 - 61)



**Page 62**

```
1                                    10:10
2    Q.  Great.  Thank you.             10:10
3        And then on the right it seems -- this    10:10
4    chart seems to further break down categories of    10:10
5           Do you see that?           10:10
6    A.  Yes.                          10:10
7    Q.  Okay.  And there's a column or really a    10:10
8    box that says              Do you see    10:10
9    that?                             10:11
10   A.  Yes.                          10:11
11                                     0:11
12                                        10:11
13                                     0:11
14                                        10:11
15                   Do you see all of    10:11
16   those boxes?                      10:11
17   A.  Yes.                          10:11
18   Q.  Okay.  Do you have an understanding as to    10:11
19   what            means?            10:11
20                                     0:11
21                                        10:11
22                                     0:11
23   Q.  Okay.  And so that means that a user has    10:11
24   taken an action to share the data; is that fair?    10:11
25   A.  Correct.                      10:11
```

**Page 63**

```
1    Q.  Okay.  And so what does         10:11
2        mean?                         10:11
3    MS. STEIN:  Object to form.        10:11
4    THE WITNESS:                      10:11
5                                      10:11
6    BY MS. WEAVER:                    10:11
7    Q.  I'm sorry, did you --          10:11
8                                        12
9                                        12
10                                     :12
11                                     :12
12                                        12
13                                     0:12
14                                        10:12
15                                        12
16                                        2
17                                        2
18                                        12
19                                        12
20                                        12
21                                        2
22                                        12
23                                     :12
24
25
```

**Page 64**

```
1                                        10:12
2
3    MS. STEIN:  Objection to form.        10:12
4                                        10:13
5                                        10:13
6                                        10:13
7
8    BY MS. WEAVER:                       10:13
9    Q.  Okay.                         10:13
10                                        10:13
11                                     10:13
12                                        10:13
13
14
15                                     10:13
16
17
18                                     0:13
19                                     0:13
20
21                                        13
22
23                                        10:13
24
25
```

**Page 65**

```
1                                     0:13
2
3                                        10:13
4
5                                     0:14
6    Q.  Okay.                         0:14
7                                        10:14
8                                     :14
9                                     10:14
10   MS. STEIN:  Object. Objection to form.    10:14
11   BY MS. WEAVER:                     10:14
12   Q.  Okay.  And then there's this box that says    10:14
13                          Do you see    10:14
14   that?                             10:14
15   A.  Yes, I do.                     10:14
16   Q.  What does that refer to?        10:14
17                                        10:14
18                                     0:14
19
20                                        10:14
21                                     0:14
22                                        14
23                                        10:14
24
25                                        10:14
```

17 (Pages 62 - 65)



**Page 66**

1    10:15
2    10:15
3    10:15
4    0:15
5    10:15
6  Q. How did you know?   10:15
7  So how does Facebook retain that   10:15
8 information once it draws that inference?   10:15
9  A. You know, there would be --   10:15
10  MS. STEIN: Objection.   10:15
11    10:15
12    10:15
13    10:15
14    0:15
15 BY MS. WEAVER:   10:15
16  Q. And how does Facebook record those   10:15
17 interests, if you will?   10:15
18  MS. STEIN: Objection to form.   10:15
19    10:15
20    10:15
21    10:16
22    10:16
23   
24 BY MS. WEAVER:   10:16
25  Q. Okay. And so how does that signal come   10:16

**Page 67**

1 through in terms of data to Facebook and where does   10:16
2 it keep it?   10:16
3    10:16
4    10:16
5   
6   
7    0:16
8   
9  Q. Okay. I'm just trying to understand --   10:16
10 well, let me go back. For the   10:16
11 right, where does Facebook maintain that data?   10:16
12  MS. STEIN: Objection. Form.   10:16
13  THE WITNESS: What do you mean?   10:16
14 BY MS. WEAVER:   10:16
15  Q. Well, I'm trying to understand. Facebook   10:16
16 receives   is that right?   10:16
17  A. Yes.   10:16
18  Q. And where does it receive it and where   10:16
19 does it go? Where does the data go?   10:16
20  A. It's a -- it's a very complicated   10:16
21 question, so let me try to answer it may be with,   10:16
22 you know, like a high-level perspective.   10:17
23  So when you come to Facebook for the first   10:17
24 time in your life you will create an account, right?   10:17
25 To create an account you need to provide the   10:17

**Page 68**

1 username and a password. And then it will ask you a   10:17
2 couple of questions. What is your first name? What   10:17
3 is your last name? What is your date of birth, and   10:17
4 so on and so on.   10:17
5  All that information lives in some, you   10:17
6 know, database somewhere, right? The next time you   10:17
7 come to Facebook you decide to post a photo of   10:17
8 yourself, you know, celebrating your birthday. That   10:17
9 information lives somewhere in a distributed   10:17
10 database, right?   10:17
11  Then some people will start liking your   10:17
12 page, saying -- will most likely be your friends.   10:17
13 That information is captured somewhere about who has   10:17
14 liked your photo.   10:17
15  Then the next day you come in and you --   10:17
16 you like Beyonce's page because you just saw her two   10:17
17 months and you want to keep up with her work. That   10:18
18 information is captured somewhere.   10:18
19  But all that information is available   10:18
20 to -- to you, right? You can go into your Facebook   10:18
21 settings and you can find all that information.   10:18
22  Q. Okay. When you say it is captured   10:18
23 somewhere, where is the somewhere?   10:18
24    10:18
25    10:18

**Page 69**

1  Q. Use your example. I go on Facebook's   10:18
2 website and I take an action. Where is that   10:18
3 captured? You said it's captured somewhere. Where   10:18
4 is the somewhere?   10:18
5    10:18
6   
7  Q. Okay.   10:18
8  A. That's a database.   10:18
9  Q. And what if it's a like?   10:18
10  A. Again, it's an activity.   10:18
11  Q. Okay. What if it's something that   10:18
12 Facebook infers? Where is it captured?   10:18
13  A. The inference?   10:18
14  Q. Yes.   10:19
15    :19
16    10:19
17    10:19
18   
19    :19
20    :19
21   
22    10:19
23    10:19
24  A. Again, I guess I'm going to level a little   10:19
25 bit the conversation.   10:19

18 (Pages 66 - 69)



Page 70

1     If you ever liked Beyonce's page, that          10:19
2 would recapture it on your, you know, like personal  10:19
3 profile. And if any advertiser, let's say,          10:19
4 Beyonce's label wants to advertise against an        10:19
5 audience of people that like Beyonce, they would     10:19
6 basically identify that in their ad campaign         10:19
7 settings and then we would find whoever may like     10:19
8 Beyonce's page and we will deliver on that about     10:19
9 Beyonce to them. Very, very high level.              10:19
10    Q. I understand the functioning that you're      10:19
11 describing. I don't understand where the data goes  10:19
12 and how Facebook draws the inference.               10:19
13    A. I'm really sorry, but I'm having a hard       10:20
14 time hearing. Is it me or is it your mic?           10:20
15       MS. WEAVER: I'm not having a hard time        10:20
16 hearing.                                            10:20
17       MS. STEIN: It's the mic.                      10:20
18       MS. WEAVER: Oh, okay. Can you hear me         10:20
19 now or is it --                                     10:20
20    Q. Okay. So I'll repeat the question.            10:20
21 Where -- well -- how does Facebook infer data from  10:20
22 engagement on the site?                             10:20
23                                                     10:20
24                                                     10:20
25    Q. And --                                        10:20

Page 71

1                                                      10:20
2       THE REPORTER: I'm sorry, "I mean in most      10:20
3 cases"...                                            10:20
4 BY MS. WEAVER:                                       10:20
5    Q. And --                                         10:20
6       THE REPORTER: I'm sorry, "I mean in most      10:20
7 cases"...                                            10:20
8       THE WITNESS:                                   10:20
9       THE REPORTER: Thank you.                       10:20
10 BY MS. WEAVER:                                       10:20
11    Q. Let me move on. I'm going to return to        10:20
12 that because I think we need to drill down a little  10:20
13 bit. But I'll just go to          Do you            10:21
14 see that category?                                  10:21
15    A. Yes.                                          10:21
16    Q. And so          is                            10:21
17                                                     10:21
18    A. Yes.                                          10:21
19    Q. Okay.                                         10:21
20                                                     10:21
21                                                     10:21
22                                                     10:21
23    A. It's -- sorry.                                10:21
24       MS. STEIN: Are you asking him to read         10:21
25 from the document or are you asking him his         10:21

Page 72

1 understanding?                                       10:21
2                                                      10:21
3                                                      10:21
4                                                      10:21
5                                                     21
6                                                      10:21
7                                                      10:21
8                                                      10:21
9                                                      10:21
10 BY MS. WEAVER:                                       10:21
11    Q. Do you know what a data broker is?            10:21
12    A. My definition of data broker?                 10:21
13    Q. Yes.                                          10:22
14    A. Anybody that has access to a broad set of     10:22
15 data.                                               10:22
16    Q. Okay. Is Facebook a data broker?              10:22
17    A. No.                                           10:22
18    Q. Okay. Did you talk to anybody -- well,        10:22
19 strike that.                                        10:22
20       Do you see where it says                     10:22
21            on this document?                        10:22
22    A. Yes.                                          10:22
23    Q. What does that refer to?                      10:22
24    A. I guess a list of different categories I      10:22
25 listed myself. It's also documented here.           10:22

Page 73

1    Q. And so do you see to the right there it        10:22
2                                                      10:22
3                                                      10:22
4                                                      10:22
5    A. Yes.                                           10:22
6    Q. And is it your understanding that those        10:22
7 are examples of the kind -- kinds of data that       10:22
8 Facebook collects                                    10:22
9    A. Yes. I don't know if it's exhaustive or        10:23
10 not, but I would imagine that it is exhaustive.      10:23
11    Q. Thank you. And then underneath that do        10:23
12 you see where it says "Advertisers"?                 10:23
13    A. Yes.                                          10:23
14    Q. What is an advertiser?                         10:23
15    A. Someone that is running marketing             10:23
16 companies on Facebook.                               10:23
17    Q. Okay. And then there's a parenthetical        10:23
18 that refers to "Custom audiences,                    10:23
19            Do you see that?                          10:23
20    A. Yes.                                          10:23
21    Q. What is custom audiences?                      10:23
22    A. A custom audience is a reference to a         10:23
23 products whereby a business can upload and encrypt   10:23
24 its -- a version of their database of customers for  10:23
25 the purpose of running a campaign that targets those 10:23

19 (Pages 70 - 73)

1 customers.                                          10:23
2   Q.  Okay.  I want to break that down a little     10:23
3 bit.                                                10:23
4        MS. WEAVER:  I'm not seeing that on my       10:23
5 live feed.                                          10:23
6        Could you read his response back, please.    10:24
7        (The record was read by the       10:24
8        court reporter, as requested)     10:24
9 BY MS. WEAVER:                                      10:24
10  Q.  Okay.  And when you say "encrypt," what do    10:24
11 you mean?                              10:24
12  A.  They wouldn't upload the raw data.  They      10:24
13 would upload a version of that data.       10:24
14       THE REPORTER:  I'm sorry, could you repeat   10:24
15 that last part, please?              10:24
16       THE WITNESS:  They wouldn't upload raw       10:24
17 customer data.  They would upload encrypted personal   10:24
18 or hashed personal data.              10:24
19 BY MS. WEAVER:                        10:24
20  Q.  Thank you.  And when you say "raw customer    10:24
21 data," what do you mean?              10:24
22  A.  Email addresses.               10:24
23  Q.  Anything else?                10:24
24  A.  No.                     10:24
25                               24
                                   Page 74

1 well, strike that.                                   10:26
2                                          10:26
3                                            10:26
4                                          10:26
5                                      10:26
6        Q.  Got it.  Does advertisers here also      10:26
7 include political campaigns?           10:26
8        A.  I'm looking at the -- sorry.  Sorry.  I  10:26
9 need to answer that, I guess.  What do you mean?  In  10:26
10 what context?                         10:26
11     Q.  Do political campaigns advertise?          10:26
12     A.  Yes, they do.                  10:26
13     Q.  Okay.  And when they are seeking           10:26
14 conversion, are they seeking to encourage certain    10:26
15 actions by Facebook users?            10:26
16       MS. STEIN:  Objection to form.              10:27
17       THE WITNESS:  Yeah, but that wouldn't        10:27
18 probably include if they read, or if they donated,   10:27
19 probably include if they read, or if they donated,   10:27
20 or if they took an action on their website,          10:27
21 depending on what the campaign is actually optimized  10:27
22 for.                          10:27
23 BY MS. WEAVER:                        10:27
24     Q.  Got it.                  10:27
25     A.  But, no, the conversion wouldn't be that I  10:27
                                   Page 76

1                                      0:24
2                                      10:25
3                                      :25
4                                      10:25
5                                      10:25
6                                      
7                                      5
8                                      10:25
9                                      25
10                                     10:25
11                                     10:25
12                                     0:25
13                                     10:25
14                                     
15                                     0:25
16                                     
17                                     5
18                                     0:25
19                                     0:26
20                                     
21                                     26
22                                     5
23                                     
24 Q.  And that could also include engaging in --   10:26
                                   Page 75

1 voted for Biden or I voted for Trump.  That's not --  10:27
2        THE REPORTER:  I'm sorry, could you please   10:27
3 slow down.  The last part?            10:27
4        THE WITNESS:  Oh, sorry.              10:27
5        THE REPORTER:  "The conversion"...          10:27
6        THE WITNESS:  The conversion that           10:27
7 political campaigns are tracking have to do with      10:27
8 fundraising, donations, registration, this kind of   10:27
9 things.                        10:27
10 BY MS. WEAVER:                        10:27
11                                          10:27
12                                          10:27
13                                          0:27
14                                     
15                                     7
16                                     
17 BY MS. WEAVER:                        10:27
18     Q.  And then do you see on the right of        10:27
19 Advertisers it says "Existing customer               10:27
20 relationships"?  Do you see that?  It's to the right  10:27
21 of Advertisers.                   10:28
22     A.  Yes.                   10:28
23     Q.  What does "Existing customer               10:28
24 relationships," that subcategories of advertisers,   10:28
25 refer to?                     10:28
                                   Page 77

20 (Pages 74 - 77)



3445



**Page 78**

1    A.  And so going back to our example earlier,    10:28
2 if -- if you are Walmart again, and you know that --    10:28
3 let's say there are thousands of people that    10:28
4 attempted to purchase a TV from Walmart's website    10:28
5 and you have an understanding of the email addresses    10:28
6 of those people.  Then you can encrypt those email    10:28
7 addresses, make them available to Facebook to create    10:28
8 what we call a custom audience.    10:28
9        And then Facebook will, you know, like --    10:28
10 can target those specific users to the extent that    10:28
11 they are also Facebook users, of course, with an ad    10:28
12 that offers them, let's say, a discount for that    10:28
13 specific TV.    10:28
14    Q.  What do you mean by "encrypt"?    10:28
15                                                        :29
16                                                        0:29
17                                                        10:29
18                                                        10:29
19                                                        0:29
20                                                        :29
21    Q.  So what is the difference between    10:29
22 encryption and hashing?    10:29
23    A.  It's same thing in that sense.    10:29
24    Q.  It is the same thing?    10:29
25    A.  Yeah.    10:29

**Page 79**

1    Q.  Is it true that hashing has two inputs --    10:29
2 well, let me go back.  Is it fair to say that    10:29
3 encryption has two inputs so that if you have a key,    10:29
4 you can associate data point together; is that fair?    10:29
5        MS. STEIN:  Object to form.  He's not here    10:29
6 as a technical expert, so...    10:29
7        You can give your high-level    10:29
8 understanding, if you have one.    10:29
9        THE WITNESS:  Yes, I don't -- I don't    10:29
10 want -- I don't want to talk about, you know, like    10:29
11 encryption.    0:29
12                                                        :29
13                                                        0:30
14                                                        10:30
15                                                        10:30
16 BY MS. WEAVER:    10:30
17    Q.  Okay.  Well, just looking at this page,    10:30
18 you see that there's the word "Hashed data matching"    10:30
19 on it?  It's below -- it's in the native data box    10:30
20 there.    10:30
21    A.  Yes.    10:30
22    Q.  Do you see where it says "Hashed data    10:30
23 matching"?    10:30
24    A.  Yes.    10:30
25    Q.  What is hashed data matching?    10:30

**Page 80**

1    A.  This is the data that we were talking    10:30
2 about used for custom audience.    10:30
3    Q.  So could you, please, explain what hashed    10:30
4 data matching is?    10:30
5                                                        30
6                                                        0
7                                                        :30
8                                                        10:30
9                                                        0:30
10                                                        10:30
11                                                        0:30
12                                                        10:30
13                                                        :31
14                                                        10:31
15
16
17                                                        10:31
18
19
20
21                                                        10:31
22
23
24                                                        10:31
25                                                        1

**Page 81**

1
2    Q.  And then going now back to the appended    10:31
3 data chart.  Do you see where it says "Purchase    10:31
4 history," near "Advertisers"?    10:31
5    A.  Yes.    10:31
6    Q.  What does that refer to?    10:31
7                                                        31
8
9                                                        0:32
10                                                        0:32
11                                                        10:32
12                                                        10:32
13                                                        10:32
14
15                                                        10:32
16                                                        0:32
17                                                        32
18                                                        10:32
19                                                        2
20    Q.  Okay.  So Facebook is getting data about,    10:32
21 for example, that I had something in my cart that I    10:32
22 didn't purchase; is that right?    10:32
23        MS. STEIN:  Object to form.    10:32
24        THE WITNESS:  No, not that, no.    10:32
25

21 (Pages 78 - 81)

3446



1 BY MS. WEAVER:                                      10:32
2   Q.  Okay.  Who has it?  You just gave that as     10:32
3 an example.                                         10:32
4   A.  Yeah, but that is a logic that takes place    10:32
5 on the advertiser's side.                           10:32
6   Q.  Okay.                                         10:32
7   A.  The advertiser selects the marketing team     10:32
8 on the advertiser side to decide what kind of       10:32
9 campaign they want to run.  And they create a       10:33
10 segment of their customers that they want to target 10:33
11 with their ad campaign, and then they will decide   10:33
12 what creative they want to use, like how the ad is  10:33
13 going to look like.                                 10:33
14   Q.  Right.  But this is a list of information     10:33
15 that Facebook receives, right?                      10:33
16        MS. STEIN:  Objection to form.              10:33
17        THE WITNESS:  The information we receive     10:33
18 is not the activities.  It's hashed email addresses 10:33
19 or hashed phone numbers from the advertisers.       10:33
20 BY MS. WEAVER:                                      10:33
21   Q.  Okay.  Looking at this chart here, it's      10:33
22 labeled, "What kinds of information does Facebook   10:33
23 receive?" correct?                                  10:33
24        MS. STEIN:  Objection to form.              10:33
25        (Background audio interference.)            10:33
                                            Page 82

1        MS. WEAVER:  Somebody needs to put their     10:33
2 phones on mute or their computers on mute.          10:34
3   Q.  Returning to the document, sir, isn't this    10:34
4 page a list of information that Facebook receives    10:34
5 about people?                                        10:34
6        MS. STEIN:  Objection to form.               10:34
7        THE WITNESS:  We received information that   10:34
8 an associate hashed email address with a Walmart    10:34
9 customer.                                           10:34
10        MS. WEAVER:  Okay.  Tat's -- I'll just      10:34
11 move to strike as nonresponsive.  We will move on. 10:34
12   Q.  Going back to this category that says        10:34
13 "Both."  Do you see that, near [redacted]          10:34
14   A.  Yes.                           10:34
15   Q.  What does "both" mean?                  10:34
16        MS. STEIN:  Objection to form.             10:34
17 [redacted]                                          10:34
18 [redacted]
19 [redacted]                                          10:34
20 [redacted]
21 [redacted]                                          10:34
22 [redacted]
23 BY MS. WEAVER:                                     10:34
24   Q.  Okay.  And so does this document reflect     10:34
25 that Facebook receives from [redacted]             10:34
                                            Page 83

1 [redacted]                                          10:34
2        MS. STEIN:  Objection to form.  The         10:35
3 document speaks for itself.                         10:35
4        MS. WEAVER:  I'm here to depose him about   10:35
5 the document, Deb.  It was identified ahead of time. 10:35
6        Please answer the question.                 10:35
7        MS. STEIN:  Yeah, Lesley, this document is  10:35
8 all about targeted advertising, and you've been     10:35
9 going on for about an hour about targeted           10:35
10 advertising which isn't even in this case.  It's   10:35
11 outside the scope of this case.                    10:35
12        MS. WEAVER:  You can instruct him not to    10:35
13 answer if you want, but I'm actually --            10:35
14        MS. STEIN:  Lesley, I've let this witness   10:35
15 testify for an hour about targeted advertising.  So 10:35
16 if you want to ask him about the scope of this      10:35
17 deposition, you're free to, but suggesting that just 10:35
18 because you sent us a document about targeted       10:35
19 advertising --                                     10:35
20        MS. WEAVER:  Deb, stop lecturing and        10:35
21 wasting my minutes with the witness, please.       10:35
22        MS. STEIN:  Lesley, I am stating my         10:35
23 position for the record.  This is a 30(b)(6)       10:35
24 deposition on a specific set of topics.  You've gone 10:35
25 beyond the scope.  I've been very liberal in that. 10:35
                                            Page 84

1        I will let the witness continue answering   10:35
2 some more questions, but if it continues focusing on 10:35
3 targeted advertising, then we're going to have to   10:36
4 move on.                                           10:36
5 BY MS. WEAVER:                                     10:36
6   Q.  So the question -- I'm sorry, K.P. -- the    10:36
7 question is this: [redacted]                       10:36
8 [redacted]                                          10:36
9 [redacted]                                          10:36
10 [redacted]                                         10:36
11        MS. STEIN:  Objection to form.             10:36
12        THE WITNESS:  I don't know the definition  10:36
13 of an [redacted]                                   10:36
14 BY MS. WEAVER:                                     10:36
15   Q.  Okay.                                       10:36
16   A.  [redacted]                                  10:36
17 [redacted]
18 [redacted]                                         10:36
19 [redacted]                                         10:36
20   Q.  Thank you.                                  10:36
21        And does Facebook also receive [redacted]  10:36
22 [redacted]                                        10:36
23   A.  In what context?                           10:36
24 [redacted]                                         10:36
25 [redacted]                                         10:36
                                            Page 85

22 (Pages 82 - 85)



10:36

10:36

:36

10:36

:36

9    Q.  Okay.  And do you see where it says "Web    10:36
10  pixels" here?                          10:36
11    A.  Yes.                    10:37
12    Q.  What does that refer to?         10:37
13    A.  It refers to the different implementation    10:37
14  of the Facebook pixel that is used in conjunction --    10:37
15  in conjunction with ad campaigns most of the time.    10:37
16    Q.  Okay.  And what is a conversion pixel?    10:37
17    A.  It's a pixel that is strategically    10:37
18  placed -- "strategically" meaning it's down to the    10:37
19  advertiser -- on the page, on their website that    10:37
20  tracks the effectiveness of their ad campaign    10:37
21  depending on their -- their objective of the    10:37
22  company.                    10:37
23    Q.  Okay.  And then "Web SDK," do you see    10:37
24  that?                      10:37
25    A.  Yes.                    10:37

Page 86

1    Q.  What does that refer to?         10:37
2    A.  So this is the version of the SDK that is    10:37
3  used by websites.                10:37
4    Q.  Okay.  And did that change over time?    10:37
5    A.  Yes, we update the SDKs quite regularly.    10:38
6    Q.  Okay.  And "Mobile SDK," what is that?    10:38
7    A.  This is the SDK that is used by native    10:38
8  apps, meaning iOS and Android.           10:38
9    Q.  Okay.  I just want to go back to    10:38
10                          10:38
11                          10:38
12    A.  I think we discussed about that before.    10:38
13  So I'll try to repeat my previous response.    10:38
14                          10:38
15                          10:38
16                          10:38
17    Q.  Okay.  I see that I guess the videographer    10:38
18  would like to take a quick break.  So do you want to    10:38
19  just -- is that comfortable for you, K.P., to take a    10:38
20  break for a little bit here?            10:38
21    A.  Yes, I need a coffee.             10:38
22        MS. WEAVER:  Okay.  So why don't we come    10:38
23  back at, do you want to say, 10:50?         10:38
24        THE WITNESS:  10 minutes from now?    10:38
25        MS. WEAVER:  Yeah, does that work?  Well,    10:39

Page 87

1  11 minutes?  Okay.  Great.           10:39
2        THE VIDEOGRAPHER:  We are off the record    10:39
3        10:39  at        a.m.          10:39
4        (Recess.)                10:39
5        10:39    (Off record:     a.m.)
6        (On record:  10:53 a.m.)         10:39
7        THE VIDEOGRAPHER:  We are on the record at    10:53
8        10:53        a.m.
9  BY MS. WEAVER:                   10:53
10    Q.  Hello, K.P.  You understand you are still    10:53
11  under oath, correct?                10:53
12    A.  Yes, I do.                10:53
13    Q.  Okay.  Returning to where we left off, we    10:53
14  were discussing         before the break.    10:53
15  Do you recall that?              10:53
16    A.  Yes, I do.                10:53
17                          :53
18                          :53
19                          10:53
20
21
22        MS. STEIN:  Object to form.         10:53
23  BY MS. WEAVER:                   10:53
24    Q.  And so to the right here do you see it    10:53
25                          10:53

Page 88

1                          10:53
2
3    A.  Yes, I do.                10:54
4    Q.  Okay.  So does this reflect that Facebook    10:54
5  receives                      10:54
6                          10:54
7        MS. STEIN:  Objection to form.       10:54
8        THE WITNESS:                10:54
9                          10:54
10                          10:54
11                          10:54
12                          10:54
13                          10:54
14  BY MS. WEAVER:                   10:54
15    Q.  Okay.  And do you see here where it says    10:54
16                          10:54
17    A.  Yes.                    10:54
18    Q.  Do you see that?  What does that refer to?    10:54
19        MS. STEIN:  Objection.  Asked and    10:54
20  answered.                    10:54
21        You can answer.              10:54
22        THE WITNESS:  This is in relation to the    10:54
23  web SDK and refers to activities captured in -- this    10:54
24  is for the purpose of those examples via the    10:55
25  Facebook log-in button and a like button.       10:55

Page 89

23 (Pages 86 - 89)

3448

1 BY MS. WEAVER:                                    10:55
2    Q. Okay. And do you see at the bottom of the   10:55
3 page here it refers to "Onavo"?                   10:55
4    A. Yes.                      10:55
5    Q. And what is Onavo?                10:55
6    A. Onavo is a -- an app we acquired some       10:55
7 five, six years ago, if I'm not mistaken, that's   10:55
8 offers the users the ability to compress the data  10:55
9 from all apps that they used on their phones to save 10:55
10 on data charges.                  10:55
11    Q. So it was called Onavo Protect; is that    10:55
12 correct?                        10:55
13    A. I don't remember the exact name of the     10:55
14 app.                          10:55
15    Q. Do you recall that it was a VPN, a virtual  10:55
16 private network?                  10:55
17       MS. STEIN: Objection to form.         10:55
18       THE WITNESS: Yes.              10:55
19 BY MS. WEAVER:                       10:55
20                                  :55
21                               0:55
22                               5
23                                  10:55
24
25
                                        Page 90

1                                  10:56
2
3                               56
4                               :56
5       MS. STEIN: Objection to form. Beyond the  10:56
6 scope.                         10:56
7       MS. WEAVER: It relates directly to the   10:56
8 data that Facebook was collecting through Onavo.    10:56
9    Q. Isn't it true that Facebook suspended      10:56
10 Onavo?                         10:56
11       MS. STEIN: Objection to form. Beyond the  10:56
12 scope. This witness is not testifying about --     10:56
13       MS. WEAVER: Are you instructing him not   10:56
14 to answer my question about Onavo?            10:56
15       MS. STEIN: That it's not subject to this  10:56
16 testimony. He's not here -- he knows it -- he's not 10:56
17 designated --                     10:56
18       MS. WEAVER: State an objection to form or 10:56
19 instruct him not to answer. Please don't fill my   10:56
20 record with your speeches.              10:56
21       MS. STEIN: Okay. It's not a speech. I'm   10:56
22 explaining that this witness came prepared to      10:56
23 testify about certain things. He's not a company   10:56
24 witness on suspensions, so he's not answering the  10:56
25 question.                      10:56
                                        Page 91

1 BY MS. WEAVER:                                    10:56
2    Q. Do you see to the right of the word        10:56
3 "Onavo" here, K.P., where it                  10:56
4                    Do you see that?       10:57
5    A. Yes, I see that.             10:57
6    Q. What does that refer to?          10:57
7    A. Again, only guess.            10:57
8    Q. What -- what do you believe it means?      10:57
9       MS. STEIN: The witness should not guess.   10:57
10 If he knows, he can answer. If he does not know, he  10:57
11 should not answer.                10:57
12       THE WITNESS: I don't know.          10:57
13 BY MS. WEAVER:                       10:57
14    Q. Okay. Does that refer to the fact that    10:57
15 Facebook received                           10:57
16                                  10:57
17       MS. STEIN: Objection. The witness just   10:57
18 said he doesn't know.               10:57
19 BY MS. WEAVER:                       10:57
20    Q. You can answer the question.         10:57
21    A. I don't know.               10:57
22    Q. Okay. Did you have any personal         10:57
23 involvement with Onavo?              10:57
24    A. No, I didn't.              10:57
25    Q. Okay. Do you know who did?          10:57
                                        Page 92

1    A. It's a very broad question. So in what     10:57
2 capacity?                        10:57
3    Q. Who oversaw the Onavo project from within   10:57
4 Facebook? It was a partnership, correct?       10:57
5    A. No, it's not a partnership. It's an       10:57
6 acquisition.                     10:57
7    Q. Okay. So who oversaw that acquisition?     10:57
8    A. On the Facebook side or --        10:57
9    Q. Yes.                    10:58
10    A. -- after the acquisition?          10:58
11    Q. On the Facebook side.            10:58
12    A. I don't know.               10:58
13    Q. Okay. What about after the acquisition?    10:58
14    A. The -- I guess the CEO of Onavo.        10:58
15    Q. Okay. Move on.               10:58
16       Do you know what an                 10:58
17    A. I don't know.               10:58
18    Q. So I'll turn to the next page on this     10:58
19 document. And that's the one beginning at 425. Do  10:58
20 you see that? It says "Hard Questions" at the top?  10:58
21    A. Yes.                    10:58
22    Q. Okay. And then do you see where it says    10:58
23                               Do   10:58
24 you see that?                   10:58
25    A. I see that.                10:58
                                        Page 93

24 (Pages 90 - 93)



1   Q.  And in quotes it says                    10:58
2                                                 10:58
3                        Do you see that?         10:58
4   A.  I see that.          10:58
5   Q.  And do you see that it's in quotations?   10:58
6   A.  Yes.                 10:59
7   Q.  And is that in quotations because that was   10:59
8 Facebook's policy at the time?        10:59
9        MS. STEIN:  Objection to form.  If the    10:59
10 witness knows what the people who wrote this --    10:59
11       MS. WEAVER:  Please stop coaching him and    10:59
12 telling him to say that he doesn't know.       10:59
13       MS. STEIN:  Lesley -- Lesley, do not      10:59
14 accuse me of coaching.  You've gotten --       10:59
15       MS. WEAVER:  That's strike one.          10:59
16   Q.  Okay.  Go ahead, K.P.          10:59
17       MS. STEIN:  Excuse me?        10:59
18 BY MS. WEAVER:                       10:59
19   Q.  I'll ask the question again.  Do you know    10:59
20 at this point in time whether Facebook's policy was,   10:59
21                                                 10:59
22                                                 10:59
23   A.  I can only speak at a high level.  This     10:59
24 has always been not just the policy but the way we    10:59
25 operated as a business.              10:59
                                      Page 94

1   Q.  Okay.  Thank you.                 10:59
2       And then do you see it says          10:59
3              right below it?           10:59
4   A.  Yes, yes.              10:59
5   Q.  Okay.  And then there's a bullet point    10:59
6 that says                                11:00
7                                        11:00
8                                        11:00
9              Do you see that?          11:00
10  A.  Yes, I do.             11:00
11  Q.  Okay.  So is it a true statement that at    11:00
12 this time Facebook's policy prohibited sharing of   11:00
13 data with data brokers or similar entities?    11:00
14  A.  Yes.                 11:00
15  Q.  Okay.  And do you have an understanding as   11:00
16 to what the                              11:00
17            what does that mean?        11:00
18  A.  It means that Facebook as a business only   11:00
19 makes public commitments about things that are    11:00
20 within our control.            11:00
21  Q.  Okay.  And so I just want to direct your    11:00
22 attention to the bottom bullet point there in the   11:00
23 second sentence.  Do you see where it says       11:00
24                                        1:01
25                                        11:01
                                      Page 95

1                            Do you see     11:01
2 that?                      11:01
3   A.  I see that.            11:01
4   Q.  Okay.                            11:01
5                                        1:01
6                                        1:01
7                                        11:01
8                                        11:01
9                                        11:01
10                                       1:01
11                                       1:01
12                                       11:01
13  Q.  Okay.  What is -- a little bit lower     11:01
14 there, do you see                 referenced?    11:01
15  A.  Yes.                 11:01
16  Q.  What does that refer to?       11:01
17  A.  I don't know.            11:01
18  Q.  Okay.  There's a question here          11:02
19                                        11:02
20                 Do you see that?        11:02
21  A.  Yes, I see that.          11:02
22  Q.  And there's something there that says     11:02
23            Do you see it?             11:02
24  A.  Yes.                 11:02
25  Q.  What is that?            11:02
                                      Page 96

1   A.  Sorry, I'm searching back so I can see    11:02
2 you.                        11:02
3       So there is a -- an option for every app    11:02
4 that you see on your feed to check who is the    11:02
5 advertiser and why you may have been targeted.    11:02
6   Q.  Okay.  And can you -- that was during the   11:02
7 time period in 2012 to 2017?       11:02
8   A.  My -- I don't know exactly when that    11:02
9 option was added, but I believe it was always there.   11:02
10  Q.  Okay.  And                         11:02
11              Do you see that?          11:02
12  A.  Yes.
13  Q.  And it says                        11:03
14                       Do you        11:03
15 see that?                  11:03
16  A.  Yes.                 11:03
17  Q.  So is it true that -- well, let me back    11:03
18 up.  What is the activity log?      11:03
19  A.  It's a list of every single action you    11:03
20 have taken on Facebook.        11:03
21  Q.  Okay.  And what is "Download Your        11:03
22 Information"?               11:03
23  A.  It's a user-friendly way of downloading --   11:03
24 it's a file basically, but it's a user-friendly file   11:03
25 of everything that Facebook held -- all the    11:03
                                      Page 97

25 (Pages 94 - 97)



**Page 98**

1 information that Facebook has for you.  11:03
2    Q. Okay.  11:03
3  11:03
4  11:03
5  :03
6  :03
7
8  :04
9    Q. Okay. And back to the DYI. You say it's  11:04
10 all the information that Facebook has for you; is  11:04
11 that correct?  11:04
12    A. Yes.  11:04
13    Q. What do you mean by that?  11:04
14    A. It includes from things from like the  11:04
15 information you submitted when you created your  11:04
16 account, to the photos that you may have uploaded,  11:04
17 to the pixels of your friends you may have liked, to  11:04
18 the ads you may have seen, the videos you may have  11:04
19 watched. It's a -- it's a very lengthy, you know,  11:04
20 like document with different things.  11:04
21    Q. Okay.  11:04
22  11:04
23  :04
24
25  :04

**Page 99**

1  :04
2  :05
3 BY MS. WEAVER:  11:05
4    Q. Okay. So it includes the conversions and  11:05
5 purchases off Facebook?  11:05
6    A. I don't know about that, but it includes  11:05
7 the apps that you have logged in. It includes, I  11:05
8 think, the websites that you may have liked, and so  11:05
9 on.  11:05
10    Q. Okay. Does the Do It Yourself network  11:05
11 include the  11:05
12  11:05
13    MS. STEIN: Objection to form.  11:05
14    THE WITNESS: I think you're referring to  11:05
15 the DYI file?  11:05
16 BY MS. WEAVER:  11:05
17    Q. Yes. I'll ask the question again. Sorry.  11:05
18    Does the DIY file include  11:05
19  11:05
20    MS. STEIN: Objection to form.  11:05
21    THE WITNESS: It should include interests,  11:05
22 which are  so yes.  11:05
23 BY MS. WEAVER:  11:05
24    Q. Does it also include  11:05
25    MS. STEIN: Objection to form.  11:05

**Page 100**

1    MS. WEAVER: What's the objection?  11:06
2    MS. STEIN:  is a very vague  11:06
3 term, Lesley.  11:06
4    MS. WEAVER: No. It's listed right here  11:06
5 on the document. So I'm going to restate the  11:06
6 question.  11:06
7    Q. Does the DIY tool also include the  11:06
8  11:06
9  11:06
10    MS. STEIN: Objection to form.  11:06
11    THE WITNESS: So I will answer with, you  11:06
12 know, like a high-level understanding that the DYI  11:06
13 file includes the pages that you liked. And by  11:06
14 default, that's a behavior.  11:06
15 BY MS. WEAVER:  11:06
16    Q. Does Facebook engage in -- okay. But  11:06
17 just -- sorry. Just go back to that question.  11:06
18    Do you know, as you sit here today,  11:06
19 whether the DIY tool includes  11:06
20  11:06
21  11:06
22    MS. STEIN: Objection to form.  11:06
23    THE WITNESS: DYI file includes activities  11:06
24 such as you liking a page that may suggest an  11:07
25 interest and, by default, explain a behavior or  11:07

**Page 101**

1 describe a behavior.  11:07
2 BY MS. WEAVER:  11:07
3    Q. Okay.  11:07
4  :07
5  11:07
6  11:07
7    Q. Okay. Going back to the page ending in  11:07
8 425. We were near the bottom of the page there.  11:07
9    A. Yes.  11:07
10    Q. Do you see where it says  11:07
11  11:07
12    A. Yes.  11:07
13    Q. What does that refer to?  11:07
14    A.  11:07
15  11:07
16  11:07
17    THE REPORTER: I'm sorry,  11:08
18  --  11:08
19    THE WITNESS: -- and pixel.  11:08
20    THE REPORTER: I'm sorry,  11:08
21  11:08
22    THE WITNESS: -- captured through the SDKs  11:08
23 and pixel.  11:08
24    THE REPORTER: Thank you.  11:08
25

26 (Pages 98 - 101)

**Page 102**

1 BY MS. WEAVER:                                    11:08
2    Q.  And what is third-party                    11:08
3 again?                          11:08
4    A.  I think we exhausted that, but I will go    11:08
5 back to the definition as it's being offered in a  11:08
6 previous page:                                     11:08
7                                                    11:08
8                          11:08
9    Q.  And is that contained in the DYI tool or    11:08
10 the DYI file?                   11:08
11       MS. STEIN:  Object to form.  Objection to   11:08
12 form.                          11:08
13       THE WITNESS:  I'm sorry, how can a file     11:08
14 include activities as you have already opted out?  11:08
15 BY MS. WEAVER:                  11:08
16    Q.  Okay.  What I'm asking is whether the DIY  11:08
17 tool collects third-party              as it's    11:08
18 referred to there?              11:08
19    A.  I'm sorry, I feel like I'm repeating       11:08
20 myself.  But the DYI file identified the apps that 11:09
21 you used, the websites that you may have liked and 11:09
22 so on.  So it captures             as per --      11:09
23    Q.  Okay.                    11:09
24    A.  -- the definition of the previous page.    11:09
25    Q.  Does it collect all third-party            11:09

**Page 103**

1                                 11:09
2       MS. STEIN:  Objection to form.             11:09
3       THE WITNESS:  All?  I don't know.          11:09
4 BY MS. WEAVER:                   11:09
5    Q.  Yeah.  Okay.               11:09
6       How would you find out?                    11:09
7    A.  I would have to look at the DYI file.      11:09
8    Q.  Okay.  And have you looked at any DYI      11:09
9 files to prepare for your deposition today?        11:09
10    A.  No, I have not, because that would be a    11:09
11 violation of my commitment to users' privacy.     11:09
12    Q.  Did you look at DYI files for any of the   11:09
13 named plaintiffs in this action to prepare for the 11:09
14 deposition?                     11:09
15    A.  No, because that would be in violation of  11:09
16 my commitment to users' privacy.                   11:09
17    Q.  To prepare --            11:10
18    A.  I would be fired --       11:10
19    Q.  If your --               11:10
20    A.  -- if I look --          11:10
21    Q.  If your lawyers had you look at the        11:10
22 plaintiffs' DYI files to prepare for deposition in 11:10
23 this action?                    11:10
24    A.  I would be fired.        11:10
25    Q.  Okay.  Well, we'll table that.           11:10

**Page 104**

1    Q.  Can you look at your --                    11:10
2    A.  No one here --            11:10
3    Q.  Can you look at your own --                11:10
4    A.  I can only look at mine.  11:10
5    Q.  -- DYI -- oh, okay.  So can you look at     11:10
6 your own DYI file to determine whether or not all  11:10
7 third-party             is included in it?         11:10
8    A.  I can, but not right now.  11:10
9    Q.  Okay.  Right.             11:10
10       Okay.  Give me a moment here.              11:10
11       Okay.  So let's turn for a moment to the   11:11
12 page ending in 3428.  It says           at top.    11:11
13       Do you know who Maritza Johnson is?        11:11
14    A.  No, I don't.            11:11
15    Q.  Okay.  And do you see, it says,           11:11
16                                11:11
17                                11:11
18       Do you see that?          11:11
19    A.  Yes, I do see that.      11:11
20    Q.  So did Facebook track people's -- users'  11:11
21 location?                       11:11
22    A.  Facebook will have an understanding of the 11:11
23 user's location based on different signals.        11:11
24    Q.  Okay.  And you see here it says -- when    11:11
25 you say "different signals," what do you mean?     11:11

**Page 105**

1    A.  Like if someone is using the app from      11:11
2 their mobile phone and they have allowed us access 11:11
3 to their GPS, we would have a precise, you know,   11:11
4 understanding of that location.  If someone is     11:12
5 accessing Facebook through their computer, we will 11:12
6 try to determine their location from an IP address 11:12
7 and so on.                      11:12
8    Q.  Okay.  And do you see where it says,       11:12
9                                11:12
10 It's the last bullet point --   11:12
11    A.  Ah.                      11:12
12    Q.  -- on the top.           11:12
13    A.  Yes.                     11:12
14    Q.  Okay.  So the question is, what is        11:12
15                                11:12
16    A.  Could I read the whole thing quickly just  11:12
17 to make sure I'm --             11:12
18    Q.  Absolutely, of course.   11:12
19       (Pause while witness peruses document.)    11:12
20    A.  Okay.                    11:12
21    Q.  What is                  11:12
22       MS. STEIN:  I will just instruct the       11:13
23 witness to make sure that you only testify about  11:13
24 things that you know, and that if there are things 11:13
25 in this document that you don't know or are not a  11:13



1 company term, to please, you know, tell the        11:13
2 examiner, because you should not be testifying      11:13
3 beyond the scope of what your -- what's at issue in  11:13
4 this deposition and --                              11:13
5        MS. WEAVER: This is completely within the   11:13
6 scope, Deb, and that's improper coaching.           11:13
7    Q.   So, sir, do you know what                   11:13
8 is?                              11:13
9    A.   I think there is an example for             11:13
10       here.                    11:13
11   Q.   I'm sorry?                                  11:13
12   A.                                               11:13
13                               11:13
14   Q.   Okay. That's an example of                 11:13
15                               11:13
16   A.   Yes.                    11:13
17                                                    11:13
18                                                    11:13
19       MS. STEIN: Objection to form.               11:13
20                                                    11:13
21                                                    13
22                                                    11:14
23                                                    1:14
24                                                    14
25
                                              Page 106

1                                                     14
2
3                                                     11:14
4                                                     1:14
5                                                     11:14
6                                                     :14
7 BY MS. WEAVER:                  11:14
8    Q.                                               11:14
9                                                     11:14
10                                                    11:14
11                                                    11:14
12   A.   Those are things that are --   11:14
13       MS. STEIN: Objection to form.   11:14
14       You may answer.          11:14
15                                                    11:14
16
17 BY MS. WEAVER:                  11:15
18   Q.   Okay. So --             11:15
19                                                    1:15
20                                                    :15
21
22                                                    :15
23                                                    11:15
24                                                    5
25                                                    5
                                              Page 107

1                                                     11:15
2                                                     11:15
3 BY MS. WEAVER:                  11:15
4    Q.   Okay. And where does that data that --     11:15
5 the           -- strike that.   11:15
6       Where is the          stored?   11:15
7                                                     11:15
8                                                     11:15
9
10
11                                                    11:15
12                                                    11:15
13   Q.   Okay. And is it contained in the DYI       11:15
14 file?                           11:15
15   A.   That -- how is that relevant for you?      11:15
16   Q.   I get to ask the questions.                11:16
17                                                    11:16
18                                                    11:16
19                                                    6
20                                                    :16
21                                                    11:16
22        And so it wouldn't show up in a -- in user's  11:16
23 DYI file.                       11:16
24   Q.   Okay. And when --       11:16
25       MS. STEIN: I'm just waiting for my feed
                                              Page 108

1 here.
2       Oh, could you read his answer back,
3 please.                         11:16
4       (The record was read by the   11:17
5       court reporter, as requested)   11:17
6 BY MS. WEAVER:                  11:17
7    Q.   And what do you mean by "associated"?     11:17
8                                                    11:17
9                                                    11:17
10
11                                                   7
12
13
14
15                                                   17
16                                                   :17
17                                                   11:17
18                                                   17
19   Q.   Right, but it's still one individual. The  11:17
20 source of the -- the -- originally is one user,    11:17
21 right?                          11:17
22       MS. STEIN: Objection to form.   11:17
23 BY MS. WEAVER:                  11:17
24   Q.   Because either I live in San Francisco or  11:17
25 I indicated -- I mean, all of this data comes from  11:17
                                              Page 109

28 (Pages 106 - 109)



1  individuals, right?                                    11:17
2     A.  Some of the data -- sorry.  Again, if --        11:17
3  if it's -- according to the previous definition, if    11:17
4  it's native data, that means that you have provided     11:17
5  that information.                                       11:18
6     Q.  Okay.  So let's -- okay.  Let's talk --          11:18
7     A.  Like you have defined San Francisco --           11:18
8     Q.  Right.                                           11:18
9     A.  -- to be your hometown.                          11:18
10    Q.  Perfect.                                          11:18
11    A.  Okay.                                             11:18
12    Q.  So it's associated with me initially,            11:18
13 right?                                                  11:18
14    A.  You have specifically suggested to your          11:18
15 Facebook friends by basically filling in that          11:18
16 specific field that Facebook asked you to do that       11:18
17 your hometown is San Francisco.  You may live in        11:18
18 Denver, but your hometown appears to be                 11:18
19 San Francisco.                                          11:18
20    Q.  Okay.                                            11:18
21                                                         11:18
22                                                         11:18
23                                                         :18
24                                                         11:18
25                                                         11:18
                                                       Page 110

1
2     Q.  Okay.  I'm just -- honestly, K.P., I'm           11:18
3  trying to understand your answer.                       11:18
4         You said the data that we are talking            11:18
5  about is not associated with specific users.  We        11:18
6  just talked about --                                    11:19
7     A.  Yes, please.                                     11:19
8     Q.  -- it was associated with an individual          11:19
9  user because they're from San Francisco.                11:19
10    A.  Yes.                                             11:19
11    Q.  So when does it become disassociated?            11:19
12    A.  But I'm trying to explain to you the             11:19
13 distinction between data that comes from                11:19
14    to use your --                                       11:19
15    Q.  Okay.                                            11:19
16    A.  -- the definition in this document, versus       11:19
17                                                         11:19
18    Q.  Okay.  And --                                    11:19
19    A.  So -- no, no, no, no.  Sorry.  I have to         11:19
20 be super precise here.                                  11:19
21                                                         :19
22                                                         11:19
23                                                         11:19
24    Q.  Right.                                           11:19
25                                                         11:19
                                                       Page 111

1                                                         11:19
2                                                          11:19
3                                                          1:19
4                                                          11:19
5                                                          11:19
6                                                          1:19
7
8                                                          11:19
9                                                          20
10
11
12
13    Q.  I understand.                                    11:20
14        By the way, would you use a different word       11:20
15 than        Is there another way to reference          11:20
16 that?                                                   11:20
17    A.  I would probably use                             11:20
18    Q.                                                   11:20
19    A.                                                   11:20
20    Q.  Okay.  Perfect.                                  11:20
21                                                         11:20
22                                                         11:20
23                                                         :20
24
25                                                         11:20
                                                       Page 112

1                                                         :20
2                                                          11:20
3
4     Q.  Okay.                                            11:20
5     A.  -- like that.                                    11:20
6     Q.  All right.  And then what about                  11:20
7         is there another term of art at Facebook used    11:20
8  to reference that?                                      11:20
9     A.  That's my definition of                          11:20
10    Q.                          Okay.                    11:20
11    A.  Oh, sorry,                                       11:20
12    Q.              I see.  Okay.                         11:20
13        So going back to what we're talking about,       11:21
14 the --                                                  11:21
15                                                         11:21
16                                                         11:21
17                                                         11:21
18    Q.  Where is that data stored?  Where is the         11:21
19 ad cluster data stored?                                 11:21
20                                                         11:21
21                                                         11:21
22                                                         11:21
23                                                         21
24    A.  Okay.  At the very high level, if we are         11:21
25 talking about the specific scenario that a business     11:21
                                                       Page 113

29 (Pages 110 - 113)

3454

1  that is operating in San Francisco wants to target          11:21
2  users in San Francisco, they will run the campaign          11:21
3  for, let's say, two days; they will target specific         11:21
4  users that live in that area.  They may target only         11:21
5  females or only men, people of a certain age, people        11:21
6  of a certain profession, depending on, you know,            11:21
7  like, what sort of campaign they want to run, right?        11:21
8       So that will all be effectively identified       11:21
9  as a potential audience of, let's say for the sake          11:21
10 of the argument, 20,000 users.  They still have no          11:22
11 access to the information.  They only understand            11:22
12 what is the potential audience their ad campaign can        11:22
13 reach.                            11:22
14                                   11:22
15                                   11:22
16                                   11:22
17                                   11:22
18                                   11:22
19                                   11:22
20                                   11:22
21                                   11:22
22                                   11:22
23
24
25                                   11:22

Page 114

1                                   11:22
2  Q.  Okay.  So let me ask this:  So I'm -- say         11:22
3  I'm being targeted in that ad campaign.  Is there a        11:22
4  way for me to find out that I was targeted by those        11:22
5  categories that the advertiser chose?          11:22
6  A.  You can see it only if that ad campaign          11:23
7  shows up to you.                  11:23
8  Q.  Okay.  And only in realtime?  And there's          11:23
9  no record of it after that?            11:23
10 A.  I think you can actually see the -- the          11:23
11 information in realtime.  But if you go to the DYI          11:23
12 file, you can see probably ad campaigns that you          11:23
13 have been displayed -- or you have seen yourself, or         11:23
14 you have clicked.                11:23
15 Q.  Okay.  But if they were --          11:23
16 A.  You know --                11:23
17 Q.  -- targeted to me and I didn't take an          11:23
18 action, it's not in the DYI file; is that right?          11:23
19 A.  You -- you will see the ad campaigns that          11:23
20 ended up showing up on your feed,                11:23
21                                   11:23
22                                   11:23
23                            11:23
24 Q.  Got it.                11:23
25      And so let's talk about the information          11:23

Page 115

1  that is used to create the          How do you          11:23
2  determine what information can be used to apply          11:24
3  those algorithms?                11:24
4  A.  I need to clarify that question.          11:24
5  Q.  Yeah, it's --                11:24
6                                   11:24
7       MS. STEIN:  Objection to form.          11:24
8       THE WITNESS:  Okay.  So are you talking          11:24
9  about                            11:24
10                                   11:24
11 BY MS. WEAVER:                11:24
12 Q.  Well, what is                11:24
13 A.  I mean, I don't know of any use of          11:24
14            but I'm trying to understand exactly          11:24
15 how you want me to answer the question in a          11:24
16 thoughtful way.                11:24
17 Q.  Okay.  Well,                11:24
18                            s that a          11:24
19 fair definition?                11:24
20 A.                                   11:24
21                                   11:24
22                                   11:25
23                                   11:25
24 Q.  That was an example, right?          11:25
25 A.  Yes.                11:25

Page 116

1  Q.  But at large, is it fair to say that          11:25
2                                   11:25
3
4       MS. STEIN:  Objection to form.          11:25
5       THE WITNESS:  I cannot talk about that.          11:25
6                                   11:25
7                                   11:25
8                                   11:25
9                                   11:25
10                            1:25
11 BY MS. WEAVER:                11:25
12 Q.  Okay.  So let's -- we can stick with your          11:25
13 example then if you like for now.          11:25
14      What if I sent a -- a private -- a message          11:25
15 in Facebook Messenger to one friend saying "I used          11:25
16 to live in San Francisco" and I've never posted          11:25
17 anything publicly about it.  Is that information          11:25
18 used to create the                11:26
19 A.  No.                11:26
20 Q.  Why not?                11:26
21 A.  That's a private conversation between you          11:26
22 and your friend --                11:26
23 Q.  Okay.                11:26
24 A.  -- that --                11:26
25 Q.  So how does the algorithm distinguish --          11:26

Page 117

30 (Pages 114 - 117)

3455

1 let me ask this: When the data is being ran on    11:26
2 algorithms, is it segregated by public or private    11:26
3 data?    11:26
4    A.  So your definition of public or private is    11:26
5 what, if I may say?    11:26
6    Q.  If a user designated something private or    11:26
7 restricted audience.    11:26
8    A.  Okay.  Let's take a little bit of a step    11:26
9 back.  Because what we define as public data is    11:26
10 basically your first name, your last name, your    11:26
11 profile picture.    11:26
12    Q.  Okay.    11:26
13    A.  Anything else that comes with a -- an    11:26
14 audience selection doesn't necessarily belong --    11:26
15 it's not necessarily by default public. It may have    11:26
16 a limited audience. It may be just you, if it's    11:26
17 things like your birthday, or it may be friends --    11:27
18 or accessible to your friends.    11:27
19    What we always, you know, like, like to    11:27
20 suggest that communications that happen over    11:27
21 messenger is also by default private, meaning that    11:27
22 it's -- the content of your exchanges with your    11:27
23 friends belong to you and your friends. So that    11:27
24 wouldn't be considered public information. But it    11:27
25 wouldn't be considered necessarily private    11:27
Page 118

1 information because it's not accessible by anybody    11:27
2 in that -- it's a private conversation but it's not    11:27
3 private data in that sense.    11:27
4    Q.  And when Facebook is, let's say -- we can    11:27
5 just stick with your ▊▊▊ example. When it    11:27
6 is using the algorithm to create ▊▊▊ such    11:27
7 as ▊▊▊ is it using that world of    11:27
8 information that you just described that is not    11:27
9 public?    11:27
10 ▊▊▊    11:27
11 ▊▊▊    11:28
12 ▊▊▊    11:28
13    Q.  Okay.  But what I'm trying to say is --    11:28
14 and I gave you a different example.  So if you    11:28
15 could, just follow my example.  Okay.    11:28
16    A.  We wouldn't. I think I made --    11:28
17    Q.  Okay.    11:28
18    A.  -- that point that --    11:28
19    Q.  When I -- when I look --    11:28
20    A.  -- you telling your friends you live in    11:28
21 San Francisco is your business and it's not for us    11:28
22 to use in any kind of ads.    11:28
23    Q.  Okay.  And that's because reading messages    11:28
24 and using that content and making it available to    11:28
25 advertisers would violate Facebook's policies,    11:28
Page 119

1 right?    11:28
2    A.  Reading private communications between you    11:28
3 and your friends would be a violation of our    11:28
4 commitment to your privacy.    11:28
5    Q.  Okay.  Switching topics just for a second.    11:28
6    You know what capabilities are; is that    11:28
7 right?    11:29
8    A.  In what --    11:29
9    Q.  In connection with -- in connection with    11:29
10 APIs?    11:29
11    A.  Yes, I do.    11:29
12    Q.  Okay.  Sorry.    11:29
13    So are you familiar with the read stream    11:29
14 capability?    11:29
15    A.  Read stream is an API but there is an    11:29
16 associated capabilities.    11:29
17    Q.  Yeah.  And what is that?    11:29
18    A.  It's an API that allows a third party to    11:29
19 access someone's News Feed.    11:29
20    Q.  Okay.  And what does "read stream" mean in    11:29
21 particular?    11:29
22    A.  It's a very poorly, you know, like,    11:29
23 defined --    11:29
24    Q.  It should probably be for the period 2012    11:29
25 to 2017.    11:29
Page 120

1    A.  Yes.  So the News Feed is also referred as    11:29
2 stream.    11:29
3    Q.  Uh-huh.    11:29
4    A.  And that API and the corresponding    11:29
5 capability effectively describes the ability to read    11:29
6 the stream.    11:29
7    Q.  Okay.    11:29
8    A.  In other words, read the News Feed.    11:29
9    Q.  Okay.  And are you aware at any point in    11:30
10 time if third parties were allowed to read Facebook    11:30
11 Messenger messages?    11:30
12    MS. STEIN:  Objection.    11:30
13 BY MS. WEAVER:    11:30
14    Q.  Through -- through API capabilities?    11:30
15    MS. STEIN:  Objection to form.  And we're    11:30
16 talking about 2012 to 2017.    11:30
17    You may answer.    11:30
18    THE WITNESS:  Between 2012 and 2017, I    11:30
19 don't think we made the -- the Messenger API -- the    11:30
20 current version of the Messenger API available.    11:30
21    THE REPORTER:  I'm sorry.  That -- that...    11:30
22    THE WITNESS:  So I'm -- between 2012 and    11:30
23 2017, the current version of the Messenger API was    11:30
24 not available.  I think the only way for third    11:30
25 parties to access Messenger was through the Inbox    11:30
Page 121

31 (Pages 118 - 121)



1 API.                                        11:30
2        MS. WEAVER: I'm sorry, I just need to      11:30
3 look really quickly.                          11:31
4    Q. What is the Inbox API?                 11:31
5    A. It's an API that allows a third party to    11:31
6 access a user's Messenger conversation.        11:31
7    Q. Okay. And what do those third parties --  11:31
8 strike that.                                11:31
9        What access were they given to --       11:31
10   A. So the third --                        11:31
11   Q. -- use Messenger conversation?         11:31
12   A. Yeah. The third parties that had access  11:31
13 to the Inbox API were app third parties that    11:31
14 replicated core Facebook functionality, including  11:31
15 messaging. So we call those integrations device  11:31
16 integrations because they were replicating       11:31
17 Facebook -- the Facebook app.                 11:31
18                                         11:31
19                                         11:31
20
21                                         11:31
22
23                                         11:32
24
25
                                          Page 122

1        THE WITNESS: Oh. Okay.               11:33
2        MS. STEIN: I will -- I will mute. The    11:33
3 gardeners are here. Hazards of --             11:33
4        MS. WEAVER: Yes.                      11:33
5        MS. STEIN: -- of COVID.               11:33
6 BY MS. WEAVER:                             11:33
7    Q. I'm going to direct your attention just to  11:33
8 a few pages here.                           11:33
9    A. Okay.                               11:33
10   Q. Great.                              11:33
11                                         
12                                         
13
14                                         11:34
15
16
17
18
19
20
21                                         11:34
22
23                                         
24
25
                                          Page 124

1        Q. So I'm going to turn to the page ending  11:32
2
3                                         11:32
4
5                                         11:32
6                                         11:32
7                                         11:32
8                                         11:32
9    Q. So I'm going to turn to the page ending  11:32
10 with 429 now. It's just the next page of the same  11:32
11 document.                                11:32
12        Oh, strike it. I will move on.           11:32
13        Going, actually, to the page ending in     11:33
14 430. What is                as used in this     11:33
15 document?                               11:33
16   A. Can I take a quick moment to read the     11:33
17 document?                               11:33
18   Q. Of course. Sorry.                     11:33
19   A. Thank you.                          11:33
20        (Pause while witness peruses document.)    11:33
21   A. I'm sorry, there's a little bit of          11:33
22 background noise. I don't know where it's coming.   11:33
23        MS. WEAVER: I think that's Ms. Stein.     11:33
24 But maybe not.                           11:33
25        MS. STEIN: Sorry. Sorry.             11:33
                                          Page 123

1                                         11:34
2
3                                         11:34
4
5
6
7
8
9
10                                        11:34
11                                        11:34
12                                        
13                                        11:34
14                                        11:35
15                                        11:35
16
17   Q. Okay. And so if you turn to the second    11:35
18 page here ending in 3431, do you see where it says  11:35
19              It's in bold.                  11:35
20   A. Yeah.                             11:35
21   Q. Okay. And then it says,                11:35
22                                        11:35
23                                        11:35
24        Do you see that?                    11:35
25   A. Yes.                              11:35
                                          Page 125

32 (Pages 122 - 125)



1    Q.  Do you -- what is                              11:35
2                                                        11:35
3                                  11:35
4    Q.  And what do you mean by graph?                 11:35
5    A.  Everything at Facebook is the graph.  Any      11:35
6 entity, any connection that's affecting the part of   11:35
7 the graph.                          11:35
8    Q.  Okay.  Is it a relational database?         11:35
9                                     :35
10                                    35
11                                         11:36
12                                         11:36
13                                         11:36
14                                         11:36
15
16                                         11:36
17                                         1:36
18
19                                         11:36
20
21                                         :36
22
23                                         11:36
24
25                                         6
                                      Page 126

1                                      :36
2                                         11:36
3
4                                         11:36
5    Q.  Okay.  And if I go to delete my Facebook       11:36
6 account, what is deleted?  Is all the data relating   11:36
7 to me deleted?                     11:36
8    A.  Your interactions with public entities         11:36
9 will not be deleted.               11:36
10   Q.  So how do you identify all of the data to      11:37
11 delete?                          11:37
12   A.  My -- my response would be anything that       11:37
13 lives in the "Download Your Information" file is      11:37
14 going to disappear.               11:37
15   Q.  What about all the rest of the data in the     11:37
16 graph?                           11:37
17   A.  Again, the only exception here would be,       11:37
18 you know, like, your interactions with public        11:37
19 entities.  If you end -- ended up commenting on       11:37
20 United's page you didn't like their service, that    11:37
21 is, by default, public and is not personal           11:37
22 information.  And, to some extent, it belongs also   11:37
23 to United because you did that on their entity.      11:37
24   Q.  So --                      11:37
25   A.  But pretty much every -- everything else       11:37
                                      Page 127

1 that is associated to you will be deleted.           11:37
2    Q.  Okay.  And when you say "is associated to      11:37
3 me," what do you mean?             11:37
4                                     :37
5                                      7
6                                         1:38
7
8                                      :38
9
10
11
12                                         11:38
13                                         11:38
14                                         11:38
15
16   Q.  Okay.  You -- you referred earlier to data    11:38
17 that is not associated with individuals.  Do you     11:38
18 recall that?                      11:38
19   A.  I need to play back my -- you know, like,      11:38
20 my sentence.  Okay.  What about it?                  11:38
21   Q.  You -- okay.  So there is data that is not     11:38
22 associated with individual users; is that right?     11:38
23   A.  Overall?                    11:38
24   Q.  Yes.                        11:38
25   A.  Yes, we -- we do have some information         11:38
                                      Page 128

1 that is not associated with specific users.          11:38
2    Q.  Right.                      11:38
3    A.  Like United's page on Facebook is not         11:38
4 associated with specific users.    11:38
5    Q.  Okay.  We'll put a pin in this and we'll       11:38
6 come back to it.  Because I think really drilling in  11:39
7 on what Facebook can identify about me specifically   11:39
8 is at the heart of this deposition.        11:39
9       Okay.  So going back to               11:39
10                Do you see the bullet point below?  It  11:39
11 says              Do you see that?         11:39
12   A.  Yes.                        11:39
13                                         11:39
14                                         11:39
15                                         11:39
16                                      39
17       Do you see that?                     11:39
18   A.  Yes.                        11:39
19   Q.  What is the Privacy XFN team?                 11:39
20   A.  It's a team that we have that reviews          11:39
21 every single product that we are launching from a    11:39
22 privacy perspective.              11:39
23   Q.  Okay.  And what is a                     11:39
24   A.                                   11:39
25                                     11:39
                                      Page 129

33 (Pages 126 - 129)

3458



**Page 130**

```
1    Q.  Okay.                                      11:39
2                                                   11:39
3                                            1:40
4                                      11:40
5    Q.  Who would know?                11:40
6    A.  I don't know.            11:40
7    Q.  Who at Facebook was in charge for          11:40
8                                      11:40
9    A.  I don't know.            11:40
10   Q.  Who is Emily Sharpe?          11:40
11   A.  I -- I don't know. I've heard that name    11:40
12 just recently.                      11:40
13   Q.  Okay. So I'd like for you to turn to the   11:40
14 next page. It says                   11:40
15                                     11:40
16            Do you see that?          11:40
17   A.  Yes.                     11:40
18   Q.  And this is page 3433.         11:40
19       Who is Travis Bright?          11:40
20   A.  I don't know.            11:40
21   Q.  Okay. So I'm going to direct your          11:40
22 attention to the last paragraph there where it says,  11:40
23 it begins,                           11:40
24                                     11:41
25            Do you see that?          11:41
                                        Page 130
```

**Page 131**

```
1    A.  And you said next page?              11:41
2    Q.  I'm on the -- sorry. I'm on the bottom     11:41
3  paragraph on the page ending with 3433.          11:41
4    A.  Oh, okay.               11:41
5        Sorry, which sentence?          11:41
6    Q.  Well, let's do this. Do you see where it   11:41
7  says                                 11:41
8    A.  Yes.                     11:41
9    Q.  Okay. So there it says,         11:41
10                                     11:41
11                                     11:41
12                                     11:41
13            Do you see that?          11:41
14   A.  Yes.                     11:41
15   Q.  And it says a little bit lower there,      11:41
16                                     11:41
17                                     11:41
18
19            Do you see that?          11:41
20   A.  Yes.                     11:41
21                                     11:41
22                                     11:41
23                                  1:41
24
25
                                        Page 131
```

**Page 132**

```
1    Q.  What is                       11:42
2                                          11:42
3                                          11:42
4                                     42
5    Q.  Got it.                      11:42
6        And then looking forward, it says,       11:42
7                                          11:42
8                                          11:42
9        Do you see that?             11:42
10   A.  Let me see. Where are you now?        11:42
11   Q.  I'm sorry. It's two sentences -- here,    11:42
12 I'll go at the sentence ahead.            11:42
13                                          11:42
14                                          11:42
15                                          11:42
16                                     11:42
17        Do you see that?             11:42
18   A.  Yes.                     11:42
19   Q.  And then it says,                 1:42
20                                          11:42
21                                     11:42
22        Do you see that?             11:42
23   A.  Yes.                     11:42
24   Q.  Do you have any familiarity with         11:42
25                                     11:42
                                        Page 132
```

**Page 133**

```
1    A.  No.                          11:42
2    Q.  Okay. Now, it -- it's referring to       11:42
3                                          11:43
4            Do you see that?          11:43
5    A.  Yes, I do see that.            11:43
6    Q.  Does Facebook do that?         11:43
7                                       1:43
8
9                                       11:43
10                                         11:43
11
12                                     1:43
13                                         11:43
14                                     43
15                                         11:43
16                                         11:43
17
18                                     :43
19                                         11:43
20
21                                         11:43
22                                     3
23                                     43
24
25
                                        Page 133
```



1       THE REPORTER:  Thank you.          11:43
2  BY MS. WEAVER:                          11:43
3                                          11:43
4                                          3
5
6                                          11:43
7
8                                          11:43
9                                          11:43
10                                         5
11                                         1:44
12                                         11:44
13                                         11:44
14
15
16
17      Q.  Okay.  So here, going back to the    11:44
18  paragraph where we started, it says         11:44
19                                              11:44
20                                         11:44
21      Do you see that?           11:44
22      A.  Yes.                   11:44
23      Q.                              11:44
24      A.                              11:44
25                                    11:44
                                        Page 134

1       Q.  Okay.  And how does Facebook anonymize    11:44
2  data?                               11:44
3       A.  That's a very broad question, but if you    11:44
4  want my high-level understanding, I'm happy to    11:44
5  answer.                             11:45
6       Q.  Yes, please.                 11:45
7       A.  So normally, we disassociate the data with    11:45
8  anybody's specific identity.  I'll -- I'll use maybe    11:45
9  the San Francisco example.  Without necessarily, you    11:45
10  know, like, suggesting who are the people that live    11:45
11  in San Francisco who have created a cluster of some    11:45
12  sort of the people that live in San Francisco.    11:45
13      MS. WEAVER:  I'm sorry, my realtime feed    11:45
14  is not working.  Could you read that answer back,    11:45
15  please.                             11:45
16          (The record was read by the    11:46
17      court reporter, as requested)    11:46
18  BY MS. WEAVER:                       11:46
19      Q.  Okay.  Does every user get a user ID?    11:46
20  Facebook user ID?                    11:46
21      A.  Everybody that has an account on the    11:46
22  Facebook platform will have a user ID.    11:46
23                                      11:46
24                                      :46
25                                      11:46
                                        Page 135

1                                          11:46
2                                          6
3                                          11:46
4
5                                          6
6                                          11:46
7
8
9
10                                         11:46
11
12                                         11:46
13      MS. WEAVER:  We should probably slow down    11:46
14  because we're making our court reporter's life    11:46
15  miserable.                          11:46
16      THE WITNESS:  Sorry.  I will -- I will.    11:46
17      MS. WEAVER:  No.  It's my fault, too.    11:46
18      Q.  Okay.  What is the purpose of a user ID?    11:46
19      MS. STEIN:  Objection to form.    11:46
20      THE WITNESS:  Are you talking specifically    11:47
21  about the Facebook user ID?    11:47
22  BY MS. WEAVER:    11:47
23      Q.  Yes.                        11:47
24      A.  It's to uniquely identify a user within    11:47
25  our own systems.                    11:47
                                        Page 136

1       Q.  And among the data Facebook collects from    11:47
2  apps developed with its API is -- is also app users'    11:47
3  IP addresses, right?                 11:47
4       A.  The SDK will pass (inaudible) --    11:47
5       THE REPORTER:  I'm sorry.  One more time.    11:47
6       THE WITNESS:  Sorry.  I'm talking    11:47
7  technical terms here.  That's probably why.    11:47
8       The SDK will pass that information.    11:47
9  BY MS. WEAVER:                       11:47
10      Q.  Okay.  So the platform that an app    11:47
11  developer uses to send data will also send a user's    11:47
12  IP address; is that correct?         11:47
13      MS. STEIN:  Objection to form.    11:47
14      THE WITNESS:  It depends.        11:47
15  BY MS. WEAVER:                       11:47
16      Q.  Well, I was just trying to say -- instead    11:47
17  of saying SDK, I was trying to put what you said    11:47
18  into English, so...                 11:48
19      A.  Yes, but there is nuance here.  Because it    11:48
20  may be the IP address of the app's back-end servers    11:48
21  or the IP address of the phone, depending on when    11:48
22  the call, the API call is initiated from.    11:48
23      Q.  Okay.  And the data Facebook collects from    11:48
24  apps also includes this unique user-specific    11:48
25  advertiser ID; is that right?        11:48
                                        Page 137

35 (Pages 134 - 137)



1   A. No.                                              11:48
2   Q. It does not?                                     11:48
3   A. That's not correct.                              11:48
4   Q. What is incorrect?                               11:48
5   A. It's a time you log in with an app using         11:48
6 Facebook, there is a unique identifier that is        11:48
7 mapped against your Facebook ID but is not the same.  11:48
8 And it's unique to the app.                           11:48
9   Q. Okay. Fair enough.                               11:48
10     And what would you call that?                    11:48
11  A. It's called app-scoped ID.                       11:48
12  Q. Okay. That's an app-scoped ID.                   11:48
13     And then are apps themselves also assigned       11:48
14 separate identifiers?                                11:49
15  A. Depends on their architecture.                   11:49
16  Q. Okay. So some do and some don't; is that         11:49
17 right?                                               11:49
18  A. Yeah. For example, if an app only uses           11:49
19 Facebook as the only way to authenticate people,     11:49
20 they may as well use the app-scope ID as their only  11:49
21 identifier. But if an app uses different             11:49
22 authentication systems from, like, Google or Apple,  11:49
23 or even email passwords, they would probably have an 11:49
24 additional identifier in order to capture all        11:49
25 different ways of authentication.                    11:49

                                                Page 138

1   Q. Okay. And when you say authenticate, what        11:49
2 do you mean?                                          11:49
3   A. Apps that require you to create an                11:49
4 account, which allow you to create an account         11:49
5 upfront, and then every time you try to log in back   11:49
6 to that app will authenticate you based on that       11:49
7 account you have created.                             11:50
8   Q. Okay. So is all data that's associated           11:50
9 with a user linked through that user's user ID?       11:50
10     MS. STEIN: Objection to form.                    11:50
11     THE WITNESS: I'm sorry. Is it in the             11:50
12 context of Facebook or third-party apps?             11:50
13 BY MS. WEAVER:                                       11:50
14  Q. Let's do Facebook for now.                       11:50
15  A. And so all the data that we have been            11:50
16 talking about this morning,                          11:50
17        will be associated back to that Facebook user 11:50
18 ID.                                                  11:50
19  Q. I'm sorry, I just didn't hear what..             11:50
20  A. The                                              11:50
21  Q. Would be associated -- yes. Okay.                11:50
22 Perfect.                                             11:50
23     And how is that mapping accomplished? Is         11:50
24 every data point that's pulled in assigned to the    11:50
25 user ID?                                             11:50

                                                Page 139

1      MS. STEIN: Objection to form.                    11:50
2                                                       11:50
3                                                       11:51
4                                                       11:51
5                                                       11:51
6                                                       11:51
7                                                       11:51
8
9 BY MS. WEAVER:                                        11:51
10  Q. Uh-huh.                                          11:51
11                                                      11:51
12                                                      11:51
13                                                      11:51
14
15  Q. Okay.                                            11:51
16                                                      11:51
17                                                      11:51
18                                                      11:51
19
20  Q. Okay. And what about              Is             11:51
21 that mapped -- information received about users from 11:51
22 third parties, what do you call that again?          11:51
23                                                      11:52
24                                                      11:52
25  Q.                                                  11:52

                                                Page 140

1                                                       11:52
2   Q. So is              received about                11:52
3 users attached to a Facebook user ID as well?         11:52
4                                                       11:52
5                                                       11:52
6                                                       11:52
7                                                       11:52
8                                                       :52
9   Q. Okay. So what we were about to get into          11:52
10 here, and we can read the document, but I'll just    11:52
11 ask you.                                             11:52
12                                                      11:52
13                                                      11:52
14
15
16                                                      11:52
17
18                                                      1:53
19                                                      11:53
20
21                                                      11:53
22                                                      11:53
23
24
25                                                      1:53

                                                Page 141

                                     36 (Pages 138 - 141)



1    THE REPORTER: I'm sorry, was there an    11:53
2  objection?                                  11:53
3    MS. STEIN: I said "Objection to form."    11:53
4    THE REPORTER: Thank you.                  11:53
5  BY MS. WEAVER:                              11:53
6    Q. How does Facebook authenticate or match    11:53
7  the data that it's receiving                11:53
8            - itself?                         11:53
9                                              11:53
10                                             11:53
11                                             11:53
12                                             1:53
13                                             4
14                                             11:54
15
16   Q. Okay.                                  11:54
17  So with a user ID you could -- you should  11:54
18  be able to identify        and data that   11:54
19  Facebook already possessed because of Facebook    11:54
20  activity, correct?                         11:54
21    MS. STEIN: Object to form.               11:54
22                                             11:54
23                                             11:54
24    MS. WEAVER: I'll move to strike. That's  11:54
25  not what I'm asking.                       11:54
                                               Page 142

1    Q. I'm just trying to understand how Facebook    11:54
2  aggregates data.                            11:54
3  So what is a cross-app identifier?          11:54
4    A. Is it in the -- sorry. I'm just looking.    11:54
5    Q. No, no. It is in the documents, but do  11:54
6  you know what a            is?             11:54
7                                              55
8                                              11:55
9                                              11:55
10   Q. Okay. So do you know what a hashed UID  11:55
11  is?                                        11:55
12   A. In the context of audience network?    11:55
13  Sorry.                                     11:55
14                                             11:55
15                                             11:55
16                                             11:55
17                                             5
18   Q. Okay. So I'll ask you to just look at the    11:55
19  bottom of page 433.                        11:55
20   A. Yes.                                   11:55
21   Q. Do you see where it begins -- it's in the    11:55
22  middle of the paragraph. I apologize for this. It    11:55
23  says                                       11:56
24  Do you see that?                           11:56
25   A. Yes.                                   11:56
                                               Page 143

1    Q.                                        11:56
2                                              11:56
3                                              11:56
4                                              11:56
5                                              11:56
6            Do you see that?                  11:56
7    A. Yes, I see that.                       11:56
8    Q. And then it says                       11:56
9                               Do             11:56
10  you see that?                              11:56
11   A. Yes.                                   11:56
12   Q. And it says                            11:56
13                                             11:56
14                                             11:56
15                      Do you                 11:56
16  see that?                                  11:56
17   A. Yes.                                   11:56
18   Q. So is this a practice that Facebook     11:56
19  engaged in during -- from 2012 to 2017?    11:56
20   A. With regards to                        11:56
21   Q. No, in general.                        11:57
22   A. In general, our objective is           11:57
23                                             11:57
24                                             11:57
25                                             11:57
                                               Page 144

1                                              11:57
2                                              1:57
3    Q. Okay. Is it true that the Facebook UID is    11:57
4  the same across all of the browsers and devices you    11:57
5  are logged into?                           11:57
6    A. For what is -- for what is related to  11:57
7  Facebook, yes, that's true.                 11:57
8    Q. Okay. And then how does -- just to return    11:57
9  to our discussion of app-scoped IDs, how does    11:57
10  mapping between user ID and app-scoped ID  11:57
11  accomplished? Is there a table?            11:57
12                                             1:57
13                                             11:57
14                                             11:57
15                                             11:57
16                                             11:58
17                                             1:58
18                                             1:58
19  BY MS. WEAVER:                             11:58
20   Q. I'm sorry, I've lost --                11:58
21   A. The user settings, whatever you want it.    11:58
22   Q. Okay. But it's not -- the DIY profile is    11:58
23  not doing the mapping. Facebook is doing the    11:58
24  mapping. Where is that done?               11:58
25   A. Facebook is doing the mapping ads and it's    11:58
                                               Page 145

37 (Pages 142 - 145)



1 captured in the DYI files.                          11:58
2    Q.  Okay.  Forget the DIY file.  Where -- how    11:58
3 does the mapping between the user ID and app-scoped  11:58
4 ID happen?                                           11:58
5         MS. STEIN:  Objection to form.              11:58
6                                                      11:58
7                                                      1:58
8
9                                                      11:58
10
11                                                     11:58
12
13                                                     11:58
14
15    Q.  Okay.  So how -- how is the mapping          11:58
16 accomplished?  Is it an algorithm?                  11:58
17         MS. STEIN:  Objection to form and --        11:58
18 BY MS. WEAVER:                                      11:58
19    Q.  Is there --                       11:58
20         MS. STEIN:  -- it's really beyond the       11:58
21 scope of this deposition at this point.             11:58
22         MS. WEAVER:  Fully disagree.  We are        11:59
23 trying to figure out what data can be produced for  11:59
24 nine plaintiffs.                        11:59
25         MS. STEIN:  You're asking about mapping of  11:59
                                              Page 146

1 IDs.                                      11:59
2         MS. WEAVER:  Exactly.  I know that you       11:59
3 don't -- well, anyway.                    11:59
4    Q.  So let's continue.                 11:59
5    A.  It's -- don't worry.               11:59
6    Q.  Thank you.                         11:59
7                                                      9
8                                                      11:59
9                                                      11:59
10    Q.  I see.  Okay.  So it --           11:59
11                                                     11:59
12                                                     11:59
13                                                     11:59
14    Q.  Okay.  All right.  Good.  Thank you.         11:59
15         Let me turn to one other -- I apologize,    11:59
16 but I want to just stick with this.       12:00
17         Okay.  So let's talk about hashing then     12:00
18 for a second.  Is it true that Facebook -- well, is  12:00
19 hashing a one-way function?               12:00
20    A.  I don't understand what you mean by that.    12:00
21    Q.  Hashing is a process of assigning a          12:00
22 particular piece of data to --            12:00
2                                                      12:00
2                                          12:00
25    A.  Yes.                             12:00
                                              Page 147

1    Q.  -- to assign, right?  Okay.                   12:00
2         So when Facebook hashes that data, is it     12:00
3 possible to reverse engineer and reidentify where    12:00
4 the data came from?                       12:00
5    A.  I don't know.  I -- my technical knowledge    12:00
6 is not sufficient to answer that question.           12:00
7    Q.  Okay.  Can hash data be reidentified using   12:00
8 data stored on Facebook systems?          12:00
9    A.  It's not meant to be, so I don't know.        12:00
10    Q.  Okay.  Okay.                      12:00
11         Is there a rule that Facebook follows       12:01
12 about when data is hashed?               12:01
13                                                     12:01
14                                                     12:01
15                                                     12:01
16
17    Q.  Okay.  Are you aware of a rule that data     12:01
18 is hashed after 90 days?                 12:01
19    A.  In what context?                  12:01
20    Q.  I -- never mind.  If you're not familiar     12:01
21 with it, it's fine.                      12:01
22         Is a reidentifier assigned to hashed data?   12:01
23                                                     2:01
24                                                     12:01
25                                                     12:02
                                              Page 148

1                                                      12:02
2                                                      12:02
3                                                      12:02
4    Q.  Okay.  Yes.  So is a reidentifier attached    12:02
5 to hash data?                            12:02
6                                                      12:02
7                                                      12:02
8                                                      12:02
9
10    Q.  Okay.  And so for hashed data it can be      12:02
11 reidentified for purposes of deletion; is that       12:02
12 correct?                                 12:02
13         MS. STEIN:  Objection to form.             12:02
14         THE WITNESS:  I don't know.              12:02
15         MS. WEAVER:  What was the objection?        12:02
16         MS. STEIN:  Objection to form.             12:02
17         MS. WEAVER:  What was the basis?           12:02
18         MS. STEIN:  I find your question confusing  12:02
19 and overbroad.                           12:02
20         MS. WEAVER:  Okay.  Just wanted to make     12:02
21 sure you weren't coaching the witness.    12:02
22         MS. STEIN:  I'm saying "Objection to       12:02
23 form."                                   12:02
24         Lesley, please stop with your coaching     12:02
25 objections.  I've not made a lot of objections and   12:03
                                              Page 149

38 (Pages 146 - 149)



1 they're almost always just objection to form.     12:03
2 BY MS. WEAVER:     12:03
3   Q.  Are any outputs or products like interests     12:03
4 generated from hashed data?     12:03
5   A.  No.     12:03
6   Q.  Is information collected from hashed data?     12:03
7
8
9
10
11
12   Q.  Okay.  And that would include, for     12:03
13 example, interests -- is that right? -- an interest     12:03
14 category?     12:03
15
16
17
18
19
20
21
22     12:04
23
24
25     12:04
Page 150

1
2
3
4
5
6
7
8     12:04
9     12:04
10
11
12
13   Q.  Okay.  So for creating custom audiences     12:04
14 are hash -- is hashed data combined with nonhashed     12:04
15 or identified data such as the user profile?     12:04
16   A.  No.  Why would we do that?  It doesn't     12:05
17 make sense.  I mean from -- not even from a     12:05
18 technical perspective.  But not even for the purpose     12:05
19 of running a successful campaign.     12:05
20       Spotify wants to target specific users     12:05
21 that are already on their platform for the purpose     12:05
22 of retargeting.  So there is no point in us, you     12:05
23 know, like using any other data unless they     12:05
24 specified into their app -- ad campaign.  But that     12:05
25 would be broader than just the custom audience.     12:05
Page 151

1   Q.  Okay.  All right.  So back to -- we're     12:05
2 almost done with this, I hope.  And thank you for     12:05
3 your patience.  I know we're getting into lunchtime.     12:05
4       Okay.  Turn, if you wouldn't mind, to the     12:05
5 next page.  It's ending on 434.     12:05
6   A.  Yes.     12:05
7   Q.  Just looking at the top paragraph there,     12:05
8 do you see where it says     12:05
9
10
11
12
13 Do you see that?     12:06
14   A.  Yes.     12:06
15
16
17
18
19
20
21
22
23
24
25     12:06
Page 152

1     12:06
2
3
4       MS. STEIN:  Object to form.  You can talk     12:06
5 about the 2012 to 2017 time period.  Don't speculate     12:06
6 as to all times.     12:07
7       THE WITNESS:  Yeah, this is a very     12:07
8 difficult question because it depends on the nature     12:07
9 of the integration and the app in question.     12:07
10 BY MS. WEAVER:     12:07
11
12
13     12:07
14
15
16
17
18
19
20
21
22
23
24
25
Page 153

39 (Pages 150 - 153)

3464

1     12:07
2     12:07
3
4     :07
5     7
6     2:07
7     12:08
8     12:08
9
10     Q. Except for categories you've identified    12:08
11 previously?    12:08
12     A. I'm sorry, I don't understand your --    12:08
13     Q. So derived data is not contained in the    12:08
14 DIY file, right?    12:08
15     MS. STEIN: Objection. Misstates your    12:08
16 testimony.    12:08
17     THE WITNESS: I -- I disagree with that    12:08
18 statement.    12:08
19 BY MS. WEAVER:    12:08
20     Q. Are [redacted] contained in the DIY file?    12:08
21     A. The [redacted] is not personal    12:08
22 information.    12:08
23     Q. Okay.    12:08
24     A. And [redacted] -- I'm sorry, I have to    12:08
25 basically make sure that's my -- for the record, my    12:08

Page 154

1 voice is here.    12:08
2 [redacted]    12:08
3 [redacted]    12:08
4     Q. Okay. I think we are done with this    12:09
5 document. I want to make sure.    12:09
6     You can set aside Exhibit 3. I dont    12:09
7 think we'll be returning to it, but I can't promise.    12:09
8     So we've discussed a vast amount of --    12:09
9 well, strike that.    12:09
10     Do you know how much data Facebook    12:09
11 processes on a daily basis, roughly?    12:09
12     MS. STEIN: Objection. Outside the scope.    12:09
13     THE WITNESS: I don't know.    12:09
14 BY MS. WEAVER:    12:09
15     Q. Okay. Where does Facebook store all of    12:09
16 its data relating to U.S. users?    12:09
17     A. I don't know the exact locations. [redacted]    12:09
18 [redacted]    12:10
19     Q. And do you recall how many current    12:10
20 Facebook users there are in the United States?    12:10
21     A. Roughly, I think 200 million or something.    12:10
22     Q. Okay. And do you know how many users,    12:10
23 U.S. users, there have been from 2007 to the    12:10
24 present?    12:10
25     A. No, I don't know.    12:10

Page 155

1     MS. STEIN: Objection. Outside the scope.    12:10
2 BY MS. WEAVER:    12:10
3     Q. Do you know where in general user data is    12:10
4 stored? What's a UDB? Are you familiar with the    12:10
5 term?    12:10
6     A. No, but I suspect it means user database.    12:10
7     Q. And what is it?    12:10
8     A. I don't know.    12:10
9     Q. Does Facebook have user databases?    12:10
10     A. We have different databases where we store    12:10
11 information.    12:10
12     Q. Okay. Are you familiar with a database    12:10
13 called MySQL database?    12:11
14     A. Yes.    12:11
15     Q. What is it?    12:11
16     A. It's a database that stores different    12:11
17 kinds of information.    12:11
18     Q. What kind of information?    12:11
19     A. Different entities from users to    12:11
20 businesses and so on.    12:11
21     Q. Okay. So what specific information about    12:11
22 users does MySQL database store?    12:11
23 [redacted]    12:11
24 [redacted]    2:11
25     Q. And how many databases support MySQL    12:11

Page 156

1 database? Is it one database or is it many?    12:11
2     A. So this is where I think where we are in    12:11
3 technical territory that I'm not well-placed to    12:11
4 respond. We are talking about database    12:11
5 architecture, which is not my area of expertise.    12:11
6     Q. Okay. Do you recall assisting -- well,    12:11
7 strike that.    12:12
8     Do you know what an interrogatory is?    12:12
9     A. Someone that has been interrogated.    12:12
10     Q. Fair enough. We received some written    12:12
11 responses about the location of user data, which is    12:12
12 at the square of this deposition. And Facebook    12:12
13 identified a few databases where it says user data    12:12
14 is stored. And I'm just asking if you are familiar    12:12
15 with them.    12:12
16     A. I'm aware of MySQL. I'm aware of Tao.    12:12
17 I'm aware of Hive databases where different kinds of    12:12
18 information is stored.    12:12
19     Q. Okay. I'm just trying to understand what    12:12
20 is stored in each of them.    12:12
21     A. Well, I can't tell you at a high level.    12:12
22     MS. STEIN: Lesley, he already testified    12:12
23 to this. He told you that this is beyond the scope.    12:12
24     MS. WEAVER: Please do not state for him.    12:12
25 Please provide me the information.    12:12

Page 157

40 (Pages 154 - 157)

3465



**Page 158**

1    MS. STEIN: No, Lesley, Lesley, I'm    12:12
2  allowed to make my objection. I'm not coaching the    12:12
3  witness.    12:12
4    MS. WEAVER: And that's a fact?    12:12
5    MS. STEIN: I'm about to tell you that the    12:12
6  interrogatories, the technical interrogatories, were    12:12
7  not verified by this witness.    12:12
8    MS. WEAVER: Who were they verified by?    12:13
9    MS. STEIN: The other individual who    12:13
10 verified the other portion of interrogatories.    12:13
11 BY MS. WEAVER:    12:13
12    Q. So you're not prepared to testify about    12:13
13 the location of user data today; is that correct?    12:13
14    MS. STEIN: That's an unfair    12:13
15 characterization. He is not testifying about the    12:13
16 architecture of his book systems.    12:13
17    MS. WEAVER: Well, we're going to have to    12:13
18 get somebody back for that.    12:13
19    Q. So do you know what's contained in MySQL    12:13
20 database at all    :13
21    
22    12:13
23    :13
24    12:13
25    12:13

**Page 160**

1    12:15
2    Q. Going back to Tao, is it Tao or Dow?    12:15
3    A. T-A-O.    12:15
4    Q. Okay. That stands for the associations    12:15
5  and optics server; is that right?    12:15
6    A. I don't remember what it stands for, but    12:15
7    2:15
8    12:15
9
10
11    Q. Okay.    12:15
12    A. It identifies people's connections with    12:15
13 friends and other entities on the platform.    12:16
14    Q. And is that -- is the data contained in    12:16
15 Tao mapped by user ID?    12:16
16    12:16
17    6
18    Q. Okay. And are you able to describe its    12:16
19 system architecture?    12:16
20    A. No.    12:16
21    Q. What is ZippyDB? Do you know?    12:16
22    A. No, I don't really recall what -- ZippyDB.    12:16
23    Q. With regard to Hive, how is data brought    12:16
24 into Hive? Do you know?    12:16
25    A. Brought in?    12:16

**Page 159**

1    12:13
2    Q. Okay. And what is --    12:13
3    :13
4    12:14
5    12:14
6
7    Q. And what is Hive?    12:14
8    A. It's a database that captures logs.    12:14
9    Q. And what are logs?    12:14
10    A. It's an activity that you have taken on-    12:14
11 or off-platform made by a call that was made from an    12:14
12 app on your behalf.    12:14
13    12:14
14    12:14
15    Q. Okay. And is the data contained in Hive    12:14
16 associated with user IDs?    12:14
17    4
18    12:14
19    Q. Okay. So give me examples of the kinds of    12:14
20 activity that are associated with user IDs and Hive.    12:15
21    :15
22    12:15
23    12:15
24    :15
25    12:15

**Page 161**

1    Q. Yes.    12:16
2    12:16
3
4    Q. Okay.    12:17
5    12:17
6    Q. How long -- so when user data is brought    12:17
7  into Hive, your testimony is    12:17
8    12:17
9    12:17
10    MS. STEIN: Object to form.    12:17
11    12:17
12 BY MS. WEAVER:    12:17
13    Q. How long is the user association -- or    12:17
14 strike that.    12:17
15    How long are those associations retained    12:17
16 in Hive?    12:17
17    12:17
18    Q. So how long is the data that's contained    12:17
19 in Hive from on-site activity and associated with    12:17
20 the Facebook user ID, how long -- how long is that    12:17
21 association maintained? Do you understand?    12:17
22    12:17
23    12:17
24    12:17
25    2:17

41 (Pages 158 - 161)



Page 162

1  1    Q.  Okay.  I'm not asking a good question.     12:17
2    Let me try again.  Sorry.                          12:17
2  3         For on-site activity that is contained in   12:18
3  4  Hive and is connected with the Facebook user ID, is  12:18
4  5  it anonymized or hashed at any point or does it     12:18
5  6  always retain the user ID?                          12:18
6  7         MS. STEIN:  Objection to form.              12:18
7                                                         12:18
8
9                                                         12:18
10
11
12                                                        12:18
13                                                        2:18
14
15                                                        18
16
17                                                        18
18                                                        2:18
19                                                        9
20  2                                                     12:19
21  2                                                     12:19
22  2
23  23  BY MS. WEAVER:                                    12:19
24  24    Q.  Okay.  And so all of that is associated    12:19
25  25  with the Facebook user ID, correct?              12:19

Page 163

1                                                         12:19
2
3    Q.  Okay.  So now let's talk about -- well,         12:19
4  let me ask this:  Is that, all the data in Hive,      12:19
5  contained in the DIY file?                            12:19
6    A.  The -- let me think.                            12:19
7                                                         12:19
8    Q.  Like privacy controls should be in the DIY     12:19
9  file?                                                  12:19
10    A.  If you change the privacy controls you        12:19
11  mean?                                                 12:19
12    Q.  I -- in general what the settings are,        12:19
13  sure, yeah.  Is that in the DIY file?                12:19
14                                                        12:19
15                                                        12:19
16                                                        12:19
17                                                        12:19
18
19    Q.  Either.  You can answer both questions.       12:20
20         MS. STEIN:  Objection to form.                12:20
21         THE WITNESS:  We -- we will know and the     12:20
22  DIY file should indicate whether your date of birth  12:20
23  is private information, i.e., only available to you  12:20
24  or available to your friends or available to the     12:20
25  public.  Because we need to be able to control the   12:20

Page 164

1  access to that piece of information whenever someone   12:20
2  requests that information.                             12:20
3         And similarly --                               12:20
4  BY MS. WEAVER:                                         12:20
5    Q.  I don't mean to cut you off, but let me        12:20
6  just ask because I don't think we -- we want to have   12:20
7  as little time together as possible in some sense,     12:20
8  so let me just ask you what I'm trying to get at.      12:20
9         If changes in privacy controls are stored     12:20
10  in Hive, are they also shown in the DIY tool --      12:20
11  file?                                                 12:20
12    A.  The DYI file should include, irrespective     12:21
13  of whether they're on Hive or not, should include    12:21
14  the privacy settings of any posts that you made or    12:21
15  any piece of information in your profile.             12:21
16         THE REPORTER:  I'm sorry, "privacy --        12:21
17  privacy settings"...                                  12:21
18         THE WITNESS:  Any -- the privacy settings    12:21
19  of any posts you made or any piece of your profile   12:21
20  info.                                                 12:21
21  BY MS. WEAVER:                                        12:21
22    Q.  So is all data in Hive that is mapped to     12:21
23  Facebook user IDs available in the DIY file?          12:21
24                                                        12:21
25                                                        12:21

Page 165

1    Q.  Okay.  You're saying what is in Hive is       12:21
2  smaller than what is in the DIY file, but everything  12:21
3  in Hive is in the DIY file?  Is that your testimony?  12:21
4    A.  Well, for what it relates to you, right.      12:21
5  Not the totality of the Hive database.                12:21
6    Q.  Okay.                                          12:22
7    A.  Because there are certain things on Hive     12:22
8  that are mine that, hopefully, you don't have access  12:22
9  to.  So yes.                                          12:22
10                                                       12:22
11                                                       12:22
12                                                       12:22
13                                                       12:22
14                                                       12:22
15
16    Q.  Is all of the app-scoped ID files in Hive    12:22
17  available to the DIY file?                            12:22
18         MS. STEIN:  Objection to form.               12:22
19  BY MS. WEAVER:                                        12:22
20    Q.  Let me ask it again.  Let me ask it again.   12:22
21  It was just unclear.                                  12:22
22         For all of the app-scoped ID data           12:22
23  available in Hive, is that also available in the DIY  12:22
24  file?                                                 12:22
25    A.  Yeah, okay.  Let me try to answer that      12:22

42 (Pages 162 - 165)

3467



```
 1  question to the best of my ability.        12:22
 2                                        2:23
 3                                        12:23
 4                                        12:23
 5                                        12:23
 6                                        :23
 7                                        12:23
 8                                        12:23
 9                                        12:23
10
11      Q.  Okay.  But what if it's not?  Is that    12:23
12  contained in the DIY file?                12:23
13      A.  When it's not in what sense?        12:23
14      Q.  I just --              12:23
15      MS. WEAVER:  The realtime is really not    12:23
16  working.  Could you please read his response back.  12:23
17          (The record was read by the    12:24
18          court reporter, as requested)    12:24
19  BY MS. WEAVER:                12:24
20      Q.  So how in the DIY file does it appear?    12:24
21  What does that look like, last attempted effort to    12:24
22  reidentify with an app?            12:25
23      MS. STEIN:  Object to form.        12:25
24      THE WITNESS:  You have the list of apps    12:25
25  that you have authenticated using Facebook log-in at  12:25
                                        Page 166
```

```
 1      A.  Someone in data science.            12:26
 2      Q.  Do you have a name of somebody in data    12:26
 3  science?                    12:26
 4      A.  No, I don't.                12:26
 5      Q.  Could you find that out?            12:26
 6      A.  Are you asking me or the counsel?        12:26
 7      Q.  I'm asking Facebook, you.            12:26
 8      A.  I could.                12:26
 9      Q.  Yeah.                12:26
10      A.  But I need -- I need to understand exactly    12:26
11  the technical, you know, aspects of your question    12:26
12  and make sure --                12:26
13                                        26
14                                        12:26
15
16                                        12:26
17                                        2:27
18                                        12:27
19                                        12:27
20      Q.  Do you know if that's occurred in this    12:27
21  case?                    12:27
22      MS. STEIN:  I'm just going to object    12:27
23  because the witness just told you that he didn't    12:27
24  know one way or the other and is guessing, so...    12:27
25  BY MS. WEAVER:                12:27
                                        Page 168
```

```
 1  the time, the last --            12:25
 2  BY MS. WEAVER:                12:25
 3      Q.  So just a list of apps, okay.        12:25
 4          Does the DIY tool capture things like I    12:25
 5  left items in a shopping cart?            12:25
 6      A.  If it happens on a shopping cart on    12:25
 7  Facebook, yes.  If it happens on a shopping cart    12:25
 8  on -- from a third-party website, no.        12:25
 9      Q.  Okay.  So do you have any understanding    12:25
10  that data in Hive is anonymized in any way at any    12:25
11  point in time?                12:25
12      A.  I don't know.                12:25
13      Q.  Okay.  Should -- would it be possible to    12:25
14  search Hive by user ID to identify all the files    12:25
15  contained in Hive relating to that user ID?        12:26
16      MS. STEIN:  Objection to form.  Beyond the    12:26
17  scope.                    12:26
18      THE WITNESS:  I don't know.        12:26
19  BY MS. WEAVER:                12:26
20      Q.  Who would know?            12:26
21      A.  Someone with technical knowledge of    12:26
22  databases.                12:26
23      Q.  And who at Facebook has that knowledge    12:26
24  that would know whether you can search Hive by using  12:26
25  user ID?                    12:26
                                        Page 167
```

```
 1      Q.  Do you know if that's occurred in this    12:27
 2  case?                    12:27
 3      A.  I don't know what information is available    12:27
 4  for your plaintiffs.                12:27
 5      Q.  Yeah.  Do you know what's been collected    12:27
 6  by Facebook relating to our plaintiffs out of the    12:27
 7  Hive database?                12:27
 8      A.  I'm aware that they -- the DYI files of    12:27
 9  those plaintiffs were made available to -- to the    12:27
10  plaintiffs.  Based on what you've told me, I assume    12:27
11  that's sufficient.                12:27
12      Q.  I'm specifically asking about Hive,    12:27
13  though, not DIY file.                12:27
14      A.  Yes, I understand that your question is    12:27
15  about Hive.  But there's nothing in Hive that will    12:28
16  make you or your plaintiffs more aware of the    12:28
17  information that they need to know about that we    12:28
18  have access about.                12:28
19      Q.  But how do you know that if you don't know    12:28
20  whether or not a search has been done to find that    12:28
21  out?                    12:28
22                                        12:28
23                                        12:28
24      MS. STEIN:  I think now is a good time for    12:28
25  lunch.                    12:28
                                        Page 169
```

43 (Pages 166 - 169)

3468



MS. WEAVER: That's fine. We can go to 12:28
lunch and why don't we -- do you want a half an 12:28
hour? 12:28
THE REPORTER: Do you want to go off the 12:28
record first? 12:28
MS. WEAVER: Yes, let's go off the record. 12:28
THE VIDEOGRAPHER: We are off the record 12:28
12:28 8 at p.m.
12:28
(Whereupon a luncheon recess was had.) 12:28

Tuesday, February 23, 2021 01:15
1:19 P.M. 01:15
01:15
THE VIDEOGRAPHER: We are on the record at 01:19
1:19 p.m. 01:19
EXAMINATION (resumed) 01:19
BY MS. WEAVER: 01:19
Q. Good afternoon, K.P. Do you understand 01:19
that you are still under oath? 01:19
A. Yes, I do. Thank you. 01:19
Q. Okay. Let's change focus a little bit. 01:19
What is News Feed? 01:20
A. The easiest way to describe the News Feed 01:20
is a collection of stories published by pages you 01:20
follow or your friends that you would see when you 01:20
go to Facebook or when you open the Android or iOS, 01:20
yeah. 01:20
Q. And does an algorithm determine the 01:20
content that a user receives on News Feed? 01:20
A. Yes, it does. 01:20
Q. It's an intelligent algorithm, right; so 01:20
it's constantly learning? 01:20
[redacted] 01:20
01:20
01:20

[redacted] 01:20
01:20
01:20
01:20
MS. STEIN: Objection to form. 01:21
[redacted] 01:21
01:21
BY MS. WEAVER: 01:21
Q. And so when a user clicks on a story or 01:21
engages with it, does Facebook record that activity? 01:21
A. There is a record of that activity, yes. 01:21
Q. Fair enough. Thank you. 01:21
So is one objective of News Feed to 01:21
increase users interaction with varying courses of 01:21
content to learn what they are interested in? 01:21
A. The main objective of the News Feed is to 01:21
keep you informed about the things that matter to 01:21
you. 01:21
Q. Right. And so how does News Feed 01:21
determine what matters to you? 01:21

A. Based on your interactions with the 01:21
comments that show up there, it trains itself. 01:21
Q. And is it true that the more the user 01:22
engages on the platform, the more accurate News Feed 01:22
will be? 01:22
A. The level -- 01:22
MS. STEIN: Object to form. 01:22
THE WITNESS: It's very subjective. 01:22
BY MS. WEAVER: 01:22
Q. Okay. But isn't it true that the more 01:22
data points the algorithm has about users, the more 01:22
it can correctly gauge whether or not it is giving 01:22
users the content they want to see? 01:22
MS. STEIN: Objection to form. 01:22
THE WITNESS: Like I think I said, the 01:22
purpose of the News Feed is to connect you with 01:22
information that's relevant to you. And so there is 01:22
no element of accuracy in that sense. It all goes 01:22
back to relevance. And relevance -- 01:22
BY MS. WEAVER: 01:22
Q. Okay. 01:22
A. -- is very subjective. 01:22
Q. And what does relevance mean to you? 01:22
A. Relevance is a way of being captured by 01:22
the kind of interactions you have with that piece of 01:23

1 content.                                      01:23
2   Q.  Okay.  So when you say -- so Facebook is    01:23
3 trying to give me a News Feed that I will find    01:23
4 relevant; is that right?              01:23
5   A.  Correct.                 01:23
6   Q.  And how does it find what is relevant to    01:23
7 me?                 01:23
8                      :23
9                    1:23
10                    01:23
11                    01:23
12                    01:23
13   Q.  So is it Facebook's view that these data    01:23
14 sets are necessary to determine the relevancy of    01:23
15 these updates to users?         01:23
16       MS. STEIN:  Objection to form.  Beyond the    01:23
17 scope.             01:23
18       THE WITNESS:  Are you talking about    01:23
19 specific data sets?         01:23
20 BY MS. WEAVER:             01:23
21   Q.  In general, just in general at a high    01:23
22 level.             01:23
23       MS. STEIN:  Objection to form and beyond    01:23
24 the scope.             01:23
25                    01:24
                                              Page 174

1                      01:24
2                      01:24
3
4 BY MS. WEAVER:             01:24
5   Q.  Okay.  And what signals are those?      01:24
6                      01:24
7                    01:24
8                      01:24
9                    4
10   Q.  And all of this is data that Facebook    01:24
11 collects about users while they're on and off the    01:24
12 platform, correct?         01:24
13   A.  We record --            01:24
14       MS. STEIN:  Objection to form.      01:24
15                    01:24
16                    01:24
17
18                    01:24
19
20                    4
21                    :24
22
23                    01:24
24                    24
25   Q.  Is there a standard set of documents or    01:24
                                              Page 175

1 manuals that describes how News Feed operates?    01:24
2   A.  There is nothing like that.      01:25
3   Q.  Okay.  Does Facebook use internal training    01:25
4 manuals when a new hire comes on or do they point    01:25
5 just everybody to the public website?      01:25
6   A.  For what purposes?      01:25
7   Q.  For -- let's say you hire an engineer who    01:25
8 is going to work on the algorithm for News Feed.    01:25
9   A.  I haven't been through that training so I    01:25
10 don't have firsthand experience.      01:25
11   Q.  Okay.  When you started at Facebook did    01:25
12 they give you a training manual?      01:25
13   A.  What do you mean, like a book printed?    01:25
14   Q.  Yeah, or online, some kind of way to    01:25
15 acclimate you to how Facebook operates.      01:25
16   A.  Well, they're -- my obligations to    01:25
17 Facebook are documented in different formats.  In    01:25
18 2012 I did not get a paper copy of that, but I was    01:25
19 given links to trainings that I had to undertake to    01:25
20 verify my understanding of the company's policies.    01:25
21   Q.  Okay.  So we discussed this earlier in the    01:26
22 morning.  But apps on Facebook's platform send    01:26
23 information about users of those apps to Facebook,    01:26
24 right?             01:26
25   A.  Apps on Facebook platform send information    01:26
                                              Page 176

1 about those users back to Facebook, is that the    01:26
2 question?             01:26
3   Q.  Yes.             01:26
4       MS. STEIN:  Objection to form.      01:26
5       THE WITNESS:  They send certain pieces of    01:26
6 information about those users, the users' activities    01:26
7 to those --             01:26
8 BY MS. WEAVER:             01:26
9   Q.  Right.  Is it a true statement that app    01:26
10 developers share data with Facebook through the    01:26
11 Facebook software development kit?      01:26
12   A.  Different kinds of data, but yes.      01:27
13   Q.  Yes?  The answer is "yes," isn't it?    01:27
14   A.  Yes.             01:27
15   Q.  Okay.  So I'm just going to say, apps on    01:27
16 Facebook's platform send information about users of    01:27
17 those apps to Facebook, correct?      01:27
18       MS. STEIN:  Objection.  The witness      01:27
19 clarified the statement for you.      01:27
20       THE WITNESS:  Yeah, an app developer that    01:27
21 uses the SDK will send different pieces of      01:27
22 information related to that user or the activity of    01:27
23 that user to that third-party app.      01:27
24 BY MS. WEAVER:             01:27
25   Q.  Okay.  Are you familiar with action    01:27
                                              Page 177

45 (Pages 174 - 177)

**Page 178**

```
 1 importers?                                      01:27
 2    A. Action importers? Vaguely.                01:27
 3    Q. Okay. What's your recollection?           01:27
 4       MS. STEIN: Objection to form.             01:27
 5       THE WITNESS: I -- I don't want to answer  01:27
 6 because I don't know in what context.           01:27
 7       MS. WEAVER: Are you instructing him not   01:27
 8 to answer?                                      01:27
 9       MS. STEIN: Did you hear me instruct him   01:28
10 not to answer, Lesley?                          01:28
11       MS. WEAVER: Okay.                         01:28
12       MS. STEIN: The witness is testifying in   01:28
13 response to your question. Why don't you listen to 01:28
14 him.                                            01:28
15       MS. WEAVER: I'd rather listen to him for  01:28
16 sure.                                           01:28
17    Q. What are -- what is action importers,     01:28
18 K.P., please?                                   01:28
19    A. I need you to provide me a little bit more 01:28
20 context.                                        01:28
21    Q. What is your understanding of what action 01:28
22 importers is?                                   01:28
23                                                 01:28
24                                                 01:28
25                                                 01:28
```
Page 178

**Page 179**

```
 1                                                 01:28
 2    Q. When you say --                           01:28
 3       MS. WEAVER: Could you repeat the last     01:28
 4 part? Could you read back his response? Realtime 01:28
 5 is still not working.                           01:28
 6       (The record was read by the              01:28
 7       court reporter, as requested)            01:28
 8 BY MS. WEAVER:                                  01:28
 9    Q. Okay. And when did action importers       01:29
10 function? Was it during the 2012 to 2017 time   01:29
11 frame?                                          01:29
12    A. I don't know.                             01:29
13    Q. Who would know?                           01:29
14    A. I don't know who would know.              01:29
15    Q. Can you, as testifying on behalf of       01:29
16 Facebook today, say that you do not know who was 01:29
17 involved with action importers?                 01:29
18    A. No, because my understanding of that      01:29
19 feature -- my recollection, again, being before 01:29
20 my -- you know, my date of arrival at Facebook. 01:29
21    Q. Okay. Are you aware at one time -- that   01:29
22 in or around 2012, Facebook wanted to balance   01:29
23 leverage with apps by establishing data reciprocity? 01:29
24       MS. STEIN: Objection to form.             01:29
25       THE WITNESS: I don't agree with the       01:29
```
Page 179

**Page 180**

```
 1 nature of the question. It wasn't about data    01:29
 2 reciprocity per se. It was about reciprocity from 01:29
 3 the perspective of the people to publish content to 01:30
 4 Facebook from a third-party app.                01:30
 5 BY MS. WEAVER:                                  01:30
 6    Q. What is data reciprocity, to your         01:30
 7 understanding?                                  01:30
 8    A. Data in that context is very broad. I'm   01:30
 9 talking about specific obligations stemming out of 01:30
10 the platform policies that require a third-party 01:30
11 developer to allow people to post activity from that 01:30
12 app back to Facebook.                           01:30
13    Q. No, I'm talking about Facebook and apps   01:30
14 sharing data with each other. Facebook provided 01:30
15 data to apps and apps provided data back to      01:30
16 Facebook. Are you aware --                      01:30
17       MS. STEIN: Objection.                     01:30
18 BY MS. WEAVER:                                  01:30
19    Q. -- of that occurring during the time      01:30
20 frame 2012 to 2017?                             01:30
21       MS. STEIN: Objection to form.             01:30
22       THE WITNESS: There was a significant      01:30
23 number of apps that were social that enabled people 01:30
24 to post activity to happen back to Facebook. If you 01:30
25 went for a run with Nike --                     01:30
```
Page 180

**Page 181**

```
 1 BY MS. WEAVER:                                  01:30
 2    Q. I'm not talking about users --            01:30
 3       MS. STEIN: Lesley -- Lesley, let the      01:31
 4 witness finish his answer.                      01:31
 5       MS. WEAVER: He's not answering the right  01:31
 6 question.                                       01:31
 7       MS. STEIN: He's answering -- just don't   01:31
 8 cut off the witness when he's speaking.         01:31
 9 BY MS. WEAVER:                                  01:31
10    Q. K.P., this is what I'm asking. Let me     01:31
11 rephrase the question.                          01:31
12       I'm not talking about users sharing data. 01:31
13 I'm talking about the apps providing data to     01:31
14 Facebook and Facebook providing data to the apps. 01:31
15       Are you aware of that kind of data        01:31
16 reciprocity occurring during 2012 through 2017? 01:31
17       MS. STEIN: Objection to form.             01:31
18       THE WITNESS: I think I'm trying to        01:31
19 respond to the question, but I don't know that's -- 01:31
20 maybe it's my fault; I'm not making myself clear. 01:31
21       People that -- people that log in with a  01:31
22 third-party app are making their Facebook data   01:31
23 available to a third-party app. And in response, a 01:31
24 third-party app can allow a user to publish back to 01:31
25 Facebook. That involves some sort of data setting 01:31
```
Page 181

46 (Pages 178 - 181)

1 as well. If that's what you're referring to. then          01:31
2 the answer is yes.                                         01:31
3 BY MS. WEAVER:                                             01:31
4      Q.  Did Facebook provide user data to the           01:31
5 apps?                                                      01:31
6      A.  To the extent that user log in with             01:32
7 Facebook, yes.                                             01:32
8      Q.  Okay. And at some point did you hear of          01:32
9 anyone saying they wanted to let apps crawl               01:32
10 Facebook's APIs and access Facebook's data as long       01:32
11 as Facebook could call their APIs and crawl their        01:32
12 website and access their data? Were you aware of         01:32
13 that occurring?                                           01:32
14         MS. STEIN: Objection to form.                   01:32
15         THE WITNESS: I think the way it was             01:32
16 stated is fundamentally wrong because there's no way     01:32
17 you can crawl an API.                                     01:32
18 BY MS. WEAVER:                                            01:32
19      Q.  Okay. Are you aware of Facebook entering       01:32
20 into agreements with apps so that they could access      01:32
21 each other's data?                                        01:32
22         MS. STEIN: Objection to form.                   01:32
23         THE WITNESS: That's a very broad               01:32
24 statement. The moment someone -- a third-party           01:32
25 developer agrees to the platform terms and creates       01:32
                                                        Page 182

1 and develop an account on Facebook, that means that      01:32
2 there is a contractual relationship between the           01:33
3 third-party developer and Facebook.                       01:33
4      To the extent as part of this contractual           01:33
5 engagement, which is online terms form, right? To         01:33
6 the extent then that a third-party developer uses         01:33
7 Facebook log-in, and they do that in a policy            01:33
8 compliant way, data extends between Facebook and the     01:33
9 third-party developer on behalf of user with the         01:33
10 user's consent.                                           01:33
11         And in return, if the developer has            01:33
12 provided capabilities for people or features to         01:33
13 their apps for people to be posting their                01:33
14 activities, whether it was a game that they played,      01:33
15 a round they took, a music they played, back to          01:33
16 Facebook, those will also constitute a data              01:33
17 exchange.                                                 01:33
18 BY MS. WEAVER:                                            01:33
19      Q.  And what was the Apps Events tool?             01:33
20      A.  I'm sorry, which one?                          01:33
21      Q.  App Events.                                    01:33
22      A.  So App Event is an equivalent of a            01:33
23 Facebook pixel. Facebook pixel --                        01:33
24      Q.  Okay.                                          01:34
25      A.  -- works on the web and App Event works in     01:34
                                                        Page 183

1 native iOS or Android app.                               01:34
2      Q.  And are you aware, then, of a custom           01:34
3 analytics -- well, are you aware of something called     01:34
4 Custom Events?                                            01:34
5      A.  Yes, I'm aware.                                 01:34
6      Q.  What is that?                                   01:34
7      A.  And so Facebook provided a predetermined       01:34
8 list of events that any developer could use as an       01:34
9 off-the-shelf solution, events like an app in store,    01:34
10 events like app registration, things like that,         01:34
11 where -- predetermined list. I think there were 18     01:34
12 of them.                                                 01:34
13         A custom app event is an event that an app    01:34
14 developer can create to track specific activity to      01:34
15 that app that is for that app and that app only. So     01:34
16 a custom event for a Nike app would be a run, which     01:34
17 is an event specific to this app. Or for Spotify it     01:34
18 would be a track to listen to which is specific to      01:34
19 Spotify.                                                 01:34
20      Q.  And then does Facebook use the information    01:35
21 it collects to provide analytics like aggregate its     01:35
22 statistics and insights for its advertisers and         01:35
23 third-party partners?                                    01:35
24      A.  To the extent that -- sorry.                  01:35
25         THE REPORTER: Was there an objection?          01:35
                                                        Page 184

1         MS. STEIN: I said "Objection to form."         01:35
2         THE REPORTER: Thank you.                        01:35
3                                                          01:35
4                                                          01:35
5                                                          01:35
6
7 BY MS. WEAVER:                                            01:35
8      Q.  And -- strike that.                            01:35
9         And did Facebook often obtain sensitive        01:35
10 data from app developers?                                01:35
11         MS. STEIN: Objection to form.                  01:35
12         THE WITNESS: It depends. What do you          01:35
13 mean by "sensitive data"?                                01:35
14 BY MS. WEAVER:                                           01:35
15      Q.  Did Facebook receive information about        01:35
16 diseases, medical conditions and injuries, or sexual    01:35
17 and reproductive health from apps?                       01:36
18      A.  By design, the app events, they do not       01:36
19 allow, you know, a third-party developer to be         01:36
20 passing that information.                                01:36
21      Q.  Okay. Well, I don't know what you mean by     01:36
22 "by design," but the question is pretty simple.         01:36
23         Is it your testimony today that Facebook      01:36
24 did not obtain data relating to diseases, medical       01:36
25 conditions and injuries, or sexual and reproductive     01:36
                                                        Page 185

47 (Pages 182 - 185)



Page 186

1 health from apps?                              01:36
2     A.  Well, it's a very broad question, so I'm    01:36
3 trying to respond to the best of my ability.        01:36
4         So by design, access to that information     01:36
5 was not available.  However, if the app developer      01:36
6 decided to tell us about an event that was a custom      01:36
7 event that may have disclosed some of that         01:36
8 information, we would have discussed it.          01:36
9     Q.  As you sit here today, do you know whether      01:36
10 or not Facebook received data that related to       01:36
11 diseases, medical conditions and injuries, or sexual     01:37
12 and reproductive health?                   01:37
13    A.  There was an incident we had a year or two    01:37
14 ago with period tracker apps that were sending app      01:37
15 events, custom app events, around the cycle of a      01:37
16 certain user.  If that's what you mean by :his      01:37
17 category, then the answer is yes.            01:37
18    Q.  Okay.  And did those categories also      01:37
19 include mental health and psychological states,       01:37
20 types of medical devices and health trackers,       01:37
21 medical treatments, body specifications, bodily        01:37
22 activities and biological cycles, among o:her      01:37
23 things?                          01:37
24    A.  I don't know, but I don't think it's      01:37
25 possible to do that.                  01:37

Page 187

1     Q.  Were you part of the team that       01:37
2 investigated this?                   01:37
3     A.  No.                   01:37
4     Q.  Who was?                 01:37
5     A.  I don't know.              01:37
6     Q.  Okay.  When Facebook did receive the     01:37
7 sensitive information such as diseases, medical      01:37
8 conditions, injuries, sexual and reproductive      01:37
9 health, did that -- where did that data go?       01:37
10        MS. STEIN:  Objection to form.      01:37
11        THE WITNESS:  You're making an assumption     01:38
12 that we did receive.  I only referred to a specific     01:38
13 incident around period trackers.           01:38
14 BY MS. WEAVER:                    01:38
15    Q.  Okay.  So in that instance, where did --    01:38
16    A.  I can only respond to that.          01:38
17    Q.  Okay.  In that instance, where did the     01:38
18 data go?                        01:38

Page 188 / Page 189



**Page 190**

1 Q. How would you refresh your recollection? 01:40
2 A. I would have to look at the entire 01:40
3 universe of apps that have been in scope that have 01:40
4 been sending this kind of events. 01:40
5   01:40
6   01:40
7   01:40
8 Q. Were any regulators involved? 01:40
9 A. For that, I don't know. 01:41
10 Q. Okay. When Facebook receives information 01:41
11 about an individual from an app, does Facebook 01:41
12 associate that information with other information 01:41
13 Facebook has collected about that individual through 01:41
14 the Facebook user ID? 01:41
15 MS. STEIN: Objection to form. 01:41
16 THE WITNESS: Again, depends what kind of 01:41
17 data we're talking about here. 01:41
18 BY MS. WEAVER: 01:41
19 Q. Let's say sensitive health data like 01:41
20 diseases, medical, injuries, sexual or reproductive 01:41
21 health. 01:41
22   01:41
23  
24   01:41
25  

**Page 191**

1 A. If the user basically establishes that 01:41
2 they are suffering from a certain disease and they 01:41
3 decide to post on Facebook and tell their friends 01:41
4 about it, then yes. 01:41
5 Q. So even if the post is to three of my 01:41
6 friends, Facebook will collect that data; is that 01:41
7 right? 01:41
8 MS. STEIN: Objection to form. 01:42
9 THE WITNESS: Well, you're posting it to 01:42
10 Facebook, so, yes, Facebook will have an 01:42
11 understanding of that. 01:42
12 BY MS. WEAVER: 01:42
13 Q. Even if it's to a restricted audience? 01:42
14 A. That audience will have access to that 01:42
15 data, but someone has to host the data in order to 01:42
16 be able to sell it to that audience, and we provide 01:42
17 the service. 01:42
18 Q. And then does Facebook -- I'm sorry. 01:42
19 A. Sorry. We provide the service, so yes. 01:42
20 Q. So then does Facebook then use that 01:42
21 information to create custom target audiences for 01:42
22 advertisers? 01:42
23 A. Are you talking broadly or about the 01:42
24 specific things? 01:42
25 Q. Both. 01:42

**Page 192**

1 MS. STEIN: Objection to form. 01:42
2   01:42
3   01:42
4   01:42
5   01:42
6   1:42
7   1:43
8   01:43
9   01:43
10  
11 BY MS. WEAVER: 01:43
12 Q. So let's talk about custom audiences for a 01:43
13 moment, though, please. 01:43
14 So if I posted to three friends that I had 01:43
15 a medical condition and Facebook collects that 01:43
16 information, does Facebook use that information to 01:43
17 create a custom audience for advertisers if they are 01:43
18 seeking something about a medical condition? 01:43
19 A. No, that's not how it works. 01:43
20 Q. Why doesn't it work that way? Why does it 01:43
21 only work for Beyonce but not a medical condition? 01:43
22 MS. STEIN: Objection to form. 01:43
23 THE WITNESS: Because a custom audience is 01:43
24 an advertisement product that reengages with 01:43
25 customers of an existing business. 01:43

**Page 193**

1 BY MS. WEAVER: 01:43
2 Q. Right. I understand what it is. 01:43
3 So I'm a business and I come to Facebook 01:43
4 and I say "I want -- I want to target people with 01:43
5 this medical condition." Does Facebook provide 01:44
6 that -- that custom audience? 01:44
7 A. No, that's not how it works. If you 01:44
8 really want to use custom audience, you need to 01:44
9 provide with hashed email addresses or information 01:44
10 about the users that you have diagnosed to have 01:44
11 suffered from that disease. 01:44
12 Q. Could you repeat the last part of the 01:44
13 sentence? I just didn't understand. 01:44
14 A. So let's say you use a medical app for the 01:44
15 sake of the argument. 01:44
16 Q. Okay. 01:44
17 A. And you have a thousand users that went 01:44
18 through a questionnaire and they have been diagnosed 01:44
19 with, say, alcoholism. That's probably a bad 01:44
20 example because I don't think -- but, anyhow, let's 01:44
21 use that. 01:44
22 Then to the extent that you can identify 01:44
23 those users because they have created an account 01:44
24 with that medical app using their email address or 01:44
25 the phone number, you can upload the email addresses 01:44

49 (Pages 190 - 193)

1 of those thousand users hashed to us and then we are 01:44
2 going to create the custom audience ad campaign 01:45
3 trying to find those 1,000 users on Facebook. 01:45
4 To the extent that they exist, they will 01:45
5 see an ad. 01:45
6 But it will be 01:45
7 a database provided by the third party hashed, so 01:45
8 anonymized with specific people that have been 01:45
9 diagnosed to suffer from a certain disease. 01:45
10 Q. Okay. Let's talk for a moment about APIs. 01:45
11 We touched upon them this morning. Do you recall 01:45
12 that? 01:45
13 A. Yes. 01:45
14 Q. You're aware at some point that -- well, 01:45
15 there was more than one version of Graph API over 01:45
16 time; is that right? 01:45
17 A. Yes, Version 1 of the API, it's being -- 01:45
18 running from 2008 or 2009 until 2000 -- May 1st, 01:45
19 2015. 01:46
20 Q. It was accessible until April 2015 or 01:46
21 May 2015? 01:46
22 A. I think it's May 1st, but it may be.. 01:46
23 MS. WEAVER: You should amend your rog 01:46
24 responses, Deb. 01:46
25 Q. And by "accessible," that means third 01:46
Page 194

1 parties could access data through it; is that 01:46
2 correct? 01:46
3 A. Yes. 01:46
4 Q. Okay. And then Graph API Version 2 came 01:46
5 into being at some point; is that right? 01:46
6 A. Graph API V2 was launched on April 30, 01:46
7 2014. 01:46
8 Q. Okay. And it was accessible until 01:46
9 May 2020; is that right? 01:46
10 A. The Version 2? I'm sorry. 01:46
11 Q. Version 2, yeah. 01:46
12 A. Are you talking about Version 2? 01:46
13 Q. Yes, Version 2 was accessible until 01:46
14 May 2020; is that correct? 01:46
15 A. I need to check because I don't know when 01:46
16 the last version -- the last Version 2 of the API 01:47
17 was final, approved. Because we have Version 3 01:47
18 right now. 01:47
19 Q. Okay. Right. And Version 3 came into 01:47
20 effect May 2018; is that right? 01:47
21 A. That seems about right. 01:47
22 Q. Okay. And that was accessible -- it will 01:47
23 be accessible through August 2021; is that correct? 01:47
24 A. So let me take a step back to explain a 01:47
25 little bit how the replacement process works because 01:47
Page 195

1 I think that may be helpful. 01:47
2 An API is rolled out at a specific point 01:47
3 in time and the version of this API is successful 01:47
4 for the next 2-plus years. Each time we release a 01:47
5 new version of the API, that means that the previous 01:47
6 would be accessible for the period of time between 01:47
7 that plus-2 years. So the lifetime of the version 01:47
8 of the API would be 2-plus years, more or less two 01:47
9 to three months on top of the 2-year mark. 01:47
10 But we have versions that start from 2.0 01:47
11 to 2.1 all the way to 2.10 or 11, if I'm not 01:48
12 mistaken. And then we switch to Version 3. And 01:48
13 Version 3.0 will be available for 2-plus years, 01:48
14 Version 3.1 would be available for 2-plus years, so 01:48
15 on and so on. 01:48
16 Q. Understood. You're familiar with the 01:48
17 phrase "Public APIs"? 01:48
18 A. Yes. 01:48
19 Q. What is the difference between a public 01:48
20 API and a private API? 01:48
21 A. A public API is an API that is available 01:48
22 in general availability, meaning that the 01:48
23 third-party developer that wants to access this API 01:48
24 has to go through the process, we call it app 01:48
25 review, where the developer will specifically ask 01:48
Page 196

1 for permission to access that API, and once 01:48
2 approved, will be able to access that API. 01:48
3 Q. When was the process of app review first 01:48
4 implemented? 01:48
5 A. The introduction of Version 2 of the API 01:48
6 coincided with the introduction of the app review 01:48
7 process. 01:49
8 Q. So April of 2015? 01:49
9 A. April 30, 2014. 01:49
10 Q. 2014? 01:49
11 A. Yes. 01:49
12 Q. So prior to April 2014 there was no app 01:49
13 review? 01:49
14 A. There was no proactive app review. There 01:49
15 was reactive app review and that's where we have 01:49
16 detected violation of the policies. 01:49
17 Q. Okay. And we discussed this before. But 01:49
18 what is a capability? 01:49
19 A. A capability is a way to provide access 01:49
20 control to a private API. 01:49
21 Q. And what is a permission? 01:49
22 A. A permission is a way to gain user's 01:49
23 consent for access to specific data points. 01:49
24 Q. Okay. And what was -- at a very high 01:49
25 level, what was the difference between Graph API 01:49
Page 197

50 (Pages 194 - 197)

1  Versions 1.0 and 2.0?                                    01:50
2      A.  At the very high level?                          01:50
3      Q.  Yes.                                             01:50
4      A.  Access to friends' information was               01:50
5  deprecated with introduction of Version 2 of the         01:50
6  API.                                                     01:50
7      Q.  And what do you mean by "friends'                01:50
8  information was deprecated"?                              01:50
9      A.  And so in Version 1 of the API a user            01:50
10 could log in with a third-party app and allow access     01:50
11 to this app to their friends' photos or their            01:50
12 friends' birthdays, things like that.                    01:50
13         With Version 2 of the API, this feature          01:50
14 was completely deprecated.  So a user could only         01:50
15 allow a third-party app to have access to their own      01:50
16 birthday information and their own photos.               01:50
17     Q.  And why was it deprecated?                       01:50
18     A.  Because we realized that the photos of           01:50
19 your friends should only be given -- or access to        01:50
20 your friends' photos should only be given by your        01:50
21 friends and not yourself.                                01:50
22     Q.  And how did Facebook come to realize that?       01:50
23     A.  It was the time that a user researched and       01:51
24 some of our own findings for how people used to log      01:51
25 in on third-party apps.                                  01:51

Page 198

1      Q.  It had nothing to do with the FTC               01:51
2  investigation?                                           01:51
3      A.  No.                                              01:51
4         MS. STEIN:  Objection to form.  Out of           01:51
5  scope.                                                   01:51
6  BY MS. WEAVER:                                           01:51
7      Q.  You said "No"?  Is that your testimony?          01:51
8      A.  No, this was our own decision.                   01:51
9      Q.  What was Post-Search API?                        01:51
10     A.  An API that allowed a third party to            01:51
11 search for public posts on Facebook.                     01:51
12     Q.  Did Post-Search API enable analytics via        01:51
13 listening tracking mentions of keywords and hashtags    01:51
14 over time?                                               01:51
15         MS. STEIN:  Objection to form.               01:51
16         THE WITNESS:  I want to understand a          01:52
17 little bit better.  Do you have a specific example       01:52
18 in mind?                                                 01:52
19 BY MS. WEAVER:                                           01:52
20     Q.  I don't.  I was just asking the question.       01:52
21         MS. STEIN:  Objection to form.               01:52
22         THE WITNESS:  I'm having hard time           01:52
23 understanding what sort of analytics you are looking    01:52
24 for.                                                     01:52
25 BY MS. WEAVER:                                           01:52

Page 199

1      Q.  Do you know what sentiment analysis is?         01:52
2      A.  Yes.                                             01:52
3      Q.  What is it?                                      01:52
4      A.  Normally brands do certain analysis to          01:52
5  understand how their brands are perceived in social     01:52
6  media.                                                   01:52
7      Q.  And so did Post-Search API enable               01:52
8  sentiment analysis?                                      01:52
9      A.  I don't think that would be valuable, so        01:52
10 my answer is no.                                         01:52
11     Q.  You're answering it didn't do that because      01:52
12 you don't think it would be valuable?                    01:52
13         MS. STEIN:  Objection.  Argumentative.       01:52
14 BY MS. WEAVER:                                           01:52
15     Q.  I don't understand the answer.                  01:52
16     A.  Post-Search on account of public posts.         01:52
17 And those are not necessarily posts that a brand        01:52
18 would use to inform or to understand the sentiment      01:52
19 of people against that brand.                            01:53
20     Q.  Okay.  So your testimony is that               01:53
21 Post-Search API did not allow sentiment analysis or     01:53
22 enable sentiment analysis?                               01:53
23     A.  I'm saying that the public posts may not        01:53
24 be relevant for a brand to establish sentiment          01:53
25 analysis.                                                01:53

Page 200

1      Q.  Did Facebook deprecate Post-Search API?         01:53
2      A.  Yes.                                             01:53
3         MS. STEIN:  Objection.  Outside the scope.    01:53
4         THE WITNESS:  Yes, we did.                    01:53
5  BY MS. WEAVER:                                           01:53
6      Q.  And why?                                         01:53
7      A.  I don't think it was a very heavily used        01:53
8  API.                                                     01:53
9      Q.  What do you mean by it was not very             01:53
10 heavily used?                                            01:53
11     A.  Like if there was only one or two              01:53
12 developers using it, that means that there's no          01:53
13 point in us maintaining an API that doesn't have        01:53
14 those use.                                               01:53
15     Q.  So during the transition period from Graph     01:53
16 API Version 1.0 to 2.0, did Facebook inform certain     01:53
17 third parties that they would no longer access          01:54
18 friends' data?                                           01:54
19         MS. STEIN:  Objection to form.  And          01:54
20 objection to scope.                                      01:54
21         This witness is not our corporate designee   01:54
22 on communications with third parties.  He's the         01:54
23 designee on the topic ordered by Judge Corley.  So      01:54
24 he's not authorized to testify about communications     01:54
25 that you are asking him about.                           01:54

Page 201

51 (Pages 198 - 201)

3476



**Page 202**

1 MS. WEAVER: I don't think you understand. 01:54
2 This is what data was shared with third parties. 01:54
3 Are you declining to allow the witness to testify 01:54
4 what was shared with third parties? 01:54
5 MS. STEIN: You're asking him about 01:54
6 communications with developers. Do you want -- 01:54
7 MS. WEAVER: No, I'm not. I'm asking 01:54
8 about what was -- I'm leading into what data was 01:54
9 shared with whitelisted third parties and others. 01:54
10 Are you going to impede -- continue to 01:54
11 impede this deposition? 01:54
12 MS. STEIN: Okay. First of all, I'm not 01:54
13 impeding. Second of all, that's not what you asked. 01:54
14 So if you'd like to ask what got shared with 01:54
15 whitelisted apps -- 01:54
16 MS. WEAVER: Would you please read back my 01:54
17 question. 01:54
18 (The record was read by the 01:55
19 court reporter, as requested) 01:55
20 BY MS. WEAVER: 01:55
21 Q. Please answer. 01:55
22 A. So on April 30, 2014, we hold our annual 01:55
23 conference called F8, and that's when we announced 01:55
24 introduction of Version 2 of the API. So the 01:55
25 communications were broad about the deprecation of 01:55

**Page 203**

1 the Version 1 of the API and the deprecation of 01:55
2 access to any of the friends' data. 01:55
3 Q. And so some third parties were allowed to 01:55
4 continue to access friends' data while others were 01:55
5 not; is that correct? 01:55
6 A. After the deprecation of the Version 1 of 01:55
7 the API, the only integrations that maintain their 01:55
8 access to friends' data were device integrations. 01:55
9 Q. And what is the phrase "whitelisting"? 01:55
10 A. I would decline the opportunity to lecture 01:56
11 as on the use of white or blacklists right now, but 01:56
12 I would use the term "allow lists" for the purposes 01:56
13 of being politically correct from now on. 01:56
14 You can use whatever term you would use, 01:56
15 but I will use the term "allow lists" to refer to 01:56
16 anything that you may use the term "whitelist." 01:56
17 Q. Okay. During the time period 2012 to 01:56
18 2017, did Facebook use the term "whitelist"? 01:56
19 A. Yes. 01:56
20 Q. Did you? 01:56
21 A. Yes. 01:56
22 Q. Okay. And you said that Facebook only 01:56
23 whitelisted integration partners a moment ago, 01:56
24 didn't you? 01:56
25 A. I didn't use that term in relation to 01:56

**Page 204**

1 device integrations. 01:56
2 Q. Okay. 01:56
3 A. We can read back my statement, but I'm 01:56
4 pretty certain that I said the only integrations 01:56
5 that could access to friends' information were 01:56
6 device integrations. 01:56
7 01:56
8
9 :57
10
11 01:57
12
13 01:57
14 01:57
15 01:57
16 01:57
17 MS. STEIN: Lesley, this is out of scope. 01:57
18 This deposition -- 01:57
19 MS. WEAVER: It's not. I'm trying to 01:57
20 understand what companies had access to user data. 01:57
21 MS. STEIN: No, friends of friends' data. 01:57
22 MS. WEAVER: No. 01:57
23 MS. STEIN: It's ___ - stop. This 01:57
24 deposition -- 01:57
25 MS. WEAVER: You can instruct him -- you 01:57

**Page 205**

1 can instruct him not to answer or object to form, or 01:57
2 we can call Judge Corley. 01:57
3 MS. STEIN: We can call Judge Corley if 01:57
4 you want because you're asking merits questions. 01:57
5 This deposition is supposed to be about what data 01:57
6 Facebook collected and which of that data was 01:57
7 accessible or shareable, and so far -- 01:57
8 MS. WEAVER: Exactly. Maybe you don't 01:58
9 understand, Deb, but this goes to the heart of 01:58
10 whether ___ were receiving 01:58
11 friends' data and when. That is what I am trying to 01:58
12 figure out. 01:58
13 MS. STEIN: No, that's not what -- that is 01:58
14 not what this deposition is about. This witness is 01:58
15 not testifying about specific apps. 01:58
16 He's talking about what types and 01:58
17 categories of data got collected and what could have 01:58
18 been -- could have been accessed or shared, right? 01:58
19 This is supposed to be high level, not about, you 01:58
20 know, who did what when. 01:58
21 MS. WEAVER: Are you done? 01:58
22 MS. STEIN: Yes. 01:58
23 BY MS. WEAVER: 01:58
24 01:58
25 :58

52 (Pages 202 - 205)

1  Q.  Thank you.                                  01:58
2        So your testimony that only device        01:58
3  integrators were whitelisted would not include  01:58
4              would it?                            01:58
5        MS. STEIN:  Objection to form.            01:58
6        THE WITNESS:  I think your use of the term 01:58
7  "whitelist" in relation to user data is problematic 01:58
8  here.  I'm not trying to criticize you.  I'm trying 01:58
9  to understand exactly what you mean.  Because    01:59
10 whitelist is an access control or an allow list to 01:59
11 an API.  That API doesn't necessarily need to allow 01:59
12 access to user data.  It may be pages data.  Your 01:59
13 assumption is that --                            01:59
14       THE REPORTER:  It may be what data?       01:59
15       THE WITNESS:  Pages data.                 01:59
16       MS. WEAVER:  Okay.  So let's move on.  The 01:59
17 documents will speak for themselves.  We can move 01:59
18 on.                                              01:59
19       THE WITNESS:  No, I want to continue my   01:59
20 response if that's okay, because I want to make sure 01:59
21 that it's covered.  I have the --               01:59
22 BY MS. WEAVER:                                   01:59
23    Q.  I don't think what you're saying is      01:59
24 accurate, and I'd like to just move on, if you don't 01:59
25 mind.                                            01:59

Page 206

1    A.  I have reasons to believe that my response 01:59
2  is 100 percent accurate.                         01:59
3    Q.  Okay.  I understand.                       01:59
4        Were there third parties who were using   01:59
5  friends' data for research also whitelisted?     01:59
6        MS. STEIN:  If the witness has something  01:59
7  that he needs to clarify now, we should do that now. 01:59
8  I'm sure Judge Corley would want his testimony to be 01:59
9  clarified in something that he's comfortable with. 01:59
10 BY MS. WEAVER:                                   01:59
11    Q.  What would you like to add?              01:59
12       MS. STEIN:  If there's a clarification you 02:00
13 need to make, let's make sure we have a clear    02:00
14 record.                                          02:00
15       THE WITNESS:  Yes.  So I would like to    02:00
16 suggest that there are three -- three things that 02:00
17 are -- is worth clarifying here.                 02:00
18       We have the data.  We have APIs that allow 02:00
19 access to the data.  And then we have access     02:00
20 controls to that data.  Right?  What you're talking 02:00
21 about here is the allow list also known as       02:00
22 whitelist.                                       02:00
23       That is very broad because it --          02:00
24 BY MS. WEAVER:                                   02:00
25    Q.  I was talking about friends' permissions, 02:00

Page 207

1  right?                                           02:00
2    A.  Yes, but to the extent that the allow list 02:00
3  you're talking about are for APIs that are not   02:00
4  exposing this kind of data, then I would argue that 02:00
5  the question about           is                  02:00
6  irrelevant.                                      02:00
7    Q.  Okay.  You can argue that.               02:00
8        Back to my question.  Were there -- other 02:00
9  third parties who were using friends' data for   02:00
10 research, were they also whitelisted?            02:00
11       MS. STEIN:  Objection to form.            02:00
12       THE WITNESS:  I have no recollection of   02:01
13 any other device integrations being access -- or 02:01
14 having access to friends' information beyond May 1, 02:01
15 2015.                                            02:01
16 BY MS. WEAVER:                                   02:01
17    Q.  Right.  But between the time when they   02:01
18 announced the transition and before 2015, were there 02:01
19 researchers who were whitelisted and given access to 02:01
20 friends' data?                                   02:01
21    A.  They didn't need to be whitelisted because 02:01
22 that was also publically available through Version 1 02:01
23 of the API.                                      02:01
24    Q.  Did that include Cambridge Analytica?    02:01
25    A.  Cambridge Analytica was never a developer 02:01

Page 208

1  on the platform.                                 02:01
2    Q.  Okay.  But I was just asking about        02:01
3  researchers.  Do you recall that?               02:01
4    A.  If --                                     02:01
5    Q.  Let me ask the question again.  So were   02:01
6  there certain third parties who were given friends' 02:01
7  data for research who were also whitelisted?     02:01
8        MS. STEIN:  Objection to form.            02:01
9        THE WITNESS:  Access to public APIs       02:01
10 doesn't come through a whitelist.  The access    02:01
11 control that we use for access to public APIs is a 02:01
12 process called app review.                       02:02
13       Now, back in 2014, before even the app    02:02
14 review was introduced, any third party could access 02:02
15 anything from the -- that was made available through 02:02
16 Version 1 of the API with the appropriate user's 02:02
17 consent.                                         02:02
18       There were a number of researchers, and I 02:02
19 think I can double-guess if -- the name of the   02:02
20 specific researcher that you have in mind that's 02:02
21 built an application on our platform on the Version 02:02
22 1 of the API, they requested and gained permission 02:02
23 from users to access their data and their friends' 02:02
24 data, and that's the end of it.                  02:02
25

Page 209

53 (Pages 206 - 209)

3478

1 BY MS. WEAVER: 02:02
2   Q. Okay. Are you familiar with Crimson 02:02
3 Hexagon? 02:02
4   A. I have an understanding of the company but 02:02
5 nothing more than that. 02:02
6   Q. Do you know who does have information 02:02
7 about what Crimson Hexagon accessed? 02:02
8   A. No. 02:02
9     MS. STEIN: Objection to form. 02:02
10 BY MS. WEAVER: 02:02
11 02:02
12 02:03
13
14
15
16
17 02:03
18 :03
19 :03
20 02:03
21
22 02:03
23
24 02:03
25
Page 210

1 02:03
2 03
3 03
4
5 02:03
6 02:03
7
8 02:03
9
10 :03
11 02:03
12 02:03
13 :03
14 :03
15 02:03
16 04
17 02:04
18 04
19 02:04
20 02:04
21 04
22
23 02:04
24 02:04
25
Page 211

1 02:04
2
3 02:04
4 :04
5   Q. Can you think of any others? 02:04
6   A. I cannot remember all capabilities, no. 02:04
7   Q. Okay. What is Groups API? 02:04
8   A. It's an API that allows third parties to 02:04
9 help group administrators manage the groups from 02:04
10 posting contents to moderating or allowing members 02:04
11 to join the group and so on. 02:05
12   Q. When was it launched? 02:05
13   A. I don't remember the date it was launched. 02:05
14   Q. Was it between 2012 to 2017? 02:05
15   A. Most likely, yes. 02:05
16   Q. And then it was -- does Groups API still 02:05
17 exist? 02:05
18   A. I think that the Groups API was fully 02:05
19 deprecated in May 2018. 02:05
20   Q. And you were part of that decision, right? 02:05
21   A. Yes. 02:05
22   Q. And why was it deprecated? 02:05
23   A. So I can answer from my perspective why 02:05
24 it's since been deprecated. 02:05
25     MS. STEIN: If you don't know from the 02:05
Page 212

1 company's perspective, then I'm going to direct the 02:05
2 witness not to answer. 02:05
3     MS. WEAVER: I'm sorry, you're going to 02:05
4 have to be deposed again. 02:05
5   Q. Do you have an understanding on behalf 02:05
6 company as to why Groups API was deprecated? 02:05
7 02:06
8 02:06
9 2:06
10     THE REPORTER: I'm sorry, "Make sure 02:06
11 that"... 02:06
12     THE WITNESS: -- third parties couldn't 02:06
13 access its members. 02:06
14 BY MS. WEAVER: 02:06
15   Q. Okay. What is Live Video API? 02:06
16   A. It's an API that allows a third party to 02:06
17 broadcast live video on Facebook. 02:06
18   Q. I'm sorry, I didn't hear that either. 02:06
19   A. Sorry. It's an API -- I have changed my 02:06
20 headset. 02:06
21   Q. I know, I know. It's me. I'm kind of 02:06
22 deaf. 02:06
23   A. So it's an API that allows a third party 02:06
24 to broadcast live video on Facebook. 02:06
25   Q. Okay. And when did it first come into 02:06
Page 213

54 (Pages 210 - 213)

1  being?                                      02:06
2      A.  2015, 2016, maybe.                  02:06
3      Q.  And what is an endpoint?            02:06
4      A.  An endpoint in reference to an API?  02:06
5      Q.  Uh-huh.                             02:07
6      A.  It's -- how should I explain it?    02:07
7      Q.  I can try, but don't make fun of me.  02:07
8      A.  Please.                             02:07
9      Q.  Is an endpoint an object that is accessed  02:07
10 through an API?                             02:07
11     A.  I -- I don't know that the endpoint refers  02:07
12 to the -- the object. It refers to, I think, the  02:07
13 structure of the API. But it may be used in both  02:07
14 ways.                                       02:07
15     Q.  Okay. And then what is a data field with  02:07
16 regard to API?                              02:07
17     A.  Okay. So let me try to explain maybe in a  02:07
18 different way.                              02:07
19        So there are objects and fields.     02:07
20     Q.  Uh-huh.                             02:07
21     A.  So an object can be, let's say, the Crate  02:07
22 & Barrel Facebook page. A field can be the picture  02:07
23 that is being used on that page.            02:07
24        So when you make an API call against that  02:07
25 object where you specify the object ID, you can add  02:07
                                              Page 214

1  perimeters in the API request about what is it the  02:08
2  API needs to respond to. And you can respond that  02:08
3  in the field section. You can specify that you want  02:08
4  the name of the page potentially, the profile  02:08
5  picture of the page, or you can specify if you want  02:08
6  posts made against that page.               02:08
7      Q.  Thank you. That's very helpful.     02:08
8         So is an object an endpoint in that   02:08
9  description? Are those the same?            02:08
10     A.  An endpoint from the API perspective, you  02:08
11 know, the API that requests access to the page,  02:08
12 there's just an API that requests access to, I don't  02:08
13 know, a friends connection. That would be a  02:08
14 different endpoint.                         02:08
15     Q.  I see. Okay. So are you aware of an  02:08
16 endpoint Get Event ID Live Videos?          02:08
17     A.  No.                                 02:08
18     Q.  Okay. You prepared Facebook's       02:08
19 interrogatory responses relating to capabilities and  02:09
20 permissions, right?                         02:09
21        MS. STEIN: Objection. Form.          02:09
22 BY MS. WEAVER:                              02:09
23     Q.  Was that you or was that someone else?  02:09
24     A.  I'm supported the counsels in, you know,  02:09
25 like this response, but I don't recall exactly  02:09
                                              Page 215

1  what's that.                                02:09
2      Q.  I know. I know. And it's cute and you  02:09
3  worked very hard and we're grateful.        02:09
4         MS. STEIN: I'll add I believe that was  02:09
5  the other individual who verified part of it.  02:09
6         MS. WEAVER: Okay. So we're going to have  02:09
7  talk to him. So I'll try --                 02:09
8      Q.  So do you know -- let me just try this  02:09
9  then. For the call Get Event ID Live Video, do you  02:09
10 know what it was seeking and what it obtained?  02:09
11     A.  I think it's associated with the live  02:09
12 event, most likely, the live video that is being  02:09
13 broadcast. But I don't understand exactly the event  02:09
14 in connection with the live video.          02:09
15     Q.  Okay. Do you know the difference between  02:10
16 "get" and "post"?                           02:10
17     A.  Yes.                                02:10
18     Q.  What's the difference?              02:10
19     A.  The one is a read and the other is a  02:10
20 write.                                      02:10
21     Q.  Okay. And so do you know what Get User ID  02:10
22 Live Videos is?                             02:10
23     A.  No, I don't -- I don't know the exact  02:10
24 endpoints.                                  02:10
25     Q.  Okay. Do you know what Post User ID Live  02:10
                                              Page 216

1  Videos is?                                  02:10
2      A.  I don't, no.                        02:10
3      Q.  Okay. Does Facebook know which third  02:10
4  parties had access to Live Video API?       02:10
5      A.  Historically, yes.                  02:10
6      Q.  Okay. What's Pages API?             02:10
7      A.  I think I used that example earlier, so it  02:10
8  may be repetitive. It's an API that allows and pays  02:11
9  administrator to manage the page with -- which may  02:11
10 includes -- manage the pages, which may include  02:11
11 posting content on the page, updating the profile  02:11
12 picture on the page, responding to comments made by  02:11
13 users on the page, and so on.               02:11
14     Q.  Okay.                              02:11
15                                            02:11
16                                            02:11
17                                           11
18                                            02:11
19                                            02:11
20        MS. STEIN: Objection to form.        02:11
21                                            02:11
22                                           2:11
23                                           2:12
24
25
                                              Page 217

1 BY MS. WEAVER:                                    02:12
2                                                   02:12
3
4                                                   02:12
5
6                                                   02:12
7
8                                                   02:12
9
10                                                  02:12
11                                                  02:12
12                                                  2
13                                                  02:12
14                                                  02:12
15
16      Q.  Okay.  What was the API Chatter?       02:12
17      A.  I haven't heard that for a long time.  I  02:12
18 think it was an API that provided access to trending  02:12
19 topics.                                          02:13
20      Q.  And what data could third parties access  02:13
21 through Chatter?                                  02:13
22      A.  The topics.                             02:13
23      Q.  Okay.  What -- what do you mean by      02:13
24 "topics"?                                         02:13
25      A.  So, for example, it would be like COVID.  02:13
                                                    Page 218

1 It would be like U.S. elections.  It would be like  02:13
2 Trump.                                            02:13
3      Q.  And what do you mean they could access the  02:13
4 topics?  Like the word "Trump" would come up or -- I  02:13
5 don't really understand.                          02:13
6      A.  So the Chatter API was meant to be used  02:13
7 by, I guess, media companies that were looking for  02:13
8 what was trending on social media.                02:13
9          And so the scenario that you can think of  02:13
10 is like the day before yesterday an airplane ends  02:13
11 and exploded.  That's most likely very heavily    02:13
12 discussed on social media.  And if a certain company  02:13
13 has access to that API, they would identify that's a  02:14
14 Boeing 777 or "ends and explodes in air" would be a  02:14
15 trending topic on Facebook.                       02:14
16      Q.  And how did Facebook decide what was a   02:14
17 trending topic?                                   02:14
18      A.  I don't know the specifics of how this API  02:14
19 worked.                                           02:14
20      Q.  Was it an algorithm that ran on people   02:14
21 mentioning the word?                              02:14
22      A.  It has to be some, you know, like        02:14
23 mentioning and frequency of mentions.             02:14
24      Q.  And did it matter whether or not the     02:14
25 mentions were public or private?                  02:14
                                                    Page 219

1      A.  For the Chatter API, I think it was      02:14
2 probably a combination of both public and private  02:14
3 posts.                                            02:14
4      Q.  Did Chatter then give -- well, give access  02:14
5 to aggregated public and private Facebook data?   02:14
6      A.  The only data that was accessible is, like  02:14
7 I mentioned before, the topics.  So, by default,  02:14
8 they are aggregated.                              02:15
9          I don't -- I don't remember an indication  02:15
10 of how many people or how many posts made about that  02:15
11 specific topic as part of the response in the API.  02:15
12 I believe it was just those are the five most     02:15
13 heavily -- most popular topics discussed.         02:15
14      Q.  Okay.  Is there -- so you said this     02:15
15 already, but just for foundation, what were private  02:15
16 APIs?                                             02:15
17      A.  Private APIs are APIs that are not in    02:15
18 general availability and whose access control is  02:15
19 maintained by partnerships.                       02:15
20      Q.  By -- I'm sorry -- maintained by what?   02:15
21      A.  Partnerships.  So someone in partnerships  02:15
22 in the --                                         02:15
23      Q.  Somebody in partnerships, okay.          02:15
24      A.  -- would have to approve the access to   02:15
25 that given API.                                   02:15
                                                    Page 220

1      Q.  Okay.  And when was the first private API  02:15
2 launched?                                         02:15
3      A.  I -- I honestly don't know.              02:15
4      Q.  Was it like 2012 or 2014 or --           02:16
5      A.  I -- I believe that private APIs have    02:16
6 always been there since the invention of Facebook.  02:16
7      Q.  Okay.  Do you know the capability auto   02:16
8 granted friends photo video tags?                 02:16
9      A.  Is that one single name?                 02:16
10     Q.  Yes.                                      02:16
11     A.  Auto granted friends --                   02:16
12     Q.  Yeah.                                     02:16
13     A.  -- photo video tag?                       02:16
14     Q.  Yes.                                      02:16
15     A.  That's a very weird capability.  Okay.  I  02:16
16 don't know.                                       02:16
17     Q.  What do you understand the capability to  02:16
18 be?                                               02:16
19          MS. STEIN:  Object to form.             02:16
20          THE WITNESS:  I don't know.  As you can  02:16
21 probably tell, the names of the capability are not  02:16
22 always self-explanatory, so...                    02:16
23 BY MS. WEAVER:                                    02:16
24     Q.  Yes, but you said it's a very weird       02:16
25 capability.  What did you understand it to mean when  02:16
                                                    Page 221

56 (Pages 218 - 221)

3481



1 you said that? 02:16
2 A. Something that -- 02:16
3 MS. STEIN: Objection to form. 02:16
4 THE WITNESS: Sorry. 02:17
5 BY MS. WEAVER: 02:17
6 Q. What did you understand it to mean when 02:17
7 you said that? 02:17
8 A. It has multiple pieces of content there. 02:17
9 That's what makes it weird. 02:17
10 Q. Okay. Do you know if there's a private 02:17
11 API associated with it? 02:17
12 A. I don't. 02:17
13 02:17
14 02:17
15 7
16
17 02:17
18 7
19 02:17
20 02:17
21
22 2:17
23 02:17
24
25 02:17
Page 222

1 02:17
2 7
3 02:18
4 02:18
5
6 02:18
7 02:18
8 2:18
9 02:18
10 02:18
11 02:18
12 02:18
13
14 MS. WEAVER: Okay. Can we -- I just 02:18
15 wanted -- I didn't hear the first part of your 02:18
16 answer. Would you mind reading the first part back, 02:18
17 please. 02:18
18 (The record was read by the 02:18
19 court reporter, as requested) 02:18
20 BY MS. WEAVER: 02:18
21 Q. Okay. I'm just -- let me break it down. 02:18
22 I took a photo and it -- sent it to one friend in 02:18
23 Facebook Messenger. 02:19
24 A. Uh-huh. 02:19
25 Q. I download an app. The app gets the 02:19
Page 223

1 photo. Does the photo have my privacy setting on 02:19
2 that it was only for Facebook Messenger? 02:19
3 A. That photo wouldn't be accessible through 02:19
4 an API. 02:19
5 Q. Okay. I post a photo and make it 02:19
6 available to three friends, and my friend downloads 02:19
7 an app back when friends permission worked, and gets 02:19
8 the -- the app gets the photo. Does the photo have 02:19
9 the privacy restriction on it? 02:19
10 A. Okay. So it's a very complicated 02:19
11 scenario, so let's talk about it, right? 02:19
12 Your friend has access to that photo. 02:19
13 Q. This is when friends permission still 02:19
14 existed. 02:19
15 A. Okay. But there were preconditions. So 02:19
16 your friend can see that photo, right? 02:19
17 Q. Yes. 02:19
18 A. Because you posted it on your Facebook 02:19
19 profile, but you only made it accessible to three 02:19
20 friends. 02:19
21 Q. Right. 02:19
22 A. Right? That's the scenario? 02:19
23 Q. Right. 02:20
24 A. So your friends logs in with a third-party 02:20
25 app that requests access to their friends' photos? 02:20
Page 224

1 Q. Yes. 02:20
2 A. Given that app, that photo is accessible 02:20
3 to your friends, your friend can give consent for 02:20
4 the third-party developer to have access to that 02:20
5 photo. 02:20
6 02:20
7 02:20
8 2:20
9 02:20
10 02:20
11 02:20
12
13 Q. Okay. 02:20
14 :20
15 02:20
16 02:20
17
18 :20
19 02:21
20 02:21
21
22 02:21
23 02:21
24
25 Q. For a given API, is it possible to know 02:21
Page 225

57 (Pages 222 - 225)

3482



which third parties obtained access to -- through 02:21
calls made to that API? 02:21
A. No. 02:21
[redacted]
Q. Okay. And does Facebook keep a record of 02:21
what entities had -- which entities made those calls 02:22
on those APIs? 02:22
[redacted]
Q. What were extended APIs? 02:22
A. "Extended APIs" is a term we use to 02:22
describe private APIs. 02:22
Q. Okay. Makes sense. And then you're 02:22

Page 226

familiar with the phrase "PMD"? 02:23
A. Yes. 02:23
Q. And what is that? 02:23
A. I think it stands for preferred marketing 02:23
development. 02:23
[redacted]
Q. What's a marketing API? 02:23
A. APIs that allow a third party to run at 02:23
(indecipherable). 02:23
Q. And how is that different than custom 02:23
audience? 02:23
A. Custom audience is a feature that is 02:23
accessible through the market behavior. 02:23
Q. Okay. What other features are available 02:23
on marketing APIs other than custom audience? 02:23
A. So this is not necessarily my expertise, 02:23
so I may be missing certain things. But the 02:23
marketing API allows you to schedule a marketing 02:24

Page 227

campaign on Facebook the way you would otherwise do 02:24
it if you were going to facebook.com and doing it on 02:24
the platform. 02:24
MS. STEIN: Hey, Lesley, when you get to a 02:24
good break point, can we take a short break? 02:24
MS. WEAVER: I think it's time to take a 02:24
break now, if that's what's popular and democratic. 02:24
We can reconvene in ten minutes or so. 02:24
THE VIDEOGRAPHER: We are off the record 02:24
at 2:24 p.m. 02:24
(Recess.) 02:24
(Off record: 2:24 p.m.) 02:24
(On record: 2:37 p.m.) 02:24
THE VIDEOGRAPHER: We are on the record at 02:37
2:37 p.m. 02:37
BY MS. WEAVER: 02:37
Q. You understand you're still under oath? 02:37
A. Yes, I do. 02:38
Q. Okay. Thank you. 02:38
Who -- how were decisions made about what 02:38
third parties had access to data through private 02:38
APIs? 02:38
MS. STEIN: That's outside the scope of 02:38
about how decisions were made, but if you want to 02:38
ask, you know, who had access, that's fine. 02:38

Page 228

BY MS. WEAVER: 02:38
Q. Please answer. 02:38
[redacted]

Page 229

[redacted] 02:40
Q. And who was involved in making those 02:40
decisions? 02:40
MS. STEIN: Objection. Outside the scope. 02:40
MS. WEAVER: You will not let me explore 02:40
who made those decisions so that we can figure out 02:40
who to talk to about those issues? 02:40
MS. STEIN: Lesley, you weren't even 02:40
supposed to be asking about decision-making. But I 02:40
mean if you -- if you want to ask the witness if he 02:40
knows who the right people are to talk about things, 02:40
you can ask him for this particular question, but, 02:40
please, why don't you focus on the topics that Judge 02:40
Corley directed this deposition to be about. 02:40
BY MS. WEAVER: 02:40
Q. During the time period 2012 to 2017, who 02:40
decided which third parties would have extended 02:40
permissions and therefore access to more third-party 02:40
data? 02:40
[redacted]
Q. I'm hoping for names. Who were the 02:41
project managers who had that authority? 02:41

[redacted]
Q. I'm asking, who were the product managers 02:41
who were in charge of them? Who decided whether or 02:41
not they would be whitelisted? 02:41
[redacted]
Q. Can you identify a single person by name 02:41
who was involved in decision-making around which 02:41
third parties would get extended permissions during 02:42
2012 to 2017? 02:42
A. So what do you mean by extended 02:42
permissions? 02:42
Q. Private APIs. 02:42
A. Again, the number of private APIs is 02:42
significant for a single person to have been 02:42
involved. 02:42

Q. I'm just asking if you can even give me 02:42
one name of one person. 02:42
A. As it relates to [redacted] or as relates 02:42
to partner -- 02:42
Q. Any name. 02:42
A. I have been involved in some of that -- 02:42
Q. Right. 02:42
A. -- but not as it relates to [redacted] 02:42
But, yes, I was responsible for allowing access to 02:42
third parties to private APIs. 02:42
Q. Was it so hard for you to come up with 02:42
your own name? 02:42
A. See, it's confusing when you're dropping a 02:42
lot of different things in one sentence. 02:42
Q. Okay. Who was the product manager in 02:42
charge of determining what access to data [redacted] 02:42
and [redacted] had? 02:42
A. Again -- 02:42
MS. STEIN: Objection. Lesley, can we 02:43
please focus on the topics that Judge Corley ordered 02:43
this deposition to be about? It is not about who 02:43
did what when. He's not the person most 02:43
knowledgeable on these issues. He's here to testify 02:43
about what data gets collected by Facebook during 02:43
2012 and 2017, what they had, and what could be 02:43

shared or accessed by third parties. 02:43
BY MS. WEAVER: 02:43
Q. Are you declining to identify even one 02:43
name other than your own? 02:43
MS. STEIN: Asked and answered. He gave 02:43
you a name. You asked for one name. 02:43
MS. WEAVER: Deb, I'm not asking -- 02:43
MS. STEIN: He gave it to you. 02:43
MS. WEAVER: I can -- we can all read the 02:43
transcript. I'm asking the witness. 02:43
Q. Can you identify one name other than your 02:43
own who was involved in deciding what third parties 02:43
had access to users' data during the time period 02:43
2012 - 2017 through private APIs? 02:43
A. User data and private APIs. Not 02:43
salesperson. 02:43
Q. Okay. 02:43
A. I'm trying -- I'm just trying to 02:43
understand what you're looking for. 02:43
MS. WEAVER: Will you read the question 02:44
back, please? 02:44
(The record was read by the 02:44
court reporter, as requested) 02:44
THE WITNESS: I cannot remember anybody 02:44
but myself at this point to give you answer to those 02:44

**Page 234**

1 question.                                    02:44
2 BY MS. WEAVER:                               02:44
3    Q.  Okay.                                 02:44
4    A.  Especially as it relates to partner APIs   02:44
5 that allow access to user data.              02:44
6                                              02:44
7                                              02:44
8
9    Q.  I'm sorry, that allows access to what?   02:44
10   A.  A user's News Feed.                    02:44
11   Q.  So what's the difference between read   02:44
12 stream and auto granted read stream?         02:44
13   A.  It's basically the same API behind those   02:45
14 two capabilities.                            02:45
15   Q.  Okay.  And we discussed briefly before   02:45
16 that friends permissions were deprecated.  Do you   02:45
17 recall that?                                 02:45
18   A.  Yes.                                   02:45
19   Q.  Roughly how many capabilities were related   02:45
20 to friends permissions that were deprecated?   02:45
21                                              45
22                                              02:45
23                                              45
24                                              02:45
25                                              02:45

**Page 235**

1                                              02:45
2                                              02:45
3                                              2:45
4
5                                              46
6                                              02:46
7                                              46
8                                              2:46
9                                              46
10                                             46
11       THE REPORTER:  I'm sorry.  Core Facebook?   02:46
12       THE WITNESS:  Functionality.          02:46
13       THE REPORTER:  Thank you.             02:46
14 BY MS. WEAVER:                              02:46
15   Q.  So is it true that certain friends    02:46
16 capabilities like friends about me, friends actions,   02:46
17 friends check-ins, friends online presence, friends   02:46
18 photo video tags were deprecated when fiends   02:46
19 permissions were deprecated?                 02:46
20                                              46
21                                              02:46
22                                              02:46
23                                              02:47
24                                              02:47
25

**Page 236**

1    Q.  Okay.  So those capabilities were not   02:47
2 deprecated, the ones I just listed?          02:47
3                                              02:47
4                                              02:47
5                                              02:47
6                                              02:47
7    Q.  Who would know about what was deprecated   02:47
8 with regard to friends permissions?          02:47
9    A.  With regards to friends permissions, I   02:47
10 think I --                                   02:47
11   Q.  The issue that we're discussing right now,   02:47
12 you're saying --                             02:47
13   A.  I'm --                                 02:47
14   Q.  I'm sorry, just allow me to -- allow me to   02:47
15 ask the question.                            02:47
16       The very issue we're discussing right now,   02:47
17 you just said you don't know specifically.  Who   02:47
18 would?                                       02:47
19                                              7
20                                              47
21                                              02:47
22                                              02:48
23                                              02:48
24                                              2:48
25                                              02:48

**Page 237**

1
2    Q.  Okay.  Thank you.  I understand.      02:48
3       Who is the person most knowledgeable about   02:48
4 which specific permissions and capabilities were   02:48
5 deprecated and were not?                     02:48
6       MS. STEIN:  Objection to form.         02:48
7       THE WITNESS:  So I -- I think that's -- if   02:48
8 you go through the developer change log, you can   02:48
9 find that information on your own when it comes to   02:48
10 the public APIs.                             02:48
11 BY MS. WEAVER:                              02:48
12   Q.  I want to understand Facebook's internal   02:48
13 decision-making process when it decided to deprecate   02:48
14 friends permissions.                         02:48
15       Who is knowledgeable on that topic?   02:48
16       MS. STEIN:  Okay.  Lesley, this deposition   02:48
17 is not about that subject.                   02:48
18 BY MS. WEAVER:                              02:49
19   Q.  Are you refusing to provide a name?   02:49
20   A.  Look, I think that you -- what you're   02:49
21 asking is not really what you intend to ask.  That's   02:49
22 why I'm really confused.  Because the question you   02:49
23 ask me is very different from the specification you   02:49
24 provide to my counsel.                       02:49
25       So can we actually be a little bit more   02:49

Veritext Legal Solutions
866 299-5127

3485



1 precise? What you're asking is who can tell me? 02:49
2 The developer docs can tell you. That's the answer. 02:49
3 You don't need to reference a single human to 02:49
4 actually give you the -- the truth. Because the 02:49
5 developer docs and the change log there is the 02:49
6 source of truth. 02:49
7    Q. Who created the developer docs and the 02:49
8 change logs? 02:49
9    A. They are automatically generated by the 02:49
10 code. 02:49
11    Q. Who created the code? 02:49
12    A. An engineer. 02:49
13    Q. Do you know who the engineers are who 02:49
14 created the code? 02:49
15    A. It's probably not a single engineer that 02:49
16 created that code. 02:49
17    Q. Can you name one name? 02:49
18    A. I don't remember a specific name of an 02:49
19 engineer. 02:49
20    Q. Do you know whether or not [redacted] 02:50
21 [redacted] was deprecated? 02:50
22    A. No, I don't remember the exact date. 02:50
23    Q. Who would know? 02:50
24    A. I really cannot tell you who would know. 02:50
25    Q. Is that in the developer pages? 02:50

Page 238

1    A. Private APIs are not documented in the 02:50
2 developer pages. 02:50
3 [redacted] 02:50
4 [redacted]
5 [redacted] 02:50
6 [redacted]50
7    Q. And do you know who had access to can read 02:50
8 nonapp friends? 02:50
9    A. I don't recall the entire list of apps 02:50
10 that had access to that. 02:51
11    Q. Can you identify a category or even one? 02:51
12    A. App -- apps that had access to the 02:51
13 Messenger inbox that we discussed before are good 02:51
14 candidates for having that capability. 02:51
15    Q. And which apps do you mean when you 02:51
16 refer -- when you say those who had access to the 02:51
17 Messenger inbox? 02:51
18 [redacted] 02:51
19 [redacted]51
20    Q. Can you think of any others? 02:51
21 [redacted] 02:51
22    Q. Okay. And could they both read and write? 02:51
23    A. They can only read -- sorry, they can only 02:51
24 write. 02:51
25    Q. Could they send and receive? 02:51

Page 239

1    A. No, they just sent. 02:51
2       MS. WEAVER: Okay. Anne, why don't you go 02:51
3 ahead and mark that exhibit. 02:51
4    Q. We'll mark as Exhibit -- is it 4? -- a 02:51
5 document bearing Bates numbers FB-CA-MDL-00227697 02:51
6 through 699. 02:52
7          (Exhibit 4 was marked for 02:52
8          identification and attached 02:52
9          hereto.) 02:52
10 BY MS. WEAVER: 02:52
11    Q. And while we're waiting for the marking, 02:52
12 just, when did the [redacted] API first come into use? 02:52
13    A. I don't remember the exact date. But the 02:52
14 [redacted] API was also used by Facebook Messenger, so I 02:52
15 assume that it was probably around that time frame. 02:52
16    Q. I'm sorry, what do you mean by that time 02:52
17 frame? The year? 02:52
18    A. 2012, 2013. 02:52
19    Q. And is it still in effect? 02:52
20    A. The [redacted] API has been deprecated. 02:52
21    Q. And were you involved with its 02:52
22 deprecation? 02:52
23    A. For third parties, yes. 02:52
24    Q. Why was it deprecated? 02:52
25    A. Why? 02:52

Page 240

1    Q. Yes. 02:52
2 [redacted] 02:52
3 [redacted] 02:52
4 [redacted] 02:53
5 [redacted] 02:53
6 [redacted]
7    Q. Okay. Have you -- do you have Exhibit 4 02:53
8 loaded yet? 02:53
9    A. I can see it, yes. 02:53
10    Q. Okay. Can you pull it up? 02:53
11    A. Yes. 02:53
12    Q. And I'm just going to ask you about a 02:53
13 question there on the front page, but take your 02:53
14 time. 02:53
15       (Pause while witness peruses document.) 02:54
16    A. Okay. 02:54
17    Q. Do you recognize Exhibit 4? 02:54
18    A. Yes. 02:54
19    Q. What is it? 02:54
20    A. It's an email exchange between myself and 02:54
21 four or five other people. 02:54
22    Q. That includes Simon Cross; is that 02:54
23 correct? 02:54
24    A. That's correct. 02:54
25    Q. And the underlying email looks like he 02:54

Page 241

61 (Pages 238 - 241)

3486



1 sent an email around January 29, 2015, to Steven   02:54
2 Elia; is that right?   02:54
3    A. Let me see. I have to go back.   02:54
4    Q. Just look at the top of the page there.   02:54
5    A. I think it's under chronological, the way   02:54
6 you look at it. So the first thing, I'm looking   02:54
7 there at the bottom of the exhibit.   02:54
8       (Pause while witness peruses document.)   02:54
9    A. Sorry, what -- how can I --   02:54
10    Q. Okay. What does this document reflect?   02:54
11 Let me ask you a different question.   02:55
12       MS. STEIN: Form.   02:55
13 BY MS. WEAVER:   02:55
14    Q. Do you see where it says "Recent Activity"   02:55
15 and then it has a number there at the top of the   02:55
16 email?   02:55
17    A. Yes.   02:55
18    Q. What does that refer to, in general?   02:55
19    A. I think that's a task number.   02:55
20    Q. Okay. What is a task number?   02:55
21    A. So we used a tool that is called the task   02:55
22 monitor to track progress against specific things   02:55
23 that need to happen.   02:55
24    Q. Okay.   02:55
25    A. It's a program management tool of some   02:55
Page 242

1 sort.   02:55
2    Q. Thank you.   02:55
3       And just looking right at the very first   02:55
4 message under "Task Description," do you see it says   02:55
5 "Title," and then underneath that "Assigned to Eddie   02:55
6 O'Neil"?   02:55
7    A. Yes.   02:55
8    Q. And then do you see there it says   02:55
9 "Creator" and then your name?   02:56
10    A. Yes.   02:56
11    Q. What does that mean?   02:56
12    A. Who has initiated the -- the task, that   02:56
13 would be the creator, and who the task is assigned   02:56
14 to is the person that has the obligation to complete   02:56
15 the task.   02:56
16    Q. Okay. And then when it says   02:56
17 "Description," there's a description. Do you see   02:56
18 that?   02:56
19    A. Yes.   02:56
20    Q. And is that a description that you wrote?   02:56
21    A. Yes.   02:56
22    Q. Okay. And so you wrote   02:56
23                                                02:56
24                                   02:56
25       Do you see that?   02:56
Page 243

1    A. Yes.   02:56
2    Q. And you wrote                          02:56
3                                                02:56
4                                   02:56
5       Do you see that?   02:56
6    A. Yes.   02:56
7    Q. Was that true?   02:56
8                                                02:56
9                                2:56
10    Q. Okay. And then do you see the next   02:56
11 sentence,                                       02:56
12                                   2:57
13                                                02:57
14                                   02:57
15       Do you see that?   02:57
16    A. Yes.   02:57
17    Q. Is that what you did with regard to both   02:57
18 of them?   02:57
19                                                02:57
20                                                02:57
21
22    Q. Okay. And did you shut down the          02:57
23 API?   02:57
24    A. Yes. I believe I already answer that   02:57
25 question.   02:57
Page 244

1    Q. Okay. Do you know what the new -- the   02:57
2 capability stream search hire rate limit is?   02:57
3    A. Stream search?   02:57
4    Q. Stream search hire rate limit.   02:57
5    A. No, I don't know the specific.   02:57
6    Q. Okay. What is the API                     02:57
7 It's                                             02:57
8    A. I don't remember that specific API.   02:58
9                                                02:58
10                                                02:58
11                                                02:58
12
13                                2:58
14
15                                2:58
16
17                                58
18                                                02:58
19                                2:58
20
21    Q. Do you know what the internal black hole   02:58
22 system was?   02:58
23    A. Internal black hole? No, I haven't heard   02:58
24 of that statement.   02:58
25    Q. Okay. Okay. What was whitelisted offline   02:58
Page 245

62 (Pages 242 - 245)



**Page 246**

1  access?                                    02:58
2                                              02:58
3                                              02:58
4
5     Q.  Is that -- did that capability function   02:59
6  from 2012 to 2017?                          02:59
7     A.  Yes.                                  02:59
8     Q.  Is it still functioning?             02:59
9     A.  No.                                   02:59
10    Q.  When was it deprecated?              02:59
11    A.  Maybe in 2018.  I don't remember exactly.   02:59
12    Q.  What is implicit offline access?     02:59
13    A.  Implicit offline access?  I don't know.   02:59
14    Q.  Do you know if it makes access tokens   02:59
15  never expire?                              02:59
16    A.  Possibly, but I don't know.          02:59
17    Q.  Okay.  What about just the           02:59
18  deprecated, do you know what that is?      02:59
19    A.  No.                                   02:59
20    Q.  How about user to app whitelisted apps?   02:59
21    A.  No.                                   02:59
22    Q.  What about the API              So   02:59
23  it's                                        03:00
24    A.               I don't know of this    03:00
25  API.                                        03:00

**Page 247**

1                                              03:00
2                                              03:00
3
4                                          00
5
6                                              03:00
7                                              03:00
8                                              03:00
9                                          03:00
10                                          :00
11
12                                          :00
13                                             03:00
14                                             03:00
15
16    Q.  I'll try it this way.                03:01
17    A.  I don't know that.                   03:01
18    Q.  A -- A installs an app, is friends with B;   03:01
19  B is friends with C.  Was this a capability that   03:01
20  allowed the app to query C even though neither B nor   03:01
21  C had installed the app?                   03:01
22    A.  I mean, I understand --             03:01
23        MS. STEIN:  Objection to form.       03:01
24        THE WITNESS:  Sorry.                 03:01
25        MS. STEIN:  Objection to form.       03:01

**Page 248**

1        THE WITNESS:  I understand that what you   03:01
2  describe in that capability's, you know, description   03:01
3  field is probably represented by the use case you   03:01
4  extend, but I don't know of this capability.   03:01
5  BY MS. WEAVER:                              03:01
6                                              03:01
7                                          03:01
8
9                                          3:01
10
11                                             03:01
12                                             03:02
13
14        MS. STEIN:  Objection to form.       03:02
15        THE WITNESS:  I don't know.          03:02
16  BY MS. WEAVER:                              03:02
17                                             2
18                                             03:02
19
20
21                                             03:02
22                                             03:02
23
24  BY MS. WEAVER:                              03:02
25                                             03:02

**Page 249**

1                                             2
2                                             03:02
3                                             03:02
4                                             3:02
5
6     Q.  Uh-huh.                             03:02
7                                             03:02
8                                             03:02
9                                             03:02
10                                            03:02
11
12                                            03:03
13                                            03:03
14                                            03:03
15                                            03:03
16                                            03:03
17                                            03:03
18                                            03:03
19
20                                            3:03
21
22
23
24    Q.  So we talked a little bit about interests   03:03
25  earlier.  Do you remember that?           03:03

63 (Pages 246 - 249)



Page 250

1   A. Yes.                                          03:03
2   Q. So does Facebook use the data that it         03:03
3 collects about users to identify the interests that   03:03
4 they have?                                         03:04
5   A. Facebook identifies --                        03:04
6        MS. STEIN: Object to form. Objection to      03:04
7 form.                                              03:04
8        THE WITNESS: So Facebook identifies the      03:04
9 interest based on the user's action on the platform.  03:04
10 I like (indecipherable). It's a way for us to      03:04
11 identify a user's interests.                       03:04
12 BY MS. WEAVER:                                     03:04
13                                                    03:04
14                                                    03:04
15                                                    3:04
16        MS. STEIN: Objection to form.               03:04
17                                                    03:04
18                                                    03:04
19                                                    03:04
20                                                    03:04
21 BY MS. WEAVER:                                     03:04
22                                                    03:04
23                                                    03:04
24   Q. Why does Facebook collect data from other     03:04
25 third parties?                                     03:04

1   A. Why?                                          03:04
2   Q. Yes.                                          03:04
3                                                    03:05
4                                                    03:05
5                                                    03:05
6
7                                                    :05
8                                                    03:05
9                                                    03:05
10                                                   03:05
11                                                   03:05
12
13   Q. Does Facebook use any of the information       03:05
14 it obtains from third parties to develop the       03:05
15 interest categories through which users are        03:05
16 targeted?                                          03:05
17        MS. STEIN: Objection to form.               03:05
18        THE WITNESS: I don't know.                  03:05
19 BY MS. WEAVER:                                     03:05
20   Q. You don't know?                              03:05
21   A. I don't think so.                            03:05
22   Q. What's the basis of your saying "I don't      03:05
23 think so"?                                         03:05
24   A. Because, again, the question is very         03:06
25 broad. If you are talking about pixel data that are  03:06

Page 251

1 provided by third parties, yes, that informs the ads   03:06
2 targeting, but it doesn't form the interests.      03:06
3   Q. Can you identify for a user what interest     03:06
4 categories they have been placed in?               03:06
5   A. Those categories that have been placed in,    03:06
6 which I am not -- I'm not sure that I agree with    03:06
7 that term -- would be identified for the user under   03:06
8 their app -- sorry, under their Facebook settings in  03:06
9 the DYI file.                                      03:06
10   Q. And that DIY file, is it completely          03:06
11 historical? So it will show me yesterday I was in   03:06
12 this interest category and five days ago I was in   03:06
13 this category? Or does it just list the categories   03:06
14 in general?                                        03:06
15   A. Just lists the categories in general.        03:06
16   Q. And if I'm no longer in a category, does     03:06
17 it list that category?                             03:07
18   A. No.                                          03:07
19   Q. And the lists of interest change over        03:07
20 time, then, right?                                 03:07
21   A. It depends on how you use the platform.      03:07
22 If you haven't used the platform for the last five   03:07
23 years, probably not.                               03:07
24   Q. Okay. But let's just say it's you. When      03:07
25 were you last on the platform?                     03:07

Page 252

1   A. I don't know. Maybe during the lunch         03:07
2 break.                                             03:07
3   Q. Okay. So do your interest categories         03:07
4 change over time?                                  03:07
5        MS. STEIN: We're talking about 2012 to      03:07
6 2017.                                              03:07
7 BY MS. WEAVER:                                     03:07
8   Q. Did your interest categories change          03:07
9 between 2012 and 2017?                             03:07
10   A. I'm pretty certain that they had.           03:07
11   Q. Okay. And what causes them to change?        03:07
12   A. The thought that they may have taken         03:07
13 action against certain entities that I have        03:07
14 expressed an affinity about.                       03:07
15   Q. Do they change at all based on information    03:07
16 Facebook learns about whether those interests are --  03:07
17 provide for effective ad placement?                03:08
18   A. I'm almost certain that I'm confused right    03:08
19 now. Can you repeat the question?                  03:08
20        MS. WEAVER: Please read it back.            03:08
21        (The record was read by the                03:08
22        court reporter, as requested)              03:08
23        THE WITNESS: I'm still having a hard        03:08
24 time, but let me try to answer the question the way   03:08
25 I understand, all right?                           03:08

Page 253

64 (Pages 250 - 253)



1     Are those interests used to inform ad     03:08
2  targeting criteria? The answer is yes.     03:08
3  BY MS. WEAVER:     03:08
4                                             03:08
5                                             03:08
6
7                                             03:08
8
9                                          08
10                                         08
11                                         03:09
12                                         03:09
13                                         03:09
14
15     Q. And when you say "an ad," what do you     03:09
16  mean?     03:09
17     A. An ad is being defined as a story that     03:09
18  shows up on your Facebook News Feed that is not     03:09
19  necessarily generated by a friend or a page you     03:09
20  follow but is sponsored by a third party.     03:09
21     Q. So an ad could include something that     03:09
22  wasn't -- well, strike that.     03:09
23        So there's one category of ads that     03:09
24  literally looks like an ad to the user, "Go buy     03:09
25  these shoes"; is that correct?     03:09

Page 254

1     A. Sure, yes.     03:09
2     Q. Right. And then there's -- there are     03:09
3  other categories of ads that don't look like     03:09
4  advertisements necessarily but it's something that     03:09
5  shows up in the News Feed; is that right?     03:09
6     A. Every single ad unit that shows up on your     03:09
7  News Feed is clearly identified as an ad.     03:09
8     Q. Okay. And how is it identified?     03:09
9     A. Kind of different, but I think in most     03:10
10  cases you can see that this is a sponsored, you     03:10
11  know, like story or something like that.     03:10
12     Q. Sponsored story? Is that the language     03:10
13  from 2012 to 2017?     03:10
14     A. I cannot remember the exact language. I     03:10
15  think I need to look up some historical, you know,     03:10
16  like, UI treatment.     03:10
17     Q. Are there documents at Facebook that     03:10
18  describe how interests are created?     03:10
19     A. How interests are created? I think I've     03:10
20  already responded to that question multiple times     03:10
21  today.     03:10
22        I think interests are associations for     03:10
23  certain people with certain entities -- entities     03:10
24  that exist on the Facebook platform -- and those     03:10
25  entities are public figures, businesses, anything     03:10

Page 255

1  that is not a friend.     03:10
2     Q. The question that I asked is, are there     03:10
3  documents that describe how they're created?     03:10
4     A. I can only say one.     03:11
5     Q. Are there web links or websites within     03:11
6  Facebook that discuss how interests are being     03:11
7  generated?     03:11
8     A. I haven't seen a public document about     03:11
9  that, no.     03:11
10     Q. Is there a team that focuses -- let me     03:11
11  just back up.     03:11
12        You've testified that interests change     03:11
13  over time, right?     03:11
14     A. Yes.     03:11
15     Q. And how -- who decides what the new     03:11
16  interests are and what the old interests are?     03:11
17     A. Okay. So let's assume that between 2012     03:11
18  and 2017 I started liking more pages. That's     03:11
19  something that will further expand the list of     03:11
20  interests that I have.     03:11
21        So if in 2012 I didn't like the Starbucks     03:11
22  page, but in 2015 I like the Starbucks page, that     03:11
23  means my interests can be updated. It is an action     03:11
24  that is driven and dialed by me. It's not --     03:11
25     Q. What is -- got it. I understand.     03:11

Page 256

1     A. It's not something that the PM, or product     03:12
2  manager, at Facebook or someone else will dictate.     03:12
3  It's given by the user.     03:12
4                                             03:12
5                                             03:12
6
7        MS. STEIN: Objection to form.     03:12
8                                             03:12
9                                             03:12
10                                         12
11                                         03:12
12                                         03:12
13                                         03:12
14                                         03:12
15
16     Q. And so there's a historical record over     03:12
17  time of what I have been interested in the past and     03:12
18  I'm interested in today; is that fair?     03:12
19        MS. STEIN: Objection to form. Misstates     03:12
20  his testimony.     03:12
21        THE WITNESS:                         03:12
22                                            03:12
23                                            03:13
24                                            03:13
25                                            03:13

Page 257

65 (Pages 254 - 257)



**Page 258**

7 BY MS. WEAVER:                                        03:13
8     Q.  Where is the interest graph maintained?     03:13
9     A.  For a given user?                            03:13
10    Q.  Yes.                            03:13
11    A.  It lives in the DYI file.              03:13
12    Q.  Facebook doesn't access the DIY file,       03:13
13 right? That's for users to access data?           03:13
14    A.  Well, we provide the hosting of that file.  03:13
15    Q.  Right.  So where is the actual data that    03:13
16 is extracted through the DIY tool?  Where is the   03:13
17 actual data in the interest graph maintained?      03:13
18    A.  I'm not sure I understand the question.     03:13
19    Q.  Okay.  The DIY file is created though a      03:14
20 tool to face the users, right?                03:14
21    A.  Yes.                            03:14
22    Q.  Okay.  If I'm an advertiser and I'm --      03:14
23 come to you and I say "I want to target people with  03:14
24 these interests," does Facebook go to the DIY tool?  03:14
25    A.  To do a lookup, no, that's not how.     03:14

Page 258

1     Q.  Exactly.  So where is the interest graph    03:14
2 maintained at Facebook?                  03:14
3         MS. STEIN:  Objection to form.         03:14
4         Would you know let the witness explain,    03:14
5 Lesley?  He's clearly trying to tell you how this    03:14
6 works.                            03:14
7         THE WITNESS:  Okay.  So I'm an advertiser   03:14
8 and I want to target people that like R&B.  It's a   03:14
9 very broad category, so bear with me, right.        03:14

Page 259

**Page 260**

1                                            03:15
2                                        03:15
3                                        03:15
4
5 BY MS. WEAVER:                           03:15
6     Q.  Okay.  I understand that.  But I'm asking   03:15
7 you where -- so there's data and information that    03:15
8 Facebook has about you and your interests right now,  03:15
9 right?                               03:16
10    A.  Yes.                           03:16
11    Q.  Where is it?                    03:16
12    A.  The way you ask it, I would say in some    03:16
13 database.                          03:16
14    Q.  Which database is in it?             03:16
15    A.  In some database.               03:16
16    Q.  Which database?               03:16
17                                        03:16
18    Q.  Where -            Where is this     03:16
19 information?                        03:16
20    A.  I think we need to talk to someone that    03:16
21 understands the database architecture at Facebook to  03:16
22 give you a precise answer.             03:16
23    Q.  Have you ever heard anybody refer to the   03:16
24 interest graph as a profile?           03:16
25    A.  No.                           03:16

Page 260

1     Q.  Why does Facebook allow advertisers to     03:16
2 custom target advertising through the selection of   03:16
3 interests?                          03:17
4         MS. STEIN:  Objection to form.  Beyond the  03:17
5 scope.                             03:17
6         Are you really asking questions about      03:17
7 targeting advertising?  Like that directly, Lesley?  03:17
8 I know you've done half the depo on it, but now you  03:17
9 want to know why Facebook does targeted advertising?  03:17
10 BY MS. WEAVER:                          03:17
11    Q.  Please answer the question.           03:17

Page 261

3491



Page 262 (top left):

```
 1                                        3:18
 2
 3                                        3:18
 4
 5                                        3:18
 6                                        3:18
 7                                        3:18
 8
 9                                        03:18
10                                        3:18
11                                        8
12                                        :18
13                                        3:18
14                                        3:18
15                                        3:18
16                                        :18
17                                        :18
18                                        19
19                                        03:19
20                                        03:19
21                                        03:19
22
23 BY MS. WEAVER:                         03:19
24     Q. Do you believe that most users join    03:19
25 Facebook because they want to receive ads?     03:19
                                        Page 262
```

Page 263 (bottom left):

```
 1     MS. STEIN: Objection to form. Lacks      03:19
 2 foundation. Beyond the scope.                 03:19
 3     THE WITNESS: It's really hard for me to   03:19
 4 understand or be able to identify the intention of   03:19
 5 2.8 billion people.                           03:19
 6 BY MS. WEAVER:                                03:19
 7     Q. Are there documents that contain the   03:19
 8 information about the API capabilities that you      03:19
 9 didn't know anything about today?             03:19
10     MS. STEIN: Objection to form.            03:19
11 Argumentative.                                03:19
12     THE WITNESS: My understanding is that you   03:19
13 are reading through some of those documents, so I    03:19
14 would assume that there are documents.        03:19
15 BY MS. WEAVER:                                03:19
16     Q. I'm just wondering if there's a manual   03:19
17 that lists what these API capabilities are or any    03:19
18 kind of document that lays out what they are and     03:20
19 what their functions are.                     03:20
20
21
22                                        20
23
24
25                                        03:20
                                        Page 263
```

Page 264 (top right):

```
 1                                        03:20
 2                                        3:20
 3     MS. STEIN: Objection to form.            03:20
 4     THE WITNESS:                             03:20
 5 BY MS. WEAVER:                                03:20
 6     Q. And it would accurately reflect all of the   03:20
 7 capabilities in 2012, for example?           03:20
 8     A. In 2012 I don't think that tool existed.   03:20
 9     Q. So when did the tool first come into   03:20
10 existence?                                    03:20
11     A. My recollection of using that tool for the   03:20
12 first time was around 2014 or 2015.           03:20
13     Q. So for the capabilities prior to that   03:20
14 time, is there a document that collects a     03:20
15 description of what all the capabilities were and    03:20
16 how they functioned and the data that was accessed   03:20
17 through them?                                 03:20
18                                        3:20
19                                        :21
20                                        03:21
21
22     MS. WEAVER: Okay. Why don't we take a    03:21
23 little break and I'll mark a few things. I don't     03:21
24 think we'll be going that much longer. Hold on just   03:21
25 a little longer.                              03:21
                                        Page 264
```

Page 265 (bottom right):

```
 1     We can go off the record.                03:21
 2     THE VIDEOGRAPHER: We are off the record   03:21
 3 at 3:21 p.m.                                  03:21
 4     (Recess.)                                03:34
 5     (Off record: 3:21 p.m.)                  03:34
 6     (On record: 3:34 p.m.)                   03:34
 7     THE VIDEOGRAPHER: We are on the record at   03:34
 8 3:34 p.m.                                     03:34
 9 BY MS. WEAVER:                                03:34
10     Q. You understand you're still under oath?   03:34
11     A. Yes, I do.                            03:34
12     Q. Okay. So were you involved in collecting   03:34
13 or looking for documents that Facebook possesses    03:34
14 relating to the plaintiffs in this action?    03:34
15     A. No.                                   03:34
16     Q. Okay. Do you know what Facebook did to   03:34
17 collect documents relating to the plaintiffs in this   03:34
18 action?                                       03:34
19     A. My understanding is that we made available   03:34
20 the DYI file for each of the plaintiffs.      03:34
21     MS. WEAVER: Okay. We'll mark Plaintiffs'   03:34
22 5 and 6, two Excel spreadsheets that were provided   03:34
23 us by Facebook's counsel. This may take a second.   03:34
24     (Exhibit 5 was marked for                03:34
25     identification and attached.)            03:34
                                        Page 265
```

67 (Pages 262 - 265)



1    (Exhibit 6 was marked for        03:34
2       identification and attached   03:34
3       hereto.)              03:34
4       THE WITNESS: Do you want me to do    03:34
5 anything?              03:35
6 BY MS. WEAVER:                   03:35
7    Q. Yes, will you pull them up?        03:35
8    A. Shall we start with 5?        03:35
9    Q. Sure. Take a look at both Exhibits 5 and    03:35
10 6 and tell me if you've seen them before.     03:35
11    A. I'm just trying to understand what is the   03:35
12 file I'm looking at.            03:35
13       (Pause while witness peruses document.)   03:35
14    A. Okay. Can I look at 6?        03:35
15    Q. Please do.             03:36
16       (Pause while witness peruses document.)   03:36
17    A. Okay.              03:36
18    Q. Have you seen these documents before?    03:36
19    A. No, I haven't.           03:36
20    Q. Okay. Do you -- are you aware of Facebook    03:36
21 searching Hive databases to obtain documents    03:36
22 relating to the plaintiffs in this case?     03:36
23       MS. STEIN: Objection to form.        03:36
24       THE WITNESS: I don't know how to respond   03:36
25 to that question. Are you talking about Hive    03:36

Page 266

1 specifically?             03:36
2 BY MS. WEAVER:                   03:36
3    Q. I'm actually talking about -- these     03:36
4 documents were produced to us and Facebook has said   03:36
5 that it --                 03:36
6                       03:36
7                    01:36
8       Did you prepare for your deposition to    03:36
9 discuss these documents today?         03:37
10    A. No, I haven't.          03:37
11    Q. Okay. Do you know if there's a Hive table   03:37
12 named                      03:37
13    A. I don't know of that specific table.     03:37
14    Q. Okay. Do you know why -- I guess if you   03:37
15 don't know anything about that, I guess we'll just   03:37
16 have to come back.            03:37
17       MS. WEAVER: I think we need to go off the   03:37
18 record again. We'll be back. We're off the record.   03:37
19       THE VIDEOGRAPHER: We are off the record   03:37
20 at 3:37 p.m.              03:37
21    (Recess.)              03:38
22    (Off record: 3:37 p.m.)         01:38
23    (On record: 3:47 p.m.)         01:38
24       THE VIDEOGRAPHER: We're on the record at   03:47
25 3:47 p.m.              03:47

Page 267

1 BY MS. WEAVER:                   03:47
2    Q. Returning just for a moment to Exhibits 5   03:47
3 and 6, K.P., if you wouldn't mind, let's just look   03:47
4 at the columns on the left in those files.       03:47
5       Do you know what that refers to?      03:47
6    A. Sorry, just for the record, I'm under    03:47
7 oath.              03:47
8    Q. Yes. Good job. Thank you.        03:47
9                       03:47
10                       03:48
11
12                       03:48
13                       03:48
14                       3:48
15                       :48
16                    03:48
17                       03:48
18                    8
19                       03:48
20
21                       03:48
22                       03:48
23                    03:48
24       MS. STEIN: I'm just going to object for   03:48
25 lack of foundation.            03:48

Page 268

1       THE WITNESS: I don't know what it may be.   03:48
2 I can only look at the description, but I agree with   03:48
3 you, the format doesn't suggest -- it's like --   03:48
4 BY MS. WEAVER:                   03:48
5    Q. Are you aware of whether or not tables    03:49
6 like this are created for Facebook's internal    03:49
7 analytics?             03:49
8    A. I don't know.           03:49
9       MS. STEIN: Objection to form.        03:49
10 BY MS. WEAVER:                   03:49
11    Q. Okay. Are you aware of whether or not    03:49
12 Facebook tracks events related to the changes in    03:49
13 users' privacy settings and maintains them in Hive?   03:49
14    A. We have an obligation to make sure that we   03:49
15 understand when users are changing their privacy    03:49
16 settings. So what privacy settings they have    03:49
17 established for any activity they have on the    03:49
18 platform. So in that sense, yes, we do have a    03:49
19 record of that.            03:49
20    Q. I guess I'm asking something slightly     03:49
21 different. Do you know whether Facebook logs events   03:49
22 for every Facebook user that reflects their changes   03:49
23 in privacy settings, including old and new value   03:49
24 over time?              03:49
25    A. My understanding of your question -- well,   03:49

Page 269

68 (Pages 266 - 269)

3493

1 I have already answered that. Yes, Facebook has an            03:49
2 obligation to maintain a record of user's settings            03:50
3 in the privacy settings.                03:50
4       Q.  And do you believe that's contained in the     03:50
5 DIY file?                      03:50
6       A.  So the DYI file would include information        03:50
7 about the -- sorry.  Let me take a step back just to    03:50
8 make sure that I answer the question appropriately.     03:50
9            So the DYI file would have information        03:50
10 about a photo and when you uploaded that photo.  But    03:50
11 if you really want to check the privacy setting of      03:50
12 that photo there is probably a link that will link      03:50
13 you to the original post to check the privacy           03:50
14 setting of that photo.                03:50
15       Q.  You say "probably."  Do you know?            03:50
16       A.  I -- I think that's my understanding of      03:50
17 what I would be looking at, the DYI file, if I had      03:50
18 it in front of me.                03:50
19       Q.  Do you know whether the data contained in      03:50
20 these two Excel spreadsheets is contained in the DIY    03:50
21 files for those individuals?            03:50
22            MS. STEIN:  Objection.  Lacks foundation.    03:51
23            THE WITNESS:  I don't know what am I          03:51
24 looking at here.                03:51
25
                                            Page 270

1 BY MS. WEAVER:                    03:51
2       Q.  Okay.  Let me -- let me --          03:51
3       A.  I see the user ID --            03:51
4       Q.  Let me tell you that your counsel has        03:51
5 represented that this -- the first table logs events    03:51
6 related to the changes in user privacy settings,        03:51
7 including the old value and the new value.  Is it        03:51
8 your understanding that that is contained in the DIY    03:51
9 file?                      03:51
10       A.  The change of the privacy settings doesn't   03:51
11 necessarily mean that the users has posted             03:51
12 something.                    03:51
13       Q.  I don't understand your response.  I'm       03:51
14 just asking a simple question.            03:51
15       A.  Okay.  Your question is not that simple.      03:51
16       Q.  Let me ask my question, okay?            03:51
17            Is the information contained in this --      03:51
18 these logs in the DIY files for these people?           03:51
19            MS. STEIN:  Objection to form.  And the      03:51
20 witness should feel free to explain his answer as he    03:51
21 was just trying to do.                03:51
22            THE WITNESS:  Okay.  So let's say you go     03:51
23 to Facebook and you go to the composer and you look     03:51
24 at the privacy setting of your composer to be          03:52
25 public.  And you decide that whatever you are           03:52
                                            Page 271

1 planning to post next is not relevant for the           03:52
2 general public, but you only want to post it to your    03:52
3 friends or you want to be accessible by your            03:52
4 friends.                      03:52
5            Then you click on the option and you        03:52
6 change the privacy setting.  That is locked.  But       03:52
7 you haven't made the post yet.  If you made the         03:52
8 post, that's when the information can actually be        03:52
9 available in the DYI file.            03:52
10            So every time you change your app settings   03:52
11 or your settings in the composer doesn't mean that      03:52
12 you create an entry that will be available in the       03:52
13 DYI file.                    03:52
14 BY MS. WEAVER:                    03:52
15       Q.  I'm just asking a very specific question.     03:52
16       A.  And I'm answering with the best of my        03:52
17 ability because what you are saying here is             03:52
18 different.                    03:52
19       Q.  Yeah.  Is the answer that you don't know      03:52
20 whether or not this information is in the DIY file?     03:52
21            MS. STEIN:  Objection.  Form.            03:52
22            THE WITNESS:  My -- my answer is that this   03:52
23 information there is not always associated with the     03:52
24 user posting a piece of content on Facebook, and as     03:53
25 a consequence of that, that is not going to be          03:53
                                            Page 272

1 broadly available in the DYI file.          03:53
2 BY MS. WEAVER:                    03:53
3       Q.  Thank you.                03:53
4                                            :53
5                                            3:53
6                                            03:53
7
8                                            :53
9                                            3
10       Q.  Okay.  Has the data made available through   03:53
11 the DYI tool changed over time?            03:53
12       A.  It's a very broad question.  Are you         03:53
13 talking about specific individual?            03:53
14       Q.  I'm talking from 2012 to 2017, what -- how   03:53
15 has data made available in the DIY tool changed over    03:53
16 time?                      03:53
17       A.  I think the DYI file presents activity       03:53
18 that you have on the platform, and that's problem.      03:53
19 Because people are doing different things on the        03:54
20 platform than they did in 2012.            03:54
21       Q.  Right.  I'm not talking about the content;   03:54
22 I'm talking about the capabilities.  So how has it      03:54
23 over time changed what users could obtain about         03:54
24 their activity through the DYI tool?            03:54
25       A.  Again, the content is available if the       03:54
                                            Page 273

Veritext Legal Solutions
866 299-5127

3494

1 features are available. In that sense, yes, the    03:54
2 data would have changed.    03:54
3    Q. Did the fields change?    03:54
4    A. The fields described pieces of data, so    03:54
5 yes, they would have changed.    03:54
6    Q. Okay. Well, did the -- what I'm asking    03:54
7 is, in 2012 could I search for privacy settings, but    03:54
8 in 2017 I could not?    03:54
9    A. No, that's -- that wouldn't have changed.    03:54
10    Q. Are the same categories of information    03:54
11 available in the DYI tool in 2012 as it was in 2017?    03:54
12    A. Again, for the sake of the argument, if    03:54
13 you were able to see photos posted in 2017, that    03:55
14 meant that the composer allowed you to post photos    03:55
15 on Facebook. If in 2012 you could only post text,    03:55
16 that means that you wouldn't be able to see any    03:55
17 photos because you wouldn't be able to post any    03:55
18 photos.    03:55
19    Q. We are not understanding each other.    03:55
20    I understand that my content changes over    03:55
21 time. The question is whether the categories of    03:55
22 objects collected and made available in the DYI tool    03:55
23 changed over time.    03:55
24    MS. STEIN: And, Lesley, I actually -- and    03:55
25 I'm not trying to be combative. I actually think he    03:55
                                                 Page 274

1 was answering your question. So I don't want -- I    03:55
2 don't want to repeat what the witness said.    03:55
3    But, K.P., why don't you try again.    03:55
4    THE WITNESS: I'll try one more time.    03:55
5    The way the question is framed suggests    03:55
6 that nothing would change. And I'm answering the    03:55
7 question by saying, yes, it would change because the    03:55
8 features are available and the comment that can be    03:55
9 posted in the app will change. As a consequence of    03:55
10 that, the data that shows up in the DYI will be    03:55
11 different. 2017 --    03:55
12 BY MS. WEAVER:    03:55
13    Q. Do you --    03:56
14    A. Between 2012 and 2017, Facebook -- the    03:56
15 Facebook app provided different capabilities to the    03:56
16 users. Some of them may have been deprecated since.    03:56
17 Some of them may be still available. But the way    03:56
18 your DYI file looked in 2012 cannot be the same as    03:56
19 the way it looks in 2017.    03:56
20    And I'm not just talking about the same    03:56
21 things that you did in 2012 and repeated in 2017.    03:56
22 I'm talking about the enhancement with additional    03:56
23 pieces of information that may not have been    03:56
24 possible in 2012.    03:56
25    Q. So who decided what data is collected in    03:56
                                                 Page 275

1 the DYI tool?    03:56
2    A. I -- I don't know.    03:56
3    MS. WEAVER: Okay. I think we have no    03:56
4 more questions at this time. This deposition    03:56
5 remains open. There are a number of questions that    03:56
6 were not answered.    03:56
7    Q. Oh, I have one more question. How long    03:56
8 has the DYI tool existed?    03:57
9    A. I believe since 2012-2013 or something    03:57
10 around that time frame.    03:57
11 BY MS. WEAVER:    03:57
12    Q. So for data prior to that time, is there    03:57
13 any record for users of what data Facebook    03:57
14 maintained on them?    03:57
15    A. The DYI files shouldn't show data for    03:57
16 those users even prior to the date the tool was    03:57
17 available to users. I'm talking about the data that    03:57
18 the tool was exposed to users.    03:57
19    Q. When did the DYI tool begin collecting    03:57
20 data about users?    03:57
21    MS. STEIN: Objection to form.    03:57
22    THE WITNESS: I think everybody that has a    03:57
23 Facebook account since forever, they would be able    03:57
24 to download the DYI file and find that information    03:57
25 to be available in the DYI file.    03:57
                                                 Page 276

1    The question is when can they -- when have    03:57
2 they started downloading that file? And it's my    03:57
3 understanding is that they -- the ability for people    03:57
4 to download information that Facebook had on their    03:57
5 behalf started in 2012-2013 time frame.    03:58
6    MS. WEAVER: Okay. I think we have no    03:58
7 further questions. And, again, the deposition    03:58
8 remains open.    03:58
9    We can go off the record.    03:58
10    MS. STEIN: Well, I don't want to go off    03:58
11 the record yet because I would like to say that we    03:58
12 disagree and object to the idea that this deposition    03:58
13 is being held open.    03:58
14    And, you know, we'll just express our    03:58
15 disappointment that, you know, the witness spent a    03:58
16 lot of time preparing for this deposition on the    03:58
17 topics that Judge Corley ordered this deposition to    03:58
18 be on, and, you know, we're disappointed that, you    03:58
19 know, there wasn't time spent on those topics.    03:58
20    MS. WEAVER: We disagree. This deponent    03:58
21 does not know where user data is maintained and did    03:58
22 not -- could not even address the spreadsheets that    03:58
23 obtained user data that we sent to you ahead of    03:58
24 time, and I think it was an unfortunate waste of all    03:58
25 of our time. We can go off the record.    03:58
                                                 Page 277

70 (Pages 274 - 277)

3495

1    THE VIDEOGRAPHER: We are off the record    03:58
2 at 3:58 p.m., and this concludes data testimony    03:58
3 given by Konstantinos Papamiltiadis. The total    03:58
4 number of media units used was six and will be    03:59
5 retained by Veritext Legal Solutions.    03:59
6    MS. WEAVER: Thank you very much, Mr.    03:59
7 Papamiltiadis.    03:59
8    THE WITNESS: Thank you for having me.    03:59
9    (At the time of 3:58 p.m., the deposition    04:00
10   was concluded.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                Page 278

1    CERTIFICATE OF REPORTER
2    I, ASHALA TYLOR, CSR No. 2436, in and for the State
3 of California, do hereby certify:
4    That the foregoing proceedings were taken before me
5 at the time and place herein set forth; that any
6 witnesses in the foregoing proceedings, prior to
7 testifying, were placed under oath; that a verbatim
8 record of the proceedings were made by me using machine
9 shorthand which was thereafter transcribed under my
10 direction; further that the foregoing is an accurate
11 transcription thereof.
12    That before the completion of the deposition,
13 review of the transcript was not requested.
14    I further certify that I am neither financially
15 interested in this action nor a relative or employee of
16 any attorney or any of the parties hereto.
17    In compliance with Section 8016 of the Business and
18 Professions Code, I certify under penalty of perjury
19 that I am a Certified Shorthand Reporter with
20 California License No. 2436 in full force and effect.
21 WITNESS my hand this 26th day of February, 2021.
22
23    *a. 3lor*
24
25    Ashala Tylor, CSR #2436, RPR, CRR, CLR
                                                Page 280

1    PENALTY OF PERJURY CERTIFICATE
2
3    I hereby declare I am the witness in the within
4 matter, that I have read the foregoing transcript and
5 know the contents thereof; that I declare that the same
6 is true to my knowledge, except as to the matters which
7 are therein stated upon my information or belief, and
8 as to those matters, I believe them to be true.
9    I declare being aware of the perjury of
10 perjury, that the foregoing answers are true and
11 correct.
12
13
14
15 Executed on the _____ day of _____, 20__, at
16 _____, _____.
17   (CITY)          (STATE)
18
19    _____
20         KONSTANTINOS PAPAMILTIADIS
21         FACEBOOK INC. REPRESENTATIVE
22
23
24
25
                                                Page 279

Veritext Legal Solutions
866 299-5127

3496

**[& - 265]**

**&**

**&**  3:3 5:3,12 8:5,7
8:9,11 214:22

**0**

**00213423**  6:16
46:11
**00227697**  6:19
240:5
**01434884.csv**  6:21
**01434885.csv**  6:23
**02843**  1:6 2:6 7:17

**1**

**1**  1:25 6:8 7:11
10:4,8,24 11:2,13
11:16,20 12:2,13
12:17,19 13:3,5
14:3 15:13 17:19
88:1 162:1 170:1
194:17 198:9
203:1,6 208:14,22
209:16,22 211:20
211:24 236:21
**1,000**  194:3
**1-29-15**  6:19
**1.0**  198:1 201:16
211:12,13
**10**  6:8,12 16:5
87:24 88:10 162:9
170:10 192:4
**100**  207:2
**10166**  5:15
**10:50**  87:23
**11**  88:1,11 162:10
170:11 196:11
**11625**  280:24
**12**  88:12 162:12
170:12
**1201**  4:7
**12th**  3:8

**13**  88:13 162:13
170:13
**14**  88:14 162:14
170:14
**15**  88:15 162:15
170:15
**15-20**  58:6
**16**  88:16 162:16
170:16
**1600**  3:8
**17**  88:17 162:17
170:17
**171**  6:4
**18**  1:6 2:6 7:17
88:18 162:18
170:18 184:11
**1899**  46:19
**19**  88:19 162:19
170:19
**1st**  194:18,22

**2**

**2**  6:12 10:11,13,23
11:3,8,9,24 12:1
13:6,18,20,20,22
46:9 88:1 162:1
170:1 195:4,10,11
195:12,13,16
196:4,7,8,9,13,14
197:5 198:5,13
202:24
**2.0**  196:10 198:1
201:16
**2.1**  196:11
**2.10**  196:11
**2.8**  263:5
**2.x**  244:12
**20**  88:20 162:20
170:20 279:15
**20,000**  114:10
**200**  5:14 155:21

**2000**  194:18
**2007**  155:23
**2008**  194:18
**2009**  194:18
**2012**  17:12 18:25
28:25 29:13 61:23
97:7 120:24
121:16,18,22
144:19 153:5
176:18 179:10,22
180:20 181:16
203:17 212:14
221:4 230:16
231:19 232:25
233:14 240:18
246:6 251:10
253:5,9 255:13
256:17,21 264:7,8
273:14,20 274:7
274:11,15 275:14
275:18,21,24
**2012-2013**  276:9
277:5
**2012-2017**  61:20
**2013**  240:18
**2014**  50:11 53:12
195:7 197:9,10,12
202:22 209:13
221:4 264:12
**2015**  194:19,20,21
197:8 208:15,18
214:2 236:21
242:1 256:22
264:12
**2016**  214:2
**2017**  17:13 21:18
28:25 29:14 61:24
97:7 120:25
121:16,18,23
144:19 153:5
179:10 180:20

181:16 203:18
212:14 226:5
230:16 231:19
232:25 233:14
246:6 251:10
253:6,9 255:13
256:18 273:14
274:8,11,13
275:11,14,19,21
**2018**  30:15 49:3
188:24,25 195:20
212:19 235:7,25
236:6 237:1
246:11
**2019**  188:25
**2020**  195:9,14
251:10
**2021**  1:19 2:19 7:1
7:7 171:1 195:23
280:21
**206.623.3384**  4:9
**21**  88:21 162:21
170:21
**212.351.4000**  5:16
**213.229.7000**  5:8
**22**  88:22 162:22
170:22
**23**  1:19 2:19 7:1
88:23 162:23
170:23 171:1
**23rd**  7:6
**24**  88:24 162:24
170:24
**240**  6:17
**2436**  1:23 2:20
280:2,20,25
**25**  88:25 162:25
170:25
**256**  147:23
**265**  6:20

**[266 - account]**

| | | | |
|---|---|---|---|
| **266** 6:22 | **49** 6:14 | **ability** 90:8 | 215:12 217:4,18 |
| **26th** 280:21 | | 101:14 121:5 | 218:8,11,18,20 |
| **280** 1:25 | **5** | 123:5 149:2 | 219:3,13 220:4,18 |
| **2843** 1:4 2:4 | **5** 6:20 88:3 162:4 | 150:16 151:11 | 220:24 224:12,25 |
| **29** 242:1 | 170:4 265:22,24 | 166:1 186:3 | 225:4,16,17,22 |
| **2s** 13:10 | 266:8,9 268:2 | 249:15 272:17 | 226:1 227:11,13 |
| | **5,000** 17:1 | 277:3 | 228:21,25 229:3,4 |
| **3** | **5-8-14** 6:15 | **able** 89:11 142:18 | 229:14,18,21 |
| **3** 6:14 49:22,23 | **515** 6:13 | 144:4 160:18 | 230:1,18 231:2,5 |
| 50:2,3,4,7,10,12 | **526** 6:13 | 163:25 191:16 | 231:15 232:9,16 |
| 51:10 53:1,13 | **537** 6:13 | 197:2 251:5 263:4 | 233:13 234:5,7,9 |
| 56:14 88:2 155:6 | **548** 6:13 | 274:13,16,17 | 234:22 235:5,9,23 |
| 162:2 170:2 | **555** 3:8 | 276:23 | 236:24 239:6,7,10 |
| 195:17,19 196:12 | | **absolutely** 105:18 | 239:12,16 241:3 |
| **3.0** 196:13 | **6** | **abstract** 126:11 | 243:24 244:12 |
| **3.1** 196:14 | **6** 6:11,22 11:22 | **access** 14:16 15:6 | 245:18 246:1,12 |
| **30** 6:11 11:22 | 13:11 84:23 88:5 | 25:23 33:1 35:14 | 246:13,14 247:7 |
| 84:23 112:4 195:6 | 162:5 170:5 | 37:5 40:17,23,24 | 247:12 248:25 |
| 197:9 202:22 | 265:22 266:1,10 | 41:1 44:25 45:5 | 249:7,12 258:12 |
| **3200** 4:7 | 266:14 268:3 | 48:23,24 64:11 | 258:13 264:18,20 |
| **333** 5:6 | **699** 6:19 240:6 | 65:5 72:8,14 | **accessed** 51:16 |
| **3428** 104:12 | | 78:15,16 79:12,13 | 112:4 205:18 |
| **3431** 125:18 | **7** | 105:2 114:11 | 210:7 214:9 226:6 |
| **3433** 130:18 131:3 | **7** 88:6 162:6 170:6 | 120:19 121:25 | 233:1 263:25 |
| | **777** 219:14 | 122:6,9,12,21,23 | 264:16 |
| **4** | **8** | 123:4 151:4 | **accessible** 118:18 |
| **4** 6:17 88:3 162:3 | **8** 50:11 57:24 88:7 | 153:24 164:1 | 119:1 194:20,25 |
| 170:3 240:4,7 | 162:7 170:7 | 165:8 169:18 | 195:8,13,22,23 |
| 241:7,17 | **8016** 280:17 | 182:10,12,20 | 196:6 205:7 220:6 |
| **415.445.4003** 3:10 | | 186:4 190:7 | 224:3,19 225:2 |
| **424** 50:21 56:15 | **9** | 191:14 195:1 | 227:20 272:3 |
| 56:16 58:9 | **9** 6:4,12,25 10:3 | 196:23 197:1,2,19 | **accessing** 63:15 |
| **425** 93:19 101:8 | 10:12 12:13 14:5 | 197:23 198:4,10 | 105:5 |
| **429** 123:10 | 88:9 162:8 170:9 | 198:15,19 201:17 | **acclimate** 176:15 |
| **430** 123:14 | **90** 148:18 149:2 | 203:2,4,8 204:5 | **accomplished** |
| **433** 143:19 | **90071** 5:7 | 204:20 206:10,12 | 139:23 145:11 |
| **434** 152:5 | **91** 6:25 | 207:19,19 208:13 | 146:16 168:15 |
| **443** 6:16 46:12 | **94607** 3:9 | 208:14,19 209:9 | **account** 20:8 21:2 |
| **4473154** 1:24 | **98101-3052** 4:8 | 209:10,11,14,23 | 21:6,8 42:2 44:23 |
| **46:37.1.** 268:22 | | 211:5,11,12,20,23 | 67:24,25 78:20,20 |
| **47th** 5:6,14 | **a** | 213:9,13 215:11 | 79:15,15 98:16 |
| | **a.m.** 2:18 7:2,6 | | |
| | 88:2,3,5,7 | | |

[account - affinity]

| | | | |
|---|---|---|---|
| 127:4,6 132:13 | 89:23 100:23 | 141:8 143:23 | 262:16,21,25 |
| 135:21 139:4,4,7 | 101:5 102:14 | 144:1,3,24 151:24 | **advantage** 131:16 |
| 140:3 148:25 | 141:13 158:20,22 | 154:20,21,24 | **advertise** 42:19 |
| 149:1,9 153:17 | 158:23 159:3,24 | 155:2 194:2,5,5 | 70:4 75:4 76:11 |
| 161:24 183:1 | 162:15 163:7 | 253:17 254:1,11 | 261:16,18 |
| 193:23 200:16 | 165:13 177:6 | 254:15,17,21,24 | **advertised** 261:25 |
| 249:10 276:23 | 183:14 186:22 | 255:6,7 259:25 | **advertisement** |
| **accounts** 19:22 | **activity** 14:20,21 | **adavis** 3:12 | 114:15,15 192:24 |
| 34:11 | 14:24 21:22 28:7 | **add** 207:11 214:25 | 261:14,18 262:1,6 |
| **accuracy** 107:3 | 31:12 59:25 61:2 | 216:4 259:17 | **advertisements** |
| 173:18 | 61:5,7 65:18 69:5 | **added** 39:1,2 | 254:5 255:4 |
| **accurate** 26:5 38:6 | 69:10 81:7 90:21 | 81:12 97:9 | **advertiser** 43:24 |
| 173:4 206:24 | 91:4 92:4,15 | **additional** 138:24 | 70:3 73:14 75:18 |
| 207:2 280:10 | 97:10,18 98:2,7,8 | 275:22 | 75:19,23 80:5 |
| **accurately** 264:6 | 101:15 112:1,10 | **address** 9:19 | 81:16 82:7,8 |
| **accuse** 94:14 | 112:17,18,19 | 31:13 60:24,24 | 86:19 97:5 115:5 |
| **acquired** 90:6 | 113:9,10,11 128:4 | 62:12 63:10,13,15 | 115:22 137:25 |
| 132:3 | 142:20 145:1 | 65:7 78:18 80:7,8 | 150:15,16 258:22 |
| **acquires** 152:25 | 154:2 156:23 | 80:12,13,21,22 | 259:7,15,17,24 |
| **acquisition** 93:6,7 | 159:10,18,20 | 83:8 105:6 112:5 | **advertiser's** 82:5 |
| 93:10,13 130:14 | 161:19 162:2 | 119:12 137:12,20 | **advertisers** 41:9 |
| **action** 7:21 10:5 | 163:1 166:4 | 137:21 193:24 | 73:12 76:6 77:12 |
| 32:11 39:3,5,19 | 172:15,16 177:22 | 249:13 277:22 | 77:19,21,24 81:4 |
| 62:24 66:20 69:2 | 180:11,24 184:14 | **addresses** 74:22 | 82:19 83:17,21 |
| 75:22 76:20 97:19 | 242:14 268:20 | 78:5,7,16,17 | 85:8 93:23 94:3 |
| 98:3 103:13,23 | 269:17 273:17,24 | 79:13 82:18 137:3 | 94:22 119:25 |
| 115:18 162:18,19 | **actor** 257:13 | 143:14 151:10 | 141:12 143:13 |
| 177:25 178:2,17 | **actual** 258:15,17 | 193:9,25 | 144:23 184:22 |
| 178:21 179:9,17 | **ad** 32:12 43:13 | **adjust** 9:17 | 191:22 192:17 |
| 188:10 250:9 | 44:2,4,12 64:23 | **administrator** | 254:5,8 261:1 |
| 253:13 254:13 | 70:6 75:2 78:11 | 217:9 | 262:12 |
| 256:23 265:14,18 | 81:19 82:11,12 | **administrators** | **advertising** 84:8 |
| 280:15 | 86:15,20 96:20 | 212:9 | 84:10,15,19 85:3 |
| **actions** 1:8 2:8 | 105:9 106:12,12 | **adobe** 218:11 | 261:2,7,9 262:7 |
| 38:8 45:14 76:15 | 106:18,21 107:5 | **ads** 31:22 41:25 | **affiliation** 258:3 |
| 89:16 102:7 144:4 | 107:22 110:21 | 56:17 65:2 75:14 | **affiliations** 7:24 |
| 178:25 235:16 | 113:15,19 114:12 | 97:14 98:18 | 70:24 |
| **actively** 150:21 | 114:22,23 115:3,6 | 119:22 132:15 | **affinity** 40:6 66:1 |
| **activities** 41:23 | 115:12,19,21 | 145:25 194:6 | 66:13 175:6 192:8 |
| 42:10 46:2 63:5 | 116:22 117:18 | 252:1 254:23 | 253:14 |
| 82:18 87:14 88:18 | 119:5,7 136:2,12 | 255:3 260:3 | |

[affirmed - api]

**affirmed** 9:10
**afternoon** 171:8
**ag** 49:7
**age** 114:5
**agencies** 48:11
**aggregate** 184:21
**aggregated** 130:24
  132:16 134:19
  185:4 187:19
  220:5,8 254:10
**aggregates** 141:11
  141:22 143:2
**ago** 48:22 90:7
  132:3 186:14
  203:23 252:12
**agree** 7:9 45:18,24
  179:25 252:6
  269:2
**agreed** 64:6,7
**agreeing** 76:3
**agreement** 29:1
**agreements**
  182:20
**agrees** 182:25
  259:24
**ags** 49:2
**ah** 105:11
**ahead** 19:17 42:9
  56:1 81:9 84:5
  94:16 132:12
  240:3 277:23
**air** 219:14
**airplane** 219:10
**alcoholism** 193:19
**algorithm** 107:9
  110:20 113:14
  116:18 117:25
  119:6 146:16
  147:24 171:18,21
  171:23 172:8,12
  173:11 176:8

219:20
**algorithms** 107:19
  107:23 116:3
  117:2 118:2 257:4
**aliases** 132:13
**aligns** 229:10
**allow** 22:16,22
  23:12,14,25 35:17
  40:22 56:2 107:1
  114:17 132:7,20
  139:4 150:9
  180:11 181:24
  185:19 198:10,15
  200:21 202:3
  203:12,15 206:10
  206:11 207:18,21
  208:2 227:15
  234:5 236:14,14
  245:17 261:1
**allowed** 105:2
  121:10 122:23
  158:2 178:24
  199:10 203:3
  211:10 223:10
  244:8 247:2,20
  249:14,16 274:14
**allowing** 95:25
  212:10 231:15
  232:9 235:2 251:8
**allows** 39:18 40:13
  120:18 122:5
  124:20 145:1
  212:8 213:16,23
  217:8 227:25
  234:7,9 239:5
  244:2
**amend** 194:23
**amended** 6:8
  11:20
**amount** 16:20
  40:25 152:9 155:8

**analysis** 65:22
  150:9,10 200:1,4
  200:8,21,22,25
**analytic** 254:4
**analytica** 208:24
  208:25
**analytics** 184:3,21
  199:12,23 269:7
**analyze** 30:8,16
  31:6 125:12
**analyzes** 30:20
**android** 20:9
  34:20,24 64:20
  87:8 171:16 184:1
**angeles** 5:7
**anne** 3:5 8:6 46:10
  240:2
**announced** 202:23
  208:18
**annual** 202:22
**anon** 267:12
**anonymize** 135:1
**anonymized**
  108:21 130:24
  134:19,23,24
  162:4 167:10
  187:19,25 188:3,4
  194:8 250:19
**answer** 6:24 9:22
  14:13 19:17 21:15
  21:19 23:12,13,14
  24:13,25 25:11
  27:7 42:6 47:15
  54:16,22 55:11,22
  56:3 59:10 67:21
  76:9 84:6,13
  89:21 91:14,19
  92:10,11,20
  100:11 107:14
  109:2 111:3
  116:15 121:17

135:5,14 146:9
  148:6 163:19
  165:25 168:19
  177:13 178:5,8,10
  181:4 182:2
  186:17 190:24
  200:10,15 202:21
  205:1 212:23
  213:2 223:16
  229:2 233:25
  238:2 244:24
  245:13 250:20
  253:24 254:2
  260:22 261:11
  270:8 271:20
  272:19,22 273:9
**answered** 57:19
  89:20 233:5
  235:21 270:1
  276:6
**answering** 85:1
  91:24 181:5,7
  200:11 272:16
  275:1,6
**answers** 26:19
  279:10
**anybody** 25:1 26:1
  42:21 53:5 57:14
  72:14,18 119:1
  233:24 260:23
**anybody's** 135:8
**anymore** 241:6
**anyway** 147:3
**ap** 41:1
**api** 16:21 17:6,15
  17:19 40:10,12,24
  42:18 43:2 44:16
  120:15,18 121:4
  121:14,19,20,23
  122:1,4,5,13,23
  137:2,22 140:4

Page 4

[api - area]

| | | | |
|---|---|---|---|
| 147:12 159:4 | 196:17 207:18 | 185:10,18 186:5 | apply 116:2 |
| 161:2 166:5,6 | 208:3 209:9,11 | 186:14,15 188:7,9 | appointment 44:8 |
| 182:17 194:15,17 | 220:16,17,17 | 190:11,23 193:14 | appropriate |
| 195:4,6,16 196:2 | 221:5 226:6,11,22 | 193:24 196:24 | 209:16 |
| 196:3,5,8,20,20 | 226:23,24 227:11 | 197:3,6,12,14,15 | appropriately |
| 196:21,21,23 | 227:13,15,22 | 198:10,11,15 | 210:17 270:8 |
| 197:1,2,5,20,25 | 228:22 229:5,14 | 209:12,13 223:25 | approve 220:24 |
| 198:6,9,13 199:9 | 231:1,3,6,12,22 | 223:25 224:7,8,25 | approved 195:17 |
| 199:10,12 200:7 | 231:23 232:10 | 225:2,15,24 | 197:2 |
| 200:21 201:1,8,13 | 233:14,15 234:4 | 226:14,19 229:19 | approves 39:22 |
| 201:16 202:24 | 235:6,23 236:22 | 229:20,21,25 | apps 34:11,15 |
| 203:1,7 206:11,11 | 236:24 237:10 | 239:5,12 246:17 | 46:2 52:7 58:19 |
| 208:23 209:16,22 | 239:1 245:19 | 246:20 247:2,7,9 | 61:11,23,25 87:8 |
| 211:21,24 212:7,8 | 249:8,20 | 247:12,14,18,20 | 90:9 99:7 101:6 |
| 212:16,18 213:6 | apologies 13:14 | 247:21 248:6,7 | 102:7,20 130:14 |
| 213:15,16,19,23 | apologize 13:17 | 250:14 251:4,9,11 | 131:16 132:4 |
| 214:4,10,13,16,24 | 143:22 147:15 | 252:8 272:10 | 137:2,24 138:13 |
| 215:1,2,10,11,12 | app 30:7 32:23 | 275:9,15 | 139:3,12 141:13 |
| 217:4,6,8,14,15 | 41:9 61:3 63:10 | app's 137:20 | 143:8 145:13,15 |
| 217:15 218:3,16 | 90:6,14 97:3 | appear 145:16,17 | 152:23,23 165:14 |
| 218:18 219:6,13 | 105:1 122:13,17 | 166:8,20 | 166:24 167:3 |
| 219:18 220:1,11 | 131:17 132:13 | appearance 8:1 | 176:22,23,25 |
| 220:25 221:1 | 137:2,10 138:5,8 | appearances 3:1 | 177:15,17 179:23 |
| 222:11,13 223:7 | 138:11,12,18,20 | 7:24 | 180:13,15,15,23 |
| 224:4 225:25 | 138:21 139:6 | appears 110:18 | 181:13,14 182:5,9 |
| 226:2,7,8,12,14 | 140:4,5,7,17,17 | | 182:20 183:13,19 |
| 226:21 227:14,25 | 143:3,6 144:24 | | 185:6,17 186:1,14 |
| 229:8,10,17 | 145:9,10,14 146:3 | | 189:20 190:3 |
| 230:20 231:11 | 147:9,12,13 | | 198:25 202:15 |
| 234:6,7,13,24,24 | 151:24 152:12,16 | | 205:15 239:9,12 |
| 240:12,14,20 | 152:25 153:1,9 | | 239:15 243:23 |
| 241:3,4 243:24 | 159:12,24,25 | | 246:20 |
| 244:8,23 245:6,7 | 160:1 161:9,22,25 | | april 194:20 195:6 |
| 245:8 246:22,23 | 165:11,16,22 | | 197:8,9,12 202:22 |
| 246:25 263:8,17 | 166:3,4,7,10,22 | | architected 159:6 |
| apis 16:18 17:3,4 | 177:9,20,23 179:1 | application | architecture |
| 17:5 25:23 40:9 | 180:4,12 181:22 | 209:21 | 138:15 157:5 |
| 40:18,23 41:12 | 181:23,24 183:21 | applications 40:13 | 158:16 160:19 |
| 48:23 120:10 | 183:22,25 184:1,9 | 40:14 | 169:22 260:21 |
| 132:7,20,25 | 184:10,13,13,15 | applied 107:24 | area 114:4 129:25 |
| 182:10,11 194:10 | 184:15,15,16,17 | 108:1,1 | 157:5 |

[argue - aware]

| | | | |
|---|---|---|---|
| **argue** 208:4,7 | 243:5,13 | **attachment** 50:20 | **authenticated** |
| **argument** 38:13 | **assigning** 147:21 | **attachments** 50:11 | 140:13 166:8,25 |
| 114:10 162:9 | **assisting** 157:6 | **attempted** 78:4 | **authentication** |
| 193:15 274:12 | **associate** 79:4 | 166:9,21 | 138:22,25 |
| **argumentative** | 83:8 125:15 | **attend** 261:21 | **authorities** 72:7 |
| 200:13 263:11 | 190:12 | **attending** 7:7 | 133:22,24 134:9 |
| **arrival** 179:20 | **associated** 60:14 | **attention** 11:23 | **authority** 133:12 |
| **arrived** 187:23 | 108:21 109:7 | 50:21 95:22 124:7 | 133:17,20,20 |
| **arrow** 80:11 | 110:12,23 111:5,8 | 130:22 | 230:25 |
| **arrows** 80:18 | 120:16 128:1,2,17 | **attorney** 8:2 | **authorized** 22:6 |
| **art** 113:7 | 128:22 129:1,4 | 280:16 | 23:9 56:7 201:24 |
| **artists** 259:12 | 134:25 139:8,17 | **attorneys** 1:13 | **auto** 72:6 73:2 |
| **ashala** 1:23 2:19 | 139:21 141:6 | **attract** 261:23 | 221:7,11 234:6,12 |
| 7:20 280:2,25 | 143:15 159:16,20 | **attribute** 163:17 | 238:20 |
| **aside** 155:6 | 159:22 161:19 | **auction** 114:16,16 | **automatic** 11:1 |
| **asked** 51:12 89:19 | 162:24 165:11 | **audience** 25:20 | **automatically** |
| 110:16 162:12,13 | 166:2 188:10 | 70:5 73:22 78:8 | 238:9 |
| 202:13 233:5,6 | 216:11 222:11 | 80:2 114:9,12,18 | **availability** |
| 256:2 | 226:14 257:9 | 118:7,14,16 | 196:22 220:18 |
| **asking** 30:19 | 258:5 272:23 | 143:12 148:15 | **available** 14:17 |
| 43:20 46:9,16 | **association** 110:24 | 150:11,17,24,25 | 21:18 32:22 68:19 |
| 49:16 71:24,25 | 116:21 142:12,14 | 151:8,25 189:17 | 75:11 78:7 119:24 |
| 72:2 102:16 | 159:17 161:13,17 | 191:13,14,16 | 121:20,24 142:23 |
| 142:25 146:25 | 161:21,22 162:17 | 192:6,17,23 193:6 | 163:23,24,24 |
| 154:5 157:14 | 257:22 | 193:8 194:2 223:1 | 164:23 165:12,17 |
| 162:1 168:6,7 | **associations** 160:4 | 227:18,19,22 | 165:23,23 169:3,9 |
| 169:12 181:10 | 161:15 255:22 | 259:16 260:2,3 | 181:23 186:5 |
| 199:20 201:25 | **assume** 20:8 29:14 | 261:21 | 196:13,14,21 |
| 202:5,7 205:4 | 47:23 66:1 83:18 | **audiences** 73:18 | 208:22 209:15 |
| 209:2 211:6 230:9 | 160:16 161:2 | 73:21 81:1 85:19 | 211:13 224:6 |
| 231:7 232:1 233:7 | 169:10 240:15 | 143:13 150:8 | 225:11,12 227:21 |
| 233:10 237:21 | 256:17 263:14 | 151:13 191:21 | 235:4 265:19 |
| 238:1 260:6 261:6 | 268:10,14 | 192:12 259:21 | 272:9,12 273:1,10 |
| 269:20 271:14 | **assumption** | 262:12 | 273:15,25 274:1 |
| 272:15 274:6 | 187:11 206:13 | **audio** 7:8 82:25 | 274:11,22 275:8 |
| **aspects** 15:12 | **atlas** 144:9,20 | **august** 195:23 | 275:17 276:17,25 |
| 16:21 153:15 | **attached** 10:9,14 | **auld** 3:3 8:5,7,9,11 | **avenue** 4:7 5:6,14 |
| 158:23 168:11 | 49:24 53:18 141:3 | **authenticate** | **aware** 121:9 |
| **assign** 148:1 | 149:4 222:18 | 138:19 139:1,6 | 122:18 148:17 |
| **assigned** 138:13 | 236:22 240:8 | 140:6 142:6 246:3 | 157:16,16,17 |
| 139:24 148:22 | 265:25 266:2 | | 169:8,16 179:21 |

[aware - bob]

180:16 181:15
182:12,19 184:2,3
184:5 194:14
215:15 236:3
266:20 269:5,11
279:9

**b**

**b** 6:6,11 11:22
15:14 84:23
247:18,19,20
**back** 15:13 23:10
26:24 37:19 42:22
51:17 52:25 53:1
56:13,14 58:8
59:23 62:21 67:10
74:6 75:12 77:12
78:1 79:2 81:2
83:12 87:9,23
97:1,17 98:2,9,21
100:17 101:7
102:5 108:19
109:2 113:13
118:9 125:15
128:19 129:6,9
134:17 135:14
137:20 139:5,17
140:7 142:9 152:1
158:18 160:2
166:16 173:19
177:1 179:4
180:12,15,24
181:24 183:15
185:4 195:24
202:16 204:3
208:8 209:13
223:16 224:7
225:15 233:21
242:3 251:11
253:20 256:11
257:25 267:16,18
270:7

**background** 82:25
123:22
**backgrounded**
33:8
**bad** 193:19
**balance** 179:22

**barrel** 214:22
**based** 42:14 80:8
80:24 104:23
106:23 108:2
116:23 139:6
150:17,24,25
169:10 172:4
173:1 174:8 229:5
245:11 250:9
253:15
**basic** 17:3,4 80:9
**basically** 22:20
38:15 40:12 70:6
97:24 110:15,25
118:10 126:11
140:11,18 154:25
188:7 191:1
234:13
**basis** 149:17
155:11 251:22
**bates** 46:11,17,19
50:21 56:15 58:9
240:5
**battery** 32:16,21
**beacons** 35:14
**bear** 19:6 259:9
**bearing** 46:11
240:5
**beat** 114:17
**beginning** 8:1
93:19 135:25
**begins** 130:23
143:21

**behalf** 8:19,23 9:1
9:3 12:8 22:7 27:1
47:1 56:7 159:12
179:15 183:9
213:5 277:5

**behaviors** 33:7
99:24 100:2,9,21
102:6
**belief** 279:7
**believe** 12:3 35:15
39:8 49:11 53:12
53:13 92:8 97:9
98:5 207:1 216:4
220:12 221:5
244:24 262:15,24
264:4 270:4 276:9
279:8
**belong** 118:14,23
**belongs** 127:22
**best** 166:1 186:3
272:16
**better** 31:21 32:8
39:13 63:24
199:17 261:16,17
262:10,17,20
**beyonce** 66:5,22
70:5,9 150:22
151:5,9 192:8,21
259:21

**beyonce's** 65:25
66:22 67:4,7
68:16 70:1,4,8
128:14 150:24
259:11
**beyond** 22:5 52:21
84:25 91:5,11
106:3 146:20
157:23 167:16
174:16,23 208:14
261:4 263:2
**bfalaw.com** 3:11
3:12,14
**bid** 115:23
**bidder** 114:22
**biden** 77:1
**big** 55:2
**billion** 263:5
**biological** 186:22
**birth** 68:3 163:22
**birthday** 68:8
118:17 198:16
**birthdays** 198:12
**bit** 27:9,10 40:19
42:7 54:14 69:25
71:13 74:3 87:20
96:13 118:8
123:21 131:15
171:11 178:19
195:25 199:17
237:25 249:24
250:23 262:8
**black** 245:21,23

**bleichmar** 3:3 8:5
8:7,9,11
**bluetooth** 35:13
**bob** 143:23 144:1

[bodily - capability]

bodily 186:21
body 186:21

bold 125:19
book 158:16
176:13
books 44:8
bottom 50:22 90:2
95:22 101:8 131:2
143:19 225:14
242:7
bowl 261:20,21,25
box 62:8 65:12
79:19
boxes 62:16
brand 200:17,19
200:24 262:2,5,5
262:5
branded 58:19
61:11,14,22,25
brands 200:4,5
break 38:23 42:7
62:4 74:2 87:18
87:20 88:14
223:21 228:5,5,7
253:2 264:23
briefly 234:15
bright 130:15,19
bring 23:21 24:1
brings 141:22
broad 27:21 41:4
42:5 44:20 72:14
93:1 109:8 117:6
135:3 163:14
180:8 182:23
186:2 192:2
202:25 207:23
251:25 259:9
273:12
broadcast 213:17
213:24 216:13

broader 151:25
broadly 26:17
35:22 48:25 61:18
116:10,12,14
191:23 273:1
broker 71:22 72:3
72:11,12,16
brokers 25:6,9
71:20 73:8 83:18
83:22 85:8 95:7
95:13 96:7,9
141:13 250:15
brought 160:23,25
161:6
browser 11:1
31:17 32:22 33:2
102:6
browsers 144:13
145:2,4
browsing 88:25
89:5
bucket 24:11
budget 259:25
build 22:20 23:25
25:17,19,24
262:16
building 132:25
built 23:23 132:7
132:20 209:21
bullet 95:5,22
105:10 129:10
business 20:14
24:4,9,16,20 25:1
25:4 26:2,15 41:2
41:10 42:21 44:4
46:5 51:22,24
53:15 73:23 94:25
95:18 113:25
119:21 175:7
192:25 193:3
261:15,22 262:14

280:17
businesses 24:10
24:18 25:25 41:5
66:14 156:20
255:25 261:18
262:13
button 39:15,25
40:4,6 41:12
89:25,25
buy 43:15 75:4
254:24

c

c 4:1,5 5:1 247:19
247:20,21 268:18
268:19
ca 6:16,19,21,23
46:11 240:5
calculated 108:8
114:25 174:8
calendar 249:17
california 1:2 2:2
3:9 5:7 7:17 48:4
280:3,20
call 25:21 26:8,14
52:4 78:8 122:15
137:22,22 138:10
140:4,22 147:12
159:11 161:2
166:5,6 182:11
196:24 205:2,3
214:24 216:9
222:14 259:13
called 25:15 34:2
51:24 52:1,17
66:21 90:11
138:11 147:23
156:13 184:3
202:23 209:12
210:12 226:12
227:11 229:12
242:21

calling 64:19
calls 58:4 159:4
226:2,10
cambridge 208:24
208:25
camera 30:4,5
35:20
campaign 44:13
70:6 73:25 75:2
76:21 81:19 82:9
82:11 86:20 107:5
114:2,7,12 115:3
115:6 151:8,19,24
194:2 228:1
259:25
campaigns 44:3,4
76:7,11 77:7,13
86:15 115:12,19
115:21 141:8
144:25

candidates 239:14
candy 192:4
capabilities 24:1
120:6,16 121:14
183:12 211:19
212:6 215:19
234:14,19 235:5,8
235:16,21,22
236:1,4,23 237:4
263:8,17,21,23
264:1,7,13,15,19
273:22 275:15
capability 120:14
121:5 185:4
197:18,19 210:12
210:19,20 211:7,9
211:10,18 212:4

[capability - coach]

221:7,15,17,21,25
239:3,5,14 245:2
246:2,5 247:6,19
248:4
**capability's** 248:2
**capacity** 93:2
**capture** 138:24
145:1 167:4
**captured** 68:13,18
68:22 69:3,3,12
87:15 88:19 89:23
101:16,22 146:1
158:25 159:4,25
173:24
**captures** 40:6
102:22 159:8
**car** 261:24
**card** 73:4
**cards** 73:3
**cari** 4:5 8:12,16
**carrier** 31:15 65:8
**cart** 39:1,2,13
81:13,21 167:5,6
167:7
**carts** 38:20
**case** 1:5 2:5 7:17
19:8 25:10 80:9
84:10,11 149:3,8
153:19 160:17
168:21 169:2
229:9,10,16,19,24
248:3 266:22
268:14
**cases** 21:21 71:1,3
71:7 241:2,4,5
255:10
**categories** 12:23
15:19 25:4,15
26:17 35:24 58:10
60:6 62:4 72:21
72:24 80:24 115:5

154:10 186:18
205:17 251:15
252:4,5,13,15
253:3,8 255:3
274:10,21
**category** 18:6
25:16,21 26:1,7
71:14 83:12
150:14 186:17
239:11 252:12,13
252:16,17 254:23
257:9,11,12 259:9
**causes** 253:11
**cease** 110:24
**celebrating** 68:8
**cell** 35:14
**centralized** 101:10
**ceo** 93:14
**certain** 15:11,18
16:1,21 32:25
33:2 37:5 43:3
45:1 66:4,4,13,14
72:8 75:13 76:14
91:23 114:5,6
125:12 149:7
153:15 158:23,23
165:7 174:25
177:5 186:16
191:2 194:9 200:4
201:16 204:4
209:6 213:7
219:12 227:24
229:6 235:15
245:19 253:10,13
253:18 254:11
255:23,23 257:8
257:12 258:5
267:6
**certainly** 260:17
**certificate** 279:1
280:1

**certified** 280:19
**certify** 280:3,14
280:18
**cetera** 62:12 73:4
**chances** 262:9
**change** 87:4 149:3
149:7 163:10
171:11 237:8
238:5,8 252:19
253:4,8,11,15
256:12 271:10
272:6,10 274:3
275:6,7,9
**changed** 213:19
273:11,15,23
274:2,5,9,23
**changes** 164:9
172:3 267:12
269:12,22 271:6
274:20
**changing** 269:15
**characteristics**
114:20 125:2,13
**characterization**
158:15
**charge** 130:7
231:8,10 232:16
**charges** 90:10
**chart** 62:4 81:3
82:21 85:24
100:21
**chatter** 218:16,21
219:6 220:1,4
**check** 97:4 168:19
195:15 235:17
270:11,13
**chen** 5:20 9:4,4
**choice** 38:12
**chose** 115:5
**chrome** 144:3

**chronological**
242:5
**city** 279:17
**civil** 6:11 11:22
**clarification** 28:1
207:12 234:22
**clarified** 177:19
207:9
**clarify** 28:9 29:15
29:15 116:4 207:7
**clarifying** 207:17
**clarity** 262:8
**clark** 5:5 8:25,25
**claufenberg** 4:11
**clear** 64:10 181:20
207:13 245:13
**clearly** 255:7
259:5
**click** 39:24 75:3
272:5
**clicked** 115:14
**clicks** 172:14
**close** 29:24
**closely** 26:11
**closer** 23:21
**cloud** 132:4
**clr** 1:23 2:20
280:25

**cnn.com** 38:11
**cnn.com.** 38:15
**coach** 28:21 29:9

[coaching - connected]

coaching 94:11,14
106:6 149:21,24
158:2
code 27:13,16,17
40:18,25 124:20
238:10,11,14,16
248:18,22 280:18
coffee 87:21
coincided 197:6
colleague 46:10
collect 20:22,23,24
21:9 27:19 28:11
30:3 31:13,15,16
33:6,13,17 34:12
35:1,6,12,16,18
35:23,25 36:14,16
37:3 62:8,13,19
62:20,21 63:2,9
63:13 65:3 67:10
86:4 102:25 191:6
250:24 265:17
collected 14:20
31:20 32:7 38:19
58:19 59:25 64:1
67:16 109:11,16
150:6,9,18 169:5
190:13 205:6,17
232:24 273:7
274:22 275:25
collecting 91:8
265:12 276:19
collection 171:14
collective 57:23,23
229:5
collects 27:24
28:16 31:9 34:9
36:8,23 37:7 38:8
63:17 65:6 73:8
102:17 137:1,23
175:11 184:21
192:15 250:3

264:14
column 62:7 268:9
268:18,19
columns 268:4
combative 274:25
combination
83:17,21 125:1,3
220:2
combined 151:14
come 9:23 31:2
38:16 45:1 52:25
56:13 66:25 67:23
68:7,15 87:22
111:22 129:6
151:9 189:15
193:3 198:22
209:10 213:25
219:4 222:15
232:11 240:12
258:23 264:9
267:16
comes 61:2 109:25
111:13,25 118:13
131:10 176:4
226:18 229:4
237:9
comfortable 87:19
207:9
coming 123:22
commencing 2:18
comment 275:8
commenting
127:19 162:20
comments 26:8
173:2 217:12
268:17
commerce 44:9
commitment
103:11,16 120:4
commitments
95:8,16,19

commonest 229:9
communicate
40:13 51:18,20,21
communicated
190:22 223:8
communications
30:17,21 118:20
120:2 189:16
201:22,24 202:6
202:25
community 22:19
31:7
companies 23:24
25:23 26:3,9
73:16 204:20
219:7
company 22:7
40:7 44:9 57:25
86:22 91:2,23
106:1 122:19
210:4 213:6
219:12 229:12
company's 176:20
213:1
compete 194:5
competing 260:2
competitor 114:18
complete 54:14,18
55:15 56:2,5
243:14
completed 81:14
completely 106:5
131:22 198:14
252:10
completes 44:11
completion 280:12
compliance
280:17
compliant 183:8
complicated 67:20
147:8 224:10

comply 189:21
composer 271:23
271:24 272:11
274:14
compress 90:8
computer 37:20
105:5
computers 31:10
83:2
concept 28:2
concise 55:2
concluded 278:10
concludes 278:2
conclusion 107:11
condition 192:15
192:18,21 193:5
conditions 185:16
185:25 186:11
187:8
conducted 48:1
conference 202:23
confidential 1:13
confirm 37:23
75:12 140:11
confused 13:19
237:22 253:18
confusing 63:19
149:18 232:13
236:20
congress's 33:4
congressional
30:14 33:5 45:12
45:22
conjunction 86:14
86:15
connect 22:16,21
22:22 23:21 24:2
173:16 190:25
connected 22:17
31:10,11,13,14
162:3 188:15

Page 10

3506

[connection - create]

connection  23:2
36:17,20 120:9,9
126:6,12 158:24
215:13 216:14
connections  70:23
160:7,8,12 245:11
consecutively
46:22
consent  35:21,22
36:1,7,9,15 44:25
45:4 94:3,22
183:10 197:23
209:17 225:3
235:2
consequence
234:24 272:25
275:9
consider  26:6
considerable
16:20
considered  118:24
118:25
consistent  58:21
106:24
constantly  171:22
171:25
constituents  24:4
constitute  183:16
consult  15:21
consumer  1:4 2:4
7:14
consumers  25:24
contact  249:15
contain  263:7
contained  55:6
102:9 108:13
154:13,20 158:19
159:15 160:14
161:18 162:2
163:5 165:10
166:12 167:15

267:6 270:4,19,20
271:8,17
content  27:13 30:8
30:11,17,20 31:7
31:21 32:9 40:3,5
118:22 119:24
171:19 172:11,20
173:13 174:1,10
174:11 175:9
180:3 217:11
222:8 272:24
273:21,25 274:20
contents  16:6 18:7
28:17 30:1 51:11
212:10 217:23
279:5
context  14:15 76:4
76:10 85:23 86:1
86:3 96:23 116:9
117:9 139:12
143:12 148:19
150:7 178:6,20
180:8
continue  7:8 85:1
147:4 202:10
203:4 206:19
continued  4:1 5:1
continues  85:2
contractual  183:2
183:4
contributes
262:14
control  95:20
96:19 163:25
197:20 206:10
209:11 220:18
264:20
controls  163:8,10
163:16,17 164:9
207:20 236:24
264:18

conversation
69:25 80:24
117:21 119:2
122:6,11
conversations
102:7
conversion  73:18
74:25 75:9,16,22
76:2,5,14,25 77:5
77:6,11 86:16
conversions  88:25
89:5 99:4
cookie  37:3,8
144:9
cookies  37:5,7
cooperative  95:24
96:4,9
copy  46:22 55:5
176:18
core  122:14
235:10,11
corley  201:23
205:2,3 207:8
230:14 232:20
277:17
corner  46:21
corporate  201:21
correct  14:25 19:2
20:15,15 41:14
45:21 57:8 59:19
61:9 62:25 75:23
75:24 82:23 88:11
88:20,21 90:12
93:4 98:11 110:23
125:11 137:12
138:3 141:14,17
141:23 142:20
149:12 153:2
158:13 161:9
162:25 165:15
174:5 175:12

177:17 195:2,14
195:23 203:5,13
241:23,24 244:9
250:15 254:6,25
257:6 279:11
correctly  28:10
173:12
corresponding
121:4 235:23
counsel  3:1 5:20
7:13,23 8:4 9:5,13
10:1 18:15 27:6
57:15 168:6
237:24 265:23
271:4
counsel's  9:21
counsels  15:10
58:5 215:24
couple  9:24 13:10
30:13 68:2 261:12
course  51:22
53:15 78:11
105:18 123:18
courses  172:19
court  1:1 2:1 7:16
7:19 9:6 74:8
109:5 135:17
136:14 166:18
179:7 202:19
223:19 233:23
253:22
cover  50:19 53:4
covered  206:21
covid  26:5 124:5
218:25
crate  214:21
crawl  182:9,11,17
create  21:5,8
22:17 44:23 67:24
67:25 78:7 82:9
107:2 116:1,6

Page 11

[create - data]

117:18 119:6
125:14 132:13
139:3,4 150:11,17
150:23 153:17
184:14 191:21
192:17 194:2
249:10 259:13
272:12
**created** 19:22
21:24 22:13 23:19
46:19 69:17 98:15
107:8 117:2
135:11 139:7
140:3 193:23
238:7,11,14,16
249:18 255:18,19
256:3 258:19
269:6
**creates** 110:21
113:15 182:25
**creating** 21:1
116:22 141:8
151:13
**creative** 82:12
130:14 152:23
**creator** 243:9,13
**credit** 73:3
**criminal** 133:12
133:22,24
**crimson** 210:2,7
**criteria** 229:6,7
254:2 259:18
**criticize** 206:8
**cross** 6:18 143:3,6
241:22
**crr** 1:23 2:20
280:25
**crush** 192:4
**crutcher** 5:3,12
**csr** 1:23 2:20
280:2,25

**curiosity** 52:8
**current** 17:9,10,20
18:19,19 19:3
106:24 121:20,23
155:19
**currently** 129:14
**custom** 73:18,21
73:22 78:8 80:2
150:8,11,17,23,25
151:7,13,25 184:2
184:4,13,16 186:6
186:15 188:13,15
191:21 192:12,17
192:23 193:6,8
194:2 227:17,19
227:22 261:2
**customer** 74:17,20
77:19,23 80:6,25
83:9 84:1 85:9,13
85:18 113:2 123:6
**customers** 73:24
74:1 82:10 85:16
192:25
**customized** 83:25
85:9
**cut** 164:5 181:8
**cute** 216:2
**cv** 18:19
**cycle** 186:15
**cycles** 186:22

**d**

**d** 6:1
**daily** 155:11
**data** 12:12 14:5,16
14:20,23 15:6,6
16:5,9 20:22 21:9
21:22 25:6,9
26:12,23 27:5,12
27:14 28:1,8
35:16,18,25 36:6
36:8,15 37:4,7

38:8,19 45:15,25
48:24 51:15 58:10
58:13,13,14,17,19
58:24 59:1,5,13
59:15,18,19,21,25
60:9,11,13,18,20
60:25 61:6,7 62:5
62:14,24 63:5,9
63:16,18,25 64:5
64:6,11 65:24
67:1,11,11,16,19
70:11,21 71:13,16
71:16,19,22 72:3
72:11,12,15,16
73:2,7,8 74:12,13
74:17,18,21 75:11
79:4,18,19,22,25
80:1,4,9,14,15,21
80:22 81:3,9,20
83:13,18,22 84:1
85:8,9,16,22,25
86:3,7 87:10,11
87:11,14 88:14,17
90:8,10 91:8
93:23 95:7,7,13
95:13,24 96:4,7,9
96:9 98:22,23,25
99:11,18,22 100:8
100:19 101:16,18
101:21 102:2,17
102:22 103:1
104:7 105:9,15,21
106:7,10,13,15
107:8,10,24,24
108:2,4,5,6,7,20
109:15,25 110:2,4
110:20 111:4,13
111:14,17,21,22
111:25 112:7,7,9
112:15,22 113:2,7
113:15,18,19

116:1,6,9,10,12
116:14,17,18
117:2,3,6,18
118:1,3,9 119:3,6
119:10 127:6,10
127:15 128:5,6,8
128:12,16,21
130:24 131:7,9,16
131:23 132:8,16
132:20 133:3,7,15
134:3,9,20,23,24
135:2,7 137:1,11
137:23 139:8,15
139:16,17,20,24
140:20 141:2,5,11
141:12,12,22,22
142:7,7,18,18
143:2 146:23
147:22 148:2,4,7
148:8,12,14,17,22
149:2,5,10 150:4
150:6,7 151:6,14
151:15,23 152:8
152:10,11,12,12
152:15,16,16,19
153:1,2,19 154:13
155:3,3,10,16
156:3 157:11,13
158:13 159:15
160:14,23 161:6
161:18 163:4
164:22 165:22
167:10 168:1,2
173:11 174:13,19
175:10 177:10,12
179:23 180:1,6,8
180:14,15,15
181:12,13,14,15
181:22,25 182:4
182:10,12,21
183:8,16 185:4,10

Veritext Legal Solutions
866 299-5127

[data - deposition]

185:13,24 186:10
187:9,18,19,22
188:2,3,5,21
189:5,13 190:5,6
190:17,19,22
191:6,15,15 195:1
197:23 201:18
202:2,8 203:2,4,8
204:20,21 205:5,6
205:11,17 206:7
206:12,12,14,15
207:5,18,19,20
208:4,9,20 209:7
209:23,24 211:12
214:15 217:18
218:20 220:5,6
223:9 228:21
230:19 232:16,24
233:13,15 234:5
234:23 235:6,9
250:2,15,18,20,24
251:5,25 254:4,7
254:9,10 258:13
258:15,17 260:7
264:16 270:19
273:10,15 274:2,4
275:10,25 276:12
276:13,15,17,20
277:21,23 278:2
**data's** 109:11
**database** 68:6,10
69:8 73:24 85:13
126:8,9 156:6,12
156:13,16,22
157:1,1,4 158:20
158:22 159:1,5,8
160:7,9 161:5
162:22 165:5
169:7 194:7
260:13,14,15,16
260:21 267:5

**databases** 84:1
85:10 156:9,10,25
157:13,17 167:22
266:21
**datasift** 218:10,13
**date** 68:3 163:22
179:20 212:13
238:22 240:13
268:11 276:16
**dated** 50:11
**dating** 23:10,10
**david** 4:4,6 8:18
**davis** 3:5 8:6,6
10:5,20 11:2
46:10
**day** 15:5,5,8,8
47:16 68:15 192:4
219:10 225:15
258:1 279:15
280:21
**days** 37:19 40:24
112:4 114:3
148:18 149:2
252:12
**deaf** 213:22
**deb** 50:17 84:5,20
106:6 194:24
205:9 233:7
**deborah** 5:4 8:23
**decide** 68:7 82:8
82:11 191:3
219:16 271:25
**decided** 186:6
230:17 231:8
237:13 275:25
**decides** 43:15
151:7 256:15
**deciding** 233:12
**decision** 189:2
199:8 212:20
229:5 230:9

231:13,17 237:13
**decisions** 228:20
228:24 230:3,6
**decker** 5:21 7:18
**declare** 279:3,5,9
**decline** 203:10
**declining** 202:3
233:3
**default** 100:14,25
118:15,21 127:21
220:7
**defendant** 5:2 6:9
8:22,24 11:21
**define** 20:23 40:10
60:15 118:9
**defined** 12:12 14:5
59:20 75:18,23
110:7 120:23
124:14 254:17
**defining** 152:10
**definitely** 30:25
80:25 160:7
262:20
**definition** 19:19
24:8 25:3 41:4,19
42:15 51:15 58:18
61:4 72:12 85:12
102:5,24 108:2
110:3 111:16
112:6 113:9
116:19,20 118:4
**definitions** 19:9
53:20
**degree** 60:14
107:3
**delete** 127:4,5,11
161:23 187:24
188:4,5,12 189:2
190:5
**deleted** 127:6,7,9
128:1,15 187:22

188:2,21 189:5,11
189:14
**deletion** 149:1,11
188:16,17
**deliver** 70:8
**democratic** 228:7
**demographic**
132:15
**demographics**
188:20 261:22
**denver** 110:18
111:1
**depending** 76:21
86:21 114:6
137:21 159:18
230:20
**depends** 20:23
21:21 38:24 60:14
68:24 109:13,15
137:14 138:15
150:15 153:3,8
163:14 185:12
190:16 229:8
252:21
**depo** 54:10 261:8
**deponent** 277:20
**depose** 84:4
**deposed** 46:14
47:5,7,10 213:4
**deposition** 1:16
2:16 6:9 7:12 9:20
10:2,5 11:21 12:5
15:3,10,12,22
19:8 23:9 26:25
28:3 29:12 41:18
48:6,9,10,23 49:1
49:6,10,10,18
52:25 55:23 57:12
57:15,18,20 58:2
84:17,24 103:9,14
103:22 106:4

[deposition - disagree]

| | | | |
|---|---|---|---|
| 129:8 146:21 | 248:2 255:18 | 24:5,8,9,17,17 | **dialed** 256:24 |
| 157:12 202:11 | 256:3 | 25:2,22 40:22 | **dictate** 257:2 |
| 204:18,24 205:5 | **described** 119:8 | 44:15,15,25 45:4 | **difference** 52:18 |
| 205:14 230:14 | 162:16 188:3 | 45:4 137:11 140:4 | 78:21 196:19 |
| 232:21 237:16 | 192:8 274:4 | 140:17 147:11 | 197:25 216:15,18 |
| 267:8 276:4 277:7 | **describes** 58:10 | 177:20 180:11 | 218:4 234:11 |
| 277:12,16,17 | 121:5 126:11 | 182:25 183:3,6,9 | **different** 16:8 |
| 278:9 280:12 | 176:1 | 183:11 184:8,14 | 18:1 25:10 32:13 |
| **depositions** 47:17 | **describing** 70:11 | 185:19 186:5 | 38:25 39:10 41:5 |
| 48:1,7,13,13 | **description** 6:7 | 188:12 189:17,19 | 51:15 52:4,10 |
| **deprecate** 201:1 | 12:22 215:9 243:4 | 196:23,25 208:25 | 72:24 85:18 86:13 |
| 237:13 | 243:17,17,20 | 225:4 227:7 237:8 | 89:10 98:20 |
| **deprecated** 198:5 | 247:10 248:2 | 238:2,5,7,25 | 104:23,25 112:14 |
| 198:8,14,17 | 264:15 269:2 | 239:2 | 117:9 119:14 |
| 212:19,22,24 | **design** 185:18,22 | **developers** 41:9 | 138:21,25 142:23 |
| 213:6 234:16,20 | 186:4 230:22 | 177:10 185:5,10 | 145:2 155:18 |
| 234:22,25 235:1,6 | **designated** 91:17 | 201:12 202:6 | 156:10,16,19 |
| 235:18,19 236:2,6 | 118:6 | 227:12 250:14 | 157:17 162:14,21 |
| 236:7,21,23,25 | **designed** 51:24 | **developers.face...** | 176:17 177:12,21 |
| 237:5 238:21 | **designee** 201:21 | 16:19 | 214:18 215:14 |
| 240:20,24 246:10 | 201:23 | **development** | 218:2 227:17 |
| 246:18 275:16 | **designing** 104:17 | 177:11 227:5 | 232:14 236:19 |
| **deprecation** | **desktop** 31:16 | **device** 20:9,10 | 237:23 242:11 |
| 202:25 203:1,6 | **detected** 197:16 | 25:16 32:10,13 | 255:9 269:21 |
| 240:22 | **determine** 104:6 | 34:10,12 35:16,18 | 272:18 273:19 |
| **derek** 8:20 | 105:6 116:2 | 37:8 41:24 52:1 | 275:11,15 |
| **derivative** 105:9 | 119:12 171:18 | 63:11 64:13 65:4 | **differentials** |
| 105:15,21 106:7,9 | 172:25 174:10,14 | 65:7,8 92:4,15 | 261:13 |
| 106:12,14 107:8 | 175:1 245:13 | 122:15 203:8 | **difficult** 54:15 |
| **derived** 65:18,19 | **determined** | 204:1,6,7 205:24 | 153:8 |
| 66:12 106:17,18 | 106:22 | 206:2 208:13 | **direct** 10:17 11:23 |
| 108:5,6,7 116:1,6 | **determines** 245:10 | 210:20,23,24 | 50:20 95:21 124:7 |
| 116:9,10,12,13,17 | **determining** | 211:4 235:8,24 | 130:21 213:1 |
| 117:2,6,18 119:6 | 232:16 | 236:4 249:11 | **directed** 230:14 |
| 128:5,6,8,12 | **develop** 23:6 | **devices** 31:11,25 | **direction** 280:10 |
| 154:13 155:3 | 183:1 251:14 | 32:19 33:7 36:17 | **directly** 44:23 |
| 257:22 | **developed** 107:23 | 36:19,23 43:1 | 91:7 96:1 112:8 |
| **derives** 257:15 | 137:2 | 144:13 145:4 | 261:7 |
| **describe** 12:24 | **developer** 16:7,13 | 186:20 | **disagree** 146:22 |
| 101:1 160:18 | 16:24 17:1,21 | **diagnosed** 193:10 | 154:17 277:12,20 |
| 171:13 226:24 | 22:1,3 23:5,17 | 193:18 194:9 | |

[disappear - earlier]

disappear 127:14
disappointed
   277:18
disappointment
   277:15
disassociate 135:7
   161:25
disassociated
   110:22 111:11
disclosed 186:7
discount 78:12
discoverable
   12:12 14:4
discovered 126:23
discovery 6:12
   10:2,12 12:12
   14:5
discuss 14:19
   256:6 267:9
discussed 81:10
   87:12 128:13
   143:13 155:8
   176:21 186:8
   194:6 197:17
   219:12 220:13
   234:15 239:13
   250:18
discussing 35:25
   47:8,11 88:14
   236:11,16
discussion 41:16
   60:8 145:9
disease 191:2
   193:11 194:9
diseases 185:16,24
   186:11 187:7
   190:20
display 260:3
displayed 115:13
   174:10

distinction 24:16
   63:8 111:13
distinguish 117:25
distributed 10:20
   68:9
distributing 11:3
district 1:1,2 2:1,2
   7:16,16
diy 98:23 99:18
   100:7,19 102:16
   134:9 145:22
   146:2 154:5,14,20
   163:5,8,13,22
   164:10,23 165:2,3
   165:12,17,23
   166:12,20 167:4
   169:13 252:10
   258:12,16,19,24
   270:5,20 271:8,18
   272:20 273:15
dko 4:10
dkt 6:13
dloeser 4:12
dmvs 72:6
docs 238:2,5,7
document 1:7 2:7
   11:24 12:20 13:9
   16:4 46:11 50:16
   54:14,18,21,24
   55:5,15,17 56:1
   57:7 59:8 61:11
   71:25 72:4,21
   83:3,24 84:3,5,7
   84:18 86:1 93:19
   98:20 100:5,9
   105:19,25 111:16
   123:11,15,17,20
   124:13,15 136:1
   141:10 155:5
   240:5 241:15
   242:8,10 256:8

263:18 264:14
   266:13,16
documentation
   16:8,13 17:2,16
documented 16:18
   19:20 72:25 112:8
   176:17 239:1
   264:21
documents 15:18
   15:19,21,23 16:1
   16:16,24 17:21
   18:6,17 46:18,20
   46:22 49:5,9,17
   55:18 143:5
   175:25 206:17
   255:17 256:3
   263:7,13,14
   265:13,17 266:18
   266:21 267:4,9
doing 51:22 134:4
   145:23,23,25
   154:2 228:2 262:1
   262:6 273:19
dollars 43:25
donated 76:19
donations 77:8
dotted 80:13
double 40:25
   148:24 168:19
   209:19
dow 160:2
download 16:6
   97:10,21 127:13
   223:25 276:24
   277:4
downloaded 18:7
downloading
   97:23 277:2
downloads 224:6
draw 63:8

drawn 69:16
draws 66:8 70:12
drill 71:12
drilling 129:6
drive 44:8
driven 70:23
   101:5 256:24
driving 144:6

dropping 232:13
ds 268:5
dstein 5:9
duly 9:10
dunn 5:3,12 8:23
   9:1,2
dyi 97:11 98:9
   99:15 100:12,23
   102:9,10,20 103:7
   103:8,12,22 104:5
   104:6 108:13,23
   115:11,18 128:14
   142:23 146:1
   154:1 164:12,25
   165:13 166:8
   169:8 252:9
   258:11 265:20
   270:6,9,17 272:9
   272:13 273:1,11
   273:17,24 274:11
   274:22 275:10,18
   276:1,8,15,19,24
   276:25
dynamic 108:12
   113:20,21

          e

e 3:4 4:1,1 5:1,1
   6:1,6
earlier 23:18 40:9
   41:15 56:20 61:19
   78:1 80:25 128:16

**[earlier - exactly]**

176:21 217:7
249:25
**easiest** 171:13
**eddie** 243:5
**editing** 229:18
**effect** 195:20
240:19 280:20
**effective** 253:17
254:5 262:7,13
**effectively** 37:23
90:20 114:8 121:5
262:15
**effectiveness**
86:20
**effort** 166:9,21
**egan** 53:8
**eight** 15:7
**either** 23:12 42:18
51:3 109:24
131:11 163:19
213:18 248:10
**elections** 219:1
**element** 173:18
**elia** 6:18 242:2
**email** 6:14,17
50:11,19 51:11,18
53:4,5,10,14,18
54:6 55:2 56:8
62:11 74:22 78:5
78:6,16,17,18
79:13 80:6,12,21
82:18 83:8 138:23
143:14 151:10
193:9,24,25
241:20,25 242:1
242:16 249:13
**emails** 52:2
**embedded** 38:7,14
39:10
**emily** 130:10

**employed** 57:24
107:20
**employee** 15:7
19:3 26:12 280:15
**employees** 52:21
53:10,14
**employment**
47:18
**enable** 199:12
200:7,22 244:11
246:2 249:1
**enabled** 180:23
235:8
**encompassed**
24:20
**encourage** 76:14
**encrypt** 73:23
74:10 78:6,14
**encrypted** 74:17
75:11
**encryption** 78:22
79:3,11
**ended** 79:14
115:20 127:19
162:20,20
**endpoint** 214:3,4
214:9,11 215:8,10
215:14,16
**endpoints** 216:24
**ends** 50:21 150:18
219:10,14
**enforcement**
133:10,12
**engage** 20:5 69:23
96:9 100:16
**engaged** 25:14
144:19
**engagement** 62:15
65:13 70:22 99:12
99:19 100:8,20
101:4 183:5

**engages** 172:15
173:4
**engaging** 39:23
75:25
**engineer** 27:17
148:3 176:7
238:12,15,19
**engineering**
230:22
**engineers** 238:13
**english** 63:22
137:18
**enhanced** 84:1
85:9,13
**enhancement**
275:22
**enter** 21:2
**entering** 182:19
**enterprise** 52:14
**entire** 126:15
190:2 239:9
**entirely** 80:23
**entities** 66:13
70:24 71:1 95:8
95:13 127:8,19
156:19 158:25
160:13 211:11
226:10,10 253:13
255:23,23,25
258:4
**entity** 126:6,12
127:23 174:11
175:7
**entries** 162:21
**entry** 160:1
162:12,14 166:2,3
268:22 272:12
**equivalent** 183:22
**erin** 53:8
**esi** 54:10 55:23

**especially** 234:4
**esq** 3:4,5,6,7 4:4,5
4:6 5:4,5,13
**essentially** 211:12
**establish** 19:8
52:24 55:14 192:7
200:24
**established** 269:17
**establishes** 191:1
**establishing**
179:23
**et** 62:12 73:4
**eu** 129:15
**event** 37:22 38:14
43:11 183:22,25
184:13,13,16,17
186:6,7 188:7
215:16 216:9,12
216:13 268:15
**events** 183:19,21
184:4,8,9,10
185:18 186:15,15
188:9,13,15 190:4
190:23 249:18
269:12,21 271:5
**eventually** 75:5
**everybody** 8:3
27:11,18 135:21
151:8 176:5
276:22
**evolved** 20:1
**exact** 90:13
155:17 188:22
211:8 216:23
238:22 240:13
255:14
**exactly** 12:14 14:1
24:8 27:8 48:21
49:9 55:12 97:8
109:9 112:2
116:14 147:2

Page 16

3512

[exactly - facebook]

168:10 205:8
206:9 215:25
216:13 218:4
229:24 244:19
246:11 257:25
259:1
**examination** 6:2
9:14 171:6
**examined** 9:12
**examiner** 106:2
**example** 16:4 21:6
25:6 28:13 34:17
44:14,17 52:1
61:16 65:25 69:1
78:1 81:10,21
82:3 89:1 105:9
106:9,14 116:24
117:13 119:5,14
119:15 131:21
135:9 138:18
142:9 150:13
151:5 153:16
158:24 193:20
199:17 217:7
218:25 222:17
227:6 229:17
251:3 261:20
264:7 268:21
**examples** 73:7
89:24 159:19
**excel** 6:20,22
265:22 270:20
**exception** 127:17
**exceptions** 126:16
**exchange** 6:17
95:25 96:14
183:17 241:20
**exchanges** 118:22
**excuse** 94:17
**executed** 279:15

**exhausted** 102:4
**exhaustive** 73:9
73:10
**exhibit** 6:8,12,14
6:17,20,22 10:4,8
10:11,13,23 11:16
11:20 12:2 13:18
15:13 46:9 49:21
49:22,23 50:2,7
50:10,12 51:10
53:1,13 56:14
155:6 240:3,4,7
241:7,17 242:7
265:24 266:1
**exhibits** 9:25
10:18 266:9 268:2
**exist** 110:24
113:23 194:4
212:17 255:24
**existed** 224:14
264:8 276:8
**existence** 264:10
**existing** 77:19,23
192:25
**exists** 113:22
**expand** 256:19
**expanded** 258:2
**experience** 25:24
176:10 229:9
262:17
**experiences** 24:1
25:19 96:20
**expert** 79:6
**expertise** 157:5
227:23
**expire** 246:15
**explain** 33:19
40:10 80:3 100:25
111:12 195:24
214:6,17 259:4
271:20

**explaining** 91:22
**explanatory**
221:22
**explicit** 31:4 64:4
89:16 102:7
107:10
**explicitly** 62:8,19
62:20,21 67:10,16
109:16 112:8
**exploded** 219:11
**explodes** 219:14
**explore** 230:5
**exploring** 129:14
**export** 133:7
**expose** 236:25
**exposed** 276:18
**exposing** 208:4
**express** 251:9
277:14
**expressed** 96:5
192:7 253:14
**expressly** 64:1
**extend** 248:4
**extended** 226:22
226:23 230:17
231:18,20
**extends** 183:8
**extension** 244:21
**extent** 15:9 21:11
45:3 78:10 89:10
127:22 143:16
162:18 168:16
182:6 183:4,6
184:24 193:22
194:4 208:2
225:11
**external** 131:12
245:15,16,19

**extract** 132:8,20

**extracted** 258:16
**extracting** 133:3
**extracts** 133:15
134:3
**eyes** 1:13

### f

**f8** 202:23
**face** 125:13
129:11,14,23
130:2 258:20
**facebook** 1:4,17
2:4,16 5:2,20 6:9
7:12,14 8:24 9:1,3
9:5 11:21 12:8
14:16 15:7 18:25
19:11,18,21,23,25
20:7,9,12,13,13
20:14,14,15 21:9
21:25 22:1,2,3,3
22:13,14,14 23:5
23:6,17 24:3
25:14,19 27:1,2
27:19,24 28:11,14
28:16 29:21 30:5
30:8,14,20 31:2,9
31:19,25 32:18
33:6,13,17,24
34:3,4,5,9,12,15
34:25 35:5,12,16
35:25 36:8,16,23
37:3,7,13,15,21
37:23 38:7,7,9,14
38:16,17 39:19
40:23 41:2,6,10
41:10,12,13,23
42:2,2,11,19,23
43:24 44:15,16,23
44:24 45:2,7,13
45:23 46:1,6 47:1
47:18 48:22 51:16
51:19,22 52:8,9

**[facebook - federal]**

| | | | |
|---|---|---|---|
| 52:10,21 53:6,10 | 141:3,11,21 142:6 | 226:4,5,9 228:1 | 159:12 |
| 53:14 54:5,8,11 | 142:19,19 143:1,9 | 229:22 232:24 | **fair** 20:5 22:23 |
| 54:20,21 55:17 | 144:8,12,18 145:3 | 235:10,11 240:14 | 24:3 27:2 28:3 |
| 56:8,25 57:5,8,21 | 145:7,13,23,25 | 244:3 245:6 | 29:7,16 41:20 |
| 60:1,4 61:3,5,7,11 | 147:18,22 148:2,8 | 249:10,16,19 | 47:17 57:10,22 |
| 61:17,25 63:10,14 | 148:11 149:9 | 250:2,5,8,13,24 | 62:24 63:16,25 |
| 63:15,17,18 64:1 | 151:8 152:11,16 | 251:4,11,13 252:8 | 79:2,4 107:24 |
| 65:3 66:7,16 67:1 | 152:18,25 153:1 | 253:16 254:4,7,18 | 116:19 117:1 |
| 67:3,8,11,15,23 | 153:18,24 155:10 | 255:17,24 256:6 | 138:9 157:10 |
| 68:7,20 69:12 | 155:15,20 156:9 | 257:2,22 258:12 | 172:17 257:18 |
| 70:12,21 71:8,16 | 157:12 158:22 | 258:24 259:2,10 | **falaw.com** 3:13 |
| 72:2,16 73:8,16 | 159:3 161:8,20 | 260:1,8,21 261:1 | **falling** 261:22 |
| 76:15 77:11 78:7 | 162:3,25 164:23 | 261:9 262:11,19 | **familiar** 120:13 |
| 78:9,11,20 79:15 | 166:5,25 167:7,23 | 262:25 263:25 | 122:18 148:20 |
| 80:10 81:20 82:15 | 168:7 169:6 | 265:13,16 266:20 | 156:4,12 157:14 |
| 82:22 83:4,25 | 171:16 172:15 | 267:4 268:13 | 177:25 196:16 |
| 85:7,17,21 86:6 | 174:2 175:10 | 269:12,21,22 | 210:2,11 227:1 |
| 86:14 87:16 88:19 | 176:3,11,15,17,23 | 270:1 271:23 | **familiarity** 132:24 |
| 89:1,4,6,16,25 | 176:25 177:1,10 | 272:24 274:15 | **familiarize** 15:11 |
| 90:21,23 91:4,8,9 | 177:11,17 179:16 | 275:14,15 276:13 | 16:21 |
| 92:15 93:4,8,11 | 179:20,22 180:4 | 276:23 277:4 | **family** 34:11 |
| 93:23 94:2,22 | 180:12,13,14,16 | 279:21 | 143:8 |
| 95:9,17,18 96:8 | 180:24 181:14,14 | **facebook's** 27:20 | **far** 117:8 205:7 |
| 96:14 97:14,20,25 | 181:22,25 182:4,7 | 29:22 41:12 44:16 | 211:18 |
| 98:1,4,8,10 99:5 | 182:11,19 183:1,3 | 69:1 94:8,20 95:6 | **fault** 136:17 |
| 100:16 101:6,6 | 183:7,8,16,23,23 | 95:12 119:25 | 181:20 |
| 104:20,22 105:5 | 184:7,20 185:9,15 | 126:14 131:9 | **fb** 6:16,19,21,23 |
| 109:18 110:15,16 | 185:23 186:10 | 152:23 174:13 | 46:11 240:5 245:7 |
| 112:5 113:1,7 | 187:6,20 190:5,10 | 176:22 177:16 | **feasibility** 129:14 |
| 117:15 119:4 | 190:11,13,14 | 182:10,10 215:18 | **feature** 124:12 |
| 121:10 122:14,17 | 191:3,6,10,10,18 | 237:12 265:23 | 178:23 179:19 |
| 122:17 126:5 | 191:20 192:15,16 | 269:6 | 198:13 227:19 |
| 127:4,5 129:3,7 | 193:3,5 194:3 | **facebook.com** | **features** 30:4 |
| 130:2,7 131:23 | 198:22 199:11 | 20:2 228:2 | 31:22 183:12 |
| 132:2,7,14,20 | 201:1,16 203:18 | **faces** 125:11 | 227:21 274:1 |
| 133:3,6,15 134:3 | 203:22 204:11 | **facial** 123:14 | 275:8 |
| 134:8 135:1,20,22 | 205:6 213:17,24 | 124:11,11 125:22 | **february** 1:19 |
| 135:23 136:21 | 214:22 217:3 | 129:9 130:7 | 2:19 7:1,6 171:1 |
| 137:1,23 138:6,7 | 219:15,16 220:5 | **facilities** 52:3 | 280:21 |
| 138:19 139:12,14 | 221:6 223:23 | **fact** 57:6 75:9 | **federal** 6:10 11:22 |
| 139:17 140:4,18 | 224:2,18 225:15 | 81:12 92:14 158:4 | |

[feed - form]

feed  74:5 97:4
  108:25 115:20
  120:19 121:1,8
  135:13 171:12,13
  171:19,24 172:11
  172:18,21,24
  173:4,16 174:3
  175:24 176:1,8
  234:8,10 254:18
  255:5,7
feeds  175:2
feel  102:19 271:20
feeling  29:6
females  114:5
  259:19
fi  35:13 61:17 65:7
field  110:16
  214:15,22 215:3
  222:25 225:7
  248:3
fields  18:8 214:19
  268:16 274:3,4
figure  146:23
  205:12 230:6
figured  107:16
figures  65:20
  255:25
file  18:8 32:23
  97:24,24 99:15,18
  100:13,23 102:10
  102:13,20 103:7
  104:6 108:14,23
  115:12,18 127:13
  128:15 142:23
  146:2 154:1,5,9
  154:14,20 163:5,9
  163:13,22 164:11
  164:12,23,25
  165:2,3,12,13,17
  165:24 166:9,12
  166:20 169:13,23

252:9,10 258:11
258:12,14,19
265:20 266:12
270:5,6,9,17
271:9 272:9,13,20
273:1,17 275:18
276:24,25 277:2
filed  7:15
files  16:7 54:21
  55:1 103:9,12,22
  146:1 165:16
  167:14 169:8
  268:4 270:21
  271:18 276:15
fill  91:19
filling  110:15
final  195:17
finally  152:8
financially  7:21
  280:14
find  68:21 70:7
  78:19 103:6 115:4
  149:18 154:2
  168:5 169:20
  174:3,6 194:3
  237:9 276:24
findings  198:24
fine  29:17 52:23
  52:23 148:21
  170:1 228:25
  268:18
finish  181:4
fire  37:22 38:14
  43:10 44:7,10
fired  103:18,24
firefox  143:23
  144:1

first  9:10 10:4
  19:7 21:3 45:2

47:22 48:20 51:4
56:15 67:23 68:2
114:21 118:10
170:4 197:3
202:12 210:15
213:25 221:1
222:23 223:11,15
223:16 240:12
242:6 243:3
249:13 261:14,15
264:9,12 271:5
firsthand  176:10
fitness  229:21,25
five  16:11 25:15
  90:7 220:12
  241:21 252:12,22
floor  5:6,14
flow  89:12 189:24
  235:2
focus  54:11
  171:11 230:13
  232:20
focuses  256:10
focusing  85:2
follow  65:21
  119:15 171:15
  254:20
followed  66:22
follows  9:12
  148:11
fonti  3:3 8:5,7,9
  8:11
foods  261:25
force  280:20
foregoing  279:4
  279:10 280:4,6,10
foregrounded
  33:8
forever  276:23
forget  146:2

form  12:18 14:10
  18:11 19:13 20:17
  21:10 22:5,25
  24:6,22 25:7 32:2
  33:10 36:2 37:11
  38:22 42:4,13
  43:8 44:18 45:19
  47:9 54:9 55:7,8
  55:18,19 58:25
  59:2,22 60:12
  63:3 64:3 65:10
  66:18 67:12 76:16
  77:15 79:5 81:23
  82:16,24 83:6,16
  84:2 85:11 88:22
  89:7 90:17,22
  91:5,11,18 94:9
  99:1,13,20,25
  100:10,22 102:11
  102:12 103:2
  106:19 107:13,25
  109:22 116:7
  117:4 121:15
  136:19 137:13
  139:10 140:1
  141:25 142:3,21
  146:5,17 149:13
  149:16,23 150:1
  151:10 153:4,21
  161:10 162:6
  163:20 165:18
  166:23 167:16
  172:9 173:7,14
  174:16,23 175:14
  177:4 178:4
  179:24 180:21
  181:17 182:14,22
  183:5 185:1,11
  187:10 190:15
  191:8 192:1,22
  199:4,15,21

Page 19

3515

[form - given]

201:19 205:1
206:5 208:11
209:8 210:9
211:14 215:21
217:20 221:19
222:3 237:6
242:12 247:23,25
248:14 250:6,7,16
251:17 252:2
257:7,19 259:3
261:4 263:1,10
264:3 266:23
269:9 271:19
272:21 276:21
**format**   12:11 14:4
14:14 268:10
269:3
**formats**   176:17
**forth**   12:13 280:5
**forward**   27:25
41:18 132:6
**foundation**   19:7
22:9 52:24 220:15
263:2 268:25
270:22
**foundational**
51:18
**four**   17:25 25:15
26:17 42:20 47:20
47:23 48:21
241:21
**fourth**   26:7 47:6
**frame**   149:8
179:11 180:20
189:1 240:15,17
276:10 277:5
**framed**   275:5
**framing**   28:24
95:3 142:13
**francisco**   106:22
107:3,5,6 109:9

109:10,17,24
110:7,17,19 111:9
111:23 112:5
114:1,2,21 117:16
119:21 135:9,11
135:12 259:20,22
**free**   12:24 84:17
271:20
**frequency**   219:23
**friday**   51:3,5,6
**friend**   117:15,22
223:22 224:6,12
224:16 225:3
244:12 247:8,9,13
247:14 254:19
256:1
**friendly**   97:23,24
**friends**   44:22 45:7
45:9 68:12 98:17
110:15 118:17,18
118:23,23 119:20
120:3 123:7 140:3
160:13 163:24
171:15 191:3,6
192:14 198:4,7,11
198:12,19,20,21
201:18 203:2,4,8
204:5,21,21
205:11 207:5,25
208:9,14,20 209:6
209:23 215:13
221:8,11 224:6,7
224:13,20,24,25
225:3,16,19
234:16,20,23,23
234:25 235:15,16
235:16,17,17,17
235:18 236:8,9,21
237:14 238:21
239:4,6,8 244:4
244:14 246:22,22

246:23,23,24,24
247:2,2,8,13,18
247:19 248:9,13
249:16 272:3,4
**front**   241:13
270:18
**ftc**   199:1
**full**   152:10 239:6
244:12 280:20
**fully**   16:18 146:22
153:12 212:18
**fun**   214:7
**function**   44:4
147:19 179:10
246:5
**functionality**
122:14 235:10,12
**functionally**   52:18
**functioned**   264:16
**functioning**   70:10
246:8
**functions**   54:5
263:19
**fundamentally**
182:16
**fundraising**   77:8
**further**   13:9 62:4
256:19 277:7
280:10,14
**future**   95:24
174:12 175:2,16
175:23,23

**g**

**gain**   152:12
197:22
**gained**   209:22
**game**   44:14,15
183:14
**games**   34:11 44:17
192:6

**gardeners**   124:3
**gated**   211:20
235:23
**gauge**   173:12
**general**   27:4 28:2
43:6 49:16 128:8
128:9,10 144:21
144:22 156:3
163:12 174:21,21
196:22 220:18
242:18 252:14,15
272:2
**generated**   150:4
238:9 254:19
256:7
**genre**   66:4 192:6
**getting**   13:19
81:20 140:16
152:3
**gibson**   5:3,12 8:23
9:1,2
**gibsondunn.com**
5:9,10,17
**give**   19:19 24:16
25:9 31:1 50:15
79:7 104:10
148:24 149:6
159:19 174:3
176:12 220:4,4
225:3 227:6
229:17 232:1
233:25 238:4
260:22 262:18
264:1
**given**   96:1 108:21
122:9 176:19
198:19,20 208:19
209:6 220:25
225:2,20,25
245:18 249:7
250:18 257:3

[given - hear]

258:9 278:3
giving   147:13
  173:12
global   53:24
go   7:9 13:22 19:17
  29:8 38:11 42:9
  67:10,19,19 68:20
  69:1 71:13 79:2
  81:9 87:9 94:16
  100:17 102:4
  110:25 114:16
  115:11 127:5
  132:12 154:1
  170:1,3,5 171:16
  187:9,18 196:24
  235:2 237:8 240:2
  242:3 254:24
  258:24 265:1
  267:17 271:22,23
  277:9,10,25
goes   37:19 70:11
  80:12,13,14 161:2
  173:18 205:9
  223:11
going   7:6 9:24
  10:6 12:25 19:12
  19:13 23:7 27:25
  28:19 29:13 41:18
  43:14 47:12 50:3
  50:4 54:15 69:24
  71:11 78:1 81:2
  82:13 83:12 84:9
  85:3 98:2,21
  100:5 101:7 112:3
  113:13 114:16
  123:9,13 124:7
  127:14 129:9
  130:21 134:17
  140:7,11 148:25
  158:17 160:2
  162:16 168:22

174:9 175:1 176:8
  177:15 194:2
  202:10 213:1,3
  216:6 228:2
  241:12 259:20,22
  264:24 268:24
  272:25
good   7:5 8:3,6,19
  8:20 9:16 21:16
  61:1 147:14 162:1
  169:24 171:8
  228:5 229:13
  239:13 268:8
google   34:23
  64:23 65:2 136:2
  136:12 138:22
gotten   94:14
governments   54:3
gps   35:19 65:7
  105:3
grand   5:6
granted   221:8,11
  234:6,12 238:20
granular   259:18
  262:11
graph   17:6,15
  125:19,22 126:1,2
  126:3,4,5,7,10,13
  126:22,24,25
  127:1,3,16 194:15
  195:4,6 197:25
  201:15 211:11,13
  245:12 257:24
  258:8,17 259:1
  260:24
grateful   216:3
gray   210:21,24
  211:4
great   11:12 14:19
  14:23 15:1,13
  18:5,23 27:19

29:11 42:9 62:2
  88:1 124:10
grip   218:10
group   76:3 212:9
  212:11
groups   212:7,9,16
  212:18 213:6,7
guess   9:22 27:7
  30:23 34:19 40:20
  52:24 61:20 69:24
  72:24 76:9 87:17
  92:7,9 93:14
  142:12 209:19
  219:7 250:17
  261:24 267:14,15
  269:20
guessing   148:24
  168:24

h

h   6:6
hairdresser
  257:14
half   15:8 57:24
  170:1 261:8
hand   46:21 280:21
handled   231:3
happen   65:23
  118:20 142:14
  146:4 163:7
  165:14 180:24
  235:24 242:23
happened   81:12
happening   61:5
  87:14 88:18 101:5
  159:18 162:15
  166:4
happens   61:2 67:3
  113:23 159:21
  163:1 167:6,7
  223:11

happy   135:4
hard   13:4 17:23
  46:22 55:5 70:13
  70:15 93:20
  199:22 216:3
  232:11 253:23
  263:3
harder   40:19
hardware   32:21
hash   148:7 149:5
  151:14
hashed   74:18
  78:17,18 79:18,22
  79:25 80:3,13,21
  82:18,19 83:8
  130:24 134:20
  143:10,14,14
  144:9,14,20
  148:12,14,14,18
  148:22 149:10
  150:4,6,7 151:6
  151:10,14 152:17
  162:4 193:9 194:1
  194:7
hashes   148:2
hashing   78:22
  79:1 147:17,19,21
hashtags   199:13
hazards   124:3
he'll   19:15
head   47:12
headset   213:20
health   185:17
  186:1,12,19,20
  187:9 189:24
  190:19,21
hear   36:3 59:16
  60:17 70:18
  139:19 175:21
  178:9 182:8
  213:18 223:15

Page 21

[heard - implicitly]

**heard** 112:23
130:11 218:14,17
245:23 260:23
**hearing** 70:14,16
**heart** 129:8 205:9
**heavily** 201:7,10
219:11 220:13
**held** 97:25 277:13
**hello** 88:10
**help** 22:19,20
25:17,19 36:25
212:9
**helpful** 25:13
26:20 196:1 215:7
**helps** 25:10
**hereto** 10:10,15
49:25 240:9 266:3
280:16
**hexagon** 210:3,7
**hey** 63:12 162:10
228:4
**high** 43:20,22 46:3
46:4 67:22 70:9
79:7 89:8 94:23
100:12 106:20
113:24 135:4
157:21 159:5
162:8 174:21
197:24 198:2
205:19
**higher** 262:9
**highest** 114:22
**highly** 1:13
**hill** 248:17,18
249:1
**hill's** 249:4
**hire** 176:4,7 245:2
245:4
**historical** 252:11
255:15 257:16
263:22 267:7

**historically** 20:1
25:14 217:5
**history** 81:4,16
**hit** 262:12

**hold** 202:22
264:24
**hole** 245:21,23
**home** 39:11 80:8
119:11
**hometown** 109:17
110:9,17,18
111:23
**homework** 58:5
**honest** 148:24
**honestly** 111:2
221:3
**hope** 19:6 152:2
**hopefully** 165:8
**hoping** 230:24
**host** 191:15
**hosting** 258:14
**hour** 84:9,15
170:2
**hours** 58:6
**house** 5:20 9:5

**huge** 38:24
**hugely** 131:10
**huh** 57:9 61:1
90:25 121:3
140:10 214:5,20
223:24 249:6
**human** 19:22
238:3
**hyperlink** 54:6
55:6
**hyperlinks** 18:2
**hypothetically**
112:1

**i**

**i.e.** 163:23
**ian** 5:20 9:4
**idea** 31:2 49:14
80:19 116:22
277:12
**identification** 10:9
10:14 18:17 49:24
240:8 265:25
266:2
**identified** 84:5
100:21 102:20
109:18 114:8
151:15 154:10
157:13 252:7
255:7,8 259:12
**identifier** 33:21
34:1,3,5,6,18 35:5
64:22 138:6,21,24
143:3,6
**identifiers** 33:17
33:20 34:10,10,12
35:1 64:13,15
65:4,5 135:24
138:14
**identifies** 160:12
226:19 250:5,8

**identify** 18:2
37:25 38:3,4,5,17
70:6 107:20
127:10 129:7
136:24 142:18
151:11 167:14
188:5,9,14,18,19
188:20 189:22
193:22 219:13
231:16 233:3,11
239:11 250:3,11
252:3 257:5 260:1
263:4
**identifying** 79:14
**identity** 34:4,16
45:1,8 135:8
143:7
**idfa** 64:21 136:2
136:12
**ids** 34:10 37:8
145:9 147:1
159:16,20,25
164:23 165:11
168:14 248:6
**iii** 13:7
**imagine** 25:2
73:10 75:2 188:7
231:2
**impede** 202:10,11
**impeding** 202:13
**implement** 43:14
44:1
**implementation**
43:18 86:13
**implemented**
38:25 197:4
**implicit** 107:10
246:12,13
**implicitly** 62:13
63:1,17,17 64:1
65:3

**[import - installed]**

| | | | |
|---|---|---|---|
| **import** 178:25 | **incorrect** 138:4 | **information** 16:7 | 184:20 185:15,20 |
| **important** 79:11 | **increase** 172:19 | 16:17 18:8 26:5 | 186:4,8 187:7 |
| **importers** 178:1,2 | **indecipherable** | 27:12,14,16,17,19 | 190:10,12,12 |
| 178:17,22 179:9 | 60:19 175:17 | 27:25 28:6,7,11 | 191:21 192:9,16 |
| 179:17 | 227:16 250:10 | 28:16 30:3,9,17 | 192:16 193:9 |
| **impossible** 35:11 | **indefinitely** | 30:21 31:10,15,16 | 198:4,8,16 204:5 |
| **improper** 106:6 | 161:23 | 31:20,25 32:7,19 | 208:14 210:6 |
| **inaudible** 137:4 | **independent** 91:1 | 32:20 33:6,13 | 211:25 225:9,19 |
| **inbox** 121:25 | **independently** | 34:9,13 35:1,6,12 | 225:23 226:19 |
| 122:4,13,24 | 131:18 | 35:13,17 36:16,23 | 235:3 236:25 |
| 239:13,17 | **india** 61:18 | 38:16 39:4,22 | 237:9 250:13 |
| **inboxes** 122:22 | **indicate** 163:22 | 41:10,22,24 42:10 | 251:13 253:15 |
| **incident** 186:13 | **indicated** 109:25 | 42:22,25 43:6 | 260:7,19 263:8 |
| 187:13 | 111:23 | 45:5,14,17 46:1,5 | 267:6 268:10 |
| **include** 20:2 25:6 | **indicating** 80:20 | 57:7 60:4 63:11 | 270:6,9 271:17 |
| 32:16 38:20 42:25 | **indication** 220:9 | 65:17 66:8 68:5,9 | 272:8,20,23 273:5 |
| 75:25 76:2,7,18 | **individual** 109:12 | 68:13,18,19,21 | 273:6 274:10 |
| 76:19 77:13 98:23 | 109:19 111:8 | 72:9 77:12 80:5 | 275:23 276:24 |
| 98:25 99:11,18,21 | 128:22 158:9 | 82:14,17,22 83:4 | 277:4 279:7 |
| 99:24 100:7 | 190:11,13 216:5 | 83:7,20 85:7 94:2 | **informed** 172:22 |
| 102:14 107:4 | 260:4 273:13 | 94:21 95:25 97:11 | **informs** 172:11 |
| 150:12 164:12,13 | **individuals** 53:6 | 97:13,22 98:1,10 | 252:1 |
| 186:19 206:3 | 110:1 128:17 | 98:15 107:21 | **initially** 110:12,23 |
| 208:24 217:10 | 134:5 135:24 | 108:18 110:5 | **initiated** 137:22 |
| 249:20 254:21 | 270:21 | 114:11 115:1,11 | 159:24 162:18 |
| 270:6 | **industry** 40:12 | 115:25 116:2,6,22 | 243:12 |
| **included** 18:8 25:5 | 117:7 | 116:23 117:17 | **injuries** 185:16,25 |
| 104:7 | **infer** 62:14 65:13 | 118:24 119:1,8 | 186:11 187:8 |
| **includes** 32:20 | 66:5 70:21 | 127:13,22 128:25 | 190:20 |
| 85:8 98:14 99:4,6 | **inference** 65:23 | 134:13 137:8 | **innovative** 104:17 |
| 99:7 100:13,19,23 | 66:8 69:13,16 | 140:6,21 141:16 | **inputs** 79:1,3 |
| 137:24 165:13 | 70:12 | 142:11 143:17 | 172:7 |
| 217:10 241:22 | **inferred** 14:23 | 148:16 150:6 | **ins** 32:23 41:11 |
| **including** 15:6 | 99:11,19,22 100:8 | 154:22 155:3 | 235:17 |
| 31:22 37:8 41:11 | 100:19 101:3 | 156:11,17,18,21 | **insights** 184:22 |
| 41:23 72:5 100:20 | 112:9 128:13 | 157:18,25 163:23 | **instagram** 20:2 |
| 122:14 269:23 | **infers** 69:12 | 164:1,2,15,24,25 | 62:1 143:9 153:11 |
| 271:7 | **info** 62:11 164:20 | 165:12 169:3,17 | 153:12,15,16,17 |
| **incorporate** | **inform** 175:16,21 | 169:23 172:5 | 154:3 262:19 |
| 125:22 | 192:5 200:18 | 173:17 176:23,25 | **installed** 61:20 |
| | 201:16 254:1 | 177:6,16,22 | 102:8 247:9,14,21 |

[installs - kind]

installs 247:18
instance 174:12
  175:23 187:15,17
  189:18
instruct 23:12
  54:15 84:12 91:19
  105:22 178:9
  204:25 205:1
instructing 91:13
  178:7
instruction 6:24
integrate 153:1
integrated 153:12
  153:14,20,22
integration 131:7
  152:9,10,15 153:9
  203:23 248:19,23
integrations 15:5
  122:15,16 203:7,8
  204:1,4,6 208:13
  235:8,24 236:5
integrator 204:7
  205:24
integrators 206:3
  211:3
intelligent 171:21
  171:23 172:8
intend 237:21
intent 262:8
intention 263:4
interact 104:16
interacted 75:13
interacting 258:3
interaction 172:19
interactions 127:8
  127:18 172:10
  173:1,25 174:9
  175:15
interest 66:12
  100:25 128:12
  150:13 151:1,1

250:9 251:15
252:3,12,19 253:3
253:8 257:15
258:8,17 259:1
260:24
interested 7:22
  172:20 257:17,18
  280:15
interests 66:17
  99:21 100:20
  150:3,13,17
  249:24 250:3,11
  252:2 253:16
  254:1 255:18,19
  255:22 256:6,12
  256:16,16,20,23
  257:5,21,24 258:5
  258:6,24 260:8
  261:3
interference 82:25
internal 152:18
  176:3 237:12
  245:21,23 269:6
internally 52:13
  54:11 56:9
internet 31:17
interrogated
  157:9
interrogatories
  158:6,6,10
interrogatory
  157:8 215:19
introduce 30:12
introduced 209:14
introduction
  197:5,6 198:5
  202:24
invention 221:6
investigated 187:2
investigation
  189:4 199:2

investment 44:12
  261:17
involved 134:6
  179:17 189:3
  190:8 230:2,22,23
  231:17,25 232:6
  233:12 240:21
  265:12
involvement 92:23
involves 181:25
ios 87:8 171:16
  184:1 249:11
ip 31:13 60:24,24
  63:10,12,14 65:7
  105:6 112:5
  119:11 137:3,12
  137:20,21
irrelevant 208:6
  225:23
irrespective
  164:12
issue 106:3 236:11
  236:16
issues 230:7
  232:23
issuing 147:8
item 16:22 75:6
items 38:20 167:5
itselves 172:12

j

january 242:1
jersey 48:4
job 1:24 15:4,5,8
  268:8
johnson 104:13
join 212:11 262:24
joined 18:25
joint 48:8
joke 249:3
joking 60:19

judge 201:23
  205:2,3 207:8
  230:13 232:20
  277:17
junk 261:24

k

k.p. 9:19 10:22
  11:23 13:2,11
  29:12 38:17 50:19
  53:1 56:11 85:6
  87:19 88:10 92:3
  94:16 111:2
  162:12,13 171:8
  178:18 181:10
  268:3 275:3
keep 67:2 68:17
  154:4 172:22
  226:9
keeping 31:7
keller 4:3 8:13,17
  8:18,21
kellerrohrback.c...
  4:10,11,12
key 79:3
keywords 199:13
kimberly 5:21
  7:18
kind 27:21 56:11
  64:11 65:21 66:4
  69:23 73:7 77:8
  82:8 101:15
  108:12 119:22
  128:4 141:5 149:3
  156:18 173:25
  174:12 176:14
  181:15 188:13
  190:4,6,16 208:4
  213:21 217:24
  227:9 248:25
  255:9 263:18

Page 24

3520

[kinds - lesley]

**kinds** 36:6,8 57:7
60:4 63:16 73:7
82:22 111:21
156:17 157:17
159:19 177:12
222:17
**kit** 177:11
**knew** 189:11
**know** 10:19 12:23
14:14 15:4,24
16:2,22 17:2,24
18:1 19:13,13
20:7 21:5 23:1,8
23:20,23 24:9,15
26:11 28:5 29:4,9
29:23 30:6 31:4
33:11,14,15,16,22
34:5 36:19 37:13
37:20 38:12 40:17
43:23 44:8,24
46:17 47:11,25
49:8 51:11 53:23
55:4,13 56:20
58:4,4 63:14 66:3
66:6,9,20 67:22
68:6,8,24 70:2
72:6,7,11 73:9
76:18 78:2,9
79:10 80:24 81:13
85:12 92:10,12,18
92:21,25 93:12,16
93:17 94:12,19
96:4,8,11,17,19
97:8 98:19 99:6
100:12,18 103:3
104:13 105:3,24
105:25 106:1,7
108:11 109:9
112:2,8 114:6,14
114:17,24 115:16
116:13 117:6

118:19 120:6,22
123:22 125:13
126:10 127:18
128:19 130:1,4,5
130:6,9,11,20
133:21 134:7,8,14
134:15,16 135:10
143:6,10 147:2
148:5,9,13,14
149:14 151:23
152:3 154:7
155:10,13,17,22
155:25 156:3,8
157:8 158:19
160:16,21,24
161:24 163:21
167:12,18,20,24
168:11,20,24
169:1,3,5,17,19
169:19 178:6
179:12,13,14,14
179:16,20 181:19
185:19,21 186:9
186:24 187:5
189:3,9,13,15
190:9 192:3
195:15 200:1
205:20 210:6
212:25 213:21,21
214:11 215:11,13
215:24 216:2,2,8
216:10,15,21,23
216:25 217:3
218:4,6,8,10,13
218:14 219:18,22
221:3,7,16,20
222:10,20 223:3
225:25 228:25
229:21,22 236:7
236:17 238:13,20
238:23,24 239:7

245:1,5,21 246:13
246:14,16,18,24
247:5,6,15,17
248:2,4,8,10,11
248:15 249:3
251:18,20 253:1
255:11,15 257:9
258:4 259:4 261:8
261:9 263:9
264:19 265:16
266:24 267:11,13
267:14,15 268:5
269:1,8,21 270:15
270:19,23 272:19
273:4,9 276:2
277:14,15,18,19
277:21 279:5
**knowing** 104:15
**knowledge** 15:25
57:23 144:5 148:5
167:21,23 189:8
279:6
**knowledgeable**
232:23 237:3,15
**known** 207:21
**knows** 56:4 91:16
92:10 94:10
230:11
**ko** 4:4 8:18,18
13:10
**konstantinos** 1:18
2:17 6:3 7:13 9:9
278:3 279:20
**kutscher** 5:5 8:25

**l**

**label** 70:4
**labeled** 82:22
**labs** 130:15
**lack** 268:25
**lacks** 263:1 270:22

**lag** 27:9,10
**landing** 39:12
**language** 255:12
255:14
**laptop** 32:10
**large** 117:1
**late** 235:25
**laufenberg** 4:5
8:12,12,16,16
**launched** 195:6
212:12,13 221:2
**launching** 129:21
**laura** 5:13 9:2
**lawyers** 103:21
**laying** 19:7
**layperson** 63:22
**lays** 263:18
**lead** 8:4
**leading** 144:5
202:8
**leads** 81:7
**learn** 60:22 172:8
172:20
**learning** 69:19,20
69:23 107:19,23
171:22 172:1
**learns** 253:16
**lecture** 203:10
**lecturing** 84:20
**left** 58:11 88:13
167:5 268:4
**legal** 7:19 117:7
230:23 278:5
**lengthy** 98:19
**lesley** 3:4 8:4 13:8
28:23 38:18 55:9
55:20 84:7,14,22
94:13,13 100:3
149:24 157:22
158:1,1 162:10,13
178:10 181:3,3

Veritext Legal Solutions
866 299-5127

[lesley - looking]

204:17 228:4
230:8 232:19
237:16 259:5
261:7 274:24
level  32:16,21
43:21,22 46:3,4
65:22 67:22 69:24
70:9 79:7 89:9
94:23 100:12
106:20 113:24
135:4 142:15
157:21 159:5
162:8 168:17
173:6 174:22
197:25 198:2
205:19 264:19
leverage  179:23
liberal  84:25
license  280:20
life  67:24 136:14
lifetime  196:7
liked  66:22 68:14
70:1 98:17 99:8
100:13 102:21
159:13 259:11
likes  39:22 89:16
liking  40:2 67:4,7
68:11 100:24
128:14 162:20
256:18 258:3
limit  245:2,4
limited  17:12 98:6
118:16
line  6:25 80:13
225:14
link  144:4 270:12
270:12
linked  132:14
139:9
links  176:19 256:5

list  25:10 57:4
66:11 72:5,24
82:14 83:4 97:19
98:3 166:24 167:3
184:8,11 206:10
207:21 208:2
217:16,16 239:6,9
244:12 245:17
249:16 252:13,17
254:10 256:19
257:23 264:1
listed  20:18,21
42:17 72:25 100:4
100:9 236:2
listen  178:13,15
184:18
listening  150:22
151:9 199:13
listens  150:24
lists  62:11,13
64:15 203:12,15
252:15,19 263:17
263:20
literally  254:24
litigation  1:5 2:5
7:15 48:16,17
litigations  48:19
litrenta  6:14 53:2
little  27:9,10 40:19
42:7 54:14 69:24
71:12 74:2 87:20
96:13 118:8
123:21 131:15
164:7 171:11
178:19 195:25
199:17 237:25
249:24 250:23
262:8 264:23,25
live  74:5 106:21
107:2,6 109:16,24
110:17 114:4,20

117:16 119:12,20
135:10,12 159:23
213:15,17,24
215:16 216:9,11
216:12,14,22,25
217:4 259:19,22
lives  68:5,9 109:9
109:10 127:13
159:13 258:11
llp  3:3 4:3 5:3,12
lmumm  5:17
loaded  241:8
locating  13:4
location  12:11
14:4,15 35:19
65:6 75:10 104:12
104:21,23 105:4,6
106:23,24,25
116:9,22,23
119:11 128:7
155:2,3 157:11
158:13 222:22
locations  146:14
155:17
locked  33:23
188:8 272:6
lodged  12:22
loeser  4:6 8:20,20
log  29:21 34:15
36:20 41:12 44:22
44:24 45:6 89:25
97:10,18 98:2,8
138:5 139:5 166:9
166:25 168:16
169:22 181:21
182:6 183:7
198:10,24 226:8
237:8 238:5 251:3
263:24,25
logged  42:2 45:9
99:7 140:14

144:14 145:5,14
logic  82:4
logins  89:16
logs  159:8,9
224:24 226:5,7
238:8 269:21
271:5,18
long  57:17,20
132:3 161:6,13,15
161:18,20,20
182:10 218:17
225:22 276:7
longer  201:17
211:11 235:3
252:16 264:24,25
longest  136:9
look  11:17 49:5,9
49:17 50:20,22
51:13 59:8 82:13
103:7,12,20,21
104:1,3,4,5
119:19 122:3
135:25 143:18
154:6 166:21
190:2 229:8,11
237:20 242:4,6
255:3,15 259:10
266:9,14 268:3
269:2 271:23
looked  103:8
275:18
looking  13:25
15:13 53:4 54:24
56:14 58:8,9
62:21 68:25 76:8
79:17 81:16 82:21
112:3 125:10,21
132:6 143:4 152:7
199:23 219:7
233:19 242:6
243:3 265:13

Veritext Legal Solutions
866 299-5127

[looking - mechanisms]

266:12 270:17,24
**looks** 53:16
241:25 254:24
275:19
**lookup** 258:25
**loosely** 28:5
226:18
**los** 5:7
**lost** 145:20
**lot** 23:24 131:10
149:25 229:23
231:5 232:14
261:18,24 277:16
**loudly** 108:17
**lower** 46:20 96:13
131:15
**loyalty** 73:3
**lunch** 169:25
170:1 253:1
**luncheon** 170:9
**lunchtime** 152:3
**lweaver** 3:11

**m**

**machine** 69:19,20
69:23 107:19,23
280:8
**main** 172:21
**maintain** 26:10
55:17 67:11 203:7
226:5 270:2
**maintained**
161:21,23 220:19
220:20 258:8,17
259:2 276:14
277:21
**maintaining**
201:13
**maintains** 168:16
269:13
**making** 119:24
136:14 181:20,22

187:11 226:14
230:2,9 231:13,17
237:13
**male** 259:19
**man** 46:19
**manage** 41:6
212:9 217:9,10
**management**
242:25
**manager** 230:21
231:11,14 232:15
257:2
**managers** 230:25
231:7,10
**manual** 176:12
263:16
**manuals** 176:1,4
**manufacturers**
25:16 261:24
**map** 140:18
**mapped** 138:7
140:21 142:10
160:15 164:22
**mapping** 139:23
145:10,23,24,25
146:3,15,25 147:9
147:11
**maritza** 104:13
**mark** 10:4,12 46:8
196:9 240:3,4
264:23 265:21
**marked** 10:8,13
49:10,21,23 240:7
265:24 266:1
**market** 227:20
**marketing** 73:15
82:7 227:4,7,11
227:12,13,14,22
227:25,25 262:10
**marking** 9:24 10:6
240:11

**martie** 5:5 8:25
**match** 78:18 80:10
81:18 142:6
**matching** 79:18
79:23,25 80:4,14
80:21 125:1,5,8
125:14
**materials** 27:13
53:18
**matt** 6:15 8:10
53:7
**matter** 7:14
172:22 219:24
279:4
**matters** 11:24
13:6,24 15:15
172:25 279:6,8
**matthew** 3:6,7 8:8
**md** 1:6 2:6 7:17
**mdl** 1:4 2:4 6:16
6:19,21,23 46:11
240:5
**mean** 16:15 17:1,5
18:20 20:23,24
21:16,25 23:1
26:23 27:2 28:1
30:11,23 31:1
33:19,23 34:14
39:17 40:14 43:9
49:7,8 52:12 59:9
60:11,21 63:2,4
63:20 66:19,19
67:13 71:1,2,6
74:11,21 75:1,16
76:9 78:14 80:18
83:15 95:17 96:6
98:4,13 104:25
108:17 109:7,25
113:22 116:13
120:20 126:4
128:3 139:2

146:11,13 147:20
151:17 163:11
164:5 173:23
176:13 185:13,21
186:16 188:1
198:7 201:9 206:9
211:17 218:23
219:3 221:25
222:6 226:4,13,17
226:18 229:16
230:10 231:20
239:15 240:16
243:11 247:22
249:2 254:16
257:11,24 268:21
271:11 272:11
**meaning** 86:18
87:8 118:21
196:22 235:1
**meanings** 28:10
**means** 12:15
14:14 19:17 32:4
43:12 61:3 62:19
62:23 92:8 95:18
110:4 144:14
156:6 183:1
194:25 196:5
201:12 249:12
256:23 274:16
**meant** 22:16,22
51:13 53:21 148:9
150:9 166:6 219:6
229:10,17 245:18
274:14
**measure** 32:11
**measurement**
56:17 73:19 75:1
77:12 144:4
**mechanisms**
264:20

[media - need]

media 7:11 38:12
200:6 219:7,8,12
278:4
medical 185:16,24
186:11,20,21
187:7 190:20
192:15,18,21
193:5,14,24
melamed 3:7 8:10
8:10
member 76:3
members 212:10
213:9,13
memory 49:15
men 114:5
mental 186:19
mentioned 33:3
40:9 61:19 220:7
mentioning
219:21,23
mentions 199:13
219:23,25
menu 96:23
merge 152:12
merits 205:4
message 117:14
243:4 244:3
messages 119:23
121:11 244:13
messaging 52:6,7
56:8 122:15
messenger 20:3,13
51:25 52:9,10,12
61:25 117:15
118:21 121:11,19
121:20,23,25
122:6,11,21 123:7
143:9 223:23
224:2 239:13,17
240:14

metadata 222:15
222:18,25 223:3
225:7
methods 134:12
mic 70:14,17
middle 143:22
migrate 244:11
million 155:21
millions 259:14
mind 61:4 148:20
152:4 189:23
199:18 206:25
209:20 223:16
268:3
minds 149:3,7
mine 104:4 165:8
minute 87:10
minutes 84:21
87:24 88:1 228:8
miserable 136:15
missing 13:16
227:24
mission 23:20
misstates 154:15
257:19
mistaken 49:4
90:7 196:12
mkutscherclark
5:10
mmelamed 3:14
mmmontgomery
3:13
mobile 25:17
31:14 87:6 102:7
105:2 132:4
model 262:14
moderating
212:10
modern 262:6
moment 104:10
104:11 123:16

182:24 192:13
194:10 203:23
268:2
money 123:7,8
monitor 41:6
242:22
montgomery 3:6
8:8,8
months 68:17
196:9
morning 7:5 8:3,6
8:19,20 9:16,17
139:16 176:22
194:11 239:19
mouse 33:9
move 55:20,24
56:13 71:11 83:11
83:11 85:4 93:15
111:1 123:12
142:24 206:16,17
206:24
movements 33:9
moving 145:2
multiple 222:8
255:20
mumm 5:13 9:2,2
music 66:2,3
183:15 192:10
mute 83:2,2 124:2

**n**

n 4:1 5:1 6:1
name 7:18 21:3,3
45:2,2 68:2,3
90:13 118:10,10
130:11,15 168:2
209:19 215:4
218:14 221:9
231:16 232:2,5,12

233:4,6,6,11
237:19 238:17,17
238:18 243:9
248:18,22 249:5
249:13,13
named 46:19
103:13 267:12
names 32:23 53:5
221:21 230:24
native 55:7,18
58:13,17 60:9,10
61:3,3,6 62:5
79:19 87:7 99:11
99:18 100:7,19
108:2 110:4
111:13,21,22,25
112:6,12,15
113:14 119:10
139:16 184:1
nature 12:11 14:4
108:12 153:8
180:1 211:8
near 81:4 83:13
101:8
nearby 35:13
36:18,24
necessarily 28:7
40:18 43:16 75:3
75:6 106:23 107:4
118:14,15,25
135:9 151:11
159:17 200:17
206:11 225:10
227:23 241:5
254:19 255:4
271:11
necessary 174:14
need 9:21 10:25
10:25 11:4 17:17
19:8 26:10 29:14
42:7 49:21 50:6

[need - objects]

59:23 67:25 71:12
76:9 87:21 116:4
122:2 128:19
132:12,15 147:9
163:25 168:10,10
168:19 169:17
178:19 193:8
195:15 206:11
207:13 208:21
234:21 238:3
242:23 244:11
255:15 260:20
267:17
**needed** 132:7,20
**needs** 83:1 207:7
215:2
**neither** 247:20
280:14

**network** 36:24
90:16 92:4,15
99:10 126:15
143:12
**never** 81:13
110:24 117:16
148:20 208:25
246:15
**new** 5:15,15 9:17
48:4,5 175:2
176:4 196:5 245:1
256:15 269:23
271:7
**news** 26:3 120:19
121:1,8 171:12,13
171:19 172:11,18
172:21,24 173:4
173:16 174:3
175:23 176:1,8
234:7,10 254:18
255:5,7

**nike** 180:25
184:16
**nine** 146:24
168:14
**noise** 123:22
**nonapp** 239:3,8
**nonhashed** 151:14
**nonresponsive**
83:11
**normally** 55:16
135:7 200:4
**northern** 1:2 2:2
7:16
**nos** 6:13
**notice** 6:8 10:2,5
11:20 12:5,23
58:2
**noticing** 8:2
**nuance** 137:19
**number** 7:17 10:3
10:12 11:13 12:13
14:5 15:9 17:23
46:17 50:21 56:15
58:9 62:12,14
64:15 65:7 80:8
80:12,21 180:23
189:20 193:25
209:18 229:13
231:23 242:15,19
242:20 254:12
276:5 278:4
**numbering** 46:22
**numbers** 46:11
82:19 143:15
240:5
**numeral** 13:7
**nzos** 26:3

**o**

**o** 160:3
**o'neil** 243:6

**o0o** 7:3
**oakland** 3:9
**oath** 88:11 171:9
228:17 265:10
268:7 280:7
**object** 19:13 20:17
21:10 22:25 23:7
32:2 36:2 37:11
39:23 45:19 58:25
63:3 65:10 79:5
81:23 88:22 90:22
102:11 142:21
153:4 161:10
166:23 168:22
173:7 205:1 214:9
214:12,21,25,25
215:8 221:19
222:14 250:6
268:24 277:12
**objection** 12:18
14:10 21:10 22:5
23:11 24:6,22
25:7 28:22 33:10
36:4 38:22 42:4
42:13 43:8 44:18
47:9 52:20 54:9
55:8,19 59:2,6,22
60:12 64:3 65:10
66:10,18 67:12
76:16 77:15 82:16
82:24 83:6,16
84:2 85:11 89:7
89:19 90:17 91:5
91:11,18 92:17
94:9 99:1,13,20
99:25 100:1,10,22
102:11 103:2
106:19 107:13,25
109:22 116:7
117:4 121:12,15
136:19 137:13

139:10 140:1
141:25 142:2,3
146:5,17 149:13
149:15,16,22
150:1 153:21
154:15 155:12
156:1 158:2 162:6
163:20 165:18
167:16 172:9
173:14 174:16,23
175:14 177:4,18
178:4 179:24
180:17,21 181:17
182:14,22 184:25
185:1,11 187:10
189:7 190:15
191:8 192:1,22
199:4,15,21
200:13 201:3,19
201:20 206:5
208:11 209:8
210:9 211:14
215:21 217:20
222:3 230:4
232:19 237:6
247:23,25 248:14
250:6,16 251:17
257:7,19 259:3
261:4 263:1,10
264:3 266:23
269:9 270:22
271:19 272:21
276:21
**objections** 7:25
12:22 149:25,25
**objective** 21:23
86:21 144:22
172:18,21
**objects** 214:19
274:22

[obligation - okay]

**obligation** 243:14
269:14 270:2
**obligations** 176:16
180:9
**obliged** 133:9
**observes** 63:18,19
**obsolete** 46:23
**obtain** 36:7 185:9
185:24 266:21
273:23
**obtained** 216:10
226:1 277:23
**obtains** 32:19
251:14
**obvious** 19:9
229:19
**obviously** 18:16
258:6
**occur** 47:20 49:2
**occurred** 168:20
169:1
**occurring** 180:19
181:16 182:13
**oculus** 20:3
**offered** 102:5
**offers** 20:12 78:12
90:8
**offline** 45:14
73:18 74:25 75:8
75:14 76:5 81:17
81:18 113:9,10
245:25 246:12,13
**oh** 70:18 77:4
104:5 109:2
113:11 123:12
124:1 128:10
131:4 276:7
**okay** 10:24 11:6
11:12 12:4,10,16
13:6,12,24 14:2
14:19,23 15:1

16:3,9,12,24
17:11,15 18:15,23
18:25 20:21 21:7
23:4 27:13,24
28:16 29:16 30:3
30:8,25 31:9,19
31:24 32:16 33:17
34:2,8,25 35:3,8
35:10 36:16,22
37:3,6,16 39:15
40:3,16 41:8,18
41:21 42:14,20,25
43:5,9,22 44:19
45:11,25 46:8,16
46:25 47:4,14,20
47:25 48:12,18
49:1,5,12,15,20
50:5,9,14,17 51:2
51:6,8,14,17
52:16,23 53:4,13
53:17,23 54:4,19
55:4,16 57:2,6
58:1,7,21,24
59:10,13,18,21,24
60:3,8,17,22 61:1
61:6,10,22 62:7
62:18,23 63:1,21
64:9,12,18 65:3,6
65:12 66:25 67:9
68:22 69:7,11,16
69:22 70:18,20
71:19 72:16,18
73:17 74:2,10
76:13 77:11 79:17
80:17,20 81:9,20
82:2,6,21 83:10
83:24 85:15 86:1
86:9,16,23 87:4,6
87:9,17,22 88:1
88:13 89:4,15
90:2 91:21 92:14

92:22,25 93:7,13
93:15,22 94:16
95:1,5,11,15,21
96:4,8,13,18 97:6
97:10,21 98:2,6,9
98:21,25 99:4,10
100:16 101:3,7
102:16,23 103:5,8
103:25 104:5,9,10
104:11,15,24
105:8,14,20
106:14,17 107:18
107:22 108:4,13
108:19,24 109:11
110:6,6,11,20
111:2,15,18
112:11,20,25
113:4,10,12,21,24
115:2,8,15 116:8
116:17 117:12,23
118:8,12 119:13
119:15,17,23
120:5,12,20 121:7
121:9 122:7 123:2
124:1,9,23 125:10
125:17,21 126:8
126:13,18 127:5
128:2,16,20,21
129:5,9,23 130:1
130:13,21 131:4,9
133:2,11 134:8,17
135:1,19,23 136:5
136:18 137:10,23
138:9,12,16 139:1
139:8,21 140:15
140:20 141:9,21
142:16 143:10,18
145:3,8,22 146:2
146:15 147:10,14
147:17 148:1,7,10
148:10,17 149:4

149:10,20 150:12
151:3,13 152:1,4
152:15,20 153:13
154:23 155:4,15
155:22 156:12,21
157:6,19 159:2,15
159:19 160:4,8,11
160:18 161:4
162:1,24 163:3
165:1,6,25 166:11
167:3,9,13 171:11
172:7 173:10,21
174:2 175:5 176:3
176:11,21 177:15
177:25 178:3,11
179:9,21 182:8,19
183:24 185:21
186:18 187:6,15
187:17,20 190:10
190:24 193:16
194:10 195:4,8,19
195:22 197:17,24
200:20 202:12
203:17,22 204:2,7
206:16,20 207:3
208:7 209:2 210:2
210:19 211:5,22
212:7 213:15,25
214:15,17 215:15
215:18 216:6,15
216:21,25 217:3,6
217:14 218:16,23
220:14,23 221:1,7
221:15 222:10,17
223:6,14,21 224:5
224:10,15 225:13
226:9,20,25
227:21 228:19
232:15 233:17
234:3,15,21 236:1
237:2,16 239:22

**[okay - parties]**

240:2 241:7,10,16
242:10,20,24
243:16,22 244:10
244:22 245:1,6,9
245:15,25,25
246:17 247:15
249:2 251:7
252:24 253:3,11
255:8 256:17
258:19,22 259:7
260:6 261:12
264:22 265:12,16
265:21 266:14,17
266:20 267:11,14
269:11 271:2,15
271:16,22 273:10
274:6 276:3 277:6
**old**  37:19 40:24
256:16 269:23
271:7
**omission**  36:13
**onavo**  90:3,5,6,11
91:8,10,14 92:3
92:16,23 93:3,14
**once**  66:8 189:5
197:1
**ones**  35:2 147:13
236:2
**online**  45:14 81:17
176:14 183:5
235:17 246:4
**open**  11:12 22:17
29:23 140:5
171:16 276:5
277:8,13
**opening**  268:16
**operate**  95:24
**operated**  94:25
**operates**  176:1,15
**operating**  32:20
114:1

**operations**  33:7
**operators**  25:17
**opportunity**  50:16
203:10 259:16
262:16
**opposed**  87:11
**opposite**  245:17
**opt**  92:3 93:16
101:11 126:17,21
126:23
**opted**  102:14
**optics**  160:5
**optimize**  75:19,20
**optimized**  76:21
**optimizing**  89:13
**option**  97:3,9
149:6 249:10
272:5
**options**  44:22

**order**  6:12 10:2,12
12:12 14:5 25:20
138:24 175:21
191:15 244:13
259:14
**ordered**  201:23
232:20 277:17
**original**  270:13
**originally**  21:24
109:20
**outcome**  7:22
**outputs**  150:3
**outside**  23:8 84:11
155:12 156:1
189:7 201:3
228:23 230:4
**overall**  128:23

**overbroad**  149:19
**oversaw**  93:3,7
**owns**  37:21 231:11

**p**

**p**  4:1,1 5:1,1
**p.m.**  2:19 162:13
170:7 171:2,5
228:10,12,13,15
265:3,5,6,8
267:20,22,23,25
278:2,9
**page**  6:2,7,25
11:24 12:1 13:6
13:10,11,18,20,20
13:22 15:14 18:10
39:11,12,13,13
51:12 56:15 57:3
58:8 65:25 66:22
67:8 68:12,16
70:1,8 79:17 83:4
86:19 90:3 93:18
98:21 100:24
101:7,8 102:6,24
104:12 123:9,10
123:13 125:18
127:20 128:14
129:3 130:14,18
131:1,3 143:19
152:5 214:22,23
215:4,5,6,11
217:9,11,12,13,22
241:13 242:4
254:19 256:22,22
257:5,8,12,13,13
257:13,14 259:11
**pages**  1:25 17:2,23
17:24 18:1 38:21
38:25 39:8,10
50:23 65:20 71:8
71:8 100:13 124:8
171:14 206:12,15

217:6,10 238:25
239:2 256:18
257:22 258:4
259:11
**panel**  92:3 93:16
**papamiltiadis**
1:18 2:17 6:3 7:13
9:9,20 278:3,7
279:20
**paper**  176:18
**paragraph**  130:22
131:3 134:18
143:22 152:7
**parenthetical**
73:17
**park**  5:14

**part**  15:4 36:14
74:15 77:3 126:6
175:22 179:4
183:4 187:1
189:16 193:12
212:20 216:5
220:11 223:15,16
231:13 251:6
**participants**  7:7
**participation**
48:10
**particular**  60:18
120:21 147:22
230:12
**parties**  7:9 14:17
23:25 46:2 59:14
59:17,19 60:1
71:17 72:5 113:2
121:10,25 122:7
122:12,13 131:12
140:22 195:1
201:17,22 202:2,4
202:9 203:3 207:4

[parties - personalize]

208:9 209:6 212:8
213:8,12 217:4,18
218:20 226:1
228:21 229:4
230:17 231:18
232:10 233:1,12
240:23 249:8
250:14,19,25
251:14 252:1
280:16
**partly** 46:16
**partner** 24:9 25:1
25:2 26:6,15
42:15 72:20 227:9
232:4 234:4
**partners** 24:4,5,10
24:16,17,17,20
25:5,10,15,22
26:9,11,18 41:15
41:19,22 42:10,16
43:5,5 184:23
203:23 227:10
250:15
**partnership** 93:4
93:5 96:7
**partnerships**
220:19,21,21,23
230:21
**parts** 12:3 89:11
155:18
**party** 7:21 25:22
34:15 37:18 38:24
39:4,20,25 40:6
40:22 45:15,25
81:8 84:1 85:9,16
87:15 88:18 102:2
102:17,25 104:7
120:18 122:5
139:12 142:11
159:24 161:22
165:14 166:4,10

167:8 177:23
178:24 179:1
180:4,10 181:22
181:23,24 182:24
183:3,6,9 184:23
185:5,19 194:7
196:23 198:10,15
198:25 199:10
209:14 213:16,23
223:8,10,12,13
224:24 225:4,6,11
225:18,20,24
227:15 230:18
245:20 246:3
251:4,9,11 254:13
254:14,20
**pass** 137:4,8
**passed** 223:6,9
**passing** 140:7
185:20
**password** 68:1
**passwords** 21:3
138:23
**patience** 152:3
**pattern** 125:1,5,6
125:8,8,14,15
129:24
**patterns** 125:7,10
125:11 185:5
**pause** 105:19
123:20 241:15
242:8 266:13,16
**payments** 20:15
**pays** 217:8
**pdf** 13:11 18:11
55:18
**penalties** 279:9
**penalty** 279:1
280:18
**people** 22:16,20
22:22 24:1 26:5

27:22 30:18,21,23
34:14 35:1,6
51:18,21 52:5,9
54:20 57:5,8 60:5
68:11 70:5 75:13
76:18 78:3,6
79:14 83:5 86:7
94:10 96:1,19
104:16 106:21
107:2,4,6 109:17
109:18 113:1
114:5,5,20 126:17
126:21 135:10,12
138:19 143:8
144:6 145:1 149:7
158:24 175:6
180:3,11,23
181:21,21 183:12
183:13 193:4
194:8 198:24
200:19 219:20
220:10 225:8
230:11 241:21
244:13 249:9,15
249:17 251:8,10
254:12 255:23
258:23 259:8,11
259:19,21 263:5
271:18 273:19
277:3
**people's** 104:20
125:11 160:12
**perceived** 200:5
**percent** 207:2
**percentage** 75:13
**perfect** 110:10
112:20 139:22
**performance** 44:2
44:3 144:23,24
254:7,9

**performed** 33:7
**perimeters** 215:1
**period** 17:12,16
21:12 25:18 28:25
29:13 61:20 97:7
112:2 120:24
122:22 153:5
186:14 187:13
188:7 189:20
196:6 201:15
203:17 204:15
230:16 233:13
258:2
**periodically** 172:4
**perjury** 279:1,10
280:18
**permission** 9:21
197:1,21,22
209:22 224:7,13
234:23
**permissions**
207:25 215:20
230:18 231:18,21
234:16,20,25
235:19 236:8,9,21
236:22 237:4,14
248:12

**person** 230:21
231:3,16,24 232:2
232:22 237:3
243:14
**person's** 244:3
**personal** 52:15
70:2 74:17,18
78:17,18 92:22
127:21 154:21
262:18
**personalize** 31:21
32:9

[personally - poor]

personally   188:9
perspective   67:22
  129:22 151:18
  180:3 212:23
  213:1 215:10
  262:19
peruses   105:19
  123:20 241:15
  242:8 266:13,16
phone   31:14 32:8
  32:12 37:1 62:12
  65:7 80:8,12,21
  82:19 105:2
  132:13 137:21
  143:14 144:3
  193:25
phones   31:10 83:2
  90:9
photo   68:7,14
  124:22 159:13
  162:20,21 221:8
  221:13 222:14,14
  222:19,22 223:1,4
  223:5,6,11,22
  224:1,1,3,5,8,8,12
  224:16 225:2,5,6
  225:10,15,17,23
  229:18 235:18
  270:10,10,12,14
photos   35:20
  98:16 198:11,16
  198:18,20 224:25
  225:16 229:18,22
  230:1 249:22
  274:13,14,17,18
phrase   196:17
  203:9 227:1
picture   45:3
  118:11 124:21
  214:22 215:5
  217:12

piece   40:21 60:13
  60:18 147:22
  164:1,15,19
  173:25 272:24
pieces   40:15 45:1
  177:5,21 211:24
  222:8 235:3 274:4
  275:23
pin   129:5
pixel   37:13,15,19
  37:22 38:7,14,25
  39:9 41:13 42:18
  43:2,10 44:7,10
  86:14,16,17 87:16
  88:19 89:9,10
  101:19,23 142:11
  183:23,23 251:25
pixels   37:25 38:4
  38:19 44:1 86:10
  98:17
place   7:9 26:9
  68:25 82:4 148:13
  222:23 223:11
  261:15 268:20
  280:5
placed   38:20
  86:18 131:11
  157:3 252:4,5
  280:7
placement   253:17
places   236:20
placing   114:15
plain   37:16
plaintiff   3:2
plaintiffs   4:2 7:14
  8:4,7,9,10,13,17
  8:19,21 11:20
  15:17 103:13,22
  146:24 169:4,6,9
  169:10,16 265:14
  265:17,20,21

266:22
plaintiffs'   6:8
planning   272:1
platform   14:20,21
  14:24 19:24,25
  20:1,4 21:24,25
  22:1,4,13,15 23:5
  23:18,23,25 26:2
  26:4 38:1,1 41:7
  48:22 52:11 61:5
  61:7 65:18 66:13
  66:14 98:4,5,7
  126:12 135:22
  137:10 140:25
  141:1,2 143:16
  151:21 153:16
  156:24 159:4,11
  160:13 162:15
  163:2 173:4
  175:12,16 176:22
  176:25 177:16
  178:24 180:10
  182:25 209:1,21
  228:3 229:13
  250:9 252:21,22
  252:25 255:24
  269:18 273:18,20
platforms   261:16
  262:7
play   44:21 45:6
  128:19 192:4
played   183:14,15
plays   44:17
please   7:25 8:15
  9:7 11:15,18
  25:13 28:21 55:11
  55:22 56:2 74:6
  74:15 77:2 80:3
  83:20 84:6,21
  91:19 94:11 106:1
  109:3 111:7 135:6

135:15 149:24
157:24,25 166:16
178:18 192:13
202:16,21 214:8
223:17 229:2
230:13 232:20
233:21 253:20
261:11 266:15
plug   32:23 39:16
  41:11
plus   196:4,7,8,13
  196:14
pm   257:1
pmd   227:1
point   21:17 79:4
  94:20 95:5,22
  105:10 108:9
  113:22 119:18
  121:9 129:10
  139:24 141:11
  146:21 151:22
  162:4 167:11
  176:4 182:8
  194:14 195:5
  196:2 201:13
  228:5 233:25
  235:1 262:18
points   35:14
  173:11 197:23
policies   16:5,10
  31:3 64:7 95:6
  119:25 176:20
  180:10 197:16
policy   53:24 94:8
  94:20,24 95:12
  133:10 183:7
political   76:7,11
  77:7,13
politically   203:13
poor   142:13 144:5

Veritext Legal Solutions
866 299-5127

[poorly - product]

poorly  120:22
popular  220:13
  228:7
portal  20:14 21:6
  61:19
portion  158:10
portions  10:17
position  84:23
positions  152:23
possessed  142:19
possesses  141:16
  142:8 265:13
possession  141:18
possible  21:4
  148:3 164:7
  167:13 168:18
  186:25 225:25
  247:5 275:24
possibly  246:16
post  31:2 68:7
  163:15 180:11,24
  188:16 191:3,5
  199:9,12 200:7,16
  200:21 201:1
  216:16,25 217:23
  217:23,24 218:3
  224:5 251:11
  270:13 272:1,2,7
  272:8 274:14,15
  274:17
posted  117:16
  192:14 224:18
  225:19 271:11
  274:13 275:9
posting  175:6,8
  183:13 191:9
  212:10 217:11
  272:24
posts  28:17 29:25
  164:14,19 199:11
  200:16,17,23

215:6 217:16,17
  217:22 220:3,10
potential  66:12
  114:9,12 192:5
potentially  39:2
  107:1 215:4
  259:15
power  229:11,25
powered  235:23
  241:4
practice  144:18
practiced  9:25
pre  188:17
precise  105:3
  111:20 238:1
  260:22
preconditions
  224:15
predetermined
  184:7,11
prefer  9:20
preferred  227:4,6
  227:12
preparation  15:10
prepare  15:2,22
  49:18 57:11,15,17
  58:1 103:9,13,17
  103:22 267:8
prepared  9:23
  91:22 158:12
  215:18
preparing  57:20
  58:3 277:16
presence  19:23
  41:6 229:12
  235:17
present  5:19 7:23
  28:25 155:24
presented  53:21
presents  273:17

preserve  149:2
pretty  18:13 43:21
  127:25 185:22
  204:4 253:10
previous  87:13
  98:21 102:6,24
  108:2 110:3 142:9
  175:8 196:5
previously  140:13
  154:11
primary  21:23
  22:12
printed  55:13
  176:13
prior  197:12
  264:13 276:12,16
  280:6
privacy  1:5 2:5
  7:15 56:24 64:7
  103:11,16 120:4
  129:13,19,22
  163:8,10,16,17
  164:9,14,16,17,18
  223:4,7,10,12
  224:1,9 267:7,12
  269:13,15,16,23
  270:3,11,13 271:6
  271:10,24 272:6
  274:7
private  48:16,17
  90:16 94:2,21
  117:14,21 118:2,4
  118:6,21,25 119:2
  119:3 120:2
  163:23 196:20
  197:20 219:25
  220:2,5,15,17
  221:1,5 222:10
  223:2 225:8
  226:24 228:21
  231:22,23 232:10

233:14,15 235:6
  236:24 239:1
proactive  197:14
probably  21:16
  24:10,21 25:1
  31:15 34:24 36:12
  40:1 43:13,13
  44:7 46:23 61:17
  69:15 76:19 81:18
  96:6 112:17
  115:12 120:24
  136:13 137:7
  138:23 142:13
  150:22 158:25
  159:23 188:9,19
  193:19 220:2
  221:21 238:15
  240:15 248:3
  252:23 268:19
  270:12,15
problem  29:19
  54:25 273:18
problematic  206:7
procedure  6:11
  11:22
proceed  9:13
proceeding  7:25
proceedings  280:4
  280:6,8
process  9:18 134:6
  147:21 195:25
  196:24 197:3,7
  209:12 237:13
processes  155:11
processing  117:10
produced  18:11
  18:18 49:7 105:9
  146:23 267:4
product  20:19
  22:14 28:14 39:12
  44:9 51:23,25

Page 34

[product - question]

52:14,15 60:1
87:16 88:19 95:25
116:17 129:21
132:2 192:24
230:21 231:7,10
231:11,14 232:15
257:1 262:17
production 15:18
  18:16
products 20:12,19
  20:21 21:5,11,17
  27:20 28:12,14
  29:22 30:18 31:21
  32:8,10 42:17,22
  44:10 58:20 61:12
  61:14 73:23
  104:18 150:3
  262:20,21
profession 114:6
professions
  280:18
profile 1:5 2:5
  7:15 45:3 62:11
  70:3 118:11 141:7
  145:16,18,22
  151:15 163:18
  164:15,19 215:4
  217:11 224:19
  260:24
profiles 132:14
program 69:17
  242:25
programs 69:22
progress 242:22
prohibit 95:6
prohibited 95:12
project 93:3
  230:25 249:5
promise 155:7
promotes 31:4

pronounce 210:16
pronounced
  210:17
properties 152:24
protect 90:11
protecting 148:15
provide 30:18,22
  41:22 42:10 43:6
  45:4,16 46:1,5
  67:25 72:8 132:3
  134:9,13 157:25
  178:19 182:4
  184:21 185:4
  191:16,19 193:5,9
  197:19 237:19,24
  251:5 253:17
  258:14 262:7
provided 40:3,5
  59:13,15,19 110:4
  113:2 132:3
  143:17 180:14,15
  183:12 184:7
  194:7 211:20
  217:15 218:18
  241:3 252:1
  265:22 275:15
provider 31:17
  38:12 44:6
providers 45:16
  46:1
provides 77:11
  254:4,7 262:11
providing 39:21
  181:13,14 185:3
  222:13
psychological
  186:19
public 65:20 72:6
  73:2 95:19 116:5
  118:2,4,9,15,24
  119:9 127:8,18,21

163:25 176:5
196:17,19,21
199:11 200:16,23
209:9,11 213:8
217:16,16,21
219:25 220:2,5
223:2 237:10
255:25 256:8
271:25 272:2
publically 208:22
publicly 117:17
publish 180:3
  181:24
published 171:14
publishers 41:9
publishing 26:2
pull 10:1 49:20
  241:10 266:7
pulled 139:24
purchase 44:11
  75:17 78:4 81:3,7
  81:14,16,22 89:12
  144:2
purchased 75:9
purchaser 45:15
purchases 38:20
  41:25 43:7 45:15
  73:3,4 75:20 89:1
  99:5 144:6
purchasing 75:6
purged 113:21
purpose 22:12
  23:4,19 73:25
  89:24 136:18
  151:18,21 171:24
  173:16
purposes 28:3
  29:12 31:7 141:7
  148:15 149:11
  176:6 185:3
  203:12 235:9

251:8
pursuant 6:10
  11:21
put 24:11 46:20
  63:22 83:1 94:2
  94:21 97:14 129:5
  137:17
puts 110:21

q

qualified 168:18
quantify 17:23
query 69:18 247:7
  247:13,20
question 9:22 13:2
  21:19 22:11 25:11
  26:19 29:15,18
  30:10 43:21 47:15
  54:19 55:11,22
  57:19 59:4,10
  63:24 67:21 70:20
  84:6 85:6,7 86:6
  91:14,25 92:20
  93:1 94:19 96:18
  99:17 100:6,17
  105:14 116:4,15
  135:3 146:10
  148:6 149:18
  153:8,9 162:1,12
  162:13 163:14
  166:1 168:11,13
  168:19 169:14
  177:2 178:13
  180:1 181:6,11,19
  185:22 186:2
  188:6 192:3
  199:20 202:17
  204:14 208:5,8
  209:5 230:12
  231:12 233:20
  234:1,21 235:21
  236:15 237:22

Veritext Legal Solutions
866 299-5127

[question - recovered]

241:13 242:11
244:25 245:14
250:20 251:24
253:19,24 255:20
256:2 258:18
261:11 266:25
269:25 270:8
271:14,15,16
272:15 273:8,12
274:21 275:1,5,7
276:7 277:1
questionnaire
 193:18
questions   16:22
 28:24 68:2 85:2
 93:20 108:16
 163:19 205:4
 261:6 276:4,5
 277:7
quick   87:18
 123:16
quickly   105:16
 122:3
quite   24:13 60:17
 87:5
quotations   94:5,7
quotes   94:1

**r**

r   4:1 5:1
r&b   192:10 259:8
 259:12
ran   219:20
range   152:9
rate   245:2,4
raw   60:11,15,20
 60:24 74:12,16,20
 78:16
rawness   60:14
rbc   122:19 244:20
reach   25:20
 114:13 259:16

reaches   107:10
reactive   197:15
read   40:2 46:24
 71:24 74:6,7
 76:19 105:16
 109:2,4 120:13,15
 120:20 121:5,8,10
 123:1,16 124:14
 135:14,16 141:10
 166:16,17 179:4,6
 202:16,18 204:3
 212:3 216:19
 223:18 233:9,20
 233:22 234:6,11
 234:12 239:3,7,22
 239:23 253:20,21
 279:4
reading   32:6
 85:24 119:23
 120:2 223:16
 263:13
ready   8:22
realize   80:7
 198:22
realized   198:18
really   12:14 24:15
 27:16 40:24 55:14
 62:7 70:13 122:3
 129:6 141:18
 146:20 160:22
 166:15 193:8
 219:5 237:21,22
 238:24 249:3
 261:6 263:3
 270:11
realtime   107:16
 107:24 108:8
 114:25 115:8,11
 116:18 117:3,10
 135:13 166:15
 174:8 179:4

259:10
reason   54:17
 115:21 251:7
reasons   207:1
 251:3
reauthenticate
 166:7
recall   41:16 48:18
 49:12 88:15 90:15
 128:18 155:19
 157:6 160:22
 189:25 194:11
 209:3 215:25
 234:17 239:9
recapture   70:2
receive   30:16 57:8
 67:18 82:17,23
 85:7,21 86:6
 185:15 187:6,12
 239:25 244:3,9
 262:25
received   83:7
 92:15 140:21
 141:2 157:10
 186:10
receives   30:20
 45:13 57:5 60:5
 67:16 71:17 82:15
 83:4,25 89:5
 141:12 171:19
 190:10 250:13
receiving   142:7
 205:10
recess   88:3 170:9
 228:11 265:4
 267:21
recipient   162:19
reciprocity   179:23
 180:2,2,6 181:16
recognition
 123:14 124:11,12

125:22 129:10
 130:8
recognize   11:16
 12:4 53:5,7
 241:17
recollection   178:3
 178:23 179:19
 188:22 190:1
 208:12 264:11
reconfirm   45:7
reconvene   228:8
record   7:6,10,24
 11:19 12:21 26:10
 29:5,10 40:10
 46:24 50:10 59:18
 61:6 66:16,21
 74:7 78:19 84:23
 88:1,3,5,6 91:20
 107:22 109:4
 115:9 135:16
 154:25 166:17
 170:4,5,6 171:4
 172:15,16 175:13
 175:15 179:6
 202:18 207:14
 223:18 226:9
 228:9,12,13,14
 233:22 253:21
 257:16 265:1,2,5
 265:6,7 267:18,18
 267:19,22,23,24
 268:6 269:19
 270:2 276:13
 277:9,11,25 278:1
 280:8
recorded   7:11
 188:11
recording   7:8
records   72:6 73:2
recovered   189:6

[reengages - reproductive]

reengages 192:24
refer 26:15,25
 65:16 72:23 77:25
 81:6 86:12 87:1
 89:18 92:6,14
 96:16 101:13
 113:1 203:15
 239:16 242:18
 260:23 268:23
reference 73:22
 112:15 113:8
 214:4 238:3
referenced 23:17
 96:14
referred 22:15
 41:15 102:18
 121:1 124:12
 128:16 129:24
 187:12 239:18
referring 25:9
 29:13 99:14 133:2
 148:23 149:1
 182:1 235:20
refers 41:5 61:13
 71:19 73:18 81:18
 86:13 89:23 90:3
 101:14 143:7
 214:11,12 245:19
 268:5
reflect 83:24
 85:17 89:4 242:10
 264:6
reflects 269:22
refresh 10:25 11:1
 11:5,11 49:21
 50:6 190:1
refusing 237:19
regard 160:23
 214:16 236:8
 244:17

regarding 12:11
 14:8 267:6
regardless 21:7
regards 16:17
 144:20 236:9
registered 119:11
registration 72:7
 73:2 77:8 184:10
regular 53:15
regularly 87:5
regulation 133:10
regulators 48:1,3
 54:3 131:12 190:8
reidentified 148:7
 149:11
reidentifier
 148:22 149:4
reidentify 148:3
 166:22
relate 166:3
related 7:20 15:12
 26:13 63:5 145:6
 154:2 156:23
 158:21 177:22
 186:10 234:19,25
 236:4 269:12
 271:6
relates 1:7 2:7
 91:7 165:4 232:3
 232:3,8 234:4
relating 61:7
 127:6 155:16
 167:15 169:6
 185:24 215:19
 265:14,17 266:22
relation 47:18
 89:22 155:2
 203:25 206:7
relational 126:8
 160:9

relationship 183:2
relationships 54:3
 77:20,24
relative 280:15
release 196:4
relevance 173:19
 173:19,23,24
relevancy 174:14
relevant 14:18
 21:12 39:3 108:15
 171:24 173:17
 174:4,6,12 175:2
 175:24 200:24
 262:16,22 272:1
reliably 144:23
remain 175:24
 257:23
remains 45:9
 276:5 277:8
remember 16:11
 47:22 48:21 50:22
 90:13 160:6 211:8
 212:6,13 218:12
 220:9 233:24
 238:18,22 240:13
 244:19 245:8
 246:11 249:14,21
 249:23,25 255:14
remote 1:16
remotely 7:7
remove 188:13
removed 127:2
repeat 18:18
 29:18 59:4 70:20
 74:14 83:19 87:13
 125:4 179:3
 193:12 247:10
 253:19 275:2
repeated 275:21
repeating 102:19

repetitive 217:8
rephrase 181:11
replacement
 195:25
replicated 122:14
replicating 122:16
 235:10
reported 1:22
reporter 7:20 8:14
 9:7,13 71:2,6,9
 74:8,14 77:2,5
 83:19 101:17,20
 101:24 109:5
 121:21 133:13,16
 133:19 134:1
 135:17 136:3,6,10
 137:5 142:1,4
 145:17 164:16
 166:18 170:3
 175:18 179:7
 184:25 185:2
 202:19 206:14
 210:22 211:1
 213:10 223:19
 233:23 235:11,13
 248:21 253:22
 262:3 280:1,19
reporter's 136:14
reporting 132:8
 132:21 133:3
repository 169:23
representative
 1:17 2:17 7:12
 279:21
represented 248:3
 271:5
represents 19:23
 57:3
reproductive
 185:17,25 186:12
 187:8 190:20

[request - rpr]

**request**  15:18
18:18,24 44:25
215:1 226:8,15,21
**requested**  18:16
74:8 109:5 135:17
166:18 179:7
202:19 209:22
223:19 225:16
233:23 253:22
280:13
**requesting**  229:21
**requests**  164:2
215:11,12 224:25
226:12
**require**  35:21
117:10 139:3
180:10
**required**  248:11
**requires**  21:2
166:5
**research**  207:5
208:10 209:7
**researched**  198:23
**researcher**  209:20
**researchers**
208:19 209:3,18
**resources**  23:23
**respond**  157:4
181:19 186:3
187:16 215:2,2
266:24
**responded**  249:18
255:20
**responding**
217:12
**response**  12:17
27:3 32:12 58:2
74:6 87:13 127:12
134:10 166:16
172:5 175:8
178:13 179:4

181:23 206:20
207:1 215:25
220:11 222:13
226:8 271:13
**responses**  157:11
194:24 215:19
**responsibility**
31:5
**responsible**  54:2
231:14 232:9
**rest**  127:15
**restate**  13:2 100:5
**restore**  149:8
**restrict**  259:20
**restricted**  118:7
191:13 223:1
**restricting**  225:10
**restriction**  224:9
**restrictions**
131:11
**result**  165:14
**results**  125:22
126:20
**resume**  18:20
**resumed**  171:6
**retail**  73:3 75:10
**retailer**  257:14
**retailers**  72:8
**retain**  66:7 162:5
**retained**  108:10
161:15 278:5
**retains**  187:20
**retargeting**
151:22
**retrieve**  217:22
**return**  60:8 71:11
145:8 183:11
261:17
**returned**  217:16
248:13

**returning**  83:3
88:13 155:7 268:2
**reverse**  148:3
**review**  10:18
15:21 16:3,10,25
17:15 18:12 28:18
50:16 196:25
197:3,6,13,14,15
209:12,14 280:13
**reviewed**  13:3
16:1,4,5,6,7,9,12
17:2,9,22,25 18:6
**reviews**  129:20
**right**  9:23 10:6
11:1 13:22 16:13
17:8,24 18:3 19:1
19:4 28:18 34:21
36:11 37:9 38:10
40:4 43:1 44:20
46:21 51:8 52:5
53:11 56:21,25
61:8,21 62:3 63:9
65:8 67:4,6,11,16
67:24 68:6,10,20
68:25 71:17 73:1
73:4 75:21 77:14
77:18,20 81:11,22
82:14,15 88:24
91:3 92:2 95:3
100:4 104:8,9
109:12,19,21
110:1,8,13 111:24
113:6,16 114:7
115:18 116:24
120:1,7 126:15
128:22 129:2
133:22 137:3,25
138:17 141:12,18
145:14 147:14
148:1 150:10,13
152:1,19 154:14

160:5 162:14
165:4 171:21,25
172:1,24 174:4
176:24 177:9
181:5 183:5
187:21 189:12
191:7 193:2
194:16 195:5,9,18
195:19,20,21
203:11 205:18
207:20 208:1,17
212:20 215:20
224:11,16,21,22
224:23 229:19
230:11 232:7
235:4 236:11,16
242:2 243:3
252:20 253:18,25
255:2,5 256:13
258:13,15,20
259:9 260:1,8,9
262:12 273:21
**rights**  45:16
**rob**  53:7 56:20
**rog**  194:23
**rohrback**  4:3 8:17
8:18,21
**roi**  261:17 262:10
**rolled**  196:2
**roman**  13:7
**roughly**  49:13
155:11,21 234:19
**round**  183:15
**route**  90:20 91:3
**row**  162:9

**rpr**  1:23 2:20
280:25

Veritext Legal Solutions
866 299-5127

[rudimentary - see]

**rudimentary**
26:22
**rule** 6:10 11:22
148:11,13,17
**run** 75:15 81:19
82:9 114:2,7
118:1 151:7
180:25 184:16
227:15 259:24
**running** 44:5
73:15,25 116:18
117:2 131:18
151:19 154:4
194:18 257:4
**runs** 69:17 107:9
110:20 113:14

**s**

**s** 4:1 5:1,6 6:6
**safe** 31:8
**saga** 192:4
**sake** 38:13 114:9
162:9 193:15
274:12
**salary** 26:13

**salesperson**
233:16
**san** 106:22 107:3
107:5,6 109:9,10
109:17,24 110:7
110:17,19 111:9
111:23 112:5
114:1,2,21 117:16
119:21 135:9,11
135:12 259:20,22

**sat** 48:13
**save** 90:9
**saw** 68:16
**saying** 21:21 29:4
55:13 68:12
117:15 137:17
141:20 149:22
165:1 182:9
200:23 206:23
211:3 236:12
251:22 272:17
275:7
**says** 11:24 13:6
14:3 15:14,17
30:16 45:13 56:17
57:6,9 58:13
61:11 62:8,13,14
64:12 65:12 72:20
73:2,12 77:19
79:22 81:3 83:12
85:25 86:9 88:25
89:15 92:3 93:20
93:22 94:1 95:2,6
95:23 96:22 97:13
101:10 104:12,15
104:24 105:8
125:18,21 129:11
129:13 130:14,22
131:7,9,15,22
132:6,19 134:18
143:23 144:8,12
152:8 157:13
225:7 242:14
243:4,8,16 268:5
268:12
**scan** 107:20
**scenario** 44:20
113:25 219:9
224:11,22 262:9
**scenarios** 42:20
43:4 81:15 241:2

241:4
**schedule** 13:20,22
13:23 15:14
227:25
**science** 168:1,3
**scope** 22:6 23:8
52:21 84:11,16,25
91:6,12 106:3,6
138:20 140:7
145:14 146:21
147:9,12,13
155:12 156:1
157:23 159:25
160:1 161:9 166:3
167:17 174:17,24
189:7 190:3 199:5
201:3,20 204:17
228:23 230:4
248:7 261:5 263:2
**scoped** 138:11,12
140:17 145:9,10
146:3 165:11,16
165:22 248:6
**screens** 37:20
**scrolling** 12:20
**scutari** 6:15 53:7
**sdk** 40:16,17,21
40:23 42:18 43:3
86:23 87:2,6,7,16
88:20 89:23 137:4
137:8,17 142:11
177:21
**sdks** 41:12 87:5
101:16,22
**se** 126:9 180:2
**search** 125:19,23
126:1,2,14,24
132:8,21 133:3,7
134:3,10,12,13
167:14,24 168:14
169:20 199:9,11

199:12 200:7,16
200:21 201:1
218:3 245:2,3,4
274:7
**searched** 273:6
**searching** 97:1
126:3,14 266:21
**seattle** 4:8
**second** 25:21
95:23 120:5
125:17 147:18
162:12 202:13
257:11 265:23
**section** 152:22
215:3 280:17
**see** 10:23 11:9,10
13:18 14:3,6,7
15:17 31:22 32:9
41:25 50:5 51:2,4
54:5 55:7 56:18
58:10,14,18 59:24
61:4 62:5,8,15
64:12,16,23 65:13
66:21 71:14,19
72:20 73:1,12,19
75:2 77:18,20
79:18,22 80:11,15
80:16 81:3 83:13
85:25 86:9,23
87:17 88:24 89:1
89:15,18 90:2
92:2,4,5 93:20,22
93:24,25 94:3,4,5
95:2,9,23 96:1,3
96:14,19,20,21,23
97:1,4,11,13,15
101:10 104:15,18
104:19,24 105:8
113:12 114:21
115:6,10,12,19,21
125:7,15,18,24

[see - similarly]

129:10,11,17
130:16,25 131:6
131:13,19,24
132:9,10,17,22
133:4,5 134:21
142:12 143:21,24
144:6,7,10,16
145:12,13 147:10
152:8,13 171:15
172:6 173:13
194:5 215:15
224:16 225:14
226:7 232:13
241:9 242:3,14
243:4,8,17,25
244:5,10,15 247:2
255:10 260:2
261:24 262:21
271:3 274:13,16
seeing   10:22 11:7
74:4
seeking   76:13,14
192:18 216:10
seen   12:2,3 43:13
50:12,23 51:6
75:14 98:18
115:13,22 124:21
254:12 256:8
266:10,18
sees   143:23 144:1
segment   82:10
segregated   118:2
selection   118:14
261:2
selects   82:7
self   221:22 259:12
sell   191:16
selling   44:10
semi   149:3
send   41:9 42:22
55:2 137:11,11

176:22,25 177:5
177:16,21 239:25
244:3,9,13
sending   142:11
186:14 190:4
sense   26:16 31:6
32:4 39:21 58:23
78:23 119:3
151:17 153:22,24
164:7 166:13
173:18 226:25
229:23 269:18
274:1
sensitive   185:9,13
187:7 190:19
sent   53:14 84:18
117:14 188:13
223:22 240:1
242:1 277:23
sentence   12:15
45:18 75:17 95:23
128:20 131:5
132:12 193:13
232:14 244:11
sentences   132:11
sentiment   200:1,8
200:18,21,22,24
separate   48:7
131:23 138:14
server   144:3 146:6
146:9,12 160:5
servers   90:21,23
91:4 137:20
155:18
service   22:20
31:17 44:6 114:19
114:19 127:20
191:17,19 210:18
248:12 251:6
services   20:13
21:8 27:23 42:1

104:17 132:4
session   247:8,9,13
247:14 248:12
sessions   15:9
set   12:13 49:21
53:20 72:14 84:24
153:1 155:6
175:25 280:5
sets   174:14,19
259:25
setting   129:16
130:3 181:25
223:7 224:1
267:12 270:11,14
271:24 272:6
settings   35:17,18
37:8 68:21 70:7
145:12,13,21
163:12 164:14,17
164:18 223:4,10
223:12 252:8
267:7 269:13,16
269:16,23 270:2,3
271:6,10 272:10
272:11 274:7
sexual   185:16,25
186:11 187:8
190:20
share   39:4,4 54:21
62:24 64:6 93:23
94:1,21 177:10
shareable   205:7
shared   39:19 64:2
64:5 202:2,4,9,14
205:18 233:1
sharing   95:7,12
130:23 134:19
152:16 180:14
181:12
sharpe   130:10

shaw   147:23
shelf   184:9
sherman   53:7
56:21 57:11
shoes   254:25
shopping   38:20
167:5,6,7
short   228:5
shorthand   280:9
280:19
show   108:22
114:23 128:14
173:2 252:11
276:15
showed   32:12
showing   115:20
132:15
shown   124:21
164:10
shows   11:2 115:7
172:11 254:18
255:5,6 275:10
shut   244:22
side   44:9 81:11
82:5,8 93:8,11
sides   152:11
signal   32:22 66:23
66:25
signals   35:13
104:23,25 174:25
175:5
signature   226:12
226:13,16 280:24
signed   38:9
significant   180:22
231:1,24
similar   47:7 81:10
95:7,13 114:20
125:15 236:25
similarly   164:3

[simon - spotify]

simon  6:18 241:22
simone  6:14 53:2
simple  37:17
43:21 185:22
271:14,15
simplify  131:17
singer  257:13
single  20:19 21:4
68:25 97:19 98:3
126:11 129:21
221:9 231:3,14,16
231:24 238:3,15
255:6
sir  83:3 106:7
sit  60:3 100:18
186:9
site  53:22 62:15
65:13 70:22 80:10
99:12,19 100:8,20
101:4 112:17,18
112:19 113:11,12
128:4,4 140:23
141:13 142:7,8,18
159:21 161:7,8,19
162:2
sites  46:2 87:15
88:18 148:16
six  16:11 90:7
278:4
slides  53:21
slightly  269:20

slow  77:3 136:13
small  152:9
smaller  165:2
259:23
social  41:11
180:23 200:5
219:8,12

socially  22:23
software  25:22
32:21 40:15,22
177:11
solution  184:9
solutions  7:19
278:5
solve  144:8
somebody  44:7
83:1 126:13
158:18 168:2
220:23
someone's  63:9
120:19 122:24
159:13
sorry  8:14 12:19
13:4,12 24:8,23
27:10 28:19 36:3
49:14 54:24 59:7
59:15,23 62:20
63:7 70:13 71:2,6
71:23 74:14 76:8
76:8 77:2,4 83:19
85:6 86:5 97:1
99:17 100:17
101:17,20 102:13
102:19 106:11
110:2 111:19
113:11 120:12
121:21 122:2
123:18,21,25,25
124:19 131:2,5
132:11 133:10,13
133:16,16,18
135:13 136:3,6,10
136:16 137:5,6
139:11,19 142:1
143:4,13 144:24
145:17,20 146:8
152:18 154:12,24
162:1 164:16

175:18,19 183:20
184:24 191:18,19
195:10 210:22
211:5 213:3,10,18
213:19 220:20
222:4 234:9,23
235:11 236:14
239:23 240:16
242:9 247:24
248:21 249:2
251:10 252:8
262:4 268:6,16
270:7
sort  26:6 29:1 96:6
114:7 126:16
135:12 161:2
181:25 199:23
229:12 243:1
source  109:20
238:6
space  32:22
108:11
speak  57:14 94:23
206:17
speaking  35:22
112:1 181:8
speaks  84:3
specific  35:2 43:17
70:24 75:4 78:10
78:13 81:19 84:24
110:16 111:5
113:25 114:3
129:1,4 134:4,25
135:8 137:24
141:6 143:15
151:1,12,20
156:21 163:17
174:19 180:9
184:14,17,18
187:12 188:10
189:17 191:24

194:8 196:2
197:23 199:17
205:15 209:20
211:24 217:17
220:11 237:4
238:18 242:22
245:5,8 260:3
267:13 268:19
272:15 273:13
specifically  18:9
58:1 61:14 65:1
110:14 129:7
136:20 163:15
169:12 196:25
236:17 248:25
249:9,14 267:1
specification
237:23
specifications
186:21
specificity  250:23
specifics  219:18
236:3
specified  151:24
specify  214:25
215:3,5
speculate  153:5
speech  91:21
speeches  91:20
speed  36:17,20
spell  44:20
spend  58:3 262:10
spent  16:19 43:25
277:15,19
spoken  57:13
sponsored  254:20
255:10,12
spotify  150:22,23
151:2,7,9,20
184:17,19 239:21

Veritext Legal Solutions
866 299-5127

3537

[spreadsheet - strong]

spreadsheet 6:20
6:22 162:9,10
spreadsheets
265:22 270:20
277:22
square 157:12
stamp 46:19
217:23 222:19
standard 40:13
175:25
stands 160:4,6
210:18 227:4
starbucks 256:21
256:22
start 9:24 10:24
22:2 68:11 114:14
152:20 188:8
196:10 266:8
started 134:18
176:11 222:23
256:18 277:2,5
state 7:23 8:1
12:21 28:22 48:4
48:11 49:2,7
91:18 149:3
157:24 279:17
280:2
stated 182:16
279:7
statement 27:21
31:1 32:14,15,18
32:24 34:8 36:22
37:1,2,6 41:8,13
42:3,6 95:11
154:18 177:9,19
182:24 204:3
245:24
states 1:1 2:1 7:16
61:23 155:20
186:19

stating 84:22
statistics 184:22
stein 5:4 8:22,23
12:18,21 13:8
14:10 19:12 20:17
21:10 22:5,25
23:7,14 24:6,22
25:7 28:19,23
29:4,8 32:2 33:10
36:2 37:11 38:22
42:4,13 43:8
44:18 45:19 47:9
50:15 52:20 54:9
54:17 55:8,19,23
56:4 58:25 59:2,6
59:22 60:12 63:3
64:3 65:10 66:10
66:18 67:12 70:17
71:24 76:16 77:15
79:5 81:23 82:16
82:24 83:6,16
84:2,7,14,22
85:11 88:22 89:7
89:19 90:17,22
91:5,11,15,21
92:9,17 94:9,13
94:17 99:1,13,20
99:25 100:2,10,22
102:11 103:2
105:22 106:19
107:13,25 108:25
109:22 116:7
117:4 121:12,15
123:23,25 124:2,5
136:19 137:13
139:10 140:1
141:25 142:3,21
146:5,17,20,25
149:13,16,18,22
153:4,21 154:15
155:12 156:1

157:22 158:1,5,9
158:14 161:10
162:6 163:20
165:18 166:23
167:16 168:22
169:24 172:9
173:7,14 174:16
174:23 175:14
177:4,18 178:4,9
178:12 179:24
180:17,21 181:3,7
181:17 182:14,22
185:1,11 187:10
189:7 190:15
191:8 192:1,22
199:4,15,21
200:13 201:3,19
202:5,12 204:17
204:21,23 205:3
205:13,22 206:5
207:6,12 208:11
209:8 210:9
211:14 212:25
215:21 216:4
217:20 221:19
222:3 228:4,23
230:4,8 232:19
233:5,8 237:6,16
242:12 247:23,25
248:14 250:6,16
251:17 253:5
257:7,19 259:3
261:4 263:1,10
264:3 266:23
268:24 269:9
270:22 271:19
272:21 274:24
276:21 277:10
stemming 180:9
step 108:19 118:8
130:23 134:18

195:24 270:7
steven 6:18 242:1
stick 117:12 119:5
147:16
stop 84:20 94:11
149:24 204:23
storage 32:22
108:11
store 75:19 115:1
130:2 155:15
156:10,22 184:9
stored 26:13,14
37:7 108:6,7,7
113:18,19,20
131:22 148:8
156:4,24 157:14
157:18,20 164:9
stores 156:16
stories 171:14
172:6 175:7,8
storing 129:11,14
story 40:2 172:14
254:17 255:11,12
strategically 86:17
86:18
stream 36:25
120:13,15,20
121:2,6 212:3
234:6,12,12 245:2
245:3,4
street 3:8
strength 32:22
strict 116:21
strike 72:19 76:1
83:11 94:15 108:5
122:8 123:12
142:24 155:9
157:7 161:14
185:8 254:22
strong 66:1

3538

[structure - targeting]

structure 214:13
subcategories
77:24
subject 91:15
223:12 237:17
subjective 173:8
173:22
subjects 54:12
submit 64:5
submitted 30:14
62:22 98:15
subset 42:16
164:24
successful 151:19
196:3
successfully 123:8
140:13
suffer 194:9
suffered 193:11
suffering 191:2
sufficient 148:6
169:11
sufficiently 264:21
suggest 15:24 66:2
100:24 110:25
118:20 129:16
130:3 207:16
269:3
suggested 110:14
136:1
suggesting 84:17
135:10
suggests 40:1
188:7 254:11
275:5
suite 3:8 4:7
suits 210:21,25
211:4
super 111:20
261:20,21,25

supermarket 73:3
supermarkets
72:7
suppliers 26:8
support 156:25
241:6
supported 215:24
supposed 205:5,19
230:9
supposing 57:5
113:15
sure 12:14 15:11
15:23 19:9 24:7
25:8 26:4,18
27:10 28:4 29:3
30:10 32:3 43:2
43:25 45:8 55:12
80:23 105:17,23
144:22 149:21
150:20 154:25
155:5 161:17
163:13 168:12
178:16 188:18
206:20 207:8,13
213:8,10 229:23
247:11,11 252:6
255:1 258:18
266:9 269:14
270:8
surfaces 24:2
suspect 156:6
suspended 91:9
suspensions 91:24
swear 9:7
switch 59:23
196:12
switching 120:5
sworn 9:10
sync 249:15,17
system 32:20
160:19 245:22

systems 43:23
136:25 138:22
144:15 148:8
158:16

**t**

t 6:6 160:3
table 103:25
145:11 267:11,13
271:5
tables 267:5 269:5
tablet 32:11
tag 129:16 130:3
221:13
tags 221:8 235:18
take 7:9 11:17
31:6 39:19 57:17
66:20 69:2 79:12
87:18,19 108:19
115:17 118:8
123:16 131:16
195:24 228:5,6
241:13 264:22
265:23 266:9
270:7
taken 2:17 7:13
39:3 62:24 97:20
98:3 159:10
178:25 222:20
253:12 280:4
takes 82:4
talk 19:21 22:3
27:11 43:23 44:14
56:8 57:11 59:9
59:24 72:18 79:10
110:6 115:25
117:5 147:17
153:4 163:3
165:10 192:12
194:10 216:7
224:11 230:7,11
260:20

talked 111:6 212:3
249:24
talking 19:21 21:1
21:17,22 25:18
27:7 28:6 40:15
42:15 59:8 60:20
67:4,7 76:5 80:1
98:22 108:20
111:4 113:13,25
116:8,10,21
121:16 128:6
136:20 137:6
139:16 150:8,21
152:19 157:4
163:6,15 174:18
180:9,13 181:2,12
181:13 190:17
191:23 195:12
204:16 205:16
207:20,25 208:3
211:23 251:25
253:5 266:25
267:3 268:9
273:13,14,21,22
275:20,22 276:17
talks 152:22

target 78:10 82:10
114:1,3,4,20
151:20 191:21
192:9 193:4
258:23 259:8
261:2
targeted 84:8,9,15
84:18 85:3 97:5
115:3,4,17 251:16
261:9
targeting 81:11
107:6 192:5 252:2
254:2 259:18

Page 43

[targeting - thinking]

261:7

targets   73:25

task   242:19,20,21
   243:4,12,13,15

tat's   83:10

team   53:24 54:2
   82:7 129:13,19,20
   187:1 256:10

tech   130:8

technical   79:6
   137:7 148:5
   151:18 157:3
   158:6 167:21
   168:11 188:6

technically   124:24
   168:17 246:2
   247:4

technology   23:24
   130:8

telephones   52:3

tell   14:15 44:16
   106:1 123:7
   124:15,16 157:21
   158:5 186:6 191:3
   221:21 238:1,2,24
   259:5 266:10
   271:4

telling   94:12
   119:20

template   129:23

templates   129:11
   129:15 130:2

ten   228:8

tens   259:12

term   100:3 106:1
   112:22,23 113:7
   117:7,8 133:22
   141:19 156:5
   203:12,14,15,16
   203:18,25 206:6
   226:23 252:7

terms   28:5 67:1
   137:7 182:25
   183:5 210:18
   236:19 248:12

territory   157:3

test   44:8 49:15

testified   9:12 47:1
   88:17 157:22
   256:12

testify   9:10 12:7
   12:10 14:8 19:14
   22:7,8 23:10 56:6
   84:15 91:23
   105:23 158:12
   201:24 202:3
   232:23

testifying   12:17,25
   27:1 35:4 54:10
   91:12 106:2
   158:15 178:12
   179:15 205:15
   280:7

testimony   11:25
   13:7,24 17:11
   30:14 33:5 45:12
   91:16 154:16
   161:7 165:3
   185:23 199:7
   200:20 206:2
   207:8 257:20
   278:2

testing   123:5

text   52:5,6 274:15

thank   9:16 11:15
   21:20 22:18 26:20
   58:7 62:2 71:9
   73:11 74:20 85:20
   95:1 101:24
   123:19 134:1
   142:4 147:6,14
   152:2 171:10

172:17 185:2
   206:1 211:1 215:7
   228:19 235:13
   237:2 243:2 268:8
   273:3 278:6,8

thanks   29:20
   50:17

theirs   80:6

thereof   279:5
   280:11

thing   43:17 75:4
   78:23,24 105:16
   126:11 147:8
   242:6

things   16:8 31:18
   32:25 36:25 39:1
   39:1 56:5 57:4
   65:21 77:9 91:23
   95:19 98:14,20
   105:24,24 107:12
   107:15 108:12
   118:17 119:11
   136:1,4,7,10
   165:7 167:4
   172:22 184:10
   186:23 191:24
   198:12 207:16
   217:24 222:23
   227:24 230:11
   232:14 242:22
   264:23 273:19
   275:21

think   9:25 13:8
   18:13 19:20 20:18
   21:3 25:4,18 26:8
   30:6,25 32:17
   33:1 35:22 42:6
   46:4 48:20,24
   49:3 50:6 51:12
   53:20 54:18 57:4
   57:19 60:7 61:16

61:19,22 64:19
   65:1 71:12 79:11
   81:17 87:12 91:1
   99:8,14 102:4
   106:9 115:10
   116:20 119:16
   121:19,24 123:23
   129:6,24 133:9
   135:25 141:4,19
   143:7 147:22
   148:23,25 155:4,7
   155:21 157:2
   162:7 163:6 164:6
   168:17 169:24
   173:15 181:18
   182:15 184:11
   186:24 193:20
   194:22 196:1
   200:9,12 201:7
   202:1 204:8,10
   206:6,23 209:19
   210:17 212:3,5,18
   214:12 216:11
   217:7 218:18
   219:9 220:1 227:4
   227:8 228:6
   235:20,21 236:10
   236:19 237:7,20
   239:18,20 242:5
   242:19 245:19
   247:4 251:21,23
   255:9,15,19,22
   260:20 263:24
   264:8,19,24
   267:17 268:21,23
   270:16 273:17
   274:25 276:3,22
   277:6,24

thinking   108:17
   189:19

[third - trains]

**third** 4:7 14:17
18:6 23:25 25:22
26:1 34:15 37:18
38:24 39:4,6,20
39:25 40:5,22
45:15,25 46:2
59:13,17,19 60:1
71:17 72:5 81:8
84:1 85:9,16
87:15 88:18 102:2
102:17,25 104:7
113:2 120:18
121:10,24 122:5,7
122:10,12,13
139:12 140:22
142:10 159:24
161:22 165:14
166:4,10 167:8
177:23 178:24
179:1 180:4,10
181:22,23,24
182:24 183:3,6,9
184:23 185:5,19
194:7,25 196:23
198:10,15,25
199:10 201:17,22
202:2,4,9 203:3
207:4 208:9 209:6
209:14 212:8
213:8,12,16,23
217:3 218:20
223:8,9,12,13
224:24 225:4,6,11
225:18,20,24
226:1 227:15
228:21 229:4
230:17,18 231:18
232:10 233:1,12
240:23 245:20
246:3 249:8
250:14,19,25

251:4,9,11,14
252:1 254:13,14
254:20
**thought** 253:12
**thoughtful** 116:16
**thousand** 193:17
194:1
**thousands** 78:3
259:12
**three** 17:25 24:4
48:6,7,10,13,21
58:10 60:5 112:4
191:5 192:14
196:9 207:16,16
224:6,19 225:8

**tim** 268:15
**time** 8:1,14 13:4
15:9 16:20 17:12
17:16 21:12 25:18
26:24 28:25 29:13
45:6 53:10 56:1
58:3 67:24 68:6
70:14,15 84:5
86:15 87:4 94:8
94:20 95:12 97:7
112:2 121:10
122:22 130:8
132:3 137:5 138:5
139:5 140:5 149:8
153:5 164:7 167:1
167:11 169:24
179:10,21 180:19
188:25 194:16
196:3,4,6 198:23
199:14,22 203:17
204:15 208:17
217:23 218:17
222:19 228:6
230:16 233:13

236:23 240:15,16
241:14 252:20
253:4,24 256:13
257:17 258:2
262:15 264:2,12
264:14 268:22
269:24 272:10
273:11,16,23
274:21,23 275:4
276:4,10,12 277:5
277:16,19,24,25
278:9 280:5
**times** 47:4 153:6
192:4 255:20

**title** 243:5
**today** 12:5,7,25
13:3 14:8 15:3,22
17:12 19:15 35:4
47:8 49:18 56:7
57:12,15 60:3
100:18 103:9
158:13 179:16
185:23 186:9
255:21 257:18
263:9 267:9
**token** 247:7,12
**tokens** 246:14
**told** 157:23 168:23
169:10
**tool** 98:23 100:7
100:19 102:9,17
134:9 164:10
167:4 183:19
242:21,25 258:16
258:20,24 263:20
263:24 264:8,9,11
273:11,15,24
274:11,22 276:1,8

276:16,18,19
**tools** 20:14 41:3,5
41:10
**top** 6:17 23:25
56:17 57:6 93:20
104:12 105:12
152:7 189:23
196:9 242:4,15
**topic** 12:13,17,19
13:3,5 14:3,9
201:23 217:17
219:15,17 220:11
237:15
**topics** 30:13 47:7
47:8,11 84:24
120:5 218:19,22
218:24 219:4
220:7,13 230:13
232:20 277:17,19

**total** 278:3
**totality** 165:5
**touched** 194:11
**towers** 35:14
**track** 31:25 44:2,3
44:12 75:8 104:20
144:23 184:14,18
242:22
**tracker** 186:14
189:20
**trackers** 186:20
187:13
**tracking** 32:4 77:7
199:13
**tracks** 86:20
150:25 269:12
**training** 176:3,9
176:12
**trainings** 176:19
**trains** 172:12
173:2

Veritext Legal Solutions
866 299-5127

[transcribed - understands]

transcribed  280:9
transcript  233:10
  279:4 280:13
transcription
  280:11
transition  201:15
  208:18 210:11
travis  130:15,19
treatment  255:16
treatments  186:21
trending  218:18
  219:8,15,17
trouble  50:18
true  30:19 31:9
  32:14,15,18,24
  34:8,18 36:22
  37:1,2,6 41:8,13
  42:3,9 54:20 55:1
  79:1 80:23 91:9
  95:11 97:17 145:3
  145:7 147:18
  173:3,10 177:9
  211:10 235:15
  244:7 279:6,8,10
truly  262:15
trump  77:1 219:2
  219:4
▇▇▇▇▇▇▇
trustworthy
  245:11
truth  9:11,11,12
  31:1 238:4,6
try  35:18 37:16
  63:24 67:21 87:13
  105:6 125:7,13
  139:5 140:5 162:1
  165:25 214:7,17
  216:7,8 247:16
  253:24 260:1
  275:3,4

trying  30:12 40:21
  52:24 54:13 55:25
  60:22 63:21,23
  67:9,15 111:3,12
  116:14 119:13
  131:17 137:16,17
  141:4 143:1
  146:23 154:7,7
  157:19 164:8
  174:3 181:18
  186:3 194:3
  204:19 205:11
  206:8,8 233:18,18
  259:5 261:23
  266:11 271:21
  274:25
tuesday  1:19 2:19
  7:1 171:1
turn  15:14 35:19
  93:18 101:15
  104:11 123:9
  125:17 130:13
  147:15 152:4
turned  130:3
turning  56:14
turns  129:16
tv  37:1 78:4,13
  261:19
tvs  31:11
two  15:19 40:13
  47:24 48:12,15
  52:19 68:16 79:1
  79:3 111:21 114:3
  132:11 162:21
  186:13 196:8
  201:11 225:19
  234:14 265:22
  270:20
tylor  1:23 2:20
  7:20 280:2,25

type  32:23 63:12
  65:8 159:18 175:9
types  32:23
  186:20 205:16

**u**

u.s.  48:17 61:18
  155:16,18,23
  192:5 219:1
udb  156:4
udid  64:18
uh  57:9 61:1 90:25
  121:3 140:10
  214:5,20 223:24
  249:6
ui  255:16
uid  143:10 144:9
  144:12,20 145:3
unchanged  257:23
unclean  165:21
underlying  241:25
  249:7
underneath  73:11
  130:16 243:5
understand  12:14
  12:16 17:11,17,19
  23:11 24:7,13,19
  26:23 28:9 30:10
  32:3 45:13 51:12
  53:9 54:13 55:12
  55:25 63:21,23
  67:9,15 70:10,11
  88:10 111:3
  112:13 114:11
  116:14 117:8
  124:21 125:3
  141:19 143:1
  146:13 147:20
  150:20 154:6,8,12
  157:19 161:17,21
  168:10 169:14
  171:8 175:19

193:2,13 199:16
  200:5,15,18 202:1
  204:20 205:9
  206:9 207:3
  211:19 216:13
  219:5 221:17,25
  222:6 228:17
  229:24 233:19
  237:2,12 247:22
  248:1 253:25
  256:25 258:18
  260:6 263:4
  265:10 266:11
  268:13,17 269:15
  271:13 274:20
understanding
  12:24 19:15 22:9
  23:5,15,18 27:5
  27:15,22 33:25
  34:14 39:11 51:9
  51:14 53:17 54:5
  57:2 58:16,22
  60:9 61:12 62:18
  72:1 73:6 78:5
  79:8 80:17 85:18
  89:12 95:15
  100:12 104:22
  105:4 109:8
  112:25 124:17,18
  134:11 135:4
  141:5 167:9
  176:20 178:21
  179:18 180:7
  191:11 199:23
  210:4 213:5 245:9
  247:1 263:12
  265:19 269:25
  270:16 271:8
  274:19 277:3
understands
  260:21

[understood - users]

| | | | |
|---|---|---|---|
| **understood** 40:8 | 42:16,18 43:10 | 108:22 109:20 | **user's** 14:20 90:21 |
| 196:16 | 44:16 51:23,25 | 111:9,23 112:9 | 104:23 108:18,22 |
| **undertake** 176:19 | 52:1,2,2,3,9,11,12 | 118:6 129:15 | 122:6 137:11 |
| **unfair** 158:14 | 52:13,13,14,22 | 134:25 135:19,19 | 139:9 183:10 |
| **unfortunate** | 54:8,20 55:3 | 135:20,22 136:18 | 197:22 209:16 |
| 277:24 | 63:10 69:1 80:10 | 136:21,24 137:24 | 229:18 234:7,10 |
| **unicefs** 26:3 | 82:12 89:10 95:2 | 139:9,9,17,25 | 244:14 247:8,9,13 |
| **unique** 34:9 | 111:14 112:14,17 | 140:12,19 141:3,6 | 247:14 249:13 |
| 137:24 138:6,8 | 112:21 116:13 | 142:10,10,14,17 | 250:9,11 270:2 |
| 153:16 | 117:7 119:22 | 144:14 145:10,12 | **userid** 268:12 |
| **uniquely** 37:25 | 122:11 131:21 | 145:13,16,18,21 | **username** 21:2 |
| 136:24 | 134:12 135:8,23 | 146:3 151:15 | 68:1 |
| **unit** 7:11 255:6 | 136:1,3,6,10 | 156:3,6,9 157:11 | **users** 20:5,22 21:9 |
| **united** 1:1 2:1 | 138:20 140:2 | 157:13 158:13 | 21:18 24:5 27:20 |
| 7:16 61:23 127:23 | 159:24 162:8 | 159:16,20,22,23 | 28:12 29:21 30:1 |
| 155:20 | 176:3 184:8,20 | 160:15 161:6,13 | 30:4,9,23 31:11 |
| **united's** 127:20 | 191:20 192:4,9,16 | 161:20 162:3,5,17 | 31:20 32:1,7 |
| 129:3 | 193:8,14,21 | 162:18,25 163:18 | 33:18,23,25 34:11 |
| **units** 278:4 | 200:18 201:14 | 164:23 167:14,15 | 35:17,19 36:15,17 |
| **universe** 190:3 | 203:11,12,14,14 | 167:25 168:14,17 | 36:25 37:8,25 |
| **unreportable** 27:3 | 203:15,16,18,25 | 169:23 171:19,24 | 41:23 42:10 43:1 |
| **update** 87:5 258:6 | 206:6 209:11 | 172:14 173:3 | 43:6 45:14,17 |
| **updated** 256:23 | 225:20 226:23 | 177:22,23 178:25 | 52:11 64:2 76:15 |
| **updates** 172:4 | 229:9,10,16,19,24 | 181:24 182:4,6 | 78:10,11,19 79:14 |
| 174:15 | 229:25 240:12 | 183:9 186:16 | 80:10 89:6 90:8 |
| **updating** 217:11 | 241:2,4,5 247:7 | 188:19 190:14 | 91:3 103:11,16 |
| **upfront** 139:5 | 247:12 248:3 | 191:1 198:9,14,23 | 104:20 109:12 |
| **upload** 73:23 | 250:2 251:13 | 204:20 206:7,12 | 111:5 114:2,4,10 |
| 74:12,13,16,17 | 252:21 261:20 | 216:21,25 222:23 | 128:22 129:1,4 |
| 143:14 193:25 | **useful** 104:17 | 225:10,22 229:22 | 130:3 137:2 |
| 249:20 | **user** 1:5 2:5 7:15 | 233:15 234:5 | 140:21 141:3,17 |
| **uploaded** 98:16 | 12:12 14:4,16 | 235:2 245:11 | 143:16 148:15 |
| 222:20 270:10 | 15:6 19:11,18,21 | 246:3,20 247:3,7 | 151:12,20 155:16 |
| **uploading** 10:6 | 21:2 28:8 31:14 | 247:12 248:6,7,12 | 155:20,22,23 |
| **usage** 185:5 | 34:6 37:23 38:5,8 | 250:19 252:3,7 | 156:19,22 158:20 |
| **use** 19:15 20:7 | 38:9,15 39:18,22 | 254:24 257:3 | 158:21 172:19 |
| 27:20,22 28:5 | 43:11,12,15 44:15 | 258:9 268:13 | 173:11,13 174:15 |
| 30:4,18 31:11,19 | 44:17 45:8,9 | 269:22 271:3,6 | 175:11 176:23 |
| 31:20 32:1,7,8,9 | 48:24 62:22,23 | 272:24 273:6 | 177:1,6,6,16 |
| 34:11,25 35:3,3,5 | 63:11,14 80:6 | 277:21,23 | 181:2,12 188:14 |
| 41:5,11,19 42:1 | 97:23,24 101:14 | | 188:20 190:25 |

**[users - way]**

193:10,17,23
194:1,3 209:23
217:13 230:1
233:13 250:3
251:15 258:13,20
261:22 262:17,24
267:6 269:13,15
271:11 273:23
275:16 276:13,16
276:17,18,20
**uses** 42:21 54:11
63:14 134:8
137:11 138:18,21
147:12,23 177:21
183:6
**usually** 85:17

**v**

**v2** 195:6
**vague** 100:2
**vaguely** 178:2
**validated** 45:23
**valuable** 131:10
200:9,12
**value** 22:19
269:23 271:7,7
**various** 47:11
**varying** 172:19
**vast** 155:8
**vc** 1:6 2:6 7:17
**verbatim** 280:7
**verified** 158:7,8
158:10 216:5
229:12
**verify** 176:20
**veritext** 7:18
278:5
**version** 17:7,8,9
17:10,19,20 31:18
33:2 51:23,25
52:14 55:5 73:24
74:13 87:2 121:20

121:23 126:2
194:15,17 195:4
195:10,11,12,13
195:16,16,17,19
196:3,5,7,12,13
196:14 197:5
198:5,9,13 201:16
202:24 203:1,6
208:22 209:16,21
211:11,13,20,24
244:12
**versions** 32:21
175:2 196:10
198:1
**versus** 75:20
111:16 112:19
**video** 7:8 36:25
213:15,17,24
216:9,12,14 217:4
221:8,13 235:18
249:20
**videoconferenci...**
52:3
**videographer** 5:21
7:5,19 9:6 11:4
87:17 88:1,6
170:6 171:4 228:9
228:14 265:2,7
267:19,24 278:1
**videos** 28:17 29:25
98:18 215:16
216:22 217:1
238:21
**videotaped** 1:16
2:16
**view** 30:1 174:13
262:19
**viewed** 38:21 39:8
254:11
**violate** 119:25

**violated** 229:14
**violation** 103:11
103:15 120:3
197:16
**violence** 31:4
**virtual** 1:16 2:18
90:15
**visit** 41:24 75:5
**visited** 37:24
38:15 254:12
**visiting** 38:4 107:5
**visits** 37:21 43:7
43:11 75:19
**voice** 155:1
**volume** 231:1
**voted** 76:18 77:1,1
**vp** 56:24
**vpn** 90:15

**w**

**wait** 13:19
**waiting** 27:6 46:13
108:25 240:11
**walmart** 75:3,5,7
75:8,14,15 78:2
78:20 79:15 81:11
83:8
**walmart's** 78:4
**want** 11:12 17:25
27:10 28:4,20
29:1,5 40:24 42:6
43:22,24 44:2,21
45:12 59:24 68:17
74:2 78:15 79:10
79:10 82:9,10,12
84:13,16 87:9,18
87:23 95:21 114:7
116:15 124:14
131:16 135:4
145:21 147:16
149:8 155:5 164:6
170:1,3 173:13

178:5 190:7 193:4
193:4,8 199:16
202:6 205:4
206:19,20 207:8
213:8 215:3,5
228:24 230:10
237:12 258:23
259:8 261:9
262:25 266:4
270:11 272:2,3
275:1,2 277:10
**wanted** 16:20 75:8
149:6,20 179:22
182:9 223:15
241:5
**wants** 70:4 114:1
114:19 123:6
151:20 196:23
229:25 259:17
261:15
**warrants** 132:8,21
133:4,7 134:4,10
134:13
**washington** 4:8
**waste** 277:24
**wasting** 84:21
108:11
**watch** 20:13
**watched** 98:19
**way** 36:14 40:17
46:21 52:12,20
54:4 55:4 61:4
64:19 94:24 97:23
112:14,15 114:25
115:4 116:16
121:24 127:2
138:19 147:19
162:7 167:10
168:24 171:13
173:24 176:14
182:15,16 183:8

Page 48

**[way - witness]**

192:20 196:11
197:19,22 214:18
228:1 242:5
247:16 250:10
251:5 253:24
260:12 262:1,6,11
262:13 275:5,17
275:19
**ways** 24:2 51:20
52:4 138:25
144:25 214:14
**we've** 131:11
155:8
**weaver** 3:4 6:4 8:3
8:4 9:15 10:11,16
10:21 11:7,10,14
11:19 13:1,13
14:12 18:15,24
19:16 20:20 21:14
22:10 23:3,11,16
24:12,24 25:12
28:21 29:3,7,11
32:5 33:12 36:5
37:12 39:7 42:8
42:24 43:19 45:10
45:20 46:8 47:13
50:1,10,17 51:1
52:23 54:13,19
55:10,21,25 56:10
59:3,11 60:2,16
63:6 64:8 65:11
66:15,24 67:14
70:15,18 71:4,10
72:2,10 74:4,9,19
76:23 77:10,17
79:16 82:1,20
83:1,10,23 84:4
84:12,20 85:5,14
87:22,25 88:9,23
89:14 90:1,19,24
91:7,13,18 92:1

92:13,19 94:11,15
94:18 99:3,16,23
100:1,4,15 101:2
102:1,15 103:4
106:5 107:7,17
108:3 109:6,23
116:11 117:11
121:13 122:2
123:23 124:4,6
133:14,23 134:2
135:13,18 136:5,8
136:13,17,22
137:9,15 139:13
140:9 142:5,24
145:19 146:7,18
146:22 147:2
149:15,17,20
150:2 153:10,23
154:19 155:14
156:2 157:24
158:4,8,11,17
161:12 162:23
164:4,21 165:19
166:15,19 167:2
167:19 168:25
170:1,5 171:7
172:13 173:9,20
174:20 175:4,20
177:8,24 178:7,11
178:15 179:3,8
180:5,18 181:1,5
181:9 182:3,18
183:18 185:7,14
187:14 189:10
190:18 191:12
192:11 193:1
194:23 199:6,19
199:25 200:14
201:5 202:1,7,16
202:20 204:19,22
204:25 205:8,21

205:23 206:16,22
207:10,24 208:16
210:1,10 211:2,16
213:3,14 215:22
216:6 218:1
221:23 222:5
223:14,20 228:6
228:16 229:1
230:5,15 233:2,7
233:9,20 234:2
235:14 237:11,18
240:2,10 242:13
248:5,16,24
250:12,21 251:19
253:7,20 254:3
257:10 258:7
260:5 261:10
262:23 263:6,15
264:5,22 265:9,21
266:6 267:2,17
268:1 269:4,10
271:1 272:14
273:2 275:12
276:3,11 277:6,20
278:6
**web** 17:24 18:1,10
31:11 65:20 86:9
86:23 89:23
183:25 256:5
**website** 16:18 17:1
20:4,6,10,11
22:13 37:18,22,24
38:5,7,8 39:20
40:1 43:11 58:19
67:5 69:2 70:24
76:20 78:4 81:8
86:19 88:25 89:11
101:6 102:6 167:8
176:5 182:12
254:13,14

**websites** 41:24
43:6 61:11 87:3
99:8 102:21 256:5
**weird** 221:15,24
222:9
**went** 180:25
193:17
**whatsapp** 143:9
**white** 203:11
**whitelist** 203:16
203:18 204:11,16
206:7,10 207:22
209:10 246:17
**whitelisted** 202:9
202:15 203:23
204:13 206:3
207:5 208:10,19
208:21 209:7
231:9 245:25
246:20
**whitelisting** 203:9
**wi** 35:13 61:17
65:7
**wide** 40:12
**wider** 25:20
**window** 33:8
143:23 144:2,3
**wire** 123:6
**wired** 123:8
**witness** 6:2 9:7
11:6,9,11 12:19
12:24 13:12 14:11
19:14 20:18 21:13
22:6 23:1,9 24:7
24:23 25:8 28:22
32:3 33:11 36:3
38:23 42:5,14
43:9 44:19 47:10
50:15,23 59:1,7
59:23 60:13 63:4
64:4 66:11,19

[witness - zoom]

67:13 71:8 72:4
74:16 76:17 77:4
77:6,16 79:9
81:24 82:17 83:7
83:17,21 84:14,21
85:1,12 87:24
89:8,22 90:18,23
91:12,22,24 92:9
92:12,17 94:10
99:2,14,21 100:11
100:23 101:19,22
102:13 103:3
105:19,23 106:20
107:15 108:1
116:8 117:5
121:18,22 123:20
124:1 133:18,21
136:12,16,20
137:6,14 139:11
140:2 142:22
145:18 146:6
149:14,21 153:7
153:22 154:17
155:13 158:3,7
161:11 162:7
163:21 164:18
166:24 167:18
168:23 172:10
173:8,15 174:18
174:25 175:15
177:5,18,20 178:5
178:12 179:25
180:22 181:4,8,18
182:15,23 185:3
185:12 187:11
189:9 190:16
191:9 192:2,23
199:16,22 201:4
201:21 202:3
205:14 206:6,15
206:19 207:6,15

208:12 209:9
210:24 211:15
213:2,12 217:21
221:20 222:4
230:10 233:10,24
235:12 237:7
241:15 242:8
247:24 248:1,15
248:22 250:8,17
251:18 253:23
257:8,21 259:4,7
262:5 263:3,12
264:4 266:4,13,16
266:24 269:1
270:23 271:20,22
272:22 275:2,4
276:22 277:15
278:8 279:3
280:21
**witness's** 189:8
**witnesses** 29:9
280:6
**won** 115:23
**wondering** 263:16
**word** 44:21 60:10
79:18 92:2 112:14
140:2 219:4,21
**words** 40:20 45:7
45:9 112:21 121:8
**work** 15:5 26:11
37:20 43:23 52:9
53:6 68:17 81:1
85:19 87:25
124:23 176:8
188:12 192:20,21
261:15

**worked** 216:3
219:19 224:7
**working** 30:13
135:14 166:16

179:5
**workplace** 51:24
**works** 40:11 43:17
183:25,25 192:19
193:7 195:25
259:6
**workset** 52:1,17
**world** 22:17 23:21
23:21 26:3 46:23
51:24 119:7
**worry** 147:5
**worth** 207:17
**write** 122:24
216:20 239:22,24
**writing** 40:18
144:9
**written** 33:5 53:11
157:10
**wrong** 182:16
**wrote** 94:10
243:20,22 244:2

**x**

**x** 6:1,6 38:15
**xfn** 129:13,19

**y**

**yeah** 11:7,9 13:10
15:20 21:13 28:4
29:19 33:21 39:24
43:20 76:17 78:25
82:4 84:7 87:25
89:8 103:5 116:5
120:17 122:12
125:12,20 128:11
133:8,25 138:18
140:24 146:14
153:7 163:13
165:25 168:9,13
169:5 171:17
176:14 177:20
195:11 221:12

272:19
**year** 186:13 196:9
240:17
**years** 15:8 16:6
47:21,23,24 48:22
57:24 90:7 196:4
196:7,8,13,14
229:13 252:23
257:24
**yesterday** 51:3
219:10 252:11
**york** 5:15,15 48:5

**z**

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT W

 

March 1, 2021

**VIA E-MAIL**

Deborah L. Stein
Gibson Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
dstein@gibsondunn.com

Russell H. Falconer
Gibson Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
rfalconer@gibsondunn.com

Martie Kutscher Clark
Gibson Dunn & Crutcher LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
mkutscherclark@gibsondunn.com

Laura C. Mumm
Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
lmumm@gibsondunn.com

Re:     *In re Facebook, Inc. Consumer Privacy User Profile*,
        Northern District of California Case No. 3:18-md-02843-VC

Dear Counsel:

Plaintiffs write pursuant to the April 1, 2020 Stipulation and Order on Discovery Dispute Resolution Procedures (Dkt. No. 393) to request that the parties meet and confer regarding Facebook's failure to produce all data and information in Facebook's possession relating to the Named Plaintiffs in this action.

First, in the data deposition of Facebook conducted on February 23, 2020, the Company testified that Facebook obtains data from third parties about users' off-platform activity that is *not* included in data downloaded from the DYI tool. For example, ███████████████████ ████████████████████████████████████████ Dep. at 98:21-24. Facebook also testified that ████████████████████████████████████████████ ██ *Id*. at 140:16-19, 141:21-143:17. Facebook further testified that ████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████ *Id*. at 38:11-39:14. Additionally, ███████ ████████████████████████████████████████ *e.g.*, FB-CA-MDL-01434884; FB-CA-MDL-01434885.

Given Facebook's testimony and representations, Plaintiffs renew their request that Facebook supplement their production of all data and information relating to the Named

Plaintiffs as required by Discovery Order No. 9. Please produce these documents no later than April 1, 2021.

Second, consistent with Schedule B of Plaintiffs' Amended 30(b)(6) Notice, prior email correspondence before the depositions, requests during meet and confers before the depositions, and requests during the depositions on Feb. 23 and Feb. 24, Plaintiffs renew their request for all materials each designee reviewed in preparation for the depositions. *See, e.g.*, Schedule B ("All documents which deponent has consulted or reviewed or plans to consult in preparation for his or her deposition and has relied upon or will rely upon for testimony on the above deposition topic."); *see also* Feb. 11, 2011 email from D. Ko to Facebook (identifying case law requiring party designating 30(b)(6) witness to produce documents reviewed by designee in preparation for the deposition *prior* to the deposition). Both deponents testified that they reviewed documents in advance of the depositions.

For example, during the monetization deposition, Facebook's designee testified that she prepared notes and conducted Facebook Workplace chats with other Facebook employees in preparation for her deposition, and consulted and relied on both in responding to questions during the deposition. *See, e.g.*, Lee Tr. 21:23-22:3; 36:16-37:2; 214:17-215:22. Plaintiffs also request that these materials be produced immediately.

Finally, at 7:15 p.m. on the eve of the monetization deposition, Facebook produced to Plaintiffs a document prepared by Facebook's finance team reflecting Facebook's revenue by channel from 2012-2017, as well as definitions for each revenue channel. This document contains responsive information to Plaintiffs' second requests for production Nos. 14-17 and is the type of basic financial information of the company Plaintiffs have requested for nearly 15 months. Plaintiffs reiterate their request that Facebook produce this information for the entire class period, January 1, 2007 to present.

Regards,

Derek W. Loeser
dloeser@kellerrohrback.com

Lesley E. Weaver
lweaver@bfalaw.com

# EXHIBIT X

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel 213.229.7000
www.gibsondunn.com

Deborah L. Stein
Direct: +1 213.229.7164
Fax: +1 213.229.6164
DStein@gibsondunn.com

April 1, 2021

<u>VIA E-MAIL</u>

Derek W. Loeser
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101

Lesley E. Weaver
Bleichmar Fonti & Auld LLP
555 12th Street, Suite 1600
Oakland, CA 94607

Re:  *In re Facebook, Inc. Consumer Privacy User Profile Litigation*

Counsel:

We write in response to Plaintiffs' recent flurry of letters purporting to invoke the parties' expedited dispute protocol and threatening to file a series of accelerated motions to compel. Plaintiffs' letters are an abuse of the parties' dispute protocol, which is intended to address a party's refusal to produce previously-requested information—not to demand information never previously requested or discussed. Plaintiffs' letters also reflect an abusive litigation tactic that is making it nearly impossible to move this case forward. Plaintiffs' letters seek to unravel many months, if not more, of negotiations; ignore rulings Judge Chhabria and Judge Corley have issued; and informally demand information on an expedited schedule that has never been discussed and has no bearing on this case.[1]

Facebook would like this case to move forward quickly and efficiently so that the parties can finally litigate Plaintiffs' live claims on the merits. It is impossible to make progress when Plaintiffs insist on an unfocused, whack-a-mole discovery process that unwinds past agreements and work. The parties dedicate an enormous amount of time and resources to meeting and conferring regarding discovery requests. The meet and confer process that Judge Corley ordered is designed to allow the parties to reach a compromise and move on. Facebook cannot have faith in this process or rely upon agreements the parties

---

[1] In this letter, we respond specifically to Plaintiffs' letters dated March 4, March 1, February 19, and February 11, each of which invoke the parties expedited dispute protocol. Facebook responded separately on March 23 to Plaintiffs' March 18 demand that the parties enter a Rule 53 stipulation. Facebook responded by email on March 22 to Plaintiffs' March 15 demand for certain deposition transcripts and interrogatory responses from government matters. Facebook responded by email on March 21 to Plaintiffs' March 16 letter taking the position that inadvertent, privileged testimony may not be clawed back. Facebook is responding separately to Plaintiffs' additional demand, also in their March 1 letter, for a list of the materials counsel selected for Facebook's deponents to review in advance of their depositions. Facebook will also respond separately to Plaintiffs' letter dated March 9, which raises various complaints with respect to Facebook's 516 pages of responses to Plaintiffs' Fourth Set of Interrogatories.

Beijing · Brussels · Century City · Dallas · Denver · Dubai · Frankfurt · Hong Kong · Houston · London · Los Angeles · Munich
New York · Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

3553

have reached when Plaintiffs constantly seek to reopen and expand those agreements. Facebook urges Plaintiffs to reevaluate their approach and to focus on forward progress.

## I.    Plaintiffs' March 1 letter demanding "all data" relating to the Named Plaintiffs.

Plaintiffs' March 1, 2021 letter demands Facebook produce "all data and information relating to the Named Plaintiffs"—even if the data was not shared with third parties. There is no basis for this overbroad request. After the parties engaged in nearly a year of negotiations, informal discovery, and briefing on Plaintiffs' blanket demand for data "relating" to the Named Plaintiffs, Plaintiffs finally informed the Court on the last page of their sur-reply on Facebook's motion to enforce the partial stay of discovery that they "seek only a holding that the sensitive data Facebook collected about ten Named Plaintiffs and *shared* with third parties is relevant." Plaintiffs conceded: "**Plaintiffs do not contend that information that was not shared is relevant, which substantially narrows the information Facebook would be required to produce in this case**." Dkt. 548 at 9.

Plaintiffs' "renew[ed]" request for "all data" related to the Named Plaintiffs— including data that was never shared—seeks to unwind more than a year of forward progress. It also directly contradicts the representations Plaintiffs made to the Court in their prior briefing, which the Court accepted and relied on in issuing Discovery Order 9.

### A.    Facebook produced more than 1,000,000 pages of user data.

For nearly a year, Plaintiffs insisted that Facebook locate and produce any data Facebook presently has access to that might, in any way, relate to any Named Plaintiff, plus any derivative materials drawing on that data. Plaintiffs demanded all of this information even if it was never shared outside the Company and even if it is not associated with any particular user.

In response to this request, Facebook discussed with Plaintiffs in **January 2020** that the best way to produce the individual user data that could be within the scope of this case was to produce for each Named Plaintiff the content and information that Facebook associates with each Named Plaintiffs' account. This information is contained in the "Download Your Information" ("DYI") file that Facebook also makes available to users. Facebook's current DYI tool reflects, in human-readable form, the most complete compilation of data Facebook maintains relating to any user, including any individual user data that third parties might have been able to access.

Beginning in February 2020, Facebook produced the information contained in the DYI file for each of the Named Plaintiffs, plus certain additional information (such as a spreadsheet containing data tracking how Plaintiffs adjusted their Facebook privacy settings). **In total, Facebook produced more than <u>one million pages</u> of individual user data it maintains relating to the Named Plaintiffs.**[2]

Facebook made these productions despite repeatedly expressing concerns that much the data it produced is not probative of any issue in this privacy litigation—which is about data sharing (not the data Facebook maintains). As Judge Chhabria explained in the first line of his Motion to Dismiss Order: "This lawsuit, which stems from the Cambridge Analytica scandal, is about Facebook's practice of sharing its users' personal information with third parties. . . . [Plaintiffs'] principal allegations are that Facebook: (i) made sensitive user

---

[2] These productions were extremely burdensome and took many months to complete because they required reformatting data that is typically available only on a live website into individual documents for use in litigation. Plaintiffs initially objected to the format in which Facebook produced the materials. Facebook then reproduced documents to address Plaintiffs' formatting concerns. Plaintiffs amended their complaint in August 2020 to substitute new Named Plaintiffs. Facebook subsequently produced the same materials for the new Named Plaintiffs.

3554

information available to countless companies and individuals without the consent of the users, and (ii) failed to prevent those same companies and individuals from selling or otherwise misusing the information." *Id.* at 1. The more than one-million pages of individual user data Facebook produced far exceed that scope. Facebook's productions of individual user data are overinclusive in that Facebook produced the data it associates with each Named Plaintiffs' account and did not limit its production to data that actually was accessed by or shared with third parties. Facebook also did not limit its productions "sensitive data," as defined in the Court's motion to dismiss order as the only type of data at issue in this case. *See, e.g., id.* at 1, 7, 9, 13.

### B.   Plaintiffs demanded vast amounts of additional data—even if never shared.

After Facebook produced the individual user data that Facebook associates with the Named Plaintiffs' accounts—including data outside the scope of this case—Plaintiffs insisted that Facebook also locate and produce any other data that might, in any way, relate to any Named Plaintiff, as well as any materials derived from that data. In making this demand, Plaintiffs focused largely on a database called Hive and demanded that Facebook produce any data relating to any Named Plaintiff that is currently in that database. Plaintiffs articulated no basis on which the data they demanded could be relevant to their live claims.

The parties met and conferred about Plaintiffs' demand over the course of several months.[3]



As Facebook explained, Plaintiffs' blanket demand not only sought large volumes of data having nothing to do with their claims—it was also nearly impossible to satisfy. As Facebook has explained,

Facebook explained that such a remarkable undertaking and would result in the production of massive amounts of internal data tables that are

---

[3] At one point during the parties' extensive discussions on this issue, Facebook asked Plaintiffs if they would, at minimum, agree that if Facebook hypothetically possessed a database that had the ability to receive data, but no ability to output (*i.e.*, share) data, that database would be out of scope. Plaintiffs refused to agree, arguing that the hypothetical database could theoretically create "inferences" from user data that Facebook could use to place advertisements on its platform.

[4] Plaintiffs state that "counsel has demonstrated that Hive tables can be searched by userID [*sic*]." To be clear, as Facebook has repeatedly informed Plaintiffs, individual Hive tables can be searched by user ID only if user ID is one of the fields tracked in the table. The database housing Hive tables is not indexed by user ID such that a single search can be conducted to find which of the 12 million Hive tables contains data related to a particular user ID.

[5] This does not include any data produced in response to subpoenas or as part of Facebook's discovery obligations. Certain Hive data has been produced in those contexts.

irrelevant and immaterial to Plaintiffs' claims, which concern only sensitive individual user data that was ***shared*** with third parties.

### C.   The Parties litigated the scope of discoverable user data and Plaintiffs conceded that only shared data is relevant.

The parties then litigated the scope of discoverable user data in connection with Facebook's motion to enforce the partial stay of discovery. Throughout their briefs, Plaintiffs repeatedly acknowledged that the only data that is relevant to this case is data that was shared with third parties:

- "This discovery dispute concerns sensitive user information that Facebook has shared with third parties without users' consent." (Dkt. 547-3 at 1).

- "Plaintiffs' standing to bring their claims, and the validity of many of those claims, depends on . . . whether Facebook shared that information with third parties." (Dkt. 526 at 5); *see also id.* at 10–11 (acknowledging that Plaintiffs' claims require proof that Facebook shared Plaintiffs' information with third parties).

- "[S]ensitive user information is relevant if Facebook shared it without users' consent." (Dkt. 547-3 at 2).

- "[T]he legal theories upheld at the pleading stage . . . turn . . . on whether Facebook shared [sensitive information] with third parties." (*Id.* at 4).

After four rounds of briefing, on the last page of their sur-reply, Plaintiffs finally conceded what they should have said a year earlier:  "***Plaintiffs do not contend that information that was not shared is relevant***." (Dkt. 547-3 at 9 (emphasis added)).  This concession—while welcome—raised frustrating and still unanswered questions about why Plaintiffs had forced the parties to spend many hundreds of attorney hours over the previous year negotiating and litigating over the relevance of data that was never shared or made accessible outside of Facebook.

### D.   Judge Corley held that the discoverable user data in this case is sensitive data shared with third parties.

In Discovery Order 9, Judge Corley addressed the user data relevant to this case and largely adopted the position Plaintiffs took in their sur-reply brief.  The Court held the user data relevant to this case is "information that Facebook collects and shares with third parties about Facebook's users."  The Court explained that Plaintiffs' claims "challenge Facebook's sharing of user data and alleged failure to monitor how third parties used such shared information." (Discovery Order 9, Dkt. 557 at 2 (emphasis added).)

Discovery Order 9 further explained that the information "Facebook collects and shares with third parties" is not necessarily limited to the information users post on Facebook (as Facebook had argued) and would also include any *shared* data: (1) collected from a user's on-platform activity; (2) obtained from third parties regarding a user's off-platform activities; and (3) inferred from a user's on or off-platform activity. *Id.*

### E.   Facebook confirmed it completed its production of discoverable user data.

To comply with Discovery Order 9, Facebook investigated whether any discoverable user data had not already been produced. We did not identify any such data. Indeed, as stated earlier, the DYI file is *overinclusive* of the universe of discoverable data under Pretrial Order 20 and Discovery Order 9.

Again, this data-privacy litigation relates to Facebook's alleged practice of sharing certain "sensitive" user data with third parties. Third parties who are permitted access to

4

individualized data about Facebook users access that data through application programming interfaces ("APIs"). APIs are a standard industry programming tool, and they allow applications to access data and features of other applications, services, or operating systems. All of the APIs Facebook has made available to third parties query Facebook's Social Graph only and allow access to a subset of the information contained in the Social Graph.[6] Facebook's current "Download Your Information" or "DYI" tool retrieves data from, and allows users to download the information Facebook maintains about them in, the Social Graph. It is the most complete compilation of data Facebook maintains for any user and reflects a human-readable version of the data relating to any user in Facebook's Social Graph—including, but not limited to, the data that could have potentially been accessed by third parties.

### F.   The Court allowed a 30(b)(6) deposition to allow Plaintiffs to confirm Facebook had satisfied is production obligations.

After Facebook reported its preliminary finding that it completed its productions of discoverable user data, as described in Pretrial Order 20 and Discovery Order 9, Plaintiffs told the Court: "[I]t is, frankly, just impossible for us to believe that." (12/9/2020 Hr'g Tr. at 19:22-23.)

To address Plaintiffs' "disbelief . . . as to how Facebook operates," the Court suggested a 30(b)(6) deposition to narrowly address "the discoverable user data as articulated by Discovery Order 9." *See* 12/9/2020 Hr'g Tr. at 26:6-9; Discovery Order 11, Dkt. 588. Ignoring the Court's instructions, Plaintiffs issued a deposition notice on 12 extraneous topics. Judge Corley quashed this notice—explaining it was "way beyond what she had in mind." *See* 1/15/2021 Hr'g Tr. at 17:12-13. The Court explained, "[w]e just need somebody under oath" (*id.*) to "verify [Facebook's] representation" (*id.* at 35:3-5) that it has produced all discoverable data within the scope of Discovery Order 9.

The 30(b)(6) deposition on discoverable user data was held on February 23, 2021. Facebook designated Konstantinos Papamiltiadis as its witness on this issue. Mr. Papamiltiadis is Facebook's Vice President of Platform Partnerships, has over eight years of experience at Facebook, and has 127 reports. Consistent with Judge Corley's instructions, Mr. Papamiltiadis spent nearly 20 hours preparing to testify about the discoverable user data under Discovery Order 9—including the user data Facebook collects, how Facebook uses different categories of user data, which categories of user data Facebook shares, and how shared categories of user data are reflected in produced materials.

### G.   Plaintiffs declined to use the 30(b)(6) deposition as ordered and reverted to their position that all data relating to the Named Plaintiffs must be produced—even if not shared.

Rather than use the 30(b)(6) deposition to address the topic the Court ordered, Plaintiffs pursued their own agenda and used the deposition to explore all of the topics in the

---

[6] Facebook uses the term the "Social Graph" to describe the complex web of peoples, places, things, actions, and connections on the Facebook Platform. The Facebook product that users see is powered by a series of databases that work in tandem to provide Facebook users a seamless experience. As Facebook users navigate through Facebook and interact with it—including, for example, by liking posts made by other users, watching videos, posting photos, and sending messages—the users create new relationships and connections between themselves and the content they are able to see. This web of peoples, places, things, actions, and connections are referred to as the "Social Graph."

notice the Court had rejected. At the deposition, Plaintiffs did not even ask the most basic questions about what user data Facebook shares with third parties. Plaintiffs never asked "what categories of user data does Facebook make accessible to third parties?" Nor did they ask whether the materials Facebook has produced reflect the scope of user data accessible to third parties. Plaintiffs instead questioned Mr. Papamiltiadas for hours regarding different types of data Facebook has used only internally (which Plaintiffs were already aware existed)—including "data from third parties about users' off-platform activity," data derived from the Facebook Pixel, and "information . . . associated with users via app-scoped IDs."

Plaintiffs now demand all of that data after they tactically avoided asking Mr. Papamiltiadas whether any of it has been shared or otherwise made accessible to third parties. It has not. Plaintiffs did not even seek to learn whether any of the data they asked about was collected on an individual or aggregate level, whether it is stored (and, if so, for how long), or whether it is anonymized. It is Plaintiffs' burden to demonstrate how information they seek is relevant to live claims. The Court ordered a narrow 30(b)(6) deposition specifically to allow Plaintiffs to understand whether any user data relevant to their claims was yet to be produced, and Plaintiffs deliberately declined to use the deposition to address that issue.

Rather, it seems that after spinning in circles on this issue for more than a year, Plaintiffs have relapsed to their original position that Facebook must locate and produce all data relating in any way, shape, or form, to the Named Plaintiffs—even if it was not shared and exists only as part of aggregated or anonymized data sets. The Court has already rejected this position. And with Plaintiffs having obtained a ruling from the Court accepting Plaintiffs' earlier position that discoverable user data is limited to data that was shared with third parties, Plaintiffs are judicially estopped from now arguing that user data is discoverable irrespective of whether it was shared. *See, e.g.*, *United Nat. Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 779 (9th Cir. 2009) (citing *New Hampshire v Maine*, 532 U.S. 742, 750 (2001)).

Facebook confirms again: Third parties who are able to access individualized user data access that data through APIs that pull from Facebook's Social Graph only, and the DYI files Facebook produced reflects a human-readable version of the data relating to each Named Plaintiff in Facebook's Social Graph—including, but not limited to, the data that could have potentially been accessed by third parties. Facebook's productions under Discovery Order 9 are complete.

## II.   Plaintiffs' March 4 letter demanding supplemental interrogatory responses relating to "Business Partners."

Plaintiffs' letter demanding that Facebook supplement its responses to Interrogatories 14 and 15, which concern "Business Partners," raises the same concerns about unnecessary re-litigation of previously decided issues. The parties litigated—and Judge Corley decided—this issue **last month**. *See* Dkt. 608. Facebook confirmed, consistent with Judge Corley's Order, that its responses to these Interrogatories are complete. Facebook's responses to Interrogatories 14 and 15 are extraordinarily comprehensive and alone span **195 pages**—most of which are single-spaced tables, using a Size 7 font.

After speaking with Plaintiffs about this issue, we understand Plaintiffs to demand additional information in response to these Interrogatories on two grounds. First, Plaintiffs explained that they believe Judge Corley intended her Discovery Order on Business Partners (Dkt. 608) to "expand the case" beyond Judge Chhabria's Motion to Dismiss Order (and Plaintiffs' Complaint) to reach *all of Facebook's business relationships*. Second, Plaintiffs highlight that Facebook has had business relationships over the past decade with entities that do not appear in Facebook's Interrogatory responses.

3558

Plaintiffs position seeks to unwind more than three years of litigation, multiple court orders, and Plaintiffs' own allegations and discovery requests. Neither this case nor the specific Interrogatories at issue concern every business relationship Facebook has ever had.

> **A.** **Judge Chhabria's Motion to Dismiss ruling allowed Plaintiffs' "Business-Partner" allegations to move forward with respect to a finite set of third parties.**

In his decision on Facebook's Motion to Dismiss, Dkt. 298, Judge Chhabria made clear that Plaintiffs would ***not*** be permitted to litigate a sweeping attack on Facebook's entire business and all of its business relationships. Plaintiffs' First Amended Consolidated Complaint was 1,442 paragraphs and 412 pages. Dkt. 257. Judge Chhabria observed, "it seems the plaintiffs sought to identify anything Facebook has ever been reported to have done wrong . . . . [T]he presence of so many disparate and vague allegations makes it nearly impossible for Facebook to meaningfully respond to all of them, much less for the Court to effectively address them." Dkt. 298 at 5-6.

To avoid "bogging the case down at the pleading stage for years," *id.* at 6, Judge Chhabria did not address each of Plaintiffs' improperly pleaded theories and claims. Instead, he concluded that Plaintiffs adequately pleaded "four categories" of potential wrongdoing related to "Facebook's practice of sharing its users' personal information with third parties." *Id.* at 6, 1. He then dismissed certain claims, *id.* at 30, and ***stayed all other claims and theories not falling into the four categories of alleged misconduct***. *Id.* at 6 ("All other prioritized claims not addressed by this ruling will be stayed.").

The first two theories Judge Chhabria allowed to move forward concern data-sharing with app developers. Judge Chhabria described the third theory as "sharing sensitive user information with business partners." Dkt. 298 at 8. The fourth theory concerns Facebook's enforcement of its data-use policies with respect to third parties.

The third "Business Partner" theory Judge Chhabria allowed to move forward is about Facebook's alleged practice of entering "data reciprocity" agreements with third parties in connection with arrangements to make certain Facebook functionalities available on third-party devices and platforms. *See* Dkt. 298 at 8. Plaintiffs' Complaint uses the term "Business Partners" to describe "roughly 150" entities with whom Facebook partnered to "develop and integrate Facebook's User Platform on multiple devices and operating systems." *See* SACC ¶¶ 430-440.[7] The Complaint alleges that Facebook "gave Business Partners access to users' content and information" to facilitate these partnerships. *Id.* In support of its allegations with respect to "Business Partners," Plaintiffs cite a list of entities Facebook describes as its "integration partners" that Facebook shared with Congress (SACC ¶ 431), and a New York Times article about Facebook's integration partners (SACC ¶¶ 433, 435).

Judge Chhabria similarly explained that the list of "Business Partners" Plaintiffs had identified "came from Facebook itself, which asserted that it had 'integration partnerships' with these companies." Dkt. 298, at 8. Judge Chhabria held that the misconduct Facebook allegedly engaged in with respect to these entities was "relatively straightforward": "Facebook shared information about its users with this non-exclusive list of business

---

[7] These partnerships served two primary purposes: (i) to enable users to access their Facebook accounts or specific Facebook features on devices and platforms built by other companies, such as Blackberry and Apple, before the existence of the "app store"; and (ii) to enable users to connect their Facebook social experiences with other popular apps and websites, like Yahoo and Twitter—if they chose to do so. Some transfer of data was needed to allow users to access their Facebook accounts on devices and platforms built by other companies (like Blackberry) and, if they explicitly chose, to connect their Facebook accounts with other platforms.

3559

partners, and that those companies in turn shared data with Facebook." *Id.* at 8. "These partnerships, the complaint alleges, were built in part on 'data reciprocity.' Facebook and its partners agreed to exchange information about users' activities with each other." *Id.* (internal quotations omitted).

### B.    Facebook provided nearly 200 pages of responses to Plaintiffs' Interrogatories regarding "Business Partners."

Plaintiffs' Fourth Set of Interrogatories seeks information about the "Business Partners" alleged in their Complaint. Specifically, Interrogatory 14 seeks a list of "Business Partners" that had access to "Not Generally Available" information about users even if users did not download an app made by the entity.[8] Interrogatory 15 seeks details about the "Not Generally Available" information the so-called "Business Partners" were able to access.

Plaintiffs' own Interrogatories recognize that the "Business Partner" theory does not concern all of Facebook's business relationships. Consistent with Plaintiffs' Complaint and Judge Chhabria's Order, Plaintiffs' Interrogatories defined "Business Partners" as "third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems."

Facebook served nearly 200 pages of responses to these Interrogatories. As parties typically do in their responses to interrogatories, Facebook also provided definitions that it would use in its response. Facebook offered a definition of "Business Partners" that was intended to add clarity and capture all entities falling into the business partner conduct Judge Chhabria described in Pretrial Order 20. The parties discussed their definitions of "Business Partners" at length over the course of several months.

### C.    Plaintiffs litigated the scope of Facebook's Interrogatory responses.

After months of back-and-forth—during which Facebook confirmed it did not withhold any relevant or responsive information based on its definition of "Business Partners"—Plaintiffs insisted on litigating the definition of "Business Partners" that would be used to respond to their Interrogatories.

Judge Corley found the term "Business Partners" to refer to the third category of potential liability identified by Judge Chhabria and deciphered "no meaningful difference between the parties' definitions." Dkt. 608. Judge Corley confirmed that "Business Partners" would include companies with which Facebook had agreements "to exchange information about users' activities with each other," consistent with Judge Chhabria's explanation, even if Facebook did not label them "integration partners," *id.*, and she ordered Facebook to confirm it had fully responded to Plaintiffs' requests. *Id.* Facebook confirmed it had.

### D.    Plaintiffs now argue Judge Corley's order with respect to "Business Partners" expands the scope of the case to reach all of Facebook's business relationships.

Plaintiffs now seek to relitigate this issue. During a meet and confer, Plaintiffs' counsel represented that they believe Judge Corley intended her Order to greatly "expand" the "Business Partner" theory articulated in Plaintiffs' Complaint and by Judge Chhabria.

---

[8] The Interrogatories define "Not Generally Available" information to be information "to which that Facebook User has restricted access such that the only Facebook Users who may access that Content and Information are the Facebook User's Friends or another limited audience." This definition explicitly asks about activities conducted on Facebook (which users can limit the audience for).

In Plaintiffs' words, nearly three years into this litigation, Judge Corley "expanded the case" to concern Facebook's relationship with any entity that has ever received a single piece of information relating in any way to people who use Facebook, so long as, at any point in time, that entity told Facebook anything that could be interpreted to concern Facebook users.  Plaintiffs take this position even though Plaintiffs' Business Partner allegations refer to a finite number of entities with whom Facebook allegedly entered "data reciprocity" agreements in connection making Facebook functionalities available on third-party devices and platforms.  *See* SACC ¶¶ 430-440.

For instance, Plaintiffs' letter claims the "Business Partner" theory now extends to Facebook vendors that performed statistical analyses for Facebook using anonymized data, on the basis that these vendors accessed anonymized information to perform analyses for Facebook and then reported their conclusions back to Facebook. ████████████

████████████████████████████████████████████

██████████████████ No allegations about relationships of this nature appear in the Complaint, nor is it clear how they could possibly be actionable. [10]

Plaintiffs' extreme and unfounded position would bring nearly every entity with which Facebook has ever interacted within the scope of this case—even where the relationship is clearly disclosed within Facebook's terms and has no relationship to the conduct actually alleged.  Indeed, Plaintiffs' letter recites every type of business relationship Facebook's 30(b)(6) deponent said Facebook has had over the years and demands that Facebook update its interrogatory responses to address every entity falling into each category he listed.  Plaintiffs seek this information even with respect to relationships that did not include any sort of data sharing, much less the type of arrangements described in Plaintiffs' Complaint and Judge Chhabria's motion to dismiss order. [11]

---

[9] Plaintiffs' selective quoting of Ms. Lee's testimony is tremendously misleading. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

[10] Facebook's use of vendors and work with measurement partners is clearly disclosed in its Data Policy and thus cannot constitute the type of illicit data-sharing partnership the Court has found actionable.  *See* MTD Order, Dkt. 298, at 21-22 (dismissing claims where information sharing at issue was disclosed in Facebook's Data Use Policy); *see also* FB's 6/8/12 Data Use Policy, FB-CA-MDL-00233442 at 00233455 ("We give your information to the people and companies that help us provide, understand and improve the services we offer.  For example, we may use outside vendors to help host our website, serve photos and videos, process payments, analyze data, measure the effectiveness of ads, or provide search results." (emphasis added)); *see also* SACC ¶ 561 (quoting same).

[11] The first two categories of entities Mr. Papamiltiadis listed, "device manufacturers and mobile operators that . . . help us build Facebook-like experiences in order to reach a wider audience," Tr. at 25:16-20, and "developer partners . . . [which] are third-party software companies that have access to our APIs and they build experience[s] for both consumers and other businesses," *id*. at 25:21-25, are already accounted for in Facebook's Interrogatory responses.  The second two categories described

*(Cont'd on next page)*

9

3561

It is clear that neither Judge Chhabria nor Judge Corley intended to open the door to such wide-ranging and irrelevant inquiries. For starters, it is clear that Judge Chhabria's Motion to Dismiss ruling did not bucket all of Facebook's business relationships into the "Business Partner" theory, which would have expanded the case to include theories of liability going far beyond what Plaintiffs even alleged. To the contrary, Judge Chhabria made clear that his motion to dismiss order allowed four alleged theories of potential liability to move forward and that Plaintiffs' remaining allegations would be stayed. Dkt. 298 at 6.

Judge Chhabria identified specific theories of relief that would move forward to focus this case and make it manageable to litigate—not to allow Plaintiffs to conduct a roving investigation of all of Facebook's business relationships over the past 13 years without stating cognizable claims. Judge Corley's February 1, 2021 order with respect to "Business Partners" certainly did not expand this case to allow such an investigation. The order makes clear that it tracks the third category of potential misconduct described in Judge Chhabria's Motion to Dismiss ruling and that Facebook should identify the entities Judge Chhabria described, even if Facebook does not call some of those entities "integration partners."

We confirm again that our 195 pages of responses to Interrogatories 14 and 15 are complete to the best of our knowledge and consistent with Judge Corley's Discovery Order with Respect to Business Partners. Discovery in this case is ongoing, and should we become aware of any additional responsive information during the course of our ongoing factual investigation, we will update our responses accordingly.

## III.   Plaintiffs' February 19 letter demanding additional materials provided to government entities.

Plaintiffs' letter regarding RFP 6 follows the same pattern and raises the same concerns as the letters addressed above. This letter backtracks on more than a year of productive discussions and litigation regarding Plaintiffs' RFPs 6 and 43; inappropriately invokes the parties' expedited dispute resolution protocol to demand materials never previously requested; and seeks materials relating only to events that occurred years after this case was filed.

### A.   Facebook agreed to make cloned productions from certain government matters under RFP 6 to kick-start discovery while the parties negotiated threshold ESI issues.

Plaintiffs served RFP 6 in November 2019. The request demands document productions Facebook provided government entities in matters touching on related issues. The parties extensively negotiated this request and completed negotiating it a year ago, in early 2020.

Facebook largely agreed to produce the materials RFP 6 requests. Even though courts usually frown upon the type of "cloned discovery" requested by RFP 6,[12] Facebook agreed to make certain cloned productions from numerous matters under RFP 6 in a good faith effort to move discovery forward.

As Plaintiffs know, the parties had tremendous difficulty negotiating an ESI Protocol, custodians, and search terms, and have been negotiating these threshold ESI issues for 18 months. To kick-start document discovery during these negotiations, Facebook agreed to

by Mr. Papamiltiadis—"business[es] that . . . publish[] on our platform, from news companies to [NGOs]" and "suppliers"—have no apparent relationship to user data and Mr. Papamiltiadis identified none.

[12] *King County v. Merrill Lynch & Co., Inc.*, No. C10-1156-RSM, 2011 WL 3438491, at *3 (W.D. Wash., Aug. 5, 2011) (quotation omitted)

3562

produce—and did produce—all of the Facebook documents produced in response to the FTC's document requests during its 2011 and 2019 investigations into Facebook. On top of that, Facebook also agreed to review the Facebook documents it had produced to various other state and federal entities in 9 additional government matters and to produce those documents, so long as they were responsive to Plaintiffs' document requests.

The parties agreed that Facebook would complete its productions under RFP 6 by July 3, 2020. Even though RFP 6 sought documents produced to government entities through "the present" (*i.e.*, through November 2019, when RFP 6 was served), Facebook ultimately agreed to produce responsive documents it had produced to government entities through April 15, 2020.

### B. After the parties reached an agreement on cloned discovery, Plaintiffs sought more.

Facebook understood the parties' negotiations regarding materials from government matters were complete. However, after the parties completed negotiating RFP 6, Plaintiffs issued RFP 43, which sought additional materials exchanged in 10 government matters, including: "All privilege logs, interrogatory responses, written reports, correspondence and deposition transcripts." During the parties' meet and confer discussions, Plaintiffs told us that they issued this RFP because the parties had agreed RFP 6 would apply only to document productions but Plaintiffs in fact wanted any other piece of paper to have exchanged hands with any government entity in any matter touching on related issues. Facebook objected to this request in June 2020.

Six months after Facebook served its responses and objections to RFP 43, on December 10, 2020, Plaintiffs sent Facebook a letter stating they would agree to limit the scope of RFP 43 to deposition transcripts from government matters and any written discovery responses Facebook provided government entities. Then, in a subsequent meet and confer, Plaintiffs informed Facebook that their revised request for written discovery responses also included a demand for all of Facebook's counsel's formal and informal correspondence with the government. On February 12, 2021, Plaintiffs filed a motion to compel all materials demanded under RFP 43. Facebook responded on February 18.

### C. After filing a motion to compel certain materials from government matters, Plaintiffs return to RFP 6 to seek additional materials they did not include in their motion.

On February 19, *one day after Facebook responded to Plaintiffs' motion to compel*, Plaintiffs sent Facebook another letter demanding *additional* materials from government matters—this time supposedly under the ambit of RFP 6, which the parties had finished negotiating a year earlier. Plaintiffs' letter invokes RFP 6 to demand that Facebook now review and produce any document productions made in the 10 government matters since April 2020. It further demands that Facebook produce materials created and provided to the FTC pursuant to a consent decree that was entered in July 2020.

#### 1. There is no basis for additional cloned productions—Facebook produced the cloned materials it agreed to provide, and the parties now have their own search terms.

As an initial matter, the parties completed negotiating RFP 6 in April 2020 and reached an agreement on the scope of Facebook's productions in response to that RFP. Plaintiffs' efforts to revisit that agreement a year later undermines the time and effort the parties put into negotiating and compromising discovery requests and makes it difficult for the meet and confer process to work effectively.

3563

In any case, RFP 6 does not request the documents Plaintiffs seek. Plaintiffs defined the "Relevant Time Period" for this request as materials provided to government entities "through the present" (*i.e.*, through November 2019). Despite Plaintiffs' November 2019 cut-off, Facebook agreed to produce materials in response to RFP 6 that had been produced to government entities through April 2020. The parties agreed Facebook would complete its production of these materials by July 3, 2020. Facebook did.

There is no good-faith basis for Plaintiffs' demand that Facebook now review and produce additional cloned productions from government matters. As explained above, courts typically reject blanket demands for document productions from other actions for two reasons. First, "compelling a responding party to do duplicate searches—one for responsive documents in their custody and control and one for all documents in their custody and control that were previously produced in other litigation—is definitionally unduly burdensome." *Goro v. Flowers Foods, Inc.*, No. 17-CV-02580-JLS-JLB, 2019 WL 6252499 *18 (S.D. Cal., Nov. 22, 2019); *accord In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods Liability Lit.*, MDL No. 2672, 2017 WL 4680242 (N.D. Cal., Oct., 18, 2017) (Corley, M.J.) (rejecting cloned discovery requests). Second, cloned discovery "is irrelevant and immaterial unless the fact that particular documents were produced or received by a party is relevant to the subject matter of the subject case." *King County*, 2011 WL 3438491, at *3 (quotation omitted).

Facebook agreed to jump-start document discovery, while the parties negotiated threshold ESI issues, by reviewing and producing certain materials produced to government entities. The parties have now negotiated search strings *for a year* and finally appear to have reached agreement to use search strings that hit on approximately 6 million documents. On the eve of finalizing that agreement, Plaintiffs seek to substantially expand that universe by requiring Facebook to also engage in an ongoing review of all documents produced in numerous government matters for any additional responsive documents.

It is neither practical nor reasonable to expect Facebook to continue to track every document produced in numerous other actions (handled by multiple law firms) and to review every one of those documents for responsiveness—in addition to approximately 6 million documents identified through search strings. This is precisely why courts generally reject requests for cloned discovery. To the extent documents have been produced to government entities since April 15, 2020 that are responsive to Plaintiffs' RFPs, the parties have agreed to search for those materials by running the agreed-upon and court-ordered search terms against the agreed-upon and court-ordered custodians. Plaintiffs' request that Facebook separately review its ongoing productions to government entities is unreasonable, unduly burdensome, and not proportional to the needs of the case.

### 2. Materials created for the FTC after July 2020 are neither responsive to RFP 6 nor relevant to this case.

Finally, Plaintiffs' letter demands materials Facebook agreed to create and produce to the FTC, as part of the FTC's ongoing monitoring of Facebook under a consent decree that was entered in July 2020.[13] These materials fall outside of the timeframe of RFP 6. They also appear to be among the materials Plaintiffs requested originally through RFP 43 (which seeks "written reports" to the government) but later told Facebook and the Court they had dropped from their request.

---

[13] Plaintiffs also seem to request categories of materials Facebook put on legal hold for periods of 6 months to 5 years under the FTC's 2011 consent decree. To the extent these materials remained on hold when this action was filed and are captured by the negotiated custodians and search terms, they will be produced.

More fundamentally, materials created for the FTC after July 2020 and as part of the FTC's forward-looking monitoring of Facebook have no conceivable relevance to this case, which was filed in March 2018 and concerns conduct before that date.

## IV.   Plaintiffs February 11 letter regarding "Developer Manuals."

Finally, Plaintiffs invoke the parties' dispute resolution protocol to compel the immediate production of materials over which there is no dispute and no apparent urgency. Plaintiffs' February 11, 2021 letter demands—under threat of an immediate motion to compel—that Facebook produce within 8 days, what they describe as "manuals" relating to Facebook's systems that were created over the course of a decade. While not entirely clear, Facebook understands this request to seek every iteration of its developer website to have been published since 2007, because this site provides technical instructions to application developers regarding how to use Facebook's systems.

Plaintiffs are correct that the parties discussed this request previously. However, these discussions took place **a year ago** in March 2020 and related to a demand that Facebook produce "developer manuals" in connection with an ESI deposition Plaintiffs had noticed. Judge Corley ultimately ruled that the noticed deposition would not move forward. Plaintiffs did not follow up with this document demand again until a meet and confer held in November 2020. During that meet and confer, Plaintiffs' counsel informed Facebook that it should *not* prioritize collection and production of the developer documents and should instead focus on other targeted collections.

Three months later, during a meet and confer held on February 11, 2021, Plaintiffs (out of nowhere) demanded that Facebook locate and produce all "developer manuals" within one week, in anticipation of an upcoming 30(b)(6) deposition. Facebook urged Plaintiffs to clarify their request and to identify any specific, targeted documents they believed they needed for the deposition—explaining it would be difficult to locate, collect, and produce a large volume of materials within a matter of days.

Plaintiffs did not clarify their request or limit it to specific documents. Instead, hours after the meet and confer, Plaintiffs sent Facebook a letter purporting to invoke the parties' dispute protocol with respect to "developer manuals."

There is no outstanding dispute with respect to these documents. As Facebook understands, Plaintiffs seek different versions of its developer website that have been published over time. Facebook does not object to producing the current version of Facebook's developer website (which Plaintiffs can access at developers.facebook.com) or any prior versions of the website Facebook maintains to the extent they have been archived internally at Facebook. But the Wayback Machine appears to maintain more than 30,000 saved instances of past versions of the developer website. If there are specific versions of the site that Plaintiffs seek, they should identify them. The parties should meet and confer to clarify what specific information Plaintiffs are seeking and define an appropriate set of responsive materials.

Finally, as Facebook has told Plaintiffs numerous times, the parties must agree upon a schedule for Facebook to produce documents in response to targeted requests. Plaintiffs' ongoing demands that Facebook immediately locate and produce one-off materials significantly interfere with Facebook's ability to produce responsive documents found among the millions of documents hitting on the parties' agreed-upon search strings. Facebook encourages Plaintiffs to limit, narrow, and clarify their requests and to work with Facebook to develop a production schedule.

3565

Sincerely,

Deborah L. Stein

3566

# EXHIBIT Y

 

**VIA ELECTRONIC MAIL**

Martie Kutscher Clark
Gibson Dunn & Crutcher LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
mkutscherclark@gibsondunn.com

Russell H. Falconer
Gibson Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
rfalconer@gibsondunn.com

Deborah L. Stein
Gibson Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
dstein@gibsondunn.com

Colin B. Davis
Gibson Dunn & Crutcher LLP
3161 Michelson Drive,
Irvine, CA 92612-4412 USA
cdavis@gibsondunn.com

Laura C. Mumm
Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
lmumm@gibsondunn.com

Re: *In re Facebook, Inc. Consumer Privacy User Profile*,
Northern District of California Case No. 3:18-md-02843-VC

Dear Counsel:

At the mediators' request, we send this message as a final attempt to avoid impasse on Facebook's production of the named plaintiffs' data. We look forward to your response on September 16.

At its core, this case is about what "content and information" (Facebook's term for data and information as set forth in its own terms of service) Facebook took from Plaintiffs, what Facebook told Plaintiffs it would do with their content and information and what Facebook *actually* did with it. This includes, but is not limited to, sharing it with third parties, negligently allowing third parties to take it and use it for improper purposes and failing to monitor third parties' use, which is precisely what occurred with Cambridge Analytica and Dr. Kogan, the scandal that sparked these consolidated actions. Facebook asserts it disclosed all its practices as to users' content and information and that users consented to those practices. To test this assertion, Plaintiffs need to understand whether Facebook's actions matched the conduct Facebook describes in its terms of service and privacy policies.

Plaintiffs opened discovery in this case with the modest request that Facebook describe and identify the kinds of data it has collected on only the nine Named Plaintiffs, as opposed to the hundreds of millions of class members in this action. We have simply asked: what did Facebook collect about users and what did it do with it? RFP No. 9 seeks all documents Facebook has relating to the Named Plaintiffs, including the content and information collected about each of them.. RFP No. 10 seeks documents sufficient to identify the categories of "content and information" Facebook collects, tracks, and maintains about each Named Plaintiff. It has been Plaintiffs' hope that this modest request could serve as a road map for class-wide discovery.

In Discovery Order No. 9, Judge Corley agreed. She identified the proper scope of discovery related to the data Facebook accumulates about the Named Plaintiffs as: (1) data collected from a user's on-platform activity; (2) data obtained from third parties regarding a user's off-platform activity; and (3) data inferred from a user's on- or off-platform activity. Dkt. No. 557.

To date, Facebook has not produced data from categories 2 or 3. Such a production would include Facebook's profiles of the Named Plaintiffs, and data Facebook acquires through its agreements with business partners, including data it bought and sold about Named Plaintiffs from data brokers in the heart of the Class Period. The parties have conferred and communicated at length about this issue, both before and after Judge Corley's order.

Instead, Facebook continues to limit discovery to category 1. Facebook has repeatedly told Plaintiffs it has "produced the information contained in the DYI file for each of the Named Plaintiffs, plus certain additional information (such as a spreadsheet containing data tracking how Plaintiffs adjusted their Facebook privacy settings)." *E.g.*, Apr. 1, 2021 letter at 2 (attached). The external tool that Facebook created to share with Plaintiffs some small subset of the information Facebook collects about them does not meet the scope of discovery Judge Corley identified or even address the heart of Plaintiffs' claims in this case. Plaintiffs know what they shared on the platform. But Plaintiffs do not know what Facebook collects, infers, embeds and tracks to create data sets about the Plaintiffs. Plaintiffs want to see those data sets and they want to know how Facebook uses them. Plaintiffs can then compare those actions to Facebook's disclosures and the parties can have a meaningful dialogue about the scope of consent.

Because of Facebook's secrecy and refusal to be transparent, there is a significant information asymmetry. Thus, it is impossible for Plaintiffs to identify with specificity the full scope of information Facebook has not produced about the Named Plaintiffs. But some internal Facebook documents give a clue to the types of information it collects about users. For example, Dep. Ex. 3 (attached) defines three broad categories of data Facebook "receive[s] about people": native data, appended data, and behavioral data. *See* Ex. 3 at FB-CA-MDL-00213424. For those types of data, Facebook identifies categories of data it explicitly collects,

implicitly collects, and infers.  It appears that the Named Plaintiffs' data Facebook has produced is limited to information in the explicit collection category: profile information; posts, likes, shares; and location (checkins).  Facebook has *not* produced all of the Named Plaintiffs' data it implicitly collects— ███████████████████████████████████  And Facebook has *not* produced the Named Plaintiffs' data it infers— ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████ Nor has Facebook disclosed the extent to which it shares or makes accessible some or all of this data to third parties and what it does to monitor third parties' use of it.

The document at Bates No. FB-CA-MDL-00178902 provides further insight into the types of information Facebook collects about its users that it has not produced (limited to the Named Plaintiffs) here.  Summarizing the value proposition of being able to read data from Facebook's platform, Sam Lessin writes: "████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ ██ Among the data Lessin says Facebook has about each user is ██████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ While the context for these descriptions is ████████████████████████████████████████ ████████████████████ the descriptions quoted above reflect the data Facebook actually collects on its users. Facebook has *not* produced aggregated data about the Named Plaintiffs' friends, derived data about the Named Plaintiffs, Facebook's opinions of the Named Plaintiffs, or data provided by third parties to the graph about the Named Plaintiffs.

Facebook's patents also lend a clue into the kinds of data collects.  For example, Facebook holds a patent titled "Determining user Personality Characteristics From Social Network System Communications and Characteristics" (U.S. Patent No. 9740752), which can be used to identify personality characteristics (e.g., extroversion, agreeableness, conscientiousness, emotional stability, and openness), which can be targeted by marketers on Facebook. Another patent, "Receiving Information About a User from a Third Party Application Based On Action Types" describes how "linguistic data and non-linguistic data associated with the user" are used "in a trained model to predict one or more personality characteristics for the user." These "inferred personality characteristics are stored in connection with the user's provide, and may be used for targeting, ranking, selecting versions of products, and various other purposes." (U.S. Patent 8732802B2 at 2). Examples of personality characteristics include: "extroversion, agreeableness, conscientiousness, emotional stability, and

openness." The patent further explains that "[e]ach user of the social networking system is associated with a user profile, which is stored in the user profile store. A user profile includes declarative information about the user that was explicitly shared by the user, and may also include profile information inferred by the social networking system. In one embodiment, a user profile includes multiple data fields, each field describing one or more attributes of the corresponding user of the social networking systems." Each of these patents identify the types of information about Facebook users, including the Named Plaintiffs, that Plaintiffs have sought but which Facebook has not yet produced. These references are not intended to be complete. Rather, they are only included for the purpose of providing examples of Facebook acknowledging the existence of some aspects of the data Plaintiffs seek.

If Facebook will not make a complete production of all data it has collected about these nine people, Facebook must identify what it is withholding and why. And even if Facebook does make a complete production, the parties must confer in advance of the production in order to agree on the form of those productions, given the complexities with the kinds of data collected, inferred, aggregated and used.

Regards,

Derek W. Loeser                     Lesley E. Weaver
dloeser@kellerrohrback.com          lweaver@bfalaw.com

# ATTACHMENT A

| | |
|---|---|
| **From:** | Simone LiTrenta </O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SIMONEL051> |
| **Sent:** | Thursday, May 08, 2014 4:34 PM |
| **To:** | Matt Scutari; Rob Sherman; Emily Sharpe; Emily Vacher; Maritza Johnson; Travis Bright |
| **Cc:** | Erin Egan |
| **Subject:** | Offsite presentation |
| **Attachments:** | Combined papers.docx |

Hey, all. Attached is the combined doc of privacy team papers that Marne will be sending out with the rest of global policy team papers.

Now on to the slide deck☺. If someone has started slides already and can share the format with the group so we can make the look and feel uniform, that would be great. If someone is a PPT genius and wants to take the lead on combining finished slides into one deck and making minor changes, let me know. Otherwise, please save your slides to the folder for slides and I can combine.

https://www.dropbox.com/sh/hquhjw021dr3qty/AADBwXtmeiNZJRBZR6-xjIgia

Erin would like to review the slide on the plane Monday morning. If everyone can finish their slides by COB Friday/Saturday, I can get them to her Sunday night.

If you would like to discuss your slides with Erin, please let me know ASAP and I will find time manana.

Simone



Exhibit
FB 0003

30(b)(6)-Data (Papamiltiadis)

Confidential

3573
FB-CA-MDL-00213423

# ATTACHMENT B

From:           Douglas Purdy </O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP
                (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DOUGLAS PURDY>
Sent:           Thursday, August 30, 2012 10:17 AM
To:             Sam Lessin
Cc:             Mike Vernal
Subject:        Re: Platform Business Model Framing

I am on vacation this week (still), but happy to help.

That said, in wonder if you should just take the pen on the deck moving forward so I can have a day off and not be the bottle neck?

I can send you want I have so far in an hour when I get back to a computer.

On Aug 30, 2012, at 10:11 AM, "Sam Lessin" <sl@fb.com> wrote:

1.  Sorry I wasn't clearer about my plans / being out.  That is my bad guys / didn't mean to leave this hanging (obviously super important)
2.  Doug, really glad you are framing this up / working on this …
3.  Here are my notes on where things are from Friday, I think a lot of it is covered below but I just want to make sure we are in sync here, are presenting all the hard questions for this offsite



Confidential

3591
FB-CA-MDL-00178902



Confidential



Confidential

working on this.

going to see the attached to frame things up.


On Aug 28, 2012, at 6:15 PM, Mike Vernal <vernal@fb.com> wrote:


Doug - as context, we're having an mteam offsite on Tue + Wed of next week to talk about three-year-plan stuff, and one of the discussions we're going to have is ██████████████████████████████

Sam is at burning man (not sure when he gets back), and we left it a little ambiguous about who was pulling together what, so I'd like to at least get started pulling together a deck that we can use to frame the conversation.  Can you ask the PMs to pull together a few slides?

Ideally, I think we want to cover:

██████████████████████████████████████████████████████████████████████

Not sure of the best framing (and I'm a little feverish right now), but it would be good to at least start pulling this together. ██████████████████████████████████ Otherwise, I think you/PMs have most/all the context.

██████████████████████████████████

Confidential



I think Sam is probably the right person to write-up ███████████ but the rest I think the PMs have the context on.

-mike

Confidential

# EXHIBIT Z

| From: | Mumm, Laura C. |
| To: | Matthew Melamed; Daniel B. Garrie; Gail Andler; Daniel Garrie |
| Cc: | Snyder, Orin; Stein, Deborah L.; Falconer, Russ; Kutscher Clark, Martie; Lesley Weaver; Anne Davis; Derek Loeser; Cari Laufenberg; David Ko; Benjamin Gould; Chris Springer |
| Subject: | RE: In re Facebook - Extension Request |
| Date: | September 16, 2021 2:41:35 PM |

Counsel,

Thank you for your letter regarding data relating to the Named Plaintiffs. We are confused by some of the positions Plaintiffs articulate in the letter and seek clarification before we respond in full. The source of our confusion is that Plaintiffs' letter appears to be demanding that Facebook produce "all data it has collected" about the Named Plaintiffs, which goes well beyond what Plaintiffs have repeatedly told the Court they were seeking.

When the parties previously briefed the question of what user data was responsive to Plaintiffs' requests and relevant to Plaintiffs' claims, Plaintiffs assured the Court:

> Plaintiffs do not demand, as Facebook repeatedly claims, 'that Facebook search *millions* of disaggregated data sets for any data to have ever crossed Facebook's systems relating to a Named Plaintiff and any derivative materials drawing on that data - such as data sets tracking hours of peak user activity to monitor strains on Facebook's system.' . . . To the contrary, Plaintiffs seek only a holding that the sensitive data Facebook collected about *ten Named Plaint,jfs* and *shared* with third parties is relevant. **Plaintiffs do not contend that information that was not shared is relevant, which substantially narrows the information Facebook would be required to produce in this case**.

Dkt. 548 at 9 (emphasis added).

Plaintiffs told the Court repeatedly in their briefing that only data Facebook shared or made accessible to third parties was potentially relevant.

- "To be clear, Plaintiffs are <u>not</u> interested in every piece of data Facebook collected from and about them. Instead, for just ten Named Plaintiffs, Plaintiffs respectfully request that the Court rule that the sensitive information from and about them that Facebook <u>shared with or made accessible to third parties</u> is relevant to this action." *Id.* at 2 (emphasis added).

- "This discovery dispute concerns sensitive user information that Facebook has shared with third parties without users' consent." (Dkt. 548 at 1.)

- "[T]his case is about whether Facebook acted unlawfully in making sensitive user information available to third parties and in failing to do anything meaningful to prevent third parties from misusing the information they obtained." (*Id.*)

- "Regardless of the source or how Facebook acquired it, sensitive user information is relevant if Facebook shared it without users' consent." (*Id.* at 2.)

- "[T]he discovery Plaintiffs seek [is] . . . exactly what information about these ten plaintiffs Facebook possesses and shared with third parties." (*Id.* at 3.)

- "Facebook's improper sharing of user information, whether that information was derived from on- and off-platform activity or obtained from off the platform, is relevant to the legal theories upheld at the pleading stage, which turn not on how or where the information was originally generated, but on what kind of information it was and whether Facebook shared it with third parties." (*Id.* at 3-4.)

- "[A]ny sensitive information that Facebook shared with or made accessible to third parties is relevant here, regardless of its source." (*Id.* at 5.)

- "Even for the claims that do involve a reasonable expectation of privacy, such as the invasion-of-privacy torts under California law, Plaintiffs do not claim that *all* off-platform information is relevant. Information would be relevant if—like Plaintiffs' on-platform activity—it was shared only with a 'limited audience.' . . . Such sharing would be improper under the Order's reasoning without raising any new issues." (*Id.* at 5.)

- "To show that data was shared beyond the scope of users' consent, Plaintiffs need to understand *what* was shared. Indeed, at trial, how can Plaintiffs point to data that was shared without their consent if Facebook has not produced it?" (*Id.* at 5.)

Moreover, in a hearing with Judge Corley, Mr. Loeser affirmed that Plaintiffs are only interested in information that was "shared [with] or made accessible" to third parties. 12/9/20 Hr'g Tr. at 18:15-16.

Please confirm whether Plaintiffs are still only seeking data that was shared with or made accessible to third parties, consistent with the position they took before Judge Corley. If Plaintiffs' request has expanded to include data that was *not* shared with or made accessible to third parties, please explain Plaintiffs' basis for taking a position directly at odds with the one they presented to the Court in October 2020 and on which the Court relied in issuing Discovery Order Number 9.

Regards,
Laura
**Laura C. Mumm**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
200 Park Avenue, New York, NY 10166-0193
Tel +1 212.351.2404 • Fax +1 212.817.9504
LMumm@gibsondunn.com • www.gibsondunn.com

**From:** Matthew Melamed <mmelamed@bfalaw.com>
**Sent:** Friday, September 10, 2021 11:16 PM
**To:** Daniel B. Garrie <Daniel@lawandforensics.com>; Gail Andler <JudgeAndler@iCloud.com>; Daniel

Garrie <DGarrie@jamsadr.com>
**Cc:** Snyder, Orin <OSnyder@gibsondunn.com>; Stein, Deborah L. <DStein@gibsondunn.com>;
Falconer, Russ <RFalconer@gibsondunn.com>; Kutscher Clark, Martie
<MKutscherClark@gibsondunn.com>; Mumm, Laura C. <LMumm@gibsondunn.com>; Lesley
Weaver <lweaver@bfalaw.com>; Anne Davis <adavis@bfalaw.com>; Derek Loeser
<dloeser@kellerrohrback.com>; Cari Laufenberg <claufenberg@kellerrohrback.com>; David Ko
<dko@kellerrohrback.com>; Benjamin Gould <bgould@KellerRohrback.com>; Chris Springer
<cspringer@kellerrohrback.com>
**Subject:** RE: In re Facebook - Extension Request

**[WARNING: External Email]**

Counsel:

Attached is a letter specifying the named plaintiffs' data Plaintiffs seek from Facebook.

Thanks,
Matt

Matthew S. Melamed
Bleichmar Fonti & Auld LLP
555 12th Street, Suite 1600
Oakland, CA 94607
(415) 445-4003
www.bfalaw.com

---

**From:** Daniel B. Garrie <Daniel@lawandforensics.com>
**Sent:** Friday, September 10, 2021 11:08 AM
**To:** Gail Andler <JudgeAndler@iCloud.com>; Matthew Melamed <mmelamed@bfalaw.com>; Daniel
Garrie <DGarrie@jamsadr.com>
**Cc:** Snyder, Orin <OSnyder@gibsondunn.com>; Stein, Deborah L. <DStein@gibsondunn.com>;
Falconer, Russ <RFalconer@gibsondunn.com>; Kutscher Clark, Martie
<MKutscherClark@gibsondunn.com>; Mumm, Laura C. <LMumm@gibsondunn.com>; Lesley
Weaver <lweaver@bfalaw.com>; Anne Davis <adavis@bfalaw.com>; Derek Loeser
<dloeser@kellerrohrback.com>; Cari Laufenberg <claufenberg@kellerrohrback.com>; David Ko
<dko@kellerrohrback.com>; Benjamin Gould <bgould@KellerRohrback.com>; Chris Springer
<cspringer@kellerrohrback.com>
**Subject:** RE: In re Facebook - Extension Request

Me neither.

Daniel

---

**From:** Gail Andler <JudgeAndler@iCloud.com>
**Sent:** Friday, September 10, 2021 1:12 PM

**To:** Matthew Melamed <mmelamed@bfalaw.com>; Daniel Garrie <DGarrie@jamsadr.com>; Daniel B. Garrie <Daniel@lawandforensics.com>
**Cc:** Snyder, Orin <OSnyder@gibsondunn.com>; Stein, Deborah L. <DStein@gibsondunn.com>; Falconer, Russ <RFalconer@gibsondunn.com>; Kutscher Clark, Martie <MKutscherClark@gibsondunn.com>; Mumm, Laura C. <LMumm@gibsondunn.com>; Lesley Weaver <lweaver@bfalaw.com>; Anne Davis <adavis@bfalaw.com>; Derek Loeser <dloeser@kellerrohrback.com>; Cari Laufenberg <claufenberg@kellerrohrback.com>; David Ko <dko@kellerrohrback.com>; Benjamin Gould <bgould@KellerRohrback.com>; Chris Springer <cspringer@kellerrohrback.com>
**Subject:** Re: In re Facebook - Extension Request

I have no problem with that.
Gail Andler



**Hon. Gail Andler (Ret.)**
Arbitrator/Mediator/Special Master
 5 Park Plaza Suite 400
Irvine, California 92614
gandler@jamsadr.com
Tel 714-937-8251

**From:** Matthew Melamed <mmelamed@bfalaw.com>
**Date:** Friday, September 10, 2021 at 10:11 AM
**To:** Gail Andler <judgeandler@icloud.com>, Daniel Garrie <DGarrie@jamsadr.com>, Daniel Garrie <Daniel@lawandforensics.com>
**Cc:** "Snyder, Orin" <OSnyder@gibsondunn.com>, "Stein, Deborah L." <DStein@gibsondunn.com>, "Falconer, Russ" <RFalconer@gibsondunn.com>, "Kutscher Clark, Martie" <MKutscherClark@gibsondunn.com>, "Mumm, Laura C." <LMumm@gibsondunn.com>, Lesley Weaver <lweaver@bfalaw.com>, Anne Davis <adavis@bfalaw.com>, Derek Loeser <dloeser@kellerrohrback.com>, Cari Laufenberg <claufenberg@kellerrohrback.com>, David Ko <dko@kellerrohrback.com>, Benjamin Gould <bgould@KellerRohrback.com>, Chris Springer <cspringer@kellerrohrback.com>
**Subject:** In re Facebook - Extension Request

Judge Andler and Mr. Garrie:

Plaintiffs said yesterday we would send an email by noon today about the named plaintiffs' data we seek from Facebook. We ask for a brief extension, until the end of the day, to send the email.

Thank you,
Matt


Matthew S. Melamed
Bleichmar Fonti & Auld LLP
555 12th Street, Suite 1600
Oakland, CA 94607
(415) 445-4003
www.bfalaw.com

CAUTION: This email originated from outside Law & Forensics's Email System. Please make sure you recognize the sender and know the content is safe before you click on any links or open any attachments.

# EXHIBIT AA
# PROVIDED VIA SHARE FILE

# EXHIBIT AB

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley Weaver (Cal. Bar No.191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintₐᵢfs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION**<br><br>Judge: Hon. Vince Chhabria<br>Hon. Jacqueline Scott Corley<br>Special Master Daniel Garrie<br>Courtroom: 4, 17th Floor<br><br>JAMS Ref. No.: 1200058674<br><br>ORAL ARGUMENT REQUESTED |

3632

# TABLE OF CONTENTS

I.   PLAINTIFFS' SEPARATE STATEMENT ................................................................ 1

II.  INTRODUCTION ................................................................................................. 1

III. RELEVANT BACKGROUND ............................................................................. 3

    A.  The Discovery Requests .............................................................................. 3

    B.  Facebook's Response ................................................................................... 3

    C.  The Resulting Briefing and Orders ............................................................. 4

    D.  Facebook's Deficient Response to Judge Corley's Orders .......................... 5

    E.  Facebook Has Discoverable Information That It Has Declined to Produce ... 6

    F.  Plaintiffs' Unsuccessful Attempts to Mediate This Issue ............................ 7

IV.  ARGUMENT ....................................................................................................... 8

    A.  The Court Has Already Determined the Information Plaintiffs Seek Is Relevant—
        Whether or Not Facebook Claims That It Has Been Shared. ....................... 8

    B.  Whether the Named Plaintiffs' Information Was Shared Is a Contested Question on
        Which Plaintiffs Are Entitled to Evidence, Not Assertion ......................... 9

    C.  Facebook Has Failed to Substantiate a Disproportionate Burden in Identifying the
        Data It Possesses Relating to Nine People .............................................. 11

    D.  Plaintiffs Have Made Proposals to Reduce the Burden of Production on Facebook ... 13

V.   CONCLUSION ................................................................................................. 13

## I.    PLAINTIFFS' SEPARATE STATEMENT

Pursuant to ¶ 6 of the Protocol for Resolving Discovery Disputes—Order No. 1, Dkt. No. 733, Plaintiffs' Separate Statement is provided as Attachment A to this Motion to Compel.

## II.    INTRODUCTION

There are no questions more central to this litigation than what information Facebook has collected about users, what it does with that information, and specifically what it shares or makes accessible to third parties. Plaintiffs have sought to learn from the outset of discovery what Facebook has collected, analyzed and how it is used. Decl. of Derek W. Loeser, Ex. 1.[1] In 2019, Plaintiffs asked Facebook to identify the data sources containing information about the Named Plaintiffs (at the time there were thirty). Finally, last year Plaintiffs brought a motion to compel, limiting the request to just nine Named Plaintiffs. After consulting with Judge Chhabria, Judge Corley ruled on "the proper scope of discovery related to the data Facebook accumulates about the named Plaintiffs." Discovery Order No. 9 at 1. She found the following types of user-related information to be relevant:

- Data collected from a user's on-platform activity;
- Data obtained from third parties regarding a user's off-platform activities; and
- Data inferred from a user's on or off-platform activity.

*Id.* at 1-2.

Notwithstanding the Court's Order, Facebook continues to improperly impose its narrow view of relevance on the scope of discovery, producing almost no information that falls into the second and third categories that Judge Corley enumerated. In fact, it has failed to produce any new documents with the Named Plaintiffs' information since Discovery Order No. 9 issued.

Instead, Facebook limited its production to the first category—and almost exclusively from Facebook's "Download Your Information" ("DYI") tool. This tool, which did not operate until 2010, allows users to access and review some of their own platform activity, for a portion of

---

[1] Further references to "Ex. ___" will be to Exhibits to the Declaration of Derek W. Loeser.

the Class Period.[2] The DYI tool excludes significant other information collected and inferred by Facebook about users, including information collected from off-platform activity and information inferred from data Facebook collects about the users.

Facebook has asserted repeatedly that Plaintiffs have conceded that they are entitled only to information that has been shared with third parties. But Plaintiffs are not required to accept Facebook's own position on what was or was not shared or made accessible. That would allow Facebook to determine unilaterally what sharing or made accessible means in this highly technical context, and then, based on its own interpretation, determine what information should be discovered and presented to the jury. These are ultimate issues of fact that a factfinder, not Facebook, must decide. Plaintiffs are not required to take Facebook's answers on trust, and, as Plaintiffs will explain in detail, they have good reasons not to do so.

Discovery Order No. 9 is not limited to "shared" information. Judge Corley refused to limit Plaintiffs' 30(b)(6) deposition to questions about shared information, Ex. 6, and expressly held that "whether particular user data is not shared, not admissible, or not monetized, is not a valid reason to object to a particular deposition question," Ex. 7.

In correspondence and other papers, Facebook has suggested that it would be unduly burdensome to produce all of the information required by Judge Corley's order. These suggestions have vaguely gestured in the direction of a burden argument rather than expressly claiming or demonstrating that one actually exists. The first step in understanding if there is a burden is identifying the data sources for all data, however collected, relating to the Named Plaintiffs, including inferred data. Plaintiffs ask that Facebook be ordered to identify the following aspects of those data sources: (1) the name of the database or data log; (2) a description of the data source's purpose and function; (3) information about the default retention status of the data source (at a minimum, whether it is retained and for how long); (4) information about the current retention status of the data source (at a minimum, whether it is retained and for how long);

---

[2] Plaintiffs have been only been able to find categories of information included in DYI from 2012 to present. Thus, there are arbitrary, temporal limitations in this data collection in addition to substantive.

and (5) where the current retention status differs from default retention status, the date the change was implemented. Following the identification of these data sources, Plaintiffs will work with Facebook and the Special Master to develop an efficient discovery plan to produce the relevant information associated with the Named Plaintiffs, sufficient to establish, on a classwide basis, Facebook's common practices throughout the Class Period. It will then be for the factfinder to determine if Facebook's use of that data, including sharing, selling, or making it available to third parties, was consistent with the promises Facebook made to Class member.[3]

## III.    RELEVANT BACKGROUND

### A.    The Discovery Requests

On November 25, 2019, Plaintiffs' served Requests for Production Nos. 9-13, which seek documents relating to the Named Plaintiffs.[4] Ex. 1 at 12-13. In brief, Request No. 9 seeks all documents relating to each of the Named Plaintiffs; Request No. 10 seeks documents sufficient to show the categories of content and information Facebook collects, tracks, and maintains about them; and Requests Nos. 11-13 seek documents identifying third parties that were able to access information about the Named Plaintiffs. On July 16, 2020, Plaintiffs also served Interrogatories 16-17, which sought the identify of all third parties and business partners that had access to Named Plaintiffs' content and information, as well the specific content and information that was accessed. Ex. 2.

### B.    Facebook's Response

In response to these requests, Facebook produced more than one million pages of individual user data it maintained relating to the Named Plaintiffs from the DYI tool. *E.g.*, Ex. 3 at 1. Facebook acknowledges that its production is entirely limited to the information the Named Plaintiffs themselves shared on Facebook. *Id.* Virtually all of it is available in the DYI Tool. Facebook produced no other information about the Named Plaintiffs, even though during the

---

[3] Plaintiffs reserve the right to address on reply relevant facts disclosed for the first time in conjunction with Facebook's Motion for a Protective Order Against Production of API Call Logs, filed the same day as this brief.

[4] The requests define "documents" broadly, consistent with its usage in Federal Rule of Civil Procedure 34(a)(1)(A). *Id.* at 8.

months of negotiations over this issue, Facebook informed Plaintiffs and acknowledged to the Court that it has substantial amounts of data about the Named Plaintiffs Ex. 10 at 8:10-13 ("There is other – there's Facebook-generated information, information generated by third parties, information received from third parties. We have not represented that that is comprehensively included in our production."); *see also id.* at 10:1-21 (Facebook explaining to Court that producing all the data and tables associated with a Named Plaintiff would be a "multiweek endeavor").

## C.     The Resulting Briefing and Orders

Because Facebook improperly limited its production in response to Plaintiffs' RFPs 9-13 to information from the DYI tool, Plaintiffs filed a motion last September to compel discovery related to these requests. Ex. 4. Plaintiffs asked the Court to compel production of sensitive information Facebook derives and collects from business partners, app developers, apps, and other sources. This request included "native, appended and behavioral data" and purportedly anonymized data that could be connected to the Named Plaintiffs. *Id.* at 7-11.

On October 8, 2020, Facebook responded to Plaintiffs' cross-motion. Ex. 3 (Dkt. No. 537). Facebook conceded that its production was limited to information derived from the Named Plaintiffs' activity on the platform. Facebook contended that all information related to the Named Plaintiffs that they did not themselves share on Facebook was outside the scope of the case; that all information not shared through one of the four theories of the case was not within the scope of the case; that Plaintiffs were not entitled to all data collected from third parties about the Named Plaintiffs; that the Stored Communications Act and Video Protection Privacy Act claims did not require the production of additional data Facebook had collected about the Named Plaintiffs; and that Facebook could not reasonably collect any of the additional information Plaintiffs sought. *Id.* at 6-10.

On October 29, 2020, Judge Corley issued Discovery Order No. 9, resolving the dispute by rejecting Facebook's contentions. Ex. 5 (Dkt. No. 557). Notably, Judge Corley "consult[ed] with the district court" before ruling "that discovery is not as limited as Facebook contends." *Id.*

at 1. Judge Corley held that "the discoverable user data at issue includes" three categories of information: "[1] Data collected from a user's on-platform activity; [2] Data obtained from third parties regarding a user's off-platform activities; and [3] Data inferred from a user's on or off-platform activity." *Id.* at 2.

On December 11, 2020, Judge Corley issued Discovery Order No. 11, further clarifying the scope of discoverable user data at issue. Ex. 6 (Dkt. No. 588). In advance of upcoming testimony from its corporate designee, Facebook sought a ruling that "user data not shared with or accessible to third parties is not relevant" and that "because Facebook does not share inferred user data, the inferred user data Facebook maintains is not relevant." *Id.* at 1. In response, Judge Corley recognized that how Facebook "specifically uses this data is an open question," provided that "[w]hat is needed now is more detail about Facebook's collection and use of user data," and ordered Facebook to provide a corporate designee to testify "regarding the discoverable user data as articulated by Discovery Order No. 9." *Id.*

On January 15, 2021, Judge Corley issued Discovery Order No. 12, providing more guidance about the scope of the upcoming corporate testimony. Ex. 7 (Dkt. No. 602). In light of continued disagreement about the scope of the testimony about user data, Judge Corley held that "whether particular user data is not shared, not admissible, or not monetized, is not a valid reason to object to a particular deposition question." *Id.* at 1-2.[5]

### D. Facebook's Deficient Response to Judge Corley's Orders

Judge Corley's orders have not so far resulted in production of additional documents responsive to Requests for Production Nos. 9-13, and it does not appear that such productions are forthcoming. In fact, Facebook's most recent position, provided in an April 1, 2021 letter, Ex. 8, repeats the positions it took before Discovery Order No. 9 was issued. In the letter, Facebook

---

[5] Judge Corley also provided that, "[i]f the deponent is unable or unprepared to answer particular questions, that can be addressed with further, more targeted, 30(b)(6) depositions if needed." *Id.* at 2. Facebook's designees, Konstantinos Papamiltiadis and Amy Lee, were unable or unprepared to answer numerous questions about the specific issues on which Judge Corley ordered testimony: discoverable user data as defined by Discovery Order No. 9 "and how Facebook monetizes—directly or indirectly—and thus values user data." *Id.* at 1. Consistent with Discovery Order No. 12, Plaintiffs will seek additional corporate testimony on these topics.

again contended that data collected but not shared is irrelevant. *Id.* at 3. It also again conceded that Facebook's production related to the Named Plaintiffs largely reflected information collected from their on-platform activity, and that virtually all of it was available to the Named Plaintiffs themselves through the DYI tool. *Id.* at 2.

Facebook also misleadingly asserted that Plaintiffs conceded information not shared is not relevant, *id.* at 4, neglecting to note that the parties have long disputed the factual and legal question of what information is shared. Relatedly, Facebook misleadingly paraphrased Discovery Order No. 9 to limit discoverable information related to the Named Plaintiffs to information that was shared with third parties, *id.*, ignoring Judge Corley's conclusion that "[h]ow [Facebook] specifically uses this data is an open question," Ex. 6 (Dkt. No. 588) at 1. Finally, Facebook stated that Facebook had completed its production of discoverable user data before Discovery Order No. 9. *Id.* at 4-5.

Similarly, Facebook has objected to Plaintiffs' Interrogatories 16-17, which asks Facebook to identify the content and information accessed by which third parties. Ex. 2. Facebook has claimed that it was investigating what information it could produce in response to these Interrogatories, but thus far has produced none.

**E.    Facebook Has Discoverable Information That It Has Declined to Produce**

Facebook *does* have plenty of information on the Named Plaintiffs that falls into Judge Corley's second and third categories. Facebook told the Court as much last year. Ex. 10 at 8, 10. And ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ *See* Ex. 11 (FB-CA-MDL-00213424-439). ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

1
2
3

[redacted]

4    What's more, Facebook connects and integrates information generated from on-platform
5  activity with information about users that it has obtained from third parties and off-platform
6  activity. This is clear not only from internal documents, *see* Ex. 11 (FB-CA-MDL-00213424); Ex.
7  12 (FB-CA-MDL-00149613); Ex. 13 (FB-CA-MDL-00203262), but also from patent applications
8  and publicly reported information. One application published on July 6, 2017 plainly shows how
9  Facebook can associate its own profile of a user with media consumption data generated off-
10  platform. Ex. 14. Indeed, Plaintiffs have learned from investigative journalists—not Facebook—
11  that Facebook creates internal categories queried by third parties who pay Facebook for the
12  privilege of accessing users based on them. ProPublica identified some of these categories in
13  2016, which include Dissociative identity disorder, Specific social phobia, Becet's disease, Fetal
14  alcohol spectrum disorder, and Why Did I Get Married?, among more than 50,000 others.[6]

15    None of this information has been produced for the Named Plaintiffs.

16    **F.    Plaintiffs' Unsuccessful Attempts to Mediate This Issue**

17    Plaintiffs have attempted to resolve this issue repeatedly, including through mediation.
18  During the mediation sessions, and in related communications, Facebook's asserted that
19  production of all information that could be associated with the Named Plaintiffs was untenable. In
20  response, Plaintiffs repeatedly asked for information that would assist the parties in limiting the
21  burden of production on Facebook. Plaintiffs' requests included, but are not limited to:

22    • On July 9, 2021, Plaintiffs asked Facebook for a data model for the Named Plaintiffs'
23      data, a list of the APIs and SDK calls used to access the data model for the Named
         Plaintiffs, a list of third parties permitted to make the API and SDK calls against the
24      Named Plaintiffs' data. Ex. 15. Facebook did not respond.
25    • On July 18, 2021, Plaintiffs provided further clarification regarding the information

26

27  [6] Information available for download at Facebook Ad Categories (propublica.org) (Row 378:
    Dissociative identity disorder; Row 436: Specific social phobia; Row 592: Becet's disease; Row
28  669: Fetal alcohol spectrum disorder; Row 1000: Why Did I Get Married?).

requested in their July 9, 2021 communication. *Id.* Facebook did not respond.

- On September 10, 2021, Plaintiffs asked for the complete production of information Facebook has collected about the Named Plaintiffs or an explanation of what specific information it is withholding. Ex. 16. Facebook did not respond.

Finally, on October 6, 2021, the Special Master declared impasse on the issue of "Production of Named Plaintiffs' data in compliance with Dkt. No. 557."

## IV. ARGUMENT

### A. The Court Has Already Determined the Information Plaintiffs Seek Is Relevant—Whether or Not Facebook Claims That It Has Been Shared.

About a year ago, after several months of negotiations, the parties submitted briefs to Judge Corley on whether the information about users' activities on the Facebook platform was the only kind of relevant information. On this issue, Judge Corley sided with Plaintiffs, "rul[ing]" that "the discoverable user data at issue includes" not only (1) "[d]ata collected from a user's on-platform activity," but also (2) "[d]ata obtained from third parties regarding a user's off-platform activities," and (3) "[d]ata inferred from a user's on or off-platform activity." Discovery Order No. 9 at 2. Facebook has produced almost no discovery in the second or third categories encompassed by Judge Corley's order.

Facebook, pointing largely to the parties' briefs, has argued that information within the second and third categories listed by Judge Corley is relevant only if it has been shared with a third party. This argument is erroneous for several independently sufficient reasons.

*First*, this argument contradicts the plain language of Discovery Order No. 9. In listing the three categories of discoverable user information, Judge Corley did not require the information to have been shared with a third party. Facebook should not be allowed to read such a requirement into the order, particularly in light of the fact - recognized by Judge Corley – that how Facebook uses information is an "open issue."

*Second*, Facebook's argument ignores what happened in the immediate aftermath of Discovery Order No. 9. After the order was issued, Facebook told Plaintiffs that it had already produced all the information related to the Named Plaintiffs that had been shared with third parties. *See* Ex. 17 (Hr'g Tr. 17-18 (Dec. 9, 2020)). Plaintiffs suggested that a 30(b)(6) deposition

on users' information would be appropriate. *See id.* at 28-29. The Court agreed. *See id.* at 29-30; Discovery Order No. 11 at 1-2.

Then, when the parties were not able to agree on the topics for the 30(b)(6) deposition, Judge Corley issued Discovery Order No. 12 on January 15, 2021. There, she stated that one of the topics was "discoverable user data as defined by Discovery Order No. 9." Discovery Order No. 12 at 1. And she noted that "whether particular user data *is not shared*, not admissible, or not monetized, *is not a valid reason to object to a particular deposition question*." *Id.* at 1-2 (emphasis added).

Thus, when Facebook asserted that it had already turned over all the discoverable information defined by Discovery Order No. 9, Corley did not allow Facebook to limit discovery to what it claimed had been shared. Rather, she recognized that Plaintiffs were entitled to test Facebook's claims about how users' information was shared, used, and monetized. That is precisely what Plaintiffs are requesting through this motion.

**B.     Whether the Named Plaintiffs' Information Was Shared Is a Contested Question on Which Plaintiffs Are Entitled to Evidence, Not Assertion**

Plaintiffs are not required to accept Facebook's contention that other information was not shared. This is so for several reasons.

*First*, there is evidence that Facebook shared information in Judge Corley's other two categories—information inferred about a user and information about a user's off-platform activities—with third parties. An email exchange between two directors at Facebook touches on about what ████████████████████████████████████████████████████ Ex. 18. The exchange identifies that information: (1) ███████████ ████████████████████ (2) ███████████████████████████████ ████████████████████ and (3) ███████████████████ ██████████████████████████████████████████████████ *Id.* Note that the second and third kinds of information fall neatly into Judge Corley's second and third categories. While Facebook has called this email discussion "hypothetical," it seems best read—and at the very least it is *reasonable* to read it—as describing Facebook's actual practices.

Moreover, in connection with its ADI, Facebook asked app developers █████████████ ██████████████████████████████████████████████████████████████████████████ ████████████████████ Ex. 23 (FB-CA-MDL-00377690, question 18) (emphasis added). This question strongly suggests that Facebook was shared inferred data with app developers. Finally, there is location-related metadata associated with posts made by Named Plaintiffs that is accessible to third parties but that has not been produced and is not available through Facebook's DYI tool.[7]

     *Second*, internal documents demonstrate that Facebook itself does not know what information may have been shared with third parties. ████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██ Ex. 19 (FB-CA-MDL-0195247); *see also* Ex. 20 at 6:2-4 ("What we cannot produce -- because it's simply not recorded, it's not the way our platform is constructed – is what data was actually shared . . . .") (statement of Mr. Snyder). Indeed, Facebook had to launch its ADI to determine which third parties are taking what content and information about its users. *See generally* Ex. 23 (FB_CA-MDL-00377690). ███████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ███████████████████████████████ (*see id.*, Question 10), and ████████████ ██████████████████████████████████ (*id.*, Question 11). ██████████████████ ██████████████████████████████████████████████████████ ████████████████ (*id.*, Question 12), and █████████████████████████████████████████████████ ████████████████████████████ (*id.*, Question 13). As a result, Facebook is trying to identify for itself what user information was shared and through what channels. It is difficult to credit Facebook's

---

[7] Documents produced by reveal that third-party applications could obtain this metadata about users. *See* Ex. 21 (FB-CA-MDL-01938268). Such sharing with applications also extended to data and metadata about users' friends. *Id.*

assertion that it has produced all shared information when it is still in the midst of an elaborate

investigation seeking to determine what information what information it shared with third parties.

*Third*, the question of what information Facebook shared is *the* central issue in this case.

For instance, one of Plaintiffs' claims—and indeed the fourth category of misconduct recognized

by Judge Chhabria—is whether Facebook properly monitored user content and information, and

in particular whether it had sufficient safeguards in place to ensure that user content and

information would not be disclosed without consent. Foundational to that claim is determining

what information was made accessible to third parties in the first place.

*Fourth*, requiring Plaintiffs to defer to Facebook's own account of its practices contradicts

the whole point of discovery. *See, e.g.*, *Stein v. Farmers Ins. Co. of Ariz.*, No.

319CV00410DMSAHG, 2020 WL 7240318, at *3 (S.D. Cal. Dec. 8, 2020) (declining to require

policy holder to depend only on "the statements and testimony of the insurer's employees as to

the evaluations and motivations of the insurer"); *Fed. Indus., Inc. v. Cameron Techs. US, Inc.*,

No. CV 07-1098-VBF(CTX), 2008 WL 11343314, at *3 (C.D. Cal. Oct. 16, 2008) (party was

"entitled to probe the veracity of and support for [the other's] claim" of damages and causation).

If Facebook is so confident that this information was in fact not shared or made accessible, then it

should have no problem disclosing this information to defend its position.

*Fifth*, Facebook's claim about what it did and did not share or make accessible raises the

question what sharing information means. From the beginning of this case, the parties have

disputed what it means to share information. The definition of what it means to share users'

information in the context of this case—where the sharing does not include anything physical,

and where information can be provided to third parties without ever leaving Facebook's

systems—is likely to remain contested through summary judgment, if not trial, and will be

informed by the discovery Plaintiffs seek here.

### C. Facebook Has Failed to Substantiate a Disproportionate Burden in Identifying the Data It Possesses Relating to Nine People.

Once a party seeking discovery has established that the discovery is relevant, the party

resisting discovery bears the burden of showing "why the discovery is irrelevant, overly broad, or

unduly burdensome or oppressive, and thus should not be permitted." *Proofpoint, Inc. v. Vade Secure, Inc.*, No. 19CV04238MMCRMI, 2020 WL 7398791, at *3 (N.D. Cal. Dec. 17, 2020) (citing *Proofpoint, Inc. v. Vade Secure, Inc.*, No. 19-cv-04238-MMC (RMI), 2020 WL 6591210, at *4 (N.D. Cal. Nov. 11, 2020); *Colaco v. ASIC Advantage Simplified Pension Plan*, 301 F.R.D. 431, 434 (N.D. Cal. 2014); *Dominguez v. Schwarzenegger*, No. C 09-2306 CW (JL), 2010 WL 3341038, at *3 (N.D. Cal. Aug. 25, 2010)). This is a "heavy burden." *Dairy v. Harry Shelton Livestock, LLC*, No. 18-CV-06357-RMI, 2021 WL 4476778, at *1 (N.D. Cal. Sept. 30, 2021). The party resisting discovery cannot rest on an assertion of burden, but "must actually demonstrate the nature of the burden" with affidavits or other evidence. *Dish Network, LLC. v. Jadoo TV, Inc.*, No. CV 18-9768-FMO (KSX), 2020 WL 2070990, at *3 (C.D. Cal. Feb. 28, 2020).

Here, Facebook asserts that producing all the information that could be associated with the Named Plaintiffs is disproportionately burdensome, but in more than a year of conferring, it has not provided any evidence for that assertion. Moreover, if there really is a burden associated with Plaintiffs' request, it is because ███████████████████████████████████ ████████████████████████████████████████████████████████ ██████ Plaintiffs, who are merely seeking the information Facebook has that can be associated with the Named Plaintiffs, should not be worse off because of Facebook's own data architecture decisions. *See, e.g.*, *Lou v. Ma Labs., Inc.*, No. 12-CV-05409 WHA (NC), 2013 WL 12328278, at *2 (N.D. Cal. Mar. 28, 2013) ("The Court finds that the burden defendants claim excuses them from producing such documents is of their own making, and thus not compelling. . . . [D]efendants are the master of their own record keeping."), *clarified on denial of reconsideration*, No. 12-CV-05409 WHA NC, 2013 WL 1615785 (N.D. Cal. Apr. 15, 2013).

Judge Chhabria's early admonition to Facebook about burden is relevant here: "[T]here is often a lot of talk about proportionality and whatnot. This is a big case. It is a significant issue. . . . [T]his is not the type of case where we are going to be saying: Well, that might end up—that effort might end up uncovering some relevant information; but, you know, it is just too expensive

or difficult, and so we are not going to make Facebook do it." Ex. 22 at 29:3-10.

**D.      Plaintiffs Have Made Proposals to Reduce the Burden of Production on Facebook**

Nevertheless, Plaintiffs have identified a series of ways Facebook could provide preliminary information that would enable the parties to meaningfully confer regarding the possibility of agreeing on a less burdensome production. Specifically, Plaintiffs have asked for production of a data model for the Named Plaintiffs' information. Ex. 15. Plaintiffs have asked Facebook to provide a list of the APIs and SDK calls used to access the Named Plaintiffs' data model. *Id.* Plaintiffs have asked for a list of third parties permitted to make such API and SDK calls against the Named Plaintiffs' data. *Id.* Plaintiffs have asked for schemas identifying how the Named Plaintiffs' information is received, stored, and shared. *Id.* Plaintiffs have asked for snapshots in time of all information Facebook had that is capable of being associated with the Named Plaintiffs on three specific dates: December 17, 2019; May 20, 2021; and August 18, 2021. Plaintiffs have even asked Facebook to simply identify the information it can associate with the Named Plaintiffs that it is not producing, so that the parties' dispute can be defined by a common understanding of the information at issue. Ex. 16.

Although Facebook has responded to these proposals with silence, Plaintiffs believe there is still a productive path forward. To understand the burden associated with the information Plaintiffs are requesting, Facebook should be ordered to identify all data sources that may contain information relating to the Named Plaintiffs.

**V.      CONCLUSION**

For the foregoing reasons, Plaintiffs move to compel Facebook to identify all data sources that may contain information relating to the Named Plaintiffs, including but not limited to their profiles and identifiers. Specifically, Plaintiffs request that Facebook provide: (1) the name of the database or data log; (2) a description of the data source's purpose and function; (3) information about the default retention status of the data source (at a minimum, whether it is retained and for how long); (4) information about the current retention status of the data source (at a minimum, whether it is retained and for how long); and (5) where current retention status differs from

default retention status, the date the change was implemented. For each data source, Facebook should provide, at a minimum: (1) the data schema; (2) definitions and descriptions of each field; (3) tool(s) which Facebook use to search each data source; and (4) instruction sets and manuals for all tools identified as being used by Facebook to search any data source identified in this step. With the Special Master's assistance, the parties can use this information to develop an efficient discovery plan going forward.

Dated: October 18, 2021

Respectfully submitted,

KELLER ROHRBACK L.L.P.

By: _/s/ Derek W. Loeser_
        Derek W. Loeser

Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Adele A. Daniel (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com
bgould@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com


*Plaintiffs' Co-Lead Counsel*

BLEICHMAR FONTI & AULD LLP

By: _/s/ Lesley E. Weaver_
        Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew S. Melamed (SBN 260272)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmelamed@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley Weaver (Cal. Bar No.191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaint۸fs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **DECLARATION OF DEREK W. LOESER PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION**<br><br>Judge: Hon. Vince Chhabra<br>Hon. Jacqueline Scott Corley<br>Special Master Daniel Garrie<br>Courtroom: 4, 17th Floor<br><br>JAMS Ref. No.: 1200058674<br><br>ORAL ARGUMENT REQUESTED |

I, Derek W. Loeser, declare as follows:

1.      I am a partner at the law firm of Keller Rohrback L.L.P. and am Co-Lead Counsel for Plaintiffs in the above-captioned matter. I submit this declaration in support of Plaintiffs' Motion to Compel Production of Named Plaintiffs' Content and Information. I have personal knowledge of the information contained herein, and, if called as a witness, I could and would testify competently thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of Plaintiffs' Second Set of RFPs to Facebook.

1        3.      Attached hereto as Exhibit 2 is a true and correct copy of Plaintiffs' Fourth Set of

2  Interrogatories to Facebook.

3        4.      Attached hereto as Exhibit 3 is a true and correct copy of a filing in this action

4  docketed at ECF No. 537.

5        5.      Attached hereto as Exhibit 4 is a true and correct copy of a filing in this action

6  docketed at ECF No. 526.

7        6.      Attached hereto as Exhibit 5 is a true and correct copy of a filing in this action

8  docketed at ECF No. 557.

9        7.      Attached hereto as Exhibit 6 is a true and correct copy of a filing in this action

10  docketed at ECF No. 588.

11        8.      Attached hereto as Exhibit 7 is a true and correct copy of a filing in this action

12  docketed at ECF No. 602.

13        9.      Attached hereto as Exhibit 8 is a true and correct copy of correspondence dated

14  April 1, 2021 received from counsel representing Defendant.

15        10.      Attached hereto as Exhibit 9 is a true and correct copy of Facebook's Second

16  Amended Responses and Objections to Plaintiffs' Fourth Set of Interrogatories.

17        11.      Attached hereto as Exhibit 10 is a true and correct copy of a transcript of a hearing

18  held on August 14, 2020 in this action.

19        12.      Attached hereto as Exhibit 11 is a true and correct copy of a document produced in

20  discovery in this action with initial Bates number FB-CA-MDL-00213424.

21        13.      Attached hereto as Exhibit 12 is a true and correct copy of a document produced in

22  discovery in this action with initial Bates number FB-CA-MDL-00149613.

23        14.      Attached hereto as Exhibit 13 is a true and correct copy of a document produced in

24  discovery in this action with initial Bates number FB-CA-MDL-00203262.

25        15.      Attached hereto as Exhibit 14 is a true and correct copy of United States Patent

26  Application Publication No. US 2017/0195435 A1, dated July 6, 2017.

27

28

16.     Attached hereto as Exhibit 15 is a true and correct copy of an email dated July 9, 2021 from Matthew Melamed, one of the attorneys representing Plaintiffs, to attorneys representing Defendant Facebook.

17.     Attached hereto as Exhibit 16 is a true and correct copy of correspondence dated September 10, 2021 from counsel representing Plaintiffs to counsel representing Defendant Facebook.

18.     Attached hereto as Exhibit 17 is a true and correct copy of excerpts from the transcript of a hearing in this action on December 9, 2020.

19.     Attached hereto as Exhibit 18 is a true and correct copy of Exhibit C to the filing in this action docketed at ECF No. 526.

20.     Attached hereto as Exhibit 19 is a true and correct copy of a document produced in discovery with Bates number FB-CA-MDL-01952478.

21.     Attached hereto as Exhibit 20 is a true and correct copy of excerpts from the transcript of a hearing in this action on November 4, 2019.

22.     Attached hereto as Exhibit 21 is a true and correct copy of a document produced in discovery with initial Bates number FB-CA-MDL-01938268.

23.     Attached hereto as Exhibit 22 is a true and correct copy of the transcript of a hearing in this action on March 5, 2020.

24.     Attached hereto as Exhibit 23 is a true and correct copy of a document produced in discovery with initial Bates number FB-CA-MDL-00377690.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of October, 2021 at Seattle, Washington.


*/s/ Derek W. Loeser*
Derek W. Loeser

# Exhibit 1

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

*Plaint₍ⱼfs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION TO DEFENDANT FACEBOOK, INC.**<br><br>Judge: Hon. Vince Chhabria<br>Courtroom: 4, 17th Floor |

PROPOUNDING PARTY:     Plaintiffs

RESPONDING PARTY:      Facebook

SET NUMBER:            Two (2)

Plaintiffs hereby propound the following requests for production of documents to

Defendant Facebook, Inc. ("Facebook"), pursuant to Federal Rules of Civil Procedure 26 and 34,

and request that Facebook produce the documents and electronically-stored information set forth

herein within thirty (30) days of service of these requests, at Bleichmar Fonti & Auld LLP, 555

12th Street, Suite 1600, Oakland, CA 94607.

## INSTRUCTIONS

1.      You shall respond to these requests for the production of documents in a manner

consistent with the Federal Rules of Civil Procedure and the following instructions:

2.      In responding to each document request, furnish all responsive documents

available at the time of production, including documents in your possession, custody or control,

and in the possession, custody or control of your agents, employees, partners, representatives,

subsidiaries, affiliates, investigators, or by your attorneys or their agents, employees or

investigators.

3.      If any otherwise responsive document was, but is no longer, in existence or in

your possession, custody or control, identify the type of information contained in the document,

its current or last known custodian, the location/address of such document, the identity of all

persons having knowledge or who had knowledge of the document and describe in full the

circumstances surrounding its disposition from your possession or control.

4.      This is a continuing request for the production of documents and requires

supplemental responses as provided for in the Federal Rules of Civil Procedure. If, after making

your initial production, you (or any other persons acting on your behalf) obtain or become aware

of any further documents responsive to any document request, you are required to produce such additional documents to plaintiffs. Each supplemental response shall be served on plaintiffs no later than thirty days after the discovery of the further information.

5.      You shall produce the original of each document described below or, if the original is not in your custody, then a copy thereof, and in any event, all non-identical copies which differ from the original or from the other copies produced for any reason, including, without limitation, the making of notes thereon.

6.      Documents shall be produced as kept in the regular course of business together with the original folders, binders, boxes or other containers in which they were maintained.

7.      All documents or things that respond in whole or in part to any portion of these requests are to be produced in their entirety, including attachments and their enclosures.

8.      Documents attached to each other should not be separated.

9.      Documents not otherwise responsive to any particular document request shall be produced if such documents mention, discuss, refer to, or explain the documents called for by any document request, or if such documents are attached to documents called for by any document request.

10.     Documents shall be produced in such fashion as to identify the custodian of each document.

11.     Identify the source of each document produced, by identifying: (a) all of the person(s) who possessed the document; (b) the positions or titles of any such individuals; and (c) all of the divisions and departments where each document was located. If you are unable to determine the individual(s) who possessed the document, identify the department and division where the document was located when produced.

12.    If you claim any form of privilege, whether based on statute or otherwise, as a ground for not producing any document, state the following:

    a.    The date of the document;

    b.    The name, the present or last known home and business address, the telephone numbers, the title (or position), and the occupation of those individuals who prepared, produced, reproduced or who were recipients of said document;

    c.    A description of the document sufficient to identify it without revealing the information for which the privilege is claimed;

    d.    The nature of the privilege asserted;

    e.    The factual basis upon which you claim any such privilege;

    f.    The location of the document; and

    g.    The custodian of the document.

13.    To the extent you object to any document request, you must provide specific responses as to what portion of the request you object to and state expressly why you will not respond to such request in sufficient detail to permit the Court to determine the validity of the objection. Responsive documents to which your objection does not apply should be produced.

14.    If you claim that all or any part of any document request, the Definitions, or Instructions is vague or ambiguous, please identify the specific language you consider vague or ambiguous and state the interpretation of the language in question you used to frame your response.

15.    Each document requested herein is to be produced in its entirety and without deletion or excision, regardless of whether you consider the entire document to be relevant or responsive to any document request. If you have removed, excised or deleted any portion of a

document, stamp the word "REDACTED" on each page of the document that you have redacted. Redactions should be included on the privilege log described in Instruction No. 13, above.

16.　　One copy of each document should be produced. A document that varies in any way from the original or from any other copy, including drafts or a document with handwritten notations or deletions constitutes a separate document and must be produced, whether or not the original is in your possession, custody or control. Color (*i.e.*, not black and white) originals should be produced in color. If any identical copy cannot be produced for any reason (*e.g.*, faint writing, erasures, etc.), produce the original.

17.　　Indicate the origin of each document and number each document with consecutive Bates numbers.

## **DEFINITIONS**

Unless otherwise stated, the terms set forth below are defined as follows and shall be used in construing the meaning of these requests for the production of documents.

1.　　The use of the singular shall be deemed to include the plural, and the use of one gender shall include all others, as appropriate, in the context.

2.　　The present tense of a verb includes its past tense, and vice versa.

3.　　"And" and "or" are to be construed conjunctively and disjunctively, as necessary, to bring within the scope of this request for production all responses that might otherwise be construed to be outside its scope.

4.　　"Any" and "all" mean each and every.

5.　　"App" means an interactive software application developed to utilize the core technologies of the Facebook social networking platform.

6.　　"App Developer Investigation" or "ADI" means (as described in paragraph seven of the Chen Declaration) Facebook's investigation to determine "whether there has been misuse

of data in violation of Facebook's policies and associated legal liabilities, in connection with the first version of the [Facebook] Platform."

7.     "Apps Others Use" means the setting used to prevent the disclosure of personal information to third party App Developers through Facebook's API, as described in paragraphs 366 to 368 of the FAC.

8.     "App Settings" means settings that a User can alter or accept to limit Third Parties from accessing or obtaining Users' Content and Information, including Apps Others Use, Granular Data Permissions, Platform Opt Out, and the like.

9.     "Chen Declaration" means the Declaration of Stacy Chen in Support of Respondent's Opposition to the Attorney General's Petition, *Attorney General Maura Healy v. Facebook, Inc.*, No. 1984CV02597-BFS-1 (Mass. Super Ct., Suffolk Cty.).

10.    "Communication" means the transmittal (in the form of facts, ideas, thoughts, opinions, data, inquiries or otherwise) and includes, but is not limited to, correspondence, memoranda, reports, presentations, face-to-face conversations, telephone conversations, text messages, instant messages, messages sent on Facebook Messenger, voice messages, negotiations, agreements, inquiries, understandings, meetings, letters, notes, telegrams, mail, electronic mail or email, and postings of any type.

11.    "Computer System" or "Computer Systems" include(s), but is not limited to, any server (whether physical or virtual), desktop computer, tablet computer, point of sale system, smart phone, cellular telephone, networking equipment, internet site, intranet site, and the software programs, applications, scripts, operating systems, or databases used to control, access, store, add, delete, or modify any information stored on any of the foregoing non-exclusive list.

12.    "Content and Information" refers to the definition in footnote 2 of the FAC, referring to "content" and "information" as Facebook's Statements of Rights and

Responsibilities have defined those terms. In brief, Facebook has generally used "information" to mean facts and other information about Users, including the actions they take, and "content" to mean anything Users post on Facebook that would not be included in the definition of "information." Content and Information also includes both personally identifiable content and information and anonymized content and information that is capable of being de-anonymized. *See* FAC ¶¶ 223-224. Content and Information includes data that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular User, including:

a. Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

b. Characteristics of protected classifications under California or federal law.

c. Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

d. Biometric information.

e. Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an Internet Web site, application, or advertisement.

f. Geolocation data.

g. Audio, electronic, visual, thermal, olfactory, or similar information.

h. Professional or employment-related information.

  i. Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. section 1232g, 34 C.F.R. Part 99).

  j. Inferences drawn from any of the information identified in this paragraph to create a profile, dossier, or similar collection of information about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

  13. "Document" or "Documents" is defined to include any Document, ESI, or Electronic Media stored in any medium, and is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a)(1)(A), including, but not limited to, electronic or computerized data compilations, Communications, electronic chats, instant messaging, documents created through Workplace by Facebook, encrypted or self-destructing messages, messages sent via Facebook messenger, email Communications, other electronically stored information from Personal computers, sound recordings, photographs, and hard copy Documents maintained in your Personal files.

  14. "Electronic Media" means any magnetic, optical, or other storage media device used to record ESI including but not limited to computer memory, hard disks, floppy disks, flash memory devices, CDs, DVDs, Blu-ray discs, cloud storage (*e.g.*, DropBox, Box, OneDrive, or SharePoint), tablet computers (*e.g.*, iPad, Kindle, Nook, or Samsung Galaxy), cellular or smart phones (*e.g.*, BlackBerry, iPhone, or Samsung Galaxy), personal digital assistants, magnetic tapes of all types, or any other means for digital storage and/or transmittal.

  15. "Electronically Stored Information" or "ESI" means information that is stored in Electronic Media, regardless of the media or whether it is in the original format in which it was created, and that is retrievable in perceivable form and includes, but is not limited to, metadata,

PLAINTIFFS' SECOND SET OF RFPS TO     7     MDL No. 2843
FACEBOOK, INC.               CASE No. 18-MD-02843-VC

3659

system data, deleted data, fragmented data, data pertaining to or maintained in Apps, database contents, and computer code.

16. "FAC" refers to the First Amended Consolidated Complaint filed February 22, 2019, ECF No. 257.

17. "Facebook," "Defendant," "You," or "Your" shall mean Facebook, Inc. and any of its executives, directors, officers, employees, partners, members, representatives, agents (including attorneys, accountants, consultants, investment advisors or bankers), and any other Person purporting to act on its behalf. In the case of business entities, these defined terms include parents, subsidiaries, affiliates, predecessor entities, successor entities, these defined terms include parents, subsidiaries, affiliates, predecessor entities, successor entities, divisions, departments, groups, acquired entities and/or related entities or any other entity acting or purporting to act on its behalf.

18. "FTC Consent Order" shall refer to the July 27, 2012 Federal Trade Commission Consent Order in *In the Matter of Facebook, Inc.*, No. C-4365.

19. "Granular Data Permissions" means the setting through which the User accessing an App may limit the categories of Content and Information an App Developer may collect.

20. "Identify," with respect to Documents, means to give, to the extent known, the (a) type of Document; (b) general subject matter; (c) date of the Document; (d) author(s); (e) addressee(s); and (f) recipient(s).

21. "Including" means "including but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify the request, definition or instruction but not to limit the request.

22.     "Internal Policy" or "Internal Policies" mean any formal or informal policy, procedure, rule, guideline, collaborative document, directive, instruction, or practice, whether written or unwritten, that You expect Your employees to follow in performing their jobs.

23.     "Misuse of Data," when used as a capitalized phrase, means the use by an App of a User's Content or Information that was broader or different than the use of that content or information only in connection with the person that gave the permission to the App to access such User's Content or Information.

24.     "Named Plaintiffs" means Steven Akins, Jason Ariciu, Samuel Armstrong, Anthony Bell, Bridgett Burk, Brendan Carr, John Doe, Terry Fischer, Shelly Forman, Paige Grays, Mary Beth Grisi, Tabielle Holsinger, Taunna Lee Johnson, Olivia Johnston, Tyler King, Ashley Kmieciak, William Lloyd, Gretchen Maxwell, Scott McDonnell, Ian Miller, Jordan O'Hara, Bridget Peters, Kimberly Robertson, Scott Schinder, Cheryl Senko, Dustin Short, Tonya Smith, Mitchell Staggs, Charnae Tutt, Barbara Vance-Guerbe, and Juliana Watson.

25.     "Person" or "Persons" means any natural Person or any business, legal or governmental entity or association.

26.     "Platform" refers to the services, tools, and products provided by Facebook to third parties to create their own applications and services that access data in Facebook.

27.     "Platform Opt Out" means the setting a User may access to choose that his or her Content and information is not accessed or obtained by any Apps or websites on Facebook's Platform.

28.     "Privacy Controls" means the audience selectors that control what information in a User's profile can be viewed by other Users, and includes Profile Privacy Settings, Profile Privacy Controls, Publisher Privacy Controls, and the like.

29.     "Relating to," "relate to," "referring to," "refer to," "reflecting," "reflect," "concerning," or "concern" means all Documents which comprise, explicitly or implicitly refer to, were reviewed in conjunction with, or were created, generated or maintained as a result of the subject matter of the request, including, but not limited to, all Documents which reflect, record, memorialize, embody, discuss, evaluate, consider, review or report on the subject matter of the request.

30.     "Third Parties" include the following:

    a.  Apps, App Developers, Whitelisted Apps, and Business Partners, as those terms are used in the FAC;

    b.  Any person that develops an application, software experience, game, or website that accesses Content and Information from Facebook's API or other Facebook software; and

    c.  Any person with which Facebook has or had an integration partnership.

31.     "User(s)" means individuals who maintain a Facebook account and can generally access the typical Facebook experience through website or mobile applications.

32.     Capitalized terms and acronyms not specifically defined herein have the same definition as in the FAC.

## RELEVANT TIME PERIOD

The relevant time period for each Document Request is January 1, 2007 through the present (the "Relevant Time Period"), unless otherwise specifically indicated. Each Document Request shall be interpreted to include all documents and information that relate to the Relevant Time Period or otherwise specified period, even if such documents or information were prepared or published outside of the Relevant Time Period or otherwise specified period. If a document prepared before or after this period is necessary for a correct or complete understanding of any

document covered by a request, you must produce the earlier or subsequent document as well. If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the production request.

## DOCUMENT REQUESTS

### REQUEST FOR PRODUCTION NO. 6

All Documents provided to or received from any governmental entity or regulator in the United States and United Kingdom in response to any formal or informal inquiry or investigation relating to whether Users' Content and Information was accessed or obtained by any Third Parties without proper consent or authorization, including but not limited to all inquiries or investigations arising out of the Cambridge Analytica Scandal, the FTC Consent Order, and any inquiry or investigation related to the settlement agreement with the FTC announced on July 24, 2019.

### REQUEST FOR PRODUCTION NO. 7

All organizational charts, personnel directories, or other documents sufficient to show Your organizational structure, including:

(a)     the identity of subsidiaries, affiliates, and joint ventures, and your ownership interest, control of, or participation in any subsidiary or affiliate or joint venture related to agreements, engineering, access, use, transmission, receipt, collection or analysis of Facebook Users' Content and Information by Third Parties;

(b)     the organization of any division, department, unit or subdivision of your company that has responsibilities relating to agreements, engineering, access, use, transmission, receipt, collection or analysis of Users' Content and Information by Third Parties; and

(c)     the names, titles, job descriptions, and employment periods for your present and former employees who has or had responsibilities relating to agreements, engineering, access,

use, transmission, receipt, collection or analysis of Users' Content and Information by Third

Parties; and

(d)     the names, titles, job descriptions, and employment periods of Your present or

former directors, officers, or senior managers, as well as any secretaries or administrative

assistants assigned to these directors, officers, or senior managers.

## REQUEST FOR PRODUCTION NO. 8

All versions (including each updated or amended version thereof) of Facebook's

"Platform Policies," which have been called the "Developer Principles and Policies," the

"Platform Guidelines," or the "Developer Terms of Service" (collectively, the "Platform

Policies").

## REQUEST FOR PRODUCTION NO. 9

All Documents relating to each of the Named Plaintiffs, including but not limited to all

Content and Information collected about each of them or gained from business relationships or

any other source.

## REQUEST FOR PRODUCTION NO. 10

For each of the Named Plaintiffs, Documents sufficient to show the categories of Content

and Information Facebook collects, tracks, and maintains about them.

## REQUEST FOR PRODUCTION NO. 11

Documents sufficient to identify all Third Parties to which Facebook granted access to

Named Plaintiffs' Content and Information, what categories of Content and Information

Facebook granted access to, how Facebook allowed these Third Parties to access the Named

Plaintiffs' Content and Information, and the business purpose of all such access.

**REQUEST FOR PRODUCTION NO. 12**

Documents relating to any partnerships or agreements Facebook entered into with Third Parties for access to Named Plaintiffs' Content and Information.

**REQUEST FOR PRODUCTION NO. 13**

For all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information, Documents sufficient to show any use by Third Parties of such Content and Information not in connection with the User that granted the permission to the Third Party or inconsistent with Facebook's agreement with that Third Party.

**REQUEST FOR PRODUCTION NO. 14**

Documents sufficient to show the monetary or retail value of each named Plaintiff's Content and Information to Facebook, updated to reflect whenever Facebook's terms of service changed, including the calculation of revenue earned by Facebook for each Named Plaintiff based upon bartering or selling access to such Named Plaintiff's Content and Information.

**REQUEST FOR PRODUCTION NO. 15**

Documents sufficient to show the money or any other thing of value, including but not limited to money or any other thing of value paid in exchange for targeted advertising, that Facebook received in exchange for each Named Plaintiff's Content and Information, which entities paid Facebook, and when such payments were made.

**REQUEST FOR PRODUCTION NO. 16**

Documents sufficient to show the monetary or retail value of Users' Content and Information to Facebook, including all monthly, quarterly, and annual financial reporting relating to same, and including but not limited to the calculation of average revenue per user, any changes to such monetary or retail value relating to changes to Facebook's terms of service, and any financial reporting of Content and Information as an asset.

**REQUEST FOR PRODUCTION NO. 17**

All Documents relating to Facebook's assessment of the monetary or retail value of

Users' Content and Information to Users (as distinct from value to Facebook), including

analyses for providing compensation to Users for their Content and Information, including but

not limited to Users compensated in connection with the Onavo or Research app.

**REQUEST FOR PRODUCTION NO. 18**

All Documents that have been transmitted to Users by Facebook relating to whether

Users' Content and Information was accessed or obtained by Third Parties.

**REQUEST FOR PRODUCTION NO. 19**

All Documents supporting the escalation of those Apps escalated to Phase Two of ADI

for Enhanced Examination and/or Phase Three of ADI for Enforcement and designated as

follows in the Chen Declaration ¶ 34:

> (d) each [A]pp to which a request for information was sent; (e) each [A]pp for
>
> which an interview was sought with the developer; (f) each [A]pp for which a
>
> remote or onsite audit was requested to be conducted; (g) each [A]pp for which
>
> actual misuse was found and identification of that misuse; (h) each [A]pp that was
>
> banned for actual misuse; and (i) each [A]pp that was banned for failing to
>
> cooperate with Facebook's investigation.

Facebook has described identification of these Apps as non-privileged and has

already produced it to the Massachusetts Attorney General's Office. *See* Chen

Declaration ¶ 35.

**REQUEST FOR PRODUCTION NO. 20**

The list of Apps that Facebook provided to the Massachusetts Attorney General's Office

and that the Chen Declaration ¶ 35 describes as "the subject of external actions or

communications with third parties, including the growing list of Apps Facebook has suspended as part of the [ADI], whether because of policy violations or because of their refusal to cooperate with Facebook's investigation."

**REQUEST FOR PRODUCTION NO. 21**

Communications between Facebook and Third Parties relating to the ADI, including but not limited to Communications that Facebook provided to the Massachusetts Attorney General's Office. *See* Chen Declaration ¶ 37.

**REQUEST FOR PRODUCTION NO. 22**

All "Privacy Risk Assessment[s]," and notes or agenda relating to Facebook's "focused subject-matter-specific meetings," "focused subject-matter-specific discussions," "weekly intra- and inter-team meetings," and "Privacy Summit[s]," as detailed in "Facebook's Privacy Program Overview" included in any PricewaterhouseCoopers LLP ("PwC") assessment report prepared pursuant to the FTC Consent Order.

**REQUEST FOR PRODUCTION NO. 23**

Unredacted versions and Documents in support of the assessment reports, including the Initial Assessment Report and Biennial Reports, prepared by PwC pursuant to the FTC Consent Order.

**REQUEST FOR PRODUCTION NO. 24**

Documents sufficient to identify all Third Parties to which Facebook granted access to Users' Content and Information not generally available through Platform pursuant to partnerships or agreements between Facebook and those Third Parties.

**REQUEST FOR PRODUCTION NO. 25**

All Documents relating to agreements or partnerships described in Request No. 24.

**REQUEST FOR PRODUCTION NO. 26**

For each of the Third Parties that Facebook entered into partnerships or agreements with as described in Request No. 24, Documents sufficient to identify:

- The fields, kinds, or categories of Content and Information that were accessed or obtained by such Third Parties;

- How each such Third Party accessed or obtained the Content and Information of Users;

- How each such Third Party used the Content and Information accessed or obtained;

- Where the Content and Information obtained by such Third Parties currently resides and who has access to it.

**REQUEST FOR PRODUCTION NO. 27**

Documents sufficient to show all forms and formats in which Facebook transmitted to Third Parties information concerning Users' liking, viewing, retrieving, or otherwise requesting or obtaining videos on, using, or by means of the Facebook Platform.

**REQUEST FOR PRODUCTION NO. 28**

All Documents relating to Internal Policies by Facebook on the monitoring of Third Parties' compliance with Facebook's Platform Policy, Data Policy, or SRR.

**REQUEST FOR PRODUCTION NO. 29**

All Documents relating to Internal Policies by Facebook on the enforcement of Facebook's Platform Policy, Data Policy, or SRR against Third Parties.

**REQUEST FOR PRODUCTION NO. 30**

All Documents relating to measures and controls, including proposed measures and controls, put in place by Facebook to prevent Third Parties from violating Facebook's Platform Policy, Data Policy, or SRR.

**REQUEST FOR PRODUCTION NO. 31**

All Documents relating to Facebook's audits, inquiries, and investigations of Third

Parties investigating compliance with any provisions of Facebook's Platform Policy, Data

Policy, or SRR regarding the access, use, transmission, receipt, collection and analysis of Users'

Content and Information on and off the Platform.

**REQUEST FOR PRODUCTION NO. 32**

All Documents Concerning Misuse of Data, including investigations, examinations,

inquiries, or audits—or Communications regarding such investigations, examinations, inquiries,

or audits—regarding Misuse of Data prior to the deprecation of Graph API v.1.0.

**REQUEST FOR PRODUCTION NO. 33**

Documents sufficient to show the notice that Facebook provided to Users regarding

modifications to Facebook's SRR or Data Policy, and all Communications related thereto.

**REQUEST FOR PRODUCTION NO. 34**

All Documents relating to the conditioning of Third Parties' access to Users' Content and

Information on the purchase of Mobile App Install Ads, payment of Content and Information in-

kind (referred internally as Reciprocity or Data Reciprocity), or other payment.

**REQUEST FOR PRODUCTION NO. 35**

Documents relating to the manner in which a Facebook User could control how his or her

data was shared through their Privacy Controls and App Settings throughout the Relevant Time

Period, including but not limited to screenshots of the Facebook website and the Facebook

mobile application.

**REQUEST FOR PRODUCTION NO. 36**

All Documents concerning User testing, evaluation and analysis of Facebook's Privacy

Controls and App Settings during the Relevant Time Period, including but not limited to design

documents, correspondence, analyses, and reports.

Dated: November 25, 2019

Respectfully submitted,

KELLER ROHRBACK L.L.P.

BLEICHMAR FONTI & AULD LLP

By:    /s/ Derek W. Loeser
       Derek W. Loeser

By:    /s/ Lesley E. Weaver
       Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)
Lynn Lincoln Sarko (admitted *pro hac vice*)
Gretchen Freeman Cappio (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
bgould@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaint₁ffs' Co-Lead Counsel*

# Exhibit 2

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' FOURTH SET OF INTERROGATORIES TO DEFENDANT FACEBOOK, INC.** |

PROPOUNDING PARTY:    Plaintiffs

RESPONDING PARTY:    Defendant Facebook, Inc.

SET NUMBER:    Four (4)

      Plaintiffs hereby propound the following interrogatories to Defendant Facebook, Inc. ("Facebook"), pursuant to Federal Rules of Civil Procedure 26 and 33, and request that Facebook respond to the interrogatories below within thirty (30) days of service of these requests at Keller Rohrback L.L.P., 1201 Third Avenue, Suite 3200, Seattle, WA 98101.

## INSTRUCTIONS

      1.    You shall respond to these interrogatories in a manner consistent with the Federal Rules of Civil Procedure and the following instructions:

      2.    In responding to these Interrogatories, you must answer the Interrogatories in writing and under oath pursuant to Rule 33(b)(5).

3.     If you object to an Interrogatory on the grounds that it calls for disclosure of information which you claim is privileged, then answer such Interrogatory as follows: (a) furnish all information and facts called for by such Interrogatory for which you do not assert a claim of privilege; and (b) for each communication, recommendation, fact, or advice which you claim is privileged, state the basis for your claim of privilege and all the facts that substantiate that basis, including each of the participants in the allegedly privileged communication.

4.     If you object to any portion of an Interrogatory, provide all information responsive to any portion of the Interrogatory to which you do not object.

5.     Unless otherwise stated, there are no time limits applicable to any interrogatory. When a time limit is specified in a discovery request, this time limit does not alter your obligations under the Federal Rules of Civil Procedure to supplement your responses.

6.     Seasonable and timely supplementation is required. Accordingly, if any additional information relating in any way to these discovery requests are acquired or discovered subsequent to the date of your response, this information shall be furnished to Plaintiffs' counsel promptly after such information is discovered.

7.     In answering these Interrogatories, furnish all knowledge and information available to you or subject to your reasonable inquiry, access or control, however obtained including hearsay. This includes, but is not limited to, information in the actual or constructive possession of your attorneys and anyone else acting on your behalf.

8.     Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition except where such words have a specific custom and usage definition in your trade or industry, in which case they shall be interpreted in accordance with such usual custom and usage definition of which you are aware. In construing the interrogatories and requests herein: (i) the singular shall include the plural and the plural shall include the singular; (ii) a masculine, feminine, or neuter pronoun shall not exclude the other genders; (iii) the terms "any" and "all" shall be understood to mean "any and all"; and (iv) the words "and" and "or" shall be read in the conjunctive or disjunctive or

both, as the case may be, all to the end that the interpretation applied results in the more expansive interpretation.

## DEFINITIONS

Unless otherwise stated, the terms set forth below are defined as follows and shall be used in construing the meaning of these interrogatories.

1.      The use of the singular shall be deemed to include the plural, and the use of one gender shall include all others, as appropriate, in the context.

2.      The present tense of a verb includes its past tense and vice versa.

3.      "2012 Consent Decree" means the Decision and Order entered by the Federal Trade Commission (FTC) in 2012 in *In the Matter of Facebook, Inc.*, No. C-4365, pursuant to an agreement between the FTC and Facebook.

4.       "And" and "or" are to be construed both conjunctively and disjunctively, as necessary, to bring within the scope of this request for production all responses that might otherwise be construed to be outside its scope.

5.      The words "all" and "any" means each and every.

6.      The phrase "describe in detail" or "detailed description" includes a request for a complete description and explanation of the facts, circumstances, analysis, opinion, and other information relating to the subject matter of a specific interrogatory.

7.      "Facebook," "Defendant," "you," and "your" shall mean Facebook, Inc. and any of its executives, directors, officers, employees, partners, members, representatives, agents (including attorneys, accountants, consultants, investment advisors or bankers), and any other Person purporting to act on its behalf. In the case of business entities, these defined terms include parents, subsidiaries, affiliates, predecessor entities, successor entities, divisions, departments, groups, acquired entities and/or related entities or any other entity acting or purporting to act on its behalf.

8. "Action" means this case captioned *In re: Facebook, Inc. Consumer Privacy User Profile Litigation*, Case No. 18-md-02843-VC and each of the constituent Actions transferred to and/or consolidated therein.

9. "API" refers to an application programming interface.

10. "App" means an interactive software application developed to utilize the core technologies of the Facebook social networking platform.

11. "Business Partners" refers to the third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems, including, but not limited to, the third parties listed in paragraph 484 of Plaintiffs' First Amended Consolidated Complaint.

12. "Content and Information" refers to the definition in footnote 2 of the First Amended Consolidated Complaint, referring to "content" and "information" as Facebook's Statements of Rights and Responsibilities have defined those terms. In brief, Facebook has generally used "information" to mean facts and other information about Facebook Users, including the actions they take, and "content" to mean anything Facebook Users post on Facebook that would not be included in the definition of "information." Content and Information also includes both personally identifiable content and information and anonymized content and information that is capable of being de-anonymized. *See* First Am. Consol. Compl. ("FAC") ¶¶ 223-224. Content and Information includes data that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular Facebook User, including:

A. Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

B. Characteristics of protected classifications under California or federal law.

3676

C.      Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

D.      Biometric information.

E.      Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an Internet Web site, application, or advertisement.

F.      Geolocation data.

G.      Audio, electronic, visual, thermal, olfactory, or similar information.

H.      Professional or employment-related information.

I.      Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. § 1232g, 34 C.F.R. pt. 99).

J.      Inferences drawn from any of the information identified in this paragraph to create a profile, dossier, or similar collection of information about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

13.     "Data Analytics Infrastructure" refers to the services, applications, utilities and systems that are used for either preparing data for modeling, estimating models, validating models, business intelligence, scoring data, or related activities, including but not limited to databases and data warehouses, statistical and data mining systems, and scoring engines.

14.     "Database" refers to any organized collection of information that is stored electronically.

15.     "Facebook Archive" means the archived activity of the Named Plaintiffs You produced in this action.

16.     "Facebook User" means a person who maintains or has maintained a Facebook account.

17. "Friends of Installing Users" refers to Facebook Users:

    A.    who did not install a particular App, but whose Content and Information became accessible to that App because they were Facebook friends with an Installing User; or

    B.    whose Content and Information became accessible to a Business Partner because they were Facebook friends with an Installing User.

18. "Including" means "including but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify a request, definition, or instruction but not to limit it.

19. "Installing User" refers to a Facebook User who installed a particular App via his or her Facebook account or who used the services or products of a Business Partner in connection with his or her Facebook account.

20. "Not Generally Available," when used as an adjective to modify Content and Information, refers to a Facebook User's Content and Information to which that Facebook User has restricted access such that the only Facebook Users who may access that Content and Information are the Facebook User's Friends or another limited audience.

21. "Platform" refers to the services, tools, and products provided by Facebook to third parties to create their own applications and services that access data in Facebook.

22. "Third Parties" include the following:

    A.    Apps, App Developers, Whitelisted Apps, and Business Partners, as those terms are used in the FAC;

    B.    Any person that develops an application, software experience, game, or website that accesses Content and Information from Facebook's API or other Facebook software; and

    C.    Any person with which Facebook has or had an integration partnership.

23. Capitalized terms and acronyms not specifically defined herein have the same definition as in the First Amended Consolidated Complaint.

# INTERROGATORIES

**INTERROGATORY NO. 8:**

Identify by name and time period in operation each Facebook Database and Data Analytics Infrastructure that contains Facebook Users' Content and Information.

**INTERROGATORY NO. 9:**

For each Database and Data Analytics Infrastructure identified in your answer to Interrogatory No. 8, identify the corresponding query interfaces (e.g., including graphical interfaces, command-oriented interfaces, and APIs) that have called or accessed data from such Database to respond to either internal or external queries.

**INTERROGATORY NO. 10:**

For each query interface identified in your answer to Interrogatory No. 9, identify whether such query interface is or has been used to respond to internal queries, external queries, or both.

**INTERROGATORY NO. 11:**

For each query interface identified in your answer to Interrogatory No. 10 as being or having been used to respond to external queries, identify the complete list of fields or query parameters available for queries by a Third Party via such query interfaces. For each of the fields or query parameters, describe in detail the acceptable ranges and formats of their values and identify which parameters are optional for queries and which are required.

**INTERROGATORY NO. 12:**

For each Database and Data Analytics Infrastructure identified in your answer to Interrogatory No. 8, describe in detail the system architectures of, and types of data contained by, such system.

## INTERROGATORY NO. 13:

For every API by means of which Third Parties could access the Not Generally Available Content and Information of Friends of Installing Users, list the name of the API, a description of its function, the data fields of Not Generally Available Content and Information of Friends of Installing Users to which it allowed access, the number of calls it received each month, the volume of data it returned each month, the number of Friends of Installing Users whose Content and Information was accessed, the name of every Third Party that Facebook allowed to use that API, and the period during which each Third Party was allowed to use the API.

## INTERROGATORY NO. 14:

Identify every Business Partner that had the ability to access the Not Generally Available Content and Information of Facebook Users even if such Facebook Users had not downloaded an App from that Business Partner and time period during which each such Business Partner had that ability.

## INTERROGATORY NO. 15:

For each Business Partner identified in your answer to Interrogatory No. 14, provide:

a) The name of each API or other data transfer mechanism by means of which the Business Partner accessed the Not Generally Available Content and Information of Facebook Users when such Facebook Users had not downloaded an App from that Business Partner;

b) a detailed description of the function of each such API or other data transfer mechanism;

c) the elements of Not Generally Available Content and Information that each such API or other data transfer mechanism allowed access to;

d) the number of calls the Business Partner made to each such API or other data transfer mechanism each month;

e) the volume of data transferred from each such API or other data transfer mechanism to

3680

each Business Partner each month;

    f)   the number of Friends of Installing Users whose Content and Information was so accessed by each Business Partner; and

    g)   any filters or access restrictions that limited the set of Facebook Users about whom each Business Partner could access Not Generally Available Content and Information.

**INTERROGATORY NO. 16:**

For each Named Plaintiff, identify all Third Parties who had the ability to access such Named Plaintiff's Not Generally Available Content and Information by virtue of the fact that the Named Plaintiff was a Friend of an Installing User, the date and time of each request for such access, and the specific Content and Information that was accessed.

**INTERROGATORY NO. 17:**

For each Named Plaintiff, identify each Facebook Business Partner that had the ability to access the Named Plaintiff's Not Generally Available Content and Information, even if the Named Plaintiff had not downloaded an App from that Business Partner, the date and time of each request for such access, and the specific Content and Information that was accessed.

**INTERROGATORY NO. 18:**

Identify by Bates number every document You provided or made available to PwC related to any investigation, audit or assessment related to the subject matter of the Complaint.

**INTERROGATORY NO. 19:**

Identify all members of Facebook's senior management team involved in the review and oversight of Facebook's Privacy Program instituted pursuant to the 2012 Consent Decree.

3681

**INTERROGATORY NO. 20:**

Identify all members of the Board of Directors involved in the review and oversight of Facebook's Privacy Program instituted pursuant to the 2012 Consent Decree.

**INTERROGATORY NO. 21:**

For each such individual identified above in Interrogatories 19 and 20, describe in detail their duties and responsibilities relating thereto.

**INTERROGATORY NO. 22:**

Describe in detail the facts and circumstances relied upon by Facebook in assessing and agreeing to pay a $5 billion fine to the Federal Trade Commission.

**INTERROGATORY NO. 23:**

Identify every person involved in the decision to pay the $5 billion fine to the Federal Trade Commission.

**INTERROGATORY NO. 24:**

Identify every noncustodial source of ESI on which is stored information (in any form) sufficient to determine (1) whether Third Parties accessed the Not Generally Available Content and Information of Facebook Users by virtue of their being Friends of Installing Users; (2) which Third Parties accessed such Content and Information; and (3) which Facebook Users, by virtue of their being Friends of Installing Users, had their Not Generally Available Content and Information accessed by Third Parties.

**INTERROGATORY NO. 25:**

Identify every noncustodial source of ESI on which is stored information (in any form) sufficient to determine (1) whether any Business Partners accessed the Not Generally Available

Content and Information of Facebook Users even if such Users did had not downloaded an App from those Business Partners; (2) which Business Partners accessed such Content and Information; and/or (3) which Facebook Users had their Not Generally Available Content and Information accessed in that manner.

## INTERROGATORY NO. 26:

Identify by name and time period all Third Parties that obtained Facebook Users' Content and Information through friend permissions prior to 2009.

## INTERROGATORY NO. 27:

Identify by name and time period all Third Parties to whom Facebook granted whitelisted access, the time period of the grant of whitelisted access, and the Third Parties for which such access was granted.

## INTERROGATORY NO. 28:

Describe the criteria Facebook used to determine which Third Parties would be granted whitelisted access.

## INTERROGATORY NO. 29:

Identify by name and time period all Third Parties that were Business Partners of Facebook and were granted access to Facebook Users' Content and Information.

## INTERROGATORY NO. 30:

Identify all categories of Content and Information available to a Facebook User through the "Access Your Information" or "Download Your Information" tools, such as users' public and private posts, Facebook messenger messages, and any attached content.

**INTERROGATORY NO. 31:**

Identify all categories of Content and Information Facebook collects, tracks, and maintains about Facebook Users that are excluded from the Access Your Information or Download Your Information tools, such as advertisements served to a Facebook User, likes, audience selector information, reports of offensive content, or support communications.

**INTERROGATORY NO. 32:**

For each Named Plaintiff, identify each category of Content and Information Facebook collects, tracks, and maintains about them and for each category, indicate (1) whether each category has been produced in this action and the Bates Range associated with each category of produced Content and Information; (2) whether each category of Content and Information is available to Facebook Users through the "Access Your Information" or "Download Your Information" tools; and (3) for each category of Content and Information that has not been produced in this action, its location, and the reason it has not been produced.

**INTERROGATORY NO. 33:**

For all documents produced in this action relating to the Named Plaintiffs' Content and Information, describe any associated data that reflects whether the Content and Information was publicly or privately shared.

**INTERROGATORY NO. 34:**

Identify by name, time period and type of data accessed all Third Parties Facebook has removed or banned from the Platform for violating Facebook Users' privacy or for failure to comply with Facebook's privacy policies.

Dated: July 16, 2020

Respectfully submitted,

KELLER ROHRBACK L.L.P.

By:     /s/ Derek W. Loeser
        Derek W. Loeser

Derek W. Loeser (admitted *pro hac vice*)
Lynn Lincoln Sarko (admitted *pro hac vice*)
Gretchen Freeman Cappio (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Adele A. Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

BLEICHMAR FONTI & AULD LLP

By:     /s/ Lesley E. Weaver
        Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

3685

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **CERTIFICATE OF SERVICE** |

I hereby certify that I have served a true and correct copy of:

- **PLAINTIFFS' FOURTH SET OF INTERROGATORIES TO DEFENDANT FACEBOOK, INC.**

via Email on this 16th day of July, 2020 to the person(s) set forth below:

Joshua Seth Lipshutz
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Ave NW
Washington, D.C.
jlipshutz@gibsondunn.com

Kristin A. Linsley, Esq.
Brian Michael Lutz
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street
Suite 3000
San Francisco, CA 94105
KLinsley@gibsondunn.com
BLutz@gibsondunn.com

Orin Snyder
Laura Mumm
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166
osnyder@gibsondunn.com
lmumm@gibsondunn.com

Martie Kutscher-Clark
**GIBSON, DUNN & CRUTCHER LLP**
1881 Page Mill Road
Palo Alto, CA
MKutscherClark@gibsondunn.com

Russell Falconer
**GIBSON, DUNN & CRUTCHER LLP**
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
rfalconer@gibsondunn.com

Deborah Stein
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
dstein@gibsondunn.com

Colin B. Davis
**GIBSON, DUNN & CRUTCHER LLP**
3161 Michelson Drive
Irvine, CA 92612-4412
cdavis@gibsondunn.com

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed at Seattle, Washington, on July 16, 2020.

_/s/ Sarah Skaggs_
Sarah Skaggs

# Exhibit 3

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
   osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Kristin A. Linsley (SBN 154148)
   klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
   mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
   dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
   jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br> This document relates to: <br><br> ALL ACTIONS | CASE NO. 3:18-MD-02843-VC <br><br> **DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20** <br><br> Judge:  Hons. Vince Chhabria and Jacqueline Scott Corley <br> Courtroom 4, 17th Floor |

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

3689

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

    I.      The stay imposed by Pretrial Order 20 includes a discovery stay. ............................... 2

    II.     This case is about information users share with their friends on Facebook. ................ 3

         A.     The four live theories all concern data users shared with their Facebook
              friends. ......................................................................................................... 3

         B.     The threshold "global issues" addressed in the Order show that the
              actionable claims relate only to information users shared on Facebook. ........... 4

    III.    Facebook produced all data Plaintiffs shared on Facebook; no other user data is
         relevant. .................................................................................................................. 6

    IV.    The Court should deny Plaintiffs' "Cross-Motion to Compel." ................................ 10

CONCLUSION ................................................................................................................. 10

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

Gibson, Dunn &
Crutcher LLP

3690

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Meyers v. Cty. of Sacramento*,
  2020 WL 207213 (E.D. Cal. Jan. 14, 2020)......................................................................2

*Mujica v. AirScan, Inc.*,
  771 F.3d 580 (9th Cir. 2014)............................................................................................3

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
  655 F.3d 1039 (9th Cir. 2011)..........................................................................................2

Gibson, Dunn &
Crutcher LLP

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

3691

## INTRODUCTION

The lawsuit Plaintiffs describe is not this case. This case is about ***information sharing***. Specifically, it concerns sensitive information ***that users shared with their Facebook friends*** and that third parties allegedly accessed as a result of friend sharing, whitelisting, and integration partner agreements. Pretrial Order 20 is clear on this point, and Plaintiffs do not identify a single line in Judge Chhabria's comprehensive order, much less in their own allegations, that supports their description of the case that survived dismissal.

The Order explains on its first page: "This lawsuit . . . is about Facebook's practice of ***sharing*** its users' personal information with third parties." Dkt. 298 ("Order") at 1 (emphasis added). It then says that each of the four live theories concerns "***substantive and revealing content that users intended only for a limited audience*** [*i.e.*, their Facebook friends], such as their photographs, videos they made, videos they watched, their religious and political views, their relationship information, and the actual words contained in their messages." *Id.*; *see also id.* at 7, 13, 17. The user data relevant to those theories consists of "***information [users] make available to their friends on [Facebook]***. *Id.* at 1.

Plaintiffs do not dispute that Facebook produced all of the information the Named Plaintiffs ever shared on Facebook. These productions consist of ***more than one million pages of data*** and necessarily include any data Facebook shared under the live theories. But, Plaintiffs insist they are entitled to any other data that has ever crossed Facebook's servers that relates in any way to any Named Plaintiff and all derivative materials drawing on this data. Plaintiffs seek these materials even if the underlying data is not associated with any user and even if they were never shared with any third party. Plaintiffs do not even attempt to explain why they would need such data in a case concerning information ***they shared on the Facebook platform*** and that Facebook allegedly shared beyond the audience Plaintiffs intended. Instead, Plaintiffs openly admit that they seek these extraneous materials not to pursue live claims, but to resuscitate stayed and dismissed theories or to search for new ones.

Plaintiffs largely avoid the Court's instruction to brief "what the scope of discovery is based on the claims in Judge Chhabria's ruling [Pretrial Order 20]." 9/4/2020 Hr'g Tr. at 5:8-10. Instead, Plaintiffs devote the majority of their brief to side issues and seek to compel Facebook to produce all documents responsive to five RFPs that are not before the Court. The Court should disregard these diversions, conform discovery to the four operative theories, and deny Plaintiffs' motion to compel.

## ARGUMENT

### I.     The stay imposed by Pretrial Order 20 includes a discovery stay.

Plaintiffs take the surprising position that Pretrial Order 20 sets virtually no bounds on the scope of discovery in this case and allows them to explore theories Judge Chhabria stayed or dismissed.[1]

Plaintiffs' position makes no sense. When a stay is in place, it "include[s] a stay of discovery." *Meyers v. Cty. of Sacramento*, 2020 WL 207213, at *1 (E.D. Cal. Jan. 14, 2020). Judge Chhabria stayed all but Plaintiffs' core theories because Plaintiffs filed a 1,440-paragraph pleading. As he explained, "it seems the plaintiffs sought to identify anything Facebook has ever been reported to have done wrong . . . [and] the presence of so many disparate and vague allegations ma[de] it nearly impossible for Facebook to meaningfully respond to all of them, much less for the Court to effectively address them." Order at 5-6. In order to avoid "bogging the case down at the pleading stage for years," *id.* at 6, Judge Chhabria therefore issued an opinion regarding Plaintiffs' core allegations, without addressing most of their improperly pleaded theories, which he stayed, *id.* Judge Chhabria surely did not intend to allow discovery on hundreds of "disparate and vague allegations" that did not satisfy Rule 8. The very point of the stay was to focus this case—not to allow Plaintiffs to explore "anything Facebook has ever been reported to have done wrong" without stating cognizable claims.

Plaintiffs even suggest Pretrial Order 20 allows discovery to "reviv[e]" claims dismissed with prejudice. Opp'n at 6 n.3. To support this curious position, Plaintiffs cite a footnote in Judge Chhabria's analysis of Plaintiffs' deceit by concealment claim. *Id.* (citing Order at 37 n.21). Judge Chhabria held that Plaintiffs stated a plausible claim arising from Facebook's alleged practices concerning whitelisting and integration partners. But he held the claim did not satisfy Rule 9(b)'s heightened pleading standard with respect to friend sharing and Facebook's enforcement measures. He then said in a footnote that dismissal of a subset of the claim would not "preclude . . . plaintiff[s] from seeking revival if discovery reveals a factual basis that justified reconsideration." Order at 37 n.21. Judge Chhabria cited *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1059 (9th Cir. 2011), which holds a plaintiff who fails to satisfy the PLRA's heightened pleading standard may potentially seek revival if other case-related discovery later allows the plaintiff to satisfy the

---

[1]   In addition to the discovery Plaintiffs seek from Facebook, Plaintiffs have served overbroad subpoenas on 27 third parties. These parties also require clear guidance as to the scope of discovery.

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

Gibson, Dunn &
Crutcher LLP

PLRA's heightened pleading standard.  Judge Chhabria certainly did not intend this footnote to create a gaping hole allowing discovery on hundreds of allegations that did not survive dismissal.  *See Mujica v. AirScan Inc.*, 771 F.3d 580, 593 n.7 (9th Cir. 2014) ("To the extent [earlier cases] suggest[] that courts retain discretion to permit discovery whenever a plaintiff has failed to satisfy Rule 8's plausibility standard, it is simply incompatible with *Iqbal* and *Twombly*.").

Pretrial Order 20 plainly defines the scope of discovery in defining the scope of the case.

## II.      This case is about information users share with their friends on Facebook.

A plain reading of Pretrial Order 20 explains the scope of the case Judge Chhabria allowed to move forward.[2]  Plaintiffs say the Order describes this case as concerning any data Facebook receives or infers about users and how that data may be used to target them.  To support this position Plaintiffs quote vague passages from the Order stating the case concerns "sensitive information."  Plaintiffs then say Judge Chhabria did not define "sensitive" and ask the Court to interpret the term to include any data Plaintiffs believe to be personal—including information they provide to third parties, information third parties collect through cookies, public records, and even inferences Facebook draws.  Opp'n at 4.

Plaintiffs disregard what Pretrial Order 20 actually says.  It describes "sensitive information" to be "substantive and revealing content that users intended only for a limited audience," and clarifies that this data is "**information [users] make available to their friends on [Facebook]**."  Order at 1.  To read the ruling otherwise would expand the case far beyond what Judge Chhabria considered and would also raise a host of thorny legal questions his Order does not address.

### A.      The four live theories all concern data users shared with their Facebook friends.

As discussed, Pretrial Order 20 allows four theories of relief to move forward.  Each theory concerns information users shared with their Facebook friends.

*Friend sharing*.  Friend sharing was a capability through which users could share with apps information their friends posted and made available to their Facebook friends.  Plaintiffs do not dispute

---

[2]   Plaintiffs disingenuously argue that Facebook takes an "unduly narrow" view of discovery, citing a comment Judge Chhabria made before discovery began advising Facebook to produce materials regarding "friends' information and friends' of friends information."  Opp'n at 13.  Facebook has now produced nearly 1.5 million pages of documents, before the parties have even reached a search term agreement, including all information the Named Plaintiffs shared with their friends and friends of their friends.  Those productions also include all of the Facebook documents produced to the FTC in response to its document requests in two related investigations.  They also include documents produced to a host of other government actors in related actions responsive to Plaintiffs' RFPs.  In addition to these materials, Facebook proposed search terms hitting on millions of additional documents.

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

this.  Friend sharing underlies the Cambridge Analytica events, it has been hotly litigated, and there is no dispute as to what it is about.  The Order explains: "[W]hen users accessed apps on the Facebook Platform, the app developers were not merely able to obtain information about the users they were interacting with; [but] were also able to obtain any information about the users' Facebook friends that the users themselves had access to," "such as photographs, videos they watched, religious preferences, posts, and even sometimes private one-on-one messages sent through Facebook."  *Id*. at 6-7.

*Whitelisting*.  Whitelisting is an extension of friend sharing and is about the same data. *Id*. at 8.

***Integration Partner Agreements.***  Facebook allegedly "[s]har[ed] sensitive user information with business partners," through a list of "integration partnerships," to integrate Facebook with devices, websites, and social-media platforms.  *Id*. at 8-9.  As with the other theories, the "sensitive user information" at issue is "substantive and revealing content that users intended only for a limited audience [i.e. their Facebook friends]."  *Id*. at 1.  The purpose of these agreements was to allow users to integrate their Facebook activities *that they shared* on Facebook with other platforms and sites.

Plaintiffs say the Order allows claims relating to integration partners to proceed as to some broader set of "sensitive information" that they find personal in nature.  Opp'n at 7.  Plaintiffs provide no support for this assertion; the Order describes this theory as involving the same "sensitive user data" underlying the other theories of relief.  And it must.  As discussed below, the Order holds that Plaintiffs demonstrated standing, a reasonable expectation of privacy, and a lack of consent only with respect to Facebook's alleged practice of sharing information users shared with their Facebook friends.

*Enforcement*.  This theory relates to how Facebook enforced its data-use policies with respect to data third parties obtained through friend sharing, whitelisting, and integration partner agreements, and it concerns the same data that users shared with their Facebook friends.  Order at 9.

**B.     The threshold "global issues" addressed in the Order show that the actionable claims relate only to information users shared on Facebook.**

Pretrial Order 20 addressed various "global issues" and holds Plaintiffs demonstrated a reasonable expectation of privacy, standing, and lack of consent only with respect to Facebook's alleged practice of sharing with third parties information users shared with their friends on Facebook.

*Expectation of privacy*.  Pretrial Order 20 addresses Facebook's argument that Plaintiffs were not injured, and therefore lack standing, because they did not have a reasonable expectation of privacy

over information they share with their Facebook friends. *Id*. at 1 ("Facebook argues that people have no legitimate privacy interest in information they make available to their friends on social media."). With respect to users' privacy expectations, Pretrial Order 20 holds: "the issue of whether users have a reasonable expectation of privacy *in information they share with their social media friends* is best understood as relating to the merits, not standing." *Id*. at 10-11 n.2 (emphasis added). On the merits, the Order holds that "[w]hen you share sensitive information with a limited audience . . . you retain privacy rights and can sue someone for violating them." *Id.* at 2. It then analyzes whether users retain a reasonable expectation of privacy over information *they share with their friends*, *see id*. at 10-12, and concludes: "social media users can have their privacy invaded if sensitive information *meant only for a few dozen friends* is shared more widely," *id*. at 11.

Pretrial Order 20 is so clear that this case concerns information that users shared with their Facebook friends that it goes out of its way to say *sua sponte*: "It seems quite possible that a user whose settings allow information to be shared not only with their friends, but friends of friends, loses any expectation of privacy." *Id*. at 11 n.3. Nowhere does Pretrial Order 20 consider whether users maintain a reasonable expectation of privacy over information beyond what users share on Facebook (as Plaintiffs wrongly suggest) such as information users provide third parties, public records, information third parties obtain through cookies, or information Facebook "infers" about users.

**Standing.** With respect to standing, Pretrial Order 20 holds: "The alleged injury is 'concrete' largely for the reasons already discussed – if you use a company's social media platform *to share sensitive information with only your friends*, then you suffer a concrete injury when the company disseminates that information widely." *Id*. at 17. The Order goes on to say that Plaintiffs' injuries are sufficiently particularized with respect to which third parties allegedly received their data because, "[i]f, as alleged in the complaint, *Facebook made users' 'friends only' information readily available* to such a broad swath of companies . . . it is virtually inevitable that some of these companies obtained information on the named plaintiffs." *Id*. at 18. The Order did not hold—or even consider—whether Plaintiffs have standing to sue Facebook with respect to information users did not share on Facebook.

**Consent**. On the issue of consent, the Court addressed whether Plaintiffs consented to the conduct underlying their claims because they "agreed, when they signed up for their accounts, that

Gibson, Dunn &
Crutcher LLP

3696

Facebook could disseminate their 'friends only' information in the way it has done." *Id.* at 18.  Pretrial Order 20 holds that judicially noticeable materials demonstrate that a subset of users consented to sharing their "friends only" information through friend sharing, but do not establish at the pleading stage that all users consented to sharing friends-only information through friend sharing, whitelisting, and integration agreements.  *Id.* at 18-29.  The Order did not consider whether Plaintiffs consented to sharing information they did not share on Facebook.

The Order is clear that this case is about sensitive information users made available to their friends on Facebook and third parties allegedly accessed.  Discovery must conform to these theories.

**III.    Facebook produced all data Plaintiffs shared on Facebook; no other user data is relevant.**

Facebook produced ***more than one million pages of content and information*** related to the Named Plaintiffs.[3] ***Those materials include everything each Named Plaintiff ever shared on Facebook*** (unless they deleted it).  This includes, but is not limited to, the "Download Your Information" ("DYI") file that Facebook makes available to users,[4] plus *additional* information.

Plaintiffs do not dispute that the produced materials include any data users shared with their Facebook friends (sensitive or otherwise).  Yet, Plaintiffs demand that Facebook search *millions* of disaggregated data sets for any data to have ever crossed Facebook's systems relating to a Named Plaintiff and any derivative materials drawing on that data—such as data sets tracking hours of peak user activity to monitor strains on Facebook's system.  They demand such materials without regard for whether they were ***_shared_*** with any third party, much less under a live theory.  To support this position, Plaintiffs misinterpret a handful of Facebook documents,[5] but their argument boils down to the following:  Facebook has documents drawing on data relating to users; therefore, Facebook must search

---

[3]    Since filing its opening brief, Facebook produced approximately 250,000 additional pages of information related to Named Plaintiffs who were added to the case in August.

[4]    Plaintiffs assert that the DYI data is not useful because it does not display on an item-by-item basis the audience that Plaintiffs set for each of their posts.  Facebook agreed to investigate whether it could produce this data for relevant posts—bearing in mind that the request involves granular data for *more than a million pages* of activity.  Facebook also reminded Plaintiffs that their accounts display this information.  If Plaintiffs believe the audience set to a particular post is critical evidence for their case, they could screen-shot that information from their accounts and produce it.  They could also identify particular posts to Facebook so that Facebook can produce the relevant information.

[5]    Because the Court ordered the parties not to submit declarations or evidence, 9/4/2020 Hr'g Tr. at 5:8-10, 18-22, Facebook does not here submit declarations or documents to dispute Plaintiffs' characterization of the materials they cite.  If the Court is inclined to issue a ruling relying on the exhibits Plaintiffs submitted, Facebook respectfully requests permission to do so.

Gibson, Dunn & Crutcher LLP

3697

for and produce any materials drawing upon any data it has ever collected or created that relates in any way to a Named Plaintiff.  The Court should reject this position, which largely asks Facebook to search for materials that are out of scope and consist largely of data already produced in other formats.

**Data the Named Plaintiffs did not share on Facebook is out of scope,** including public records, data Plaintiffs shared with third parties, and information created by Facebook.  Facebook produced all of the information the Named Plaintiffs shared on Facebook (sensitive or otherwise).  These productions necessarily include any information shared under the live theories.[6]

Plaintiffs say the case is about data Facebook creates and that third parties share with Facebook that is used to draw "inferences" about users.  For instance, Plaintiffs may allow websites to collect data about their shopping habits through cookies.  Those sites then might share this data with other parties (including Facebook) to better place the site's advertisements.  As discussed above, nothing in Pretrial Order 20 supports Plaintiffs' argument that this type of data is part of this lawsuit.  This would be a very different case if—as Plaintiffs say—it were about Facebook sharing information that third parties passed on to Facebook.  To establish this sort of "third party data" claim, Plaintiffs would have had to allege (and prove) the nature of each of their relationships with the specific third parties at issue, the circumstances under which those third parties obtained their data, whether each individual user consented to that third party sharing data with Facebook, the circumstances under which the data was provided to Facebook, and so on.  None of that is at issue here and nothing in Pretrial Order 20 suggests it is.  Nor could Plaintiffs conceivably establish facts of this nature on a class-wide basis.

Plaintiffs seem to concede they demand these materials because "the very purpose of collecting all of this data . . . is to use it to target users."  Opp'n at 12.  As Plaintiffs admit, Pretrial Order 20 dismisses their targeted advertising theory.[7]  To the extent any advertisers received sensitive user data through friend sharing, whitelisting, or integration agreements, that user data was already produced.

---

[6]   To describe the data Plaintiffs believe Facebook maintains, Plaintiffs cite their Exhibit B at page 9, which was prepared by an employee in 2014 and regards Facebook's ads platform.  The document does not reflect Facebook's standard terminology, nor does Facebook agree with Plaintiffs' character-ization of the document.  In any case, Facebook does not dispute that it receives data from third par-ties in connection with its ads platform and maintains internal analyses which rely on user data.

[7]   Plaintiffs walk back their position that they need discovery to pursue their dismissed "targeted advertising" and "psychographic marketing" theories.  Opp'n at 11.  But Plaintiffs have been arguing for a year that these theories justify their demands for every piece of information Facebook collects and infers about users and took this position in the recent joint status updates that prompted this brief-ing.  *See* 8/13/2020 Status Update at 2-3, 9, Dkt. 495; 7/30/2020 Status Update at 3, Dkt. 484.

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

Gibson, Dunn & Crutcher LLP

In any case, as discussed in its opening brief and below, Facebook actually produced the majority of data it receives from third parties in the off-Facebook Activity portion of the DYI materials.

**Data not shared through one of the four theories is out of scope.**   Plaintiffs say they provide evidence that Facebook shares data beyond what users share on Facebook.  Opp'n at 9-10.  Even if that were true, it is not relevant to this lawsuit.  The live theories concern data users shared with their Facebook friends that third parties accessed via friend sharing, whitelisting, or integration agreements.

In any case, the documents Plaintiffs cite describe Facebook's data *sources*; they say nothing about whether or how Facebook *shares* information.  Of note, Plaintiffs claim their Exhibit C "confirms that Facebook shares [the data they seek] with third parties."  Opp'n at 9.  Exhibit C is an email outlining *hypothetical* platform capabilities—it does not discuss what data Facebook actually shared.

**The integration partner theory does not entitle Plaintiffs to all data from third parties.** Plaintiffs suggest Facebook must locate and produce all data points it has ever received from any third party regarding a Named Plaintiff because Facebook's integration partner agreements were built in part on "data reciprocity."  Opp'n at 11.  This argument is a red herring and misrepresents what "data reciprocity" means.  Facebook did not, as Plaintiffs suggest, have agreements with integration partners to trade user data.  Data reciprocity arrangements allowed users to post their Facebook activities to third-party platforms if the third-party platform also allowed its users to post their activities to Facebook.  Plaintiffs acknowledge this.  *See* SACC ¶ 657(g) ("'Reciprocity' agreements . . . requir[ed] Apps that used data from Facebook to <u>allow their users</u> to share their data back to Facebook"); *see also id.* ¶¶ 239, 745.  Any user data relating to that type of sharing was produced.  Again, Facebook produced everything the Plaintiffs shared on Facebook.  This includes any Facebook activities Plaintiffs *elected* to share on other platforms and any off-Facebook activities Plaintiffs *elected* to share on Facebook.  In any event, even if some other data from integration partners existed, only data received from *those partners* could even possibly be relevant—not data from thousands of other third parties.[8]

**Plaintiffs' SCA and VPPA claims do not require additional data.**   Plaintiffs contend this case concerns data beyond what they shared on Facebook because Pretrial Order 20 did not dismiss

---

[8]   Plaintiffs concede they seek any such data to prove damages.  If the Court is inclined to require broad discovery to support damages, Facebook respectfully requests the opportunity to submit briefing regarding why any such discovery should be bifurcated from liability-related discovery.

Gibson, Dunn & Crutcher LLP

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

their claims under the Stored Communications Act ("SCA") and Video Privacy Protection Act ("VPPA"). Opp'n at 4-5. Plaintiffs highlight that their SCA claim turns, in part, on "whether the shared information includes the contents of an electronic communication." *Id*. at 5. But the sensitive data at issue includes "private one-on-one messages" sent on Facebook. Order at 17; *see id*. at 1, 32. Similarly, Plaintiffs' VPPA claim survived dismissal on the basis that Facebook shared "information about the videos that users received in their private [Facebook] messages and about videos they 'liked.'" *Id*. at 34. Plaintiffs' messages and any videos they shared or liked were produced.

**The additional data Plaintiffs seek cannot even be reasonably collected**.[9] Facebook understands Plaintiffs seek two forms of data: (i) any additional data regarding users' off-Facebook Activity provided by third parties, and (ii) any derivative materials that draw from user data. Again, these materials are not relevant to any live theory. Facebook also cannot reasonably identify them.

With respect to off-Facebook Activity, as Facebook explained in its opening brief, the produced DYI materials include the vast majority of data Facebook receives from third parties. It is not clear what else Plaintiffs seek or how it could be relevant. Any off-Facebook Activity provided by third parties that is *not* included in the DYI materials is data Facebook has not linked to a particular user or data that is so granular that it is preserved only temporarily. There is no centralized way to search for either type of data. To the extent it exists, it is organized by the third parties who provided it. Facebook would therefore need to review every data set it has received from thousands of third parties and then attempt to link to the Named Plaintiffs data points it previously did not associate with any user. Such an exercise is unlikely to be fruitful or at all useful, particularly on a class-wide basis.

Facebook also explained that, within 90 days, any user data not included in the DYI materials is disassociated from the user's ID, anonymized entirely, or deleted (depending on the nature of the data and any business reasons for retaining it). Plaintiffs argue that Facebook should *still* be able to find any derivative materials drawing from data relating to any Named Plaintiff because data disassociated from a user's ID can sometimes be linked back to the user's account. Plaintiffs' explanation of this process is oversimplified, incorrect, and ignores that much of the data they demand

---

[9] Plaintiffs say Facebook did not prove undue burden because it did not submit declarations or evidence. The Court instructed the parties not to submit such materials. 9/4/2020 Tr. at 5:8-10, 18-22.

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

is fully anonymized or not retained at all.[10]  The argument also misses the point.  There is no way for Facebook to run a centralized search for a user's ID, random ID, or any "hashed data" identifiers across millions of data sets, which are largely used for business analytics (like scoping infrastructure needs).  The only way to search these tables is to open all of them and search each to find any data relating to a particular user, whether by user ID or otherwise.  The issue is opening and searching each table.[11]

To be clear, Facebook is not—as Plaintiffs suggest—urging the Court to issue a ruling regarding the scope of discovery based on undue burden.  Facebook is highlighting that this is not a situation in which there are marginally relevant materials that are easy to sweep into an ongoing collection.  The user data Plaintiffs seek has nothing to do with the four operative theories, most of it was actually produced, and any additional data would be virtually impossible to locate.  If Plaintiffs are able to identify some specific type of data about user activity that is relevant to the case, Facebook will search for that data.  But Plaintiffs' position that Facebook must search the entire company for every document including any data relating to a Named Plaintiff is simply not reasonable.

## IV.    The Court should deny Plaintiffs' "Cross-Motion to Compel."

Plaintiffs style their brief as a "cross-motion to compel" compliance with five RFPs and criticize Facebook for not submitting declarations and evidence about these requests.  The Court should disregard this diversion, which puts the cart before the horse.  The Court directed the parties to submit "no declarations," as this briefing is "just a legal question as to what the scope of discovery is based on the claims in Judge Chhabria's ruling."  9/4/2020 Tr. at 5:8-10, 18-22.  Facebook told Plaintiffs it will produce materials responsive to the RFPs they identify that are in Facebook's possession and relate to the operative theories.  The Court must resolve this threshold legal issue before it can consider (on a full evidentiary record) whether Facebook produced the relevant evidence responsive to specific RFPs.

## CONCLUSION

The Court should enforce the stay Judge Chhabria imposed, allow discovery only on the four operative theories of relief detailed in Pretrial Order 20, and deny Plaintiffs' cross-motion to compel.

---

[10]  Plaintiffs' Exhibit B, which they cite on page 12 of their brief, describes the ability to reidentify data points that remain live on a user's Facebook page.  This live data has already been produced.

[11]  Plaintiffs did not ease the burden of searching millions of data sets by identifying 10 Named Plaintiffs they *intend* to identify as class representatives.  In any case, the other 14 Named Plaintiffs have not withdrawn their claims and have reserved their rights to proceed as class representatives.

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

DATE:  October 8, 2020

Respectfully submitted,

**GIBSON, DUNN & CRUTCHER, LLP**

By:  *Orin Snyder*
Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS REQUEST TO ENFORCE THE
PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20

# Exhibit 4

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' OPPOSITION TO DEFENDANT FACEBOOK, INC.'S REQUEST TO ENFORCE THE PARTIAL STAY OF DISCOVERY IN PRETRIAL ORDER NO. 20 AND CROSS-MOTION TO COMPEL DISCOVERY RELATED TO REQUESTS FOR PRODUCTION NOS. 9 THROUGH 13**<br><br>Judges:  Hon. Vince Chhabria<br>Hon. Jacqueline S. Corley<br>Courtroom:  4, 17th Floor |

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.    ARGUMENT ........................................................................................................2

    A.    The Order does not limit discovery to users' platform activity. ...........................2

    B.    The discovery requests at issue and Facebook's response ....................................6

    C.    Relevant sensitive information is not limited to platform activity, but also includes sensitive information Facebook derives and collects from business partners, app developers, apps, and other sources. ................................................7

        1.    User data includes, in Facebook's words, "native, appended and behavioral data" that Facebook collects from business partners, apps and other activity. ...................................................................................8

        2.    Internal documents confirm that Facebook's description of data "associated" with users is misleading. ....................................................11

    D.    Facebook has not established that the burden of producing the data relating to ten Plaintiffs is disproportional to the needs of this case. ...............................12

III.    CONCLUSION ...................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Doe v. Gangland Prods., Inc.*,
   730 F.3d 946 (9th Cir. 2013) ............................................................................. 10

*Harris v. Best Buy Stores, L.P.*,
   No. 3:15-cv-00657-HSG (KAW), 2016 WL 6024556 (N.D. Cal. Oct. 14, 2016) ................ 13

*Polaris Innovations Ltd. v. Kingston Tech. Co.*,
   No. CV1600300CJCRAOX, 2017 WL 3275615 (C.D. Cal. Feb. 14, 2017) ......................... 14

*Shulman v. Grp. W. Prods., Inc.*,
   18 Cal.4th 200 (1998) ....................................................................................... 10

*SPS Techs., LLC v. Briles Aerospace, Inc.*,
   No. CV 18-9536 MWF, 2020 WL 4341717 (C.D. Cal. June 25, 2020) .......................... 14

*Sullivan v. Personalized Media Commc'ns, LLC*,
   No. 16-MC-80183-MEJ, 2016 WL 5109994 (N.D. Cal. Sept. 21, 2016) .......................... 14

**Statutes**

18 U.S.C. § 2702(a) ............................................................................... 3, 4, 5, 10

18 U.S.C. § 2710(b)(2) ............................................................................ 3, 4, 5, 10

**Other Authorities**

Fed. R. Civ. P. 26(b)(1) ..................................................................................... 13

Local Rule 5-1(i)(3) ......................................................................................... 16

## I.   INTRODUCTION

Facebook does not want Plaintiffs to obtain discovery showing the full breadth of its wrongful disclosure of its users' sensitive information. Accordingly, Facebook seeks to limit discovery in this case to a single category of improperly shared information: users' activity on the Facebook platform. The sensitive information that Facebook collects and shares with third parties is much more extensive than this. It collects users' sensitive information from a variety of sources—including from third parties—then pools the information with user-posted activity and generates additional information from the full data set it accumulates. It then shares this information about users and their friends with third parties. All of this information, including who has access to it and how it is used, is relevant to Plaintiffs' claims.

As a result, there are at least three compelling reasons that Facebook's motion should be denied and Plaintiffs' cross-motion to compel production of documents responsive to Requests for Production ("RFPs") Nos. 9 through 13[1] should be granted.

*First*, contrary to Facebook's tortured reading of Pretrial Order No. 20 ("Order" or "PTO 20"), Dkt. No. 298, the Court did not limit discovery in this case only to information regarding user activity on Facebook. While that information—and Facebook's subsequent disclosure of it—is of course relevant, that is not the only type of sensitive information relevant to Plaintiffs' claims or the four categories of wrongdoing recognized by the Order.

*Second*, the universe of data Facebook collects and shares about users is also not limited to user activity on Facebook, but instead consists of a sea of information obtained from a wide variety of sources, including from business partners, app developers, apps, and other third parties. Indeed, as Facebook's own documents show, it collects information about users far beyond what Facebook has produced in this case. And discovery produced to date further confirms that Facebook not only collects this information, but links it to users and shares it with third parties—putting to rest Facebook's nonsensical suggestions that Plaintiffs have failed to articulate what additional evidence exists or that Facebook cannot "associate" certain data with a

---

[1] For details on these RFPs, see *infra* § II.B.

user.

*Third*, there is no justification for Facebook's claims of undue burden. Such an argument should be accorded minimal weight in a case of this size and complexity involving a company whose business model is premised upon the collection and production of electronic information about billions of users. Facebook has come nowhere near meeting its burden of demonstrating why data regarding solely Named Plaintiffs—relative to the hundreds of millions of potential class members whose information is ultimately at issue in this case—is not proportional to the needs of the case. In fact, pursuant to the Court's recent guidance regarding streamlining Plaintiffs' discovery, Plaintiffs have reduced the number of individuals who will be class representatives to ten, down from the twenty-three. Plaintiffs only seek the discovery at issue here related to these ten Plaintiffs (for purposes of this motion, the "Named Plaintiffs.")

## II.   ARGUMENT

A.   **The Order does not limit discovery to users' platform activity.**

PTO 20 does not directly address the question raised by Facebook in its motion—whether this case is limited to user activity on the Facebook platform or includes all the sensitive information about users that Facebook improperly shared with third parties. But the Order nowhere expressly limits the case to user activity. *Cf.* Mot.[2] at 1. Nor does it make sense to read the Order that way. That sort of limitation would conflict not only with claims and theories that the Order upheld, but also with the grounds on which they were allowed to proceed to discovery.

Facebook, under the guise of enforcing a discovery stay that was never issued in the first place, spends many pages straining to read the Order to limit discovery to data relating only to users' on-platform activity. This provides a misleading picture of what the Order says and inaccurately ascribes to the Court a set of internally inconsistent views.

*1. The Order.*  The Order summarizes its understanding of Plaintiffs' claims in a two-sentence précis near the beginning: "Broadly speaking, this case is about whether Facebook

---

[2] Def. Facebook, Inc,'s Opening Brief in Supp. of Its Req. to Enforce the Partial Stay of Discovery in Pretrial Order No. 20 ("Mot."), Dkt. No. 515.

acted unlawfully in making user information widely available to third parties. It's also about whether Facebook acted unlawfully in failing to do anything meaningful to prevent third parties from misusing the information they obtained." Order at 3. This description focuses on *Facebook's* unlawful disclosure of information about users and their friends to third parties—not on whether that information was originally posted, shared, or generated by users on the Facebook platform.

The Order then discusses the four categories of Facebook's wrongdoing. These categories are: (1) "[g]iving app developers access to sensitive user information"; (2) "[c]ontinued disclosure to whitelisted apps"; (3) "[s]haring sensitive user information with business partners"; and (4) "[f]ailure to restrict the use of sensitive information." Order at 6-9. These categories line up neatly with the earlier description of the action as alleging that "Facebook acted unlawfully in making user information widely available to third parties" (the first three categories) and that Facebook "fail[ed] to do anything meaningful to prevent third parties from misusing the information they obtained" (the fourth category). *Id.* at 3.

Using these four categories of wrongdoing as a framework, the Order analyzed whether Plaintiffs had standing to bring their claims and whether they stated valid claims. It ruled that Plaintiffs had standing because they alleged that their "sensitive information was disseminated to third parties in violation of their privacy." *Id.* at 14. It upheld nearly all of Plaintiffs' claims (e.g., three privacy-based tort claims under California law, a claim under the Stored Communications Act ("SCA"), a claim for breach of contract, and a claim for unjust enrichment) except to the extent they were based on the first category of wrongdoing, the disclosure of user information to app developers. *Id.* at 30-34, 38-41. It upheld in its entirety Plaintiffs' claim under the Video Privacy Protection Act ("VPPA"). *Id.* at 34-35. And it upheld Plaintiffs' claim for negligence, which was based on the fourth category of wrongdoing. *Id* at 35-36.

**2.  The Order's rationale.**  Why did the Order conclude that Plaintiffs had standing and had stated valid claims? On these points, the Order is clear. Plaintiffs had standing because "their "sensitive information was disseminated to third parties in violation of their privacy." *Id.* at 14.

PARTIAL STAY OF DISCOVERY                                      CASE No. 18-md-02843-VC

3709

This reasoning focuses not on *where* the user information was originally generated—whether on the Facebook platform or off it—but on its nature ("sensitive") and on what Facebook did with it ("disseminated" it "to third parties").

Similarly, when discussing the claims, the Order focused not on the original provenance of the information about users, but on its nature and on what Facebook did with it. So, for example, the Order ruled that:

- Plaintiffs had stated valid privacy torts because Facebook had disseminated information that was "sensitive" and as to which Plaintiffs had a reasonable expectation of privacy. *Id.* at 30-33.

- Plaintiffs had stated a claim under the Stored Communications Act because Facebook had disseminated the content of their electronic communications and had not gained their consent to do so. *Id.* at 33-34.

- Plaintiffs had stated a claim under the Video Privacy Protection Act because Facebook had disseminated "information which identifies a person as having requested or obtained specific video materials or services," *id.* at 34 (citation omitted), and Facebook qualified as a "video tape services provider" under the statute, *id.* at 35.

### 3. *"Sensitive information" is not defined by where Facebook collects that information.*

The Order repeatedly notes that Facebook shares "sensitive" user information without consent. Facebook pins its argument to this one word, maintaining that the Order "defined" sensitive user information to mean only information about what users post on Facebook, Mot. at 1, or users' platform activity, Mot. at 8. But the common-sense meaning of "sensitive information" encompasses more than just what users did on the platform. Consider, for example, a Facebook user's Amazon.com order for an over-the-counter contraceptive or another user's entry of "alcoholic support group in Tower District, Fresno" into a search engine. "Sensitive information" also includes information that Facebook can infer from on-platform information—a category of information it has not produced. (Think of the inferences that Facebook can draw from weekly photographs of a user taken at M.D. Anderson Cancer Center.) Facebook's objection that such information is categorically not "sensitive" is false.

It is true that when the Order gave examples of sensitive user information, the examples it

used concerned information generated on the Facebook platform. *E.g.*, Order at 1, 17. Nowhere, however, did the Order *define* or *limit* sensitive information to users' platform activity only. And the Order's reasoning certainly is not limited to such information. Rather, as noted above, Plaintiffs' standing to bring their claims, and the validity of many of those claims, depends on the nature rather than the provenance of the information, and on whether Facebook shared that information with third parties. And, as Plaintiffs have learned through discovery, the sensitive information about users that Facebook collects and shares with business partners and app developers includes both information originally generated outside the Facebook platform and information derived from on- and off-platform activity.

It also is farfetched for Facebook to argue that the Order rules that *all* of Plaintiffs' claims—including their federal statutory claims—rise or fall depending on whether the information that Facebook shared is "sensitive" in the sense of being embarrassing or deeply intimate. The validity of Plaintiffs' claim under the SCA, for example, does not turn on how embarrassing or intimate the information is that Facebook shared, but on whether the shared information includes the contents of an electronic communication. 18 U.S.C. § 2702(a)(1). Similarly, Plaintiffs VPPA claim turns on whether the information that Facebook shared includes "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3). If, for example, Facebook collected and shared a user's video-watching queue from a different platform, that would constitute a VPPA violation.

In sum, while the Order does not explicitly address the issue posed by Facebook's motion, it certainly does not limit discovery in this case to on-platform user activity and reading it that way is inconsistent with the Court's reasoning. It is also inconsistent with statements by the Court during the motion to dismiss hearing about the breadth of user data that is relevant to Plaintiffs' claims:

> For example, if – I'm a Facebook user. And, you know, I'm trying to assess the
> likelihood that my sensitive information got into the hands of third parties and, if
> so, how many third parties and, if so, what kinds of third parties. If I have a full

> understanding of the third parties that had access to the information, and a full
> understanding of what type of information they had access to, and a full
> understanding of who they were, and what they – and what restrictions were
> placed on them, we then have a better understanding of what was likely to have
> happened to me.

Nov. 4, 2019 Tr. at 15:20-16:4. It is the "full understanding" referred to by the Court that

Plaintiffs seek, and that Facebook refuses to allow.

Finally, this reading prevents Named Plaintiffs from discovering even the general policies

and practices of Facebook governing the sharing of their sensitive information, policies and

practices that are critical for this case. *See* Pretrial Order No. 30 at 2, Dkt. No. 347 ("[T]he best

way to assess the merits and to determine whether class certification is appropriate is almost

certainly to conduct discovery on Facebook's general practices."). Plaintiffs submit that

Facebook's exclusion of this information from discovery is not what the Order intended.

**4. *The Order stayed claims, not discovery.*** Plaintiffs organized their claims into three

categories: prioritized claims, prioritized consumer protection act claims alleged in the

alternative, and non-prioritized claims. First Am. Consolidated Compl. ("FACC") at 317-411,

Dkt. No. 257. The Order made the simple observation that "[a]ll other prioritized claims not

addressed by this ruling will be stayed (effectively, relegated to non-prioritized status) and

adjudicated, if necessary, at a later state in the proceedings with the other non-prioritized

claims." Order at 6.  Facebook's claim that this holding somehow imposed a stay of *discovery* is

baffling.  The Order does not, and does not purport to, stay discovery in any fashion.[3]

**B.     The discovery requests at issue and Facebook's response**

The present dispute arises from five discovery requests, each of which asks for data that

Facebook possesses about Named Plaintiffs, the third parties that Facebook disclosed this data

to, and the types of information that was disclosed to them. *See* Ex. A, Def. Facebook, Inc.'s

Resps. & Objs. to Pls.' Second Set of Reqs. for Produc. In particular, RFP No. 9 requests "[a]ll

---

[3] Even if it were, the Order observed that "[o]f course, dismissal of a subset of claims with
prejudice does not preclude a plaintiff from seeking revival if discovery reveals a factual basis
that justifies reconsideration[.]" Order at 37 n.21 (citations omitted).

Documents relating to each of the Named Plaintiffs, including but not limited to all Content and Information collected about each of them or gained from business relationships or any other source."[4] *Id.* RFP No. 10 asks Facebook to produce, "[f]or each of the Named Plaintiffs, Documents sufficient to show the categories of Content and Information Facebook collects, tracks, and maintains about them." *Id.* RFP Nos. 11-13 then request documents requesting Facebook to identify the third parties that were able to access this information, including the categories of data that were disclosed to them and how they accessed it. *Id.* Plaintiffs propounded these requests nearly one year ago in November 2019.

In response to these requests, Facebook produced information collected by the DYI ("Download Your Information") tool. This limited tool allows downloads of some, but not all, information relating to users' activity on the platform. And Facebook freely acknowledges that Plaintiffs can access this information themselves. *Id.* ("[A]ll Facebook users are free to download their DYI file if they wish."). In addition to the DYI production, Facebook has produced an undefined category of "additional information associated with [users'] accounts" for each Plaintiff. Mot. at 6. But Facebook does not describe what the "additional information" is, likely because it is extremely limited—it consists solely of information users can access through their account in the form of their privacy settings and information reflecting user activity on Facebook. Critically, the form of production also obscures whether some of the activity was public or private. Thus, virtually all of Facebook's 850,000-page production relating to the original Named Plaintiffs in this case was already accessible to Plaintiffs and tells only part of the story.

C.   **Relevant sensitive information is not limited to platform activity, but also includes sensitive information Facebook derives and collects from business partners, app developers, apps, and other sources.**

Facebook acknowledges that it collects and shares substantial amounts of additional sensitive information about users beyond their platform activity. *See, e.g.*, Aug. 14, 2020 Hr'g

---

[4] The requests use the definition of "Content and Information" from Facebook's Statement of Rights of Responsibilities—a definition that is not limited to on-platform data.

Tr. 8:10-13 ("[T]here's Facebook-generated information, information generated by third parties, information received from third parties. We have not represented that that is comprehensively included in our production."); *see also* Mot. at 10-15 (describing off-platform activity and internal analytics it has not produced). However, Facebook contends that this other information is not relevant to this case. This is false.

1. **User data includes, in Facebook's words, "native, appended and behavioral data" that Facebook collects from business partners, apps and other activity.**



*See* Ex. B, FB-CA-MDL-00213424-439.





——the only type of data Facebook has partially produced about users so far—is important for this case, so too is ███████████████████████████ ███████████████████████ Moreover, ████████████████████████ ████████████████████████████████████████████ ████████ *See* Ex. B, FB-CA-MDL-00213424-439 ███████████████████ ████████████████████████████████████████████████████ ████████ "████████████████"); *id.* at FB-CA-MDL-00213424 (████████████████ ██ ████████████ ████████████ ██████████████████████████████████ ████████████████████████████).

Critically—and contrary to Facebook's suggestion that this data is irrelevant and duplicative of information it has already produced (Mot. at 14)—discovery confirms that Facebook shares this data with third parties. ██████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ██████████████████████████████ █████████████████████████████████████████████████████

3715



*Id.*.

Another internal document, ████████████████████████████

These documents make clear that Facebook collects sensitive user information in a variety of different ways and discloses it to third parties.

Facebook's insistence that it need only produce on-platform Native Data makes even less sense when considering Plaintiffs' claims. Plaintiffs' statutory and common law claims are not limited to information generated from users' activities on Facebook. For example, under the VPPA, Plaintiffs must prove that Facebook disclosed "personally identifiable information concerning any consumer" to "any person" absent written or informed consent. 18 U.S.C. § 2710(b)(2). Under the SCA, Plaintiffs must prove that Facebook "knowingly divulge[d] to any person or entity the contents of any communication" users did not intend for Facebook to divulge. 18 U.S.C. § 2702(a). The source of the information—that is, whether it was the result of on- or off- platform activity, gleaned directly from users' posts, or inferred from them—is irrelevant. Disclosure of any of this information without consent is actionable.

Similarly, Plaintiffs' Public Disclosure of Private Acts claim requires Plaintiffs to prove that Facebook disclosed a private fact about the plaintiff that is objectionable and offensive to a reasonable person. *Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 958 (9th Cir. 2013). Likewise, Plaintiffs' Intrusion into Private Affairs claim requires Plaintiffs to prove an intrusion by Facebook into a private matter that is highly offensive to a reasonable person. *Shulman v. Grp. W. Prods., Inc.*, 18 Cal.4th 200, 231 (1998). In order to prove these claims, Plaintiffs must

ascertain the private facts about them that Facebook is collecting and disclosing, whether they originate from platform activity or not.

Across many claims, the Order sustained Plaintiffs' allegations about Facebook's undisclosed data reciprocity programs with business partners. Plaintiffs are thus entitled to know what sensitive user data, of any type or source, Facebook shared with its business partners. Plaintiffs are further entitled to any data that Facebook received from its business partners in return, since the value of that data constitutes the benefit Facebook received in the transaction, a benefit that Plaintiffs are entitled to recover under, *inter alia*, the unjust enrichment claim that the Court sustained. Order at 41;[5] *see also* Order at 8 (noting the allegation that "Facebook and its [business] partners agreed to exchange information about users' activities with each other").

Facebook notes repeatedly that targeted advertising and psychographic marketing are not part of this case. *See, e.g.*, Mot. at 9. This argument misses the point. The question is not whether Facebook should or should not have engaged in targeted advertising and psychographic marketing. The question is whether, when doing so, Facebook shared sensitive user and friend information without consent. Plaintiffs are entitled to obtain the discovery necessary to substantiate the allegation that improper sharing has occurred in the context of these activities.

2.      **Internal documents confirm that Facebook's description of data "associated" with users is misleading.**

Facebook claims it has produced all data it possesses that is "associated" with Named Plaintiffs. That is, while it generated and collected reams of data about Named Plaintiffs, Facebook claims that most of that data, including Appended and Behavioral Data, is anonymized and cannot be connected to Named Plaintiffs. This is false.

Facebook explains that Appended and Behavioral Data cannot be associated with Plaintiffs' Facebook accounts because such data is "disassociated from the user's ID within 90

---

[5] Facebook's position blocking discovery of what it possesses and shares is in tension with Facebook's own discovery requests to Named Plaintiffs. Facebook's Interrogatory No. 8 asks Plaintiffs to "Identify all entities other than Cambridge Analytica that You believe have 'misused sensitive information from Your Facebook Account.'" But Facebook itself will not identify with whom it shared that sensitive information, let alone what information it possesses.

days" (Mot. at 15). But, as confirmed by internal documents, what actually happens is that



Indeed, the very purpose of collecting all of this data in the first place is to use it to target users and their friends.

*Cf.* Mot. at 15.

Similarly,

*See* Ex. B. "Hashed data matching" is the process of matching different data sets through the hash values of unique identifiers. For instance, when an advertiser uploads a spreadsheet of Custom Audience data including hashed email addresses, Facebook can match this data to its users through the hashed email address field.

Thus, it simply is untrue that it would be "nearly impossible" to produce the "disassociated" data in this case for Named Plaintiffs. Mot. at 15. Facebook clearly has the ability to connect Named Plaintiffs' user information through RIDs and hashed data matching, and should be ordered to do so in response to RFP Nos. 9-13.

D.    **Facebook has not established that the burden of producing the data relating to ten Plaintiffs is disproportional to the needs of this case.**

Facebook also suggests that "the burdens of locating the additional information Plaintiffs seek would far exceed the needs of the case." Mot. at 12. But the burden associated with producing the requested information is not undue; it is proportional to the needs of this complex

---

[6] Ex. E, PwC_CPUP_FB00030737-738.
[7] *Id.* at PwC_CPUP_FB00030738



case. In assessing proportionality, Federal Rule of Civil Procedure 26 directs consideration of

"the importance of the issues at stake in the action, the amount in controversy, the parties'

relative access to relevant information, the parties' resources, the importance of the discovery in

resolving the issues, and whether the burden or expense of the proposed discovery outweighs its

likely benefit." Fed. R. Civ. P. 26(b)(1). Helpfully, Judge Chhabria provided further guidance at

the March 5, 2020 Case Management Conference, stating:

> I am concerned that Facebook has, you know, often made statements reflecting an
> unduly narrow view of what should be turned over to the Plaintiffs. And, you
> know, this is a big case. I mean, there is often a lot of talk about proportionality
> and whatnot. This is a big case. It is a significant issue. You know, and there is --
> this is not the type of case where we are going to be saying: Well, that might end
> up -- that effort might end up uncovering some relevant information; but, you
> know, it is just too expensive or difficult, and so we are not going to make
> Facebook do it. This is really not one of those cases where that is very -- that type
> of argument is likely to carry the day. You know, and, as I have said a number of
> times, you know, the best way to figure out what happened as it relates to the
> claims that are going forward now is to -- for Facebook to produce all
> information, all documents about the practices associated with giving third parties
> access to friends' information and friends' of friends information.

Tr. at 28:25-29:18. Judge Chhabria's observations regarding the size of this case remain on

point. The proposed class period extends from 2007 to the present, the potential class members

number in the hundreds of millions, and the third parties with whom Facebook shared user data

appear to number in the tens of thousands. In that context, Plaintiffs' request for the data

concerning ten individual users seems not only proportional to the needs of the case but modest.

Furthermore, Facebook's claims of burden are unsupported. "[T]he party opposing

discovery has the burden of showing that discovery should not be allowed, and also has the

burden of clarifying, explaining and supporting its objections with competent evidence." *Harris*

*v. Best Buy Stores, L.P.*, No. 3:15-cv-00657-HSG (KAW), 2016 WL 6024556, at *1 (N.D. Cal.

Oct. 14, 2016) (quoting *La. Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*, 285 F.R.D.

481, 485 (N.D. Cal. 2012)).  A party claiming undue burden or expense "ordinarily has far better

information—perhaps the only information—with respect to that part of the determination." Fed.

R. Civ. P. 26(b)(1) advisory committee's note (2015).  Therefore, the "party claiming that

discovery imposes an undue burden must 'allege specific facts which indicate the nature and extent of the burden, usually by affidavit or other reliable evidence.'" *Sullivan v. Personalized Media Commc'ns, LLC*, No. 16-MC-80183-MEJ, 2016 WL 5109994, at *3 (N.D. Cal. Sept. 21, 2016) (quoting *Nationstar Mortg., LLC v. Flamingo Trails No. 7 Landscape Maint. Ass'n*, No. 2:15-cv-01268-RFB-NJK, 2016 WL 4071988, at *4 (D. Nev. July 28, 2016)).[8] Facebook has furnished no evidentiary support for its objections of undue burden and its objections should be overruled.

Plaintiffs emphasize that they are seeking discovery about *ten Named Plaint₋ifs*—not millions, not thousands, and not hundreds of users. Based on the information Plaintiffs obtain about themselves, and about Facebook's general practices and procedures, they will seek to prove their class claims. Facebook's contention that Plaintiffs are not even entitled to obtain in discovery the evidence necessary to show what Facebook collects about them, and with whom it shares the information is impossible to square with Facebook's basic discovery obligations under the Federal Rules.

### III.   CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Facebook's motion to impose a discovery stay and grant Plaintiffs' motion to compel discovery responsive to Requests for Production Nos. 9 through 13.

---

[8] *See also SPS Techs., LLC v. Briles Aerospace, Inc.*, No. CV 18-9536 MWF (ASx), 2020 WL 4341717, at *2-3 (C.D. Cal. June 25, 2020) (overruling objection to requests for production of documents and noting that the party resisting discovery must describe "in specific detail, how each Request is overly broad and unduly burdensome by submitting affidavits or other evidence describing the nature of the burden"); *Polaris Innovations Ltd. v. Kingston Tech. Co.*, No. CV1600300CJCRAOX, 2017 WL 3275615, at *6 (C.D. Cal. Feb. 14, 2017) (court grants motion to compel production of documents by defendant Kingston in part because "[r]egarding its assertion that the requests are overly burdensome, Kingston has not submitted any evidentiary declaration to support this objection.").

Dated: September 28, 2020

Respectfully submitted,


KELLER ROHRBACK L.L.P.

By:   */s/ Derek W. Loeser*
      Derek W. Loeser


Derek W. Loeser (admitted *pro hac vice*)
Lynn Lincoln Sarko (admitted *pro hac vice*)
Gretchen Freeman Cappio (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Adele A. Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com


Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com


Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

BLEICHMAR FONTI & AULD LLP

By:   */s/ Lesley E. Weaver*
      Lesley E. Weaver


Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

3721

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

I, Derek W. Loeser, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of September, 2020, at Seattle, Washington.

/s/ Derek W. Loeser
Derek W. Loeser

## CERTIFICATE OF SERVICE

I, Sarah Skaggs, hereby certify that on September 28, 2020, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

**In addition, the following were served via email:**

Paven Malhotra
Matan Shacham
Bryn Anderson Williams
pmalhotra@keker.com
bwilliams@kvn.com
bwilliams@kvn.com

Anjeza Hassan
annie.sara@yahoo.com

/s/ *Sarah Skaggs*
Sarah Skaggs

# Plaintiffs' Exhibit A

Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
  klinsley@gibsondunn.com
Brian M. Lutz (SBN 255976)
  blutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DEFENDANT FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION** |

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

3725

Defendant Facebook, Inc. ("Defendant" or "Facebook"), by and through its attorneys, and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the Local Civil Rules of the U.S. District Court for the Northern District of California, the Court orders in this action, and the parties' agreements and conferences among counsel, provides the following responses and objections to Plaintiffs' Second Set of Requests for Production (the "Requests").

## PRELIMINARY STATEMENT

1.     Facebook's responses to the Requests are made to the best of Facebook's current knowledge, information, belief, and understanding of Plaintiffs' requests.  Facebook's factual and legal investigation of this matter is ongoing.  Facebook reserves the right to supplement or amend any responses should future investigation indicate that such supplementation or amendment is necessary.

2.     Facebook's responses to the Requests are made solely for the purpose of and in relation to this action.  Each response is given subject to all appropriate objections (including, but not limited to, objections concerning privilege, competency, relevancy, materiality, propriety, and admissibility).  All objections are reserved and may be interposed at any time.

3.     Facebook's responses are premised on its understanding that Plaintiffs seek only that information that is within Facebook's possession, custody, and control.

4.     Facebook incorporates by reference each and every general objection set forth below into each and every specific response.  From time to time, a specific response may repeat a general objection for emphasis or some other reason.  The failure to include any general objection in any specific response shall not be interpreted as a waiver of any general objection to that response.

5.     Nothing contained in these Responses and Objections or provided in response to the Requests consists of, or should be construed as, an admission relating to the accuracy, relevance, existence, or nonexistence of any alleged facts or information referenced in any Request.

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

3726

# GENERAL OBJECTIONS

1.  Facebook objects to each Request, including the Definitions and Instructions, to the extent that it purports to impose obligations beyond those imposed by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Civil Rules of the U.S. District Court for the Northern District of California, and any agreements between the parties.

2.  Facebook objects to each Request to the extent it seeks information unrelated or irrelevant to the claims or defenses in this litigation.  In particular, the Court has held that individuals who joined Facebook in or after 2009 consented to data sharing policies described in Facebook's "Statement of Rights and Responsibilities" and "Data Use Policy," and dismissed Plaintiffs' claims to the extent they are based on data-sharing practices disclosed in these documents.  Facebook will not produce documents relevant only to dismissed claims or theories of relief.  Nor will Facebook produce documents related only to individuals who are not parties to this case.

3.  Facebook objects to each and every Request to the extent that the Request seeks information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence.

4.  Facebook objects to each Request as overly broad and unduly burdensome, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information.  For example, many of the Requests seek "all documents" regarding particular subject matters, which would require Facebook to conduct searches broader than a reasonable and diligent search of reasonably accessible files (including electronic files) where responsive documents reasonably would be expected to be found.  Such Requests are not proportional to the needs of the case.

5.  Facebook objects to each Request to the extent it purports to request the identification and disclosure of information or documents that were prepared in anticipation of litigation, constitute attorney work product, reveal privileged attorney-client communications, or are otherwise protected from disclosure under any applicable privileges, laws, or rules.

Facebook hereby asserts all such applicable privileges and protections, and excludes privileged and protected information from its responses to each Request. *See generally* Fed. R. Evid. 502; Cal. Code Evid. § 954. Inadvertent production of any information or documents that are privileged or otherwise immune from discovery shall not constitute a waiver of any privilege or of any other ground for objecting to the discovery with respect to such information or documents or the subject matter thereof, or the right of Facebook to object to the use of any such information or documents or the subject matter thereof during these or any other proceedings. In the event of inadvertent disclosure of any information or inadvertent production or identification of documents or communications that are privileged or otherwise immune from discovery, Plaintiffs will return the information and documents to Facebook and will be precluded from disclosing or relying upon such information or documents in any way.

6.      Facebook objects to each and every Request to the extent it is argumentative, lacks foundation, or incorporates allegations and assertions that are disputed or erroneous. In furnishing the responses herein, Facebook does not concede the truth of any factual assertion or implication contained in any Request, Definition, or Instruction. The production of documents in response to any Request shall not be construed as adopting a legal position.

7.      Facebook objects to each and every Request to the extent that the information sought is more appropriately pursued through another means of discovery, such as responses to interrogatories.

8.      Facebook objects to each and every Request, Definition, and Instruction to the extent that it seeks information outside of Facebook's possession, custody, and control.

9.      Facebook objects to each Request to the extent that it requests information protected by the right of privacy of Facebook and/or third parties, or information that is confidential, proprietary, or competitively sensitive.

10.     Facebook objects to each Request to the extent that it seeks documents or information already in Plaintiffs' possession or available in the public domain. Such information is equally available to Plaintiffs.

11.     Facebook objects to each Request to the extent that it calls for the production of "each," "every," "any," or "all" documents in cases where such a demand is overly broad and/or causes undue burden and expense.

## OBJECTIONS TO DEFINITIONS

1.     Facebook incorporates by references the responses and objections to Definitions and Instructions contained in its Responses and Objections to Plaintiffs' First Set of Requests for Production of Documents.

2.     Facebook generally objects to any definitions or terms defined by reference to capitalized terms and acronyms relied upon in Plaintiffs' First Amended Complaint, which themselves may be vague, ambiguous, unduly broad, or unduly burdensome.

3.     Facebook objects to Plaintiffs' definition of "App" as vague, ambiguous, overbroad, and unduly burdensome on the ground that it includes any "application developed to utilize the core technologies of the Facebook social networking platform" without identifying or defining what the "core," rather than peripheral, technologies of the Facebook are or were at any given time.  Facebook further objects to this definition as vague and ambiguous on the ground that Facebook cannot identify what any online applications are or were "developed to" do or presume the intent of any third parties that Facebook does not control.

4.     Facebook objects to Plaintiffs' definitions of "App Developer Investigation" and "ADI" as overly broad and unduly burdensome on the ground that these definitions include investigations into persons, entities, applications, and/or developers that are not relevant to Plaintiffs' remaining claims.  Facebook further objects to these definitions to the extent they seek documents or information protected by the attorney-client privilege and/or the work product doctrine.

5.     Facebook objects to Plaintiffs' definition of "Apps Others Use" as vague and ambiguous on the ground that it is defined by reference to other vague, ambiguous, and/or undefined terms, including "App," "App Developers," and "API."  Facebook further objects to

4

this definition as overly broad and unduly burdensome on the ground that the applicable account settings available to Facebook members have changed over time and this definition is not limited to a particular time period or particular settings.

6.      Facebook objects to Plaintiffs' definition of "App Settings" as vague and ambiguous on the ground that it is defined by reference to other vague, ambiguous, and/or undefined terms, including "App," "User," "Content and Information," "Apps Others Use," "Granular Data Permissions," and "Platform Opt Out."  Facebook further objects to this definition as overly broad and unduly burdensome on the ground that the applicable account settings available to Facebook members have changed over time and this definition is not limited to a particular time period or particular settings.

7.      Facebook generally objects to Plaintiffs' definitions of "Communication," "Computer System," "Content and Information," "Document(s)," "Electronic Media," "ESI," "Electronically Stored Information," and "Identify" to the extent that Plaintiffs purport to use these defined terms to request the identification and disclosure of documents or information that: (a) were prepared in anticipation of litigation; (b) constitute attorney work product; (c) reveal privileged attorney-client communications; or (d) are otherwise protected from disclosure under any applicable privileges, laws, and/or rules.  Facebook further objects to the extent that these definitions purport to impose obligations that go beyond the requirements of the Federal and Local Rules.

8.      Facebook objects to Plaintiffs' definition and use of the terms "You," "Your," or "Facebook" as vague, ambiguous, overly broad, and unduly burdensome to the extent the terms are meant to include "directors, officers, employees, partners, members, representatives, agents (including attorneys, accountants, consultants, investment advisors or bankers), and any other Person purporting to act on [Facebook, Inc.'s] behalf. . . . parents, subsidiaries, affiliates, predecessor entities, successor entities, divisions, departments, groups, acquired entities and/or related entities or any other entity acting or purporting to act on its behalf" over which Facebook

exercises no control, and to the extent that Plaintiffs purport to use these terms to impose obligations that go beyond the requirements of the Federal and Local Rules.

9.     Facebook objects to Plaintiffs' definition of "Granular Data Permissions" as vague and ambiguous on the ground that it is defined by reference to other vague, ambiguous, and/or undefined terms, including "App," "User," "Content and Information," and "App Developer."  Facebook further objects to this definition as overly broad and unduly burdensome on the ground that the applicable account settings available to Facebook members have changed over time and this definition is not limited to a particular time period or particular settings.

10.     Facebook objects to Plaintiffs' definitions of "Internal Policy" or "Internal Policies" as overly broad and unduly burdensome to the extent that Plaintiffs purport to seek the identification and disclosure of documents or information that: (a) was prepared in anticipation of litigation; (b) constitute attorney work product; (c) reveal privileged attorney-client communications; or (d) are otherwise protected from disclosure under any applicable privileges, laws, and/or rules.  Facebook further objects to these definitions as unduly broad and unduly burdensome to the extent they seek statements or directives which are implicit, informal, unwritten, or unofficial.  For the purposes of these Responses and Objections, Facebook will interpret and use "Internal Policy" or "Internal Policies" as referring to the final, written, non-privileged version of any relevant policy, procedure, or directive provided to Facebook employees that is relevant to this litigation.

11.     Facebook objects to Plaintiffs' definition of "Misuse of Data" as vague and ambiguous on the ground that it is defined by reference to other vague, ambiguous, and/or undefined terms, including "App," "User," and "Content [or] Information," and "App Developer."  Facebook further objects to this definition to the extent it assumes disputed facts or legal conclusions, particularly that Facebook members' data was "misused."

12.     Facebook objects to Plaintiffs' definitions of "Person" as vague, ambiguous, overly broad, and unduly burdensome to the extent that Plaintiffs intend to use the terms to

include "any natural person or any business, legal or governmental entity or association" over which Facebook exercises no control.

13.     Facebook objects to Plaintiffs' definitions of "[i]dentify," "[i]ncluding," "[r]elating to," "relate to," "referring to," "refer to," "reflecting," "reflect," "[c]oncerning," and "concern" on the ground that the definitions make the Requests overly broad and unduly burdensome and impose obligations that go beyond the requirements of the Federal and Local Rules.  Facebook shall construe these terms as commonly and ordinarily understood.

14.     Facebook objects to Plaintiffs' definition of "Platform Opt Out" as vague and ambiguous on the ground that it is defined by reference to other vague, ambiguous, and/or undefined terms, including "App," "User," and "Content and [I]nformation."  Facebook further objects to this definition as overly broad and unduly burdensome on the ground that the applicable account settings available to Facebook members have changed over time and this definition is not limited to a particular time period or particular settings

15.     Facebook objects to Plaintiffs' definition of "Privacy Controls" as vague, ambiguous, overly broad, and unduly burdensome on the ground that the applicable account settings available to Facebook members have changed over time and this definition is not limited to a particular time period or particular settings.

16.     Facebook objects to Plaintiffs' definition of "Privacy Controls" as vague, ambiguous, overly broad, and unduly burdensome to the extent the terms are meant to include applications, application developers, and/or "[a]ny person that develops an application, software experience, game, or website that accesses Content and Information from Facebook's API or other Facebook software," and to the extent it encompasses individuals or entities outside of Facebook's knowledge and/or who may not be relevant to this litigation.

17.     Facebook objects to Plaintiffs' "Relevant Time Period," which dates back to January 1, 2007, as overly broad, unduly burdensome, and disproportionate to the needs of the litigation.  In response to Plaintiffs' requests, Facebook will produce the following categories of documents dating back to January 1, 2007:  (i) documents reflecting Facebook's platform

7

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

3732

policies and user terms, (ii) Facebook's 2009 revisions to its user terms, and (iii) Documents reflecting privacy-related disclosures, communications, and other materials provided to users relating to Facebook's pre-2009 user terms and 2009 revisions to those terms.  For all other categories of materials, Facebook will produce documents dating back to March 20, 2012 in response to Plaintiffs' requests.

## OBJECTIONS TO INSTRUCTIONS

1.      Facebook objects to Plaintiffs' Instructions to the extent that they impose obligations that go beyond the requirements of the Federal and Local Rules.

2.      Facebook objects to Plaintiffs' Instruction No. 2 as ambiguous as to the meaning of "available."  Facebook further objects to the Instruction to the extent it exceeds the requirements of the Federal Local Rules.

3.      Facebook objects to Plaintiffs' Instruction No. 3 as unduly burdensome to the extent it requires Facebook to describe detailed information about documents which are no longer in existence or in Facebook's possession, custody, or control, which likely amounts to an extremely large volume of documents given the scope of Plaintiffs' claims and document requests.  Facebook will comply with Instruction No. 3 only to the extent it can ascertain the requested information about the subject documents through reasonable, good-faith investigation and inquiry.

4.      Facebook objects to Plaintiffs' Instruction No. 7 to the extent that it imposes obligations that go beyond the requirements of the Federal and Local Rules.

5.      Facebook objects to Plaintiffs' Instruction No. 12 as ambiguous and unduly burdensome.  Facebook further objects to the Instruction to the extent it exceeds the requirements of the Federal and Local Rules.

3733

## SPECIFIC RESPONSES AND OBJECTIONS

**REQUEST FOR PRODUCTION NO. 6:**

All Documents provided to or received from any governmental entity or regulator in the United States and United Kingdom in response to any formal or informal inquiry or investigation relating to whether Users' Content and Information was accessed or obtained by any Third Parties without proper consent or authorization, including but not limited to all inquiries or investigations arising out of the Cambridge Analytica Scandal, the FTC Consent Order, and any inquiry or investigation related to the settlement agreement with the FTC announced on July 24, 2019.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all documents provided to or received from any governmental entities or regulators in broad categories of "inquir[ies]" and investigation[s]" without regard for whether such information relates to Plaintiffs' claims.

(D) Facebook objects to this Request as overbroad as to time to the extent it seeks document predating March 20, 2012.

Subject to and without waiving the foregoing objections, Facebook will produce documents in response to this Request to the extent that those documents are responsive to Plaintiffs' other Requests, identified by a reasonable, good-faith search, and by December 26, 2019, Facebook will produce all document demand letters from the FTC associated with its 2018-2019 investigation into Facebook along with correspondence regarding the scope of those demands.

**REQUEST FOR PRODUCTION NO. 7:**

All organizational charts, personnel directories, or other documents sufficient to show Your organizational structure, including:

(a)     the identity of subsidiaries, affiliates, and joint ventures, and your ownership interest, control of, or participation in any subsidiary or affiliate or joint venture related to agreements, engineering, access, use, transmission, receipt, collection or analysis of Facebook Users' Content and Information by Third Parties;

(b)     the organization of any division, department, unit or subdivision of your company that has responsibilities relating to agreements, engineering, access, use, transmission, receipt, collection or analysis of Users' Content and Information by Third Parties; and

(c)     the names, titles, job descriptions, and employment periods for your present and former employees who has or had responsibilities relating to agreements, engineering, access, use, transmission, receipt, collection or analysis of Users' Content and Information by Third Parties; and

(d)     the names, titles, job descriptions, and employment periods of Your present or former directors, officers, or senior managers, as well as any secretaries or administrative assistants assigned to these directors, officers, or senior managers.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.   Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks "all" organizational charts, personnel directories, or other documents sufficient to show Facebook's organizational structure, including the categories of entities, divisions, or individuals described in the Request, which are merely "related" or "relating" to agreements, engineering, access, use, transmission, receipt, collection or analysis of Facebook Users' Content and Information by Third Parties, including those which may have no bearing on any issues in this Action and the names, titles, job descriptions, and employment periods of all present or former Facebook directors, officers, or senior managers, as well as any secretaries or administrative assistants assigned to these directors, officers, or senior managers, including those which may have no involvement with or knowledge of issues in this Action.

(D) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have any documents in its possession, custody, or control responsive to this Request.   Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 8:**

All versions (including each updated or amended version thereof) of Facebook's "Platform Policies," which have been called the "Developer Principles and Policies," the "Platform Guidelines," or the "Developer Terms of Service" (collectively, the "Platform Policies").

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks "all" versions of certain documents without any limitation as to the relevant time period or whether the versions sought are in final form.

(D) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

(E) Facebook further objects to this Request to the extent that the Request seeks materials that are cumulative or duplicate of materials produced to Plaintiffs previously.

Subject to and without waiving the foregoing objections, Facebook will produce the final, written versions of Facebook's Platform Policies issued to users dating back to January 1, 2007, to the extent that those policies have not been produced to Plaintiffs previously.

**REQUEST FOR PRODUCTION NO. 9:**

All Documents relating to each of the Named Plaintiffs, including but not limited to all Content and Information collected about each of them or gained from business relationships or any other source.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents merely "relating" to each of the Named Plaintiffs, including all Content and Information collected about each of them from any business relationship or any other source, including those which may have no bearing on any issues in this Action, and including those that are outside of Facebook's possession, custody, or control.

(D) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks "all" Content and Information "collected about each" Named Plaintiffs, which could include automated logs of actions taken, transaction-level date, and high-level summary documents used only for technical purposes, including those which may have no bearing on any issues in this Action.

3738

(E) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

Subject to and without waiving the foregoing objections, Facebook will produce documents that are responsive to this Request and which are uniquely associated with Content and Information related to the Named Plaintiffs' accounts or specifically relate to the sharing of the Named Plaintiffs' Content and Information with third-parties, identified by a reasonable, good-faith search of documents that are in Facebook's possession, custody, or control, to the extent the Named Plaintiffs have provided information sufficient to identify their accounts.

**REQUEST FOR PRODUCTION NO. 10:**

For each of the Named Plaintiffs, Documents sufficient to show the categories of Content and Information Facebook collects, tracks, and maintains about them.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks Documents sufficient to show all categories of Content and Information Facebook collects, tracks, and maintains about each of the Named

14
FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

3739

Plaintiffs, including, for example, Content and Information that Facebook did not share with any third parties and that does not relate to any issue in this Action.

(D) Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Request 9.

(E) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

Subject to and without waiving the foregoing objections, Facebook will produce documents that are responsive to this Request and which are uniquely associated with Content and Information related to the Named Plaintiffs' accounts, identified by a reasonable, good-faith search of documents that are in Facebook's possession, custody, or control, to the extent the Named Plaintiffs have provided information sufficient to identify their accounts.

**REQUEST FOR PRODUCTION NO. 11:**

Documents sufficient to identify all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information, what categories of Content and Information Facebook granted access to, how Facebook allowed these Third Parties to access the Named Plaintiffs' Content and Information, and the business purpose of all such access.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks Documents sufficient to identify all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information and other information relating to such information sharing, including Third Parties who were granted access to such Content and Information other than in connection with the allegations in Plaintiffs' Complaint.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have documents in its possession, custody, or control responsive to this Request.  Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 12:**

Documents relating to any partnerships or agreements Facebook entered into with Third Parties for access to Named Plaintiffs' Content and Information.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

16

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

3741

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it broadly seeks all Documents "relating" to any partnerships or agreements Facebook entered into with Third Parties for access to Named Plaintiffs' Content and Information, including those which may have no bearing on any issues in this Action, and including those that are outside of Facebook's possession, custody, or control.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have documents in its possession, custody, or control responsive to this Request.  Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

## REQUEST FOR PRODUCTION NO. 13:

For all Third Parties to which Facebook granted access to Named Plaintiffs' Content and Information, Documents sufficient to show any use by Third Parties of such Content and Information not in connection with the User that granted the permission to the Third Party or inconsistent with Facebook's agreement with that Third Party.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 13:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it broadly seeks Documents regarding "all Third Parties" who obtained access to certain content and information, including Third Parties who were granted access to such Content and Information other than in connection with the allegations in Plaintiffs' Complaint.

(D) Facebook further objects to this Request on the ground, and to the extent, that it seeks information that is outside of Facebook's possession, custody, or control because it seeks information regarding Third Parties' use of Named Plaintiffs' Content and Information.

Subject to and without waiving the foregoing objections, Facebook will produce cease-and-desist letters sent to app developers identified as having access to Facebook users' Content and Information during the Relevant Time Period relating to policy violations involving potential misuse of user data.

**REQUEST FOR PRODUCTION NO. 14:**

Documents sufficient to show the monetary or retail value of each named Plaintiff's Content and Information to Facebook, updated to reflect whenever Facebook's terms of service changed, including the calculation of revenue earned by Facebook for each Named Plaintiff based upon bartering or selling access to such Named Plaintiff's Content and Information.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request on the grounds that "monetary or retail value of each named Plaintiff's Content and Information to Facebook" and "calculation of revenue earned by Facebook for each Named Plaintiff" are ambiguous and vague.

(D) Facebook further objects to this Request on the grounds that it assumes disputed facts or legal conclusions, particularly that Facebook "barter[s]" or "sell[s]" access to the "Named Plaintiff[s'] Content and Information" to any Third Parties.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have any documents in its possession, custody, or control responsive to this Request.

**REQUEST FOR PRODUCTION NO. 15:**

Documents sufficient to show the money or any other thing of value, including but not limited to money or any other thing of value paid in exchange for targeted advertising, that Facebook received in exchange for each Named Plaintiff's Content and Information, which entities paid Facebook, and when such payments were made.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

19

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-md-02843-VC

3744

(C) Facebook objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks Documents regarding all entities who provided money or any other thing of value to Facebook other than in connection with the allegations in Plaintiffs' Complaint.

(D) Facebook further objects to this Request on the grounds that "money or any other thing of value . . . that Facebook received in exchange for each Named Plaintiff's Content and Information" is ambiguous and vague.

(E) Facebook further objects to this Request on the grounds that it assumes disputed facts or legal conclusions, particularly that Facebook received "money or any other thing of value" from Third Parties in exchange for the "Named Plaintiff[s'] Content and Information."

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have any documents in its possession, custody, or control responsive to this Request.

## REQUEST FOR PRODUCTION NO. 16:

Documents sufficient to show the monetary or retail value of Users' Content and Information to Facebook, including all monthly, quarterly, and annual financial reporting relating to same, and including but not limited to the calculation of average revenue per user, any changes to such monetary or retail value relating to changes to Facebook's terms of service, and any financial reporting of Content and Information as an asset.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 16:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other

applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users who are not parties to the Action and financial information unrelated to Plaintiffs' claims.

(D) Facebook further objects to this Request on the grounds that "monetary or retail value of Users' Content and Information to Facebook" is ambiguous and vague.

(E)  Facebook further objects to this Request as misleading to the extent that it suggests that Facebook's per-user revenues reflect the value of any information for which Plaintiffs seek compensation in this Action.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have any documents in its possession, custody, or control responsive to this Request.

**REQUEST FOR PRODUCTION NO. 17:**

All Documents relating to Facebook's assessment of the monetary or retail value of Users' Content and Information to Users (as distinct from value to Facebook), including analyses for providing compensation to Users for their Content and Information, including but not limited to Users compensated in connection with the Onavo or Research app.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.   Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users who are not parties to the Action.

(D) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, to the extent, that the Request seeks all Documents "relating to" Facebook's assessment of the monetary or retail value of Users' Content and Information to Users and information relating to compensation for data and/or information not related to Plaintiffs' claims

(E) Facebook further objects to this Request on the grounds that "monetary or retail value of Users' Content and Information to Users" is ambiguous and vague.

(F)   Facebook further objects to this Request as misleading to the extent that it suggests any compensation offered for information in connection with the Onavo or Research app reflects the value of any information for which Plaintiffs seek compensation in this Action.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have any documents in its possession, custody, or control responsive to this Request.

**REQUEST FOR PRODUCTION NO. 18:**

All Documents that have been transmitted to Users by Facebook relating to whether Users' Content and Information was accessed or obtained by Third Parties.

22

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

3747

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(B) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks Documents transmitted to Users who are not parties to the Action.

(C) Facebook further objects to the Request on the ground that the Request seeks documents that are already in Plaintiffs' possession, custody, or control.

Subject to and without waiving the foregoing objections, Facebook will produce Facebook's communications to users regarding the Cambridge Analytica events.

**REQUEST FOR PRODUCTION NO. 19:**

All Documents supporting the escalation of those Apps escalated to Phase Two of ADI for Enhanced Examination and/or Phase Three of ADI for Enforcement and designated as follows in the Chen Declaration ¶ 34:

(d) each [A]pp to which a request for information was sent; (e) each [A]pp for which an interview was sought with the developer; (f) each [A]pp for which a remote or onsite audit was requested to be conducted; (g) each [A]pp for which actual misuse was found and identification of that misuse; (h) each [A]pp that was banned for actual misuse; and (i) each [A]pp that was banned for failing to cooperate with Facebook's investigation.

Facebook has described identification of these Apps as non-privileged and has already produced it to the Massachusetts Attorney General's Office. *See* Chen Declaration ¶ 35.

23

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

3748

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that the Request seeks all Documents supporting the escalation of certain Apps, including escalations not relevant to the claims or defenses in this Action.

Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 20:**

The list of Apps that Facebook provided to the Massachusetts Attorney General's Office and that the Chen Declaration ¶ 35 describes as "the subject of external actions or communications with third parties, including the growing list of Apps Facebook has suspended as part of the [ADI], whether because of policy violations or because of their refusal to cooperate with Facebook's investigation."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

Subject to and without waiving the foregoing objections, Facebook will produce relevant lists of Apps that Facebook provided to the Massachusetts Attorney General's Office.

**REQUEST FOR PRODUCTION NO. 21:**

Communications between Facebook and Third Parties relating to the ADI, including but not limited to Communications that Facebook provided to the Massachusetts Attorney General's Office. *See* Chen Declaration ¶ 37.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that the Request seeks all Communications between Facebook and Third Parties "relating" to the ADI, including communications unrelated to Plaintiffs' claims.

Subject to and without waiving the foregoing objections, to the extent non-privileged, responsive documents are identified by a reasonable, good-faith search, Facebook will produce Communications between Facebook's ADI team and third-party app developers relating to ADI.

**REQUEST FOR PRODUCTION NO. 22:**

All "Privacy Risk Assessment[s]," and notes or agenda relating to Facebook's "focused subject-matter-specific meetings," "focused subject-matter-specific discussions," "weekly intra- and inter-team meetings," and "Privacy Summit[s]," as detailed in "Facebook's Privacy Program Overview" included in any PricewaterhouseCoopers LLP ("PwC") assessment report prepared pursuant to the FTC Consent Order.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that the Request seeks

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

3751

all notes and agenda regarding various topics, including notes and agenda unrelated to Plaintiffs' claims.

Facebook stands on its objections.

**REQUEST FOR PRODUCTION NO. 23:**

Unredacted versions and Documents in support of the assessment reports, including the Initial Assessment Report and Biennial Reports, prepared by PwC pursuant to the FTC Consent Order.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request as seeking information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects that the term "assessment reports" is ambiguous and vague. Facebook will construe this term to mean the "Privacy Risk Assessments" referenced in Request No. 22.

(D) Facebook further objects to the Request to the extent that the Request seeks documents that are not in Facebook's possession, custody, or control because the Request seeks documents that support assessment reports prepared by another entity.

(E) Facebook further objects to the Request as Facebook lacks sufficient knowledge to identify with certainty documents relied upon by another entity.

Facebook stands on its objections.

27

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

3752

**REQUEST FOR PRODUCTION NO. 24:**

Documents sufficient to identify all Third Parties to which Facebook granted access to Users' Content and Information not generally available through Platform pursuant to partnerships or agreements between Facebook and those Third Parties.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.   Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks Documents sufficient to identify all Third Parties to which Facebook granted access to Users' Content and Information not generally available through Platform pursuant to partnerships or agreements between Facebook and those Third Parties, including Third Parties who were granted access to such Content and Information other than in connection with the allegations in Plaintiffs' Complaint.

Subject to and without waiving the foregoing objections, Facebook will produce final agreements with integration partners and device manufacturers responsive to this Request.

**REQUEST FOR PRODUCTION NO. 25:**

All Documents relating to agreements or partnerships described in Request No. 24.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.   Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "relating" to the subject agreements or partnerships, including those which are not relevant to the subject matter of the Action.

(D)  Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Request 24.

Subject to and without waiving the foregoing objections, Facebook will produce agreements with its integration partners and device manufacturers responsive to this Request.

**REQUEST FOR PRODUCTION NO. 26:**

For each of the Third Parties that Facebook entered into partnerships or agreements with as described in Request No. 24, Documents sufficient to identify:

- The fields, kinds, or categories of Content and Information that were accessed or obtained by such Third Parties;

- How each such Third Party accessed or obtained the Content and Information of Users;

- How each such Third Party used the Content and Information accessed or obtained;

- Where the Content and Information obtained by such Third Parties currently resides and who has access to it.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 26:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.   Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to the Request to the extent that the Request seeks Documents that are not in Facebook's possession, custody, or control because the Request relates to the conduct of Third Parties.

(E)  Facebook further objects to this Request as seeking information outside of Facebook's knowledge regarding the actions and knowledge of third parties.

(D) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users that are not parties to the Action.

Subject to and without waiving the foregoing objections, based on Facebook's understanding of the Request, Facebook states it does not have documents in its possession, custody, or control responsive to Request No. 26.

**REQUEST FOR PRODUCTION NO. 27:**

Documents sufficient to show all forms and formats in which Facebook transmitted to Third Parties information concerning Users' liking, viewing, retrieving, or otherwise requesting or obtaining videos on, using, or by means of the Facebook Platform.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(B) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users not a party to the Action.

(C) Facebook further objects to this Request on the grounds that the term "transmitted" is ambiguous and vague in that it could refer to any and all forms of conveying information, including passively making information available to a third party by hosting and displaying the information a User chooses to include on his or her Facebook profile page.

Subject to and without waiving the foregoing objections, Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 28:**

All Documents relating to Internal Policies by Facebook on the monitoring of Third Parties' compliance with Facebook's Platform Policy, Data Policy, or SRR.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 28:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "Relating" to the subject Internal Policies, including Policies unrelated to Plaintiffs' claims.

Subject to and without waiving the foregoing objections, to the extent non-privileged, responsive documents are identified by a reasonable, good-faith search, Facebook will produce final, formal, written Policies that governed access to Facebook consumer data by third-party Applications during the Relevant Time Period.

**REQUEST FOR PRODUCTION NO. 29:**

All Documents relating to Internal Policies by Facebook on the enforcement of Facebook's Platform Policy, Data Policy, or SRR against Third Parties.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other

applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "relating" to the subject Internal Policies, including Policies unrelated to Plaintiffs' claims.

(D) Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Request 28.

Subject to and without waiving the foregoing objections, Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 30:**

All Documents relating to measures and controls, including proposed measures and controls, put in place by Facebook to prevent Third Parties from violating Facebook's Platform Policy, Data Policy, or SRR.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "Relating" to the subject measures and controls, including measures and controls unrelated to Plaintiffs' claims.

(D) Facebook further objects to this Request on the grounds that the phrases "measures and controls" and "proposed measures and controls" are ambiguous and vague and undefined.

(F) Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Requests 28 and 29.

Subject to and without waiving the foregoing objections, to the extent non-privileged, responsive documents are identified by a reasonable, good-faith search, Facebook will produce final, formal, written Policies that governed access to Facebook consumer data by third-party Applications during the Relevant Time Period.

**REQUEST FOR PRODUCTION NO. 31:**

All Documents relating to Facebook's audits, inquiries, and investigations of Third Parties investigating compliance with any provisions of Facebook's Platform Policy, Data Policy, or SRR regarding the access, use, transmission, receipt, collection and analysis of Users' Content and Information on and off the Platform.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 31:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other

applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "relating" to the subject audits, inquiries, and investigations, including audits, inquires, and investigations unrelated to Plaintiffs' claims.

Subject to and without waiving the foregoing objections, Facebook will produce cease-and-desist letters sent to app developers during the Relevant Time Period relating to policy violations involving the use of User data. Facebook is willing to meet and confer with Plaintiffs regarding any other documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 32:**

All Documents Concerning Misuse of Data, including investigations, examinations, inquiries, or audits-or Communications regarding such investigations, examinations, inquiries, or audits-regarding Misuse of Data prior to the deprecation of Graph API v.1.0.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 32:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

35
FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

3760

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case in that it seeks all Documents "Concerning" Misuse of Data.

(D) Facebook further objects that the phrase "prior to the deprecation of Graph API v.1.0" is ambiguous and vague and undefined.  Facebook will construe this phrase to mean prior to April 30, 2015.

(E) Facebook further objects to the Request to the extent that it is cumulative or duplicative of other Requests, such as Requests 31.

Subject to and without waiving the foregoing objections, Facebook will produce cease-and-desist letters sent to app developers during the Relevant Time Period relating to policy violations involving the use of User data.  Facebook is willing to meet and confer with Plaintiffs regarding any other documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

**REQUEST FOR PRODUCTION NO. 33:**

Documents sufficient to show the notice that Facebook provided to Users regarding modifications to Facebook's SRR or Data Policy, and all Communications related thereto.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 33:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other

applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action and/or disproportionate to the needs of the case on the grounds that it seeks all Communications "related" to the subject notice.

(D) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users who are not parties to the Action.

Subject to and without waiving the foregoing objections, Facebook will produce final, exemplar versions of notifications that Facebook made to users regarding material changes to its Data Use Policy and Statement of Rights and Responsibilities dating back to January 1, 2007.

**REQUEST FOR PRODUCTION NO. 34:**

All Documents relating to the conditioning of Third Parties' access to Users' Content and Information on the purchase of Mobile App Install Ads, payment of Content and Information in-kind (referred internally as Reciprocity or Data Reciprocity), or other payment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 34:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that it seeks all Documents "relating" to certain subjects, including Documents unrelated to Plaintiffs' claims and documents that are not within Facebook's possession, custody, or control.

(D) Facebook further objects to this Request to the extent it is based on the false and incorrect premise that Facebook "condition[ed]" or "condition[s]" access to information on certain purchases and/or payments.

Subject to and without waiving the foregoing objections, Facebook will produce final, formal, written Policies and agreements that governed access to Facebook consumer data by third-party Applications, integration partners, and mobile phone manufacturers during the Relevant Time Period.

## REQUEST FOR PRODUCTION NO. 35:

Documents relating to the manner in which a Facebook User could control how his or her data was shared through their Privacy Controls and App Settings throughout the Relevant Time Period, including but not limited to screenshots of the Facebook website and the Facebook mobile application.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 35:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that it seeks all Documents "relating" to the subject manner of control, including Documents that are not within Facebook's possession, custody, or control.

(D) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users that are not parties to the Action.

(E) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

Subject to and without waiving the foregoing objections, to the extent non-privileged documents are identified by a reasonable, good-faith search, Facebook will produce its user terms dating back to January 1, 2007, to the extent they have not been produced to Plaintiffs' previously, and screen shots sufficient to show how a user could control how data was shared with third-party applications.

**REQUEST FOR PRODUCTION NO. 36:**

All Documents concerning User testing, evaluation and analysis of Facebook's Privacy Controls and App Settings during the Relevant Time Period, including but not limited to design documents, correspondence, analyses, and reports.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 36:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Request on the following additional grounds:

(A) Facebook objects to this Request to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection.  Facebook interprets this Request as though it excludes documents protected by these privileges and protections.

(B) Facebook objects to this Request to the extent it seeks to impose obligations that go beyond the requirements of the Federal and Local Rules.

(C) Facebook further objects to this Request as ambiguous and confusing on the grounds that the phrase "User testing, evaluation and analysis of Facebook's Privacy Controls and App Settings" is ambiguous and vague and not defined.

(D) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, unlikely to lead to the discovery of admissible evidence, and/or disproportionate to the needs of the case on the grounds that it seeks all Documents "concerning" the subject User testing, evaluation and analysis, including Documents which are not within Facebook's possession, custody, or control.

(E) Facebook further objects to this Request as overly broad, unduly burdensome, irrelevant to the subject matter of this Action and/or disproportionate to the needs of the case on the grounds, and to the extent, that the Request seeks information about Users that are not parties to the Action.

(F) Facebook further objects to the Request on the grounds that the Request seeks documents that are public, already in Plaintiffs' possession, custody, or control, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

Subject to and without waiving the foregoing objections, Facebook is willing to meet and confer with Plaintiffs regarding the documents being sought by this Request, their relevance to the Plaintiffs' claims (if any), and what documents Facebook could reasonably produce proportionate to the needs of the case.

DATE:  December 26, 2019        Respectfully submitted,

**GIBSON, DUNN & CRUTCHER, LLP**

By:  /s/ *Joshua S. Lipshutz*
Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Brian M. Lutz (SBN 255976)
blutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

41

FACEBOOK, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION
CASE NO. 3:18-MD-02843-VC

3766

# Plaintiffs' Exhibit C

# Plaintiffs' Exhibit D

# Redacted in its Entirety

# Plaintiffs' Exhibit E

# Redacted in its Entirety

# Exhibit 5

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4

5    IN RE: FACEBOOK, INC. CONSUMER           MDL No. 2843
     PRIVACY USER PROFILE LITIGATION          Case No.  18-md-02843-VC (JSC)
6

7                                             **DISCOVERY ORDER NO. 9**

8                                             (Dkt. Nos. 515, 526, 537, 548)

9

10

11          This MDL matter has been assigned to the undersigned for management of discovery.

12   Now pending before the Court are the Parties' briefs concerning the proper scope of discovery

13   related to the data Facebook accumulates about the named Plaintiffs.  (Dkt. Nos. 515, 526, 537,

14   548.)   In brief, Facebook contends that the district court's order specifically defined the data at

15   issue as "substantive and revealing content that users intended only for a limited audience."  (Dkt.

16   No. 298.)  Based on this definition, Facebook argues that for any named Plaintiff data to be

17   relevant and discoverable, it must meet two criteria.  First, the discoverable data must have arisen

18   from user activity occurring on the Facebook platform, such as Facebook posts and sent messages.

19   Second, the named Plaintiff must have then overtly shared such data with a limited audience, such

20   as their friends.  Facebook submits that this is the only plausible reading of the district court's

21   order limiting Plaintiffs to four actionable categories of potential liability.  Plaintiffs respond that

22   the universe of discoverable data Facebook collects for each user is much larger and necessarily

23   includes: (1) user activity occurring off the Facebook platform; and (2) user data that can be

24   inferred from user activity occurring on or off the Facebook platform.  A second question

25   presented by the briefs is whether discovery may proceed on the claims the district court stayed.

26          After carefully considering the papers submitted by the Parties, and consulting with the

27   district court, the Court rules that discovery is not as limited as Facebook contends.  Plaintiffs

28   correctly argue that Facebook's restrictive view of relevant discovery would exclude an enormous

United States District Court
Northern District of California

1  amount of information that Facebook collects and shares with third parties about Facebook's

2  users.  The district court's order (Dkt. No. 298) did not limit Plaintiffs' claims to only challenging

3  the sharing of data Facebook collects from a user's on-platform activity; the claims also challenge

4  Facebook's sharing of user data and alleged failure to monitor how third parties used such shared

5  information.

6       Accordingly, the Court rules the discoverable user data at issue includes:

7          • Data collected from a user's on-platform activity;

8          • Data obtained from third parties regarding a user's off-platform activities; and

9          • Data inferred from a user's on or off-platform activity.

10       As for the stayed claims, and again after consulting with the district court, the Court rules

11  that discovery is stayed as to the stayed claims.  Of course, if a particular discovery request is

12  relevant to both a stayed and non-stayed claim, then discovery is not stayed merely because the

13  discovery request is also relevant to a stayed claim.

14       **IT IS SO ORDERED.**

15  Dated: October 29, 2020

16

17

18  JACQUELINE SCOTT CORLEY
     United States Magistrate Judge

19

20

21

22

23

24

25

26

27

28

# Exhibit 6

1
2
3
4
5
6
7
8

<div style="text-align:center">

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

</div>

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843 <br> Case No.  18-md-02843-VC (JSC) <br><br> **DISCOVERY ORDER NO. 11** |

9
10
11

This MDL matter has been assigned to this Court for management of discovery.  The Court held a discovery status conference on December 9, 2020 and this Order memorializes the decisions made at the hearing.

12
13
14
15
16
17
18
19
20
21
22
23
24

**A.  30(b)(6) Witness**.  At the hearing, Facebook insisted it does not have any documents reflecting its valuation of the user data it collects.  It also contended that Plaintiffs conceded that user data not shared with or accessible to third parties is not relevant, (Dkt. No. 548 at 10), and because Facebook does not share inferred user data, the inferred user data Facebook maintains is not relevant.  Facebook both collects and uses data about its users as part of its business model, including data derived from third parties.  How it specifically uses this data is an open question, but if the Court were to accept Facebook's arguments about the scope of production, it would eliminate Discovery Order No. 9's third category of discovery: data inferred from a user's on or off-platform activity.  What is needed now is more detail about Facebook's collection and use of user data so future discovery requests can be tailored to Plaintiffs' better understanding of the internal operations of Facebook as well the terminology it uses for describing data that is potentially responsive to Plaintiffs' discovery requests.

25
26
27

The Court accordingly orders Facebook to provide a 30(b)(6) witness regarding the discoverable user data as articulated by Discovery Order No. 9.  (Dkt. No. 557.)  Facebook shall also provide a 30(b)(6) witness on how it monetizes—directly or indirectly—and thus

28

<div style="text-align:left">
United States District Court<br>
Northern District of California
</div>

United States District Court
Northern District of California

1    values user data.  Plaintiffs shall provide Facebook with their 30(b)(6) Notice on or before

2    December 18, 2020 and Facebook will have until January 13, 2021 to submit an initial

3    response.  The 30(b)(6) topics shall be narrowly tailored to assist Plaintiffs with identifying

4    relevant discovery in the above two areas.  The deposition will be limited to the time

5    period of 2012 through 2017 to reduce burden and given its investigatory purpose.

6  **B. Search Terms**.  The Parties shall continue to meet and confer the week of December 14-

7    18 regarding their competing proposals.  Given the deadline for submission of final

8    proposals—Christmas Eve—the Parties shall submit a stipulation by December 18, 2020,

9    agreeing to a new deadline for final proposals.

10  **C. Five-Day Détente**.  The Parties shall meet and confer to choose five consecutive business

11    days during the upcoming holidays where no communications will take place between the

12    Parties regarding the case.  Communications on other topics are encouraged.

13  **D. Plaintiffs' Interrogatory Responses and Privacy Settings Data**.  Plaintiffs shall

14    supplement their interrogatory responses regarding what they characterize as their sensitive

15    information with specific examples rather than general categories.

16  **E. Additional Proposed Custodians**.  The addition of further custodians for discovery

17    purposes is premature at this time.

18  **F. Dismissal of Named Plaintiffs**.  The parties shall file a stipulation regarding the dismissal

19    of certain named plaintiffs in accordance with what was discussed at the hearing no later

20    than December 18, 2020.

21  **G. Next Status Conference**.  The next video status conference shall be January 15, 2021 at

22    8:30 a.m.  The Parties shall submit a joint status update by January 14, 2021 at 12:00 p.m.

23    **IT IS SO ORDERED.**

24  Dated: December 11, 2020

25

26

27    JACQUELINE SCOTT CORLEY
      United States Magistrate Judge

28

2

# Exhibit 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: FACEBOOK, INC. CONSUMER
PRIVACY USER PROFILE LITIGATION

MDL No. 2843
Case No.  18-md-02843-VC (JSC)

**DISCOVERY ORDER NO. 12**

This MDL matter has been assigned to this Court for management of discovery.  The Court
held a discovery status conference on January 15, 2021 and this Order memorializes the decisions
made at the hearing.

A. **ADI**.  Plaintiffs shall select 20 entries, from the previously identified 400 entries, for in
   camera review by the Court and notify Facebook by January 22, 2021—or earlier if
   possible—of the specific entries selected.  The Parties shall then simultaneously brief the
   Court, limiting the respective briefs to 20 pages total, by February 5, 2021.  By that same
   date, Facebook shall submit the documents for in camera review to
   jscsettlement@cand.uscourts.gov.

B. **30(b)(6) Depositions**.  The Parties have thus far been unsuccessful in negotiations
   regarding the 30(b)(6) deposition required by Discovery Order No. 11.  (Dkt. No. 588.)
   The Court orders the Parties to conduct the deposition in the month of February, preferably
   prior to the next status conference.  Further, the deposition shall be no longer than 10 hours
   in total (over at least two days).  The scope of the depositions shall be limited to the
   discoverable user data as defined by Discovery Order No. 9, (Dkt. No. 557), and how
   Facebook monetizes—directly or indirectly—and thus values user data.  The purpose of
   the depositions is to gain a better understanding of Facebook's internal operations, related
   to the scope of the depositions as described above; whether particular user data is not

shared, not admissible, or not monetized, is not a valid reason to object to a particular

deposition question.  If the deponent is unable or unprepared to answer particular

questions, that can be addressed with further, more targeted, 30(b)(6) depositions if

needed.

**C. Next Status Conference**.  The next video status conference shall be February 24, 2021 at

8:30 a.m.  The Parties shall submit a joint status update by February 23, 2021 at 12:00 p.m.

**IT IS SO ORDERED.**

Dated: January 15, 2021

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

3784

# Exhibit 8

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel 213.229.7000
www.gibsondunn.com

Deborah L. Stein
Direct: +1 213.229.7164
Fax: +1 213.229.6164
DStein@gibsondunn.com

April 1, 2021

<u>VIA E-MAIL</u>

Derek W. Loeser
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101

Lesley E. Weaver
Bleichmar Fonti & Auld LLP
555 12th Street, Suite 1600
Oakland, CA 94607

Re:   *In re Facebook, Inc. Consumer Privacy User Profile Litigation*

Counsel:

We write in response to Plaintiffs' recent flurry of letters purporting to invoke the parties' expedited dispute protocol and threatening to file a series of accelerated motions to compel. Plaintiffs' letters are an abuse of the parties' dispute protocol, which is intended to address a party's refusal to produce previously-requested information—not to demand information never previously requested or discussed. Plaintiffs' letters also reflect an abusive litigation tactic that is making it nearly impossible to move this case forward. Plaintiffs' letters seek to unravel many months, if not more, of negotiations; ignore rulings Judge Chhabria and Judge Corley have issued; and informally demand information on an expedited schedule that has never been discussed and has no bearing on this case.[1]

Facebook would like this case to move forward quickly and efficiently so that the parties can finally litigate Plaintiffs' live claims on the merits. It is impossible to make progress when Plaintiffs insist on an unfocused, whack-a-mole discovery process that unwinds past agreements and work. The parties dedicate an enormous amount of time and resources to meeting and conferring regarding discovery requests. The meet and confer process that Judge Corley ordered is designed to allow the parties to reach a compromise and move on. Facebook cannot have faith in this process or rely upon agreements the parties

---

[1] In this letter, we respond specifically to Plaintiffs' letters dated March 4, March 1, February 19, and February 11, each of which invoke the parties expedited dispute protocol. Facebook responded separately on March 23 to Plaintiffs' March 18 demand that the parties enter a Rule 53 stipulation. Facebook responded by email on March 22 to Plaintiffs' March 15 demand for certain deposition transcripts and interrogatory responses from government matters. Facebook responded by email on March 21 to Plaintiffs' March 16 letter taking the position that inadvertent, privileged testimony may not be clawed back. Facebook is responding separately to Plaintiffs' additional demand, also in their March 1 letter, for a list of the materials counsel selected for Facebook's deponents to review in advance of their depositions. Facebook will also respond separately to Plaintiffs' letter dated March 9, which raises various complaints with respect to Facebook's 516 pages of responses to Plaintiffs' Fourth Set of Interrogatories.

Beijing · Brussels · Century City · Dallas · Denver · Dubai · Frankfurt · Hong Kong · Houston · London · Los Angeles · Munich
New York · Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

3786

have reached when Plaintiffs constantly seek to reopen and expand those agreements. Facebook urges Plaintiffs to reevaluate their approach and to focus on forward progress.

**I.      Plaintiffs' March 1 letter demanding "all data" relating to the Named Plaintiffs.**

Plaintiffs' March 1, 2021 letter demands Facebook produce "all data and information relating to the Named Plaintiffs"—even if the data was not shared with third parties.  There is no basis for this overbroad request.  After the parties engaged in nearly a year of negotiations, informal discovery, and briefing on Plaintiffs' blanket demand for data "relating" to the Named Plaintiffs, Plaintiffs finally informed the Court on the last page of their sur-reply on Facebook's motion to enforce the partial stay of discovery that they "seek only a holding that the sensitive data Facebook collected about ten Named Plaintiffs and *shared* with third parties is relevant."  Plaintiffs conceded: "**Plaintiffs do not contend that information that was not shared is relevant, which substantially narrows the information Facebook would be required to produce in this case**."  Dkt. 548 at 9.

Plaintiffs' "renew[ed]" request for "all data" related to the Named Plaintiffs— including data that was never shared—seeks to unwind more than a year of forward progress. It also directly contradicts the representations Plaintiffs made to the Court in their prior briefing, which the Court accepted and relied on in issuing Discovery Order 9.

**A.      Facebook produced more than 1,000,000 pages of user data.**

For nearly a year, Plaintiffs insisted that Facebook locate and produce any data Facebook presently has access to that might, in any way, relate to any Named Plaintiff, plus any derivative materials drawing on that data.  Plaintiffs demanded all of this information even if it was never shared outside of the Company and even if it is not associated with any particular user.

In response to this request, Facebook discussed with Plaintiffs in **January 2020** that the best way to produce the individual user data that could be within the scope of this case was to produce for each Named Plaintiff the content and information that Facebook associates with each Named Plaintiffs' account.  This information is contained in the "Download Your Information" ("DYI") file that Facebook also makes available to users. Facebook's current DYI tool reflects, in human-readable form, the most complete compilation of data Facebook maintains relating to any user, including any individual user data that third parties might have been able to access.

Beginning in February 2020, Facebook produced the information contained in the DYI file for each of the Named Plaintiffs, plus certain additional information (such as a spreadsheet containing data tracking how Plaintiffs adjusted their Facebook privacy settings). **In total, Facebook produced more than <u>one million pages</u> of individual user data it maintains relating to the Named Plaintiffs**.[2]

Facebook made these productions despite repeatedly expressing concerns that much the data it produced is not probative of any issue in this privacy litigation—which is about data sharing (not the data Facebook maintains).  As Judge Chhabria explained in the first line of his Motion to Dismiss Order:  "This lawsuit, which stems from the Cambridge Analytica scandal, is about Facebook's practice of sharing its users' personal information with third parties. . . . [Plaintiffs'] principal allegations are that Facebook: (i) made sensitive user

---

[2] These productions were extremely burdensome and took many months to complete because they required reformatting data that is typically available only on a live website into individual documents for use in litigation.  Plaintiffs initially objected to the format in which Facebook produced the materials.  Facebook then reproduced documents to address Plaintiffs' formatting concerns.  Plaintiffs amended their complaint in August 2020 to substitute new Named Plaintiffs.  Facebook subsequently produced the same materials for the new Named Plaintiffs.

3787

information available to countless companies and individuals without the consent of the users, and (ii) failed to prevent those same companies and individuals from selling or otherwise misusing the information." *Id.* at 1. The more than one-million pages of individual user data Facebook produced far exceed that scope. Facebook's productions of individual user data are overinclusive in that Facebook produced the data it associates with each Named Plaintiffs' account and did not limit its production to data that actually was accessed by or shared with third parties. Facebook also did not limit its productions "sensitive data," as defined in the Court's motion to dismiss order as the only type of data at issue in this case. *See, e.g., id.* at 1, 7, 9, 13.

### B. Plaintiffs demanded vast amounts of additional data—even if never shared.

After Facebook produced the individual user data that Facebook associates with the Named Plaintiffs' accounts—including data outside the scope of this case—Plaintiffs insisted that Facebook also locate and produce any other data that might, in any way, relate to any Named Plaintiff, as well as any materials derived from that data. In making this demand, Plaintiffs focused largely on a database called Hive and demanded that Facebook produce any data relating to any Named Plaintiff that is currently in that database. Plaintiffs articulated no basis on which the data they demanded could be relevant to their live claims.

The parties met and conferred about Plaintiffs' demand over the course of several months.[3]



As Facebook explained, Plaintiffs' blanket demand not only sought large volumes of data having nothing to do with their claims—it was also nearly impossible to satisfy. As Facebook has explained,

Facebook explained that such a remarkable undertaking and would result in the production of massive amounts of internal data tables that are

---

[3] At one point during the parties' extensive discussions on this issue, Facebook asked Plaintiffs if they would, at minimum, agree that if Facebook hypothetically possessed a database that had the ability to receive data, but no ability to output (*i.e.*, share) data, that database would be out of scope. Plaintiffs refused to agree, arguing that the hypothetical database could theoretically create "inferences" from user data that Facebook could use to place advertisements on its platform.

[4] Plaintiffs state that "counsel has demonstrated that Hive tables can be searched by userID [*sic*]."

[5] This does not include any data produced in response to subpoenas or as part of Facebook's discovery obligations. Certain Hive data has been produced in those contexts.

irrelevant and immaterial to Plaintiffs' claims, which concern only sensitive individual user data that was **shared** with third parties.

### C.      The Parties litigated the scope of discoverable user data and Plaintiffs conceded that only shared data is relevant.

The parties then litigated the scope of discoverable user data in connection with Facebook's motion to enforce the partial stay of discovery. Throughout their briefs, Plaintiffs repeatedly acknowledged that the only data that is relevant to this case is data that was shared with third parties:

- "This discovery dispute concerns sensitive user information that Facebook has shared with third parties without users' consent." (Dkt. 547-3 at 1).

- "Plaintiffs' standing to bring their claims, and the validity of many of those claims, depends on . . . whether Facebook shared that information with third parties." (Dkt. 526 at 5); *see also id.* at 10–11 (acknowledging that Plaintiffs' claims require proof that Facebook shared Plaintiffs' information with third parties).

- "[S]ensitive user information is relevant if Facebook shared it without users' consent." (Dkt. 547-3 at 2).

- "[T]he legal theories upheld at the pleading stage . . . turn . . . on whether Facebook shared [sensitive information] with third parties." (*Id.* at 4).

After four rounds of briefing, on the last page of their sur-reply, Plaintiffs finally conceded what they should have said a year earlier:  "***Plaintiffs do not contend that information that was not shared is relevant***." (Dkt. 547-3 at 9 (emphasis added)).  This concession—while welcome—raised frustrating and still unanswered questions about why Plaintiffs had forced the parties to spend many hundreds of attorney hours over the previous year negotiating and litigating over the relevance of data that was never shared or made accessible outside of Facebook.

### D.      Judge Corley held that the discoverable user data in this case is sensitive data shared with third parties.

In Discovery Order 9, Judge Corley addressed the user data relevant to this case and largely adopted the position Plaintiffs took in their sur-reply brief.  The Court held the user data relevant to this case is "information that Facebook collects and shares with third parties about Facebook's users."  The Court explained that Plaintiffs' claims "challenge Facebook's sharing of user data and alleged failure to monitor how third parties used such shared information." (Discovery Order 9, Dkt. 557 at 2 (emphasis added).)

Discovery Order 9 further explained that the information "Facebook collects and shares with third parties" is not necessarily limited to the information users post on Facebook (as Facebook had argued) and would also include any *shared* data: (1) collected from a user's on-platform activity; (2) obtained from third parties regarding a user's off-platform activities; and (3) inferred from a user's on or off-platform activity.  *Id.*

### E.      Facebook confirmed it completed its production of discoverable user data.

To comply with Discovery Order 9, Facebook investigated whether any discoverable user data had not already been produced. We did not identify any such data. Indeed, as stated earlier, the DYI file is *overinclusive* of the universe of discoverable data under Pretrial Order 20 and Discovery Order 9.

Again, this data-privacy litigation relates to Facebook's alleged practice of sharing certain "sensitive" user data with third parties. Third parties who are permitted access to

3789

individualized data about Facebook users access that data through application programming interfaces ("APIs").  APIs are a standard industry programming tool, and they allow applications to access data and features of other applications, services, or operating systems.  All of the APIs Facebook has made available to third parties query Facebook's Social Graph only and allow access to a subset of the information contained in the Social Graph.[6]  Facebook's current "Download Your Information" or "DYI" tool retrieves data from, and allows users to download the information Facebook maintains about them in, the Social Graph.  It is the most complete compilation of data Facebook maintains for any user and reflects a human-readable version of the data relating to any user in Facebook's Social Graph—including, but not limited to, the data that could have potentially been accessed by third parties.

F.    **The Court allowed a 30(b)(6) deposition to allow Plaintiffs to confirm Facebook had satisfied is production obligations.**

After Facebook reported its preliminary finding that it completed its productions of discoverable user data, as described in Pretrial Order 20 and Discovery Order 9, Plaintiffs told the Court: "[I]t is, frankly, just impossible for us to believe that." (12/9/2020 Hr'g Tr. at 19:22-23.)

To address Plaintiffs' "disbelief . . . as to how Facebook operates," the Court suggested a 30(b)(6) deposition to narrowly address "the discoverable user data as articulated by Discovery Order 9." *See* 12/9/2020 Hr'g Tr. at 26:6-9; Discovery Order 11, Dkt. 588.  Ignoring the Court's instructions, Plaintiffs issued a deposition notice on 12 extraneous topics.  Judge Corley quashed this notice—explaining it was "way beyond what she had in mind." *See* 1/15/2021 Hr'g Tr. at 17:12-13.  The Court explained, "[w]e just need somebody under oath" (*id.*) to "verify [Facebook's] representation" (*id.* at 35:3-5) that it has produced all discoverable data within the scope of Discovery Order 9.

The 30(b)(6) deposition on discoverable user data was held on February 23, 2021.  Facebook designated Konstantinos Papamiltiadis as its witness on this issue.  Mr. Papamiltiadis is Facebook's Vice President of Platform Partnerships, has over eight years of experience at Facebook, and has 127 reports.  Consistent with Judge Corley's instructions, Mr. Papamiltiadis spent nearly 20 hours preparing to testify about the discoverable user data under Discovery Order 9—including the user data Facebook collects, how Facebook uses different categories of user data, which categories of user data Facebook shares, and how shared categories of user data are reflected in produced materials.

G.    **Plaintiffs declined to use the 30(b)(6) deposition as ordered and reverted to their position that all data relating to the Named Plaintiffs must be produced—even if not shared.**

Rather than use the 30(b)(6) deposition to address the topic the Court ordered, Plaintiffs pursued their own agenda and used the deposition to explore all of the topics in the

---

[6] Facebook uses the term the "Social Graph" to describe the complex web of peoples, places, things, actions, and connections on the Facebook Platform.  The Facebook product that users see is powered by a series of databases that work in tandem to provide Facebook users a seamless experience.  As Facebook users navigate through Facebook and interact with it—including, for example, by liking posts made by other users, watching videos, posting photos, and sending messages—the users create new relationships and connections between themselves and the content they are able to see.  This web of peoples, places, things, actions, and connections are referred to as the "Social Graph."

3790

notice the Court had rejected.  At the deposition, Plaintiffs did not even ask the most basic questions about what user data Facebook shares with third parties.  Plaintiffs never asked "what categories of user data does Facebook make accessible to third parties?"  Nor did they ask whether the materials Facebook has produced reflect the scope of user data accessible to third parties.  Plaintiffs instead questioned Mr. Papamiltiadas for hours regarding different types of data Facebook has used only internally (which Plaintiffs were already aware existed)—including "data from third parties about users' off-platform activity," data derived from the Facebook Pixel, and "information . . . associated with users via app-scoped IDs."

Plaintiffs now demand all of that data after they tactically avoided asking Mr. Papamiltiadas whether any of it has been shared or otherwise made accessible to third parties.  It has not.  Plaintiffs did not even seek to learn whether any of the data they asked about was collected on an individual or aggregate level, whether it is stored (and, if so, for how long), or whether it is anonymized.  It is Plaintiffs' burden to demonstrate how information they seek is relevant to live claims.  The Court ordered a narrow 30(b)(6) deposition specifically to allow Plaintiffs to understand whether any user data relevant to their claims was yet to be produced, and Plaintiffs deliberately declined to use the deposition to address that issue.

Rather, it seems that after spinning in circles on this issue for more than a year, Plaintiffs have relapsed to their original position that Facebook must locate and produce all data relating in any way, shape, or form, to the Named Plaintiffs—even if it is was not shared and exists only as part of aggregated or anonymized data sets.  The Court has already rejected this position.  And with Plaintiffs having obtained a ruling from the Court accepting Plaintiffs' earlier position that discoverable user data is limited to data that was shared with third parties, Plaintiffs are judicially estopped from now arguing that user data is discoverable irrespective of whether it was shared.  *See, e.g.*, *United Nat. Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 779 (9th Cir. 2009) (citing *New Hampshire v Maine*, 532 U.S. 742, 750 (2001)).

Facebook confirms again:  Third parties who are able to access individualized user data access that data through APIs that pull from Facebook's Social Graph only, and the DYI files Facebook produced reflects a human-readable version of the data relating to each Named Plaintiff in Facebook's Social Graph—including, but not limited to, the data that could have potentially been accessed by third parties.  Facebook's productions under Discovery Order 9 are complete.

## II. Plaintiffs' March 4 letter demanding supplemental interrogatory responses relating to "Business Partners."

Plaintiffs' letter demanding that Facebook supplement its responses to Interrogatories 14 and 15, which concern "Business Partners," raises the same concerns about unnecessary re-litigation of previously decided issues.  The parties litigated—and Judge Corley decided—this issue **last month**.  *See* Dkt. 608.  Facebook confirmed, consistent with Judge Corley's Order, that its responses to these Interrogatories are complete.  Facebook's responses to Interrogatories 14 and 15 are extraordinarily comprehensive and alone span **195 pages**—most of which are single-spaced tables, using a Size 7 font.

After speaking with Plaintiffs about this issue, we understand Plaintiffs to demand additional information in response to these Interrogatories on two grounds.  First, Plaintiffs explained that they believe Judge Corley intended her Discovery Order on Business Partners (Dkt. 608) to "expand the case" beyond Judge Chhabria's Motion to Dismiss Order (and Plaintiffs' Complaint) to reach *all of Facebook's business relationships*.  Second, Plaintiffs highlight that Facebook has had business relationships over the past decade with entities that do not appear in Facebook's Interrogatory responses.

3791

Plaintiffs position seeks to unwind more than three years of litigation, multiple court orders, and Plaintiffs' own allegations and discovery requests. Neither this case nor the specific Interrogatories at issue concern every business relationship Facebook has ever had.

### A.   Judge Chhabria's Motion to Dismiss ruling allowed Plaintiffs' "Business-Partner" allegations to move forward with respect to a finite set of third parties.

In his decision on Facebook's Motion to Dismiss, Dkt. 298, Judge Chhabria made clear that Plaintiffs would *not* be permitted to litigate a sweeping attack on Facebook's entire business and all of its business relationships. Plaintiffs' First Amended Consolidated Complaint was 1,442 paragraphs and 412 pages. Dkt. 257. Judge Chhabria observed, "it seems the plaintiffs sought to identify anything Facebook has ever been reported to have done wrong . . . . [T]he presence of so many disparate and vague allegations makes it nearly impossible for Facebook to meaningfully respond to all of them, much less for the Court to effectively address them." Dkt. 298 at 5-6.

To avoid "bogging the case down at the pleading stage for years," *id.* at 6, Judge Chhabria did not address each of Plaintiffs' improperly pleaded theories and claims. Instead, he concluded that Plaintiffs adequately pleaded "four categories" of potential wrongdoing related to "Facebook's practice of sharing its users' personal information with third parties." *Id.* at 6, 1. He then dismissed certain claims, *id.* at 30, and *stayed all other claims and theories not falling into the four categories of alleged misconduct*. *Id*. at 6 ("All other prioritized claims not addressed by this ruling will be stayed.").

The first two theories Judge Chhabria allowed to move forward concern data-sharing with app developers. Judge Chhabria described the third theory as "sharing sensitive user information with business partners." Dkt. 298 at 8. The fourth theory concerns Facebook's enforcement of its data-use policies with respect to third parties.

The third "Business Partner" theory Judge Chhabria allowed to move forward is about Facebook's alleged practice of entering "data reciprocity" agreements with third parties in connection with arrangements to make certain Facebook functionalities available on third-party devices and platforms. *See* Dkt. 298 at 8. Plaintiffs' Complaint uses the term "Business Partners" to describe "roughly 150" entities with whom Facebook partnered to "develop and integrate Facebook's User Platform on multiple devices and operating systems." *See* SACC ¶¶ 430-440.[7] The Complaint alleges that Facebook "gave Business Partners access to users' content and information" to facilitate these partnerships. *Id.* In support of its allegations with respect to "Business Partners," Plaintiffs cite a list of entities Facebook describes as its "integration partners" that Facebook shared with Congress (SACC ¶ 431), and a New York Times article about Facebook's integration partners (SACC ¶¶ 433, 435).

Judge Chhabria similarly explained that the list of "Business Partners" Plaintiffs had identified "came from Facebook itself, which asserted that it had 'integration partnerships with these companies." Dkt. 298, at 8. Judge Chhabria held that the misconduct Facebook allegedly engaged in with respect to these entities was "relatively straightforward": "Facebook shared information about its users with this non-exclusive list of business

---

[7] These partnerships served two primary purposes: (i) to enable users to access their Facebook accounts or specific Facebook features on devices and platforms built by other companies, such as Blackberry and Apple, before the existence of the "app store"; and (ii) to enable users to connect their Facebook social experiences with other popular apps and websites, like Yahoo and Twitter—if they chose to do so. Some transfer of data was needed to allow users to access their Facebook accounts on devices and platforms built by other companies (like Blackberry) and, if they explicitly chose, to connect their Facebook accounts with other platforms.

partners, and that those companies in turn shared data with Facebook." *Id.* at 8. "These partnerships, the complaint alleges, were built in part on 'data reciprocity.' Facebook and its partners agreed to exchange information about users' activities with each other." *Id.* (internal quotations omitted).

**B.** **Facebook provided nearly 200 pages of responses to Plaintiffs' Interrogatories regarding "Business Partners."**

Plaintiffs' Fourth Set of Interrogatories seeks information about the "Business Partners" alleged in their Complaint. Specifically, Interrogatory 14 seeks a list of "Business Partners" that had access to "Not Generally Available" information about users even if users did not download an app made by the entity.[8] Interrogatory 15 seeks details about the "Not Generally Available" information the so-called "Business Partners" were able to access.

Plaintiffs' own Interrogatories recognize that the "Business Partner" theory does not concern all of Facebook's business relationships. Consistent with Plaintiffs' Complaint and Judge Chhabria's Order, Plaintiffs' Interrogatories defined "Business Partners" as "third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems."

Facebook served nearly 200 pages of responses to these Interrogatories. As parties typically do in their responses to interrogatories, Facebook also provided definitions that it would use in its response. Facebook offered a definition of "Business Partners" that was intended to add clarity and capture all entities falling into the business partner conduct Judge Chhabria described in Pretrial Order 20. The parties discussed their definitions of "Business Partners" at length over the course of several months.

**C.** **Plaintiffs litigated the scope of Facebook's Interrogatory responses.**

After months of back-and-forth—during which Facebook confirmed it did not withhold any relevant or responsive information based on its definition of "Business Partners"—Plaintiffs insisted on litigating the definition of "Business Partners" that would be used to respond to their Interrogatories.

Judge Corley found the term "Business Partners" to refer to the third category of potential liability identified by Judge Chhabria and deciphered "no meaningful difference between the parties' definitions." Dkt. 608. Judge Corley confirmed that "Business Partners" would include companies with which Facebook had agreements "to exchange information about users' activities with each other," consistent with Judge Chhabria's explanation, even if Facebook did not label them "integration partners," *id.*, and she ordered Facebook to confirm it had fully responded to Plaintiffs' requests. *Id.* Facebook confirmed it had.

**D.** **Plaintiffs now argue Judge Corley's order with respect to "Business Partners" expands the scope of the case to reach all of Facebook's business relationships.**

Plaintiffs now seek to relitigate this issue. During a meet and confer, Plaintiffs' counsel represented that they believe Judge Corley intended her Order to greatly "expand" the "Business Partner" theory articulated in Plaintiffs' Complaint and by Judge Chhabria.

---

[8] The Interrogatories define "Not Generally Available" information to be information "to which that Facebook User has restricted access such that the only Facebook Users who may access that Content and Information are the Facebook User's Friends or another limited audience." This definition explicitly asks about activities conducted on Facebook (which users can limit the audience for).

3793

In Plaintiffs' words, nearly three years into this litigation, Judge Corley "expanded the case" to concern Facebook's relationship with any entity that has ever received a single piece of information relating in any way to people who use Facebook, so long as, at any point in time, that entity told Facebook anything that could be interpreted to concern Facebook users. Plaintiffs take this position even though Plaintiffs' Business Partner allegations refer to a finite number of entities with whom Facebook allegedly entered "data reciprocity" agreements in connection making Facebook functionalities available on third-party devices and platforms. *See* SACC ¶¶ 430-440.

For instance, Plaintiffs' letter claims the "Business Partner" theory now extends to Facebook vendors that performed statistical analyses for Facebook using anonymized data, on the basis that these vendors accessed anonymized information to perform analyses for Facebook and then reported their conclusions back to Facebook. ██████████

████████████████████████████████████████████████████

██████████████████████ No allegations about relationships of this nature appear in the Complaint, nor is it clear how they could possibly be actionable.[10]

Plaintiffs' extreme and unfounded position would bring nearly every entity with which Facebook has ever interacted within the scope of this case—even where the relationship is clearly disclosed within Facebook's terms and has no relationship to the conduct actually alleged. Indeed, Plaintiffs' letter recites every type of business relationship Facebook's 30(b)(6) deponent said Facebook has had over the years and demands that Facebook update its interrogatory responses to address every entity falling into each category he listed. Plaintiffs seek this information even with respect to relationships that did not include any sort of data sharing, much less the type of arrangements described in Plaintiffs' Complaint and Judge Chhabria's motion to dismiss order.[11]

---

[9] Plaintiffs' selective quoting of Ms. Lee's testimony is tremendously misleading. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

[10] Facebook's use of vendors and work with measurement partners is clearly disclosed in its Data Policy and thus cannot constitute the type of illicit data-sharing partnership the Court has found actionable. *See* MTD Order, Dkt. 298, at 21-22 (dismissing claims where information sharing at issue was disclosed in Facebook's Data Use Policy); *see also* FB's 6/8/12 Data Use Policy, FB-CA-MDL-00233442 at 00233455 ("We give your information to the people and companies that help us provide, understand and improve the services we offer. For example, we may use outside vendors to help host our website, serve photos and videos, process payments, analyze data, measure the effectiveness of ads, or provide search results." (emphasis added)); *see also* SACC ¶ 561 (quoting same).

[11] The first two categories of entities Mr. Papamiltiadis listed, "device manufacturers and mobile operators that . . . help us build Facebook-like experiences in order to reach a wider audience," Tr. at 25:16-20, and "developer partners . . . [which] are third-party software companies that have access to our APIs and they build experience[s] for both consumers and other businesses," *id*. at 25:21-25, are already accounted for in Facebook's Interrogatory responses. The second two categories described

*(Cont'd on next page)*

9

It is clear that neither Judge Chhabria nor Judge Corley intended to open the door to such wide-ranging and irrelevant inquiries. For starters, it is clear that Judge Chhabria's Motion to Dismiss ruling did not bucket all of Facebook's business relationships into the "Business Partner" theory, which would have expanded the case to include theories of liability going far beyond what Plaintiffs even alleged. To the contrary, Judge Chhabria made clear that his motion to dismiss order allowed four alleged theories of potential liability to move forward and that Plaintiffs' remaining allegations would be stayed. Dkt. 298 at 6.

Judge Chhabria identified specific theories of relief that would move forward to focus this case and make it manageable to litigate—not to allow Plaintiffs to conduct a roving investigation of all of Facebook's business relationships over the past 13 years without stating cognizable claims. Judge Corley's February 1, 2021 order with respect to "Business Partners" certainly did not expand this case to allow such an investigation. The order makes clear that it tracks the third category of potential misconduct described in Judge Chhabria's Motion to Dismiss ruling and that Facebook should identify the entities Judge Chhabria described, even if Facebook does not call some of those entities "integration partners."

We confirm again that our 195 pages of responses to Interrogatories 14 and 15 are complete to the best of our knowledge and consistent with Judge Corley's Discovery Order with Respect to Business Partners. Discovery in this case is ongoing, and should we become aware of any additional responsive information during the course of our ongoing factual investigation, we will update our responses accordingly.

## III. Plaintiffs' February 19 letter demanding additional materials provided to government entities.

Plaintiffs' letter regarding RFP 6 follows the same pattern and raises the same concerns as the letters addressed above. This letter backtracks on more than a year of productive discussions and litigation regarding Plaintiffs' RFPs 6 and 43; inappropriately invokes the parties' expedited dispute resolution protocol to demand materials never previously requested; and seeks materials relating only to events that occurred years after this case was filed.

### A. Facebook agreed to make cloned productions from certain government matters under RFP 6 to kick-start discovery while the parties negotiated threshold ESI issues.

Plaintiffs served RFP 6 in November 2019. The request demands document productions Facebook provided government entities in matters touching on related issues. The parties extensively negotiated this request and completed negotiating it a year ago, in early 2020.

Facebook largely agreed to produce the materials RFP 6 requests. Even though courts usually frown upon the type of "cloned discovery" requested by RFP 6,[12] Facebook agreed to make certain cloned productions from numerous matters under RFP 6 in a good faith effort to move discovery forward.

As Plaintiffs know, the parties had tremendous difficulty negotiating an ESI Protocol, custodians, and search terms, and have been negotiating these threshold ESI issues for 18 months. To kick-start document discovery during these negotiations, Facebook agreed to

by Mr. Papamiltiadis—"business[es] that . . . publish[] on our platform, from news companies to [NGOs]" and "suppliers"—have no apparent relationship to user data and Mr. Papamiltiadis identified none.

[12] *King County v. Merrill Lynch & Co., Inc.*, No. C10-1156-RSM, 2011 WL 3438491, at *3 (W.D. Wash., Aug. 5, 2011) (quotation omitted)

produce—and did produce—all of the Facebook documents produced in response to the FTC's document requests during its 2011 and 2019 investigations into Facebook. On top of that, Facebook also agreed to review the Facebook documents it had produced to various other state and federal entities in 9 additional government matters and to produce those documents, so long as they were responsive to Plaintiffs' document requests.

The parties agreed that Facebook would complete its productions under RFP 6 by July 3, 2020. Even though RFP 6 sought documents produced to government entities through "the present" (*i.e.*, through November 2019, when RFP 6 was served), Facebook ultimately agreed to produce responsive documents it had produced to government entities through April 15, 2020.

### B. After the parties reached an agreement on cloned discovery, Plaintiffs sought more.

Facebook understood the parties' negotiations regarding materials from government matters were complete. However, after the parties completed negotiating RFP 6, Plaintiffs issued RFP 43, which sought additional materials exchanged in 10 government matters, including: "All privilege logs, interrogatory responses, written reports, correspondence and deposition transcripts." During the parties' meet and confer discussions, Plaintiffs told us that they issued this RFP because the parties had agreed RFP 6 would apply only to document productions but Plaintiffs in fact wanted any other piece of paper to have exchanged hands with any government entity in any matter touching on related issues. Facebook objected to this request in June 2020.

Six months after Facebook served its responses and objections to RFP 43, on December 10, 2020, Plaintiffs sent Facebook a letter stating they would agree to limit the scope of RFP 43 to deposition transcripts from government matters and any written discovery responses Facebook provided government entities. Then, in a subsequent meet and confer, Plaintiffs informed Facebook that their revised request for written discovery responses also included a demand for all of Facebook's counsel's formal and informal correspondence with the government. On February 12, 2021, Plaintiffs filed a motion to compel all materials demanded under RFP 43. Facebook responded on February 18.

### C. After filing a motion to compel certain materials from government matters, Plaintiffs return to RFP 6 to seek additional materials they did not include in their motion.

On February 19, *one day after Facebook responded to Plaintiffs' motion to compel*, Plaintiffs sent Facebook another letter demanding *additional* materials from government matters—this time supposedly under the ambit of RFP 6, which the parties had finished negotiating a year earlier. Plaintiffs' letter invokes RFP 6 to demand that Facebook now review and produce any document productions made in the 10 government matters since April 2020. It further demands that Facebook produce materials created and provided to the FTC pursuant to a consent decree that was entered in July 2020.

#### 1. There is no basis for additional cloned productions—Facebook produced the cloned materials it agreed to provide, and the parties now have their own search terms.

As an initial matter, the parties completed negotiating RFP 6 in April 2020 and reached an agreement on the scope of Facebook's productions in response to that RFP. Plaintiffs' efforts to revisit that agreement a year later undermines the time and effort the parties put into negotiating and compromising discovery requests and makes it difficult for the meet and confer process to work effectively.

In any case, RFP 6 does not request the documents Plaintiffs seek. Plaintiffs defined the "Relevant Time Period" for this request as materials provided to government entities "through the present" (*i.e.*, through November 2019). Despite Plaintiffs' November 2019 cut-off, Facebook agreed to produce materials in response to RFP 6 that had been produced to government entities through April 2020. The parties agreed Facebook would complete its production of these materials by July 3, 2020. Facebook did.

There is no good-faith basis for Plaintiffs' demand that Facebook now review and produce additional cloned productions from government matters. As explained above, courts typically reject blanket demands for document productions from other actions for two reasons. First, "compelling a responding party to do duplicate searches—one for responsive documents in their custody and control and one for all documents in their custody and control that were previously produced in other litigation—is definitionally unduly burdensome." *Goro v. Flowers Foods, Inc*., No. 17-CV-02580-JLS-JLB, 2019 WL 6252499 *18 (S.D. Cal., Nov. 22, 2019); *accord In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods Liability Lit.*, MDL No. 2672, 2017 WL 4680242 (N.D. Cal., Oct., 18, 2017) (Corley, M.J.) (rejecting cloned discovery requests). Second, cloned discovery "is irrelevant and immaterial unless the fact that particular documents were produced or received by a party is relevant to the subject matter of the subject case." *King County*, 2011 WL 3438491, at *3 (quotation omitted).

Facebook agreed to jump-start document discovery, while the parties negotiated threshold ESI issues, by reviewing and producing certain materials produced to government entities. The parties have now negotiated search strings *for a year* and finally appear to have reached agreement to use search strings that hit on approximately 6 million documents. On the eve of finalizing that agreement, Plaintiffs seek to substantially expand that universe by requiring Facebook to also engage in an ongoing review of all documents produced in numerous government matters for any additional responsive documents.

It is neither practical nor reasonable to expect Facebook to continue to track every document produced in numerous other actions (handled by multiple law firms) and to review every one of those documents for responsiveness—in addition to approximately 6 million documents identified through search strings. This is precisely why courts generally reject requests for cloned discovery. To the extent documents have been produced to government entities since April 15, 2020 that are responsive to Plaintiffs' RFPs, the parties have agreed to search for those materials by running the agreed-upon and court-ordered search terms against the agreed-upon and court-ordered custodians. Plaintiffs' request that Facebook separately review its ongoing productions to government entities is unreasonable, unduly burdensome, and not proportional to the needs of the case.

### 2.   Materials created for the FTC after July 2020 are neither responsive to RFP 6 nor relevant to this case.

Finally, Plaintiffs' letter demands materials Facebook agreed to create and produce to the FTC, as part of the FTC's ongoing monitoring of Facebook under a consent decree that was entered in July 2020.[13] These materials fall outside of the timeframe of RFP 6. They also appear to be among the materials Plaintiffs requested originally through RFP 43 (which seeks "written reports" to the government) but later told Facebook and the Court they had dropped from their request.

---

[13] Plaintiffs also seem to request categories of materials Facebook put on legal hold for periods of 6 months to 5 years under the FTC's 2011 consent decree. To the extent these materials remained on hold when this action was filed and are captured by the negotiated custodians and search terms, they will be produced.

More fundamentally, materials created for the FTC after July 2020 and as part of the FTC's forward-looking monitoring of Facebook have no conceivable relevance to this case, which was filed in March 2018 and concerns conduct before that date.

## IV.  Plaintiffs February 11 letter regarding "Developer Manuals."

Finally, Plaintiffs invoke the parties' dispute resolution protocol to compel the immediate production of materials over which there is no dispute and no apparent urgency. Plaintiffs' February 11, 2021 letter demands—under threat of an immediate motion to compel—that Facebook produce within 8 days, what they describe as "manuals" relating to Facebook's systems that were created over the course of a decade. While not entirely clear, Facebook understands this request to seek every iteration of its developer website to have been published since 2007, because this site provides technical instructions to application developers regarding how to use Facebook's systems.

Plaintiffs are correct that the parties discussed this request previously. However, these discussions took place **a year ago** in March 2020 and related to a demand that Facebook produce "developer manuals" in connection with an ESI deposition Plaintiffs had noticed. Judge Corley ultimately ruled that the noticed deposition would not move forward. Plaintiffs did not follow up with this document demand again until a meet and confer held in November 2020. During that meet and confer, Plaintiffs' counsel informed Facebook that it should *not* prioritize collection and production of the developer documents and should instead focus on other targeted collections.

Three months later, during a meet and confer held on February 11, 2021, Plaintiffs (out of nowhere) demanded that Facebook locate and produce all "developer manuals" within one week, in anticipation of an upcoming 30(b)(6) deposition. Facebook urged Plaintiffs to clarify their request and to identify any specific, targeted documents they believed they needed for the deposition—explaining it would be difficult to locate, collect, and produce a large volume of materials within a matter of days.

Plaintiffs did not clarify their request or limit it to specific documents. Instead, hours after the meet and confer, Plaintiffs sent Facebook a letter purporting to invoke the parties' dispute protocol with respect to "developer manuals."

There is no outstanding dispute with respect to these documents. As Facebook understands, Plaintiffs seek different versions of its developer website that have been published over time. Facebook does not object to producing the current version of Facebook's developer website (which Plaintiffs can access at developers.facebook.com) or any prior versions of the website Facebook maintains to the extent they have been archived internally at Facebook. But the Wayback Machine appears to maintain more than 30,000 saved instances of past versions of the developer website. If there are specific versions of the site that Plaintiffs seek, they should identify them. The parties should meet and confer to clarify what specific information Plaintiffs are seeking and define an appropriate set of responsive materials.

Finally, as Facebook has told Plaintiffs numerous times, the parties must agree upon a schedule for Facebook to produce documents in response to targeted requests. Plaintiffs' ongoing demands that Facebook immediately locate and produce one-off materials significantly interfere with Facebook's ability to produce responsive documents found among the millions of documents hitting on the parties' agreed-upon search strings. Facebook encourages Plaintiffs to limit, narrow, and clarify their requests and to work with Facebook to develop a production schedule.

3798

Sincerely,

Deborah L. Stein

3799

# Exhibit 9

CERTAIN PAGES MARKED CONFIDENTIAL OR
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
  klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
  mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
  dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.,*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br> This document relates to: <br><br> ALL ACTIONS | CASE NO. 3:18-MD-02843-VC <br><br> **DEFENDANT FACEBOOK, INC.'S SECOND AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES** |

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3801

Defendant Facebook, Inc. ("Defendant" or "Facebook"), by and through its attorneys, and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the Local Civil Rules of the U.S. District Court for the Northern District of California, the Court's orders in this action, and the parties' agreements and conferences among counsel, provides the following amended responses and objections to Plaintiffs' Fourth Set of Interrogatories (the "Interrogatories").

## PRELIMINARY STATEMENT

1.      Facebook's responses to the Interrogatories are made to the best of Facebook's current knowledge, information, and belief.  Facebook reserves the right to supplement or amend any responses should future investigation indicate that such supplementation or amendment is necessary or appropriate.

2.      Facebook's responses to the Interrogatories are made solely for the purpose of and in relation to this action.  Each response is given subject to all appropriate objections (including, but not limited to, objections concerning privilege, competency, relevancy, materiality, propriety, and admissibility).  All objections are reserved and may be interposed at any time.

3.      Facebook's responses are premised on its understanding that Plaintiffs seek only that information that is within Facebook's possession, custody, and control.

4.      Nothing contained in these Responses and Objections or provided in response to the Interrogatories consists of, or should be construed as, an admission relating to the accuracy, relevance, existence, or nonexistence of any alleged facts or information referenced in any Interrogatory.

## GENERAL OBJECTIONS

1.      Facebook objects to the Interrogatories to the extent they contain discrete subparts requiring Facebook to engage in separate and distinct inquiries to respond to each subpart so that

the subparts should be construed as independent interrogatories, and that, in total, would cause Plaintiffs to exceed the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories.  ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1).

2.      Facebook objects to the Interrogatories to the extent they exceed the maximum number of permissible Interrogatories under Discovery Order No. 6 and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22. Notwithstanding and without waiving this Objection, Facebook has made a good faith effort to respond to the Interrogatories, in whole or in part, to the extent it is able.

## OBJECTIONS TO DEFINITIONS

1.      Facebook incorporates by reference the responses and objections to Definitions and Instructions contained in its Responses and Objections to Plaintiffs' First, Second, and Third Sets of Interrogatories.

2.      Facebook objects to Plaintiffs' definitions of "and" and "or" as unreasonable, inconsistent with the Federal Rules of Civil Procedure, vague, and grammatically incoherent. Facebook will interpret "and" and "or" in accordance with their ordinary, everyday meaning, which includes interpreting disjunctive terms disjunctively and conjunctive terms conjunctively.

3.      Facebook objects to Plaintiffs' definition of "describe in detail" or "detailed description" on the ground that the definition makes the Interrogatories overly broad and unduly burdensome and imposes obligations that go beyond the requirements of the Federal and Local Rules.  Facebook shall construe these terms as commonly and ordinarily understood.  Facebook further objects to this definition to the extent it seeks information beyond relevant facts,

2
FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3803

including Facebook's analyses or opinions, which are appropriately sought through contention interrogatories, which are not appropriate or justified at this early stage.

       4.    Facebook objects to Plaintiffs' definition of "App" as vague, ambiguous, overbroad, and unduly burdensome on the ground that it includes any "application developed to utilize the core technologies of the Facebook social networking platform" without identifying or defining what the "core," rather than peripheral, technologies of Facebook's platform are or were at any given time. Facebook further objects to this definition as vague and ambiguous on the ground that Facebook cannot identify what any online applications are or were "developed to" do or presume the intent of any third parties that Facebook does not control.

       5.    Facebook objects to Plaintiffs' definition of "Business Partners" as vague, ambiguous, and overly broad to the extent it refers to entities with which Facebook "partnered" to "develop and integrate" Facebook "on a variety of devices and operating systems" without defining any of those terms. Facebook will construe "Business Partners" as referring to the integration partners and/or device manufacturers with whom Facebook has entered into agreements that have been and/or will be produced in response to Request for Production No. 24. During the parties' meet and confer discussions, beginning on or about August 27, 2020, Plaintiffs took the position that "Business Partners" refers to a broader set of entities than the integration partners and/or device manufacturers described in Facebook's August 14 Objection because Plaintiffs understood the Court to describe a broader set of "Business Partners" than the set of entities Facebook describes (hereinafter referred to as Facebook's "Integration Partners") in Pretrial Order 20. Via email on September 11, 2020, Plaintiffs clarified that they understood the Court had adopted a "conduct-based definition" for "Business Partners" under which the term "Business Partners" described entities with whom "Facebook shared information about its

users . . . and those companies in turn shared data with Facebook."  Plaintiffs thus contend that "Business Partners" include any and all entities with whom Facebook exchanged user data in any form.  Having considered Plaintiffs' arguments, Facebook maintains its Objection to Plaintiffs' definition of "Business Partners" and will continue to construe this term as pertaining to Facebook's Integration Partners.  *First*, Plaintiffs have not re-issued their Fourth Set of Interrogatories with a revised definition of "Business Partners" that follows the definition adopted in their September 11 email.  The definition of "Business Partners" in Plaintiffs' Fourth Set of Interrogatories refers to entities with whom "Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems" and does not mention sharing user data. Plaintiffs' proposed post-hoc revision of the term "Business Partners" is inconsistent with the discovery requests Facebook is responding to.  *Second*, Plaintiffs' proposed revision to "Business Partners" is inconsistent with the allegations in Plaintiffs' Second Amended Consolidated Complaint ("SACC").  Apart from conclusory allegations regarding data sharing without user consent, Plaintiffs allege Facebook's "Business Partners" were entities with whom Facebook partnered to "develop and integrate Facebook's User Platform on multiple devices and operating systems," SACC, ECF No. 491, ¶ 430, and that these partnerships "allowed Facebook to expand its reach by outsourcing . . . the time, labor, and money required to build Facebook's Platform on different devices," *id.* ¶ 433, which required Facebook and the Business Partners to "exchange information about users' activities with each other," *id.* ¶ 434.  The SACC includes a partial list of "Business Partners," which Facebook had provided to Congress in June 2018.  *Id.* ¶ 431.  As the letter to Congress that Plaintiffs cite to makes clear, this list is of Facebook's Integration Partners.  Plaintiffs also concede that certain of the other entities they reference as being "Business Partners"—including Airbnb, Lyft, and Netflix—are actually "whitelisted apps," and

therefore relate to a separate category of allegations in the SACC. *Id.* ¶ 457. As a result, the only set of "Business Partners" about which Plaintiffs' SACC asserts non-conclusory allegations are Facebook's Integration Partners. *Third*, the Court's Order on Facebook's Motion to Dismiss does not—and cannot—broaden the set of relevant entities. Rather, the Court describes Plaintiffs' allegations as being "difficult to pin down" but describes the relevant entities as being a set of Facebook's "integration partner[s]," as identified in Facebook's letter to Congress, with whom Facebook had "data reciprocity" agreements. MTD Order, ECF No. 298, at 8. Moreover, while the Court can narrow a plaintiff's claim on a motion to dismiss, it cannot rewrite the complaint to broaden them. *E.g.*, *Gregory Vill. Partners, L.P. v. Chevron U.S.A., Inc.*, 805 F. Supp. 2d 888, 895 (N.D. Cal. 2011) ("A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. . . . Review is limited to the contents of the complaint." (internal citations omitted)). *Fourth*, the Court recently affirmed that discovery is stayed as to all of Plaintiffs' stayed claims. ECF No. 557 at 9. Accordingly, Plaintiffs are not entitled to discovery as to entities about which they have articulated no particularized claims, much less stayed ones. Facebook thus stands on its original objection to Plaintiffs' definition of "Business Partners" and declines to adopt Plaintiffs' later-adopted definition.

6.      Facebook objects to Plaintiffs' definition of "Content and Information" as vague, ambiguous, overly broad, and unduly burdensome. While purporting to cite Facebook's Statements of Rights and Responsibilities, Plaintiffs have expanded the scope of "Content and Information" to include 10 subcategories of information—including "thermal [and] olfactory" information—that are not derived from that definition. Facebook objects to this definition to the extent it purports to seek documents or information that is not relevant to Plaintiffs' non-stayed claims and bears no relation to third-party application developers being granted access to

5

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3806

"sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties"). Facebook will construe this term as referring to "[i]nformation and content [users] provide" as described in Facebook's Data Policy. If Facebook identifies any additional categories of user content and information that are relevant to Plaintiffs' non-stayed claims, Facebook will update its responses accordingly.

7.     Facebook objects to Plaintiffs' definition of "Database" as vague, ambiguous, overly broad, and unduly burdensome to the extent the term is meant to include "any" organized collection of information that is stored electronically, which, for example, could include any files on an individual Facebook employee's computer. Facebook will construe this term as referring to enterprise-wide electronic collection of related data organized for ready access.

8.     Facebook objects to Plaintiffs' definition of "Data Analytics Infrastructure" as vague, ambiguous, overly broad, and unduly burdensome to the extent the term is meant to include all "services, applications, utilities and systems" used by Facebook, terms that are, themselves, broad and undefined. "Systems," for instance, could refer to any methodologies or operational procedures put in place for Facebook personnel to analyze data but are not themselves mechanical or electronic means for processing, analyzing, or storing user data.

6

Moreover, all "services, applications, utilities and systems" used by Facebook includes processes and mechanisms that do not support any of the functions at issue, to wit, the sharing of user content and information with third parties. Facebook further objects to this definition to the extent it seeks information relating to "modeling, estimating models, validating models, business intelligence, scoring data, or related activities, including but not limited to databases and data warehouses, statistical and data mining systems, and scoring engines," which bear no relevance to Plaintiffs' live claims. *See* MTD Order, ECF No. 298, at 6-10. Facebook will construe this term as relating to any internal electronic databases that may contain content or information relevant to Plaintiffs' claims.

9.     Facebook objects to Plaintiffs' definition of "Facebook Archive" as vague, ambiguous, and inaccurate. Facebook has produced several categories of information relating to each of the Named Plaintiffs in this action, none of which is appropriately characterized as having been drawn from an "archive" as commonly understood. Facebook further objects to this definition on the basis that this term does not appear in the Interrogatories.

10.     Facebook objects to Plaintiffs' definition of "Not Generally Available" on the ground that the term "access" is vague and ambiguous. Facebook will construe this term as referring to content posted on the Facebook Platform by a user for which that user has limited the audience of other Facebook users who may view, interact with, or share a particular item of content.

11.     Facebook objects to Plaintiffs' definition of "Third Parties" to the extent it relies on other undefined terms, including "Whitelisted Apps," or other vague and ambiguous terms including "Business Partners." Facebook will construe this term as referring to individuals or entities other than Facebook or individual Facebook users.

12.     Facebook objects to the portion of Plaintiffs' definition of the term "Facebook," "Defendant," "you," and "your" that defines Facebook to include its "executives, directors, officers, employees, partners, members, representatives, agents (including attorneys, accountants, consultants, investment advisors or bankers), and any other Person purporting to act on [Facebook, Inc.'s] behalf . . . includ[ing] parents, subsidiaries, affiliates, predecessor entities, successor entities, divisions, departments, groups, acquired entities and/or related entities or any other entity acting or purporting to act on its behalf." This portion of the definition is vague, ambiguous, overly broad, unduly burdensome, and inconsistent with basic principles of corporate separateness.  Facebook's response to the Interrogatory (if any) will use a definition of "Facebook" that encompasses only Facebook, Inc.

## OBJECTIONS TO INSTRUCTIONS

1.     Facebook objects to Plaintiffs' "Instructions" to the extent that they impose obligations that go beyond the requirements of the Federal and Local Rules.

2.     With respect to Plaintiffs' Instruction 5, which requests that Facebook answer discovery requests for a continuing time period, for consistency, the time period reflected in Facebook's responses to these Interrogatories is consistent with Facebook's responses to Plaintiffs' other discovery requests, unless a specific time period is identified in a particular request and/or Facebook's response to a particular request.

## SPECIFIC OBJECTIONS

### INTERROGATORY NO. 8:

Identify by name and time period in operation each Facebook Database and Data Analytics Infrastructure that contains Facebook Users' Content and Information.

## RESPONSE TO INTERROGATORY NO. 8 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory on the ground that the definitions of "Content and Information," "Database," and "Data Analytics Infrastructure" are vague, ambiguous, overly broad, and unduly burdensome. Facebook will construe these terms as described in its objections to their Definitions.

(B)     Facebook objects to this Interrogatory on the ground that it seeks only irrelevant information, as the structure and organization of Facebook's databases have no possible relation to or bearing on Plaintiffs' live claims or Facebook's defenses.

(C)     Facebook objects to this Interrogatory as seeking information duplicative of information provided previously through the parties' extensive letter exchange and meet and confer discussions regarding sources of ESI and as otherwise outside the scope of additional ESI information the Court has allowed Plaintiffs to seek. *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

(D)     Facebook objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed. Thus, the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

(E)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, and/or disproportionate to the needs of the case in

that it seeks information relating to "each" Facebook Database and Data Analytics Infrastructure, without regard for whether the "Database or Data Analytics Infrastructure" has any bearing on Plaintiffs' live claims or Facebook's defenses. Specifically, Facebook objects to this Interrogatory to the extent it seeks information related to the content, structure, or organization of "Databases or Data Analytics Infrastructures" unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 8**:

Users make their Content and Information available on the Facebook Platform by uploading it directly to the Platform. The Facebook Platform is powered by a series of databases that Facebook relies upon for production purposes and which work in tandem to provide Facebook users a seamless experience as they access different categories and types of content posted on the Platform, by themselves or other users. As Facebook users navigate through the Facebook Platform and interact with objects on the Platform by, among other things, liking posts

made by other users, watching videos, posting photos, and sending messages, they actively change the content and information available on the Facebook Platform. The array of relationships between users, objects, and actions is referred to as the Social Graph, which is a model of the relationships between users, objects, and actions. These databases described below constitute the primary infrastructure that maintains the Facebook Platform, and, thus, contain the content and information that makes up the Social Graph. As relevant here, Plaintiffs have been provided with the content and information from the Social Graph—and therefore from the below databases—that was uniquely associated with their Facebook profiles as of the date(s) each set was pulled. Additionally, through their Facebook profiles, Plaintiffs have access to the content or information they have posted to the Platform and not deleted since those productions were made.

The key databases Facebook uses to support the Facebook Platform, all of which were in use during the Relevant Time Period asserted by Plaintiffs and which store all of the content and information users post to Facebook and therefore contain all of the historical user content and information presently accessible via the Social Graph, are:





**INTERROGATORY NO. 9:**

For each Database and Data Analytics Infrastructure identified in your answer to

Interrogatory No. 8, identify the corresponding query interfaces (e.g., including graphical

interfaces, command-oriented interfaces, and APIs) that have called or accessed data from such

Database to respond to either internal or external queries.

**RESPONSE TO INTERROGATORY NO. 9 – HIGHLY CONFIDENTIAL –**
**ATTORNEYS' EYES ONLY:**

Facebook restates and incorporates its Preliminary Statement, General Objections,

Objections to Definitions, and Objections to Instructions as though fully set forth in this

Response. Facebook further objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts

that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for

separate information about "each" Database and Data Analytics Infrastructure that Facebook

identified in its answer to Interrogatory No. 8. *See, e.g.*, *New Amsterdam Project Mgmt.*

*Humanitarian Found. v. Laughrin*, 2009 WL 102816, at *5 (N.D. Cal. Jan. 14, 2009) ). During

the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that

Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D.

441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state

facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or

separate" from each other "should be viewed as containing a subpart" for each separate subject matter. Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, several individual databases that contain different information and operate differently. Facebook will therefore treat Plaintiffs' inquiry into "each" Database and Data Infrastructure as an individual Interrogatory. *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

(B)     Facebook objects to this Interrogatory on the ground that the definitions of "Content and Information," "Database," and "Data Analytics Infrastructure" are vague, ambiguous, overly broad, and unduly burdensome. Facebook will construe these terms as described in its objections to their Definitions.

(C)     Facebook objects to this Interrogatory on the ground that the term "corresponding query interfaces" is vague, ambiguous, and undefined. Facebook will construe this term as referring to the manner by which data from each database is accessed or queried.

(D)     Facebook objects to this Interrogatory on the ground that it seeks information relating to "internal . . . queries" within Facebook. Plaintiffs' claims relate to allegedly improper access to user content and information by third parties, not Facebook or its personnel. Facebook will construe this Interrogatory as relating only to external queries.

(E)     Facebook objects to this Interrogatory on the ground that it seeks only irrelevant information, as the structure and organization of Facebook's "Databases and Data Analytics Infrastructure" have no possible relation to or bearing on to Plaintiffs' live claims or Facebook's defenses.

(F)     Facebook objects to this Interrogatory as seeking information duplicative of information provided previously through the parties' extensive letter exchange and meet and confer discussions regarding sources of ESI and as otherwise outside the scope of additional ESI information the Court has allowed Plaintiffs to seek. *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

(G)     Facebook further objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed.  Thus, the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

(H)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, and/or disproportionate to the needs of the case in that it seeks information relating to "query interfaces" for "each" Facebook Database and Data Analytics Infrastructure, without regard for whether the "query interface" or "Database or Data Analytics Infrastructure" has any bearing on Plaintiffs' live claims or Facebook's defenses. Specifically, Facebook objects to this Interrogatory to the extent it seeks information related to "query interfaces" or "Databases" or "Data Analytics Infrastructures" unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of

14

"sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 9**:

Application Programming Interfaces ("APIs") are standard computing protocols used throughout the digital world. Each time a user visits or uses an app, the user necessarily interacts through an API. And every company that allows third parties to communicate with their servers uses APIs. As just one example, e-mail programs like Outlook or Mail on iOS communicate with the user's e-mail provider (Yahoo, Gmail, etc.) through APIs to obtain the user's messages. Facebook has a series of public APIs that are published on its developer website (https://developers.facebook.com/), and any app developer can use them or request to use them to send or receive information from the Facebook Platform.

To the extent third parties are able to access user content and information, it is primarily through Graph API, which is the API Facebook has made broadly available to all app developers on its Platform and queries the Facebook Platform. There have been several iterations of the Graph API including, among others, Graph API v.1 (most recent version from 2010 to April 2014 and accessible to April 2015), Graph API v.2 (most recent version from April 2014 to May

2018 and accessible to May 2020), and Graph API v.3 (most recent version from May 2018 to July 2020 and accessible to August 2021).  A changelog detailing changes made to the Graph API when a new version is introduced is available on Facebook's developer website (https://developers.facebook.com/docs/graph-api/changelog/).

Individuals or business entities, including third party developers of apps connected to the Facebook Platform, may request access to endpoints that are not publicly available through the Graph API when they are necessary to enhance user experience on their app or product.  To receive approval to access these endpoints associated with non-public data, a third party is required to go through the App Review process, which may include having its identity verified by Facebook.  In that process, Third Parties are required to specify the types of data their apps will be requesting from users and describe how that data will be used.

As relevant here, the APIs a third party may be granted access to after being approved through the App Review process and which may allow that third party to request access to some forms of user data include:

- Groups API, which allows a developer to read and create Facebook Group data on behalf of group members;

- Live Video API, which enables video encoders, cameras, web, and desktop applications to stream live video directly to Facebook user profiles, pages, and groups; and,

16

3817

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 9

- Pages API, which, among other things, allows apps to update a Facebook Page's settings and content, create and get Posts, get Comments on Page owned content, get Page insights, and update actions that users are able to perform on a Page.

Facebook, like virtually all online companies, also uses other APIs that are not generally available to all app developers. Among other things, these other APIs can be used to provide third parties access to certain capabilities that are not accessible through any of the public APIs and for which the third party has demonstrated a need. These are commonly referred to a "private" APIs. The vast majority of private APIs do not enable third-party apps to access user content and information.

As used here, the term "capability" describes a group of functionalities that are provided to a particular app or third party and give that app or third party the ability to access certain data through one or more APIs. An app cannot access a capability associated with a private API unless a Facebook employee has approved it to do so.

After an extensive investigation,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 9



18

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3819

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 9



19

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3820

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 9**



This list is the result of extensive investigation by Facebook's engineers, who, among other things, manually reviewed the code of each capability to determine which capabilities granted access to user's friends' data and, if so, to identify the specific data fields accessible through the capability. Capabilities associated with Facebook's first-party apps (*i.e.*, internal Facebook programs developed to enable Facebook's own products that do not involve sharing user information with third parties) are excluded from this list.

**INTERROGATORY NO. 10:**

For each query interface identified in your answer to Interrogatory No. 9, identify whether such query interface is or has been used to respond to internal queries, external queries, or both.

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3821

## RESPONSE TO INTERROGATORY NO. 10 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each" query interface that Facebook identified in its answer to Interrogatory No. 9. *See, e.g., New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009).  During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, several individual query interfaces that operate differently.  Facebook will therefore treat Plaintiffs' inquiry into "each" query interface as an individual Interrogatory.  *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).  Facebook considers this

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 10**

Interrogatory to include at least five subparts and therefore the below Response to constitute Facebook's Responses Nos. 10 to 14.

(B)     Facebook objects to this Interrogatory on the ground that the term "query interface" is vague, ambiguous, and undefined.  Facebook will construe this term as referring to the manner by which data from each database is accessed or queried.

(C)     Facebook objects to this Interrogatory on the ground that it seeks only irrelevant information, as the structure and organization of Facebook's databases have no possible relation to or bearing on to Plaintiffs' live claims or Facebook's defenses.

(D)     Facebook objects to this Interrogatory on the ground that it seeks information relating to "internal queries" within Facebook.  Plaintiffs' claims relate to allegedly improper access to user content and information by third parties, not Facebook or its personnel.  Facebook will construe this Interrogatory as relating only to external queries.

(E)     Facebook objects to this Interrogatory as seeking information duplicative of information provided previously through the parties' extensive letter exchange and meet and confer discussions regarding sources of ESI and as otherwise outside the scope of additional ESI information the Court has allowed Plaintiffs to seek.  *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

(F)     Facebook further objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed.  Thus, the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

3823

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 10

(G)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, and/or disproportionate to the needs of the case in that it seeks information relating to "query interfaces," without regard for whether the "query interface" has any bearing on Plaintiffs' live claims or Facebook's defenses. Specifically, Facebook objects to this Interrogatory to the extent it seeks information related to "query interfaces" unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 10**: Graph API is available to third parties external to Facebook. Third parties seeking to access more than basic public data (public profile and email address) must undergo the App Review process to receive additional access to permissions.

**Response No. 11**: Groups API is available to third parties external to Facebook upon approval through the App Review process.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 10

**Response No. 12**: Live Video API is available to third parties external to Facebook upon approval through the App Review process.

**Response No. 13**: Pages API is available to third parties external to Facebook upon approval through the App Review process.

**Response No. 14**: During the relevant time period, the following capabilities associated with private APIs may have been available to third parties external to Facebook only upon approval by Facebook:



24

3825

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 10



25

3826

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 10**



## INTERROGATORY NO. 11:

For each query interface identified in your answer to Interrogatory No. 10 as being or having been used to respond to external queries, identify the complete list of fields or query parameters available for queries by a Third Party via such query interfaces. For each of the

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

fields or query parameters, describe in detail the acceptable ranges and formats of their values and identify which parameters are optional for queries and which are required.

## RESPONSE TO INTERROGATORY NO. 11 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each" query interface that Facebook identified in its answer to Interrogatory No. 10.  Not only does the Interrogatory embed subparts by asking for information about "each" query interface, the Interrogatory demands separate information about "each" field or query parameter identified.  Each of those inquiries is itself a subpart to be counted against the interrogatory limit.  *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009).  During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate

and distinct subjects, to wit, several individual query interfaces that operate differently and are associated with different data end points, among other things. Facebook will therefore treat Plaintiffs' inquiry into "each" query interface as an individual Interrogatory. *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2]). Facebook considers this Interrogatory to include at least 60 subparts and therefore the below Response to constitute Facebook's Responses Nos. 15 to 75.

(B)     Facebook objects to this Interrogatory as vague, ambiguous, and confusing. As drafted, Facebook does not sufficiently understand the Interrogatory to provide a meaningful response.

(C)     Facebook objects to this Interrogatory on the ground that the term "query interface" is vague, ambiguous, and undefined. Facebook will construe this term as referring to the manner by which data from each database is accessed or queried.

(D)     Facebook objects to this Interrogatory on the ground that it seeks only irrelevant information, as the structure and organization of Facebook's databases have no possible relation to or bearing on Plaintiffs' live claims or Facebook's defenses.

(E)     Facebook objects to this Interrogatory as seeking information duplicative of information provided previously through the parties' extensive letter exchange and meet and confer discussions regarding sources of ESI and as otherwise outside the scope of additional ESI information the Court has allowed Plaintiffs to seek. *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

(F)　　Facebook further objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed.  Thus, the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

(G)　　Facebook objects to this Interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, and/or disproportionate to the needs of the case in that it seeks information relating to "each" query interface, without respect for whether the query interface has any bearing on Plaintiffs' live claims or Facebook's defenses.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information related to the "query interfaces" unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(H)　　Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1);

3830

Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit. Sept. 4 Hr'g Tr. at 14:17-22. Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 15**: The list of permissions an app developer may be granted approval to access through Graph API, and therefore which data endpoints that app developer may potentially access through the Graph API, are publicly available on Facebook's Developer site.[1] In order to access non-public user data[2] associated with a specific permission through Graph API, an app developer needs approval from Facebook and the user. First, in order to gain access to a particular permission, an app developer needs to have that permission approved through App Review. Second, when users log onto the developer's app, they receive a request to grant the developer's app permission to access that category of their data (*i.e.*, the specific data associated with the approved permission). Users can grant or deny the requested permissions or any subset of them. The below list[3] includes permissions and/or data points available through Facebook's public APIs, including Graph API, that could provide—subject to relevant privacy controls and user settings, and the user's choices in the Granular Data Permissions dialog—user information

---

[1]  The Facebook Developers site is located here: https://developers.facebook.com/docs/permissions/reference.

[2]  The Facebook Data Policy defines "public information" as information that "can be seen by anyone, on or off our Products, including if they don't have an account. This includes your Instagram username; any information you share with a public audience; information in your public profile on Facebook; and content you share on a Facebook Page, public Instagram account or any other public forum, such as Facebook Marketplace."

[3]  This list is based on readily available records and represents this information to the best of Facebook's present knowledge.

to third-party consumer apps during the period between 2010-2018 (though few were available during the entire period).[4]  The permissions and/or data points included on the list below were published on Facebook's publicly available website for developers, which also explained the functionalities of and various restrictions on these permissions over time.

- age_range

- basic_info

- context

- cover

- currency

- default

- devices

- email

- first_name

- friends_about_me

- friends_activities

- friends_birthday

- friends_education_history

- friends_events

- friends_groups

- friends_hometown

- friends_interests

---

[4]  In particular, any permission beginning with "friends_" was deprecated with the transition to Graph API v.2.

31

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3832

- friends_likes

- friends_location

- friends_photos

- friends_questions

- friends_relationship_details

- friends_relationships

- friends_religion_politics

- friends_status

- friends_subscriptions

- friends_website

- friends_work_history

- gender

- id

- last_name

- link

- locale

- middle_name

- name

- name_format

- picture

- public_profile

- read_custom_friendlists

- read_friendlists

- read_mailbox

- read_page_mailboxes

- read_requests

- read_stream

- short_name

- timezone

- updated_time

- user_about_me

- user_actions.books

- user_actions.fitness

- user_actions.music

- user_actions.news

- user_actions.video

- user_actions:APP_NAMESPACE

- user_activities

- user_age_range

- user_birthday

- user_education_history

- user_events

- user_friends

- user_games_activity

- user_gender

- user_groups

3834

- user_hometown

- user_interests

- user_likes

- user_link

- user_location

- user_managed_groups

- user_online_presence

- user_photos

- user_posts

- user_questions

- user_relationship_details

- user_relationships

- user_religion_politics

- user_status

- user_subscriptions

- user_tagged_places

- user_videos

- user_website

- user_work_history

- username

- verified

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

**Response No. 16**:  As noted, there are a handful of additional APIs that a developer may request access to if necessary for the operation of their app.  Each of these APIs has its own unique set of permissions and/or endpoints associated with that API.  Information regarding these APIs and their associated permissions and/or endpoints are available on the Facebook Developers page.

As relevant here, the endpoints a developer presently may access through the Groups API after having been approved by Facebook include:

- /{application-id}/app_installed_groups

- /{group-id}/albums

- /{group-id}/docs

- /{group-id}/events

- /{group-id}/feed

- /{group-id}/files

- /{group-id}/live_videos

- /{group-id}/opted_in_members

- /{group-id}/photos

- /{group-id}/videos

- /{user-id}/groups

**Response No. 17**:  The endpoints a developer presently may access through the Live Video API after having been approved by Facebook include:

- DELETE /{live_video_id}

- GET /{event-id}/live_videos

- GET /{group-id}/live_videos

- GET /{live-video-id}

- GET /{live-video-id}/comments

- GET /{live-video-id}/crosspost_shared_pages

- GET /{live-video-id}/likes

- GET /{live-video-id}/polls

- GET /{live-video-id}/reactions

- GET /{page-id}/live_videos

- GET /{user-id}/live_videos

- POST /{event-id}/live_videos

- POST /{group-id}/live_videos

- POST /{live_video_id}

- POST /{live_video_id}/input_streams

- POST /{live_video_id}/polls

- POST /{page-id}/live_videos

- POST /{user-id}/live_videos

- GET /{live-video-input-stream-id}

- POST /{live_video_id}/input_streams

- GET /{live-video-id}/polls

- GET /{video-poll-id}

- POST /{live_video_id}/polls

- POST /{video_poll_id}

**Response No. 18**:  The data fields that may be accessed through the Pages API after

having been approved by Facebook include:

- id

- about

- access_token

- ad_campaign

- affiliation

- app_id

- artists_we_like

- attire

- awards

- band_interests

- band_members

- best_page

- bio

- birthday

- booking_agent

- built

- business

- can_checkin

- can_post

- category

- category_list

- checkins

- company_overview

3838

- connected_instagram_account

- contact_address

- copyright_attribution_insights

- copyright_whitelisted_ig_partners

**Response No. 19**:

**Response No. 20**:

**Response No. 21**:

**Response No. 22**:

3839

**Response No. 23**:

**Response No. 24**:

**Response No. 25**:

**Response No. 26**:

**Response No. 27**:

**Response No. 28**:

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**

**Response No. 29**:

**Response No. 30**:

**Response No. 31**:

**Response No. 32**:

**Response No. 33**:

3841

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

**Response No. 34**:

**Response No. 35**:

**Response No. 36**:

**Response No. 37**:

**Response No. 38**:

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3842

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

**Response No. 39**:

**Response No. 40**:

**Response No. 41**:

**Response No. 42**:

**Response No. 43**:

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3843

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

**Response No. 44**:

**Response No. 45**:

**Response No. 46**:

**Response No. 47**:

**Response No. 48**:

---

[5]  In contrast to other permissions that grant access to a user's friend list, the "auto_granted_read_friendlists"
capability returns custom lists or groups of friends curated by the user, which could reflect or otherwise include
all of a user's friends.

3844

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

**Response No. 49**:

**Response No. 50**:

**Response No. 51**:

**Response No. 52**:

**Response No. 53**:

3845

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

**Response No. 54**:



45

3846

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

**Response No. 55**:

**Response No. 56**:

3847

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11**



**Response No. 57**:

**Response No. 58**:



3848

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

**Response No. 59**:

**Response No. 60**:

**Response No. 61**:

**Response No. 62**:

**Response No. 63**:

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3849

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

**Response No. 64**:

**Response No. 65**:

**Response No. 66**:

**Response No. 67**:

---

[6] The types of possible social context are whether an app user's nearby friend is currently traveling, near the app user, or in the app user's neighborhood; whether it is the nearby friend's birthday or some other celebration day; what song they are listening to; and what game they are playing.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

**Response No. 68**:

**Response No. 69**:

**Response No. 70**:

**Response No. 71**:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 11

**Response No. 72:**

**Response No. 73:**

**Response No. 74:**

**Response No. 75:**

## INTERROGATORY NO. 12:

For each Database and Data Analytics Infrastructure identified in your answer to

Interrogatory No. 8, describe in detail the system architectures of, and types of data contained by,

such system.

3852

**RESPONSE TO INTERROGATORY NO. 12:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Interrogatory on the following grounds:

(A)   Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each" Database and Data Analytics Infrastructure that Facebook identified in its answer to Interrogatory No. 8. *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009). During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter. Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, several individual databases that contain different information and operate differently. Facebook will therefore treat Plaintiffs' inquiry into "each" Database and Data Infrastructure as an individual Interrogatory. *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each

had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

(B)     Facebook objects to this Interrogatory on the ground that the definitions of "Database," and "Data Analytics Infrastructure" are vague, ambiguous, overly broad, and unduly burdensome.  Facebook will construe these terms as described in its objections to their Definitions.

(C)     Facebook objects to this Interrogatory on the ground that the term "system architectures" is vague, ambiguous, and undefined.  Facebook further objects to this Interrogatory on the ground that Facebook's "system architectures," however defined, are unrelated to Plaintiffs' claims.

(D)     Facebook objects to this Interrogatory on the ground that it seeks only irrelevant information, as the structure and organization of Facebook's databases have no possible relation to or bearing on Plaintiffs' live claims or Facebook's defenses.

(E)     Facebook objects to this Interrogatory as seeking information duplicative of information provided previously through the parties' extensive letter exchange and meet and confer discussions regarding sources of ESI and as otherwise outside the scope of additional ESI information the Court has allowed Plaintiffs to seek.  *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

(F)     Facebook further objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed.  Thus,

53

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3854

the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

(G)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, and/or disproportionate to the needs of the case in that it seeks information relating to "each" "Facebook Database and Data Analytics Infrastructure," without regard for whether the "Database or Data Analytics Infrastructure" has any bearing on Plaintiffs' live claims or Facebook's defenses.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information related to the content, structure, or organization of Databases unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(H)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it

54

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3855

would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook is willing to meet and confer with Plaintiffs regarding what information is being sought by this Interrogatory, its relevance to Plaintiffs' claims (if any), and what information Facebook could reasonably provide proportionate to the needs of this case.  Facebook does not understand what information Plaintiffs are seeking via this Interrogatory, as written.

## INTERROGATORY NO. 13:

For every API by means of which Third Parties could access the Not Generally Available Content and Information of Friends of Installing Users, list the name of the API, a description of its function, the data fields of Not Generally Available Content and Information of Friends of Installing Users to which it allowed access, the number of calls it received each month, the volume of data it returned each month, the number of Friends of Installing Users whose Content and Information was accessed, the name of every Third Party that Facebook allowed to use that API, and the period during which each Third Party was allowed to use the API.

## RESPONSE TO INTERROGATORY NO. 13:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook further objects to this Interrogatory on the following grounds:

(A)    Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "every" API.  *See, e.g.*, *New Amsterdam Project Mgmt.*

55
FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

3856

*Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009).  During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, several individual APIs that contain different information and operate differently.  Facebook will therefore treat Plaintiffs' inquiry into "each" API as an individual Interrogatory.  *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).  Not only does the Interrogatory embed subparts by asking for information about "every API by means of which Third Parties could access the Not Generally Available Content and Information of Friends of Installing Users," the Interrogatory demands a list of 6 different types of information about each responsive API.  Each of those inquiries is itself a subpart to be counted against the Interrogatory limit.

(B)     Facebook objects to this Interrogatory on the basis that it is cumulative and duplicative of Interrogatories Nos. 9, 10, 11, 14, 15, and 27, among others.

(C)     Facebook objects to this Interrogatory on the ground that the definition of "Not Generally Available" data is vague, ambiguous, overly broad, and unduly burdensome. Facebook will construe this term as described in its objections to its Definition.

(D)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, and/or disproportionate to the needs of the case.  Specifically, Facebook objects to this Interrogatory on the basis that it seeks an overly broad and unduly burdensome volume of data, which presents not only practical limitations as to its analysis, delivery, and use, but is largely irrelevant.  Thus, the burdens of compiling such information outweigh the utility of the information.

(E)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, in that it seeks information regarding the volume of API calls and data returned each month.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to API calls, applications, and user data unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-

Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user

information as being that "Facebook shared with or made accessible to third parties").

     (F)    Facebook further objects to this Interrogatory to the extent the Interrogatory seeks

information not in Facebook's possession, custody, or control.

     (G)    Facebook further objects to this Interrogatory on the ground that it seeks

Facebook's protected trade secrets and other sensitive, proprietary information that would pose

security and business risks to Facebook and risks to Facebook users' privacy if disclosed.  Thus,

the burdens of production would outweigh the utility of the production of this information, which

are not relevant to Plaintiffs' claims.

     (H)    Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded

the maximum number of permissible Interrogatories under Discovery Order No. 6, under which

each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1);

Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the

most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it

would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless

made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

     Subject to and without waiving the foregoing objections, and subject to the ongoing

nature of discovery in this action, Facebook responds as follows:

     **Response No. 76**:

     For a list of APIs by which third parties could access the not generally available content

and information of friends of installing users and the data fields associated with each API,

Facebook directs Plaintiffs to Facebook's responses to Interrogatory Nos. 9, 10, and 11.

For information relating to business partners who could access the not generally available content and information of friends of installing users, Facebook directs Plaintiffs to Facebook's responses to Interrogatory Nos. 14 and 15.

For information relating to so-called "whitelisted" applications who could access the not generally available content and information of friends of installing users, Facebook directs Plaintiffs to Facebook's response to Interrogatory No. 27.

With regard to the last relevant category of third parties who could access the not generally available content and information of friends of installing users—third party application developers that had access to "sensitive user information" via friend-sharing between 2009 and 2015—Facebook continues to investigate what information it can produce in response to this request. Facebook is willing to meet and confer with Plaintiffs regarding what information is being sought by this Interrogatory, its relevance to Plaintiffs' claims (if any), and what relevant and probative information is reasonably available to Facebook such that it is appropriate for discovery in this case.

With regard to Plaintiffs' request for over 10 years of monthly data regarding the number of calls certain APIs received, the volume of data returned, and the numbers of users whose data was accessed, Facebook continues to investigate what information it can produce in response to this request. Facebook is willing to meet and confer with Plaintiffs regarding what information is being sought by this Interrogatory, its relevance to Plaintiffs' claims (if any), and what relevant and probative information is reasonably available to Facebook such that it is appropriate for discovery in this case.

## INTERROGATORY NO. 14:

Identify every Business Partner that had the ability to access the Not Generally Available Content and Information of Facebook Users even if such Facebook Users had not downloaded an App from that Business Partner and time period during which each such Business Partner had that ability.

## RESPONSE TO INTERROGATORY NO. 14 – CONFIDENTIAL:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook further objects to this Interrogatory on the following grounds:

(A)    Facebook objects to this Interrogatory as an improper compound interrogatory that also embeds multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each such Business Partner." *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009). During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter. Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate

3861

and distinct subjects, to wit, each of dozens of different "Business Partners" that have separate relationships and/or contracts with Facebook. Facebook therefore considers Plaintiffs' inquiries into "each" Business Partner as separate Interrogatories. *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

(B)     Facebook objects to this Interrogatory on the ground that the definition of "Not Generally Available" data is vague, ambiguous, overly broad, and unduly burdensome. Facebook will construe this term as described in its objections to its Definition.

(C)     Facebook objects to this Interrogatory on the ground that the definition of "Business Partners" is vague, ambiguous, overly broad, and unduly burdensome. Facebook will construe this term as described in its objections to its Definition.

(D)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case. Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to Business Partners unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD

Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(E)     Facebook objects to this Interrogatory on the basis that it is cumulative and duplicative of prior requests, including RFPs 12 and 24.

(F)     Facebook objects to this Interrogatory on the basis that the information sought is more appropriately pursued through another means of discovery, such as a request for the production of documents.

(G)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information. Responding fully to Plaintiffs' Interrogatory would require Facebook to conduct a broad investigation—including conducting witness interviews and analyzing a large number of documents that have not yet been identified and produced—to identify all Business Partners who were permitted to access to information through a large number of APIs (many of which are unrelated to any live claim or defense) over the course of at least thirteen years.

(H)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it

CONFIDENTIAL
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 14**

would enforce a 75 Interrogatory limit. Sept. 4 Hr'g Tr. at 14:17-22. Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

### Response No. 77:

"Business Partners" is not a term of art used within Facebook used to describe third parties to whom "Facebook outsourced . . . 'the time, labor, and money required to build Facebook's Platform on different devices and operating systems,'" pursuant to "integration partnerships." MTD Order, ECF No. 298, at 8 (quoting FACC ¶ 486). To avoid confusion, Facebook will refer to these entities as "Integration Partners." Facebook's Integration Partners are companies Facebook engaged to build integrations for a variety of devices, operating systems, and other products where Facebook and its partners wanted to offer people a way to receive Facebook or Facebook experiences. These integrations were built by Facebook partners, for Facebook users, but approved by Facebook. They included, for example:

- *Facebook-branded apps*: Some partners built versions of Facebook for their device or operating system that had all or substantially all of the features that Facebook built directly on the Facebook website and in Facebook's mobile apps.

- *Social Networking Service Hubs*: Some partners built "hubs" into their products, where people could see notifications from their friends or the people they followed on Facebook, MySpace, Twitter, Google and other services. People could often also use these integrations to post on these social networking services.

3864

- *Syncing Integrations*: Some partners enabled people to sync their Facebook data (*e.g.*, photos, contacts, events, and videos) with their device in order to integrate Facebook features on their device. This allowed people to, for example, easily upload pictures to Facebook and to download their Facebook pictures to their phones, or to integrate their Facebook contacts into their device address book.

- *USSD Services*: Some partners developed USSD services, which are services that provided Facebook notifications and content via text message. This was useful for feature phones that did not have the ability to connect to the Internet; it particularly helped Facebook bring its service to people in the developing world.

To provide these experiences, Facebook permitted partners to use certain Facebook APIs. In general, partners were licensed to use the APIs solely for providing specific integrations approved by Facebook to Facebook users who requested these services on the partners' products. These integrations were reviewed by Facebook, which had to approve implementations of these APIs. Typically, these apps were reviewed and "certified" by members of Facebook's partnerships and engineering teams. In these and other ways, these partnerships differed significantly from third-party app developers' use of published APIs to build apps for consumers on Facebook's developer platform. Among other things, third-party app developers use the information they receive in order to build their own experiences, not to build Facebook-approved applications for purposes designated by Facebook. Integration Partners were not permitted to use data received through Facebook APIs for independent purposes unrelated to the approved integration without user consent.

Below is a list of Facebook's Integration Partners during the Relevant Time Period asserted by Plaintiffs. For information relating to the period during which each integration was

active, Facebook directs Plaintiffs to Facebook's responses to Interrogatory No. 15. The lack of an access revocation date does not signify that such access was never revoked or otherwise terminated.

- Accedo

- Acer

- ████████████

- Airtel

- Alcatel/TCL

- Alibaba[7]

- Amazon

- ████████████

- Apple

- AT&T

- Blackberry

- ████████

- Dell

- DNP

- Docomo

- Garmin

- Gemalto

- ████████████

---

[7] Alibaba only had APIs that allows it to query endpoints not associated with user's friends' data fields during the relevant time period, but is included on this list for completeness.

3866

███████████

- HP/Palm

- HTC

- Huawei

- INQ

███████████

- Kodak

- LG

- MediaTek/Mstar

███████████

- Microsoft

- Miyowa/Hape Esia

███████████

- Motorola/Lenovo

- Mozilla

███████████

- Myriad

- Nexian

███████████

- Nuance

- Nokia

- O2

- Opentech ENG

- Opera

- OPPO

- Orange

- Pantech



- Qualcomm



- Samsung

- Sony



- Sprint



- TIM

- T-Mobile

- Tobii

- U2topia

- Verisign

- Verizon

- Virgin Mobile

- Vodafone

- Warner Bros.

67

3868

**CONFIDENTIAL**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 14**

- Western Digital

- Yahoo

- ███████

- Zing Mobile

This list is comprehensive to the best of Facebook's ability, as explained in the June 29, 2018 Facebook letter that is cited in paragraph 432 of the SACC.

## INTERROGATORY NO. 15:

For each Business Partner identified in your answer to Interrogatory No. 14, provide:

a) The name of each API or other data transfer mechanism by means of which the Business Partner accessed the Not Generally Available Content and Information of Facebook Users when such Facebook Users had not downloaded an App from that Business Partner;

b) a detailed description of the function of each such API or other data transfer mechanism;

c) the elements of Not Generally Available Content and Information that each such API or other data transfer mechanism allowed access to;

d) the number of calls the Business Partner made to each such API or other data transfer mechanism each month;

e) the volume of data transferred from each such API or other data transfer mechanism to each Business Partner each month;

f) the number of Friends of Installing Users whose Content and Information was so accessed by each Business Partner; and

g) any filters or access restrictions that limited the set of Facebook Users about whom each Business Partner could access Not Generally Available Content and Information.

3869

## RESPONSE TO INTERROGATORY NO. 15 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33. Not only does the Interrogatory ask for separate information about "each" Business Partner identified in Facebook's answer to Interrogatory No. 14, *see, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009), the Interrogatory demands a list of 7 different types of information about each. Each of those inquiries is itself a subpart to be counted against the Interrogatory limit. During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter. Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, each of dozens of different "Business Partners" that have separate relationships and/or contracts with Facebook. Facebook will therefore treat Plaintiffs' inquiry into "each" Business Partner as an individual Interrogatory. *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct*

*subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. §
33.30[2])). Although Facebook has provided a single table of data points relevant to each
Integration Partner for ease of review, Facebook considers this Interrogatory to pose a separate
Interrogatory about 67 different entities, and therefore the below Response to constitute at least
67 discrete Responses.

(B)     Facebook objects to this Interrogatory on the ground that the definition of "Not
Generally Available" data is vague, ambiguous, overly broad, and unduly burdensome.
Facebook will construe this term as described in its objections to its Definition.

(C)     Facebook objects to this Interrogatory on the ground that the definition of
"Business Partners" is vague, ambiguous, overly broad, and unduly burdensome. Facebook will
construe this term as described in its objections to its Definition.

(D)     Facebook objects to this Interrogatory as overly broad, unduly burdensome,
and/or disproportionate to the needs of the case. Specifically, Facebook objects to this
Interrogatory on the basis that it seeks an overly broad and unduly burdensome volume of data,
which presents not only practical limitations as to its analysis, delivery, and use, but is largely
irrelevant. The burdens of compiling such information outweigh the utility of the information.

(E)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of
information that is not reasonably available at this stage in the case and that would be unduly
burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary
to investigate as weighed against Plaintiffs' need for the information. Responding fully to
Plaintiffs' Interrogatory would require Facebook to conduct a broad investigation—including
analyzing a large number of documents that have not yet been identified and produced and that
may or may not be in Facebook's possession, custody, and control—to identify all Business

Partners who were permitted to access information through a large number of APIs (many of which are unrelated to any live claim or defense) over the course of at least thirteen years and then provide detailed historical information about each of those APIs and how they were utilized.

(F)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to API calls, applications, and user data unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(G)     Facebook further objects to this Interrogatory on the ground that the Interrogatory seeks information not in Facebook's possession, custody, or control.

(H)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it

would enforce a 75 Interrogatory limit. Sept. 4 Hr'g Tr. at 14:17-22. Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

### Response No. 78:

With regard to the APIs Facebook's Integration Partners had access to, Facebook has provided a table below identifying, by Integration Partner, the APIs that may have allowed each Integration Partner to query (but would not have necessarily returned) endpoints associated with user's friends' data fields during the relevant time period, their associated apps, the date ranges during which they were active, and the data fields associated with the APIs they had access to. Note that the lack of an access revocation date does not signify that such access was never revoked or otherwise terminated.

However, it is important to note that the Integration Partner's—or any third party's—ability to query an API does not automatically translate into the ability to access or receive user data, as

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 15**



With regard to Plaintiffs' request for over 10 years of monthly data regarding the number of API calls made, the volume of data returned, and the numbers of users whose data was accessed, Facebook continues to investigate what information it can produce in response to this request. Facebook is willing to meet and confer with Plaintiffs regarding what information is being sought by this Interrogatory, its relevance to Plaintiffs' claims (if any), and what relevant and probative information is reasonably available to Facebook such that it is appropriate for discovery in this case.

3874