# EXHIBIT C
# VOLUME THREE
# OF REDACTED VERSION OF DOCUMENT
# SOUGHT TO BE FILED UNDER SEAL

**INTERROGATORY NO. 16:**

For each Named Plaintiff, identify all Third Parties who had the ability to access such Named Plaintiff's Not Generally Available Content and Information by virtue of the fact that the Named Plaintiff was a Friend of an Installing User, the date and time of each request for such access, and the specific Content and Information that was accessed.

**RESPONSE TO INTERROGATORY NO. 16:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each" of the 21 Named Plaintiffs.  *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009).  Facebook will treat Plaintiffs' inquiry into each Named Plaintiff as a separate Interrogatory.  During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but

instead seeks information about separate and distinct subjects, to wit, each individual Named

Plaintiff, each of whom used Facebook differently. Not only does the Interrogatory embed

subparts by asking for information about each of the 21 Named Plaintiffs, the Interrogatory

contains multiple subparts describing the type of information demanded about each Named

Plaintiff. Facebook will therefore treat Plaintiffs' inquiry into "each" Named Plaintiff as an

individual Interrogatory. *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475

(N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different

products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits

[on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as

subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

(B)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject

matter of this Action, and not proportional to the needs of the case, in that it seeks information

regarding third parties' access to data not at issue in this case. Specifically, Facebook objects to

this Interrogatory to the extent it seeks information relating third party access to data unrelated to

application developers being granted access to "sensitive user information" via friend-sharing

between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the

sharing of "sensitive user information" with integration partners pursuant to "data reciprocity

agreements," and/or the misuse of "sensitive user information" disclosed in one of these three

manners as a result of Facebook's alleged failure to adopt effective policies or enforcement

procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF

No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s

Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that

"Facebook shared with or made accessible to third parties").

(C)     Facebook objects to this Interrogatory to the extent it seeks information regarding information provided to third parties through friend sharing related to users who joined Facebook in 2009 or later.  The Court held that users who joined Facebook in 2009 or later consented to friend sharing and therefore dismissed all claims related to friend sharing for such users.

(D)     Facebook objects to this Interrogatory on the ground that the definition of "Not Generally Available" data is vague, ambiguous, overly broad, and unduly burdensome. Facebook will construe this term as described in its objections to its Definition.

(E)     Facebook objects to the Interrogatory on the ground that it is overly broad and unduly burdensome.  The Interrogatory seeks information about every third party that may have had access to any of Plaintiffs' data through friend sharing, which would require investigating the data received by potentially millions of apps over the course of eight years or more.  Further, friends of Plaintiffs are likely to have changed throughout that period, as are the applications that those friends installed, and the sharing permissions used by Plaintiffs.

(F)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information.  Responding fully to Plaintiffs' Interrogatory would require Facebook first to conduct a broad investigation and analyze a large number of documents that have not yet been identified and produced and that may or may not be in Facebook's possession, custody, and control to obtain information about every third party that may have had access to any of Plaintiffs' data through friend sharing.  This would require investigating the data received by potentially millions of apps over the course of

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

eight years or more, Plaintiffs' and their friends' settings during that time period, the applications Plaintiffs' friends installed, and the sharing permissions used by Plaintiffs.

(G)     Facebook objects to the Interrogatory on the ground that it is overly broad and unduly burdensome, as Plaintiffs have repeatedly indicated that they intend to voluntarily dismiss 11 of the 21 Named Plaintiffs in order to, among other things, reduce the burden on Facebook in producing discovery related to the Named Plaintiffs.  But Plaintiffs have not yet stipulated to the dismissal of any Named Plaintiffs, so it is not clear which Named Plaintiffs Plaintiffs are seeking discovery on.

(H)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 79**:

Facebook continues to investigate what, if any, information it can produce in response to this request.

**INTERROGATORY NO. 17:**

For each Named Plaintiff, identify each Facebook Business Partner that had the ability to access the Named Plaintiff's Not Generally Available Content and Information, even if the

259

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4060

Named Plaintiff had not downloaded an App from that Business Partner, the date and time of each request for such access, and the specific Content and Information that was accessed.

**RESPONSE TO INTERROGATORY NO. 17:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each" of the 21 Named Plaintiffs. *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009). Facebook will treat Plaintiffs' inquiry into each Named Plaintiff as a separate Interrogatory. During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter. Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, each individual Named Plaintiff, each of whom used Facebook differently. Not only does the Interrogatory embed subparts by asking for information about each of the 21 Named Plaintiffs, the Interrogatory

contains multiple subparts describing the type of information demanded about each Named

Plaintiff. Facebook will therefore treat Plaintiffs' inquiry into "each" Named Plaintiff as an

individual Interrogatory. *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475

(N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different

products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits

[on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as

subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

(B)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject

matter of this Action, and not proportional to the needs of the case, in that it seeks information

regarding third parties' access to data not at issue in this case. Specifically, Facebook objects to

this Interrogatory to the extent it seeks information relating third party access to data unrelated to

application developers being granted access to "sensitive user information" via friend-sharing

between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the

sharing of "sensitive user information" with integration partners pursuant to "data reciprocity

agreements," and/or the misuse of "sensitive user information" disclosed in one of these three

manners as a result of Facebook's alleged failure to adopt effective policies or enforcement

procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF

No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s

Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that

"Facebook shared with or made accessible to third parties").

(C)     Facebook objects to this Interrogatory on the ground that the definition of "Not

Generally Available" data is vague, ambiguous, overly broad, and unduly burdensome.

Facebook will construe this term as described in its objections to its Definition.

(D)     Facebook objects to this Interrogatory on the ground that the definition of "Business Partners" is vague, ambiguous, overly broad, and unduly burdensome.  Facebook will construe this term as described in its objections to its Definition.

(E)     Facebook objects to the Interrogatory on the ground that it is overly broad and unduly burdensome.  Specifically, the Interrogatory seeks information about every Business Partner that may have had access to any of Plaintiffs' data over a thirteen-year period.

(F)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information.  Responding fully to Plaintiffs' Interrogatory would require Facebook to conduct a broad investigation—including analyzing a large number of documents that have not yet been identified and produced and that may or may not be in Facebook's possession, custody, and control—to identify all Business Partners who were permitted to access information through a large number of APIs (many of which are unrelated to any live claim or defense) over the course of at least thirteen years and then attempt to identify and provide detailed historical information about each piece of data those partners may have received.

(G)     Facebook objects to the Interrogatory on the ground that it is overly broad and unduly burdensome, as Plaintiffs have repeatedly indicated that they intend to voluntarily dismiss 11 of the 21 Named Plaintiffs in order to, among other things, reduce the burden on Facebook in producing discovery related to the Named Plaintiffs.  But Plaintiffs have not yet stipulated to the dismissal of any Named Plaintiffs, so it is not clear which Named Plaintiffs Plaintiffs are seeking discovery on.

(H)     Facebook objects to this Interrogatory on the basis that it is cumulative and duplicative of prior requests, including Interrogatory 14 and RFPs 12 and 24.

(I)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 80**:

Facebook continues to investigate what, if any, information it can produce in response to this request.

## INTERROGATORY NO. 18:

Identify by Bates number every document You provided or made available to PwC related to any investigation, audit or assessment related to the subject matter of the Complaint.

## RESPONSE TO INTERROGATORY NO. 18:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory to the extent it seeks information equally available to Plaintiffs.  Plaintiffs are able to identify which produced documents reflect

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

communications with PwC relating to any investigation, audit, or assessment related to the subject matter of the Complaint.

(B)     Facebook objects to this Interrogatory on the ground that it seeks information having no relevance to the claims or defenses at issue. There is no claim or defense at issue in the case that concerns which materials Facebook made available to PwC.

(C)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, in that it seeks information regarding materials made available to PwC having no bearing on the claims and defenses in the case. Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to documents unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(D)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, and/or disproportionate to the needs of the case. In order to answer this Interrogatory, Facebook would need to collect all materials made available to PwC over a seven year period, then compare those materials to the 1.2 million pages produced in this action to date, identify on a

per-document basis which documents made available to PwC overlap with produced materials, and then create a list of the matching Bates numbers. The burden of such an investigation far outweighs any potential utility it could serve.

(E)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit. Sept. 4 Hr'g Tr. at 14:17-22. Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 81**:

The parties have met and conferred extensively regarding Plaintiffs' repeated requests that Facebook produce or otherwise identify all documents that were provided to PwC in connection with its any investigations, audits, or assessments related to the subject matter of the Complaint. As Facebook has explained, it does not have a central file or repository of documents that were provided to auditors or examiners from PwC, who were often on site at Facebook and meeting directly with Facebook personnel over the course of several years. As a result, Facebook does not have an identifiable and complete set of materials that were provided to PwC or that PwC may have considered over the course of a decade. Facebook already identified for Plaintiffs previously-produced documents that were referenced in PwC's Initial and Biennial Assessment Reports (on May 29, 2020) and previously-produced communications

between Facebook and PwC (on May 9, 2020), both of which Plaintiffs could have identified on their own. It is unclear what additional information Plaintiffs seek through their request, which appears to be a make-work interrogatory, demanding that Facebook try to ascertain which documents in Facebook's productions were provided to PwC over the course of a decade (a fact that has absolutely no probative value here).

Facebook also notes that Plaintiffs have subpoenaed PwC directly, and (as Facebook understands) PwC has produced over 22,000 pages of documents to Plaintiffs, Bates numbered PwC_CPUP_FB00000001 - PwC_CPUP_FB00022281. Facebook further directs Plaintiffs to that production.

Facebook sets forth below the previously-identified documents in Facebook's productions that include: (1) communications between Facebook and PwC and (ii) documents referenced by PwC in its Initial and Biennial Assessment Reports.

- FB-CA-MDL-00000001 - FB-CA-MDL-00000005
- FB-CA-MDL-00000006 - FB-CA-MDL-00000010
- FB-CA-MDL-00000011 - FB-CA-MDL-00000025
- FB-CA-MDL-00000094 - FB-CA-MDL-00000104
- FB-CA-MDL-00000105 - FB-CA-MDL-00000116
- FB-CA-MDL-00000117 - FB-CA-MDL-00000132
- FB-CA-MDL-00000133 - FB-CA-MDL-00000149
- FB-CA-MDL-00000179 - FB-CA-MDL-00000194
- FB-CA-MDL-00000195 - FB-CA-MDL-00000210
- FB-CA-MDL-00000211 - FB-CA-MDL-00000226
- FB-CA-MDL-00000292 - FB-CA-MDL-00000299

- FB-CA-MDL-00000300 - FB-CA-MDL-00000305

- FB-CA-MDL-00193055 - FB-CA-MDL-00193056

- FB-CA-MDL-00193058 -FB-CA-MDL-00193064

- FB-CA-MDL-00193071 - FB-CA-MDL-00193071

- FB-CA-MDL-00193087 - FB-CA-MDL-00193094

- FB-CA-MDL-00193096 - FB-CA-MDL-00193102

- FB-CA-MDL-00277488 - FB-CA-MDL-00277499

- FB-CA-MDL-00331537 - FB-CA-MDL-00331547

- FB-CA-MDL-1115879 - FB-CA-MDL-1115881

- FB-CA-MDL-00178297

- FB-CA-MDL-00178298

- FB-CA-MDL-00178386

- FB-CA-MDL-00178388

- FB-CA-MDL-00178431

- FB-CA-MDL-00178433

- FB-CA-MDL-00178434

- FB-CA-MDL-00178441

- FB-CA-MDL-00178443

- FB-CA-MDL-00178451

- FB-CA-MDL-00178452

- FB-CA-MDL-00178454

- FB-CA-MDL-00178455

- FB-CA-MDL-00178456

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4068

- FB-CA-MDL-00178457

- FB-CA-MDL-00178458

- FB-CA-MDL-00178459

- FB-CA-MDL-00178465

- FB-CA-MDL-00178468

- FB-CA-MDL-00178501

- FB-CA-MDL-00178506

- FB-CA-MDL-00178553

- FB-CA-MDL-00178556

- FB-CA-MDL-00178571

- FB-CA-MDL-00178572

- FB-CA-MDL-00179910

- FB-CA-MDL-00179912

- FB-CA-MDL-00180999

- FB-CA-MDL-00181000

- FB-CA-MDL-00185486

- FB-CA-MDL-00185487

- FB-CA-MDL-00185751

- FB-CA-MDL-00185753

- FB-CA-MDL-00185754

- FB-CA-MDL-00185784

- FB-CA-MDL-00185785

- FB-CA-MDL-00185801

- FB-CA-MDL-00185803

- FB-CA-MDL-00185811

- FB-CA-MDL-00185812

- FB-CA-MDL-00185900

- FB-CA-MDL-00185901

- FB-CA-MDL-00185934

- FB-CA-MDL-00185935

- FB-CA-MDL-00186056

- FB-CA-MDL-00186057

- FB-CA-MDL-00186091

- FB-CA-MDL-00186092

- FB-CA-MDL-00186115

- FB-CA-MDL-00186117

- FB-CA-MDL-00186119

- FB-CA-MDL-00186120

- FB-CA-MDL-00186121

- FB-CA-MDL-00186122

- FB-CA-MDL-00186145

- FB-CA-MDL-00186163

- FB-CA-MDL-00186165

- FB-CA-MDL-00186166

- FB-CA-MDL-00186172

- FB-CA-MDL-00186173

4070

- FB-CA-MDL-00186665

- FB-CA-MDL-00186666

- FB-CA-MDL-00186667

- FB-CA-MDL-00186670

- FB-CA-MDL-00186671

- FB-CA-MDL-00186672

- FB-CA-MDL-00186962

- FB-CA-MDL-00186963

- FB-CA-MDL-00186964

- FB-CA-MDL-00186965

- FB-CA-MDL-00186966

- FB-CA-MDL-00186967

- FB-CA-MDL-00186968

- FB-CA-MDL-00187023

- FB-CA-MDL-00187024

- FB-CA-MDL-00187191

- FB-CA-MDL-00187192

- FB-CA-MDL-00187193

- FB-CA-MDL-00187194

- FB-CA-MDL-00187195

- FB-CA-MDL-00187196

- FB-CA-MDL-00187197

- FB-CA-MDL-00187202

4071

- FB-CA-MDL-00187203

- FB-CA-MDL-00187362

- FB-CA-MDL-00187363

- FB-CA-MDL-00187727

- FB-CA-MDL-00187733

- FB-CA-MDL-00187734

- FB-CA-MDL-00187736

- FB-CA-MDL-00187737

- FB-CA-MDL-00187739

- FB-CA-MDL-00187742

- FB-CA-MDL-00187781

- FB-CA-MDL-00187782

- FB-CA-MDL-00187783

- FB-CA-MDL-00187784

- FB-CA-MDL-00187785

- FB-CA-MDL-00187786

- FB-CA-MDL-00187838

- FB-CA-MDL-00187840

- FB-CA-MDL-00187864

- FB-CA-MDL-00187865

- FB-CA-MDL-00187866

- FB-CA-MDL-00187867

- FB-CA-MDL-00187868

271

4072

- FB-CA-MDL-00187869

- FB-CA-MDL-00187870

- FB-CA-MDL-00187871

- FB-CA-MDL-00187872

- FB-CA-MDL-00187873

- FB-CA-MDL-00187874

- FB-CA-MDL-00187875

- FB-CA-MDL-00187921

- FB-CA-MDL-00187922

- FB-CA-MDL-00188005

- FB-CA-MDL-00188006

- FB-CA-MDL-00188007

- FB-CA-MDL-00188008

- FB-CA-MDL-00188009

- FB-CA-MDL-00188010

- FB-CA-MDL-00188011

- FB-CA-MDL-00188012

- FB-CA-MDL-00188014

- FB-CA-MDL-00188133

- FB-CA-MDL-00188135

- FB-CA-MDL-00188217

- FB-CA-MDL-00188218

- FB-CA-MDL-00188219

- FB-CA-MDL-00188220

- FB-CA-MDL-00188221

- FB-CA-MDL-00188222

- FB-CA-MDL-00188223

- FB-CA-MDL-00188224

- FB-CA-MDL-00188606

- FB-CA-MDL-00188721

- FB-CA-MDL-00188723

- FB-CA-MDL-00188790

- FB-CA-MDL-00188791

- FB-CA-MDL-00188792

- FB-CA-MDL-00188793

- FB-CA-MDL-00188794

- FB-CA-MDL-00188795

- FB-CA-MDL-00188796

- FB-CA-MDL-00188797

- FB-CA-MDL-00188798

- FB-CA-MDL-00188799

- FB-CA-MDL-00188800

- FB-CA-MDL-00188803

- FB-CA-MDL-00188872

- FB-CA-MDL-00188873

- FB-CA-MDL-00188874

- FB-CA-MDL-00188875

- FB-CA-MDL-00188876

- FB-CA-MDL-00188877

- FB-CA-MDL-00188878

- FB-CA-MDL-00188879

- FB-CA-MDL-00188880

- FB-CA-MDL-00188881

- FB-CA-MDL-00188882

- FB-CA-MDL-00188886

- FB-CA-MDL-00188956

- FB-CA-MDL-00188957

- FB-CA-MDL-00188958

- FB-CA-MDL-00188959

- FB-CA-MDL-00188960

- FB-CA-MDL-00188961

- FB-CA-MDL-00188962

- FB-CA-MDL-00188963

- FB-CA-MDL-00188964

- FB-CA-MDL-00188965

- FB-CA-MDL-00188976

- FB-CA-MDL-00188979

- FB-CA-MDL-00189051

- FB-CA-MDL-00189052

4075

- FB-CA-MDL-00189053

- FB-CA-MDL-00189054

- FB-CA-MDL-00189055

- FB-CA-MDL-00189056

- FB-CA-MDL-00189057

- FB-CA-MDL-00189058

- FB-CA-MDL-00189059

- FB-CA-MDL-00189060

- FB-CA-MDL-00189351

- FB-CA-MDL-00189352

- FB-CA-MDL-00189430

- FB-CA-MDL-00189431

- FB-CA-MDL-00189432

- FB-CA-MDL-00189433

- FB-CA-MDL-00189434

- FB-CA-MDL-00189435

- FB-CA-MDL-00189436

- FB-CA-MDL-00189437

- FB-CA-MDL-00189438

- FB-CA-MDL-00189439

- FB-CA-MDL-00189452

- FB-CA-MDL-00189453

- FB-CA-MDL-00189516

- FB-CA-MDL-00189517

- FB-CA-MDL-00189518

- FB-CA-MDL-00189519

- FB-CA-MDL-00189574

- FB-CA-MDL-00189581

- FB-CA-MDL-00189598

- FB-CA-MDL-00189599

- FB-CA-MDL-00189678

- FB-CA-MDL-00189679

- FB-CA-MDL-00189680

- FB-CA-MDL-00189681

- FB-CA-MDL-00189682

- FB-CA-MDL-00189683

- FB-CA-MDL-00189684

- FB-CA-MDL-00189685

- FB-CA-MDL-00189686

- FB-CA-MDL-00189687

- FB-CA-MDL-00189688

- FB-CA-MDL-00189689

- FB-CA-MDL-00189690

- FB-CA-MDL-00189782

- FB-CA-MDL-00189784

- FB-CA-MDL-00191099

- FB-CA-MDL-00191101

- FB-CA-MDL-00191103

- FB-CA-MDL-00191104

- FB-CA-MDL-00191105

- FB-CA-MDL-00191106

- FB-CA-MDL-00191120

- FB-CA-MDL-00191121

- FB-CA-MDL-00191122

- FB-CA-MDL-00191123

- FB-CA-MDL-00191125

- FB-CA-MDL-00191127

- FB-CA-MDL-00191128

- FB-CA-MDL-00191129

- FB-CA-MDL-00191130

- FB-CA-MDL-00191144

- FB-CA-MDL-00191145

- FB-CA-MDL-00191146

- FB-CA-MDL-00191283

- FB-CA-MDL-00191285

- FB-CA-MDL-00191287

- FB-CA-MDL-00191288

- FB-CA-MDL-00191289

- FB-CA-MDL-00191290

- FB-CA-MDL-00191304

- FB-CA-MDL-00191305

- FB-CA-MDL-00191306

- FB-CA-MDL-00191428

- FB-CA-MDL-00191429

- FB-CA-MDL-00191798

- FB-CA-MDL-00191800

- FB-CA-MDL-00191801

- FB-CA-MDL-00191802

- FB-CA-MDL-00192001

- FB-CA-MDL-00192002

- FB-CA-MDL-00192004

- FB-CA-MDL-00192005

- FB-CA-MDL-00192006

- FB-CA-MDL-00192015

- FB-CA-MDL-00192029

- FB-CA-MDL-00192030

- FB-CA-MDL-00192031

- FB-CA-MDL-00192032

- FB-CA-MDL-00192034

- FB-CA-MDL-00192035

- FB-CA-MDL-00192036

- FB-CA-MDL-00192038

- FB-CA-MDL-00192039

- FB-CA-MDL-00192040

- FB-CA-MDL-00192043

- FB-CA-MDL-00192044

- FB-CA-MDL-00192045

- FB-CA-MDL-00192049

- FB-CA-MDL-00192050

- FB-CA-MDL-00192052

- FB-CA-MDL-00192053

- FB-CA-MDL-00192054

- FB-CA-MDL-00192063

- FB-CA-MDL-00192077

- FB-CA-MDL-00192078

- FB-CA-MDL-00192079

- FB-CA-MDL-00192080

- FB-CA-MDL-00192082

- FB-CA-MDL-00192083

- FB-CA-MDL-00192084

- FB-CA-MDL-00192086

- FB-CA-MDL-00192087

- FB-CA-MDL-00192088

- FB-CA-MDL-00192091

- FB-CA-MDL-00192092

- FB-CA-MDL-00192093

- FB-CA-MDL-00192097

- FB-CA-MDL-00192098

- FB-CA-MDL-00192100

- FB-CA-MDL-00192101

- FB-CA-MDL-00192102

- FB-CA-MDL-00192111

- FB-CA-MDL-00192125

- FB-CA-MDL-00192126

- FB-CA-MDL-00192127

- FB-CA-MDL-00192128

- FB-CA-MDL-00192130

- FB-CA-MDL-00192131

- FB-CA-MDL-00192132

- FB-CA-MDL-00192134

- FB-CA-MDL-00192135

- FB-CA-MDL-00192136

- FB-CA-MDL-00192139

- FB-CA-MDL-00192140

- FB-CA-MDL-00192141

- FB-CA-MDL-00192948

- FB-CA-MDL-00192949

- FB-CA-MDL-00192955

- FB-CA-MDL-00192956

- FB-CA-MDL-00197086

- FB-CA-MDL-00197087

- FB-CA-MDL-00197177

- FB-CA-MDL-00197178

- FB-CA-MDL-00197986

- FB-CA-MDL-00197987

- FB-CA-MDL-00198205

- FB-CA-MDL-00198206

- FB-CA-MDL-00198514

- FB-CA-MDL-00198515

- FB-CA-MDL-00200227

- FB-CA-MDL-00200228

- FB-CA-MDL-00200894

- FB-CA-MDL-00200895

- FB-CA-MDL-00201542

- FB-CA-MDL-00201543

- FB-CA-MDL-00201551

- FB-CA-MDL-00201649

- FB-CA-MDL-00201651

- FB-CA-MDL-00201652

- FB-CA-MDL-00201654

- FB-CA-MDL-00201655

- FB-CA-MDL-00201656

- FB-CA-MDL-00201657

- FB-CA-MDL-00201660

- FB-CA-MDL-00201661

- FB-CA-MDL-00201662

- FB-CA-MDL-00201663

- FB-CA-MDL-00201664

- FB-CA-MDL-00201665

- FB-CA-MDL-00201666

- FB-CA-MDL-00201667

- FB-CA-MDL-00201668

- FB-CA-MDL-00201669

- FB-CA-MDL-00201670

- FB-CA-MDL-00201673

- FB-CA-MDL-00201674

- FB-CA-MDL-00201675

- FB-CA-MDL-00201676

- FB-CA-MDL-00201677

- FB-CA-MDL-00201678

- FB-CA-MDL-00201679

- FB-CA-MDL-00201680

- FB-CA-MDL-00201681

- FB-CA-MDL-00201682

- FB-CA-MDL-00201683

- FB-CA-MDL-00201684

- FB-CA-MDL-00201685

- FB-CA-MDL-00201686

- FB-CA-MDL-00201687

- FB-CA-MDL-00201688

- FB-CA-MDL-00201689

- FB-CA-MDL-00201690

- FB-CA-MDL-00201691

- FB-CA-MDL-00201692

- FB-CA-MDL-00201693

- FB-CA-MDL-00201694

- FB-CA-MDL-00201695

- FB-CA-MDL-00201696

- FB-CA-MDL-00201697

- FB-CA-MDL-00201698

- FB-CA-MDL-00201699

- FB-CA-MDL-00201700

- FB-CA-MDL-00201703

- FB-CA-MDL-00201704

- FB-CA-MDL-00201705

- FB-CA-MDL-00201706

- FB-CA-MDL-00201707

- FB-CA-MDL-00201708

- FB-CA-MDL-00201709

- FB-CA-MDL-00201710

- FB-CA-MDL-00201711

- FB-CA-MDL-00201712

- FB-CA-MDL-00201713

- FB-CA-MDL-00201714

- FB-CA-MDL-00201715

- FB-CA-MDL-00201716

- FB-CA-MDL-00201728

- FB-CA-MDL-00201731

- FB-CA-MDL-00201733

- FB-CA-MDL-00201734

- FB-CA-MDL-00201735

- FB-CA-MDL-00201736

- FB-CA-MDL-00201739

- FB-CA-MDL-00201740

- FB-CA-MDL-00201741

- FB-CA-MDL-00201742

- FB-CA-MDL-00201745

- FB-CA-MDL-00201746

- FB-CA-MDL-00201747

- FB-CA-MDL-00201748

284

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4085

- FB-CA-MDL-00201751

- FB-CA-MDL-00201752

- FB-CA-MDL-00201753

- FB-CA-MDL-00201754

- FB-CA-MDL-00201755

- FB-CA-MDL-00201756

- FB-CA-MDL-00201757

- FB-CA-MDL-00201758

- FB-CA-MDL-00201759

- FB-CA-MDL-00201760

- FB-CA-MDL-00201761

- FB-CA-MDL-00201762

- FB-CA-MDL-00201763

- FB-CA-MDL-00201764

- FB-CA-MDL-00201765

- FB-CA-MDL-00201766

- FB-CA-MDL-00201767

- FB-CA-MDL-00201768

- FB-CA-MDL-00201769

- FB-CA-MDL-00201772

- FB-CA-MDL-00201773

- FB-CA-MDL-00201774

- FB-CA-MDL-00201775

4086

- FB-CA-MDL-00201776

- FB-CA-MDL-00201777

- FB-CA-MDL-00201778

- FB-CA-MDL-00201779

- FB-CA-MDL-00201780

- FB-CA-MDL-00201781

- FB-CA-MDL-00201782

- FB-CA-MDL-00201783

- FB-CA-MDL-00201784

- FB-CA-MDL-00201785

- FB-CA-MDL-00201786

- FB-CA-MDL-00201787

- FB-CA-MDL-00201788

- FB-CA-MDL-00201789

- FB-CA-MDL-00201790

- FB-CA-MDL-00201791

- FB-CA-MDL-00201792

- FB-CA-MDL-00201793

- FB-CA-MDL-00201794

- FB-CA-MDL-00201795

- FB-CA-MDL-00201796

- FB-CA-MDL-00201797

- FB-CA-MDL-00201798

4087

- FB-CA-MDL-00201799

- FB-CA-MDL-00201800

- FB-CA-MDL-00201801

- FB-CA-MDL-00201802

- FB-CA-MDL-00201803

- FB-CA-MDL-00201804

- FB-CA-MDL-00201805

- FB-CA-MDL-00201806

- FB-CA-MDL-00201809

- FB-CA-MDL-00201810

- FB-CA-MDL-00201811

- FB-CA-MDL-00201812

- FB-CA-MDL-00201813

- FB-CA-MDL-00201814

- FB-CA-MDL-00201815

- FB-CA-MDL-00201816

- FB-CA-MDL-00201817

- FB-CA-MDL-00201818

- FB-CA-MDL-00201819

- FB-CA-MDL-00201820

- FB-CA-MDL-00201821

- FB-CA-MDL-00201822

- FB-CA-MDL-00201823

- FB-CA-MDL-00201824

- FB-CA-MDL-00201825

- FB-CA-MDL-00201826

- FB-CA-MDL-00201827

- FB-CA-MDL-00202077

- FB-CA-MDL-00202079

- FB-CA-MDL-00202329

- FB-CA-MDL-00202332

- FB-CA-MDL-00203260

- FB-CA-MDL-00203261

- FB-CA-MDL-00203911

- FB-CA-MDL-00203912

- FB-CA-MDL-00203913

- FB-CA-MDL-00203914

- FB-CA-MDL-00203959

- FB-CA-MDL-00203960

- FB-CA-MDL-00204978

- FB-CA-MDL-00204979

- FB-CA-MDL-00217161

- FB-CA-MDL-00217163

- FB-CA-MDL-00217594

- FB-CA-MDL-00217598

- FB-CA-MDL-00217599

- FB-CA-MDL-00217603

- FB-CA-MDL-00217748

- FB-CA-MDL-00217749

- FB-CA-MDL-00218605

- FB-CA-MDL-00218607

- FB-CA-MDL-00218608

- FB-CA-MDL-00218610

- FB-CA-MDL-00219178

- FB-CA-MDL-00219187

- FB-CA-MDL-00219196

- FB-CA-MDL-00220111

- FB-CA-MDL-00220112

- FB-CA-MDL-00220114

- FB-CA-MDL-00220117

- FB-CA-MDL-00220139

- FB-CA-MDL-00220142

- FB-CA-MDL-00220157

- FB-CA-MDL-00220158

- FB-CA-MDL-00220203

- FB-CA-MDL-00220205

- FB-CA-MDL-00220233

- FB-CA-MDL-00220234

- FB-CA-MDL-00220423

- FB-CA-MDL-00220424

- FB-CA-MDL-00220425

- FB-CA-MDL-00220426

- FB-CA-MDL-00220427

- FB-CA-MDL-00220428

- FB-CA-MDL-00220429

- FB-CA-MDL-00220582

- FB-CA-MDL-00220583

- FB-CA-MDL-00220644

- FB-CA-MDL-00220645

- FB-CA-MDL-00220646

- FB-CA-MDL-00220648

- FB-CA-MDL-00220812

- FB-CA-MDL-00220813

- FB-CA-MDL-00220814

- FB-CA-MDL-00220882

- FB-CA-MDL-00220883

- FB-CA-MDL-00220962

- FB-CA-MDL-00220963

- FB-CA-MDL-00220964

- FB-CA-MDL-00220965

- FB-CA-MDL-00220966

- FB-CA-MDL-00220967

- FB-CA-MDL-00220968

- FB-CA-MDL-00220969

- FB-CA-MDL-00220970

- FB-CA-MDL-00220971

- FB-CA-MDL-00220972

- FB-CA-MDL-00220973

- FB-CA-MDL-00220974

- FB-CA-MDL-00220975

- FB-CA-MDL-00220980

- FB-CA-MDL-00220981

- FB-CA-MDL-00220982

- FB-CA-MDL-00220984

- FB-CA-MDL-00220985

- FB-CA-MDL-00220986

- FB-CA-MDL-00220987

- FB-CA-MDL-00221066

- FB-CA-MDL-00221067

- FB-CA-MDL-00221068

- FB-CA-MDL-00221069

- FB-CA-MDL-00221070

- FB-CA-MDL-00221071

- FB-CA-MDL-00221072

- FB-CA-MDL-00221073

4092

- FB-CA-MDL-00221074

- FB-CA-MDL-00221075

- FB-CA-MDL-00221076

- FB-CA-MDL-00221077

- FB-CA-MDL-00221078

- FB-CA-MDL-00221079

- FB-CA-MDL-00221084

- FB-CA-MDL-00221085

- FB-CA-MDL-00221086

- FB-CA-MDL-00221087

- FB-CA-MDL-00221166

- FB-CA-MDL-00221167

- FB-CA-MDL-00221168

- FB-CA-MDL-00221169

- FB-CA-MDL-00221170

- FB-CA-MDL-00221171

- FB-CA-MDL-00221172

- FB-CA-MDL-00221173

- FB-CA-MDL-00221174

- FB-CA-MDL-00221175

- FB-CA-MDL-00221176

- FB-CA-MDL-00221177

- FB-CA-MDL-00221178

4093

- FB-CA-MDL-00221179

- FB-CA-MDL-00221180

- FB-CA-MDL-00221259

- FB-CA-MDL-00221260

- FB-CA-MDL-00221261

- FB-CA-MDL-00221262

- FB-CA-MDL-00221263

- FB-CA-MDL-00221264

- FB-CA-MDL-00221265

- FB-CA-MDL-00221266

- FB-CA-MDL-00221267

- FB-CA-MDL-00221268

- FB-CA-MDL-00221269

- FB-CA-MDL-00221270

- FB-CA-MDL-00221271

- FB-CA-MDL-00221272

- FB-CA-MDL-00221277

- FB-CA-MDL-00221278

- FB-CA-MDL-00221279

- FB-CA-MDL-00221280

- FB-CA-MDL-00221359

- FB-CA-MDL-00221360

- FB-CA-MDL-00221361

4094

- FB-CA-MDL-00221362

- FB-CA-MDL-00221363

- FB-CA-MDL-00221364

- FB-CA-MDL-00221365

- FB-CA-MDL-00221366

- FB-CA-MDL-00221367

- FB-CA-MDL-00221368

- FB-CA-MDL-00221369

- FB-CA-MDL-00221370

- FB-CA-MDL-00221371

- FB-CA-MDL-00221378

- FB-CA-MDL-00221379

- FB-CA-MDL-00221381

- FB-CA-MDL-00221386

- FB-CA-MDL-00221387

- FB-CA-MDL-00221388

- FB-CA-MDL-00221389

- FB-CA-MDL-00222208

- FB-CA-MDL-00222209

- FB-CA-MDL-00222220

- FB-CA-MDL-00222221

- FB-CA-MDL-00222222

- FB-CA-MDL-00222233

- FB-CA-MDL-00222234

- FB-CA-MDL-00222235

- FB-CA-MDL-00222246

- FB-CA-MDL-00225931

- FB-CA-MDL-00225932

- FB-CA-MDL-00225935

- FB-CA-MDL-00225936

- FB-CA-MDL-00225939

- FB-CA-MDL-00225940

- FB-CA-MDL-00225943

- FB-CA-MDL-00225944

- FB-CA-MDL-00226198

- FB-CA-MDL-00226201

- FB-CA-MDL-00226217

- FB-CA-MDL-00226227

- FB-CA-MDL-00226231

- FB-CA-MDL-00226236

- FB-CA-MDL-00226310

- FB-CA-MDL-00226313

- FB-CA-MDL-00226314

- FB-CA-MDL-00226315

- FB-CA-MDL-00226318

- FB-CA-MDL-00226321

- FB-CA-MDL-00226323

- FB-CA-MDL-00226326

- FB-CA-MDL-00226329

- FB-CA-MDL-00226401

- FB-CA-MDL-00226414

- FB-CA-MDL-00226415

- FB-CA-MDL-00226483

- FB-CA-MDL-00226489

- FB-CA-MDL-00226501

- FB-CA-MDL-00226507

- FB-CA-MDL-00226515

- FB-CA-MDL-00226523

- FB-CA-MDL-00226531

- FB-CA-MDL-00226532

- FB-CA-MDL-00226540

- FB-CA-MDL-00226541

- FB-CA-MDL-00226549

- FB-CA-MDL-00226557

- FB-CA-MDL-00226564

- FB-CA-MDL-00226571

- FB-CA-MDL-00226578

- FB-CA-MDL-00226586

- FB-CA-MDL-00227414

4097

- FB-CA-MDL-00227418

- FB-CA-MDL-00227460

- FB-CA-MDL-00227464

- FB-CA-MDL-00227469

- FB-CA-MDL-00227473

- FB-CA-MDL-00227824

- FB-CA-MDL-00227993

- FB-CA-MDL-00227994

- FB-CA-MDL-00228008

- FB-CA-MDL-00228270

- FB-CA-MDL-00228271

- FB-CA-MDL-00228272

- FB-CA-MDL-00228273

- FB-CA-MDL-00228274

- FB-CA-MDL-00228287

- FB-CA-MDL-00228289

- FB-CA-MDL-00228301

- FB-CA-MDL-00228302

- FB-CA-MDL-00228310

- FB-CA-MDL-00228311

- FB-CA-MDL-00228312

- FB-CA-MDL-00228313

- FB-CA-MDL-00228351

- FB-CA-MDL-00228352

- FB-CA-MDL-00228355

- FB-CA-MDL-00228357

- FB-CA-MDL-00228360

- FB-CA-MDL-00228364

- FB-CA-MDL-00228368

- FB-CA-MDL-00228373

- FB-CA-MDL-00228385

- FB-CA-MDL-00228397

- FB-CA-MDL-00228411

- FB-CA-MDL-00228423

- FB-CA-MDL-00228435

- FB-CA-MDL-00228447

- FB-CA-MDL-00228461

- FB-CA-MDL-00228486

- FB-CA-MDL-00228500

- FB-CA-MDL-00229204

- FB-CA-MDL-00229206

- FB-CA-MDL-00229207

- FB-CA-MDL-00229208

- FB-CA-MDL-00229209

- FB-CA-MDL-00229216

- FB-CA-MDL-00229217

- FB-CA-MDL-00229218

- FB-CA-MDL-00229219

- FB-CA-MDL-00229220

- FB-CA-MDL-00229249

- FB-CA-MDL-00229251

- FB-CA-MDL-00229252

- FB-CA-MDL-00229253

- FB-CA-MDL-00229254

- FB-CA-MDL-00229261

- FB-CA-MDL-00229264

- FB-CA-MDL-00229265

- FB-CA-MDL-00229266

- FB-CA-MDL-00229368

- FB-CA-MDL-00229371

- FB-CA-MDL-00229372

- FB-CA-MDL-00229373

- FB-CA-MDL-00229387

- FB-CA-MDL-00229389

- FB-CA-MDL-00229390

- FB-CA-MDL-00229391

- FB-CA-MDL-00229392

- FB-CA-MDL-00229393

- FB-CA-MDL-00229394

4100

- FB-CA-MDL-00229395

- FB-CA-MDL-00229398

- FB-CA-MDL-00229399

- FB-CA-MDL-00229400

- FB-CA-MDL-00229401

- FB-CA-MDL-00229402

- FB-CA-MDL-00229403

- FB-CA-MDL-00229404

- FB-CA-MDL-00229407

- FB-CA-MDL-00229408

- FB-CA-MDL-00229409

- FB-CA-MDL-00229410

- FB-CA-MDL-00229411

- FB-CA-MDL-00229412

- FB-CA-MDL-00229413

- FB-CA-MDL-00229416

- FB-CA-MDL-00229417

- FB-CA-MDL-00229418

- FB-CA-MDL-00229419

- FB-CA-MDL-00229420

- FB-CA-MDL-00229421

- FB-CA-MDL-00229422

- FB-CA-MDL-00229423

- FB-CA-MDL-00229424

- FB-CA-MDL-00229425

- FB-CA-MDL-00229426

- FB-CA-MDL-00229427

- FB-CA-MDL-00229428

- FB-CA-MDL-00229429

- FB-CA-MDL-00229430

- FB-CA-MDL-00229431

- FB-CA-MDL-00229432

- FB-CA-MDL-00229433

- FB-CA-MDL-00229434

- FB-CA-MDL-00229435

- FB-CA-MDL-00229553

- FB-CA-MDL-00229557

- FB-CA-MDL-00229558

- FB-CA-MDL-00229559

- FB-CA-MDL-00229560

- FB-CA-MDL-00229561

- FB-CA-MDL-00229562

- FB-CA-MDL-00229563

- FB-CA-MDL-00229564

- FB-CA-MDL-00229565

- FB-CA-MDL-00229566

- FB-CA-MDL-00229567

- FB-CA-MDL-00229568

- FB-CA-MDL-00229572

- FB-CA-MDL-00229586

- FB-CA-MDL-00229587

- FB-CA-MDL-00229588

- FB-CA-MDL-00229589

- FB-CA-MDL-00229590

- FB-CA-MDL-00229667

- FB-CA-MDL-00229668

- FB-CA-MDL-00229729

- FB-CA-MDL-00229730

- FB-CA-MDL-00229731

- FB-CA-MDL-00229733

- FB-CA-MDL-00229734

- FB-CA-MDL-00229736

- FB-CA-MDL-00229737

- FB-CA-MDL-00229739

- FB-CA-MDL-00229934

- FB-CA-MDL-00229935

- FB-CA-MDL-00229936

- FB-CA-MDL-00229938

- FB-CA-MDL-00229982

- FB-CA-MDL-00229983
- FB-CA-MDL-00229990
- FB-CA-MDL-00229992
- FB-CA-MDL-00229993
- FB-CA-MDL-00230037
- FB-CA-MDL-00230039
- FB-CA-MDL-00230140
- FB-CA-MDL-00230143
- FB-CA-MDL-00230144
- FB-CA-MDL-00230147
- FB-CA-MDL-00230148
- FB-CA-MDL-00230153
- FB-CA-MDL-00230637
- FB-CA-MDL-00230638
- FB-CA-MDL-00230640
- FB-CA-MDL-00230754
- FB-CA-MDL-00230755
- FB-CA-MDL-00230815
- FB-CA-MDL-00230816
- FB-CA-MDL-00230817
- FB-CA-MDL-00230818
- FB-CA-MDL-00230819
- FB-CA-MDL-00230820

