# FACEBOOK EXHIBIT O

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
  klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
  mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
  dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

IN RE: FACEBOOK, INC. CONSUMER
PRIVACY USER PROFILE LITIGATION,

This document relates to:

ALL ACTIONS

CASE NO. 3:18-MD-02843-VC

**MOTION FOR RECONSIDERATION OF
SPECIAL MASTER'S ORDER
REGARDING PRODUCTION OF ADI
RELATED DOCUMENTS**

**HEARING REQUESTED**

Gibson, Dunn &
Crutcher LLP

1

**TABLE OF CONTENTS**

2

INTRODUCTION ........................................................................................................... 1

3

ARGUMENT ................................................................................................................... 3

4

I. Facebook seeks reconsideration of the Tentative Order's ruling that ADI-
5  related communications among non-attorneys are discoverable. ............................... 3

6  A. Judge Corley considered and rejected Plaintiffs' request for ADI-
   communications and instead found discoverable three specific buckets
7   of "underlying fact[ual]" materials. ................................................................ 4

8  B. Contrary to Judge Corley's guidance, the Special Master ordered
9   Facebook to produce large volumes of ADI communications. ......................... 6

10

II. Facebook seeks reconsideration of the production timeline required by the
  Tentative Order because it would be impossible for Facebook to comply with. .......... 8

11

12

III. Facebook seeks reconsideration of the Tentative Order's requirement that
  Facebook produce documents that are not relevant to the live claims and
13  defenses in this case. ............................................................................................... 11

14

IV. Facebook seeks reconsideration of any requirement that Facebook produce
  materials over which it asserts privilege without the Special Master having
15  conducted the document-by-document *in camera* review that Ninth Circuit
  authority requires. ................................................................................................... 12

16

17 V. Facebook seeks reconsideration of the Tentative Order's holding that Facebook
  must produce attorney audits and "all memoranda" prepared by its consulting
18  experts. ................................................................................................................... 14

19

CONCLUSION .............................................................................................................. 15

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

1
2

# TABLE OF AUTHORITIES

**Cases**

Page(s)

3
4

*Attorney General v. Facebook, Inc.*,
    164 N.E.3d 873 (Mass. 2021) ..........................................................................7, 12

5

*California Dep't of Soc. Servs. v. Leavitt*,
    523 F.3d 1025 (9th Cir. 2008) ................................................................................5

6
7

*Dolby Lab'ys Licensing Corp. v. Adobe Inc.*,
    402 F. Supp. 3d 855 (N.D. Cal. 2019) ...................................................................13

8
9

*Fosbre v. Las Vegas Sands Corp.*,
    2016 WL 183476 (D. Nev. Jan. 14, 2016) .............................................................13

10
11

*Leon v. Cnty. of San Diego*,
    202 F.R.D. 631 (S.D. Cal. 2001) ...........................................................................11

12

*In re High-Tech Emp. Antitrust Litig.*,
    2013 WL 772668 (N.D. Cal. Feb. 28, 2013) ..........................................................13

13
14

*In re Lidoderm Antitrust Litig.*,
    2016 WL 861019 (N.D. Cal. Mar. 7, 2016) ...........................................................13

15
16

*In re Grand Jury*,
    13 F.4th 710 (9th Cir. 2021) ..................................................................................13

17

*In re Kellogg Brown & Root, Inc.*,
    756 F.3d 754 (D.C. Cir. 2014) ...............................................................................13

18
19

*In re Gen. Motors LLC Ignition Switch Litig.*,
    80 F. Supp. 3d 521 (S.D.N.Y. 2015) ......................................................................13

20
21

*Pearson v. Ariz.*,
    2020 WL 5544373 (D. Ariz. Sept. 16, 2020) .........................................................13

22

*Phoenix Techs. Ltd. v. VMware, Inc.*,
    195 F. Supp. 3d 1096 (N.D. Cal. 2016) .................................................................13

23
24

*Pitkin v. Corizon Health, Inc.*,
    2017 WL 6496565 (D. Or. Dec. 18, 2017) .............................................................13

25

*Smith-Brown v. Ulta Beauty, Inc.*,
    2019 WL 2644243 (N.D. Ill. June 27, 2019) ..........................................................13

26
27

*Todd v. STAAR Surgical Co.*,
    2015 WL 13388227 (C.D. Cal. Aug. 21, 2015) ......................................................13

28

Gibson, Dunn &
Crutcher LLP

*United States ex rel. Wollman v. Mass. Gen. Hosp., Inc.*,
    475 F. Supp. 3d 45 (D. Mass. 2020) ..............................................................................................13

Gibson, Dunn &
Crutcher LLP

MOTION FOR RECONSIDERATION OF SPECIAL MASTER'S ORDER REGARDING PRODUCTION OF ADI RELATED DOCUMENTS
CASE NO. 3:18-MD-02843-VC

**INTRODUCTION**

Facebook respectfully seeks reconsideration of the Special Master's December 8, 2021 Tentative Order re: Production of ADI Related Documents ("Tentative Order").[1]  Complying with the Tentative Order would require a massive and overbroad collection and review of ADI materials that would likely take ***thousands*** of attorney hours to complete.  Undertaking that process would run counter to Judge Corley's guidance and basic proportionality principles, and completing it on the timeframe the Tentative Order requires is literally impossible.

This case is not about ADI and how it was conducted.  It is about long-deprecated forms of data-sharing that ended before ADI even began.  Judge Corley recognized that communications about how ADI was conducted were not relevant and potentially privileged and limited ADI discovery accordingly to certain documents she found to contain "underlying facts" that ADI uncovered.  The Tentative Order does the opposite, throwing a bomb into the discovery process without any concern for relevance, privilege, burden, or proportionality.  By opening up the case to a massive ADI review with just six weeks before the substantial completion deadline, the Tentative Order would hamstring this litigation in months of additional discovery on a sideshow topic.  The Tentative Order should be modified to reflect Judge Corley's guidance that the ADI productions should be limited to relevant underlying factual materials and proportionate to the needs of this case.

After working with the parties for nearly two years to focus Plaintiffs' ADI requests, Judge Corley identified three categories of materials for Facebook's ADI production and made clear that the production should be tailored and proportionate.  The Tentative Order would upend Judge Corley's guidance by requiring a colossal collection and review of ADI communications far beyond the scope Judge Corley contemplated and the proportionality principles articulated in Rule 26.  After a burdensome sampling exercise and *in camera* review of ADI correspondence among non-attorneys, Judge Corley did not order Facebook to produce a single ADI communication.  Instead, she found: "a lot of it" not "relevant at all" and found some materials to be "privilege[d]."  Apr. 6, 2021 Hr'g Tr. (Ex. B) at 17:8–21.  Recognizing that Plaintiffs' overbroad request for ADI communications was

---

[1] Under the Special Master's briefing protocol (Protocol for Resolving Discovery Disputes – Order No. 1, JAMS Ref. No. 1200058674, Aug. 20, 2021), the Special Master's rulings are "tentative" and "become final" only "[i]n the absence of a timely request for reconsideration."  *Id.* ¶¶ 7-8.  The Special Master granted Facebook an extension of one day, until December 15, 2021, to file this reconsideration motion.

unworkable, infeasible, and unrealistic, Judge Corley instead guided the parties toward a limited production of three categories of underlying factual materials. *Id*. at 18:13-15; *id*. at 18:1-4. The Tentative Order blows far beyond those boundaries and unwinds Judge Corley's guidance.

The Tentative Order is also impossible to comply with. Under the Tentative Order, within two weeks of a request from Plaintiffs, Facebook could have to conduct a detailed review of many thousands of communications relating to up to ███ **apps**, and assess which relate in any way to an investigatory report prepared by outside experts at the direction of counsel. This would be a gargantuan and disproportionate undertaking. The review would require *thousands* of attorney hours and could be completed accurately only by attorneys who have significant experience with ADI. A similar review for just **six apps** required more than 300 attorney hours from attorneys who worked on ADI. The review the Tentative Order contemplates would be many orders of magnitude larger, and it would only be the start. The Tentative Order opens the door for endless large, rapid-fire reviews.

Judge Corley did not intend ADI productions to cause a multi-month expenditure of such proportions. The Tentative Order's sweeping language erases nearly two years of work to focus the universe of discoverable ADI documents, and it disregards Judge Corley's care and calibration in identifying three categories of materials that she found potentially discoverable and proportionate.

The Tentative Order also conflicts directly with the Massachusetts Supreme Judicial Court's recent holding that ADI communications are privileged, and runs afoul of authority requiring a document-by-document *in camera* review before ordering a party to produce documents over which it asserts privilege. The Special Master has not reviewed any communications he ordered Facebook to produce, and Judge Corley—who did—stated that many appeared to be privileged and irrelevant.

Facebook respectfully asks the Special Master to reconsider his ruling and instead confine Facebook's ADI production obligations to the three categories of ADI materials Judge Corley ordered Facebook to produce under compulsion on the basis that they concern "underlying facts": (i) background and technical reports prepared by consulting experts; (ii) audits conducted by non-attorneys, and (iii) interviews conducted by non-attorneys. In the event that the Special Master does not reconsider or modify the Tentative Order, Facebook respectfully requests a stay of the order pending appeal to Judge Corley. Facebook requests a hearing on this motion.

MOTION FOR RECONSIDERATION OF SPECIAL MASTER'S ORDER REGARDING PRODUCTION OF ADI RELATED DOCUMENTS
CASE NO. 3:18-MD-02843-VC

## ARGUMENT

I.  **Facebook seeks reconsideration of the Tentative Order's ruling that ADI-related communications among non-attorneys are discoverable.**

Facebook respectfully seeks reconsideration of the Special Master's finding that "Judge Corley's order does not exclude non-attorney internal Facebook communications, communications with [Facebook's consulting experts], or communications with third party app developers from the scope of ADI documents to be produced." Tentative Order ¶ 12.

When Facebook first raised to Judge Corley the massive volume of ADI-related communications and the myriad privilege issues they implicate, Judge Corley made clear that any ADI production would be proportionate and limited to relevant, non-privileged documents going to the "underlying facts." She did not order that every single underlying document be produced. Rather, she observed correctly that many of the documents were not relevant or necessary.

Judge Corley worked with the parties to design a sampling exercise so that she could provide guidance on which ADI-related materials would be discoverable. After an *in camera* review of sample ADI communications among non-attorneys (of Plaintiffs' choosing), Judge Corley did not order production of a single communication. Instead, she recognized that many of the materials she reviewed were not relevant and that many were privileged. Ex. B at 17:15-21. In response, Plaintiffs insisted they did not need ADI communications and limited their request: "[T]he facts underlying these communications are what we're really seeking." *Id.* at 18:13-15; id. at 18:1-4. The parties then spent months negotiating and litigating which "underlying facts" from ADI Facebook would produce, all with the understanding that communications were off the table.

Judge Corley ultimately found three specific categories of ADI materials potentially discoverable on the basis that they could contain "underlying facts"—(i) background and technical reports prepared by outside experts, (ii) audits of app developers conducted by non-attorneys, and (iii) interviews of app developers conducted by non-attorneys. The Tentative Order blows past these categories and would require Facebook to conduct an enormously burdensome collection and review of nearly all ADI communications relating to up to ███ apps—and to produce many volumes of those communications within a matter of days. That is simply not possible.

Gibson, Dunn & Crutcher LLP

A.      **Judge Corley considered and rejected Plaintiffs' request for ADI-communications.**

1.      Plaintiffs initially demanded that Facebook produce all ADI-related documents and communications.  Understanding there were potentially millions of privileged documents within the scope of Plaintiffs' request and in an effort to avoid unnecessary burdens on the parties and the Court, Judge Corley asked the parties to identify a sample of materials so that she could provide guidance on which materials she believed to be privileged. July 13, 2020 Hr'g Tr. (Ex. C) at 44:23–48:8.

2.      The parties agreed to a sampling exercise for materials connected with six exemplar apps.[2] Dkt 513-1 (Ex. D).  The parties agreed to 26 ADI custodians.  Facebook collected and reviewed all communications from those custodians hitting on the six apps' names or ID numbers, then produced non-privileged documents and logged privileged communications.  *Id.*  Facebook's logs contained over 6,000 entries.  Dkt. 599 (Ex. E) at 4; Southwell Decl. ¶ 17.  Completing this sampling process for just six apps took more than **300 attorney hours**.  Southwell Decl. ¶ 17.

3.      Plaintiffs ultimately moved to compel all entries on Facebook's exemplar privilege logs that did not list an attorney as an author or recipient (i.e. non-attorney communications).  Judge Corley ordered Plaintiffs to select 20 of those entries for *in camera* review and ordered the parties to submit simultaneous briefs regarding the 20 documents.  Dkt. 602 (Ex. F) ¶ A; Jan. 15, 2021 Hr'g Tr. (Ex. G) at 4:15–11:19; *id.* at 12:13–15.[3]  She did not permit declarations.  *Id.*

4.      **After conducting an *in camera* review of the 20 non-attorney communications Plaintiffs chose, Judge Corley did not order a single communication (or attachment) produced.** Judge Corley stated:  "[A] lot of it I don't think is relevant at all"—some materials are "privilege[d] and I actually think you don't even need."  Ex. B at 17:8–21.  Judge Corley expressed a preliminary view that "underlying facts" from ADI would be discoverable, Dkt. 711 (Ex. I) at 1, but that "there are certainly going to be documents in there that are "(a) attorney-client privilege[d]; or (b) attorney work product."  Ex. B at 16:22–24.  She then explained that she was not inclined to issue a ruling on

---

[2] The parties agreed to two apps that were investigated but not suspended, two apps that were investigated and suspended for non-compliance with the investigation, and two apps that were investigated and suspended not only for non-compliance with the investigation.

[3] Plaintiffs' Motion To Compel Production of Documents Related To Facebook's App Developer Investigation—which demanded productions of the materials Judge Corley reviewed *in camera*, along with all other non-attorney communications from ADI—is Docket Number 611-2 (Ex. H) in this case.

Gibson, Dunn &
Crutcher LLP

the 20 documents she reviewed because any ruling could not resolve the parties' broader privilege dispute, and the parties would likely be back before the Court on "every single document." *Id.* at 17:15–21.

5.     After declining to order production of non-attorney ADI communications, Judge Corley pressed Plaintiffs to focus and narrow their request. She asked them "what . . . precisely [it is] that the plaintiffs need from th[e] investigation." Ex. B at 17:22–23. Plaintiffs clarified they did not actually seek the materials they challenged and selected for *in camera* review, which consisted of non-attorney ADI communications, and instead sought the underlying facts: "[T]he facts underlying these communications are what we're really seeking." *Id.* at 18:13–15; *id.* at 18:1–4. In reliance on that representation, the parties mediated Plaintiffs' request for "facts" for more than three months.

6.     When the parties did not resolve the dispute in mediation, Judge Corley ordered the parties to submit a joint letter brief. Dkt. 693 (Ex. J). She then issued an order reflecting her understanding that Plaintiffs no longer sought communications from ADI. Ex. I. She explained, Plaintiffs sought "background and technical investigations" and "Facebook conducted audits and interviews." *Id.* at 2–3. Judge Corley even confirmed that "[n]one of the documents [Plaintiffs seek] were part of the *in camera* review the Court earlier conducted"—which focused exclusively on ADI-communications among non-attorneys of Plaintiffs' choosing. *Id.* at 3. Further emphasizing that she did not intend ADI communications to remain in scope, Judge Corley permitted Facebook to submit a single declaration in support of its position that the specific "investigatory materials" she described Plaintiffs to be seeking were privileged. *Id.*; *see also* Dkt. 720 (Declaration of Alexander H. Southwell) (Ex. K). She did not permit or require additional declarations about Facebook's claim of privilege over other types of ADI materials, including millions of individual communications.

7.     On September 8, 2021 Judge Corley issued an order resolving the parties' ADI privilege dispute. *See* Dkt. 736 at 7 (Ex. L). The order stated that Facebook refused to produce "reports, audits and interviews, *non-attorney communications*" and "dispose[d] of Docket No[.] 611"—Plaintiffs' prior motion to compel non-attorney ADI communications. *Id.* at 2, 7 (emphasis added). In doing so, Judge Corley did not order production of any ADI-related communications. *Id.* at 7. When a party has moved to compel materials, and a court resolves the motion without granting

the request, the request is presumed denied. *California Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1031 (9th Cir. 2008) ("The court did not expressly discuss the request to authorize discovery, but also did not order discovery, thereby implicitly denying the request.").

8. **Instead of ordering Facebook to produce ADI communications, Judge Corley ordered Facebook to produce three categories of materials for the six exemplar apps the parties had chosen previously**: "background and technical reports, audits and developer interviews." Ex. L at 7. Judge Corley reasoned that she was ordering production of these materials because "Facebook has offered no special reasons why those particular documents are privileged." *Id.* She further stated that "Facebook has not explained how a non-attorney's interview or audit of a developer would be protected from discovery by the attorney-client privilege." *Id.* at 6.

9. Judge Corley ordered the "parties to work with the Special Master regarding production of additional materials *consistent with the guidance offered by [her] Order*." Ex. L at 7 (emphasis added). The clear implication was that she expected the parties to work with the Special Master to determine if Facebook should produce the same categories of materials for additional apps.

## B. Contrary to Judge Corley's guidance, the Special Master ordered Facebook to produce large volumes of ADI communications.

10. The Special Master's Tentative Order states that "Judge Corley's order does not exclude non-attorney internal Facebook communications, communications with [Facebook's consulting experts], or communications with third party app developers from the scope of ADI documents to be produced." Tentative Order ¶ 12. This holding guts Judge Corley's ruling, is inconsistent with the Federal Rules of Civil Procedure, and contravenes a recent decision from the Massachusetts Supreme Judicial Court.

11. Judge Corley worked with the parties for *years* to focus Plaintiffs' ADI requests on a reasonable, workable, and proportionate set of materials. To accomplish this, she ordered a lengthy, time-consuming, and burdensome sampling exercise and conducted an *in camera* review of non-attorney communications that Plaintiffs selected. **After completing that process, Judge Corley did not order production of a single ADI communication**.

12. The entire point of the sampling exercise and *in camera* review was to allow Judge

6

MOTION FOR RECONSIDERATION OF SPECIAL MASTER'S ORDER REGARDING PRODUCTION OF ADI RELATED DOCUMENTS
CASE NO. 3:18-MD-2843-VC

Corley to assess whether there was a relevant, proportionate, and non-privileged set of ADI-related communications that were discoverable.  She determined no such communications existed.  Instead—after reviewing a sample of non-attorney communications—she observed that many were irrelevant and others privileged.  Ex. B at 17:8–21.  Recognizing that the burden of review would be disproportionate to the limited benefits of production, she steered the parties away from ADI communications and declined to provide guidance on the 20 non-attorney communications she reviewed.  Judge Corley reasoned that even addressing 20 documents could not provide useful guidance, and she would end up needing to review *all* non-attorney ADI communications *in camera*.  *Id.* at 17:15–17.  This would not have been reasonable, workable, or useful, given her finding that "a lot of" the material was not "relevant at all" and that many would be privileged.  *Id.* at 17:8–21.

13.     The Tentative Order ignores Judge Corley's guidance and the proportionality requirement in Rule 26, and sends the parties back to square one.  It would allow Plaintiffs to again demand that Facebook review essentially **all** ADI-related communications, requiring an astronomical collection and review that would take many months and thousands of attorney hours to complete.

14.     This is the outcome Judge Corley sought to prevent.  Her guidance was designed to ensure that ADI would not hijack and further delay this case.  To move the process forward, Judge Corley focused the parties on three categories of underlying factual materials and avoided ordering a review of millions of irrelevant and privileged communications.  If Judge Corley thought it would be fruitful for Facebook to review additional ADI communications beyond the thousands Facebook reviewed for the parties' sampling exercise, she would have ordered that long ago.

15.     The Tentative Order also conflicts with the Massachusetts Supreme Judicial Court's holding in *Attorney General v. Facebook,* Inc., 164 N.E.3d 873 (Mass. 2021) (Ex. M).  There, the court reversed a ruling about the privileged nature of ADI (including non-attorney communications) and held:  "[A]ny confidential communications relating to ADI among Facebook, Gibson Dunn, and other members of the ADI team would almost certainly be privileged."  Ex. M at 888.

16.     Facebook respectfully asks the Special Master to reconsider its ruling that Judge Corley's order "does not exclude non-attorney internal Facebook communications [or] communications with [Facebook's consulting experts]," and to modify the Tentative Order to clarify

7

MOTION FOR RECONSIDERATION OF SPECIAL MASTER'S ORDER REGARDING PRODUCTION OF ADI RELATED DOCUMENTS
CASE NO. 3:18-MD-02843-VC

Gibson, Dunn &
Crutcher LLP

that Facebook's ADI production obligations are limited to the categories of underlying factual materials Judge Corley found potentially discoverable and ordered Facebook to produce for the six exemplar apps under compulsion:  (i) background and technical reports prepared by outside consultants, (ii) interviews conducted by non-attorneys, and (iii) audits conducted by non-attorneys.

II.     **Facebook seeks reconsideration of the production timeline required by the Tentative Order because it would be impossible for Facebook to comply with.**

To the extent the Special Master does not reconsider his ruling that ADI communications are discoverable, Facebook respectfully seeks reconsideration of the production schedule the Tentative Order requires, which would be impossible for Facebook to comply with.  Under the Tentative Order, within two weeks of receiving a request for ADI communications, Facebook could be required to collect and review communications relating to up to ▮▮▮▮ **apps**, and assess which—if any—are "in connection with" an investigatory report prepared by Facebook's outside experts.  This could require Facebook to collect and conduct a detailed review of ▮▮▮▮▮▮▮▮▮▮▮▮ **documents within a matter of days**—a process that would take **thousands** of attorney hours.

To the extent this process is designed to provide a sample of ADI communications to assess whether they are relevant, the parties already conducted such a sampling exercise.  Judge Corley found that the non-attorney communications relating to six apps the parties chose were largely irrelevant and that production of ADI communications was simply was not workable.  The burdens and infeasibility of the Special Master's Tentative Order underscore that conclusion.

1.     The Tentative Order requires Facebook to produce ADI materials "on a rolling weekly basis," beginning with "reports for which related audits and non-attorney interviews are available." Tentative Order ¶ 13.  As explained in the accompanying declaration of Alexander H. Southwell, Facebook would need at least three to five weeks to begin these rolling productions so that it can collect the materials, train reviewers, and carry out the review—all of which would take more time around the holidays.  Southwell Decl. ¶ 5.  Once Facebook's review begins, it estimates that it would then require at least three months to complete rolling productions of all background and technical reports, audits conducted by non-attorneys, and interviews conducted by non-attorneys.  *Id.* ¶ 6.

2.     Nor would that colossal project be the end.  After Facebook makes an initial

MOTION FOR RECONSIDERATION OF SPECIAL MASTER'S ORDER REGARDING PRODUCTION OF ADI RELATED DOCUMENTS
CASE NO. 3:18-MD-02843-VC

production of background and technical reports, the Tentative Order allows Plaintiffs to request all "non-attorney internal Facebook communications, communications with [Facebook's consulting experts], or communications with third party app developers in connection with a statistically significant sample of the reports provided." Tentative Order ¶ 14. Facebook must then produce those communications within "ten business days," and—after reviewing the materials—Plaintiffs may request more "upon a showing of relevance." Tentative Order ¶ 15-16.

3.      The Sisyphean schedule the Tentative Order requires is impractical and impossible to comply with. The Tentative Order requires Facebook to prioritize production of background and technical reports for apps "for which related audits and non-attorney interviews are available." Tentative Order ¶ 13.[4] There are █████████ such reports associated with audits Facebook conducted. Southwell Decl. ¶ 10.[5] Given the relatively low number of reports associated with apps for which audits are available, a statistically significant sample of the reports may be all of them.[6]

4.      The █████████ reports for which there are related audits alone **concern █████ █████ apps**. Id. The ADI team did not collect and store communications by app or by report. Id. ¶ 8. As a result, Facebook would need to locate and collect all ADI-related communications relating to █████ apps and then conduct a careful analysis of whether each of those communications relates in any way to one of the reports. Id.

5.      If Facebook were to produce ████ reports for which there are related audits in its first rolling production, the volume of communications Facebook would have to collect and review within two weeks would be in the order of █████████████████ documents. Id. ¶ 12. Even though the Tentative Order would require production of only certain types of communications, this would not meaningfully narrow the universe of documents Facebook would need to collect and review. Id. To determine which non-attorney communications are "in connection with" a particular report, Facebook would need to recreate the history of its investigation of each app addressed by that report, figure out exactly what steps were taken to prepare the report, and then

---

[4] As discussed below, unlike Judge Corley's Order, the Tentative Order does not distinguish between attorney audits and non-attorney audits. *See infra* at 14.

[5] Facebook is continuing to assess what, if any, interviews and related reports fall within the Order, which could potentially increase the number of reports and associated apps at issue. Southwell Decl. ¶ 10.

[6] Ambiguity as to the statistically significant sample the order describes is likely to cause prolonged disputes.

1   assess which communications relate to those steps. *Id.* This would require reviewing a substantial

2   volume of attorney communications in order to assess which non-attorney communications were "in

3   connection with" each report.[7] Under the Tentative Order, Facebook could be required to complete

4   this analysis *in less than two weeks* for ████████████ **apps**. That is an impossible task.

5       6.      Not only would the Tentative Order require Facebook to review a massive volume of

6   materials, Facebook could not expedite its review by hiring contract reviewers. Attorneys who are

7   not familiar with ADI would not be able to accurately analyze which ADI communications were "in

8   connection with" a particular report. Attorneys who have significant familiarity with ADI would

9   need to conduct the review, which would constrain how quickly Facebook could complete it. *Id.*

10  ¶ 13. The ADI was complex and nuanced, and detailed familiarity with ADI would be required to

11  recreate the steps that were taken to prepare each background and technical report and review

12  accurately whether particular communications were in connection with that process. *Id.* ¶¶ 12–13.

13      7.      Making the review even more difficult and onerous, many, if not all, ADI-related

14  communications "in connection with" a background or technical report would also contain attorney

15  advice or work product that would need to be reviewed carefully for privilege and quality checked for

16  accuracy and consistency across communications. *Id.* ¶ 16.

17      8.      The Tentative Order's requirement that Facebook complete all of this work in just two

18  weeks is not possible. The sampling exercise Facebook conducted for **six apps** involved review of

19  approximately 6,000 communications, and more than 300 Gibson Dunn attorney hours were spent to

20  collect, review, produce, and log them. *Id.* ¶ 17. A similar review for ████████████ additional

21  apps would likely take many months, and certainly cannot be completed within 10 business days.

22      9.      Facebook respectfully asks the Special Master to reconsider his ruling that, at

23  Plaintiffs' request, Facebook must produce within ten business days communications associated with

24  "a statistically significant sample of the reports [in Facebook's initial production]."

25      10.     If the Special Master believes that he would benefit from considering a sample of ADI

26  communications to assess relevance and privilege, Facebook would (at the Special Master's request)

27  ---

28  [7] Indeed, when Facebook briefed to Judge Corley its claim of privilege over the 20 non-attorney communications Plaintiffs selected for review *in camera*, many of Facebook's explanations of why particular non-attorney communications were privileged referred back to attorney communications that provided relevant context. Dkt. 613 (Ex. N) at 11–15, 17–19.

Gibson, Dunn & Crutcher LLP

10

MOTION FOR RECONSIDERATION OF SPECIAL MASTER'S ORDER REGARDING PRODUCTION OF ADI RELATED DOCUMENTS
CASE NO. 3:18-MD-02843-VC

submit *in camera* the 20 non-attorney communications from the six exemplar apps Plaintiffs selected for Judge Corley to review.  The parties' sampling exercise from those apps was designed and conducted specifically to allow the Court to provide guidance on which ADI materials may be relevant and which may be privileged.  Collecting, reviewing, and logging those materials took more than 300 hours from Gibson Dunn attorneys, Southwell Decl. ¶ 17—in addition to substantial time from Facebook's in-house legal team and vendors.  Facebook then invested significant additional time to brief to Judge Corley why the 20 non-attorney communications from that exercise Plaintiffs selected for her review were privileged.  There is no reason to repeat that work.  To the extent the Special Master would benefit from reviewing non-attorney communications *in camera* beyond the 20 Plaintiffs selected for Judge Corley to review, any such communications should come from the materials Facebook already collected, reviewed, and logged for the six exemplar apps.

## III.   Facebook seeks reconsideration of the Tentative Order's requirement that Facebook produce documents that are not relevant to the live claims and defenses in this case.

Facebook respectfully seeks reconsideration of the Tentative Order's requirement that Facebook produce documents even if they are not relevant.  As Judge Chhabria and the Special Master have reminded Plaintiffs repeatedly, and as the law and Federal Rules make crystal clear, Facebook can only be required to produce documents that are relevant to the live claims and defenses in this case.

1.      The Tentative Order would require Facebook to produce certain ADI communications. Tentative Order ¶ 14–15.  Then, if Plaintiffs can demonstrate these produced communications are relevant, Plaintiffs may request additional communications.  *Id* ¶ 16.  That process is backwards. Plaintiffs are not entitled to materials that are not relevant.  *Leon v. Cnty. of San Diego*, 202 F.R.D. 631, 634 (S.D. Cal. 2001) ("The threshold issue in any discovery dispute is determining whether the requested discovery meets the requirements of [Rule 26] regarding relevance.").

2.      As Judge Chhabria and the Special Master have recognized previously, Facebook—as the producing party—is entitled to make relevance determinations, and Plaintiffs are not entitled to discovery regarding materials that are not relevant.  *See* Mar. 5, 2020 Hr'g Tr. (Ex. O) at 7:23–8:10 ("[Facebook] would never be required to do a log of the stuff that they pulled out and determined was irrelevant or non-responsive to your request."); Supplemental Order Regarding The Use Of TAR

¶¶ 2, 4, 16, JAMS Ref. No. 1200058674, Oct. 9, 2021 (Ex. P) (denying Plaintiffs' request for Facebook to use TAR and denying Plaintiffs participation in Facebook's relevancy determinations). The Special Master's Tentative Order undermines this basic principle, particularly given Judge Corley's finding that many of the documents at issue are entirely irrelevant. Ex. B at 17:8–21.

3.    Facebook respectfully seeks reconsideration of the Tentative Order to the extent it requires Facebook to produce materials that are not relevant to the case.

**IV.    Facebook seeks reconsideration of any requirement that Facebook produce materials over which it asserts privilege without the Special Master having conducted the document-by-document *in camera* review that Ninth Circuit authority requires.**

To the extent the Special Master intended to order Facebook to produce (and not merely to log) ADI communications over which it asserts privilege, Facebook respectfully seeks reconsideration of that holding.  It is not clear whether the Tentative Order requires Facebook to *produce* ADI communications that Plaintiffs request even if Facebook asserts privilege over those communications, or whether it allows Facebook to log privileged communications consistent with the parties' Privilege Protocol.  ADI was a legal investigation designed and led at all stages by attorneys in order to advise Facebook on its legal risks (including in this litigation and related actions) and communications from the investigation are privileged.  To the extent the Special Master intended to issue a blanket ruling requiring Facebook to produce massive volumes of communications over which it has asserted privilege, that holding conflicts directly with controlling authority.

1.    The Massachusetts Supreme Judicial Court recently considered whether ADI communications (including non-attorney communications) are privileged.  That court held that "any confidential communications relating to ADI among Facebook, Gibson Dunn, and other members of the ADI team would almost certainly be privileged." Ex. M at 888.

2.    While Facebook disagrees, Judge Corley found that the ADI served a dual legal and business purpose.  Dkt. 736 at 6.  Judge Corley recognized that certain non-attorney communications she reviewed *in camera* appeared to be privileged.  Ex. B at 17:8–21, 18:1-4, 18:13-15.  She also recognized that Plaintiffs would not be entitled to ADI materials to the extent they include work product or attorney advice.  *Id.* at 16:22–25.

3.      A long line of Ninth Circuit authority holds that a court must assess "dual purpose" materials for privilege *in camera* and on a document-by-document basis.  courts in the Ninth Circuit consistently apply the "because of" test to determine whether specific documents are entitled to work product protection and the "primary purpose" test to determine whether they are protected by the attorney-client privilege.  *See Phoenix Techs. Ltd. v. VMware, Inc.*, 195 F. Supp. 3d 1096, 1102 (N.D. Cal. 2016) (describing "because of" test); *In re Grand Jury*, 13 F.4th 710, 716–17 (9th Cir. 2021) (adopting "primary purpose" test for dual purpose documents).[8]

4.      Neither the "primary purpose" test for attorney-client communications nor the "because of" test for attorney work product allows for a categorical ruling that materials from a dual-purpose investigation are discoverable.  Both tests require a fact-intensive analysis of whether specific documents served a legal purpose.[9]  This requires either a document-by-document inquiry or a sampling of the relevant types of documents to determine which types of materials served a legal purpose.[10]  This is also consistent with Judge Corley's view that the Court could not fully resolve the parties' dispute regarding attorney-client privilege for ADI-related communications based on an *in*

---

[8]  In the context of dual-purpose investigations, documents are considered privileged if legal advice was a primary purpose, or "one of the significant purposes of [the] attorney-client communication" at issue.  *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 759–60 (D.C. Cir. 2014) (emphasis added); *see also Todd v. STAAR Surgical Co.*, 2015 WL 13388227, at *10 (C.D. Cal. Aug. 21, 2015) (conclusions reached by consultant retained by law firm were protected work product because work, while "related to routine business matters, was being channeled through [the law firm] so that it could provide legal advice . . . in anticipation of litigation"); *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 530 (S.D.N.Y. 2015) (documents underlying investigation created by outside law firm were privileged and work product because "an attorney-client privilege that fails to account for the multiple and often-overlapping purposes of internal investigations would threaten to limit the valuable efforts of corporate counsel to ensure their client's compliance with the law"); *Pearson v. Ariz.,* 2020 WL 5544373, at *3 (D. Ariz. Sept. 16, 2020) (investigation report was protected work product despite the defendant's concession that "it would have investigated the incident underlying this case regardless of whether litigation was anticipated"); *Pitkin v. Corizon Health, Inc.*, 2017 WL 6496565, at *4 (D. Or. Dec. 18, 2017) (holding investigation report and supporting documents were privileged, even though the investigation was required under corporate policies and contracts, because "at least one primary purpose of the investigation was to assess the situation from a legal perspective, provide legal guidance, and prepare for possible litigation and/or administrative proceedings"); *United States ex rel. Wollman v. Mass. Gen. Hosp., Inc.*, 475 F. Supp. 3d 45, 65 (D. Mass. 2020) (holding, after *in camera* review, that investigation report prepared by law firm was attorney-client privileged); *Smith-Brown v. Ulta Beauty, Inc.*, 2019 WL 2644243, at *3 (N.D. Ill. June 27, 2019) (finding internal investigation documents privileged, but only after *in camera* review of each document).

[9]  *See, e.g., In re High-Tech Emp. Antitrust Litig.*, 2013 WL 772668, at *8 (N.D. Cal. Feb. 28, 2013) (finding sample 17 documents reviewed *in camera*—out of 166 total documents—privileged, but declining to rule on remaining withheld documents); *Fosbre v. Las Vegas Sands Corp.*, 2016 WL 183476, at *7–10 (D. Nev. Jan. 14, 2016) (granting *in camera* review of sample of 190 documents, noting that privilege of a dual-purpose document "can only be determined by evaluating the communication itself").  .

[10]  *Dolby Lab'ys Licensing Corp. v. Adobe Inc.*, 402 F. Supp. 3d 855, 868–76 (N.D. Cal. 2019) (in challenge of over 4,000 privileged documents, court reviewed a sample *in camera* and appointed special master to decide future privilege disputes); *In re Lidoderm Antitrust Litig.*, 2016 WL 861019, at *7 (N.D. Cal. Mar. 7, 2016) (analyzing sample documents *in camera* "to provide guidance [on] . . . ongoing assertions of privilege").

13

1    *camera* review of 20 communications among non-attorneys.  Ex. B at 17:15–21.

2        5.    Facebook cannot be ordered to produce privileged materials without the Special

3    Master conducting such an analysis and applying the "primary purpose" and "because of" tests to

4    those materials.  Facebook respectfully asks the Special Master to reconsider his Tentative Order to

5    the extent he is ordering production of communications over which Facebook is asserting privilege,

6    without conducting the *in camera* review that the Ninth Circuit requires.

7    **V.    Facebook seeks reconsideration of the Tentative Order's holding that Facebook must**

8    **produce attorney audits and "all memoranda" prepared by its consulting experts.**

9        Facebook respectfully seeks reconsideration of the Tentative Order's holding that "all

10   memoranda prepared by [Facebook's consulting experts]" and "all audits," including attorney audits,

11   "are within the scope of Judge Corley's order."  Tentative Order ¶ 11.  Judge Corley's Order does not

12   find discoverable "all audits" or "all memoranda" by Facebook's consulting experts.  With respect to

13   audits, Judge Corley's Order states: "Plaintiffs are not seeking documents created by counsel,

14   counsel's edits, or any communications with counsel.  Facebook has not explained how a non-

15   attorney's interview or audit of a developer would be protected from discovery by the attorney-client

16   privilege."  Ex. L at 6.  As for memoranda, Judge Corley's Order describes as discoverable two

17   specific types of memoranda prepared by these experts: "background and technical reports."  *Id.*

18       1.    Judge Corley's Order is clear that she is ordering Facebook to produce only non-

19   attorney audits.  Her order states "Plaintiffs are not seeking documents created by counsel, counsel's

20   edits, or any communications with counsel."  Ex. L at 6.  She also explained that she was ordering

21   Facebook to produce certain audit reports because "Facebook has not explained how a non-attorney's

22   interview or audit of a developer would be protected from discovery by the attorney-client privilege."

23   *Id.*  There is no fair way to read this ruling to find attorney audits to be within the scope of Judge

24   Corley's Order.  Nor has Facebook had an opportunity to create a record regarding attorney audits

25   given that Plaintiffs did not seek these materials, as Judge Corley recognized.

26       2.    Judge Corley's order also does not find every single memorandum prepared by

27   Facebook's consulting experts discoverable.  Her Order refers specifically to two types of

28   memoranda prepared by Facebook's consulting experts—"background and technical reports."

Gibson, Dunn &
Crutcher LLP

14

MOTION FOR RECONSIDERATION OF SPECIAL MASTER'S ORDER REGARDING PRODUCTION OF ADI RELATED DOCUMENTS
CASE NO. 3:18-MD-02843-VC

3.      During the December 4 hearing before the Special Master, the parties and the Special Master discussed production of memoranda prepared by outside experts.  Consistent with Judge Corley's prior guidance, the only "memoranda" discussed at the hearing were the "background and technical reports" prepared by Facebook's consulting experts that Judge Corley had ordered produced—not a separate category of materials.  Southwell Decl. ¶ 4.

4.      Other memoranda prepared by Facebook's consulting experts are outside the scope of Judge Corley's guidance and the scope of documents she ordered the Special Master to work with the parties to produce.  Facebook has never had an opportunity to submit briefing or an evidentiary record regarding the other types of memoranda that its outside experts created or to demonstrate that these materials contain privileged information and work product.  *Id.*  Nor has the Special Master or Judge Corley conducted an *in camera* review of the other types of memoranda Facebook's experts prepared in order to analyze privilege under the "primary purpose" and "because of" tests.

5.      Facebook respectfully asks the Special Master to reconsider his order that Facebook produce these materials.  Facebook should not be ordered to produce additional types of memoranda that Judge Corley did not identify as potentially discoverable and for which Facebook has not had an opportunity to develop a record demonstrating privilege. At minimum, Facebook must be provided an opportunity to submit briefing and an evidentiary record regarding its claim of privilege over memoranda prepared by its outside experts beyond those addressed by Judge Corley, as neither the parties nor Judge Corley have ever previously addressed these materials.

## CONCLUSION

Facebook respectfully asks the Special Master to reconsider his ruling.  In the event that the Special Master does not reconsider or modify the Tentative Order, Facebook respectfully requests a stay of the order pending appeal to Judge Corley.  Facebook requests a hearing on this motion.

Dated:  December 15, 2021          **GIBSON, DUNN & CRUTCHER, LLP**

By: */s/ Orin Snyder*
Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

Gibson, Dunn &
Crutcher LLP

MOTION FOR RECONSIDERATION OF SPECIAL MASTER'S ORDER REGARDING PRODUCTION OF ADI RELATED DOCUMENTS
CASE NO. 3:18-MD-02843-VC

1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

11

IN RE: FACEBOOK, INC. CONSUMER
PRIVACY USER PROFILE LITIGATION

12

13

This document relates to:

14

15

ALL ACTIONS.

16
17
18
19
20
21
22
23
24
25
26
27
28

CASE NO. 3:18-MD-02843-VC

**DECLARATION OF ALEXANDER**
**SOUTHWELL IN SUPPORT OF**
**FACEBOOK'S MOTION FOR**
**RECONSIDERATION**

Gibson, Dunn &
Crutcher LLP

DECLARATION OF ALEXANDER SOUTHWELL IN SUPPORT OF FACEBOOK'S MOTION FOR RECONSIDERATION
CASE NO. 3:18-MD-02843-VC

I, Alexander H. Southwell, hereby declare as follows:

1.      I am an attorney licensed to practice law in the State of New York. I am a partner with the law firm of Gibson, Dunn & Crutcher LLP. I submit this declaration in support of Facebook's Motion for Reconsideration.  I make this declaration on my own knowledge, and I would testify to the matters stated herein under oath if called upon to do so.

2.      I led the Gibson Dunn team engaged to develop and conduct the App Developer Investigation ("ADI"), and my team worked with ███████ and ███████ to investigate millions of apps as part of the ADI.

3.      On December 8, 2021, the Special Master ordered Facebook to produce on a rolling weekly basis various materials created as part of the ADI, including "all memoranda prepared by ██ ███████ or ███████ and all background reports, technical reports, audits, and non-attorney developer interviews in connection with the ADI." Order ¶ 13. The Order requires Facebook to begin its productions of materials with those relating to apps for which audits and/or non-attorney interviews are available. *Id.*

4.      When discussing "memoranda" prepared by ███████ or ███████ at the hearing on December 4, 2021, we discussed the background and technical reports prepared by ██ ███████ or ███████, which Judge Corley had ordered produced for six apps in her September 8, 2021 Order.  We did not discuss any other categories or types of "memoranda," largely because that was not part of Judge Corley's order.  Other memoranda created by ███████ and ███████ contain privileged information and attorney work product, and were drafted under the specific direction of Gibson Dunn for the purposes of allowing Gibson Dunn to assess and advise Facebook on potential legal risks.

5.      The Special Master's order instructs Facebook to produce materials on a rolling basis each week, but does not state when those productions are to begin.  Facebook would need at least three

Gibson, Dunn & Crutcher LLP

to five weeks to begin producing an initial collection of the materials described by the order—including background and technical reports and audits and interviews conducted by non-attorneys. These materials are not currently collected in a document-review platform. Collection of these materials would likely require multiple weeks to complete and may involve collecting from varied document repositories, sources, and custodians. Then they would need to be transferred into a document-review platform. Uploading the background and technical reports to a database for review on a rolling basis would likely require at least two-four days to complete for each group of documents collected from a particular repository, source, or custodian.

6.     Once the materials are uploaded to a review platform they will need to be reviewed. I believe there are ███████ background reports and ████ technical reports, each of which varies in length from dozens to many hundreds of pages. ADI materials are nuanced and unique, and Facebook will need to staff and train a review team to review them. It would likely take at least two to three weeks to recruit and train reviewers (it will be more difficult to recruit and staff reviewers around the holidays) and then for them to review the first set of materials required for production under the Special Master's order. Additional time will likely be required to recruit and train a review team with enough members to review the substantial volume of total reports. I am informed and aware that, at the same time that this review would be conducted, Facebook is separately completing a review of many millions of documents in connection with other document requests that have been issued in this case. This separate review places further constraints on the resources of our vendors, the senior attorneys who are needed to manage and quality check the review, and the in-house attorneys at Facebook. In total, a preliminary estimate, without the benefit of testing and subject to change, is at least three months to complete a review of all of the background and technical reports (once the reviewers begin), even if we are able to recruit and train a review team of say thirty attorneys.

Gibson, Dunn &
Crutcher LLP

7.     The tentative order further states that "within five days of receiving the first rolling production from Facebook, Plaintiffs may request all non-attorney internal Facebook communications, communications with ████████ or ████████, or communications with third party app developers in connection with a statistically significant sample of the reports provided," and that Facebook must provide such communications within ten business days.  Order ¶¶ 14–15.

8.     It would not be feasible for Facebook to produce all such communications within ten days of receiving such a request.  The ADI team did not collect and store communications organized by report.  Providing communications in connection with a given report created as part of the ADI would require Facebook to collect all ADI-related communications and then identify and conduct a careful analysis of whether each communication relates in any way to one of the reports.  The time to complete this process would vary widely depending on the report and it could take weeks to identify and review communications related to a relatively simple report and far more for more complex reports, as explained more below.

9.     It is my understanding that the Special Master's order requires communications to be collected and produced from the 26 ADI-related custodians to which the parties agreed previously.  The complete inboxes of these custodians have not been collected, except for the 3 ADI custodians who are among the other 81 custodians in this case.  These custodians' inboxes would need to be collected, uploaded to a review database, and searched for ADI-related communications that refer to any of the apps referenced in the first set of reports Facebook produces.

10.    Under the Special Master's order, Facebook's first production would include background and technical reports associated with apps for which Facebook also has audits and/or interviews conducted by non-attorneys.  There are ████ background and technical reports associated with the audits Facebook conducted that concern around ████ apps.  Given the quick timing of Facebook's reconsideration motion, we are continuing to assess what,

Gibson, Dunn &
Crutcher LLP

if any, interviews and related reports fall within the Order, which could potentially increase the number of reports and associated apps.

11.     I estimate that reviewing ADI-related communications referencing the ███████ apps addressed by Facebook's audits alone, to identify any communications "in connection with" the background and technical reports that address those apps, could take months.

12.     First, I estimate the volume of communications would, at minimum, be in the order of ████████████████████████████ documents. When Facebook previously collected and reviewed ADI communications associated with just six apps, the review involved approximately 6,000 documents.[1] I recognize that the tentative order contemplates production specifically of non-attorney internal Facebook communications or communications with Facebook's consulting experts. As a practical matter, this limitation would not significantly narrow the number of communications Facebook would need to collect and review.  In order to accurately assess which non-attorney communications may be "in connection" with a particular report, Facebook would likely need to assess most, if not all, ADI related communications regarding the apps referenced in each report to get a full picture of the work that went into each report and which non-attorney communications relate to that work.  Put differently, understanding the context of isolated non-attorney communications will require assessing surrounding attorney communications that the Special Master has not ordered produced.  My team also found this to be true during the parties' prior sampling exercise for the six exemplar apps. When we briefed to Judge Corley Facebook's claim of privilege over the 20 non-attorney communications Plaintiffs selected for review in camera, we frequently needed to review large numbers of attorney communications to understand the full context of non-attorney communications, and we

---

[1] This number is distinct from the number of entries that appeared on Facebook's logs for two reasons.  First, Facebook produced any non-privileged materials from that review.  Second, Facebook produced a separate privilege log for each of the six apps that were part of the sampling exercise.  When a document referenced more than one of the six apps, it appeared on the privilege log created for each app that it referenced.

Gibson, Dunn &
Crutcher LLP

referred Judge Corley to certain attorney communications to help her understand the context of the non-attorney communications Plaintiffs had selected for her review.  Dkt. 613 at 11–15, 17–19.

13.     Second, significant familiarity with the ADI would be required to review accurately whether communications were in connection with a background and/or technical report.  The ADI was complex and nuanced, and—in my experience and professional judgment—only attorneys who worked on the ADI would be able to accurately review communications to determine if they were "in connection with" a particular background or technical report.  Communications in connection with a report often times would not say so explicitly and may not even explicitly reference the ADI.  Conversely, apps and developers that were the subject of a background or technical report created as part of the ADI will commonly appear in communications with ADI custodians that were not in connection with an ADI background and/or technical report.  To understand whether particular communications were "in connection with" a report, the reviewer will need to understand the context of each report, the types of communications that may have occurred around each individual report (which would have varied based on the circumstances), and be able to distinguish carefully among ADI-related communications that were related to reports, ADI-related communications that were not related to reports, and communications about apps addressed by reports that were not related to ADI at all.

14.     For example, because the ADI covered millions of apps, many of which were active on the Facebook Platform while the ADI was ongoing, communications from different Facebook stakeholders about and with developers of these apps would have been common.  Such communications would likely have included some of the ADI custodians, but many of even these communications may not have been related to the ADI but instead would have been related to other Facebook purposes and initiatives.  Reviewers with deep, personal knowledge of the ADI would be needed in order to accurately distinguish these materials.

Gibson, Dunn & Crutcher LLP

15.     There are currently two Gibson Dunn associates who have the required familiarity with the ADI to conduct this review accurately.  Two other attorneys who have the requisite familiarity to conduct this review are on leave and will not return to the firm until at least late January.

16.     Moreover, many, if not most, ADI related communications "in connection with" a background or technical report, would contain attorney advice or attorney work-product that would need to be reviewed carefully for privilege, redacted, and carefully quality checked for accuracy and consistency across communications.  Gibson Dunn reviewed and relied on background and technical reports to create work product and provide legal advice to Facebook and to direct ███████████ and ███████████ to take action in furtherance of the investigation for the purpose of assessing litigation risk.  Communications "in connection with" background and technical reports in most cases will relate directly to Gibson Dunn's work-product and advice.

17.     More than 300 Gibson Dunn attorney hours were spent to collect, review, produce, and log documents and communications for the six exemplar apps.  More than 90% of that time was from attorneys with deep, personal familiarity with ADI.  The privilege logs that Facebook prepared for just 6 apps, contained more than 6,000 entries.  Conducting a similar review for ████ apps could potentially require Facebook to logs ███████████████ documents and require hundreds of thousands of attorney hours (accounting for many millions of dollars of billable hours) to complete.

\*        \*        \*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 15, 2021 in New York, New York.

Alexander H. Southwell

Gibson, Dunn &
Crutcher LLP

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br> This document relates to: <br><br> ALL ACTIONS | **MDL NO. 2843** <br><br> CASE NO. 3:18-MD-02843-VC-JSC <br><br> HON. VINCE CHHABRIA <br> COURTROOM 4 – 17TH FLOOR <br> SPECIAL MASTER: DANIEL GARRIE ESQ. <br><br> **ORDER REGARDING PRODUCTION OF ADI RELATED DOCUMENTS** |

## BACKGROUND

1.      On September 8, 2021, Judge Corley issued an order granting Plaintiffs' motion to compel the production of materials in connection with Facebook's app developer investigation ("ADI") that involved a review of all "apps that had access to large amounts of data before [Facebook] changed [its] platform policies in 2014." See https://about.fb.com/news/2019/09/an-update-on-our-app-developer-investigation/.

2.      Pursuant to the order:

> In light of Facebook's unchallenged public proclamations as to the business purpose of the ADI, the Court finds that the ADI served a dual purpose and that, as a general matter, documents generated as part of that investigation were not created because of litigation. On or before September 21, 2021, Facebook shall produce the background and technical reports, audits and developer interviews of the six exemplar apps chosen by the parties as Facebook has offered no special reasons why those particular documents are privileged other than what has been addressed. The parties shall work with the Special Master regarding production of additional materials consistent with the guidance offered by this Order. See Exhibit A (Order Granting Motion to Compel ADI Materials).

3.      According to Judge Corley's order, Facebook produced 11 documents related to the ADI. Following this production, Plaintiffs raised multiple issues in connection with Facebook's ADI production and requested "all memoranda prepared by ████████ and/or ████████ related to ADI of all apps it investigated or investigated at Facebook's direction, the background and technical reports, audits, and developer interviews, and internal Facebook communications regarding these materials (including those pertaining to the six exemplar apps)." See Exhibit B (Plaintiffs' Email of September 24, 2021).

4.      The parties subsequently met and conferred regarding Facebook's ADI production, but were unable to resolve the outstanding issues.

5.      On October 26, 2021, Special Master Garrie issued Order Regarding Outstanding ADI Issues which ordered the parties to provide summaries of the outstanding ADI issues and the parties' respective positions.

6.      On October 22, 2021, Plaintiffs submitted their initial statement. Plaintiffs argue that pursuant to Judge Corley's order, Facebook should produce the following in connection with the ADI: (1) all memoranda prepared by ▮▮▮▮▮▮▮ or ▮▮▮▮▮▮▮; (2) all background reports, technical reports, audits, and developer interviews; (3) all internal Facebook communications relating to items 1 and 2; (4) all communications with ▮▮▮▮▮▮ or ▮▮▮▮▮▮▮ related to items 1 and 2; and (5) all communications with third-party app developers. See Exhibit C (Plaintiffs' Statement Concerning ADI Issues in Advance of Hearing). Plaintiffs also argued that Facebook's production of 11 reports relating to the six exemplar apps pursuant to Judge Corley's order was incomplete because Facebook's privilege logs include references to additional reports relating to these apps that were not provided. Id.

7.      On October 22, 2021, Facebook submitted its initial statement. Facebook argues, among other things, that (1) Facebook produced all documents ordered by Judge Corley; and (2) the five categories of ADI-related documents Plaintiffs request go beyond the scope of Judge Corley's order. See Exhibit D (Facebook's Supplemental Submission Re: ADI).

8.      On November 4, 2021, Plaintiffs submitted their response. Plaintiffs argue, among other things that (1) Facebook should produce additional reports regarding the six exemplar apps because additional reports were identified in Facebook's privilege logs; and (2) Facebook failed to show how the five categories of ADI-related documents Plaintiffs request are not "consistent with the guidance offered by" Judge Corley's order. See Exhibit E (Plaintiffs' Response Re: ADI).

9.     On November 4, 2021, Facebook submitted its response. Facebook argues, among other things that (1) Facebook's production pursuant to Judge Corley's order is complete; (2) Plaintiffs' requests for all reports and memoranda for all apps or developers investigated in phases two or three of the ADI and beyond the scope of Judge Corley's order; and (3) there is no basis for Plaintiffs to request ADI related communications because Judge Corley previously re-viewed these communications *in camera* and did not order the production of such communica-tions. See Exhibit F (Facebook's Response Re: ADI).

10.     A hearing was held on December 4, 2021, regarding the parties' submissions and other information related to the ADI issues.

### FINDINGS

11.     Special Master Garrie finds that Plaintiffs' requests for all memoranda prepared by ████████████ or ████████████ and all background reports, technical reports, audits, and developer interviews in connection with the ADI are within the scope of Judge Corley's order as the order explicitly includes these categories of documents. See Exhibit A ("Facebook shall pro-duce the background and technical reports, audits and developer interviews of the six exemplar apps chosen by the parties").

12.     Special Master Garrie finds that Judge Corley's order does not exclude non-attor-ney internal Facebook communications, communications with ████████████ or ████████ ████ or communications with third party app developers from the scope of ADI documents to be produced, but rather only addresses reports, audits, and interviews. Id. at 6 ("The documents dis-cussed in this Order—background and technical reports, audits, and interviews prepared and con-ducted by non-attorneys—are work product, not attorney-client privilege material."). As a result,

Special Master Garrie finds that additional information regarding the relevance of such communications is necessary to determine whether such communications should be produced.

## ORDER

13.    Facebook is to produce, on a rolling weekly basis, all memoranda prepared by ▮▮▮▮▮ or ▮▮▮▮▮ and all background reports, technical reports, audits, and non-attorney developer interviews in connection with the ADI.[1] Such production is to begin with the reports for which related audits and non-attorney interviews are available.

14.    Within five days of receiving the first rolling production from Facebook, Plaintiffs may request all non-attorney internal Facebook communications, communications with ▮▮▮▮ or ▮▮▮▮▮ or communications with third party app developers in connection with a statistically significant sample of the reports provided.

15.    Within ten business days of receiving the request for communications from Plaintiffs, Facebook is to provide such communications for the reports selected by Plaintiffs.

16.    After reviewing the communications from the sample of reports, Plaintiffs may request additional ADI related communications upon a showing that the communications are relevant.

**IT IS SO ORDERED.**

December 8, 2021

Daniel Garrie
Discovery Special Master

---

[1] Facebook is to update any applicable privilege logs as appropriate pursuant to the Privilege Protocol.

**EXHIBIT B**

Pages 1 - 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Magistrate Judge

IN RE FACEBOOK, INC., CONSUMER )
PRIVACY USER PROFILE            )
LITIGATION.                     )
                                )   NO. 18-md-02843 VC (JSC)
                                )
_____)

San Francisco, California
Tuesday, April 6, 2021

**TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**

**APPEARANCES BY ZOOM WEBINAR:**

For Plaintiffs:
                    KELLER ROHRBACK LLP
                    1201 Third Avenue - Suite 3200
                    Seattle, Washington  98101
             BY:    **DEREK W. LOESER, ATTORNEY AT LAW**
                    **CARI C. LAUFENBERG, ATTORNEY AT LAW**
                    **DAVID J. KO, ATTORNEY AT LAW**

                    KELLER ROHRBACK LLP
                    801 Garden Street
                    Santa Barbara, California  93101
             BY:    **CHRISTOPHER L. SPRINGER, ATTORNEY AT LAW**

             **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

```
 1   APPEARANCES BY ZOOM WEBINAR:  (CONTINUED)

 2   For Plaintiffs:
                          BLEICHMAR, FONTI & AULD LLP
 3                        555 12th Street - Suite 1600
                          Oakland, California  94607
 4                 BY:    LESLEY E. WEAVER, ATTORNEY AT LAW
                          MATTHEW S. MELAMED, ATTORNEY AT LAW
 5                        ANNE K. DAVIS, ATTORNEY AT LAW

 6   For Defendant:
                          GIBSON, DUNN & CRUTCHER LLP
 7                        200 Park Avenue
                          New York, New York  10166
 8                 BY:    ORIN SNYDER, ATTORNEY AT LAW

 9                        GIBSON, DUNN & CRUTCHER LLP
                          555 Mission Street - Suite 3000
10                        San Francisco, California  94105
                   BY:    MARTIE P. KUTSCHER CLARK, ATTORNEY AT LAW
11
                          GIBSON, DUNN & CRUTCHER LLP
12                        2100 McKinney Avenue - Suite 1100
                          Dallas, Texas  75201
13                 BY:    RUSSELL H. FALCONER, ATTORNEY AT LAW

14                        GIBSON, DUNN & CRUTCHER LLP
                          333 South Grand Avenue
15                        Los Angeles, California  90071
                   BY:    DEBORAH L. STEIN, ATTORNEY AT LAW
16
     Also Present:        Judge Gail Andler, JAMS
17                        Discovery Mediator

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **Tuesday - April 6, 2021**                                    **9:00 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Court is now in session.  The Honorable |
| 5 | Jacqueline Scott Corley presiding. |
| 6 | Calling Civil action 3:18-md-2843, In Re Facebook, Inc., |
| 7 | Consumer Privacy User Profile Litigation. |
| 8 | And you can start. |
| 9 | **MR. LOESER:**  Good morning, Your Honor.  Derek Loeser |
| 10 | from Keller Rohrback with Cari Laufenberg, David Ko, and Chris |
| 11 | Springer also from Keller Rohrback. |
| 12 | **THE COURT:**  Good morning. |
| 13 | **MS. WEAVER:**  Good morning, Your Honor.  Leslie Weaver |
| 14 | of Bleichmar, Fonti & Auld with Matt Melamed and Anne Davis. |
| 15 | **THE COURT:**  Good morning. |
| 16 | **MR. SNYDER:**  Good morning, Your Honor, and good |
| 17 | morning, Judge Andler.  This is Orin Snyder from Gibson Dunn. |
| 18 | With me on the Zoom conference are Deborah Stein, Russell |
| 19 | Falconer, and Martie Kutscher Clark.  I think that's it for our |
| 20 | group. |
| 21 | **THE COURT:**  Yes.  That's all I see.  Good morning. |
| 22 | **MR. SNYDER:**  Good morning. |
| 23 | **JUDGE ANDLER:**  Good morning, Your Honor.  Gail Andler |
| 24 | from JAMS. |
| 25 | **THE COURT:**  Good morning, Judge Andler. |

1      All right.  So I understand, Judge Andler, you have agreed

2   to assist the parties with mediating their discovery issues,

3   and so thank you everyone for your statement.

4      Let me give you sort of my thoughts as sort of when I

5   threw out there this somewhat novel idea of a discovery

6   mediator -- maybe not so novel; maybe you've done that before,

7   Judge -- what I envisioned.

8      So I didn't appoint a special master.  I sort of see

9   Judge Andler's role more akin to when the parties choose

10  private mediation -- right? -- you choose a private mediator to

11  help you resolve the entire case.  Instead, here the parties

12  have selected a private mediator to help you resolve all those

13  little battles in the bigger case; right?  So the discovery

14  dispute is sort of a small battle in there.

15     So I don't -- I want us to keep those roles the same so I

16  don't want recommendations from Judge Andler or anything like

17  that.  I think that actually in some ways would make it harder

18  for her to do her job because then the parties would be sort of

19  posturing to get a recommendation out of her as well as

20  everyone having confidential, very candid, open communications

21  allowing her to use her experience to help you sort of come up

22  with a resolution.

23     And then in addition, the request about setting the rules.

24  So when parties choose private mediation, the judges, we're not

25  involved in any way other than we try to make sure the parties

1  have the discovery that they need to have a meaningful

2  mediation; right?  So I leave that to Judge Andler.  If she's

3  going to say to a party, "You need to have such and such here,"

4  I assume you will follow that because you-all retained her

5  because you actually want to move the discovery process

6  forward; but I really just view it just like a private mediator

7  except that she's mediating the discovery disputes.

8      And to that end, then, I would also think that just like

9  when I serve as a settlement judge, I don't have any

10 communications with the trial judge about the case unless I

11 have the parties' consent.  So I would assume she may have

12 communications with me, but it would be with the parties'

13 consent.

14     And it could be something -- I would expect it would be

15 things like, "Judge Corley, the parties are going to -- we

16 weren't able to resolve this dispute.  We narrowed it.  It's

17 going to be presented to you in this format.  What do you think

18 about that?"  Maybe or not.  It's completely sort of up to all

19 of you and Judge Andler how to do that, but that is also

20 another role is when you're unable and you're still at impasse

21 on something, she can then help you figure out -- because we

22 often have a lot of discussions just how it's going to be

23 presented, that she can help you figure out how to present it:

24 Timing, page length, all those kinds of things.

25     And as you know, I've signed every stipulation you've

```
1    submitted to me.  If you submit me a stip, I will sign it.  If
2    you come to agreement with her, I'll sign it, unless it's,
3    like -- it's going to be 50 pages.  Well, I might sign it, but
4    I probably won't read it all.
5         So that's sort of how I see that.  And I thought what
6    might be helpful now is to go through the parties' statement,
7    and there are a couple things I think I need to rule on but
8    then sort of give you examples of how I think Judge Andler may
9    help you address those things so that I don't have to then
10   rule.
11        And one reason why is it will be much faster that way, and
12   also it will be more accurate because you-all know your case
13   and what's going on so much better than I do, and Judge Andler
14   is going to know it as well because she's going to have the
15   privilege of spending more time with you.
16        So, anyway, does anyone have any just thoughts?  So that's
17   sort of my thoughts.  You wanted some guidance.  Those are my
18   thoughts.
19             MR. LOESER:  Sure.  Thank you, Your Honor.  We
20   appreciate the guidance.  I think it's helpful for the parties.
21        I will say from the plaintiffs' perspective, the requests,
22   and some of which you went through, were made based on the
23   notion that we want to make sure that Judge Andler has the
24   authority and the tools that are helpful and necessary to move
25   disputes forward because what we really don't want to have
```

1   happen is to end up sort of stimied at this turn or stimied at

2   that turn; and if Judge Andler simply had some other tool that

3   she could utilize to move the parties forward, that that would

4   be provided.

5        So, for example, requiring the parties to have someone

6   with authority attend, if what you're saying is that's really

7   up to Judge Andler, if that's something she wants to request,

8   she can, then I think that that's helpful.

9        Similarly, if Judge Andler finds herself in the midst --

10  and I'm sorry for speaking as if you're not there --

11            **JUDGE ANDLER:**  That's all right.

12       **MR. LOESER:**  -- obviously you are, Judge Andler -- in

13  the midst of a dispute that's highly technical, she may find it

14  useful to have someone with some technical expertise come on

15  board to help get through that dispute.

16       And so really what we're saying is if it's okay for

17  Judge Andler in her role as discovery mediator to utilize to

18  ask the parties "Please do this and please do that," and that

19  that can be brought to bear, I think that would be very helpful

20  in moving disputes past everyone's just disagreeing to actually

21  getting to resolution.

22            **THE COURT:**  Yeah.  I mean, I assume you-all, when I

23  threw out that idea, you-all actually pretty readily agreed to

24  it of a discovery mediator because you want the process to

25  work.

1          But it is a voluntary process just like private mediation.

2     It's a voluntary process, but you-all selected Judge Andler

3     because of her, because I looked, her tremendous expertise and

4     knowledge; that, you know, I assume that if she asks for

5     something, you'll do it because that's why you selected her

6     because you actually want to try to move things forward a

7     little faster and more smoothly than I'm able to help you do.

8          **MR. SNYDER:**  Thank you, Judge Corley.

9          Nice to meet you, Judge Andler.  This is Orin Snyder from

10    Gibson Dunn.

11         Lawyers always say we're delighted to have you help us

12    reach agreement on discovery disputes, but in this case it is

13    heartfelt and sincere because I can say, and Judge Corley would

14    attest, this has not been the finest moment in efficient

15    discovery process, and so we truly do welcome your involvement.

16         And our goal is to resolve every discovery dispute without

17    having to hopefully bother Judge Corley again.  She's been

18    incredibly patient, and both parties understand why she made

19    the suggestion.  This is a case that taxes the federal

20    judiciary in a way that's not fair to other litigants and other

21    parties.  So having a voluntary mediator like you is really the

22    best outcome that we can imagine here so we're looking forward

23    to it.

24         And we also agree that you should work with us to develop

25    the most flexible, efficient, fluid, fair, reasonable,

1    pragmatic approach to get us there; and so we're in your hands

2    to help us figure that out but, you know, we want to roll up

3    our sleeves and get discovery done.   It's very costly.   We have

4    a hundred people reviewing documents as we speak.   We want to

5    get to the finish line so we can get to the next stage of the

6    litigation; and with your help, we're confident that we'll do

7    that so we look forward to that.

8              **THE COURT:**   So if we can go through some of the

9    issues, and then I'll just sort of suggest where I think -- and

10   it's completely up to you guys and Judge Andler, but where she

11   might be able to assist.

12             So one of the issues is the document production.   I

13   understand that Facebook proposed a schedule I think very

14   recently.   But, again, that's something she can set up a

15   discovery mediation with the parties to sit down, and really I

16   think setting some deadlines would be very useful, and can talk

17   to you about what's realistic and how to get it done and

18   priorities and those kinds of things and hopefully work out

19   some schedule.

20             And even Facebook raised an issue of there being a lot of

21   nonresponsive hits that may also be something that she could

22   work with all the parties in coming up with something that

23   maybe reduces that that everyone's comfortable with.

24             The great thing about having a neutral that you trust --

25   right? -- is the neutral can sort of look under the hood and if

1    the neutral tells one side or the other something, you have

2    confidence in her that it's -- you don't just have to rely on

3    the other side; right?  That's the nice thing about a neutral.

4    So I'm hoping that we can work out some deadlines there so we

5    can really get that discovery completed.

6         The same thing with respect to, you know, the 30(b)(6)

7    depositions.  So what I envision is -- again, these are just

8    suggestions, I'm not ordering anything, which is, you know,

9    you'll have these regularly scheduled discovery mediations and

10   you'll have these agendas.  One is the 30(b)(6).  I think what

11   plaintiffs say and Facebook says sort of didn't meet in your

12   statement about what each side's position is; but, again, she

13   can sit there with you and help you get it out, get whatever

14   documents you want or not and if it's not, then get it

15   presented to me some way.

16        Let's see, a couple other things that I think maybe.  One

17   is the testimony -- sworn testimony and written discovery from

18   the regulatory action.  So let me ask Facebook.  With respect

19   to the transcripts that you've agreed to produce, have you

20   identified for plaintiffs who those are that you have the

21   deposition or sworn transcripts?

22            MR. FALCONER:  I'm not sure that we have, Your Honor,

23   but we'd be happy to.

24            THE COURT:  Yeah.  So I think you should do that

25   within the week as well as identify those that you're

1    withholding; right?

2              **MR. FALCONER:**  From the noncustodians?

3              **THE COURT:**  Yeah.  I mean, I don't -- I'll just tell

4    you my view, which is if they gave testimony that's relevant to

5    the issues in this case, then it would be discoverable absent

6    there being some other reason why.  It would be relevant.  And

7    I don't know -- I know it's not deliberative process privilege

8    so we already went through that before.

9         But at a minimum within a week identify who you're

10   producing when and identify who you're not producing.  And,

11   again, that can go on your agenda, and I've given you some

12   guidance with respect to that.

13        I don't know with respect to the -- yeah.

14        Then there's the issue of the letters.  And I don't

15   know -- I don't know, like, what the plaintiffs mean by

16   "discovery responses"; right?  So they've already produced the

17   documents, for example, that were produced to the FTC.  So by

18   "discovery responses," what is it that the plaintiff is

19   referring to?

20             **MS. WEAVER:**  Good morning, Your Honor.  Lesley Weaver

21   for plaintiffs.

22        We discussed this a little bit at the last hearing.

23   Instead of propounding formal written interrogatories, the FTC

24   asked questions, substantive questions, and requested in their

25   letters sworn responses; and we then -- in the last hearing you

1    told us to identify those letters and Facebook should produce

2    the responses.  So we've identified the letters, but we have

3    not received the responses.

4              THE COURT:  Okay.

5         All right.  And what is Facebook's position on that?

6              MR. FALCONER:  So we received plaintiffs' requests.

7    We don't have an exact number, but it's 100 to 200 questions

8    that they've asked for responses for.  It's taking us some time

9    to gather the responses and then assess them for the same kinds

10   of issues that we talked about at the hearing last time with

11   Your Honor.  So we are in the process of doing that and happy

12   to confer with plaintiffs once we've completed -- just once we

13   have our arms around what did they ask for, what do the

14   responses look like, how much of it is responsive or

15   nonresponsive.

16        And, again, you know, we understood the Court to say

17   "Let's get kind of a narrowed request from plaintiffs and then

18   the parties can meet and confer about what should be produced

19   and what shouldn't"; and we think that's the kind of thing that

20   we could perhaps hopefully work through with Judge Andler on

21   some of the questions go outside the bounds of the case, some

22   of them are within; you know, what's a fair kind of reasonable

23   proportional scope of production kind of balancing relevancy

24   and burden concerns.

25             THE COURT:  Well, I don't know that there's going to

1   be a great deal of burden if we're only talking about 100 or

2   200 questions and the answers; right?  So I don't know that

3   there's burden.

4        You had raised before confidentiality issues or things.  I

5   don't know that that applies either.  I think it might be

6   Facebook's confidentiality in which case then it can be

7   produced subject to a protective order.  So I think we need

8   something a little bit more definitive in terms of timing.

9        When did they provide you with the questions that they

10  wanted Facebook's responses to?

11            MR. FALCONER:  My memory is maybe it was March 22nd,

12  but I'm going by memory so don't quote me on that.

13            THE COURT:  Oh, all right.  Does that seem about

14  right?

15            MS. WEAVER:  Yes, Your Honor.

16            THE COURT:  Okay.  All right.  So not tremendously

17  long ago.

18        All right.  Put that on your agenda then.

19            MR. LOESER:  Your Honor, if I may, just very briefly,

20  as you well know, we keep having arguments about relevancy and

21  scope; and so I would just ask if with that example of these

22  letters and everything else, if Facebook is going to be

23  withholding based upon some scope or relevancy contention, that

24  they tell us what it is so that if it's problematic, we can

25  bring that to Judge Andler or to you if it is a problematic --

1     **THE COURT:**  You identified the questions, the 100 to

2     200 questions, that you want whatever Facebook's response was

3     to the FTC.  So they need to tell you "We're producing these

4     responses"; and if there's some that they're not, they have to

5     identify specifically "We're not" and for what reason.

6     **MR. LOESER:**  Okay.  Thank you.

7     **THE COURT:**  That's what you mean; right?  Yeah.  No,

8     they have to do that.

9     **MR. KO:**  Your Honor, David Ko.

10    Just to follow-up on that, does your guidance at the

11    previous hearing with respect to the related deposition

12    transcripts in which you suggested that really they should only

13    be redacting for confidentiality and privilege grounds, does

14    that same guidance apply with respect to these written

15    responses as well?

16    **THE COURT:**  Yes.  I mean, right, there's going to be a

17    protective order.  You can only use it for purposes of this

18    litigation and all those kinds of things, they can be produced

19    to that; but, yes, just like regular -- that's just what we do.

20    We don't redact for relevance.

21    **MR. KO:**  Thank you, Your Honor.

22    **THE COURT:**  All right.  I guess, let's see, another

23    issue that I think would be terrific or might be helpful for

24    you to work with Judge Andler is there's the issue as to

25    whether Facebook has responded completely to the question of

```
 1    identifying all companies that Facebook agreed to exchange

 2    information with, and there's a dispute arising out of what was

 3    testified to at the 30(b)(6).

 4        That, to me, seems like an issue that -- right? -- you can

 5    show Judge Andler, "Here's their deposition -- here's

 6    Judge Corley's ruling, here's the deposition testimony, and

 7    here's sort of" -- then the parties can just say what their

 8    position is and she can help you work through it; right?

 9        I mean, my hope is, like with all mediators, that you take

10    to heart -- when they have a view of something, that you take

11    it to heart and your position -- you may disagree or disagree,

12    but it may help shape your position somewhat and she may have

13    compromises or things in mind and creative things.

14        Okay.  And then you agreed on all the search terms.  Thank

15    you.

16        Just so you think, Judge Andler, they don't agree on

17    anything, they do, and actually have worked quite hard.

18            JUDGE ANDLER:  Excellent.

19            MR. LOESER:  And we agreed on Judge Andler,

20    Judge Corley.

21            THE COURT:  And Judge Andler, yes.

22            JUDGE ANDLER:  Thank you.

23            MS. WEAVER:  In less than a year.

24            THE COURT:  Yeah.  That actually was pretty quick.

25        So now I'd actually like to talk to you about, unless
```

1  there's anything else, about the ADI documents, the app

2  developer investigation documents.

3       And sort of let me tell you what my thinking is about

4  that, and I did review the Massachusetts Supreme -- the Supreme

5  Judicial Court -- I can't remember -- the highest court of

6  Massachusetts decision; and my view is -- and also I think I

7  have the benefit, which they didn't have, at looking at some

8  documents in camera -- my view is, and this is what I'm going

9  to tell you my tentative view is, is that certainly the

10  investigation was done in anticipation of litigation, but also

11  I can't conceive of how it wouldn't have been done otherwise as

12  well; right?

13       I mean, Facebook wasn't going to let -- well, because they

14  said it.  When they said to the public and to their users

15  "We're doing this to protect you," they didn't say "But our

16  primary purpose was to protect our shareholders"; right?

17       I mean, if they were immune from liability, they still

18  would have gone and looked back even though the platform had

19  changed; right?  There are some apps that were suspended

20  because they were -- or you considered them to be bad actors or

21  concerned about that, and I think that would have been done.

22       All that's to say, though, there certainly are going to be

23  documents in there that are, A, attorney-client privilege; or,

24  B, attorney work product.  For example, if Gibson Dunn made

25  edits to requests for information or those kinds of things,

 1   that's classic work product that's not going to be

 2   discoverable.   Any advice that was given is not going to be

 3   discoverable.

 4        But in terms of the ADI team, at least from what I've

 5   seen, it looks like a lot of that was just generated there

 6   separate that may have then been reviewed but would have been

 7   done anyway.

 8        But also the way I was looking at it in looking through

 9   and looking at those documents is that a lot of it I don't

10   think is relevant at all, and so what I wanted to know from

11   plaintiffs -- and this I sort of was thinking about it after

12   reading the Massachusetts case where the AG did much more

13   targeted discovery, and sort of get a sense from the plaintiffs

14   because I think this will be helpful.

15        Because I'm afraid I'm just going to rule on these 20

16   documents and then we're going to be back here with every

17   single document.   I don't think plaintiffs need every single

18   document.   There's certain information, like you say, that you

19   need and maybe it's not even going to be privilege.   There's

20   going to be other information that may be privilege and I

21   actually think you don't even need.

22        So what is it precisely that the plaintiffs need from that

23   investigation?

24        **MR. KO:**   Your Honor, this is David Ko.   I can speak to

25   that first.

 1          I think to directly answer that question, what we need and

 2     what we've asked for and what we've identified in our brief are

 3     the facts underlying the investigation that relate to our

 4     claims, and in particular which apps were in violation or in

 5     potential violation of which Facebook policies and over what

 6     period of time these entities were in violation of these

 7     policies and the specific conduct that caused them to be in

 8     violation.  And that's obviously relevant to our claims

 9     regarding whether or not Facebook allowed third parties to

10     access user information and whether Facebook properly monitored

11     the disclosure of this information as they claim they did.

12          And so that really relates big picture, you know, our

13     argument that the facts underlying these communications are

14     what we're really seeking.  That really I think responds to

15     your question most directly.

16          **THE COURT:**  Right.  So you don't need to know -- you

17     don't need to know, like, when a request for information was

18     sent.  I know you've been provided responses to those so I

19     don't think I'm saying anything.  You don't even know when it

20     was sent or re-sent or when the response was received or any of

21     those kinds of things.  You want -- well, you have been

22     provided with the responses -- right? -- and the actual

23     requests that went out.

24          **MR. KO:**  Correct.

25          **THE COURT:**  And -- okay.

1        All right.  So let me hear from Facebook.  With that in

2   mind in terms of your privilege log, how does that change that

3   or does it, or maybe you already understood that?

4        **MS. KUTSCHER CLARK:**  Your Honor, it's a little bit

5   difficult because this is the first time we're hearing this

6   request.  To date we have never received an information

7   request.  We just received a request for all of the ADI

8   documents.  So I think this is definitely something we would

9   need to think about a little bit more.

10       I think what might make sense is if plaintiffs want to

11  issue a request, then we can look at it in context; but what

12  was a little bit tricky in the briefing was we were dealing

13  with a request for all of the ADI documents and then plaintiffs

14  said, "Well, give us the underlying facts," but we had never

15  received a specific request for specific facts.

16       **MR. KO:**  Your Honor, I think that's a

17  mischaracterization.  I think we've asked repeatedly about this

18  information.  You know, we've conferred about ADI, as you know,

19  for well -- almost over a year now and we presented these

20  issues to Your Honor last June.  You know, you accurately

21  ordered this privilege log to make sure that you had the proper

22  context.

23       And throughout those discussions, we have asked over and

24  over again that we obtain the actual facts underlying this

25  investigation; and if there's any doubt about this, this is

 1    obviously included in our briefing.  We made it clear that

 2    that's what we wanted in our briefing and, in fact, we put it

 3    in our proposed order.  So I'm a bit surprised that

 4    Ms. Kutscher Clark believes that this is the first time that --

 5              **THE COURT:**  All right.  This is good because it's

 6    giving Judge Andler a hint of why I thought a discovery

 7    mediator would be useful.

 8         So let me ask you this:  Do you need information, then,

 9    about apps that were investigated but Facebook in the end took

10    no action against?

11         **MR. KO:**  Yeah.  That's why I was very precise in

12    saying that there could have been a potential violation.  We

13    need to know that -- we need to know the thought process, if

14    you will.  I mean, not the privileged information but to the

15    extent there was an escalation but not an enforcement, that is

16    still relevant because that relates to whether or not they're

17    actually and accurately monitoring the disclosure of this

18    information as they suggest.

19              **THE COURT:**  Okay.

20              **MS. KUTSCHER CLARK:**  Your Honor, I think we need an

21    actual discovery request.  I hear everything Mr. Ko is saying,

22    and of course we've discussed this extensively, but we do not

23    have any interrogatories asking for information like this.

24    Right now what I'm hearing is "We want all of the facts

25    underlying ADI," and that's a difficult thing to respond to.

1    So I think this needs to start with an actual request in

2  writing that we can look at and evaluate, and then we can

3  narrow it from there.  But, you know, a request for any

4  information underlying ADI or, for instance, Mr. Ko is saying

5  any violation of a Facebook policy, Facebook has a lot of

6  policies.  Some of those policies might be relevant here, some

7  of them might not be.  So I think we need to see an actual

8  request that we can evaluate.

9        **MR. SNYDER:**  Martie, can I jump in here?

10    Judge, we agree that a narrowing makes a lot of sense and

11  we're asking for a discovery request not to have form over

12  substance or to delay but to facilitate and hopefully we can

13  cut through all this because I think what you said makes

14  absolute sense.

15    For example, we've already given them the suspensions

16  list.  That, they have.  Escalations -- you know, a lot of the

17  escalations involved my firm and legal advice; some did, some

18  didn't.  So if we see -- you know, "all the facts" is very

19  vague.  We don't know what that means because we have thousands

20  of facts -- millions of facts, because we had investigators

21  looking at all myriad of things.  So as precise a request as

22  they can make, then we can hopefully cut through a lot of this

23  and give them the nonprivilege stuff that is responsive and

24  relevant.

25    I mean, we really want to get through this ADI piece, but

```
1   right now we're kind of shooting in the dark because all facts

2   underlying the investigation, having been involved in that

3   investigation, I don't know what that means.  I really don't.

4          THE COURT:  That's not what they're -- I understand

5   that.

6          So then my next question is, because you had suggested,

7   I'm prepared then to rule on the motion but Facebook had

8   said -- and, as I said, my tentative view is I don't

9   necessarily agree with the Massachusetts -- well, I think we

10  all agree about the dual purpose doctrine and what the

11  Ninth Circuit rule is with respect to that.  The Massachusetts

12  court kind of -- kind of applied the same rule.  I mean, they

13  at one point did use the same rule, and without really any

14  analysis sort of came to the conclusion that it was -- well,

15  I'm not sure what it was.  I'm not sure they were applying the

16  same rule as the Ninth Circuit.

17         So I'm prepared to issue a ruling, but I wanted to ask

18  Facebook about what they're -- I don't know what more you would

19  say, but I want to make sure it's fair because I understand --

20  it's clear that this investigation was set up with the intent

21  to make it privileged.  That's clear.  That's not dispositive,

22  but that's clear.  So given that, I do want to make sure that

23  they are able to fairly present it, and so that's why --

24         MR. SNYDER:  Because I would respectfully disagree

25  with the following:  I think that because when it was set up,
```

```
 1   it was set up for the reason you said because we wanted to
 2   assure our users that the platform, you know, was safe and had
 3   been safe in the past, but it was not set up so that we can --
 4   so that we can shroud it in a privilege.  It was set up -- it
 5   was set up in a privilege way because we understood that to the
 6   extent we have to take enforcement action, it would require,
 7   you know, legal advice and the lawyers were embedded in and
 8   involved in, you know, hundreds and hundreds of decisions on a
 9   weekly, daily basis about escalation, about all manner of the
10   investigation.
11        So it wasn't just that lawyers were put in to make it
12   privilege.  Lawyers were embedded in.  In fact, we set up the
13   investigation because it required legal advice at every turn.
14        THE COURT:  That may be what you're saying.  I don't
15   know that I have seen -- I don't know that I have --
16        MR. SNYDER:  I can --
17        THE COURT:  I don't know that I've seen that.  That's
18   why I want to ask:  Is there anything else that you want to
19   present in an admissible format as opposed to the attorney --
20        MR. SNYDER:  Yes.  What I would like to do,
21   Your Honor, because my partner Alex Southwell was literally
22   living in Palo Alto with a number of my partners and associates
23   for weeks if not months, in the guts of this investigation,
24   again, not as a fig leaf but as lawyers practicing law and
25   advising the client, I think it would be helpful for the Court
```

in its determination for us to put in an affidavit where we can
outline in a nonprivilege way the extent to which legal advice
was involved at every step in the investigation.

    That might even be helpful to the plaintiffs in then
identifying what it is they want to know because, as I said,
all of the -- all -- I don't know what percentage but a
substantial number of the decisions made by the investigators
on the field were made sitting next to lawyers, texting,
e-mailing with lawyers, at every turn.  Hundreds -- I haven't
seen our privilege log, but it must be tens if not hundreds of
thousands of entries of iterative discussions between my team
and the investigators because they were living together for
months and months and months doing this investigation hand in
glove, hand in hand, shoulder to shoulder.

    THE COURT:  Yeah, but don't forget what the test is in
the Ninth Circuit is dual purpose and would the investigation
have occurred anyway; and it's inconceivable to me that if
Facebook had been immune from liability, that they wouldn't
have gone in and investigated the apps to see if there were any
other bad actors there.

    That's just -- that's just inconceivable to me that, of
course, they would have gone in and investigated those apps;
and, therefore, my view is that those facts discovered, the
facts, not the advice given, the facts would be discoverable.
So I'm just saying that's what my view is, but I will allow you

1  to submit an affidavit.

2      And I know before I said no affidavits, but now having

3  looked at it all, I think that that would be a mistake --

4          MR. SNYDER:  Thank you.

5          THE COURT:  -- an error on my part to rule

6  definitively on that without doing that.  And then, of course,

7  I'll let -- but, as you said, a nonprivileged affidavit.

8          MR. SNYDER:  Yes, Your Honor.

9          MR. KO:  And, Your Honor, will we be allowed to

10 respond to that affidavit?

11         THE COURT:  Yes.  You're going to get to see it and

12 then you're going to get to respond.

13         MR. KO:  Because I think just to preview what -- you

14 know, Mr. Snyder, what I hear him saying is simply because of

15 the volume, that somehow this is all privilege.  But as you

16 correctly pointed out, both the dual purpose and the facts

17 underlying the investigation is what we are entitled to.

18     And it's clear -- I mean, I get -- I understand that it

19 was a massive investigation, but just the sheer fact that it

20 involved lots of communications does not take away from the

21 fact that we would be entitled to the underlying facts

22 regarding the escalation of these apps and the subsequent

23 enforcement to the extent that was done.  And so that's what we

24 are seeking and I think it's pretty clear what we would be

25 entitled to here.

1          **MS. WEAVER:**  Your Honor, if I can --

2          **THE COURT:**  That will shorten the privilege log if you

3     only did the sample privilege log for six apps greatly; right?

4     None of those e-mails about "Are you available for this

5     meeting?" or "Can we move it?" or "Should you change the weekly

6     report so that it has this information?"

7          **MR. SNYDER:**  No.

8          **THE COURT:**  You don't need any of that; right?  You

9     just want the facts.  You just want what's in the report.

10         **MR. LOESER:**  Your Honor, I'm going to raise my hand,

11    and I have a question about this affidavit.

12         And if the notion is that Facebook is going to submit the

13    affidavit of a lawyer, I'm wondering how that works in this

14    case.  That would appear to, then, be a witness.

15         And one of the central claims is a failure to monitor, and

16    I'm a little -- I guess I'm confused as to how a lawyer

17    testifying in this action about the work that that lawyer did,

18    some of which would be privilege, some would not, wouldn't be a

19    waiver of the attorney-client privilege or at least introduce a

20    lawyer as a witness.  And I'm just throwing that question out

21    there wondering how that works.

22         **THE COURT:**  I don't know.  This is a perfect thing I

23    think for you-all to discuss with Judge Andler; right?  So --

24    and I appreciate, Mr. Loeser, you being very candid about that.

25    Essentially you're, like, warning them, "Just because we're

```
 1    sitting here doesn't mean if you submit some affidavit, that
 2    we're not going to argue there's some waiver."  And I
 3    appreciate you being transparent about that, and Facebook will
 4    have to think about that -- have to think about that.
 5         And of course, then, there is the issue in Massachusetts
 6    the court did hold that it was work product but that, you know,
 7    the fact work product was discoverable in any event.  And so
 8    maybe this is a way of working through that as well and getting
 9    that information.  And you could, for example, show
10    Judge Andler a lot of those documents.
11         MS. WEAVER:  Your Honor, and on a related note, you
12    know, to the extent that Facebook is raising as a defense in
13    this action to the negligence claims and the invasion of
14    privacy that they investigated and maintained users privacy,
15    we're entitled to discovery.  So it's akin to the waiver
16    argument but it exists whether or not they put in a declaration
17    by a lawyer.  If Facebook is going to rely on the investigation
18    as a defense, we should get discovery of it.
19         THE COURT:  Well, that is -- sure.  Of course.  But I
20    don't know if that's the case.  They'll have to make that
21    decision.  Yeah, they'll have to make that decision.
22         Okay.  So there we are.  I've punted everything I think
23    except that within a week Facebook has to tell you which
24    deposition transcripts they're producing and which ones they
25    are not.
```

```
 1        And, Judge Andler, it would be great if you were able to

 2   join us on all of these hearings.  I think that would be

 3   useful.

 4        JUDGE ANDLER:  I'd be happy to.  I just have to have

 5   notice so that my case manager can let the counsel in my

 6   arbitrations and mediations that are scheduled through 2022

 7   know that we will have a later start in those sessions.  So it

 8   will be pretty easy for Matt to do that.  So if counsel just

 9   give enough notice, I'm happy to do that.

10        THE COURT:  And we'll be by video.

11        JUDGE ANDLER:  Great.

12        THE COURT:  For as long as the Administrative Office

13   of the U.S. Courts allow us to be by video, we will be by

14   video.

15        JUDGE ANDLER:  Thank you.

16        THE COURT:  So I'm hoping that will be permanent.

17        JUDGE ANDLER:  Thank you.

18        THE COURT:  So why --

19        MR. LOESER:  A lot of people agree with you,

20   Your Honor.

21        THE COURT:  Yeah.  No, I know.  Yeah.  I have a lot of

22   these cases right now that I'm managing that have attorneys

23   from all across the country and it just makes so much sense,

24   unless you're an airline.

25        So shall we meet again in, say, three weeks you think?
```

```
 1            MR. SNYDER:  Sounds good.

 2            THE COURT:  Yeah.  How about April 27th?  And is

 3    8:30 better?

 4        Let me ask Judge Andler.  We can start earlier at 8:30 if

 5    that's better.

 6            JUDGE ANDLER:  That's usually much better for me if

 7    it's not inconvenient for counsel and the Court.

 8            THE COURT:  I think we've done that.  Why don't we do

 9    April 27th, then, at 8:30 a.m.  And I expect between now and

10    then you will meet and mediate your little cases.

11        All right.  Great.  Thanks, everyone.  I hope you have a

12    vaccine plan if you don't already have a vaccine.  Soon it will

13    be open to everyone.

14            ALL:  Thank you, Your Honor.

15            JUDGE ANDLER:  Thank you, Counsel, and we will be in

16    touch so we can set something up.

17                (Proceedings adjourned at 9:37 a.m.)

18                          ---oOo---

19

20

21

22

23

24

25
```

1

2

3                        **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Wednesday, April 7, 2021

8

9

10

11    _____

12          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

Pages 1 - 64

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, MAGISTRATE JUDGE

IN RE: FACEBOOK, INC. CONSUMER    )
PRIVACY USER PROFILE LITIGATION.  )  NO. 18-MD-2843 VC (JSC)
                                     San Francisco, California
                                     Monday, July 13, 2020

**TRANSCRIPT OF ZOOM VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                        BLEICHMAR FONTI & AULD LLP
                        555 12th Street
                        Suite 1600
                        Oakland, California  94607
                BY:  **LESLEY E. WEAVER, ESQ.**
                     **ANNE K. DAVIS, ESQ.**
                     **MATTHEW MONTGOMERY, ESQ.**

                        KELLER RORHBACK, LLP
                        1201 Third Avenue
                        Suite 3200
                        Seattle, Washington  98101
                BY:  **DEREK W. LOESER, ESQ.**
                     **DAVID J. KO, ESQ.**
                     **CARI C. LAUFENBERG, ESQ.**

                        GIRARD SHARP LLP
                        601 California Street
                        Suite 1400
                        San Francisco, California  94108
                BY:  **ANGELICA M. ORNELAS, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED**:

For Defendants:

     GIBSON DUNN & CRUTCHER LLP
     200 Park Avenue
     New York, New York  10166
  **BY:  ORIN SNYDER, ESQ.**


     GIBSON DUNN & CRUTCHER LLP
     1881 Page Mill Road
     Palo Alto, California  94304
  **BY:  MARTIE P. KUTSCHER CLARK, ESQ.**

     GIBSON DUNN & CRUTCHER LLP
     2100 McKinney Avenue
     Suite 1100
     Dallas, Texas  75201
  **BY:  RUSSELL H. FALCONER, ESQ.**

     GIBSON DUNN & CRUTCHER LLP
     333 South Grand Avenue
     Los Angeles, CA 90071-3197
  **BY:  DEBORAH L. STEIN, ESQ.**

| | |
|---|---|
| 1 | **<u>Monday - July 13, 2020</u>**                                      **<u>8:32 a.m.</u>** |

1   <u>Monday - July 13, 2020</u>                                    <u>8:32 a.m.</u>

2                      **P R O C E E D I N G S**

3          THE COURT:  Calling Civil Action 18-2842, In Re

4   Facebook.  Counsel, starting with plaintiff, please state your

5   appearances.

6          MR. LOESER:  Good morning.  It's Derek Loeser for

7   plaintiffs.

8          THE COURT:  Good morning.

9          MS. WEAVER:  Good morning, Your Honor. Leslie Weaver

10  with BFA.  Anne Davis and Angelica Ornelas are with me.

11         THE COURT:  Good morning.

12         MR. KO:  Good morning, Your Honor.  David Ko, Keller

13  Rohrback, also on behalf of plaintiffs.

14         MS. LAUFENBERG:  And good morning, Your Honor. Cari

15  Laufenberg on behalf of plaintiffs.

16         THE COURT:  Good morning.  So, for Facebook?

17         MS. STEIN:  Good morning, Your Honor. I saw Orin

18  Snyder's name up a moment ago, but it looks like he's no

19  longer on this screen.

20         THE CLERK:  I promoted him, and I don't see him.

21         MS. STEIN:  I'm getting text messages saying there is

22  a little bit of a technical error, but I think he'll be on

23  momentarily.

24         THE CLERK:  Okay.

25         MS. STEIN:  Yeah.  He says it says "Waiting."

1          And, this is Deborah Stein for Facebook.  And I'm here

2     with Martie Kutscher Clark.  And hopefully Orin Snyder will be

3     here in a moment.  I'm not sure; maybe he should disconnect and

4     try again.

5          Do you think that's the best thing, for him to hang up and

6     try again?

7              **THE CLERK:**  Sure.  I mean, as soon as I see his name,

8     I will promote him to a panelist.

9              **THE COURT:**  No apologies needed.

10    (Off-the-Record discussion)

11    (A pause in the proceedings)

12            **MR. SNYDER:**  (Inaudible)

13            **THE COURT:**  Can't hear you, Mr. Snyder.

14            **MR. SNYDER:**  Okay.  I apologize.  My iPad was not

15    allowing me to connect, so now I'm on my iPhone.

16            **THE COURT:**  We can see you now.

17            **MR. SNYDER:**  Okay.  Great.  Thank you so much.  I

18    apologize.  I don't know why.

19            **THE COURT:**  Not a problem.  Not a problem.  Why don't

20    you go ahead and make your appearance; everyone else has.

21            **MR. SNYDER:**  Okay.  Orin Snyder for defendants, from

22    Gibson Dunn.  Thank Your Honor.

23            **THE COURT:**  We do have a court reporter this morning,

24    taking down the transcript.

25          All right.  So thank you very much, everyone, for your

1   statements.  I thought we should just discuss them, the issues,

2   in the order the parties presented them.

3        First, with respect to plaintiffs' document production.

4   Not really sure, plaintiffs say they're not withholding

5   anything.

6        The only thing I guess that Facebook raised was some

7   potential dispute regarding the production of documents versus,

8   maybe, interrogatories.  But I didn't understand plaintiffs'

9   statement to say that they were refusing to produce those

10  documents.

11       I don't know if anyone from the plaintiffs wants to

12  respond.

13          **MS. WEAVER:**  Angelica Ornelas will be addressing this

14   for us, Your Honor.

15          **MS. ORNELAS:**  Thank Your Honor.

16       So I think what we've tried to do here is explain that we

17  are searching for responsive materials, to the extent that they

18  are in plaintiffs' possession.

19       What we are excluding from the search are materials from

20  the user account and user archive, itself, for a couple of

21  different reasons.  One is as to the offensive ads that

22  Facebook is seeking, it's not clear that that content is

23  located within those sources, to begin with.  There does appear

24  to be identification of advertisers that sent content to the

25  users.  But the ads, themselves, do not appear to be in the

1    archive.

2        So that is one of the reasons why we don't think that

3    should be is encompassed within our search.  If that helps.

4            THE COURT:  Well, what you're saying is that you

5    can't produce them.  That you don't -- you don't have the

6    ability to produce them.

7            MS. ORNELAS:  From the Facebook user account and

8    archive.

9        But otherwise, if the plaintiffs do have standalone

10   records of things like the offensive ads that Facebook is

11   seeking, we are searching and collecting those items.

12           MS. KUTSCHER CLARK:  Your Honor, if I could respond

13   to that for a minute, I'd appreciate it.

14           THE COURT:  Go ahead.

15           MS. KUTSCHER CLARK:  The issue here isn't limited to

16   advertisements.

17       And I just want to start by saying we're not seeking

18   discovery from the there was here to abuse the plaintiffs, or

19   to harass them.  It's because we think this case should have

20   been dismissed on standing grounds at the motion-to-dismiss

21   stage, and Judge Chhabria held that we would have an

22   opportunity to seek discovery from the plaintiffs regarding

23   their allegations, and an opportunity to move to dismiss

24   individual plaintiffs on standing grounds.

25       And to that end, the plaintiffs have a lot of allegations

1    in their complaint, not just about the advertisements, to the

2    effect that because of conduct Facebook engaged in, they

3    experienced certain activity on the Facebook platform.

4         That includes that the plaintiffs received what they call

5    highly offensive advertisements; that they received friend

6    requests from people they call "trolls" who they didn't

7    actually know; that they experienced third-party interference

8    with their accounts, so someone who was not them was posting on

9    their accounts.  We have requested information from plaintiffs

10   regarding those allegations.

11        So for instance, documents sufficient to show any highly

12   offensive advertisements they actually received, or documents

13   sufficient to show any friend requests they received from

14   trolls, so people they didn't actually know.  And plaintiffs

15   seem to have taken the categorical position that they will not

16   produce any materials from their Facebook accounts.

17        And for us that's problematic, because Facebook's not in a

18   position to identify that information.  We don't know if a

19   particular friend request came from someone the plaintiffs knew

20   or did not know, whether a post on their account was a post a

21   particular plaintiff actually made, or whether a third party

22   gained access to an account mained that post.

23        So we're just requesting materials to show that type of

24   information.

25             THE COURT:  But I don't understand -- I don't hear

1    them saying that they're refusing to identify that.   Of

2    course, that's relevant.   That's not what I heard.

3         I guess what I heard is they don't -- they don't know how

4    they could necessarily access and show that to Facebook, but

5    they could identify for it.   The allegation was made in the

6    complaint, so obviously, they have to be able to identify it.

7         Is that what you're saying, Ms. Ornelas?

8         **MS. ORNELAS:**   Your Honor, to the extent that the

9    plaintiffs do have those records in their possession, custody,

10   or control, they're going to be produced.   However, to the

11   extent that Facebook is asking us to search through the

12   Facebook user platform and archive, the records that they are

13   requesting don't appear to be contained in those sources.

14        So we are agreeing to search and collect materials, to the

15   extent they exist.   But for -- for right now, it doesn't appear

16   like those materials are within the platform and the archive,

17   which is why we are anticipating carving them out of our

18   search.

19        **THE COURT:**   And just to -- how would they identify --

20   how would they go about and find to produce to Facebook an ad

21   that they found, that they believed was offensive?

22        **MS. KUTSCHER CLARK:**   Sure.   So there's a lot of ways

23   that they could do this.   And we've actually discussed this

24   previously, so I'm a little surprised to hear the response

25   today, because previously the response has been:   If you want,

1    we can look.

2        So for instance, on Facebook plaintiffs have a feature

3    called:  Download your information.  And you can download there

4    sort of a history of all of your activity on Facebook, and

5    pretty much everything you've ever done on Facebook.  And they

6    would be able to find a lot of this information there.

7        Many Facebook users --

8            **THE COURT:**  Would it show ads?

9            **MS. KUTSCHER CLARK:**  I don't know, off the top of my

10    head, if it would show every ad, but I believe certain

11    advertising information would be reflected there.

12        A lot of this information also comes across through

13    emails.  So a lot of users have their accounts set up to send

14    information to them by email, as well, so users would receive

15    emails.

16        And I do just want to clarify, we're not just talking

17    about advertisements.  You know, some of this is about friend

18    requests people received.  And they --

19            **THE COURT:**  I'm just taking -- I'm just taking it --

20    I'm taking it one at a time.  Because you said that they

21    refused, I -- I'm just not hearing that.  I'm just trying to

22    figure out.

23        How would they -- I know they could describe to you an ad

24    that they recall seeing that they found was offensive.  I'm

25    trying to figure out, because this is a dispute about a

1   document production, how -- how are you saying they should

2   actually produce to you that ad?

3       What is the search that they're supposed do?  What -- at

4   least for the ads, I don't think you know.

5       Okay.  So now as to --

6           **MS. KUTSCHER CLARK:**  No.  For their ads, I see three

7   ways they could find the information.  First, they could go

8   through their download-their-information file, and any ads

9   that are contained within it they could produce the relevant

10  pages of their download-their-information file or, you know,

11  screenshot it and produce it.

12      To the extent any ads were received from Facebook by

13  email, they could produce those as emails.  To the extent any

14  ads are currently on their Facebook news feed, they could

15  produce those materials by, again, either screenshotting or

16  PDFing the pages.

17          **THE COURT:**  Okay.  So, Ms. Ornelas, are you

18  downloading the information files for your clients?

19          **MS. ORNELAS:**  Sure, Your Honor.  So when we -- we

20  have downloaded that information.  And that's what I was

21  referring to earlier, where it appears that within that file,

22  there is some limited advertiser information.  The ads,

23  themselves, do not appear to be located within that file.

24      With respect to, you know, stand-alone emails or

25  screenshots, that is something that we are searching for, and

1   collecting, and reviewing.

2       The issue is to the extent that Facebook believes the ads,

3   themselves, are within the download file that Ms. Kutscher just

4   described, that's where I think the disconnect is here.

5           **MS. WEAVER:**  Your Honor, if I may just explain, the

6    archive that we're talking about is a select subset of users'

7    platform activity that Facebook designates and allows users to

8    download.  Ordinarily, users don't that.  And that's --

9    Facebook produced that to us, already.  So when Ms. Ornelas

10   says that they excluded advertisement, that's because it is

11   not the entire world of Facebook activity.

12       And I think it's exactly right that, really, the

13   information that Facebook wants is better suited to a

14   contention interrogatory or a deposition.  It's really not a

15   document request that's proportional to the needs here, because

16   we can communicate that.  And the second piece is --

17          **THE COURT:**  Well, why -- I don't hear -- I don't hear

18    that it's proportionality.  I hear that you don't have it.

19          **MS. WEAVER:**  That's true, as well.  I guess the

20    question is, yes, could we go through the archives and maybe

21    identify some reference to an ad?  I don't know.

22       But these are, you know, highly -- these are -- they're

23   not sorted that way.  There's no section that says:  Here are

24   the advertising.  We're not aware that we have it.  If Facebook

25   produced it to us, maybe that would help.  But we don't have

1    them right now.

2        And Facebook knows what advertisements it serves to these

3    plaintiffs.  Right?  They know what agreements they have, and

4    who's been allowed to advertise on the platform.

5        But, you know, for example, to come at this another way,

6    let me just say that our allegations aren't -- really, the

7    heart of the case is not about specific individual

8    advertisements.  Although, each of our plaintiffs received

9    notice that Cambridge Analytica obtained their data, so

10   Facebook knows that already.

11       But the heart of our case is that it's the volume of data

12   and advertisements that people got because Facebook was

13   funneling all of this information out.

14       And we still don't even have from Facebook documents

15   sufficient to show which third parties accessed their data.  If

16   Facebook produced that to us, which they still haven't, we

17   could go to our plaintiffs and say: Of these millions of apps,

18   which do you find offensive that were advertising to you?

19       But it's kind of asking us to answer from information that

20   Facebook exclusively has.  And that's -- that's one of our

21   issues.

22           THE COURT:  Well, it's kind of a chicken -- it's a

23   chicken-and-egg thing, I think.  I don't know about that.  But

24   -- I don't know if I necessarily agree with that.

25       But it does sound like the way to approach this is, first,

1    perhaps to do it as interrogatories.  And then the plaintiffs

2    will identify, you know:  These are the ads...

3        Whatever the question is, whatever your question is about

4    standing, ask that.  And then perhaps then go to the documents.

5        **MS. STEIN:**  Your Honor, if I may, to that point, I

6    think our issue here is as we were meeting and conferring, we

7    were repeatedly told by plaintiffs that they wouldn't search

8    for these various things like troll requests, and -- and these

9    were things that were specifically pled.  We did not hear from

10   plaintiffs that they did not have access to this information.

11       Obviously, if they don't have it, they don't have it.  But

12   for some of these -- and Martie, I think, was going to go on

13   into detail which ones they were.  For some of these

14   categories, plaintiffs have it.  They can say -- if there's

15   something on their Facebook -- in their Facebook history that

16   shows activity that weren't their (audio interference) post,

17   they should produce those to us.  They've been telling us they

18   won't even search.

19       And, you know, the suggestion that there's some

20   proportionality issue here, I mean, that's the first time we've

21   heard that this case has some sort of proportionality problem.

22   I mean, we've been working night and day on production on our

23   end.  We keep getting told about how huge this case is from

24   plaintiffs' perspective.

25       So I think having them do some searching of the accounts

1    to produce a very discrete number of documents is not a lot to

2    ask.

3         And our fear that is going down the interrogatory path,

4    we're then going to be told that a contention 'rog is

5    premature, and they don't have the information.  We're just --

6         **THE COURT:**  No, no, no.  No, because I'm telling you

7    now, I'm saying, they're suggesting do that first.  They made

8    the allegations in their complaint.  So, what is the

9    information that they had that those allegations were based

10   on?  Right?  That's what you want to know first.

11        And then -- I mean, to the extent there is some friend

12   requests, for example, they say that they got that they weren't

13   aware of or that they believe was a troll, that they should be

14   -- is there any reason, Ms. Ornelas, you can't identify that?

15        **MS. ORNELAS:**  Your Honor, this goes back to the way

16   that the information is provided in the download file.  There

17   are certain lists of different types of friend requests, for

18   example accepted friends, removed friends, rejected friends.

19   There is, you know, no list within the download file of, you

20   know, particularly suspicious friend requests.

21        So to the extent there are suspicious friend requests

22   captured within those different lists, that would be something

23   that, of course, we could respond to an interrogatory asking us

24   to identify which of the requests appearing on these different

25   lists were considered suspicious.

1          **MS. KUTSCHER CLARK:**  Well, --

2          **MR. LOESER:**  Your Honor, Derek Loeser --

3          **MS. KUTSCHER CLARK:**  -- if I can respond to that, I

4    think the concern is we're not asking for plaintiffs to look

5    at their file and send us a specified list by Facebook of

6    suspicious friend requests.  We can see who requested them to

7    be friends.

8      We need them to identify for us:  Which were the friend

9    requests that you thought were from trolls?  Who were the

10   people you don't actually know in real life?  And we have no

11   way to do that.

12     So I think what Ms. Ornelas is saying is they are able to

13   look at the file and, you know, it might not be captured in one

14   particular area, they might have to do some work, but they're

15   able to see a record of who requested their clients to be

16   friends.

17     And we would like them to produce the pages of the file

18   that show friend requests from people they did not actually

19   know, who they believed to have been trolls.

20          **THE COURT:**  All right.  But the first half of that

21   sounded like an interrogatory.  You want them to identify

22   those friend requests.  But I mean -- maybe it goes hand in

23   hand, because they identify it by looking at the page, and

24   seeing it.

25     Mr. Loeser, you wanted to say something?

1              **MR. LOESER:**  Yeah.  I think, Your Honor, you're on --

2     I think you've sort of figured out exactly what the problem

3     is, and your suggestion is a good one, and one that -- it's

4     working talking about for a minute.

5              Certainly, a contention 'rog asking them to explain the

6     basis for allegations in the complaint, that does -- that's

7     always seemed to us like what this request was really after.

8     Because they're not asking for information; they've all the

9     information.  They're asking us to characterize the

10    information.  And that's exactly what a contention 'rog is.

11             And obviously, if we receive that 'rog, we'll answer it

12    with the information we have.  But I think it is also very

13    true, we don't yet have from Facebook the most critical

14    information in this case, which is who did they give our

15    plaintiffs' data to or sell access to, and what information did

16    they provide.

17             Once we have that information, we can completely answer

18    the contention interrogatory.  But at present, we can only

19    answer with what limited information we have.

20             **THE COURT:**  You can answer it, based on the

21    allegations that you made in the complaint.  I mean, that's

22    the whole -- it's a chicken-and-egg thing, right?

23             Because their argument as to standing that Judge Chhabria

24    will have to decide is if you didn't know that you were

25    receiving a friend request from someone suspicious, how you

1     were harmed by it.  Right?

2              MR. LOESER:  Right.

3              THE COURT:  Right?  So that's sort of a chicken and

4     egg.  So to say:  Well, until we know who sent it -- no.  You

5     made allegations in the complaint of some injury, thus far.

6          And they want to know, what is that based upon.

7              MR. LOESER:  Right.  I would --

8              THE COURT:  Sounds like -- I don't know --

9              MR. LOESER:  Yeah, I guess --

10             THE COURT:  I don't know if I'd call it a contention

11    interrogatory so much as like:  Identify for us, you alleged

12    X.  Okay, who is -- who did the friend request come from?

13             MR. LOESER:  Right.  I guess I would describe it as

14    part of a chicken and an egg.  Because they've focused on this

15    one aspect of the case which is, you know, ads that people

16    received that they found offensive.

17         But the heart of the case is they took information, user

18    data, and they shared it with third parties.  That then led to

19    a variety of things.  One of those things was ads that people

20    found offensive.

21         But the basis of the case is that they took data, and they

22    shared it without consent.

23         But I hear what you are saying.

24             THE COURT:  Well, that's your argument to Judge

25    Chhabria.  And I get it.

1          Like, you may think okay, you can whack that away, but

2     you're not going to win your standing argument, anyway.

3          Okay, but they're still entitled to do their discovery on

4     what they believe their argument is, to make their argument.  I

5     mean, I -- I hear what you're saying.  But that doesn't mean

6     they don't get the discovery on those allegations.

7               **MR. LOESER:**  Right.

8               **THE COURT:**  It may ultimately not prevail.  But this

9      is just discovery.

10         Okay.  So --

11              **MR. LOESER:**  To be clear, though -- I'm sorry,

12    Your Honor.  But to be clear on what we would be able to do if

13     we received a contention interrogatory today, we would be able

14     to answer with regard to the information we have at present.

15         But as discovery unfolds and we get the information we're

16    waiting for, then obviously, that would be supplemented with a

17    lot more information.

18              **THE COURT:**  Right.  But what I understand

19     Ms. Kutscher saying is you made certain allegations in the

20      complaint, and they want to know the basis for them now.

21         And to the extent, then -- for example, if your clients

22    had in mind particular friend requests, if they did, then, you

23    know, look at that file and -- or -- I don't know how you would

24    do it or if you can do it -- identify that friend request.

25              **MS. WEAVER:**  Your Honor, we will do that.  And we

1   have always said we would search for everything off the

2   platform, which is what we had when we filed.

3        I mean, the other piece, of course, and the proof problem

4   in the case at a specific level is that Facebook, itself, has

5   said they can't identify how our individual plaintiffs were

6   harmed.

7        And certainly, the friends of friends, when friends gave

8   permission so that third parties I didn't know about because

9   they downloaded those apps, that's what we need to try to

10  understand from Facebook how those systems work.

11       Because I -- this is one of those odd cases where the

12  plaintiffs don't know specifically how they were harmed.  They

13  just know the vol- -- that's not sweeping.  But in some sense,

14  there's two pieces.  There's the narrow, kind of, what happened

15  to me specifically, and what offensive ads.

16       And then there is the larger portion of the case, which

17  is:  I didn't understand that when I was sending a private

18  message and attaching a photo to one friend, that that data and

19  information was being sent to literally so many third parties,

20  Facebook tells us they can't identify them all.

21       And so we're still working on that second piece.  And

22  that's why we keep hearing it as sort of a contention

23  interrogatory.

24       But we will give them the information we currently

25  possess, and identify and respond to a 'rog based on what we

```
 1   now know, but we're just conditioning that on there's a lot
 2   that we have yet to learn.
 3               THE COURT:  No, no, no, I understand.  And that's an
 4   argument for Judge Chhabria in terms of what the --
 5               MS. WEAVER:  Got it.
 6               THE COURT:  -- was, and the standing, as to
 7   discovery.
 8               MS. KUTSCHER CLARK:  And I do want to be clear if I
 9   may, for a second, I think that the argument that Ms. Weaver
10   is making might apply to certain types of requests, and we
11   don't need to dig into those right now.
12        But the specific ones that we're talking about, for
13   instance, friend requests from trolls, there's no information
14   that plaintiffs would need from Facebook to identify friend
15   requests from people they don't know.  The plaintiffs either
16   knew the people, or didn't know the people.  I don't think
17   there's something they would need from Facebook to identify
18   that.
19        Another one of the requests has to do with interference on
20   their Facebook accounts.  So one of the things we want to know
21   is:  Were there posts on your account?  Did something appear on
22   your wall that you didn't do, yourself?
23        The plaintiffs don't need information from Facebook to
24   say:  This post on my wall this day wasn't from me.  Someone
25   else did it.
```

1          That's the type of stuff we're seeking right now, because

2    there are allegations about those things in the complaint.   So

3    I don't think there should be any delay answering questions

4    like that.

5          **MS. WEAVER:**  We will answer with what --

6          **THE COURT:**  What they need to do is review the

7     downloaded file from the user activity.  And it may or may not

8     be in there.  I just don't know how complete it is.

9          Like, somebody sitting here today probably can't remember

10   the name, exactly, or anything like that.  Right?  So they need

11   to review the file.  And maybe it's in there, maybe it's not.

12         But, I guess I don't hear the plaintiffs saying that their

13   clients aren't going to be reviewing that downloaded file.

14         **MS. ORNELAS:**  Well, Your Honor, that file, when

15    taking into account the volume that it measures to date, we're

16    talking about 116,000 documents that total, you know,

17    somewhere in the ballpark of 46 gigabytes of data.

18         So that is a significant volume to be searching, which is

19   why our initial position was carving that voluminous source

20   out, and instead, focusing on the documents that plaintiffs

21   have, things like screenshots or emails, things like that.

22   Because what we do know is, for example, when there is a

23   suspicious log-in attempt, a user is notified by Facebook, at

24   least that's my understanding.  And they get an email that

25   says:  Hey, was this you?  You have logged in from halfway

1  across the globe.

2      So things like that, you know, we are searching for.  But

3  to the extent that, you know, Facebook thinks it's proportional

4  to have us search through that volume of data without knowing

5  whether that kind of content is in the download file itself, we

6  just don't think that that is, you know, proportional at this

7  time.

8      Particularly when --

9          **THE COURT:**  I guess I don't -- I don't understand.

10     So either -- like, either it shows friend requests, or it

11  doesn't.  And if it doesn't, it doesn't.  You can figure that

12  out.

13         **MS. KUTSCHER CLARK:**  It does, yes.

14         **THE COURT:**  All I will say is this:  The plaintiff

15  certainly can't argue standing based on some friend requests

16  that they then didn't search for within their file.  That's

17  all.

18     I mean, you'll produce whatever evidence you produce,

19  right?  And then that's it.  You're held to it.

20     So that's -- that's the direction I'm going to give.

21  That's all.  I mean, I don't really quite --

22         **MS. WEAVER:**  I understand Your Honor.

23         **THE COURT:**  Yes, it will take the plaintiff some time

24  to cull through their files.  Okay.  They're the named

25  plaintiffs.

1          **MS. WEAVER:**   Yeah.   We will do that, Your Honor.

2      I think the other point, though, is that there is -- there

3  remains -- for example, if Facebook has a list of trolls and

4  had a list of suspicious apps and we can show them to our

5  plaintiffs, they may remember.

6      But I hear your point.   We'll give the specific

7  information we have now.   And later on, we will be -- we'll be

8  amending any 'rog responses, once discovery is complete.   And

9  then a judge can make a ruling on standing.

10          **THE COURT:**   Okay.   Okay.   All right.

11      Let's see.   So the next area was the app developer

12  investigation.   And so --

13          **MR. SNYDER:**   Your Honor, may I be heard on that one?

14          **THE COURT:**   Yes.

15          **MR. SNYDER:**   So Your Honor, thank you.   This is both

16   not right, and also not accurately described by the plaintiffs

17   in the submission.

18      Let me be very brief.   The so-called "app developer

19  investigation" is an internal investigation conducted by my law

20  firm, Gibson Dunn, in the wake of the Cambridge Analytica

21  events, commenced in 2018.

22      And the purpose of this internal investigation that my

23  partner Al Southwell is leading was to advise Facebook about

24  legal risks and exposures, including in this lawsuit

25  (Indicating), relating to apps on the Facebook platform prior

1    to 2015.  It's been ongoing since that time.

2         And first, plaintiffs wanted every single document

3    relating to that internal investigation, including my law

4    firm's files.  That was obviously overbroad.

5         To be clear, we are producing documents relating to this

6    investigation.  What I mean by that, Your Honor, is when my law

7    firm, working with Facebook and outside consultants, discovered

8    activity prior to 2015 involving third-party apps that it

9    wanted to follow up with, and communicated with those

10   third-party apps, those communications are not privileged.

11   Those communications we are producing, and have produced.  In

12   fact, we have already produced 16,000 documents related to the

13   investigation.  And as we continue our production, we will

14   continue to produce thousands of documents relating to the

15   investigation.

16        What we are objecting to, and only objecting to, is core

17   attorney/client and work-product communications, such as my law

18   firm's internal analysis.  Such as communications between my

19   law firm and counsel at Facebook concerning the investigation.

20        What we propose makes sense here is that we conclude our

21   production relating to this internal investigation.  And once

22   plaintiffs have reviewed these materials and identified apps

23   that they believe to be relevant, or want -- or -- or want

24   additional documents, they can issue more tailored requests for

25   information specific to particular apps.

1      For example, let's assume hypothetically in 2012 there was

2   some app that did something that the investigation uncovered.

3   We then, as part of our investigative protocol, communicated

4   with that app.  Call it App X.  We wrote them a letter.  That

5   letter will be produced  and they will then have the name of

6   that app.  And any communications with that app.

7      In one or two instances, only, we actually -- I think one,

8   maybe, we filed a lawsuit against a company.  That is all

9   public.

10      After they review those documents, we can take -- we can

11   then meet and confer, and there can be a live dispute.  Right

12   now, there is no live dispute other than they say they want

13   everything.  And they are focusing on a Massachusetts Superior

14   Court ruling.  And as we told the Court -- which -- which --

15   which was a motion to compel by the Massachusetts Attorney

16   General regarding a completely different -- substantially

17   different document requests than plaintiffs.

18      We objected to that request in Massachusetts because, as

19   framed, it did invade attorney/client privilege, work product,

20   and the like.  The Superior Court ruled against us.

21      But Facebook took that up to the Supreme Judicial Court in

22   Massachusetts, and they granted the extraordinary review of the

23   Superior Court's work product determination.  That is in

24   litigation.  And so nothing that's happening in Massachusetts

25   should either bind or control here.

1        This is not right.  When they get the tens of thousands of

2   documents they will see that there are -- I'm making it up --

3   ten, 20, 30, 40, 50 different apps -- maybe more, I don't know

4   the number -- maybe Martie does -- with which we communicated

5   as a result of our investigation.  They'll know the names of

6   those apps.  They can then follow up and ask questions about

7   those apps.  We're going to turn over all those documents.

8        What we're not turning over is our law firm's files, and

9   our communications with our client that were all pursuant to

10   this privileged investigation.

11             THE COURT:  When is that production going to be

12    complete?

13             MR. SNYDER:  Martie?

14             MS. KUTSCHER CLARK:  So we made a production on

15    Wednesday that included about 10,000 additional pages of

16    materials with the third parties.  We're continuing to review

17    them.  The volume is extraordinarily high, because it includes

18    every communication with apps about this investigation.

19        I think it would probably take us another several weeks to

20   work through the rest of the documents.  I think it's in the

21   range of tens of thousands of additional documents to review.

22   And we're actively working on that.

23        But again, these include every letter that went to an app

24   saying they were suspended, and why.  So once the production is

25   complete, plaintiffs will have the ability to identify any apps

1    that were suspended for reasons they're concerned about, or

2    that are actually relevant to the case.

3         And as Mr. Snyder said, then they could request additional

4    information about those apps, and we'd have something narrower

5    and more tailored that we can focus on.

6              **MR. KO:**  Your Honor, this is David --

7              **MR. SNYDER:**  Let me make one more point, Your Honor,

8     because -- so there's nothing -- there's no sort of nefarious

9     suggestion.

10        As it turns out, the vast majority of apps that were

11   suspended were suspended because we wrote them, saying:  "Dear

12   Mr. or Mrs. App, we have these questions for you," and they

13   never wrote back.  Probably out of business, or didn't care.

14        We then suspended them for non-compliance with our

15   platform rules because they simply ignored our initial inquiry.

16        So I think a high majority, if not in the nineties, high

17   nineties of the so-called suspended apps (Indicating quotation

18   marks) are just apps about which we had questions and followup.

19        And then they never wrote back to us, and we said "You're

20   suspended because you're a scofflaw, you didn't respond to us."

21             **MR. KO:**  This is David Ko on behalf of plaintiffs.

22   May I respond?

23             **THE COURT:**  Yes.

24             **MR. KO:**  So I'm a bit surprised, first of all, that

25    Mr. Snyder says this issue is premature.  We have been going

1   back and forth on this.

2        And as you know, in last hearing, you did direct Facebook

3   to try and get to a final position on this issue so that we

4   could actually brief it.  We thought we came to some sort of

5   final position, as you can tell from what Mr. Snyder is saying.

6   He refuses to actually have a final position on this.

7        And on the communications in particular that they are

8   claiming they will produce to suggest that we should narrow our

9   subsequently -- subsequently narrow our request, that doesn't

10  make sense to us for a variety of reasons.  Including, most

11  notably, the fact what they are offering to produce here are

12  internal communications with third parties.  That has nothing

13  to do and has no bearing on the relevance of the internal

14  documents and communications that we are entitled to.

15       I understand what Mr. Snyder is saying, that there is a

16  certain degree of those communications that could be

17  privileged.  But it is inconceivable that all of them are.  And

18  all you have to do is take one look at the statement that we

19  attached or the exhibit that we attached to our statement that

20  shows their publicly-available announcement about this ADI in

21  which they claim -- Facebook claims -- that this is something

22  that involved hundreds of people.  Not just attorneys.  Right?

23       They don't say it's an employer-driven investigation.

24  They say this involved external investigators.  They say it

25  involved policy groups at Facebook.  They say it involved

1   engineers, hundreds of people that were involved in this

2   investigation.  Platform operations folks.  Developer

3   operations.

4       This resulted -- this investigation -- which is ongoing,

5   by the way -- has resulted in thousands, tens of thousands of

6   apps being suspended.

7       So even if Mr. Snyder is correct in saying that the vast

8   majority of them relate to some sort of investigation in which

9   third parties did not respond, you still have a substantial

10  amount of third parties that are potentially in violation of

11  Facebook's (Inaudible).

12      So --

13      **MR. SNYDER:**  And -- and plaintiffs will get the names

14  of any -- plaintiffs will get any communications that we had

15  with any third-party app which puts them on notice of either a

16  perceived, suspected or actual violation.  They will have,

17  chapter and verse, the names, serial numbers, addresses of

18  those apps.

19      **MR. KO:**  Yeah.

20      **MR. SNYDER:**  And the fact is, yes -- the fact is this

21  was a large investigation, because the company committed to

22  conduct a retrospective investigation to see if there was a,

23  quote, "another Cambridge Analytica out there," close quote.

24  Turns out there wasn't.

25      Having said that, it takes a lot of engineers and a lot of

```
1   people at the company, and a lot of lawyers, I might say.  It
2   wasn't just Mr. Southwell.  We had a big team of lawyers
3   working with a big team at Facebook to look prior to 2015 at
4   every single third-party app to determine which ones complied,
5   and which ones didn't.
6        And the plaintiffs are going to have a cornucopia of
7   information about third-party apps.  And I just would
8   respectfully suggest that they be a little patient.
9        As Martie said, we're going to complete the production.
10  And I assume they'll have a lot of questions to ask about those
11  apps, and a lot of work to do to follow up.  And we will follow
12  up with respect to any third-party communications with those
13  apps.
14       So --
15       MR. KO:  The fundamental disconnect is, so,
16   Mr. Snyder is basically suggesting that we just received this
17   information, right, about external communications that they
18   had with third parties, and a potential list of these apps.
19       We are entitled to much more.  This is discovery related
20  to our case that is fundamentally about Facebook allowing
21  third-party app developers to misuse and abuse it.  Information
22  of user content information.
23       External communications with third party developers is one
24  tranche of that.  Right?  Internal documents and communications
25  related to their analysis from non-attorneys that are not
```

1 privileged are obviously relevant and responsive to our

2 requests regarding their enforcement policies.  And so that's

3 what we're asking.

4      And that's what the disconnect is here, Your Honor.

5           THE COURT:  So is it Facebook's position that, for

6 example, any communications among engineers that didn't

7 involve attorneys, because they all come under the umbrella of

8 this lawyer-directed investigation, they're privileged?

9           MR. SNYDER:  Your Honor, the engineers were all

10 working.  There were internal legal teams, external legal

11 teams.  And everything that was done within the rubric of this

12 investigation is at the direction of counsel.

13      Let me make another point though, Your Honor, just to be

14 clear --

15           THE COURT:  So that's --

16           MR. SNYDER:  Yes.  Yes.

17           THE COURT:  I just want know if that's a yes.

18           MR. SNYDER:  Yes, yes.

19           THE COURT:  All right.  So --

20           MR. SNYDER:  But Your Honor, here's what plaintiffs

21 have failed to mention.

22      This so-called "ADI," which is really an internal legal

23 investigation, is separate and apart from Facebook's normal and

24 regular enforcement activities.

25      Facebook has an enforcement team.  And all it does is

1   enforce the rules and regulations and policies on the platform.

2   That enforcement team works with engineers on a regular basis,

3   and -- and is not done at the -- in the ordinary course, under

4   the direction of counsel.

5        And we have produced and will produce numerous documents,

6   because plaintiffs have asked for them, concerning our ordinary

7   enforcement activities which do involve engineers and policy

8   people.  And that stands in sharp contrast to the legal

9   investigation that my firm conducted.

10       And so -- and Martie, I don't know what the volume of

11  those documents are, but they are fairly voluminous.

12            **THE COURT:**  Okay.  But what I guess I don't

13   understand, at some point you're going to have to produce a

14   privilege log.  Because just because you say they're

15   privileged doesn't mean that the plaintiffs have to accept

16   that.

17       So I'm trying -- so when -- when do you intend to do that?

18            **MS. KUTSCHER CLARK:**  If I could respond briefly,

19   because I think there's a little bit of a misunderstanding

20   here.

21       The concern we're having at the moment is the requests

22  we're receiving from plaintiffs keeps changing.  When we came

23  before the Court last time, we were under the impression that

24  the plaintiffs were seeking the materials that the

25  Massachusetts AG'd requested.  So we went back and we talked to

1  the plaintiffs about our position as to those materials.

2      During that discussion, the plaintiffs told us for the

3  first time -- or at least we understood for the first time --

4  that they are seeking every single document from the

5  investigation, about the investigation, related to the

6  investigation.  That's a really different request, and it's

7  extraordinarily broad.

8      And our position with respect to privilege and whether and

9  to what extent we could prepare a privilege log is very

10  difficult to analyze when we're talking about every single

11  document.  It would be a privilege log with millions and

12  millions of entries.  So what we're suggesting right now is

13  that we finish producing the letters that show who was

14  suspended, and why, so that the plaintiffs can make a more

15  tailored request.

16      And at that point, we're not necessarily objecting to

17  producing any of the underlying information.  So for instance,

18  what we understand the plaintiffs ultimately want is underlying

19  data showing platform violations, or showing what an app did

20  with users' data.

21      To the extent that we can uncover that underlying data,

22  we're not objecting to digging up that data and providing it to

23  plaintiffs so that they can do their own analysis.  What we're

24  objecting to doing is taking our attorney files and the work

25  that our attorneys and attorney-led team did to look at that

1   data, and analyze it, and make decisions about that data, and

2   simply handing it over to the plaintiffs.

3           **MR. LOESER:**  Your Honor, if I may, just briefly.

4    Because again, I think your question went right to the heart

5    of the matter.

6        If we have two engineers talking about Facebook's data

7   policies in connection and then fallout from Cambridge

8   Analytica, can that possibly be privileged.  And I think the

9   reason why we feel like this controversy is ready to be

10   briefed, the parties are taking positions that are directly

11   contrary on a large body of information that we believe is

12   directly relevant.

13       If you go to the exhibit we provided, which is Facebook's

14   public announcement of the ADI investigation, this does not say

15   Gibson Dunn lawyers are conducting an internal investigation

16   for the purpose of legal advice.

17       And I'll just read what it says, because I think it should

18   give a pretty good idea --

19           **THE COURT:**  No, I understand.  But you're not

20    seeking, are you, like, memos among Gibson Dunn attorneys.

21           **MR. LOESER:**  No.  No.  We are not seeking privileged

22    information.  We're seeking --

23           **THE COURT:**  Okay.

24           **MR. LOESER:**  Yeah.  We want the information -- like,

25    for example, one of the categories of people involved, from

1    their announcement, they say:  Among the people involved in

2    this are policy specialists.

3        They say (As read):

4            "We promised that we would review all of the apps

5            that had access to large amounts of information

6            before we changed our platform policies in 2014.  It

7            has involved hundreds of people: attorneys, external

8            investigators, data scientists, engineers, policy

9            specialists, platform partners and other teams across

10           the country."

11       And the next line is really critical for this.

12           "Our review helps us to better understand patterns of

13           abuse in order to root out bad actors among

14           developers."

15       That is a business activity, and it is a critical business

16   activity for this case.  We are not interested in the legal

17   advice and the legal communications.  We want the business

18   activity information that would be produced because it's

19   directly relevant and responsive.  If they want to withhold it,

20   they need to log it.  But it's certainly not going to be

21   privileged.

22           **MR. SNYDER:**  Well, we strongly, respectfully

23    disagree, because my law firm was involved in every decision.

24           **THE COURT:**  Okay, but we're not going to adjudicate

25    that now.

1          **MR. SNYDER:**  Right.

2          **THE COURT:**  The question, though, because it's not --

3     so they're not seeking the stuff that's clearly privileged, so

4     you don't have to worry about that.  And I don't even think

5     that ever really even needs to be logged, because that would

6     be a waste of time.

7          But with respect to the other stuff, there's arguments

8     there.  Both ways.  Privilege is not clear, and there's

9     arguments both ways.

10         And so the question is then, how, how -- I certainly --

11    it's not -- I can't adjudicate that right now, like just

12    generally out there.  It has to be done in context.  Right?

13         So maybe the thing to do -- I do, I have to say, I just

14    think, Mr. Loeser, I understand, but we're not in a great rush,

15    you noticed, so -- is start reviewing those documents, and then

16    see -- we can take a subset.  Because the way I'm going to be

17    able to adjudicate this is take some exemplars, and rule, and

18    then the parties then can use that and apply it.  Right?  You

19    don't need the log of every single document.

20         So maybe what you do is you take a particular app, or you

21    get some names or something, right, and we focus on that

22    subset, and I adjudicate that.  That's not going to resolve the

23    privilege for everything, but it will be a roadmap that the

24    parties can then apply.  But I think we are going to need a

25    certain set -- I want it to be in context of a particular

1   document.  So the question is:  How do we get there.

2       And I don't think we necessarily need to wait until all

3   the production is done.  I don't think that is the case.  The

4   parties should get together and decide on, you know -- I don't

5   know what it is that the plaintiffs think necessarily are

6   there.  Maybe Facebook can come up with -- I don't know -- a

7   hundred documents that you're going to log.

8           MR. SNYDER:  We can also be helpful, Your Honor.

9    And, and -- because the vast majority -- I think it's

10   99 percent, but that's just from what my partner, you know,

11    has allowed to.

12       Since the vast majority are people we wrote to and

13   suspended because they didn't write back to us, you know, maybe

14   we can highlight a couple of ones where we had further

15   activity, they wrote back to us, we engage with them.

16       And then we can go behind the curtain, so to speak, on

17   your exemplar idea, and we can take a look at what our work

18   product and attorney/client activity was behind the contain,

19   look at what engineers were doing, and then figure out how to

20   tee up a privilege exemplar for handful of apps.

21           THE COURT:  Well, and for example, Mr. Loeser brought

22    up like policy (audio interference), things like that.  That's

23    not going to be particular to an app.

24       But maybe plaintiffs can point out, you know, because

25   what's --

1          **MR. LOESER:**  Your Honor, you're breaking up on us.

2      (Off-the-Record discussion)

3      (A pause in the proceedings)

4          **THE COURT:**  I'm back.

5          **MR. LOESER:**  We lost you right when you started

6  talking about policy specialists.

7          **THE COURT:**  I came to the courthouse so I'd have good

8  internet.  I got the Court give me an upgraded laptop, and

9  it's, like, worse than ever.  I'm actually at the courthouse,

10  where there's very few people here.

11      In any event.  So, you know, I think, you know,

12  plaintiffs -- maybe starting with this -- identify some

13  documents that you think that you would be entitled to.  Like

14  discussions among the policymakers that Facebook was referring

15  to.

16      Facebook then, you know, look at them, and just say: Oh,

17  no, yeah, I can produce those now.

18      But I think we're just going to have to do it sort of in

19  tranches.  But I agree with the plaintiffs, I don't think we

20  need to wait until the end because I don't think it is

21  necessarily specific to particular apps.

22      I think this suggests there's broader things going on that

23  would be relevant, and that may very well not be privileged.

24  But I don't think there's anything right now.  I --

25          **MR. SNYDER:**  The reason that makes sense, Your Honor,

1    is that, you know, without reviewing attorney/client

2    privileges, we did have an internal protocol for this internal

3    investigation.  Sort of an escalation protocol.  And so things

4    did follow a particular prescribed course in the investigation

5    of an app.  And it was a massive undertaking, because the

6    company had to literally evaluate every app prior to 2015.

7    And so there is an established protocol that governs

8    escalation of these app investigations.  And policy was

9    involved in some of those.

10       But I think we -- we can work with plaintiffs, I think,

11   and identify our own protocol for how to frame the privilege

12   inquiry, and then key it up for Your Honor when it's ripe.

13          **MR. LOESER:**  Well, Your Honor, for the exemplar

14   approach to work, it would need to be -- let's take policy

15   specialists, for example.  We would say:  Look, we want -- and

16   I don't know if there's a way for us to connect it to some

17   particular app or not; it depends on what other discovery we

18   got.  But we want all the conversations and discussions that

19   relate to -- in which policy specialists were involved.

20       For the exemplar to work, Facebook would then need to

21   provide that, or produce a log that identifies everything that

22   they're not providing.  It can't be some cherrypicked set of a

23   couple of documents here and there that try to somehow prove

24   the point that Orin's trying to make.  It needs to provide the

25   parties with the full ambit of the information, so that we can

1   then meaningfully brief the dispute.

2          **THE COURT:**  So of the --

3          **MS. STEIN:**  It sounds like we have our work cut out

4    for us on a meet-and-confer, Your Honor.  I mean, this is one

5    of the issues that we've been trying to focus plaintiffs on,

6    which is the over-breadth of the request.  And we've been

7    trying to discuss:  What do you actually want?

8        And so I think this will help give us some structure for a

9    meet-and-confer process, so that we can get a better sense as

10   to what plaintiffs are looking for.

11         **THE COURT:**  Well, they actually do want everything.

12   They do want everything.

13         **MR. SNYDER:**  Yes.

14         **THE COURT:**  They recognize there are certain things

15   that they can't get, because of privilege.  But the thing is

16   that there's a fine line in these types of things, what is

17   privileged and what's not privileged.  And so, yeah.  So what

18   they want is everything.  That is true.  But they recognize

19   there's some things they can't get.

20       But maybe it's to take it off in chunks.  Maybe, you know,

21   start with the policy stuff.  But that's going to take some

22   work, then, reviewing it, saying:  Well, maybe we can't really

23   defend privilege here.

24       Or if you're going to log it all, then log it all, and

25   we'll make a decision.  I think you probably can approach it

```
 1    that way.
 2              MR. KO:  Your Honor, David Ko --
 3              MR. SNYDER:  Yeah, the problem --
 4              MR. KO:  Just one -- one more point to make in
 5     response to what both Mr. Snyder and Mr. Stein have been
 6     saying.
 7          So, the exemplar approach and the sample documents.
 8    Again, all that they are offering to produce to us are external
 9    communications and (audio interference) with third parties.
10          As Mr. Loeser was indicating, there are a whole swath of
11    documents related to internal documents and communications
12    regarding their analysis, right, that may not have escalated to
13    the point of notifying a third party regarding this escalation
14    protocol that Mr. Snyder alludes to.  Right?
15          And so there are a wide range of categories of documents
16    that we are entitled to, based on our discovery requests.
17              THE COURT:  No, Mr. Ko, I understand.  I'm not
18     limiting it.  What I'm saying is, there's no way I can resolve
19     this, just on a general thing.  It has to be specific.  Some
20     things may be privileged, and some things not.
21          I'm trying to figure out -- if there are millions of
22    things, I'm just saying let's just take it in pieces.
23              MR. KO:  Sure.
24              THE COURT:  So start with what you want, most
25     important, what you think is the most yield, or what you think
```

1   would be the best exemplar for me to rule on.  What area.

2   Like --

3               MR. KO:  Yeah, and here's an example of --

4               THE COURT:  Not waiving your right to get everything

5   else.

6               MR. KO:  Sure.  And I understand that, Your Honor.

7       And here is an example for why this issue is, to a certain

8   extent, ripe.  You know, in addition to the policy specialists

9   that Mr. Loeser alluded to, the app -- the ADI very clearly

10  involved external investigators.  So there are documents that,

11  by their own very nature, they've presumably waived the

12  privilege.

13      So communications --

14          THE COURT:  Well, that's -- I don't accept that

15  statement, at all.  That is way too simplistic.

16          MR. SNYDER:  Our law firm --

17          THE COURT:  Uh-uh, I don't need to do that.  That is

18  not a correct statement of the law, Mr. Ko, that just because

19  an external -- if the external investigator was hired by

20  Gibson & Dunn, it may very well be privileged.

21      So anyway --

22          MR. KO:  That's fair, you are absolutely correct.

23  All I'm saying is, in response to that statement, they're

24  identifying a categorical privilege and assertion over all

25  these documents, excluding this narrow category of documents

1   that they claim they're going to produce regarding

2   communications with third-party app developers.  So it kind of

3   runs both ways is all I'm saying, Your Honor.

4          **MS. WEAVER:**  Your Honor, if I may, I think we heard

5   an offer from Mr. Snyder that we had not previously heard.

6   And we actually started this discussion months ago by asking

7   about the escalation process.  So, if we got a deadline for

8   Facebook to send to us the documents sufficient to describe

9   the escalation process, we might be able to identify

10  categories.

11         We're a little constrained, because we don't know, really,

12  what to ask for.  We would only be working off experience in

13  other cases about how investigations were run, and we know that

14  Facebook is really specialized.  So we don't have a lot of

15  insight, really, into how it was run.  Certainly prior to, you

16  know, 2018.  We know about their communications with third

17  parties because we've seen them, both in the public domain and

18  documents that we've received here.

19         But I think getting a description from Facebook about:

20  These are the teams, this is who did what, something like that

21  by a certain date within a reasonable amount of time, then we

22  can dig in and make a proposal about:  These are the test

23  categories we want.  If that's the direction Your Honor wants

24  to go in.

25         **MR. SNYDER:**  Your Honor, that is all privileged,

1    which is why I say, without waiving privilege, I was simply

2    saying that we can't -- we had engineers, we had outside

3    consultants, we had lawyers, we had policy people all working

4    together to investigate every app on the platform prior to

5    2015.

6        And you know, if we meet and confer and they asked us

7    about those consultants, I would say Gibson Dunn hired them.

8    And they all were Covelled (phonetic), and they're all working

9    within -- at the direction of counsel.  But --

10        **MS. WEAVER:**  Well, if I may, this is where we begin

11    to get confused.  Because if they are categorically saying

12    everything is privileged, then maybe we should brief that.

13    That can't be right.

14        So I don't know what we have to do to --

15        **THE COURT:**  I agree.

16        **MS. WEAVER:**  Yeah.

17        **THE COURT:**  I doubt that that's correct.  But a lot

18    of it may be, and a lot of it may not.  So to brief it gets us

19    nowhere, unless we do it in context.  That's all.

20        **MS. WEAVER:**  So how can we develop an understanding?

21    As plaintiffs, to understand how these things are reviewed,

22    I'm a bit stymied.

23        **THE COURT:**  Well, I think we start with something.

24    Like, we start with something.

25        **MR. SNYDER:**  I think the judge had a great idea.

```
1              THE COURT:  Focus on something.  They produce a log,

2    and then, and then we -- we -- we -- I rule on that.  Right?

3    So we start with --

4              MS. WEAVER:  But I'm concerned, Your Honor, that

5    they'll cherry-pick only privileges communications between

6    lawyers and --

7              MR. SNYDER:  No.  No, we have an obligation --

8              MS. WEAVER:  -- get to the heart of the issue --

9              MR. SNYDER:  We have an ob- --

10      (Reporter interruption)

11             MR. SNYDER:  Your Honor --

12             MS. WEAVER:  My apologies.

13             THE COURT:  So this is what you do.  You start

14   with -- ask for communications among policy people, that no

15   lawyers were on.  Just start with that.  You ask for that.

16   Right?

17             MR. SNYDER:  Or another --

18             THE COURT:  Or ask for communications among the

19   external investigators, which no lawyers were on.

20        In other words, that's, right, going to be your Backs

21   (phonetic) case.  So start by asking for those.

22             MR. SNYDER:  I thought, Judge, you had an excellent

23   idea.  Let's say there's App X that we had correspondence

24   with, and it's in those 16,000 pages.  And we have back and

25   forth with an app about some platform violation.
```

1    They can then ask us with respect to that particular app

2  and -- and engagement with that app, what is behind the

3  curtain?  You know, who else communicated at Facebook before

4  you sent that?  And we can look at those documents, and

5  determine what's privileged and what's not.

6    And if we make a categorical privilege claim with respect

7  to everything so-called "behind the curtain," that could be

8  teed up for Your Honor because that would be illustrative of an

9  approach to a particular app enforcement that grows out of the

10 legal investigation.

11    **MR. LOESER:**  And Your Honor, I think, again, for this

12  to work -- and this is Derek Loeser speaking -- we will come

13  up with a couple categories that we will choose.

14    They may not be the categories that Mr. Snyder would like

15 us to choose, but they will be the categories that we think

16 will show as best we can, when we don't have the information

17 when we are making the choices, why there is a problem with the

18 approach that they're taking.

19    **MR. SNYDER:**  And I just want to warn everyone or

20  caution everyone, this was a massive investigation because the

21  CEO committed to Congress and the public that he was going to

22  direct this investigation.

23    So if you ask, just as a caution -- narrate, no -- for

24 every communication between consultants and among consultants,

25 that will be probably tens of millions of communications.

1    Because every time we told a consultant to do something with

2    respect to an app, and it was always a legal direction, the --

3    the consultants didn't direct the investigation, I imagine that

4    the consultants then went off into consultant-land and

5    exchanged 10 million emails before they came back with the work

6    product, brought it to counsel, and then a decision was made.

7         So the volume here is -- we should look at the volume.  My

8    guess is we're talking about many tens of millions of

9    documents.

10        **MR. LOESER:**  Well, Your Honor, we haven't received

11    many millions of anything.  But I think a lot of what

12    Mr. Snyder just said sort of highlights the problems and the

13    reasons why I think this will result in briefing.

14        For one, maybe we'll start as a category the

15    communications between the CEO and the data policy people.  And

16    this is -- I mean, everything you'll read about this from their

17    public statements, this is a very public activity that Facebook

18    has done.  And it's very important, clearly, to get this

19    information about this investigation to its users.  That's why

20    they keep posting about it.

21        We can come up with some categories that we think will

22    make clear to the Court what the problem is and where the

23    limits of privilege are.

24        As you've, I think, rightly noted, we do not want access

25    to and understand that we don't get access to privileged

1    communications.  But there's a lot here that's not privileged.

2    And we know that because of the public things that Facebook has

3    said, including what the CEO has said.

4        And we'll figure out some categories that try and bring

5    this into focus for the Court.

6        **THE COURT:**  I think that's the way to do it.  And I

7    guess on Wednesday, you did get some -- about 10,000 pages,

8    and you can look at that and see if that helps.

9        But I do want to -- I don't think necessarily we should

10   wait to adjudicate it, but I do want to adjudicate it in a

11   context.  And it'll be just one small piece, and that then

12   will, I think -- I've found, at least, that'll help with the

13   other, the other side.  Okay, so that will be on your agenda to

14   discuss.

15       Okay.  I do have a settlement at 9:30 so we have to -- I'm

16   going to be late for.

17       Let's see.  Oh, the search terms.  So the stipulation that

18   the parties signed said that Facebook was going to provide

19   search terms for a broad spectrum of custodians.

20       So tell me how Facebook has come up with that broad

21   spectrum of custodians that they will provide on July 21st.

22       **MS. KUTSCHER CLARK:**  Sure, Your Honor.  And, I think

23   the issue that was raised in the statement was a bit of a

24   misunderstanding.  So I think we can resolve that easily.

25       The search term protocol provides a deadline to propose

search terms for each custodian.  We divided the custodians
into eight groups.  And what we said is we would propose a
comprehensive set of search terms by the 21st.  But the
deadline to propose search terms for the first four groups is
also the 21st, with future deadlines for other groups.

        The way we understood that is we'll be providing a
comprehensive set of search terms that will apply broadly next
week, but we're not proposing any terms that are specific to
custodians we have not yet interviewed, until the deadlines for
those custodians.

        So the idea is there will be a comprehensive set of terms
for the first four groups that will include terms that are
specific to the custodians within those groups.  So we talk to
those people, we learn jargon, we learned code names.  We'll
include that sort of information.  To the extent groups of
custodians were not interviewed, we're not going to have
specific terms for those people yet because we're still talking
to them.

        **THE COURT:**  But they will be included in the broader
search terms.

        **MS. KUTSCHER CLARK:**  I'm sorry; I just didn't
understand some of --

        **THE COURT:**  Sorry.  But what you're saying is --
but -- but is the broader search terms will apply to them.
You just won't have the specific search terms.

1          **MS. KUTSCHER CLARK:**  Yes, exactly.

2      And the one thing I do want to clarify, just to make sure

3  we're all on the same page, is there is one RFP, a single RFP

4  that is not covered by the first four groups of custodians.

5      So because we will not yet have spoken to any of the

6  custodians about the issues with that RFP, we did not intend to

7  propose a comprehensive set of search terms for that one

8  specific RFP.  But otherwise, they will all be covered, in

9  addition to the specific terms for the first four groups.

10          **MS. WEAVER:**  Which RFP is that?

11          **MS. KUTSCHER CLARK:**  Don't hold me to this; off the

12  top of my head, I think it's 22.  But I would need to look

13  again at my notes.

14          **MS. WEAVER:**  Okay.  This is the first we're learning

15  of it.  But we're fine with that, Your Honor.  The statement

16  did read as though they were limiting it to 41.  We

17  understand, and I think you will understand the point.

18          **MS. KUTSCHER CLARK:**  Yeah.  I think it was just a

19  misunderstanding.  We're happy to talk more about it.

20          **THE COURT:**  Okay, great.  What else should we talk

21  about?

22          **MS. WEAVER:**  Your Honor, very briefly, just

23  43(b)(2)(C), I think you've seen kind of an example of the

24  crossing of ships in the night.

25      For example, you know, with regard to ADI, it has been

1   very hard for us to get our arms around what Facebook is

2   withholding.  And we, for example, have told Facebook that we

3   will tell them if we are withholding anything, any categories

4   of documents that are responsive.  And things got a little

5   flipped around.

6       I think we originally framed it as:  Let us know if you

7   categorically object to any RFP.  And they -- initially they

8   said yes, then they said -- the final response was only 19,

9   which is ADI.

10      But then when we dug in, and we started meeting and

11  conferring, it became unclear to us whether Facebook is taking

12  a position with regard to certain categories of documents that

13  are responsive.  Meaning we're not objecting categorically to

14  an RFP, but are they withholding some small subset that is

15  responsive that they haven't identified to us because they're

16  saying no, that's not relevant?  And the whole point of

17  34(b)(2)(C) is to make that transparent, so the parties can

18  engage.

19      And, and this is what we understand now, Facebook is

20  saying: Well, for search term documents, we're not ready yet.

21  And we understand that, and we will wait.

22      But we want to know now for categories of RFPs where

23  search terms are not required, has Facebook decided that there

24  are responsive materials which are not relevant?  And we heard

25  some of it today.  Some of it came out in their statement.  But

```
 1   that's the conversation that we want to have.  And we think
 2   we're entitled to that.
 3              MR. SNYDER:  Your Honor, just briefly, they raised
 4    the same issue with Judge Chhabria with regard to our FTC
 5    production.  And Judge Chhabria ruled, clearly consistent with
 6    the federal rules, that defendants, like all parties, are
 7    presumed to conduct their relevance review in good faith and
 8    are not required to make such disclosures which are not
 9    required.  That is to say, there's no requirement that we
10    identify irrelevant documents in advance.
11        We are going to.  We've produced 1,200,000 pages of
12    documents, including, I think, 40- or 60,000 that are internal
13    Facebook documents, already.  We will continue to produce
14    responsive relevant documents.  The rules require that.  We've
15    done it.  And we don't have an obligation to say what is
16    irrelevant and not being produced.  That's just backwards.
17    It's been rejected by Judge Chhabria.  And really, we think,
18    you know, it makes no sense whatsoever.
19              MS. WEAVER:  Well, we don't see -- go ahead.
20              THE COURT:  I guess what -- for example, something
21    that's been produced are documents that were produced to the
22    FTC.  Right?
23        And so --
24              MR. SNYDER:  Yes.
25              THE COURT:  -- one question is:  Did you withhold
```

1    anything that's not relevant?

2         **MR. SNYDER:**  That was asked of us.  And Judge

3    Chhabria said we did not have to -- I don't know the answer to

4    that, but --

5         **MS. KUTSCHER CLARK:**  No, we didn't.  He didn't

6    withhold anything on relevance grounds, no.

7         **MR. SNYDER:**  We did not.

8         **THE COURT:**  Okay.  You did not.  Okay.  All right.

9    So, Ms. Weaver, what is -- what is the -- the search

10   terms, I get, were not -- they can't know until they've

11   searched.

12   So what is -- with respect to what's been done so far,

13   what is the concern?

14        **MS. WEAVER:**  Other regulatory documents, so they

15   produced to the ICO and DCMS in the UK.  Those are regulatory

16   bodies.  Did they categorically decide that there were

17   portions of those inquiry not relevant to our case?

18   For example, this has arisen -- this is in a slightly

19   different context -- with regard to PwC documents.  They have

20   said PwC was looking at things not relevant to the case.  But

21   we don't know what those are, even generally, by topic.  And if

22   they told us, we might agree.  But they're just making the

23   decision, without sharing it with us.

24   They have said at different points:  We're only producing

25   certain kinds of materials relating to advertising.  We don't

1    know where they're drawing that line.  This has arisen in the

2    context of the financial documents, the RFPs that seek

3    information about their finances.  So, how are they drawing the

4    line been between what they think is relevant, and what they

5    think isn't?

6        These are all things where we need them to take a

7    position, and frankly, some of these things, it would be

8    helpful if they did it in writing.  Because when we have these

9    conversations, it's circular for us.  And we -- there's

10   misunderstanding.  And if they put it on paper, we can see it,

11   and it's helpful.

12       **MS. STEIN:**  Your Honor, we have not taken a

13   categorical position on anything that we're withholding.

14   We're doing this, as plaintiffs do in every case.  Which is we

15   meet and confer -- I mean, we've had a gazillion

16   meet-and-confers on plaintiffs' RFPs, to use a technical

17   estimation of the time.  And then, our reviewing and producing

18   documents for relevance the way -- and responsiveness the way

19   parties do in every case.

20       There's no category of documents that we're sort of

21   secretly setting aside.  Documents are either responsive and

22   relevant, or they're not.  Most of this it's very hard to argue

23   about in a vacuum, which is what we've repeatedly said to

24   plaintiffs.  But these are why the -- the search term ones, as

25   Ms. Weaver has noted, you know, it's fighting about it in a

1    vacuum about what the scope is going to be.

2              **THE COURT:**  We're not --

3              **MS. STEIN:**  Right.  For the specific RFPs, we've had

4    very detailed conversations about what's getting produced.

5    There's been no categorical objection to some sort of -- I

6    mean, this use of the term "categorical," there's no bucket of

7    documents that we're setting aside as irrelevant.  We look at

8    documents on a document-by-document basis, as they populate.

9    And, you know, a reviewer will look at them for whether

10   they're responsive or not.  But, I mean, it's no different

11   than any other case.

12       And it's just really been very challenging for us because

13   we keep getting asked about categorical, you know, objections.

14   We don't have a categorical, you know, bucket that we're

15   refusing to produce.

16             **MR. LOESER:**  Your Honor, if I can --

17             **THE COURT:**  For the PwC documents, were there

18   documents that were withheld as non-responsive -- as -- yeah,

19   as not relevant?

20             **MS. KUTSCHER CLARK:**  Your Honor, that's a difficult

21   question to answer because plaintiffs' (audio interference)

22   the PwC documents, it's a much more complicated request, where

23   they asked for the documents referenced in particular PwC

24   reports.  Ands the issue there is more about the fact that

25   it's very difficult for us to identify what PwC, as a third

1    party, relied on.  So there have not been relevance objections

2    to those documents.  Some of them haven't been produced

3    because we're having difficulties identifying them.

4         But for all other materials, what we have consistently

5    told plaintiffs is we are determining relevance based on the

6    four theories of liability that Judge Chhabria laid out in his

7    motion-to-dismiss order.  Judge Chhabria said these are the

8    four theories that are in play in the case.  And we are making

9    every relevance determination, based on those four theories.

10   And that's what we have consistently told the plaintiffs.

11         **THE COURT:**  But, so, but I do think, I do think that

12   you do have an obligation to, as part of the meet-and-confer,

13   explain -- give examples.  For example:  This is a document

14   that is responsive to your requests but that we decided was

15   irrelevant.  Just explain that.

16         **MR. KO:**  Your Honor, this is David Ko again.  And

17   just -- I completely agree, that's what we've been asking and

18   in the context of this specific example of PwC that we're

19   discussing is exactly where it's come up.

20         I'm a bit surprised that Ms. Kutcher Clark is saying that

21   they are not withholding on relevance grounds due to some

22   technical misunderstanding of our requests.  They have made it

23   clear in their meet-and-confers to us that they believe that

24   both the Facebook privacy program and PwC (inaudible) contains

25   large amounts of information they believe are not relevant to

1    this case.

2         And so we asked them to identify what those are, because

3    our view of those reports by PwC and the underlying Facebook

4    privacy program is that we believe most of it is relevant.   And

5    we have provided them with examples why.   They have refused to

6    give us examples in response for what is not relevant.

7         So you --

8              **MS. KUTSCHER CLARK:**   May I respond to those?

9         (Reporter interruption)

10             **MR. SNYDER:**   Sorry, my phone keeps on falling down.

11   That's what's happening.   I'm muting it; I apologize.

12             **MS. KUTSCHER CLARK:**   The issue with the PwC

13   documents, Mr. Ko is correct in that we don't believe

14   everything PwC looked into over a ten-year period is

15   necessarily relevant to this case.   However, we haven't

16   provided had a detailed analysis of that, because those

17   materials haven't actually been requested.   And we've talked

18   about those, ad nauseam.

19        The plaintiffs did not serve a document request for all of

20   the documents between Facebook and PwC.   They served a very

21   different request.   So we have been talking about that request.

22   And at this point it would be premature to do the type of work

23   Mr. Ko is describing, because we don't have it a request for

24   that information.

25             **THE COURT:**   Okay.   All right.   So the only guidance

1    I'm going to give here is that if -- if responsive documents

2    are being withheld on the ground that you decided they're not

3    relevant, I do think, and I -- I -- that you should -- as part

4    of the meet-and-confer, you explain why, and you give an

5    example.  That that's part of the meet-and-confer process.

6    If -- if it's being withheld on relevance grounds.  If it's

7    not, then there's not.  But if it is, then you should sort of

8    give the other side an explanation as to how you're drawing

9    that line.

10           **MR. LOESER:**  Your Honor, this is Derek Loeser.  That

11   would be very helpful.

12           **MR. SNYDER:**  Judge, I'm having -- I know Your Honor's

13   late.

14       Are you suggesting that every time a reviewer -- I'm not

15   being facetious.  Every time a reviewer takes a document and

16   asks whether it's relevant, we have to make a notation so that

17   we can explain?

18           **THE COURT:**  No, of course I'm not suggesting that at

19   all, Mr. Snyder, and I don't.  What I said is as part of the

20   meet-and-confer process, generally when you've made decisions

21   as to what's relevant, what -- they say somewhat

22   categorically, but sort of give -- just give an explanation:

23   This is the direction that we gave our reviewers.  Right?

24   This is where we draw, where we drew the line.

25       That's what I'm saying.  Like, generally --

1          **MR. SNYDER:**  Understood.

2          **THE COURT:**  -- drew the line.  And they can say:

3     Okay, I understand that, I agree.  We don't want those

4     documents.  We already have a lot of documents --

5          **MR. SNYDER:**  We've done that; we've done that

6     already, and I've even done that on earlier meet-and-confers.

7     We will do it again, and we will do it with force and clarity

8     again.  But we will make that clear.

9          Thank you.

10          **THE COURT:**  Okay.

11          **MR. LOESER:**  Your Honor, I do think that would be

12     helpful.  An example would be the conversation we had about

13     ADI.  Clearly, they made the decision that all information

14     that was internal would be withheld.  But when you look at

15     their offer for what they're producing, they talk about all

16     these communications with third parties, but they're not --

17     they haven't 'fessed up to what they actually were doing, was

18     eliminating from what they intended to produce everything that

19     was internal to Facebook.

20          So that kind of conversation would allow the parties to

21     quickly realize where the disconnects are.

22          **MS. STEIN:**  ADI is completely --

23          **THE COURT:**  As I understand the ADI, they believe,

24     their position is that everything that was done as part of

25     their -- the investigation, and whether they were outside

```
 1   investigators or internal Facebook people, is privileged.
 2   What they've agreed to produce are the communications like
 3   with the app developers, because clearly they're not part of
 4   Facebook.  They weren't hired at the direction of the
 5   attorneys.
 6            MR. LOESER:  Right.
 7            THE COURT:  But I understand it's a broad privilege.
 8   So -- okay.
 9       When shall we have -- is it two weeks?
10            MS. WEAVER:  Yes, Your Honor, that would be fine.
11            THE CLERK:  (Inaudible)
12            MS. WEAVER:  That's Friday the 31st?
13            THE COURT:  Go back to Friday.
14            MS. WEAVER:  I'm sorry; this is Monday, isn't it?  My
15   fault.
16            THE COURT:  We were meeting on Fridays, so that's
17   fine.
18       Ms. Means, how does Friday the 31st look?
19            THE CLERK:  Oh, the 31st is fine.  Do you want 9:00
20   or 8:30?
21            THE COURT:  Can we do 8:30 again?
22            THE CLERK:  Yes.
23            THE COURT:  Okay.  All right.  We'll have the
24   statement due whatever the schedule is that I set.  That seems
25   to be working well.
```

1      **MS. STEIN:**  Your Honor, on the schedule, if -- if we

2   could build in a little bit more time between when can we

3   get -- sort of do the initial exchange, and then when we do

4   the final exchange, I think that would be helpful.

5      It's just -- the schedule has proven a little bit tight as

6   we have to sort of work through issues, often with our client,

7   and get approvals.  It would -- right now, we typically have a

8   24-hour turnaround.

9              **THE COURT:**  So what would you propose?

10             **MS. STEIN:**  I think 48 hours would be better, or at

11  least 36 hours.

12             **THE COURT:**  Ms. Weaver, can you work something out

13  with them?

14             **MS. WEAVER:**  Yes, of course.  That's no problem.

15             **THE COURT:**  Okay.  Whatever you guys work out is fine

16  with me.

17             **MS. STEIN:**  Thank you.

18             **MS. KUTSCHER CLARK:**  Your Honor, one more timing

19  request.

20      We're starting to find that during our meet-and-confers,

21  we're sort of returning a little bit to the game of

22  whack-a-mole we were all playing before we started meeting with

23  you.  And we're finding that we're having a little bit of

24  difficulty focusing and making progress, due to the sheer

25  number of issues that are on meet-and-confer agendas, and being

1  discussed.

2      And we're just hoping that perhaps we could have a little

3  bit of guidance limiting the number of issues, or at least

4  focusing the number of issues, so that we can make sure we are

5  moving forward with those things, and not spinning our wheels

6  on 15 things instead of making progress on five.

7          **MS. WEAVER:**  May I respond to that, Your Honor?

8          **THE COURT:**  Yes.

9          **MS. WEAVER:**  We believe that it has been very narrow.

10  We haven't raised any pressures of issues that we haven't

11  previously -- like ADI, there are a number of issues that we

12  have, in fact, been sitting on.

13      We understand -- we worked would with them to give them

14  six weeks to do this first set of search terms.  But certainly,

15  there are all kinds of issues -- deposition protocols, all

16  kinds of things -- that we have been waiting on.  So I'm really

17  kind of baffled by that.  And I don't know what issues we have

18  been raising.

19      I do think it's true that Facebook asks us to send them a

20  detailed email before each meet-and-confer on the topics we

21  wish to discuss, which we have been doing.

22      So this is a little bit out of left field to me, but we

23  are really trying to work with the system here.

24          **THE COURT:**  Okay.  I don't know what I can do, sort

25  of out of context.

```
 1              MS. STEIN:  Yeah, I don't think -- I don't think

 2    Ms. Kutscher Clark meant it in any way to suggest that there

 3    was a lack of cooperation on either side.  I think we're just

 4    all dealing with a lot of issues, and thought we were making

 5    more progress when it was sort of tailored in advance as to

 6    what we should specifically be discussing.

 7              MS. KUTSCHER CLARK:  Exactly.

 8              THE COURT:  I see.  I think what you have to discuss

 9    is the ADI.  Right?  You're going to get the search terms on

10    July 21st.

11              MS. KUTSCHER CLARK:  (Nods head)

12              THE COURT:  You have the plaintiffs' production,

13    because now you have to discuss how you're going to get that

14    information.  And you have the defendant's ongoing production.

15              MS. WEAVER:  And the 34(b)(2)(C) issues, if they are

16    withholding.

17              THE COURT:  Well, yeah.  That's related to their

18    production and if they're withholding anything.  So I think

19    those are the topics.  It's a lot.

20         Sounds like things are moving forward.

21              MS. WEAVER:  We are, in fact, meeting and conferring

22    slightly less than we were doing it three times a week which,

23    although that was productive, that was a little intense.

24              THE COURT:  That was intense.

25              MR. LOESER:  Well, and Your Honor, at the beginning
```

```
 1    of every meet-and-confer we have ten minutes of generally

 2    getting along really well.

 3              MS. WEAVER:  That's true.

 4              THE COURT:  You're all getting along just fine.  You

 5    know, these are very trying times.

 6              MS. STEIN:  We've all learned a lot about each other.

 7              THE COURT:  Yeah.  Yeah.

 8              MR. SNYDER:  Judge, that's because I stopped

 9    attending them.

10              MR. LOESER:  That was a huge advantage for all of us,

11    that's true.

12        (Laughter)

13              MR. KO:  At least now you freely admit it, Orin.

14              THE COURT:  All right.  I will see you, then, on the

15    31st at 8:30 a.m.

16              MR. LOESER:  Thank Your Honor.

17              MR. SNYDER:  Thank Your Honor.

18              THE CLERK:  Court is adjourned.  Thank you, everyone.

19        (Proceedings concluded)

20

21

22

23

24

25
```

**CERTIFICATE OF REPORTER**

     I, BELLE BALL, Official Reporter for the United States

Court, Northern District of California, hereby certify that the

foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Tuesday, July 14, 2020

# EXHIBIT D

# EXHIBIT A

FILED UNDER SEAL

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **JOINT STATUS UPDATE**<br><br>Judge:  Hon. Vince Chhabria and<br>Hon. Jacqueline Scott Corley<br>Courtroom:  VIA VIDEO CONFERENCE<br>Hearing Date: January 15, 2021<br>Hearing Time: 8:30 a.m. |

The parties respectfully submit this Joint Status Update in advance of the Court's discovery conference scheduled for January 15, 2021 at 8:30 a.m.

## I.      PLAINTIFFS' STATEMENT

### 1.      Issues the Parties Have Addressed Since the Last Discovery Conference

**a.      Facebook's Document Production**:  Document production following the agreement on search terms is not proceeding at the pace envisioned by the parties' joint stipulation. The protocol agreed upon by the parties provided that Facebook would produce documents on a rolling basis 30 days after agreement upon terms, or by December 7, 2020. On that day, however, Facebook produced fewer than 500 search term documents. Facebook promised to produce its next installment of documents on January 11. On that day, Facebook produced just 1,561 documents. These numbers do not square with Facebook's earlier representations that the search terms ordered and agreed upon, as applied to Groups 1-4, would hit on roughly 3 million documents. Plaintiffs seek firm deadlines by which Facebook will commence and conclude meaningful document productions arising out of the search terms that the parties have negotiated for nine months, as well as transparency into why document production is proceeding so slowly.

**b.      Search Terms:** Unfortunately, the cooperation the parties have engaged in the past did not continue following the last discovery conference. Pursuant to the parties' stipulated Search Terms Protocol (Dkt. 573) Facebook delivered a proposal on November 13, which was narrowed from the Court's earlier rulings. Facebook withdrew two previously proposed search strings as well as custodians previously proposed for thirty-one search strings, and added just six search strings. Facebook's initial proposal identified 839,789 documents. Plaintiffs delivered their counterproposal on November 23, proposing additional custodians for 111 strings, revisions to six strings, and 35 additional terms. Plaintiffs' counterproposal identified 2,446,701 documents, adding 1,606,912 documents. On December 3, Facebook delivered initial hit reports that were inaccurate in many ways. Following Plaintiffs' identification of numerous deficiencies,

Facebook delivered corrected reports on December 14 and December 18. Also on December 14, Facebook delivered its response, which rejected Plaintiffs' counterproposal in its entirety. The parties met and conferred regarding the competing proposals between December 15 and 22, before breaking for the holidays. The parties exchanged "best and final offers" on January 8, and Facebook now has an additional ten days to deliver hit reports on those proposals. Three business days after hit reports are circulated, on January 21, the parties will identify remaining custodian and string disputes for submission to the Court and may identify a limited number of strings for sampling.

Despite the opportunity these exchanges presented, the parties reached little substantive agreement so far. At the outset, Facebook took an uncompromising position—entirely rejecting each one of Plaintiffs' proposals (including additional custodians and strings), without seeking to discuss them in the twenty-day period prior to the deadline for its response. Moreover, Facebook's response was unreasonable—for example, it proposed custodians with zero hits 250 times across 29 strings. Indeed, Facebook has proposed and re-proposed custodians with no document hits, despite its representations that it is carefully considering and narrowly tailoring its proposed custodians to each search string. Facebook's failure to engage meaningfully by substantively discussing the parties' proposals over the course of the past month means that the parties now have an extremely limited opportunity to make substantive counterproposals before submission of their disputes to the Court. Had Facebook provided even a portion of the January 8 proposal in December, the parties would be much farther along. Still, Plaintiffs remain hopeful that the parties will be able to resolve a significant number of the remaining disputes following review of updated hit counts.

    **c.**     **30(b)(6) Witnesses:** The Court's Discovery Order No. 11, entered on December 11, 2020, required Facebook to provide a 30(b)(6) witness regarding user data as articulated by Discovery Order No. 9 and another 30(b)(6) witness regarding how Facebook monetizes – directly or indirectly – and values user data. Plaintiffs issued a narrow, targeted and specific deposition notice on December 18, 2020 limited to the topics identified by the Court, and did so

specifically to avoid dispute at the deposition about the scope of testimony set forth in the notice. *See* attached. Facebook has objected to this notice on numerous grounds, set forth in a nine page, single-spaced letter received at 11:00 pm last night, including that Plaintiffs' topics do not adhere to Discovery Order No. 9. Plaintiffs believe the more specific notice that we served is appropriate and will prevent scope disputes at the deposition regarding the designated topics; however, Plaintiffs are not interested in engaging in a lengthy dispute with Facebook regarding the language of the deposition notice and believe the Parties' time is better spent on the deposition itself. Accordingly, if and to the extent deemed appropriate by the Court, Plaintiffs propose, in the alternative, the three topics set forth in the Order for the time period 2012-2017: (1) identification of what data Facebook collects and obtains from a user's on-platform and off-platform activity, and how Facebook maintains and uses it, including data inferred from that activity and data; (2) how Facebook shares or makes accessible to which third parties all data described in Topic 1; (3) how Facebook monetizes—directly or indirectly—and thus values user data described in Topic 1. Plaintiffs ask that these depositions proceed remotely no later than the second week of February.

      **d.**     **Discovery of Named Plaintiffs:** Plaintiffs produced an additional 3,224 documents, totaling 5,364 pages, since the last discovery conference on December 9, 2020, and continue to review documents for future rolling productions. Consistent with Facebook's preference, Plaintiffs are providing supplemental interrogatory responses on a rolling basis. Further supplemental information will be served on or before January 22, 2021. As discussed with Facebook, Plaintiffs will also prepare a superseding, omnibus set of responses to the pending interrogatories once all supplemental responses are complete.

      **e.**     **Privilege Log Issues:** To date, Facebook has provided privilege logs corresponding solely to productions completed by September 18, 2020. Plaintiffs challenged 1,599 of Facebook's 4,432 initial privilege log entries on October 2, 2020. Facebook responded on December 2, 2020, providing a revised privilege log on December 7, 2020. The parties continue to discuss remaining challenges. Plaintiffs have identified to Facebook the following

two categories of documents as a starting point for substantive discussions: 1) 152 documents for which the withheld information was disclosed to email distribution lists whose individual recipients are not identified, and 2) 459 documents listed for which no attorney is identified on the log, no attorneys are visible on the face of the documents, and the withheld information does not appear to seek, contain, or provide legal advice. Plaintiffs believe that substantive discussion on these topics will aid in narrowing the remaining privilege log disputes.

   **f.**  **ADI:** Pursuant to the order this Court entered on October 6, 2020, Facebook produced on December 10, 2020 privilege logs for six exemplar apps that were investigated as part of ADI. Other than correspondence with app developers consisting of 65 pages of documents, Facebook asserted attorney client privilege over every email, chart, table, slide, diagram, agenda, task list, chart, and spreadsheet associated with the company's investigation of these six apps. It is Plaintiffs' understanding that the Court wishes to view examples of purportedly privileged documents to assess the privilege claims. July 13 Tr. 36:16-19 ("Because the way I'm going to be able to adjudicate this is to take some exemplars, and rule, and then the parties then can use that and apply it.") Plaintiffs identified to Facebook 400 documents where the logs show that no attorney was an author or recipient. In light of Discovery Order No. 7, which "anticipates that briefing on the privilege dispute will commence no later than some time in January 2021[,]" Plaintiffs proposed a briefing schedule to Facebook on December 22, 2020, but Facebook believes any such briefing is premature. Plaintiffs therefore propose that they provide a subset of these documents for an *in camera* review along with an opening brief by January 29, 2021. Plaintiffs seek guidance from the Court on the total number of documents it would like to review.

   For its part, Facebook has asked that the parties engage in another months-long, drawn-out meet and confer regarding each of the thousands of privilege log entries. Plaintiffs do not believe that this is what the Court contemplated and ask for submission deadlines to bring these issues to a close.

   **g.**  **Confidentiality of Documents in the Public Domain:** Facebook has asked the

Court to further maintain a document under seal, claiming confidentiality despite the fact that the document can be found on several public websites. Plaintiffs have been willing to submit the matter to the Court based upon the briefs already on file but, in the spirit of compromise, have agreed to Facebook's request for an extended briefing schedule which will be submitted as a stipulation for Court approval.

**h.** **Facebook's Responses and Objections to Plaintiffs' Fourth Set of Interrogatories:** Facebook served its Responses and Objections to Plaintiffs' Fourth Set of Interrogatories on November 20, 2020. Plaintiffs have since identified several deficiencies in Facebook's responses that remain unresolved and sought to discuss them. For example, Plaintiffs have asked Facebook to answer interrogatories about the company's "business partners" as Judge Chhabria defined them in his order on the motion to dismiss. PTO No. 20 at 8. Facebook has insisted upon limiting its responses to integration partners, which are a narrower group of companies than the business partners described by Judge Chhabria. Plaintiffs expect to file a motion to compel in accordance with the Court's order on briefing matters but would appreciate any guidance the Court wishes to provide.

Facebook has also not verified its substantive interrogatory responses. The identities of those who verify the interrogatories on behalf of Facebook are relevant to ongoing custodian and deposition discussions. As such, Plaintiffs ask that Facebook provide these verifications no later than January 22, 2021, more than two months after responses were provided.

**i.** **Sworn Testimony and Written Discovery Responses in Related Actions:** Plaintiffs have requested the deposition transcripts and written discovery responses from the ten governmental and regulatory actions the company has identified as related to this action. Facebook has produced documents from those actions but to date has not produced relevant evidence from the same actions in the form of testimony or sworn responses. Plaintiffs request guidance from the Court on a deadline by which these materials will be produced.

## FACEBOOK'S STATEMENT

Facebook addresses the work completed since the December 9 conference, provides an update on the ordered 30(b)(6) deposition, and responds to the issues Plaintiffs raise.

## I. Progress since the December conference

*Facebook's document production and review continues*.  Facebook's primary focus has been its ongoing document review, including review of the **3.1 million documents** (including families) that hit on the final search strings for the 38 custodians in Groups 1 to 4.  Facebook produced nearly 14,000 documents since December 7 (not 2,000, as Plaintiffs say).

*Search string negotiations are ongoing*.  Substantial resources continue to be dedicated to search string negotiations.  Facebook made a search string proposal for the 43 custodians in Groups 5 to 8, which proposed adding **more than 1.5 million documents to the 3.1 million documents** it is reviewing currently.  Plaintiffs' counter-proposal demanded more than **2,600** changes that would have added **nearly 7 million documents** to Facebook's review.  Facebook invested hundreds of hours to evaluate and provide written responses to all 2,600 proposed changes.[1]  The parties met and conferred before the holidays and exchanged final proposals on January 8.  The parties will continue negotiations in accordance with their stipulation.  Dkt. 573.

*Facebook logged 6,100 privileged documents*.  Facebook served 6 privilege logs, which log approximately 6,100 documents, under the parties' sampling protocol to log exemplar materials from Facebook's attorney-driven App Developer Investigation (Dkt. 518).

*Facebook responded to Plaintiffs' 30(b)(6) deposition notice*.  Facebook provided its initial response to Plaintiffs' 30(b)(6) deposition notice on January 13 (attached as **FB Exhibit A**) and is prepared to meet and confer with Plaintiffs on the topics for the deposition.

*The parties negotiated two stipulations*.  The parties negotiated and agreed to an Expert Stipulation.  They also agreed to a schedule to brief the confidentiality of leaked materials.

---

[1]  The hits Plaintiffs cite for the parties' proposals do not include families, and their statement that Facebook "withdrew" previously proposed strings/custodian combinations is inaccurate.  Facebook *replaced* certain strings with strings the Court ordered for Groups 1-4, which the parties' stipulation requires.  *See* Dkt. 573 ¶ 2.

*Plaintiffs did not amend their interrogatory responses*.  Facebook continues to await substantive answers to the interrogatories it served in August that ask Plaintiffs to identify the "sensitive" information they believe this case to be about, as Discovery Order No. 11 directs.

## II.    Upcoming 30(b)(6) Deposition

Despite the Court's instructions, the proposed 30(b)(6) deposition notice Plaintiffs served is not narrowly tailored to the two areas of inquiry the Court identified in Discovery Order No 11.  Instead, it purports to notice a deposition for Feb. 5 on **12** sweeping, generalized topics that concern nearly every aspect of Facebook's business.  The notice's breadth, number of subject areas, and lack of specificity make it impossible for Facebook to meaningfully prepare a witness—much less on a prompt timetable.  To move the ball forward, on Wednesday Facebook sent Plaintiffs a letter describing with reasonable particularity the topics on which it is able to prepare a deponent to address the issues the Court identified.  *See* **FB Exhibit A**.  Facebook is hopeful that its efforts to specify these areas of inquiry will help the parties reach agreement on appropriate topics, allow Facebook to prepare a witness, and avoid unnecessary disputes during the deposition.  Once the topics are settled, the parties should agree on a date for the deposition.

## III.    Additional Issues Raised by Plaintiffs

Plaintiffs' portion of the joint update continues a concerning trend of asking the Court for rulings on issues that have not been raised to Facebook or about which the parties are actively meeting and conferring.  The meet-and-confer process is supposed to be a genuine effort to reach negotiated resolution without Court intervention, not a perfunctory box to be checked on the path to motion practice (which should not be considered inevitable).  By using their status updates to seek rulings on unripe issues, Plaintiffs are undermining the meet-and-confer process, forcing Facebook to brief significant issues in fewer than 24 hours and in an artificially confined space, and imposing on the Court to issue premature and potentially unnecessary rulings.

*Plaintiffs have not raised challenges to Facebook's ADI privilege logs*.  Plaintiffs' submission assumes it is a foregone conclusion that the Court will engage in *in camera* review of ADI documents, jumping straight to the question of how many documents the Court will review.

But Plaintiffs have not made a showing that *in camera* review is necessary or appropriate.

Facebook served 6 ADI privilege logs on Dec. 10—one related to each app selected for the sampling exercise to show the universe of materials related to each investigation. Under the parties' stipulation, Plaintiffs were required, within 30 days, to "identify in writing any particular privilege log entries that it asserts are not privileged" and explain its challenges "with reasonable specificity . . . as to each privilege log entry"—to be followed by a response and meet and confer process. Dkt. 462 ¶¶ D(1)-(4). Plaintiffs have not served *any* challenges to the logs, much less particularized objections. Instead, Plaintiffs sent an email telling Facebook they intend to brief and seek *in camera* review of **every single entry** on Facebook's logs that does not include the name of an attorney. They attached to their email a list of these entries, which account for 400 of the 6100 documents Facebook logged, but refuse to identify the bases for their challenges.

This unrestrained approach sweeps in hundreds of highly detailed entries that indicate clearly the logged documents reveal legal advice from Gibson Dunn and other attorneys and make a prima facie showing of privilege. *See, e.g., United States v. ChevronTexaco*, 241 F. Supp. 2d 1065, 1077 (N.D. Cal. 2002) (communications between non-lawyers revealing counsel's advice are privileged). Plaintiffs' list even includes entries for attachments to privileged emails, disclosing the attachment was produced independently or is a blank .htm file. It appears Plaintiffs identified 400 documents to challenge by simply running a search for entries where no attorney appears, without even reading Facebook's detailed entries for each document.

"Once a party has made a *prima facie* showing that a document is privileged," it is incumbent upon the challenging party to "show a factual basis sufficient to support a reasonable, good faith belief that *in camera* inspection may reveal evidence that information in the materials is not privileged." *Rembrandt v. Apple*, 2016 WL 427363, *3 (N.D. Cal. Feb. 4, 2016). If Plaintiffs wish to challenge Facebook's logs, they must articulate a legally and factually sufficient challenge "as to each . . . entry," allow Facebook to respond, and meet and confer in good faith. Dkt. 462 ¶¶ D(1)-(4). Plaintiffs repeatedly take shortcuts—creating enormous volumes of unnecessary work for Facebook. Now they are asking the Court to review extensive

briefing and large swaths of documents to check Facebook's work, when they have not even conducted a sufficiently careful review to raise targeted and particularized challenges.

*The additional privilege issues Plaintiffs raise are not ripe*.  At the outset of discovery, Plaintiffs demanded Facebook produce materials it produced to government entities in related investigations/actions.  Facebook produced these materials as they were produced to the government—maintaining any redactions.  Facebook served a Privilege Log for nearly 4,500 of these documents, the majority of which relate to narrow preexisting redactions.

Plaintiffs have no basis to challenge this log; they received what they requested—cloned productions from government actions.  But Plaintiffs sent Facebook a letter listing 10 categorical bases on which they purport to challenge 1,599 redactions made in other matters.  The vague list includes "no counsel is present," "the document does not appear to contain the solicitation or provision of legal advice," and "the document does not appear to have been created in anticipation of litigation."  Plaintiffs list hundreds of documents purportedly falling into each category, with no other detail.  Even if Plaintiffs were entitled to challenge redactions from cloned productions (they are not), this is not an appropriate way to raise challenges.  Plaintiffs must detail "with reasonable specificity" specific factual and legal bases for challenging "each . . . individually logged document," Dkt. 462 ¶ D(2), so Facebook can meaningfully assess them.

*Plaintiffs' request that Facebook produce an arbitrary number of documents each month is unworkable*.  Facebook has dozens of attorneys reviewing documents and will continue to make productions every four weeks.  But Facebook cannot guarantee a certain production volume each month, no matter how many documents it reviews, because the number of documents produced depends on how many reviewed documents are responsive/non-privileged. To date, the review set generated by the search strings has had a very low responsiveness rate, further confirming that Plaintiffs already received the documents most relevant to this case in the materials produced to regulators and that Plaintiffs' proposed searches are wildly overbroad.

*Plaintiffs seek to brief unripe issues about FB's interrogatory responses*.  Facebook served **more than 500 pages** of interrogatory responses in November.  Plaintiffs now say they

identified "several deficiencies" they wish to brief, but only discussed one with Facebook: the meaning of "business partners." The parties are meeting-and-conferring on that issue on Friday afternoon, so it is concerning that Plaintiffs predetermined they will "file a motion to compel."

In any event, Facebook answered the interrogatories consistent with Plaintiffs' own definitions. Plaintiffs' interrogatories defined "Business Partners" as "the third parties with whom Facebook partnered to develop and integrate Facebook on a variety of devices and operating systems," citing a list of "integration partners" Facebook provided to Congress. This tracks Plaintiffs' Complaint, which raises allegations about this same list of "integration partners" (SACC, Dkt. 491, ¶¶ 430-440), and the Motion to Dismiss Order, which recognizes that the "non-exclusive list of companies that the complaint identifies as business partners . . . came from . . . [Facebook's list of] 'integration partnerships' . . . in a letter to . . . the House of Representatives" (Pretrial Order 20, Dkt. 298 at 9). Facebook will be amending its interrogatory responses within the next two weeks, and will serve its verifications with those amendments.

*Plaintiffs are not entitled to confidential materials from government investigations*. Facebook agreed to kick-start discovery by re-producing responsive documents it produced in 10 related government investigations/actions. Plaintiffs now demand written discovery and deposition transcripts from those matters. There is a general presumption *against* this type of "cloned discovery." *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods Liability Lit.*, 2017 WL 4680242, at *1-2 (N.D. Cal., Oct. 18, 2017). That presumption is even stronger here, given Plaintiffs seek materials that would reveal confidential aspects of 10 government investigations, many of which are governed by confidentiality agreements that would not even allow production of the materials.[2] If the Court is inclined consider Plaintiffs' request to compel production of these documents, Facebook respectfully requests full briefing.

---

[2] Nor would it be efficient for Facebook's counsel to coordinate with the law firms that handled these 10 related actions to locate, analyze, and redact the materials Plaintiffs seek. Plaintiffs can ask their own interrogatories, and producing deposition transcripts will not reduce the number of depositions in this action, as Plaintiffs will not agree to forgo deposing a given witness if prior testimony from the witness is produced. They seek transcripts as impeachment material. *See In re TFT-LCD Antitrust Litig.*, 2013 WL 12171856, at *3 (N.D. Cal. May 29, 2013) (rejecting "side excursion[s] into . . . []other lawsuit[s] . . . to gauge . . . credibility.")

Dated: January 14, 2021                          Respectfully submitted,


KELLER ROHRBACK L.L.P.                           BLEICHMAR FONTI & AULD LLP

By:      */s/ Derek W. Loeser*                   By:      */s/ Lesley E. Weaver*
         Derek W. Loeser                                  Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)        Lesley E. Weaver (SBN 191305)
Cari Campen Laufenberg (admitted *pro hac vice*) Anne K. Davis (SBN 267909)
David J. Ko (admitted *pro hac vice*)            Matthew P. Montgomery (SBN 180196)
Benjamin Gould (SBN 250630)                      Angelica M. Ornelas (SBN 285929)
Adele Daniel (admitted *pro hac vice*)           Joshua D. Samra (SBN 313050)
1201 Third Avenue, Suite 3200                    555 12th Street, Suite 1600
Seattle, WA 98101                                Oakland, CA 94607
Tel.: (206) 623-1900                             Tel.: (415) 445-4003
Fax: (206) 623-3384                              Fax: (415) 445-4020
dloeser@kellerrohrback.com                       lweaver@bfalaw.com
claufenberg@kellerrohrback.com                   adavis@bfalaw.com
dko@kellerrohrback.com                           mmontgomery@bfalaw.com
bgould@kellerrohrback.com                        aornelas@bfalaw.com
adaniel@kellerrohrback.com                       jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*


GIBSON, DUNN, & CRUTCHER LLP

By: */s/ Orin Snyder*
Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000

Facsimile: 212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant Facebook, Inc.*

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

I, Lesley E. Weaver, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of January, 2021, at Oakland, Washington.

/s/ *Lesley E. Weaver*

Lesley E. Weaver

**CERTIFICATE OF SERVICE**

I, Lesley E. Weaver, hereby certify that on January 14, 2021, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

/s/ *Lesley E. Weaver*

# PLAINTIFFS'
# EXHIBIT A

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' NOTICE OF DEPOSITION OF DEFENDANT FACEBOOK, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)** |

**TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** under Federal Rules of Civil Procedure 26 and

30(b)(6), Plaintiffs, by their counsel, will take the deposition of Defendant Facebook, Inc.

("Facebook") at 9:00 a.m. on February 5, 2021 via remote audio-video conference and through a

remote platform deposition service mutually agreed upon by the parties. The deposition will be

taken before a person authorized by law to administer oaths under Federal Rules of Civil

Procedure 28(a) and shall continue from one day to the next, excluding Sundays and holidays,

until the examination is completed.

Pursuant to Rule 30(b)(6) and the Court's Discovery Order No. 11 (Dkt. No. 588),

Defendant is hereby notified of its duty to designate one or more officers, directors, managing

agents or other persons most knowledgeable or qualified to testify on its behalf concerning the

matters set forth below in Topics 1-12. Each such designee produced to testify has an affirmative

duty to have first reviewed all Documents, reports, and other matters known or reasonably

known or available to Facebook and to familiarize himself or herself with all potential witnesses

known or reasonably available to provide informed, binding answers at the deposition.

Defendant Facebook shall inform Plaintiffs of such designations(s) at a reasonable time prior to

the deposition(s), but no later than 7 days before the deposition(s), by setting forth the identity of

the person(s) designated to testify with respect to the matters specified below in Topics 1-12. The

deposition will continue on the day noticed and for additional days, if necessary, excluding

Sundays and holidays until completed.

      Plaintiffs issue this notice pursuant to Discovery Order No. 11 and reserve the right to

notice and conduct additional Rule 30(b)(6) depositions of Defendant on separate, non-

duplicative topics.

Dated: December 18, 2020

KELLER ROHRBACK L.L.P.

By:    */s/ Derek W. Loeser*
       Derek W. Loeser

Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David J. Ko (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Adele Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301

BLEICHMAR FONTI & AULD LLP

By:    */s/ Lesley E. Weaver*
       Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of:

- **PLAINTIFFS' NOTICE OF DEPOSITION OF DEFENDANT FACEBOOK, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)**

via Email on this 18th day of December, 2020 to the person(s) set forth below:

Joshua Seth Lipshutz
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Ave NW
Washington, D.C.
jlipshutz@gibsondunn.com

Kristin A. Linsley
Brian Michael Lutz
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street
Suite 3000
San Francisco, CA 94105
KLinsley@gibsondunn.com
BLutz@gibsondunn.com

Orin Snyder
Laura Mumm
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166
osnyder@gibsondunn.com
lmumm@gibsondunn.com

Martie Kutscher-Clark
**GIBSON, DUNN & CRUTCHER LLP**
1881 Page Mill Road
Palo Alto, CA
MKutscherClark@gibsondunn.com

Russell Falconer
**GIBSON, DUNN & CRUTCHER LLP**
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
rfalconer@gibsondunn.com

Deborah Stein
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
dstein@gibsondunn.com

Colin B. Davis
**GIBSON, DUNN & CRUTCHER LLP**
3161 Michelson Drive
Irvine, CA 92612-4412
cdavis@gibsondunn.com

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed at Seattle, Washington, on December 18, 2020.

/s/ Sarah Skaggs
Sarah Skaggs

## SCHEDULE A

**I.    DEFINITIONS AND RULES OF CONSTRUCTION**

In the event of any conflict or ambiguity between the following definitions, common usage and reference to any cited rules, statutes, or regulations should be used to provide the broadest interpretation of the term in question.

1.     "Business Plan" means any plan created or prepared by Facebook regarding Facebook's historical and future business strategy, including but not limited to Facebook's historical and future operations, and Facebook's historical and future financial positions.

2.     "Computer System" or "Computer Systems" include(s), but is not limited to, any server (whether physical or virtual), desktop computer, tablet computer, point of sale system, smart phone, cellular telephone, networking equipment, internet site, intranet site, and the software programs, applications, scripts, operating systems, or databases used to control, access, store, add, delete, or modify any information stored on any of the foregoing non-exclusive list.

3.     "Content and Information" refers to the definition in footnote 2 of the First Amended Complaint ("FAC"), referring to "content" and "information" as Facebook's Statements of Rights and Responsibilities have defined those terms. In brief, Facebook has generally used "information" to mean facts and other information about Users, including the actions they take, and "content" to mean anything Users post on Facebook that would not be included in the definition of "information." Content and Information also includes both personally identifiable content and information and anonymized content and information that is capable of being de-anonymized. *See* FAC ¶¶ 223-224. Content and Information includes data that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular User, such as:

a. Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

b. Characteristics of protected classifications under California or federal law.

c. Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

d. Biometric information.

e. Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an Internet Web site, application, or advertisement.

f. Geolocation data.

g. Audio, electronic, visual, thermal, olfactory, or similar information.

h. Professional or employment-related information.

i. Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. section 1232g, 34 C.F.R. Part 99).

j. Inferences drawn from any of the information identified in this paragraph to create a profile, dossier, or similar collection of information about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

4.     "Discovery Order No. 9" refers to the Court's October 29, 2020 Order (Dkt. No. 557), in which held, *inter alia*, that the discoverable data at issue in this case includes "Data collected from a user's on-platform activity; Data obtained from third parties regarding a user's off-platform activities; and Data inferred from a user's on or off-platform activity."

5.     "Data Warehouse" refers to refers to the open source, peta-byte (and potentially larger) scale data warehousing framework based on Hadoop that was developed by the Data Infrastructure Team at Facebook, also known as the "Hive."

6.     "Discovery Order No. 11" refers to the Court's December 11, 2020 Order (Dkt. No. 588), in which it ordered, *inter alia*, Defendant Facebook "to provide a 30(b)(6) witness regarding the discoverable user data as articulated by Discovery Order No. 9. (Dkt. No. 557.) Facebook shall also provide a 30(b)(6) witness on how it monetizes—directly or indirectly—and thus values user data."

7.     "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term pursuant to Fed. R. Civ. P. 34(a)(1)(A), and includes, without limitation, any writing, drawing, graph, chart, photography, phonorecord, Electronically-Stored Information (as defined herein) or digitally encoded data, database, graphic, and/or other data compilations from which information can be obtained, translated if necessary, by the respondent through detection devices into reasonably usable form, or other information, including originals, translations and drafts thereof, and all copies bearing notations and marks not found on the original. The term "Document" further means any document now or at any time in the possession, custody, or control of the entity to whom this document request is directed (together with any predecessors, successors, affiliates, subsidiaries, or divisions thereof, and their officers, directors, employees, agents and attorneys), including drafts. Without limiting the term "control" as used in the

preceding sentence, a Person is deemed to be in control of a document if the Person has the right or ability to secure the document or a copy thereof from another Person having actual possession thereof, including, but not limited to, work product contracted by You from others. Documents that are identical but in the possession of more than one Person or entity are separate documents within the meaning of this term. Also, a draft or non-identical copy is a separate document within the meaning of this term.

8. "Electronically-Stored Information" or "ESI" includes, but is not limited to, the following:

a. all items covered by Fed. R. Civ. P. 34(a)(1)(A);

b. information or data that is generated, received, processed, and recorded by computers and other electronic devices, including metadata (*e.g.*, author, recipient, file creation date, file modification date, etc.);

c. internal or external web sites, intranets and extranets;

d. output resulting from the use of any software program, including, without limitation, word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, texts, Facebook Messenger, WhatsApp, AOL Instant Messenger (or similar programs), bulletin board programs, screenshots/screengrabs, screen sharing recordings, webcasts, screencasts, operating systems, source code, PRF files, PRC files, batch files, ASCII files, and all miscellaneous media on which they reside regardless of whether said electronic data exists in an active file, a deleted file, or file fragment; and

e. activity listings of electronic mail receipts and/or transmittals; and any and all items stored on computer memories, hard disks, floppy disks, CDROM, magnetic

tape, microfiche, or on any other media for digital data storage, or transmittal, such as, but not limited to, personal digital assistants (*e.g.*, iPhones), hand-held wireless devices (*e.g.*, BlackBerrys), or similar devices, and file folder tabs, or containers and labels appended to, or relating to, any physical storage device associated with each original or copy of all documents requested herein.

9.      "Hive" refers to the open source, peta-byte (or potentially larger) scale data warehousing framework based on Hadoop that was developed by the Data Infrastructure Team at Facebook, also known as the Data Warehouse.

10.      "Including" means "including but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify the request, definition, or instruction but not to limit the topic.

11.      "Policies and Procedures" mean any formal or informal policy, procedure, rule, guideline, internal manuals, collaborative document, directive, instruction, or practice, whether written or unwritten, that You expect Your employees to follow in performing their jobs.

12.      "Marketing Plan" means any plan created or prepared by Facebook regarding Facebook's historical and future marketing or advertising strategy.

13.      "User Data" or "Data" refers to the categories of Content and Information referenced by the Court in Discovery Order No. 9 (Dkt. No. 557), including "Data collected from a user's on-platform activity; Data obtained from third parties regarding a user's off-platform activities; and Data inferred from a user's on or off-platform activity."

14.      "You" or "your" or "Facebook" or "Defendant" means Defendant Facebook, Inc., together with your predecessors, successors, parents, subsidiaries, divisions or affiliates (foreign or domestic), and their respective current and former officers, directors, agents, attorneys,

accountants, employees, partners, managers, members or other persons occupying similar positions or performing similar functions, and all persons acting or purporting to act on its behalf.

15.     Words used in the plural include the singular, and words used in the singular include the plural.

## II.     RELEVANT TIME PERIOD

Unless otherwise specified or agreed upon by the parties, consistent with Discovery Order No. 11, the relevant time period for purposes of this Notice is January 1, 2012 through December 31, 2017.

## III.     MATTERS FOR TESTIMONY

1.     The format, nature, and location of User Data as set forth in Discovery Order No. 9, including how and why such Data is collected, obtained, or inferred, and how it is maintained.

2.     The name, location, and function of all of Facebook's electronic or database systems that contain User Data, including but not limited to Hive and Data Warehouse, whether stored on an individual user level or in another form.

3.     The identity, nature and location at Facebook of all the metadata associated with User Data, including but not limited to nodes, edges, and fields, as set forth in https://developers.facebook.com/docs/graph-api/overview/.

4.     How User Data is or can be associated or linked to specific Facebook users—such as User IDs or other unique identifiers such as e-mail addresses and RIDs, as set forth in PwC_CPUP_FB00030737-38—and the identity, nature, and location of all such associations, including but not limited to nodes, edges, and fields, as set forth in https://developers.facebook.com/docs/graph-api/overview/.

6.      Identification of the types of third parties to which Facebook makes User Data accessible or with which Facebook shares User Data.

7.      For each type of third party identified in Topic 6, identify what kinds of User Data Facebook shares or makes accessible; for what general purposes it is shared or made accessible; and how Facebook ensures it is used for those purposes.

8.      The Policies and Procedures applicable to how User Data is collected, obtained, inferred, created, and maintened, and how it is shared or made accessible to third parties, including any data deletion and retention policies related to User Data, and the impact of the litigation hold placed in this case to such Policies and Procedures.

9.      For each type of third party identified in Topic 6, identify how Facebook shares or makes User Data accessible, including the format of such data, the metadata shared or made accessible, and the nodes, edges, and fields as set forth in https://developers.facebook.com/docs/graph-api/overview/.

10.     How Facebook monetizes—directly or indirectly—and values User Data.

11.     The identity, location, and retention of Documents related to how Facebook monetizes—directly or indirectly—and values User Data, including but not limited to:

    a.  All such Marketing Plans and Business Plans created or prepared by Facebook;

    b.  All such Documents, including drafts and correspondence, created or prepared by Facebook to share with third parties, including but not limited to institutional and individual investors, venture capitalists, and/or private equity firms;

    c.  All such Documents created in connection with preparing Facebook's quarterly and annual reports and/or any other of Facebook's publicly available filings to the SEC related to how Facebook generates revenue, and materials regarding the key

metrics identified by Facebook in these reports such as Daily Active Users (DAU), Monthly Active Users (MAU), and Average Revenue Per User (ARPU).

12.     The identity of all third parties that helped Facebook create or prepare any of the Documents described in Topic 11 above.

# EXHIBIT A

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' NOTICE OF DEPOSITION OF DEFENDANT FACEBOOK, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)** |

**TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** under Federal Rules of Civil Procedure 26 and

30(b)(6), Plaintiffs, by their counsel, will take the deposition of Defendant Facebook, Inc.

("Facebook") at 9:00 a.m. on February 5, 2021 via remote audio-video conference and through a

remote platform deposition service mutually agreed upon by the parties. The deposition will be

taken before a person authorized by law to administer oaths under Federal Rules of Civil

Procedure 28(a) and shall continue from one day to the next, excluding Sundays and holidays,

until the examination is completed.

Pursuant to Rule 30(b)(6) and the Court's Discovery Order No. 11 (Dkt. No. 588),

Defendant is hereby notified of its duty to designate one or more officers, directors, managing

agents or other persons most knowledgeable or qualified to testify on its behalf concerning the

matters set forth below in Topics 1-12. Each such designee produced to testify has an affirmative

duty to have first reviewed all Documents, reports, and other matters known or reasonably

known or available to Facebook and to familiarize himself or herself with all potential witnesses

known or reasonably available to provide informed, binding answers at the deposition.

Defendant Facebook shall inform Plaintiffs of such designations(s) at a reasonable time prior to

the deposition(s), but no later than 7 days before the deposition(s), by setting forth the identity of

the person(s) designated to testify with respect to the matters specified below in Topics 1-12. The

deposition will continue on the day noticed and for additional days, if necessary, excluding

Sundays and holidays until completed.

Plaintiffs issue this notice pursuant to Discovery Order No. 11 and reserve the right to

notice and conduct additional Rule 30(b)(6) depositions of Defendant on separate, non-

duplicative topics.

Dated: December 18, 2020

KELLER ROHRBACK L.L.P.

By:    /s/ Derek W. Loeser
        Derek W. Loeser

Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David J. Ko (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Adele Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301

BLEICHMAR FONTI & AULD LLP

By:    /s/ Lesley E. Weaver
        Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a true and correct copy of:

- **PLAINTIFFS' NOTICE OF DEPOSITION OF DEFENDANT FACEBOOK, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)**

via Email on this 18th day of December, 2020 to the person(s) set forth below:

Joshua Seth Lipshutz
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Ave NW
Washington, D.C.
jlipshutz@gibsondunn.com

Kristin A. Linsley
Brian Michael Lutz
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street
Suite 3000
San Francisco, CA 94105
KLinsley@gibsondunn.com
BLutz@gibsondunn.com

Orin Snyder
Laura Mumm
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166
osnyder@gibsondunn.com
lmumm@gibsondunn.com

Martie Kutscher-Clark
**GIBSON, DUNN & CRUTCHER LLP**
1881 Page Mill Road
Palo Alto, CA
MKutscherClark@gibsondunn.com

Russell Falconer
**GIBSON, DUNN & CRUTCHER LLP**
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
rfalconer@gibsondunn.com

Deborah Stein
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
dstein@gibsondunn.com

Colin B. Davis
**GIBSON, DUNN & CRUTCHER LLP**
3161 Michelson Drive
Irvine, CA 92612-4412
cdavis@gibsondunn.com

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed at Seattle, Washington, on December 18, 2020.

*/s/ Sarah Skaggs*
Sarah Skaggs

## SCHEDULE A

**I.     DEFINITIONS AND RULES OF CONSTRUCTION**

In the event of any conflict or ambiguity between the following definitions, common usage and reference to any cited rules, statutes, or regulations should be used to provide the broadest interpretation of the term in question.

1.      "Business Plan" means any plan created or prepared by Facebook regarding Facebook's historical and future business strategy, including but not limited to Facebook's historical and future operations, and Facebook's historical and future financial positions.

2.      "Computer System" or "Computer Systems" include(s), but is not limited to, any server (whether physical or virtual), desktop computer, tablet computer, point of sale system, smart phone, cellular telephone, networking equipment, internet site, intranet site, and the software programs, applications, scripts, operating systems, or databases used to control, access, store, add, delete, or modify any information stored on any of the foregoing non-exclusive list.

3.      "Content and Information" refers to the definition in footnote 2 of the First Amended Complaint ("FAC"), referring to "content" and "information" as Facebook's Statements of Rights and Responsibilities have defined those terms. In brief, Facebook has generally used "information" to mean facts and other information about Users, including the actions they take, and "content" to mean anything Users post on Facebook that would not be included in the definition of "information." Content and Information also includes both personally identifiable content and information and anonymized content and information that is capable of being de-anonymized. *See* FAC ¶¶ 223-224. Content and Information includes data that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular User, such as:

a. Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

b. Characteristics of protected classifications under California or federal law.

c. Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

d. Biometric information.

e. Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an Internet Web site, application, or advertisement.

f. Geolocation data.

g. Audio, electronic, visual, thermal, olfactory, or similar information.

h. Professional or employment-related information.

i. Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. section 1232g, 34 C.F.R. Part 99).

j. Inferences drawn from any of the information identified in this paragraph to create a profile, dossier, or similar collection of information about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

4.      "Discovery Order No. 9" refers to the Court's October 29, 2020 Order (Dkt. No. 557), in which held, *inter alia*, that the discoverable data at issue in this case includes "Data collected from a user's on-platform activity; Data obtained from third parties regarding a user's off-platform activities; and Data inferred from a user's on or off-platform activity."

5.      "Data Warehouse" refers to refers to the open source, peta-byte (and potentially larger) scale data warehousing framework based on Hadoop that was developed by the Data Infrastructure Team at Facebook, also known as the "Hive."

6.      "Discovery Order No. 11" refers to the Court's December 11, 2020 Order (Dkt. No. 588), in which it ordered, *inter alia*, Defendant Facebook "to provide a 30(b)(6) witness regarding the discoverable user data as articulated by Discovery Order No. 9. (Dkt. No. 557.) Facebook shall also provide a 30(b)(6) witness on how it monetizes—directly or indirectly—and thus values user data."

7.      "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term pursuant to Fed. R. Civ. P. 34(a)(1)(A), and includes, without limitation, any writing, drawing, graph, chart, photography, phonorecord, Electronically-Stored Information (as defined herein) or digitally encoded data, database, graphic, and/or other data compilations from which information can be obtained, translated if necessary, by the respondent through detection devices into reasonably usable form, or other information, including originals, translations and drafts thereof, and all copies bearing notations and marks not found on the original. The term "Document" further means any document now or at any time in the possession, custody, or control of the entity to whom this document request is directed (together with any predecessors, successors, affiliates, subsidiaries, or divisions thereof, and their officers, directors, employees, agents and attorneys), including drafts. Without limiting the term "control" as used in the

preceding sentence, a Person is deemed to be in control of a document if the Person has the right

or ability to secure the document or a copy thereof from another Person having actual possession

thereof, including, but not limited to, work product contracted by You from others. Documents

that are identical but in the possession of more than one Person or entity are separate documents

within the meaning of this term. Also, a draft or non-identical copy is a separate document within

the meaning of this term.

     8.     "Electronically-Stored Information" or "ESI" includes, but is not limited to, the

following:

    a.   all items covered by Fed. R. Civ. P. 34(a)(1)(A);

    b.   information or data that is generated, received, processed, and recorded by

        computers and other electronic devices, including metadata (*e.g.*, author,

        recipient, file creation date, file modification date, etc.);

    c.   internal or external web sites, intranets and extranets;

    d.   output resulting from the use of any software program, including, without

        limitation, word processing documents, spreadsheets, database files, charts,

        graphs and outlines, electronic mail, texts, Facebook Messenger, WhatsApp, AOL

        Instant Messenger (or similar programs), bulletin board programs,

        screenshots/screengrabs, screen sharing recordings, webcasts, screencasts,

        operating systems, source code, PRF files, PRC files, batch files, ASCII files, and

        all miscellaneous media on which they reside regardless of whether said

        electronic data exists in an active file, a deleted file, or file fragment; and

    e.   activity listings of electronic mail receipts and/or transmittals; and any and all

        items stored on computer memories, hard disks, floppy disks, CDROM, magnetic

tape, microfiche, or on any other media for digital data storage, or transmittal, such as, but not limited to, personal digital assistants (*e.g.*, iPhones), hand-held wireless devices (*e.g.*, BlackBerrys), or similar devices, and file folder tabs, or containers and labels appended to, or relating to, any physical storage device associated with each original or copy of all documents requested herein.

9. "Hive" refers to the open source, peta-byte (or potentially larger) scale data warehousing framework based on Hadoop that was developed by the Data Infrastructure Team at Facebook, also known as the Data Warehouse.

10. "Including" means "including but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify the request, definition, or instruction but not to limit the topic.

11. "Policies and Procedures" mean any formal or informal policy, procedure, rule, guideline, internal manuals, collaborative document, directive, instruction, or practice, whether written or unwritten, that You expect Your employees to follow in performing their jobs.

12. "Marketing Plan" means any plan created or prepared by Facebook regarding Facebook's historical and future marketing or advertising strategy.

13. "User Data" or "Data" refers to the categories of Content and Information referenced by the Court in Discovery Order No. 9 (Dkt. No. 557), including "Data collected from a user's on-platform activity; Data obtained from third parties regarding a user's off-platform activities; and Data inferred from a user's on or off-platform activity."

14. "You" or "your" or "Facebook" or "Defendant" means Defendant Facebook, Inc., together with your predecessors, successors, parents, subsidiaries, divisions or affiliates (foreign or domestic), and their respective current and former officers, directors, agents, attorneys,

accountants, employees, partners, managers, members or other persons occupying similar positions or performing similar functions, and all persons acting or purporting to act on its behalf.

15.     Words used in the plural include the singular, and words used in the singular include the plural.

## II.     RELEVANT TIME PERIOD

Unless otherwise specified or agreed upon by the parties, consistent with Discovery Order No. 11, the relevant time period for purposes of this Notice is January 1, 2012 through December 31, 2017.

## III.     MATTERS FOR TESTIMONY

1.     The format, nature, and location of User Data as set forth in Discovery Order No. 9, including how and why such Data is collected, obtained, or inferred, and how it is maintained.

2.     The name, location, and function of all of Facebook's electronic or database systems that contain User Data, including but not limited to Hive and Data Warehouse, whether stored on an individual user level or in another form.

3.     The identity, nature and location at Facebook of all the metadata associated with User Data, including but not limited to nodes, edges, and fields, as set forth in https://developers.facebook.com/docs/graph-api/overview/.

4.     How User Data is or can be associated or linked to specific Facebook users—such as User IDs or other unique identifiers such as e-mail addresses and RIDs, as set forth in PwC_CPUP_FB00030737-38—and the identity, nature, and location of all such associations, including but not limited to nodes, edges, and fields, as set forth in https://developers.facebook.com/docs/graph-api/overview/.

6.     Identification of the types of third parties to which Facebook makes User Data accessible or with which Facebook shares User Data.

7.     For each type of third party identified in Topic 6, identify what kinds of User Data Facebook shares or makes accessible; for what general purposes it is shared or made accessible; and how Facebook ensures it is used for those purposes.

8.     The Policies and Procedures applicable to how User Data is collected, obtained, inferred, created, and maintened, and how it is shared or made accessible to third parties, including any data deletion and retention policies related to User Data, and the impact of the litigation hold placed in this case to such Policies and Procedures.

9.     For each type of third party identified in Topic 6, identify how Facebook shares or makes User Data accessible, including the format of such data, the metadata shared or made accessible, and the nodes, edges, and fields as set forth in https://developers.facebook.com/docs/graph-api/overview/.

10.    How Facebook monetizes—directly or indirectly—and values User Data.

11.    The identity, location, and retention of Documents related to how Facebook monetizes—directly or indirectly—and values User Data, including but not limited to:

> a.  All such Marketing Plans and Business Plans created or prepared by Facebook;
>
> b.  All such Documents, including drafts and correspondence, created or prepared by Facebook to share with third parties, including but not limited to institutional and individual investors, venture capitalists, and/or private equity firms;
>
> c.  All such Documents created in connection with preparing Facebook's quarterly and annual reports and/or any other of Facebook's publicly available filings to the SEC related to how Facebook generates revenue, and materials regarding the key

metrics identified by Facebook in these reports such as Daily Active Users
(DAU), Monthly Active Users (MAU), and Average Revenue Per User (ARPU).

12.     The identity of all third parties that helped Facebook create or prepare any of the
Documents described in Topic 11 above.

# FB Exhibit A

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel 213.229.7000
www.gibsondunn.com

Deborah L. Stein
Direct: +1 213.229.7164
Fax: +1 213.229.6164
DStein@gibsondunn.com

January 13, 2021

<u>VIA E-MAIL</u>

Derek W. Loeser
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101

Lesley E. Weaver
Bleichmar Fonti & Auld LLP
555 12th Street, Suite 1600
Oakland, CA 94607

Re:      *In re Facebook, Inc. Consumer Privacy User Profile Litigation*

Counsel:

We write in response to Plaintiffs' December 18, 2020 30(b)(6) deposition notice (the "Notice"), which purports to notice a deposition for February 5 on twelve sweeping topics—entirely untethered from the Discovery Order authorizing the Notice—without conferring with Facebook on scheduling as Local Rule 30-1 requires. Given Judge Corley's clear instructions regarding the purpose of this deposition and the topics it should cover, we are disappointed that the Notice continues Plaintiffs' pattern of misusing civil discovery in pursuit of a roving investigation into all aspects of Facebook's business.

We will work with Plaintiffs to tailor the scope of the Notice consistent with Discovery Order No. 11 so that Facebook can meaningfully prepare its designee(s). We will also cooperate with Plaintiffs on finding a mutually agreeable date for the deposition that allows Facebook sufficient time to prepare its designee(s) after the topics are finalized. However, the Notice as drafted neither is "narrowly tailored" to two areas of inquiry as Judge Corley instructed nor particularizes topics with the "painstaking specificity" required to prepare a corporate designee on "particular subject areas . . . that are relevant to the issues in dispute." *Uschold v. Carriage Servs., Inc.*, No. 4:17-cv-4424, 2019 WL 8298261, at *3 (N.D. Cal. Jan. 22, 2019).[1]

---

[1] As per Judge Corley's direction, this letter serves as Facebook's initial response to Plaintiffs' proposed notice. *See* Dkt. 588 at 2. Facebook reserves its right to serve formal objections at a later date (including to any amended or supplemental notice that Plaintiffs might serve).

# GIBSON DUNN

Derek W. Loeser
Lesley E. Weaver
January 13, 2021
Page 2

## I.    The court ordered a deposition on two narrowly tailored areas of inquiry.

Judge Corley ordered an early 30(b)(6) deposition on two specific areas of inquiry: (i) the scope of "discoverable user data" and (ii) how Facebook "monetizes … and thus values user data." (Discovery Order No. 11, Dkt. 588 at 1–2). She further instructed, "[t]he 30(b)(6) topics shall be narrowly tailored to assist Plaintiffs with identifying relevant discovery in the above two areas." (*Id.* at 2).

### A.    The scope of "discoverable user data."

The deposition is intended to identify any additional document collections that may be needed to satisfy Discovery Order 9. That Order identifies three categories of data that are discoverable to the extent they are shared with (or accessible by) third parties: "(i) data collected from a user's on-platform activity; (ii) data obtained from third parties regarding a user's off-platform activities; and (iii) data inferred from a user's on or off-platform activity." Dkt. 557 at 2. Judge Corley instructed that the deposition should address whether information in each of these three categories was shared with or made accessible to third parties between 2012 and 2017, and whether any additional shared data should be produced under Discovery Order 9. Dkt. 588 at 1–2. As Facebook has explained, its investigation to date indicates that the "Download Your Information" ("DYI") file that Facebook makes available to users and produced to Plaintiffs includes all discoverable user data under Discovery Order 9.

Consistent with Judge Corley's order, Facebook is prepared to offer one or more 30(b)(6) deponents to testify on the following narrowly tailored topics regarding the use of user data between 2012 and 2017. For the purposes of the deposition, Facebook will consider data to have been shared with or made accessible to third parties to the extent it was transmitted to a third party or the third party was able to directly access or view the information. Facebook will not consider data to have been shared with or made accessible to a third party to the extent Facebook used the data only internally, including to provide a service to a third party.

#### Topic 1:  Data collected from a user's on-platform activity

<u>Collected data</u>. Facebook's designee will be prepared to testify about whether Facebook collects the following types of information from users' on-platform activity, depending on how a user used Facebook's products: (i) information and content the user provided, (ii) the user's networks and connections on Facebook's products, (iii) the user's usage of Facebook's products, (iv) information about transactions the user made on Facebook's products, and (v) things others did and

**GIBSON DUNN**

Derek W. Loeser
Lesley E. Weaver
January 13, 2021
Page 3

information they provided about the user while using Facebook's products. Facebook intends to offer this testimony to identify the categories of information Facebook may have collected from a user's on-platform activity. Facebook does not intend for the designee to provide details about the categories of information Facebook may have collected from a user's on-platform activity, except as described below.

Shared and produced data. Facebook's designee will be prepared to testify about whether the types of information the Company maintains from a user's on-platform activity are included in the user's DYI file, and whether, as a result, the DYI file includes all available information from the user's on-platform activity that may have been shared with or made available to third parties.

To the extent the designee identifies any categories of on-platform activity that are not included in the DYI file, the designee will be prepared to testify about whether that data was shared with third parties, and—if it was not—whether it was used for a different purpose.

**Topic 2: Data obtained from third parties regarding a user's off-platform activities**

Collected data. Facebook's designee will be prepared to testify about whether advertisers, app developers, and publishers could send Facebook information about a user's activities off Facebook through Facebook Business Tools—including information about the user's device, websites the user visited, purchases the user made, the ads the user saw, and how the user used their services. Facebook's designee will further be prepared to testify about whether Facebook may have received information about a user's online and offline actions and purchases from third-party data providers who had the rights to provide Facebook with that information. Facebook intends to offer this testimony to identify the categories of information Facebook may have received from third parties. Facebook does not intend for its designee to provide details regarding the categories of information it may have received from third parties, except as described below.

Shared data. Facebook's designee will be prepared to testify about whether Facebook shared or otherwise made accessible to third parties the categories of information it received from other third parties.

# GIBSON DUNN

Derek W. Loeser
Lesley E. Weaver
January 13, 2021
Page 4

To the extent the designee identifies any categories of information from third parties regarding users' off-platform activity that may have been shared, the designee will testify about whether that category of data appears in the DYI file.

<u>Data that was not shared or made accessible</u>.  Facebook's designee will be prepared to testify about whether Facebook used information obtained from third parties about a user's off-platform activities for any purpose other than the following purposes, none of which involved sharing data obtained from third parties with other third parties: (i) to provide, personalize, and improve its products; (ii) to provide measurement, analytics, and other business services; (iii) to promote safety, integrity, and security; (iv) to communicate with users, and (v) to research or innovate for social good.  Facebook intends to offer this testimony to confirm that data obtained from third parties served a different purpose.

**Topic 3:  Data inferred from a user's on or off-platform activity**

<u>Collected data</u>.  Facebook's designee will be prepared to testify about Facebook's ability to draw certain inferences from data it obtains from users and/or third parties.  The purpose of this testimony is to confirm that Facebook has this ability.  Facebook does not intend for its designee to provide details regarding Facebook's technology during the relevant period or the nature of the inferences that Facebook's tools may have drawn, except as described below.

<u>Shared data</u>.  Facebook's designee will be prepared to testify about whether Facebook shared or otherwise made accessible to third parties any category of information it inferred about users.

To the extent the designee identifies any categories of inferred data that may have been shared or made accessible to third parties, the designee will testify about whether that category of data appears in the DYI file.

<u>Data that was not shared or made accessible</u>. Facebook's designee will be prepared to testify about whether Facebook used data inferred from a user's on or off-platform activity for any purpose other than the following purposes, none of which involve sharing data obtained from third parties with other third parties: (i) to provide, personalize, and improve its products; (ii) to provide measurement, analytics, and other business services; (iii) to

# GIBSON DUNN

Derek W. Loeser
Lesley E. Weaver
January 13, 2021
Page 5

promote safety, integrity, and security; (iv) to communicate with users, and (v) to research or innovate for social good.  The purpose of this testimony is to confirm that data Facebook did not share or make accessible to third parties served a different purpose.

**B.      How Facebook "monetizes … and thus values user data**."

This area of inquiry is intended to help Plaintiffs understand how Facebook makes use of user data to earn revenue, so that Plaintiffs are able to issue document requests targeting financial data that is relevant to the issues in this case.  To that end, the deposition should address at a high level how Facebook makes use of user data to sell targeted advertising on the platform (revenues from which account for the majority of Facebook's revenue and are outside the scope of discovery in this case), and how (if at all) Facebook otherwise monetizes user data.

Consistent with Judge Corley's order, Facebook is prepared to offer one or more 30(b)(6) deponents to testify on the following narrowly tailored topics regarding how user data was monetized between 2012 and 2017.

**Topic 4:  How Facebook monetized user data.**

<u>Data was not sold</u>.  Facebook's designee will be prepared to testify that Facebook did not sell any user information to anyone during the relevant time period and will explain that selling user data would undermine Facebook's business model, which relies on user data to place advertisements.

<u>Advertising revenue</u>.  Facebook's designee will be prepared to testify about Facebook's use of user data to target advertisements, which accounted for between 84% and 98% of Facebook's revenue each year during the relevant time period, and about whether Facebook shared user data with, or otherwise made it accessible to, third parties as part of its targeted advertising business.  Because targeted advertising is not at issue in this case, Facebook's deponent will provide a general overview of Facebook's advertising platform and confirm that user data was not shared or otherwise made accessible to third parties through targeted advertising.  Facebook does not intend for its deponent to provide testimony regarding the details or mechanics of Facebook's advertising platform or Facebook's relationships with third parties whose advertisements Facebook places.

# GIBSON DUNN

Derek W. Loeser
Lesley E. Weaver
January 13, 2021
Page 6

Other sources of revenue.  Facebook's designee will be prepared to testify about Facebook's sources of revenue other than advertising and whether user data was shared or otherwise made accessible to third parties in connection with those other sources of revenue.  Because the purpose of this testimony is to allow Plaintiffs to identify any relevant revenue source(s) so that they can make appropriate discovery requests, Facebook does not intend for its deponent to provide additional details regarding its revenue sources.

Valuation materials.  Facebook's designee will be prepared to testify about whether the Company, in its regular course of business from 2012 to 2017, calculated the retail value of its users' data.  To the extent the deponent testifies that Facebook did calculate the retail value of its users' data in the regular course of its business, the deponent will identify the form of any such valuations.  Because the purpose of this testimony is to assist Plaintiffs to request relevant materials, Facebook does not intend for the deponent to provide testimony regarding specific materials or the contents of any such materials.

II.    **The Notice is untethered from the Court's Order, fails to provide the specificity needed to prepare a 30(b)(6) deponent, and violates various procedural rules.**

Rather than narrowly tailor the Notice to the topics above, the Notice seeks a boundless inquisition into nearly every aspect of Facebook's business, without regard for the Court's instructions or the live theories of the case.  Compounding this problem, the noticed topics are exceedingly vague and overbroad, making it impossible for Facebook to prepare its corporate designee(s), and it suffers from numerous procedural defects.  Facebook summarizes each of these issues below, which it reserves the right to address in more detail in formal Responses and Objections to the Notice.

A.    **The Notice is entirely untethered from the ordered areas of inquiry.**

The Notice veers away from the two areas of inquiry the Court authorized for an early 30(b)(6) deposition—discoverable user data and how Facebook monetizes user data.  The Notice also makes no effort to "narrowly tailor" its topics "to assist Plaintiffs with identifying relevant discovery in [those] two areas."  Dkt. 588 at 1-2.

On the issue of discoverable user data, the Court made clear that the primary purpose of the deposition is to identify what categories of user data are shared with third parties and whether any shared data remains unproduced.  The notice does not even address these issues.

# GIBSON DUNN

Derek W. Loeser
Lesley E. Weaver
January 13, 2021
Page 7

The notice instead seeks testimony on **all** of the Company's "**Policies and Procedures**" relating to how user data is "collected, obtained, inferred, created, and maintained, and how it is shared or made accessible to third parties." (Topic 8). It asks Facebook to prepare a witness to **identify the third parties** who access data. (Topic 6). On the issue of third parties, the Notice then asks for testimony regarding "**the format**" including "the nodes, edges, and fields" of the data provided to each third party (Topic 9), **why** the data is shared with each third party (Topic 7), and "how Facebook ensures" that third parties use the data for proper purposes (Topic 7).

The Notice goes on to request an ESI deposition regarding "**the format, nature, and location**" at Facebook of all user data (Topic 1), how user data "is maintained" (Topic 1), and the "identity, nature, and location of **all the metadata** associated with user data" (Topic 3). The notice doesn't stop there. It also asks for testimony about "**all of Facebook's electronic or database systems** that contain user data," how data is stored in each database (Topic 2), and technical details regarding how data "is or can be associated or linked" to users and "the identity, nature, and location of all such associations, including but not limited to nodes, edges, and fields" (Topic 4). These topics are far afield from the limited inquiry the Court ordered for this early 30(b)(6) deposition.

The same issues plague the requests concerning monetization. The purpose of this deposition is to help Plaintiffs better understand how user data fits into Facebook's business model so that they can request relevant financial discovery. The only noticed topic that even attempts to address this issue is Topic 10 ("How Facebook monetizes—directly or indirectly—and values user data.") But Topic 10 merely parrots the general area of testimony the Court ordered without following her instruction to propose "narrowly tailored" topics on that issue. The Notice then proposes several additional topics that fall far outside the area of inquiry the Court ordered. It asks for testimony regarding "**the identity, location, and retention" of all documents regarding how the Company monetizes data**, including all of the Company's marketing and business plans, all materials prepared for and correspondence with investors, and all documents underlying the company's public financial filings. (Topic 11). The notice goes on to demand testimony regarding **all of the third parties** who assisted Facebook to create *any* document relating to monetization (Topic 12).

These topics have virtually nothing to do with the narrow areas of inquiry the Court ordered or any live issue in the case. Instead, a number of Plaintiffs' proposed topics seek testimony only about Facebook's electronic databases, how Facebook stores and maintains ESI, the structure of Facebook's ESI, the location of Facebook's ESI, and Facebook's document retention policies. The Court has already rejected Plaintiffs' request to conduct an ESI deposition of this nature, and many of Plaintiffs proposed topics appear to be lifted

# GIBSON DUNN

Derek W. Loeser
Lesley E. Weaver
January 13, 2021
Page 8

directly from this previously rejected notice. *See* May 15, 2020 Hr'g Tr. at 6:16-22; ECF No. 436 at 1.

### B.     Facebook cannot meaningfully prepare a witness on the noticed topics.

Even if the noticed topics were within the ordered areas of inquiry, the Notice does not allow Facebook to meaningfully prepare one or more witnesses.  As an initial matter, the sheer breadth of the notice and number of subject areas would likely require Facebook to prepare a dozen or more witnesses on virtually hundreds of different issues.  This would not be reasonable or practical under normal circumstances and certainly is not practical within the timeframe in which the Court expects this deposition to take place.

Even putting aside the number and breadth of the topics raised, the Notice fails to "provide fair warning" of the topics Plaintiffs seek to address.  *Uschold v. Carriage Servs.*, Inc., No. 4:17-cv-4424, 2019 WL 8298261, at *3 (N.D. Cal. Jan. 22, 2019).  In order to provide a fair opportunity to prepare a corporate designee, Rule 30(b)(6) requires "the requesting party . . . to designate, with painstaking specificity, the particular subject areas that are intended to be questioned, and that are relevant to the issues in dispute." *Id*.

The Notice fails woefully short of satisfying Rule 30(b)(6)'s particularity requirement.  For example, a number of noticed topics use the phrase "including but not limited to" to describe their subject matter.  This approach has been rejected by courts as failing Rule 30(b)(6)'s "reasonable particularity requirement" because it "defeats the purpose of requiring the noticing party to delineate categories at all." *Tri-State Hosp. Supply Corp. v. United States*, 226 F.R.D. 118, 125 (D.D.C. 2005); *see also Trustees of Bos. Univ. v. Everlight Elecs. Co.*, 2014 WL 5786492, at *3 (D. Mass. Sept. 24, 2014).  One topic includes a demand for testimony on all of the Company's data policies and procedures (Topic 8) and another seeks testimony regarding how Facebook "ensures" third parties use data for proper purposes (Topic 7).  These topics fail to provide Facebook with any guidance as to what specific information Plaintiffs will be seeking regarding the Company's data policies and enforcement measures, and they appear to seek testimony regarding hundreds of issues across numerous departments.  Plaintiffs' remaining topics suffer from similar flaws.

Even if they had been properly framed, many of Plaintiffs' topics simply are not suitable for deposition testimony—much less the limited 30(b)(6) deposition ordered in this case.  Plaintiffs ask Facebook to prepare a 30(b)(6) deponent on ESI topics, including the location and format of extraordinarily vast amounts of data.  The Notice asks for testimony regarding "**the format, nature, and location**" at Facebook of any document Facebook possesses that includes or draws upon a single piece of information relating to any user (Topic 1) and the "identity, nature, and location of **all the metadata** associated with" such

# GIBSON DUNN

Derek W. Loeser
Lesley E. Weaver
January 13, 2021
Page 9

documents (Topic 3). The Notice also asks for testimony about how data "is or can be associated or linked" to users and "the identity, nature, and location of all such associations, including but not limited to notes, edges, and fields" (Topic 4). It is not practical or efficient to prepare a 30(b)(6) deponent on the locations of such vast amounts of data—much of which is not even within the scope of relevant discovery. This is particularly true given that the parties have already spent hundreds of hours exchanging correspondence and meeting and conferring on the nature and locations of Facebook's ESI.

Facebook similarly cannot reasonably prepare a deponent on Topic 11, which demands that Facebook prepare a deponent to identify and testify to the location of all of the Company's marketing and business plans, all materials prepared for and correspondence with investors, and all documents underlying the company's publicly financial filings. The operative terms in Topic 11 are defined so broadly that it is impossible for Facebook to understand, much less cabin, what Plaintiffs intend to capture. Whatever that might be, it would require preparation of a designee on an enormous volume of documents with no meaningful connection to the issues in this case, and the testimony would not serve to limit or focus Plaintiffs' request for discovery into an essentially unlimited set of financial documents.

Many of Plaintiffs' topics are also inappropriate because they are duplicative of discovery Facebook already provided through more appropriate discovery mechanisms. For instance, Topic 7 asks Facebook to identify the types of data it shares with third parties and for what purpose each type of data is shared. This Topic is largely redundant of several of Plaintiffs' Interrogatories, to which Facebook provided approximately 500 pages of written responses. *See* Facebook's R&Os to Interrogatory Nos. 9, 10, 11, 13, 14, 15, 27, & 34. Similarly, Topic 2 requests "the name, location, and function of all of Facebook's electronic or database systems that contain User Data." Facebook already provided Plaintiffs extensive informal and formal written discovery about its databases.

Facebook wishes to effectively prepare its designee(s) to testify. It also wishes to avoid unnecessary disruptions and the need to engage the Court to resolve objections during this deposition. Plaintiffs' failure to draft appropriate, narrowly tailored, and specific topics invites an unproductive deposition that is unlikely to satisfy the parties' or the Court's goals.

## C. Additional Defects

The Notice also suffers from numerous procedural defects.

**Plaintiffs improperly noticed the deposition for February 5.** Plaintiffs purport to notice the Deposition for February 5, 2021, but did not meet and confer with Facebook about

# GIBSON DUNN

Derek W. Loeser
Lesley E. Weaver
January 13, 2021
Page 10

this date, as the Local Rules require. See Civil L.R. 30-1. Regardless, it is premature to set a deposition date, as the parties have not yet agreed on topics, which will dictate the time Facebook needs to sufficiently prepare a witness. Facebook suggests the parties meet and confer regarding a reasonable date after the parties have agreed on (or the Court has ordered) the deposition topics.

**Plaintiffs improperly demand that the deposition continue indefinitely.** Absent a Court order or an agreement between the parties, a deposition in no event may a deposition exceed "1 day of 7 hours." Fed. R. Civ. P. 30(d)(1). Ignoring this limitation, Plaintiffs' notice twice directs that the "deposition . . . shall continue from one day to the next, excluding Sundays and holidays, until the examination is completed," suggesting that Plaintiffs intend to question Facebook's corporate designee(s) indefinitely. This direction is contrary to Rule 30(d)(1). And under the circumstances here, given that Judge Corley ordered a narrowly tailored deposition on discrete topics within the two identified areas of inquiry, the deposition should be limited to five hours.

**Plaintiffs improperly demand that Facebook disclose its corporate designee(s) in advance of the deposition.** Plaintiffs' notice purports to require Facebook to identify "the person(s) designated to testify with respect to the matters specified" in each topic at least seven days before the deposition. There is no such requirement in the Federal Rules or the Local Civil Rules. Because a 30(b)(6) deposition is limited to information known or reasonably available to Facebook—and not any witness's personal knowledge—the identity of the corporate designee(s) should not affect Plaintiffs' preparation.

Facebook is prepared to meet and confer with Plaintiffs regarding each of these issues and Facebook's proposed topics at Plaintiffs' earliest convenience.

Sincerely,

Deborah L. Stein

# EXHIBIT F

1

2          UNITED STATES DISTRICT COURT

3          NORTHERN DISTRICT OF CALIFORNIA

4

5   IN RE: FACEBOOK, INC. CONSUMER          MDL No. 2843
    PRIVACY USER PROFILE LITIGATION         Case No.  18-md-02843-VC (JSC)
6

7                                           **DISCOVERY ORDER NO. 12**

8

9

10

11          This MDL matter has been assigned to this Court for management of discovery.  The Court

12   held a discovery status conference on January 15, 2021 and this Order memorializes the decisions

13   made at the hearing.

14       **A.  ADI**.  Plaintiffs shall select 20 entries, from the previously identified 400 entries, for in

15          camera review by the Court and notify Facebook by January 22, 2021—or earlier if

16          possible—of the specific entries selected.  The Parties shall then simultaneously brief the

17          Court, limiting the respective briefs to 20 pages total, by February 5, 2021.  By that same

18          date, Facebook shall submit the documents for in camera review to

19          jscsettlement@cand.uscourts.gov.

20       **B.  30(b)(6) Depositions**.  The Parties have thus far been unsuccessful in negotiations

21          regarding the 30(b)(6) deposition required by Discovery Order No. 11.  (Dkt. No. 588.)

22          The Court orders the Parties to conduct the deposition in the month of February, preferably

23          prior to the next status conference.  Further, the deposition shall be no longer than 10 hours

24          in total (over at least two days).  The scope of the depositions shall be limited to the

25          discoverable user data as defined by Discovery Order No. 9, (Dkt. No. 557), and how

26          Facebook monetizes—directly or indirectly—and thus values user data.  The purpose of

27          the depositions is to gain a better understanding of Facebook's internal operations, related

28          to the scope of the depositions as described above; whether particular user data is not

shared, not admissible, or not monetized, is not a valid reason to object to a particular deposition question. If the deponent is unable or unprepared to answer particular questions, that can be addressed with further, more targeted, 30(b)(6) depositions if needed.

**C. Next Status Conference.** The next video status conference shall be February 24, 2021 at 8:30 a.m. The Parties shall submit a joint status update by February 23, 2021 at 12:00 p.m.

**IT IS SO ORDERED.**

Dated: January 15, 2021

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

# EXHIBIT G

Pages **1 - 32**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Magistrate Judge

```
                              )
IN RE:  FACEBOOK, INC.        )   NO. 18-MD-02843 VC (JSC)
        CONSUMER PRIVACY USER )
        PROFILE LITIGATION.   )
                              )
_____)
```

San Francisco, California
Friday, January 15, 2021

**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:

            KELLER ROHRBACK LLP
            1201 Third Avenue, Suite 3200
            Seattle, Washington  98101
      BY:   **DEREK W. LOESER, ATTORNEY AT LAW**
            **CARI C. LAUFENBERG, ATTORNEY AT LAW**
            **DAVID KO, ATTORNEY AT LAW**
            **CHRIS SPRINGER, ATTORNEY AT LAW**


            BLEICHMAR, FONTI & AULD LLP
            555 12th Street, Suite 1600
            Oakland, California  94607
      BY:   **LESLEY E. WEAVER, ATTORNEY AT LAW**
            **MATTHEW MONTGOMERY, ATTORNEY AT LAW**
            **ANGELICA M. ORNELAS, ATTORNEY AT LAW**
            **ANNE K. DAVIS, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported Remotely By:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
                       CSR No. 7445, Official U.S. Reporter

```
 1   APPEARANCES VIA ZOOM:   (CONTINUED)

 2   For Defendant:
                           GIBSON, DUNN & CRUTCHER LLP
 3                         333 South Grand Avenue
                           Los Angeles, California 90017
 4                 BY:     DEBORAH L. STEIN, ATTORNEY AT LAW

 5                         GIBSON, DUNN & CRUTCHER LLP
                           2001 Ross Avenue, Suite 2100
 6                         Dallas, Texas 75201
                   BY:     RUSSELL H. FALCONER, ATTORNEY AT LAW
 7
                           GIBSON, DUNN & CRUTCHER LLP
 8                         1050 Connecticut Avenue, NW
                           Washington, D.C.  20036
 9                 BY:     JOSHUA S. LIPSHUTZ, ATTORNEY AT LAW

10                         GIBSON, DUNN & CRUTCHER LLP
                           555 Mission Street, Suite 3000
11                         San Francisco, California  94105
                   BY:     MARTIE P. KUTSCHER CLARK
12                         ATTORNEY AT LAW

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1    Friday, January 15, 2021                          8:30 a.m.

 2                       P R O C E E D I N G S

 3                          ---o0o---

 4         THE CLERK:  Court is now in session.  The Honorable

 5    Jacqueline Scott Corley presiding.

 6         Calling Civil Action 18-MD-2843, In Re:  Facebook, Inc.

 7    Consumer Privacy User Profile.

 8         Counsel, starting with plaintiffs, can you please state

 9    your appearance.

10         MS. WEAVER:  Good morning.  It's Lesley Weaver of

11    Bleichmar, Fonti & Auld.  And today with me I have Anne Davis,

12    Matt Montgomery, and Angelica Ornelas.

13         MR. LOESER:  Good morning, Your Honor.  Derek Loeser

14    from Keller Rohrback with Cari Laufenberg and David Ko and

15    Chris Springer, also from Keller Rohrback.

16         MS. STEIN:  Good morning, Your Honor.  Deborah Stein

17    for Facebook from Gibson Dunn.  I'm here with Josh Lipshutz,

18    Russ Falconer, and Martie Kutscher.

19         THE COURT:  Good morning.

20         Okay.  Just so you know, I have a criminal matter at 9:00;

21    so we're going to hit sort of the high points.

22         Let's start with the ADI because, as I understood it, this

23    was sort of different from the other privilege log because

24    Facebook has taken the position that because all these

25    documents, interviews -- I don't know what the ADI is -- were
```

 1   created as part of a lawyer-directed investigation, they're

 2   privileged.

 3        So I don't -- I don't think it's premature in the sense

 4   now that you've gone through the stip, the process that the

 5   parties agreed to, you were able to narrow it down.  I think

 6   now is the time to -- and plaintiffs have focused on, I guess,

 7   their e-mails or memos, or whatever it would be, in which

 8   there's no attorney on the string, on that.  And so I think

 9   that's ripe to go forward.

10        I don't know what meeting and conferring will do.  As you

11   explained, you put very detailed explanations of why it's

12   privileged.  Either they don't believe you or, what's often the

13   case, they want confirmation.  Right?  So that's why we'll do

14   some samples.

15        So what I was going to suggest -- sometimes when we do

16   these, if the parties need guidance, including the party

17   claiming they're privileged, I let each side pick any number.

18   I don't see why Facebook should maybe pick any.  It really

19   should be I just think plaintiff.  I was going to say pick 20.

20        And then let's just get simultaneous briefs because, while

21   I do this all the time, I know with respect to investigations,

22   it'd be nice to bring me up to speed on the state of the law

23   with respect to that and privilege.  And then I'll review them.

24        So that would be my proposal.

25        **MS. STEIN:**  All right.  Thank you, Your Honor.

1        I think the issue here is that while this exercise started

2   as, you know, what I think was intended by plaintiffs to be

3   some sort of categorical challenge to investigate -- to an

4   investigation, the way this has played out in the privilege log

5   is that we've logged about 6,000 entries.  Plaintiffs have said

6   they want to challenge anything that doesn't have a lawyer on

7   it.  But the logs look very much like you would expect an

8   ordinary privilege log to look like, where the entries that

9   they're challenging facially say things like, you know, "E-mail

10  revealing advice from Gibson Dunn concerning the structure of a

11  legal investigation," you know, things like that; "E-mail

12  summarizing advice from Gibson Dunn" or from someone from

13  Facebook in-house counsel.  So it's not necessarily something

14  that is any different than you would ordinarily see.

15       And we feel that plaintiffs haven't -- are just saying:

16  We want to challenge everything.  But there really isn't a

17  rhyme or reason that connects it to how this started out as a

18  challenge to whether this investigation was privileged.

19          THE COURT:  Well, they've now challenged 400 out of

20  6,000.  So that's good.  That's narrowed -- right? --

21  considerably.

22       And I think whenever there's not a lawyer on it --

23  right? -- that's always more on the edges.  That's more on the

24  edges.  So I think that the showing sufficient to allow the

25  *in camera* review is there.  I feel more comfortable when I have

1    it in context and I can see it.  That's why I say just do a

2    sample, and then that should be the end of the matter.

3         **MS. KUTSCHER CLARK:**  Your Honor, if I can add to that,

4    I think a concern we have about jumping directly into briefing,

5    particularly if the briefing is going to be simultaneous, is we

6    don't actually really know what we're briefing at this point.

7    We don't know what plaintiffs' position is.  We don't know why

8    they think these particular documents are not privileged.

9         Each one of these documents, the way they're logged --

10   and, you know, we've looked at them carefully -- they're

11   summarizing legal advice; they're conveying legal advice.  This

12   isn't -- you know, we're not standing on a work

13   product assertion.

14        **THE COURT:**  No, no.  But it's your burden.  It's your

15   burden; so you know what to brief.  Whatever it is that meets

16   your burden.  Right?  It's your burden.  It's not their burden.

17   It's your burden to show that they're privileged.  So --

18        **MS. STEIN:**  Yes, Your Honor.  And --

19        **THE COURT:**  -- whatever the case law is, whatever it

20   is that says just because an attorney isn't -- which you did a

21   little bit -- isn't on the string doesn't mean, if it's

22   conveying legal advice -- it shouldn't be very long.

23        **MS. STEIN:**  So just for clarity, Your Honor, is what

24   you're asking for for briefing where plaintiffs challenge

25   certain entries, they pick certain entries that they want to

```
1    challenge; we respond why we believe our log has made the
2    showing that we're entitled to show; and then Your Honor will
3    decide who's right on the law and decide which ones, if any,
4    you're going to review in camera?
5            THE COURT:  Well, I think I'll just review them all
6    in camera with the briefs and then decide:  Yes, the privilege
7    was appropriately invoked.
8        And then that should be the end of the matter.  Right?  I
9    don't then expect -- if, let's say, all 20 I believe were
10   properly invoked, that should be the end of the matter because
11   plaintiff should really be picking the 20 out of the 400 that
12   they feel most strongly might not be privileged.  Right?  So
13   it's sort of an exemplar in that state.
14       If I don't agree, well, then it becomes more complicated.
15   Right?
16           MS. STEIN:  Right.  I guess sort of a parallel
17   question is that, because this is in the context of an
18   investigation, I suspect we may want to provide supporting
19   information.  You may not be able to tell, Your Honor, from the
20   face -- some of the documents, I think you will be able to see
21   that it's revealing direct attorney communications or whatnot.
22   Others may be something that was at the direction of counsel
23   which may require context.
24           THE COURT:  But isn't that on the log that you already
25   provided to them, or did you just say -- I don't think you
```

```
 1    attached -- did you just say "Direction of counsel" with

 2    identifying the counsel or...

 3              MS. STEIN:  I think it depends on the entry,

 4    Your Honor.  But given that this was an attorney-driven

 5    investigation, I would -- I just don't know what kind of

 6    additional information Your Honor might want for us to support

 7    that aspect.

 8              THE COURT:  Whatever you think meets your burden,

 9    that's all.

10              MS. STEIN:  Thank you.

11              THE COURT:  Whatever you think you need, or maybe more

12    than you think you need, to meet your burden.  Right?

13         MR. KO:  Your Honor, this is David Ko on behalf of

14    plaintiffs.

15         And thank you for that.  I think that's what we've been

16    wanting to do, quite frankly, since last spring and summer, to

17    give you --

18              THE COURT:  I'm going to stop you, Mr. Ko.

19         MR. KO:  Okay.

20              THE COURT:  You should retract the last thing you

21    said.  Not productive.  Not helpful.  Okay?

22         MR. KO:  Sounds good.  Scratch that from the record.

23    I fulfill my New Year's resolution.

24         But let me ask for some context -- or some clarification

25    on the 20, because with respect to the 400 entries that we have
```

1    identified to Facebook, those include both parent documents and

2    attachments.

3         So our assumption would be the 20 -- the 20, you know,

4    exemplars that we propose to you would be both -- you know, one

5    document or one communication would be both the parent and the

6    attachment or attachments.  So --

7              THE COURT:  Yeah.  There were 400 entries.  So 20

8    entries.

9              MR. KO:  Well, I guess that's what I was hoping to get

10   clarification on, Your Honor, because the 400 comprises

11   documents that reflect both the parent and the underlying

12   attachments.

13             THE COURT:  You mean a single entry would comprise

14   both?

15             MR. KO:  Well, no.  There would -- for example, there

16   could be seven entries that relate to one document.

17        So the way that Facebook has logged these materials, they

18   include -- for example, if there's an e-mail and then a

19   diagram, you know, they claim that there's a diagram that was

20   attached to the e-mail that is also privileged.  And then

21   there's also another attachment -- because oftentimes in

22   e-mails we attach one or more attachments -- and then there's a

23   spreadsheet.  So what they've done is they've separately logged

24   those.  So --

25             THE COURT:  That's okay.  20 entries.

1    And look, if it turns out one of the entries involving an

2    e-mail, I say, "Oh, not privileged," well, then you're going to

3    have a discussion anyway; and maybe something then that was

4    attached, if it's not in your 20, we'll have a discussion

5    about.

6        Just 20 entries.

7            **MR. KO:**  Understood.  Thank you, Your Honor.

8            **MR. MONTGOMERY:**  Okay.  Your Honor, before we move on,

9    quick question.

10       How long do you want the briefs?

11           **THE COURT:**  I don't think they should be long.  I

12   mean, I'm thinking, like, ten pages.  But you tell me because

13   it's -- I don't know.

14           **MS. WEAVER:**  Ten pages is fine.  We can do that.  And

15   when would you --

16           **THE COURT:**  Well, let me ask Facebook because it is

17   their burden.

18           **MS. STEIN:**  Thank you, Your Honor.

19       I think it's -- because we don't necessarily know what's

20   being challenged, it's a little bit up in the air.  I think

21   we'll probably need more than ten pages for 20 documents

22   because we may need to provide --

23           **THE COURT:**  Okay.  So one page -- no more than one

24   page per document.  I don't mean -- just 20 total.  Right?  You

25   can divide it up any way you want among the 20 entries, but 20

```
 1   total.
 2            MS. WEAVER:  Your Honor, the one thing I would ask --
 3            THE COURT:  Yeah.
 4            MS. WEAVER:  -- is that if we are -- if they are
 5   putting in declarations that we're seeing for the first time,
 6   plaintiffs would like an opportunity to respond to any new
 7   information that's provided.
 8       I mean, to your point --
 9            THE COURT:  I don't want declarations.  I don't want
10   declarations.
11            MS. WEAVER:  Okay.
12            THE COURT:  I want the log of the entries.  I want
13   what was logged for the entries.  And then I want briefs, like
14   the argument.
15            MS. WEAVER:  Okay.
16            THE COURT:  No declarations.
17            MR. MONTGOMERY:  Okay.
18            THE COURT:  I want to make this simple.  If we need
19   more, then we can get more at the time.
20            MR. MONTGOMERY:  Last question, I promise, on ADI.
21       We proposed filing our brief on January 29th.  Is that
22   still a deadline the Court wants us to hold to?
23            THE COURT:  Well, that seems a little soon.  I don't
24   know.  When are you going to identify -- when are the
25   plaintiffs going to identify the 20?
```

1          **MR. MONTGOMERY:**  We could do it within seven days; so

2     by next Friday.

3          **THE COURT:**  Okay.  So that would be the 22nd.  So

4     I think a brief by the 29th might be a little -- how about the

5     5th?  Does that work, Ms. Stein?

6          **MS. STEIN:**  For plaintiffs to submit an opening brief

7     on the 5th?

8          **THE COURT:**  No.  I thought we were just going to have

9     simultaneous briefs.

10         **MS. STEIN:**  I think that's going to be a little bit

11    fast for us, Your Honor, if we've just found out what the

12    entries are.

13         **THE COURT:**  That's two weeks.  Well, no, because you

14    already logged them.  Right?  It's merely putting down into

15    more paper the analysis that's already been done because

16    they've already been logged.

17         I mean, and also, I thought this was going on in other

18    cases and this is not new or -- ADI.  I mean, we've known this

19    is at issue.  You know.  You have your argument as to why

20    they're privileged.  I assume somewhere in a file, virtual,

21    there's a memo, quite thorough, with all the law and anything.

22    It just needs to be turned into a brief.

23         So I think the 5th would be fine.  That's two weeks.

24         But if you can identify, Mr. Montgomery, before the 22nd,

25    that would be helpful.

```
 1              MR. MONTGOMERY:  We will try to do so, Your Honor.
 2              THE COURT:  I mean, same thing.  It shouldn't take --
 3    I mean, you've had those.  You've analyzed them.  It's the 400
 4    to the 20.
 5         Okay.  All right.  So that takes care of the ADI.
 6         And then I'll have argument if I need it.  If I need
 7    something more, I will.  I promise.  I don't want to make a
 8    decision that I'm not comfortable with.
 9         Okay.  So the 30(b)(6) deponent, so I did read the notice
10    and Facebook's letter.  And then now plaintiff has another
11    proposal -- I guess you're -- I don't know, Ms. Stein, you seem
12    to be the lead today -- just more generally.
13         I mean, the idea was -- right?  We went through this whole
14    exercise about the scope of discovery.  Long, long months.  And
15    then Facebook was saying:  Well, actually, we've already
16    produced everything within that scope.  And so that's sort of
17    like, let's just cut to it.  Right?
18         And so what about plaintiffs' proposal in the statement
19    now, just those three topics, which is essentially the topic:
20    What is it that you -- what information do you gather about
21    users?  What do you do with it?
22              MS. STEIN:  Well, Your Honor --
23              THE COURT:  And how do you monetize it?
24              MS. STEIN:  -- that's what we endeavored to do in the
25    letter that we sent plaintiffs, was to take those three topics
```

1   and put some more meat on the bones of what we would be

2   preparing a witness on, because the topics, as Your Honor

3   proposed, which really is exactly what our letter fleshes

4   out --

5            **THE COURT:**  Well, except this.  I don't mean to

6   interrupt you, because we're done at 9:00.  Except that your

7   letter is more like a topic and a directive.  Right?  "Data was

8   not sold."  It's sort of almost like a directive to the witness

9   will testify.

10       No.  The witness will testify as to what the witness

11  knows.  And that may be what you believe, but that's not the

12  topic, that data was not sold.  The topic is:  How do they

13  monetize it? wherever that may lead.  It may lead that the data

14  was not sold.  Right?

15       But the problem I had with the letter was it jumped to the

16  conclusion as to -- not the topic, as to what it was going to

17  be, almost like a directive.

18       But if you take what plaintiff says and yours and you take

19  out the directives, then I think that's -- then you are on the

20  same page.

21           **MS. STEIN:**  Yes.  Your Honor, I don't think we were

22  intending to direct a witness on anything.  I think what we

23  were trying to do was explain, you know, more -- in more

24  particularity what a witness -- the subjects within this that a

25  witness was going to be focused on, because we obviously need

```
 1   to be able to prepare witnesses -- one or more witnesses to
 2   meaningfully testify.
 3        And the topics, just the three big categories could go in
 4   a lot of different places.  And I think the fact that
 5   plaintiffs' notice looks different from what we thought this
 6   was is a good reason for that.
 7        So, I mean, we certainly didn't intend to be suggesting
 8   that we were directing a witness to testify --
 9             THE COURT:  Well, I'm just looking at Topic 4, how
10   Facebook monetized user data.  First, data was not sold.
11        No, that's not the topic.  That's not what their question
12   is.  Their question is:  How did they monetize it? wherever it
13   may lead.
14        And a lot of this is coming from because you guys have
15   made representations, all in good faith, all what you've been
16   told.  Right?  And so now it's like, okay, where is it coming
17   from?
18        So I don't even know, actually -- this is just sort of a
19   preliminary initial "Let's get started," because we seem to
20   be -- like, I just couldn't figure out how to break through all
21   this stuff.
22             MS. STEIN:  Sure.
23             THE COURT:  So I don't even know that the -- and if
24   the witness is asked something they can't answer, then they
25   can't answer.  Right?  That's okay.  Then we know.  Like, it's
```

1    exploratory in that sense.  So --

2          **MS. STEIN:**  Right.  We --

3          **MR. LOESER:**  Your Honor --

4          **MS. STEIN:**  -- just wanted -- we just wanted to make

5    sure, Your Honor, what we were trying to avoid for any

6    30(b)(6).  We have an obligation to prepare, and we want to

7    make sure that everyone's on the same page and we get there and

8    we don't spend the day fighting about the scope of the

9    deposition.

10         So what we were trying to do in our letter was really just

11   say:  Hey, here's what we're prepping the witness on, the

12   subjects.  Here's how we understand it.  You know, if there's

13   some disagreement on this, if we're missing something, let us

14   know.

15         We do not expect -- we don't want this to be a directive,

16   Your Honor.  You know, that's not the intention.  It was sort

17   of more of a blueprint of how we were going to be focusing,

18   you know, with our client on what questions needed to be

19   answered, but, you know, certainly not a directive.

20         **MR. LOESER:**  Your Honor?

21         **THE COURT:**  Yes.

22         **MR. LOESER:**  Derek Loeser.  If I could be heard for a

23   moment.

24         This topic -- you know, there's no sense talking about the

25   past.  I know Your Honor isn't interested in it.  So I'll just

1    try and be practical here.

2        We have an order.  The order indicates what the subjects

3    are.  You issued another order indicating that there needed to

4    be a 30(b)(6) notice.  We took the three topics that were the

5    subject of Discovery Order Number 9 and we reduced them to very

6    concrete, very specific topics.  They track directly to the

7    order.

8        **THE COURT:**  You mean, you're talking about your

9    notice, or are you talking about what's in your CMC statement?

10       **MR. LOESER:**  I'm talking about our notice and why

11   we --

12       **THE COURT:**  Okay.  I don't want to talk about your

13   notice.  That was way beyond what I had in mind too.

14       **MR. LOESER:**  Okay.

15       **THE COURT:**  That was way beyond what I had in mind.

16   So I don't want to talk about your notice.

17       Because you put something in your CMC statement.  I want

18   to talk about that --

19       **MR. LOESER:**  Okay.  What we put in our --

20       **THE COURT:**  -- what you put in your CMC statement.

21       **MR. LOESER:**  Right.  What we put in our statement was:

22   We're happy to go back to just having a deposition that is

23   defined by those three topics.  But what we'd like to avoid is

24   having a deposition in which most of the deposition is spent

25   fighting with Facebook about whether we get to ask all of the

```
 1   questions we want to about those three topics.  And so --
 2            THE COURT:  You can ask.  They may not be able to
 3   answer.  So it would be best to spend your time on what the
 4   witness is able to answer.
 5            MR. LOESER:  And --
 6            THE COURT:  This is not -- it doesn't come up against
 7   anything or anything like that.  It's like an exploratory --
 8   frankly, I wish I could be there and ask the questions because
 9   I want to know.
10            MR. LOESER:  Well, Your Honor, you are --
11            MS. WEAVER:  We wouldn't mind, Your Honor.
12            MR. LOESER:  -- invited.
13            THE COURT:  I'm not.  But I will --
14            MR. LOESER:  You are welcome.
15            THE COURT:  I'm not.  You can hire a special master
16   for that, if you want.
17            MR. LOESER:  I guess here's what I'm trying --
18            MS. KUTSCHER CLARK:  Your Honor, I --
19            MR. LOESER:  We have a letter from them, which is like
20   a bit of a maze, and it says what is and is not going to be the
21   subject of this testimony.
22       I disagree and we all on the plaintiff side wholeheartedly
23   disagree with the various and many and confusing limitations
24   their letter describes.
25       If what that letter indicates is that when we go to the
```

1    deposition, those are the objections that they're going to make

2    and they're going to follow the roadmap that they have put in

3    their letter about what they're not going to allow the witness

4    to testify to, I think that that would be -- it's highly

5    inefficient.  Also, it would just be completely inappropriate,

6    given the scope of the -- just the general three topics that

7    the witness is supposed to be testifying about.  That's kind of

8    the practical problem that we see.

9         And we're happy to go ahead and go take the deposition,

10   but I fear that what we're going to get is, where they've set

11   forth in this detailed letter this path, this narrow path that

12   they want this witness to travel, it's just going to be a huge

13   problem because the path has nothing to do with the areas that

14   we're entitled to take discovery.

15        **THE COURT:**  The problem is, we're never going to get

16   to that depo if I leave it to you all just to negotiate the

17   scope.  We're never.  It'll be five months from now until it

18   gets there.  It just needs to get started and get there.

19        I mean, maybe -- I think the place to start, actually, is

20   for Facebook to identify:  Here's the general topics.

21        I mean, they're not -- it shouldn't -- it's not -- this is

22   pretty basic stuff in some sense.  Right?  This is to get at

23   the basic.  Like, one of the main questions is user data, what

24   is collected and what is done with it.  Right?  That's it.

25   That's it.

1    And so there have been representations that have been made

2    that the stuff that's been produced is all.  So there are

3    people there.

4    So, Facebook, identify to plaintiffs who's going to be the

5    deponent.  Right?

6    That'll then let you know somewhat what that person knows

7    or doesn't know.  And then the same thing with the

8    monetization.

9    I think that's a start, and then you go and we'll see what

10   we get.  And if you don't get what I think you should get, no

11   one's going anywhere; we can come back and do it again.  This

12   is just to try to break through that logjam and get started.

13   **MR. LOESER:**  I hear that, Your Honor, and I appreciate

14   that.  And obviously, we will jump right in and try and do

15   that.  I think Facebook obviously understands that this is a

16   witness that's supposed to be prepared to testify, and so

17   hopefully the witness comes prepared to testify about the full

18   range of topics that these issues relate to.

19   **THE COURT:**  Well, that's what Ms. Stein said.  That's

20   why she sent the letter, because they understand that they have

21   to prepare the witness to testify.

22   **MR. LOESER:**  But --

23   **MS. STEIN:**  That's exactly --

24   **MR. LOESER:**  -- I mean, I don't want to bore -- you

25   know, I'm sorry to -- we can move on; but what the letter says

1   is what they're going to prepare the witness to testify about.

2        THE COURT:  That's what I said.  Isn't that what I

3   said at the beginning?  That's what I said.  They heard it.

4   I'm confident that they heard it, that that's not going -- that

5   that's not going to happen.

6        For example, it can't be -- I'll give you an example.

7        Well, did you gather this type of -- did you gather this

8   type of information about users?

9        No.  The witness can't answer that because that

10  information wasn't shared.

11       Right?

12       MR. LOESER:  Okay.

13       THE COURT:  That's a different question.  The question

14  is what did they gather, and then what was shared.

15       MS. STEIN:  Right.

16       THE COURT:  Whether it was shared or not.  Right?

17       Ms. Stein is shaking --

18       MS. STEIN:  Right.

19       THE COURT:  -- her head "yes."

20       We're all --

21       MS. STEIN:  Right.

22       THE COURT:  -- on the same --

23       MR. LOESER:  Right.  And so --

24       MS. STEIN:  We understand --

25       MR. LOESER:  -- by the same --

1      **MS. STEIN:** -- that, and that was what our letter was

2    intended to communicate, that they would get to ask questions

3    about the scope of what was collected and then they would

4    narrow it down to find out what was shared or accessed.

5        But Mr. Loeser identified our concern, Your Honor, is that

6    they're primed to say that our witness isn't prepared.  And we

7    really -- we take this seriously.  It's important.  We know

8    it's binding on the company.  And so we want to do the best

9    that we can to, you know, make everyone happy here.

10       You know, we will take Your Honor's topics.  Our letter

11   should not be viewed as a directive.  If there's something that

12   plaintiffs looked at and think is missing, you know, we should

13   discuss that before the depositions so that we know and we can

14   make sure the witness is prepared.

15       But we were trying to cover the -- in doing this letter,

16   we were trying to cover the landscape of everything.  And,

17   you know, I'm sorry some of it sounded like a directive.  We

18   were just really trying to flesh out what we thought this

19   meant.  And the categories of things that we listed of what was

20   collected, we think that's everything.  So we were just really

21   trying to be comprehensive here so that we were all on the same

22   page.

23       **THE COURT:**  So, Mr. Loeser, if you look at the topics

24   from their letter, as opposed to what's underneath, does that

25   cover -- I think that covers everything.

1          **MS. WEAVER:**  I think, Your Honor --

2          **MR. LOESER:**  Well, not really.  I mean, the topics

3    identify the categories that are indicated in the Court's

4    orders; but then there's this complicated roadmap about what is

5    and isn't going to be testified about.

6          **THE COURT:**  That's why I said if you just look at the

7    topics, that covers everything -- right? -- the topics.

8          **MR. LOESER:**  Well, I believe that the topics identify

9    the categories that are set forth in the order.  So --

10          **THE COURT:**  Okay.

11          **MR. LOESER:**  -- yes, those are the topics.

12          **THE COURT:**  There we are.  So that's the guidance.

13    That's what the witness should be prepared to testify to.

14       And as I said, and Facebook said they understand.  That

15    Facebook believes something wasn't shared or that the purpose

16    ultimately wouldn't be admissible is not a reason not to answer

17    the question.  Right?

18          **MR. LOESER:**  Okay.  And so we're not --

19          **THE COURT:**  It's discovery --

20          **MR. LOESER:**  -- doing things --

21          **THE COURT:**  -- as to what user was -- what information

22    was collected, what did they do with it, how, why.

23       And then, where that leads to, what the consequence of

24    that is, who knows?

25          **MR. LOESER:**  So let me just --

1        **THE COURT:**  Great.

2        **MR. LOESER:**  Not to beat a dead horse, to use a bad

3   metaphor here, but the -- I'll just read a statement in their

4   letter, and I think that this will provide clarification on

5   what will happen with that.

6        Page 3 of their letter, at the bottom of the page, there's

7   a statement (reading):

8            "Facebook does not intend for its designee to

9        provide details regarding the categories of

10       information it may have received from third parties,

11       except as described below."

12       Well, we're not going to limit our questioning to the

13  narrow scope that this letter seems to suggest the witness will

14  be testifying about.

15       And I think what Your Honor is saying is we're just

16  focused on the main topics; we don't need to worry about the

17  limitations set forth in this letter because the witness will

18  be prepared to testify about the full topic; and it's

19  testimony -- Facebook will not have made the decision not to

20  prepare the witness to testify to this limitation that's set

21  forth in this letter.

22       **THE COURT:**  Well, I guess the question is "details."

23  Right?  Details, I don't know what that means, "details,"

24  versus sort of categories or things like that.  If we're going

25  to go into details about all those, then you're going to run

1    out of time.  So -- right?

2        It's sort of a high-level:  Genesis of it was, again, that

3    Facebook's representation, after we went through all this

4    briefing about the scope of discovery as to plaintiffs' user

5    information, that they had, in fact, produced all of

6    plaintiffs' user information.  So, that is shared.

7        So let's now find out what is it that they collect about

8    users.

9            **MR. LOESER:**  Okay.  I hear Your Honor.

10           **THE COURT:**  Whether it be from a third party, whether

11   it be from their own -- whatever it is.  Whatever it is.  What

12   is it?

13       And categories.  Right?  If there's a particular detail,

14   they're not going to be able to go into details about -- I

15   don't know -- which apps or this or that or that.  Right?  This

16   is just --

17           **MR. LOESER:**  No.  I hear that.

18           **THE COURT:**  -- high level.

19           **MR. LOESER:**  And I agree with you.

20           **MS. WEAVER:**  Your Honor --

21           **MS. KUTSCHER CLARK:**  And, Your Honor --

22           **MR. LOESER:**  All I'm talking --

23           **MS. WEAVER:**  You're right.  Let's get started.  We'd

24   love a date, and we will take this deposition according to your

25   direction.

1    And so if Ms. Stein wants to identify who they'll be

2    producing, we're ready, you know, early February to take this

3    deposition.

4         THE COURT:  Well, I don't know about -- in February.

5         But, Ms. Kutscher Clark, you were trying to say something.

6         MS. KUTSCHER CLARK:  Oh.  I just wanted to assure

7    the Court that the type of language surrounding the type of

8    detail that would be testified to is really intended to zoom in

9    on what's relevant here.

10        The idea was, to the extent the deponent, for instance,

11   testifies that particular data is used only for a security

12   feature, you know, to make sure that there isn't a security

13   breach on the platform, they don't then need to go into detail,

14   for instance, about how that security feature operates.

15        That's all we're intending to convey there.  Let's get to

16   the types of data and the types of uses that are actually

17   relevant here, and, of course, we'll provide testimony about

18   that.  But if it's clearly outside the scope of what we're

19   talking about in this case, a high-level explanation should be

20   sufficient.

21        THE COURT:  Okay.  I don't think Mr. Loeser disagrees

22   with that.

23        MR. MONTGOMERY:  Before Your Honor has to leave us,

24   can I just clarify that we're talking about, really, two

25   depositions:  one deposition about the monetization and one

```
 1   deposition about data?

 2           THE COURT:  Yeah.  I mean, I don't know.  It seems

 3   like the data would be the longer deposition.  Right?

 4           MR. MONTGOMERY:  I think we're anticipating, you know,

 5   a full day for each, if that's permissible by the Court.

 6           MS. STEIN:  That sounds -- for, you know, a 30(b)(6)

 7   and when -- on two topics, when you often get seven hours for

 8   one 30(b)(6), like, we understand these are important topics,

 9   but, you know, I think two full days is, you know, a little bit

10   of overkill here.  I think, you know, a few hours --

11           THE COURT:  Ten hours.

12           MS. STEIN:  -- each for an --

13           THE COURT:  Ten hours.  Ten hours.  And I would think

14   that plaintiffs would want most of it to go to the user

15   information.  I mean, that -- I mean, seven hours for that

16   I think you could do easily.  I don't know.  Maybe not.  I

17   don't know.

18       Ten hours.

19           MS. WEAVER:  We will take the deposition, and we will

20   report back.

21           THE COURT:  But not in -- ten hours over two days,

22   though -- right? -- not one day.  Or even more.  However you

23   want to do it.

24       Okay.  Excellent.

25           MS. STEIN:  And, Your Honor, just for clarification,
```

 1   you know, I understand that plaintiffs want the identities of

 2   these witnesses.  I don't know them yet.  I don't know who --

 3          THE COURT:  Oh, no, no, no.  I understand you don't.

 4   No, no.  They didn't -- I actually brought that up.

 5       I just thought, when you tell them, then that gives them

 6   comfort -- right? -- that you're not taking the engineer from

 7   wherever.  Right?  You're actually -- there are people within

 8   Facebook who actually know this information -- right? -- that

 9   they're high enough up that they have the big picture.

10          MS. STEIN:  Right.

11          THE COURT:  So my thinking was that when you share

12   that name, that'll give them some comfort that the person will

13   be -- when you say "be prepared" -- right? -- it's like you

14   can't tell them what -- you can prepare them in the sense of

15   what they should prepare to testify.  They're going to have to

16   know or do the gathering to know.

17          MS. STEIN:  Correct, Your Honor.

18       One thing that I would just appreciate some clarification

19   on.  These witnesses are not being deposed in their personal

20   capacity right now.  So I just want to make sure that we're not

21   going to be -- you know, by giving them the names in advance,

22   we're not going to be seeing e-mails that these people are

23   being shown and impeached and whatnot; that this is a

24   deposition to get information from them, but not to start a

25   whole cross-examination of them in their personal capacity.

1          **MS. WEAVER:**  Deb, we agree with that, except to the

2     extent if it relates to the topic of the deposition, we may

3     introduce -- obviously, we'll be introducing exhibits and if a

4     deponent's name has to be on it.

5          But we agree, not personal capacity.  This is a

6     corporate deposition, both of them.

7          **THE COURT:**  There may be e-mails.  Right?  There's

8     documents they reviewed that lead them to believe that there

9     was other user information that was collected about users.

10    Right?  So they will probably show the deponent one of those

11    e-mails and say:  Well, doesn't this mean this?  Right?

12         **MS. STEIN:**  Yes, Your Honor.

13         **THE COURT:**  That would be the objective.

14         **MS. STEIN:**  I normally -- unless someone is also being

15    deposed in their personal capacity, I normally don't share the

16    name of a 30(b)(6) deponent in advance of a deposition.  So I

17    just don't want this to sort of get turned into something that

18    is not a 30(b)(6) deposition.

19         **THE COURT:**  Okay.  It won't.  All right?  And there'll

20    be a record.  So no worries.

21         **MS. WEAVER:**  And is Your Honor planning on providing

22    dates for the depositions?

23         **THE COURT:**  No.  I said it needs to happen by -- in

24    February.

25         **MS. WEAVER:**  Okay.  Is this a leap year?

```
 1                        (Laughter.)
 2          THE COURT:  I don't think so.
 3          MS. WEAVER:  I think not.
 4          MS. STEIN:  It's an odd year; so I don't think so.
 5          MS. WEAVER:  Sorry, Deb.  No February 29th.
 6          THE COURT:  Okay.  I have a change of plea.
 7      Just let me give some guidance as to deposition
 8  transcripts or written discovery.  I mean, clearly, anything
 9  that Facebook has said under oath about relevant topics is
10  relevant.  And I would think discovery, unless there's some
11  privilege I'm not aware of -- right?  So if they did an
12  interrogatory answer on a relevant topic, that's discoverable.
13          MS. STEIN:  Your Honor, this is a very serious issue
14  for us, especially because this is in the context of government
15  investigations.  And we're dealing with government entities who
16  often don't even want us to get the transcript because it's
17  their investigation.  So, you know, having this clone discovery
18  issue about what's going on in government investigations is a
19  very significant issue, and respectfully --
20          THE COURT:  Well, that's different than -- that's
21  different than an interview.  I thought what was in the letter
22  was depositions.
23          MS. WEAVER:  Your Honor, it's both depositions and the
24  FTC, who has unequivocally stated in this proceeding that they
25  do not object to us receiving information.  We have the FTC's
```

```
 1   written letters that ask for sworn responses to substantive
 2   answers.
 3            THE COURT:  So, okay.  Let me just, because I'm --
 4            MS. WEAVER:  We just want --
 5            THE COURT:  I'm just giving guidance.  I'm not ruling.
 6   I'm just giving guidance because it's not ripe and presented to
 7   me.
 8       My guidance is, for example, if -- it's almost like Jencks
 9   material.  Right?
10            MS. WEAVER:  Right.
11            THE COURT:  If a witness made statements on the
12   topics, if they're going to be a witness in the case, if
13   they're going to be deposed, then I think it's certainly
14   relevant what they said under oath in another case on the same
15   topics.  Right?  Not if it was unrelated.  And the same thing
16   with interrogatory responses.  And then I gave a caveat, which
17   is, unless there's some privilege of which I'm not aware.
18       That's all.  That's just the guidance that I'm giving.
19            MS. WEAVER:  Okay.  We will bring it before you if we
20   can't resolve it.
21            THE COURT:  Okay.  I guess we need a next date.  What
22   is today?  Today is the 15th.
23       How about February 24th at 8:30?  Maybe you'll have taken
24   that depo, and I'm sure there'll be lots to discuss.
25                         (Laughter.)
```

1           MS. WEAVER:  That's fine here.

2           MS. STEIN:  That's fine, Your Honor.

3           MR. LOESER:  We will all be so knowledgeable by then,

4  Your Honor.

5                         (Laughter.)

6           THE COURT:  It's true.  I wish I could take the depo.

7  I would.

8           MR. LOESER:  You really are invited.  We'll send

9  you --

10          MS. WEAVER:  You know, some judges have done things

11 like that.

12          THE COURT:  Yeah.  I wish I had time, but no time.

13     All right.  Thank you very much.

14          MS. STEIN:  Thank you, Your Honor.

15          MS. WEAVER:  Thank you, Your Honor.

16          MR. LOESER:  Thank you, Your Honor.

17             (Proceedings adjourned at 9:05 a.m.)

18                       ---o0o---

19

20

21

22

23

24

25

1

2                       <u>CERTIFICATE OF REPORTER</u>

3           I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6     DATE:  Monday, January 18, 2021

7

8     _____

9           Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
                  Official Reporter, U.S. District Court

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT H

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS RELATED TO FACEBOOK'S APP DEVELOPER INVESTIGATION**<br><br>Judge:  Hon. Jacqueline Scott Corley<br>Courtroom:  4, 17th Floor |

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   STATEMENT OF FACTS .................................................................................4

    A.    Facebook's Enforcement Efforts ...........................................................4

    B.    Plaintiffs' Requests for the ADI Materials............................................7

    C.    Status of the Massachusetts Attorney General Action...........................9

III.  ARGUMENT ....................................................................................................10

    A.    The ADI Materials Are Not Protected by the Work Product Doctrine................10

        1.    Applicable Standard ..................................................................10

        2.    The ADI Materials Were Prepared to Assure the Public that
             Facebook Cared About User Privacy ........................................10

        3.    Even if Facebook Had Conducted the ADI Partially in Anticipation
             of Litigation, the ADI Materials Would Still Not Be Protected ...............11

        4.    Plaintiffs Have a Substantial Need for the ADI Materials and Cannot
             Obtain Their Substantial Equivalent by Other Means.............................13

    B.    The ADI Materials Are Not Protected by the Attorney-Client Privilege..............14

        1.    Applicable Standard ..................................................................14

        2.    The Underlying Facts and Information Part of the ADI Are Not
             Privileged ..................................................................................15

        3.    Because the Attorney Client Privilege Does Not Protect
             Communications Made Primarily for Business Purposes, Facebook
             Cannot Claim Privilege Over All the ADI Materials. .............................16

        4.    Even if Facebook's Claim of Privilege is Accepted, Should
             Facebook Rely on the ADI as a Defense, the Privilege Is Waived...........19

IV.   CONCLUSION .................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Marsh*,
   312 F.R.D. 584 (E.D. Cal. 2015) ...................................................................................12

*Attorney General v. Facebook, Inc.*,
   No. SJC-12946 (Dec. 4, 2019),
   https://boston.suffolk.edu/sjc/pop.php?csnum=SJC_12946..................................................10

*In re Capital One Consumer Data Sec. Breach Litig.*,
   No. 1:19MD2915, 2020 WL 2731238 (E.D. Va. May 26, 2020), *aff'd*, 2020
   WL 3470261 (E.D. Va. June 25, 2020)................................................................................12

*Chevron Corp. v. Pennzoil Co.*,
   974 F.2d 1156 (9th Cir. 1992) .....................................................................................19

*Connolly Data Sys., Inc. v. Victor Techs., Inc.*,
   114 F.R.D. 89 (S.D. Cal. 1987)....................................................................................10

*In re CV Therapeutics, Inc. Sec. Litig.*,
   No. C-03-3709 ..........................................................................................................17

*Datel Holdings Ltd. v. Microsoft Corp.*,
   No. 09-cv-05535, 2011 WL 866993 (N.D. Cal. Mar. 11, 2011) ...........................................18

*District of Columbia v. Facebook, Inc.*,
   No. 2018-CA-008715-B (D.C. Super. Ct. 2018) .................................................................10

*Dolby Labs. Licensing Corp. v. Adobe Inc.*,
   402 F. Supp. 3d 855 (N.D. Cal. 2019)................................................................ 14, 16, 18

*F.D.I.C. v. Fid. & Deposit Co. of Md.*,
   196 F.R.D. 375 (S.D. Cal. 2000)...................................................................................10

*Fourth Age Ltd. v. Warner Bros. Dig. Distrib., Inc.*,
   No. CV 12-09912 AB (SHX), 2015 WL 12720324 (C.D. Cal. Aug. 6, 2015).....................16

*Healey v. Facebook, Inc.*,
   Suffolk Superior Court Action No. 1984CV02597-BLS-1 (Jan. 17, 2020),
   https://newenglandinhouse.com/files/2020/01/Short-Form-Decision-and-
   Order-Regarding-AGs-Petition-to-Compel-Compliance-with-CID-Facebook-
   Jan.-2020.pdf................................................................................................... 5, 9, 10

*LightGuard Sys., Inc. v. Spot Devices, Inc.*,
   281 F.R.D. 593 (D. Nev. 2012).....................................................................................17

*Marceau v. IBEW*,
 246 F.R.D. 610 (D. Ariz. 2007) ......................................................................16

*MediaTek Inc. v. Freescale Semiconductor, Inc.*,
 No. 4:11–cv–05341 YGR (JSC), 2013 WL 5594474 (N.D. Cal. Oct. 10, 2013) ..................18

*Neuder v Battelle Pac. Nw. Nat'l Lab.*,
 194 F.R.D. 289 (D.D.C. 2000)........................................................................17

*Newport Pac. Inc. v. Cty. of San Diego*,
 200 F.R.D. 628 (S.D. Cal. 2001)......................................................................10

*SanDisk Corp. v. Round Rock Research LLC*,
 No. 11-CV-05243-RS (JSC), 2014 WL 691565 (N.D. Cal. Feb. 21, 2014)..........................16

*Shopify Inc. v. Express Mobile, Inc.*,
 No. 20-MC-80091-JSC, 2020 WL 4732334 (N.D. Cal. Aug. 14, 2020) ........................17, 18

*Sky Valley Ltd. P'ship v. ATX Sky Valley, Ltd.*,
 150 F.R.D. 648 (N.D. Cal. 1993) ......................................................................15

*Stevens v. Corelogic, Inc.*,
 No. 14-cv-1158-BAS(JLB), 2016 WL 397936 (S.D. Cal. Feb. 2, 2016)..............................17

*Thompson v. C & H Sugar Co.*,
 No. 12-CV-00391 NC, 2014 WL 595911 (N.D. Cal. Feb. 14, 2014)..................................13

*United Coal Cos. v. Powell Constr. Co.*,
 839 F.2d 958 (3d Cir. 1988) ..........................................................................10

*United States v. Bilzerian*,
 926 F.2d 1285 (2d Cir. 1991)...........................................................................19

*United States v. Christensen*,
 828 F.3d 763 (9th Cir. 2015) ..........................................................................17

*United States v. Martin*,
 278 F.3d 988 (9th Cir. 2002) ..........................................................................14

*United States v. Richey*,
 632 F.3d 559 (9th Cir. 2011) .............................................................. 3, 11, 12, 14

*Upjohn Co. v. United States*,
 449 U.S. 383 (1981)....................................................................................15

*Vallabharpurapu v. Burger King Corp.*,
 276 F.R.D. 611 (N.D. Cal. 2011)......................................................................14

*Waymo LLC v. Uber Techs., Inc.*,
No. 17CV00939WHAJSC, 2017 WL 2485382 (N.D. Cal. June 8, 2017) ............................13

**Other Authorities**

Facebook's Use and Protection of User Data: Hearing Before the H. Energy and
Commerce Comm. ("Zuckerberg Statement"), 2018 WL 1757479 (Apr. 11,
2018) .................................................................................................................... 7, 11, 12

Fed.R.Civ.P. 26(b)(3) ................................................................................................. 10, 13

LOCAL RULE 5-1(i)(3) ...................................................................................................22

## I.    INTRODUCTION

In 2018, the world learned that Cambridge Analytica's app on the Facebook platform had misused a substantial and alarming amount of Facebook users' private information. In the wake of this scandal, Facebook publicly announced the App Developer Investigation ("ADI"), described as an effort to investigate whether other apps may have similarly misused users' information. Facebook said the ADI would review every app on the platform "that had access to large amounts of information," and that it would involve hundreds of people, including not just attorneys, but also "external investigators, data scientists, engineers, policy specialists, platform partners and other teams across the company."[1] The ongoing ADI has thus far resulted in the suspension of tens of thousands of apps for reasons including "inappropriately sharing data obtained from [Facebook], making data publicly available without protecting people's identity or something else that was in clear violation of [Facebook's] policies."[2]

Facebook has characterized the ADI as a new and distinct endeavor that was *entirely* lawyer-driven, and thus entirely privileged. In reality, the ADI was a continuation of Facebook's longstanding if lackluster investigative and enforcement efforts. Long before the ADI began, Facebook's DevOps team attempted—unsuccessfully—to enforce policies designed to prevent third party apps from misusing user information. Dressed up with a new name and trumpeted with repeated press releases, the stated purpose of the ADI was the same as FB's existing program: to protect users' data from misuse by third-party apps.

Given the clear relevance of the ADI to Plaintiffs' claims, Plaintiffs seek discovery related to the ADI that does not explicitly contain legal advice. But to date, Facebook has refused to produce virtually all documents generated or uncovered by the ADI ("the ADI Materials"), claiming that they are shielded from production by work product or attorney client privilege. Pursuant to this Court's instructions and the parties' agreement, Facebook has now produced

---

[1] *An Update on Our App Developer Investigation*, Facebook (Sept. 20, 2019), https://about.fb.com/news/2019/09/an-update-on-our-app-developer-investigation/
[2] *Id.*

privilege logs for six apps investigated as part of the ADI, containing over 6,000 entries.[3] These logs show that, other than correspondence with the app developers related to the Requests for Information ("RFIs") sent by Facebook, the Company is claiming work-product protection and attorney-client privilege over every email, chart, table, slide, image, diagram, agenda, task list, chart, and spreadsheet associated with the investigation. Facebook has asserted that every one of those documents in the logs is privileged in full and has withheld each of them in their entirety.

From these sample logs, Plaintiffs identified 400 entries that fail to identify an attorney as an author or recipient. From these 400, pursuant to Discovery Order No. 12, ECF No. 602, Plaintiffs selected 20 for *in camera* review.[4] Following that review, informed by the Court's review of the 20 documents as well as the arguments below, Plaintiffs respectfully ask the Court to rule that the ADI is not categorically work product or privileged. Importantly, Plaintiffs rely in this motion solely upon items in the public record, cognizant of this Court's admonition against declarations and evidentiary submissions.[5]

First, Facebook's blanket work-product claims fail both because the ADI was not conducted in anticipation of litigation and because the logs do not identify any such litigation. Rather, Facebook repeatedly and publicly stated that the purpose of ADI was not to prepare for litigation but to "make sure that people can continue to enjoy engaging social experiences on Facebook while knowing their data will remain safe."[6] Because the stated purpose of the ADI

---

[3] Joint Status Update at 4, ECF No. 599 (Jan. 24, 2021). These six are the apps the parties agreed upon as a sampling of the more than 100,000 apps Facebook identified as part of the ADI. *See* Facebook, Inc.'s Administrative Mot. to File Under Seal, ECF No. 514; *see also* Stipulation & Order re Process to Log Exemplar Materials from Facebook's App Developer Investigation, ECF No. 518; Further Stipulation & Order re Process to Log Exemplar Materials from Facebook's App Developer Investigation, ECF No. 533.

[4] Joint Status Update at 4. In addition, the electronic versions of the logs containing the 400 entries without an attorney and the 20 selected by Plaintiffs for *in camera* review were provided to the Court in connection with the parties' stipulation that the Court entered on the day of this filing, February 5, 2020. *See* ECF No. 610, ¶ 3.

[5] *See* Hr'g Tr. 11:2-16 (Jan. 15, 2021) ("*I don't want declarations. I don't want declarations … No declarations.*") (emphasis added). To the extent Facebook relies on declarations in its brief, Plaintiffs respectfully request the Court strike and ignore them.

[6] *An Update on Our App Developer Investigation*, *supra* note 1.

was to reassure users that Facebook would protect user data, not to prepare for litigation, it is not entitled to work-product protection.

Second, even if Facebook had an unstated litigation-related motive for conducting the ADI, the law is clear that to claim work-product protection over such dual-purpose documents, Facebook must establish that the documents at issue would not have been produced in substantially similar form absent the prospect of litigation. *United States v. Richey*, 632 F.3d 559, 567–68 (9th Cir. 2011). Here, Facebook has repeatedly claimed that it had been investigating third-party misuse of Facebook users' information since at least 2012. App reviews were business as usual and would have been performed whether litigation was anticipated or not. They are thus not work product.

Third, the ADI Materials are not categorically protected by the attorney-client privilege. The privilege does not apply to the underlying facts and information regarding the ADI, including the information Plaintiffs seek, including which third-party apps violated which policies over what period of time, and what user data and information these third parties obtained and ultimately misused. Plaintiffs are entitled to this information given the central relevance of the ADI to Plaintiffs' claims—and in particular to the fourth category of misconduct upheld by Judge Chhabria regarding Facebook's failure to monitor (*see* Pretrial Order No. 20 at 9-10, ECF No. 298).

Finally, the ADI Materials are not protected by the attorney-client privilege because the privilege does not protect communications made primarily for business purposes. The mere presence of attorneys does not change that fact, particularly where, as Facebook itself admits, the investigation involved hundreds of non-attorneys—many of whom were engaged in the effort before it was rebranded "the ADI." And where *no attorneys are present*, as is the case with respect to the entries submitted here, Facebook's argument is even weaker.

Thus, Plaintiffs respectfully request that, in addition to any guidance the Court sees fit to provide, the Court order that (1) the 20 documents selected for *in camera* review should be produced, (2) Facebook is not entitled to a categorical claim of privilege over the entirety of the

ADI, and (3) Facebook produce, at a minimum, all of the underlying facts and information regarding the ADI, including which third-party apps violated which Facebook policies over what period of time and what user information they obtained and misused.

Significantly, at 4:02 p.m. on the day this brief was due to be filed, Facebook sent Plaintiffs a letter (attached hereto as Exhibit A), stating that one of the 20 documents Plaintiffs selected for *in camera* review is not in fact privileged and seeming to suggest that the procedure agreed to by the parties and ordered by the Court should somehow be altered accordingly. This letter came on the day of filing even though Plaintiffs identified the document at issue to Facebook more than two weeks ago, on January 21, 2021, and Facebook had several weeks to review and log these documents. The letter itself demonstrates that there is little or no distinction between ADI and Facebook's other enforcement efforts. In any event, Plaintiffs insist that Facebook submit this document for *in camera* review along with the remaining selected entries in accordance with the parties' stipulation governing this process.[7]

## II.      STATEMENT OF FACTS

### A.      Facebook's Enforcement Efforts

Long before Facebook first announced the ADI, Facebook's purported promise to enforce privacy protections were critical to users and a key business strategy for the company. It had policies in place to attempt to enforce third-party app developers from misappropriating user data and information. For example, from at least 2010 to 2014, the Platform Policy, which governed the conduct of apps on the platform, stated that Facebook "can take enforcement action against you and any or all of your applications if we determine in our sole judgment that you or your application violates Facebook Platform Terms and Policies."[8] From 2014 to at least 2018, the Platform Policy stated that Facebook "may enforce against your app or website if we conclude

---

[7] *See* ECF No. 514, *supra* note 3.
[8] *Facebook Platform Policies* (Apr. 25, 2012),
https://web.archive.org/web/20120501025801/http://developers.facebook.com/policy/ (last visited Feb. 5, 2021).

that your app violates our terms or is negatively impacting the Platform."[9] The Platform Policy

also indicated that "[e]nforcement is both automated and manual, and can include disabling your

app, restricting you and your app's access to platform functionality, requiring that you delete

data, terminating our agreements with you and any other action that we deem appropriate."[10]

Facebook's Statement of Rights and Responsibilities ("SRR")—governing Facebook's

relationship with users—affirmed this promise of enforcement, stating from at least August 2009

to April 2018 that Facebook would "require applications to respect your privacy, and your

agreement with that application will control how the application can use, store, and transfer that

content and information."[11] The SRR further stated that application developers must meet or

comply with the requirements set out in Facebook's Platform Policies.[12]

     Indeed, in 2012 Facebook claimed that it had "put in place an enforcement program to

prevent and respond to potential developer misuse of user information" (the "Enforcement

Program").[13] According to Facebook, its internal "Development Operations" or "DevOps" team

"has consistently played a central role in enforcing Facebook's [P]olicies and protecting user

data and Facebook's Platform."[14] This ongoing enforcement program included the "regular and

proactive monitoring of apps" and investigations into "potential app violations."[15]  Facebook

---

[9] *Facebook Platform Policy* (Mar. 25, 2015),
https://web.archive.org/web/20160412175450/https://developers.facebook.com/policy/ (last
visited Feb. 5, 2021).

[10] *Id.*

[11] *Second Amended Consolidated Complaint* ¶ 559, ECF No. 491 (citing *Statement of Rights and Responsibilities*, Facebook (June 18, 2010),
https://web.archive.org/web/20100618224059/http://www.facebook.com/terms.php (last visited
Feb. 5, 2021).

[12] *Id.*

[13] Decision & Order re Attorney General's Petition to Compel Compliance with Civil
Investigative Demand Pursuant to G.L. c. 93A, § 7 ("*Healey* Order") at 3 (citing the Petition to
Compel Compliance with Civil Investigative Demand Pursuant to G.L. c. 93A, § 7 (the
"Petition") ¶ 27), *Healey v. Facebook, Inc.*, Suffolk Superior Court Action No. 1984CV02597-
BLS-1 (Jan. 17, 2020), https://newenglandinhouse.com/files/2020/01/Short-Form-Decision-
and-Order-Regarding-AGs-Petition-to-Compel-Compliance-with-CID-Facebook-Jan.-
2020.pdf.

[14] *Id.* (citing Petition ¶ 28).

[15] Letter from Facebook, Inc. to Chairman Chuck Grassley, Ranking Member Dianne Feinstein,
U.S. Senate Committee on the Judiciary, *Facebook's Response to U.S. Senate Committee on*

also stated, "we regularly take enforcement action against apps. For example, in 2017, we took action against about 370,000 apps, ranging from imposing certain restrictions to removal of the app from the platform."[16]

Thus, at least since 2012, Facebook has claimed that it was investigating, evaluating, and taking action against app developers that were violating its policies. Of course none of this was effective. Indeed, in the wake of the Cambridge Analytica scandal and the vast amounts of data being misused by this particular app, Facebook rechristened its enforcement efforts as the "ADI" and issued press releases seeking to reassure users that it was protecting their data. The first such press release, in March 2018, stated that the ADI involved a "review all of the apps that had large amounts of information."[17] Facebook touted the breadth of the effort, saying that:

> It has involved hundreds of people: attorneys, external investigators, data scientists, engineers, policy specialists, platform partners and other teams across the company. *Our review helps us to better understand patterns of abuse in order to root out bad actors among developers.*
>
> We initially identified apps for investigation based on how many users they had and how much data they could access. Now, we also identify apps based on signals associated with an app's potential to abuse our policies. *Where we have concerns, we conduct a more intensive examination. This includes a background investigation of the developer and a technical analysis of the app's activity on the platform.* Depending on the results, a range of actions could be taken from requiring developers to submit to in-depth questioning, to conducting inspections or banning an app from the platform.[18]

In September 2019, Facebook claimed that the ADI had investigated millions of apps, suspended tens of thousands, and that the ADI was "not yet complete" as Facebook continued to investigate and suspend apps.[19]

Facebook also launched a public-relations campaign led by CEO Mark Zuckerberg. Zuckerberg made public posts to users describing Facebook's ongoing efforts and

---

*the Judiciary Questions for the Record* at 121-22 ("Facebook's Response") (June 8, 2018), https://www.judiciary.senate.gov/imo/media/doc/Zuckerberg%20Responses%20to%20Judiciar y%20Committee%20QFRs.pdf.

[16] *Id.* at 6.

[17] *An Update on Our App Developer Investigation, supra* note 1.

[18] *Id.* (emphasis added).

[19] *Id.*

acknowledging their continuation, noting that the Company took "important steps a few years ago in 2014 to prevent bad actors from accessing people's information . . . But there's more we need to do and I'll outline those steps here: First, we will investigate all apps that had access to large amounts of information before we changed our platform to dramatically reduce data access in 2014, and we will conduct a full audit of any app with suspicious activity."[20] In April 2018, Zuckerberg testified to Congress that "[w]e're now investigating every single app that had access to a large amount of people's information on Facebook in the past. And if we find someone that improperly used data, we're going to ban them from our Platform and tell everyone affected."[21] He admitted "that we didn't do enough" to protect users' data. "We didn't take a broad enough view of our responsibility," he said, "and that was a big mistake, and it was my mistake, and I'm sorry. I started Facebook, I run it, and I'm responsible for what happens here."[22]  Such public proclamations do not portray a confidential, lawyer-driven inquiry conducted for litigation purposes only.

## B.    Plaintiffs' Requests for the ADI Materials

In November 2019, Plaintiffs issued document requests for information related to the ADI, and, in particular, documents related to two phases of the ADI: Enhanced Examination and Enforcement. These phases, under which suspicious apps were "escalated" for special investigation or action, were disclosed in a declaration that Facebook submitted in the Massachusetts Attorney General's action against it. After meeting and conferring over this request for over four months, Facebook told Plaintiffs and the Court that the ADI was *categorically privileged* except for a limited set of documents related to RFIs that Facebook had sent to third-party app developers and to the apps' responses to those RFIs.  Plaintiffs then sought guidance from the Court in June and July 2020, asking to brief these issues.

The Court initiated the process that led to this briefing. The parties spent the next several

---

[20] Mark Zuckerberg ("Zuckerberg Post"), Facebook (Mar. 21, 2018), https://www.facebook.com/zuck/posts/10104712037900071

[21] *Facebook's Use and Protection of User Data: Hearing Before the H. Energy and Commerce Comm.* ("Zuckerberg Statement", 2018 WL 1757479 at 10 (Apr. 11, 2018).

[22] *Id.* at 9.

weeks negotiating a protocol to select apps for which Facebook could conduct a review, producing non-privileged documents and logging the rest. The parties selected six apps from three different categories: apps that were investigated but not suspended in the ADI; apps that were suspended for non-cooperation; and apps that were suspended for some reason other than non-cooperation.[23] The parties also agreed on a set of custodians for Facebook to review.[24]

Ultimately, in December 2020, Facebook produced six different privilege logs (one for each app) totaling over 6,000 entries.[25] Every single document identified in these logs is being withheld in its entirety. The entries included not just emails but excel files, agendas, chats, slides, images, tables, task trackers, diagrams, and reports.[26] And, despite Facebook's promise that Plaintiffs would receive a "cornucopia" of information about the six apps,[27] Facebook has produced only 65 pages of material reflecting Facebook's RFIs from these apps, and in some instances, the apps developers' RFI responses.

In reviewing Facebook's logs, Plaintiffs identified 400 entries that reflect no attorneys.[28] The attorney-free entries include a handful of emails conclusively stating that they reflect the sharing of legal advice, and also attachments such as agendas, images, tables, slides, diagrams, excel files, data files, graphics, task trackers, chat messages, and charts.[29] For instance, one of these entries indicates that it is an █████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████[30]

---

[23] *See* Decl. of Martie Kutscher in Supp. of Facebook, Inc.'s Administrative Mot. to File Under Seal, ECF No. 514-1 at Ex. A(1)(B).

[24] *Id.*

[25] Joint Status Update at 4.

[26] *Id.*

[27] *See* Hr'g Tr. 30:6-8 (July 13, 2020) (Mr. Snyder: "And the plaintiffs are going to have a cornucopia of information about third-party apps. And I just respectfully suggest that they be a little patient.").

[28] Joint Status Update at 4.

[29] *Id.*

[30] *See* Plaintiffs' selections to Facebook Exemplar ADI-Related Privilege Logs ("Entry Log"), line 8 of 20 (FB-ADI-0000003177-3178). The electronic version of this log was provided to the

Another indices that it is a ██████████████████████████[31]Yet
another indicates that is a ████████████████████████[32]Notably,
the attachments also include transmissions to and from third party ████████ and a file that
was created in September 2014, years before the ADI was started.[33]

Consistent with Discovery Order No. 12, Plaintiffs selected 20 of the 400 entries for an *in camera* review and notified Facebook of its selections on January 21, 2020. ECF No. 602 at 1.

## C.    Status of the Massachusetts Attorney General Action

Facebook's categorical claim of privilege over the ADI has already been considered and rejected by another court. In *Healey*, the Massachusetts Attorney General is investigating access and use of Facebook user data by third-party app developers and through that action seeks documents regarding the ADI.[34] The trial court in *Healey* rejected Facebook's work-product claim in its entirety and confined the attorney-client privilege to a small subset of documents (for which Facebook would produce a privilege log).[35] The *Healey* court specifically concluded that "Facebook's ADI is fairly described as 'business as usual.'"[36] The court continued, "[t]he record shows that Facebook, as part of its normal business operations, has been engaged in a continuous review of Platform apps for possible violations of its Policies since 2012, and that the ADI is just another iteration of that program . . The Court therefore concludes that Facebook's ADI is not being conducted 'in anticipation of litigation or for trial,' and would have been undertaken by the Company 'irrespective of the prospect of litigation.'"[37]

Facebook appealed this decision to the Massachusetts Supreme Court. The Court held

---

Court in connection with the parties' stipulation that the Court entered on the day of this filing, February 5, 2020. *See* ECF No. 610, ¶ 3.

[31] *See* Entry Log, line 9 of 20 (FB-ADI-0000004847-4850).

[32] *See* Entry Log, line 11 of 20 (FB-ADI-0000003217-3218).

[33] *See* Entry Log, line 14 of 20 (FB-ADI-0000002536-2537).

[34] *Healey* Order at 7-9.

[35] *Id.* at 16-18.

[36] *Id.* at 14.

[37] *Id.* at 14-15.

oral argument on December 4, 2020, and its decision is currently pending.[38] Notably, the Court inquired whether this Court had ruled on the ADI privilege issues. Facebook's counsel incorrectly suggested that "they may well be waiting for this Court."[39] The parties here are not and have never been waiting for any other court to rule on these issues.[40]

### III.   ARGUMENT

**A.   The ADI Materials Are Not Protected by the Work Product Doctrine**

#### 1.   Applicable Standard

Federal law provides the governing law on the scope and extent of the attorney work-product doctrine in federal court. *Connolly Data Sys., Inc. v. Victor Techs., Inc.,* 114 F.R.D. 89, 95 (S.D. Cal. 1987*); F.D.I.C. v. Fid. & Deposit Co. of Md.*, 196 F.R.D. 375, 381 (S.D. Cal. 2000); *United Coal Cos. v. Powell Constr. Co.,* 839 F.2d 958, 966 (3d Cir. 1988) ("the work-product privilege is governed, even in diversity cases, by a uniform federal standard embodied in Fed.R.Civ.P. 26(b)(3) . . ."). Under federal law, Federal Rule of Civil Procedure ("FRCP") 26(b)(3)(A) provides that, "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial . . ." Fed. R. Civ. P. 26(b)(3)(A). Further, "[t]he party seeking to invoke the work-product doctrine bears the burden of establishing that any documents claimed as work product were prepared in anticipation of litigation." *Newport Pac. Inc. v. Cty. of San Diego*, 200 F.R.D. 628, 632 (S.D. Cal. 2001). As set forth below, Facebook has failed to meet its burden here.

#### 2.   The ADI Materials Were Prepared to Assure the Public that Facebook Cared About User Privacy

Facebook and its representatives have repeatedly and publicly stated that the ADI was conducted to protect user privacy *as promised to users*.  For example, Facebook announced the

---

[38] Oral Argument, *Attorney General v. Facebook, Inc.*, No. SJC-12946 (Dec. 4, 2019), https://boston.suffolk.edu/sjc/pop.php?csnum=SJC_12946.

[39] *Id.* at 16:50.

[40] In addition to the Massachusetts Attorney General action, the District of Columbia Attorney General has an action against Facebook and has also sought to compel production of materials associated with the ADI. *See District of Columbia v. Facebook, Inc.*, No. 2018-CA-008715-B (D.C. Super. Ct. 2018).

ADI to the public, in a press release which stated in part, "[w]e have a responsibility to everyone who uses Facebook to make sure their privacy is protected. ***That's why*** we're making changes to prevent abuse."[41]  A subsequent public press release stated that reviewing apps as part of the ADI "helps us to better understand patterns of abuse ***in order to root out bad actors among developers.***"[42]  That press release continued, "our goal is to bring problems to light so we can address them quickly, stay ahead of bad actors and make sure that people can continue to enjoy engaging in social experiences on Facebook while knowing their data will remain safe."[43] Indeed, on April 10, 2018, Mark Zuckerberg, Facebook's CEO, testified to the U.S. House of Representatives that "to make sure no other app developers are out there misusing data, we're now investigating every single app that had access to a large amount of people's information on Facebook in the past."[44]  By these repeated public statements Facebook made very clear that the purpose of the ADI was to root out misbehaving apps and protect user information, not litigation. As such, the ADI Materials are not protected work product.

### 3.     Even if Facebook Had Conducted the ADI Partially in Anticipation of Litigation, the ADI Materials Would Still Not Be Protected

Even if the ADI was initiated in part due to litigation—and there is no evidence in the public record that it was—there can be no doubt that any litigation purpose was, at most, in addition to the stated purpose of protecting user data.  Under the law of the Ninth Circuit, "where a document serves a dual purpose, that is, where it was not prepared exclusively for litigation, then the 'because of' test is used." *Richey*, 632 F.3d at 567–68(citation omitted).  "In applying the 'because of' standard, courts must consider the totality of the circumstances and determine whether the 'document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of litigation.'" *Id.* at 568 (citation omitted). The question, then, is whether Facebook can establish that the ADI Materials would

---

[41] *Cracking Down on Platform Abuse*, Facebook (Mar. 21, 2018),
  https://about.fb.com/news/2018/03/cracking-down-on-platform-abuse/ (emphasis added).
[42] *An Update on Our App Developer Investigation*, *supra* note 1 (emphasis added).
[43] *Id.*
[44] Zuckerberg Statement, 2018 WL 1757479 at 10.

not have been created in substantially similar form absent the prospect of litigation. It cannot.

The record shows that Facebook had been claiming to enforce its policies for years before the ADI began, albeit weakly and ineffectively, and these public relations campaigns were just the precursor to the widely-touted ADI. As established above, on April 11, 2018, Zuckerberg testified before the U.S. House of Representatives, stating that "[w]e've had a review process for apps for years.  We've reviewed tens of thousands of apps a year and taken action against a number of them."[45]  Facebook told the Senate Judiciary Committee that in 2017 alone, the year before the Cambridge Analytica scandal came to light, that it had taken enforcement action "against about 370,000 apps, ranging from imposing certain restrictions to removal of the app from the platform."[46]

This evidence makes clear that Facebook was claiming to investigate apps for potential violations of its privacy policies for public relations purposes long before such efforts were christened the "ADI."  Facebook cannot establish that the ADI Materials would not have been created in substantially similar form absent the prospect of litigation.  *See Richey*, 632 F.3d at 568 (appraisal report held not to be work product because there was no "evidence in the record that Richey would have prepared the appraisal work file differently in the absence of prospective litigation"); *Anderson v. Marsh*, 312 F.R.D. 584, 593 (E.D. Cal. 2015) (police department investigative report of a shooting incident held not to be work product because "these documents would have been created in substantially similar form regardless of the prospect of litigation"); *In re Capital One Consumer Data Sec. Breach Litig.*, No. 1:19MD2915, 2020 WL 2731238, at *4 (E.D. Va. May 26, 2020), *aff'd*, 2020 WL 3470261 (E.D. Va. June 25, 2020) ("[T]he fact that the investigation was done at the direction of outside counsel and the results were initially

---

[45] Zuckerberg Statement, 2018 WL 1757479 at 43; *see also* Facebook's Answer to Pls.' First Am. Consolidated Compl. ⁋ 564, ECF No. 373 ("Facebook admits that it implemented a comprehensive privacy program following its 2012 Consent Decree with the FTC.").
[46] Facebook's Response, *supra* note 15 at 6.

provided to outside counsel, does not satisfy the 'but for' formulation.").[47] The ADI Materials are thus not protected work product.

### 4. Plaintiffs Have a Substantial Need for the ADI Materials and Cannot Obtain Their Substantial Equivalent by Other Means.

Even if the ADI Materials were protected work product, Plaintiffs have sufficient need of them to overcome such protection for any fact work product involved. A party may obtain discovery of fact work product materials if "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). The fourth category of misconduct recognized by Judge Chhabria in his order on the motion to dismiss was Facebook's failure to properly enforce its policy prohibiting third party apps from using information about Facebook users for any purpose other than enhancing the interaction between the apps and the user. PTO No. 20 at 9-10, ECF No. 298. Such data misuse by third parties was precisely the focus of the ADI.[48] Thus, Plaintiffs have substantial need for the ADI Materials and cannot obtain them elsewhere. *Thompson v. C & H Sugar Co.*, No. 12-CV-00391 NC, 2014 WL 595911, at *4 (N.D. Cal. Feb. 14, 2014) (finding plaintiffs had demonstrated a substantial need for investigation documents where the investigation were relevant to the litigation and plaintiffs could not obtain the fact underlying the investigation from other sources); *Waymo LLC v. Uber Techs., Inc.*, No. 17CV00939WHAJSC, 2017 WL 2485382, at *13 (N.D. Cal. June 8, 2017) (M.J. Corley) (finding in dicta that plaintiff had "met its burden of showing a substantial need" for documents related to investigation by Stroz Friedberg hired by defendant).

Plaintiffs also cannot obtain these materials by other means without undue hardship. According to Facebook, the ADI "involved hundreds of people: attorneys, external investigators, data scientists, engineers, policy specialists, platform partners and other teams across the company" and that the "investigation has addressed millions of apps.  Of those, tens of thousands

---

[47] Facebook has sought to distinguish the ADI from its earlier investigative and enforcement efforts by asserting that the ADI was "retrospective," but all investigations and enforcement actions are retrospective by nature.

[48] *Cracking Down on Platform Abuse*, *supra* note 41.

have been suspended . . ."[49] Conducting such an investigation without Facebook's unique insider knowledge would essentially be impossible and is clearly constitutes undue hardship. *Vallabharpurapu v. Burger King Corp.*, 276 F.R.D. 611, 618 (N.D. Cal. 2011) (M.J. Corley) (finding that plaintiffs had a right to the survey information performed by defendant where plaintiffs would incur significant cost and time to compile the information themselves and the surveys presented the only present source of the information.). Even if Plaintiffs could duplicate Facebook's investigation and issue thousands of third-party subpoenas, many of the app developers are now defunct. Accordingly, Plaintiffs either cannot obtain the ADI Materials by other means at all or cannot do so without undue hardship. Any fact work product in the ADI Materials is therefore discoverable.

## B.     The ADI Materials Are Not Protected by the Attorney-Client Privilege

### 1.     Applicable Standard

The attorney-client privilege protects "confidential communications between attorneys and clients," if they "are made for the purpose of giving legal advice." *Richey*, 632 F.3d at 566 (citation omitted). When (1) legal advice is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived. *See id.*

The federal courts apply the privilege strictly: "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) (quoting *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981)). As a corollary, "the party asserting" the attorney-client privilege "bears the burden of proving that it applies." *Dolby Labs. Licensing Corp. v. Adobe Inc.*, 402 F. Supp. 3d 855, 863 (N.D. Cal. 2019) (citation omitted).  Facebook has failed to meet this burden here.

---

[49] *An Update on Our App Developer Investigation*, *supra* note 1.

### 2.      The Underlying Facts and Information Part of the ADI Are Not Privileged

It is axiomatic that "the privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney[.]" *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981); *see also Sky Valley Ltd. P'ship v. ATX Sky Valley, Ltd.*, 150 F.R.D. 648, 663 (N.D. Cal. 1993) ("[T]he privilege . . . blocks access only to communications, not to underlying information, data, or documents."). A party invoking the privilege can only "prevent access to confidential communications, not to underlying evidence or facts, even if privileged communications alluded to such evidence or facts." *Sky Valley*, 150 F.R.D. at 663–64. Indeed, Gibson Dunn has authored articles about the attorney-client privilege in which it acknowledges that the privilege "protects the communication but not the underlying information."[50] As such, Plaintiffs are entitled to all of the underlying facts and information regarding the ADI, including which third-party app developers violated which Facebook policies over what period of time, and the information that these third parties obtained without user consent.

Nevertheless, Facebook has sought to cloak the entirety of the ADI under a claim of privilege excepting only a smattering of documents between Facebook and third parties related to RFIs sent by Facebook. This attempt to limit production to only communications with third parties is untenable. As a result of the ADI, Facebook has banned aps from its platform for "reasons including inappropriately sharing data obtained from us, making data publicly available without protecting people's identity or something else that was in clear violation of our policies."[51] These reasons represent the underlying facts and information that are not protected by the privilege. Documents concerning them should be produced.

Furthermore, Facebook's claims that Plaintiffs are in fact obtaining this discovery is belied by the record. For these six apps alone, Facebook produced just 65 pages of documents

---

[50] F. Joseph Warren, Daniel P. Chung & A. Syarief, *Privilege – United States* at 2, Gibson, Dunn & Crutcher (Nov. 2018), https://www.gibsondunn.com/wp-content/uploads/documents/publications/Warin-Chung-Know-how-US-Privilege-GIR-November-2016.pdf.
[51] *An Update on Our App Developer Investigation*, *supra* note 1.

consisting of RFIs sent by Facebook and to four of the six apps, and their responses to the RFIs. No information in these documents reflect what policies were violated, what specific data was obtained, or any of the reasons behind the action taken or not taken against these apps. On the other hand, Facebook seeks to withhold more than 6,000 documents for *just these six apps alone*. Thus, Facebook is attempting to protect the clear and overwhelming majority of these documents pursuant to the attorney-client privilege and Plaintiffs have no other source for that information.

> **3.     Because the Attorney Client Privilege Does Not Protect Communications Made Primarily for Business Purposes, Facebook Cannot Claim Privilege Over All the ADI Materials.**

"[T]he attorney-client privilege does not protect business communications and advice." *SanDisk Corp. v. Round Rock Research LLC*, No. 11-CV-05243-RS (JSC), 2014 WL 691565, at *3 (N.D. Cal. Feb. 21, 2014). "When a communication may relate to both legal and business advice, the proponent of the privilege must make a clear showing that the primary purpose of the communication was securing legal advice." *Dolby Labs.*, 402 F. Supp. 3d at 873 (citation omitted); *see also SanDisk*, 2014 WL 691565, at *3 (when communications "serve both legal and business purposes, there is general agreement that the privilege applies where the *primary or predominant purpose* of the attorney-client consultation is to seek legal advice or assistance") (citation omitted).

As set forth above, since at least 2012, Facebook has engaged in an effort—albeit unsuccessfully—to monitor third-party apps and enforce its policies against them. This is a textbook example of a business purpose. As a further effort in the same vein, the ADI has as one of its goals "the business purpose of addressing issues of continuing concern to management." *Marceau v. IBEW*, 246 F.R.D. 610, 613 (D. Ariz. 2007).

Facebook has also failed to make the required clear showing that every ADI document has as its "primary or predominant purpose" the provision or seeking of legal advice or assistance. As many courts have recognized, determining "[t]he predominant purpose of a particular document" generally requires "document-by-document analysis to decide what information, document, or line the attorney client privilege applies to." *Fourth Age Ltd. v.*

*Warner Bros. Dig. Distrib., Inc.*, No. CV 12-09912 AB (SHX), 2015 WL 12720324, at *7 (C.D. Cal. Aug. 6, 2015) (citing *In re Cty. of Erie*, 473 F.3d 413, 420–21 (2d Cir. 2007)). For that reason, a "claim of privilege must be made and sustained on a question-by-question or document-by-document basis; a blanket claim of privilege is unacceptable. The scope of the privilege should be strictly confined within the narrowest possible limits." *United States v. Christensen*, 828 F.3d 763, 803 (9th Cir. 2015) (citation omitted); *see also LightGuard Sys., Inc. v. Spot Devices, Inc.*, 281 F.R.D. 593, 600 (D. Nev. 2012) ("When determining whether a document seeks legal advice, courts have examined the *nature*, *content*, and *context* in which the document was prepared.") (citing *AT&T Corp. v. Microsoft Corp.*, No. 02-0164 MHP (JL), 2003 WL 21212614, at *3 (N.D. Cal. Apr. 18, 2003)).

Facebook's blanket claim of privilege is justified by none of the reasons Facebook has advanced. It is not enough that the ADI involved the violation of Facebook's policies, because the policies are not themselves privileged. *See, e.g.*, *Stevens v. Corelogic, Inc.*, No. 14-cv-1158-BAS(JLB), 2016 WL 397936, at *5 (S.D. Cal. Feb. 2, 2016) (holding that corporation's legal compliance policies were not privileged). Nor is it enough that attorneys were involved in the ADI. *See, e.g.*, *In re CV Therapeutics, Inc. Sec. Litig.*, No. C-03-3709 SI(EMC), 2006 WL 1699536, at *4 (N.D. Cal. June 16, 2006) ("The mere fact that a document was sent to an attorney does not make it a privileged communication."), *as clarified on reconsideration*, No. C-03-3709 SI (EMC), 2006 WL 2585038 (N.D. Cal. Aug. 30, 2006); *Shopify Inc. v. Express Mobile, Inc.*, No. 20-MC-80091-JSC, 2020 WL 4732334, at *3 (N.D. Cal. Aug. 14, 2020) (M.J. Corley) ("[T]he inclusion of an attorney on the communication does not itself bring a document within the privilege's ambit.").

Furthermore, the privilege does not apply if the legal advice is incidental. *See Neuder v Battelle Pac. Nw. Nat'l Lab.*, 194 F.R.D. 289, 293 (D.D.C. 2000). Here, Facebook has repeatedly claimed that primary purpose of the ADI was to assess its prior risk and bring litigation against third party apps violating the Company's policies. But of the millions of apps and app developers it has reviewed and the tens of thousands it has suspended, Facebook has filed just two lawsuits

against three companies.[52] The statistics simply do not support Facebook's claim that the entire investigation was solely for a legal purpose. Instead, the primary purpose of the ADI is exactly what Facebook has publicly stated: to root out misuse of user data and enforce its data use policies. That purpose is a business one.

Especially dubious is Facebook's blanket claim of privilege over even those ADI communications or documents exchanged solely among non-attorneys. For example, a technical discussion among software engineers, even if prompted by a request from an attorney, is not itself privileged. *See Dolby Labs.*, 402 F. Supp. 3d at 867 (discussing *Datel Holdings Ltd. v. Microsoft Corp.*, No. 09-cv-05535, 2011 WL 866993 (N.D. Cal. Mar. 11, 2011)). Similarly, if there is no evidence that a document is received or reviewed by counsel, the document is not privileged—again, even if the document was created at counsel's request. *See MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 4:11–cv–05341 YGR (JSC), 2013 WL 5594474, at *4 (N.D. Cal. Oct. 10, 2013); *see also Shopify Inc.*, 2020 WL 4732334, at *3 (declining to find documents were entitled to attorney-client privilege where they were prepared for simultaneous review by legal and non-legal attorney). To claim privilege over communications between non-attorneys, Facebook must clearly show that in them "the employees discuss or transmit legal advice given by counsel," or "an employee discusses her intent to seek legal advice about a particular issue." *Dolby Labs.*, 402 F. Supp. 3d at 866 (citation omitted). "A vague declaration that states only that the document reflects an attorney's advice is insufficient to demonstrate that the document should be found privileged." *Id.* (citation omitted). The entries here fall in that category, as Facebook's descriptions of those that Plaintiffs selected for *in camera* review simply reflect that legal information was conveyed, shared, or relayed, without any further specificity, including

---

[52] *An Update on Our App Developer Investigation*, *supra* note 1 ("We've also taken legal action when necessary. In May, we filed a lawsuit in California against Rankwave, a South Korean data analytics company that failed to cooperate with our investigation. We've also taken legal action against developers in other contexts. For example, we filed an action against LionMobi and JediMobi, two companies that used their apps to infect users' phones with malware in a profit-generating scheme.").

with respect to the attachments that were selected for review.[53]

### 4.     Even if Facebook's Claim of Privilege is Accepted, Should Facebook Rely on the ADI as a Defense, the Privilege Is Waived

Finally, to the extent that the attorney-client privilege is found to apply to the ADI, any effort by Facebook to rely on the ADI as a defense in this case in the future would waive the privilege. "The privilege which protects attorney-client communications may not be used both as a sword and a shield." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (citation omitted). Thus, when a party—through an affirmative act, such as a defense—puts privileged information at issue, such that "fairness requires disclosure of the protected communication" to the other party, the privilege is implicitly waived. *Id.*; *see also, e.g.*, *United States v. Bilzerian*, 926 F.2d 1285, 1292–93 (2d Cir. 1991).

In its public statements, Facebook has often pointed to the ADI as evidence of how seriously it takes its users' privacy.[54] Should Facebook try to use the ADI as a legal defense—for example, to support its affirmative defense that it exercised reasonable efforts, Answer to Pls.' First Am. Consolidated Compl. at 128, ECF No. 373—Plaintiffs must in fairness be given an opportunity to probe what the ADI has done or failed to do. Facebook "cannot invoke the attorney-client privilege to deny [Plaintiffs] access to the very information that [they] must refute" to defeat a defense to liability. *Chevron*, 974 F.2d at 1163.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that, in addition to any guidance the Court may provide, the Court grant Plaintiffs' Motion to Compel, and order that (1) the 20 documents selected for *in camera* review be produced in their entirety, (2) Facebook is not entitled to a categorical claim of privilege over the entirety of the ADI, and (3) Facebook produce all of the underlying facts and information regarding the ADI, including which third party apps violated which Facebook policies over what period of time and what Facebook user information they obtained and misused.

---

[53] ECF No. 602 at 1.
[54] *An Update on Our App Developer Investigation*, supra note 1.

Dated: February 5, 2021

Respectfully submitted,

KELLER ROHRBACK L.L.P.

BLEICHMAR FONTI & AULD LLP

By:  */s/ Derek W. Loeser*
     Derek W. Loeser

By:  */s/ Lesley E. Weaver*
     Lesley E. Weaver

Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Adele A. Daniel (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
bgould@kellerrohrback.com
adaniel@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew P. Montgomery (SBN 180196)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmontgomery@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Derek W. Loeser, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this day of February, 2021, at Seattle, Washington.

/s/ Derek W. Loeser
Derek W. Loeser

## CERTIFICATE OF SERVICE

I, Sarah Skaggs, hereby certify that on February 5, 2021, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

**In addition, the following were served via email:**

Anjeza Hassan
annie.sara@yahoo.com

/s/ *Sarah Skaggs*

Sarah Skaggs

# EXHIBIT I

1

2

3

4                   UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7    IN RE: FACEBOOK, INC. CONSUMER          Case No.  18-md-02843-VC   (JSC)

8    PRIVACY USER PROFILE LITIGATION
                                             **FURTHER ORDER RE: ADI**
9                                            **PRIVILEGE DISPUTE**

10                                           Re: Dkt. No. 699

11

12

13          In March 2018, in response to the disclosure of the Cambridge Analytical data-sharing

14   incident, Facebook initiated an app developer investigation (ADI) that involved a review of all

15   "apps that had access to large amounts of data before [Facebook] changed [its] platform policies in

16   2014."  *See* https://about.fb.com/news/2019/09/an-update-on-our-app-developer-investigation/.

17   Facebook told the public that its investigation

18                   has involved hundreds of people: attorneys, external investigators,
                     data scientists, engineers, policy specialists, platform partners and
19                   other teams across the company. Our review helps us to better
                     understand patterns of abuse in order to root out bad actors among
20                   developers.

21   *Id*.  Facebook nonetheless argues in this litigation that *all* documents and communications

22   generated in connection with the ADI are protected from discovery under the attorney-client and

23   work product privileges.  (Dkt. No. 612.)

24          The parties thereafter submitted briefs on the issue (Dkt Nos. 611, 612), and Facebook

25   submitted certain of the withheld documents for *in camera* review.  At the discovery conference

26   on April 6, 2021, the Court expressed her view that much of the ADI documentation is

27   discoverable.  While outside counsel's edits and advice might not be discoverable, the underlying

28   facts are discoverable since Facebook would have conducted the investigation regardless of any

potential legal liability. (Dkt. No. 657 at 16-17.) In response Plaintiffs stated that they, in fact, are only seeking the underlying facts and not legal advice. In particular, Plaintiffs explained they are seeking :

> which apps were in violation or in potential violation of which Facebook policies and over what period of time these entities were in violation of these policies and the specific conduct that caused them to be in violation. And that's obviously relevant to our claims regarding whether or not Facebook allowed third parties to access user information and whether Facebook properly monitored the disclosure of this information as they claim they did.

(*Id.* at 18.) The Court therefore ordered the parties to meet and confer to see if they could agree on a production. (Dkt. No. 655.)

By the time of the June 23, 2021 status conference, the parties had not reached agreement. Accordingly, the Court ordered the parties to submit a further discovery dispute joint letter brief by July 2, 2021. (Dkt. No. 693.) They have now done so. (Dkt. No. 699.) Facebook proposes that it produce the following information as to each App that it suspended as a result of the investigation:

a. **App ID**: Each App's unique app identifier.
b. **App Name**: The name of each app.
c. **App Creation Date**: The date on which the app was created on the Facebook Platform.
d. **Ever Installed Users**: The number of Facebook users that have ever installed the app on Facebook as of April 28, 2019.
e. **Developer(s)**: A list of all developer accounts, including user name and user ID, associated with the app, which includes users listed as having the following roles: administrator, creator, developer, and disabled.
f. **Business(es)**: A list of all businesses identified as being an "Owner" of the app in Facebook's records as of April 28, 2019. This is a data field the developer has the option of including.
g. **API Call Information**:
   i. A list of the API call permissions granted for each app by users.
   ii. The total number of users that granted the app each permission to access data through the API as of April 28, 2019.

(Dkt. No. 699-1 at 4 (footnotes omitted).)

Plaintiffs contend that this information omits critical, relevant information. In particular, Plaintiffs seek documents (not created by lawyers) from the "Enhanced Examination phase" that involve background and technical investigations to identify the potential for data misuse. (Dkt.

United States District Court
Northern District of California

No. 699 at 5.) They also seek documents from the "Enforcement phase," including Facebook conducted audits and interviews. (*Id.*) As the Court understands, Facebook has not offered to produce any of this information. None of these documents were part of the *in camera* review the Court earlier conducted.

Although the Court has before it the declaration in support of privilege that Facebook submitted in the Massachusetts Attorney General action (Dkt. No. 699-5), on or before August 2, 2021 Facebook may submit a further declaration with supporting exhibits in support of its assertion that these investigatory materials are privileged from discovery. Plaintiffs may respond *to the declaration and any attached exhibits* on or before August 9, 2021. No further briefing is required. Facebook already submitted a 25 page brief in support of its privilege assertion.

**IT IS SO ORDERED.**

Dated: July 26, 2021

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge

# EXHIBIT J

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: FACEBOOK, INC. CONSUMER
PRIVACY USER PROFILE LITIGATION

This Order relates to:

ALL ACTIONS

Case No. 18-md-02843-VC (JSC)

**ORDER FOLLOWING JUNE 23, 2021
DISCOVERY CONFERENCE**

The Court held a further discovery status conference with the parties on June 23, 2021. This Order confirms the matters discussed.

1.  The parties shall file a joint proposed case schedule by July 2, 2021. If they cannot stipulate to the full schedule, by that same date they shall submit competing proposals on any issue on which they do not agree. Each side is limited to one page per disputed issue to explain why the Court should adopt that side's proposal.

2.  The parties shall file a stipulation regarding Facebook's production of App Developer Investigation (ADI) documents by July 2, 2021. If the parties are not in agreement, then by that same date they shall file a discovery dispute joint letter which identifies the documents Facebook has agreed to produce and which additional documents Plaintiffs believe should be produced.

3.  The parties shall file a stipulation regarding the use of technology assisted review (TAR) to filter non-responsive documents out of Facebook's review set by July 2, 2021. If the parties are not in agreement, then by that same date they shall file a discovery dispute joint letter regarding the issue.

4.  The parties have resolved their disputes regarding search strings 5-8.

United States District Court
Northern District of California

5. The Court will issue a written order on Facebook's motion to maintain the confidentiality of the documents that were made public in violation the Six4Three litigation protective order. (Dkt. No. 643.) In the interim, should Plaintiffs seek to use any such documents in this action, they shall file them under seal and Facebook will have the burden to show that they are properly sealable in accordance with Civil Local Rule 79-5(b).

6. The Court sets a further discovery status conference for July 28, 2021 at 8:30 a.m. The parties shall file a **_joint_** status update by noon July 27, 2021.

**IT IS SO ORDERED.**

Dated: June 23, 2021

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California

2

# EXHIBIT K

1
2
3
4
5
6
7
8
9
10
11
12

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

13  IN RE: FACEBOOK, INC. CONSUMER
    PRIVACY USER PROFILE LITIGATION,

    CASE NO. 3:18-MD-02843-VC

14  This document relates to:

    **DECLARATION OF ALEXANDER H.**
    **SOUTHWELL IN SUPPORT OF**
15  ALL ACTIONS

    **FACEBOOK'S POSITION IN THE**
    **PARTIES' JULY 2, 2021 LETTER BRIEF**
16  **REGARDING ADI PRIVILEGE DISPUTE**

17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

I, Alexander H. Southwell, hereby declare as follows:

1.     I am an attorney licensed to practice law in the State of New York.  I am a partner with the law firm of Gibson, Dunn & Crutcher LLP.  I submit this declaration in support of Facebook's position in the parties' July 2, 2021 letter brief regarding their ADI privilege dispute (Dkt. 699).  This declaration is submitted pursuant to the Court's instructions in its July 26, 2021 Order (Dkt. 711) and to provide the facts necessary for the Court to consider Facebook's claim of privilege.  Nothing contained herein should be construed as a waiver of any protection from disclosure, including without limitation the attorney-client communication privilege and work product doctrine and Facebook reserves all such rights and protections.  I make this declaration based on my own knowledge, and I would testify to the matters stated herein under oath if called upon to do so.

### The App Developer Investigation

2.     Facebook initiated the Application Developer Investigation ("ADI" or the "Investigation") because, in the wake of the reporting of data misuse by Cambridge Analytica in March 2018, Facebook anticipated that it would have to respond to known and expected legal challenges in connection with applications and developers that may have had access to certain data because they were active before Facebook placed additional, significant limitations on the amount and type of data developers could request from users through the Facebook Platform in 2014.

3.     Facebook retained outside counsel (Gibson, Dunn & Crutcher LLP) experienced with cybersecurity and data privacy internal investigations to design and direct a new investigation that could, among other things, gather the facts necessary for providing legal advice to Facebook about litigation, compliance, regulatory inquiries, and other legal risks facing the company resulting from potential data misuse and activities by third-party app developers operating on the prior version of Facebook's platform.

4.     I led the Gibson Dunn team engaged to develop and conduct the Investigation.  I am a former federal prosecutor and have more than two decades of experience with large-scale, corporate investigations, including fluency in privilege law and its application to conducting internal

Gibson, Dunn &
Crutcher LLP

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

1  investigations, as well as technology, data privacy, and cybersecurity investigations, which I brought
2  to bear in leading the ADI.

3       5.    As described in the Declaration of Stacy Chen, attached as Exhibit A, a legal-led
4  investigation is not Facebook's usual response when the company determines that violations of its
5  Platform policies may have occurred. Unlike in the typical case, an attorney-led investigation was
6  necessary here because the internal Facebook teams that address potential Platform policy violations
7  neither had the capacity nor were they set up to: (i) address the company's legal risks with respect to
8  the historical Platform; (ii) address compliance risks with applicable laws regarding the historical
9  Platform; or (iii) assess Facebook's position in pending or anticipated litigation or regulatory
10 inquiries. Moreover, given the historical focus of the investigation's inquiry, significant investigation
11 was required to develop the framework and baseline data that would form the foundation of the
12 investigation. Unlike Facebook's other enforcement efforts, the ADI is in essence an historical
13 investigation to try to identify any misuse of data in violation of Facebook's policies and associated
14 legal liabilities, in connection with the first version of the Platform.

15      6.    As Ms. Chen explained, in setting up the legally-driven ADI, Facebook anticipated
16 that it would have to respond to known and expected legal challenges in connection with apps and
17 developers that may have had access to certain data because they were active before Facebook placed
18 additional, significant limitations on the amount and type of data developers could request from users
19 through the Facebook Platform in 2014. From the outset, the company contemplated a review of
20 potentially millions of apps that would inform the company's legal strategy.

21      7.    Facebook anticipated such legal challenges in part because the extensive media
22 attention surrounding the Cambridge Analytica events almost immediately triggered litigation and
23 regulatory inquiries, including, for example:

24    • legal matters related to apps and developers that, like Dr. Aleksandr Kogan and his App,
25     thisisyourdigitallife, may have misused information from the time period before Facebook
26     placed additional limitations on developers;

27    • legal matters involving Facebook and its directors and officers alleging, *inter alia*, violations
28     of the U.S. securities laws and breach of fiduciary duties;

Gibson, Dunn & Crutcher LLP

2

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

1     •   legal matters alleging, *inter alia*, violations of consumer protection statutes and common law

2        claims for breach of contract and fraud; and

3     •   investigations and potential enforcement actions against the company at both the state and

4        federal levels and from international regulators.

5       8.      Exhibit A of the Chen Declaration includes a list of all pending domestic and

6 international litigation relating to the Cambridge Analytica events and the misuse of user data by

7 third-party apps as of October 2019, when the declaration was executed. This multitude of threatened

8 and pending litigation was and is the backdrop of the ADI and, as such, has been the primary driving

9 force behind the decisions made by Gibson Dunn and Facebook counsel throughout the ADI process.

10       9.      I led our Gibson Dunn team, and we worked with Facebook's in-house attorneys and

11 members of Facebook's Partnerships, Data Policy, and DevOps teams on the ADI. I and my team at

12 Gibson Dunn also led the recruitment and retention of technical experts and investigators for the

13 ADI, including two leading forensic consulting firms with expertise in assisting with technology-

14 focused internal investigations. These firms operated as an extension of the Gibson Dunn team to

15 support our provision of legal advice to Facebook, and the investigators worked under the direction

16 of Gibson Dunn and Facebook Legal. The "ADI team," as used herein, is comprised of Gibson Dunn

17 lawyers and paralegals, our experts from the two leading forensic consulting firms, and Facebook in-

18 house counsel and internal partners including subject matter experts, all of whom operated at the

19 direction of counsel. At its largest, the ADI team consisted of over 300 members. Gibson Dunn's

20 confidential engagement letters with the two leading forensic consulting firms are attached, and filed

21 under seal, as Exhibits B, C and D.

22       10.      Gibson Dunn and in-house counsel needed to partner with the outside expert

23 consulting firms and Facebook personnel to effectively advise Facebook of legal risk. The ADI team

24 worked at the direction of counsel, relied on counsel's input and guidance, and played a necessary

25 role in facilitating legal advice by counsel and implementing that advice by the company. The ADI

26 was an iterative process through which ADI team members, including counsel and subject matter

27 experts, were able to learn as the investigation progressed. As such, documents initially drafted by

28 members of the ADI team were generally prepared by or at the direction of counsel, and counsel

1   edited or otherwise helped shape their contents to ensure they were serving the legal purpose for
2   which they were created.

3       11.     Gibson Dunn and in-house counsel took steps to ensure that communications by and
4   among the ADI team remained confidential and privileged, including by instructing the team to limit
5   communications about ADI and access to investigatory documents to only employees, consultants,
6   and counsel who needed access to them for purpose of facilitating legal advice.  In addition, materials
7   created in the course of the ADI were stored securely, with access limited to those necessary to the
8   investigation.

9       12.     The three investigative steps of the ADI are laid out in the Chen Declaration at
10  paragraphs 11-20.

11                          **Plaintiffs' Requests for Documents**

12      13.     I understand that Plaintiffs have sought certain categories of documents and
13  information about ADI.  Because Facebook has received multiple articulations of these requests, *see*
14  Exhibit E, I address the requests as articulated in the July 26, 2021 Order issued by Judge Jacqueline
15  Scott Corley [Dkt. No. 711] (the "Order").

16      14.     As described by the Court's order, the first category of documents Plaintiffs seek are
17  those "documents (not created by lawyers) from the 'Enhanced Examination phase' that involve
18  background and technical investigations to identify the potential for data misuse."  Order at 2 (citing
19  Dkt. No. 699 at 5).  Although this category is not entirely clear, as I understand it, this request seeks
20  all ADI-related documents and communications generated by a non-attorney in connection with any
21  app specifically examined by one or more background or technical investigation reports.

22      15.     As described by the Court's order, the second category of documents Plaintiffs seek
23  are those "documents from the 'Enforcement phase,' including Facebook conducted audits and
24  interviews."  Order at 2 (citing Dkt. No. 699 at 5).  Although this request is also not entirely clear, I
25  understand it to seek all documents and communications regarding potential and actual enforcement
26  against apps or developers, including audits and interviews, regardless of whether such documents
27  and communications were actually conveyed to third parties and regardless of author.

28

Gibson, Dunn &
Crutcher LLP

4

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

## The Enhanced Examination Phase

16.     In the Enhanced Examination phase, apps were selected for further review by counsel through proprietary risk-based approaches based on counsel's assessment of where and how the greatest legal risk to the company might arise to provide legal advice to Facebook regarding potential risks and active and potential litigation.

17.     Once an app or developer had been identified for further review based on criteria that my team had devised, Gibson Dunn and in-house counsel directed our forensic consultants to conduct intensive background and technical investigations, collect and compile specific evidence that counsel believed particularly salient to their legal analyses, and report their findings to counsel (*i.e.*, the Enhanced Examination process). A report for a single developer could include extensive technical and other details and these reports were specifically tailored by counsel, in substance and format, so that counsel could evaluate the potential for data misuse and associated legal risks. Reports varied tremendously based on counsel's instructions and what counsel determined was needed to provide legal advice and many were hundreds of pages long.

18.     Enhanced Examination also included application of a proprietary model (called the Risk-Prioritization Formula) developed under the guidance and with the advice of counsel that assisted in assessing the risks related to access to data, and the associated legal risks to Facebook, based in part on the permissions granted to apps and the number of users that authorized specific permissions. The Risk-Prioritization Formula was used exclusively in the ADI to prioritize apps for review during the Enhanced Examination phase.

19.     Facebook has already produced tens of thousands of pages of communications with developers regarding apps that were reviewed in the ADI through December 2019 because these communications with third parties are not privileged, regardless of whether the communications were created by lawyers or non-lawyers. From these communications, Plaintiffs know the app names, app IDs, and contact information for the developers associated with many of the apps that the ADI team assessed through the Enhanced Examination phase.

20.     Beyond those communications with external developers, there are numerous communications and documents created at the direction of counsel to assist counsel in the provision

Gibson, Dunn & Crutcher LLP

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

of legal advice and that contain or reveal the mental impressions and advice of counsel. Facebook has not produced these documents because they are privileged. As noted above, Gibson Dunn worked directly with the rest of the ADI team to design ADI-specific investigation reports to contain information relevant to counsel's evaluation of the potential for data misuse and associated legal risk.

a. **Background reports**. Counsel designed the background reports to capture information counsel deemed relevant to assessing the risk of data misuse and legal risk to Facebook. These reports varied in content depending on the particulars of the investigation, as directed by counsel. For example, Gibson Dunn and Facebook's in-house legal team often sought different information from different types of developers (e.g., corporate vs. individual), when providing legal advice.

b. **Technical reports**. Counsel devoted substantial time with the rest of the ADI team, to work through the technical information available about apps and developers on Facebook's platform, understand the significance of that data, and weigh the value of various technical details to our legal risk analysis. With our ADI consulting experts, we identified which details were most relevant to our legal risk analysis for inclusion in the reports. When we needed a more nuanced understanding about the data to render our legal advice to Facebook, working with our technical experts, we designed proprietary analytics (that had not before existed at Facebook and were used exclusively in ADI) in order to score, rank, and better understand the available data. Because our counsel team consistently had questions about certain data points to assist in the rendering of legal advice, over time, those questions were built into the structure of the reports, so that counsel would have the answer at their fingertips to streamline their legal decision-making process.

c. To facilitate our attorney review at scale, we instructed the ADI team regarding the criteria and information that were important to us in rendering our opinion on legal risk, and requested that they, based on these attorney-selected criteria, include preliminary recommendations in their reports to facilitate Gibson Dunn's legal advice about the risk of data misuse.

6

Gibson, Dunn & Crutcher LLP

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

d.  In connection with preparation and review of the background and technical investigation reports, there were extensive internal communications with counsel and at the direction of counsel regarding apps or developers in the Enhanced Examination phase between and among both attorney and non-attorney members of the ADI team, all of whom worked together to obtain the information required by Gibson Dunn for the provision of legal advice to Facebook.  Such communications were sent for the purpose of analyzing the legal risk posed by an app or developer, including whether such legal risk warranted further investigation or enforcement.

21.    Although counsel may not have drafted each of these documents directly, the documents created as part of the Enhanced Examination phase were created at the direction of counsel, reflect attorney advice and mental impressions regarding the evidence counsel deemed important in rendering legal advice, and were directly used by counsel to provide legal advice to Facebook.

### The Enforcement Phase of the ADI

22.    The "Enforcement phase" refers to the final phase of ADI, in which counsel reviewed the results of the investigations prepared at our direction (as explained in paras. 16-21, *supra*), recommended next steps to Facebook in-house counsel for approval, and drafted requests for information or other follow-up sent to developers.  If we determined that an information request response was inadequate, we may have attempted various additional methods of engagement with the developer, including conducting interviews or requesting audits of data security or storage infrastructure.

23.    In consultation with the rest of the ADI team, the Gibson Dunn team also determined on a case-by-case basis if any additional enforcement action was appropriate, such as suspending the developer and/or the app.  We made recommendations about whether Facebook should take legal steps, including sending cease and desist letters, or engaging in litigation against developers.

24.    As previously noted, Plaintiffs already have tens of thousands of pages of communications with developers, many of which refer or relate to the Enforcement phase, including

7

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

1    audits and interviews specifically, because these communications with third parties are not

2    privileged. These include the RFIs Facebook sent developers and their responses.

3          25.    Beyond the external documents, there are a large volume of internal ADI documents,

4    related to the "Enforcement phase" of ADI. These documents were created by or at the direction of

5    counsel to facilitate legal advice, and they contain or reveal the mental impressions and advice of

6    counsel related to enforcement options.

7       a.   **Written Memoranda and Recommendations**. Following our review of the materials

8           created during the Enhanced Examination phase, Gibson Dunn drafted individualized

9           recommendations containing advice and legal analysis for Facebook in-house counsel

10           regarding whether to pursue various enforcement methods—including interviews and audits

11           as well as litigation—and why. Our recommendations often highlighted the information and

12           open questions most relevant to our team's legal analysis of the risk of data misuse in detail,

13           and offered a recommended method of either pursuing further engagement to address our

14           concerns or taking legal measures, as discussed above. Our recommendations also may have

15           weighed various, competing options for enforcement, along with the strengths and

16           weaknesses of each.

17       b.   **Draft Internal Documents**. In connection with these recommendations, my team at Gibson

18           Dunn worked with the other internal and external ADI team members to draft other

19           documents that would guide further engagement or legal action. For example, when assisting

20           counsel to evaluate the potential for further enforcement and associated legal risk, the ADI

21           team frequently prepared memoranda analyzing the adequacy or implication of developer

22           responses to prior enforcement actions and created other internal documents in support of

23           such analysis, like notes and impressions from conversations or other interactions with

24           developers. At the direction of counsel, the ADI team also often iterated on the content of

25           potential follow-up communications to developers, the precise points to cover in a potential

26           interview, or allegations that would be stated in a complaint. This work was conducted to

27           provide legal advice to Facebook.

28

Gibson, Dunn &
Crutcher LLP

**8**

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

1      c.  In connection with the drafting of these documents and the provision of the legal advice

2          contained therein, there were extensive internal communications at the direction of counsel

3          among and between both attorney and non-attorney members of the ADI team, all of whom

4          worked together for Gibson Dunn to provide legal advice to Facebook.  These

5          communications were often sent for the purpose of discussing these recommendations, and

6          draft internal documents composed in connection with those recommendations, like draft

7          complaints and interview outlines, were all necessary for the provision of legal advice.

8      26.     I am aware that at various times the Plaintiffs have emphasized to the Court that they

9  seek "the facts underlying the investigation," April 6. Hearing Tr. 18:3 [Dkt. No. 657], and "not legal

10  advice," Order at 2 (citing *id.*).  Indeed, at mediation sessions in which I participated over the course

11  of four months, Plaintiffs suggested that Facebook could satisfy their requests for "facts underlying

12  the investigation" by producing specific data points Plaintiffs sought about certain apps addressed

13  through ADI.  Facebook offered to produce data for a list of apps already requested by and produced

14  to Plaintiffs, as well as other information, subject to a non-waiver agreement.  At the final mediation

15  on this issue, Plaintiffs presented a materially different request that also sought large volumes of

16  internal ADI emails and documents.  *See* Dkt. 699-2.  Facebook continues to be willing to provide the

17  data it previously offered to provide Plaintiffs so long as producing that information will not be

18  construed to waive Facebook's claim of privilege or the work-product protection with respect to ADI.

19      27.     Attached as Exhibit E is a document laying out three steps that would need to occur

20  for Facebook to execute any order requiring Facebook, over its objection, to comply with Plaintiffs'

21  additional ADI requests.  As noted above and in Exhibit E, the scope of Plaintiffs' requests is not

22  clear, and may reach many millions of documents.  To the extent Plaintiffs seek underlying

23  information about apps relevant to their claims (as Plaintiffs repeatedly indicated they sought

24  throughout the parties' mediations), it remains far more efficient for Facebook to produce that factual

25  information directly in response to an appropriately scoped discovery request than it would be to

26  collect and review millions of pieces of ADI-related communications and documents to determine if

27  they contain any factual information that can somehow be extracted from the accompanying

28

9

Gibson, Dunn &
Crutcher LLP

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

1  privileged discussions—an exercise that would be extremely burdensome and would likely take many

2  months (if not more) to complete.

3                                                       *     *     *

4        I declare under penalty of perjury under the laws of the United States of America that the

5  foregoing is true and correct.  Executed on August 2, 2021 in New York, New York.

6

7

8

9                                                       _____

10                                                      Alexander H. Southwell

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

SOUTHWELL DECLARATION IN SUPPORT OF FACEBOOK'S POSITION IN THE PARTIES' JULY 2, 2021 LETTER BRIEF
CASE NO. 3:18-MD-02843-VC

# EXHIBIT L

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION

Case No.  18-md-02843-VC   (JSC)

**ORDER GRANTING MOTION TO COMPEL ADI MATERIALS**

Re: Dkt. Nos. 611, 612, 699, 711, 719, 720, 721, 727, 729

In early 2018, the public learned that "Cambridge Analytica, a British political consulting firm, used personal information from millions of Facebook accounts to send targeted political messages during the 2016 presidential election." *In re Facebook, Inc. Consumer Privacy User Profile* Litigation, 402 F.Supp.3d 767, 777 (N.D. Cal. Sep. 9, 2019). "In the months that followed, reports emerged suggesting that the ability of . . . entities like Cambridge Analytica to obtain sensitive Facebook user information was the norm rather than the exception." *Id.* Following the disclosure, Facebook initiated an app developer investigation (ADI) that involved a review of all "apps that had access to large amounts of data before [Facebook] changed [its] platform policies in 2014." *See* https://about.fb.com/news/2019/09/an-update-on-our-app-developer-investigation/. As the ADI, or, more precisely, the information the ADI uncovered, is directly relevant to Plaintiffs' claims in this MDL action, Plaintiffs seek information learned from and generated by the ADI. While Facebook has agreed to produce some data, it resists disclosure of reports, audits and interviews created or conducted by non-attorneys on the grounds that such documents are protected by attorney-work product or the attorney-client privilege. After several rounds of briefing and attempts among the parties to resolve, or at least narrow, the dispute, the issue is now ripe for decision.

United States District Court
Northern District of California

**DOCUMENTS AT ISSUE**

Facebook's ADI consisted of three phases: (1) Detection and Identification of offending apps, (2) Enhanced Examination, and (3) Enforcement. In the Enhanced Examination Phase, the ADI forensic team conducted intensive background and technical investigations of the identified apps that, among other things, might identify the potential for data misuse. (Dkt. No. 699-5 ¶ 17.) In the Enforcement phase, to assist Facebook with deciding whether to take action against an app, additional investigation might be conducted including interviews or audits of data security or storage infrastructure. (*Id.* ¶ 19.) Plaintiffs seek material from the second and third phases that does not involve communications with lawyers or content created by lawyers. While Facebook has agreed to produce some information (Dkt. No. 699-1 at 4), it refuses on privilege grounds to produce the reports, audits and interviews, and non-attorney communications related to the same.

**ANALYSIS**

The parties agree that federal law governs this dispute. (Dkt. Nos. 611-2 at 16, 612-2 at 12, 699 at 4, 727 at 5 n.1) (applying federal law).) "The work product doctrine protects from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *United States v. Richey*, 632 F.3d 559, 567 (9th Cir. 2011). "To qualify for work-product protection, documents must: (1) be 'prepared in anticipation of litigation or for trial' and (2) be prepared 'by or for another party or by or for that other party's representative.'" *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt*, 357 F.3d 900, 907 (9th Cir. 2004). A finding that a document was prepared in anticipation of litigation, however, does not always end the inquiry.

> In circumstances where a document serves a dual purpose, that is, where it was not prepared exclusively for litigation, then the "because of" test is used. Dual purpose documents are deemed prepared because of litigation if in light of the nature of the document and the factual situation in a particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation. In applying the because of standard, courts must consider the totality of the circumstances and determine whether the document was created because of anticipated litigation, *and would not have been created in substantially similar form but for the prospect of litigation*.

*Richey*, 632 F.3d at 567-68 (emphasis added). The party resisting production of material based on

2

United States District Court
Northern District of California

1   the work product privilege bears the burden of proving that the privilege applies. *See Hernandez v.*

2   *Tanninen*, 604 F.3d 1095, 1102 (9th Cir. 2010).

3        Facebook has met its burden of proving that the documents were prepared in anticipation

4   of litigation.  Shortly before Facebook initiated the ADI, a nationwide consumer class action was

5   filed against Facebook in this Court. (Dkt. No. 1).  Within weeks, more than 40 actions were filed

6   which were consolidated into this Multi-District Litigation.  Facebook offers evidence that the

7   ADI was launched in part to address potential regulatory and litigation risks posed by apps that

8   had been on the Facebook platform since before Facebook changed in policies in 2014.  (Dkt. No.

9   699-5, Dkt. No. 720.)

10        Facebook's own public pronouncements about the ADI, however, demonstrate that the

11   documents were not created exclusively in anticipation of litigation and that, in fact, Facebook

12   would have conducted the ADI in substantially similar form even in the absence of potential

13   litigation.  *See Richey*, 632 F.3d at 568.

14        On March 21, 2018, Mark Zuckerberg, Facebook's CEO, publicly posted:

15             I want to share an update on the Cambridge Analytica situation—
               including the steps we've already taken and our next steps to address
16             this important issue.

17             We have a responsibility to protect your data, and if we can't then
18             we don't deserve to serve you.  I've been working to understand
               exactly what happened and how to make sure this doesn't happen
19             again.

20             [W]e already took the most important steps a few years ago in 2014
21             to prevent bad actors from accessing people's information in this
               way. But there's more we need to do and I'll outline those steps
22             here:

23             First, we will investigate all apps that had access to large amounts of
24             information before we changed our platform to dramatically reduce
               data access in 2014, and we will conduct a full audit of any app with
25             suspicious activity.  We will ban any developer from out platform
               that does not agree to a thorough audit. And if we find developers
26             that misused personally identifiable information, we will ban them
               and tell everyone affected by those apps.
27

28   Mr. Zuckerberg concluded:

3

United States District Court
Northern District of California

> I started Facebook, and at the end of the day I'm responsible for what happens on our platform. I'm serious about doing what it takes to protect our community. While this specific issue involving Cambridge Analytica should no longer happen with new apps today, that doesn't change what happened in the past. We will learn from this experience to secure our platform further and make our community safer for everyone going forward.

https://www.facebook.com/zuck/posts/1010471203790007. This statement specifically identifies the purpose of the ADI as serving Facebook's business goal of protecting Facebook's customers' data by figuring out what happened, how it happened, and removing apps that misused customers' data so that Facebook could "secure our platform further and make our community safer for everyone going forward." *Id.*

Two months later, Facebook updated the public on the "app investigation and audit" Mr. Zuckerberg promised on March 21, 2018.

> The investigation process is in full swing, and it has two phases. First, a comprehensive review to identify every app that had access to this amount of Facebook data. And second, where we have concerns, we will conduct interviews, make requests for information (RFI)—which ask a series of detailed question about the app and the data it had access to—and perform audits that may include on-site inspections.

> We have large teams of internal and external experts working hard to investigate these apps as quickly as possible. To date thousands of apps have been investigated and around 200 have been suspended—pending a thorough investigation into whether they did in fact misuse any data. Where we find evidence that these or other apps did misuse data, we will ban them and notify people via this website. It will show people if they or their friends installed an app that misused data before 2015—just as we did for Cambridge Analytica.

> There is a lot more work to be done to find all the apps that may have misused people's Facebook data—and it will take time. We are investing heavily to make sure this investigation is as thorough as possible. We will keep you updated on our progress.

https://fb.com/new/2018/05/update-on-app-audit/. This statement again demonstrates that a "core purpose" of the ADI was a business rather than legal purpose: to assure its customers that it was

4

conducting a thorough investigation to remove bad apps and advise customers if their data may have been misused.  And the ADI was being conducted "as quickly as possible," —not because of fast-tracked litigation, as the pace of this MDL surely demonstrates—but because of the need to weed out the bad apps to protect Facebook's consumers, its good will, and its business.

Facebook provided a further update on "our ongoing App Developer Investigation" on September 20, 2019. Facebook explained that its investigation

> has involved hundreds of people: attorneys, external investigators, data scientists, engineers, policy specialists, platform partners and other teams across the company. Our review helps us to better understand patterns of abuse in order to root out bad actors among developers.

Facebook explained further

> that where it has concerns, it "conduct[s] a more intensive examination. This includes background investigation of the developer and a technical analysis of the app's activity on the platform. Depending on the results, a range of actions could be taken from requiring developers to submit to in-depth questioning, to conducting inspections or banning an app from the platform.

https://about.fb.com/news/2019/an-update-on-our-app-developer-investigation/.  Facebook told the public about its investigation, including the background and technical analysis it now claims is privileged work product, to assure the public that Facebook was cleaning up its platform and thus generate trust in its site—a classic business purpose.  The ADI team members Facebook identified were enlisted to help Facebook "better understand patterns of abuse in order to root out bad actors."

In light of Facebook's own statements, the Court finds that Facebook would have conducted the ADI in substantially the same form even in the absence of potential litigation; that is, that Facebook did not initiate the ADI because of the prospect of litigation.  *See Phoenix Techs. Ltd. v. VMware, Inc.*, 195 F. Supp. 3d 1096, 1105 (N.D. Cal. 2016) (holding that dual purpose documents were not protected work product because they served a business purpose independent of litigation).  Facebook's assertion that the ADI served *only* a litigation purpose (Dkt. No. 727 at 3) is patently implausible in light of Facebook's public pronouncements.  It is inconceivable that Facebook would not have initiated a speedy, large-scale-subject matter specialist investigation into

United States District Court
Northern District of California

1  app data misuse in the absence of potential litigation.  Such assertion could only be true if the

2  Court found that Facebook was lying to the public when it stated that the purpose of the ADI was

3  to root out bad apps and secure Facebook's platform so that consumers could have faith in the

4  company.  Facebook, unsurprisingly, does not offer any evidence to support such a finding.

5  Indeed, after asking the Court for the opportunity to submit additional evidence, it provided a

6  declaration from outside counsel which does not even acknowledge these statements. There is no

7  evidence from anyone at Facebook that addresses the repeated public proclamations as to the

8  obvious business purpose of the ADI.

9        Facebook's suggestion that these materials may also be protected by the attorney-client

10  privilege is unpersuasive given that Plaintiffs are not seeking documents created by counsel,

11  counsel's edits, or any communications with counsel.  Facebook has not explained how a non-

12  attorney's interview or audit of a developer would be protected from discovery by the attorney-

13  client privilege under federal law.  At best such material would be attorney work product.  For the

14  reasons explained above, it is not under the totality of the circumstances here given Facebook's

15  public exhortations of the business purpose behind its ADI.

### MOTION TO STRIKE

16

17        Facebook moves to strike Plaintiffs' response to Facebook's supplemental declaration.

18  (Dkt. No. 727.)  For the most part the response addresses the declaration and thus is

19  unobjectionable.  The new argument as to the attorney-client privilege "primary purpose" test is

20  stricken and, in any event, is moot as the Court is not addressing the application of the attorney-

21  client privilege.  The documents discussed in this Order—background and technical reports,

22  audits, and interviews prepared and conducted by non-attorneys—are work product, not attorney-

23  client privilege material.  The Court has nonetheless reviewed Facebook's motion to strike's

24  substantive arguments, including the cases buried in footnote 1, and none persuade the Court

25  otherwise.

### CONCLUSION

26

27        In light of Facebook's unchallenged public proclamations as to the business purpose of the

28  ADI, the Court finds that the ADI served a dual purpose and that, as a general matter, documents

generated as part of that investigation were not created because of litigation.  On or before

September 21, 2021, Facebook shall produce the background and technical reports, audits and

developer interviews of the six exemplar apps chosen by the parties as Facebook has offered no

special reasons why those particular documents are privileged other than what has been addressed.

The parties shall work with the Special Master regarding production of additional materials

consistent with the guidance offered by this Order.

This Order disposes of Docket Nos. 611, 612, 699, 720, 727.

**IT IS SO ORDERED.**

Dated:  September 8, 2021

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California

# EXHIBIT M

487 Mass. 109

**ATTORNEY GENERAL**

**v.**

**FACEBOOK, INC.**

**SJC-12946**

Supreme Judicial Court of Massachusetts, Suffolk.

Argued December 4, 2020.

Decided March 24, 2021.

**Background:** Attorney General filed petition, seeking an order compelling social networking company to comply with requests, contained within civil investigative demands, that sought identities of applications and developers that company reviewed at various stages of internal investigation conducted by its law firm, other information associated with review of identified applications, and internal communications about those applications. The Superior Court Department, Suffolk County, Brian A. Davis, J., 2020 WL 742136, allowed petition in part. Company applied for direct appellate review, which was granted.

**Holdings:** The Supreme Judicial Court, Kafker, J., held that:

(1) some, but not all, information requested by Attorney General demand was protected from disclosure on basis of attorney-client privilege;

(2) although some of information sought was covered by work product doctrine, remand was appropriate to determine whether information was protected as opinion work product or subject to disclosure as fact work product;

(3) information was prepared in anticipation of litigation, as required for it to be covered by work product doctrine; and

(4) Attorney General established substantial need for information requested in civil investigative demand that could

not be obtained without undue hardship, such that information was subject to disclosure to extent it was fact work product.

Ordered accordingly.

**1. Pretrial Procedure** ⚖35
   **Privileged Communications and Confidentiality** ⚖168

Social networking company did not waive its attorney-client and work product objections to Attorney General's requests, contained within third civil investigative demand, that sought identities of applications and developers that company reviewed at various stages of internal investigation conducted by its law firm, other information associated with review of identified applications, and internal communications about those applications, despite contention it waived such objection by failing to move to modify or set aside demand; company worked with Attorney General and communicated its objections to demand, including its assertions of privilege, and company also complied with requests in demand it believed called for nonprivileged information.

**2. Pretrial Procedure** ⚖35
   **Privileged Communications and Confidentiality** ⚖173

Party asserting the protections of the attorney-client privilege and the work product doctrine bears the burden of proving both the privilege and the doctrine apply.

**3. Privileged Communications and Confidentiality** ⚖102

The "attorney-client privilege" protects all confidential communications between a client and its attorney undertaken for the purpose of obtaining legal advice.

See publication Words and Phrases for other judicial constructions and definitions.

### 4. Privileged Communications and Confidentiality ⇔106, 156

The attorney-client privilege covers the flow of confidential communications in both directions, from the attorney to the client and from the client to the attorney, as the purpose of the privilege is to enable clients to make full disclosure to legal counsel of all relevant facts so counsel may render fully informed legal advice, with the goal of promoting broader public interests in the observance of law and administration of justice.

### 5. Privileged Communications and Confidentiality ⇔112

A construction of the attorney-client privilege that would leave internal investigations wide open to third-party invasion would effectively penalize an institution for attempting to conform its operations to legal requirements by seeking the advice of knowledgeable and informed counsel.

### 6. Privileged Communications and Confidentiality ⇔123

Attorney-client privilege applies to corporations.

### 7. Privileged Communications and Confidentiality ⇔123

The attorney-client privilege for business organizations is essential in light of the vast and complicated array of regulatory legislation confronting the modern corporation.

### 8. Privileged Communications and Confidentiality ⇔112

Despite the strong protections given to material subject to attorney-client privilege, the privilege is to be construed narrowly, because it frustrates the investigative or fact-finding process, and creates an inherent tension with society's need for full and complete disclosure of all relevant evidence during implementation of the judicial process.

### 9. Privileged Communications and Confidentiality ⇔145

Information requested by Attorney General in civil investigative demand, which sought documents from social networking company sufficient to identify applications and developers that company reviewed at various stages of internal investigation conducted by its law firm, and other information associated with review of identified applications, was not protected from disclosure on basis of attorney-client privilege; Attorney General did not require production of any documents or communications exchanged between company and its attorneys, and requests permitted company to comply without disclosing any such communications.

### 10. Privileged Communications and Confidentiality ⇔145

Information requested by Attorney General in civil investigative demand, which sought all of social networking company's internal communications and internal correspondence concerning categories of applications and developers that company reviewed at various stages of internal investigation conducted by its law firm was protected from disclosure due to attorney-client privilege; investigation was initiated in part to gather facts needed to advise company on various legal risks it faced.

### 11. Privileged Communications and Confidentiality ⇔102

The attorney-client privilege applies to communications between counsel and client made as part of an internal investigation that is undertaken to gather facts for the purposes of providing legal advice.

### 12. Pretrial Procedure ⇔359

The "work product doctrine" protects: (1) documents and tangible things; prepared (2) by or for another party or by or for that other party's representative, in-

cluding his or her attorney, consultant, surety, indemnitor, insurer, or agent; and (3) in anticipation of litigation or for trial. Mass. R. Civ. P. 26(b) (3).

> See publication Words and Phrases for other judicial constructions and definitions.

**13. Pretrial Procedure ⬄35**

The work product protection is broader than the attorney-client privilege, in that it is not restricted solely to confidential communications between an attorney and client. Mass. R. Civ. P. 26(b) (3).

**14. Pretrial Procedure ⬄35**

The purpose of the work product doctrine is to establish a zone of privacy for strategic litigation planning to prevent one party from piggybacking on the adversary's preparation. Mass. R. Civ. P. 26(b) (3).

**15. Pretrial Procedure ⬄359**

Document is prepared "in anticipation of litigation," for purposes of work product doctrine if, in light of nature of document and factual situation in particular case, document can be fairly said to have been prepared because of prospect of litigation. Mass. R. Civ. P. 26(b) (3).

> See publication Words and Phrases for other judicial constructions and definitions.

**16. Pretrial Procedure ⬄359**

Anticipation of litigation, for purposes of work product doctrine, does not have to be primary purpose or motivation. Mass. R. Civ. P. 26(b) (3).

**17. Pretrial Procedure ⬄359**

Document that would have been prepared irrespective of prospect of litigation is not covered by work product doctrine. Mass. R. Civ. P. 26(b) (3).

**18. Pretrial Procedure ⬄35**

Opinion work product may be reflected in interviews, statements, memoranda, correspondence and in countless other tangible and intangible ways. Mass. R. Civ. P. 26(b) (3).

**19. Pretrial Procedure ⬄35**

Opinion work product is only discoverable, if at all, in rare or extremely unusual circumstances. Mass. R. Civ. P. 26(b) (3).

**20. Pretrial Procedure ⬄35**

Although it is discoverable in some circumstances, fact work product is still protected so that each side must undertake its own investigation of the relevant facts and not simply "freeload" on opposing counsel. Mass. R. Civ. P. 26(b) (3).

**21. Pretrial Procedure ⬄359**

When a factual document selected or requested by counsel exposes the attorney's thought processes and theories, it may be appropriate to treat the document as opinion work product, even though the document on its face contains only facts. Mass. R. Civ. P. 26(b) (3).

**22. Pretrial Procedure ⬄35**

Not every item which may reveal some inkling of lawyer's mental impressions, conclusions, opinions, or legal theories is protected as opinion work product, as the focus, selection, or arrangement of facts must reflect attorney's thought process in some meaningful way. Mass. R. Civ. P. 26(b) (3).

**23. Pretrial Procedure ⬄35**

Information may appropriately be treated as fact work product if it can be produced in a format that removes any portions that contain attorney opinions, thoughts, or conclusions. Mass. R. Civ. P. 26(b) (3).

**24. Antitrust and Trade Regulation ⚘343**

Although information requested by Attorney General in civil investigative demand, which sought documents from social networking company sufficient to identify applications and developers that company reviewed at various stages of internal investigation conducted by its law firm, and other information associated with review of identified applications, was covered by work product doctrine, remand was appropriate to determine whether information was protected as opinion work product or subject to disclosure as fact work product. Mass. R. Civ. P. 26(b) (3).

**25. Antitrust and Trade Regulation ⚘341**

Information requested by Attorney General in civil investigative demand, which sought documents from social networking company sufficient to identify applications and developers that company reviewed at various stages of internal investigation conducted by its law firm, and other information associated with review of identified applications, was prepared in anticipation of litigation and, thus, was covered by work product doctrine; investigation was staffed by outside counsel and forensic consultants and had methodology distinct from company's ongoing enforcement program, it was focused on past violations, not ongoing operations, and served to defend company against vast litigation it was facing, rather than just improving its ongoing operations. Mass. R. Civ. P. 26(b) (3).

**26. Pretrial Procedure ⚘35**

Simply funneling an organization's investigation through outside counsel does not bring with it the protection of the work product doctrine if the organization would have conducted these activities irrespective of anticipated litigation. Mass. R. Civ. P. 26(b) (3).

**27. Pretrial Procedure ⚘35**

Work product doctrine applies as long as corporation had the prospect of litigation in mind. Mass. R. Civ. P. 26(b) (3).

**28. Pretrial Procedure ⚘35**

Party seeking fact work product is required to demonstrate substantial need and undue hardship absent its production. Mass. R. Civ. P. 26(b) (3).

**29. Pretrial Procedure ⚘359**

A "substantial need" exists, as required for party to obtain fact work product, where the information is relevant and the requesting party cannot reasonably obtain the information or its substantial equivalent elsewhere; there also must be special circumstances excusing the party's failure to obtain the requested materials itself. Mass. R. Civ. P. 26(b) (3).

See publication Words and Phrases for other judicial constructions and definitions.

**30. Pretrial Procedure ⚘359**

When deciding whether a substantial need exists for discovery of documents created in response to a litigation threat, courts consider, among other factors: (1) the importance of the materials to the party seeking discovery for case preparation: (2) the difficulty the party will have obtaining it by other means: and (3) the likelihood the party, even if he or she obtains the information by independent means, will not have the substantial equivalent of the documents he or she seeks.

**31. Pretrial Procedure ⚘359, 406**

The substantial need inquiry, when deciding whether party is entitled to obtain fact work product, requires a careful examination of whether non-disclosure will impair the truth-seeking function of discovery. Mass. R. Civ. P. 26(b) (3).

ATTY. GEN. v. FACEBOOK, INC.      Mass.  **877**
Cite as 164 N.E.3d 873 (Mass. 2021)

**32. Antitrust and Trade Regulation**
  ⬅343

Attorney General established substantial need for information requested in civil investigative demand, which sought documents from social networking company sufficient to identify applications and developers that company reviewed at various stages of internal investigation conducted by its law firm, and other information associated with review of identified applications, that could not be obtained without undue hardship, such that information was subject to disclosure to extent it was fact work product; information was central to investigation, as it identified applications that might have misused user data on prior version of company's platform, Attorney General had mandate to investigate such potential misuse of user data as well as any misrepresentations by company, it was unlikely Attorney General would be able to obtain substantial equivalent of information, and Attorney General undoubtedly would incur enormous costs and delay in her investigation if the information was not disclosed.  Mass. R. Civ. P. 26(b) (3).

———————

Attorney at Law, Attorney-client relationship, Work product. Attorney General. Consumer Protection Act, Investigative demand. Privileged Communication.

Petition filed in the Superior Court Department on August 15, 2019.

The case was heard by Brian A. Davis, J.

The Supreme Judicial Court granted an application for direct appellate review.

Felicia H. Ellsworth, Boston, for the respondent.

Sara E. Cable, Assistant Attorney General, for the petitioner.

The following submitted briefs for amici curiae:

Thomas O. Bean & Anuj Khetarpal, Boston, for Association of Corporate Counsel.

Ariel Fox Johnson, of the District of Columbia, & Joseph Jerome, for Common Sense Media.

Steven P. Lehotsky, Kevin P. Martin, Boston, William E. Evans, Boston, Ben Robbins, & Martin J. Newhouse, Boston, for Chamber of Commerce of the United States of America & another.

David A. Vicinanzo, Boston, of New Hampshire, Mark Tyler Knights, Hannah R. Bornstein, Boston, & Marissa Elkins, Amherst, for National Association of Criminal Defense Lawyers.

Alan Butler & Megan Iorio, of the District of Columbia, & Caitriona Fitzgerald for Electronic Privacy Information Center.

James M. Campbell, Boston,, for Lawyers for Civil Justice.

Present: Budd, C.J., Gaziano, Lowy, Cypher, & Kafker, JJ.

KAFKER, J.

$\llcorner_{110}$In this case we address the applicability of the attorney-client privilege and the work product doctrine to an internal investigation conducted by the respondent, Facebook, Inc. (Facebook). After public reporting revealed potential widespread misuse of Facebook user data by third-party applications (apps), Facebook hired a law firm, Gibson, Dunn & Crutcher LLP (Gibson Dunn), to conduct a far-reaching investigation to identify the extent to which apps had misused user data and advise Facebook on potential resulting legal liabilities. This investigation is known as the app developer investigation (ADI). Around the same time, the Attorney General opened an investigation into Facebook under G. L. c. 93A, focusing on whether

Facebook misrepresented the extent to which it protected or misused user data.

As part of that investigation, the Attorney General served Facebook with several civil investigative demands (demands). At issue are six requests contained within these demands that sought the identities of the apps and developers that Facebook reviewed at various stages of the ADI, other information associated with the review of the identified apps, and internal communications about those apps. Facebook asserted that both the attorney-client privilege and the work product doctrine protected this information. The Attorney General filed a petition in the Superior Court seeking an order compelling Facebook to comply with the disputed requests. A judge concluded that most of the information is neither privileged nor work product, as it was not prepared in anticipation of litigation, and that even if it was prepared in anticipation of litigation, it is all factual information.

We conclude that the Attorney General's targeted requests allow Facebook to tailor its responses to the first five of the six ⌊U⌋requests to avoid disclosure of communications protected by the attorney-client privilege. We also conclude, however, that the documents sought by the first five requests were prepared in anticipation of litigation and therefore are covered by the work product doctrine. We further conclude that a remand is required to separate "opinion" work product from "fact" work product for at least some of these documents. To the extent the work product is fact work product, we conclude that the Attorney General has satisfied the heavy burden of demonstrating a substantial need for the information. Finally, as

for the sixth request, seeking internal communications about the apps, we have determined that this request encompasses both privileged and nonprivileged communications, and therefore requires preparation of a privilege log and further review as determined by the judge.[1]

1. <u>Background</u>. a. <u>Facebook Platform</u>. Facebook provides social networking services through its website and mobile app. It has over 1 billion daily users and over 2 billion active accounts. Users generate a variety of data through their use of Facebook. In 2007, Facebook launched the first version of the Facebook Platform. The Platform connects Facebook users with third-party app developers and enables users to share Facebook data with the apps and developers. The Platform allows these third parties to integrate their apps with the data generated by users and collected by Facebook. For our purposes, the practical effect of the Platform is that third-party developers are given access to Facebook user data. The Attorney General alleges that over 9 million apps and websites had integrated with the Platform as of March 31, 2012.

Use of the Platform by apps and developers is governed by various policies, including Facebook's Platform policy, terms of service, and data use policy. As relevant here, these policies prohibited third-party developers from selling or licensing the data they obtained from Facebook users. The policies also prohibited developers from sharing user data with "any ad network, data broker or other advertising or monetization-related service." A developer had to register to use the Platform and affirmatively agree to comply with the various policies governing use of the Platform;

---

1. We acknowledge the amicus briefs submitted by the Association of Corporate Counsel, Common Sense Media, the Chamber of Commerce of the United States and the New England Legal Foundation, the National Association of Criminal Defense Lawyers, the Electronic Privacy Information Center, and Lawyers for Civil Justice.

⌐₁₁₂however, as of late 2013, apps generally could be launched on the Platform without any review or approval by Facebook.

Facebook has an internal enforcement program that monitors and responds to developer misuse of the Platform. This is known as its developer operations team.[2] This enforcement team monitors daily app and developer behavior with the goal of "identifying abnormalities that might signal potential policy violations." The activities of this enforcement program generally are not led by attorneys, however. In addition to monitoring compliance, this team enforces Facebook's policies according to its own rubrics and protocols. By way of illustration, Facebook estimates that it took enforcement action against about 370,000 apps in 2017 as a result of these routine enforcement efforts.

In April 2014, Facebook revised its Platform and the accompanying policies to improve protections for user data.[3] These changes "enhance[d] users' ability to control app developers' access to their information." Specifically, they restricted the categories of information apps could access and gave users more tools to limit the type of information apps could access. Facebook also added a screening mechanism that required apps and developers to obtain Facebook's approval before getting access to many advanced categories of user data.

After this screening mechanism was put in place, Facebook rejected the requests of roughly fifty percent of apps that sought access to the additional user data.

b. _Cambridge Analytica incident._ In March 2018, several news outlets reported on an incident involving Facebook, an individual named Aleksandr Kogan, and a company named Cambridge Analytica. Briefly, Kogan used an app on the prior version of the Platform to access and collect the data of as many as 87 million Facebook users worldwide, roughly 70 million of whom were located in the United States. Kogan sold this data to Cambridge Analytica, a political data analytics and advertising firm, and other related entities. Cambridge Analytica used this data to create "psychographic profiles" on the Facebook users. Cambridge Analytica then used these profiles to target Facebook users with political advertising. According to Facebook, this conduct violated ⌐₁₁₃the Platform policies described above in multiple ways.[4]

The 2018 reporting of this incident sparked a wave of litigation against and investigations into Facebook. By the end of 2018, Facebook faced at least five securities class actions, eight derivative actions, three books and records actions, and thirty-nine consumer-based suits, most of which also were class actions.[5] This num-

---

**2.** Among the impounded materials in this case are detailed descriptions of the developer operations team provided to the Attorney General by Facebook.

**3.** Facebook formally refers to the version of the Platform that was in effect before these changes as "Graph API v. 1.0." We refer to it as the "prior version" of the Platform.

**4.** Facebook first learned that Kogan and Cambridge Analytica had accessed the data in December 2015, again from public reporting. At that point, Facebook suspended Kogan's app from the Platform. It did not ban Cam-

bridge Analytica from the Platform at that time. Facebook also did not disclose the violations to the users whose information was implicated at the time. Instead, Facebook only pursued enforcement action against Kogan and obtained assurances that Kogan and Cambridge Analytica had deleted all of the improperly collected data. The subsequent reporting in 2018 revealed that, contrary to those representations, Cambridge Analytica had not deleted the Facebook user data.

**5.** All but one of these consumer lawsuits have been consolidated in a multidistrict litigation in the United States District Court for the

ber swelled to at least sixty-five litigations before the end of 2019. Facebook is also being investigated by a number of State, Federal, and foreign regulators.

c. ADI.[6] Facebook launched the ADI investigation soon after the reporting on Cambridge Analytica in March 2018. According to Facebook, the purpose of the ADI is to "gather the facts necessary for providing legal advice to Facebook about litigation, compliance, regulatory inquiries, and other legal risks facing the company resulting from potential data misuse and activities by third-party app developers operating on the prior version of the Platform." The goal of the ADI, therefore, is to identify any other apps that misused user data on the prior version of the Platform and assess Facebook's potential legal liability as a result of any uncovered misuse. Facebook states that the ADI has been "designed, managed, and overseen" by Gibson Dunn and Facebook's in-house counsel, and these attorneys "devised and tailored the ADI's methods, protocols, and strategies to address the specific risks posed by these legal challenges." Gibson Dunn recruited and retained the outside technical experts and investigators involved in the ADI.

Counsel also developed the framework for the ADI. In broad terms, the ADI consists of three separate phases. The first phase focuses on detection and identification. The goal of this phase is ⌐114either to elevate an app or developer for closer in-

vestigation or to exclude apps that pose less risk. Using four different methods, Facebook has reviewed millions of apps and determined which ones should be investigated further.[7] If an app is identified by one of the methods used during the first phase, then the app warrants further review by the ADI team. The second phase focuses on enhanced examination. This phase involves "background" or "technical" investigations of the apps escalated in the first phase. The third phase involves engagement with, and potentially enforcement against, apps or developers that violated Facebook's policies.

The ADI involves various types of personnel. Facebook's in-house legal team and Gibson Dunn hired multiple forensic consulting firms to assist with the investigation. At times, the ADI has included as many as 300 internal and external experts. Despite the number of people involved in the investigation, Facebook represents that it has taken various steps to ensure that the ADI remains confidential. This includes limiting communications about the investigation and restricting access to documents.

d. Attorney General's investigation. Shortly after the media coverage of the Cambridge Analytica incident in March 2018, the Attorney General began investigating Facebook under G. L. c. 93A, § 6. The purpose of the investigation is to identify any other apps that misused user data and assess whether Facebook followed its

---

Northern District of California. See In re: Facebook, Inc., Consumer Privacy User Profile Litigation, U.S. Dist. Ct., No. 18-md-02843-VC, MDL No. 2843 (N.D. Cal.).

**6.** Some details regarding the ADI are impounded. Therefore, our discussion of the ADI here does not include certain details.

**7.** The four methods are (1) the user-impact method, in which apps with a large number of installing users are prioritized for review;

(2) the categorical method, in which the ADI investigative team, relying on past investigative experience, groups apps and developers into categories and prioritizes them for review; (3) the escalations method, in which apps are prioritized based on information from other sources, both internally and externally; and (4) the low impact method, in which apps that do not pose as much legal risk as others are deprioritized for review.

policies and commitments to its users regarding user data. Over the course of the investigation, the Attorney General has issued three demands. The first demand was issued in April 2018. The second demand, issued in June 2018, sought information on the apps that Facebook had suspended and information on Facebook's internal policies and procedures surrounding apps. As part of its response, Facebook provided the Attorney General with detailed information on how it has conducted the ADI.

The third demand, issued on November 5, 2018, is the subject of this dispute. In this demand, the Attorney General sought the identities of and information regarding the apps and developers that Facebook identified and reviewed as part of the ADI. Specifically, the Attorney General took the detailed descriptions of the ADI that Facebook provided and used that language in her requests. In response, Facebook provided updated information on suspended apps but refused to comply with several of the requests.

There are six contested requests at the center of this dispute. The judge below described these requests as follows:

"1. The group of 6,000 apps with a large number of installing users[8] . . . ;

"2. The group of apps and developers that fall within certain categories that, based on Facebook's 'past investigative experience,' present an elevated risk of potential policy violations . . . ;

"3. The group of apps and developers that were reported to Facebook from outside of the ADI process, such as through the Data Abuse Bounty Pro-

gram (to the extent not already produced), media reporting and inquiries, and other referrals from internal Facebook teams . . . ;[9]

"4. The group of apps and/or developers on which, to date, Facebook has conducted a 'detailed background check . . . to gauge whether the app or developer has engaged in behavior that may pose a risk to Facebook user data or raise suspicions of data misuse, to identify connections with other entities of interest, and to search for any other indications of fraudulent activity' . . . ;

"5. The group of apps on which, to date, Facebook has conducted a 'technical review' to analyze 'available technical information about the apps derived from Facebook's available internal usage records in order to gauge data collection practices -- such as the disproportionate collection of data and broad data requests -- which may suggest data misuse' . . . ; and

"6. All of Facebook's internal communications and internal correspondence concerning the apps that 'had access to large amounts of Facebook data before the 2014 changes to [Facebook's] Platform took effect,' and/or for which Facebook has conducted an 'in-depth review,' a 'Background Information Investigation' or a 'Technical Investigation.' "

The first five requests require Facebook to produce documents sufficient to identify the apps and facts concerning them (app information). Specifically, the first five requests seek the identity of all the apps described in the requests. For some of the

---

**8.** The apps sought in the first request were not simply the apps that had the largest number of installing users; these apps were selected using a combination of factors, including the number of installing users and permissions to certain types of data.

**9.** The data abuse bounty program provides third parties an avenue to refer apps that may have engaged in wrongful conduct to Facebook. Facebook has complied with this portion of the first contested request and identified apps and developers flagged through this program.

apps, the Attorney General also seeks the following additional factual information: the app developer or publisher; whether the app was released to the public; the date the app was first released to the public; the date Facebook first reviewed the app's privacy policy; the "basis and initial source(s) of reports, allegations or concerns of data misuse of user information obtained or accessed through the app"; the categories of user information for which the app obtained permissions; the number of users who downloaded or installed the app; and the number of users who did not download or install the app but whose information was still accessed or obtained by the app.

For each of these five requests, the Attorney General provided that "[i]n lieu of documents in response to this Request, the Commonwealth will accept information in a spreadsheet format." Facebook therefore is not required to produce any existing documents sent to or created by the ADI team in regard to the first five requests; rather, it simply is required to assemble a list of apps that is responsive to each request and provide the additional requested information concerning those apps. The sixth request is different, however; it seeks internal communications about many of those apps.

e. *Prior productions*. Throughout the investigation, Facebook has engaged extensively with the Attorney General. Facebook has provided the Attorney General with the name of every app and developer that it has suspended from the Platform.[10] Similarly, Facebook provided the Attorney General with the identities of ⌊ᵤ⌋ any developers that it sought to interview or audit or from which it requested information.

Facebook has also provided the Attorney General with numerous narrative responses at various stages of the investigation. As part of these narratives, Facebook has provided the Attorney General with a detailed overview of the ADI and a general summary of the criteria used in each phase. Throughout its engagement with the Attorney General, Facebook emphasized that it was not waiving any applicable privilege over the investigation.

Facebook also has produced at least 15,000 documents across seven productions in response to the third demand. This includes communications with developers and requests for information. Similarly, Facebook has met with the members of the Attorney General's investigative team on numerous occasions.

f. *Public statements about ADI*. Facebook has made several public statements about the ADI since its inception. Facebook publicly announced its investigation into the Kogan incident on March 21, 2018. In this statement, Facebook said, "We will investigate all apps that had access to large amounts of information before we changed our platform in 2014 to reduce data access, and we will conduct a full audit of any app with suspicious activity. If we find developers that misused personally identifiable information, we will ban them from our platform." It also said that it would "tell people affected by apps that have misused their data" and expand its program for rewarding people who report data misuse by app developers.

In the months that followed, Facebook made other public statements about the ADI. On April 11, 2018, Mark Zuckerberg, the chief executive officer of Facebook, testified before Congress, stating,

---

**10.** Only one app -- Kogan's app -- has been suspended for actual misuse of user data. When it provided the identities of other suspended apps, Facebook did not explain why it suspended each app. Instead, it provided general explanations for why groups of apps were suspended, which was often because of their affiliation with a particular developer.

"We're in the process of investigating every app that had access to a large amount of information before we locked down our platform in 2014. If we detect suspicious activity, we'll do a full forensic audit. And if we find that someone is improperly using data, we'll ban them and tell everyone affected."

He also told Congress that, at that time, "around 200 apps . . . from a handful of developers" had been suspended pending investigation into whether they misused data.

⎣₁₁₈Facebook provided a more detailed public update on the ADI in a press release in May 2018:

"The investigation process is in full swing, and it has two phases. First, a comprehensive review to identify every app that had access to this amount of Facebook data. And second, where we have concerns, we will conduct interviews, make requests for information (RFI) -- which ask a series of detailed questions about the app and the data it has access to -- and perform audits that may include on-site inspections.

"We have large teams of internal and external experts working hard to investigate these apps as quickly as possible. To date thousands of apps have been investigated and around 200 have been suspended -- pending a thorough investigation into whether they did in fact misuse any data. Where we find evidence that these or other apps did misuse data, we will ban them and notify people via this website. It will show people if they or their friends installed an app that misused data before 2015 -- just as we did for Cambridge Analytica."

Facebook provided another public update in August 2018. It stated that it had suspended an app "for failing to agree to our request to audit and because it's clear that [the app] shared information with re-

searchers as well as companies with only limited protections in place." Facebook also informed the public, "Since launching our investigation in March, we have investigated thousands of apps. And we have suspended more than 400 due to concerns around the developers who built them or how the information people chose to share with the app may have been used -- which we are now investigating in much greater depth."

Finally, in September 2019, Facebook announced:

"We wanted to provide an update on our ongoing [ADI], which we began in March of 2018 as part of our response to the episode involving Cambridge Analytica.

" . . .

"We initially identified apps for investigation based on how many users they had and how much data they could access. Now, we also identify apps based on signals associated with an app's potential to abuse our policies. Where we have concerns, we conduct a more intensive examination. This includes a background investigation of the developer and a ⎣₁₁₉technical analysis of the app's activity on the platform. Depending on the results, a range of actions could be taken from requiring developers to submit to in-depth questioning, to conducting inspections or banning an app from the platform . . . .

"To date, this investigation has addressed millions of apps. Of those, tens of thousands have been suspended for a variety of reasons while we continue to investigate.

"It is important to understand that the apps that have been suspended are associated with about 400 developers. This is not necessarily an indication that these apps were posing a threat to people.

Many were not live but were still in their testing phase when we suspended them. It is not unusual for developers to have multiple test apps that never get rolled out. And in many cases, the developers did not respond to our request for information so we suspended them, honoring our commitment to take action. "In a few cases, we have banned apps completely. That can happen for any number of reasons including inappropriately sharing data obtained from us, making data publicly available without protecting people's identity or something else that was in clear violation of our policies. We have not confirmed other instances of misuse to date other than those we have already notified the public about, but our investigation is not yet complete. We have been in touch with regulators and policymakers on these issues. We'll continue working with them as our investigation continues."

g. Procedural history. In August 2019, the Attorney General filed a petition to compel compliance with the third demand in the Superior Court. Facebook opposed the petition, arguing that the requests sought information protected by the attorney-client privilege and work product doctrine. A hearing was held on the petition on November 7, 2019.

In January 2020, a Superior Court judge largely granted the Attorney General's petition. He first concluded that the work product doctrine did not apply because the ADI was a continuation of Facebook's ongoing app enforcement program, rather than done in anticipation of litigation. He also concluded that even if the app information was work product, it nonetheless was discoverable because it constituted fact work product and the Attorney

|_{120}General had demonstrated a substantial need for the information. The judge then concluded that the attorney-client privilege did not apply to most of the information sought because the app information was factual in nature and because Facebook had "touted" the ADI in public and therefore could not claim a privilege over the investigation. The judge further concluded that the wording of the sixth request was broad enough that it likely sought some privileged communications that included "requests for legal advice and/or legal advice on the part of Facebook and its attorneys . . . ." He emphasized that he was not compelling the production of such communications and ordered Facebook to prepare a detailed privilege log so that the Attorney General could challenge any assertions of privilege. Facebook appealed, and we granted its application for direct appellate review.[11]

2. Discussion. a. Waiver of objections to demand. Before reaching the merits, we first address the Attorney General's argument that Facebook has waived its objections to the third demand by failing to move to modify or set it aside under G. L. c. 93, § 6 (7). The Attorney General argues that § 6 (7), as well as our decision in Attorney Gen. v. Bodimetric Profiles, 404 Mass. 152, 533 N.E.2d 1364 (1989) (Bodimetric), require recipients of demands to file such a motion to preserve any objections to a demand, something that Facebook did not do here.

In Bodimetric, we held that "failure to bring such a motion pursuant to [§ 6 (7)] constitutes a waiver by the person to whom the [demand] is served." Bodimetric, supra at 154, 533 N.E.2d 1364. The recipient of the demand in that case refused to

---

**11.** Facebook's attempts to stay the judge's order pending appeal were unsuccessful. Facebook has been producing the app information and communications to the Attorney General subject to a protective order during the pendency of this appeal.

comply with it and merely sent a letter stating its objections to the Attorney General. Id. at 155, 533 N.E.2d 1364. We further explained that "[t]he recipient [of a demand] may not remain passive . . . raising legal arguments only after the Attorney General brings a motion to compel." Id. Despite the fact that the recipient had "[sent] a letter to the Attorney General stating its objections to the [demand,] . . . [m]erely informing the Attorney General of its refusal to comply [did] not suffice to shift the burden to the Attorney General to take the next legal step." Id. The judge below rejected this argument, concluding that, under Bodimetric, a judge has the discretion to deem a failure to file a timely motion for relief as a waiver of the right to object to the ⌊₁₂₁demand but is not obligated to do so. The judge then determined that Facebook had not waived its right to object to the demand.

**[1]** We agree that Facebook has not waived its objections to the demand. Whereas the recipient of the demand in Bodimetric refused to comply altogether, Facebook's engagement with the Attorney General has been far from passive. Instead, Facebook has worked with the Attorney General and communicated its objections to the third demand, including its assertions of privilege. Facebook has also complied with the requests in the demand that Facebook believes call for nonprivileged information. Moreover, finding waiver here could discourage cooperation with the Attorney General and result in increased litigation whenever the Attorney General serves a demand. We therefore conclude that Facebook has not waived its objections to the demand.

**[2]** b. Legal standards. This case implicates both the attorney-client privilege and the work product doctrine. We review the applicability of both de novo. Commissioner of Revenue v. Comcast Corp., 453 Mass. 293, 302, 901 N.E.2d 1185 (2009) (Comcast). Facebook, as the party asserting the protections, bears the burden of proving that both the privilege and the work product doctrine apply. Id. at 304, 901 N.E.2d 1185. See Clair v. Clair, 464 Mass. 205, 215, 982 N.E.2d 32 (2013) ("The party asserting attorney-client privilege has the burden of establishing that the privilege applies to the communications at issue").

**[3–7]** c. Attorney-client privilege. We begin with the attorney-client privilege. The attorney-client privilege protects "all confidential communications between a client and its attorney undertaken for the purpose of obtaining legal advice." Suffolk Constr. Co. v. Division of Capital Asset Mgt., 449 Mass. 444, 448, 870 N.E.2d 33 (2007). See Comcast, 453 Mass. at 303, 901 N.E.2d 1185 (elements of privilege). See also Mass. G. Evid. § 502(b) (2021).[12] The privilege covers the flow of confidential communications in both directions -- from the attorney to the client and from the client to the attorney -- as the "purpose of the privilege 'is to enable clients to make full disclosure to legal counsel of all relevant facts . . . so that counsel may render fully informed legal advice,' with the goal of 'promot[ing] broader public interests in the observance of law and ⌊₁₂₂administration of justice.' " Comcast, supra, quoting Suffolk Constr. Co., supra at 449, 870 N.E.2d 33. We have emphasized

---

**12.** The attorney-client privilege applies to corporations. See Upjohn Co. v. United States, 449 U.S. 383, 389-390, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Indeed, "the attorney-client privilege for business organizations [is] essential in light of 'the vast and complicated array of regulatory legislation confronting the modern corporation.' " In re Kellogg Brown & Root, Inc., 756 F.3d 754, 757 (D.C. Cir. 2014), cert. denied, 574 U.S. 1122, 135 S.Ct. 1163, 190 L.Ed.2d 914 (2015), quoting Upjohn Co., supra at 392, 101 S.Ct. 677.

the value of protecting confidential attorney-client communications, as the "social good derived from the proper performance of the functions of lawyers acting for their clients . . . outweigh[s] the harm that may come from the suppression of the evidence." Hanover Ins. Co. v. Rapo & Jepsen Ins. Servs., Inc., 449 Mass. 609, 615-616, 870 N.E.2d 1105 (2007), quoting Commonwealth v. Goldman, 395 Mass. 495, 502, 480 N.E.2d 1023, cert. denied, 474 U.S. 906, 106 S.Ct. 236, 88 L.Ed.2d 237 (1985). See Matter of a Grand Jury Investigation, 437 Mass. 340, 351, 772 N.E.2d 9 (2002) (Grand Jury Investigation) ("Considerable public benefit inures when an institution voluntarily scrutinizes its own operations for the purpose of seeking advice from counsel on how to comply with the law, particularly where today's increasingly dense regulatory terrain makes such compliance 'hardly an instinctive matter'"). "A construction of the attorney-client privilege that would leave internal investigations wide open to third-party invasion would effectively penalize an institution for attempting to conform its operations to legal requirements by seeking the advice of knowledgeable and informed counsel." Grand Jury Investigation, supra.

[8]   Despite the strong protections given to material subject to the attorney-client privilege, "[w]e consistently have held that the privilege is to be construed narrowly." Clair, 464 Mass. at 215, 982 N.E.2d 32, citing Comcast, 453 Mass. at 304, 901 N.E.2d 1185. We do so because the privilege "frustrate[s] the investigative or fact-finding process . . . [and] create[s] an inherent tension with society's need for full and complete disclosure of all relevant evidence during implementation of the judicial process'" (citation omitted). Comcast, supra. See Hanover Ins. Co., 449 Mass. at 615, 870 N.E.2d 1105, quoting In re Grand Jury Investigation No. 83-2-35, 723 F.2d 447, 451 (6th Cir. 1983), cert.

denied, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984). See also Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 24 (1st Cir. 2011) ("attorney-client privilege must be narrowly construed because it comes with substantial costs and stands as an obstacle of sorts to the search for truth" [citation omitted]). We also have recognized that the privilege can be waived. Comcast, supra at 303, 901 N.E.2d 1185.

In balancing these competing concerns and determining whether the privilege applies, we focus on the distinctions between attorney-client communications and underlying facts. As we explained in Chambers v. Gold Medal Bakery, Inc., 464 Mass. 383, 392, 983 N.E.2d 683 (2013):

⊥123"[The distinction between communications and underlying facts] is crucial because attorney-client privilege only protects against disclosure of confidential communications made to render legal services. [Comcast, 453 Mass. at 305, 901 N.E.2d 1185]. It does not immunize underlying facts available from another source from discovery just because a client disclosed the facts to an attorney. See M.S. Brodin & M. Avery, Massachusetts Evidence § 5.4.4 (8th ed. 2007 & Supp. 2013), quoting Upjohn Co. v. United States, 449 U.S. 383, 395-396 [101 S.Ct. 677, 66 L.Ed.2d 584] (1981) [(Upjohn)] ('A fact is one thing and a communication concerning that fact is an entirely different thing')."

In Upjohn, supra, the United States Supreme Court explained this distinction:

"The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney: '[T]he protection of the privilege extends only to communications and not to facts. . . . The client cannot be compelled to answer the question, "What did

ATTY. GEN. v. FACEBOOK, INC.   Mass.   **887**
Cite as 164 N.E.3d 873 (Mass. 2021)

you say or write to the attorney?" but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.' ... Here, the Government was free to question the employees who communicated with [the company's lawyer] and outside counsel." (Emphasis in original; citation omitted.)

This distinction is important and somewhat collapsed by the advocacy in the instant case. Facebook interprets the requests as seeking confidential communications between Facebook and its outside counsel or information that does not exist independently of such communications. This fails to take into account the fact that the underlying data about apps' breaches of privacy policies is all independently discoverable and cannot be protected by Facebook's initiation of its own factual investigation. The attorney-client privilege only protects communications between the attorney and the client about such factual information, not the facts themselves.

**[9]**  i.  <u>First five requests</u>. The first five requests do not require the production of any communications between Facebook and counsel ⌐124⌐during the ADI process.[13] Rather, these requests only seek documents "sufficient to identify" the apps that fall within the five categories of requested documents identified <u>supra</u> or lists of the apps themselves, and other information associated with those apps. While this certainly requires the production of factual information relevant to the Attorney General's investigation, and such factual information has almost certainly been contained in attorney-client communications, it does not require the production of the attorney-

client communications themselves. This is a crucial distinction; as the Supreme Court explained in <u>Upjohn</u>, 449 U.S. at 396, 101 S.Ct. 677, a client "may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney" (citation omitted).

The app information sought by the Attorney General in the first five requests differs from the type of information that has been deemed covered by the attorney-client privilege. For example, <u>Upjohn</u> involved responses to questionnaires and interview notes that included responses to questions. See <u>Upjohn</u>, 449 U.S. at 397, 101 S.Ct. 677. Corporate employees communicated factual information to the corporation's attorneys in response to requests from the attorneys for information. The Court held that such communications of factual information were covered by the privilege. <u>Id.</u> at 395, 101 S.Ct. 677. Similarly, in <u>Federal Trade Comm'n</u> v. <u>Boehringer Ingelheim Pharms., Inc.</u>, 180 F. Supp. 3d 1, 30-32 (D.D.C. 2016) (<u>Boehringer III</u>), aff'd, 892 F.3d 1264, 1266 (D.C. Cir. 2018) (<u>Boehringer IV</u>), the court held that the privilege shielded, among other things, PowerPoint presentations and spreadsheets that summarized facts and analyzed how various litigation and settlement outcomes would have an impact on the company financially. Company employees prepared the documents and sent them to the company's general counsel at her request to assist her with settlement negotiations. <u>Boehringer III</u>, <u>supra</u> at 32. In affirming the conclusion that the documents were privileged, the United States Court of Appeals for the District of Columbia Circuit emphasized:

---

**13.**  On the other hand, the sixth contested request, which we address <u>infra</u>, explicitly

seeks communications.

"[T]he attorney-client privilege 'only protects disclosure of communications' . . . . [It] does not prevent the [Federal Trade Commission's] discovery of the underlying facts ⌊125data possessed by [the company] and its employees. . . . But [it] does protect the communication of facts by corporate employees to the general counsel when . . . the communications were for the purpose of obtaining or providing legal advice" (emphasis in original).

Boehringer IV, supra at 1268.

In the first five requests, the Attorney General is not requiring the production of documents or communications that were exchanged between Facebook (including its employees) and its attorneys, and the requests permit Facebook to comply without disclosing any such communications. Therefore, Facebook cannot rely on the attorney-client privilege as a basis for refusing to comply with these requests. We reiterate that "[t]he client cannot be compelled to answer the question, 'What did you say or write to the attorney,'" particularly where those communications occur during an internal investigation (citation omitted). See Upjohn, 449 U.S. at 396, 101 S.Ct. 677. Facebook is not being compelled to answer those questions, however, and it does not have to produce any communications with its attorneys. Given the flexibility provided to Facebook in its response, the factual information it is required to produce in response to the first five requests is thus not covered by the attorney-client privilege. As will be explained infra, however, as framed, the requests do implicate the work product doctrine.

**[10]**   ii. Sixth request. The sixth request broadly seeks "[a]ll of Facebook's internal

communications and internal correspondence concerning" several categories of apps sought in the other requests. Facebook refused to comply with this request and asserted that it called for the production of privileged communications. The judge below ordered Facebook to produce a detailed privilege log identifying any documents it was withholding on the basis of the privilege. While this case proceeded on appeal, Facebook provided the Attorney General with at least two privilege logs responsive to this request.[14]

**[11]**   As explained above, the attorney-client privilege certainly applies to communications between counsel and client made as part of an internal investigation that is undertaken to gather facts for the purposes of providing legal advice. See, e.g., Grand Jury ⌊126Investigation, 437 Mass. at 351, 772 N.E.2d 9. See also Upjohn, 449 U.S. at 390, 101 S.Ct. 677. The ADI is such an investigation, as it was initiated in part to gather the facts needed to advise Facebook on various legal risks facing the company. See Comcast, 453 Mass. at 303, 901 N.E.2d 1185 (elements of privilege). As such, any confidential communications relating to the ADI among Facebook, Gibson Dunn, and other members of the ADI team would almost certainly be privileged. There may also be other responsive communications between counsel and client outside the ADI that are privileged. At the same time, the breadth of the request includes communications outside the ADI that may not otherwise involve attorney-client communications. The Attorney General is seeking communications dating back to April 30, 2014, which is years before the ADI began in the spring of 2018.[15] The request, on its face, also ap-

---

**14.**   In one log, Facebook identified seven categories for which it is withholding documents on a categorical basis. This includes 40,108 documents. The other log contained 947 en-

tries over which it is asserting the privilege.

**15.**   Facebook represents that it "has never claimed that the privilege derived from the

plies to communications between Facebook employees who are not lawyers and are not acting at the direction of lawyers. Further sorting out of this request is required.

We therefore agree with the judge below that the appropriate course of action is for Facebook to prepare a detailed privilege log so that the Attorney General can challenge any assertions of privilege.

**[12–14]**  d. <u>Work product doctrine</u>. Facebook also argues that the app information requested is protected by the work product doctrine. The work product doctrine "protects (1) 'documents and tangible things,' [prepared] (2) 'by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent),' and (3) 'in anticipation of litigation or for trial.' " <u>McCarthy</u> v. <u>Slade Assocs., Inc.</u>, 463 Mass. 181, 194, 972 N.E.2d 1037 (2012), quoting P.M. Lauriat, S.E. McChesney, W.H. Gordon, & A.A. Rainer, Discovery § 4:5 (2d ed. 2008 & Supp. 2011).[16] Importantly, "[t]he work product protection is broader than the attorney-client privilege in that it is not restricted solely to confidential communications between an attorney and client." <u>Federal Trade Comm'n</u> v. <u>Boehringer Ingelheim Pharms., Inc.</u>, 778 F.3d 142, 149 (D.C. Cir.

2015) (<u>Boehringer II</u>), cert. denied, 577 U.S. 1102, 136 S.Ct. 925, 193 L.Ed.2d 790 (2016).[17] "The purpose of the doctrine is to establish a 'zone of privacy for strategic litigation planning . . . to prevent one party from piggybacking on the adversary's preparation.' " <u>Comcast</u>, 453 Mass. at 311-312, 901 N.E.2d 1185, quoting <u>United States</u> v. <u>Adlman</u>, 68 F.3d 1495, 1501 (2d Cir. 1995).

**[15–17]**  A document is prepared in anticipation of litigation if, "in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared <u>because of the prospect of litigation</u>" (emphasis added). <u>Comcast</u>, 453 Mass. at 317, 901 N.E.2d 1185, quoting <u>United States</u> v. <u>Adlman</u>, 134 F.3d 1194, 1202 (2d Cir. 1998) (<u>Adlman II</u>). Anticipation of litigation does not have to be the primary purpose or motivation. <u>Comcast</u>, <u>supra</u> at 317 n.28, 901 N.E.2d 1185. But a document that would have been prepared "irrespective of the prospect of litigation" is not covered by the work product doctrine (citation omitted). <u>Id.</u> at 318-319, 901 N.E.2d 1185. See <u>Adlman II</u>, <u>supra</u> at 1202 ("documents that are prepared in the ordinary course of business or that would have

[ADI] attaches to pre-[ADI] communications." Rather, "it has only withheld pre-[ADI] communications to the extent they are privileged on other grounds."

**16.**  Rule 26 (b) (3) of the Massachusetts Rules of Civil Procedure, 365 Mass. 772 (1974), states:

"Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party

seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."

**17.**  At the same time, it is also narrower than the attorney-client privilege, as it only protects documents prepared in anticipation of litigation. <u>Boehringer II</u>, 778 F.3d at 149.

been created in essentially similar form irrespective of the litigation" not covered).

[18, 19] If the work product doctrine applies, the court must determine what type of work product is at issue. Rule 26 (b) (3) differentiates between two types of work product. The greatest protection is provided to opinion work product, or work product that conveys the "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." See Mass. R. Civ. P. 26 (b) (3), 365 Mass. 772 (1974). Opinion work product "may be reflected in interviews, statements, memoranda, correspondence and in countless other tangible and intangible ways." Miller v. Holzmann, 238 F.R.D. 30, 32 (D.D.C. 2006). See Securities & Exch. Comm'n v. Collins |_128& Aikman Corp., 256 F.R.D. 403, 410 (S.D.N.Y. 2009) (opinion work product "constitutes legal documents drafted by an attorney -- her mental impressions, conclusions, opinions, and legal theories"). Opinion work product is only discoverable, if at all, "in rare or 'extremely unusual' circumstances." Comcast, 453 Mass. at 315, 901 N.E.2d 1185, quoting Reporters' Notes to Rule 26 (b) (3), Mass. Ann. Laws Court Rules, Rules of Civil Procedure, at 545 (LexisNexis 2008).

[20] In contrast, all other work product is discoverable "upon a showing that the party seeking discovery has substantial need of the materials ... and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Mass. R. Civ. P. 26 (b) (3). This type of work product is often referred to as fact work product. See Comcast, 453 Mass. at 314, 901 N.E.2d 1185 (differences between opinion and fact work product); Cahaly v. Benistar Prop. Exch.

Trust Co., 85 Mass. App. Ct. 418, 425, 10 N.E.3d 659 (2014) (same). Although it is discoverable in some circumstances, fact work product is still protected so that "each side must undertake its own investigation of the relevant facts and not simply freeload on opposing counsel." Boehringer II, 778 F.3d at 156.

[21–23] The line between fact work product and opinion work product is not always clear. Indeed, "[w]hen a factual document selected or requested by counsel exposes the attorney's thought processes and theories, it may be appropriate to treat the document as opinion work product, even though the document on its face contains only facts." Id. at 151. Yet "not every item which may reveal some inkling of a lawyer's mental impressions, conclusions, opinions, or legal theories is protected as opinion work product." In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007, 1015 (1st Cir. 1988). The focus, selection, or arrangement of the facts must reflect the attorney's thought process in some "meaningful way." Boehringer II, supra. See Boehringer III, 180 F. Supp. 3d at 26, quoting Boehringer II, supra at 152 (fact information is not opinion work product where "[n]one of the documents reveal[s] how [the attorney] analyzed the data she requested or what data or scenarios she presented to her client. In other words, she did not 'sharply focu[s] or wee[d]' the facts contained in these documents such that revealing these facts would reveal her legal impressions of the case"). Importantly, where a document contains both fact and opinion work product, a court may still order its production if the opinion portions can |_129be redacted or removed. Boehringer II, supra.[18] Ultimate-

---

**18.** In other words, information may appropriately be treated as fact work product if it can be produced in a format that removes any

portions that contain attorney opinions, thoughts, or conclusions. See McCarthy, 463 Mass. at 197-198 & n.34, 972 N.E.2d 1037.

ATTY. GEN. v. FACEBOOK, INC.    Mass.  **891**
Cite as 164 N.E.3d 873 (Mass. 2021)

ly, as long as disclosing the information would not reveal an attorney's "mental impressions, conclusions, opinions, or legal theories," it is not entitled to near-absolute protection and is subject to disclosure upon a showing of substantial need and undue hardship. See Mass. R. Civ. P. 26 (b) (3).

**[24]** Applying these principles, we conclude that the app information required to be produced is clearly covered by the work product doctrine. We also conclude that if this app information is not opinion work product, Facebook must disclose that information, because the Attorney General has demonstrated a substantial need for the information and could not obtain it without undue hardship. The difficult issue is separating fact from opinion work product in the first five requests. We set out the mode of analysis here but remand to the judge its application to the specific requests.[19]

**[25]** i. In anticipation of litigation. We begin with the threshold question whether the information is protected by the work product doctrine. In assessing whether the app information required to be produced is work product, the parties focus on the third element -- whether the app information was prepared "in anticipation of litigation." The judge below did as well, concluding that Facebook's existing app enforcement efforts and its public statements about the ADI demonstrate that the ADI was not done in anticipation of litigation.

**[26]** We disagree with the judge on this point. We recognize that the existence of an ongoing compliance program is an important consideration when assessing whether an internal investigation was undertaken in anticipation of litigation. Indeed, simply funneling an organization's investigation through outside counsel does not bring with it the protection of the work product doctrine ⌊1230⌋if the organization would have conducted these activities irrespective of anticipated litigation. See, e.g., In re Premera Blue Cross Customer Data Sec. Breach Litig., 296 F. Supp. 3d 1230, 1245-1246 (D. Or. 2017) (merely directing consultant to report to outside counsel and label communications "privileged" or "work product" insufficient to treat reports created as in anticipation of litigation).

Here, however, the ADI is meaningfully distinct from Facebook's ongoing enforcement program. It is staffed by outside counsel and outside forensic consultants, and it has its own distinct methodology. It is focused on past violations, not ongoing operations, and it serves a very different purpose: defending Facebook against the vast litigation it is facing, rather than just improving its ongoing operations. The record here does not support the contention that Facebook's compliance and enforcement team could have or would have conducted a massive investigation into potential past misconduct in the ordinary course of business.[20] This was not business as usual for Facebook.

See also Washington Bancorp. v. Said, 145 F.R.D. 274, 278-279 (D.D.C. 1992) (index was discoverable fact work product even though it contained some opinion work product that could be redacted or removed prior to production).

**19.** We recognize that the Attorney General is "piggy-backing" on the extensive factual and technical investigation undertaken by Facebook rather than attempting to engage in this

enormous investigation herself. While normally prohibited, rule 26 permits such piggybacking where there is a substantial need and undue hardship.

**20.** Tellingly, Facebook did not initiate an investigation when it first learned of Kogan's misconduct in 2015. Instead, it waited until substantial public reporting in 2018 made litigation and regulatory investigations a near certainty.

[27] The Attorney General argues that "the purpose of the ADI was to improve the Platform and remedy the loss of user trust" and not because of impending litigation. The fact that the ADI also serves business purposes does not alter the analysis. In Comcast, 453 Mass. at 317 n.28, 901 N.E.2d 1185, we rejected a formulation of the work product doctrine that excludes documents that were primarily prepared for a business or other nonlitigation purpose. Instead, we made clear that the work product doctrine applies as long the corporation "had 'the prospect of litigation in mind.'" Id. at 318, 901 N.E.2d 1185, quoting Adlman II, 134 F.3d at 1204. See Comcast, supra at 319, 901 N.E.2d 1185 (documents "created 'because of' the reasonability possibility of litigation" covered by doctrine). That the ADI also serves Facebook's business purposes independent of litigation, therefore, does not mean that the work product doctrine does not apply.

The determinative question is whether Facebook compiled the app information because of the prospect of litigation or whether it would have compiled the app information regardless of the prospect of litigation. See Comcast, 453 Mass. at 318-319, 901 N.E.2d 1185 (document prepared "irrespective of the prospect of litigation" is not covered by work product doctrine). Given the focus of the ADI, its structure and design, and its litigation purposes, we conclude [13] that Facebook has established that the ADI was initiated, and the app information compiled, in anticipation of litigation. Therefore, the app information is work product.

ii. _Fact or opinion work product._ The next issue is whether the app information is properly considered opinion work product, which is only discoverable in extreme circumstances, or fact work product, which is discoverable if the Attorney General demonstrates a substantial need and undue hardship. See Mass. R. Civ. P. 26 (b) (3). The judge below concluded that the app information is not opinion work product, because the requests seek "indisputably factual information" like the identity of apps or developers. Facebook counters that "but for the involvement, analysis, and advice of counsel, the [app information] the Attorney General seeks would not exist," because it is the product of "criteria designed by, and reflecting the legal judgment of, Facebook's counsel." For this reason, Facebook argues that the app information should be considered opinion work product.

In deciding whether this is opinion work product, we focus on what the specific information requested would reveal and not on the ADI as a whole. We also focus on what the requested information would divulge about the confidential as opposed to the publicly revealed aspects of the ADI process, that is, whether the documents required to be produced reveal confidential aspects of the ADI process or just those publicly announced.

We begin with the recognition that the underlying factual information about the apps, and the potential privacy violations, that the Attorney General sought was not protected by the work product doctrine. Had Facebook not informed the Attorney General how it conducted its own factual investigation, the Attorney General would have been free to perform her own thorough investigation of all the underlying factual information to uncover data misuse by apps.

The requests, however, do seek the names of the apps, and other associated information, identified by Facebook's own investigatory process. They do so tracking Facebook's own methodology and public disclosures. This clearly asks for work product; the only question is whether it is fact or opinion work product.

In answering this question, we focus on the flexibility allowed in the response, the particular factual information requested, and the previous public disclosures. As drafted, the requests allow Facebook to tailor its response to remove any and all notes, impressions, [132]and legal analysis except the names themselves and the specific additional factual information requested, and what those names and this additional factual information themselves reveal. See In re Chrysler Motors Corp. Overnight Evaluation Program Litig., 860 F.2d 844, 846 (8th Cir. 1988) (tape was not opinion work product where it "d[id] not itself contain counsel's mental impressions, conclusions or legal theories"); In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d at 1014 (opinion work product "encompass[ed] materials that contain the mental impressions, conclusions, opinions or legal theories of an attorney"; rest was ordinary work product [emphasis added]).

Facebook also previously has publicized general statements regarding the ADI reflected in the five requests, thereby further reducing the risk that the disclosure of the names of the apps and some of the additional factual information requested about those apps will reveal confidential opinion work product. See New York Times Co. v. United States Dep't of Justice, 939 F.3d 479, 496 (2d Cir. 2019) ("We first evaluate whether … public statements about the memoranda were specific enough to have effectuated disclosure of parts of the memoranda and accompanying exhibits, thereby waiving the work product privilege with respect to those parts"). That being said, the specifics of the five requests and additional information requested must be considered to determine whether fact or opinion work product is being sought, or whether further review is required to make this determination.

We begin with the five requests, and the names of the apps that fall into these requests. They are:

"1. The group of 6,000 apps with a large number of installing users …;

"2. The group of apps and developers that fall within certain categories that, based on Facebook's 'past investigative experience,' present an elevated risk of potential policy violations …;

"3. The group of apps and developers that were reported to Facebook from outside of the ADI process …;

"4. The group of apps and/or developers on which, to date, Facebook has conducted a 'detailed background check' …; [and]

"5. The group of apps on which, to date, Facebook has conducted a 'technical review….' "

[133]Some of this information has been discussed in public statements made by Facebook. Facebook's chief executive officer testified before Congress that Facebook was "investigating every app that had access to a large amount of information" and that it considered "suspicious activity" to be apps that had "a significant number of users and … sought to access significant or unexpected data fields." Similarly, in its September 2019 release, Facebook announced to the public that it was conducting "background investigations" and "technical analyses." It also publicized that it was "analyz[ing] potentially suspicious activity from our analysis of logs and usage patterns by these apps" and "conduct[ing] an audit using internal and external experts."

All these public disclosures are important because a corporate defendant cannot publicize its "internal investigation to assert the propriety of its actions to third parties and simultaneously … block third parties from testing whether its representations about the internal investigation are

accurate." Grand Jury Investigation, 437 Mass. at 354, 772 N.E.2d 9. Facebook also has provided to the Attorney General more specific information on the ADI framework and an overview of the types of criteria that guide each phase. See In re Steinhardt Partners, L.P., 9 F.3d 230, 235 (2d Cir. 1993) (disclosure of protected thought processes to adversary waives work product protection). This more specific information also helped the Attorney General frame the five requests. In this unusual context, where (1) the underlying facts on the apps and their data breaches are discoverable; (2) the general scope and methodology, and some of the results, of Facebook's internal investigation have been made public as part of its defense of its actions; and (3) Facebook already explained its more specific methodology for conducting its factual investigation to its adversary the Attorney General, it is difficult to discern how opinion work product would be divulged by production of the names of the apps, and most of the other purely factual information requested in the first five categories of apps. See Boehringer II, 778 F.3d at 152, quoting In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d at 1015 ("There is no 'real, nonspeculative danger of revealing the lawyer's thoughts' when the thoughts are already well-known"). See also New York Times Co., 939 F.3d at 495, quoting Rockwell Int'l Corp. v. United States Dep't of Justice, 235 F.3d 598, 605 (D.C. Cir. 2001) ("common sense suggests that verbal description of the contents of a document, if sufficiently specific, is as 'inconsistent [34]with the maintenance of secrecy' of that document as would be disclosure of the document itself").

Nonetheless, a careful comparison of the specific factual information requested, and the particular public statements already made regarding the investigatory process, is necessary to determine whether the information requested will reveal counsel's thought processes as well as purely factual information. If undisclosed strategic decision-making by counsel, including the assessment of legal risk or liability, is revealed by the factual analysis, such factual analysis may be classified as opinion work product. A good example of a request posing such risk is the second request, which would force Facebook to identify which apps it determined, based on its " 'past investigative experience,' present[ed] an elevated risk of potential policy violations." This reference to past investigatory experience and evaluation of elevated risk of violations appears to seek to reveal undisclosed aspects of the ADI process that may divulge counsel's investigatory practices, legal risk assessment, and other thought processes and impressions. This is quite different from some of the more straightforward factual requests, seeking for example the names and details concerning the 6,000 apps that Facebook has targeted for having a large number of users or the groups of apps that were reported to Facebook outside the ADI process.

Some of the categories of additional factual information requested raise similar concerns. In particular, for some of the apps, the Attorney General is seeking the "basis and initial source(s) of reports, allegations or concerns of data misuse of user information obtained or accessed through the app." Whether at least this last category of additional information seeks to probe into counsel's undisclosed thought processes requires further investigation by the judge.

In sum, we cannot conclude on the record before us that none of the information requested falls into the category of opinion work product, as the judge determined. It is true that the app information here is readily distinguishable from more typical

examples of opinion work product, such as the memorandum in Comcast that contained "a detailed analysis of various corporate entities and address[ed] various options, and attendant litigation risks, for [a] stock sale in light of applicable Massachusetts law," Comcast, 453 Mass. at 300, 901 N.E.2d 1185, or the memorandum in Schaeffler that analyzed the tax implications of business transactions and included advice related to potential $\lfloor_{195}$investigation by a Federal agency, Schaeffler v. United States, 806 F.3d 34, 43-45 (2d Cir. 2015). We also recognize that some aspects of the ADI process already have been publicized widely, and Facebook cannot claim protection for opinion work product for investigatory procedures it has publicly proclaimed. See Grand Jury Investigation, 437 Mass. at 354, 772 N.E.2d 9. See also New York Times Co., 939 F.3d at 496 (public statements describing contents of work product that are "sufficiently specific . . . are tantamount to public disclosure of . . . the relevant [work product]" and therefore constitute waiver). The question that remains is whether some of the factual information about the apps that Facebook is required to produce will reveal any meaningful previously undisclosed attorney thoughts or strategies. See Boehringer II, 778 F.3d at 152, citing In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d at 1015. To answer that question, remand is required that compares the specific requests, particularly those identified in this opinion as problematic, the previous public disclosures, and what the particular information requested would reveal. The incomplete record here does not allow us to perform such review ourselves. The judge is also much better positioned than this court to

perform this type of document-by-document work product review.[21]

[28]   iii.   Substantial need and undue hardship. Although further line drawing is required by the judge to determine what information requested is fact work product and what is opinion work product, we recognize, based on the record before us, that a significant amount of information ultimately will be determined to be fact work product. We therefore address the issue whether the fact work product must be produced. This requires the Attorney General to demonstrate substantial need and undue hardship. See Mass. R. Civ. P. 26 (b) (3). Absent such substantial need and undue hardship, the Attorney General would be expected and required to do her own investigation. See Baker v. General Motors Corp., 209 F.3d 1051, 1054 (8th Cir. 2000) (fact work product "not discoverable unless the party seeking discovery has a substantial need for the materials and the party cannot obtain the substantial equivalent of the materials by other means" [emphasis added]).

$\lfloor_{196}$[29–31]   A substantial need exists where the fact information is relevant and the requesting party cannot reasonably obtain the information or its substantial equivalent elsewhere. See Boehringer III, 180 F. Supp. 3d at 14, citing Boehringer II, 778 F.3d at 155. There also must be "'special circumstances' excus[ing] the movant's failure to obtain the requested materials itself." Boehringer II, supra. When interpreting the analogous Federal rule, courts consider, among other factors, "(1) the importance of the materials to the party seeking them for case preparation, (2) the difficulty the party will have obtain-

---

**21.**  Because Facebook has now started to produce information responsive to the first five requests, the judge will be able to review the disclosed information in camera when determining whether the disclosures reveal opinion

work product. The judge also may conduct further hearings with counsel to discuss specific requests and the risks of disclosure of counsel's thoughts, impressions, or opinions that they may present.

ing them by other means, and (3) the likelihood that the party, even if he obtains the information by independent means, will not have the substantial equivalent of the documents he seeks." Burrow v. Forjas Taurus S.A., 334 F. Supp. 3d 1222, 1229 (S.D. Fla. 2018), citing Advisory Committee Note (1970) to Fed. R. Civ. P. 26. Ultimately, "[t]he 'substantial need' inquiry requires a careful examination of whether non-disclosure will impair the truth-seeking function of discovery." Boehringer II, supra at 156.

[32]  Here, several considerations support the Attorney General's claim of a substantial need for the fact work product. The app information is certainly relevant and important; it is central to the Attorney General's investigation, as it identifies apps that may have misused user data on the prior version of the Platform. See Cahaly, 85 Mass. App. Ct. at 425, 10 N.E.3d 659, citing McCarthy, 463 Mass. at 195, 972 N.E.2d 1037 (substantial need exists where work product at issue central to claims). The Attorney General has a mandate to investigate such potential misuse of Massachusetts users' data as well as potential misrepresentations by Facebook, and considerable authority with which to do so. See Exxon Mobil Corp. v. Attorney Gen., 479 Mass. 312, 323-324, 94 N.E.3d 786 (2018), cert. denied, ⸺ U.S. ⸺, 139 S. Ct. 794, 202 L.Ed.2d 570 (2019) (Attorney General has "manifest interest in enforcing G. L. c. 93A"). There is also a strong public interest in disclosure in cases in which the Attorney General is investigating potential unfair or deceptive trade practices involving Massachusetts consumers that is absent in a typical civil dispute. See Boehringer III, 180 F. Supp. 3d at 14, quoting Boehringer II, 778 F.3d at 157 ("in the investigatory context here," Federal Trade Commission "was entitled to learn

facts on a broader scale than [that] available to a typical civil litigant").

The great difficulty in obtaining this information also is obvious. Given the scope of the ADI, the millions of apps to be analyzed, and the vast quantity of information at issue, uncovering this otherwise discoverable factual information would be a ⌊₁₃₇monumental, if not Herculean, task absent Facebook disclosing the app information. See In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d at 1019 ("scope of this massive litigation and its consequent special needs called for unorthodox measures").

Finally, it is unlikely that the Attorney General would be able to obtain the substantial equivalent of this app information, even with extraordinary efforts. As the Attorney General argues, only Facebook has access to the information and data that are necessary to identify the apps that have potentially misused user data. An important part of the ADI framework is Facebook's own knowledge of and experience with the Platform and the apps and developers that operate on it. Through its design of the Platform and its ongoing efforts to police the Platform, Facebook has developed valuable expertise that has guided the ADI, relying on its own internal knowledge and expertise regarding its Platform and apps to guide its internal searches. Without such expertise, therefore, it is unclear whether the Attorney General would be able to replicate the work of the ADI and identify many of the apps and developers that may be misusing user data.

This is not a case where the internal investigation involved simply interviewing key employees and other witnesses or reviewing a manageable number of documents, tasks that can be easily replicated by third parties or government investigators. See, e.g., In re Int'l Sys. & Controls

Corp. Sec. Litig., 693 F.2d 1235, 1240 (5th Cir. 1982) ("discovery of work product will be denied if a party can obtain the information he seeks by deposition"); Gay v. P.K. Lindsay Co., 666 F.2d 710, 713 (1st Cir. 1981), cert. denied, 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 849 (1982) ("there is in general no justification for discovery of the statement of a person contained in work product materials when the person is available to be deposed"). Rather, it is an enormously complex effort in which counsel and the ADI team analyzed millions of apps and enormous amounts of data. This analysis was also enabled in large part by Facebook's prior expertise in developing and policing the Platform. Facebook is not only in a far better position than the Attorney General, but also essentially uniquely positioned to identify which apps potentially misused user data. Therefore, we are persuaded that the Attorney General would be unable to otherwise obtain the substantial equivalent of the factual app information, even with an extraordinary expenditure of time and resources. See Ward v. Peabody, 380 Mass. 805, 817-818, 405 N.E.2d 973 (1980) (that materials are not available from any other source is "favorable to requiring production").

⌐138For these same reasons, the Attorney General has demonstrated that she is unable to obtain the requested information or its substantial equivalent without undue hardship. Undue hardship may exist where shielding fact work product would impose extraordinary expense on the requesting party. See, e.g., In re Int'l Sys. & Controls Corp. Sec. Litig., 693 F.2d at 1241 ("[I]n the ordinary case, the cost of one or a few depositions is not enough to justify discovery of work product.... But there have been cases in which unusual expense has constituted undue hardship" [emphasis added]). Also relevant is the amount of time it would take to obtain or produce the materials independently. See, e.g., In re

Chrysler Motors Corp. Overnight Evaluation Program Litig., 860 F.2d at 846 ("considerable delay" factor supporting undue hardship); Resolution Trust Corp. v. Heiserman, 151 F.R.D. 367, 376 (D. Colo. 1993) (undue hardship exists where it would be "extremely difficult, not to mention wasteful, for defendants to attempt to replicate [opposing party's] three-year investigation" in complex case "involv[ing] massive amounts of documentation").

As explained above, the Attorney General undoubtedly would incur enormous costs and delay in her investigation if the app information is not disclosed. Through the ADI, Facebook has reviewed millions of apps to determine whether they potentially misused user data. When the Attorney General filed the petition to compel in August 2019, the ADI had been operating for nearly one and one-half years. Moreover, so great was the task of the ADI that the investigative team has at times swelled to include hundreds of outside experts. There is no other way for the Attorney General to try to obtain this information other than to essentially recreate and duplicate the work of the ADI. See, e.g., In re Chrysler Motors Corp. Overnight Evaluation Program Litig., 860 F.2d at 846 (undue hardship exists where "replication of the [work product] would involve duplication of effort and considerable delay and expense"); Washington Bancorp. v. Said, 145 F.R.D. 274, 279 (D.D.C. 1992) ("the time and money it would take" to review 2,400 boxes of documents to create document index constitutes undue hardship because "no value and only waste in requiring such a duplicative effort"). Facebook acknowledges this reality; its position is simply that the Attorney General must conduct her own independent investigation for reasons of adversarial fairness. To seek to obtain the app information, therefore, the Attorney General would have to expend an ⌐139exorbitant amount of public

resources and conduct a multiyear investigation to obtain information that Facebook already has in its possession. Such effort and expense is sufficient to demonstrate undue hardship. See, e.g., Collins & Aikman Corp., 256 F.R.D. at 411 ("A page-by-page manual review of ten million pages of records is strikingly expensive in both monetary and human terms and constitutes 'undue hardship' by any definition").

In sum, we conclude the Attorney General has demonstrated both substantial need and undue hardship for the fact work product about the apps.

3. Conclusion. For the reasons described above, we conclude that the first five requests are not covered by the attorney-client privilege, as they do not require the production of communications between Facebook and its counsel. As the sixth request does include communications covered by the attorney-client privilege, Facebook must produce a privilege log as required by the Superior Court judge. We therefore affirm the judge's order in these respects.

We also conclude, however, that the work product doctrine applies to the documents requested, and a remand is required to determine whether some of the documents requested constitute opinion work product. We therefore reverse and remand the decision of the Superior Court judge concluding that the work product doctrine does not apply and that, even if it did, none of the documents required to be produced would reveal opinion work product. Finally, we conclude that the Attorney General has demonstrated that there is substantial need and undue hardship requiring the production of the documents that do constitute fact work product.

So ordered.



---

487 Mass. 140

### In the MATTER OF Doreen M. ZANKOWSKI.

### SJC-12850

Supreme Judicial Court of Massachusetts, Suffolk.

Argued October 7, 2020.

Decided March 25, 2021.

**Background:** In an attorney discipline case, hearing panel recommended suspension from the practice of law for one year and a day, but the Board of Bar Overseers modified the recommendation to a two-year suspension. The Board filed an information in the Supreme Judicial Court, Suffolk County, and a single Justice of the Supreme Judicial Court, Gaziano, J., issued six-month suspension. Bar counsel appealed.

**Holdings:** The Supreme Judicial Court, Lowy, J., held that:

(1) attorney violated rules of professional conduct governing excessive fees, dishonesty, and fitness to practice law by overbilling clients, and

(2) two-year suspension from the practice of law was appropriate discipline.

Remanded for order of suspension.

---

**1. Attorneys and Legal Services ⇐1161**

In attorney disciplinary proceeding, Supreme Judicial Court reviews record to determine whether single justice's decision is supported by sufficient evidence, free from errors of law, and free from any abuse of discretion.

**2. Attorneys and Legal Services ⇐1163(5)**

While Supreme Judicial Court reviews entire record in attorney disciplinary pro-

# EXHIBIT N

# Facebook's Brief In Opposition To Plaintiffs' Request For Privileged Investigatory Materials

## FILED TEMPORARILY UNDER SEAL

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
   osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
   dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Kristin A. Linsley (SBN 154148)
   klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
   mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

Joshua S. Lipshutz (SBN 242557)
   jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br> This document relates to: <br><br> ALL ACTIONS | CASE NO. 3:18-MD-02843-VC <br><br> **DEFENDANT FACEBOOK, INC.'S BRIEF IN OPPOSITION TO PLAINTIFFS' REQUEST FOR PRIVILEGED INVESTIGATORY MATERIALS** <br><br> Judge:  Hons. Vince Chhabria and Jacqueline Scott Corley <br> Courtroom 4, 17th Floor |

Gibson, Dunn &
Crutcher LLP

1

**TABLE OF CONTENTS**

2

Page

3       INTRODUCTION ................................................................................................ 1

4       BACKGROUND .................................................................................................. 2

5       I.      In March 2018, The Media Reports Data Misuse by Cambridge Analytica................. 2

6       II.     This Case and Dozens of Related Cases are Filed Against Facebook ......................... 2

7       III.    Facebook Hires Gibson Dunn to Design and Launch a Retrospective Internal
8               Investigation to Assess Legal Risk ..................................................................... 3

9       IV.     The Investigation Is Distinct from Facebook's Regular Enforcement Efforts ............ 3

        V.      Plaintiffs Demand Access to All of Facebook's ADI Materials .................................. 4
10
                A.      Facebook Produces Non-Privileged Materials.................................................... 4
11
                B.      The Court Orders the Parties to Identify Representative Materials ................ 5
12
                C.      Plaintiffs Challenge Privileged Documents Not Sent or Received by
13                      Attorneys ............................................................................................ 5

14      ARGUMENT ...................................................................................................... 6

15      I.      ADI is a Privileged Legal Investigation.......................................................... 6

16              A.      Investigation Materials are Protected by the Attorney-Client Privilege .......... 6

17      II.     Investigation Materials Fall Within the Work-Product Protection ............................. 8

18              A.      The Materials Were Created Because of Actual and Anticipated
                        Litigation ............................................................................................ 9
19
                B.      Factual Investigatory Materials Are "Opinion" Work Product........................ 9
20
        III.    Each of the Documents Plaintiffs Challenge is Independently Privileged ................ 10
21
                A.      Documents Summarizing, Reflecting, or Relaying Attorney Advice are
22                      Privileged ........................................................................................... 11

23              B.      Communications With and Among Experts Operating at the Direction
                        of Counsel are Privileged ................................................................... 14
24
                C.      Images Used to Communicate in Privileged Communications are
25                      Privileged ........................................................................................... 17

26              D.      Facts Collected at the Direction of Counsel are Privileged ........................... 18

27      CONCLUSION .................................................................................................. 20

28

i

1

**TABLE OF AUTHORITIES**

2

Page(s)

3

**Cases**

4

*Admiral Ins. Co. v. U.S. District Court*,
5     881 F.2d 1486 (9th Cir. 1989).................................................................................9

6
*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
    306 F.R.D. 234 (N.D. Cal. 2015)...........................................................................9

7
*AT&T Corp. v. Microsoft Corp.*,
8     2003 WL 21212614 (N.D. Cal. Apr. 18, 2003) ..................................................7, 8

9
*Chevron Corp. v. Pennzoil Co.*,
10     974 F.2d 1156 (9th Cir. 1992).................................................................................9

11
*Dukes v. Wal-Mart Stores, Inc.*,
    2013 WL 1282892 (N.D. Cal. Mar. 26, 2013)........................................................9

12
*Fed. Trade Comm'n v. Boehringer Ingelheim Pharms., Inc.*,
13     180 F. Supp. 3d 1 (D.D.C. 2016) .....................................................................8, 19

14
*Finjan, Inc. v. Sonicwall, Inc.*,
15     2018 WL 4998149 (N.D. Cal. Oct. 15, 2018) ........................................................9

16
*Fosbre v. Los Vegas Sands Corp.*,
    2016 WL 183476 (D. Nev. Jan. 14, 2016) ...............................................7, 12, 19

17
*In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*,
18     357 F.3d 900 (9th Cir. 2004).................................................................................10

19
*In re Kellogg Brown & Root, Inc.*,
20     756 F.3d 754 (D.C. Cir. 2014) ...............................................................................7

21
*Mitchell Eng'g v. City & Cty. of S.F.*,
    2010 WL 1853493 (N.D. Cal. May 6, 2010) .......................................................10

22
*Phoenix Techs. Ltd. v. VMware, Inc.*,
23     195 F. Supp. 3d 1096 (N.D. Cal. 2016) ...............................................................10

24
*S.E.C. v. Schroeder*,
    2009 WL 1125579 (N.D. Cal. Apr. 27, 2009), *objections overruled*,
25     2009 WL 1635202 (N.D. Cal. June 10, 2009) .....................................................10

26
*Scalia v. Int'l Longshore & Warehouse Union*,
27     336 F.R.D. 603 (N.D. Cal. 2020)......................................................................1, 12

28
*Todd v. STAAR Surgical Co.*,
    No. CV-14-05263-MWF, 2015 WL 13388227 (C.D. Cal. Aug. 21, 2015)...........1, 7, 15

*United States v. Kovel*,
    296 F.2d 918 (2d Cir. 1961) ............................................................................1, 7, 15

*United States v. Richey*,
    632 F.3d 559 (9th Cir. 2011) ................................................................1, 7, 9, 11, 15

*United States v. Sanmina Corp.*,
    968 F.3d 1107 (9th Cir. 2020) ...................................................................7, 9, 19

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981) ...................................................................................2, 7, 8

**Other Authorities**

https://www.facebook.com/zuck/posts/10104712037900071 ............................................8

Restatement (Third) of the Law Governing Lawyers § 69 ...................................................18

**Rules**

Fed. R. Civ. P. 26(b)(3)(A) .........................................................................................15

**Treatises**

24 Fed. Prac. & Proc. Evid. § 5484 (1st ed.) ...................................................................18

Gibson, Dunn &

Crutcher LLP

DEFENDANT FACEBOOK, INC.'S BRIEF IN OPPOSITION TO PLAINTIFFS' REQUEST FOR
PRIVILEGED INVESTIGATORY MATERIALS

**INTRODUCTION**

This brief addresses twenty privilege-log entries Plaintiffs challenge on the basis that the entries do not include the names of attorneys.  Plaintiffs offer no explanation for their position that communications among non-attorneys cannot be privileged.  And there is none.  The attorney-client privilege and work-product doctrine frequently protect communications between non-attorneys, including in the scenarios Plaintiffs challenge.  Indeed, the majority of the entries Plaintiffs dispute refer only to the top email on a chain that is otherwise among attorneys and explicitly summarizes or discusses counsel's legal advice.  *See Scalia v. Int'l Longshore & Warehouse Union*, 336 F.R.D. 603, 618 (N.D. Cal. 2020).  In other instances, Plaintiffs challenge log entries for materials created by experts whom counsel retained specifically to assist in providing Facebook with legal advice.  *See Todd v. STAAR Surgical Co.*, No. CV-14-05263-MWF (RZx), 2015 WL 13388227, at *5 (C.D. Cal. Aug. 21, 2015) (citing *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011) and *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)).  Decades of well-established case law leaves no doubt that materials of this nature are privileged and protected from disclosure.

The entries Plaintiffs challenge are also protected from disclosure because each relates to materials from an internal legal investigation, designed and directed by Facebook's outside counsel, Gibson, Dunn & Crutcher.  This investigation—referred to as the App Developer Investigation ("ADI" or "Investigation")—was designed to assess legal risks as Facebook faced a storm of lawsuits and regulatory scrutiny in the wake of reporting on data misuse by Cambridge Analytica in March 2018.  Based on its experience conducting these types of investigations, and with an eye toward litigation, counsel designed and developed a confidential, privileged investigation to gather the facts needed to provide advice to Facebook about litigation, compliance, regulatory inquiries, and other legal risks.  The Investigation was retrospective in nature, its details were kept confidential, and, at all times, counsel worked toward a quintessentially legal goal: to identify and address potential legal exposure arising from other apps that posed risks similar to those unearthed in connection with Cambridge Analytica, before Facebook put additional safeguards in place in 2014.

Plaintiffs now seek to bypass the limits of discovery and demand that Facebook hand over its attorneys' assessment of the risks that certain apps and developers may pose for the Company in this lawsuit and others.  But that is precisely what the long-standing laws of privilege and work product are designed to prevent.  Indeed, in structuring and directing the Investigation, Facebook relied on the well-

established protections for such legal investigations grounded in seminal cases like *Upjohn Co. v. United States*, 449 U.S. 383 (1981) and Rule 26(b)(3).  Communications and documents prepared in connection with the Investigation are privileged whether or not an attorney sent or received them.

This brief proceeds in two parts.  First, Facebook describes the Investigation and explains why Investigation materials—including those sent and received by non-attorneys, such as those challenged—are protected by the attorney-client privilege and work-product protection.  Second, Facebook addresses each of the specific log entries Plaintiffs challenge and details how each reflects counsel's legal advice or work prepared at counsel's direction to allow counsel to advise Facebook.

The Court should deny Plaintiffs' request and hold that materials from Facebook's Investigation conducted by and at the direction of counsel are protected by the attorney-client privilege and work-product protection and that each of the documents Plaintiffs challenge was properly withheld.

## BACKGROUND

### I.   In March 2018, The Media Reports Data Misuse by Cambridge Analytica

On March 17, 2018, media outlets broke the news that a company called Cambridge Analytica misappropriated data regarding millions of Facebook users from an app developer named Aleksandr Kogan.  Kogan had created a personality quiz app on Facebook's platform five years earlier called "thisisyourdigitallife."  SACC, Dkt. 491 ¶¶ 394, 397.  Through that app he obtained data from users who downloaded it.  Consistent with Facebook's pre-2014 policies, he also obtained limited data about those users' friends through "friend sharing," so long as those friends "had their privacy settings set to allow it."  *Id*. ¶¶ 397-99.  Kogan then violated Facebook's policies and terms of use and sold this data to Cambridge Analytica.  *Id.* ¶ 411.  Facebook changed its platform in 2014 to reduce data access (*e.g.*, transitioned away from friend sharing)

### II.   This Case and Dozens of Related Cases are Filed Against Facebook

Three days after the media broke the Cambridge Analytica story, a nationwide consumer protection class action was filed against Facebook in this Court on March 20, 2018.  *See Price v. Facebook*, No. 3:18-cv-01732-VC (N.D. Cal.), Dkt. 1.  This was just the tip of the iceberg.  Given the nature of the news, Facebook anticipated it soon would face a flood of litigation.  And it was right.  Within weeks, a single class action morphed into nearly 40 (which were consolidated into this MDL) and Facebook faced dozens of other lawsuits and regulatory inquiries across the country.  At least sixty-five cases relating to the Cambridge Analytica events and information shared with third parties through

friend sharing have been filed since March 2018, in addition to inquiries from numerous regulators.

## III.   Facebook Hires Gibson Dunn to Design and Launch a Retrospective Internal Investigation to Assess Legal Risk

To prepare for anticipated and actual litigation, Facebook's in-house legal team hired Gibson, Dunn & Crutcher, to conduct an internal investigation and advise the company on its litigation risks and strategy.  The Investigation was structured as a confidential, internal, retrospective, and legal-driven review into developers and apps that were active on Face..book before it changed its platform in 2014 to reduce data access and transition away from friend sharing.  The Investigation's primary purpose was to review apps that had access to large amounts of data before the 2014 platform changes, with the core goal of uncovering and assessing legal risks posed by other apps that obtained data through friend sharing and providing legal advice to Facebook about legal challenges those apps might present in this litigation and other related cases.

Gibson Dunn has extensive experience conducting cybersecurity and data privacy internal investigations, and with Facebook's in-house counsel, it managed and oversaw all stages of the Investigation.[1]  Under counsel's leadership, the team devised and tailored the Investigation's methods, protocols, and strategies.  Gibson Dunn also led the recruitment of and retained technical experts and investigators, including two leading forensic consulting firms with expertise in assisting with technology-focused investigations.[2]

Facebook attorneys, along with a core Investigation team, including employees with expertise from various departments, collaborated with Gibson Dunn to build out the Investigation.  Counsel also took steps to ensure that communications by and among individuals working on the Investigation remain confidential and privileged, including by limiting communications about the Investigation and restricting access to investigatory documents.

## IV.   The Investigation Is Distinct from Facebook's Regular Enforcement Efforts

Consistent with its litigation purpose, the Investigation is fundamentally different than

---

[1]     *See* Decl. of Stacy Chen in Support of Respondent's Opposition to the Attorney General's Petition, *Attorney General v. Facebook, Inc.*, (Mass. Super. Jan. 17, 2020) (No. 1984cv02597-BLS-1, Dkt. 29) (hereinafter "Chen Decl.").  Facebook does not submit declarations in support of its brief pursuant to the Court's instructions but refers the Court to the January 17, 2020 Declaration of Stacy Chen, which addresses the factual assertions made in this brief.  *Id.*  If the Court would like additional declarations to support Facebook's factual representations, Facebook will submit them at the Court's request.

[2]     Gibson Dunn attorneys and members of the consulting firms at times used Facebook email accounts (@fb.com), rather than their own firm's email accounts, in order to access internal Facebook tools and information required for the Investigation.

DEFENDANT FACEBOOK, INC.'S BRIEF IN OPPOSITION TO PLAINTIFFS' REQUEST FOR PRIVILEGED INVESTIGATORY MATERIALS

Facebook's preexisting monitoring, compliance, and enforcement efforts.  Facebook's ordinary policing of its platform is conducted by a team known as Developer Operations, or "DevOps."  DevOps monitors, in real time, daily app and developer behavior with the aim of identifying abnormalities that might signal potential policy violations.  DevOps enforces Facebook policies, and has developed its own rubrics and procedures for how to enforce those policies against bad actors.  On occasion, DevOps may elevate an issue to attorneys for guidance, but it is generally not a legal-supervised effort.

By contrast, the Investigation was launched following the 2018 media reports about Cambridge Analytica specifically to address potential regulatory and litigation risks—*including in this case*—posed by apps that had been on the Facebook platform before it changed its policies in 2014.  The Investigation is not a routine, ordinary course, or real-time policy monitoring effort.  It is a retrospective legal lookback, focused on a finite, albeit large, set of apps and developers that may have had access to large sets of user data before 2014.  Unlike DevOps, which operates under the guidance of non-lawyer employees, the Investigation is and always has been attorney-led and it has served primarily to inform legal decision-making.  Indeed, Facebook's counsel has used information generated in the Investigation to advise the company about how to respond to numerous litigations—*including this one*—to mitigate legal risks, and to initiate lawsuits against developers.

## V.     Plaintiffs Demand Access to All of Facebook's ADI Materials

Plaintiffs now seek to improperly commandeer the fruits of Facebook's confidential, privileged internal Investigation.  Like Facebook, Plaintiffs want to explore whether other bad actors may have misused Facebook user data before Facebook changed its data-sharing policies in 2014.  But rather than investigate those issues through proper civil discovery tools, Plaintiffs demanded that Facebook produce every single document from, about, or relating to its Investigation, which was designed to identify legal risks and provide legal advice about those risks.  *See* July 13, 2020 Hr'g Tr. at 40:11-12.  This unrestrained request asked Facebook to hand over hundreds of thousands (perhaps millions) of privileged documents created specifically to assess legal risks, including in this case.

### A.     Facebook Produces Non-Privileged Materials

In response to Plaintiffs' blanket demand for Investigation documents, Facebook agreed to produce materials related to its regular platform enforcement efforts, consistent with the fourth live theory of this case—which concerns Facebook's efforts to enforce how certain third parties used user data. *See* Pretrial Order 20, Dkt. 298 at 9.  Facebook already produced thousands of documents

DEFENDANT FACEBOOK, INC.'S BRIEF IN OPPOSITION TO PLAINTIFFS' REQUEST FOR
PRIVILEGED INVESTIGATORY MATERIALS

regarding app enforcement, and the parties have also negotiated 25 search strings regarding platform enforcement that hit on hundreds of thousands of additional documents.

Facebook further agreed to collect and produce non-privileged materials relating to the Investigation and already produced more than 30,000 pages of non-privileged materials from the Investigation, which are communications with third parties about the Investigation. These communications are largely with the apps Facebook investigated, and include, among other things, Facebook's Requests for Information, the apps' responses to those requests, and correspondence with the apps regarding the results of Facebook's Investigation, including if the app had been suspended.

Facebook objected only to producing Investigation materials that constitute attorney-client communications and documents reflecting its attorneys' strategy, mental impressions, conclusions, and legal theories. It also made clear that—given the large number of privileged documents—it would be unduly burdensome for Facebook to review and log all privileged documents from the Investigation.[3]

**B. The Court Orders the Parties to Identify Representative Materials**

Recognizing the significant volume of documents at issue, the Court directed the parties to take this privilege dispute "in pieces," July 13, 2020 Hr'g Tr. at 41:22, and to devise an exemplar privilege log to provide Plaintiffs and the Court with representative entries to assess Facebook's privilege claim.

Facebook proposed, and the parties agreed to, a logging exercise that would provide a comprehensive and representative sampling to fully address this dispute. *See* Dkt. 518, 518-A. The parties agreed to six exemplar apps (of the *millions* addressed by ADI) falling into three categories and core ADI custodians against whose files Facebook would run the selected apps' names and ID numbers.

Facebook then reviewed the materials identified. It produced responsive, non-privileged materials relating to the exemplar apps, which consist of third-party communications relating to the Investigation. Facebook prepared and served six privilege logs—one for each exemplar app—which collectively contain about 6,100 entries. These logs have been provided to the Court as Excel files.

**C. Plaintiffs Challenge Privileged Documents Not Sent or Received by Attorneys**

Under the parties' stipulation, Plaintiffs were required to "identify in writing *any particular privilege log entries* that it asserts are not privileged" and explain the challenges "with reasonable

[3] Nor should Facebook have to. The Parties stipulated that they need not log as privileged "[c]ommunications between a party and its outside counsel or inside counsel, or between inside and outside counsel, in connection with this Action (on or after the March 20, 2018 commencement of the Action), and work product material prepared in connection with this Action (after commencement of the Action)." Dkt. 462 at ¶ C(5).

specificity . . . as to each privilege log entry." Dkt. 462 ¶¶ D(1)-(4).  In violation of this requirement, Plaintiffs challenged *every single entry on Facebook's logs that does not include the name of an attorney* (about 400 of the 6100 entries).  Plaintiffs provided no basis for their sweeping challenges and refused to meet and confer in an effort to narrow the parties' dispute, as their stipulation requires.  *Id.*

On January 15, the Court ordered Plaintiffs to "select 20 entries, from the previously identified 400" from which it would assess Facebook's privilege claim, Discovery Order 12, Dkt. 602 ¶ A, and advised "that should be the end of the matter."  Jan. 15, 2021 Tr. at 6:2.  Plaintiffs identified 20 entries, but provided no basis for challenging them other than that they do not include the names of attorneys.

## ARGUMENT

## I.     ADI is a Privileged Legal Investigation[4]

Contrary to Plaintiffs' blanket challenge, communications and documents prepared in connection with the Investigation—which was created and led by attorneys to advise Facebook in actual and anticipated litigation—are privileged and protected by the work-product doctrine whether or not an attorney sent or received them.  Nearly all of the documents Plaintiffs challenge contain communications between an attorney and client for the purpose of giving legal advice, while others are communications containing information collected for purposes of seeking legal advice.  All were part of Facebook's attorney-driven Investigation and are protected from disclosure.

### A.     Investigation Materials are Protected by the Attorney-Client Privilege

"The attorney-client privilege protects confidential communications between attorneys and clients, which are made for the purpose of giving legal advice."  *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020) (citing *Upjohn*, 449 U.S. at 389).  It is "the oldest of the privileges for confidential communications known to the common law," and its "purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  *Upjohn*, 449 U.S. at 389.  "More than three decades ago, the Supreme Court held that the attorney-client privilege protects confidential employee communications made during a business's internal investigation led by company lawyers."  *In re*

---

[4]     Facebook anticipates Plaintiffs will cite a ruling regarding the Investigation from the Massachusetts Superior Court with respect to certain documents sought by the Massachusetts Attorney General in connection with an ongoing regulatory investigation.  This is a red herring.  First, this decision is on appeal to the Massachusetts Supreme Judicial Court, which granted direct review of the Superior Court's decision.  Second, while the Superior Court rejected Facebook's work-product assertion as to certain of the information requested by the Massachusetts Attorney General (which is being considered on appeal), the court recognized that many of the materials may be protected by the attorney-client communications privilege.

Gibson, Dunn & Crutcher LLP

*Kellogg Brown & Root, Inc.*, 756 F.3d 754, 756 (D.C. Cir. 2014) (Kavanaugh, J.).  Facebook relied upon these well-settled legal principles in designing and conducting the Investigation, and they decisively protect Facebook's Investigation documents.

### 1.     The Attorney-Client Privilege Protects Non-Lawyer Communications

Plaintiffs' primary argument is that the attorney-client privilege cannot apply to communications an attorney did not send or receive.  This is not the law.  The attorney-client privilege protects communications between non-attorneys in all of the scenarios Plaintiffs challenge.  For example, documents and communications between non-attorneys that summarize, relay, or discuss obtaining legal advice are protected by attorney-client privilege.  *See, e.g.*, *Fosbre v. Los Vegas Sands Corp.*, 2016 WL 183476, at *9 (D. Nev. Jan. 14, 2016).  Likewise, communications containing information "compiled by [employees] for the purpose of seeking legal advice and later communicated to counsel are [also] protected by attorney-client privilege." *AT&T Corp. v. Microsoft Corp.*, 2003 WL 21212614, at *3 (N.D. Cal. Apr. 18, 2003)).  And, contrary to Plaintiffs' challenges, attorney-client privilege often applies to third parties retained by counsel.  *Todd*, 2015 WL 13388227, at *5 (citing *Richey*, 632 F.3d at 566 and *Kovel*, 296 F.2d at 922).  Plaintiffs' boilerplate challenge to every entry on Facebook's logs that does not include the name of an attorney ignores these well-settled rules.

### 2.     The Attorney-Client Privilege Protects Factual Communications

The Supreme Court has also long recognized that the attorney-client privilege extends to communications in which a client provides its lawyer with facts necessary to render legal advice.  *See Upjohn*, 449 U.S. at 390.  As the Court recognized in *Upjohn*, the attorney-client privilege exists "to protect not only the giving of professional advice to those who can act on it *but also the giving of information to the lawyer to enable him to give sound and informed advice*." *Id.* (emphasis added).  Courts routinely hold that even purely factual exchanges involving nonlegal personnel are protected from disclosure so long as those facts are gathered at counsel's direction for the purpose of providing legal advice.  *See AT&T*, 2003 WL 21212614, at *3; *Fed. Trade Comm'n v. Boehringer Ingelheim Pharms., Inc.*, 180 F. Supp. 3d 1, 30, 34 (D.D.C. 2016) (attorney-client privilege protects "factual material compiled during a corporation's internal investigations . . . . at counsel's request for later use in providing legal advice" and "extend[s] to communications between corporate employees who are working together to compile facts for in-house counsel to use in rendering legal advice").

Gibson Dunn and Facebook's legal team designed and conducted the Investigation specifically

Gibson, Dunn &
Crutcher LLP

to gather facts needed to provide legal advice about litigation and other legal risks.  The attorney-client privilege protects communications gathering and conveying these facts.

### 3.  Facebook's Public Statements Did not Waive Privilege

Plaintiffs previously suggested that Facebook waived privilege over the Investigation because it made high-level public statements disclosing that it was conducting an investigation.[5]  Given the highly publicized nature of the Cambridge Analytica events—and consistent with Facebook's ongoing commitment to transparency—Facebook has made occasional generalized public statements about the Investigation.  But these high-level statements mention only the Investigation's existence and general goals,[6] do not disclose the substance of attorney-client communications, and do not create waiver.

Courts in this Circuit have recognized implicit waivers of privileged communications only where a party has used the attorney-client privilege as both a "sword" and a "shield" to gain a litigation advantage.  *See, e.g.*, *Finjan, Inc. v. Sonicwall, Inc.*, 2018 WL 4998149, at *4 (N.D. Cal. Oct. 15, 2018) (citing *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156 (9th Cir. 1992); *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 306 F.R.D. 234, 241-43 (N.D. Cal. 2015)).  Nothing of the sort occurred here.  Facebook never affirmatively used statements about the Investigation as a sword to advance its case, nor have any of Facebook's statements put the substance of the communications Plaintiffs challenge at issue. *See, e.g.*, *Dukes v. Wal-Mart Stores, Inc.*, 2013 WL 1282892, at *6-9 (N.D. Cal. Mar. 26, 2013) (Corley, M.J.) (privilege not waived by generalized statements that provided "no information about the actual content" of a privileged memorandum, and the company had not attempted to use it in litigation).

## II.  Investigation Materials Fall Within the Work-Product Protection

The work-product protection also covers the materials that Plaintiffs seek.  The work-product doctrine, which is grounded in Federal Rule of Civil Procedure 26(b)(3), "protects 'from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation.'" *Sanmina Corp.*, 968 F.3d at 1119 (quoting *Admiral Ins. Co. v. U.S. District Court*, 881 F.2d 1486, 1494 (9th Cir. 1989)).  The doctrine "shelters the mental processes of the attorney . . . and protects both

---

[5]   Because this briefing is simultaneous, Facebook responds to the arguments it anticipates Plaintiffs will make.  If the court is inclined to make a ruling based on an argument Facebook has not anticipated, Facebook requests the opportunity to submit supplemental briefing on that issue before the Court issues a ruling.

[6]   For example, on March 21, 2018, Facebook's founder Mark Zuckerberg publicly announced the Investigation, explained its purpose as "investigat[ing] all apps that had access to large amounts of information before we changed our platform to dramatically reduce data access in 2014," and stated that the company would inform users if their personal data is found to have been abused.  *See* https://www.facebook.com/zuck/posts/10104712037900071.

material prepared by agents for the attorney as well as those prepared by the attorney himself." *Id.* (internal quotations and citation omitted). "The primary purpose of the work-product rule is to prevent exploitation of a party's efforts in preparing for litigation." *Id.*

Plaintiffs seek to end-run this doctrine. Rather than serve tailored discovery requests to develop their case, they seek to commandeer work conducted by Facebook's counsel in connection with assessing legal risks certain apps and developers may pose for Facebook in this case and other related actions. The Court should reject this transparent attempt to invade Facebook's attorney work product.

### A.      The Materials Were Created Because of Actual and Anticipated Litigation

The work-product protection extends to documents generated in connection with an investigation, so long as the materials were prepared "*because of* the prospect of litigation." *Richey*, 632 F.3d at 568 (emphasis added). This is true even if documents prepared at the direction of counsel to assist in defending against litigation also prove useful for other purposes, which is often the case. *See In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 908-09 (9th Cir. 2004). The key question in determining whether information was generated "because of" litigation is whether it "would not have been created in substantially similar form but for the prospect of that litigation." *Phoenix Techs. Ltd. v. VMware, Inc.*, 195 F. Supp. 3d 1096, 1102 (N.D. Cal. 2016) (quoting *In re Grand Jury Subpoena*, 357 F.3d at 908).

The investigatory materials at issue were unquestionably created because of anticipated and actual litigation. When Facebook commenced the Investigation, it faced numerous lawsuits, including this one, and the prospect of many more to come—all concerning the issues on which the Investigation focused. Facebook's in-house and outside counsel designed the Investigation to gather the facts needed to provide legal advice to Facebook about litigation, compliance, regulatory inquiries, and other legal risks facing the Company. There is no question the materials at issue here would not have been created but for those actual and anticipated actions.

### B.      Factual Investigatory Materials Are "Opinion" Work Product

The work product protection covers factual materials created as part of a legal investigation. Investigatory materials created in connection with "a litigation-related investigation are likely to be permeated with the investigator's own impressions and possibly even attorney theories or strategy, and are therefore protected from discovery." *Mitchell Eng'g v. City & Cty. of S.F.*, 2010 WL 1853493, at *1 (N.D. Cal. May 6, 2010) (internal citations omitted). Attorneys "use[] their knowledge about the

facts and theories of the case to identify and filter which facts and comments [are] important to [an] investigation." *S.E.C. v. Schroeder*, 2009 WL 1125579, at *7 (N.D. Cal. Apr. 27, 2009), *objections overruled*, 2009 WL 1635202 (N.D. Cal. June 10, 2009).  For this reason, even factual data can reflect counsel's opinions or legal theories, when compiled at an attorney's direction.  *See, e.g.*, *id*.

Some of the documents Plaintiffs challenge are factual in nature.  Those materials are the direct result of analyses involving attorney-derived criteria and judgment about legal risk, and thus reflect the thought processes of counsel concerning, among other things, the types of app features or activities counsel identified as indicating potential policy violations and where counsel would look for potential data and privacy vulnerabilities.  Without counsel's mental impressions, analysis, and legal advice, the information Plaintiffs seek would not exist.  Plaintiffs may serve proper discovery requests to develop facts in support of their case.  But they cannot simply piggyback on counsel's work.  *See Richey*, 632 F.3d at 567 ("The work-product doctrine covers documents or the compilation of materials prepared by agents of the attorney in preparation for litigation.").  The documents and information from the Investigation are quintessential examples of privileged materials protected from disclosure.

## III.    Each of the Documents Plaintiffs Challenge is Independently Privileged

As discussed above, the materials Plaintiffs seek are categorically protected under the attorney-client privilege and the work-product doctrine, which the documents Plaintiffs challenge illustrate.

Plaintiffs initially challenged wholesale every entry on Facebook's privilege logs that does not include the name of an attorney (about 400 of 6100 entries).  Plaintiffs then identified 20 of those entries to brief.  The entries Plaintiffs identified in fact confirm that the Investigation was directed by attorneys for the purpose of assessing legal risks.  Indeed, most of the entries Plaintiffs challenge are the top email on an email chain among attorneys, attachments originally circulated by or to attorneys, or materials created to seek legal advice.[7]

Facebook addresses the entries Plaintiffs identified for this briefing below, explaining how each entry is privileged.[8]  Facebook reminds the Court that Plaintiffs have not identified any bases for their

---

[7]    If Plaintiffs had fulfilled their obligation to meet and confer about the challenged documents, Facebook would have provided Plaintiffs with this context.  This would likely have avoided burdening the Court with this and other straightforward privilege disputes.

[8]    Facebook agreed to produce two documents it logged originally—a communication Plaintiffs identified (FB-ADI-0000003224) and its parent email.  These documents are not ADI-related and were inadvertently captured by the searches used for this exercise.  *See* Ex. A (letter from D. Stein).  Facebook confirmed it is not withholding other similar materials.  *Id.*  For this reason, Facebook discusses 19 documents (not 20) below.

challenges other than that no attorney appears on the challenged entries they dispute. Because Facebook is not aware of the specific arguments Plaintiffs intend to make, for each document, Facebook describes the challenged entry, explains why the referenced document is facially privileged, and provides surrounding context to better illustrate the document's privileged nature. Facebook submits each of the challenged documents as exhibits for *in camera* review, in addition to other documents, such as the email chain by which challenged attachments were sent, to provide additional context.[9]

## A.    Documents Summarizing, Reflecting, or Relaying Attorney Advice are Privileged

Plaintiffs challenge a number of documents that summarize or relay counsel's legal advice, which are addressed in this section. Such materials are indisputably privileged—even when they are sent by non-attorneys to other non-attorneys. "Communications between non-attorney employees for purposes of obtaining or relaying legal advice are protected by the attorney-client privilege." *Fosbre*, 2016 WL 183476, at *9; *see also Scalia*, 336 F.R.D. at 618 (when "employees discuss or transmit legal advice given by counsel," the communications are protected).

| Document # | Log ID # | Bases for Withholding |
|---|---|---|
| Document 1 | FB-ADI-0000000541 | Attorney-client privilege; work product. |

Plaintiffs challenge an attachment, likely because it was sent by one non-lawyer to another non-lawyer, but this document is privileged on its face. The context further confirms that the attachment was sent as part of a privileged conversation, pursuant to a privileged investigation directed by counsel, and originally circulated by an attorney. Plaintiffs concede the attachment as originally circulated by an attorney is privileged by not challenging the underlying email.

**The challenged document plainly summarizes Gibson Dunn's advice on the investigation and its preliminary findings for its client, making it both a privileged communication and protected by the work-product doctrine.** The challenged document is a set of slides, ███████ ███████████████████████████████████████████████████████████████████

**The full email chain further demonstrates that the challenged attachment is properly withheld as privileged.** The email to which the challenged document is attached is the top email on a chain among attorneys. The chain originates with ██████████ the in-house attorney ██████████████████████████████████████████████████████████ email is marked "A/C Priv" and "ATTORNEY WORK PRODUCT CREATED IN ANTICIPATION OF LITIGATION AT THE DIRECTION OF COUNSEL." Plaintiffs do not dispute that ██████████████████████████████████████ is privileged or that the slides are privileged as attached to ██████████ email.

**When Gibson Dunn's legal advice was forwarded again, it did not waive privilege.** ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ █████████████████ subsequent discussion of this privileged email, ██████

---

[9]    On these materials Facebook highlights in yellow names of Gibson Dunn attorneys and consultants retained by Gibson Dunn, many of whom used "@fb.com" email addresses for their work on the Investigation.

DEFENDANT FACEBOOK, INC.'S BRIEF IN OPPOSITION TO PLAINTIFFS' REQUEST FOR PRIVILEGED INVESTIGATORY MATERIALS

Gibson, Dunn & Crutcher LLP

████████████████████████████████████████████████████████.

| Document # | Log ID # | Bases for Withholding |
|---|---|---|
| Document 2 | FB-ADI-0000000004 | Attorney-client privilege; work product. |

Plaintiffs challenge as Document 2 an earlier version of Document 1. As discussed above, this is a set of slides conveying counsel's advice and work product. Ex. 2A.

**The context of the full email chain—which contains a discussion of legal advice and is indisputably privileged—further demonstrates that the challenged document was properly logged and withheld.** ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ As above, nothing about this discussion among core ADI team members, ████████████████████████████, waives privilege over slides providing a detailed description of counsel's advice and findings.

| Document # | Log ID # | Bases for Withholding |
|---|---|---|
| Document 3 | FB-ADI-0000004935 | Attorney-client privilege; work product. |

Plaintiffs challenge an image embedded in an email, likely because it was sent by one non-lawyer to another non-lawyer, but this image is privileged on its face. The surrounding context further shows the image was sent as part of a privileged communication, pursuant to an investigation directed by counsel and was circulated to Gibson Dunn attorneys. Plaintiffs concede the image as originally circulated to Gibson Dunn is privileged by not challenging the underlying email.

**The challenged image plainly summarizes Gibson Dunn's legal advice on the Investigation's focus and key priorities for its client, making it both a privileged communication and protected by the work-product doctrine.** The image summarizes Gibson Dunn's advice regarding the Investigation's scope and design, ████████████████████████

**The full email chain—which details Gibson Dunn's findings and recommendations and solicits legal advice—further demonstrates the challenged image was properly withheld as privileged.** ████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████.[10] Plaintiffs do not dispute this email (or the images as embedded in it) is privileged. █████████████████████

████████████████████████████████████████ Plaintiffs again do not dispute that these communications seeking legal advice (with the images embedded lower on the chain) are privileged.

**Privilege still attaches when one core ADI team member responds directly to another on this chain.** Plaintiffs' challenge is presumably based on the fact that, in the top email on the chain, ████████████████████████████████████████████████

████████████████████████████████████████ This discussion among core Investigation

---

[10]   Due to the manner in which documents are processed and produced for litigation, the images appear as separate documents here, but they were not intended to be, and were not, freestanding.

team members regarding advice sought from counsel is plainly privileged and does render the privilege waived for an image that was originally circulated to counsel and provides a summary of counsel's advice and findings.

| Document # | Log ID # | Bases for Withholding |
|---|---|---|
| Document 4 | FB-ADI-0000004878 | Attorney-client privilege; work product. |

Plaintiffs challenge this email, presumably because it was a communication between non-lawyers, but the email is plainly privileged. The challenged email cannot be separated from the rest of the email chain, which was initially sent to in-house counsel ▉▉▉▉▉ and Gibson Dunn attorneys pursuant to a privileged investigation, and which Plaintiffs concede is privileged.

**The challenged email relays Gibson Dunn's advice, making it both a privileged communication and protected by the work-product doctrine.** ▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

**The full email chain, which includes Gibson Dunn attorneys and summarizes their legal advice, further demonstrates that the email was properly withheld as privileged.** The challenged email is the top email on an email chain sent to numerous attorneys. *Id.* The chain ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ is labeled "A/C PRIV" and "ATTORNEY WORK PRODUCT CREATED IN ANTICIPATION OF LITIGATION AT THE DIRECTION OF COUNSEL." Recipients include Gibson Dunn attorneys, as well as Facebook's lead in-house counsel on the Investigation at the time ▉▉▉▉▉▉ Plaintiffs do not dispute that this email is privileged. The subsequent communications on the email thread include a discussion about Gibson Dunn's legal advice and seek additional legal advice from Gibson Dunn. Plaintiffs also do not dispute that these emails are privileged. ▉▉▉▉▉▉▉▉[11]

| Document # | Log ID # | Bases for Withholding |
|---|---|---|
| Document 5 | FB-ADI-0000006118 | Attorney-client privilege; work product. |

Plaintiffs likely challenge this attachment because it was sent by one non-lawyer to another non-lawyer, but the attachment is facially privileged. The email chain further shows it was originally sent by a Gibson Dunn attorney, in a privileged conversation, pursuant to the privileged Investigation. Plaintiffs concede the attachment as circulated by Gibson Dunn is privileged by not challenging the underlying email or its attachments (which include the challenged document).

**The challenged document relays Gibson Dunn's advice on the Investigation's design, status, and next steps, making it both a privileged communication and protected by the work-product doctrine.** ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ It is labeled "Privileged & Confidential – Attorney Work Product – Attorney-Client Communication," and it is facially privileged.

**The full email chain, which discusses a future meeting between Gibson Dunn and Facebook about ADI, further demonstrates the challenged document was properly withheld as**

---

[11]   The email contains a number of embedded images, which due to production format appear as grey boxes with separate email attachments. These images are attached for the Court's convenience as Exhibits 4B-E.

DEFENDANT FACEBOOK, INC.'S BRIEF IN OPPOSITION TO PLAINTIFFS' REQUEST FOR PRIVILEGED INVESTIGATORY MATERIALS

**privileged.** The email to which the challenged document is attached is the top entry in a chain among attorneys. The chain reflects that the challenged document was prepared and originally sent by a Gibson Dunn attorney in advance of a meeting with Gibson Dunn and Facebook personnel. Ex. 5B (second communication in thread). Plaintiffs do not dispute that earlier emails on the chain from Gibson Dunn attorneys (including the email circulating this document) are privileged.

**Forwarding Gibson Dunn's analysis to an ADI team member does not constitute waiver.** Plaintiffs' challenge is presumably based on the fact that a recipient of Gibson Dunn's analysis, forwarded it to another *original recipient* of Gibson Dunn's email for the purposes of providing instructions regarding the upcoming meeting. Nothing about this discussion among ADI team members to prepare for meeting with counsel waives privilege.

### B. Communications With and Among Experts Operating at the Direction of Counsel are Privileged

Plaintiffs challenge various communications with and documents prepared by experts retained by Gibson Dunn to assist it in providing legal advice to Facebook. These experts were engaged directly by Gibson Dunn to operate as an extension of counsel and to support counsel in investigating, understanding, and identifying apps and developers that could have potentially misused user data and advising Facebook about legal risk issues. The experts assisted in interpreting technical findings and data. They also assisted in developing an investigative framework that reflected counsel's assessment of risky app and developer profiles, how counsel should prioritize its review, and when Facebook should pursue further action.

The attorney-client privilege extends to "communications with a third party" where, as here, "that third party has been retained as an agent for the purposes of assisting a lawyer in providing advice to a client." *Todd*, 2015 WL 13388227 at *5 (citing *Richey*, 632 F.3d at 566 and *Kovel*, 296 F.2d at 922). "The vital element to the assertion of the privilege . . . is that the communication be made in confidence for the purpose of obtaining *legal* advice *from the lawyer*." *Id.* (internal quotations and citation omitted). Similarly, the work-product protection extends to the work and mental impressions of consultants retained by counsel to assist in the provision of legal advice. *See* Fed. R. Civ. P. 26(b)(3)(A) ("[A] party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . . .").

| Document # | Log ID # | Bases for Withholding |
|---|---|---|
| Document 6 | FB-ADI-0000004849 | Attorney-client privilege; work product |
| Document 7 | FB-ADI-0000004850 | Attorney-client privilege; work product |
| Document 8 | FB-ADI-0000004851 | Attorney-client privilege; work product |
| Document 9 | FB-ADI-0000003218 | Attorney-client privilege; work product |

Plaintiffs challenge four attachments, presumably because they were attached to emails sent by a non-lawyer to other non-lawyers, but these documents are facially privileged. The context provided in the full email chains shows that the attachments were originally circulated to in-

Gibson, Dunn & Crutcher LLP

house attorneys—including ███████—in a privileged communication, pursuant to the privileged Investigation. Plaintiffs concede the attachments as originally circulated are privileged by not challenging the underlying email or the challenged document as attached to it.

**The challenged documents reflect Gibson Dunn's legal advice and were prepared at the direction of counsel to facilitate a discussion about the Investigation's structure, making them both privileged communications and protected by the work-product doctrine.**

The first attachment (FB-ADI-0000004849) is an agenda prepared at Facebook Legal's direction to facilitate a discussion ████████████████████. The agenda is labeled "AC PRIV," is privileged on its face as an attorney-client communication, and is also protected by the work-product doctrine.

The second attachment (FB-ADI-0000004850) is a table of investigative records ████████ ████████████████████████████████████ for the continued provision of legal advice. It reveals the mental impressions of counsel, and it is privileged on its face and protected by the work-product doctrine.

The third attachment (FB-ADI-0000004851) is also a table of investigative records ████████ ████████████████████████████. Again, the table conveys previously rendered legal advice ████████████████████████████████████ and it is privileged on its face and protected by the work-product doctrine.

The fourth attachment (FB-ADI-0000003218) is a diagram depicting the Investigation's fact-development workflow that was created ████ at the direction of Facebook Legal and Gibson Dunn ████████████████████ for the continued provision of legal advice. Ex. 6-9D. For the same reasons as the first three attachments, it is privileged on its face and protected by the work-product doctrine.

**The email chain to which the four challenged documents are attached includes core ADI attorneys, reveals counsel's analyses and recommendations, and further demonstrates that its attachments are privileged.** Ex. 6-9E. The email to which the challenged documents are attached is the top entry in a chain originally sent to attorneys. ████████████████████ ████████████████████████████████████ Plaintiffs do not dispute that this email, including the attachments (as originally transmitted) is privileged.

**Providing these privileged documents to other employees performing work on the Investigation does not constitute a waiver.** Plaintiffs appear to argue that the first three challenged attachments are not privileged because ████████████████████ ████████████████████████████████████ Informing other employees working on the Investigation about it does not constitute a waiver.

Plaintiffs also will likely argue that the fourth challenged attachment is not privileged because one of the employees who received ████████ email then forwarded the message (with its attachments) to herself, using a different subject line. *See* Ex. 6-9F (top email showing same attachments). Nothing about this record-keeping action waives privilege.

DEFENDANT FACEBOOK, INC.'S BRIEF IN OPPOSITION TO PLAINTIFFS' REQUEST FOR PRIVILEGED INVESTIGATORY MATERIALS

Gibson, Dunn & Crutcher LLP

| Document # | Log ID # | Bases for Withholding |
|---|---|---|
| Document 10 | FB-ADI-0000002534 | Attorney-client privilege; work product. |

██████████████████████████████████ the context of this email illustrates that it is a privileged communication sent at the direction of Gibson Dunn pursuant to the privileged Investigation.

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████ Such internal communications ███████████████ are privileged communications sent at the direction of Gibson Dunn, pursuant to the Investigation, conducted by Gibson Dunn and Facebook Legal in order to address and advise on legal risks associated with third party developer access to and use of data.

**The challenged communication is between consultants acting at Gibson Dunn's direction in order to compile information to facilitate Gibson Dunn's ability to advise its client, making the email both privileged and protected by the work-product doctrine.** ████
██████████████████████████████████ In the email, a consultant ████████ working at the direction of counsel shared access to a document that was compiled in order to gather information needed for Gibson Dunn to provide legal advice. To this end, the email includes an attached spreadsheet that reflects Gibson Dunn's advice related to specific apps and developers, and reveals information gathered by the investigative team at Gibson Dunn's direction for use in providing further advice regarding ongoing investigations. ████████ The email sharing this information is privileged and protected by the work-product doctrine.

| Document # | Log ID # | Bases for Withholding |
|---|---|---|
| Document 11 | FB-ADI-0000002537 | Attorney-client privilege; work product. |

████████████████████████████████████████████████████
████████████████ The context illustrates that this spreadsheet is a privileged communication between agents of Gibson Dunn sent at the direction of Gibson Dunn pursuant to ADI.

**The challenged document reflects Gibson Dunn's legal advice to its client on next steps in the Investigation, making it both a privileged communication and protected by the work-product doctrine.** The challenged attachment was compiled by core ADI investigators, reflects the core investigative and enforcement efforts of the ADI, and was sent in furtherance of the ADI. It is a tracker document that collects relevant information for the provision of legal advice, and reflects legal advice rendered by Gibson Dunn and the status of various app- or developer-specific investigations conducted as part of ADI. The document reflects both a confidential attorney-client communication and opinion work product, and it is privileged on its face.

**The fact that the privileged table was sent to a consultant acting at Gibson Dunn's behalf does not waive privilege or the work-product doctrine.** ████████████████████████
████████████████ But as with Document 10, the email demonstrates that consultants working at the direction of Gibson Dunn merely shared access to a document that gathered information required

DEFENDANT FACEBOOK, INC.'S BRIEF IN OPPOSITION TO PLAINTIFFS' REQUEST FOR PRIVILEGED INVESTIGATORY MATERIALS

Gibson, Dunn & Crutcher LLP

for the continued provision of legal advice by Gibson Dunn.  This exchange does not waive privilege over the table.

| Document # | Log ID # | Bases for Withholding |
|---|---|---|
| Document 12 | FB-ADI-0000002505 | Attorney-client privilege; work product. |

████████████████████████████████████████
████████ in this context, the communication is privileged.  Ex. 12. ████████
████████ This document reveals these processes and the ADI team's internal methods.  There are two attachments to the email, over which Facebook does not assert privilege because they were sent to external developers, and those have been independently produced.  *See* Log Entry FB-ADI-0000002506, FB-ADI-0000002507.

### C.    Images Used to Communicate in Privileged Communications are Privileged

Plaintiffs challenge images used to convey substantive information during privileged discussions on Facebook's internal instant messaging platform.  Memes, emojis, and other images have become a hallmark of the way people communicate, particularly on instant-messaging platforms, and they provide a succinct way to convey substantive information.  For instance, a thumbs up can convey agreement or permission.  A thumbs down can convey disagreement, or displeasure.  Adding a smiley face to an otherwise rude comment may convey sarcasm.  When these images are used during privileged conversations they are privileged.  *See* Restatement (Third) of the Law Governing Lawyers § 69 (privilege reaches communications "in any form," including "communication through technolog████ enhanced methods" and "nonverbal communicative acts"); *see also* 24 Fed. Prac. & Proc. Evid. § 5484 (1st ed.) (finding privileged "objects . . . used as a method of communication.")

Plaintiffs challenge two embedded images, both of which were used during privileged discussions on Facebook's internal instant messaging platform.  During these discussions, the challenged images would have appeared in-line, alongside and as a substitute for substantive text.  But due to the manner in which documents are processed and produced, they appear as attachments to the chat messages (which themselves appear similar to emails).

| Document # | Log ID # | Bases for Withholding |
|---|---|---|
| Document 13 | FB-ADI-0000000085 | Attorney-client privilege; work product. |

Plaintiffs likely challenge this image because it was sent by one non-attorney to another non-attorney, but the image was used to communicate in a privileged chat.

**The challenged image, Ex. 13A, communicates understanding in a chat conversation about Gibson Dunn's recommendations** ████████ **making it a privileged communication and protected by the work-**

Gibson, Dunn & Crutcher LLP

**product doctrine**. The chat in which the challenged image was sent concerns counsel's recommended next steps for certain apps and developers discussed during a meeting with in-house counsel and Gibson Dunn. *See* Ex. 13B at p. 4 (referencing a ".png"). The discussion between these ADI team members is privileged, including images used to communicate. For additional context regarding this discussion, Facebook submits a separate email—that Plaintiffs do not challenge. ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ The image is privileged in this context.[12]

| Document # | Log ID # | Bases for Withholding |
|---|---|---|
| Document 14 | FB-ADI-0000003178 | Attorney-client privilege; work product. |

Plaintiffs likely challenge this image because it was sent by one non-attorney to another non-attorney, but the image was used to communicate understanding in a privileged chat.

**The challenged embedded image, Ex. 14A, is used to communicate understanding in a message** ████████████████████ **making it both a privileged communication and protected by the work-product doctrine**. *See* Ex. 14B. Context demonstrates that the challenged image is facially privileged and protected by the work-product doctrine. ██████████

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████ This conversation about enforcement measures performed at Gibson Dunn's direction is plainly privileged. In this context, the image is privileged.

### D.     Facts Collected at the Direction of Counsel are Privileged

Finally, Plaintiffs challenge various documents reflecting facts compiled at the direction of counsel. These materials are protected from disclosure. The attorney-client privilege protects "factual material compiled during a corporation's internal investigation … at counsel's request for later use in providing legal advice" and "extend[s] to communications between corporate employees who are working together to compile facts for in-house counsel to use in rendering legal advice." *Fosbre*, 2016 WL 183476, at *9; *see also Boehringer Ingelheim Pharms.*, 180 F. Supp. 3d at 30, 34. The work-product protection similarly extends to work compiled by non-attorneys at counsel's direction. The doctrine "shelters the mental processes of the attorney … and protects both material prepared by agents for the attorney as well as those prepared by the attorney himself." *Sanmina Corp.*, 968 F.3d at 1119 (internal quotation marks and citation omitted).

---

[12]  To the extent Plaintiffs challenge the image files in Documents 13 and 14 divorced from their context as part of privileged chats, the images have been produced independently in other, non-privileged contexts.

DEFENDANT FACEBOOK, INC.'S BRIEF IN OPPOSITION TO PLAINTIFFS' REQUEST FOR
PRIVILEGED INVESTIGATORY MATERIALS

Gibson, Dunn &
Crutcher LLP

| Document # | Log ID # | Bases for Withholding |
|---|---|---|
| Document 15 | FB-ADI-0000001051 | Attorney-client privilege; work product. |

Plaintiffs may have challenged this email because it was sent by one non-attorney to another non-attorney, but the email is privileged.  The rest of the chain, which includes Gibson Dunn attorneys and Plaintiffs concede is privileged by not challenging it, provides additional context that shows the email was sent at the direction of counsel pursuant to a privileged investigation.

**The challenged email was sent at the direction of Counsel and discusses the process for compiling information needed for Gibson Dunn to render legal advice, making it both a privileged communication and protected by the work-product doctrine.**  The challenged document is the second of two emails on a chain regarding counsel's recommendation ████. ████████████████████████████████████████████████████████████ It is marked "Attorney Client Privileged" and "Attorney [W]ork [P]roduct," and conveys that its contents should be kept confidential.  Plaintiffs concede ████████ original email is privileged by not challenging it. ██████████████ ████████████████ This communication is plainly privileged because it is a communication between individuals working at "at the direction of" Facebook legal and Gibson Dunn, *id.*, discussing how to carry out these attorneys' fact-gathering directives.

| Document # | Log ID # | Bases for Withholding |
|---|---|---|
| Document 16 | FB-ADI-0000001328 | Attorney-client privilege; work product. |

The challenged document is ████████ response to the email ████████████ above and is privileged for the same reasons. ████████████████ response also shows he is working with a Gibson Dunn attorney (Nathan Powell) on collecting investigation-related facts.

| Document # | Log ID # | Bases for Withholding |
|---|---|---|
| Document 17 | FB-ADI-0000001325 | Attorney-client privilege; work product. |

Plaintiffs likely challenge this task message because it is sent to a non-attorney, but this task document is privileged. ████████████████████████████████████████████████████ ████████████████████████████████████████████ The contents of this task are privileged, and additional context confirms that the task was created at the direction of counsel pursuant to a privileged investigation.

**The challenged document provides significant detail on methods employed in the Investigation summarizing Gibson Dunn's advice, making it both a privileged communication and protected by the work-product doctrine.**  The task email ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████.[13]

**Additional materials reveal that the task was created at counsel's direction, further demonstrating that it was properly withheld as privileged.**  This particular task was created ████████████ at counsel's direction, which the following additional documents (none of which are challenged) demonstrate:

---

[13]    Comments from "Task Reaper" and "Butterfly Bot" were generated automatically.

DEFENDANT FACEBOOK, INC.'S BRIEF IN OPPOSITION TO PLAINTIFFS' REQUEST FOR PRIVILEGED INVESTIGATORY MATERIALS

█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
███████████████████

| Document # | Log ID # | Bases for Withholding |
|---|---|---|
| Document 18 | FB-ADI-0000003275 | Attorney-client privilege; work product. |

Plaintiffs presumably challenge this excel spreadsheet because it was sent by one non-attorney to another non-attorney, but the spreadsheet is privileged. The timing of this document illustrates that it was compiled at the direction of counsel in order to prepare ADI.

**The challenged spreadsheet compiles data at the request of Facebook Legal in order to structure the Investigation, making it both a privileged communication and protected by the work-product doctrine.** ███████████████████████ It reveals counsel's impressions and determinations regarding which various criteria could be used by counsel to assess legal risk. This information is privileged and protected work product.

**Surrounding context reveals the spreadsheet was created as part of Facebook Legal's initial efforts to design the investigation.** The challenged spreadsheet is attached to an email ███████████████████████████ The email is sent on March 21, 2018, four days after the Cambridge Analytica story broke, the day after this litigation began, █████████████████████████

| Document # | Log ID # | Bases for Withholding |
|---|---|---|
| Document 19 | FB-ADI-0000004860 | Attorney-client privilege; work product. |

Plaintiffs presumably challenge this chat because it involves non-attorneys, but the chat is privileged because it reflects fact-gathering methods conducted at the request of Facebook Legal.

**The challenged chat exchange requests factual information necessary for Facebook Legal to render legal advice related to app enforcement, making it both a privileged communication and protected by the work-product doctrine.** █████████████████ ████████ gathered this information at the direction of Facebook Legal, and Facebook Legal used this information to advise on further enforcement measures. This factual discussion is privileged and, like each of the documents above, was properly withheld.

## CONCLUSION

The Court should deny Plaintiffs' request for Facebook's investigatory files, hold that materials from Facebook's Investigation are protected by the attorney-client privilege and work-product doctrine, and hold that each of the documents Plaintiffs challenge was properly withheld as privileged.

Gibson, Dunn & Crutcher LLP

DEFENDANT FACEBOOK, INC.'S BRIEF IN OPPOSITION TO PLAINTIFFS' REQUEST FOR PRIVILEGED INVESTIGATORY MATERIALS

DATE:  February 5, 2021                  Respectfully submitted,

**GIBSON, DUNN & CRUTCHER, LLP**

By:  *Orin Snyder*
Orin Snyder (*pro hac vice*)
osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Deborah Stein (SBN 224570)
dstein@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook, Inc.*

# EXHIBIT O

                                  Pages 1 - 33

                        UNITED STATES DISTRICT COURT

                      NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

IN RE: FACEBOOK, INC. CONSUMER )
PRIVACY USER PROFILE LITIGATION)
                               )      **NO. 18-md-02843 VC**
                               )
_____)
                                     San Francisco, California
                                     Thursday, March 5, 2020

                        <u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiff:          KELLER ROHRBACK LLP
                        1201 Third Avenue - Suite 3200
                        Seattle, Washington  98101
                   BY:  **DEREK W. LOESER, ATTORNEY AT LAW**
                        **CARI C. LAUFENBERG, ATTORNEY AT LAW**
                        **DAVID KO, ATTORNEY AT LAW**

                        801 Garden Street
                        Santa Barbara, California  93101
                   BY:  **CHRISTOPHER L. SPRINGER, ATTORNEY AT LAW**

                        BLEICHMAR FONTI & AULD LLP
                        555 12th Street - Suite 1600
                        Oakland, California  94607
                   BY:  **LESLEY E. WEAVER, ATTORNEY AT LAW**
                        **ANNE K. DAVIS, ATTORNEY AT LAW**

For Defendant Facebook:

                        GIBSON, DUNN & CRUTCHER LLP
                        555 Mission Street - Suite 3000
                        San Francisco, California  94105
                   BY:  **JOSHUA S. LIPSHUTZ, ATTORNEY AT LAW**

                        1881 Page Mill Road
                        Palo Alto, California  94304
                   BY:  **MARTIE P. KUTSCHER, ATTORNEY AT LAW**

            **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Reported By:    Marla F. Knox, RPR, CRR, RMR, Official Reporter

**APPEARANCES:** **(CONT'D)**

For Defendant Facebook:

                        GIBSON DUNN and CRUTCHER LLP
                        200 Park Avenue
                        New York, New York  10166
                   BY:  **ORIN SNYDER, ATTORNEY AT LAW**

                        333 South Grand Avenue
                        Los Angeles, California  90071
                   BY:  **DEBORAH L. STEIN, ATTORNEY AT LAW**

<u>**Thursday - March 5, 2020**</u>                    <u>**2:03 p.m.**</u>

1
2                            P R O C E E D I N G S

3                                  ---oOo---

4            **THE CLERK:**  Calling Case Number 18-MD-2843, In Re:

5    Facebook Inc. Consumer Privacy User Profile Litigation.

6        Counsel, for Plaintiffs please state your appearances for

7    the record.

8            **MR. LOESER:**  Hi, this is Derek Loeser for Plaintiffs.

9    With me in my office are Cari Laufenberg and David Ko and also

10   appearing are Lesley Weaver and Annie Davis and Matt

11   Montgomery.

12           **THE CLERK:**  Thank you.  And for Defendant.

13           **MR. SNYDER:**  Good afternoon, Judge.  It is Orin Snyder

14   for Facebook from Gibson Dunn, and with me on the phone are

15   Deborah Stein, Josh Lipshutz and Martie Kutscher.

16           **THE COURT:**  Okay.  Hi, Everybody.  So it sounds like

17   everything is going great.

18           **MR. SNYDER:**  All over the world, Your Honor.

19           **THE COURT:**  Yeah.  I don't really know where to start

20   or what to do with you at this point.  I guess -- I will -- let

21   me start with this:  You know, there is -- for a while now we

22   have been discussing Facebook's production of the same

23   documents that it produced to the FTC.

24       And, you know, the Plaintiffs have been asking for me to

25   order Facebook to simply turn over all the same documents.  And

**PROCEEDINGS**

1    I responded that I thought out of fairness to Facebook, if

2    Facebook wanted to review all those documents again and, you

3    know, sort of try to determine whether it produced some stuff

4    to the FTC that it shouldn't produce to the Plaintiffs --

5    either because it is privileged or too far afield from this

6    litigation or something like that -- that that would be

7    appropriate.

8        And so I gave them -- I said that they could do that.  It

9    sounds like from reading your papers, that Facebook is prepared

10   to make that production by the end of this month; that is, all

11   of the stuff that it turned over to the FTC minus whatever it

12   concludes it should withhold for privilege reasons or for

13   relevance reasons in this litigation.

14       I assume that that would cover the vast majority of the

15   documents that the Plaintiffs would want in this litigation.

16   Am I wrong about that?  And if I'm wrong about that, what am I

17   missing?

18            MR. LOESER:  So, Your Honor -- this is Derek Loeser.

19   Just before I start, it sounds like someone is on a cell phone

20   or something.  While you were speaking there was probably

21   breathing.  It makes it a little hard to hear the Court.  So if

22   there is a mute someone can press, that would be useful.

23            THE COURT:  Do you need -- do you need me to repeat

24   what I said?  I mean the short version --

25            MR. LOESER:  No.  I think I heard --

**PROCEEDINGS**

1      **THE COURT:**  Okay, go ahead.

2         **MR. LOESER:**  Sorry.  Yeah, I think the short

3   version -- I guess I will repeat it back to you to make sure I

4   have it -- is whether Facebook's offer to produce FTC materials

5   after its privilege and relevancy review at the end of March is

6   sufficient or not.

7         And here is our concern:  First, on this question of

8   privilege review, there is no privilege remaining for these

9   documents in the Ninth Circuit.

10        So that's -- we will circle back to that later, but

11  Your Honor has indicated that there is --

12        **THE COURT:**  You mean because they waived the privilege

13  by turning it over to FTC?

14        **MR. LOESER:**  Yes.  The Ninth Circuit, with every

15  circuit except for the Eighth Circuit, has rejected any notion

16  that you can voluntarily turn information over to a government

17  agency and retain attorney-client privilege for that

18  information.

19        **THE COURT:**  Yeah, but one of the things --

20        **MR. LOESER:**  Yeah, but --

21        **THE COURT:**  One of the things that we discussed was

22  that -- you know, they might have reasons to do a more careful

23  review in this case than in their interactions with the FTC;

24  right.  So maybe there could have been inadvertent --

25  privileged documents inadvertently produced to the FTC; right?

PROCEEDINGS

1    **MR. LOESER:**  Yeah.  I don't want to distract because I

2  think this might be something we have to brief, and the Court

3  would have to rule on whether there is such a thing as

4  inadvertent production in which you can preserve a privilege.

5         **THE COURT:**  Okay.

6         **MR. LOESER:**  I don't think anything Facebook did when

7  turning documents over to the Government would be considered

8  anything other than a waiver of an attorney-client privilege,

9  but I think --

10        **THE COURT:**  Okay --

11        **MR. LOESER:**  -- what I was --

12        **THE COURT:**  I don't know a lot about -- sorry.  I was

13 just going to say:  I don't know a lot about that issue.  So

14 that may be that is something you ultimately need to brief.

15 That's fine.

16        **MR. LOESER:**  So the heart of your question is the

17 relevancy review and why are we not satisfied with Facebook

18 simply saying they are going to conduct a relevancy review and

19 give us what makes it through their screen.

20     I guess I would put it to you this way:  One, we are very

21 concerned about that review and whether their interpretation of

22 relevance coincides in any meaningful way with our own.  From

23 everything we have heard from Facebook so far, they have a

24 very, very narrow view of what is relevant here.  That's the

25 first concern.

PROCEEDINGS

1       The second concern is the whole reason why we spent months

2   fighting with Facebook to get the FTC correspondence was so

3   that we could look and see and evaluate really what was given

4   to the FTC.  And we have that correspondence and we have gone

5   through it.

6       And, frankly, based on your review -- with the exception

7   of some very discrete categories -- there is a very clean

8   overlap between those two matters.  So what we said to Facebook

9   is:  Okay, let's talk about that.  We both have read this

10  correspondence.  Tell us what you think is not relevant by

11  category so we can come to some agreement so you can then do

12  your review once and produce the documents once.

13      What we are very concerned about with the October deadline

14  is the process that Facebook has in mind would involve them

15  unilaterally pulling documents out of production; not telling

16  us what they pulled and not logging it in any way -- which is

17  what they said they are going to do -- and then us having to

18  sit there and try to piece together what has been removed.

19      It is very likely that we would disagree with what they

20  are going to do, and then we would have a fight and motions

21  practice.  And then if we prevail, another production would

22  have to occur.  And that in and of itself --

23      **THE COURT:**  How is that different from -- let's say

24  the FTC action never happened; right.  And you submitted

25  document requests, you know, that were similar to what the FTC

**PROCEEDINGS**

1   didn't ask but the FTC action never happened.  And then

2   Facebook would be going through its documents and deciding what

3   to -- and they would do an initial cut -- they would take an

4   initial cut.  They would have an initial universe of documents

5   and they would go through those, and they would pull out stuff

6   that they conclude is not responsive to your requests.

7        And they would never be required to do a log of the stuff

8   that they pulled out and determined was irrelevant or

9   non-responsive to your request.  So I guess, why should they

10  have to do that here?

11        **MR. LOESER:**  Well, the technical reason why is under

12  Rule 34 if you are reviewing materials and it is a set of

13  materials, you do have to log or provide some information on

14  how you are calling documents out.

15        Here, we are not talking -- we live in a world where they

16  have already done all this work, and they have already produced

17  these documents; and we have asked for them in discovery.  So

18  if they are going to remove something from a production of

19  materials that we have asked for that already exist, the

20  standard mechanism under the discovery rule is for them to tell

21  us how they are removing, what they are removing and what the

22  basis is for -- of it is.

23        But I do think that the point you make it certainly brings

24  to mind, you know, why are we bothering with any of this.  And

25  the reason why we are bothering with it is that we felt the

PROCEEDINGS

1   fact that they have already gathered documents based on an

2   investigation that very significantly, if not entirely,

3   overlaps with this case, it is just a much faster way to get

4   this information.

5        Now, I understand Facebook doesn't want this to be faster.

6   But the fact of the matter is they have gathered this

7   information.  They have reviewed it.  They have used search

8   terms and custodians for the production, and we would get a

9   significant head-start here if these materials could be turned

10  over as opposed to having to wait to do this whole mechanism

11  and process over again starting as if it hasn't already

12  happened.  So that's problem one.

13       Problem two is really the question of search terms and

14  custodians, which is something we want to talk about today;

15  and, perhaps, we should talk about it next.  But really, you

16  know, we asked for the FTC materials because it obviously is

17  relevant and overlaps and because it is a means and a method to

18  just get this moving much faster than having to start all over

19  again.

20       **MR. SNYDER:**  Your Honor, may I be heard?  It is Orin

21  Snyder.

22       **THE COURT:**  Sure.

23       **MR. SNYDER:**  How are you, Judge?  Nice to be talking

24  to you on the phone.  Sorry we are not there in person, but

25  thanks for accommodating our request.

PROCEEDINGS

```
 1        This is a little bit like either The Twilight Zone or
 2   Alice In Wonderland because the roles here seem to be reversed.
 3   We, as the Defendant, are eager -- in fact, chomping at the
 4   bit -- to prosecute our defenses.  And we are trying to
 5   proceed, not only in an efficient manner but in a prompt
 6   manner, in getting to document production and then depositions.
 7        And we have given search terms and -- to the other side
 8   and we are producing the documents, the FTC documents.  We are
 9   reviewing them -- not categorically.  We are reviewing them
10   document by document just as you had suggested we do.  We have
11   agreed to provide that by the 31st.
12        What the Plaintiffs are saying is, Judge, we are not even
13   ready to engage on search terms.  We don't want to even give
14   you any Plaintiffs for depositions until we know what search
15   terms you and the FTC agree to and until we basically figure
16   out what theory of the case we want because they are confined
17   now, Your Honor, to the four topics that you identified --
18   having gone through their kitchen sink complaint -- and
19   identified as four potential theories.
20        On those theories we are prepared to produce documents
21   pursuant to the proper document request promptly.  We are
22   working literally every day around the clock to do that.
23        We are not seeking to delay anything.  We intend to comply
24   with the October cutoff date.  We are ready to proceed on the
25   merits of our defenses.
```

**PROCEEDINGS**

 1      And it is the Plaintiffs, Judge, truly -- and we can walk
 2  you through how they are holding up things at every turn; and
 3  we believe, respectfully, it is because they are not content
 4  with these four theories, and they want to search around for
 5  something else that they can allege either in the pleading or
 6  otherwise.
 7      And, Your Honor, the metrics belie any notion of delay
 8  here.  Not only did we respond to their 1,400 paragraph
 9  Complaint, we produced already 150,000 pages of documents.  We
10  are promptly producing the FTC documents.  We gave them the
11  search terms.
12      We met and conferred with them for over 15 hours.
13          THE COURT:  Could I ask you --
14          MR. SNYDER:  Ninety --
15          THE COURT:  Sorry to interrupt.
16          MR. SNYDER:  Sure.
17          THE COURT:  Part of the problem with this discussion
18  is, you know, this is nobody's fault; but I don't have the
19  ability based on the amount of time I have spent on this and
20  the amount -- and based on the information you have given me
21  and based on the things that you both are saying here today --
22  I don't have the ability to determine who is in the wrong, who
23  is being unreasonable.  I mean, no matter how --
24          MR. SNYDER:  Right.
25          THE COURT:  -- no matter how much either of you pound

**PROCEEDINGS**

```
 1   the podium --
 2           MR. SNYDER:   I have a suggestion -- but I have a
 3   suggestion for the Court.   And I think that you said:   Where do
 4   we go and what do we do from here?
 5           We, Facebook, want to follow the Federal Rules of Civil
 6   Procedure with dispatch and the utmost good-faith.   We are
 7   already producing hundreds of thousands of documents before the
 8   parties have even agreed to an ESI protocol, search terms or
 9   custodians.
10           If the Plaintiffs would meet and confer with us on ESI
11   protocol, search terms and custodians, we will get to work in a
12   hurry, Judge; and we will produce whatever is responsive,
13   relevant and non-privileged.
14           THE COURT:   I wonder if the best way to move things
15   along is -- I'm interested in both of your thoughts on this --
16   but I wonder if I should try to find a Magistrate Judge who can
17   sit down with you-all -- refer this case to a Magistrate Judge
18   for discovery purposes and have it be somebody who can sit down
19   with you-all in person once every two weeks to sort of make
20   sure that things are still moving; make sure that the
21   Plaintiffs are not unfairly picking at Facebook; to make sure
22   that Facebook is not adopting an artificially narrow definition
23   of relevance; and just to -- you know, is there somebody with
24   the -- and, frankly, somebody who knows something about
25   electronic discovery.
```

PROCEEDINGS

 1          You know, that is not something that I ever -- you know,

 2    as a lawyer in my practice -- as a lawyer I never had to deal

 3    with electronic discovery or hardly ever.  You know, and it is

 4    rare that anything comes up for me as a District Judge.

 5          Maybe what we need is somebody who can really roll up

 6    their sleeves with some expertise on this stuff and help you

 7    cut through it all.

 8          MR. SNYDER:  Your Honor, it is Mr. Snyder.  The issue

 9    there is -- we are always happy to meet with a Magistrate Judge

10    if there is an impasse.

11          What I'm trying to explain -- I guess, not effectively --

12    to the Court is it is so premature because the Plaintiffs are

13    not coming to the table in the ordinary course as a Plaintiff

14    prosecuting a case normally would, which would be chomping at

15    the bit to get custodians, search terms and --

16          THE COURT:  Right.  But, again -- sorry to interrupt

17    but, again, I'm not in a position to know whether that's

18    actually true or not; right.  I don't -- all I know sitting

19    here is that we have two sides in a massive case that are

20    having a tremendous amount of difficulty even, you know,

21    figuring out the terms under which they are going to negotiate

22    the production of discovery, and --

23          MR. SNYDER:  You know what, Judge -- we are okay with

24    that, Judge.  I think -- look, we know -- and I know this

25    sounds overly declarative.  We know that we are not only in

**PROCEEDINGS**

 1   good-faith but we are working hard to do the right thing here.

 2   And if Your Honor wants a Magistrate Judge to evaluate that, we

 3   are confident that the Judge will agree because we are ready to

 4   go.

 5        We have a year to prove and we think win our case, and we

 6   do not want to delay anything.  It really is the Plaintiff who

 7   put the brakes on.  So if Your Honor thinks that going in front

 8   of a Magistrate Judge is constructive, we are all for it

 9   because we do not want this case to be delayed.  We want to go

10   forward on the current schedule.

11            **THE COURT:**  And, you know, maybe --

12            **MR. LOESER:**  Your Honor --

13            **THE COURT:**  -- we set something up where you are just

14   required -- you know, sorry to make you fly all these times;

15   but it is just like an in-person meeting.

16        I mean, I had a real problem case awhile back where I -- I

17   felt the need to do this, and there were just regular in-person

18   meetings with the Magistrate Judge.  And, you know, things

19   got -- things started moving along once I did that.

20        Mr. Loeser?

21            **MR. LOESER:**  Your Honor, it's Derek Loeser.  If I

22   could be heard.

23            **THE COURT:**  Go ahead.

24            **MR. LOESER:**  We don't have any problem with a

25   Magistrate Judge.  We think Magistrate Judge Corley, for

1  example, is someone who has a lot of experience with issues

2  like this.  I will say --

3      THE COURT:  That's the person -- that's the person who

4  fixed my last problem case.  Anyway, sorry.  Go ahead.

5      MR. LOESER:  We would be in favor of that because I

6  can tell you that, you know, it is nice to hear Mr. Snyder --

7  and I understand that he may not have a great grasp on the

8  meet-and-confers and disputes that have occurred because he

9  hasn't been on any of those meet-and-confer calls -- but I can

10  tell you, we have tried very hard for a very long time to

11  engage Facebook and have a reasonable conversation about search

12  terms and custodians.

13      We have offered up what seemed to us like common-sense

14  solutions; like, why don't we start with what you have already

15  gathered for the FTC.  Why don't we look at the custodians you

16  have used there.  Why don't we look at the search terms.  They

17  rejected all of that.

18      They have no organizational charts they claim; no charts

19  that are -- not called organizational charts but have the same

20  information.  You know, if in discovery it ends up being the

21  case that such materials actually exist, which wouldn't

22  surprise us, I guess Facebook would have some explaining to do.

23      In the absence of any of this detailed information, we

24  have just sort of gone out on the Internet to come up with as

25  much information as we can to put together search terms and

1    custodians.   Facebook has refused to discuss those.

2         So the idea that we have somehow -- Plaintiffs in a

3    litigation want to slow down discovery is pretty ridiculous and

4    obviously untrue.   We would welcome biweekly -- we will sit

5    down with a Magistrate three times a week if that's what it

6    takes.   We will be there as much as we need to be there.   We

7    will fly there.   We want this case to move.   We want to meet

8    the deadline.

9         What we don't want to have happen is what Facebook has

10   structured here, which is they have produced 150,000 documents

11   that relate only to a handful of named Plaintiffs.   The

12   materials are produced in a fashion that makes them largely

13   unusable.   They have achieved what Your Honor said they should

14   not do which is bifurcate discovery.

15        And at the present rate with what they are doing with

16   discovery, meeting that deadline seems very, very challenging.

17   We want to meet that deadline.   We want to come there, and we

18   will talk to anyone that we need to talk to make that happen.

19             THE COURT:   Okay.   I think that's what I'm going to

20   do.

21        Are there any -- I mean -- I will preface my question that

22   I'm about to ask you with the statement that I am generally

23   very reluctant to appoint anybody from outside the court

24   system, you know, Special Master, Special Discovery Master,

25   what have you.

PROCEEDINGS

1        But I just wanted to check.  I know it happens a lot in

2    MDLs that a Special Discovery Master is appointed, somebody

3    from outside the court.  So even though I'm -- I doubt I would

4    do it.  I just wanted to ask people what they thought about

5    that as opposed to a Magistrate Judge.

6        MS. STEIN:  Thank you, Your Honor.  This is Deborah

7    Stein for Facebook just chiming in.  I think we are comfortable

8    with a Magistrate Judge and are happy to participate in that

9    process.

10        You know, I take it from Plaintiffs' Counsel that, you

11    know, he would like someone from Facebook who has been involved

12    in these calls to, you know, address the Court today on this.

13        And I have been involved in the calls.  I don't think that

14    Plaintiffs --

15        THE COURT:  Well, I don't need -- I appreciate it, but

16    I don't really want to hear anymore discussion of who is right

17    or wrong.

18        MS. STEIN:  Okay.

19        THE COURT:  Simply because we can be here for three

20    hours, and I still would not be a position to know who is right

21    or wrong.

22        Do you-all -- do you-all have a suggestion or a request

23    for a Magistrate Judge?

24        MS. STEIN:  We are fine, Your Honor, with whoever you

25    would like.  I think that from our perspective, you know, I

1  think what would make sense on a timing front would be whatever

2  Your Honor thinks would make sense for the initial meeting and

3  then, you know, on a going forward basis for the Magistrate to

4  make determinations as to when the next meeting would make

5  sense.

6      There are probably some instances where two weeks, you

7  know, is really too quick.  And maybe there are other instances

8  where, you know, a follow-up call or something is required.

9  But, you know, I think having a standing two-week in-person

10 might be a bit onerous and might make more sense to have it

11 tied to, you know, specific milestones.

12     **MS. WEAVER:**  Your Honor, if I might, this is Lesley

13 Weaver on behalf of Plaintiffs.

14     And just to chime in here, I think -- if I'm hearing the

15 Court correctly, I do think having somebody very skilled in ESI

16 would be very helpful in this case.

17     We think a lot of this production needs to be done in

18 native form.  And that's going to be more complex than, I

19 think, even ordinarily occurs in your run-of-the-mill antitrust

20 or securities case just because of the natural environment a

21 lot of the subject material lives in.

22     Magistrate Judge Corley certainly has that experience.  I

23 think Magistrate Judge Beeler does.  If Your Honor decided that

24 he wanted to consider a Special Master, we would be happy to

25 discuss that.  And Judge Laporte, who is now at JAMS, might be

**PROCEEDINGS**

 1    a good candidate given her expertise with ESI as well.  So

 2    those are just three options I think we would be comfortable

 3    with.

 4            **MR. SNYDER:**  Your Honor, may I suggest that we meet

 5    and confer and suggest a name if we can agree on one just

 6    because we are going to want to get client input on this one.

 7    Judge Grewal may have an opinion.

 8                        (Laughter)

 9            **MR. LOESER:**  Your Honor, Derek Loeser -- I'm sorry, go

10    ahead.

11            **THE COURT:**  Yeah, that's fine.  I mean, even if you

12    agree on a name, you may not get that name just because -- you

13    know, it is going to depend on people's schedules; but why

14    don't you go ahead and send -- go ahead and send Kristen an

15    e-mail telling us what -- you know, whether -- whether the

16    parties want to jointly recommend somebody or jointly request

17    somebody and that can be -- you can do that by Monday.  Does

18    that sound okay?

19            **MR. LOESER:**  Great, Judge.  That sounds fine,

20    Your Honor.  Just won't be any great surprise if the three

21    names we just provided are likely the ones that we think make

22    the most sense.

23            **THE COURT:**  Okay.

24            **MR. LOESER:**  In the meantime we have a collection of

25    issues that we need to advance with all due* dispatch.  And so

**PROCEEDINGS**

1   I'm not sure where that leaves us with those issues.  I think

2   the meet-and-confer process with regard to those issues is

3   frankly at an impasse and it is not any great need to keep

4   going around in circles.

5        So I suppose we will send in this e-mail.  Hopefully we

6   will have an agreement in the next couple of days or if no

7   agreement, the Court can simply indicate who the Special Master

8   will be.  And it would then be the plan to submit these

9   disputes to the Magistrate or Special Master.

10        THE COURT:  I'm happy to, you know, make an attempt to

11   cut through some of the stuff if it would be helpful to you.

12        I will start with Facebook.  I have a question of

13   Facebook.  I'm looking at Footnote 2 of Facebook's case

14   management statement.

15        It says (reading):  "Plaintiff's contend Facebook has not

16   completed production of certain FTC correspondence that the

17   parties discussed with the Court.  This is untrue.  Facebook

18   has produced all document demands and correspondence that it

19   agreed to provide from the FTC proceedings."

20        That was a little ambiguous to me.  I don't know if that

21   was just -- it was sort of a mistake in the way you worded it.

22   But "we have produced everything that we agreed to provide."

23        I thought that I ordered you to provide all correspondence

24   between you and the FTC about document production.  So I just

25   wanted to get clear whether you have provided -- whether you

1   have disclosed to the Plaintiffs all correspondence between you

2   and the FTC regarding document production.

3       **MS. KUTSCHER:**  Your Honor, this is Martie Kutscher at

4   Gibson.

5       I think the wording of the footnote was just a little bit

6   unclear.  There was nothing intentional about that wording.  At

7   the last case management conference we had discussed that

8   Facebook had already produced all document demands from the FTC

9   from its 2018/2019 investigation as well as correspondence from

10  the FTC describing the scope of those demands.

11      And we understood that the Court had ordered us to produce

12  the same materials from the earlier FTC proceeding.  So we

13  produced those materials.

14      The parties had separately discussed producing additional

15  correspondence from the 2018/2019 investigation from Facebook

16  regarding the scope of what was produced in that investigation,

17  and that correspondence has been produced.

18      **THE COURT:**  Okay.  A related issue is that the

19  Plaintiffs want search terms that were used to prepare the FTC

20  productions.  I'm not really seeing what is wrong with

21  providing the Plaintiffs with search terms that were used to

22  prepare the FTC productions.  It may -- it may streamline the

23  process of figuring out what search terms to use and what

24  search terms not to use, and I don't see how Facebook is harmed

25  in any real way by providing those to the Plaintiffs.

1        **MS. STEIN:**  Your Honor, this is Deborah Stein again.

2        This is an issue that we have gone around with Plaintiffs

3   on and we actually prepared a joint letter on because it is an

4   important issue.  And for some reason the matter that we had

5   fully briefed did not get presented to Your Honor.

6        We have a concern about this for a variety of reasons.  We

7   do think that it will end up creating inefficiencies because

8   these are different cases with different requests for

9   production.

10       And we have a concern that what is really going on here is

11  that they are looking for the FTC search terms for different

12  reasons than efficiency purposes; that they are looking to sort

13  of second-guess the FTC investigation.  And we have provided

14  them with very broad, lengthy boolean searches that they are

15  free to build upon and make -- propose searches that they think

16  hit upon their actual request for production that are tethered

17  to their request for production and what is at issue in this

18  case as opposed to the FTC case.

19       They are getting the FTC documents from us starting with

20  search terms that have already been used and run and that they

21  are getting the documents for doesn't really advance getting

22  them more documents here.

23            **THE COURT:**  Well, I mean your argument --

24            **MS. STEIN:**  And for some reason we have been unable to

25  get them to either build upon --

**PROCEEDINGS**

1          **THE COURT:**  Sorry to interrupt.  Hello?

2          **MS. STEIN:**  -- that we have provided them or for them

3    to even provide their own search terms.  I, frankly, have never

4    dealt with a case where Plaintiffs don't send over boolean

5    search terms.  I mean, they are often broader than what we want

6    to see; but, you know, here we just got a list of words that

7    includes things like "likes" and --

8          **MR. SNYDER:**  But before -- Deborah, let me just add to

9    that.  This is Orin Snyder from Gibson Dunn.

10        Your Honor, here is the problem.  They are getting all the

11   FTC documents that relate to the -- to their case.  The FTC

12   investigated other things that have nothing to do with this

13   case at all.  Let's call it X, Y and Z.

14         **THE COURT:**  I know but --

15         **MR. SNYDER:**  And we should not --

16         **THE COURT:**  It sounds like you're arguing -- if I may

17   interrupt, it sounds like what you are saying is that if you

18   turn over the search terms that you used for the FTC documents,

19   then they are going to react in an overzealous way to that and

20   they are going to start demanding stuff that isn't relevant to

21   this litigation, and that is -- it is just going to be a

22   distraction.

23        But that, of course, can be dealt with.  If they start

24   asking -- if receiving those search terms starts causing them

25   to ask for stuff that they shouldn't be entitled to in this

PROCEEDINGS

```
 1   litigation, that can be dealt with at that time.
 2        On the other hand, maybe the search terms that you used
 3   would help inform the search terms that are used in this case.
 4   And it feels a little bit like you are just hiding the ball by
 5   not being willing to give them those search terms.
 6            MR. SNYDER:  No, Your Honor.  Your Honor took pains to
 7   identify four potential theories buried in their pleading.  And
 8   the Court held in its decision that the case is limited to
 9   those four theories.
10            THE COURT:  For now.
11            MR. SNYDER:  -- and anything else -- right.  For now.
12   And, therefore, we should be engaging in discovery based on
13   those theories with search terms and custodians.  They want now
14   discovery into essentially what the FTC asked us to produce
15   that has nothing to do with this case which is a classic
16   fishing expedition.
17            THE COURT:  Yeah, but --
18            MR. SNYDER:  And we have agreed --
19            THE COURT:  -- all I'm asking you to give them is the
20   search terms.
21            MR. SNYDER:  Right.
22            THE COURT:  I'm not asking you to give them the
23   documents.
24            MR. SNYDER:  But the search terms are the key -- it is
25   the same thing effectively, Your Honor, because it identifies
```

**PROCEEDINGS**

1   areas that have nothing to do with this case, and it would lead

2   not only to unnecessary motion practice but --

3          **THE COURT:**  Oh, there is going to be plenty of

4   unnecessary motion practice in this case.  I don't think we

5   need to worry about that.

6          **MR. SNYDER:**  But the Court has already held at the

7   last CMC, the January one, that not all materials produced to

8   the FTC must be reproduced here.  Giving them the search terms

9   would be an end-run around that ruling.

10      This is not FTC versus Facebook.  This is the Plaintiffs

11   versus Facebook.

12          **THE COURT:**  Why?  Why?  I'm not saying you give them

13   access to the universe of documents searched.  I'm just saying

14   you give them the search terms to help them -- to help them

15   inform their position on what the search terms should be.

16          **MR. SNYDER:**  That's not why they want them.

17      Martie, go ahead.

18          **MS. KUTSCHER:**  One of the bigger issues we are also

19   facing on this issue is what the Plaintiffs requested in their

20   document request was all of the FTC materials and then a slew

21   of other materials.  So they have those requests and they have

22   twenty-some odd additional requests.

23      We are giving them the FTC materials, and the FTC search

24   terms are crafted around those materials.  They are not crafted

25   for the additional searches or the additional requests the

**PROCEEDINGS**

 1   Plaintiffs had made.

 2       So using the FTC search terms as a starting point just

 3   isn't really an effective way to start because those searches

 4   are tailored towards the documents they are already getting

 5   from the FTC productions and really are not tailored or

 6   relevant to the additional document demand, and that's what we

 7   need to figure out, the searches for those demands.

 8           MR. LOESER:  Your Honor --

 9           THE COURT:  But you can make those arguments after you

10   give them the search terms.  You can make those arguments after

11   you give them the search terms.  You can say:  Here is the

12   search terms, but we can't -- we can't be tied to this because

13   it is going to produce a bunch of stuff that is irrelevant.  I

14   mean, what am I missing?

15           MR. LOESER:  Which, Your Honor, is exactly why we want

16   the search terms.  I'm sorry to interrupt, Mr. Snyder, but you

17   know, what we are hearing is a lot of description of things

18   that were after that were inappropriate, and we were searching

19   for materials that were not related to our case.

20       That is all not true.  We want the search terms

21   specifically to identify things that are related to the case.

22   And if it kind of seems like hiding the ball, that's exactly

23   what it is.  These terms resulted in the production of

24   materials for an investigation that significantly overlaps.

25   They are a good starting place.

PROCEEDINGS

1    When we get the terms, we can look at ones.  If they don't
2    relate to this matter, we will cross them off the list.  If we
3    want to argue with Facebook about what does or doesn't relate
4    to matter, then that is the meet-and-confer we were trying to
5    have with them which they refuse to have.
6        It just doesn't make sense to claim that these terms are
7    not helpful or unrelated.  Obviously they are.  They resulted
8    in the production for an investigation that overlaps
9    substantially with this case.
10        I can promise the Court and Mr. Snyder and everybody else
11   on the phone, we have no intention of using them
12   inappropriately or for any purpose other than identifying
13   appropriate search terms for the subject matter of our case.
14   We have no other intention.
15        **MR. SNYDER:**  Your Honor, we have -- this is
16   Mr. Snyder.  We have briefed this already.  Your Honor's point,
17   it wouldn't be fair to weigh in without more information; that
18   you need three hours.  If I can respectfully request, this is a
19   big issue for Facebook for reasons that we set forth in our
20   briefing.
21        We believe this should be a threshold issue or be for the
22   Magistrate Judge, and it would be unfair for Your Honor, based
23   on this limited record, to rule on this issue.
24        We are not hiding the ball at all.  This has to do with
25   them getting results of search -- searches that -- Facebook

PROCEEDINGS

1   conducted internally to produce documents to the FTC.

2       The way the Federal Rules work is the parties meet and

3   confer and agree on search terms based on the case before them.

4   And we would respectfully request that once the Magistrate

5   Judge is in place, this will be the first issue to address; and

6   that we abide that rather than have it -- frankly, a ruling on

7   at best a partial record.

8       **THE COURT:**  It sounds like you are working on briefing

9   already.  Why don't you submit a letter brief to me, a joint

10  letter, by Monday.  And then I will decide whether to rule on

11  it or kick it to the Magistrate Judge.

12      **MR. SNYDER:**  That sounds great.

13      **MR. LOESER:**  Your Honor, Derek Loeser.  That sounds

14  fine.  We do have the materials already prepared.  In case you

15  are interested in knowing, they weren't filed because after we

16  prepared our portion, Facebook indicated that it would provide

17  us with search terms and custodians.  We waited for that.

18  That's when we got their 9 custodian and 12 search strings

19  which wasn't worth waiting for.  So we have those materials.

20      **THE COURT:**  The only other thing I want to say right

21  now, and I'm going to -- I mean, I have said it a number of

22  times on the record already -- I am concerned -- you know,

23  without making any suggestions about anybody, you know, whether

24  anybody is acting in bad faith or being dilatory or anything

25  like that, I am concerned that Facebook has, you know, often

**PROCEEDINGS**

1   made statements reflecting an unduly narrow view of what should

2   be turned over to the Plaintiffs.

3        And, you know, this is a big case.  I mean, there is often

4   a lot of talk about proportionality and whatnot.  This is a big

5   case.  It is a significant issue.  You know, and there is --

6   this is not the type of case where we are going to be saying:

7   Well, that might end up -- that effort might end up uncovering

8   some relevant information; but, you know, it is just too

9   expensive or difficult, and so we are not going to make

10  Facebook do it.

11       This is really not one of those cases where that is

12  very -- that type of argument is likely to carry the day.  You

13  know, and, as I have said a number of times, you know, the best

14  way to figure out what happened as it relates to the claims

15  that are going forward now is to -- for Facebook to produce all

16  information, all documents about the practices associated with

17  giving third parties access to friends' information and

18  friends' of friends information.

19       And I --

20       **MR. SNYDER:**  Your Honor, may I be heard on that

21  because Your Honor has no basis for concern on that score.

22       If I was there, I would look you in the eyes.  I'm telling

23  you, Judge, we are not only acting in good-faith; we are eager

24  to produce documents, whatever the expense, that are relevant

25  to the issues in this case.

**PROCEEDINGS**

1       And we have been trying to do that by meeting and

2    conferring and trying to get moving in accordance with the

3    Federal Rules of Civil Procedure which is, you ask us for

4    documents.   We meet and confer on custodians and search terms,

5    and we produce documents.

6       We are not saying expense.   What we are saying is --

7    Your Honor knows the history of the case as well as we do.   It

8    started in' 18.   Your Honor gave them discovery on five topics.

9    They filed a Complaint.   Your Honor identified deficiencies in

10   that Complaint.   They filed a new Complaint.   Your Honor sifted

11   through this kitchen sink Complaint and identified the viable

12   potential theories.   And on those theories not only is there no

13   ball hiding, we want to get on with it.   It is not that

14   complicated.

15           **THE COURT:**  I have heard --

16        **MR. SNYDER:**  But, Judge -- what they want to do,

17   Judge, is they really are still looking for a better theory and

18   that's what this is all about.   Otherwise, they would be acting

19   like a Plaintiff and saying:   Okay.   Let's get the search terms

20   and let's get the custodians.

21       Instead, they want to backdoor FTC search terms because

22   they are looking for some other theory of the case.   But I am

23   confident, Your Honor, that when you see our performance on the

24   issues in this case in terms of our production of documents,

25   you will have no basis for concern because we want to get on

**PROCEEDINGS**

 1   with it because we think those documents actually are the key

 2   to us winning this case.

 3           THE COURT:  I can't wait.  Okay.  So we will -- we

 4   will hear from you-all on a couple of things by Monday.  And in

 5   the meantime, I will look into the possibility of a Magistrate

 6   Judge referral for discovery purposes.

 7           MR. SNYDER:  Great.  Thank you.

 8           MR. LOESER:  Derek Loeser.  Before we all hang up and

 9   go our separate ways, can I raise a couple other discrete

10   issues?

11           THE COURT:  Only if it is really quick.

12           MR. LOESER:  Yeah.  One is just this process for

13   having Your Honor receive joint submissions on disputes, and

14   it's just really a housekeeping thing.

15       Under your rules, you know, there is a procedure where

16   each side puts together five pages and submits it to the Court.

17   One of the problems we have been having with these sort of

18   endless meet-and-confers is there is no deadline to actually

19   submit the materiality to the Court.  And that was the basis

20   for our proposal where there would be five days after a

21   meet-and-confer for one party to submit the materials and then

22   three days after that for the other side.

23       I do think it would remove a real practical problem we are

24   having in terms of the speed with which things can get to the

25   Court.

1      **THE COURT:**  Yeah, that's -- I hear you.  And we will

2  let the Magistrate Judge figure out how they want to address

3  that.

4      **MR. LOESER:**  Okay.  And the very last thing is we have

5  a UK Plaintiff which Your Honor has noted before.  The UK

6  Plaintiff we have wishes to withdraw.  We have two other UK

7  Plaintiffs who are prepared to substitute in.  Claims are

8  exactly the same and simply it would be two people substituting

9  in for one substituting out.

10      We have asked Facebook to consent.  They refuse.  They

11  have indicated they are going to oppose our substitutions.  And

12  so if that's really the position they are going to take at this

13  stage of the case that we are in, then we will be filing a

14  motion just asking for substitution for this purpose.

15      **THE COURT:**  Okay.  I mean -- I was -- I may be

16  ignorant on this topic.  I was scratching my head about whether

17  the class could include everybody in the UK or people from the

18  UK.  But assuming it can, I can't imagine denying a request to

19  substitute in Plaintiffs at this relatively early stage in the

20  case.  But -- and maybe Facebook can consider my comment in

21  deciding whether to oppose it.  But if they -- if they want to

22  oppose it, they have a right to do so; and I will decide the

23  motion.

24      **MR. LOESER:**  Okay.  Your Honor, and for Plaintiffs we

25  are looking really forward to a process where there are more

**PROCEEDINGS**

1    than 12 search terms and 9 custodians.  We appreciate the time,

2    Your Honor, has spent dealing with these issues today.

3              **THE COURT:**  All right.  Thank you.

4         **MR. SNYDER:**  Thank you.

5         **MS. STEIN:**  Good night.

6         **MR. LOESER:**  Thank you.

7              (Proceedings adjourned at 1:47 p.m.)

8                     ---oOo---

9

10                **CERTIFICATE OF REPORTER**

11         We certify that the foregoing is a correct transcript

12    from the record of proceedings in the above-entitled matter.

13

14   DATE:   Sunday, March 8, 2020

15

16

17

18   _____

19              Marla F. Knox, RPR, CRR
                 U.S. Court Reporter
20

21

22

23

24

25

# EXHIBIT P

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br> This document relates to: <br><br> ALL ACTIONS | MDL No. 2843 <br> CASE NO. 3:18-MD-02843-VC-JSC <br><br> Hon. Vince Chhabria <br> Courtroom 4 – 17th Floor <br> Special Master: Daniel Garrie, Esq. <br><br> **SUPPLEMENTAL ORDER REGARDING THE USE OF TAR** <br><br> **JAMS REF. NO: 1200058674** |

## BACKGROUND

1.      On August 18, 2021, Special Master Daniel Garrie ("Special Master Garrie") and Judge Gail Andler declared an impasse on the issue of whether Facebook should be compelled to use Technology Assisted Review ("TAR") in their review and production.

2.      Pursuant to the Protocol for Resolving Discovery Disputes, Plaintiffs submitted their opening brief regarding the use of TAR on August 30, 2021. Plaintiffs argue that requiring Facebook to implement TAR is within the Special Master's discretion and that Facebook should be compelled to use TAR because (a) TAR will increase the pace of discovery, which Plaintiffs assert is currently insufficient to meet the needs of the case; and (b) implementing a TAR protocol will increase cooperation and transparency in discovery, which Plaintiffs assert have been insufficient thus far as "Facebook has continued to assert an unduly narrow view of relevance". See Exhibit A (Plaintiffs' Brief Regarding the Use of TAR).

3.      Pursuant to the Protocol for Resolving Discovery Disputes, Facebook submitted their Opposition to Motion to Compel TAR on September 9, 2021. Facebook argues that (a) the ESI Protocol forecloses Plaintiffs' request that the Special Master compel TAR; (b) the case Law unanimously rejects Plaintiffs' request for an order compelling TAR; (c) Plaintiffs offer no justification for an order compelling Facebook to use TAR; and (d) compelling Facebook to use TAR at this stage would delay discovery. See Exhibit B (Facebook's Opposition to Motion to Compel TAR).

4.      Under the Protocol for Resolving Discovery Disputes, Plaintiffs submitted their Reply Brief Regarding the Use of TAR on September 14, 2021, in which they argue, among other things, that (a) implementing TAR will make discovery more efficient; (b) TAR will ad-

vance cooperation and transparency; (c) Plaintiffs have identified numerous deficiencies in Facebook's production; (d) Facebook is not on track to meet the substantial completion deadline; and (e) Facebook's governmental productions are the bare minimum of what's required. See Exhibit C (Reply Brief Regarding the Use of TAR).

     5.     On September 22, 2021, Special Master Garrie issued an Order Regarding the Use of TAR in which he ordered Facebook (a) to provide responses regarding the tools and methodologies used in their review; and (b) to make available a technical knowledgeable in the analytics, review tools, and methodologies used in Facebook's production to guide Special Master Garrie through an in-camera review of samples of the documents reviewed and to explain the review process. See Exhibit D (Order Regarding the Use of TAR).

     6.     On September 30, 2021, Facebook responded to the tools and methodologies used in its review according to the Order Regarding the Use of TAR. See Exhibit E (FB Supplemental Submission re: TAR).

     7.     On October 5, 2021, Special Master Garrie held an ex parte hearing with Counsel for Facebook and a technical resource was available to discuss the FB Supplemental Submission re: TAR and Facebook's review process.

     8.     On October 7, 2021, Facebook submitted the Declaration of Danny Thong ISO Facebook's Opposition to Plaintiffs' Motion to Compel TAR which clarifies Facebook's use of analytics and other tools in their review. See Exhibit F (Declaration of Danny Thong ISO Facebook's Opposition to Plaintiffs' Motion to Compel TAR).

//

//

**FINDINGS**

9.  Special Master Garrie finds that it is not appropriate to compel a party to use TAR without a "showing of gross negligence in the review and production process, the failure to produce relevant specific documents known to exist or that are likely to exist or other malfeasance." *Winfield v. City of New York,* No. 15-cv-05236, 2017 WL 5664852, *4 (SDNY November 27, 2017) at *9; see also *In re Mercedes-Benz Emissions Litig.*, No. 2:16-CV-00881, 2020 WL 103975, at *2 (D.N.J. January 9, 2020) (the court "left open the possibility of compelling the use of TAR "if Plaintiffs contend that Defendants' actual production is deficient.").

10.  Special Master Garrie finds that Plaintiffs do not offer sufficient justification for compelling Facebook to use TAR because there do not appear to be deficiencies in Facebook's production to date and Facebook appears to be on pace to meet the January 31, 2022 deadline for substantial completion of discovery.

11.  Special Master Garrie finds that implementing TAR at this stage is not likely to make discovery more efficient as Facebook has already completed over two thirds of its review and Facebook is on pace to meet the substantial completion deadline for discovery.

12.  Special Master Garrie finds that advancing cooperation and transparency is not sufficient justification for compelling TAR as Facebook's supplemental submissions regarding their review have clarified their use of analytics and other tools. See Exhibits E and F. Facebook has only used analytics and other tools to prioritize documents for review, not to filter nonresponsive documents, which is permitted by the ESI Protocol.

13.  Special Master Garrie finds that Facebook's production does not appear to date to be deficient based on Facebook's submissions, the ex parte hearing, and in-camera review of production samples.

14.     Special Master Garrie finds, based on Facebook's submissions, the ex parte hear-ing, and in-camera review of production samples, that Facebook appears to be on pace to meet the substantial completion deadline for discovery as they have already reviewed over two thirds of the documents in the review population.

15.     Special Master Garrie finds that Plaintiffs' argument that "Facebook's governmen-tal productions are the bare minimum of what's required" fails because Facebook's governmen-tal productions account for approximately 12% of the documents produced to date.

## ORDER

16.     Special Master Garrie denies the Plaintiffs' request to order Facebook to use TAR.

**IT IS SO ORDERED.**

October 9, 2021

Daniel Garrie
Discovery Special Master