# FACEBOOK EXHIBIT AI

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

# Exhibit 61

# Filed Under Seal

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
   osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Kristin A. Linsley (SBN 154148)
   klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
   mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
   dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Joshua S. Lipshutz (SBN 242557)
   jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Facebook, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION<br><br>This document relates to:<br><br>ALL ACTIONS | MDL NO. 2843<br>CASE NO. 3:18-MD-02843-VC-JSC<br><br>**FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION**<br><br>Judge: Hon. Vince Chhabria<br>Hon. Jacqueline Scott Corley<br>Special Master Daniel Garrie<br>Courtroom: 4, 17th Floor<br><br>JAMS Ref. No.: 1200058674 |

FACEBOOK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NAMED PLAINTIFFS' CONTENT AND INFORMATION
CASE NO. 3:18-MD-02843-VC-JSC

Gibson  Dunn &
Crutcher LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

<u>Page</u>

I.     INTRODUCTION ..................................................................................................... 1

II.    BACKGROUND ...................................................................................................... 2

       A.   Plaintiffs initially demanded all data related to Named Plaintiffs. ...................... 2

       B.   Plaintiffs conceded that only data that was shared with third parties is relevant. ................. 3

       C.   Judge Corley allowed Plaintiffs to conduct a Rule 30(b)(6) deposition. .............................. 5

       D.   Plaintiffs reverted to their initial demands for all data relating to Named Plaintiffs. ............ 6

III.   ARGUMENT ............................................................................................................ 6

       A.   Facebook's productions under Discovery Order 9 are complete. ......................... 7

            1.   The scope of discovery is limited to data that was shared with third parties. ................. 7

            2.   Plaintiffs have not identified any deficiencies in Facebook's productions. .................. 8

       B.   Plaintiffs' distrust does not entitle them to "discovery on discovery." ................................. 9

       C.   Plaintiffs are judicially estopped from seeking information that was not shared. ............... 12

       D.   The information Plaintiffs now seek is nonresponsive and otherwise unavailable. ............ 13

IV.    CONCLUSION ....................................................................................................... 15

Gibson  Dunn &
Crutcher LLP

1

# TABLE OF AUTHORITIES

2

*Bresk v. Unimerica Ins. Co.*
   2017 WL 10439831 (C.D. Cal. Nov. 16, 2017)..................................................................10

3

*Brewer v. BNSF Railway Co.*,
   2018 WL 1756432 (D. Mont. Jan. 11, 2018) ...................................................................10

4

5

*Han v. Futurewei Techs., Inc.*,
   2011 WL 4344301 (S.D. Cal. Sept. 15, 2011) ................................................................11

6

7

*MAO-MSO Recovery, LLC v. Mercury Gen.*,
   2019 WL 1423772 (C.D. Cal. Feb. 19, 2019)...................................................................15

8

*United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*,
   555 F.3d 772 (9th Cir. 2009)...........................................................................................11

9

10

*United States v. Ibrahim*,
   522 F.3d 1003 (9th Cir. 2008)..........................................................................................12

11

*Uschold v. Carriage Servs., Inc.*,
   2019 WL 8298261 (N.D. Cal. Jan. 22, 2019) ................................................................10

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson Dunn &
Crutcher LLP

## I.   INTRODUCTION

Plaintiffs' motion to compel seeks to revive a boundless demand that Plaintiffs conceded long ago—in court—sought data well beyond what Plaintiffs would be entitled to in this case.  One year ago, Plaintiffs represented to Judge Corley:

> Plaintiffs seek only a holding that the sensitive data Facebook collected about *ten Named Plaintiffs* and *shared* with third parties is relevant.  Plaintiffs do not contend that information that was not shared is relevant, which substantially narrows the information Facebook would be required to produce in this case.

Based on Plaintiffs' representations, Judge Corley issued a ruling that discoverable user data is data Facebook **shared** relating to the Named Plaintiffs, including any shared data in three categories Plaintiffs had requested.  After Facebook reported its productions were complete, Plaintiffs told Judge Corley "[w]e just don't believe [that]," and they demanded a Rule 30(b)(6) deposition to test it.  But once they got into the deposition, Plaintiffs tactically avoided that topic and instead asked about a host of issues having nothing to do with this case.

Now, seeking to capitalize on the presence of a new decider, Plaintiffs attempt to rewrite that history.  Plaintiffs disown their concessions that "information that was not shared" is not relevant and say they are entitled to all data relating to the Named Plaintiffs—shared or not.  They mischaracterize hearings before Judge Corley.  And they conflate Judge Corley's instructions about the scope of their squandered deposition with the scope of the data she found discoverable.

Making matters worse, Plaintiffs' motion is itself a moving target.  Throughout the motion, Plaintiffs flip-flop between saying the discoverable data in this case is *not* limited to shared data and arguing that the real issue is that Facebook has not yet produced all shared data.  Then, after spinning in circles with arguments they have either abandoned or cannot support, Plaintiffs—out of nowhere— demand extensive discovery about Facebook's data infrastructure (not data about Named Plaintiffs).

