Declaration of Deborah Stein

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
    osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Rosemarie T. Ring (SBN 220769)
    rring@gibsondunn.com
Kristin A. Linsley (SBN 154148)
    klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
    mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
    dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
    jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br> This document relates to: <br><br> ALL ACTIONS | CASE NO. 3:18-MD-02843-VC <br><br> **DECLARATION OF DEBORAH STEIN IN SUPPORT OF OPPOSITION OF FACEBOOK, INC., GIBSON, DUNN & CRUTCHER LLP, AND ORIN SNYDER TO PLAINTIFFS' MOTION FOR SANCTIONS** |

I, Deborah Stein, hereby declare as follows:

1.  I am a partner at the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for Facebook, Inc. ("Facebook") in the above-captioned matter.  I am a member in good standing of the State Bars of California and New York.  I submit this declaration in support of Facebook, Inc.'s, Gibson, Dunn & Crutcher LLP's, and Orin Snyder's Opposition To Plaintiffs' Motion For Sanctions.  I make this declaration on my own knowledge and information contained in our files, and I would testify to the matters stated herein under oath if called upon to do so.

2.  I have been litigating complex cases for over two decades and take my obligations as an officer of the Court very seriously.  I strive for candor and transparency with the Court and with opposing counsel and have never been sanctioned by a court.  In my professional and personal estimation, the Facebook team has acted professionally and in good faith with respect to what has been an extremely challenging discovery process.  I submit this declaration to provide the Court with a more complete record on which to evaluate Plaintiffs' request for sanctions.  I hope that, with the benefit of the record, the Court will agree that our conduct has been reasonable and in good faith and does not warrant sanctions.

3.  I have been actively involved in this matter since early 2020, shortly before the World Health Organization declared COVID-19 a pandemic.  I want to assure the Court that our team pushed through many challenges associated with the global pandemic in order to mitigate their impact on the case.  The team, of course, endured the same extreme disruptions to work and life that so many experienced:  the team was scattered physically; many were dealing with heightened family obligations, including Zoom-schooling from home; and multiple associates on the team had to take leave (medical, family, bereavement).  But the team pushed through it all—including substantial technological challenges to remote document review—to meet our

1

obligations:  As detailed in Paragraphs 10.g. and 10.h herein, it is my understanding that, between March 2021 and March 2022 alone, Gibson Dunn attorneys worked over 17,000 hours on document review, collection, and production tasks, and more than 170 contract lawyers collectively worked over 100,000 hours on document review.

4.    In my over 20 years of active practice, I have litigated against some of the finest, toughest lawyers in the country who aggressively pursued discovery against my clients.  In all of those cases, including MDLs and other class actions, I have been able to work cooperatively with opposing counsel to narrow disputes and minimize discovery motion practice before the courts. This case stands out as a notable exception, but not for a lack of trying.  Gibson Dunn and Facebook have poured an extraordinary amount of time and resources into responding to informal and formal discovery demands by Plaintiffs and looking for reasonable proposals for providing responsive information to demands that, as written, did not appear to have any bounds. Looking at any particular discovery dispute in the case in a vacuum does not tell the complete story because it reveals little about the volume of informational demands (as opposed to formal discovery requests) to which we were constantly responding.

5.    We outlined many of the challenges we were facing in discovery in a February 27, 2020 Case Management Statement.  Dkt. 378.  In that Statement, we advised the Court that "Facebook's efforts over the last 50 days have included responding to Plaintiffs' 1400 paragraph complaint (which alone took approximately 30 days of work), producing nearly 150,000 pages of materials, engaging in more than 15 hours of meet and confer discussions, and exchanging more than 75 emails and approximately 25 letters with Plaintiffs."  *Id.* at 2.

6.    Another challenge that we identified in that February 27, 2020 Statement related to Plaintiffs' quick trigger on litigating discovery issues.  Specifically, the Statement noted that

"[o]n numerous occasions, Plaintiffs have demanded positions from counsel on topics raised for the first time in a meet and confer discussion and declared the parties to be at an impasse when Facebook did not immediately capitulate to Plaintiffs' position.  More concerning, Plaintiffs have twice sent Facebook correspondence outlining Plaintiffs' position on a topic never previously discussed along with a proposed joint letter to the Court.  In these scenarios, Plaintiffs have demanded that unless counsel will agree within days to Plaintiffs' position, Facebook should fill out its half of the proposed letter for filing."  Dkt. 378 at 12.

7.   The discovery challenges persisted and it was thus a welcome relief when Judge Corley suggested that the parties work with a discovery mediator.  The parties engaged Judge Gail Andler, who brought in Daniel Garrie (later appointed Special Master) to provide technical assistance.  Judge Andler and Mr. Garrie set in motion a process designed to have the parties focus on several issues at a time, make progress on and resolve those issues, and then move on to the next set of issues.  The idea was that by prioritizing issues—rather than trying to deal with everything at once—we would get more done.  And I believe we did.

