# Exhibit 1

Pages 1 - 64

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, MAGISTRATE JUDGE

IN RE: FACEBOOK, INC. CONSUMER      )
PRIVACY USER PROFILE LITIGATION.    )   NO. 18-MD-2843 VC (JSC)
                                        San Francisco, California
                                        Monday, July 13, 2020

**TRANSCRIPT OF ZOOM VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        BLEICHMAR FONTI & AULD LLP
        555 12th Street
        Suite 1600
        Oakland, California  94607
  BY: **LESLEY E. WEAVER, ESQ.**
     **ANNE K. DAVIS, ESQ.**
     **MATTHEW MONTGOMERY, ESQ.**

        KELLER RORHBACK, LLP
        1201 Third Avenue
        Suite 3200
        Seattle, Washington  98101
  BY: **DEREK W. LOESER, ESQ.**
     **DAVID J. KO, ESQ.**
     **CARI C. LAUFENBERG, ESQ.**

        GIRARD SHARP LLP
        601 California Street
        Suite 1400
        San Francisco, California  94108
  BY: **ANGELICA M. ORNELAS, ESQ.**

Reported By: **BELLE BALL, CSR 8785, CRR, RDR**
        Official Reporter, U.S. District Court

    (Appearances continued, next page)

**<u>APPEARANCES, CONTINUED</u>:**

For Defendants:

        GIBSON DUNN & CRUTCHER LLP
        200 Park Avenue
        New York, New York  10166
  BY:  **ORIN SNYDER, ESQ.**


        GIBSON DUNN & CRUTCHER LLP
        1881 Page Mill Road
        Palo Alto, California  94304
  BY:  **MARTIE P. KUTSCHER CLARK, ESQ.**

        GIBSON DUNN & CRUTCHER LLP
        2100 McKinney Avenue
        Suite 1100
        Dallas, Texas  75201
  BY:  **RUSSELL H. FALCONER, ESQ.**

        GIBSON DUNN & CRUTCHER LLP
        333 South Grand Avenue
        Los Angeles, CA 90071-3197
  BY:  **DEBORAH L. STEIN, ESQ.**

<u>**Monday - July 13, 2020**</u>                                          **8:32 a.m.**

<u>**P R O C E E D I N G S**</u>

**THE COURT:**  Calling Civil Action 18-2842, In Re Facebook.  Counsel, starting with plaintiff, please state your appearances.

**MR. LOESER:**  Good morning.  It's Derek Loeser for plaintiffs.

**THE COURT:**  Good morning.

**MS. WEAVER:**  Good morning, Your Honor. Leslie Weaver with BFA.  Anne Davis and Angelica Ornelas are with me.

**THE COURT:**  Good morning.

**MR. KO:**  Good morning, Your Honor.  David Ko, Keller Rohrback, also on behalf of plaintiffs.

**MS. LAUFENBERG:**  And good morning, Your Honor. Cari Laufenberg on behalf of plaintiffs.

**THE COURT:**  Good morning.  So, for Facebook?

**MS. STEIN:**  Good morning, Your Honor. I saw Orin Snyder's name up a moment ago, but it looks like he's no longer on this screen.

**THE CLERK:**  I promoted him, and I don't see him.

**MS. STEIN:**  I'm getting text messages saying there is a little bit of a technical error, but I think he'll be on momentarily.

**THE CLERK:**  Okay.

**MS. STEIN:**  Yeah.  He says it says "Waiting."

```
 1        And, this is Deborah Stein for Facebook.  And I'm here
 2   with Martie Kutscher Clark.  And hopefully Orin Snyder will be
 3   here in a moment.  I'm not sure; maybe he should disconnect and
 4   try again.
 5        Do you think that's the best thing, for him to hang up and
 6   try again?
 7             THE CLERK:  Sure.  I mean, as soon as I see his name,
 8   I will promote him to a panelist.
 9             THE COURT:  No apologies needed.
10        (Off-the-Record discussion)
11        (A pause in the proceedings)
12             MR. SNYDER:  (Inaudible)
13             THE COURT:  Can't hear you, Mr. Snyder.
14             MR. SNYDER:  Okay.  I apologize.  My iPad was not
15   allowing me to connect, so now I'm on my iPhone.
16             THE COURT:  We can see you now.
17             MR. SNYDER:  Okay.  Great.  Thank you so much.  I
18   apologize.  I don't know why.
19             THE COURT:  Not a problem.  Not a problem.  Why don't
20   you go ahead and make your appearance; everyone else has.
21             MR. SNYDER:  Okay.  Orin Snyder for defendants, from
22   Gibson Dunn.  Thank Your Honor.
23             THE COURT:  We do have a court reporter this morning,
24   taking down the transcript.
25        All right.  So thank you very much, everyone, for your
```

1   statements.  I thought we should just discuss them, the issues,

2   in the order the parties presented them.

3       First, with respect to plaintiffs' document production.

4   Not really sure, plaintiffs say they're not withholding

5   anything.

6       The only thing I guess that Facebook raised was some

7   potential dispute regarding the production of documents versus,

8   maybe, interrogatories.  But I didn't understand plaintiffs'

9   statement to say that they were refusing to produce those

10  documents.

