# Exhibit 3

Pages 1 - 22

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Magistrate Judge

IN RE FACEBOOK, INC. CONSUMER   )
PRIVACY USER PROFILE            )
LITIGATION.                     )   **NO. 18-MD-02843 VC (JSC)**
_____ )

San Francisco, California
Friday, August 14, 2020

**TRANSCRIPT OF REMOTE VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:

        KELLER ROHRBACK LLP
        1201 Third Avenue, Suite 3200
        Seattle, Washington  98101
   BY:  **DEREK W. LOESER, ATTORNEY AT LAW**
       **DAVID J. KO, ATTORNEY AT LAW**


        BLEICHMAR, FONTI & AULD LLP
        555 - 12th Street, Suite 1600
        Oakland, California  94607
   BY:  **LESLEY E. WEAVER, ATTORNEY AT LAW**
       **ANNE K. DAVIS, ATTORNEY AT LAW**
       **ANGELICA M. ORNELAS, ATTORNEY AT LAW**
       **MATTHEW P. MONTGOMERY, ATTORNEY AT LAW**

For Defendants:

        GIBSON, DUNN & CRUTCHER LLP
        200 Park Avenue
        New York, New York  10166-0193
   BY:  **ORIN SNYDER, ATTORNEY AT LAW**


    **(APPEARANCES VIA ZOOM CONTINUED ON FOLLOWING PAGE)**


Reported Remotely By:  Ana M. Dub, RDR, CRR, CCRR, CRG, CCG
                  Official Reporter, CSR No. 7445

```
1   APPEARANCES VIA ZOOM:   (CONTINUED)

2   For Defendants:
                              GIBSON, DUNN & CRUTCHER LLP
3                             Trammell Crow Center
                              2001 Ross Avenue, Suite 2100
4                             Dallas, Texas 75201
                    BY:   RUSSELL H. FALCONER, ATTORNEY AT LAW
5
                              GIBSON, DUNN & CRUTCHER LLP
6                             333 S. Grand Avenue
                              Los Angeles, California 90071
7                   BY:   DEBORAH L. STEIN, ATTORNEY AT LAW

8                             GIBSON,  DUNN & CRUTCHER LLP
                              1881 Page Mill Road
9                             Palo Alto, California 94304
                    BY:   MARTIE KUTSCHER CLARK, ATTORNEY AT LAW
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| **Friday - August 14, 2020** | **8:27 a.m.** |

**P R O C E E D I N G S**

---o0o---

**THE CLERK:**  We're a minute early, but court is now in session.  Let's see.  Calling Civil Action 18-MD-2843, In Re Facebook, Inc. Consumer Privacy User Profile Litigation.

Counsel, starting with plaintiff, can you please state your appearance.

**MS. WEAVER:**  Sure.  This is Lesley Weaver of Blakemar Fonti & Auld.  With me is Anne Davis and Angelica Ornelas.

And I see that Matt Montgomery actually is not -- he should be with us.  So he should probably be elevated.  I apologize.  I missed him before.  Don't tell him.

**MR. LOESER:**  Good morning.  You have Derek Loeser from Keller Rohrback.

**THE COURT:**  Good morning.

**MR. KO:**  Good morning, Your Honor.  Nice to see you again.  David Ko, Keller Rohrback, also on behalf of plaintiffs.

**THE COURT:**  Good morning.

And here comes Mr. Montgomery.  He's here.

All right.  And for Facebook?

**MR. SNYDER:**  Good morning, Judge.  It's Orin Snyder from Gibson Dunn with my colleagues, Deb Stein, Martie Kutscher Clark, and Russ Falconer.

1    **THE COURT:**  Good morning.

2    Okay.  Thank you for your statement.

3    Let's see.  It sounds like there are not too many things

4    to discuss.  Let's just start.

5    The search terms you're working on, I will just make this

6    observation.  I do think it would be unreasonable to insist

7    that all terms apply to all custodians.  That just can't be

8    right.  People have different positions.  So I give you that

9    guidance in working on that.

10   Now, with respect to the data about plaintiffs, let's go

11   through.  And why don't plaintiffs tell us what is the data

12   that you're missing that you think is relevant.  So one thing

13   you've identified is the data about what data about the

14   plaintiffs was shared with advertisers.  Is that correct?

15   **MS. WEAVER:**  That is correct in general terms,

16   Your Honor.  Basically, what has been produced to us is

17   user-facing data through an Access Your Account tool, for the

18   most part.

19   Now, I want you to know that we have reviewed all of the

20   plaintiffs' data with more than one pass-through.  We've done

21   targeted searches.  We've had 18 people, and more at times,

22   going through the documents.  So we're pretty familiar with

23   what's there.

24   There are two problems that we have.  The first is that

25   Your Honor ordered us last -- two weeks ago to discuss

 1   precisely what has been produced and precisely what is the data

 2   that is being withheld.

 3        And we -- in the course of our meet-and-confer sessions,

 4   Facebook did not identify the examples that they put in their

 5   statement.  We didn't discuss those.  So once again, we are

 6   getting information the first time in the statement.

 7        And it would have been better if we had discussed it,

 8   because when we look at those documents -- we've looked at them

 9   before -- they are not what we're seeking.  And the reason that

10   they're not -- and if you look, there's an example of one of

11   them they gave us.  The content is missing.  So there's an

12   event that says one of the users went to a website, but the

13   content of what they did on the site is stripped away.

14        And our experts say, you know, what did you put in your

15   shopping cart?  What did you access?  How long were you on it?

16        And that data is also married to GPS data --

17             THE COURT:  Okay.  I have the statement --

18             MS. WEAVER:  Yeah.

19             THE COURT:  -- in front of me.

20             MS. WEAVER:  Yes.

21             THE COURT:  Can you put me to the page and the Bates

22   number?

23             MS. WEAVER:  The Bates number of the document -- hang

24   on.

25             THE COURT:  Well, first, the page of the statement so

