# Exhibit 5

**Pages 1 - 53**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline S. Corley, Magistrate Judge

IN RE:  FACEBOOK, INC. CONSUMER  )
PRIVACY USER PROFILE LITIGATION.)  **NO. 18-MD-02843 VC (JSC)**
                                )

San Francisco, California
Wednesday, December 9, 2020

**TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:
                    KELLER ROHRBACK LLP
                    1201 Third Avenue - Suite 3200
                    Seattle, Washington  98101
               BY:  **DEREK LOESER, ATTORNEY AT LAW**
                    **CARI LAUFENBERG, ATTORNEY AT LAW**
                    **DAVID J. KO, ATTORNEY AT LAW**

                    BLEICHMAR, FONTI & AULD LLP
                    555 12th Street - Suite 1600
                    Oakland, California  94607
               BY:  **LESLEY E. WEAVER, ATTORNEY AT LAW**
                    **ANNE K. DAVIS, ATTORNEY AT LAW**
                    **MATTHEW P. MONTGOMERY, ATTORNEY AT LAW**
                    **ANGELICA M. ORNELAS, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Reported By:       Marla F. Knox, RPR, CRR, RMR
                   United States Official Court Reporter

```
 1   APPEARANCES VIA ZOOM:   (CONT'D)

 2   For Defendant:
                             GIBSON, DUNN & CRUTCHER LLP
 3                           1881 Page Mill Road
                             Palo Alto, California  94304
 4                      BY:  MARTIE KUTSCHER CLARK, ATTORNEY AT LAW

 5                           GIBSON, DUNN & CRUTCHER LLP
                             333 South Grand Avenue
 6                           Los Angeles, California  90071
                        BY:  DEBORAH L. STEIN, ATTORNEY AT LAW
 7
                             GIBSON, DUNN & CRUTCHER LLP
 8                           2100 McKinney Avenue - Suite 1100
                             Dallas, Texas  75201
 9                      BY:  RUSSELL H. FALCONER, ATTORNEY AT LAW

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   Wednesday - December 9, 2020                          10:00 a.m.
 2                        P R O C E E D I N G S
 3                              ---oOo---
 4          THE CLERK:  Court is now in session.  The Honorable
 5   Jacqueline Scott Corley is presiding.
 6          Calling civil action 18-md-2843, In Re: Facebook Inc.
 7          Go ahead and start.
 8          THE COURT:  All right.  Good morning, everyone.  You
 9   don't have to make your appearances.  And thank you for your
10   status update.
11          Let's just go through and talk through the things and see
12   where we are at and what we can do.
13          So the first issue is search terms for the 5 through 8
14   group.  And I'm not sure if there is anything to discuss here.
15   I think the Plaintiffs said they were hopeful the parties could
16   work out the schedule, and I don't believe Facebook said
17   anything about it.
18          So, Ms. Weaver, or whoever from the Plaintiff wants to
19   address that.  Is there anything to discuss?
20             MS. WEAVER:  Not from our perspective, Your Honor.
21             MS. DAVIS:  No.
22             THE COURT:  Okay.  Great.  We will just knock that
23   off.
24          Now, the second thing was RFPs 14 to 17, Plaintiffs' RFPs.
25          And Facebook seemed to suggest that the search terms had
```

1  been agreed to for those, but Plaintiffs seem to suggest that
2  they had not.  So I don't know where we are with that.
3          **MS. WEAVER:**  Mr. Ko will address that.
4          **MR. KO:**  This is David Ko on behalf of Plaintiffs.
5     So really the reason why we identified that issue in our
6  statement -- two reasons -- I mean, I think this is likely
7  coming at a head such that we will brief this to you shortly.
8     To answer your question, the reason why these RFPs are not
9  actually covered by the -- or this dispute, more specifically,
10 is not covered by the RFPs and the search strings is that we
11 are seeking a targeted search and a certain -- and a specific
12 group of materials that we believe Facebook should produce
13 pursuant to a targeted search.
14     And that is separate from the documents that they may
15 potentially produce that are, you know, possibly responsive to
16 these RFPs.
17     And just to add some color to that, you know, the search
18 strings that we agreed to -- and, quite frankly, that you
19 ordered in Discovery Order Number 8, I believe -- there are
20 actually only one search string that specifically relates to
21 these -- that solely relates to these RFPs.
22     And so -- and in this next round of negotiations, I think
23 there are only about three or four strings that the parties are
24 actually negotiating such that these strings may produce
25 potentially relevant information.

1   Okay.

2   **MS. WEAVER:** Yep.

