# Exhibit 7

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

```
1                 UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE: FACEBOOK, INC. CONSUMER ) MDL No. 2843

5    PRIVACY USER PROFILE LITIGATION) Case No.

6    _____) 18-md-02843-VC

7    This document relates to:      )

8    ALL ACTIONS                    )

9    _____)

10

11

12

13     *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

14

15

16     REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

17             FACEBOOK INC. REPRESENTATIVE,

18               KONSTANTINOS PAPAMILTIADIS

19               TUESDAY, FEBRUARY 23, 2021

20

21

22   Reported by:

23   Ashala Tylor, CSR #2436, CLR, CRR, RPR

24   JOB NO. 4473154

25   PAGES 1 - 280
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4   IN RE: FACEBOOK, INC. CONSUMER ) MDL No. 2843

5   PRIVACY USER PROFILE LITIGATION) Case No.

6   _____) 18-md-02843-VC

7   This document relates to:      )

8   ALL ACTIONS                    )

9   _____)

10

11

12

13

14

15

16       Videotaped deposition of FACEBOOK, INC.

17   REPRESENTATIVE, KONSTANTINOS PAPAMILTIADIS taken via

18   virtual Zoom, commencing at 9:10 a.m. and ending at

19   3:58 p.m., on Tuesday, February 23, 2021, before Ashala

20   Tylor, CSR No. 2436, RPR, CRR, CLR.

21

22

23

24

25

                                          Page  2

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:

 3        BLEICHMAR FONTI & AULD LLP

 4        BY:  LESLEY E. WEAVER, ESQ.

 5             ANNE DAVIS, ESQ.

 6             MATTHEW MONTGOMERY, ESQ.

 7             MATTHEW MELAMED, ESQ.

 8        555 12th Street, Suite 1600

 9        Oakland, California  94607

10        415.445.4003

11        lweaver@bfalaw.com

12        adavis@bfalaw.com

13        mmmontgomery@falaw.com

14        mmelamed@bfalaw.com

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    A P P E A R A N C E S (continued)

 2    FOR PLAINTIFFS:

 3            KELLER ROHRBACK LLP

 4            BY:   DAVID KO, ESQ.

 5                  CARI C. LAUFENBERG, ESQ.

 6                  DAVID LOESER, ESQ.

 7            1201 Third Avenue, Suite 3200

 8            Seattle, Washington  98101-3052

 9            206.623.3384

10            dko@kellerrohrback.com

11            claufenberg@kellerrohrback.com

12            dloeser@kellerrohrback.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page  4

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    A P P E A R A N C E S (continued)

2    FOR THE DEFENDANT FACEBOOK, INC.:

3            GIBSON, DUNN & CRUTCHER LLP

4            BY:  DEBORAH STEIN, ESQ.

5                  MARTIE KUTSCHER CLARK, ESQ.

6            333 S. Grand Avenue, 47th Floor

7            Los Angeles, California  90071

8            213.229.7000

9            dstein@gibsondunn.com

10           mkutscherClark@gibsondunn.com

11                  - and -

12           GIBSON DUNN & CRUTCHER LLP

13           BY:  LAURA MUMM, ESQ.

14           200 Park Avenue, 47th Floor

15           New York, New York  10166

16           212.351.4000

17           lmumm@gibsondunn.com

18

19   Also Present:

20           Ian Chen, In-House Facebook Counsel

21           Kimberly Decker, Videographer

22

23

24

25
```

Page 5

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                    I N D E X

 2  WITNESS          EXAMINATION BY              PAGE

 3  KONSTANTINOS PAPAMILTIADIS

 4                   Ms. Weaver                 9, 171

 5

 6                  E X H I B I T S

 7  NO.             DESCRIPTION                 PAGE

 8  Exhibit 1    Plaintiffs' Amended Notice of       10

 9               Deposition of Defendant Facebook,

10               Inc. Pursuant to Federal Rule of

11               Civil Procedure 30(b)(6)

12  Exhibit 2    Discovery Order No. 9              10

13               (Dkt. Nos. 515, 526, 537, 548)

14  Exhibit 3    Email from Simone LiTrenta to      49

15               Matt Scutari and others, 5-8-14,

16               FB CA MDL 00213423 - 443

17  Exhibit 4    Email exchange, top one from      240

18               Simon Cross to Steven Elia,

19               1-29-15, FB-CA-MDL-00227697 - 699

20  Exhibit 5    Excel spreadsheet,               265

21               FB-CA-MDL-01434884.csv

22  Exhibit 6    Excel spreadsheet,               266

23               FB-CA-MDL-01434885.csv

24               Instruction Not to Answer

25                    Page 91, LIne 9

                                             Page 6
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                    Tuesday, February 23, 2021

 2                         9:10 a.m.

 3                         --o0o--

 4

 5              THE VIDEOGRAPHER:  Good morning.  We are       09:10

 6     going on the record at 9:10 a.m. on February 23rd of   09:10

 7     2021.  All participants are attending remotely.        09:10

 8              Audio and video recording will continue to    09:10

 9     take place unless all parties agree to go off the      09:10

10     record.                                                09:10

11              This is Media Unit 1 of the recorded          09:10

12     deposition of Facebook, Inc. representative,           09:10

13     Konstantinos Papamiltiadis, taken by counsel for the   09:10

14     plaintiffs in the matter of Facebook, Inc. Consumer    09:10

15     Privacy User Profile Litigation filed in the           09:10

16     United States District Court, Northern District of     09:10

17     California, Case Number 18-md-02843-VC.                09:10

18              My name is Kimberly Decker from Veritext      09:10

19     Legal Solutions and I'm the videographer.  The court   09:10

20     reporter is Ashala Tylor.  I'm not related to any      09:10

21     party in this action, nor am I financially             09:11

22     interested in the outcome.                             09:11

23              Counsel and all present will now state        09:11

24     their appearances and affiliations for the record.     09:11

25     If there are any objections to proceeding, please      09:11
```

Page 7

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | state them at the time of your appearance, beginning | 09:11 |
| 2 | with the noticing attorney. | 09:11 |
| 3 | MS. WEAVER:  Good morning, everybody.  I'm | 09:11 |
| 4 | Lesley Weaver, co-lead counsel for plaintiffs and | 09:11 |
| 5 | from Bleichmar Fonti & Auld. | 09:11 |
| 6 | MS. DAVIS:  Good morning.  Anne Davis also | 09:11 |
| 7 | for plaintiffs, Bleichmar Fonti & Auld. | 09:11 |
| 8 | MR. MONTGOMERY:  Matthew Montgomery for | 09:11 |
| 9 | plaintiffs, Bleichmar Fonti & Auld. | 09:11 |
| 10 | MR. MELAMED:  Matt Melamed for plaintiffs, | 09:11 |
| 11 | Bleichmar Fonti & Auld. | 09:11 |
| 12 | MS. LAUFENBERG:  Cari Laufenberg for | 09:11 |
| 13 | plaintiffs from Keller -- | 09:11 |
| 14 | THE REPORTER:  I'm sorry, one more time, | 09:11 |
| 15 | please. | 09:11 |
| 16 | MS. LAUFENBERG:  Cari Laufenberg for | 09:11 |
| 17 | plaintiffs from Keller Rohrback. | 09:11 |
| 18 | MR. KO:  David Ko of Keller Rohrback also | 09:11 |
| 19 | on behalf of the plaintiffs.  Good morning. | 09:12 |
| 20 | MR. LOESER:  Good morning.  Derek Loeser | 09:12 |
| 21 | from Keller Rohrback for plaintiffs. | 09:12 |
| 22 | MS. STEIN:  Are you ready for defendant? | 09:12 |
| 23 | Deborah Stein from Gibson, Dunn on behalf | 09:12 |
| 24 | of defendant Facebook. | 09:12 |
| 25 | MS. CLARK:  Martie Kutscher Clark from | 09:12 |

Page 8

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Gibson, Dunn also on behalf of Facebook. | 09:12 |
| 2 | MS. MUMM:  Laura Mumm from Gibson, Dunn on | 09:12 |
| 3 | behalf of Facebook. | 09:12 |
| 4 | MR. CHEN:  And this is Ian Chen.  I am | 09:12 |
| 5 | in-house counsel for Facebook. | 09:12 |
| 6 | THE VIDEOGRAPHER:  Would the court | 09:12 |
| 7 | reporter please swear in the witness. | 09:12 |
| 8 | | 09:13 |
| 9 | KONSTANTINOS PAPAMILTIADIS, | 09:13 |
| 10 | being first duly sworn or affirmed to testify | 09:13 |
| 11 | to the truth, the whole truth, and nothing but | 09:13 |
| 12 | the truth, was examined and testified as follows: | 09:13 |
| 13 | THE REPORTER:  Proceed, Counsel. | 09:13 |
| 14 | EXAMINATION | 09:13 |
| 15 | BY MS. WEAVER: | 09:13 |
| 16 | Q.  Good morning.  And thank you very much for | 09:13 |
| 17 | being here this morning and as we adjust to this new | 09:13 |
| 18 | process. | 09:13 |
| 19 | May I address you as K.P. throughout the | 09:13 |
| 20 | deposition or would you prefer Mr. Papamiltiadis? | 09:13 |
| 21 | A.  I don't need to ask counsel's permission | 09:13 |
| 22 | to answer that question.  I guess you can. | 09:13 |
| 23 | Q.  All right.  You come prepared. | 09:13 |
| 24 | I'm going to start by marking a couple of | 09:13 |
| 25 | exhibits, and I think that you've practiced with | 09:13 |

Page 9

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    BY MS. WEAVER:                                          09:57

2        Q.   Do you have an Exhibit 3?                      09:57

3        A.   So we're going to 3?                           09:57

4        Q.   We are going to 3.                             09:58

5        A.   Okay.  I don't see it yet.                     09:58

6        Q.   I think you might need to refresh.             09:58

7             Do you have Exhibit 3 yet?                     09:58

8        A.   Yes.                                           09:58

9        Q.   Okay.                                          09:58

10            MS. WEAVER:  For the record, Exhibit 3 is      09:58

11   an email dated May 8, 2014, with some attachments.     09:58

12       Q.   Have you seen Exhibit 3 before?               09:58

13       A.   No, I haven't.                                 09:58

14       Q.   Okay.  Did --                                  09:58

15            MS. STEIN:  Why don't you give the witness     09:58

16   an opportunity to review the document.                 09:58

17            MS. WEAVER:  Okay.  Thanks, Deb.  You were     09:58

18   about to get in trouble.                                09:58

19       Q.   So there's the cover email, K.P., but if      09:58

20   you look at the attachment, and I direct your          09:58

21   attention to the Bates number that ends with 424.      09:58

22   Remember the -- if you look at the bottom there.       09:58

23            THE WITNESS:  Yes, I've seen those pages,      09:58

24   yes.                                                    09:59

25

                                        Page 50

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | BY MS. WEAVER: | 09:59 |
| 2 | Q.   Okay.  And when did you last see them? | 09:59 |
| 3 | A.   Either yesterday or Friday. | 09:59 |
| 4 | Q.   When did you first see them? | 09:59 |
| 5 | A.   Maybe Friday. | 09:59 |
| 6 | Q.   Okay.  You hadn't seen them before Friday? | 09:59 |
| 7 | A.   No. | 09:59 |
| 8 | Q.   Is that right?  Okay. | 09:59 |
| 9 | Do you have an understanding as to what | 09:59 |
| 10 | Exhibit 3 is? | 09:59 |
| 11 | A.   I don't know the contents of the email, | 09:59 |
| 12 | but I think I can understand the page that you asked | 09:59 |
| 13 | me to look at, what it meant to be. | 09:59 |
| 14 | Q.   Okay.  And what is your understanding? | 09:59 |
| 15 | A.   It's definition of different data that | 09:59 |
| 16 | Facebook may have accessed. | 09:59 |
| 17 | Q.   Okay.  And let me back up again.  This is | 09:59 |
| 18 | foundational.  Do people communicate by email at | 09:59 |
| 19 | Facebook? | 09:59 |
| 20 | A.   It's one of the ways to communicate, yes. | 09:59 |
| 21 | Q.   How else do people communicate in the | 09:59 |
| 22 | course of doing business at Facebook? | 09:59 |
| 23 | A.   We use a version of the product that is | 09:59 |
| 24 | designed for the business world called Workplace. | 09:59 |
| 25 | We use a version of our Messenger product, which is | 10:00 |

Page 51

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | also an example, a device called Workset.  We use | 10:00 |
| 2 | emails.  We use █████.  We use other | 10:00 |
| 3 | videoconferencing facilities.  We use our telephones | 10:00 |
| 4 | to call each other.  Different ways. | 10:00 |
| 5 | Q.   And people text as well; is that right? | 10:00 |
| 6 | A.   We don't like text messaging.  We have our | 10:00 |
| 7 | own messaging apps. | 10:00 |
| 8 | Q.   Just out of curiosity, is the Facebook | 10:00 |
| 9 | Messenger that people that work at Facebook use, is | 10:00 |
| 10 | that different than the Facebook Messenger that | 10:00 |
| 11 | users on the platform use, or is it the same? | 10:00 |
| 12 | A.   I mean I use Messenger the same way you | 10:00 |
| 13 | would use it.  But internally I don't use that | 10:00 |
| 14 | version of the product.  I use an Enterprise | 10:00 |
| 15 | personal product -- | 10:00 |
| 16 | Q.   Okay. | 10:00 |
| 17 | A.   -- which is called Workset. | 10:00 |
| 18 | Q.   And what's the difference functionally | 10:00 |
| 19 | between those two? | 10:00 |
| 20 | MS. STEIN:  Objection.  This is like way | 10:00 |
| 21 | beyond the scope about what employees at Facebook | 10:00 |
| 22 | use. | 10:01 |
| 23 | MS. WEAVER:  Okay.  Fine.  It's fine.  I | 10:01 |
| 24 | was trying to establish a foundation, but I guess we | 10:01 |
| 25 | can come back to that in another deposition. | 10:01 |

Page 52

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So, K.P., back to Exhibit 3.  Do you who | 10:01 |
| 2 | Simone LiTrenta is? | 10:01 |
| 3 | A.   No. | 10:01 |
| 4 | Q.   Okay.  Looking at just the cover email, do | 10:01 |
| 5 | you recognize the names of anybody on this email as | 10:01 |
| 6 | individuals who work at Facebook? | 10:01 |
| 7 | A.   I recognize Matt Scutari, Rob Sherman, and | 10:01 |
| 8 | Erin Egan. | 10:01 |
| 9 | Q.   And you understand that those are | 10:01 |
| 10 | employees of Facebook during the time this email was | 10:01 |
| 11 | written; is that right? | 10:01 |
| 12 | A.   That is 2014?  Yes, I believe so. | 10:01 |
| 13 | Q.   Okay.  And do you believe Exhibit 3 to be | 10:01 |
| 14 | an email sent by employees at Facebook in the | 10:01 |
| 15 | regular course of business? | 10:01 |
| 16 | A.   Yes, that looks like. | 10:01 |
| 17 | Q.   Okay.  Do you have an understanding as to | 10:01 |
| 18 | what the materials that are attached to this email | 10:02 |
| 19 | are? | 10:02 |
| 20 | A.   I think it's a set of definitions that -- | 10:02 |
| 21 | or slides that were meant to be presented at an | 10:02 |
| 22 | off-site. | 10:02 |
| 23 | Q.   Okay.  And what is -- do you know what the | 10:02 |
| 24 | global policy team is? | 10:02 |
| 25 | A.   Yes. | 10:02 |

Page 53

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1        Q.    What is it?                                  10:02

2        A.    It's a team that is responsible for our      10:02

3   relationships with governments and regulators.          10:02

4        Q.    Okay.  And just again by way of              10:02

5   understanding how Facebook functions, you see           10:02

6   there's a ▮▮▮▮▮ hyperlink here in the email?            10:02

7        A.    Yes.                                          10:02

8        Q.    Does Facebook also use ▮▮▮▮▮▮?               10:02

9              MS. STEIN:  Objection to form.  This         10:02

10  isn't -- not an ESI depo and he is not testifying       10:02

11  about what Facebook uses internally.  Let's focus on    10:02

12  the subjects that he's here for.                         10:02

13             MS. WEAVER:  I'm trying to understand if     10:02

14  this document is complete, and that's a little bit      10:02

15  difficult to do.  So are you going to instruct him      10:03

16  not to answer?                                           10:03

17             MS. STEIN:  Is there a reason why you        10:03

18  think the document is not complete?                      10:03

19             MS. WEAVER:  Okay.  Let me question.         10:03

20       Q.    So is it true that Facebook -- people use    10:03

21  ▮▮▮▮▮▮ at Facebook to share document files?            10:03

22       A.    Can I answer?                                 10:03

23       Q.    Yes.                                          10:03

24       A.    Sorry, I was looking at the document.        10:03

25       Q.    No problem.                                   10:03
```

