# Exhibit 69

```
                                              Pages 1 - 64

                  UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

   BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, MAGISTRATE JUDGE

IN RE: FACEBOOK, INC. CONSUMER    )
PRIVACY USER PROFILE LITIGATION.  )  NO. 18-MD-2843 VC (JSC)
                                     San Francisco, California
                                     Monday, July 13, 2020
```

**TRANSCRIPT OF ZOOM VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
        BLEICHMAR FONTI & AULD LLP
        555 12th Street
        Suite 1600
        Oakland, California  94607
  **BY:  LESLEY E. WEAVER, ESQ.**
      **ANNE K. DAVIS, ESQ.**
      **MATTHEW MONTGOMERY, ESQ.**

        KELLER RORHBACK, LLP
        1201 Third Avenue
        Suite 3200
        Seattle, Washington  98101
  **BY:  DEREK W. LOESER, ESQ.**
      **DAVID J. KO, ESQ.**
      **CARI C. LAUFENBERG, ESQ.**

        GIRARD SHARP LLP
        601 California Street
        Suite 1400
        San Francisco, California  94108
  **BY:  ANGELICA M. ORNELAS, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
        Official Reporter, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED**:

For Defendants:

>       GIBSON DUNN & CRUTCHER LLP
>       200 Park Avenue
>       New York, New York  10166
>  **BY: ORIN SNYDER, ESQ.**

>       GIBSON DUNN & CRUTCHER LLP
>       1881 Page Mill Road
>       Palo Alto, California  94304
>  **BY: MARTIE P. KUTSCHER CLARK, ESQ.**

>       GIBSON DUNN & CRUTCHER LLP
>       2100 McKinney Avenue
>       Suite 1100
>       Dallas, Texas  75201
>  **BY: RUSSELL H. FALCONER, ESQ.**

>       GIBSON DUNN & CRUTCHER LLP
>       333 South Grand Avenue
>       Los Angeles, CA 90071-3197
>  **BY: DEBORAH L. STEIN, ESQ.**

```
 1  to 2015.  It's been ongoing since that time.
 2       And first, plaintiffs wanted every single document
 3  relating to that internal investigation, including my law
 4  firm's files.  That was obviously overbroad.
 5       To be clear, we are producing documents relating to this
 6  investigation.  What I mean by that, Your Honor, is when my law
 7  firm, working with Facebook and outside consultants, discovered
 8  activity prior to 2015 involving third-party apps that it
 9  wanted to follow up with, and communicated with those
10  third-party apps, those communications are not privileged.
11  Those communications we are producing, and have produced.  In
12  fact, we have already produced 16,000 documents related to the
13  investigation.  And as we continue our production, we will
14  continue to produce thousands of documents relating to the
15  investigation.
16       What we are objecting to, and only objecting to, is core
17  attorney/client and work-product communications, such as my law
18  firm's internal analysis.  Such as communications between my
19  law firm and counsel at Facebook concerning the investigation.
20       What we propose makes sense here is that we conclude our
21  production relating to this internal investigation.  And once
22  plaintiffs have reviewed these materials and identified apps
23  that they believe to be relevant, or want -- or -- or want
24  additional documents, they can issue more tailored requests for
25  information specific to particular apps.
```

1         For example, let's assume hypothetically in 2012 there was
2    some app that did something that the investigation uncovered.
3    We then, as part of our investigative protocol, communicated
4    with that app.  Call it App X.  We wrote them a letter.  That
5    letter will be produced  and they will then have the name of
6    that app.  And any communications with that app.
7         In one or two instances, only, we actually -- I think one,
8    maybe, we filed a lawsuit against a company.  That is all
9    public.
10        After they review those documents, we can take -- we can
11   then meet and confer, and there can be a live dispute.  Right
12   now, there is no live dispute other than they say they want
13   everything.  And they are focusing on a Massachusetts Superior
14   Court ruling.  And as we told the Court -- which -- which --
15   which was a motion to compel by the Massachusetts Attorney
16   General regarding a completely different -- substantially
17   different document requests than plaintiffs.
18        We objected to that request in Massachusetts because, as
19   framed, it did invade attorney/client privilege, work product,
20   and the like.  The Superior Court ruled against us.
21        But Facebook took that up to the Supreme Judicial Court in
22   Massachusetts, and they granted the extraordinary review of the
23   Superior Court's work product determination.  That is in
24   litigation.  And so nothing that's happening in Massachusetts
25   should either bind or control here.

```
 1        This is not right.  When they get the tens of thousands of
 2   documents they will see that there are -- I'm making it up --
 3   ten, 20, 30, 40, 50 different apps -- maybe more, I don't know
 4   the number -- maybe Martie does -- with which we communicated
 5   as a result of our investigation.  They'll know the names of
 6   those apps.  They can then follow up and ask questions about
 7   those apps.  We're going to turn over all those documents.
 8        What we're not turning over is our law firm's files, and
 9   our communications with our client that were all pursuant to
10   this privileged investigation.
11             THE COURT:  When is that production going to be
12    complete?
13             MR. SNYDER:  Martie?
14             MS. KUTSCHER CLARK:  So we made a production on
15    Wednesday that included about 10,000 additional pages of
16    materials with the third parties.  We're continuing to review
17    them.  The volume is extraordinarily high, because it includes
18    every communication with apps about this investigation.
19        I think it would probably take us another several weeks to
20   work through the rest of the documents.  I think it's in the
21   range of tens of thousands of additional documents to review.
22   And we're actively working on that.
23        But again, these include every letter that went to an app
24   saying they were suspended, and why.  So once the production is
25   complete, plaintiffs will have the ability to identify any apps
```

1  document.  So the question is:  How do we get there.

2  And I don't think we necessarily need to wait until all
3  the production is done.  I don't think that is the case.  The
4  parties should get together and decide on, you know -- I don't
5  know what it is that the plaintiffs think necessarily are
6  there.  Maybe Facebook can come up with -- I don't know -- a
7  hundred documents that you're going to log.

8  **MR. SNYDER:**  We can also be helpful, Your Honor.
9  And, and -- because the vast majority -- I think it's
10  99 percent, but that's just from what my partner, you know,
11  has allowed to.

12  Since the vast majority are people we wrote to and
13  suspended because they didn't write back to us, you know, maybe
14  we can highlight a couple of ones where we had further
15  activity, they wrote back to us, we engage with them.

16  And then we can go behind the curtain, so to speak, on
17  your exemplar idea, and we can take a look at what our work
18  product and attorney/client activity was behind the contain,
19  look at what engineers were doing, and then figure out how to
20  tee up a privilege exemplar for handful of apps.

21  **THE COURT:**  Well, and for example, Mr. Loeser brought
22  up like policy (audio interference), things like that.  That's
23  not going to be particular to an app.

24  But maybe plaintiffs can point out, you know, because
25  what's --