# EXHIBIT 5

**Pages 1 - 30**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Magistrate Judge

```
IN RE FACEBOOK, INC., CONSUMER )
PRIVACY USER PROFILE          )
LITIGATION.                   )
                              )    NO. 18-md-02843 VC (JSC)
                              )
                              )
```

San Francisco, California
Tuesday, April 6, 2021

**TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**

**APPEARANCES BY ZOOM WEBINAR:**

For Plaintiffs:
        KELLER ROHRBACK LLP
        1201 Third Avenue - Suite 3200
        Seattle, Washington  98101
  **BY:** **DEREK W. LOESER, ATTORNEY AT LAW**
      **CARI C. LAUFENBERG, ATTORNEY AT LAW**
      **DAVID J. KO, ATTORNEY AT LAW**

        KELLER ROHRBACK LLP
        801 Garden Street
        Santa Barbara, California  93101
  **BY:** **CHRISTOPHER L. SPRINGER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
             Official Reporter

| | |
|---|---|
| 1 | But it is a voluntary process just like private mediation. |
| 2 | It's a voluntary process, but you-all selected Judge Andler |
| 3 | because of her, because I looked, her tremendous expertise and |
| 4 | knowledge; that, you know, I assume that if she asks for |
| 5 | something, you'll do it because that's why you selected her |
| 6 | because you actually want to try to move things forward a |
| 7 | little faster and more smoothly than I'm able to help you do. |
| 8 | **MR. SNYDER:**  Thank you, Judge Corley. |
| 9 | Nice to meet you, Judge Andler.  This is Orin Snyder from |
| 10 | Gibson Dunn. |
| 11 | Lawyers always say we're delighted to have you help us |
| 12 | reach agreement on discovery disputes, but in this case it is |
| 13 | heartfelt and sincere because I can say, and Judge Corley would |
| 14 | attest, this has not been the finest moment in efficient |
| 15 | discovery process, and so we truly do welcome your involvement. |
| 16 | And our goal is to resolve every discovery dispute without |
| 17 | having to hopefully bother Judge Corley again.  She's been |
| 18 | incredibly patient, and both parties understand why she made |
| 19 | the suggestion.  This is a case that taxes the federal |
| 20 | judiciary in a way that's not fair to other litigants and other |
| 21 | parties.  So having a voluntary mediator like you is really the |
| 22 | best outcome that we can imagine here so we're looking forward |
| 23 | to it. |
| 24 | And we also agree that you should work with us to develop |
| 25 | the most flexible, efficient, fluid, fair, reasonable, |

1  pragmatic approach to get us there; and so we're in your hands
2  to help us figure that out but, you know, we want to roll up
3  our sleeves and get discovery done.  It's very costly.  We have
4  a hundred people reviewing documents as we speak.  We want to
5  get to the finish line so we can get to the next stage of the
6  litigation; and with your help, we're confident that we'll do
7  that so we look forward to that.
8      **THE COURT:**  So if we can go through some of the
9  issues, and then I'll just sort of suggest where I think -- and
10 it's completely up to you guys and Judge Andler, but where she
11 might be able to assist.
12     So one of the issues is the document production.  I
13 understand that Facebook proposed a schedule I think very
14 recently.  But, again, that's something she can set up a
15 discovery mediation with the parties to sit down, and really I
16 think setting some deadlines would be very useful, and can talk
17 to you about what's realistic and how to get it done and
18 priorities and those kinds of things and hopefully work out
19 some schedule.
20     And even Facebook raised an issue of there being a lot of
21 nonresponsive hits that may also be something that she could
22 work with all the parties in coming up with something that
23 maybe reduces that that everyone's comfortable with.
24     The great thing about having a neutral that you trust --
25 right? -- is the neutral can sort of look under the hood and if

1  identifying all companies that Facebook agreed to exchange
2  information with, and there's a dispute arising out of what was
3  testified to at the 30(b)(6).
4      That, to me, seems like an issue that -- right? -- you can
5  show Judge Andler, "Here's their deposition -- here's
6  Judge Corley's ruling, here's the deposition testimony, and
7  here's sort of" -- then the parties can just say what their
8  position is and she can help you work through it; right?
9      I mean, my hope is, like with all mediators, that you take
10 to heart -- when they have a view of something, that you take
11 it to heart and your position -- you may disagree or disagree,
12 but it may help shape your position somewhat and she may have
13 compromises or things in mind and creative things.
14     Okay.  And then you agreed on all the search terms.  Thank
15 you.
16     Just so you think, Judge Andler, they don't agree on
17 anything, they do, and actually have worked quite hard.
18         **JUDGE ANDLER:**  Excellent.
19         **MR. LOESER:**  And we agreed on Judge Andler,
20 Judge Corley.
21         **THE COURT:**  And Judge Andler, yes.
22         **JUDGE ANDLER:**  Thank you.
23         **MS. WEAVER:**  In less than a year.
24         **THE COURT:**  Yeah.  That actually was pretty quick.
25     So now I'd actually like to talk to you about, unless

