# PLAINTIFFS' EXHIBIT 5

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

**CONFIDENTIAL ROUGH DRAFT**

1          UNCERTIFIED REALTIME ROUGH DRAFT OF

2          ALLISON HENRIX TAKEN 5/5/2022

3

4                          ***

5    THIS REALTIME ROUGH DRAFT IS UNEDITED AND

6    UNCERTIFIED AND MAY CONTAIN UNTRANSLATED

7    STENOGRAPHIC SYMBOLS, AN OCCASIONAL REPORTER'S

8    NOTE, A MISSPELLED PROPER NAME/OR NONSENSICAL WORD

9    COMBINATIONS.  PURSUANT TO CCP SECTION 2025.540(b),

10   IT MAY NOT BE USED, CITED, OR TRANSCRIBED AS THE

11   CERTIFIED TRANSCRIPT OF THE DEPOSITION PROCEEDINGS.

12   THIS REALTIME ROUGH DRAFT TRANSCRIPT MAY NOT BE

13   CITED OR USED IN ANY WAY OR AT ANY TIME TO REBUT OR

14   CONTRADICT THE CERTIFIED TRANSCRIPT OF THE

15   DEPOSITION PROCEEDINGS AS PROVIDED BY THE

16   DEPOSITION OFFICER.  THIS DOCUMENT IS NOT TO BE

17   RELIED UPON IN WHOLE OR IN PART AS THE OFFICIAL

18   TRANSCRIPT.  THIS UNCERTIFIED REALTIME ROUGH DRAFT

19   VERSION HAS NOT BEEN REVIEWED OR EDITED BY THE

20   CERTIFIED SHORTHAND REPORTER FOR ACCURACY.

21

22   ACCEPTANCE OF THIS REALTIME ROUGH DRAFT IS AN

23   AUTOMATIC FINAL COPY ORDER.  I AGREE NOT TO SHARE,

```
24  GIVE, COPY, SCAN, FAX, OR IN ANY WAY DISTRIBUTE THE

25  REALTIME ROUGH DRAFT IN ANY FORM (WRITTEN OR
```

1

✦

**CONFIDENTIAL ROUGH DRAFT**

```
 1  COMPUTERIZED) TO ANY PARTY.  HOWEVER, MY OWN

 2  EXPERTS, CO-COUNSEL, CLIENT(S) AND STAFF MAY HAVE

 3  LIMITED INTERNAL USE OF SAME WITH THE UNDERSTANDING

 4  THAT I AGREE TO DESTROY ALL REALTIME ROUGH DRAFTS

 5  AND/OR COMPUTERIZED FORMS, IF ANY, AND REPLACE SAME

 6  WITH THE FINAL TRANSCRIPT AND/OR FINAL COMPUTERIZED

 7  FORM, UPON ITS COMPLETION.

 8

 9

10      Acceptance of this realtime draft is an

11  automatic final copy order.

12

13

14          THE VIDEOGRAPHER:  Okay.  We are on the

09:16:26 15  record it's 9:16 a.m. Pacific time on May 5th,

16  2022.  This is the deposition of Allison Hendrix.

17  We are here in the matter of In Re:  Facebook, Inc.

18  Consumer Privacy User Profile Litigation.  I'm John

19  Macdonell the videographer with Veritext.  Before

09:16:45 20  the reporter swears the witness would counsel
```

21  please identify themselves beginning with the

22  noticing attorney please.

23          MR. KO:  Good morning, everyone.

24  David Ko of Keller Rohrbach of plaintiffs and with

09:16:59 25  me here today is Cari Laufenberg, Derek Loeser,

2

⬆

**CONFIDENTIAL ROUGH DRAFT**

09:17:04 1  Emma Wright and Adele Daniele I believe also of

2  Keller-Rohrback.

3          MR. BLUME:  And good morning this is Rob

4  Blume from Gibson Dunn on behalf of Ms. Ali Hendrix

09:17:20 5  and Facebook.

6          And on the video is with me in the room

7  is Prachi Mistry, Kelly Herbert and Ian Chen from

8  Facebook at Gibson Dunn and on the video I think is

9  Joe LoPresti, Dana Zolle Hauser, Andrew Kuntz and I

09:17:48 10  think that's all we have.

11          SPECIAL MASTER GARRIE:  This is

12  Special Master Garrie on behalf -- behalf of the

13  Court.

14          MR. BLUME:  And --

09:18:02 15  MR. KO:  Pretty big crowd.

16          MR. BLUME:  And the part -- as we spoke

17  before we went on the record, the transcript we

```
          18  seek to have the transcript conversation under the

          19  existing protective orders.

09:18:13  20            THE COURT REPORTER:  If you could raise

          21  your right hand for me, please.

          22            THE DEPONENT:  (Complies.)

          23            THE COURT REPORTER:  You do solemnly

          24  state, under penalty of perjury, that the testimony

09:18:13  25  you are about to give in this deposition shall be
```

                                                              3

↑

                         **CONFIDENTIAL ROUGH DRAFT**

```
09:18:13   1  the truth, the whole truth and nothing but the

           2  truth?

           3            THE DEPONENT:  I do.

           4                      ALLISON HENDRIX,

09:18:13   5  having been administered an oath, was examined and

           6  testified as follows:

           7

           8                      EXAMINATION

           9  BY MR. KO:

09:18:40  10       Q.   Good morning Ms. Hendrix?

          11       A.   Good morning.

          12       Q.   We met off the record, but my name is

          13  David Ko of Keller -- backand I will be taking your

          14  deposition today.
```

09:18:52 15          I believe you have taken your -- I

16 believe you have taken a deposition before; is that

17 correct?

18          A.   Yes.

19          Q.   So you know how this goes a bit but let

09:19:02 20 me remind of a few of the ground rules that are

21 most important to me.

22          The most important task here today is to

23 create a clean record and for Rebecca the

24 court reporter to transcribe everything that we say

09:19:14 25 so please wait I've finished my question before

                                                              4

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

09:19:20  1 moving onto answer even though you think the answer

2 likewise until you finish your response before

3 moving onto my next question.

4          Does that sound fair?

09:19:28  5          A.   Yes.

6          Q.   And to the extent I ask a yes-or-no

7 question and your response is in -- it is important

8 for the record to answer in that manner rather than

9 shaking your head or giving an inaudible response.

09:19:45 10          Does that sound fair?

11          A.   Yes.

```
         12        Q.   From time to time your counsel Mr. Blume

         13   may object to some of my questioning.  But unless

         14   he clearly instructs you not to answer I -- I ask

09:19:57 15   that you respond to my question nonetheless.

         16             Does that sound fair?

         17        A.   Yes.

         18        Q.   And we'll be here for a few hours it

         19   won't be an entire long day of seven -- seven or

09:20:10 20   eight hours like a normal deposition but it will be

         21   a pretty long day.  So if at any time you need a

         22   break, just please let me know and I will do my

         23   best to accommodate.

         24             Okay.

09:20:20 25        A.   Yes.
```

                                                              5

✦

                        **CONFIDENTIAL ROUGH DRAFT**

```
09:20:25  1        Q.   Ms. Hendrix, by the way, would you prefer

          2   Ms. Ms. Hendrix Allison how would you like to be

          3   addressed during this deposition?

          4        A.   Ms. Hendrix is fine.

09:20:35  5        Q.   Okay.  Great.  Ms. Hendrix anything that

          6   you any that prevent from testifying honestly or

          7   truthfully today?

          8        A.   No.
```

              9      Q.   Great.

09:20:46 10            Let me start by showing you the notice

         11   that governs your term today.

         12            So let's start with the 30(b)(6) notice

         13   that I assume you have seen.  But we'll talk about

         14   that here in a second.

09:21:07 15            I can see the little confused the

         16   exhibits will be shown to you both on this platform

         17   that you can access or I believe if you would like

         18   we can share it on the screen for you.

         19            Whatever you prefer?

09:21:23 20      A.   I wasn't sure if the machine next to me

         21   was -- was what I was going to be viewing it on and

         22   it looks like it's you might need to log in to into

         23   it.

         24            (Discussion off the stenographic record.)

09:21:57 25      Q.   (By Mr. Ko)  So while that's being fired

                                                              6

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

09:21:59  1   up I will note for the record.  This exhibit will

          2   be exhibit 330.

          3            (Exhibit 330 was marked for

          4   identification by the court reporter and is

09:22:03  5   attached hereto.)

6          MR. KO:  And it many be a copy of the

7     30(b)(6) notice dated March 1st, 2022.

8          Q.   (By Mr. Ko)  Let me know when you have

9     that up?

09:22:20 10    A.   If folder currently appears to be empty

11    but maybe I need to do something.

12         Q.   Yeah, give it a little time?

13         MR. BLUME:  Click on that right there.

14         THE DEPONENT:  Yes.

09:22:33 15    MR. KO:  You need refresh.  Great.

16         While you do that for the record is clear

17    that exact title of this documents plaintiffs

18    second amended notice of deposition of defendant

19    Facebook pursuant to FRCP 30(b)(6).

09:22:51 20    Q.   Do you see that document in front of you

21    now Ms. Hendrix?

22         A.   I do.

23         Q.   Have you seen this notice before?

24         A.   I believe so, yes.

09:22:59 25    Q.   You are testifying on certain topics in

                                                       7

⌃

**CONFIDENTIAL ROUGH DRAFT**

09:23:01  1   this notice, correct?

2          A.   Correct.

                  3          Q.   And let me turn your attention page 11

                  4   section 3 of this notice?

09:23:27    5          A.   I'm not see a section three of what

                  6   appears to be page 11.

                  7          Q.   Go ahead to page 11 of the notice and I

                  8   don't know what PDF you may have up I'm talking

                  9   about the page 11 of the notice itself that appears

09:23:40  10   at the bottom of -- of the document?

                11          A.   I'm on what seems to be page 11 and it

                12   starts with matters for testimony.

                13          Q.   Right.  And so by section three I'm just

                14   simply referring to roman numerals 3 that proceeds

09:23:56  15   --

                16          A.   Okay.

                17          Q.   -- proceeds the matters?

                18          A.   All right.  I'm here.

                19          Q.   So do you see.

09:24:04  20          Great.  Do you see under matters for

                21   testimony a topic 1?

                22          A.   Yes.

                23          Q.   And to state that you are testifying on

                24   topic 1 of this notice?

09:24:20  25          A.   Yes.

                                                                     8

**CONFIDENTIAL ROUGH DRAFT**

09:24:24 1    Q.   Turn with me to the next page to topic 3.

2   Is it accurate to state that you are testifying on

3   topic 3 of this notice?

4    A.   Yes.

09:24:41 5    Q.   And sorry go a little out of order now go

6   back to page 11 topic two is it accurate to state

7   that you are testifying on some aspects of topic

8   two of this notice?

9    A.   Yes.

09:24:57 10    Q.   In particular you are testifying as to

11   topics 22B and 2D except as those topics relate to

12   targeted advertising, correct?

13    A.   Yes.

14    Q.   Would you agree with me that topics 2B

09:25:14 15   and 2D have relationship -- have some relationship

16   to topic 3?

17        MR. BLUME:  Objection.  Form.

18        THE DEPONENT:  What do you mean?

19    Q.   (By Mr. Ko)  Do you understand the word

09:25:29 20   "related" means?

21        MR. BLUME:  Objection.  Form.

22        THE DEPONENT:  I know what the word

23   related means and if you want to repeat your

24   question I can slowly look at this and see.

09:25:46 25      Q.   (By Mr. Ko)  Sure.

                                                              9

↟

                        **CONFIDENTIAL ROUGH DRAFT**

09:25:47  1           Are topics 2B and 2D related to topic 3?

          2           MR. BLUME:  Objection.  Form.

          3           THE DEPONENT:  So you are asking how

          4    topics 2B and 2D are related to 23?

09:26:15  5           Q.   (By Mr. Ko)  No.  I'm not -- first of

          6    all, I'm not asking how.  And I'm not -- and I

          7    didn't talk about 23, I said are topics 2B and 2D

          8    related to topics 3?

          9           MR. BLUME:  Objection.  Form.

09:26:33 10           MR. KO:  Mr. Blume in the past just for

         11    edification we had had a standing objection or

         12    we've stipulated to a standing objection as to form

         13    and I'm happy to do that here to the extent those

         14    objections are -- are form objections.

09:26:50 15           MR. BLUME:  Well, I don't -- I don't

         16    think we can.

         17           MR. KO:  You don't want to tip late

         18    that's fine.

         19           MR. BLUME:  I prefer not a standing

09:26:56 20    objection I just I'm not sure I'm not even sure

         21    what you mean, but that's -- my objection is to the

22  form of the question.

23          THE DEPONENT:  Yeah, I -- I can't -- I'm

24  going to decline to answer that because like we --

09:27:08 25  we never sold data so it's like I'm not going wrap

                                                    10

↟

                    **CONFIDENTIAL ROUGH DRAFT**

09:27:14  1  all of these statements in together and say they

        2  are related.  I'm sorry.

        3      Q.   (By Mr. Ko)  Okay.  Is topics are aspects

        4  of topic 2B and 2D this is not a trick question

09:27:26  5  this is just a basic are aspects of 2B and 2D

        6  related in any way to topic 3?

        7          MR. BLUME:  Objection.

        8          THE DEPONENT:  What do you mean by

        9  related.  Maybe you can help me?

09:28:09 10      Q.   (By Mr. Ko)  I'm -- I'm the Webster

       11  dictionary but I have a very common understanding

       12  of what the word related means.

       13          Do you have an understanding of what the

       14  word related means?

09:28:19 15      A.   I would love to under -- I would love to

       16  understand what your common understanding is.

       17      Q.   Is there --

       18      A.   That could help me answer this question.

09:28:36
```
19        Q.   So your counsel designated you and you
20   con send to testify as to topics 2B and 2D and you
21   answered yes to that question, correct?
22        A.   I can testify with respect to the topics
23   that I already acknowledged that I'm here to
24   testify.
```
09:28:51
```
25        Q.   So you assume you have an understanding
```

                                                        11

↑

                    **CONFIDENTIAL ROUGH DRAFT**

09:28:53
```
1    of what topics 2B and 2D encompass; is that
2    correct?
3         A.   Yes.
4         Q.   If the Court or the jury wanted to know
```
09:29:07
```
5    whether or not Ms. Hendrix believed that topics 2B
6    and 2D were in anyway shape or form related to
7    topics 3 how would you respond to that question?
8              MR. BLUME:  Objection.  Speculation.
9    Vague.
```
09:29:22
```
10             THE DEPONENT:  So 3B is identification by
11   category of the type of data or information to
12   which Facebook sold again we've never done that.
13   Made ex I believe able or made available or allowed
14   third parties to use -- to target users which I'm
```
09:29:41
```
15   not here to testify to on ads the types well let's
```

16   go to B.

17        The purposes for which such data or

18   information was shared or made available -- made

19   accessible or permitted third parties to target the

09:29:54 20   later of which I'm not here to speak to.

21        How Facebook insured third parties use of

22   such data or information was limited to the use

23   case.

24        And when we go to topic 3 an overview of

09:30:08 25   the processes of developing privacy or app settling

                                                      12

♠

                    **CONFIDENTIAL ROUGH DRAFT**

09:30:12 1   or other controls made available to users to

2   prevent or limited their data or information from

3   being accessed by third parties including the dates

4   during which each app setting or other controls

09:30:24 5   were available.

6        And I will go ahead and help us not

7   continuing to read it.  So topic two does speak to

8   the platform.  And topic 3 speaks to how people

9   could use settings to control information through

09:30:41 10   the platform, so they are somewhat related.

11        Q.   (By Mr. Ko)  Okay.  Thank you.

12        In particular topic 3C in which you

13  indicated earlier that you are were testifying on

14  behalf of Facebook for indicates that you will be

09:31:03 15  providing testimony as to Facebook's monitoring an

16  enforcement of contractual terms with third

17  parties.

18          Do you see that -- of course Ime has some

19  extra language but do you see topic 3C?

09:31:14 20      A.  I do.

21      Q.  Do you feel that that has any

22  relationship with topic 2D which asks for how

23  Facebook insured third parties use of such data or

24  information was limited to the use case?

09:31:26 25          MR. BLUME:  Objection.  Form.

                                                    13

↟

                    **CONFIDENTIAL ROUGH DRAFT**

09:31:40  1          THE DEPONENT:  Those topics are similar.

2      Q.  (By Mr. Ko)  Great.  Thank you.

3          I believe you are also tasked -- turn to

4  page 13 of the notice and in particular topic 66?

09:32:05  5      A.  I just read it.

6      Q.  Is it accurate to state that you also

7  testifying as to some aspects of topic 6 of this

8  notice?

9          MR. BLUME:  Objection.  She's not -- we

09:32:22 10   are not presenting her as a witness on topic six so

11   no I can contrary.

12          MR. KO:  That's on -- Mr. Blume indicate

13   that Ms. Hendrix is testifying as to the portions

14   of topic.

09:32:33 15          MR. BLUME:  Right.  You are right I'm

16   sorry.  My you are absolutely right.  Mr. Ko,

17   that's right.  I'm sorry.

18      Q.   (By Mr. Ko)  Let me restate the question?

19      A.   I and prepared.

09:32:42 20      Q.   Let -- sorry -- sorry Ms. Hendrix I

21   apologize.  Let me so we have a clean record.  Let

22   me just ask it again.

23          Is it accurate to state testifying as to

24   some aspects of topic 6 of this notice?

09:32:56 25      A.   Yes.

                                                      14

✦

                    **CONFIDENTIAL ROUGH DRAFT**

09:32:57  1      Q.   In particular, you are testifying as to

2   "the development of friend sharing" and "the

3   communication of this technology to users including

4   the drafting of Facebook's terms of service SRR and

09:33:16  5   data and privacy policies related to friend

6   sharing" and I added a -- to there but is it

```
          7  accurate to state that you are testifying as to

          8  that portion of topic 6?

          9       A.   The first part, no.  But I am here to

09:33:32 10  talk about the -- the -- like the drafting of

         11  Facebook's terms of service.  SRR and data and

         12  privacy policies related to friend sharing.

         13       Q.   Great.  Thank you that's helpful.

         14            So it's accurate to state that you are

09:33:46 15  testifying on behalf of Facebook today as to the

         16  drafting of Facebook's terms and service SRR, and

         17  data and privacy policies related to friend

         18  sharing, correct?

         19       A.   Yes.

09:34:01 20       Q.   And for all of these topics that we just

         21  went through, which is -- which are topic -- topics

         22  1 portions of two including 2B and 2D.  Topic 3 and

         23  portions of topic 6, you understand that you are

         24  testifying on behalf of Facebook, correct?

09:34:20 25       A.   Correct.
```

                                                      15

                    **CONFIDENTIAL ROUGH DRAFT**

```
09:34:22  1       Q.   Do you understand that you are not

          2  testifying in your individual capacity, correct?

          3       A.   That's correct and just to qualify for
```

```
          4   2B, not the -- the third parties to target.
09:34:37  5        Q.   Correct.
          6             You are not here to testify as to the
          7   aspects of topic two related to targeted
          8   advertising?
          9        A.   That's correct.
09:34:50 10        Q.   Do you understand that your testimony is
         11   binding on the company?
         12        A.   Yes.
         13        Q.   Now pursuant to the notice this -- these
         14   topics and your testimony today will cover the time
09:35:09 15   period from January 1st, 2007 to the present.
         16             Do you understand that time period
         17   reflected in the notice?
         18        A.   I do.
         19        Q.   Great.
09:35:21 20             So unless I otherwise specify, a range or
         21   a specific date that I'm interested in with respect
         22   to my question, my questions will generally relate
         23   to this entire time period.
         24             Okay.
09:35:36 25        A.   I understand.
```

                                                              16

09:35:40  1        Q.   Ms. Hendrix, what did you do to prepare

          2   for this deposition?

          3        A.   I -- I reviewed a number of documents.  I

          4   met with fellow teammates.  I met with my counsel.

09:36:05  5   I'm -- would you like me to go into defense tile.

          6        Q.   I ask some follow-up questions thank you.

          7             When you say "teammates" what do you mean

          8   by that?

          9        A.   I -- I met with individual employees at

09:36:23 10   Meta Facebook so that I could prepare for these

         11   topics.

         12        Q.   And by the way thank you for reminding me

         13   of Facebook's new corporate name.  I just want make

         14   sure the record is clear.

09:36:38 15             Your testimony today is on behalf of both

         16   Meta and Facebook; is that fair?

         17        A.   Yes.

         18        Q.   And so to the extent I say Facebook that

         19   will be son minus a Meta and the Meta that will be

09:36:55 20   synonymous with Facebook; is that okay?

         21        A.   Yes.

         22        Q.   And your corporate testimony pursuant to

         23   rule 30(b)(6) will also be on behalf of meth

         24   targeted advertising and Facebook, correct?

09:37:07 25        A.   Yes.

⬆

**CONFIDENTIAL ROUGH DRAFT**

09:37:10  1       Q.   So the individuals and employees that you

2    spoke with at Facebook, what groups or departments

3    were they a part of?

4          MR. BLUME:  Objection.  Form.

09:37:31  5          THE DEPONENT:  I met with -- it might be

6    easier if I just state the individual's names.

7       Q.   (By Mr. Ko)  Sure.

8          What -- how many -- approximately how

9    many individuals did you meet that were -- and this

09:37:47 10   is just with respect to the Facebook employees that

11   you described?

12      A.   So setting aside our lawyers, I met with

13   Simon Cross, Eddie O'Neil, Rob Sherman, Preti** his

14   name is hard to pronounce it starts with a P.

09:38:18 15          I -- I think -- oh and Kristy Cook.  I

16   think those -- I think that's a comprehensive list

17   of the people that I met with over videoconference.

18      Q.   And with respect to Kristy Cook and --

19      A.   Oh, forgot, Ed Palmieri.  Edward

09:38:48 20   Palmieri.

21      Q.   So I count six individuals that you met

22   with in preparation for this deposition at least

23  six individuals at Facebook setting aside your

24  lawyers; is that correct?

09:39:04 25    A.   Yes, those -- those are the teammates

                                                        18

⬆

**CONFIDENTIAL ROUGH DRAFT**

09:39:06  1  that I sought additional information from.

          2    Q.   And with respect to pre at any time tee

          3  and Kristy what departments at Facebook are they

          4  in?

09:39:19  5    A.   I'm going to refer to my notes here.  She

          6  so pretty tee is the functional head for user

          7  research and Kristy is a member of the -- I think

          8  present day she's on the global operations team

          9  that's led by John DeVine.

09:39:56 10    Q.   And you say presently that's her role.

         11  What was her role prior to that?

         12         MR. BLUME:  Objection.  Form.

         13         THE DEPONENT:  Her role hasn't changed

         14  but there was -- but her team was moved into a

09:40:11 15  different org recently and I can't recall the name

         16  of exactly which org she had been sitting in

         17  before.  But her day-to-day responsibilities as I

         18  understand them haven't -- haven't changed.

         19    Q.   (By Mr. Ko)  And you just indicated that

09:40:32 20   you were looking at some your notes.  So I assume

21   you brought some notes with you to this deposition

22   today?

23         A.   Yes, I -- I did.

24         Q.   Are they notes that you created yourself?

09:40:46 25        A.   Yes.

                                                    19

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

09:40:49 1         Q.   And those are notes that you've obviously

2    referred to once and that intend to refer to

3    throughout this deposition, I assume?

4         A.   If needed.  I mean, I probably spent 30,

09:41:01 5   40 hours like preparing just -- just meeting with

6    counsel, let alone all of time reviewing all of the

7    documents.  So as I'm sure you can imagine, this is

8    very lengthy period of time, so I felt comfortable

9    that I -- I wanted to be helpful to you.  And be

09:41:22 10  able to responsive so yes, I -- I asked if I create

11   notes and -- and I created them.

12         Q.   Appreciate that.

13              MR. KO:  Counsel Blume, we would request

14   a copy and a version of these notes following this

09:41:39 15  deposition.

16              MR. BLUME:  Noted.

17          Q.    (By Mr. Ko)  Now earlier you had asked or

18     you had indicated that there were some documents

19     that you reviewed in connection with your

09:41:56 20     preparation did those documents consist of

21     documents that understood were provided by

22     plaintiff's counsel in connection with this

23     deposition?

24          A.    I did receive documents that you guys

09:42:17 25     sent over a handful of days ago, I think.

                                                                20

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

09:42:23  1          Q.    And did you review all those documents?

2          A.    I did look through I didn't read every

3     word but I did review them all.

4          Q.    And other than tranche of documents I

09:42:36  5     assume you reviewed other additional documents in

6     connection with this -- in connection with

7     preparing for this deposition?

8          A.    Yes.

9          Q.    Okay.  And can you describe -- tell me

09:42:48 10     what those documents consisted of?

11          A.    I probably won't be comprehensive I will

12     do my best so it's news room posts, tasks, emails,

13     I believe the documents that we've shared with you,

          14   which and then transcripts from prior testimony.

09:43:23  15   Like yeah, I -- I don't know if you want me to go

          16   further but it was, you know, a lot of materials.

          17        Q.   No that's great I was just trying to get

          18   a general understanding of the types and categories

          19   of documents you reviewed and so that was helpful.

09:43:38  20             When you said that there were documents

          21   that "we've shared with you."

          22             Do you mean to talk about the documents

          23   that Facebook has produced in connection with

          24   discovery in this case or are you talking about

09:43:53  25   some other set of documents that were shared?

                                                              21

⬆

                       **CONFIDENTIAL ROUGH DRAFT**

09:43:56   1        A.   I believe these are the documents that

           2   we've introduced to you in connection with my

           3   testimony.

           4        Q.   Okay.  So you believe that there was a

09:44:06   5   specific set of documents that were provided to us

           6   in connection with this testimony?

           7             MR. BLUME:  And I will object to the

           8   extent that that your understanding of what was

           9   produced and when and to whom came from discussions

09:44:22  10   with counsel that you should not respond to that

11  question.

12       Q.   (By Mr. Ko)  Are you going to follow your

13  counsel's instruction?

14       A.   Yes, I don't have anything further to add

09:44:39 15  than what I said.

16       Q.   Take a look at schedule B of the notice,

17  which is Exhibit 330 and it's at page 16?

18       A.   Okay I'm here.

19       Q.   There is a paragraph, paragraph 1 that to

09:45:08 20  be fair it doesn't ask you directly it asks four

21  counsel to produce and provide all documents which

22  the person Facebook designates to testify on its

23  behalf has consulted or reviewed or plans to

24  consultant in preparation for this deposition and

09:45:23 25  has relied upon or will rely upon testimony

                                                          22

↟

**CONFIDENTIAL ROUGH DRAFT**

09:45:27  1  concerning the above deposition topics ."

2            Did I read that correctly?

3       A.   Yes.

4       Q.   And you had indicated that in addition to

09:45:34  5  the documents we provided to you that you have

6  reviewed a large set of additional categories of

7  documents to prepare for this deposition, correct?

```
           8          MR. BLUME:  Objection.
           9          THE DEPONENT:  I would bucket into --
09:45:50  10   into two categories.  Those documents that you
          11   noticed us on and those documents that we provided
          12   to you.  I didn't --
          13          Q.   (By Mr. Ko)  And with --
          14          A.   -- review other documents.
09:46:04  15          Q.   Right.  I was talking about this --
          16   this -- that second later categories apologize if I
          17   was unclear.
          18          So --
          19          A.   Well --
09:46:13  20          Q.   -- in addition --
          21          A.   The third bucket is my notes.
          22          Q.   Okay.  Great.  Thank you for that
          23   clarification.
          24          So there -- there -- to be clear, there
09:46:24  25   is a set of documents that you reviewed in
```

                                                         23

⬆

                      **CONFIDENTIAL ROUGH DRAFT**

```
09:46:30   1   preparation for this deposition outside of the
           2   documents we provided to you, correct?
           3          A.   Yes.
           4          MR. KO:  Okay, Counsel Blume --
```

09:46:46   5          THE DEPONENT:  I should --

           6          MR. KO:  Go ahead.

           7          MR. BLUME:  Go ahead.

           8          THE DEPONENT:  Well, I -- I -- I had a

           9   deposition in another matter very, very recently

09:46:56  10   and so in terms of scope and me really wanting to

          11   make sure that I'm being really responsive,

          12   you know, over the last couple of months I have had

          13   to review documents that might have been odd of

          14   scope.  But -- but that would -- I don't know.

09:47:15  15   Like I just want to make sure like I -- I did

          16   review documents not too long ago for another case

          17   but I don't know if they are relevant to this.

          18      Q.   (By Mr. Ko)  Understood.  Thank you for

          19   that explanation.

09:47:31  20          MR. KO:  So Counsel Blume we would

          21   request consist with both the schedule and our

          22   previous request that you produce to us all the

          23   documents that Ms. Hendrix reviewed in connection

          24   with preparing for this deposition today and I will

09:47:50  25   also note to reserve the right to reopen this

                                                              24

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

09:47:52   1   deposition after you produce those documents to us.

2              MR. BLUME:  All -- all of those documents

3    have been produced in discovery.  You already have

4    every document that she looked at in preparation

09:48:03  5    for this 30(b)(6) witness and so pursuant to

6    discovery protocol those do not have to be produced

7    again.  So but you have them all.

8              MR. KO:  Thank you for that explanation

9    and our view we would like to know the specific

09:48:18 10    documents and not just a reference to the -- the

11    entire discovery production.

12              MR. BLUME:  And that is I don't remember

13    go ahead.

14              MR. KO:  Yeah.  So we -- just to clarify

09:48:29 15    we would renew our request consist with this notice

16    and consist with our prior request in and meet and

17    conference that you prepare and produce this

18    material with the specific reference to which

19    documents were reviewed by Ms. Hendrix.

09:48:45 20              MR. BLUME:  And we would object.  It's

21    work product engages privileged conversations and

22    pursuant to the discovery protocol not -- we are

23    not required to reproduce documents for purposes of

24    depositions that already been produced in discovery

09:49:02 25    every document that she reviewed that in

25

**CONFIDENTIAL ROUGH DRAFT**

09:49:06  1  preparation for this 30(b)(6) deposition has been

2  previously produced.

3          THE DEPONENT:  And can testify --

4          MR. BLUME:  Wait for a question.

09:49:13  5          THE DEPONENT:  Oh, sorry.

6      Q.   (By Mr. Ko)  Sorry.  Ms. Hendrix what you

7  were going to say?

8      A.   I might --

9          MR. BLUME:  Is -- is there a question?

09:49:23 10          MR. KO:  I said yeah the question what

11  were going to say.

12          THE DEPONENT:  I --

13      Q.   (By Mr. Ko)  Go ahead.

14      A.   I might -- I might have caused a noise

09:49:32 15  because I can testify well I am testifying, I

16  didn't open up any of those old -- I was just

17  trying to be clear that I -- I have -- I have

18  testified recent on another case.  But after I

19  testified I never reviewed any of those documents

09:49:52 20  but it sound like you already have them anyway.

21      Q.   What case did you testify recently on?

22          MR. BLUME:  Hang on.

23          Okay.  You can answer.

```
         24              THE DEPONENT:  It -- it was the DC
09:50:14 25  attorney general case.
```

```
                                                26
```

↑

```
                    **CONFIDENTIAL ROUGH DRAFT**

09:50:18  1      Q.   (By Mr. Ko)  Thank you.

          2              MR. KO:  By the having Mr. Blume I'm

          3  having trouble hearing you a little bit.

          4              MR. BLUME:  Oh --

09:50:24  5              MR. KO:  When you note object or note

          6  anything for the record if you clean over and speak

          7  into the microphone that would helpful.  Thank you.

          8              MR. BLUME:  How is that; is that better.

          9              MR. KO:  Yeah, I think so, thanks.

09:50:36 10      Q.   (By Mr. Ko)  And when was that deposition

         11  Ms. Hendrix?

         12      A.   I don't remember the precise date.

         13      Q.   Approximately when requests that

         14  deposition Ms. Hendrix?

09:50:58 15      A.   It was in June.

         16      Q.   June of 2021?

         17      A.   2022.

         18              MR. BLUME:  We are only in May.

         19              MR. KO:  Oh, May.

09:51:10 20              THE DEPONENT:  Oh shit, excuse my
```

```
        21  language I'm going backwards.  Sorry.  The last

        22  month.  April.

        23      Q.  (By Mr. Ko)  Okay.  So you testified in

        24  the DC attorney action in April of 2022, correct?

09:51:27 25      A.  Yes.  Sorry.  It looks like I'm having
```

                                                                    27

⬆

                        **CONFIDENTIAL ROUGH DRAFT**

```
09:51:30  1  morning fatigue.

          2          MR. KO:  No morning time does generally

          3  fly these days so you were getting ahead of

          4  yourself a little bit.

09:51:39  5          It's okay.

          6      Q.  (By Mr. Ko)  So with respect to some of

          7  these topics and as we discussed because these

          8  topics relate to various policies and contracts

          9  that were applicable to users and third parties, I

09:51:59 10  assume you have reviewed some of these policies and

         11  contracts; is that fair to say?

         12      A.  Yes.

         13      Q.  And let be a little more specific.

         14          Are you familiar with the statement of

09:52:14 15  rights and responsibilities or SRRs?

         16      A.  Yes.

         17      Q.  What are they?
```

18          A.    It's not two separate things like the SRR

19     is abbreviate the statement of rights and

09:52:29 20     responsibilities and it is the terms of -- of

21     service for using Facebook.

22          Q.    And throughout today I will -- I will be

23     using the acronym SRR and is it okay for purposes

24     of the deposition that as you note when I say SRR

09:52:51 25     when you say SRR we can assume that refers to the

                                                              28

↟

                    **CONFIDENTIAL ROUGH DRAFT**

09:52:55  1     statements of rights and responsibilities; is that

2     fair?

3          A.    Yes, if you would like to refer to the

4     SRR that wasn't the name of it initially.  But I'm

09:53:06  5     happy to know and agree that SRR means just terms

6     of service generally.

7          Q.    And we'll get to the various iterations

8     and names in a moment.

9               But before we do that, let me ask you

09:53:18 10     about Facebook's data use policy.  And I know it

11     had different names as well.  But are you familiar

12     with the Facebook's data use policy?

13          A.    I am.

14          Q.    And what Facebook's -- what is -- what is

09:53:31 15   that?

16        A.   Facebook data use policy which also been

17   referred to privacy policy it tells people what it

18   is that we collect and how they their information

19   can be used and its high level response there.

09:53:52 20        Q.   And with respect to -- to back up a

21   little bit I apologize on the SRR.  You had

22   indicated that it reflected the terms of service

23   for using Facebook.  And so with would be terms of

24   service for the Facebook user I assume?

09:54:11 25        A.   Yes, if you sign up for Facebook you

                                                          29

↟

                    **CONFIDENTIAL ROUGH DRAFT**

09:54:13 1   agree that you have read the data use policy and

2   you agree to terms of service.

3        Q.   Now I assume you are also familiar with

4   Facebook's platform policy; is that correct?

09:54:32 5        A.   Yes.

6        Q.   What is that?

7        A.   It's no longer referred as to the

8   Facebook's platform policies.  We have platform

9   terms and developers policies and those are the

09:54:46 10   terms and policies that -- third -- developers use

11   of our platform technologies.

```
        12        Q.   And when did that name change occur or

        13   when did that change occur?

        14             MR. BLUME:  Objection.  Form.

09:55:04 15             THE DEPONENT:  It was in -- we announced

        16   the change in mid 2020 and the terms went into

        17   effect in August 31st, of that same year.

        18        Q.   (By Mr. Ko)  So up until the mid of 2020

        19   Facebook had something called a platform policy; is

09:55:25 20   that correct?

        21        A.   Yes.  We had the Facebook platform

        22   policies sitting here today I know there's been --

        23   another name like developer policies, but there --

        24   they are the same documents in terms of what I

09:55:40 25   described the -- the document to be earlier.
```

                                                          30

♠

                      **CONFIDENTIAL ROUGH DRAFT**

```
09:55:43  1             MR. BLUME:  And Mr. Ko I'm still here my

         2   apologize I just mistakingly unplugged here I'm

         3   setting here right here I'm getting back on online

         4   no need to wait or you can if you like.

09:55:58  5             MR. KO:  Got it.  I appreciate that it

         6   was a voice of God.  I didn't see your face.

         7        Q.   (By Mr. Ko)  Now with respect to the

         8   platform policy can you describe at a high level
```

          9  just as you did with respect to the SRR and the

09:56:14  10  data use policy what Facebook's platform policy

         11  attempted to do?

         12      A.   Facebook's platform terms and developer

         13  policies are -- our agreement with developers with

         14  respect to how they will use the platform and

09:56:36  15  there's a number of -- it's -- it's the rules with

         16  respect to using the technology to the extent the

         17  developer chooses to use it.  It's not always

         18  relevant.

         19      Q.   And that policy in contract is between

09:56:54  20  Facebook and the -- the third party developer,

         21  correct?

         22      A.   Yes, the developers when they create and

         23  register as a developer on our platform, they agree

         24  to adhere to the platform terms and -- and

09:57:07  25  developer policies.

                                                              31

↟

                    **CONFIDENTIAL ROUGH DRAFT**

09:57:11   1      Q.   And was the Facebook user or was a

          2  Facebook user a party to that policy or contract?

          3      A.   To the extent the Facebook who has agreed

          4  to other terms of service chooses to register as a

09:57:27   5  developer than yes.

          6        Q.   So only if the user was a developer would

          7   that policy apply, correct?

          8        A.   What do you mean by "apply"?

          9        Q.   Well, you answered the question -- let me

09:57:48 10   ask it this way.

         11             As a general matter the Facebook platform

         12   policy governed the relationship between a Facebook

         13   developer and Facebook, correct?

         14        A.   That is our agreement with developers who

09:58:02 15   use our platform, yes.

         16        Q.   And it wasn't a contract that governed

         17   Facebook's relationship with its users because

         18   those were reflected in the SRR and DUPs, correct?

         19        A.   To the extent a user is also a developer,

09:58:25 20   they agree to the platform terms and developer

         21   policies in connection with their use of the

         22   platform.

         23        Q.   Outside of that carve out, Facebook users

         24   interactions with the Facebook platform and on

09:58:47 25   Facebook were governed by the SRRs and DUPs,

                                                                    32

↟

                         **CONFIDENTIAL ROUGH DRAFT**

09:58:54  1   correct?

          2             MR. BLUME:  Objection.  Form.

```
            3              THE DEPONENT:  If a user does not use --

            4      does not develop apps on our platform than they are

09:59:05    5      only subject to the terms that are relevant to

            6      them.

            7          Q.    (By Mr. Ko)  And those terms would be --

            8      reflected in the SRR DUPs, correct.

            9          A.    If they use any of other -- other

09:59:21   10      products because there's other terms of -- there's

           11      other terms of use depending on what you choose

           12      like depending on your relationship with us, but

           13      if -- if you just go and just sign up for Facebook

           14      all you want to do is use Facebook, than the terms

09:59:37   15      of service and our data use policy would be the two

           16      primary documents that you -- agree that you have

           17      read and will adhere to.

           18          Q.    Thank you.  Thank you.

           19              And it's fair to say that the vast

09:59:51   20      majority of Facebook users would fall under that

           21      umbrella, correct?

           22              MR. BLUME:  Objection.  Form.

           23              THE DEPONENT:  Sitting here today, I -- I

           24      don't -- I'm not -- I don't know the answer to

10:00:11   25      that.
```

                                                                    33

**CONFIDENTIAL ROUGH DRAFT**

10:00:13  1      Q.   (By Mr. Ko)  Do you have general

2   understanding of how many users were also

3   developers on the Facebook relative to users that

4   did not develop on the Facebook platform?

10:00:29  5      A.   That is not a data point that I know of

6   today.

7      Q.   And separate and a part a specific or

8   precise data point, do you have any understanding

9   of the total number of users in the relevant time

10:00:49 10   period that used Facebook but did not also develop

11   on the platform, such that they were subject to the

12   platform policy and subsequent iterations of that

13   platform policy?

14           MR. BLUME:  Objection.  Objection just to

10:01:09 15   be clear what topic are we talking about Mr. Ko?

16           MR. KO:  All of them.

17           MR. BLUME:  That's beyond the scope.

18   Objection.

19           MR. KO:  You can answer unless Mr. Blume

10:01:21 20   besides to instruct not to answer.

21           MR. BLUME:  If you know, you can answer.

22           THE DEPONENT:  I have already told Mr. Ko

23   that I don't know.  I can continue to repeat

24   myself.  I'm not prepared to speak to that.  It's

10:01:33 25   not on the topic.

                                                        34

↑

                        **CONFIDENTIAL ROUGH DRAFT**

10:01:33  1        Q.    (By Mr. Ko)  That's fine.  And I was just

          2   trying to get -- to be fair, I was -- I was just

          3   trying to get a general understanding I heard your

          4   response saying you didn't have a specific data

10:01:43  5   point and I was just serious whether or not you

          6   were aware because you seem to understand that

          7   there was a distinction between users who developed

          8   and users who do not.  And so the natural follow up

          9   was whether or not the, you knew, spoliation of the

10:01:59 10   former relative to the later and I heard I don't

         11   remember response to say and you don't know and you

         12   don't have any idea; is that correct?

         13        A.    I did.

         14              MR. BLUME:  Objection.

10:02:08 15              THE DEPONENT:  I did not prepare to speak

         16   to that today.

         17        Q.    (By Mr. Ko)  I want to show because you

         18   have indicated before somewhat confusing to a --

         19   have -- I to walk through I want to make sure we on

10:02:30 20   the same page with responsive to these policies.

         21   I'm going to share my screen this is not an exhibit

22   but this is just my understanding of these relevant

23   policies.

24        Do you see in front of you Ms. Hendrix?

10:02:54 25        MR. BLUME:  Is this oh produced total.

                                                            35

↰

**CONFIDENTIAL ROUGH DRAFT**

10:02:55  1        MR. KO:  No like I said this is something

 2   that I indicated.

 3        Q.   (By Mr. Ko)  Do you see this in front of

 4   you Ms. Hendrix?

10:03:11  5        A.   Yes, I can see what displaying on the

 6   screen.

 7        Q.   Thank you.

 8        Again this is just to help orient

 9   ourselves and to help me understand what you are

10:03:18 10   here to testify about.

11        So with respect to the statement of

12   rights and responsibilities or the -- the SRR as

13   you described earlier there were various names that

14   were associated with the SRR; is that fair to say?

10:03:41 15        A.   I'm only aware of terms of service and

16   statements of rights and responsibility.

17        Q.   Okay.  That's helpful so -- so the terms

18   of service I believe the terms of service is what

              19  this is called now, correct?

10:03:57 20            MR. BLUME:  Objection.  Form.

              21            THE DEPONENT:  Yes, that's my

              22  understanding.

              23       Q.   (By Mr. Ko)  And it's my understanding?

              24       A.   And I'm going to ask you there's --

10:04:10 25  there's a lot documents and materials and so like

                                                              36

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

10:04:12  1  you -- I may need to refresh back to -- to them.

          2  Because there a lot of information that I prepared.

          3  But go ahead.

          4       Q.   Yeah.  I understand there's a lot --

10:04:24  5  there's a lot to unpack in these topics, I agree.

          6  So this is -- I'm not trying to put you on the spot

          7  I'm trying to hopefully you will see I'm -- I'm

          8  trying to help us because there so many names

          9  flying around that I want to make sure you and I

10:04:40 10  are on the same page with these to these things.

          11            So as you indicated the SRR was renamed

          12  to the terms of service; is that correct?

          13       A.   Yes, I believe so.

          14       Q.   And do you have any understanding of when

10:05:03 15  the SRR was renamed to the terms of service?

```
16      A.   I would have to look at the documents.

17      Q.   Does it refresh your recollection at all

18   when I put here that in 2018 and precisely

19   April 19th, 2018, the SRR was renamed to the terms
10:05:25 20   of service?

21      A.   I would rather rely on your document that

22   I have never seen until just now like I want to see

23   the actual documents and the dates that are on

24   them.  So I am sorry, but like we can get the --
10:05:38 25   the terms and policies up and I can go through each
```

37

᭡

**CONFIDENTIAL ROUGH DRAFT**

```
10:05:41  1   of the respected name change and the dates if

 2   that's how you want to use the time today.  But I'm

 3   not going to rely on your document.

 4      Q.   Sure that's fair enough.  So I'm going to
10:05:52  5   delete that for you because I have not trying to

 6   present that this is the Bible or this is a cannon

 7   that we have to all follow.

 8           I was trying to helpful to both of us.

 9   But you acknowledge that the SRR was at some point
10:06:05 10   changed to the terms of service, correct?

11      A.   Yes.

12      Q.   Okay.  And you don't have a recollection
```

13  of when it actually changed names, right?

14        A.   I would need to refresh.  I know I -- I

10:06:23 15  know.  I need that I need to go to the documents

16  I'm distracted seeing you guys typing and like

17  changing the text at -- live as we are sitting

18  here.

19        Q.   Okay.  Well, I'm -- I apologize

10:06:39 20  distracting you.  But I'm trying to figure out from

21  you as the corporate designee who you acknowledge

22  before that you are here to testify as to these

23  policies.  I'm curious whether or not you know when

24  it was renamed from the SRR to the terms of service

10:06:57 25  and your testimony is that you have don't know so

                                                    38

↑

                    **CONFIDENTIAL ROUGH DRAFT**

10:06:59 1  I'm just putting a question right here nor now?

2             MR. BLUME:  Actually, objection that

3  wasn't her testimony.  Her testimony was she wanted

4  to see the document and she would be able to do

10:07:08 5  that as opposed to to memory test.

6             MR. KO:  Fair enough.

7        Q.   (By Mr. Ko)  Without looking at the

8  documents, you don't know when the name changed

9  from SRR to terms of service; is that correct?

10:07:19 10      A.   I know that I know.  I know that I don't

        11   remember without referring to the dates.

        12      Q.   Got it.

        13           And you said that you are only aware of

        14   two names that this user terms of service had over

10:07:38 15   the relevant time period.

        16           So the -- here I'm happy to get rid of

        17   it, but it was my understanding that at some point

        18   before the SRR it was identified as terms of use,

        19   does that sound familiar to you?

10:07:53 20      A.   I would like to ask my counsel if I can

        21   have access to all of these documents and, again,

        22   you are changing the text right here live in front

        23   of me.  And I think that is highly in appropriate

        24   I'm not a lawyer for the company but I don't like

10:08:06 25   what you are doing.  So I would like.

                                                                39

⬆

                         **CONFIDENTIAL ROUGH DRAFT**

10:08:10  1      Q.   Well --

         2      A.   I would like to see the documents before

         3   you keep having me watch you change the text.  Like

         4   this is -- this seems highly in appropriate.

10:08:19  5      Q.   Okay.

         6      A.   Well, I -- it's not.  It's no different

7   than if I had on the stand and I was -- I was

8   creating or writing down on the screen things that

9   were reflective what I thought were reflective of

10:08:32 10   your testimony.  But I understand that you are

11   uncomfortable with it and I don't want to make you

12   uncomfortable so I just -- I'm just trying to get

13   to understand what -- how these various policies

14   were called over the relevant time period.  And

10:08:46 15   that was all that I was an attempt to do.

16          So let me start -- let me start over.

17          You -- it's your testimony that you are

18   aware of a contract that applied to Facebook users

19   and that this contract had two different names and

10:09:04 20   they were the statement of rights and

21   responsibilities and the terms of service; is that

22   correct?

23   A.    That's my recollection is that we start

24   with the term of service it becomes a statement of

10:09:18 25   rights and responsibilities and then has

                                                    40

♠

**CONFIDENTIAL ROUGH DRAFT**

10:09:20 1   subsequently been renamed that's my understanding.

2   I would love the benefit of reviewing these

3   documents in as for as timing, but that's my

4  understanding.

10:09:36  5      Q.  So for purposes of today when I refer to

6  the SRRs or the terms of service, they will be

7  synonymous and that isn't with your understanding

8  of these contracts and policies; is that fair?

9            MR. BLUME:  Objection.  Asked and

10:09:54 10  answered.

11            THE DEPONENT:  Yes, we already agreed to

12  that.

13      Q.  (By Mr. Ko)  Okay.  Now with respect to

14  the data use policy, you had indicated that there

10:10:08 15  were different names for that and some of the names

16  I have seen in the documents it referred to as or

17  simply the data policy; is that consist with your

18  understanding?

19            MR. BLUME:  Objection.  Form.

10:10:31 20            THE DEPONENT:  I know we had privacy

21  policy data use policy we could have a title data

22  policy.  I would need to refresh to the terms all

23  of which I'm confident we've produced to you that

24  are publicly available, so again like you -- you

10:10:49 25  have this information.

41

^

**CONFIDENTIAL ROUGH DRAFT**

10:10:53  1      Q.   (By Mr. Ko)  Right.

          2           I'm not asking whether or not we have it.

          3  I'm asking for purposes of this deposition again

          4  this is not I'm not trying to put on the spot.  I'm

10:11:02  5  trying to understand what we are talking about here

          6  so we speak the same land a lot of names and

          7  acronym flying around.

          8           With respect to Facebook's data use

          9  policy you have indicated that it -- you have heard

10:11:16 10  of the data use policy also referred to as the data

         11  policy and the privacy policy; is that correct?

         12      A.   I didn't say that.  I said it was

         13  possible.  I would need to refresh the titles but I

         14  think.

10:11:30 15      Q.   So --

         16      A.   I know it was privacy policy I'm certain

         17  it's also data use policy whether it has at some

         18  point in time been called data policy I have

         19  reviewed all of those like different versions but I

10:11:41 20  just don't remember sitting here today.

         21      Q.   So for purposes of this deposition today

         22  in our confers when I refer to data use policy,

         23  that would be cinnamon mouse with at least the

         24  privacy policy and potential the data policy; is

10:12:02 25  that fair?

✦

**CONFIDENTIAL ROUGH DRAFT**

10:12:02  1      A.   Yes.

        2      Q.   And with respect to the platform policy

        3  you had indicated that it was also changed to the

        4  platform teams and developer -- development teams

10:12:20  5  policy in mid 2020.

        6           Do you recall that?

        7      A.   I didn't say.

        8           MR. BLUME:  Objection.

        9           THE DEPONENT:  Either are of those

10:12:26 10  things.

       11      Q.   (By Mr. Ko)  Okay.  I apologize for

       12  putting words in your mouth.  What is the -- your

       13  relationship between the platform teams and

       14  development teams policy and the Facebook platform

10:12:38 15  policy?

       16           MR. BLUME:  Objection.  Form.

       17           THE DEPONENT:  Those aren't things.

       18      Q.   (By Mr. Ko)  I'm sorry.  I didn't get

       19  that over your counsel's objections?

10:12:49 20           MR. BLUME:  Just repeat your answer.

       21           THE DEPONENT:  Those aren't things.

       22      Q.   (By Mr. Ko)  When you say "those" what

23   are you referring to?

24        A.   You said platform teams developer teams I

10:13:01 25   never said those words today until just now.

43

**CONFIDENTIAL ROUGH DRAFT**

10:13:03  1        Q.   Okay.  Earlier today when you had said

2   that there was change to the platform policy in mid

3   2020 what you were referring to?

4        A.   In mid 2020 but more importantly

10:13:24  5   August 31st, 2020, the platform terms and developer

6   policies, which is what is -- what is live today,

7   so developers agree as of and effective

8   August 31st, 2020 they agree to adhered to the

9   platform terms and the developer policies.

10:13:51 10        Q.   And today is there a thing that exist --

11   exist called the Facebook platform policy?

12        A.   That term is no longer in effect.  It is

13   the platform terms and developer policies.

14        Q.   So the platform terms and the developer

10:14:13 15   policy have -- well, they as you said they govern

16   the relationship between Facebook and its

17   developers, correct?

18        A.   Yes.

19        Q.   And so is it fair for purposes of this

10:14:31 20    deposition is that when I refer to the platform

21    policy I'm also referring to the platform terms and

22    the development policy or would prefer that I keep

23    those things distinct?

24         A.   If we refer to the platform policies I

10:14:47 25    will understand you to be meaning the platform

44

**CONFIDENTIAL ROUGH DRAFT**

10:14:51  1    terms and developer policies.

2         Q.   That were enacted in August 31st, of

3    2020, correct?

4         A.   Yes.

10:15:00  5              MR. BLUME:  Objection to -- objection to

6    how that relates to your earlier qualification that

7    your questions cover a time period dating back to

8    2007, so as long as you are clear -- you are clear

9    temporal clarity in your questions, that's fine.

10:15:20 10         Q.   (By Mr. Ko)  Schedule B turning back to

11    schedule B of the notice at Exhibit 330.  The

12    schedule asks for a CV of the person Facebook

13    designates to testify on its behalf.

14              Do you see that in paragraph two?

10:15:44 15         A.   I do.

16         Q.   Do you have a CV to offer in response to

```
17  this request?

18      A.   Not -- not on me right now.

19      Q.   Do you have a copy of your CV I assume?

10:16:05 20      A.   I have a resume on my machine at home,

21  yeah.

22           MR. KO:  Counsel Blume consist with our

23  request on topic 1 we would ask that you would

24  provide us with a copy of Ms. Hendrix CV?

10:16:22 25           MR. BLUME:  Noted.
```

                                                            45
⬆

                    **CONFIDENTIAL ROUGH DRAFT**

```
10:16:23  1      Q.   (By Mr. Ko)  What is your current

2  position at Facebook?

3      A.   I'm a director of privacy and data

4  policy.

10:16:31  5      Q.   What are your general rules or what is

6  your -- what are your general responsibilities in

7  connection with that role?

8      A.   My team is accountable for the developer

9  and management of all terms and policies governing

10:16:45 10  third party data collection and use as well as the

11  education and supporting the enforcement of the

12  platform terms and the developer policies.

13      Q.   How long --
```

```
           14            MR. BLUME:  And Mr. Ko. --
10:17:02   15            MR. KO:  Go ahead.
           16            MR. BLUME:  Sorry, we've gone about a
           17   hour little bit of a transition period if you
           18   finish come to a break shortly we can take one.
           19            MR. KO:  Sure.
10:17:15   20       Q.   (By Mr. Ko)  How long have you been in
           21   that role?
           22       A.   I -- what do you mean?
           23       Q.   How long have you been the director of
           24   the team accountable for the develop -- the
10:17:36   25   developers and men all terms covering third party
```

46

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

```
10:17:40    1   data collection and use as well as the education in
            2   supporting -- supporting of the enforcement terms
            3   and developer policies CHECK/CHECK?
            4       A.   I have always -- I have always been
10:17:57    5   involved in that work when I was promoted to
            6   director, I believe it was sometime in 2019.
            7       Q.   And when you say you have always been
            8   involved in that work I assume to mean that you
            9   have been involved in this type of work ever since
10:18:16   10   you joined Facebook in I believe 2008?
```

11          A.   Yes, I have always been involved in that

12     type of work since I joined the company.

13          Q.   And is this -- is this called the

14     platform policy team at Facebook or there some

10:18:36 15     other name that you refer to your team as?

16          A.   My team is referred as the data policy

17     management and enforcement team.

18          Q.   Were there any prior iterations of that

19     team name?

10:18:53 20          MR. BLUME:   Objection.   Form.

21          THE DEPONENT:   That -- ever since the

22     team has been created that has been our name.

23          Q.   (By Mr. Ko)   So since you join Facebook

24     in 2008, you have always been part of the data

10:19:11 25     policy management and enforcement team?

                                                          47

↑

                    **CONFIDENTIAL ROUGH DRAFT**

10:19:14  1          MR. BLUME:   Objection.   Form.

 2          THE DEPONENT:   No.

 3          Q.   (By Mr. Ko)   When you joined Facebook

 4     what team were you a part of?

10:19:26  5          A.   I joined the developer operations team.

 6          Q.   How long were you part of the developer

 7     operations team?

8       A.   I moved out of the developer operations

9   team onto a called global policy management.  I

10:19:51 10   believe that occurred in a round 2010 but I would

11   need to refer to documents to be certain but around

12   that time.

13       Q.   And after you became part of the global

14   policy management team were there any other teams

10:20:10 15   that you were involved in or associated with before

16   you became part of the data policy management and

17   everyone team?

18          MR. BLUME:  Objection.  Compound.

19          THE DEPONENT:  Could you repeat your

10:20:24 20   question?

21       Q.   (By Mr. Ko)  Yeah, I'm just trying to get

22   the understanding of the teams you were involved in

23   between your current role and the global policy

24   management team.

10:20:35 25          Can you describe or identify what those

48

↑

**CONFIDENTIAL ROUGH DRAFT**

10:20:36 1   teams were?

2       A.   Developer operations is the name of the

3   team when I joined it.  They changed the name to

4   platform operations and now it's back to developer

10:20:55 5    operations or at least that's how I refer to that

6    team and that's -- and that's it in terms of the

7    teams.

8        Q.   And so the global policy management team

9    was that in connection with or under the same

10:21:12 10   umbrella as either of the developer operations or

11   platform operations teams?

12       A.   Global policy management is a different

13   team than developer operations also referred to

14   previously as platform operations.

10:21:30 15       Q.   Is fair to say the sum total of the teams

16   that you were involved with -- would be the

17   developer operations team, the platform operations

18   team and the global policy management team?

19            MR. BLUME:  Objection.  Form.

10:21:50 20            THE DEPONENT:  Did you leave out the team

21   that I'm on today?

22       Q.   (By Mr. Ko)  You said were part of the

23   data policy management everyone team correct?

24       A.   That's the team that I manage today.

10:22:03 25       Q.   Is that related to in any way with the

                                                        49

↟

                    **CONFIDENTIAL ROUGH DRAFT**

10:22:06 1   developer operations team?

2          MR. BLUME:  Objection.  Form.

3          THE DEPONENT:  It's not the same team.

4     Q.   (By Mr. Ko)  So thank you for

10:22:18  5  clarification.  Sounds like are four teams that you

6  have been part of throughout your career at

7  Facebook, the data policy management everyone team,

8  the developer operations team, the platform

9  operations team and the global policy management

10:22:30 10  team; is that correct?

11          MR. BLUME:  Objection.

12          THE DEPONENT:  I think it's more.

13          MR. KO:  What the objection Mr. Blume.

14          MR. BLUME:  Are you talking about the

10:22:39 15  team name or the make up of the teams because the

16  personality of those teams may have changed the

17  names may not have but my guess is over the time

18  there have been a lot of different members of the

19  team it's like, you know, I wish we were still in

10:22:52 20  the '69 met but we are not unfortunately.

21          MR. KO:  Right.  Thank you for that.  I'm

22  glad I asked I apologize if there's any confusion

23  I'm just talking about the team names I just want

24  to understand the some all the teams ever been a

10:23:09 25  part of Ms. Hendrix and the name by which those

                                                    50

⬆

**CONFIDENTIAL ROUGH DRAFT**

10:23:13  1  teams were associated with.

2        So can you describe to the Court all the

3  team names that you have ever been involved with at

4  Facebook?

10:23:33  5        THE DEPONENT:  I have been a part of

6  three organizations the first the name was

7  developer operations it became platform operations.

8  I don't know if it -- I don't remember if it became

9  DevOps before I switched over to global policy

10:23:47 10  management and then the third team is team I'm on

11  today the privacy and data policy is -- the

12  ultimate org by team is referred to as the data

13  policy management and enforcement team.

14        MR. KO:  Okay.  Great.  Thank you.  And

10:24:05 15  if you would like to take the break as your counsel

16  requested Ms. Hendrix I'm happy to do so.

17        THE DEPONENT:  Sure.

18        THE VIDEOGRAPHER:  Okay.  We are off the

19  record.  It's 10:24 a.m.

10:24:17 20        (Recess taken.)

21        THE VIDEOGRAPHER:  Okay.  We are back on

22  the record.  It's 10:43 a.m.

23        Q.  (By Mr. Ko)  Welcome back from the break

24  Ms. Hendrix.

10:43:33 25      By the way you are in Palo Alto for this

51

↑

**CONFIDENTIAL ROUGH DRAFT**

10:43:35  1  deposition, correct?

2      A.   Yes, I believe so.  We on the border of

3  Los Altos but I'm just confident but I'm pretty

4  confident we are in Palo Alto.

10:43:47  5      Q.   Where are you specifically you are in an

6  office are you at Facebook's office se in

7  Gibson Dunn offices?

8      A.   I'm in the Gibson Dunn law office.

9          MR. BLUME:  Can't you tell by our fancy

10:43:58 10  artwork.

11          MR. KO:  Sorry I minimized your video.

12  So I couldn't tell.

13          (Discussion off the stenographic record.)

14      Q.   (By Mr. Ko)  And along with, I don't know

10:44:15 15  if that was a reference another deposition I took,

16  but the -- along with your counsel Mr. Blume, there

17  are other attorneys at Gibson Dunn present with

18  you, I assume?

19      A.   Yes, at the -- at the outset of this we

10:44:33 20  said who they were.

21          MR. BLUME:  Yeah, with -- with me -- with

22   me in the room is.

23          MR. KO:  Go ahead.

24          MR. BLUME:  I can show you if you want

10:44:48 25   now I lost my video so with me is -- is who is here

                                                        52

⬆

**CONFIDENTIAL ROUGH DRAFT**

10:44:53  1   Prachi is here, Ian is here and Keller.

2          MR. KO:  Ian Chen an employee of

3   Facebook.

4          MR. BLUME:  Ian Chen, yes.

10:45:06  5          MR. KO:  Anybody else in the room with

6   you?

7       A.  No.

8          MR. BLUME:  No.  Here just so you can see

9   there is everybody?

10:45:16 10          MR. KO:  I appreciate that.

11       Q.   (By Mr. Ko)  I want to ask some basic

12   questions about Facebook's organizational structure

13   this is related to topic 1.

14          First does Facebook have an

10:45:27 15   organizational structure?

16       A.   Yes, Facebook has an organizational

17   structure.

18      Q.   I assume they had add -- an

19   organizational structure since January 1 of 2007,

10:45:44 20   correct?

21      A.   Yes.

22      Q.   If I wanted to know if Facebook

23   organizational structure look like where would I

24   look?

10:46:03 25      A.   You would go to what I believe it's

                                                          53

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

10:46:07  1   called like the org -- there's an org chart, like

2   you can look up a person and see what -- who they

3   report into.

4      Q.   And this org chart that I assume has

10:46:21  5   existed ever since January 1 of 2007, correct?

6      A.   Yes, we've always been able to look up as

7   far as -- as to the best of my knowledge we can

8   look each other up and so what team.

9      Q.   And --

10:46:43 10      A.   They are on.

11      Q.   And when you say you can look each other

12   up.  I assume you are talking about the some sort

13   of internal tool that a Facebook could access to do

14   that?

10:46:54 15      A.   Yes, we have an internal company wiki

16  where you can type in a search bar someone's name

17  such as myself.  And you can see who reports into

18  me and who I report into.

19      Q.   And is that true with respect to every

10:47:12 20  employee at Facebook.  In other words you if you

21  could be up at any employee at Facebook and find

22  out who that person to and what person's report to

23  him or her to the extent those things are

24  applicable?

10:47:29 25      A.   For them and yes.

                                                        54

**CONFIDENTIAL ROUGH DRAFT**

10:47:34  1      Q.   And other than this internal tool that

2  one could access or excuse me the internal wiki are

3  there any other documents that you could point me

4  or the Court to that reflect Facebook's

10:47:46  5  organizational structure?

6              MR. BLUME:  Pre IPO or post IPO.

7              MR. KO:  I would like to start with the

8  entire time period first.

9              MR. BLUME:  Well, okay.  The -- they just

10:48:02 10  didn't have public filings before they became a

11  public.

12          MR. KO:  Stop your object to my questions

13   and I will leave it at that.

14          MR. BLUME:  Okay.

10:48:13 15          THE DEPONENT:  I don't believe there's

16   been other documents like -- like what I just

17   referred to.

18      Q.   (By Mr. Ko)  Okay.  So other than the --

19   this internal wiki is there any other documents or

10:48:28 20   information you -- you could point me or the Court

21   to -- to show what Facebook's organizational

22   structure looked like?

23          MR. BLUME:  Objection.

24          THE DEPONENT:  Not that I'm aware of.

10:48:50 25      Q.   (By Mr. Ko)  And when you said before

                                                    55

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

10:48:53  1   that you could go to this org chart, I just want to

2   make sure I understand.  The org chart you are

3   talking about is synonymous with this internal wiki

4   tool and page, correct?

10:49:16  5      A.   No, not synonymous mouse like there's a

6   company wiki which is internal to Facebook

7   employees and you can look up people by name and

8   then you can click on see org or something to that

9  effect and then the page will display the person in

10:49:39 10  the way that I described.

11      Q.   Is that company wiki distinct from the

12  org chart that you had referred to before?

13      A.   Think of the internal wiki as the name of

14  the place you can go and see internal documents and

10:50:10 15  find people so it's not the same thing but that's

16  where you go to find to look people up.

17      Q.   Yeah, and I wasn't asking whether or not

18  it was anything.  I asked had whether or not the

19  company wiki was distinct from the org chart that

10:50:29 20  you had referred to before.

21      A.   I don't know what you mean.

22      Q.   In response to a question that I had

23  asked of whether or not -- this was the question,

24  question if I wanted to know if Facebook -- what

10:50:47 25  Facebook's organizational -- organizational

56

↑

**CONFIDENTIAL ROUGH DRAFT**

10:50:49  1  structure looked like where would I like answer?

2          MR. BLUME:  Objection.

3      Q.   You would go to what I believe is called

4  like org there's an org chart like you can look up

10:50:59  5  a person and see what -- who they report into.

6          So I'm just asking a simple question

7   based on that question and answer exchange.

8          When you said org chart what were you

9   referring to were you referring to the company's

10:51:15 10  wiki or something else?

11     A.   The company wiki is what I go to to find

12   out who a person reports into and the word org is

13   there and you click see org or something to that

14   effect and then you will see who reports to them to

10:51:41 15  the extent they are a manager and who they report

16   to and you do that within the company wiki.

17     Q.   (By Mr. Ko)  Thank you.

18          And other than this -- well, you had also

19   talked about this internal wiki containing internal

10:52:10 20  documents.

21          Do you recall that?

22     A.   Yes.

23     Q.   What internal documents are you referring

24   to?

10:52:26 25     A.   So it could be -- a host of things so a

                                              57

↥

                    **CONFIDENTIAL ROUGH DRAFT**

10:52:29  1  seem might create their own internal wiki page.

2   It's basically a place where -- where you can

3   create a page that's -- that you -- like the

4   company wiki is -- is can be used for like a place

10:52:52   5   where teams can share information with each other.

6   And it can be I believe locked down to just certain

7   people it could be publicly visible not to publicly

8   but internal employees could all be able to see the

9   content.  It just depends.

10:53:16   10       Q.   And would these internal documents

11   reflect a particular group's organizational

12   structure?

13       A.   I'm not aware of like any ability to type

14   in the word developer operations for example and --

10:53:35   15   and see the chart.  Like don't think of the chart

16   that way.  It's literally you look up a human by

17   name, and then you can see what team they are on

18   and then you can see who reports into them.

19            But I'm not aware -- aware of anything

10:53:53   20   else.

21       Q.   I see it's helpful so it's employee or

22   individual based in other words like you said you

23   type in Allison Hendrix and you can see every

24   person that Allison Hendrix and every person that

10:54:10   25   reports to you, correct?

58

**CONFIDENTIAL ROUGH DRAFT**

10:54:13  1      A.   Yes.

2      Q.   And you can also see what -- while you

3   can't type in DevOps or developer operations by

4   typing in Allison Hendrix you can see what group or

10:54:25  5   team you are a part of as well as the groups or

6   teams that report to you and -- and that you report

7   to; is that fair?

8      A.   Yes, you can see you can's the reporting

9   line.  I believe the -- using my team as an

10:54:44 10   example.  The data policy management and everyone

11   team, I -- I believe it would be up to if teams, if

12   it's -- because that's a team name within the

13   broader team.  So I think you have the ability to

14   edit and get more granular with respect to the

10:55:02 15   specific name, if you are on it.

16          But other wise if you look me up it might

17   be on the privacy and data policy because I'm on

18   I'm a sub team win that team and I think -- I think

19   that the -- I think that although people might have

10:55:17 20   the ability to add that, I don't -- it's -- I

21   don't -- I'm not sure.

22      Q.   When you say that "people might have the

23   ability to add that" are you referring to as adding

24   that as part of the search for hypothetically

10:55:39 25   Allison Hendrix or are you saying that's something

⬆

**CONFIDENTIAL ROUGH DRAFT**

10:55:41  1   that IT or someone else at Facebook would have to

2   revise in order for that sub team or more granular

3   level of -- of information needed to be discovered?

4        A.   You can look people up by individual

10:55:57  5   names and then when you find me there are -- able

6   sections like about me so I have the ability to go

7   to myself and the team wiki and if I can if I

8   choose to like edit certain sections of my profile.

9        Q.   Got it.  Understood.

10:56:21 10        Now it's fair to say that there are

11   groups or departments at Facebook, correct?

12        A.   Yes.

13        Q.   And you indicated that you are part of

14   DevOps or developer operations, correct?

10:56:43 15        A.   I -- I joined the company when I

16   joined -- I joined the developer operations team.

17        Q.   And there are of course individuals and

18   employees within your team, correct?

19        A.   You cut off, could you say that again.

10:57:01 20        Q.   Sure.

21        There -- there are of course individuals

22   and employees within each team, correct?

23        A.   There are employees in each team and they

24   are individuals, yes.

10:57:20 25      Q.   I want to show a list of teams that I'm

60

↥

**CONFIDENTIAL ROUGH DRAFT**

10:57:23  1   aware of and I want to ask you some questions based

2   upon that.

3            You will be pleased to know that this is

4   PDF and I can type anything to here, so hopefully

10:57:41  5   that won't be distracting to you.

6            But here is a list that I'm aware of that

7   reflects the various teams at Facebook and let me

8   read to you and into the record and, again, this is

9   just designed to help us facilitate this Q and A.

10:58:04 10            But the groups/departments that I'm aware

11   of are as follows management, legal, policy,

12   communications, platform and operations development

13   operations, advertising, security, privacy, human

14   resources, growth, sales and marketing, academic

10:58:28 15   research, engineering, and user research.

16            Do these all look like departments at

17   Facebook to you?

18        A.   So sales and marketing are not on the

```
         19  same team.  Like and -- and this doesn't seem --
10:58:56 20  like -- like, you know, we have and HR team.  We
         21  have a legal team.  There's many sub teams within
         22  teams.  We have product teams.  Multiple product
         23  teams.  Multiple comps teams within comps.  We have
         24  platform -- we have marketing teams.  We do have
10:59:22 25  partnership's teams I don't see we have -- like we
```

                                                              61

✦

                        **CONFIDENTIAL ROUGH DRAFT**

```
10:59:29  1  have -- we have a research team but there's also
          2  other researchers embedded in team so the way that
          3  you are structuring this is a bit inconsistent with
          4  how we are structure and we -- we referred to each
10:59:42  5  other more as organizations.  Like -- than
          6  departments, but or at least I do.
          7      Q.   Yeah, super help from -- from point
          8  forward I will do my best to refer to various
          9  Facebook teams as organizations first of all.  I
11:00:03 10  will not refer to them as departments and groups
         11  pen what I'm hearing you say with respect to this
         12  list is that it's incomplete; is that correct?
         13      A.   Yes, it appears to -- yes, it appear to
         14  be incomplete like there's public policy teams.
11:00:34 15      Q.   And I heard I just want to make sure I --
```

16  I get from you because you are the Facebook

17  designee on Facebook's organizational structure.

18      I want to make sure I'm not missing a

19  important or major or -- or or team for that

11:00:52 20  matter.  Any organization that -- that you can

21  think of that is not listed here.  I want you to

22  tell the Court what organizations they are.

23      A.   Well, you don't have the Facebook

24  culinary team.  And you don't have like and I don't

11:01:15 25  know what you mean by privacy.  Like you don't have

                                                62

&#9650;

**CONFIDENTIAL ROUGH DRAFT**

11:01:17 1  the privacy and data policy org you just have the

2  word privacy.  There's a privacy team that are co

3  chief privacy officer **Michelle prad dispel one

4  the other co privacy Jerry Egan that's who I role

11:01:35 5  up into.

6      So it's very difficult for me to do this

7  live.  And -- and be able to tell the Court

8  accurately if I have, you know -- there's a choice

9  in competition team.  And these are teams within

11:01:54 10  teams as well and so I just -- I am quite sure

11  sitting here now that I can express competence.

12  But had I, you know, the opportunity I could

```
        13  better, you know, I just need to review some

        14  documents.

11:02:16 15      Q.   Well, you did review documents in

        16  connection with the deposition and you are

        17  Facebook's corporate designee as to organizational

        18  structure so in light of that -- and you are right

        19  this isn't meant to be a memory test I'm simply

11:02:29 20  asking it seemed like a rattled off several groups

        21  that aren't listed here.  I acknowledge that this

        22  is -- is incomplete lie need you to helm me

        23  complete it.

        24       So can you identify the group -- the

11:02:45 25  organizations at Facebook, not the sub
```

                                                        63

↑

                    **CONFIDENTIAL ROUGH DRAFT**

```
11:02:49  1  organizations but the organizations at Facebook

         2  that are missing from this list.

         3      A.   There's the finance and -- team, the

         4  accounting team, the investor relation team.

11:03:07  5  There's the data -- there are data science teams.

         6  There are teams that work on our data centers,

         7  security teams.  Well you have there.

         8      Q.   There's -- there's a security listed

         9  here.  Super helpful.  Finance, accounting and
```

11:03:45 10   investor relations, data science.

11              Earlier when you say -- said Facebook

12   culinary did I hear that correctly?

13        A.   Yes.

14        Q.   Okay.  I know you give a way a lot of

11:04:02 15   free food so that probably is billing team?

16        A.   There's a facilities team.  IT teams.

17        Q.   Okay.  And I want to go back to -- one of

18   your first responses and reactions to this list.

19              You had talked about multiple product

11:04:23 20   teams, right?

21        A.   Yes.

22        Q.   And obviously there's -- there are a lot

23   of product managers at Facebook working on a

24   variety of different products, correct?

11:04:37 25        A.   Yes.

                                                      64

♠

                    **CONFIDENTIAL ROUGH DRAFT**

11:04:38  1        MR. BLUME:  Objection.  Beyond the scope.

2         Q.   (By Mr. Ko)  Do the product managers --

3    do the product managers role into a team on this

4    list or would they have a separate organizational

11:04:52  5   or would they have a separate organization for

6    themselves?

```
          7             MR. BLUME:  Objection.  Beyond the scope.

          8             THE DEPONENT:  So you need to appreciate

          9     that Meta has a family's of apps and services.  So

11:05:11 10     there -- for example using legal there's product

         11     counsel what's up for product counsel mention for

         12     Facebook for Instagram.  Et cetera so these teams

         13     up is port different apps and services that we

         14     provide.

11:05:31 15             So using the legal team, all of those

         16     different people are on our legal team.  Then --

         17     I'm just trying to go from memory here, you know,

         18     I -- this -- this is one of those ones might have

         19     been user for you to be typing.  Because I don't

11:06:00 20     remember everything I have rattled off.

         21             But I -- I believe that I have given you

         22     all of the names of teams that are relevant to the

         23     topics that I'm -- I'm prepared to cover, so I

         24     don't think I have omitted any teams that are not a

11:06:19 25     part of -- like -- like I -- like I definitely
```

                                                                   65

❤

                         **CONFIDENTIAL ROUGH DRAFT**

```
11:06:24  1     think that I have given all of the names of the

          2     teams that are relevant to the topics.

          3         Q.   (By Mr. Ko)  Thank you.  That's very
```

           4  helpful and so my typing was not intended to be

11:06:38   5  nefarious whatsoever I'm trying to help us in this

           6  testimony.

           7           So maybe well maybe I type?

           8      A.   Well Mr. Ko I didn't know the video was

           9  capturing the screen that was made me -- I thought

11:06:50  10  only one on video.  So that was what made

          11  uncomfortable just so we are clear.  So I to the

          12  extent that you can continue to engage in these

          13  exercises I'm totally comfortable with you typing

          14  so I apologize for the -- my confusion.

11:07:04  15      Q.   Okay.  Thank you for -- thank you for

          16  that I appreciate that.

          17           One organization that you had mentioned

          18  too, that seems to be missing here that's a pretty

          19  big one or the partnership teams, correct

11:07:20  20  partnership organizations, correct?

          21      A.   Yes and there's games teams too.  Teams

          22  that support games within partnerships though I

          23  believe and yes that's right.

          24      Q.   Great.

11:07:40  25           So all of this is to day that this list

                                                              66

**CONFIDENTIAL ROUGH DRAFT**

11:07:42  1   here that I'm showing you and that I read into the

2   record before is definitely incomplete as to the

3   total number of organizations at Facebook, right?

4           MR. BLUME:  Objection.  Beyond the scope.

11:08:01  5           THE DEPONENT:  What I -- are

6   displaying -- is incomplete.  I submitted it with

7   my testimony, I can't see what I said.  But I do

8   think we have captured primarily the high level

9   organization -- structure of Meta, yeah.

11:08:26  10       Q.   (By Mr. Ko)  Great.  Thank you for that.

11           Now what organizations were responsible

12   for or otherwise worked on any aspect of developer

13   access to the Facebook platform?

14       A.   This would be -- and, again, this is

11:08:56  15   assuming this is for the entire period, relevant

16   period?

17       Q.   Correct.

18       A.   Okay.  So --

19           MR. BLUME:  Hang on -- hang on one

11:09:07  20   second.

21           THE DEPONENT:  Okay.  Sorry.

22           MR. BLUME:  I'm just looking at -- at the

23   notice what topic is this?

24           MR. KO:  Topic 1 Mr. Blume.

11:09:16  25           MR. BLUME:  Well, how is it related.

67

✦

**CONFIDENTIAL ROUGH DRAFT**

11:09:18  1        MR. KO:  The organizational structure.

          2        MR. BLUME:  As that relates to 1A, B and

          3   C which of 1ABC and is relating.

          4        MR. KO:  It's really referring to all I

11:09:28  5   will try to helpful it tell you it's 1B in

          6   particular.

          7        MR. BLUME:  Okay.  Thank you.

          8        THE DEPONENT:  And can I be remind of

          9   what 1B is I don't have the document in front of

11:09:43 10   in.

         11     Q.    (By Mr. Ko)  It's pretty long let me

         12   fogies?

         13        MR. BLUME:  Can I show --

         14        MR. KO:  It is helpful.  Yeah, you can

11:09:50 15   show it to you but while you show it to her really

         16   the processes for drafting the various policies

         17   that were in place with respect to both users and

         18   developers.

         19        THE DEPONENT:  Going back to the prior

11:10:12 20   question I did forget about the strategic response

         21   team and so now what teams would be working on what

         22   I just read in -- in the -- at Facebook's we are a

```
          23  team of teams and you -- we -- we largely involve

          24  nearly all parts of the org, you know, not the

11:10:34  25  culinary team for an example on -- on these kind of
```
                                                                    68

▲

                        **CONFIDENTIAL ROUGH DRAFT**

```
11:10:38   1  topics.  But it would be legal and privacy org and

           2  privacy and data policy org, public policy, comps,

           3  marketing, product, eng, is I think I said comps.

           4  Partnerships, can be involved.

11:11:05   5      Q.   (By Mr. Ko)  How about the platform and

           6  platform and development -- developer operations

           7  team?

           8      A.   Developer operations would be involved as

           9  well it all depends on the nature and scope of this

11:11:22  10  specific topic within the topics on listed in 2B.

          11      Q.   Got it.

          12           Several organizations at Facebook were

          13  responsible for otherwise worked on aspects of

          14  developer access to the Facebook platform; is that

11:11:42  15  fair to say?

          16      A.   Yes, I mean going back to the earlier

          17  example it really needs to be granular so for

          18  example developer operations wouldn't work closely

          19  on the update to the SRR.
```

11:12:03 20      Q.   Well, and that's -- that's a good segue

21   into my next question which is -- which is which --

22   which organizations at Facebook were responsible

23   for drafting and enforcing the policies applicable

24   to use of the Facebook platform I by developers?

11:12:28 25      A.   Drafting and enforcing are two different

69

☗

**CONFIDENTIAL ROUGH DRAFT**

11:12:31  1  things.  So in regards to drafting like the

2   statement of rights and responsibilities that is

3   largely, that is a legal difference, but with input

4   from, again -- multiple policy oranges the -- the

11:12:48  5  comms team, marketing teams and then in regards to

6   the everyone that again is -- my team, legal,

7   developer operations, external data use and there's

8   an eCrime team.  I forgot to mention the -- I

9   believe it's referred to now as the content policy

11:13:23 10  team.  I forgot to mentioned that earlier that was

11   rebranded from the global policy management team

12   that I referred to earlier so same team different

13   name.

14           Many teams get pulled in for both

11:13:40 15  drafting and then in -- drafting of terms and

16   policies and then depending on the enforcement

17  aspect of it, we collaborate on enforcement

18  approach with multiple teams as well.

19      Q.   And I appreciate that distinguishing the

11:14:07 20  difference between drafting and enforcing.  So

21  let's unpack that and let's just focus on the

22  drafting to start with.

23          You've testified as to who was part of

24  the drafting of the SRRs can you also describe to

11:14:23 25  the Court what organizations were responsible for

70

⬆

**CONFIDENTIAL ROUGH DRAFT**

11:14:26  1  drafting the data use policies?

2      A.   It would be the same response with

3  respect to the drafting of the SRR for the data --

4  for the data use policy.  The same teams would be

11:14:46  5  pulled in.

6      Q.   How about with respect to the platform

7  policies?

8      A.   The same response.

9      Q.   Who -- okay.

11:15:00 10          And with respect to the drafting of the

11  SRRs.  DUPs and platform policies, who would you

12  say of the -- of the organizations that you have

13  described, who you say had primary responsibility

```
            14  for drafting these policies?
11:15:20 15             MR. BLUME:  Objection.  Time frame.
            16             THE DEPONENT:  Legal has the primarily
            17  responsible of drafting all three of those but
            18  there is a period of time where -- where the
            19  platform policies are managed by myself, the team
11:15:46 20  I'm on I'm the global policy management team.  But
            21  as I said earlier we -- we don't do things in a
            22  vacuum, but I -- I was the person who drove the
            23  development and updates to the platform policies.
            24  And now oops -- I think that's -- I think that's
11:16:10 25  all I have -- I am so sorry.
```

                                                    71

↑

                     **CONFIDENTIAL ROUGH DRAFT**

```
11:16:12  1      Q.  (By Mr. Ko)  And when you say that there
         2  were updates made to the platform policy in
         3  particular what are you referring to?
         4      A.  Well, there's been multiple versions of
11:16:32  5  what you and I earlier agreed we are just going to
         6  call them platform policies now present date
         7  platform terms and developer policies but there's
         8  multiple changes over the years based on a number
         9  of factors.
11:16:47 10      Q.  So the global policy management team for
```

11 which you are currently or were involved in they

12 were responsible for and had primary responsibility

13 with respect to the drafting of these platform

14 policies and updates there to; is that fair to say?

11:17:09 15          MR. BLUME:  Objection.

16          THE DEPONENT:  It all depends on what

17 time period.  But from -- so in the context of the

18 platform terms and developer policies that we

19 launched, that was very like co driven with legal

11:17:32 20 and -- and my team working pretty much side by

21 side.  But, again, with input and feedback from all

22 of the respected teams that I outlined before.

23      Q.   (By Mr. Ko)  Great.

24          And with respect to the SRRs and DUPs and

11:17:54 25 all iterations there to what other organizations

                                                        72

**CONFIDENTIAL ROUGH DRAFT**

11:18:04  1 other than legal have primarily responsible for

2 drafting and revising and updating those respected

3 policies?

4          MR. BLUME:  Objection.  Form.

11:18:17  5          THE DEPONENT:  Legal has always and

6 continues today to be the manager of those performs

7 and -- and policy.

8      Q.   (By Mr. Ko)  Are there any other?

9      A.   With significant input from other teams

11:18:31 10  but they -- they -- they are the -- they hold the

11  pen.

12      Q.   From the teams that you had described

13  before, and organizations are there any that you

14  can identify that had primary responsibility or co

11:18:51 15  responsibility with the drafting of these similar

16  to how the global management team had co

17  responsibility with legal as to the platform

18  policies?

19          MR. BLUME:  Objection.  Form.

11:19:03 20          THE DEPONENT:  I just realized I forgot

21  to reference to the content strategy team.

22          So having corrected myself there now I

23  apologize Mr. Ko could you repeat your question.

24      Q.   (By Mr. Ko)  Sure.

11:19:20 25          And so this -- this team that you had

73

&uarr;

**CONFIDENTIAL ROUGH DRAFT**

11:19:23  1  recalled this content strategy team they were or

2  had primarily responsibility along with the global

3  management team to help update the platform

4  policies with legal; is that correct?

11:19:38  5          MR. BLUME:  Objection.

      6          THE DEPONENT:  I -- I am only comfortable

      7   saying that the legal team has the primary

      8   responsible for the terms and service also known as

      9   the SRR and the data use policy also referred to as

11:19:51 10   the privacy policy.  But the next largest

      11   contributor being the -- Aaron Egan's privacy and

      12   data policy team again many people have -- proposed

      13   revisions but those two teams legal being primarily

      14   accountable but working most closely with Aaron

11:20:15 15   Egan's org over the years but, again, everyone has

      16   a chance to review and and provide feedback and

      17   input.

      18      Q.   (By Mr. Ko)  And with respect to the

      19   privacy and data policy team that Aaron Egan was in

11:20:34 20   charge of at least for some period of time.  Are

      21   you saying that they were the next largest

      22   contributors to legal with respect to just the SRRs

      23   and data use policy or are you saying with respect

      24   to all the policies that we have been talking about

11:20:55 25   including the Facebook platform policy?

                                                           74

✦

                    **CONFIDENTIAL ROUGH DRAFT**

11:20:59  1      A.   So Aaron Egan's team of which I'm now on,

2   primarily would play a role in the data use policy

3   updates.  Again legal holding the pen, but -- but

4   Aaron Egan's org the policy and data policy team

11:21:23 5   would be providing input and feedback and seeking,

6   you know, feedback on -- on data policy update

7   dates and the research team has been involved as

8   well.

9        Q.   How about with respect to the SRRs who --

11:21:47 10   who would you say or what organization would you

11   say is the next largest contributor to the SRRs

12   outside of legal?

13        A.   I would say that both -- content policy

14   global policy management team they and Joel

11:22:17 15   Kaplan's which Aaron reports into Joel that they

16   would be the primary people.  But legal largely

17   drives terms the -- the terms of service updates.

18   But they do seek input.  Again because nothing here

19   is done in a vacuum.

11:22:39 20        Q.   What was the organization that Joel

21   Kaplan class part of?

22        A.   Well, Joel is still at the company.  He

23   has -- his teams -- so Aaron reports into Joel.  So

24   Joel is public policy and privacy and data policy

11:23:08 25   oranges I am trying to think who else.  I might

75

**CONFIDENTIAL ROUGH DRAFT**

11:23:10  1  have to refresh my memory.

2      Q.   But primarily Joel leads the team that

3  manage our public policy privacy and data policy

4  teams.

11:23:28  5      Q.   So was Monika content and Joel's cap

6  Lance public policy and privacy team that were the

7  next largest contributors other than to legal to

8  the SRRs?

9      A.   Monika reports.

11:23:42 10      Q.   Is that?

11      A.   Monika Bickert into Joel Kaplan.

12      Q.   Okay.  So other than legal, I just want

13  to make sure I'm crystal clear other than legal the

14  next largest contributor to the SRRs is the public

11:24:10 15  policy and privacy organization; is that accurate?

16      A.   I think it's more accurate to say other

17  than legal Joel Kaplan's org teams that I just out

18  lined are the -- are given a chance to preview and

19  provide feedback.  Along with other teams, but

11:24:31 20  they -- the teams that report into Joel would have

21  an opportunity to review and provide input on

22  updates.

23      Q.   And Joel's team and organization selected

24  public policy and privacy data teams; is correct?

11:24:49 25  Check.

76

**\*\*CONFIDENTIAL ROUGH DRAFT\*\***

11:24:50 1      A.   And content policy team that has also

2  been and sometimes is still currently referred as

3  the global policy management team of those org

4  primarily Aaron Monika I wouldn't say that more had

11:25:06 5  more input over the other they both an opportunity

6  to provide input.  But legal largely drives updates

7  to the terms of service.

8      Q.   Facebook has as you indicated before a

9  finance team or organization, correct?

11:25:30 10      A.   Yes there's a finance team at Facebook.

11      Q.   And they also -- Facebook also an account

12  team organization, correct?

13      A.   Yes the finance and there's finance and

14  accounting teams.

11:25:46 15      Q.   And did the Facebook finance and -- and

16  accounting organizations exist prior to Facebook's

17  IPO in 2012?

18           MR. BLUME:  Objection.

19           THE DEPONENT:  So we -- we definitely had

11:26:08 20  finance and accounting teams, yes prior to the IPO.

21      Q.   (By Mr. Ko)  Fair to say that Facebook

22  had a finance and accounting team for the entire

23  time period that it was in existence or has been in

24  existence?

11:26:31 25      A.   We are just talking about during the

                                                          77

↑

**CONFIDENTIAL ROUGH DRAFT**

11:26:34  1  relevant period right.  You are talking about when

2  Facebook was first created.

3      Q.   Fair enough.  Yes from January 1st, 2007

4  to present has it always been the case that

11:26:44  5  Facebook has had had a finance and accounting team?

6              MR. BLUME:  Objection.  Compound.

7              THE DEPONENT:  It's fair to say that to

8  that there's always been -- to the extent it

9  became -- it becomes relevant a team that -- that

11:27:01 10  works on finance and accounting.

11      Q.   (By Mr. Ko)  Approximately how many

12  individuals have been on the finance team over the

13  relevant time period?

14              MR. BLUME:  In total?

11:27:21 15      Q.   (By Mr. Ko)  Do you understand the

16  question?

17      A.   Yes, but I -- I don't know the -- I don't

```
        18   know the answer to -- from 2007 to 2022 that number

        19   obviously has changed and grown but I don't know

11:27:41 20   the specifics sitting here today.

        21        Q.   Can you give the Court a general

        22   understanding of the number of employees that were

        23   in the finance team throughout the relevant time

        24   period and not in total but just an estimate as to

11:27:58 25   year over year, about how many individuals were on
```

                                                                  78

⬆

                         **CONFIDENTIAL ROUGH DRAFT**

```
11:28:01  1   that team?

         2             MR. BLUME:  Objection.  Form.

         3             THE DEPONENT:  I.

         4             MR. BLUME:  Don't guess.

11:28:08  5             THE DEPONENT:  Yeah, I can.  I don't

         6   know.

         7        Q.   (By Mr. Ko)  Ms. Hendrix in topic 11 of

         8   the aspects of topic 1 that you have agreed to

         9   testify as to are the employees in each department

11:28:23 10   as they relate to some of the sub topics in topic

        11   1.

        12             So let me try it again.

        13             Do you have any understanding of the

        14   number of employees in the finance team over the
```

11:28:34 15   relevant time period?

16              MR. BLUME:  Objection.  Beyond the scope.

17              THE DEPONENT:  No, I.

18       Q.   (By Mr. Ko)  I was?

19       A.   I don't know I know the finance and

11:28:47 20   accounting teams are accountable for valuations of

21   the company.  But I don't know and I know I could

22   provide you with some names of those senior most

23   accountable people.  Dave Wehner, you know, being

24   privacy officer or chief finance officer.  But I

11:29:04 25   don't know -- I can't give you numbers of how many

                                                          79

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

11:29:09  1   employees have come and gone from 2007 to 2022 but

2   I'm prepared to speak on what those teams do.

3       Q.   Do you have a general understanding of

4   how many employees are currently in -- on the

11:29:24  5   finance team under Dave Wehner?

6              MR. BLUME:  Objection.  Beyond the scope.

7              MR. KO:  Let me just make sure and

8   respond to that objection on the record the topic

9   is clear is asking for the employees in each

11:29:37 10   department and so one could easily and logically

11   conclude that topic would relate to the amount and

             12   number of employees in.

             13            MR. BLUME:  As.

             14            MR. KO:  So.

11:29:49 15            MR. BLUME:  As -- as the number and

             16   amount of those employees relate to the

             17   calculations of revenues gross profits net profits

             18   goodwill Ime paraments an assets recognize mice had

             19   by Facebook relate to users data or information

11:30:01 20   including not are you limited Facebook's public

             21   reporting.

             22            There are many in the finance

             23   organization has nothing to do with user data and

             24   information.

11:30:11 25            And so requesting the numbers of those

                                                          80

♠

                     **CONFIDENTIAL ROUGH DRAFT**

11:30:12  1   people is beyond the scope of one sub topic A.

              2            MR. KO:  I had a question.  Let me just

              3   ask the question.

              4       Q.   (By Mr. Ko)  Again.  Do you have an

11:30:26  5   understanding of how many employees are currently

              6   under the finance team on the financial team under

              7   Dave Wehner?

              8            MR. BLUME:  Objection.  Same objection.

                9           THE DEPONENT:  As you sit here today, I

11:30:46 10     know I can give that information in terms of how

               11     many people report into him, but I didn't interpret

               12     the topic to require me to show up with numbers.

               13     But more to be prepared to speak to those sub

               14     topics.

11:31:04 15          Q.   (By Mr. Ko)  So I just wanted to make

               16     sure the record is clear.

               17           Do you have an understanding as to how

               18     many employees were on either the finance or

               19     accounting teams at any point in time during the

11:31:18 20     relevant time period?

               21           MR. BLUME:  Objection.  Beyond the scope.

               22           THE DEPONENT:  I could find out how many

               23     are on the teams today but I don't know the numbers

               24     from January 1, 2007 up until present.

11:31:40 25          Q.   (By Mr. Ko)  That's hell fingerprint full

                                                                  81

↑

                        **CONFIDENTIAL ROUGH DRAFT**

11:31:42  1     you could -- if you want one could find out that

                2     information right, that's not hard to get, correct?

                3          A.   I -- I think it might take sometime

                4     because you have to click on, you know, look up

11:31:57  5     Dave Wehner's name and see who reports to him keep

         6  clicking to find all the way down the chain.  But I

         7  didn't do that.

         8      Q.   And I'm not asking you what you did.  You

         9  made that clear in how you interpreted this.

11:32:14 10  I'm -- I'm just simply asking you if one wanted to

        11  find out how many individuals were on the finance

        12  and accounting organizations or any organization

        13  for that matter throughout the relevant time period

        14  that is information one could obtain, correct?

11:32:32 15          MR. BLUME:  Objection.  Beyond the scope.

        16          THE DEPONENT:  I don't know if we have

        17  retained any type of records as the teams have

        18  grown and change had over the years.  So I -- I

        19  don't know if we could produce that.

11:32:55 20      Q.   (By Mr. Ko)  You did produce it presently

        21  at least, correct?

        22          MR. BLUME:  Objection.  Beyond the scope.

        23          THE DEPONENT:  I could.

        24          MR. BLUME:  No.

11:33:07 25          THE DEPONENT:  I won't --

                                                        82

↑

                    **CONFIDENTIAL ROUGH DRAFT**

11:33:08  1      Q.   (By Mr. Ko)  You didn't get an

          2  instruction that you --

```
              3              MR. BLUME:  You are --

              4              MR. KO:  I have question.

11:33:13      5              MR. BLUME:  You are asking.

              6              MR. KO:  I'm using.

              7              MR. BLUME:  --

              8              MR. KO:  Remember how earlier unless

              9      Mr. Blume clearly instructs you not to answer the

11:33:28     10      question I would request that you answer my

             11      question nonetheless that's the way this -- this

             12      goes.

             13              So you could produce the information as

             14      to how many employees were part of a particular

11:33:48     15      Facebook organization and you could find that out

             16      presently if you wanted to, right.

             17              MR. BLUME:  Okay.  Different that's a

             18      different question, no objection to that question.

             19              THE DEPONENT:  Your question doesn't make

11:34:04     20      sense to me.  You said were and then present.  So

             21      are you talking past.  Are you talking present.  I

             22      think you need to be a little more clear.

             23         Q.   (By Mr. Ko)  Fair enough.  Sorry for the

             24      confusion I agree.

11:34:18     25              To the extent you wanted to find out the
```

                                                              83

**CONFIDENTIAL ROUGH DRAFT**

11:34:21 1   number of employees within a particular

2   organization at Facebook, you could find that out,

3   correct?

4        A.   I have the ability to go to Dave Wehner's

11:34:42 5   Facebook wiki profile click on that org button and

6   do tons of other clicks because I see who reports

7   and who reports to them and so and so and so on and

8   then ultimately have a number.  So that that is

9   number that I -- that I could find out.

11:35:02 10       Q.   And that would be true for any

11   organization at Facebook, correct?

12            MR. BLUME:  Objection.  Calls for

13   speculation.

14            THE DEPONENT:  It is technically possible

11:35:13 15   to find a human and count the amount of humans that

16   report into that human.

17       Q.   (By Mr. Ko)  Turn to topic 1A of the

18   notice.

19            Do you see the items listed there?

11:35:31 20   A.   May -- may -- may Rob pass me this.

21   Okay.

22       Q.   Yeah, absolutely and just so for your

23   benefit, I would ask that just have the notice

24   handy throughout this deposition.  You could have

11:35:45 25  that in front of you because obviously referring to

84

↑

**CONFIDENTIAL ROUGH DRAFT**

11:35:49 1  you a lot?

2        A.   I mean it's just handy I'm trying to

3  follow the rules so the extent you refer to it.

4  I -- I will it's right here.  I just didn't know if

11:35:58 5  I was allowed to ask for it.

6            Okay.

7        A.   I see 1A, yes.

8        Q.   Do you see the items listed there?

9        A.   Yes.

11:36:13 10      Q.   What employees or organizations as

11  Facebook were responsible for the items listed in

12  1A?

13       A.   Finance and being for the team account

14  able for valuation for the company.

11:36:33 15      Q.   In addition to valuation are they also

16  responsible for the calculation of reference gross

17  profits -- and good payments and payment and assess

18  ex recognized by Facebook relating to its users?

19           MR. BLUME:  I'm sorry to users data and

11:36:52 20  information not the users.

21       Q.   (By Mr. Ko)  Sure.  You can answer it

22   that way?

23        A.   Well reporting of revenue is handled by

24   across functional team, which includes finance and

11:37:08 25   legal and investor relations and corporate

                                                                85

**CONFIDENTIAL ROUGH DRAFT**

11:37:11 1   communications.  So for the reporting aspect those

2   are the teams but just for valuations which I'm --

3   I'm just going that with generally to talk about

4   the calculation of these things if you prefer you

11:37:27 5   don't know do so I can hammer off word all -- all

6   of the calculation of -- of revenues is done by

7   financial and accounting.  The reporting is done by

8   those additional teams I named.

9        Q.   Thank you.

11:37:40 10        That's helpfully yes we can refer to

11   these items as valuation thank you for that

12   clarification.

13        So this other cross functional team

14   what -- what was this specific cross functional

11:37:56 15   team that did the reporting of the revenues?

16        A.   Well, it's finance legal investor

17   relations but corporate but going to 1A there's no

18   monetization like no user data monetization

19   calculation.  I don't know if I should make that

11:38:13 20   clear.  But just the team that like calculates our

21   revenues is finance and accounting, but there's

22   nothing pertaining to -- of user data that's tied

23   to that.

24        Q.   And when you say there's -- there's no

11:38:29 25   monetization calculation or user data monetization

                                                        86

↟

                    **CONFIDENTIAL ROUGH DRAFT**

11:38:32  1   calculation win the topic, what -- what did you

2   mean by that?

3        A.   We don't put a number on -- on a price

4   on -- on users data.  98 percent of our revenues

11:38:45  5   are through ads.

6        Q.   It's gotten even higher in recent years?

7             MR. BLUME:  Objection.

8        Q.   (By Mr. Ko)  With respect to let's unpack

9   your statement about not putting a number on a

11:39:07 10   particular user.  Is it your testimony that

11   Facebook neither directly nor indirectly places a

12   number on Facebook's users data information?

13        A.   We.

14             MR. BLUME:  Objection.  Form.

11:39:22 15             THE DEPONENT:  We -- we have never done

16   that.  We don't -- we don't do that at all.

17      Q.   (By Mr. Ko)  So it's your testimony that

18   you do not place any indirect value or

19   quantification on a particular's users data or

11:39:39 20   information.

21       Do I understand your testimony correctly?

22       MR. BLUME:  Objection.  Form.

23       THE DEPONENT:  I don't quite understand

24   what you mean.  But in -- in regards to like

11:39:49 25   revenue, a person's data is not a factor in how

                                    87

⬆

**CONFIDENTIAL ROUGH DRAFT**

11:39:54 1  we -- in how we make money.

2      Q.   (By Mr. Ko)  Well, you don't?

3      A.   It's based.

4      Q.   Report?

11:40:03 5      A.   98 percent ads.

6      Q.   Don't Facebook's public publicly

7   available financial accounting including their

8   10-Ks report as a key metrics of the company

9   average revenue per user?

11:40:17 10       MR. BLUME:  Objection.  Beyond the scope.

11  Not your topic.

12       MR. KO:  I note for the record I highly

13    disagree but go ahead and answer that question.

14            MR. BLUME:  It's covered by topic ten

11:40:28 15    David so the monetization she's here to talk about

16    the organizational structure involved in the

17    calculation not the calculation itself that's topic

18    ten, so that's my objection and there's no reason

19    for her to speculate on that.

11:40:46 20            MR. KO:  Noted I will ask the question

21    again.

22        Q.    (By Mr. Ko)  Doesn't Facebook's publicly

23    available financial documents including their 10-Ks

24    report ASCII metrics to the company average revenue

11:40:59 25    per user?

                                                        88

↟

**CONFIDENTIAL ROUGH DRAFT**

11:41:01 1            MR. BLUME:  Object instruct not to ants

2    in the capacity of your 30(b)(6) if you know

3    individually you can answer but not as a 30(b)(6)

4    witness to regard to that topic.

11:41:10 5            THE DEPONENT:  I don't know.  I know we

6    calculate a revenue by Facebook user geographic

7    based on or the estimate of the geographic in which

8    ad impressions are delivered virtual and digital

9    goods are purchased or consumer hardware devices

11:41:23 10    are shipped.

11    Q.    (By Mr. Ko)  Average revenue per user an

12    important metrics for purposes of calculating

13    revenues?

14         MR. BLUME:  Objection.  Instruct you not

11:41:35 15    to answer in your role as a 30(b)(6) witness beyond

16    the scope if you know in your personal capacity I

17    guess you answer in that capacity although you

18    have.

19         Hendrix in your personal capacity coming

11:41:50 20    up, so...?

21         THE DEPONENT:  I don't remember his

22    question.

23    Q.    (By Mr. Ko)  Is average revenue per user

24    an important metrics for purposes of calculating

11:42:00 25    revenue?

                                                        89

⬥

            **CONFIDENTIAL ROUGH DRAFT**

11:42:00  1         MR. BLUME:  Observation.  Beyond the

2    scope.  Please don't answer in regard to your

3    30(b)(6) capacity.

4         THE DEPONENT:  I have already said we

11:42:11  5    don't calculate revenue by users like we -- we

6    don't have that so, so I don't.

7       Q.   (By Mr. Ko)  ARPU an acronym that sounds

8   familiar to you?

9       A.   No.

11:42:31 10   Q.   You never heard of ARPU?

11           MR. BLUME:  Objection.  Her personally or

12   her as a corporate representative.

13           MR. KO:  I will ask both but, you know,

14   definitely in your corporate capacity.

11:42:46 15           MR. BLUME:  It's beyond the scope of the

16   corporate designation in topic 1 so I instruct you

17   not to speculate or guess.

18           THE DEPONENT:  I don't -- I don't know.

19       Q.   (By Mr. Ko)  So as I just make sure the

11:42:58 20   record is clear.

21           As a corporate designee of Facebook who

22   consented to testifying on behalf of the

23   corporation as to the organizational structure

24   including the calculation of revenues your answer

11:43:13 25   is that you don't know and have never heard of the

                                                    90

**CONFIDENTIAL ROUGH DRAFT**

11:43:16  1   acronym ARPU; is that correct?

2           MR. BLUME:  Objection to your

3   recharacterization of topic 1 the organizational

              4    structure related to the calculation of revenue.

11:43:26  5    Not terms involved in the calculation of revenue

              6    beyond the scope.  You have a witness to topic ten

              7    that is upcoming you are free to ask those

              8    questions so I instruct not to answer to the extent

              9    it's beyond the scope of topic 1.

11:43:45 10              MR. KO:  Yes-or-no question Ms. Hendrix.

             11              MR. BLUME:  Instruct not to.

             12              MR. KO:  Corporate.

             13              MR. BLUME:  You.

             14              MR. BLUME:  Instruct.

11:43:52 15              MR. KO:  Spoking your.

             16              MR. BLUME:  I'm instructing her not to

             17    answer that's my that's my objection.

             18              SPECIAL MASTER GARRIE:  Noted for the

             19    record please move forward.

11:44:03 20              MR. KO:  Objection is noted for the

             21    record Mr. Counsel co please ask the question

             22    again.

             23       Q.   (By Mr. Ko)  Please ask the question

             24    again?

11:44:16 25              SPECIAL MASTER GARRIE:  Did she answer

                                                                91

↑

                        **CONFIDENTIAL ROUGH DRAFT**

11:44:17  1   the question.

2              MR. KO:  No she did not that's why

3    keeping asking that's why I many a little confused.

4              SPECIAL MASTER GARRIE:  So we noted the

11:44:24  5   objection Ms. Hendrix could you please answer the

6    question given the advice you rived from your

7    counsel.

8              MR. BLUME:  You know in your personal

9    capacity you can answer.

11:44:34 10             THE DEPONENT:  I don't know that acronym.

11        Q.   (By Mr. Ko)  Do you know the acronym MAU?

12        A.   Yes.

13        Q.   What does that refer to?

14        A.   Monthly active users.

11:44:48 15        Q.   Have you heard of the acronym DAU?

16        A.   Yes.

17        Q.   What does that refer to?

18        A.   Daily active users.

19        Q.   You never heard of ARPU or average

11:45:04 20   revenue per user; is that correct?

21             MR. BLUME:  Objection.  Asked and

22   answered. in her personally capacity.

23             THE DEPONENT:  It's still correct that I

24   don't know that acronym.

11:45:30 25        Q.   (By Mr. Ko)  Now turning back to the SRRs

✦

**CONFIDENTIAL ROUGH DRAFT**

11:45:33  1  and DUPs.  Are those -- is it fair to say that the

2  SRRs and DUPs are how Facebook discloses to users

3  how Facebook uses the data information Facebook

4  collects about them?

11:45:56  5      A.   So you are referring to them as -- in the

6  plural, so there's only an SRR and a DUP.  So I

7  don't know what else you are referring to when you

8  say SRRs and DUPs.

9      Q.   Okay.  I was referring to them plurally

11:46:12 10  because that's fair and let's back up a little bit.

11           There were various iterations of both the

12  SRRs and the DUP, correct?

13      A.   Yes.

14      Q.   And so when I'm referring to them in the

11:46:26 15  plural I'm talking about all the various versions

16  and iterations of the SRR and the DUP.  So

17  hopefully with that clarification my question could

18  potential be more clear.  I'm happy to try and

19  rephrase but let me try again.

11:46:46 20           Would you agree with me, that the SRRs

21  and the DUPs govern how Facebook uses the data and

22  information Facebook collects from and about

23  Facebook users?

24        A.   So you are breaking up so I haven't heard

11:47:07 25  all of your words and could someone go on mute.

                                                    93

↑

                    **CONFIDENTIAL ROUGH DRAFT**

11:47:12  1          MR. BLUME:  There -- I think there was

      2  typing someone was typing it was -- it blocked

      3  blocked you out.

      4          Could you ask that again, David.

11:47:24  5          MR. KO:  Would you agree with me that the

      6  SRRs and the DUPs govern how Facebook uses the data

      7  and information Facebook collects from and about

      8  Facebook users.

      9          MR. BLUME:  Objection.  Form.

11:47:41 10          THE DEPONENT:  The -- I agree that the

     11  SRR is the terms -- the agreement with people who

     12  use our service.  And that the data use policy is

     13  the document which outlines the different -- not

     14  the different that the data use policy is the

11:48:01 15  primary document that outlines to people what we

     16  collect and how we will use the information and how

     17  it is so the TUP being the primary document in

     18  terms of use of information.  But there's a whole

     19  host of educational materials another there.  But

11:48:16 20  those -- the DUP is the primary source.

21      Q.   (By Mr. Ko)  Okay.  Are any of these

22  educational materials policies or contracts that

23  Facebook asks the user to consent to?

24          MR. BLUME:  Objection.  Form.

11:48:40 25          THE DEPONENT:  When you user signs up

                                                        94

⬆

**CONFIDENTIAL ROUGH DRAFT**

11:48:42 1  their -- they are freeing that he have they have

2  read the data use policy and they are using -- I

3  don't remember the question.

4      Q.   (By Mr. Ko)  Are any of these educational

11:49:16 5  materials policies or contracts that -- at Facebook

6  asks the user to consent to?

7          MR. BLUME:  Objection.  Form.

8          THE DEPONENT:  They are materials

9  intended to -- to educate people but they are

11:49:28 10  not -- for example, we don't agree to the help

11  center.

12      Q.   (By Mr. Ko)  Let me ask it a different

13  way and again this is just to orient ourselves for

14  purposes of this discussion.

11:49:45 15          But is it fair to say that the SRR and

16  the DUP are the two primary policies or contracts

17   that govern how Facebook uses the data and

18   information Facebook collects from and about users?

19        MR. BLUME:  Objection.

11:50:05 20        THE DEPONENT:  With respect to the

21   Facebook product, yes.  I -- those are the two

22   primary documents.

23        Q.   (By Mr. Ko)  And when I say data and

24   information, the SRR contains a provision in it

11:50:29 25   that -- that is referred to as quote content

                                                        95

↟

                    **CONFIDENTIAL ROUGH DRAFT**

11:50:33  1   information "does that sound familiar"?

2        A.   I need to look at whatever version you

3   are referring to.

4        Q.   That's fair.

11:50:45  5        But without referring to a particular

6   version, let me ask it this way, does the phrase

7   content and information sound familiar to you at

8   all?

9        MR. BLUME:  Objection.  Form.

11:50:57 10        THE DEPONENT:  Yes, and I just want to

11   flag that we agreed at the outset that Facebook and

12   Meta would be interchangeable I just want to flag

13   that, you know, the terms of service the SRR is

          14  with -- with respect to Facebook.  But there's

11:51:12  15  Instagram terms of service for example I just want

          16  to make sure that point is clear and other things

          17  like Oklahoma trust and you know WhatsApp so I used

          18  just Facebook in that legal conclusion response

          19  just to mean people who use the Facebook app.

11:51:33  20          MR. BLUME:  And David we have been going

          21  a little more than a hour if you are coming up to a

          22  break.

          23          MR. KO:  Sure.  Thank you for that

          24  explanation.

11:51:42  25      Q.   (By Mr. Ko)  Let me ask the question I

                                                          96

⬆

                   **CONFIDENTIAL ROUGH DRAFT**

11:51:43   1  was asking before does the phrase consent and

           2  information sound familiar to you at all?

           3          MR. BLUME:  Objection.

           4          THE DEPONENT:  Yes.

11:51:53   5      Q.   (By Mr. Ko)  What is your understanding

           6  of content and information?

           7          MR. BLUME:  Objection.  Form.

           8          THE DEPONENT:  That's incredibly board

           9  like what do you mean.

11:52:09  10      Q.   (By Mr. Ko)  I'm asking you said what

11 understood what content -- content and information

12 is, correct?

13          MR. BLUME:  Objection.

14          THE DEPONENT:  Yes, but you -- you

11:52:19 15 earlier said content and information as if it was a

16 header in the SRR one of the various versions many

17 all of which I reviewed.  Sitting here today, I

18 would need to look at the terms of service to see

19 if that is a header, but now you've broaden us out

11:52:36 20 or so I'm interpreting so now you are just asking

21 me generally like what the definition of content

22 and information mean to me.  So I'm not sure where

23 you are heading with this.

24     Q.   (By Mr. Ko)  Let's go back to in the

11:52:51 25 context of the SRR.  Are you familiar with the

                                                        97

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

11:52:57 1 phrase content and information in the context of

2 the SRR?

3     A.   I would need to -- to look I'm not -- I'm

4 not just there's so much material as I'm sure you

11:53:11 5 understand I -- I don't remember.  But I'm more

6 than happy to be presented with whatever you

7 apparently are seeing that I'm not.  So I can --

8       Q.   I'm not seeing?

9       A.   -- refresh my recollection.

11:53:26 10     Q.   We can do that in a moment, but -- but

11   before we do that.  I'm just establishing some

12   foundation and some things that you know or you

13   don't know without having to go to the document.

14           So is it your testimony that you don't

11:53:39 15  know what content and information in the context of

16   the various refers to simply yes or no?

17           MR. BLUME:  Objection.  Form. and scope.

18           THE DEPONENT:  It's not that I don't know

19   it's that I don't remember and need to refresh I

11:53:54 20  don't think the Court expect to remember every

21   single word in every version of the document I

22   think that that is unfair.

23       Q.   (By Mr. Ko)  Okay.  Well, your objection

24   is duly noted but I think you are probably assuming

11:54:09 25  way to much in my question.  I'm asking you a very

                                                    98

⌃

**CONFIDENTIAL ROUGH DRAFT**

11:54:11  1  simple and straightforward yes-or-no question.

2           Does the term "content and information"

3   in the context of the SRR mean anything to you?

4           MR. BLUME:  Objection.  You can answer in

11:54:29  5   your -- in your personal capacity if it means

6   anything to you.

7           MR. KO:  Stop -- stop Mr. Blume.

8           MR. BLUME:  I'm giving her instruction

9   you don't have to interrupt me.

11:54:39 10           THE DEPONENT:  I know what content like

11   for example, the SRR community standards and those

12   are types of content that you may or may not more

13   so may not upload onto Facebook.  So content

14   insofar as what type of content you can post or

11:55:02 15   content insofar as what content we collect and what

16   we will use with it and/or how we can use that in

17   the context of the data use policy.  So hopefully

18   that gave you a little bit more color.  But if we

19   are getting specific to like is there a -- a

11:55:19 20   heading content and information.  I don't remember.

21   I would need to to take a look.  But hopefully that

22   gives you more clarity.  On -- on content can be

23   used depends on the context of the conversation or

24   of the question of which you haven't provided any.

11:55:37 25           MR. BLUME:  Ready for a break David.

99

↑

**CONFIDENTIAL ROUGH DRAFT**

11:55:39  1           MR. KO:  Almost.  Thank you -- thank you

2  -- Hendrix it slowly does let me just ask a few

3  follow-up questions.  It's exactly what I was

4  trying to get at.

11:55:49  5      Q.   (By Mr. Ko)  You responded that you

6  understood that content and information included

7  information that Facebook collects and -- and what

8  Facebook will use with it and how Facebook can use

9  that in the context of the data use policy you

11:56:04 10  recall that answer a moment ago?

11      A.   I would just trying to give you examples

12  of what it could mean if all just depends on the

13  location of the -- which word the content and/or

14  organization is, so I don't think even think my

11:56:18 15  response is helpful.

16      Q.   Well, it was helpful to me.  So in -- in

17  the context of the SRRs.  Is it fair to say that

18  content and information includes the type of

19  information that Facebook collects about a user?

11:56:41 20          MR. BLUME:  Objection.  Form.

21          THE DEPONENT:  I -- again I need to see

22  the section of the SRR that you are referring to

23  like the -- the data use policy is the primary

24  document which has been referred as the privacy

11:57:03 25  policy that there is to tell you what do you

100

⬆

**CONFIDENTIAL ROUGH DRAFT**

11:57:06  1  collect and how is the information used.  So in the

2  actual SRR, I would need to, you know, if you don't

3  mind showing me, like the sentence that you are

4  seeing, that's causing you to ask me that question.

11:57:22  5  But it's just -- I'm not able to go further and

6  speculation unless -- unless I knew what you were

7  talking about and I frankly don't.

8      Q.   (By Mr. Ko)  In the data use policy as

9  you described it governs the types of or it governs

11:57:43 10  how Facebook collects user information and how it

11  is used.  There are provisions in the data use

12  policy as a general matter, that deal with content

13  and information or do you not know one way or the

14  other?

11:57:59 15          MR. BLUME:  Objection.  Beyond the scope.

16  Form.

17          THE DEPONENT:  The data use policy

18  absolutely discusses what information we collect

19  and how that information can be used.  It also

11:58:12 20  helps you learn how could you can control your

21  information and -- and yes in the SRR there are

22  disclosures to people about being careful about

23  what they share, for example with their friends

```
        24  because their friend, you know, use that
11:58:30 25  information to be very careful.  So there -- so
```

                                                               101

⬆

                         **CONFIDENTIAL ROUGH DRAFT**

```
11:58:33  1  there is -- that is refresh my memory of it a

          2  section within the SRR to take you -- us back to

          3  where you were going.

          4          MR. BLUME:  All right.  Let's we have
11:58:42  5  been going.

          6          MR. KO:  Thank you for.

          7          MR. BLUME:  20 minutes let's take a break

          8  please.

          9          THE DEPONENT:  I need a break.
11:58:47 10          MR. KO:  Sure.  We can take a break.

         11          (Discussion off the stenographic record.)

         12          THE VIDEOGRAPHER:  Sure.  We are off the

         13  record 11:58 a.m.

         14          (Recess taken.)
12:15:07 15          THE VIDEOGRAPHER:  We are back on the

         16  record it's 12:15 p.m.

         17      Q.  (By Mr. Ko)  Ms. Hendrix, welcome back

         18  from the break.

         19          We were talking a moment ago about the
12:15:22 20  SRRs and the DUPs with respect to the former.  The
```

21   SRRs, at any point in time every Facebook user in

22   the United States is subject to the same SRR,

23   correct?

24        A.   Yes, that's correct.

12:15:44 25        Q.   And at any point in time every Facebook

                                                            102

⬆

**CONFIDENTIAL ROUGH DRAFT**

12:15:47  1   user in the United States is subjected to the same

2   DUP or data use policy, correct?

3        A.   That's correct.

4        Q.   And these contracts and policies as we

12:15:57  5   have discussed before have been subject to various

6   changes over time, but put another way there was

7   only one operative SRR at a time, correct?

8        A.   Yes, there's just been the one agreement

9   with users who agree to use the service and not

12:16:25 10   two.

11        Q.   And there was only operative DUP data use

12   policy at the time, correct?

13        A.   That's correct we have terms and privacy

14   policy the term -- the terms and privacy policy the

12:16:40 15   names having evolve but just those two.

16        Q.   So in -- in 2013, for exampling let's

17   pick a point in time, the operative SRR at the time

```
          18   was a contract that Facebook had every single

          19   Facebook user in the United States; is that

12:16:58  20   correct?

          21        A.   Yes.

          22        Q.   And same question with respect to the

          23   DUP.  In 2013, to pick up a time a illustrative

          24   time example there only one data use policy and

12:17:15  25   that was operative and applicable to a user at that
```

                                                        103

↑

                    **CONFIDENTIAL ROUGH DRAFT**

```
12:17:18   1   time for every user in the United States, correct?

           2        A.   Yes.

           3        Q.   And this would be true for the entire

           4   time period from January 1st, to --

12:17:30   5   January 1st, 2007 to present, correct, there only

           6   one operative SRR and one operative DUP, correct?

           7        A.   Yes.

           8        Q.   And there was never a time period in

           9   which there was more than one SRR that would be

12:17:47  10   applicable to a particular user, correct?

          11        A.   That's correct.

          12        Q.   And similarly there bass never a time

          13   from January 1st, 2007 to present when there was

          14   more than one DUP applicable to a particular user,
```

12:18:06 15   correct?

16   A.   That's -- that's correct.

17        What do you mean by "applicable"?

18   Q.   Only one contract or policy that governed

19   Facebook's relationship with users?

12:18:28 20   A.   Okay.  So yes, I -- I don't need to

21   correct my prior responses.

22   Q.   Ms. Hendrix are you familiar with the

23   settings that Facebook made available to its users?

24        MR. BLUME:  Objection.  Form.

12:18:50 25        THE DEPONENT:  What settings are you

                                                    104

♠

                    **CONFIDENTIAL ROUGH DRAFT**

12:18:51  1   referring to.  Just to help fair enough I'm going

2   to orient you to topic 3 in topic 3.  There's a

3   description as to the privacy and app settings.

4        THE DEPONENT:  Okay.  Yes, thank you.

12:19:16  5   Q.   (By Mr. Ko)  So are you here today to

6   testify on behalf of Facebook as to the development

7   and revisions of those particular settings?

8   A.   Yes, how -- how they are developed and

9   the processes for developing them.

12:19:38 10   Q.   Are you specifically familiar with the

11   privacy settings?

```
          12      A.   Yes.

          13      Q.   What are they?

          14           MR. BLUME:  Objection.  Form.

12:19:51  15           THE DEPONENT:  Well, they -- the privacy

          16  settings can be for your content that you are

          17  uploading to Facebook so to the extent that we

          18  provide with the ability to have a privacy setting

          19  attached to a given piece of content, than there's

12:20:08  20  no types of privacy settings.  And then there's the

          21  application settings.

          22      Q.   (By Mr. Ko)  So I assume then you are

          23  familiar with -- with app settings or application

          24  settings?

12:20:27  25      A.   Yes.
```

                                                        105

♠

                        **CONFIDENTIAL ROUGH DRAFT**

```
12:20:28   1      Q.   What is the distinction between privacy

           2  settings and application settings?

           3      A.   Well, the privacy settings relate to and

           4  are relevant to your app settings so you've got

12:20:42   5  your privacy settings and then a subset of those

           6  settings are settings that you can apply to your

           7  vies of the Facebook platform applications.

           8      Q.   So the two are related, correct?
```

9    A.   Yes, that's correct.

12:21:03 10    Q.   And as you said the two are relevant to

11   each other, correct?

12    A.   Yes.

13    Q.   And let me try and -- and characterize

14   what I think and you are more than free and I

12:21:24 15   welcome edits to characterization or revisions to

16   this characterization but in thinking about the

17   user privacy settings it occurred to me that

18   they -- they more or -- or they reflect the control

19   that Facebook allowed users to try restrict or

12:21:41 20   limit what information related to the user or their

21   friends were being shared; is that a fair

22   characterization?

23    A.   The friend element of your description is

24   confusing because I can't control my friends

12:22:04 25   privacy settings.

106

✦

**CONFIDENTIAL ROUGH DRAFT**

12:22:04 1    Q.   Well for now let's -- let's eliminate the

2   friend the users friend from that.

3       So is fair to say that the privacy

4   settings reflect the control that Facebook allowed

12:22:18 5   its users to try to reflect or limit or what --

       6  what information related to the user was being

       7  shared.

       8          Do you agree with that statement?

       9      A.   I would characterize it more as what

12:22:35 10  information the user could tell Facebook that they

      11  wanted to be displayed, so for example, you might

      12  set your post to publics or everyone or you might

      13  set your post to friend of friends any custom

      14  network or just to only me.

12:22:56 15          So there's -- there's a number of

      16  settings it just depends on what the context is

      17  of -- of what we are talking about.

      18      Q.   That's helpful.

      19          Let's go with how you characterize it and

12:23:09 20  in particular the aspect of your response that said

      21  displayed.

      22          So it's your testimony that the privacy

      23  settings primarily governed how a Facebook user

      24  could control what information was being displayed

12:23:32 25  on her or his Facebook profile; is that correct?

                                                           107

↟

                    **CONFIDENTIAL ROUGH DRAFT**

12:23:38  1          MR. BLUME:  Objection.

       2          THE DEPONENT:  I would describe it as the

           3  privacy settings to the extent there is a privacy

           4  setting attached to the information so for example

12:23:51   5  your name is permanently public.  Like you don't

           6  hide your name.  But to the extent there's a

           7  privacy settings and then the user has the choice

           8  to use that setting and depending what him her or

           9  them would like to do they will set it as public or

12:24:14  10  to just their friends or only to themselves for

          11  example.

          12       Q.   (By Mr. Ko)  Or to a -- a custom

          13  audience, right?

          14       A.   Right if there's accustom network or that

12:24:32  15  they created or something like that.

          16       Q.   Would it be accurate to say it's the

          17  privacy settings -- well, remember how earlier I

          18  had asked about whether or not the privacy settings

          19  related to what information a user would want to

12:24:47  20  share or restrict about themselves and I want to

          21  focus in on -- on the share aspect of it.

          22            Is there any part of the privacy settings

          23  that reflect what information could be shared or

          24  restricted by a particular user?

12:25:07  25       A.   What do you mean by "shared"?

                                                            108

**CONFIDENTIAL ROUGH DRAFT**

12:25:11  1      Q.   Well, let me ask you because you said in

2    response to the question that I had asked, you had

3    talked about what a user would display.

4            In what con technical or what -- what do

12:25:23  5    you mean when you say display?

6      A.   I mean, let's say that I upload an album

7    of photos from an event, I went to and took

8    pictures and I want to upload them to my Facebook

9    profile.  In the context of doing so, I'm presented

12:25:40 10    with the option to upload this as an only me album.

11    So I'm only allowed on Facebook my album or set it

12    for everyone the whole public someone who doesn't

13    even use Facebook could navigate.  Or I could set

14    it to my friends or the custom piece that I

12:26:00 15    referred to.  And then by using that settings,

16    programmatically it tells the Facebook product to

17    render or not render the content depending on the

18    setting that I selected.

19      Q.   And the privacy settings would be

12:26:17 20    applicable to that process, correct?

21      A.   Right the product respects privacy.

22      Q.   And have you heard of the term on

23    platform activity?

24      A.   Yes.

12:26:31 25      Q.   Have you heard of the term off platform

                                                           109

⬆

                       **CONFIDENTIAL ROUGH DRAFT**

12:26:33  1  activity?

          2       A.   Yes.

          3       Q.   What is your understanding of these two

          4  terms?

12:26:43  5       A.   It depends on the context of the use of

          6  the term platform.

          7       Q.   Can we agree that the platform is --

          8  let's start with the context of the Facebook

          9  platform.

12:26:58 10            Does that help or do you need more?

         11       A.   Not quite.

         12       Q.   Okay.

         13       A.   Not quite.

         14       Q.   So can you describe to me what the

12:27:06 15  different versions of the platform you are thinking

         16  of or the various versions of -- of the platform

         17  you are thinking of?

         18       A.   Well some people will refer to as the

         19  Facebook app or website as the Facebook platform.

12:27:21 20  I in my years working at the company, when I hear

         21  the word platform, I many a bias in the sense I

22   have always worked on our platform technology

23   for -- to mean the -- the -- the Facebook platform

24   that we -- that we launched in May of 2007.

12:27:42 25         So that's why it's important for us to be

110

**CONFIDENTIAL ROUGH DRAFT**

12:27:45  1   on the same page with respect to the word platform.

2   Because there were, if we are just going back now

3   to the set of technologies that allowed third

4   parties, you know, to -- to connect with the

12:27:56  5   Facebook app, that -- that is the platform as I

6   speaking to and those apps could be either on

7   Facebook or off of Facebook.

8         Depending on where the developer wanted

9   to host them.

12:28:08 10   Q.   Okay.  Given -- given that distinction

11   between on and off platform.

12         Do the privacy settings deal with both on

13   and off platform activity as you described?

14   A.   So the privacy settings apply to the --

12:28:32 15   the settings that you are setting for the content

16   you are uploading to the Facebook service then

17   there's also privacy settings related to apps and

18   those settings can be used with respect to the

19  information that you share with third party

12:28:49 20  applications or that otherwise make available

21  through the platform.

22      Q.   And so those -- that particular setting

23  or settings those are the app settings, correct?

24      A.   App settings, yes there -- those would

12:29:07 25  apply to your use of the Facebook platform as I

111

↟

**CONFIDENTIAL ROUGH DRAFT**

12:29:11  1  just described my -- my understanding -- like

2  the -- the platform technologies.

3      Q.   And with respect to both of these

4  settings, which as you described were related to

12:29:27  5  each other.  Would it be fair to say that

6  collectively these settings are the controls

7  Facebook enacted to try to give Facebook users

8  control of what information they could share on

9  Facebook?

12:29:46 10          MR. BLUME:  Objection.  Form.

11          THE DEPONENT:  Yeah, I -- I wouldn't say

12  try they always have given people control over

13  their content.

14      Q.   (By Mr. Ko)  Okay.  Collectively is it

12:29:57 15  fair to say that these settings are the control

16  Facebook enacted to give users control of what

17  information they could share on Facebook?

18      A.   Not quite because I won't explain my

19  problem with your -- with your question.  I don't

12:30:15 20  understand it.

21      Q.   Okay.  Well, I'm trying to get to a point

22  where we can come to a common understanding.  So I

23  got -- eliminated the portion that you were

24  uncomfortable when I removed try from my question.

12:30:29 25      Who are the other aspect of my question

112

♠

**CONFIDENTIAL ROUGH DRAFT**

12:30:31 1  that are unclear?

2      A.   Please restate.

3      Q.   Collectively is fair to say that the

4  privacy and app settings are the controls Facebook

12:30:43 5  enacted to give users control of what information

6  they could share on Facebook?

7      A.   No.

8      Q.   What -- what -- what are -- are there any

9  other settings that I'm missing here?

12:30:59 10      A.   The settings don't necessarily, like it's

11  just -- I'm confused over your question.  So like I

12  could go and post hate speech today but I have

13   agreed not to do that.  So that's the SRR.  Not a

14   privacy setting.

12:31:15 15        Q.   Okay.  Can you unpack that a little bit?

16        A.   No.

17        Q.   You can't.  Because you just gave me an

18   explanation so I'm trying to figure out what you

19   mean by that?

12:31:30 20        A.   I'm -- I mean what I said and I even gave

21   an an example.

22        Q.   Okay.  And you said the settings don't

23   control over hate -- hate speech post that you

24   would make and so why -- why is that?

12:31:52 25        A.   Privacy settings are for what you want to

                                                          113

**CONFIDENTIAL ROUGH DRAFT**

12:31:59  1   be visible to people who use Facebook, you know,

2   and then there's -- there's app settings on --

3   depending on the relevant period would apply to

4   what you want to enable to be shared through the

12:32:19  5   Facebook APIs.

6             So that's why your question and I used

7   the hate speech example none of those settings

8   would the exception of some of the ability for us

9   to prevent certain types of content from even being

12:32:36 10   uploaded such as child exploitation kind of content

11   wherever technically possible we try to prevent

12   that con ten a technical or get it down ASAP but

13   those settings don't control the content that I'm

14   publishing they control who can see it.  And where

12:32:56 15   it can flow through the APIs.

16        Q.   Thank you.

17             So with respect to -- let's -- let's go

18   to the app settings.  Is it fair to say that the

19   app settings governed the controls Facebook enacted

12:33:21 20   to try and -- well to give Facebook users control

21   of what information could be shared on Facebook

22   through Facebook APIs?

23        A.   That question doesn't make sense.

24        Q.   You said that the way in which third

12:33:40 25   parties could access information about a -- about a

                                                        114

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

12:33:43  1   Facebook user was through APIs, correct?

2        A.   I did not say that.

3        Q.   Okay.  Well, let me ask it more directly.

4             Facebook APIs were the way or accessing a

12:33:59  5   Facebook API or APIs was the way in which a third

6   party app developer could access information about

7    a Facebook user, correct?

8                MR. BLUME:  Objection.

9                THE DEPONENT:  Does the way the

12:34:21 10    characterizing is just not the way that technically

11    it works.  So for example if I'm a developer of a

12    third party applicants and I want to navigate to

13    John Smith's profile manually I go and see that.

14    That's why I don't want to narrow the developer

12:34:36 15    community can actually always they have human they

16    go to my profile or any profile and see what

17    information is public.  Certain information is

18    always public and then other information is not

19    public but that's because the user has chosen to

12:34:53 20    set their settings in a -- in a -- to only me for

21    example.

22                So developers of course can get

23    information subject to the controls that we have in

24    place through the platform but that -- those --

12:35:08 25    that the data will only be accessible to the APIs

                                                        115

↑

                    **CONFIDENTIAL ROUGH DRAFT**

12:35:13  1    to the extent that users didn't choose to not make

2    their data available for example by opting out of

3    the platform or by -- well, that -- we should end

                4   there.

12:35:28    5        Q.   (By Mr. Ko)  I wasn't trying to

                6   exhaustive in my question.  I apologize if I wasn't

                7   clear unclear one way in which a third party

                8   developer access information on a particular user

                9   is through an API through the Facebook platform or

12:35:44   10   in connection with the Facebook platform, correct?

               11        A.   If the user chooses to share that

               12   information, and make it accessible through the

               13   platform for example by not opting out.

               14        Q.   Yes or no.

12:36:05   15        A.   I answered your question.

               16        Q.   So if the user -- if user choose he to

               17   share the information and make it axes I believe

               18   flow the platform one way in which a third party

               19   developer to access information about that

12:36:17   20   particular user is through an API, correct?

               21        A.   And yes subject to the fact that the

               22   platform has changed and we are on the 13th some

               23   version.  So it's -- it's how -- how it works

               24   depends also on when you are asking me.  So like,

12:36:41   25   you know, the -- the move from version 1 to version

                                                                  116

↑

                        **CONFIDENTIAL ROUGH DRAFT**

12:36:44 1    two there's no longer friend permissions available.

2    So it's all about -- so the friend's settings

3    wouldn't apply, right.

4         Q.   When you said a moment ago, "if the user

12:36:55 5    chooses to share that information."

6              Through what mechanism can that user

7    decide to choose to share that information?

8         A.   Well they choose to create a Facebook

9    account.  Then they choose to decide what they want

12:37:13 10   to fill in and complete.  They choose what they

11   want to share.  They choose who they want to share

12   it with.  They choose whether they want to use

13   the -- the platform application and historically

14   they have chosen whether they want to allow their

12:37:29 15   information to be shared by their friends who

16   install.  There's just a serious of choices it all

17   depends on the choices each individual users makes

18   and then the Facebook product respects those

19   privacy settings.

12:37:46 20        Q.   Back to the information that they choose

21   to share, how do they decide that?

22        A.   I canted speak for the -- each individual

23   user.  I -- I can tell you how I choose to share

24   content.

12:37:58 25        Q.   I -- I understand the confusion.

✦

**CONFIDENTIAL ROUGH DRAFT**

12:38:01  1  Technically speaking with respect to a user's

2  interaction on the Facebook platform is there a

3  tool or a setting that they can select in terming

4  what to share with a third party?

12:38:20  5       MR. BLUME:  And objection to the extent

6  this relates to topic 6 and not the communication

7  but the technology, I would instruct her not to

8  answer you have a witness on that coming.

9       MR. KO:  It's not related to topic six

12:38:36 10  for your gratification.

11       MR. BLUME:  All right.  What topic does

12  it relate to then.

13       MR. KO:  Topic 3 privacy and app

14  settings.

12:38:44 15       MR. BLUME:  You asked about technology.

16  So that's what confused me.

17       Q.  (By Mr. Ko)  Ms. Hendrix, what were the

18  settings that a user could utilize to control the

19  information that they wanted to share?

12:39:02 20       A.  And with who and where?

21       Q.  Let's start with the third-party app

22  developer.

23        Q.   And what the relevant period.

24        Q.   I already instructed unless I specify

12:39:20 25  otherwise I'm talking about the entire time.

                                                                118

↑

                       **CONFIDENTIAL ROUGH DRAFT**

12:39:23  1     A.   Well --

          2          MR. BLUME:  Objection.  Scope.

          3          THE DEPONENT:  From 2007 to 2022 today,

          4     those settings have changed.  So for example,

12:39:36  5     there's not a setting for use to specify which

          6     piece of information you are comfortable that you

          7     have shared with your friends that's visible to

          8     your friends on Facebook that are comfortable

          9     sharing third party applications so apps improve

12:39:53 10     and socialize for example birthday app I might sure

         11     you can set -- I don't care take my birthday to a

         12     third-party app.  That setting is no longer exists

         13     because that's no longer technically possible

         14     through the product.  But also might be comfortable

12:40:12 15     sharing my photos by private photos so might to

         16     nope you share my birthday that I have set to

         17     private.  But you can't share my photos that I have

         18     set to private.

         19          Q.   (By Mr. Ko)  Take a look at the notice

12:40:30 20   again and on page nine of the notice there's a

21   reference to users privacy settings.

22             Do you see that.  That would be paragraph

23   22 is?

24        A.   I see what it says.

12:40:57 25        Q.   Do you agree that a user's privacy

                                                      119

⬆

**CONFIDENTIAL ROUGH DRAFT**

12:40:59 1   settings means the audience selector on the

2   Facebook app that purported to allow Facebook users

3   to control with whom their information was shared?

4        A.   I agree that -- that is what it says.

12:41:16 5   But in the context of audience selector like

6   what -- like -- does that mean to you like per

7   object privacy like what I'm sharing on Facebook

8   and then whether I'm allowing that content to be

9   shared off of Facebook.  Generally this -- this

12:41:36 10  could be generalized into -- into like -- I mean

11  these I think are your words but I hope I'm clear.

12  Like every user has a choice with respect to using

13  the product and then to the extent we offer privacy

14  controls, they can choose whether to use them.

12:41:55 15  Those controls include whether to use the Facebook

16  platform or whether to, for example, opt out so

17  yes, I mean at all times people are controlling

18  their information to the extent they choose to use

19  Facebook.

12:42:19 20     Q.   How would you describe to the Court what

21  your understanding of users privacy settings

22  consist of?

23     A.   I just described how it works and so

24  that's my response.  I mean, going back to the SRR

12:42:33 25  we tell people keep in mind that what you share and

                                                        120

⬆

**CONFIDENTIAL ROUGH DRAFT**

12:42:36  1  make visible to your friends, means that you are at

2  some point in time they could be doing something

3  with that information that you are not aware of

4  that those disclosures have always been in place

12:42:49  5  just to tell people to be careful about the content

6  that they upload to be aware of the settings that

7  they are selecting that's why we have all of the

8  different educational resources on top of the data

9  use policy in the SRR that really -- really help

12:43:05 10  you understand that these decisions you are making

11  have potential consequences but that you ultimately

12  control the audience until you choose to share and

13  choose to share it to everyone or choose to share

              14   it with your friends than technically those people

12:43:22  15   could do something that you don't desire them to

              16   do.

              17         But ultimately the settings is the --

              18   your decisions on the visibility of that content,

              19   including whether you want to enable that content

12:43:39  20   to be used in the context of third party

              21   applications.

              22   Q.   Great.

              23         And that would be both the privacy and

              24   app settings that we were -- that we have been

12:43:50  25   talking about, correct?

                                                                121

⬆

                       **CONFIDENTIAL ROUGH DRAFT**

12:43:52   1   A.   Privacy and app settings are the specific

            2   controls but then the SRR the data use policy the

            3   help senior all of the privacy check-ups and all of

            4   those are also a part -- a part of the overall user

12:44:07   5   experience so that people have that understanding

            6   of the -- of how they choose to use those settings,

            7   so it -- they all interrelate.

            8   Q.   What -- what organization or or

            9   organizations at Facebook were responsible for

12:44:24  10   developing the privacy and app settings?

11        A.    So this would go back to my earlier

12   point.  It's a teams to teams of engineers to build

13   you need product manager to drive legal to advice

14   you need policy to advice you need comms to advice

12:44:41 15   you need platform marketing teams to add anxiety.

16   You need to -- to just ensure that all of these

17   relevant stakeholders are a part of the process and

18   that can -- they are not at the table all the time

19   always together but they all are a part of -- and

12:44:58 20   part -- and the privacy program managers.  The

21   privacy review teams.  Like they are all a part of

22   the teams that understand what it is that we want

23   to build and how it's going to work and how we are

24   going to communicate that and so it's a team of

12:45:14 25   teams.

                                                    122

^

                    **CONFIDENTIAL ROUGH DRAFT**

12:45:15 1        Q.    I understand.  And would expect there to

2    be a lot of organizations and teams that were part

3    of it.

4              So can you identify which teams had the

12:45:25 5    primary responsibility for developing the privacy

6    and app settings?

7                   MR. BLUME:   Objection.

```
          8          THE DEPONENT:  So the platform product

          9   team would be more closely involved in the app

12:45:40 10   setting development and then because setting aside

         11   let's take we didn't have even have a Facebook

         12   platform as I have described it, you know, the

         13   third party applications, if just had Facebook you

         14   had product and engineer tools that have nothing to

12:45:57 15   do with the third party applications or the

         16   Facebook platform.  So there's product teams but

         17   these product teams work on different products and

         18   there's legal teams and within those legal teams

         19   they support and counsel different product teams.

12:46:10 20          Same with comms, same with policy, same

         21   with marketing for example.

         22     Q.   (By Mr. Ko)  So what were the -- I'm

         23   trying to get in this instance I am trying to get a

         24   list -- a finite list if you will of the

12:46:34 25   organizations that were part of developing the
```

123

```
                    **CONFIDENTIAL ROUGH DRAFT**

12:46:38  1   privacy settings so I had heard you to say that

          2   legal engineers, policy, privacy, marketing, those

          3   were -- the teams that were responsible for

          4   developing the settings, correct?
```

12:46:55  5          MR. BLUME:  Objection.  Asked and

       6   answered.

       7          THE DEPONENT:  No, I mean like we have a

       8   privacy program team.  There's content strategy

       9   gist, like it's -- like how you get involved all

12:47:10 10   depends on the nature and scope of what is shipping

      11   and what is -- what is being launched.  So we

      12   launched a fundraiser API at one point in time.

      13   And so maybe the team that works on social good in

      14   helping people really, you know, complement the

12:47:27 15   mission of connecting people and helping people for

      16   example, like using the -- the API to help raise

      17   funds.

      18      Q.   (By Mr. Ko)  Earlier today you were able

      19   to identify organizations that had both -- that had

12:47:48 20   primarily responsibility or -- or were most

      21   important to process of drafting the SRRs and the

      22   DUPs and the platform policies.

      23          Do you recall that?

      24      A.   I do.

12:48:02 25      Q.   I'm going to ask you that same type of

                                                      124

✦

                    **CONFIDENTIAL ROUGH DRAFT**

12:48:04  1   question with respect to the privacy settings and

2    the API settings.

3              Can you identify which Facebook

4    organizations have the primary responsibility for

12:48:17  5    developing the privacy and app settings?

6              MR. BLUME:  Objection.

7              THE DEPONENT:  It would be the same teams

8    that work on -- so we don't pull in an engineer to

9    help write the terms of service but an engineer and

12:48:35 10    product team member will need to be very deep hey

11    involved in understanding how we are describing how

12    things work because they are the ones who are

13    ensuring us that what we say, is consist in the

14    data use policy for example is consist with what

12:48:49 15    they have built.

16              So it is just like nothing can be done in

17    a vacuum and it's -- I wouldn't say that there's

18    ever -- a finite list I always joke around as the

19    person who has been responsible for developing the

12:49:08 20    Facebook platform policies since 2009, I will

21    accept a proposed policy change from a member of

22    the culinary team.  So we don't say you are not

23    included just because there's finite list there's

24    primary people and so that's -- the way -- the way

12:49:27 25    that we work at this company.

**CONFIDENTIAL ROUGH DRAFT**

12:49:30  1      Q.   (By Mr. Ko)  That's helpful I just

2   want -- I want to try listen to my question as

3   closely I was actually asking a yes or no I

4   appreciate the explanation.

12:49:40  5           But it's it sounds like the answer will

6   be no.  But my -- my question was, can you identify

7   which Facebook organizations ever the primary

8   responsibility for developing the privacy and app

9   settings.  Sounds like your answer is no, you

12:49:57 10  cannot; is that fair?

11      A.   No it is not fair.  So if you want me.

12      A.   You finite.

13      Q.   No, I didn't -- let me ask again.

14           Can you identify yes or no, which

12:50:09 15  Facebook organizations have the primary

16  responsibility for developing the privacy and app

17  settings yes or no?

18           MR. BLUME:  Objection.

19           THE DEPONENT:  What do you mean by

12:50:19 20  "developing"?

21      Q.   (By Mr. Ko)  Okay.  You have an

22  understanding of what the term developing means?

23           MR. BLUME:  Objection.

                    24            THE DEPONENT:  Well, yes, but are you

12:50:32 25  saying developing.

                                                                126

⬆

                        **CONFIDENTIAL ROUGH DRAFT**

12:50:33 1      Q.   (By Mr. Ko)  What is?

         2      A.   Developing the route.

         3            MR. BLUME:  Hold.

         4            THE DEPONENT:  With you please not talk

12:50:38 5  over each.  Are you saying in development insofar

         6  as actually developing or writing the code or

         7  developing insofar what the content what is the

         8  text what is the control.  Why do we want the

         9  control should we have the control.  It all depends

12:50:56 10  on what we are talking about.  So we want.

         11      Q.   (By Mr. Ko)  Stop later?

         12      A.   Box it into the a single piece.

         13      Q.   Let's start with the latter?

         14      A.   I don't remember what my latter was.

12:51:06 15      Q.   Your later was developing insofar as the

         16  content what is the text what is the control why

         17  don't we want the control should we have the

         18  control that's what I'm referring to?

         19      A.   That would be our privacy XFN which

12:51:23 20  consist of that that product teams will go or that

21  pull teams in so that's legal.  Privacy program

22  managers.  Policy product counselors.  And then

23  natural you need the product teams because they

24  have a vision for their product and how they want

12:51:44 25  to be used and what they want to build, so it's

127

↑

**CONFIDENTIAL ROUGH DRAFT**

12:51:49 1  very collaborative.

2       Q.   And with respect to the aspect of

3  development as it relates to engineers can you

4  answer the question of what teams or organizations

12:52:07 5  at Facebook have the primary responsibility for

6  developing the privacy and app settings?

7            MR. BLUME:  Objection.  Beyond the scope

8  for designated topics.

9            THE DEPONENT:  It all depends.  So for

12:52:20 10  example, a research team member might conduct a

11  small study and the focus group to make sure people

12  understand these settings they they might improve

13  improved upon or that we should do things such as,

14  maybe I think Pratiti when I spoke with her it was

12:52:42 15  the research team like some researchers embedded in

16  product teams there's a research teams as well it

17  was -- an individual research team that was the

```
          18  catalyst for the development of the privacy checkup

          19  tool.

12:52:55  20          So again it all depends on who proposing

          21  going annoying culinary comment.

          22      Q.   (By Mr. Ko)  So there was a research team

          23  that had its hand in the development of privacy and

          24  app settings; is that accurate?

12:53:11  25          MR. BLUME:  Objection.
```

                                                              128

↑

                        **CONFIDENTIAL ROUGH DRAFT**

```
12:53:17   1          THE DEPONENT:  It is accurate to say that

           2  we rely on internal research employees to help us

           3  ensure that we are that people understand our terms

           4  and the products including the settings.

12:53:33   5      Q.   (By Mr. Ko)  So this research team as you

           6  indicated conducted stud it is, correct?

           7          MR. BLUME:  Objection.

           8          THE DEPONENT:  So there are researchers

           9  at Facebook and the -- where they -- and who they

12:53:47  10  report into is different the way that -- that that

          11  works, so.

          12      Q.   (By Mr. Ko)  I'm not asking who they

          13  report to I just simple asked this research team

          14  conducted stud it is; is that correct?
```

12:54:00 15          MR. BLUME:  If it doesn't involve

16   reporting lines than beyond the scope.

17          MR. KO:  Mr. Blume topic three overview

18   for process of privacy through app settings.

19          Okay stop with those objections.

12:54:20 20     Q.  (By Mr. Ko)  Ask you again Ms. Hendrix

21   this research team conducted stud it is; is that

22   correct?

23     A.  Well, I don't know which research team

24   you are talking about.  Like.

12:54:29 25     Q.  I'm talking?

                                                   129

⬆

              **CONFIDENTIAL ROUGH DRAFT**

12:54:30  1     A.  I'm trying.

2          MR. BLUME:  Let her finish please.

3          THE DEPONENT:  I'm trying to tell you

4   that like the research -- researchers at our

12:54:37  5   company and I can -- I -- are some of are on like a

6   team and some are embedded win our team so a

7   product manager might say hey I have an idea for

8   updating a -- an app setting or -- Aaron reports

9   privacy setting.  And so could you help me conduct

12:54:57 10   research into whether or not and how we could and

11   might develop this setting if it's new or ensure

```
        12  that the setting is understood.  So that's speaking

        13  to or, you know, just different teams, like -- a

        14  college could have an experience and say hey we

12:55:21 15  might want to improve or this or something.

        16  Everybody can have ideas.

        17      Q.   (By Mr. Ko)  I'm looking at the

        18  transcript and at 12:52 you gave me an example, in

        19  response to your confusion over the word

12:55:35 20  development.

        21           You gave me an example of what certain

        22  groups and teams did at Facebook and one example

        23  you gave was that quote a research teem member

        24  might conduct a small study and the focus group to

12:55:51 25  make sure people understand these settings that
```
                                                        130

✦

                        **CONFIDENTIAL ROUGH DRAFT**

```
12:55:54  1  might improve or be improved upon ."

         2           With respect to that example and no other

         3  example, are you talking about the settings when

         4  you refer to the settings you are talking about the

12:56:10  5  privacy and app settings, correct?

         6      A.   In my example I was talking about the

         7  privacy checkup tool.

         8      Q.   Okay.  So in connection with the privacy
```

          9  checkup tool.  Facebook did research and conducted

12:56:29 10  the studies, correct?

          11          MR. BLUME:  Objection.

          12          THE DEPONENT:  I know that from my

          13  conversation with Pratiti that there was research

          14  into -- well now I would have to look at my notes

12:56:51 15  if that's okay.

          16     Q.   (By Mr. Ko)  Yeah.  Please -- please do

          17  so.  Again this bass a yes-or-no question.  You

          18  gave an example I'm just trying to clarify and

          19  understand your response.

12:57:07 20     A.   I don't agree with you that it was a yes

          21  or no but that doesn't really matter.

          22          So I just want to see if I have that.

          23          MR. BLUME:  Can you ask the question

          24  again Dave just so we are -- so the record is

12:57:35 25  clear.

                                                      131

 ⬆

                    **CONFIDENTIAL ROUGH DRAFT**

12:57:36  1          MR. KO:  Yeah but I will want to wait

           2  until she reviews what she needs to review so I

           3  don't have to ask it again.

           4          MR. BLUME:  Fair enough.

12:57:45  5          THE DEPONENT:  Okay I think I find the

            6   example I did find the example that I was referring

            7   to.

            8        Q.   (By Mr. Ko)  This is a yes-or-no question

            9   do you understand that?

12:57:54 10        A.   I don't -- I don't remember your

           11   question.  This we need to precise here so if you

           12   could repeat it.

           13        Q.   I'm about to ask a yes-or-no question.

           14   Okay?

12:58:05 15        A.   You can think it is and I can disagree

           16   with it but go ahead.

           17        Q.   Yes or no, when you were describing

           18   research studies that Facebook did were they in

           19   connects with Facebook's privacy or app settings?

12:58:22 20             MR. BLUME:  Objection.

           21             THE DEPONENT:  It was related to.  But,

           22   again, from my notes here, if helpful, because it's

           23   on the topic that I think you are asking, which is

           24   researchers will generally doing a study to test

12:58:40 25   any change a consent flow or study flow so yes

                                                                132

  ⬆

                        **CONFIDENTIAL ROUGH DRAFT**

12:58:44  1   researchers are involved.

            2        Q.   (By Mr. Ko)  Yes researchers are involved

3   to the extent well researchers are involved and

4   they conduct studies in connection with the privacy

12:58:55  5   and app settings, correct?

6          MR. BLUME:  Objection for that example.

7          THE DEPONENT:  They can be it all depends

8   on the nature and scope of the change I'm not

9   testifying -- involved in every single settings

12:59:08 10   change or text or wording.  It's where appropriate

11   and depending on the catalyst for like because

12   again product team members will pull in researchers

13   decide they want to conduct research on their own

14   initiative.  But there are times when researchers

12:59:23 15   are pulled in to review app and conduct studies

16   into app settings and privacy settings, yes.

17      Q.   (By Mr. Ko)  And Ms. Hendrix, this is

18   just, you know, you don't have take my advice for

19   you answer -- answer would like to answer.

12:59:39 20          This go a loose faster answer a yes or no

21   and you free to say no, you can say no?

22          MR. BLUME:  She --

23          MR. KO:  That's --

24          MR. BLUME:  She clarify.

12:59:48 25          MR. KO:  Let me finish let me finish

                                                        133

**CONFIDENTIAL ROUGH DRAFT**

12:59:50  1  Mr. Blume if your answer is no.  That's fine.  But

2  I'm just making a suggest to speed things up for

3  both of us.  Otherwise we are going to be very I

4  hope this wasn't teak the long.  But if you would

01:00:04  5  like to keep not answering yes or no questions.

6            MR. BLUME:  Okay.

7            MR. KO:  With yes or no either yes or no

8  you are free to do but I'm just making a suggestion

9  with that 1:00 o'clock I promised there --

01:00:17  10           MR. BLUME:  I will make.

11           MR. KO:  Go ahead.

12           MR. BLUME:  Can make a suggestion the

13  fact is your questions are unclear and vague and

14  ambiguous these clarifying to record to make it

01:00:25  15  accurate it's not yes or no the way you want she's

16  made that clear.  So I suggest my suggestion is if

17  you are question become more precise than perhaps

18  yes or no maybe appropriate -- is what causing her

19  to happen what the answers are.

01:00:41  20           MR. KO:  I don't know how to get precise

21  than using the answers that provide Ms. Hendrix.

22  But it is 1:00 o'clock we should break for lunch as

23  I promised we would.

24           THE VIDEOGRAPHER:  Okay.  We are off the

01:00:54 25  record it's 1:00 o'clock p.m.

                                                    134

↑

                    **CONFIDENTIAL ROUGH DRAFT**

01:00:56  1          (Recess taken.)

          2          THE VIDEOGRAPHER:  All right.  Everybody

          3  we are back on the record it's 2:07 p.m.

          4      Q.   (By Mr. Ko)  Ms. Hendrix, there was a

02:07:14  5  research org or team at Facebook, correct?

          6      A.   There are people -- research teams and

          7  researchers on embedded within different product

          8  teams at Facebook.

          9      Q.   And research teams and researchers

02:07:33 10  conducted studies, correct?

         11          MR. BLUME:  Objection.

         12          THE DEPONENT:  Yes, the researchers

         13  conduct studies.

         14      Q.   (By Mr. Ko)  Are you familiar with the

02:07:48 15  term UX or user experience?

         16      A.   Yes.

         17      Q.   These research team and researchers

         18  conducted studies in compensation with either the

         19  UX teem or the user experience in general; is that

02:08:05 20  fair to say?

         21          MR. BLUME:  I'm sorry.  What topic are we

22  on?

23          MR. KO:  Topic 3B Rob.

24      Q.   (By Mr. Ko)  More importantly I'm

02:08:25 25  following on questions and more importantly and

                                                    135

⬆

              **CONFIDENTIAL ROUGH DRAFT**

02:08:27  1  answers that Ms. Hendrix gave with respect to

       2  research that was done at Facebook.

       3      Q.   So let me again Ms. Hendrix were studies

       4  by the user experience by the research teams and/or

02:08:45  5  researchers?

       6          MR. BLUME:  Objection.

       7          THE DEPONENT:  What do you mean by the

       8  user experience?

       9      Q.   (By Mr. Ko)  I asked a moment ago whether

02:08:57 10  or not you are familiar with term UX or user

      11  experience, right?

      12      A.   I am I just am you are familiar with my

      13  understanding.

      14      Q.   What is your understanding of the term UX

02:09:14 15  or user experience?

      16      A.   So it's generally a term that we have

      17  used to describe a person and their experience

      18  interacting with our services.

```
        19      Q.   Were study done by the research team or
02:09:30 20   researchers at Facebook in connection with a user
        21   or person's experience interacting with Facebook
        22   services?
        23           MR. BLUME:  Objection.  Time frame.
        24           THE DEPONENT:  From the relevant period
02:09:50 25   to today, there are researchers that conduct into
```

                                                            136

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

```
02:09:57  1   users experiences using our services.
         2      Q.   (By Mr. Ko)  And in connection with that
         3   research is fair to say that certain studies were
         4   done?
02:10:11  5      A.   Well, that's what I just said.
         6      Q.   Okay.  And these studies I believe you
         7   had received to earlier this afternoon focus
         8   groups.
         9           Do you remember that?
02:10:27 10      A.   There are certain research conducted
        11   where the teams will like depending on the research
        12   they might use a focus group.
        13      Q.   So some instances over the relevant time
        14   period there were studies done that -- by the
02:10:49 15   research team or researchers at Facebook in which
```

16   they conducted or used or used a focus group in

17   connection with that study is that fair to say?

18            MR. BLUME:  Objection.  You just asked

19   that and she just answered that.

02:11:07 20   Q.  (By Mr. Ko)  You can answer.

21   A.   Yes.

22       Q.   Is it also fair to say that studies were

23   done in connection with the user experience as it

24   relates to privacy and app setting that a user to

02:11:24 25   utilize?

137

⬆

**CONFIDENTIAL ROUGH DRAFT**

02:11:26  1   A.   Yes.

2       Q.   Thank you.

3            Before lunch I believe you had referred

4   to the privacy checkup tool.

02:11:42  5            Do you recall that?

6       A.   I do.

7       Q.   What is the privacy checkup tool?

8       A.   It is an educational type of resource

9   tool used to ensure that people are oh wear of and

02:12:05 10   remind of their -- like and encourage them to check

11   the settings because if you join in Facebook in one

12   year you might get to older and change your

13  settings so it's the ability to check in people and

14  remind them of the settings that they have and give

02:12:23 15  them an opportunity to make any changes.  They

16  always have that but that's -- the motivator.

17       Q.   By settings you are referring to the

18  privacy and app settings, correct?

19       A.   Right.  The privacy and app settings.

02:12:42 20       Q.   Do you recall when the privacy checkup

21  tool was rolled out?

22       A.   I -- I will to check that in my notes.  I

23  think I have this your notes.

24       Q.   While you check your notes.  Let me see

02:12:59 25  if this date rings a bell to you is it?

                                                138

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

02:13:02 1       A.   It's May 2014.

2       Q.   Okay.  Great.

3            So the privacy checkup tool was rolled

4  out by Facebook in May of 2014, correct?

02:13:17 5            MR. BLUME:  Objection.  Asked and

6  answered.

7       Q.   (By Mr. Ko)  Was there any aspect of the

8  privacy checkup tool that disclosed to the user

9  what third-party app developers could see or obtain

02:13:32 10   about a user?

11        A.   I know that it let's people know what

12   apps they have and is educating on them to see if

13   they want them to still uninstall those apps or

14   keep the apps.  The specifics I don't remember

02:13:52 15   sitting here right now.

16        Q.   Do you recall any part of the privacy

17   checkup tool, which related to any disclosure by

18   Facebook whatsoever about what third-party app

19   developers could obtain from a particular user?

02:14:21 20            MR. BLUME:  Objection.

21            THE DEPONENT:  I'm not sure how granular

22   it got.  But it's like at a -- up level our

23   practice is to point people and to different

24   settings pages and stuff within the context of

02:14:46 25   these tools that we have, but I don't remember

                                                     139

♠

                    **CONFIDENTIAL ROUGH DRAFT**

02:14:51 1   specifically the details for how it is evolved.

2        Q.   (By Mr. Ko)  And is the privacy checkup

3   tool when you say that it -- that it you believe

4   that it pointed users to different settings pages;

02:15:10 5   semiannually is your testimony that the privacy

6   checkup tool referred to and pointed to users

7   towards specifically the privacy and app settings?

8          A.   I said that I don't remember, but I would

9   be surprised if in fact it did not.  It told them

02:15:26 10  the scope of the information that they had shared

11   and the apps that -- that -- that they had

12   installed.

13              But I don't remember specifically.  Again

14   I would be incredibly shocked given the way that we

02:15:41 15  have all these links to the different places people

16   can go to learn more if it did not, but that's all

17   that I can remember sitting here today.

18          Q.   Do you recall whether or not there was a

19   reference in the privacy checkup tool to the SRRs?

02:16:03 20             MR. BLUME:  Objection.

21              THE DEPONENT:  I don't recall.

22          Q.   (By Mr. Ko)  Do you recall there was a

23   difference or reference in the privacy checkup tool

24   to the DUP?

02:16:14 25             MR. BLUME:  Objection.

                                                      140

❖

                  **CONFIDENTIAL ROUGH DRAFT**

02:16:17  1             THE DEPONENT:  I don't recall.

2          Q.   (By Mr. Ko)  With regard to the privacy?

3          A.   But there's links to overall.

4       Q.   With respect to the privacy checkup tool

02:16:29 5   that was enacted rolled out at Facebook in May of

6       2014, is that tool still available to you?

7       A.   Yes.

8       Q.   And that tool has been I assume available

9       to all Facebook users from maybe of 2014 to

02:16:45 10  present, correct?

11      A.   I don't know that to be true I imagine it

12      would have rolled out in waves but I'm not sure.

13      Q.   Well, what do you mean when it was rolled

14      out in waves?

02:17:05 15  A.   Consist with other practices, we don't

16      just turn all users live.  There's times where you

17      will maintain the current experience and then ship

18      any user experience changes we want to make and

19      then additional testing of how those changes that

02:17:28 20  we decided to make are -- are being utilized and

21      received, so the -- the research doesn't begin and

22      end at the initial launch.  The -- the teams would

23      be monitoring the user experience to see if we

24      should roll out more broadly or before rolling out

02:17:49 25  more broadly make any adjustments based on the

141

**CONFIDENTIAL ROUGH DRAFT**

02:17:53 1   initial wave.  Some things are roll out all at

2   once.  But some things are rolled out in waves for

3   like localization purposes.

4         Q.   And with respect to the teams that would

02:18:11 5   be monitoring the user experience, what teams would

6   those be?

7              MR. BLUME:  Objection.

8              THE DEPONENT:  Likely, the -- largely the

9   product and engineering leader and potential

02:18:34 10  research teams it all depends on what change we are

11  making would factor in who would be paying most

12  attention but largely it would be the product and

13  where applicable research related teams.

14        Q.   (By Mr. Ko)  When you said it was consist

02:19:01 15  with other practices at Facebook to roll certain

16  products or programs out in waves, could you

17  characterize for the Court, to what extent it was

18  the general practice of Facebook to roll certain

19  programs out relative to as you said rolling things

02:19:26 20  out all at once?

21             MR. BLUME:  Objection.

22             THE DEPONENT:  What is copy of over

23  question.

24        Q.   (By Mr. Ko)  I'm just trying to get an

02:19:43 25  understanding and unpack your response.  When I

142

✦

**CONFIDENTIAL ROUGH DRAFT**

02:19:45  1   asked about the privacy -- the privacy checkup tool

2   being rolled out in May of 2014, you said that it

3   was likely that it was rolled out in waves,

4   correct?

02:19:56  5        A.   I -- I mean to say it could have been.

6   It could have also been rolled out all at once.

7        Q.   So then since you don't know exactly what

8   happened with respect to the privacy checkup tool,

9   but you did say it was consist with other practices

02:20:11 10   at Facebook to roll things out in waves, correct?

11        A.   So we announced the fact of the privacy

12   checkup in May.  It starts rolling out in August so

13   just to be clearer on that point.  I'm sorry.

14             I don't know if it was rolled out

02:20:29 15   specifically in waves.

16        Q.   And let's set aside you made it clear you

17   don't recall specifically what happened with

18   respect to the privacy checkup tool.  I'm not

19   focusing on the processor of your response in which

02:20:45 20   you said it was consist with other practices to

21   roll things out in waves.

22             Do you recall that testimony yes or no?

23      A.   Yes, I recall having said that.

24      Q.   And you also said and provided testimony

02:21:01 25  that sometimes Facebook rolled things out all at

143

⬆

**CONFIDENTIAL ROUGH DRAFT**

02:21:05  1  once, correct?

2           MR. BLUME:  Some objection.

3           THE DEPONENT:  Correct.

4      Q.   Can you give me an understanding if you

02:21:18  5  know it's fine if you don't if you know to what

6  extent it was the general practice of Facebook to

7  roll things out in waves or whether it was a

8  general practice of Facebook to roll things out all

9  at once?

02:21:29 10          MR. BLUME:  Objection.  Form.

11          THE DEPONENT:  It all depends on what is

12  being launched if it's like a text change it will

13  be translated for the fact it's a global company so

14  we need to make sure the language is the right

02:21:44 15  language and that can take sometime.  We also need

16  to test features.  We want the experience to be

17  uniform across the global user experience.  But we

18  also need to know whether what we've decided to

19  test because we -- we don't always want to proceed

02:22:00 20   with something.  So we'll test in a given region

21   see how it's performing and decide whether to open

22   it up more broadly.

23          Q.   (By Mr. Ko)  So it's fair to say then

24   there wasn't one general practice with respect to

02:22:20 25   following certain programs out.  I hear you to say

                                                            144

↑

                    **CONFIDENTIAL ROUGH DRAFT**

02:22:23 1   that sometimes it was rolled out in waves and

2   sometimes it was rolled at once.  It just depends

3   is -- is that correct?

4            In other words there was no predominant

02:22:34 5   practice as -- as to those two methods in rolling

6   out a certain product, correct?

7          A.   So to take a step back the teams that are

8   involved in the development or revisions to

9   features opportunities terms documents they will

02:22:51 10   collaborate on the launch plan.  We have go to

11   market plans.  And everyone will and line on what

12   is the right approach for the given thing that is

13   being updated and tested for example.  So it's --

14   there's a process by which we make those decisions.

02:23:15 15          Q.   Was there a predominant practice as to

16   how Facebook rolled certain parameters out?

17          MR. BLUME:  Objection.  Form.

18          THE DEPONENT:  It all depends like I

19     said.  So I have described the way that we approach

02:23:28 20     it.  It's the process of the teams that are all

21     involved.  In, you know, the announcement of the

22     launch using privacy checkup as an example there

23     will have been the teams that I referred to earlier

24     that will and line on -- on the content of that

02:23:45 25     announcement and those similar teams will align on

                                                      145

&uarr;

**CONFIDENTIAL ROUGH DRAFT**

02:23:48  1     the timing for launching.  Those things.  So it all

2     just again depends on which team is launching what

3     thing.

4          Q.   (By Mr. Ko)  So based on your response is

02:23:59  5     it fair so and would you agree with me that there

6     was not a predominant practice as to how Facebook

7     rolled certain programs out?

8          A.   No.

9          Q.   Okay.  Which is because you are saying

02:24:12 10     that -- you claim that it all depends, right and

11     certain circumstances there -- there are situations

12     in which Facebook rolled things out in waves and in

13     certain circumstances there are situations in which

14  Facebook rolled things out all once.  Did I

02:24:30 15  understand your testimony correctly?

16      A.   I believe that's what I said.  But like

17  for example, using the SRR and the data use policy,

18  you know, that's not an example of a wave that we

19  would do.  It just all depends.

02:24:53 20      Q.   Are you familiar --

21      A.   There's always a process.

22      Q.   Are you familiar with privacy short cuts?

23      A.   Yes, I am.

24      Q.   What -- what is privacy short cuts?

02:25:14 25      A.   So that was launched in December of 2012

146

⬆

**CONFIDENTIAL ROUGH DRAFT**

02:25:16 1  and it complements the privacy tour that users new

2  users go through in their -- in the user sign up

3  flow.  And it -- it's right -- it's -- it's next to

4  the home button but it's just an ability to

02:25:41 5  complement that privacy tour and provide with more

6  information on the privacy settings.

7      Q.   I'm sorry you said tour as in, TOUR?

8      A.   Yes.  We have a privacy tour for new

9  users.

02:25:57 10      Q.   Okay.  In connection with the privacy

11   tour and specifically with respect to the privacy

12   short cuts, do you recall whether there was any

13   reference or disclosure to the SRR?

14        A.   I don't remember sitting here right now.

02:26:25 15        Q.   Do you recall whether or not there was

16   any reference or disclosure in the privacy short

17   cuts that referred the user to the DUP?

18        A.   I don't remember.

19        Q.   Are the privacy short cuts so you said

02:26:50 20   they were rolled out in Facebook in December of

21   2012, right?

22        A.   Yes, I said that.

23        Q.   Are they still in existence today?

24        A.   Yes, I -- yes they are.

02:27:13 25        Q.   I believe it or not I have an exhibit for

147

↑

**CONFIDENTIAL ROUGH DRAFT**

02:27:15  1   you.  We are going to put on a platform a copy of

2   what will be marked as exhibit 331.

3             (Exhibit 331 was marked for

4   identification by the court reporter and is

02:27:21  5   attached hereto.)

6             MR. KO:  Just give it a moment and while

7   it magically arrives in your platform.  The -- I

          8  will note for the report that tab J is a

          9  Bates-stamped FB-CA-MDL-00,005,751st.

02:28:16 10       Q.   (By Mr. Ko)  Let me know when you have a

         11  copy of that?

         12       A.   I have it.

         13       Q.   Okay.  Does this document look familiar

         14  to you at all Ms. Hendrix?

02:28:47 15       A.   Yeah, I think I have seen this before

         16  not -- yes, it looks familiar.

         17       Q.   And by the way just for your benefit, you

         18  can see portions of this exhibit that is -- that is

         19  being screen shared as well, but it sounds like --

02:29:04 20  or it looks like you have a good handling on

         21  looking at the document directly, so whatever you

         22  choice.

         23            So there's a reference in this document

         24  and I'm looking at the second page the privacy

02:29:19 25  short cuts.

                                                          148

  ⬆

                       **CONFIDENTIAL ROUGH DRAFT**

02:29:19  1            Do you see that?

          2       A.   I am there.

          3       Q.   Is fair to say given the description and

          4  take a moment to read if you need is fair to say

02:29:35  5   that the privacy short cuts were designed to help

6   users get quicker access to Alaska seeing their

7   privacy settings and controls?

8        A.   What did you say I am so sorry I was

9   reading.

02:29:53  10        Q.   Is fair to say that the privacy short

11   cuts to help users to get quicker access to seeing

12   their privacy settings and controls?

13        A.   I don't know if quick -- maybe quicker is

14   fair.  It's just making -- it's just having that

02:30:13  15   short cut right next to the home button.  So it

16   makes it like prominent every where they go.

17        Q.   Let's do it that way because to you know

18   a short cut would mean quicker.  But let's just use

19   your example as a short cut.

02:30:36  20        So is it fair to say that the privacy

21   short cuts were designed to help users access a

22   short cut to see their privacy settings and

23   controls?

24        A.   I'm just struggling.  So I don't know if

02:31:12  25   so some of their controls I guess.

                                                        149

↟

**CONFIDENTIAL ROUGH DRAFT**

02:31:16  1        Q.   Yeah, some of the controls I believe well

2   if you look at exhibit 331, there's a reference to

3   this post made by Sam Lessin who I assume you know.

4   But Sam Lessin describes in this post under privacy

02:31:31 5   short cuts that there is a way in which to access

6   key settings from the privacy short cut, correct?

7         A.   Where -- where does he say.

8         Q.   I'm looking at the third sentence that

9   begins now?

02:31:59 10        A.   Yes, it says now to tee settings go to

11   the tool who can contact me et cetera.

12        Q.   And so the privacy short cuts were

13   designed to help users access key settings from the

14   privacy short cut tool bar, correct?

02:32:28 15        A.   It's designed to improve a person's

16   access to their privacy settings and controls.

17        Q.   And do you have any understanding -- and

18   when Mr. Lessin describes in this post that there

19   are certain key settings that a user can access, do

02:32:59 20   you have an understanding of what key settings

21   those are?

22        A.   It would be the settings around who can

23   see my stuff, who can contact me and how do I stop

24   someone from bothering me.

02:33:19 25        Q.   And there's an example of that down below

150

**CONFIDENTIAL ROUGH DRAFT**

02:33:21  1  I know it's a little fuzzy do you see that many a

2  example which believe is the snapshot of the

3  privacy short cut tool and the three things you

4  just described?

02:33:32  5      A.   Yes, I see this.

6      Q.   So according to this post those were the

7  key settings that a user could access from the

8  privacy short cut tool, correct?

9           MR. BLUME:  Objection.  Asked and

02:33:42 10  answered.

11           THE DEPONENT:  Well, they can access them

12  from many other places.  This was just like an

13  improvement to the -- it -- it was a short cut, if

14  you will.  Huh of what's happening.

02:34:01 15           MR. KO:  Nothing has happened for me I

16  don't know if something has happened for you.

17           THE DEPONENT:  We have a menu that popped

18  up on could

19           MR. BLUME:  Keep going.

02:34:11 20           THE DEPONENT:  You can keep going.  Thank

21  you.

22      Q.   (By Mr. Ko)  Now you say it was an

23  improvement what do you mean by that?

24      A.   Well, it was a short cut.  So it's --

02:34:29 25  like users had the ability to access their controls

151

⬆

**CONFIDENTIAL ROUGH DRAFT**

02:34:33  1  via multiple interfaces but this put the privacy

2  short cut on essentially every page on their

3  Facebook experience, so it -- it's an improvement

4  in the sense that it's right there instead of

02:34:49  5  having to navigate to the setting in another

6  method.  This is just -- that's what I mean it's an

7  improvement.

8      Q.   Because before the user had to navigate

9  through a separate set of pages to access this set

02:35:05 10  of controls, correct?

11      A.   I -- you said pages but.

12      Q.   Let me ask it this way.  The post says at

13  the first sentence underneath privacy short cuts

14  "up until now if you wanted to change your privacy

02:35:28 15  and timeline controls on Facebook, you would need

16  to stop what you are going and navigate through a

17  separate set of pages"?

18      A.   Okay, yes, it says that.

19      Q.   Today we are announcing new short cuts

02:35:42 20  you can easily get to.  Now for key settings, you

```
        21   just go to the tool bar to help manage "who can see

        22   my stuff" "who contact me" and "how do I stop

        23   someone from bothering me" you can also access help

        24   center content from these short cuts.

02:36:06 25            Did I read that correctly?
```

152

⬆

                         **CONFIDENTIAL ROUGH DRAFT**

```
02:36:07  1   A.   Yes.

          2   Q.   So the privacy short cuts were and

          3   correct me if I'm wrong, is fair to say that the

          4   privacy short cuts were designed to improve the way

02:36:20  5   in which users could access key privacy settings;

          6   is that fair to say?

          7   A.   I mean I did use the word improve but it

          8   also complements the existing resources that they

          9   already had.

02:36:41 10   Q.   So yes or no you can -- you can no if you

         11   would like that's totally fine.

         12            Yes or no is it fair to say that the

         13   privacy short cuts were design to improve the way

         14   in which users could access key privacy settings?

02:36:55 15            MR. BLUME:  Objection.

         16            THE DEPONENT:  I mean I feel like we

         17   just -- like I -- I do view as an improvement to
```

18   what was already -- it wasn't a change in the -- in

19   the controls that they had.  But it was just

02:37:24 20   intended to be a -- a short cut on the Facebook

21   site to help people further navigate to the

22   controls that they had.

23        Q.   (By Mr. Ko)  Would that be a yes in

24   response to my question objection you are

02:37:44 25   characterizing it and she's explaining?

                                                        153

↑

                    **CONFIDENTIAL ROUGH DRAFT**

02:37:48  1        MR. KO:  So.

2        MR. BLUME:  That's why I objection.

3        MR. KO:  Yes or no, is it fair to say

4   that the privacy short cuts were designed to

02:37:54  5   improve the way in which use access key privacy

6   settings.

7        MR. BLUME:  Objection she said she saw it

8   as an improvement.  Asked and answered.

9        THE DEPONENT:  I view it as an

02:38:10 10   improvement to --

11        Q.   (By Mr. Ko)  Thank you?

12        A.   But not as an improvement to -- to the

13   controls themselves.  But now you can actually get

14   there with that on every page that shows up on the

02:38:22 15   interface.

16      Q.   Are there any studies or research done in

17   connection with this change?

18           MR. BLUME:  Objection.

19           THE DEPONENT:  I don't remember.

02:38:43 20      Q.   (By Mr. Ko)  One of the settings that you

21   can access on this drop down in the privacy short

22   cuts is a -- at the very top of the privacy short

23   cuts a reference to quote who can see my stuff end

24   quote.

02:38:56 25           Do you see that?

                                                    154

↟

                    **CONFIDENTIAL ROUGH DRAFT**

02:39:01 1      A.   Yes.

2      Q.   Do you know whether the drop down

3   revealed -- well first of all, there is a drop down

4   based on that specific button, correct?

02:39:14 5           MR. BLUME:  Objection.  It's getting so

6   far beyond topic 3 that.

7           MR. KO:  That's incredibly that you say

8   that Mr. Blume but your objection is noted.

9           MR. BLUME:  Thank you.  Incredible it has

02:39:28 10   nothing to do use users privacy or apps settings

11   this is a technological change.  So it goes beyond

12   topic 3.  It's incredible.

13          MR. KO:  So the record is clear and I

14   want to make sure.

02:39:41 15     Q.   (By Mr. Ko)  So Ms. Hendrix you are here

16   to testify as to the process of developing privacy

17   or app settings or other controls made available to

18   users to prevent or limit their data or information

19   from being accessed?

02:39:56 20          MR. BLUME:  And.

21          MR. KO:  Hold on.

22          MR. BLUME:  Technology.

23          MR. BLUME:  Well no it's a legal

24   question.  This technology doesn't go to any of

02:40:03 25   those points David.  You have to understand it to

                                                      155

✦

                  **CONFIDENTIAL ROUGH DRAFT**

02:40:06  1   ask.  But it doesn't -- what you just described is

2   not what we are talking about so it's way beyond

3   what you just described as the topic.

4          MR. KO:  You can make an objection.

02:40:21  5          MR. BLUME:  It's beyond the scope.

6          MR. KO:  Do you have an objection.

7          MR. BLUME:  It's beyond the scope.

8     Q.   (By Mr. Ko)  Ms. Hendrix you are here to

```
            9  testify as to the process?

02:40:33  10      A.   Let me SDK again.  Ms. Hendrix consist

           11  with topic 3, you are here to testify as to the

           12  processes of developing or privacy or app settings

           13  or other controls made available to users to

           14  prevent or limit their data or information from

02:40:50  15  being accessed by third parties; is that correct.

           16      A.   Yes, but the privacy short cuts is not a

           17  control and it's not an app or a privacy settings.

           18           MR. BLUME:  Exactly.

           19  BY MR. KO:

02:41:06  20      Q.   (By Mr. Ko)  Great well this is very

           21  helpful because my next question was you have

           22  referred throughout this day about educational --

           23  certain educational materials that you believe were

           24  made available to users to help them control the

02:41:19  25  information that they make available.
```

                                                              156

↟

                        **CONFIDENTIAL ROUGH DRAFT**

```
02:41:22   1           Do you recall that testimony?

            2           MR. BLUME:  Objection.  That's not her

            3  testimony.

            4           THE DEPONENT:  I -- I refer to

02:41:34   5  educational resources are just additional
```

6    information and attempts to have people understand

7    the controls that we provide.

8        Q.    (By Mr. Ko)  And I believe one example

9    this is a how the privacy checkup tool came back

02:41:52 10    the privacy CHECK/CHECK up tool of the educational

11    resources Facebook provided, correct?

12        A.    Right it's an educational resource that

13    tells people, you know, what current settings and

14    Ed indicate on the change their settings their

02:42:08 15    controls that they can do so.

16        Q.    Would you characterize these privacy

17    short cuts to be under the same umbrella as or

18    under the same umbrella of educational resources

19    that you put the privacy checkup tool under?

02:42:26 20        A.    These are -- those are different things

21    but it's all designed to just future explain the

22    controls and the settings that we have built.  Like

23    there's multiple ways that if a user wants to

24    understand they can go to the controls themselves

02:42:44 25    and see what they have set.  But these are

157

⬆

**CONFIDENTIAL ROUGH DRAFT**

02:42:47  1    additional measures that we continue to evolve and

2    undertake in order to future educate and remind

 3   people about decisions that they have made.  Some

 4   people have set up their Facebook accounts 18 plus

02:43:00  5   years ago.

 6          So I wouldn't call them controls versus

 7   educational resources reminding them of controls.

 8      Q.   And that was very much you educational re

 9   ours only.  One example of a educational resource I

02:43:17 10   gave privacy checkup tool my question whether or

11   not you believe the privacy short cut tool is also

12   a educational resource?

13      A.   It is a -- it is a franchisee within the

14   Facebook experience that if you click on it, you

02:43:51 15   can -- and then go to that tool bar and get access

16   to those things that you already read. so I will

17   spare us and just helped point you to the decisions

18   that you made or for example the last sentence the

19   help center, so that you can -- if you have more

02:44:15 20   questions you can go to the help center as well.

21      Q.   So is the privacy short cuts tool yes or

22   no an example have of an educational resource that

23   you were describing earlier today?

24          MR. BLUME:  Objection.  Asked and

02:44:34 25   answered.

                                                    158

**CONFIDENTIAL ROUGH DRAFT**

02:44:40 1          THE DEPONENT:  It is a short cut to

2    resources that are available.

3          Q.   (By Mr. Ko)  So do you view it as part of

4    the -- so you -- you were the one who testified as

02:44:47 5    to educational resources, correct?

6          MR. BLUME:  Objection.  Asked and

7    answered.

8          THE DEPONENT:  I -- I did say -- say

9    that.

02:44:58 10         Q.   (By Mr. Ko)  So I ever a very simple

11   question.

12         Do you believe when you are talking about

13   educational resources is the privacy short cut

14   tools part of the educational resources you had in

02:45:11 15   mind or is it not a part of the educational

16   resources that you had testified to earlier?

17         A.   I view of it as being a part of in the

18   sense it provides the a short cut to the actual

19   resources to it would be under the umbrella of what

02:45:31 20   the features and functionalities that we offer to

21   help further education and/or remind people of the

22   actual settings and control that we have in place.

23         Q.   Okay.  We can put -- we can move on from

24   this exhibit.

02:45:56 25          Now in connection with the materials that

                                                        159

↟

                    **CONFIDENTIAL ROUGH DRAFT**

02:45:57  1   you reviewed in preparation for this deposition,

          2   did you review any pleadings in connection with

          3   this case?

          4          A.   What is a pleading?

02:46:16  5          Q.   Are you familiar with the allegations in

          6   this case related to friend sharing or the sharing

          7   of friend data?

          8          A.   Yes so did you mean like the complaint?

          9   Is that a pleading.

02:46:32 10          Q.   Which have moved on from that is that's

         11   okay.

         12          What is your understanding of these

         13   allegations that you are familiar with?

         14          MR. BLUME:  How is that a question

02:46:44 15   relevant to a corporate representative.

         16          Q.   In exposure capacity a corporate designee

         17   December nail are you aware of this claims this

         18   this case that relate to friend sharing?

         19          MR. BLUME:  She -- asked and answered you

02:47:00 20   already asked that question you are wasting time.

         21          MR. KO:  You are waist time by injecting

22  speaking objections into the record.

23          MR. BLUME:  David you are asking the same

24  question in a row even.

02:47:12 25          MR. KO:  I did not -- there was -- the

                                                        160

↑

                    **CONFIDENTIAL ROUGH DRAFT**

02:47:14  1  record speaks.

2          MR. BLUME:  Yes, it does.

3          MR. KO:  -- also any ways please just

4  object and that's all.

02:47:22  5     Q.  (By Mr. Ko)  In exposure capacity

6  correspond December my aware of the claims in the

7  case related to friend sharing?

8          THE DEPONENT:  I am here to talk about

9  the topics and part of that I have -- I have

02:47:36 10  researched friend sharing and -- and reminded

11  myself on things that I didn't know.  Did I Zoom

12  zoom in on your actual complaints I didn't think

13  that was my job but I did do my research into the

14  topics.

02:47:54 15     Q.  (By Mr. Ko)  You are making a lot of

16  assumptions about the questions I'm I'm simply

17  asking you whether or not you aware yes or no I'm

18  not whether or not you researched I'm not granular

```
          19  deep dive into all the allegations I'm not asking
02:48:08  20  if you all the ins and outs of the allegations I'm
          21  simply asking you are you aware of the allegations
          22  in this case related to friend sharing?
          23       MR. BLUME:  David, you asked 14 in this
          24  case.
02:48:24  25  Q.  (By Mr. Ko)  I I can microphone are still
```

                                                         161
⬆

                   **CONFIDENTIAL ROUGH DRAFT**

```
02:48:26   1  defined?
           2       MR. BLUME:  In 144618 she -- are you
           3  familiar with the allegations in the case related
           4  to friend sharing or the friend of sharing data she
02:48:35   5  said yes so it is exactly the same question and
           6  it's just wasting time.
           7       It's an asked and answered about 30
           8  seconds ago.
           9       MR. KO:  I am asking you.
02:48:48  10  Q.  (By Mr. Ko)  In your capacity as a
          11  corporate designee on behalf of Facebook to make
          12  sure and address any of the objections that you
          13  need to make Mr. Blume.  Are you aware of these
          14  claims in your capacity as a corporate designee on
02:49:04  15  behalf of Facebook?
```

16          MR. BLUME:  Same objection.

17          THE DEPONENT:  I'm here to prepare to

18  speak to the topics and if you want to get into

19  them I'm more than happy to speak to them.  I know

02:49:14 20  that I have seen and had a chance to review the

21  complaint.  I don't remember sitting here right now

22  your precise all of details and just generally

23  aware that.  Global policy differential.

24          SPECIAL MASTER GARRIE:  The question he's

02:49:31 25  asking is just yes or no or you don't know.

162

♠

**CONFIDENTIAL ROUGH DRAFT**

02:49:33  1          THE DEPONENT:  I feel like getting.

2          MR. BLUME:  She's --

3          SPECIAL MASTER GARRIE:  You if

4  understand -- if you don't please stop.  Please

02:49:43  5  read the question Mr. Ko either you answer or no,

6  or I cannot answer that question in a yes or no

7  fashion.  And let's move forward.

8          MR. KO:  Thank you Special Master Garrie.

9          SPECIAL MASTER GARRIE:  So please read

02:49:57 10  the question back Counsel Ko and then move forward.

11     Q.   (By Mr. Ko)  In your capacity -- in

12  hardware as corporate designee on behalf of

```
        13  Facebook are you aware of the claims related to

        14  friend sharing in this case?

02:50:15 15          MR. BLUME:  Objection.

        16          THE DEPONENT:  I don't remember the

        17  specific claims.  I'm aware -- sorry.  Sorry Garrie

        18  [sic].  I know I said.  I need to...

        19          MR. KO:  Great thank you that was very

02:50:33 20  helpful.

        21          MR. BLUME:  Twice.

        22      Q.   (By Mr. Ko)  Do you know with respect to

        23  friend sharing what is your understanding of that

        24  term?

02:51:08 25      A.   I don't remember if it's defined in any
```

                                                              163

⌃

                     **CONFIDENTIAL ROUGH DRAFT**

```
02:51:12  1  of this.  But I can speak, if you would like me to

         2  generally about friend sharing the topic.

         3      Q.   Yes, that's what I am asking many I'm --

         4  I'm not asking about a specific definition.  I'm

02:51:26  5  just simply asking whether or not you understand

         6  what the concept of friend sharing refers to?

         7      A.   So the concept of friend sharing is you

         8  create a Facebook account, you choose to friend

         9  people, so you -- you create friend connections.
```

02:51:46 10    And those friends you choose whether to share

11    information with them and that's -- just for

12    purposes of time I will stop there.

13        Q.   For some portion of the relevant time

14    period Facebook permitted third-party app

02:52:12 15    developers to access friend information; is that

16    correct?

17            MR. BLUME:  Objection.

18            THE DEPONENT:  You are trying to get do

19    yes or no I need to actually ask the question

02:52:33 20    again.

21            MR. BLUME:  Open an ended open question

22    he's.

23        Q.   (By Mr. Ko)  Is it accurate to say that

24    for any portion of the relevant time period

02:52:43 25    Facebook permitted third-party app developers to

                                                        164

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

02:52:46  1    access friend information?

2            MR. BLUME:  Objection.

3            THE DEPONENT:  I wouldn't state it that

4    way.

02:52:58  5        Q.   (By Mr. Ko)  How would you state?

6        A.   During the relevant time period for

7   certain portions of it, Facebook enabled people to

8   enable their friends to share certain information

9   with third-party apps.

02:53:14 10       Q.   So for some portions of the relevant time

11   period, Facebook enabled people to enable their

12   friends to share certain information with

13   third-party apps, correct?

14            MR. BLUME:   Objection.   Asked and

02:53:30 15   answered you just read her answer.

16            THE DEPONENT:

17            Is that what I said?

18            THE DEPONENT:   I that's what I said if

19   that's what I said correct otherwise let's just go

02:53:42 20   with what I said.

21       Q.   (By Mr. Ko)   I'm reading verbatim from

22   your answer to make you feel better.   And are you

23   aware at all of what periods of time within that

24   relevant time period Facebook -- Facebook enabled

02:53:59 25   people to enable their friends to share certain

                                                    165

↑

**CONFIDENTIAL ROUGH DRAFT**

02:54:01  1   information with third-party apps?

2       A.   That would be up until I -- I'm not

3   actually, I don't remember the precise date when

          4  it -- when we got \everyone\enforcement one of

02:54:26  5  V1 so I -- I'm not sure of the precise date.

          6      Q.   And when you already peg to V1 I assume

          7  you are referring to Graph version 1 -- 1.0, right?

          8      A.   That's right.  Anyone that developed an

          9  app after April of 2014, did not have the ability

02:54:47 10  to ask people to share their friends information

         11  because their trends enabled them to do so through

         12  their privacy app and app settings.

         13      Q.   And this Graph version 1 as also referred

         14  to API version 1 does that sound familiar?

02:55:09 15      A.   Yes.

         16      Q.   And it was replaced as you said in April

         17  of 2014, with Graph version two or Graph API

         18  version two; is that correct?

         19      A.   I wouldn't say replaced, no.

02:55:30 20      Q.   How would you say it?

         21      A.   We -- we created another version of the

         22  Graph -- Graph API so it's not accurate to say we

         23  placed because version 1 and 2 were live or awhile

         24  at the same time.

02:55:46 25      Q.   And how long obviously rolls things

                                                            166

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

02:55:49 1  obviously it takes time to notify app developers.

2          How long was it the case that version 1.0

3  was still in existence?

4      A.   I just testified moments ago that I don't

02:56:03 5  remember the precise date when that version was no

6  longer recorded.

7      A.   But I do know that April 14th, 2014

8  anything -- any app created thereafter could not

9  have been built on V1 only v2.

02:56:21 10     Q.   With respect to v2 your testimony that

11  app developers on v2 could no longer access certain

12  information about a user friend; is that fair to

13  say?

14         MR. BLUME:  Objection.  That was not her

02:56:47 15  testimony.

16         MR. KO:  You can object.

17         MR. BLUME:  Mischaracterize rising her

18  testimony.

19         MR. KO:  Thank you.

02:57:05 20     Q.   (By Mr. Ko)  Can you answer the question

21  Ms. Hendrix?

22      A.   I didn't understand what you asked me.

23      Q.   You said in connection with Graph V.--

24  Graph v2 an app developer did not have the ability

02:57:23 25  to ask people to share their friends information.

167

✦

**CONFIDENTIAL ROUGH DRAFT**

02:57:28  1          Do I understand your testimony correctly?

2          A.   To be very precise they could still ask

3     for the in app friend list, but no friend

4     permissions that were available in the v2 they --

02:57:42  5     there was no friend permissions in v2.  You could

6     only ask for my inapp friend list.

7          Q.   Other than the inapp friend list, in

8     connection with the Graph v2, there were no other

9     friend permissions allowed, correct?

02:58:02 10          A.   Those were -- yes.  They were deprecated.

11          Q.   Now this change with respect to the v2 as

12     it applied to app developers and their ability to

13     access certain friend permissions, was that change

14     reflected in Facebook's platform policies with

02:58:35 15     third-party app developers?

16          A.   What do you mean.

17          Q.   This was a change correct you would agree

18     with me on that?

19          A.   It was.

02:58:54 20          Q.   Go ahead?

21          A.   It was a product change.

22          Q.   In connection with that product change

23   was that reflected in any policy platform policy?

24            MR. BLUME:  Objection.

02:59:11 25            THE DEPONENT:  I don't understand what

                                                              168

↑

                    **CONFIDENTIAL ROUGH DRAFT**

02:59:12  1   you mean.

          2       Q.   (By Mr. Ko)  Was there a change in any

          3   policy that reflected the fact that app developers

          4   could no longer request friend permissions in Graph

02:59:31  5   V.2?

          6       A.   That's not a yes-or-no question.  I'm

          7   sorry if you ask it open-ended did you make changes

          8   to the Facebook platform policies in connection

          9   with the change V1 to v2 I can answer that and the

02:59:51 10   answer yes but your question doesn't make sense to

         11   me.

         12       Q.   Let's start that way.  So you made

         13   changes to the Facebook platform policy in

         14   connection with the change from V1 to V.2, correct?

03:00:04 15       A.   Yes.

         16       Q.   And I imagine that those changes were in

         17   fact made in the platform policy, the -- the?

         18       A.   I just.

         19       Q.   Policy -- let me finish my question?

03:00:16 20      A.   I just said that.

21           MR. BLUME:  Asked and answered.

22      Q.   (By Mr. Ko)  A large part of making sure

23 is the record is clear.

24           MR. BLUME:  Just wasting time David.

03:00:29 25      Q.   (By Mr. Ko)  In connection with changes

                                               169

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

03:00:31 1 made to the Facebook platform policy, there were --

2 well, I -- let me -- let me ask this way.

3           In connection with the change from V1 to

4 v2 there were certain changes made to the

03:00:48 5 platform -- Facebook platform policy, correct?

6      A.   Correct.

7      Q.   And was the change regarding third party

8 access to certain friend permissions reflected in

9 any of those changes in the Facebook platform

03:01:07 10 policy?

11           MR. BLUME:  Objection.  Form.

12           THE DEPONENT:  No we don't detail the

13 products and how they work in the -- in the

14 agreement with developers.

03:01:22 15      Q.   (By Mr. Ko)  Would you agree with me that

16 was a big change for Facebook and its app

17  developers?

18          MR. BLUME:  Objection.

19          THE DEPONENT:  What do you mean by it.

03:01:32 20          THE DEPONENT:  It referring to third

21  party app developers access to and lack thereof

22  certain friend permissions.

23          MR. BLUME:  Objection.

24          THE DEPONENT:  I agree it was a

03:01:49 25  significant way that the Facebook platform worked.

                                                    170

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

03:01:57  1     Q.   (By Mr. Ko)  And this was -- this was a

2  big deal for the app developers too, right?

3          MR. BLUME:  Objection.  It's beyond the

4  scope.  Speculation.

03:02:12  5          THE DEPONENT:  I'm not going -- yeah, I

6  can speculate whether it was a big deal at the time

7  43, 40 some million apps like each of these apps on

8  the platform will have experienced different

9  hurdles some of which that didn't need friend

03:02:27 10  permissions.  Obviously that's not significant to

11  them.  But others would have to go in and configure

12  their apps and make changes to adjust to the -- the

13  new way that the platform worked in v2.

14      Q.   (By Mr. Ko)  With respect to the

03:02:43 15   43 million or 40 some million apps that you -- you

16   referred to a moment ago is that the number of apps

17   that have existed throughout the relevant time

18   period or are you referring to some specific point

19   in time?

03:03:03 20      A.   I'm referring to a specific period of

21   time as a data point.  I'm familiar with -- of in

22   2013 roughly we had about 40 some -- in the lower

23   40 million apps on the platform.

24      Q.   And do you know how many apps are on the

03:03:23 25   platform today?

                                              171

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

03:03:23 1        MR. BLUME:  Objection.  Beyond the scope.

2        What topic is that?

3        MR. KO:  \everyone\enforcement Mr. Blume.

4        MR. BLUME:  Okay.  What topic is that?

03:03:42 5      Q.   (By Mr. Ko)  So you found it necessary

6   and -- and relevant to understand how many apps

7   were on the Facebook platform as of 2013 and you

8   reported that that number is about 40 to 43 million

9   correct?

03:03:53 10       MR. BLUME:  Objection.

11          THE DEPONENT:  Not for this case.  No.

12     Q.   (By Mr. Ko)  Got it.

13          Do you have an understanding of how many

14     apps were on the Facebook platform at at any time

03:04:05 15     other than 2013 sitting here today?

16          MR. BLUME:  Objection.  Beyond the scope.

17          THE DEPONENT:  I know that I have

18     reviewed and been provided with information

19     throughout -- for different reasons some of which

03:04:17 20     have nothing to do with litigation that I had

21     numbers presented to me.  I know I can find how

22     many are on the platform today.  I don't know

23     sitting here today if I can tell you more than just

24     that one example that I remember.

03:04:36 25     Q.   (By Mr. Ko)  Was there any policy,

172

**CONFIDENTIAL ROUGH DRAFT**

03:04:38 1     platform policy or otherwise that reflected the

2     fact that third-party app developers could no

3     longer access certain friend permissions in

4     connection with Graph v2?

03:04:52 5          MR. BLUME:  Objection.

6          THE DEPONENT:  For like the fourth time I

7     apologize I'm getting tired and grumpy like I

8   already told me I did make a policy change

9   personally developed along with all of the other

03:05:03 10   teams that work on and develop the policies.  We

11   did make a policy change in connection with the

12   Facebook platform change from V1 to v2.

13       Q.   (By Mr. Ko)  And in connection with that

14   policy change was there anything -- was there any

03:05:20 15   language that related to or otherwise covered the

16   fact that third-party app developers were no longer

17   accessing friend data or friend permissions?

18            MR. BLUME:  Objection.  Asked and

19   answered.

03:05:36 20            THE DEPONENT:  Not in the specific

21   Facebook platform policy document, right right but

22   else you go let's say friend permissions page on

23   the developer documentation site.  You might see a

24   V1 to v2 leader on the top explaining the fact that

03:05:53 25   we announced change and linking to the

173

⬆

**CONFIDENTIAL ROUGH DRAFT**

03:05:56 1   announcement.  But, again, I'm -- I am trying not

2   to -- I should stop trying to help you with my

3   questions what I'm giving myself feedback on.  But

4   there you go.

03:06:11  5      Q.   (By Mr. Ko)  So after this change was

       6   made with respected to third-party app developer

       7   access over friend permissions and friend data, you

       8   don't dispute that third parties continue to access

       9   this?

03:06:29 10          MR. BLUME:  Objection.

      11      Q.   (By Mr. Ko)   Information correct?

      12          MR. BLUME:  Objection to the

      13   characterization inconsistent with her testimony.

      14          THE DEPONENT:  I -- I dispute what you

03:06:37 15   just said.

      16      Q.   (By Mr. Ko)  Okay.  So you deny or is it

      17   your testimony that after app of 2014 third-party

      18   app developers no longer obtained information about

      19   a user's friend?

03:06:57 20          MR. BLUME:  Objection.  What -- how is

      21   monitor contractual times.

      22          Ask about the contracting terms but other

      23   than it's beyond the scope I will instruct her not

      24   to answer.

03:07:08 25          MR. KO:  Can you please stop with the

                                                         174

↟

                       **CONFIDENTIAL ROUGH DRAFT**

03:07:09  1   speaking objections.

2            MR. BLUME:  I'm -- I'm giving her

3    instruction David she has to understand my

4    instruction.  Okay.

03:07:16 5            MR. KO:  Correct.

6            MR. BLUME:  Object know objecting to

7    object to the form.

8            MR. BLUME:  Enter vice president they can

9    take down what I'm saying.

03:07:21 10           THE DEPONENT:  My instruction is beyond

11   the scope and I'm instruct not her to answer.

12           MR. KO:  Special Master clear in the

13   Northern district of California that counsel

14   defending a deposition are not permitted to log

03:07:37 15  speaking objections on the record.  If Mr.

16           MR. BLUME:  Unless it's instruct.

17           MR. KO:  Has a problem.

18           MR. BLUME:  Unless it's an instruction to

19   the witness.

03:07:45 20           SPECIAL MASTER GARRIE:  Wait, wait ate.

21           MR. KO:  Not clear.

22           MS. WEAVER:  Time out just not talking

23   doesn't mean it's invitation to speak this means

24   I'm thinking what I'm going to say.

03:08:02 25           I believe Counsel Blume you are

175

**CONFIDENTIAL ROUGH DRAFT**

03:08:04  1  instructing her not answer is that beyond the scope

2  is that not your instruction.

3            MR. BLUME:  That what I was articulating

4  yes.

03:08:13  5            SPECIAL MASTER GARRIE:  Okay.  Can you

6  lane in so I hear the objections better just for

7  own edification.

8            MR. BLUME:  Yeah, eliminated to

9  microphone to try to stop the feedback, yes.

03:08:23  10            SPECIAL MASTER GARRIE:  Okay.  I'm

11  going -- okay.  So that objection is fine.  The

12  objections going forward please finish the

13  objection and just state the objection HearSay

14  whatever everybody here knows the federal rules

03:08:38  15  some state transitioned objection.  And we'll move

16  it forward if your instruction though is to

17  instruct the witness your answer not to answer the

18  question because it's beyond the scope because of

19  attorney-client privileged you are well within your

03:08:49  20  rights to make said instruction.  I noted

21  Counsel Ko for the record, please Counsel Blume on

22  a going forward basis make sure you continue with

23  your objections being compliance and in compliance

24   with federal rules and we continue forward.

03:09:06 25          Counsel Ko, but I want to just say

                                                        176

✦

**CONFIDENTIAL ROUGH DRAFT**

03:09:11 1   Counsel Blume just not to answer the whole reason

2   why isn't -- I instruct the witness not the answer

3   because it's beyond the scope of the -- beyond the

4   scope.  Okay.

03:09:22 5          MR. BLUME:  Understood.  Is there good

6   time to take a break.

7          MR. KO:  To be clear why don't we go off

8   the record.

9          SPECIAL MASTER GARRIE:  One second

03:09:28 10  Counsel Ko I welcome your comment in 30 seconds.

11          MR. KO:  Okay.

12          SPECIAL MASTER GARRIE:  I finished

13  Counsel Blume I had one more sentence unrelated

14  to -- I was going to suggest if we at a breaking

03:09:46 15  point given that we take a break after I hear from

16  Counsel Ko's point and then Counsel Ko I welcome

17  your point now.

18          MR. KO:  So the instruction not to answer

19  has to relate to a privilege.  It is improper to

03:10:04 20  instruct an answer or instruct the a witness not to

```
           21  answer on the grounds that it's entity.  Mr. Blume

           22  can log his objection for the record an it's noted

           23  but -- but the witness must try and answer the

           24  question.  It's not privileged.  This is not

03:10:18   25  privileged information.
```

                                                            177

⬆

                      **CONFIDENTIAL ROUGH DRAFT**

```
03:10:21    1          SPECIAL MASTER GARRIE:  Counsel.  Direct

            2  your arguments to not each other please.  That

            3  doesn't -- noted Counsel Ko doesn't means not

            4  entitled to state his objection and state

03:10:35    5  instructioning his client not to answer.  His

            6  client can say, I'm not going to answer a

            7  question -- per the direction of counsel and then

            8  you can then respond to according B but we have to

            9  let the process play out in the -- in that fashion

03:10:49   10  and we will address it accordingly.

           11          Counsel Blume what were going to say.

           12          MR. BLUME:  That -- that -- that doesn't

           13  apply in the 30(b)(6) setting when the witness

           14  called to per notice to peak.

03:11:02   15          MS. WEAVER:  I haven't ruled wait time.

           16          MR. BLUME:  Counsel blew.

           17          MR. BLUME:  I'm respond to privilege.
```

```
         18          MS. WEAVER:  I understand --

         19  Counsel Blume unintentional I didn't address.

03:11:12 20          MR. BLUME:  Okay.

         21          SPECIAL MASTER GARRIE:  It's not here and

         22  now.

         23          MR. BLUME:  Fair enough.

         24          SPECIAL MASTER GARRIE:  If your

03:11:17 25  instruction is as such than and counsel co how
```

                                                        178

↟

                     **CONFIDENTIAL ROUGH DRAFT**

```
03:11:21  1  about this this what I understand your point

          2  counsel do we ask the return when return from five

          3  minute we ask Counsel Blume wants to instruct the

          4  witness not to answer the question and counsel --

03:11:34  5  and the witness wants to respond and then you ban

          6  to point out that that's not a valid objection

          7  united the central rules and then Counsel Blume

          8  wanted to respond to 30(b)(6) I get to make a

          9  ruling great what were going to take a 35 minute

03:11:48 10  break and we'll resume in five minutes and I know

         11  note that I appreciate you know co your position.

         12  And counsel column as well okay.

         13          MR. BLUME:  Thank you Your Honor.

         14          SPECIAL MASTER GARRIE:  Thank you we'll
```

03:12:02 15  return at five minutes I'm look agriculture the

16  Zoom time five minutes whatever time zone you are

17  in.

18          THE VIDEOGRAPHER:  We off the record at

19  3:12 p.m.

03:20:03 20          (Recess taken.)

21          THE VIDEOGRAPHER:  Okay.  We are back on

22  the record it's 3:24 p.m.

23          SPECIAL MASTER GARRIE:  I was giving some

24  thought to a -- our provider discourse and I just

03:24:39 25  wanted.

                                                          179

⬆

**CONFIDENTIAL ROUGH DRAFT**

03:24:40 1          THE DEPONENT:  Two important things one

2  let's make sure we are on the same let's being

3  let's respect actual let everybody gets words in

4  part so the court reporter doesn't have to go back

03:24:51 5  and listen to this whole thing.  Pain staking it to

6  transcript it properly.

7          Next same for the objections.  Let -- let

8  them get said.  But keep them limited to the

9  federal -- just to the rules.  Right.  And -- and

03:25:09 10  from there I will turn it -- I believe to

11  Counsel Blume you mentioned that the witness you

```
          12  are muted I can figure out who is speaking continue

          13  Zoom.  So if you wanted to say anything

          14  Counsel Blume.

03:25:25  15          MR. BLUME:  Yes yes the witness has a

          16  clarification.

          17          SPECIAL MASTER GARRIE:  Okay.

          18          THE DEPONENT:  May I go ahead.

          19          SPECIAL MASTER GARRIE:  Yeah.

03:25:32  20          THE DEPONENT:  So I want to correct my

          21  earlier testimony about the fact there was a

          22  platform policy change in connection with the move

          23  from the -- the -- the launch of v2.  Actually we

          24  also in April on the same date announced the update

03:25:54  25  to login V4 and so the policy that I was referring
```

                                                                     180

⬆

                        **CONFIDENTIAL ROUGH DRAFT**

```
03:25:58   1  to was tied to the V4 login product.  But it

           2  happened at the same time as the announcement of

           3  the v2 version of the Graph API so I just wanted to

           4  make sure I corrected myself.  Because I was

03:26:13   5  mistaken on how I communicated that and realized

           6  during the break.

           7      Q.   (By Special Master Garrie:)  Noted for

           8  the record.
```

               9            With that said, Counsel Ko I'm going to.

03:26:24 10    Thank you for clarification and co-counsel I turn

        11    it back over to you.

        12        Q.   (By Mr. Ko)  Thank you

        13    Special Master Garrie and thank you Ms. Hendrix for

        14    that clarification.

03:26:36 15        Q.   (By Mr. Ko)  So let me up pack that a

        16    little bit to make sure I understand.

        17            With that clarification are you

        18    suggesting or indicating that there was not a

        19    platform policy change in connection with the

03:26:50 20    launch of v2?

        21        A.   Not tied to the V1 to v2, that is

        22    correct.

        23        Q.   So when Facebook began the roll out of

        24    Graph V.-- Graph v2 in April of 2014 there was not

03:27:17 25    a corresponding platform policy change that

                                                        181

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

03:27:21  1    reflected the launch of Graph v2; is that correct?

         2        A.   There's a few inaccuracy sees in your

         3    question and how we described the -- the V1 to v2.

         4        Q.   Let me ask it this way, in the transition

03:27:51  5    from Graph V1 to v2 that began in April of 2014,

         6  was there any reference, to any -- to any aspect of

         7  the platform policy that reflected the move by

         8  Facebook to Graph v2?

         9      A.   No.

03:28:23 10      Q.   Now in connection with the deprecation

        11  of -- by Facebook of allowing third parties to

        12  access friend information, was that deprecation

        13  reflected in any SRR in 2014 or otherwise?

        14           MR. BLUME:  Objection.  Form.

03:28:58 15           THE DEPONENT:  Yes as to otherwise.

        16  Because we are talking about 2007 all the way to

        17  today.

        18      Q.   (By Mr. Ko)  So the deprecation of friend

        19  sharing by Facebook was reflected in SRRs post 2014

03:29:19 20  I presume; is that your testimony?

        21           MR. BLUME:  Objection.

        22           THE DEPONENT:  No, that's not my

        23  testimony.

        24      Q.   (By Mr. Ko)  Okay.  Was -- was there any

03:29:31 25  SRR at any point in time over the relevant time

                                                          182

✦

                    **CONFIDENTIAL ROUGH DRAFT**

03:29:34  1  period that reflected the deprecation of friend

          2  data?

3       A.   Friend permissions and yes at some point

4    in time when it was appropriate we did make changes

03:29:57  5    to the relevant terms and policies.

6       Q.   And when was that?

7       A.   I don't recall the precise date today but

8    it would have been when V1 was no longer relevant

9    improper to delete those disclosure to people who

03:30:19  10   were using apps that were still using version 1 of

11   the platform.

12      Q.   And while you don't recall the precise

13   date do you have a general understanding of what

14   time period were referring to is it is it sometime

03:30:35  15   after 2014 so is there a general time frame in

16   which you understand that these changes were made

17   in the SRR?

18      A.   It would have been after the May 2015

19   date by the precise timing thereafter I don't

03:31:04  20   remember sitting here today.

21      Q.   What's the significance of May 2015?

22      A.   Well developers when we announced that we

23   were deprecating friend permissions and that's

24   why -- sorry I will stop.  When were deprecating

03:31:26  25   friend permissions we gave them -- we announced

183

**CONFIDENTIAL ROUGH DRAFT**

03:31:29  1  they had a subject to breaking change policy

2  decision to give them a year to transvision and

3  configure their apps and build them on v2.

4       Q.   And where -- when you say that quote we

03:31:45  5  announced educational ."

6            What do you mean by that?

7       A.   We told -- we announced at F8 or

8  developer event to developers that we were changing

9  the way that the -- the platform worked

03:32:03 10  specifically moving forward from V1 to v2 and that

11  they had one year up to -- up -- to make those

12  changes to move from V1 over to v2.

13           MR. BLUME:  That announcement at the F8

14  conference that you are referring to that was made

03:32:21 15  in 2014, correct.

16           THE DEPONENT:  Yes and there were many

17  other like public like news rooms policy issues

18  posts and things limited to response to just the F8

19  developer event but that was one of -- of the -- of

03:32:35 20  the announcement that I recalled.

21       Q.   (By Mr. Ko)  So who you are saying

22  May 2015 are you saying as of May 2015 Facebook

23  gave one year to developers to conform to the new

24  model or are you saying that by May 2015 all users

03:32:57 25   were expected to comply with the new -- with the

184

↟

**CONFIDENTIAL ROUGH DRAFT**

03:33:01  1   deprecation of friend data?

2                MR. BLUME:  Objection.

3                THE DEPONENT:  The terms you have used

4   don't make sense.

03:33:11  5        Q.   (By Mr. Ko)  You testified that that

6   Facebook announced would give developers one year

7   to comply.

8                Do you recall that?

9        A.   It's not compliance so no, I don't think

03:33:25 10   I said the word comply if I did maybe -- maybe I'm

11   getting tired.  I don't think I would have said

12   that.

13        Q.   I believe I think you said changes.

14   Facebook that they would give developers one year

03:33:40 15   to make the changes to move from V1 over to v2 when

16   did they make that announcement?

17        A.   The announcement was made in April 2014

18   so the extent the developers wanted to continue to

19   use the platform and off their apps to people they

03:34:01 20   would need to make the changes by a year from the

21   date of the announcement.

22      Q.   So when you are referring to pay of 2015

23   it was Facebook's intention that all developers

24   would have made the changes to move from V1 over to

03:34:21 25   v2, correct?

185

⬆

**CONFIDENTIAL ROUGH DRAFT**

03:34:26  1            MR. BLUME:  Objection.  Form.

2            THE DEPONENT:  The goal was to get the

3   developer community to move over.  The 90

4   daybreaking change policy normal we agreed to come

03:34:40  5   arbitrary date of one year CHECK/CHECK.

6            Q.   (By Mr. Ko)    And when you say that

7   quote we agreed of an arbitrary date of one year ",

8   what departments or individuals were responsible

9   for that decision?

03:34:59 10            MR. BLUME:  Objection.  Beyond the scope.

11            THE DEPONENT:  The same group of teams

12   that I referred to earlier today that worked on

13   platform product and policies.

14            Q.   (By Mr. Ko)  Now after May of 2015

03:35:19 15   certain third parties continued to access friend

16   data, correct?

17            MR. BLUME:  Objection.  Beyond the scope

18   unless you tell me what topic I'm going to instruct

```
         19  you not to answer.
03:35:31 20           THE DEPONENT:  Yeah, it's fundamentally
         21  related Rob to topic 3 including top 3C.
         22           MR. BLUME:  And --
         23           MR. KO:  Let me ask this Ms.
         24           MR. BLUME:  Aim happy to talk off the
03:35:45 25  record don't pace.
```

                                                      186

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

```
03:35:47  1           MR. KO:  I want to make this --
          2           MR. BLUME:  Let finish.
          3           MR. KO:  I want to.
          4           MR. BLUME:  Happy to go off the record.
03:35:55  5           SPECIAL MASTER GARRIE:  Hold on.
          6           MR. BLUME:  We are still on the record
          7  you still talking over each other the
          8  court reporter can't take anything.  So
          9  Counsel Blume make your statement Counsel Ko make
03:36:04 10  your statement.  You objected.  You objected Blume
         11  saying beyond the scope.  Unless he can counsel can
         12  provide you the -- the indication of why -- what is
         13  within the scope of what this witness has been
         14  submitted to.
03:36:22 15           Counsel Ko do you find I believe you did.
```

16          MR. BLUME:  He did.

17          MR. KO:  Yeah, I identified topic 3 and

18     3C in particular.

19          SPECIAL MASTER GARRIE:  Okay and counsel

03:36:32 20  Counsel Blume did you respond to that.

21          MR. BLUME:  I did.  And -- and my -- well

22     I didn't but my response was that as it topic 3 is

23     overview of processes of developing privacy or app

24     settings or other controls available to users to

03:36:51 25  prevent or limit their data from being accessed by

                                                      187

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

03:36:55  1  third parties including dates and the data so it's

2     controls it's processing for developing controls

3     available to users and C is including Facebook's

4     monitoring enforcement of contractual threshold use

03:37:10  5  user da or information including

6     \everyone\enforcement or policy relating access to

7     such data for information beyond the use case and

8     the question was certain third parties continue to

9     access friend data which is beyond the processes of

03:37:25 10  developing apps privacy or app settings made

11     available to users.

12          SPECIAL MASTER GARRIE:  And Counsel Ko

13  what was your response.

14        MR. KO:  My response is that Facebook's

03:37:47 15  monitoring and enforcement of its contractual terms

16  with third parties regarding their use -- use of

17  users data or information obviously includes a

18  users information related to a users friend and

19  also includes information related to friend sharing

03:38:12 20  of which Ms. Hendrix who clearly testified defense

21  provide indicated 2014 with a one year grace

22  period.

23        So in order for us to understand how

24  Facebook actually monitored and enforced this

03:38:27 25  purported detriment indication I'm certainly

                                                    188

**CONFIDENTIAL ROUGH DRAFT**

03:38:29  1  allowed to ask this witness about that monitoring

2  and enforcement and if I would note if Ms. Hendrix

3  is not the appropriate witness and Mr. Blume has

4  not prepared Ms. Hendrix to testify as to these

03:38:43  5  topics, we would request that Facebook provide a

6  witness that can.

7        MR. BLUME:  And there is a witness on

8  third party data and -- and -- and in topic two

9  Ms. Hendrix is here to speak about processes for

03:39:02 10   monitoring enforcement.  Not -- not any specificity

11   with regard to whether third parties accessed

12   friend data that's another topic noticed.  He's

13   here to talk about the processes of developing

14   controls focused on Mondayen fort men not the

03:39:19 15   actual acts of the third parties in a specific date

16   and time.

17        Q.   (By Mr. Ko)  Well Mr. Blume I'm so glad

18   you referred to topic two?

19             SPECIAL MASTER GARRIE:  Counsel Ko, what

03:39:30 20   was your response Counsel Ko.

21             MR. KO:  I was saying I'm glad Mr. Blume

22   referenced topic 2B and 2D which Ms. Hendrix

23   testified to as being related to topic 2D in

24   particular 2D in particular asks and request

03:39:49 25   Facebook to provide a witness to identify the

                                                            189

⬆

             **CONFIDENTIAL ROUGH DRAFT**

03:39:52  1   category and type of data or information which

2   Facebook stoled made available including how as 2D

3   indicates has Facebook insured use of such data or

4   information was limited to to use case.

03:40:09  5             SPECIAL MASTER GARRIE:  Okay.  Is that

6   Ms. Hendrix or not.

7          MR. KO:  That's what I want to know.

8          MR. BLUME:  Yes it's.

9          SPECIAL MASTER GARRIE:  No, no one second

03:40:16 10  I'm asking the questions now.  So Counsel Blume.

11          MR. BLUME:  Yes.

12          SPECIAL MASTER GARRIE:  Just my collar

13  fission submitted as a witness 30(b)(6) witness on

14  2E.

03:40:28 15          MR. BLUME:  How Facebook insured third

16  parties use such data.  It's -- it is the policies

17  and procedures that allow Facebook to monitor third

18  parties use of data.  The question was, the

19  question "now after May of 2015, certain third

03:40:43 20  parties continue to access friend data.  That

21  doesn't go to Facebook policies or procedures or

22  processes that were developed in order to monitor

23  third parties over between 2007 and and present.

24  It goes to what were the actions of third parties

03:40:57 25  in May of 2015.  That is beyond the scope of 2D it

                                              190

⌃

**CONFIDENTIAL ROUGH DRAFT**

03:41:01 1  is beyond the scope the topic 3.  If they wanted to

2  ask or create a topic that said, identify all third

3  party applications that continue to access friend

          4  data or use friend data at any time.  They could
03:41:14  5  have it's not how they worded their topics.  Ms. --
          6  Ms. Hendrix is -- is -- is focuseses on policies
          7  and procedures she's been going it her whole career
          8  happy and policies and procedures for Monday torque
          9  the -- the acts and accesses of -- of third party
03:41:35 10  and how Facebook insured that -- that the use of
         11  data was limited to the use case.
         12          That is the agreements of the developers,
         13  policy and procedures not.
         14          SPECIAL MASTER GARRIE:  I got it.
03:41:48 15          MR. BLUME:  Not actually --
         16          SPECIAL MASTER GARRIE:  I understand.  I
         17  understand Facebook's position Counsel Ko.
         18          MR. KO:  Two responses
         19  Special Master Garrie one it is divorced from
03:42:01 20  reality if one can only testify as to the policies
         21  and procedures and not the facts for which those
         22  policies and procedures can be applied.  So my
         23  question with respect to whether or not third
         24  parties continue to access information about a
03:42:18 25  friend or users a friend obviously relates to the

                                                        191

↥

03:42:22  1  policies the ultimate policies and procedures that

2  Facebook applied.  Such that Ms. Hendrix as

3  Mr. Blume is indicating has spent her life

4  enforcing certain policies and procedures that

03:42:34  5  relate to the monitoring \everyone\enforcement of

6  user information.

7          Secondly, and more practical point is as

8  follows:  Ms. Hendrix is the one that described in

9  response to one of my questions her knowledge of

03:42:51 10  friend deprecation and so I am perfectly entitled

11  to store her knowledge of friend deprecation to

12  which is exactly what I'm doing she seems to be

13  fully aware of several aspects of friend

14  deprecation key claim in this case and so of

03:43:09 15  course.

16          SPECIAL MASTER GARRIE:  I got.

17          MR. KO:  I am able to ask questions about

18  that.

19          SPECIAL MASTER GARRIE:  Okay.  So just so

03:43:18 20  I understand Counsel Blume did you instruct her not

21  to answer just I can scroll back up to see what.

22          MR. BLUME:  Yes.

23          THE DEPONENT:  I'm not -- I'm not -- they

24  will have Ms. Hendrix in her personal capacity and

03:43:32 25  he's free to ask what she knows.  But as a

192

**CONFIDENTIAL ROUGH DRAFT**

03:43:35  1  corporate representative she -- she is prepared to

2  talk about topics relating to the processes and

3  procedures not with regard to the actions and

4  specific third parties.

03:43:46  5          SPECIAL MASTER GARRIE:  I understand.

6          MR. BLUME:  So I am not -- I'm

7  instructing at her this point not to answer this

8  question she's not prepared to speak to it today

9  and it's not because because it's not covered by

03:43:57 10  her topics.  Maybe if I add one thing

11  Special Master Garrie there may be helpful.  The --

12  the under come pulling Facebook provided Aaron

13  reports ton of material as you know on audience

14  network which was a review of this very question

03:44:48 15  which now they have.  That is not a topic and

16  because -- that was focused on in review whether or

17  not the very question that -- that -- that Mr. Ko

18  asked, which is did third parties continue to

19  access friend data after the deprecation and

03:45:03 20  accountability so it's just one of the --

21          MS. WEAVER:  Can I ask one question.

22          SPECIAL MASTER GARRIE:  No one defended

23   one take I apologize counsel is that the witness I

24   can't see people are muted one take one defended I

03:45:17 25   apologize counsel weaver that's the standard here.

193

⬆

**CONFIDENTIAL ROUGH DRAFT**

03:45:24  1          So I don't believe she's prepared.  The

2   witness is prepared to answer your question

3   Counsel Ko at this point in capacity as a 30(b)(6)

4   witness on behalf of the company she's here.

03:45:44  5          MR. KO:  And I.

6          SPECIAL MASTER GARRIE:  And I understand

7   your position and -- I note it and I understand it.

8   We haven't heard if she will answer or not so

9   before we advance further down the path.  H

03:46:01 10  Ms. Hendrix, I have to -- if I look like I'm

11  looking a way I have two monitors I'm just trying

12  to read the prior testimony on that to see if you

13  actually what your answer was.

14          Okay.  Before.

03:46:34 15          MR. KO:  The question was at 335

16  Special Master Garrie after May of 2015 certain

17  third parties continue to access friend data,

18  correct.

19          SPECIAL MASTER GARRIE:  Well, in the

03:47:07 20  offhand Ms. Hendrix do you want -- are you -- you

21  have been instructed by your lawyer,, are you going

22  to answer the question.

23          THE DEPONENT:  I thought I said earlier I

24  don't remember the precise, I don't remember the

03:47:22 25  precise date I think it's actually referred to in

                                                      194

⬆

**CONFIDENTIAL ROUGH DRAFT**

03:47:25 1  the FTC order to point to a public, you know,

2  document, but I don't remember.  I just know and I

3  also would like to for the record, I never said

4  grace period we don't refer to our breaking changes

03:47:36 5  as grace periods.

6          So I like to correct that.  And I haven't

7  been doing this also my entire life.  I would like

8  to correct.  I only been going this since I joined

9  in October of 2008.

03:47:49 10         But all of the relevant disclosures and

11  privacy settings that needed to be in place were --

12  I can testify with 100 percent that they stayed in

13  place and changes were made once we were certain no

14  longer friend information or friend permissions

03:48:06 15  were being made available to third-party apps.

16          Q.   (By Special Master Garrie:)  That's

17    sufficient.  Counsel Ko next question?

18         THE DEPONENT:  Thank you.

19    Q.  (By Mr. Ko)  Okay.  With respect to topic

03:48:21 20    2D Ms. Hendrix, are you prepared to testify on that

21    topic as it relates to friend sharing and the

22    defense pre indication of friend sharing in

23    connection with Graph v2?

24    A.    I believe I am.

03:48:48 25    Q.    Great.

                                                           195

⬆

              **CONFIDENTIAL ROUGH DRAFT**

03:48:49  1         So since you are prepared to testify on

2    that top are you a bear of any third parties to

3    access friend data following the deprecation of --

4    of friend sharing in connection with Graph V1?

03:49:03  5         MR. BLUME:  Objection.  Same objection D

6    is how Facebook insured third party was limited to

7    the use case which is policy and for

8    \everyone\enforcement of policies and procedures.

9         MR. KO:  Is there anything Mr. Blume in

03:49:17 10    topic two that refers to policy and procedures I

11    don't know why you keep raising that.

12         MR. BLUME:  It relates to the category --

13    identifying of the identification of data or

14  information to which Facebook sold which it didn't

03:49:29 15  as she testified.  Made accessible or made

16  available or allowed.  So it's not what actually

17  occurred.  What the third parties specifically did.

18       But the type of data including D our

19  Facebook insured that the use of that data was

03:49:44 20  limited to the use case, which is

21  \everyone\enforcement mechanisms behind the

22  policies it's not which thirds what third parties

23  were doing when.

24       MR. KO:  Now I am going to request

03:49:57 25  Special Master Garrie that we go off the record

                                                    196

⬆

              **CONFIDENTIAL ROUGH DRAFT**

03:49:59 1  because we have been talking about this point for

2  15 minutes and I have a suggest as to move forward.

3       SPECIAL MASTER GARRIE:  Okay.  We can go

4  over the record we'll go back on the record I'm

03:50:12 5  going to rule.

6       MR. KO:  Yup thank you the we do this way

7  Special Master Garrie if -- if sorry.

8       THE VIDEOGRAPHER:  You guys want to go

9  off the just to be sure.

03:50:30 10       SPECIAL MASTER GARRIE:  Off the record.

```
        11            THE DEPONENT:  Thank you we are over the

        12   record it's 3:50 p.m.

        13            (Recess taken.)

        14            THE VIDEOGRAPHER:  We are back on the

04:09:55 15   record it's 4:09 p.m.

        16            MR. KO:  Thank you for allowing the

        17   lawyers and Special Master Garrie to do their legal

        18   thing.  But I just want to make sure that the

        19   record is clear with respect to your answer to the

04:10:10 20   following question.

        21            With respect to topic 2D or 3C are you

        22   prepared to testify on either of these topics as

        23   they relate to friend sharing and the deprecation

        24   of friend sharing in connection with Graph v2.

04:10:36 25            MR. BLUME:  She is and she said that at
```

                                                        197

↟

                     **CONFIDENTIAL ROUGH DRAFT**

```
04:10:38  1   the outset.

         2            MR. KO:  I was asking Ms. Hendrix.

         3            MR. BLUME:  It's a legal question on

         4   prepare you already asked that in the third

04:10:45  5   question of the day, yes she's prepared to do that,

         6   accept as it relates to targeted advertisers.

         7        Q.   (By Mr. Ko)  Ms. Hendrix can you answer
```

              8  that question?

              9          MR. BLUME:  It's -- it's.

04:10:57  10          Okay and you asked and answered you can

             11  answer go ahead.

             12          THE DEPONENT:  It's still yes.

             13     Q.   (By Mr. Ko)  Thank you.

             14          And as it relates to third party

04:11:10  15  developers that actually continued to access friend

             16  information post deprecation of this friend

             17  sharing, are you prepared tomorrow testify on that

             18  topic?

             19          MR. BLUME:  Objection.

04:11:28  20          THE DEPONENT:  When V1 was deprecated

             21  there was no concept of requesting friend

             22  permissions from people.

             23     Q.   (By Mr. Ko)  Do you mean when you say

             24  there was concept of requesting friend permissions

04:11:48  25  from people?

                                                          198

▲

                    **CONFIDENTIAL ROUGH DRAFT**

04:11:49   1     A.   I mean the product -- it just wouldn't

              2  work.  Right.  If you didn't move your app and

              3  build off of v2 from a technical standpoint at

              4  deprecation of V1 you could no longer call the

04:12:07  5   Graph API and we have any friend permissions.

        6   There was no longer the ability to request friend

        7   permissions.  You have said friend sharing and

        8   friend data.  I just want make sure we are clear.

        9   Because today you ask people to share inapp friend

04:12:23 10   list which returns of course the friend public

       11   friend profile picture and name if that person has

       12   an opted out of platform.  So that's why they

       13   terminology is really important here.  So friend

       14   permissions once V1 was duly deprecated a longer a

04:12:41 15   thing from a product perspective.

       16           MR. BLUME:  There you go.

       17       Q.   (By Mr. Ko)  Are you familiar with the

       18   term whitelisting?

       19       A.   Yes.

04:12:51 20       Q.   What's your understanding of that term?

       21       A.   It's a.

       22           MR. BLUME:  Hold on.  This is clearly

       23   topic 7.

       24           MR. KO:  That is not.  You have

04:13:01 25   superficial understanding of these topics

                                                    199

↟

                    **CONFIDENTIAL ROUGH DRAFT**

04:13:03  1   Mr. Blume.

2      Q.   (By Mr. Ko)  Can you please answer that

3  question?

4           MR. BLUME:  Was -- was that a personal

04:13:08  5  insult.  Wow whitelisting topic 7 is discuss

6  whitelisting.  What -- here the problem is.

7           SPECIAL MASTER GARRIE:  One second,

8  Counsel Blume.

9           MR. KO:  Note your objection.

04:13:23 10           SPECIAL MASTER GARRIE:  Counsel Ko.

11  Counsel Blume I say it more one more time.  Say the

12  objection.  I believe the objecting

13  Mr. Counsel Blume your saying is Objection.  Beyond

14  the scope of what this witness is here to testify

04:13:34 15  to; is that your objection is.

16           MR. BLUME:  Yeah well he first got

17  answered but thought about off the record.  That's

18  fine now moving what is topic seven whit list

19  particular apps I'm hard pressed to see where that

04:13:50 20  falls in her topics.

21           SPECIAL MASTER GARRIE:  Is your

22  objection.

23           MR. BLUME:  The objection is beyond the

24  scope.

04:13:57 25           SPECIAL MASTER GARRIE:  Got it.

**CONFIDENTIAL ROUGH DRAFT**

04:13:59  1        Counsel Ko.

         2        MR. KO:  Well, my position is very

         3   consist how it has been before.  Mr. Blume is

         4   perfectly entitled to note his objection for the

04:14:06  5   record.  But I would ask that Ms. Hendrix answer

         6   the question regardless and more --  when asked her

         7   first if she was familiar with the term

         8   whitelisting.  So she said yes so I'm styled to her

         9   understanding what is.

04:14:22 10        MR. BLUME:  She is corporate

        11   representative.

        12        SPECIAL MASTER GARRIE:  She's a 30(b)(6)

        13   witness on specific issues Counsel Ko so if they

        14   relate to the topics at issues she is hear too

04:14:34 15   testify please show the topic and issue she own

        16   how -- where whitelist is stated and then I can

        17   then issue a ruling on whether or not I will order

        18   the witness to answer the question or not.

        19        MR. KO:  Special Master Garrie Facebook's

04:14:50 20   monitoring an \everyone\enforcement of third

        21   parties is obviously related to both the continual

        22   access of friends data and relatedly the

        23   whitelisting by Facebook of certain third parties

```
         24  to continue to access that data, so the monitoring
04:15:07 25  and enforcing of user information is fundamentally
```

                                                              201

↟

                        **CONFIDENTIAL ROUGH DRAFT**

```
04:15:11  1  related to the whitelisting of these permissions.

          2         In addition topic 2D indicates how

          3  Facebook insured third parties use of data or

          4  information was in fact limited to the use case.

04:15:23  5  If there were whitelisting or exceptions or any

          6  other special permissions that continued on and

          7  that Facebook continued to allow third parties to

          8  access I am certainly entitled to explore and

          9  ellies sit testimony regarding how Facebook

04:15:39 10  monitored and enforced those third parties.

         11         THE DEPONENT:  Can you read the back the

         12  question court reporter.

         13         (Record read as follows:

         14         MR. KO:  Was the question at four.

04:16:47 15         MR. BLUME:  If I may be heard?

         16         MR. KO:  The idea Special Master Garrie

         17  that I can lay foundation.

         18         SPECIAL MASTER GARRIE:  No wait stopped.

         19  I haven't ruled just because I haven't -- as

04:17:02 20  reiterate relates to the topics you here to testify
```

21 about as whitelisting relates to that's topics

22 Ms. Hendrix, can you please answer the question I

23 know I note your objection for the record

24 Counsel Blume but it's overruled as it relates to

04:17:16 25 the topics you are here to speak to please provide

202

↑

**CONFIDENTIAL ROUGH DRAFT**

04:17:19 1 your answer to the question.

2        THE DEPONENT:  I just don't understand

3 how it relates to monitoring and

4 \everyone\enforcement if friend permissions have

04:17:31 5 been deprecated then there's no friend permissions

6 to review for example at app review because

7 developers from a product technical perspective

8 can't answer it so it doesn't make any sense.  It's

9 not -- it's not related to why I'm here.

04:17:49 10     Q.   (By Mr. Ko)  Okay.  Are you prepared in

11 connection with any of the topics that you have

12 been designated to speak on about are you prepared

13 to testify on behalf of Facebook as to any aspect

14 of whitelisting at all?

04:18:06 15        MR. BLUME:  Asked -- just asked that

16 question and she just answered it.

17        MR. KO:  Stop Mr. Blume.

             18          SPECIAL MASTER GARRIE:  No, you got to

             19  object Counsel Blume or let the question.

04:18:16 20          MR. BLUME:  Asked and answered.  It was.

             21          SPECIAL MASTER GARRIE:  Answer the

             22  question.

             23          MR. BLUME:  Special Master Garrie it was

             24  the question you just asked her.

04:18:27 25          MR. BLUME:  You can answer question.

                                                        203

↑

                     **CONFIDENTIAL ROUGH DRAFT**

04:18:29  1          THE DEPONENT:  I agree that that my

          2  response to Special Master Garrie's question is

          3  accurate.  I don't see how whitelisting is relevant

          4  to the topics on why I'm -- I'm here today.  Like I

04:18:43  5  don't -- I don't see it.  I'm not trying to be

          6  evasive I just don't understand.

          7          THE DEPONENT:  And I feel like Mr. Ko

          8  just might not understand.

          9     Q.   (By Mr. Ko)  Yeah, I'm trying to be very

04:18:55 10  precise with my words and I understand that you

         11  don't believe it's relevant.  So it's just a simple

         12  yes-or-no question for the record.

         13          Are you prepared -- do you have an

         14  objection Rob?

04:19:12 15          MR. BLUME:  Yes asked and answered now a

16  third party.  This is just wasting time.

17          MR. KO:  Notwithstanding Mr. Blume on the

18  record are you prepared Ms. Hendrix to testify on

19  any aspect of whitelisting as it relates to the

04:19:30 20  happens you have been designated to testify on

21  behalf of Facebook for.

22          MR. BLUME:  Objection.

23          Special Master Garrie does she now have

24  to answer that a third time?

04:19:50 25          SPECIAL MASTER GARRIE:  Did you was the

                                                       204

↟

**CONFIDENTIAL ROUGH DRAFT**

04:19:51 1  answer in the -- Ms. Hendrix I I believe was the

2  first second the think the third I believe it was

3  yes but you are not sure.

4          Can you just was affirmative yes I'm

04:20:03 5  confused at this point just yes or no.

6          THE DEPONENT:  I said yes to the specific

7  question of whether I'm familiar with the topic of

8  whitelisting is not a define term.

9          SPECIAL MASTER GARRIE:  No, no that's

04:20:15 10  knots that's not the question all I'm interested if

11  is are you the question was are you prepared to

```
         12   testify on aspect of whitelisting as it relates to

         13   what you ever been designate to testify on behalf

         14   of Facebook for.

04:20:38 15           MR. BLUME:  I read her answer one thing

         16   doesn't relate to the other that's what she don't

         17   how it receipts and I think the problem

         18   Special Master Garrie is that I don't think Mr. Ko

         19   understand the concept so said I don't under how it

04:20:53 20   receipts to monitoring \everyone\enforcement if

         21   friend permissions have been deprecated there's no

         22   friend permission to review and so it doesn't

         23   relate to her topics it's just doesn't relate it's

         24   the concept and that's -- my fear is Mr. Ko doesn't

04:21:06 25   understand the concept of whitelisting and so.
```

                                                            205

♠

                        **CONFIDENTIAL ROUGH DRAFT**

```
04:21:09  1           SPECIAL MASTER GARRIE:  Wait one second

          2   we can fix this.  Can.

          3           Can you please define whitelisting.

          4           MR. KO:  Perfect.

04:21:19  5           MR. BLUME:  Not Noe not a corporate what

          6   she means.

          7           SPECIAL MASTER GARRIE:  What understand

          8   in her capacity.  Well she was asked whether she's
```

9    prepared to speak to whitelisting in response to

04:21:30 10    any of the topics she's here to speak today.

11          What was stated is, she doesn't

12    understand how whitelisting applies to what she is

13    here to speak about today.  I'm asking her to

14    explain to me, her definition of whitelisting so

04:21:44 15    that way I can then -- we can move forward because

16    I don't.

17          MR. BLUME:  With all do respect

18    Your Honor.  It's how we prepared it's whether or

19    not sufficiently adequately prepared.  We have

04:21:56 20    obligation understand the rules to adequately

21    prepare the witness pursuant to the topics as

22    stated.  Her personal understanding may mean

23    nothing there is a topic.

24          SPECIAL MASTER GARRIE:  I understand my

04:22:06 25    point.

206

↑

**CONFIDENTIAL ROUGH DRAFT**

04:22:06 1          MR. BLUME:  So.

2          SPECIAL MASTER GARRIE:  Well then as --

3    as it is defined.  However -- as the corporate

4    representative how dough do you know not believe

04:22:15 5    whitelisting relates in any way to needs you have

6   been designated to speak about it on.

7          MR. BLUME:  It's defined in the document.

8          THE DEPONENT:  Well I what to.

9          THE DEPONENT:  Do the plaintiffs counsel

04:22:33 10   do they define do you want to read their definition

11   if the answer is yes to that first then try to

12   respond.

13          SPECIAL MASTER GARRIE:  I thought the

14   deposition actually notice.  So that's what I been

04:22:45 15   operating under the understanding of what it is.

16   But so maybe -- is it not there Counsel Blume.

17          MR. BLUME:  It's defined in -- in I'm not

18   sure the -- on page ten.

19          THE DEPONENT:  In a part whit listed

04:23:03 20   partners any entity or person provided access to a

21   capability such as a permission to read or write

22   information via a specific API call that was not

23   provided to all entities or persons right so with

24   that understanding and that definition.

04:23:25 25          Mr. Cost question is because I have been

                                                    207

✦

                    **CONFIDENTIAL ROUGH DRAFT**

04:23:29  1   operating with that definition but and patternly

2   maybe this isn't but the question was from Mr. Ko,

3    Ms. Hendrix Ms. Hendrix testify in any aspect of

4    whitelisting as it relates to what you have been

04:23:51  5    designated to testify on behalf of Facebook.  Using

6    the definition that was just read into the record?

7              THE DEPONENT:  Thank you for pointing

8    this out to me and I don't have any -- I don't --

9    sorry that I didn't recall that that was in there.

04:24:09 10              I don't, sitting here today that there is

11   any relevancy with respect to anything that I have

12   been told to to be prepared for that relates to any

13   of those topics?

14              THE DEPONENT:  I can swear under oath

04:24:25 15   that I just sitting here today, I -- I struggle to

16   come up with anything.

17              MR. BLUME:  It's not that she's not

18   prepared it just doesn't apply.

19              SPECIAL MASTER GARRIE:  Well,.

04:24:36 20              MR. BLUME:  That's the difference.

21              SPECIAL MASTER GARRIE:  Well you are --

22   you are -- Counsel Blume he's entitled to answer

23   the question and she's entitled to answer question

24   whether whitelisting is appropriate in her view as

04:24:49 25   to the witness that she designated by Facebook is

208

**CONFIDENTIAL ROUGH DRAFT**

04:24:52  1  prepared to speak to that and her position is, no,

2  it's not and I don't understand why.  Which is what

3  she has said.  So we can move forward.

4          MR. KO:  This is he this is all --

04:25:06  5  Special Master Garrie this sort of insanity if you

6  will as bell.

7          SPECIAL MASTER GARRIE:  No, no adjective

8  there's no -- another -- you need to take more time

9  to think about what you are going to words you are

04:25:18  10  going to use we are going to curb your words will

11  not insanity construction tiff any question any

12  words that not future -- result in future

13  frustration.

14          MR. KO:  Noted I apologize I apologize

04:25:37  15  I'm so frustrated today.

16          I have -- the point I wanted to make

17  Special Master Garrie I had asked the question are

18  you familiar with the term whitelisting.  The

19  answer was yes.  The next question is what your

04:25:51  20  understanding of that term and that is what led to

21  this another 20 minutes on the record of back and

22  forth to a very bass six question.

23          SPECIAL MASTER GARRIE:  Well.

24          MR. KO:  And of course all of my

04:26:04 25   questions related to Ms. Hendrix.

⬆

**CONFIDENTIAL ROUGH DRAFT**

04:26:06  1        Capacity as a 30(b)(6) witness and,

        2   again, Mr. Blume can object for the record but he

        3   certainly did not instruct the witness not to

        4   answer as he has.

04:26:16  5        MR. BLUME:  I can actually.

        6        SPECIAL MASTER GARRIE:  Yeah.

        7        MR. BLUME:  I actually can.

        8        MR. KO:  Only with respect to privilege.

        9        MR. BLUME:  That's not the rule.

04:26:21 10        SPECIAL MASTER GARRIE:  No 30(b)(6) with

       11   regards to 30(b)(6) he can -- because the witness

       12   is here to testify in certain subjects under the

       13   case law in the 9N circuit they have to preserve

       14   their rights because of the witness's testimony can

04:26:36 15   be called to trial accordingly so he is obligated

       16   to make sure that the witness -- only on the

       17   subjects that they are before or been designated

       18   as.  I -- I -- I believe the case -- don't quote

       19   me, but I want there's a ninth circuit base that

04:26:59 20   links in the all over I cannery it as sit here now.

       21   So he's tiled to and needs to rated and note the

22  objections for the record and instruct the witness

23  because this statements are binding.

24          MR. KO:  Special Master Garrie do you

04:27:26 25  mind I believe we are on the record I men

                                                            210

↑

**CONFIDENTIAL ROUGH DRAFT**

04:27:30  1  Ms. Hendrix you have been relieved at some periods

       2  of time for the last hour and a half.  But I'm

       3  dealing with bit of a personal emergency I was

       4  hoping that take five minutes to address this and

04:27:40  5  then we get back on the record if you wouldn't

       6  mind.

       7          SPECIAL MASTER GARRIE:  Yeah please open

       8  the break out rooms to everybody take time to five

       9  minutes we'll con inventor in 35 minutes.

04:27:55 10          THE VIDEOGRAPHER:  Okay we off the

      11  record. -- rough the record it's 4:28 p.m.

      12          (Recess taken.)

      13          THE VIDEOGRAPHER:  We are back on the

      14  record, it's 4:40 p.m.

04:40:57 15          SPECIAL MASTER GARRIE:  Ready to go back

      16  on the record.

      17          MR. BLUME:  Yes.

      18          SPECIAL MASTER GARRIE:  No Counsel Ko was

19   that a yes from you all right we are going back on

04:41:06 20   the record I want to make another statement before

21   anybody says anything.

22          Let's go back on the record.

23          THE VIDEOGRAPHER:  Thank you we are back

24   on record it's 4:41 p.m.

04:41:16 25          MS. WEAVER:  Okay.  This is Special

211

↟

**CONFIDENTIAL ROUGH DRAFT**

04:41:18 1   Master I'm going to remind counsel again do not

2   talk each other or I will be all of person so

3   keeper trying -- to get this right.  But it is

4   critical for the purposes of the court reporter to

04:41:31 5   have a full and complete record.  We -- you are

6   still constantly talking over each other and the

7   witness and advice verify is please endeavor among

8   yourself to allow each other to finish speaking.

9          And show the courtesy and respect and so so on and

04:41:51 10   so forth.

11          With that stayed I will turn it back to

12   Counsel Ko to continue forward.

13          MR. KO:  Thank you Special Master Garrie.

14          Q.   (By Mr. Ko)  And Ms. Hendrix, thank you

04:42:02 15   for your patients.  I actually hope to only have a

16  few more series of questions for you.  If all goes

17  according to plan so the end is site rat least with

18  respect to that.

19       Q.   Now with respect to the topics that you

04:42:25 20  have been designated to testify on behalf of

21  Facebook for,.

22            Are you prepared to testify as to any

23  aspect of these topics as -- as they relate to

24  whitelisting?

04:42:47 25            MR. BLUME:  Objection.  Asked and

                                                            212

♠

**CONFIDENTIAL ROUGH DRAFT**

04:42:47  1  answered.

2            THE DEPONENT:  I have already made it

3  clear, I believe on the record with all due respect

4  that I am prepared to speak on the topics and based

04:43:00  5  on the definition here of whitelisted partners and,

6  again, saying for the record that we do not have

7  affixed definition as it a corporate company

8  precisely of what that means it can means different

9  things to different people I not able sitting here

04:43:18 10  today after reviewing the topics multiple times

11  able to provide any information that I think is at

12  all relevant on my understanding and this

13  definition of whitelisting to those topics.

14       Q.   (By Mr. Ko)  Thank you for making that

04:43:33 15  clear.

16            Now with respect to the poll seats and

17  procedures that I believe your counsel has

18  indicated you can testify as to, are there any

19  policies and procedures that relate to third

04:43:50 20  parties use of friend -- use of user information

21  beyond the use case?

22       A.   I need to refresh use refers to purpose

23  of any entity to obtain user data.

24            And then your question again I -- I'm

04:44:12 25  sorry.

                                                    213

**CONFIDENTIAL ROUGH DRAFT**

04:44:14  1       Q.   With respect to the policies and

2  procedures that I believe you are prepared to

3  testify on are there any policies and procedures

4  that relate to third parties use of user

04:44:26  5  information beyond the use case?

6       A.   What -- wait isn't the opposite of what

7  you asked me are you asking and what policies and

8  monitoring procedures are in relate or in place

9  that relate to user data.

04:44:47 10     Q.   I don't know?

11     A.   For use case.

12     Q.   I don't what understanding you have of --

13   of my previous question.  But I'm simply asking you

14   this question.  With respect to the policies and

04:44:56 15   procedures that I believe you are prepared to

16   testify on, are there any policies and procedures

17   that relate to third parties use of user

18   information beyond the use case?

19          MR. BLUME:  Objection.

04:45:20 20          THE DEPONENT:  There are policies with

21   respect to use of friend data and they exist today

22   we still allow to share inapps friend list and in

23   terms of monitoring for user information than yes

24   there's an app review team and there's other teams

04:45:43 25   within DevOps that review apps for compliance with

                                                          214

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

04:45:49  1   policies govern use of user information.

2     Q.   (By Mr. Ko)  And those policies that

3   govern the use of user information what are they

4   and to be helpful.

04:46:11  5     A.   Well.

6     Q.   I'm referring to the specific ones that

7    you just mentioned in your prior response.

8         A.   Well I didn't mention specific policies I

9    just said you know there's still a friend -- there

04:46:26 10   are still -- a friend a friend related policies

11   because the login product still allows to access

12   inapp friend list so there are friend specific

13   provisions.

14         A.   I believe there's two that relate to use

04:46:40 15   of friend information and then there's other

16   policies for use of user information in the

17   platform terms and the developer policies and the

18   term -- the terms of service perhaps elsewhere but

19   for the relevant topics that's the locations that

04:46:58 20   come to mind.

21    Q.   Any other policies that you can think of

22   that contain this information?

23         MR. BLUME:  Objection.  Form.

24         THE DEPONENT:  I don't have anything

04:47:10 25   further to add in response to what I said.

215

&uarr;

**CONFIDENTIAL ROUGH DRAFT**

04:47:23 1    Q.   (By Mr. Ko)  Given your understanding of

2    the term whitelisted apps as indicated in this

3    notice are you aware of whether or not the SRR ever

        4  indicated at any time that Facebook was going to

04:47:48  5  allow whitelisted partners to continue making

        6  specific app calls with respect to friend data?

        7           MR. BLUME:  Objection.  Form.

        8           THE DEPONENT:  I -- I -- it's hard for me

        9  to answer my question because I don't like the way

04:48:11 10  you worded so it's hard for me to do like yes or

     11  no.

     12     Q.   (By Mr. Ko)  What part of the question

     13  did you not like?

     14     A.   I'm -- I'm going to need you to restate

04:48:25 15  it.

     16     Q.   You have a certain understanding of

     17  whitelisted partners you had indicated that to me

     18  earlier, right?

     19     A.   Yes, and -- and I believe that I'm

04:48:37 20  supposed to for -- my purposes today, adopt this --

     21  this description in No. 26.  Is that correct?

     22     Q.   Given the definition of whitelisted

     23  partners or whitelist or whitelisted or

     24  whitelisting as indicated in paragraph 26 of the

04:48:58 25  notice, do you know whether or not SRRs at any time

                                   216

⌃

04:49:03  1  ever indicated that Facebook was going to whitelist

2  certain apps and permit them to continue accessing

3  friend information after 2014?

4          MR. BLUME:  Objection.  Form.

04:49:18  5          THE DEPONENT:  That would not be anything

6  in the SRRs.

7      Q.  (By Mr. Ko)  Same question with respect

8  to the data use policy.  Or all iterations there

9  to.

04:49:33 10          Did the data use policy at any time ever

11  indicate that Facebook was going to whitelist

12  certain apps and permit to them to accessing friend

13  data after 2014?

14          MR. BLUME:  Objection.  Form.

04:49:48 15          THE DEPONENT:  The data policy at all

16  times during the relevant period made clear to

17  people what data was available through the

18  platform.  So like I said to the extent the V1 apps

19  were still live regarding of when they were

04:50:03 20  deprecated those disclosures were there in multiple

21  locations including the controls and settings that

22  people had to control their information we never

23  removed those disclosures until it was no longer

24  relevant to people.

04:50:23 25      Q.  (By Mr. Ko)  And I know you testified

217

⬆

**CONFIDENTIAL ROUGH DRAFT**

04:50:24  1   that you don't recall exactly when that occurred.

2   But with respect to the rolling out of v2 or Graph

3   v2, when that occurred, was there any aspect of the

4   data use policy that ever indicated that Facebook

04:50:42  5   was going to whitelist certain apps and permit them

6   to continue accessing friend data?

7            MR. BLUME:  Objection.

8            THE DEPONENT:  I don't believe that we

9   would have communicated that in the data use

04:51:01 10   policy.  Sorry I hear myself speculating I'm having

11   afternoon fatigue that just wouldn't be the

12   location -- the -- that's not the purpose of the

13   data policy poll.

14       Q.   (By Mr. Ko) So to be the clear data

04:51:15 15   policy did not disclose or reflect any indication

16   that Facebook was going to whitelist certain apps

17   and permit them to continue accessing friend data,

18   correct?

19            MR. BLUME:  Asked and answered.

04:51:40 20            THE DEPONENT:  The -- the data use policy

21   told people including the product itself, right so

22   when user goes to login they would see that the app

```
           23  was requesting friend information right and the

           24  users friends were still able to see that they

04:51:56   25  could unless they opted out of platform enabled
```

218

⬆

**CONFIDENTIAL ROUGH DRAFT**

```
04:52:00    1  their friends who those who choose platform and log

            2  in to apps.  So all of facts with respect to how it

            3  worked were available to people at all times

            4  throughout both the product and the user experience

04:52:13    5  by using the product and through the privacy and

            6  app settings and -- and data use poll seen and help

            7  center and all of the educational tools that we

            8  have discussed flowed the dated.  Always made it

            9  clear that that was how the platform worked now a

04:52:31   10  somebody set of the platform that's developing on

           11  v2 worked in a different way but it's more

           12  important to tell people what is happening with the

           13  V1.

           14        Q.   (By Mr. Ko)  So in connection with the

04:52:46   15  data use policy, was there ever a disclosure at any

           16  time over the relevant time period that Facebook

           17  was going to whitelist certain apps and permit them

           18  to continuing accessing friend data?

           19             MR. BLUME:  Objection.  Form.
```

04:53:08 20          THE DEPONENT:  I don't -- I don't know.

21   I -- I'm sure we have versions I could find out.  I

22   don't believe that we would have done so.  Because

23   it's not the right document, that's...

24        Q.   (By Mr. Ko)  Regardless of whether or not

04:53:22 25   it was the right document and and you have and we

                                                        219

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

04:53:29  1   provided your counsel and it sounds like to you

2   ultimately a copy of or at least a reference to the

3   fact that we were going to discuss the data use

4   policy among the other policies that are

04:53:42  5   applicability to users in this case.

6          Did you in fact review the data use

7   policies in connection with preparing for this

8   deposition?

9        A.   I testified earlier today that I reviewed

04:53:57 10   multiple versions of the data use polling sees.  I

11   am sitting here today to tell you I don't believe

12   that the contents of any of those versions would

13   have included any topics pertaining to the word

14   whitelist because that again is not what privacy

04:54:12 15   policies or data use policies for Meta purposes

16   that's -- that's not that's not the place I would

17    put it, but I don't recall having seen it in -- all

18    of the versions that I did review.

19         Q.    And in connection with the data use

04:54:29 20    policies that you reviewed and were in place over

21    the relevant time period, was there ever any

22    indication or disclosure that in those data use

23    policies that Facebook was going to permit certain

24    third parties to access certain friend information

04:54:53 25    about a user in connection with graft v2?

                                                          220

✦

                    **CONFIDENTIAL ROUGH DRAFT**

04:55:00  1              MR. BLUME:  Objection.  Form.

         2              THE DEPONENT:  To try to be helpful like

         3    there -- there was no disclosure that certain apps

         4    would no longer have access to friend information.

04:55:19  5    That is helpful thank you.  And, again, I should

         6    correct myself all apps even to today should give

         7    friend data I should have friend permissions bu

         8    I -- I -- just wanted to clarify that point.  And

         9    when you say that certain apps can continue to

04:55:41 10    continue to get friend data to this day you just

         11    talking about the carve out that you had described

         12    before the inapp friend list correct yes through

         13    the apps because keeping in there's other methods

14  that friends can and we disclose to tell them what

04:56:00 15  they find full of what share with their friends if

16  were just talking about the platform then that's

17  correct.

18      Q.   Any other friend information other than

19  the inapp friend list on the platform that a

04:56:14 20  third-party app developer can access today?

21      A.   Every since v2 there has not been any

22  friend permissions built whether via a public API

23  or a private or partners rather API.  Like I -- I

24  can confirm that that friend permissions have gone

04:56:35 25  a way.

                                          221

⬆

                **CONFIDENTIAL ROUGH DRAFT**

04:57:04  1      Q.   Does the term or are you familiar with

2  the term integration partner?

3      A.   I am.

4      Q.   What is your understanding of that?

04:57:15  5      A.   Those are.  Those are server providers

6  who build and -- let's use -- I think I can better

7  respond with an example.  Like Facebook is

8  available on BlackBerry and BlackBerry is an

9  integration partner and well was available.  And so

04:57:37 10  integration partners are people -- are partners who

11  enabled you to replicate Facebook on your -- on

12  their devices.  So people could have -- so I guess

13  put differently.  If you don't have -- if you don't

14  have an integration partner then you can't use

04:57:56 15  Facebook on -- it just doesn't techily work.

16  They -- they replicate Facebook for people.  So

17  they can use Facebook on other things like in their

18  cars.  Like ███████ is -- is an example.

19      Q.   Are you aware of whether or not any

04:58:17 20  integration partners continue to access friend data

21  after 2014?

22          MR. BLUME:  Objection.  Beyond the scope.

23          THE DEPONENT:  Hum.

24          MR. BLUME:  Hold on.

04:58:35 25          THE DEPONENT:  Okay.

                                                            222

**CONFIDENTIAL ROUGH DRAFT**

04:58:35 1          MR. BLUME:  Same question with regard

2  integration third parties instruct you not to

3  answer.  Beyond the scope.

4      Q.   (By Mr. Ko)  Are you going to follow that

04:58:45 5  instruction?

6      A.   Yes.

7      Q.   Are you aware of whether or not the SRR

8   or any iteration there to every indicated at any

9   time that Facebook was going to permit certain

04:59:06 10   integration partners to continuing accessing friend

11   data after 2014?

12          MR. BLUME:  Objection.

13          THE DEPONENT:  I'm aware that even from

14   the relevant people up until today there is a

04:59:21 15   service provider section within the context of the

16   data use policy which is directly incorporated by

17   reference in the terms of service and/or SRR and

18   that explains very clearly that there are service

19   providers who help us provide services such as our

04:59:39 20   products I'm not quoting me on the language and

21   those integration partners for example, would be

22   agreeing to terms and those terms had provisions on

23   user data, which required those partners to be very

24   clear about what it was they were collecting and

04:59:53 25   how they were going to use that information that

223

➤

**CONFIDENTIAL ROUGH DRAFT**

04:59:56 1   could only be used in accordance with our agreement

2   with integration partners which whose to Facebook

3   for example on the BlackBerry service app phone

4   rather.

05:00:06  5       Q.   (By Mr. Ko)  So your understanding of

6    sorry.  So your understanding of integration

7    partners and your description of integration

8    partners is that they fit under the umbrella of the

9    service provider language and the data use policy?

05:00:26 10       A.   Say that again you cut off.

11       Q.   The description of integration partners

12   that you have provided is it your understanding

13   that they would fit under the umbrella of the

14   service provider language in the data use policy?

05:00:48 15       A.   It does.

16       Q.   So does do the he think I answer the to

17   question but I'm going to ask it nonetheless so

18   that the record is clear.

19            Did the data use policies ever indicate

05:01:13 20   at any time that Facebook was going to permit and

21   integration partner to continue accessing friend

22   data after 2014?

23       A.   There's too much waving op concepts going

24   on in your question.  The --

05:01:31 25       Q.   It's complicated case?

                                                    224

↑

                    **CONFIDENTIAL ROUGH DRAFT**

05:01:32  1       A.   Sorry go ahead.

2      Q.   Go ahead sorry I didn't mean to

3    interrupt?

4      A.   The data use policy told people about the

05:01:40   5    Facebook platform and how they could control their

6    information with applications on that -- that use

7    the Facebook platform.  But there's also another

8    section I believe it's been mostly referred to as

9    service providers and our just added upon that

05:01:57  10    which is another paragraph which is different and

11    distinction and that telling people that we have

12    certain partners, you know, I would have to pull

13    the precise language.  That help us provide our

14    products and so the example in that service

05:02:14  15    provider section that I'm referring to is that

16    these integration partners allow users to access

17    Facebook for exam will ██████ to enable people to

18    share their ██████ device hardware like when you

19    are on using playing that game and they beat their

05:02:32  20    friends they could because of their service

21    provider relationship with us enable people to

22    share on Facebook some story they beat their friend

23    in a game or they beat super Mario brother for

24    example.

05:02:48  25      Q.   So is it your term that there were

225

**CONFIDENTIAL ROUGH DRAFT**

05:02:50  1   aspects of the data use policy that communicated to

2   users that service providers including but not

3   limited to integration partners continue to access

4   information about a users friend; that fair to say?

05:03:06  5        MR. BLUME:  Objection.  Form.

6        THE DEPONENT:  I don't remember if the

7   word integration was in there but the word part is

8   in there and the first sentence of multiple

9   versions if not all of them is very clear to

05:03:18 10   people.  That we have partners that be us provide

11   access to and to Facebook's products like to

12   improve them I should stop rambling and what it

13   says and actually refer to the precise language.

14   But it's always been clear.

05:03:36 15        Q.   (By Mr. Ko)  Is there language in the

16   data use policy that reflects -- that reflects how

17   Facebook would control or not control the

18   information that a third party would acquire about

19   a user or a users friend?

05:04:01 20        MR. BLUME:  Objection.  Form.

21        THE DEPONENT:  The data use policy has

22   always told about what third party applications can

23   access through or platform and what including the

24  information that their friends can share.  It's

05:04:15 25  always been clear.

⬆

**CONFIDENTIAL ROUGH DRAFT**

05:04:20  1      Q.   (By Mr. Ko)  Is there anything in the

2  data use policy that reflects any language about

3  how Facebook would monitor or enforce the use of

4  that information once it was acquired by that third

05:04:35  5  party?

6      A.   So the answer is yes, there's information

7  about the fact -- not I should answer yes to your

8  question.  So the -- the data use policy tells

9  people to be careful about -- and the terms of

05:04:59 10  service, tells -- tells people to careful what it

11  is they they are sharing and be aware of the

12  information they share not just with their friends

13  but -- but with applications and that those

14  applications are required to respect the users

05:05:13 15  privacy but to be very closely to read their terms

16  of service because the developer also has terms for

17  use of their third party application.  So it

18  cautious people so there's relevant language always

19  in the relate van period on the topic of the fact

05:05:30 20  that developers are required to respect their

```
     21  privacy policy their privacy and for people to read

     22  the terms and policies of the developer because

     23  they govern the developers use of the information

     24  that the person is choosing to share.

05:05:47 25      Q.   And how did Facebook ensure that third
```

                                                              227

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

```
05:05:50  1  parties were in fact required to respect the users

       2  privacy?

       3           MR. BLUME:  Objection.  Form.

       4           THE DEPONENT:  Throughout our agreements

05:06:01  5  with like we insured because the developers

       6  contractually agreed and are obligated to adhere to

       7  those terms so in terms of requiring like that is

       8  the agreements that we had with developers and the

       9  provisions included there in required developers to

05:06:21 10  follow our terms and respect and comply with their

      11  own privacy policies.

      12      Q.   (By Mr. Ko)  And those contractual

      13  agreements I assume you are talking about the

      14  platform policy?

05:06:35 15      A.   The platform terms and developer policies

      16  today and any other applicable provision to the

      17  extent there is one.  But yes those are the primary
```

18   terms.

19        Q.   Are there any aspect or are there any

05:06:52 20   policies other hand the platform terms and

21   developer policies or the platform policy before

22   that that reflects this contractual agreement

23   between Facebook and the third party app developer

24   as to how they would go about respecting a users

05:07:15 25   privacy?

                                                    228

↑

                  **CONFIDENTIAL ROUGH DRAFT**

05:07:18  1          MR. BLUME:  Objection.

2          THE DEPONENT:  So the terms the SRR

3   have -- have disclosures that there's other

4   provisions and at the very bottom of them it tells

05:07:37  5   people that there could be additional terms and

6   policies and it has incorporates by reference the

7   platform terms and in the relevant period the

8   platform policies so it makes people aware that

9   there are terms of use for developers who use our

05:07:55 10   platform and so that's the SRR and then for the

11   data use policy, all -- I won't repeat myself.  I

12   think I went over that.

13        Q.   (By Mr. Ko)  So is it your testimony that

14   the SRRs link to or reference the -- the platform

05:08:19 15   policy or the current iteration of it which --

16   which are the platform terms and developer

17   policies?

18         A.   Yes, at -- at the bottom it links to

19   things like the advertising guidelines and other

05:08:32 20   different terms associated with different products

21   for the use of different apps and services that we

22   offer and required third parties to adhere to.

23         Q.   And were there specific provisions in the

24   data use policy or excuse me were the specific

05:08:50 25   provisions in the platform policy or the platform

                                                            229

↟

                    **CONFIDENTIAL ROUGH DRAFT**

05:08:53  1   terms and developer policies that reflected how a

2   third party app developer was to respect a users

3   privacy?

4              MR. BLUME:   Objection.

05:09:12  5              THE DEPONENT:   That's aboard statement

6   there are provisions and always have been you have

7   to privacy policy to tell people what it is that

8   you have collect how will use and/or share the

9   information you have comply the privacy policy you

05:09:24 10   have to not be -- don't he mislead confuse or

11   surprise people which could pertain to our topics

```
          12   today.  So there were definitely provisions that

          13   are privacy related in the formerly known in the

          14   platform policies and current versions of the

05:09:45  15   platform terms and developer policies such as only

          16   the request the information to mean mean fully

          17   improve the users experience.  So it's a broad

          18   privacy is broad statement so those are examples of

          19   privacy related provisions.

05:10:04  20        Q.   (By Mr. Ko)  With respect to the

          21   provisions that you are referring to that required

          22   the third-party app developers to respect the users

          23   privacy, how did Facebook and monitor and enforce

          24   those terms?

05:10:20  25        A.   We automatic -- we monitor using both
```

                                                      230

♠

                     **CONFIDENTIAL ROUGH DRAFT**

```
05:10:25   1   automated and manual means, so we have automated

           2   tools that have been dynamic over the years as we

           3   have -- we have updated them or built different

           4   types of automated monitoring tactics.  Good a

05:10:41   5   example would be we built a privacy policy crawler

           6   would help crawl and detect broken privacy policy

           7   link we have the developers to privacy policy if

           8   broken user can't find than the automated crawler
```

9  can detect that and then a human well no never mind

05:11:01 10  like the automated crawler can -- can detect that

11  and I believe it can automated enforce I don't

12  believe it goes to a human so I maybe mistaken

13  there.  But I'm pretty sure the automated is

14  complete but either way the -- the issue gets

05:11:21 15  suffered on addressed and -- oh I should stop I'm

16  ram diagnose even your late operative DUP even

17  fatigue.

18       Q.   This automated system is fair to describe

19  that as a preemptive measure?

05:11:37 20           MR. BLUME:  Objection.

21       Q.   (By Mr. Ko)  Or was it more of a reactive

22  measure?

23           MR. BLUME:  Objection.

24           THE DEPONENT:  I -- I don't know what you

05:11:49 25  mean by preemptive measure I mean the crawler runs

                                                        231

↑

                    **CONFIDENTIAL ROUGH DRAFT**

05:11:52  1  and if the app is live on the platform and not in

2  developer mode, for example, like the -- the

3  crawler can -- it I'm not remembering sit here

4  today often I think it's each but -- but I do not

05:12:11  5  want -- I should stop speculating but the crawler

6   proactive calls and detects.  So it doesn't like --

7   so I don't what you mean by pre -- preemptive.

8       Q.   (By Mr. Ko)  Other than this crawler,

9   what were the other ways in which Facebook

05:12:29 10   monitored and enforced terms -- its terms with

11   third parties regarding user privacy?

12       A.   ████████████████████████████

13   ████████████████████████████████

14   ██████████████████     ███████████████

05:12:53 15   ████████   ██████████████████████████

16   ████████████████████████████████

17   ██████████████████████████████

18   ████████████████████████████████████

19   ████████████████████████████████████

05:13:12 20   ██████████████████████████████████

21   ████████████████████████████████████

22   █████████████████████████

23       So it's just meant as a signal and also

24   users people can report apps through for example

05:13:31 25   any post that a person shares from an app.  There's

232

⬆

**CONFIDENTIAL ROUGH DRAFT**

05:13:36  1   an ability at each post for a user to report what

2   they are seeing for multiple reasons.  We also

                3    receive reports internally, external for example,

                4    from the press or other third parties like

05:13:52    5    advertisers might point out something or other

                6    developers might observe that there's violations

                7    and so through user reports, external and internal

                8    reports and then proactive developer operations,

                9    team members manually going in to review

05:14:13 10    applications for compliance with the terms and

              11    policies and I forgot another privacy related

              12    provision.  But like the circuit requirements to

              13    protect data obtain from us against unauthorized

              14    use access or disclosure.

05:14:37 15    ████████████████████████████████████████

              16    ████████████████████████████████████████

              17    ██████████████████████████████████

              18    ████████████████████████████████████

              19    ███████████████████████████████

05:14:53 20    ████████████████████████████████████████

              21    ██████████████████████████████████████

              22    ████████████████████  so there's a lot of

              23    monitoring that goes -- that takes place both in --

              24    on Facebook and then off of Facebook depending

05:15:10 25    on -- on yeah, I should stop getting tired.  Sorry.

                                                              233

‸

**CONFIDENTIAL ROUGH DRAFT**

05:15:16 1     Q.   Would you agree with me Facebook job

2  policy enforcely and monitor API abuse bothered

3  parties on its platform?

4     A.  I agree with that we committed to -- to

05:15:29 5  policing our platform through and we did through

6  multiple measures including agreements with

7  developers, at times, we introduced the formal app

8  review them but there was always teams that were

9  proactively reviewing apps for compliance prior to

05:15:47 10  that.  So I -- I do agree that Facebook needs to

11  and has had like policy enforcement review measures

12  that have been, you know, effective and practical

13  and proportionate to the platform.

14     Q.   But Facebook succeed in effort to police

05:16:11 15  and monitor API abuse on its platform?

16        MR. BLUME:  Objection.  Hold on.  Calls

17  for a legal conclusion.  And outside the scope of

18  the topics.

19        Instruct you not to answer on behalf of

05:16:34 20  the organization.

21        THE DEPONENT:  Does that I mean in my

22  personal.

23     Q.  (By Mr. Blume)  No?

24     A.  Or I don't answer at all.

05:16:42 25          THE DEPONENT:  Okay.

                                                          234
↟

                    **CONFIDENTIAL ROUGH DRAFT**

05:16:43 1      Q.   (By Mr. Ko)  You are going to follow the

         2  instructions of your counsel?

         3      A.   Yes, sir.

         4      Q.   Would you agree with me that it was

05:16:51 5  difficult if not impossible for Facebook to capture

         6  all the data abuse and misuse that was happening on

         7  its platform?

         8          MR. BLUME:  Hold on.  Objection.

         9  Compound.  Vague and calls for a legal conclusion

05:17:14 10 and beyond the scope of the topics and instruct you

         11 not to answer as a 30(b)(6) witness.

         12     Q.   (By Mr. Ko)  Are you going to follow that

         13 instruction?

         14     A.   Yes, sir.

05:17:29 15     Q.   Now would you agree with me and of course

         16 I'm asking as I always have been for these

         17 questions in your capacity as a 30(b)(6) witness

         18 that is here to testify on matters such as

         19 monitoring and enforcement as re flexed in topic 3.

05:17:48 20         Would you agree that it was difficult if

         21 not impossible for Facebook to monitor enforce,

22   police all the API abuse that was happening on its

23   platform?

24        MR. BLUME:  Objection.  Calls not for

05:18:02 25   facts but opinion of an organization which is

235

↟

**CONFIDENTIAL ROUGH DRAFT**

05:18:04  1   beyond the scope of the 30(b)(6) and for I instruct

2   not to answer.

3   BY MR. BLUME:

4        Q.   Know are you going to follow that

05:18:14  5   instruction?

6        A.   Yes, sir.

7        Q.   Are you aware of any facts speaking on

8   behalf of the company are you aware of any facts or

9   circumstances in which it became known that it was

05:18:27 10   Ime impossible for Facebook to police and monitor

11   all the abuse that was happening on its platform?

12        MR. BLUME:  Again, to the extent that you

13   are aware of any facts that relate to some

14   assessment of.

05:18:43 15        SPECIAL MASTER GARRIE:  Counsel is there

16   an objection.

17        MR. BLUME:  Yeah, I'm about to it's a

18   privilege objection and so I'm define the scope of

19  privilege for her if I may?

05:18:52 20        SPECIAL MASTER GARRIE:  Yeah sure I just

21  wasn't sure if there was an objection.

22        MR. BLUME:  Yes to extent if you become

23  aware of facts about the possibility of Facebook

24  monitoring as a result of a conversations with

05:19:05 25  legal counsel or based on advice of legal

                                                    236

⬆

**CONFIDENTIAL ROUGH DRAFT**

05:19:09  1  counseling I instruct you not to answer and -- and

2  as well I would object that it is -- sufficiently

3  vague as to outside the scope of the topics about

4  which you are testifying as a 30(b)(6) witness,

05:19:29  5  which is another instruction not to answer.

6        Q.   (By Mr. Blume)  Are you going to follow

7  that instruction?

8        A.   I am nor sure if supposed to wait for

9  Special Master Garrie because he turned on his

05:19:44 10  video and he.

11        SPECIAL MASTER GARRIE:  Thank you.

12        THE DEPONENT:  That means he might talk.

13        SPECIAL MASTER GARRIE:  That is true.

14  Counsel Ko what -- within the scope of what this

05:20:04 15  witness was designated too what does your question

16   map to.

17          MR. KO:  Topic 3C Special Master.

18          SPECIAL MASTER GARRIE:  Can you read.

19          MR. KO:  Facebook's monitoring and

05:20:18 20   \everyone\enforcement of contractual term with

21   third parties regarding their use of a of use's

22   data or information.

23          We can screen share it too for

24   \everyone\enforcement to see.  Enforcing.

05:20:38 25          SPECIAL MASTER GARRIE:  That would be

                                                        237

⬆

**CONFIDENTIAL ROUGH DRAFT**

05:20:39 1   helpful.

2          MR. BLUME:  If I may Your Honor?

3          SPECIAL MASTER GARRIE:  One second.

4   Counsel Counsel Blume defense nature what

05:21:08 5   designated by testify to testify to.

6          MR. BLUME:  The possibility of monitoring

7   the is a legal conclusion the concept of what

8   constitutes abuse on the platform as a legal

9   conclusion.  There are also too vague terms for

05:21:28 10   30(b)(6) witness to opine on and to the extent

11   she's aware of those facts that led to those

12   conclusions they are privileged and therefore in

13    appropriate.

14              SPECIAL MASTER GARRIE:  And for the privy

05:21:41 15    guess.  But Facebook's monitoring enforced of

16    contractual terms of third parties regarding their

17    use of user data or information including each of

18    policies regulating access regulating access to

19    such data or information beyond the use case.

05:22:02 20              And you -- Facebook put forward this

21    witness to a opinion on this topic.

22              MR. BLUME:  Not the -- the Ime pocket --

23    the -- conclusion that something was impossible to

24    monitor that is -- what is -- it's presumably a

05:22:19 25    legal conclusion of impossibility.

                                                      238

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

05:22:21 1    SPECIAL MASTER GARRIE:  No.

2              MR. BLUME:  It's sufficiently vague and

3    undefined.

4              SPECIAL MASTER GARRIE:  Okay.  Noted

05:22:25 5    impossibility in the function not a lawyer.  But as

6    a function of her duties as an employee of Facebook

7    whether it was possible or not.  Not a legal.

8        Q.   (By Mr. Blume)  Right?

9              SPECIAL MASTER GARRIE:  Testifying

05:22:35 10  conclusion right it's whether or not it was

11  possible to accomplish this and so please answer --

12  so overruled.  Counsel Blume subject for the first

13  overruled with respect to the scope.  However,

14  still with regards to the objection with regard to

05:22:54 15  privilege for purposes of clarity of Counsel Blume

16  or any conversations you had with lawyers or Blume

17  Blume would you like to instruct the witness with

18  regards to privilege.

19          MR. BLUME:  Actually if we just jump off

05:23:06 20  the record I figure out the answer and whether it's

21  privileged and then we go forward.

22          SPECIAL MASTER GARRIE:  Okay we'll go off

23  the record.

24          THE VIDEOGRAPHER:  We are the reviewed

05:23:17 25  it's 5:26.

                                                        239

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

05:23:24  1          (Recess taken.)

2          THE VIDEOGRAPHER:  Back on the record

3  it's 5:27 p.m.

4          MR. KO:  Okay I just want to make sure

05:27:54  5  that Special Master Garrie is is here for this so I

6  will wait.  Hello.

7          At this point, Your Honor, Special Master

8    Mr. Blume Ms. Hendrix I'm not going to ask any

9    questions and I going to reserve the righted to ask

05:28:17 10  questions related to topics one, topics 2B, 2D

11   topics three and portions of topic six to the

12   appropriate Facebook witness that can answer these

13   questions and reserve the right to seek additional

14   time, so that Facebook can identify the proper

05:28:39 15  witness such that we have our substantive questions

16   answered.

17          But at this point I have no further

18   questions for you thank you for your time

19   Ms. Hendrix.

05:28:48 20          MR. BLUME:  If I may

21   Special Master Garrie respond.

22          SPECIAL MASTER GARRIE:  I mean, sure.

23   Suddenly I think.

24          MR. BLUME:  Yeah, Ms. Hendrix is here and

05:28:58 25  prepared as she said a number of times to speak on

                                                    240

⬆

**CONFIDENTIAL ROUGH DRAFT**

05:29:02 1   these topics.  There is no other witness that will

2    speak to those topics.  If Mr. Ko has questions for

3    Ms. Hendrix on those topics any one of them that he

4   mentioned he is obligated to ask those today.

05:29:17  5   There is absolutely no reason whatsoever no good

6   faith reason whatsoever to request any other

7   witness address to topics no other witness will be

8   prepared to address any of those topics.  That

9   is -- we have fulfilled our obligation to prepare

05:29:36 10   Ms. Hendrix to answer those topics and Mr. Ko had

11   more than sufficient time to get through.  We

12   object not only to extending any other deposition

13   to topics for which those witnesses are not

14   prepared.  We also object to any extensions of any

05:29:53 15   time based on this deposition.  I will note that

16   plaintiff's sent Ms. Hendrix more than 150

17   documents to prepare for this deposition.  They

18   asked -- they present two maybe three of those

19   documents the fact that they choose not to to go

05:30:15 20   through the documents the other 147 of them is a

21   choice that they made.  The types of questions that

22   Mr. Ko asked are choices he made.  And so their

23   fill your to get whatever information they thought

24   that they would want to get is making of their own.

05:30:32 25          If time is an issue, Ms. Hendrix is here

241

**CONFIDENTIAL ROUGH DRAFT**

05:30:35 1    but we will not present another witness on the

2    topics nor will we nor we will bring Ms. Phrase

3    content Hendrix back as a 30(b)(6) on these

4    topics -- reports as as far as Facebook is

05:30:58 5    concerned, the topics for which Ms. -- Ms. Hendrix

6    designated our now closed with the conclusion of

7    this deposition by Mr. Ko and we will move onto did

8    other topics.

9            MR. KO:  I just want to note for the

05:31:12 10   record Special Master Garrie and Mr. Blume that

11   addition to the reasons I identified earlier about

12   why we reserve to right to ask questions to the

13   appropriate witness on these topics, I just want to

14   make sure that the cleared is clear that we have

05:31:28 15   spent substantial amount of time on the record

16   today having basic disputes over the witnesses

17   ability to answer or not these questions and

18   response to topics and just to make clear another

19   ground for which we are seeking to reserve the

05:31:50 20   right to reopen the deposition is Mr. Blume's

21   improper instructions -- instructing the witness

22   not to answer.

23           MR. BLUME:  I will.

24           SPECIAL MASTER GARRIE:  Counsel Blume.

05:32:02 25           MR. BLUME:  I will note

242

**CONFIDENTIAL ROUGH DRAFT**

05:32:03 1  Special Master Garrie the purpose of obviously in

2  your presence is to make those decisions here the

3  objections I made for privilege of course were

4  proper the privilege discussion and the objections

05:32:14 5  to made to scope are certainly proper and the

6  extent that those questions are fit better in other

7  topics which I noted on the record.  There are

8  other witnesses who will testify at Mr. Ko failed

9  to make a record I will note that any of the topics

05:32:28 10  for which Ms. Hendrix was designated she was -- she

11  was not prepared for she explained her efforts to

12  prepare.

13         And so again we object to additional time

14  and we object to the extension of the topics or any

05:32:44 15  continuation and we request that

16  Special Master Garrie that you determine that

17  Ms. Hendrix is released from her obligations under

18  the second amended notice of deposition pursuant to

19  rule 30(b)(6).

05:33:00 20         SPECIAL MASTER GARRIE:  Well here's the

21  good news I can rule on that.  Denied.

22         I will take under consideration both

```
          23  party's positions.  I will likely request future

          24  briefing limited briefing in the accelerated

05:33:16  25  schedule and issue are more welcome to bring this
```

243

⬆

**CONFIDENTIAL ROUGH DRAFT**

```
05:33:18   1  before Judge Chhabria and use the record

           2  accordingly an explain it to him accordingly.

           3          If you disagree with my ruling or finding

           4  if I do from or the witness or someone else is to

05:33:31   5  be produced to respond.  With that noted I thank

           6  the witness and we will be finish for today unless

           7  there are further questions or requests or rulings

           8  of Counsel Blume or Counsel Ko to desire.

           9          MR. BLUME:  I only note that if I -- I

05:33:56  10  make the request if additional questions or

          11  Ms. Hendrix is designated he ask them right nose

          12  she here and prepared to continue.

          13          MR. KO:  We'll stand by original re

          14  service rights as noted in the previous six minutes

05:34:13  15  on the record.

          16          SPECIAL MASTER GARRIE:  And just for the

          17  record, to be clear I have no position one way or

          18  the other, as to the request to relief beyond

          19  denying counsel's Blume that I make the ruling here
```

05:34:26 20  now.

21          MR. BLUME:  Right.

22          THE DEPONENT:  And --

23          MR. KO:  Thank you.

24          MR. BLUME:  And appreciate that and --

05:34:31 25  and -- that's fine we have made -- we have made our

                                                    244

↑

**CONFIDENTIAL ROUGH DRAFT**

05:34:36  1  point.

2          SPECIAL MASTER GARRIE:  So noted we are

3  done.  Just make sure the designation is

4  confidential as been recorded.  Are there any

05:34:46  5  standing orders for transcripts for 30(b)(6)

6  depositions are we going to standing orders for the

7  other witnesses.

8          MR. BLUME:  I believe so I'm the wrong

9  person but I believe that's the case.

05:35:02 10          MR. KO:  I apologize I forgot one thing.

11  In my haste to conclude this.  I -- are not go make

12  the formal ask on the record Mr. Blume, that you

13  provide Ms. Hendrix SP deposition transcript with

14  the transcript application arm RFP asking Facebook

05:35:22 15  to produce all such material CHECK/CHECK.

16          MR. BLUME:  Well the DC we'll DC AG

17 transcript request and that's -- we'll take it

18 under consideration.  Again I urge Mr. Ko if you

19 have additional questions for Ms. Hendrix, we are

05:35:44 20 not stopping the deposition.  She's here and

21 prepared.  And if you choose to end I will consider

22 that that you have nothing further for her.

23          MR. KO:  So the record is clear I have of

24 course do have a lot further, but your conditions.

05:35:59 25          MR. BLUME:  We'll here.

                                              245

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

05:36:00 1          MR. KO:  Continued stocks let me finish.

2          MR. KO:  Continue objections and not to

3 answer and the fact that there is witness is not

4 prepared to testify as the to basic issues on

05:36:10 5 claims and allegations regarding this case in

6 particular are the reasons why we would hope to

7 seek an actual witness or this witness to actually

8 testify as to these topics.

9          MR. BLUME:  Well, I think should be clear

05:36:26 10 so the issues you believe and to her topics,

11 include whitelisting, as it relates to the topics

12 that for which she is designated.  We also

13 understand that you asked whether or not they were

        14  third-party apps who continued to be given

05:36:42 15  permission to access friends data after May of

        16  2015.  That she believed was that we objected to

        17  under -- under topic 2D that is that that topic.

        18  Can you please state for the record any other areas

        19  that -- and then privilege of course which we

05:37:03 20  objected to.  But because Ms. Hendrix is here and

        21  available, if you could put on the record exactly

        22  what other topics you believe she -- you were

        23  prevented from her asking her about under the same

        24  topics so that we can appropriately address those

05:37:23 25  and deal with them rather than burden this witness

                                                        246

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

05:37:26  1  with when she's here rent available based on your

         2  desire to just do it another day.  If you put on

         3  the record specifically what it is you believe --

         4  what information I believe you were deprived from

05:37:38  5  her on the topics for which she was designated and

         6  that -- and that were asked about and that were

         7  asked about not topic that you were not that you

         8  didn't talk about the questions you asked the

         9  answers in which you believe deprived in your view

05:37:56 10  objections unfounded.

```
        11            MR. KO:  I think the record is clear as
        12   to both your instruction and the witnesses
        13   inability to ask it -- answer basic questions with
        14   respect to topics 2D, and 3C in particular.  But I
05:38:13 15   will note for the record, that all of these topics
        16   which do relate to monitoring and
        17   \everyone\enforcement and how Facebook enforced its
        18   policies with respect to third expert use of user
        19   information were all the type of that Ms. Hendrix
05:38:37 20   had difficult he on behalf of.
        21            MR. BLUME:  She's here prepared to talk
        22   about the policies with respect to the -- the use
        23   of use -- the third use of information.  That's --
        24   exactly what she's here's to testify to I would
05:38:49 25   suggest that if you have any questions you did not
```

247

^

**CONFIDENTIAL ROUGH DRAFT**

```
05:38:51  1   ask about any of her topics you ask them now.  We
         2   can discuss later or -- or -- debate whether
         3   whether or not my objections were appropriate but
         4   to topics questions issues that you did not raise
05:39:06  5   and -- and not give Ms. Hendrix the opportunity to
         6   testify to we are prepared to sit here right now
         7   and -- answer those questions.  But we will not
```

8   consent to simply taking an extra day with her to

9   ask questions or to hit topics that she did not

05:39:23 10   cover today.  Because she is very well prepared --

11   I'm sorry she very prepared to read your things to

12   regard to topic 2D or 3KC in particular she is

13   prepared to talk about monitoring.  And how

14   Facebook -- how Facebook this quote from the

05:39:39 15   record.  How Facebook enforced its policies with

16   third to party party used she prepared to as we

17   said.  And so you have questions on that topic.

18   I -- I request that you ask them now.

19          MR. KO:  You made per textually clear you

05:39:52 20   do consent to my request and I understand.

21          MR. BLUME:  I just said I just said I

22   did.  I just said.  On the record.  Mr. Ko that

23   with regard to topics 2D and 3C you just said, you

24   note for the record quote that all of these topics

05:40:09 25   that -- which do relate to monitoring and how

                                                    248

**CONFIDENTIAL ROUGH DRAFT**

05:40:12  1   Facebook enforces policies with respect to third

2   party use of -- third parties use of use of user

3   information.  That's what you just described.  And

4   I'm telling you on the record, with Ms. Hendrix to

05:40:25 5  my left, prepared to answer all of these questions.

6  So if you have them.  I beg to ask them now.  And

7  don't come back and ask them later we are open and

8  willing to answer those questions as we said all

9  along.  That is -- that -- the how that you just

05:40:42 10  quoted was exactly the how that I quoted.  And we

11  are more and happy to answer questions on that

12  topic.

13      Q.   (By Mr. Blume)  You have made?

14           MR. KO:  You allowed me to finish.  You

05:40:53 15  probably understand my statement in full.

16           I understand and you have made it

17  perfectly clear that you do not consent to our

18  request to reopen this deposition.  And I get that.

19  And we obviously oppose that.

05:41:08 20           I will note for the record that one of

21  the reasons why we need another deposition is that

22  you have unfairly and unreasonably limited these

23  topics as you have noted many times on the record

24  today that these topics only relate to the policies

05:41:25 25  and procedures that Facebook enacted in connection.

249

**CONFIDENTIAL ROUGH DRAFT**

05:41:30 1           MR. BLUME:  You are free -- you.

2          MR. KO:  That's all I have to say.

3          MR. BLUME:  You are required know I am.

4          SPECIAL MASTER GARRIE:  Counsel.

05:41:35 5          MR. BLUME:  You are.

6          SPECIAL MASTER GARRIE:  Here what we are

7  going to do.

8          THE DEPONENT:  You both have been

9  pontificating for sometime on the record we ceased

05:41:43 10 pontification here's what we will do.

11          Bear with me.

12          Ms. Hendrix would you mind stepping out

13 for two minutes so I speak to the lawyers.  We will

14 go off the record.

05:41:58 15          THE VIDEOGRAPHER:  Okay.  We are off the

16 record it's 5:42 p.m.

17          (Recess taken.)

18          THE VIDEOGRAPHER:  Okay.  We back on the

19 record.

06:03:22 20          SPECIAL MASTER GARRIE:  All right let's

21 go on the record.

22          THE VIDEOGRAPHER:  6:03 p.m.

23          MR. KO:  Mr. Blume your begging was per

24 suave stiff I will try to ask some more questions

06:03:41 25 but I will note for the record that of course the

**CONFIDENTIAL ROUGH DRAFT**

06:03:48  1   the positions that we have taken prior to this most

2   recent break is that there are a number of and

3   March rid this this witness she has not prepared to

4   certain as aspects of these topics and that you

06:04:04  5   have given improper instructions not to answer.

6           So for reasons they reserve the right to

7   reopen the deposition.  But as long as we are all

8   here, I do want to ask some more follow-up

9   questions with respect to these topics if

06:04:22 10  Ms. Hendrix is still available.

11          MR. BLUME:  Okay.  Go ahead.

12      Q.   (By Mr. Ko)  Ms. Hendrix take a look at

13  the notice again?

14      A.   I'm here.

06:04:38 15      Q.   Okay.

16      A.   Can you look at topic three.

17      A.   Yes.

18      Q.   And can you identify for me all the

19  instances in which Facebook was able to identify

06:04:56 20  whether or not a third party was using Facebook

21  users data or information beyond the use case?

22          MR. BLUME:  Hang on one second, please.

23          THE DEPONENT:  Again which -- which

24   the -- uses of use of data beyond the use case is

06:05:40 25   covered by which subsection of topic 3.

251

⬆

**CONFIDENTIAL ROUGH DRAFT**

06:05:43  1          MR. KO:  3C.

2          MR. BLUME:  -- enforcement of contractual

3   terms, including enforcement of pool sees regular

4   gull lating access.  That one.?

06:06:00  5          MR. KO:  That would be.

6          MR. BLUME:  Is that -- is that that.

7          MR. KO:  That would be what I said when I

8   said 3C.

9          MR. BLUME:  Okay.  I mean to tent you can

06:06:15 10   answer to regard to the over viewing processes

11   regarding the monitoring \everyone\enforcement if

12   you can if you not.

13          THE DEPONENT:  And the question again is

14   what?

06:06:25 15      Q.   (By Mr. Ko)  Can you identify all the

16   instances in which Facebook was able to identify

17   whether or not a third party was using Facebook's

18   users data information beyond the use case?

19          MR. BLUME:  And, again, this talks to

06:06:35 20   processes.  Mr. Ko.  It's just.

21          SPECIAL MASTER GARRIE:  Counsel counsel

22   are you objecting.

23          MR. BLUME:  I'm objecting it's beyond the

24   scope.  If you are prepared to -- if you have been

06:06:45 25   prepared to talk to the identity of specific

                                                    252

⬆

**CONFIDENTIAL ROUGH DRAFT**

06:06:47  1   instances as opposed to the overview of the

2   processes which is what topic 3 asks for you may

3   but if you are not prepared you are not prepared.

4          THE DEPONENT:  Well during the relevant

06:07:03  5   period from 2007 to 202022, I don't believe we have

6   that logging that I can definitely speak to the

7   process process of developing the setting or other

8   control made available to users to prevent or

9   eliminate or data from being accessed bothered

06:07:25 10   patients including how Facebook monitors an

11   enforces a contractual terms with those third

12   parties.  But the specific amounts I don't even

13   think we as a company could produce that if we

14   wanted to and I -- so I don't comprepared with the

06:07:47 15   knowledge of that.

16          Q.   (By Mr. Ko)  Can you identify?

17          A.   Which is outside of the scope of what I'm

18   reading here.

19        Q.   Can you identify all the factual

06:08:00 20   instances or circumstances for when Facebook did in

21   fact detect abuse on its platform?

22             MR. BLUME:   And I instruct to the extent

23   that you learned of quote abuse on the platform

24   through conversations with counsel, I would

06:08:15 25   instruct you not to answer.  And I -- I obviously

253

↑

**CONFIDENTIAL ROUGH DRAFT**

06:08:18  1   review the topic and the question and determine

2   whether it's -- within the copy of topic 3 as far

3   as you are concerned in your prep.

4        Q.   (By Mr. Ko)  I'm not prepared to answer

06:08:31  5   all of the nor do I think Facebook can answer all

6   of the amount or violations of performance sees

7   that we have suffered in apps from 2007 to 2022.

8        Q.   Can you describe to the Court whether or

9   not you are aware of the factual circumstances in

06:08:59 10   which Facebook determined that an app was not

11   complying with its policies?

12             MR. BLUME:   Objection.  How they

13   determined whether they were complying or whether

14   they are complying.

06:09:20 15          MR. KO:  I'm trying to ask questions

16  related to this topic and you continue to object

17  during off of scope and instruct to witness not to

18  answer.  I thought your begging would allow to

19  ally ask questions that you.

06:09:32 20          SPECIAL MASTER GARRIE:  Well--

21          MR. BLUME:  Mr. Garrie we walk through

22  topic three with your instructions sir.  And put it

23  in -- in -- in identify how -- where it talks about

24  factual instances or circumstances of abuse.  Where

06:09:52 25  it topic 3 speaks to the number of instances of

                                                    254

♠

            **CONFIDENTIAL ROUGH DRAFT**

06:09:57 1  abuse.  And Mr. Garrie if you show where it is than

2  we will be advised, but there's nothing -- I see I

3  don't operative DUP see the words facts or

4  instances at all in -- in topic 3 and so I'm hard

06:10:13 5  pressed to heard Mr. Ko repeatedly make this

6  witness feel as though she's inadequately prepared

7  on the face of third-party app three the words

8  thats using in questions don't even appear.

9          MR. KO:  Pretty simple.  Well, if I can

06:10:30 10  respond I will Special Master Garrie.

11          SPECIAL MASTER GARRIE:  Can you share

```
          12  your screen and then a response to the point raised

          13  by counsel Blume to share your for -- okay your

          14  response first Counsel Ko and I will go through it.

06:10:50  15          MR. KO:  As we discussed earlier it's bit

          16  divorced from -- if a witness cannot testify as to

          17  the facts that apply with respect to how Facebook

          18  monitored and enforced its contractual terms of

          19  third parties.  Similarly it's a bit divorced

06:11:05  20  from -- if Facebook is trying to suggest that they

          21  cannot provide a witness that will testify as to

          22  the facts that apply to how and this is in

          23  connection with 2D how Facebook insured third

          24  parties use of such data or information was limited

06:11:21  25  to to the use case and this once again goes back to
```

                                                          255

♠

                      **CONFIDENTIAL ROUGH DRAFT**

```
06:11:24   1  the point earlier where we are discussing where all

           2  of these things as Ms. Hendrix has testified before

           3  were fairly it Tera tiff and things he value at the

           4  factual circumstances changed.

06:11:39   5          So the idea that she can not sit here and

           6  testify as to the facts that actually under lie

           7  Facebook's monitoring \everyone\enforcement of

           8  contractual terms is a bit unreasonable from my
```

9   perspective and does not comport with the actual

06:11:55 10   testimony that we would hope to ellies it from this

11   witness on these topics.

12          MR. BLUME:  Ass Mr. Ko described prepared

13   to facts with apply this is how quote from what he

14   just said.  And she is prepared to testify as to

06:12:13 15   the facts that apply with respect to how Facebook

16   monitored enforced its contractual terms she will

17   testify to that.  She will also testify to the

18   facts that apply quote as to how and -- how and

19   this is in connection with 2D he says how Facebook

06:12:28 20   insured their father use of da she completely

21   prepared to testify to that.  But if -- Mr. Ko if

22   refer to his question that's what he's asking he's

23   making he's respond to my objection stating what

24   exactly she prepared to but then the questions he

06:12:46 25   has don't ask those questions.

                                                     256

⬆

              **CONFIDENTIAL ROUGH DRAFT**

06:12:53 1          MR. KO:  Logical to the facts related.

2          SPECIAL MASTER GARRIE:  One second one

3   second you are both are repeating your and meant

4   just again so the question is can you describe for

06:13:03 5   the Court whether or not you are aware of the

6   factual circumstances in which Facebook determined

7   that an app was no, ma'am complying with its

8   policies.

9          MR. BLUME:  With all due respect that

06:13:16 10  wasn't the question he asked.

11          THE DEPONENT:  His question.

12          SPECIAL MASTER GARRIE:  No, no well

13   that's the question -- okay that's one question

14   that was asked and you objected how they determined

06:13:25 15  whether they complying or whether they are

16   complying Counsel Ko responded well and then you

17   responded and I don't think an answer was ever

18   provided by the witness and then there was another

19   question asked.

06:13:42 20          MR. BLUME:  The question was -- the

21   outstanding question is, are you -- whether or not

22   you are aware quote of the factual circumstances in

23   which Facebook determined that an app specific app

24   was not complying with its policies.  But then when

06:13:56 25  he describes in his argument to you what he really

257

✦

**CONFIDENTIAL ROUGH DRAFT**

06:14:00  1  wants to know is, quote how and -- how -- how

2   Facebook monitored enforced its contractual terms

           3   if just asked that question that he stated in

           4   necessary objection Ms. Hendrix will answer that.

06:14:14   5   How Facebook monitored enforced she also answer the

           6   next question he defense pots in response to my

           7   question which, is how Facebook insured third mate

           8   use of data.  She's prepared to answer that and

           9   that speaks -- that is topic three knew we are

06:14:29  10   prepared.  All he has to do is ask those questions

          11   and we'll move this along.  But he wants specific

          12   instances of misconduct which is not topic 3.

          13          MR. KO:  I don't understand how can talk

          14   monitoring without specific instances of misconduct

06:14:47  15   but.

          16          SPECIAL MASTER GARRIE:  If you are

          17   wanting to based already her his argument

          18   Counsel Blume is based on her work experiences how

          19   did that shape what the things she's here to

06:15:01  20   testify about.  It's understand what counsel

          21   pointed.

          22          MR. BLUME:  Yeah, that's not the topic

          23   though.

          24          SPECIAL MASTER GARRIE:  I'm just

06:15:10  25   communicating.

                                                          258

**CONFIDENTIAL ROUGH DRAFT**

06:15:11  1                MR. BLUME:  I hear.  Yeah, I get it well

        2  before overview of the processes of developing

        3  privacy or app setting or other controls made

        4  available to users to prevent or limit the data or

06:15:32  5  information from being accessed by third party

        6  including the dates during which each such privacy

        7  or app setting or other control were available.

        8                MR. BLUME:  Right.

        9                SPECIAL MASTER GARRIE:  So overview

06:15:48 10  processes.

       11                SPECIAL MASTER GARRIE:  Specific dates.

       12  Then the data and information which is defense

       13  defining terms covered by so they then they data

       14  and information if you read the definition of

06:16:00 15  information.  Can you go up.

       16                MR. KO:  Sure.

       17                SPECIAL MASTER GARRIE:  The definition of

       18  Counsel Ko I think there is where -- so information

       19  as understood maybe my -- it's getting late.

06:16:12 20                MR. BLUME:  Page 4 page 4.

       21                SPECIAL MASTER GARRIE:  Yeah date the

       22  information refers to personal information content

       23  and information and data collected and derived

       24  about users.  Users.

06:16:30 25          MR. BLUME:  Correct.

                                                    259

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

06:16:31  1          SPECIAL MASTER GARRIE:  Including wait --

        2    including information ordered relevant in the

        3    court's October 29th, 2020 this is discovery order

        4    No. 9 which on platform off platform or third

06:16:44  5    party.  It is extremely broad.

        6          MR. BLUME:  Yes.

        7          SPECIAL MASTER GARRIE:  It's coverly

        8    usable data -- issue new this case to include data

        9    collected from a users on platform activity data

06:16:54 10    obtained from third parties regarding users off

        11    platform act five and data inferred from users on

        12    or off platform activity so that's how we are

        13    defining information so going back to where we are

        14    at.

06:17:06 15          MR. BLUME:  Yup what of that is covered

        16    by each setting is control is the question is the

        17    topic, right what of that broad swath of data topic

        18    for Ms. Hendrix well that's broad swath of data

        19    what is covered by each setting or control.

06:17:22 20          SPECIAL MASTER GARRIE:  You asked me walk

        21    through so you are saying to prevent or limit the

```
          22  data or information data or information is on or

          23  off platform activity with third parties it's

          24  specific technical defined information that is how.

06:17:36  25          MR. BLUME:  I agree.
```

                                                              260

                                ↟

                        **CONFIDENTIAL ROUGH DRAFT**

```
06:17:38   1          SPECIAL MASTER GARRIE:  That is how

           2  defined in the Court judge correspondly which

           3  spoken at length about.

           4          MR. BLUME:  But the process it's the

06:17:44   5  first sentence it's the processes of the developing

           6  privacy made available to prevent or limit the.

           7          SPECIAL MASTER GARRIE:  No, no privacy or

           8  other controls.

           9          MR. BLUME:  Yeah right but not an

06:17:55  10  instance those are the controls in place what is.

          11          SPECIAL MASTER GARRIE:  I get you just

          12  asked me made available to users to prevent or

          13  limit their data.

          14          MR. BLUME:  Right.

06:18:03  15          SPECIAL MASTER GARRIE:  Or information

          16  being axe ceilings had including the dates during

          17  which of these -- okay I'm walking through covered

          18  blah blah and the default setting for each.  So
```

19  there's.

06:18:14 20          MR. BLUME:  Right.

21          THE DEPONENT:  Your point is the scope

22  here from where you read in three as you read.

23          MR. BLUME:  Privacy app settings and

24  controls.

06:18:24 25          SPECIAL MASTER GARRIE:  All right.

                                                    261
⬆

            **CONFIDENTIAL ROUGH DRAFT**

06:18:24  1          MR. BLUME:  That's what it is, that's the

2  scope.

3          SPECIAL MASTER GARRIE:  For data or

4  information.

06:18:29  5          MR. BLUME:  Right.  Privacy for app

6  settings or other controls that's what this topic

7  focuses on.

8          SPECIAL MASTER GARRIE:  The point where

9  is -- Counsel Blume is accessed by third parties,

06:18:41 10  right.  So their -- and your point your argument is

11  that doesn't cover the specific factual background

12  that generated.

13          MR. BLUME:  Well the topic is focuses on

14  privacy or app settings or other controls that gosh

06:18:56 15  all of this stuff.  That's what this focuses on

16  they could have written a topic that said identify

17  all instances in which a third party improperly

18  accessed data that's not what this says I don't

19  deny they want that information.  But this specific

06:19:11 20  topic talks about privacy and app setting and

21  controls.

22          SPECIAL MASTER GARRIE:  3D.

23      Q.  (By Mr. Blume)  Cover all this stuff?

24          SPECIAL MASTER GARRIE:  3D theory 3B or

06:19:18 25  not.

                                                    262

♠

                **CONFIDENTIAL ROUGH DRAFT**

06:19:21  1          MR. BLUME:  Yes.

2          MR. KO:  Yes this all topics.

3          SPECIAL MASTER GARRIE:  This where.

4          MR. BLUME:  Privacy an app set.

06:19:24  5          SPECIAL MASTER GARRIE:  Wait, wait.

6          MR. BLUME:  Pro eds so.

7          SPECIAL MASTER GARRIE:  Investigation.

8          MR. BLUME:  Sorry it's the including:

9  Section leading to section B.

06:19:39 10          SPECIAL MASTER GARRIE:  Yeah so including

11  any process processes check.  Reviews check.

12  Investigations or particular instances that would

```
        13  drive a particular you investigate a particular

        14  activity you explained.

06:19:54 15          MR. BLUME:  It's the privacy or it's the

        16  privacy app setting or control that -- that -- that

        17  monitor investigations not the facts.

        18          SPECIAL MASTER GARRIE:  You are reached.

        19          MR. BLUME:  Know goes into it's privacy

06:20:05 20  and apps settings and controls that focus on other

        21  processes reviews investigations -- and studies

        22  it's normal tells us about the investigations or

        23  the queries it's tell us about the -- privacy or

        24  app setting or other controls how they drafted it I

06:20:19 25  mean their own words.  I don't how we can viewed in
```

                                                263

⬆

                      **CONFIDENTIAL ROUGH DRAFT**

```
06:20:24  1  some way that's -- that's -- that requires us toen

         2  fore from the very words in the page that it means

         3  something other than the plain language.

         4          SPECIAL MASTER GARRIE:  What about 3C.

06:20:35  5          MR. BLUME:  Same way privacy or app

         6  settings and other controls including those about

         7  Facebook's Monday torque \everyone\enforcement of

         8  contractual therms the third program mice sub

         9  actions ABC is to discuss and overview of the
```

06:20:48 10   processes of developing privacy or app setting or

11   other controls.

12        SPECIAL MASTER GARRIE:  So then explain

13   what reasoning how does responsible more and

14   \everyone\enforcement relate to what you are

06:21:00 15   talking about.

16        MR. BLUME:  What's -- what privacy or app

17   setting are in place that help Facebook monitor

18   enforce contracts tall terms of third parties what

19   controls are in place to help Facebook monitor

06:21:11 20   \everyone\enforcement the contractual terms of

21   third parties not when has third parties violated

22   but what does Facebook do to monitor that.

23        SPECIAL MASTER GARRIE:  Just answer my

24   question you keep the other part of the answer.

06:21:23 25   Just focus on my questions.  Rather than the -- the

                                                    264

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

06:21:26  1   other part.

2        MR. BLUME:  Yes, I am sorry I thought

3   answered B but that's how topic 3C if you -- sub

4   topics AB and C are included.

06:21:35  5        THE DEPONENT:  I get.

6        MR. BLUME:  Document.

<pre>
        7              THE DEPONENT:  Honestly.

        8              MR. BLUME:  What privacy.

        9              THE DEPONENT:  Counsel app setting or
06:21:41 10  controls.

       11              SPECIAL MASTER GARRIE:  Counsel Blume

       12  Counsel Blume I hear you got a -- a second -- take

       13  a breath.  Just going through I'm trying to

       14  understand your position and perspective and then
06:21:52 15  we can have further conversation.

       16              MR. BLUME:  Right.

       17              SPECIAL MASTER GARRIE:  So you prepared

       18  the witness like from what I -- so from your --

       19  from Facebook's perspective the witnesses is
06:22:02 20  prepared to testify as to the process of developing

       21  privacy or app settings or other blah blah blah and

       22  the date so that's what -- available.  Not and yore

       23  position is having the witnesses as a

       24  representative of the company speak to what drove
06:22:26 25  to particular instances to drive those processes
</pre>

                                                      265

❦

                        **CONFIDENTIAL ROUGH DRAFT**
<pre>
06:22:29  1  and actions that witness isn't prepare to testify

        2  to that.

        3              MR. BLUME:  Yeah.  There's in here that
</pre>

```
          4  speaks to.

06:22:36  5              SPECIAL MASTER GARRIE:  I'm not answer my

          6  question I'm.

          7              MR. BLUME:  Yes.

          8              SPECIAL MASTER GARRIE:  I'm judging.

          9              MR. BLUME:  Prepared to.

06:22:44 10      Q.  (By Mr. Blume)  What perhaps to testify

         11  to.  Exactly how you described just described.  The

         12  process he the privacy an upsetting and controls.

         13              SPECIAL MASTER GARRIE:  Counsel Blume I

         14  got answer my question.  And not been much of other

06:22:56 15  questions much.

         16              MR. BLUME:  Got it.

         17              THE DEPONENT:  Much more get this done.

         18              SPECIAL MASTER GARRIE:  Understood.

         19              MR. BLUME:  And if I May, Mr. Garrie in

06:23:15 20  its fair to Ms. Hendrix.

         21              SPECIAL MASTER GARRIE:  I understand

         22  counsel.

         23              MR. BLUME:  She has.

         24              SPECIAL MASTER GARRIE:  Counsel Blume I

06:23:20 25  have been a 30(b)(6) witness.
```

266

**CONFIDENTIAL ROUGH DRAFT**

06:23:21  1              MR. BLUME:  Right.

          2              THE DEPONENT:  Understand the concept

          3     the -- instruct I understand the case law don't

          4     accept invitation to.

06:23:27  5              MR. BLUME:  No I understand.

          6              SPECIAL MASTER GARRIE:  I'm July

          7     scrolling.

          8              MR. BLUME:  The text.

          9              THE DEPONENT:  To read what the question

06:23:31 10     was.

         11              MR. BLUME:  Understood.  Okay.  And your

         12     obstruction -- the long obstruction counsel the

         13     short and short of your instruction was to instruct

         14     the witness not to answer.

06:24:20 15              MR. BLUME:  Right.

         16              SPECIAL MASTER GARRIE:  Based on it's

         17     entity.

         18              MR. BLUME:  Yes to the question identify

         19     all factual instances other circumstances.

06:24:27 20              MR. BLUME:  In fact that's the question

         21     and did it in fact detect I object I objected that

         22     beyond the scope of topic three.

         23              SPECIAL MASTER GARRIE:  Okay.

         24              MR. BLUME:  Simply enough.

06:24:36 25              SPECIAL MASTER GARRIE:  Thank you.  All

✦

**CONFIDENTIAL ROUGH DRAFT**

06:24:37  1  right Counsel Ko you can stop sharing.

2       Counsel Ko any -- any point of question

3  before snoop sure, two quick things.  One again I

4  just come back to the simple and practical point

06:24:59  5  that I'm not sure how one could suggest that the

6  factual circumstances behind monitoring or

7  \everyone\enforcement are not related to this

8  topic.  And No. two with respect to 2D in

9  particular which we have talked about quite often

06:25:14 10  in which Mr. Blume likes to both either ignore or

11  inject policies and procedures into there's no

12  aspect of section 2D which requires Facebook to

13  produce a witness about how Facebook insured third

14  parties use of data and information with limits to

06:25:34 15  the use case.  I'm not quite sure how I -- lit any

16  testimony if what ever I'm not allowed to factual

17  circumstances blind how Facebook insured that.

18       MR. BLUME:  Again he can's he ask that

19  question.

06:25:48 20       SPECIAL MASTER GARRIE:  Yeah.

21       MR. BLUME:  Canst CEO how Facebook ensure

22  ask that question.  She sit here an answer that as

```
       23  long as we -- we want.  Ask that question.  Very

       24  question that is listed in topic ask that.

06:26:07 25          SPECIAL MASTER GARRIE:  So there's a
```

                                                             268

↟

                        **CONFIDENTIAL ROUGH DRAFT**

```
06:26:08  1  question pending.  Are you going to take the advice

        2  of your counsel Ms. Hendrix before we.

        3          THE DEPONENT:  Yeah, I don't remember

        4  the -- yes I'm going to take the advice of counsel.

06:26:23  5          SPECIAL MASTER GARRIE:  Okay.  Good.

        6  Mr. -- Counsel Ko would you like to ask another

        7  question I'm not -- I'm -- I'm the parties I

        8  probable as -- as both rights are can bring a

        9  motion for the Special Master seeking an additional

06:26:43 10  topic or clarification for the 30(b)(6) accordingly

       11  for said witness to be provided to speak to that.

       12  However, I do so I remind both parties of that

       13  opportunity.

       14          With that said, Mr. -- Counsel Ko do you

06:27:02 15  have another question.

       16          MR. KO:  I do thank you Special Master.

       17  I will note that just my position on the record I

       18  will note that overall this dogs has been so

       19  unhelpful just because we spent 17 minutes
```

06:27:17 20   listening to Mr. Blume discuss with you what this

21   notice means on the record and so I just repeated.

22          SPECIAL MASTER GARRIE:   Counsel Ko I

23   wouldn't so much about getting additional time or

24   not getting additional time at this time.  I'm

06:27:32 25   inclined if such a request is made maybe not with

269

&uarr;

**CONFIDENTIAL ROUGH DRAFT**

06:27:37 1   this witness but if -- I wouldn't focus on the time

2   at this point I would just ask the additional

3   questions you may have.

4          MR. KO:  Thank you I appreciate that.

06:27:50 5     Q.   (By Mr. Ko)  With respect to data Ms. Use

6   on the Facebook platform can you describe the

7   factual circumstances in which Facebook utilized

8   certain policies and procedures to in fact enforce

9   and monitor data use use on the Facebook platform?

06:28:18 10     A.   Yes so first we developed the policies

11   that developers agree to and must comply with.  We

12   train for example we train the teams accountable

13   for policing the platform which is primarilily the

14   developers operations team so we train them on

06:28:38 15   those policies and create specific guidance and

16   instructions for how they can review apps for

17    compliance with the terms and policies.  To the

18    extent we agree that those additional criteria

19    guidelines for reviewing for compliance might be

06:29:02 20    helpful to our teams that are actually going the

21    review.

22              And then we train all of the different

23    teams, so for example, the app review team the

24    enforcement team, the investigations team, all of

06:29:20 25    the vendor vendors that work on reviewing apps for

270

♠

**CONFIDENTIAL ROUGH DRAFT**

06:29:26  1    compliance so we will train \everyone\enforcement

2    on those terms.  We also train our sales and

3    partnerships and other teams including our own

4    teams as we grow and build new people, so that

06:29:39  5    broad wide group of the company can understand what

6    these terms are so that they can help us police the

7    platform by servicing and identifying those

8    potential violations of terms and Ed indicate how

9    they with report those violations to the

06:29:59 10    appropriate.  We teach them how ask questions about

11    the policies to the extent that they have them.  We

12    train the external developer community and at times

13    even nondevelopers on our terms where applicable.

14          We do monitoring which has evolved over

06:30:24 15  time different types of monitoring.  But we use

16  both automated and manual means to detect potential

17  violations to again including like the reporting

18  chance that I -- that I referred to earlier and I

19  also referred to the 

06:30:44 20

21

22

23

24

06:31:09 25

271

**CONFIDENTIAL ROUGH DRAFT**

06:31:14  1

2          We present day asked developers

3  proactively to do -- we put the data use -- do the

4  use checkup tool in front of developers which shows

06:31:31  5  the permissions that they have they already know

6  that they have them and they are available at app

7  dashboard in other settings that we put in front of

8  them.  Those permissions and ask them to yearly

9  review that and then assessed whether they still

06:31:47 10  need those provisions.  We have automated tools

```
          11  inplace that will prevent a developer that

          12  accessing a users information through the platform

          13  if they haven't used the application within 90

          14  days.  We -- we also put certain developers in --

06:32:10  15  with access to certain information or tire amounts

          16  of install what we refer to data pro section

          17  assessment that ask them questions about their data

          18  use practices primarily focused on sections three

          19  through six of the platform terms.

06:32:28  20        We require apps to go through app review

          21  for nearly all use of the platform if they want to

          22  request a new permission than so that would trigger

          23  a thorough of review of the app at the app review

          24  stage each time they want to decide that they are

06:32:47  25  building their app in a way that requires the need
```

272

**CONFIDENTIAL ROUGH DRAFT**

```
06:32:51   1  to request permissions which require review all of

           2  which do for Facebook login.  If they are asking

           3  for more than named profile picture and email, even

           4  those apps that don't require up front app review

06:33:07   5  are reviewed every year during the app re-review

           6  process.  Where the teams are asking -- are

           7  presented with number of questions designed to
```

8  surface potential violations of the search such as

9  █████████████████████████████████████████

06:33:25 10  ████████████████    ███████████████████████

11  ████████████████████████████████   ████

12  ██████████████████████████████████████████

13  ██████████████████████████████████████

14  █████████████████████████████████████████

06:33:45 15  █████████████████████

16          We have data boundary program where we

17  pay external reporting parties when they report to

18  us so we incentivize the reporting of potential

19  violations as an additional monitoring and

06:34:02 20  \everyone\enforcement tax -- tactic.  We have

21  there's a third party I DC attorney CHECK/CHECK

22  which servers to independently be reviewing apps

23  for potential comply with just not our platforms

24  and others and we -- we were the leader in getting

06:34:22 25  that to -- to come into plays we engage an ask for

273

♠

**CONFIDENTIAL ROUGH DRAFT**

06:34:27 1  help through the entire community.

2          Again my educating all of these

3  individuals on the terms.  Going back to the data

4  point program.  We -- that is not just specific to

06:34:43  5  platform term data collection through permissible

6  means it also includes data that is accessed

7  through unauthorized means by scraping us.  So that

8  is another part of the bounty that will pay out

9  where the criteria is met for example.  If we

06:35:00 10  already are a bear of an investigation because it's

11  been reported either internally surfaced internally

12  by reported by another person externally than we

13  will thank the reporting party.  We -- I feel in

14  incredibly come pre sensitive because please let if

06:35:19 15  you have any further questions on that point.

16      Q.  Sounds like you got your second wind?

17          MR. KO:  Rebecca that amazing good job.

18          THE DEPONENT:  I'm not Rebecca but thank

19  you.

06:35:33 20          MR. KO:  Right.  I wasn't talking to you,

21  I was taling to Rebecca transcribing all of that.

22          THE DEPONENT:  Oh.

23          MR. KO:  So with respect.

24          MR. KO:  Sorry, I implied.

06:35:46 25          THE DEPONENT:  I can't see the transcript

                                                        274

♠

                    **CONFIDENTIAL ROUGH DRAFT**

06:35:46  1  so I didn't know what referring I can whatever you

2   are referring to.  So I am sorry.  But I thought

3   were directing your comment to me.

4        Q.   (By Mr. Ko)  All the examples that you

06:35:59  5   gave in response to my question.

6             Can you identify all the instances in

7   which Facebook actually applied those policies and

8   procedures that you described to a particular app?

9             MR. BLUME:  Objection.  We are back to

06:36:17 10   topic 3.  If you point to which of the topics and

11   sub topics talk about particular instances of

12   applications of the policies.

13             MR. KO:  So I'm looking at topic 2D in

14   particular.

06:36:38 15             MR. BLUME:  Okay.

16             MR. KO:  Addition to 3D.  So I don't know

17   if I have to respond to that.  But.

18             MR. BLUME:  Well she's here.

19             MR. KO:  Let me I'm just to the record is

06:36:48 20   clear.

21        Q.   (By Mr. Ko)  Identify all the instances

22   in which Facebook actually applied those policies

23   and procedures that you described to a particular

24   app?

06:36:57 25             MR. BLUME:  How they -- well,.

**CONFIDENTIAL ROUGH DRAFT**

06:37:00  1           MR. KO:  And you object.

          2           MR. BLUME:  Yeah to the extent it's 2D my

          3  objection is she -- I mean clear why you didn't ask

          4  to want the just described how they ensure it.  I'm

06:37:10  5  not sure how this particular instances fits under

          6  2D, so if you educate me I will perhaps mere myth

          7  but as read in the plain language of the 2D, I

          8  think it's not -- what specific instances is not

          9  covered.

06:37:28 10           MR. KO:  I don't have a duty to try

         11  educate you you can.

         12           MR. BLUME:  It's your job.

         13           MR. KO:  Object.

         14           MR. BLUME:  You want to answer because

06:37:34 15  it's your topic.  So you can -- you wrote it.  So

         16  if you want answer.

         17           MR. KO:  Stop repeating.

         18           MR. BLUME:  I would ask educate me on it.

         19           MR. KO:  This Special Master why

06:37:46 20  completely unhelpful da.

         21           SPECIAL MASTER GARRIE:  Counsel Ko.

         22           MR. BLUME:  Mr. Ko that's not use.

         23           SPECIAL MASTER GARRIE:  Counsel stop

                24  talking.

06:37:54 25          MR. BLUME:  That is not why.

                                                      276

↟

                    **CONFIDENTIAL ROUGH DRAFT**

06:37:55  1          SPECIAL MASTER GARRIE:  Stop put yourself

          2  on mute.  Can you please bring up 2D Counsel Ko.  I

          3  will rule.  Let's see.

          4          SPECIAL MASTER GARRIE:  Court reporter

06:39:00  5  I'm looking for the question can you read it back

          6  court reporter I'm looking for the exact question.

          7  Can you read it back please.

          8          (Record read as follows:

          9          SPECIAL MASTER GARRIE:  Counsel Ko are

06:39:40 10  you whether 2D limited to use case can you clarify

         11  when you say particular app what do you mean.

         12          MR. KO:  So a particular well I wanted to

         13  start broken which I'm entitled to do.  But I am

         14  talking about first if she has any understanding

06:39:57 15  with respect to when or the number of times I'm

         16  generally speaking either one.  Of when she was

         17  aware of the actual times in which Facebook applied

         18  all the sample she gave of the various policies and

         19  procedures that Facebook enacted to a particular

06:40:21 20  app that may have either been using information

21   beyond the use case or in any improper way.

22           SPECIAL MASTER GARRIE:  What was the

23   issue how is this beyond the scope Counsel Blume

24   I'm trying to read your answer but it was very

06:41:14 25   long.

                                                    277

⬆

                    **CONFIDENTIAL ROUGH DRAFT**

06:41:15  1           MR. BLUME:  Because it asks how not when

         2   not whatnot which.  All words they knew and could

         3   have written in this topic but they didn't they

         4   choose how and now if he's trying to planned to

06:41:29  5   include when, which, what.

         6           SPECIAL MASTER GARRIE:  So it your

         7   position that Facebook will introduce.  If I

         8   hypothetically, let the plaintiff submitted another

         9   set of 30(b)(6) deposition requests and they modify

06:41:43 10   accordingly will you submit a different witness to

        11   answer these questions.

        12           MR. BLUME:  If there somehow permitted to

        13   file additional 30B6s.

        14           SPECIAL MASTER GARRIE:  Yes.

06:41:54 15           MR. BLUME:  We take that under

        16   consideration as the -- as to whether -- as to

        17   whether put someone up for yet another 30(b)(6)

18   which now be third request -- I mean.

19        SPECIAL MASTER GARRIE:  I think my pretty

06:42:08 20   clear what -- pretty pretty clarity as to this

21   part.  So okay.

22        MR. BLUME:  If yeah they want -- if

23   you -- if you want give permission to continue with

24   another -- with another 30(b)(6) witness on those

06:42:23 25   specific topics we know they know how ask them they

                                                    278

↑

                    **CONFIDENTIAL ROUGH DRAFT**

06:42:27  1   should do properly and we'll consider when we get

2   it.

3        SPECIAL MASTER GARRIE:  Is the witness my

4   concern is witness isn't prepared to answer the --

06:42:42  5   the other pieces of the question; is that basically

6   your concern.

7        MR. BLUME:  Right I would ask -- I would

8   ask you to determine that it -- she wasn't required

9   to prepare because then that's going to -- we'll

06:42:56 10   deal with another request that's separate but I

11   don't want to this believe whether she read how and

12   she have somehow interpreted how to mean, what and

13   when and which.  And that she's somehow was

14   inadequate in efforts to prepare.  She spent a lot

06:43:12 15   of time doing this and just don't think it's fair

16   to suggested that when -- when we read how, whether

17   they are titled to do again in another depo or

18   another.

19          SPECIAL MASTER GARRIE:  I got

06:43:24 20   Counsel Blume I noted your request for the record.

21   You stop sharing Counsel Ko.  I'm going to reframe

22   from issue any ruling to your request Counsel Blume

23   in part because I just haven't read them all.  But

24   I do.

06:43:46 25          So Counsel Ko, so Ms. Hendrix, returning

                                                        279

↑

             **CONFIDENTIAL ROUGH DRAFT**

06:43:50  1   back to you, which is what we are here for.

2          I counsel the objected as beyond the

3   scope.  Is that correct Counsel Blume I believe

4   that was your objection.

06:44:03  5          MR. BLUME:  It was.

6          SPECIAL MASTER GARRIE:  Okay.  Are you

7   going to heed the advice of counsel so I have

8   reread it all but we are talking about 30 pages so

9   I just cutting to the chase.

06:44:15 10          THE DEPONENT:  I'm prepared to answer

11   everything that is described in the topics and I

```
         12  agree with my counsel that nothing in here asked to

         13  prepare how many violations of specific provisions

         14  we suffered over the years.

06:44:32 15          SPECIAL MASTER GARRIE:  I'm not ruling

         16  any which way or the other as to that I haven't I

         17  wasn't privy to motions or the conversations

         18  between the lawyers so we -- I don't know what was

         19  exchanged I understand and appreciate what you are

06:44:45 20  coming from.  And I -- and I -- and I commend you

         21  for your patients today and as I thought it was

         22  three hours as well.

         23          So with that said Counsel Ko, so are you

         24  going to answer the question or -- or follow the

06:45:02 25  instructions of counsel.
```

                                                    280

♠

                    **CONFIDENTIAL ROUGH DRAFT**

```
06:45:04  1          THE DEPONENT:  I'm not prepared to answer

          2  subjects that were not included in the topics that

          3  I was asked to prepare for so I -- I can answer the

          4  question I'm going to follow my advice of counsel.

06:45:18  5          SPECIAL MASTER GARRIE:  There you go

          6  we'll stop there.

          7          Counsel Ko ask another question.

          8     Q.   (By Mr. Ko)  So outside of the examples
```

9   that you gave for the various ways in which

06:45:31 10   Facebook would enforce, was it also the case that

11   individual employees often determined whether or

12   not Facebook would enforce against a particular

13   third party?

14       A.   Human beings are charged with -- to the

06:45:51 15   extent they are for example on developer they are

16   accountable to understand and known the policies to

17   ten they have questions or surface any gray areas

18   and aren't sure.  There are teams like the data

19   point management \everyone\enforcement and product

06:46:07 20   policy team that mangers most of the provisions in

21   the developer policies except those that apply to

22   collection and use of data obtained from us.

23          They would review those applications for

24   compliance.  And to the extent they surfaced a

06:46:24 25   violation they wouldly to enforcement rubric that

281

✦

**CONFIDENTIAL ROUGH DRAFT**

06:46:28  1   is a -- a document that outlines each provision and

2   what the -- the appropriate \everyone\enforcement

3   action is if we suffered those violations.  And

4   then they would be instructed to follow those --

06:46:48  5   that -- and that take that appropriate

```
        6  \everyone\enforcement action.  I didn't speak in

        7  grab you largest contributors with respect to the

        8  \everyone\enforcement actions they could take but

        9  it's the \everyone\enforcement actions would be

06:47:00 10  decided when we launched the policies an initially

       11  which was first developed in 2009 because we wanted

       12  to ensure consist and uniform maltee in enforcement

       13  no one is accountable for making exceptions because

       14  we are not an exceptions based company.  If we

06:47:24 15  surface violationen farce exhibit with the

       16  \everyone\enforcement rubric and we do so for

       17  example, today based solely on the nature and scope

       18  severity of the violation and not with respect to

       19  the relationship that we have with the -- the

06:47:41 20  developer who has been concluded by a human as

       21  violating a specific provision.

       22          Specific of how it's gone during the

       23  relevant period, it is true that during a period of

       24  time, the \everyone\enforcement rubric did have a

06:47:56 25  protocol for reaching out to anyone who managed the
```

282

⬆

**CONFIDENTIAL ROUGH DRAFT**

```
06:48:00  1  relationship with the partners to notify them that

        2  their partners has been found to be violating one
```

3   or more of the respective provisions that has

4   changed and now we do not have that protocol and

06:48:13  5   procedure they were -- they are notified via what

6   we refer to as -- as a FYI email that outlines what

7   we have surfaced and the fact we will be reaching

8   out to partner through the developer operations

9   team.  So that they can be prepared to respond to

06:48:29 10  the developer to the extent that a developer has

11  any questions or confusion we encourage developers

12  to rely to communications that we have sent that

13  outline the violations but it is common -- common

14  practice for a developer that has -- that is --

06:48:48 15  that is a managed partner to reach out to their --

16  the person at the company that they have Louisiana

17  direct relationship with on and but no additional

18  time is given in the context of that.  So

19  developers -- all developers whether managed or

06:49:05 20  unmanaged must comply with the terms.  There are no

21  exceptions and they have the exact same amount of

22  time afforded to them whether they are managed or

23  unmanaged.  And the enforcement rubric is what we

24  look to when the team surfaces a violation.

06:49:22 25      Q.   And what is the case that aural

283

**CONFIDENTIAL ROUGH DRAFT**

06:49:24  1  developers did in fact comply with these terms?

2          A.   I don't understand your question.

3          Q.   Are you aware of the instances in which

4  developers did or did not comply with the terms

06:49:43  5  that you had described a moment ago?

6          A.   As we have done throughout today, I do my

7  own bitching and moaning I have already answered

8  that question for so for the third time I will let

9  you know I'm not prepared to tell you ever single

06:49:59 10  violation that has been surfaced and confirmed that

11  2007 to 2022 I was not asked to prepare for that.

12  It is not included in the topics that you wrote.

13  It's how do they processes work.  I have explained

14  in thorough detail, potential like overly

06:50:18 15  explaining how we are doing this.  But, again, I

16  would just ask we try to repeat questions I have

17  answered because I am getting tired but stay here

18  all night.

19          Q.   Well to be fair Ms. Hendrix I was

06:50:32 20  responding to your question or your response you

21  didn't understand my question.  But it sounds like

22  understood my question?

23          MR. BLUME:  Anyway can you ask the next

24  one.

06:50:50 25      Q.   (By Mr. Ko)  Wasn't it the case that

                                                            284

↑

                    **CONFIDENTIAL ROUGH DRAFT**

06:50:52  1   Facebook existing relationship with a third party

          2   and the type of partner they were determined

          3   whether or not Facebook was going to enforce its

          4   policies against that third party?

06:51:01  5      A.   Absolutely not.

          6      Q.   With respect to the enforcement rubric,

          7   can you identify any instances in which employees

          8   went outside of that rubric to decide not to

          9   enforce against a particular third party?

06:51:19 10      A.   As I have just said and said earlier we

         11   are not exception based have managed partners

         12   additional time to come into compliance due to the

         13   need to reach out the managed part necessary so

         14   they we surfaced the issue the answer to that is --

06:51:35 15   is sometime during the relevant period where --

         16   where look to the rubric and there's a column for

         17   manage and unmanaged which shows the -- the

         18   developer operations team that they need to take

         19   that additional step of notifying the partner

06:51:48 20   manager of what they have surfaced within the

         21   application.  And but there's not any instances

06:52:09
```
22  where we would ignore or turn a blind eye to a

23  violation.  The only distinction as between

24  unmanaged unmanaged would there have been times

25  where a developer might get a little bit more time
```

285

↑

**CONFIDENTIAL ROUGH DRAFT**

```
06:52:12  1  due to the -- the need to reach out to partner

          2  manager, but at the end of the day, we always

          3  enforce those provisions as we surface any

          4  violation.

06:52:24  5      Q.   How did Facebook ensure that they were

          6  actually enforcing those provisions?

          7      A.   Through the required through the

          8  education of the policies.  So your job on

          9  developer operations is not to enforce the policies

06:52:41 10  but in order to effectively enforce them you have

         11  to ensure that you have a very strong understanding

         12  of all of the terms and policies that are

         13  applicable to each respective application.

         14          To the extent that you acquire that

06:52:53 15  knowledge, if you ever are unsure the process calls

         16  to reach out to either the data policy management

         17  and enforcement team or for nondata policy related

         18  questions for the -- the policies team that handles
```

19  everything that my team does not you ask for gray

06:53:11 20  areas we will either use that as a trigger toen

21  form the need to policy enforcement potentially

22  develop going back to another topic to develop new

23  policies so if think we need to be clearer or we go

24  back to the -- the team meat on developer ops and

06:53:30 25  let know hey this is not a gray area this is the

286

↟

**CONFIDENTIAL ROUGH DRAFT**

06:53:32  1  respective provision or provisions that you should

2  site to.  Or give other kind of guidance or

3  clarify.

4          So there is through education, we also do

06:53:44  5  Q and A where audit a sample of the enforcement

6  actions that we have taken to and decisions that we

7  have made to assess an ensure for quality assurance

8  perspective expect tiff that we are effectively an

9  accurately poll police the platform consist with

06:54:06 10  the terms and policies that we have in place.

11          So yes, leaning in on all of the

12  additional methods that I described for -- for

13  automated and manual means for education review,

14  re-review.

06:54:28 15      Q.   Couldn't executives like Mark Zuckerberg

```
         16   Sheryl Sandberg for that matter determine Schwab

         17   enforce a platform policy against a third party?

         18            MR. BLUME:  Objection.  Was -- it

         19   couldn't or didn't -- was what the first can you --

06:54:48 20   missed first part of that question.

         21            MR. KO:  Couldn't.

         22            MR. BLUME:  Could you either reread or

         23   you reask it.

         24            MR. KO:  Sure.

06:54:59 25       Q.   (By Mr. Ko)  Couldn't individuals like
```

♠

**CONFIDENTIAL ROUGH DRAFT**

```
06:55:01  1   Mark Zuckerberg and Sheryl Sandberg for that matter

          2   any Facebook executive determine whether or not to

          3   enforce the platform policies -- enforce Facebook's

          4   Facebook platform policy again a third party?

06:55:20  5       A.   So you are wanting to speculate on what

          6   our executives might be able to do given their

          7   roles at our company?

          8       Q.   Not I'm asking to speculate.  Speculate.

          9   I'm asking as a corporate designee of Facebook if

06:55:34 10   you aware of any instances in connection with

         11   Facebook's monitoring and enforcement of third

         12   parties or whether individuals like Mark or
```

13  Sheryl Sandberg or any other Facebook executive for

14  that matter could determine themselves whether or

06:55:49 15  not to enforce platform policies against a third

16  party?

17          MR. BLUME:  Objection.  Compound. and

18  does call for speculation.

19          THE DEPONENT:  Yeah the word could of

06:56:01 20  course Mark could decide that if we told him

21  something was against policy, as with any human, he

22  could have feedback like the culinary whether that

23  poll police in place out dated or doesn't make

24  sense given the fact that you know time does go and

06:56:20 25  things change.  So sure it's possible that any

                                                    288

⬆

**CONFIDENTIAL ROUGH DRAFT**

06:56:23  1  human including external people outside of the

2  company could have opinions on whether we should

3  enforce but those opinions would be whether the

4  efficacy and retaining the policy itself or whether

06:56:41  5  it should be clear or not, again we are not an

6  exceptions based policy.

7          Q.   (By Mr. Ko)  Have you heard of a T0

8  partner?

9          A.   I have heard of T0.

06:57:03 10      Q.   What is your understanding of T0?

         11      A.   I don't -- I don't remember.  I just know

         12   I have heard of it.  But it doesn't apply in the

         13   context of the monitoring enforcement and policing

         14   of the platform and whether to enforce on

06:57:22 15   violations whether you are T0 or however far the

         16   numbers go, so I am not remembering right now, I

         17   don't -- that's not relevant to the question of

         18   whether a developer with that designation has to

         19   the extent she even it's relevant to them has that

06:57:40 20   status that's not relevant to the question of

         21   whether they are violating our policies and whether

         22   we will enforce them.

         23      Q.   Is there poly \everyone\enforcement

         24   Facebook enforce ago as to partner in the T0

06:57:54 25   category?

                                                        289

♠

                      **CONFIDENTIAL ROUGH DRAFT**

06:57:57  1      A.   It.

          2           MR. BLUME:  Object other the ones the

          3   policies they already spoken about.

          4           MR. KO:  I have question you can raise an

06:58:09  5   objection.

          6           SPECIAL MASTER GARRIE:  Counsel Blume you

7   didn't make an objections are you making an

8   objection.

9        MR. BLUME:  I'm trying to save time go

06:58:15 10   back through the policies again or.

11        SPECIAL MASTER GARRIE:  Counsel do you

12   have an objection to the question or not.

13        MR. BLUME:  No.  No objection.  Yes.

14   Objection to form.

06:58:27 15        SPECIAL MASTER GARRIE:  There you go,

16   please answer the question Ms. Hendrix.

17        THE DEPONENT:  I -- sitting here today

18   don't believe T0 or that type of specificity it was

19   managed or unmanaged columns is what I'm confident

06:58:41 20   saying it has been.  But it's -- that is certainly

21   not the case today.

22        Q.   (By Mr. Ko)  Have you heard of a T1 or T2

23   partner?

24        A.   Yes and it -- I have just for purposes of

06:58:57 25   our time, same response.  We do not take into

                                              290

⬆

                **CONFIDENTIAL ROUGH DRAFT**

06:59:01 1   accounted what -- what type of partner you are.

2   And we only enforce based on the nature scope and

3   severity of the violation consist can the

            4  \everyone\enforcement rubric which does not

06:59:14    5  distinguish between tier zero and no tier partners

            6  or anything like that.  It's all whether -- whether

            7  Facebook knows who you are, and works with you

            8  directly through our teams or not, through just if

            9  you are just a developer that we haven't -- any

06:59:34   10  type of direct relationship with other than

           11  contract with you to comply with our provisions and

           12  adhere to our terms, it is not -- same response to

           13  any questions that you presented with respect to

           14  tire -- tier zero.

06:59:52   15      Q.   So with respect to I just make sure the

           16  record is clear but with respect to T0T1 and T2 is

           17  there any poly or rubric that governed how Facebook

           18  would enforce its policies and to partners in these

           19  tiers?

07:00:10   20           MR. BLUME:  Objection.  Asked and

           21  answered.

           22           THE DEPONENT:  I have nothing further to

           23  add other than what I have said.

           24      Q.   (By Mr. Ko)  Was it also the case that

07:00:17   25  Facebook would factor in how much third parties

                                                    291

↑

                        **CONFIDENTIAL ROUGH DRAFT**

07:00:20  1  were spending on advertising on the Facebook

2  platform before determining whether or not to

3  enforce its policies against these third parties?

4       A.   Well the previous question was never the

07:00:31  5  case it's we only had hanged and unmanaged columns

6  in the context of the rubric none of that had

7  whether or not to enforce or not.

8            Now, whether a developer was accepting

9  zero dollars, or a lot more money than zero

07:00:49 10  dollars, that is not a factor in whether to

11  ultimately enforce the provision.

12       Q.   So advertising spend was not a part of

13  the enforcement rubric, correct?

14            MR. BLUME:  Objection.  Asked and

07:01:05 15  answered.

16            THE DEPONENT:  Correct it's not a part of

17  the \everyone\enforcement rubric partners might be

18  like can we have more time.  This is important

19  partnered used and we would let them know that the

07:01:17 20  developer must come into compliance with our

21  policies and now sitting here present day that

22  doesn't contemplate any extensions of time that we

23  wouldn't afford in -- to a nonmanaged developer

24  and, again, those extensions are baked into the

07:01:33 25  rubric so for example you don't get an extensions

♠

**CONFIDENTIAL ROUGH DRAFT**

07:01:36  1   for severity high severity provisions.

2       Q.   (By Mr. Ko)  Are you familiar with the

3   2012 FTC consent degree?

4       A.   Yes, I am.

07:01:47  5       Q.   Are you aware of the subsequent 2019 FTC

6   \everyone\enforcement action?

7       A.   Yes.

8       Q.   So the consent degree and be sent

9   enforcement action would you agree he that would

07:02:00 10   relate to some manner would that relate to

11   Facebook's Monday torque and enforcement?

12           MR. BLUME:  Objection to the extent it

13   calls for a legal conclusion -- to extent you

14   understand -- to extent the answer to that question

07:02:18 15   calls into effect conversations with counsel I

16   instruct you not to answer.

17       Q.   (By Mr. Ko)  So the order which is

18   publicly available for you to read, does have

19   section that contemplates the -- that contemplates

07:02:41 20   broadly Monday torque an enforcement and -- and we

21   did also and I personally remember meeting with the

22   auditor in the context of the 12K so I feel

          23  comfortable confirming again and that's public that

          24  yes both of those orders do speak to monitoring and

07:03:04  25  enforcement.

                                                                293

↑

                      **CONFIDENTIAL ROUGH DRAFT**

07:03:05   1      Q.   Thank you and the -- the initial FTC

           2  consent degree in 2012 Facebook agreed to certain

           3  provisions and certain things for lack of a better

           4  term to improve their Monday torque and

07:03:24   5  \everyone\enforcement of their policies; is that

           6  fair to say?

           7           MR. BLUME:  Objection.  To the extent the

           8  consent degree speaks for itself as to it's terms

           9  it does.

07:03:36  10           SPECIAL MASTER GARRIE:  Counsel.

          11           MR. BLUME:  As to specific.

          12           SPECIAL MASTER GARRIE:  What's the

          13  objection.

          14           MR. BLUME:  That the consent degree

07:03:41  15  speaks for itself it's the best evidence of what it

          16  says.

          17           SPECIAL MASTER GARRIE:  It's the best

          18  evidence P okay.

          19      Q.   (By Mr. Ko)  You can answer?

07:03:54 20         SPECIAL MASTER GARRIE:  Are you instruct

21  figure witness not to answer the question or.

22         MR. BLUME:  As to the terms of the

23  consent degree is beyond the scope of her topic.

24  But I'm sure you want to show it to her she can

07:04:06 25  walk through it Mr. Ko.

294

⬆

                  **CONFIDENTIAL ROUGH DRAFT**

07:04:08  1         SPECIAL MASTER GARRIE:  I don't want to

2  show it to her but Counsel Ko would you like to --

3  so.

4         MR. KO:  I would like an answer to my

07:04:17  5  question.

6         SPECIAL MASTER GARRIE:  Ms. Hendrix.

7         THE DEPONENT:  Yeah.

8         MR. BLUME:  You know the answer answer.

9         THE DEPONENT:  So the only team that is

07:04:24 10  allowed to interpret the language of each of those

11  orders is the legal team.  The only communications

12  with respect to the interpretation of the order is

13  privileged conversations that we had had with the

14  legal team so we rely on the language of the order,

07:04:41 15  but I'm not able to speak to nonprivileged

16  conversations about the order because the legal

17  team interprets and provides guidance on the order

18  and even present day I tell my teams you do not try

19  to interpret the order you go to the legal team to

07:05:02 20  interpret any questions you have about the order.

21          MR. KO:

22          (Discussion off the stenographic record.)

23          MR. KO:  Sorry about that Rebecca.

24          SPECIAL MASTER GARRIE:

07:05:23 25          (Discussion off the stenographic record.)

295

⬆

**CONFIDENTIAL ROUGH DRAFT**

07:05:24  1          MS. WEAVER:  Sounds go we are going off

2  the record we are talking about a 35 minute break.

3          THE VIDEOGRAPHER:  Okay we off the record

4  it's 73:05 p.m.

07:16:29  5          (Recess taken.)

6          THE VIDEOGRAPHER:  We are back on the

7  record at 7:16 p.m.

8          MR. KO:  Ms. Hendrix congratulations I

9  further for questions I just want to note for the

07:16:52 10  record that consist with our prior conversations

11  plaintiffs the reserve the right to -- open the

12  deposition as to these topics.

13          MR. BLUME:  And consist I thought with

```
          14  Special Master Garrie's request to finish up those
07:17:11  15  topics short of objecting and debating our the
          16  questions that were asked and objected again we --
          17  we have -- we are not prepared to bring this
          18  witness back on these topics she remains available
          19  to answer although we ever gone beyond seven hours
07:17:26  20  we still making her available to answer questions
          21  on all those topics and so I again urge you to
          22  finish the questions on these topics because
          23  those -- it's I Al normal sure what your objection
          24  to be to questions not yet asked about topics and
07:17:45  25  why you would be permitted to leave open the
```

                                              296

⬆

                      **CONFIDENTIAL ROUGH DRAFT**

```
07:17:48   1  deposition to cover ground you have not yet covered
           2  when we are making her available to finish this out
           3  today.
           4           SPECIAL MASTER GARRIE:  I will note be
07:17:58   5  for the record Counsel Blume Counsel Ko post
           6  expense tip on the record on this issue two hours
           7  earlier.  Both sides positions are node.  I'm still
           8  denying your request counsel Counsel Blume.  And.
           9           MR. BLUME:  Close it out.
07:18:14  10           SPECIAL MASTER GARRIE:  No further
```

```
        11  questions from Counsel Ko; is that correct

        12  Counsel Ko.

        13          MR. KO:  Correct.

        14          SPECIAL MASTER GARRIE:  Counsel Blume I

07:18:26 15  mean any instructions.

        16          MR. BLUME:  No, nothing from us.

        17          SPECIAL MASTER GARRIE:  Okay.  Before we

        18  go off the record we would standing orders for the

        19  transcript this is 30(b)(6) you weren't sure

07:18:39 20  Counsel Blume is anybody from here from your team

        21  that might be able to clarify.

        22          MR. BLUME:  I assume would -- I I'm it's

        23  the same standing order as we'll Rebecca but it's

        24  the substantial ordering to we ever depositions

07:18:54 25  please.
```

                                                     297
↑

                    **CONFIDENTIAL ROUGH DRAFT**
```
07:18:55  1          SPECIAL MASTER GARRIE:  As long as it's

         2  the same that's fine.

         3          MR. BLUME:  It's the same.

         4          THE COURT REPORTER:  Got it.

07:19:02  5          MR. BLUME:  Excellent.

         6          THE DEPONENT:  Rebecca, thank you.  Nice

         7  to meet everybody but sorry thank you I could see
```

```
          8  even I participated in that over time agriculture

          9  apologize for when I did it I'm sure

07:19:15 10  \everyone\enforcement else -- the same thank you so

         11  and I hope good you rest.

         12            THE COURT REPORTER:

         13            SPECIAL MASTER GARRIE:  You are the upon

         14  person -- should given talk to.

07:19:27 15            MR. BLUME:  Are we off?

         16            THE DEPONENT:  Thank you.

         17            THE VIDEOGRAPHER:  Okay to go over the

         18  record everybody?

         19            SPECIAL MASTER GARRIE:  Yes.

07:19:33 20            THE VIDEOGRAPHER:  Thank you.  We off the

         21  record it's 7:19 p.m.

         22

         23

         24

         25
```