# EXHIBIT C

## Redacted Version of Document Sought to Be Filed Under Seal

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

3161 Michelson Drive
Irvine, CA 92612-4412
Tel 949.451.3800
www.gibsondunn.com

Colin B. Davis
Direct: +1 949.451.3993
Fax: +1 949.475.4792
CDavis@gibsondunn.com

June 14, 2022

VIA E-MAIL

Lesley Weaver, Esq.
Bleichmar Fonti & Auld LLP
555 12th Street, Suite 1600
Oakland, CA 94607
lweaver@bfalaw.com

Derek W. Loeser, Esq.
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
dloeser@kellerrohrback.com

Re:   In re Facebook, Inc. Consumer Privacy User Profile Litigation

Dear Lesley and Derek:

This letter addresses the May 19, 2022 Rule 30(b)(6) deposition of Facebook's corporate representative Amy Lee and responds to Plaintiffs' May 26 letter.

At the Case Management Conference held on June 9, Judge Chhabria ordered the parties to complete Rule 30(b)(6) testimony by June 30, except for Rule 30(b)(6) Topics 5 and 9, and Rule 30(b)(6) testimony relating to advertising. Judge Chhabria further ordered Facebook to complete its production of financial documents by July 1. So the parties can meet the June 30 deadline for Topic 10 and the July 1 deadline for production of financial documents, and work immediately to resolve any disputes, including—if necessary—through mediation, we request a meet and confer on June 15 to discuss the scope of additional testimony, if any, that Facebook will provide on Topic 10, and any additional financial documents Facebook will produce.

A.   **Ms. Lee Was Adequately Prepared to Testify About Topic 10.**

As we explained in our May 18 correspondence, Ms. Lee was prepared to testify at her May 19 deposition about Topic 10 in Plaintiffs' March 1, 2022 second amended Rule 30(b)(6) notice to Facebook. Topic 10 seeks testimony regarding "Facebook's calculation of revenues, gross profits, and net profits recognized by Facebook relating to Users' Data or Information, including but not limited to how Facebook monetized User Data or Information, how Facebook

GIBSON DUNN

Lesley Weaver, Esq.
Derek W. Loeser, Esq.
June 14, 2022
Page 2

quantified the value of sharing User Data or Information, and Facebook's business and marketing strategy regarding the monetization and quantification of User Data or Information." Accordingly, Facebook prepared Ms. Lee to testify about:

- How Facebook generates revenue through products (primarily advertising products) that utilize Facebook user data;
- The "value" of user data, which exists in the context of Facebook's advertising products;
- Facebook's business and marketing strategies related to revenue generation through products (primarily advertising products) that utilize Facebook user data;
- Key business metrics related to Facebook users, including engagement metrics (e.g., DAU/MAU) and revenue metrics (e.g., ARPU);
- Facebook's calculation of revenue and profits, including revenue and profits generated through products (primarily advertising products) that utilize Facebook user data;
- Facebook's 2012 IPO Prospectus and periodic Form 10-K and Form 10-Q filings with the SEC, as they relate to (i) revenue generated through products (primarily advertising products) that utilize Facebook user data, and (ii) key business metrics related to Facebook users;
- Documents shared by Plaintiffs in advance of Ms. Lee's deposition; and
- The following documents: FB-CA-MDL-01994705, FB-CA-MDL-02130372, FB-CA-MDL-01750523 (attachment at FB-CA-MDL-01750529), FB-CA-MDL-02335850 (attachment at FB-CA-MDL-02335852), FB-CA-MDL-02175536, FB-CA-MDL-02320097, FB-CA-MDL-02543690, and FB-CA-MDL-02936308.

Ms. Lee's preparation was extensive, lasting approximately 20 hours over ten preparation sessions. Ms. Lee also met with several other knowledgeable employees in preparation for her deposition, including Bonnie Ng, Justin Osofsky, and Seethalakshmi Sethuraman. Ms. Lee provided significant testimony relating to Topic 10.

As a result of these efforts, Ms. Lee was prepared for and testified about at least the following topics that were within the scope of Topic 10:

- Key business metrics related to Facebook users, including engagement metrics (e.g., DAU/MAU) and revenue metrics (e.g., ARPU). *See* Lee 30(b)(6) Tr. at 35:2–36:23, 37:4–40:11, 44:19–46:11.

