1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3   Before The Honorable Vince Chhabria, Judge

4

5   In re:                        )
                                  )
6   FACEBOOK, INC. CONSUMER       )   No. 18MD02843-VC
    PRIVACY USER PROFILE          )
7   LITIGATION,                   )
                                  )
8   _____)

9                                 San Francisco, California
                                  Tuesday, July 26, 2022
10

    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
11             RECORDING 1:01 - 1:45 = 44 MINUTES

12  APPEARANCES:

13  For Plaintiffs:
                                  Keller Rohrback LLP
14                                1201 Third Avenue, Suite 3200
                                  Seattle, Washington 98101
15                           BY:  DEREK W. LOESER, ESQ.
                                  BENJAMIN B. GOULD, ESQ.
16
                                  Bleichmar Fonti & Auld LLP
17                                555 12th Street, Suite 1600
                                  Oakland, California 94607
18                           BY:  LESLEY ELIZABETH WEAVER, ESQ.
                                  ANNE K. DAVIS, ESQ.
19                                MATTHEW MELAMED, ESQ.

20  For Defendant Facebook, Inc.:
                                  Gibson, Dunn & Crutcher LLP
21                                555 Mission Street
                                  Suite 3000
22                                San Francisco, California
                                   94105
23                           BY:  ROSEMARIE T. RING, ESQ.

24
                    (APPEARANCES CONTINUED ON NEXT PAGE)
25

2

```
 1  APPEARANCES:  (Cont'd.)

 2                              Gibson, Dunn & Crutcher LLP
                                200 Park Avenue
 3                              New York, New York 10166
                           BY:  ORIN SNYDER, ESQ.
 4
                                Gibson, Dunn & Crutcher LLP
 5                              333 South Grand Avenue
                                Los Angeles, California 90071
 6                         BY:  DEBORAH L. STEIN, ESQ.

 7                              Gibson, Dunn & Crutcher LLP
                                1881 Page Mill Road
 8                              Palo Alto, California 94304
                           BY:  MARTIE KUTSCHER CLARK, ESQ.
 9
                                Meta Platforms Inc.
10                              1601 Willow Road
                                Menlo Park, California 94025
11                         BY:  SANDEEP N. SOLANKI, ESQ.

12

13  Transcribed by:             Echo Reporting, Inc.
                                Contracted Court Reporter/
14                              Transcriber
                                echoreporting@yahoo.com
15

16

17

18

19

20

21

22

23

24

25
```

3

1  Tuesday, July 26, 2022                                    1:01 p.m.

2                        P-R-O-C-E-E-D-I-N-G-S

3                             --oOo--

4            THE CLERK:  Calling case number 18-MD-02843, In re

5  Facebook, Inc. Consumer Privacy User Profile Litigation.

6        Counsel for the plaintiffs, please state your

7  appearances for the record, and then defendants.

8            MR. LOESER (via Zoom):  Derek Loeser from Keller

9  Rohrback.  With me is Ben Gould from Keller Rohrback as

10 well.

11           THE COURT:  Hello.

12           MS. WEAVER (via Zoom):  Lesley Weaver of Bleichmar

13 Fonti.  And with me here today are Anne Davis and Matt

14 Melamed.

15           THE COURT:  Hi.

16           MS. WEAVER:  Hi.

17           MS. RING (via Zoom):  And for Facebook, your

18 Honor, Rose Ring from Gibson, Dunn and Crutcher.  And I have

19 with me Sandeep Solanki from Facebook, and from Gibson, Orin

20 Snyder, Deb Stein, and Martie Kutscher Clark.

21           THE COURT:  Hello, everyone.

22           MS. RING:  Hello.

23           MR. LOESER:  Good afternoon, your Honor.

24           THE COURT:  Okay.  So I read the case management

25 statement.  And I guess the question is, is there anything

4

1  that I can do today to help move things along?

2          MR. LOESER:  Well, your Honor, I'll start if

3  that's okay.  And I think my goal for the day is to try and

4  keep this as short as possible for you.  I think the

5  statements do a good job of listing the issues.

6      There are a few issues that continue, in our view, to

7  be problematic, but they're described in the statement.

8  They have to do with the 30(b)(6) depositions in particular

9  and some of the documents that we're still waiting for in

10 the named plaintiff data process which is taking a long

11 time.

12     But I'll just cut to the chase, which is to answer your

13 question --

14          THE COURT:  Before you cut to the chase --

15          MR. LOESER:  Yes.

16          THE COURT:  -- let me ask, on the 30(b)(6)

17 depositions, you have some disputes pending -- disputes

18 about how those depositions have gone, pending in front of

19 the special master?

20          MR. LOESER:  We do.  We have a process -- after

21 certain of the depositions -- witnesses testified in a

22 variety ways that they didn't know or they weren't familiar

23 with documents -- we set up a process to get some answers by

24 written testimony and in some instances further oral

25 testimony.  And there will be some additional briefing on

5

1   whether it will be by oral testimony or not and whether

2   there will be some more time.

3          THE COURT:  Okay.  And obviously I'm not -- I

4   haven't read anything about these most recent 30(b)(6)

5   depositions, so I can't reach any independent conclusion

6   about whether -- whose fault it is or whatever.

7      But to the extent that there continue to be the same

8   kinds of problems with the 30(b)(6) depositions that

9   occurred before -- that I was privy to that occurred before

10  with Facebook's witnesses not being prepared to answer

11  questions that they were on notice, that they needed to

12  answer or not being familiar with documents that they were

13  on notice that they needed to answer questions about, what

14  should I do to try to fix that for any future, you know, new

15  depositions or redos, re-depositions that take place?

