# EXHIBIT 31

**Redacted Version of Document Sought to be Sealed**

**Full 30(b)(6) Deposition Transcript of
Konstantinos Papamiltiadis,
dated February 23, 2021**

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE: FACEBOOK, INC. CONSUMER ) MDL No. 2843

5    PRIVACY USER PROFILE LITIGATION) Case No.

6    _____) 18-md-02843-VC

7    This document relates to:      )

8    ALL ACTIONS                    )

9    _____)

10

11

12

13    *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

14

15

16     REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

17            FACEBOOK INC. REPRESENTATIVE,

18             KONSTANTINOS PAPAMILTIADIS

19             TUESDAY, FEBRUARY 23, 2021

20

21

22    Reported by:

23    Ashala Tylor, CSR #2436, CLR, CRR, RPR

24    JOB NO. 4473154

25    PAGES 1 - 280

                                        Page  1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE: FACEBOOK, INC. CONSUMER ) MDL No. 2843

5    PRIVACY USER PROFILE LITIGATION) Case No.

6    _____) 18-md-02843-VC

7    This document relates to:       )

8    ALL ACTIONS                     )

9    _____)

10

11

12

13

14

15

16        Videotaped deposition of FACEBOOK, INC.

17   REPRESENTATIVE, KONSTANTINOS PAPAMILTIADIS taken via

18   virtual Zoom, commencing at 9:10 a.m. and ending at

19   3:58 p.m., on Tuesday, February 23, 2021, before Ashala

20   Tylor, CSR No. 2436, RPR, CRR, CLR.

21

22

23

24

25

                                              Page  2

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:

 3         BLEICHMAR FONTI & AULD LLP

 4         BY:  LESLEY E. WEAVER, ESQ.

 5              ANNE DAVIS, ESQ.

 6              MATTHEW MONTGOMERY, ESQ.

 7              MATTHEW MELAMED, ESQ.

 8         555 12th Street, Suite 1600

 9         Oakland, California  94607

10         415.445.4003

11         lweaver@bfalaw.com

12         adavis@bfalaw.com

13         mmmontgomery@falaw.com

14         mmelamed@bfalaw.com

15

16

17

18

19

20

21

22

23

24

25
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    A P P E A R A N C E S (continued)

 2   FOR PLAINTIFFS:

 3         KELLER ROHRBACK LLP

 4         BY:  DAVID KO, ESQ.

 5              CARI C. LAUFENBERG, ESQ.

 6              DAVID LOESER, ESQ.

 7         1201 Third Avenue, Suite 3200

 8         Seattle, Washington  98101-3052

 9         206.623.3384

10         dko@kellerrohrback.com

11         claufenberg@kellerrohrback.com

12         dloeser@kellerrohrback.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page  4

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   A P P E A R A N C E S (continued)

 2   FOR THE DEFENDANT FACEBOOK, INC.:

 3           GIBSON, DUNN & CRUTCHER LLP

 4           BY:  DEBORAH STEIN, ESQ.

 5               MARTIE KUTSCHER CLARK, ESQ.

 6           333 S. Grand Avenue, 47th Floor

 7           Los Angeles, California  90071

 8           213.229.7000

 9           dstein@gibsondunn.com

10           mkutscherClark@gibsondunn.com

11                  - and -

12           GIBSON DUNN & CRUTCHER LLP

13           BY:  LAURA MUMM, ESQ.

14           200 Park Avenue, 47th Floor

15           New York, New York  10166

16           212.351.4000

17           lmumm@gibsondunn.com

18

19   Also Present:

20           Ian Chen, In-House Facebook Counsel

21           Kimberly Decker, Videographer

22

23

24

25
```

                                    Page 5

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                    I N D E X

 2   WITNESS            EXAMINATION BY            PAGE

 3   KONSTANTINOS PAPAMILTIADIS

 4                   Ms. Weaver                  9, 171

 5

 6                  E X H I B I T S

 7   NO.              DESCRIPTION               PAGE

 8   Exhibit 1    Plaintiffs' Amended Notice of    10

 9                Deposition of Defendant Facebook,

10                Inc. Pursuant to Federal Rule of

11                Civil Procedure 30(b)(6)

12   Exhibit 2    Discovery Order No. 9           10

13                (Dkt. Nos. 515, 526, 537, 548)

14   ███████      ███████████████████████        ██

██                ████████████████████████

██                ████████████████████

17   Exhibit 4    █████████████████████          ██

██                █████████████████████

██                ████████████████████████

20   Exhibit 5    ██████████████████             ██

██                ██████████████████████

██   ███████      ██████████████████            ██

██                ██████████████████████

24              Instruction Not to Answer

25                  Page 91, LIne 9
```

                                         Page 6

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                Tuesday, February 23, 2021

 2                     9:10 a.m.

 3                     --o0o--

 4

 5          THE VIDEOGRAPHER:  Good morning.  We are         09:10

 6   going on the record at 9:10 a.m. on February 23rd of    09:10

 7   2021.  All participants are attending remotely.         09:10

 8          Audio and video recording will continue to       09:10

 9   take place unless all parties agree to go off the       09:10

10   record.                                                 09:10

11          This is Media Unit 1 of the recorded             09:10

12   deposition of Facebook, Inc. representative,            09:10

13   Konstantinos Papamiltiadis, taken by counsel for the    09:10

14   plaintiffs in the matter of Facebook, Inc. Consumer     09:10

15   Privacy User Profile Litigation filed in the            09:10

16   United States District Court, Northern District of      09:10

17   California, Case Number 18-md-02843-VC.                 09:10

18          My name is Kimberly Decker from Veritext         09:10

19   Legal Solutions and I'm the videographer.  The court    09:10

20   reporter is Ashala Tylor.  I'm not related to any       09:10

21   party in this action, nor am I financially              09:11

22   interested in the outcome.                              09:11

23          Counsel and all present will now state           09:11

24   their appearances and affiliations for the record.      09:11

25   If there are any objections to proceeding, please       09:11
```

Page 7

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | state them at the time of your appearance, beginning | 09:11 |
| 2 | with the noticing attorney. | 09:11 |
| 3 | MS. WEAVER:  Good morning, everybody.  I'm | 09:11 |
| 4 | Lesley Weaver, co-lead counsel for plaintiffs and | 09:11 |
| 5 | from Bleichmar Fonti & Auld. | 09:11 |
| 6 | MS. DAVIS:  Good morning.  Anne Davis also | 09:11 |
| 7 | for plaintiffs, Bleichmar Fonti & Auld. | 09:11 |
| 8 | MR. MONTGOMERY:  Matthew Montgomery for | 09:11 |
| 9 | plaintiffs, Bleichmar Fonti & Auld. | 09:11 |
| 10 | MR. MELAMED:  Matt Melamed for plaintiffs, | 09:11 |
| 11 | Bleichmar Fonti & Auld. | 09:11 |
| 12 | MS. LAUFENBERG:  Cari Laufenberg for | 09:11 |
| 13 | plaintiffs from Keller -- | 09:11 |
| 14 | THE REPORTER:  I'm sorry, one more time, | 09:11 |
| 15 | please. | 09:11 |
| 16 | MS. LAUFENBERG:  Cari Laufenberg for | 09:11 |
| 17 | plaintiffs from Keller Rohrback. | 09:11 |
| 18 | MR. KO:  David Ko of Keller Rohrback also | 09:11 |
| 19 | on behalf of the plaintiffs.  Good morning. | 09:12 |
| 20 | MR. LOESER:  Good morning.  Derek Loeser | 09:12 |
| 21 | from Keller Rohrback for plaintiffs. | 09:12 |
| 22 | MS. STEIN:  Are you ready for defendant? | 09:12 |
| 23 | Deborah Stein from Gibson, Dunn on behalf | 09:12 |
| 24 | of defendant Facebook. | 09:12 |
| 25 | MS. CLARK:  Martie Kutscher Clark from | 09:12 |

Page 8

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    Gibson, Dunn also on behalf of Facebook.              09:12
 2            MS. MUMM:  Laura Mumm from Gibson, Dunn on     09:12
 3    behalf of Facebook.                                   09:12
 4            MR. CHEN:  And this is Ian Chen.  I am         09:12
 5    in-house counsel for Facebook.                        09:12
 6            THE VIDEOGRAPHER:  Would the court             09:12
 7    reporter please swear in the witness.                 09:12
 8                                                          09:13
 9            KONSTANTINOS PAPAMILTIADIS,                    09:13
10        being first duly sworn or affirmed to testify     09:13
11        to the truth, the whole truth, and nothing but    09:13
12        the truth, was examined and testified as follows: 09:13
13            THE REPORTER:  Proceed, Counsel.              09:13
14                    EXAMINATION                           09:13
15    BY MS. WEAVER:                                        09:13
16      Q.   Good morning.  And thank you very much for     09:13
17    being here this morning and as we adjust to this new  09:13
18    process.                                              09:13
19            May I address you as K.P. throughout the      09:13
20    deposition or would you prefer Mr. Papamiltiadis?     09:13
21      A.   I don't need to ask counsel's permission       09:13
22    to answer that question.  I guess you can.            09:13
23      Q.   All right.  You come prepared.                 09:13
24            I'm going to start by marking a couple of     09:13
25    exhibits, and I think that you've practiced with      09:13
```

Page 9

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | your counsel about how to pull those down.  These | 09:13 |
| 2 | will be the deposition notice and Discovery Order | 09:13 |
| 3 | Number 9. | 09:13 |
| 4 | So, first, we'll mark as Exhibit 1 the | 09:13 |
| 5 | notice for deposition in this action.  And Ms. Davis | 09:13 |
| 6 | is going to be marking that right now and uploading | 09:13 |
| 7 | it. | 09:13 |
| 8 | (Exhibit 1 was marked for | 09:13 |
| 9 | identification and attached | 09:13 |
| 10 | hereto.) | 09:13 |
| 11 | MS. WEAVER:  And then as Exhibit 2 she | 09:13 |
| 12 | will mark Discovery Order Number 9. | 09:13 |
| 13 | (Exhibit 2 was marked for | 09:13 |
| 14 | identification and attached | 09:13 |
| 15 | hereto.) | 09:13 |
| 16 | BY MS. WEAVER: | 09:13 |
| 17 | Q.   And I'll direct you to the portions of | 09:13 |
| 18 | those exhibits I'd like you to review.  Just let us | 09:13 |
| 19 | know when you have those. | 09:14 |
| 20 | MS. DAVIS:  They are distributed now. | 09:14 |
| 21 | BY MS. WEAVER: | 09:14 |
| 22 | Q.   Are you seeing those, K.P., in your -- | 09:14 |
| 23 | A.   Not -- yes, I can see Exhibit 2 now. | 09:14 |
| 24 | Q.   Okay.  Let's start with 1. | 09:14 |
| 25 | A.   I don't need to refresh -- I don't need to | 09:14 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | refresh the browser, right?  It's automatic, so... | 09:14 |
| 2 | MS. DAVIS:  On my end it shows that 1 and | 09:14 |
| 3 | 2 are distributing. | 09:14 |
| 4 | THE VIDEOGRAPHER:  And you do need to | 09:14 |
| 5 | refresh. | 09:14 |
| 6 | THE WITNESS:  Okay. | 09:15 |
| 7 | MS. WEAVER:  Yeah, I'm still just seeing | 09:15 |
| 8 | 2. | 09:15 |
| 9 | THE WITNESS:  Yeah, I can only see 2. | 09:15 |
| 10 | MS. WEAVER:  Do you see it now? | 09:15 |
| 11 | THE WITNESS:  Let me refresh as well. | 09:15 |
| 12 | Okay.  Great.  Do you want me to open | 09:15 |
| 13 | number 1? | 09:15 |
| 14 | BY MS. WEAVER: | 09:15 |
| 15 | Q.   Yes, please.  Thank you. | 09:15 |
| 16 | Do you recognize Exhibit 1? | 09:15 |
| 17 | A.   Can I take a look? | 09:15 |
| 18 | Q.   Yes, please. | 09:15 |
| 19 | MS. WEAVER:  And, for the record, | 09:15 |
| 20 | Exhibit 1 is Plaintiffs' Amended Notice of | 09:15 |
| 21 | Deposition of Defendant Facebook, Inc. Pursuant to | 09:15 |
| 22 | Federal Rule of Civil Procedure 30(b)(6). | 09:15 |
| 23 | Q.   K.P., I'll direct your attention just to | 09:16 |
| 24 | page 2 of the document where it says "Matters for | 09:16 |
| 25 | Testimony." | 09:16 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Page 2 you said? | 09:16 |
| 2 | Q.   Yes.  Have you seen Exhibit 1 before? | 09:16 |
| 3 | A.   I believe I have seen parts of that. | 09:16 |
| 4 | Q.   Okay.  So do you recognize it as the | 09:16 |
| 5 | notice for the deposition today? | 09:16 |
| 6 | A.   Yes. | 09:16 |
| 7 | Q.   And are you here today to testify on | 09:16 |
| 8 | behalf of Facebook? | 09:16 |
| 9 | A.   Yes, I am. | 09:16 |
| 10 | Q.   Okay.  And are you here to testify | 09:16 |
| 11 | regarding the format, nature, and location of | 09:16 |
| 12 | discoverable user data as defined by Discovery Order | 09:16 |
| 13 | Number 9 as set forth on Topic 1? | 09:17 |
| 14 | A.   I am not really sure I understand exactly | 09:17 |
| 15 | what that sentence means. | 09:17 |
| 16 | Q.   Okay.  Do you understand that you are | 09:17 |
| 17 | testifying in response to Topic 1? | 09:17 |
| 18 | MS. STEIN:  Objection to form. | 09:17 |
| 19 | THE WITNESS:  Topic 1 is -- sorry, | 09:17 |
| 20 | scrolling through the document. | 09:17 |
| 21 | MS. STEIN:  I'll just state for the record | 09:17 |
| 22 | that we lodged objections to the description of the | 09:17 |
| 23 | categories in this notice, but, you know, the | 09:17 |
| 24 | witness is free to describe his understanding as to | 09:17 |
| 25 | what he's going to be testifying about today. | 09:17 |

Page 12

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | BY MS. WEAVER: | 09:17 |
| 2 | Q.   So I'll restate my question, K.P.  Have | 09:17 |
| 3 | you reviewed Topic 1 before today? | 09:17 |
| 4 | A.   I'm sorry, I'm having a hard time locating | 09:17 |
| 5 | where is the Topic 1. | 09:17 |
| 6 | Q.   Okay.  It's page 2 where it says "Matters | 09:17 |
| 7 | for Testimony" under Roman Numeral III. | 09:17 |
| 8 | MS. STEIN:  Lesley, I think it may be | 09:17 |
| 9 | further down in the document. | 09:18 |
| 10 | MR. KO:  Yeah, there's a couple page 2s. | 09:18 |
| 11 | K.P., it's page 6 of the PDF. | 09:18 |
| 12 | THE WITNESS:  Okay.  Sorry. | 09:18 |
| 13 | BY MS. WEAVER: | 09:18 |
| 14 | Q.   My apologies. | 09:18 |
| 15 | A.   I was like -- I was like, what am I | 09:18 |
| 16 | missing here? | 09:18 |
| 17 | Q.   I apologize for that. | 09:18 |
| 18 | I see.  Yes, it's page 2 of the exhibit. | 09:18 |
| 19 | A.   Wait.  Now, I'm getting confused.  It's | 09:18 |
| 20 | page 2 -- so I have page 2 under Schedule A.  I | 09:18 |
| 21 | have -- | 09:18 |
| 22 | Q.   Right.  Go to Schedule A and page 2 of | 09:18 |
| 23 | Schedule A. | 09:18 |
| 24 | A.   Okay.  Matters of testimony.  That's what | 09:18 |
| 25 | you're looking at? | 09:18 |

Page 13

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Exactly. | 09:18 |
| 2 | A.   Okay. | 09:18 |
| 3 | Q.   So do you see where it says "Topic 1:  The | 09:18 |
| 4 | format, nature, and location of 'discoverable user | 09:18 |
| 5 | data' as defined by Discovery Order Number 9?"  Do | 09:18 |
| 6 | you see that? | 09:18 |
| 7 | A.   Yes, I do see that. | 09:18 |
| 8 | Q.   Are you here today to testify regarding | 09:18 |
| 9 | that topic? | 09:18 |
| 10 | MS. STEIN:  Objection to form. | 09:18 |
| 11 | THE WITNESS:  Like I said -- | 09:18 |
| 12 | BY MS. WEAVER: | 09:19 |
| 13 | Q.   You may answer. | 09:19 |
| 14 | A.   I don't know what "format" means in that | 09:19 |
| 15 | context, or "location," but I'm here to tell you | 09:19 |
| 16 | about how Facebook has access to user data and how | 09:19 |
| 17 | this is made available to third parties if that's | 09:19 |
| 18 | relevant. | 09:19 |
| 19 | Q.   Okay.  Great.  And are you here to discuss | 09:19 |
| 20 | data collected from a user's on-platform activity as | 09:19 |
| 21 | well as off-platform activity? | 09:19 |
| 22 | A.   Yes. | 09:19 |
| 23 | Q.   Okay.  Great.  As well as data inferred | 09:19 |
| 24 | from on- or off-platform activity? | 09:19 |
| 25 | A.   That's correct. | 09:19 |

Page 14

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    Okay.  Great. | 09:19 |
| 2 | What did you do to prepare for your | 09:19 |
| 3 | deposition today? | 09:19 |
| 4 | A.    Well, part of my job is to -- you know, | 09:19 |
| 5 | and so my day-to-day job is to work on integrations | 09:19 |
| 6 | that have access to data, including user data.  I | 09:19 |
| 7 | have been a Facebook employee for the last eight and | 09:19 |
| 8 | a half years, so this is my day-to-day job to some | 09:19 |
| 9 | extent.  At the same time I had a number of sessions | 09:19 |
| 10 | with my counsels in preparation of this deposition | 09:19 |
| 11 | to make sure that I familiarize myself with certain | 09:19 |
| 12 | aspects related to this deposition. | 09:20 |
| 13 | Q.    Great.  And looking back at Exhibit 1, if | 09:20 |
| 14 | you turn to the next page, it says "Schedule B" | 09:20 |
| 15 | after the matters? | 09:20 |
| 16 | A.    Yes. | 09:20 |
| 17 | Q.    Do you see where it says Plaintiffs' | 09:20 |
| 18 | request for production of certain documents?  There | 09:20 |
| 19 | are two categories of documents. | 09:20 |
| 20 | A.    Yeah. | 09:20 |
| 21 | Q.    Did you review any documents or consult | 09:20 |
| 22 | them to prepare for your deposition today? | 09:20 |
| 23 | A.    I'm not sure they all documents.  This is | 09:20 |
| 24 | something I can, you know, like suggest that I have | 09:20 |
| 25 | knowledge of. | 09:20 |

Page 15

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | I reviewed certain documents, yes, but I | 09:20 |
| 2 | don't know if that was all of them. | 09:20 |
| 3 | Q.   Okay.  And what did you review? | 09:20 |
| 4 | A.   I reviewed this document, for example.  I | 09:20 |
| 5 | reviewed some data policies from the past 10 or so | 09:20 |
| 6 | years.  I reviewed the contents of the download | 09:20 |
| 7 | information files.  I reviewed developer | 09:20 |
| 8 | documentation.  Different things. | 09:21 |
| 9 | Q.   Okay.  So when you say you reviewed data | 09:21 |
| 10 | policies, about how many did you review? | 09:21 |
| 11 | A.   I can't remember.  Five or six. | 09:21 |
| 12 | Q.   Okay.  And you said you also reviewed | 09:21 |
| 13 | developer documentation; is that right? | 09:21 |
| 14 | A.   Yes. | 09:21 |
| 15 | Q.   And what do you mean by that?  What were | 09:21 |
| 16 | those documents? | 09:21 |
| 17 | A.   And so any information with regards to our | 09:21 |
| 18 | APIs is fully documented on our website, | 09:21 |
| 19 | developers.facebook.com.  And so while I spent a | 09:21 |
| 20 | considerable amount of my time there, I wanted to | 09:21 |
| 21 | familiarize myself with certain aspects of the API | 09:21 |
| 22 | that's maybe, you know, the item of your questions | 09:21 |
| 23 | here. | 09:21 |
| 24 | Q.   Okay.  And how many developer documents | 09:21 |
| 25 | did you review? | 09:21 |

Page 16

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    I mean the developer website is 5,000 | 09:21 |
| 2 | pages.  I reviewed at least, you know, documentation | 09:21 |
| 3 | for the basic APIs. | 09:21 |
| 4 | Q.    And when you say "the basic APIs," which | 09:21 |
| 5 | APIs do you mean? | 09:22 |
| 6 | A.    The Graph API. | 09:22 |
| 7 | Q.    Which version? | 09:22 |
| 8 | A.    Well, there is only one version right now. | 09:22 |
| 9 | Q.    You reviewed the current version? | 09:22 |
| 10 | A.    The current version, yes. | 09:22 |
| 11 | Q.    Okay.  Did you understand that testimony | 09:22 |
| 12 | today was to be limited to the time period 2012 to | 09:22 |
| 13 | 2017? | 09:22 |
| 14 | A.    Yes, I do. | 09:22 |
| 15 | Q.    Okay.  So did you review the Graph API | 09:22 |
| 16 | documentation for that time period? | 09:22 |
| 17 | A.    I don't need to.  I understand. | 09:22 |
| 18 | Q.    Because -- | 09:22 |
| 19 | A.    Because I understand Version 1 of the API | 09:22 |
| 20 | as well as I do the current version. | 09:22 |
| 21 | Q.    And how many developer documents did you | 09:22 |
| 22 | say you reviewed? | 09:22 |
| 23 | A.    It's hard to quantify a number of pages. | 09:22 |
| 24 | They're web pages, right?  So I don't know how you | 09:22 |
| 25 | want me to -- I may have reviewed like three or four | 09:22 |

Page 17

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | different, you know, like web pages. | 09:22 |
| 2 | Q.   So you would identify those by hyperlinks; | 09:22 |
| 3 | is that right? | 09:22 |
| 4 | A.   Yes. | 09:22 |
| 5 | Q.   Great.  And then did you say that you | 09:22 |
| 6 | reviewed a third category of documents as well? | 09:22 |
| 7 | A.   Yes, the contents of the downloaded | 09:23 |
| 8 | information file, the fields included, more | 09:23 |
| 9 | specifically. | 09:23 |
| 10 | Q.   And was that a web page as well? | 09:23 |
| 11 | A.   That was produced in the form of PDF. | 09:23 |
| 12 | Q.   And did you review anything else? | 09:23 |
| 13 | A.   I don't think so.  That's -- that's pretty | 09:23 |
| 14 | much it. | 09:23 |
| 15 | MS. WEAVER:  Okay.  So, Counsel, we | 09:23 |
| 16 | obviously already have requested production and | 09:23 |
| 17 | identification of those documents.  If they've | 09:23 |
| 18 | already been produced -- we repeat the request. | 09:23 |
| 19 | Q.   Do you have a current -- current CV? | 09:23 |
| 20 | A.   You mean a resume? | 09:23 |
| 21 | Q.   Yes. | 09:23 |
| 22 | A.   Yes, I do. | 09:23 |
| 23 | Q.   Okay.  Great. | 09:23 |
| 24 | MS. WEAVER:  We request that as well. | 09:23 |
| 25 | Q.   Okay.  You joined Facebook in 2012; that's | 09:23 |

Page 18

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | right? | 09:23 |
| 2 | A.   Correct. | 09:23 |
| 3 | Q.   And you're a current employee; is that | 09:23 |
| 4 | right? | 09:24 |
| 5 | A.   Yes. | 09:24 |
| 6 | Q.   So I hope you'll bear with us.  We're | 09:24 |
| 7 | laying the foundation, and this is our first | 09:24 |
| 8 | deposition in this case, and so we need to establish | 09:24 |
| 9 | a few definitions that I'm sure will seem obvious to | 09:24 |
| 10 | you. | 09:24 |
| 11 | What is a Facebook user? | 09:24 |
| 12 | MS. STEIN:  I'm just going to -- I'm just | 09:24 |
| 13 | going to, you know, object to form, and, you know, | 09:24 |
| 14 | the witness can testify as to his -- the | 09:24 |
| 15 | understanding he'll use today. | 09:24 |
| 16 | BY MS. WEAVER: | 09:24 |
| 17 | Q.   So that means you may answer.  Go ahead. | 09:24 |
| 18 | So what is a Facebook user? | 09:24 |
| 19 | A.   So I'll give you the definition that I | 09:24 |
| 20 | have.  I don't think it's anywhere documented.  But | 09:24 |
| 21 | when we talk about the Facebook user, we are talking | 09:24 |
| 22 | about the -- the accounts that the human has created | 09:24 |
| 23 | that represents their presence on the Facebook | 09:24 |
| 24 | platform. | 09:24 |
| 25 | Q.   And what is a Facebook platform? | 09:24 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.   Historically that platform has evolved      09:25

 2   from being just facebook.com to include Instagram,    09:25

 3   Messenger, Oculus, and --                             09:25

 4        Q.   And so is the platform the website upon      09:25

 5   which users engage?  Is that fair to say?             09:25

 6        A.   It's not just the website because you most   09:25

 7   likely use -- I don't know if you have a Facebook     09:25

 8   account, but I assume that you may have used          09:25

 9   Facebook on your Apple device or your Android         09:25

10   device.  So it's not just the website.  It used to    09:25

11   be just the website.                                  09:25

12        Q.   So Facebook now offers products and         09:25

13   services like Facebook Messenger, Facebook Watch,     09:25

14   Facebook Portal, Facebook Business Tools and          09:25

15   Facebook Payments, correct?  Is that correct?         09:25

16        A.   That's --                                   09:25

17             MS. STEIN:  Object to form.                 09:25

18             THE WITNESS:  I think you just listed some   09:25

19   of our products, not every single product.           09:25

20   BY MS. WEAVER:                                        09:25

21        Q.   Okay.  For the products that I listed, do   09:25

22   they all collect data from users?                     09:25

23        A.   I mean depends how you define "collect."    09:26

24        Q.   What does -- what does collect mean to      09:26

25   you?                                                  09:26
```

Page 20

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.    If we are talking about creating an        09:26

 2   account which requires the user to enter a username,  09:26

 3   passwords, first name, last name, I don't think       09:26

 4   that's possible in every single one of those          09:26

 5   products.  I don't know that you can create an        09:26

 6   account on Portal, for example.                       09:26

 7        Q.    Okay.  But regardless of whether or not    09:26

 8   you create an account, do all of those services       09:26

 9   collect data about Facebook users?                    09:26

10             MS. STEIN:  Objection to form and object    09:26

11   to the extent that some of those products may not be  09:26

12   from the relevant time period.                        09:26

13             THE WITNESS:  Yeah.                          09:26

14   BY MS. WEAVER:                                         09:26

15        Q.    You may answer.                             09:26

16        A.    I mean that's -- that's probably a good    09:26

17   point.  The products that you're talking about have   09:26

18   not been available to users before 2017, but I'll     09:26

19   answer the question by --                             09:26

20        Q.    Thank you.                                  09:26

21        A.    -- saying it depends.  In most cases we    09:26

22   are talking about activity data and not --            09:27

23        Q.    What is the primary objective of the       09:27

24   platform when it was originally created?              09:27

25        A.    By "platform" you mean Facebook or the     09:27
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    Facebook developer platform?                          09:27
2         Q.   Facebook -- well, let's start with          09:27
3    Facebook and then talk about the Facebook developer   09:27
4    platform.                                             09:27
5              MS. STEIN:  Objection to form and beyond    09:27
6    the scope of what this witness is authorized to       09:27
7    testify about on behalf of the company.               09:27
8              But you can testify as to your              09:27
9    understanding just for foundation.                    09:27
10   BY MS. WEAVER:                                        09:27
11        Q.   I'll ask the question again.                09:27
12             What was the primary purpose of the         09:27
13   Facebook platform when it was created, the website?   09:27
14        A.   So Facebook, the -- the Facebook product,   09:27
15   which also is referred as platform, is -- or was      09:27
16   always meant to allow people to connect with each     09:27
17   other and create a more open and connected world.     09:27
18        Q.   Thank you.                                  09:27
19        A.   Which would help the value of community     09:27
20   and we build a service to basically help people       09:28
21   connect.                                              09:28
22        Q.   So it was meant to allow people to connect  09:28
23   socially as well; is that fair?                       09:28
24        A.   No, that's --                               09:28
25             MS. STEIN:  Object to form.                 09:28
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  I mean I don't know of any | 09:28 |
| 2 | other connection. | 09:28 |
| 3 | BY MS. WEAVER: | 09:28 |
| 4 | Q.    Okay.  And what was the purpose of the | 09:28 |
| 5 | Facebook developer platform, in your understanding? | 09:28 |
| 6 | A.    The Facebook develop -- | 09:28 |
| 7 | MS. STEIN:  I'm going to object here. | 09:28 |
| 8 | This, you know, is both outside the scope of the | 09:28 |
| 9 | deposition and what this witness is authorized to | 09:28 |
| 10 | testify about.  And dating -- dating back -- | 09:28 |
| 11 | MS. WEAVER:  I understand your objection. | 09:28 |
| 12 | You can either instruct him not to answer or allow | 09:28 |
| 13 | him to answer. | 09:28 |
| 14 | MS. STEIN:  I will allow him to answer to | 09:28 |
| 15 | his understanding. | 09:28 |
| 16 | BY MS. WEAVER: | 09:28 |
| 17 | Q.    So you referenced the Facebook developer | 09:28 |
| 18 | platform earlier.  What's your understanding of its | 09:28 |
| 19 | purpose when it was created? | 09:28 |
| 20 | A.    And so our mission to -- you know, to | 09:28 |
| 21 | connect the world and bring the whole world closer | 09:28 |
| 22 | together is not something that we could do on our | 09:28 |
| 23 | own resources, you know.  So we built the platform, | 09:29 |
| 24 | like a lot of technology companies have done, to | 09:29 |
| 25 | allow third parties to build on top of our platform | 09:29 |

Page  23

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | and bring capabilities and experiences for people to | 09:29 |
| 2 | connect on their surfaces in many ways. | 09:29 |
| 3 | Q.   And is it fair to say that Facebook has | 09:29 |
| 4 | three constituents then:  Its business partners, | 09:29 |
| 5 | developer partners, and users? | 09:29 |
| 6 | MS. STEIN:  Objection to form. | 09:29 |
| 7 | THE WITNESS:  I'm not sure I understand | 09:29 |
| 8 | exactly the definition of developer -- sorry, | 09:29 |
| 9 | business partner.  Because, you know, like developer | 09:29 |
| 10 | partners are also businesses.  So I could probably | 09:29 |
| 11 | put them in the same bucket. | 09:29 |
| 12 | BY MS. WEAVER: | 09:29 |
| 13 | Q.   I just didn't quite understand your answer | 09:29 |
| 14 | there, and my -- | 09:29 |
| 15 | A.   So I -- so I cannot really, you know, like | 09:29 |
| 16 | give a distinction between business partners and | 09:29 |
| 17 | developer partners.  Developer partners are also | 09:29 |
| 18 | businesses. | 09:30 |
| 19 | Q.   Got it.  So who do you understand to be | 09:30 |
| 20 | encompassed in the business partners? | 09:30 |
| 21 | A.   Probably -- | 09:30 |
| 22 | MS. STEIN:  Objection to form. | 09:30 |
| 23 | THE WITNESS:  Sorry. | 09:30 |
| 24 | BY MS. WEAVER: | 09:30 |
| 25 | Q.   You may answer. | 09:30 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    A business partner is probably anybody | 09:30 |
| 2 | that is not a developer partner, I would imagine, in | 09:30 |
| 3 | that definition. | 09:30 |
| 4 | Q.    Can you think of categories of business | 09:30 |
| 5 | partners that would be included in that?  Would it | 09:30 |
| 6 | include data brokers, for example? | 09:30 |
| 7 | MS. STEIN:  Objection to form. | 09:30 |
| 8 | THE WITNESS:  I'm not sure what you're | 09:30 |
| 9 | referring to, data brokers.  But I can -- I can give | 09:30 |
| 10 | you a list of different partners in case that helps | 09:30 |
| 11 | answer the question. | 09:30 |
| 12 | BY MS. WEAVER: | 09:30 |
| 13 | Q.    Yes, that would be helpful, please. | 09:30 |
| 14 | A.    So historically Facebook has engaged with | 09:30 |
| 15 | maybe four or five categories of so-called partners. | 09:30 |
| 16 | One category of them is device manufacturers and | 09:30 |
| 17 | mobile operators.  They help us build the -- within | 09:30 |
| 18 | that period of time that I think you're talking | 09:31 |
| 19 | about, they help us build Facebook-like experiences | 09:31 |
| 20 | in order to reach a wider audience. | 09:31 |
| 21 | A second category is what we call | 09:31 |
| 22 | developer partners.  Those are third-party software | 09:31 |
| 23 | companies that have access to our APIs and they | 09:31 |
| 24 | build experience for both consumers and other | 09:31 |
| 25 | businesses. | 09:31 |

Page 25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              A third category is anybody that is a       09:31
 2   business that is publishing on our platform, from      09:31
 3   news companies to NZOs, the UNICEFs of this world.     09:31
 4   The WHO is using our platform to make sure that        09:31
 5   people have accurate information about COVID; we       09:31
 6   would consider them to be a partner of some sort.      09:31
 7              And a fourth category would be what, I      09:31
 8   think, other comments may call suppliers.  We -- we    09:31
 9   have partners in place with companies like            09:31
10   Salesforce because we need to maintain a record of     09:31
11   our, you know, partners.  We work very closely with   09:32
12   Workday because that's where our employee data is      09:32
13   stored.  My salary and everything related to me        09:32
14   somehow is stored to like this.  We would still call  09:32
15   them or refer to them as a business partner in that    09:32
16   sense.                                                 09:32
17              So those broadly are the four categories   09:32
18   of partners that I can -- I'm not sure if that         09:32
19   answers your question.                                 09:32
20       Q.    That's very helpful.  No, thank you very     09:32
21   much.                                                  09:32
22              And so, again, this is rudimentary, but    09:32
23   what do you understand "data" to mean?                 09:32
24              And let me back up and say every time I    09:32
25   ask you in this deposition -- I refer to "you,"        09:32
```

