# EXHIBIT 106

**Redacted Version of Document Sought to be Sealed**

**Full Deposition Transcript of
Jackie Chang,
dated December 16, 2021**

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE:  FACEBOOK, INC.          MDL No. 2843

CONSUMER PRIVACY USER          Case No. 18-md-02843-VC-JSC

PROFILE LITIGATION

------------------------/

CONFIDENTIAL

REMOTE DEPOSITION OF JACKIE CHANG

Thursday, December 16, 2021

Job No. 4976949

Reported Remotely and Stenographically by:

JANIS JENNINGS, CSR No. 3942, CLR, CCRR

Pages 1 - 312

Page 2

1

2

3

4

5

6

7

8             REMOTE DEPOSITION OF JACKIE CHANG, located

9    in Hillsborough, California, taken on behalf of the

10   Plaintiffs, beginning at 9:43 a.m., on Thursday,

11   December 16, 2021, sworn remotely by Janis Jennings,

12   Certified Shorthand Reporter No. 3942, CLR, CCRR,

13   located in the City of Walnut Creek, County of

14   Contra Costa, State of California.

15

16

17

18

19

20

21

22

23

24

25

```
 1    REMOTE APPEARANCES:

 2

 3        For Plaintiffs:

 4              KELLER ROHRBACK L.L.P.

 5              BY:  DEREK W. LOESER, ESQ.

 6                   DAVID KO, ESQ.

 7                   ADELE A. DANIEL, ESQ.

 8              1201 Third Avenue, Suite 3200

 9              Seattle, Washington  98101

10              206.623.1900

11              dloeser@kellerrohrback.com

12              dko@kellerrohrback.com

13              adaniel@kellerrohrback.com

14

15        BLEICHMAR FONTI & AULD LLP

16              BY:  LESLEY E. WEAVER, ESQ.

17                   ANNE K. DAVIS, ESQ.

18                   MATTHEW S. MELAMED, ESQ.

19              555 12th Street, Suite 1600

20              Oakland, California  94607

21              415.445.4003

22              lweaver@bfalaw.com

23              adavis@bfalaw.com

24              mmelamed@bfalaw.com

25
```

Page 4

```
 1   APPEARANCES:

 2

 3       FOR DEFENDANT FACEBOOK, INC.:

 4            GIBSON, DUNN & CRUTCHER LLP

 5            BY:  RUSSELL H. FALCONER, ESQ.

 6                 LAURA C. MUMM, ESQ.

 7                 MATT BUONGIORNO, ESQ.

 8            2001 Ross Avenue, Suite 2100

 9            Dallas, Texas 75201

10            214.698.3100

11            rfalconer@gibsondunn.com

12            lmumm@gibsondunn.com

13            mbuongiorno@gibsondunn.com

14

15       Also Remotely Present:

16            DANIEL GARRIE, SPECIAL MASTER

17            JAMS

18            555 W. 5th Street, 32nd Floor

19            Los Angeles, California 90013

20

21            IAN CHEN, ESQ., Facebook, Inc.

22            SHAWNA HAYNES, Videographer

23

24

25
```

Page 5

1                            I N D E X

2

3    WITNESS                                           PAGE

4    JACKIE CHANG

5

6

7         EXAMINATION BY MR. LOESER                    13

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                              Page 6
  1                      E X H I B I T S

  2

  3   EXHIBIT                                                  PAGE

  4   Exhibit 1    Plaintiffs' Amended Notice of                15

  5                Deposition to Jackie Chang

  6   Exhibit 2    LinkedIn web page Jackie Chang               21

  7   Exhibit 3    Email thread dated 9/30/13 from Ime          57

  8                ██████████████████████████████

  9   ██          ██████████████████████████

 10                FB-CA-MDL-02187146 - 2187149

 11   Exhibit 4    Email thread dated 5/3/13 from Marie         71

 12   ██           ███████████████████████████

 13                FB-CA-MDL-00191044 - 191047

 14   Exhibit 5    Email thread dated 8/16/13 from              86

 15   ██          ██████████████████████████████

 16   ██           ████████████████

 17                FB-CA-MDL-00195621 - 195626

 18   ██  ████████████  ████████████████          ██

 19                FB-CA-MDL-00195627 - 195631

 20   Exhibit 7    Email thread dated 8/21/13 from              97

 21   ██          ██████████████████████████████

 22   ██          ██████████████████████████████

 23                FB-CA-MDL-01128015 - 1128017

 24   Exhibit 8    Excel spreadsheet; FB-CA-MDL-01128018       122

 25
```

```
                                                              Page 7

 1                          E X H I B I T S

 2

 3   EXHIBIT                                                   PAGE

 4   Exhibit 9    Message summary dated 4/24/13 from            138

 5               Brendan Moore;

 6               FB-CA-MDL-02135819 - 2135824

 7   Exhibit 10   Email thread dated 8/23/13 from               151

 ▮               ███████████████████████████████

 ▮               █████████████████████████████████

10               FB-CA-MDL-01754048 - 01754052

11   Exhibit 11   Email thread dated 9/3/13 from Simon          159

 ▮               ██████████████████████████████

13               FB-CA-MDL-00197163

 ▮   ███████████████████████████████████████████       ███

 ▮               ████████████████████████

16               FB-CA-MDL-00197164 - 197176

17   Exhibit 13   Email thread dated 12/10/13 from             165

 ▮               ███████████████████████████████████

 ▮               ███████████████████████████████

20   Exhibit 14   Email thread dated 2/9/14 from Ime           171

 ▮               ████████████████████████████████

 ▮               ███████████████████

23               FB-CA-MDL-00202562 - 202563

 ▮   ████████████████████████████████████████████      ███

 ▮               ██████████████████████████████████
```

Page 8

```
 1                    E X H I B I T S

 2

 3   EXHIBIT                                        PAGE

 4   Exhibit 16  f8 Keynote Section.mp4             189

 5   Exhibit 17  Facebook's CEO Mark Zuckerberg F8  189

 6               2014 Keynote (Full Transcript)

 7   Exhibit 18  Email thread dated 3/23/14 from    198

 █               ████████████████████████████████

 █               ██████████████████████

10               FB-CA-MDL-01688164 - 1688168

11   Exhibit 19  Email thread dated 9/4/12 from Ime 206

 █               ████████████████████████████████

 █               ███████████████████████████

14               FB-CA-MDL-01680930 - 1680937

15   Exhibit 20  Email dated 10/24/13 from Simon    223

 █               ████████████████████████████████

 █               █████████████████████████

18               FB-CA-MDL-00199729 - 199730

19   Exhibit 21  Message summary dated 9/3/19 from  229

20               Paul Stepnowsky;

21               FB-CA-MDL-02089985 - 89988

22   Exhibit 22  Email thread dated 3/27/14 from Simon 236

 █               ████████████████████████████████

24               FB-CA-MDL-01943707 - 1943709

25
```

Page 9

1                        E X H I B I T S

2

3    EXHIBIT                                              PAGE

4    Exhibit 23  Email dated 11/21/13 from Jackie          245

■           ██████████████████████

■           █████████████████████

■           ████████████████████████████

8    Exhibit 24  Email thread dated 3/28/14 from           266

■           ███████████████████████

■           ████████████████████████████

■           ████████

12               FB-CA-MDL-01129621 - 1129649

13   Exhibit 25  New York Times article "Facebook          270

14               Gave Device Makers Deep Access to

15               Data on Users and Friends"

16   Exhibit 26  Email thread dated 8/28/14 from           273

■           █████████████████████████

■           ████████████████████████

■           █████████

20               FB-CA-MDL-00220376 - 220377

■     ██████████████████████████████████     ██

■           ████████████

23               FB-CA-MDL-01198438 - 1198446

24   Exhibit 28  Message summary dated 10/16/19 from       287

25               Jackie Chang; FB-CA-MDL-02090193



Page 10

1                    E X H I B I T S

2

3   EXHIBIT                                        PAGE

4   Exhibit 29  Email dated 3/22/18 from Jack Rooney    297

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 11

```
 1              THURSDAY, DECEMBER 16, 2021; 9:43 A.M.
 2
 3
 4              THE VIDEOGRAPHER:  Good morning.  We are
 5    going on the record at 9:43 a.m. on December 16th,     09:43
 6    2021.  Please note that the microphones may pick up    09:43
 7    background noise, private conversations and            09:43
 8    interference if unmuted.  When muted, remember to      09:43
 9    unmute to speak on the record.  Audio and video        09:44
10    recording will continue to take place unless all       09:44
11    parties agree to go off the record.                    09:44
12              This is media unit 1 of the video recorded   09:44
13    deposition of Jackie Chang taken by counsel for        09:44
14    plaintiff in the matter of In Re Facebook, Inc.        09:44
15    Consumer Privacy User Profile Litigation, all          09:44
16    related actions, filed in the United States            09:44
17    District Court, Northern District of California,       09:44
18    MDL No. 2843, case No. 18-md-02843-VC-JSC.             09:44
19              This deposition is being conducted via       09:44
20    Veritext Virtual Zoom Technology and all parties are   09:44
21    appearing remotely.  My name is Shawna Haynes from     09:44
22    the firm Veritext Legal Solutions and I'm the          09:44
23    videographer.  The court reporter is Janis Jennings    09:45
24    from the firm Veritext Legal Solutions.  I am not      09:45
25    related to any party in this action, nor am I          09:45
```

Page 12

```
 1   financially interested in the outcome.                09:45
 2            Counsel and everyone attending remotely will 09:45
 3   state their appearances and affiliations for the      09:45
 4   record.  If there are any objections to proceeding,   09:45
 5   please state them at the time of your appearance      09:45
 6   beginning with the noticing attorney.                 09:45
 7            MR. LOESER:  Good morning.  My name is Derek 09:45
 8   Loeser for the plaintiffs from the firm of Keller     09:45
 9   Rohrback.                                             09:45
10            MS. WEAVER:  Good morning.  This is Lesley    09:45
11   Weaver from Bleichmar Fonti.  With me is Matt         09:45
12   Melamed and Anne Davis, also of my firm, on behalf    09:45
13   of plaintiffs.  Good morning, everybody.              09:45
14            MR. LOESER:  And I also have Adele Daniel     09:45
15   from Keller Rohrback.                                 09:45
16            MR. FALCONER:  Good morning.  This is Russ    09:46
17   Falconer, with Gibson Dunn & Crutcher, here on        09:46
18   behalf of the defendant and on behalf of the          09:46
19   witness.  I'm here with my colleagues Laura Mumm and  09:46
20   Colin Davis, as well as Ian Chen from Facebook.       09:46
21            SPECIAL MASTER GARRIE:  Last, Daniel Garrie   09:46
22   with JAMS.  I'm the special master.                   09:46
23            THE VIDEOGRAPHER:  Okay.  Anyone else?        09:46
24            Thank you.  Will the court reporter please    09:46
25   swear in the witness.                                 09:46
```

Page 13

1                        JACKIE CHANG,

2              the witness herein, was sworn and

3              testified as follows:

4                                                   09:46

5              DEPOSITION REPORTER:  Thank you.     09:46

6              Please begin, Counsel.              09:46

7

8                        EXAMINATION                09:46

9    BY MR. LOESER:                                 09:46

10       Q.   Good morning, Miss Chang.  Could you please  09:46

11   state and spell your last name for the record?  09:46

12       A.   Chang, C-h-a-n-g.                     09:46

13       Q.   Miss Chang, have you ever had your    09:46

14   deposition taken before?                       09:47

15       A.   No.                                   09:47

16       Q.   Okay.  Well, there are some ground rules  09:47

17   that make the -- that really are designed to make  09:47

18   the record clear.  The first is that we should try  09:47

19   not to talk over each other.  I will ask a question.  09:47

20   I'll try to ask a clear question.  If you don't  09:47

21   understand the question, please ask me to restate  09:47

22   it.  And if you answer the question, I will assume  09:47

23   that you understood the question.              09:47

24              Is that okay?                       09:47

25       A.   Yes.                                  09:47

Page 14

```
 1      Q.   And, again, we need to try not to speak at    09:47
 2   the same time because it tortures the court           09:47
 3   reporter.  She can't take down our testimony if we    09:47
 4   are talking over each other.                          09:47
 5           If at any point you need to take a break,     09:47
 6   please let me know.  I may finish asking a few        09:47
 7   questions but, of course, if you would like to take   09:47
 8   a break, we will make sure to allow you to take       09:47
 9   breaks.                                               09:47
10           During the testimony, your counsel may        09:47
11   interpose objections and he has every right to do     09:47
12   that.  You should answer the question unless you're   09:47
13   instructed not to do so by your counsel.              09:47
14           Do you understand that?                       09:47
15      A.   Yes.                                          09:48
16      Q.   And you understand that your obligation here  09:48
17   today is to testify honestly and truthfully?          09:48
18      A.   Yes.                                          09:48
19      Q.   And that you are under oath?                  09:48
20      A.   Yes.                                          09:48
21      Q.   Your testimony today is going to cover the    09:48
22   time period from 2007 through 2021.  Do you           09:48
23   understand that?                                      09:48
24      A.   Yes.                                          09:48
25      Q.   And that will be the time period that's       09:48
```

Page 15

```
 1   covered unless I specifically state otherwise.    09:48
 2   Okay?                                             09:48
 3       A.   Yes.                                     09:48
 4           MR. LOESER:  I'm going to show you what will 09:48
 5   be marked as Exhibit No. 1 and that is your       09:48
 6   deposition notice.  And bear with us while we work 09:48
 7   out the clunkiness of the platform here.  We are  09:48
 8   going to get the document up so you can see it, and 09:48
 9   it will also be published via Veritext platform.  So 09:48
10   it will be on a screen with the screen share, but 09:48
11   also you will have access to the document via the 09:48
12   Veritext platform.                                09:48
13           (Exhibit 1 marked for identification.)    09:49
14           MR. LOESER:  We need -- in the world of   09:49
15   Zoom, things always start interestingly.  We need to 09:49
16   enable screen sharing so that we can do that.     09:49
17           THE VIDEOGRAPHER:  It's enabled now.      09:49
18   BY MR. LOESER:                                    09:49
19       Q.   Miss Chang, this is the deposition notice 09:49
20   that requires your attendance.  Have you seen this 09:49
21   before?                                           09:49
22       A.   No.                                      09:49
23       Q.   Do you understand that you're testifying 09:49
24   today in response to a subpoena directing you to  09:49
25   appear to have your deposition taken?             09:49
```

```
                                               Page 16
 1          MR. FALCONER:  Objection.  Foundation.      09:49

 2          Go ahead.                                   09:49

 3          THE WITNESS:  Sorry.  Can you repeat the    09:49

 4   question?                                          09:49

 5   BY MR. LOESER:                                     09:49

 6      Q.   Sure.  Do you understand that your testimony 09:49

 7   today is being taken in response to a subpoena that 09:49

 8   requires your -- a deposition notice that requires 09:49

 9   your attendance?                                   09:50

10      A.   Yes.                                       09:50

11          MR. LOESER:  We can stop sharing that.      09:50

12   BY MR. LOESER:                                     09:50

13      Q.   Miss Chang, what did you do to prepare today 09:50

14   for your deposition?                               09:50

15      A.   I met with counsel, Mr. Falconer and Miss  09:50

16   Mumm and Mr. Chen, and I can't remember the other  09:50

17   one.                                               09:50

18      Q.   And how many times did you meet with them? 09:50

19      A.   I met with them about three times.         09:50

20      Q.   And for how much time each time?           09:50

21      A.   About three hours.                         09:50

22      Q.   And did you speak to anyone at Facebook     09:50

23   about your testimony today?                        09:50

24      A.   No.  I mean, Mr. -- Mr. Chen, the counsel   09:50

25   or...                                              09:51
```

Page 17

```
 1        Q.    Mr. Chen is in-house counsel at Facebook?    09:51
 2        A.    Yes.  I think so.                            09:51
 3        Q.    And did you review any documents to prepare  09:51
 4   for your testimony today?                               09:51
 5        A.    Yes.                                         09:51
 6        Q.    And what documents?  Can you generally       09:51
 7   describe the documents that you reviewed?               09:51
 8        A.    They appeared to be emails and an Excel      09:51
 9   spreadsheet.                                            09:51
10        Q.    And any other types of documents that you    09:51
11   reviewed?                                               09:51
12        A.    Not that I recall.                           09:51
13        Q.    And how many documents would you say in      09:51
14   total did you review?                                   09:51
15        A.    About maybe four or five.                    09:51
16        Q.    And were those documents selected by         09:51
17   counsel?                                                09:51
18        A.    Yes.                                         09:51
19        Q.    And did they refresh your recollection as to 09:51
20   any events during the time period that we're            09:52
21   covering today?                                         09:52
22        A.    Sorry, can you -- sorry, in what sense?      09:52
23        Q.    Did it remind you of events or occurrences   09:52
24   or whether you saw things you remembered from your      09:52
25   experience with them?                                   09:52
```

Page 18

```
 1      A.   Well, I saw the emails, but some of them I    09:52
 2  don't really recall too well since it was -- it was    09:52
 3  a little far back for me.                               09:52
 4      Q.   And were these all emails that were -- where  09:52
 5  you were the sender or the recipient?                   09:52
 6      A.   I believe I was cc'd on them.                  09:52
 7           MR. LOESER:  And, Counsel, we would ask that  09:52
 8  you would, obviously, make sure that any material       09:52
 9  that Miss Chang reviewed to prepare for this            09:52
10  deposition is produced or has been produced.  Do you    09:52
11  know --                                                 09:53
12           Counsel, do you know if those materials have  09:53
13  all been produced?                                      09:53
14           MR. FALCONER:  Yeah, they have.               09:53
15  BY MR. LOESER:                                          09:53
16      Q.   And Miss Chang, did you review any of the     09:53
17  pleadings or filings in this case to prepare today?     09:53
18      A.   No.                                            09:53
19      Q.   Miss Chang, what is your understanding of     09:53
20  what this case is about?                                09:53
21           MR. FALCONER:  And, Miss Chang, I'm going to  09:53
22  instruct you here.  If the only understanding you       09:53
23  have of what the case is about is something you         09:53
24  learned in conversations with counsel, don't reveal     09:53
25  what you learned in those conversations.                09:53
```

Page 19

```
 1            If you have an independent understanding    09:53
 2   outside of conversations with counsel, you're free   09:53
 3   to share that.                                        09:53
 4            THE WITNESS:  Well, I believe everything I   09:53
 5   know is from counsel.                                 09:53
 6   BY MR. LOESER:                                        09:53
 7      Q.   Okay.  You've never read anything about this 09:53
 8   case in the newspaper or online or anything like      09:53
 9   that?                                                 09:53
10      A.   Not specifically, no.                         09:53
11            MR. LOESER:  Counsel, I will just note for   09:53
12   the record that two days ago, Tuesday, December       09:54
13   14th, at 7:09 p.m. Pacific Time, Facebook made        09:54
14   production of 1,807 documents.  That production       09:54
15   included 1,204 documents for which this deponent was  09:54
16   a custodian, an additional 65 documents where this    09:54
17   deponent was identified in the metadata or its        09:54
18   directed text.                                        09:54
19            The produced documents from Miss Chang make  09:54
20   up over 25 percent of all the custodial documents we  09:54
21   have received for this deponent.                      09:54
22            And I will just note for the record that we  09:54
23   reserve our right to recall this witness because of   09:54
24   this late production.                                 09:54
25            MR. FALCONER:  Great.  We'll reserve all     09:54
```

Page 20

1    rights as well.                                             09:54

2    BY MR. LOESER:                                             09:54

3        Q.   Miss Chang, what is your current position at 09:54

4    Facebook?                                                  09:54

5        A.   Director of academic partnerships.               09:54

6        Q.   And how long have you had that position?         09:54

7        A.   Since March.                                      09:54

8        Q.   And who do you report to in that position?       09:54

9        A.   Currently or...                                   09:54

10       Q.   Yes, currently.                                   09:55

11       A.   Alvin Bowles.                                     09:55

12       Q.   And what is his position?                         09:55

13       A.   VP of business ecosystem partnerships.            09:55

14       Q.   And who reports to you currently?                 09:55

15       A.   Brina Collins, Christina Fan and Rachel           09:55

16   Mersey.                                                    09:55

17       Q.   And what are each of their jobs?                  09:55

18       A.   Product programs, research of partnerships        09:55

19   and academic programs.                                     09:55

20       Q.   Miss Chang, what's the total amount of time 09:55

21   you've worked for Facebook?                                09:55

22       A.   14 years, a little over.                          09:55

23            MR. LOESER:  We're going to show you what         09:55

24   will be marked Exhibit 2, which is your LinkedIn           09:55

25   resume, and we'll screen share that as well.               09:55

Page 21

```
 1              (Exhibit 2 marked for identification.)    09:56
 2   BY MR. LOESER:                                       09:56
 3       Q.   Miss Chang, I just want to quickly walk     09:56
 4   through your resume.  I would like to start at the   09:56
 5   bottom at your initial experience at Facebook, which 09:56
 6   is user operations and the time period is April 2007 09:56
 7   to September 2007.  Is that accurate?                09:56
 8       A.   Yes.                                        09:56
 9       Q.   And what is it that you did in user         09:56
10   operations during that timeframe?                    09:56
11       A.   I answered user tickets which were emailed  09:56
12   questions.                                           09:56
13       Q.   So questions from Facebook users?           09:56
14       A.   Correct.                                    09:56
15       Q.   And what are the kinds of questions that    09:56
16   Facebook users would ask you?                        09:56
17       A.   I got locked out of my account.  How do I   09:56
18   use this feature?                                    09:56
19       Q.   And were you asked any questions about user 09:56
20   privacy and concerns users had about what was        09:57
21   happening to their content and information?          09:57
22       A.   I don't remember specifically.              09:57
23       Q.   And after user operations, you were the     09:57
24   global accounts manager, national direct sales, and  09:57
25   that's from 2007 to 2010; is that correct?           09:57
```

Page 22

```
 1    A.   Yes.                                          09:57
 2    Q.   And what is it that you did in that           09:57
 3  position?                                            09:57
 4    █    ███████████████████████████████████████   █████
      █  ████████████████████████████████████████    █████
      █  █████████████                                █████
 7    Q.   And what does it mean that you were the      09:57
 8  account manager?                                     09:57
 9    A.   I would support the ad agency or brands       09:57
10  whenever they made an advertising buy to ensure that 09:57
11  their ad campaign ran as they bought it on our       09:57
12  platform.                                            09:57
13    Q.   And were you involved in determining how      09:57
14  user content information was used in these ad        09:58
15  campaigns?                                           09:58
16    A.   No.                                           09:58
17    Q.   Did you have an understanding of what         09:58
18  content and information was used in ad campaigns?    09:58
19    A.   Sorry, in what sense?                         09:58
20    Q.   How were ad campaigns operated?               09:58
21       MR. FALCONER:  Objection.  Form.                09:58
22       THE WITNESS:  Sorry.  I'm not sure.  I guess    09:58
23  that's hard to answer in a -- answer.  In what       09:58
24  sense?  In how I supported it or --                  09:58
25  / / /                                                09:58
```

Page 23