4104

- FB-CA-MDL-00230821

- FB-CA-MDL-00230822

- FB-CA-MDL-00230823

- FB-CA-MDL-00230824

- FB-CA-MDL-00232464

- FB-CA-MDL-00232465

- FB-CA-MDL-00232530

- FB-CA-MDL-00232531

- FB-CA-MDL-00232532

- FB-CA-MDL-00232533

- FB-CA-MDL-00232534

- FB-CA-MDL-00232535

- FB-CA-MDL-00232536

- FB-CA-MDL-00232537

- FB-CA-MDL-00232538

- FB-CA-MDL-00232539

- FB-CA-MDL-00232540

- FB-CA-MDL-00232543

- FB-CA-MDL-00232544

- FB-CA-MDL-00232547

- FB-CA-MDL-00232548

- FB-CA-MDL-00232550

- FB-CA-MDL-00232615

- FB-CA-MDL-00232616

- FB-CA-MDL-00232617

- FB-CA-MDL-00232618

- FB-CA-MDL-00232619

- FB-CA-MDL-00232620

- FB-CA-MDL-00232621

- FB-CA-MDL-00232622

- FB-CA-MDL-00232623

- FB-CA-MDL-00232624

- FB-CA-MDL-00232625

- FB-CA-MDL-00232760

- FB-CA-MDL-00232762

- FB-CA-MDL-00232823

- FB-CA-MDL-00232824

- FB-CA-MDL-00232825

- FB-CA-MDL-00232826

- FB-CA-MDL-00232827

- FB-CA-MDL-00232828

- FB-CA-MDL-00232829

- FB-CA-MDL-00232830

- FB-CA-MDL-00232831

- FB-CA-MDL-00232832

- FB-CA-MDL-00232833

- FB-CA-MDL-00232834

- FB-CA-MDL-00232896

- FB-CA-MDL-00232897

- FB-CA-MDL-00232898

- FB-CA-MDL-00232899

- FB-CA-MDL-00232900

- FB-CA-MDL-00232901

- FB-CA-MDL-00232902

- FB-CA-MDL-00232903

- FB-CA-MDL-00232904

- FB-CA-MDL-00232905

- FB-CA-MDL-00232906

- FB-CA-MDL-00232909

- FB-CA-MDL-00232913

- FB-CA-MDL-00232974

- FB-CA-MDL-00232975

- FB-CA-MDL-00232976

- FB-CA-MDL-00232977

- FB-CA-MDL-00232978

- FB-CA-MDL-00232979

- FB-CA-MDL-00232980

- FB-CA-MDL-00232981

- FB-CA-MDL-00232982

- FB-CA-MDL-00232983

- FB-CA-MDL-00232984

- FB-CA-MDL-00232985

- FB-CA-MDL-00232989

- FB-CA-MDL-00232992

- FB-CA-MDL-00232993

- FB-CA-MDL-00232994

- FB-CA-MDL-00232996

- FB-CA-MDL-00232997

- FB-CA-MDL-00233058

- FB-CA-MDL-00233059

- FB-CA-MDL-00233060

- FB-CA-MDL-00233061

- FB-CA-MDL-00233062

- FB-CA-MDL-00233063

- FB-CA-MDL-00233064

- FB-CA-MDL-00233065

- FB-CA-MDL-00233066

- FB-CA-MDL-00233067

- FB-CA-MDL-00233068

- FB-CA-MDL-00233090

- FB-CA-MDL-00233091

- FB-CA-MDL-00233152

307

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4108

- FB-CA-MDL-00233153

- FB-CA-MDL-00233214

- FB-CA-MDL-00233215

- FB-CA-MDL-00233351

- FB-CA-MDL-00233353

- FB-CA-MDL-00233414

- FB-CA-MDL-00233415

- FB-CA-MDL-00233416

- FB-CA-MDL-00233417

- FB-CA-MDL-00233418

- FB-CA-MDL-00233419

- FB-CA-MDL-00233420

- FB-CA-MDL-00233421

- FB-CA-MDL-00233422

- FB-CA-MDL-00233423

- FB-CA-MDL-00233424

- FB-CA-MDL-00233425

- FB-CA-MDL-00242983

- FB-CA-MDL-00242984

- FB-CA-MDL-00242986

- FB-CA-MDL-00242987

- FB-CA-MDL-00242988

- FB-CA-MDL-00242991

- FB-CA-MDL-00243050

- FB-CA-MDL-00243068

- FB-CA-MDL-00243300

- FB-CA-MDL-00243302

- FB-CA-MDL-00243304

- FB-CA-MDL-00243673

- FB-CA-MDL-00243674

- FB-CA-MDL-00243930

- FB-CA-MDL-00243932

- FB-CA-MDL-00243933

- FB-CA-MDL-00243954

- FB-CA-MDL-00243980

- FB-CA-MDL-00243983

- FB-CA-MDL-00244103

- FB-CA-MDL-00244106

- FB-CA-MDL-00244109

- FB-CA-MDL-00244132

- FB-CA-MDL-00244135

- FB-CA-MDL-00244139

- FB-CA-MDL-00244143

- FB-CA-MDL-00244147

- FB-CA-MDL-00244151

- FB-CA-MDL-00244155

- FB-CA-MDL-00245666

- FB-CA-MDL-00245667

- FB-CA-MDL-00250414

- FB-CA-MDL-00250418

- FB-CA-MDL-00250419

- FB-CA-MDL-00250420

- FB-CA-MDL-00250421

- FB-CA-MDL-00250422

- FB-CA-MDL-00250427

- FB-CA-MDL-00250428

- FB-CA-MDL-00250429

- FB-CA-MDL-00250434

- FB-CA-MDL-00250435

- FB-CA-MDL-00250436

- FB-CA-MDL-00250441

- FB-CA-MDL-00250442

- FB-CA-MDL-00250443

- FB-CA-MDL-00250448

- FB-CA-MDL-00250449

- FB-CA-MDL-00250450

- FB-CA-MDL-00250455

- FB-CA-MDL-00250456

- FB-CA-MDL-00250791

- FB-CA-MDL-00250792

- FB-CA-MDL-00251302

- FB-CA-MDL-00251305

- FB-CA-MDL-00251462

- FB-CA-MDL-00252149

- FB-CA-MDL-00252153

- FB-CA-MDL-00252157

- FB-CA-MDL-00252162

- FB-CA-MDL-00252170

- FB-CA-MDL-00252175

- FB-CA-MDL-00252181

- FB-CA-MDL-00252187

- FB-CA-MDL-00252224

- FB-CA-MDL-00252231

- FB-CA-MDL-00252236

- FB-CA-MDL-00252241

- FB-CA-MDL-00252246

- FB-CA-MDL-00252386

- FB-CA-MDL-00252387

- FB-CA-MDL-00252399

- FB-CA-MDL-00252440

- FB-CA-MDL-00252454

- FB-CA-MDL-00252460

- FB-CA-MDL-00252467

- FB-CA-MDL-00252474

- FB-CA-MDL-00252494

- FB-CA-MDL-00252495

- FB-CA-MDL-00252550

- FB-CA-MDL-00252635

- FB-CA-MDL-00252636

- FB-CA-MDL-00252637

- FB-CA-MDL-00252638

- FB-CA-MDL-00252639

- FB-CA-MDL-00252641

- FB-CA-MDL-00252643

- FB-CA-MDL-00252656

- FB-CA-MDL-00252658

- FB-CA-MDL-00252672

- FB-CA-MDL-00252899

- FB-CA-MDL-00252901

- FB-CA-MDL-00252902

- FB-CA-MDL-00252904

- FB-CA-MDL-00252906

- FB-CA-MDL-00252933

- FB-CA-MDL-00252935

- FB-CA-MDL-00252936

312

4113

- FB-CA-MDL-00252937

- FB-CA-MDL-00252938

- FB-CA-MDL-00252939

- FB-CA-MDL-00252940

- FB-CA-MDL-00252941

- FB-CA-MDL-00252942

- FB-CA-MDL-00252944

- FB-CA-MDL-00252946

- FB-CA-MDL-00252947

- FB-CA-MDL-00252985

- FB-CA-MDL-00252987

- FB-CA-MDL-00252991

- FB-CA-MDL-00253027

- FB-CA-MDL-00253029

- FB-CA-MDL-00253042

- FB-CA-MDL-00253045

- FB-CA-MDL-00253048

- FB-CA-MDL-00253051

- FB-CA-MDL-00253055

- FB-CA-MDL-00253059

- FB-CA-MDL-00253064

- FB-CA-MDL-00253069

- FB-CA-MDL-00253076

4114

- FB-CA-MDL-00253078

- FB-CA-MDL-00253089

- FB-CA-MDL-00253091

- FB-CA-MDL-00253171

- FB-CA-MDL-00253173

- FB-CA-MDL-00253176

- FB-CA-MDL-00253177

- FB-CA-MDL-00253178

- FB-CA-MDL-00253179

- FB-CA-MDL-00253180

- FB-CA-MDL-00253181

- FB-CA-MDL-00253182

- FB-CA-MDL-00253183

- FB-CA-MDL-00253184

- FB-CA-MDL-00253185

- FB-CA-MDL-00253186

- FB-CA-MDL-00253187

- FB-CA-MDL-00253188

- FB-CA-MDL-00253189

- FB-CA-MDL-00253190

- FB-CA-MDL-00253191

- FB-CA-MDL-00253193

- FB-CA-MDL-00253194

- FB-CA-MDL-00253212

- FB-CA-MDL-00253214

- FB-CA-MDL-00253217

- FB-CA-MDL-00253221

- FB-CA-MDL-00253222

- FB-CA-MDL-00253226

- FB-CA-MDL-00253227

- FB-CA-MDL-00253229

- FB-CA-MDL-00253230

- FB-CA-MDL-00253231

- FB-CA-MDL-00253233

- FB-CA-MDL-00253236

- FB-CA-MDL-00253237

- FB-CA-MDL-00253238

- FB-CA-MDL-00253239

- FB-CA-MDL-00253240

- FB-CA-MDL-00253241

- FB-CA-MDL-00253242

- FB-CA-MDL-00253243

- FB-CA-MDL-00253244

- FB-CA-MDL-00253245

- FB-CA-MDL-00253246

- FB-CA-MDL-00253247

- FB-CA-MDL-00253248

- FB-CA-MDL-00253249

- FB-CA-MDL-00253250

- FB-CA-MDL-00253289

- FB-CA-MDL-00253291

- FB-CA-MDL-00253292

- FB-CA-MDL-00253293

- FB-CA-MDL-00253296

- FB-CA-MDL-00253297

- FB-CA-MDL-00253298

- FB-CA-MDL-00253299

- FB-CA-MDL-00253300

- FB-CA-MDL-00253301

- FB-CA-MDL-00253302

- FB-CA-MDL-00253303

- FB-CA-MDL-00253304

- FB-CA-MDL-00253305

- FB-CA-MDL-00253306

- FB-CA-MDL-00253307

- FB-CA-MDL-00253308

- FB-CA-MDL-00253309

- FB-CA-MDL-00253314

- FB-CA-MDL-00253315

- FB-CA-MDL-00253424

- FB-CA-MDL-00253427

- FB-CA-MDL-00253429

- FB-CA-MDL-00253430

- FB-CA-MDL-00253433

- FB-CA-MDL-00253435

- FB-CA-MDL-00253559

- FB-CA-MDL-00253562

- FB-CA-MDL-00253565

- FB-CA-MDL-00253568

- FB-CA-MDL-00253571

- FB-CA-MDL-00253593

- FB-CA-MDL-00253594

- FB-CA-MDL-00253595

- FB-CA-MDL-00253607

- FB-CA-MDL-00253623

- FB-CA-MDL-00253624

- FB-CA-MDL-00253761

- FB-CA-MDL-00253884

- FB-CA-MDL-00253886

- FB-CA-MDL-00253950

- FB-CA-MDL-00253951

- FB-CA-MDL-00253953

- FB-CA-MDL-00253954

- FB-CA-MDL-00253956

- FB-CA-MDL-00253959

- FB-CA-MDL-00253961

- FB-CA-MDL-00254018

- FB-CA-MDL-00254047

- FB-CA-MDL-00254078

- FB-CA-MDL-00254085

- FB-CA-MDL-00254086

- FB-CA-MDL-00254087

- FB-CA-MDL-00254089

- FB-CA-MDL-00254090

- FB-CA-MDL-00254503

- FB-CA-MDL-00254504

- FB-CA-MDL-00254639

- FB-CA-MDL-00254642

- FB-CA-MDL-00254677

- FB-CA-MDL-00254680

- FB-CA-MDL-00260135

- FB-CA-MDL-00260137

- FB-CA-MDL-00260301

- FB-CA-MDL-00260302

- FB-CA-MDL-00262387

- FB-CA-MDL-00262393

- FB-CA-MDL-00262454

- FB-CA-MDL-00262460

- FB-CA-MDL-00262521

- FB-CA-MDL-00262522

- FB-CA-MDL-00262523

- FB-CA-MDL-00262524

- FB-CA-MDL-00262941

- FB-CA-MDL-00262942

- FB-CA-MDL-00262980

- FB-CA-MDL-00262985

- FB-CA-MDL-00262986

- FB-CA-MDL-00262991

- FB-CA-MDL-00262993

- FB-CA-MDL-00262996

- FB-CA-MDL-00262997

- FB-CA-MDL-00263000

- FB-CA-MDL-00263025

- FB-CA-MDL-00263029

- FB-CA-MDL-00263036

- FB-CA-MDL-00263041

- FB-CA-MDL-00263068

- FB-CA-MDL-00263074

- FB-CA-MDL-00263080

- FB-CA-MDL-00263086

- FB-CA-MDL-00263092

- FB-CA-MDL-00263100

- FB-CA-MDL-00263211

- FB-CA-MDL-00263220

- FB-CA-MDL-00263221

- FB-CA-MDL-00263230

- FB-CA-MDL-00263557

- FB-CA-MDL-00263560

- FB-CA-MDL-00263561

- FB-CA-MDL-00263564

- FB-CA-MDL-00263565

- FB-CA-MDL-00263568

- FB-CA-MDL-00263570

- FB-CA-MDL-00263573

- FB-CA-MDL-00263578

- FB-CA-MDL-00263583

- FB-CA-MDL-00263592

- FB-CA-MDL-00263598

- FB-CA-MDL-00263604

- FB-CA-MDL-00263610

- FB-CA-MDL-00263615

- FB-CA-MDL-00263640

- FB-CA-MDL-00263667

- FB-CA-MDL-00263668

- FB-CA-MDL-00263679

- FB-CA-MDL-00263718

- FB-CA-MDL-00263719

- FB-CA-MDL-00263720

- FB-CA-MDL-00263722

- FB-CA-MDL-00263845

- FB-CA-MDL-00263847

- FB-CA-MDL-00263849

- FB-CA-MDL-00263851

- FB-CA-MDL-00263871

- FB-CA-MDL-00263873

- FB-CA-MDL-00263874

- FB-CA-MDL-00263876

- FB-CA-MDL-00263877

- FB-CA-MDL-00263879

- FB-CA-MDL-00263880

- FB-CA-MDL-00263882

- FB-CA-MDL-00263883

- FB-CA-MDL-00263885

- FB-CA-MDL-00263887

4122

- FB-CA-MDL-00263889

- FB-CA-MDL-00263891

- FB-CA-MDL-00263895

- FB-CA-MDL-00263899

- FB-CA-MDL-00263903

- FB-CA-MDL-00263923

- FB-CA-MDL-00263927

- FB-CA-MDL-00263928

- FB-CA-MDL-00263940

- FB-CA-MDL-00263942

- FB-CA-MDL-00263944

- FB-CA-MDL-00263953

- FB-CA-MDL-00263957

- FB-CA-MDL-00264028

- FB-CA-MDL-00264033

- FB-CA-MDL-00264038

- FB-CA-MDL-00264043

- FB-CA-MDL-00264048

- FB-CA-MDL-00264054

- FB-CA-MDL-00264060

- FB-CA-MDL-00264066

- FB-CA-MDL-00264072

- FB-CA-MDL-00264078

- FB-CA-MDL-00264084
- FB-CA-MDL-00264091
- FB-CA-MDL-00264207
- FB-CA-MDL-00264209
- FB-CA-MDL-00264210
- FB-CA-MDL-00264213
- FB-CA-MDL-00264808
- FB-CA-MDL-00264813
- FB-CA-MDL-00264867
- FB-CA-MDL-00264868
- FB-CA-MDL-00264869
- FB-CA-MDL-00264870
- FB-CA-MDL-00264871
- FB-CA-MDL-00264872
- FB-CA-MDL-00264873
- FB-CA-MDL-00264874
- FB-CA-MDL-00264875
- FB-CA-MDL-00264876
- FB-CA-MDL-00264877
- FB-CA-MDL-00265010
- FB-CA-MDL-00265011
- FB-CA-MDL-00265069
- FB-CA-MDL-00265070

- FB-CA-MDL-00265071

- FB-CA-MDL-00265072

- FB-CA-MDL-00265073

- FB-CA-MDL-00265074

- FB-CA-MDL-00265075

- FB-CA-MDL-00265076

- FB-CA-MDL-00265077

- FB-CA-MDL-00265078

- FB-CA-MDL-00265079

- FB-CA-MDL-00265080

- FB-CA-MDL-00265081

- FB-CA-MDL-00265139

- FB-CA-MDL-00265140

- FB-CA-MDL-00265141

- FB-CA-MDL-00265142

- FB-CA-MDL-00265143

- FB-CA-MDL-00265144

- FB-CA-MDL-00265145

- FB-CA-MDL-00265146

- FB-CA-MDL-00265147

- FB-CA-MDL-00265148

- FB-CA-MDL-00265149

- FB-CA-MDL-00265150

- FB-CA-MDL-00265152

- FB-CA-MDL-00265210

- FB-CA-MDL-00265211

- FB-CA-MDL-00265212

- FB-CA-MDL-00265213

- FB-CA-MDL-00265214

- FB-CA-MDL-00265215

- FB-CA-MDL-00265216

- FB-CA-MDL-00265217

- FB-CA-MDL-00265218

- FB-CA-MDL-00265219

- FB-CA-MDL-00265220

- FB-CA-MDL-00265238

- FB-CA-MDL-00265241

- FB-CA-MDL-00265300

- FB-CA-MDL-00265301

- FB-CA-MDL-00265302

- FB-CA-MDL-00265303

- FB-CA-MDL-00265304

- FB-CA-MDL-00265305

- FB-CA-MDL-00265306

- FB-CA-MDL-00265307

- FB-CA-MDL-00265308

- FB-CA-MDL-00265309

- FB-CA-MDL-00265310

- FB-CA-MDL-00265311

- FB-CA-MDL-00265314

- FB-CA-MDL-00265373

- FB-CA-MDL-00265374

- FB-CA-MDL-00265375

- FB-CA-MDL-00265376

- FB-CA-MDL-00265377

- FB-CA-MDL-00265378

- FB-CA-MDL-00265379

- FB-CA-MDL-00265380

- FB-CA-MDL-00265381

- FB-CA-MDL-00265382

- FB-CA-MDL-00265383

- FB-CA-MDL-00265465

- FB-CA-MDL-00265495

- FB-CA-MDL-00265497

- FB-CA-MDL-00265527

- FB-CA-MDL-00265552

- FB-CA-MDL-00265553

- FB-CA-MDL-00265566

- FB-CA-MDL-00265567

4127

- FB-CA-MDL-00265624

- FB-CA-MDL-00265625

- FB-CA-MDL-00265684

- FB-CA-MDL-00265685

- FB-CA-MDL-00265686

- FB-CA-MDL-00265687

- FB-CA-MDL-00265688

- FB-CA-MDL-00265689

- FB-CA-MDL-00265690

- FB-CA-MDL-00265691

- FB-CA-MDL-00265692

- FB-CA-MDL-00265693

- FB-CA-MDL-00265694

- FB-CA-MDL-00265700

- FB-CA-MDL-00265701

- FB-CA-MDL-00265756

- FB-CA-MDL-00265757

- FB-CA-MDL-00265758

- FB-CA-MDL-00265759

- FB-CA-MDL-00265760

- FB-CA-MDL-00265761

- FB-CA-MDL-00265762

- FB-CA-MDL-00265763

- FB-CA-MDL-00265764

- FB-CA-MDL-00265765

- FB-CA-MDL-00265766

- FB-CA-MDL-00265767

- FB-CA-MDL-00265768

- FB-CA-MDL-00265823

- FB-CA-MDL-00265824

- FB-CA-MDL-00265825

- FB-CA-MDL-00265826

- FB-CA-MDL-00265827

- FB-CA-MDL-00265828

- FB-CA-MDL-00265829

- FB-CA-MDL-00265830

- FB-CA-MDL-00265831

- FB-CA-MDL-00265832

- FB-CA-MDL-00265833

- FB-CA-MDL-00265834

- FB-CA-MDL-00265835

- FB-CA-MDL-00265890

- FB-CA-MDL-00265891

- FB-CA-MDL-00265892

- FB-CA-MDL-00265893

- FB-CA-MDL-00265894

- FB-CA-MDL-00265895

- FB-CA-MDL-00265896

- FB-CA-MDL-00265897

- FB-CA-MDL-00265898

- FB-CA-MDL-00265899

- FB-CA-MDL-00265900

- FB-CA-MDL-00265936

- FB-CA-MDL-00265937

- FB-CA-MDL-00265994

- FB-CA-MDL-00265995

- FB-CA-MDL-00265996

- FB-CA-MDL-00265997

- FB-CA-MDL-00265998

- FB-CA-MDL-00265999

- FB-CA-MDL-00266000

- FB-CA-MDL-00266001

- FB-CA-MDL-00266002

- FB-CA-MDL-00266003

- FB-CA-MDL-00266004

- FB-CA-MDL-00266005

- FB-CA-MDL-00266006

- FB-CA-MDL-00266063

- FB-CA-MDL-00266064

- FB-CA-MDL-00266065

- FB-CA-MDL-00266066

- FB-CA-MDL-00266067

- FB-CA-MDL-00266068

- FB-CA-MDL-00266069

- FB-CA-MDL-00266070

- FB-CA-MDL-00266071

- FB-CA-MDL-00266072

- FB-CA-MDL-00266073

- FB-CA-MDL-00266347

- FB-CA-MDL-00266351

- FB-CA-MDL-00266405

- FB-CA-MDL-00266406

- FB-CA-MDL-00266407

- FB-CA-MDL-00266408

- FB-CA-MDL-00266409

- FB-CA-MDL-00266410

- FB-CA-MDL-00266411

- FB-CA-MDL-00266412

- FB-CA-MDL-00266413

- FB-CA-MDL-00266414

- FB-CA-MDL-00266415

- FB-CA-MDL-00266416

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4131

- FB-CA-MDL-00266417

- FB-CA-MDL-00268604

- FB-CA-MDL-00268606

- FB-CA-MDL-00268609

- FB-CA-MDL-00268688

- FB-CA-MDL-00268689

- FB-CA-MDL-00268719

- FB-CA-MDL-00268720

- FB-CA-MDL-00268721

- FB-CA-MDL-00268722

- FB-CA-MDL-00268723

- FB-CA-MDL-00268724

- FB-CA-MDL-00268725

- FB-CA-MDL-00268726

- FB-CA-MDL-00268727

- FB-CA-MDL-00268728

- FB-CA-MDL-00268729

- FB-CA-MDL-00268730

- FB-CA-MDL-00268731

- FB-CA-MDL-00268732

- FB-CA-MDL-00268733

- FB-CA-MDL-00268734

- FB-CA-MDL-00268736

- FB-CA-MDL-00268739

- FB-CA-MDL-00268745

- FB-CA-MDL-00268746

- FB-CA-MDL-00268749

- FB-CA-MDL-00268755

- FB-CA-MDL-00268757

- FB-CA-MDL-00268758

- FB-CA-MDL-00268784

- FB-CA-MDL-00268785

- FB-CA-MDL-00268786

- FB-CA-MDL-00268787

- FB-CA-MDL-00268788

- FB-CA-MDL-00268789

- FB-CA-MDL-00268790

- FB-CA-MDL-00268791

- FB-CA-MDL-00268792

- FB-CA-MDL-00268793

- FB-CA-MDL-00268794

- FB-CA-MDL-00268795

- FB-CA-MDL-00268796

- FB-CA-MDL-00268797

- FB-CA-MDL-00268798

- FB-CA-MDL-00268799

4133

- FB-CA-MDL-00268800

- FB-CA-MDL-00268801

- FB-CA-MDL-00268802

- FB-CA-MDL-00268828

- FB-CA-MDL-00268829

- FB-CA-MDL-00268830

- FB-CA-MDL-00268831

- FB-CA-MDL-00268832

- FB-CA-MDL-00268833

- FB-CA-MDL-00268834

- FB-CA-MDL-00268835

- FB-CA-MDL-00268836

- FB-CA-MDL-00268837

- FB-CA-MDL-00268838

- FB-CA-MDL-00268839

- FB-CA-MDL-00268840

- FB-CA-MDL-00268841

- FB-CA-MDL-00268842

- FB-CA-MDL-00268843

- FB-CA-MDL-00268844

- FB-CA-MDL-00268881

- FB-CA-MDL-00269041

- FB-CA-MDL-00269042

4134

- FB-CA-MDL-00269043

- FB-CA-MDL-00269045

- FB-CA-MDL-00274491

- FB-CA-MDL-00274493

- FB-CA-MDL-00274498

- FB-CA-MDL-00274546

- FB-CA-MDL-00274926

- FB-CA-MDL-00275060

- FB-CA-MDL-00275083

- FB-CA-MDL-00275132

- FB-CA-MDL-00275133

- FB-CA-MDL-00275134

- FB-CA-MDL-00275135

- FB-CA-MDL-00275136

- FB-CA-MDL-00275137

- FB-CA-MDL-00275313

- FB-CA-MDL-00275314

- FB-CA-MDL-00275420

- FB-CA-MDL-00275909

- FB-CA-MDL-00186936

- FB-CA-MDL-00186937

- FB-CA-MDL-00186938

- FB-CA-MDL-00186941

- FB-CA-MDL-00186942

- FB-CA-MDL-00186943

## INTERROGATORY NO. 19:

Identify all members of Facebook's senior management team involved in the review and oversight of Facebook's Privacy Program instituted pursuant to the 2012 Consent Decree.

## RESPONSE TO INTERROGATORY NO. 19 - CONFIDENTIAL:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook objects to this Interrogatory on the following grounds:

(A)    Facebook objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Interrogatory as though it excludes information protected by these privileges and protections.

(B)    Facebook objects to this Interrogatory on the ground that the terms "involved," "senior management team," and "Facebook's Privacy Program" are vague, ambiguous, and undefined. Without definition, each term is susceptible to a number of meanings, including several levels of Facebook employees and a variety of privacy related work streams or settings.

(C)    Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, in that it seeks information regarding individuals involved with Facebook's Privacy Program without regard for whether their involvement related to issues in this case. Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to individuals involved with Facebook's Privacy Program to the extent their role did not implicate application developers being granted

access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(D)     Facebook objects to this Interrogatory as overly broad and unduly burdensome, to the extent that it seeks the identies of individuals who were only incidentally "involved in" the "oversight of Facebook's Privacy Program."

(E)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information. Responding fully to Plaintiffs' Interrogatory would require Facebook to conduct an investigation regarding what, if any, involvement any member of Facebook's Senior Management team had in Facebook's Privacy Program over the last eight years. The burden of such an investigation outweighs any potential utility it could serve.

(F)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1);

Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit. Sept. 4 Hr'g Tr. at 14:17-22. Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 82**:

Between 2012 and 2020, Facebook designated a team of employees who were directly responsible for the Facebook Privacy Program (the "Privacy Governance Team"). The Privacy Governance Team was responsible for reviewing company-wide privacy decisions, including product decisions and establishing, communicating, and monitoring relevant control policies and procedures. The members of the Privacy Governance Team included:

- Michael Richter

- Erin Egan

- Joe Sullivan

- Alex Stamos

- Ed Palmieri

- Joshua Smith

- Susan Cooper

- Katherine Tassi

- Ashlie Beringer

- Yvonne Cunnane

- Joel Kaplan

- Elliot Schrage

- Gary Briggs

- Yul Kwon

## INTERROGATORY NO. 20:

Identify all members of the Board of Directors involved in the review and oversight of Facebook's Privacy Program instituted pursuant to the 2012 Consent Decree.

## RESPONSE TO INTERROGATORY NO. 20:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook objects to this Interrogatory on the following grounds:

(A) Facebook objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Interrogatory as though it excludes information protected by these privileges and protections.

(B) Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, in that it seeks information regarding individuals involved with Facebook's Privacy Program without regard for whether their involvement related to issues in this case. Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to individuals involved with Facebook's Privacy Program to the extent their role did not implicate application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of

"sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(C)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information.  Responding fully to Plaintiffs' Interrogatory would require Facebook to conduct an investigation regarding what, if any, involvement any member of Facebook's Board of Directors had in Facebook's Privacy Program over the last eight years.  The burden of such an investigation outweighs any potential utility it could serve.

(D)     Facebook objects to this Interrogatory on the ground that the terms "involved" and "Facebook's Privacy Program" are vague, ambiguous, and undefined.  For example, without definition, the terms could include a variety of privacy related work streams or settings.

(E)     Facebook objects to this Interrogatory as overly broad and unduly burdensome, to the extent that it seeks the identifies of individuals who were only incidentally "involved in" the "oversight of Facebook's Privacy Program."

(F)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1);

Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit. Sept. 4 Hr'g Tr. at 14:17-22. Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 83**:

As indicated *supra*, the Privacy Governance Team was directly responsible for the Facebook Privacy Program. However, Facebook's business and affairs, including the Privacy Program, are ultimately managed by or under the direction of the Board of Directors, in its entirety. *See* FB-CA-MDL-00009727.

**INTERROGATORY NO. 21:**

For each such individual identified above in Interrogatories 19 and 20, describe in detail their duties and responsibilities relating thereto.

**RESPONSE TO INTERROGATORY NO. 21:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each" individual identified in response to Interrogatories 19 and 20. *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009). During the parties' meet and confers

340

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4141

and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter. Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, several different individuals and their roles and/or duties in relation to Facebook. Facebook will therefore treat Plaintiffs' inquiry into "each" individual as an individual Interrogatory. *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

(B)     Facebook objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Interrogatory as though it excludes information protected by these privileges and protections.

(C)     Facebook objects to this Interrogatory on the ground that the term "Facebook's Privacy Program" is vague, ambiguous, and undefined. For example, without definition, the term could include a variety of privacy related work streams or settings.

(D)     Facebook objects to this Interrogatory as overly broad and unduly burdensome, to the extent that it seeks the identifies of individuals who were only incidentally "involved in" the "oversight of Facebook's Privacy Program."

(E)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, in that it seeks information regarding individuals involved with Facebook's Privacy Program without regard for whether their involvement related to issues in this case.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to individuals involved with Facebook's Privacy Program to the extent their role did not implicate application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(F)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information.  Responding fully to Plaintiffs' Interrogatory would require Facebook to conduct an investigation regarding what, if

any, involvement any member of Facebook's Board of Directors or Senior Management Team had in Facebook's Privacy Program over the last eight years. The burden of such an investigation outweighs any potential utility it could serve.

(G)    Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit. Sept. 4 Hr'g Tr. at 14:17-22.

Facebook stands on its objections.

## INTERROGATORY NO. 22:

Describe in detail the facts and circumstances relied upon by Facebook in assessing and agreeing to pay a $5 billion fine to the Federal Trade Commission.

## RESPONSE TO INTERROGATORY NO. 22:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook objects to this Interrogatory on the following grounds:

(A)    Facebook objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Interrogatory as though it excludes information protected by these privileges and protections.

4144

(B)     Facebook objects to this Interrogatory to the extent it seeks information related to confidential settlement negotiations that are protected from disclosure by Federal Rule of Evidence 408.

(C)     Facebook objects to this Interrogatory on the basis that it seeks an overbroad set of information that would be unduly burdensome for Facebook to provide.  The FTC's 2018 investigation of Facebook's practices involved a large number of issues—many of which do not relate to any live claims or defenses in this case—and, as with any settlement, a very large number of considerations factored into the Company's settlement decision.  Requiring Facebook to create a comprehensive list of such "facts and circumstances" is an unduly burdensome mechanism for Facebook to provide the information Plaintiffs appear to be seeking.

(D)     Facebook objects to this Interrogatory on the ground that it seeks information unrelated and irrelevant to the claims or defenses in this litigation because Facebook's decision to settle claims with a government agency has no bearing on Plaintiffs claims against the Company.  Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, to the extent it seeks information relating to issues investigated by the FTC unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2

(describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(E)     Facebook objects to this Interrogatory on the basis that the non-privileged information Plaintiffs seek is publicly available or otherwise within Plaintiffs' custody or control.  Facebook has issued public statements and filed various court documents regarding its settlement with the FTC and the reasons for the settlement.

(F)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.

(G)     Facebook objects to this Interrogatory on the basis that Plaintiffs' request that Facebook "[d]escribe in detail the facts and circumstances relied upon by Facebook" is so vague and overbroad that the Interrogatory is impossible to answer.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 84**:

To the extent Plaintiffs seek non-privileged information pertaining Facebook's decision to settle with the Federal Trade Commission, Facebook directs Plaintiffs to its public statements regarding that decision, including, among others:

- https://about.fb.com/news/2019/07/ftc-agreement/

- https://about.fb.com/news/2020/04/final-ftc-agreement/

## INTERROGATORY NO. 23:

Identify every person involved in the decision to pay the $5 billion fine to the Federal Trade Commission.