Plaintiffs' motion crashes into a long list of roadblocks.  *First*, Plaintiffs point to no actual deficiencies in Facebook's productions.   After saying for more than one year that Facebook's productions are incomplete, rather than point to any evidence to support that false accusation, Plaintiffs

request invasive discovery to prove it.  *Second,* Plaintiffs are not entitled to "discovery on discovery" because they do not believe Facebook's productions are complete.  Judge Chhabria, Judge Corley, and the Special Master have previously rejected Plaintiffs' efforts to audit Facebook's discovery process, and the Special Master should do so again here.  *Third*, Plaintiffs are judicially estopped from demanding user data that was not shared with third parties after arguing to Judge Corley that this data is not relevant.  Plaintiffs secured relief based on this concession to Judge Corley, and must be bound by it before the Special Master.  *Fourth*, the list of demands in Plaintiffs' motion—which seeks information about Facebook's "data sources" that Plaintiffs say they will use "to develop an efficient discovery plan"—is not properly before the Special Master.  This is not the topic on which the mediators declared impasse, Judge Corley has repeatedly rejected this request, and it largely concerns materials that Facebook provided in an effort to advance the parties' negotiations and that Plaintiffs apparently have not bothered to review.

Moving discovery disputes from Judge Corley to the Special Master was not meant to be an opportunity to ditch past concessions or to put a new face on old arguments.  The Special Master should see this motion for what it is: an opportunistic, wasteful, and abusive attempt to erase the proceedings before Judge Corley, gain access to information Plaintiffs have conceded is irrelevant, and hunt for *anything* to stall this case before it finally reaches the merits.  The motion should be denied.

## II.    BACKGROUND

### A.  Plaintiffs initially demanded all data related to Named Plaintiffs.

In November 2019, Plaintiffs served RFP 9, which requests "[a]ll Documents relating to each of the Named Plaintiffs."  Ex. G at 12; *see also id.* at 12–13 (RFPs 10–13); Ex. K at 9 (Interrogatories 16-17).  At first blush that request may seem reasonable.  But taken literally, it would require collection, review, and analysis of millions of documents and tables to determine whether any information within them—including information derived from aggregated and anonymized data—might relate back to a particular user.  In response to this and similar requests, Facebook agreed to produce the content and information that Facebook associates with each Named Plaintiff's account.  This information is contained in the "Download Your Information" ("DYI") file that Facebook makes available to users.

Facebook's DYI tool reflects, in human-readable and producible form, the most complete

compilation of data Facebook maintains relating to any user.  Ex. C ¶ 5.  Beginning in February 2020, Facebook produced the information contained in the DYI file for each Named Plaintiff, plus additional information (such as a spreadsheet tracking how Plaintiffs adjusted their Facebook privacy settings).  In total, Facebook produced approximately **one million pages** of user data relating to Named Plaintiffs.

Plaintiffs belittle the DYI file, claiming it is merely a record of what users post to Facebook.  That is false.  Most of the DYI files Facebook produced are tens of thousands of pages each; they average 32,493 pages each and range from 226 pages to a whopping **272,110 pages** (depending on how active a particular user is and what data they may have deleted).

Exhibit A is an average-size DYI file produced in this case, which—due to its size—Facebook provides via share file.  Exhibit B is a list of categories of data contained in each user's DYI file (unless data in a given category does not exist or the user deleted it).  *See also* Ex. C ¶ 6.  Categories of information in users' DYI file include biographical information, ads viewed, friend lists, games played, location, logins and logouts, messages, page visits, photos, profile visits, religious and political views, status updates, and much more.  Ex. B.  **All told, the DYI files contain more than 100 categories of information that go well beyond a user's "platform activity."**  Facebook produced all of this despite repeatedly noting that much of it is not shared or relevant to any issue in this privacy litigation.

After Facebook completed these productions, Plaintiffs insisted that Facebook also locate and produce any other data that might, in any way, relate to any Named Plaintiff, and any materials derived from that data.  They focused on a data warehouse called Hive and demanded that Facebook produce any information in Hive that might be derived, in full or in part, from data about the Named Plaintiffs.  Facebook explained this would not be possible because Hive stores more than 12 million database tables and is not indexed by user, so there is no way to search across all tables at once for an individual user's ID.  Ex. L at 12–15; *see also* Ex. E ¶ 7.  Instead, each of Hive's 12 million tables would need to be searched individually for any information relating back in any way to a Named Plaintiff, which would be nearly impossible, given both the volume of Hive data and the fact that much of the data in Hive is anonymized.  *See id.*  Facebook further explained there would be no reason to take on such an undertaking because third parties do not have access to Hive tables.  *See id.*

**B.  Plaintiffs conceded that only data that was shared with third parties is relevant.**

3

Gibson  Dunn &
Crutcher LLP

After nearly one full year of negotiations, the parties briefed the issue to Judge Corley.  In that briefing, Facebook argued that Judge Chhabria's motion-to-dismiss order limits this case to data that users themselves share *on Facebook*—all of which had been produced.  *See* Ex. L at 10–15.  Plaintiffs disagreed, arguing that the "sensitive information that Facebook collects and shares with third parties is much more extensive."  Ex. M at 1.  Plaintiffs specifically demanded that Facebook also produce materials reflecting users' off-platform activity and what they called "derived" information.