8.   It was also comforting to be able to receive feedback from Judge Andler and Mr. Garrie regarding the relative strength of the discovery positions Facebook and Gibson Dunn were taking in this matter.  We took their recommendations very seriously and endeavored to meet all of their recommended timetables for communicating with Plaintiffs.  Additionally, other members of the team and I asked the mediators on multiple occasions to tell us if they ever believed our positions were unreasonable so that we could act on that feedback in real time.  I never heard Judge Andler or Special Master Garrie say that they thought our discovery positions, or behavior, was unprofessional or in bad faith, even when Facebook's discovery position did not ultimately prevail.

9.   I understand that the Gibson Dunn attorneys leading this case (Orin Snyder, Russ Falconer, Martie Kutscher Clark, Josh Lipshutz, Brian Lutz, Kristin Linsley, Rose Ring, and myself) have practiced law for more than 150 years combined without being sanctioned.  When calculating the number of years of practice, Gibson Dunn team members did not include years spent in clerkships.

10.  **Document Production.**  Facebook, through Gibson Dunn and contract attorneys, has earnestly reviewed and produced an enormous volume of documents and electronic information.

a.   I have reviewed document production statistics maintained and updated by Gibson Dunn team members, dating from September 7, 2018 to April 5, 2022, and my testimony is based on my understanding of those statistics.

b.   Non-custodial document productions.  Even before the parties agreed upon search terms for collection of documents from Facebook custodians, Facebook produced a substantial volume of documents.  For example, in April and July 2020, Facebook produced approximately 302,562 pages of cloned discovery that was produced to regulators in other actions—including the Facebook documents Facebook produced to the FTC in response to its document requests in two related investigations.  Facebook also prioritized production of the named plaintiffs' data, as requested by Plaintiffs, and produced nearly one million pages of the named plaintiffs' data by October 2020.  *Infra* para. 12.d.

c.   Search term negotiation.  I have reviewed internal notes, correspondence, and prior filings regarding negotiations between Facebook and Plaintiffs on search terms to familiarize myself with the approximate number of documents that would be collected from Facebook's custodians.  The parties divided 81 document custodians into two groups for their

4

search term negotiations.  The search terms negotiated by the parties and ordered by Judge

Corley for the first group of custodians resulted in a review population of approximately 3.1

million documents.  *See* Dkt. 599 at 6.  The search strings the parties agreed to for the second

group of custodians added approximately 2.6 million additional documents to the review set.  *See*

Dkt. 654 ¶ 7.  Together, it is my understanding that Facebook's review set included these

approximately 5.7 million documents, as well as a significant volume of other custodial and non-

custodial materials.  At my direction, my team consulted with our document vendor to determine

the approximate number of pages of documents within Facebook's custodial collection.  I

understand based on the work of my team that our document vendor does not determine the

number of pages within a document until that document is produced but that our best estimate is

that Facebook has reviewed approximately 24 million pages of custodial documents in addition

to a significant volume of additional custodial and non-custodial materials.



d.  Document production.  Based upon my review of our files, it is my

understanding that from September 2018 through March 18, 2022, Facebook has produced

approximately 660,000 documents, amounting to approximately 3,000,000 pages of documents. At my direction, Gibson Dunn team members created the above chart based on the above data, which I believe accurately reflects the timeline of Facebook's production to date.  Not present in this timeline, however, is the fact that Facebook has also produced an additional 80-gigabyte table of structured data relating to "calls" to Facebook by third parties for information—which I understand to be equivalent to approximately 4–6 million pages of documents.

        e.   <u>Responsiveness and pace of production</u>.  It is my understanding, based on a review of our files to date, that approximately 250,000 documents in our custodial review set (without families) were found to be responsive and nonprivileged.  That amounts to less than 5% of the 5.7 million documents hitting on the negotiated and ordered search terms.  As Facebook informed the Court nearly 15 months ago, "the review set generated by the search strings has had a very low responsiveness rate" Dkt. 599 at 9.  Facebook explored other means to expedite review and production of the most responsive documents, such as using technology-assisted review ("TAR") rather than human review to determine that certain custodial documents were non-responsive.  But as Facebook informed the Court, Plaintiffs insisted on several burdensome conditions that Facebook believed would defeat the purpose of TAR by slowing down Facebook's document review and production.  Dkt. 697 at 4.  When Plaintiffs later moved to compel Facebook to use TAR, Facebook argued that there would be no substantial time-saving benefit from using TAR.  And, as set forth in the briefing, Facebook explained that once it became clear that the parties could not agree to a TAR protocol that would remove non-responsive documents to streamline discovery, Facebook decided not to use TAR in this manner. Instead, Facebook focused substantial resources into an efficient, prioritized process supported by analytics for completing human review on all documents.  The Special Master conducted an

*in camera* review of a sample of 500 unreviewed documents that the analytics tool predicted to be non-responsive.  After his *in camera* review, the Special Master found that "there do not appear to be deficiencies in Facebook's production to date and Facebook appears to be on pace to meet the January 31, 2022 deadline for substantial completion of discovery."  Dkt. 746 at 3.