11      I don't know if anyone from the plaintiffs wants to

12  respond.

13          **MS. WEAVER:**  Angelica Ornelas will be addressing this

14   for us, Your Honor.

15          **MS. ORNELAS:**  Thank Your Honor.

16      So I think what we've tried to do here is explain that we

17  are searching for responsive materials, to the extent that they

18  are in plaintiffs' possession.

19      What we are excluding from the search are materials from

20  the user account and user archive, itself, for a couple of

21  different reasons.  One is as to the offensive ads that

22  Facebook is seeking, it's not clear that that content is

23  located within those sources, to begin with.  There does appear

24  to be identification of advertisers that sent content to the

25  users.  But the ads, themselves, do not appear to be in the

1    were harmed by it.  Right?

2              **MR. LOESER:**  Right.

3              **THE COURT:**  Right?  So that's sort of a chicken and

4    egg.  So to say:  Well, until we know who sent it -- no.  You

5    made allegations in the complaint of some injury, thus far.

6        And they want to know, what is that based upon.

7              **MR. LOESER:**  Right.  I would --

8              **THE COURT:**  Sounds like -- I don't know --

9              **MR. LOESER:**  Yeah, I guess --

10             **THE COURT:**  I don't know if I'd call it a contention

11   interrogatory so much as like:  Identify for us, you alleged

12   X.  Okay, who is -- who did the friend request come from?

13             **MR. LOESER:**  Right.  I guess I would describe it as

14   part of a chicken and an egg.  Because they've focused on this

15   one aspect of the case which is, you know, ads that people

16   received that they found offensive.

17       But the heart of the case is they took information, user

18   data, and they shared it with third parties.  That then led to

19   a variety of things.  One of those things was ads that people

20   found offensive.

21       But the basis of the case is that they took data, and they

22   shared it without consent.

23       But I hear what you are saying.

24             **THE COURT:**  Well, that's your argument to Judge

25   Chhabria.  And I get it.

 1          For example, let's assume hypothetically in 2012 there was

 2     some app that did something that the investigation uncovered.

 3     We then, as part of our investigative protocol, communicated

 4     with that app.  Call it App X.  We wrote them a letter.  That

 5     letter will be produced  and they will then have the name of

 6     that app.  And any communications with that app.

 7          In one or two instances, only, we actually -- I think one,

 8     maybe, we filed a lawsuit against a company.  That is all

 9     public.

10          After they review those documents, we can take -- we can

11     then meet and confer, and there can be a live dispute.  Right

12     now, there is no live dispute other than they say they want

13     everything.  And they are focusing on a Massachusetts Superior

14     Court ruling.  And as we told the Court -- which -- which --

15     which was a motion to compel by the Massachusetts Attorney

16     General regarding a completely different -- substantially

17     different document requests than plaintiffs.

18          We objected to that request in Massachusetts because, as

19     framed, it did invade attorney/client privilege, work product,

20     and the like.  The Superior Court ruled against us.

21          But Facebook took that up to the Supreme Judicial Court in

22     Massachusetts, and they granted the extraordinary review of the

23     Superior Court's work product determination.  That is in

24     litigation.  And so nothing that's happening in Massachusetts

25     should either bind or control here.

1      This is not right.  When they get the tens of thousands of

2   documents they will see that there are -- I'm making it up --

3   ten, 20, 30, 40, 50 different apps -- maybe more, I don't know

4   the number -- maybe Martie does -- with which we communicated

5   as a result of our investigation.  They'll know the names of

6   those apps.  They can then follow up and ask questions about

7   those apps.  We're going to turn over all those documents.

8      What we're not turning over is our law firm's files, and

9   our communications with our client that were all pursuant to

10  this privileged investigation.

11          **THE COURT:**  When is that production going to be

12   complete?

13          **MR. SNYDER:**  Martie?

14          **MS. KUTSCHER CLARK:**  So we made a production on

15   Wednesday that included about 10,000 additional pages of

16   materials with the third parties.  We're continuing to review

17   them.  The volume is extraordinarily high, because it includes

18   every communication with apps about this investigation.

19      I think it would probably take us another several weeks to

20  work through the rest of the documents.  I think it's in the

21  range of tens of thousands of additional documents to review.

22  And we're actively working on that.

23      But again, these include every letter that went to an app

24  saying they were suspended, and why.  So once the production is

25  complete, plaintiffs will have the ability to identify any apps

1   that were suspended for reasons they're concerned about, or

2   that are actually relevant to the case.

3        And as Mr. Snyder said, then they could request additional

4   information about those apps, and we'd have something narrower

5   and more tailored that we can focus on.

6        **MR. KO:**  Your Honor, this is David --

7        **MR. SNYDER:**  Let me make one more point, Your Honor,

8    because -- so there's nothing -- there's no sort of nefarious

9    suggestion.

10       As it turns out, the vast majority of apps that were

11  suspended were suspended because we wrote them, saying:  "Dear

12  Mr. or Mrs. App, we have these questions for you," and they

13  never wrote back.  Probably out of business, or didn't care.