```
1    I know where to go.
2             MS. WEAVER:  That is going to be harder for me.
3    I think it's page 6.  The Bates number -- and I'm going to
4    ask -- Anne, if you can help me, it's 01037245.
5             THE COURT:  Don't see that.  It's redacted
6    information?
7             MS. WEAVER:  Some of the information was redacted,
8    yes.  But this information we can discuss in the hearing, if
9    that is --
10            THE COURT:  No, no.  I understand.  We can -- I'm not
11   worried --
12            MS. WEAVER:  Yeah.
13            THE COURT:  -- about that.
14      I'm just trying to find it.  I don't see it.
15            MS. WEAVER:  Yeah.  Hang on just a moment.
16            THE COURT:  Maybe the sentence at the first page of
17   the --
18            MS. WEAVER:  Yeah, I'm actually looking -- I
19   apologize.  I'm looking for the actual statement.  I have too
20   many things open on my laptop.
21      But for all of the documents that they've identified,
22   Your Honor, these are PDFs that reflect some activity.
23            THE COURT:  I just want to start with -- I want to
24   start with --
25            MS. WEAVER:  Fine.  Okay.  So if you go to page 5 of
```

```
 1    the statement and if we look at, for example, where it says
 2    "Ms. Tutt reviewed content on Amtrak.com," it doesn't tell us
 3    what the content is or it doesn't tell us --
 4              THE COURT:  Okay.  Or the --
 5              MS. WEAVER:  -- what they did.
 6              THE COURT:  -- other one, that Ms. Tutt viewed content
 7    on a news site and --
 8              MS. WEAVER:  Right.  And it doesn't --
 9              THE COURT:  -- tell you what the content is.
10              MS. WEAVER:  -- tell us what they do.
11              THE COURT:  Let me ask Facebook.
12         Do you have that content?
13              MR. SNYDER:  Mr. Falconer, I think, will address this.
14              MR. FALCONER:  Good morning, Your Honor.  Russ
15    Falconer for Facebook.
16         Our understanding is there is some machine-readable data
17    in some cases that might reflect the off-Facebook activity that
18    Ms. Weaver is describing in a kind of raw, disaggregated way.
19    That information is not associated with the plaintiff's account
20    in the way that the user-created, user-shared content and
21    information is associated with a user account.
22         And so I hear -- I don't know -- confusion and frustration
23    from Ms. Weaver that they feel like they don't understand what
24    we've produced.
25         The Court ordered us to, you know, be as clear as we can
```

1    on named plaintiffs' data, what has been produced and what has

2    been withheld.   And what we've tried to do is say that we've

3    produced all content information that the plaintiffs share on

4    Facebook and then some of the other categories of information

5    that we identified in our statement; so device information,

6    geolocation information, certain other information that is

7    associated with their account.   And we have been -- I think

8    we've tried to be clear; and if we failed in this, we

9    apologize.

10        There is other -- there's Facebook-generated information,

11   information generated by third parties, information received

12   from third parties.   We have not represented that that is

13   comprehensively included in our production.

14        What we have produced are Facebook analytics, third-party

15   data, off-Facebook activity, anything like that that is

16   associated with a user's account.

17        And so that's -- I think the point of departure between

18   the parties right now is maybe the level of generality with

19   which we have described what we have not produced.   But

20   that's -- we've tried to be as clear about the, sort of, large

21   buckets that are not included in the named plaintiff data we've

22   produced to date.

23            THE COURT:   So, for example, when you say Ms. Weaver

24   said, as you said, that the plaintiff viewed content on

25   Amtrak.com, are you saying you don't have any way of

1    identifying what that content is that she viewed at that