3   **THE COURT:** So the next issue is the named Plaintiffs' data. And here I actually am kind of confused because Facebook suggested that there may not be any data other than what they have already produced. And then I don't understand why (video freeze interruption.)

8   **MS. KUTSCHER CLARK:** Right, Your Honor.

So, as we noted in our submission, we learned for the first time in Plaintiffs' sur-reply brief on the named Plaintiffs' data that what they are really seeking is only data about the named Plaintiffs that was shared with third parties.

And for us seeing that in the sur-reply brief was a really big aha moment because we had spent literally hundreds of hours meeting and conferring about data that is never shared outside of Facebook.

So now that we understand what they are really seeking is the type of data that is actually shared or made accessible to third parties, we have been taking a much closer look at what would be responsive to that. And as we currently understand, what has been produced really does cover that universe.

But we obviously want to be a hundred percent sure that that is correct, and we are talking about a 13-year period, so it is a very long time.

So we have been conducting a very careful investigation

1  within the company to be a hundred percent sure that the
2  materials produced to date reflect the full scope of any data
3  that could have been shared or made accessible to third parties
4  about the named Plaintiffs since 2007.
5       And if we do come across anything additional, we will
6  obviously report that to Plaintiffs and discuss a production
7  format with them, but to date we have not come across anything
8  that has not been produced already that could have even
9  potentially been shared with third parties.
10           **MR. LOESER:**  Your Honor, if I may, I think there will
11 probably be multiple comments in response to that statement.
12 That makes no sense to us at all.
13      First of all, the question of their brief, which they
14 quote in their statement, talks about information, in fact,
15 shared.  And what our brief said in our reply was information
16 shared or made accessible.
17      And we were very careful to use that language, "made
18 accessible," because Facebook has said for a long time that it
19 doesn't keep records of what it actually shares, which seemed
20 hard to believe to us.
21      But in order to avoid a semantic game, we also included
22 the reference to "made accessible" because whether it was
23 shared, whether they have records of it, if it was put in a
24 place or utilized in a way where third parties had access to
25 it, that substantially expands the universe of potential

1  information.
2      Also, as, Your Honor --
3          **THE COURT:** That's what I heard Facebook just say.
4  They agree.
5          **MS. KUTSCHER CLARK:** Yeah.
6          **THE COURT:** It is made accessible, not just shared.
7          **MS. KUTSCHER CLARK:** Yes.
8          **MR. LOESER:** Then, perhaps, we need some clarification
9  on what they interpret "made accessible" to mean because it
10 doesn't mean the same thing as actually shared.
11     And so if we could hear clearly from Facebook that they
12 agree with that, that would be helpful.
13     Second, the nature of the information that Facebook was
14 ordered to produce is such that it is impossible to believe
15 that there isn't information that exists.
16     We are talking about entirely distinct categories of
17 information from what they have produced.  They have produced
18 the information that users post.  As Your Honor well knows,
19 what they didn't produce was all the information collected
20 from -- off platform activities and inferred from and about on
21 and off platform activity.
22     And it is, frankly, just impossible for us to believe that
23 while the universe of potential discoverable information was
24 expanded threefold, actually, there isn't anything that fits
25 those categories, categories which were derived from our review

```
 1   of Facebook's production to see what else do they do and what
 2   else do they do with it.
 3          So it just -- it just seems baffling to me that after all
 4   of this fighting and all their effort to keep us from getting
 5   this information, they are now coming back and claiming it
 6   doesn't really exist.
 7              MS. KUTSCHER CLARK:  Your Honor --
 8              MS. STEIN:  So, Your Honor, respectfully, we are not
 9   doing anything to prevent Plaintiffs from getting information.
10          We spent months dealing with Plaintiffs taking the
11   position that even if the data was in a black box that was
12   inaccessible to anyone, that they would want to know what was
13   in that black box.  So they did a complete 180 in their
14   sur-reply brief.
15          Leaving that aside, we are trying to figure out whether
16   there is anything else to be produced.  The inferences that
17   Mr. Loeser just mentioned -- Facebook does not share or make
18   accessible inferences with third parties, period, full stop.
19          Those inferences are the way that Facebook has its
20   business model.  It uses those inferences to run its business.
21   It does not sell those inferences.  It doesn't share those
22   inferences.  It does not make them accessible.
23          That is why companies come to Facebook and ask Facebook to
24   help with targeted advertising because we, Facebook, will not
25   share those inferences with anyone.  That would destroy
```

==Facebook's business model.==

  **MS. WEAVER:** So, if I may, we have received no production of data Facebook receives from third parties.

  We have received no inferred data. And this is the semantic game that Facebook has played since the beginning that analysts and governments have challenged.