Page 54

| | | |
|---|---|---|
| 1 | A.    It's -- it's true that for files that are | 10:03 |
| 2 | concise that are too big to send by email we would | 10:03 |
| 3 | use ████████ . | 10:03 |
| 4 | Q.    Okay.  Is there any way to know whether or | 10:03 |
| 5 | not a hard copy version of a document like this was | 10:03 |
| 6 | everything that was contained in the hyperlink or | 10:03 |
| 7 | would you have to see it in native form? | 10:03 |
| 8 | MS. STEIN:  Objection to form. | 10:03 |
| 9 | Lesley, next. | 10:03 |
| 10 | BY MS. WEAVER: | 10:03 |
| 11 | Q.    Please answer the question. | 10:03 |
| 12 | A.    I'm not sure I understand exactly what you | 10:03 |
| 13 | saying.  I don't even know what you have printed | 10:03 |
| 14 | out, so I cannot really establish whether it's a | 10:03 |
| 15 | complete document or not. | 10:03 |
| 16 | Q.    Okay.  Is there -- normally -- let me ask | 10:03 |
| 17 | this.  Does Facebook maintain document like -- | 10:04 |
| 18 | documents like this in PDF form or are they native? | 10:04 |
| 19 | MS. STEIN:  Objection to form. | 10:04 |
| 20 | Lesley, move on. | 10:04 |
| 21 | BY MS. WEAVER: | 10:04 |
| 22 | Q.    Please answer the question. | 10:04 |
| 23 | MS. STEIN:  It's not an ESI deposition. | 10:04 |
| 24 | Move on. | 10:04 |
| 25 | MS. WEAVER:  I'm trying to understand this | 10:04 |

Page 55

| | | |
|---|---|---|
| 1 | document, which we gave to you ahead of time, and | 10:04 |
| 2 | whether or not it's complete.  So please allow him | 10:04 |
| 3 | to answer. | 10:04 |
| 4 | MS. STEIN:  Ask him if he knows whether | 10:04 |
| 5 | it's complete.  Don't ask him about things that have | 10:04 |
| 6 | nothing to do with what he's here to testify about | 10:04 |
| 7 | here today.  He's not authorized on behalf of | 10:04 |
| 8 | Facebook to talk about ████, email, messaging | 10:04 |
| 9 | that gets used internally. | 10:04 |
| 10 | BY MS. WEAVER: | 10:04 |
| 11 | Q.   So, K.P., can I ask you, is there any kind | 10:04 |
| 12 | of -- for ████ is there any -- well, just -- I'll | 10:04 |
| 13 | move on.  I'll come back to it. | 10:04 |
| 14 | So looking back at Exhibit 3, and turning | 10:04 |
| 15 | to the first page ending at Bates number 424 -- | 10:04 |
| 16 | A.   424, yes. | 10:05 |
| 17 | Q.   ████████████████████ | 10:05 |
| 18 | Do you see that? | 10:05 |
| 19 | A.   Yes. | 10:05 |
| 20 | Q.   And you said earlier that you know who Rob | 10:05 |
| 21 | Sherman is; is that right? | 10:05 |
| 22 | A.   Yes, I do. | 10:05 |
| 23 | Q.   And who is he? | 10:05 |
| 24 | A.   He's the VP of privacy. | 10:05 |
| 25 | Q.   And he's still at Facebook; is that right? | 10:05 |

Page 56

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Yes, he is. | 10:05 |
| 2 | Q.    Okay.  And do you have an understanding as | 10:05 |
| 3 | to what this page represents? | 10:05 |
| 4 | A.    I think that's a list of things that | 10:05 |
| 5 | supposing Facebook receives about people. | 10:05 |
| 6 | Q.    Okay.  ███████████████████ | 10:05 |
| 7 | ████████████████████████████ | 10:05 |
| 8 | ████████████████  Is that correct? | 10:05 |
| 9 | A.    Uh-huh, that's what it says, yes. | 10:05 |
| 10 | Q.    Fair enough. | 10:05 |
| 11 | So did you talk to Mr. Sherman to prepare | 10:05 |
| 12 | for your deposition today? | 10:05 |
| 13 | A.    No, I haven't spoken to him. | 10:05 |
| 14 | Q.    Did you speak to anybody other than your | 10:06 |
| 15 | counsel to prepare for your deposition today? | 10:06 |
| 16 | A.    No, I haven't. | 10:06 |
| 17 | Q.    And how long did you take to prepare for | 10:06 |
| 18 | your deposition? | 10:06 |
| 19 | A.    I think I already answered that question. | 10:06 |
| 20 | I been preparing for this deposition for as long as | 10:06 |
| 21 | I have been at Facebook. | 10:06 |
| 22 | Q.    Fair enough. | 10:06 |
| 23 | A.    It's a collective -- collective knowledge | 10:06 |
| 24 | of my last 8 and a half years of being employed at | 10:06 |
| 25 | this company. | 10:06 |

Page 57

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1       Q.    Okay.  And specifically to prepare for        10:06

 2   this deposition in response to this notice, how much    10:06

 3   time did you spend preparing?                           10:06

 4       A.    I don't know.  Between, you know, calls       10:06

 5   with my counsels and homework that I have done for      10:06

 6   myself, I would say 15-20 hours.                        10:06

 7       Q.    Okay.  Thank you.                             10:06

 8             And looking back now at the page that we      10:06

 9   were looking at ending in Bates number 424, do you      10:06

10   see that it describes three categories of data on       10:06

11   the left?                                               10:06

12       A.    Yes.                                          10:06

13       Q.    ████████████████████████████████             10:07

14   ████████████████      Do you see that?                 10:07

15       A.    Yes.                                          10:07

16       Q.    Do you have an understanding as to what      10:07

17   ███████████  is?                                        10:07

18       A.    ████████████████████████████████            10:07

19   ████████████████████████████████████████████          10:07

20   ████████  .                                            10:07

21       Q.    ███████  ████████████████████████████        10:07

22   ████████████                                           10:07

23       A.    ████████████████████                         10:07

24       Q.    Okay.  And then what is ██████████████        10:07

25             MS. STEIN:  Object to form.                   10:07
```

Page 58

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  Data that is -- what? | 10:07 |
| 2 | MS. STEIN:  Objection to form. | 10:07 |
| 3 | BY MS. WEAVER: | 10:07 |
| 4 | Q.   I'll repeat the question.  What is | 10:07 |
| 5 | ██████████ | 10:07 |
| 6 | MS. STEIN:  Same objection. | 10:07 |
| 7 | THE WITNESS:  It's -- sorry.  I have to | 10:07 |
| 8 | look at the document while you're talking.  I don't | 10:07 |
| 9 | mean to talk over you. | 10:07 |
| 10 | It's okay I answer the question now? | 10:07 |
| 11 | BY MS. WEAVER: | 10:07 |
| 12 | Q.   Yes. | 10:07 |
| 13 | A.   ████  ██████████ | 10:07 |
| 14 | ███ | 10:07 |
| 15 | Q.   ████████████ | 10:07 |
| 16 | █████ | 10:07 |
| 17 | A.   ██████ | 10:08 |
| 18 | Q.   ████  ████████████ | 10:08 |
| 19 | █████████████ | 10:08 |
| 20 | A.   ██████████ | 10:08 |
| 21 | Q.   Okay.  And what is ████████? | 10:08 |
| 22 | MS. STEIN:  Objection to form. | 10:08 |
| 23 | THE WITNESS:  Sorry, I need to switch back | 10:08 |
| 24 | to see -- you don't want to talk.  Okay. | 10:08 |
| 25 | ████████████ | 10:08 |

Page 59

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   ████████████████████████████████                  10:08

 2   BY MS. WEAVER:                                     10:08

 3       Q.   Okay.  And as you sit here today, are     10:08

 4   there any other kinds of information Facebook       10:08

 5   receives about people other than these three       10:08

 6   categories?                                         10:08

 7       A.   I don't think so.                          10:08

 8       Q.   Okay.  Let's return to our discussion of   10:08

 9   █████████.  Do you have an understanding as to why  10:08

10   the word ██████ is being used?  What does that      10:08

11   mean?  Is it the same as raw data?                  10:09

12           MS. STEIN:  Objection to form.              10:09

13           THE WITNESS:  Every piece of data has a     10:09

14   degree of rawness associated with it.  Depends how  10:09

15   you define raw.                                     10:09

16   BY MS. WEAVER:                                      10:09

17       Q.   Okay.  I just didn't quite hear.  Every    10:09

18   piece of data has a particular --                   10:09

19       A.   (Indecipherable).  I'm joking.             10:09

20           They -- if you are talking about raw data,  10:09

21   what do you mean?                                   10:09

22       Q.   Okay.  Well, I'm trying to learn from you, 10:09

23   so let me ask you.                                  10:09

24       A.   The IP address -- the IP address is raw    10:09

25   data.                                               10:09
```

Page 60



```
 1        Q.   Uh-huh, okay.  Good.                        10:09

 2        A.   But it comes through activity that happens  10:09

 3   on a native Facebook app.  The ██████ means, in my    10:09

 4   mind, the way I see the definition there, as          10:09

 5   ████████████████████████████████████                 10:09

 6        Q.   ██████   ████████████████████               10:09

 7   ████████████████████████████████████████             10:09

 8   ███████████                                           10:09

 9        A.   █████████                                   10:09

10        Q.   Okay.  And so when we -- when this          10:09

11   document says ████████████████████████████           10:09

12   ████████████████████████████████████████             10:10

13   ███████████                                           10:10

14        A.   ████████████████████████                   10:10

15        Q.   ████                                        10:10

16        A.   ████████████████████████████               10:10

17   ████████████████████████████████████████             10:10

18   ████████████████████████████████  ██████             10:10

19   ████████████████████████████████████████             10:10

20   ████████████████████████████████████                 10:10

21   ██████████████████████████████████                   10:10

22        Q.   ██████   ████████████████████████          10:10

23   ████████████████████████████████████████████         10:10

24   ██████                                                10:10

25        A.   ████████████████████  ██████████           10:10
```

Page 61

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    ██████████████                                10:10

 2         Q.   Great.  Thank you.                  10:10

 3              And then on the right it seems -- this   10:10

 4    chart seems to further break down categories of   10:10

 5    ██████████████   Do you see that?             10:10

 6         A.   Yes.                                10:10

 7         Q.   Okay.  And there's a column or really a   10:10

 8    box that says ██████████████████   Do you see   10:10

 9    that?                                         10:11

10         A.   Yes.                                10:11

11         Q.   ████████████████████████████       10:11

12    ████████████████████  ███████████            10:11

13    ██████████████████  █████████████            10:11

14    ████████████  █████████████████████          10:11

15    ████████████████████   Do you see all of     10:11

16    those boxes?                                  10:11

17         A.   Yes.                                10:11

18         Q.   Okay.  Do you have an understanding as to   10:11

19    what █████████████████   means?              10:11

20         A.   ███████████████████████            10:11

21    ████████  ████████████████████████           10:11

22    ███████████████████                          10:11

23         Q.   Okay.  And so that means that a user has   10:11

24    taken an action to share the data; is that fair?   10:11

25         A.   Correct.                            10:11
```

                                        Page 62

```
1        Q.   Okay.  And so what does ████████          10:11

2    ████████ mean?                                     10:11

3           MS. STEIN:  Object to form.                 10:11

4           THE WITNESS:  ███████████████               10:11

5    ████████████████████                               10:11

6    BY MS. WEAVER:                                      10:11

7        Q.   I'm sorry, did you --                      10:11

8        A.   █████████████████████████████             10:12

9    ██████████████████████████████████████             10:12

10   █████████████████████      ████████████████        10:12

11   ██████████████████████████████                     10:12

12   ██████████████████████████████                     10:12

13   ███████   █████████████████████████████            10:12

14   ███████████████████████████████████████            10:12

15   ██████████████████████████████                     10:12

16       Q.   ██████████████████████████                10:12

17   ███████████████████████████████████████            10:12

18   █████████████████                                  10:12

19       A.   ██████████   █████████   ████████         10:12

20   ██████████                                         10:12

21       Q.   █████   ███████████████████████           10:12

22   ██████████████████████████████████████             10:12

23   █████████████████████████   █████████              10:12

24   █████████████████                                  10:12

25        ███████████████████████████████               10:12
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ | 10:12 |
| 2 | ▉▉▉▉▉ | 10:12 |
| 3 | MS. STEIN:  Objection to form. | 10:12 |
| 4 | THE WITNESS: ▉▉▉▉▉▉▉ | 10:13 |
| 5 | ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ | 10:13 |
| 6 | ▉▉▉▉▉▉▉▉▉▉▉▉▉ | 10:13 |
| 7 | ▉▉▉▉▉▉▉▉ | 10:13 |
| 8 | BY MS. WEAVER: | 10:13 |
| 9 | Q.  Okay. | 10:13 |
| 10 | A. ▉▉▉▉▉▉▉▉▉ | 10:13 |
| 11 | ▉▉▉▉▉▉▉ | 10:13 |
| 12 | Q. ▉▉ ▉▉▉▉▉▉ | 10:13 |
| 13 | ▉▉▉▉▉▉ | 10:13 |
| 14 | A. ▉▉ | 10:13 |
| 15 | Q. ▉▉▉▉▉▉▉▉▉ ▉ | 10:13 |
| 16 | ▉▉▉▉ | 10:13 |
| 17 | A. ▉▉ | 10:13 |
| 18 | Q. ▉▉ ▉▉▉▉▉ | 10:13 |
| 19 | A. ▉▉▉▉▉▉▉▉▉ | 10:13 |
| 20 | ▉▉▉ | 10:13 |
| 21 | Q. ▉▉▉▉▉▉ | 10:13 |
| 22 | A. ▉▉▉▉▉▉ | 10:13 |
| 23 | Q. ▉▉▉▉▉▉▉ | 10:13 |
| 24 | A. ▉▉ | 10:13 |
| 25 | Q. ▉▉▉▉▉ | 10:13 |

Page 64

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1      A.   ██████████████████████████████           10:13