1   there's anything else, about the ADI documents, the app
2   developer investigation documents.
3       And sort of let me tell you what my thinking is about
4   that, and I did review the Massachusetts Supreme -- the Supreme
5   Judicial Court -- I can't remember -- the highest court of
6   Massachusetts decision; and my view is -- and also I think I
7   have the benefit, which they didn't have, at looking at some
8   documents in camera -- my view is, and this is what I'm going
9   to tell you my tentative view is, is that certainly the
10  investigation was done in anticipation of litigation, but also
11  I can't conceive of how it wouldn't have been done otherwise as
12  well; right?
13      I mean, Facebook wasn't going to let -- well, because they
14  said it.  When they said to the public and to their users
15  "We're doing this to protect you," they didn't say "But our
16  primary purpose was to protect our shareholders"; right?
17      I mean, if they were immune from liability, they still
18  would have gone and looked back even though the platform had
19  changed; right?  There are some apps that were suspended
20  because they were -- or you considered them to be bad actors or
21  concerned about that, and I think that would have been done.
22      All that's to say, though, there certainly are going to be
23  documents in there that are, A, attorney-client privilege; or,
24  B, attorney work product.  For example, if Gibson Dunn made
25  edits to requests for information or those kinds of things,

1  that's classic work product that's not going to be
2  discoverable.  Any advice that was given is not going to be
3  discoverable.
4      But in terms of the ADI team, at least from what I've
5  seen, it looks like a lot of that was just generated there
6  separate that may have then been reviewed but would have been
7  done anyway.
8      But also the way I was looking at it in looking through
9  and looking at those documents is that a lot of it I don't
10 think is relevant at all, and so what I wanted to know from
11 plaintiffs -- and this I sort of was thinking about it after
12 reading the Massachusetts case where the AG did much more
13 targeted discovery, and sort of get a sense from the plaintiffs
14 because I think this will be helpful.
15     Because I'm afraid I'm just going to rule on these 20
16 documents and then we're going to be back here with every
17 single document.  I don't think plaintiffs need every single
18 document.  There's certain information, like you say, that you
19 need and maybe it's not even going to be privilege.  There's
20 going to be other information that may be privilege and I
21 actually think you don't even need.
22     So what is it precisely that the plaintiffs need from that
23 investigation?
24         **MR. KO:**  Your Honor, this is David Ko.  I can speak to
25 that first.

1    All right.  So let me hear from Facebook.  With that in
2 mind in terms of your privilege log, how does that change that
3 or does it, or maybe you already understood that?
4    **MS. KUTSCHER CLARK:**  Your Honor, it's a little bit
5 difficult because this is the first time we're hearing this
6 request.  To date we have never received an information
7 request.  We just received a request for all of the ADI
8 documents.  So I think this is definitely something we would
9 need to think about a little bit more.
10    I think what might make sense is if plaintiffs want to
11 issue a request, then we can look at it in context; but what
12 was a little bit tricky in the briefing was we were dealing
13 with a request for all of the ADI documents and then plaintiffs
14 said, "Well, give us the underlying facts," but we had never
15 received a specific request for specific facts.
16    **MR. KO:**  Your Honor, I think that's a
17 mischaracterization.  I think we've asked repeatedly about this
18 information.  You know, we've conferred about ADI, as you know,
19 for well -- almost over a year now and we presented these
20 issues to Your Honor last June.  You know, you accurately
21 ordered this privilege log to make sure that you had the proper
22 context.
23    And throughout those discussions, we have asked over and
24 over again that we obtain the actual facts underlying this
25 investigation; and if there's any doubt about this, this is

1  right now we're kind of shooting in the dark because all facts
2  underlying the investigation, having been involved in that
3  investigation, I don't know what that means.  I really don't.
4              **THE COURT:**  That's not what they're -- I understand
5  that.
6       So then my next question is, because you had suggested,
7  I'm prepared then to rule on the motion but Facebook had
8  said -- and, as I said, my tentative view is I don't
9  necessarily agree with the Massachusetts -- well, I think we
10 all agree about the dual purpose doctrine and what the
11 Ninth Circuit rule is with respect to that.  The Massachusetts
12 court kind of -- kind of applied the same rule.  I mean, they
13 at one point did use the same rule, and without really any
14 analysis sort of came to the conclusion that it was -- well,
15 I'm not sure what it was.  I'm not sure they were applying the
16 same rule as the Ninth Circuit.
17      So I'm prepared to issue a ruling, but I wanted to ask
18 Facebook about what they're -- I don't know what more you would
19 say, but I want to make sure it's fair because I understand --
20 it's clear that this investigation was set up with the intent
21 to make it privileged.  That's clear.  That's not dispositive,
22 but that's clear.  So given that, I do want to make sure that
23 they are able to fairly present it, and so that's why --
24             **MR. SNYDER:**  Because I would respectfully disagree
25 with the following:  I think that because when it was set up,