**GIBSON DUNN**

Lesley Weaver, Esq.
Derek W. Loeser, Esq.
June 14, 2022
Page 3

- The components of Facebook's gross revenues. *See id.* at 49:24–53:15, 54:4–14.
- How Facebook calculates revenues and profits generated through advertising products that utilize Facebook user data. *See id.* at 89:15–91:14, 92:8–94:17, 142:25–145:16.
- Facebook's revenue recognition policies. *See id.* at 119:22–13, 126:15–127:5, 128:1–128:16, 144:22–145:16.
- Types of revenue-sharing agreements into which Facebook entered. *See id.* at 128:17–130:5, 147:22–25.

Unfortunately, a significant amount of Plaintiffs' questioning went far beyond the scope of the topic on which Ms. Lee was designated to testify.

For example, although Ms. Lee was prepared to testify about the fact that Facebook generates revenue through advertising products that utilize Facebook user data, Plaintiffs' questioning delved into the mechanics of how Facebook's targeted advertising products work. *See e.g.*, Tr. at 118:8–119:21 (discussion of whether Facebook allows for the targeting of ads based on lists of IDFAs via Custom Audiences); 138:19–139:17 (discussion of whether advertisers could scrape Facebook IDs from the Graph API to create Custom Audiences); 97:19–101:7 (discussion of whether Facebook allowed for the targeting of individuals based on device identifiers). This questioning went far beyond the scope of Topic 10 and is more properly addressed to the separate corporate representative whom Facebook has designated to provide testimony related to targeted advertising components of Topics 2 and 8.

Plaintiffs also ventured beyond the scope of Topic 10 by questioning Ms. Lee about potential monetization models for the Facebook Platform that Facebook considered but ultimately elected not to implement. *See e.g.*, Tr. at 61:25–64:11 ( ); 65:21–16 ( ). This line of questioning was outside the topic on which Ms. Lee was designated to testify because it addresses ways in which Facebook *does not* generate revenue.

Similarly, Plaintiffs incorrectly suggest that Ms. Lee was inadequately prepared to testify on the noticed topic because she was unable to answer questions about Onavo and Facebook Viewpoints. *See* Tr. at 201:1–202:21; May 26 Letter at 3–4. Instances in which Facebook purportedly paid third parties for data are not within the scope of Topic 10, which seeks testimony about how *Facebook* monetizes its business through products that utilize user data—not how separate third parties allegedly monetize data by making it available it to

**GIBSON DUNN**

Lesley Weaver, Esq.
Derek W. Loeser, Esq.
June 14, 2022
Page 4

Facebook. Nor does Topic 10 seek testimony about how Facebook compensates users for time associated with completing surveys or performing other research tasks.

Plaintiffs further questioned Ms. Lee about myriad subjects that went far beyond the scope of Topic 10 including:

- Why Facebook refers to people that use its services as "users" opposed to "members." *See* Tr. at 36:24–37:3.
- The meaning of the phrase "policy-violating ads." *See id.* at 77:3–80:7.
- Whether FB can "isolate the number of friends a person has at any given point in time" or if it "only maintain[s] the current count." *See id.* at 110:21–111:9.
- ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *See id.* at 114:1–115:4.
- Whether Partner Categories were deprecated because of Cambridge Analytica. *See id.* at 147:11–148:7.
- Changes Facebook made to its measurement products. *See id.* at 149:25–151:20; 172:20–173:15.
- ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *ee id.* at 165:4–16.
- Facebook's Lighthouse program. *See id.* at 167:15–168:21.
- ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *See id.* at 168:22–172:12.
- Facebook's investigations following the Cambridge Analytica incident. *See id.* at 186:11–25, 187:22–188:4, 190:1–8.

Additionally, at times during the deposition, you introduced emails and other documents, and asked Ms. Lee to decipher and then explain what the authors may have meant. Although these types of questions fall outside the proper scope of a corporate representative deposition, Ms. Lee did her best to answer the questions in her personal capacity. Understandably, Ms. Lee was unable to get into the mind of others or speculate what they may have meant in all of these messages. *See e.g.*, Tr. at 122:10–126:14 (asking for the meaning of various contractual terms in an unexecuted contract drafted by ▇▇▇).