16     Should I order Facebook's general counsel to be at

17  every 30(b)(6) deposition for the remainder of this case,

18  for example?  What --

19          MR. LOESER:  Fine --

20          THE COURT:  Again, I don't know, maybe the special

21  master will conclude that Facebook was not at fault for the

22  latest problems, right?  But assuming it continues to be

23  Facebook's fault, it seems to me that some additional

24  measure needs to be taken to ensure that it stops happening.

25          MR. LOESER:  I think that's correct, your Honor.

6

1  I think there are some depositions that have gone better
2  than others.  There are some witnesses that have been better
3  able to answer questions than others.

4       But a problem we continue to have has to do with
5  specifics, when you try to get specific answers that relate
6  to procedures or audits, things of that sort that are
7  described in documents.  I don't really know what else to
8  say to Facebook.  We've given them the documents.  We ask
9  questions about the events described in the documents.

10      The witnesses often say things like, you know, "I can
11  read the document just like you.  I don't know anything
12  about it.  I wasn't there.  I didn't perform that audit,"
13  whatever.  And I'm not really sure what else to say other
14  than repeatedly informing Facebook these witnesses need to
15  come prepared.

16      If having their general counsel present means that they
17  will take us up on what I think these documents we're
18  handing over early should allow them to do, which is go
19  research the documents, go talk to the authors of the
20  documents, come ready to respond to what's discussed in the
21  documents -- if someone else needs to be there to make that
22  happen, you know, that's fine with us.

23      But that really is kind of the challenge that keeps
24  repeating itself.

25           MS. RING:  Your Honor, look, we disagree with the

7

1 premise.  The initial issue that you're talking about was

2 the first 30(b)(6) deposition.  That issue arose because of

3 an exchange between counsel.  And all of that, as we

4 discussed yesterday -- look, I'm really -- I also don't want

5 to drag this out, but there has to be some relationship to

6 the truth here.

7      So I'm going to try to keep it very high level, but

8 it's just these 30(b)(6) topics are all of Facebook's data

9 practices for the last 15 years.  It's impossible.  That's

10 the conclusion I've reached.  But we are doing our best.

11      That first issue that came up on the first deposition,

12 again, was an exchange between counsel.  So when we say the

13 problems in that first issue persisting, no.  Completely

14 separate issue.

15      The issues that we are having, which are repeating and

16 which we have worked with the special master to address and

17 he very helpfully advised us to send a letter in advance of

18 the depositions to say how we interpret the topic, because

19 we have not had -- we have not been able to have meaningful

20 meet and confers about these ridiculously overbroad topics.

21      They are not particularized at all, which is required

22 by the rule, but you know, we've moved past that.

23      And these witnesses are -- I mean I was just looking

24 at -- they've had over 80 hours of 30(b)(6) testimony to

25 date.  Eleven witnesses, 18 days, 5,000 hours to prepare

1  them.  It's just false to say that these witnesses are

2  coming unprepared.

3          THE COURT:  But doesn't that kind of beg the

4  question of what sorts of answers these witnesses have

5  provided?

6          MS. RING:  No, it doesn't.  What it reflects is

7  the broad scope of these topics.  That is the only thing it

8  reflects.

9      I have been on these depositions, your Honor, and I've

10 been at these preps.  And it is impossible for us -- they

11 get down to -- they want every little detail of every little

12 audit.  They will show a document, you know, "This was

13 written by Mr. So-and-so.  What did he mean when he said

14 this?"

15     "I don't know.  Why don't you depose that person."

16     These are not 30(b)(6) topics.

17     Now, I will say of course -- of course, given the

18 breadth of these topics, there are things that these

19 witnesses can't answer or, you know, answer --

20         THE COURT:  Maybe something -- one thing you just

21 kind of alluded to earlier -- and maybe I misinterpreted it,

22 but I think you maybe alluded to the concept that some of

23 these questions are just unanswerable because they are

24 asking about Facebook's data sharing practices going back

25 over the last 15 years and it's impossible to isolate

9

1  exactly what was happening at any given time over the last

2  15 years.

3      Did I interpret your comments correctly or no?

4          MS. RING:  Almost.  I would add just one thing.

5  It's not even about data sharing.

6      This is just everything that -- every bit of user data

7  that Facebook has collected, how it stored it, how it used

8  it --

9          THE COURT:  I see.

10          MS. RING:  -- regardless of whether it was shared.

11          THE COURT:  Right.

12          MS. RING:  So it's really a daunting task, your

13  Honor, and I've never seen anything like it in all my years

14  of practice.  And we are doing our best.

15      And so, you know, these follow-up proceedings that are

16  going on right now with the special master, I also want to

17  be clear, the special master after this deposition said,

18  "Okay" -- and we were open to this.  Fine.  If there are

19  things -- and particularly very detailed things that no

20  witness can commit to memory, it's just not possible.  We

21  said, "Look, we can consider answering questions in

22  writing," basically giving them more rogs.  Okay.  We will

23  do that.

24      So the special master said:  Okay.  Fine.  Send

25  questions that you asked during the depositions but were not

10

1  answered.  And he said -- he made clear, this isn't like a,

2  you know, field of dreams thing.  Just limit it.

3          THE COURT:  Right.

4          MS. RING:  We got 160 questions --

5          THE COURT:  I guess the answer -- and --

6          MS. RING:  -- most of which weren't even asked

7  during the deposition.