Page 26

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | because you're testifying on behalf of Facebook, I | 09:32 |
| 2 | mean Facebook.  Is that fair? | 09:32 |
| 3 | A.   (Unreportable response.) | 09:32 |
| 4 | Q.   Do you have -- what is your general | 09:32 |
| 5 | understanding of what data is? | 09:32 |
| 6 | A.   I'm waiting for my counsel.  She is not | 09:32 |
| 7 | talking so I can answer, I guess. | 09:32 |
| 8 | Q.   Yes, exactly. | 09:32 |
| 9 | A.   There is a little bit of lag -- there is a | 09:32 |
| 10 | little bit of lag.  Sorry.  I just want to make sure | 09:32 |
| 11 | I don't talk over about you -- everybody. | 09:33 |
| 12 | Data is information. | 09:33 |
| 13 | Q.   Okay.  And content and code and materials | 09:33 |
| 14 | as well are all information.  Is that all data, in | 09:33 |
| 15 | your understanding? | 09:33 |
| 16 | A.   Code is not really information. | 09:33 |
| 17 | Information in the code, if you are an engineer, | 09:33 |
| 18 | yes.  But not in a -- for everybody else. | 09:33 |
| 19 | Q.   Great.  Does Facebook collect information | 09:33 |
| 20 | about how users use Facebook's products? | 09:33 |
| 21 | A.   It's kind of broad statement, but we do | 09:33 |
| 22 | have an understanding of when people use our | 09:33 |
| 23 | services, yes. | 09:33 |
| 24 | Q.   Okay.  So Facebook collects -- and so | 09:33 |
| 25 | going forward, when we say "information," we may | 09:33 |

Page 27

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | also mean data and we can ask for clarification. | 09:33 |
| 2 | But, in general, that's the same concept for | 09:33 |
| 3 | purposes of this deposition; is that fair? | 09:33 |
| 4 | A.   Yeah.   I just want to make sure that, you | 09:34 |
| 5 | know, like we don't use those terms very loosely, | 09:34 |
| 6 | because sometime the information that we are talking | 09:34 |
| 7 | about is activity information and not necessarily | 09:34 |
| 8 | user data. | 09:34 |
| 9 | Q.   I understand.   So we'll just clarify so | 09:34 |
| 10 | that we have our meanings correctly. | 09:34 |
| 11 | So does Facebook collect information about | 09:34 |
| 12 | when users are using and have last used products, | 09:34 |
| 13 | for example? | 09:34 |
| 14 | A.   Any product, no.   The Facebook products, | 09:34 |
| 15 | yes. | 09:34 |
| 16 | Q.   Okay.   And Facebook collects information | 09:34 |
| 17 | about posts and videos and contents that they | 09:34 |
| 18 | review; is that right? | 09:34 |
| 19 | MS. STEIN:   I'm just going -- sorry.   I | 09:34 |
| 20 | just want to -- so -- | 09:34 |
| 21 | MS. WEAVER:   Please don't coach the | 09:34 |
| 22 | witness.   Just state an objection. | 09:34 |
| 23 | MS. STEIN:   No, Lesley, this is to you | 09:34 |
| 24 | actually.   Just so you're framing your questions in | 09:34 |
| 25 | the present, but the time period is 2012 to 2017. | 09:34 |

Page 28

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Do you want to have some sort of agreement so that | 09:34 |
| 2 | that's -- | 09:34 |
| 3 | MS. WEAVER:  Sure. | 09:34 |
| 4 | MS. STEIN:  You know what I'm saying?  I | 09:34 |
| 5 | just want to have something on the record.  I have a | 09:35 |
| 6 | feeling -- | 09:35 |
| 7 | MS. WEAVER:  That is fair. | 09:35 |
| 8 | MS. STEIN:  -- it might go in and out. | 09:35 |
| 9 | But I don't coach witnesses, so -- you know, for the | 09:35 |
| 10 | record. | 09:35 |
| 11 | MS. WEAVER:  Great. | 09:35 |
| 12 | Q.   So for purposes of this deposition, K.P., | 09:35 |
| 13 | we're going to be referring to the time period 2012 | 09:35 |
| 14 | to 2017.  You can assume that.  If you need to | 09:35 |
| 15 | clarify a question, let's just clarify it.  Is | 09:35 |
| 16 | that -- is that fair?  Okay. | 09:35 |
| 17 | A.   That's fine by me. | 09:35 |
| 18 | But can you repeat the question? | 09:35 |
| 19 | Q.   Yeah, no problem. | 09:35 |
| 20 | A.   Thanks. | 09:35 |
| 21 | Q.   So does Facebook also log when users are | 09:35 |
| 22 | using and have last used Facebook's products? | 09:35 |
| 23 | A.   Yes, we would know when you open them up | 09:35 |
| 24 | and when you close it. | 09:35 |
| 25 | Q.   And also what posts, videos, and other | 09:35 |

Page 29

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | contents users view? | 09:35 |
| 2 |     A.   Yes, we would. | 09:35 |
| 3 |     Q.   Okay.  And do you collect information | 09:35 |
| 4 | about how users' use features like the camera, | 09:36 |
| 5 | Facebook camera? | 09:36 |
| 6 |     A.   I don't know.  I don't think so.  Unless | 09:36 |
| 7 | it's within the app itself. | 09:36 |
| 8 |     Q.   Okay.  Does Facebook analyze content | 09:36 |
| 9 | information about users? | 09:36 |
| 10 |     A.   I'm not sure I understand the question. | 09:36 |
| 11 | What do you mean "content"? | 09:36 |
| 12 |     Q.   Well, I'm just trying to introduce a | 09:36 |
| 13 | couple of topics here, and I'm actually working off | 09:36 |
| 14 | the congressional testimony that Facebook submitted | 09:36 |
| 15 | in 2018. | 09:36 |
| 16 |        So it says "We also receive and analyze | 09:36 |
| 17 | content, communications and information that other | 09:36 |
| 18 | people provide when they use our products." | 09:36 |
| 19 |        So I'm just asking you, is it true that | 09:36 |
| 20 | Facebook receives and analyzes content, | 09:36 |
| 21 | communications and information that other people | 09:36 |
| 22 | provide? | 09:36 |
| 23 |     A.   By "other people," I guess we mean users? | 09:36 |
| 24 |     Q.   Yes. | 09:36 |
| 25 |     A.   Okay.  I think there's definitely some | 09:36 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | truth to that statement.  I mean just to give you an | 09:37 |
| 2 | idea, if you come to Facebook and you post something | 09:37 |
| 3 | that is against our policies, if -- if it's an | 09:37 |
| 4 | explicit, you know, something that promotes violence | 09:37 |
| 5 | or something like that, we have a responsibility to | 09:37 |
| 6 | take it down.  So in that sense we do analyze that | 09:37 |
| 7 | content for the purposes of keeping our community | 09:37 |
| 8 | safe. | 09:37 |
| 9 | Q.   Okay.  Is it true that Facebook collects | 09:37 |
| 10 | information about the computers, phones, connected | 09:37 |
| 11 | TVs and other web-connected devices that users use? | 09:37 |
| 12 | A.   Throughout the -- the activity we would | 09:37 |
| 13 | collect the IP address.  If it's connected -- or if | 09:37 |
| 14 | the user is connected through a mobile phone, we | 09:37 |
| 15 | probably collect information about the carrier.  If | 09:37 |
| 16 | they are on a desktop, we collect information about | 09:37 |
| 17 | their Internet service provider, yes, the browser | 09:37 |
| 18 | version, things like this. | 09:37 |
| 19 | Q.   Okay.  And does Facebook use the | 09:37 |
| 20 | information collected about users' use of their | 09:37 |
| 21 | products to better personalize the content, | 09:38 |
| 22 | including ads or features they see? | 09:38 |
| 23 | A.   Yes. | 09:38 |
| 24 | Q.   Okay.  And -- and so also do -- does | 09:38 |
| 25 | Facebook track that information across devices that | 09:38 |

Page 31

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | users use? | 09:38 |
| 2 | MS. STEIN:  Object to the form. | 09:38 |
| 3 | THE WITNESS:  I'm not sure I understand | 09:38 |
| 4 | what "tracking" means in that sense. | 09:38 |
| 5 | BY MS. WEAVER: | 09:38 |
| 6 | Q.   So I'm just again reading to you. | 09:38 |
| 7 | "We use information collected about users' | 09:38 |
| 8 | use of our products on their phone to better | 09:38 |
| 9 | personalize the content they see when they use our | 09:38 |
| 10 | products on another device such as their laptop or | 09:38 |
| 11 | tablet, or to measure whether they took an action in | 09:38 |
| 12 | response to an ad we showed them on their phone on a | 09:38 |
| 13 | different device." | 09:38 |
| 14 | Is that a true statement? | 09:38 |
| 15 | A.   Yes, that's a true statement. | 09:38 |
| 16 | Q.   Okay.  Does that include battery level? | 09:38 |
| 17 | A.   I don't think so. | 09:38 |
| 18 | Q.   Is it a true statement that Facebook | 09:38 |
| 19 | obtains information from these devices which | 09:38 |
| 20 | includes information about the operating system, | 09:38 |
| 21 | hardware and software versions, battery level, | 09:39 |
| 22 | signal strength, available storage space, browser | 09:39 |
| 23 | type, app and file names and types, and plug-ins? | 09:39 |
| 24 | Is that a true statement? | 09:39 |
| 25 | A.   There are certain things there that I | 09:39 |

Page 32

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | don't think we have any access to.  But there are | 09:39 |
| 2 | certain others like the browser version like I | 09:39 |
| 3 | mentioned before that we do. | 09:39 |
| 4 | Q.   Again, this is from Congress's | 09:39 |
| 5 | congressional written testimony. | 09:39 |
| 6 | Does Facebook collect information about | 09:39 |
| 7 | operations and behaviors performed on devices such | 09:39 |
| 8 | as whether a window is foregrounded or backgrounded | 09:39 |
| 9 | or mouse movements? | 09:39 |
| 10 | MS. STEIN:  Objection to form. | 09:39 |
| 11 | THE WITNESS:  I don't know. | 09:39 |
| 12 | BY MS. WEAVER: | 09:39 |
| 13 | Q.   Does Facebook collect that information? | 09:39 |
| 14 | A.   I don't know. | 09:39 |
| 15 | Q.   You don't know? | 09:39 |
| 16 | A.   I don't know. | 09:39 |
| 17 | Q.   Okay.  Does Facebook collect identifiers | 09:39 |
| 18 | about users? | 09:39 |
| 19 | A.   Can you explain what you mean by | 09:39 |
| 20 | "identifiers"? | 09:39 |
| 21 | Q.   Yeah.  What is an identifier?  Do you | 09:39 |
| 22 | know? | 09:40 |
| 23 | A.   Well, I mean the users are locked in when | 09:40 |
| 24 | they are on Facebook, so we already have an | 09:40 |
| 25 | understanding of who the users are.  Is that an | 09:40 |

Page 33

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | identifier? | 09:40 |
| 2 | Q.   Okay.  Is there something called a | 09:40 |
| 3 | Facebook identifier? | 09:40 |
| 4 | A.   There's a Facebook identity. | 09:40 |
| 5 | Q.   Do you know what a Facebook identifier is, | 09:40 |
| 6 | a user identifier? | 09:40 |
| 7 | A.   No. | 09:40 |
| 8 | Q.   Okay.  So is this statement true: | 09:40 |
| 9 | Facebook collects information about unique | 09:40 |
| 10 | identifiers, device IDs and other identifiers, such | 09:40 |
| 11 | as from games, apps or accounts users use and family | 09:40 |
| 12 | device identifiers?  Does Facebook collect that | 09:40 |
| 13 | information? | 09:40 |
| 14 | A.   I mean we have an understanding of people | 09:40 |
| 15 | that log in on third-party apps using the Facebook | 09:40 |
| 16 | identity, and we have an ID for that, yes. | 09:40 |
| 17 | Q.   And, for example, Apple has its own | 09:40 |
| 18 | identifier; isn't that true? | 09:40 |
| 19 | A.   Yes, we have an Apple ID, I guess. | 09:40 |
| 20 | Q.   And there's an Android ID as well; is that | 09:41 |
| 21 | right? | 09:41 |
| 22 | A.   Yes. | 09:41 |
| 23 | Q.   And a Google ID? | 09:41 |
| 24 | A.   It's probably the same as Android, yes. | 09:41 |
| 25 | Q.   Okay.  And so does Facebook use those | 09:41 |

Page 34

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | identifiers to collect information about people? | 09:41 |
| 2 | A.   Those specific ones, no. | 09:41 |
| 3 | Q.   Okay.  Do they use -- they don't use | 09:41 |
| 4 | those -- are you -- are you testifying today that | 09:41 |
| 5 | Facebook does not use the Apple identifier to | 09:41 |
| 6 | collect information about people? | 09:41 |
| 7 | A.   We don't. | 09:41 |
| 8 | Q.   Okay. | 09:41 |
| 9 | A.   How can we? | 09:41 |
| 10 | Q.   Okay. | 09:41 |
| 11 | A.   It's impossible. | 09:41 |
| 12 | Q.   Does Facebook collect information about | 09:41 |
| 13 | Bluetooth signals and information about nearby Wi-Fi | 09:41 |
| 14 | access points, beacons and cell towers? | 09:41 |
| 15 | A.   I believe we do, yes. | 09:41 |
| 16 | Q.   Does Facebook collect data from device | 09:41 |
| 17 | settings, information that users allow us -- let me | 09:41 |
| 18 | try that.  Do they collect data from device settings | 09:41 |
| 19 | when users turn them on, such as their GPS location, | 09:41 |
| 20 | camera or photos? | 09:41 |
| 21 | A.   Some of that would require consent, but I | 09:42 |
| 22 | think, broadly speaking, if there is consent, yes, | 09:42 |
| 23 | we do collect. | 09:42 |
| 24 | Q.   For these other categories that we have | 09:42 |
| 25 | been discussing, does Facebook collect that data | 09:42 |

Page 35

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | without consent? | 09:42 |
| 2 | MS. STEIN:  Object to form. | 09:42 |
| 3 | THE WITNESS:  Sorry, I didn't hear the | 09:42 |
| 4 | objection. | 09:42 |
| 5 | BY MS. WEAVER: | 09:42 |
| 6 | Q.  You said that for these kinds of data you | 09:42 |
| 7 | sometimes had to obtain consent.  Are there -- is | 09:42 |
| 8 | there other kinds of data that Facebook collects | 09:42 |
| 9 | without consent? | 09:42 |
| 10 | A.  No, no, no. | 09:42 |
| 11 | Q.  All right. | 09:42 |
| 12 | A.  I should probably say that's from | 09:42 |
| 13 | everything.  But it seems that there was an omission | 09:42 |
| 14 | from my part.  There's no way we can collect any of | 09:42 |
| 15 | that data without users' consent. | 09:42 |
| 16 | Q.  Okay.  Does Facebook collect information | 09:42 |
| 17 | about users' connection speed and other devices that | 09:42 |
| 18 | are nearby? | 09:42 |
| 19 | A.  I don't know about the other devices, but | 09:42 |
| 20 | the connection speed is something that we would log, | 09:42 |
| 21 | yes. | 09:42 |
| 22 | Q.  Okay.  Well, is it a true statement that | 09:42 |
| 23 | "Facebook collects information about other devices | 09:42 |
| 24 | that are nearby or on their network so we can do | 09:42 |
| 25 | things like help users stream a video from their | 09:43 |

Page 36

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | |
|---|---|
| 1 | phone to their TV"?  Is that a true statement? | 09:43 |
| 2 | A.   Yes, that's a true statement. | 09:43 |
| 3 | Q.   Okay.  Does Facebook also collect cookie | 09:43 |
| 4 | data? | 09:43 |
| 5 | A.   We have access to certain cookies, yes. | 09:43 |
| 6 | Q.   Okay.  So it's a true statement that | 09:43 |
| 7 | Facebook collects data from cookies stored on a | 09:43 |
| 8 | users' device, including cookie IDs and settings; is | 09:43 |
| 9 | that right? | 09:43 |
| 10 | A.   Yes. | 09:43 |
| 11 | MS. STEIN:  Object to form. | 09:43 |
| 12 | BY MS. WEAVER: | 09:43 |
| 13 | Q.   Do you know what a Facebook pixel is? | 09:43 |
| 14 | A.   Yes, I do. | 09:43 |
| 15 | Q.   What is a Facebook pixel? | 09:43 |
| 16 | A.   How -- okay.  Let me try to make it plain | 09:43 |
| 17 | and simple. | 09:43 |
| 18 | On a third-party website there is one | 09:44 |
| 19 | pixel which goes back to the old days of how, you | 09:44 |
| 20 | know, like the computer screens used to work.  This | 09:44 |
| 21 | Facebook owns, and whenever someone visits that | 09:44 |
| 22 | website, that pixel will fire an event that will | 09:44 |
| 23 | effectively confirm to Facebook that a user has | 09:44 |
| 24 | visited that website. | 09:44 |
| 25 | Q.   So do pixels uniquely identify users of | 09:44 |

Page 37

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    the platform on and off the platform?                    09:44

2        A.   No.                                             09:44

3        Q.   What do they identify?                          09:44

4        A.   The pixels identify someone visiting the        09:44

5    website.  It doesn't identify the user.                  09:44

6        Q.   So is it accurate to say that where a           09:44

7    website has embedded a Facebook pixel, Facebook          09:44

8    collects data about user actions on that website,        09:44

9    even if the user is not signed in to Facebook,           09:44

10   right?                                                   09:44

11       A.   And so let's say you go to CNN.com -- I         09:44

12   don't know if that's your media provider of choice,      09:44

13   but for the sake of the argument -- and there is a       09:44

14   Facebook pixel embedded.  That will fire an event        09:45

15   that will basically say user X has visited CNN.com.      09:45

16   And that information will come to Facebook, and          09:45

17   Facebook will actually identify whether it was K.P.      09:45

18   or Lesley.                                               09:45

19       Q.   And does data collected from pixels            09:45

20   include items placed in shopping carts or purchases      09:45

21   or which pages are viewed?                               09:45

22            MS. STEIN:  Objection to form.                  09:45

23            THE WITNESS:  Can we break it down?  It's       09:45

24   huge.  Maybe.  Depends on whether the third party        09:45

25   has implemented the pixel on different pages.            09:45

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              Things added to the cart.  Not the things      09:45
 2    that have been added to the cart but potentially the      09:45
 3    action taken.  It's not relevant for -- for the           09:45
 4    third party to share that information but share the       09:45
 5    action.                                                   09:45
 6              What was the third one?                         09:45
 7    BY MS. WEAVER:                                            09:45
 8         Q.    I believe it was which pages are viewed.       09:45
 9         A.    Yes.  So, like I said, if there is a pixel     09:46
10    embedded on different pages, we would have an             09:46
11    understanding that it wasn't just the home page but       09:46
12    it was, say, the landing page, or it was a product        09:46
13    page, better say, or the cart page, or something          09:46
14    like that.                                                09:46
15         Q.    Okay.  What is the like button?               09:46
16         A.    It's a plug-in.                               09:46
17         Q.    And what does that mean?                       09:46
18         A.    It's something that allows the user to         09:46
19    take action that will be shared on Facebook on a          09:46
20    third-party website.                                      09:46
21         Q.    And so in a sense is a like providing          09:46
22    information about whether a user approves or likes         09:46
23    an object that it is engaging with?                       09:46
24         A.    Yeah, if you like -- if you click on the       09:46
25    like button when you are -- again, on a third-party       09:46
```

Page 39

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | website, and that suggests that you're probably | 09:46 |
| 2 | liking that story that you just read. | 09:47 |
| 3 |     Q.   Okay.  So there's some content provided by | 09:47 |
| 4 | the like button; is that right? | 09:47 |
| 5 |     A.   Well, the content is provided by the third | 09:47 |
| 6 | party.  The like button captures your affinity with | 09:47 |
| 7 | that company. | 09:47 |
| 8 |     Q.   Understood. | 09:47 |
| 9 |     You mentioned APIs earlier.  Could you | 09:47 |
| 10 | just for the record define an API and explain how it | 09:47 |
| 11 | works. | 09:47 |
| 12 |     A.   An API is basically an industry-wide | 09:47 |
| 13 | standard that allows two applications to communicate | 09:47 |
| 14 | with each other.  And what I mean by applications, | 09:47 |
| 15 | I'm talking about pieces of software. | 09:47 |
| 16 |     Q.   Okay.  And what is an SDK? | 09:47 |
| 17 |     A.   An SDK is a way to, you know, access the | 09:47 |
| 18 | APIs without necessarily writing code that would | 09:47 |
| 19 | make it a little bit harder. | 09:47 |
| 20 |     So, in other words, I guess, what I'm | 09:47 |
| 21 | trying to say is that the -- the SDK is a piece of | 09:47 |
| 22 | software that would allow a third-party developer to | 09:48 |
| 23 | access the Facebook APIs through the SDK, whereas in | 09:48 |
| 24 | the old days if you want to really access the API | 09:48 |
| 25 | you have to double the amount of code or maybe even | 09:48 |

Page 40

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | more to access the same AP. | 09:48 |
| 2 | Q.   Got it.  And what are Facebook business | 09:48 |
| 3 | tools? | 09:48 |
| 4 | A.   It's a very broad definition, but it | 09:48 |
| 5 | refers to the different tools that businesses use to | 09:48 |
| 6 | monitor their presence manage on the Facebook | 09:48 |
| 7 | platform. | 09:48 |
| 8 | Q.   Okay.  So is it a true statement that | 09:48 |
| 9 | advertisers, app developers, and publishers can send | 09:48 |
| 10 | Facebook information through Facebook business tools | 09:48 |
| 11 | they use, including social plug-ins, like the like | 09:48 |
| 12 | button, Facebook log-in, Facebook's APIs and SDKs or | 09:48 |
| 13 | the Facebook pixel?  Is that a true statement? | 09:48 |
| 14 | A.   That -- that's correct. | 09:48 |
| 15 | Q.   And you referred to partners earlier.  Do | 09:49 |
| 16 | you recall that discussion? | 09:49 |
| 17 | A.   Yes. | 09:49 |
| 18 | Q.   Okay.  So going forward in the deposition | 09:49 |
| 19 | we'll use your definition of partners.  Is that | 09:49 |
| 20 | fair? | 09:49 |
| 21 | A.   That's okay by me. | 09:49 |
| 22 | Q.   So do partners provide information about | 09:49 |
| 23 | users' activities off Facebook, including | 09:49 |
| 24 | information about their device, websites they visit, | 09:49 |
| 25 | purchases they make, the ads they see and how they | 09:49 |

Page 41

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1   use their services whether or not they have a          09:49
2   Facebook account or are logged in to Facebook?  Is     09:49
3   that a true statement?                                 09:49
4          MS. STEIN:  Objection to form.                  09:49
5          THE WITNESS:  This is a very broad              09:49
6   statement.  So if you want me to answer I think we     09:49
7   need to break it down a little bit.                    09:49
8   BY MS. WEAVER:                                         09:49
9      Q.   Great, go ahead.  So is it true that           09:49
10  partners provide information about users' activities   09:49
11  off Facebook?                                          09:49
12     A.   Again --                                       09:49
13         MS. STEIN:  Objection to form.                  09:49
14         THE WITNESS:  Okay.  Based on my                09:49
15  definition of what a partner is, we're only talking    09:50
16  about a subset for those partners that use any of      09:50
17  the products that you just listed before.  They        09:50
18  either use the pixel or the SDK or the -- to the API   09:50
19  or they advertise on Facebook.                         09:50
20         Okay.  So for those four scenarios,             09:50
21  anybody, any business out there that uses any of       09:50
22  those products, they do send some information back     09:50
23  to Facebook.                                           09:50
24  BY MS. WEAVER:                                         09:50
25     Q.   Okay.  And that can include information        09:50
```

Page 42

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    about users' devices; is that right?              09:50

 2         A.   I'm not sure about the pixel or the API  09:50

 3    or -- the SDK, most likely, yes, in certain       09:50

 4    scenarios.                                        09:50

 5         Q.   Okay.  Do partners -- those partners in  09:50

 6    general provide information about websites users' 09:50

 7    visits and purchases they make?                   09:50

 8              MS. STEIN:  Objection to form.           09:50

 9              THE WITNESS:  Okay.  So that would mean   09:50

10    that they use the pixel and they would have to fire 09:50

11    an event when the user visits their website, and  09:51

12    that means that they will do that after the user has 09:51

13    probably seen an ad and they will probably -- and 09:51

14    it's up to them about how they're going to implement 09:51

15    it if the user decides to buy something.          09:51

16              But that's not necessarily how the whole 09:51

17    thing works.  This is just one specific            09:51

18    implementation.                                    09:51

19    BY MS. WEAVER:                                     09:51

20         Q.   Yeah, I'm just asking at a very high     09:51

21    level.  It's a pretty simple question.            09:51

22         A.   Okay.  At a very high level, if you want 09:51

23    to, you know, like talk about how the systems work, 09:51

24    if you are an advertiser on Facebook, you want to 09:51

25    make sure that your dollars are well spent.  And  09:51
```

                                                    Page  43

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | what you would do is implement the pixels because | 09:51 |
| 2 | you want to track the performance of your ad | 09:51 |
| 3 | campaigns.  And how do you track the performance of | 09:51 |
| 4 | your ad campaigns?  It's a function of what business | 09:51 |
| 5 | you're running. | 09:51 |
| 6 | If you're in the service provider, you | 09:51 |
| 7 | would probably fire a pixel when somebody makes an | 09:51 |
| 8 | appointment, or, you know, books a test drive.  If | 09:51 |
| 9 | you are a product company or a commerce side and you | 09:51 |
| 10 | are selling products, you'll fire a pixel when | 09:52 |
| 11 | someone completes a purchase.  And like that you can | 09:52 |
| 12 | track the investment that you made on your ad | 09:52 |
| 13 | campaign. | 09:52 |
| 14 | Q.  Let's talk, for example, about a game | 09:52 |
| 15 | developer.  If a game developer has a Facebook user | 09:52 |
| 16 | on it, do they use Facebook's API to tell Facebook | 09:52 |
| 17 | what games a user plays, for example? | 09:52 |
| 18 | MS. STEIN:  Objection to form. | 09:52 |
| 19 | THE WITNESS:  Okay.  This is again a very | 09:52 |
| 20 | broad scenario.  But let me spell it out, right? | 09:52 |
| 21 | So let's say I want to play Word With | 09:52 |
| 22 | Friends.  I have options.  I can log in with | 09:52 |
| 23 | Facebook or I can create an account directly. | 09:52 |
| 24 | If I log in with Facebook, then, you know, | 09:52 |
| 25 | the developer will request my consent to access | 09:52 |

Page  44

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    certain pieces of my identity that will come from      09:52

 2    Facebook, like my first name, like my last name,       09:52

 3    like my profile picture.  To the extent that I         09:52

 4    provide consent to that developer, the developer       09:53

 5    will have access to that information.                  09:53

 6              From then on every time I log in to play     09:53

 7    Words with Friends, Facebook will have to reconfirm    09:53

 8    the identity of that user and make sure that the       09:53

 9    user remains logged in with Words with Friends.        09:53

10    BY MS. WEAVER:                                         09:53

11        Q.   Okay.  So, again, this is from the            09:53

12    congressional testimony, and I just want to           09:53

13    understand it.  It says "Facebook also receives        09:53

14    information about users' online and offline actions    09:53

15    and purchaser -- purchases from third-party data       09:53

16    providers who have the rights to provide us with       09:53

17    users' information."                                   09:53

18              Do you agree with that sentence?             09:53

19              MS. STEIN:  Object to form.                  09:53

20    BY MS. WEAVER:                                         09:53

21        Q.   Is that correct?                              09:53

22        A.   Well, if it's on the congressional and        09:53

23    it's validated by Facebook, I would say, yes, I        09:53

24    agree.                                                 09:53

25        Q.   Okay.  So do the third-party data             09:53
```

Page 45

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    providers provide Facebook information about the      09:53
 2    activities on the third-parties' apps or sites at a   09:53
 3    high level?                                            09:54
 4         A.   I think -- at a high level, it would be      09:54
 5    the same business that would provide information,      09:54
 6    not anything Facebook.                                 09:54
 7         Q.   Got it.                                       09:54
 8              MS. WEAVER:   Okay.   I'll mark now as        09:54
 9    Exhibit 2 -- or I say I will, but I am asking my        09:54
10    ████████████████████████████████████      ████
      ██ ████████████████████████████████████████  ████
      ██ ██████████████                              ████
13         Q.   And while we're waiting, have you been        09:54
14    deposed before?                                         09:54
15         A.   Yes.                                          09:54
16         Q.   Okay.   So I'm asking partly just if you      09:54
17    know what a Bates number is.                            09:54
18              There are documents -- and there actually     09:54
19    was a man named Bates in 1899 who created a stamp       09:54
20    that he put on these documents in the lower             09:54
21    right-hand corner.   So it's just a way of              09:54
22    consecutively numbering hard copy documents that        09:54
23    would probably be obsolete in your world, but that      09:55
24    is what I just read into the record.                    09:55
25         A.   Okay.                                         09:55
```

Page 46

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Have you testified on behalf of Facebook | 09:55 |
| 2 | before? | 09:55 |
| 3 | A.   No. | 09:55 |
| 4 | Q.   Okay.  How many times have you been | 09:55 |
| 5 | deposed? | 09:55 |
| 6 | A.   This my fourth one. | 09:55 |
| 7 | Q.   And were you deposed on topics similar to | 09:55 |
| 8 | the topics we're discussing today? | 09:55 |
| 9 | MS. STEIN:  Objection to form. | 09:55 |
| 10 | THE WITNESS:  I've been deposed and | 09:55 |
| 11 | discussing about various topics.  I don't know where | 09:55 |
| 12 | this is going to head to -- | 09:55 |
| 13 | BY MS. WEAVER: | 09:55 |
| 14 | Q.   Okay. | 09:55 |
| 15 | A.   -- so I can answer that question at the | 09:55 |
| 16 | end of the day. | 09:55 |
| 17 | Q.   Fair enough.  Were those depositions in | 09:55 |
| 18 | relation to your employment at Facebook? | 09:55 |
| 19 | A.   Yes. | 09:55 |
| 20 | Q.   Okay.  And did they occur in the last four | 09:55 |
| 21 | years? | 09:55 |
| 22 | A.   I can't remember the first one, but I | 09:55 |
| 23 | assume it would be in the last four years, but they | 09:55 |
| 24 | are the last two years. | 09:55 |
| 25 | Q.   Okay.  Do you know if any of those | 09:55 |

Page 47

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    depositions were conducted by regulators?          09:55

2        A.    Yes.                                      09:55

3        Q.    Which regulators?                         09:56



12       Q.    Okay.  And what were the other two        09:56

13   depositions or three depositions that you have sat  09:56

14   for?                                                09:56

18       Q.    Okay.  Do you recall what each of those   09:56

19   litigations were about?                             09:56

Page  48

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1         ████  ██████████████████████        ████

 █  ███████████████                            ████

 █    ██  ████████████████████████             ████

 █  ██████████                                 ████

 █    ██  ██████████████████████               ████

 █  ████████████████                           ████

 █    ██  ███████████████████                  ████

 █    ██  ████████████████████████             ████

 █  ███████████████████████████                ████

 █  ████████████████████████████████████       ████

11         A.    I believe so, yes.                    09:57

12         Q.    Okay.  And do you recall how many there  09:57

13   were, roughly?                                      09:57

14         A.    I have no idea.  I'm sorry.             09:57

15         Q.    That's okay.  It's not a memory test, but  09:57

16   I'm just asking in general.                         09:57

17         ██████████████████████████████         ████

 █  ████████████████████████████               ████

 █    ██    ██                                  ████

 █    ██  ██████████████████████               ████

 █  █████████████████████████████████          ████

 █  ████████████████                           ████

 █            ████████████████████             ████

 █            █████████████████████            ████

 █            ████████████                     ████
```

Page 49

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    BY MS. WEAVER:                                      09:57