```
 1   BY MR. LOESER:                                        09:58
 2
```



```
19      Q.   And were you involved at all in figuring out 09:59
20   who -- what Facebook users would be exposed to that   09:59
21   ad campaign?                                          09:59
22      A.   No.  That's -- that would be outside of my    09:59
23   scope.  I was focused on supporting the ad campaign.  09:59
24      Q.   Okay.  So who would be involved in figuring   09:59
25   out what users were exposed to the campaign?  Is      09:59
```

Page 24

1   that how it would work, someone would advertise on      10:00

2   the platform, that ad would not go to everybody on      10:00

3   the platform, would it?                                 10:00

4       A.   I'm not sure about the technical mechanics.    10:00

5   I would imagine the product team would know.            10:00

6       Q.   And was being a global accounts manager a      10:00

7   promotion from user operations?                         10:00

8       A.   It was a lateral movement.                     10:00

9       Q.   And then from 2010 to 2014, you were the       10:00

10  strategic partner manager, social commerce and          10:00

11  developer platform.  Tell me what you did there.         10:00

12  ██    ████████████████████████████          ████

    ██  ████████████████████████████████████    ████

    ██  ███████████████████████████████████     ████

    ██  ████████████████████████████████        ████

16      Q.   And was that position a promotion from         10:01

17  global accounts manager or a lateral?                    10:01

18      A.   Lateral.                                        10:01

19      Q.   And how many different partners did you work    10:01

20  with in your capacity as the manager?                    10:01

21      A.   I don't remember the specific number.           10:01

22      Q.   Was it like hundreds, or a few, or what's       10:01

23  your recollection?                                       10:01

24      A.   Sorry.  Over -- over what period of time?       10:01

25      Q.   [Audio distortion] 2007 to...                   10:01

Page 25

| | | |
|---|---|---|
| 1 | A.   Sorry.  2010 to 2014 or... | 10:01 |
| 2 | Q.   I'm sorry.  2010 to 2014, yeah. | 10:01 |
| 3 | A.   I -- again, I don't remember the numbers | 10:01 |
| 4 | specifically, but could be in there, in maybe around | 10:01 |
| 5 | a hundred, I guess, over time.  But not all managed | 10:01 |
| 6 | at once or anything. | 10:02 |
| 7 | Q.   And, Miss Chang, what is social commerce and | 10:02 |
| 8 | developer platform? | 10:02 |
| 9 | A.   Sorry.  Can you -- can you repeat that? | 10:02 |
| 10 | Q.   Yeah.  I'm looking at your job title.  It | 10:02 |
| 11 | includes the words "social commerce and developer | 10:02 |
| 12 | platform."  Can you tell me what that is? | 10:02 |
| 13 | A.   So the developer platform was something we | 10:02 |
| 14 | launched in 2007 which -- which provided APIs and | 10:02 |

15

████████████████████████████████

████████████████████████████

████████████████████████████

██████████████████████████

████████████████████████████

████  █  ████████████████████

██  ██████

██  █████████████████████

████████████████████████

| | | |
|---|---|---|
| 24 | Q.   And are there other types of verticals other | 10:03 |
| 25 | than commerce verticals? | 10:03 |

Page 26

1      A.    That I managed directly or --              10:03

2      Q.    No, that just exist at Facebook.           10:03

3      A.    Yes.  There could be gaming, for example.  10:03

4      Q.    And as best as you recall, can you just    10:03

5  describe for me the different verticals at Facebook  10:03

6  presently.                                           10:03

7      A.    So presently, it's a bit different.        10:03

8      Q.    Okay.                                       10:03

9      A.    Yeah.

10     Q.    At this time, how many different verticals 10:04

11 were there in 2010 to 2014?                          10:04

12     A.    So I don't remember the specific number, but 10:04

13 an example is like gaming, social media, I guess.    10:04

14 Sorry, I can't -- I can't remember all of them.      10:04

15     Q.    Can you remember, what did you view as the 10:04

16 main categories of verticals at this time?           10:04

17     A.    I was just mostly focused on social        10:04

18 commerce, which was the specific vertical I was      10:04

19 focused on.  So I probably have less recollection    10:04

20 around other ones, but the ones that I can recall    10:04

21 right now is gaming, for example.                    10:04

22     Q.    Let's move to your next position, manager, 10:04

23 Internet.org and mobile inclusion partnerships, and  10:04

24 that's from 2014 to 2017; is that correct?           10:05

25     A.    Correct.                                    10:05

Page 27

```
 1      Q.   And was that a lateral move also?        10:05

 2      A.   It was a lateral move with a promotion.  10:05

 3      Q.   And what did you do in that position,    10:05

 4  Miss Chang?                                        10:05

 5      A.   My focus was to work with our Internet.org 10:05

 6  product team, which was focused on launching new   10:05

 7  connectivity initiatives to help connect parts of  10:05

 8  the world that didn't have Internet access.        10:05

 9           My group was specifically focused on content 10:05

10  so that when we enabled access, you know, we would  10:05

11  be able to bring in relevant local content.        10:05

12      Q.   And so this was not just in the          10:05

13  United States, but in other countries as well?     10:05

14      A.   Correct.                                  10:05

15      Q.   So you were involved in content in other 10:06

16  countries that was published on the Facebook       10:06

17  platform?                                          10:06

18      A.   No, I wouldn't state it that way.  Content 10:06

19  in the sense of websites that we would enable access 10:06

20  via the Free Basics or Internet.org service.  So it 10:06

21  wasn't related to the developer platform.          10:06

22      Q.   And what are "mobile inclusion           10:06

23  partnerships"?                                      10:06

24      A.   Mobile inclusion partnerships consisted of 10:06

25  working with non-profits.  So, for example, we would 10:06
```

Page 28

```
 1   work with like the WHO, who would focus on creating   10:06
 2   content that was localized to help, you know,         10:06
 3   perhaps a -- perhaps a very specific region within    10:06
 4   Africa to drive awareness around malaria.             10:06
 5           And so we would work with groups where there  10:07
 6   wasn't content available to be able to localize it    10:07
 7   and help address more of, like, you know, global      10:07
 8   health issues or localized issues.                    10:07
 9       Q.   And did you work with foreign governments in 10:07
10   this role as well?                                    10:07
11       A.   I've interacted with them, but I didn't      10:07
12   formally do business or anything with them.           10:07
13       Q.   So your next position was head of business   10:07
14   platform partnerships.  Was that a promotion?  It     10:07
15   sounds like a promotion.                              10:07
16       A.   I would say it was a lateral movement with a 10:07
17   promotion.                                            10:07
18       Q.   And that was from 2017 through September of  10:07
19   2019; is that correct?                                10:07
20       A.   Correct.                                     10:07
21       Q.   And tell me what you did in that role.       10:07
22       A.   Sure.  Shifting from Internet.org, I moved   10:07
23   over to focus around how we can enable more local     10:08
24   and small businesses through -- through like          10:08
25   features and offerings.                               10:08
```

Page 29

```
 1              So, for example, you know, a local      10:08
 2    restaurant, being able to help connect their --  10:08
 3    their online reservation system through Open Table 10:08
 4    so people can make reservations via their page.  10:08
 5       Q.   And did you have particular clients or were 10:08
 6    you just overseeing the operation?               10:08
 7       A.   So I didn't work with clients because this 10:08
 8    was just platform offerings, so it was more of   10:08
 9    integration with APIs.  This is different than   10:08
10    advertising sales, which I haven't been in for a 10:08
11    while.                                           10:09
12       Q.   Okay.  And we'll get into questions about 10:09
13    APIs.                                            10:09
14              But so were you helping design what APIs 10:09
15    were made available to these partners on the     10:09
16    platform?                                        10:09
17       A.   I did not design it.  I'm not on the product 10:09
18    team.  I was mostly working with partners to help 10:09
19    drive adoption.                                  10:09
20       Q.   And what did you do help drive adoption?  10:09
21
```

Page 30

1 ███████████████████████████████████████████   ██████

  █   ████████████████████████████████           ██████

3      Q.   And then moving to your -- the next job from   10:09

4  that is the job you currently hold; is that right,   10:09

5  director of platform product partnerships?   10:09

6      A.   Correct.   10:10

7      Q.   And that entry in your resume starts with   10:10

8  "Research Platform/Academic Partnerships/Developer   10:10

9  Platform & Business Platform."   10:10

10          Can you explain what all that means --   10:10

11          [Simultaneous talking]   10:10

12 BY MR. LOESER?

13      Q.   -- the tasks that you performed as the   10:10

14 director of platform product partnerships; is that   10:10

15 right?   10:10

16          DEPOSITION REPORTER:  Excuse me.  Can you   10:10

17 repeat your question, please.   10:10

18 BY MR. LOESER:   10:10

19      Q.   Yes.  Are -- the line in your resume that   10:10

20 starts, "Research Platform/Academic Partnerships,   10:10

21 Developer Platform & Business Platform," is that a   10:10

22 description of what it is that you are doing as the   10:10

23 director of platform product partnerships?   10:10

24      A.   Correct.  But I haven't updated it to my   10:10

25 most recent, which is now I'm fully focused on   10:10

Page 31

 1    academic partnerships since March.                    10:10

 2        Q.   Okay.  Well, let's talk about what's in your 10:10

 3    LinkedIn resume right now.                             10:10

 4             Can you please explain to me what it is that 10:11

 5    you are doing as the director of platform product     10:11

 6    partnerships before your current transition to just   10:11

 7    dealing with academic partnerships?                   10:11

 8        A.   Yes.  I would work with product teams,       10:11

 9    product teams that include business platform, which   10:11

10    is that, yeah, the example I gave you around Open      10:11

11    Table.  I came back to support the developer          10:11

12    platform through its login service, and what that     10:11

13    meant was working with the product team to help them  10:11

14    with their go-to-market strategy so that we could     10:11

15    work with the actual partnerships' teams that were    10:11

16    in market to ensure that they had the right           10:11

17    materials to be able to connect and -- connect with   10:11

18    partners and, you know, help them to adopt these      10:11

19    products.                                             10:11

20        Q.   What do you mean by the "right materials"?   10:11

21        A.   "Right materials" meaning ensuring that they 10:12

22    had the right marketing language, meaning just        10:12

23    because you create something, if you can't talk       10:12

24    about it and market it correctly, people wouldn't be  10:12

25    able to understand it.                                10:12

Page 32

1          So ensuring that partner managers who are on     10:12

2     the ground would have the right information to        10:12

3     connect with partners to help them understand what    10:12

4     the product was.                                       10:12

5     Q.   And this describes your role as to research       10:12

6     these different platforms.  What did you do to         10:12

7     research the platforms?                                10:12

8     A.   So currently, I work with the Facebook Open       10:12

9     Research and Transparency Team, where they've          10:12

10    developed researcher APIs so that we can now enable    10:12

11    privacy preserved measures to allow researchers to     10:12

12    use that data for their studies.                       10:12

13    Q.   And what are -- explain to me what                10:13

14    privacy -- what was the description, of the            10:13

15    measures?  Privacy what?                               10:13

16    A.   Privacy preserving measures.  So I'm not the     10:13

17    technical or product owner, so I'll specify that.      10:13

18    But high level, you know, in ensuring that, you        10:13

19    know, information is going through a virtual clean     10:13

20    room, differential privacy applied.  I am not an       10:13

21    expert in this, so I don't know the details of how     10:13

22    it all works.                                          10:13

23    Q.   And is this a new task or is this something      10:13

24    that someone else did before you did it?               10:13

25    A.   I'm not sure I understand.                        10:13

Page 33

1       Q.    This privacy preserving structure, is that    10:13
2   something new, or is that something that previously    10:13
3   existed?                                                10:13
4       A.    So that was created by the product team.      10:13
5   What my team focused on is working with researchers     10:13
6   to drive adoption for that product.  So I can't         10:14
7   speak to that -- the specifics of the history of        10:14
8   that product.                                           10:14
9       Q.    And how do researchers drive adoption of the  10:14
10  product?                                                10:14
11      A.    They're able to go through the Facebook Open   10:14
12  Research and Transparency, or FORT, environment and,    10:14
13  you know, they can apply for access.  And we work       10:14
14  with researchers when they apply for access and help    10:14
15  get them set up so they can access those APIs -- or     10:14
16  sorry, not APIs, datasets.                              10:14
17      Q.    Miss Chang, when did you transition to your   10:14
18  current role?                                           10:14
19      A.    March --                                      10:14
20      Q.    I'm sorry.  Go ahead.                         10:14
21      A.    March 2021.                                   10:14
22      Q.    Okay.  And so did someone take over the task  10:14
23  that you previously were responsible for?               10:14
24      A.    Yes.  It transferred over to another team.    10:15
25      Q.    And what team was that?                       10:15

Page 34

```
 1      A.   The -- the acronym is PPM, but I'm trying to   10:15
 2  recall what the "PPM" stands for.  Product partner      10:15
 3  marketing.                                              10:15
 4      Q.   And who runs that team?                        10:15
 5      A.   Kelly Stonelake.                               10:15
 6      Q.   Have you worked with -- is Kelly a man or a    10:15
 7  woman?                                                  10:15
 8      A.   I believe she -- she's a she.                  10:15
 9      Q.   And had you worked with her before as the      10:15
10  director of platform product partnerships?             10:15
11      A.   Yes.                                           10:15
12      Q.   Are there any other jobs or roles that you     10:15
13  performed at Facebook that are not covered by the       10:15
14  resume that we just went through?                       10:16
15      A.    In what sense?  Do you mean like -- sorry.    10:16
16      Q.   Did you have any other positions other than    10:16
17  the ones that are listed there?                         10:16
18      A.   No.                                            10:16
19      Q.   During the time that you have worked for       10:16
20  Facebook, what software systems have you used to        10:16
21  communicate with your colleagues?                       10:16
22      A.   Sorry.  I don't understand.                    10:16
23      Q.   How did you communicate with your colleagues   10:16
24  over the past 14 years at Facebook?                     10:16
25      A.   Well, I think it depends on what year it       10:16
```

Page 35

```
 1   was.  When I first started, you know, we would    10:16
 2   have -- we would use Facebook Chat, and then we    10:16
 3   would -- we evolved to Workplace Chat, and then    10:16
 4   email.                                             10:16
 5      Q.   Okay.  So you have described three different 10:16
 6   things.  Are there any other -- I'm calling them   10:17
 7   "systems," you might call them something else.     10:17
 8           Are there any other systems that you used to 10:17
 9   communicate with your colleagues?                  10:17
10      A.   Not that I recall.                         10:17
11      Q.   For example, did you use Slack?            10:17
12      A.   No.  Well, I haven't used Slack, but I can't 10:17
13   speak for others.                                  10:17
14      Q.   WIP, do you use WIP?                        10:17
15      A.   Yes.  But I don't think that's a            10:17
16   communication tool.  More of a document tool.      10:17
17      Q.   Okay.  Let's expand -- have we covered all 10:17
18   the different communication tools that you've used 10:17
19   over the last 14 years?                            10:17
20      A.   To my understanding.  I don't know if you  10:17
21   would classify other types but, yes, email and work 10:17
22   chat.                                              10:17
23      Q.   I assume you talk to your employees; right, 10:17
24   to your --                                         10:17
25      A.   Oh, yes.  I guess, yeah, verbal.           10:17
```

Page 36

```
 1       Q.    And did you chat with them using your phone? 10:18
 2       A.    Through apps like Workplace.               10:18
 3       Q.    But not just using -- what kind of phone   10:18
 4   have you had over the last 14 years?  Is it an       10:18
 5   iPhone?                                              10:18
 6       A.    An Apple iPhone.                           10:18
 7       Q.    And did you use the chat feature on your   10:18
 8   iPhone to communicate with others?                   10:18
 9       A.    Sorry, which chat feature?                 10:18
10       Q.    On your iPhone -- is there a chat feature on 10:18
11   your iPhone?                                         10:18
12       A.    I've used -- I've used the Workplace Chat  10:18
13   application.                                         10:18
14       Q.    How about texting?  Did you text on your   10:18
15   iPhone with your colleagues regarding work?          10:18
16       A.    No.                                        10:18
17       Q.    You never texted your colleagues with your 10:18
18   iPhone?                                              10:18
19             MR. FALCONER:  Objection.  Asked and       10:18
20   answered.                                            10:18
21   BY MR. LOESER:                                       10:18
22       Q.    I'm sorry.  You did not text your colleagues 10:18
23   for work-related matters on your iPhone --           10:18
24       A.    Oh, for work, no.                          10:19
25       Q.    Did you ever utilize a personal email      10:19
```

Page 37

```
 1   account for work-related communications?          10:19
 2       A.   No.                                       10:19
 3       Q.   Did you ever send anything from your work 10:19
 4   account to your home account to save it for any    10:19
 5   particular reason?                                 10:19
 6       A.   I mean, I believe I've accidentally sent  10:19
 7   something to my personal email just because it may 10:19
 8   have auto-populated, but not intentionally.        10:19
 9       Q.   Okay.  So you never thought this is worth 10:19
10   saving or this is important, I'm going to send it to 10:19
11   my home address?                                   10:19
12       A.   No.                                       10:19
13       Q.   Now, we went over your whole time and work 10:19
14   for Facebook.  And it sounds like you have done some 10:19
15   work directly involving users; is that right?      10:19
16   That's where you started?                          10:19
17       A.   Yes, interacting with users in user       10:19
18   operation.                                         10:19
19       Q.   And you also had a position where you     10:19
20   interacted with advertisers; is that right?        10:19
21       A.   Correct.  Working with advertisers in the 10:19
22   global national sales.                             10:20
23       Q.   And you also had positions where you      10:20
24   interacted with partners; is that right?           10:20
25       A.   Correct.                                  10:20
```

Page 38

 1      Q.   Now, is there any other category of entities   10:20
 2   that utilize Facebook that you interacted with other   10:20
 3   than those?  Does that cover everything, or are        10:20
 4   there other types of Facebook partners or actors?      10:20
 5   Do you understand what I'm asking?                     10:20
 6      A.   Can you give an example?                       10:20
 7      Q.   You've interacted with users, you've           10:20
 8   interacted with advertisers, you've interacted with    10:20
 9   partners.                                              10:20
10           Is there any other category you've            10:20
11   interacted with or does that cover everything?         10:20
12      A.   I think so.                                    10:20
13      Q.   You think that covers everything?              10:20
14      A.   Well, I don't know how you -- sorry, I'm       10:20
15   trying to understand the full definition.  But to my   10:20
16   knowledge, yes.  Yeah.                                 10:20
17      Q.   And you clearly have a lot of experience       10:20
18   with working with partners; is that right?             10:20
19      A.   Correct.                                       10:20
20      Q.   Have you been involved in helping form any     10:21
21   policies or procedures at Facebook?                    10:21
22      A.   In what sense?                                 10:21
23      Q.   In any of the different types of users,        10:21
24   advertisers, partners, were you involved in helping    10:21
25   create policy for any of those groups?                 10:21

Page 39

```
 1      A.    No.                                        10:21
 2      Q.    Do you have particular things that you would 10:21
 3   consider major accomplishments for yourself at      10:21
 4   Facebook?                                           10:21
 5      A.    I would say the time here in itself and, you 10:21
 6   know, working with -- you know, working with        10:21
 7   partners on new innovative things, you know, such as 10:21
 8   ███████████████████████████████████████████████████
     █ ████████████████████████████████████████    █████
     █ ████████████████████████████████████████    █████
     █ ████████████████████████████████████████    █████
12   know, new access in different regions of the world. 10:22
13   And then now working with researchers trying to     10:22
14   enable that -- that area too.                       10:22
15      Q.    And do you feel like you have been able to  10:22
16   influence how Facebook does business with its       10:22
17   partners?                                           10:22
18      A.    In what sense?                             10:22
19      Q.    In the sense of evolving or changing their 10:22
20   practices or innovating their practices.            10:22
21      A.    I guess it's a little broad, but in the    10:22
22   sense that I'm able to help the partners achieve the 10:22
23   goals where it makes sense, yes.                    10:22
24      Q.    How is the term "partner" used by Facebook? 10:22
25      A.    Partner is someone that Facebook is working 10:23
```

Page 40

```
 1   with.  It doesn't necessarily mean that there's a      10:23
 2   monetary exchange, but someone that we would           10:23
 3   collaborate with for a larger goal or objective.       10:23
 4       Q.   And sometimes there's a monetary exchange     10:23
 5   with partners?                                          10:23
 6       A.   Advertisers, for example, would be a          10:23
 7   partner.                                                10:23
 8       Q.   Are there other types of partners for which   10:23
 9   there is a monetary exchange?                           10:23
10       A.   I don't know in full depth.  It's possible.   10:23
11       Q.   What do you mean by "monetary exchange"?      10:23
12       A.   I guess that's what I meant by I don't know   10:23
13   fully.  So my understanding in terms of advertising,   10:23
14   like if you buy advertising, in that sense.            10:23
15       Q.   So people spending money -- paying Facebook   10:23
16   money; right?  Is that what advertisers do?            10:23
17       A.   Yeah.  Not people, but advertisers.           10:24
18       Q.   Okay.  And are there partners where Facebook  10:24
19   pays the partners money?                                10:24
20       A.   I imagine there is, but I don't work on that  10:24
21   directly.                                               10:24
22       Q.   But can you identify any of those types of    10:24
23   partners?                                               10:24
24       A.   No, I don't know specifically.                10:24
25       Q.   What are the different types of partners      10:24
```

Page 41

1    that you're aware of?                                    10:24

2        A.   I would say the ones you've listed,            10:24

3    advertisers -- advertisers, developers, anyone that     10:24

4    we worked with in that sense.                           10:24

5    ███  ██████████████████████████████  ████

██  ███  █████                                              ████

██  ███  ██████████████████                                 ████

██  ███  ██████████████████████████████  ████

██  █████████████████████████████████████  ████

██  ██████████████████████████████████████  ████

██  ██████████████████████████████████  ████

██  ██████████████████████████████  ████

██  ████████████████                                        ████

14       Q.   So partners can be advertisers; right?         10:25

15       A.   Yes, correct.                                  10:25

16   ███  ████████████████████████████  ████

██  █████████████████████████████████████  ████

██  ██████████████████████████████████  ████

██  ███████████████████████████  ████

██  ███████████████████████████████████  ████

██  ███  ██████████████████████████  ████

██  ████████████████████████████████  ████

██  ██████████████████████████████████████  ████

██  ██████████████████████████████████████  ████

██  █████████████████████  ████

Page 42

1          And then I also worked with them when I          10:26

2    moved over to developer platform when they          10:26

3    integrated the Like button plugin.          10:26

4    ███  ███████████████████  ████

██████████████████████████████████

██  █████████████████████████  ████

██  ████

██  ██  ██████████████████  ████

██  ██  ████████████████████████

██  ████████████████████████  ████

██  ████████████  ████

██  ██  ██████████████  ████

13          MR. FALCONER:  Objection.  Form.          10:26

14          THE WITNESS:  Sorry.

15          MR. FALCONER:  I -- objection.  Form.          10:26

16          Go ahead.          10:26

17   BY MR. LOESER:

18       Q.   Do you have --

19   ██  ███████████  ████

██  ██  ██████████████████  ████

██  ████████████  ████

██  ████████████████████  ████

██  ██████████████████████  ████

██  ████████████  ████

██  ██  ██████████████  ████



Page 44

```
 1  ███████████████████████████                    ████
 █  ████████████████                                ████
 █      ██    ████                                  ████
 █        ██   ██████████████████████████████      ████
 █  ████████████████████                            ████
 █          ██████████████████████████             ████
 █          ██████████                              ████
 █          ████████████████████████               ████
 █  ████████████████████████████████████           ████
 █  ████████████████████████                        ████
```

11  BY MR. LOESER:                                   10:28

12      Q.   Are app developers considered partners?   10:28

13      A.   Yes, if -- yes.                          10:28

14      Q.   And do you know what "data brokers" are?   10:28

15      A.   Like generally or...                     10:28

16      Q.   Yes, generally.                          10:29

17      A.   Yes.                                     10:29

18      Q.   What are data brokers?                   10:29

19      A.   They are an entity that may facilitate the   10:29

20  trade of data.                                   10:29

21      Q.   Okay.  And they're considered partners as   10:29

22  well at Facebook?                                10:29

23      A.   I don't know.  I don't work with data   10:29

24  brokers.                                         10:29

25      Q.   Do you know -- you mentioned the monetary   10:29

Page 45

```
 1   exchange aspect.  Do you know if there was a        10:29
 2   monetary exchange between Facebook and data brokers? 10:29
 3        A.   I don't know.                             10:29
 4        Q.   Are advertisers sometimes also app        10:29
 5   developers?                                         10:29
 6        A.   Yes.                                      10:29
 7        Q.   Miss Chang, why does Facebook have partners? 10:29
 8        A.   I think that depends in terms of -- so    10:29
 9   Facebook is hard to generalize as one entity.  It's 10:30
10   made up of, you know, different groups trying to    10:30
11   drive different goals.  And I would say related to  10:30
12   different goals, they may partner to help achieve   10:30
13   that goal.  So I can't speak to what every          10:30
14   individual team's goals are.                        10:30
15        Q.   So let's just think in terms of the partners 10:30
16   with which you've been involved.                    10:30
17        A.   Okay.                                     10:30
18        Q.   Why does Facebook have those partnerships? 10:30
19             DEPOSITION REPORTER:  Excuse me.  I lost the 10:30
20   last word.  "Why does Facebook..."                  10:30
21   BY MR. LOESER:                                      10:30
22        Q.   -- have those partnerships?               10:30
23   ██    ████████████████████████        ████          
██  ██████████████████████████████████████████
██  ██████████████████████████████████████
```

Page 46

1    ▮

▮   ▮

▮   ▮

▮   ▮

▮   ▮

▮   ▮

▮   ▮

▮   ▮

▮

▮   ▮

▮   ▮

▮   ▮

13        Q.   And wasn't another purpose for Facebook to      10:31

14   collect information about the user for its own use?     10:31

15        A.   I don't know.  That would be a bit outside     10:31

16   of my -- my specific role.                              10:31

17        Q.   Facebook shared user content information       10:32

18   with partners; is that right?                           10:32

19        A.   In what sense?                                 10:32

20        Q.   Well, I'm asking you, in your role involved    10:32

21   in all the capacities dealing with partners, was        10:32

22   there a sharing of user content information --           10:32

23             MR. FALCONER:  Objection.  Form.               10:32

24             THE WITNESS:  So we would have public APIs,     10:32

25   where if people consented, you know, I believe they      10:32

Page 47