## RESPONSE TO INTERROGATORY NO. 23 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Interrogatory as though it excludes information protected by these privileges and protections.

(B)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, and/or disproportionate to the needs of the case. In order to answer this Interrogatory, Facebook would need to conduct an investigation regarding who among Facebook's management, employees, attorneys, and others, had any "involvement" in Facebook's decision to settle with the FTC. The burden of such an investigation outweighs any potential utility it could serve.

(C)     Facebook objects to this Interrogatory on the ground that it seeks information unrelated and irrelevant to the claims or defenses in this litigation because Facebook's decision to settle claims with a government agency has no bearing on Plaintiffs claims against the Company. Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, to the extent it seeks information relating to issues investigated by the FTC unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 23

of information to so-called "white listed" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(D)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit. Sept. 4 Hr'g Tr. at 14:17-22.

(E)     Facebook objects to this Interrogatory on the basis that Plaintiffs' request that Facebook "every person involved in the decision" to settle with the Federal Trade Commission is so vague and overbroad that the Interrogatory is impossible to answer.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 85**:

Facebook's response to the Federal Trade Commission's 2018 investigation, including the assessment of the terms of a potential settlement, was guided by a Special Committee of Facebook's Board of Directors, who were represented by Independent Legal Counsel. After

347
FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4148

extensive deliberations and analysis, the Special Committee recommended approval of the proposed settlement. The Special Committee was composed of Kenneth Chenault, Marc Andreesen, and Jeffrey Zients. Facebook's Board of Directors voted to approve the proposed settlement.

**INTERROGATORY NO. 24:**

Identify every noncustodial source of ESI on which is stored information (in any form) sufficient to determine (1) whether Third Parties accessed the Not Generally Available Content and Information of Facebook Users by virtue of their being Friends of Installing Users; (2) which Third Parties accessed such Content and Information; and (3) which Facebook Users, by virtue of their being Friends of Installing Users, had their Not Generally Available Content and Information accessed by Third Parties.

**RESPONSE TO INTERROGATORY NO. 24:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed. Thus, the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

(B)     Facebook objects to this Interrogatory as seeking information duplicative of information provided previously through the parties' extensive letter exchange and meet and confer discussions regarding sources of ESI and otherwise outside the scope of additional ESI

information the Court has allowed Plaintiffs to seek. *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

(C)     Facebook objects to this Interrogatory to the extent it is seeks to impose an unduly burdensome obligation on Facebook—beyond that required by the Federal Rules—to investigate sources of ESI containing information that is not otherwise responsive to Plaintiffs' requests for production, thereby improperly shifting the burden onto Facebook to identify broad sets of information Plaintiffs might deem relevant to their claims separate from the parties' agreed upon process for identifying relevant sources of ESI. The parties negotiated a detailed process for identifying and producing relevant and responsive ESI, *see* ECF No. 416, which requires the parties to meet and confer regarding non-custodial ESI to be preserved. The parties have also negotiated at length regarding a process by which Facebook will conduct custodial interviews and disclose relevant sources of ESI. ECF No. 461. Facebook has separately undertaken extensive efforts to respond to those RFPs the parties agree do not require custodial data searches and has disclosed the non-custodial data sources responsive to such requests. This Interrogatory subverts the orderly process the parties have agreed to.

(D)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, and/or disproportionate to the needs of the case. Specifically, Facebook objects to this Interrogatory to the extent it seeks information related to the content, structure, or organization of ESI that do not store or reflect data related to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three

manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(E)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.

Facebook stands on its objections.

**INTERROGATORY NO. 25:**

Identify every noncustodial source of ESI on which is stored information (in any form) sufficient to determine (1) whether any Business Partners accessed the Not Generally Available Content and Information of Facebook Users even if such Users did had not downloaded an App from those Business Partners; (2) which Business Partners accessed such Content and Information; and/or (3) which Facebook Users had their Not Generally Available Content and Information accessed in that manner.

**RESPONSE TO INTERROGATORY NO. 25:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook objects to this Interrogatory on the following grounds:

350
FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4151

(A)     Facebook objects to this Interrogatory on the ground that it seeks Facebook's protected trade secrets and other sensitive, proprietary information that would pose security and business risks to Facebook and risks to Facebook users' privacy if disclosed.  Thus, the burdens of production would outweigh the utility of the production of this information, which are not relevant to Plaintiffs' claims.

(B)     Facebook objects to this Interrogatory as seeking information duplicative of information provided previously through the parties' extensive letter exchange and meet and confer discussions regarding sources of ESI and otherwise outside the scope of additional ESI information the Court has allowed Plaintiffs to seek.  *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

(C)     Facebook objects to this Interrogatory to the extent it is seeks to impose an unduly burdensome obligation on Facebook—beyond that required by the Federal Rules—to investigate sources of ESI containing information that is not otherwise responsive to Plaintiffs' requests for production, thereby improperly shifting the burden onto Facebook to identify broad sets of information Plaintiffs might deem relevant to their claims separate from the parties' agreed upon process for identifying relevant sources of ESI.  The parties negotiated a detailed process for identifying and producing relevant and responsive ESI, *see* ECF No. 416, which requires the parties to meet and confer regarding non-custodial ESI to be preserved.  The parties have also negotiated at length regarding a process by which Facebook will conduct custodial interviews and disclose relevant sources of ESI.  ECF No. 461.  Facebook has separately undertaken extensive efforts to respond to those RFPs the parties agree do not require custodial data searches and has disclosed the non-custodial data sources responsive to such requests.  This Interrogatory subverts the orderly process the parties have agreed to.

(D)    Facebook objects to this Interrogatory on the ground that the definition of "Business Partners" is vague, ambiguous, overly broad, and unduly burdensome.  Facebook will construe this term as described in its objections to its Definition.

(E)    Facebook objects to this Interrogatory as overly broad, unduly burdensome, irrelevant to the subject matter of this Action, and/or disproportionate to the needs of the case. Specifically, Facebook objects to this Interrogatory to the extent it seeks information related to the content, structure, or organization of ESI that do not store or reflect data related to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557 at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548 at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(F)    Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.

Facebook stands on its objections.

**INTERROGATORY NO. 26:**

Identify by name and time period all Third Parties that obtained Facebook Users' Content and Information through friend permissions prior to 2009.

**RESPONSE TO INTERROGATORY NO. 26:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory on the ground that the term "friend permissions" is vague, ambiguous, and undefined.

(B)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, and/or disproportionate to the needs of the case.  Specifically, Facebook objects to this Interrogatory on the basis that it seeks an overly broad and unduly burdensome volume of data that would require Facebook to conduct an investigation of each of the millions of apps connected to the Facebook Platform during the relevant time period, which presents not only practical limitations as to its analysis, delivery, and use, but is largely irrelevant.  Thus, the burdens of compiling such information outweigh the utility of the information.

(C)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information.  Responding fully to Plaintiffs' Interrogatory would require Facebook to conduct a broad investigation—including analyzing a large number of documents that have not yet been identified and produced and that may or may not be in Facebook's possession, custody, and control—to identify potentially

millions of apps connected to the Facebook Platform during the relevant time period, without regard to whether such apps have any relationship to any live claim or defense.

(D)     Facebook objects to this Interrogatory on the basis that it seeks information only as to time-barred claims.

(E)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, in that it seeks all information regarding third parties' access to APIs prior to 2009.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to API calls, applications, and user data that do not implicate application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(F)     Facebook objects to this Interrogatory to the extent it is cumulative and duplicative of prior Interrogatories, including Interrogatory No. 13.

(G)     Facebook further objects to this Interrogatory on the ground that the Interrogatory seeks information not in Facebook's possession, custody, or control.

(H)    Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 86**:

Facebook has conducted an investigation into the information Plaintiffs seek and presently understands that it is not possible to create the data set requested.

**INTERROGATORY NO. 27:**

Identify by name and time period all Third Parties to whom Facebook granted whitelisted access, the time period of the grant of whitelisted access, and the Third Parties for which such access was granted.

**RESPONSE TO INTERROGATORY NO. 27 – HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY:**

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response.  Facebook objects to this Interrogatory on the following grounds:

(A)    Facebook objects to this Interrogatory as containing multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33.  Although Facebook has provided two tables of data points relevant to each of the third-party applications for ease of review, Facebook considers this Interrogatory—in conjunction with Interrogatory No.

13—to pose a separate Interrogatory about over 600 different entities, and therefore the below Response to constitute over 600 discrete Responses.

(B)   Facebook objects to this Interrogatory on the ground that the term "whitelisted" is vague, ambiguous, and undefined. For the purposes of this Interrogatory, Facebook will construe the term "whitelisted" consistent with the Court's Order on Facebook's Motion to Dismiss, ECF No. 298, to mean applications that were allowed continued access to users' friends' data for a period of time after Facebook transitioned to Graph API v.2.0, either because they were granted temporary extension of access to friends permissions under Graph API v. 1.0 or because they were otherwise approved for access to private APIs that allowed them to to query endpoints associated with data fields that may have been associated with a user's friends after the transition to Graph API v. 1.0.

(C)   Facebook objects to this Interrogatory to the extent it seeks information both as to "all Third Parties to whom Facebook granted whitelisted access" and "the Third Parties for which such access was granted," as both clauses appear to seek the same information. Facebook will construe the Interrogatory as seeking only "all Third Parties to whom Facebook granted whitelisted access."

(D)   Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case. Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to "whitelisted access" unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one

of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

      (E)    Facebook objects to this Interrogatory to the extent it is cumulative and duplicative of prior Interrogatories, including Interrogatory No. 13.

      (F)    Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information. Responding fully to Plaintiffs' Interrogatory would require Facebook first to analyze a large number of documents that have not yet been identified and produced and that may or may not be in Facebook's possession, custody, and control.

      (G)    Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit. Sept. 4 Hr'g Tr. at 14:17-22. Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

      Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 27**

### Response No. 87:

After an extensive investigation, Facebook has identified the lists of third-party applications below.

The first list below consists of apps that requested and were given permission by the app user to access friend permissions at some point during the apps' existence, and were given a one-time extension allowing them to continue to access the fields available through Graph API V1 (potentially including friend data) after the deprecation of Graph API V1 in May 2015. These extensions were for less than six months, with the exception of one company, which received an extension until January 2016. The list below provides the name of each third-party application that received a short-term extension, the date the app was created, the date the app's extension to the deprecation of Graph API V1 expired (which was the last date on which the app could have accessed non-public information from the app user's friends), and the app's requested and obtained permissions for friend data.[12]

Three limitations apply to this list. *First*, it includes apps for which at least one user granted access to a friend-related data field during the app's existence and did not subsequently change that permission.



---

[12]  Facebook has provided information about all known permissions for friend-related data fields sought and granted at any time. Note that the data field names are listed as they appear in Facebook's internal database.

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC



*Third*, this list is comprehensive to the best of Facebook's ability, as explained in the June 29, 2018 Facebook letter that is cited in paragraph 432 of the SACC.

The interaction of these apps with the app installers' friends' privacy settings occurred in the same manner that these settings governed all third-party apps calling the Graph API in the V1 time period, as described in Facebook's Response No. 77 to Interrogatory No. 14.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 27

The second list below consists of third-party applications that had access to capabilities which were associated with private APIs that may have allowed third party application developers to query endpoints associated with data fields associated with a user's friends after the transition to Graph API v.2.[13] The vast majority of capabilities that allowed access to private APIs did not enable third-party apps to access user data. The private APIs that do enable third-party apps to access user data generally are used for the following limited purposes (not all of which involved third parties gaining access to data associated with a user's friends):

*Integration Partners*: Facebook's integration partners use private APIs to access user data at Facebook's direction and for the purpose of providing Facebook's services to users. One example of Facebook's integration partnerships was its partnership with Blackberry to offer the Facebook experience on Blackberry devices.

*Business Integrations*: Many of Facebook's private APIs are used by businesses to manage their presences on Facebook and to facilitate transactions or communications with people on Facebook.[14] The programs using these private APIs allow businesses to manage their content on Facebook, do business on Facebook, or advertise on Facebook. Some illustrative examples include:

---

[13] This Response does not include Facebook's Integration Partners, which are addressed in Facebook's responses to Interrogatory Nos. 14 and 15.

[14] Although the names sound similar, "integration partners" and "business integrations" are very different. Integration partners are third parties (such as device manufacturers) that help Facebook provide Facebook experiences to users; they are Facebook's own service providers. Business integrations are tools developed either by a third-party business or the business's service provider; the business uses these tools to interact with people on Facebook and to administer its own content and services on Facebook.

- *Merchants*: Facebook allows merchants to sell products and services on Facebook (such as by using Buy on Facebook). Facebook offers these merchants – which include vendors such as ▮ – access to private APIs to upload product information and obtain users' order information and payment details for order fulfillment.

- *Jobs*: Private APIs allow third-party recruiting and career networking services such as ▮ to create job postings on Facebook and to receive job applications from users.

*Media Integrations:* Media businesses use private APIs to access public content or the media company's own posts, so that they can do things like show current topics, issues of interest, or what people are saying about them publicly. Examples include companies like ▮

*Search Integrations:* Search integrations use private APIs to search public content on Facebook. One example of a search integration is ▮ which uses private search APIs to provide users with relevant search results based on public content on Facebook.

*Beta/Test APIs:* Facebook routinely provides third-party developers access to private APIs to test new functionalities or products before making those APIs available to the public. For example, Facebook built a private API for developers to test its Reactions API before offering it publicly. The Reactions API allows a business on Facebook to collect statistical data on the number of reactions ("likes," "wows," "love") to a piece of content posted to its Facebook page. The Reactions API is now a public API, published and described in Facebook's developer guidance.

373
FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4174

*Specialized Consumer Experiences:* In limited cases, consumer-facing apps use private APIs to enable specific functionalities that will not be used by the vast majority of apps. These include:

- *Games:* Facebook developed private APIs to support certain specialized functionalities used by game apps. For example, in the past Facebook allowed people to use Facebook's own virtual currency (Facebook Credits) to purchase enhanced in-game features; some functions related to this currency were performed through private APIs that were not made available to the entire developer base.

- *Additional Customized Experiences:* Facebook has developed private APIs to enable select partners to offer custom, seamless experiences for users seeking to more closely integrate their Facebook experiences with other things they like to do, such as listening to music, watching movies, or pursuing and sharing interests and hobbies. These custom experiences are built by companies such as ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮.

The following list includes of third-party applications that had access to capabilities which were associated with private APIs that may have allowed third party application developers to query endpoints associated with data fields that may have been associated with a user's friends after the transition to Graph API v.2. It does not include:

- *Facebook's First-Party Apps*: A large portion of the apps approved to access capabilities are internal Facebook programs developed to enable the Company's own products. They do not involve sharing user information with third parties.[15]

---

[15] The company identified apps as first-party apps when (1) they were labeled as first-party apps in Facebook's records; (2) all of an app's developers and administrators were Facebook employees; or (3) they were identified as first-party apps by Facebook's Partnerships and Platform teams. Facebook's systems do not specifically note

374

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4175

- *Integration Partners*: Facebook's Integration Partners are addressed in Facebook's responses to Interrogatory Nos. 14 and 15.

- *Never Installed*: Apps that were approved to access capabilities but were never actually installed by a single user have been omitted.

The list below provides the named of each third-party application, the capabilities associated with private APIs that may have allowed each application to query (but would not have necessarily returned) endpoints associated with user's friends' data fields during the relevant time period, the date ranges during which they were active, and the data fields associated with the APIs they had access to. Note that the lack of an access revocation date does not signify that such access was never revoked or otherwise terminated.

Please note that many apps appear in multiple rows of the spreadsheet. That is because an app may have been approved to access more than one capability. When that is the case, each capability-app pair is listed on a separate row in order to be able to provide precise dates when Facebook granted the app access to the capability or removed the app from the list authorized to access the capability.

A large portion the listed apps likely were never public because they were test or beta versions of apps that developers created to ensure the apps would work before launching them publicly. These apps were identified by finding apps with a de minimis number of app installs (ten or fewer) or that followed naming conventions commonly used for test apps (including "test" or "dev" in the app name).

---

when a capability is used by only Facebook's own programs; to distinguish access in this manner required manual review of the relevant capabilities and, at times, apps. When in doubt, Facebook took the conservative approach of labeling the app a third-party app and including it in this response.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 27

Last, it should be noted that Facebook made clear that before an app could access any non-public information, the app was required to ask the user for permission. These requirements applied to apps whether they accessed non-public data through public or private APIs.


CONFIDENTIAL
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 28

## INTERROGATORY NO. 28:

Describe the criteria Facebook used to determine which Third Parties would be granted whitelisted access.

## RESPONSE TO INTERROGATORY NO. 28 - CONFIDENTIAL:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory on the ground that the term "whitelisted" is vague, ambiguous, and undefined. For the purposes of this Interrogatory, Facebook will construe the term "whitelisted" consistent with the Court's Order on Facebook's Motion to Dismiss, ECF No. 298, to mean applications that were allowed continued access to users' friends' data for a period of time after Facebook transitioned to Graph API v.2.0, either because they were granted temporary extension of access to friends permissions under Graph API v. 1.0 or because they were otherwise approved for access to private APIs that allowed them to to query endpoints associated with data fields that may have been associated with a user's friends after the transition to Graph API v. 1.0.

(B)     Facebook objects to this Interrogatory on the ground that the term "criteria" is vague, ambiguous, and undefined.

(C)     Facebook objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Interrogatory as though it excludes information protected by these privileges and protections.

462

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4263

CONFIDENTIAL

**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 28**

(D)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to "whitelisted access" unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(E)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

4264

**Response No. 88**:

With regard to particular third parties and particular decisions related to the permissions granted to them, Facebook responds that pursuant to Federal Rule of Civil Procedure 33(d), the answer to this Interrogatory may be determined by examining Facebook's previous and forthcoming document productions and the burden of deriving or ascertaining the answer to this Interrogatory will be substantially the same for Plaintiff as it would be for Facebook.

With regard Facebook's broader decision-making processes, the term "whitelisting" refers to a wide variety of situations and does not necessarily indicate access to additional user data beyond what is available through public APIs. In fact, the term "whitelist" is often used in contexts that have nothing to do with developer access to user data. For example, Facebook whitelists each user for a specific language, so their Facebook experience is displayed in their preferred language (*e.g.*, Brazilians are whitelisted to Portuguese unless they specify otherwise). Facebook can also whitelist the number of API calls third-party developers make.

Facebook may also whitelist certain partners to allow them access to products for purposes of beta testing.

CONFIDENTIAL
**FACEBOOK'S RESPONSE TO INTERROGATORY NO. 28**

████ It is common to help partners transition their apps during Platform changes to prevent their apps from crashing or causing disruptive experiences for users.

Facebook takes many factors into account when it engages with third parties to enable particular functionalities, solve a problem, address an unmet need, or beta test a new product, which may include providing a third party access to a non-public API. Facebook works across its Product and Partnerships teams to identify well-known, reputable partners and collaborate with them to develop, approve, and execute product plans to accomplish the shared purpose of the partnership. The types of data that a partner can access depends on the nature and purpose of the partnership. Regardless of the reason for whitelisting a particular partner, Facebook is targeted in its approach. Data access is narrowly limited to what a partner needs to provide the user experience.

## INTERROGATORY NO. 29 [WITHDRAWN BY PLAINTIFFS]:

Identify by name and time period all Third Parties that were Business Partners of Facebook and were granted access to Facebook Users' Content and Information.

## RESPONSE TO INTERROGATORY NO. 29 [WITHDRAWN BY PLAINTIFFS]:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case. Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating access to user data unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreementsand/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(B)     Facebook objects to the Interrogatory on the ground that it is overly broad and unduly burdensome. Specifically, the Interrogatory seeks information about every Business Partner that may have had access to any user data over a thirteen-year period.

(C)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information. Responding fully to

Plaintiffs' Interrogatory would require Facebook to conduct a broad investigation—including analyzing a large number of documents that have not yet been identified and produced and that may or may not be in Facebook's possession, custody, and control—to identify all Business Partners who were permitted access to any user content and information over the course of at least thirteen years, without respect for whether the partner or particular information has any relationship to any live claim or defense.

(D)     Facebook objects to this Interrogatory on the basis that it is cumulative and duplicative of prior requests, including Interrogatories 14 and 17 and RFPs 12 and 24.

(E)     Facebook objects to this Interrogatory on the basis that the information sought is more appropriately pursued through another means of discovery, such as a request for the production of documents.

(F)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit. Sept. 4 Hr'g Tr. at 14:17-22. Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Plaintiffs have withdrawn this Interrogatory.

## INTERROGATORY NO. 30:

Identify all categories of Content and Information available to a Facebook User through the "Access Your Information" or "Download Your Information" tools, such as users' public and private posts, Facebook messenger messages, and any attached content.

## RESPONSE TO INTERROGATORY NO. 30:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory on the ground that the phrase "'Access Your Information' or 'Download Your Information' tools" is vague, ambiguous, and undefined. Without definition, these terms may have various meanings. For example, the selections and options available to users under certain tools has varied over time and across devices.

(B)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, in that which types of information are available to users through Facebook's "Access Your Information" or "Download Your Information" tools are not relevant to any live claim. Facebook further objects to this Interrogatory to the extent it seeks information relating to user data unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(C)     Facebook further objects to the Interrogatory on the ground that it seeks information that is public, already in the possession, custody, or control of Plaintiffs, or obtainable from some other source that is more convenient, less burdensome, or less expensive. Plaintiffs have access through Facebook's Platform and mobile apps to Facebook's Access Your Information and Download Your Information tools and can readily see what information is available there.  Facebook has also produced all information contained in these tools for the Named Plaintiffs.

(D)     Facebook objects to this Interrogatory to the extent it is cumulative and duplicative of prior requests, including RFP Nos. 9 and 10.

(E)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 89**:

A list of the categories of information that Facebook users can access through the Download Your Information tool is publicly available at the Facebook Help Center, *see What categories of my Facebook data are available to me?*,

https://www.facebook.com/help/930396167085762, Table 2, Information you can download

using the Download Your Information tool (last visited Nov. 19, 2020). That list is also reproduced below.

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| About Me | Information you added to the **About** section of your timeline like relationships, work, education, where you live and more. It includes any updates or changes you made in the past and what is currently in the **About** section of your timeline. | Downloaded Info |
| Account Status History | The dates when your account was reactivated, deactivated, disabled or deleted. | Downloaded Info |
| Active Sessions | All stored active sessions, including date, time, device, IP address, machine cookie and browser information. | Downloaded Info |
| Address | Your current address or any past addresses you had on your account. | Downloaded Info |
| Ads | Ads you've recently viewed. | Downloaded Info |
| Ads Clicked | Dates, times and titles of ads clicked (limited retention period). | Downloaded Info |
| Ad Topics | A list of topics that you may be targeted against based on your stated likes, interests and other data you put in your timeline. | Downloaded Info |
| Advertising ID | The unique advertising identification numbers provided by your mobile device. These numbers are used to show you ads on the apps you use on your device. | Downloaded Info |

Facebook, Inc.'s Second Amended Responses & Objections to Plaintiffs' Fourth Set of Interrogatories
CASE NO. 3:18-MD-02843-VC

4271

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Alternate Name | Any alternate names you have on your account (example: a maiden name or a nickname). | Downloaded Info |
| Apps | All of the apps you have added. | Downloaded Info |
| Articles | Articles you've recently read. | Downloaded Info |
| Autofill Information | Information you've provided, such as your address, that is used to pre-fill messages when you contact a business through Messenger. | Downloaded Info |
| Chat | A history of the conversations you've had on Facebook Chat (a complete history is available directly from your messages inbox). | Downloaded Info |
| Chat Rules | Chat Rules you've accepted. | Downloaded Info |
| Check-ins | The places you've checked into. | Downloaded Info |
| Currency | Your preferred currency on Facebook. If you use Facebook Payments, this will be used to display prices and charge your credit cards. | Downloaded Info |
| Current City | The city you added to the **About** section of your timeline. | Downloaded Info |
| Date of Birth | The date you added to Birthday in the **About** section of your timeline. | Downloaded Info |
| Dating | The number of times you've recently visited the Dating section of Facebook. | Downloaded Info |

4272

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Device ID | The unique identification numbers provided by the devices you use to log into Facebook. | Downloaded Info |
| Device Locale | The country and language from which you're accessing Facebook as determined by the devices you're using. | Downloaded Info |
| Education | Any information you added to Education field in the About section of your timeline. | Downloaded Info |
| Emails | Email addresses added to your account (even those you may have removed). | Downloaded Info |
| Email Address Verifications | A history of when you've verified your email address. | Downloaded Info |
| Events | Events you've joined or been invited to. | Downloaded Info |
| Event Contacts You've Blocked | People you've blocked from inviting you to events. | Downloaded Info |
| Event Interactions | The number of times you've recently visited the Events section of Facebook. | Downloaded Info |
| Events Visited | Event pages you've recently visited. | Downloaded Info |
| Facebook Live Videos | Live videos you've recently watched. | Downloaded Info |
| Facebook Watch Topics for Recommendations | A collection of topics that is used to show you relevant videos in the Facebook Watch tab. The topics are based on your previous interaction history | Downloaded Info |

472

4273

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| | with things like links, videos, photos and Pages you've liked. | |
| Facial Recognition Data | A unique number based on a comparison of the photos you're tagged in. We use this data to help others tag you in photos. | Downloaded Info |
| Family | Friends you've indicated are family members. | Downloaded Info |
| Favorite Quotes | Information you've added to the Favorite Quotes section of the **About** section of your timeline. | Downloaded Info |
| Followers | A list of people who follow you. | Downloaded Info |
| Friends | A list of your friends. | Downloaded Info |
| Friend Requests | Pending, sent and received friend requests. | Downloaded Info |
| Friends You See Less | Friends whose activity you've chosen to see less of on Facebook. | Downloaded Info |
| Fundraisers | Fundraisers you've recently viewed. | Downloaded Info |
| Gender | The gender you added to the **About** section of your timeline. | Downloaded Info |
| Groups | A list of groups you belong to on Facebook. | Downloaded Info |

Facebook, Inc.'s Second Amended Responses & Objections to Plaintiffs' Fourth Set of Interrogatories
CASE NO. 3:18-md-02843-VC

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Group Interactions | The number of times you've interacted with Groups on Facebook. | Downloaded Info |
| Groups Visited | Groups you've recently visited. | Downloaded Info |
| Hometown | The place you added to hometown in the **About** section of your timeline. | Downloaded Info |
| ID | A copy of the ID you submitted to confirm your identity and to help improve our automated systems for detecting fake IDs and related abuse. | Personal Data Request |
| Instant Games | Instant Games you've played. | Downloaded Info |
| IP Address Activity | Your recent activity from specific IP addresses. | Downloaded Info |
| IP Address Message Activity | Your recent message activity from specific IP addresses. | Downloaded Info |
| IP Address Payment Activity | Your recent payment activity from specific IP addresses. | Downloaded Info |
| Language Settings | Your preferred language settings. | Downloaded Info |
| Last Location | Your most recent location determined by your device. | Downloaded Info |
| Linked Accounts | Accounts you've linked to your Portal. | Downloaded Info |

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Live Video Subscriptions | Scheduled Live videos you've subscribed to. | Downloaded Info |
| Logins | IP address, date and time associated with logins to your Facebook account. | Downloaded Info |
| Logouts | IP address, date and time associated with logouts from your Facebook account. | Downloaded Info |
| Marketplace Categories | Categories you've recently viewed. | Downloaded Info |
| Marketplace Interactions | Your recent interactions on Marketplace. | Downloaded Info |
| Marketplace Items | Items you've recently viewed. | Downloaded Info |
| Marketplace Services | Services you've recently viewed. | Downloaded Info |
| Matched Contacts | Contact information that may be associated with your account. | Personal Data Request |
| Menu Items | Areas of Facebook you've recently accessed through the main menu. | Downloaded Info |
| Messages | Messages you've sent and received on Facebook. Note, if you've deleted a message it won't be included in your download as it has been deleted from your account. | Downloaded Info |
| Messenger Contacts You've Blocked | Contacts you've blocked on Messenger. | Downloaded Info |

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4276

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Milestone Notifications | Notifications about your activity milestones, such as the number of reactions on a post, you've received and dismissed. | Downloaded Info |
| Mobile Service Provider and Country Code | The service provider and country code associated with your phone number. | Downloaded Info |
| Name | The name on your Facebook account. | Downloaded Info |
| Name Changes | Any changes you've made to the original name you used when you signed up for Facebook. | Downloaded Info |
| News Feed Topics for Recommendations | A collection of topics that is used to show you relevant public posts in parts of your News Feed. The topics are based on your previous interaction history with things like links, videos, photos and Pages you've liked. | Downloaded Info |
| News Topics for Recommendations | A collection of topics that is used to show you relevant articles in the News tab. The topics are based on your previous interaction history with things like posts, videos, photos and Pages you've liked. | Downloaded Info |
| Notification ID | The identification numbers that we use to send you Facebook notifications on your device. | Downloaded Info |
| Page Notifications | Chat notifications you've dismissed from Pages you visit. | Downloaded Info |
| Page Visits | Pages you've recently visited. | Downloaded Info |

Facebook, Inc.'s Second Amended Responses & Objections to Plaintiffs' Fourth Set of Interrogatories
CASE NO. 3:18-MD-02843-VC

4277

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Page Transparency Notices | A list of pages that you've received and dismissed notices from. | Downloaded Info |
| Pages You Admin | A list of pages you admin. | Downloaded Info |
| Pages You've Recommended | Pages you've recommended to others. | Downloaded Info |
| Pending Friend Requests | Pending, sent and received friend requests. | Downloaded Info |
| People | People and friends you've interacted with recently, including comments and reactions. | Downloaded Info |
| People Viewed | People you've recently viewed when new friends were suggested to you. | Downloaded Info |
| Phone Numbers | Mobile phone numbers you've added to your account, including verified mobile numbers you've added for security purposes. | Downloaded Info |
| Photos | Photos you've uploaded to your account. | Downloaded Info |
| Photo Effects | A list of the photo effects you've used. | Downloaded Info |
| Photos Metadata | Any metadata that is transmitted with your uploaded photos. | Downloaded Info |
| Platforms | Platforms you've used to log into Facebook, such as the Facebook app or a browser. | Downloaded Info |

4278

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Pokes | A list of who's poked you and who you've poked. Poke content from our mobile poke app is not included because it's only available for a brief period of time. After the recipient has viewed the content it's permanently deleted from our systems. | Downloaded Info |
| Political Views | Any information you added to Political Views in the About section of timeline. | Downloaded Info |
| Preferred Language for Videos | The preferred language for videos as determined by videos you've previously viewed. | Downloaded Info |
| Previously Removed Contacts | Friends you've recently removed but added back. | Downloaded Info |
| Primary Location | Your primary location is determined by information we use to support Facebook Products, such as the current city you entered on your profile and your device connection information. | Downloaded Info |
| Profile Visits | People whose profiles you've recently visited. | Downloaded Info |
| Recent Activities | Actions you've taken and interactions you've recently had. | Downloaded Info |
| Recently Visited | Videos and shows you've recently visited. | Downloaded Info |
| Record Details | Details included in some administrative records. | Downloaded Info |
| Registration Date | The date you joined Facebook. | Downloaded Info |

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4279

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Religious Views | The current information you added to Religious Views in the **About** section of your timeline. | Downloaded Info |
| Removed Friends | People you've removed as friends. | Downloaded Info |
| Saved Post Reminders | Reminders you've received after you've saved a post. | Downloaded Info |
| Screen Names | The screen names you've added to your account, and the service they're associated with. You can also see if they're hidden or visible on your account. | Downloaded Info |
| Secret Conversations | A list of the times you've used Secret Conversations in Messenger. | Downloaded Info |
| Secret Conversations You've Reported | A list of the secret conversations you've reported to Facebook. | Downloaded Info |
| See First | Profiles and Pages you've recently chosen to see first in your News Feed. | Downloaded Info |
| See Less | Profiles and Pages you've recently chosen to see less of in your News Feed. | Downloaded Info |
| Selected Language | The language you've selected to use Facebook in. | Downloaded Info |
| Session Type | Your current active session types. | Downloaded Info |
| Show Pages | A list of the Show Pages you've viewed and the videos you've watched from them. | Downloaded Info |

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4280

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Shows | A list of the individual videos you've watched. | Downloaded Info |
| Spoken Languages | The languages you added to Spoken Languages in the **About** section of your timeline. | Downloaded Info |
| Status Updates | Any status updates you've posted. | Downloaded Info |
| Time Spent | The amount of time you've spent watching videos from a Show Page. | Downloaded Info |
| Time Viewed | The amount of an individual video you've watched. | Downloaded Info |
| Timezone | The timezone you've selected. | Downloaded Info |
| Work | Any current information you've added to Work in the **About** section of your timeline. | Downloaded Info |
| Videos | Videos you've posted to your timeline. | Downloaded Info |
| Video Creator Pages | Video creator Pages you've recently viewed. | Downloaded Info |
| Videos You've Removed | Videos you've removed from your Watch list. | Downloaded Info |
| Your Facebook Activity | A history of when you've accessed Facebook. | Downloaded Info |

4281

| What info is available? | What is it? | Where can I find it? |
|---|---|---|
| Your Pinned Posts | Posts you've pinned on your timeline. | Downloaded Info |

## INTERROGATORY NO. 31:

Identify all categories of Content and Information Facebook collects, tracks, and maintains about Facebook Users that are excluded from the Access Your Information or Download Your Information tools, such as advertisements served to a Facebook User, likes, audience selector information, reports of offensive content, or support communications.

## RESPONSE TO INTERROGATORY NO. 31:

Facebook restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth in this Response. Facebook objects to this Interrogatory on the following grounds:

(A)    Facebook objects to this Interrogatory on the ground that the phrase "'Access Your Information' or 'Download Your Information' tools" is vague, ambiguous, and undefined. Without definition, these terms may have various meanings. For example, the selections and options available to users under certain tools has varied over time and across devices.

(B)    Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case, in that which types of information are available to users through Facebook's "Access Your Information" or "Download Your Information" tools are not relevant to any live claim. Facebook further objects to this Interrogatory to the extent it seeks information relating to user data unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009

and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(C)     Facebook further objects to the Interrogatory on the ground that it seeks information that is public, already in the possession, custody, or control of Plaintiffs, or obtainable from some other source that is more convenient, less burdensome, or less expensive, to wit, Facebooks data policies, which are publicly available and have already been produced to Plaintiffs.

(D)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, and/or disproportionate to the needs of the case.  Specifically, this Interrogatory seeks information related all internal business analytics or analyses that include user information, which are analyses that are conducted by thousands of Facebook data scientists and engineers over an enormous amount of data.  Even a large team of engineers working full time for several years likely could not identify all of the information Plaintiffs seek.  Facebook therefore objects to this Interrogatory on the basis that it seeks an overly broad and unduly burdensome volume of data, which presents not only practical limitations as to its analysis, delivery, and use, but is largely irrelevant.  Thus, the burdens of compiling such information outweigh the utility of the information.

(E)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded

the maximum number of permissible Interrogatories under Discovery Order No. 6, under which

each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1);

Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the

most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it

would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless

made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing

nature of discovery in this action, Facebook responds as follows:

**Response No. 90**:

The parties have met and conferred extensively regarding Plaintiffs' requests that

Facebook prepare a list of all of the data points Facebook has or may have collected regarding

each of the Named Plaintiffs.  Facebook has repeatedly directed Plaintiffs to Facebook's Data

Policy, which contains a comphrensive explanation of the types of data Facebook collects for

users, including descriptive lists of the types of data that fall into particular categories.  Plaintiffs

have not presented any questions or expressed concerns regarding the detail provided in the Data

Policy.

Accordingly, Facebook responds that pursuant to Federal Rule of Civil Procedure 33(d),

the answer to this Interrogatory may be determined by examining Facebook's document

productions, particularly all produced versions of Facebook's Data Policy, including, *inter alia*,

FB-CA-MDL-00009502, FB-CA-MDL-00303103, FB-CA-MDL-00303116, and FB-CA-MDL-

00335292, and the burden of deriving or ascertaining the answer to this Interrogatory will be

substantially the same for Plaintiff as it would be for Facebook.

Facebook also directs Plaintiffs to its present Data Policy, which represents the most comprehensive available list of the types of data Facebook collects about each user. The present Data Policy is publicly available at https://www.facebook.com/policy.php (last visited Nov. 19, 2020) and is reproduced below:

**Data Policy**

This policy describes the information we process to support Facebook, Instagram, Messenger and other products and features offered by Facebook (Facebook Products or Products). You can find additional tools and information in the Facebook Settings and Instagram Settings.

**What kinds of information do we collect?**

To provide the Facebook Products, we must process information about you. The types of information we collect depend on how you use our Products. You can learn how to access and delete information we collect by visiting the Facebook Settings and Instagram Settings.

**Things you and others do and provide**.

- **Information and content you provide.** We collect the content, communications and other information you provide when you use our Products, including when you sign up for an account, create or share content, and message or communicate with others. This can include information in or about the content you provide (like metadata), such as the location of a photo or the date a file was created. It can also include what you see through features we provide, such as our camera, so we can do things like suggest masks and filters that you might like, or give you tips on using camera formats. Our systems automatically process content and communications you and others provide to analyze

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

context and what's in them for the purposes described below. Learn more about how you can control who can see the things you share.

- Data with special protections: You can choose to provide information in your Facebook profile fields or Life Events about your religious views, political views, who you are "interested in," or your health. This and other information (such as racial or ethnic origin, philosophical beliefs or trade union membership) could be subject to special protections under the laws of your country.