After four rounds of briefing, Plaintiffs shifted gears in a sur-reply.  They assured Judge Corley that their request for "[a]ll Documents relating to each of the Named Plaintiffs" was narrowly tailored, emphasizing that they sought "only a holding that the sensitive data Facebook collected about *ten Named Plaintiffs* and *shared* with third parties is relevant."  Ex. O at 9 (emphasis in original).  They even argued that Judge Chhabria's holding that Plaintiffs had standing was *based on* the fact that certain information about them had been shared.  *Id.* at 5.  Plaintiffs clarified:

> Plaintiffs do not demand, as Facebook repeatedly claims, that "Facebook search *millions* of disaggregated data sets for any data to have ever crossed Facebook's systems relating to a Named Plaintiff and any derivative materials drawing on that data – such as data sets tracking hours of peak user activity to monitor strains on Facebook's systems."  Opp'n at 6.  To the contrary, Plaintiffs seek only a holding that the sensitive data Facebook collected about *ten Named Plaintiffs* and *shared* with third parties is relevant.  Plaintiffs do not contend that information that was not shared is relevant, which substantially narrows the information Facebook would be required to produce in this case.

*Id.* at 9 (emphasis in original).  Plaintiffs repeated this refrain throughout their brief:

- "This discovery dispute concerns sensitive user information that Facebook has shared with third parties without users' consent."  *Id.* at 1.

- "[S]ensitive user information is relevant if Facebook shared it without users' consent."  *Id.* at 2.

- "[T]he legal theories upheld at the pleading stage" turn on "whether Facebook shared [sensitive information] with third parties."  *Id.* at 4.

- "Plaintiffs have standing . . . because their sensitive information was disseminated to third parties in violation of their privacy."  *Id.* at 5 (quotation marks and citation omitted).

- "Plaintiffs seek an order holding that all sensitive data about the ten Named Plaintiffs that Facebook shared with or made accessible to third parties is relevant to this action."  *Id.* at 9.

4

Judge Corley then issued a short order (Ex. P) largely adopting Plaintiffs' sur-reply position:

> Plaintiffs correctly argue that Facebook's restrictive view of relevant discovery would exclude an enormous amount of information that Facebook collects and shares with third parties about Facebook's users. The district court's order (Dkt. No. 298) did not limit Plaintiffs' claims to only challenging the sharing of data Facebook collects from a user's on-platform activity; the claims also challenge Facebook's sharing of user data and alleged failure to monitor how third parties used such shared information.

To comply with Judge Corley's order, Facebook looked for any categories of individual user data that could have been shared but had not been produced. For a basic technological reason, Facebook found none. When a third party—such as an app developer or business partner—obtains user-related data, it accesses it through an "application programming interface," or "API." Ex. E ¶¶ 3–7. These APIs pull information exclusively from Facebook's "Social Graph," not data warehouses like Hive. *See id.* A user's DYI file, which Facebook produced for all Named Plaintiffs, contains the most complete current set of data about that user that is in the Social Graph (and more). *See* Ex. C ¶ 5.

### C. Judge Corley allowed Plaintiffs to conduct a Rule 30(b)(6) deposition.

In a December 2020 joint status report, Plaintiffs again demanded that Facebook produce additional information regarding the Named Plaintiffs. *See* Ex. Q at 1–2. Facebook explained that it was conducting an investigation but "[t]o Facebook's knowledge, the materials it produced reflect the information related to the Named Plaintiffs that could have been shared with third parties." *Id.* at 9.

Plaintiffs told Judge Corley that they found it "impossible to believe" there was no more discoverable "information that exists." Ex. R at 19:14–15; *id.* at 19:22 (Facebook's representation is "just impossible for us to believe"); *id.* at 28:15–16 ("We just don't believe . . . their description of what is or is not shared or made accessible."). When pressed, Plaintiffs gestured at "information [used] to target [ads to] the Plaintiffs," and Judge Corley redirected them back to *shared* information: "No, no, no, no. I don't think so. . . . This is—this came from Cambridge Analytica and that they had access to information." *Id.* at 23:21–25. When Plaintiffs pushed ahead, Judge Corley again focused back on shared information: "What did you mean in your sur-reply by 'shared'?" *Id.* at 24:13–14. Plaintiffs

Gibson  Dunn &
Crutcher LLP

were unable to provide any clear answer.  We suggest the Special Master review this transcript.

To address Plaintiffs' "disbelief . . . as to how Facebook operates," Judge Corley determined "we just need somebody under oath saying: No, this is how it operates."  *Id.* at 26:7–9.  Judge Corley allowed Plaintiffs to conduct a Rule 30(b)(6) deposition "to verify the representation that yes, we collect this information—inferential data, but it is not made accessible to third parties."  *Id.* at 35:3–5.

Plaintiffs deliberately squandered that opportunity.  They issued a deposition notice on 12 broad topics, many having nothing to do with the case.  Ex. S.  Judge Corley effectively quashed this notice, stating:  "That was way beyond what I had in mind.  So I don't want to talk about your notice."  Ex. T at 17:15–16.  Judge Corley *again* explained that the deposition was intended to allow Plaintiffs to explore whether shared data had not been produced, noting "this is pretty basic stuff."  Ex. T at 19:21–22.  But Plaintiffs ignored those instructions and used the deposition to explore a host of unrelated issues, including using nearly two hours to ask questions about how Facebook places ads.  *See* Ex. V.  Plaintiffs declined to ask even basic questions to test their professed disbelief about what user-related data Facebook makes accessible to third parties.  *Id.*  Plaintiffs never even asked, "Are you aware of any types of individual user data Facebook shares that are not in the DYI data Facebook produced?"