      f.  <u>Production of native files</u>.  Spreadsheets and presentations, such as files from Microsoft Excel and Microsoft PowerPoint, were produced in their native form rather than produced as images, unless they were produced with redactions.  These documents are counted as a single document and single page, even though they may be the equivalent of dozens or hundreds of printed pages.  Our document reviewers are required to review every page of a native file before marking it for responsiveness.  Even the 80-gigabyte table referenced in Paragraph 10.d. appears in the production as a single document and a single page.

      g.  <u>Gibson Dunn attorney hours for document review, collection, production</u>. At my direction, Gibson Dunn team members gathered billing information reflecting the number of hours attorneys (excluding partners and two senior associates) billed to task codes related to document collection and production, and document review.  I understand based on my review of the billing information gathered that between March 2021 and March 2022 alone, 77 Gibson Dunn associates collectively devoted over 17,000 hours to document collection, review, and production.  In that time, paralegals and case assistants at Gibson Dunn devoted approximately 600 additional hours to document collection and production.

      h.  <u>Contract attorney hours of document review and production</u>.  Based upon my review of statistics provided by our contract attorney vendor, I understand that our vendor reported that 170 contract attorneys have devoted over 100,000 hours to document review in this case between March 2021 and March 2022.

7

DECLARATION OF DEBORAH STEIN IN SUPPORT OF OPPOSITION OF FACEBOOK, INC., GIBSON, DUNN & CRUTCHER LLP, AND ORIN SNYDER TO PLAINTIFFS' MOTION FOR SANCTIONS
CASE NO. 3:18-MD-02843-VC

11. **App Developer Investigation ("ADI").**

      a.   Judge Corley helped the parties navigate the complexities of the ADI privilege dispute and addressed the issue in multiple discovery hearings.  Ultimately, she worked with parties to establish a process by which Facebook would search for and log documents relating to six exemplar apps.  We provided this log on December 10, 2020.  Plaintiffs thereafter challenged every entry where no attorney appeared on the communication (approximately 400 out of 6,000 entries).  Judge Corley ordered Plaintiffs in January 2021 to choose 20 of those communications for *in camera* review and ordered simultaneous briefing.  Dkt. 602 at 1.  That briefing was completed in February 2021.  In April 2021, Judge Corley provided the parties with some tentative views on the briefing and provided instructions on next steps.  Dkt. 655.  In the ensuing months, we worked with the discovery mediators in an effort to reach resolution on the scope of ADI-related documents to be searched for and produced.

      b.   To be clear, we produced many ADI-related documents before the ADI dispute was even briefed to Judge Corley.  Based upon my review of document production statistics maintained and updated by Gibson Dunn attorneys, I understand that between March and December 2020, Facebook produced 13,908 documents, amounting to 30,617 pages, of non-privileged ADI materials.  I understand that these documents included Facebook's communications with the app developers it investigated, such as requests for information to app developers, responses from app developers, and Facebook suspension notices for apps, which detailed the grounds for suspension.  These documents also included a list of apps that were suspended as a result of ADI.

      c.   The parties were not able to reach agreement on ADI in the discovery mediation and made further submissions to Judge Corley, at her direction.  On September 8,

2021, Judge Corley ordered Facebook to "produce the background and technical reports, audits and developer interviews of the six exemplar apps chosen by the parties." Dkt. 736 at 7. Based upon my review of our files, on September 21, 2021, Facebook produced the 11 documents that fell within the order's scope. *See* FB-CA-MDL-02014085– FB-CA-MDL-02014463. I did not understand Judge Corley to be ordering production of anything beyond the documents she identified for the six exemplar apps in light of her order that the parties "work with the Special Master regarding production of additional materials consistent with the guidance offered by" the Order. Dkt. 736 at 7.

       d.   We then awaited instructions from the Special Master as to his desired next steps. Following our production of documents pursuant to Judge Corley's Order, through October, we participated in meet and confer discussions with Plaintiffs' counsel regarding the scope of production of additional ADI-related documents consistent with the guidance in Judge Corley's Order. *See* Dkt. 761-3 at 3-4. The Special Master initially set a hearing on the matter for November 11, 2021, *id.*, but postponed the hearing until December 4, 2021 to accommodate the trial schedule of my partner, Orin Snyder.

       e.   On December 8, 2021, the Special Master ordered Facebook to produce "all memoranda" prepared by its consulting experts and "all background reports, technical reports, audits, and non-attorney developer interviews" related to ADI, as well as allowed Plaintiffs to request "all non-attorney internal Facebook communications, communications with [Facebook's consulting experts], or communications with third party app developers in connection with a statistically significant sample of the reports provided." Dkt. 788-3 at 4. Facebook moved for reconsideration of this order, which the Special Master granted.