14       We then suspended them for non-compliance with our

15  platform rules because they simply ignored our initial inquiry.

16       So I think a high majority, if not in the nineties, high

17  nineties of the so-called suspended apps (Indicating quotation

18  marks) are just apps about which we had questions and followup.

19       And then they never wrote back to us, and we said "You're

20  suspended because you're a scofflaw, you didn't respond to us."

21       **MR. KO:**  This is David Ko on behalf of plaintiffs.

22  May I respond?

23       **THE COURT:**  Yes.

24       **MR. KO:**  So I'm a bit surprised, first of all, that

25   Mr. Snyder says this issue is premature.  We have been going

1    back and forth on this.

2        And as you know, in last hearing, you did direct Facebook

3    to try and get to a final position on this issue so that we

4    could actually brief it.  We thought we came to some sort of

5    final position, as you can tell from what Mr. Snyder is saying.

6    He refuses to actually have a final position on this.

7        And on the communications in particular that they are

8    claiming they will produce to suggest that we should narrow our

9    subsequently -- subsequently narrow our request, that doesn't

10   make sense to us for a variety of reasons.  Including, most

11   notably, the fact what they are offering to produce here are

12   internal communications with third parties.  That has nothing

13   to do and has no bearing on the relevance of the internal

14   documents and communications that we are entitled to.

15       I understand what Mr. Snyder is saying, that there is a

16   certain degree of those communications that could be

17   privileged.  But it is inconceivable that all of them are.  And

18   all you have to do is take one look at the statement that we

19   attached or the exhibit that we attached to our statement that

20   shows their publicly-available announcement about this ADI in

21   which they claim -- Facebook claims -- that this is something

22   that involved hundreds of people.  Not just attorneys.  Right?

23       They don't say it's an employer-driven investigation.

24   They say this involved external investigators.  They say it

25   involved policy groups at Facebook.  They say it involved

1    engineers, hundreds of people that were involved in this

2    investigation.  Platform operations folks.  Developer

3    operations.

4        This resulted -- this investigation -- which is ongoing,

5    by the way -- has resulted in thousands, tens of thousands of

6    apps being suspended.

7        So even if Mr. Snyder is correct in saying that the vast

8    majority of them relate to some sort of investigation in which

9    third parties did not respond, you still have a substantial

10   amount of third parties that are potentially in violation of

11   Facebook's (Inaudible).

12       So --

13           MR. SNYDER:  And -- and plaintiffs will get the names

14   of any -- plaintiffs will get any communications that we had

15   with any third-party app which puts them on notice of either a

16   perceived, suspected or actual violation.  They will have,

17   chapter and verse, the names, serial numbers, addresses of

18   those apps.

19           MR. KO:  Yeah.

20           MR. SNYDER:  And the fact is, yes -- the fact is this

21   was a large investigation, because the company committed to

22   conduct a retrospective investigation to see if there was a,

23   quote, "another Cambridge Analytica out there," close quote.

24   Turns out there wasn't.

25       Having said that, it takes a lot of engineers and a lot of

1    people at the company, and a lot of lawyers, I might say.  It

2    wasn't just Mr. Southwell.  We had a big team of lawyers

3    working with a big team at Facebook to look prior to 2015 at

4    every single third-party app to determine which ones complied,

5    and which ones didn't.

6         And the plaintiffs are going to have a cornucopia of

7    information about third-party apps.  And I just would

8    respectfully suggest that they be a little patient.

9         As Martie said, we're going to complete the production.

10   And I assume they'll have a lot of questions to ask about those

11   apps, and a lot of work to do to follow up.  And we will follow

12   up with respect to any third-party communications with those

13   apps.

14        So --

15        **MR. KO:**  The fundamental disconnect is, so,

16    Mr. Snyder is basically suggesting that we just received this

17    information, right, about external communications that they

18    had with third parties, and a potential list of these apps.

19        We are entitled to much more.  This is discovery related

20   to our case that is fundamentally about Facebook allowing

21   third-party app developers to misuse and abuse it.  Information

22   of user content information.

23        External communications with third party developers is one

24   tranche of that.  Right?  Internal documents and communications

25   related to their analysis from non-attorneys that are not

1  privileged are obviously relevant and responsive to our

2  requests regarding their enforcement policies.  And so that's

3  what we're asking.

4       And that's what the disconnect is here, Your Honor.

5            **THE COURT:**  So is it Facebook's position that, for

6  example, any communications among engineers that didn't

7  involve attorneys, because they all come under the umbrella of

8  this lawyer-directed investigation, they're privileged?

9            **MR. SNYDER:**  Your Honor, the engineers were all

10 working.  There were internal legal teams, external legal

11 teams.  And everything that was done within the rubric of this

12 investigation is at the direction of counsel.

13      Let me make another point though, Your Honor, just to be

14 clear --

15           **THE COURT:**  So that's --

16           **MR. SNYDER:**  Yes.  Yes.

17           **THE COURT:**  I just want know if that's a yes.

18           **MR. SNYDER:**  Yes, yes.