2    particular time, even though you were able to say she viewed

3    that website at that time?

4            MR. FALCONER:  I think for an individual plaintiff on

5    an individual website, if it was just that question -- could we

6    tell for one of the named plaintiffs what specific content she

7    viewed on the Amtrak website? -- if it was, you know, ten years

8    ago or seven years ago, probably not.  If it was a year ago,

9    maybe.  That data may or may not have been associated with --

10           THE COURT:  Well, if it was this year --

11           MR. FALCONER:  Yeah.

12           THE COURT:  -- with that particular --

13           MR. FALCONER:  Sure.

14           THE COURT:  -- data this year.

15           MR. FALCONER:  The answer is it's possible.  There may

16   be some website-specific data about that named plaintiff; there

17   may not be.  There's some --

18           THE COURT:  Okay.  And so you haven't searched for it,

19   or you're withholding it, or -- I guess, why hasn't it been

20   produced?

21           MR. FALCONER:  So as we understood the Court's

22   mandate or, sort of, the Court's --

23           THE COURT:  No, no, no.  I'm just asking.

24           MR. FALCONER:  Oh.

25           THE COURT:  I'm just asking.

1          **MR. FALCONER:**  Because the reason for that is that

2     just to find it for one named plaintiff would be like a

3     multiweek endeavor, if not longer.  And the reason for that is

4     that -- let's take the Amtrak example.

5          With this off-Facebook activity data, the tables and the

6     database where the data is stored, you know, they've been

7     explained to us like each one of them is a book.  And the book

8     is organized by topic.  The topic that the book is organized by

9     is the advertiser.  It's Amtrak; it's not the named plaintiff.

10          So for every Facebook advertiser there's a book.  Right?

11     There's a table that has some data for advertisement, website

12     activity, that kind of thing.

13          So to gather the information for one named plaintiff on

14     Amtrak, that, we could probably do.  To gather the data for one

15     named plaintiff on every advertiser on every off-Facebook

16     activity that has ever happened, just for one named plaintiff,

17     we have to go into each of those books individually and look

18     for that one named plaintiff, and then we'd have to do it for

19     each of the other 23 named plaintiffs.

20          So that's the reason why we have not undergone that to

21     date.

22          **THE COURT:**  I understand that.  So have you identified

23     every instance that you have that the plaintiff viewed content

24     on some website, whatever it is?

25          **MR. FALCONER:**  Every instance where Facebook has been

1   able to associate that off-Facebook activity with a named

2   plaintiff's account.   Sometimes they can't make the connection.

3   But where it's connected, we've identified it.   That's included

4   in the production.

5            THE COURT:   I assume that for this privacy case --

6   right? -- some content is obviously more private than other

7   content and the plaintiffs may not necessarily need or want.

8   They need exemplars.   Right?   And there is a standing argument

9   that you guys are maintaining that they have to defeat and

10  damages and all that.   There are particular instances.   Right?

11  So there may be particular instances where you then have to go

12  do that.

13       In other words, if it's the data that was shared, which is

14  sort of at the heart of the case, you're probably going to have

15  to do some work on that.   Whether it's every instance, probably

16  not; but certainly certain instances.

17       Now, plaintiffs, it sounds like, have a template of where

18  to start.   It may not be Amtrak, but it may be the next one

19  there.   Right?

20            MR. FALCONER:   Your Honor, could I be heard on that?

21            MS. WEAVER:   Well, may I --

22            MR. FALCONER:   Or, go ahead.

23            MS. WEAVER:   I would like to respond.