  Facebook says: We do not sell your data. And it may be true that they don't put it in a box and hand the data over the way you do a widget. They do sell inferences.

  And what we need to know is how our clients were targeted based on the amalgamation and analysis of all the data that Facebook is pulling from everywhere. So we want the inferred data.

  I want to know if I have been targeted as a 50-year-old woman in Oakland as having a higher insurance risk or a different financial risk.

  That is how Facebook makes its money, and they have refused to be transparent about this all around the world. But we are in this lawsuit. They keep telling us they don't make -- and this ties back to the revenue argument.

  Let us see how they make their money. Maybe they are right. But all we have been doing is fighting with the lawyers. It is time for evidence.

  We would love a 30(b)(6). We would love documents. We would love data. All we have been getting right now is sitting

1  in Facebook Zoom meet-and-confers and positions.  And we are
2  ready for the evidence.
3          **MS. KUTSCHER CLARK:**  Your Honor, I have two quick
4  responses.
5          **MR. KO:**  Your Honor --
6          **THE COURT:**  Let's let Ms. Kutscher go.
7          **MR. KO:**  Okay, Martie.
8          **THE COURT:**  We can't hear you -- at least I can't hear
9  her.
10          **MS. KUTSCHER CLARK:**  Can you hear me now?  I'm
11  speaking more loudly.  Okay.
12      First of all, this case is not about targeted advertising.
13  Judge Chhabria said very clearly in his Motion To Dismiss order
14  that the case is not about targeted advertising.  Plaintiffs
15  conceded that the case is not about targeted advertising in the
16  briefing on this issue.
17      In terms of the inferences, the off-Facebook activity, it
18  is not correct that none of that information has been produced.
19      The information we produced previously includes thousands
20  and thousands of pages of users off-platform activity.  It also
21  includes massive lists of user's interests that Facebook has
22  derived from their activity on and off the platform.
23      During the briefing Plaintiffs were asking for more of
24  that information.  They were asking for information the
25  Plaintiffs are not able to see themselves that Facebook might

1  have in those categories.
2      What we have been doing is trying to find out -- and we
3  have conducted extensive, extensive investigations at Facebook
4  to understand whether there is any additional information in
5  any of those categories that could have potentially been made
6  available to a third party in any way, shape or form.
7      And the answer we are repeatedly getting is no. What has
8  been produced represents the universe of what could have been
9  made available in any way to a third party.
10     But, again, we are continuing to conduct this
11 investigation because we want to be a hundred percent sure, and
12 that is what we are working on. But, in the meantime, we have
13 not come across any type of information that is ever made
14 accessible; has ever been made accessible that is outside what
15 has already been produced.
16         **MS. WEAVER:** Your Honor, we view this as them trying
17 to re-litigate an order that you already issued in Discovery
18 Order Number 9.
19     The scope of the case is whether private information sent
20 in voice -- let's say Facebook Messenger was used and
21 amalgamated with our information to target the Plaintiffs and
22 either --
23         **THE COURT:** No, no, no, no. I don't think so. I
24 don't think so; right. This is -- this came from Cambridge
25 Analytica and that they had access to information.

1         **MS. WEAVER:**  Right.
2         **THE COURT:**  Right.
3         **MS. WEAVER:**  Right.  And they used it to -- they
4    targeted lazy liberals to stay home and not vote in the
5    election.  This is exactly Cambridge Analytica.  They drew
6    inferences about people and crafted messages to them to get
7    them to stay home.
8         Or it recently came out that 3.5 million African Americans
9    were targeted with message to influence their voting behavior.
10   This is squarely within Cambridge Analytica, and this is
11   exactly the case.
12        So people need to understand how they are being --
13        **THE COURT:**  What did you mean in your sur-reply by
14   "shared"?  I guess that's the question.
15        **MS. WEAVER:**  Or reasonable made accessible.  Yeah, I
16   mean, that's -- the issue is --
17        **THE COURT:**  What is -- to the point, what does "made
18   accessible" mean?
19        **MS. WEAVER:**  Right.  So I -- I'm Cambridge Analytica,
20   and I want information so that I can target individuals who I
21   think will respond to my messaging in an election.  And our
22   nine named Plaintiffs, many of them feel they were targeted in
23   this way.
24        So Facebook ran its algorithm based on all of the data
25   that it had, and it didn't separate the private and the