2    ████████████████                                10:13

3      Q.   ████     ██████████████████████████      10:13

4    ████████████████                                10:13

5      A.   ████████████████████████                 10:14

6      Q.   Okay.   ████████████████████             10:14

7    ██████████████████████████████                  10:14

8    ██████████████████████████████                  10:14

9      A.   ████                                     10:14

10        MS. STEIN:   Object.   Objection to form.  10:14

11   BY MS. WEAVER:                                  10:14

12     Q.   Okay.   And then there's this box that says  10:14

13   ████████████████████████        Do you see      10:14

14   that?                                           10:14

15     A.   Yes, I do.                               10:14

16     Q.   What does that refer to?                 10:14

17     A.   ███████████████████████                  10:14

18   ██████████████████████████████                  10:14

19     Q.   ████████████████                         10:14

20     A.   ██████████████████████████████          10:14

21   ██████████████████████████████                  10:14

22     Q.   ██████████████████████████               10:14

23   ████████     ████████████████████████          10:14

24   ████████                                         10:14

25     A.   ██████████████████████████████          10:14
```

Page 65

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | ████████████████████████ | 10:15 |
| 2 | ████████████████████████ | 10:15 |
| 3 | ████████████████████████ | 10:15 |
| 4 | ████████████████████████ | 10:15 |
| 5 | ████ ████████████████ | 10:15 |
| 6 | Q.   How did you know? | 10:15 |
| 7 | So how does Facebook retain that | 10:15 |
| 8 | information once it draws that inference? | 10:15 |
| 9 | A.   You know, there would be -- | 10:15 |
| 10 | MS. STEIN:  Objection. | 10:15 |
| 11 | THE WITNESS:  █████████████ | 10:15 |
| 12 | ████████████████████████ | 10:15 |
| 13 | ████████████████████ | 10:15 |
| 14 | ████████████████ | 10:15 |
| 15 | BY MS. WEAVER: | 10:15 |
| 16 | Q.   And how does Facebook record those | 10:15 |
| 17 | interests, if you will? | 10:15 |
| 18 | MS. STEIN:  Objection to form. | 10:15 |
| 19 | THE WITNESS:  ██████████████ | 10:15 |
| 20 | ██████ ████████████████ | 10:15 |
| 21 | ██████████ ████████████ | 10:16 |
| 22 | ████████████████████ | 10:16 |
| 23 | ████████ | 10:16 |
| 24 | BY MS. WEAVER: | 10:16 |
| 25 | Q.   Okay.  And so how does that signal come | 10:16 |

Page 66

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | through in terms of data to Facebook and where does | 10:16 |
| 2 | it keep it? | 10:16 |
| 3 | A.   ███████████████████████████ | 10:16 |
| 4 | ██████ ███████████████████████ | 10:16 |
| 5 | ██████ | 10:16 |
| 6 | Q.   Right. | 10:16 |
| 7 | A.   I'm talking about you liking Beyonce's | 10:16 |
| 8 | page on Facebook. | 10:16 |
| 9 | Q.   Okay.  I'm just trying to understand -- | 10:16 |
| 10 | well, let me go back.  For the ██████████ | 10:16 |
| 11 | ████ right, where does Facebook maintain that data? | 10:16 |
| 12 | MS. STEIN:  Objection.  Form. | 10:16 |
| 13 | THE WITNESS:  What do you mean? | 10:16 |
| 14 | BY MS. WEAVER: | 10:16 |
| 15 | Q.   Well, I'm trying to understand.  Facebook | 10:16 |
| 16 | receives ██████████████████ is that right? | 10:16 |
| 17 | A.   Yes. | 10:16 |
| 18 | Q.   And where does it receive it and where | 10:16 |
| 19 | does it go?  Where does the data go? | 10:16 |
| 20 | A.   It's a -- it's a very complicated | 10:16 |
| 21 | question, so let me try to answer it may be with, | 10:16 |
| 22 | you know, like a high-level perspective. | 10:17 |
| 23 | So when you come to Facebook for the first | 10:17 |
| 24 | time in your life you will create an account, right? | 10:17 |
| 25 | To create an account you need to provide the | 10:17 |

Page 67

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | username and a password.  And then it will ask you a | 10:17 |
| 2 | couple of questions.  What is your first name?  What | 10:17 |
| 3 | is your last name?  What is your date of birth, and | 10:17 |
| 4 | so on and so on. | 10:17 |
| 5 | All that information lives in some, you | 10:17 |
| 6 | know, database somewhere, right?  The next time you | 10:17 |
| 7 | come to Facebook you decide to post a photo of | 10:17 |
| 8 | yourself, you know, celebrating your birthday.  That | 10:17 |
| 9 | information lives somewhere in a distributed | 10:17 |
| 10 | database, right? | 10:17 |
| 11 | Then some people will start liking your | 10:17 |
| 12 | page, saying -- will most likely be your friends. | 10:17 |
| 13 | That information is captured somewhere about who has | 10:17 |
| 14 | liked your photo. | 10:17 |
| 15 | Then the next day you come in and you -- | 10:17 |
| 16 | you like Beyonce's page because you just saw her two | 10:17 |
| 17 | months and you want to keep up with her work.  That | 10:18 |
| 18 | information is captured somewhere. | 10:18 |
| 19 | But all that information is available | 10:18 |
| 20 | to -- to you, right?  You can go into your Facebook | 10:18 |
| 21 | settings and you can find all that information. | 10:18 |
| 22 | Q.    Okay.  When you say it is captured | 10:18 |
| 23 | somewhere, where is the somewhere? | 10:18 |
| 24 | A.    ██████████████████████████ | 10:18 |
| 25 | ████████████████  ████████████████ | 10:18 |

Page 68

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        Q.   Use your example.  I go on Facebook's        10:18

 2   website and I take an action.  Where is that           10:18

 3   captured?  You said it's captured somewhere.  Where    10:18

 4   is the somewhere?                                       10:18

 5        A.   ██████████████████████████████████████       10:18

 6   ████████████████████                                    10:18

 7        Q.   Okay.                                          10:18

 8        A.   That's a database.                             10:18

 9        Q.   And what if it's a like?                       10:18

10        A.   Again, it's an activity.                       10:18

11        Q.   Okay.  What if it's something that            10:18

12   Facebook infers?  Where is it captured?                 10:18

13        A.   The inference?                                 10:18

14        Q.   Yes.                                           10:19

15        A.   ████████████████████                          10:19

16        Q.   ██████  ████████████████████████             10:19

17   ██████████  ███████████████████████  ███               10:19

18   ██████████████                                          10:19

19        A.   ████████████████████████                      10:19

20        Q.   ████████████████████████                      10:19

21        A.   ████                                          10:19

22        Q.   ██████  ██████████████████████████           10:19

23   ██████████████████████████████████████                 10:19

24        A.   Again, I guess I'm going to level a little    10:19

25   bit the conversation.                                   10:19
```

Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | If you ever liked Beyonce's page, that | 10:19 |
| 2 | would recapture it on your, you know, like personal | 10:19 |
| 3 | profile.  And if any advertiser, let's say, | 10:19 |
| 4 | Beyonce's label wants to advertise against an | 10:19 |
| 5 | audience of people that like Beyonce, they would | 10:19 |
| 6 | basically identify that in their ad campaign | 10:19 |
| 7 | settings and then we would find whoever may like | 10:19 |
| 8 | Beyonce's page and we will deliver on that about | 10:19 |
| 9 | Beyonce to them.  Very, very high level. | 10:19 |
| 10 | Q.   I understand the functioning that you're | 10:19 |
| 11 | describing.  I don't understand where the data goes | 10:19 |
| 12 | and how Facebook draws the inference. | 10:19 |
| 13 | A.   I'm really sorry, but I'm having a hard | 10:20 |
| 14 | time hearing.  Is it me or is it your mic? | 10:20 |
| 15 | MS. WEAVER:  I'm not having a hard time | 10:20 |
| 16 | hearing. | 10:20 |
| 17 | MS. STEIN:  It's the mic. | 10:20 |
| 18 | MS. WEAVER:  Oh, okay.  Can you hear me | 10:20 |
| 19 | now or is it -- | 10:20 |
| 20 | Q.   Okay.  So I'll repeat the question. | 10:20 |
| 21 | Where -- well -- how does Facebook infer data from | 10:20 |
| 22 | engagement on the site? | 10:20 |
| 23 | A.   ██████████████████████████ | 10:20 |
| 24 | ██████████████████████████ | 10:20 |
| 25 | Q.   And -- | 10:20 |

Page 70

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1       A.    ███████████████████████████████        10:20

2             THE REPORTER:  I'm sorry, "I mean in most    10:20

3    cases"...                                             10:20

4    BY MS. WEAVER:                                        10:20

5       Q.    And --                                       10:20

6             THE REPORTER:  I'm sorry, "I mean in most    10:20

7    cases"...                                             10:20

8             THE WITNESS:  ███████████████████       10:20

9             THE REPORTER:  Thank you.                    10:20

10   BY MS. WEAVER:                                        10:20

11      Q.    Let me move on.  I'm going to return to      10:20

12   that because I think we need to drill down a little   10:20

13   bit.  But I'll just go to ███████████  Do you         10:21

14   see that category?                                    10:21

15      A.    Yes.                                          10:21

16      Q.    And so ███████████ is ████████████████       10:21

17   ████████████████████████████████████                  10:21

18      A.    Yes.                                          10:21

19      Q.    Okay.  ████████████████████████████          10:21

20   ██████████████                                         10:21

21      A.    ██████                                        10:21

22      Q.    ████████████████████████                      10:21

23      A.    It's -- sorry.                                10:21

24            MS. STEIN:  Are you asking him to read        10:21

25   from the document or are you asking him his            10:21
```

Page 71

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   understanding?                                   10:21

 2          ██████████   ████████████████████         10:21

 3   ████████████                                     10:21

 4           ████████████   ████████████████████      10:21

 5   ██████████████████████████████████              10:21

 6   ████████████████████████████                    10:21

 7   ████████████████████████████████████,           10:21

 8   ████████████████████████████████████            10:21

 9   ████████████                                     10:21

10   BY MS. WEAVER:                                   10:21

11          Q.   Do you know what a data broker is?   10:21

12          A.   My definition of data broker?        10:21

13          Q.   Yes.                                  10:22

14          A.   Anybody that has access to a broad set of   10:22

15   data.                                            10:22

16          Q.   Okay.  Is Facebook a data broker?    10:22

17          A.   No.                                   10:22

18          Q.   Okay.  Did you talk to anybody -- well,   10:22

19   strike that.                                     10:22

20          Do you see where it says   ████████       10:22

21   ██████████   on this document?                   10:22

22          A.   Yes.                                  10:22

23          Q.   What does that refer to?             10:22

24          A.   I guess a list of different categories I   10:22

25   listed myself.  It's also documented here.       10:22
```

Page 72

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1        Q.    And so do you see to the right there it        10:22
2    ███████████████████████████████████                     10:22
3    ████████████████████████████████████████                10:22
4    ██████████████████████████████████                      10:22
5        A.    Yes.                                           10:22
6        Q.    And is it your understanding that those        10:22
7    are examples of the kind -- kinds of data that           10:22
8    Facebook collects from ████████████                      10:22
9        A.    Yes.  I don't know if it's exhaustive or       10:23
10   not, but I would imagine that it is exhaustive.          10:23
11       Q.    Thank you.  And then underneath that do        10:23
12   you see where it says "Advertisers"?                     10:23
13       A.    Yes.                                           10:23
14       Q.    What is an advertiser?                         10:23
15       A.    Someone that is running marketing              10:23
16   companies on Facebook.                                   10:23
17       Q.    Okay.  And then there's a parenthetical        10:23
18   that refers to "Custom audiences, ████████████           10:23
19   ████████████   Do you see that?                          10:23
20       A.    Yes.                                           10:23
21       Q.    What is custom audiences?                      10:23
22       A.    A custom audience is a reference to a          10:23
23   products whereby a business can upload and encrypt       10:23
24   its -- a version of their database of customers for      10:23
25   the purpose of running a campaign that targets those    10:23
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | customers. | 10:23 |
| 2 | Q.   Okay.  I want to break that down a little | 10:23 |
| 3 | bit. | 10:23 |
| 4 | MS. WEAVER:  I'm not seeing that on my | 10:23 |
| 5 | live feed. | 10:23 |
| 6 | Could you read his response back, please. | 10:24 |
| 7 | (The record was read by the | 10:24 |
| 8 | court reporter, as requested) | 10:24 |
| 9 | BY MS. WEAVER: | 10:24 |
| 10 | Q.   Okay.  And when you say "encrypt," what do | 10:24 |
| 11 | you mean? | 10:24 |
| 12 | A.   They wouldn't upload the raw data.  They | 10:24 |
| 13 | would upload a version of that data. | 10:24 |
| 14 | THE REPORTER:  I'm sorry, could you repeat | 10:24 |
| 15 | that last part, please? | 10:24 |
| 16 | THE WITNESS:  They wouldn't upload raw | 10:24 |
| 17 | customer data.  They would upload encrypted personal | 10:24 |
| 18 | or hashed personal data. | 10:24 |
| 19 | BY MS. WEAVER: | 10:24 |
| 20 | Q.   Thank you.  And when you say "raw customer | 10:24 |
| 21 | data," what do you mean? | 10:24 |
| 22 | A.   Email addresses. | 10:24 |
| 23 | Q.   Anything else? | 10:24 |
| 24 | A.   No. | 10:24 |
| 25 | Q.   ███████████████████████ | 10:24 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



| | | |
|---|---|---|
| 1 | | 10:24 |
| 2 | A. | 10:24 |
| 3 | | 10:25 |
| 4 | | 10:25 |
| 5 | | 10:25 |
| 6 | | 10:25 |
| 7 | | 10:25 |
| 8 | | 10:25 |
| 9 | | 10:25 |
| 10 | | 10:25 |
| 11 | | 10:25 |
| 12 | | 10:25 |
| 13 | | 10:25 |
| 14 | | 10:25 |
| 15 | | 10:25 |
| 16 | Q. | 10:25 |
| 17 | | 10:25 |
| 18 | A. | 10:25 |
| 19 | | 10:25 |
| 20 | | 10:26 |
| 21 | | 10:26 |
| 22 | Q. | 10:26 |
| 23 | | 10:26 |
| 24 | A. | 10:26 |
| 25 | Q.   And that could also include engaging in -- | 10:26 |

Page 75

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | well, strike that. | 10:26 |
| 2 | ████████████████████████ | 10:26 |
| 3 | ████████████████████████ | 10:26 |
| 4 | A.   ████████████████ | 10:26 |
| 5 | ████████████████ | 10:26 |
| 6 | Q.   Got it.  Does advertisers here also | 10:26 |
| 7 | include political campaigns? | 10:26 |
| 8 | A.   I'm looking at the -- sorry.  Sorry.  I | 10:26 |
| 9 | need to answer that, I guess.  What do you mean?  In | 10:26 |
| 10 | what context? | 10:26 |
| 11 | Q.   Do political campaigns advertise? | 10:26 |
| 12 | A.   Yes, they do. | 10:26 |
| 13 | Q.   Okay.  And when they are seeking | 10:26 |
| 14 | conversion, are they seeking to encourage certain | 10:26 |
| 15 | actions by Facebook users? | 10:26 |
| 16 | MS. STEIN:  Objection to form. | 10:27 |
| 17 | THE WITNESS:  Yeah, but that wouldn't | 10:27 |
| 18 | include, you know, like what people voted.  It would | 10:27 |
| 19 | probably include if they read, or if they donated, | 10:27 |
| 20 | or if they took an action on their website, | 10:27 |
| 21 | depending on what the campaign is actually optimized | 10:27 |
| 22 | for. | 10:27 |
| 23 | BY MS. WEAVER: | 10:27 |
| 24 | Q.   Got it. | 10:27 |
| 25 | A.   But, no, the conversion wouldn't be that I | 10:27 |

Page 76

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | voted for Biden or I voted for Trump.  That's not -- | 10:27 |
| 2 | THE REPORTER:  I'm sorry, could you please | 10:27 |
| 3 | slow down.  The last part? | 10:27 |
| 4 | THE WITNESS:  Oh, sorry. | 10:27 |
| 5 | THE REPORTER:  "The conversion"... | 10:27 |
| 6 | THE WITNESS:  The conversion that | 10:27 |
| 7 | political campaigns are tracking have to do with | 10:27 |
| 8 | fundraising, donations, registration, this kind of | 10:27 |
| 9 | things. | 10:27 |
| 10 | BY MS. WEAVER: | 10:27 |
| 11 | Q.    ████    ███████████████████ | 10:27 |
| 12 | ████████████████████████████ | 10:27 |
| 13 | ████████████████████████████ | 10:27 |
| 14 | ██████ | 10:27 |
| 15 | ███████  ███████████ | 10:27 |
| 16 | ████████  █████ | 10:27 |
| 17 | BY MS. WEAVER: | 10:27 |
| 18 | Q.    And then do you see on the right of | 10:27 |
| 19 | Advertisers it says "Existing customer | 10:27 |
| 20 | relationships"?  Do you see that?  It's to the right | 10:27 |
| 21 | of Advertisers. | 10:28 |
| 22 | A.    Yes. | 10:28 |
| 23 | Q.    What does "Existing customer | 10:28 |
| 24 | relationships," that subcategories of advertisers, | 10:28 |
| 25 | refer to? | 10:28 |