1  it was set up for the reason you said because we wanted to
2  assure our users that the platform, you know, was safe and had
3  been safe in the past, but it was not set up so that we can --
4  so that we can shroud it in a privilege.  It was set up -- it
5  was set up in a privilege way because we understood that to the
6  extent we have to take enforcement action, it would require,
7  you know, legal advice and the lawyers were embedded in and
8  involved in, you know, hundreds and hundreds of decisions on a
9  weekly, daily basis about escalation, about all manner of the
10 investigation.
11      So it wasn't just that lawyers were put in to make it
12 privilege.  Lawyers were embedded in.  In fact, we set up the
13 investigation because it required legal advice at every turn.
14          **THE COURT:**  That may be what you're saying.  I don't
15 know that I have seen -- I don't know that I have --
16          **MR. SNYDER:**  I can --
17          **THE COURT:**  I don't know that I've seen that.  That's
18 why I want to ask:  Is there anything else that you want to
19 present in an admissible format as opposed to the attorney --
20          **MR. SNYDER:**  Yes.  What I would like to do,
21 Your Honor, because my partner Alex Southwell was literally
22 living in Palo Alto with a number of my partners and associates
23 for weeks if not months, in the guts of this investigation,
24 again, not as a fig leaf but as lawyers practicing law and
25 advising the client, I think it would be helpful for the Court

1  in its determination for us to put in an affidavit where we can
2  outline in a nonprivilege way the extent to which legal advice
3  was involved at every step in the investigation.
4      That might even be helpful to the plaintiffs in then
5  identifying what it is they want to know because, as I said,
6  all of the -- all -- I don't know what percentage but a
7  substantial number of the decisions made by the investigators
8  on the field were made sitting next to lawyers, texting,
9  e-mailing with lawyers, at every turn.  Hundreds -- I haven't
10 seen our privilege log, but it must be tens if not hundreds of
11 thousands of entries of iterative discussions between my team
12 and the investigators because they were living together for
13 months and months and months doing this investigation hand in
14 glove, hand in hand, shoulder to shoulder.
15     **THE COURT:**  Yeah, but don't forget what the test is in
16 the Ninth Circuit is dual purpose and would the investigation
17 have occurred anyway; and it's inconceivable to me that if
18 Facebook had been immune from liability, that they wouldn't
19 have gone in and investigated the apps to see if there were any
20 other bad actors there.
21     That's just -- that's just inconceivable to me that, of
22 course, they would have gone in and investigated those apps;
23 and, therefore, my view is that those facts discovered, the
24 facts, not the advice given, the facts would be discoverable.
25 So I'm just saying that's what my view is, but I will allow you

1    to submit an affidavit.
2        And I know before I said no affidavits, but now having
3    looked at it all, I think that that would be a mistake --
4        **MR. SNYDER:** Thank you.
5        **THE COURT:** -- an error on my part to rule
6    definitively on that without doing that. And then, of course,
7    I'll let -- but, as you said, a nonprivileged affidavit.
8        **MR. SNYDER:** Yes, Your Honor.
9        **MR. KO:** And, Your Honor, will we be allowed to
10   respond to that affidavit?
11       **THE COURT:** Yes. You're going to get to see it and
12   then you're going to get to respond.
13       **MR. KO:** Because I think just to preview what -- you
14   know, Mr. Snyder, what I hear him saying is simply because of
15   the volume, that somehow this is all privilege. But as you
16   correctly pointed out, both the dual purpose and the facts
17   underlying the investigation is what we are entitled to.
18       And it's clear -- I mean, I get -- I understand that it
19   was a massive investigation, but just the sheer fact that it
20   involved lots of communications does not take away from the
21   fact that we would be entitled to the underlying facts
22   regarding the escalation of these apps and the subsequent
23   enforcement to the extent that was done. And so that's what we
24   are seeking and I think it's pretty clear what we would be
25   entitled to here.

1    **MS. WEAVER:** Your Honor, if I can --

2    **THE COURT:** That will shorten the privilege log if you
3    only did the sample privilege log for six apps greatly; right?
4    None of those e-mails about "Are you available for this
5    meeting?" or "Can we move it?" or "Should you change the weekly
6    report so that it has this information?"

7    **MR. SNYDER:** No.

8    **THE COURT:** You don't need any of that; right? You
9    just want the facts. You just want what's in the report.

10   **MR. LOESER:** Your Honor, I'm going to raise my hand,
11   and I have a question about this affidavit.

12   And if the notion is that Facebook is going to submit the
13   affidavit of a lawyer, I'm wondering how that works in this
14   case. That would appear to, then, be a witness.

15   And one of the central claims is a failure to monitor, and
16   I'm a little -- I guess I'm confused as to how a lawyer
17   testifying in this action about the work that that lawyer did,
18   some of which would be privilege, some would not, wouldn't be a
19   waiver of the attorney-client privilege or at least introduce a
20   lawyer as a witness. And I'm just throwing that question out
21   there wondering how that works.

22   **THE COURT:** I don't know. This is a perfect thing I
23   think for you-all to discuss with Judge Andler; right? So --
24   and I appreciate, Mr. Loeser, you being very candid about that.
25   Essentially you're, like, warning them, "Just because we're