Finally, Plaintiffs appeared at times to treat the deposition as a records topic instead of a monetization topic. For example, Plaintiffs suggested that Ms. Lee was unprepared to testify about Exhibit 375 because she could not identify where all of the source data used to create the document was stored. *See* Tr. at 203:13–208:12. As we explained in our May 18 correspondence, Ms. Lee was prepared to testify about the monetization metrics in the

**GIBSON DUNN**

Lesley Weaver, Esq.
Derek W. Loeser, Esq.
June 14, 2022
Page 5

document. The source(s) of the data used to compute these monetization metrics, however, is a records topic and is beyond the scope of the topic on which Ms. Lee was designated to testify. Plaintiffs similarly suggested that Ms. Lee was unprepared to testify about Exhibit 360 because she did know the underlying source(s) of the data used to create the document, *see id.* at 20:10–22:1, 53:16–54:3, and that Ms. Lee was unprepared to testify about Exhibit 374 because she could not identify the location(s) of data used to calculate the revenue impact of restricting third parties' access to data. *See id.* at 197:7–22. Again, the source(s) and location(s) of data are outside the scope of Topic 10, which seeks testimony about monetization—not Facebook's corporate recordkeeping.

At bottom, Ms. Lee was prepared to testify about Topic 10 and did so fully and completely when Plaintiffs' questioning was in scope. But a substantial portion of Plaintiffs' questioning strayed well beyond the scope of Topic 10 and thus beyond the scope of what Ms. Lee was designated to testify about.

**B.    Response to Plaintiffs' May 26, 2022 Letter.**

In your letter dated May 26, 2022, Plaintiffs request that Facebook search for and produce certain additional financial documents, and provide additional testimony on additional subjects purportedly within the scope of Topic 10.

**1.    Plaintiffs' request for production of additional financial documents.**

The parties' discussions regarding Facebook's production of additional financial information have been ongoing for some time. Beginning as early as 2020, Plaintiffs requested that Facebook produce documents reflecting the "value" of user data. As we informed you on numerous occasions, Facebook does not assign a value to user data, and therefore, it does not have documents reflecting the "value" of user data. When Plaintiffs raised this issue to Judge Corley in December 2020, Judge Corley permitted Plaintiffs to take a first Rule 30(b)(6) deposition of Facebook regarding monetization, so that Plaintiffs could issue "narrowed" requests for financial documents.

Although Plaintiffs took a monetization-focused Rule 30(b)(6) deposition of Facebook in February 2021, they did not issue "narrowed" financial requests until a year later, in February 2022. In March 2022, Facebook agreed to conduct a reasonable search for documents falling into the seven discrete categories plaintiffs identified, even though none of those documents reflect the "value" of user data. Between April 15 and May 6, 2022, Facebook produced more than 6,500 documents falling into one or more of Plaintiffs' seven categories. The Bates numbers of the documents Facebook produced between April 15 and May 6 as a result of this additional search are listed on Exhibit A to this letter.

GIBSON DUNN

Lesley Weaver, Esq.
Derek W. Loeser, Esq.
June 14, 2022
Page 6

Facebook's production of financial information covers some of the very same categories of documents requested in Plaintiffs' May 26 letter. For example, Plaintiffs request that Facebook produce a quarterly revenue report similar to Exhibit 364 for all the months in the Class Period. Between April 15 and May 6, Facebook produced more than 150 similar reports covering at least the time period between February 2010 and May 2016. *See, e.g.*, FB-CA-MDL-03124536, FB-CA-MDL-03123639, FB-CA-MDL-03126101, FB-CA-MDL-03125307, FB-CA-MDL-03126919, FB-CA-MDL-03125929. Facebook is evaluating whether additional reports exist outside the time period for which documents already have been produced. To the extent incremental additional documents are identified, Facebook will produce them.

Plaintiffs also request the source documents used in the calculation of Exhibit 372 and documents related to Facebook's assessment and decision-making regarding deprecating Partner Categories and the measurement categories Ms. Lee testified to in connection with Exhibit 372. We are working to identify whether and to what extent these documents exist and are responsive to Plaintiffs' document requests. If our search identifies any incremental non-privileged, responsive documents, we will produce them.

Plaintiffs also request documents sufficient to identify the revenue impact of cutting off access to third-party companies that received RFIs as part of the ADI process, including but not limited to the companies identified in Exhibit 373. Please explain why Plaintiffs believe this request is not already adequately covered by Facebook's ongoing search for, and production of, ADI-related materials.

Plaintiffs also request documents relating to Facebook's analysis of the revenue impacts of "any changes" implemented after Cambridge Analytica's activities with respect to Facebook user data came to light. This is an extremely broad and vague request. Moreover, we would expect documents reflecting analyses of revenue impacts resulting from changes implemented in response to the Cambridge Analytica events to be fully covered by Facebook's prior document production, which used several Cambridge Analytica-related search strings to identify potentially responsive documents. Facebook is willing to meet and confer with Plaintiffs, including through discovery mediation, about why Plaintiffs believe this request is not already adequately covered by Facebook's prior production and to otherwise discuss a possible resolution of this issue.