8          THE COURT:  Okay.  The answer is, like I said, I

9  can't really --

10          MS. RING:  Yes.

11          THE COURT:  I have no ability from this perch to

12  understand what happened at the more recent 30(b)(6)

13  depositions and I think we need to wait and see how the

14  special master rules on the disputes that you've teed up.

15  And then I need to think about what, you know, if any,

16  remedy is required -- is needed going forward for any future

17  depositions.

18      And I think that's just something to think about.  But

19  I mean if the special master's ruling reflects ongoing

20  problems with Facebook's conduct, then I have to think about

21  what's sort of the next level of supervision that needs to

22  happen to make sure that that stops -- the problems stop

23  occurring.

24      But one step at a time.  You know, let's see what the

25  special master says.

1    Ms. Ring, your comment about, you know, how difficult

2 it is to answer so many of these questions about Facebook's

3 data practices going back 15 years made me think about

4 another comment that you made in the case management

5 statement.  And it's similar to a comment you've made in the

6 past, and I just continue to be confused by it, so I wanted

7 to ask you about it.

8    So on page 10 of the case -- I guess it's ECF page 10,

9 your page nine of the case management statement in the

10 paragraph on named plaintiff data.  You say, "Facebook

11 nevertheless proposed producing additional named plaintiffs'

12 data and is doing so now.  Even though plaintiffs have not

13 shown that any of the data was shared or made accessible to

14 third parties so as to be relevant to their claims."

15    How are the plaintiffs -- I mean if you can even answer

16 these questions about Facebook's data practices going back

17 over the last 15 years, how are the plaintiffs supposed to,

18 quote-unquote, show that data was shared or made accessible

19 to third parties so as to be relevant to their claims?

20         MS. RING:  That -- well, Judge Corley tried to

21 help the parties work through that and for that purpose gave

22 plaintiffs the opportunity to take a 30(b)(6) to look into

23 that question.

24    So, for example, the exercise we're going through right

25 now where plaintiffs can choose 250 tables from Hive.  We

1  choose 250 tables from Hive.  Then we have to search these

2  tables and produce them to plaintiffs.  We don't even know

3  if there's going to be named plaintiff data in these tables.

4      But what we do know is that Hive tables are not

5  accessible to third parties.  Okay?  So what they could

6  do -- and this is I think what Judge Corley always had in

7  mind was, first, that question -- in reading -- when I

8  joined the case and reading all the transcripts --

9          THE COURT:  I'll bet Judge Corley is so glad she's

10 a district judge right now.

11         MS. RING:  I bet so too.  And I felt her pain

12 reading those transcripts.  I really did.

13     And I think what she said is, look, Facebook,

14 plaintiffs don't have to take your word for it that this

15 data wasn't shared -- which I think is a completely fair

16 point, absolutely.

17     So in other words, they don't have to take our word.

18 We say well, we've given you all the data that's ever been

19 shared.  They don't have to take our word for that.  Okay?

20     But what we are doing right now -- so but the way to

21 then -- to look at this and say what -- you know, in the

22 systems where the -- you know, the different sources of data

23 and are those sources accessible to third parties.  That you

24 can take discovery on.

25     What we are doing right now and plaintiffs have

13

1  demanded is give us all of the named plaintiff data.  We

2  want to see everything you have and then we'll see whether

3  that was shared.  That is ridiculous.  Okay?

4       I mean what is the data source?  Is that data source

5  accessible to third parties?  No?  Then that's not relevant

6  to this case.

7       What is this data source?  Is that data source --

8            THE COURT:  Are you going to be able to show which

9  data was accessible to third parties and which was not --

10           MS. RING:  Yes, we --

11           THE COURT:  -- going back over the past 15 years?

12      I mean that --

13           MS. RING:  Your Honor, as I sit here today, I

14  can't --

15           THE COURT:  It would surprise me if you were able

16  to show that.

17           MS. RING:  As I sit here today, I can't go over 15

18  years.  And I want to be very careful in the representations

19  I make to the Court, obviously.

20      But I have been representing Facebook for over a

21  decade.  I know a lot about the systems, and when I talk to

22  those engineers, I mean -- and the question is, was this

23  data shared with third parties?  Was this data made

24  accessible to third parties?  They're systems.  They either

25  were or they weren't.

1      So I mean, you know -- so I feel confident, and that's

2  why the thing that's been most confusing to me about this

3  case since joining it is how, again -- and actually having

4  this exchange with you, I'm starting -- it's helping me

5  understand.

6      If the premise is or the concern is that we'll never be

7  able to show what was and wasn't shared with a third party,

8  then maybe this approach makes sense.  Just show us

9  everything you have.

10      But that's not the case.  But that is what we've jumped

11  to.  We've skipped right over whether it could be determined

12  whether data was shared or made accessible.  We skipped over

13  that entirely.  And that is not what Judge Corley had in

14  mind.  And I know that because, in reading the

15  transcripts -- but most recently in January when she was

16  ruling on this named plaintiff data issue, she said it again

17  in the order, that it does matter whether the data was

18  shared.  She said it twice in her January order of this

19  year.

20      But there is -- I'll just tell you, there is no

21  discussion of that.  These depos, it doesn't matter whether

22  it was shared.  There is no -- it doesn't matter.  All we

23  talk about is all of the data that exists, where it's

24  stored, how it's used.

25      We have lost any connection to data sharing.  And that

1 is why this case will never end.  I mean it is -- to go back

2 over 15 years of any kind of data no matter whether it was

3 shared or not, we'll never get to the bottom of that.  And

4 it's so unnecessary.