 2         Q.   Do you have an Exhibit 3?                 09:57

 3         A.   So we're going to 3?                      09:57

 4         Q.   We are going to 3.                        09:58

 5         A.   Okay.  I don't see it yet.                09:58

 6         Q.   I think you might need to refresh.        09:58

 7              Do you have Exhibit 3 yet?                09:58

 8         A.   Yes.                                      09:58

 9         Q.   Okay.                                     09:58

10    ████████████████████████████████████        ████

█     ████████████████████████████████████████    ████

█        ██  ██████████████████████████           ████

█        ██  ██████████████████                   ████

14         Q.   Okay.  Did --                             09:58

15              MS. STEIN:  Why don't you give the witness 09:58

16    an opportunity to review the document.             09:58

17              MS. WEAVER:  Okay.  Thanks, Deb.  You were 09:58

18    about to get in trouble.                           09:58

19        ██  ████████████████████████████        ████

█     ██████████████████████████████████          ████

█     ████████████████████████████████████        ████

█     ████████████████████████████████            ████

█        ████████████████████████████████████     ████

█     ██████                                       ████

25
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    BY MS. WEAVER:                                          09:59
 2         Q.   Okay.  And when did you last see them?       09:59
 3         A.   Either yesterday or Friday.                  09:59
 4         Q.   When did you first see them?                 09:59
 5         A.   Maybe Friday.                                09:59
 6         Q.   Okay.  You hadn't seen them before Friday?   09:59
 7         A.   No.                                           09:59
 8         Q.   Is that right?  Okay.                         09:59
 9    ████████████████████████████████   ███████
      ████████████                        ███████
      ██  ███████████████████████         ███████
      █████████████████████████████████   ███████
      █████████████████████████           ███████
      ██  ██████████████████████████       ███████
      ██  ██████████████████████████       ███████
      ██  ████████████████████             ███████
17         Q.   Okay.  And let me back up again.  This is   09:59
18    foundational.  Do people communicate by email at      09:59
19    Facebook?                                              09:59
20         A.   It's one of the ways to communicate, yes.   09:59
21         Q.   How else do people communicate in the       09:59
22    course of doing business at Facebook?                  09:59
23         A.   We use a version of the product that is     09:59
24    designed for the business world called Workplace.     09:59
25    We use a version of our Messenger product, which is   10:00
```

Page 51

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | also an example, a device called Workset.  We use | 10:00 |
| 2 | emails.  We use Zoom.  We use other | 10:00 |
| 3 | videoconferencing facilities.  We use our telephones | 10:00 |
| 4 | to call each other.  Different ways. | 10:00 |
| 5 |     Q.   And people text as well; is that right? | 10:00 |
| 6 |     A.   We don't like text messaging.  We have our | 10:00 |
| 7 | own messaging apps. | 10:00 |
| 8 |     Q.   Just out of curiosity, is the Facebook | 10:00 |
| 9 | Messenger that people that work at Facebook use, is | 10:00 |
| 10 | that different than the Facebook Messenger that | 10:00 |
| 11 | users on the platform use, or is it the same? | 10:00 |
| 12 |     A.   I mean I use Messenger the same way you | 10:00 |
| 13 | would use it.  But internally I don't use that | 10:00 |
| 14 | version of the product.  I use an Enterprise | 10:00 |
| 15 | personal product -- | 10:00 |
| 16 |     Q.   Okay. | 10:00 |
| 17 |     A.   -- which is called Workset. | 10:00 |
| 18 |     Q.   And what's the difference functionally | 10:00 |
| 19 | between those two? | 10:00 |
| 20 |     MS. STEIN:  Objection.  This is like way | 10:00 |
| 21 | beyond the scope about what employees at Facebook | 10:00 |
| 22 | use. | 10:01 |
| 23 |     MS. WEAVER:  Okay.  Fine.  It's fine.  I | 10:01 |
| 24 | was trying to establish a foundation, but I guess we | 10:01 |
| 25 | can come back to that in another deposition. | 10:01 |

Page 52

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 53

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1 ████ ████████                                          ████

  █ ████ ██████████████████                              ████

  █ ████████████████████████                             ████

4      Q.   Okay.  And just again by way of              10:02

5  understanding how Facebook functions, you see         10:02

6  there's a Dropbox hyperlink here in the email?        10:02

7      A.   Yes.                                          10:02

8      Q.   Does Facebook also use Dropbox?              10:02

9          MS. STEIN:  Objection to form.  This          10:02

10 isn't -- not an ESI depo and he is not testifying     10:02

11 about what Facebook uses internally.  Let's focus on  10:02

12 the subjects that he's here for.                       10:02

13         MS. WEAVER:  I'm trying to understand if       10:02

14 this document is complete, and that's a little bit     10:02

15 difficult to do.  So are you going to instruct him     10:03

16 not to answer?                                         10:03

17         MS. STEIN:  Is there a reason why you          10:03

18 think the document is not complete?                    10:03

19         MS. WEAVER:  Okay.  Let me question.           10:03

20     Q.   So is it true that Facebook -- people use     10:03

21 Dropbox at Facebook to share document files?           10:03

22     A.   Can I answer?                                 10:03

23     Q.   Yes.                                          10:03

24     A.   Sorry, I was looking at the document.         10:03

25     Q.   No problem.                                   10:03

Page 54

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   It's -- it's true that for files that are | 10:03 |
| 2 | concise that are too big to send by email we would | 10:03 |
| 3 | use Dropbox. | 10:03 |
| 4 | Q.   Okay.  Is there any way to know whether or | 10:03 |
| 5 | not a hard copy version of a document like this was | 10:03 |
| 6 | everything that was contained in the hyperlink or | 10:03 |
| 7 | would you have to see it in native form? | 10:03 |
| 8 | MS. STEIN:  Objection to form. | 10:03 |
| 9 | Lesley, next. | 10:03 |
| 10 | BY MS. WEAVER: | 10:03 |
| 11 | Q.   Please answer the question. | 10:03 |
| 12 | A.   I'm not sure I understand exactly what you | 10:03 |
| 13 | saying.  I don't even know what you have printed | 10:03 |
| 14 | out, so I cannot really establish whether it's a | 10:03 |
| 15 | complete document or not. | 10:03 |
| 16 | Q.   Okay.  Is there -- normally -- let me ask | 10:03 |
| 17 | this.  Does Facebook maintain document like -- | 10:04 |
| 18 | documents like this in PDF form or are they native? | 10:04 |
| 19 | MS. STEIN:  Objection to form. | 10:04 |
| 20 | Lesley, move on. | 10:04 |
| 21 | BY MS. WEAVER: | 10:04 |
| 22 | Q.   Please answer the question. | 10:04 |
| 23 | MS. STEIN:  It's not an ESI deposition. | 10:04 |
| 24 | Move on. | 10:04 |
| 25 | MS. WEAVER:  I'm trying to understand this | 10:04 |

Page 55

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | document, which we gave to you ahead of time, and | 10:04 |
| 2 | whether or not it's complete.  So please allow him | 10:04 |
| 3 | to answer. | 10:04 |
| 4 | MS. STEIN:  Ask him if he knows whether | 10:04 |
| 5 | it's complete.  Don't ask him about things that have | 10:04 |
| 6 | nothing to do with what he's here to testify about | 10:04 |
| 7 | here today.  He's not authorized on behalf of | 10:04 |
| 8 | Facebook to talk about Dropbox, email, messaging | 10:04 |
| 9 | that gets used internally. | 10:04 |
| 10 | BY MS. WEAVER: | 10:04 |
| 11 | Q.   So, K.P., can I ask you, is there any kind | 10:04 |
| 12 | of -- for Dropbox is there any -- well, just -- I'll | 10:04 |
| 13 | move on.  I'll come back to it. | 10:04 |

Page 56

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

13      A.    No, I haven't spoken to him.            10:05

14      Q.    Did you speak to anybody other than your    10:06

15  counsel to prepare for your deposition today?    10:06

16      A.    No, I haven't.                          10:06

17      Q.    And how long did you take to prepare for    10:06

18  your deposition?                                 10:06

19      A.    I think I already answered that question.   10:06

20  I been preparing for this deposition for as long as    10:06

21  I have been at Facebook.                         10:06

22      Q.    Fair enough.                            10:06

23      A.    It's a collective -- collective knowledge    10:06

24  of my last 8 and a half years of being employed at    10:06

25  this company.                                    10:06

Page 57

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1        Q.    Okay.  And specifically to prepare for      10:06

2   this deposition in response to this notice, how much   10:06

3   time did you spend preparing?                          10:06

4        A.    I don't know.  Between, you know, calls     10:06

5   with my counsels and homework that I have done for     10:06

6   myself, I would say 15-20 hours.                       10:06

7        Q.    Okay.  Thank you.                           10:06
```

Page 58

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1



Page 59



Page 60

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



22      Q.   Okay.   Can you think of any other branded      10:10

23   apps in the United States that were used during 2012      10:10

24   to 2017?                                                 10:10

25      A.   Facebook branded apps?   Messenger,              10:10

Page 61

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Instagram.                                    10:10

2        Q.    Great.   Thank you.                 10:10



Page 62

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



    21          Q.   Okay.  No, I'm just trying to understand          10:12

    22    and put it in English for a layperson by -- so you          10:12

    23    understand what I'm trying to do here.  So let me          10:12

    24    try to ask a better question.                               10:12

    25               Is it fair to say that the data that is          10:12

                                                          Page 63

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | implicitly collected by Facebook is not expressly | 10:12 |
| 2 | shared by users? | 10:12 |
| 3 |      MS. STEIN:  Objection to form. | 10:12 |
| 4 |      THE WITNESS:  So they may not be explicit | 10:13 |
| 5 | shared because they submit the data to us, but they | 10:13 |
| 6 | have agreed to share that data because they have | 10:13 |
| 7 | agreed to the privacy policies -- | 10:13 |
| 8 | BY MS. WEAVER: | 10:13 |
| 9 |    Q.   Okay. | 10:13 |
| 10 |    A.   -- that make it clear that we will have | 10:13 |
| 11 | access to this kind of data. | 10:13 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 65

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
1                                              ████        10:15

    ████                                       ████        10:15

    ████                                       ████        10:15

    ████                                       ████        10:15

    ████                                       ████        10:15

6        Q.   How did you know?                            10:15

7             So how does Facebook retain that             10:15

8    information once it draws that inference?              10:15

9        A.   You know, there would be --                  10:15

10            MS. STEIN:  Objection.                        10:15

11            THE WITNESS:  There would be a list of        10:15

12   potential interest that would be derived by your       10:15

13   affinity to certain entities on the platform,          10:15

14   certain businesses on the platform.                    10:15

15   BY MS. WEAVER:                                          10:15

16       Q.   And how does Facebook record those            10:15

17   interests, if you will?                                10:15

18            MS. STEIN:  Objection to form.                10:15

19                     ████████                ████

     ████████                                  ████

     ████████                                  ████

     ████████                                  ████

     ████                                      ████

24   BY MS. WEAVER:                                          10:16

25       ██    ████████                        ████
```

Page 66

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12              MS. STEIN:  Objection.  Form.              10:16

13              THE WITNESS:  What do you mean?             10:16

14    BY MS. WEAVER:                                        10:16

15

16

17

18

19

20

21

22

23

24

25
```

Page 67

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 68

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1                                                        ▆▆▆
 ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆             ▆▆▆
 ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆                        ▆▆▆
 ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆                          ▆▆▆
 ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆                        ▆▆▆
 ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆                            ▆▆▆
 ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆                         ▆▆▆
 ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆                         ▆▆▆
 ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆                               ▆▆▆
 ▆   ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆                          ▆▆▆
 ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆                         ▆▆▆
 ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆                                10:19
```

13        A.   I'm really sorry, but I'm having a hard        10:20

14   time hearing.  Is it me or is it your mic?               10:20

15        MS. WEAVER:  I'm not having a hard time             10:20

16   hearing.                                                 10:20

17        MS. STEIN:  It's the mic.                           10:20

18        MS. WEAVER:  Oh, okay.  Can you hear me             10:20

19   now or is it --                                          10:20

```
20   ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆                                  ▆▆▆
 ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆                           ▆▆▆
 ▆  ▆▆▆▆▆▆▆▆▆▆▆▆                                         ▆▆▆
 ▆   ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆                           ▆▆▆
 ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆                           ▆▆▆
 ▆   ▆   ▆▆▆▆                                            ▆▆▆
```

Page  70

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1                  ▮                                                      ▮
 ▮                                                                        ▮
 ▮       ▮                                                                ▮
 ▮       ▮                                                                ▮
 ▮          ▮       ▮                                                     ▮
 ▮                  ▮                                                     ▮
 ▮       ▮                                                                ▮
 ▮                  ▮                                                     ▮
 9             THE REPORTER:  Thank you.                          10:20
10      BY MS. WEAVER:                                            10:20
11          Q.   Let me move on.  I'm going to return to         10:20
12      that because I think we need to drill down a little      10:20
13                                                                        ▮
 ▮                                                                        ▮
 ▮          ▮       ▮                                                     ▮
 ▮          ▮       ▮                                                     ▮
 ▮                                                                        ▮
 ▮          ▮       ▮                                                     ▮
 ▮          ▮       ▮                                                     ▮
 ▮                                                                        ▮
 ▮          ▮       ▮                                                     ▮
 ▮          ▮       ▮                                                     ▮
 ▮          ▮       ▮                                                     ▮
 ▮                  ▮                                                     ▮
 ▮                                                                        ▮
```

Page 71

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1      ████████████                                    ████
 █           ████████████████████                       ████
 █      ████████████                                    ████
 █           █████████████████████                      ████
 █      █████████████████████████                       ████
 █      █████████████████████                           ████
 █      ██████████████████████████                      ████
 █      ██████████████████████████                      ████
 █      ██████████                                     10:21
10      BY MS. WEAVER:                                 10:21
11           Q.    Do you know what a data broker is?  10:21
12           A.    My definition of data broker?       10:21
13           Q.    Yes.                                10:22
14           A.    Anybody that has access to a broad set of  10:22
15      data.                                          10:22
16           Q.    Okay.  Is Facebook a data broker?   10:22
17           A.    No.                                 10:22
18           Q.    Okay.  Did you talk to anybody -- well,  10:22
19      strike that.                                   10:22
20           ████████████████████                      ████
 █      ███████████████████                            ████
 █         ██    ████                                  ████
 █         ██    █████████████                         ████
 █         ██    █████████████████████                 ████
 █      ████████████████████                           ████
```

Page  72

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1 ███ ████████████████████████ ████

██ ███████████████████████████ ████

██ ██████████████████████████████ ████

██ ██████████████████████████ ████

██ ███ ██████ ████

██ ████████████████████████ ████

██ ██████████████████████████ ████

██ █████████████████████ ████

██ ███ ███████████████████████████ ████

██ ███████████████████████████ ████

██ ███ █████████████████████████ ████

██ █████████████████████ ████

██ ███ ██████ 10:23

14       Q.    What is an advertiser?                   10:23

15       A.    Someone that is running marketing        10:23

16   companies on Facebook.                             10:23

17 ███ ██████████████████████████ ████

██ ██████████████████████████████ ████

██ ███████████████████████ ████

██ ███ ██████ 10:23

21       Q.    What is custom audiences?                10:23

22       A.    A custom audience is a reference to a    10:23

23   products whereby a business can upload and encrypt 10:23

24   its -- a version of their database of customers for 10:23

25   the purpose of running a campaign that targets those 10:23

Page  73

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   customers.                                         10:23

 2        Q.   Okay.  I want to break that down a little  10:23

 3   bit.                                               10:23

 4             MS. WEAVER:  I'm not seeing that on my    10:23

 5   live feed.                                         10:23

 6             Could you read his response back, please.  10:24

 7                  (The record was read by the          10:24

 8                  court reporter, as requested)        10:24

 9   BY MS. WEAVER:                                     10:24

10        Q.   Okay.  And when you say "encrypt," what do  10:24

11   you mean?                                          10:24

12        A.   They wouldn't upload the raw data.  They  10:24

13   would upload a version of that data.              10:24

14             THE REPORTER:  I'm sorry, could you repeat  10:24

15   that last part, please?                           10:24

16             THE WITNESS:  They wouldn't upload raw    10:24

17   customer data.  They would upload encrypted personal  10:24

18   or hashed personal data.                          10:24

19   BY MS. WEAVER:                                     10:24

20        Q.   Thank you.  And when you say "raw customer  10:24

21   data," what do you mean?                           10:24

22        A.   Email addresses.                         10:24

23        Q.   Anything else?                           10:24

24        A.   No.                                      10:24

25        Q.   ███████████████████████        ████████  10:24
```

Page 74

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 75

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  ▬▬▬▬▬▬▬▬▬                                    ▬▬▬

▬   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬          ▬▬▬

▬  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬                     ▬▬▬

▬   ▬  ▬▬▬▬▬▬▬▬▬▬▬▬              ▬▬▬

▬  ▬▬▬▬▬▬▬▬▬▬▬                       ▬▬▬

▬   ▬  ▬▬▬▬▬▬▬▬▬▬▬▬              ▬▬▬

▬  ▬▬▬▬▬▬▬▬▬                          ▬▬▬

▬   ▬  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬          ▬▬▬

▬  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬              ▬▬▬

▬   ▬▬▬▬▬▬                                     10:26

11       Q.   Do political campaigns advertise?          10:26

12       A.   Yes, they do.                              10:26

13       Q.   Okay.  And when they are seeking           10:26

14  conversion, are they seeking to encourage certain    10:26

15  actions by Facebook users?                           10:26

16            MS. STEIN:  Objection to form.             10:27

17            THE WITNESS:  Yeah, but that wouldn't       10:27

18  include, you know, like what people voted.  It would 10:27

19  probably include if they read, or if they donated,   10:27

20  or if they took an action on their website,          10:27

21  depending on what the campaign is actually optimized 10:27

22  for.                                                 10:27

23  BY MS. WEAVER:                                       10:27

24       Q.   Got it.                                    10:27

25       A.   But, no, the conversion wouldn't be that I 10:27

Page 76

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    voted for Biden or I voted for Trump.  That's not --        10:27

 2              THE REPORTER:  I'm sorry, could you please          10:27

 3    slow down.  The last part?                                   10:27

 4              THE WITNESS:  Oh, sorry.                            10:27

 5              THE REPORTER:  "The conversion"...                  10:27

 6              THE WITNESS:  The conversion that                   10:27

 7    political campaigns are tracking have to do with             10:27

 8    fundraising, donations, registration, this kind of           10:27

 9    things.                                                      10:27

10    BY MS. WEAVER:                                               10:27

11         Q.   Okay.  And so Facebook provides conversion         10:27

12    measurement information back to the advertisers              10:27

13    which could include political campaigns; is that             10:27

14    right?                                                       10:27

15              MS. STEIN:  Objection to form.                     10:27

16              THE WITNESS:  Yes.                                 10:27

17    BY MS. WEAVER:                                               10:27

18    ███  ██████████████████████████                      ███

██  ███████████████████████                                ███

██  █████████████████████████████████████                  ███

██  █████████████                                           ███

██    ██   ████                                             ███

██    ██  ██████████████████                                ███

██  ████████████████████████████████████                   ███

██  ████████████                                            ███
```

                                                    Page  77

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



    21      Q.   So what is the difference between         10:29

    22  encryption and hashing?                            10:29

    23      A.   It's same thing in that sense.            10:29

    24      Q.   It is the same thing?                     10:29

    25      A.   Yeah.                                      10:29

                                           Page 78

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Is it true that hashing has two inputs -- | 10:29 |
| 2 | well, let me go back.  Is it fair to say that | 10:29 |
| 3 | encryption has two inputs so that if you have a key, | 10:29 |
| 4 | you can associate data point together; is that fair? | 10:29 |
| 5 | MS. STEIN:  Object to form.  He's not here | 10:29 |
| 6 | as a technical expert, so... | 10:29 |
| 7 | You can give your high-level | 10:29 |
| 8 | understanding, if you have one. | 10:29 |
| 9 | THE WITNESS:  Yes, I don't -- I don't | 10:29 |
| 10 | want -- I don't want to talk about, you know, like | 10:29 |
| 11 | encryption.  But it's important here, I think, to | 10:29 |
| 12 | take away is that we don't have access to those | 10:29 |
| 13 | email addresses and they don't have access to the | 10:30 |
| 14 | people who we ended up identifying as users who have | 10:30 |
| 15 | both a Facebook account and a Walmart account. | 10:30 |
| 16 | BY MS. WEAVER: | 10:30 |

Page 79

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  ████  ████████████████████████  ████

██  ██████████████████████                    10:30

3      Q.   So could you, please, explain what hashed    10:30

4  data matching is?                              10:30

5      A.   If an advertiser has information about a    10:30

6  user, a customer of theirs, like their email    10:30

7  address -- I didn't realize that we can actually be    10:30

8  based on phone number or home address, but if it    10:30

9  seems to be the case, then that's basic data that we    10:30

10 can use to match those users on the Facebook site.    10:30

11  ████  ████████████████████████████  ████

██  ██████████████████████  ████

██  ████████████████████████  ████

██  ██████████████████████████  ████

██  ████████████████  ████

██  ████  ████████████████  ████

██  ████  ██████████████████████  ████

██  ████████████████  ████

██  ████  ██████  ████

██  ████  ████████████████  ████

██  ████████████████████████  ████

██  ████████████████  ████

██  ████  ██████████████████████  ████

██  ████████████████████████  ████

██  ██████████████████                    10:31

                                        Page 80

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



20      Q.    Okay.   So Facebook is getting data about,     10:32

21  for example, that I had something in my cart that I      10:32

22  didn't purchase; is that right?                          10:32

23          MS. STEIN:   Object to form.                     10:32

24          THE WITNESS:   No, not that, no.                 10:32

25

                                        Page 81

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    BY MS. WEAVER:                                        10:32

 2         Q.   Okay.  Who has it?  You just gave that as   10:32

 3    an example.                                           10:32

 4         A.   Yeah, but that is a logic that takes place  10:32

 5    on the advertiser's side.                             10:32

 6         Q.   Okay.                                       10:32

 7         A.   The advertiser selects the marketing team   10:32

 8    on the advertiser side to decide what kind of         10:32

 9    campaign they want to run.  And they create a         10:33

10    segment of their customers that they want to target   10:33

11    with their ad campaign, and then they will decide     10:33

12    what creative they want to use, like how the ad is    10:33

13    going to look like.                                   10:33

14    ▮   ██████████████████████████████                   ██

▮     ██████████████████████                              ██

▮          █████████████████████                         ██

▮          █████████████████████████████                 ██

▮     ████████████████████████████████████               ██

▮     ██████████████████████████████                     ██

▮     ██████████████                                     ██

▮   ▮   █████████████████████████████                    ██

▮     ███████████████████████████████                    ██

▮     █████████████                                       ██

▮          ███████████████████                            ██

25              (Background audio interference.)          10:33
```

Page 82

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          MS. WEAVER:   Somebody needs to put their          10:33

2     phones on mute or their computers on mute.          10:34



Page 83

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 84

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 85

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 86

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    ████  ████████████████████████              ████

██   ████  ████████████████████████████████         ████

██   ████████████████████                            ████

██   ████  █████████████████████████████            ████

██   ████  ██████████████████████████████████       ████

██   ████  █████████████████████████████████        ████

██   ████  █████████████████████████████████        ████

██   ████████████████████████████                   ████

██   ████  ████████████████████████████             ████

██   ████████████████████████████████████████       ████

██   ███████████████████████████████                ████

██   ████  ████████████████████████████████         ████

██   ██████████████████████████████████             ████

██         █████████████████████████████████████    ████

██   ██████████████████████████████████████████     ████

██   ████████████████████████████████               10:38

17       Q.   Okay.  I see that I guess the videographer    10:38

18   would like to take a quick break.  So do you want to    10:38

19   just -- is that comfortable for you, K.P., to take a    10:38

20   break for a little bit here?                            10:38

21       A.   Yes, I need a coffee.                          10:38

22            MS. WEAVER:  Okay.  So why don't we come       10:38

23   back at, do you want to say, 10:50?                     10:38

24            THE WITNESS:  10 minutes from now?             10:38

25            MS. WEAVER:  Yeah, does that work?  Well,      10:39

                                              Page 87

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    1   11 minutes?  Okay.  Great.                          10:39
      2                THE VIDEOGRAPHER:  We are off the record  10:39
 2                     10:39  3   at        a.m.
      10:39
 3    4              (Recess.)                                 10:39
                       10:39  5             (Off record:      a.m.)
 4    10:39
 5    6              (On record:  10:53 a.m.)                  10:39
 6    7                THE VIDEOGRAPHER:  We are on the record at  10:53
 7                     10:53  8        a.m.
 8    10:53
 9    9    BY MS. WEAVER:                                      10:53
10    10       Q.   Hello, K.P.  You understand you are still  10:53
11    11   under oath, correct?                                10:53
12    12       A.   Yes, I do.                                 10:53
13    ██        ██        ████████████████████████          ████
██    ██        ███████████████████████████                 ████
██    ██        ████████████████                            ████
██    ██    ██  ██████████                                  ████
██    ██    ██  █████████████████████████                   ████
██    ██        ████████████████████████████                ████
██    ██        █████████████████████████████               ████
██    ██        ████████████████                            ████
██    ██    ██  ████████                                     10:53
22    22                MS. STEIN:  Object to form.           10:53
23    23   BY MS. WEAVER:                                     10:53
24    24        ██  ████████████████████████                 ████
██    ██        ████████████████████████████                ████
```

Page 88



Page 89

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 91



Page 92

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   It's a very broad question.  So in what | 10:57 |
| 2 | capacity? | 10:57 |
| 3 | Q.   Who oversaw the Onavo project from within | 10:57 |
| 4 | Facebook?  It was a partnership, correct? | 10:57 |
| 5 | A.   No, it's not a partnership.  It's an | 10:57 |
| 6 | acquisition. | 10:57 |
| 7 | Q.   Okay.  So who oversaw that acquisition? | 10:57 |
| 8 | A.   On the Facebook side or -- | 10:57 |
| 9 | Q.   Yes. | 10:58 |
| 10 | A.   -- after the acquisition? | 10:58 |
| 11 | Q.   On the Facebook side. | 10:58 |
| 12 | A.   I don't know. | 10:58 |
| 13 | Q.   Okay.  What about after the acquisition? | 10:58 |
| 14 | A.   The -- I guess the CEO of Onavo. | 10:58 |

Page 93

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



1   █████

        █████

        █████

        █████

        █████

        █████

        █████

        █████      10:59

9        MS. STEIN:  Objection to form.  If the   10:59

10  witness knows what the people who wrote this --   10:59

11        MS. WEAVER:  Please stop coaching him and   10:59

12  telling him to say that he doesn't know.   10:59

13        MS. STEIN:  Lesley -- Lesley, do not   10:59

14  accuse me of coaching.  You've gotten --   10:59

15        MS. WEAVER:  That's strike one.   10:59

16    Q.  Okay.  Go ahead, K.P.   10:59

17        MS. STEIN:  Excuse me?   10:59

18  █████

        █████

        █████

        █████

        █████

        █████

        █████

        █████      10:59

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 96



Page 97

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    ████████████████████████████████            ███████

█    ████        ███████████████████████████     ███████

█    ███████████████████████████████████████     ███████

█    ██████████████████████████████              ███████

█    ████      ███████████████████████████       ███████

█    ████      ████████████████████████          ███████

█    ███████████████████████████                 ███████

█    ████      ████████████████████████          11:04
```

9        Q.    Okay.  And back to the DYI.  You say it's    11:04

10   all the information that Facebook has for you; is       11:04

11   that correct?                                           11:04

12       A.    Yes.                                          11:04

13       Q.    What do you mean by that?                     11:04

14       A.    It includes from things from like the         11:04

15   information you submitted when you created your         11:04

16   account, to the photos that you may have uploaded,      11:04

17   to the pixels of your friends you may have liked, to    11:04

18   the ads you may have seen, the videos you may have      11:04

19   watched.  It's a -- it's a very lengthy, you know,      11:04

20   like document with different things.                    11:04

```
21   ████      █████████████████████████████████    ███████

█    ██████████████████████████████████████████     ███████
```

23   DIY tool include appended data?                         11:04

24       A.    No.                                           11:04

25       Q.    Okay.  Does it include behavioral data?       11:04

Page 98

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. STEIN:  Objection to form. | 11:04 |
| 2 | THE WITNESS:  Yes, it does. | 11:05 |
| 3 | BY MS. WEAVER: | 11:05 |
| 4 | Q.   Okay.  So it includes the conversions and | 11:05 |
| 5 | purchases off Facebook? | 11:05 |
| 6 | A.   I don't know about that, but it includes | 11:05 |
| 7 | the apps that you have logged in.  It includes, I | 11:05 |
| 8 | think, the websites that you may have liked, and so | 11:05 |
| 9 | on. | 11:05 |
| 10 | Q.   Okay.  Does the Do It Yourself network | 11:05 |
| 11 | include the native data that was inferred from | 11:05 |
| 12 | engagement on the site? | 11:05 |
| 13 | MS. STEIN:  Objection to form. | 11:05 |
| 14 | THE WITNESS:  I think you're referring to | 11:05 |
| 15 | the DYI file? | 11:05 |
| 16 | BY MS. WEAVER: | 11:05 |
| 17 | Q.   Yes.  I'll ask the question again.  Sorry. | 11:05 |
| 18 | Does the DIY file include native data that | 11:05 |
| 19 | is inferred from engagement on the site? | 11:05 |
| 20 | MS. STEIN:  Objection to form. | 11:05 |
| 21 | THE WITNESS:  It should include interests, | 11:05 |
| 22 | which are inferred data, so yes. | 11:05 |
| 23 | BY MS. WEAVER: | 11:05 |
| 24 | Q.   Does it also include behaviors? | 11:05 |
| 25 | MS. STEIN:  Objection to form. | 11:05 |

Page 99

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1          MS. WEAVER:  What's the objection?        11:06

2          MS. STEIN:  "Behaviors" is a very vague   11:06

3   term, Lesley.                                     11:06

4   ███████████████████████████████████████    █████ 11:06

█   ████████████████████████████████████       █████

█   ████████████                               █████

█   ██  ███████████████████████████████████    █████

█   ████████████████████████████████████████████ █████

█   ████████████████████████████████████      █████

█        ██████████████████████████          █████

█        ████████████████████████████████████ █████

█   ████████████████████████████████████████   █████

█   ██████████████████████████████████         █████

█   ██████████████████████████                 █████

█   ████████████████                           █████

█      ██  ████████████████████████████████     █████

█   ████████████████████████████████████       █████

█        ████████████████████████████████       █████

█   ████████████████████████████████████████   █████

█   ████████████████████████████████████████████ █████

█   ████████████████████████████████           11:06

22         MS. STEIN:  Objection to form.           11:06

23         THE WITNESS:  DYI file includes activities 11:06

24  such as you liking a page that may suggest an     11:07

25  interest and, by default, explain a behavior or   11:07
```

Page 100

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    describe a behavior.                               11:07

2    BY MS. WEAVER:                                      11:07

3        Q.    Okay.  But is that to be inferred from the   11:07

4    engagement on the site?                            11:07

5        A.    It's driven by your activities happening    11:07

6    on the Facebook website or the Facebook apps.      11:07
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



1 �ও▬▬▬▬▬▬                                        ▬▬▬

▬   ▬   ▬▬▬▬▬▬▬▬▬▬▬                              ▬▬▬

▬   ▬▬▬                                          ▬▬▬

▬   ▬   ▬▬▬▬▬▬▬▬▬▬▬                              ▬▬▬

▬   ▬▬▬▬▬▬▬▬▬▬▬                                  ▬▬▬

▬   ▬▬▬▬▬▬▬▬▬▬                                   ▬▬▬

▬   ▬▬▬▬▬▬▬▬▬▬                                   ▬▬▬

▬   ▬▬▬▬▬▬                                       11:08

9          Q.   And is that contained in the DYI tool or      11:08

10     the DYI file?                                           11:08

11             MS. STEIN:  Object to form.  Objection to       11:08

12     form.                                                   11:08

13             THE WITNESS:  I'm sorry, how can a file          11:08

14     include activities as you have already opted out?       11:08

15     BY MS. WEAVER:                                          11:08

16     ▬   ▬▬▬▬▬▬▬▬▬▬▬▬                             ▬▬▬

▬   ▬▬▬▬▬▬▬▬▬▬▬                                  ▬▬▬

▬   ▬▬▬▬▬                                        ▬▬▬

▬   ▬   ▬▬▬▬▬▬▬▬▬                                ▬▬▬

▬   ▬▬▬▬▬▬▬▬▬▬▬                                  ▬▬▬

▬   ▬▬▬▬▬▬▬▬▬▬▬                                  ▬▬▬

▬   ▬▬▬▬▬▬▬▬▬▬                                   ▬▬▬

▬   ▬   ▬▬▬                                      ▬▬▬

▬   ▬   ▬▬▬▬▬▬▬▬▬                                ▬▬▬

25         Q.   Does it collect all third-party behavioral     11:09

                                              Page 102

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | data? | 11:09 |
| 2 | MS. STEIN:  Objection to form. | 11:09 |
| 3 | THE WITNESS:  All?  I don't know. | 11:09 |
| 4 | BY MS. WEAVER: | 11:09 |
| 5 | Q.   Yeah.  Okay. | 11:09 |
| 6 | How would you find out? | 11:09 |
| 7 | A.   I would have to look at the DYI file. | 11:09 |
| 8 | Q.   Okay.  And have you looked at any DYI | 11:09 |
| 9 | files to prepare for your deposition today? | 11:09 |
| 10 | A.   No, I have not, because that would be a | 11:09 |
| 11 | violation of my commitment to users' privacy. | 11:09 |
| 12 | Q.   Did you look at DYI files for any of the | 11:09 |
| 13 | named plaintiffs in this action to prepare for the | 11:09 |
| 14 | deposition? | 11:09 |
| 15 | A.   No, because that would be in violation of | 11:09 |
| 16 | my commitment to users' privacy. | 11:09 |
| 17 | Q.   To prepare -- | 11:10 |
| 18 | A.   I would be fired -- | 11:10 |
| 19 | Q.   If your -- | 11:10 |
| 20 | A.   -- if I look -- | 11:10 |
| 21 | Q.   If your lawyers had you look at the | 11:10 |
| 22 | plaintiffs' DYI files to prepare for deposition in | 11:10 |
| 23 | this action? | 11:10 |
| 24 | A.   I would be fired. | 11:10 |
| 25 | Q.   Okay.  Well, we'll table that. | 11:10 |

Page 103

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              Can you look at your --                    11:10

 2        A.   No one here --                              11:10

 3        Q.   Can you look at your own --                 11:10

 4        A.   I can only look at mine.                    11:10

 5        Q.   -- DYI -- oh, okay.  So can you look at     11:10

 6   your own DYI file to determine whether or not all     11:10

 7   third-party behavioral data is included in it?        11:10

 8        A.   I can, but not right now.                   11:10

 9        Q.   Okay.  Right.                                11:10

10             Okay.  Give me a moment here.               11:10
```