```
 1   would be able to provide that data to the          10:32
 2   application developer.                              10:32
 3   BY MR. LOESER:                                      10:32
 4      Q.   Okay.  And so through the API, a partner    10:32
 5   could obtain user content information about users;  10:32
 6   is that right?                                      10:32
 7           MR. FALCONER:  Objection.  Form.            10:32
 8           THE WITNESS:  I think that depends.  I      10:32
 9   wouldn't generalize it to that because it would be  10:32
10   dependent on what the developer created and what    10:33
11   they were approved to use.                          10:33
12   BY MR. LOESER:                                      10:33
13      Q.   Okay.  But there were partners that were    10:33
14   approved to have access to various API permissions; 10:33
15   is that right?                                      10:33
16           MR. FALCONER:  Objection.  Form.            10:33
17           THE WITNESS:  I imagine so.                 10:33
18   BY MR. LOESER:                                      10:33
19      Q.   And don't you, in fact, know so from your -- 10:33
20   from the work you did with partners?                10:33
21           MR. FALCONER:  Objection.  Form and asked   10:33
22   and answered.                                       10:33
23           THE WITNESS:  So for specific partners for  10:33
24   specific permissions, yes, but I thought you were   10:33
25   trying to speak to it more generally, which I didn't 10:33
```

Page 48

1    manage generally.  There was an operations team for          10:33

2    that.                                                        10:33

3    BY MR. LOESER:                                               10:33

4        Q.   And when Facebook shares -- when Facebook           10:33

5    shares user information with a third party, what             10:33

6    does that mean to you?                                       10:33

7        A.   I think it depends on what specific -- what         10:33

8    specific group.  So in the context of my experience          10:34

9    on the developer platform, it would be through the           10:34

10   developer APIs and the permissions there.                    10:34

11       Q.   Okay.  And I just want to make sure I               10:34

12   understand how you use the terminology.                      10:34

13            Through the APIs -- APIs are a way for a            10:34

14   third party that has permission to obtain various            10:34

15   categories of information that Facebook has                  10:34

16   collected about the user; is that right?                     10:34

17            MR. FALCONER:  Objection.  Form.                    10:34

18            Go ahead.                                           10:34

19            THE WITNESS:  Sorry.  Can you restate that?         10:34

20            MR. LOESER:  Why don't we just repeat the          10:34

21   question.  Would you read the question back, please,         10:34

22   Miss Jennings.                                               10:34

23            (Record read as follows:                           10:34

24            "Q.   Okay.  And I just want to make sure           10:34

25            I understand how you use the terminology.           10:34

Page 49

| | | |
|---|---|---|
| 1 | Through the APIs -- APIs are a way for a | 10:34 |
| 2 | third party that has permission to obtain | 10:34 |
| 3 | various categories of information that | 10:34 |
| 4 | Facebook has collected about the user; | 10:34 |
| 5 | is that right?") | |
| 6 | THE WITNESS:  No. | 10:35 |
| 7 | MR. FALCONER:  Same objection. | 10:35 |
| 8 | BY MR. LOESER: | 10:35 |
| 9 | Q.   So APIs are a way for a third party to | 10:35 |
| 10 | obtain various categories of information that | 10:35 |
| 11 | Facebook has collected about a user; correct? | 10:35 |
| 12 | A.   Yes.  It's a -- it's a vehicle, but I | 10:35 |
| 13 | wouldn't necessarily say -- again, I'm not a | 10:35 |
| 14 | technical person.  I don't know if that's all | 10:35 |
| 15 | technically how it's done, but to my understanding, | 10:35 |
| 16 | it sounds right. | 10:35 |
| 17 | Q.   Are you familiar with the concept at | 10:35 |
| 18 | Facebook of reciprocity? | 10:35 |
| 19 | A.   Yes. | 10:35 |
| 20 | MR. FALCONER:  Objection.  Form. | 10:35 |
| 21 | Go ahead. | 10:35 |
| 22 | BY MR. LOESER: | 10:35 |
| 23 | Q.   Can you explain to me how Facebook uses the | 10:35 |
| 24 | term reciprocity with -- particularly with respect | 10:35 |
| 25 | to partners? | 10:36 |

Page 50

```
 1          MR. FALCONER:  Same objection.           10:36
 2          THE WITNESS:  My understanding of        10:36
 3   reciprocity is a value exchange.                10:36
 4   BY MR. LOESER:                                  10:36
 5      Q.   And explain what you mean by that.      10:36
 6      A.   "Value" meaning -- and it doesn't       10:36
 7   necessarily mean monetary.  So, you know, going back  10:36
 8   to partnerships, ensuring that if we're going to 10:36
 9   partnerships, there's value in that experience.  10:36
10
15      Q.   So is value another way of saying       10:36
16   information?  So when there's value -- when there is  10:36
17   reciprocity with a partner, that means that Facebook  10:36
18   is giving that partner some information about users,  10:36
19   and Facebook is obtaining from that partner some 10:37
20   information about users; is that right?          10:37
21      A.   Not to my understanding.                10:37
22      Q.   It's not your understanding that in exchange  10:37
23   for providing information, Facebook gets back    10:37
24   information?                                     10:37
25      A.   Well, I think it's dependent.  So when I was  10:37
```

Page 51

1   talking about the value exchange, it doesn't have to    10:37

2   be information.  Value can be in the sense of like      10:37

3   experience.  So if the experience is making the user    10:37

4   experience better, meaning it brings like delight to    10:37

5   a user, then that's also an exchange in value.          10:37

6       Q.   However, it is sometimes an exchange of        10:37

7   information; is that correct?                           10:37

8       A.   Yes.  It could be.                             10:37

9   ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

24      A.   I don't know.                                  10:38

25      Q.   Do you know anything about how it studies --   10:38

Page 52

1   Facebook studies that information or analyzes it?      10:38

2       A.   No.  That would be outside my scope.         10:38

3       Q.   Do you know if, in fact, information that is  10:38

4   published back is studied and analyzed by Facebook?   10:38

5       A.   I don't know.                                 10:38

6       Q.   You don't know if that happens, or you just  10:38

7   don't know anything about it?                          10:38

8       A.   I just don't know.  It is outside my scope   10:38

9   so I can't really speak to it.                         10:38

10      Q.   And Miss Chang, you worked with partners      10:38

11  with whom there was reciprocity; is that right?        10:39

12      A.   In what sense?                                10:39

13           MR. FALCONER:  Objection to form.             10:39

14  BY MR. LOESER:                                         10:39

15  ███ ████████████████████ ███

█ █████████████████████████████████

█ ████████████████████████████ ███

█ █████████████████████ ███

█ ██ ████████████████████████████████

█ ██████████████████████████████ ███

█ ████████████████████████████ ███

█ ██ ██████ ███

█ ██ ████████████████ ███

24      Q.   It's an important concept to Facebook;        10:39

25  right?                                                 10:39

Page 53

```
 1      A.   I don't know.                          10:39
 2      Q.   Were you involved in making sure that there  10:39
 3   was reciprocity with partners with whom you worked?  10:39
 4      A.   I don't know in the sense that I -- I'm not  10:39
 5   sure I understand.                              10:39
 6      Q.   Well, did you ever, for example, communicate  10:39
 7   to your colleagues that some interaction with a  10:39
 8   partner was positive because there was progress with  10:40
 9   reciprocity?                                    10:40
10      A.   I'm not sure I understand.  So when I would  10:40
11   work with a partner, I would try to ensure that I'm  10:40
12   always representing the voice of a partner       10:40
13   holistically, meaning the different ways that we're  10:40
14   working with them, the things that would impact  10:40
15   their business.  Not necessarily in the scope of  10:40
16   reciprocity.                                    10:40
17      Q.   But you would also want to make sure that if  10:40
18   Facebook was giving content information to the   10:40
19   partner, that Facebook was getting back some     10:40
20   information; isn't that correct?                10:40
21      A.   I didn't regulate that.  Well, I guess I'm  10:40
22   having a hard time understanding.  Like I don't  10:40
23   regulate that.                                  10:40
24      Q.   You don't recall any examples of where you  10:40
25   were endeavoring to encourage reciprocity?      10:41
```

Page 54

```
 1      A.   I'm not sure I understand.              10:41

 2      Q.   Miss Chang, are some partners considered   10:41

 3  more valuable to Facebook than other partners?   10:41

 4      A.   I guess in the -- I guess it depends on what   10:41

 5  specific initiative or project.  I wouldn't say it's   10:41

 6  one holistic stack rank.                          10:41

 7      Q.   Okay.  Can you think of any -- any       10:41

 8  characteristics of a partner that would make it more   10:41

 9  valuable to Facebook than other partners?        10:41

10  ███  ██████████████████████████████       ████

██  ██████████████████████████████         ████

██  ██████████████████████████████████     ████

██  ████████████████████████████████       ████

██  ████████████████████████████████████████  ████

██  ██████████████████████████████████       ████

██  █████████████████████████████████████████  ████

██  ███████████████████████████████           ████

██  ██████████████████████████              ████

19      Q.   So is a partner that publishes back a lot of   10:42

20  content information considered a valuable partner   10:42

21  for Facebook?                                     10:42

22           MR. FALCONER:  Objection.  Form.        10:42

23  BY MR. LOESER:                                    10:42

24      Q.   Taking into account on determining whether   10:42

25  that was a valuable partner?                      10:42
```

Page 55

| | | |
|---|---|---|
| 1 | MR. FALCONER:  Same objection. | 10:42 |
| 2 | THE WITNESS:  Again, I don't know.  And I | 10:42 |
| 3 | guess it's kind of hard to generalize it, so I don't | 10:42 |
| 4 | know. | 10:42 |
| 5 | BY MR. LOESER: | 10:42 |
| 6 | Q.   So is the value of a partner based on how | 10:42 |
| 7 | much user content information Facebook obtains from | 10:42 |
| 8 | a partner? | 10:42 |
| 9 | MR. FALCONER:  Objection.  Form.  And asked | 10:42 |
| 10 | and answered. | 10:42 |
| 11 | THE WITNESS:  I don't know. | 10:42 |
| 12 | BY MR. LOESER: | 10:42 |
| 13 | Q.   Miss Chang, are some partners considered | 10:43 |
| 14 | vendors? | 10:43 |
| 15 | A.   Yes.  Yeah. | 10:43 |
| 16 | Q.   So what would a "vendor" be? | 10:43 |
| 17 | A.   A vendor would be -- sorry.  A vendor would | 10:43 |
| 18 | be someone we buy services from. | 10:43 |
| 19 | Q.   Okay.  And can you think of any examples of | 10:43 |
| 20 | services that Facebook buys? | 10:43 |
| 21 | ███   ████████████████████████████████ | ███ |
| | ███████████████████████████████████ | ███ |
| | ███████████ | ███ |
| 24 | Q.   So they would provide a service?  That | 10:43 |
| 25 | particular type of partner would provide a service | 10:43 |

Page 56

1   to Facebook?                                           10:43

2       A.   That partner in the advertising capacity     10:43

3   could also be a vendor.                                10:43

4       Q.   And a lot of partner arrangements, the       10:43

5   information the partner obtains from Facebook is       10:44

6   used to support that partner's business; is that      10:44

7   right?                                                 10:44

8            MR. FALCONER:  Objection.  Form.              10:44

9            THE WITNESS:  Sorry.  I don't understand.     10:44

10  Can you -- can you say it another way or...            10:44

11  BY MR. LOESER:                                         10:44

12      Q.   What is your understanding of what a partner  10:44

13  does when it obtains user content information from     10:44

14  Facebook?                                              10:44

15           MR. FALCONER:  Objection.  Form.              10:44

16           THE WITNESS:  I don't know.  If there's       10:44

17  something more specific...                             10:44

18  BY MR. LOESER:                                         10:44

19      Q.   Do you know anything about how Facebook uses  10:44

20  user content information in its advertising            10:44

21  business?                                              10:44

22      A.   No, not technically.                          10:44

23      Q.   Do you know anything about how Facebook       10:44

24  monetizes information that it obtains from its         10:45

25  partners?                                              10:45

Page 57

| | | |
|---|---|---|
| 1 | MR. FALCONER:  Objection.  Form. | 10:45 |
| 2 | Go ahead. | 10:45 |
| 3 | THE WITNESS:  Not specifically. | 10:45 |
| 4 | BY MR. LOESER: | 10:45 |
| 5 | Q.  Well, generally, do you know? | 10:45 |
| 6 | A.  No.  I don't -- well, I don't know in the | 10:45 |
| 7 | capacity that -- sorry, if you can give me an | 10:45 |
| 8 | example. | 10:45 |
| 9 | Q.  Was that something that you ever discussed | 10:45 |
| 10 | with your colleagues, how Facebook monetizes | 10:45 |
| 11 | information? | 10:45 |
| 12 | A.  No, not that I -- that I recall. | 10:45 |
| 13 | Q.  Do you know what group at Facebook managed | 10:45 |
| 14 | the relationship with data brokers? | 10:45 |
| 15 | A.  No. | 10:45 |
| 16 | Q.  Do you know if data brokers were ever app | 10:45 |
| 17 | developers for Facebook? | 10:46 |
| 18 | A.  I don't know. | 10:46 |
| 19 | Q.  Do you know if data brokers were ever | 10:46 |
| 20 | advertisers for Facebook? | 10:46 |
| 21 | A.  I don't know. | 10:46 |
| 22 | MR. LOESER:  I will show you what we will | 10:46 |
| 23 | mark as Exhibit 3.  We will screen share that as | 10:46 |
| 24 | well. | 10:46 |
| 25 | (Exhibit 3 marked for identification.) | 10:46 |

Page 58

| | | |
|---|---|---|
| 1 | BY MR. LOESER: | 10:46 |
| 2 | Q.   This is an email from -- and I'm not sure | 10:46 |
| 3 | I'm saying this name right.  Ime Archibong.  Do you | 10:46 |
| 4 | know who that is? | 10:46 |
| 5 | A.   Yes, Ime Archibong. | 10:46 |
| 6 | Q.   Ime Archibong.  What is Ime Archibong's job? | 10:46 |
| 7 | A.   At this time or... | 10:46 |
| 8 | Q.   Yes. | 10:46 |
| 9 | A.   I believe he was the director of platform | 10:47 |
| 10 | partnerships. | 10:47 |
| 11 | Q.   Okay.  So someone who had the job before | 10:47 |
| 12 | you? | 10:47 |
| 13 | A.   I didn't have that job. | 10:47 |
| 14 | Q.   So the Exhibit 3 is an email from Ime | 10:47 |
| 15 | Archibong to you, dated September 30th, 2013; right? | 10:47 |
| 16 | A.   Sorry.  Can you repeat that?  I was also | 10:47 |
| 17 | reading the email. | 10:47 |
| 18 | Q.   I'm just identifying this exhibit for the | 10:47 |
| 19 | record.  And it is an email from Ime Archibong to | 10:47 |
| 20 | you dated September 30th, 2013; is that correct? | 10:47 |
| 21 | A.   Yes, correct. | 10:47 |
| 22 | Q.   And do you see the subject line on that | 10:47 |
| 23 | email? | 10:47 |
| 24 | A.   Yes. | 10:47 |
| 25 | ███  ████████████████████████████████████  ███ | |





Page 61

████████████████████████████████████████

█  ████████████████████████████████████  ████

█  ███████████████████████████████████  ████

█  ███████████████████████████████  ████

█        █  ████████████████████████████████

█  ████████████████████████████  ████

█        █  ████████

█        █  ████████████████████████████████

█  ██████████████████████████  ████

██       █  ███████████████████████████████  ████

██  ████████                                      ████

12       Q.   What about data that was sold by Facebook?   10:51

13   Were you involved at all with that?                    10:51

14       A.   No.                                           10:51

15       Q.   And are you aware of any data that was sold   10:51

16   by Facebook?                                           10:51

17       A.   Not to my knowledge, no.                      10:51

18            MR. FALCONER:  Derek, can we take a quick     10:52

19   break whenever you are done with this document?        10:52

20            MR. LOESER:  Sure.  Now is fine.              10:52

21            MR. FALCONER:  All right.                     10:52

22            MR. LOESER:  You want 10 minutes?  15         10:52

23   minutes?                                               10:52

24            MR. FALCONER:  Yeah.                          10:52

25            THE VIDEOGRAPHER:  This marks the end of      10:52

Page 62

| | | |
|---|---|---|
| 1 | media No. 1 in the deposition of Jackie Chang. | 10:52 |
| 2 | Going off the record.  The time is 10:52. | 10:52 |
| 3 | (Off the record.) | 10:52 |
| 4 | THE VIDEOGRAPHER:  This marks the beginning | 11:14 |
| 5 | of media No. 2 in the deposition of Jackie Chang. | 11:14 |
| 6 | We are back on the record.  The time is 11:14. | 11:14 |
| 7 | BY MR. LOESER: | 11:14 |
| 8 | Q.   Miss Chang, Facebook collects content and | 11:14 |
| 9 | information about its users from its partners and | 11:14 |
| 10 | uses that information in its advertising business; | 11:14 |
| 11 | is that correct? | 11:14 |
| 12 | MR. FALCONER:  Objection.  Form. | 11:14 |
| 13 | THE WITNESS:  I can't speak to that broadly, | 11:14 |
| 14 | meaning I don't know the technical specifics to be | 11:14 |
| 15 | able to support that statement. | 11:15 |
| 16 | BY MR. LOESER: | 11:15 |
| 17 | Q.   But do you know that generally to be the | 11:15 |
| 18 | case, Miss Chang? | 11:15 |
| 19 | A.   No.  I -- I don't really feel comfortable | 11:15 |
| 20 | answering because I don't know. | 11:15 |
| 21 | Q.   Do you know how Facebook makes money? | 11:15 |
| 22 | A.   My understanding is advertising. | 11:15 |
| 23 | Q.   And do you know whether advertising collects | 11:15 |
| 24 | and uses user content and information? | 11:15 |
| 25 | MR. FALCONER:  Objection.  Form. | 11:15 |

Page 63

```
 1              THE WITNESS:  I don't know, meaning I don't   11:15
 2  understand the product mechanics around that.            11:15
 3  BY MR. LOESER:                                           11:15
 4     Q.   What do you understand about the advertising     11:15
 5  business at Facebook?                                    11:15
 6     A.   Not much since I haven't worked on it since      11:15
 7  2010.                                                    11:15
 8     Q.   Do you know what portion of Facebook's           11:15
 9  revenue comes from its advertising business?             11:15
10     A.   Not specifically.                                11:15
11     Q.   Do you have any idea at all?                     11:15
12     A.   I think a good portion.                          11:16
13     Q.   And does the advertising business utilize in     11:16
14  any way, as far as you understand it, content and        11:16
15  information that Facebook collects from its              11:16
16  partners?                                                11:16
17              MR. FALCONER:  Objection.  Form.             11:16
18              THE WITNESS:  Again, I don't know enough      11:16
19  about the technical specifics to make that               11:16
20  assertion.  I don't know.                                11:16
21  BY MR. LOESER:                                           11:16
22     Q.   Well, I'm not asking about the technical         11:16
23  specifics, just the general concept.  Is that            11:16
24  something you understand?                                11:16
25     A.   I don't know.                                    11:16
```

Page 64

```
 1      Q.    Miss Chang, are people who create apps for   11:16
 2  Facebook called "developers"?                          11:16
 3      A.    Yes.                                          11:16
 4      Q.    Are there other types of developers?         11:16
 5      A.    I only know of app developers.               11:16
 6      Q.    And we mentioned APIs before, but can you    11:17
 7  please just explain what "APIs" are.                   11:17
 8      A.    Application programming interface.  It's a   11:17
 9  way for, you know, two -- two services to connect      11:17
10  and speak to each other.                               11:17
11      Q.    And how does Facebook use APIs with regard   11:17
12  to user content and information?                       11:17
13      A.    I'm not sure I understand the question.      11:17
14      Q.    Do you understand how Facebook uses APIs at  11:17
15  all?                                                   11:17
16      A.    Well, Facebook doesn't use the APIs.  The    11:17
17  developer -- so, sorry, can you be a little more       11:17
18  specific?                                              11:17
19      Q.    Yeah.  How do APIs work at Facebook on its   11:17
20  platform?                                              11:17
21      A.    I think that depends because APIs can be     11:17
22  used in a lot of different cases.  Are you speaking    11:17
23  to developer platform or?                              11:18
24      Q.    Yes.  How are -- how do third parties access 11:18
25  user content information through APIs?                 11:18
```

Page 65

```
 1      A.   So they can go through our developer        11:18
 2   platform and go through the process of approvals and 11:18
 3   submitting their app to access APIs.                11:18
 4      Q.   Explain that process in as much detail as   11:18
 5   you can.                                            11:18
 6      A.   Unfortunately, I can't.  I don't work on the 11:18
 7   operations side.  So generally, we prefer them to go 11:18
 8   through the flow, and that flow is managed by -- on  11:18
 9   the product and operation side.  So I can't speak to 11:18
10   the exact process.                                  11:18
11      Q.   Okay.  You are familiar with the different  11:18
12   sorts of APIs that Facebook provides for its        11:18
13   third-party access to --                            11:18
14      A.   Sorry, you broke up.  Can you say that      11:18
15   again?                                              11:18
16      Q.   Have you ever looked at a list of APIs that 11:18
17   are -- that app developers can use if they have     11:19
18   permission to do so?                                11:19
19      A.   I have looked at developer.Facebook.com,    11:19
20   which has a list of APIs.                           11:19
21      Q.   Okay.  And are you familiar with any of     11:19
22   those APIs?                                         11:19
23      A.   I don't -- probably not, since it's been a  11:19
24   couple years since I've worked on that directly.    11:19
25      Q.   For example, are you familiar with the      11:19
```

Page 66

1    friends permission APIs?                              11:19

2        A.   I know what the name is, but I don't know    11:19

3    like the specifics around it.                         11:19

4        Q.   What do you know about it?                    11:19

5        A.   I've heard of it, like I've seen the name     11:19

6    like in emails, but I don't remember what it exactly  11:19

7    does and the technical specifics of it.               11:19

8        Q.   Do you know what information the friends API 11:19

9    permissions allow a third party to access?           11:20

10       A.   I don't recall specifically.                 11:20

11       Q.   In order to have access to APIs, what does a 11:20

12   developer need to do?                                 11:20

13       A.   So I think that depends.  Are you talking    11:20

14   about just the developer platform workflow or...      11:20

15       Q.   We can start there, yeah.                    11:20

16       A.   Sure.  On developer platform, they would go  11:20

17   to developer.Facebook.com, go through the documents   11:20

18   and, generally, they would follow the workflow for    11:20

19   approval.                                             11:20

20       Q.   And is there a team that evaluates those     11:20

21   approvals?                                            11:20

22       A.   Yes.                                         11:20

23       Q.   And what about partners?  Do they just -- is 11:20

24   that just the only system that exists for them, too,  11:20

25   or is there something else?                           11:20

Page 67

```
 1              MR. FALCONER:  Objection.  Form.        11:20
 2              THE WITNESS:  I'm not sure I understand.  11:21
 3    BY MR. LOESER:                                     11:21
 4         Q.   Do partners just go through the developer 11:21
 5    platform you just described, or is there another way 11:21
 6    for them to negotiate API permissions?             11:21
 7         A.   So --                                    11:21
 8              MR. FALCONER:  Objection.  Form.         11:21
 9              THE WITNESS:  So they go through that     11:21
10    process.                                           11:21
11    BY MR. LOESER:                                     11:21
12         Q.   So there's -- so there's no difference    11:21
13    between how partners access and make use of APIs and 11:21
14    the public, the public --                          11:21
15         A.   Sorry I --                               11:21
16              MR. FALCONER:  Objection.  Form.         11:21
17    BY MR. LOESER:                                     11:21
18         Q.   I'm just trying to understand.  We will get 11:21
19    into some documents that maybe will flush this out. 11:21
20              But in terms of the different ways that APIs 11:21
21    are accessed, you have described a way that         11:21
22    developers just go on a platform.  And I'm asking   11:21
23    you:  Is there a different way for partners that    11:21
24    interact with Facebook?                            11:21
25              MR. FALCONER:  Objection.  Form.         11:21
```