- **Networks and connections.** We collect information about the people, Pages, accounts, hashtags and groups you are connected to and how you interact with them across our Products, such as people you communicate with the most or groups you are part of. We also collect contact information if you choose to upload, sync or import it from a device (such as an address book or call log or SMS log history), which we use for things like helping you and others find people you may know and for the other purposes listed below.

- **Your usage.** We collect information about how you use our Products, such as the types of content you view or engage with; the features you use; the actions you take; the people or accounts you interact with; and the time, frequency and duration of your activities. For example, we log when you're using and have last used our Products, and what posts, videos and other content you view on our Products. We also collect information about how you use features like our camera.

- **Information about transactions made on our Products.** If you use our Products for purchases or other financial transactions (such as when you make a purchase in a game or make a donation), we collect information about the purchase or transaction. This

includes payment information, such as your credit or debit card number and other card information; other account and authentication information; and billing, shipping and contact details.

- **Things others do and information they provide about you.** We also receive and analyze content, communications and information that other people provide when they use our Products. This can include information about you, such as when others share or comment on a photo of you, send a message to you, or upload, sync or import your contact information.

## Device Information

As described below, we collect information from and about the computers, phones, connected TVs and other web-connected devices you use that integrate with our Products, and we combine this information across different devices you use. For example, we use information collected about your use of our Products on your phone to better personalize the content (including ads) or features you see when you use our Products on another device, such as your laptop or tablet, or to measure whether you took an action in response to an ad we showed you on your phone on a different device.

**Information we obtain from these devices includes**:

- **Device attributes:** information such as the operating system, hardware and software versions, battery level, signal strength, available storage space, browser type, app and file names and types, and plugins.

- **Device operations:** information about operations and behaviors performed on the device, such as whether a window is foregrounded or backgrounded, or mouse movements (which can help distinguish humans from bots).

- **Identifiers:** unique identifiers, device IDs, and other identifiers, such as from games, apps or accounts you use, and Family Device IDs (or other identifiers unique to Facebook Company Products associated with the same device or account).

- **Device signals:** Bluetooth signals, and information about nearby Wi-Fi access points, beacons, and cell towers.

- **Data from device settings:** information you allow us to receive through device settings you turn on, such as access to your GPS location, camera or photos.

- **Network and connections:** information such as the name of your mobile operator or ISP, language, time zone, mobile phone number, IP address, connection speed and, in some cases, information about other devices that are nearby or on your network, so we can do things like help you stream a video from your phone to your TV.

- **Cookie data:** data from cookies stored on your device, including cookie IDs and settings. Learn more about how we use cookies in the Facebook Cookies Policy and Instagram Cookies Policy.

**Information from partners.**

Advertisers, app developers, and publishers can send us information through Facebook Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Facebook pixel. These partners provide information about your activities off Facebook—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services—whether or not you have a Facebook account or are logged into Facebook. For example, a game developer could use our API to tell us what games you play, or a business could tell us about a purchase you made in its

store. We also receive information about your online and offline actions and purchases from third-party data providers who have the rights to provide us with your information.

Partners receive your data when you visit or use their services or through third parties they work with. We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us. Learn more about the types of partners we receive data from. To learn more about how we use cookies in connection with Facebook Business Tools, review the Facebook Cookies Policy and Instagram Cookies Policy.

**How do we use this information?**

We use the information we have (subject to choices you make) as described below and to provide and support the Facebook Products and related services described in the Facebook Terms and Instagram Terms. Here's how:

**Provide, personalize and improve our Products.**

We use the information we have to deliver our Products, including to personalize features and content (including your News Feed, Instagram Feed, Instagram Stories and ads) and make suggestions for you (such as groups or events you may be interested in or topics you may want to follow) on and off our Products. To create personalized Products that are unique and relevant to you, we use your connections, preferences, interests and activities based on the data we collect and learn from you and others (including any data with special protections you choose to provide); how you use and interact with our Products; and the people, places, or things you're connected to and interested in on and off our Products. Learn more about how we use information about you to personalize your Facebook and Instagram experience, including features, content and recommendations in Facebook Products; you can also learn more about how we choose the ads that you see.

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

- **Information across Facebook Products and devices:** We connect information about your activities on different Facebook Products and devices to provide a more tailored and consistent experience on all Facebook Products you use, wherever you use them. For example, we can suggest that you join a group on Facebook that includes people you follow on Instagram or communicate with using Messenger. We can also make your experience more seamless, for example, by automatically filling in your registration information (such as your phone number) from one Facebook Product when you sign up for an account on a different Product.

- **Location-related information:** We use location-related information-such as your current location, where you live, the places you like to go, and the businesses and people you're near-to provide, personalize and improve our Products, including ads, for you and others. Location-related information can be based on things like precise device location (if you've allowed us to collect it), IP addresses, and information from your and others' use of Facebook Products (such as check-ins or events you attend).

- **Product research and development:** We use the information we have to develop, test and improve our Products, including by conducting surveys and research, and testing and troubleshooting new products and features.

- **Face recognition:** If you have it turned on, we use face recognition technology to recognize you in photos, videos and camera experiences. The face-recognition templates we create may constitute data with special protections under the laws of your country. Learn more about how we use face recognition technology, or control our use of this technology in Facebook Settings. If we introduce face-recognition technology to your

Instagram experience, we will let you know first, and you will have control over whether we use this technology for you.

- **Ads and other sponsored content:** We use the information we have about you-including information about your interests, actions and connections-to select and personalize ads, offers and other sponsored content that we show you. Learn more about how we select and personalize ads, and your choices over the data we use to select ads and other sponsored content for you in the Facebook Settings and Instagram Settings.

Provide measurement, analytics, and other business services.

We use the information we have (including your activity off our Products, such as the websites you visit and ads you see) to help advertisers and other partners measure the effectiveness and distribution of their ads and services, and understand the types of people who use their services and how people interact with their websites, apps, and services. Learn how we share information with these partners.

**Promote safety, integrity and security.**

We use the information we have to verify accounts and activity, combat harmful conduct, detect and prevent spam and other bad experiences, maintain the integrity of our Products, and promote safety and security on and off of Facebook Products. For example, we use data we have to investigate suspicious activity or violations of our terms or policies, or to detect when someone needs help. To learn more, visit the Facebook Security Help Center and Instagram Security Tips.

**Communicate with you.**

We use the information we have to send you marketing communications, communicate with you about our Products, and let you know about our policies and terms. We also use your information to respond to you when you contact us.

**Research and innovate for social good.**

We use the information we have (including from research partners we collaborate with) to conduct and support research and innovation on topics of general social welfare, technological advancement, public interest, health and well-being. For example, we analyze information we have about migration patterns during crises to aid relief efforts. Learn more about our research programs.

**How is this information shared?**

Your information is shared with others in the following ways:

Sharing on Facebook Products

People and accounts you share and communicate with

When you share and communicate using our Products, you choose the audience for what you share. For example, when you post on Facebook, you select the audience for the post, such as a group, all of your friends, the public, or a customized list of people. Similarly, when you use Messenger or Instagram to communicate with people or businesses, those people and businesses can see the content you send. Your network can also see actions you have taken on our Products, including engagement with ads and sponsored content. We also let other accounts see who has viewed their Facebook or Instagram Stories.

**Public information** can be seen by anyone, on or off our Products, including if they don't have an account. This includes your Instagram username; any information you share with a public

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4292

audience; information in your public profile on Facebook; and content you share on a Facebook Page, public Instagram account or any other public forum, such as Facebook Marketplace. You, other people using Facebook and Instagram, and we can provide access to or send public information to anyone on or off our Products, including in other Facebook Company Products, in search results, or through tools and APIs. Public information can also be seen, accessed, reshared or downloaded through third-party services such as search engines, APIs, and offline media such as TV, and by apps, websites and other services that integrate with our Products.

Learn more about what information is public and how to control your visibility on Facebook and Instagram.

**Content others share or reshare about you**

You should consider who you choose to share with, because people who can see your activity on our Products can choose to share it with others on and off our Products, including people and businesses outside the audience you shared with. For example, when you share a post or send a message to specific friends or accounts, they can download, screenshot, or reshare that content to others across or off our Products, in person or in virtual reality experiences such as Facebook Spaces. Also, when you comment on someone else's post or react to their content, your comment or reaction is visible to anyone who can see the other person's content, and that person can change the audience later.

People can also use our Products to create and share content about you with the audience they choose. For example, people can share a photo of you in a Story, mention or tag you at a location in a post, or share information about you in their posts or messages. If you are uncomfortable with what others have shared about you on our Products, you can learn how to report the content.

**Information about your active status or presence on our Products.**

People in your networks can see signals telling them whether you are active on our Products, including whether you are currently active on Instagram, Messenger or Facebook, or when you last used our Products.

Apps, websites, and third-party integrations on or using our Products.

When you choose to use third-party apps, websites, or other services that use, or are integrated with, our Products, they can receive information about what you post or share. For example, when you play a game with your Facebook friends or use a Facebook Comment or Share button on a website, the game developer or website can receive information about your activities in the game or receive a comment or link that you share from the website on Facebook. Also, when you download or use such third-party services, they can access your public profile on Facebook, and any information that you share with them. Apps and websites you use may receive your list of Facebook friends if you choose to share it with them. But apps and websites you use will not be able to receive any other information about your Facebook friends from you, or information about any of your Instagram followers (although your friends and followers may, of course, choose to share this information themselves). Information collected by these third-party services is subject to their own terms and policies, not this one.

Devices and operating systems providing native versions of Facebook and Instagram (i.e. where we have not developed our own first-party apps) will have access to all information you choose to share with them, including information your friends share with you, so they can provide our core functionality to you.

*Note: We are in the process of restricting developers' data access even further to help prevent abuse. For example, we will remove developers' access to your Facebook and Instagram data if*

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

*you haven't used their app in 3 months, and we are changing Login, so that in the next version, we will reduce the data that an app can request without app review to include only name, Instagram username and bio, profile photo and email address. Requesting any other data will require our approval.*

**New owner**.

If the ownership or control of all or part of our Products or their assets changes, we may transfer your information to the new owner.

**Sharing with Third-Party Partners**

We work with third-party partners who help us provide and improve our Products or who use Facebook Business Tools to grow their businesses, which makes it possible to operate our companies and provide free services to people around the world. We don't sell any of your information to anyone, and we never will. We also impose strict restrictions on how our partners can use and disclose the data we provide. Here are the types of third parties we share information with:

Partners who use our analytics services.

We provide aggregated statistics and insights that help people and businesses understand how people are engaging with their posts, listings, Pages, videos and other content on and off the Facebook Products. For example, Page admins and Instagram business profiles receive information about the number of people or accounts who viewed, reacted to, or commented on their posts, as well as aggregate demographic and other information that helps them understand interactions with their Page or account.

<u>Advertisers</u>.

We provide advertisers with reports about the kinds of people seeing their ads and how their ads are performing, but we don't share information that personally identifies you (information such as your name or email address that by itself can be used to contact you or identifies who you are) unless you give us permission. For example, we provide general demographic and interest information to advertisers (for example, that an ad was seen by a woman between the ages of 25 and 34 who lives in Madrid and likes software engineering) to help them better understand their audience. We also confirm which Facebook ads led you to make a purchase or take an action with an advertiser.

<u>Measurement partners</u>.

We share information about you with companies that aggregate it to provide analytics and measurement reports to our partners.

<u>Partners offering goods and services in our Products</u>.

When you subscribe to receive premium content, or buy something from a seller in our Products, the content creator or seller can receive your public information and other information you share with them, as well as the information needed to complete the transaction, including shipping and contact details.

<u>Vendors and service providers</u>.

We provide information and content to vendors and service providers who support our business, such as by providing technical infrastructure services, analyzing how our Products are used, providing customer service, facilitating payments or conducting surveys.

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

<u>Researchers and academics</u>.

We also provide information and content to research partners and academics to conduct research that advances scholarship and innovation that support our business or mission, and enhances discovery and innovation on topics of general social welfare, technological advancement, public interest, health and well-being.

<u>Law enforcement or legal requests</u>.

We share information with law enforcement or in response to legal requests in the circumstances outlined below.

Learn more about how you can control the information about you that you or others share with third-party partners in the Facebook Settings and Instagram Settings.

**How do the Facebook Companies work together?**

Facebook and Instagram share infrastructure, systems and technology with other Facebook Companies (which include WhatsApp and Oculus) to provide an innovative, relevant, consistent and safe experience across all Facebook Company Products you use. We also process information about you across the Facebook Companies for these purposes, as permitted by applicable law and in accordance with their terms and policies. For example, we process information from WhatsApp about accounts sending spam on its service so we can take appropriate action against those accounts on Facebook, Instagram or Messenger. We also work to understand how people use and interact with Facebook Company Products, such as understanding the number of unique users on different Facebook Company Products.

**How can I manage or delete information about me?**

We provide you with the ability to access, rectify, port and erase your data. Learn more in your Facebook Settings and Instagram Settings.

We store data until it is no longer necessary to provide our services and Facebook Products, or until your account is deleted - whichever comes first. This is a case-by-case determination that depends on things like the nature of the data, why it is collected and processed, and relevant legal or operational retention needs. For example, when you search for something on Facebook, you can access and delete that query from within your search history at any time, but the log of that search is deleted after 6 months. If you submit a copy of your government-issued ID for account verification purposes, we delete that copy 30 days after review, unless otherwise stated. Learn more about deletion of content you have shared and cookie data obtained through social plugins.

When you delete your account, we delete things you have posted, such as your photos and status updates, and you won't be able to recover that information later. Information that others have shared about you isn't part of your account and won't be deleted. If you don't want to delete your account but want to temporarily stop using the Products, you can deactivate your account instead. To delete your account at any time, please visit the Facebook Settings and Instagram Settings.

**How do we respond to legal requests or prevent harm?**

We access, preserve and share your information with regulators, law enforcement or others:

- In response to a legal request (like a search warrant, court order or subpoena) if we have a good faith belief that the law requires us to do so. Thmay include responding to legal

requests from jurisdictions outside of the United States when we have a good-faith belief that the response is required by law in that jurisdiction, affects users in that jurisdiction, and is consistent with internationally recognized standards.

- When we have a good-faith belief it is necessary to: detect, prevent and address fraud, unauthorized use of the Products, violations of our terms or policies, or other harmful or illegal activity; to protect ourselves (including our rights, property or Products), you or others, including as part of investigations or regulatory inquiries; or to prevent death or imminent bodily harm. For example, if relevant, we provide information to and receive information from third-party partners about the reliability of your account to prevent fraud, abuse and other harmful activity on and off our Products.

Information we receive about you (including financial transaction data related to purchases made with Facebook) can be accessed and preserved for an extended period when it is the subject of a legal request or obligation, governmental investigation, or investigations of possible violations of our terms or policies, or otherwise to prevent harm. We also retain information from accounts disabled for terms violations for at least a year to prevent repeat abuse or other term violations.

**How do we operate and transfer data as part of our global services?**

We share information globally, both internally within the Facebook Companies, and externally with our partners and with those you connect and share with around the world in accordance with this policy. Your information may, for example, be transferred or transmitted to, or stored and processed in the United States or other countries outside of where you live for the purposes as described in this policy. These data transfers are necessary to provide the services set forth in the Facebook Terms and Instagram Terms and to globally operate and provide our

Products to you. We utilize standard contract clauses, rely on the European

Commission's adequacy decisions about certain countries, as applicable, and obtain your consent

for these data transfers to the United States and other countries.

**How will we notify you of changes to this policy?**

We'll notify you before we make changes to this policy and give you the opportunity to

review the revised policy before you choose to continue using our Products.

**Privacy notice for California residents**

If you are a California resident, you can learn more about your consumer privacy rights

by reviewing the California Privacy Notice.

**How to contact Facebook with questions**

You can learn more about how privacy works on Facebook and on Instagram. If you have

questions about this policy, you can contact us as described below. We may resolve disputes you

have with us in connection with our privacy policies and practices through TrustArc. You can

contact TrustArc through its website.


Contact Us
You can contact us online or by mail at:
Facebook, Inc.
ATTN: Privacy Operations
1601 Willow Road
Menlo Park, CA 94025

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4300

**INTERROGATORY NO. 32:**

For each Named Plaintiff, identify each category of Content and Information Facebook collects, tracks, and maintains about them and for each category, indicate (1) whether each category has been produced in this action and the Bates Range associated with each category of produced Content and Information; (2) whether each category of Content and Information is available to Facebook Users through the "Access Your Information" or "Download Your Information" tools; and (3) for each category of Content and Information that has not been produced in this action, its location, and the reason it has not been produced.

**RESPONSE TO INTERROGATORY NO. 32:**

Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for separate information about "each" of the 21 Named Plaintiffs.  *See, e.g.*, *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009).  Facebook will treat Plaintiffs' inquiry into each Named Plaintiff as a separate Interrogatory.  During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL

4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, each individual Named Plaintiff, each of whom used Facebook differently.  Not only does the Interrogatory embed subparts by asking for information about each of the 21 Named Plaintiffs, the Interrogatory contains multiple subparts describing the type of information demanded about each Named Plaintiff.  Facebook will therefore treat Plaintiffs' inquiry into "each" Named Plaintiff as an individual Interrogatory.  *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

(B)      Facebook objects to this Interrogatory on the ground that the phrase "'Access Your Information' or 'Download Your Information' tools" is vague, ambiguous, and undefined. Without definition, these terms may have various meanings.  For example, the selections and options available to users under certain tools has varied over time and across devices.

(C)      Facebook further objects to the Interrogatory on the ground that it seeks the identification of information that are public, already in the possession, custody, or control of Plaintiffs, or obtainable from some other source that is more convenient, less burdensome, or less expensive, to wit, the identification of categories of data already produced to Plaintiffs.

(D)      Facebook objects to this Interrogatory on the ground that the request is confusing, vague, and ambiguous.  As drafted, Facebook is not able to meaningfully discern the information requested.

501

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4302

(E)     Facebook further objects to this Interrogatory on the ground that it seeks

Facebook's protected trade secrets and other sensitive, proprietary information that would pose

security and business risks to Facebook and risks to Facebook users' privacy if disclosed. Thus,

the burdens of production would outweigh the utility of the production of this information, which

are not relevant to Plaintiffs' claims.

(F)     Facebook further objects to the Interrogatory on the ground that it seeks

information that are public, already in the possession, custody, or control of Plaintiffs, or

obtainable from some other source that is more convenient, less burdensome, or less expensive,

to wit, Facebooks data policies, which have already been produced to Plaintiffs.

(G)     Facebook objects to this Interrogatory as overly broad, unduly burdensome,

and/or disproportionate to the needs of the case. Specifically, this Interrogatory seeks

information related all internal business analytics or analyses that include user information,

which are analyses that are conducted by thousands of Facebook data scientists and engineers

over an enormous amount of data. Even a large team of engineers working full time for several

years likely could not identify all of the information Plaintiffs seek. Facebook therefore objects

to this Interrogatory on the basis that it seeks an overly broad and unduly burdensome volume of

data, which presents not only practical limitations as to its analysis, delivery, and use, but is

largely irrelevant. Thus, the burdens of compiling such information outweigh the utility of the

information.

(H)     Facebook objects to the Interrogatory on the ground that it is overly broad and

unduly burdensome, as Plaintiffs have repeatedly indicated that they intend to voluntarily

dismiss 11 of the 21 Named Plaintiffs in order to, among other things, reduce the burden on

Facebook in producing discovery related to the Named Plaintiffs. But Plaintiffs have not yet

stipulated to the dismissal of any Named Plaintiffs, so it is not clear which Named Plaintiffs Plaintiffs are seeking discovery on.

(I)     Facebook objects to this Interrogatory to the extent it seeks details regarding "whether each category of Content and Information is available to Facebook Users through the 'Access Your Information' or 'Download Your Information' tools," as the scope and nature of the data made available to users through these tools have no relevance to Plaintiffs' claims.

(J)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case. Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to user data unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

(K)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded the maximum number of permissible Interrogatories under Discovery Order No. 6, under which each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1); Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it

would enforce a 75 Interrogatory limit. Sept. 4 Hr'g Tr. at 14:17-22. Facebook has nevertheless made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

**Response No. 91**:

Facebook responds that pursuant to Federal Rule of Civil Procedure 33(d), the answer to this Interrogatory may be determined by examining Facebook's document productions, particularly Facebook's production of the documents available to Plaintiffs via the Download Your Information Tool, including FB-CA-MDL-00378871–FB-CA-MDL-00405229, FB-CA-MDL-00405251–FB-CA-MDL-00555261, FB-CA-MDL-00555354–FB-CA-MDL-00841017, FB-CA-MDL-00843750–FB-CA-MDL-01115859, FB-CA-MDL-01199605–FB-CA-MDL-01432962, and the burden of deriving or ascertaining the answer to this Interrogatory will be substantially the same for Plaintiff as it would be for Facebook.

Facebook continues to investigate what other data related to the Named Plaintiffs is relevant and responsive in this action.

**INTERROGATORY NO. 33:**

For all documents produced in this action relating to the Named Plaintiffs' Content and Information, describe any associated data that reflects whether the Content and Information was publicly or privately shared.

**RESPONSE TO INTERROGATORY NO. 33:**

Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory as embedding multiple discrete sub-parts that count against the number of interrogatories permitted under Fed. R. Civ. P. 33 by asking for

separate information about "each" of the 21 Named Plaintiffs.  *See, e.g., New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, No. 07-00935-JF (HRL), 2009 WL 102816, at *6 (N.D. Cal. Jan. 14, 2009).  Facebook will treat Plaintiffs' inquiry into each Named Plaintiff as a separate Interrogatory.  During the parties' meet and confers and via email on September 11, 2020, Plaintiffs have argued that Facebook's objection is improper and inconsistent with *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998), under which interrogatories that ask "the responding party to state facts, identify witnesses, or identify documents" regarding subject matters that are "discrete or separate" from each other "should be viewed as containing a subpart" for each separate subject matter.  Here, Plaintiffs' Interrogatory does not ask Facebook to provide "information related to the same subjects such that they should be counted as one interrogatory," *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 2020 WL 4673947, at *5 (N.D. Cal. Aug. 12, 2020) (internal quotation marks and citations omitted), but instead seeks information about separate and distinct subjects, to wit, each individual Named Plaintiff, each of whom used Facebook differently.  Facebook will therefore treat Plaintiffs' inquiry into "each" Named Plaintiff as an individual Interrogatory.  *Collaboration Properties, Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004) (holding interrogatories asking for information about each of "26 different products" each had "26 discrete subparts" because "'a party cannot avoid the numerical limits [on interrogatories] by asking questions about *distinct subjects*, but numbering the questions as subparts.'" (quoting 7–33 Moore's Fed. Prac., Civ. § 33.30[2])).

(B)     Facebook further objects to the Interrogatory on the ground that it seeks the identification of information that are public, already in the possession, custody, or control of Plaintiffs, or obtainable from some other source that is more convenient, less burdensome, or less

expensive, to wit, each the audience limitations each Named Plaintiff has presently applied to items they have shared on the Facebook Platform.

(C)     Facebook objects to this Interrogatory on the ground that the request is confusing, vague, and ambiguous.  Among other things, the term "associated data" is vague and undefined. As drafted, Facebook is not able to meaningfully discern the information requested.

(D)     Facebook objects to this Interrogatory on the ground that it is overly broad and unduly burdensome.  Facebook has produced nearly 900,000 pages of data reflecting the individual actions each Named Plaintiff has taken on the Facebook Platform.  Reconstructing the individual audience settings for each action or object posted would be unduly burdensome and Plaintiffs have not demonstrated a compelling need for this information, which is equally available to them and within their knowledge.

(E)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case.  Specifically, Facebook objects to this Interrogatory to the extent it seeks information relating to user data unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission and use of "sensitive user data."  *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2 (describing the relevant scope of user information as being that "Facebook shared with or made accessible to third parties").

4307

(F)     Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded

the maximum number of permissible Interrogatories under Discovery Order No. 6, under which

each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1);

Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the

most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it

would enforce a 75 Interrogatory limit.  Sept. 4 Hr'g Tr. at 14:17-22.  Facebook has nevertheless

made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

Subject to and without waiving the foregoing objections, and subject to the ongoing

nature of discovery in this action, Facebook responds as follows:

**Response No. 92**:

Facebook responds that pursuant to Federal Rule of Civil Procedure 33(d), the answer to

this Interrogatory may be determined by examining Facebook's document productions,

particularly Facebook's production of the Named Plaintiffs' current privacy settings[16], historical

privacy settings, and data relating to intervening changes thereto, including FB-CA-MDL-

00843007–FB-CA-MDL-00843247, FB-CA-MDL-01434763–FB-CA-MDL-0143488, and the

burden of deriving or ascertaining the answer to this Interrogatory will be substantially the same

for Plaintiff as it would be for Facebook.

Plaintiffs have also requested that Facebook produce data relating to the individual

privacy settings as to each object (*e.g.*, photo, comment, or message) on each of the Named

Plaintiffs' profiles.  Facebook continues to investigate what information it can produce in

response to this request but presently understands it is not possible to create the data set

---

[16] Facebook's productions of the Named Plaintiffs' privacy settings are "current" as of the day they were pulled for production.  If the Named Plaintiffs subsequently changed their privacy settings, this information will be out of date.

requested in an automated manner and would instead require manual review of Plaintiffs' entire profiles, which constituted nearly 900,000 pages of data when produced in this action. All of the data Facebook would need to review to provide the requested information is in Plaintiffs' possession, custody, and control, both in the form of the Named Plaintiffs' Facebook profiles and any preservation copies thereof that Plaintiffs have made by, *inter alia*, using the Download Your Information tool. If Plaintiffs identify a discrete and narrow set of objects for which they would like the individual settings produced, Facebook will investigate whether a narrower production is possible.

However, Plaintiffs have equal access to this information via their Facebook accounts. Accordingly, Facebook directs Plaintiffs to their own Facebook accounts for further information about whether their content and information was publicly or privately shared.

## INTERROGATORY NO. 34:

Identify by name, time period and type of data accessed all Third Parties Facebook has removed or banned from the Platform for violating Facebook Users' privacy or for failure to comply with Facebook's privacy policies.

## RESPONSE TO INTERROGATORY NO. 34 - CONFIDENTIAL:

Facebook objects to this Interrogatory on the following grounds:

(A)     Facebook objects to this Interrogatory on the ground that the phrase "violating Facebook users' privacy" is vague, ambiguous, and undefined. Whether certain actions "violate" a Facebook user's understanding of privacy is subjective and will vary based on the individual user.

(B)     Facebook objects to this Interrogatory as overly broad, unduly burdensome, and/or disproportionate to the needs of the case. Specifically, Facebook objects to this

Interrogatory on the basis that it seeks an overly broad and unduly burdensome volume of data, which presents not only practical limitations as to its analysis, delivery, and use, but is largely irrelevant. The burdens of compiling such information outweigh the utility of the information.

(C)     Facebook objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege, doctrine, or protection. Facebook interprets this Interrogatory as though it excludes information protected by these privileges and protections.

(D)     Facebook objects to this Interrogatory on the basis that it seeks a compilation of information that is not reasonably available at this stage in the case and that would be unduly burdensome for Facebook to provide, particularly in view of the disproportionate cost necessary to investigate as weighed against Plaintiffs' need for the information. Responding fully to Plaintiffs' Interrogatory would require Facebook first to analyze a large number of documents that have not yet been identified and produced to any identify any apps over a 13-year time period that violated or were suspected of having violated any one of Facebook's policies.

(E)     Facebook objects to this Interrogatory as overly broad, irrelevant to the subject matter of this Action, and not proportional to the needs of the case. Specifically, Facebook objects to this Interrogatory to the extent it seeks the identities of Third Parties "removed or banned" from the Platform for reasons unrelated to application developers being granted access to "sensitive user information" via friend-sharing between 2009 and 2015, the disclosure of information to so-called "whitelisted" applications, the sharing of "sensitive user information" with integration partners pursuant to "data reciprocity agreements," and/or the misuse of "sensitive user information" disclosed in one of these three manners as a result of Facebook's alleged failure to adopt effective policies or enforcement procedures governing the transmission

and use of "sensitive user data." *See* MTD Order, ECF No. 298, at 6-10; *see also* Discovery

Order No. 9, ECF No. 557, at 2; Pls.' Sur-Reply to Def.'s Mot. to Stay, ECF No. 548, at 2

(describing the relevant scope of user information as being that "Facebook shared with or made

accessible to third parties").

     (F)    Facebook objects to this Interrogatory on the basis that Plaintiffs have exceeded

the maximum number of permissible Interrogatories under Discovery Order No. 6, under which

each party may serve up to 75 Interrogatories, ECF No. 508; *see also* R. Civ. P. 33(a)(1);

Advisory Committee Note to 1993 Amendment to Rule 33(a)(1), and an interrogatory is not the

most "effective way to get [the] information" Plaintiffs seek, in which case the Court indicated it

would enforce a 75 Interrogatory limit. Sept. 4 Hr'g Tr. at 14:17-22. Facebook has nevertheless

made a good faith effort to respond to Plaintiffs' Interrogatory, to the extent possible.

     Subject to and without waiving the foregoing objections, and subject to the ongoing

nature of discovery in this action, Facebook responds as follows:

**Response No. 93**:

     Facebook responds that pursuant to Federal Rule of Civil Procedure 33(d), Facebook

directs Plaintiffs to Facebook's document productions, including FB-CA-MDL-00345547, which

is a table that Facebook understands to be the most comprehensive record of app enforcement

actions maintained by Facebook in the ordinary course of business, and the burden of deriving or

ascertaining the answer to this Interrogatory will be substantially the same for Plaintiff as it

would be for Facebook.

     For ease of review, FB-CA-MDL-00345547 includes the following information:

4311

CONFIDENTIAL
FACEBOOK'S RESPONSE TO INTERROGATORY NO. 34

 In addition, Facebook confronted a wide variety of potential policy violations and took a significant number of enforcement actions. Data misuse was only one of the many issues that Facebook confronted—and one that presented itself very infrequently compared to other types of violations. But when data misuse violations did occur, Facebook treated them as a high priority.

Moreover, this table does not capture all enforcement actions taken by the company. For example, it does not capture all manual warnings delivered to app developers, nor does it capture custom enforcement actions such as Facebook's deletion of Aleksandr Kogan's app in December 2015 and Facebook's subsequent pursuit of certifications of deletion from Kogan and related parties.

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4312

DATE:  February 11, 2021

Respectfully submitted,

**GIBSON, DUNN & CRUTCHER, LLP**

By: */s/ Deborah Stein*
Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

512

FACEBOOK, INC.'S SECOND AMENDED RESPONSES & OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES
CASE NO. 3:18-MD-02843-VC

4313

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
   osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
   klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
   mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
   dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
   jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.,*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DEFENDANT FACEBOOK, INC.'S SECOND AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES** |

## VERIFICATION

I, Steven Elia, declare:

   I am an Engineering Manager at Defendant Facebook, Inc. and am authorized to make

this verification on its behalf. I am familiar with the contents of DEFENDANT FACEBOOK,

INC.'S SECOND AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFFS' FOURTH

SET OF INTERROGATORIES, specifically Facebook's Responses & Objections to

Interrogatory Nos. 8, 9, 10, 11, 15, 26, and 27.  I further declare that the matters set forth in

Facebook's Responses & Objections to Interrogatory Nos. 8, 9, 10, 11, 15, 26, and 27 as

reflected in DEFENDANT FACEBOOK, INC.'S SECOND AMENDED RESPONSES AND

OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES are true and

correct to the best of my knowledge, information, and belief, based on my review of documents,

records, and information possessed by or known to Facebook, Inc. and its officers or employees,

and on that basis I allege them to be true.

I declare under penalty of perjury under the laws of the United States and the State of

California that the foregoing is true and correct, and that I executed this Verification on

February 11, 2021 at San Jose, California.

Steven Elia

2

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Kristin A. Linsley (SBN 154148)
  klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
  mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
  dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Facebook, Inc.,*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DEFENDANT FACEBOOK, INC.'S SECOND AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES** |

## VERIFICATION

I, Konstantinos Papamiltiadis, declare:

    I am the Vice President, Developer Platforms & Programs at Defendant Facebook, Inc.

and am authorized to make this verification on its behalf.  I am familiar with the contents of

DEFENDANT FACEBOOK, INC.'S SECOND AMENDED RESPONSES AND OBJECTIONS

TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES, specifically Facebook's

Responses & Objections to Interrogatory Nos. 14, 18, 19, 20, 22, 23, 28, 30, 31, 32, 33, and 34.

I further declare that the matters set forth in Facebook's Responses & Objections to Interrogatory Nos. 14, 18, 19, 20, 22, 23, 28, 30, 31, 32, 33, and 34 as reflected in DEFENDANT FACEBOOK, INC.'S SECOND AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFFS' FOURTH SET OF INTERROGATORIES are true and correct to the best of my knowledge, information, and belief, based on my review of documents, records, and information possessed by or known to Facebook, Inc. and its officers or employees, and on that basis I allege them to be true.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that I executed this Verification on February 11, 2021 at Palo Alto, California.

Konstantinos Papamiltiadis

# Exhibit 10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Magistrate Judge

IN RE FACEBOOK, INC. CONSUMER )
PRIVACY USER PROFILE )
LITIGATION. ) **NO. 18-MD-02843 VC (JSC)**
_____ )

San Francisco, California
Friday, August 14, 2020

**TRANSCRIPT OF REMOTE VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:

                    KELLER ROHRBACK LLP
                    1201 Third Avenue, Suite 3200
                    Seattle, Washington  98101
          BY:  **DEREK W. LOESER, ATTORNEY AT LAW**
               **DAVID J. KO, ATTORNEY AT LAW**


                    BLEICHMAR, FONTI & AULD LLP
                    555 - 12th Street, Suite 1600
                    Oakland, California  94607
          BY:  **LESLEY E. WEAVER, ATTORNEY AT LAW**
               **ANNE K. DAVIS, ATTORNEY AT LAW**
               **ANGELICA M. ORNELAS, ATTORNEY AT LAW**
               **MATTHEW P. MONTGOMERY, ATTORNEY AT LAW**

For Defendants:

                    GIBSON, DUNN & CRUTCHER LLP
                    200 Park Avenue
                    New York, New York  10166-0193
          BY:  **ORIN SNYDER, ATTORNEY AT LAW**


          **(APPEARANCES VIA ZOOM CONTINUED ON FOLLOWING PAGE)**


Reported Remotely By:  Ana M. Dub, RDR, CRR, CCRR, CRG, CCG
                       Official Reporter, CSR No. 7445

<u>**APPEARANCES VIA ZOOM:**</u>  (CONTINUED)

For Defendants:

GIBSON, DUNN & CRUTCHER LLP
Trammell Crow Center
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
BY:  **RUSSELL H. FALCONER, ATTORNEY AT LAW**

GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue
Los Angeles, California 90071
BY:  **DEBORAH L. STEIN, ATTORNEY AT LAW**

GIBSON,  DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, California 94304
BY:  **MARTIE KUTSCHER CLARK, ATTORNEY AT LAW**

Friday - August 14, 2020                                8:27 a.m.

P R O C E E D I N G S

---o0o---

THE CLERK:  We're a minute early, but court is now in session.  Let's see.  Calling Civil Action 18-MD-2843, In Re Facebook, Inc. Consumer Privacy User Profile Litigation.

Counsel, starting with plaintiff, can you please state your appearance.

MS. WEAVER:  Sure.  This is Lesley Weaver of Blakemar Fonti & Auld.  With me is Anne Davis and Angelica Ornelas.

And I see that Matt Montgomery actually is not -- he should be with us.  So he should probably be elevated.  I apologize.  I missed him before.  Don't tell him.

MR. LOESER:  Good morning.  You have Derek Loeser from Keller Rohrback.

THE COURT:  Good morning.

MR. KO:  Good morning, Your Honor.  Nice to see you again.  David Ko, Keller Rohrback, also on behalf of plaintiffs.

THE COURT:  Good morning.

And here comes Mr. Montgomery.  He's here.

All right.  And for Facebook?

MR. SNYDER:  Good morning, Judge.  It's Orin Snyder from Gibson Dunn with my colleagues, Deb Stein, Martie Kutscher Clark, and Russ Falconer.

**THE COURT:**  Good morning.

Okay.  Thank you for your statement.

Let's see.  It sounds like there are not too many things to discuss.  Let's just start.

The search terms you're working on, I will just make this observation.  I do think it would be unreasonable to insist that all terms apply to all custodians.  That just can't be right.  People have different positions.  So I give you that guidance in working on that.

Now, with respect to the data about plaintiffs, let's go through.  And why don't plaintiffs tell us what is the data that you're missing that you think is relevant.  So one thing you've identified is the data about what data about the plaintiffs was shared with advertisers.  Is that correct?

**MS. WEAVER:**  That is correct in general terms, Your Honor.  Basically, what has been produced to us is user-facing data through an Access Your Account tool, for the most part.

Now, I want you to know that we have reviewed all of the plaintiffs' data with more than one pass-through.  We've done targeted searches.  We've had 18 people, and more at times, going through the documents.  So we're pretty familiar with what's there.

There are two problems that we have.  The first is that Your Honor ordered us last -- two weeks ago to discuss

precisely what has been produced and precisely what is the data that is being withheld.

And we -- in the course of our meet-and-confer sessions, Facebook did not identify the examples that they put in their statement. We didn't discuss those. So once again, we are getting information the first time in the statement.

And it would have been better if we had discussed it, because when we look at those documents -- we've looked at them before -- they are not what we're seeking. And the reason that they're not -- and if you look, there's an example of one of them they gave us. The content is missing. So there's an event that says one of the users went to a website, but the content of what they did on the site is stripped away.