### D.  Plaintiffs reverted to their initial demands for all data relating to Named Plaintiffs.

After the deposition, Plaintiffs reverted to their initial demand for "all data and information relating to the Named Plaintiffs," even if never shared.  Ex. W.  Facebook responded on April 1, 2021, noting this "directly contradict[ed] the representations Plaintiffs made to the Court in their prior briefing," and confirmed it had not identified shared user data beyond what it had produced.  Ex. X at 2.  Facebook explained again that "[t]hird parties who are able to access individualized user data access that data through APIs that pull from Facebook's Social Graph only, and the DYI files Facebook produced reflect[] a human-readable version of the data relating to each Named Plaintiff in Facebook's Social Graph."  *Id.* at 6.  Plaintiffs never responded and refused to address whether they were changing their position.  *See* Ex. Z.  Instead, they filed this motion, arguing Judge Corley's order "is not limited to 'shared' information."  Mot. at 2.  Plaintiffs never once articulated that position over the prior year.

## III.   ARGUMENT

The Special Master should deny Plaintiffs' motion.

6

Gibson Dunn & Crutcher LLP

### A.  Facebook's productions under Discovery Order 9 are complete.

Facebook has confirmed repeatedly that its productions of potentially shared data relating to the Named Plaintiffs are complete.[1]  Plaintiffs identify no shared data missing from those productions. Instead, they say they are entitled to *all* data relating in any way to the Named Plaintiffs.  But as Plaintiffs have admitted, there is no genuine dispute that this case is about *shared* data.

### 1.  The scope of discovery is limited to data that was shared with third parties.

The complaint, Judge Chhabria's motion-to-dismiss order, Plaintiffs' briefing, Judge Corley's discovery order, and the hearings before Judge Corley all make crystal clear that the only user data at issue in this *privacy* class action is data *that was shared with or made accessible to third parties*.  As Judge Chhabria put it in the very first sentence of his motion-to-dismiss order:  "This lawsuit, which stems from the Cambridge Analytica scandal, is about Facebook's practice of sharing its users' personal information with third parties."  Ex. F at 1.  Much to Plaintiffs' chagrin, the case is *not* about "targeted advertising" or "psychographic marketing" (which Plaintiffs avoid mentioning by name but cannot resist bringing up more subtly, *see* Mot. at 7).  While not relevant, Facebook has confirmed repeatedly that it does not share individual user data with advertisers when it places ads.  *See also* Ex. D.  Nor is this case about all of the ways in which Facebook collects, maintains, and uses data.

With their feet to the fire in briefing before Judge Corley, Plaintiffs admitted this.  They told Judge Corley Facebook did *not* need to "search millions of disaggregated data sets for any data to have ever crossed Facebook's systems relating to a Named Plaintiff and any derivative materials drawing on that data."  Ex. O at 9 (quotation marks and emphasis omitted).  Instead, they sought "only a holding that the sensitive data Facebook collected about *ten Named Plaintiffs* and *shared* with third parties is relevant."  *Id.* (emphasis in original).  And they promised that they did "**not contend that information that was not shared is relevant**."  *Id.* (emphasis added).  In reliance on those promises, Judge Corley held that discoverable user data is data that was shared with third parties, including any shared data in specific categories Plaintiffs requested.  Ex. P at 2.

At hearings that took place after Judge Corley issued her order, Plaintiffs again acknowledged

---

[1]  Plaintiffs recently disclosed information identifying additional Facebook accounts for certain Named Plaintiffs.  Facebook is collecting and will produce the information associated with these accounts.

7

that what they "said in [their] reply was information shared or made accessible [is relevant]," which they said meant "if it was put in a place or utilized in a way where third parties had access to it." Ex. R at 18:15–16, 23–25. Judge Corley emphasized that the parties were both discussing information that was "shared" or "made accessible." *Id.* at 19:6; *see also id.* at 19:3–4. One month later, Judge Corley reiterated that "[t]he question is what did they gather, and then what was shared." Ex. T at 21:13–14.

### 2. Plaintiffs have not identified any deficiencies in Facebook's productions.

Facebook has repeatedly confirmed that it has not identified user data that could have been shared with third parties beyond what is reflected in the Named Plaintiffs' DYI files. Plaintiffs have done nothing to rebut that confirmation.