9

f.   On December 20, 2021, in response to Facebook's Motion For Reconsideration, the Special Master ordered Facebook to produce the same memoranda, reports, audits, and interviews, Dkt. 788-5 at 4, which Facebook did not appeal to Judge Corley.  Based on my review of our files, it is my understanding that Facebook began rolling productions of reports, memoranda, and interview documents on January 21, 2022.  This is within the five-week timeframe that Facebook informed the Special Master it needed to begin productions following the Order.  *See infra* Ex. 26, Dec. 15, 2021 Decl. of Alexander H. Southwell, ¶ 5.  It is also my understanding that between January 21, 2022 and March 3, 2022, Facebook produced 296,152 pages of reports, memoranda, and interview documents.  *See* FB-CA-MDL-02220950–FB-CA-MDL-02223021, FB-CA-MDL-02321029–FB-CA-MDL-02322500, FB-CA-MDL-02545732–FB-CA-MDL-02673443, FB-CA-MDL-02685212–FB-CA-MDL-02789719, FB-CA-MDL-02791593–FB-CA-MDL-02852028.

g.   The Special Master's December 20, 2021 Amended Order eliminated the provision of his prior order allowing Plaintiffs to demand communications relating to a statistically significant sample of the reports provided, and instead ordered Facebook to "provide to Special Master Garrie for *in camera* review, all ADI related communications pertaining to the six exemplar applications" chosen by the parties for the sampling exercise.  To the best of my knowledge, including my review of our files, on December 24, 2021 (Christmas Eve, just four days later), Facebook tendered over 6,000 documents to the Special Master for *in camera* review.  The Special Master later indicated that he would prefer a different format.  Gibson Dunn attorneys and our document vendor worked over the holiday period to provide the documents in the Special Master's preferred format.  The documents were ultimately provided to the Special Master in a new format on January 5, 2022.

h.   Five days later, on January 10, 2022, the Special Master ordered Facebook to produce all documents relating to the ADI.  At a hearing following this order, the Special Master clarified that he had not intended his order to sweep as broadly as it was written. Facebook again moved for reconsideration, and the Special Master again granted Facebook's motion.  Ex. 36 at 5.  We understood the Special Master's January 31, 2022 Amended Supplemental Order Regarding Production Of ADI Related Documents to significantly narrow the scope of ADI-related communications to be searched for, logged and produced.  Ex. 38 at 5. We believed that with this narrowing, Facebook was now positioned to be able to comply with his order as amended.  It is my good faith belief that Facebook produced the documents called for by the January 31 order by March 3, 2022.

i.   I understand from the work performed by my team that following the Special Master's January 31, 2022 Amended Supplemental Order, Facebook began production of those ADI-related communications within four weeks.  Between February 28, 2022 and March 3, 2022, Facebook produced 19,524 documents, amounting to 68,683 pages of ADI-related communications.  *See* FB-CA-MDL-02673444–FB-CA-MDL-02685211, FB-CA-MDL-02852029–FB-CA-MDL-02908943.

j.   The Special Master's January 31, 2022 Amended Supplemental Order required production of documents from the "custodians the parties have identified and collected."  Dkt. 828.  Because documents had only been collected through a certain date, Facebook reached out to Plaintiffs to discuss additional collections through a later date and to jointly seek amendment of the Amended Supplemental Order, which the Court addressed during the March 30, 2022 case management conference.  I understand that Facebook has agreed to

11

collect documents for this time period from MDL custodians as well as ADI custodians, and to use search terms for the collection that the parties are negotiating.

           k.   I understand that between March and December 2020, Facebook produced 13,908 documents, amounting to 30,617 pages, of non-privileged ADI materials.  Between Judge Corley's ADI Order on September 8, 2021 and February 2, 2022 (Plaintiffs' chosen window for reporting Facebook's ADI-related productions), Facebook produced 50 documents totaling 3,923 pages (for a total of 13,958 documents and 34,540 pages).  Two days later, on February 4, Facebook produced 405 documents totaling 8,735 pages.  One week after that, Facebook produced 1,096 documents totaling 30,298 pages.  Between February 2, 2022 and the date Plaintiffs filed their motion for sanctions, Facebook produced more than 28,000 documents (360,000 pages) relating to ADI.

           l.   In total, Facebook has produced nearly 42,000 documents totaling more than 395,000 pages relating to ADI.

### 12. Named Plaintiff Data.

           a.   It is my recollection that Plaintiffs made production of data associated with them one of their first and highest priorities in discovery.  Accordingly, Facebook prioritized producing information from the named plaintiffs' DYI files.  Although the named plaintiffs may access their DYI files themselves (in HTML), it is my understanding that the data was not available to Plaintiffs in the same format that Facebook produced it (for example, paginated, or extracted text).  I understand based on the work of my team that compiling the information from the DYI files and putting it into a producible format was not simply a matter of sending already-existing materials, and some DYI files took three days of processing time to prepare.

b.   At my direction, my team reviewed Facebook's productions of the named plaintiffs' data.  These productions occurred over eighteen production volumes from February 2020 through October 2020, with a final additional production in October 2021.  These productions include instances where Facebook reproduced DYI files for certain named plaintiffs with new formatting at Plaintiffs' request, or where Facebook supplemented its production for two named plaintiffs when it became known they had an additional Facebook account.  Having reviewed the information within the named plaintiffs' DYI files produced to Plaintiffs, I am aware that those files include shared data, non-shared data, on-platform data, off-platform data, and inferred data.  *E.g.*, Ex. 43.