19           **THE COURT:**  All right.  So --

20           **MR. SNYDER:**  But Your Honor, here's what plaintiffs

21 have failed to mention.

22      This so-called "ADI," which is really an internal legal

23 investigation, is separate and apart from Facebook's normal and

24 regular enforcement activities.

25      Facebook has an enforcement team.  And all it does is

1   enforce the rules and regulations and policies on the platform.

2   That enforcement team works with engineers on a regular basis,

3   and -- and is not done at the -- in the ordinary course, under

4   the direction of counsel.

5       And we have produced and will produce numerous documents,

6   because plaintiffs have asked for them, concerning our ordinary

7   enforcement activities which do involve engineers and policy

8   people.  And that stands in sharp contrast to the legal

9   investigation that my firm conducted.

10      And so -- and Martie, I don't know what the volume of

11  those documents are, but they are fairly voluminous.

12          **THE COURT:**  Okay.  But what I guess I don't

13  understand, at some point you're going to have to produce a

14  privilege log.  Because just because you say they're

15  privileged doesn't mean that the plaintiffs have to accept

16  that.

17      So I'm trying -- so when -- when do you intend to do that?

18          **MS. KUTSCHER CLARK:**  If I could respond briefly,

19  because I think there's a little bit of a misunderstanding

20  here.

21      The concern we're having at the moment is the requests

22  we're receiving from plaintiffs keeps changing.  When we came

23  before the Court last time, we were under the impression that

24  the plaintiffs were seeking the materials that the

25  Massachusetts AG'd requested.  So we went back and we talked to

1   the plaintiffs about our position as to those materials.

2        During that discussion, the plaintiffs told us for the

3   first time -- or at least we understood for the first time --

4   that they are seeking every single document from the

5   investigation, about the investigation, related to the

6   investigation.  That's a really different request, and it's

7   extraordinarily broad.

8        And our position with respect to privilege and whether and

9   to what extent we could prepare a privilege log is very

10  difficult to analyze when we're talking about every single

11  document.  It would be a privilege log with millions and

12  millions of entries.  So what we're suggesting right now is

13  that we finish producing the letters that show who was

14  suspended, and why, so that the plaintiffs can make a more

15  tailored request.

16       And at that point, we're not necessarily objecting to

17  producing any of the underlying information.  So for instance,

18  what we understand the plaintiffs ultimately want is underlying

19  data showing platform violations, or showing what an app did

20  with users' data.

21       To the extent that we can uncover that underlying data,

22  we're not objecting to digging up that data and providing it to

23  plaintiffs so that they can do their own analysis.  What we're

24  objecting to doing is taking our attorney files and the work

25  that our attorneys and attorney-led team did to look at that

data, and analyze it, and make decisions about that data, and

simply handing it over to the plaintiffs.

      **MR. LOESER:**  Your Honor, if I may, just briefly.

Because again, I think your question went right to the heart

of the matter.

      If we have two engineers talking about Facebook's data

policies in connection and then fallout from Cambridge

Analytica, can that possibly be privileged.  And I think the

reason why we feel like this controversy is ready to be

briefed, the parties are taking positions that are directly

contrary on a large body of information that we believe is

directly relevant.

      If you go to the exhibit we provided, which is Facebook's

public announcement of the ADI investigation, this does not say

Gibson Dunn lawyers are conducting an internal investigation

for the purpose of legal advice.

      And I'll just read what it says, because I think it should

give a pretty good idea --

      **THE COURT:**  No, I understand.  But you're not

seeking, are you, like, memos among Gibson Dunn attorneys.

      **MR. LOESER:**  No.  No.  We are not seeking privileged

information.  We're seeking --

      **THE COURT:**  Okay.

      **MR. LOESER:**  Yeah.  We want the information -- like,

for example, one of the categories of people involved, from

1  their announcement, they say:  Among the people involved in

2  this are policy specialists.

3      They say (As read):

4          "We promised that we would review all of the apps

5          that had access to large amounts of information

6          before we changed our platform policies in 2014.  It

7          has involved hundreds of people: attorneys, external

8          investigators, data scientists, engineers, policy

9          specialists, platform partners and other teams across

10          the country."

11      And the next line is really critical for this.

12          "Our review helps us to better understand patterns of

13          abuse in order to root out bad actors among

14          developers."

15      That is a business activity, and it is a critical business

16  activity for this case.  We are not interested in the legal

17  advice and the legal communications.  We want the business

18  activity information that would be produced because it's

19  directly relevant and responsive.  If they want to withhold it,

20  they need to log it.  But it's certainly not going to be

21  privileged.

22          **MR. SNYDER:**  Well, we strongly, respectfully

23  disagree, because my law firm was involved in every decision.

24          **THE COURT:**  Okay, but we're not going to adjudicate

25  that now.

1      **MR. SNYDER:**  Right.

2      **THE COURT:**  The question, though, because it's not --

3   so they're not seeking the stuff that's clearly privileged, so

4   you don't have to worry about that.  And I don't even think

5   that ever really even needs to be logged, because that would

6   be a waste of time.