24       So what we're talking about right now and what they've

25  produced is, there's a tool so users can download data.   And

1    even in what they're downloading, there is content missing.

2       But there's another whole bucket of data that they haven't

3    identified to us that is responsive, and that's the first step.

4    We need the identification of the fields of the data that they

5    collect through their third-party relationships, whether it's

6    apps or websites, et cetera.  And it is this database that

7    Facebook searches using algorithms to target the users.

8       What they've given us is sort of the window dressing of

9    the platform activity, and I've identified for you that

10   something is missing even from that.

11      But there is -- and, Your Honor, we've talked to our

12   experts; and maybe it's better to have experts talk or put in a

13   declaration because I can tell you, their position will be that

14   this is, quote/unquote, not associated with the users but that

15   doesn't make sense.

16      There is an event ID, because the reason Facebook is

17   collecting it in the first place is to target people with the

18   data.  So there is a way to go back and find -- and I agree

19   with Mr. Falconer that this data set will be immense.  And that

20   is the scope of the case.  And that's why we said only for the

21   24 because --

22           **THE COURT:**  I'm just going to --

23           **MS. WEAVER:**  Yeah.

24           **THE COURT:**  -- tell you guys, I think maybe you need

25   to think about a special master.

1        There's just no --

2            **MS. WEAVER:**  Yes.

3            **THE COURT:**  I don't have the time or the patience or

4    the expertise to wade through any of this, like the nuance that

5    you're getting into.  So I don't know what to do.

6            **MS. STEIN:**  Your Honor, may I be heard for a moment?

7        So I think the good news on, sort of, your reaction to

8    this is that this exercise was really about, sort of,

9    identifying categories so that we could have a conversation

10   about what's required in this case, because there is a whole

11   lot of information being sought here that has absolutely

12   nothing to do with the issues that are being litigated in this

13   case.

14           **THE COURT:**  No.  I understand that argument.  I don't

15   even know how to figure out what it is that we're even talking

16   about.

17           **MS. STEIN:**  Right.

18           **MS. WEAVER:**  So Facebook --

19           **MS. STEIN:**  So, Your Honor, what's being --

20           **MS. WEAVER:**  Could I --

21           **MS. STEIN:**  -- talked about right now is what's called

22   off-Facebook activity.  And that off-Facebook activity has no

23   relationship to the issues that the dismissal order said are

24   viable right now and that are not stayed.  The order of

25   dismissal --

1          THE COURT:  No.  I read that.  I read it.  I

2   understand.

3          MS. STEIN:  Okay.  Good.

4          THE COURT:  So this --

5          MS. STEIN:  And so the off-Facebook activity --

6          THE COURT:  -- this has been previewed -- just, can I

7   finish?

8          MS. STEIN:  I'm sorry, Your Honor.

9          THE COURT:  Because I'm really losing patience with

10   this case.

11       This has been previewed for a while.  So what I was hoping

12   to do is you guys could just tee up what that data is so I can

13   rule if it's discoverable or not.

14       I don't even know how to get to that point.

15          MR. SNYDER:  Your Honor, I think there's a very

16   easy --

17          MS. WEAVER:  If I could, I was waiting.

18       Your Honor, we would like them to identify what they're

19   withholding.  That's it.

20          THE COURT:  But that's a chicken-and-egg problem.

21   That's a chicken-and-egg problem.  And I'm not sure -- and see,

22   this is the problem I'm having.  You said you've now reviewed

23   it all.  What is missing?  You've identified --

24          MS. WEAVER:  So I'll give you examples.  There are no

25   examples --