1  public -- at least Facebook has never even taken that position
2  in this case -- and said:  Here are the people.
3      So they are targeting, and we want to see --
4          **THE COURT:**  Have they provided the named -- the names
5  of those people?
6          **MS. WEAVER:**  No.  They just allowed the messages to go
7  through to them, so they are targeted.
8          **THE COURT:**  So Cambridge Analytica didn't have that
9  information then?
10         **MS. WEAVER:**  Cambridge Analytica also got data but
11 also targeted them.  It's both.
12         **THE COURT:**  Okay.  And so it is the data that
13 Cambridge Analytica then got?
14         **MS. WEAVER:**  That's a piece of it, and it is also how
15 they are targeted going forward.
16     What we don't know is what the business partners and --
17 that is a separate -- Cambridge Analytica got it through an
18 app, through Kogan's app.
19     But what is also going on is the data sharing -- which the
20 business partners and the white listed apps -- and we are not
21 getting the data that they have on the Plaintiffs.  We don't
22 have one shred of data.  All we have is this, you know, the
23 actual platform activity.
24     So we need -- what we would really like is to take some
25 evidence on this, Your Honor, because --

1           **THE COURT:**  You mean the 30(b)(6)?

2           **MS. WEAVER:**  That would be great.

3           **THE COURT:**  Well, I think that is probably where we
4    are at now.  I think --

5           **MS. WEAVER:**  That would be great.

6           **THE COURT:**  I think there is this disconnect, right,
7    or disbelief -- I guess I should say more than disconnect -- as
8    to how Facebook operates.  And so we just need somebody under
9    oath saying:  No, this is how it operates.

10          **MR. KO:**  Your Honor, just one last thing on this --
11   not to belabor the point -- I wish I could share my screen
12   right now.  I'm looking at Facebook's data use policy right now
13   in the section that says "information that we share."

14          And included in that category are sharing with third-party
15   partners, and that includes partners who use Analytica
16   services, measurement partners, partners offering goods and
17   services in our products, advertisers, vendors and service
18   providers, researchers and academics, law enforcement or
19   pursuant to legal request.

20          So they, by their own admission in public and pursuant to
21   their data use policy, talk about the information that they
22   share --

23          **MS. WEAVER:**  Share.

24          **MR. KO:**  -- with third parties.  So I know Ms. Stein
25   said full stop, they don't share anything.  That's --

1       **THE COURT:** No, no, no, that's not what she said.
2  What she said is they produced what they shared, not that they
3  don't share anything.
4       **MS. WEAVER:** But that's not --
5       **MS. STEIN:** I said that we don't share inferences.
6       **MS. WEAVER:** All we had was a subset of user's
7  platform activity.  I'm sorry, Deb.
8       **MS. STEIN:** I said we don't share inferences.  That is
9  what I said.
10      **MS. KUTSCHER CLARK:** Your Honor, I think a big piece
11 of what is getting lost here is third parties frequently draw
12 their own inferences, and that might have been what happened in
13 Cambridge Analytica.  We know that happens in other settings.
14     So Facebook shares various categories of information, and
15 third parties might use that information in different ways.
16 They might combine that with information they have.  We don't
17 have visibility into that.
18     But once the information is shared, third parties might
19 use it to form their own conclusions; but that's not
20 information we would have.
21      **MS. WEAVER:** But we don't even have the data that
22 Cambridge Analytica got; right?
23      **THE COURT:** I don't know.  Is that true?
24      **MS. KUTSCHER CLARK:** I believe you do because
25 Cambridge Analytica only received data that Kogan was able to

1  access through his app and what --
2      **MS. WEAVER:** Can you identify to us by Bates number
3  which documents those are because I don't believe we have that.
4      **MS. KUTSCHER CLARK:** That's not the way the materials
5  have been produced.
6      What we have produced is the universe of data that could
7  have been made accessible to third parties.
8      We did not produce nor was there a request specifically
9  for information requested by Kogan.
10     **MR. LOESER:** So, Your Honor, just -- this is an
11 interesting discussion, and I think Your Honor has rightly
12 identified that the parties, frankly, are just -- these are
13 lawyers talking about things that -- we need evidence.  A
14 30(b)(6) is an excellent idea.
15     We just don't believe how -- their description of what is
16 or is not shared or made accessible.  We need to put somebody
17 under oath and have them testify about that.
18     The documents that we have seen in their production that
19 describe their practices talk about sharing; talk about
20 absorbing off-platform activity; talk about sharing inferences.
21     The ADI investigation where they sent their own
22 questionnaires out to apps asked the apps to identify any
23 information that was obtained from Facebook and inferences
24 drawn from it.
25     And so there is a huge disconnect between what we think is

---oOo---

**CERTIFICATE OF REPORTER**

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Thursday, December 10, 2020

_____

Marla F. Knox, RPR, CRR
U.S. Court Reporter