Page 77

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   And so going back to our example earlier, | 10:28 |
| 2 | if -- if you are Walmart again, and you know that -- | 10:28 |
| 3 | let's say there are thousands of people that | 10:28 |
| 4 | attempted to purchase a TV from Walmart's website | 10:28 |
| 5 | and you have an understanding of the email addresses | 10:28 |
| 6 | of those people.  Then you can encrypt those email | 10:28 |
| 7 | addresses, make them available to Facebook to create | 10:28 |
| 8 | what we call a custom audience. | 10:28 |
| 9 | And then Facebook will, you know, like -- | 10:28 |
| 10 | can target those specific users to the extent that | 10:28 |
| 11 | they are also Facebook users, of course, with an ad | 10:28 |
| 12 | that offers them, let's say, a discount for that | 10:28 |
| 13 | specific TV. | 10:28 |
| 14 | Q.   What do you mean by "encrypt"? | 10:28 |
| 15 | A.   ███████████████████████████ | 10:29 |
| 16 | ████████████████    ███████████████ | 10:29 |
| 17 | ██████████████████████████ | 10:29 |
| 18 | ████████████████████████████████ | 10:29 |
| 19 | ████████████████████████████████ | 10:29 |
| 20 | ████████████████████ | 10:29 |
| 21 | Q.   So what is the difference between | 10:29 |
| 22 | encryption and hashing? | 10:29 |
| 23 | A.   It's same thing in that sense. | 10:29 |
| 24 | Q.   It is the same thing? | 10:29 |
| 25 | A.   Yeah. | 10:29 |

Page 78

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Is it true that hashing has two inputs -- | 10:29 |
| 2 | well, let me go back.  Is it fair to say that | 10:29 |
| 3 | encryption has two inputs so that if you have a key, | 10:29 |
| 4 | you can associate data point together; is that fair? | 10:29 |
| 5 | MS. STEIN:  Object to form.  He's not here | 10:29 |
| 6 | as a technical expert, so... | 10:29 |
| 7 | You can give your high-level | 10:29 |
| 8 | understanding, if you have one. | 10:29 |
| 9 | THE WITNESS:  Yes, I don't -- I don't | 10:29 |
| 10 | want -- I don't want to talk about, you know, like | 10:29 |
| 11 | encryption.  ███████████████████ | 10:29 |
| 12 | ████████████████████████ | 10:29 |
| 13 | ████████████████████████ | 10:30 |
| 14 | ██████████████████████████ | 10:30 |
| 15 | ███████████████████ | 10:30 |
| 16 | BY MS. WEAVER: | 10:30 |
| 17 | Q.   Okay.  Well, just looking at this page, | 10:30 |
| 18 | you see that there's the word "Hashed data matching" | 10:30 |
| 19 | on it?  It's below -- it's in the native data box | 10:30 |
| 20 | there. | 10:30 |
| 21 | A.   Yes. | 10:30 |
| 22 | Q.   Do you see where it says "Hashed data | 10:30 |
| 23 | matching"? | 10:30 |
| 24 | A.   Yes. | 10:30 |
| 25 | Q.   What is hashed data matching? | 10:30 |

Page 79

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    This is the data that we were talking | 10:30 |
| 2 | about used for custom audience. | 10:30 |
| 3 | Q.    So could you, please, explain what hashed | 10:30 |
| 4 | data matching is? | 10:30 |
| 5 | A.    ███████████████████████ | 10:30 |
| 6 | ██████████████████████ | 10:30 |
| 7 | ██████████████████████████ | 10:30 |
| 8 | ████████████████████████ | 10:30 |
| 9 | ███████████████████████████ | 10:30 |
| 10 | ██████████████████████████ | 10:30 |
| 11 | Q.    ████████████████████ | 10:30 |
| 12 | ██████████████████████ | 10:30 |
| 13 | ████████████████████████ | 10:31 |
| 14 | █████████████████████████ | 10:31 |
| 15 | ████  ██████████ | 10:31 |
| 16 | A.    ██████  ████████ | 10:31 |
| 17 | Q.    ████  ████████████████ | 10:31 |
| 18 | █████████████ | 10:31 |
| 19 | A.    ██████ | 10:31 |
| 20 | Q.    ███  ███████████ | 10:31 |
| 21 | ██████████████████████████ | 10:31 |
| 22 | ███████████████ | 10:31 |
| 23 | A.    ████████████████████ | 10:31 |
| 24 | ███████  ███████████████ | 10:31 |
| 25 | ███████████████████ | 10:31 |

Page 80

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | ███████████████████ | 10:31 |
| 2 | Q.   And then going now back to the appended | 10:31 |
| 3 | data chart.  Do you see where it says "Purchase | 10:31 |
| 4 | history," near "Advertisers"? | 10:31 |
| 5 | A.   Yes. | 10:31 |
| 6 | Q.   What does that refer to? | 10:31 |
| 7 | A.   ██████████████████████████ | 10:31 |
| 8 | █████████████████ | 10:32 |
| 9 | Q.   ██████  ███████████████████ | 10:32 |
| 10 | A.   ███████████████████████████ | 10:32 |
| 11 | █████████████  ████████████████ | 10:32 |
| 12 | ████████████████████████ | 10:32 |
| 13 | ██████████████████████████ | 10:32 |
| 14 | ███████████████████ | 10:32 |
| 15 | ███████████████████████████████ | 10:32 |
| 16 | ███████████████████████ | 10:32 |
| 17 | ███████████████████████ | 10:32 |
| 18 | ██████████████████████████ | 10:32 |
| 19 | ████████████████ | 10:32 |
| 20 | Q.   Okay.  So Facebook is getting data about, | 10:32 |
| 21 | for example, that I had something in my cart that I | 10:32 |
| 22 | didn't purchase; is that right? | 10:32 |
| 23 | MS. STEIN:  Object to form. | 10:32 |
| 24 | THE WITNESS:  No, not that, no. | 10:32 |
| 25 | | |

Page 81

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | BY MS. WEAVER: | 10:32 |
| 2 |     Q.   Okay.  Who has it?  You just gave that as | 10:32 |
| 3 | an example. | 10:32 |
| 4 |     A.   Yeah, but that is a logic that takes place | 10:32 |
| 5 | on the advertiser's side. | 10:32 |
| 6 |     Q.   Okay. | 10:32 |
| 7 |     A.   The advertiser selects the marketing team | 10:32 |
| 8 | on the advertiser side to decide what kind of | 10:32 |
| 9 | campaign they want to run.  And they create a | 10:33 |
| 10 | segment of their customers that they want to target | 10:33 |
| 11 | with their ad campaign, and then they will decide | 10:33 |
| 12 | what creative they want to use, like how the ad is | 10:33 |
| 13 | going to look like. | 10:33 |
| 14 |     Q.   Right.  But this is a list of information | 10:33 |
| 15 | that Facebook receives, right? | 10:33 |
| 16 |     MS. STEIN:  Objection to form. | 10:33 |
| 17 |     THE WITNESS:  The information we receive | 10:33 |
| 18 | is not the activities.  It's hashed email addresses | 10:33 |
| 19 | or hashed phone numbers from the advertisers. | 10:33 |
| 20 | BY MS. WEAVER: | 10:33 |
| 21 |     Q.   Okay.  Looking at this chart here, it's | 10:33 |
| 22 | labeled, "What kinds of information does Facebook | 10:33 |
| 23 | receive?" correct? | 10:33 |
| 24 |     MS. STEIN:  Objection to form. | 10:33 |
| 25 |     (Background audio interference.) | 10:33 |

Page 82

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. WEAVER:  Somebody needs to put their | 10:33 |
| 2 | phones on mute or their computers on mute. | 10:34 |
| 3 | Q.   Returning to the document, sir, isn't this | 10:34 |
| 4 | page a list of information that Facebook receives | 10:34 |
| 5 | about people? | 10:34 |
| 6 | MS. STEIN:  Objection to form. | 10:34 |
| 7 | THE WITNESS:  We received information that | 10:34 |
| 8 | an associate hashed email address with a Walmart | 10:34 |
| 9 | customer. | 10:34 |
| 10 | MS. WEAVER:  Okay.  Tat's -- I'll just | 10:34 |
| 11 | move to strike as nonresponsive.  We will move on. | 10:34 |
| 12 | Q.   Going back to this category that says | 10:34 |
| 13 | "Both."  Do you see that, near ███████████? | 10:34 |
| 14 | A.   Yes. | 10:34 |
| 15 | Q.   What does "both" mean? | 10:34 |
| 16 | MS. STEIN:  Objection to form. | 10:34 |
| 17 | ██████████  ████████████████ | 10:34 |
| 18 | ████████████████████ | 10:34 |
| 19 | █████████████  ███████████████ | 10:34 |
| 20 | ██████████  ███████████ | 10:34 |
| 21 | ██████████  ███████████████ | 10:34 |
| 22 | ████████████ | 10:34 |
| 23 | BY MS. WEAVER: | 10:34 |
| 24 | Q.   Okay.  And so does this document reflect | 10:34 |
| 25 | that Facebook receives from ████████████ | 10:34 |

Page 83

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | ███████████████████████ | 10:34 |
| 2 | MS. STEIN:  Objection to form.  The | 10:35 |
| 3 | document speaks for itself. | 10:35 |
| 4 | MS. WEAVER:  I'm here to depose him about | 10:35 |
| 5 | the document, Deb.  It was identified ahead of time. | 10:35 |
| 6 | Please answer the question. | 10:35 |
| 7 | MS. STEIN:  Yeah, Lesley, this document is | 10:35 |
| 8 | all about targeted advertising, and you've been | 10:35 |
| 9 | going on for about an hour about targeted | 10:35 |
| 10 | advertising which isn't even in this case.  It's | 10:35 |
| 11 | outside the scope of this case. | 10:35 |
| 12 | MS. WEAVER:  You can instruct him not to | 10:35 |
| 13 | answer if you want, but I'm actually -- | 10:35 |
| 14 | MS. STEIN:  Lesley, I've let this witness | 10:35 |
| 15 | testify for an hour about targeted advertising.  So | 10:35 |
| 16 | if you want to ask him about the scope of this | 10:35 |
| 17 | deposition, you're free to, but suggesting that just | 10:35 |
| 18 | because you sent us a document about targeted | 10:35 |
| 19 | advertising -- | 10:35 |
| 20 | MS. WEAVER:  Deb, stop lecturing and | 10:35 |
| 21 | wasting my minutes with the witness, please. | 10:35 |
| 22 | MS. STEIN:  Lesley, I am stating my | 10:35 |
| 23 | position for the record.  This is a 30(b)(6) | 10:35 |
| 24 | deposition on a specific set of topics.  You've gone | 10:35 |
| 25 | beyond the scope.  I've been very liberal in that. | 10:35 |

Page 84

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | I will let the witness continue answering | 10:35 |
| 2 | some more questions, but if it continues focusing on | 10:35 |
| 3 | targeted advertising, then we're going to have to | 10:36 |
| 4 | move on. | 10:36 |
| 5 | BY MS. WEAVER: | 10:36 |
| 6 | Q.   So the question -- I'm sorry, K.P. -- the | 10:36 |
| 7 | question is this: ████████████████████████ | 10:36 |
| 8 | ███████████████████████████████████ | 10:36 |
| 9 | ███████████████████████████████████ | 10:36 |
| 10 | ████████ | 10:36 |
| 11 | MS. STEIN:  Objection to form. | 10:36 |
| 12 | THE WITNESS:  I don't know the definition | 10:36 |
| 13 | of an ████████████████████████ | 10:36 |
| 14 | BY MS. WEAVER: | 10:36 |
| 15 | Q.   Okay. | 10:36 |
| 16 | A.   ████████████████████████████ | 10:36 |
| 17 | ███████████████████████████████ | 10:36 |
| 18 | ███████████████████████████████ | 10:36 |
| 19 | ████████████ | 10:36 |
| 20 | Q.   Thank you. | 10:36 |
| 21 | And does Facebook also receive ████████ | 10:36 |
| 22 | ████ | 10:36 |
| 23 | A.   In what context? | 10:36 |
| 24 | ██ ████████████████████████ ██ | 10:36 |
| 25 | ███████████████████████ | 10:36 |

Page 85

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    A.   ██████  ███████████████████████        10:36

 2    Q.   ████                                    10:36

 3    A.   ██████  ████████████████████████        10:36

 4  ███████████████████                            10:36

 5    Q.   ██████  ████████████  ████████████      10:36

 6  ████████████████  ██████████████████████       10:36

 7  ███████████████████████████                    10:36

 8    A.   ██████                                  10:36
```

 9        Q.   Okay.  And do you see where it says "Web          10:36

10   pixels" here?                                                10:36

11        A.   Yes.                                               10:37

12        Q.   What does that refer to?                           10:37

13        A.   It refers to the different implementation          10:37

14   of the Facebook pixel that is used in conjunction --         10:37

15   in conjunction with ad campaigns most of the time.           10:37

16        Q.   Okay.  And what is a conversion pixel?             10:37

17        A.   It's a pixel that is strategically                 10:37

18   placed -- "strategically" meaning it's down to the           10:37

19   advertiser -- on the page, on their website that             10:37

20   tracks the effectiveness of their ad campaign                10:37

21   depending on their -- their objective of the                 10:37

22   company.                                                     10:37

23        Q.   Okay.  And then "Web SDK," do you see              10:37

24   that?                                                        10:37

25        A.   Yes.                                               10:37

Page 86

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   What does that refer to? | 10:37 |
| 2 | A.   So this is the version of the SDK that is | 10:37 |
| 3 | used by websites. | 10:37 |
| 4 | Q.   Okay.  And did that change over time? | 10:37 |
| 5 | A.   Yes, we update the SDKs quite regularly. | 10:38 |
| 6 | Q.   Okay.  And "Mobile SDK," what is that? | 10:38 |
| 7 | A.   This is the SDK that is used by native | 10:38 |
| 8 | apps, meaning iOS and Android. | 10:38 |
| 9 | Q.   Okay.  I just want to go back to | 10:38 |
| 10 | ███████████████████   ███████████████ | 10:38 |
| 11 | ████████████████████ | 10:38 |
| 12 | A.   I think we discussed about that before. | 10:38 |
| 13 | So I'll try to repeat my previous response. | 10:38 |
| 14 | ████████████████████████ | 10:38 |
| 15 | ██████████████████████████████ | 10:38 |
| 16 | ████████████████ | 10:38 |
| 17 | Q.   Okay.  I see that I guess the videographer | 10:38 |
| 18 | would like to take a quick break.  So do you want to | 10:38 |
| 19 | just -- is that comfortable for you, K.P., to take a | 10:38 |
| 20 | break for a little bit here? | 10:38 |
| 21 | A.   Yes, I need a coffee. | 10:38 |
| 22 | MS. WEAVER:  Okay.  So why don't we come | 10:38 |
| 23 | back at, do you want to say, 10:50? | 10:38 |
| 24 | THE WITNESS:  10 minutes from now? | 10:38 |
| 25 | MS. WEAVER:  Yeah, does that work?  Well, | 10:39 |

Page 87

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1      1   11 minutes?  Okay.  Great.                        10:39

        2              THE VIDEOGRAPHER:  We are off the record  10:39

 2                  10:39    3    at       a.m.

        10:39

 3      4          (Recess.)                                  10:39

                    10:39    5              (Off record:      a.m.)

 4      10:39

 5      6          (On record:  10:53 a.m.)                   10:39

 6      7              THE VIDEOGRAPHER:  We are on the record at  10:53

 7                  10:53    8          a.m.

 8      10:53

 9      9   BY MS. WEAVER:                                    10:53

10     10        Q.  Hello, K.P.  You understand you are still  10:53

11     11   under oath, correct?                              10:53

12     12        A.  Yes, I do.                               10:53

13     13        Q.  Okay.  Returning to where we left off, we  10:53

14     14   were discussing ██████████████  before the break.  10:53

15     15   Do you recall that?                               10:53

16     16        A.  Yes, I do.                               10:53

17     17        Q.  ████████████████████████████████  █:53

18     18   ████████████████████████████████████              10:53

19     19   ████████████████████████████████████              10:53

20     20   ████████████████████                              10:53

21     21        A.  ████████                                 10:53

22     22              MS. STEIN:  Object to form.            10:53

23     23   BY MS. WEAVER:                                    10:53

24     24        Q.  And so to the right here do you see it   10:53

25     25   ██████████████████████████████████                10:53
```