Plaintiffs also request documents relating to payments that Facebook has made or is making to any third parties for user data or "information derivative of user data." As we have explained above, programs in which Facebook purportedly paid for user data are not within the scope of Topic 10, which relates to how *Facebook* monetizes its business through products

**GIBSON DUNN**

Lesley Weaver, Esq.
Derek W. Loeser, Esq.
June 14, 2022
Page 7

that utilize user data—not how third parties monetize data by making it available to Facebook, or how Facebook compensates users for time associated with completing research tasks. Further, we would expect documents regarding Onavo in particular to be covered by Facebook's prior document production, which used at least one Onavo-related search string (PL-9, applied to custodian groups 5-8) to identify potentially responsive documents. Nonetheless, Facebook is willing to meet and confer with Plaintiffs about the extent to which Plaintiffs believe this request is not adequately covered by Facebook's prior production and how Facebook reasonably can search for additional non-privileged documents responsive to Plaintiffs' request by the Court's July 1 deadline.

Plaintiffs also seek the creation for the entire class period of a document similar to the document Facebook prepared and produced prior to Ms. Lee's February 2021 Rule 30(b)(6) deposition. Creating a new document solely for the purposes of discovery is beyond the scope of Rule 34 of the Federal Rules of Civil Procedure. Facebook further directs Plaintiffs to the numerous substantially similar documents it already has produced that cover other portions of the class period back to 2010, which is as far back as Facebook maintains similarly granular revenue information. *See, e.g.*, FB-CA-MDL-03113809, FB-CA-MDL-03113814, FB-CA-MDL-03113819, FB-CA-MDL-03113883, FB-CA-MDL-03113848, FB-CA-MDL-03114341, FB-CA-MDL-03114552, FB-CA-MDL-03114559, FB-CA-MDL-03114562.

Finally, Plaintiffs request the documents used to prepare Ms. Lee for her testimony. Facebook already has identified documents Ms. Lee was prepared to testify about—both in our May 18 correspondence and above. As Facebook has explained in prior correspondence, any remaining documents used to prepare Ms. Lee for her testimony are protected by the work-product doctrine. *See, e.g.*, June 2, 2022 email from A. Schwing to D. Garrie and D. Ko, et al.

  2.   **Plaintiffs' request for additional testimony.**

Your May 26 letter states that Plaintiffs intend to seek additional testimony from Facebook on several topics, including "how Facebook monetizes data acquired about users by sharing it, matching it with other data, making it available through APIs, etc." Plaintiffs had the opportunity to ask Ms. Lee about this subject at her May 19 deposition but apparently chose not to do so. Indeed, your May 26 letter does not identify a single question on this subject that Ms. Lee supposedly was unprepared to answer. Although that alone should preclude further questioning of Facebook on this topic, we are prepared to meet and confer with you regarding the nature and scope of the additional testimony Plaintiffs seek.

Plaintiffs also seek additional testimony relating to "any payments made to third parties for access or user [sic] of user data (e.g., Onavo, paying data brokers for data, etc.)." As we have explained above, programs in which Facebook purportedly paid for user data are not

**GIBSON DUNN**

Lesley Weaver, Esq.
Derek W. Loeser, Esq.
June 14, 2022
Page 8

within the scope of Topic 10, which is about how Facebook monetizes its business through products that utilize user data—not how third parties monetize data by making it available to Facebook, or how Facebook compensates users for time associated with completing research tasks. And to the extent that Plaintiffs seek testimony regarding payments to data brokers, Facebook has designated a separate witness to address this topic.

Plaintiffs also seek additional testimony relating to a document "identifying in part the revenue impact of cutting off access to data to companies identified through the ADI investigation." Ms. Lee was prepared to testify about Exhibit 374. However, Plaintiffs suggested Ms. Lee was unprepared to testify about Exhibit 374 because she could not identify the specific source of data to calculate the revenue impact of restricting certain third parties' access to data. *See id.* at 197:7–22. Testimony about the source(s) of data are outside the scope of Topic 10, which concerns monetization—not corporate recordkeeping.

Facebook is available to meet and confer with Plaintiffs, as set forth above, to bring these issues to a mutually satisfactory resolution.

Sincerely,

GIBSON, DUNN & CRUTCHER LLP

Colin B. Davis

CBD