5      So anyway, I -- that is why we keep saying it.  But you

6 asking that question is helpful, because if the concern

7 is -- and I don't think that that was what was motivating

8 Judge Corley's concern, that that could never be determined

9 whether data was shared.

10      She simply said, "They don't have to take your word for

11 it," which again, I think is fair.  We'd like them to take

12 our word for it, but they don't have to.  But it doesn't

13 mean you skip over that question entirely.

14           THE COURT:  Okay.  Could I ask you what is

15 potentially a related question.

16      You're talking about doing a limited motion for summary

17 judgment relating to the individual plaintiffs in

18 conjunction with the motion for class certification.  Can

19 you tell me what you're contemplating there?

20           MS. RING:  Well, I mean now, as you know, we've

21 deposed all of the named plaintiffs.  And they're asserting

22 various privacy injuries and so on.  It would just be on

23 injury.

24      And they've talked about the data that they had on

25 Facebook, the data that they had elsewhere on the Internet,

1  how they feel they been harmed.  And I'm sorry, your Honor,

2  I don't have all the details at my fingertips.  But it would

3  just be a motion I've filed in many cases, which is just

4  that this named plaintiff does not have any injury so as to

5  establish Article III standing.

6          THE COURT:  Okay.  Well, first -- this is maybe a

7  small point, but you're contemplating a summary judgment

8  motion on standing.  I mean it would be a motion to dismiss

9  for lack of jurisdiction, right?  If a named plaintiff does

10 not have Article III standing, that means I don't have

11 jurisdiction over the claim and I would dismiss the claim.

12     I would not enter summary judgment.  It would be a

13 12(b)(1) motion, right?

14         MS. RING:  I've brought it as a summary judgment

15 motion in other cases, just because of the fact issues,

16 right?

17         THE COURT:  I think that's wrong.  If it's a

18 jurisdictional question, it's not a summary judgment issue.

19 It's a 12(b)(1) issue.  And in 12(b)(1) motions, there can

20 be factual disputes.

21         MS. RING:  I'm -- yeah, I have done that.  But

22 once we reach this stage -- and as I understand it,

23 obviously, when we moved to dismiss the case initially, we

24 did move on standing grounds and that was denied.

25         THE COURT:  Correct.

17

1          MS. RING:  And when that happens in other cases,

2     what I've done is we -- in opposing class -- you know, when

3     we're briefing class certification, we also bring a motion

4     for summary judgment for lack of standing.

5          THE COURT:  Yeah, but you don't enter summary

6     judgment against somebody if there's no jurisdiction.  You

7     just dismiss the case.  So that's not the right way to do

8     it.

9          But anyway, so what is the -- to the extent that you

10    want to argue that the named plaintiffs lack standing,

11    what's the argument?  Why do they lack standing?  They had

12    no Article III injury because why?

13         MS. RING:  Your Honor, I don't know -- I didn't --

14    I don't have all the facts in front of me, but --

15         THE COURT:  Well, that's fine.  You're proposing

16    this thing that you're calling a limited motion for summary

17    judgment regarding standing and you're proposing --

18         MS. RING:  Yes.

19         THE COURT:  -- filing it around the same time or

20    in conjunction with the plaintiffs' filing of a motion for

21    class certification.  And you're proposing that we schedule

22    it that way, so I want to know what is it that you're

23    planning on arguing?  Is it really a summary judgment issue

24    or a 12(b)(1) issue?

25         If it's a 12(b)(1) issue, what is the issue?  If there

1  anything that prevents you from just asserting it in

2  opposition to the class certification motion as opposed to

3  filing a separate motion on it?

4      I'm just trying to understand it.  I don't --

5          MS. RING:  Yeah, I understand.  I mean it is -- it

6  is a separate motion.  It's not part of any class

7  certification briefing.  It's standing.  And it is basically

8  that these plaintiffs now -- we've taken their depositions.

9  They can't show any injury.

10     Again, when you ruled on our --

11         THE COURT:  "They can't show any injury."

12         MS. RING:  Right.

13         THE COURT:  So are you saying because they can't

14  prove that their data was shared?

15         MS. RING:  They can't prove that their data was

16  shared or I mean there are named plaintiffs --

17         THE COURT:  If it's based on the idea that they

18  can't -- if your motion -- if your assertion that they lack

19  standing is based on the assertion that they can't prove

20  that their data was shared, isn't the easy answer to that

21  that there's plenty of evidence of Facebook's widespread

22  practice of sharing user data with third parties and if --

23  based on all of that evidence, one can infer that the named

24  plaintiffs were among many, many users whose information was

25  shared with third parties?

19

1          MS. RING:  How can you infer that?  Just

2 because --

3          THE COURT:  Because Facebook --

4          MS. RING:  -- there was data shared, then it must

5 have been --

6          THE COURT:  -- was -- because --

7          MS. RING:  -- everyone's data?

8          THE COURT:  Because it was --

9          MS. RING:  I don't think that's a fair inference.

10         THE COURT:  The --

11         MS. RING:  But moreover --

12         THE COURT:  Wait a minute.  Hold on.

13     There's evidence that Facebook was sharing tons of

14 information about its users with tons of third parties.

15 It's not a fair inference that if I'm a user, Facebook was

16 sharing that information about me?

17     I mean if it was sort of "Come get it, third parties.

18 Come harvest this information from" --

19         MS. RING:  But it wasn't.

20         THE COURT:  -- "from our users."

21         MS. RING:  But it wasn't.

22         THE COURT:  Well, didn't Facebook pay $5,000,000

23 to the FTC based on allegations that it was sharing user

24 information on a widespread basis?