Page 104

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 105



Page 106

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 107

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1

11:15

13      Q.   Okay.  And is it contained in the DYI      11:15

14  file?                                               11:15

15      A.   That -- how is that relevant for you?      11:15

16      Q.   I get to ask the questions.                11:16

17      A.   No, I mean -- I'm -- I'm thinking loudly.  11:16

18  That a user's information, when it is -- so the --  11:16

19  okay.  So let me take a step back.                  11:16

20          That data that we are talking about are     11:16

21  anonymized.  They are not associated with a given   11:16

22  user.  And so it wouldn't show up in a -- in user's 11:16

23  DYI file.                                           11:16

24      Q.   Okay.  And when --                         11:16

25          MS. STEIN:  I'm just waiting for my feed

Page 108

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | here. | |
| 2 | Oh, could you read his answer back, | |
| 3 | please. | 11:16 |
| 4 | (The record was read by the | 11:17 |
| 5 | court reporter, as requested) | 11:17 |
| 6 | BY MS. WEAVER: | 11:17 |
| 7 | Q.   And what do you mean by "associated"? | 11:17 |
| 8 | A.   Like we have a broad understanding of who | 11:17 |
| 9 | lives in San Francisco but we don't know exactly who | 11:17 |
| 10 | lives in San Francisco. | 11:17 |
| 11 | Q.   Okay.  But the data's collected from | 11:17 |
| 12 | individual users, right? | 11:17 |
| 13 | A.   It depends. | 11:17 |
| 14 | Q.   On what? | 11:17 |
| 15 | A.   It depends on whether the data has been | 11:17 |
| 16 | collected because some are explicitly said "I live | 11:17 |
| 17 | in San Francisco."  Some people have their hometown | 11:17 |
| 18 | identified on Facebook, some people don't. | 11:17 |
| 19 | Q.   Right, but it's still one individual.  The | 11:17 |
| 20 | source of the -- the -- originally is one user, | 11:17 |
| 21 | right? | 11:17 |
| 22 | MS. STEIN:  Objection to form. | 11:17 |
| 23 | BY MS. WEAVER: | 11:17 |
| 24 | Q.   Because either I live in San Francisco or | 11:17 |
| 25 | I indicated -- I mean, all of this data comes from | 11:17 |

Page 109

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    individuals, right?                              11:17
2    ████      ███████████████████████████    ██████
█    ████████████████████████████████████    ██████
█    ████████████████████████████████████    ██████
█    ██████████████████                       11:18
6         Q.   Okay.  So let's -- okay.  Let's talk -- 11:18
7         A.   Like you have defined San Francisco --  11:18
8         Q.   Right.                                  11:18
9         A.   -- to be your hometown.                 11:18
10        Q.   Perfect.                                11:18
11        A.   Okay.                                   11:18
12        Q.   So it's associated with me initially,   11:18
13   right?                                            11:18
14        A.   You have specifically suggested to your 11:18
15   Facebook friends by basically filling in that     11:18
16   specific field that Facebook asked you to do that 11:18
17   your hometown is San Francisco.  You may live in  11:18
18   Denver, but your hometown appears to be           11:18
19   San Francisco.                                    11:18
20        Q.   Okay.  So an algorithm runs on this data 11:18
21   and it creates an ad cluster and puts me -- when  11:18
22   does it become disassociated with me?  Because it 11:18
23   was initially associated, correct?                11:18
24        A.   That association will never cease to exist 11:18
25   unless you basically go there and suggest that you 11:18
```

Page 110

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    move to Denver.                                        11:18

 2         Q.   Okay.  I'm just -- honestly, K.P., I'm       11:18

 3    trying to understand your answer.                      11:18

 4              You said the data that we are talking         11:18

 5    about is not associated with specific users.  We       11:18

 6    just talked about --                                   11:19

 7         A.   Yes, please.                                 11:19

 8         Q.   -- it was associated with an individual      11:19

 9    user because they're from San Francisco.               11:19

10         A.   Yes.                                          11:19

11         Q.   So when does it become disassociated?        11:19

12         ████      ██████████████████████████         ████

     ████   ███████████████████████████████████████       ████

     ████   █████████████████                              ████

     ████      ████   ██████                               ████

     ████      ████   ███████████████████████████████    ████

     ████   ████████████████                               11:19

18         Q.   Okay.  And --                                11:19

19         A.   So -- no, no, no, no.  Sorry.  I have to     11:19

20    be super precise here.                                 11:19

21              There are two kinds of native data.  There   11:19

22    are native data that come because you have, as a       11:19

23    user, indicated that your hometown is San Francisco.   11:19

24         Q.   Right.                                        11:19

25         A.   And there is native data that comes from     11:19
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | your activity.  So if -- hypothetically speaking, I | 11:19 |
| 2 | don't -- I don't know exactly what period of time we | 11:19 |
| 3 | are going to be looking at, but let's say for the | 11:19 |
| 4 | last three -- the last 30 days you have accessed | 11:19 |
| 5 | Facebook from an IP address in -- in San Francisco, | 11:19 |
| 6 | that is still, according to our definition, native | 11:19 |
| 7 | data.  But it's -- it's not data that's -- it's | 11:19 |
| 8 | directly explicitly, you know, like, documented by | 11:19 |
| 9 | the user, but it's in data inferred by their | 11:20 |
| 10 | activity. | 11:20 |
| 11 | Q.   Okay.  And so the -- | 11:20 |
| 12 | A.   Still native. | 11:20 |
| 13 | Q.   I understand. | 11:20 |
| 14 | By the way, would you use a different word | 11:20 |
| 15 | than native data?  Is there another way to reference | 11:20 |
| 16 | that? | 11:20 |
| 17 | A.   I would probably use on-site activity. | 11:20 |
| 18 | Q.   On-site activity? | 11:20 |
| 19 | A.   Versus off-site activity. | 11:20 |
| 20 | Q.   Okay.  Perfect. | 11:20 |
| 21 | Do you -- would you use the -- the words | 11:20 |
| 22 | "appended data" or is there another term for that? | 11:20 |
| 23 | A.   I haven't heard that term until recently. | 11:20 |
| 24 | Until this -- | 11:20 |
| 25 | Q.   Okay.  Do you have another understanding | 11:20 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    of how people at Facebook refer to it?              11:20

 2         A.   Customer data provided by third parties or  11:20

 3    something --                                        11:20

 4         Q.   Okay.                                      11:20

 5         A.   -- like that.                              11:20

 6         Q.   All right.  And then what about behavioral  11:20

 7    data; is there another term of art at Facebook used  11:20

 8    to reference that?                                  11:20

 9         A.   That's my definition of offline activity.  11:20

10         Q.   Offline activity.  Okay.                   11:20

11         A.   Oh, sorry, off-site activity.              11:20

12         Q.   Off-site.  I see.  Okay.                   11:20

13    ████████████████████████████████████████████   ████

██    ████████████████████████████████████████████████   ████

██    ██████████████████████████████████████████████   ████

██    ████████████████████████                           ████

██        ████   ████                                    ████

██        ████   ██████████████████████████████████████   ████

██    ████████████████████████                           ████

██        ████   ████████████████████████████████████   ████

██        ████   ██████████████████████████████████   ████

██    ████████████████████████████████████████████████   ████

██    ██████████████████████████████                     11:21

24         A.   Okay.  At the very high level, if we are   11:21

25    talking about the specific scenario that a business  11:21
```

                                        Page 113

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | that is operating in San Francisco wants to target | 11:21 |
| 2 | users in San Francisco, they will run the campaign | 11:21 |
| 3 | for, let's say, two days; they will target specific | 11:21 |
| 4 | users that live in that area.  They may target only | 11:21 |
| 5 | females or only men, people of a certain age, people | 11:21 |
| 6 | of a certain profession, depending on, you know, | 11:21 |
| 7 | like, what sort of campaign they want to run, right? | 11:21 |
| 8 | So that will all be effectively identified | 11:21 |
| 9 | as a potential audience of, let's say for the sake | 11:21 |
| 10 | of the argument, 20,000 users.  They still have no | 11:22 |
| 11 | access to the information.  They only understand | 11:22 |
| 12 | what is the potential audience their ad campaign can | 11:22 |
| 13 | reach. | 11:22 |
| 14 | And then when they start, you know, like, | 11:22 |
| 15 | placing the advertisement, then their advertisement | 11:22 |
| 16 | is going to go into an auction.  That auction may | 11:22 |
| 17 | actually, you know, allow others to beat against | 11:22 |
| 18 | that same audience.  So if there is a competitor of | 11:22 |
| 19 | this service, or another service that wants to | 11:22 |
| 20 | target people with similar characteristics that live | 11:22 |
| 21 | in San Francisco, they may or may not see the first | 11:22 |
| 22 | ad.  So it's the highest bidder that will have the | 11:22 |
| 23 | ad show up. | 11:22 |
| 24 | ███████████████████████████   █████ | |
| █ | ███████████████████████████████ | 11:22 |

Page 114

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   ████████████████████████████████████████    11:22

 2       Q.   Okay.  So let me ask this:  So I'm -- say   11:22

 3   I'm being targeted in that ad campaign.  Is there a   11:22

 4   way for me to find out that I was targeted by those   11:22

 5   categories that the advertiser chose?    11:22

 6       A.   You can see it only if that ad campaign   11:23

 7   shows up to you.    11:23

 8       Q.   Okay.  And only in realtime?  And there's   11:23

 9   no record of it after that?    11:23

10       A.   I think you can actually see the -- the   11:23

11   information in realtime.  But if you go to the DYI   11:23

12   file, you can see probably ad campaigns that you   11:23

13   have been displayed -- or you have seen yourself, or   11:23

14   you have clicked.    11:23

15       Q.   Okay.  But if they were --    11:23

16       A.   You know --    11:23

17       Q.   -- targeted to me and I didn't take an   11:23

18   action, it's not in the DYI file; is that right?   11:23

19       A.   You -- you will see the ad campaigns that   11:23

20   ended up showing up on your feed, but you wouldn't   11:23

21   see any ad campaigns that, for whatever reason, you   11:23

22   haven't seen, because there was another advertiser   11:23

23   that won the bid.    11:23

24       Q.   Got it.    11:23

25            And so let's talk about the information   11:23
```

Page 115

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    that is used to create the derived data.  How do you      11:23

 2    determine what information can be used to apply            11:24

 3    those algorithms?                                          11:24

 4         A.   I need to clarify that question.                 11:24

 5         Q.   Yeah, it's -- so is only public                  11:24

 6    information used to create derived data?                   11:24

 7              MS. STEIN:  Objection to form.                   11:24

 8              THE WITNESS:  Okay.  So are you talking           11:24

 9    about derived data in the context of location, or          11:24

10    you're talking about derived data broadly?                 11:24

11    BY MS. WEAVER:                                             11:24

12         Q.   Well, what is derived data broadly?              11:24

13         A.   I mean, I don't know of any use of derived       11:24

14    data broadly, but I'm trying to understand exactly         11:24

15    how you want me to answer the question in a                11:24

16    thoughtful way.                                            11:24

17
```

Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        Q.   But at large, is it fair to say that          11:25

 2   derived data is created through algorithms running      11:25

 3   on realtime data?                                       11:25

 4        MS. STEIN:   Objection to form.                    11:25

 5        THE WITNESS:   I cannot talk about that.           11:25

 6   But derived data is a -- a broad, you know, like,       11:25

 7   industry term that you can use, and it's a legal        11:25

 8   term as well, as far as I understand.   It can be       11:25

 9   used in different context and it doesn't always         11:25

10   require realtime processing.                            11:25

11   BY MS. WEAVER:                                          11:25

12        Q.   Okay.   So let's -- we can stick with your    11:25

13   example then if you like for now.                       11:25

14             What if I sent a -- a private -- a message    11:25

15   in Facebook Messenger to one friend saying "I used      11:25

16   to live in San Francisco" and I've never posted         11:25

17   anything publicly about it.   Is that information       11:25

18   used to create the derived data for ad clusters?        11:26

19        A.   No.                                           11:26

20        Q.   Why not?                                      11:26

21        A.   That's a private conversation between you     11:26

22   and your friend --                                      11:26

23        Q.   Okay.                                         11:26

24        A.   -- that --                                    11:26

25        Q.   So how does the algorithm distinguish --      11:26
```

                                                    Page 117

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | let me ask this:  When the data is being run on | 11:26 |
| 2 | algorithms, is it segregated by public or private | 11:26 |
| 3 | data? | 11:26 |
| 4 | A.   So your definition of public or private is | 11:26 |
| 5 | what, if I may say? | 11:26 |
| 6 | Q.   If a user designated something private or | 11:26 |
| 7 | restricted audience. | 11:26 |
| 8 | A.   Okay.  Let's take a little bit of a step | 11:26 |
| 9 | back.  Because what we define as public data is | 11:26 |
| 10 | basically your first name, your last name, your | 11:26 |
| 11 | profile picture. | 11:26 |
| 12 | Q.   Okay. | 11:26 |
| 13 | A.   Anything else that comes with a -- an | 11:26 |
| 14 | audience selection doesn't necessarily belong -- | 11:26 |
| 15 | it's not necessarily by default public.  It may have | 11:26 |
| 16 | a limited audience.  It may be just you, if it's | 11:26 |
| 17 | things like your birthday, or it may be friends -- | 11:27 |
| 18 | or accessible to your friends. | 11:27 |
| 19 | What we always, you know, like, like to | 11:27 |
| 20 | suggest that communications that happen over | 11:27 |
| 21 | messenger is also by default private, meaning that | 11:27 |
| 22 | it's -- the content of your exchanges with your | 11:27 |
| 23 | friends belong to you and your friends.  So that | 11:27 |
| 24 | wouldn't be considered public information.  But it | 11:27 |
| 25 | wouldn't be considered necessarily private | 11:27 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | information because it's not accessible by anybody | 11:27 |
| 2 | in that -- it's a private conversation but it's not | 11:27 |
| 3 | private data in that sense. | 11:27 |
| 4 | Q.   And when Facebook is, let's say -- we can | 11:27 |
| 5 | just stick with your ad clusters example.  When it | 11:27 |
| 6 | is using the algorithm to create derived data, such | 11:27 |
| 7 | as ad clusters, is it using that world of | 11:27 |
| 8 | information that you just described that is not | 11:27 |
| 9 | public? | 11:27 |
| 10 | A.   We would be using native data such as your | 11:27 |
| 11 | registered home location and things like your IP | 11:28 |
| 12 | address to determine where you live. | 11:28 |
| 13 | Q.   Okay.  But what I'm trying to say is -- | 11:28 |
| 14 | and I gave you a different example.  So if you | 11:28 |
| 15 | could, just follow my example.  Okay. | 11:28 |
| 16 | A.   We wouldn't.  I think I made -- | 11:28 |
| 17 | Q.   Okay. | 11:28 |
| 18 | A.   -- that point that -- | 11:28 |
| 19 | Q.   When I -- when I look -- | 11:28 |
| 20 | A.   -- you telling your friends you live in | 11:28 |
| 21 | San Francisco is your business and it's not for us | 11:28 |
| 22 | to use in any kind of ads. | 11:28 |
| 23 | Q.   Okay.  And that's because reading messages | 11:28 |
| 24 | and using that content and making it available to | 11:28 |
| 25 | advertisers would violate Facebook's policies, | 11:28 |

Page 119

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | right? | 11:28 |
| 2 | A.   Reading private communications between you | 11:28 |
| 3 | and your friends would be a violation of our | 11:28 |
| 4 | commitment to your privacy. | 11:28 |
| 5 | Q.   Okay.  Switching topics just for a second. | 11:28 |
| 6 | You know what capabilities are; is that | 11:28 |
| 7 | right? | 11:29 |
| 8 | A.   In what -- | 11:29 |
| 9 | Q.   In connection with -- in connection with | 11:29 |
| 10 | APIs? | 11:29 |
| 11 | A.   Yes, I do. | 11:29 |
| 12 | Q.   Okay.  Sorry. | 11:29 |
| 13 | So are you familiar with the read stream | 11:29 |
| 14 | capability? | 11:29 |
| 15 | A.   Read stream is an API but there is an | 11:29 |
| 16 | associated capabilities. | 11:29 |
| 17 | Q.   Yeah.  And what is that? | 11:29 |
| 18 | A.   It's an API that allows a third party to | 11:29 |
| 19 | access someone's News Feed. | 11:29 |
| 20 | Q.   Okay.  And what does "read stream" mean in | 11:29 |
| 21 | particular? | 11:29 |
| 22 | A.   It's a very poorly, you know, like, | 11:29 |
| 23 | defined -- | 11:29 |
| 24 | Q.   It should probably be for the period 2012 | 11:29 |
| 25 | to 2017. | 11:29 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yes.  So the News Feed is also referred as | 11:29 |
| 2 | stream. | 11:29 |
| 3 | Q.   Uh-huh. | 11:29 |
| 4 | A.   And that API and the corresponding | 11:29 |
| 5 | capability effectively describes the ability to read | 11:29 |
| 6 | the stream. | 11:29 |
| 7 | Q.   Okay. | 11:29 |
| 8 | A.   In other words, read the News Feed. | 11:29 |
| 9 | Q.   Okay.  And are you aware at any point in | 11:30 |
| 10 | time if third parties were allowed to read Facebook | 11:30 |
| 11 | Messenger messages? | 11:30 |
| 12 | MS. STEIN:  Objection. | 11:30 |
| 13 | BY MS. WEAVER: | 11:30 |
| 14 | Q.   Through -- through API capabilities? | 11:30 |
| 15 | MS. STEIN:  Objection to form.  And we're | 11:30 |
| 16 | talking about 2012 to 2017. | 11:30 |
| 17 | You may answer. | 11:30 |
| 18 | THE WITNESS:  Between 2012 and 2017, I | 11:30 |
| 19 | don't think we made the -- the Messenger API -- the | 11:30 |
| 20 | current version of the Messenger API available. | 11:30 |
| 21 | THE REPORTER:  I'm sorry.  That -- that... | 11:30 |
| 22 | THE WITNESS:  So I'm -- between 2012 and | 11:30 |
| 23 | 2017, the current version of the Messenger API was | 11:30 |
| 24 | not available.  I think the only way for third | 11:30 |
| 25 | parties to access Messenger was through the Inbox | 11:30 |

Page 121

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | API. | 11:30 |
| 2 | MS. WEAVER:  I'm sorry, I just need to | 11:30 |
| 3 | look really quickly. | 11:31 |
| 4 | Q.   What is the Inbox API? | 11:31 |
| 5 | A.   It's an API that allows a third party to | 11:31 |
| 6 | access a user's Messenger conversation. | 11:31 |
| 7 | Q.   Okay.  And what do those third parties -- | 11:31 |
| 8 | strike that. | 11:31 |
| 9 | What access were they given to -- | 11:31 |
| 10 | A.   So the third -- | 11:31 |
| 11 | Q.   -- use Messenger conversation? | 11:31 |
| 12 | A.   Yeah.  The third parties that had access | 11:31 |
| 13 | to the Inbox API were app third parties that | 11:31 |
| 14 | replicated core Facebook functionality, including | 11:31 |
| 15 | messaging.  So we call those integrations device | 11:31 |
| 16 | integrations because they were replicating | 11:31 |
| 17 | Facebook -- the Facebook app. | 11:31 |
| 18 | Q.   Are you aware -- are you familiar with the | 11:31 |
| 19 | company Royal Bank of Canada, RBC? | 11:31 |
| 20 | A.   Yes.  Yes. | 11:31 |
| 21 | Q.   Did -- did they have access to Messenger | 11:31 |
| 22 | inboxes during this time period? | 11:32 |
| 23 | A.   They had the access to an API that allowed | 11:32 |
| 24 | them to write into someone's inbox. | 11:32 |
| 25 | Q.   And why? | 11:32 |

Page 122

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    But -- but not to read. | 11:32 |
| 2 | Q.    Okay.  And why -- | 11:32 |
| 3 | A.    Why? | 11:32 |
| 4 | Q.    -- did they have that access? | 11:32 |
| 5 | A.    Because we were testing the ability for a | 11:32 |
| 6 | Royal Bank of Canada customer that wants to wire | 11:32 |
| 7 | money to friends to tell them through Messenger that | 11:32 |
| 8 | they have successfully wired the money. | 11:32 |
| 9 | ████   ███████████████████████ | ███ |
| ██ | ████████████████████████████████ | ███ |
| ██ | ██████ | ███ |
| ██ | ████████████████████ | ███ |
| ██ | ██████████████████████ | ███ |
| ██ | ██████████████████████████████ | ███ |
| ██ | ████████ | ███ |
| ██ | ███   ██████████████████████ | ███ |
| ██ | █████████ | ███ |
| ██ | ███   ███████████ | ███ |
| ██ | ███   ██████ | ███ |
| ██ | ██████████████████████ | ███ |
| 21 | A.    I'm sorry, there's a little bit of | 11:33 |
| 22 | background noise.  I don't know where it's coming. | 11:33 |
| 23 | MS. WEAVER:  I think that's Ms. Stein. | 11:33 |
| 24 | But maybe not. | 11:33 |
| 25 | MS. STEIN:  Sorry.  Sorry. | 11:33 |

Page 123

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  Oh.  Okay. | 11:33 |
| 2 | MS. STEIN:  I will -- I will mute.  The | 11:33 |
| 3 | gardeners are here.  Hazards of -- | 11:33 |
| 4 | MS. WEAVER:  Yes. | 11:33 |
| 5 | MS. STEIN:  -- of COVID. | 11:33 |
| 6 | ████████████ | ████ |
| | ██  ██  ████████████████████████ | ████ |
| | ██████████████ | ████ |
| | ██  ██  ████ | ████ |
| | ██  ██  ████ | ████ |
| | ████████████████████████████ | ████ |
| | ██████████████████████ | ████ |
| | ████████ | ████ |
| | ██  ████████████████████████ | ████ |
| | ████████████████████ | ████ |
| | ██  ██  ██████████ | ████ |
| | ██  ██  ██████████████ | ████ |
| 18 | Q.   -- your understanding. | 11:34 |
| 19 | Yes, sorry. | 11:34 |
| 20 | A.   So it's a -- it's a code that allows us to | 11:34 |
| 21 | understand who may be shown or seen in a picture, in | 11:34 |
| 22 | a photo. | 11:34 |
| 23 | Q.   Okay.  And how does it work? | 11:34 |
| 24 | A.   Technically? | 11:34 |
| 25 | Q.   Yes. | 11:34 |

Page 124

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Through a combination of pattern matching | 11:34 |
| 2 | and other characteristics. | 11:34 |
| 3 | Q.    Combination of?  I just didn't understand | 11:34 |
| 4 | you.  Could you repeat it again. | 11:34 |
| 5 | A.    Pattern matching. | 11:34 |
| 6 | Q.    Pattern -- | 11:34 |
| 7 | A.    So we try to see patterns. | 11:34 |
| 8 | Q.    Pattern -- pattern matching? | 11:34 |
| 9 | A.    Yes. | 11:34 |
| 10 | Q.    Okay.  And what patterns?  It's looking at | 11:34 |
| 11 | people's faces for those patterns; is that correct? | 11:34 |
| 12 | A.    Yeah.  Would analyze certain | 11:34 |
| 13 | characteristics of your face and try to, you know, | 11:34 |
| 14 | create a matching with a pattern.  And then when we | 11:35 |
| 15 | see a similar pattern, we can associate this back to | 11:35 |
| 16 | you. | 11:35 |
| 17 | | |

Page 125

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    Do you -- what is Graph Search? | 11:35 |
| 2 | A.    Graph Search is our own version of | 11:35 |
| 3 | searching within the graph. | 11:35 |
| 4 | Q.    And what do you mean by graph? | 11:35 |
| 5 | A.    Everything at Facebook is the graph.  Any | 11:35 |
| 6 | entity, any connection that's affecting the part of | 11:35 |
| 7 | the graph. | 11:35 |
| 8 | Q.    Okay.  Is it a relational database? | 11:35 |
| 9 | A.    It's not a -- a database per se.  The | 11:35 |
| 10 | graph is -- I don't know.  It's a -- it's an | 11:35 |
| 11 | abstract thing that describes basically every single | 11:36 |
| 12 | connection and entity on -- on the platform. | 11:36 |
| 13 | Q.    Okay.  So if somebody is using Graph | 11:36 |
| 14 | Search, they are searching all over Facebook's | 11:36 |
| 15 | entire network; is that right? | 11:36 |
| 16 | A.    Sort of, because there may be exceptions | 11:36 |
| 17 | to that.  Like people that opt out from -- | 11:36 |
| 18 | Q.    Okay. | 11:36 |
| 19 | A.    -- from that they wouldn't have their | 11:36 |
| 20 | results in that. | 11:36 |
| 21 | Q.    If people opt out, are they still in the | 11:36 |
| 22 | graph? | 11:36 |
| 23 | A.    They can opt out from being discovered | 11:36 |
| 24 | through Graph Search. | 11:36 |
| 25 | Q.    But they're still in the graph? | 11:36 |

Page 126

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   But they are still in the graph, yes. | 11:36 |
| 2 | Q.   Is there any way to be removed from the | 11:36 |
| 3 | graph? | 11:36 |
| 4 | A.   You have to delete your Facebook account. | 11:36 |
| 5 | Q.   Okay.  And if I go to delete my Facebook | 11:36 |
| 6 | account, what is deleted?  Is all the data relating | 11:36 |
| 7 | to me deleted? | 11:36 |
| 8 | A.   Your interactions with public entities | 11:36 |
| 9 | will not be deleted. | 11:36 |
| 10 | Q.   So how do you identify all of the data to | 11:37 |
| 11 | delete? | 11:37 |
| 12 | A.   My -- my response would be anything that | 11:37 |
| 13 | lives in the "Download Your Information" file is | 11:37 |
| 14 | going to disappear. | 11:37 |
| 15 | Q.   What about all the rest of the data in the | 11:37 |
| 16 | graph? | 11:37 |
| 17 | A.   Again, the only exception here would be, | 11:37 |
| 18 | you know, like, your interactions with public | 11:37 |
| 19 | entities.  If you end -- ended up commenting on | 11:37 |
| 20 | United's page you didn't like their service, that | 11:37 |
| 21 | is, by default, public and is not personal | 11:37 |
| 22 | information.  And, to some extent, it belongs also | 11:37 |
| 23 | to United because you did that on their entity. | 11:37 |
| 24 | Q.   So -- | 11:37 |
| 25 | A.   But pretty much every -- everything else | 11:37 |

Page 127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | that is associated to you will be deleted. | 11:37 |
| 2 | Q. Okay. And when you say "is associated to | 11:37 |
| 3 | me," what do you mean? | 11:37 |
| 4 | A. Any kind of on-site or off-site activity. | 11:37 |
| 5 | Q. What about derived data? | 11:37 |
| 6 | A. The derived data, again, if we are talking | 11:38 |
| 7 | about location? Are we? | 11:38 |
| 8 | Q. No. Just in general. Derived data in | 11:38 |
| 9 | general. | 11:38 |
| 10 | A. Oh. In general? | 11:38 |
| 11 | Q. Yeah. | 11:38 |
| 12 | A. Derived data may be your interest like we | 11:38 |
| 13 | discussed before that may be inferred from you | 11:38 |
| 14 | liking Beyonce's page, that will show up in the DYI | 11:38 |
| 15 | file. So, yes, they will be deleted. | 11:38 |
| 16 | Q. Okay. You -- you referred earlier to data | 11:38 |
| 17 | that is not associated with individuals. Do you | 11:38 |
| 18 | recall that? | 11:38 |
| 19 | A. I need to play back my -- you know, like, | 11:38 |
| 20 | my sentence. Okay. What about it? | 11:38 |
| 21 | Q. You -- okay. So there is data that is not | 11:38 |
| 22 | associated with individual users; is that right? | 11:38 |
| 23 | A. Overall? | 11:38 |
| 24 | Q. Yes. | 11:38 |
| 25 | A. Yes, we -- we do have some information | 11:38 |

Page 128

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | that is not associated with specific users. | 11:38 |
| 2 | Q.   Right. | 11:38 |
| 3 | A.   Like United's page on Facebook is not | 11:38 |
| 4 | associated with specific users. | 11:38 |
| 5 | Q.   Okay.  We'll put a pin in this and we'll | 11:38 |
| 6 | come back to it.  Because I think really drilling in | 11:39 |
| 7 | on what Facebook can identify about me specifically | 11:39 |
| 8 | is at the heart of this deposition. | 11:39 |

Page 129

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 130

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 131

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1



Page 132

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 133

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 134

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
13          MS. WEAVER:  I'm sorry, my realtime feed      11:45
14   is not working.  Could you read that answer back,    11:45
15   please.                                              11:45
16                    (The record was read by the         11:46
17                    court reporter, as requested)       11:46
18   BY MS. WEAVER:                                       11:46
19      Q.   Okay.  Does every user get a user ID?        11:46
20   Facebook user ID?                                    11:46
21      A.   Everybody that has an account on the         11:46
22   Facebook platform will have a user ID.               11:46
23      Q.   Okay.  And are there -- does Facebook use    11:46
24   any other identifiers for individuals?               11:46
25
```

Page 135

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1

13          MS. WEAVER:  We should probably slow down        11:46

14     because we're making our court reporter's life        11:46

15     miserable.                                             11:46

16          THE WITNESS:  Sorry.  I will -- I will.           11:46

17          MS. WEAVER:  No.  It's my fault, too.             11:46

18     Q.   Okay.  What is the purpose of a user ID?          11:46

19          MS. STEIN:  Objection to form.                    11:46

20          THE WITNESS:  Are you talking specifically        11:47

21     about the Facebook user ID?                            11:47

22     BY MS. WEAVER:                                         11:47

23     Q.   Yes.                                              11:47

24     A.   It's to uniquely identify a user within           11:47

25     our own systems.                                       11:47

                                        Page 136

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   And among the data Facebook collects from | 11:47 |
| 2 | apps developed with its API is -- is also app users' | 11:47 |
| 3 | IP addresses, right? | 11:47 |
| 4 | A.   The SDK will pass (inaudible) -- | 11:47 |
| 5 | THE REPORTER:  I'm sorry.  One more time. | 11:47 |
| 6 | THE WITNESS:  Sorry.  I'm talking | 11:47 |
| 7 | technical terms here.  That's probably why. | 11:47 |
| 8 | The SDK will pass that information. | 11:47 |
| 9 | BY MS. WEAVER: | 11:47 |
| 10 | Q.   Okay.  So the platform that an app | 11:47 |
| 11 | developer uses to send data will also send a user's | 11:47 |
| 12 | IP address; is that correct? | 11:47 |
| 13 | MS. STEIN:  Objection to form. | 11:47 |
| 14 | THE WITNESS:  It depends. | 11:47 |
| 15 | BY MS. WEAVER: | 11:47 |
| 16 | Q.   Well, I was just trying to say -- instead | 11:47 |
| 17 | of saying SDK, I was trying to put what you said | 11:47 |
| 18 | into English, so... | 11:48 |
| 19 | A.   Yes, but there is nuance here.  Because it | 11:48 |
| 20 | may be the IP address of the app's back-end servers | 11:48 |
| 21 | or the IP address of the phone, depending on when | 11:48 |
| 22 | the call, the API call is initiated from. | 11:48 |
| 23 | Q.   Okay.  And the data Facebook collects from | 11:48 |
| 24 | apps also includes this unique user-specific | 11:48 |
| 25 | advertiser ID; is that right? | 11:48 |

Page 137

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   No. | 11:48 |
| 2 | Q.   It does not? | 11:48 |
| 3 | A.   That's not correct. | 11:48 |
| 4 | Q.   What is incorrect? | 11:48 |
| 5 | A.   It's a time you log in with an app using | 11:48 |
| 6 | Facebook, there is a unique identifier that is | 11:48 |
| 7 | mapped against your Facebook ID but is not the same. | 11:48 |
| 8 | And it's unique to the app. | 11:48 |
| 9 | Q.   Okay.  Fair enough. | 11:48 |
| 10 | And what would you call that? | 11:48 |
| 11 | A.   It's called app-scoped ID. | 11:48 |
| 12 | Q.   Okay.  That's an app-scoped ID. | 11:48 |
| 13 | And then are apps themselves also assigned | 11:48 |
| 14 | separate identifiers? | 11:49 |
| 15 | A.   Depends on their architecture. | 11:49 |
| 16 | Q.   Okay.  So some do and some don't; is that | 11:49 |
| 17 | right? | 11:49 |
| 18 | A.   Yeah.  For example, if an app only uses | 11:49 |
| 19 | Facebook as the only way to authenticate people, | 11:49 |
| 20 | they may as well use the app-scope ID as their only | 11:49 |
| 21 | identifier.  But if an app uses different | 11:49 |
| 22 | authentication systems from, like, Google or Apple, | 11:49 |
| 23 | or even email passwords, they would probably have an | 11:49 |
| 24 | additional identifier in order to capture all | 11:49 |
| 25 | different ways of authentication. | 11:49 |