```
                                                     Page 68
  1              THE WITNESS:  So I -- like I think it's a    11:21
  2   little broad.  So I -- I'm struggling to know           11:21
  3   exactly.  But, yes, they -- depending on specific       11:21
  4   need, they could go through a partnership               11:22
  5   organization.                                           11:22
  6   BY MR. LOESER:                                          11:22
  7      Q.   And were you involved at all in working with    11:22
  8   partners and specifically with regard to the APIs       11:22
  9   that they sought permission to utilize?                 11:22
 10              MR. FALCONER:  Objection.  Form.             11:22
 11              THE WITNESS:  Sorry.  I don't understand,    11:22
 12   like going through the developer platform or...         11:22
 13   BY MR. LOESER:                                          11:22
 14      Q.   No.  Just in your role working with             11:22
 15   partners, have you ever had occasion to discuss with    11:22
 16   partners the permissions that they wanted for APIs?     11:22
 17      A.   Yes.                                            11:22
 18      Q.   Okay.  And explain that process.                11:22
 19      A.   So I don't remember in detail because it's      11:22
 20   been a long time.  But they could email us about it,    11:22
 21   and we would generally refer them to where they         11:22
 22   needed to go.                                           11:22
 23      Q.   And do you know when Facebook first started     11:23
 24   using APIs with its partners?                           11:23
 25      A.   Sorry.  Can you say that -- state that          11:23
```

Page 69

```
 1  again?                                                 11:23

 2      Q.   Do you know when Facebook first started       11:23

 3  using APIs with its partners?                          11:23

 4      A.   I'm not sure I understand that question.      11:23

 5  Technically, I don't know.                             11:23

 6      Q.   Do you know who came up with the various      11:23

 7  APIs that Facebook has?                                11:23

 8      A.   No.                                           11:23

 9      Q.   Are you familiar with the concept of Friend   11:23

10  Sharing on the Facebook platform?                      11:23

11      A.   I think I've heard of it, but I don't know    11:23

12  what it is.                                            11:23

13      Q.   Are you aware that on the Facebook platform   11:23

14  for a period of time, when a friend downloaded an      11:24

15  app, that app could obtain access to that person's     11:24

16  friends via Friend Sharing APIs?                       11:24

17           MR. FALCONER:  Objection.  Form.              11:24

18           Go ahead.                                     11:24

19           THE WITNESS:  I don't remember.               11:24

20  BY MR. LOESER:                                         11:24

21      Q.   You don't remember anything about that?       11:24

22      A.   No.                                           11:24

23      Q.   That's not something you were involved at     11:24

24  all in?                                                11:24

25      A.   I don't remember.                             11:24
```

Page 70

```
1      Q.    That wasn't a significant part of the work   11:24
2   that you did for Facebook?                            11:24
3      A.    I don't understand.  Sorry, I -- I worked on 11:24
4   a lot of things, so I don't know the meaning of       11:24
5   that.                                                 11:24
6      Q.    But the work that you did with regard to     11:24
7   Friend Sharing in particular does not stand out for   11:24
8   you as being particularly meaningful?                 11:24
9           MR. FALCONER:  Objection --
10          THE WITNESS:  I don't think I worked on       11:24
11  Friend Sharing.                                       11:24
12  BY MR. LOESER:
13     Q.    Do you know what sort of information is       11:24
14  generally made available through friends              11:25
15  permissions?                                          11:25
16     A.    No, I don't.                                 11:25
17     Q.    Are you aware of whether an app can obtain    11:25
18  information about a person's friends who did not       11:25
19  download the app?                                     11:25
20          MR. FALCONER:  Objection.  Form.              11:25
21          THE WITNESS:  I don't know.                   11:25
22  BY MR. LOESER:                                        11:25
23     Q.    Do you know how many different friends        11:25
24  permissions APIs there are?                           11:25
25     A.    I don't know.                                11:25
```

Page 71

```
 1      Q.   Are you familiar with the term "high-signal   11:25
 2   APIs"?                                                 11:25
 3      A.   No.                                            11:25
 4      Q.   Are you familiar with the read_stream          11:25
 5   permissions APIs?                                      11:25
 6      A.   I've heard of it.                              11:25
 7      Q.   Okay.  What do you know about that?            11:25
 8      A.   I can't recall.  It's been so long, I don't    11:25
 9   know.                                                  11:26
10      Q.   Do you know who came up with the idea of       11:26
11   friends permissions APIs?                              11:26
12      A.   No, I don't.                                   11:26
13      Q.   Do you know what purpose it served?            11:26
14      A.   No.                                            11:26
15      Q.   Do you know if it was controversial?           11:26
16      A.   I don't know.                                  11:26
17      Q.   Do you know if that was a API -- the friends   11:26
18   APIs were often misused or abused by app developers?   11:26
19      A.   I don't know.                                  11:26
20           MR. LOESER:  I will show you Exhibit -- what   11:26
21   we marked as Exhibit 4.                                11:26
22           (Exhibit 4 marked for identification.)         11:26
23   BY MR. LOESER:                                         11:26
24      Q.   We will share that as well.                    11:26
25           Exhibit 4 is an email from Marie Hagman to     11:26
```

Page 72

```
 1   Chris Daniels, with a cc to you, dated May 3rd,        11:27

 2   ████████████████████████████████                       ████

 3           Do you see that, Miss Chang?                    11:27

 4       A.   Yes.  May I read it?                           11:27

 5       Q.   Yes, of course.  I'm going to ask you some     11:27

 6   specific questions about different parts of the         11:27

 7   email string, but -- so we will go through it, but      11:27

 8   if you want to take a look at it, go ahead.             11:27

 9       A.   Okay.                                          11:27

10   ██   ██████████████████████                            ████

     ██   ██   ██████████████████████████████              ████

     ██   ████████████████████████████████████████        ████

     ██   ████████████████████                             ████

14       Q.   Okay.  And if this email was cc'd to you,     11:28

15   does that mean that you received the email?            11:28

16       A.   Yes.                                          11:28

17       Q.   As we go through a lot of these emails, if    11:28

18   you are on the email as a recipient, you don't have    11:28

19   any reason to believe you didn't receive the emails;   11:28

20   right?                                                 11:28

21       A.   Sorry.  I didn't what?                        11:28

22       Q.   If you're on an email as a recipient -- we    11:28

23   are going to go through a number of emails -- there    11:28

24   is no reason for you to believe that you did not       11:28

25   actually receive the email; correct?                   11:28
```

Page 73

1        A.    I don't think so.                              11:28

2        ███    ████████████████████████████████████

██  ███████████████████████████████              ███

██  ████████████████████████████                 ███

██     ███    ████                                ███

██     ███    ████████████████████████████        ███

██     ███    ███████████████████                 ███

██     ███    █████████████████████████████████   ███

██     ████████████████████████████████            ███

███  ███████                                       ███

███    ███    ████████████████████               ███

12       Q.    Okay.  When you say a "permission," that     11:29

13    means permission to access and use an API; is that    11:29

14    right?                                                11:29

15       A.    Again, I don't know the technical specifics. 11:29

16       Q.    Can you use an API if you don't have         11:29

17    permission to use the API?                            11:29

18       A.    I don't know.                                11:29

19       Q.    You don't have any understanding of what     11:29

20    "permissions" means in connection with an API?        11:29

21       A.    I don't think I understand in -- how the     11:29

22    context you're referring it to.                       11:29

23       ███    █████████████████████████            ███

███  ███████████████████████████████████           ███

███    █████████                                    ███









Page 80



24          MR. FALCONER:  Objection.  Foundation.        11:37

25          THE WITNESS:  Sorry.  Can you say that         11:37

Page 81

1    again?                                            11:38

2    BY MR. LOESER:                                    11:38

3            ██        ████████████████████████████









Page 86

1  ███████████████████████                    ████

   █      ████████████████████████            ████

   █   ██████████                             ████

   █         ██████████████████████████████   ████

   █   ████████████████████████████████       ████

   █   ████████████████                        ████

7           MR. LOESER:  Okay.  We can go to the next    11:43

8  exhibit, which should be tab 5.                        11:44

9           Actually, if we can go off the record for    11:44

10 one second.  Give us three minutes.                    11:44

11          THE VIDEOGRAPHER:  Okay.  Going off the       11:44

12 record.  The time is 11:44.                            11:44

13          (Off the record.)                             11:44

14          THE VIDEOGRAPHER:  We are back on the         11:48

15 record.  The time is 11:48.                            11:48

16          (Exhibit 5 marked for identification.)        11:48

17 BY MR. LOESER:                                          11:48

18    Q.  Miss Chang, we are showing you what's now       11:48

19 been marked Exhibit 5, which we will screen share as   11:48

20 well, which is an email from Constantin, and I'm       11:48

21 sure I will get this last name wrong, but              11:49

22 Koumouzelis.  Is that how you say that?                11:49

23    A.  Sorry.  I'm also trying to update the           11:49

24 Egnyte.  I can't even say his last name.  I call him   11:49

25 "KP."                                                  11:49

Page 87

```
 1     Q.   Okay.  So an email from KP to Visha Gupta --   11:49
 2     A.   Oh, sorry.  Wrong person.  Not the same         11:49
 3  person.                                                 11:49
 4     Q.   How do you say this person's last name?         11:49
 5     A.   I don't know how to say his last name.          11:49
 6     Q.   Call him "CK."  How about that?                 11:49
 7     A.   Okay.                                           11:49
 8     Q.   And it is an email sent Friday, August 16th,    11:49
 9  and it goes to a number of people.                      11:49
10          Visha Gupta, do you know who that is?           11:49
11     A.   I think I know.  I think I could see his        11:49
12  face, but I don't know well.                            11:49
13     Q.   Okay.  And it also went to Douglas Purdy.       11:49
14  Do you know who that is; right?                         11:49
15     A.   Yes.                                            11:49
16     Q.   And his job was what?                           11:49
17     A.   Director of Platform Product, I think.          11:49
18     Q.   And there are several other people that         11:50
19  received this email, and you're familiar with who       11:50
20  these people are; right?                                11:50
21     A.   Yes, I know who they are.                       11:50
22     Q.   And these are people that you worked with       11:50
23  regularly at the time?                                  11:50
24     A.   Not necessarily regularly.  I probably know     11:50
25  them more via emails.                                   11:50
```

Page 88

1      Q.   Who is Eddie O'Neil?                          11:50

2      A.   I believe in 2013, he was a product manager.  11:50

3      ██   ████████████████████████████████             ██

██   ████████████████████████                            ██

██   ██   ████████████████                               ██

██   ██   ████████████████████████████████████          ██

██   ████████████                                        ██

██   ██   ██████                                         ██

██   ██   ████████████████████████████████████          ██

██   ██████████████████████████████████████             ██

██   ██████████                                          ██

██   ██   ██████████████████                             ██

13          MR. LOESER:  Okay.  Well, why don't we look   11:50

14   at the attachment.  Maybe that will refresh your     11:51

15   recollection.                                        11:51

16          We will mark Exhibit 6.                        11:51

17          (Exhibit 6 marked for identification.)         11:51

18          THE WITNESS:  Sorry.  Am I supposed to open    11:51

19   it?                                                  11:51

20   BY MR. LOESER:                                       11:51

21      Q.   Yes.  We can go to Exhibit 6.                 11:51

22      A.   I don't see anything.                         11:51

23      Q.   It takes a minute.  It's traveling through    11:51

24   space.                                               11:51

25      A.   Oh, okay.                                     11:51

Page 89

```
 1      Q.   If you can take a minute to familiarize      11:51

 2   yourself with the document.                          11:51

 3      A.   Yes, may I have a minute?  Thank you.        11:51

 4      Q.   So I will have a couple of questions about a 11:53

 5   few paragraphs of this.  So when you have had enough  11:53

 6   time to familiarize yourself with the document --    11:53

 7      A.   Do I need to read the whole thing or...      11:53

 8      Q.   No.                                          11:53

 9      A.   Okay.  Okay.                                 11:53
```

10   ▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆    ▆▆

▆    ▆    ▆▆▆▆▆▆▆▆▆▆    ▆▆

▆    ▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆    ▆▆

▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆    ▆▆

▆    ▆    ▆▆▆▆▆▆▆▆▆▆    ▆▆

▆    ▆    ▆▆▆▆▆▆▆▆▆▆▆    ▆▆

▆    ▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆    ▆▆

▆    ▆▆▆▆▆▆▆▆▆▆▆    ▆▆

▆    ▆    ▆▆▆▆▆▆▆▆▆▆▆▆    ▆▆

▆    ▆    ▆▆▆▆▆▆▆▆▆▆▆▆    ▆▆

▆    ▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆    ▆▆

▆    ▆▆▆▆▆▆▆▆    ▆▆

▆    ▆    ▆▆▆▆▆▆▆    ▆▆

▆    ▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆    ▆▆

▆    ▆▆▆▆▆▆▆▆▆▆▆    ▆▆







Page  93

1

7        A.     Sorry, where is that one?                    11:57

8        Q.     It's on screen share, as well, if that's    11:57

9    easier.                                                11:57

10       A.     Okay.  Oh, sorry.  Yes.                      11:57

11



Page 97

1  ███  ████████████████████████  ████

█  █████████████████████████████  ████

█  ███  ████████████████          ████

█  ███  ████████████████████████  ████

█  ██████████████████████████████ ████

█  ███  ████████████          ████

7      Q.   You have no recollection of that whatsoever? 12:02

8      A.   No.                                            12:02

9      Q.   Do you remember what your job was in 2013?   12:02

10     A.   I believe it was a partner manager.          12:02

11          MR. LOESER:  I will move to Exhibit 7.       12:02

12          (Exhibit 7 marked for identification.)       12:02

13  BY MR. LOESER:                                        12:02

14     Q.   It will show up shortly and we will screen   12:02

15  share the exhibit as well.  It's thinking.  You will  12:02

16  get it.  We're waiting for the document to load.     12:02

17          Okay.  Do you have it?  Can you see the       12:03

18  document?  There we go.                               12:04

19          All right.  I'm showing you Exhibit 7, which  12:04

20  is an email from KP.  We can agree to call this       12:04

21  person "KP"; right?                                   12:04

22     A.   Yes.                                          12:04

23     Q.   You know who I'm talking to when I say "KP"? 12:04

24     A.   Yes.                                          12:04

25     Q.   Okay.  And it's an email to Ime Archibong    12:04

Page 98

1    and yourself; is that right?                          12:04

2        A.   Yes.                                          12:04

3    ███  ██████████████████████████            ███

███████████████████████████████████          ███

███████████████████████████████               ███

███  ██  ████                                  ███

███  ██  ████████████████████████████████████████████

███████████████████████████████               ███

████████████████████                           ███

███  ██  ████                                  ███

███  ██  ██████████████████████████████        ███

█████████████████████████                      ███

███  ██  ██████████████████████████████        ███

██████████████████████████████████████████████████

███  ███                                        ███

███  ██  ██████████████████████████████████████████

████████████████████████████                   ███

███  ██  ████████████████████████              ███

19       Q.   Okay.  Do you want to take --              12:05

20            MR. FALCONER:  My apologies.  My mic was    12:05

21   muted.  I had a form objection to that last           12:05

22   question.  Sorry.  I was late on that.                12:05

23   BY MR. LOESER:                                        12:05

24       Q.   I'm going to ask you some questions about   12:05

25   this email string, and I can just jump right in or   12:05

Page 99

1    if you want to flip through the document first,        12:05

2    that's fine too.                                        12:05

3        A.   Yes.  If I can have one minute to look, that  12:05

4    would be great.  Thank you.                             12:05

5            Yes, okay.                                      12:06

6        Q.   Okay.  Why don't we go to the beginning of    12:06

7    the email string, so if you flip through to the end    12:06

8    of this document, on the second-to-the-last page,      12:06

9    there's an email from Ime Archibong to you, dated      12:06

10   August 21st, 2013.  Do you see that?                    12:06

11       A.   Yes.                                           12:06

12       Q.   And it has the same subject line we read      12:06

13   before?                                                 12:06

14       A.   Yes.                                           12:06

15       Q.   And that email forwards a string -- forwards  12:06

16   an email that you sent down in the paragraph below     12:07

17   it.  Do you see that?  You sent it at 2:30 a.m.         12:07

18       A.   Yes.                                           12:07

19       ███  ████████████████████████████████████████

███  ██████████████████████████████████████████    ████

███  █████████████                                  ████

███     ███  ███████████████████████████████        ████

███          ████████████████████████████████       ████

███          ██████████████████████████████          ████

███          ████████████████████████████████        ████



Page 101

```
 1        ██    ████                                    ████

██              ██████████████████████                  ████

██              ████████████████████████████████████████████

██    ████████████████████                              ████

██    ██████████████                                    ████

██        ██    ████████████████████████████████████████████

██    ██████████████████████████████████                ████

██    ████████████████████████████████                  ████

██    ████████████████████████████                      ████

10            DEPOSITION REPORTER:   Excuse me.   There was  12:09

11    an interruption in the audio.  Can you repeat your     12:09

12    question, please, Counsel.                             12:09

13    BY MR. LOESER:                                         12:09

14        ██    ██████████████████████████████████          ████

██    ██████████████████████████████████████████████        ████

██    ████████████████████████████████████████████████      ████

██    ██████████████████████████████                        ████

██        ██    ████████████████████████████████████        ████

██    ██████████████████                                    ████

██        ██    ██████████████████████████████████████      ████

██    ████████████████████████████████████████████          ████

██    ██████████████████████████████████████                ████

██        ██    ██████████████████████████                  ████

██        ██    ████████████████████████████████████        ████

██    ██████████████████
```



Page 102



Page 104

1    ████████████████                                    ████

█    ███    █████████████████████████████               ████

█        ███████████████████████████████████████████████████

█    ██████████████████                                 ████

█        ███    █████████████                           ████

█            ██████████████████████████                 ████

█            ████████████████████████████████████████████████

█    ██████████████████████████████████                 ████

█    ████████████████                                   ████

█    ███    ████████████████████████                    ████

11          MR. FALCONER:  Objection.  Form.            12:12

12          THE WITNESS:  Sorry.  Is that a question     12:12

13    or...                                             12:12

14    BY MR. LOESER:                                    12:12

15        ███    ██████████████████████████████████████████████

█    ██████████████████████████████████                 ████

█    █████████████████████                              ████

█        ███    ██████████████████████████              ████

█    █████████████████████████████████████████          ████

█    ██████████████████                                 ████

█        ███    █████████████████████████████████████████████

█    ██████████████████████████                         ████

█        ███    ██████████████████████                  ████

█        ███    ███████████████████████████             ████

█            ██████████████████████████                 ████



Page 106

1          MR. FALCONER:  Objection.  Asked and        12:14

2    answered.                                           12:14

3          THE WITNESS:  Sorry.  What was the question   12:14

4    again?                                              12:14

5    BY MR. LOESER:                                      12:14

Page 107







Page 113





Page 115



Page 116



15          MR. FALCONER:  Derek, just a reminder, we        12:25

16     have about five minutes until we need to break.       12:25

17

Page 117

6          MR. LOESER:  Okay.  We can move on from that  12:26

7    exhibit.                                              12:26

8    BY MR. LOESER:                                        12:26

9          Q.   Now, Miss Chang, you are aware that Graph  12:26

10   API version 1 was replaced with Graph API version 2;  12:27

11   right?                                                12:27

12         A.   I don't know specifically.                 12:27

Page 118



Page 119

1      ████████████████████████████████████     ██████

█      ██████████████████████████████████████     ██████

█      ████████████████                            ██████

4          A.    I don't remember.                  12:29

5          Q.    Did you receive annual performance reviews?  12:29

6          A.    In what year?                      12:29

7          Q.    In any year.                       12:29

8          A.    I received a performance review.   12:29

9          Q.    And in connection with your performance  12:29

10    review, were you required to describe what you did  12:29

11    during the year that was being reviewed?     12:29

12         A.    I believe so, yes.                 12:29

13         Q.    And in those performance reviews, were you  12:29

14    careful to make sure that you described all of the  12:29

15    important, or at least the most important things,  12:29

16    you worked on?                               12:29

17         A.    At that time, yes.                 12:29

18         ██   ████████████████████████████████████████

█    ████████████████████████████████████     ██████

█    ██████████████████████████████████████     ██████

█    ██████████████████████████████████████████████████

█    ██████████████████████████████            ██████

█    ████   ██████████████████████████████     ██████

24         Q.    Okay.  Would that be generally an accurate  12:30

25    statement, though, that the tasks that you performed  12:30

Page 120