And our experts say, you know, what did you put in your shopping cart? What did you access? How long were you on it?

And that data is also married to GPS data --

THE COURT: Okay. I have the statement --

MS. WEAVER: Yeah.

THE COURT: -- in front of me.

MS. WEAVER: Yes.

THE COURT: Can you put me to the page and the Bates number?

MS. WEAVER: The Bates number of the document -- hang on.

THE COURT: Well, first, the page of the statement so

1   I know where to go.

2           MS. WEAVER:  That is going to be harder for me.

3   I think it's page 6.  The Bates number -- and I'm going to

4   ask -- Anne, if you can help me, it's 01037245.

5           THE COURT:  Don't see that.  It's redacted

6   information?

7           MS. WEAVER:  Some of the information was redacted,

8   yes.  But this information we can discuss in the hearing, if

9   that is --

10          THE COURT:  No, no.  I understand.  We can -- I'm not

11  worried --

12          MS. WEAVER:  Yeah.

13          THE COURT:  -- about that.

14      I'm just trying to find it.  I don't see it.

15          MS. WEAVER:  Yeah.  Hang on just a moment.

16          THE COURT:  Maybe the sentence at the first page of

17  the --

18          MS. WEAVER:  Yeah, I'm actually looking -- I

19  apologize.  I'm looking for the actual statement.  I have too

20  many things open on my laptop.

21      But for all of the documents that they've identified,

22  Your Honor, these are PDFs that reflect some activity.

23          THE COURT:  I just want to start with -- I want to

24  start with --

25          MS. WEAVER:  Fine.  Okay.  So if you go to page 5 of

1    the statement and if we look at, for example, where it says

2    "Ms. Tutt reviewed content on Amtrak.com," it doesn't tell us

3    what the content is or it doesn't tell us --

4         **THE COURT:** Okay. Or the --

5         **MS. WEAVER:** -- what they did.

6         **THE COURT:** -- other one, that Ms. Tutt viewed content

7    on a news site and --

8         **MS. WEAVER:** Right. And it doesn't --

9         **THE COURT:** -- tell you what the content is.

10        **MS. WEAVER:** -- tell us what they do.

11        **THE COURT:** Let me ask Facebook.

12    Do you have that content?

13        **MR. SNYDER:** Mr. Falconer, I think, will address this.

14        **MR. FALCONER:** Good morning, Your Honor. Russ

15    Falconer for Facebook.

16    Our understanding is there is some machine-readable data

17    in some cases that might reflect the off-Facebook activity that

18    Ms. Weaver is describing in a kind of raw, disaggregated way.

19    That information is not associated with the plaintiff's account

20    in the way that the user-created, user-shared content and

21    information is associated with a user account.

22    And so I hear -- I don't know -- confusion and frustration

23    from Ms. Weaver that they feel like they don't understand what

24    we've produced.

25    The Court ordered us to, you know, be as clear as we can

1    on named plaintiffs' data, what has been produced and what has

2    been withheld.  And what we've tried to do is say that we've

3    produced all content information that the plaintiffs share on

4    Facebook and then some of the other categories of information

5    that we identified in our statement; so device information,

6    geolocation information, certain other information that is

7    associated with their account.  And we have been -- I think

8    we've tried to be clear; and if we failed in this, we

9    apologize.

10        There is other -- there's Facebook-generated information,

11   information generated by third parties, information received

12   from third parties.  We have not represented that that is

13   comprehensively included in our production.

14        What we have produced are Facebook analytics, third-party

15   data, off-Facebook activity, anything like that that is

16   associated with a user's account.

17        And so that's -- I think the point of departure between

18   the parties right now is maybe the level of generality with

19   which we have described what we have not produced.  But

20   that's -- we've tried to be as clear about the, sort of, large

21   buckets that are not included in the named plaintiff data we've

22   produced to date.

23            THE COURT:  So, for example, when you say Ms. Weaver

24   said, as you said, that the plaintiff viewed content on

25   Amtrak.com, are you saying you don't have any way of

1  identifying what that content is that she viewed at that

2  particular time, even though you were able to say she viewed

3  that website at that time?

4       MR. FALCONER:  I think for an individual plaintiff on

5  an individual website, if it was just that question -- could we

6  tell for one of the named plaintiffs what specific content she

7  viewed on the Amtrak website? -- if it was, you know, ten years

8  ago or seven years ago, probably not.  If it was a year ago,

9  maybe.  That data may or may not have been associated with --

10      THE COURT:  Well, if it was this year --

11      MR. FALCONER:  Yeah.

12      THE COURT:  -- with that particular --

13      MR. FALCONER:  Sure.

14      THE COURT:  -- data this year.

15      MR. FALCONER:  The answer is it's possible.  There may

16  be some website-specific data about that named plaintiff; there

17  may not be.  There's some --

18      THE COURT:  Okay.  And so you haven't searched for it,

19  or you're withholding it, or -- I guess, why hasn't it been

20  produced?

21      MR. FALCONER:  So as we understood the Court's

22  mandate or, sort of, the Court's --

23      THE COURT:  No, no, no.  I'm just asking.

24      MR. FALCONER:  Oh.

25      THE COURT:  I'm just asking.

 1          **MR. FALCONER:**  Because the reason for that is that

 2     just to find it for one named plaintiff would be like a

 3     multiweek endeavor, if not longer.  And the reason for that is

 4     that -- let's take the Amtrak example.

 5          With this off-Facebook activity data, the tables and the

 6     database where the data is stored, you know, they've been

 7     explained to us like each one of them is a book.  And the book

 8     is organized by topic.  The topic that the book is organized by

 9     is the advertiser.  It's Amtrak; it's not the named plaintiff.

10          So for every Facebook advertiser there's a book.  Right?

11     There's a table that has some data for advertisement, website

12     activity, that kind of thing.

13          So to gather the information for one named plaintiff on

14     Amtrak, that, we could probably do.  To gather the data for one

15     named plaintiff on every advertiser on every off-Facebook

16     activity that has ever happened, just for one named plaintiff,

17     we have to go into each of those books individually and look

18     for that one named plaintiff, and then we'd have to do it for

19     each of the other 23 named plaintiffs.

20          So that's the reason why we have not undergone that to

21     date.

22          **THE COURT:**  I understand that.  So have you identified

23     every instance that you have that the plaintiff viewed content

24     on some website, whatever it is?

25          **MR. FALCONER:**  Every instance where Facebook has been

able to associate that off-Facebook activity with a named
plaintiff's account.  Sometimes they can't make the connection.
But where it's connected, we've identified it.  That's included
in the production.

     **THE COURT:**  I assume that for this privacy case --
right? -- some content is obviously more private than other
content and the plaintiffs may not necessarily need or want.
They need exemplars.  Right?  And there is a standing argument
that you guys are maintaining that they have to defeat and
damages and all that.  There are particular instances.  Right?
So there may be particular instances where you then have to go
do that.

    In other words, if it's the data that was shared, which is
sort of at the heart of the case, you're probably going to have
to do some work on that.  Whether it's every instance, probably
not; but certainly certain instances.

    Now, plaintiffs, it sounds like, have a template of where
to start.  It may not be Amtrak, but it may be the next one
there.  Right?

     **MR. FALCONER:**  Your Honor, could I be heard on that?

     **MS. WEAVER:**  Well, may I --

     **MR. FALCONER:**  Or, go ahead.

     **MS. WEAVER:**  I would like to respond.

    So what we're talking about right now and what they've
produced is, there's a tool so users can download data.  And

1  even in what they're downloading, there is content missing.

2      But there's another whole bucket of data that they haven't

3  identified to us that is responsive, and that's the first step.

4  We need the identification of the fields of the data that they

5  collect through their third-party relationships, whether it's

6  apps or websites, et cetera.  And it is this database that

7  Facebook searches using algorithms to target the users.

8      What they've given us is sort of the window dressing of

9  the platform activity, and I've identified for you that

10  something is missing even from that.

11      But there is -- and, Your Honor, we've talked to our

12  experts; and maybe it's better to have experts talk or put in a

13  declaration because I can tell you, their position will be that

14  this is, quote/unquote, not associated with the users but that

15  doesn't make sense.

16      There is an event ID, because the reason Facebook is

17  collecting it in the first place is to target people with the

18  data.  So there is a way to go back and find -- and I agree

19  with Mr. Falconer that this data set will be immense.  And that

20  is the scope of the case.  And that's why we said only for the

21  24 because --

22          **THE COURT:**  I'm just going to --

23          **MS. WEAVER:**  Yeah.

24          **THE COURT:**  -- tell you guys, I think maybe you need

25  to think about a special master.

1    There's just no --

2        MS. WEAVER:  Yes.

3        THE COURT:  I don't have the time or the patience or

4    the expertise to wade through any of this, like the nuance that

5    you're getting into.  So I don't know what to do.

6        MS. STEIN:  Your Honor, may I be heard for a moment?

7    So I think the good news on, sort of, your reaction to

8    this is that this exercise was really about, sort of,

9    identifying categories so that we could have a conversation

10   about what's required in this case, because there is a whole

11   lot of information being sought here that has absolutely

12   nothing to do with the issues that are being litigated in this

13   case.

14       THE COURT:  No.  I understand that argument.  I don't

15   even know how to figure out what it is that we're even talking

16   about.

17       MS. STEIN:  Right.

18       MS. WEAVER:  So Facebook --

19       MS. STEIN:  So, Your Honor, what's being --

20       MS. WEAVER:  Could I --

21       MS. STEIN:  -- talked about right now is what's called

22   off-Facebook activity.  And that off-Facebook activity has no

23   relationship to the issues that the dismissal order said are

24   viable right now and that are not stayed.  The order of

25   dismissal --

1        **THE COURT:**  No.  I read that.  I read it.  I

2 understand.

3        **MS. STEIN:**  Okay.  Good.

4        **THE COURT:**  So this --

5        **MS. STEIN:**  And so the off-Facebook activity --

6        **THE COURT:**  -- this has been previewed -- just, can I

7 finish?

8        **MS. STEIN:**  I'm sorry, Your Honor.

9        **THE COURT:**  Because I'm really losing patience with

10 this case.

11    This has been previewed for a while.  So what I was hoping

12 to do is you guys could just tee up what that data is so I can

13 rule if it's discoverable or not.

14    I don't even know how to get to that point.

15        **MR. SNYDER:**  Your Honor, I think there's a very

16 easy --

17        **MS. WEAVER:**  If I could, I was waiting.

18    Your Honor, we would like them to identify what they're

19 withholding.  That's it.

20        **THE COURT:**  But that's a chicken-and-egg problem.

21 That's a chicken-and-egg problem.  And I'm not sure -- and see,

22 this is the problem I'm having.  You said you've now reviewed

23 it all.  What is missing?  You've identified --

24        **MS. WEAVER:**  So I'll give you examples.  There are no

25 examples --

THE COURT:  You did.

MS. WEAVER:  Okay.

THE COURT:  No.  I'm going to let Mr. Snyder talk.

MS. WEAVER:  Fine.

MR. SNYDER:  Your Honor, I share your frustration, and I think this is very easy.

For example, on advertisement, we have gone, I think as indicated in our statement, above and beyond the call of duty because we didn't really want to just say, "We're not giving you what advertisements you reviewed or ads that you've clicked on, even though it's outside the scope of the case."

This case --

THE COURT:  No, no.  That's an argument.  Please, let's try not to argue.

MR. SNYDER:  Right.

THE COURT:  I'm going to decide that at some point.

MR. SNYDER:  Okay.  So what I would --

THE COURT:  Just --

(Simultaneous cross-talk.)

THE COURT:  -- that.

MR. SNYDER:  What I would respectfully suggest is, we can, Your Honor, tee it up for you in a very simple way, because Judge Chhabria's order is very clear about what's in and what's out.  And then each side can succinctly, efficiently, and clearly make their arguments about what is in

and what's out.  And it's not going to be difficult,

Your Honor.  I think it's pretty clear.

    I agree, on this call, people using terminology --

"on-platform," "off-platform" -- it all sounds like

gobbledegook.  I think there's a very clear, efficient, and

efficacious way for us to tee this up in a short statement to

Your Honor; and Your Honor can rule on it, if Your Honor wants

more argument on it, without us having these dueling

Zoom/Hollywood Squares, you know, arguments about what's in and

what's out that's not going to really lead to any fair ruling.

    **THE COURT:**  This is what I need to ask Ms. Weaver, is:

Do you know what it is that you want or that you believe exists

that you don't have?

    **MS. WEAVER:**  Yes.

    **THE COURT:**  You do.  Okay.

    **MS. WEAVER:**  More or less.  We don't know what form

they keep it in or how they keep it.  It is this data set that

they mine, yes.

    **THE COURT:**  Okay.  So is there any reason why, then,

we can't adjudicate that dispute as discoverability?

    **MS. WEAVER:**  We can --

    **MR. SNYDER:**  I think we can --

    **MS. WEAVER:**  -- adjudicate that, Your Honor.

    **THE COURT:**  We can?  Okay.

    **MR. SNYDER:**  We can and we should.

```
 1              THE COURT:  All right.

 2              MR. SNYDER:  And I think we can do it very simply

 3   without a lot of drama or complication.

 4              THE COURT:  So that's what --

 5              MR. FALCONER:  Your Honor --

 6              THE COURT:  -- I want you to do, then, on this,

 7   I think.

 8        And, I mean, it doesn't have to be the joint letter brief,

 9   whatever.  I mean, it's a big issue.  It kind of goes to the

10   heart of the case.  So I want you to have the ability.  You're

11   going to probably need your experts to some extent -- at least

12   plaintiffs -- to be involved with it.

13        And I probably want four briefs.  Right?  Whoever goes

14   first, second, first, second, so that there's -- my guess is

15   it's not till we get to the second two briefs that we'll really

16   be able to meet there.  That just seems to be the process that

17   we need to do.

18        So you guys work it out, how that's going to be presented.

19   I'm not giving you any limits at all.  You only have the limit

20   of my time and attention span.  So just keep that in mind.

21                         (Laughter.)

22              MS. WEAVER:  And how much time, Your Honor, would you

23   like between briefs and the hearing?  What kind of timing --

24              THE COURT:  We'll put a hearing.  I'll figure it out.

25              MS. WEAVER:  Okay.
```

1    THE COURT:  I mean, to be honest, I'm just swamped at

2  the moment.

3    MS. WEAVER:  I know.

4    THE COURT:  So, but you get it to us.  We'll get

5  through it.  And we will set it for hearing.  I think it's

6  important to have an oral --

7    MR. LOESER:  And, Your Honor, if I could be heard for

8  one quick minute on one --

9    THE COURT:  Yes.

10    MR. LOESER:  This is Derek Loeser.

11    -- just, process point.

12    Where we stand right now, we generally think we know

13  what's missing, and we can describe it in our briefs.

14    Facebook obviously has specific knowledge about what's

15  missing.  And so because they haven't identified specifically

16  what they're withholding, I really think it would be improper

17  for them to argue in their brief that we haven't been specific

18  enough with what we're seeking.  If that is going to be their

19  argument in their brief, then they should comply with your last

20  order, which was to identify specifically what they're

21  withholding.

22    But that's the only --

23    THE COURT:  Yeah.  No, I understood.  So that's why

24  I'm doing four briefs.

25    And in the meantime, you should be talking and really

1  trying to narrow.  It is in both sides' interest to have it

2  teed up as accurately as possible for me to decide.  Otherwise,

3  I'm going to make a wrong decision one way or the other because

4  I won't understand.

5      **MR. SNYDER:**  And, Your Honor, it's in everyone's

6  interest to have you not be frustrated with us, which I

7  understand and I think your frustration is well-placed, one.

8      Two, we want Your Honor to continue to preside over

9  discovery; and we would, I think, lose a lot if we had to start

10  fresh with a special master.

11      And mindful of that, we're going to work to narrow the

12  issues.  Maybe we can even eliminate them.  And we have a lot

13  of other work to do in the meantime.  So however long

14  Your Honor needs, we're going to obviously abide and respect

15  that, and we're not going to, you know, ask you to turn around

16  a ruling.

17      There's a lot we have to do on search terms and privilege

18  logs and ADI protocols.  So there's a ton of work for us to do

19  while Your Honor takes -- you know, takes the time necessary to

20  adjudicate this issue, which is ripe now.

21      **THE COURT:**  Yeah.  Just don't put a hearing date.

22  I'll pick it.  So that's not a problem.

23      **MR. LOESER:**  The only thing I would add to that,

24  Your Honor, is that we would like you to be very frustrated

25  with Orin all the time, but not with us.

1                    (Laughter.)

2          **THE COURT:**  Well, this week has not been -- I've been

3    frustrated a lot, and I apologize for that.

4          **MR. SNYDER:**  Don't apologize.

5          **MS. WEAVER:**  It's tough times.

6          **THE COURT:**  There's a lot.  There's just a lot,

7    scheduling.

8          **MR. SNYDER:**  Yes, Your Honor.

9          **THE COURT:**  Okay.  So, which leads me to my next

10   point, which is the joint statement -- okay? -- which is, you

11   all are extremely talented, experienced lawyers.  If you can't

12   figure out a way, a process for this statement to work -- it's

13   really, actually, for you.  Right?  The statement is a great

14   way of assessing where we are, what our disputes are,

15   crystallizing it.  It's for you more than me, quite honestly.

16   And if you guys can't figure out together a way to do that,

17   then we've got to go back to zero and start over.  I mean, this

18   should be the easy part.

19         So I'm not going to tell you how to do that joint

20   statement.  The only thing I'm going to tell you is I want it

21   however -- what is -- just even one day, I give you, right,

22   before this?  I take it upon myself; I will make time to read

23   it the night before or early the morning before.  That's my

24   only deadline.  You guys work it out.  Whatever works best for

25   you and gets it.  But the point is, it should really try to

1  crystallize it.

2      My own view is -- and with other cases -- is that -- at

3  least with discovery disputes, is if you do time for a reply as

4  opposed to changing what you've already said, that tends to

5  work better.  But I'm not ruling at all.  I want you guys to

6  come up with it.  It's, frankly, below my pay grade to have to

7  tell you how to do it.

8                          (Laughter.)

9      MR. LOESER:  We hear that loud and clear, Your Honor,

10 and we will keep talking to Facebook about it.

11     We just think that it would be really useful for everyone

12 here, including for you, if people talk about things that they

13 put in their statements before it's submitted to the Court.

14 And so that's our mission in trying to come up with a better

15 way to do this.  That's what we're trying to accomplish.

16     THE COURT:  Maybe you could do a statement, a draft,

17 and then you talk about what's in the draft.  Right?  So then

18 you know what's in there before you -- I don't know, but that

19 would --

20     MR. LOESER:  Yeah.  We'll figure it out.

21     THE COURT:  Yes.  I know you guys can figure it out

22 because you're all outstanding lawyers.  That's why you're on

23 this case.

24     Okay.  So then we need to pick our next date.  How about

25 we push it out three weeks, to September 3rd?

1       **MR. LOESER:**  I think that's the 749th day of March;

2   so, sounds great.

3                       (Laughter.)

4           **MS. WEAVER:**  That's fine, Your Honor.

5           **MR. SNYDER:**  And two months before Election Day,

6   assuming the post offices --

7           **MS. WEAVER:**  There is one.

8           **MR. SNYDER:**  -- assuming the post offices and the

9   polling places aren't shut down permanently.

10          **THE COURT:**  All right.  Okay.

11          **MR. LOESER:**  Don't depress us, Orin.

12          **THE COURT:**  I apologize for having to lecture a little

13  bit, but to be honest, you guys can do better.  I know you can.

14  I know you can.  I have tremendous respect for all of you.

15      Okay.  Great.  I look forward to our next conference.

16  It'll be September 3rd at 8:30 a.m.

17          **MR. SNYDER:**  Thank you, Judge.

18          **MS. WEAVER:**  Thank you, Your Honor.

19          **MR. SNYDER:**  Thank you for everything you're doing.

20  Appreciate it.

21          **THE CLERK:**  Court's adjourned.

22                  (Proceedings adjourned at 8:51 a.m.)