The best way to understand the nature and extent of a user's DYI file is to view one. Exhibit A (provided via share file) is the DYI file for Terry Fischer (a Named Plaintiff). This file contains nearly 2,000 documents and more than 16,000 pages. *See* Ex. A. A simple review makes clear that it is not limited, as Plaintiffs say, to information users themselves post on Facebook. For example, Plaintiffs say DYI files exclude "information collected and inferred by Facebook about users," Mot. at 2, but Ms. Fischer's DYI file contains a 22-page list of approximately 560 interests Facebook has inferred for her. *See* Ex. A at FB-CA-MDL-00405315–5336. These include general interests like American culture, books, comics, faith, and journalism; more specific interests like diabetes mellitus awareness, the Kitsap Sun, PragerU, and the Non-GMO Project; and many others. *See id.* Plaintiffs also say DYI files exclude "information collected from off-platform activity," Mot. at 2, but Ms. Fischer's file includes over 370 pages of off-platform activity, *see* Ex. A at FB-CA-MDL-00405489–5860, plus a 13-page list of the names of businesses she visited off Facebook, *see id.* at FB-CA-MDL-00405476–5488. For instance, Ms. Fischer's file shows that, among hundreds of other activities, she made a purchase from JCPenney on October 16, 2019, *see id.* at FB-CA-MDL-00405558; interacted with winred.com on 30 occasions between August and October 2019, *see id.* at FB-CA-MDL-00405513–5514; visited diynetwork.com on 36 occasions between October 2019 and January 2020, *see id.* at FB-CA-MDL-00405641–5643; and accessed a Bible app (YouVersion Bible App + Audio, Daily Verse, Ad Free) almost every day between July 26, 2019 and January 21, 2020, *see id.* at FB-CA-MDL-00405758–5772. The information contained in a user's DYI file is the most complete set of data

8

Facebook maintains about any user and the best representation of the data about a user in the Social Graph, from which the APIs that share data pull.  *See* Ex. C; Ex. E.

In arguing that Facebook's voluminous productions may be incomplete, Plaintiffs pretend not to understand how Facebook shared user-related data with third parties.  They insinuate that user data is shared in various complex ways that Plaintiffs and the Special Master may not comprehend.  *See* Mot. at 6–7.  And, three-and-a-half years after filing a lawsuit alleging that Facebook wrongfully shared their data, Plaintiffs wax philosophical over "what sharing information means." *Id.* at 11.

Those arguments are decoys.  Plaintiffs know—as their prior briefing and discovery requests indicate—that the data sharing at issue in this case takes place through APIs.  Plaintiffs' interrogatories ask Facebook to identify specific categories of APIs it uses to share data, Ex. K; in response Facebook has disclosed expansive lists of APIs and the data they pull spanning more than 300 pages, Ex. U.  Plaintiffs have also subpoenaed numerous third parties asking them to disclose the APIs through which they accessed user data.  *E.g.*, Ex. H at 8 ("identify each of Facebook's application programming interfaces ('APIs') [it] used to access or obtain" user data).[2]  And in the same sur-reply in which they conceded the only user data relevant to this case is shared data, Plaintiffs also conceded: ███████  ████████████████████████████████████████ Ex. O at 9.  Plaintiffs' sudden attempt to throw up smoke about "what sharing information means" is as disingenuous as it is unsupported.

**B.  Plaintiffs' distrust does not entitle them to "discovery on discovery."**

Unable to identify any categories of shared data that are not reflected in the Named Plaintiffs' DYI files, Plaintiffs return to their usual refrain that they do not believe Facebook's representations and need more discovery to test them.  Plaintiffs have already squandered an opportunity Judge Corley gave them to do so, and the Special Master should reject this recycled argument.

**<u>Plaintiffs are not entitled to check Facebook's homework</u>**.  "A plaintiff's mere suspicion that

---

[2]  *See* 3/3/20 Subpoena to Brayola Fitting Technologies; 3/3/20 Subpoena to Bumble Trading, Inc.; 3/3/20 Subpoena to Coffee Meets Bagel, Inc.; 3/3/20 Subpoena to DNP Imagingcomm America Corporation; 3/3/20 Subpoena to Flo Health, Inc.; 3/3/20 Subpoena to Netflix, Inc.; 3/3/20 Subpoena to On the Rebound, Inc.; 3/3/20 Subpoena to Spotify USA, Inc.; 3/3/20 Subpoena to Tinder, Inc.; 3/3/20 Subpoena to United Parcel Service, Inc.; 3/3/20 Subpoena to Walgreens Company; 3/3/20 Subpoena to Warner Brothers Entertainment, Inc.; 3/3/20 Subpoena to Yahoo!, Inc.; 3/3/20 Subpoena to Zoosk, Inc.; 5/21/20 Subpoena to Six4Three LLC; 7/16/20 Subpoena to 3DNA Corp. (DBA NationBuilder); 7/16/20 Subpoena to CubeYou, Inc.; 7/16/20 Subpoena to FullContact, Inc.; 8/7/20 Subpoena to DigitalStakeout, Inc.; 8/7/20 Subpoena to X1 Discovery, Inc.  Facebook can provide these subpoenas upon request if the Special Master would like them.

9

Gibson  Dunn &
Crutcher LLP

additional documents must exist is an insufficient basis to grant a motion to compel." *Bresk v. Unimerica Ins. Co.*, 2017 WL 10439831, at *5 (C.D. Cal. Nov. 16, 2017). For this reason, "'discovery on discovery' is disfavored and, to be both relevant and proportional to the needs of the case, a party seeking it must show a specific deficiency in the other party's production." *Uschold v. Carriage Servs., Inc.*, 2019 WL 8298261, at *4 (N.D. Cal. Jan. 22, 2019) (quotation marks and citation omitted); *see also, Brewer v. BNSF Railway*, 2018 WL 1756432, at *4 (D. Mont. Jan. 11, 2018) ("a court must guard against excessive probing into a party's meta-discovery in order to prevent belabored discovery.").