c.   For example, the DYI productions contained on-platform "native" data about each of the named plaintiffs and spanned approximately 100 types of information.  For example, my team has reviewed one of the Named Plaintiffs' DYI files and determined that it included over 15,000 pages of on-platform information, including over 2,000 pages of posts and comments (FB-CA-MDL-00030955-1367; FB-CA-MDL-00549452-0246; FB-CA-MDL-00020602-0845; FB-CA-MDL-00556596-6941; FB-CA-MDL-00020259-0471; FB-CA-MDL-00556944-7167); over 1,000 pages of likes and reactions (FB-CA-MDL-00020858-1335; FB-CA-MDL-00548833-9365); and 179 pages of login and location information (FB-CA-MDL-00557274-7430; FB-CA-MDL-00559836-9859).  This on-platform information was as detailed as it was extensive.  This individual's produced posts and comments discussed, ███████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

13

██████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████

    d.   For the Court's review, we have included a smaller excerpted DYI file associated with one of the Named Plaintiffs at Exhibit 43.  This excerpt includes samples of on-platform data (e.g., posts and comments, *supra* Paragraph 12.c., a list of ads that were clicked on ████████████████████████████████, Ex. 43 at FB-CA-MDL-00560337, a list of advertisers who uploaded a contact list with the individual's information (e.g., █████████████████████ FB-CA-MDL-00560345); off-platform data (e.g., login and location information included this individual's IP addresses as well as the geographic location from which they logged in ████████████ Ex. 43 at FB-CA-MDL-00559836, and a list of the names of businesses and websites they visited ███████████████████ FB-CA-MDL-00560222-328); and inferred data (e.g., a list of inferred ad "topics," like ██████ ████████████████████████████████████ ███████████████████████████████████ ████████████████████████████████(FB-CA-MDL-00560376 to

14

FB-CA-MDL-00560380); Facebook Watch Topics for Recommendations like ███

███████████ (PLAINTIFFS0069780). ███████████

███████████████████████████

███████████████████ (PLAINTIFFS00069781) , and

███████████████████ (PLAINTIFFS00069782).  I

understand based on work by my team that Facebook's productions of the information in the

named plaintiffs' DYI files include more than 22,000 inferences regarding the named plaintiffs.

*See* Ex. 41 at Ex. C.  In total, these productions amount to nearly one million pages of documents

about the named plaintiffs.

     e.   Facebook also produced the available privacy settings for each Named

Plaintiff.  *See* FB-CA-MDL-01434763 - FB-CA-MDL-0143488.

     f.   <u>The process has worked</u>.  In my experience participating in mediation

sessions with Judge Andler and Daniel Garrie, and in proceedings before Special Master Garrie,

the mediators' and Special Master's work with the parties has succeeded in narrowing the scope

of the parties' disputes.

     g.   <u>Facebook has engaged in the process in good faith</u>.  I have reviewed

records of the proceedings regarding the named plaintiffs' data since Plaintiffs filed their Motion

to Compel Production of Named Plaintiffs' Content and Information before the Special Master

on October 18, 2021.  It is my understanding that the Special Master has issued 11 orders on

named plaintiff data (*i.e.*, Nov. 29, 2021; Dec. 17, 2021; Dec. 29, 2021; Jan. 12, 2022; Jan. 18,

2022; Jan. 31, 2022; Feb. 8, 2022 (by email); Feb. 10, 2022; Feb. 20, 2022; Mar. 8, 2022 (by

email); Mar. 22, 2022).  (This count does not include two amended orders (Feb. 14, 2022; Feb.

22, 2022) which simply reflected different hearing dates.)  The Special Master has conducted

three technical hearings with four Facebook employees (one of whom appeared at two hearings) for more than ten hours of sworn testimony (Jan. 14, 2022; Feb. 17, 2022; Mar. 9, 2022).  The Special Master submitted over 20 questions and informational requests to Facebook (submitted Jan. 18, 2022 via JAMS; Feb. 8, 2022; Feb. 10, 2022; Feb. 21, 2022; Mar. 8, 2022).  Facebook has filed 6 submissions to the Special Master (Jan. 6, 2022 Letter; Jan. 27, 2022 Letter; Feb. 2, 2022 Letter; Feb. 9, 2022 Letter; Feb. 15, 2022 Letter; Mar. 7, 2022 Letter) as well as 5 declarations (Oct. 28, 2021 Declarations of Ben Mitchell, Sukhesh Miryala, Karandeep Anand; Dec. 10, 2021 Declarations of David Pope, Mengge Ji), totaling over 170 pages.

**13. Depositions**

a.   Facebook has taken six named plaintiff depositions and will take the last two on April 15, 2022 and April 28, 2022, which were the first dates Plaintiffs made those two witnesses available pursuant to the Court's February 10, 2022 order regarding deposition scheduling.  Dkt. 847.  I understand Plaintiffs have taken 14 depositions of current or former Facebook employees, and 11 more depositions have been scheduled (not including three depositions Plaintiffs recently postponed, *infra* Paragraph 13.b.).  Facebook is also conferring with Plaintiffs to schedule additional depositions.  In late March, Plaintiffs identified the next tranche of 12 witnesses they wish to depose, including three apex witnesses.  Facebook offered deposition dates for three of the witnesses three business days later, and has advised Plaintiffs where they have requested depositions of former employees.