7      But with respect to the other stuff, there's arguments

8   there.  Both ways.  Privilege is not clear, and there's

9   arguments both ways.

10      And so the question is then, how, how -- I certainly --

11   it's not -- I can't adjudicate that right now, like just

12   generally out there.  It has to be done in context.  Right?

13      So maybe the thing to do -- I do, I have to say, I just

14   think, Mr. Loeser, I understand, but we're not in a great rush,

15   you noticed, so -- is start reviewing those documents, and then

16   see -- we can take a subset.  Because the way I'm going to be

17   able to adjudicate this is take some exemplars, and rule, and

18   then the parties then can use that and apply it.  Right?  You

19   don't need the log of every single document.

20      So maybe what you do is you take a particular app, or you

21   get some names or something, right, and we focus on that

22   subset, and I adjudicate that.  That's not going to resolve the

23   privilege for everything, but it will be a roadmap that the

24   parties can then apply.  But I think we are going to need a

25   certain set -- I want it to be in context of a particular

1    document.  So the question is:  How do we get there.

2        And I don't think we necessarily need to wait until all

3    the production is done.  I don't think that is the case.  The

4    parties should get together and decide on, you know -- I don't

5    know what it is that the plaintiffs think necessarily are

6    there.  Maybe Facebook can come up with -- I don't know -- a

7    hundred documents that you're going to log.

8        MR. SNYDER:  We can also be helpful, Your Honor.

9    And, and -- because the vast majority -- I think it's

10   99 percent, but that's just from what my partner, you know,

11   has allowed to.

12       Since the vast majority are people we wrote to and

13   suspended because they didn't write back to us, you know, maybe

14   we can highlight a couple of ones where we had further

15   activity, they wrote back to us, we engage with them.

16       And then we can go behind the curtain, so to speak, on

17   your exemplar idea, and we can take a look at what our work

18   product and attorney/client activity was behind the contain,

19   look at what engineers were doing, and then figure out how to

20   tee up a privilege exemplar for handful of apps.

21       THE COURT:  Well, and for example, Mr. Loeser brought

22   up like policy (audio interference), things like that.  That's

23   not going to be particular to an app.

24       But maybe plaintiffs can point out, you know, because

25   what's --

1          **MR. LOESER:**  Your Honor, you're breaking up on us.

2     (Off-the-Record discussion)

3     (A pause in the proceedings)

4          **THE COURT:**  I'm back.

5          **MR. LOESER:**  We lost you right when you started

6    talking about policy specialists.

7          **THE COURT:**  I came to the courthouse so I'd have good

8    internet.  I got the Court give me an upgraded laptop, and

9    it's, like, worse than ever.  I'm actually at the courthouse,

10   where there's very few people here.

11         In any event.  So, you know, I think, you know,

12   plaintiffs -- maybe starting with this -- identify some

13   documents that you think that you would be entitled to.  Like

14   discussions among the policymakers that Facebook was referring

15   to.

16         Facebook then, you know, look at them, and just say: Oh,

17   no, yeah, I can produce those now.

18         But I think we're just going to have to do it sort of in

19   tranches.  But I agree with the plaintiffs, I don't think we

20   need to wait until the end because I don't think it is

21   necessarily specific to particular apps.

22         I think this suggests there's broader things going on that

23   would be relevant, and that may very well not be privileged.

24   But I don't think there's anything right now.  I --

25         **MR. SNYDER:**  The reason that makes sense, Your Honor,

1    is that, you know, without reviewing attorney/client

2    privileges, we did have an internal protocol for this internal

3    investigation.  Sort of an escalation protocol.  And so things

4    did follow a particular prescribed course in the investigation

5    of an app.  And it was a massive undertaking, because the

6    company had to literally evaluate every app prior to 2015.

7    And so there is an established protocol that governs

8    escalation of these app investigations.  And policy was

9    involved in some of those.

10       But I think we -- we can work with plaintiffs, I think,

11   and identify our own protocol for how to frame the privilege

12   inquiry, and then key it up for Your Honor when it's ripe.

13       **MR. LOESER:**  Well, Your Honor, for the exemplar

14   approach to work, it would need to be -- let's take policy

15   specialists, for example.  We would say:  Look, we want -- and

16   I don't know if there's a way for us to connect it to some

17   particular app or not; it depends on what other discovery we

18   got.  But we want all the conversations and discussions that

19   relate to -- in which policy specialists were involved.

20       For the exemplar to work, Facebook would then need to

21   provide that, or produce a log that identifies everything that

22   they're not providing.  It can't be some cherrypicked set of a

23   couple of documents here and there that try to somehow prove

24   the point that Orin's trying to make.  It needs to provide the

25   parties with the full ambit of the information, so that we can

1   then meaningfully brief the dispute.

2            **THE COURT:** So of the --

3            **MS. STEIN:** It sounds like we have our work cut out

4   for us on a meet-and-confer, Your Honor. I mean, this is one

5   of the issues that we've been trying to focus plaintiffs on,

6   which is the over-breadth of the request. And we've been

7   trying to discuss: What do you actually want?