```
 1                THE COURT:  You did.

 2                MS. WEAVER:  Okay.

 3                THE COURT:  No.  I'm going to let Mr. Snyder talk.

 4                MS. WEAVER:  Fine.

 5                MR. SNYDER:  Your Honor, I share your frustration, and

 6   I think this is very easy.

 7        For example, on advertisement, we have gone, I think as

 8   indicated in our statement, above and beyond the call of duty

 9   because we didn't really want to just say, "We're not giving

10   you what advertisements you reviewed or ads that you've clicked

11   on, even though it's outside the scope of the case."

12        This case --

13                THE COURT:  No, no.  That's an argument.  Please,

14   let's try not to argue.

15                MR. SNYDER:  Right.

16                THE COURT:  I'm going to decide that at some point.

17                MR. SNYDER:  Okay.  So what I would --

18                THE COURT:  Just --

19                        (Simultaneous cross-talk.)

20                THE COURT:  -- that.

21                MR. SNYDER:  What I would respectfully suggest is, we

22   can, Your Honor, tee it up for you in a very simple way,

23   because Judge Chhabria's order is very clear about what's in

24   and what's out.  And then each side can succinctly,

25   efficiently, and clearly make their arguments about what is in
```

1    and what's out.  And it's not going to be difficult,

2    Your Honor.  I think it's pretty clear.

3         I agree, on this call, people using terminology --

4    "on-platform," "off-platform" -- it all sounds like

5    gobbledegook.  I think there's a very clear, efficient, and

6    efficacious way for us to tee this up in a short statement to

7    Your Honor; and Your Honor can rule on it, if Your Honor wants

8    more argument on it, without us having these dueling

9    Zoom/Hollywood Squares, you know, arguments about what's in and

10   what's out that's not going to really lead to any fair ruling.

11        THE COURT:  This is what I need to ask Ms. Weaver, is:

12   Do you know what it is that you want or that you believe exists

13   that you don't have?

14        MS. WEAVER:  Yes.

15        THE COURT:  You do.  Okay.

16        MS. WEAVER:  More or less.  We don't know what form

17   they keep it in or how they keep it.  It is this data set that

18   they mine, yes.

19        THE COURT:  Okay.  So is there any reason why, then,

20   we can't adjudicate that dispute as discoverability?

21        MS. WEAVER:  We can --

22        MR. SNYDER:  I think we can --

23        MS. WEAVER:  -- adjudicate that, Your Honor.

24        THE COURT:  We can?  Okay.

25        MR. SNYDER:  We can and we should.

```
 1            THE COURT:  All right.
 2            MR. SNYDER:  And I think we can do it very simply
 3   without a lot of drama or complication.
 4            THE COURT:  So that's what --
 5            MR. FALCONER:  Your Honor --
 6            THE COURT:  -- I want you to do, then, on this,
 7   I think.
 8       And, I mean, it doesn't have to be the joint letter brief,
 9   whatever.  I mean, it's a big issue.  It kind of goes to the
10   heart of the case.  So I want you to have the ability.  You're
11   going to probably need your experts to some extent -- at least
12   plaintiffs -- to be involved with it.
13       And I probably want four briefs.  Right?  Whoever goes
14   first, second, first, second, so that there's -- my guess is
15   it's not till we get to the second two briefs that we'll really
16   be able to meet there.  That just seems to be the process that
17   we need to do.
18       So you guys work it out, how that's going to be presented.
19   I'm not giving you any limits at all.  You only have the limit
20   of my time and attention span.  So just keep that in mind.
21                        (Laughter.)
22            MS. WEAVER:  And how much time, Your Honor, would you
23   like between briefs and the hearing?  What kind of timing --
24            THE COURT:  We'll put a hearing.  I'll figure it out.
25            MS. WEAVER:  Okay.
```

1          **THE COURT:**  I mean, to be honest, I'm just swamped at

2     the moment.

3          **MS. WEAVER:**  I know.

4          **THE COURT:**  So, but you get it to us.  We'll get

5     through it.  And we will set it for hearing.  I think it's

6     important to have an oral --

7          **MR. LOESER:**  And, Your Honor, if I could be heard for

8     one quick minute on one --

9          **THE COURT:**  Yes.

10         **MR. LOESER:**  This is Derek Loeser.

11         -- just, process point.

12         Where we stand right now, we generally think we know

13    what's missing, and we can describe it in our briefs.

14         Facebook obviously has specific knowledge about what's

15    missing.  And so because they haven't identified specifically

16    what they're withholding, I really think it would be improper

17    for them to argue in their brief that we haven't been specific

18    enough with what we're seeking.  If that is going to be their

19    argument in their brief, then they should comply with your last

20    order, which was to identify specifically what they're

21    withholding.

22         But that's the only --

23         **THE COURT:**  Yeah.  No, I understood.  So that's why

24    I'm doing four briefs.

25         And in the meantime, you should be talking and really

```
 1   trying to narrow.  It is in both sides' interest to have it

 2   teed up as accurately as possible for me to decide.  Otherwise,

 3   I'm going to make a wrong decision one way or the other because

 4   I won't understand.

 5          MR. SNYDER:  And, Your Honor, it's in everyone's

 6   interest to have you not be frustrated with us, which I

 7   understand and I think your frustration is well-placed, one.

 8       Two, we want Your Honor to continue to preside over

 9   discovery; and we would, I think, lose a lot if we had to start

10   fresh with a special master.

11       And mindful of that, we're going to work to narrow the

12   issues.  Maybe we can even eliminate them.  And we have a lot

13   of other work to do in the meantime.  So however long

14   Your Honor needs, we're going to obviously abide and respect

15   that, and we're not going to, you know, ask you to turn around

16   a ruling.