Page 88

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | ███████████████████   ██████████ | 10:53 |
| 2 | ██████ | 10:54 |
| 3 | A.   Yes, I do. | 10:54 |
| 4 | Q.   Okay.  So does this reflect that Facebook | 10:54 |
| 5 | receives ████████████████████████████ | 10:54 |
| 6 | ██████████████████ | 10:54 |
| 7 | MS. STEIN:  Objection to form. | 10:54 |
| 8 | THE WITNESS:   ███████   █████████████ | 10:54 |
| 9 | ████████████████████████████████ | 10:54 |
| 10 | ██████████████████████████████ | 10:54 |
| 11 | ██████████████████████████████████ | 10:54 |
| 12 | ████████████████████████████████ | 10:54 |
| 13 | █████████████ | 10:54 |
| 14 | BY MS. WEAVER: | 10:54 |
| 15 | Q.   Okay.  And do you see here where it says | 10:54 |
| 16 | ██████████████████████████████ | 10:54 |
| 17 | A.   Yes. | 10:54 |
| 18 | Q.   Do you see that?  What does that refer to? | 10:54 |
| 19 | MS. STEIN:  Objection.  Asked and | 10:54 |
| 20 | answered. | 10:54 |
| 21 | You can answer. | 10:54 |
| 22 | THE WITNESS:  This is in relation to the | 10:54 |
| 23 | web SDK and refers to activities captured in -- this | 10:54 |
| 24 | is for the purpose of those examples via the | 10:55 |
| 25 | Facebook log-in button and a like button. | 10:55 |

Page 89

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | BY MS. WEAVER: | 10:55 |
| 2 | Q.    Okay.  And do you see at the bottom of the | 10:55 |
| 3 | page here it refers to "Onavo"? | 10:55 |
| 4 | A.    Yes. | 10:55 |
| 5 | Q.    And what is Onavo? | 10:55 |
| 6 | A.    Onavo is a -- an app we acquired some | 10:55 |
| 7 | five, six years ago, if I'm not mistaken, that's | 10:55 |
| 8 | offers the users the ability to compress the data | 10:55 |
| 9 | from all apps that they used on their phones to save | 10:55 |
| 10 | on data charges. | 10:55 |
| 11 | Q.    So it was called Onavo Protect; is that | 10:55 |
| 12 | correct? | 10:55 |
| 13 | A.    I don't remember the exact name of the | 10:55 |
| 14 | app. | 10:55 |
| 15 | Q.    Do you recall that it was a VPN, a virtual | 10:55 |
| 16 | private network? | 10:55 |
| 17 | MS. STEIN:  Objection to form. | 10:55 |
| 18 | THE WITNESS:  Yes. | 10:55 |
| 19 | BY MS. WEAVER: | 10:55 |
| 20 | Q.    ███████████████████████e all of the | 10:55 |
| 21 | ████████████████████████████ | 10:55 |
| 22 | ████████████   ████████████ | 10:55 |
| 23 | ██████████████   ██████████████████ | 10:55 |
| 24 | ███████████ | 10:55 |
| 25 | Q.    ███████ | 10:56 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.   ████████████    ████████████████        10:56

 2   ███████                                            10:56

 3        Q.   ████████    ████████████████████         10:56

 4   ████████████████████████████                       10:56

 5           MS. STEIN:  Objection to form.  Beyond the 10:56

 6   scope.                                              10:56

 7           MS. WEAVER:  It relates directly to the    10:56

 8   data that Facebook was collecting through Onavo.   10:56

 9        Q.   Isn't it true that Facebook suspended    10:56

10   Onavo?                                             10:56

11           MS. STEIN:  Objection to form.  Beyond the 10:56

12   scope.  This witness is not testifying about --    10:56

13           MS. WEAVER:  Are you instructing him not   10:56

14   to answer my question about Onavo?                 10:56

15           MS. STEIN:  That it's not subject to this  10:56

16   testimony.  He's not here -- he knows it -- he's not 10:56

17   designated --                                      10:56

18           MS. WEAVER:  State an objection to form or 10:56

19   instruct him not to answer.  Please don't fill my  10:56

20   record with your speeches.                         10:56

21           MS. STEIN:  Okay.  It's not a speech.  I'm 10:56

22   explaining that this witness came prepared to      10:56

23   testify about certain things.  He's not a company  10:56

24   witness on suspensions, so he's not answering the  10:56

25   question.                                          10:56
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   BY MS. WEAVER:                                    10:56
 2       Q.   Do you see to the right of the word      10:56
 3   "Onavo" here, K.P., where it ███████████████      10:56
 4   ████████████████████████   Do you see that?       10:57
 5       A.   Yes, I see that.                          10:57
 6       Q.   What does that refer to?                  10:57
 7       A.   Again, only guess.                        10:57
 8       Q.   What -- what do you believe it means?     10:57
 9            MS. STEIN:  The witness should not guess.  10:57
10   If he knows, he can answer.  If he does not know, he  10:57
11   should not answer.                                 10:57
12            THE WITNESS:  I don't know.               10:57
13   BY MS. WEAVER:                                     10:57
14       Q.   Okay.  Does that refer to the fact that   10:57
15   Facebook received ████████████████████████████    10:57
16   ████████████████                                   10:57
17            MS. STEIN:  Objection.  The witness just  10:57
18   said he doesn't know.                              10:57
19   BY MS. WEAVER:                                     10:57
20       Q.   You can answer the question.              10:57
21       A.   I don't know.                             10:57
22       Q.   Okay.  Did you have any personal          10:57
23   involvement with Onavo?                            10:57
24       A.   No, I didn't.                             10:57
25       Q.   Okay.  Do you know who did?               10:57
```

Page 92

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   It's a very broad question.  So in what | 10:57 |
| 2 | capacity? | 10:57 |
| 3 | Q.   Who oversaw the Onavo project from within | 10:57 |
| 4 | Facebook?  It was a partnership, correct? | 10:57 |
| 5 | A.   No, it's not a partnership.  It's an | 10:57 |
| 6 | acquisition. | 10:57 |
| 7 | Q.   Okay.  So who oversaw that acquisition? | 10:57 |
| 8 | A.   On the Facebook side or -- | 10:57 |
| 9 | Q.   Yes. | 10:58 |
| 10 | A.   -- after the acquisition? | 10:58 |
| 11 | Q.   On the Facebook side. | 10:58 |
| 12 | A.   I don't know. | 10:58 |
| 13 | Q.   Okay.  What about after the acquisition? | 10:58 |
| 14 | A.   The -- I guess the CEO of Onavo. | 10:58 |
| 15 | Q.   Okay.  Move on. | 10:58 |
| 16 | Do you know what an ███████ | 10:58 |
| 17 | A.   I don't know. | 10:58 |
| 18 | Q.   So I'll turn to the next page on this | 10:58 |
| 19 | document.  And that's the one beginning at 425.  Do | 10:58 |
| 20 | you see that?  It says "Hard Questions" at the top? | 10:58 |
| 21 | A.   Yes. | 10:58 |
| 22 | Q.   Okay.  And then do you see where it says | 10:58 |
| 23 | ████████████████████████  Do | 10:58 |
| 24 | you see that? | 10:58 |
| 25 | A.   I see that. | 10:58 |

Page 93

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    And in quotes it says ███████████ | 10:58 |
| 2 | ██████████████████████████████████ | 10:58 |
| 3 | ███████████████████████   Do you see that? | 10:58 |
| 4 | A.    I see that. | 10:58 |
| 5 | Q.    And do you see that it's in quotations? | 10:58 |
| 6 | A.    Yes. | 10:59 |
| 7 | Q.    And is that in quotations because that was | 10:59 |
| 8 | Facebook's policy at the time? | 10:59 |
| 9 | MS. STEIN:  Objection to form.  If the | 10:59 |
| 10 | witness knows what the people who wrote this -- | 10:59 |
| 11 | MS. WEAVER:  Please stop coaching him and | 10:59 |
| 12 | telling him to say that he doesn't know. | 10:59 |
| 13 | MS. STEIN:  Lesley -- Lesley, do not | 10:59 |
| 14 | accuse me of coaching.  You've gotten -- | 10:59 |
| 15 | MS. WEAVER:  That's strike one. | 10:59 |
| 16 | Q.    Okay.  Go ahead, K.P. | 10:59 |
| 17 | MS. STEIN:  Excuse me? | 10:59 |
| 18 | BY MS. WEAVER: | 10:59 |
| 19 | Q.    I'll ask the question again.  Do you know | 10:59 |
| 20 | at this point in time whether Facebook's policy was, | 10:59 |
| 21 | ████████████████████████████████████ | 10:59 |
| 22 | ██████████████████████████████████ | 10:59 |
| 23 | A.    I can only speak at a high level.  This | 10:59 |
| 24 | has always been not just the policy but the way we | 10:59 |
| 25 | operated as a business. | 10:59 |

Page 94

```
1       Q.    Okay.  Thank you.                        10:59

2             And then do you see it says ████████     10:59

3       ████████    right below it?                    10:59

4       A.    Yes, yes.                                 10:59

5       Q.    Okay.  And then there's a bullet point    10:59

6   that says ██████████████████████                    11:00

7   ████████████████████████                            11:00

8   ████████████████████████                            11:00

9   ████████████    Do you see that?                    11:00

10      A.    Yes, I do.                                11:00

11      Q.    Okay.  So is it a true statement that at  11:00

12  this time Facebook's policy prohibited sharing of   11:00

13  data with data brokers or similar entities?         11:00

14      A.    Yes.                                      11:00

15      Q.    Okay.  And do you have an understanding as 11:00

16  to what the ████████████████████                    11:00

17  ██████████    what does that mean?                  11:00

18      A.    It means that Facebook as a business only 11:00

19  makes public commitments about things that are      11:00

20  within our control.                                 11:00

21      Q.    Okay.  And so I just want to direct your  11:00

22  attention to the bottom bullet point there in the   11:00

23  second sentence.  Do you see where it says ███████   11:00

24  ████████████████████                                11:01

25  ████████████████████                                11:01
```

Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    ████████████████████████ Do you see                    11:01

2    that?                                                   11:01

3        A.    I see that.                                   11:01

4        Q.    Okay.  ███████████████████                    11:01

5    ███████████████████                                     11:01

6        A.    ████████████████████                          11:01

7    ████████████████████                                    11:01

8        Q.    █████  ██████████████████                     11:01

9    ██████████████████████████                              11:01

10       A.    ████                                          11:01

11       Q.    █████████████████████████                     11:01

12       A.    ████████████                                  11:01

13       Q.    Okay.  What is -- a little bit lower          11:01

14   there, do you see ████████████████ referenced?          11:01

15       A.    Yes.                                          11:01

16       Q.    What does that refer to?                      11:01

17       A.    I don't know.                                 11:01

18       Q.    Okay.  There's a question here ███████        11:02

19   ████████████████████████                                11:02

20   ████████████████ Do you see that?                       11:02

21       A.    Yes, I see that.                              11:02

22       Q.    And there's something there that says         11:02

23   ██████████████ Do you see it?                           11:02

24       A.    Yes.                                          11:02

25       Q.    What is that?                                 11:02

Page 96

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Sorry, I'm searching back so I can see | 11:02 |
| 2 | you. | 11:02 |
| 3 | So there is a -- an option for every app | 11:02 |
| 4 | that you see on your feed to check who is the | 11:02 |
| 5 | advertiser and why you may have been targeted. | 11:02 |
| 6 | Q.    Okay.  And can you -- that was during the | 11:02 |
| 7 | time period in 2012 to 2017? | 11:02 |
| 8 | A.    My -- I don't know exactly when that | 11:02 |
| 9 | option was added, but I believe it was always there. | 11:02 |
| 10 | Q.    Okay.  And ██████████████████████ | 11:02 |
| 11 | ████████████████    Do you see that? | 11:02 |
| 12 | A.    Yes. | |
| 13 | Q.    And it says ████████████████████ | 11:03 |
| 14 | ██████████████████████████    Do you | 11:03 |
| 15 | see that? | 11:03 |
| 16 | A.    Yes. | 11:03 |
| 17 | Q.    So is it true that -- well, let me back | 11:03 |
| 18 | up.  What is the activity log? | 11:03 |
| 19 | A.    It's a list of every single action you | 11:03 |
| 20 | have taken on Facebook. | 11:03 |
| 21 | Q.    Okay.  And what is "Download Your | 11:03 |
| 22 | Information"? | 11:03 |
| 23 | A.    It's a user-friendly way of downloading -- | 11:03 |
| 24 | it's a file basically, but it's a user-friendly file | 11:03 |
| 25 | of everything that Facebook held -- all the | 11:03 |

Page 97

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | information that Facebook has for you. | 11:03 |
| 2 | Q.    Okay.  ███████████████████████ | 11:03 |
| 3 | ███████████████████████████████████ | 11:03 |
| 4 | ███████   █████████████████ | 11:03 |
| 5 | A.    ████████████████████ | 11:03 |
| 6 | Q.    ██████   ██████████████████ | 11:03 |
| 7 | ████████████████████ | 11:03 |
| 8 | A.    █████████████████ | 11:04 |
| 9 | Q.    Okay.  And back to the DYI.  You say it's | 11:04 |
| 10 | all the information that Facebook has for you; is | 11:04 |
| 11 | that correct? | 11:04 |
| 12 | A.    Yes. | 11:04 |
| 13 | Q.    What do you mean by that? | 11:04 |
| 14 | A.    It includes from things from like the | 11:04 |
| 15 | information you submitted when you created your | 11:04 |
| 16 | account, to the photos that you may have uploaded, | 11:04 |
| 17 | to the pixels of your friends you may have liked, to | 11:04 |
| 18 | the ads you may have seen, the videos you may have | 11:04 |
| 19 | watched.  It's a -- it's a very lengthy, you know, | 11:04 |
| 20 | like document with different things. | 11:04 |
| 21 | Q.    █████   ███████████████████████ | 11:04 |
| 22 | ███████████████████████████████████ | 11:04 |
| 23 | ██████████████████████ | 11:04 |
| 24 | A.    █████ | 11:04 |
| 25 | Q.    Okay.  Does it include behavioral data? | 11:04 |

Page 98

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | ███████ ██████████ | 11:04 |
| 2 | ████████ ███████████ | 11:05 |
| 3 | BY MS. WEAVER: | 11:05 |
| 4 | Q.   Okay.   So it includes the conversions and | 11:05 |
| 5 | purchases off Facebook? | 11:05 |
| 6 | A.   I don't know about that, but it includes | 11:05 |
| 7 | the apps that you have logged in.   It includes, I | 11:05 |
| 8 | think, the websites that you may have liked, and so | 11:05 |
| 9 | on. | 11:05 |
| 10 | Q.   Okay.   Does the Do It Yourself network | 11:05 |
| 11 | include the ████████████████████ | 11:05 |
| 12 | ████████████ | 11:05 |
| 13 | MS. STEIN:   Objection to form. | 11:05 |
| 14 | THE WITNESS:   I think you're referring to | 11:05 |
| 15 | the DYI file? | 11:05 |
| 16 | BY MS. WEAVER: | 11:05 |
| 17 | Q.   Yes.   I'll ask the question again.   Sorry. | 11:05 |
| 18 | Does the DIY file include ████████████ | 11:05 |
| 19 | ████████████████████ | 11:05 |
| 20 | MS. STEIN:   Objection to form. | 11:05 |
| 21 | THE WITNESS:   It should include interests, | 11:05 |
| 22 | which are ██████████ so yes. | 11:05 |
| 23 | BY MS. WEAVER: | 11:05 |
| 24 | Q.   Does it also include ███████████ | 11:05 |
| 25 | MS. STEIN:   Objection to form. | 11:05 |

Page 99

| | | |
|---|---|---|
| 1 | MS. WEAVER:  What's the objection? | 11:06 |
| 2 | MS. STEIN:  ███████ is a very vague | 11:06 |
| 3 | term, Lesley. | 11:06 |
| 4 | MS. WEAVER:  No.  It's listed right here | 11:06 |
| 5 | on the document.  So I'm going to restate the | 11:06 |
| 6 | question. | 11:06 |
| 7 | Q.   Does the DIY tool also include the ███ | 11:06 |
| 8 | ████████████████████████████████████████ | 11:06 |
| 9 | ████████████████████████████ | 11:06 |
| 10 | MS. STEIN:  Objection to form. | 11:06 |
| 11 | THE WITNESS:  So I will answer with, you | 11:06 |
| 12 | know, like a high-level understanding that the DYI | 11:06 |
| 13 | file includes the pages that you liked.  And by | 11:06 |
| 14 | default, that's a behavior. | 11:06 |
| 15 | BY MS. WEAVER: | 11:06 |
| 16 | Q.   Does Facebook engage in -- okay.  But | 11:06 |
| 17 | just -- sorry.  Just go back to that question. | 11:06 |
| 18 | Do you know, as you sit here today, | 11:06 |
| 19 | whether the DIY tool includes ██████████ | 11:06 |
| 20 | ████████████████████████████████████████ | 11:06 |
| 21 | ███████████████████████████? | 11:06 |
| 22 | MS. STEIN:  Objection to form. | 11:06 |
| 23 | THE WITNESS:  DYI file includes activities | 11:06 |
| 24 | such as you liking a page that may suggest an | 11:07 |
| 25 | interest and, by default, explain a behavior or | 11:07 |

Page 100

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    describe a behavior.                                    11:07
2    BY MS. WEAVER:                                          11:07
3         Q.   Okay.  ████████████████████████              11:07
4    ████████████████████                                    11:07
5         ██  ██████████████████████                         11:07
6    ███████████████████████████                             11:07
7         Q.   Okay.  Going back to the page ending in       11:07
8    425.  We were near the bottom of the page there.        11:07
9         A.   Yes.                                           11:07
10        Q.   Do you see where it says ███████████          11:07
11   ███████████                                             11:07
12        A.   Yes.                                           11:07
13        Q.   What does that refer to?                       11:07
14        A.   ████████████████████████████                  11:07
15   ████████████████████████████                            11:07
16   █████████████████████████                               11:07
17             THE REPORTER:  I'm sorry, ████████            11:08
18   ███████                                                 11:08
19             THE WITNESS:  -- and pixel.                    11:08
20             THE REPORTER:  I'm sorry, ████████            11:08
21   ███████                                                 11:08
22             THE WITNESS:  -- captured through the SDKs     11:08
23   and pixel.                                              11:08
24             THE REPORTER:  Thank you.                      11:08
25                                                            11:08
```