25         MS. RING:  Your Honor, you know that doesn't

1  establish that there was that kind of wide -- there are lots

2  of reasons that -- that issues like that are resolved.  And,

3  no, I don't think that shows that there was tons of data

4  sharing so as to support an --

5         THE COURT:  Okay.  But let's assume --

6         MS. RING:  No, I don't.

7         THE COURT:  Let's assume that there's plenty of

8  evidence that Facebook was sharing user data with third

9  parties on a widespread basis.  Okay.  Let's assume that --

10         MS. RING:  Okay.

11         THE COURT:  -- for the sake of my question.  Okay?

12     If there is such evidence, then a reasonable fact

13  finder could infer that an individual named plaintiff in

14  this case had their information shared, right?

15         MR. SNYDER (via Zoom):  If I could be heard on

16  that.

17     Hey, Rose, can I just --

18     Because I argued this, your Honor.  It's nice to see

19  you.

20         THE COURT:  Nice to see you.

21         MR. SNYDER:  On the motion to dismiss -- and I

22  think that --

23         THE COURT:  I remember that.  It was like four

24  years ago or something, right?

25         MR. SNYDER:  I know you miss me, so I'm keeping

1  quiet.  But it is nice to see you and everyone else.  Happy

2  summer.

3      So the mere sharing of information we believe is not

4  sufficient to confer standing on the plaintiffs.  That --

5  and a lot of the data breach cases would show that.  There

6  needs to be a concrete injury, an injury in fact under

7  _Spokeo_ and its progeny.  And what we argued --

8          THE COURT:  Wait a minute.  You sound like you're

9  just re-arguing the motion to dismiss from four years ago.

10  I don't think we need to do that.

11          MR. SNYDER:  Well, your Honor, what I'm saying is

12  that at that time, your Honor ruled under Rule 12(b)(6) that

13  the allegations stated a plausible claim standing.  So that

14  was the standard.

15      Now, the question is based on the undisputed record

16  evidence --

17          THE COURT:  Right.

18          MR. SNYDER:  -- do the plaintiffs have standing.

19  And I'll give you two examples.

20      Plaintiff One says her religious beliefs were shared,

21  but she has publicized her religious beliefs on public blogs

22  for years.

23      I'll give you Example Two.  Example Two is a particular

24  plaintiff claims that information about his or her medical

25  condition was shared.  But that medical condition was also

22

1  either on public Facebook or a blog, a public blog.  I can't

2  remember which.

3      So those two plaintiffs, just illustratively, we

4  contend that there is no injury because there is no

5  expectation of privacy for those two individuals in the

6  shared information because those selves and plaintiffs

7  publicly shared that information.

8          THE COURT:  Okay.

9          MR. SNYDER:  So those are specific facts that are

10 undisputed.  And then the more broad principle --

11         THE COURT:  So I understand -- and then it gets

12 into the discussion we had four years ago about to what

13 extent those are merits issues and to what extent those are

14 standing issues.

15     To the extent they're merits issues, it would need to

16 be a summary judgment motion, right?

17         MR. SNYDER:  Right.

18         THE COURT:  But I think the answer is, at this

19 late stage, that probably to the extent that Facebook wants

20 to contend that individual -- you know, I gave you an

21 opportunity at the beginning of this litigation, right -- or

22 I shouldn't say beginning, but after the summary judgment

23 motion was -- sorry, after the motion to dismiss was

24 adjudicated, which wasn't exactly the beginning but early

25 on, you know, I gave you an opportunity to limit discovery

23

1   to the question of whether Facebook was liable to the

2   individual plaintiffs and to adjudicate first the question

3   of whether Facebook was liable to the individual plaintiffs

4   before jumping to class cert discovery and before jumping to

5   a motion for class certification.

6        And you declined that.  And so now we are approaching

7   the class certification stage.

8        And certainly we need to have a discussion about

9   timing.  And the plaintiffs say that they might need more

10  time with their experts, and we can talk about that.

11       But I think the answer is, to the extent -- at this

12  stage, to the extent that Facebook believes that the named

13  plaintiffs lack standing, you can make that assertion in

14  your opposition to the motion for class certification.

15       And if I conclude that they lack standing, then the

16  result of that would be the case would be dismissed, because

17  I don't have jurisdiction, and obviously I wouldn't rule on

18  the class certification motion.

19       But I think at this late stage, that's the way that we

20  should -- that would be most fair way to structure it, is

21  you want to include standing as a basis for opposing class

22  certification, you can do that.

23            MR. SNYDER:  And for the substantive impairment in

24  the privacy claims themselves that I just illustratively

25  described for those two illustrative plaintiffs, those are

24

 1  summary judgment claims because it goes to the substance.

 2          THE COURT:  Right.  And I gave you an opportunity,

 3  like I said, at the outset to structure the litigation so

 4  that that sort of question could be adjudicated first.  And

 5  you declined and you opened the floodgates for discovery on

 6  class cert and all that, and that was your prerogative.

 7      But now, to the extent, you know, those points -- those

 8  points that you're making might be relevant to class

 9  certification, right, because you might argue that you can't

10  certify a class because some of these people, you know,

11  disclosed all of their information and other people wanted

12  to keep it confidential.  And so you can't certify a class

13  because the common questions don't predominate or whatever.

14      But as far as, you know, summary judgment on the

15  merits, you had the opportunity to go down that road and you

16  declined it.  And so we're doing class certification now.