Page 138

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Okay.  And when you say authenticate, what | 11:49 |
| 2 | do you mean? | 11:49 |
| 3 | A.   Apps that require you to create an | 11:49 |
| 4 | account, which allow you to create an account | 11:49 |
| 5 | upfront, and then every time you try to log in back | 11:49 |
| 6 | to that app will authenticate you based on that | 11:49 |
| 7 | account you have created. | 11:50 |
| 8 | Q.   Okay.  So is all data that's associated | 11:50 |
| 9 | with a user linked through that user's user ID? | 11:50 |
| 10 | MS. STEIN:  Objection to form. | 11:50 |
| 11 | THE WITNESS:  I'm sorry.  Is it in the | 11:50 |
| 12 | context of Facebook or third-party apps? | 11:50 |
| 13 | BY MS. WEAVER: | 11:50 |
| 14 | Q.   Let's do Facebook for now. | 11:50 |
| 15 | A.   And so all the data that we have been | 11:50 |
| 16 | talking about this morning, native data, behavioral | 11:50 |
| 17 | data, will be associated back to that Facebook user | 11:50 |
| 18 | ID. | 11:50 |
| 19 | Q.   I'm sorry, I just didn't hear what... | 11:50 |
| 20 | A.   The behavioral data -- | 11:50 |
| 21 | Q.   Would be associated -- yes.  Okay. | 11:50 |
| 22 | Perfect. | 11:50 |
| 23 | And how is that mapping accomplished?  Is | 11:50 |
| 24 | every data point that's pulled in assigned to the | 11:50 |
| 25 | user ID? | 11:50 |

Page 139

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. STEIN:  Objection to form. | 11:50 |
| 2 | THE WITNESS:  So in my -- so you use Word | 11:50 |
| 3 | With Friends and you have created an account using | 11:51 |
| 4 | Facebook.  The app developer will make an API call | 11:51 |
| 5 | the next time you try to open the app and | 11:51 |
| 6 | authenticate yourself.  The information that they | 11:51 |
| 7 | are going to be passing back to us is your app-scope | 11:51 |
| 8 | ID. | 11:51 |
| 9 | BY MS. WEAVER: | 11:51 |
| 10 | Q.   Uh-huh. | 11:51 |
| 11 | A.   And we are going to basically confirm to | 11:51 |
| 12 | them, that, that, yes, this is a user; that you have | 11:51 |
| 13 | previously authenticated successfully and they | 11:51 |
| 14 | should be logged in. | 11:51 |
| 15 | Q.   Okay. | 11:51 |
| 16 | A.   Now, what -- what we are getting from the | 11:51 |
| 17 | app developer is your app-scoped ID.  And what we | 11:51 |
| 18 | basically do is map it on our end with the Facebook | 11:51 |
| 19 | User ID. | 11:51 |
| 20 | Q.   Okay.  And what about appended data?  Is | 11:51 |
| 21 | that mapped -- information received about users from | 11:51 |
| 22 | third parties, what do you call that again? | 11:51 |
| 23 | Off-site?  No, that's behavioral. | 11:52 |
| 24 | A.   Yeah, so this is -- | 11:52 |
| 25 | Q.   Off-platform? | 11:52 |

Page 140

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Off-platform, yes. | 11:52 |
| 2 | Q.   So is off-platform data received about | 11:52 |
| 3 | users attached to a Facebook user ID as well? | 11:52 |
| 4 | A.   I'm trying to think.  No.  My | 11:52 |
| 5 | understanding is that that's not the kind of data | 11:52 |
| 6 | that would be associated with a specific user | 11:52 |
| 7 | profile because they are for the purposes of | 11:52 |
| 8 | creating ad campaigns. | 11:52 |
| 9 | Q.   Okay.  So what we were about to get into | 11:52 |
| 10 | here, and we can read the document, but I'll just | 11:52 |
| 11 | ask you.  At some point Facebook aggregates data, | 11:52 |
| 12 | right?  It receives data from advertisers or data | 11:52 |
| 13 | brokers or apps about their activities off-site, | 11:52 |
| 14 | correct? | 11:52 |
| 15 | A.   Yes. | 11:52 |
| 16 | Q.   And then it also possesses information | 11:52 |
| 17 | about users, correct? | 11:53 |
| 18 | A.   The possession is not really the right | 11:53 |
| 19 | term, but I understand, I think, what you are | 11:53 |
| 20 | saying. | 11:53 |
| 21 | Q.   Okay.  And so how does -- and Facebook | 11:53 |
| 22 | also aggregates this data?  It brings the data | 11:53 |
| 23 | together; is that correct? | 11:53 |
| 24 | A.   Yes. | 11:53 |
| 25 | MS. STEIN:  Objection to form. | 11:53 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              THE REPORTER:  I'm sorry, was there an      11:53

 2   objection?                                             11:53

 3              MS. STEIN:  I said "Objection to form."     11:53

 4              THE REPORTER:  Thank you.                   11:53

 5   BY MS. WEAVER:                                         11:53

 6        Q.   How does Facebook authenticate or match     11:53

 7   the data that it's receiving off-site to the data     11:53

 8   that it possesses on-site -- itself?                  11:53

 9        A.   Back to the previous example.  The ID of    11:53

10   that user will be mapped to a user ID.  If a third    11:53

11   party is sending information via SDK or a pixel and   11:53

12   that association will be, I guess -- let me see.      11:53

13   That's probably poor framing.                         11:54

14              The association will happen at the user ID 11:54

15   level.                                                11:54

16        Q.   Okay.                                       11:54

17              So with a user ID you could -- you should  11:54

18   be able to identify off-site data and data that      11:54

19   Facebook already possessed because of Facebook        11:54

20   activity, correct?                                    11:54

21              MS. STEIN:  Object to form.                11:54

22              THE WITNESS:  Yes, but that's not          11:54

23   different from what's available in your DYI file.     11:54

24              MS. WEAVER:  I'll move to strike.  That's  11:54

25   not what I'm asking.                                  11:54
```

Page 142

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q.    I'm just trying to understand how Facebook          11:54

2    aggregates data.                                          11:54

3         So what is a cross-app identifier?                   11:54

4    ████  ████████████████████████████████████████  ████

     █  ████  ██████████████████████████████████████  ████

     █  ████████████████████████████████████████              ████

7    A.    I think it refers to an identity that               11:55

8    people have across their family of apps between          11:55

9    Instagram, Facebook, Messenger, and WhatsApp.            11:55

10   Q.    Okay.  So do you know what a hashed UID             11:55

11   is?                                                       11:55

12   A.    In the context of audience network?                11:55

13   Sorry.  In audiences, as we discussed, advertisers        11:55

14   can upload hashed email addresses or hashed phone         11:55

15   numbers.  They will then be associated with specific      11:55

16   users on our platform to the extent that they have        11:55

17   that information provided to us.                          11:55

18   ████  ████████████████████████████████████████  ████

     █  ████████████████████                                   ████

     █  ████  ████                                             ████

     █  ████  ██████████████████████████████████████  ████

     █  ████████████████████████████████████████████  ████

     █  ████████████████████████████████████████████  ████

     █  ██████████████████                                     ████

     █  ████  ████                                             ████

                                           Page  143

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 144

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  ████████████████████████████████████████     ██████

   ██  ████████████████████████████████████                    11:57

3       Q.   Okay.  Is it true that the Facebook UID is      11:57

4  the same across all of the browsers and devices you         11:57

5  are logged into?                                            11:57

6       A.   For what is -- for what is related to            11:57

7  Facebook, yes, that's true.                                 11:57

8       Q.   Okay.  And then how does -- just to return       11:57

9  to our discussion of app-scoped IDs, how does               11:57

10  mapping between user ID and app-scoped ID                  11:57

11  accomplished?  Is there a table?                           11:57

12       A.   So under your user settings you can see --      11:57

13  your Facebook user settings you can see which apps         11:57

14  you have logged in, right?  So there is an app-scope      11:57

15  ID for each one of those apps.  And it should also        11:57

16  appear on your user profile.                              11:58

17            THE REPORTER:  I'm sorry, "also appear"...      11:58

18            THE WITNESS:  On the user profile.              11:58

19  BY MS. WEAVER:                                            11:58

20       Q.   I'm sorry, I've lost --                         11:58

21       A.   The user settings, whatever you want it.        11:58

22       Q.   Okay.  But it's not -- the DIY profile is       11:58

23  not doing the mapping.  Facebook is doing the             11:58

24  mapping.  Where is that done?                             11:58

25       A.   Facebook is doing the mapping ads and it's      11:58

                                               Page 145

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    captured in the DYI files.                          11:58
 2        Q.   Okay.  Forget the DIY file.  Where -- how  11:58
 3    does the mapping between the user ID and app-scoped 11:58
 4    ID happen?                                          11:58
 5            MS. STEIN:  Objection to form.              11:58
 6            THE WITNESS:  Which server?                 11:58
 7    BY MS. WEAVER:                                      11:58
 8        Q.   Sorry?                                     11:58
 9        A.   Which server?  I can't answer that         11:58
10    question.                                           11:58
11    ██    ████████████████████                    ███
      ██  ████████                                   ███
      ██    ██  ██████████████████████               ███
      ██  ████████████████                           ███
      ██    ██  ████████████████████                 ███
      ██  ████████████████████████                        11:58
17            MS. STEIN:  Objection to form and --        11:58
18    BY MS. WEAVER:                                      11:58
19        Q.   Is there --                                11:58
20            MS. STEIN:  -- it's really beyond the       11:58
21    scope of this deposition at this point.             11:58
22            MS. WEAVER:  Fully disagree.  We are        11:59
23    trying to figure out what data can be produced for  11:59
24    nine plaintiffs.                                    11:59
25            MS. STEIN:  You're asking about mapping of  11:59
```

Page 146

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | IDs. | 11:59 |
| 2 | MS. WEAVER:  Exactly.  I know that you | 11:59 |
| 3 | don't -- well, anyway. | 11:59 |
| 4 | Q.   So let's continue. | 11:59 |
| 5 | A.   It's -- don't worry. | 11:59 |
| 6 | Q.   Thank you. | 11:59 |
| 7 | A.   This is -- this is actually not very | 11:59 |
| 8 | complicated thing.  Because we are issuing the | 11:59 |
| 9 | app-scope ID, so we don't need to do that mapping. | 11:59 |
| 10 | Q.   I see.  Okay.  So it -- | 11:59 |
| 11 | A.   We do the mapping when -- the developer | 11:59 |
| 12 | uses that app-scope ID when they make an API call. | 11:59 |
| 13 | But we are the ones giving them the app-scope ID. | 11:59 |
| 14 | Q.   Okay.  All right.  Good.  Thank you. | 11:59 |
| 15 | Let me turn to one other -- I apologize, | 11:59 |
| 16 | but I want to just stick with this. | 12:00 |
| 17 | Okay.  So let's talk about hashing then | 12:00 |
| 18 | for a second.  Is it true that Facebook -- well, is | 12:00 |
| 19 | hashing a one-way function? | 12:00 |
| 20 | A.   I don't understand what you mean by that. | 12:00 |
| 21 | Q.   Hashing is a process of assigning a | 12:00 |
| 22 | particular piece of data to -- I think Facebook | 12:00 |
| 23 | uses -- what's it called? -- shaw 256, which is an | 12:00 |
| 24 | algorithm -- | 12:00 |
| 25 | A.   Yes. | 12:00 |

Page 147

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1     Q.    -- to assign, right?  Okay.                    12:00

2           So when Facebook hashes that data, is it      12:00

3     possible to reverse engineer and reidentify where   12:00

4     the data came from?                                  12:00

5     A.    I don't know.  I -- my technical knowledge     12:00

6     is not sufficient to answer that question.           12:00

7     Q.    Okay.  Can hash data be reidentified using     12:00

8     data stored on Facebook systems?                     12:00

9     A.    It's not meant to be, so I don't know.         12:00

10                                                         

                                                          

                                                          

                                                          

                                                          

                                                          

                                                         12:01

17    Q.    Okay.  Are you aware of a rule that data       12:01

18    is hashed after 90 days?                             12:01

19    A.    In what context?                               12:01

20    Q.    I -- never mind.  If you're not familiar       12:01

21    with it, it's fine.                                  12:01

22          Is a reidentifier assigned to hashed data?     12:01

23    A.    I think you may be referring -- I'm            12:01

24    double-guessing.  So give me an honest -- if I'm     12:01

25    going through an account -- I think you are          12:02

Page 148

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    referring to the deletion of an account and our       12:02
 2    ability to preserve the data for 90 days in this      12:02
 3    kind of semi state in case they change their minds.   12:02
 4    ███  ████████████████████████████████      ██████
      █  ██████████████                           ██████
      █  ███  ██████████████████████████████             12:02
 7    to people to change their minds within a certain     12:02
 8    time frame in case they want to restore in their     12:02
 9    Facebook account.                                     12:02
10    ███  ████████████████████████████████      ██████
      █  ██████████████████████████████████████  ██████
      █  ████████████                                      12:02
13            MS. STEIN:  Objection to form.               12:02
14            THE WITNESS:  I don't know.                   12:02
15            MS. WEAVER:  What was the objection?          12:02
16            MS. STEIN:  Objection to form.               12:02
17            MS. WEAVER:  What was the basis?              12:02
18            MS. STEIN:  I find your question confusing    12:02
19    and overbroad.                                        12:02
20            MS. WEAVER:  Okay.  Just wanted to make       12:02
21    sure you weren't coaching the witness.                12:02
22            MS. STEIN:  I'm saying "Objection to          12:02
23    form."                                                12:02
24            Lesley, please stop with your coaching        12:02
25    objections.  I've not made a lot of objections and    12:03
```

Page 149

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | they're almost always just objection to form. | 12:03 |
| 2 | BY MS. WEAVER: | 12:03 |
| 3 |     Q.   Are any outputs or products like interests | 12:03 |
| 4 | generated from hashed data? | 12:03 |
| 5 |     A.   No. | 12:03 |
| 6 |     Q.   Is information collected from hashed data? | 12:03 |
| 7 |     A.   The hashed data, at least in the context | 12:03 |
| 8 | of custom audiences we have been talking about, it's | 12:03 |
| 9 | not collected.  It's meant to allow us for analysis. | 12:03 |
| 10 |     Q.   For analysis on it; is that right? | 12:03 |
| 11 |     A.   To create a custom audience. | 12:03 |
| 12 |     Q.   Okay.  And that would include, for | 12:03 |
| 13 | example, interests -- is that right? -- an interest | 12:03 |
| 14 | category? | 12:03 |
| 15 |     A.   That depends on the advertiser.  The | 12:03 |
| 16 | advertiser may have the ability for themselves to | 12:03 |
| 17 | create the custom audience based on interests that | 12:03 |
| 18 | they have collected on their ends but not on our -- | 12:03 |
| 19 | on our end. | 12:03 |
| 20 |     Just to make sure that we understand what | 12:04 |
| 21 | we're talking about here.  If you're actively | 12:04 |
| 22 | listening on Beyonce on Spotify, and you're probably | 12:04 |
| 23 | not the only one, Spotify can create a custom | 12:04 |
| 24 | audience based on whoever listens to Beyonce's | 12:04 |
| 25 | tracks.  That would be the custom audience based on | 12:04 |

Page 150

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | any interest, but an interest that is specific to | 12:04 |
| 2 | Spotify. | 12:04 |
| 3 |     Q.   Okay. | 12:04 |
| 4 |     A.   But we have no access to that. | 12:04 |
| 5 |     Q.   In your example, is the -- Beyonce, is | 12:04 |
| 6 | that hashed data? | 12:04 |
| 7 |     A.   If Spotify decides to run a custom | 12:04 |
| 8 | audience campaign on Facebook for everybody that has | 12:04 |
| 9 | been listening to Beyonce on Spotify, it would come | 12:04 |
| 10 | in the form of hashed email addresses that we | 12:04 |
| 11 | wouldn't necessarily have the ability to identify | 12:04 |
| 12 | with specific users. | 12:04 |
| 13 |     Q.   Okay.  So for creating custom audiences | 12:04 |
| 14 | are hash -- is hashed data combined with nonhashed | 12:04 |
| 15 | or identified data such as the user profile? | 12:04 |
| 16 |     A.   No.  Why would we do that?  It doesn't | 12:05 |
| 17 | make sense.  I mean from -- not even from a | 12:05 |
| 18 | technical perspective.  But not even for the purpose | 12:05 |
| 19 | of running a successful campaign. | 12:05 |
| 20 |         Spotify wants to target specific users | 12:05 |
| 21 | that are already on their platform for the purpose | 12:05 |
| 22 | of retargeting.  So there is no point in us, you | 12:05 |
| 23 | know, like using any other data unless they | 12:05 |
| 24 | specified into their app -- ad campaign.  But that | 12:05 |
| 25 | would be broader than just the custom audience. | 12:05 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      Q.    Okay.  All right.  So back to -- we're      12:05

2    almost done with this, I hope.  And thank you for   12:05

3    your patience.  I know we're getting into lunchtime. 12:05



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 153

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 154

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



12:10

19      Q.   And do you recall how many current          12:10

20   Facebook users there are in the United States?       12:10

21      A.   Roughly, I think 200 million or something.   12:10

22      Q.   Okay.  And do you know how many users,       12:10

23   U.S. users, there have been from 2007 to the         12:10

24   present?                                             12:10

25      A.   No, I don't know.                            12:10

                                          Page 155

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. STEIN:  Objection.  Outside the scope. | 12:10 |
| 2 | BY MS. WEAVER: | 12:10 |
| 3 | Q.   Do you know where in general user data is | 12:10 |
| 4 | stored?  What's a UDB?  Are you familiar with the | 12:10 |
| 5 | term? | 12:10 |
| 6 | A.   No, but I suspect it means user database. | 12:10 |
| 7 | Q.   And what is it? | 12:10 |
| 8 | A.   I don't know. | 12:10 |
| 9 | Q.   Does Facebook have user databases? | 12:10 |
| 10 | A.   We have different databases where we store | 12:10 |
| 11 | information. | 12:10 |
| 12 | Q.   Okay.  Are you familiar with a database | 12:10 |
| 13 | called MySQL database? | 12:11 |
| 14 | A.   Yes. | 12:11 |
| 15 | Q.   What is it? | 12:11 |
| 16 | A.   It's a database that stores different | 12:11 |
| 17 | kinds of information. | 12:11 |
| 18 | Q.   What kind of information? | 12:11 |
| 19 | A.   Different entities from users to | 12:11 |
| 20 | businesses and so on. | 12:11 |
| 21 | Q.   Okay.  So what specific information about | 12:11 |
| 22 | users does MySQL database store? | 12:11 |
| 23 | A.   Anything related to your activity on the | 12:11 |
| 24 | platform is stored in MySQL. | 12:11 |
| 25 | Q.   And how many databases support MySQL | 12:11 |

Page 156

| | | |
|---|---|---|
| 1 | database?  Is it one database or is it many? | 12:11 |
| 2 | A.   So this is where I think where we are in | 12:11 |
| 3 | technical territory that I'm not well-placed to | 12:11 |
| 4 | respond.  We are talking about database | 12:11 |
| 5 | architecture, which is not my area of expertise. | 12:11 |
| 6 | Q.   Okay.  Do you recall assisting -- well, | 12:11 |
| 7 | strike that. | 12:12 |
| 8 | Do you know what an interrogatory is? | 12:12 |
| 9 | A.   Someone that has been interrogated. | 12:12 |
| 10 | Q.   Fair enough.  We received some written | 12:12 |
| 11 | responses about the location of user data, which is | 12:12 |
| 12 | at the square of this deposition.  And Facebook | 12:12 |
| 13 | identified a few databases where it says user data | 12:12 |
| 14 | is stored.  And I'm just asking if you are familiar | 12:12 |
| 15 | with them. | 12:12 |
| 16 | A.   I'm aware of MySQL.  I'm aware of Tao. | 12:12 |
| 17 | I'm aware of Hive databases where different kinds of | 12:12 |
| 18 | information is stored. | 12:12 |
| 19 | Q.   Okay.  I'm just trying to understand what | 12:12 |
| 20 | is stored in each of them. | 12:12 |
| 21 | A.   Well, I can't tell you at a high level. | 12:12 |
| 22 | MS. STEIN:  Lesley, he already testified | 12:12 |
| 23 | to this.  He told you that this is beyond the scope. | 12:12 |
| 24 | MS. WEAVER:  Please do not state for him. | 12:12 |
| 25 | Please provide me the information. | 12:12 |

Page 157

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. STEIN:  No, Lesley, Lesley, I'm | 12:12 |
| 2 | allowed to make my objection.  I'm not coaching the | 12:12 |
| 3 | witness. | 12:12 |
| 4 | MS. WEAVER:  And that's a fact? | 12:12 |
| 5 | MS. STEIN:  I'm about to tell you that the | 12:12 |
| 6 | interrogatories, the technical interrogatories, were | 12:12 |
| 7 | not verified by this witness. | 12:12 |
| 8 | MS. WEAVER:  Who were they verified by? | 12:13 |
| 9 | MS. STEIN:  The other individual who | 12:13 |
| 10 | verified the other portion of interrogatories. | 12:13 |
| 11 | BY MS. WEAVER: | 12:13 |
| 12 | Q.   So you're not prepared to testify about | 12:13 |
| 13 | the location of user data today; is that correct? | 12:13 |
| 14 | MS. STEIN:  That's an unfair | 12:13 |
| 15 | characterization.  He is not testifying about the | 12:13 |
| 16 | architecture of his book systems. | 12:13 |
| 17 | MS. WEAVER:  Well, we're going to have to | 12:13 |
| 18 | get somebody back for that. | 12:13 |
| 19 | Q.   So do you know what's contained in MySQL | 12:13 |
| 20 | database at all other than to say users' activities? | 12:13 |
| 21 | A.   Anything else related to the users | 12:13 |
| 22 | activities on Facebook should be in MySQL database. | 12:13 |
| 23 | Certain -- certain aspects of those activities, for | 12:13 |
| 24 | example, their connection with other people or with | 12:13 |
| 25 | other entities would probably be captured in Tao | 12:13 |

Page 158

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | database. | 12:13 |
| 2 | Q.   Okay.  And what is -- | 12:13 |
| 3 | A.   Their activities on Facebook or | 12:13 |
| 4 | off-platform or API calls will be captured on Hive. | 12:14 |
| 5 | That's at a very high level how our database are | 12:14 |
| 6 | architected. | 12:14 |
| 7 | Q.   And what is Hive? | 12:14 |
| 8 | A.   It's a database that captures logs. | 12:14 |
| 9 | Q.   And what are logs? | 12:14 |
| 10 | A.   It's an activity that you have taken on- | 12:14 |
| 11 | or off-platform made by a call that was made from an | 12:14 |
| 12 | app on your behalf.  The fact that you may have | 12:14 |
| 13 | liked someone's photo is something that lives in | 12:14 |
| 14 | Hive. | 12:14 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    ████████████████████                                    12:15

2         Q.   Going back to Tao, is it Tao or Dow?          12:15

3         A.   T-A-O.                                        12:15

4         Q.   Okay.  That stands for the associations       12:15

5    and optics server; is that right?                       12:15

6         A.   I don't remember what it stands for, but      12:15

7    it's definitely connections, database.                  12:15

8         Q.   Okay.  When you say it's the connections,     12:15

9    is it a relational database?                            12:15

10        A.   Yes.                                          12:15

11        Q.   Okay.                                         12:15

12        A.   It identifies people's connections with       12:15

13   friends and other entities on the platform.             12:16

14    ██   ████████████████████████████           ██

██   █████████████████████████                      ██

██   ██   █████████████████████████                 ██

██   █████████████                                  ██

██   ██   █████████████████████████                 ██

██   ████████████████████                           ██

██   ██   ██                                        12:16

21        Q.   What is ZippyDB?  Do you know?               12:16

22        A.   No, I don't really recall what -- ZippyDB.   12:16

23    ██   ███████████████████████████████          ██

██   ███████████████████████                        ██

██   ██   ██████████████                            ██

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
1                                                   12:17

10          MS. STEIN:  Object to form.              12:17

11          THE WITNESS:  Yes.                       12:17

12  BY MS. WEAVER:                                   12:17

13
```

Page 161



1    1         Q.   Okay.  I'm not asking a good question.    12:17

     2    Let me try again.  Sorry.                            12:17

2    3              For on-site activity that is contained in  12:18

23   23   BY MS. WEAVER:                                       12:19

24   24         Q.   Okay.  And so all of that is associated   12:19

25   25   with the Facebook user ID, correct?                 12:19

                                                          Page 162

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.   Because of activity that happens on the    12:19
 2   platform, yes.                                        12:19
 3        ████    ████████████████████████████            ████
     ██   ████████████████████████████████                ████
     ██   ██████████████████████████                      ████
     ██   ████    ████████████████████████                ████
     ██   ████████████████████████████                    12:19
 8        Q.   Like privacy controls should be in the DIY 12:19
 9   file?                                                 12:19
10        A.   If you change the privacy controls you     12:19
11   mean?                                                 12:19
12        Q.   I -- in general what the settings are,      12:19
13   sure, yeah.  Is that in the DIY file?                 12:19
14        A.   It's a very broad question because depends 12:19
15   whether -- are you talking about specifically a post 12:19
16   that you made and the privacy controls for that or   12:19
17   privacy controls for a specific attribute on your    12:19
18   user profile?                                         12:20
19        Q.   Either.  You can answer both questions.     12:20
20             MS. STEIN:  Objection to form.              12:20
21             THE WITNESS:  We -- we will know and the    12:20
22   DIY file should indicate whether your date of birth   12:20
23   is private information, i.e., only available to you   12:20
24   or available to your friends or available to the      12:20
25   public.  Because we need to be able to control the    12:20
```

Page 163

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    access to that piece of information whenever someone        12:20

2    requests that information.                                  12:20

3            And similarly --                                    12:20

4    BY MS. WEAVER:                                              12:20

5        Q.   I don't mean to cut you off, but let me            12:20

6    just ask because I don't think we -- we want to have        12:20

7    as little time together as possible in some sense,          12:20

8    so let me just ask you what I'm trying to get at.           12:20

9

                                                                 12:21

                                                            Page 164

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1
                                                      12:22
18        MS. STEIN:  Objection to form.            12:22
19   BY MS. WEAVER:                                   12:22
20        Q.   Let me ask it again.  Let me ask it again.  12:22
21   It was just unclean.                             12:22
22
```

Page 165

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1    ████████████████████████████                    ████

      ████████████████████████████████                ████

      █████████████████████████████████████████████   ████

      ████████████████████████████████████            ████

      █████████████████████████████████████           ████

      ███████████████████████████████████             ████

      ██████████████████████████████████████          ████

      ████████████████████████████████████████         ████

      ██████████████████████████████████████████       ████

      ████████████                                      ████

      ███   ████████████████████████████               ████

      ████████████████████                             ████

      ███   █████████████████████                       ████

      ███   ██████████                       12:23

15           MS. WEAVER:  The realtime is really not    12:23

16    working.  Could you please read his response back.  12:23

17                    (The record was read by the        12:24

18                    court reporter, as requested)       12:24

19    BY MS. WEAVER:                                      12:24

20        ███   ████████████████████████████            ████

      ███████████████████████████████████████           ████

      ███████████████████████                  12:25

23           MS. STEIN:  Object to form.                 12:25

24        ████████████████████████████████              ████

      ██████████████████████████████████████    12:25
```

Page 166

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1    the time, the last --                          12:25

 2    BY MS. WEAVER:                                  12:25

 3    ████  ██  ████████████████                      ████

 █    ██        ████████████████████████             ████

 █    ██████████████████████                          ████

 █    ██        ██  ████████████████████              ████

 █    ████████████████████████████████████            ████

 █    ████████████████████████████                    ████

 █    ██        ██  ████████████████████████          ████

 █    ██████████████████████████████████████          ████

 █    ██████████████                                  ████

 █    ██        ██  ████████████                       ████

 █    ██        ██  ██████████████████████████         ████

 █    ████████████████████████████████████            ████

 █    ████████████████████████████████                12:26

16          MS. STEIN:  Objection to form.  Beyond the  12:26

17    scope.                                          12:26

18          THE WITNESS:  I don't know.               12:26

19    BY MS. WEAVER:                                  12:26

20        Q.   Who would know?                        12:26

21        A.   Someone with technical knowledge of    12:26

22    databases.                                      12:26

23    ██        ██  ████████████████████████          ████

 █    ████████████████████████████████████████        ████

 █    ████████████                                     12:26
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1      ██      ████████████████████████              12:26

2         Q.   Do you have a name of somebody in data   12:26

3   science?                                            12:26

4         A.   No, I don't.                             12:26

5         Q.   Could you find that out?                 12:26

6         A.   Are you asking me or the counsel?        12:26

7         Q.   I'm asking Facebook, you.                12:26

8         A.   I could.                                 12:26

9         Q.   Yeah.                                     12:26

10         A.   But I need -- I need to understand exactly 12:26

11   the technical, you know, aspects of your question  12:26

12   and make sure --                                   12:26

13      ██   ██████████████████████████████   ████

██   ████████████████████████████████   ████

██   ██████████████████████████   ████

██      ██   ████████████████████████████████   ████

██   █████████████████████████████████   ████

██   ███████████████████████████████████   ████

██   █████████████████████████████           12:27

20         Q.   Do you know if that's occurred in this  12:27

21   case?                                              12:27

22            MS. STEIN:  I'm just going to object      12:27

23   because the witness just told you that he didn't   12:27

24   know one way or the other and is guessing, so...   12:27

25   BY MS. WEAVER:                                     12:27
```

Page 168

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q.   Do you know if that's occurred in this          12:27

2    case?                                                 12:27

3    A.   I don't know what information is available       12:27

4    for your plaintiffs.                                  12:27

5    Q.   Yeah.  Do you know what's been collected         12:27

6    by Facebook relating to our plaintiffs out of the     12:27

7    Hive database?                                        12:27

8    A.   I'm aware that they -- the DYI files of          12:27

9    those plaintiffs were made available to -- to the     12:27

10   plaintiffs.  Based on what you've told me, I assume   12:27

11   that's sufficient.                                    12:27

12   ████   ████████████████████████              ███

     ███   █████████████████                       ███

     ███   ████   ████████████████████████         ███

     ███   ██████████████████████████████████████  ███

     ███   ██████████████████████████████████      ███

     ███   ████████████████████████████████████    ███

     ███   ██████████████                          ███

     ███   ████   ██████████████████████████████████  ███

     ███   █████████████████████████████████████   ███

     ███   ██████                                  ███

     ███   ████   ████████████████████████████     ███

     ███   ██████████████████████████████          12:28

24           MS. STEIN:  I think now is a good time for    12:28

25   lunch.                                                12:28

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    MS. WEAVER:  That's fine.  We can go to          12:28

2    lunch and why don't we -- do you want a half an          12:28

3    hour?          12:28

4    THE REPORTER:  Do you want to go off the          12:28

5    record first?          12:28

6    MS. WEAVER:  Yes, let's go off the record.          12:28

7    THE VIDEOGRAPHER:  We are off the record          12:28

8    at          p.m.          12:28

9    (Whereupon a luncheon recess was had.)          12:28

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Tuesday, February 23, 2021 | 01:15 |
| 2 | 1:19 P.M. | 01:15 |
| 3 | | 01:15 |
| 4 | THE VIDEOGRAPHER:  We are on the record at | 01:19 |
| 5 | 1:19 p.m. | 01:19 |
| 6 | EXAMINATION (resumed) | 01:19 |
| 7 | BY MS. WEAVER: | 01:19 |
| 8 | Q.   Good afternoon, K.P.  Do you understand | 01:19 |
| 9 | that you are still under oath? | 01:19 |
| 10 | A.   Yes, I do.  Thank you. | 01:19 |
| 11 | Q.   Okay.  Let's change focus a little bit. | 01:19 |
| 12 | What is News Feed? | 01:20 |
| 13 | A.   The easiest way to describe the News Feed | 01:20 |
| 14 | is a collection of stories published by pages you | 01:20 |
| 15 | follow or your friends that you would see when you | 01:20 |
| 16 | go to Facebook or when you open the Android or iOS, | 01:20 |
| 17 | yeah. | 01:20 |
| 18 | Q.   And does an algorithm determine the | 01:20 |
| 19 | content that a user receives on News Feed? | 01:20 |
| 20 | A.   Yes, it does. | 01:20 |
| 21 | Q.   It's an intelligent algorithm, right; so | 01:20 |
| 22 | it's constantly learning? | 01:20 |
| 23 | A.   It's an intelligent algorithm because the | 01:20 |
| 24 | purpose of the feed is to be relevant to the user. | 01:20 |
| 25 | Q.   Right.  But -- so it's constantly | 01:20 |

Page 171

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | learning, right? | 01:20 |
| 2 | A.   Yes, it will -- | 01:20 |
| 3 | Q.   Changes -- | 01:20 |
| 4 | A.   It updates itself periodically based on | 01:20 |
| 5 | information around your response to some of the | 01:20 |
| 6 | stories that you see. | 01:20 |
| 7 | Q.   Okay.  And what are the inputs for the | 01:20 |
| 8 | algorithm so that it can be intelligent and learn? | 01:20 |
| 9 | MS. STEIN:  Objection to form. | 01:21 |
| 10 | THE WITNESS:  Your interactions with | 01:21 |
| 11 | content that shows up on the News Feed informs how | 01:21 |
| 12 | the algorithm trains itselves -- itself. | 01:21 |
| 13 | BY MS. WEAVER: | 01:21 |
| 14 | Q.   And so when a user clicks on a story or | 01:21 |
| 15 | engages with it, does Facebook record that activity? | 01:21 |
| 16 | A.   There is a record of that activity, yes. | 01:21 |
| 17 | Q.   Fair enough.  Thank you. | 01:21 |
| 18 | So is one objective of News Feed to | 01:21 |
| 19 | increase users interaction with varying courses of | 01:21 |
| 20 | content to learn what they are interested in? | 01:21 |
| 21 | A.   The main objective of the News Feed is to | 01:21 |
| 22 | keep you informed about the things that matter to | 01:21 |
| 23 | you. | 01:21 |
| 24 | Q.   Right.  And so how does News Feed | 01:21 |
| 25 | determine what matters to you? | 01:21 |