```
 1   that were important were likely the tasks that were    12:30
 2   discussed in your review?                              12:30
 3      A.   I'm not sure.  I don't know.                   12:30
 4      Q.   What's the documentation that's created for    12:30
 5   performance reviews?                                   12:30
 6      A.   I'm not sure I understand.                     12:30
 7      Q.   Do you fill something out to describe the      12:30
 8   work you've done?                                      12:30
 9      A.   So we have a tool, a performance tool, but I   12:30
10   don't know if that was -- I don't remember if that     12:30
11   was there that year.                                   12:30
12      Q.   Do you recall -- well, what years do you       12:30
13   recall that being there?                               12:30
14      A.   I don't know -- I don't know specifically      12:30
15   what year, but it's -- I mean, I know it exists, but   12:30
16   I don't remember what year exactly it started.         12:30
17      Q.   Do you recall that you generally were          12:30
18   reviewed every year?                                   12:31
19      A.   I don't -- I don't think so.                   12:31
20      Q.   Okay.  And do you recall any paperwork         12:31
21   whatsoever being handed to you in connection with      12:31
22   your performance reviews?                              12:31
23      A.   Paperwork or...                                12:31
24      Q.   Did you fill anything out at all?  Did you     12:31
25   write anything down to describe the work you did       12:31
```

Page 121

1    that was being reviewed?                              12:31

2        A.   So, again, I think it depends on what year, 12:31

3    but there is a tool.  We fill it out, so I don't --   12:31

4    I guess if you can be more specific.                  12:31

5        Q.   When you're being reviewed, do the people    12:31

6    you report to write something about you?              12:31

7        A.   Generally?                                   12:31

8        Q.   Generally.                                   12:31

9        A.   Yes.                                         12:31

10           MR. LOESER:  Counsel, I don't think we have   12:31

11   received any performance reviews from Miss Chang,     12:31

12   and to the extent any of them discuss any of the      12:31

13   topics related to this case, we would ask to make     12:31

14   sure that those are produced.                         12:32

15           MR. FALCONER:  Great.  And we have just hit   12:32

16   12:30, so let's go ahead and take our lunch break.    12:32

17   It's going to be an hour, so we'll be back at 1:30.   12:32

18   Maybe 1:35, but somewhere in there.                   12:32

19           MR. LOESER:  Okay.  Can we get a count on     12:32

20   time remaining?                                       12:32

21           THE VIDEOGRAPHER:  Sure.  Would you like me   12:32

22   to do that once we go off the record or right now?    12:32

23           MR. LOESER:  Yeah, that's fine.               12:32

24           THE VIDEOGRAPHER:  Okay.  This marks the end  12:32

25   of media No. 2 in the deposition of Jackie Chang.     12:32

Page 122

1    Off the record.  The time is 12:32.              12:32

2              (Lunch recess.)                          12:32

3              THE VIDEOGRAPHER:  This marks the beginning   13:35

4    of media No. 3 in the deposition of Jackie Chang.   13:35

5    We are back on the record.  The time is 1:35.     13:35

6    BY MR. LOESER:                                     13:35

7       Q.   Good afternoon, Miss Chang.  When we left   13:35

8    off, we were talking about Exhibit 7.  And as we   13:35

9    saw, there was an attachment indicated in that     13:35

10   ████████████████████████████████████   █████

██   ████████████████████████   █████

12             Do you recall our discussion of that?     13:35

13      A.   Sorry.  I'm just opening it up.  Yes.      13:36

14             MR. LOESER:  I would like to introduce as   13:36

15   Exhibit 8 the actual attachment, which we will     13:36

16   introduce as the native file Excel spreadsheet.  And   13:36

17   then I will screen share and we can look through   13:36

18   some folders.  This might take two hours to upload.   13:36

19             (Exhibit 8 marked for identification.)     13:36

20             MR. LOESER:  Oh, look.  It's already there.   13:36

21   BY MR. LOESER:                                     13:36

22      ██     ████████████████████████   █████

██   ████████████████████████████   █████

██   ████████████████████████████████████

██   ████████████████████████████████████

Page 123

1  █████████████████████████████████   ████

2  Excel?                                                    13:37

3      A.   Yes, the service, yeah.                          13:37

4      Q.   And is that something -- do you use Excel        13:37

5  regularly?                                                13:37

6      A.   I guess.  Not lately, but yeah.                  13:37

7      Q.   Do you know how to navigate your way around      13:37

8  an Excel file?                                            13:37

9      A.   Yes.                                             13:37

10     █    ██████████████████████████   ████

██  █████████████████████████████   ████

██  ███████                           ████

██  █    █████                        ████

██  █    ████████████████████████    ████

██  █    █████                        ████

██  █    ████████████████████████    ████

██  ████████████████████████████████  ████

██  ███████████████████████           ████

██  ██████████████████████████████   ████

██  ██████████████                    ████

██  ██████████████████████████████   ████

██  ███████████████████               ████

██  █    ██████████████████████████████████

██  ███████████                       ████

██  █    ███████████████████████      ████

Page 124

1

17    have access to this fully or --                          13:39

18        Q.   No.  Unfortunately, we are just screen          13:39

19    sharing.                                                 13:39

20        A.   Oh, okay.  Got it.                              13:39

21             MR. FALCONER:  It is in the Exhibit Share if    13:39

22    you want to look at it.                                  13:39

23             THE WITNESS:  Okay.  Got it.  I am going to     13:39

24    open it.  Okay.                                          13:39

25             Sorry, can you repeat your question?            13:39

Page 125

 1   BY MR. LOESER:

 2       ██  ████████████████████████████████████████

 ██  ██████████████████████████████████████  ██████

 ██  ████████████████████████████████████  ██████

 ██  ████████████████████████  ██████

 ██    ██  ██████████████████████████████  ██████

 ██  ██████████████████████  ██████

 8       Q.   Did you work with partners that were mobile   13:39

 9   apps?                                                  13:39

10       A.   I worked with partners that may have had a   13:39

11   mobile app, but I did not work holistically on        13:39

12   mobile apps.                                           13:39

13       Q.   Okay.  And over the long time that you have   13:40

14   been working with partners, I gather that there were   13:40

15   lots of different types of partners that you worked    13:40

16   with that may have had a number of these different     13:40

17   types of apps.  Is that fair to say?                   13:40

18       A.   Sorry.  I don't understand that.  You mean    13:40

19   that fall into different categories or...              13:40

20       Q.   Yeah.  You work maybe with some mobile apps   13:40

21   and some game apps.  You work with partners that had   13:40

22   these different types of apps; right?                  13:40

23       A.   No.  I don't know where I could classify      13:40

24   that with specificity.                                 13:40

25       ██  ████████████████████████████████████████

Page 126



Page 128

21      MR. LOESER:  Okay.  We can leave this        13:44

22  document, as fascinating as it is.              13:44

23      If we can go back to Exhibit 7, which is     13:44

24  your August 21st, 2013 email.                    13:44

25  / / /                                            13:44

Page 129

```
 1   BY MR. LOESER:                                    13:44
 2       ███ ███████████████████████████████████████
     █ ██████████████████████████████████████████████
     █ █████████████████████████████████████      ████
     █    ███████████████████████████████████      ████
     █ ████████████████████████████████████████     ████
     █ ████████████████████████████████████████████████
     █ ██████████████████████████████████████      ████
     █ ████████████████████████████████            ████
     █      ██████████████████████████████         ████
     █      ████████████████████                   ████
     █    ██████████████████████████████████       ████
     █  ███████████████                            ████
     █    ███ ████████████████████████████████████  ████
     █ ████████████████████████████████████         ████
     █ ██████████████████████████████               ████
     █    ███ ████████████████████████              ████
18           MR. LOESER:  Counsel, I don't believe we   13:45
19   have received this document, so please make sure    13:45
20   it's been produced.                                 13:45
21           MR. FALCONER:  We'll -- yeah.  We'll look    13:45
22   into it.                                            13:45
23           MR. LOESER:  Well, I'm asking you to do a    13:45
24   little more than look into it.  If you can please    13:45
25   make sure it's produced, I would appreciate it.     13:45
```



Page 130

```
 1              MR. FALCONER:  Yeah.  I mean, I'm not going   13:46
 2    to make that commitment to you, but like I said,       13:46
 3    I'll look into it.                                      13:46
 4    BY MR. LOESER:                                          13:46
 5    ███    ████████████████████████████          ██
      █  ██████████████████████████████████          ██
      █  ████████████                                ██
      █    ███  ███████████████████                  ██
      █    ███  ██████████████████████████           ██
      █  ████████████████████████████████████        ██
      █  ██████████████████████████████████████      ██
      █  ████████████████████████████████████        ██
      █  ███████████████████████████                 ██
      █    ███  ██████████████████████              ██
15    Q.    Is it your practice to send email that     13:46
16    includes false information?                       13:46
17    A.    I -- I don't know.  I don't really          13:46
18    understand that question.                         13:46
19    Q.    Is it your general practice when you're     13:46
20    communicating with your colleagues to send them an  13:46
21    email that contains false information?            13:46
22    A.    I -- I don't know.  I -- I usually don't   13:47
23    have that intention.                              13:47
24    Q.    And so when you wrote this email, is it fair  13:47
25    to assume that you were endeavoring to communicate  13:47
```

Page 131

1  accurate information?                               13:47

2           MR. FALCONER:  Objection.  Form.          13:47

3           THE WITNESS:  So, again, I don't -- like I 13:47

4  don't remember this.  I don't want to assume like -- 13:47

5  yeah, I don't want to assume anything.             13:47

6  BY MR. LOESER:                                      13:47

7      Q.   I'm not asking you if you remember this   13:47

8  email.  I'm asking you if -- you sent this email;   13:47

9  right?                                              13:47

10     A.   That's what it says.                       13:47

11     Q.   And it was your general practice when      13:47

12 sending email to communicate accurate information;  13:47

13 right?                                              13:47

14     A.   Yes.                                       13:47

15     Q.   And it was not your general practice to    13:47

16 communicate information that you knew to be false;  13:47

17 right?                                              13:47

18     A.   Again, I feel like that's -- I don't know. 13:47

19 Like I don't know what the information is, so my    13:47

20 intent generally is not -- I don't know the         13:47

21 information itself.                                 13:48

22     Q.   Right.  I'm not asking you if the          13:48

23 information is or isn't false.  I'm asking you if it 13:48

24 is your intent to generally communicate accurate    13:48

25 information in your --                              13:48

Page 132

```
 1      A.   It is my intent to, yes, provide        13:48
 2   information.                                     13:48
 3      Q.   And you testified you couldn't recall most 13:48
 4   of what we talked about with regard to this email. 13:48
 5           Is there something else that you can think 13:48
 6   of that would refresh your recollection regarding  13:48
 7   the events discussed in this email?              13:48
 8      A.   Not that I know of.                      13:48
 9      Q.   And so would you agree that this email is 13:48
10   the best evidence, that you're aware of, of what you 13:48
11   knew and were thinking at the time regarding these 13:48
12   topics?                                          13:48
13           MR. FALCONER:  Objection.  Form and      13:48
14   foundation.                                      13:48
15           THE WITNESS:  So, again, I can't make that 13:48
16   assumption.                                      13:48
17   BY MR. LOESER:                                   13:48
18      Q.   You can't make the assumption that this  13:48
19   email is the best evidence of what you were thinking 13:48
20   at the time you wrote the email?                 13:48
21      A.   Correct.  I don't know.                  13:49
22      Q.   But you can't remember -- you can't identify 13:49
23   anything else that would be a more accurate       13:49
24   reflection of what you were thinking at the time you 13:49
25   wrote this email?                                13:49
```

Page 133

```
 1      A.   Correct.  I don't -- I don't know, so I      13:49
 2  don't know what the expanse is.                        13:49
 3      Q.   Is it fair to say that if this email doesn't  13:49
 4  refresh your recollection of the events at the time,   13:49
 5  you're not aware of anything else that would?          13:49
 6      A.   I don't -- I don't know.                       13:49
 7      Q.   You don't know if there is any other          13:49
 8  evidence that would refresh your recollection?         13:49
 9      A.   That question would assume I would know,      13:49
10  which I don't know.                                     13:49
11      Q.   But I'm asking you, do you know of any other  13:49
12  evidence that would refresh your recollection?         13:49
13      A.   I don't know.                                  13:49
14      Q.   You don't know if there is any other          13:49
15  evidence that would refresh your recollection?         13:49
16      A.   Again, I don't know what I don't know, so I   13:49
17  can't make that assumption that I would know.          13:49
18      Q.   And if there were something else that might   13:50
19  refresh your recollection, what might that be?         13:50
20           MR. FALCONER:  Objection.  Asked and          13:50
21  answered.  Lack of foundation.                          13:50
22  BY MR. LOESER:                                          13:50
23      Q.   You didn't -- there's not like a recorded     13:50
24  transcripts of communications that you had, as far     13:50
25  as you know, is there?                                  13:50
```

Page 134

 1      A.   I don't -- to my knowledge, I don't think    13:50
 2   so.                                                  13:50
 3      Q.   Is it fair to say that if someone wanted to  13:50
 4   figure out what you were thinking about these topics 13:50
 5   at the time of this email, this email would be a     13:50
 6   good guide for what you were thinking?               13:50
 7           MR. FALCONER:  Objection.  Form and          13:50
 8   foundation.                                          13:50
 9           THE WITNESS:  Again, I can't speculate on    13:50
10   that.                                                13:50
11   BY MR. LOESER:                                       13:50
12      Q.   I'm not asking you to speculate on anything. 13:50
13   I'm just asking you if you think this email would be 13:50
14   a good guide of what you were thinking about the     13:50
15   topics discussed in the email --                     13:50
16      A.   Well, that would require me to speculate.    13:51
17      Q.   What would it require you to speculate at?   13:51
18      A.   You're asking me if I know if this is the    13:51
19   best, which would assume I know what everything is   13:51
20   and I don't know what everything is, so I don't      13:51
21   know.  So I can't make that assumption.              13:51
22      Q.   Let me be specific.  Would you agree that    13:51
23   this email is a good guide of what you were thinking 13:51
24   about the topics discussed in the email at the time  13:51
25   you sent the email?                                  13:51

Page 135

| | | |
|---|---|---|
| 1 | MR. FALCONER:  Objection.  Form.  Foundation | 13:51 |
| 2 | and asked and answered. | 13:51 |
| 3 | THE WITNESS:  Again, when you say "good," I | 13:51 |
| 4 | don't know where I could like -- where I could say I | 13:51 |
| 5 | know what a definition of good means. | 13:51 |
| 6 | BY MR. LOESER: | 13:51 |
| 7 | Q.   I will try one more time.  Would you agree | 13:51 |
| 8 | that the email that you wrote is evidence of what | 13:51 |
| 9 | you were thinking about the subjects discussed in | 13:51 |
| 10 | your email at the time you sent the email? | 13:52 |
| 11 | MR. FALCONER:  Objection.  Excuse me. | 13:52 |
| 12 | Objection.  Form. | 13:52 |
| 13 | THE WITNESS:  Again, I don't remember.  I | 13:52 |
| 14 | know the email is there, so I don't want to | 13:52 |
| 15 | speculate what I was thinking because I don't know. | 13:52 |
| 16 | BY MR. LOESER: | 13:52 |
| 17 | Q.   Do you ever go back and read your old emails | 13:52 |
| 18 | to try and understand what you were thinking at some | 13:52 |
| 19 | earlier time? | 13:52 |
| 20 | A.   Generally, no.  I have a lot of emails. | 13:52 |
| 21 | Q.   Have you ever done that? | 13:52 |
| 22 | A.   Have I ever looked at an email? | 13:52 |
| 23 | Q.   Have you ever gone back and looked at an | 13:52 |
| 24 | email you wrote earlier to refresh your recollection | 13:52 |
| 25 | about what you were thinking at the time on a | 13:52 |

Page 136

1   subject?                                              13:52

2       A.   I have done that.                            13:52

3       Q.   And when you've done that, have you found    13:52

4   that you're able to refresh your recollection about   13:53

5   something you were thinking by reading your old       13:53

6   email?                                                13:53

7       A.   That depends.  It depends on whether that    13:53

8   ███████████████████████████████████████████     ███

    ███████████████████████████████████████████     ███

    ███████████████████████████████████████         ███

    ████████████████████████████████████████████    ███

    █████████████████████████████████████████████████

    ██    █    ██████████████████████████████████████

    █████████████████████████████████████████████████

    ███████████████████████████████████████████     ███

    █████████████████████████████████████          ███

    █████████████████████████████████████████      ███

    ████████████████████████████████████████       ███

    ██    █    █████████████████████████

20      Q.   Do you need the question read back?          13:53

21      A.   Well, I can tell you, I don't understand the 13:54

22  intent of the question.                               13:54

23      Q.   How about just answer the question.          13:54

24      A.   I don't know.                                13:54

25      ██    █████████████████████████████████████

Page 137

1   ████████████████████████████████    ███████

██  ████████████████████████████████    ███████

██  ███████████████████████████████████    ███████

██  ███████████████████████████████████████    ███████

██    ███    ██████████████████████████████    ███████

██  ███████████████████████████████████████████████████

██  ███████████████████████████████    ███████

██    ███    ███████████████████████████████████████████

██  ██████████████████████████████████████    ███████

██  ███████████████████████████████    ███████

██  ████████████████████████████████████████    ███████

██  ███████████████████████████████    ███████

██    ███    ████████████████████████████████    ███████

██  █████████████████    ███████

15          MR. FALCONER:  Sorry, I think my audio is      13:54

16   out.  I had an objection to that last question as      13:55

17   argumentative.                                          13:55

18          MR. LOESER:  We can go to Exhibit 9.  I will    13:55

19   have this document marked as Exhibit 9.  This is an    13:55

20   email from Brendan Moore to you, dated April 24th,     13:55

21   2013.                                                   13:55

22          MR. FALCONER:  Derek, I apologize.  I'm        13:55

23   having a hard time hearing you.  Is there any way      13:55

24   you can turn up your audio or move closer to the mic   13:55

25   or anything?                                            13:55

Page 138

```
 1              MR. LOESER:  Let me try and change -- is      13:55
 2    that any clearer?                                        13:55
 3              MR. FALCONER:  Yeah.  That's a little          13:55
 4    better.  Thank you.                                      13:55
 5              (Exhibit 9 marked for identification.)         13:55
 6    BY MR. LOESER:                                           13:55
 7       Q.   Miss Chang, you are looking at an email from     13:55
 8    Brendan Moore to, it looks like, himself and also to     13:56
 9    ███████████████████████████████████████████    ██████
      ███████████████████████████████              ██████
11             Do you see that?                                13:56
12       A.   Yes.                                             13:56
13       Q.   Who is Brendan Moore?                            13:56
14       A.   He was a colleague of mine.                      13:56
15       Q.   Okay.  Do you know what his job was at the       13:56
16    time?                                                    13:56
17       A.   He was a data analyst.  I don't know if he       13:56
18    was an intern or full time at the time.                  13:56
19       Q.   And this email, it looks like it forwards a      13:56
20    chat; is that -- is that right?                          13:56
21       A.   It looks to be.  I'm not sure.                   13:56
22       Q.   Okay.  And it appears that you had -- you        13:56
23    were communicating with Mr. Moore via chat and that     13:56
24    he sent that communication to himself and to you; is    13:56
25    that right?                                              13:56
```

Page 139

```
 1          MR. FALCONER:  Objection.  Foundation.      13:56
 2          THE WITNESS:  I don't know what his intent   13:57
 3   was.  I don't know if that was true or not.         13:57
 4   BY MR. LOESER:                                       13:57
 5      Q.   Well, I'm not asking about his intent.  I'm  13:57
 6   just looking at the document and trying to           13:57
 7   understand what it is.  Does it appear to reproduce  13:57
 8   a chat that you had with Mr. Moore?                  13:57
 9      A.   I don't know.                                13:57
10      Q.   Okay.                                        13:57
11          MR. FALCONER:  Derek, can I -- if I           13:57
12   represent that this is just how chats get produced   13:57
13   in discovery, does that help?  Is that helpful?      13:57
14          MR. LOESER:  That is.  Thank you.             13:57
15   BY MR. LOESER:                                       13:57
16
```

Page 140



```
21        Q.   Okay.  What is GK generally?              13:59

22        A.   A gatekeeper.                             13:59

23        Q.   Okay.  And what is that?                  13:59

24        A.   I don't know the technicals behind that, so  13:59

25   I'm sure I'm explaining incorrectly, but from what I  13:59
```

Page 141

1    understand, it's some sort of permissioning --          13:59

2    permissioning system.                                    13:59

3        Q.   Permissioning for partners to get access to     13:59

4    permissions; is that right?                              13:59

5        A.   Again, I don't know where I can make that       13:59

6    assertion.  It's more technical than I'm familiar        13:59

7    with.                                                    13:59

Page 142

1    ██    ████████████████████                                      ██████

2    Q.    Do you know what a "vertical" is?              14:00

3    A.    A vertical, I think it depends on what         14:00

4    context it's being used.                             14:00

5    ██    █████████████████████████████████████████████

██  ████████████████████████████████████████████████

██    ██    ███████████████████                         ██████

██    ██    ████████████████████████████████           ██████

██    ████████                                          ██████

██    ██    ████████████                                ██████

██    ████████████████████████████████                 ██████

██    ████████████                                     ██████

██    ██████████████████                               ██████

██    ██    ███████████████████████                    ██████

██    ██████████████████████████████████               ██████

██    ███████████████████████████                      ██████

██    ██████████████████████████████████████           ██████

██    ████████                                          ██████

██    ██    ███████████████████                         ██████

██    ██    ████████████████████                        ██████

██    ████████████████████████████████                 ██████

██    ███████████████████████████████████              ██████

██    █████████████████████                            ██████

██    ██████████████████████████                       ██████

██    ██████████████████████████████████████           ██████











Page 148



Page 149

Page 150



Page 151



15        MR. LOESER:  The next exhibit is Exhibit 10.   14:11

16        (Exhibit 10 marked for identification.)   14:11

17   BY MR. LOESER:   14:11

18      Q.   For the record, Exhibit 10 is an email from   14:11

19   KP to Miss Chang, dated August 23rd, 2013, Subject   14:11

20

Page 152

1    ████████████████████████████████████████████

████████████████████████████████████████  ████

████████████████████████████████████████  ████

████  █████████████████████  ████

5    Q.   Okay.  Now, as we -- as I mentioned a moment   14:14

6    ago, this is an email from KP to you that starts an   14:14

7    email string.  And the subject is the same as the   14:14

8    subject of the earlier August 21st email that we   14:14

9    talked about.                                        14:14

10        And if you go down to the email at the         14:14

11   bottom of the first page, or midway through the      14:14

12   first page, it's an email from you to Chris Daniels,  14:14

13   Ime Archibong and KP, with a CC to Simon Cross,       14:14

14   dated August 22nd, 2013.  Do you see that?            14:14

15   A.   Yes.                                             14:14

16   ████████████████████████████████  ████

████████████████████████████  ████

████  ████  ████

████  ████████████████████████████████  ████

████████████████████████████████████  ████

████  ██████████████████████████████  ████

████  ████████████████████████  ████

████  ██████████████████████████████  ████

████  ████████████████████████████  ████

████  ████████████████████████  ████



Page 154







Page 158



Page 159

         1          MR. LOESER:  We can put that document aside,   14:22

         2   and I will introduce Exhibit 11, which for the        14:22

         3   record is an email from Simon Cross to Ime            14:22

         4   Archibong, Jackie Chang, and KP, dated September      14:22

         5   ██████████████████████████████████████████    ███████

             ██ ████████████                                ███████

         7          (Exhibit 11 marked for identification.)   14:23

         8   BY MR. LOESER:                                        14:23

         9      Q.   So, Miss Chang, if you look at this email,   14:23

        10   who is Simon Cross?                                   14:23

        11      A.   He was a colleague.                           14:23

        12      Q.   Okay.  Was he in the same department or do   14:23

        13   you recall what his position was?                     14:23

        14      A.   I think he was a partner manager at this     14:23

        15   time.                                                 14:23

        16      Q.   Okay.  Does that mean you were reporting to   14:23

        17   him or he was reporting to you?                       14:23

        18      A.   I was reporting to Ime and I had no reports. 14:23

        19       ██   ██████████████████████████████████████████████████

        ██  ████████████████████████████████████    ███████

        ██  ██████████████████████████████████      ███████

        ██  ██  ████████████████████████            ███████

        ██  ██  ████████████████████████████████    ███████

        ██  ██████████████████████████████████████  ███████

        ██  ██████████████████████████████████████  ███████

Page 160

```
 1  ████████████████████████                                    ████
 █    ██    ████████████████████████                            ████
 3        MR. FALCONER:  Objection.  Foundation.       14:24
 4        MR. LOESER:  All right.  Let's turn to the   14:24
 5  attachment, which we will introduce as Exhibit 12.  14:24
 6        (Exhibit 12 marked for identification.)      14:24
 7  BY MR. LOESER:                                      14:24
 8    Q.   And I will represent for the record,        14:24
 9  Miss Chang, that Exhibit 12 is the document that was  14:24
10  attached to Mr. Cross' email that went to you, among  14:24
11  others.                                             14:24
12  ████████████████████████████████████████████████
 █  ████████████████████████████████                  ████
 █        ████████████████████████                    ████
 █    ██  ████                                        ████
 █    ██  ████████████████████████████                ████
 █  ██████████████████████████████████████            ████
 █  ████████████                                      ████
 █    ██  ████████████████████████████                ████
 █    ██  ████████████████████████████████████████████  ████
 █  ████████████████████████████████████████          ████
 █  ████████████████████████████████████              ████
 █  ██████                                            ████
 █        ████████████████████                        ████
 █    ██  ████                                        ████
```

Page 161





Page 164



Page 165



19          MR. LOESER:  We can go to the next exhibit.    14:31

20          (Exhibit 13 marked for identification.)      14:32

21    BY MR. LOESER:                                      14:32

22      Q.   This will be Exhibit 13, which is an         14:32

23    email from Simon Cross to you and others, dated     14:32

Page 166

1          Do you see this document, Miss Chang?          14:32

2     A.   Now, I do.  Can I have time to read through     14:32

3  it?                                                     14:33

4     Q.   Sure.                                           14:33

5     A.   Okay.                                           14:33

6     Q.   And if you flip through this email string,      14:33

7  ████████████████████████████████████████████████████

██  ██████████████████████████████████████████    ████

██        ██████████████████                       ████

██        ██      ████                             ████

██        ██      ████████████████████████████████████

██   ██████████████████████████                    ████

██        ██      ██████████████████████            ████

██   ██████████████████████████████████            ████

██   ████████████████████████████                  ████

██        ██      ████████████████████████████████████

██   ██████████████████████████████                ████

██        ██      ████████████████                 ████

██        ██      ████████████████████████████████████

██   ████████████████                              ████

██        ██      ████████████████████████          ████

██        ██      ██████████████████████████        ████

██   ██████████████████████████████████            ████

██   ████████████████████████████████████████████████

██   ████████████████████████████████              ████

Page 167

Page 168