23                      ---o0o---

24

25

```
 1
 2                    CERTIFICATE OF REPORTER
 3          I certify that the foregoing is a correct transcript
 4    from the record of proceedings in the above-entitled matter.
 5
 6    DATE:  Saturday, August 15, 2020
 7
 8
 9    _____
10    Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
           Official Reporter, U.S. District Court
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

# Exhibit 11

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

# Exhibit 12

# Exhibit 13

| From: | Scott Renfro </O=THEFACEBOOK/OU=EXTERNAL (FYDIBOHF25SPDLT)/CN=RECIPIENTS/CN=EC939C23AC4348C6B7F2B4AE6DE65518> |
|---|---|
| Sent: | Tuesday, March 04, 2014 2:33 PM |
| To: | Maritza Johnson; Rob Sherman; Erin Egan |
| Subject: | FW: 3rd party ads data |

On 3/3/14, 2:26 PM, "Aldo King" <aiking@fb.com> wrote:

+ Ed, Shirine, and Mark for reference

Here are most of the places where 3rd party data connects into or out of the ads system:

███

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

### Custom Audiences
We allow advertisers to upload lists of their customers to have ads shown to them on Facebook.  We create custom audiences today based on email addresses, phone numbers, FB user id's, and Apple iOS IDFAs.  We also allow mobile app developers to create custom audiences based on information that they have provided to Facebook via the FB mobile SDKs (below).

### FB Mobile SDKs
Developers can choose to send information about how their users interact with their apps to Facebook.  Developers can set up "custom app events" within their app using the FB Mobile SDKs.  When a user does a pre-defined action, developers can have the FB SDK send each activity to Facebook.  We log that information to count app installs and aggregate them for app analytics. By default, the SDK is set to report installs only (through the developer can turn this off). ████████████████████████████

### Conversion Tracking
Websites can implement a Facebook pixel that is triggered when users land on specific pages.  The pixel sends information from the user's FR cookie to Facebook and we attribute the conversion with a specific ad.

### Website Custom Audiences
Websites can implement a Facebook pixel (different from conversion tracking) that is triggered when users land on specific pages.  The pixel sends information from the user's FR cookie to Facebook.  Facebook resolves that info back to a specific user and Facebook places that user into a custom audience for that advertiser.  Users can opt-out of this process through a cookie-based opt-out accessible from the Ads privacy settings page on Facebook.

### Partner Categories
Facebook partners with select data partners and allows that to create custom audiences based on their own data.  These custom audiences (called "Partner Categories") are then available for use by any advertiser on Facebook. ████████████████████ ████████████████████ Users can opt-out of these categories through partner-specific opt-outs.

████████████████████

████████████████████████████████████

████████████████████████████

1



On 3/3/14, 6:40 AM, "Scott Renfro" <srenfro@fb.com> wrote:

Can you give me a quick summary of our use of 3rd party data for ads? Feel free to cc relevant folks from ads.

I'm in DC this week for discussions about big data and privacy and ads seems to be the main place we're leveraging non-FB data directly or indirectly.

4369
Highly Confidential - Attorneys' Eyes Only                    FB-CA-MDL-00203263

# Exhibit 14



US 20170195435A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: US 2017/0195435 A1
Sarukkai (43) Pub. Date: Jul. 6, 2017

(54) **CORRELATING MEDIA CONSUMPTION DATA WITH USER PROFILES**

(71) Applicant: **Facebook, Inc.**, Menlo Park, CA (US)

(72) Inventor: **Ramesh Rangarajan Sarukkai**, Los Gatos, CA (US)

(21) Appl. No.: 14/985,089

(22) Filed: **Dec. 30, 2015**

**Publication Classification**

(51) **Int. Cl.**
| | |
|---|---|
| *H04L 29/08* | (2006.01) |
| *H04N 21/45* | (2006.01) |
| *G06T 1/00* | (2006.01) |
| *H04N 21/254* | (2006.01) |
| *H04N 21/4627* | (2006.01) |
| *H04N 21/8358* | (2006.01) |
| *H04N 21/4788* | (2006.01) |
| *H04N 21/258* | (2006.01) |

(52) **U.S. Cl.**
CPC ............. *H04L 67/22* (2013.01); *H04L 67/12* (2013.01); *H04L 67/306* (2013.01); *H04N 21/4788* (2013.01); *H04N 21/4532* (2013.01); *H04N 21/25883* (2013.01); *H04N 21/2541* (2013.01); *H04N 21/4627* (2013.01); *H04N 21/25875* (2013.01); *H04N 21/8358* (2013.01); *G06T 1/0021* (2013.01); *G06T 2201/0064* (2013.01)

(57) **ABSTRACT**

In one embodiment, one or more computer systems of a social-networking system retrieve a user profile for a user associated with a media device. The one or more computer systems of a social-networking system receive media consumption. The one or more computer systems of a social-networking system correlates the user profile and the media consumption data to determine device-based media consumption data associated with content being consumed on the media device. The one or more computer systems of a social-networking system store data that associates the user profile with the device-based media consumption data.



**100**



**FIG. 1**



**200**

*FIG. 2*



**FIG. 3**

4374



**FIG. 4**

4375



*FIG. 5*

4376



*FIG. 6*

4377



*FIG. 7*

4378



**FIG. 8**

4379



**FIG. 9**

## CORRELATING MEDIA CONSUMPTION DATA WITH USER PROFILES

### TECHNICAL FIELD

[0001] This disclosure generally relates to analyzing media consumption.

### BACKGROUND

[0002] A social-networking system, which may include a social-networking website, may enable its users (such as persons or organizations) to interact with it and with each other through it. The social-networking system may, with input from a user, create and store in the social-networking system a user profile associated with the user. The user profile may include demographic information, communication-channel information, and information on personal interests of the user. The social-networking system may also, with input from a user, create and store a record of relationships of the user with other users of the social-networking system, as well as provide services (e.g., wall posts, photo-sharing, event organization, messaging, games, or advertisements) to facilitate social interaction between or among users.

[0003] The social-networking system may send over one or more networks content or messages related to its services to a mobile or other computing device of a user. A user may also install software applications on a mobile or other computing device of the user for accessing a user profile of the user and other data within the social-networking system. The social-networking system may generate a personalized set of content objects to display to a user, such as a newsfeed of aggregated stories of other users connected to the user.

[0004] A mobile computing device—such as a smartphone, tablet computer, or laptop computer—may include functionality for determining its location, direction, or orientation, such as a GPS receiver, compass, gyroscope, or accelerometer. Such a device may also include functionality for wireless communication, such as BLUETOOTH communication, near-field communication (NFC), or infrared (IR) communication or communication with a wireless local area networks (WLANs) or cellular-telephone network. Such a device may also include one or more cameras, scanners, touchscreens, microphones, or speakers. Mobile computing devices may also execute software applications, such as games, web browsers, or social-networking applications. With social-networking applications, users may connect, communicate, and share information with other users in their social networks.

### SUMMARY OF PARTICULAR EMBODIMENTS

[0005] Particular embodiments allow a social-networking system to correlate or merge user profile data of a user of the social-networking system with media consumption data. In some embodiments, the social-networking system determines or captures media consumption data through a user device, a media device, or by receiving data from a content provider. In particular embodiments, media consumption data may be captured by or sent to the social-networking system via a user device, a media device, or a content provider. In particular embodiments, a user device may capture media consumption data and allow a social-network to correlate the media consumption data with a user profile.

[0006] The embodiments disclosed above are only examples, and the scope of this disclosure is not limited to them. Particular embodiments may include all, some, or none of the components, elements, features, functions, operations, or steps of the embodiments disclosed above. Embodiments according to the invention are in particular disclosed in the attached claims directed to a method, a storage medium, a system and a computer program product, wherein any feature mentioned in one claim category, e.g. method, can be claimed in another claim category, e.g. system, as well. The dependencies or references back in the attached claims are chosen for formal reasons only. However any subject matter resulting from a deliberate reference back to any previous claims (in particular multiple dependencies) can be claimed as well, so that any combination of claims and the features thereof are disclosed and can be claimed regardless of the dependencies chosen in the attached claims. The subject-matter which can be claimed comprises not only the combinations of features as set out in the attached claims but also any other combination of features in the claims, wherein each feature mentioned in the claims can be combined with any other feature or combination of other features in the claims. Furthermore, any of the embodiments and features described or depicted herein can be claimed in a separate claim and/or in any combination with any embodiment or feature described or depicted herein or with any of the features of the attached claims.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0007] FIG. 1 illustrates an example network environment associated with a social-networking system.

[0008] FIG. 2 illustrates an example social graph.

[0009] FIG. 3 illustrates an example network environment.

[0010] FIG. 4 illustrates an example environment in which a social-networking system may identify a user of a user device.

[0011] FIG. 5 illustrates an example environment in which a social-networking system may determine media consumption data.

[0012] FIG. 6 illustrates an example method for correlating user profile data with media consumption data received from a user device.

[0013] FIG. 7 illustrates an example method for correlating user profile data with media consumption data received from a content provider.

[0014] FIG. 8 illustrates an example method for correlating user profile data with media consumption data received from a media device.

[0015] FIG. 9 illustrates an example computer system.

### DESCRIPTION OF EXAMPLE EMBODIMENTS

[0016] FIG. 1 illustrates an example network environment 100 associated with a social-networking system. Network environment 100 includes a user 101, a client system 130, a social-networking system 160, and a third-party system 170 connected to each other by a network 110. Although FIG. 1 illustrates a particular arrangement of user 101, client system 130, social-networking system 160, third-party system 170, and network 110, this disclosure contemplates any suitable arrangement of user 101, client system 130, social-networking system 160, third-party system 170, and network 110. As an example and not by way of limitation, two or more of

client system **130**, social-networking system **160**, and third-party system **170** may be connected to each other directly, bypassing network **110**. As another example, two or more of client system **130**, social-networking system **160**, and third-party system **170** may be physically or logically co-located with each other in whole or in part. Moreover, although FIG. **1** illustrates a particular number of users **101**, client systems **130**, social-networking systems **160**, third-party systems **170**, and networks **110**, this disclosure contemplates any suitable number of users **101**, client systems **130**, social-networking systems **160**, third-party systems **170**, and networks **110**. As an example and not by way of limitation, network environment **100** may include multiple users **101**, client system **130**, social-networking systems **160**, third-party systems **170**, and networks **110**.

[0017]    In particular embodiments, user **101** may be an individual (human user), an entity (e.g., an enterprise, business, or third-party application), or a group (e.g., of individuals or entities) that interacts or communicates with or over social-networking system **160**. In particular embodiments, social-networking system **160** may be a network-addressable computing system hosting an online social network. Social-networking system **160** may generate, store, receive, and send social-networking data, such as, for example, user-profile data, concept-profile data, social-graph information, or other suitable data related to the online social network. Social-networking system **160** may be accessed by the other components of network environment **100** either directly or via network **110**. In particular embodiments, social-networking system **160** may include an authorization server (or other suitable component(s)) that allows users **101** to opt in to or opt out of having their actions logged by social-networking system **30** or shared with other systems (e.g., third-party systems **170**), for example, by setting appropriate privacy settings. A privacy setting of a user may determine what information associated with the user may be logged, how information associated with the user may be logged, when information associated with the user may be logged, who may log information associated with the user, whom information associated with the user may be shared with, and for what purposes information associated with the user may be logged or shared. Authorization servers may be used to enforce one or more privacy settings of the users of social-networking system **30** through blocking, data hashing, anonymization, or other suitable techniques as appropriate. Third-party system **170** may be accessed by the other components of network environment **100** either directly or via network **110**. In particular embodiments, one or more users **101** may use one or more client systems **130** to access, send data to, and receive data from social-networking system **160** or third-party system **170**. Client system **130** may access social-networking system **160** or third-party system **170** directly, via network **110**, or via a third-party system. As an example and not by way of limitation, client system **130** may access third-party system **170** via social-networking system **160**. Client system **130** may be any suitable computing device, such as, for example, a personal computer, a laptop computer, a cellular telephone, a smartphone, a tablet computer, or an augmented/virtual reality device.

[0018]    This disclosure contemplates any suitable network **110**. As an example and not by way of limitation, one or more portions of network **110** may include an ad hoc network, an intranet, an extranet, a virtual private network

(VPN), a local area network (LAN), a wireless LAN (WLAN), a wide area network (WAN), a wireless WAN (WWAN), a metropolitan area network (MAN), a portion of the Internet, a portion of the Public Switched Telephone Network (PSTN), a cellular telephone network, or a combination of two or more of these. Network **110** may include one or more networks **110**.

[0019]    Links **150** may connect client system **130**, social-networking system **160**, and third-party system **170** to communication network **110** or to each other. This disclosure contemplates any suitable links **150**. In particular embodiments, one or more links **150** include one or more wireline (such as for example Digital Subscriber Line (DSL) or Data Over Cable Service Interface Specification (DOCSIS)), wireless (such as for example Wi-Fi or Worldwide Interoperability for Microwave Access (WiMAX)), or optical (such as for example Synchronous Optical Network (SONET) or Synchronous Digital Hierarchy (SDH)) links. In particular embodiments, one or more links **150** each include an ad hoc network, an intranet, an extranet, a VPN, a LAN, a WLAN, a WAN, a WWAN, a MAN, a portion of the Internet, a portion of the PSTN, a cellular technology-based network, a satellite communications technology-based network, another link **150**, or a combination of two or more such links **150**. Links **150** need not necessarily be the same throughout network environment **100**. One or more first links **150** may differ in one or more respects from one or more second links **150**.

[0020]    FIG. **2** illustrates example social graph **200**. In particular embodiments, social-networking system **160** may store one or more social graphs **200** in one or more data stores. In particular embodiments, social graph **200** may include multiple nodes—which may include multiple user nodes **202** or multiple concept nodes **204**—and multiple edges **206** connecting the nodes. Example social graph **200** illustrated in FIG. **2** is shown, for didactic purposes, in a two-dimensional visual map representation. In particular embodiments, a social-networking system **160**, client system **130**, or third-party system **170** may access social graph **200** and related social-graph information for suitable applications. The nodes and edges of social graph **200** may be stored as data objects, for example, in a data store (such as a social-graph database). Such a data store may include one or more searchable or queryable indexes of nodes or edges of social graph **200**.

[0021]    In particular embodiments, a user node **202** may correspond to a user of social-networking system **160**. As an example and not by way of limitation, a user may be an individual (human user), an entity (e.g., an enterprise, business, or third-party application), or a group (e.g., of individuals or entities) that interacts or communicates with or over social-networking system **160**. In particular embodiments, when a user registers for an account with social-networking system **160**, social-networking system **160** may create a user node **202** corresponding to the user, and store the user node **202** in one or more data stores. Users and user nodes **202** described herein may, where appropriate, refer to registered users and user nodes **202** associated with registered users. In addition or as an alternative, users and user nodes **202** described herein may, where appropriate, refer to users that have not registered with social-networking system **160**. In particular embodiments, a user node **202** may be associated with information provided by a user or information gathered by various systems, including social-network-

ing system **160**. As an example and not by way of limitation, a user may provide his or her name, profile picture, contact information, birth date, sex, marital status, family status, employment, education background, preferences, interests, or other demographic information. In particular embodiments, a user node **202** may be associated with one or more data objects corresponding to information associated with a user. In particular embodiments, a user node **202** may correspond to one or more webpages.

[0022] In particular embodiments, a concept node **204** may correspond to a concept. As an example and not by way of limitation, a concept may correspond to a place (such as, for example, a movie theater, restaurant, landmark, or city); a website (such as, for example, a website associated with social-network system **160** or a third-party website associated with a web-application server); an entity (such as, for example, a person, business, group, sports team, or celebrity); a resource (such as, for example, an audio file, video file, digital photo, text file, structured document, or application) which may be located within social-networking system **160** or on an external server, such as a web-application server; real or intellectual property (such as, for example, a sculpture, painting, movie, game, song, idea, photograph, or written work); a game; an activity; an idea or theory; an object in a augmented/virtual reality environment; another suitable concept; or two or more such concepts. A concept node **204** may be associated with information of a concept provided by a user or information gathered by various systems, including social-networking system **160**. As an example and not by way of limitation, information of a concept may include a name or a title; one or more images (e.g., an image of the cover page of a book); a location (e.g., an address or a geographical location); a website (which may be associated with a URL); contact information (e.g., a phone number or an email address); other suitable concept information; or any suitable combination of such information. In particular embodiments, a concept node **204** may be associated with one or more data objects corresponding to information associated with concept node **204**. In particular embodiments, a concept node **204** may correspond to one or more webpages.

[0023] In particular embodiments, a node in social graph **200** may represent or be represented by a webpage (which may be referred to as a "profile page"). Profile pages may be hosted by or accessible to social-networking system **160**. Profile pages may also be hosted on third-party websites associated with a third-party server **170**. As an example and not by way of limitation, a profile page corresponding to a particular external webpage may be the particular external webpage and the profile page may correspond to a particular concept node **204**. Profile pages may be viewable by all or a selected subset of other users. As an example and not by way of limitation, a user node **202** may have a corresponding user-profile page in which the corresponding user may add content, make declarations, or otherwise express himself or herself. As another example and not by way of limitation, a concept node **204** may have a corresponding concept-profile page in which one or more users may add content, make declarations, or express themselves, particularly in relation to the concept corresponding to concept node **204**.

[0024] In particular embodiments, a concept node **204** may represent a third-party webpage or resource hosted by a third-party system **170**. The third-party webpage or resource may include, among other elements, content, a

selectable or other icon, or other inter-actable object (which may be implemented, for example, in JavaScript, AJAX, or PHP codes) representing an action or activity. As an example and not by way of limitation, a third-party webpage may include a selectable icon such as "like," "check-in," "eat," "recommend," or another suitable action or activity. A user viewing the third-party webpage may perform an action by selecting one of the icons (e.g., "check-in"), causing a client system **130** to send to social-networking system **160** a message indicating the user's action. In response to the message, social-networking system **160** may create an edge (e.g., a check-in-type edge) between a user node **202** corresponding to the user and a concept node **204** corresponding to the third-party webpage or resource and store edge **206** in one or more data stores.

[0025] In particular embodiments, a pair of nodes in social graph **200** may be connected to each other by one or more edges **206**. An edge **206** connecting a pair of nodes may represent a relationship between the pair of nodes. In particular embodiments, an edge **206** may include or represent one or more data objects or attributes corresponding to the relationship between a pair of nodes. As an example and not by way of limitation, a first user may indicate that a second user is a "friend" of the first user. In response to this indication, social-networking system **160** may send a "friend request" to the second user. If the second user confirms the "friend request," social-networking system **160** may create an edge **206** connecting the first user's user node **202** to the second user's user node **202** in social graph **200** and store edge **206** as social-graph information in one or more of data stores **164**. In the example of FIG. **2**, social graph **200** includes an edge **206** indicating a friend relation between user nodes **202** of user "A" and user "B" and an edge indicating a friend relation between user nodes **202** of user "C" and user "B." Although this disclosure describes or illustrates particular edges **206** with particular attributes connecting particular user nodes **202**, this disclosure contemplates any suitable edges **206** with any suitable attributes connecting user nodes **202**. As an example and not by way of limitation, an edge **206** may represent a friendship, family relationship, business or employment relationship, fan relationship (including, e.g., liking, etc.), follower relationship, visitor relationship (including, e.g., accessing, viewing, checking-in, sharing, etc.), subscriber relationship, superior/subordinate relationship, reciprocal relationship, non-reciprocal relationship, another suitable type of relationship, or two or more such relationships. Moreover, although this disclosure generally describes nodes as being connected, this disclosure also describes users or concepts as being connected. Herein, references to users or concepts being connected may, where appropriate, refer to the nodes corresponding to those users or concepts being connected in social graph **200** by one or more edges **206**.

[0026] In particular embodiments, an edge **206** between a user node **202** and a concept node **204** may represent a particular action or activity performed by a user associated with user node **202** toward a concept associated with a concept node **204**. As an example and not by way of limitation, as illustrated in FIG. **2**, a user may "like," "attended," "played," "listened," "cooked," "worked at," or "watched" a concept, each of which may correspond to a edge type or subtype. A concept-profile page corresponding to a concept node **204** may include, for example, a selectable "check in" icon (such as, for example, a clickable "check in"

icon) or a selectable "add to favorites" icon. Similarly, after a user clicks these icons, social-networking system **160** may create a "favorite" edge or a "check in" edge in response to a user's action corresponding to a respective action. As another example and not by way of limitation, a user (user "C") may listen to a particular song ("Imagine") using a particular application (SPOTIFY, which is an online music application). In this case, social-networking system **160** may create a "listened" edge **206** and a "used" edge (as illustrated in FIG. **2**) between user nodes **202** corresponding to the user and concept nodes **204** corresponding to the song and application to indicate that the user listened to the song and used the application. Moreover, social-networking system **160** may create a "played" edge **206** (as illustrated in FIG. **2**) between concept nodes **204** corresponding to the song and the application to indicate that the particular song was played by the particular application. In this case, "played" edge **206** corresponds to an action performed by an external application (SPOTIFY) on an external audio file (the song "Imagine"). Although this disclosure describes particular edges **206** with particular attributes connecting user nodes **202** and concept nodes **204**, this disclosure contemplates any suitable edges **206** with any suitable attributes connecting user nodes **202** and concept nodes **204**. Moreover, although this disclosure describes edges between a user node **202** and a concept node **204** representing a single relationship, this disclosure contemplates edges between a user node **202** and a concept node **204** representing one or more relationships. As an example and not by way of limitation, an edge **206** may represent both that a user likes and has used at a particular concept. Alternatively, another edge **206** may represent each type of relationship (or multiples of a single relationship) between a user node **202** and a concept node **204** (as illustrated in FIG. **2** between user node **202** for user "E" and concept node **204** for "SPOTIFY").

[0027] In particular embodiments, social-networking system **160** may create an edge **206** between a user node **202** and a concept node **204** in social graph **200**. As an example and not by way of limitation, a user viewing a concept-profile page (such as, for example, by using a web browser or a special-purpose application hosted by the user's client system **130**) may indicate that he or she likes the concept represented by the concept node **204** by clicking or selecting a "Like" icon, which may cause the user's client system **130** to send to social-networking system **160** a message indicating the user's liking of the concept associated with the concept-profile page. In response to the message, social-networking system **160** may create an edge **206** between user node **202** associated with the user and concept node **204**, as illustrated by "like" edge **206** between the user and concept node **204**. In particular embodiments, social-networking system **160** may store an edge **206** in one or more data stores. In particular embodiments, an edge **206** may be automatically formed by social-networking system **160** in response to a particular user action. As an example and not by way of limitation, if a first user uploads a picture, watches a movie, or listens to a song, an edge **206** may be formed between user node **202** corresponding to the first user and concept nodes **204** corresponding to those concepts. Although this disclosure describes forming particular edges **206** in particular manners, this disclosure contemplates forming any suitable edges **206** in any suitable manner.

[0028] FIG. **3** illustrates an example network environment for some embodiments described in this disclosure. Social-

networking system **160** (or any other system capable of performing steps of the methods described in this disclosure) may be connected via network **110** to a plurality of connected devices **304**. Connected devices **304** may include, without limitation, Internet-enabled television sets **304**a that connect to network **110** through a local internet service provider (ISP), mobile devices **304**b that connect to network **110** through a wireless connection such as a wireless cellular data network, or TVs **304**d that connect to network **110** through a set-top box (STB) or gateway device **304**c. STB/gateway **304**c may be any hardware or software that delivers content or possesses a network interface card (NIC) for connecting to a local area network (LAN). For example, STB/gateway **304**c may be a cable box provided by a multiple-system operator (MSO), such as COMCAST, TIME WARNER, AT&T U-VERSE, or DISH NETWORK. In such examples, STB/gateway **304**c may receive content from MSOs **302**. As another example, STB/gateway **304**c may be a device that streams video from third-party internet sites or services such as over-the-top content (OTT) providers **303**. As an example and not by way of limitation, a gateway device may include devices from ROKU, BOXEE, APPLE TV, or GOOGLE TV that allow users to access content from OTT providers **303** such as NETFLIX, HULU, AMAZON VIDEO, or YOUTUBE. Additionally or alternatively, a gateway device may be a digital video recorder (DVR) or a digital media player (DMP). In some embodiments, STB/gateway **304**c may be a stand-alone device. In other embodiments, the functionality of STB/gateway **304**c may be incorporated into TV **304**d.

[0029] In general, a user's social connections or activities can be used to customize or personalize the user's experience with a social TV viewing system such as the system of FIG. **3**. Some embodiments may utilize methods to customize a user's experience as described in U.S. patent application Ser. No. 12/759,676 entitled "Token-Activated, Federated Access to Social Network Information," which is incorporated herein by reference. In particular embodiments, connected devices **304** receive content from MSOs **302** or OTT providers **303** while receiving or sending social data to social-networking system **160**. For example, a user watching a particular TV show or movie on either service may choose to share that he or she is currently viewing the program to his or her friends. Conversely, a user browsing the Electronic Programming Guide (EPG) of an MSO **302** or the content navigator of an OTT provider **303** may be presented with social data including the content that his or her friends on social-networking system **160** have watched, are currently watching, or plan to watch. Thus, after exchanging authorization messages **306** with social-networking system **160** to authenticate the user's social networking identity with his or her connected device **304**, connected devices **304** may receive discover messages **308** that identify content being consumed or watched by his or her friends on the social network, and send share messages **307** to inform social-networking system **160** of what the user has, is, or plans to watch or "consume." Although FIG. **3** depicts these messages as being sent directly between social-networking system **160** and connected devices **304**, in particular embodiments, authorization, share, and discover messages **306**, **307**, and **308** may be exchanged between the provider from which content is being accessed, namely, MSOs **302** and OTT providers **303**. This disclosure contem-

plates any suitable means of routing messages from connected devices **304** to social-networking system **160**.

[0030] Although increasingly rare, there are scenarios wherein a particular user of the social-networking system has no means of linking his TV or media device to social-networking system **160**. Unconnected devices **305** lack any means of connecting to Internet/network **110**. For example, a user may not have a local ISP, and only TV service from an MSO. As another example, a user may have both cable service from an MSO as well as interne access from a local ISP, but his or her STB **304***c* may not include an NIC. In such configurations, MSO **302** may communicate authorization, share, and discover messages with social-networking system **160**, and unconnected device **305** may communicate with MSOs **302** (e.g., via STB **304***c*). In particular embodiments, unconnected device **305** may communicate indirectly with social-networking system **160** via a connected device. For example, and not by way of limitation, mobile device **304***b* may record audio or video data from unconnected device **305** and send the data to social-networking system **160**.

[0031] In particular embodiments, content may be delivered to user devices **304** and **305** tagged with content identifiers and metadata. For example, COMCAST may utilize its own proprietary EPG data format that lists the program name, air date, actors, producer, director, etc. In particular embodiments, content providers **302** and **303** may obtain content identifiers and metadata from content databases **301**, such as that provided by ROVI. Each particular piece of content may be sent from devices **304**, or, in particular embodiments, via content providers **302** and **303**, as graph data including a graph object and graph action. Social-networking system **160** may de-duplicate graph data for the same graph object in a graph data store by comparing various attributes about the content object; for example, name, actors, duration, air date, etc. Thus, social-networking system **160** may attribute graph data sent from HULU that a particular user watched the critically-acclaimed feature film "The Marine" to the same graph object as a user currently watching "The Marine" on COMCAST digital cable, irrespective of the source and format of the content metadata.

[0032] FIG. **4** illustrates an example environment in which social-networking system **160** may identify a user of one or more user devices **410**. In the illustrated embodiment, user devices **410** may include a personal computer **410***a,* a mobile device **410***b* such as a smartphone, a laptop computer **410***c,* a gaming console **410***d,* a TV **410***e,* or any other appropriate user device. User devices **410** may communicate with network **110**, STB/gateway **304***c,* or other user devices **410** via a wireless communications protocol such as WIFI or BLUETOOTH.

[0033] In general, social-networking system **160** may identify a user device **410** of user **101** by communicating with a user device **410** via network **110**. In some embodiments, a user device may be identified after the user device communicates with social-networking system **160**. In some embodiments, social-networking system **160** may identify a first user device via communicating with a second user device. As an example, mobile device **410***a* may utilize WIFI or BLUETOOTH sniffing to capture a unique device identifier for TV **410***e.* The unique device identifier may include, for example, a MAC address, a serial number, a unique product identification number, an IP address, a mul-

ticast domain name system (mDNS) identifier, or any other data that may be used to identify the specific models or manufacturers of TV **410***e.* In some embodiments, a unique device identifier for TV **410***e* may be for a device associated with TV **410***e.* For example, a unique device identifier may identify a router that TV **410***e* is connected to, a STB that TV **410***e* is connected to, or any other device associated with TV **410***e.* In some embodiments, a unique device identifier for TV **410***e* may be an identifier assigned when a user device is paired with TV **410***e* (e.g., via BLUETOOTH). Once captured, the unique identifier for TV **410***e* may be analyzed by mobile device **410***a* or sent to social-networking system **160** for analysis. In some embodiments, the captured unique device identifier may be compared to a database of unique device identifiers in order to identify TV **410***e.* In particular embodiments, a user device may be identified passively without user input. Additionally or alternatively, a user device may be identified only if a user explicitly provides social-networking system **160** with identification information for the user device. In some embodiments, a notification may request that a user explicitly provide social-networking system **160** with identification information for a user device.

[0034] Social-networking system **160** may utilize the information obtained from user devices **410** to deliver specific content to a user device. For example, if social-networking system **160** determines that user **101** is utilizing an IPHONE as mobile device **410***b,* social-networking system **160** may communicate to laptop computer **410***c* to display advertisements directed to IPHONE users. As another example, if social-networking system **160** determines that user **101** is utilizing an XBOX as gaming console **410***d,* social-networking system **160** may communicate to personal computer **410***a* to display advertisements directed to XBOX users.

[0035] In particular embodiments, social-networking system **160** may also identify a user of a user device. In some embodiments, the identity of the user device may be used to identify a user by, for example, cross-referencing the identity of the user device with known user devices for the user. In other embodiments, the user may be identified by other means, such as by the user communicating authentication information to social-networking system **160**. Social-networking system **160** may also access a user profile for the user of the identified user device. In particular embodiments, social-networking system **160** may store information indicating an association between a user device and a user.

[0036] FIG. **5** illustrates an environment in which social-networking system **160** may determine media consumption data. In particular embodiments, media consumption data may include the identity of the media content consumed. In some embodiments, media consumption data includes metadata about the media content which may identify a genre, air date, actor, artist, producer, director, content creator, content provider, television station or network, radio station or network, etc.

[0037] In particular embodiments, media consumption data may include a time, date, duration, or location for the consumption of the media content. For example, if user **101** consumed a television show by watching the show on a television, media consumption data may include the time and date that the user viewed the content. In some embodiments, time or date data may include the time or date that media content will be recorded, such as a time or date of a future recording set on a DVR. In some embodiments,

duration data may include the duration that a particular user consumed media content. In some embodiments, media consumption data includes the location that media content is consumed or will be consumed.

[0038] In particular embodiments, media consumption data may include user input data. User input data may include, as an example and not by way of limitation, channel changing behavior, use of a remote control, clickstream data, user interactions with a media device, etc. For example, media consumption may include data that indicates that during a television show, user **101** muted the volume on TV **410***e* when advertisements were displayed. In this example, media consumption data may also indicate that user **101** unmuted TV **410***e* during particular advertisements. As a further example, media consumption data may indicate that user **101** clicked on an advertisement while consuming media using HULU on laptop **410***c*.

[0039] In particular embodiments, social-networking system **160** may receive media consumption data from user device **410**. As discussed further below, social-networking system **160** may utilize various methods to determine media consumption data, such as the identity of what user **101** is watching on a media device, such as TV **410***e*. These methods may include acoustic or visual fingerprinting, analyzing electrical interference, analyzing signals on an HDMI cable, analyzing closed-captioning, analyzing images from an incoming video stream, analyzing explicit signals from user **101**, and analyzing embedded signals, such as watermark data. In particular embodiments, media consumption data may be determined by capturing or analyzing data **530** via sensor **525**.

[0040] In some embodiments, social-networking system **160** may determine device-based media consumption data. In particular embodiments, device-based media consumption data may be media consumption data associated with a particular user device. As an example, user **101** may be watching a show on TV **410***e*. Device-based media consumption for TV **410***e* may be media consumption data for the show being watched on TV **410***e*. In particular embodiments, social-networking system **160** may determine device-based media consumption data by determining an association between media consumption data and a user device. In the above example, TV **410***e* may communicate media consumption data to social-networking system **160** including a unique device identifier indicating an association between the media consumption data and TV **410***e*. As another example, user device **410** may capture media consumption data from TV **410***e* (e.g., by using an acoustic fingerprint) and also capture a unique identifier for TV **410***e* (e.g., via BLUETOOTH) which may indicate an association between the media consumption data and TV **410***e*. In this example, user device **410** may additionally or alternatively send with the media consumption data with a unique identifier for itself, indicating an association between the media consumption data and user device **410**. In some embodiments, social-networking system **160** may determine media consumption data for user **101** by receiving data from TV **410***e*. For example, TV **410***e* may be an internet-enabled TV and may send media consumption data to social-networking system **160** via network **110**.

[0041] In particular embodiments, social-networking system **160** may determine device-based media consumption data by receiving data from content source **510**. As an example, content source **510** may be a content provider, such as an MSO **302** or an OTT provider **303**. The content provider may collect and send to social-networking system **160** device-based media consumption data. In particular embodiments, a content provider may collect and send set-top box data to social-networking system **160**. In particular embodiments, content source **510** may be STB/gateway **304***c*. For example, a set-top box may record media consumption data and send the data to social-networking system **160**.

[0042] FIG. **6** illustrates an example method for correlating user profile data with media consumption data received from user device **410**. In step **610**, user device **410** sends and social-networking system **160** receives identifying information (e.g., information sufficient to retrieve a user profile for a user of user device **410**). In particular embodiments, identifying information may be authentication information (e.g., information uniquely identifying a user, such as a username, email address, or phone number), a unique device identifier for a user device of the user, or any other suitable information. In some embodiments, identifying information may include identifiers obtained via explicit pairing of a user device with a media device (e.g., a unique device identifier, an identifier assigned when a user device paired with a media device, etc.). In some embodiments, known information about a user, such as the user's interests, location, or other known information, may be identifying information. For example, social-network **160** may receive information that identifies a household, but then use known location for one or more members of the household to determine which member is correlated with media consumption data. In step **620**, social-networking system **160** retrieves a user profile of the identified user.

[0043] In step **630**, content provider **600***b* sends media content to media device **600***a*. In particular embodiments, a content provider may be an MSO, an OTT provider, a music streaming service (e.g. SPOTIFY, PANDORA INTERNET RADIO, etc.), a radio broadcaster, or any other provider of media content. In particular embodiments, media content may include video content, such as a TV show, a movie, a video game, a live video stream, etc. Additionally or alternatively, media content may include audio content, such as a radio broadcast, a podcast, an internet radio stream, a live audio stream, etc. In some embodiments, media content may include shared media collections (e.g., a photo album).

[0044] In particular embodiments, a media device may be a TV, a user device, or any other device capable of receiving or allowing a user to consume media content. In some embodiments, a media device may include a TV and a STB/gateway. This disclosure contemplates a media device including a device capable of receiving or consuming media content, any number of set-top boxes, and any number of gateway devices, connected in any suitable arrangement.

[0045] In step **640**, the media content is consumed via media device **600***a*. In particular embodiments, a user may consume media content by viewing or listening to a media device that is producing sound or images corresponding to the media content. As an example, a user may consume media content by viewing a television show. In particular embodiments, consuming media content includes instructing a media device to record media content immediately or in the future. For example, a user may consume media content by instructing a media device that includes a TV and gateway device TIVO to record a television show. In particular embodiments, media content may be consumed when

a user places media content in a queue or list. For example, a user may consume media by placing videos into a queue on NETFLIX.

[0046] In step 650, media consumption data may be sent from media device 600a to user device 410 or captured from media device 600a by user device 410. As discussed above, media consumption data may include the identity of the media content, metadata, a time, a date, a duration, a location, channel changing behavior, user input data, etc. In some embodiments, media consumption data may be sent to user device 410 via a wireless communications protocol such as WIFI or BLUETOOTH or by any other suitable means. In particular embodiments, discussed further below, user device 410 may capture media consumption data or information sufficient to determine media consumption data from media device 600a (e.g., by capturing audio, video, images, electrical interference patterns, and other such information from media device 600a).

[0047] In some embodiments, media consumption data may be captured by acoustic fingerprinting. For example, while user 101 is watching TV 410e, a mobile app associated with social-networking system 160 may be running on user device 410 of user 101. User device 410 may capture environmental data 530 (e.g., audio, images, video, location data, or other data captured from or associated with the environment) using a sensor 525 (e.g., a microphone, camera, GPS, or other sensor). Environmental data 530 may include, for example, audio from a show being viewed on TV 410e. In some embodiments, environmental data 530 may be sent to social-networking system 160, which may then analyze environmental data 530 in order to determine what user 101 is watching on the TV 410e, a time, date, or duration, or other media consumption data. For example, social-networking system 160 may compare environmental data 530 that includes environmental sounds to audio of known television shows. Based on the comparison, social-networking system 160 may determine media consumption data, such as the identity of a show user 101 is watching on TV 410e. In some embodiments, user device 410 may first analyze environmental data 530 and determine what the user is watching on TV 410e before sending data to social-networking system 160.

[0048] In some embodiments, social-networking system 160 may utilize environmental data 530 received from multiple users 101 in order to determine whether the multiple users are consuming media separately or together. For example, if two users are in the same room while watching the same TV show, environmental data 530 captured by each users' user device may be similar. Social-networking system 160 may compare environmental data captured from each user and determine that the two users are located in the same environment if the environmental data 530 from each user is substantially similar. As an example, social-networking system 160 may compare GPS or other location data determined via sensor 525 and sent by the users' user devices 410 in order to determine that two or more users are watching the same TV show at the same location. In some embodiments, social-networking system 160 may post content to social-networking system 160 indicating that the two users are watching the same TV show at the same location.

[0049] In some embodiments, media consumption data may be determined by visual fingerprinting. For example, environmental data 530 including images from an incoming video stream may be captured and analyzed to determine what a user is currently watching. For example, user 101 may use sensor 525 that includes a camera to capture images of a TV show being consumed on TV 410e. In some embodiments, the captured images may be sent to social-networking system 160. User device 410 or social-networking system 160 may analyze the captured images and compare them to a database of images for known media content. By comparing the captured images with the known images, social-networking system 160 or user device 410 may be able identify a TV show that user 101 is watching and thus determine media content.

[0050] In some embodiments, social-networking system 160 may utilize phase delay to determine media consumption data. For example, most cable providers utilize a unique time delay in sending signals to customers. Social-networking system 160 may determine this delay by, for example, analyzing environmental data 530 (e.g., environmental sounds or signals from an HDMI cable). Once the delay has been determined, social-networking system 160 may compare it to known delays of content providers. For example, if the delay is determined to be 102 ms, social-networking system 160 may determine that user 101 is watching content from COMCAST if COMCAST has a known delay of 102 ms. Once a content provider is determined, social-networking system 160 may determine media consumption data by cross-referencing environmental data 530 with known schedules of media content for the content provider (e.g., if user 101 is determined to be watching COMCAST at 6 PM, environmental data 530 may be compared to known data about shows being offered by COMCAST at 6 PM).

[0051] In some embodiments, electrical interference may be utilized to determine media consumption data. For example, media device 600a may include a connected device 304 plugged into an electrical outlet in the home of user 101. Media device 600a may also include a TV 410e plugged into the same electrical outlet, or any other electrical outlet in the home of user 101. The connected device 304 may capture electrical interference (e.g., noise) present on a power cord plugged into the electrical outlet. This electrical interference may be introduced into the electrical wiring of the user's home by TV 410e. The electrical interference may be due to variance in the electrical load from a television caused by varying sounds or volumes of a television show being displayed. In some embodiments, the electrical interference may be unique for each television show. This electrical interference pattern may be captured and sent to social-networking system 160 by the connected device 304. Social-networking system 160 may analyze the captured electrical interference pattern and compare it to a database of electrical interference patterns or fingerprints for known television shows. By comparing the captured electrical interference pattern with the stored electrical interference fingerprints, social-networking system 160 may be able match the captured pattern with the pattern of a television show and thus determine media consumption data for the media content being consumed by user 101.

[0052] In some embodiments, closed-captioning may be utilized to determine media consumption data. For example, STB/gateway 304c that is part of media device 600a may receive a video stream from content provider 600b that includes closed-captioning information. The STB/gateway 304c may analyze the video stream and capture closed-captioning information. The captured closed-captioning information may then be sent to social-networking system

160 where it may be analyzed and compared to closed-captioning data of known television shows. Based on the comparison, social-networking system 160 may match the captured closed-captioning information with closed-captioning of a known television show and thus determine media consumption data for the media content being consumed by a user.

[0053] In some embodiments, explicit signals embedded in the media content may be utilized to determine media consumption data. In some embodiments, an explicit signal may include a digital watermark, such as an audio or visual watermark. In some embodiments, a digital watermark may be imperceptible to humans without technological aid. For example, a content creator of a movie may embed an audio or visual watermark into the movie. The watermark may include information that identifies media consumption data for the content being displayed (e.g., title, episode number, time, date, etc.). User device 410 may capture all or part of the watermark data (e.g., via sensor 525), which may then be sent to social-networking system 160. Social-networking system 160 may then use data including all or part of the watermark to determine media consumption data for the media content being consumed by a user.

[0054] In some embodiments, social-networking system 160 may determine media consumption data by analyzing explicit signals from the users. For example, social-networking system 160 may analyze posts of user 101 on social-networking system 160 in order to determine what user 101 is or will be watching. As one example, if user 101 posts "I can't wait to watch 'Lone Survivor' tonight," social-networking system 160 may determine that user 101 is planning to consume the show "Lone Survivor." As another example, if two users are chatting about the show "Lone Survivor," social-networking system 160 may determine that the users are planning to consume the show "Lone Survivor." In some embodiments, explicit signals from a user may include a user pairing a user device with a media device. As an example, a user may explicitly pair a mobile phone with a TV via BLUETOOTH, and either the mobile device or the TV may send data to social-networking system 160 sufficient to determine media data.

[0055] In some embodiments, signals on an HDMI cable may be utilized to determine media consumption data. For example, a media device may include a connected device that captures electrical patterns of signals travelling across an HDMI cable. These electrical patterns may be unique for each particular piece of media content. The electrical patterns may be captured and sent to social-networking system 160. Social-networking system 160 may analyze the captured electrical patterns and compare them to a database of electrical patterns for known pieces of media content. By comparing the captured electrical patterns with the known electrical patterns, social-networking system 160 may be able match the captured patterns with the patterns of a particular media content and thus determine media consumption data for the media content being consumed by the user.

[0056] In step 660, user device 410 sends media consumption data to social-networking system 160. In some embodiments, user device 410 may send all or part of the data received in step 650. Additionally or alternatively, user device 410 may send media consumption data generated from the data received in step 650. In some embodiments, user device 410 may send data in step 660 that is the result

of analyzing, processing, parsing, adding to, subtracting from, altering, or modifying the data received in step 650. In particular embodiments, the media consumption data may be, may be used to determine, or may be modified to be device-specific media consumption data.

[0057] In step 670, social-networking system 160 determines a correlation between the user profile retrieved in step 620 and the media consumption data received in step 660. In particular embodiments, the user profile may be correlated with the media consumption data by using the identifying information sent in step 610. For example, a software application may send the media consumption data, the identifying information, and data that indicates a correlation by indicating that that the media consumption data and the identifying information were sent by the same software application. As another example, and not by way of limitation, a mobile device and a TV may be paired via BLUETOOTH. In this example, an application on the mobile device may send data to social-networking system 160 that may determine a correlation, such as an IP address of a STB connected with the TV, a name for a WI-FI access point used by the TV or mobile device, or an identifier assigned during the pairing. In particular embodiments, the correlation may be determined because the same user device 410 sent both the identifying information and the media consumption data to social-networking system 160. For example, user device 410 may send media consumption data, identifying information, and in each case, also send a unique device identifier that indicates a correlation by indicating that both the media consumption data and the identifying information were sent from the same user device 410. In particular embodiments, there may be multiple users associated with a household or with a media device. In such cases, social-networking system 160 may determine which among the multiple users are correlated with media consumption data by using contextual information (e.g., a unique device identifier for a device associated with a particular user, an explicit signal from one of the users, a location of one of the users, or other such information).

[0058] In particular embodiments, social-networking system 160 may correlate the user profile with the media consumption data by storing user profile data indicating an association. In some embodiments, social-networking system 160 may merge the user profile and the media consumption data.

[0059] FIG. 7 illustrates an example method for correlating user profile data with media consumption data received from content provider 600b. In step 710, user device 410 sends and social-networking system 160 receives identifying information. In step 720, social-networking system 160 retrieves a user profile of the identified user. In step 730, content provider 600b sends media content to media device 600a. In step 740, the media content is consumed via media device 600a.

[0060] In step 750, media device 600a sends media consumption data to content provider 600b. In particular embodiments, media consumption data may include set-top box data. As an example, media device 600a may include TV 410e and a STB provided by an MSO content provider 600b. As user 101 consumes media using TV 410e, the STB may send set-top box data to the MSO. Set-top box data may indicate what channel the TV is tuned to, the identity of media content, information about the STB, a time or date, a viewing duration, remote control usage, channel changing

behavior, user interactions with an EPG, user interactions with a video on demand (VOD) service, etc.

[0061] In particular embodiments, media consumption data may include user interactions with media device **600***a*, such as clickstream data. For example, media device **600***a* may include personal computer **410***a*. User **101** may consume media content using personal computer **410***a*, by, for example, using content provider NETFLIX. NETFLIX may record the user's interactions with personal computer **410***a*. For example, NETFLIX may receive data indicating that user **101** played part of a movie, added a television show into a queue, or searched for a particular cartoon using NETFLIX.

[0062] In step **760**, content provider **600***b* sends media consumption data to social-networking system **160**. In some embodiments, content provider **600***b* may send all or part of the data received in step **750**. Additionally or alternatively, content provider **600***b* may send data generated from the data received in step **750**. In some embodiments, content provider **600***b* may send data in step **760** that is the result of analyzing, processing, parsing, adding to, subtracting from, altering, or modifying the data received in step **750**. In particular embodiments, the media consumption data may be, may be used to determine, or may be modified to be device-specific media consumption data.

[0063] In step **770**, social-networking system **160** determines a correlation between the user profile retrieved in step **720** and the media consumption data received in step **760**. In some embodiments, content provider **600***b* may send information to social-networking system in step **760** that allows social-networking system **160** to determine a correlation to user profile information. As an example, content provider COMCAST may send to social-networking system **160** media consumption data associated with media device **600***a*. In this example, COMCAST may also send information that would allow the identification of a user or a media device (e.g., a name, home address, MAC address for a media device, etc.). Social-networking system **160** may then use the information to correlate the media consumption data with the user profile. For example, if content provider **600***b* sends to social-networking system **160** media consumption data along with a user's name and location, social-networking may cross-reference the user's name and location with similar user profile information in a user profile to determine a correlation. As another example, the identifying information sent in step **710** and the media consumption data sent in step **760** may both include a unique device identifier for media device **600***a* or user device **410**, which may indicate a correlation if cross-referenced with known media devices or user devices of a user. In some embodiments, multiple pieces or types of information may be used to determine a correlation. For example, a combination of IP address, mDNS identifier, WIFI name, unique identifier for a user device, unique device identifier for a user (e.g., an email address, phone number, etc.), or other suitable information may allow social-networking system **160** to determine a correlation to user profile information.

[0064] FIG. 8 illustrates an example method for correlating user profile data with media consumption data received from media device **600***a*. In step **810**, user device **410** sends and social-networking system **160** receives identifying information. In step **820**, media device **600***a* sends and social-networking system **160** receives identifying information. In particular embodiments, identifying information

may be authentication information (e.g., information uniquely identifying a user, such as a username, email address, or phone number), a unique device identifier for media device **600***a*, or any other suitable information. In particular embodiments, media device **600***a* may send identifying information directly to social-networking system **160**, as depicted in FIG. **8**. In other embodiments, media device **600***a* may send identifying information to social-networking system **160** via a user device **410**. For example, user device **410** may utilize WIFI or BLUETOOTH sniffing to capture a unique device identifier from media device **600***a* and then send that information to social-networking system **160**.

[0065] In step **830**, social-networking system **160** retrieves a user profile of the identified user. The user may be identified based on identifying information sent from user device **410**, identifying information sent from media device **600***a*, or a combination of the two. In particular embodiments, only step **810** or step **820** may occur. For example, identifying information may sent from media device **600***a*, but not from user device **410**. Media device **600***a* may include a gateway device that communicates to social-networking system **160** via network **110**. Media device **600***a* may send identifying information to social-networking system **160** sufficient to retrieve a user profile for the user of media device **600***a*. As another example, identifying information may sent from user device **410**, but not from media device **600***a*. User device **410** may send identifying information to social-networking system **160** sufficient to retrieve a user profile for the user of user device **410**. In step **840**, content provider **600***b* sends media content to media device **600***a*. In step **850**, the media content is consumed via media device **600***a*.

[0066] In step **860**, media device **600***a* sends media consumption data to social-networking system **160**. The media consumption data may include set-top box data, data indicating user interactions with media device **600***a*, or other media consumption data. For example, media device **600***a* may be an internet-enabled television. The internet-enabled television may send media consumption data to social-network system **160**. In particular embodiments, the media consumption data may be, may be used to determine, or may be modified to be device-specific media consumption data.

[0067] In step **870**, social-networking system **160** determines a correlation between the user profile retrieved in step **830** and the media consumption data received in step **860**. In particular embodiments, the user profile may be correlated with the media consumption data by using the identifying information sent in step **810**. Additionally or alternatively, the user profile may be correlated with the media consumption data by using the identifying information sent in step **820**. For example, the identifying information sent in either step **810** or step **820** and the media consumption data may both include a unique device identifier for media device **600***a*, indicating a correlation.

[0068] FIG. 9 illustrates an example computer system **900**. In particular embodiments, one or more computer systems **900** perform one or more steps of one or more methods described or illustrated herein. In particular embodiments, one or more computer systems **900** provide functionality described or illustrated herein. In particular embodiments, software running on one or more computer systems **900** performs one or more steps of one or more methods described or illustrated herein or provides functionality

described or illustrated herein. Particular embodiments include one or more portions of one or more computer systems **900**. Herein, reference to a computer system may encompass a computing device, and vice versa, where appropriate. Moreover, reference to a computer system may encompass one or more computer systems, where appropriate.

[0069] This disclosure contemplates any suitable number of computer systems **900**. This disclosure contemplates computer system **900** taking any suitable physical form. As example and not by way of limitation, computer system **900** may be an embedded computer system, a system-on-chip (SOC), a single-board computer system (SBC) (such as, for example, a computer-on-module (COM) or system-on-module (SOM)), a desktop computer system, a laptop or note-book computer system, an interactive kiosk, a mainframe, a mesh of computer systems, a mobile telephone, a personal digital assistant (PDA), a server, a tablet computer system, an augmented/virtual reality device, or a combination of two or more of these. Where appropriate, computer system **900** may include one or more computer systems **900**; be unitary or distributed; span multiple locations; span multiple machines; span multiple data centers; or reside in a cloud, which may include one or more cloud components in one or more networks. Where appropriate, one or more computer systems **900** may perform without substantial spatial or temporal limitation one or more steps of one or more methods described or illustrated herein. As an example and not by way of limitation, one or more computer systems **900** may perform in real time or in batch mode one or more steps of one or more methods described or illustrated herein. One or more computer systems **900** may perform at different times or at different locations one or more steps of one or more methods described or illustrated herein, where appropriate.

[0070] In particular embodiments, computer system **900** includes a processor **902**, memory **904**, storage **906**, an input/output (I/O) interface **908**, a communication interface **910**, and a bus **912**. Although this disclosure describes and illustrates a particular computer system having a particular number of particular components in a particular arrangement, this disclosure contemplates any suitable computer system having any suitable number of any suitable components in any suitable arrangement.

[0071] In particular embodiments, processor **902** includes hardware for executing instructions, such as those making up a computer program. As an example and not by way of limitation, to execute instructions, processor **902** may retrieve (or fetch) the instructions from an internal register, an internal cache, memory **904**, or storage **906**; decode and execute them; and then write one or more results to an internal register, an internal cache, memory **904**, or storage **906**. In particular embodiments, processor **902** may include one or more internal caches for data, instructions, or addresses. This disclosure contemplates processor **902** including any suitable number of any suitable internal caches, where appropriate. As an example and not by way of limitation, processor **902** may include one or more instruction caches, one or more data caches, and one or more translation lookaside buffers (TLBs). Instructions in the instruction caches may be copies of instructions in memory **904** or storage **906**, and the instruction caches may speed up retrieval of those instructions by processor **902**. Data in the data caches may be copies of data in memory **904** or storage

**906** for instructions executing at processor **902** to operate on; the results of previous instructions executed at processor **902** for access by subsequent instructions executing at processor **902** or for writing to memory **904** or storage **906**; or other suitable data. The data caches may speed up read or write operations by processor **902**. The TLBs may speed up virtual-address translation for processor **902**. In particular embodiments, processor **902** may include one or more internal registers for data, instructions, or addresses. This disclosure contemplates processor **902** including any suitable number of any suitable internal registers, where appropriate. Where appropriate, processor **902** may include one or more arithmetic logic units (ALUs); be a multi-core processor; or include one or more processors **902**. Although this disclosure describes and illustrates a particular processor, this disclosure contemplates any suitable processor.

[0072] In particular embodiments, memory **904** includes main memory for storing instructions for processor **902** to execute or data for processor **902** to operate on. As an example and not by way of limitation, computer system **900** may load instructions from storage **906** or another source (such as, for example, another computer system **900**) to memory **904**. Processor **902** may then load the instructions from memory **904** to an internal register or internal cache. To execute the instructions, processor **902** may retrieve the instructions from the internal register or internal cache and decode them. During or after execution of the instructions, processor **902** may write one or more results (which may be intermediate or final results) to the internal register or internal cache. Processor **902** may then write one or more of those results to memory **904**. In particular embodiments, processor **902** executes only instructions in one or more internal registers or internal caches or in memory **904** (as opposed to storage **906** or elsewhere) and operates only on data in one or more internal registers or internal caches or in memory **904** (as opposed to storage **906** or elsewhere). One or more memory buses (which may each include an address bus and a data bus) may couple processor **902** to memory **904**. Bus **912** may include one or more memory buses, as described below. In particular embodiments, one or more memory management units (MMUs) reside between processor **902** and memory **904** and facilitate accesses to memory **904** requested by processor **902**. In particular embodiments, memory **904** includes random access memory (RAM). This RAM may be volatile memory, where appropriate. Where appropriate, this RAM may be dynamic RAM (DRAM) or static RAM (SRAM). Moreover, where appropriate, this RAM may be single-ported or multi-ported RAM. This disclosure contemplates any suitable RAM. Memory **904** may include one or more memories **904**, where appropriate. Although this disclosure describes and illustrates particular memory, this disclosure contemplates any suitable memory.

[0073] In particular embodiments, storage **906** includes mass storage for data or instructions. As an example and not by way of limitation, storage **906** may include a hard disk drive (HDD), a floppy disk drive, flash memory, an optical disc, a magneto-optical disc, magnetic tape, or a Universal Serial Bus (USB) drive or a combination of two or more of these. Storage **906** may include removable or non-removable (or fixed) media, where appropriate. Storage **906** may be internal or external to computer system **900**, where appropriate. In particular embodiments, storage **906** is non-volatile, solid-state memory. In particular embodiments, storage **906** includes read-only memory (ROM). Where

appropriate, this ROM may be mask-programmed ROM, programmable ROM (PROM), erasable PROM (EPROM), electrically erasable PROM (EEPROM), electrically alterable ROM (EAROM), or flash memory or a combination of two or more of these. This disclosure contemplates mass storage 906 taking any suitable physical form. Storage 906 may include one or more storage control units facilitating communication between processor 902 and storage 906, where appropriate. Where appropriate, storage 906 may include one or more storages 906. Although this disclosure describes and illustrates particular storage, this disclosure contemplates any suitable storage.

[0074]   In particular embodiments, I/O interface 908 includes hardware, software, or both, providing one or more interfaces for communication between computer system 900 and one or more I/O devices. Computer system 900 may include one or more of these I/O devices, where appropriate. One or more of these I/O devices may enable communication between a person and computer system 900. As an example and by way of limitation, an I/O device may include a keyboard, keypad, microphone, monitor, mouse, printer, scanner, speaker, still camera, stylus, tablet, touch screen, trackball, video camera, another suitable I/O device or a combination of two or more of these. An I/O device may include one or more sensors. This disclosure contemplates any suitable I/O devices and any suitable I/O interfaces 908 for them. Where appropriate, I/O interface 908 may include one or more device or software drivers enabling processor 902 to drive one or more of these I/O devices. I/O interface 908 may include one or more I/O interfaces 908, where appropriate. Although this disclosure describes and illustrates a particular I/O interface, this disclosure contemplates any suitable I/O interface.

[0075]   In particular embodiments, communication interface 910 includes hardware, software, or both providing one or more interfaces for communication (such as, for example, packet-based communication) between computer system 900 and one or more other computer systems 900 or one or more networks. As an example and by way of limitation, communication interface 910 may include a network interface controller (NIC) or network adapter for communicating with an Ethernet or other wire-based network or a wireless NIC (WNIC) or wireless adapter for communicating with a wireless network, such as a WI-FI network. This disclosure contemplates any suitable network and any suitable communication interface 910 for it. As an example and not by way of limitation, computer system 900 may communicate with an ad hoc network, a personal area network (PAN), a local area network (LAN), a wide area network (WAN), a metropolitan area network (MAN), or one or more portions of the Internet or a combination of two or more of these. One or more portions of one or more of these networks may be wired or wireless. As an example, computer system 900 may communicate with a wireless PAN (WPAN) (such as, for example, a BLUETOOTH WPAN), a WI-FI network, a WI-MAX network, a cellular telephone network (such as, for example, a Global System for Mobile Communications (GSM) network), or other suitable wireless network or a combination of two or more of these. Computer system 900 may include any suitable communication interface 910 for any of these networks, where appropriate. Communication interface 910 may include one or more communication interfaces 910, where appropriate. Although this disclosure

describes and illustrates a particular communication interface, this disclosure contemplates any suitable communication interface.

[0076]   In particular embodiments, bus 912 includes hardware, software, or both coupling components of computer system 900 to each other. As an example and not by way of limitation, bus 912 may include an Accelerated Graphics Port (AGP) or other graphics bus, an Enhanced Industry Standard Architecture (EISA) bus, a front-side bus (FSB), a HYPERTRANSPORT (HT) interconnect, an Industry Standard Architecture (ISA) bus, an INFINIBAND interconnect, a low-pin-count (LPC) bus, a memory bus, a Micro Channel Architecture (MCA) bus, a Peripheral Component Interconnect (PCI) bus, a PCI-Express (PCIe) bus, a serial advanced technology attachment (SATA) bus, a Video Electronics Standards Association local (VLB) bus, or another suitable bus or a combination of two or more of these. Bus 912 may include one or more buses 912, where appropriate. Although this disclosure describes and illustrates a particular bus, this disclosure contemplates any suitable bus or interconnect.

[0077]   Herein, a computer-readable non-transitory storage medium or media may include one or more semiconductor-based or other integrated circuits (ICs) (such, as for example, field-programmable gate arrays (FPGAs) or application-specific ICs (ASICs)), hard disk drives (HDDs), hybrid hard drives (HHDs), optical discs, optical disc drives (ODDs), magneto-optical discs, magneto-optical drives, floppy diskettes, floppy disk drives (FDDs), magnetic tapes, solid-state drives (SSDs), RAM-drives, SECURE DIGITAL cards or drives, any other suitable computer-readable non-transitory storage media, or any suitable combination of two or more of these, where appropriate. A computer-readable non-transitory storage medium may be volatile, non-volatile, or a combination of volatile and non-volatile, where appropriate.

[0078]   Herein, "or" is inclusive and not exclusive, unless expressly indicated otherwise or indicated otherwise by context. Therefore, herein, "A or B" means "A, B, or both," unless expressly indicated otherwise or indicated otherwise by context. Moreover, "and" is both joint and several, unless expressly indicated otherwise or indicated otherwise by context. Therefore, herein, "A and B" means "A and B, jointly or severally," unless expressly indicated otherwise or indicated otherwise by context.

[0079]   The scope of this disclosure encompasses all changes, substitutions, variations, alterations, and modifications to the example embodiments described or illustrated herein that a person having ordinary skill in the art would comprehend. The scope of this disclosure is not limited to the example embodiments described or illustrated herein. Moreover, although this disclosure describes and illustrates respective embodiments herein as including particular components, elements, feature, functions, operations, or steps, any of these embodiments may include any combination or permutation of any of the components, elements, features, functions, operations, or steps described or illustrated anywhere herein that a person having ordinary skill in the art would comprehend. Furthermore, reference in the appended claims to an apparatus or system or a component of an apparatus or system being adapted to, arranged to, capable of, configured to, enabled to, operable to, or operative to perform a particular function encompasses that apparatus, system, component, whether or not it or that particular function is activated, turned on, or unlocked, as long as that

apparatus, system, or component is so adapted, arranged, capable, configured, enabled, operable, or operative. Additionally, although this disclosure describes or illustrates particular embodiments as providing particular advantages, particular embodiments may provide none, some, or all of these advantages.

What is claimed is:

1. A method comprising:

by the one or more computer systems of the social-networking system, retrieving a user profile for a user of the social-networking system, wherein the user is associated with a media device;

by the one or more computer systems of the social-networking system, receiving media consumption data;

by the one or more computer systems of the social-networking system, correlating the media consumption data with the user profile to determine device-based media consumption data associated with media content being consumed on the media device; and

by the one or more computer systems of the social-networking system, storing data associating the user profile with the device-based media consumption data.

2. The method of claim 1, wherein the user profile is retrieved based on a unique device identifier for a user device associated with the user.

3. The method of claim 2, wherein the user device is the media device.

4. The method of claim 1, wherein the user profile is retrieved based on authentication information for the user.

5. The method of claim 1, wherein the media consumption data comprises information uniquely identifying the media content being consumed on the media device.

6. The method of claim 5, wherein the information uniquely identifying the content comprises one or more of:

an acoustic fingerprint;

a video fingerprint;

information about a phase delay;

information about electrical interferences associated with the media device;

information about closed-captioning associated with the content; or a digital watermark.

7. The method of claim 1, wherein the media consumption data comprises set-top box data.

8. The method of claim 7, wherein the set-top box data comprises one or more of:

information indicating a television channel the media device is tuned to;

information indicating the identity of the media content;

information indicating a time or date associated with the media content;

information indicating a viewing duration of the media content;

information indicating use of a remote control; or information indicating channel changing behavior.

9. One or more computer-readable non-transitory storage media embodying software that is operable when executed to:

retrieve a user profile for a user of the social-networking system, wherein the user is associated with a media device;

receive media consumption data;

correlate the media consumption data with the user profile to determine device-based media consumption data associated with media content being consumed on the media device; and

store data associating the user profile with the device-based media consumption data.

10. The media of claim 9, wherein the user profile is retrieved based on a unique device identifier for a user device associated with the user.

11. The media of claim 10, wherein the user device is the media device.

12. The media of claim 9, wherein the user profile is retrieved based on authentication information for the user.

13. The media of claim 9, wherein the media consumption data comprises information uniquely identifying the media content being consumed on the media device.

14. The media of claim 13, wherein the information uniquely identifying the content comprises one or more of:

an acoustic fingerprint;

a video fingerprint;

information about a phase delay;

information about electrical interferences associated with the media device;

information about closed-captioning associated with the content; or

a digital watermark.

15. The media of claim 9, wherein the media consumption data comprises set-top box data.

16. The media of claim 15, wherein the set-top box data comprises one or more of:

information indicating a television channel the media device is tuned to;

information indicating the identity of the media content;

information indicating a time or date associated with the media content;

information indicating a viewing duration of the media content;

information indicating use of a remote control; or

information indicating channel changing behavior.

17. A system comprising: one or more processors; and a memory coupled to the processors comprising instructions executable by the processors, the processors being operable when executing the instructions to:

retrieve a user profile for a user of the social-networking system, wherein the user is associated with a media device;

receive media consumption data;

correlate the media consumption data with the user profile to determine device-based media consumption data associated with media content being consumed on the media device; and

store data associating the user profile with the device-based media consumption data.

18. The system of claim 17, wherein the user profile is retrieved based on a unique device identifier for a user device associated with the user.

19. The system of claim 18, wherein the user device is the media device.

20. The system of claim 17, wherein the user profile is retrieved based on authentication information for the user.

* * * * *

# Exhibit 15

| | |
|---|---|
| **From:** | Matthew Melamed <mmelamed@bfalaw.com> |
| **Sent:** | Friday, July 9, 2021 3:19 PM |
| **To:** | Snyder, Orin; Stein, Deborah L.; Falconer, Russ; Kutscher Clark, Martie; Mumm, Laura C. |
| **Cc:** | Gail Andler; Daniel B. Garrie; dgarrie@jamsadr.com; Lesley Weaver; Anne Davis; Derek Loeser; Cari Laufenberg; David Ko; Chris Springer |
| **Subject:** | In re Facebook |

Counsel,

In response to your request during our last mediation session that Plaintiffs identify high priority discovery, below are four categories of information we would like you to provide by July 16, 2021. Providing responsive information should not prevent or delay Facebook from providing the other discovery to which Plaintiffs are entitled, nor should it supplant the requirement that Facebook respond to Plaintiffs' discovery requests in full.

1. A data model for the Named Plaintiffs' data. RFP Nos. 9-10, 39-40; Interrogatory Nos. 31-33.
   By "data model," we mean data models, associated data dictionaries, and/or protocols—whatever terminology is used by Facebook—that describes how information and data is collected, sorted, analyzed, searched, and maintained. This also includes descriptions of encryption retention and deletion processes for each kind of data.
2. A list of API and SDK calls used to access the data model identified in #1. RFP No. 37; Interrogatory Nos. 9, 13, 15.
3. A list of third parties with permission to access the capabilities to make each of the API and SDK calls against the Named Plaintiffs' data in #2. RFP Nos. 11-13, 24, 26; Interrogatory No. 14, 16-17, 26-27.
4. The contracts between Facebook and each of the third parties identified in #3. RFP Nos. 11-12, 24-26.

Please reach out if you have any questions.

Thanks,
Matt

Matthew S. Melamed
Bleichmar Fonti & Auld LLP
555 12th Street, Suite 1600
Oakland, CA 94607
(415) 445-4003
www.bfalaw.com

4394

# Exhibit 16

 

September 10, 2021

Martie Kutscher Clark
Gibson Dunn & Crutcher LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
mkutscherclark@gibsondunn.com

Russell H. Falconer
Gibson Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
rfalconer@gibsondunn.com

Deborah L. Stein
Gibson Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
dstein@gibsondunn.com

Colin B. Davis
Gibson Dunn & Crutcher LLP
3161 Michelson Drive,
Irvine, CA 92612-4412 USA
cdavis@gibsondunn.com

Laura C. Mumm
Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
lmumm@gibsondunn.com

> Re: *In re Facebook, Inc. Consumer Privacy User Profile*,
> Northern District of California Case No. 3:18-md-02843-VC

Dear Counsel:

At the mediators' request, we send this message as a final attempt to avoid impasse on Facebook's production of the named plaintiffs' data. We look forward to your response on September 16.

At its core, this case is about what "content and information" (Facebook's term for data and information as set forth in its own terms of service) Facebook took from Plaintiffs, what Facebook told Plaintiffs it would do with their content and information and what Facebook *actually* did with it. This includes, but is not limited to, sharing it with third parties, negligently allowing third parties to take it and use it for improper purposes and failing to monitor third parties' use, which is precisely what occurred with Cambridge Analytica and Dr. Kogan, the scandal that sparked these consolidated actions. Facebook asserts it disclosed all its practices as to users' content and information and that users consented to those practices. To test this assertion, Plaintiffs need to understand whether Facebook's actions matched the conduct Facebook describes in its terms of service and privacy policies.

Plaintiffs opened discovery in this case with the modest request that Facebook describe and identify the kinds of data it has collected on only the nine Named Plaintiffs, as opposed to the hundreds of millions of class members in this action. We have simply asked: what did Facebook collect about users and what did it do with it? RFP No. 9 seeks all documents Facebook has relating to the Named Plaintiffs, including the content and information collected about each of them.. RFP No. 10 seeks documents sufficient to identify the categories of "content and information" Facebook collects, tracks, and maintains about each Named Plaintiff. It has been Plaintiffs' hope that this modest request could serve as a road map for class-wide discovery.

In Discovery Order No. 9, Judge Corley agreed. She identified the proper scope of discovery related to the data Facebook accumulates about the Named Plaintiffs as: (1) data collected from a user's on-platform activity; (2) data obtained from third parties regarding a user's off-platform activity; and (3) data inferred from a user's on- or off-platform activity. Dkt. No. 557.

To date, Facebook has not produced data from categories 2 or 3. Such a production would include Facebook's profiles of the Named Plaintiffs, and data Facebook acquires through its agreements with business partners, including data it bought and sold about Named Plaintiffs from data brokers in the heart of the Class Period. The parties have conferred and communicated at length about this issue, both before and after Judge Corley's order.

Instead, Facebook continues to limit discovery to category 1. Facebook has repeatedly told Plaintiffs it has "produced the information contained in the DYI file for each of the Named Plaintiffs, plus certain additional information (such as a spreadsheet containing data tracking how Plaintiffs adjusted their Facebook privacy settings)." *E.g.*, Apr. 1, 2021 letter at 2 (attached). The external tool that Facebook created to share with Plaintiffs some small subset of the information Facebook collects about them does not meet the scope of discovery Judge Corley identified or even address the heart of Plaintiffs' claims in this case. Plaintiffs know what they shared on the platform. But Plaintiffs do not know what Facebook collects, infers, embeds and tracks to create data sets about the Plaintiffs. Plaintiffs want to see those data sets and they want to know how Facebook uses them. Plaintiffs can then compare those actions to Facebook's disclosures and the parties can have a meaningful dialogue about the scope of consent.

Because of Facebook's secrecy and refusal to be transparent, there is a significant information asymmetry. Thus, it is impossible for Plaintiffs to identify with specificity the full scope of information Facebook has not produced about the Named Plaintiffs. But some internal Facebook documents give a clue to the types of information it collects about users. For example, Dep. Ex. 3 (attached) defines three broad categories of data Facebook "receive[s] about people": native data, appended data, and behavioral data. *See* Ex. 3 at FB-CA-MDL-00213424. For those types of data, Facebook identifies categories of data it explicitly collects,

implicitly collects, and infers. It appears that the Named Plaintiffs' data Facebook has produced is limited to information in the explicit collection category: profile information; posts, likes, shares; and location (checkins). Facebook has *not* produced all of the Named Plaintiffs' data it implicitly collects— █████████████████████████████████████ And Facebook has *not* produced the Named Plaintiffs' data it infers— █████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████ █████████████████ Nor has Facebook disclosed the extent to which it shares or makes accessible some or all of this data to third parties and what it does to monitor third parties' use of it.

The document at Bates No. FB-CA-MDL-00178902 provides further insight into the types of information Facebook collects about its users that it has not produced (limited to the Named Plaintiffs) here. Summarizing the value proposition of being able to read data from Facebook's platform, Sam Lessin writes: █████████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████ ███ Among the data Lessin says Facebook has about each user is █████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████ While the context for these descriptions is █████████████████████████████████████████████ █████████████████, the descriptions quoted above reflect the data Facebook actually collects on its users. Facebook has *not* produced aggregated data about the Named Plaintiffs' friends, derived data about the Named Plaintiffs, Facebook's opinions of the Named Plaintiffs, or data provided by third parties to the graph about the Named Plaintiffs.

Facebook's patents also lend a clue into the kinds of data collects. For example, Facebook holds a patent titled "Determining user Personality Characteristics From Social Network System Communications and Characteristics" (U.S. Patent No. 9740752), which can be used to identify personality characteristics (e.g., extroversion, agreeableness, conscientiousness, emotional stability, and openness), which can be targeted by marketers on Facebook. Another patent, "Receiving Information About a User from a Third Party Application Based On Action Types" describes how "linguistic data and non-linguistic data associated with the user" are used "in a trained model to predict one or more personality characteristics for the user." These "inferred personality characteristics are stored in connection with the user's provide, and may be used for targeting, ranking, selecting versions of products, and various other purposes." (U.S. Patent 8732802B2 at 2). Examples of personality characteristics include: "extroversion, agreeableness, conscientiousness, emotional stability, and

openness." The patent further explains that "[e]ach user of the social networking system is associated with a user profile, which is stored in the user profile store. A user profile includes declarative information about the user that was explicitly shared by the user, and may also include profile information inferred by the social networking system. In one embodiment, a user profile includes multiple data fields, each field describing one or more attributes of the corresponding user of the social networking systems." Each of these patents identify the types of information about Facebook users, including the Named Plaintiffs, that Plaintiffs have sought but which Facebook has not yet produced. These references are not intended to be complete. Rather, they are only included for the purpose of providing examples of Facebook acknowledging the existence of some aspects of the data Plaintiffs seek.

If Facebook will not make a complete production of all data it has collected about these nine people, Facebook must identify what it is withholding and why. And even if Facebook does make a complete production, the parties must confer in advance of the production in order to agree on the form of those productions, given the complexities with the kinds of data collected, inferred, aggregated and used.

Regards,

Derek W. Loeser
dloeser@kellerrohrback.com

Lesley E. Weaver
lweaver@bfalaw.com

# ATTACHMENT A

| From: | Simone LiTrenta </O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SIMONEL051> |
|---|---|
| Sent: | Thursday, May 08, 2014 4:34 PM |
| To: | Matt Scutari; Rob Sherman; Emily Sharpe; Emily Vacher; Maritza Johnson; Travis Bright |
| Cc: | Erin Egan |
| Subject: | Offsite presentation |
| Attachments: | Combined papers.docx |

Hey, all.  Attached is the combined doc of privacy team papers that Marne will be sending out with the rest of global policy team papers.

Now on to the slide deck☺.  If someone has started slides already and can share the format with the group so we can make the look and feel uniform, that would be great.  If someone is a PPT genius and wants to take the lead on combining finished slides into one deck and making minor changes, let me know.  Otherwise, please save your slides to the folder for slides and I can combine.

https://www.dropbox.com/sh/hquhjw021dr3qty/AADBwXtmeiNZJRBZR6-xjlgia

Erin would like to review the slide on the plane Monday morning.  If everyone can finish their slides by COB Friday/Saturday, I can get them to her Sunday night.

If you would like to discuss your slides with Erin, please let me know ASAP and I will find time manana.

Simone



**Exhibit
FB 0003**

30(b)(6)-Data (Papamiltiadis)

**Confidential**

[redacted]

[redacted]

[redacted]

[redacted]

# ATTACHMENT B

| | |
|---|---|
| **From:** | Douglas Purdy </O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DOUGLAS PURDY> |
| **Sent:** | Thursday, August 30, 2012 10:17 AM |
| **To:** | Sam Lessin |
| **Cc:** | Mike Vernal |
| **Subject:** | Re: Platform Business Model Framing |

I am on vacation this week (still), but happy to help.

That said, in wonder if you should just take the pen on the deck moving forward so I can have a day off and not be the bottle neck?

I can send you want I have so far in an hour when I get back to a computer.

On Aug 30, 2012, at 10:11 AM, "Sam Lessin" <sl@fb.com> wrote:

1. Sorry I wasn't clearer about my plans / being out. That is my bad guys / didn't mean to leave this hanging (obviously super important)
2. Doug, really glad you are framing this up / working on this …
3. Here are my notes on where things are from Friday, I think a lot of it is covered below but I just want to make sure we are in sync here, are presenting all the hard questions for this offsite



1



Confidential

FB-CA-MDL-00178903



Confidential

**From:** Douglas Purdy <dmp@fb.com>
**Date:** Wednesday, August 29, 2012 12:47 AM
**To:** Mike Vernal <vernal@fb.com>
**Cc:** Sam Lessin <sl@fb.com>
**Subject:** Re: Platform Business Model Framing

working on this.

going to see the attached to frame things up.

On Aug 28, 2012, at 6:15 PM, Mike Vernal <vernal@fb.com> wrote:

Doug - as context, we're having an mteam offsite on Tue + Wed of next week to talk about three-year-plan stuff, and one of the discussions we're going to have is ███████████████████████████████

Sam is at burning man (not sure when he gets back), and we left it a little ambiguous about who was pulling together what, so I'd like to at least get started pulling together a deck that we can use to frame the conversation. Can you ask the PMs to pull together a few slides?

Ideally, I think we want to cover:



Not sure of the best framing (and I'm a little feverish right now), but it would be good to at least start pulling this together. ████████████████████████████████████████ Otherwise, I think you/PMs have most/all the context.

4

Confidential

FB-CA-MDL-00178905



I think Sam is probably the right person to write-up ███████ but the rest I think the PMs have the context on.

-mike

Confidential

# Exhibit 17

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline S. Corley, Magistrate Judge

IN RE:  FACEBOOK, INC. CONSUMER )
PRIVACY USER PROFILE LITIGATION.)  **NO. 18-MD-02843 VC (JSC)**
——————————————————————  )

San Francisco, California
Wednesday, December 9, 2020

**TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**


**APPEARANCES VIA ZOOM:**

For Plaintiffs:

        KELLER ROHRBACK LLP
        1201 Third Avenue - Suite 3200
        Seattle, Washington  98101
  BY:  **DEREK LOESER, ATTORNEY AT LAW**
       **CARI LAUFENBERG, ATTORNEY AT LAW**
       **DAVID J. KO, ATTORNEY AT LAW**

        BLEICHMAR, FONTI & AULD LLP
        555 12th Street - Suite 1600
        Oakland, California  94607
  BY:  **LESLEY E. WEAVER, ATTORNEY AT LAW**
       **ANNE K. DAVIS, ATTORNEY AT LAW**
       **MATTHEW P. MONTGOMERY, ATTORNEY AT LAW**
       **ANGELICA M. ORNELAS, ATTORNEY AT LAW**


**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**




Reported By:      Marla F. Knox, RPR, CRR, RMR
               United States Official Court Reporter

4425