Plaintiffs have not identified anything beyond their own speculation to show a deficiency in Facebook's productions of potentially shared information, much less a "specific deficiency." Plaintiffs' cursory attempt to do so adopts their usual strategy of plucking isolated lines out of context. They rely on a document that Facebook has repeatedly told them outlines *hypothetical* capabilities— not actual practices—and this is clear on the face of the document. Mot. at 9. Plaintiffs similarly cite a document entitled "Ads and Measurement" and deliberately conflate data the document indicates was available to place ads with data Facebook *shared* with app developers. *Id*. at 7; Ex. D ¶ 3. Plaintiffs also bizarrely cite a question Facebook asked app developers that has nothing to do with data sharing, Mot. at 10; misconstrue a document where employees discuss *how to classify data as UII* to be something sinister, *id*.; and cite various documents discussing data Facebook maintains without making any effort to show that data is shared, *id*. at 7. Finally, Plaintiffs claim shared information has not been produced because the DYI file does not include "location-related metadata." Mot. at 10. But the DYI file includes location information, *e.g.*, Ex. A at FB-CA-MDL-00417382, and—where a user allowed it—extensive lists of the user's GPS coordinates.[3] None of Plaintiffs' cherry-picked quotes demonstrates a "specific deficiency" in Facebook's productions.

**Facebook has disclosed the types of data it shares**. *See, e.g.*, Ex. U. Plaintiffs suggest the typical rules of discovery do not apply here because "the question of what information Facebook shared is *the* central issue in this case." Mot. at 11. That is nonsense. Facebook has already disclosed the relevant APIs at issue in response to Plaintiffs' requests. Ex. U. What Plaintiffs apparently mean is

---

[3] Ms. Fischer's DYI file does not include this data, likely because her settings did not allow it to be collected. Ex. AB includes 27 pages from separate DYI file Facebook produced for Plaintiff Jason Ariciu, listing hundreds of latitudes and longitudes where Facebook estimates he logged into Facebook over a 6-month period.

that they now want to audit *all* of Facebook's information so that *they* can decide what was shared (and thus relevant). That is a nonstarter: a "requesting party . . . must rely on the representations of the producing party or its representative that it is producing all responsive, relevant, and non-privileged discovery." *Han v. Futurewei Techs., Inc.*, 2011 WL 4344301, at *5 (S.D. Cal. Sept. 15, 2011). And even if Facebook did produce all of the information relating to the Named Plaintiffs, Plaintiffs would still have to rely on Facebook to determine which categories of information could have been shared.

**Plaintiffs already had an opportunity to probe Facebook's representations, and they squandered it.** Judge Corley previously allowed Plaintiffs to conduct a Rule 30(b)(6) deposition to address their "disbelief . . . as to how Facebook operates." Ex. R at 26:7–8. Facebook made its then-VP of Platform Partnerships, Konstantinos Papamiltiadis, available. Mr. Papamiltiadis had more than eight years of experience at Facebook and more than 120 reports, and he spent almost 20 hours preparing. Plaintiffs deliberately wasted that opportunity and tactically avoided asking *any* questions to confirm whether Mr. Papamiltiadis was aware of types of shared data that Facebook had not already produced. *See supra* at 6. Facebook urges the Special Master to review the deposition transcript.

Plaintiffs' failure to use the Rule 30(b)(6) deposition for its intended purpose does not entitle them to admittedly irrelevant information. The biggest tell in Plaintiffs' motion is that it never—not once—cites to Mr. Papamiltiadis's deposition. In a motion to compel documents that are ostensibly for Plaintiffs to verify Facebook's representations that its productions are complete, one would expect the centerpiece to be the deposition Judge Corley authorized for that very purpose. Its absence is nothing short of extraordinary, and it would be astonishing if the true explanation were not so obvious: Plaintiffs do not want verification that they have all categories of potentially shared user data. Instead, as discovery nears its end,[4] Plaintiffs are desperate for *anything* that will breathe new life into their dying case. That is why they spent their Rule 30(b)(6) deposition exploring *new* potential avenues of litigation instead of verifying that the productions relating to *this* case were complete. That is why, years into a case about data sharing, they raise questions about "what sharing information means"

---

[4] Even now, Plaintiffs do not demand all of the information they will eventually seek; they demand a list of information that they intend to later "use . . . to develop an efficient discovery plan." Mot. at 14. Plaintiffs' endless discovery campaign, if successful, guarantees that discovery will blow far beyond the substantial completion deadline.

Gibson Dunn & Crutcher LLP

without even attempting to supply an answer.  Mot. at 11.  And that is why they claim (baselessly) that "Facebook itself does not know what information may have been shared with third parties," *id.* at 10—conflating questions about *what particular data may have been shared about a specific user* (which Facebook cannot identify) with *what categories of data could be shared* (which Facebook has identified and produced).  *See id.* at 10–11.  Years into this case, as the discovery deadline approaches and after throwing away their opportunity to test Facebook's production, Plaintiffs are entitled to nothing more.

**Plaintiffs conflate the scope of the *deposition* Judge Corley allowed with the scope of data she found discoverable**.  In authorizing a Rule 30(b)(6) deposition, Judge Corley allowed Plaintiffs to *ask questions* about information Facebook maintains that may not have been shared—with the goal of identifying which types of information *were* shared.  *See* Ex. T at 21:13–14 ("The question is what did they gather, and then what was shared.").  Judge Corley did *not* order Facebook to produce data that was never shared—if she had, there would have been no need for the deposition.  Plaintiffs pluck isolated statements from the hearings to tell a different story, but the transcripts—just like the parties' underlying briefing on this issue—speak for themselves.  Facebook encourages the Special Master to read these materials in full.  *See* Exs. R, T (transcripts); *see also* Exs. L, M, N, O (underlying briefs).