b.   After filing their motion for sanctions, in which they seek sanctions for Facebook postponing depositions due to delays in producing documents, Plaintiffs postponed three depositions.  On April 6, 2022, Plaintiffs unilaterally postponed the depositions of Doug Purdy and Monika Bickert, citing Facebook's purported outstanding document production, the

number of depositions scheduled that week, and the number of documents on Facebook's privilege log.  On the same day, Plaintiffs also postponed the deposition of non-party Joseph Chancellor because their preference was to wait for additional documents.

        c.  Facebook has also met-and-conferred extensively with Plaintiffs about a Rule 30(b)(6) deposition.  As part of those efforts (which remain ongoing), Facebook has agreed to 16 hours of Rule 30(b)(6) deposition testimony on at least nine topics and offered deposition dates for multiple 30(b)(6) witnesses in April and the first week of May.

        14. Proceedings before the discovery mediators and the Special Master have been productive in narrowing and deciding disputes, and Facebook's legal arguments have often been successful.

        a.  <u>Zuckerberg Notebooks.</u>  Plaintiffs moved to compel production of the personal, handwritten notebooks of Facebook's founder and CEO, Mark Zuckerberg, from the early days of Facebook over 15 years ago, when Mr. Zuckerberg was 22 years old.  On September 29, 2021, the Special Master ordered Facebook to "locate and collect" any notebooks of Mark Zuckerberg.  Dkt. 745 ¶ 9.  On November 12, 2021, I updated the Special Master (in a JAMS filing) on the status of Facebook's search.  Specifically, I informed the Special Master that, despite extensive efforts, Facebook had not located any notebooks (in full or in part).  I also invited the opportunity to share with the Special Master the comprehensive steps Facebook had already taken in an effort to locate any existing notebooks.  With Plaintiffs' permission, we provided that information to the Special Master on November 23, 2021 in an *ex parte* hearing. In January 2022, after an extensive and diligent search, I notified the Special Master that Facebook was unable to locate any notebooks and provided a description of the extensive steps Facebook and counsel had taken to search for them.  Ex. 37.  At a subsequent discovery

mediation, Plaintiffs tried to revive this issue, and the Special Master told them the issue was resolved.

    b.   <u>Apex Custodians.</u>  On October 21, 2021, the Special Master ordered the parties to "meet and confer and submit a joint proposed protocol for performing a search and collection" of documents from Mark Zuckerberg and Sheryl Sandberg.  Dkt. 753 ¶ 10.  Since the Special Master's order issued, with the Special Master's assistance, my team has continued to work with Plaintiffs to negotiate a set of search terms to be used for the collection.  It is my understanding that Plaintiffs' initial proposed search strings hit on 770,000 documents.  The Special Master then ordered Plaintiffs to identify their top ten search terms.  I understand that Plaintiffs proposed amended search terms in early March 2022.  It is my understanding that Plaintiffs' amended search terms still hit on approximately 410,000 documents.  My team is continuing to work with Plaintiffs and the Special Master to cabin the review to a population that is reasonable and possible.

    c.   <u>Additional custodians and search terms relating to the "Secret Sauce"</u> <u>Memo</u>.  In December 2020, shortly after Facebook began reviewing documents identified through the parties' first round of agreed-upon search terms, Plaintiffs demanded immediate production of a document they had read about in the newspaper, an observational memorandum that Plaintiffs refer to as the "Secret Sauce" Memo.  We met and conferred about the document in January and February of 2021.  Facebook agreed to locate and produce the memorandum if Plaintiffs would agree to defer premature, ad hoc requests for immediate production of documents to provide Facebook the opportunity to review and produce the documents that had been collected.  Plaintiffs never responded and raised the issue months later in an August mediation.  Facebook agreed to produce the memorandum, and produced it in September 2021.

*See* FB-CA-MDL-02014080.  Plaintiffs then demanded that Facebook supplement the production by producing the document electronically, producing associated metadata, and all subsequent versions of the memorandum.  Plaintiffs did not request a meet-and-confer at the time, and my best recollection is that the issue got back-burnered in light of the tremendous volume of briefing, correspondence, and mediation obligations during that time-frame.  Months later, even though we had not discussed the issue with Plaintiffs, the discovery mediators declared impasse.  Plaintiffs moved to compel Facebook to produce all subsequent iterations of the memorandum, all documents reflecting further discussions that informed those iterations, and metadata associated with the memorandum.  Dkt. 827 ¶ 7.  We reached out to Plaintiffs and offered to provide them with what we thought they were seeking: the metadata for the memorandum, all other iterations, any relevant and non-privileged communications to which other iterations of the report are attached, as well as relevant and non-privileged communications relating to the report within the existing review set.  Plaintiffs declined, I believe because they wanted a more onerous search process than what we thought was appropriate under the circumstances.  The Special Master ordered Facebook to do everything it had agreed to do, but he did not order the broad relief Plaintiffs requested regarding new custodians and search terms; instead, he ordered Facebook to make a "good faith effort" to identify any custodians involved with the memo and, if Facebook located any who were not already custodians in the case, conduct a targeted collection of additional documents.  Dkt. 827 at 5.  Facebook produced documents responsive to this Order on February 23, 2022 and April 5, 2022.