8       And so I think this will help give us some structure for a

9   meet-and-confer process, so that we can get a better sense as

10  to what plaintiffs are looking for.

11           **THE COURT:** Well, they actually do want everything.

12  They do want everything.

13           **MR. SNYDER:** Yes.

14           **THE COURT:** They recognize there are certain things

15  that they can't get, because of privilege. But the thing is

16  that there's a fine line in these types of things, what is

17  privileged and what's not privileged. And so, yeah. So what

18  they want is everything. That is true. But they recognize

19  there's some things they can't get.

20      But maybe it's to take it off in chunks. Maybe, you know,

21  start with the policy stuff. But that's going to take some

22  work, then, reviewing it, saying: Well, maybe we can't really

23  defend privilege here.

24      Or if you're going to log it all, then log it all, and

25  we'll make a decision. I think you probably can approach it

1    that way.

2              **MR. KO:**  Your Honor, David Ko --

3              **MR. SNYDER:**  Yeah, the problem --

4              **MR. KO:**  Just one -- one more point to make in

5     response to what both Mr. Snyder and Mr. Stein have been

6     saying.

7         So, the exemplar approach and the sample documents.

8    Again, all that they are offering to produce to us are external

9    communications and (audio interference) with third parties.

10        As Mr. Loeser was indicating, there are a whole swath of

11   documents related to internal documents and communications

12   regarding their analysis, right, that may not have escalated to

13   the point of notifying a third party regarding this escalation

14   protocol that Mr. Snyder alludes to.  Right?

15        And so there are a wide range of categories of documents

16   that we are entitled to, based on our discovery requests.

17             **THE COURT:**  No, Mr. Ko, I understand.  I'm not

18    limiting it.  What I'm saying is, there's no way I can resolve

19    this, just on a general thing.  It has to be specific.  Some

20    things may be privileged, and some things not.

21        I'm trying to figure out -- if there are millions of

22   things, I'm just saying let's just take it in pieces.

23             **MR. KO:**  Sure.

24             **THE COURT:**  So start with what you want, most

25    important, what you think is the most yield, or what you think

```
 1    would be the best exemplar for me to rule on.  What area.
 2    Like --
 3              MR. KO:  Yeah, and here's an example of --
 4              THE COURT:  Not waiving your right to get everything
 5    else.
 6              MR. KO:  Sure.  And I understand that, Your Honor.
 7         And here is an example for why this issue is, to a certain
 8    extent, ripe.  You know, in addition to the policy specialists
 9    that Mr. Loeser alluded to, the app -- the ADI very clearly
10    involved external investigators.  So there are documents that,
11    by their own very nature, they've presumably waived the
12    privilege.
13         So communications --
14              THE COURT:  Well, that's -- I don't accept that
15    statement, at all.  That is way too simplistic.
16              MR. SNYDER:  Our law firm --
17              THE COURT:  Uh-uh, I don't need to do that.  That is
18    not a correct statement of the law, Mr. Ko, that just because
19    an external -- if the external investigator was hired by
20    Gibson & Dunn, it may very well be privileged.
21         So anyway --
22              MR. KO:  That's fair, you are absolutely correct.
23    All I'm saying is, in response to that statement, they're
24    identifying a categorical privilege and assertion over all
25    these documents, excluding this narrow category of documents
```

1    that they claim they're going to produce regarding

2    communications with third-party app developers.  So it kind of

3    runs both ways is all I'm saying, Your Honor.

4            MS. WEAVER:  Your Honor, if I may, I think we heard

5    an offer from Mr. Snyder that we had not previously heard.

6    And we actually started this discussion months ago by asking

7    about the escalation process.  So, if we got a deadline for

8    Facebook to send to us the documents sufficient to describe

9    the escalation process, we might be able to identify

10   categories.

11       We're a little constrained, because we don't know, really,

12   what to ask for.  We would only be working off experience in

13   other cases about how investigations were run, and we know that

14   Facebook is really specialized.  So we don't have a lot of

15   insight, really, into how it was run.  Certainly prior to, you

16   know, 2018.  We know about their communications with third

17   parties because we've seen them, both in the public domain and

18   documents that we've received here.

19       But I think getting a description from Facebook about:

20   These are the teams, this is who did what, something like that

21   by a certain date within a reasonable amount of time, then we

22   can dig in and make a proposal about:  These are the test

23   categories we want.  If that's the direction Your Honor wants

24   to go in.

25            MR. SNYDER:  Your Honor, that is all privileged,

```
 1    which is why I say, without waiving privilege, I was simply

 2    saying that we can't -- we had engineers, we had outside

 3    consultants, we had lawyers, we had policy people all working

 4    together to investigate every app on the platform prior to

 5    2015.

 6        And you know, if we meet and confer and they asked us

 7    about those consultants, I would say Gibson Dunn hired them.

 8    And they all were Covelled (phonetic), and they're all working

 9    within -- at the direction of counsel.  But --

10        MS. WEAVER:  Well, if I may, this is where we begin

11    to get confused.  Because if they are categorically saying

12    everything is privileged, then maybe we should brief that.

13    That can't be right.

14        So I don't know what we have to do to --

15        THE COURT:  I agree.

16        MS. WEAVER:  Yeah.

17        THE COURT:  I doubt that that's correct.  But a lot

18    of it may be, and a lot of it may not.  So to brief it gets us

19    nowhere, unless we do it in context.  That's all.

20        MS. WEAVER:  So how can we develop an understanding?

21    As plaintiffs, to understand how these things are reviewed,

22    I'm a bit stymied.

23        THE COURT:  Well, I think we start with something.

24    Like, we start with something.

25        MR. SNYDER:  I think the judge had a great idea.
```

1          **THE COURT:**  Focus on something.  They produce a log,

2     and then, and then we -- we -- we -- I rule on that.  Right?