17       There's a lot we have to do on search terms and privilege

18   logs and ADI protocols.  So there's a ton of work for us to do

19   while Your Honor takes -- you know, takes the time necessary to

20   adjudicate this issue, which is ripe now.

21          THE COURT:  Yeah.  Just don't put a hearing date.

22   I'll pick it.  So that's not a problem.

23          MR. LOESER:  The only thing I would add to that,

24   Your Honor, is that we would like you to be very frustrated

25   with Orin all the time, but not with us.
```

1                        (Laughter.)

2           **THE COURT:**  Well, this week has not been -- I've been

3      frustrated a lot, and I apologize for that.

4           **MR. SNYDER:**  Don't apologize.

5           **MS. WEAVER:**  It's tough times.

6           **THE COURT:**  There's a lot.  There's just a lot,

7      scheduling.

8           **MR. SNYDER:**  Yes, Your Honor.

9           **THE COURT:**  Okay.  So, which leads me to my next

10     point, which is the joint statement -- okay? -- which is, you

11     all are extremely talented, experienced lawyers.  If you can't

12     figure out a way, a process for this statement to work -- it's

13     really, actually, for you.  Right?  The statement is a great

14     way of assessing where we are, what our disputes are,

15     crystallizing it.  It's for you more than me, quite honestly.

16     And if you guys can't figure out together a way to do that,

17     then we've got to go back to zero and start over.  I mean, this

18     should be the easy part.

19          So I'm not going to tell you how to do that joint

20     statement.  The only thing I'm going to tell you is I want it

21     however -- what is -- just even one day, I give you, right,

22     before this?  I take it upon myself; I will make time to read

23     it the night before or early the morning before.  That's my

24     only deadline.  You guys work it out.  Whatever works best for

25     you and gets it.  But the point is, it should really try to

1    crystallize it.

2        My own view is -- and with other cases -- is that -- at

3    least with discovery disputes, is if you do time for a reply as

4    opposed to changing what you've already said, that tends to

5    work better.  But I'm not ruling at all.  I want you guys to

6    come up with it.  It's, frankly, below my pay grade to have to

7    tell you how to do it.

8                            (Laughter.)

9        MR. LOESER:  We hear that loud and clear, Your Honor,

10   and we will keep talking to Facebook about it.

11       We just think that it would be really useful for everyone

12   here, including for you, if people talk about things that they

13   put in their statements before it's submitted to the Court.

14   And so that's our mission in trying to come up with a better

15   way to do this.  That's what we're trying to accomplish.

16       THE COURT:  Maybe you could do a statement, a draft,

17   and then you talk about what's in the draft.  Right?  So then

18   you know what's in there before you -- I don't know, but that

19   would --

20       MR. LOESER:  Yeah.  We'll figure it out.

21       THE COURT:  Yes.  I know you guys can figure it out

22   because you're all outstanding lawyers.  That's why you're on

23   this case.

24       Okay.  So then we need to pick our next date.  How about

25   we push it out three weeks, to September 3rd?

```
 1            MR. LOESER:  I think that's the 749th day of March;
 2    so, sounds great.
 3                           (Laughter.)
 4            MS. WEAVER:  That's fine, Your Honor.
 5            MR. SNYDER:  And two months before Election Day,
 6    assuming the post offices --
 7            MS. WEAVER:  There is one.
 8            MR. SNYDER:  -- assuming the post offices and the
 9    polling places aren't shut down permanently.
10            THE COURT:  All right.  Okay.
11            MR. LOESER:  Don't depress us, Orin.
12            THE COURT:  I apologize for having to lecture a little
13    bit, but to be honest, you guys can do better.  I know you can.
14    I know you can.  I have tremendous respect for all of you.
15        Okay.  Great.  I look forward to our next conference.
16    It'll be September 3rd at 8:30 a.m.
17            MR. SNYDER:  Thank you, Judge.
18            MS. WEAVER:  Thank you, Your Honor.
19            MR. SNYDER:  Thank you for everything you're doing.
20    Appreciate it.
21            THE CLERK:  Court's adjourned.
22                  (Proceedings adjourned at 8:51 a.m.)
23                          ---o0o---
24
25
```

1

2                      **CERTIFICATE OF REPORTER**

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Saturday, August 15, 2020

7

8

9    _____

10         Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
              Official Reporter, U.S. District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25