Page 101

| | | |
|---|---|---|
| 1 | BY MS. WEAVER: | 11:08 |
| 2 |    Q.   And what is third-party ███████ | 11:08 |
| 3 | again? | 11:08 |
| 4 |    A.   I think we exhausted that, but I will go | 11:08 |
| 5 | back to the definition as it's being offered in a | 11:08 |
| 6 | previous page: ███████████ | 11:08 |
| 7 | ██████████████████ | 11:08 |
| 8 | █████████ | 11:08 |
| 9 |    Q.   And is that contained in the DYI tool or | 11:08 |
| 10 | the DYI file? | 11:08 |
| 11 |      MS. STEIN:  Object to form.  Objection to | 11:08 |
| 12 | form. | 11:08 |
| 13 |      THE WITNESS:  I'm sorry, how can a file | 11:08 |
| 14 | include activities as you have already opted out? | 11:08 |
| 15 | BY MS. WEAVER: | 11:08 |
| 16 |    Q.   Okay.  What I'm asking is whether the DIY | 11:08 |
| 17 | tool collects third-party █████████ as it's | 11:08 |
| 18 | referred to there? | 11:08 |
| 19 |    A.   I'm sorry, I feel like I'm repeating | 11:08 |
| 20 | myself.  But the DYI file identified the apps that | 11:09 |
| 21 | you used, the websites that you may have liked and | 11:09 |
| 22 | so on.  So it captures █████████ as per -- | 11:09 |
| 23 |    Q.   Okay. | 11:09 |
| 24 |    A.   -- the definition of the previous page. | 11:09 |
| 25 |    Q.   Does it collect all third-party ███████ | 11:09 |

Page 102

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | ▮▮▮ | 11:09 |
| 2 | MS. STEIN:  Objection to form. | 11:09 |
| 3 | THE WITNESS:  All?  I don't know. | 11:09 |
| 4 | BY MS. WEAVER: | 11:09 |
| 5 | Q.    Yeah.  Okay. | 11:09 |
| 6 | How would you find out? | 11:09 |
| 7 | A.    I would have to look at the DYI file. | 11:09 |
| 8 | Q.    Okay.  And have you looked at any DYI | 11:09 |
| 9 | files to prepare for your deposition today? | 11:09 |
| 10 | A.    No, I have not, because that would be a | 11:09 |
| 11 | violation of my commitment to users' privacy. | 11:09 |
| 12 | Q.    Did you look at DYI files for any of the | 11:09 |
| 13 | named plaintiffs in this action to prepare for the | 11:09 |
| 14 | deposition? | 11:09 |
| 15 | A.    No, because that would be in violation of | 11:09 |
| 16 | my commitment to users' privacy. | 11:09 |
| 17 | Q.    To prepare -- | 11:10 |
| 18 | A.    I would be fired -- | 11:10 |
| 19 | Q.    If your -- | 11:10 |
| 20 | A.    -- if I look -- | 11:10 |
| 21 | Q.    If your lawyers had you look at the | 11:10 |
| 22 | plaintiffs' DYI files to prepare for deposition in | 11:10 |
| 23 | this action? | 11:10 |
| 24 | A.    I would be fired. | 11:10 |
| 25 | Q.    Okay.  Well, we'll table that. | 11:10 |

Page 103

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Can you look at your -- | 11:10 |
| 2 | A.   No one here -- | 11:10 |
| 3 | Q.   Can you look at your own -- | 11:10 |
| 4 | A.   I can only look at mine. | 11:10 |
| 5 | Q.   -- DYI -- oh, okay.  So can you look at | 11:10 |
| 6 | your own DYI file to determine whether or not all | 11:10 |
| 7 | third-party ███████████ is included in it? | 11:10 |
| 8 | A.   I can, but not right now. | 11:10 |
| 9 | Q.   Okay.  Right. | 11:10 |
| 10 | Okay.  Give me a moment here. | 11:10 |
| 11 | Okay.  So let's turn for a moment to the | 11:11 |
| 12 | page ending in 3428.  It says ███████ at top. | 11:11 |
| 13 | Do you know who Maritza Johnson is? | 11:11 |
| 14 | A.   No, I don't. | 11:11 |
| 15 | Q.   Okay.  And do you see, it says, ████████ | 11:11 |
| 16 | ███████████████████████████ | 11:11 |
| 17 | ███████████████████████ | 11:11 |
| 18 | ████████   Do you see that? | 11:11 |
| 19 | A.   Yes, I do see that. | 11:11 |
| 20 | Q.   So did Facebook track people's -- users' | 11:11 |
| 21 | location? | 11:11 |
| 22 | A.   Facebook will have an understanding of the | 11:11 |
| 23 | user's location based on different signals. | 11:11 |
| 24 | Q.   Okay.  And you see here it says -- when | 11:11 |
| 25 | you say "different signals," what do you mean? | 11:11 |

Page 104

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Like if someone is using the app from | 11:11 |
| 2 | their mobile phone and they have allowed us access | 11:11 |
| 3 | to their GPS, we would have a precise, you know, | 11:11 |
| 4 | understanding of that location.  If someone is | 11:12 |
| 5 | accessing Facebook through their computer, we will | 11:12 |
| 6 | try to determine their location from an IP address | 11:12 |
| 7 | and so on. | 11:12 |
| 8 | Q.    Okay.  And do you see where it says, ████ | 11:12 |
| 9 | ██████████████████████████████████████████ | 11:12 |
| 10 | It's the last bullet point -- | 11:12 |
| 11 | A.    Ah. | 11:12 |
| 12 | Q.    -- on the top. | 11:12 |
| 13 | A.    Yes. | 11:12 |
| 14 | Q.    Okay.  So the question is, what is | 11:12 |
| 15 | ████████████ | 11:12 |
| 16 | A.    Could I read the whole thing quickly just | 11:12 |
| 17 | to make sure I'm -- | 11:12 |
| 18 | Q.    Absolutely, of course. | 11:12 |
| 19 | (Pause while witness peruses document.) | 11:12 |
| 20 | A.    Okay. | 11:12 |
| 21 | Q.    What is ████████████ | 11:12 |
| 22 | MS. STEIN:  I will just instruct the | 11:13 |
| 23 | witness to make sure that you only testify about | 11:13 |
| 24 | things that you know, and that if there are things | 11:13 |
| 25 | in this document that you don't know or are not a | 11:13 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    company term, to please, you know, tell the          11:13

 2    examiner, because you should not be testifying       11:13

 3    beyond the scope of what your -- what's at issue in  11:13

 4    this deposition and --                               11:13

 5            MS. WEAVER:  This is completely within the   11:13

 6    scope, Deb, and that's improper coaching.            11:13

 7       Q.   So, sir, do you know what ███████████        11:13

 8    is?                                                  11:13

 9       A.   I think there is an example for ███████      11:13

10    ████ there.                                          11:13

11       Q.   I'm sorry?                                   11:13

12       A.   ████████████  ██████████████████            11:13

13    ██████                                               11:13

14       Q.   Okay.  That's an example of ██████           11:13

15    ██████                                               11:13

16       A.   Yes.                                         11:13

17       ██  ██████  ████████████████████                 11:13

18    ████████████████████                                 11:13

19            MS. STEIN:  Objection to form.               11:13

20            ████████████  █████████████████             11:13

21    ████████████████████████                             11:13

22    ██████████████████████████████                       11:14

23    ████████████████████  ████████████████              11:14

24    ████████████████████████████                         11:14

25    ██████████                                           11:14
```

Page 106

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1                                              11:14
2                                              11:14
3                                              11:14
4                                              11:14
5                                              11:14
6                                              11:14
7    BY MS. WEAVER:                            11:14
8         Q.                                   11:14
9                                              11:14
10                                             11:14
11                                             11:14
12        A.    Those are things that are --   11:14
13              MS. STEIN:  Objection to form. 11:14
14              You may answer.                11:14
15                                             11:14
16                                             11:14
17   BY MS. WEAVER:                            11:15
18        Q.    Okay.  So --                   11:15
19                                             11:15
20                                             11:15
21                                             11:15
22                                             11:15
23                                             11:15
24                                             11:15
25                                             11:15
```



Page 107

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | ██████████     ███████████████ | 11:15 |
| 2 | ████████████████████████████ | 11:15 |
| 3 | BY MS. WEAVER: | 11:15 |
| 4 | Q.   Okay.  And where does that data that -- | 11:15 |
| 5 | the ████████████ -- strike that. | 11:15 |
| 6 | Where is the ████████████ stored? | 11:15 |
| 7 | ██  █████████████████████ | 11:15 |
| 8 | ████████  ████████████████  ██████████ | 11:15 |
| 9 | ████████ | 11:15 |
| 10 | ██  ███████████ | 11:15 |
| 11 | ██  ████████████████████ | 11:15 |
| 12 | ███████████████████████ | 11:15 |
| 13 | Q.   Okay.  And is it contained in the DYI | 11:15 |
| 14 | file? | 11:15 |
| 15 | A.   That -- how is that relevant for you? | 11:15 |
| 16 | Q.   I get to ask the questions. | 11:16 |
| 17 | ██  ████████████████████ | 11:16 |
| 18 | ███████████████████████ | 11:16 |
| 19 | ██████  █████████████ | 11:16 |
| 20 | ██████████████████ | 11:16 |
| 21 | █████████  ████████████████ | 11:16 |
| 22 | ██████  And so it wouldn't show up in a -- in user's | 11:16 |
| 23 | DYI file. | 11:16 |
| 24 | Q.   Okay.  And when -- | 11:16 |
| 25 | MS. STEIN:  I'm just waiting for my feed | 11:16 |

Page 108

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    here.

2              Oh, could you read his answer back,

3    please.                                              11:16

4                        (The record was read by the     11:17

5                        court reporter, as requested)    11:17

6    BY MS. WEAVER:                                       11:17

7         Q.   And what do you mean by "associated"?     11:17

8         A.   ████████████████████████████████          11:17

9    █████████████████████████████████████████           11:17

10   █████████████████████                                11:17

11        Q.   ████   ██████████████████████              11:17

12   ████████████████████                                 11:17

13        A.   ████████████                               11:17

14        Q.   ████████                                   11:17

15        A.   ████████████████████████                   11:17

16   ████████████████████████████████████████             11:17

17   █████████████   ████████████████████████             11:17

18   ████████████████████████                             11:17

19        Q.   Right, but it's still one individual.  The 11:17

20   source of the -- the -- originally is one user,      11:17

21   right?                                               11:17

22              MS. STEIN:  Objection to form.            11:17

23   BY MS. WEAVER:                                       11:17

24        Q.   Because either I live in San Francisco or  11:17

25   I indicated -- I mean, all of this data comes from   11:17

                                           Page 109

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | individuals, right? | 11:17 |
| 2 | A.   Some of the data -- sorry.  Again, if -- | 11:17 |
| 3 | if it's -- according to the previous definition, if | 11:17 |
| 4 | it's native data, that means that you have provided | 11:17 |
| 5 | that information. | 11:18 |
| 6 | Q.   Okay.  So let's -- okay.  Let's talk -- | 11:18 |
| 7 | A.   Like you have defined San Francisco -- | 11:18 |
| 8 | Q.   Right. | 11:18 |
| 9 | A.   -- to be your hometown. | 11:18 |
| 10 | Q.   Perfect. | 11:18 |
| 11 | A.   Okay. | 11:18 |
| 12 | Q.   So it's associated with me initially, | 11:18 |
| 13 | right? | 11:18 |
| 14 | A.   You have specifically suggested to your | 11:18 |
| 15 | Facebook friends by basically filling in that | 11:18 |
| 16 | specific field that Facebook asked you to do that | 11:18 |
| 17 | your hometown is San Francisco.  You may live in | 11:18 |
| 18 | Denver, but your hometown appears to be | 11:18 |
| 19 | San Francisco. | 11:18 |
| 20 | Q.   Okay.  ██████████████████ | 11:18 |
| 21 | ██████████████████████████ | 11:18 |
| 22 | ████████████████  ████████ | 11:18 |
| 23 | ████████████████ | 11:18 |
| 24 | ██  ██████████████████████ | 11:18 |
| 25 | ████████████████████████ | 11:18 |

Page 110

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   ██████████████████████                                  11:18