17          MS. RING:  Your Honor --

18          MR. SNYDER:  We did not --

19          MS. RING:  Your Honor --

20          MR. SNYDER:  In declining to bifurcate, as your

21  Honor indicated that we were waving our statutory right to

22  move for summary judgment under Rule 56, that was --

23          THE COURT:  Well, you should go back and read my

24  standing order, which I referred you to when we had this

25  discussion several years ago.  Okay?

1     So what we will do is, like I said, to the extent that
2   any merits issues relate to class certification because the
3   difference among class members would prevent common issues
4   from predominating, that's fair game in the opposition to
5   class certification.

6     To the extent that you contend that named plaintiffs
7   lack standing, that's obviously fair game in opposition to
8   the motion for class certification.  And if you prevail on
9   that claim on that argument, you will get the case
10  dismissed.

11    But as we decided way back when, we're going to move
12  forward with class certification.

13    So the question now is, when should that -- we don't
14  have a hearing date or a briefing schedule for class
15  certification yet?

16          MS. RING:  No.  There's no --

17          THE COURT:  Okay.

18          MS. RING:  There's a last day for hearing, but
19  there's no briefing schedule.

20          THE COURT:  There's a last day for hearing, and
21  the last day for hearing is when?  When did we schedule that
22  for?

23          MS. RING:  March 17, 2023.

24          THE COURT:  Okay.  Great.

25    And so I know that the plaintiffs were talking about

26

1  maybe needing more time -- because of the delays in

2  receiving fact discovery and resolving some of these issues

3  relating to fact discovery, they might need more time with

4  their experts.

5      Mr. Loeser or Ms. Weaver, are you saying that you need

6  to push back the hearing date on class certification or are

7  you saying we might just need to tweak the expert schedule?

8  What do you need?

9          MR. LOESER:  I think we were thinking of tweaking

10  the expert schedule, although I'm just thinking out loud

11  right now and I don't have the calendar in front of me, but

12  that could impact the class cert timing because of the use

13  of class cert experts.

14          THE COURT:  Well, so the -- the close of fact

15  discovery right now is September 16th; is that correct?

16          MR. LOESER:  Right.

17          MS. RING:  Yes.

18          THE COURT:  Okay.  And then initial expert

19  disclosures are October 21st?

20          MS. RING:  Yes.

21          MR. LOESER:  Right.

22          THE COURT:  And I assume that's the date that the

23  plaintiffs are primarily concerned with.

24          MR. LOESER:  That's correct.

25          THE COURT:  Okay.  And then rebuttal expert

27

1  disclosures are November 18th, and I assume similarly the

2  plaintiffs are concerned about that date.

3          MR. LOESER:  Yeah.  If we pushed the October 21 by

4  90 days, our idea is it would push the other dates -- the

5  expert dates as well.  And on class cert -- I'm just looking

6  at the calendar -- I'm not sure that it would have to

7  change --

8          THE COURT:  If you are contemplating pushing back

9  initial expert disclosures 90 days, then that would -- that

10 would have to cause a delay in the class certification

11 proceedings for sure.

12     And, you know, I'm concerned about -- I hear what

13 you're saying, Mr. Loeser, about the need to have more time

14 with your experts and give the experts more time to digest,

15 you know, the discovery that's still coming in as we speak.

16 But I'm also so reluctant to further delay, you know, class

17 certification proceedings.  I don't really know what to do.

18          MR. LOESER:  I agree.  And I think that we could

19 move the expert guidelines and then look at the calendar and

20 think about just moving the class cert deadlines less, I

21 mean enough time to accommodate a couple of class cert

22 experts we would have.  But I don't think it would require

23 the same change to the class cert deadlines.

24     Frankly, we're pretty eager to move for class cert.  So

25 it's not like we're excited to push that date off.

28

1          THE COURT:  Well, so you -- okay, so initial

2   expert disclosures -- so what if we pushed those back,

3   initial expert disclosures, to -- you were saying 90 days.

4       I mean what if we did it for like 60 days?  What if we

5   did December 15th, let's say?

6          MR. LOESER:  That would be fine, your Honor.

7          THE COURT:  For initial expert disclosures.

8       And then for rebuttal expert disclosures we could do

9   like end of January, January 31st or something like that.

10          MR. LOESER:  Sure.

11          THE COURT:  And then we could do -- that way we

12   could only have a brief delay and we could have -- we'll set

13   motion deadlines too right now.  But we could say that -- so

14   after rebuttal expert disclosures, when should -- if that

15   were January 31st, when would the close of expert discovery

16   take place?

17          MR. LOESER:  Well, I suspect that -- I don't know

18   how many experts Facebook will have, but there will need to

19   be some time to take depositions of these experts to discuss

20   these reports, so I would think we would want maybe six

21   weeks.  And, again, I'm just thinking out loud.  I haven't

22   talked to anybody.

23          THE COURT:  Let's do four weeks.  So end of

24   February will be the close of expert discovery.

25          MR. LOESER:  Okay.

1          THE CLERK:  So February 28?

2          THE COURT:  Motion for class certification due --

3  so what you're contemplating is, you've taken everybody's

4  deposition so you're not going to be taking more depositions

5  during the class cert briefing; is that correct?

6          MR. LOESER:  Right.  There would be expert

7  depositions, but they would be concluded by February 28.

8          THE COURT:  Right.

9          MR. LOESER:  So there would be no more expert

10 depositions.

11         THE COURT:  So then -- so how about if you file

12 your motion for class certification on March 15th or

13 thereabouts?

14         MR. LOESER:  That makes sense.

15         THE COURT:  Okay.  And then opposition to the

16 motion for class certification can be due three weeks later.

17         MS. RING:  Your Honor, can we have a month,

18 please?