Page 172

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Based on your interactions with the | 01:21 |
| 2 | comments that show up there, it trains itself. | 01:21 |
| 3 | Q.   And is it true that the more the user | 01:22 |
| 4 | engages on the platform, the more accurate News Feed | 01:22 |
| 5 | will be? | 01:22 |
| 6 | A.   The level -- | 01:22 |
| 7 | MS. STEIN:  Object to form. | 01:22 |
| 8 | THE WITNESS:  It's very subjective. | 01:22 |
| 9 | BY MS. WEAVER: | 01:22 |
| 10 | Q.   Okay.  But isn't it true that the more | 01:22 |
| 11 | data points the algorithm has about users, the more | 01:22 |
| 12 | it can correctly gauge whether or not it is giving | 01:22 |
| 13 | users the content they want to see? | 01:22 |
| 14 | MS. STEIN:  Objection to form. | 01:22 |
| 15 | THE WITNESS:  Like I think I said, the | 01:22 |
| 16 | purpose of the News Feed is to connect you with | 01:22 |
| 17 | information that's relevant to you.  And so there is | 01:22 |
| 18 | no element of accuracy in that sense.  It all goes | 01:22 |
| 19 | back to relevance.  And relevance -- | 01:22 |
| 20 | BY MS. WEAVER: | 01:22 |
| 21 | Q.   Okay. | 01:22 |
| 22 | A.   -- is very subjective. | 01:22 |
| 23 | Q.   And what does relevance mean to you? | 01:22 |
| 24 | A.   Relevance is a way of being captured by | 01:22 |
| 25 | the kind of interactions you have with that piece of | 01:23 |

Page 173

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | content. | 01:23 |
| 2 |     Q.   Okay.  So when you say -- so Facebook is | 01:23 |
| 3 | trying to give me a News Feed that I will find | 01:23 |
| 4 | relevant; is that right? | 01:23 |
| 5 |     A.   Correct. | 01:23 |
| 6 |     Q.   And how does it find what is relevant to | 01:23 |
| 7 | me? | 01:23 |
| 8 |     A.   It's calculated in realtime, and based on | 01:23 |
| 9 | the interactions you're going to have with the | 01:23 |
| 10 | content that is displayed to you, we will determine | 01:23 |
| 11 | whether content from the same entity or of the same | 01:23 |
| 12 | kind would be relevant to you in a future instance. | 01:23 |
| 13 |     Q.   So is it Facebook's view that these data | 01:23 |
| 14 | sets are necessary to determine the relevancy of | 01:23 |
| 15 | these updates to users? | 01:23 |
| 16 |         MS. STEIN:  Objection to form.  Beyond the | 01:23 |
| 17 | scope. | 01:23 |
| 18 |         THE WITNESS:  Are you talking about | 01:23 |
| 19 | specific data sets? | 01:23 |
| 20 | BY MS. WEAVER: | 01:23 |
| 21 |     Q.   In general, just in general at a high | 01:23 |
| 22 | level. | 01:23 |
| 23 |         MS. STEIN:  Objection to form and beyond | 01:23 |
| 24 | the scope. | 01:23 |
| 25 |         THE WITNESS:  There are certain signals | 01:24 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | that we are going to be using to determine how the | 01:24 |
| 2 | future versions of the New Feeds would be relevant | 01:24 |
| 3 | to you. | 01:24 |
| 4 | BY MS. WEAVER: | 01:24 |
| 5 | Q.   Okay.  And what signals are those? | 01:24 |
| 6 | A.   Your affinity with the people that posting | 01:24 |
| 7 | those stories, so the business entity that is | 01:24 |
| 8 | posting those stories to your previous response to | 01:24 |
| 9 | content of the same type. | 01:24 |
| 10 | Q.   And all of this is data that Facebook | 01:24 |
| 11 | collects about users while they're on and off the | 01:24 |
| 12 | platform, correct? | 01:24 |
| 13 | A.   We record -- | 01:24 |
| 14 | MS. STEIN:  Objection to form. | 01:24 |
| 15 | THE WITNESS:  We record the interactions | 01:24 |
| 16 | you have with that platform to inform the future | 01:24 |
| 17 | (indecipherable) -- | 01:24 |
| 18 | THE REPORTER:  I'm sorry, I did not -- I'm | 01:24 |
| 19 | sorry, I did not understand. | 01:24 |
| 20 | BY MS. WEAVER: | 01:24 |
| 21 | Q.   In order to inform?  I did not hear the | 01:24 |
| 22 | last part. | 01:24 |
| 23 | A.   A future -- a future instance of the News | 01:24 |
| 24 | Feed that will remain relevant to you. | 01:24 |
| 25 | Q.   Is there a standard set of documents or | 01:24 |

Page 175

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   manuals that describes how News Feed operates?       01:24

 2        A.   There is nothing like that.               01:25

 3        Q.   Okay.  Does Facebook use internal training  01:25

 4   manuals when a new hire comes on or do they point   01:25

 5   just everybody to the public website?               01:25

 6        A.   For what purposes?                         01:25

 7        Q.   For -- let's say you hire an engineer who  01:25

 8   is going to work on the algorithm for News Feed.    01:25

 9        A.   I haven't been through that training so I  01:25

10   don't have firsthand experience.                    01:25

11        Q.   Okay.  When you started at Facebook did    01:25

12   they give you a training manual?                    01:25

13        A.   What do you mean, like a book printed?     01:25

14        Q.   Yeah, or online, some kind of way to       01:25

15   acclimate you to how Facebook operates.             01:25

16        A.   Well, they're -- my obligations to         01:25

17   Facebook are documented in different formats.  In   01:25

18   2012 I did not get a paper copy of that, but I was  01:25

19   given links to trainings that I had to undertake to 01:25

20   verify my understanding of the company's policies.  01:25

21        Q.   Okay.  So we discussed this earlier in the 01:26

22   morning.  But apps on Facebook's platform send      01:26

23   information about users of those apps to Facebook,  01:26

24   right?                                              01:26

25        A.   Apps on Facebook platform send information 01:26
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | about those users back to Facebook, is that the | 01:26 |
| 2 | question? | 01:26 |
| 3 |      Q.   Yes. | 01:26 |
| 4 |         MS. STEIN:  Objection to form. | 01:26 |
| 5 |         THE WITNESS:  They send certain pieces of | 01:26 |
| 6 | information about those users, the users' activities | 01:26 |
| 7 | to those -- | 01:26 |
| 8 | BY MS. WEAVER: | 01:26 |
| 9 |      Q.   Right.  Is it a true statement that app | 01:26 |
| 10 | developers share data with Facebook through the | 01:26 |
| 11 | Facebook software development kit? | 01:26 |
| 12 |      A.   Different kinds of data, but yes. | 01:27 |
| 13 |      Q.   Yes?  The answer is "yes," isn't it? | 01:27 |
| 14 |      A.   Yes. | 01:27 |
| 15 |      Q.   Okay.  So I'm just going to say, apps on | 01:27 |
| 16 | Facebook's platform send information about users of | 01:27 |
| 17 | those apps to Facebook, correct? | 01:27 |
| 18 |         MS. STEIN:  Objection.  The witness | 01:27 |
| 19 | clarified the statement for you. | 01:27 |
| 20 |         THE WITNESS:  Yeah, an app developer that | 01:27 |
| 21 | uses the SDK will send different pieces of | 01:27 |
| 22 | information related to that user or the activity of | 01:27 |
| 23 | that user to that third-party app. | 01:27 |
| 24 | BY MS. WEAVER: | 01:27 |
| 25 |      Q.   Okay.  Are you familiar with action | 01:27 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | importers? | 01:27 |
| 2 | A.   Action importers?  Vaguely. | 01:27 |
| 3 | Q.   Okay.  What's your recollection? | 01:27 |
| 4 | MS. STEIN:  Objection to form. | 01:27 |
| 5 | THE WITNESS:  I -- I don't want to answer | 01:27 |
| 6 | because I don't know in what context. | 01:27 |
| 7 | MS. WEAVER:  Are you instructing him not | 01:27 |
| 8 | to answer? | 01:27 |
| 9 | MS. STEIN:  Did you hear me instruct him | 01:28 |
| 10 | not to answer, Lesley? | 01:28 |
| 11 | MS. WEAVER:  Okay. | 01:28 |
| 12 | MS. STEIN:  The witness is testifying in | 01:28 |
| 13 | response to your question.  Why don't you listen to | 01:28 |
| 14 | him. | 01:28 |
| 15 | MS. WEAVER:  I'd rather listen to him for | 01:28 |
| 16 | sure. | 01:28 |
| 17 | Q.   What are -- what is action importers, | 01:28 |
| 18 | K.P., please? | 01:28 |
| 19 | A.   I need you to provide me a little bit more | 01:28 |
| 20 | context. | 01:28 |
| 21 | Q.   What is your understanding of what action | 01:28 |
| 22 | importers is? | 01:28 |
| 23 | A.   It was a feature, by my recollection, of | 01:28 |
| 24 | the platform that allowed the third party to do an | 01:28 |
| 25 | import of all the actions taken by a user on a | 01:28 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | third-party app. | 01:28 |
| 2 | Q.   When you say -- | 01:28 |
| 3 | MS. WEAVER:  Could you repeat the last | 01:28 |
| 4 | part?  Could you read back his response?  Realtime | 01:28 |
| 5 | is still not working. | 01:28 |
| 6 | (The record was read by the | 01:28 |
| 7 | court reporter, as requested) | 01:28 |
| 8 | BY MS. WEAVER: | 01:28 |
| 9 | Q.   Okay.  And when did action importers | 01:29 |
| 10 | function?  Was it during the 2012 to 2017 time | 01:29 |
| 11 | frame? | 01:29 |
| 12 | A.   I don't know. | 01:29 |
| 13 | Q.   Who would know? | 01:29 |
| 14 | A.   I don't know who would know. | 01:29 |
| 15 | Q.   Can you, as testifying on behalf of | 01:29 |
| 16 | Facebook today, say that you do not know who was | 01:29 |
| 17 | involved with action importers? | 01:29 |
| 18 | A.   No, because my understanding of that | 01:29 |
| 19 | feature -- my recollection, again, being before | 01:29 |
| 20 | my -- you know, my date of arrival at Facebook. | 01:29 |
| 21 | ████  ████████████████████████ | ████ |
| ██ | ██████████████████████████ | ████ |
| ██ | ███████████████████████████ | 01:29 |
| 24 | MS. STEIN:  Objection to form. | 01:29 |
| 25 | ████████████████████ | 01:29 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1   ████████████████████████████████████████      ███████
 █   ██████████████████████████████████████████    ███████
 █   ███████████████████████████████████████████   ███████
 █   ███████████████████████████████             01:30
 5   BY MS. WEAVER:                                01:30
 6        ██   ████████████████████████████████    ███████
 █   █████████████████                              ███████
 █        ██   ██████████████████████████████████  ███████
 █   ██████████████████████████████████████████    ███████
 █   ████████████████████████████████████████      ███████
 █   ███████████████████████████████████████████   ███████
 █   ██████████████████████████                     ███████
 █        ██   ██████████████████████████████       ███████
 █   ████████████████████████████████████████      ███████
 █   █████████████████████████████████              ███████
 █   █████████████████████████                    01:30
17          MS. STEIN:  Objection.                 01:30
18   BY MS. WEAVER:                                 01:30
19        ██   ████████████████████████████████     ███████
 █   ████████████████████                          01:30
21          MS. STEIN:  Objection to form.         01:30
22        █████████████████████████████████████     ███████
 █   █████████████████████████████████████████     ███████
 █   ██████████████████████████████████████████    ███████
 █   ███████████████████████████                   01:30
```

Page 180

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   BY MS. WEAVER:                                      01:30

 2       ███  █████████████████████████████             01:30

 3           MS. STEIN:  Lesley -- Lesley, let the       01:31

 4   witness finish his answer.                          01:31

 5           MS. WEAVER:  He's not answering the right    01:31

 6   question.                                           01:31

 7           MS. STEIN:  He's answering -- just don't     01:31

 8   cut off the witness when he's speaking.             01:31

 9   BY MS. WEAVER:                                      01:31

10       ███  █████████████████████████████████   ████

 █   ████████████████████████████               ████

 █           █████████████████████████████████████   ████

 █   ████████████████████████████████████████   ████

 █   ██████████████████████████████████████████   ████

 █           ████████████████████████████████   ████

 █   ██████████████████████████████████████████        01:31

17           MS. STEIN:  Objection to form.              01:31

18           █████████████████████████████████   ████

 █   ███████████████████████████████████████████   ████

 █   ██████████████████████████████████████████   ████

 █           █████████████████████████████████████   ████

 █   █████████████████████████████████████   ████

 █   ███████████████████████████████████████████   ████

 █   ███████████████████████████████████████████   ████

 █   ███████████████████████████████████████        01:31
```

Page 181

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    ██████████████████████████████████████        ███████

█     ████████████████████                          01:31

3    BY MS. WEAVER:                                  01:31

4        Q.   Did Facebook provide user data to the  01:31

5    apps?                                           01:31

6        A.   To the extent that user log in with    01:32

7    Facebook, yes.                                  01:32

8         ██   ████████████████████████████████     ███████

█    ██████████████████████████████████             ███████

█    ████████████████████████████████████████       ███████

█    ████████████████████████████████████████       ███████

█    ████████████████████████████████████████       ███████

█    ████████████████████                            01:32

14           MS. STEIN:  Objection to form.          01:32

15            ██████████████████████████████         ███████

█    ████████████████████████████████████████████   ███████

█    ████████████████████████████                    01:32

18   BY MS. WEAVER:                                  01:32

19        ██   ████████████████████████████████      ███████

█    ████████████████████████████████████████        ███████

█    ████████████████████████                         01:32

22           MS. STEIN:  Objection to form.          01:32

23            ██████████████████████████████         ███████

█    ████████████████████████████████████████        ███████

█    ████████████████████████████████████████        ███████
```

Page 182

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



01:33

18    BY MS. WEAVER:                                     01:33

19          Q.   And what was the Apps Events tool?      01:33

20          A.   I'm sorry, which one?                    01:33

21          Q.   App Events.                              01:33

22          A.   So App Event is an equivalent of a       01:33

23    Facebook pixel.  Facebook pixel --                  01:33

24          Q.   Okay.                                    01:34

25          A.   -- works on the web and App Event works in   01:34

Page 183

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    native iOS or Android app.                          01:34

2        Q.   And are you aware, then, of a custom        01:34

3    analytics -- well, are you aware of something called 01:34

4    Custom Events?                                       01:34

5        A.   Yes, I'm aware.                             01:34

6        Q.   What is that?                               01:34

7        A.   And so Facebook provided a predetermined    01:34

8    list of events that any developer could use as an    01:34

9    off-the-shelf solution, events like an app in store, 01:34

10   events like app registration, things like that,      01:34

11   where -- predetermined list.  I think there were 18  01:34

12   of them.                                             01:34

13          A custom app event is an event that an app    01:34

14   developer can create to track specific activity to   01:34

15   that app that is for that app and that app only.  So 01:34

16   a custom event for a Nike app would be a run, which  01:34

17   is an event specific to this app.  Or for Spotify it 01:34

18   would be a track to listen to which is specific to   01:34

19   Spotify.                                             01:34

20       Q.   And then does Facebook use the information  01:35

21   it collects to provide analytics like aggregate its  01:35

22   statistics and insights for its advertisers and      01:35

23   third-party partners?                                01:35

24       A.   To the extent that -- sorry.                01:35

25          THE REPORTER:  Was there an objection?        01:35
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. STEIN:  I said "Objection to form." | 01:35 |
| 2 | THE REPORTER:  Thank you. | 01:35 |
| 3 | THE WITNESS:  The purposes of us providing | 01:35 |
| 4 | this capability was to provide aggregated data back | 01:35 |
| 5 | to the third-party developers about usage patterns | 01:35 |
| 6 | on their apps. | 01:35 |
| 7 | BY MS. WEAVER: | 01:35 |
| 8 | Q.   And -- strike that. | 01:35 |
| 9 | And did Facebook often obtain sensitive | 01:35 |
| 10 | data from app developers? | 01:35 |
| 11 | MS. STEIN:  Objection to form. | 01:35 |
| 12 | THE WITNESS:  It depends.  What do you | 01:35 |
| 13 | mean by "sensitive data"? | 01:35 |
| 14 | BY MS. WEAVER: | 01:35 |
| 15 | Q.   Did Facebook receive information about | 01:35 |
| 16 | diseases, medical conditions and injuries, or sexual | 01:35 |
| 17 | and reproductive health from apps? | 01:36 |
| 18 | A.   By design, the app events, they do not | 01:36 |
| 19 | allow, you know, a third-party developer to be | 01:36 |
| 20 | passing that information. | 01:36 |
| 21 | Q.   Okay.  Well, I don't know what you mean by | 01:36 |
| 22 | "by design," but the question is pretty simple. | 01:36 |
| 23 | Is it your testimony today that Facebook | 01:36 |
| 24 | did not obtain data relating to diseases, medical | 01:36 |
| 25 | conditions and injuries, or sexual and reproductive | 01:36 |

Page 185

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   health from apps?                                    01:36
 2        A.   Well, it's a very broad question, so I'm   01:36
 3   trying to respond to the best of my ability.         01:36
 4             So by design, access to that information   01:36
 5   was not available.  However, if the app developer    01:36
 6   decided to tell us about an event that was a custom  01:36
 7   event that may have disclosed some of that           01:36
 8   information, we would have discussed it.             01:36
 9        Q.   As you sit here today, do you know whether 01:36
10   or not Facebook received data that related to        01:36
11   diseases, medical conditions and injuries, or sexual 01:37
12   and reproductive health?                             01:37
13        A.   There was an incident we had a year or two 01:37
14   ago with period tracker apps that were sending app   01:37
15   events, custom app events, around the cycle of a     01:37
16   certain user.  If that's what you mean by this       01:37
17   category, then the answer is yes.                    01:37
18        Q.   Okay.  And did those categories also       01:37
19   include mental health and psychological states,      01:37
20   types of medical devices and health trackers,        01:37
21   medical treatments, body specifications, bodily      01:37
22   activities and biological cycles, among other        01:37
23   things?                                              01:37
24        A.   I don't know, but I don't think it's       01:37
25   possible to do that.                                 01:37
```

Page 186

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Were you part of the team that | 01:37 |
| 2 | investigated this? | 01:37 |
| 3 | A.   No. | 01:37 |
| 4 | Q.   Who was? | 01:37 |
| 5 | A.   I don't know. | 01:37 |
| 6 | Q.   Okay.  When Facebook did receive the | 01:37 |
| 7 | sensitive information such as diseases, medical | 01:37 |
| 8 | conditions, injuries, sexual and reproductive | 01:37 |
| 9 | health, did that -- where did that data go? | 01:37 |
| 10 | MS. STEIN:  Objection to form. | 01:37 |
| 11 | THE WITNESS:  You're making an assumption | 01:38 |
| 12 | that we did receive.  I only referred to a specific | 01:38 |
| 13 | incident around period trackers. | 01:38 |
| 14 | BY MS. WEAVER: | 01:38 |
| 15 | Q.   Okay.  So in that instance, where did -- | 01:38 |
| 16 | A.   I can only respond to that. | 01:38 |
| 17 | Q.   Okay.  In that instance, where did the | 01:38 |
| 18 | data go? | 01:38 |
| 19 | A.   The data were aggregated and anonymized. | 01:38 |
| 20 | Q.   Okay.  But Facebook still retains it then; | 01:38 |
| 21 | is that right? | 01:38 |
| 22 | A.   No, since we have deleted the data.  They | 01:38 |
| 23 | shouldn't have arrived -- | 01:38 |
| 24 | Q.   How could you delete it if it was | 01:38 |
| 25 | anonymized? | 01:38 |

Page 187

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1        A.   What do you mean?                           01:38

2        Q.   You just said "We deleted the data," but    01:38

3   you described that data as anonymized.  So how did    01:38

4   you delete it if it was anonymized?  How did you      01:38

5   identify which data to delete?                        01:38

6        A.   This is a technical question.  But you can  01:38

7   imagine an app event that basically suggests period   01:38

8   start.  It's somewhere locked, so I can -- not me      01:38

9   personally, but we can identify probably app events   01:38

10  that are associated with a specific action that       01:38

11  shouldn't have been recorded that we will then have   01:38

12  to delete.  And we would work with the developer to   01:39

13  remove this kind of custom events from being sent.    01:39

14

21       Q.   When was that data deleted?                 01:39

22       A.   I don't have an exact recollection of       01:39

23  that.                                                 01:39

24       Q.   Was it in 2018?                             01:39

25       A.   It may be 2018, 2019, around that time      01:39
```

Page 188

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | frame. | 01:39 |
| 2 | Q.   Who made the decision to delete it? | 01:39 |
| 3 | A.   I don't know.  I wasn't involved in this | 01:39 |
| 4 | investigation. | 01:39 |
| 5 | Q.   Once that data is deleted can it be | 01:39 |
| 6 | recovered? | 01:39 |
| 7 | MS. STEIN:  Objection.  Outside the scope | 01:39 |
| 8 | of this witness's knowledge. | 01:39 |
| 9 | THE WITNESS:  I don't know. | 01:39 |
| 10 | BY MS. WEAVER: | 01:39 |
| 11 | Q.   But you knew that it was deleted; is that | 01:40 |
| 12 | right? | 01:40 |
| 13 | A.   I know that's -- the data has been | 01:40 |
| 14 | deleted, yes. | 01:40 |
| 15 | Q.   How did you come to know that? | 01:40 |
| 16 | A.   Because I was part of the communications | 01:40 |
| 17 | to the developer audience about the specific | 01:40 |
| 18 | instance. | 01:40 |
| 19 | Q.   And which developer are you thinking of? | 01:40 |
| 20 | A.   There were a number of period tracker apps | 01:40 |
| 21 | that have to comply. | 01:40 |
| 22 | Q.   Can you identify some of them? | 01:40 |
| 23 | A.   Not at the top of my mind. | 01:40 |
| 24 | Q.   Flow Health? | 01:40 |
| 25 | A.   I don't recall that. | 01:40 |

Page 189

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q. How would you refresh your recollection? | 01:40 |
| 2 | A. I would have to look at the entire | 01:40 |
| 3 | universe of apps that have been in scope that have | 01:40 |
| 4 | been sending this kind of events. | 01:40 |
| 5 | Q. Why did Facebook delete the data? | 01:40 |
| 6 | A. Because that's not the kind of data | 01:40 |
| 7 | that's -- we want to have access to. | 01:40 |
| 8 | Q. Were any regulators involved? | 01:40 |
| 9 | A. For that, I don't know. | 01:41 |
| 10 | Q. Okay. When Facebook receives information | 01:41 |
| 11 | about an individual from an app, does Facebook | 01:41 |
| 12 | associate that information with other information | 01:41 |
| 13 | Facebook has collected about that individual through | 01:41 |
| 14 | the Facebook user ID? | 01:41 |
| 15 | MS. STEIN: Objection to form. | 01:41 |
| 16 | THE WITNESS: Again, depends what kind of | 01:41 |
| 17 | data we're talking about here. | 01:41 |
| 18 | BY MS. WEAVER: | 01:41 |
| 19 | Q. Let's say sensitive health data like | 01:41 |
| 20 | diseases, medical, injuries, sexual or reproductive | 01:41 |
| 21 | health. | 01:41 |
| 22 | A. If the data has been communicated to us | 01:41 |
| 23 | through app events, no. | 01:41 |
| 24 | Q. Okay. When is the answer yes? When does | 01:41 |
| 25 | it connect it to other users? | 01:41 |

Page 190

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   If the user basically establishes that | 01:41 |
| 2 | they are suffering from a certain disease and they | 01:41 |
| 3 | decide to post on Facebook and tell their friends | 01:41 |
| 4 | about it, then yes. | 01:41 |
| 5 | Q.   So even if the post is to three of my | 01:41 |
| 6 | friends, Facebook will collect that data; is that | 01:41 |
| 7 | right? | 01:41 |
| 8 | MS. STEIN:  Objection to form. | 01:42 |
| 9 | THE WITNESS:  Well, you're posting it to | 01:42 |
| 10 | Facebook, so, yes, Facebook will have an | 01:42 |
| 11 | understanding of that. | 01:42 |
| 12 | BY MS. WEAVER: | 01:42 |
| 13 | Q.   Even if it's to a restricted audience? | 01:42 |
| 14 | A.   That audience will have access to that | 01:42 |
| 15 | data, but someone has to host the data in order to | 01:42 |
| 16 | be able to sell it to that audience, and we provide | 01:42 |
| 17 | the service. | 01:42 |
| 18 | Q.   And then does Facebook -- I'm sorry. | 01:42 |
| 19 | A.   Sorry.  We provide the service, so yes. | 01:42 |
| 20 | Q.   So then does Facebook then use that | 01:42 |
| 21 | information to create custom target audiences for | 01:42 |
| 22 | advertisers? | 01:42 |
| 23 | A.   Are you talking broadly or about the | 01:42 |
| 24 | specific things? | 01:42 |
| 25 | Q.   Both. | 01:42 |

Page 191

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. STEIN:  Objection to form. | 01:42 |
| 2 | THE WITNESS:  Like -- it's a very broad | 01:42 |
| 3 | question.  So I would say that if we know that you | 01:42 |
| 4 | use -- if you play Candy Crush Saga 10 times a day, | 01:42 |
| 5 | that may inform our targeting for U.S. potential | 01:42 |
| 6 | audience for games of this same genre. | 01:42 |
| 7 | If we have expressed -- or if we establish | 01:43 |
| 8 | your affinity to Beyonce, again like I described | 01:43 |
| 9 | before, we would use that information to target you | 01:43 |
| 10 | with like R&B music. | 01:43 |
| 11 | BY MS. WEAVER: | 01:43 |
| 12 | Q.   So let's talk about custom audiences for a | 01:43 |
| 13 | moment, though, please. | 01:43 |
| 14 | So if I posted to three friends that I had | 01:43 |
| 15 | a medical condition and Facebook collects that | 01:43 |
| 16 | information, does Facebook use that information to | 01:43 |
| 17 | create a custom audience for advertisers if they are | 01:43 |
| 18 | seeking something about a medical condition? | 01:43 |
| 19 | A.   No, that's not how it works. | 01:43 |
| 20 | Q.   Why doesn't it work that way?  Why does it | 01:43 |
| 21 | only work for Beyonce but not a medical condition? | 01:43 |
| 22 | MS. STEIN:  Objection to form. | 01:43 |
| 23 | THE WITNESS:  Because a custom audience is | 01:43 |
| 24 | an advertisement product that reengages with | 01:43 |
| 25 | customers of an existing business. | 01:43 |

Page 192

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    BY MS. WEAVER:                                        01:43

 2        Q.   Right.  I understand what it is.             01:43

 3             So I'm a business and I come to Facebook     01:43

 4    and I say "I want -- I want to target people with     01:43

 5    this medical condition."  Does Facebook provide       01:44

 6    that -- that custom audience?                          01:44

 7        A.   No, that's not how it works.  If you          01:44

 8    really want to use custom audience, you need to        01:44

 9    provide with hashed email addresses or information     01:44

10    about the users that you have diagnosed to have        01:44

11    suffered from that disease.                             01:44

12        Q.   Could you repeat the last part of the         01:44

13    sentence?  I just didn't understand.                    01:44

14        A.   So let's say you use a medical app for the    01:44

15    sake of the argument.                                   01:44

16        Q.   Okay.                                          01:44

17        A.   And you have a thousand users that went       01:44

18    through a questionnaire and they have been diagnosed   01:44

19    with, say, alcoholism.  That's probably a bad          01:44

20    example because I don't think -- but, anyhow, let's    01:44

21    use that.                                               01:44

22             Then to the extent that you can identify      01:44

23    those users because they have created an account       01:44

24    with that medical app using their email address or     01:44

25    the phone number, you can upload the email addresses   01:44
```

Page 193

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | of those thousand users hashed to us and then we are | 01:44 |
| 2 | going to create the custom audience ad campaign | 01:45 |
| 3 | trying to find those 1,000 users on Facebook. | 01:45 |
| 4 | To the extent that they exist, they will | 01:45 |
| 5 | see an ad.  But, again, the ad will compete with | 01:45 |
| 6 | other ads, like we discussed before.  But it will be | 01:45 |
| 7 | a database provided by the third party hashed, so | 01:45 |
| 8 | anonymized with specific people that have been | 01:45 |
| 9 | diagnosed to suffer from a certain disease. | 01:45 |
| 10 | Q.   Okay.  Let's talk for a moment about APIs. | 01:45 |
| 11 | We touched upon them this morning.  Do you recall | 01:45 |
| 12 | that? | 01:45 |
| 13 | A.   Yes. | 01:45 |
| 14 | Q.   You're aware at some point that -- well, | 01:45 |
| 15 | there was more than one version of Graph API over | 01:45 |
| 16 | time; is that right? | 01:45 |
| 17 | A.   Yes, Version 1 of the API, it's being -- | 01:45 |
| 18 | running from 2008 or 2009 until 2000 -- May 1st, | 01:45 |
| 19 | 2015. | 01:46 |
| 20 | Q.   It was accessible until April 2015 or | 01:46 |
| 21 | May 2015? | 01:46 |
| 22 | A.   I think it's May 1st, but it may be... | 01:46 |
| 23 | MS. WEAVER:  You should amend your rog | 01:46 |
| 24 | responses, Deb. | 01:46 |
| 25 | Q.   And by "accessible," that means third | 01:46 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | parties could access data through it; is that | 01:46 |
| 2 | correct? | 01:46 |
| 3 | A.   Yes. | 01:46 |
| 4 | Q.   Okay.  And then Graph API Version 2 came | 01:46 |
| 5 | into being at some point; is that right? | 01:46 |
| 6 | A.   Graph API V2 was launched on April 30, | 01:46 |
| 7 | 2014. | 01:46 |
| 8 | Q.   Okay.  And it was accessible until | 01:46 |
| 9 | May 2020; is that right? | 01:46 |
| 10 | A.   The Version 2?  I'm sorry. | 01:46 |
| 11 | Q.   Version 2, yeah. | 01:46 |
| 12 | A.   Are you talking about Version 2? | 01:46 |
| 13 | Q.   Yes, Version 2 was accessible until | 01:46 |
| 14 | May 2020; is that correct? | 01:46 |
| 15 | A.   I need to check because I don't know when | 01:46 |
| 16 | the last version -- the last Version 2 of the API | 01:47 |
| 17 | was final, approved.  Because we have Version 3 | 01:47 |
| 18 | right now. | 01:47 |
| 19 | Q.   Okay.  Right.  And Version 3 came into | 01:47 |
| 20 | effect May 2018; is that right? | 01:47 |
| 21 | A.   That seems about right. | 01:47 |
| 22 | Q.   Okay.  And that was accessible -- it will | 01:47 |
| 23 | be accessible through August 2021; is that correct? | 01:47 |
| 24 | A.   So let me take a step back to explain a | 01:47 |
| 25 | little bit how the replacement process works because | 01:47 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | I think that may be helpful. | 01:47 |
| 2 | An API is rolled out at a specific point | 01:47 |
| 3 | in time and the version of this API is successful | 01:47 |
| 4 | for the next 2-plus years.  Each time we release a | 01:47 |
| 5 | new version of the API, that means that the previous | 01:47 |
| 6 | would be accessible for the period of time between | 01:47 |
| 7 | that plus-2 years.  So the lifetime of the version | 01:47 |
| 8 | of the API would be 2-plus years, more or less two | 01:47 |
| 9 | to three months on top of the 2-year mark. | 01:47 |
| 10 | But we have versions that start from 2.0 | 01:47 |
| 11 | to 2.1 all the way to 2.10 or 11, if I'm not | 01:48 |
| 12 | mistaken.  And then we switch to Version 3.  And | 01:48 |
| 13 | Version 3.0 will be available for 2-plus years, | 01:48 |
| 14 | Version 3.1 would be available for 2-plus years, so | 01:48 |
| 15 | on and so on. | 01:48 |
| 16 | Q.   Understood.  You're familiar with the | 01:48 |
| 17 | phrase "Public APIs"? | 01:48 |
| 18 | A.   Yes. | 01:48 |
| 19 | Q.   What is the difference between a public | 01:48 |
| 20 | API and a private API? | 01:48 |
| 21 | A.   A public API is an API that is available | 01:48 |
| 22 | in general availability, meaning that the | 01:48 |
| 23 | third-party developer that wants to access this API | 01:48 |
| 24 | has to go through the process, we call it app | 01:48 |
| 25 | review, where the developer will specifically ask | 01:48 |

Page 196

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | for permission to access that API, and once | 01:48 |
| 2 | approved, will be able to access that API. | 01:48 |
| 3 | Q.   When was the process of app review first | 01:48 |
| 4 | implemented? | 01:48 |
| 5 | A.   The introduction of Version 2 of the API | 01:48 |
| 6 | coincided with the introduction of the app review | 01:48 |
| 7 | process. | 01:49 |
| 8 | Q.   So April of 2015? | 01:49 |
| 9 | A.   April 30, 2014. | 01:49 |
| 10 | Q.   2014? | 01:49 |
| 11 | A.   Yes. | 01:49 |
| 12 | ███  ████████████████████ | ███ |
| | ████ | ███ |
| | ███  █████████████████████ | ███ |
| | ████████████████████████ | ███ |
| | ███████████████ | 01:49 |
| 17 | Q.   Okay.  And we discussed this before.  But | 01:49 |
| 18 | what is a capability? | 01:49 |
| 19 | A.   A capability is a way to provide access | 01:49 |
| 20 | control to a private API. | 01:49 |
| 21 | Q.   And what is a permission? | 01:49 |
| 22 | A.   A permission is a way to gain user's | 01:49 |
| 23 | consent for access to specific data points. | 01:49 |
| 24 | Q.   Okay.  And what was -- at a very high | 01:49 |
| 25 | level, what was the difference between Graph API | 01:49 |