```
 1          ███████████████████████                    ████

 ▪          ██████████████████████████                 ████

 ▪     ███████████████                                 ████

 ▪       ██  ████████████████████████████████████████████

 ▪     ████████████                                    ████

 6          SPECIAL MASTER GARRIE:  Sorry.  When we get  14:36

 7     to a breaking point -- any idea when that may be?  14:36

 8          MR. FALCONER:  I was thinking after the     14:36

 9     next -- after we are done with this document.    14:36

10          MR. LOESER:  That's fine.                   14:36

11          SPECIAL MASTER GARRIE:  And then I would    14:36

12     like all the lawyers to be moved into another room.  14:36

13     Thank you.                                        14:36

14     BY MR. LOESER:                                    14:36

15        Q█ ████████████████████████████████           ████

 ▪     ██████████████████████████████████████           ████

 ▪     ████████████████████████████████                 ████

 ▪       ██  █████████████████████████████              ████

 ▪          █████████████████████████████               ████

 ▪          ██████████████████                          ████

 ▪       ██  ████████████████████                       ████

 ▪       ██  ███████████████████████                    ████

 ▪       ██  ██████████████████████████████             ████

 ▪     ████████████████████████████████████████         ████

 ▪     ███████████████████████████████████              ████
```



Page 170



```
19              MR. LOESER:  This is a fine time to take a    14:38
20   break, as Special Master Garrie has requested.           14:38
21              THE VIDEOGRAPHER:  Okay.  This marks the end   14:39
22   of media No. 3 in the deposition of Jackie Chang.        14:39
23   Going off the record.  The time is 2:39.                 14:39
24              (Off the record.)                             14:39
25              THE VIDEOGRAPHER:  This marks the beginning    15:04
```

Page 171

1    of media No. 4 in the deposition of Jackie Chang.        15:04

2    We are back on the record.  The time is 3:04.            15:04

3              MR. LOESER:  If we could mark as Exhibit 14    15:04

4    the next document, which for the record is an email      15:04

5    from Ime Archibong to Eddie O'Neil and Simon Cross,      15:04

6    ███████████████████████████████████████████     ████████

     █  ████████████████████████████████████████████████████████

8              (Exhibit 14 marked for identification.)        15:05

9    BY MR. LOESER:                                           15:05

10       Q.   Miss Chang, do you see this email?              15:05

11       A.   Yes.                                            15:05

12       Q.   And do you see that the email forwards an       15:05

13   email from Ime Archibong to you and Simon Cross on       15:05

14   the same day, February 9th, 2014?                        15:05

15       A.   Yes.                                            15:05

16       Q.   What does it mean when an email is marked as    15:05

17   "Importance High"?                                       15:05

18             MR. FALCONER:  Objection.  Foundation.         15:05

19             THE WITNESS:  That it's of high importance.    15:05

20   BY MR. LOESER:                                           15:05

21       Q.   Okay.  And if we look down to the email in      15:05

22   the middle of the page, a little further, there's an     15:05

23   email from you, part of this string, to -- is it         15:05

24   Ime?  Ime Archibong?  Am I saying that right?            15:06

25       A.   Ime.                                            15:06

Page 172

```
 1       Q.    Ime -- to Ime and Simon Cross, and that's    15:06

 2  the email that's forwarded above and then forwarded    15:06

 3  above that; is that right?                              15:06

 4       A.    Yes.  Sorry, is it okay if I read the email? 15:06

 5       Q.    Absolutely.  Yeah.                           15:06

 6       A.    Okay.                                        15:07

 7       Q.    Okay.  Let's start at the very beginning of  15:07

 8  this string, if you go to the second page.  At the      15:07

 9  very bottom of the string is an email from Ime to       15:07

10  ██████████████████████████████████████████████████████

██  ██████████████████████████████████████████████████████

██       ███████████████████████████████████       ██████

██       █████████████████████████████████         ██████

██       ████████████████████████████████████      ██████

██       █████████████████████████████████████     ██████

██       ██████████████████████████████████████    ██████

██       ███████████████████████████              ██████

██       ███████████████████████                  ██████

██    ██  ████                                      ██████

██    ██  ████████████████████████████████████    ██████

██    ██  █████████████████████                   ██████

██    ██  ██████████████████████████████████████  ██████

██    ████████████████████████████████████████    ██████

██    █████████████████████████████████           ██████

25             MR. FALCONER:  Objection.  Foundation.       15:08
```



Page 174



Page 177

1





Page 181

1 ███████████████████████████████   ████

█ █████████████████████████████████████

█   ██████                           ████

█       ███   ██████████████████████████

█   ████████████████████             ████

6          MR. LOESER:  Okay.  And I will represent to   15:19

7    you that the next document is the attachment to that   15:19

8    email.  And I don't -- I don't see a reference to   15:19

9    attachment either, so I'm not sure how that works.   15:19

10   But I think in the manner it was produced, this was   15:19

11   attached to that email.   15:19

12          And we'll confirm that for the record later,   15:19

13   Russ, just to make sure that we are right about   15:19

14   that, but that's my understanding.   15:19

15          So if we could look at Exhibit 15.   15:19

16          (Exhibit 15 marked for identification.)   15:19

17   BY MR. LOESER:   15:19

18       ███   ██████████████████████████████████

█   ███████████████████████████████   ████

█   ██████                           ████

█       ███   █████████████████████   ████

█       ███   █████████████████████████████

█   █████████████████████████████████   ████

█   ███████████████████               ████

█           ██████████████████████     ████

Page 182







Page 185



24        MR. LOESER:  Okay.  Let's go to the next        15:25

25   exhibit is a video clip that I want to play to you.   15:25

Page 186

```
 1    And it's not very long.  And then we'll have a      15:25
 2    transcript of it as well to the extent that it is   15:25
 3    not clear.                                          15:25
 4          DEPOSITION REPORTER:  Excuse me, Counsel,     15:25
 5    are you going to want this reported?                15:25
 6          MR. LOESER:  I think you'll be able to.       15:25
 7    It's not -- it's Mark Zuckerberg speaking and he's  15:25
 8    not speaking terribly quickly, but we have a        15:25
 9    transcript so -- you know what, I wouldn't bother   15:25
10    reporting it.  We will just have the transcript     15:25
11    admitted after we play the recording.               15:25
12          DEPOSITION REPORTER:  Thank you.              15:25
13          MR. LOESER:  Actually, hang on one second     15:25
14    before we do that.  If we can go back to the last   15:26
15    exhibit.                                            15:26
16    BY MR. LOESER:                                      15:26
17    █   ██████████████████████████        ███
██  ████████████████████████████       ███
██  █████████████████████████          ███
██     ████████████████████            ███
██  ████████████████████████████       ███
██  ████████████████████████████████████████
██  ███████████████                    ███
██     ████████████████                ███
██     ████████████████████            ███
```

1        ██ses where we have:"                                15:26

2        Numb██████████████████████              ████



Page 188



Page 189

1 ███████████████                                    ████

█   ██   ██████████████████████████████████████████

█   ██████████████████████████████████         ████

█   █████████████████████████████         ████

█   ████████████████████████         ████

█   ██   ███████████████████████████         ████

7          MR. LOESER:  Okay.  We can go to the next        15:29

8  exhibit.                                                 15:29

9          (Exhibit 16 and Exhibit 17 marked for           15:29

10          identification.)                                 15:29

11  BY MR. LOESER:                                           15:29

12     Q.   Now, having gone through all these emails       15:29

13  now, do you remember the connection between the         15:29

14  introduction of the new platform and the transition     15:30

15  from Graph API version 1 to version 2?                  15:30

16     A.   I don't remember in specificity like what       15:30

17  date and things around that.  This was a lot of         15:30

18  stuff going on that's all blurred together, so not      15:30

19  with like full certainty.                               15:30

20     Q.   And do you remember, as a general matter,       15:30

21  that when the new platform came on and there was a      15:30

22  transition from the older Graph to the new Graph,       15:30

23  that two of the things specifically that happened       15:30

24  was that friends permissions were publicly             15:30

25  deprecated; right?                                       15:30

Page 190

```
 1              MR. FALCONER:  Objection.  Form.           15:30

 2   BY MR. LOESER:                                        15:30

 3      Q.   I'm sorry.  Let me ask again.                 15:30

 4           Putting aside the terminology and what Graph  15:30

 5   version it was and what platform it was, there was a  15:30

 6   new platform that was introduced.  And in that        15:30

 7   new -- that new platform, Facebook publicly           15:30

 8   announced that it was -- that it was deprecating      15:30

 9   friend permissions; right?                            15:30

10              MR. FALCONER:  Objection.  Form.           15:30

11              THE WITNESS:  I think so.  I don't -- I    15:31

12   don't remember specifically like which announcement.  15:31

13   Sorry, there's a lot of F8s, so I think this is what  15:31

14   the picture is, so I don't remember.                  15:31

15              MR. LOESER:  Yeah.  Let's go ahead and play 15:31

16   this.  Maybe it will jog your memory.                 15:31

17              (Video played.)                            15:31

18              MR. LOESER:  Let's try this again because  15:31

19   there is an echo.                                     15:31

20              (Video played.)                            15:31

21   BY MR. LOESER:                                        15:32

22      Q.   We'll go through the transcript itself        15:32

23   because there was some echo there.                    15:32

24           But you know what an "F8 Conference" is?      15:32

25      A.   Yes.                                          15:32
```

Page 191

```
 1      Q.   And what we just showed you was from the     15:32

 2   April 30th, 2014 F8 Conference.  And do you recall,   15:32

 3   did you attend that conference?                       15:33

 4           MR. FALCONER:  Objection.  Form.              15:33

 5           THE WITNESS:  I -- actually, I don't          15:33

 6   remember.  I've been to many, but I don't know the    15:33

 7   exact dates of which ones I've gone to, and I've      15:33

 8   also missed some, as well, so I don't know which      15:33

 9   one.                                                  15:33

10   BY MR. LOESER:                                        15:33

11      Q.   Okay.  And I'm going to read for you what     15:33

12   Mr. Zuckerberg just said, and you can tell me if      15:33

13   this refreshes your recollection of whether you were  15:33

14   in attendance at this conference.                     15:33

15           What Mr. Zuckerberg said was:                 15:33

16           "We've also heard that sometimes you          15:33

17           can be surprised when one of your             15:33

18           friends shares some of your data with         15:33

19           an app.  So now we're going to change         15:33

20           this and we're going to make it so            15:33

21           that now everyone has to choose to

22           share their own data with an app              15:33

23           themselves.  We think this is really"         15:33

24           important -- "a really important step         15:33

25           for giving people power and control           15:33
```

Page 192

```
 1            over how they share their data in        15:33

 2            apps."                                    15:33

 3            Do you recall Mr. Zuckerberg saying that? 15:33

 4     A.    Again, I don't remember.  A lot of these all 15:33

 5  blurred together, so I don't remember that specific  15:34

 6  one.                                                 15:34

 7  ████  ██████████████████████████████████████

   █  ███████████████████████████████████████  ████

   █  █████████████████████████████████████  ████

   █  █████████████████████████████████████  ████

   █  █████████                                ████

   █  ████  ███████████████████████████████   ████

   █  ████████████████                         ████

   █  ████  ██████████████████████████████    ████

   █  ██████████                               ████

   █  ████  █████████████████████████         ████

17     Q.    Okay.  And so when Mr. Zuckerberg is talking 15:34

18  about how friends permissions were going away, at   15:34

19  the time he was saying that in April 30th, 2018      15:34

   █  ████████████████████████████████████████████

   █  ███████████████████████████████████  ████

   █  █████████████████████████████████████████████

   █  ██████████████████████                  ████

   █  ████  ██████████████████████████████    ████

   █  ████████████████████                     ████
```

Page 193

```
 1      Q.   Let's go back to your February 9th, 2014    15:35

 2   email, which is Exhibit 14.  And, again, what you    15:35

 3   wrote was:                                           15:35
```

15    Q.    Okay.  And, then, on April 30th,        15:37

16  Mr. Zuckerberg publicly announced that friends    15:37

17  permissions were going away; right?              15:37

18    A.    Per that video, yes.                     15:37

19    Q.    And, in fact, he said, "We're going to make  15:37

20  it so that now everyone has to choose to share their  15:37

21  own data with an app themselves"; right?         15:37

22    A.    Yes.                                      15:37

23    Q.    And so that would mean that no app would get  15:37

24  access to data about anyone other than the Facebook  15:37

25  user using the app.  Isn't that what he described?  15:37

Page 195

| | | | |
|---|---|---|---|
| 1 | A. | Yes. | 15:37 |
| 2 | Q. | Now, Mr. Chang, you knew at the time -- | 15:37 |
| 3 | A. | Sorry, Mrs. | 15:37 |
| 4 | Q. | Miss Chang.  I'm sorry. | 15:37 |
| 5 | A. | Yeah. | 15:38 |

6 &#9632; &#9608;&#9608;&#9608;&#9608;&#9608; &#9608;&#9608;

&#9632; &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

&#9632; &#9608;&#9608;&#9608;&#9608; &#9608;&#9608;

22   Q.   So that's a yes?                           15:39

23        MR. FALCONER:  Objection.  Foundation and  15:39

24   form.                                           15:39

25   / / /                                           15:39

Page 196

1    BY MR. LOESER:                                          15:39



Page 197

1   ████████████████████████████████   ████

██  ████████   ████

██     ██   ████████████████████████   ████

██  ████████████████████████████████   ████

██  ██████   ████

██     ██   ████████████████████████   ████

██  ██████████████████████████████   ████

██  ████████████████████   ████

██     ██   ████████████████████████   ████

██  ██████████   ████

11    Q.    Now, Mr. Zuckerberg said:                    15:40

12          "We're going to make it so that now        15:41

13          everyone has to choose to share their       15:41

14          own data with an app themselves."           15:41

15          Is that right?                               15:41

16    A.    Correct.                                     15:41

17    Q.    And yet, for those apps and developers that  15:41

18    had continued access to friend data, that wasn't  15:41

19    true; right?                                       15:41

20    A.    I -- I don't think so, because I think what  15:41

21    you're saying is that users have to choose.  And a 15:41

22    permission, from my understanding, is the ability to 15:41

23    generate dialogue to ask for permission.  So the  15:41

24    user would still have to choose to provide it.     15:41

25    Q.    So when a private API provides a partner     15:41

Page 198

1   with access to friend data permissions, right, that    15:41

2   partner can access friend data through that            15:41

3   permission; is that right?                             15:41

4        A.   My understanding --                          15:41

5             MR. FALCONER:  Objection.  Objection.  Form. 15:42

6             THE WITNESS:  My understanding is that it's   15:42

7   the ability to ask a user for that.                    15:42

8   BY MR. LOESER:                                         15:42

9        Q.   And -- now, you didn't hear Mr. Zuckerberg   15:42

10  say at that keynote address that there was a           15:42

11  population of partners that would continue to have     15:42

12  access to friends data, did you?                       15:42

13       A.   No, I didn't hear that.                      15:42

14       Q.   And, Miss Chang, do you recall that you --   15:42

15  that you attended that conference and you were         15:42

16  involved in -- you had a presentation yourself         15:42

17  there?                                                 15:42

18       A.   I don't know if it was that year.  I have    15:42

19  been involved at F8.  I have been a couple years.  I   15:42

20  don't know if it was that specific one.                15:42

21            So, yes, it could be possible.  I just -- I  15:43

22  don't remember that specific one.                      15:43

23            MR. LOESER:  Okay.  We can go to the next    15:43

24  exhibit.  It's Exhibit 18.                             15:43

25            (Exhibit 18 marked for identification.)      15:43

Page 199



1   BY MR. LOESER:                                        15:43

2       Q.   Miss Chang, you are looking at an email from 15:43

3   yourself to Deborah Liu, among others, dated March    15:44

Page 200

1

10      A.   Is it okay if I read through?        15:46

11      Q.   Yeah, please.                         15:46

12      A.   Thank you.                            15:46

13      Q.   I just have a couple questions, so if you   15:46

14   want to skim it, you can probably save yourself some   15:46

15   time.                                         15:46

16      A.   Okay.  Yes.  Okay.                    15:46









Page 205

1

15        MR. FALCONER:  Yeah.  Can you -- go ahead    15:53

16   and finish your last answer if you weren't finished.   15:53

17        THE WITNESS:  Oh, sorry.    15:53

18   BY MR. LOESER:    15:53

19   Q.   Sorry for interrupting.  Go ahead.    15:53

Page 206



18          MR. LOESER:  Exhibit 19.                    15:54

19          (Exhibit 19 marked for identification.)     15:55

20   BY MR. LOESER:                                      15:55

21      Q.   This is an email -- Exhibit 19 is an email  15:55

22   string from Ime Archibong to, among others, you,    15:55

25   is very long string, and I'm going to start at the  15:55

Page 207

1    very, very end of it and work through it.          15:55

2         So first, if you want to take a minute to    15:55

3    familiarize yourself with it, that's fine, and I   15:55

4    will ask you some specific questions that --       15:55

5         A.   Yes, please.                             15:55

6         Q.   Okay.  Are you ready to answer a few     15:59

7    questions about this document?                     15:59

8         A.   I didn't read it fully, but sure.        15:59

9         Q.   Okay.  And then, I think you'll -- we will  15:59

10   work our way through it.                           15:59

11        A.   Okay.                                    15:59

12        Q.   If you need to look at it more, that's, of  15:59

13   course, fine.                                      15:59









Page 212



Page 213



1

25          MR. LOESER:  Why don't we take a 10-minute          16:08

Page 214

```
 1   break.                                            16:08

 2          THE VIDEOGRAPHER:  This marks -- this marks 16:08

 3   the end of media No. 4 in the deposition of Jackie 16:08

 4   Chang.  Going off the record.  The time is 4:08.   16:08

 5          (Off the record.)                           16:08

 6          THE VIDEOGRAPHER:  This marks the beginning 16:22

 7   of media No. 5 in the deposition of Jackie Chang.  16:22

 8   We are back on the record.  The time is 4:22.      16:22

 9   BY MR. LOESER:                                     16:22

10     Q.   Miss Chang, we've talked a lot about the    16:22

11   planning for the rollout of Platform 3, and I want 16:22

12   to make sure the record is clear on what happened in 16:23

13   that planning and after the rollout.               16:23

14          As we saw in the materials we went through, 16:23

15   the new Platform 3 deprecated friends permissions  16:23

16   and read permissions; is that right?               16:23

17     A.   Sorry.  What are you referencing to?  Or am 16:23

18   I supposed to look at a document?                  16:23

19     Q.   No, you don't need to look at a document.  I 16:23

20   just -- we have been through the documents.  I just 16:23

21   want to make sure it's clear to the -- clear on the 16:23

22   record that those documents showed that with       16:23

23   Platform 3, friends permissions and read permissions 16:23

24   were deprecated; right?                            16:23

25     A.   Again, I don't know specifically so whatever 16:23
```

Page 215

1   was reflected in the document.                              16:23

2                                                               16:24

9   BY MR. LOESER:                                              16:24

10      Q.   But you could say generally that these             16:24

11  friends and read permissions were deprecated?               16:24

12      A.   Again, I don't feel comfortable because I          16:24

13  don't remember.                                             16:24

14

Page 216

19    Q.    Who would know that?                          16:25

20    A.    I don't -- I don't know.                      16:25

21    Q.    Okay.  You have no idea?                       16:25

22    A.    Not for an individual person, no.              16:25

23    Q.    And so in your work now with academic          16:25

24    partnerships, if you wanted to figure out if an      16:25

25    academic partner had continued access to friends     16:25

Page 217

1   permissions, for example, who would you go ask to      16:25
2   find that out?                                          16:25
3       A.   That's not possible.                           16:25
4       Q.   It's not possible for an academic researcher  16:25
5   to have access to friends permissions?                  16:26
6       A.   No.  We don't offer that through the           16:26
7   researcher API.                                         16:26
8       Q.   And when you were working with other types     16:26
9   of partners, if you wanted to find out if that          16:26
10  partner had access to friends permissions, do you       16:26
11  have any recollection at all as to who you would go      16:26
12  to to find that out?                                     16:26
13      A.   I don't know -- I don't know specifically       16:26
14  off the top of my head.  I don't know, but I             16:26
15  don't -- yeah.                                           16:26
16      Q.   So, again, I want to make sure I understand     16:26
17  and use the right terminology.  If a developer or        16:26
18  partner continued to have access to deprecated           16:26
19  permissions, does that by definition mean that the       16:26
20  app or partner was whitelisted?                          16:26
21      A.   Say that again, please.                         16:26
22      Q.   If a developer or partner continued to have     16:26
23  access to deprecated permissions after Platform 3        16:26
24  was implemented, does that by definition mean that       16:26
25  the app or partner was whitelisted?                      16:27

Page 218

```
 1          MR. FALCONER:  Objection.  Form.           16:27

 2          THE WITNESS:  I don't know.                16:27

 3          MR. FALCONER:  Go ahead.                   16:27

 4          THE WITNESS:  Sorry.  I don't know in      16:27

 5   specificity in terms of like what you're referring  16:27

 6   to, meaning the technical language, I don't know.  I  16:27

 7   don't know if it's a whitelist.  I don't know.     16:27

 8   BY MR. LOESER:                                    16:27

 9      Q.   Okay.  Do you know if whitelisting is one  16:27

10   way the developer or partner continue to have access  16:27

11   to deprecated permissions, but that there are other  16:27

12   ways as well?                                     16:27

13      A.   I don't know.                             16:27

14      Q.   And is it your understanding that a partner  16:27

15   that has a private API, and through that private API  16:27

16   gets access to friends permission, is that         16:27

17   considered a whitelist, or is that something       16:27

18   different?                                        16:27

19      A.   So, again, I don't -- I don't remember or  16:27

20   know what that would be.                          16:27

21      Q.   Okay.  Do you know if Facebook whitelisted  16:28

22   certain app developers so that they had continued  16:28

23   access to friends permissions after Platform 3 was  16:28

24   implemented?                                      16:28

25      A.   So, again, I don't remember it so I don't  16:28
```

Page 219

1   know if it could be classified as whitelist.          16:28
2       Q.   The term "whitelist" is not one you have     16:28
3   used so frequently that you remember to this day      16:28
4   what it means?                                        16:28
5       A.   No.                                          16:28
6       Q.   Do you have any idea of the process that's   16:28
7   used to determine if an app developer or partner is   16:28
8   whitelisted so that they have continued access to     16:28
9   friends permissions?                                  16:28
10      A.   Yeah.  I don't recall it.                    16:28
11      Q.   Do you know if Facebook keeps records of     16:28
12  whitelisted developers/partners?                      16:28
13      A.   I don't know.                                16:28
14      Q.   You have no recollection at all as to        16:28
15  whether that information is collected and maintained  16:29
16  in one place so that someone could easily find out    16:29
17  who are all of the whitelisted partners or            16:29
18  developers?                                           16:29
19      A.   So again --                                  16:29
20           MR. FALCONER:  Asked and answered.           16:29
21           THE WITNESS:  -- that's outside my scope, so 16:29
22  I don't know.                                         16:29
23  BY MR. LOESER:                                        16:29
24      ██   ███████████████████████████████      ████
██  ███████████████████████████████████████████████████



Page 221