```
 1   APPEARANCES VIA ZOOM:   (CONT'D)

 2   For Defendant:
                              GIBSON, DUNN & CRUTCHER LLP
 3                            1881 Page Mill Road
                              Palo Alto, California  94304
 4                       BY:  MARTIE KUTSCHER CLARK, ATTORNEY AT LAW

 5                            GIBSON, DUNN & CRUTCHER LLP
                              333 South Grand Avenue
 6                            Los Angeles, California  90071
                         BY:  DEBORAH L. STEIN, ATTORNEY AT LAW
 7
                              GIBSON, DUNN & CRUTCHER LLP
 8                            2100 McKinney Avenue - Suite 1100
                              Dallas, Texas  75201
 9                       BY:  RUSSELL H. FALCONER, ATTORNEY AT LAW

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Okay.

2            **MS. WEAVER:**  Yep.

3            **THE COURT:**  So the next issue is the named Plaintiffs'

4    data.  And here I actually am kind of confused because Facebook

5    suggested that there may not be any data other than what they

6    have already produced.  And then I don't understand why (video

7    freeze interruption.)

8            **MS. KUTSCHER CLARK:**  Right, Your Honor.

9            So, as we noted in our submission, we learned for the

10   first time in Plaintiffs' sur-reply brief on the named

11   Plaintiffs' data that what they are really seeking is only data

12   about the named Plaintiffs that was shared with third parties.

13           And for us seeing that in the sur-reply brief was a really

14   big aha moment because we had spent literally hundreds of hours

15   meeting and conferring about data that is never shared outside

16   of Facebook.

17           So now that we understand what they are really seeking is

18   the type of data that is actually shared or made accessible to

19   third parties, we have been taking a much closer look at what

20   would be responsive to that.  And as we currently understand,

21   what has been produced really does cover that universe.

22           But we obviously want to be a hundred percent sure that

23   that is correct, and we are talking about a 13-year period, so

24   it is a very long time.

25           So we have been conducting a very careful investigation

within the company to be a hundred percent sure that the
materials produced to date reflect the full scope of any data
that could have been shared or made accessible to third parties
about the named Plaintiffs since 2007.

And if we do come across anything additional, we will
obviously report that to Plaintiffs and discuss a production
format with them, but to date we have not come across anything
that has not been produced already that could have even
potentially been shared with third parties.

**MR. LOESER:** Your Honor, if I may, I think there will
probably be multiple comments in response to that statement.
That makes no sense to us at all.

First of all, the question of their brief, which they
quote in their statement, talks about information, in fact,
shared. And what our brief said in our reply was information
shared or made accessible.

And we were very careful to use that language, "made
accessible," because Facebook has said for a long time that it
doesn't keep records of what it actually shares, which seemed
hard to believe to us.

But in order to avoid a semantic game, we also included
the reference to "made accessible" because whether it was
shared, whether they have records of it, if it was put in a
place or utilized in a way where third parties had access to
it, that substantially expands the universe of potential

1  going on and the way they are describing.  The real virtue of

2  someone under oath testifying is that we can get through the

3  semantics and just figure out really what happened.  So I do

4  think that you are right; that it is time to do that.

5      Facebook can read your order.  They know what they are

6  supposed to do.  I assume they are going to go out and comply

7  in good faith with that order.  And the sure test to whether

8  that happens or not is when we get somebody under oath and they

9  testify about what exists and what doesn't exist.

10         **THE COURT:**  Why shouldn't we do that?

11         **MS. KUTSCHER CLARK:**  Your Honor, I would respectfully

12  request that before we move into a deposition, that we have the

13  opportunity to complete our investigation because we are

14  working through that right now because, again, we want to make

15  sure that what we understand is correct.

16      And obviously to even prepare a 30(b)(6) deponent, we

17  would need to complete that sort of investigation.  And I think

18  it is going to take some more time.

19      Again, we are talking about a 13-year period, and data was

20  shared in different ways with different source of third parties

21  over that period.  And this is a pretty large historical

22  exercise to look into.

23         **THE COURT:**  Right.  But I don't know why we can't -- I

24  mean, you are doing that -- but get something on calendar and

25  the Plaintiffs can draw up their questions, right, because that

1    is going to take some while, no doubt --

2                              (Laughter)

3         **THE COURT:**  -- to negotiate.  And this isn't

4    everything.  This is just, like, let's just figure it out.

5    Like, this is a big -- this is another big issue in the case.

6    We have this disconnect.

7         Let's just figure out:  How do they use this data?  How is

8    it shared?  What do they mean by "made accessible?"

9         Maybe you limit it to a time period, so you don't need to

10   complete the whole thing; right.  I mean, the time period that

11   we are most interested in -- or at least the first one -- is

12   the Cambridge Analytica.  That is how the whole case got here.

13        So what you do is start with a limited time period, and

14   that would probably --

15        **MS. WEAVER:**  We could do that, Your Honor, 2012 to

16   2016 or 2017.

17        **THE COURT:**  Much easier to prepare your witness on.

18   You can then focus your investigation on that.  We are just

19   going to take it in chunks, I guess, in a way.

20        Let's do that because I think we are -- yeah, I keep

21   hearing arguments.  Let's get -- let's get a witness in there.

22        So what I would like you to do is:  Plaintiffs, you should

23   work on that notice.  It is not an everything, all, whatever.

24   This is -- let's just figure out --

25        **MS. WEAVER:**  Targeted.

# Exhibit 18

# Plaintiffs' Exhibit C

[redacted]

# Exhibit 19

# Exhibit 20

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

```
                              )
                              )
IN RE:  FACEBOOK, INC.        )   NO. 18-MD-02843 VC
        CONSUMER PRIVACY USER )
        PROFILE LITIGATION.   )
                              )
_____   )
```

San Francisco, California
Monday, November 4, 2019

<u>TRANSCRIPT OF PROCEEDINGS</u>

<u>APPEARANCES</u>:

For Plaintiffs:

KELLER ROHRBACK LLP
1201 Third Avenue - Suite 3200
Seattle, Washington  98101
BY:  **DEREK W. LOESER, ESQ.**
     **CARI C. LAUFENBERG, ESQ.**