### C.  Plaintiffs are judicially estopped from seeking information that was not shared.

Even if Plaintiffs could otherwise seek "all" information related to the Named Plaintiffs, they are judicially estopped from doing so here based on their unequivocal representations to Judge Corley.

"The doctrine of judicial estoppel is an equitable doctrine a court may invoke to protect the integrity of the judicial process," and it was "developed to prevent litigants from 'playing fast and loose' with the courts by taking one position, gaining advantage from that position, then seeking a second advantage by later taking an incompatible position."  *United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 778 (9th Cir. 2009).  "In determining whether to apply the doctrine," a court will "typically consider (1) whether a party's later position is 'clearly inconsistent' with its original position; (2) whether the party has successfully persuaded the court of the earlier position, and (3) whether allowing the inconsistent position would allow the party to 'derive an unfair advantage or impose an unfair detriment on the opposing party.'"  *United States v. Ibrahim*, 522 F.3d 1003, 1009 (9th Cir. 2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001)).

There could not be a more apt description of Plaintiffs' conduct. Their present position is flatly contrary to their position before Judge Corley. *Compare* Ex. O at 9 ("Plaintiffs do not contend that information that was not shared is relevant"), *with* Plaintiffs' Mot. at 2 ("Discovery Order No. 9 is not limited to 'shared' information."). Plaintiffs persuaded Judge Corley of their earlier position—that relevant information is limited to data Facebook shares—and obtained a favorable discovery order as a result. Plaintiffs cannot now take back their concessions and demand new discovery on the eve of substantial completion, when they already conceded it is not relevant, the Court issued a ruling based on that representation, and the parties agreed to a substantial completion deadline based, in part, on Facebook's understanding that this issue had been put to bed.

### D. The information Plaintiffs now seek is nonresponsive and otherwise unavailable.

Following a familiar pattern, after asserting Facebook's productions are incomplete, Plaintiffs shift gears. Rather than demand user data they believe was not produced, they abruptly demand extensive discovery about Facebook's sources of electronically stored information ("ESI").[5]

Plaintiffs' list of demands is not the issue at impasse. The Special Master declared impasse regarding Facebook's "[p]roduction of Named Plaintiffs' data in compliance with [Judge Corley's Order]," 2021.10.06 Email from D. Garrie, after Plaintiffs complained Facebook had not made "a complete production of all data it has collected about [the Named Plaintiffs]," Ex. Y at 4. When forced to put pen to paper, Plaintiffs find no support for that request, so they pull out a familiar trick: They raise a different issue that itself has a complicated history. Making matters worse, none of the discovery requests Plaintiffs move on seek the materials they now demand. The Special Master instructed the parties they may brief only the impasse topic, and should deny Plaintiffs' request for this reason.[6]

Judge Corley has also repeatedly rejected Plaintiffs' demands for discovery about Facebook's

---

[5]  Plaintiffs seek to "compel Facebook to identify all data sources that may contain information relating to the Named Plaintiffs," which they define in the final paragraph of their motion to mean "(1) the name of the database or data log; (2) a description of the data source's purpose and function; (3) information about the default retention status of the data source (at a minimum, whether it is retained and for how long); (4) information about the current retention status of the data source (at a minimum, whether it is retained and for how long); and (5) where current retention status differs from default retention status, the date the change was implemented." Mot. at 13–14. They further demand, "at a minimum," "(1) the data schema; (2) definitions and descriptions of each field; (3) tool(s) which Facebook use to search each data source; and (4) instruction sets and manuals for all tools identified as being used by Facebook to search any data source identified in this step." *Id.* at 14.

[6]  *See* Protocol for Resolving Discovery Disputes ¶ 2. The Special Master separately advised the parties that he intends to "redline" any portions of the parties' briefing that strays beyond the impasse topic.

sources of ESI.  The parties invested nearly six months negotiating an ESI protocol that Judge Corley entered.  Notably, that protocol does *not* require written ESI disclosures.  Ex. I.  After agreeing to this protocol, Plaintiffs sought to side-step the parties' agreement and asked Judge Corley to order "written ESI disclosures" or a 30(b)(6) ESI deposition.  Dkt. 428 at 5.  Judge Corley rejected this request:  "On the ESI discussions, I'm not going to require any more—I'm not going to do what the plaintiffs proposed. . . .  I'm not satisfied there's anything more in particular that you need."  Ex. J at 6:16–21.

One year later, Plaintiffs tried again.  When Judge Corley authorized a deposition for Plaintiffs to explore whether any shared data about the Named Plaintiffs had not been produced, Plaintiffs issued a 30(b)(6) notice that again sought detailed testimony about Facebook's data sources.  The first three topics in Plaintiffs' notice ask for the same information Plaintiffs sought previously and now seek here:

1.  The format, nature, and location of User Data as set forth in Discovery Order No. 9, including how and why such Data is collected, obtained, or inferred, and how it is maintained.