15. The following documents are attached as exhibits to my declaration or have been filed under seal (as indicated).

a.   Attached as **Exhibit 1** is a true and correct copy of excerpts of the transcript from the July 13, 2020 videoconference proceedings before Magistrate Judge Corley.

b.   Attached as **Exhibit 2** is a true and correct copy of excerpts of the transcript from the July 31, 2020 videoconference proceedings before Magistrate Judge Corley.

c.   Attached as **Exhibit 3** is a true and correct copy of excerpts of the transcript from the August 14, 2020 videoconference proceedings before Magistrate Judge Corley.

d.   Attached as **Exhibit 4** is a true and correct copy of Facebook's August 21, 2020 Comments to the Federal Trade Commission on Data Portability, which my team retrieved from the FTC's public files.

e.   Attached as **Exhibit 5** is a true and correct copy of excerpts of the transcript from the December 9, 2020 videoconference proceedings before Magistrate Judge Corley.

f.   Attached as **Exhibit 6** is a true and correct copy of excerpts of the transcript from the January 15, 2021 videoconference proceedings before Magistrate Judge Corley.

g.   Attached as **Exhibit 7** is a true and correct copy of excerpts of the transcript from the February 23, 2021 deposition of "KP" (K. Papamiltiadis), Facebook's 30(b)(6) on Facebook's data systems.  This exhibit has been redacted and filed provisionally filed under seal.

h.   Attached as **Exhibit 8** is a true and correct copy of a March 1, 2021 letter my team and I received from Plaintiffs' counsel.  This exhibit has been redacted and filed provisionally filed under seal.

i.   Attached as **Exhibit 9** is a true and correct copy of an April 1, 2021 letter my team and I sent to Plaintiffs' counsel.  This exhibit has been redacted and filed provisionally filed under seal.

j.   Attached as **Exhibit 10** is a true and correct copy of excerpts of the transcript from the April 6, 2021 videoconference proceedings before Magistrate Judge Corley.

k.   Attached as **Exhibit 11** is a true and correct copy of a May 5, 2021 email my team and I sent to Judge Andler, Mr. Daniel Garrie, and Plaintiffs' counsel.

l.   Attached as **Exhibit 12** is a true and correct copy of an email chain ending May 7, 2021, and beginning April 26, 2021, that my team and I exchanged with Judge Andler, Mr. Garrie, and Plaintiffs' counsel.

m.   Attached as **Exhibit 13** is a true and correct copy of excerpts of the transcript from the May 18, 2021 videoconference proceedings before Magistrate Judge Corley.

n.   Attached as **Exhibit 14** is a true and correct copy of an email chain ending June 3, 2021, and beginning April 26, 2021, that my team and I exchanged with Judge Andler, Mr. Garrie, and Plaintiffs' counsel.

o.   Attached as **Exhibit 15** is a true and correct copy of an email chain ending June 14, 2021, and beginning April 26, 2021, that my team and I exchanged with Judge Andler, Mr. Garrie, and Plaintiffs' counsel.

p.   Attached as **Exhibit 16** is a true and correct copy of an email chain ending August 17, 2021, and beginning July 23, 2021, that my team and I exchanged with Judge Andler, Mr. Garrie, and Plaintiffs' counsel.

q.   Attached as **Exhibit 17** is a true and correct copy of an email chain ending August 11, 2021, and beginning June 11, 2021, that my team and I exchanged with Judge Andler, Mr. Garrie, and Plaintiffs' counsel.

r.   Attached as **Exhibit 18** is a true and correct copy of an August 31, 2021 copy of Facebook's Second Requests for Production to Jordan O'Hara.

s.   Attached as **Exhibit 19** is a true and correct copy of an August 31, 2021 copy of Facebook's Third Set of Interrogatories to Jordan O'Hara.

t.   Attached as **Exhibit 20** is a true and correct copy of a September 10, 2021 letter my team and I received from Plaintiffs' counsel.  This exhibit has been redacted and filed provisionally filed under seal.

u.   Attached as **Exhibit 21** is a true and correct copy of an email chain ending September 16, 2021, and beginning September 10, 2021, that my team and I exchanged with Judge Andler, Mr. Garrie, and Plaintiffs' counsel.

v.   Attached as **Exhibit 22** is a true and correct copy of the October 26, 2021 Order Regarding Outstanding ADI Issues.  This exhibit has been redacted and filed provisionally filed under seal.

w.   Attached as **Exhibit 23** is a true and correct copy of excerpts of the November 8, 2021 Order re: Facebook's Motion for Protective Order Against Production of API Call Logs.  This exhibit has been redacted and filed provisionally filed under seal.

x.   Attached as **Exhibit 24** is a true and correct copy of excerpts of the November 29, 2021 Order re: Plaintiffs' Motion to Compel Production of Plaintiff Data.  This exhibit has been redacted and filed provisionally filed under seal.

y.    Attached as **Exhibit 25** is a true and correct copy of excerpts of Facebook's December 10, 2021 Motion for Reconsideration of Special Master's Order Regarding Named Plaintiff Data.  This exhibit has been redacted and filed provisionally filed under seal.