3     So we start with --

4          **MS. WEAVER:**  But I'm concerned, Your Honor, that

5     they'll cherry-pick only privileges communications between

6     lawyers and --

7          **MR. SNYDER:**  No.  No, we have an obligation --

8          **MS. WEAVER:**  -- get to the heart of the issue --

9          **MR. SNYDER:**  We have an ob- --

10       (Reporter interruption)

11         **MR. SNYDER:**  Your Honor --

12         **MS. WEAVER:**  My apologies.

13         **THE COURT:**  So this is what you do.  You start

14    with -- ask for communications among policy people, that no

15    lawyers were on.  Just start with that.  You ask for that.

16    Right?

17         **MR. SNYDER:**  Or another --

18         **THE COURT:**  Or ask for communications among the

19    external investigators, which no lawyers were on.

20       In other words, that's, right, going to be your Backs

21    (phonetic) case.  So start by asking for those.

22         **MR. SNYDER:**  I thought, Judge, you had an excellent

23    idea.  Let's say there's App X that we had correspondence

24    with, and it's in those 16,000 pages.  And we have back and

25    forth with an app about some platform violation.

1      They can then ask us with respect to that particular app

2  and -- and engagement with that app, what is behind the

3  curtain?  You know, who else communicated at Facebook before

4  you sent that?  And we can look at those documents, and

5  determine what's privileged and what's not.

6      And if we make a categorical privilege claim with respect

7  to everything so-called "behind the curtain," that could be

8  teed up for Your Honor because that would be illustrative of an

9  approach to a particular app enforcement that grows out of the

10  legal investigation.

11      **MR. LOESER:**  And Your Honor, I think, again, for this

12  to work -- and this is Derek Loeser speaking -- we will come

13  up with a couple categories that we will choose.

14      They may not be the categories that Mr. Snyder would like

15  us to choose, but they will be the categories that we think

16  will show as best we can, when we don't have the information

17  when we are making the choices, why there is a problem with the

18  approach that they're taking.

19      **MR. SNYDER:**  And I just want to warn everyone or

20  caution everyone, this was a massive investigation because the

21  CEO committed to Congress and the public that he was going to

22  direct this investigation.

23      So if you ask, just as a caution -- narrate, no -- for

24  every communication between consultants and among consultants,

25  that will be probably tens of millions of communications.

1    Because every time we told a consultant to do something with

2    respect to an app, and it was always a legal direction, the --

3    the consultants didn't direct the investigation, I imagine that

4    the consultants then went off into consultant-land and

5    exchanged 10 million emails before they came back with the work

6    product, brought it to counsel, and then a decision was made.

7          So the volume here is -- we should look at the volume.  My

8    guess is we're talking about many tens of millions of

9    documents.

10         **MR. LOESER:**  Well, Your Honor, we haven't received

11    many millions of anything.  But I think a lot of what

12    Mr. Snyder just said sort of highlights the problems and the

13    reasons why I think this will result in briefing.

14         For one, maybe we'll start as a category the

15    communications between the CEO and the data policy people.  And

16    this is -- I mean, everything you'll read about this from their

17    public statements, this is a very public activity that Facebook

18    has done.  And it's very important, clearly, to get this

19    information about this investigation to its users.  That's why

20    they keep posting about it.

21         We can come up with some categories that we think will

22    make clear to the Court what the problem is and where the

23    limits of privilege are.

24         As you've, I think, rightly noted, we do not want access

25    to and understand that we don't get access to privileged

1   communications.  But there's a lot here that's not privileged.

2   And we know that because of the public things that Facebook has

3   said, including what the CEO has said.

4        And we'll figure out some categories that try and bring

5   this into focus for the Court.

6            **THE COURT:**  I think that's the way to do it.  And I

7    guess on Wednesday, you did get some -- about 10,000 pages,

8    and you can look at that and see if that helps.

9        But I do want to -- I don't think necessarily we should

10  wait to adjudicate it, but I do want to adjudicate it in a

11  context.  And it'll be just one small piece, and that then

12  will, I think -- I've found, at least, that'll help with the

13  other, the other side.  Okay, so that will be on your agenda to

14  discuss.

15       Okay.  I do have a settlement at 9:30 so we have to -- I'm

16  going to be late for.

17       Let's see.  Oh, the search terms.  So the stipulation that

18  the parties signed said that Facebook was going to provide

19  search terms for a broad spectrum of custodians.