 2        Q.   Okay.  I'm just -- honestly, K.P., I'm       11:18

 3   trying to understand your answer.                       11:18

 4             You said the data that we are talking         11:18

 5   about is not associated with specific users.  We        11:18

 6   just talked about --                                    11:19

 7        A.   Yes, please.                                  11:19

 8        Q.   -- it was associated with an individual       11:19

 9   user because they're from San Francisco.                11:19

10        A.   Yes.                                          11:19

11        Q.   So when does it become disassociated?         11:19

12        A.   But I'm trying to explain to you the          11:19

13   distinction between data that comes from ██████         11:19

14   ██████ to use your --                                   11:19

15        Q.   Okay.                                         11:19

16        A.   -- the definition in this document, versus    11:19

17   ████████████████████                                    11:19

18        Q.   Okay.  And --                                 11:19

19        A.   So -- no, no, no, no.  Sorry.  I have to      11:19

20   be super precise here.                                  11:19

21        ████████████████████████████████ ████████         11:19

22   ████████████████████████████████████                    11:19

23   ██████████████████████████████████████                  11:19

24        Q.   Right.                                        11:19

25     ███ ████████████████████████████████                  11:19
```

Page 111

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



| # | | Time |
|---|---|---|
| 1 | ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ | 11:19 |
| 2 | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ | 11:19 |
| 3 | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ | 11:19 |
| 4 | ▇▇▇▇▇▇▇▇▇▇▇▇▇ | 11:19 |
| 5 | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ | 11:19 |
| 6 | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ | 11:19 |
| 7 | ▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ | 11:19 |
| 8 | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ | 11:19 |
| 9 | ▇▇▇▇▇▇▇▇▇▇▇▇ | 11:20 |
| 10 | ▇▇▇▇ | 11:20 |
| 11 | ▇ ▇▇▇ ▇▇▇▇ | 11:20 |
| 12 | ▇ ▇▇▇▇ | 11:20 |

13    Q.   I understand.                          11:20
14         By the way, would you use a different word   11:20
15    than ▇▇▇▇▇▇   Is there another way to reference   11:20
16    that?                                       11:20
17    A.   I would probably use ▇▇▇▇▇▇▇▇           11:20
18    Q.   ▇▇▇▇▇▇▇                                11:20
19    A.   ▇▇▇▇▇▇▇▇▇                              11:20
20    Q.   Okay.  Perfect.                        11:20

| # | | Time |
|---|---|---|
| 21 | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ | 11:20 |
| 22 | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ | 11:20 |
| 23 | ▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇ | 11:20 |
| 24 | ▇▇▇▇▇ | 11:20 |
| 25 | ▇ ▇▇▇ ▇▇▇▇▇▇▇▇ | 11:20 |

Page 112

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   ████████████████████████████████████              11:20

 2        ██    ███████████████████████████████         11:20

 3   ████████████                                        11:20

 4        Q.    Okay.                                    11:20

 5        A.    -- like that.                            11:20

 6        Q.    All right.  And then what about ███████  11:20

 7   ██████ is there another term of art at Facebook used 11:20

 8   to reference that?                                  11:20

 9        A.    That's my definition of ███████████      11:20

10        Q.    ████████████████    Okay.                11:20

11        A.    Oh, sorry, ██████████████████            11:20

12        Q.    █████████████    I see.  Okay.           11:20

13              So going back to what we're talking about, 11:21

14   the -- ███████████████████████████████████████     11:21

15   ██████████████████████████████████████             11:21

16   ██████████████████                                  11:21

17        ██    ██████                                   11:21

18        Q.    Where is that data stored?  Where is the 11:21

19   ad cluster data stored?                             11:21

20        ██    ████████████████████████  ████████████  11:21

21        ██    ████  ███████████████  ████████████  ██ 11:21

22   █████████████████████████████████████████          11:21

23   ████████  ██████████████                            11:21

24        A.    Okay.  At the very high level, if we are 11:21

25   talking about the specific scenario that a business 11:21
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1       that is operating in San Francisco wants to target        11:21

2       users in San Francisco, they will run the campaign        11:21

3       for, let's say, two days; they will target specific       11:21

4       users that live in that area.  They may target only       11:21

5       females or only men, people of a certain age, people      11:21

6       of a certain profession, depending on, you know,          11:21

7       like, what sort of campaign they want to run, right?      11:21

8               So that will all be effectively identified        11:21

9       as a potential audience of, let's say for the sake        11:21

10      of the argument, 20,000 users.  They still have no        11:22

11      access to the information.  They only understand          11:22

12      what is the potential audience their ad campaign can      11:22

13      reach.                                                    11:22

14      ████████████████████████████████                          11:22

15      █████████████████████████████████                         11:22

16      ████████████████████  ████████████                        11:22

17      ███████████████████████████                               11:22

18      ██████████████  ██████████████████                        11:22

19      ██████████████████████████                                11:22

20      █████████████████████████████████                         11:22

21      ███████████████████████████████                           11:22

22      ██  ████████████████████████                              11:22

23      █████                                                     11:22

24      ███████████████████                                       11:22

25      ███████████████████████████                               11:22

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   ████████████████████████████████████████████   11:22

2       Q.   Okay.  So let me ask this:  So I'm -- say   11:22

3   I'm being targeted in that ad campaign.  Is there a   11:22

4   way for me to find out that I was targeted by those   11:22

5   categories that the advertiser chose?   11:22

6       A.   You can see it only if that ad campaign   11:23

7   shows up to you.   11:23

8       Q.   Okay.  And only in realtime?  And there's   11:23

9   no record of it after that?   11:23

10       A.   I think you can actually see the -- the   11:23

11   information in realtime.  But if you go to the DYI   11:23

12   file, you can see probably ad campaigns that you   11:23

13   have been displayed -- or you have seen yourself, or   11:23

14   you have clicked.   11:23

15       Q.   Okay.  But if they were --   11:23

16       A.   You know --   11:23

17       Q.   -- targeted to me and I didn't take an   11:23

18   action, it's not in the DYI file; is that right?   11:23

19       A.   You -- you will see the ad campaigns that   11:23

20   ended up showing up on your feed, ████████████████   11:23

21   ████████████████████████████████████████████████   11:23

22   ████████████████████████████████████████████████   11:23

23   ██████████████████████   11:23

24       Q.   Got it.   11:23

25       And so let's talk about the information   11:23

Page 115

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    that is used to create the ██████████   How do you      11:23

 2    determine what information can be used to apply          11:24

 3    those algorithms?                                        11:24

 4         A.   I need to clarify that question.               11:24

 5         Q.   Yeah, it's -- ████████████████                 11:24

 6    ██████████████████████████████████                       11:24

 7              MS. STEIN:  Objection to form.                 11:24

 8              THE WITNESS:  Okay.  So are you talking         11:24

 9    about ██████████████████████████████████████             11:24

10    ████████████████████████████████                         11:24

11    BY MS. WEAVER:                                           11:24

12         Q.   Well, what is ██████████████████               11:24

13         A.   I mean, I don't know of any use of ████████    11:24

14    ██████████████, but I'm trying to understand exactly     11:24

15    how you want me to answer the question in a              11:24

16    thoughtful way.                                          11:24

17         Q.   Okay.  Well,██████████████████████████         11:24

18    ███████████████████████████████████████; is that a      11:24

19    fair definition?                                         11:24

20         A.   ████████████████████████████████████████      11:24

21    ██████████████████████████████████████                  11:24

22    ██████████████████████████████████████                  11:25

23    ████████████████████████████████                        11:25

24         Q.   That was an example, right?                    11:25

25         A.   Yes.                                           11:25
```

Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   But at large, is it fair to say that | 11:25 |
| 2 | ████████████████████████████████████ | 11:25 |
| 3 | ████████████ | 11:25 |
| 4 | MS. STEIN:  Objection to form. | 11:25 |
| 5 | THE WITNESS:  I cannot talk about that. | 11:25 |
| 6 | █████████████████████████████████████ | 11:25 |
| 7 | █████████████████████████████████████ | 11:25 |
| 8 | ██████████████████████████  ██████████ | 11:25 |
| 9 | ████████████████████████████████████ | 11:25 |
| 10 | █████████████████████ | 11:25 |
| 11 | BY MS. WEAVER: | 11:25 |
| 12 | Q.   Okay.  So let's -- we can stick with your | 11:25 |
| 13 | example then if you like for now. | 11:25 |
| 14 | What if I sent a -- a private -- a message | 11:25 |
| 15 | in Facebook Messenger to one friend saying "I used | 11:25 |
| 16 | to live in San Francisco" and I've never posted | 11:25 |
| 17 | anything publicly about it.  Is that information | 11:25 |
| 18 | used to create the derived ████████████████ | 11:26 |
| 19 | A.   No. | 11:26 |
| 20 | Q.   Why not? | 11:26 |
| 21 | A.   That's a private conversation between you | 11:26 |
| 22 | and your friend -- | 11:26 |
| 23 | Q.   Okay. | 11:26 |
| 24 | A.   -- that -- | 11:26 |
| 25 | Q.   So how does the algorithm distinguish -- | 11:26 |

Page 117

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | let me ask this:  When the data is being run on | 11:26 |
| 2 | algorithms, is it segregated by public or private | 11:26 |
| 3 | data? | 11:26 |
| 4 | A.   So your definition of public or private is | 11:26 |
| 5 | what, if I may say? | 11:26 |
| 6 | Q.   If a user designated something private or | 11:26 |
| 7 | restricted audience. | 11:26 |
| 8 | A.   Okay.  Let's take a little bit of a step | 11:26 |
| 9 | back.  Because what we define as public data is | 11:26 |
| 10 | basically your first name, your last name, your | 11:26 |
| 11 | profile picture. | 11:26 |
| 12 | Q.   Okay. | 11:26 |
| 13 | A.   Anything else that comes with a -- an | 11:26 |
| 14 | audience selection doesn't necessarily belong -- | 11:26 |
| 15 | it's not necessarily by default public.  It may have | 11:26 |
| 16 | a limited audience.  It may be just you, if it's | 11:26 |
| 17 | things like your birthday, or it may be friends -- | 11:27 |
| 18 | or accessible to your friends. | 11:27 |
| 19 | What we always, you know, like, like to | 11:27 |
| 20 | suggest that communications that happen over | 11:27 |
| 21 | messenger is also by default private, meaning that | 11:27 |
| 22 | it's -- the content of your exchanges with your | 11:27 |
| 23 | friends belong to you and your friends.  So that | 11:27 |
| 24 | wouldn't be considered public information.  But it | 11:27 |
| 25 | wouldn't be considered necessarily private | 11:27 |

Page 118

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | information because it's not accessible by anybody | 11:27 |
| 2 | in that -- it's a private conversation but it's not | 11:27 |
| 3 | private data in that sense. | 11:27 |
| 4 | Q.   And when Facebook is, let's say -- we can | 11:27 |
| 5 | just stick with your ███████ example.  When it | 11:27 |
| 6 | is using the algorithm to create ███████, such | 11:27 |
| 7 | as ███████ is it using that world of | 11:27 |
| 8 | information that you just described that is not | 11:27 |
| 9 | public? | 11:27 |
| 10 | ██ ███████████████████████ | 11:27 |
| 11 | ████████████████████████ | 11:28 |
| 12 | █████████████████ | 11:28 |
| 13 | Q.   Okay.  But what I'm trying to say is -- | 11:28 |
| 14 | and I gave you a different example.  So if you | 11:28 |
| 15 | could, just follow my example.  Okay. | 11:28 |
| 16 | A.   We wouldn't.  I think I made -- | 11:28 |
| 17 | Q.   Okay. | 11:28 |
| 18 | A.   -- that point that -- | 11:28 |
| 19 | Q.   When I -- when I look -- | 11:28 |
| 20 | A.   -- you telling your friends you live in | 11:28 |
| 21 | San Francisco is your business and it's not for us | 11:28 |
| 22 | to use in any kind of ads. | 11:28 |
| 23 | Q.   Okay.  And that's because reading messages | 11:28 |
| 24 | and using that content and making it available to | 11:28 |
| 25 | advertisers would violate Facebook's policies, | 11:28 |

Page 119

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | right? | 11:28 |
| 2 | A.   Reading private communications between you | 11:28 |
| 3 | and your friends would be a violation of our | 11:28 |
| 4 | commitment to your privacy. | 11:28 |
| 5 | Q.   Okay.  Switching topics just for a second. | 11:28 |
| 6 | You know what capabilities are; is that | 11:28 |
| 7 | right? | 11:29 |
| 8 | A.   In what -- | 11:29 |
| 9 | Q.   In connection with -- in connection with | 11:29 |
| 10 | APIs? | 11:29 |
| 11 | A.   Yes, I do. | 11:29 |
| 12 | Q.   Okay.  Sorry. | 11:29 |
| 13 | So are you familiar with the read stream | 11:29 |
| 14 | capability? | 11:29 |
| 15 | A.   Read stream is an API but there is an | 11:29 |
| 16 | associated capabilities. | 11:29 |
| 17 | Q.   Yeah.  And what is that? | 11:29 |
| 18 | A.   It's an API that allows a third party to | 11:29 |
| 19 | access someone's News Feed. | 11:29 |
| 20 | Q.   Okay.  And what does "read stream" mean in | 11:29 |
| 21 | particular? | 11:29 |
| 22 | A.   It's a very poorly, you know, like, | 11:29 |
| 23 | defined -- | 11:29 |
| 24 | Q.   It should probably be for the period 2012 | 11:29 |
| 25 | to 2017. | 11:29 |

Page 120

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yes.  So the News Feed is also referred as | 11:29 |
| 2 | stream. | 11:29 |
| 3 | Q.   Uh-huh. | 11:29 |
| 4 | A.   And that API and the corresponding | 11:29 |
| 5 | capability effectively describes the ability to read | 11:29 |
| 6 | the stream. | 11:29 |
| 7 | Q.   Okay. | 11:29 |
| 8 | A.   In other words, read the News Feed. | 11:29 |
| 9 | Q.   Okay.  And are you aware at any point in | 11:30 |
| 10 | time if third parties were allowed to read Facebook | 11:30 |
| 11 | Messenger messages? | 11:30 |
| 12 | MS. STEIN:  Objection. | 11:30 |
| 13 | BY MS. WEAVER: | 11:30 |
| 14 | Q.   Through -- through API capabilities? | 11:30 |
| 15 | MS. STEIN:  Objection to form.  And we're | 11:30 |
| 16 | talking about 2012 to 2017. | 11:30 |
| 17 | You may answer. | 11:30 |
| 18 | THE WITNESS:  Between 2012 and 2017, I | 11:30 |
| 19 | don't think we made the -- the Messenger API -- the | 11:30 |
| 20 | current version of the Messenger API available. | 11:30 |
| 21 | THE REPORTER:  I'm sorry.  That -- that... | 11:30 |
| 22 | THE WITNESS:  So I'm -- between 2012 and | 11:30 |
| 23 | 2017, the current version of the Messenger API was | 11:30 |
| 24 | not available.  I think the only way for third | 11:30 |
| 25 | parties to access Messenger was through the Inbox | 11:30 |

Page 121

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    API.                                              11:30
 2          MS. WEAVER:  I'm sorry, I just need to      11:30
 3    look really quickly.                              11:31
 4          Q.   What is the Inbox API?                 11:31
 5          A.   It's an API that allows a third party to  11:31
 6    access a user's Messenger conversation.           11:31
 7          Q.   Okay.  And what do those third parties --  11:31
 8    strike that.                                       11:31
 9          What access were they given to --            11:31
10          A.   So the third --                         11:31
11          Q.   -- use Messenger conversation?          11:31
12          A.   Yeah.  The third parties that had access  11:31
13    to the Inbox API were app third parties that       11:31
14    replicated core Facebook functionality, including  11:31
15    messaging.  So we call those integrations device   11:31
16    integrations because they were replicating         11:31
17    Facebook -- the Facebook app.                      11:31
18          Q.   ███████████████████████████████████    11:31
19    ████████████████████████                           11:31
20          A.   ██████  ████                             11:31
21          Q.   ████████████████████████████████████   11:31
22    ███████████████████                                11:32
23          A.   ████████████████████████████████████   11:32
24    ███████████████████████                            11:32
25          Q.   ██████████                              11:32
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1     A.    ███████████████████              11:32