19         THE COURT:  Okay.  So April 15th or thereabouts?

20         THE CLERK:  April 14th.

21         THE COURT:  April 14th.  And then three weeks

22 later for the reply.

23         THE CLERK:  May 5.

24         MR. LOESER:  And, your Honor, could we have a

25 month for that?  Most of the heavy lifting is frankly done

30

1  in the reply.

2           THE COURT:  Yeah, no, three weeks should be fine.

3           MR. LOESER:  Okay.

4           THE COURT:  And then -- try to do your heavy

5  lifting in the opening brief.

6           MR. LOESER:  Okay.  We will.  There won't be any

7  left.  It will be very light by the reply.

8           THE COURT:  Light lifting.

9      And then the hearing can take place three weeks after

10 that.

11          THE CLERK:  May 25.  Do you want this on a regular

12 Thursday calendar?

13          THE COURT:  I mean it shouldn't take longer than

14 10 minutes for the hearing.

15          MS. RING:  Your Honor, maybe at my peril, but --

16 and maybe because I'm new still, relatively speaking, but I

17 do feel -- I think you would want me to do this.  Maybe I'm

18 wrong.  But as I understand it -- again, I've recently read

19 the whole record of the case.  And my understanding is that

20 we did propose starting with -- Facebook did propose,

21 starting with discovery and summary judgment for just the

22 name plaintiffs, and you didn't want to do that.

23     Instead, you said --

24          THE COURT:  No, no, no.

25          MS. RING:  -- I'm not going to bifurcate it.

1          THE COURT:  I said to Mr. Snyder, yes, if you're

2     willing to waive one-way intervention and you want to do

3     cross-motions for summary judgment as to the named

4     plaintiffs, you're perfectly free to do that.

5          I always invite defendants to do that.

6          MS. RING:  But that's a different issue.  I've

7     read your local rules.  I know them well.  I mean one-way

8     intervention, that's a merits -- that's something that would

9     go to every class member.  That's a different issue.

10         This is something -- just in my experience -- I do this

11    all the time on class certification.  You move for summary

12    judgment for standing for the named plaintiffs.

13         One-way intervention is just not an issue on that kind

14    of a motion.

15         THE COURT:  On standing.

16         MS. RING:  Well, on injury.  When you talk about

17    injury --

18         THE COURT:  Right.

19         MS. RING:  -- for individual plaintiffs.

20         One-way intervention, I totally understand that and I

21    have read your local rule --

22         THE COURT:  I understand that, but as I've said,

23    number one, to the extent you want to move for summary

24    judgment as to the named plaintiffs, I gave you that

25    opportunity.

1      To the extent you want to argue that they lack

2 standing, it's not a motion for summary judgment.  It's a

3 motion to dismiss under 12(b)(1).  And if you have been

4 filing those as summary judgment motions and if judges have

5 been granting summary judgment on standing grounds, that is

6 error.  They don't have jurisdiction --

7           MS. RING:  Okay.

8           THE COURT:  They don't have jurisdiction to enter

9 summary judgment --

10           MS. RING:  Okay.

11           THE COURT:  -- based on lack of jurisdiction.

12           MS. RING:  So we'll file a motion to dismiss.

13           THE COURT:  So what you will do --

14           MS. RING:  We're fine doing that.

15           THE COURT:  -- is you will argue in opposition to

16 class certification that the named plaintiffs lack standing.

17 That's how we're going to do it.

18      And I've seen that done regularly.  That's a common

19 argument in opposition to class certification, is that the

20 named plaintiffs lack standing.  And that's how we're going

21 to do it in this case.

22           MS. RING:  I understand that that's how it sounds

23 like we're going to do it in this case.

24           THE COURT:  No.  It's not that it sounds like

25 we're going to do it --

1          MS. RING:  I got it.  I understand.

2          THE COURT:  -- it is how we're going to do it in

3   this case.

4          MS. RING:  I understand.

5          THE COURT:  And so the hearing is -- what date

6   will the hearing take place?

7          THE CLERK:  I suggested May 25th.  Do you want to

8   do that?

9          THE COURT:  Yeah, that's fine.

10          THE CLERK:  The question was a regular Thursday;

11   is that okay?

12          THE COURT:  Oh.  We can do it on -- we can

13   specially set it.  It might make sense to specially set it

14   for sometime that week.

15          THE CLERK:  Do you want to do Tuesday the 23rd

16   then?

17          THE COURT:  Sure.

18          THE CLERK:  What time would you like that?

19          THE COURT:  Like, I don't know, 1:00 o'clock.

20          THE CLERK:  Is that enough time, and do you want

21   it in-person?

22          THE COURT:  Yes, please.

23       We will, of course -- as we're doing with all of our

24   stuff these days -- all of our hearings these days, we'll --

25   it will be available -- it will be accessible by Zoom audio.

34

1 When we have in-person hearings, those are accessible by

2 Zoom audio as well.

3        MS. RING:  Your Honor, if I may, I have another

4 scheduling question, I guess, or issue to raise, which is as

5 you know, the sanctions -- the hearing on the sanctions

6 motion is coming up.

7        THE COURT:  Yes.

8        MS. RING:  And plaintiffs indicated in their

9 section of the joint statement that they're going to be

10 filing a supplement or, you know --

11        THE COURT:  Yes.  Thanks for reminding me about

12 that.  So the hearing is what date?

13        MS. RING:  September 1st.

14        THE COURT:  Okay.  And that is full steam ahead.

15 I'm not going to continue that again.  I continued it last

16 time because all -- I and all three of my clerks got Covid

17 around the May time frame and we got way behind and then

18 there was the law clerk transition.