Page 197

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   Versions 1.0 and 2.0?                                 01:50

2        A.   At the very high level?                     01:50

3        Q.   Yes.                                        01:50

4        A.   Access to friends' information was          01:50

5   deprecated with introduction of Version 2 of the     01:50

6   API.                                                  01:50

7        Q.   And what do you mean by "friends'           01:50

8   information was deprecated"?                          01:50

9        A.   And so in Version 1 of the API a user       01:50

10   could log in with a third-party app and allow access 01:50

11   to this app to their friends' photos or their        01:50

12   friends' birthdays, things like that.                01:50

13            With Version 2 of the API, this feature     01:50

14   was completely deprecated.  So a user could only     01:50

15   allow a third-party app to have access to their own  01:50

16   birthday information and their own photos.           01:50

17

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1      ██    ████████████████████████        ███
        ██   ████████████████                 ███
        ██    ██    ██                         ███
        ██    ████████████████████████████     ███
        ██   ████████                          ███
        ██   ████████████████                  ███
        ██    ██   ███████████████████████████ ███
        ██    ██   ██████████████████           01:51
```

 9          Q.    What was Post-Search API?                  01:51

10          A.    An API that allowed a third party to       01:51

11    search for public posts on Facebook.                   01:51

12          Q.    Did Post-Search API enable analytics via   01:51

13    listening tracking mentions of keywords and hashtags   01:51

14    over time?                                             01:51

15          MS. STEIN:  Objection to form.                   01:51

16          THE WITNESS:  I want to understand a             01:52

17    little bit better.  Do you have a specific example     01:52

18    in mind?                                               01:52

19    BY MS. WEAVER:                                         01:52

20          Q.    I don't.  I was just asking the question.  01:52

21          MS. STEIN:  Objection to form.                   01:52

22          THE WITNESS:  I'm having hard time               01:52

23    understanding what sort of analytics you are looking   01:52

24    for.                                                   01:52

25    BY MS. WEAVER:                                         01:52

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        Q.    Do you know what sentiment analysis is?      01:52

 2        A.    Yes.                                         01:52

 3        Q.    What is it?                                  01:52

 4        A.    Normally brands do certain analysis to       01:52

 5   understand how their brands are perceived in social     01:52

 6   media.                                                  01:52

 7        Q.    And so did Post-Search API enable            01:52

 8   sentiment analysis?                                     01:52

 9        A.    I don't think that would be valuable, so     01:52

10   my answer is no.                                        01:52

11        Q.    You're answering it didn't do that because   01:52

12   you don't think it would be valuable?                   01:52

13              MS. STEIN:  Objection.  Argumentative.       01:52

14   BY MS. WEAVER:                                          01:52

15        Q.    I don't understand the answer.               01:52

16        A.    Post-Search on account of public posts.      01:52

17   And those are not necessarily posts that a brand        01:52

18   would use to inform or to understand the sentiment      01:52

19   of people against that brand.                           01:53

20        Q.    Okay.  So your testimony is that             01:53

21   Post-Search API did not allow sentiment analysis or     01:53

22   enable sentiment analysis?                              01:53

23        A.    I'm saying that the public posts may not     01:53

24   be relevant for a brand to establish sentiment          01:53

25   analysis.                                               01:53
```

Page 200

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1          Q.    Did Facebook deprecate Post-Search API?        01:53

2          A.    Yes.                                           01:53

3                MS. STEIN:  Objection.  Outside the scope.     01:53

4                THE WITNESS:  Yes, we did.                     01:53

5     BY MS. WEAVER:                                            01:53

6     ████   ████████                                           ███

      █      ████   █████████████████████████                  ███

      █      █████                                              ███

      █      ████   ████████████████████████                   ███

      █      ██████████                                         ███

      █      ████   █████████████████████                       ███

      █      ██████████████████████████████                     ███

      █      █████████████████████████████                      ███

      █      ████████                                           ███

15         Q.    So during the transition period from Graph     01:53

16    API Version 1.0 to 2.0, did Facebook inform certain       01:53

17    third parties that they would no longer access            01:54

18    friends' data?                                            01:54

19                MS. STEIN:  Objection to form.  And           01:54

20    objection to scope.                                       01:54

21                This witness is not our corporate designee    01:54

22    on communications with third parties.  He's the          01:54

23    designee on the topic ordered by Judge Corley.  So       01:54

24    he's not authorized to testify about communications       01:54

25    that you are asking him about.                            01:54
```

Page 201

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. WEAVER:  I don't think you understand. | 01:54 |
| 2 | This is what data was shared with third parties. | 01:54 |
| 3 | Are you declining to allow the witness to testify | 01:54 |
| 4 | what was shared with third parties? | 01:54 |
| 5 | MS. STEIN:  You're asking him about | 01:54 |
| 6 | communications with developers.  Do you want -- | 01:54 |
| 7 | MS. WEAVER:  No, I'm not.  I'm asking | 01:54 |
| 8 | about what was -- I'm leading into what data was | 01:54 |
| 9 | shared with whitelisted third parties and others. | 01:54 |
| 10 | Are you going to impede -- continue to | 01:54 |
| 11 | impede this deposition? | 01:54 |
| 12 | MS. STEIN:  Okay.  First of all, I'm not | 01:54 |
| 13 | impeding.  Second of all, that's not what you asked. | 01:54 |
| 14 | So if you'd like to ask what got shared with | 01:54 |
| 15 | whitelisted apps -- | 01:54 |
| 16 | MS. WEAVER:  Would you please read back my | 01:54 |
| 17 | question. | 01:54 |
| 18 | (The record was read by the | 01:55 |
| 19 | court reporter, as requested) | 01:55 |
| 20 | BY MS. WEAVER: | 01:55 |
| 21 | Q.  Please answer. | 01:55 |
| 22 | A.  So on April 30, 2014, we hold our annual | 01:55 |
| 23 | conference called F8, and that's when we announced | 01:55 |
| 24 | introduction of Version 2 of the API.  So the | 01:55 |
| 25 | communications were broad about the deprecation of | 01:55 |

Page 202

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | the Version 1 of the API and the deprecation of | 01:55 |
| 2 | access to any of the friends' data. | 01:55 |
| 3 | Q.   And so some third parties were allowed to | 01:55 |
| 4 | continue to access friends' data while others were | 01:55 |
| 5 | not; is that correct? | 01:55 |
| 6 | A.   After the deprecation of the Version 1 of | 01:55 |
| 7 | the API, the only integrations that maintain their | 01:55 |
| 8 | access to friends' data were device integrations. | 01:55 |
| 9 | Q.   And what is the phrase "whitelisting"? | 01:55 |
| 10 | A.   I would decline the opportunity to lecture | 01:56 |
| 11 | as on the use of white or blacklists right now, but | 01:56 |
| 12 | I would use the term "allow lists" for the purposes | 01:56 |
| 13 | of being politically correct from now on. | 01:56 |
| 14 | You can use whatever term you would use, | 01:56 |
| 15 | but I will use the term "allow lists" to refer to | 01:56 |
| 16 | anything that you may use the term "whitelist." | 01:56 |
| 17 | Q.   Okay.  During the time period 2012 to | 01:56 |
| 18 | 2017, did Facebook use the term "whitelist"? | 01:56 |
| 19 | A.   Yes. | 01:56 |
| 20 | Q.   Did you? | 01:56 |
| 21 | A.   Yes. | 01:56 |
| 22 | Q.   Okay.  And you said that Facebook only | 01:56 |
| 23 | whitelisted integration partners a moment ago, | 01:56 |
| 24 | didn't you? | 01:56 |
| 25 | A.   I didn't use that term in relation to | 01:56 |

Page 203

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | device integrations. | 01:56 |
| 2 | Q.   Okay. | 01:56 |
| 3 | A.   We can read back my statement, but I'm | 01:56 |
| 4 | pretty certain that I said the only integrations | 01:56 |
| 5 | that could access to friends' information were | 01:56 |
| 6 | device integrations. | 01:56 |
| 7 | Q.   Okay.  Was Oracle a device integrator? | 01:56 |
| 8 | A.   I don't think so. | 01:57 |
| 9 | Q.   Was Salesforce? | 01:57 |
| 10 | A.   I don't think so. | 01:57 |
| 11 | Q.   Did Facebook whitelist Oracle and | 01:57 |
| 12 | Salesforce? | 01:57 |
| 13 | A.   If they have ever whitelisted Salesforce | 01:57 |
| 14 | and Oracle, is that the question? | 01:57 |
| 15 | Q.   Did they at the time period that we're | 01:57 |
| 16 | talking about whitelist Oracle and Salesforce? | 01:57 |
| 17 | MS. STEIN:  Lesley, this is out of scope. | 01:57 |
| 18 | This deposition -- | 01:57 |
| 19 | MS. WEAVER:  It's not.  I'm trying to | 01:57 |
| 20 | understand what companies had access to user data. | 01:57 |
| 21 | MS. STEIN:  No, friends of friends' data. | 01:57 |
| 22 | MS. WEAVER:  No. | 01:57 |
| 23 | MS. STEIN:  It's Salesforce -- stop.  This | 01:57 |
| 24 | deposition -- | 01:57 |
| 25 | MS. WEAVER:  You can instruct him -- you | 01:57 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | can instruct him not to answer or object to form, or | 01:57 |
| 2 | we can call Judge Corley. | 01:57 |
| 3 |      MS. STEIN:  We can call Judge Corley if | 01:57 |
| 4 | you want because you're asking merits questions. | 01:57 |
| 5 | This deposition is supposed to be about what data | 01:57 |
| 6 | Facebook collected and which of that data was | 01:57 |
| 7 | accessible or shareable, and so far -- | 01:57 |
| 8 |      MS. WEAVER:  Exactly.  Maybe you don't | 01:58 |
| 9 | understand, Deb, but this goes to the heart of | 01:58 |
| 10 | whether Salesforce and Oracle were receiving | 01:58 |
| 11 | friends' data and when.  That is what I am trying to | 01:58 |
| 12 | figure out. | 01:58 |
| 13 |      MS. STEIN:  No, that's not what -- that is | 01:58 |
| 14 | not what this deposition is about.  This witness is | 01:58 |
| 15 | not testifying about specific apps. | 01:58 |
| 16 |      He's talking about what types and | 01:58 |
| 17 | categories of data got collected and what could have | 01:58 |
| 18 | been -- could have been accessed or shared, right? | 01:58 |
| 19 | This is supposed to be high level, not about, you | 01:58 |
| 20 | know, who did what when. | 01:58 |
| 21 |      MS. WEAVER:  Are you done? | 01:58 |
| 22 |      MS. STEIN:  Yes. | 01:58 |
| 23 | BY MS. WEAVER: | 01:58 |
| 24 |    Q.   Is Salesforce a device integrator? | 01:58 |
| 25 |    A.   It's not. | 01:58 |

Page 205

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        Q.   Thank you.                                  01:58

 2             So your testimony that only device          01:58

 3   integrators were whitelisted would not include        01:58

 4   Salesforce or Oracle, would it?                        01:58

 5             MS. STEIN:  Objection to form.              01:58

 6             THE WITNESS:  I think your use of the term  01:58

 7   "whitelist" in relation to user data is problematic   01:58

 8   here.  I'm not trying to criticize you.  I'm trying   01:58

 9   to understand exactly what you mean.  Because         01:59

10   whitelist is an access control or an allow list to    01:59

11   an API.  That API doesn't necessarily need to allow   01:59

12   access to user data.  It may be pages data.  Your     01:59

13   assumption is that --                                  01:59

14             THE REPORTER:  It may be what data?         01:59

15             THE WITNESS:  Pages data.                   01:59

16             MS. WEAVER:  Okay.  So let's move on.  The  01:59

17   documents will speak for themselves.  We can move     01:59

18   on.                                                    01:59

19             THE WITNESS:  No, I want to continue my     01:59

20   response if that's okay, because I want to make sure  01:59

21   that it's covered.  I have the --                      01:59

22   BY MS. WEAVER:                                         01:59

23        Q.   I don't think what you're saying is         01:59

24   accurate, and I'd like to just move on, if you don't  01:59

25   mind.                                                  01:59
```

Page 206

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.   I have reasons to believe that my response    01:59
 2   is 100 percent accurate.                                 01:59
 3        Q.   Okay.  I understand.                           01:59
 4             Were there third parties who were using        01:59
 5   friends' data for research also whitelisted?            01:59
 6             MS. STEIN:  If the witness has something       01:59
 7   that he needs to clarify now, we should do that now.    01:59
 8   I'm sure Judge Corley would want his testimony to be    01:59
 9   clarified in something that he's comfortable with.       01:59
10   BY MS. WEAVER:                                           01:59
11        Q.   What would you like to add?                    01:59
12             MS. STEIN:  If there's a clarification you     02:00
13   need to make, let's make sure we have a clear            02:00
14   record.                                                  02:00
15             THE WITNESS:  Yes.  So I would like to         02:00
16   suggest that there are three -- three things that        02:00
17   are -- is worth clarifying here.                         02:00
18             We have the data.  We have APIs that allow     02:00
19   access to the data.  And then we have access             02:00
20   controls to that data.  Right?  What you're talking      02:00
21   about here is the allow list also known as               02:00
22   whitelist.                                               02:00
23             That is very broad because it --               02:00
24   BY MS. WEAVER:                                           02:00
25        Q.   I was talking about friends' permissions,      02:00
```

Page 207

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | right? | 02:00 |
| 2 | A.   Yes, but to the extent that the allow list | 02:00 |
| 3 | you're talking about are for APIs that are not | 02:00 |
| 4 | exposing this kind of data, then I would argue that | 02:00 |
| 5 | the question about Salesforce or Oracle is | 02:00 |
| 6 | irrelevant. | 02:00 |
| 7 | Q.   Okay.  You can argue that. | 02:00 |
| 8 | Back to my question.  Were there -- other | 02:00 |
| 9 | third parties who were using friends' data for | 02:00 |
| 10 | research, were they also whitelisted? | 02:00 |
| 11 | MS. STEIN:  Objection to form. | 02:00 |
| 12 | THE WITNESS:  I have no recollection of | 02:01 |
| 13 | any other device integrations being access -- or | 02:01 |
| 14 | having access to friends' information beyond May 1, | 02:01 |
| 15 | 2015. | 02:01 |
| 16 | BY MS. WEAVER: | 02:01 |
| 17 | Q.   Right.  But between the time when they | 02:01 |
| 18 | announced the transition and before 2015, were there | 02:01 |
| 19 | researchers who were whitelisted and given access to | 02:01 |
| 20 | friends' data? | 02:01 |
| 21 | A.   They didn't need to be whitelisted because | 02:01 |
| 22 | that was also publically available through Version 1 | 02:01 |
| 23 | of the API. | 02:01 |
| 24 | Q.   Did that include Cambridge Analytica? | 02:01 |
| 25 | A.   Cambridge Analytica was never a developer | 02:01 |

Page 208

| | | |
|---|---|---|
| 1 | on the platform. | 02:01 |
| 2 | Q.   Okay.  But I was just asking about | 02:01 |
| 3 | researchers.  Do you recall that? | 02:01 |
| 4 | A.   If -- | 02:01 |
| 5 | Q.   Let me ask the question again.  So were | 02:01 |
| 6 | there certain third parties who were given friends' | 02:01 |
| 7 | data for research who were also whitelisted? | 02:01 |
| 8 | MS. STEIN:  Objection to form. | 02:01 |
| 9 | THE WITNESS:  Access to public APIs | 02:01 |
| 10 | doesn't come through a whitelist.  The access | 02:01 |
| 11 | control that we use for access to public APIs is a | 02:01 |
| 12 | process called app review. | 02:02 |
| 13 | Now, back in 2014, before even the app | 02:02 |
| 14 | review was introduced, any third party could access | 02:02 |
| 15 | anything from the -- that was made available through | 02:02 |
| 16 | Version 1 of the API with the appropriate user's | 02:02 |
| 17 | consent. | 02:02 |
| 18 | There were a number of researchers, and I | 02:02 |
| 19 | think I can double-guess if -- the name of the | 02:02 |
| 20 | specific researcher that you have in mind that's | 02:02 |
| 21 | built an application on our platform on the Version | 02:02 |
| 22 | 1 of the API, they requested and gained permission | 02:02 |
| 23 | from users to access their data and their friends' | 02:02 |
| 24 | data, and that's the end of it. | 02:02 |
| 25 | | |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   BY MS. WEAVER:                                        02:02

 2        Q.   Okay.  Are you familiar with Crimson        02:02

 3   Hexagon?                                              02:02

 4        A.   I have an understanding of the company but  02:02

 5   nothing more than that.                               02:02

 6        Q.   Do you know who does have information        02:02

 7   about what Crimson Hexagon accessed?                  02:02

 8        A.   No.                                          02:02

 9             MS. STEIN:  Objection to form.               02:02

10   BY MS. WEAVER:                                         02:02

11
```

Page 210

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 211

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1   ████        ██████████████████████████        ██████

    █      ██████████████                          ██████

    █      ██      ███████████████████████         ██████

    █   ████████████████████████████████           ██████

    █       ████   █████████████████████           ██████

    █       ████   ██████████████████████████      02:04

7          Q.   Okay.  What is Groups API?          02:04

8          A.   It's an API that allows third parties to   02:04

9   help group administrators manage the groups from   02:04

10  posting contents to moderating or allowing members   02:04

11  to join the group and so on.                   02:05

12         Q.   When was it launched?               02:05

13         A.   I don't remember the date it was launched.   02:05

14         Q.   Was it between 2012 to 2017?        02:05

15         A.   Most likely, yes.                   02:05

16         Q.   And then it was -- does Groups API still   02:05

17  exist?                                          02:05

18         A.   I think that the Groups API was fully   02:05

19  deprecated in May 2018.                         02:05

20         Q.   And you were part of that decision, right?   02:05

21         A.   Yes.                                02:05

22         Q.   And why was it deprecated?          02:05

23         A.   So I can answer from my perspective why   02:05

24  it's since been deprecated.                     02:05

25              MS. STEIN:  If you don't know from the   02:05
```

Page 212

```
 1   company's perspective, then I'm going to direct the      02:05
 2   witness not to answer.                                   02:05
 3          MS. WEAVER:  I'm sorry, you're going to           02:05
 4   have to be deposed again.                                02:05
 5      Q.   Do you have an understanding on behalf           02:05
 6   company as to why Groups API was deprecated?             02:05
 7      A.   There are certain groups that are not            02:06
 8   public that want to make sure that third parties         02:06
 9   couldn't access its members.                             02:06
10          THE REPORTER:  I'm sorry, "Make sure              02:06
11   that"...                                                 02:06
12          THE WITNESS:  -- third parties couldn't           02:06
13   access its members.                                      02:06
14   BY MS. WEAVER:                                           02:06
15      Q.   Okay.  What is Live Video API?                   02:06
16      A.   It's an API that allows a third party to         02:06
17   broadcast live video on Facebook.                        02:06
18      Q.   I'm sorry, I didn't hear that either.            02:06
19      A.   Sorry.  It's an API -- I have changed my         02:06
20   headset.                                                 02:06
21      Q.   I know, I know.  It's me.  I'm kind of           02:06
22   deaf.                                                    02:06
23      A.   So it's an API that allows a third party         02:06
24   to broadcast live video on Facebook.                    02:06
25      Q.   Okay.  And when did it first come into           02:06
```

Page 213

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | being? | 02:06 |
| 2 | A.   2015, 2016, maybe. | 02:06 |
| 3 | Q.   And what is an endpoint? | 02:06 |
| 4 | A.   An endpoint in reference to an API? | 02:06 |
| 5 | Q.   Uh-huh. | 02:07 |
| 6 | A.   It's -- how should I explain it? | 02:07 |
| 7 | Q.   I can try, but don't make fun of me. | 02:07 |
| 8 | A.   Please. | 02:07 |
| 9 | Q.   Is an endpoint an object that is accessed | 02:07 |
| 10 | through an API? | 02:07 |
| 11 | A.   I -- I don't know that the endpoint refers | 02:07 |
| 12 | to the -- the object.  It refers to, I think, the | 02:07 |
| 13 | structure of the API.  But it may be used in both | 02:07 |
| 14 | ways. | 02:07 |
| 15 | Q.   Okay.  And then what is a data field with | 02:07 |
| 16 | regard to API? | 02:07 |
| 17 | A.   Okay.  So let me try to explain maybe in a | 02:07 |
| 18 | different way. | 02:07 |
| 19 | So there are objects and fields. | 02:07 |
| 20 | Q.   Uh-huh. | 02:07 |
| 21 | A.   So an object can be, let's say, the Crate | 02:07 |
| 22 | & Barrel Facebook page.  A field can be the picture | 02:07 |
| 23 | that is being used on that page. | 02:07 |
| 24 | So when you make an API call against that | 02:07 |
| 25 | object where you specify the object ID, you can add | 02:07 |

Page 214

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | perimeters in the API request about what is it the | 02:08 |
| 2 | API needs to respond to.  And you can respond that | 02:08 |
| 3 | in the field section.  You can specify that you want | 02:08 |
| 4 | the name of the page potentially, the profile | 02:08 |
| 5 | picture of the page, or you can specify if you want | 02:08 |
| 6 | posts made against that page. | 02:08 |
| 7 | Q.   Thank you.  That's very helpful. | 02:08 |
| 8 | So is an object an endpoint in that | 02:08 |
| 9 | description?  Are those the same? | 02:08 |
| 10 | A.   An endpoint from the API perspective, you | 02:08 |
| 11 | know, the API that requests access to the page, | 02:08 |
| 12 | there's just an API that requests access to, I don't | 02:08 |
| 13 | know, a friends connection.  That would be a | 02:08 |
| 14 | different endpoint. | 02:08 |
| 15 | Q.   I see.  Okay.  So are you aware of an | 02:08 |
| 16 | endpoint Get Event ID Live Videos? | 02:08 |
| 17 | A.   No. | 02:08 |
| 18 | Q.   Okay.  You prepared Facebook's | 02:08 |
| 19 | interrogatory responses relating to capabilities and | 02:09 |
| 20 | permissions, right? | 02:09 |
| 21 | MS. STEIN:  Objection.  Form. | 02:09 |
| 22 | BY MS. WEAVER: | 02:09 |
| 23 | Q.   Was that you or was that someone else? | 02:09 |
| 24 | A.   I'm supported the counsels in, you know, | 02:09 |
| 25 | like this response, but I don't recall exactly | 02:09 |

Page 215

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | what's that. | 02:09 |
| 2 |     Q.   I know.  I know.  And it's cute and you | 02:09 |
| 3 | worked very hard and we're grateful. | 02:09 |
| 4 |       MS. STEIN:  I'll add I believe that was | 02:09 |
| 5 | the other individual who verified part of it. | 02:09 |
| 6 |       MS. WEAVER:  Okay.  So we're going to have | 02:09 |
| 7 | talk to him.  So I'll try -- | 02:09 |
| 8 |     Q.   So do you know -- let me just try this | 02:09 |
| 9 | then.  For the call Get Event ID Live Video, do you | 02:09 |
| 10 | know what it was seeking and what it obtained? | 02:09 |
| 11 |     A.   I think it's associated with the live | 02:09 |
| 12 | event, most likely, the live video that is being | 02:09 |
| 13 | broadcast.  But I don't understand exactly the event | 02:09 |
| 14 | in connection with the live video. | 02:09 |
| 15 |     Q.   Okay.  Do you know the difference between | 02:10 |
| 16 | "get" and "post"? | 02:10 |
| 17 |     A.   Yes. | 02:10 |
| 18 |     Q.   What's the difference? | 02:10 |
| 19 |     A.   The one is a read and the other is a | 02:10 |
| 20 | write. | 02:10 |
| 21 |     Q.   Okay.  And so do you know what Get User ID | 02:10 |
| 22 | Live Videos is? | 02:10 |
| 23 |     A.   No, I don't -- I don't know the exact | 02:10 |
| 24 | endpoints. | 02:10 |
| 25 |     Q.   Okay.  Do you know what Post User ID Live | 02:10 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    Videos is?                                            02:10

2         A.   I don't, no.                                02:10

3         Q.   Okay.  Does Facebook know which third       02:10

4    parties had access to Live Video API?                02:10

5         A.   Historically, yes.                          02:10

6         Q.   Okay.  What's Pages API?                    02:10

7         A.   I think I used that example earlier, so it  02:10

8    may be repetitive.  It's an API that allows and pays  02:11

9    administrator to manage the page with -- which may    02:11

10   includes -- manage the pages, which may include       02:11

11   posting content on the page, updating the profile     02:11

12   picture on the page, responding to comments made by   02:11

13   users on the page, and so on.                         02:11

14
                                                           02:12

25
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



1    BY MS. WEAVER:                                    02:12

2                                                      02:12

                                                       02:12

6    Q.    Do you know who would?                      02:12

7    A.    No.                                         02:12

8                                                      02:12

13   Q.    Do you know what DataSift is?               02:12

14   A.    I have heard that name, but I don't know    02:12

15   about it.                                         02:12

16                                                     02:12

                                                       Page 218

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 219

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1  ████  ████████████████████████          ████
    ██  ████████████████████████████████    ████
    ██  ██████                              ████
    ██  ██  ██████████████████████████████  ████
    ██  ██████████████████████████████      ████
    ██  ██  ████████████████████████████████ ████
    ██  ███████████████████████████████      ████
    ██  ██████████████████                   ████
    ██      ████████████████████████████████ ████
    ███ ███████████████████████████████████ ████
    ███ ██████████████████████████████████  ████
    ███ ███████████████████████████████     ████
    ███ ████████████████████████████         02:15
```

14      Q.   Okay.  Is there -- so you said this        02:15

15  already, but just for foundation, what were private   02:15

16  APIs?                                                  02:15

17      A.   Private APIs are APIs that are not in        02:15

18  general availability and whose access control is      02:15

19  maintained by partnerships.                           02:15

20      Q.   By -- I'm sorry -- maintained by what?       02:15

21      A.   Partnerships.  So someone in partnerships    02:15

22  in the --                                             02:15

23      Q.   Somebody in partnerships, okay.              02:15

24      A.   -- would have to approve the access to       02:15

25  that given API.                                        02:15

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        Q.    Okay.  And when was the first private API      02:15

 2   launched?                                                 02:15

 3        A.    I -- I honestly don't know.                    02:15

 4        Q.    Was it like 2012 or 2014 or --                 02:16

 5        A.    I -- I believe that private APIs have          02:16

 6   always been there since the invention of Facebook.        02:16
```

Page 221

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2

3

4

5

6

7

8

9

10      Q.    Okay.  Do you know if there's a private          02:17

11   API associated with it?                                  02:17

12      A.    I don't.                                         02:17

13      Q.    So when an API is providing, in response         02:17

14   to a call, an object like a photo, does that photo        02:17

15   also come with metadata?                                 02:17

16      A.    Yes, it does.                                    02:17

17      Q.    Okay.  And what's an example of the kinds        02:17

18   of metadata that's attached?                              02:17

19      A.    The time-stamp of the photo, when it was,        02:17

20   you know, taken, when it was uploaded.                    02:17

21      Q.    And --                                           02:17

22      A.    The location of the photo, if it was             02:17

23   started in the first place by the user, things like       02:17

24   that.                                                     02:17

25      Q.    Is there a metadata field for whether or         02:17

Page 222

1    not a photo is -- was for a restricted audience          02:17

2    only, like public or private?                            02:17



18                        (The record was read by the          02:18

19                        court reporter, as requested)        02:18

20   BY MS. WEAVER:                                            02:18

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page  224

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



1          Q.    Yes.                                          02:20

Page 225

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1 ████████████████████████████████  ████

  ████████████████████████  ████

  ██  ██  ████

  ██  ████████████████████████  ████

  ██████████████████████████████████  ████

  ██████████████████████  ████

  ██  ████████████████████████  ████

  ██████████████████████████████████  ████

  ██  ████████████████████████  ████

  ██████████████████████████████████  ████

  ██████████████  ████

  ██  ████████████████████████  ████

  ██████████████████████████  ████

  ██████████████████████████  ████

  ██████████  02:22

16      Q.    And when you say "signature," what do you    02:22

17 mean?                                                   02:22

18      A.    I mean that loosely, like it comes with      02:22

19 some information that identifies the app --             02:22

20      Q.    Okay.                                        02:22

21      A.    -- that makes that API request.              02:22

22      Q.    What were extended APIs?                      02:22

23      A.    "Extended APIs" is a term we use to           02:22

24 describe private APIs.                                  02:22

25      Q.    Okay.  Makes sense.  And then you're          02:22

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    familiar with the phrase "PMD"?                      02:23

 2        A.   Yes.                                        02:23

 3        Q.   And what is that?                           02:23

 4        A.   I think it stands for preferred marketing   02:23

 5    development.                                         02:23

 6        Q.   And give me an example of a preferred       02:23

 7    marketing developer.                                 02:23

 8        A.   I think Salesforce may be one of them.      02:23

 9        Q.   So is that a kind of partner?              02:23

10        A.   Yes, it would be partners mostly having     02:23

11    access to marketing APIs.  That's why it's called   02:23

12    preferred marketing developers, because of their    02:23

13    access to the marketing APIs.                        02:23

14        Q.   What's a marketing API?                     02:23

15        A.   APIs that allow a third party to run at     02:23

16    (indecipherable).                                    02:23

17        Q.   And how is that different than custom       02:23

18    audience?                                            02:23

19        A.   Custom audience is a feature that is        02:23

20    accessible through the market behavior.              02:23

21        Q.   Okay.  What other features are available    02:23

22    on marketing APIs other than custom audience?        02:23

23        A.   So this is not necessarily my expertise,    02:23

24    so I may be missing certain things.  But the         02:23

25    marketing API allows you to schedule a marketing     02:24
```

Page 227

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | campaign on Facebook the way you would otherwise do | 02:24 |
| 2 | it if you were going to facebook.com and doing it on | 02:24 |
| 3 | the platform. | 02:24 |
| 4 | MS. STEIN:  Hey, Lesley, when you get to a | 02:24 |
| 5 | good break point, can we take a short break? | 02:24 |
| 6 | MS. WEAVER:  I think it's time to take a | 02:24 |
| 7 | break now, if that's what's popular and democratic. | 02:24 |
| 8 | We can reconvene in ten minutes or so. | 02:24 |
| 9 | THE VIDEOGRAPHER:  We are off the record | 02:24 |
| 10 | at 2:24 p.m. | 02:24 |
| 11 | (Recess.) | 02:24 |
| 12 | (Off record:  2:24 p.m.) | 02:24 |
| 13 | (On record:  2:37 p.m.) | 02:24 |
| 14 | THE VIDEOGRAPHER:  We are on the record at | 02:37 |
| 15 | 2:37 p.m. | 02:37 |
| 16 | BY MS. WEAVER: | 02:37 |
| 17 | Q.   You understand you're still under oath? | 02:37 |
| 18 | A.   Yes, I do. | 02:38 |
| 19 | Q.   Okay.  Thank you. | 02:38 |
| 20 | Who -- how were decisions made about what | 02:38 |
| 21 | third parties had access to data through private | 02:38 |
| 22 | APIs? | 02:38 |
| 23 | MS. STEIN:  That's outside the scope of | 02:38 |
| 24 | about how decisions were made, but if you want to | 02:38 |
| 25 | ask, you know, who had access, that's fine. | 02:38 |

Page 228

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page  229

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 231

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 232

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

02:45

15      Q.   Okay.  And we discussed briefly before

16  that friends permissions were deprecated.  Do you

17  recall that?

18      A.   Yes.

19      Q.   Roughly how many capabilities were related

20  to friends permissions that were deprecated?