```
 1            MR. FALCONER:  Derek, you're on mute.  I      16:32
 2   don't know if you did that on purpose.               16:32
 3            MR. LOESER:  I did not do that on purpose.   16:32
 4   BY MR. LOESER:                                        16:32
 5      Q.   So if we can go back to Exhibit 8.            16:32
 6            DEPOSITION REPORTER:  Excuse me, Counsel,
 7   which exhibit?
 8            MR. LOESER:  This is Exhibit 8.  This is an  16:32
 9   Excel file.                                           16:32
10   BY MR. LOESER:
11
```



Page 223

1 ████████████████████████████████

██ ████████████████████████           ██████

3  BY MR. LOESER:                                         16:34

4      Q.   Did you have any interaction with a partner   16:35

5  in a discussion of the information -- the              16:35

6  permissions the partner was interested in, where       16:35

7  they said to you, Hey, we want to arrange so that we    16:35

8  have permission to access friends_video?                16:35

9      A.   I don't remember specifically like            16:35

10  individual permissions.                                16:35

11     Q.   Okay.  Do you remember any conversations at   16:35

12  all about friends permissions with any partner?        16:35

13     A.   I don't remember specifically anything about  16:35

14  friends permission.                                    16:35

15     Q.   Do you remember anything generally about      16:35

16  friends permissions?  And particularly, I'm asking     16:35

17  if any partner that you have worked with raised that   16:35

18  as a permission that they were interested in gaining   16:35

19  access to.                                             16:35

20     A.   I don't -- I don't -- I don't recall.         16:35

21          MR. LOESER:  Okay.  We can go to Exhibit 21.  16:36

22          (Exhibit 20 marked for identification.)       16:36

23          MR. LOESER:  Oh, is it 20?  Yeah.             16:36

24          While that's being loaded, for the record,    16:36

25  this is an email from Simon Cross to, among others,    16:36



Page 225

1  ▮▮▮▮▮▮▮▮▮▮▮▮                                        ▮▮▮▮

2      A.    I don't recall it specifically.        16:38

3      Q.    Do you recall it at all?               16:38

4      A.    No, I don't.                           16:38

5      Q.    And can you tell me what "app-based GKs"  16:38

6  are?                                             16:38

7      A.    I don't know.                          16:38

8      Q.    You have no recollection whatsoever?   16:38

9      A.    No.  Again, I'm not -- I'm not the technical 16:38

10 person, so I just don't -- I don't know technically  16:38

11 what it would mean.                              16:38

12     Q.    Okay.  Do you know what the Capabilities  16:38

13 tool was?                                        16:38

14     A.    Not specifically.  I've heard of it, but I  16:38

15 don't know it in detail.                         16:39

16     Q.    Well, what have you heard about it?    16:39

17     A.    It looks like some sort of permissioning  16:39

18 tool.                                            16:39

19     Q.    And what does that mean?               16:39

20     A.    It grants permissions.                 16:39

21     Q.    Who does it grant permissions to?      16:39

22     A.    So, again, I don't -- I don't know the  16:39

23 technical specifics, so I don't feel comfortable  16:39

24 talking about it in depth because I might        16:39

25 mischaracterize it.                              16:39

Page 226

1    Q.   Okay.  You've said all that you feel          16:39

comfortable saying about it?                            16:39

2

3    A.   Well, like all that I know about it.          16:39



Page 228

1    ████████████████████                          ████

█    ██    ██████                                  ████

█         ████████████████████                     ████

█         ██████████                               ████

█         ████████████████████████████████████████████

█    ██████████████████████████████                ████

█    ████████████████████████████████████████      ████

█    ████████████████████████                       ████

9    BY MR. LOESER:                                16:42

10        Q.   So what was your job in October of 2013?   16:42

11        A.   I believe it was partner manager.    16:42

12        ██   ██████████████████████████████████████████

█    ██████                                         ████

█         ██████████████████████████               ████

█         ██████████████████████████████           ████

█         ██████████████████████████               ████

█         ██████████████████████████               ████

█         ██████████████████████████               ████

█         ████████████████████████████████         ████

█         ██████████████████████████████████████   ████

█    ██    ██████████████████████████████████████   ████

█    ██    ██████████████████████████               ████

█    ██    ████████████████████████████████████     ████

█    ████████████████████████████                   ████

█    ██    ████████████████                          ████

Page 229

1 [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

9    Q.   Now, as the partner manager, were you aware    16:44

10   of that use for capabilities?                       16:44

11   A.   I'm not sure I understand.                      16:44

12   Q.   Did you use the capabilities tool at all in     16:44

13   your position at the time?                           16:44

14   A.   I don't remember.  There's a lot of tools,     16:44

15   so I don't remember this one specifically.           16:44

16 [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

22        MR. LOESER:  If we can go to Exhibit 22?        16:45

23        (Exhibit 21 marked for identification.)         16:45

24        MR. FALCONER:  This is Exhibit 21; right?       16:46

25        MR. LOESER:  Yeah.                               16:46

Page 230

```
 1   BY MR. LOESER:                                           16:46

 2       Q.   Miss Chang, I'm showing you Exhibit 21,         16:46

 3   which is an email from Paul Stepnowsky to, among         16:46

 4   others, you.  This is dated September 3rd, 2019, and     16:46

 5   it contains a chat message; is that right?               16:46

 6       A.   Yes, I see that.                                16:46

 7       Q.   And so in 2019, what was your position at       16:46

 8   Facebook?                                                16:46

 9       A.   I believe it was product partnerships.          16:46

10       Q.   Who is Paul Stepnowsky?                         16:46

11       A.   I don't remember specifically.                 16:46

12       Q.   Okay.  So on September 3rd of 2019, there       16:46

13   was this chat, and it starts with Paul Stepnowsky        16:47

14   ██████████████████████████████████████     ████

     ██████████████████████████████████████████     ████

     ██████████████████████████████████████     ████

17           Do you -- first of all, is "TechCrunch" a        16:47

18   publication?                                             16:47

19       A.   Yes.                                            16:47

20       Q.   Are you familiar with that publication?         16:47

21       A.   I know what it is, yes.                         16:47

22       ██   ████████████████████████████     ████

     ██  ████████████████████████████████████████     ████

     ██     ██   ████████████     ████

     ██     ██   ██████████████████████████     ████
```









1

Page 236

1   ████████████████████████████████████  ██████

██  ██████████████████████████████████  ██████

██  ████████████████████████████████  ██████

██  ██████████████████  ██████

5        MR. LOESER:  We can go to the next exhibit.   16:54

6   This should be Exhibit 22 by my count.  My tabs are   16:55

7   off now, so I will be making a lot of mistakes, I'm   16:55

8   sure.   16:55

9        MR. FALCONER:  They are off by 1.  It would   16:55

10   be easier if they were off by like 46.   16:55

11        (Exhibit 22 marked for identification.)   16:55

12   BY MR. LOESER:   16:55

13   Q.   Miss Chang, I'm showing you what's been   16:55

14   marked Exhibit 22, which is an email from Simon   16:55

15   Cross to Eddie O'Neil, dated March 27, 2014.   16:55

16   ██████████████████████████████████████

██  ████████████████████████████████  ██████

██        ██████████  ██████

██  ██  ██  ██████

██  ██  ████████████████████  ██████

██  ████████████████████████████████  ██████

██  ██  ██████████  ██████

██  ██  ████  ██████

██  ██  ████████████  ██████

██  ██  ██████████████████  ██████

Page 237







Page 239

Page 240



25      Q.    Did you have any involvement at any point in 17:03

Page 241

```
 1   your career at Facebook with screening third-party    17:03
 2   developers before -- well, strike that.               17:03
 3          Do you know whether Facebook screened          17:03
 4   third-party developers or their apps before granting  17:03
 5   them access to Graph API?                              17:03
 6   A.   I --                                              17:03
 7          MR. FALCONER:  Object to form.                  17:03
 8          THE WITNESS:  Sorry.  I don't understand.       17:03
 9   Can you give me an example.                            17:04
10   BY MR. LOESER:                                         17:04
11   Q.   Sure.  Let me ask again.  Do you know            17:04
12   whether Facebook screens apps or developers before    17:04
13   allowing them to access the Facebook Graph?           17:04
14          MR. FALCONER:  Objection.  Form.                17:04
15          Go ahead.                                       17:04
16          THE WITNESS:  So we have like a public          17:04
17   workflow that has a developer operations team that    17:04
18   reviews the apps, so I don't -- I don't know if       17:04
19   that's what you're referring to.                      17:04
20   BY MR. LOESER:                                         17:04
21   Q.   And do you know anything about the process       17:04
22   for reviewing apps, how that's done?                  17:04
23   A.   Not in detail.                                    17:04
24   Q.   Do you know if that process changed after        17:04
25   2012?                                                  17:04
```

Page 242

```
 1      A.   So I can't really speak to that process.  I   17:04
 2  don't know.                                             17:04
 3      Q.   Do you know if Facebook reviewed privacy      17:04
 4  policies of third-party apps to ensure that they       17:05
 5  complied with Facebook's own policies before           17:05
 6  providing those apps access to Facebook Graph?         17:05
 7           MR. FALCONER:  Objection.  Form.              17:05
 8           THE WITNESS:  Sorry.  Can you say that        17:05
 9  again?                                                 17:05
10  BY MR. LOESER:                                         17:05
11      Q.   Do you know if Facebook reviewed the privacy 17:05
12  policies of third-party apps?                          17:05
13      A.   I -- I don't know.                            17:05
14           MR. FALCONER:  Objection.                     17:05
15           THE WITNESS:  I'm sorry.                      17:05
16           MR. FALCONER:  Yeah.  Just same objection.    17:05
17  BY MR. LOESER:                                         17:05
18      Q.   Are you familiar with the Facebook data use  17:05
19  policy?                                                17:05
20      A.   Not in -- not -- not specifically.  I guess  17:05
21  it's in what context?                                  17:05
22      Q.   Well, have you ever read any version of      17:05
23  Facebook's data use policies?                          17:06
24      A.   So I don't remember that specifically, but   17:06
25  if you're talking about like a -- like a platform     17:06
```

Page 243

```
 1   usage, I mean, I know we have platform terms.        17:06
 2        Q.   Well, do you -- have you ever reviewed     17:06
 3   Facebook's platform policies, platform developer     17:06
 4   policies?                                            17:06
 5        A.   I mean, I have read it, but I don't remember 17:06
 6   all the details of it.                               17:06
 7        Q.   And what about the Facebook data use       17:06
 8   policies specifically?  Is that something you recall 17:06
 9   ever reading?                                        17:06
10        A.   I don't remember.                          17:06
11        Q.   During all your time working with Facebook 17:06
12   partners, did you ever become aware of any violation 17:06
13   of Facebook policies by any app developer or         17:06
14   partner?                                             17:06
15        A.   Sorry.  In what sense?                     17:06
16        Q.   In any sense.                              17:06
17        A.   I mean, I've heard that it's happened, but I 17:06
18   don't recall anything specific.                      17:07
19        Q.   Can you recall any specific instance of a  17:07
20   partner with whom you worked violating any Facebook  17:07
21   platform policy?                                     17:07
22        A.   Again, I don't remember specifically but,  17:07
23   yeah, it's definitely possible.                      17:07
24        Q.   But you never saw it happen; is that what  17:07
25   you are saying?                                      17:07
```

Page 244

```
 1      A.   I don't remember.  I don't remember every    17:07
 2  instance of my interactions so I don't know.          17:07
 3      Q.   And there was no platform policy violation    17:07
 4  of any partner with whom you worked that you can       17:07
 5  specifically recall?                                   17:07
 6      A.   Not specifically.                             17:07
 7      Q.   Do you remember generally any platform        17:07
 8  violations by any of the partners with whom you        17:07
 9  worked?                                                17:07
10      A.   I know that platform violations is possible,  17:07
11  but I don't know specifically who or what.             17:07
12      Q.   Are you aware that the data use policy has a  17:08
13  provision that states, "If an application asks         17:08
14  permission from someone else to access your           17:08
15  information, the application will be allowed to use    17:08
16  that information only in connection with the person    17:08
17  that gave the permission and no one else"?             17:08
18           MR. FALCONER:  Objection.  Form.              17:08
19           THE WITNESS:  I don't know that line          17:08
20  specifically off the top of my head.  So I'll --       17:08
21  assuming if you're reading it from an actual thing,    17:08
22  yeah, that's --                                        17:08
23  BY MR. LOESER:                                         17:08
24      Q.   And did you observe any situation in which    17:08
25  that specific policy I mentioned was violated by any   17:08
```

Page 245

```
 1    app or partner?                                  17:08

 2             MR. FALCONER:  Objection.  Form.        17:08

 3             THE WITNESS:  So I don't remember.      17:08

 4             MR. LOESER:  It we can go to tab 25.    17:09

 5             (Exhibit 23 marked for identification.) 17:09

 6    BY MR. LOESER:                                   17:09

 7       Q.   Miss Chang, I'm showing you what's been  17:09

 8    marked Exhibit 23, which is an email from you to 17:10

 9    Eddie O'Neil, Marie Hagman and Simon Cross, dated 17:10

10    ███████████████████████████              ██████

      ██ ████████████████████████████████████  ██████

      ██ ████████████████████████████████      ██████

      ██      █████████████████                ██████

      ██   ██    ████                           ██████

      ██   ██  █████████████████████████████    ██████

      ██ █████████████████████████████████      ██████

      ██  ███████████████████████████           ██████

18             And take a minute to look at your email and 17:10

19    tell me if you recall what you are referring to in 17:10

20    the subject line of this email.                  17:10

21       A.   Sorry.  I'm pulling up the document.  Okay. 17:10

22        ██    ██████████████████████████████████████

      ██ ████████████████████████████████████  ██████

      ██  █████████████████                    ██████

      ██      ██████████████████████████████   ██████
```





Page 248

```
 1   the two now.                                    17:15
 2       Q.   Okay.  And you were very involved in tasks  17:15
 3   relating to platform simplification; right?     17:15
 4       A.   I wouldn't assume that.                17:15
 5       Q.   You were involved enough to be responsible  17:15
 6   for aspects of platform simplification; right?  17:15
 7       A.   I wouldn't assume that.                17:15
 8       Q.   Even for --                            17:15
 9       A.   Being I supported -- I supported the work  17:15
10   stream, but I can't characterize because I don't  17:15
11   remember if that was my position, so that's why I  17:15
12   wouldn't assume that.                           17:15
13       Q.   But we have looked at email where you were  17:15
14   assigned a particular task with regard to platform  17:16
15   simplification; right?                          17:16
16       A.   So assigning to task doesn't mean I -- I own  17:16
17   that.                                           17:16
18       Q.   What does it mean?                     17:16
19       A.   It means I'm assigned to task.         17:16
20       Q.   Having been assigned the task, presumably  17:16
21   you learned something about it?                 17:16
22       A.   I guess.  But, again, I don't know from that  17:16
23   moment in time.  It's 2013, so I don't remember at  17:16
24   that moment in time.                            17:16
25   ██    ████████████████████████████████    ████
```









Page 253



Page 254







Page 257



```
21   BY MR. LOESER:                                        17:27

22        Q.   Deprecating friends permissions was a pretty  17:27

23   big deal for Facebook, wasn't it?                     17:27

24        A.   I don't know.                               17:27

25        Q.   At the keynote address of the F8 that       17:27
```

Page 258

1    year -- the F8 is a big deal, isn't it?                17:27

2         A.   The event is.                                17:27

3         Q.   Yeah.  And Mark Zuckerberg gave the keynote  17:27

4    address in 2014; right?                                17:27

5         A.   Like we saw, yes.                            17:27

6         Q.   And that's a big deal; right?               17:27

7         A.   I -- I don't know if it was back then.       17:27

8         Q.   Okay.  And in his keynote address, one of    17:27

9    the things he talked about was deprecating friends     17:27

10   permissions; right?                                    17:27

11        A.   I don't know if he used those words exactly, 17:27

12   but whatever the video said.                           17:27

13        Q.   Okay.  What the video said is that Facebook  17:27

14   was going to stop sharing friends data; right?         17:27

15        A.   If that's what the video said.  I don't      17:27

16   remember it specifically.                              17:27

17        Q.   We just watched the video, Miss Chang.       17:27

18        A.   Right, but I didn't memorize --              17:27

19             MR. FALCONER:  Objection.  Argumentative.    17:28

20   BY MR. LOESER:                                         17:28

21        Q.   Okay.  So you can't remember what            17:28

22   Mr. Zuckerberg said in the video clip that we showed   17:28

23   you a couple hours ago?                                17:28

24        A.   Not exactly.                                 17:28

25        Q.   Okay.  And we went through the transcript -- 17:28

Page 259

```
 1      A.   We can play it again, I guess.            17:28
 2      Q.   I read the transcript to you.  And in the  17:28
 3  transcript, Mr. Zuckerberg says that Facebook was  17:28
 4  going to stop letting apps access the content      17:28
 5  information of a person's friends who didn't use the 17:28
 6  app; right?                                         17:28
 7      A.   Is that an exact -- is that an exact       17:28
 8  reading?  I don't know.                             17:28
 9      Q.   Okay.  So that's all --                    17:28
10      A.   I --
11      Q.   None of that made any sense to you         17:28
12  whatsoever?                                         17:28
13      A.   Again, I don't know if that was specifically 17:28
14  how he said, so I think you've been using things    17:28
15  interchangeably where I don't feel comfortable      17:28
16  agreeing to that.  So I don't know what was exactly  17:28
17  said.  I don't have the transcript in front of me to 17:28
18  be able to say that's exactly what he said.         17:28
19      Q.   Well, fortunately, we have the transcript as 17:28
20  an exhibit.  So why don't we go back to that        17:28
21  exhibit.                                            17:29
22           DEPOSITION REPORTER:  Counsel, I don't think 17:29
23  you actually marked the transcript.                 17:29
24           MR. LOESER:  I think it is Exhibit 17.     17:29
25           DEPOSITION REPORTER:  Okay.  It is.  You're 17:29
```

Page 260

```
 1    right.  I apologize.                          17:29

 2    BY MR. LOESER:                                17:29

 3        Q.   If you look at that second highlighted    17:29

 4    paragraph.  Why don't you read that again,    17:29

 5    Miss Chang.                                   17:30

 6        A.   "And in the past, when one of your   17:30

 7    friend" --                                    17:30

 8        Q.   Go ahead.  Sorry.                     17:30

 9        A.   "And in the past, when one of your   17:30

10             friend blogged into an app, in this  17:30

11             case, Ilya, the app could ask him    17:30

12             not only to share his data, but also 17:30

13             data that his friends had shared     17:30

14             with him -- like photos and friend   17:30

15             lists here.  So now we're going to   17:30

16             change this, and we're going to make 17:30

17             it so that now everyone has to choose 17:30

18             to share their own data with an app  17:30

19             themselves.                          17:30

20             "So we think that this is a really   17:30

21             important step for giving people power 17:30

22             and control over how they share their 17:30

23             data with the apps.  And as developers, 17:30

24             this is going to allow you to keep   17:31

25             building apps with all the same great 17:31
```

Page 261

```
 1              social features while also giving      17:31
 2              people power and control first.  So    17:31
 3              I am really happy that we're doing      17:31
 4              this."                                  17:31
 5      Q.   Now, I want to make sure that you understand 17:31
 6   what he said here because this is something that  17:31
 7   Mr. Zuckerberg included in his keynote address.  And 17:31
 8   as he says, he was really happy they were doing   17:31
 9   this, and the "this" was eliminating friend sharing; 17:31
10   right?  Is that -- is that a description that you  17:31
11   agree with?                                        17:31
12      A.   No, I --                                   17:31
13              MR. FALCONER:  Object.  Foundation.     17:31
14              THE WITNESS:  No.  I don't know if it's 17:31
15   specifically related to that.  I can't assume that. 17:31
16   BY MR. LOESER:                                     17:31
17      Q.   Okay.  Let's read a sentence and see if we 17:31
18   can develop a common understanding.                17:31
19              "So now we're going to change this      17:31
20              and we're going to make it so that      17:32
21              now everyone has to choose their own    17:32
22              data with a" -- I'm sorry, "That now    17:32
23              everyone has to choose to share their   17:32
24              own data with an app themselves."       17:32
25              Do you understand what that means?      17:32
```

Page 262

```
 1      A.    Yes.                                     17:32

 2      Q.    What does that mean?                      17:32

 3      A.    It means that people have to opt in to share  17:32

 4  information.  So if they publish something, they    17:32

 5  have to opt in to do that.                          17:32

 6      Q.    So that means that if one person downloads  17:32

 7  an app, that app can't get access to that person's   17:32

 8  friends, unless those friends also opt into that     17:32

 9  sharing; is that right?                             17:32

10      A.    So I don't know specifically if it means to  17:32

11  that.                                               17:32

12
```

Page 263

19    Q.   Well, he was specifically referring to        17:34

20  getting rid of the ability of apps to access friend  17:34

21  permissions; right?                                  17:34

22          MR. FALCONER:   Objection.   Form and        17:34

23  foundation.                                          17:34

24          THE WITNESS:   I don't believe that's what he 17:34

25  said.   He said:                                     17:34

Page 264

```
 1              "So now we're going to change this       17:34
 2               and we're going to make it so that      17:34
 3               everyone has to choose to share         17:34
 4               their own data with an app              17:34
 5               themselves."                            17:34
 6   BY MR. LOESER:                                      17:34
 7       Q.   So, Miss Chang, how do you think Facebook  17:34
 8   made that change?  What do you think they did?      17:34
 9              MR. FALCONER:  Objection.  Form.         17:34
10              THE WITNESS:  They changed the permissioning 17:34
11   model, I'm guessing.                                17:34
12   BY MR. LOESER:                                      17:34
13       Q.   Right.  Doesn't that mean that they        17:34
14   eliminated the friend sharing APIs?  Isn't that what 17:34
15   he's saying?                                        17:34
16       A.   I don't --                                 17:34
17              MR. FALCONER:  Objection to form and     17:34
18   foundation.                                         17:34
19   BY MR. LOESER:                                      17:34
20       Q.   Right?                                     17:34
21       A.   So, again, I don't know specifically because 17:34
22   I think you're referring to one thing and I don't   17:35
23   know.                                               17:35
24       Q.   Okay.  So looking at this language, you    17:35
25   don't draw any line between making it so everyone   17:35
```

Page 265

1   has to choose to share their own data with an app        17:35

2   themselves; you draw no connection in your mind          17:35

3   between that and eliminating friend sharing?             17:35

4       A.   Again, I don't know what Mark is               17:35

5   specifically referring to, so I can't make that          17:35

6   assumption or connection.                                17:35

7       Q.   And having gone through all these emails        17:35

8   that we went through and looking at this language,       17:35

9   you still can't make that connection?                    17:35

10      A.   I can't.                                         17:35

11           MR. FALCONER:   Derek, we have been going a     17:35

12  little more than an hour.  Whenever you hit a            17:36

13  stopping point, can we take a break?                     17:36

14           MR. LOESER:   Now is fine.                      17:36

15           THE VIDEOGRAPHER:   This marks the end of       17:36

16  media No. 5 in the deposition of Jackie Chang.           17:36

17  Going off the record.  The time is 5:36.                 17:36

18           (Off the record.)                               17:36

19           THE VIDEOGRAPHER:   This marks the beginning    17:56

20  of media No. 6 in the deposition of Jackie Chang.        17:56

21  We are back on the record.  The time is 5:57.            17:57

22  BY MR. LOESER:                                           17:57

23      Q.   Miss Chang, before we were talking about the   17:57

24  2014 F8 Conference and I want to make sure I             17:57

25  understand your testimony.  Do you generally attend      17:57

Page 266

```
 1   the F8 Conferences?                              17:57
 2        A.   Not generally.  I've been to them, but I  17:57
 3   haven't been to all.                             17:57
 4        Q.   And do -- you generally just don't have much  17:57
 5   of a role there, so you can't remember much about  17:57
 6   it?                                              17:57
 7        A.   That depends on which F8.  I've spoken at F8  17:57
 8   before.                                          17:57
 9        Q.   What are the topics on which you've spoken?  17:57
10        A.   On Internet.org.                       17:57
11        Q.   Okay.  And what year?  Do you recall what  17:57
12   year that was?                                   17:57
13        A.   I don't remember what year exactly.    17:57
14             MR. LOESER:  We're going to show you the  17:57
15   next exhibit, which should be -- I know I'm going to  17:57
16   say it wrong, but I think it is Exhibit 24.      17:57
17             (Exhibit 24 marked for identification.)  17:58
18   BY MR. LOESER:                                   17:58
19        Q.   Miss Chang, you should be looking at   17:58
20   Exhibit 24, which is an email from KP to Simon   17:58
21   ██████████████████████████████████     ████████
██   ██████████████████████████████████     ████████
23             Do you see that?                       17:58
24        A.   Yes.  Can I read it?                   17:58
25        Q.   I'm just going to ask you just about one  17:58
```

Page 267

1    sentence.  So why don't we go to that and then if        17:59

2    you need more context to understand it, then, by all      17:59

3    means, take your time, but...                             17:59

4        A.   Okay.                                            17:59

5    ████ ███████████████████████████████████████████  ██████

███ ████████████████████████████████████████████████  ██████

███        █████████████████████████                  ██████

███   ████ █████████████████████                       ██████

███   ████ ███████████████████████████████            ██████

███ ████████████████████████████████████████████████  ██████

███ ████████                                          ██████

███        █████████████████████████████████████      ██████

███ ███████████████████████████████████               ██████

14             MR. FALCONER:  Objection.  Form.             17:59

15             THE WITNESS:  Can I read this document        17:59

16   first?                                                   17:59

17   BY MR. LOESER:                                           17:59

18       Q.   Yes, please.  Well, that's the only --          17:59

19   that's the only section I want to ask you about, so      17:59

20   if you want to just look at that, I will give you a      17:59

21   second.  We could speed this up.                         17:59

22       A.   Okay.                                           17:59

23       Q.   But look -- go ahead and look and see what     17:59

24   this -- what this email is and familiarize yourself      18:00

25   with it.  That's the only part I am going to be          18:00

Page 268

1    asking you about.                                    18:00



Page 269



```
24      Q.   So, Miss Chang, do you recall that there was    18:02
25   articles written about the fact that Facebook          18:02
```

Page 270