BLEICHMAR, FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, California  94607
BY:  **LESLEY E. WEAVER, ESQ.**
     **JOSHUA D. SAMRA, ESQ.**
     **ANNE K. DAVIS, ESQ.**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:  Ruth Levine Ekhaus, RDR, FCRR
              Official Reporter, CSR No. 12219

```
 1   APPEARANCES:  (CONTINUED)

 2   For Defendant:
                         GIBSON, DUNN & CRUTCHER LLP
 3                       200 Park Avenue
                         New York, New York  10166-0193
 4              BY:  ORIN SNYDER, ESQ.

 5                       GIBSON, DUNN & CRUTCHER LLP
                         555 Mission Street
 6                       San Francisco, California 94105
                BY:  JOSHUA S. LIPSHUTZ, ESQ.
 7                   KATHERINE WARREN, ESQ.

 8                       GIBSON, DUNN & CRUTCHER LLP
                         1881 Page Mill Road
 9                       Palo Alto, California 94304
                BY:  MARTIE KUTSCHER CLARK, ESQ.
10

11   ALSO PRESENT:  Anjeza Hassan, Plaintiff Pro Se

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  were accessible by the third-party apps.

2      What we cannot produce -- because it's simply not

3  recorded, it's not the way our platform is constructed -- is

4  what data was actually shared, physically through the tunnel

5  between Facebook and the third-party app.  The magnitude of

6  that data is 2.5 billion times however many apps each of those

7  2.5 billion people have, times every time you ping Uber and it

8  pings Facebook back.  And we're talking about -- I don't have

9  the number, but it's -- it would be in the trillions of data

10  bits.

11      THE COURT:  But it sounds like what you're saying --

12  and I want to make sure I'm not misunderstanding you.

13      MR. SNYDER:  Sure.

14      THE COURT:  It sounds like what you're saying is that

15  what we cannot do is reconstruct -- let's take the scenario

16  where an app is obtaining my information through my friend.

17  Right?

18      MR. SNYDER:  Correct.

19      THE COURT:  Through interactions with my friend.

20      We cannot determine which of my information the app

21  obtained.  There is just --

22      MR. SNYDER:  Through the friend.

23      THE COURT:  Through the friend.

24      MR. SNYDER:  That would -- right.  Right.

25      THE COURT:  But, can we determine -- and so you're

# Exhibit 21

| From: | Allison Hendrix [/O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=AHENDRIX] |
|---|---|
| Sent: | 7/12/2011 2:26:35 PM |
| To: | Melody Quintana [/O=THEFACEBOOK/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MQUINTANA]; Justin Shaffer [/O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=JUSTIN SCHAFFER]; Mitu Singh [/O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MITUS]; Sam Lessin [/O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SAM LESSIN]; Katie Zacarian [/O=THEFACEBOOK/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=KZACARIAN] |
| CC: | Kate O'Neill [/O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=KKONEILL]; Srinivas Narayanan [/O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SRINIVAS]; Vatsal Mehta [/O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=VATSAL.MEHTA.SV] |
| BCC: | mongoose@mongoose.thefacebook.com |
| Subject: | RE: Location FAQs |

████████████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████

████████████████████████████████████████████████
██████████████████████████

Does this help?  Let me know if you have any questions or need additional information.
Thank you!
Ali

---

**From:** Melody Quintana
**Sent:** Tuesday, July 12, 2011 2:01 PM
**To:** Justin Shaffer; Mitu Singh; Sam Lessin; Katie Zacarian
**Cc:** Kate O'Neill; Allison Hendrix; Srinivas Narayanan
**Subject:** Re: Location FAQs

+**Allison**, from a platform policy perspective, could you please provide any insight on question #2 below?

@**Justin, Mitu, Srinivas**: Thanks for your input!! I'm sanity checking that the following FAQ is accurate. Could you please confirm?

████████████████████████████████████
████████████████████████████████████████████████,
████████████████████████████████████████

---

**From:** Justin Shaffer <j@fb.com>
**Date:** Mon, 11 Jul 2011 11:06:38 -0700
**To:** Mitu Singh <mitu.singh@fb.com>, Sam Lessin <sl@fb.com>, Information Technology <melody@fb.com>, Katie Zacarian <katie@fb.com>

Confidential

Comments inline

---

**From:** Mitu Singh <mitu.singh@fb.com>
**Date:** Mon, 11 Jul 2011 10:55:52 -0700
**To:** Sam Lessin <sl@fb.com>, Melody Quintana <melody@fb.com>, Katie Zacarian <katie@fb.com>, JUSTIN SHAFFER <j@fb.com>
**Cc:** Kate O'Neill <kkoneill@fb.com>
**Subject:** RE: Location FAQs

*+Srinivas*

*Comments in line*



Confidential
FB-CA-MDL-01938269

**From:** Sam Lessin
**Sent:** Monday, July 11, 2011 10:10 AM
**To:** Melody Quintana; Katie Zacarian; Justin Shaffer; Mitu Singh
**Cc:** Kate O'Neill
**Subject:** Re: Location FAQs

███████████████████████████████████████████████████

████████████████████

Sam

**From:** Melody Quintana <melody@fb.com>
**Date:** Mon, 11 Jul 2011 10:02:20 -0700
**To:** Katie Zacarian <katie@fb.com>, Sam Lessin <sl@fb.com>, Justin Shaffer <j@fb.com>, Mitu Singh <mitu.singh@fb.com>
**Cc:** Kate O'Neill <kkoneill@fb.com>
**Subject:** Re: Location FAQs

Sorry, one additional question:

███████████████████████████████████████████████████████████████████████████████████████████████████

**From:** Katie Zacarian <katie@fb.com>
**Date:** Sun, 10 Jul 2011 22:13:06 -0700
**To:** Sam Lessin <sl@fb.com>, Justin Shaffer <j@fb.com>, Mitu Singh <mitu.singh@fb.com>
**Cc:** Kate O'Neill <kkoneill@fb.com>, Information Technology <melody@fb.com>
**Subject:** Re: Location FAQs

+Justin/Sam/Mitu

Hi Sam and Justin,

Can you help Melody find the answers to these three questions below regarding location?

Thank you,

**From:** Melody Quintana <melody@fb.com>
**Date:** Sat, 9 Jul 2011 18:51:41 -0700
**To:** Katie Zacarian <katie@fb.com>, Kate O'Neill <kkoneill@fb.com>
**Subject:** Location FAQs

Confidential

Hey Kate/Katie,

I'm sweeping through the current Places help section and merging the changes with the new Elder content. I'm not 100% sure about the three FAQs listed below — could you help me sanity check that tthey are accurate?

If you want to see the entire set, they're all under "Location" in this master doc:
https://docs.google.com/a/fb.com/document/d/1tofUw5Wh8NknYTFLYsAg0NpDADv2GpfMTld42gxzJFl/edit?hl=en_US&auth key=CKiX5dQC#bookmark=id.t7olcchhe7au

Thanks!
melody

---



Confidential

# Exhibit 22

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

IN RE: FACEBOOK, INC. CONSUMER )
PRIVACY USER PROFILE LITIGATION)
                               )     **NO. 18-md-02843 VC**
                               )
_____ )
                           San Francisco, California
                           Thursday, March 5, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:           KELLER ROHRBACK LLP
                         1201 Third Avenue - Suite 3200
                         Seattle, Washington  98101
               BY:  **DEREK W. LOESER, ATTORNEY AT LAW**
                     **CARI C. LAUFENBERG, ATTORNEY AT LAW**
                     **DAVID KO, ATTORNEY AT LAW**

                         801 Garden Street
                         Santa Barbara, California  93101
               BY:  **CHRISTOPHER L. SPRINGER, ATTORNEY AT LAW**

                         BLEICHMAR FONTI & AULD LLP
                         555 12th Street - Suite 1600
                         Oakland, California  94607
               BY:  **LESLEY E. WEAVER, ATTORNEY AT LAW**
                     **ANNE K. DAVIS, ATTORNEY AT LAW**

For Defendant Facebook:

                         GIBSON, DUNN & CRUTCHER LLP
                         555 Mission Street - Suite 3000
                         San Francisco, California  94105
               BY:  **JOSHUA S. LIPSHUTZ, ATTORNEY AT LAW**

                         1881 Page Mill Road
                         Palo Alto, California  94304
               BY:  **MARTIE P. KUTSCHER, ATTORNEY AT LAW**

       **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Reported By:    Marla F. Knox, RPR, CRR, RMR, Official Reporter

For Defendant Facebook:

                    GIBSON DUNN and CRUTCHER LLP
                    200 Park Avenue
                    New York, New York  10166
          **BY:  ORIN SNYDER, ATTORNEY AT LAW**

                    333 South Grand Avenue
                    Los Angeles, California  90071
          **BY:  DEBORAH L. STEIN, ATTORNEY AT LAW**

| | |
|---|---|
| 1 | <u>**Thursday - March 5, 2020**</u>                    <u>**2:03 p.m.**</u> |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Calling Case Number 18-MD-2843, In Re: |
| 5 | Facebook Inc. Consumer Privacy User Profile Litigation. |
| 6 | Counsel, for Plaintiffs please state your appearances for |
| 7 | the record. |
| 8 | **MR. LOESER:**  Hi, this is Derek Loeser for Plaintiffs. |
| 9 | With me in my office are Cari Laufenberg and David Ko and also |
| 10 | appearing are Lesley Weaver and Annie Davis and Matt |
| 11 | Montgomery. |
| 12 | **THE CLERK:**  Thank you.  And for Defendant. |
| 13 | **MR. SNYDER:**  Good afternoon, Judge.  It is Orin Snyder |
| 14 | for Facebook from Gibson Dunn, and with me on the phone are |
| 15 | Deborah Stein, Josh Lipshutz and Martie Kutscher. |
| 16 | **THE COURT:**  Okay.  Hi, Everybody.  So it sounds like |
| 17 | everything is going great. |
| 18 | **MR. SNYDER:**  All over the world, Your Honor. |
| 19 | **THE COURT:**  Yeah.  I don't really know where to start |
| 20 | or what to do with you at this point.  I guess -- I will -- let |
| 21 | me start with this:  You know, there is -- for a while now we |
| 22 | have been discussing Facebook's production of the same |
| 23 | documents that it produced to the FTC. |
| 24 | And, you know, the Plaintiffs have been asking for me to |
| 25 | order Facebook to simply turn over all the same documents.  And |

1  I responded that I thought out of fairness to Facebook, if

2  Facebook wanted to review all those documents again and, you

3  know, sort of try to determine whether it produced some stuff

4  to the FTC that it shouldn't produce to the Plaintiffs --

5  either because it is privileged or too far afield from this

6  litigation or something like that -- that that would be

7  appropriate.

8      And so I gave them -- I said that they could do that.  It

9  sounds like from reading your papers, that Facebook is prepared

10 to make that production by the end of this month; that is, all

11 of the stuff that it turned over to the FTC minus whatever it

12 concludes it should withhold for privilege reasons or for

13 relevance reasons in this litigation.

14     I assume that that would cover the vast majority of the

15 documents that the Plaintiffs would want in this litigation.

16 Am I wrong about that?  And if I'm wrong about that, what am I

17 missing?

18     **MR. LOESER:**  So, Your Honor -- this is Derek Loeser.

19 Just before I start, it sounds like someone is on a cell phone

20 or something.  While you were speaking there was probably

21 breathing.  It makes it a little hard to hear the Court.  So if

22 there is a mute someone can press, that would be useful.

23     **THE COURT:**  Do you need -- do you need me to repeat

24 what I said?  I mean the short version --

25     **MR. LOESER:**  No.  I think I heard --

1      **THE COURT:**  Okay, go ahead.

2      **MR. LOESER:**  Sorry.  Yeah, I think the short

3   version -- I guess I will repeat it back to you to make sure I

4   have it -- is whether Facebook's offer to produce FTC materials

5   after its privilege and relevancy review at the end of March is

6   sufficient or not.

7      And here is our concern:  First, on this question of

8   privilege review, there is no privilege remaining for these

9   documents in the Ninth Circuit.

10      So that's -- we will circle back to that later, but

11   Your Honor has indicated that there is --

12      **THE COURT:**  You mean because they waived the privilege

13   by turning it over to FTC?

14      **MR. LOESER:**  Yes.  The Ninth Circuit, with every

15   circuit except for the Eighth Circuit, has rejected any notion

16   that you can voluntarily turn information over to a government

17   agency and retain attorney-client privilege for that

18   information.

19      **THE COURT:**  Yeah, but one of the things --

20      **MR. LOESER:**  Yeah, but --

21      **THE COURT:**  One of the things that we discussed was

22   that -- you know, they might have reasons to do a more careful

23   review in this case than in their interactions with the FTC;

24   right.  So maybe there could have been inadvertent --

25   privileged documents inadvertently produced to the FTC; right?

1    MR. LOESER:  Yeah.  I don't want to distract because I

2    think this might be something we have to brief, and the Court

3    would have to rule on whether there is such a thing as

4    inadvertent production in which you can preserve a privilege.

5         THE COURT:  Okay.

6         MR. LOESER:  I don't think anything Facebook did when

7    turning documents over to the Government would be considered

8    anything other than a waiver of an attorney-client privilege,

9    but I think --

10        THE COURT:  Okay --

11        MR. LOESER:  -- what I was --

12        THE COURT:  I don't know a lot about -- sorry.  I was

13   just going to say:  I don't know a lot about that issue.  So

14   that may be that is something you ultimately need to brief.

15   That's fine.

16        MR. LOESER:  So the heart of your question is the

17   relevancy review and why are we not satisfied with Facebook

18   simply saying they are going to conduct a relevancy review and

19   give us what makes it through their screen.

20        I guess I would put it to you this way:  One, we are very

21   concerned about that review and whether their interpretation of

22   relevance coincides in any meaningful way with our own.  From

23   everything we have heard from Facebook so far, they have a

24   very, very narrow view of what is relevant here.  That's the

25   first concern.

1    The second concern is the whole reason why we spent months

2 fighting with Facebook to get the FTC correspondence was so

3 that we could look and see and evaluate really what was given

4 to the FTC.  And we have that correspondence and we have gone

5 through it.

6    And, frankly, based on your review -- with the exception

7 of some very discrete categories -- there is a very clean

8 overlap between those two matters.  So what we said to Facebook

9 is:  Okay, let's talk about that.  We both have read this

10 correspondence.  Tell us what you think is not relevant by

11 category so we can come to some agreement so you can then do

12 your review once and produce the documents once.

13    What we are very concerned about with the October deadline

14 is the process that Facebook has in mind would involve them

15 unilaterally pulling documents out of production; not telling

16 us what they pulled and not logging it in any way -- which is

17 what they said they are going to do -- and then us having to

18 sit there and try to piece together what has been removed.

19    It is very likely that we would disagree with what they

20 are going to do, and then we would have a fight and motions

21 practice.  And then if we prevail, another production would

22 have to occur.  And that in and of itself --

23    **THE COURT:**  How is that different from -- let's say

24 the FTC action never happened; right.  And you submitted

25 document requests, you know, that were similar to what the FTC

# PROCEEDINGS

1   didn't ask but the FTC action never happened.  And then

2   Facebook would be going through its documents and deciding what

3   to -- and they would do an initial cut -- they would take an

4   initial cut.  They would have an initial universe of documents

5   and they would go through those, and they would pull out stuff

6   that they conclude is not responsive to your requests.

7       And they would never be required to do a log of the stuff

8   that they pulled out and determined was irrelevant or

9   non-responsive to your request.  So I guess, why should they

10  have to do that here?

11      **MR. LOESER:**  Well, the technical reason why is under

12  Rule 34 if you are reviewing materials and it is a set of

13  materials, you do have to log or provide some information on

14  how you are calling documents out.

15      Here, we are not talking -- we live in a world where they

16  have already done all this work, and they have already produced

17  these documents; and we have asked for them in discovery.  So

18  if they are going to remove something from a production of

19  materials that we have asked for that already exist, the

20  standard mechanism under the discovery rule is for them to tell

21  us how they are removing, what they are removing and what the

22  basis is for -- of it is.

23      But I do think that the point you make it certainly brings

24  to mind, you know, why are we bothering with any of this.  And

25  the reason why we are bothering with it is that we felt the

1  fact that they have already gathered documents based on an

2  investigation that very significantly, if not entirely,

3  overlaps with this case, it is just a much faster way to get

4  this information.

5      Now, I understand Facebook doesn't want this to be faster.

6  But the fact of the matter is they have gathered this

7  information.  They have reviewed it.  They have used search

8  terms and custodians for the production, and we would get a

9  significant head-start here if these materials could be turned

10  over as opposed to having to wait to do this whole mechanism

11  and process over again starting as if it hasn't already

12  happened.  So that's problem one.

13      Problem two is really the question of search terms and

14  custodians, which is something we want to talk about today;

15  and, perhaps, we should talk about it next.  But really, you

16  know, we asked for the FTC materials because it obviously is

17  relevant and overlaps and because it is a means and a method to

18  just get this moving much faster than having to start all over

19  again.

20      **MR. SNYDER:**  Your Honor, may I be heard?  It is Orin

21  Snyder.

22      **THE COURT:**  Sure.

23      **MR. SNYDER:**  How are you, Judge?  Nice to be talking

24  to you on the phone.  Sorry we are not there in person, but

25  thanks for accommodating our request.

1    This is a little bit like either The Twilight Zone or

2  Alice In Wonderland because the roles here seem to be reversed.

3  We, as the Defendant, are eager -- in fact, chomping at the

4  bit -- to prosecute our defenses.  And we are trying to

5  proceed, not only in an efficient manner but in a prompt

6  manner, in getting to document production and then depositions.

7    And we have given search terms and -- to the other side

8  and we are producing the documents, the FTC documents.  We are

9  reviewing them -- not categorically.  We are reviewing them

10  document by document just as you had suggested we do.  We have

11  agreed to provide that by the 31st.

12    What the Plaintiffs are saying is, Judge, we are not even

13  ready to engage on search terms.  We don't want to even give

14  you any Plaintiffs for depositions until we know what search

15  terms you and the FTC agree to and until we basically figure

16  out what theory of the case we want because they are confined

17  now, Your Honor, to the four topics that you identified --

18  having gone through their kitchen sink complaint -- and

19  identified as four potential theories.

20    On those theories we are prepared to produce documents

21  pursuant to the proper document request promptly.  We are

22  working literally every day around the clock to do that.

23    We are not seeking to delay anything.  We intend to comply

24  with the October cutoff date.  We are ready to proceed on the

25  merits of our defenses.

1   And it is the Plaintiffs, Judge, truly -- and we can walk

2 you through how they are holding up things at every turn; and

3 we believe, respectfully, it is because they are not content

4 with these four theories, and they want to search around for

5 something else that they can allege either in the pleading or

6 otherwise.

7   And, Your Honor, the metrics belie any notion of delay

8 here.  Not only did we respond to their 1,400 paragraph

9 Complaint, we produced already 150,000 pages of documents.  We

10 are promptly producing the FTC documents.  We gave them the

11 search terms.

12   We met and conferred with them for over 15 hours.

13   **THE COURT:**  Could I ask you --

14   **MR. SNYDER:**  Ninety --

15   **THE COURT:**  Sorry to interrupt.

16   **MR. SNYDER:**  Sure.

17   **THE COURT:**  Part of the problem with this discussion

18 is, you know, this is nobody's fault; but I don't have the

19 ability based on the amount of time I have spent on this and

20 the amount -- and based on the information you have given me

21 and based on the things that you both are saying here today --

22 I don't have the ability to determine who is in the wrong, who

23 is being unreasonable.  I mean, no matter how --

24   **MR. SNYDER:**  Right.

25   **THE COURT:**  -- no matter how much either of you pound

1   the podium --

2      **MR. SNYDER:** I have a suggestion -- but I have a

3   suggestion for the Court. And I think that you said: Where do

4   we go and what do we do from here?

5      We, Facebook, want to follow the Federal Rules of Civil

6   Procedure with dispatch and the utmost good-faith. We are

7   already producing hundreds of thousands of documents before the

8   parties have even agreed to an ESI protocol, search terms or

9   custodians.

10     If the Plaintiffs would meet and confer with us on ESI

11   protocol, search terms and custodians, we will get to work in a

12   hurry, Judge; and we will produce whatever is responsive,

13   relevant and non-privileged.

14      **THE COURT:** I wonder if the best way to move things

15   along is -- I'm interested in both of your thoughts on this --

16   but I wonder if I should try to find a Magistrate Judge who can

17   sit down with you-all -- refer this case to a Magistrate Judge

18   for discovery purposes and have it be somebody who can sit down

19   with you-all in person once every two weeks to sort of make

20   sure that things are still moving; make sure that the

21   Plaintiffs are not unfairly picking at Facebook; to make sure

22   that Facebook is not adopting an artificially narrow definition

23   of relevance; and just to -- you know, is there somebody with

24   the -- and, frankly, somebody who knows something about

25   electronic discovery.

1    You know, that is not something that I ever -- you know,

2 as a lawyer in my practice -- as a lawyer I never had to deal

3 with electronic discovery or hardly ever.  You know, and it is

4 rare that anything comes up for me as a District Judge.

5    Maybe what we need is somebody who can really roll up

6 their sleeves with some expertise on this stuff and help you

7 cut through it all.

8    **MR. SNYDER:**  Your Honor, it is Mr. Snyder.  The issue

9 there is -- we are always happy to meet with a Magistrate Judge

10 if there is an impasse.

11    What I'm trying to explain -- I guess, not effectively --

12 to the Court is it is so premature because the Plaintiffs are

13 not coming to the table in the ordinary course as a Plaintiff

14 prosecuting a case normally would, which would be chomping at

15 the bit to get custodians, search terms and --

16    **THE COURT:**  Right.  But, again -- sorry to interrupt

17 but, again, I'm not in a position to know whether that's

18 actually true or not; right.  I don't -- all I know sitting

19 here is that we have two sides in a massive case that are

20 having a tremendous amount of difficulty even, you know,

21 figuring out the terms under which they are going to negotiate

22 the production of discovery, and --

23    **MR. SNYDER:**  You know what, Judge -- we are okay with

24 that, Judge.  I think -- look, we know -- and I know this

25 sounds overly declarative.  We know that we are not only in

1  good-faith but we are working hard to do the right thing here.

2  And if Your Honor wants a Magistrate Judge to evaluate that, we

3  are confident that the Judge will agree because we are ready to

4  go.

5      We have a year to prove and we think win our case, and we

6  do not want to delay anything.  It really is the Plaintiff who

7  put the brakes on.  So if Your Honor thinks that going in front

8  of a Magistrate Judge is constructive, we are all for it

9  because we do not want this case to be delayed.  We want to go

10 forward on the current schedule.

11         THE COURT:  And, you know, maybe --

12         MR. LOESER:  Your Honor --

13         THE COURT:  -- we set something up where you are just

14 required -- you know, sorry to make you fly all these times;

15 but it is just like an in-person meeting.

16     I mean, I had a real problem case awhile back where I -- I

17 felt the need to do this, and there were just regular in-person

18 meetings with the Magistrate Judge.  And, you know, things

19 got -- things started moving along once I did that.

20     Mr. Loeser?

21         MR. LOESER:  Your Honor, it's Derek Loeser.  If I

22 could be heard.

23         THE COURT:  Go ahead.

24         MR. LOESER:  We don't have any problem with a

25 Magistrate Judge.  We think Magistrate Judge Corley, for

1    example, is someone who has a lot of experience with issues

2    like this.  I will say --

3        **THE COURT:**  That's the person -- that's the person who

4    fixed my last problem case.  Anyway, sorry.  Go ahead.

5        **MR. LOESER:**  We would be in favor of that because I

6    can tell you that, you know, it is nice to hear Mr. Snyder --

7    and I understand that he may not have a great grasp on the

8    meet-and-confers and disputes that have occurred because he

9    hasn't been on any of those meet-and-confer calls -- but I can

10   tell you, we have tried very hard for a very long time to

11   engage Facebook and have a reasonable conversation about search

12   terms and custodians.

13       We have offered up what seemed to us like common-sense

14   solutions; like, why don't we start with what you have already

15   gathered for the FTC.  Why don't we look at the custodians you

16   have used there.  Why don't we look at the search terms.  They

17   rejected all of that.

18       They have no organizational charts they claim; no charts

19   that are -- not called organizational charts but have the same

20   information.  You know, if in discovery it ends up being the

21   case that such materials actually exist, which wouldn't

22   surprise us, I guess Facebook would have some explaining to do.

23       In the absence of any of this detailed information, we

24   have just sort of gone out on the Internet to come up with as

25   much information as we can to put together search terms and

1   custodians.  Facebook has refused to discuss those.

2       So the idea that we have somehow -- Plaintiffs in a

3   litigation want to slow down discovery is pretty ridiculous and

4   obviously untrue.  We would welcome biweekly -- we will sit

5   down with a Magistrate three times a week if that's what it

6   takes.  We will be there as much as we need to be there.  We

7   will fly there.  We want this case to move.  We want to meet

8   the deadline.

9       What we don't want to have happen is what Facebook has

10  structured here, which is they have produced 150,000 documents

11  that relate only to a handful of named Plaintiffs.  The

12  materials are produced in a fashion that makes them largely

13  unusable.  They have achieved what Your Honor said they should

14  not do which is bifurcate discovery.

15      And at the present rate with what they are doing with

16  discovery, meeting that deadline seems very, very challenging.

17  We want to meet that deadline.  We want to come there, and we

18  will talk to anyone that we need to talk to make that happen.

19          THE COURT:  Okay.  I think that's what I'm going to

20  do.

21      Are there any -- I mean -- I will preface my question that

22  I'm about to ask you with the statement that I am generally

23  very reluctant to appoint anybody from outside the court

24  system, you know, Special Master, Special Discovery Master,

25  what have you.

1    But I just wanted to check.  I know it happens a lot in

2  MDLs that a Special Discovery Master is appointed, somebody

3  from outside the court.  So even though I'm -- I doubt I would

4  do it.  I just wanted to ask people what they thought about

5  that as opposed to a Magistrate Judge.

6    **MS. STEIN:**  Thank you, Your Honor.  This is Deborah

7  Stein for Facebook just chiming in.  I think we are comfortable

8  with a Magistrate Judge and are happy to participate in that

9  process.

10    You know, I take it from Plaintiffs' Counsel that, you

11  know, he would like someone from Facebook who has been involved

12  in these calls to, you know, address the Court today on this.

13    And I have been involved in the calls.  I don't think that

14  Plaintiffs --

15    **THE COURT:**  Well, I don't need -- I appreciate it, but

16  I don't really want to hear anymore discussion of who is right

17  or wrong.

18    **MS. STEIN:**  Okay.

19    **THE COURT:**  Simply because we can be here for three

20  hours, and I still would not be a position to know who is right

21  or wrong.

22    Do you-all -- do you-all have a suggestion or a request

23  for a Magistrate Judge?

24    **MS. STEIN:**  We are fine, Your Honor, with whoever you

25  would like.  I think that from our perspective, you know, I

1   think what would make sense on a timing front would be whatever

2   Your Honor thinks would make sense for the initial meeting and

3   then, you know, on a going forward basis for the Magistrate to

4   make determinations as to when the next meeting would make

5   sense.

6       There are probably some instances where two weeks, you

7   know, is really too quick.  And maybe there are other instances

8   where, you know, a follow-up call or something is required.

9   But, you know, I think having a standing two-week in-person

10  might be a bit onerous and might make more sense to have it

11  tied to, you know, specific milestones.

12      **MS. WEAVER:**  Your Honor, if I might, this is Lesley

13  Weaver on behalf of Plaintiffs.

14      And just to chime in here, I think -- if I'm hearing the

15  Court correctly, I do think having somebody very skilled in ESI

16  would be very helpful in this case.

17      We think a lot of this production needs to be done in

18  native form.  And that's going to be more complex than, I

19  think, even ordinarily occurs in your run-of-the-mill antitrust

20  or securities case just because of the natural environment a

21  lot of the subject material lives in.

22      Magistrate Judge Corley certainly has that experience.  I

23  think Magistrate Judge Beeler does.  If Your Honor decided that

24  he wanted to consider a Special Master, we would be happy to

25  discuss that.  And Judge Laporte, who is now at JAMS, might be

1  a good candidate given her expertise with ESI as well.  So

2  those are just three options I think we would be comfortable

3  with.

4       **MR. SNYDER:**  Your Honor, may I suggest that we meet

5  and confer and suggest a name if we can agree on one just

6  because we are going to want to get client input on this one.

7  Judge Grewal may have an opinion.

8                     (Laughter)

9       **MR. LOESER:**  Your Honor, Derek Loeser -- I'm sorry, go

10  ahead.

11       **THE COURT:**  Yeah, that's fine.  I mean, even if you

12  agree on a name, you may not get that name just because -- you

13  know, it is going to depend on people's schedules; but why

14  don't you go ahead and send -- go ahead and send Kristen an

15  e-mail telling us what -- you know, whether -- whether the

16  parties want to jointly recommend somebody or jointly request

17  somebody and that can be -- you can do that by Monday.  Does

18  that sound okay?

19       **MR. LOESER:**  Great, Judge.  That sounds fine,

20  Your Honor.  Just won't be any great surprise if the three

21  names we just provided are likely the ones that we think make

22  the most sense.

23       **THE COURT:**  Okay.

24       **MR. LOESER:**  In the meantime we have a collection of

25  issues that we need to advance with all due* dispatch.  And so

1    I'm not sure where that leaves us with those issues.  I think

2    the meet-and-confer process with regard to those issues is

3    frankly at an impasse and it is not any great need to keep

4    going around in circles.

5        So I suppose we will send in this e-mail.  Hopefully we

6    will have an agreement in the next couple of days or if no

7    agreement, the Court can simply indicate who the Special Master

8    will be.  And it would then be the plan to submit these

9    disputes to the Magistrate or Special Master.

10        THE COURT:  I'm happy to, you know, make an attempt to

11   cut through some of the stuff if it would be helpful to you.

12        I will start with Facebook.  I have a question of

13   Facebook.  I'm looking at Footnote 2 of Facebook's case

14   management statement.

15        It says (reading):  "Plaintiff's contend Facebook has not

16   completed production of certain FTC correspondence that the

17   parties discussed with the Court.  This is untrue.  Facebook

18   has produced all document demands and correspondence that it

19   agreed to provide from the FTC proceedings."

20        That was a little ambiguous to me.  I don't know if that

21   was just -- it was sort of a mistake in the way you worded it.

22   But "we have produced everything that we agreed to provide."

23        I thought that I ordered you to provide all correspondence

24   between you and the FTC about document production.  So I just

25   wanted to get clear whether you have provided -- whether you

1    have disclosed to the Plaintiffs all correspondence between you

2    and the FTC regarding document production.

3         **MS. KUTSCHER:**  Your Honor, this is Martie Kutscher at

4    Gibson.

5         I think the wording of the footnote was just a little bit

6    unclear.  There was nothing intentional about that wording.  At

7    the last case management conference we had discussed that

8    Facebook had already produced all document demands from the FTC

9    from its 2018/2019 investigation as well as correspondence from

10   the FTC describing the scope of those demands.

11        And we understood that the Court had ordered us to produce

12   the same materials from the earlier FTC proceeding.  So we

13   produced those materials.

14        The parties had separately discussed producing additional

15   correspondence from the 2018/2019 investigation from Facebook

16   regarding the scope of what was produced in that investigation,

17   and that correspondence has been produced.

18        **THE COURT:**  Okay.  A related issue is that the

19   Plaintiffs want search terms that were used to prepare the FTC

20   productions.  I'm not really seeing what is wrong with

21   providing the Plaintiffs with search terms that were used to

22   prepare the FTC productions.  It may -- it may streamline the

23   process of figuring out what search terms to use and what

24   search terms not to use, and I don't see how Facebook is harmed

25   in any real way by providing those to the Plaintiffs.

1    **MS. STEIN:**  Your Honor, this is Deborah Stein again.

2    This is an issue that we have gone around with Plaintiffs

3    on and we actually prepared a joint letter on because it is an

4    important issue.  And for some reason the matter that we had

5    fully briefed did not get presented to Your Honor.

6    We have a concern about this for a variety of reasons.  We

7    do think that it will end up creating inefficiencies because

8    these are different cases with different requests for

9    production.

10   And we have a concern that what is really going on here is

11   that they are looking for the FTC search terms for different

12   reasons than efficiency purposes; that they are looking to sort

13   of second-guess the FTC investigation.  And we have provided

14   them with very broad, lengthy boolean searches that they are

15   free to build upon and make -- propose searches that they think

16   hit upon their actual request for production that are tethered

17   to their request for production and what is at issue in this

18   case as opposed to the FTC case.

19   They are getting the FTC documents from us starting with

20   search terms that have already been used and run and that they

21   are getting the documents for doesn't really advance getting

22   them more documents here.

23   **THE COURT:**  Well, I mean your argument --

24   **MS. STEIN:**  And for some reason we have been unable to

25   get them to either build upon --

**PROCEEDINGS**

1          **THE COURT:**  Sorry to interrupt.  Hello?

2          **MS. STEIN:**  -- that we have provided them or for them

3     to even provide their own search terms.  I, frankly, have never

4     dealt with a case where Plaintiffs don't send over boolean

5     search terms.  I mean, they are often broader than what we want

6     to see; but, you know, here we just got a list of words that

7     includes things like "likes" and --

8          **MR. SNYDER:**  But before -- Deborah, let me just add to

9     that.  This is Orin Snyder from Gibson Dunn.

10       Your Honor, here is the problem.  They are getting all the

11    FTC documents that relate to the -- to their case.  The FTC

12    investigated other things that have nothing to do with this

13    case at all.  Let's call it X, Y and Z.

14         **THE COURT:**  I know but --

15         **MR. SNYDER:**  And we should not --

16         **THE COURT:**  It sounds like you're arguing -- if I may

17    interrupt, it sounds like what you are saying is that if you

18    turn over the search terms that you used for the FTC documents,

19    then they are going to react in an overzealous way to that and

20    they are going to start demanding stuff that isn't relevant to

21    this litigation, and that is -- it is just going to be a

22    distraction.

23       But that, of course, can be dealt with.  If they start

24    asking -- if receiving those search terms starts causing them

25    to ask for stuff that they shouldn't be entitled to in this

1  litigation, that can be dealt with at that time.

2      On the other hand, maybe the search terms that you used

3  would help inform the search terms that are used in this case.

4  And it feels a little bit like you are just hiding the ball by

5  not being willing to give them those search terms.

6      MR. SNYDER:  No, Your Honor.  Your Honor took pains to

7  identify four potential theories buried in their pleading.  And

8  the Court held in its decision that the case is limited to

9  those four theories.

10      THE COURT:  For now.

11      MR. SNYDER:  -- and anything else -- right.  For now.

12  And, therefore, we should be engaging in discovery based on

13  those theories with search terms and custodians.  They want now

14  discovery into essentially what the FTC asked us to produce

15  that has nothing to do with this case which is a classic

16  fishing expedition.

17      THE COURT:  Yeah, but --

18      MR. SNYDER:  And we have agreed --

19      THE COURT:  -- all I'm asking you to give them is the

20  search terms.

21      MR. SNYDER:  Right.

22      THE COURT:  I'm not asking you to give them the

23  documents.

24      MR. SNYDER:  But the search terms are the key -- it is

25  the same thing effectively, Your Honor, because it identifies

1   areas that have nothing to do with this case, and it would lead

2   not only to unnecessary motion practice but --

3         THE COURT:  Oh, there is going to be plenty of

4   unnecessary motion practice in this case.  I don't think we

5   need to worry about that.

6         MR. SNYDER:  But the Court has already held at the

7   last CMC, the January one, that not all materials produced to

8   the FTC must be reproduced here.  Giving them the search terms

9   would be an end-run around that ruling.

10      This is not FTC versus Facebook.  This is the Plaintiffs

11  versus Facebook.

12        THE COURT:  Why?  Why?  I'm not saying you give them

13  access to the universe of documents searched.  I'm just saying

14  you give them the search terms to help them -- to help them

15  inform their position on what the search terms should be.

16        MR. SNYDER:  That's not why they want them.

17      Martie, go ahead.

18        MS. KUTSCHER:  One of the bigger issues we are also

19  facing on this issue is what the Plaintiffs requested in their

20  document request was all of the FTC materials and then a slew

21  of other materials.  So they have those requests and they have

22  twenty-some odd additional requests.

23      We are giving them the FTC materials, and the FTC search

24  terms are crafted around those materials.  They are not crafted

25  for the additional searches or the additional requests the

1   Plaintiffs had made.

2        So using the FTC search terms as a starting point just

3   isn't really an effective way to start because those searches

4   are tailored towards the documents they are already getting

5   from the FTC productions and really are not tailored or

6   relevant to the additional document demand, and that's what we

7   need to figure out, the searches for those demands.

8        **MR. LOESER:**  Your Honor --

9        **THE COURT:**  But you can make those arguments after you

10  give them the search terms.  You can make those arguments after

11  you give them the search terms.  You can say:  Here is the

12  search terms, but we can't -- we can't be tied to this because

13  it is going to produce a bunch of stuff that is irrelevant.  I

14  mean, what am I missing?

15       **MR. LOESER:**  Which, Your Honor, is exactly why we want

16  the search terms.  I'm sorry to interrupt, Mr. Snyder, but you

17  know, what we are hearing is a lot of description of things

18  that were after that were inappropriate, and we were searching

19  for materials that were not related to our case.

20       That is all not true.  We want the search terms

21  specifically to identify things that are related to the case.

22  And if it kind of seems like hiding the ball, that's exactly

23  what it is.  These terms resulted in the production of

24  materials for an investigation that significantly overlaps.

25  They are a good starting place.

**PROCEEDINGS**

1       When we get the terms, we can look at ones.  If they don't

2   relate to this matter, we will cross them off the list.  If we

3   want to argue with Facebook about what does or doesn't relate

4   to matter, then that is the meet-and-confer we were trying to

5   have with them which they refuse to have.

6       It just doesn't make sense to claim that these terms are

7   not helpful or unrelated.  Obviously they are.  They resulted

8   in the production for an investigation that overlaps

9   substantially with this case.

10      I can promise the Court and Mr. Snyder and everybody else

11  on the phone, we have no intention of using them

12  inappropriately or for any purpose other than identifying

13  appropriate search terms for the subject matter of our case.

14  We have no other intention.

15      **MR. SNYDER:**  Your Honor, we have -- this is

16  Mr. Snyder.  We have briefed this already.  Your Honor's point,

17  it wouldn't be fair to weigh in without more information; that

18  you need three hours.  If I can respectfully request, this is a

19  big issue for Facebook for reasons that we set forth in our

20  briefing.

21      We believe this should be a threshold issue or be for the

22  Magistrate Judge, and it would be unfair for Your Honor, based

23  on this limited record, to rule on this issue.

24      We are not hiding the ball at all.  This has to do with

25  them getting results of search -- searches that -- Facebook

1    conducted internally to produce documents to the FTC.

2        The way the Federal Rules work is the parties meet and

3    confer and agree on search terms based on the case before them.

4    And we would respectfully request that once the Magistrate

5    Judge is in place, this will be the first issue to address; and

6    that we abide that rather than have it -- frankly, a ruling on

7    at best a partial record.

8        **THE COURT:**  It sounds like you are working on briefing

9    already.  Why don't you submit a letter brief to me, a joint

10   letter, by Monday.  And then I will decide whether to rule on

11   it or kick it to the Magistrate Judge.

12       **MR. SNYDER:**  That sounds great.

13       **MR. LOESER:**  Your Honor, Derek Loeser.  That sounds

14   fine.  We do have the materials already prepared.  In case you

15   are interested in knowing, they weren't filed because after we

16   prepared our portion, Facebook indicated that it would provide

17   us with search terms and custodians.  We waited for that.

18   That's when we got their 9 custodian and 12 search strings

19   which wasn't worth waiting for.  So we have those materials.

20       **THE COURT:**  The only other thing I want to say right

21   now, and I'm going to -- I mean, I have said it a number of

22   times on the record already -- I am concerned -- you know,

23   without making any suggestions about anybody, you know, whether

24   anybody is acting in bad faith or being dilatory or anything

25   like that, I am concerned that Facebook has, you know, often

1  made statements reflecting an unduly narrow view of what should

2  be turned over to the Plaintiffs.

3      And, you know, this is a big case.  I mean, there is often

4  a lot of talk about proportionality and whatnot.  This is a big

5  case.  It is a significant issue.  You know, and there is --

6  this is not the type of case where we are going to be saying:

7  Well, that might end up -- that effort might end up uncovering

8  some relevant information; but, you know, it is just too

9  expensive or difficult, and so we are not going to make

10  Facebook do it.

11      This is really not one of those cases where that is

12  very -- that type of argument is likely to carry the day.  You

13  know, and, as I have said a number of times, you know, the best

14  way to figure out what happened as it relates to the claims

15  that are going forward now is to -- for Facebook to produce all

16  information, all documents about the practices associated with

17  giving third parties access to friends' information and

18  friends' of friends information.

19      And I --

20      **MR. SNYDER:**  Your Honor, may I be heard on that

21  because Your Honor has no basis for concern on that score.

22      If I was there, I would look you in the eyes.  I'm telling

23  you, Judge, we are not only acting in good-faith; we are eager

24  to produce documents, whatever the expense, that are relevant

25  to the issues in this case.

1     And we have been trying to do that by meeting and

2     conferring and trying to get moving in accordance with the

3     Federal Rules of Civil Procedure which is, you ask us for

4     documents.  We meet and confer on custodians and search terms,

5     and we produce documents.

6     We are not saying expense.  What we are saying is --

7     Your Honor knows the history of the case as well as we do.  It

8     started in' 18.  Your Honor gave them discovery on five topics.

9     They filed a Complaint.  Your Honor identified deficiencies in

10     that Complaint.  They filed a new Complaint.  Your Honor sifted

11     through this kitchen sink Complaint and identified the viable

12     potential theories.  And on those theories not only is there no

13     ball hiding, we want to get on with it.  It is not that

14     complicated.

15     **THE COURT:**  I have heard --

16     **MR. SNYDER:**  But, Judge -- what they want to do,

17     Judge, is they really are still looking for a better theory and

18     that's what this is all about.  Otherwise, they would be acting

19     like a Plaintiff and saying:  Okay.  Let's get the search terms

20     and let's get the custodians.

21     Instead, they want to backdoor FTC search terms because

22     they are looking for some other theory of the case.  But I am

23     confident, Your Honor, that when you see our performance on the

24     issues in this case in terms of our production of documents,

25     you will have no basis for concern because we want to get on

1    with it because we think those documents actually are the key

2    to us winning this case.

3         THE COURT:  I can't wait.  Okay.  So we will -- we

4    will hear from you-all on a couple of things by Monday.  And in

5    the meantime, I will look into the possibility of a Magistrate

6    Judge referral for discovery purposes.

7         MR. SNYDER:  Great.  Thank you.

8         MR. LOESER:  Derek Loeser.  Before we all hang up and

9    go our separate ways, can I raise a couple other discrete

10   issues?

11        THE COURT:  Only if it is really quick.

12        MR. LOESER:  Yeah.  One is just this process for

13   having Your Honor receive joint submissions on disputes, and

14   it's just really a housekeeping thing.

15        Under your rules, you know, there is a procedure where

16   each side puts together five pages and submits it to the Court.

17   One of the problems we have been having with these sort of

18   endless meet-and-confers is there is no deadline to actually

19   submit the materiality to the Court.  And that was the basis

20   for our proposal where there would be five days after a

21   meet-and-confer for one party to submit the materials and then

22   three days after that for the other side.

23        I do think it would remove a real practical problem we are

24   having in terms of the speed with which things can get to the

25   Court.

1    **THE COURT:**  Yeah, that's -- I hear you.  And we will

2  let the Magistrate Judge figure out how they want to address

3  that.

4    **MR. LOESER:**  Okay.  And the very last thing is we have

5  a UK Plaintiff which Your Honor has noted before.  The UK

6  Plaintiff we have wishes to withdraw.  We have two other UK

7  Plaintiffs who are prepared to substitute in.  Claims are

8  exactly the same and simply it would be two people substituting

9  in for one substituting out.

10    We have asked Facebook to consent.  They refuse.  They

11  have indicated they are going to oppose our substitutions.  And

12  so if that's really the position they are going to take at this

13  stage of the case that we are in, then we will be filing a

14  motion just asking for substitution for this purpose.

15    **THE COURT:**  Okay.  I mean -- I was -- I may be

16  ignorant on this topic.  I was scratching my head about whether

17  the class could include everybody in the UK or people from the

18  UK.  But assuming it can, I can't imagine denying a request to

19  substitute in Plaintiffs at this relatively early stage in the

20  case.  But -- and maybe Facebook can consider my comment in

21  deciding whether to oppose it.  But if they -- if they want to

22  oppose it, they have a right to do so; and I will decide the

23  motion.

24    **MR. LOESER:**  Okay.  Your Honor, and for Plaintiffs we

25  are looking really forward to a process where there are more

1  than 12 search terms and 9 custodians.  We appreciate the time,

2  Your Honor, has spent dealing with these issues today.

3          **THE COURT:**  All right.  Thank you.

4          **MR. SNYDER:**  Thank you.

5          **MS. STEIN:**  Good night.

6          **MR. LOESER:**  Thank you.

7              (Proceedings adjourned at 1:47 p.m.)

8                      ---oOo---

9

10                  <u>**CERTIFICATE OF REPORTER**</u>

11          We certify that the foregoing is a correct transcript

12  from the record of proceedings in the above-entitled matter.

13

14  DATE:  Sunday, March 8, 2020

15

16

17

18          _____

19                  Marla F. Knox, RPR, CRR
                    U.S. Court Reporter
20

21

22

23

24

25

4483