2.  The name, location, and function of all of Facebook's electronic or database systems that contain User Data, including but not limited to Hive and Data Warehouse, whether stored on an individual user level or in another form.

3.  The identity, nature and location at Facebook of all the metadata associated with User Data . . .

Ex. S at 6.  Judge Corley quashed that deposition notice.  *See supra* at 6.  Plaintiffs' requests for document discovery on the same topics should meet the same fate.

Even though Judge Corley rejected Plaintiffs' requests for ESI discovery, in mediation Facebook voluntarily produced much of the information Plaintiffs demand, *see* Ex. AA (share file), because Plaintiffs assured the mediators this information would advance the parties' discussion about user data.  Plaintiffs do not even acknowledge that production; they simply ask for more.

Had Plaintiffs reviewed the materials Facebook provided, they would have learned a tremendous amount about how Facebook stores data.  The documents include two training videos intended to educate viewers as to how Facebook stores and queries data in the Social Graph.  *E.g.*, *id.* at FB-CA-MDL-01959889, FB-CA-MDL-01960073.  Facebook also produced detailed technical publications regarding its data infrastructure, *e.g.*, *id.* at FB-CA-MDL-01959810, FB-CA-MDL-01959826 (academic articles regarding the consistency and functioning of Facebook's TAO system and describing Facebook's horizontally shared, geo-replicated relational database management

system), as well as internal instructional guides discussing Facebook's data storage systems (including descriptions of individual databases, their functions, data schema employed, and tools used to query databases), *e.g.*, *id.* at FB-CA-MDL-01960039 (instructional overview of the Graph API), FB-CA-MDL-01960137 (instructional wiki entry providing descriptions of data tools), FB-CA-MDL-01960080 (instructional guide on storage options in the Social Graph), FB-CA-MDL-01960128 (instructional guide on data tools), FB-CA-MDL-01960067 (instructional guide on searching with GraphQL).   Facebook also produced dozens of articles and blog posts discussing its data infrastructure, *e.g.*, *id.* at FB-CA-MDL-01959804 (blog post describing Facebook's top open data problems, including a description of its data stores and the tools used to query them), FB-CA-MDL-01959641 (article discussing the role of the MySQL database in supporting the social graph).

Given Facebook's extensive voluntary production of materials Judge Corley held Plaintiffs were not entitled to, Plaintiffs' claim that they are left in the dark falls flat.  And Facebook has already told Plaintiffs that most of the additional materials they seek do not exist or do not exist in the form Plaintiffs have requested—such as a data map, a list of sources containing data about specific individual users, or an instruction manual explaining the workings of Facebook's engineering infrastructure to laypersons.  And Facebook has answered interrogatories asking it to identify databases that house user data.  Ex. U.  It is not clear what other information Plaintiffs' vague and broad list is even asking for.

These are issues that can and should be resolved informally through discussion during the RFP meet-and-confer process, during which the parties can refine their requests, address any misunderstandings, and raise objections if needed.  None of that happened here, likely for an obvious tactical reason: Plaintiffs know that if their current demands were properly teed up, negotiated, and mediated, they would be dead on arrival.  The multiple problems with Plaintiffs' list of demands simply highlight the soundness of the rule that a "motion to compel may not be used to enforce an 'informal' request for documents or information." *MAO-MSO Recovery, LLC v. Mercury Gen.*, 2019 WL 1423772, at *3 (C.D. Cal. Feb. 19, 2019).  As a result, even aside from all of the other problems with Plaintiffs' motion to compel, it is unripe.

## IV.    CONCLUSION

Plaintiffs' motion should be denied.

1    Dated:  October 28, 2021            **GIBSON, DUNN & CRUTCHER, LLP**

2                                        By:  __/s/ Deborah Stein__

3                                        Orin Snyder (*pro hac vice*)
                                         osnyder@gibsondunn.com
4                                        200 Park Avenue
                                         New York, NY 10166-0193
5                                        Telephone:  212.351.4000
                                         Facsimile:  212.351.4035

6
                                         Deborah Stein (SBN 224570)
7                                        dstein@gibsondunn.com
                                         333 South Grand Avenue
8                                        Los Angeles, CA 90071-3197
                                         Telephone:  213.229.7000
9                                        Facsimile:  213.229.7520

10                                       Joshua S. Lipshutz (SBN 242557)
                                         jlipshutz@gibsondunn.com
11                                       1050 Connecticut Avenue, N.W.
                                         Washington, DC 20036-5306
12                                       Telephone:  202.955.8500
                                         Facsimile:  202.467.0539

13
                                         Russell H. Falconer
14                                       rfalconer@gibsondunn.com
                                         2001 Ross Avenue Suite 2100
15                                       Dallas, TX 75201
                                         Telephone:  214.698.3170

16
                                         Kristin A. Linsley (SBN 154148)
17                                       klinsley@gibsondunn.com
                                         Martie Kutscher (SBN 302650)
18                                       mkutscherclark@gibsondunn.com
                                         555 Mission Street, Suite 3000
19                                       San Francisco, CA 94105-0921
                                         Telephone:  415.393.8200
20                                       Facsimile:  415.393.8306

21
                                         *Attorneys for Defendant Facebook, Inc.*
22

23

24

25

26

27

28

Gibson  Dunn &
Crutcher LLP