z.    Attached as **Exhibit 26** is a true and correct copy of excerpts of Facebook's December 15, 2021 Motion for Reconsideration of Special Master's Order Regarding Production of ADI Related Documents.  This exhibit has been redacted and filed provisionally filed under seal.

aa.    Attached as **Exhibit 27** is a true and correct copy of the December 17, 2021 Amended Order Re: Plaintiffs' Motion to Compel Production of Plaintiff Data.

bb.    Attached as **Exhibit 28** is an email chain ending January 5, 2022, and beginning December 23, 2021, that my team and I exchanged with Plaintiffs' counsel.

cc.    Attached as **Exhibit 29** is the January 10, 2022 Supplemental Order Regarding Production of ADI Related Documents. This exhibit has been redacted and filed provisionally filed under seal.

dd.    Attached as **Exhibit 30** is Facebook's January 6, 2022 letter (without attachment) to Special Master Garrie (copying Plaintiffs' counsel) in response to the Special Master's Amended Order re: Plaintiffs' Motion to Compel Production of Plaintiff Data.  Exhibit 30 does not include the attachment to Facebook's January 6, 2022 letter because that attachment contains confidential and proprietary information about Facebook's data systems and Facebook's response to Plaintiffs' motion does not rely on any of the information in that attachment.

ee.   Attached as **Exhibit 31** is an email chain ending January 6, 2022, and beginning November 17, 2021, that my team and I exchanged with Judge Andler, Special Master Garrie, and Plaintiffs' counsel.

ff.   Attached as **Exhibit 32** is a copy of the transcript from the January 11, 2022 videoconference proceedings before Magistrate Judge Corley.  This exhibit has been redacted and filed provisionally filed under seal.

gg.   Attached as **Exhibit 33** is an email chain ending January 13, 2022, and beginning January 7, 2022, that my team and I exchanged with Judge Andler, Mr. Garrie, and Plaintiffs' counsel.

hh.   Attached as **Exhibit 34** is an email dated January 18, 2022, that my team and I exchanged with Judge Andler, Special Master Garrie, and Plaintiffs' counsel.

ii.   Attached as **Exhibit 35** is a true and correct copy of excerpts of Facebook's January 19, 2022 Motion for Reconsideration of Supplemental Order Regarding Production of ADI Related Documents.  This exhibit has been redacted and filed provisionally filed under seal.

jj.   Attached as **Exhibit 36** is a true and correct copy of the January 20, 2022 Tentative Amended Supplemental Order Regarding Production of ADI Related Documents. This exhibit has been redacted and filed provisionally filed under seal.

kk.   Attached as **Exhibit 37** is a true and correct copy of a January 27, 2022 letter I sent to Special Master Garrie, copying Plaintiffs' counsel.

ll.   Attached as **Exhibit 38** is a true and correct copy of the January 31, 2022 Amended Supplemental Order Regarding Production of ADI Related Documents.  This exhibit has been redacted and filed provisionally filed under seal.

24

mm. Attached as **Exhibit 39** is a true and correct copy of Plaintiffs' March 1, 2022 Second Amended Notice of Deposition of Defendant Facebook, Inc. Pursuant to Federal Rule of Civil Procedure 30(b)(6).

nn.   Attached as **Exhibit 40** is a true and correct copy the March 3, 2022 Order Regarding Plaintiffs' Motion to Compel Documents Facebook Designated As Privileged.

oo.   Attached as **Exhibit 41** is a true and correct copy of the March 7, 2022 letter and attachments that my team sent to Special Master Garrie.  This exhibit has been redacted and filed provisionally filed under seal.

pp.   Attached as **Exhibit 42** is a true and correct copy of the excerpts of the March 9, 2022 videoconference proceedings before Special Master Garrie.

qq.   Attached as **Exhibit 43** is a true and correct copy of excerpts of the data downloaded from Download Your Information for ████████████.  This exhibit, as indicated above and by the Bates stamps, is a compilation of DYI data produced by Facebook and produced by Plaintiffs.  This exhibit has been provisionally filed under seal.

rr.   Attached as **Exhibit 44** is a true and correct copy of Plaintiffs' initial disclosures, dated December 10, 2019.

ss.   Attached as **Exhibit 45** is a true and correct copy of an email chain excerpt ending November 4, 2021, and beginning October 27, 2021, that my team and I exchanged with Plaintiffs' counsel.

tt.     Attached as **Exhibit 46** is a true and correct copy of a December 13, 2021 letter my team and I sent to Plaintiffs' counsel.

uu.   Attached as **Exhibit 47** is a true and correct copy of an email chain ending December 15, 2021, and beginning December 7, 2021, that my team and I exchanged with Judge Andler, Special Master Garrie, and Plaintiffs' counsel.

vv.   Attached as **Exhibit 48** is a true and correct copy of email messages exchanged through the JAMS messaging portal on February 1, 2022, between Special Master Garrie and my colleague, Martie Kutscher Clark.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 11, 2022 in Los Angeles, California.

_____
Deborah Stein