20       So tell me how Facebook has come up with that broad

21  spectrum of custodians that they will provide on July 21st.

22           **MS. KUTSCHER CLARK:**  Sure, Your Honor.  And, I think

23   the issue that was raised in the statement was a bit of a

24   misunderstanding.  So I think we can resolve that easily.

25       The search term protocol provides a deadline to propose

search terms for each custodian.  We divided the custodians
into eight groups.  And what we said is we would propose a
comprehensive set of search terms by the 21st.  But the
deadline to propose search terms for the first four groups is
also the 21st, with future deadlines for other groups.

The way we understood that is we'll be providing a
comprehensive set of search terms that will apply broadly next
week, but we're not proposing any terms that are specific to
custodians we have not yet interviewed, until the deadlines for
those custodians.

So the idea is there will be a comprehensive set of terms
for the first four groups that will include terms that are
specific to the custodians within those groups.  So we talk to
those people, we learn jargon, we learned code names.  We'll
include that sort of information.  To the extent groups of
custodians were not interviewed, we're not going to have
specific terms for those people yet because we're still talking
to them.

**THE COURT:**  But they will be included in the broader
search terms.

**MS. KUTSCHER CLARK:**  I'm sorry; I just didn't
understand some of --

**THE COURT:**  Sorry.  But what you're saying is --
but -- but is the broader search terms will apply to them.
You just won't have the specific search terms.

1         **MS. KUTSCHER CLARK:**  Yes, exactly.

2       And the one thing I do want to clarify, just to make sure

3    we're all on the same page, is there is one RFP, a single RFP

4    that is not covered by the first four groups of custodians.

5       So because we will not yet have spoken to any of the

6    custodians about the issues with that RFP, we did not intend to

7    propose a comprehensive set of search terms for that one

8    specific RFP.  But otherwise, they will all be covered, in

9    addition to the specific terms for the first four groups.

10        **MS. WEAVER:**  Which RFP is that?

11        **MS. KUTSCHER CLARK:**  Don't hold me to this; off the

12   top of my head, I think it's 22.  But I would need to look

13   again at my notes.

14        **MS. WEAVER:**  Okay.  This is the first we're learning

15   of it.  But we're fine with that, Your Honor.  The statement

16   did read as though they were limiting it to 41.  We

17   understand, and I think you will understand the point.

18        **MS. KUTSCHER CLARK:**  Yeah.  I think it was just a

19   misunderstanding.  We're happy to talk more about it.

20        **THE COURT:**  Okay, great.  What else should we talk

21   about?

22        **MS. WEAVER:**  Your Honor, very briefly, just

23   43(b)(2)(C), I think you've seen kind of an example of the

24   crossing of ships in the night.

25      For example, you know, with regard to ADI, it has been

very hard for us to get our arms around what Facebook is
withholding.  And we, for example, have told Facebook that we
will tell them if we are withholding anything, any categories
of documents that are responsive.  And things got a little
flipped around.

I think we originally framed it as:  Let us know if you
categorically object to any RFP.  And they -- initially they
said yes, then they said -- the final response was only 19,
which is ADI.

But then when we dug in, and we started meeting and
conferring, it became unclear to us whether Facebook is taking
a position with regard to certain categories of documents that
are responsive.  Meaning we're not objecting categorically to
an RFP, but are they withholding some small subset that is
responsive that they haven't identified to us because they're
saying no, that's not relevant?  And the whole point of
34(b)(2)(C) is to make that transparent, so the parties can
engage.

And, and this is what we understand now, Facebook is
saying: Well, for search term documents, we're not ready yet.
And we understand that, and we will wait.

But we want to know now for categories of RFPs where
search terms are not required, has Facebook decided that there
are responsive materials which are not relevant?  And we heard
some of it today.  Some of it came out in their statement.  But

1    that's the conversation that we want to have.  And we think

2    we're entitled to that.

3             **MR. SNYDER:**  Your Honor, just briefly, they raised

4    the same issue with Judge Chhabria with regard to our FTC

5    production.  And Judge Chhabria ruled, clearly consistent with

6    the federal rules, that defendants, like all parties, are

7    presumed to conduct their relevance review in good faith and

8    are not required to make such disclosures which are not

9    required.  That is to say, there's no requirement that we

10   identify irrelevant documents in advance.

11       We are going to.  We've produced 1,200,000 pages of

12   documents, including, I think, 40- or 60,000 that are internal

13   Facebook documents, already.  We will continue to produce

14   responsive relevant documents.  The rules require that.  We've

15   done it.  And we don't have an obligation to say what is

16   irrelevant and not being produced.  That's just backwards.

17   It's been rejected by Judge Chhabria.  And really, we think,

18   you know, it makes no sense whatsoever.

19             **MS. WEAVER:**  Well, we don't see -- go ahead.

20             **THE COURT:**  I guess what -- for example, something

21   that's been produced are documents that were produced to the

22   FTC.  Right?

23       And so --

24             **MR. SNYDER:**  Yes.

25             **THE COURT:**  -- one question is:  Did you withhold

### CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Belle Ball*

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Tuesday, July 14, 2020