 2     Q.    ██████    ████████               11:32

 3     A.    █████                            11:32

 4     Q.    ████████████████████            11:32

 5     A.    ████████████████████████        11:32

 6  ███████████████████████████████           11:32

 7  ██████████████████████████████████        11:32

 8  ██████████████████████████               11:32

 9         Q.   So I'm going to turn to the page ending    11:32

10   with 429 now.  It's just the next page of the same    11:32

11   document.                                             11:32

12            Oh, strike it.  I will move on.              11:32

13            Going, actually, to the page ending in       11:33

14   430.  What is ████████████████ as used in this        11:33

15   document?                                             11:33

16      A.   Can I take a quick moment to read the         11:33

17   document?                                             11:33

18      Q.   Of course.  Sorry.                            11:33

19      A.   Thank you.                                    11:33

20            (Pause while witness peruses document.)       11:33

21      A.   I'm sorry, there's a little bit of            11:33

22   background noise.  I don't know where it's coming.    11:33

23            MS. WEAVER:  I think that's Ms. Stein.       11:33

24   But maybe not.                                        11:33

25            MS. STEIN:  Sorry.  Sorry.                   11:33
```

Page 123

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  Oh.  Okay. | 11:33 |
| 2 | MS. STEIN:  I will -- I will mute.  The | 11:33 |
| 3 | gardeners are here.  Hazards of -- | 11:33 |
| 4 | MS. WEAVER:  Yes. | 11:33 |
| 5 | MS. STEIN:  -- of COVID. | 11:33 |
| 6 | BY MS. WEAVER: | 11:33 |
| 7 | Q.   I'm going to direct your attention just to | 11:33 |
| 8 | a few pages here. | 11:33 |
| 9 | A.   Okay. | 11:33 |
| 10 | Q.   Great. | 11:33 |
| 11 | ██████████████████████████ | 11:33 |
| 12 | ████████████████████████████ | 11:34 |
| 13 | ████████ | 11:34 |
| 14 | A.   ██████████████████████████ | 11:34 |
| 15 | ████████████████████████ | 11:34 |
| 16 | Q.   ████████████ | 11:34 |
| 17 | A.   ██████████████ | 11:34 |
| 18 | Q.   █████████████ | 11:34 |
| 19 | █████████ | 11:34 |
| 20 | A.   ██████████████████████████ | 11:34 |
| 21 | ██████████████████████████████ | 11:34 |
| 22 | ███████ | 11:34 |
| 23 | Q.   ████  ██████████████ | 11:34 |
| 24 | A.   ██████████ | 11:34 |
| 25 | Q.   ██████ | 11:34 |

Page 124

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A. ████████████████████████ | 11:34 |
| 2 | ██████████████ | 11:34 |
| 3 | Q.  ████████████  █████████████████ | 11:34 |
| 4 | ████  ███████████████ | 11:34 |
| 5 | A.  ██████████ | 11:34 |
| 6 | Q.  ██████ | 11:34 |
| 7 | A.  ████████████ | 11:34 |
| 8 | Q. ██████████████ | 11:34 |
| 9 | A.  ███ | 11:34 |
| 10 | Q.  █████  ██████████  ████████████ | 11:34 |
| 11 | ██████████████████████████ | 11:34 |
| 12 | A.  █████  ███████████ | 11:34 |
| 13 | ████████████████████████ | 11:34 |
| 14 | ████████████████  ██████████ | 11:35 |
| 15 | ██████████████████████████ | 11:35 |
| 16 | ████ | 11:35 |
| 17 | Q.   Okay.  And so if you turn to the second | 11:35 |
| 18 | page here ending in 3431, do you see where it says | 11:35 |
| 19 | ████████████  It's in bold. | 11:35 |
| 20 | A.   Yeah. | 11:35 |
| 21 | Q.   Okay.  And then it says, ██████████ | 11:35 |
| 22 | ████████████████████████ | 11:35 |
| 23 | ██████ | 11:35 |
| 24 | Do you see that? | 11:35 |
| 25 | A.   Yes. | 11:35 |

Page 125

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Do you -- what is ███████████ | 11:35 |
| 2 | A.   ████████████████████ | 11:35 |
| 3 | ████████████████ | 11:35 |
| 4 | Q.   And what do you mean by graph? | 11:35 |
| 5 | A.   Everything at Facebook is the graph.  Any | 11:35 |
| 6 | entity, any connection that's affecting the part of | 11:35 |
| 7 | the graph. | 11:35 |
| 8 | Q.   Okay.  Is it a relational database? | 11:35 |
| 9 | A.   ████████████████████ ██ | 11:35 |
| 10 | ████████████████ ████████████ | 11:35 |
| 11 | ██████████████████████████ | 11:36 |
| 12 | ████████████████████ | 11:36 |
| 13 | Q.   ████ ██████████████ | 11:36 |
| 14 | ██████████████████████ | 11:36 |
| 15 | ████████████████ | 11:36 |
| 16 | A.   ██████████████████████ | 11:36 |
| 17 | ██ ████████████████ | 11:36 |
| 18 | Q.   ████ | 11:36 |
| 19 | A.   ████████████████████ | 11:36 |
| 20 | ████████████ | 11:36 |
| 21 | Q.   ██████████████████████ | 11:36 |
| 22 | ████ | 11:36 |
| 23 | A.   ████████████████████ | 11:36 |
| 24 | ████████████ | 11:36 |
| 25 | Q.   ████████████████ | 11:36 |

Page 126

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1      A.    ████████████████████████          11:36

 2      Q.    █████████████████████████         11:36

 3   ██████                                      11:36

 4      A.    ██████████████████████████        11:36

 5      Q.    Okay.  And if I go to delete my Facebook   11:36

 6   account, what is deleted?  Is all the data relating   11:36

 7   to me deleted?                             11:36

 8      A.    Your interactions with public entities   11:36

 9   will not be deleted.                       11:36

10      Q.    So how do you identify all of the data to   11:37

11   delete?                                    11:37

12      A.    My -- my response would be anything that   11:37

13   lives in the "Download Your Information" file is   11:37

14   going to disappear.                        11:37

15      Q.    What about all the rest of the data in the   11:37

16   graph?                                     11:37

17      A.    Again, the only exception here would be,   11:37

18   you know, like, your interactions with public   11:37

19   entities.  If you end -- ended up commenting on   11:37

20   United's page you didn't like their service, that   11:37

21   is, by default, public and is not personal   11:37

22   information.  And, to some extent, it belongs also   11:37

23   to United because you did that on their entity.   11:37

24      Q.    So --                            11:37

25      A.    But pretty much every -- everything else   11:37
```

Veritext Legal Solutions
866 299-5127

1   that is associated to you will be deleted.                11:37

2        Q.   Okay.  And when you say "is associated to        11:37

3   me," what do you mean?                                     11:37

4        A.   ████████████████████████████████████            11:37

5        Q.   ████████████████████████                        11:37

6        A.   ██████████████████████████████████████          11:38

7   ████████████████    ███████████                           11:38

8        Q.  ████   █████████████   █████████████              11:38

9   ████████                                                  11:38

10       A.   ████   ███████████                              11:38

11       Q.   ██████                                          11:38

12       A.   ██████████████████████████████████████          11:38

13  ████████████████████████████████████████                 11:38

14  ██████████████████████████████████████████               11:38

15  ███████   █████████████████████                          11:38

16       Q.   Okay.  You -- you referred earlier to data      11:38

17  that is not associated with individuals.  Do you           11:38

18  recall that?                                               11:38

19       A.   I need to play back my -- you know, like,        11:38

20  my sentence.  Okay.  What about it?                        11:38

21       Q.   You -- okay.  So there is data that is not       11:38

22  associated with individual users; is that right?           11:38

23       A.   Overall?                                         11:38

24       Q.   Yes.                                             11:38

25       A.   Yes, we -- we do have some information           11:38

Page 128

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    that is not associated with specific users.        11:38

2         Q.   Right.                                    11:38

3         A.   Like United's page on Facebook is not     11:38

4    associated with specific users.                     11:38

5         Q.   Okay.  We'll put a pin in this and we'll  11:38

6    come back to it.  Because I think really drilling in 11:39

7    on what Facebook can identify about me specifically  11:39

8    is at the heart of this deposition.                  11:39

9              Okay.  So going back to ████              11:39

10   ███████      Do you see the bullet point below?  It 11:39

11   says ██████████████      Do you see that?           11:39

12        A.   Yes.                                       11:39

13        Q.   ████████████████████                       11:39

14   ████████████████████████████████                    11:39

15   ████████████████████████████████                    11:39

16   ████████████████████                                11:39

17             Do you see that?                           11:39

18        A.   Yes.                                       11:39

19        Q.   What is the Privacy XFN team?              11:39

20        A.   It's a team that we have that reviews      11:39

21   every single product that we are launching from a    11:39

22   privacy perspective.                                 11:39

23        Q.   Okay.  And what is a ████████████?         11:39

24        A.   ████████████████████████████              11:39

25   ███████                                             11:39
```

Page 129

1      Q.   Okay. ███████████████████████████          11:39

2   ████████████████████████████████████████████      11:39

3   ████████████████████████████████████████          11:40

4        ██    ████████████████                        11:40

5      Q.   Who would know?                            11:40

6      A.   I don't know.                              11:40

7      Q.   Who at Facebook was in charge for ████     11:40

8   ████████████████████████████████████              11:40

9      A.   I don't know.                              11:40

10     Q.   Who is Emily Sharpe?                        11:40

11     A.   I -- I don't know.  I've heard that name   11:40

12  just recently.                                     11:40

13     Q.   Okay.  So I'd like for you to turn to the  11:40

14  next page.  It says ██████████████████████████     11:40

15  █████████████████████████████████                  11:40

16  ██████████████      Do you see that?               11:40

17     A.   Yes.                                        11:40

18     Q.   And this is page 3433.                      11:40

19          Who is Travis Bright?                       11:40

20     A.   I don't know.                              11:40

21     Q.   Okay.  So I'm going to direct your         11:40

22  attention to the last paragraph there where it says, 11:40

23  it begins, ██████████████████████████████████     11:40

24  ████████████████████████████                       11:41

25          Do you see that?                            11:41

                                              Page 130

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    And you said next page? | 11:41 |
| 2 | Q.    I'm on the -- sorry.  I'm on the bottom | 11:41 |
| 3 | paragraph on the page ending with 3433. | 11:41 |
| 4 | A.    Oh, okay. | 11:41 |
| 5 | Sorry, which sentence? | 11:41 |
| 6 | Q.    Well, let's do this.  Do you see where it | 11:41 |
| 7 | says ███████████████ | 11:41 |
| 8 | A.    Yes. | 11:41 |
| 9 | Q.    Okay.  So there it says, ████████████ | 11:41 |
| 10 | ████████████████████ | 11:41 |
| 11 | ██████████████████████████ | 11:41 |
| 12 | ████████████████ | 11:41 |
| 13 | Do you see that? | 11:41 |
| 14 | A.    Yes. | 11:41 |
| 15 | Q.    And it says a little bit lower there, | 11:41 |
| 16 | █████████████████████ | 11:41 |
| 17 | ██████████████████████████ | 11:41 |
| 18 | ██████████████ | 11:41 |
| 19 | Do you see that? | 11:41 |
| 20 | A.    Yes. | 11:41 |
| 21 | ██  █████████████████ | 11:41 |
| 22 | ████████████████████████ | 11:41 |
| 23 | ████████████████ | 11:41 |
| 24 | █████████████ | 11:42 |
| 25 | ██  ████ | 11:42 |

Page 131

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   What is ███████ | 11:42 |
| 2 | ██   ████████████████████ | 11:42 |
| 3 | ██████████████████████████████ | 11:42 |
| 4 | ███████████████████ | 11:42 |
| 5 | Q.   Got it. | 11:42 |
| 6 | And then looking forward, it says, ████ | 11:42 |
| 7 | ███████████████████████████ | 11:42 |
| 8 | ███████████████████████████ | 11:42 |
| 9 | Do you see that? | 11:42 |
| 10 | A.   Let me see.  Where are you now? | 11:42 |
| 11 | Q.   I'm sorry.  It's two sentences -- here, | 11:42 |
| 12 | I'll go at the sentence ahead.  ██████████ | 11:42 |
| 13 | ██████████████████████████████ | 11:42 |
| 14 | ███████████████████████████ | 11:42 |
| 15 | ██████████████████████████ | 11:42 |
| 16 | ████████████ | 11:42 |
| 17 | Do you see that? | 11:42 |
| 18 | A.   Yes. | 11:42 |
| 19 | Q.   And then it says, ██████████ | 11:42 |
| 20 | ██████████████████████████████ | 11:42 |
| 21 | ███████████████████ | 11:42 |
| 22 | Do you see that? | 11:42 |
| 23 | A.   Yes. | 11:42 |
| 24 | Q.   Do you have any familiarity with ███████ | 11:42 |
| 25 | ████████████████ | 11:42 |

Page 132

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A. No. | 11:42 |
| 2 | Q. Okay. Now, it -- it's referring to | 11:42 |
| 3 | ████████████████████████████ | 11:43 |
| 4 | ████ Do you see that? | 11:43 |
| 5 | A. Yes, I do see that. | 11:43 |
| 6 | Q. Does Facebook do that? | 11:43 |
| 7 | A. ██████████████████ | 11:43 |
| 8 | Q. ██ | 11:43 |
| 9 | A. ████████████████████████ | 11:43 |
| 10 | █████████████████████████ | 11:43 |
| 11 | Q. ██ | 11:43 |
| 12 | A. ██████████████████ | 11:43 |
| 13 | ████████ ████ ████ | 11:43 |
| 14 | ████████ | 11:43 |
| 15 | Q. ██████████████████ | 11:43 |
| 16 | ████████ ████ █████ █ | 11:43 |
| 17 | ██████ | 11:43 |
| 18 | ████████ ████ | 11:43 |
| 19 | ████████ ████████ | 11:43 |
| 20 | ████ ██████ | 11:43 |
| 21 | ████████ ████████████ | 11:43 |
| 22 | █████████████████ | 11:43 |
| 23 | ██████ | 11:43 |
| 24 | █ ████████ | 11:43 |
| 25 | █ ████ | 11:43 |

Page 133

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE REPORTER:  Thank you. | 11:43 |
| 2 | BY MS. WEAVER: | 11:43 |
| 3 | Q.  ███████████████████ | 11:43 |
| 4 | ███████████████████ | 11:43 |
| 5 | ██████████ | 11:43 |
| 6 | A.  ███████████████████ | 11:43 |
| 7 | ████████ | 11:43 |
| 8 | Q.  ████   ███████████████ | 11:43 |
| 9 | ████████████████ | 11:43 |
| 10 | ███████████ | 11:44 |
| 11 | A.  ████████████ | 11:44 |
| 12 | Q.  ███████████████████ | 11:44 |
| 13 | ███████████████ | 11:44 |
| 14 | A.  ██████ | 11:44 |
| 15 | Q.  ██████ | 11:44 |
| 16 | A.  ██████ | 11:44 |
| 17 | Q.  Okay.  So here, going back to the | 11:44 |
| 18 | paragraph where we started, it says "The next step | 11:44 |
| 19 | up from this is sharing of anonymized, aggregated, | 11:44 |
| 20 | or hashed data." | 11:44 |
| 21 | Do you see that? | 11:44 |
| 22 | A.  Yes. | 11:44 |
| 23 | Q.  █████████ | 11:44 |
| 24 | A.  ████████████ | 11:44 |
| 25 | ██████████ | 11:44 |

Page 134

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.