19     So that's -- the new hearing date is September 1st, and

20 that will not be continued again because I have a ton of

21 trials in the fall.  And I just had a four-week criminal

22 trial in August go away.  So this is a perfect time for me

23 to do the deep dive that's necessary to figure out the truth

24 of everything that happened.  And that's going to happen in

25 the month of August for us in chambers and we will have the

35

1 hearing on September 1st.

2      And so it does seem like it would be appropriate to

3 give the plaintiffs an opportunity to make a supplemental

4 filing and then of course give Facebook an opportunity to

5 respond to that, to sort of -- and you can include -- you

6 know, you can update your sanctions motion and include

7 anything that's happened since then.  And obviously Facebook

8 can have an opportunity to respond to all of that.

9      So, Mr. Loeser, when do you want to file a supplement

10 to your motion?

11           MR. SNYDER:  So had you not said everything that

12 you just said, I would have suggested that we push the

13 hearing out a couple weeks so we get to the end of fact

14 discovery, but --

15           THE COURT:  Yeah, I'm sorry.  Can't --

16           MR. LOESER:  It's not happening.

17           THE COURT:  Just can't do it, yeah.

18           MR. LOESER:  I think we should file that motion

19 sometime in mid-August.  There is not a lot of time in the

20 schedule, so you know, it doesn't leave us a lot of time to

21 put it in or Facebook a lot of time to respond, but --

22           THE COURT:  Yeah, well, I think you should

23 probably file your supplemental brief and any evidence that

24 you want to include -- with any exhibits or evidence that

25 you want to include with that.  I think you should file that

36

1  by August 8th and that Facebook should file its supplemental
2  response by August 19th.
3          MR. LOESER:  Okay.
4          MS. RING:  Thank you, your Honor.
5          MR. LOESER:  And, your Honor, do you have an idea
6  on the length?  Previously, the idea was as long as it
7  takes, which is still fine with us.  If you want a space
8  limit, that's fine too.
9          THE COURT:  Well, as you probably know, I'm
10 usually pretty tough on page limits and usually like to give
11 less space than the lawyers want.  But I do want to make
12 sure that both sides, and especially Facebook, has as much
13 opportunity as they need to respond to what the other side
14 says.
15     So, you know, does 40 pages sound okay for the
16 supplemental filings?
17         MR. LOESER:  That sounds fine, your Honor.
18         MS. RING:  Yes, your Honor.
19         THE COURT:  Okay.  All right.
20         MR. LOESER:  So, your Honor, we have been through
21 a lot.  I have to say --
22         THE COURT:  And that hearing will be in person as
23 well.
24         MR. LOESER:  And if I may for a moment.  I'm not
25 going to try to respond to a whole lot of what Ms. Ring

37

1  said.  I think you heard a lot of hyperbole about us taking
2  depositions in which we want everything and we're asking --
3          THE COURT:  Should we specially set this motion
4  also?  Should we specially set it for like August 31st or
5  something or Friday the 2nd maybe?  I think that might be a
6  good idea.
7          MR. LOESER:  Friday the 2nd would be --
8          THE CLERK:  Can I recommend the 1st?
9          MR. LOESER:  Could we --
10         MS. RING:  If we could -- excuse me.  Sorry.
11         MR. LOESER:  I was going to suggest Friday,
12 September 2nd would be better than the August date.
13         MS. RING:  I was actually going to agree with
14 that.
15         THE COURT:  All right.  We're making progress.
16         MS. RING:  If that works for the Court.
17         THE COURT:  All right.  Why don't we say --
18     (Court conferring with Clerk.)
19         THE COURT:  And why don't we have the hearing at
20 10:00 o'clock -- 10:00 a.m. on Friday the 2nd in person.
21    Okay.  Anything else we can do for you right now?
22         MR. LOESER:  Your Honor, I was just -- I started
23 saying -- and I'll make my comments very brief.  But I just
24 listened to a lot of hyperbole about --
25         THE COURT:  I mean I would say -- I would suggest

38

1  save it for your supplemental filing.

2          MR. LOESER:  We will do that.  I just -- it

3  bothers me when the record gets clouded up with things that

4  are so obviously untrue, but I don't want to waste your

5  time.

6          THE COURT:  The record will be clarified at the --

7  whether to your benefit or detriment, it will be clarified

8  at the sanctions hearing and in my ruling.

9          MR. LOESER:  I appreciate that, your Honor.  And

10 the class certification motion as well I think will clarify

11 many things.

12         THE COURT:  Yes.  Okay.

13         MR. LOESER:  All right.  Thank you so much your

14 Honor.

15         THE COURT:  Thank you.

16         MS. RING:  Thank you.  Thanks.

17         THE CLERK:  The Court is adjourned.

18     (Proceedings adjourned at 1:45 p.m.)

19

20

21

22

23

24

25

39

```
 1                    CERTIFICATE OF TRANSCRIBER

 2

 3        I certify that the foregoing is a true and correct

 4   transcript, to the best of my ability, of the above pages of

 5   the official electronic sound recording provided to me by

 6   the U.S. District Court, Northern District of California, of

 7   the proceedings taken on the date and time previously stated

 8   in the above matter.

 9        I further certify that I am neither counsel for,

10   related to, nor employed by any of the parties to the action

11   in which this hearing was taken; and, further, that I am not

12   financially nor otherwise interested in the outcome of the

13   action.

14

15

16        Echo Reporting, Inc., Transcriber

17            Thursday, July 28, 2022

18

19

20

21

22

23

24

25
```