21      A.   Okay.  This is the question that I need

22  clarification.  What was deprecated was the access

23  to friends permission -- sorry -- friends data

24  through the API.  As a consequence of the API being

25  deprecated, friends-related permissions were

Page  234

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | deprecated as well, meaning that there was no point | 02:45 |
| 2 | in us allowing a user to go through a consent flow | 02:45 |
| 3 | for pieces of information that were no longer | 02:45 |
| 4 | available, right? | 02:46 |
| 5 | Capabilities that gave access to the same | 02:46 |
| 6 | data through private APIs were not deprecated until | 02:46 |
| 7 | later on in 2018 because it was the same | 02:46 |
| 8 | capabilities that enabled device integrations to | 02:46 |
| 9 | have access to that data for the purposes of | 02:46 |
| 10 | replicating core Facebook functionality. | 02:46 |
| 11 | THE REPORTER:  I'm sorry.  Core Facebook? | 02:46 |
| 12 | THE WITNESS:  Functionality. | 02:46 |
| 13 | THE REPORTER:  Thank you. | 02:46 |
| 14 | BY MS. WEAVER: | 02:46 |
| 15 | Q.   So is it true that certain friends | 02:46 |
| 16 | capabilities like friends about me, friends actions, | 02:46 |
| 17 | friends check-ins, friends online presence, friends | 02:46 |
| 18 | photo video tags were deprecated when friends | 02:46 |
| 19 | permissions were deprecated? | 02:46 |
| 20 | A.   So I think what you're referring to is | 02:46 |
| 21 | capabilities.  And I think I answered that question, | 02:46 |
| 22 | that those capabilities had to be there because they | 02:46 |
| 23 | gated access to the corresponding APIs that powered | 02:47 |
| 24 | device integrations.  And that doesn't happen until | 02:47 |
| 25 | late -- later on in 2018. | 02:47 |

Page 235

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Okay.  So those capabilities were not | 02:47 |
| 2 | deprecated, the ones I just listed? | 02:47 |
| 3 | A.   I'm not aware of the specifics, but they | 02:47 |
| 4 | seem to be capabilities related to device | 02:47 |
| 5 | integrations.  And, as such, they -- they -- they | 02:47 |
| 6 | wouldn't be deprecated before 2018. | 02:47 |
| 7 | Q.   Who would know about what was deprecated | 02:47 |
| 8 | with regard to friends permissions? | 02:47 |
| 9 | A.   With regards to friends permissions, I | 02:47 |
| 10 | think I -- | 02:47 |
| 11 | Q.   The issue that we're discussing right now, | 02:47 |
| 12 | you're saying -- | 02:47 |
| 13 | A.   I'm -- | 02:47 |
| 14 | Q.   I'm sorry, just allow me to -- allow me to | 02:47 |
| 15 | ask the question. | 02:47 |
| 16 | The very issue we're discussing right now, | 02:47 |
| 17 | you just said you don't know specifically.  Who | 02:47 |
| 18 | would? | 02:47 |
| 19 | A.   I think you're using different terms in | 02:47 |
| 20 | places that are very confusing.  Like I said, | 02:47 |
| 21 | friends permissions were deprecated by May 1, 2015. | 02:47 |
| 22 | APIs that were attached to those permissions have | 02:48 |
| 23 | deprecated down at the same time.  Capabilities | 02:48 |
| 24 | which are -- are access controls to private APIs | 02:48 |
| 25 | that expose similar information were not deprecated | 02:48 |

Page 236

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    until 2018.                                           02:48

 2        Q.   Okay.  Thank you.  I understand.             02:48
```



```
                                                         Page 237
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    ████████████████████████████      ████
     ██████████████████████████████    ████
     ████████████████████████          ████
     █████████████████████████████     ████
     ████████████████████████████      ████
     ███████████                                    02:49
7         Q.    Who created the developer docs and the    02:49
8    change logs?                                    02:49
9         A.    They are automatically generated by the    02:49
10   code.                                          02:49
11        Q.    Who created the code?               02:49
12        A.    An engineer.                        02:49
13        Q.    Do you know who the engineers are who    02:49
14   created the code?                              02:49
15        A.    It's probably not a single engineer that    02:49
16   created that code.                             02:49
17        Q.    Can you name one name?              02:49
18        A.    I don't remember a specific name of an    02:49
19   engineer.                                      02:49
20        Q.    Do you know whether or not auto granted    02:50
21   friends videos was deprecated?                 02:50
22        A.    No, I don't remember the exact date.    02:50
23        Q.    Who would know?                     02:50
24        A.    I really cannot tell you who would know.    02:50
25        Q.    Is that in the developer pages?     02:50
```

Page 238

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1        A.    Private APIs are not documented in the       02:50

2   developer pages.                                        02:50
```



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page  240

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1



Page 241

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



20    Q.   Okay.  What is a task number?            02:55

21    A.   So we used a tool that is called the task    02:55

22  monitor to track progress against specific things    02:55

23  that need to happen.                              02:55

24    Q.   Okay.                                      02:55

25    A.   It's a program management tool of some      02:55

Page 242

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    sort.                                              02:55

2        Q.    Thank you.                               02:55

3
```



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 244

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 245

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 247

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page  248

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



24      Q.   So we talked a little bit about interests      03:03

25   earlier.  Do you remember that?                        03:03

Page 249

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Yes. | 03:03 |
| 2 | Q.    So does Facebook use the data that it | 03:03 |
| 3 | collects about users to identify the interests that | 03:03 |
| 4 | they have? | 03:04 |
| 5 | A.    Facebook identifies -- | 03:04 |
| 6 | MS. STEIN:  Object to form.  Objection to | 03:04 |
| 7 | form. | 03:04 |
| 8 | THE WITNESS:  So Facebook identifies the | 03:04 |
| 9 | interest based on the user's action on the platform. | 03:04 |
| 10 | I like (indecipherable).  It's a way for us to | 03:04 |
| 11 | identify a user's interests. | 03:04 |
| 12 | BY MS. WEAVER: | 03:04 |
| 13 | Q.    What -- Facebook also receives information | 03:04 |
| 14 | from other third parties like app developers and | 03:04 |
| 15 | data brokers and other partners, correct? | 03:04 |
| 16 | MS. STEIN:  Objection to form. | 03:04 |
| 17 | THE WITNESS:  I guess.  But as we | 03:04 |
| 18 | discussed, the data that's -- is being given by | 03:04 |
| 19 | third parties may be anonymized, may not be user | 03:04 |
| 20 | data.  So I cannot answer that question without -- | 03:04 |
| 21 | BY MS. WEAVER: | 03:04 |
| 22 | Q.    What -- what -- | 03:04 |
| 23 | A.    -- a little bit more specificity. | 03:04 |
| 24 | Q.    Why does Facebook collect data from other | 03:04 |
| 25 | third parties? | 03:04 |

Page 250

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Why? | 03:04 |
| 2 | Q.   Yes. | 03:04 |
| 3 | A.   For many reasons.  For example, if you log | 03:05 |
| 4 | in with Facebook on a third-party app, there's no | 03:05 |
| 5 | way for us not to be able to provide that data. | 03:05 |
| 6 | It's part of the service. | 03:05 |
| 7 | Q.   Okay.  What's another reason? | 03:05 |
| 8 | A.    For the purposes of allowing people to | 03:05 |
| 9 | express themselves using a third-party app.  Again, | 03:05 |
| 10 | within 2020 -- sorry, 2012 and 2017, people could | 03:05 |
| 11 | post back to Facebook using a third-party app.  That | 03:05 |
| 12 | is -- | 03:05 |
| 13 | Q.   Does Facebook use any of the information | 03:05 |
| 14 | it obtains from third parties to develop the | 03:05 |
| 15 | interest categories through which users are | 03:05 |
| 16 | targeted? | 03:05 |
| 17 | MS. STEIN:  Objection to form. | 03:05 |
| 18 | THE WITNESS:  I don't know. | 03:05 |
| 19 | BY MS. WEAVER: | 03:05 |
| 20 | Q.   You don't know? | 03:05 |
| 21 | A.   I don't think so. | 03:05 |
| 22 | Q.   What's the basis of your saying "I don't | 03:05 |
| 23 | think so"? | 03:05 |
| 24 | A.   Because, again, the question is very | 03:06 |
| 25 | broad.  If you are talking about pixel data that are | 03:06 |

Page 251

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | provided by third parties, yes, that informs the ads | 03:06 |
| 2 | targeting, but it doesn't form the interests. | 03:06 |
| 3 | Q.   Can you identify for a user what interest | 03:06 |
| 4 | categories they have been placed in? | 03:06 |
| 5 | A.   Those categories that have been placed in, | 03:06 |
| 6 | which I am not -- I'm not sure that I agree with | 03:06 |
| 7 | that term -- would be identified for the user under | 03:06 |
| 8 | their app -- sorry, under their Facebook settings in | 03:06 |
| 9 | the DYI file. | 03:06 |
| 10 | Q.   And that DIY file, is it completely | 03:06 |
| 11 | historical?  So it will show me yesterday I was in | 03:06 |
| 12 | this interest category and five days ago I was in | 03:06 |
| 13 | this category?  Or does it just list the categories | 03:06 |
| 14 | in general? | 03:06 |
| 15 | A.   Just lists the categories in general. | 03:06 |
| 16 | Q.   And if I'm no longer in a category, does | 03:06 |
| 17 | it list that category? | 03:07 |
| 18 | A.   No. | 03:07 |
| 19 | Q.   And the lists of interest change over | 03:07 |
| 20 | time, then, right? | 03:07 |
| 21 | A.   It depends on how you use the platform. | 03:07 |
| 22 | If you haven't used the platform for the last five | 03:07 |
| 23 | years, probably not. | 03:07 |
| 24 | Q.   Okay.  But let's just say it's you.  When | 03:07 |
| 25 | were you last on the platform? | 03:07 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.   I don't know.  Maybe during the lunch       03:07
 2   break.                                                03:07
 3        Q.   Okay.  So do your interest categories       03:07
 4   change over time?                                     03:07
 5             MS. STEIN:  We're talking about 2012 to     03:07
 6   2017.                                                 03:07
 7   BY MS. WEAVER:                                        03:07
 8        Q.   Did your interest categories change         03:07
 9   between 2012 and 2017?                                03:07
10        A.   I'm pretty certain that they had.          03:07
11        Q.   Okay.  And what causes them to change?     03:07
12        A.   The thought that they may have taken        03:07
13   action against certain entities that I have           03:07
14   expressed an affinity about.                          03:07
15        Q.   Do they change at all based on information  03:07
16   Facebook learns about whether those interests are --  03:07
17   provide for effective ad placement?                   03:08
18        A.   I'm almost certain that I'm confused right  03:08
19   now.  Can you repeat the question?                    03:08
20             MS. WEAVER:  Please read it back.           03:08
21                  (The record was read by the            03:08
22                   court reporter, as requested)         03:08
23             THE WITNESS:  I'm still having a hard       03:08
24   time, but let me try to answer the question the way   03:08
25   I understand, all right?                              03:08
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1              Are those interests used to inform ad        03:08
2     targeting criteria?  The answer is yes.               03:08
3     BY MS. WEAVER:                                        03:08
4         Q.   And Facebook provides analytic data to       03:08
5     advertisers about how effective its advertisements    03:08
6     are, correct?                                         03:08
7         A.   Facebook provides performance data to the    03:08
8     advertisers, yes.                                     03:08
9         Q.   What is performance data?                    03:08
10        A.   It's an aggregated list of data that         03:08
11    suggests whether an ad has been viewed by certain     03:09
12    number of people that have seen -- visited the        03:09
13    third-party website or took an action on the          03:09
14    third-party website.                                  03:09
15        Q.   And when you say "an ad," what do you        03:09
16    mean?                                                 03:09
17        A.   An ad is being defined as a story that       03:09
18    shows up on your Facebook News Feed that is not       03:09
19    necessarily generated by a friend or a page you       03:09
20    follow but is sponsored by a third party.             03:09
21        Q.   So an ad could include something that        03:09
22    wasn't -- well, strike that.                          03:09
23             So there's one category of ads that          03:09
24    literally looks like an ad to the user, "Go buy       03:09
25    these shoes"; is that correct?                        03:09
```

Page 254

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Sure, yes. | 03:09 |
| 2 | Q.    Right.  And then there's -- there are | 03:09 |
| 3 | other categories of ads that don't look like | 03:09 |
| 4 | advertisements necessarily but it's something that | 03:09 |
| 5 | shows up in the News Feed; is that right? | 03:09 |
| 6 | A.    Every single ad unit that shows up on your | 03:09 |
| 7 | News Feed is clearly identified as an ad. | 03:09 |
| 8 | Q.    Okay.  And how is it identified? | 03:09 |
| 9 | A.    Kind of different, but I think in most | 03:10 |
| 10 | cases you can see that this is a sponsored, you | 03:10 |
| 11 | know, like story or something like that. | 03:10 |
| 12 | Q.    Sponsored story?  Is that the language | 03:10 |
| 13 | from 2012 to 2017? | 03:10 |
| 14 | A.    I cannot remember the exact language.  I | 03:10 |
| 15 | think I need to look up some historical, you know, | 03:10 |
| 16 | like, UI treatment. | 03:10 |
| 17 | Q.    Are there documents at Facebook that | 03:10 |
| 18 | describe how interests are created? | 03:10 |
| 19 | A.    How interests are created?  I think I've | 03:10 |
| 20 | already responded to that question multiple times | 03:10 |
| 21 | today. | 03:10 |
| 22 | I think interests are associations for | 03:10 |
| 23 | certain people with certain entities -- entities | 03:10 |
| 24 | that exist on the Facebook platform -- and those | 03:10 |
| 25 | entities are public figures, businesses, anything | 03:10 |

Page 255

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | that is not a friend. | 03:10 |
| 2 | Q.   The question that I asked is, are there | 03:10 |
| 3 | documents that describe how they're created? | 03:10 |
| 4 | A.   I can only say one. | 03:11 |
| 5 | Q.   Are there web links or websites within | 03:11 |
| 6 | Facebook that discuss how interests are being | 03:11 |
| 7 | generated? | 03:11 |
| 8 | A.   I haven't seen a public document about | 03:11 |
| 9 | that, no. | 03:11 |
| 10 | Q.   Is there a team that focuses -- let me | 03:11 |
| 11 | just back up. | 03:11 |
| 12 | You've testified that interests change | 03:11 |
| 13 | over time, right? | 03:11 |
| 14 | A.   Yes. | 03:11 |
| 15 | Q.   And how -- who decides what the new | 03:11 |
| 16 | interests are and what the old interests are? | 03:11 |
| 17 | A.   Okay.  So let's assume that between 2012 | 03:11 |
| 18 | and 2017 I started liking more pages.  That's | 03:11 |
| 19 | something that will further expand the list of | 03:11 |
| 20 | interests that I have. | 03:11 |
| 21 | So if in 2012 I didn't like the Starbucks | 03:11 |
| 22 | page, but in 2015 I like the Starbucks page, that | 03:11 |
| 23 | means my interests can be updated.  It is an action | 03:11 |
| 24 | that is driven and dialed by me.  It's not -- | 03:11 |
| 25 | Q.   What is -- got it.  I understand. | 03:11 |

Page 256

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    A.   It's not something that the PM, or product        03:12

2   manager, at Facebook or someone else will dictate.      03:12

3   It's given by the user.                                 03:12

4    Q.   And there are algorithms that are running          03:12

5   on the page to identify these interests; is that        03:12

6   correct?                                                03:12

7         MS. STEIN:  Objection to form.                    03:12

8         THE WITNESS:  A page will have a certain,         03:12

9   you know, like category associated with it.             03:12

10  BY MS. WEAVER:                                          03:12

11   Q.   What do you mean by "second category"?            03:12

12   A.   A certain category.  So a page would be --         03:12

13  a page of a singer or a page of an actor or a page      03:12

14  of a hairdresser or a page of a retailer.  That's       03:12

15  what derives the interest.                              03:12

16   Q.   And so there's a historical record over            03:12

17  time of what I have been interested in the past and     03:12

18  I'm interested in today; is that fair?                  03:12

19         MS. STEIN:  Objection to form.  Misstates        03:12

20  his testimony.                                          03:12

21         THE WITNESS:  The -- the interests are           03:12

22  derived from your association with Facebook pages.      03:12

23  If that list gets -- remain unchanged throughout the    03:13

24  years, that would mean that the interests' graph is     03:13

25  the same, exactly the same as it was back in the        03:13

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    day.                                              03:13

 2            If in that time period you have expanded   03:13

 3    your affiliation by liking or interacting with more 03:13

 4    pages or other entities that have, you know,       03:13

 5    associated with certain interests, that will       03:13

 6    obviously update your interests as well.           03:13

 7    BY MS. WEAVER:                                     03:13

 8        Q.   Where is the interest graph maintained?   03:13

 9        A.   For a given user?                         03:13

10        Q.   Yes.                                       03:13

11        A.   It lives in the DYI file.                 03:13

12        Q.   Facebook doesn't access the DIY file,     03:13

13    right?  That's for users to access data?           03:13

14        A.   Well, we provide the hosting of that file. 03:13

15        Q.   Right.  So where is the actual data that  03:13

16    is extracted through the DIY tool?  Where is the   03:13

17    actual data in the interest graph maintained?      03:13

18        A.   I'm not sure I understand the question.   03:13

19        Q.   Okay.  The DIY file is created through a  03:14

20    tool to face the users, right?                     03:14

21        A.   Yes.                                       03:14

22        Q.   Okay.  If I'm an advertiser and I'm --    03:14

23    come to you and I say "I want to target people with 03:14

24    these interests," does Facebook go to the DIY tool? 03:14

25        A.   To do a lookup, no, that's not how.       03:14
```

Page 258

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



03:15

Page 259

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



1

5    BY MS. WEAVER:

6

03:15

03:15

03:16

Page 260

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        Q.   Why does Facebook allow advertisers to      03:16

 2   custom target advertising through the selection of    03:16

 3   interests?                                             03:17

 4             MS. STEIN:  Objection to form.  Beyond the   03:17

 5   scope.                                                 03:17

 6             Are you really asking questions about        03:17

 7   targeting advertising?  Like that directly, Lesley?    03:17

 8   I know you've done half the depo on it, but now you    03:17

 9   want to know why Facebook does targeted advertising?   03:17

10   BY MS. WEAVER:                                         03:17

11        Q.   Please answer the question.                  03:17

12        A.   Okay.  So there are a couple of              03:17

13   differentials here.                                    03:17

14             The first one is, how does advertisement     03:17

15   work in the first place?  So a business wants to       03:17

16   advertise on platforms where they can get better       03:17

17   ROI, better return on the investment for this          03:17

18   advertisement.  A lot of businesses still advertise    03:17

19   on TV.                                                 03:17

20             And let's use Super Bowl as an example       03:17

21   because the audience that will attend Super Bowl is    03:17

22   falling into the demographics of users that business   03:17

23   is trying to attract.  That's -- that's why, I         03:18

24   guess, you see a lot of car manufacturers or junk      03:18

25   foods being advertised during Super Bowl.  Now,        03:18
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | that's one way of doing advertisement.  It's mostly | 03:18 |
| 2 | brand. | 03:18 |
| 3 | THE REPORTER:  It's mostly what?  I'm | 03:18 |
| 4 | sorry. | 03:18 |
| 5 | THE WITNESS:  Brand.  Brand.  Brand. | 03:18 |
| 6 | A modern way of doing advertisement is by | 03:18 |
| 7 | effective advertising in platforms that can provide | 03:18 |
| 8 | a little bit more clarity and on the intent. | 03:18 |
| 9 | Because in that scenario you have higher chances of | 03:18 |
| 10 | having a better ROI for your marketing spend. | 03:18 |
| 11 | Facebook provides granular way for | 03:18 |
| 12 | advertisers to hit the right audiences because that | 03:18 |
| 13 | is very effective way for businesses and, therefore, | 03:18 |
| 14 | actually contributes to our business model very | 03:18 |
| 15 | effectively.  But at the same time we truly believe | 03:18 |
| 16 | that relevant ads have the opportunity to build a | 03:18 |
| 17 | better product experience for the users as well. | 03:18 |
| 18 | I can give you from my personal point of | 03:19 |
| 19 | view my perspective of using Facebook and Instagram | 03:19 |
| 20 | and all our products have become definitely better | 03:19 |
| 21 | when the ads that I could see on those products are | 03:19 |
| 22 | more relevant to me. | 03:19 |
| 23 | BY MS. WEAVER: | 03:19 |
| 24 | Q.  Do you believe that most users join | 03:19 |
| 25 | Facebook because they want to receive ads? | 03:19 |

Page 262

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1        MS. STEIN:  Objection to form.  Lacks     03:19

2  foundation.  Beyond the scope.     03:19

3        THE WITNESS:  It's really hard for me to    03:19

4  understand or be able to identify the intention of    03:19

5  2.8 billion people.     03:19

6  BY MS. WEAVER:     03:19

7

Page 263

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



22          MS. WEAVER:   Okay.   Why don't we take a    03:21

23    little break and I'll mark a few things.   I don't    03:21

24    think we'll be going that much longer.   Hold on just    03:21

25    a little longer.                                        03:21

Page 264

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              We can go off the record.                  03:21

 2              THE VIDEOGRAPHER:  We are off the record    03:21

 3    at 3:21 p.m.                                          03:21

 4              (Recess.)                                   03:34

 5              (Off record:  3:21 p.m.)                    03:34

 6              (On record:  3:34 p.m.)                     03:34

 7              THE VIDEOGRAPHER:  We are on the record at  03:34

 8    3:34 p.m.                                             03:34

 9    BY MS. WEAVER:                                        03:34

10         Q.   You understand you're still under oath?     03:34

11         A.   Yes, I do.                                  03:34

12         Q.   Okay.  So were you involved in collecting   03:34

13    or looking for documents that Facebook possesses      03:34

14    relating to the plaintiffs in this action?           03:34

15         A.   No.                                         03:34

16         Q.   Okay.  Do you know what Facebook did to     03:34

17    collect documents relating to the plaintiffs in this  03:34

18    action?                                               03:34

19         A.   My understanding is that we made available  03:34

20    the DYI file for each of the plaintiffs.              03:34

21    ██████████████████████████████████████  ███████

      ████████████████████████████████████████  ███████

      ████████████████████████████████████████       03:34

24              (Exhibit 5 was marked for                   03:34

25              identification and attached.)               03:34

                                          Page 265
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | (Exhibit 6 was marked for | 03:34 |
| 2 | identification and attached | 03:34 |
| 3 | hereto.) | 03:34 |
| 4 | THE WITNESS:  Do you want me to do | 03:34 |
| 5 | anything? | 03:35 |
| 6 | BY MS. WEAVER: | 03:35 |
| 7 | Q.   Yes, will you pull them up? | 03:35 |
| 8 | A.   Shall we start with 5? | 03:35 |
| 9 | Q.   Sure.  Take a look at both Exhibits 5 and | 03:35 |
| 10 | 6 and tell me if you've seen them before. | 03:35 |
| 11 | A.   I'm just trying to understand what is the | 03:35 |
| 12 | file I'm looking at. | 03:35 |
| 13 | (Pause while witness peruses document.) | 03:35 |
| 14 | A.   Okay.  Can I look at 6? | 03:35 |
| 15 | Q.   Please do. | 03:36 |
| 16 | (Pause while witness peruses document.) | 03:36 |
| 17 | A.   Okay. | 03:36 |
| 18 | Q.   Have you seen these documents before? | 03:36 |
| 19 | A.   No, I haven't. | 03:36 |
| 20 | Q.   Okay.  Do you -- are you aware of Facebook | 03:36 |
| 21 | searching Hive databases to obtain documents | 03:36 |
| 22 | relating to the plaintiffs in this case? | 03:36 |
| 23 | MS. STEIN:  Objection to form. | 03:36 |
| 24 | THE WITNESS:  I don't know how to respond | 03:36 |
| 25 | to that question.  Are you talking about Hive | 03:36 |

Page 266

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    specifically?                                    03:36

 2    BY MS. WEAVER:                                    03:36

 3    ████  ██████████████████████████        ████

██    █████████████████████████████████████    ████

██    ████████████████████████████████████     ████

██    ███████████████████████████████████      ████

██    ████████████████████████████             ████

██    ████████████████████████████████         ████

██    ████████████████████████████             ████

██    ████  ██████████████████                 ████

██    ████  ██████████████████████████████     ████

██    ███████████████████████████████          ████

██    ████  ███████████████████████████        03:37

14         Q.   Okay.  Do you know why -- I guess if you   03:37

15    don't know anything about that, I guess we'll just   03:37

16    have to come back.                               03:37

17              MS. WEAVER:  I think we need to go off the   03:37

18    record again.  We'll be back.  We're off the record.   03:37

19              THE VIDEOGRAPHER:  We are off the record   03:37

20    at 3:37 p.m.                                      03:37

21              (Recess.)                               03:38

22              (Off record:  3:37 p.m.)                03:38

23              (On record:  3:47 p.m.)                 03:38

24              THE VIDEOGRAPHER:  We're on the record at   03:47

25    3:47 p.m.                                         03:47
```

                                              Page  267

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    BY MS. WEAVER:                                          03:47



Page 268

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page  269

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  ████████████████████████████████████████   ██████

   ███████████████████████████████████████     ██████

   ██████████████████████                       03:50

4      Q.    And do you believe that's contained in the   03:50

5  DIY file?                                    03:50

6      A.    So the DYI file would include information   03:50

7  about the -- sorry.  Let me take a step back just to   03:50

8  make sure that I answer the question appropriately.   03:50

9          So the DYI file would have information   03:50

10 about a photo and when you uploaded that photo.  But   03:50

11 if you really want to check the privacy setting of   03:50

12 that photo there is probably a link that will link   03:50

13 you to the original post to check the privacy   03:50

14 setting of that photo.                       03:50

15     Q.    You say "probably."  Do you know?   03:50

16     A.    I -- I think that's my understanding of   03:50

17 what I would be looking at, the DYI file, if I had   03:50

18 it in front of me.                           03:50

19    ██  ██████████████████████████████        ██████

   ████████████████████████████████████████     ██████

   ██████████████████████████                   ██████

   ███████████████████████████████████         ██████

   ██████████████████████████████               ██████

   ██████████████                               03:51

25



Page 271

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 272

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1

 

 

 

 

 

 

 

                                                                        03:53

10      Q.   Okay.  Has the data made available through   03:53

11  the DYI tool changed over time?   03:53

12      A.   It's a very broad question.  Are you   03:53

13  talking about specific individual?   03:53

14      Q.   I'm talking from 2012 to 2017, what -- how   03:53

15  has data made available in the DIY tool changed over   03:53

16  time?   03:53

17      A.   I think the DYI file presents activity   03:53

18  that you have on the platform, and that's problem.   03:53

19  Because people are doing different things on the   03:54

20  platform than they did in 2012.   03:54

21      Q.   Right.  I'm not talking about the content;   03:54

22  I'm talking about the capabilities.  So how has it   03:54

23  over time changed what users could obtain about   03:54

24  their activity through the DYI tool?   03:54

25      A.   Again, the content is available if the   03:54

Page 273

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | features are available.  In that sense, yes, the | 03:54 |
| 2 | data would have changed. | 03:54 |
| 3 | Q.   Did the fields change? | 03:54 |
| 4 | A.   The fields described pieces of data, so | 03:54 |
| 5 | yes, they would have changed. | 03:54 |
| 6 | Q.   Okay.  Well, did the -- what I'm asking | 03:54 |
| 7 | is, in 2012 could I search for privacy settings, but | 03:54 |
| 8 | in 2017 I could not? | 03:54 |
| 9 | A.   No, that's -- that wouldn't have changed. | 03:54 |
| 10 | Q.   Are the same categories of information | 03:54 |
| 11 | available in the DYI tool in 2012 as it was in 2017? | 03:54 |
| 12 | A.   Again, for the sake of the argument, if | 03:54 |
| 13 | you were able to see photos posted in 2017, that | 03:55 |
| 14 | meant that the composer allowed you to post photos | 03:55 |
| 15 | on Facebook.  If in 2012 you could only post text, | 03:55 |
| 16 | that means that you wouldn't be able to see any | 03:55 |
| 17 | photos because you wouldn't be able to post any | 03:55 |
| 18 | photos. | 03:55 |
| 19 | Q.   We are not understanding each other. | 03:55 |
| 20 | I understand that my content changes over | 03:55 |
| 21 | time.  The question is whether the categories of | 03:55 |
| 22 | objects collected and made available in the DYI tool | 03:55 |
| 23 | changed over time. | 03:55 |
| 24 | MS. STEIN:  And, Lesley, I actually -- and | 03:55 |
| 25 | I'm not trying to be combative.  I actually think he | 03:55 |

Page 274

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | was answering your question.  So I don't want -- I | 03:55 |
| 2 | don't want to repeat what the witness said. | 03:55 |
| 3 | But, K.P., why don't you try again. | 03:55 |
| 4 | THE WITNESS:  I'll try one more time. | 03:55 |
| 5 | The way the question is framed suggests | 03:55 |
| 6 | that nothing would change.  And I'm answering the | 03:55 |
| 7 | question by saying, yes, it would change because the | 03:55 |
| 8 | features are available and the comment that can be | 03:55 |
| 9 | posted in the app will change.  As a consequence of | 03:55 |
| 10 | that, the data that shows up in the DYI will be | 03:55 |
| 11 | different.  2017 -- | 03:55 |
| 12 | BY MS. WEAVER: | 03:55 |
| 13 | Q.   Do you -- | 03:56 |
| 14 | A.   Between 2012 and 2017, Facebook -- the | 03:56 |
| 15 | Facebook app provided different capabilities to the | 03:56 |
| 16 | users.  Some of them may have been deprecated since. | 03:56 |
| 17 | Some of them may be still available.  But the way | 03:56 |
| 18 | your DYI file looked in 2012 cannot be the same as | 03:56 |
| 19 | the way it looks in 2017. | 03:56 |
| 20 | And I'm not just talking about the same | 03:56 |
| 21 | things that you did in 2012 and repeated in 2017. | 03:56 |
| 22 | I'm talking about the enhancement with additional | 03:56 |
| 23 | pieces of information that may not have been | 03:56 |
| 24 | possible in 2012. | 03:56 |
| 25 | Q.   So who decided what data is collected in | 03:56 |

Page 275

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    the DYI tool?                                      03:56

 2         A.   I -- I don't know.                       03:56

 3              MS. WEAVER:  Okay.  I think we have no    03:56

 4    more questions at this time.  This deposition      03:56

 5    remains open.  There are a number of questions that 03:56

 6    were not answered.                                 03:56

 7         Q.   Oh, I have one more question.  How long  03:56

 8    has the DYI tool existed?                          03:57

 9         A.   I believe since 2012-2013 or something   03:57

10    around that time frame.                            03:57

11    BY MS. WEAVER:                                     03:57

12         Q.   So for data prior to that time, is there 03:57

13    any record for users of what data Facebook         03:57

14    maintained on them?                                03:57

15         A.   The DYI files shouldn't show data for    03:57

16    those users even prior to the date the tool was    03:57

17    available to users.  I'm talking about the data that 03:57

18    the tool was exposed to users.                     03:57

19         Q.   When did the DYI tool begin collecting   03:57

20    data about users?                                  03:57

21              MS. STEIN:  Objection to form.           03:57

22              THE WITNESS:  I think everybody that has a 03:57

23    Facebook account since forever, they would be able 03:57

24    to download the DYI file and find that information 03:57

25    to be available in the DYI file.                   03:57
```

Page 276

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | The question is when can they -- when have | 03:57 |
| 2 | they started downloading that file?  And it's my | 03:57 |
| 3 | understanding is that they -- the ability for people | 03:57 |
| 4 | to download information that Facebook had on their | 03:57 |
| 5 | behalf started in 2012-2013 time frame. | 03:58 |
| 6 | MS. WEAVER:  Okay.  I think we have no | 03:58 |
| 7 | further questions.  And, again, the deposition | 03:58 |
| 8 | remains open. | 03:58 |
| 9 | We can go off the record. | 03:58 |
| 10 | MS. STEIN:  Well, I don't want to go off | 03:58 |
| 11 | the record yet because I would like to say that we | 03:58 |
| 12 | disagree and object to the idea that this deposition | 03:58 |
| 13 | is being held open. | 03:58 |
| 14 | And, you know, we'll just express our | 03:58 |
| 15 | disappointment that, you know, the witness spent a | 03:58 |
| 16 | lot of time preparing for this deposition on the | 03:58 |
| 17 | topics that Judge Corley ordered this deposition to | 03:58 |
| 18 | be on, and, you know, we're disappointed that, you | 03:58 |
| 19 | know, there wasn't time spent on those topics. | 03:58 |
| 20 | ████████████████████████████████████ | ████ |

Page  277

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  We are off the record | 03:58 |
| 2 | at 3:58 p.m., and this concludes data testimony | 03:58 |
| 3 | given by Konstantinos Papamiltiadis.  The total | 03:58 |
| 4 | number of media units used was six and will be | 03:59 |
| 5 | retained by Veritext Legal Solutions. | 03:59 |
| 6 | MS. WEAVER:  Thank you very much, Mr. | 03:59 |
| 7 | Papamiltiadis. | 03:59 |
| 8 | THE WITNESS:  Thank you for having me. | 03:59 |
| 9 | (At the time of 3:58 p.m., the deposition | 04:00 |
| 10 | was concluded.) | |

Page  278

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1              PENALTY OF PERJURY CERTIFICATE

2

3        I hereby declare I am the witness in the within

4    matter, that I have read the foregoing transcript and

5    know the contents thereof; that I declare that the same

6    is true to my knowledge, except as to the matters which

7    are therein stated upon my information or belief, and

8    as to those matters, I believe them to be true.

9        I declare being aware of the penalties of

10   perjury, that the foregoing answers are true and

11   correct.

12

13

14

15   Executed on the _____ day of _____, 20__, at

16   _____, _____.

17       (CITY)                    (STATE)

18

19            _____

20            KONSTANTINOS PAPAMILTIADIS

21            FACEBOOK INC. REPRESENTATIVE

22

23

24

25
```

Page  279

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                  CERTIFICATE OF REPORTER

 2        I, ASHALA TYLOR, CSR No. 2436, in and for the State

 3   of California, do hereby certify:

 4        That the foregoing proceedings were taken before me

 5   at the time and place herein set forth; that any

 6   witnesses in the foregoing proceedings, prior to

 7   testifying, were placed under oath; that a verbatim

 8   record of the proceedings were made by me using machine

 9   shorthand which was thereafter transcribed under my

10   direction; further that the foregoing is an accurate

11   transcription thereof.

12        That before the completion of the deposition,

13   review of the transcript was not requested.

14        I further certify that I am neither financially

15   interested in this action nor a relative or employee of

16   any attorney or any of the parties hereto.

17        In compliance with Section 8016 of the Business and

18   Professions Code, I certify under penalty of perjury

19   that I am a Certified Shorthand Reporter with

20   California License No. 2436 in full force and effect.

21   WITNESS my hand this 26th day of February, 2021.

22

23

24

25        Ashala Tylor, CSR #2436, RPR, CRR, CLR
```

                                          Page 280

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY





HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY





HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY





HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.