```
 1    partners continued to have access to friends data    18:02
 2    after the implementation of Graph API version 2?     18:03
 3        A.   No.  I don't know what articles you're      18:03
 4    referencing to.                                       18:03
 5             MR. LOESER:  Let's go to the next exhibit.   18:03
 6             (Exhibit 25 marked for identification.)      18:03
 7    BY MR. LOESER:                                        18:03
 8        Q.   And this is Exhibit 25.  Miss Chang, this is 18:03
 9    a New York Times article from December 16th of --     18:03
10    June 3rd, 2018.  "Facebook Gave Device Makers Deep    18:04
11    Access to Data on Users and Friends."                 18:04
12             Do you recall when this article came out?    18:04
13        A.   No.                                          18:04
14        Q.   And would it be your normal course to find   18:04
15    out if an article was written about an area that      18:04
16    concerned work that you did at Facebook?              18:04
17        A.   No.  I think I would be reading articles for 18:04
18    a very long time, so I don't focus a lot on           18:04
19    articles.  That would be our communications team.     18:04
20        Q.   Okay.  So when this article -- and the       18:04
21    subheading is:                                        18:04
22             "The company formed data-sharing             18:04
23             partnerships with Apple, Samsung and         18:04
24             dozens of other device makers,               18:04
25             raising new concerns about its privacy       18:04
```

Page 271

```
 1              protections."                          18:04
 2         As we saw in the email, you were very       18:04
 3    involved in the partnerships and the providing of 18:04
 4    extended access to deprecated permissions.        18:04
 5         But no one sent this to you and said, hey,  18:04
 6    weren't you involved in this?                      18:05
 7    A.   No.                                           18:05
 8         MR. FALCONER:  Objection.  Form.             18:05
 9    BY MR. LOESER:                                     18:05
10    Q.   You've never read this article?             18:05
11    A.   No.                                           18:05
12    Q.   And you've never communicated with anyone   18:05
13    about the scandal that surfaced when people figured 18:05
14    out that this had happened?                        18:05
15    A.   So I don't -- I don't know.                  18:05
16    Q.   So now, it's not news to you that Facebook  18:05
17    reached data-sharing partnerships with at least 60 18:05
18    device makers; right?  That was work you were doing 18:05
19    at Facebook, wasn't it?                            18:05
20    A.   No.  Specifically, I didn't work in that -- 18:05
21    on devices.                                        18:05
22    ██    ██████████████████████████████████████
██  ████████████████████████████████████████    ████
██  ████████████████████████████████████        ████
██  ██████████████████████████████████████      ████
```

Page 272

1    not an article that anyone brought to your            18:05

2    attention?                                             18:05

3        A.    I don't remember and, again, I didn't work  18:05

4    on devices.                                            18:06

5        Q.    So this is -- you're learning for the first 18:06

6    time as we talk right now that there was a scandal     18:06

7    regarding Facebook continuing to provide friends       18:06

8    data to various partners?                              18:06

9        A.    Again, I don't remember.                     18:06

10       Q.    A front-page New York Times article was not  18:06

11   something that came to your attention at Facebook?     18:06

12       A.    There's been many, so I don't remember this 18:06

13   specific one.                                          18:06

14       Q.    The scandals are so many that the scandal    18:06

15   with which you were personally involved doesn't        18:06

16   stand out for you?                                     18:06

17            MR. FALCONER:  Objection --                   18:06

18            THE WITNESS:  I would not classify it that    18:06

19   way.                                                   18:06

20            MR. FALCONER:  -- form, foundation and it     18:06

21   misstates prior testimony.                             18:06

22   BY MR. LOESER:                                         18:06

23       Q.    I'm sorry.  You can answer.                  18:06

24       A.    I would not state it the way you did.        18:06

25            MR. LOESER:  All right.  We can go to the     18:06

Page 273

```
1    next exhibit, 26.                                    18:06

2             (Exhibit 26 marked for identification.)     18:06

3    BY MR. LOESER:                                       18:07

4         Q.   Miss Chang, we're showing you Exhibit 26,  18:07

5    which is an email from Charlotte Edelson to several  18:07

6    people, including yourself, dated August 28th, 2014: 18:07

7    ████████████████████████████████████        █████

     █  ███████████████████████████              █████

     █          ███████████████                 █████

     █      █    ████████████████████████████████    █████

     █    █████████████                         █████

12        Q.   Do you know who Charlotte Edelson is?      18:08

13        A.   No, I don't -- I don't remember.           18:08

14             ██████████████████████████        █████

     █   ████                                    █████

     █    █    ███████████████████████████████████████

     █  ████████████████████████                █████

     █    █    █████████████████                 █████

     █    █    ███████████████████████████████████████

     █   ██████████████                          █████

     █    █    ████                              

     █    █    █████████████████                 █████

     █    █    ████████████████████████          █████

     █  ████████████████████████████             █████

     █  ██████████████████████████               █████
```

Page 274





Page 278



Page 280

```
 1  ████████████████████████████████████████
 2  █      ████████████████████████      ████
 3  █      █████████████████████         ████
 4  █      ████████████████████████      ████
 5  █      ███████████████████████████████
 6  █  ███████████████████████████████
 7  █  ███████████████████████████      ████
 8  █    ██   ████████████                ████
```

 9        MR. LOESER:  We can go to the next exhibit,    18:18

10   which I believe is 27.                              18:18

11        (Exhibit 27 marked for identification.)        18:19

12        MR. LOESER:  We're uploading the exhibit,      18:19

13   but it's taking a minute.                           18:19

14   BY MR. LOESER:                                      18:19

15        Q.   Okay.  We're showing you "Quip Business   18:19

16   Portal," dated June 13th, 2018.  Are you familiar   18:19

17   with the Quip business portal and how it works?     18:19

18        A.   I know Quip, the service.                 18:19

19        Q.   And we mentioned it previously, but tell me, 18:19

20   what is the Quip service?                           18:19

21        A.   It's a document-sharing service like Google 18:19

22   Docs.                                               18:19

23        Q.   So it allows you to work with other people 18:19

24   on a document in real time?                         18:20

25        A.   Yes.                                       18:20

Page 281

```
 1      Q.   And is this something that you frequently    18:20
 2  use or not?                                           18:20
 3      A.   I've used it.  I used it at whatever time    18:20
 4  the service was available just because we have a lot  18:20
 5  of rotating services.                                 18:20
 6      Q.   And is the -- is the service searchable?     18:20
 7      A.   Yes.                                          18:20
 8      Q.   How does that work?                           18:20
 9      A.   There's a search header in the service and   18:20
10  you can search for topics.                            18:20
11      Q.   Do you know when Facebook started using the  18:20
12  Quip service?                                          18:20
13      A.   I don't know exactly when.                    18:20
14      Q.   And is it something that's widely used at     18:20
15  Facebook?                                              18:20
16      A.   Not now.                                       18:20
17      Q.   When was it widely used?                       18:20
18      A.   I don't remember the years, but there was a   18:20
19  time where it was being used before us getting --      18:21
20  before Google Docs.                                    18:21
21      Q.   And so it's something that Facebook stopped   18:21
22  using?                                                 18:21
23      A.   Well, they're encouraging people to stop      18:21
24  using it, but I think there are still documents        18:21
25  there.                                                 18:21
```

Page 282

1    Q.   Okay.  And what are people now using instead  18:21

2  for the same type of functionality?                 18:21

3    A.   Google Docs.                                  18:21

4    Q.   And do you use Google Docs now?               18:21

5    A.   Yes.                                          18:21

6    Q.   And when did you start using Google Docs?     18:21

7    A.   I don't remember the year specifically.       18:21

Page 283



Page 284

1   ███████████████                                    █████

██       █████████████████████████████████           █████

██  █████████████                                     █████

██   ██  █████████████████████████████████████████████████

██  ███████████████████████████████████              █████

██       ██████████████████████████████              █████

7        Q.   2017 -- I can't tell from your LinkedIn, but  18:25

8   2007 through September 2019, it says "Head of

9   business partner business platform partnerships."

10           DEPOSITION REPORTER:  Can you repeat that

11  again?

12  BY MR. LOESER:

13       Q.   It looks like in 2017, you started with      18:25

14  Internet.org and then you transitioned to head of       18:25

15  business platform partnerships.

16           Do you know when in the year you                18:25

17  transitioned to head of business platform              18:25

18  partnerships?                                          18:25

19       A.   So I don't know the specific dates, and I     18:25

20  didn't come in as head of business partnership.  I      18:25

21  was a partner manager and then eventually left the      18:25

22  role as head.                                          18:26

23       ██  ████████████████████████████████████████████

██  ██████████████████████████████████████████████████████

██       ████████████████████████                    █████





Page 287

1 ████████████████████████████████████

██ ██████████████████████████

██ ██████████████████████                    ████

██ ████████████████████████████████         ████

██ ████████████████████████████████████      ████

██ ████████████████████████████████           ████

██ ██████████████████████████████              ████

8        Exhibit 28 is an email that will materialize 18:29

9  momentarily.                                        18:29

10        (Exhibit 28 marked for identification.)      18:29

11 BY MR. LOESER:                                       18:29

12    Q.   So, Miss Chang, we are showing you an email 18:29

13 dated October 16th, 2019, that appears like it was   18:29

14 sent to yourself, sent from you to you and also to   18:29

15 Joel Yawili, that includes a chat message.           18:29

16        Who is Joel Yawili?                           18:30

17    A.   Joel.                                        18:30

18    Q.   Joel.                                        18:30

19    A.   He was someone on the team and reported to  18:30

20 me at some point in time.  I don't remember the      18:30

21 exact period of time.                                18:30

22    ██  ████████████████████████████████████████████████

██ ██████████████████████████████████          ████

██ ██████████████████████████                   ████

██ ██  ████████████████                          ████





Page 290



```
 1
25    Q.   Miss Chang, what do you know about the      18:35
```

Page 291

1    Cambridge Analytica scandal on Facebook?                18:35

2        A.    What I know is what I've read, which is      18:36

3    dealing with like a researcher taking the              18:36

4    information and selling it to, I believe, a            18:36

5    Cambridge Analytica, which is a political agency.      18:36

6        Q.    And the researcher was Aleksandr Kogan; is  18:36

7    that right?                                             18:36

8        A.    I believe that's his name.                   18:36

9        Q.    And the problem started with an app that    18:36

10   obtained a whole lot of friends data; is that right?   18:36

11       A.    So I don't know the specifics of it.         18:36

12       Q.    And how many articles would you say you've   18:36

13   read about the Cambridge Analytica scandal?            18:36

14       A.    I don't know.                                18:36

15       Q.    Have there been any briefings internal to    18:36

16   Facebook that you attended to which the Cambridge      18:37

17   Analytica scandal was discussed?                       18:37

18       A.    I don't recall.                              18:37

19       Q.    Do you recall whether it was -- that was a   18:37

20   significant event at Facebook?                         18:37

21       A.    Yes.                                         18:37

22       Q.    And did you ever cross paths with Aleksandr  18:37

23   Kogan or Cambridge Analytica in your work with         18:37

24   partners or researchers?                               18:37

25       A.    Sorry, like him physically or...             18:37

Page 292

```
 1     Q.   No, just in your work.  Or the partners or    18:37
 2   was that a researcher that you ever interacted with   18:37
 3   in your job at Facebook?                              18:37
 4     A.   No.                                            18:37
 5     Q.   Are you --
 6     A.   I did not interact with him.  Sorry.           18:37
 7     Q.   I'm sorry.  Go ahead.                          18:37
 8     A.   Oh, I said, I did not interact with him.       18:37
 9     Q.   Have you ever worked with political            18:37
10   advertisers?                                          18:37
11     A.   Not to my knowledge.                           18:37
12     Q.   Are you aware that Facebook worked with        18:37
13   Cambridge Analytica during the 2016 Presidential     18:38
14   campaign?                                             18:38
15     A.   So I don't know the details enough to -- I     18:38
16   don't know.                                           18:38
17     Q.   That's not something that you were             18:38
18   particularly interested in learning about?           18:38
19     A.   No.                                            18:38
20     Q.   Now, you understand that the Cambridge         18:38
21   Analytica scandal had to do with the ability of an   18:38
22   app to obtain content information about the app       18:38
23   user's friends; right?                                18:38
24     A.   So, again, I don't know the details enough    18:38
25   where I would say I know that.                        18:38
```

Page 293

```
 1      Q.   So that's not something that you've gleaned    18:38
 2  from the pending article you have read about the       18:38
 3  Cambridge Analytica scandal?                           18:39
 4      A.   I don't feel comfortable making that          18:39
 5  assumption, so I don't know.  I don't remember those   18:39
 6  words exactly or anything.                             18:39
 7      Q.   Okay.  Did you read that it started with a    18:39
 8  This is a Your Digital Life app that a hundred and     18:39
 9  something thousand people downloaded, and from that,   18:39
10  content information was obtained for 87 million        18:39
11  Facebook users?                                        18:39
12      A.   I don't know that specifically.               18:39
13      Q.   Is that generally your understanding of what 18:39
14  happened?                                              18:39
15      A.   Not to that specificity, but so like I said  18:39
16  earlier, the information that he sold.                 18:39
17      Q.   Okay.  But is it your general understanding  18:39
18  that a relatively small number of people used an      18:39
19  app, and from that app, a very large number of        18:39
20  people ended up having their information obtained by  18:39
21  that app?                                             18:39
22      A.   So, again, I -- I don't know specifically.   18:39
23      Q.   I'm not asking you specifically.  I'm just   18:40
24  asking just for the very most basic of your           18:40
25  understanding of the problem.                          18:40
```

Page 294

```
 1              And do you have any understanding that a      18:40
 2   small number or relatively small number of app users    18:40
 3   caused a relatively large number of Facebook users      18:40
 4   to share their information with the app?                18:40
 5      A.   So as you said, it's all relative, which is     18:40
 6   why I don't feel comfortable making assertions on       18:40
 7   how relative it is because I don't know in detail to    18:40
 8   make that assumption.                                   18:40
 9      Q.   So you're saying that you can't testify to      18:40
10   any degree or in any way about whether the This is      18:40
11   Your Digital Life app was downloaded by a relatively    18:40
12   small number of people and, because of that, a whole    18:40
13   lot of people had their information shared with the     18:40
14   app who did not download the app?  That's not           18:40
15   something that kind of jumped out at you from           18:40
16   reading anything about this scandal?                    18:40
17              MR. FALCONER:  Objection.  Asked and         18:40
18   answered.                                               18:40
19              THE WITNESS:  So those are your words and I   18:40
20   don't know if that's what was stated.  I don't know     18:40
21   in specificity where I would stand behind that,         18:41
22   especially if I'm supposed to testify to what I         18:41
23   know.  So I don't know that specifically.               18:41
24   BY MR. LOESER:                                          18:41
25      Q.   And do you understand that it was friends       18:41
```

Page 295

1    permissions that are at the heart of the ability of      18:41

2    the This is Your Digital Life app to obtain content      18:41

3    information for so many Facebook users?                   18:41

4         A.   So I don't know.                                18:41

5         Q.   Okay.  And that's not something that you        18:41



Page 297

1    ███████████████████████████████████████████

2            MR. LOESER:  We can go to Exhibit 29.        18:43

3            (Exhibit 29 marked for identification.)      18:43

4    BY MR. LOESER:                                       18:44

5        Q.   Miss Chang, Exhibit 29 is an email from      18:44

6    Jackie Rooney, dated March 22nd, 2018, to the mteam.  18:44

7            ██████████████████              ████

█    █   ███████████████████████████████████

█       ███████████████████                   ████

█   █   ██████████████████████████            ████

█   █   ██                                    ████

█   █   ██████████████████████████████████    ████

█       ███████████████                       ████

█   █   ██                                    ████

█   █   █████████████████████████████████     ████

█       ████████████                          ████

█       ██████████████████████████████        ████

█   ████████████████████████████████████████  ████

█   ███████████████████████                   ████

█   █   ██████████████████████████████        ████

█   ██████                                    ████

22       Q.   Do you attend any of them?                 18:45

23       A.   Probably a couple.                          18:45

24       Q.   And why don't you spend a minute to look    18:45

25    through this one, and you can tell me if you        18:45

Page 298

1    attended this one.                                    18:45

2       A.   I don't know.                                 18:45

3    ███  ██████████████████████████████        ███

███  ███████████████████████████████           ███

███  ████████████████████████████████████      ███

███  ████████████████████████████████          ███

███       █████████████████████████████████    ███

8            So it appears they were going to celebrate   18:46

9    your 11 years at Facebook?                            18:46

10      A.   Yes.                                          18:46

11      Q.   Do you recall anyone congratulating you in a 18:46

12   briefing on your 11 years at Facebook?                18:46

13      A.   I mean, I don't know that one specifically.  18:46

14   They tend you call you out every Faceversary, so I    18:46

15   don't know if this specific one.                      18:46

16   ███  ██████████████████████████████████     ███

███  ████████████████████████████████████████  ███

███  ████████████████████████████████████      ███

███  ████████████████████████████████          ███

███  ███████████████                            ███

███       ████████████████████████             ███

███       ██████████████████████████           ███

███       ████████████████████████████████     ███

███       ██████████████████                    ███

███       ████████████████████████             ███



Page 300



Page 301



Page 302





Page 304

1    ████████████████████                          ██████

██    ██    ██                                      ██████

██        ████████████████████████████████████████████████

██    ████████                                       ██████

██        ████████████████████████████████          ██████

██    ████████                                       ██████

██    ██████████████                                 ██████

██        ██    ████████████████████████████████      ██████

██    ████████████████████████████████████████████    ██████

██    ██████████████████████████████████████          ██████

██    ████████████████████████████████████████████    ██████

██    ████████████████                                ██████

██        ████████████████████████████████████████████████

██    ████████████████                                ██████

██        ██████████████████████████████████          ██████

16          MR. LOESER:  Why don't we take a 10-minute    18:53

17   break.  We'll go through --                          18:53

18          MR. FALCONER:  Can we make it 5?  I know       18:53

19   Miss Chang has some obligations she needs to attend   18:53

20   to this evening, so the quicker we can finish up,     18:53

21   the better.                                           18:53

22          MR. LOESER:  Sure.  That's fine.               18:53

23          THE VIDEOGRAPHER:  This marks the end of       18:53

24   media No. 6 in the deposition of Jackie Chang.  Off   18:53

25   the record.  The time is 6:53.                        18:53

Page 305

```
 1              (Off the record.)                         18:53
 2          THE VIDEOGRAPHER:  This marks the beginning   18:59
 3   of media No. 7 in the deposition of Jackie Chang.    18:59
 4   Back on the record.  The time is 6:59.               18:59
 5          MR. LOESER:  Miss Chang, I have no further     18:59
 6   questions for you at this time.  However, I will      18:59
 7   note for the record that we are evaluating the        18:59
 8   transcript and the testimony in light of Special      19:00
 9   Master Garrie's comments, and we will communicate     19:00
10   with your counsel as to whether we intend to recall   19:00
11   you.                                                  19:00
12          And with that, I know you have something       19:00
13   else to do for tonight so we can close for the        19:00
14   evening.                                              19:00
15          MR. FALCONER:  Yeah, I mean, if there are      19:00
16   other questions, I think Miss Chang is available to   19:00
17   answer them now.                                      19:00
18          MR. LOESER:  Well, Counsel, a couple minutes   19:00
19   ago, you told me that she needed to leave so I was    19:00
20   trying to do her the courtesy of allowing that to     19:00
21   happen.                                               19:00
22          If we have other questions, it would be        19:00
23   based upon our review of the testimony and the        19:00
24   discussion of certain exhibits, so it will take us a  19:00
25   bit to sort that out.  And I don't want to make a     19:00
```

Page 306

```
 1   rash decision, so we will just reserve our rights      19:00
 2   under that and with regard to Special Master           19:00
 3   Garrie's comments and get back to you.                 19:00
 4           MR. FALCONER:  Sure.  And we will reserve       19:00
 5   all rights as well.  I can't remember what the         19:00
 6   protocol says about whether we need to say we are      19:00
 7   going to read and sign, so I will state it, we will    19:01
 8   read and sign, and we will reserve questions.          19:01
 9           MR. LOESER:  Okay.  Thank you, Miss Chang, I    19:01
10   appreciate your time today.  And, Russ, I appreciate   19:01
11   your involvement as well.  It is a good start to a     19:01
12   lot of depositions that will be taken in terms of      19:01
13   the counsel communicating clearly and effectively      19:01
14   without wasting a lot of time on the record, so I      19:01
15   really appreciate that.                                19:01
16           THE VIDEOGRAPHER:  Is there anything else we    19:01
17   need on the record before I close out?                 19:01
18           DEPOSITION REPORTER:  Counsel, I need           19:01
19   orders.  I know Gibson Dunn has a three-day expedite
20   and a rough.  What is your order?
21           MS. WEAVER:  We'd like the same.
22           DEPOSITION REPORTER:  Thank you.  Who was
23   it that said that?  I'm sorry.
24           MS. WEAVER:  It's God.  No, it's Lesley
25   Weaver, and I apologize.
```

Page 307

```
 1            DEPOSITION REPORTER:  Thank you.  I'm        19:01
 2   ready.                                                19:01
 3            THE VIDEOGRAPHER:  Okay.  We are off the     19:01
 4   record at 7:01 p.m. and this concludes today's       19:01
 5   testimony given by Jackie Chang.  The total number   19:01
 6   of media units used was seven and will be retained   19:01
 7   by Veritext Legal Solutions.                         19:02
 8            (Off the record.)                            19:02
 9            DEPOSITION REPORTER:  We're back on the      19:02
10   record.                                              19:02
11            MR. FALCONER:  Facebook requests a          19:02
12   provisional confidentiality designation for the     19:02
13   transcript from today.                               19:02
14            MR. LOESER:  Understood.                    19:02
15            (Ending time: 7:02 p.m.)
16
17
18
19
20
21
22
23
24
25
```

Page 308

1

2

3

4

5          I, Jackie Chang, do hereby declare under

6     penalty of perjury that I have read the foregoing

7     transcript; that I have made corrections as appear

8     noted, in ink, initialed by me, or attached hereto; that

9     my testimony as contained herein, as corrected, is true

10    and correct.

11          EXECUTED this _____ day of _____,

12    2021, at _____, _ _____.

13                  (City)                    (State)

14

15

16

17                  Jackie Chang

18

19

20

21

22

23

24

25

Page 309

1            I, JANIS JENNINGS, CSR No. 3942, Certified

2    Shorthand Reporter, certify:

3                  That the foregoing proceedings were taken

4    before me at the time and place therein set forth, at

5    which time the witness was duly sworn by me;

6                  That the testimony of the witness, the

7    questions propounded, and all objections and statements

8    made at the time of the examination were recorded

9    stenographically by me and were thereafter transcribed;

10                  That the foregoing pages contain a full, true

11    and accurate record of all proceedings and testimony.

12                  Pursuant to F.R.C.P. 30(e)(2) before

13    completion of the proceedings, review of the transcript

14    [X] was [ ] was not requested.

15                  I further certify that I am not a relative or

16    employee of any attorney of the parties, nor financially

17    interested in the action.

18                  I declare under penalty of perjury under the

19    laws of California that the foregoing is true and

20    correct.

21    Dated: 12/21/2021

22

23                       <%6044,Signature%>

24                  JANIS JENNINGS, CSR NO. 3942

25                  CLR, CCRR

Page 310

1    RUSSELL H. FALCONER, ESQ.

2    rfalconer@gibsondunn.com

3                                    December 21, 2021

4    RE: IN RE:  FACEBOOK, INC. CONSUMER

5        PRIVACY USER PROFILE LITIGATION

6    12/16/2021, JACKIE CHANG, JOB NO. 49769494
     The above-referenced transcript has been
7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10      to schedule a time to review the original transcript at

11      a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13      Transcript - The witness should review the transcript and

14      make any necessary corrections on the errata pages included

15      below, notating the page and line number of the corrections.

16      The witness should then sign and date the errata and penalty

17      of perjury pages and return the completed pages to all

18      appearing counsel within the period of time determined at

19      the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21      Counsel - Original transcript to be released for signature

22      as determined at the deposition.

23   __ Signature Waived - Reading & Signature was waived at the

24      time of the deposition.

25

Page 311

1   _X_  Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2       Transcript - The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, notating the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9   __  Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 312

1    IN RE:  FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION

2    JACKIE CHANG (JOB NO. 4976949)

3              E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   WITNESS                           Date

25