# EXHIBIT 116

**Redacted Version of Document Sought to be Sealed**

# Full 30(b)(6) Deposition Transcript of Amy Lee, dated February 24, 2021

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4   IN RE: FACEBOOK, INC. CONSUMER ) MDL No. 2843

5   PRIVACY USER PROFILE LITIGATION) Case No.

6   _____) 18-md-02843-VC

7   This document relates to:      )

8   ALL ACTIONS                    )

9   _____)

10

11

12

13    *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

14

15

16     REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

17          FACEBOOK INC. REPRESENTATIVE,

18                    AMY LEE

19         WEDNESDAY, FEBRUARY 24, 2021

20

21

22   Reported by:

23   Ashala Tylor, CSR #2436, CLR, CRR, RPR

24   JOB NO. 4473156

25   PAGES 1 - 226

                                        Page  1

```
1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4  IN RE: FACEBOOK, INC. CONSUMER ) MDL No. 2843

5  PRIVACY USER PROFILE LITIGATION) Case No.

6  _____) 18-md-02843-VC

7  This document relates to:      )

8  ALL ACTIONS                    )

9  _____)

10

11

12

13

14

15

16      Videotaped deposition of Facebook, Inc.

17  representative, AMY LEE, taken via virtual Zoom,

18  commencing at 11:08 a.m. and ending at 5:48 p.m., on

19  Wednesday, February 24, 2021, before Ashala Tylor, CSR

20  No. 2436, RPR, CRR, CLR.

21

22

23

24

25

                                        Page  2
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFFS:

 3        BLEICHMAR FONTI & AULD LLP

 4        BY:  LESLEY E. WEAVER, ESQ.

 5             ANNE DAVIS, ESQ.

 6             MATTHEW MONTGOMERY, ESQ.

 7             MATTHEW MELAMED, ESQ.

 8        555 12th Street, Suite 1600

 9        Oakland, California  94607

10        415.445.4003

11        lweaver@bfalaw.com

12        adavis@bfalaw.com

13        mmmontgomery@falaw.com

14        mmelamed@bfalaw.com

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    A P P E A R A N C E S  (continued)

 2   FOR PLAINTIFFS:

 3         KELLER ROHRBACK LLP

 4         BY:  DAVID KO, ESQ.

 5              CARI C. LAUFENBERG, ESQ.

 6              DAVID LOESER, ESQ.

 7         1201 Third Avenue, Suite 3200

 8         Seattle, Washington  98101-3052

 9         206.623.3384

10         dko@kellerrohrback.com

11         claufenberg@kellerrohrback.com

12         dloeser@kellerrohrback.com

13              - and -

14         KELLER ROHRBACK LLP

15         BY:  CHRIS SPRINGER, ESQ.

16         801 Garden Street, Suite 301

17         Santa Barbara, California  93101

18         805.456.1497

19         cspringer@kellerrohrback.com

20

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    A P P E A R A N C E S (continued)

 2   FOR THE DEFENDANT FACEBOOK, INC.:

 3          GIBSON, DUNN & CRUTCHER LLP

 4          BY:  MARTIE KUTSCHER CLARK, ESQ.

 5          333 S. Grand Avenue, 47th Floor

 6          Los Angeles, California  90071

 7          213.229.7000

 8          mkutscherClark@gibsondunn.com

 9                  - and -

10          GIBSON DUNN & CRUTCHER LLP

11          BY: RUSSELL HARRIS FALCONER, ESQ.

12             SHAQUILLE GRANT, ESQ.

13          2100 McKinney Avenue

14          Dallas, Texas  75201

15          214.798.3170

16          rfalconer@gibsondunn.com

17          sgrant@gibsondunn.com

18                  - and -

19          GIBSON DUNN & CRUTCHER LLP

20          BY:  COLIN B. DAVIS, ESQ.

21          3161 Michelson Drive

22          Irvine, California  92612-4412

23          949.451.3993

24          cdavis@gibsondunn.com

25
```

Page 5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    A P P E A R A N C E S (continued)

 2    Also Present:

 3            Ian Chen, In-House Facebook Counsel

 4            Kimberly Decker, Videographer

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                       I N D E X

 2    WITNESS           EXAMINATION BY              PAGE

 3    AMY LEE

 4                      Mr. Ko                10, 69, 217

 5                      Mr. Falconer               216

 6

 7

 8                     E X H I B I T S

 9    NO.        DESCRIPTION                       PAGE

10    Exhibit 7   Amy Lee LinkedIn Resume           31

11    Exhibit 8   Facebook Annual Report 2016       69

12    Exhibit 9   2012 - 2017 Consolidated Revenue  80

13                Streams

14    Exhibit 10  (Not marked)

15    Exhibit 11  (Not marked)

16    Exhibit 12  Email from James Barnes to Charlotte  178

17                Narvaez, 3-27-18, with attachment,

18                FB-CA-MDL-01191318

19

20                INSTRUCTION NOT TO ANSWER:

21                     Page 26, Line 3

22                     Page 27, Line 22

23                     Page 218, Line 16

24                     Page 218, Line 25

25                     Page 219, Line 11
```

                                              Page 7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1                    Wednesday, February 24, 2021

2                         11:08 a.m.

3                         --o0o--

4

5              THE VIDEOGRAPHER:  Good morning.  We are      11:08

6     going on the record at 11:08 on February 24th of      11:08

7     2021.                                                 11:08

8              All participants are attending remotely.     11:08

9     Audio and video recording will continue to take       11:08

10    place unless all parties agree to go off the record.  11:08

11             This is Media Unit 1 of the recorded         11:08

12    deposition of Amy Lee, Facebook, Inc.                 11:08

13    representative, taken by counsel for the plaintiffs    11:08

14    in the matter regarding Facebook, Inc. Consumer       11:08

15    Privacy User Profile Litigation filed in the          11:08

16    United States District Court, Northern District of    11:08

17    California, Case Number 18-md-02843-VC.               11:09

18             My name is Kimberly Decker from Veritext     11:09

19    Legal Solutions and I'm the videographer.  The court  11:09

20    reporter is Ashala Tylor.  I'm not related to any     11:09

21    party in this action, nor am I financially            11:09

22    interested in the outcome.                            11:09

23             Counsel and all present will now state       11:09

24    their appearances and affiliations for the record.    11:09

25    If there are any objections to proceeding, please     11:09
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | state them at the time of your appearance, beginning | 11:09 |
| 2 | with the noticing attorney. | 11:09 |
| 3 | MR. KO:  Good morning, everyone.  David Ko | 11:09 |
| 4 | of Keller Rohrback on behalf of the plaintiffs. | 11:09 |
| 5 | MS. LAUFENBERG:  Cari Laufenberg on behalf | 11:09 |
| 6 | of the plaintiffs. | 11:09 |
| 7 | MR. LOESER:  Derek Loeser on behalf of | 11:09 |
| 8 | plaintiffs from Keller Rohrback. | 11:09 |
| 9 | MR. SPRINGER:  Chris Springer of Keller | 11:09 |
| 10 | Rohrback for plaintiffs. | 11:09 |
| 11 | MS. WEAVER:  Good morning.  Lesley Weaver | 11:09 |
| 12 | of Bleichmar Fonti & Auld for plaintiffs. | 11:09 |
| 13 | MR. MONTGOMERY:  Matt Montgomery, | 11:10 |
| 14 | Bleichmar Fonti & Auld, for plaintiffs. | 11:10 |
| 15 | MS. DAVIS:  Anne Davis, Bleichmar Fonti & | 11:10 |
| 16 | Auld, for plaintiffs. | 11:10 |
| 17 | MR. MELAMED:  Good morning.  Matt Melamed, | 11:10 |
| 18 | Bleichmar Fonti & Auld, for plaintiffs. | 11:10 |
| 19 | MR. FALCONER:  Russ Falconer for Facebook | 11:10 |
| 20 | and the witness. | 11:10 |
| 21 | MR. DAVIS:  Colin Davis, Gibson, Dunn & | 11:10 |
| 22 | Crutcher, for Facebook and the witness. | 11:10 |
| 23 | MS. CLARK:  Martie Kutscher Clark at | 11:10 |
| 24 | Gibson, Dunn & Crutcher for Facebook and the | 11:10 |
| 25 | witness. | 11:10 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. GRANT:  Shaquille Grant from Gibson, | 11:10 |
| 2 | Dunn & Crutcher for Facebook and the witness. | 11:10 |
| 3 | MR. CHEN:  And this is Ian Chen.  I'm | 11:10 |
| 4 | in-house counsel for Facebook. | 11:10 |
| 5 | THE VIDEOGRAPHER:  Thank you.  Would the | 11:11 |
| 6 | court reporter please swear in the witness. | 11:11 |
| 7 | AMY LEE, | 11:11 |
| 8 | being first duly sworn or affirmed to testify | 11:11 |
| 9 | to the truth, the whole truth, and nothing but | 11:11 |
| 10 | the truth, was examined and testified as follows: | 11:11 |
| 11 | EXAMINATION | 11:11 |
| 12 | BY MR. KO: | 09:23 |
| 13 | Q.   Good morning, Amy.  As you can see, we | 11:11 |
| 14 | have a full house.  You're quite popular this | 11:11 |
| 15 | morning. | 11:11 |
| 16 | Do you go by Amy or Ms. Lee? | 11:11 |
| 17 | A.   Amy is fine. | 11:11 |
| 18 | Q.   And, Amy, have you been deposed before? | 11:11 |
| 19 | A.   Yes. | 11:11 |
| 20 | Q.   Okay.  Have you been deposed before in | 11:11 |
| 21 | your capacity as an employee of Facebook or in your | 11:11 |
| 22 | individual or personal capacity? | 11:11 |
| 23 | ███████████████████████████████ | 11:11 |
| 24 | Q.   Okay.  And how many times have you been | 11:11 |
| 25 | deposed? | 11:11 |

Page 10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    ███   █████████                              11:11
 2         Q.   Okay.  And in that deposition was it in    11:11
 3    connection with a case involving Facebook?           11:11
 4    ███   ████                                    11:11
 5         Q.   And what was the nature of that case?      11:11
 6    ███   ████████████████████████████           11:11
 7         Q.   Okay.  And do you know who the parties     11:11
 8    were in that case in addition to, of course, your    11:12
 9    employee Facebook -- employer Facebook?              11:12
10    ███   ███████████████████████   ████          11:12
      █   ██████████                               11:12
12         Q.   Okay.  And when was that deposition or     11:12
13    when did you sit for that deposition?                11:12
14    ███   ████████████                           11:12
15         Q.   Okay.  We can maybe talk about that        11:12
16    deposition a little later, but I want to just make   11:12
17    sure that you are familiar with some of the ground   11:12
18    rules for the deposition that are important to me.   11:12
19    Obviously every lawyer has their preference on what  11:12
20    the rules are, but let me just go over a few.        11:12
21         The court reporter here has the most            11:12
22    important job.  She is transcribing everything that  11:12
23    we are saying and discussing, and she's trying to    11:12
24    create a record for us.  So it's very important that 11:12
25    we don't talk over each other to the best of our     11:12
```

Page 11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | ability while we're doing the questioning. | 11:12 |
| 2 | Does that sound okay to you? | 11:12 |
| 3 | A.   Yes. | 11:12 |
| 4 | Q.   Okay.  So to the extent -- and to the | 11:12 |
| 5 | extent I ask yes-or-no questions and your answer is | 11:13 |
| 6 | in fact yes or no, please try and answer that way | 11:13 |
| 7 | rather than shaking your head or nodding your head, | 11:13 |
| 8 | especially given that we're remote today. | 11:13 |
| 9 | Does that sound okay? | 11:13 |
| 10 | A.   Yes. | 11:13 |
| 11 | Q.   Okay.  And from time to time your counsel, | 11:13 |
| 12 | Mr. Falconer, maybe others, might object to my | 11:13 |
| 13 | questioning.  And unless Mr. Falconer specifically | 11:13 |
| 14 | instructs you not to answer, I'd ask that you answer | 11:13 |
| 15 | the question anyhow.  Okay? | 11:13 |
| 16 | A.   Understood. | 11:13 |
| 17 | Q.   And I believe we have roughly five hours | 11:13 |
| 18 | to take this deposition.  It might be a little less. | 11:13 |
| 19 | But we'll try to take as many breaks as possible. | 11:13 |
| 20 | But if you ever need a break, just let me know and | 11:13 |
| 21 | we'll try our best to accommodate, okay? | 11:13 |
| 22 | A.   Yes.  Thank you. | 11:13 |
| 23 | Q.   Amy, is there anything that you can think | 11:13 |
| 24 | of that will prevent you from testifying truthfully | 11:13 |
| 25 | or honestly today? | 11:13 |

Page 12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   No. | 11:13 |
| 2 | Q.   What is your understanding of what you are | 11:13 |
| 3 | testifying about today? | 11:14 |
| 4 | A.   I understand that I'm here to testify | 11:14 |
| 5 | about how Facebook directly or indirectly monetizes | 11:14 |
| 6 | user data and how we have valued this data. | 11:14 |
| 7 | Q.   Okay.  And for this topic you are | 11:14 |
| 8 | testifying -- you do understand you're testifying on | 11:14 |
| 9 | behalf of Facebook and providing corporate | 11:14 |
| 10 | testimony.  Do you understand that? | 11:14 |
| 11 | A.   Yes. | 11:14 |
| 12 | Q.   And you understand you're not testifying, | 11:14 |
| 13 | of course, in your individual or personal capacity, | 11:14 |
| 14 | correct? | 11:14 |
| 15 | A.   Yes. | 11:14 |
| 16 | Q.   And do you understand your testimony is | 11:14 |
| 17 | binding on the company? | 11:14 |
| 18 | A.   Yes. | 11:14 |
| 19 | Q.   Okay.  Do you also understand that your | 11:14 |
| 20 | testimony today covers the time period from 2012 | 11:14 |
| 21 | through 2017? | 11:14 |
| 22 | A.   Yes. | 11:14 |
| 23 | Q.   And my questions today will -- if I don't | 11:14 |
| 24 | give you a date range, my questions will generally | 11:14 |
| 25 | relate to that time period unless I specify | 11:14 |

Page 13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | otherwise, okay? | 11:14 |
| 2 | A.  Okay. | 11:15 |
| 3 | Q.  What did you do to prepare for this | 11:15 |
| 4 | deposition today? | 11:15 |
| 5 | A.  I met with my counsel several times to | 11:15 |
| 6 | review potential -- to review the topics that I | 11:15 |
| 7 | would be expected to testify on and review some | 11:15 |
| 8 | documents that might come up in the course of | 11:15 |
| 9 | today's deposition. | 11:15 |
| 10 | Q.  And how many times did you meet with | 11:15 |
| 11 | counsel? | 11:15 |
| 12 | A.  This was probably about four times over | 11:15 |
| 13 | the past several weeks. | 11:15 |
| 14 | Q.  Okay.  And how many hours total | 11:15 |
| 15 | approximately would you say you spoke with counsel? | 11:15 |
| 16 | A.  10 or 11. | 11:15 |
| 17 | Q.  Okay.  And who did you prepare with? | 11:15 |
| 18 | A.  It was Russ Falconer, Colin Davis, | 11:15 |
| 19 | Shaquille Grant, and Ian Chen. | 11:15 |
| 20 | Q.  Okay.  Outside of these attorneys that I | 11:16 |
| 21 | believe are all here and present today, did you | 11:16 |
| 22 | speak with anyone else at Facebook about this | 11:16 |
| 23 | deposition? | 11:16 |
| 24 | A.  I spoke with Facebook colleagues who were | 11:16 |
| 25 | product experts on certain topics that we think may | 11:16 |

Page 14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | come up in the deposition. | 11:16 |
| 2 | Q.   And which Facebook colleagues? | 11:16 |
| 3 | A.   Give me a second.  I have a list. | 11:16 |
| 4 | So these colleagues included Hector Ramos, | 11:16 |
| 5 | Greg Williams -- excuse me -- V.J. Balan, Abhishek | 11:16 |
| 6 | Doshi, and Margaret Wrenn, and Deb Liu. | 11:17 |
| 7 | Q.   Okay.  And are you -- I see you're looking | 11:17 |
| 8 | at something to identify these names.  Is that -- | 11:17 |
| 9 | are these notes that you took for this deposition? | 11:17 |
| 10 | A.   I was actually looking at some chat | 11:17 |
| 11 | history in Workplace that we use for work | 11:17 |
| 12 | conversations. | 11:17 |
| 13 | Q.   Okay.  So you discussed this deposition | 11:17 |
| 14 | with those individuals via chat? | 11:17 |
| 15 | A.   Yes. | 11:17 |
| 16 | Q.   Did you have any other communications with | 11:17 |
| 17 | them outside of chatting with them or on the chat | 11:17 |
| 18 | platform?  Excuse me. | 11:17 |
| 19 | A.   Yes.  There were some videoconference | 11:17 |
| 20 | conversations too. | 11:18 |
| 21 | Q.   Okay.  And about how many times would you | 11:18 |
| 22 | say that you interacted or communicated with these | 11:18 |
| 23 | individuals about this deposition? | 11:18 |
| 24 | A.   Once per individual that I mentioned | 11:18 |
| 25 | there. | 11:18 |

Page 15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So you spoke with each of these | 11:18 |
| 2 | individuals once in addition to chatting with them | 11:18 |
| 3 | on the chat platform or Workplace chat? | 11:18 |
| 4 | A.   Sorry.   I communicated with each of these | 11:18 |
| 5 | individual once, whether it was on the chat threads | 11:18 |
| 6 | or via videoconference. | 11:18 |
| 7 | Q.   I see.   Thank you. | 11:18 |
| 8 | And about how many hours total would you | 11:18 |
| 9 | say, approximately speaking, did you spend chatting | 11:18 |
| 10 | with these individuals? | 11:18 |
| 11 | (Off the record discussion.) | 11:19 |
| 12 | BY MR. KO: | 11:19 |
| 13 | Q.   Amy, do you remember -- I'll ask again. | 11:19 |
| 14 | How many hours total would you say, | 11:19 |
| 15 | approximately speaking, did you spend speaking with | 11:19 |
| 16 | each of these individuals? | 11:19 |
| 17 | A.   Uh-huh.   Cumulatively, probably an hour or | 11:19 |
| 18 | two.   A little harder to estimate for the chat | 11:19 |
| 19 | conversations given they were more asynchronous. | 11:19 |
| 20 | Q.   Sure.   And let's start with Hector Ross, | 11:19 |
| 21 | did you say? | 11:19 |
| 22 | A.   Ramos. | 11:19 |
| 23 | Q.   Hector Ramos.   What's his position at | 11:19 |
| 24 | Facebook? | 11:19 |
| 25 | A.   I'm not sure of his current position, but | 11:20 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | I spoke with him because he had context on a | 11:20 |
| 2 | specific product historically that we were | 11:20 |
| 3 | interested in. | 11:20 |
| 4 | Q.   What product is that? | 11:20 |
| 5 | A.   Parse. | 11:20 |
| 6 | Q.   Okay.  And Greg Williams, and what's his | 11:20 |
| 7 | current role at Facebook? | 11:20 |
| 8 | A.   Similarly not sure about his current role, | 11:20 |
| 9 | but I spoke with him about a product, Karma, that we | 11:20 |
| 10 | historically offered at Facebook. | 11:20 |
| 11 | Q.   V.J., I didn't catch his last name, her or | 11:20 |
| 12 | his last name, but V.J.? | 11:20 |
| 13 | A.   Balan, B-A-L-A-N. | 11:20 |
| 14 | Q.   Okay.  And what is his position at | 11:20 |
| 15 | Facebook and what did you speak to him about? | 11:20 |
| 16 | A.   I'm unsure of his current position, but I | 11:20 |
| 17 | spoke to him about LiveRail over the time period in | 11:20 |
| 18 | question. | 11:21 |
| 19 | Q.   And then there was an Abhishek.  What did | 11:21 |
| 20 | you speak to him about and what is his current | 11:21 |
| 21 | position? | 11:21 |
| 22 | A.   Abhishek Doshi.  Not sure on his current | 11:21 |
| 23 | position, but I spoke to him about a product called | 11:21 |
| 24 | Promoted Posts over the time period in question. | 11:21 |
| 25 | Q.   Mary Wrenn, same question:  What did you | 11:21 |

Page 17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | speak to her about and what is her current position? | 11:21 |
| 2 | A.   Uh-huh.   That's Margaret Wrenn. | 11:21 |
| 3 | Q.   Oh, I'm sorry. | 11:21 |
| 4 | A.   And also unsure of her current position, | 11:21 |
| 5 | but spoke to her based on her context about the | 11:21 |
| 6 | donations product that we offered during this time | 11:21 |
| 7 | period. | 11:21 |
| 8 | Q.   And lastly Deb Liu, same question. | 11:21 |
| 9 | A.   Deb Liu is -- I believe she's a VP of | 11:21 |
| 10 | marketplace and commerce currently.   But spoke to | 11:21 |
| 11 | her about getting her contacts on the mobile app | 11:22 |
| 12 | install ads products during the time period in | 11:22 |
| 13 | question. | 11:22 |
| 14 | Q.   And I believe all these products that you | 11:22 |
| 15 | just described, they are included in the document I | 11:22 |
| 16 | believe you reviewed and your counsel very helpfully | 11:22 |
| 17 | provided to us last night; is that correct? | 11:22 |
| 18 | ██   ███   ███████████████████████   ████ | |
| | █ ████████████████████ | 11:22 |
| 20 | Q.   And generally speaking, each of these | 11:22 |
| 21 | products are represented in that document and | 11:22 |
| 22 | represent various channels of revenue that Facebook | 11:22 |
| 23 | generates for its business, correct? | 11:22 |
| 24 | ██   ██████████████████████   ████ | |
| | █ ████████████████████████████ | 11:22 |

Page 18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   ████████████████████                               11:22

 2        Q.   Okay.  And were these conversations with   11:22

 3   these individuals set up by counsel for you or did   11:23

 4   you reach out to these individuals yourself to try   11:23

 5   and understand and prepare for -- to try and         11:23

 6   understand these products and prepare for your       11:23

 7   deposition today?                                    11:23

 8        A.   They were arranged by counsel.             11:23

 9        Q.   Did you know these individuals prior to    11:23

10   preparing for this deposition today?                 11:23

11        A.   I knew of them but did not know them       11:23

12   personally.  Knew of some of them but did not know   11:23

13   them personally.                                     11:23

14        Q.   So other than these chats and these        11:23

15   conversations that you had -- and again, of course,  11:23

16   I know you reviewed this document that we're         11:23

17   discussing that we'll get into in a little bit.  But 11:23

18   other than these things, did you review any other    11:23

19   documents in preparation for this deposition today?  11:23

20        A.   Yes.                                       11:23

21        Q.   And what would those documents be?         11:23

22        A.   This is -- which documents did I review    11:24

23   with counsel in advance of today?                    11:24

24        Q.   Yes.  Or more generally, what documents    11:24

25   did you review in preparation for this deposition?   11:24
```

Page 19

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1          A.   Oh, I see.  Okay.                      11:24

2               So among the documents were -- I did   11:24

3     review with counsel a document that showed the topic  11:24

4     that I would be expected to testify on today.    11:24

5               I think that I reviewed an excerpt from  11:24

6     the complaint.  Reviewed some internal emails.   11:24

7     Reviewed a -- an excerpt from some litigation by  11:24

8     Facebook against a company called Rankwave.      11:25

9               And I also reviewed some external      11:25

10    resources around a couple of ads products to refresh  11:25

11    my memory about how those products functioned during  11:25

12    the time period in question.                     11:25

13         Q.   Okay.  And by external resources, what do  11:25

14    you mean?                                         11:25

15         A.   For example, I did a Google search on a  11:25

16    few products.                                     11:25

17         Q.   Which -- which products?                11:25

18         A.   Specifically looked at Facebook Exchange.  11:25

19         Q.   Any other products you looked at for your  11:25

20    external review?                                  11:25

21         A.   That was -- that was the product that I  11:26

22    looked to those external resources for.          11:26

23         Q.   When you mentioned a moment ago that you  11:26

24    reviewed excerpt -- excerpts from the complaint,  11:26

25    which specific excerpts did you review?          11:26
```

Page 20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   Oh, from the -- the complaint in this       11:26
 2   case.  I -- I can't recall the specific excerpt that  11:26
 3   we reviewed.                                           11:26
 4        Q.   Okay.  Did counsel direct you to which      11:26
 5   portions to review?                                    11:26
 6        A.   Yes.                                         11:26
 7        Q.   By the way, what is your understanding of   11:26
 8   what this case is about?                               11:26
 9             MR. FALCONER:  Just to clarify, David, are  11:27
10   you asking her personally or are you asking her for   11:27
11   an official position on behalf of the company?        11:27
12             MR. KO:  I'm just asking a question at      11:27
13   this deposition what she thinks -- she believes the   11:27
14   complaint is about.                                    11:27
15             MR. FALCONER:  I'll object that the         11:27
16   question is beyond the scope of the notice, but go    11:27
17   ahead.                                                 11:27
18   ██████████    █████████████              ████
██   ████████████████████████████████████████  ████
██   ████████████████████████████████████████  ████
██   ███████████████████████████              11:28
22   BY MR. KO:                                             11:28
23        Q.   Okay.  And with respect to -- well, I       11:28
24   just -- I just see that you looked down at something  11:28
25   right now.  Were you looking at the complaint or      11:28
```

Page 21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    something else?                                       11:28

2    ███  ██████████████████████████████          ████    11:28

█    ████████████████████████████████             ████

4        Q.   Okay.                                        11:28

5            MR. FALCONER:  I'm going -- I'm going to      11:28

6    move to strike that last answer from the record and  11:28

7    I'm going to remind -- just remind Ms. Lee not to     11:28

8    disclose the contents of any conversations with       11:28

9    counsel in any of your answers here today.            11:28

10            So we'll move to strike that or claw that    11:28

11   last answer back on privilege grounds, and just       11:28

12   going forward, anything you learn only from counsel,  11:28

13   don't share that as part of your answer.              11:28

14            MR. KO:  And for the record, we oppose       11:29

15   that motion to strike.                                11:29

16       Q.   Amy, in addition to the materials that you   11:29

17   reviewed -- and it sounds like you prepared some      11:29

18   notes to prepare for this deposition -- is there      11:29

19   anything else that you looked at or reviewed to       11:29

20   prepare for this deposition today?                    11:29

21   ███  ██████████████████████             ████

█    █████████████████████████████████       ████

█    ████████████████  ████████████████      ████

█    █████████████████████████████████       ████

█    ██████                                   11:29
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   And what were those internal slide          11:29

2   presentations?  What did those internal slide       11:30

3   presentations consist of?                           11:30

4   ██   ████   ████████████████████                    ████

    █ ███████████████████████████████                   ████

    █ ████████████████████████████                      ████

    █ █████████████   ████████████████                  ████

    █ ████████████████████████████████████              ████

    █ ██████                                            11:30

10     Q.   Okay.  And when you said "internal          11:30

11  briefs," what do you mean by that?                  11:30

12  ██   ████   ██████████████████                      ████

    █ █████████████████████████                         ████

    █ ████████████████████████████████████              ████

    █ ██████████████████████████████                    ████

    █ █████████████████████████████████                 ████

    █ ███████████████████████████                       ████

    █ ████████████████████████████████                  ████

    █ ██████████                                        11:31

20     Q.   And by that you mean outside of the 2012    11:31

21  through 2017 time period?                           11:31

22     A.   Correct.                                     11:31

23     Q.   And all these documents, I assume, were     11:31

24  provided to you by counsel?                          11:31

25     A.   The internal documents, yes.                11:31

Page 23

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Okay.  I'm going to show you -- you | 11:31 |
| 2 | actually don't have to access the Marked Exhibits | |
| 3 | folder for this, but I'm just going to go ahead and | |
| 4 | share my screen and show you a copy of an exhibit | |
| 5 | that's been previously marked in this case. | |
| 6 | MR. KO:  And for the record -- oh-oh. | 11:31 |
| 7 | Court reporter says that my share screen option has | 11:32 |
| 8 | been disabled. | 11:32 |
| 9 | THE REPORTER:  The videographer will | 11:32 |
| 10 | enable it. | 11:32 |
| 11 | THE VIDEOGRAPHER:  I can do it.  Hold on. | 11:32 |
| 12 | MR. KO:  Sure. | 11:32 |
| 13 | THE VIDEOGRAPHER:  Go ahead. | 11:32 |
| 14 | MR. KO:  Voila.  Thank you. | 11:32 |
| 15 | Q.   Okay.  And just so the record is clear, | 11:32 |
| 16 | this is an exhibit that was marked at a previous | 11:32 |
| 17 | deposition, Facebook Exhibit 1.  And this is a copy | 11:32 |
| 18 | of the 30(b)(6) deposition notice that we provided | 11:32 |
| 19 | to Facebook in this matter. | 11:32 |
| 20 | Earlier, a moment ago, you had described | 11:32 |
| 21 | seeing a document that reflected the topic that you | 11:32 |
| 22 | were supposed to testify about today.  Is this that | 11:32 |
| 23 | document, Amy? | 11:32 |
| 24 | A.   I believe so.  I think I specifically | 11:32 |
| 25 | looked at the piece of this -- this page of the | 11:32 |

Page 24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | document where in bullet point 2 here, it describes | 11:33 |
| 2 | the topic that I'm meant to be testifying about. | 11:33 |
| 3 |     Q.   So the record is clear, this is | 11:33 |
| 4 | Schedule A, Section III.  And Topic 2 in particular | 11:33 |
| 5 | is the topic you're testifying about on behalf of | 11:33 |
| 6 | Facebook today; is that correct? | 11:33 |
| 7 |     A.   Yes. | 11:33 |
| 8 |     Q.   And this topic says "How Facebook | 11:33 |
| 9 | monetizes - directly or indirectly - and thus values | 11:33 |
| 10 | user data." | 11:33 |
| 11 |     Did I read that correctly? | 11:33 |
| 12 |     A.   Yes. | 11:33 |
| 13 |     Q.   So you understand that to be the topic | 11:33 |
| 14 | that you're testifying and providing corporate | 11:33 |
| 15 | testimony for Facebook for today, correct? | 11:33 |
| 16 |     A.   Yes. | 11:33 |
| 17 |     Q.   And did you also look at this Schedule B | 11:33 |
| 18 | of this notice? | 11:33 |
| 19 |     A.   No, I don't recall looking at this page. | 11:34 |
| 20 |     Q.   Okay.  So there is a part of this notice, | 11:34 |
| 21 | and in particular, if you see Section 1, or | 11:34 |
| 22 | paragraph 1 of this schedule, it requests the | 11:34 |
| 23 | documents that you have consulted or reviewed in | 11:34 |
| 24 | preparation for your deposition.  And it sounds like | 11:34 |
| 25 | you have obviously reviewed a lot of documents to | 11:34 |

Page 25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | prepare for this deposition, correct? | 11:34 |
| 2 |     A.   I reviewed several documents. | 11:34 |
| 3 |     Q.   And were you ever asked to produce -- were | 11:34 |
| 4 | you ever asked by counsel to produce all the | 11:34 |
| 5 | documents that you reviewed? | 11:34 |
| 6 |     MR. FALCONER:  Objection.  I'm going to | 11:34 |
| 7 | instruct the witness not to answer that question. | 11:34 |
| 8 | It requires communications with her counsel. | 11:34 |
| 9 |     MR. KO:   Okay.  So at this point, Russ, | 11:34 |
| 10 | we'll just go ahead and formalize our request | 11:34 |
| 11 | consistent with this amended notice that -- and as | 11:34 |
| 12 | we communicated to you several times before this | 11:34 |
| 13 | deposition -- that you provide us with all the | 11:34 |
| 14 | documents that Ms. Lee reviewed in connection with | 11:35 |
| 15 | this deposition and the documents she reviewed to | 11:35 |
| 16 | prepare for this deposition. | 11:35 |
| 17 |     MR. FALCONER:  Yes, I understand that.  I | 11:35 |
| 18 | think we've separately lodged our objections to that | 11:35 |
| 19 | and we can take that up at an appropriate time. | 11:35 |
| 20 |     MR. KO:  And just so the record is clear, | 11:35 |
| 21 | we also reserve the right to reopen this deposition | 11:35 |
| 22 | to talk about any topics that those documents will | 11:35 |
| 23 | reveal that we can't get into today. | 11:35 |
| 24 |     MR. FALCONER:  Right.  And we reserve our | 11:35 |
| 25 | right to oppose that request. | 11:35 |

Page 26

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MR. KO:                                        11:35

 2       Q.   Amy, the second topic, there's a request   11:35

 3   here for your CV.  And I know that you said that you  11:35

 4   didn't review this.  But just so we're clear,        11:35

 5   counsel never asked you to provide your CV in        11:35

 6   preparation for this deposition; is that correct?    11:35

 7            MR. FALCONER:  Again, I'm going to          11:35

 8   instruct the witness not to answer any question that 11:35

 9   asks about any conversations she did or didn't have  11:35

10   with counsel.                                        11:35

11   BY MR. KO:                                           11:35

12       Q.   Have you produced a CV in this case?        11:35

13       A.   No.                                         11:35

14       Q.   Okay.  Do you have one?                     11:35

15       A.   Yes.                                        11:35

16       Q.   And if asked to produce it, would you       11:36

17   produce it?                                          11:36

18            MR. FALCONER:  Objection.  That's beyond    11:36

19   the scope of the notice of the deposition.           11:36

20            MR. KO:  It's actually in the notice, but   11:36

21   I understand.                                        11:36

22       Q.   So if asked to produce it, would you        11:36

23   produce it, Amy?                                     11:36

24            MR. FALCONER:  I'm going to instruct the    11:36

25   witness not to answer that question.  That's a       11:36
```

Page 27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | question that's appropriately directed to counsel, | 11:36 |
| 2 | not to a fact witness. | 11:36 |
| 3 | MR. KO:  Okay.  I'm going to stop sharing | 11:36 |
| 4 | here. | 11:36 |
| 5 | Q.   I believe that document is no longer on | 11:36 |
| 6 | your screen; is that right? | 11:36 |
| 7 | A.   Correct. | 11:36 |
| 8 | Q.   Okay.  What is your current position at | 11:36 |
| 9 | Facebook? | 11:36 |
| 10 | A.   I'm a product marketing lead. | 11:36 |
| 11 | Q.   What are your roles and responsibilities | 11:36 |
| 12 | as product marketing lead? | 11:36 |
| 13 | A.   I manage a team of product marketing | 11:36 |
| 14 | managers.  And collectively our team's | 11:36 |
| 15 | responsibilities are to work with product teams to | 11:36 |
| 16 | clarify the types of -- clarify what advertiser | 11:37 |
| 17 | needs are and what relevant market opportunities are | 11:37 |
| 18 | to help determine where we should make certain | 11:37 |
| 19 | product investment -- product investments across a | 11:37 |
| 20 | certain portion of our ads products portfolio. | 11:37 |
| 21 | And we work with product teams to actually | 11:37 |
| 22 | develop those ads products, work with advertisers to | 11:37 |
| 23 | test those ads product and, hopefully, establish | 11:37 |
| 24 | whether we are meeting the needs of the market -- | 11:37 |
| 25 | meeting the needs of advertisers with those | 11:37 |

Page 28

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | products. | 11:37 |
| 2 | And once we've gotten to a place where | 11:37 |
| 3 | we're ready to actually launch ads products more | 11:38 |
| 4 | broadly, we are responsible for formulating | 11:38 |
| 5 | go-to-market and launch strategies to actually roll | 11:38 |
| 6 | out these products to a broader advertiser audience. | 11:38 |
| 7 | Q.   That's helpful.  And I imagine throughout | 11:38 |
| 8 | the course of today we'll talk about some of those | 11:38 |
| 9 | responsibilities, but how long have you been in that | 11:38 |
| 10 | role? | 11:38 |
| 11 | A.   I have been in the product marketing lead | 11:38 |
| 12 | role since 2017. | 11:38 |
| 13 | Q.   And by "lead," do you mean that you are in | 11:38 |
| 14 | fact -- well, strike that. | 11:38 |
| 15 | Are there any coleads with you or are you | 11:38 |
| 16 | the lead of the group that you just described a | 11:38 |
| 17 | moment ago? | 11:38 |
| 18 | A.   I am the lead for product marketing | 11:38 |
| 19 | managers who look after a specific segment of our | 11:38 |
| 20 | ads products, specifically our ads delivery | 11:38 |
| 21 | products. | 11:39 |
| 22 | Q.   And how many product marketing managers | 11:39 |
| 23 | report to you? | 11:39 |
| 24 | A.   Right now it is about 21. | 11:39 |
| 25 | Q.   And who do you report to? | 11:39 |

Page 29

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Kristen Durkin. | 11:39 |
| 2 | Q.    What is her role? | 11:39 |
| 3 | A.    She is a product marketing director. | 11:39 |
| 4 | Q.    Do you report to anyone else or is she | 11:39 |
| 5 | your direct boss or report? | 11:39 |
| 6 | A.    She is my direct manager. | 11:39 |
| 7 | Q.    How long have you been at Facebook? | 11:39 |
| 8 | A.    A little over 10 years. | 11:39 |
| 9 | Q.    And prior -- so you indicated that you | 11:39 |
| 10 | have been the product marketing lead since 2017. | 11:39 |
| 11 | Prior to that, and specifically from the 2012 | 11:39 |
| 12 | through 2017 time period, what were your positions | 11:39 |
| 13 | at Facebook during that time? | 11:40 |
| 14 | A.    Immediately prior to becoming a targeting | 11:40 |
| 15 | product marketing lead in 2017, from 2015 to 20- -- | 11:40 |
| 16 | late 2017, I was a product marketing manager.  So an | 11:40 |
| 17 | individual contributor in a similar capacity. | 11:40 |
| 18 | From 2012 to early 2015 I was on our sales | 11:40 |
| 19 | team working directly with advertisers to adopt and | 11:40 |
| 20 | get the most -- the best available performance from | 11:40 |
| 21 | our ads products. | 11:40 |
| 22 | Q.    And prior to 2012, and I guess I would say | 11:40 |
| 23 | from when you started up to 2012, what were your | 11:40 |
| 24 | positions at Facebook? | 11:40 |
| 25 | A.    The exact title shifted a bit over time, | 11:41 |

Page 30

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | just given some of the organizational changes | 11:41 |
| 2 | that -- that happened over those years.  But I | 11:41 |
| 3 | started at Facebook in 2010.  And from 2010 through | 11:41 |
| 4 | 2012 I was in that -- a similar kind of account | 11:41 |
| 5 | management sales capacity working directly with | 11:41 |
| 6 | advertisers to use our ads products. | 11:41 |
| 7 | Q.   I notice that you're looking at something | 11:41 |
| 8 | while you're answering these questions.  Are these | 11:41 |
| 9 | your notes that are helping refresh your | 11:41 |
| 10 | recollection to answer these questions? | 11:41 |
| 11 | A.   I'm looking at my LinkedIn profile. | 11:41 |
| 12 | Q.   Oh, great.  Well, I hope I have the same | 11:41 |
| 13 | one.  Why don't we look at that.  And this is where | 11:41 |
| 14 | we're going to try out this Exhibit Share. | 11:41 |
| 15 | MR. KO:  I'm going to put -- so the record | 11:41 |
| 16 | is clear, I'm going to introduce what will be marked | 11:41 |
| 17 | as Facebook Exhibit 7. | 11:41 |
| 18 | Russ, just so you're aware, this is a | 11:42 |
| 19 | continuation of the exhibits from yesterday, so | 11:42 |
| 20 | we're starting at 7 today. | 11:42 |
| 21 | MR. FALCONER:  Got it.  Thanks. | 11:42 |
| 22 | (Exhibit 7 was marked for | 11:42 |
| 23 | identification and attached | 11:42 |
| 24 | hereto.) | 11:42 |
| 25 | MR. KO:  And it is loading, so hopefully | 11:42 |

Page 31

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | it shows up shortly. | 11:42 |
| 2 | It must be a large LinkedIn because it is | 11:42 |
| 3 | still loading.  Let me just try again.  Give me one | 11:42 |
| 4 | second. | 11:42 |
| 5 | Bear with me.  I've taken a few of these | 11:43 |
| 6 | remote depositions.  It's not always as smooth as | 11:43 |
| 7 | being in person. | 11:43 |
| 8 | Okay.  The first one is always going to be | 11:43 |
| 9 | the toughest.  I think it's on there now. | 11:43 |
| 10 | Q.   Do you see an exhibit that popped up in | 11:44 |
| 11 | your -- | 11:44 |
| 12 | A.   Yes, I have it open, the PDF open. | 11:44 |
| 13 | Q.   Great.  Again, so the record is clear, | 11:44 |
| 14 | this is Exhibit 7.  And this appears to be a copy of | 11:44 |
| 15 | your LinkedIn resume.  Is that accurate? | 11:44 |
| 16 | A.   Yes. | 11:44 |
| 17 | Q.   Okay.  Now I have to introduce -- or I | 11:44 |
| 18 | have to open it up myself. | 11:44 |
| 19 | All right.  So we're both looking at your | 11:44 |
| 20 | LinkedIn profile. | 11:44 |
| 21 | Can you read the first paragraph, the | 11:44 |
| 22 | summary of your skill set at the top there? | 11:44 |
| 23 | A.   "Lead monetization, product and | 11:44 |
| 24 | go-to-market strategy for Facebook's Ads Delivery | 11:44 |
| 25 | product group, including ads optimization, | 11:44 |

Page 32

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | targeting, bidding, insights/guidance, creative, and | 11:44 |
| 2 | Dynamic Ads products." | 11:45 |
| 3 | Q.   Okay.  And your CV goes on to list your | 11:45 |
| 4 | experience overall, of course, including at Facebook | 11:45 |
| 5 | and the various positions you've held.  Are these | 11:45 |
| 6 | accurate descriptions of the job titles and roles | 11:45 |
| 7 | and responsibilities you had at Facebook? | 11:45 |
| 8 | MR. FALCONER:  I'm going to object that | 11:45 |
| 9 | this is beyond the scope of what she's prepared to | 11:45 |
| 10 | testify about on behalf of the company.  Obviously | 11:45 |
| 11 | it's fine for her to answer based on personal | 11:45 |
| 12 | knowledge, but I just wanted to make that | 11:45 |
| 13 | distinction clear. | 11:45 |
| 14 | THE WITNESS:  Yes, these titles and | 11:45 |
| 15 | descriptions are accurate. | 11:45 |
| 16 | BY MR. KO: | 11:45 |
| 17 | Q.   You clearly have -- well, is it fair to | 11:45 |
| 18 | say that you clearly have a lot of experience and | 11:45 |
| 19 | expertise about advertising at Facebook? | 11:45 |
| 20 | A.   Yes, I would say I have been working in | 11:46 |
| 21 | ads at Facebook for 10 years. | 11:46 |
| 22 | Q.   And the first part of your LinkedIn CV in | 11:46 |
| 23 | this exhibit as you just read says that you are a | 11:46 |
| 24 | "Lead monetization, product and go-to-market | 11:46 |
| 25 | strategy for Facebook's Ads Delivery Group." | 11:46 |

Page 33

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | What do you mean when you say you are a -- | 11:46 |
| 2 | what does monetization mean to you in that context? | 11:46 |
| 3 | A.   In this context and, you know, my role as | 11:46 |
| 4 | it describes, I work with my product partners, many | 11:46 |
| 5 | teams, to guide the revenue opportunities that we | 11:46 |
| 6 | pursue within the ads delivery product team. | 11:46 |
| 7 | Q.   So is it fair to say that you have | 11:47 |
| 8 | specific expertise with respect to the monetization | 11:47 |
| 9 | of Facebook advertising? | 11:47 |
| 10 | A.   My expertise is more confined to the ads | 11:47 |
| 11 | delivery product area.  So with that qualification, | 11:47 |
| 12 | I think that that would be fair to say. | 11:47 |
| 13 | Q.   So just so the record is clear, then, it | 11:47 |
| 14 | would be fair to say that you have experience with | 11:47 |
| 15 | respect to the monetization of the ad delivery | 11:47 |
| 16 | product area? | 11:47 |
| 17 | A.   Yes. | 11:47 |
| 18 | Q.   Do you consider yourself to have expertise | 11:47 |
| 19 | in other areas of Facebook outside of advertising or | 11:47 |
| 20 | the monetization of Facebook ads? | 11:47 |
| 21 | MR. FALCONER:  Objection.  Beyond the | 11:47 |
| 22 | scope of the notice. | 11:47 |
| 23 | BY MR. KO: | 11:47 |
| 24 | Q.   You can answer. | 11:47 |
| 25 | A.   Outside of the ads delivery product area, | 11:47 |

Page 34

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | I would say I have some experience in understanding. | 11:48 |
| 2 | But less detailed than my experience and | 11:48 |
| 3 | understanding of the ads delivery product area. | 11:48 |
| 4 | Q.   What areas would those be? | 11:48 |
| 5 | MR. FALCONER:  Same objection. | 11:48 |
| 6 | THE WITNESS:  There aren't any specific | 11:48 |
| 7 | additional ads areas I would call out.  In my time | 11:48 |
| 8 | at Facebook, particularly before I started focusing | 11:48 |
| 9 | on ads delivery in 2015, I worked with advertisers | 11:48 |
| 10 | across the range of our ads products.  So have some | 11:48 |
| 11 | level of understanding of our ads products at a kind | 11:48 |
| 12 | of broad level. | 11:48 |
| 13 | BY MR. KO: | 11:48 |
| 14 | Q.   And do you have an understanding of | 11:49 |
| 15 | Facebook's finances? | 11:49 |
| 16 | MR. FALCONER:  Same objection. | 11:49 |
| 17 | THE WITNESS:  Yes. | 11:49 |
| 18 | BY MR. KO: | 11:49 |
| 19 | Q.   And what is your -- and is that | 11:49 |
| 20 | understanding based on your position as lead of the | 11:49 |
| 21 | ad delivery group? | 11:49 |
| 22 | MR. FALCONER:  Same objection. | 11:49 |
| 23 | THE WITNESS:  No.  I think in terms of | 11:49 |
| 24 | Facebook's overall finances, I have less exposure to | 11:49 |
| 25 | that via my current position.  My -- my exposure to | 11:49 |

Page 35

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | it is really, you know, more around what's broadly | 11:49 |
| 2 | available information -- as information to anybody | 11:49 |
| 3 | on Facebook's financials. | 11:49 |
| 4 | BY MR. KO: | 11:49 |
| 5 | Q.   I see.  Do you have an understanding of | 11:49 |
| 6 | how Facebook monetizes its business? | 11:49 |
| 7 | A.   Yes. | 11:50 |
| 8 | Q.   And how does -- how would you say Facebook | 11:50 |
| 9 | monetizes its business? | 11:50 |
| 10 | A.   Our biggest revenue stream is from | 11:50 |
| 11 | advertising. | 11:50 |
| 12 | Q.   And it's almost exclusively from | 11:50 |
| 13 | advertising; is that fair to say? | 11:50 |
| 14 | A.   The large majority is -- is from | 11:50 |
| 15 | advertising. | 11:50 |
| 16 | Q.   By the way, the LinkedIn profile that I | 11:50 |
| 17 | introduced as an exhibit, is that similar to the one | 11:50 |
| 18 | you were looking at while we're discussing the | 11:50 |
| 19 | questions at this deposition today? | 11:50 |
| 20 | A.   Yes. | 11:50 |
| 21 | Q.   And in addition to looking at this, are | 11:50 |
| 22 | you looking at or consulting any other sources of | 11:50 |
| 23 | information to answer my questions, like, for | 11:51 |
| 24 | example, are you browsing the web right now? | 11:51 |
| 25 | A.   So far the only resources I have been | 11:51 |

Page 36

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | looking at are the LinkedIn profile and my chat | 11:51 |
| 2 | history. | 11:51 |
| 3 | Q.   And are you communicating with anyone | 11:51 |
| 4 | during this deposition other than, of course, me? | 11:51 |
| 5 | A.   No. | 11:51 |
| 6 | Q.   Going back to the ads delivery product | 11:51 |
| 7 | group, can you describe to the Court what | 11:51 |
| 8 | specifically they do? | 11:51 |
| 9 | A.   The ads delivery products team at a high | 11:51 |
| 10 | level looks after ads products that try to match the | 11:51 |
| 11 | right ads to the right people.  And by the right | 11:51 |
| 12 | ads, I mean there are millions of businesses that | 11:52 |
| 13 | come to our advertising platform trying to reach | 11:52 |
| 14 | people who will likely be valuable customers for | 11:52 |
| 15 | them. | 11:52 |
| 16 | So whenever we match an ad to a person -- | 11:52 |
| 17 | when we choose an ad to show to -- when we choose an | 11:52 |
| 18 | ad to show to an individual, we like for the | 11:52 |
| 19 | business running that ad to reach someone who will | 11:52 |
| 20 | likely be valuable to them as a business. | 11:52 |
| 21 | We also want to make sure the person who | 11:52 |
| 22 | is seeing the ad sees content that they will find | 11:52 |
| 23 | useful and relevant and, hopefully, interesting. | 11:52 |
| 24 | So ads products that enable this match to | 11:52 |
| 25 | happen would include things like our ads targeting | 11:52 |

Page 37

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | products, optimization products.  We have certain | 11:52 |
| 2 | insights products that help advertisers make better | 11:52 |
| 3 | choices to reach the right people.  We have -- what | 11:53 |
| 4 | are some other examples? | 11:53 |
| 5 | Bidding products, budget products.  Those | 11:53 |
| 6 | are a few examples of the things that would fall | 11:53 |
| 7 | under this bucket. | 11:53 |
| 8 | Q.   Thank you.  That's helpful. | 11:53 |
| 9 | With respect to targeting products, what | 11:53 |
| 10 | does that consist of? | 11:53 |
| 11 | A.   On our platform today, advertisers have | 11:53 |
| 12 | different ways they can indicate to us the types of | 11:53 |
| 13 | audiences they would like to have their ads shown | 11:53 |
| 14 | to.  So that could include targeting based on | 11:53 |
| 15 | demographics. | 11:53 |
| 16 | I'm thinking of age, gender, location, or | 11:53 |
| 17 | also interests.  I think of, you know, types of | 11:53 |
| 18 | content you might interact with on Facebook as a | 11:54 |
| 19 | consumer.  We could take some of that activity | 11:54 |
| 20 | and -- we do take some of that activity and | 11:54 |
| 21 | formulate these into targetable interest segments | 11:54 |
| 22 | that advertisers can include as part of the ads they | 11:54 |
| 23 | set up. | 11:54 |
| 24 | There's a long list of other targeting | 11:54 |
| 25 | products, but those are a few examples. | 11:54 |

Page 38

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So what are the actual products that | 11:54 |
| 2 | you're managing? | 11:54 |
| 3 | MR. FALCONER:  I'm going to object that | 11:54 |
| 4 | this question goes beyond the scope of the topic in | 11:54 |
| 5 | the notice. | 11:54 |
| 6 | You can go ahead and answer. | 11:54 |
| 7 | THE WITNESS:  Again, it's a quite long | 11:54 |
| 8 | list of products across those broad areas that I | 11:54 |
| 9 | mentioned, and there are other areas that I actually | 11:54 |
| 10 | haven't mentioned either just because the list is so | 11:54 |
| 11 | long.  So I would say there are several dozen | 11:54 |
| 12 | products that fall under kind of the areas that we | 11:54 |
| 13 | focus on in ads delivery products. | 11:54 |
| 14 | BY MR. KO: | 11:55 |
| 15 | Q.   From all the products that you are | 11:55 |
| 16 | involved in or otherwise manage, would you say that | 11:55 |
| 17 | the targeting products, the optimization products, | 11:55 |
| 18 | and the bidding products are the primary categories | 11:55 |
| 19 | of products that you manage and the ads delivery | 11:55 |
| 20 | group manages? | 11:55 |
| 21 | MR. FALCONER:  Same objection. | 11:55 |
| 22 | THE WITNESS:  How would you characterize | 11:55 |
| 23 | "primary"? | 11:55 |
| 24 | BY MR. KO: | 11:55 |
| 25 | Q.   Well, are these the three categories that | 11:55 |

Page 39

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1   you work with the most?                              11:55

2           MR. FALCONER:  Same objection.               11:55

3           THE WITNESS:  I wouldn't say they are the     11:55

4   products we work on the most.  I have people on my    11:55

5   team who are assigned to -- to each of these product  11:55

6   areas.                                               11:55

7   BY MR. KO:                                           11:55

8       Q.   Is the ads delivery product group the       11:55

9   primary group in charge of advertising at Facebook?   11:55

10          MR. FALCONER:  Same objection.               11:55

11          THE WITNESS:  Yes, I -- I don't know how I    11:56

12  would necessarily make a determination that one ads   11:56

13  team versus another is the primary team.  But I       11:56

14  would say that within ads delivery -- I mean the ads  11:56

15  delivery team looks specifically after ads delivery   11:56

16  products.  And there are sort of other teams within   11:56

17  ads that look after their own area of products        11:56

18  within ads.                                          11:56

19  BY MR. KO:                                           11:56

20      Q.   Well, what other groups at Facebook work     11:56

21  on advertising other than the ad delivery product     11:56

22  group?                                               11:56

23          MR. FALCONER:  Same objection.               11:56

24          THE WITNESS:  Some of these teams include     11:56

25  business interfaces, business integrity, signals,     11:56
```

Page 40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | business opportunities, commerce.  Those are some | 11:56 |
| 2 | examples that come to mind, but it's not a | 11:57 |
| 3 | comprehensive list. | 11:57 |
| 4 | BY MR. KO: | 11:57 |
| 5 | Q.   Sure.  And these are all distinct groups | 11:57 |
| 6 | at Facebook that work on advertising? | 11:57 |
| 7 | A.   Yes. | 11:57 |
| 8 | MR. FALCONER:  Same objection. | 11:57 |
| 9 | THE WITNESS:  Correct. | 11:57 |
| 10 | BY MR. KO: | 11:57 |
| 11 | Q.   Now, earlier you talked about optimization | 11:57 |
| 12 | products.  And I noticed on your LinkedIn that you | 11:57 |
| 13 | indicate you have experience in optimization.  What | 11:57 |
| 14 | does that mean? | 11:57 |
| 15 | MR. FALCONER:  Same objection. | 11:57 |
| 16 | THE WITNESS:  We offer advertisers on | 11:57 |
| 17 | Facebook the opportunities to signal to us via our | 11:57 |
| 18 | optimization products the types of business outcomes | 11:57 |
| 19 | that are important to them. | 11:57 |
| 20 | For example, a business might be more | 11:58 |
| 21 | interested in driving purchases on their website, or | 11:58 |
| 22 | installs of a mobile app, or views of a video.  And | 11:58 |
| 23 | depending on the advertisers desired business | 11:58 |
| 24 | outcome, we can make -- Facebook can make | 11:58 |
| 25 | estimations on our end of which of the people in an | 11:58 |

Page 41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | advertiser's specified target audience are most | 11:58 |
| 2 | likely -- are more likely to actually lead to that | 11:58 |
| 3 | desired outcome. | 11:58 |
| 4 | So we kind of have built these | 11:58 |
| 5 | optimization products to drive more of an | 11:58 |
| 6 | advertiser's desired business outcome for the budget | 11:58 |
| 7 | they spend. | 11:58 |
| 8 | BY MR. KO: | 11:58 |
| 9 | Q.   Is it fair to say -- a moment ago you | 11:58 |
| 10 | talked about signals.  Are the signals synonymous | 11:58 |
| 11 | with the desired business outcome you had just | 11:58 |
| 12 | described? | 11:59 |
| 13 | MR. FALCONER:  Same objection. | 11:59 |
| 14 | BY MR. KO: | 11:59 |
| 15 | Q.   Or what do you mean by signals when you | 11:59 |
| 16 | said signals earlier in response to my question? | 11:59 |
| 17 | A.   Uh-huh. | 11:59 |
| 18 | MR. FALCONER:  Same objection. | 11:59 |
| 19 | THE WITNESS:  In -- in my earlier response | 11:59 |
| 20 | I was referring to signals as one of our unique ads | 11:59 |
| 21 | product teams at Facebook. | 11:59 |
| 22 | BY MR. KO: | 11:59 |
| 23 | Q.   Okay.  So it's not synonymous with the | 11:59 |
| 24 | desired business outcome.  And you work with -- in | 11:59 |
| 25 | connection with optimization, you are working with | 11:59 |

Page 42

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | advertisers and clients to try and provide them with | 11:59 |
| 2 | an ad that reaches their target audience?  Is that | 11:59 |
| 3 | fair to say? | 11:59 |
| 4 | MR. FALCONER:  Same objection. | 11:59 |
| 5 | THE WITNESS:  Yes. | 11:59 |
| 6 | BY MR. KO: | 11:59 |
| 7 | Q.   In the summary of your LinkedIn profile | 11:59 |
| 8 | you also talked about bidding.  What does that mean? | 11:59 |
| 9 | MR. FALCONER:  Same objection. | 12:00 |
| 10 | THE WITNESS:  Within our ads platform we | 12:00 |
| 11 | offer ways for an advertiser to tell us how -- for | 12:00 |
| 12 | their desired business outcome, how much are they | 12:00 |
| 13 | willing to pay or how much would they like to pay | 12:00 |
| 14 | per outcome. | 12:00 |
| 15 | So we can -- once we have that information | 12:00 |
| 16 | from an advertiser, say, an advertiser would like to | 12:00 |
| 17 | pay no more than $10 for every app install that | 12:00 |
| 18 | their ads generate, we can then make better | 12:00 |
| 19 | decisions on behalf of the advertiser to determine | 12:00 |
| 20 | who within their target audience to show an ad to. | 12:00 |
| 21 | BY MR. KO: | 12:00 |
| 22 | Q.   And you also describe in your summary of | 12:00 |
| 23 | your -- of your job responsibilities that you have | 12:00 |
| 24 | experience in "Digital & mobile media monetization." | 12:01 |
| 25 | Do you see that?  This is in the second paragraph. | 12:01 |

Page 43

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Yes. | 12:01 |
| 2 | Q.    Can you describe to the Court what you | 12:01 |
| 3 | mean when you indicate that you have experience in | 12:01 |
| 4 | digital and mobile media monetization? | 12:01 |
| 5 | MR. FALCONER:  Objection.  This question | 12:01 |
| 6 | is beyond the scope of the topic in the notice.  Go | 12:01 |
| 7 | ahead. | 12:01 |
| 8 | MR. KO:  Just so the record is clear, you | 12:01 |
| 9 | designated this witness and we have every right to | 12:01 |
| 10 | talk about whether or not this witness is the | 12:01 |
| 11 | appropriate witness for this topic. | 12:01 |
| 12 | Q.    But with that on record, Amy, you may | 12:01 |
| 13 | answer the question. | 12:01 |
| 14 | A.    So for much of my career I focused on | 12:01 |
| 15 | digital advertising, including mobile advertising. | 12:01 |
| 16 | And so this is what that phrase in my LinkedIn | 12:01 |
| 17 | profile refers to. | 12:02 |
| 18 | Q.    And what specifically do you mean when you | 12:02 |
| 19 | say "mobile media monetization"? | 12:02 |
| 20 | MR. FALCONER:  Same objection. | 12:02 |
| 21 | THE WITNESS:  It specifically refers to | 12:02 |
| 22 | mobile advertising. | 12:02 |
| 23 | BY MR. KO: | 12:02 |
| 24 | Q.    Advertising that's done on the mobile | 12:02 |
| 25 | platform? | 12:02 |

Page 44

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Correct. | 12:02 |
| 2 | Q.   A few more questions on this LinkedIn CV | 12:02 |
| 3 | in this exhibit. | 12:02 |
| 4 | If you turn to the second page, the | 12:02 |
| 5 | first -- well, at least I guess it is the second | 12:02 |
| 6 | page because you have the same version I'm looking | 12:02 |
| 7 | at. | 12:02 |
| 8 | But the top of the second page there's an | 12:02 |
| 9 | indication that "Led product and go-to-market | 12:02 |
| 10 | strategy for our Ads Delivery product portfolio, | 12:02 |
| 11 | including our most heavily-used direct response | 12:02 |
| 12 | bidding and optimization products, delivery insights | 12:03 |
| 13 | and metrics." | 12:03 |
| 14 | Did I read that correctly? | 12:03 |
| 15 | A.   Yes. | 12:03 |
| 16 | Q.   What are Facebook's most heavily-used | 12:03 |
| 17 | direct response bidding and optimization products? | 12:03 |
| 18 | MR. FALCONER:  Objection.  Beyond the | 12:03 |
| 19 | scope of the topic. | 12:03 |
| 20 | Go ahead. | 12:03 |
| 21 | THE WITNESS:  During the time frame | 12:03 |
| 22 | referenced on this portion of my LinkedIn profile, | 12:03 |
| 23 | one of our most heavily-used direct response | 12:03 |
| 24 | optimization products was called conversion | 12:03 |
| 25 | optimization.  And there were specific bidding | 12:03 |

Page 45

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | products associated with conversion optimization. | 12:03 |
| 2 | And so this is what I was referencing in this bullet | 12:03 |
| 3 | point. | 12:03 |
| 4 | BY MR. KO: | 12:03 |
| 5 | Q.  Is conversion optimization still one of | 12:03 |
| 6 | the most heavily-used response bidding and | 12:03 |
| 7 | optimization products at Facebook? | 12:03 |
| 8 | MR. FALCONER:  Same objection. | 12:03 |
| 9 | THE WITNESS:  Yes, I think you mentioned | 12:04 |
| 10 | direct response bidding and optimization products, | 12:04 |
| 11 | so yes. | 12:04 |
| 12 | BY MR. KO: | 12:04 |
| 13 | Q.  Is there a distinction between direct | 12:04 |
| 14 | response bidding and optimization and indirect | 12:04 |
| 15 | response bidding and optimization? | 12:04 |
| 16 | MR. FALCONER:  Same objection. | 12:04 |
| 17 | THE WITNESS:  By -- direct response is a | 12:04 |
| 18 | category of advertising that we often reference that | 12:04 |
| 19 | relates more to advertisers wanting to drive a | 12:04 |
| 20 | direct action from potential customers, like going | 12:04 |
| 21 | and buying something on a website or going and | 12:04 |
| 22 | installing a mobile app. | 12:04 |
| 23 | So the -- the major bucket of advertising | 12:04 |
| 24 | that's not direct response -- one major bucket of | 12:04 |
| 25 | advertising that's not direct response would be more | 12:04 |

Page 46

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | around brand advertising, which is, you know, the -- | 12:04 |
| 2 | the advertiser objectives there could include just | 12:04 |
| 3 | raising brand awareness of the business or raising | 12:05 |
| 4 | product recall for a specific product. | 12:05 |
| 5 | And so for -- for that -- for those | 12:05 |
| 6 | advertiser objectives it's a set of ads products | 12:05 |
| 7 | that would be used. | 12:05 |
| 8 | BY MR. KO: | 12:05 |
| 9 | Q.  Thank you.  That's helpful. | 12:05 |
| 10 | A few bullets down you also say that you | 12:05 |
| 11 | "Presented to global C-level stakeholders on auction | 12:05 |
| 12 | dynamics and best practices."  Do you see that? | 12:05 |
| 13 | A.  Yes. | 12:05 |
| 14 | Q.  And I notice throughout the CV and in your | 12:05 |
| 15 | current role you have experience in -- in the | 12:05 |
| 16 | Facebook ad auction.  Is that fair to say? | 12:05 |
| 17 | A.  Yes. | 12:05 |
| 18 | Q.  Could you describe to the Court what the | 12:05 |
| 19 | ad auction -- or could you describe to the Court | 12:05 |
| 20 | what the ad auction is? | 12:05 |
| 21 | MR. FALCONER:  Same objection. | 12:05 |
| 22 | THE WITNESS:  Yes.  So our ads platform is | 12:05 |
| 23 | built on an auction -- built on top of an ads | 12:05 |
| 24 | auction.  So we have, as I mentioned before, | 12:06 |
| 25 | millions of advertisers trying to reach potential | 12:06 |

Page 47

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | consumers on -- with advertisers -- I'm sorry. They | 12:06 |
| 2 | are trying to reach potential consumers with ads on | 12:06 |
| 3 | our platform. And then we have billions of people | 12:06 |
| 4 | using our kind of Facebook apps and services every | 12:06 |
| 5 | day. | 12:06 |
| 6 | So the ads auction is the mechanism that | 12:06 |
| 7 | exists to match ads with people in a way that | 12:06 |
| 8 | maximizes value for advertisers and while -- while | 12:06 |
| 9 | still preserving usefulness and relevance for | 12:06 |
| 10 | consumers. | 12:06 |
| 11 | BY MR. KO: | 12:06 |
| 12 | Q. My understanding of the ad auction is that | 12:06 |
| 13 | it is a combination of three major factors, which | 12:06 |
| 14 | would be the bid, the estimated auction rate, and | 12:06 |
| 15 | the ad quality. Do you agree with that? Is that | 12:07 |
| 16 | fair to say? | 12:07 |
| 17 | MR. FALCONER: Same objection. | 12:07 |
| 18 | THE WITNESS: Yes. At a high level, | 12:07 |
| 19 | that's correct. | 12:07 |
| 20 | BY MR. KO: | 12:07 |
| 21 | Q. And what exactly -- well, how are each of | 12:07 |
| 22 | these measured in the ad auction? | 12:07 |
| 23 | MR. FALCONER: Same objection. | 12:07 |
| 24 | MR. KO: Russ, if you want, you can just | 12:07 |
| 25 | have a -- do you want a standing objection on these | 12:07 |

Page 48

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | questions? | 12:07 |
| 2 | MR. FALCONER:  No, I'm fine, thanks. | 12:07 |
| 3 | MR. KO:  My pleasure. | 12:07 |
| 4 | THE WITNESS:  The -- so -- so I wouldn't | 12:07 |
| 5 | say that any of these components are measured.  The | 12:07 |
| 6 | bid, for example, in many cases is an input provided | 12:07 |
| 7 | by the advertiser, how much they are willing to pay | 12:07 |
| 8 | for their desired action or the desired business | 12:07 |
| 9 | outcome. | 12:07 |
| 10 | And then based on that, and based on the | 12:07 |
| 11 | advertiser and their previous ads performance and | 12:08 |
| 12 | what we know about consumers on our platform, we, | 12:08 |
| 13 | within Facebook, make estimations about how much a | 12:08 |
| 14 | given specific individual might be likely to take an | 12:08 |
| 15 | advertiser's desired action.  This is the estimated | 12:08 |
| 16 | action rate. | 12:08 |
| 17 | We also make an estimation of, if an | 12:08 |
| 18 | individual were to see a specific ad, how likely | 12:08 |
| 19 | would they be to find it useful and interesting? | 12:08 |
| 20 | And some of this gets captured -- that is one of | 12:08 |
| 21 | many inputs that gets captured in the quality aspect | 12:08 |
| 22 | that you mentioned. | 12:08 |
| 23 | BY MR. KO: | 12:08 |
| 24 | Q.   And when you're saying that -- that we -- | 12:08 |
| 25 | you, of course -- that we make an estimation of | 12:08 |

Page 49

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | certain of these factors, who at Facebook or which | 12:08 |
| 2 | groups at Facebook are making these estimations? | 12:08 |
| 3 | MR. FALCONER:  Same objection. | 12:09 |
| 4 | THE WITNESS:  For estimated action rate, | 12:09 |
| 5 | the primary team making these estimations, building | 12:09 |
| 6 | the machine learning models to make these | 12:09 |
| 7 | estimations, is the ads ranking team, which is part | 12:09 |
| 8 | of the ads delivery products team. | 12:09 |
| 9 | BY MR. KO: | 12:09 |
| 10 | Q.   Do individuals in the ads ranking team | 12:09 |
| 11 | report to you? | 12:09 |
| 12 | MR. FALCONER:  Same objection. | 12:09 |
| 13 | THE WITNESS:  It is -- these models are | 12:09 |
| 14 | built by engineers, and no engineers report to me. | 12:09 |
| 15 | BY MR. KO: | 12:09 |
| 16 | Q.   Do you interface with product managers | 12:09 |
| 17 | that manage the ads ranking team so that you can | 12:09 |
| 18 | appropriate inputs for your analysis in your work? | 12:09 |
| 19 | MR. FALCONER:  Same objection. | 12:09 |
| 20 | THE WITNESS:  I interface occasionally | 12:09 |
| 21 | with product managers and engineering managers who | 12:09 |
| 22 | more directly support those teams. | 12:10 |
| 23 | BY MR. KO: | 12:10 |
| 24 | Q.   I see.  And going back to the bid -- and | 12:10 |
| 25 | you correct me if I'm wrong because you're the | 12:10 |

Page 50

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    expert here -- the bid essentially is the money paid        12:10

2    by the advertiser to Facebook; is that fair to say?         12:10

3              MR. FALCONER:  Same objections.                   12:10

4              THE WITNESS:  I would actually say it is           12:10

5    the information that an advertiser is giving us             12:10

6    about how much a particular outcome is worth to            12:10

7    them.                                                       12:10

8    BY MR. KO:                                                  12:10

9        Q.   And do you know how they derive that              12:10

10   information?                                                12:10

11             MR. FALCONER:  Same objections.                   12:10

12             THE WITNESS:  How an advertiser would             12:10

13   derive that information?                                    12:10

14   BY MR. KO:                                                  12:10

15       Q.   Right.  In your negotiations -- I assume          12:10

16   that you discuss with these advertisers, as you say        12:10

17   in your words -- of course, the realtime is                12:11

18   lagging -- but you had indicated that they want to         12:11

19   achieve certain outcomes based on certain                  12:11

20   information that they -- they provide to you.  So I         12:11

21   assume you have discussions with them about their          12:11

22   desired outcome, correct?                                  12:11

23             MR. FALCONER:  Same objection.                    12:11

24             THE WITNESS:  When I -- when I said "based        12:11

25   on information they provide to us," I actually was         12:11
```

Page 51

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | referring to the actual bid that they would enter | 12:11 |
| 2 | into our system during the process of ads creation | 12:11 |
| 3 | in our tools. | 12:11 |
| 4 | BY MR. KO: | 12:11 |
| 5 |     Q.  I see.  So they enter an actual bid into | 12:11 |
| 6 | some system and you review that information, | 12:11 |
| 7 | correct? | 12:11 |
| 8 |         MR. FALCONER:  Same objection. | 12:11 |
| 9 |         THE WITNESS:  Our -- when they enter the | 12:11 |
| 10 | bid into our system, at that point, the -- assuming | 12:11 |
| 11 | their ads have been set up correctly and pass all | 12:12 |
| 12 | the relevant policy checks, et cetera, that ad would | 12:12 |
| 13 | then actually enter into our ads auction. | 12:12 |
| 14 | BY MR. KO: | 12:12 |
| 15 |     Q.  I see.  And what system, if it's separate | 12:12 |
| 16 | and apart from the ad auction system, what system do | 12:12 |
| 17 | they enter these bids into? | 12:12 |
| 18 |         MR. FALCONER:  Same objection. | 12:12 |
| 19 |         THE WITNESS:  So we have a number of ads | 12:12 |
| 20 | behind interfaces that advertisers use to create ads | 12:12 |
| 21 | and place orders for ads, including specifying their | 12:12 |
| 22 | bid. | 12:12 |
| 23 | BY MR. KO: | 12:12 |
| 24 |     Q.  So is there an actual name for this system | 12:12 |
| 25 | where they're submitting their bids? | 12:12 |

Page 52

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. FALCONER:  Same objection. | 12:12 |
| 2 | THE WITNESS:  One primary interface that's | 12:12 |
| 3 | used is called Ads Manager. | 12:12 |
| 4 | BY MR. KO: | 12:12 |
| 5 | Q.  And that's the primary way in which an | 12:12 |
| 6 | advertiser submits its bid; is that correct? | 12:12 |
| 7 | MR. FALCONER:  Same objection. | 12:13 |
| 8 | THE WITNESS:  There are many ways that an | 12:13 |
| 9 | advertiser can actually create an ad in our system | 12:13 |
| 10 | and enter an ad into the ad auction.  The ads -- Ads | 12:13 |
| 11 | Manager is our primary native Facebook ads-buying | 12:13 |
| 12 | interface that is used for -- when -- when | 12:13 |
| 13 | advertisers, you know, set specific bids for the -- | 12:13 |
| 14 | for the ads that they -- they want to run on our | 12:13 |
| 15 | platform. | 12:13 |
| 16 | There are other methods that advertisers | 12:13 |
| 17 | can use to enter -- create ads in our system with | 12:13 |
| 18 | kind of associated bids.  For example, we have an | 12:13 |
| 19 | ads API platform where an advertiser could either | 12:13 |
| 20 | directly create ads via the API or work with third | 12:14 |
| 21 | parties to create ads via the API, sending | 12:14 |
| 22 | associated bids for those ads. | 12:14 |
| 23 | But the Ads Manager is the main sort of | 12:14 |
| 24 | interface that Facebook offers where an advertiser | 12:14 |
| 25 | would be creating ads and sending us those | 12:14 |

Page 53

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | associated bids that they're willing to pay. | 12:14 |
| 2 | BY MR. KO: | 12:14 |
| 3 |     Q.   Thank you. | 12:14 |
| 4 |        With respect to estimated auction rates -- | 12:14 |
| 5 | we touched on that briefly -- but can you describe | 12:14 |
| 6 | to the Court what that means? | 12:14 |
| 7 |        MR. FALCONER:  Same objection. | 12:14 |
| 8 |        THE WITNESS:  Estimated action rate, | 12:14 |
| 9 | essentially -- when an advertiser gives us a bid for | 12:14 |
| 10 | desired action, let's say their desired action is | 12:14 |
| 11 | installs of their mobile app.  We actually have | 12:14 |
| 12 | to -- for purposes of our ads auction, we need to | 12:14 |
| 13 | translate that bid to kind of an advertiser's | 12:14 |
| 14 | willingness to reach -- to show an ad, a single ad, | 12:15 |
| 15 | to an individual based on that individual's | 12:15 |
| 16 | estimated likelihood to actually install the app | 12:15 |
| 17 | after they see this ad. | 12:15 |
| 18 |        So in that way, I mean, you can think of | 12:15 |
| 19 | many different advertisers having different desired | 12:15 |
| 20 | outcomes.  We sort of need to compare all of these | 12:15 |
| 21 | bids across many different advertisers on a more | 12:15 |
| 22 | apples-to-apples basis. | 12:15 |
| 23 |        So it's just like instead of, you know, | 12:15 |
| 24 | advertiser A valuing -- like sending us a bid for -- | 12:15 |
| 25 | of $10 per app install, advertiser B sending a bid | 12:15 |

Page 54

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | of, you know, a dollar per website visit, advertiser | 12:15 |
| 2 | C sending a bid of 20 cents per video view.  We want | 12:15 |
| 3 | to translate the bids from each of these advertisers | 12:16 |
| 4 | to advertiser A, B and C are willing to pay X, Y and | 12:16 |
| 5 | Z to show an ad to this person. | 12:16 |
| 6 |         In order to do that, we need to | 12:16 |
| 7 | calculate -- or make an estimation if we show any of | 12:16 |
| 8 | these ads to this person, what's the likelihood that | 12:16 |
| 9 | this person will either install -- install the app, | 12:16 |
| 10 | watch a video, or visit a website. | 12:16 |
| 11 |         So the estimated action rate refers to the | 12:16 |
| 12 | calculation that we're making about how likely an | 12:16 |
| 13 | individual is to take a given advertiser's desired | 12:16 |
| 14 | outcome. | 12:16 |
| 15 | BY MR. KO: | 12:16 |
| 16 |     Q.   I apologize.  I think I asked -- my | 12:16 |
| 17 | question was estimated auction rate, but we're | 12:16 |
| 18 | talking about estimated action rates, correct? | 12:16 |
| 19 |     A.   Correct. | 12:16 |
| 20 |         MR. FALCONER:  Same objection. | 12:16 |
| 21 | BY MR. KO: | 12:16 |
| 22 |     Q.   And finally, with respect to ad quality, | 12:16 |
| 23 | which was one of the, as you described, one of the | 12:16 |
| 24 | high-level major factors in an ad auction, can you | 12:17 |
| 25 | describe to the Court what that means? | 12:17 |

Page 55

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. FALCONER:  Same objection. | 12:17 |
| 2 | THE WITNESS:  In addition to factoring in | 12:17 |
| 3 | advertiser value into the ads auction, which is | 12:17 |
| 4 | essentially what the advertiser bid and the | 12:17 |
| 5 | calculation of estimated action rate are all about, | 12:17 |
| 6 | like how much advertiser value will -- how much | 12:17 |
| 7 | value will an advertiser get when we show this ad to | 12:17 |
| 8 | a person. | 12:17 |
| 9 | We also want to balance into the | 12:17 |
| 10 | equation -- we also want to take into account user | 12:17 |
| 11 | value into that equation.  So will the person seeing | 12:17 |
| 12 | the ad have a good experience and see content that's | 12:17 |
| 13 | useful and relevant for them if we show this person | 12:17 |
| 14 | a given ad? | 12:17 |
| 15 | And so that user value or that notion of | 12:17 |
| 16 | relevance, good experience for a consumer is -- is | 12:17 |
| 17 | wrapped up in that last quality factor. | 12:17 |
| 18 | So include several things, including, for | 12:18 |
| 19 | example, our estimation of how likely a person will | 12:18 |
| 20 | be to find content from a given business interesting | 12:18 |
| 21 | or useful.  That's one consideration. | 12:18 |
| 22 | And other -- another example consideration | 12:18 |
| 23 | would be maybe less personalized to a person but | 12:18 |
| 24 | more about, okay, is this business -- have they | 12:18 |
| 25 | generally created a good ads experience for people | 12:18 |

Page 56

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | who click through on their ads? | 12:18 |
| 2 | Or, for example, if someone is clicking | 12:18 |
| 3 | through on ads and landing on a poor website | 12:18 |
| 4 | experience and they get a lot of people bouncing off | 12:18 |
| 5 | the website immediately after clicking ads, then we | 12:18 |
| 6 | might take that as a sign that that would not lead | 12:18 |
| 7 | to a good user experience, and so that might, you | 12:18 |
| 8 | know, penalize an advertiser in the ads auction. | 12:19 |
| 9 | BY MR. KO: | 12:19 |
| 10 | Q.   And you just said that -- in your answer | 12:19 |
| 11 | you said that you wanted to take into account, | 12:19 |
| 12 | quote, user value, end quote, into the equation.  So | 12:19 |
| 13 | how do you quantify user value as it relates to ad | 12:19 |
| 14 | quality? | 12:19 |
| 15 | MR. FALCONER:  Same objection. | 12:19 |
| 16 | THE WITNESS:  It's hard to -- I don't know | 12:19 |
| 17 | if we are quantifying user value in any specific way | 12:19 |
| 18 | in this -- in this -- you know, in that reference I | 12:19 |
| 19 | made.  But what we're trying to optimize for is to | 12:19 |
| 20 | have people see ads that they will find useful, | 12:19 |
| 21 | interesting, and not lead to a sort of bad | 12:19 |
| 22 | post-ad -- post-click experience. | 12:19 |
| 23 | And so based on some of those components | 12:20 |
| 24 | we mentioned, we may either -- that might either | 12:20 |
| 25 | help more ads win an auction if we predict for an | 12:20 |

Page 57

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | individual, if we predict that they will lead to a | 12:20 |
| 2 | good user experience.  Or if there are aspects about | 12:20 |
| 3 | the ad or the advertiser that we think will lead to | 12:20 |
| 4 | a worse user experience, then that might kind of | 12:20 |
| 5 | hinder that ad from winning as many auctions for | 12:20 |
| 6 | people. | 12:20 |
| 7 | BY MR. KO: | 12:20 |
| 8 | Q.   And does information about a Facebook user | 12:20 |
| 9 | and data that Facebook has about a user improve the | 12:20 |
| 10 | ad quality? | 12:20 |
| 11 | MR. FALCONER:  Same objection. | 12:20 |
| 12 | THE WITNESS:  Some of the estimations that | 12:20 |
| 13 | we make in our -- as we try to optimize for ad | 12:20 |
| 14 | quality are based on information that we have about | 12:21 |
| 15 | people. | 12:21 |
| 16 | For example, if we know that a person has | 12:21 |
| 17 | interacted with, you know, engaged with a lot of | 12:21 |
| 18 | yoga-related content on Facebook, we might be more | 12:21 |
| 19 | likely to predict that an ad from a yoga apparel | 12:21 |
| 20 | company would be more relevant to this individual, | 12:21 |
| 21 | and that might improve, like, a yoga ad -- a yoga | 12:21 |
| 22 | ad's chances of winning the auction to show to this | 12:21 |
| 23 | individual. | 12:21 |
| 24 | BY MR. KO: | 12:21 |
| 25 | Q.   So is the ad quality and ad relevance | 12:21 |

Page 58

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | shown to a user improved by the information Facebook | 12:21 |
| 2 | has about the user? | 12:21 |
| 3 | MR. FALCONER:  Same objection. | 12:21 |
| 4 | THE WITNESS:  We are able to show more | 12:22 |
| 5 | relevant and useful ads to people based on the | 12:22 |
| 6 | information that we have about those people's | 12:22 |
| 7 | activity on Facebook. | 12:22 |
| 8 | BY MR. KO: | 12:22 |
| 9 | Q.  And if Facebook had less information about | 12:22 |
| 10 | a user, presumably the ad quality and ad relevance | 12:22 |
| 11 | would be diminished; would you agree with me on | 12:22 |
| 12 | that? | 12:22 |
| 13 | MR. FALCONER:  Same objection. | 12:22 |
| 14 | THE WITNESS:  I think it depends on the | 12:22 |
| 15 | type of information and the ways in which we might | 12:22 |
| 16 | be able to use that information in our -- in our | 12:22 |
| 17 | models. | 12:22 |
| 18 | BY MR. KO: | 12:22 |
| 19 | Q.  Now, with respect to the ad auction, I | 12:22 |
| 20 | also understand that Facebook subsidizes certain | 12:22 |
| 21 | relevant ads in the auctions.  Are you familiar with | 12:22 |
| 22 | that concept? | 12:22 |
| 23 | MR. FALCONER:  Same objection. | 12:22 |
| 24 | THE WITNESS:  I'm familiar with the | 12:22 |
| 25 | concept. | 12:22 |

Page 59

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. KO: | 12:22 |
| 2 | Q.   And what is your understanding of this | 12:22 |
| 3 | concept? | 12:23 |
| 4 | MR. FALCONER:  Same objection. | 12:23 |
| 5 | THE WITNESS:  For example, to my | 12:23 |
| 6 | understanding, there are times when we might | 12:23 |
| 7 | subsidize specific ads in the auction for very | 12:23 |
| 8 | specific reasons.  For example, we might -- well, I | 12:23 |
| 9 | guess -- can you -- can you clarify what you mean by | 12:23 |
| 10 | subsidy? | 12:23 |
| 11 | BY MR. KO: | 12:23 |
| 12 | Q.   Well, my understanding of it -- and you | 12:23 |
| 13 | tell me if I'm wrong, this is your expertise -- but | 12:23 |
| 14 | I understand that Facebook pays money or provides | 12:23 |
| 15 | some sort of revenue sharing and/or agreement with | 12:23 |
| 16 | certain advertisers for placing ads on Facebook.  Do | 12:23 |
| 17 | you understand that to be the case? | 12:24 |
| 18 | MR. FALCONER:  Same objection. | 12:24 |
| 19 | THE WITNESS:  So that Facebook pays | 12:24 |
| 20 | certain advertisers money to incentivize them to put | 12:24 |
| 21 | ads on Facebook.  Is that your question? | 12:24 |
| 22 | BY MR. KO: | 12:24 |
| 23 | Q.   Subsidizes them.  I don't mean a direct | 12:24 |
| 24 | payment, but there's some sort of revenue-sharing | 12:24 |
| 25 | agreement and/or a reduction in the bid price | 12:24 |

Page 60

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | because Facebook recognizes or otherwise agrees with | 12:24 |
| 2 | them that they're placing a, you know, a large | 12:24 |
| 3 | amount of ads on Facebook. | 12:24 |
| 4 | A.   Yes. | 12:24 |
| 5 | MR. FALCONER:  Object to form. | 12:24 |
| 6 | THE WITNESS:  I see what you mean. | 12:24 |
| 7 | Historically, I know that that has been | 12:24 |
| 8 | true.  I can't confirm if it is still the case | 12:24 |
| 9 | today.  But historically, for example, within the | 12:24 |
| 10 | 2012 to '17 time period, we did have some | 12:24 |
| 11 | arrangements with certain ad agencies where we | 12:24 |
| 12 | provided rebates to certain agencies that were | 12:25 |
| 13 | negotiated upfront before -- much before any ads | 12:25 |
| 14 | were created or entered our ads portion. | 12:25 |
| 15 | BY MR. KO: | 12:25 |
| 16 | Q.   So in addition to the rebates to the ad | 12:25 |
| 17 | agencies, are you aware of any agreements with the | 12:25 |
| 18 | advertisers directly for any type of revenue-sharing | 12:25 |
| 19 | or discount for placing their ads on Facebook? | 12:25 |
| 20 | MR. FALCONER:  Same objection. | 12:25 |
| 21 | THE WITNESS:  At least for the 2012 to | 12:25 |
| 22 | 2017 time period, I'm not aware of any other | 12:26 |
| 23 | agreements with advertisers where we were giving | 12:26 |
| 24 | revenue back to advertisers in return for placing | 12:26 |
| 25 | ads on Facebook. | 12:26 |

Page 61

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. KO:                                          12:26

2        Q.   And are you -- in trying to answer this    12:26

3    question, I see that you were looking at another    12:26

4    document.  Were you looking at the Internet for this  12:26

5    ████████████████████████████████████              ████

     ████████████████████████████████████              ████

     ████████████████  ██████████████████              ████

     ██   ██   █████████████████████████               ████

     ████████████████████████████████████              ████

     ███████████████████████████████████████           ████

     ███████████████  ██████████████████████           ████

     ███████████████████████████████████               ████

     ███████████████████                               12:26

14              MR. FALCONER:  David, we've been going a  12:26

15   little more than an hour.  Whenever you get to a    12:26

16   good point, we could take a break.                 12:26

17              MR. KO:  Sure.  How about five more      12:26

18   minutes.                                           12:27

19        Q.   If that's okay with you, Amy.  Amy, you're  12:27

20   in control.  If you want to break now, I'm happy to.  12:27

21   I just have about five more minutes, and then maybe  12:27

22   we can take a break.                               12:27

23        A.   Five minutes is okay.                    12:27

24        Q.   Are you familiar with the term ARPU?     12:27

25        A.   Yes.                                     12:27

                                           Page 62

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q. What is it? | 12:27 |
| 2 | A. It stands for average revenue per user. | 12:27 |
| 3 | Q. And this is a specific term used by | 12:27 |
| 4 | Facebook and, would you agree with me, a key metric | 12:27 |
| 5 | for Facebook? | 12:27 |
| 6 | A. It is a key metric for Facebook. | 12:27 |
| 7 | Q. And are you familiar with the term DAU? | 12:27 |
| 8 | A. Yes. | 12:27 |
| 9 | Q. And what is that? | 12:27 |
| 10 | A. It stands for daily active users. | 12:27 |
| 11 | Q. This is also a key metric for Facebook? | 12:27 |
| 12 | A. Yes. | 12:27 |
| 13 | Q. Are you familiar with the term "MAU"? | 12:27 |
| 14 | A. Yes. | 12:27 |
| 15 | Q. What is it? | 12:27 |
| 16 | A. That stands for monthly active users. | 12:27 |
| 17 | Q. This is also a key metric for Facebook? | 12:27 |
| 18 | A. Yes. | 12:27 |
| 19 | Q. And by the way, I noticed in recent years | 12:28 |
| 20 | that the nomenclature I believe has changed to ARPP | 12:28 |
| 21 | and DAP, MAP. Does that sound familiar? | 12:28 |
| 22 | MR. FALCONER: Objection. Outside the | 12:28 |
| 23 | time frame of the notice. But go ahead. | 12:28 |
| 24 | THE WITNESS: It does sound familiar. | 12:28 |
| 25 | BY MR. KO: | 12:28 |

Page 63

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   But for purposes of the 2012 to 2017 time | 12:28 |
| 2 | period, the terms ARPU, DAU, MAU were key financial | 12:28 |
| 3 | metrics for the company; is that fair to say? | 12:28 |
| 4 | A.   Yes. | 12:28 |
| 5 | Q.   And more specifically, they are key | 12:28 |
| 6 | metrics for the Facebook business as a whole.  Would | 12:28 |
| 7 | you agree with me on that too? | 12:28 |
| 8 | A.   Yes. | 12:28 |
| 9 | Q.   Other than these three metrics, are you | 12:28 |
| 10 | aware of any other metrics utilized by Facebook? | 12:28 |
| 11 | MR. FALCONER:  Objection.  Form. | 12:28 |
| 12 | BY MR. KO: | 12:28 |
| 13 | Q.   Well, let me ask this way.  That was a -- | 12:28 |
| 14 | that was a poor question. | 12:28 |
| 15 | These are the three primary metrics | 12:29 |
| 16 | utilized by Facebook for purposes of its business. | 12:29 |
| 17 | Would you agree with me on that? | 12:29 |
| 18 | MR. FALCONER:  Objection.  Form. | 12:29 |
| 19 | THE WITNESS:  These are three very | 12:29 |
| 20 | important metrics for purposes of Facebook's | 12:29 |
| 21 | business.  It's a -- yeah, I -- I don't know how | 12:29 |
| 22 | I -- primary is like a specific distinction that I'm | 12:29 |
| 23 | not sure how I -- I should assess, but those are | 12:29 |
| 24 | three important metrics. | 12:29 |
| 25 | BY MR. KO: | 12:29 |

Page 64

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   Can you think of -- as you sit here today,    12:29

2    can you think of any other metrics outside of these    12:29

3    three that are very important to Facebook to    12:29

4    measure?    12:29

5            MR. FALCONER:  Objection.  Form.    12:29

6            THE WITNESS:  I think that we track total    12:29

7    revenue is quite an important metric.    12:29

8    BY MR. KO:    12:30

9    Q.   Anything else?    12:30

10           MR. FALCONER:  Objection.  Form.    12:30

11           THE WITNESS:  Those are the main metrics    12:30

12   that come to mind as most important.    12:30

13   BY MR. KO:    12:30

14   Q.   Going back to ARPU, how does Facebook    12:30

15   calculate ARPU?    12:30

16   A.   To my understanding, it is a ratio    12:30

17   essentially from dividing quarterly revenue by    12:30

18   average monthly active users over that quarter.    12:30

19   Q.   And does Facebook track -- well, with    12:30

20   respect to monthly active users, is that tracked    12:30

21   globally, regionally, by certain geography?  Do you    12:30

22   know?    12:31

23   A.   Monthly active users.  We certainly -- I    12:31

24   think predominantly track it at a global level.    12:31

25   Q.   And in your group in particular, the ads    12:31

Page 65

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | delivery group, or to the extent you're familiar | 12:31 |
| 2 | with any other advertising group, do you track also | 12:31 |
| 3 | ARPU and/or measure it in any fashion? | 12:31 |
| 4 | MR. FALCONER: Objection. Beyond the | 12:31 |
| 5 | scope of the notice. | 12:31 |
| 6 | Go ahead. | 12:31 |
| 7 | THE WITNESS: We do not have a reason to | 12:31 |
| 8 | track ARPU within our product team specifically. | 12:31 |
| 9 | BY MR. KO: | 12:31 |
| 10 | Q. So which groups at Facebook would you say | 12:31 |
| 11 | are primarily responsible for tracking the ARPU | 12:31 |
| 12 | metric? | 12:31 |
| 13 | MR. FALCONER: Same objection. | 12:32 |
| 14 | THE WITNESS: I'm sorry, what was that, | 12:32 |
| 15 | Russ? | 12:32 |
| 16 | MR. FALCONER: Same objection. Excuse me. | 12:32 |
| 17 | THE WITNESS: The finance team would have | 12:32 |
| 18 | primary responsibility to check that. | 12:32 |
| 19 | BY MR. KO: | 12:32 |
| 20 | Q. Just a few more questions and we can take | 12:32 |
| 21 | a break. | 12:32 |
| 22 | How is DAU measured? | 12:32 |
| 23 | MR. FALCONER: I'm going to object as | 12:32 |
| 24 | beyond the scope of the topic in the notice. | 12:32 |
| 25 | You can answer based on what you know | 12:32 |

Page 66

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | personally. | 12:32 |
| 2 | THE WITNESS:  So I understand that this | 12:32 |
| 3 | would be a measure of the number of users engaging | 12:32 |
| 4 | with our platform in a given day. | 12:32 |
| 5 | BY MR. KO: | 12:32 |
| 6 | Q.   Okay.  And is it -- is it just -- if an | 12:32 |
| 7 | individual or a user, excuse me, logs on and | 12:32 |
| 8 | accesses Facebook, the Facebook app, for example, if | 12:32 |
| 9 | they do it once, are they tracked as part of the | 12:32 |
| 10 | daily average user metric? | 12:32 |
| 11 | A.   I don't recall the specific calculation | 12:32 |
| 12 | offhand. | 12:33 |
| 13 | Q.   I see. | 12:33 |
| 14 | MR. FALCONER:  I'm going to -- I didn't | 12:33 |
| 15 | want to interrupt the witness.  I want to object to | 12:33 |
| 16 | the last question as beyond the scope of the notice. | 12:33 |
| 17 | BY MR. KO: | 12:33 |
| 18 | Q.   How about with respect to the monthly | 12:33 |
| 19 | average user?  Do you understand how that is | 12:33 |
| 20 | measured? | 12:33 |
| 21 | MR. FALCONER:  Same objection. | 12:33 |
| 22 | THE WITNESS:  At a high level, it should | 12:33 |
| 23 | be the number of users who are using the platform | 12:33 |
| 24 | within -- within a given month. | 12:33 |
| 25 | But in terms of the specific -- if there | 12:33 |

Page 67

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | | |
|---|---|---|---|
| 1 | 1 | are any specific engagement triggers or activity | 12:33 |
| 2 | 2 | triggers that would define exactly who gets counted, | 12:33 |
| 3 | 3 | I would need to confirm that. | 12:33 |
| 4 | 4 | BY MR. KO: | 12:33 |
| 5 | 5 | Q.   And who would you have to confirm that | 12:33 |
| 6 | 6 | with? | 12:33 |
| 7 | 7 | A.   I might confirm it with our finance team. | 12:33 |
| 8 | 8 | They should have the most detailed understanding. | 12:33 |
| 9 | 9 | Q.   So would the finance team have the | 12:33 |
| 10 | 10 | knowledge and understand how DAU and MAU are | 12:33 |
| 11 | 11 | measured? | 12:34 |
| 12 | 12 | A.   Yes. | 12:34 |
| 13 | 13 | MR. KO:  Okay.  This is probably a good | 12:34 |
| 14 | 14 | time for a break, so I'm happy to take one now. | 12:34 |
| 15 | 15 | THE VIDEOGRAPHER:  We are off the record | 12:34 |
| 16 | 16 | 12:34  16   at       p.m. | |
| | | 12:34 | |
| 17 | | | |
| 17 | 17 | (Whereupon, a luncheon recess was had.) | 12:34 |
| 18 | | | |
| | 18 | | |
| 19 | | | |
| | 19 | | |
| 20 | | | |
| | 20 | | |
| 21 | | | |
| | 21 | | |
| 22 | | | |
| | 22 | | |
| 23 | | | |
| | 23 | | |
| 24 | | | |
| | 24 | | |
| 25 | | | |
| | 25 | | |

Page 68

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Wednesday, February 24, 2021 | |
| 2 | 1:21 p.m. | |
| 3 | | |
| 4 | THE VIDEOGRAPHER:  We are on the record at | 01:21 |
| 5 | 1:21 p.m. | 01:21 |
| 6 | EXAMINATION (continued) | 01:21 |
| 7 | BY MR. KO: | 01:21 |
| 8 | Q.   Welcome back from the break, Amy. | 01:21 |
| 9 | I want to start by having you pull from | 01:21 |
| 10 | the Exhibit Share a copy of what has been marked as | 01:21 |
| 11 | Exhibit A -- or 8, excuse me. | 01:21 |
| 12 | (Exhibit 8 was marked for | 01:21 |
| 13 | identification and attached | 01:21 |
| 14 | hereto.) | 01:21 |
| 15 | THE WITNESS:  Okay. | 01:21 |
| 16 | BY MR. KO: | 01:21 |
| 17 | Q.   Do you have that up? | 01:21 |
| 18 | A.   Yes. | 01:21 |
| 19 | MR. KO:  And, for the record, Exhibit 8 is | 01:21 |
| 20 | a Facebook annual report from 2016. | 01:21 |
| 21 | Q.   Is that what you're looking at right now? | 01:21 |
| 22 | A.   Yes. | 01:21 |
| 23 | Q.   And also for the record, this is a | 01:21 |
| 24 | document we identified to your counsel in advance of | 01:21 |
| 25 | this deposition for you to review.  Were you aware | 01:21 |

Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | of the possibility that we were going to ask | 01:21 |
| 2 | questions about this? | 01:21 |
| 3 | A.   I wasn't aware of any questions pertaining | 01:22 |
| 4 | to this specific document. | 01:22 |
| 5 | Q.   Have you reviewed this or any annual | 01:22 |
| 6 | report in advance of this deposition today? | 01:22 |
| 7 | A.   Not specifically in preparation for this | 01:22 |
| 8 | deposition. | 01:22 |
| 9 | Q.   Okay.  But you've seen this -- you have | 01:22 |
| 10 | seen this report or any other annual report before? | 01:22 |
| 11 | A.   Yes. | 01:22 |
| 12 | Q.   And specifically, have you seen this 2016 | 01:22 |
| 13 | annual report before? | 01:22 |
| 14 | A.   I can't recall if previous annual reports | 01:22 |
| 15 | I have seen were the 2016 annual report. | 01:22 |
| 16 | Q.   Fair enough. | 01:22 |
| 17 | I want to turn your attention to page 4 of | 01:22 |
| 18 | the annual report.  On that page there is a title | 01:22 |
| 19 | that says "Limitations of Key Metrics and Other | 01:22 |
| 20 | Data."  Let me know when you're there. | 01:22 |
| 21 | A.   Yes, I'm here. | 01:23 |
| 22 | Q.   Can you go ahead and read into the record | 01:23 |
| 23 | the first sentence that you see at the top of that | 01:23 |
| 24 | page. | 01:23 |
| 25 | A.   Sorry, am I on page 4 of the PDF or page 4 | 01:23 |

Page 70

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | as per the -- | 01:23 |
| 2 | Q.   Page 4 of the report. | 01:23 |
| 3 | A.   Okay.  Okay.  Yeah, I'm on page 4 of the | 01:23 |
| 4 | report.  And you asked me to read out which part | 01:23 |
| 5 | exactly? | 01:23 |
| 6 | Q.   Just the first sentence at the top of that | 01:23 |
| 7 | page. | 01:23 |
| 8 | A.   "The numbers for our key metrics, which | 01:23 |
| 9 | include our daily active users (DAUs), monthly | 01:23 |
| 10 | active users (MAUs), and average revenue per user | 01:23 |
| 11 | (ARPU), are calculated using internal company data | 01:23 |
| 12 | based on the activity of user accounts." | 01:23 |
| 13 | Q.   Do you have an understanding -- thank you | 01:23 |
| 14 | for that.  Do you have an understanding of what | 01:23 |
| 15 | internal company data this sentence is referring to? | 01:23 |
| 16 | A.   Yes. | 01:24 |
| 17 | Q.   And what internal company data is this | 01:24 |
| 18 | sentence referring to? | 01:24 |
| 19 | A.   It should be data on user activity tracked | 01:24 |
| 20 | by our growth team. | 01:24 |
| 21 | Q.   And other than the growth team, are there | 01:24 |
| 22 | any other groups at Facebook that would have access | 01:24 |
| 23 | to this -- well, strike that. | 01:24 |
| 24 | Other than the growth team, are there any | 01:24 |
| 25 | other groups or teams at Facebook that are | 01:24 |

Page 71

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | responsible for tracking this -- this data? | 01:24 |
| 2 | MR. FALCONER:  Objection.  Beyond the | 01:24 |
| 3 | scope of the notice. | 01:24 |
| 4 | Go ahead. | 01:24 |
| 5 | THE WITNESS:  I don't know if there are | 01:24 |
| 6 | other teams specifically responsible for tracking | 01:24 |
| 7 | this user activity that's referenced. | 01:24 |
| 8 | BY MR. KO: | 01:24 |
| 9 | Q.  And do you know what specific data is | 01:24 |
| 10 | utilized by the growth team to understand the | 01:24 |
| 11 | activity of user accounts? | 01:25 |
| 12 | MR. FALCONER:  Same objection. | 01:25 |
| 13 | THE WITNESS:  No, I -- I'm not familiar | 01:25 |
| 14 | with the kind of specific activities that the growth | 01:25 |
| 15 | team is tracking for these numbers. | 01:25 |
| 16 | BY MR. KO: | 01:25 |
| 17 | Q.  And earlier before the break you said that | 01:25 |
| 18 | the finance team had an understanding of how to | 01:25 |
| 19 | calculate or measure the key metrics of Facebook, | 01:25 |
| 20 | including ARPU, MAU, and DAU.  Do you recall that? | 01:25 |
| 21 | A.  Yes, I recall that discussion.  And | 01:25 |
| 22 | specifically the -- the -- the discussion had been | 01:25 |
| 23 | around which team might have a greater understanding | 01:25 |
| 24 | of the specific activities that are being captured | 01:25 |
| 25 | in the DAU and MAU numbers. | 01:25 |

Page  72

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       So I would suspect the finance team has an       01:26

2  understanding of kind of more specific details       01:26

3  around that.  But additionally, I think that the     01:26

4  growth team would have that more specific            01:26

5  understanding.  And to my understanding, they, more  01:26

6  directly, would be responsible for tracking that.    01:26

7       Q.   I see.  So the growth team -- just so the  01:26

8  record is clear, the growth team would also          01:26

9  understand how DAU, MAU and ARPU was specifically    01:26

10  measured.  Is that your testimony?                   01:26

11      A.   My understanding is that the growth team    01:26

12  should have a more specific understanding of DAU and 01:26

13  MAU calculations specifically.                       01:26

14      Q.   And same with respect to ARPU?  Is that     01:26

15  measured primarily by the finance team?              01:26

16      A.   My -- I don't know for certain, but my      01:26

17  guess would be that the finance team is responsible  01:27

18  for making the ARPU calculation.                     01:27

19      Q.   I see.  That's helpful.                      01:27

20       And with respect to the internal company        01:27

21  data that's referenced here on this first page -- or 01:27

22  excuse me, on page 4 of this annual report -- do     01:27

23  you -- do you know where this data is stored and     01:27

24  located?                                             01:27

25       MR. FALCONER:  Objection.  Beyond the           01:27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | scope of the topic in the notice. | 01:27 |
| 2 | Go ahead. | 01:27 |
| 3 | THE WITNESS:  I do not know. | 01:27 |
| 4 | BY MR. KO: | 01:27 |
| 5 | Q.   Presumably, the growth team has access to | 01:27 |
| 6 | it? | 01:27 |
| 7 | A.   I would presume they have access to the | 01:27 |
| 8 | knowledge of where the DAU and MAU data is stored | 01:27 |
| 9 | specifically. | 01:27 |
| 10 | Q.   Okay.  If you don't mind, please move | 01:27 |
| 11 | forward in that document to page 36 of the annual | 01:27 |
| 12 | report.  And this is not -- not page 36 of the PDF | 01:27 |
| 13 | but just 36 of the actual report.  And let me know | 01:27 |
| 14 | when you get there. | 01:28 |
| 15 | A.   Okay. | 01:28 |
| 16 | Q.   Do you see at the top there is a section | 01:28 |
| 17 | titled "Trends in our Monetization by User | 01:28 |
| 18 | Geography"? | 01:28 |
| 19 | A.   Yes. | 01:28 |
| 20 | Q.   And could you go ahead and read the first | 01:28 |
| 21 | two sentences of that first paragraph underneath | 01:28 |
| 22 | that heading. | 01:28 |
| 23 | A.   "We calculate our revenue by user | 01:28 |
| 24 | geography based on our estimate of the geography in | 01:28 |
| 25 | which ad impressions are delivered, virtual and | 01:28 |

Page  74

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | digital goods are purchased or virtual reality | 01:28 |
| 2 | platform devices are shipped.  We define ARPU as our | 01:28 |
| 3 | total revenue in a given geography during a given | 01:28 |
| 4 | quarter, divided by the average of the number of | 01:28 |
| 5 | MAUs in the geography at the beginning and end of | 01:28 |
| 6 | the quarter." | 01:28 |
| 7 | Q.   Thank you. | 01:28 |
| 8 | So with respect to that second sentence | 01:28 |
| 9 | would you -- it sounds like that is how Facebook -- | 01:29 |
| 10 | or that is the methodology for how Facebook | 01:29 |
| 11 | calculates ARPU; is that fair? | 01:29 |
| 12 | MR. FALCONER:  Objection.  Form. | 01:29 |
| 13 | THE WITNESS:  Yes, that's correct. | 01:29 |
| 14 | BY MR. KO: | 01:29 |
| 15 | Q.   And I assume this methodology has not | 01:29 |
| 16 | changed over time? | 01:29 |
| 17 | MR. FALCONER:  Objection.  Beyond the | 01:29 |
| 18 | scope of the topic in the notice. | 01:29 |
| 19 | THE WITNESS:  I'm not certain if it's | 01:29 |
| 20 | changed over time. | 01:29 |
| 21 | BY MR. KO: | 01:29 |
| 22 | Q.   Do you know with respect to the 2012 | 01:29 |
| 23 | through 27 [sic] time period whether or not there | 01:29 |
| 24 | were any variations in how Facebook calculated ARPU? | 01:29 |
| 25 | MR. FALCONER:  Same objection. | 01:29 |

Page 75

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  I don't know offhand. | 01:29 |
| 2 | BY MR. KO: | 01:29 |
| 3 | Q.   Do you know how geography is broken down | 01:29 |
| 4 | as described in this definition of ARPU? | 01:29 |
| 5 | MR. FALCONER:  Same objection. | 01:30 |
| 6 | THE WITNESS:  One way that I'm aware it's | 01:30 |
| 7 | broken down is by four global regions or four -- | 01:30 |
| 8 | four global regions:  U.S. and Canada, Europe, | 01:30 |
| 9 | Asia-Pacific, and rest of world. | 01:30 |
| 10 | BY MR. KO: | 01:30 |
| 11 | Q.   And so when this calculation of ARPU as | 01:30 |
| 12 | described incorporates geography the four ways, at | 01:30 |
| 13 | least as represented here, that Facebook defines | 01:30 |
| 14 | geography is through these four sub regions that you | 01:30 |
| 15 | described; is that correct? | 01:30 |
| 16 | MR. FALCONER:  Same objection.  And | 01:30 |
| 17 | objection as to form. | 01:30 |
| 18 | THE WITNESS:  Yes, these were four | 01:31 |
| 19 | regions, four geographies where Facebook was | 01:31 |
| 20 | calculating ARPU by region. | 01:31 |
| 21 | BY MR. KO: | 01:31 |
| 22 | Q.   Do you know if Facebook tracks revenue or | 01:31 |
| 23 | ARPU at a more granular level than by the four | 01:31 |
| 24 | regions represented here? | 01:31 |
| 25 | A.   Not to my knowledge. | 01:31 |

Page 76

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So you don't know whether or not we can | 01:31 |
| 2 | identify ARPU by U.S. users or U.S. MAUs? | 01:31 |
| 3 | A.   Not to my knowledge. | 01:31 |
| 4 | Q.   Okay.  And who would presumably know if | 01:31 |
| 5 | you don't know?  Would the finance team know? | 01:31 |
| 6 | A.   The finance team should know. | 01:31 |
| 7 | Q.   And with respect to the U.S. in | 01:31 |
| 8 | particular, do you know whether or not Facebook | 01:31 |
| 9 | tracks ARPU based on a regional level within the | 01:31 |
| 10 | U.S.? | 01:31 |
| 11 | MR. FALCONER:  Same objection. | 01:31 |
| 12 | THE WITNESS:  I don't know if we do, but | 01:32 |
| 13 | the finance team should be able to confirm. | 01:32 |
| 14 | BY MR. KO: | 01:32 |
| 15 | Q.   Okay.  Now, I presume there are financial | 01:32 |
| 16 | statements that are created by the finance team | 01:32 |
| 17 | reflecting revenue at a more granular level than | 01:32 |
| 18 | what's represented in the 10K.  Is that a fair | 01:32 |
| 19 | presumption? | 01:32 |
| 20 | MR. FALCONER:  Objection.  Beyond the | 01:32 |
| 21 | scope of the notice. | 01:32 |
| 22 | Go ahead. | 01:32 |
| 23 | THE WITNESS:  Whatever is included in our | 01:32 |
| 24 | public filing, the extent of what I would presume | 01:32 |
| 25 | the finance team prepared. | 01:32 |

Page 77

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. KO: | 01:32 |
| 2 | Q. Move forward a few pages to page 40 of the | 01:32 |
| 3 | annual report. And let me know when you get there. | 01:32 |
| 4 | A. Yes. | 01:32 |
| 5 | Q. On that page that reflects a consolidated | 01:32 |
| 6 | statement of Facebook's income for 2016, and, in | 01:33 |
| 7 | particular, there's a line item at the top | 01:33 |
| 8 | reflecting revenue. Do you see that? | 01:33 |
| 9 | A. Yes. | 01:33 |
| 10 | Q. And the revenue as reflected in this | 01:33 |
| 11 | annual report shows Facebook's overall revenue from | 01:33 |
| 12 | the last three years as of the date of this report | 01:33 |
| 13 | from 2014 through 2016. Do you see that? | 01:33 |
| 14 | A. Yes. | 01:33 |
| 15 | Q. And here the revenue is just one line item | 01:33 |
| 16 | and there's no details about the sources of revenue; | 01:33 |
| 17 | is that correct? | 01:33 |
| 18 | MR. FALCONER: Objection. Form. | 01:33 |
| 19 | THE WITNESS: That's correct. | 01:33 |
| 20 | BY MR. KO: | 01:33 |
| 21 | Q. And on the next page I noticed there's | 01:33 |
| 22 | another description of revenue and another chart, if | 01:33 |
| 23 | you will, of -- of Facebook's revenue at the bottom | 01:33 |
| 24 | of page 41. Do you see that? | 01:33 |
| 25 | A. Yes. | 01:33 |

Page 78

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.   Here there's at least a breakdown of the      01:33
 2   two sources -- or two primary sources perhaps -- of     01:34
 3   how Facebook generates this revenue.  Do you see        01:34
 4   that?  And it's titled "Advertising," 1, and            01:34
 5   "Payments and other fees," 2.                           01:34
 6        A.   Yes.                                           01:34
 7        Q.   So, again, I presume that there are           01:34
 8   financial statements that exist that break down at a    01:34
 9   more granular level what this advertising revenue       01:34
10   consists of on the one hand and also what this          01:34
11   payments and other fees revenue consists of on the      01:34
12   other; is that fair?                                    01:34
13             MR. FALCONER:  Objection.  Beyond the         01:34
14   scope of the notice.                                    01:34
15             Go ahead.                                     01:34
16             THE WITNESS:  The finance team has tracked    01:34
17   over these years more granular components of these      01:34
18   two categories of revenue.                              01:34
19   BY MR. KO:                                              01:34
20                                                           01:35
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
1                                                        01:35
                                                         01:35
                                                         01:35
                                                         01:35
5              (Exhibit 9 was marked for                01:35
6              identification and attached              01:35
7              hereto.)                                 01:35
8    BY MR. KO:                                          01:35
9        Q.   And that will be in your Exhibit Share    01:35
10   folder.  Let me know when you've pulled that up.   01:35
11       A.   Yes, I have it.                           01:35
12       Q.   Okay.  Great.                             01:35
13                                                       01:36
```

Page 80



01:37

Page 81

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1  ████████                                              ████████

    █  ████        █████████████████████████████          ████████

    █       ██████████████████████████████████████        ████████

    █       ███████████████████████████████████████       ████████

    █       ██████████████████████████████████████        ████████

    █       ████████████    ████████████████████████      ████████

    █       ████████████████████████                          01:37

 8          MR. FALCONER:  Objection.  Beyond the           01:37

 9  scope of the notice.                                    01:37

10          Go ahead.                                       01:37

11              ████████████    ███████████████████         ████████

    █       ████████████████████████████████████████        ████████

    █       ████████████████████                                01:37

14      Q.  Okay.  Have you ever -- I understand --          01:37

15  and you correct me if I'm wrong -- but I understand      01:38

16  there's a director of revenue at Facebook.  Are you      01:38

17  aware of that?                                           01:38

18          MR. FALCONER:  Same objection.                  01:38

19              ████████████    ████████████████████        ████████

    █       ████████████    ████████████████████████████    ████████

    █       ██████████████████████████                      ████████

    █       ████████████████                                ████████

    █       █  ██████████████████████████████████████       ████████

    █       ████████████████████████████████                    01:38

25          MR. FALCONER:  Same objection.                  01:38
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 ███████████  ████████        ██████        01:38

██ ████████                                   ██████

██  ██ ███████████████████                    ██████

██ ████████████████████████                   ██████

██ █████████                                  01:38

6        MR. FALCONER:  Same objection.        01:38

7 ███████████  █████████████████               ██████

██ █████████                                   ██████

██ ██ ███ ██████████████████                   ██████

██ ████████████████████████                    ██████

██ █████████                                   ██████

██ ██ ███████████████████                      ██████

██ ██████████████████                          ██████

██ ██ ███ ███████████████████                  ██████

██ █████████████████████████                   ██████

██ ██████████                                  01:38

17        MR. FALCONER:  And, again, I'm going to   01:38

18   instruct the witness that if -- if the only basis   01:39

19   for you to answer the question would be           01:39

20   conversations with counsel, don't reveal anything  01:39

21   that you learned from counsel.  And if you can't   01:39

22   answer the question otherwise, you can just say so.  01:39

23 ████████████  ████████████████               ██████

██ ██████████                                  01:39

25   BY MR. KO:                                        01:39

                                        Page 83



```
1                                                    01:39



                                                     01:39



                                                     01:39



 7          MR. FALCONER:  Go ahead.                 01:39

 8          MR. KO:  He can object, but you should   01:39

 9    answer my question.  And you can on a break, but you   01:39

10    can't -- unfortunately, you can't ask him a question   01:39

11    here.                                          01:39

12          THE WITNESS:  Ashley Kelly did not provide   01:39

13    me with this document directly.                01:39

14    BY MR. KO:                                     01:39

15                                                   01:40



                                                     01:40

25          MR. FALCONER:  And, again, I'm going to   01:40
```

Page 84

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   instruct the witness not to reveal anything that you      01:40

 2   said -- discussed with counsel as part of your           01:40

 3   answer.                                                   01:40

 4            THE WITNESS:  I did not.                         01:40

 5   BY MR. KO:                                                01:40

 6
```

```
25            MR. FALCONER:  Objection.  Form.                 01:41
```

Page 85



1          Go ahead.                                    01:41

01:43

Page 86

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1

2

3

4

5

6

7

8                                                                              01:43

9          MR. FALCONER:  Objection.  Beyond the          01:43

10   scope of the notice.                                          01:43

11                                                                             01:43

12

13

14

15

16

17

18

19                                                                             01:43

20          MR. FALCONER:  Same objection.                  01:44

21                                                                             01:44

22

23

24

25                                                                             01:44

Page 87



01:44

12        MR. FALCONER:  Objection.  Beyond the        01:44

13   scope of the notice.        01:44

14                                        01:45

21        MR. FALCONER:  Same objection.        01:45

22                                        01:45

01:45

Page 88

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



19          MR. FALCONER:  Objection.  Beyond the          01:46

20  scope of the notice.          01:46

21          01:46

Page 89

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1   ████████████████████████████████████       ██████        
     ██████████████████████████████████████                    ██████
     ██████████████████████                                     01:46
 4              MR. FALCONER:  Objection.  Form.                01:46
 5              Go ahead.                                       01:46
 6   BY MR. KO:                                                 01:46
 7       Q.   Should I use another animal than lion for         01:46
 8   us?                                                        01:46
 9        ██   ██████████████████████████████        ██████
     ██████████████████████████████                            ██████
     ██   ██████████████████████████████                       ██████
     ██████████████████████████████████████                    ██████
     ██████████████████████                                     01:47
14              MR. FALCONER:  Objection.  Form.                01:47
15   BY MR. KO:                                                 01:47
16        ██   ██████████████████████████        ██████
     ██        ██████████████████████████████████            ██████
     ██   ██████████████████████████████████████            ██████
     ██        ████████████████                              ██████
     ██        ██   ██████████████████████████████████      ██████
     ██        ██████████████████████████████████           ██████
     ██        ██████████████   ██████████████              ██████
     ██        ██   ████                                     ██████
     ██        ██   ████████████████████████                ██████
     ██        ████████████████                              01:47
```



```
 1

                                                      01:48

20        MR. FALCONER:  Objection.               01:48

21

                                                      01:49
```

Page 91

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1          MR. FALCONER:  Objection.  Beyond the          01:49

2     scope of your notice.                               01:49

3                                                          01:49

7          MR. FALCONER:  Same objection.                 01:49

8                                                          01:49

14         MR. FALCONER:  Objection.  Form and beyond      01:49

15    the scope of the notice.                             01:49

16                                                         01:49

                                                           01:50

24         MR. FALCONER:  Same objections.                 01:50

25                                                         01:50

                                              Page 92



01:50

9          MR. FALCONER:  Objection.  Beyond the          01:51

10   scope of the notice.          01:51

11

01:52

Page 93

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



01:52

10          But even more important is how we use that          01:52

Page 94

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1                    MR. FALCONER:  Objection.  Form.                    01:53

12                   MR. FALCONER:  Objection.  Form.                    01:54

Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1

01:55

9            MR. FALCONER:  Objection.  The document    01:55

10    speaks for itself.

01:56

Page 96

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



01:58

24      (Phone ringing.)                          01:58

25      A.    Excuse me.                           01:58

Page 97

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



02:00

Page 98

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



02:01

Page 99

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1

02:02

5          MR. FALCONER:   Objection.   Form.          02:02

6

02:03

Page 100



02:04

Page 101



21          MR. FALCONER:  Objection.  Form.          02:06

22                                                    02:06

                                                      02:06

Page 102

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



02:08

Page 103

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1

                                                      02:08

 8        MR. FALCONER:  Objection.  Form.            02:08

 9

                                                      02:08

15        MR. FALCONER:  Objection.  Form.            02:08

16

                                                      02:09
```

Page 104

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1                                                                    02:09

5              MR. FALCONER:  Same objection.        02:09

6

                                                                    02:10

Page 105

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  ▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  ▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓  02:10

4        MR. FALCONER:  Objection.  Form.   02:10

5   ▓▓▓▓▓▓  ▓▓▓▓▓▓▓  ▓▓▓▓

Page 106

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



02:13

Page 107

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



17          MR. FALCONER:  Objection.

25          MR. FALCONER:  Objection to form just on

Page 108



1    the -- are we still just 2012 and that's all?                02:15

2    BY MR. KO:                                                    02:15

Page 109

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



16    based on an advertisement they can place on Facebook    02:17

17    or some other relationship?    02:17

18         A.   I don't have specific details that I was    02:17

19    able to confirm on the exact nature of the --    02:17

20    what -- what -- what the revenue share agreement was    02:17

21    based on.    02:17

22         Q.   Sure.   Finance would have that    02:17

23    information, presumably?    02:17

24         A.   Yes.    02:17

25         Q.   Going to the top of this page on the    02:18

Page 110



02:19

Page 111



02:21

Page 112

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1   ██████████████████████████████        ████        
     ██████████████████████████████████    ████        
     ████████████████████████████████████  ████        
     ███████████████████████████████████   ████        
     ███████████                           ████        
     ██   ██████████████████████████       ████        
     ████████████████████████████████████  ████        
     ██████████████                        02:21
 9          MR. FALCONER:  Objection to form.           02:22
10          Go ahead.                                   02:22
11              ████████  ████████████████████  ████    
     █████████████████████████████████████      ████    
     █████████████████████████████████████      ████    
     █████████████████████████████████████      ████    
     █████████████████████████████████████      ████    
     ██████████████████████████████                ████
     █████████████████                             02:22
18   BY MR. KO:                                     02:22
19       Q.  Okay.                                  02:22
20          MR. FALCONER:  Hey, David, when you're  02:22
21   done with Atlas -- we have been going a little more 02:22
22   than an hour.  Can we take a break?            02:22
23          MR. KO:  Sure.  Is that okay with you,  02:22
24   Amy?                                           02:22
25          THE WITNESS:  Yes.                      02:22
```

Page 113

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. KO:  Okay.  Now is fine, Russ, because | 02:22 |
| 2 | I was going to transition to another topic. | 02:23 |
| 3 | THE VIDEOGRAPHER:  We are off the record | 02:23 |
| 4 | at 2:23 p.m. | 02:23 |
| 5 | (Recess.) | 02:23 |
| 6 | (Off record:  2:23 p.m.) | 02:23 |
| 7 | (On record:  2:42 p.m.) | 02:23 |
| 8 | THE VIDEOGRAPHER:  We are on the record at | 02:42 |
| 9 | 2:42 p.m. | 02:42 |
| 10 | BY MR. KO: | 02:42 |
| 11 | Q.  All right, Amy, welcome back from the | 02:42 |
| 12 | break. | 02:42 |
| 13 | ████████████████████████████ ██ | ██ |
| ██ | █████████████████████████ ██ | ██ |
| ██ | ██████████████████████████████ ██ | ██ |
| ██ | █████████ ██ | ██ |
| ██ | █████████████████████████████ ██ | ██ |
| ██ | ████████████████████████████ ██ | ██ |
| ██ | ███████████████████████ ██ | ██ |
| ██ | ████████████████ ██ | ██ |
| ██ | ███ █████████████████████ ██ | ██ |
| ██ | ███████████████ | 02:43 |
| 23 | MR. FALCONER:  Sorry, yeah, I was on mute. | 02:43 |
| 24 | I just wanted to object to the question for form as | 02:43 |
| 25 | outside the time period of the notice. | 02:43 |

Page 114

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. KO:                                          02:43

 2         Q.   So the vast majority of revenue generated  02:43

 3    by Facebook from 2012 through 2017 has been from     02:43

 4    advertising; is that right?                          02:43

 5         A.   Yes.                                        02:43

 6         Q.   And relative -- well, strike that.          02:43

 7              Do you understand whether or not Facebook   02:43

 8    revenue has ever been made up of any other source of 02:43

 9    revenue primarily since the inception of the         02:44

10    company?                                             02:44

11              MR. FALCONER:  Objection.  Outside the     02:44

12    time period of the notice.                           02:44

13              THE WITNESS:  I can't be -- I don't know    02:44

14    for sure, but my understanding is that ads have      02:44

15    always been the main source of revenue.              02:44

16    BY MR. KO:                                           02:44

17         Q.   And in connection with advertising -- we   02:44

18    spoke about this a little bit before -- but in       02:44

19    connection with advertising, Facebook obviously      02:44

20    utilizes Facebook user data.  Is that fair to say?   02:44

21         A.   Yes.                                        02:44

22         Q.   Okay.  And I want to actually share my      02:44

23    screen -- follow up on that and share my screen on a  02:44

24    Q and A exchange we had earlier today.               02:44

25              MR. KO:  And I'll represent to your         02:44
```

Page 115

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | counsel and for the record that this appears on | 02:44 |
| 2 | page 50, lines 16 through 24. | 02:44 |
| 3 | Q.   And I'll just go ahead and read this to | 02:45 |
| 4 | refresh your recollection. | 02:45 |
| 5 | I asked "And did Facebook have less | 02:45 |
| 6 | information about a user, presumably the ad quality | 02:45 |
| 7 | and ad relevance would be diminished, would you | 02:45 |
| 8 | agree with me on that? | 02:45 |
| 9 | "MR. FALCONER:  Same objection. | 02:45 |
| 10 | "You, Amy:  I think it depends on the type | 02:45 |
| 11 | of information and the ways in which we might be | 02:45 |
| 12 | able to use that information in our models." | 02:45 |
| 13 | Do you remember that line of questioning | 02:45 |
| 14 | earlier this morning, Amy? | 02:45 |
| 15 | A.   Yes.  I'm guessing where the question says | 02:45 |
| 16 | "And did Facebook have less information," probably | 02:45 |
| 17 | the original question would have been "If Facebook | 02:45 |
| 18 | had less information, presumably the ad quality | 02:45 |
| 19 | would be diminished." | 02:45 |
| 20 | That's sort of what I remember.  But I do | 02:45 |
| 21 | remember that, that question. | 02:45 |
| 22 | Q.   And I want to pick up on what you said | 02:45 |
| 23 | here.  And I'll leave this for you if it's | 02:46 |
| 24 | convenient, but I want to pick up on your | 02:46 |
| 25 | description here about models.  Do you see that? | 02:46 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yes. | 02:46 |
| 2 | Q.   What were you referring to when you were | 02:46 |
| 3 | talking about models? | 02:46 |
| 4 | MR. FALCONER:  Objection.  Form. | 02:46 |
| 5 | THE WITNESS:  I think -- or I -- I think | 02:46 |
| 6 | this conversation was in the context of our | 02:46 |
| 7 | discussion about Facebook's ad auction and | 02:46 |
| 8 | specifically how we make estimations around | 02:46 |
| 9 | estimated action rate and quality as considered in | 02:46 |
| 10 | the ads auction.  And to make those estimations, we | 02:46 |
| 11 | build models that rely on machine learning and data | 02:46 |
| 12 | to make -- to make those predictions and | 02:46 |
| 13 | estimations. | 02:47 |
| 14 | BY MR. KO: | 02:47 |
| 15 | Q.   And is this machine learning data based on | 02:47 |
| 16 | users' activities? | 02:47 |
| 17 | A.   That is one source of data that the -- | 02:47 |
| 18 | that would go into the model. | 02:47 |
| 19 | Q.   Are you familiar with the term | 02:47 |
| 20 | "On-platform activity"? | 02:47 |
| 21 | A.   Yes. | 02:47 |
| 22 | Q.   And what -- what does that mean to you? | 02:47 |
| 23 | A.   In the context of this user data | 02:47 |
| 24 | discussion, I interpret that to mean data -- data | 02:47 |
| 25 | about or coming from users' activities on the | 02:47 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Facebook platform. | 02:47 |
| 2 | Q.   And are you familiar with the term | 02:47 |
| 3 | "Off-platform activity"? | 02:47 |
| 4 | A.   Yes. | 02:47 |
| 5 | Q.   And what does that refer to? | 02:48 |
| 6 | MR. FALCONER:  I just want to object that | 02:48 |
| 7 | this is outside the scope of the deposition topic. | 02:48 |
| 8 | But go ahead and answer based on your | 02:48 |
| 9 | personal understanding. | 02:48 |
| 10 | THE WITNESS:  As it relates to this topic | 02:48 |
| 11 | again of data being used in models, I would | 02:48 |
| 12 | interpret that to mean data about user activities | 02:48 |
| 13 | off of the Facebook platform. | 02:48 |
| 14 | BY MR. KO: | 02:48 |
| 15 | Q.   Okay.  So when a moment ago you said that | 02:48 |
| 16 | Facebook had machine learning data based on users' | 02:48 |
| 17 | activities, that includes both users' on-platform | 02:48 |
| 18 | and off-platform activity, I presume? | 02:48 |
| 19 | MR. FALCONER:  Again, same objection. | 02:48 |
| 20 | THE WITNESS:  Yes. | 02:48 |
| 21 | BY MR. KO: | 02:48 |
| 22 | Q.   Okay.  And other than users' on- and | 02:48 |
| 23 | off-platform activity, what are some of the other | 02:48 |
| 24 | inputs that go into the machine learning database or | 02:48 |
| 25 | system? | 02:49 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. FALCONER:  Same objection. | 02:49 |
| 2 | THE WITNESS:  Assuming we're still | 02:49 |
| 3 | specifically talking about the models that are used | 02:49 |
| 4 | in -- or that our ads auction is based on, there is | 02:49 |
| 5 | information about advertisers that is used. | 02:49 |
| 6 | BY MR. KO: | 02:49 |
| 7 | Q.   And what does that -- and by the way, yes, | 02:49 |
| 8 | we are still talking about the auction context.  And | 02:49 |
| 9 | what does that information about advertisers consist | 02:49 |
| 10 | of? | 02:49 |
| 11 | MR. FALCONER:  Same objection. | 02:49 |
| 12 | THE WITNESS:  Some examples are models | 02:49 |
| 13 | might consider performance of previous ad campaigns | 02:49 |
| 14 | that the advertiser has run on Facebook.  It could | 02:49 |
| 15 | include information -- other information about | 02:50 |
| 16 | advertisers' ads, previously run ads as well. | 02:50 |
| 17 | An example I think I mentioned earlier was | 02:50 |
| 18 | if we have information that -- you know, many people | 02:50 |
| 19 | after clicking on a given advertiser's ad bounced | 02:50 |
| 20 | right back to Facebook, that could actually signal | 02:50 |
| 21 | that advertiser is having their ads drive to a bad | 02:50 |
| 22 | landing page experience, and that might be a piece | 02:50 |
| 23 | of information we use in this quality and relevance | 02:50 |
| 24 | calculation. | 02:50 |
| 25 | | |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. KO:                                         02:50

 2        Q.   And other than this information, is there  02:50

 3    any other information that the advertiser generates 02:50

 4    that gets included into -- or that is an input of   02:51

 5    the machine learning data?                          02:51

 6             MR. FALCONER:  Same objection.             02:51

 7             THE WITNESS:  There are hundreds of, if    02:51

 8    not thousands, of different types of data that are  02:51

 9    included in these models.  So there are probably    02:51

10    other -- there are other examples that I haven't    02:51

11    listed here.  But on the advertiser front, previous 02:51

12    ads performance is a -- is a major factor.          02:51

13    BY MR. KO:                                          02:51

14        Q.   I see.  Do these models also reflect or    02:51

15    test how relevant the ads are to users?             02:51

16             MR. FALCONER:  Same objection.             02:51

17             THE WITNESS:  Yes, I -- well, we are       02:51

18    trying to maximize and optimize for user relevance  02:51

19    when -- in our ads auction, so we have -- there are 02:52

20    many factors or types of signals, if you will, that 02:52

21    we use to try and correlate with high relevance for 02:52

22    advertisers.  An example -- an obvious example is   02:52

23    ads engagement, how many clicks or likes is an ad   02:52

24    getting.                                            02:52

25
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. KO: | 02:52 |
| 2 | Q.  So then that -- that data is input into | 02:52 |
| 3 | the system, machine learning system, in order -- | 02:52 |
| 4 | well, strike that. | 02:52 |
| 5 | What is the name of the model? | 02:52 |
| 6 | MR. FALCONER:  Objection.  Beyond the | 02:52 |
| 7 | scope of the topic. | 02:52 |
| 8 | Go ahead. | 02:52 |
| 9 | THE WITNESS:  Yeah, I don't -- I can't | 02:52 |
| 10 | describe any names offhand.  They have long, like, | 02:52 |
| 11 | text strings for names as I understand it. | 02:53 |
| 12 | BY MR. KO: | 02:53 |
| 13 | Q.  Yeah.  Do you know the name of the machine | 02:53 |
| 14 | learning database that Facebook uses for its ad | 02:53 |
| 15 | auctions? | 02:53 |
| 16 | A.  No. | 02:53 |
| 17 | MR. FALCONER:  Object.  Same objections as | 02:53 |
| 18 | before. | 02:53 |
| 19 | BY MR. KO: | 02:53 |
| 20 | Q.  Are there more than one databases or data | 02:53 |
| 21 | sets in which Facebook utilizes for its ad auctions | 02:53 |
| 22 | or is it just one machine learning data database | 02:53 |
| 23 | that Facebook utilizes? | 02:53 |
| 24 | MR. FALCONER:  Same objection. | 02:53 |
| 25 | THE WITNESS:  I'm not familiar with the | 02:53 |

Page 121

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | specifics on how -- how the databases are set up or | 02:53 |
| 2 | how the data is stored. | 02:53 |
| 3 | BY MR. KO: | 02:53 |
| 4 | Q.  Do you know who builds the models or has | 02:53 |
| 5 | the primary responsibility for building and | 02:53 |
| 6 | maintaining them? | 02:53 |
| 7 | MR. FALCONER:  Same objection. | 02:53 |
| 8 | THE WITNESS:  It would be our ads | 02:53 |
| 9 | engineering team. | 02:53 |
| 10 | BY MR. KO: | 02:53 |
| 11 | Q.  And that has been true for the entire time | 02:53 |
| 12 | period? | 02:54 |
| 13 | A.  Yes. | 02:54 |
| 14 | Q.  Are you familiar with the term "data | 02:54 |
| 15 | broker"? | 02:54 |
| 16 | A.  Yes. | 02:54 |
| 17 | Q.  What's your understanding of that term? | 02:54 |
| 18 | A.  At a high level, I understand that term | 02:54 |
| 19 | means company or organization who sells -- | 02:54 |
| 20 | THE REPORTER:  I'm sorry, "Organization | 02:54 |
| 21 | who" -- | 02:54 |
| 22 | MR. KO:  Yeah, I didn't catch that. | 02:54 |
| 23 | THE REPORTER:  I didn't catch -- | 02:54 |
| 24 | THE WITNESS:  I understand it's a -- I | 02:54 |
| 25 | understand it's a reference, a company or | 02:54 |

Page 122

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | organization that sells data. | 02:54 |
| 2 | BY MR. KO: | 02:54 |
| 3 | Q.   And Facebook has during the relevant time | 02:54 |
| 4 | period and beyond partnered with the data brokers; | 02:54 |
| 5 | is that correct? | 02:54 |
| 6 | MR. FALCONER:   Objection to the portion of | 02:54 |
| 7 | the question that goes outside the time period of | 02:55 |
| 8 | the notice. | 02:55 |
| 9 | Go ahead. | 02:55 |
| 10 | THE WITNESS:   We have partnered with | 02:55 |
| 11 | companies that I understand have data in different | 02:55 |
| 12 | forms. | 02:55 |
| 13 | BY MR. KO: | 02:55 |
| 14 | Q.   And do you know the identity of these | 02:55 |
| 15 | companies? | 02:55 |
| 16 | A.   Some examples that come to mind are | 02:55 |
| 17 | Acxiom, Epsilon, Experian, and Datalogix. | 02:55 |
| 18 | Q.   And going back to the ad auction model and | 02:55 |
| 19 | when we were discussing the various inputs that go | 02:55 |
| 20 | into the machine learning data, do data brokers | 02:55 |
| 21 | often or sometimes provide information into the | 02:55 |
| 22 | machine learning database? | 02:55 |
| 23 | MR. FALCONER:   Objection on both the | 02:55 |
| 24 | subject matter and the time period of the topic on | 02:56 |
| 25 | notice. | 02:56 |

Page 123

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Go ahead. | 02:56 |
| 2 | THE WITNESS:  In the -- during the time | 02:56 |
| 3 | period in question, I believe there was one example | 02:56 |
| 4 | of data on a limited basis from some of these data | 02:56 |
| 5 | partners that was the used in our ranking models. | 02:56 |
| 6 | BY MR. KO: | 02:56 |
| 7 | Q.   And what was that example? | 02:56 |
| 8 | A.   There was a program called Lighthouse | 02:56 |
| 9 | where I believe happened but would need to confirm. | 02:56 |
| 10 | Q.   I actually have some questions about | 02:56 |
| 11 | Lighthouse, but we can turn to that in a moment. | 02:56 |
| 12 | So is it your testimony today that you are | 02:57 |
| 13 | not aware or you don't know whether or not data | 02:57 |
| 14 | provided by a data broker was input into the system | 02:57 |
| 15 | or is it your testimony that you believe that they | 02:57 |
| 16 | did not? | 02:57 |
| 17 | MR. FALCONER:  Objection.  Sorry, were you | 02:57 |
| 18 | done? | 02:57 |
| 19 | MR. KO:  Sure.  Let me just finish. | 02:57 |
| 20 | MR. FALCONER:  Yes, sorry. | 02:57 |
| 21 | BY MR. KO: | 02:57 |
| 22 | Q.   So is it your testimony today that you are | 02:57 |
| 23 | not aware or that you don't know whether or not data | 02:57 |
| 24 | is provided by a data broker into the machine | 02:57 |
| 25 | learning system? | 02:57 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. FALCONER:  Objection.  Beyond the | 02:57 |
| 2 | scope of the topic in the notice. | 02:57 |
| 3 | Go ahead. | 02:57 |
| 4 | THE WITNESS:  I don't know for certain | 02:57 |
| 5 | whether data from a data broker was used in our | 02:57 |
| 6 | machine learning models. | 02:57 |
| 7 | BY MR. KO: | 02:57 |
| 8 | Q.  Okay.  Are you aware of whether or not | 02:57 |
| 9 | these data brokers generate any data based on data | 02:57 |
| 10 | provided by Facebook to the data broker? | 02:58 |
| 11 | MR. FALCONER:  Same objection. | 02:58 |
| 12 | THE WITNESS:  The question was am I aware | 02:58 |
| 13 | if these data brokers generate revenue based on -- | 02:58 |
| 14 | BY MR. KO: | 02:58 |
| 15 | Q.  No, sorry, generate any data. | 02:58 |
| 16 | So let me ask you a more straightforward | 02:58 |
| 17 | question.  Does Facebook provide Facebook user data | 02:58 |
| 18 | to third-party data brokers? | 02:58 |
| 19 | MR. FALCONER:  Same objection. | 02:58 |
| 20 | THE WITNESS:  We do not. | 02:58 |
| 21 | BY MR. KO: | 02:58 |
| 22 | Q.  Okay.  And was that true for the entire -- | 02:58 |
| 23 | that's true for the 2012 through 2017 time period or | 02:58 |
| 24 | are you saying you do not at all? | 02:58 |
| 25 | A.  This is -- | 02:58 |

Page 125

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. FALCONER:  Objection to the portion of | 02:58 |
| 2 | the question that goes outside the time period of | 02:58 |
| 3 | the notice. | 02:58 |
| 4 | THE WITNESS:  We do not -- over the time | 02:58 |
| 5 | period in question we did not provide user data to | 02:58 |
| 6 | data brokers. | 02:58 |
| 7 | BY MR. KO: | 02:58 |
| 8 | Q.   Does Facebook -- during the 2012 through | 02:58 |
| 9 | 2017 time period, does Facebook obtain or receive | 02:59 |
| 10 | information about users from data brokers? | 02:59 |
| 11 | A.   We received information, user | 02:59 |
| 12 | information -- sorry.  We received information from | 02:59 |
| 13 | data brokers for purposes of making targeting | 02:59 |
| 14 | options available to advertisers on Facebook. | 02:59 |
| 15 | It is not my understanding that any | 02:59 |
| 16 | sensitive user data at the individual level was | 02:59 |
| 17 | shared from these partners to Facebook. | 02:59 |
| 18 | Q.   Okay.  Understood. | 03:00 |
| 19 | So would you agree with me that Facebook | 03:00 |
| 20 | monetizes directly or indirectly and values user | 03:00 |
| 21 | data through offering advertising on its platform? | 03:00 |
| 22 | A.   I would -- I would say we leverage user | 03:00 |
| 23 | data in ads products that generate revenue for us. | 03:00 |
| 24 | And so I think to me that's an indirect form of | 03:00 |
| 25 | monetization of the actual user data. | 03:00 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Go ahead. | 03:00 |
| 2 | A.   I think you said, would I agree that we | 03:00 |
| 3 | value user data?  And my answer to that would be, | 03:00 |
| 4 | no, I disagree.  We don't put a specific value on | 03:01 |
| 5 | any of this user data itself. | 03:01 |
| 6 | Q.   So using your words, you said that | 03:01 |
| 7 | Facebook is able to leverage user data in ads | 03:01 |
| 8 | products.  Does the leveraging of user data in ad | 03:01 |
| 9 | products lead to the monetization of Facebook's | 03:01 |
| 10 | business? | 03:01 |
| 11 | MR. FALCONER:  Objection.  Form. | 03:01 |
| 12 | THE WITNESS:  Yes, I think we -- as we've | 03:01 |
| 13 | discussed, most of our revenue is from ads.  User | 03:01 |
| 14 | and advertiser information is a big part of what | 03:02 |
| 15 | powers ads effectiveness.  So I think that is a fair | 03:02 |
| 16 | statement. | 03:02 |
| 17 | BY MR. KO: | 03:02 |
| 18 | Q.   And let me ask it a slightly different way | 03:02 |
| 19 | just because, as I said, part of this is making sure | 03:02 |
| 20 | we create a clean record.  And I just want to make | 03:02 |
| 21 | sure I use your words. | 03:02 |
| 22 | So would it be fair to say that Facebook | 03:02 |
| 23 | monetizes its business through the leveraging of | 03:02 |
| 24 | user data? | 03:02 |
| 25 | MR. FALCONER:  Objection.  Form. | 03:02 |

Page 127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  I would say that we generate | 03:02 |
| 2 | revenue via advertising and our advertising relies | 03:02 |
| 3 | on many things, including user data. | 03:02 |
| 4 | BY MR. KO: | 03:02 |
| 5 | Q.   In the context of advertising | 03:02 |
| 6 | specifically, or monetization of its business | 03:02 |
| 7 | generally, has Facebook ever tried to quantify or | 03:03 |
| 8 | otherwise value -- strike that. | 03:03 |
| 9 | In the context of advertising, has | 03:03 |
| 10 | Facebook ever tried to quantify or otherwise assign | 03:03 |
| 11 | a monetary value to user data? | 03:03 |
| 12 | MR. FALCONER:  Objection.  The question | 03:03 |
| 13 | goes beyond the time period in the notice. | 03:03 |
| 14 | Go ahead. | 03:03 |
| 15 | MR. KO:  I don't think I put a time period | 03:03 |
| 16 | on that but -- so I'll ask with respect to 2012 | 03:03 |
| 17 | through 2017. | 03:03 |
| 18 | Q.   Has Facebook ever tried to quantify or | 03:03 |
| 19 | otherwise assign a monetary value to user data? | 03:03 |
| 20 | A.   No, we have not placed a value on user | 03:03 |
| 21 | data specifically. | 03:03 |
| 22 | Q.   Do you know -- are you aware of any | 03:03 |
| 23 | efforts to try and do that? | 03:03 |
| 24 | A.   I am not aware of any efforts like that. | 03:03 |
| 25 | Q.   Are you aware of any efforts by Facebook | 03:04 |

Page 128

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | to try and sell user data to try and set a real | 03:04 |
| 2 | market value for user data? | 03:04 |
| 3 | A.   No. | 03:04 |
| 4 | Q.   Do you know whether or not Facebook ever | 03:04 |
| 5 | tried to sell user data to set a public or private | 03:04 |
| 6 | rate for the value of user data? | 03:04 |
| 7 | A.   Was that set a public or private rate? | 03:04 |
| 8 | Q.   Correct. | 03:04 |
| 9 | A.   No, I'm not aware of any such efforts. | 03:04 |
| 10 | Q.   Do you think Facebook revenue would be | 03:04 |
| 11 | adversely or negatively impacted if it had less | 03:04 |
| 12 | access to user data? | 03:04 |
| 13 | MR. FALCONER:  Objection to form and to | 03:04 |
| 14 | the question going beyond this topic. | 03:04 |
| 15 | THE WITNESS:  It's hard for me to answer, | 03:04 |
| 16 | even unqualified answer to that question because I | 03:04 |
| 17 | think that the type of user data matters a lot. | 03:04 |
| 18 | Some data is potentially of no value for our ads | 03:05 |
| 19 | products and ads effectiveness and some might be | 03:05 |
| 20 | much more useful for ads products. | 03:05 |
| 21 | BY MR. KO: | 03:05 |
| 22 | Q.   Well, if there were more restrictions on | 03:05 |
| 23 | the amount of data that Facebook could access, do | 03:05 |
| 24 | you think that would have a material impact on | 03:05 |
| 25 | revenue? | 03:05 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. FALCONER:  Objection to form and | 03:05 |
| 2 | foundation to going outside the scope of the topic. | 03:05 |
| 3 | THE WITNESS:  Again, it depends on the | 03:05 |
| 4 | type of data that might be restricted.  For example, | 03:05 |
| 5 | if we were not allowed to use any information about | 03:05 |
| 6 | how users interact with ads on Facebook today, then | 03:05 |
| 7 | that would adversely impact the effectiveness of our | 03:05 |
| 8 | ads product. | 03:05 |
| 9 | BY MR. KO: | 03:05 |
| 10 | Q.   And the adverse impact would be in a | 03:06 |
| 11 | negative direction, right? | 03:06 |
| 12 | MR. FALCONER:  Same objections. | 03:06 |
| 13 | BY MR. KO: | 03:06 |
| 14 | Q.   You would make less revenue if you had | 03:06 |
| 15 | less information, correct? | 03:06 |
| 16 | A.   I think the -- I think our working | 03:06 |
| 17 | assumption is, you know, improvements in ads | 03:06 |
| 18 | performance lead to more revenue and deterioration | 03:06 |
| 19 | in ads performance leads to decreases in revenue. | 03:06 |
| 20 | It's an assumption we use in a lot of our ads | 03:06 |
| 21 | product development. | 03:06 |
| 22 | So if our ads became less effective | 03:06 |
| 23 | because we had restricted -- we had less access to | 03:06 |
| 24 | specific types of user information that we know is | 03:06 |
| 25 | very important about -- in predicting ads | 03:06 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | performance today and in leading to better ads | 03:06 |
| 2 | performance today, then it's likely that would | 03:06 |
| 3 | negatively affect our ads revenue. | 03:07 |
| 4 | Q.   And I think we discussed this a little bit | 03:07 |
| 5 | before.  I just want to make sure that the record is | 03:07 |
| 6 | clear. | 03:07 |
| 7 | The ability to measure ads or the | 03:07 |
| 8 | effectiveness of Facebook ads is in fact dependent | 03:07 |
| 9 | on user data that Facebook has access to, correct? | 03:07 |
| 10 | A.   Some parts of our ability to measure ads | 03:07 |
| 11 | effectiveness are dependent on the information we | 03:07 |
| 12 | have on how users -- how users engage with our ads. | 03:07 |
| 13 | Q.   Well, what are -- tell me and describe to | 03:07 |
| 14 | the Court what are some of the important user data | 03:07 |
| 15 | points in particular for the effectiveness of ads. | 03:07 |
| 16 | A.   The most -- there's a long list of data | 03:07 |
| 17 | points, but some of the most important ones that | 03:08 |
| 18 | come to mind are, you know, when -- when do | 03:08 |
| 19 | individuals see ads?  That is the -- what is the | 03:08 |
| 20 | total reach of a given advertiser's ad? | 03:08 |
| 21 | Another kind of set of important data | 03:08 |
| 22 | points are, as I mentioned before, you know, we try | 03:08 |
| 23 | to understand from advertisers what are the most | 03:08 |
| 24 | important business outcomes that they care about and | 03:08 |
| 25 | try to get this information from advertisers when | 03:08 |

Page 131

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | they're setting up ads. | 03:08 |
| 2 | So do they care about purchases on their | 03:08 |
| 3 | website?  Do they care about what people install on | 03:08 |
| 4 | their mobile app?  Do they care about people | 03:08 |
| 5 | watching their videos, for example? | 03:08 |
| 6 | So our ability to actually report on how | 03:08 |
| 7 | many people are buying things on websites, | 03:08 |
| 8 | installing a mobile app, or watching a video, for | 03:09 |
| 9 | example, depends on our ability to actually access | 03:09 |
| 10 | the data that describes when people are taking those | 03:09 |
| 11 | actions after seeing an ad. | 03:09 |
| 12 | Q.   And when you were describing the first | 03:09 |
| 13 | factor, when individuals see an ad, were you | 03:09 |
| 14 | actually saying the time at which they see it, or | 03:09 |
| 15 | were you just saying -- simply saying whether or not | 03:09 |
| 16 | they see the ad?  Or is time an actual factor in | 03:09 |
| 17 | part of this?  I just want to make sure I understand | 03:09 |
| 18 | your testimony. | 03:09 |
| 19 | A.   Whether they see an ad is important and | 03:09 |
| 20 | when they see an ad and when they take an action | 03:09 |
| 21 | or -- if they don't take an action as a result of | 03:09 |
| 22 | seeing an ad.  All of those are important. | 03:09 |
| 23 | Generally pieces of information for | 03:09 |
| 24 | advertisers when they're trying to understand how | 03:09 |
| 25 | effective their ad spend is, and important | 03:09 |

Page 132

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | information for us as we are trying to help | 03:10 |
| 2 | advertisers understand how effective their ads are. | 03:10 |
| 3 | Q.   Got it.  Thank you. | 03:10 |
| 4 | So I'm going to go ahead and show you -- | 03:10 |
| 5 | I'm going to share my screen again.  You tell me if | 03:10 |
| 6 | you're more comfortable pulling up the exhibit.  But | 03:10 |
| 7 | this is an exhibit we previously went over. | 03:10 |
| 8 | MR. KO:  For the record, it's Exhibit 7, | 03:10 |
| 9 | which was the 2016 annual report. | 03:10 |
| 10 | Q.   On page 9 of the actual report, which is | 03:10 |
| 11 | page 11 of the PDF, there's a section that talks | 03:10 |
| 12 | about advertising. | 03:10 |
| 13 | And I'm sharing my screen, Amy.  If you | 03:10 |
| 14 | feel more comfortable looking at the document itself | 03:10 |
| 15 | on your own screen, you're more than welcome to do | 03:11 |
| 16 | that.  It looks like you got maybe two screens up -- | 03:11 |
| 17 | A.   Yeah. | 03:11 |
| 18 | Q.   -- so you can do both. | 03:11 |
| 19 | A.   Yes, I'm pulling it up on my screen as | 03:11 |
| 20 | well.  And just to confirm, this is Exhibit 8, not | 03:11 |
| 21 | 7. | 03:11 |
| 22 | Q.   Yes.  Thank you for the clarification. | 03:11 |
| 23 | Exhibit 7 is your LinkedIn profile.  This is | 03:11 |
| 24 | Exhibit 8. | 03:11 |
| 25 | So I guess we can do it both ways if | 03:11 |

Page 133

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | you've got two screens.  But I am on, like I said, | 03:11 |
| 2 | page 9 of the actual report, and there's a section | 03:11 |
| 3 | here titled "We generate substantially all of our | 03:11 |
| 4 | revenue from advertising." | 03:11 |
| 5 | Do you see that? | 03:11 |
| 6 | A.   Yes. | 03:11 |
| 7 | Q.   And I believe a few bullets down, seven | 03:11 |
| 8 | bullets down, there is -- I kind of highlighted it | 03:11 |
| 9 | here -- oh, didn't mean to highlight the whole | 03:11 |
| 10 | thing. | 03:11 |
| 11 | The -- well, first of all, do you see | 03:11 |
| 12 | where it says "Our advertising revenue could be | 03:11 |
| 13 | adversely affected by a number of other factors"? | 03:12 |
| 14 | Did I read that correctly? | 03:12 |
| 15 | A.   Yes. | 03:12 |
| 16 | Q.   And then why don't you go ahead and read | 03:12 |
| 17 | into the record for me the bullet that I've | 03:12 |
| 18 | highlighted.  Well, now it's gone.  The trials and | 03:12 |
| 19 | tribulations of doing this remotely.  There, it's | 03:12 |
| 20 | highlighted. | 03:12 |
| 21 | A.   "The availability, accuracy, and utility | 03:12 |
| 22 | of analytics and measurement solutions offered by us | 03:12 |
| 23 | or third parties that demonstrate the value of our | 03:12 |
| 24 | ads to marketers, or our ability to further improve | 03:12 |
| 25 | such tools." | 03:12 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   So would you agree that this is an                03:12

2    important factor that could adversely affect ad        03:12

3    revenue?                                                03:12

4    A.   Yes.                                               03:12

5    Q.   And you would agree with me that the              03:12

6    ability to provide actual analytics and measurement    03:12

7    solutions is dependent on user data that Facebook      03:12

8    has access to?                                          03:12

9         MR. FALCONER:  Objection.  Form.                   03:13

10        Go ahead.                                          03:13

11        THE WITNESS:  Yes, it is dependent on user         03:13

12   value -- user data that Facebook has access to.        03:13

13   BY MR. KO:                                              03:13

14   Q.   Going to page 11 of the annual report.            03:13

15   And again, feel free to navigate yourself.  I just     03:13

16   have it for your convenience on the screen share as    03:13

17   well.                                                   03:13

18        But there's a section that describes --           03:13

19   and this, for the record, starts on page 10 -- but     03:13

20   there's a section that says "Our business is highly    03:13

21   competitive.  Competition presents an ongoing threat   03:13

22   to the success of our business."                       03:13

23        Do you see that?                                   03:13

24   A.   Yes.                                               03:13

25   Q.   And then going to the next page, there is         03:13

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | another portion or another paragraph underneath that | 03:13 |
| 2 | same section that says "We believe that our ability | 03:13 |
| 3 | to compete effectively depends upon many factors | 03:13 |
| 4 | both within and beyond our control, including," and | 03:14 |
| 5 | it sets forth a series of factors. | 03:14 |
| 6 | Did I read that correctly? | 03:14 |
| 7 | A.   Yes. | 03:14 |
| 8 | Q.   And one of the factors -- I'll hand it off | 03:14 |
| 9 | to you so I don't do all the talking.  Can you read | 03:14 |
| 10 | into the record this factor that I've highlighted on | 03:14 |
| 11 | the screen? | 03:14 |
| 12 | A.   "Marketing and selling efforts, including | 03:14 |
| 13 | our ability to measure the effectiveness of our ads | 03:14 |
| 14 | and to provide marketers with a compelling return on | 03:14 |
| 15 | their investments." | 03:14 |
| 16 | Q.   So based on that statement, would you | 03:14 |
| 17 | agree with me that if your ability to measure ads | 03:14 |
| 18 | decreases, Facebook would make less revenue? | 03:14 |
| 19 | MR. FALCONER:  Objection.  Form. | 03:14 |
| 20 | THE WITNESS:  I think an important piece | 03:14 |
| 21 | of this statement is our ability to compete depends | 03:14 |
| 22 | on our ability to measure the effectiveness of ads | 03:15 |
| 23 | and provide marketers with a compelling return on | 03:15 |
| 24 | their investments. | 03:15 |
| 25 | I think that latter piece of the sentence | 03:15 |

Page 136

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | is what I talked about before.  We want to make sure | 03:15 |
| 2 | we're providing highly effective ads for advertisers | 03:15 |
| 3 | because we believe that if we do that, then the | 03:15 |
| 4 | revenue should follow. | 03:15 |
| 5 | It is harder for us to be able to provide | 03:15 |
| 6 | highly effective ads for advertisers if we can't | 03:15 |
| 7 | measure how effective those ads are. | 03:15 |
| 8 | BY MR. KO: | 03:15 |
| 9 | Q.   And part of measuring the effectiveness of | 03:15 |
| 10 | ads is dependent on the amount of information | 03:15 |
| 11 | Facebook has about a user, correct? | 03:15 |
| 12 | A.   It is dependent on information that | 03:15 |
| 13 | Facebook has about users, but I wouldn't directly | 03:15 |
| 14 | say it's dependent on the amount of information. | 03:15 |
| 15 | Q.   Sure.  You said -- | 03:15 |
| 16 | A.   It would depend upon -- | 03:15 |
| 17 | Q.   Sorry, I didn't mean to cut you off. | 03:15 |
| 18 | I believe you said earlier that it depends | 03:16 |
| 19 | on how you use that information, or how Facebook | 03:16 |
| 20 | uses that information, correct? | 03:16 |
| 21 | A.   It does depend on how Facebook uses the | 03:16 |
| 22 | information.  I think the specific type of | 03:16 |
| 23 | information we're talking about is more important | 03:16 |
| 24 | than the amount of the data. | 03:16 |
| 25 | Q.   Great.  We talked -- we've talked many | 03:16 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | times and touched upon user engagement throughout | 03:16 |
| 2 | today.  Does that term sound familiar to you? | 03:16 |
| 3 | A.   Yes. | 03:16 |
| 4 | Q.   Can you describe to the Court in your | 03:16 |
| 5 | words what you believe user engagement means? | 03:16 |
| 6 | MR. FALCONER:  Objection.  Beyond the | 03:16 |
| 7 | scope of the notice. | 03:16 |
| 8 | But go ahead. | 03:16 |
| 9 | THE WITNESS:  In the context of the | 03:16 |
| 10 | discussion we've been having about ads products and | 03:16 |
| 11 | how we use user data to drive better performance | 03:17 |
| 12 | from our ads products, we consider user engagement | 03:17 |
| 13 | as one of the many factors in the types of | 03:17 |
| 14 | information that we use. | 03:17 |
| 15 | This could mean -- I think importantly for | 03:17 |
| 16 | ads, user engagement with ads content is very | 03:17 |
| 17 | important.  You know, what are the ads that -- that | 03:17 |
| 18 | people are clicking and liking? | 03:17 |
| 19 | We're also interested in users' engagement | 03:17 |
| 20 | with other types of content on the platform.  So, | 03:17 |
| 21 | for example, nonpaid posts by businesses.  You know, | 03:17 |
| 22 | how often are -- are -- is an individual, you know, | 03:17 |
| 23 | engaging with that type of content, or like | 03:18 |
| 24 | businesses in a particular category, for example. | 03:18 |
| 25 | BY MR. KO: | 03:18 |

Page 138

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   So describe that to me a little more.          03:18

2    Well, let's take a step back.                          03:18

3           So clicking and liking are two ways in          03:18

4    which Facebook measures user engagement; is that       03:18

5    correct?                                               03:18

6      A.   Yes.                                            03:18

7      Q.   And you also described just a moment ago        03:18

8    whether or not users are interested with other types   03:18

9    of content on the platform, for example, nonpaid       03:18

10   posts by businesses.  Can you describe a little more   03:18

11   what you mean by nonpaid posts by businesses?          03:18

12     A.   Yes.  I think --                                03:18

13     Q.   So -- go ahead.                                 03:18

14     A.   I first described, you know, one piece of       03:18

15   important user engagement data that we do use on the   03:18

16   ad side is user engagement with ads specifically.      03:18

17   So are they clicking and liking -- are they clicking   03:18

18   on or liking ads?                                      03:19

19          Another, you know, potentially important        03:19

20   source of information that we consider in ads is any   03:19

21   engagement with non-ad content from businesses on      03:19

22   our platform.                                          03:19

23          So, for example, a business can, you            03:19

24   know -- businesses can create a page for free on       03:19

25   Facebook and post content to that page.  We call       03:19

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | them organic posts.  And people engage with those | 03:19 |
| 2 | posts. | 03:19 |
| 3 |           And so, you know, we -- people choose -- | 03:19 |
| 4 | can also choose to follow different businesses.  And | 03:19 |
| 5 | if they follow a business, they will be more likely | 03:19 |
| 6 | to see these posts in their News Feed independent of | 03:19 |
| 7 | if businesses are actually putting ad spin behind -- | 03:19 |
| 8 | behind these posts. | 03:19 |
| 9 |           So user engagement on these types of | 03:19 |
| 10 | organic posts from businesses could be another | 03:19 |
| 11 | signal that we use in our ad models. | 03:19 |
| 12 |      Q.   That's helpful.  Thank you. | 03:20 |
| 13 |           What does Facebook do to increase user | 03:20 |
| 14 | engagement? | 03:20 |
| 15 |           MR. FALCONER:  Objection.  Beyond the | 03:20 |
| 16 | scope of the topic in the notice. | 03:20 |
| 17 |           THE WITNESS:  Can you clarify?  You're | 03:20 |
| 18 | asking about any specific types of user engagement | 03:20 |
| 19 | or any -- | 03:20 |
| 20 | BY MR. KO: | 03:20 |
| 21 |      Q.   Sure.  Let me ask it this way.  User | 03:20 |
| 22 | engagement is an important metric for Facebook to | 03:20 |
| 23 | track, correct? | 03:20 |
| 24 |           MR. FALCONER:  Same objection. | 03:20 |
| 25 |           THE WITNESS:  It depends on the type of | 03:20 |

Page 140

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | user engagement, and it depends on, like, which team | 03:20 |
| 2 | we're really speaking about. | 03:21 |
| 3 | So an example is if I am a team working on | 03:21 |
| 4 | our Facebook Watch product, I would care about | 03:21 |
| 5 | users' engagement with the Facebook Watch product | 03:21 |
| 6 | specifically and track that, and my product team | 03:21 |
| 7 | working on Facebook Watch might track that. | 03:21 |
| 8 | That same engagement data would probably | 03:21 |
| 9 | be -- like specifically would probably be less -- | 03:21 |
| 10 | much less important to the ads team. | 03:21 |
| 11 | BY MR. KO: | 03:21 |
| 12 | Q.   I understand.  That's fair enough. | 03:21 |
| 13 | By the way, I didn't know Facebook made a | 03:21 |
| 14 | watch -- or -- I don't know if that's -- | 03:21 |
| 15 | A.   It's a video-watching -- | 03:21 |
| 16 | Q.   Got it. | 03:21 |
| 17 | A.   -- tool on the platform. | 03:21 |
| 18 | Q.   You can watch a video on your watch? | 03:21 |
| 19 | A.   It's not really a -- | 03:21 |
| 20 | Q.   It's an actual tool on the platform? | 03:21 |
| 21 | A.   It's like an app, yeah.  It's not really | 03:21 |
| 22 | like a watch. | 03:22 |
| 23 | Q.   Not a watch. | 03:22 |
| 24 | A.   Correct. | 03:22 |
| 25 | Q.   Got it.  Sorry for that aside. | 03:22 |

Page 141

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | So would -- would one -- and I appreciate | 03:22 |
| 2 | the clarification you made about user engagement. | 03:22 |
| 3 | But would one important factor of user engagement be | 03:22 |
| 4 | the time that a user spends on the Facebook | 03:22 |
| 5 | platform?  Is that one important way to measure user | 03:22 |
| 6 | engagement? | 03:22 |
| 7 | MR. FALCONER:  Objection.  Beyond the | 03:22 |
| 8 | scope of the topic. | 03:22 |
| 9 | THE WITNESS:  There may be or may have | 03:22 |
| 10 | been specific teams, product teams within Facebook | 03:22 |
| 11 | tracking that specific metric over time.  I can't | 03:22 |
| 12 | say for certain if that's still the case or was ever | 03:22 |
| 13 | the case. | 03:23 |
| 14 | BY MR. KO: | 03:23 |
| 15 | Q.   Fair enough. | 03:23 |
| 16 | I don't know if you still have Exhibit 8 | 03:23 |
| 17 | in front of you.  But I'll go ahead and, since | 03:23 |
| 18 | this -- since I'm becoming more familiar with | 03:23 |
| 19 | sharing the screen in the deposition, I'll have it | 03:23 |
| 20 | up on the screen for you as well for your | 03:23 |
| 21 | convenience. | 03:23 |
| 22 | But go back to -- I'm going back to page 9 | 03:23 |
| 23 | of the annual report, and specifically the | 03:23 |
| 24 | discussion about "Facebook generating substantially | 03:23 |
| 25 | all of our revenue from advertising." | 03:23 |

Page 142

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Let me know when you're there. | 03:23 |
| 2 | A.   I'm here, yes. | 03:23 |
| 3 | Q.   By the way, we spoke about what portion of | 03:23 |
| 4 | Facebook's ad revenue was relative to the total | 03:23 |
| 5 | revenue, and here you see in that second sentence | 03:23 |
| 6 | the quote "For 2016, 2015 and 2014, advertising | 03:23 |
| 7 | accounted for 97 percent, 95 percent and 92 percent, | 03:23 |
| 8 | respectively, of our revenue." | 03:24 |
| 9 | Did I read that correctly? | 03:24 |
| 10 | A.   Yes. | 03:24 |
| 11 | Q.   And it's fair to say those are the general | 03:24 |
| 12 | statistics or percentages that have -- that | 03:24 |
| 13 | advertising revenue has reflected over or since | 03:24 |
| 14 | 2016; is that fair to say? | 03:24 |
| 15 | MR. FALCONER:  Objection.  Form and beyond | 03:24 |
| 16 | the time period of the notice. | 03:24 |
| 17 | THE WITNESS:  I know that advertising has | 03:24 |
| 18 | continued to be the large majority of our revenue, | 03:24 |
| 19 | but I can't confirm the exact percentages without | 03:24 |
| 20 | pulling them to calculate them. | 03:24 |
| 21 | BY MR. KO: | 03:24 |
| 22 | Q.   And in the -- we talked about how the | 03:24 |
| 23 | adverse -- the factors that could adversely affect | 03:24 |
| 24 | the advertising revenue.  Can you read for me the | 03:24 |
| 25 | very first factor? | 03:24 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.  Uh-huh.  "Decreases in user engagement, | 03:24 |
| 2 | including time spent on our products." | 03:24 |
| 3 | Q.  So would a good working assumption be that | 03:25 |
| 4 | increases are -- an increase to user engagement | 03:25 |
| 5 | would equal more -- an opportunity to generate more | 03:25 |
| 6 | revenue for Facebook; is that fair to say? | 03:25 |
| 7 | MR. FALCONER:  Objection.  Beyond the | 03:25 |
| 8 | scope. | 03:25 |
| 9 | Go ahead. | 03:25 |
| 10 | THE WITNESS:  I think it would depend on | 03:25 |
| 11 | the type of user engagement we're talking about. | 03:25 |
| 12 | For example, time spent on our products generally is | 03:25 |
| 13 | included here.  And this intuitively makes sense | 03:25 |
| 14 | because we make most of our revenue from | 03:25 |
| 15 | advertising. | 03:25 |
| 16 | And generally speaking, if a user is | 03:25 |
| 17 | spending more time on our products overall, then | 03:25 |
| 18 | there are likely more opportunities to show ads to | 03:25 |
| 19 | that person.  But there might be other types of user | 03:25 |
| 20 | engagement that are less -- are less relevant to our | 03:25 |
| 21 | ability to show ads to that person. | 03:25 |
| 22 | BY MR. KO: | 03:26 |
| 23 | Q.  You testified earlier about wanting users | 03:26 |
| 24 | or Facebook wanting users to have a good experience. | 03:26 |
| 25 | Do you recall that testimony? | 03:26 |

Page 144

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yes. | 03:26 |
| 2 | Q.   And I just want to make sure I understand | 03:26 |
| 3 | what Facebook means by that.  Can you describe that | 03:26 |
| 4 | in more detail? | 03:26 |
| 5 | A.   Yes.  I think specifically in the context | 03:26 |
| 6 | of how our ads auction works.  And I mentioned when | 03:26 |
| 7 | we select specific ads to go to specific | 03:26 |
| 8 | individuals, we want to match the ad to the person | 03:26 |
| 9 | in a way that is maximizing value for the advertiser | 03:26 |
| 10 | who is placing the ad so that they reach someone who | 03:26 |
| 11 | is going to help their business, and that we're also | 03:26 |
| 12 | showing the person ad content that they're more | 03:26 |
| 13 | likely to find useful and interesting and relevant. | 03:26 |
| 14 | The spirit behind that effort is if we can | 03:26 |
| 15 | provide a better user experience to people on our | 03:27 |
| 16 | platform overall, including with ads, then they are | 03:27 |
| 17 | more likely to return to our platform and continue | 03:27 |
| 18 | being sort of -- using our platform for a time. | 03:27 |
| 19 | Q.   And I think you sort of answered this in | 03:27 |
| 20 | that response that you just gave, which was helpful. | 03:27 |
| 21 | But how does Facebook evaluate whether a user has a | 03:27 |
| 22 | good experience? | 03:27 |
| 23 | A.   One way we do it specifically relating to | 03:27 |
| 24 | our ads efforts is -- well, there are a couple that | 03:27 |
| 25 | I can mention that we have used historically. | 03:27 |

Page 145

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | One is just positive engagement from | 03:27 |
| 2 | people with ads, the likes and the clicks on the | 03:28 |
| 3 | ads, for example. | 03:28 |
| 4 | A second way that -- a method we used in | 03:28 |
| 5 | the past, including the time frame referenced here, | 03:28 |
| 6 | I believe, is that, you know, something that's | 03:28 |
| 7 | actually factored into our ad auction calculations | 03:28 |
| 8 | is we surveyed users to see how they feel about the | 03:28 |
| 9 | ads they see. | 03:28 |
| 10 | For example, like on a scale of 1 to 5, | 03:28 |
| 11 | how relevant did you find this ad?  And we might use | 03:28 |
| 12 | those responses in the machine-learning models to | 03:28 |
| 13 | figure out who -- who -- what the best ads are to | 03:28 |
| 14 | show to people in the future. | 03:28 |
| 15 | Q.   How often do you survey users for this | 03:28 |
| 16 | purpose? | 03:28 |
| 17 | MR. FALCONER:  Objection.  Beyond the | 03:28 |
| 18 | scope of the topic. | 03:28 |
| 19 | THE WITNESS:  I can't confirm the exact | 03:28 |
| 20 | cadence of the surveys that might have occurred. | 03:29 |
| 21 | THE REPORTER:  I'm sorry.  I am having a | 03:29 |
| 22 | hard time understanding you. | 03:29 |
| 23 | (Discussion off the record.) | 03:29 |
| 24 | THE WITNESS:  So I think I was saying I | 03:29 |
| 25 | can't confirm the cadence with which we surveyed | 03:29 |

Page 146

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | users during the time period in question. | 03:29 |
| 2 | BY MR. KO: | 03:29 |
| 3 | Q.   And who sets up these surveys?  Is it the | 03:29 |
| 4 | engineering group or the ad engineering group? | 03:29 |
| 5 | MR. FALCONER:  Same objection. | 03:29 |
| 6 | THE WITNESS:  I don't know for certain. | 03:29 |
| 7 | BY MR. KO: | 03:29 |
| 8 | Q.   And I believe you had said -- and correct | 03:29 |
| 9 | me if I'm wrong -- that it's also important for | 03:29 |
| 10 | Facebook to evaluate whether an advertiser has a | 03:29 |
| 11 | good experience. | 03:29 |
| 12 | A.   For advertisers, I would say it's more | 03:30 |
| 13 | important to ensure they are getting value from | 03:30 |
| 14 | their ads, that they are perceiving their ads are | 03:30 |
| 15 | effective and driving the business outcomes they | 03:30 |
| 16 | care about. | 03:30 |
| 17 | Q.   And is an important metric for them and | 03:30 |
| 18 | one that Facebook discusses or negotiates with them | 03:30 |
| 19 | their return on investment or ROI? | 03:30 |
| 20 | A.   In many cases, yes. | 03:30 |
| 21 | Q.   And are you familiar with -- you | 03:30 |
| 22 | referenced it before, but you've mentioned return on | 03:30 |
| 23 | advertising or ad spend, ROAS.  Is that an important | 03:30 |
| 24 | metric for advertisers as well? | 03:30 |
| 25 | A.   For many advertisers, yes. | 03:30 |

Page 147

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   What's the distinction, by the way, | 03:30 |
| 2 | between ROI and ROAS? | 03:30 |
| 3 | A.   Return on ad spend is a metric or key | 03:30 |
| 4 | performance indicator that is more specific to | 03:31 |
| 5 | advertising.  Sometimes we use return on investment | 03:31 |
| 6 | kind of interchangeably, but return on investment is | 03:31 |
| 7 | a term that could be used outside of advertising as | 03:31 |
| 8 | well. | 03:31 |
| 9 | Q.   Fair to say ROI is slightly or generally | 03:31 |
| 10 | speaking more broad than ROAS because ROAS is | 03:31 |
| 11 | specifically focusing on advertising spend? | 03:31 |
| 12 | A.   Correct. | 03:31 |
| 13 | Q.   We talked about the different categories | 03:31 |
| 14 | of Facebook advertisers a little bit before.  But -- | 03:31 |
| 15 | and let's start with your group and your knowledge | 03:31 |
| 16 | in the ad delivery group.  Does the ad delivery | 03:31 |
| 17 | group categorize different advertisers in any way? | 03:31 |
| 18 | MR. FALCONER:  Objection.  Beyond the | 03:31 |
| 19 | scope of the topic. | 03:31 |
| 20 | THE WITNESS:  When we have product | 03:32 |
| 21 | discussions, we sometimes reference different groups | 03:32 |
| 22 | of advertisers as we talk about the different needs | 03:32 |
| 23 | of different types of advertisers. | 03:32 |
| 24 | One broad -- broad distinction that we've | 03:32 |
| 25 | commonly used in the past is we have both managed | 03:32 |

Page 148

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | advertisers and unmanaged advertisers.  Managed | 03:32 |
| 2 | advertisers would be those advertisers that have a | 03:32 |
| 3 | specific Facebook sales team assigned to them, and | 03:32 |
| 4 | unmanaged advertisers would be those advertisers who | 03:32 |
| 5 | do not. | 03:32 |
| 6 | BY MR. KO: | 03:32 |
| 7 |     Q.   So with respect to the managed advertisers | 03:33 |
| 8 | and unmanaged advertisers, does -- or other than | 03:33 |
| 9 | that distinction, does Facebook or your group | 03:33 |
| 10 | otherwise distinguish the various types of | 03:33 |
| 11 | advertisers that place ads on Facebook? | 03:33 |
| 12 |         MR. FALCONER:  Same -- same objection. | 03:33 |
| 13 |         THE WITNESS:  There are other groupings | 03:33 |
| 14 | that people within the team sometimes use depending | 03:33 |
| 15 | on the context. | 03:33 |
| 16 | BY MR. KO: | 03:33 |
| 17 |     Q.   Well, let me try to ask a more specific | 03:33 |
| 18 | question.  It's not -- it's not a trick question of | 03:33 |
| 19 | any sort.  I'm just trying to educate myself on your | 03:33 |
| 20 | group. | 03:33 |
| 21 |         But, you know, there are -- I imagine, as | 03:33 |
| 22 | we talked about before, there are different types of | 03:33 |
| 23 | advertisers that are on the Facebook platform. | 03:33 |
| 24 | There are retailers.  There are banking folks. | 03:33 |
| 25 | There's like travel and tourism, hotel industry, | 03:33 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | e-commerce, political groups. | 03:34 |
| 2 | So does your group or Facebook categorize | 03:34 |
| 3 | or group these types of advertisers into those types | 03:34 |
| 4 | of categories or is that not a distinction that | 03:34 |
| 5 | Facebook makes? | 03:34 |
| 6 | MR. FALCONER:  Same objection. | 03:34 |
| 7 | THE WITNESS:  So, yes, we have -- there | 03:34 |
| 8 | are teams who use similar categories.  And like the | 03:34 |
| 9 | precise categorization could, again, differ | 03:34 |
| 10 | depending on the context.  For example, when | 03:34 |
| 11 | businesses set up a page on Facebook, set up a | 03:34 |
| 12 | business page on Facebook, I believe they have to | 03:34 |
| 13 | specify what industry protocol that they consider | 03:34 |
| 14 | their business to be a part of.  So there's a | 03:34 |
| 15 | categorization there. | 03:34 |
| 16 | When the ads delivery product team | 03:34 |
| 17 | considers, you know, future product investments we | 03:35 |
| 18 | might make, sometimes we might conduct advertiser | 03:35 |
| 19 | research that's roughly based on, you know, | 03:35 |
| 20 | advertisers across different verticals, but it might | 03:35 |
| 21 | not, you know, align exactly with the business page | 03:35 |
| 22 | categorization that I mentioned earlier. | 03:35 |
| 23 | BY MR. KO: | 03:35 |
| 24 | ████  ████  █████████████  ████ | 03:35 |
| | █  ██████████████████████████ | 03:35 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1　██████████  ███████████████████████  ████

2　██　████████████████████████████████████  ████

3　██　█████████████████████  ████

4　██　██████████████████████████  ████

5　██　████████████████████████  ████

6　██　██████████████　03:35

7　　　　　　MR. FALCONER:  Same objection.　03:35

8　　　　████████  ██████████████  ████

9　██　████████████████████████████████  ████

10　██　████████████████████████████  ████

11　██　████████████████████████████  ████

12　██　██████████████  ████

13　██　████████████  ██████████████████  ████

14　██　██████████████  ████

15　██　████████████  ████████　03:36

16　　　　　　THE REPORTER:  Thank you.　03:36

17　BY MR. KO:　03:36

18　　　　Q.   How about some of the other groups that　03:36

19　are involved in advertising?  So obviously there's　03:36

20　your group, the ad delivery group.  But earlier this　03:36

21　morning you had talked about business interface　03:36

22　group, the business integrity group, the signals　03:36

23　group, the business opportunity group, and the　03:36

24　commerce group.　03:36

25　　　　　　Do these groups or your ad delivery group,　03:36

Page 151

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | do they differentiate between advertisers in any | 03:36 |
| 2 | fashion? | 03:37 |
| 3 | MR. FALCONER:  Same objection. | 03:37 |
| 4 | THE WITNESS:  Though I would say that | 03:37 |
| 5 | different product groups out of the list that you | 03:37 |
| 6 | mentioned there may each have different ways of | 03:37 |
| 7 | categorizing advertisers based on the needs of their | 03:37 |
| 8 | specific product group. | 03:37 |
| 9 | For example, I understand that the | 03:37 |
| 10 | business interfaces team uses -- they segment their | 03:37 |
| 11 | customers into three major groups based on usage of | 03:37 |
| 12 | our ads products.  I think they have -- they | 03:37 |
| 13 | separate advertisers into basic intermediate and | 03:37 |
| 14 | advanced advertisers. | 03:37 |
| 15 | And that serves the needs of -- of that | 03:37 |
| 16 | product team when it comes to the, you know, | 03:37 |
| 17 | understanding advertiser needs across they're -- | 03:37 |
| 18 | across the products they support. | 03:38 |
| 19 | BY MR. KO: | 03:38 |
| 20 | Q.   That's helpful. | 03:38 |
| 21 | Does Facebook -- do any of these groups or | 03:38 |
| 22 | your group isolate or identify advertisers that are | 03:38 |
| 23 | also developers on the Facebook platform? | 03:38 |
| 24 | MR. FALCONER:  Same objection. | 03:38 |
| 25 | THE WITNESS:  We have several teams who | 03:38 |

Page 152

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | focus on app advertisers.  And generally speaking, | 03:38 |
| 2 | app advertisers, in addition to being advertisers, | 03:38 |
| 3 | may also be app developers who use our mobile | 03:38 |
| 4 | developers products. | 03:38 |
| 5 | BY MR. KO: | 03:38 |
| 6 |     Q.   And what teams at Facebook are responsible | 03:38 |
| 7 | for that relationship? | 03:38 |
| 8 |         MR. FALCONER:  Same objection. | 03:38 |
| 9 |         THE WITNESS:  Do you mean -- well, two | 03:39 |
| 10 | product -- | 03:39 |
| 11 | BY MR. KO: | 03:39 |
| 12 |     Q.   I can -- I can clean that up. | 03:39 |
| 13 |        You -- you had said to me that there are | 03:39 |
| 14 | several teams that focus on app advertisers and that | 03:39 |
| 15 | some of these advertisers are, of course, obviously | 03:39 |
| 16 | developers.  So I'm just asking what teams at | 03:39 |
| 17 | Facebook are responsible for managing of the | 03:39 |
| 18 | relationship with these app advertisers that are | 03:39 |
| 19 | also developers? | 03:39 |
| 20 |         MR. FALCONER:  Objection.  Beyond the | 03:39 |
| 21 | scope of the notice. | 03:39 |
| 22 |         THE WITNESS:  So I was speaking | 03:39 |
| 23 | specifically about product teams.  And as product | 03:39 |
| 24 | teams we don't manage relationships.  We manage the | 03:39 |
| 25 | products for given advertisers. | 03:39 |

Page 153

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | So in terms of building products | 03:39 |
| 2 | specifically for app advertisers, these would be the | 03:39 |
| 3 | business opportunities team and the delivery | 03:39 |
| 4 | products team.  As -- these are the -- these are two | 03:39 |
| 5 | teams that have a specific focus on products for app | 03:39 |
| 6 | advertisers. | 03:40 |
| 7 | BY MR. KO: | 03:40 |
| 8 | Q.   Thank you. | 03:40 |
| 9 | Do you know whether or not app developers | 03:40 |
| 10 | that are also advertisers get any preferential | 03:40 |
| 11 | treatment? | 03:40 |
| 12 | MR. FALCONER:  I'm sorry, David, I | 03:40 |
| 13 | couldn't quite hear that.  Would you mind to repeat | 03:40 |
| 14 | that? | 03:40 |
| 15 | MR. KO:  Sure. | 03:40 |
| 16 | Q.   I asked, do you know whether or not app | 03:40 |
| 17 | developers that are also advertisers get any | 03:40 |
| 18 | preferential treatment? | 03:40 |
| 19 | MR. FALCONER:  Objection to form. | 03:40 |
| 20 | Go ahead. | 03:40 |
| 21 | THE WITNESS:  Can you clarify what you | 03:40 |
| 22 | might mean by "preferential treatment"? | 03:40 |
| 23 | BY MR. KO: | 03:40 |
| 24 | Q.   Are there any revenue sharing agreements | 03:40 |
| 25 | that Facebook has with app developers that are also | 03:40 |

Page 154

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | advertisers? | 03:40 |
| 2 | MR. FALCONER:  Objection.  Beyond the | 03:40 |
| 3 | scope of the notice, but go ahead. | 03:40 |
| 4 | THE WITNESS:  No. | 03:41 |
| 5 | BY MR. KO: | 03:41 |
| 6 | Q.   No, they don't, or, no, you don't know? | 03:41 |
| 7 | A.   Let me -- I was going to say, no, they | 03:41 |
| 8 | don't.  But actually I want to revise that | 03:41 |
| 9 | statement. | 03:41 |
| 10 | In general, app developers who are also | 03:41 |
| 11 | advertisers -- we do not have any revenue sharing | 03:41 |
| 12 | agreements broadly with app developers who are also | 03:41 |
| 13 | app advertisers. | 03:41 |
| 14 | We do have a product called Audience | 03:41 |
| 15 | Network where app developers, some app developers, | 03:41 |
| 16 | choose to become part of a network of apps and | 03:41 |
| 17 | services that can -- where -- where essentially | 03:42 |
| 18 | advertisers, Facebook advertisers, have their ads | 03:42 |
| 19 | show up in a broader network of apps beyond Facebook | 03:42 |
| 20 | that can help advertiser performance by broadening | 03:42 |
| 21 | reach. | 03:42 |
| 22 | And for apps who are part of this Audience | 03:42 |
| 23 | Network, we do have a revenue sharing agreement with | 03:42 |
| 24 | these apps and publishers based on the amount of | 03:42 |
| 25 | revenue from ads that are being shown in their apps | 03:42 |

Page 155

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    and on their websites via -- via this network          03:42

2    arrangement.                                            03:42

3            This is a subset of overall -- or there is      03:42

4    some overlap between the apps that participate in       03:42

5    Audience Network and apps who are also advertisers      03:42

6    on Facebook.                                            03:43

7        Q.   And when did this Audience Network begin?      03:43

8    ██  ████████████████████████████████     ███           03:43

     █  ████████████████████████████████      ███

     █  ████████████████████████████████      ███

     █  █████████████████████████████         ███

     █  ███████████                           ███

     █  ██  █████████████████████████████     ███

     █  ██████████████████████████████        ███

     █  ████████████████████████                          03:43

16       A.   Correct, yes.                                 03:43

17       Q.   I assume you're familiar with the term        03:43

18   "marketing plan"?                                       03:44

19       A.   I've heard the term used.  I think the        03:44

20   exact meaning might depend on the context.             03:44

21       Q.   Sure.  Well, does the -- does your ad         03:44

22   delivery group create market plans?                    03:44

23           MR. FALCONER:  Objection.  Beyond the          03:44

24   scope.                                                  03:44

25           THE WITNESS:  We might create a                03:44

                                           Page 156

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | go-to-market plan for a specific product. | 03:44 |
| 2 | BY MR. KO: | 03:44 |
| 3 | Q.   Are you aware of whether or not the other | 03:44 |
| 4 | groups related to advertising -- and those being the | 03:44 |
| 5 | business interface group, the business integrity | 03:44 |
| 6 | group, the signal group, the business opportunity | 03:44 |
| 7 | group or the commerce group -- have any marketing | 03:44 |
| 8 | plans? | 03:44 |
| 9 | MR. FALCONER:  Same objection. | 03:44 |
| 10 | THE WITNESS:  Similarly they might have | 03:44 |
| 11 | go-to-market plans for specific products.  So if | 03:44 |
| 12 | there's anything else that you're referring to with | 03:45 |
| 13 | respect to a marketing plan, I would have -- I -- I | 03:45 |
| 14 | might -- | 03:45 |
| 15 | BY MR. KO: | 03:45 |
| 16 | Q.   You're -- go ahead.  I'm sorry, I didn't | 03:45 |
| 17 | mean to interrupt -- cut you off. | 03:45 |
| 18 | A.   I was saying I might be able to have my | 03:45 |
| 19 | recollection refreshed with some more specific | 03:45 |
| 20 | examples.  But the first thing that comes to mind | 03:45 |
| 21 | when you asked this question is go-to-market plans | 03:45 |
| 22 | that product teams would put together before | 03:45 |
| 23 | launching a specific product. | 03:45 |
| 24 | Q.   With respect to advertisements on Facebook | 03:45 |
| 25 | and monetizing advertisements on Facebook, does the | 03:45 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | ad delivery group or any of these other five groups | 03:45 |
| 2 | possess marketing plans? | 03:45 |
| 3 | MR. FALCONER:  Same objection. | 03:45 |
| 4 | THE WITNESS:  The term in this context | 03:45 |
| 5 | doesn't ring a bell for anything specific for me. | 03:45 |
| 6 | BY MR. KO: | 03:46 |
| 7 | Q.   How about -- so you described -- we went | 03:46 |
| 8 | over your LinkedIn profile, and you had described | 03:46 |
| 9 | yourself as a lead monetization strategist for the | 03:46 |
| 10 | ad delivery group, correct? | 03:46 |
| 11 | A.   I think I said that one of the things I'm | 03:46 |
| 12 | responsible for is monetization strategy for our | 03:46 |
| 13 | portfolio of products. | 03:46 |
| 14 | Q.   So when executing the strategy with | 03:46 |
| 15 | respect to monetization of the portfolio products | 03:46 |
| 16 | that you manage, do you create a marketing plan of | 03:46 |
| 17 | any sort to plan for and effectuate your strategy? | 03:46 |
| 18 | MR. FALCONER:  Objection.  Beyond the | 03:46 |
| 19 | scope of the topic. | 03:46 |
| 20 | THE WITNESS:  Yes, I think specifically | 03:46 |
| 21 | with respect to marketing, we -- like for specific | 03:46 |
| 22 | products or products that we're making changes to, | 03:47 |
| 23 | we put together go-to-market plans to inform how we | 03:47 |
| 24 | actually launch user products in market. | 03:47 |
| 25 | | |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. KO:                                         03:47

 2        Q.   And are you responsible for or at least   03:47

 3    contribute to these go-to-market plans?            03:47

 4        A.   Yes, my team and I are responsible for    03:47

 5    these plans.                                        03:47

 6        Q.   And do you actually produce a plan in the 03:47

 7    form of -- I don't know.  You tell me.  Is it a     03:47

 8    PowerPoint presentation or a PDF?  Is there an      03:47

 9    actual plan that you produce that you share with    03:47

10    your team and others?                               03:47

11             MR. FALCONER:  Objection.  Beyond the      03:47

12    scope of the topic.                                 03:47

13             THE WITNESS:  Generally speaking, yes,     03:47

14    there would be some sort of document like a slide   03:47

15    deck that outlines the go-to-market plan.           03:47

16    BY MR. KO:                                          03:48

17        Q.   And what's the -- approximately speaking,  03:48

18    what's the frequency with which you create these    03:48

19    marketing plans?                                    03:48

20             MR. FALCONER:  Same objection.             03:48

21             THE WITNESS:  It really varies based on    03:48

22    the time of year and what is on the product road map 03:48

23    for a given period.                                 03:48

24             Last year in page 2 of 2020, we weren't    03:48

25    launching a lot of new products in my team.  So     03:48
```

Page 159

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | probably there were fewer than 10 plans.  I don't | 03:48 |
| 2 | know the specific number offhand. | 03:48 |
| 3 | BY MR. KO: | 03:48 |
| 4 | Q.   And a moment ago you said "page 2."  You | 03:48 |
| 5 | just mean the second half of the year? | 03:48 |
| 6 | A.   Yes. | 03:49 |
| 7 | Q.   And the second half of the calendar year, | 03:49 |
| 8 | right, as Facebook goes off the calendar year in -- | 03:49 |
| 9 | A.   I was referring to the calendar year, | 03:49 |
| 10 | second half of 2020. | 03:49 |
| 11 | Q.   And so how many -- in your role as lead of | 03:49 |
| 12 | the ad delivery group, since you've been lead, how | 03:49 |
| 13 | many -- approximately speaking, how many marketing | 03:49 |
| 14 | plans would you say you've worked on? | 03:49 |
| 15 | MR. FALCONER:  Objection.  Beyond the | 03:49 |
| 16 | scope of the topic. | 03:49 |
| 17 | THE WITNESS:  My team has worked on -- I | 03:49 |
| 18 | can't confirm a specific number, but it's in the | 03:49 |
| 19 | double digits of plans. | 03:49 |
| 20 | BY MR. KO: | 03:49 |
| 21 | Q.   And, again, these plans -- just so the | 03:49 |
| 22 | record is clear, my understanding is that these | 03:49 |
| 23 | plans contain strategy with respect to monetization | 03:49 |
| 24 | of certain Facebook products related to advertising; | 03:49 |
| 25 | is that correct? | 03:49 |

Page 160

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              MR. FALCONER:  Objection.  Beyond the       03:50
 2    scope.                                                03:50
 3              THE WITNESS:  Not necessarily.  These       03:50
 4    plans are more about positioning and key messages.   03:50
 5    We will try to share with advertisers when we launch 03:50
 6    a product and might also include tactics to drive    03:50
 7    adoption of these products across different groups    03:50
 8    of advertisers and address any specific concerns     03:50
 9    that different groups of advertisers might have       03:50
10    around the products.                                 03:50
11    BY MR. KO:                                           03:50
12        Q.   Okay.  And beyond these market plans, do    03:50
13    you set broader goals or targets for your group?     03:50
14              MR. FALCONER:  Same objection.             03:50
15              THE WITNESS:  Yes.                          03:51
16    BY MR. KO:                                           03:51
17        Q.   And do these goals or targets include the   03:51
18    monetization of the -- of Facebook ads?              03:51
19              MR. FALCONER:  Same objection.             03:51
20              THE WITNESS:  We sometimes set revenue      03:51
21    goals for -- for our team based on product adoption. 03:51
22    BY MR. KO:                                           03:51
23        Q.   And are these goals reflected in either     03:51
24    the marketing plans or in some other document?       03:51
25              MR. FALCONER:  Same objection.             03:51
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  They would not generally be | 03:51 |
| 2 | included in the go-to-market plans.  We would track | 03:51 |
| 3 | them separately in other documents that the team | 03:51 |
| 4 | uses. | 03:51 |
| 5 | BY MR. KO: | 03:51 |
| 6 | Q.   And what types of documents are those? | 03:51 |
| 7 | A.   We have road map documents that each | 03:51 |
| 8 | product team puts together.  We check in on status | 03:52 |
| 9 | of the road maps every month with product | 03:52 |
| 10 | leadership, and we might reference revenue and | 03:52 |
| 11 | product adoption goals in those documents. | 03:52 |
| 12 | Q.   And, again, are you responsible, or at | 03:52 |
| 13 | least contribute to the creation of these documents, | 03:52 |
| 14 | including the road map documents? | 03:52 |
| 15 | A.   I can -- | 03:52 |
| 16 | MR. FALCONER:  Same objection. | 03:52 |
| 17 | THE WITNESS:  I contribute to the road map | 03:52 |
| 18 | documents. | 03:52 |
| 19 | BY MR. KO: | 03:52 |
| 20 | Q.   And other members of your team in the ad | 03:52 |
| 21 | delivery group do, or are there other individuals | 03:52 |
| 22 | outside of the ad delivery group that contribute to | 03:52 |
| 23 | them? | 03:52 |
| 24 | MR. FALCONER:  Same objection. | 03:52 |
| 25 | THE WITNESS:  There are partners I work | 03:52 |

Page 162

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | with in the ads delivery team that also contribute. | 03:52 |
| 2 | MR. FALCONER:  David, we have been going | 03:52 |
| 3 | for a little more than an hour.  Is there a place we | 03:52 |
| 4 | can take a quick break? | 03:53 |
| 5 | MR. KO:  Sure.  I just have a few more | 03:53 |
| 6 | questions related to this and then we can wrap it | 03:53 |
| 7 | up.  It's up to you, Amy.  I'm happy to take a break | 03:53 |
| 8 | right now too if you want. | 03:53 |
| 9 | MR. FALCONER:  You mean -- when you say | 03:53 |
| 10 | "wrap it up," you mean just this topic or -- | 03:53 |
| 11 | MR. KO:  Just this topic. | 03:53 |
| 12 | MR. FALCONER:  Yeah, okay.  Yeah, it's up | 03:53 |
| 13 | to you, Amy. | 03:53 |
| 14 | THE WITNESS:  We can finish up this topic. | 03:53 |
| 15 | BY MR. KO: | 03:53 |
| 16 | Q.   Okay.  Are you familiar -- so related -- | 03:53 |
| 17 | related to documents created by your group that | 03:53 |
| 18 | reflect your strategy, are you familiar with the | 03:53 |
| 19 | term "business plan"? | 03:53 |
| 20 | A.   Yes. | 03:53 |
| 21 | Q.   Does your group or any of the five groups | 03:53 |
| 22 | that we talked about before -- well, let me take a | 03:53 |
| 23 | step back. | 03:53 |
| 24 | What's your understanding of what a | 03:53 |
| 25 | business plan is? | 03:53 |

Page 163

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   In the context I'm used to hearing that | 03:53 |
| 2 | term, it is a plan around a new business that's | 03:53 |
| 3 | being created and describes what that business is. | 03:54 |
| 4 | The product will be what their operating model will | 03:54 |
| 5 | be, what their target customer base will be in -- | 03:54 |
| 6 | THE REPORTER:  "Will be in this"... | 03:54 |
| 7 | THE WITNESS:  What their target -- what | 03:54 |
| 8 | their target customer segment will be in this kind | 03:54 |
| 9 | of thing. | 03:54 |
| 10 | BY MR. KO: | 03:54 |
| 11 | Q.   And does your -- does the ad delivery | 03:54 |
| 12 | group create business plans? | 03:54 |
| 13 | MR. FALCONER:  Objection.  Outside the | 03:54 |
| 14 | scope of the topic. | 03:54 |
| 15 | THE WITNESS:  We have created strategy | 03:54 |
| 16 | documents in the past which might be a time-closed | 03:54 |
| 17 | parallel. | 03:54 |
| 18 | BY MR. KO: | 03:54 |
| 19 | Q.   And are you aware of whether or not the | 03:55 |
| 20 | five other groups related to advertising create | 03:55 |
| 21 | business plans? | 03:55 |
| 22 | MR. FALCONER:  Same objection. | 03:55 |
| 23 | THE WITNESS:  Business plan means | 03:55 |
| 24 | something more kind of specific to me that -- it's | 03:55 |
| 25 | just not a term we really use in ads.  But in terms | 03:55 |

Page 164

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    of a strategy documents, I don't know for certain,      03:55

 2    but assume many of these other teams will also have     03:55

 3    compiled these documents.                               03:55

 4    BY MR. KO:                                              03:55

 5        Q.   And just a few more questions on this and      03:55

 6    we can take a break.                                    03:55

 7             But with respect to these strategy             03:55

 8    documents that the ads delivery group creates,          03:55

 9    what's the frequency with which they create such        03:55

10    documents?                                              03:55

11             MR. FALCONER:  Same objection.                 03:55

12             THE WITNESS:  I think what we have done        03:55

13    with an ads delivery is just do a one-time sprint to    03:56

14    build out a -- as comprehensive as we can --            03:56

15    document.  And the intent is to revisit the same        03:56

16    document and edit it over time.                         03:56

17    BY MR. KO:                                              03:56

18        Q.   And what are -- are they called strategy       03:56

19    documents or are they called something else?            03:56

20             MR. FALCONER:  Same objection.                 03:56

21             THE WITNESS:  We call it a strategy            03:56

22    document.                                               03:56

23    BY MR. KO:                                              03:56

24        Q.   Okay.  And would you think that same           03:56

25    frequency or do you know the frequency in which         03:56
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | these strategy documents are created by the other | 03:56 |
| 2 | five groups related to advertising that we discussed | 03:56 |
| 3 | before? | 03:56 |
| 4 | A.   I don't know. | 03:56 |
| 5 | MR. FALCONER:  Same objection. | 03:56 |
| 6 | THE WITNESS:  I don't know offhand. | 03:56 |
| 7 | MR. KO:  Okay.  All right.  We can take a | 03:56 |
| 8 | break.  Thank you. | 03:56 |
| 9 | THE VIDEOGRAPHER:  We are off the record | 03:56 |
| 10 | at 3:57 p.m. | 03:56 |
| 11 | (Recess.) | 03:59 |
| 12 | (Off record:  3:57 p.m.) | 03:59 |
| 13 | (On record:  4:16 p.m.) | 03:59 |
| 14 | THE VIDEOGRAPHER:  We are on the record at | 04:16 |
| 15 | 4:16 p.m. | 04:16 |
| 16 | BY MR. KO: | 04:16 |
| 17 | Q.   Welcome back from the break, Amy.  And as | 04:16 |
| 18 | I indicated before, I anticipate that -- before the | 04:16 |
| 19 | break I anticipate that we'll go for approximately | 04:16 |
| 20 | one more hour, give or take.  Don't hold me to that, | 04:16 |
| 21 | but hopefully we can get it done in that time | 04:16 |
| 22 | period. | 04:16 |
| 23 | So you recall earlier today we were | 04:16 |
| 24 | talking -- or a moment before in that previous | 04:16 |
| 25 | session we were talking about data brokers.  And | 04:16 |

Page 166

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    you're familiar with the term "data broker," right?      04:17

2        A.   Yes.                                             04:17

3        Q.   And in the past my understanding is that         04:17

4    Facebook has acknowledged both, you know, in public      04:17

5    statements and on its websites that it works with        04:17

6    measurement partners.  Are you familiar with that        04:17

7    concept?                                                  04:17

8        A.   Yes.                                             04:17

9             MR. FALCONER:  Objection.  Beyond the            04:17

10   scope of the notice.                                      04:17

11            Again, feel free to answer based on what         04:17

12   you know.                                                 04:17

13            THE WITNESS:  Yes, I'm familiar with the         04:17

14   concept.                                                  04:17

15   BY MR. KO:                                                04:17

16       Q.   Am I right that measurement partners are         04:17

17   similar to data brokers?                                  04:17

18            MR. FALCONER:  Same objection.                   04:17

19            THE WITNESS:  I think -- I think the role        04:17

20   that they play in the ads ecosystem is different.  I      04:17

21   think it would depend on many things specific you         04:17

22   might be referring to.                                    04:17

23   BY MR. KO:                                                04:17

24       Q.   Sure.  Well, why don't you describe to the       04:17

25   Court what you believe your understanding is of a         04:18
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | measurement partner. | 04:18 |
| 2 | MR. FALCONER:  Same objection. | 04:18 |
| 3 | THE WITNESS:  So many advertisers | 04:18 |
| 4 | advertise across several different ads platforms at | 04:18 |
| 5 | the same time and have a need to understand the | 04:18 |
| 6 | effectiveness of their ads across all these | 04:18 |
| 7 | different platforms in terms of driving the business | 04:18 |
| 8 | outcomes that they care about. | 04:18 |
| 9 | For example, an advertiser might -- you | 04:18 |
| 10 | know, might care about driving sales on their | 04:18 |
| 11 | website or installs of a mobile app and might want | 04:18 |
| 12 | to know after placing ads across all of these | 04:18 |
| 13 | platforms which platform was -- which platforms were | 04:18 |
| 14 | more or less effective in driving the website sales | 04:18 |
| 15 | or the app installs.  That's at a high level my | 04:18 |
| 16 | understanding of the role of measurement partners as | 04:19 |
| 17 | it relates to ads. | 04:19 |
| 18 | BY MR. KO: | 04:19 |
| 19 | Q.   And so these measurement partners, are | 04:19 |
| 20 | they -- well, can you give the Court an example or | 04:19 |
| 21 | examples of who the actual identity is of these | 04:19 |
| 22 | measurement partners? | 04:19 |
| 23 | MR. FALCONER:  I'm going to object again | 04:19 |
| 24 | that this is outside the scope of the substance of | 04:19 |
| 25 | the topic.  And then I want to make sure we're | 04:19 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | limiting the time frame to what's been noticed as | 04:19 |
| 2 | well. | 04:19 |
| 3 | MR. KO:  I think you made that clear, | 04:19 |
| 4 | Russ.  And I said unless I specify otherwise, I am | 04:19 |
| 5 | talk about the time period 2012 through 2017. | 04:19 |
| 6 | Q.   But go ahead and answer the question. | 04:19 |
| 7 | A.   I -- | 04:19 |
| 8 | Q.   Do you want me to repeat it or you got it? | 04:19 |
| 9 | A.   No, no need. | 04:19 |
| 10 | I can't -- I -- I have some examples of | 04:19 |
| 11 | measurement partners that come to mind.  Can't say | 04:19 |
| 12 | for certain if they were active in the 2012 to 2017 | 04:20 |
| 13 | time period.  But as an example, AppsFlyer is a | 04:20 |
| 14 | mobile measurement partner that supports app | 04:20 |
| 15 | advertisers in understanding the effectiveness of | 04:20 |
| 16 | their ads across different platforms. | 04:20 |
| 17 | Q.   Does the entity AppNexus ring a bell to | 04:20 |
| 18 | you at all? | 04:20 |
| 19 | A.   Yes. | 04:20 |
| 20 | Q.   Are they a measurement partner? | 04:20 |
| 21 | A.   I -- I'm not certain if they provide cross | 04:20 |
| 22 | publisher measurement capabilities.  I am familiar | 04:20 |
| 23 | with them in the context of them being a partner | 04:20 |
| 24 | that we worked with when we offered Facebook | 04:21 |
| 25 | Exchange as a product on our platform that | 04:21 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | advertisers could use. | 04:21 |
| 2 | Q.   Do you consider AppNexus to be more of a | 04:21 |
| 3 | data broker or do they fit into some category, other | 04:21 |
| 4 | category? | 04:21 |
| 5 | MR. FALCONER:  Objection.  Beyond the | 04:21 |
| 6 | scope of the notice. | 04:21 |
| 7 | THE WITNESS:  I believe they're | 04:21 |
| 8 | categorized as a demand-side platform, DSP.  And at | 04:21 |
| 9 | a high level, this category of companies helps | 04:21 |
| 10 | advertisers run ads across many different platforms. | 04:21 |
| 11 | BY MR. KO: | 04:21 |
| 12 | Q.   And did you say ESP or VSP? | 04:21 |
| 13 | A.   DSP, demand-side platform. | 04:21 |
| 14 | Q.   Thank you. | 04:21 |
| 15 | Let's go back to Exhibit 8, which was the | 04:21 |
| 16 | annual report.  And again I will share my screen for | 04:22 |
| 17 | your convenience, but you can access it yourself. | 04:22 |
| 18 | And I want you to turn to page 13 of the actual | 04:22 |
| 19 | report.  And let me know when you get there. | 04:22 |
| 20 | A.   Okay. | 04:22 |
| 21 | Q.   Again, I have it up here for your | 04:22 |
| 22 | convenience as well. | 04:22 |
| 23 | Do you see in the second paragraph down, | 04:22 |
| 24 | or I guess the first full paragraph, the one that | 04:22 |
| 25 | says or starts with "in addition"? | 04:22 |

Page 170

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Yes. | 04:22 |
| 2 | Q.    Can you go ahead and read the first two | 04:22 |
| 3 | sentences of that into the record that I've | 04:22 |
| 4 | highlighted here for you. | 04:22 |
| 5 | A.    "In addition, some of our developers or | 04:22 |
| 6 | other partners, such as those that help us measure | 04:23 |
| 7 | the effectiveness of ads, may receive or store | 04:23 |
| 8 | information provided by us or by our users through | 04:23 |
| 9 | mobile or web applications integrated with Facebook. | 04:23 |
| 10 | We provide limited information to such third parties | 04:23 |
| 11 | based on the scope of services provided to us." | 04:23 |
| 12 | Q.    And actually go ahead, if you wouldn't | 04:23 |
| 13 | mind, finish out reading that paragraph in the last | 04:23 |
| 14 | sentence I've highlighted here. | 04:23 |
| 15 | A.    "However, if these third parties or | 04:23 |
| 16 | developers fail to adopt or adhere to adequate | 04:23 |
| 17 | security -- adequate data security practices, or in | 04:23 |
| 18 | the event of a breach of their networks, our data or | 04:23 |
| 19 | our users' data may be improperly accessed, used or | 04:23 |
| 20 | disclosed." | 04:23 |
| 21 | Q.    Okay.  Thank you for doing that. | 04:23 |
| 22 | So I believe earlier today we were talking | 04:24 |
| 23 | about what information Facebook provides to -- to | 04:24 |
| 24 | data brokers.  But in this context, is it your | 04:24 |
| 25 | understanding -- I can share it again for your | 04:24 |

Page 171

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | convenience. | 04:24 |
| 2 | But with respect to the partners described | 04:24 |
| 3 | here, do you have an understanding of whether or not | 04:24 |
| 4 | these are measurement partners or data brokers or | 04:24 |
| 5 | both or some other type of partner? | 04:24 |
| 6 | MR. FALCONER:  Objection.  Outside the | 04:24 |
| 7 | scope of the notice. | 04:24 |
| 8 | THE WITNESS:  The description in the first | 04:24 |
| 9 | sentence, "Those that help us measure the | 04:24 |
| 10 | effectiveness of ads," this, to me, refers to | 04:24 |
| 11 | measurement partners. | 04:24 |
| 12 | BY MR. KO: | 04:24 |
| 13 | Q.   Okay.  And again, outside of I believe you | 04:24 |
| 14 | said AppsFlyer, you don't have any other examples | 04:24 |
| 15 | or -- any other examples of the identity of -- of | 04:24 |
| 16 | measurement partners? | 04:24 |
| 17 | MR. FALCONER:  Same objection. | 04:25 |
| 18 | THE WITNESS:  I think there was a company | 04:25 |
| 19 | likely operating in this time frame called Aggregate | 04:25 |
| 20 | Knowledge that focused more on web measurement, | 04:25 |
| 21 | cross publisher web measurement.  That was another | 04:25 |
| 22 | example.  I can't remember offhand any additional | 04:25 |
| 23 | examples right now. | 04:25 |
| 24 | BY MR. KO: | 04:25 |
| 25 | Q.   Okay.  So Facebook provides information to | 04:25 |

Page 172

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | these measurement partners, correct? | 04:25 |
| 2 | A.   Yes. | 04:25 |
| 3 | MR. FALCONER:  Same objection. | 04:25 |
| 4 | BY MR. KO: | 04:25 |
| 5 | Q.   And this info, this information consists | 04:25 |
| 6 | of information provided to Facebook or collected by | 04:25 |
| 7 | Facebook of Facebook users, correct? | 04:25 |
| 8 | MR. FALCONER:  Same objection. | 04:25 |
| 9 | THE WITNESS:  It includes certain | 04:25 |
| 10 | information relating to Facebook users, specifically | 04:25 |
| 11 | around the ads that users saw and sometimes | 04:25 |
| 12 | interacted with. | 04:26 |
| 13 | BY MR. KO: | 04:26 |
| 14 | Q.   Okay.  And in addition to information | 04:26 |
| 15 | about ads that users saw, are you aware of any other | 04:26 |
| 16 | information about Facebook users that were made | 04:26 |
| 17 | available to these measurement partners? | 04:26 |
| 18 | MR. FALCONER:  So I'm going to object | 04:26 |
| 19 | again here that this goes beyond the scope of the | 04:26 |
| 20 | topic that Ms. Lee was designated to testify on. | 04:26 |
| 21 | There was a witness designated yesterday to testify | 04:26 |
| 22 | on the scope of data collection and data sharing, | 04:26 |
| 23 | and that's really what we're talking about here. | 04:26 |
| 24 | So I don't -- I don't want to cut things | 04:26 |
| 25 | off prematurely.  If there's a connection to the | 04:26 |

Page 173

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | topic for the deposition today on the monetization | 04:26 |
| 2 | or valuation of user data, let's get to it. | 04:26 |
| 3 | Otherwise I'm going to instruct the witness not to | 04:26 |
| 4 | answer to enforce the limitation that Judge Corley | 04:26 |
| 5 | put on this deposition. | 04:26 |
| 6 | So, Ms. Lee, you can go ahead and answer, | 04:27 |
| 7 | but, Mr. Ko, I would just ask that if there is a | 04:27 |
| 8 | connection to the topic that's noticed for today, | 04:27 |
| 9 | let's please get to it sooner rather than later. | 04:27 |
| 10 | MR. KO:  There certainly is, and we only | 04:27 |
| 11 | have less than an hour anyway.  So I'll get there. | 04:27 |
| 12 | For the record, I'm there right now.  But I'll show | 04:27 |
| 13 | you in a moment. | 04:27 |
| 14 | MS. WEAVER:  I would just say -- this is | 04:27 |
| 15 | Lesley -- that the person you put up yesterday said | 04:27 |
| 16 | he didn't know what a data broker was.  So the | 04:27 |
| 17 | questioning was curtailed on that topic. | 04:27 |
| 18 | BY MR. KO: | 04:27 |
| 19 | Q.  So, Amy, thank you for the lawyers -- | 04:27 |
| 20 | allowing the lawyers to be lawyers.  Do you remember | 04:27 |
| 21 | the question that was asked of you and can you | 04:27 |
| 22 | answer it? | 04:27 |
| 23 | A.  Can you repeat the last question? | 04:27 |
| 24 | Q.  Yeah.  I asked, in addition to the | 04:27 |
| 25 | information about ads that users saw, are you aware | 04:27 |

Page 174

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | of any other information about Facebook users that | 04:27 |
| 2 | were made available to these measurement partners? | 04:27 |
| 3 | A.   I understand that we may have also shared | 04:28 |
| 4 | information about how users engaged with the ads | 04:28 |
| 5 | that they were shown.  For example, ads that they | 04:28 |
| 6 | clicked on. | 04:28 |
| 7 | Q.   Okay.  Is that all you can think of? | 04:28 |
| 8 | A.   Yes.  And I should clarify that we would | 04:28 |
| 9 | only share information about people who saw a | 04:28 |
| 10 | specific advertiser's ads. | 04:28 |
| 11 | So if one of these measurement partners is | 04:28 |
| 12 | working on behalf of Procter & Gamble, we would only | 04:28 |
| 13 | return sort of anonymized information about how -- | 04:28 |
| 14 | who -- who saw Procter & Gamble's ads and what -- | 04:28 |
| 15 | you know, who clicked on Procter & Gamble's ads. | 04:29 |
| 16 | So no sensitive or personally identifiable | 04:29 |
| 17 | information about the people who saw or engaged with | 04:29 |
| 18 | these ads would -- would be shared with the | 04:29 |
| 19 | measurement partner. | 04:29 |
| 20 | Q.   And just so the record is clear, your | 04:29 |
| 21 | testimony is that the measurement partner is | 04:29 |
| 22 | distinct from a data broker; is that correct? | 04:29 |
| 23 | MR. FALCONER:  Same objection. | 04:29 |
| 24 | THE WITNESS:  Yes, I -- I understand them | 04:29 |
| 25 | to serve just different purposes in the advertising | 04:29 |

Page 175

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | ecosystem. | 04:29 |
| 2 | BY MR. KO: | 04:29 |
| 3 | Q.   And what -- so, obviously, the measurement | 04:29 |
| 4 | partners help Facebook measure the effectiveness of | 04:29 |
| 5 | their ads.  What do you understand in Facebook's | 04:29 |
| 6 | ecosystem that data brokers do? | 04:29 |
| 7 | MR. FALCONER:  Same objection. | 04:29 |
| 8 | THE WITNESS:  Of the examples that I had | 04:30 |
| 9 | shared earlier, my understanding is part of their | 04:30 |
| 10 | revenue comes from their ability to provide | 04:30 |
| 11 | information on users to advertisers to improve the | 04:30 |
| 12 | effectiveness of their marketing campaigns. | 04:30 |
| 13 | BY MR. KO: | 04:30 |
| 14 | Q.   So the data brokers are providing | 04:30 |
| 15 | information directly to advertisers and not to | 04:30 |
| 16 | Facebook, or both? | 04:30 |
| 17 | MR. FALCONER:  Same objections. | 04:30 |
| 18 | THE WITNESS:  Generally speaking -- well, | 04:30 |
| 19 | I mean, it -- how I interpret that term is that they | 04:30 |
| 20 | are generating revenue by sharing or providing that | 04:30 |
| 21 | information about users to different parties.  They | 04:30 |
| 22 | could include Facebook.  They could include | 04:30 |
| 23 | advertising platforms.  I'm sorry.  They could | 04:31 |
| 24 | include advertisers and they could include | 04:31 |
| 25 | advertising platforms. | 04:31 |

Page 176

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. KO: | 04:31 |
| 2 | Q. Do you yourself, in your experience at | 04:31 |
| 3 | Facebook, have you worked with any data brokers? | 04:31 |
| 4 | MR. FALCONER: Same objection. | 04:31 |
| 5 | THE WITNESS: I can't recall specific | 04:31 |
| 6 | examples where I worked directly with any of these | 04:31 |
| 7 | companies. | 04:31 |
| 8 | BY MR. KO: | 04:31 |
| 9 | Q. Do you know who at Facebook or what groups | 04:31 |
| 10 | at Facebook are primarily responsible for managing | 04:31 |
| 11 | the relationship or coordinating with data brokers? | 04:31 |
| 12 | MR. FALCONER: Same objection. | 04:31 |
| 13 | THE WITNESS: We used to have a | 04:31 |
| 14 | partnerships team who managed the relationship with | 04:31 |
| 15 | some of these companies. | 04:31 |
| 16 | BY MR. KO: | 04:31 |
| 17 | Q. And that team no longer exists -- or | 04:31 |
| 18 | excuse me, that team no longer manages that | 04:32 |
| 19 | relationship or does it no longer exist? | 04:32 |
| 20 | MR. FALCONER: Same objection. | 04:32 |
| 21 | THE WITNESS: I -- I'm not sure if we | 04:32 |
| 22 | still today have a relationship with these | 04:32 |
| 23 | companies. | 04:32 |
| 24 | BY MR. KO: | 04:32 |
| 25 | Q. From the 2012 through 2017 time period, | 04:32 |

Page 177

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   did you understand it to be the case that Facebook        04:32
 2   had a relationship with data brokers?                     04:32
 3        A.   Yes.                                             04:32
 4        Q.   Go into the Exhibit Share file and pull          04:32
 5   up -- we're going to skip an exhibit.  I might get         04:32
 6   back to the one we skipped.  I went ahead and marked      04:32
 7   Facebook 12.                                               04:32
 8                     (Exhibit 12 was marked for               04:32
 9                      identification and attached             04:32
10                      hereto.)                                04:32
11   BY MR. KO:                                                 04:32
12        Q.   Do you see that and can you pull that up,        04:32
13   please?                                                    04:32
14        A.   Yes, I have it open.                             04:33
15             MR. KO:  Okay.  And for the record, this         04:33
16   is ██████████████████████████                     ██████
██   ████████████  ██████████████████              ██████
██   ████████████████████████████████████          ██████
██   ██████████████████████████████████             ██████
██   ██████████████████████████████████             ██████
██   ███████████████████                             ██████
██       ██    ██████████████████████████            ██████
██   ██████████████████████████████████             ██████
██   ████████                                        ██████
██       ██    ██████                                       04:33
```

Page 178



04:35

Page 179

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1                                                      
                                                        
                                                        
                                                        
                                                        
                                                        
                                                        
                                                        
                                                        
                                                        
                                                04:35
12         MR. FALCONER:  Objection.  Outside the       04:36
13   scope of the topic.                                04:36
14         But go ahead.                                04:36
15                                                      
                                                        
                                                        
                                                        
                                                        
                                                        
                                                        
                                                        
                                                        
                                                04:36
```

Page 180

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



04:38

Page 181

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1

04:38

8        MR. FALCONER:  Objection.  Again, this --  04:38

9  obviously, this email is outside the time period for  04:38

10  the deposition, so the witness is not prepared or  04:38

11  authorized to speak on behalf of the company from --  04:38

12  on a chat from 2018.  04:38

13        But she can answer based on personal  04:38

14  knowledge if she has any.  04:38

15        MR. KO:  Right, which is why I'm saying we  04:38

16  want to discuss the concepts discussed here.  04:38

17

04:39

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1

04:39

7          MR. FALCONER:  Same objection as before.          04:39

8

04:40

20          MR. FALCONER:  Objection.  Outside the          04:40

21    scope of the notice.          04:40

22          Go ahead.          04:40

23

Page 183

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



14          MR. FALCONER:  Same objection.          04:41

20          MR. FALCONER:  Objection to form and          04:41

21    object to being outside the scope of the notice.          04:41

Page 184



```
 1   ███████████████████████████                    ████████

     ██████████████

     ████    ██████     ███████████████████████

     ████████████████████████████████████████

     ████████████████████████████████████

     █████████████████████████████████

     ██████████████████████

     ████    ██████

     ████    ██████████████████████████████████

10              MR. FALCONER:  Objection.  Outside the     04:42

11   scope of the notice.                                   04:42

12              █████████████    ███████████████████

     ███████████████████████████████████████████

     ███████████████████████████████████████████

     ████████████████████████████████████████████

     ████████████████████████████████████

     ██████████████

     ████    ██████████████████████████████

     ██████████████████████████████████

     █████████████

21              MR. FALCONER:  Same objection.              04:43

22              ██████████████    █████████████████

     ████████████████████████████████████████

     █████████████    ████████████████████████

     ████████████████████████████████████
```

Page 185



1    BY MR. KO:                                          04:44

2

5          MR. FALCONER:  Same objection.               04:44

6

13         MR. FALCONER:  Objection.  Beyond the         04:44

14   scope of the topic in the notice.                   04:44

15

21         MR. FALCONER:  Same objection.               04:45

22

                                         Page 186

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1    BY MR. KO:                                              04:45
```

```
20          MR. FALCONER:  Objection.  Outside the           04:47
```

```
21    scope.                                                 04:47
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1

2

3

4

5

6

7

8           MR. FALCONER:   Objection.   Outside the        04:47

9      scope.                                               04:47

10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1      ████████████████████████████████████      ████

        ████████████████████████████              ████

              ████████████████████████████        ████

        ████████████    ██████████████            ████

              ██    ████                           ████

              ██   ████████████████████████        ████

        ████████████████████    ██████            ████

        ██████████████████████████████            ████

              ██████████████████████████          ████

        ████████████████████████████████████      ████

        ████████████████████████████████          ████

12              MR. FALCONER:  Objection.  Outside the       04:49

13      scope of the topic.                                  04:49

14              ████████████    ████████████████████      ████

        ████████████████████████                           ████

16      BY MR. KO:                                           04:49

17          Q.   Yeah, go ahead.  That's -- that's fair.     04:49

18              (Pause while witness peruses document.)       04:49

19              ██    ████    ████████████████████      ████

        ████████████████████████████████████████      ████

        ██    ████                                       ████

        ██    ████████████████████                       ████

        ██    ████    ████████████████                   ████

        ████████████    ████████████████              ████

        ████████                                         ████
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1

5          MR. FALCONER:  Same objection.                      04:53

6          Go ahead.                                           04:53

7

25

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1    BY MR. KO:                                              04:54

 2

 6            MR. FALCONER:  Same objection.                  04:54

 7

18            MR. FALCONER:  Objection.  Beyond the           04:55

19    scope of the topic.                                     04:55

20
```

Page 191

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1

15          MR. FALCONER:   Same objection.          04:56

16

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1           MR. FALCONER:  Same objection.                04:57
```

```
13           MR. FALCONER:  Objection.  Beyond the         04:57
14   scope of the topic.                                   04:57
```

Page 193

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



22          MR. FALCONER:  Objection.  Form.                    04:59

23

Page 194

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 195



Page 196

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1     ███████████████████                          ██████

       █    ██   ████████████████████████████       ██████

       ██████████████████████████                   ██████

       █    ██   ████████████████████████████       ██████

       ███████████████████  █████████████            ██████

       █    ██   ██                                  ██████

       █    ██   ██████████████████████              ██████

       █    ████████████████████████████             ██████

       █    █████████████                            05:03

10             MR. FALCONER:  Objection.  Beyond the    05:03

11     scope of the deposition both as to time period and  05:03

12     as to topic.  Objection to form as well.         05:03

13             Go ahead.                                 05:03

14             ██████████  ███████████████             ██████

       █    ██████████████████████████████             ██████

       █    ██████████████████████████████             ██████

       █    ████████████████████████████████           ██████

       █    █████████████████████                      ██████

       █       ████████████████████████████            ██████

       █    █████████████████████████████████          ██████

       █    ████████████████████████████████           ██████

       █    █████████████████████████████████          ██████

       █    ████████████████████████████               ██████

       █    ████████████████████                       ██████

       █       █████████████████████████████████       ██████
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



25          MR. FALCONER:  Same objection.                05:05

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1    BY MR. KO:                                              05:05

5          MR. FALCONER:   Same objections.                 05:06

Page 199

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1

                                                                    05:08
11          MR. FALCONER:   Object.   Outside the scope    05:08
12   of the topic.                                          05:08
13          But go ahead.                                   05:08
14
```

Page 200

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
21          MR. FALCONER:  Objection to form and          05:10

22    objection to outside the scope of the topic.        05:10

23
```

Page 201



```
 9          MR. FALCONER:  Objection.  Same        05:10

10   objections, both of them as before.            05:10
```

Page 202

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
14              MR. FALCONER:  Object.  Objection.        05:12

15   Misstates prior testimony and outside the scope of   05:12

16   the notice.                                           05:12
```



Page 204

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1              MR. FALCONER:  Objection.  Vague.           05:14

 2

 3

 4

 5

 6                                                           05:15

 7              MR. FALCONER:  Objection.  Outside the      05:15

 8    scope of the notice.  Objection to form.              05:15

 9
```

Page 205



1  ████████████████████████████  ████
2  ████████████                              05:16
3          MR. FALCONER:  Objection.  Vague.   05:16
4        █████████  ████████████████  ████
5  ███████████████████████                   ████
6  ████████                                  ████
7  ████ ██  ████  ████████████████        ████
8  ████████████████                          05:16
9          MR. FALCONER:  Same objection.     05:16
10 ████████                                  ████
11 ████ ██  ████████████████                ████
12 █████████████████                         05:16
13         MR. FALCONER:  Objection.  Form.   05:16
14       █████████  ████████████████       ████
15 █████████████  ███████████████████       ████
16 ████████████                              ████
17      ████████████████████                ████
18      █████████  ████████████             ████
19 ██████████████████████████                ████
20 ████████████████████████                  ████
21 ████████████████████████                  ████
22 ████████████████████████                  ████
23 ██████████████████████████                ████
24 ██████                                    05:17
25

                                    Page 206

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1    BY MR. KO:                                        05:17

2

5            MR. FALCONER:  Objection.  Form.  And,    05:17

6    objection, outside the scope of the notice.       05:17

7

Page 207



05:19

Page 208

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1  ███████████████████████████  ██████

2  ███████████████████████████  ██████

3  ████████████████  05:20

4        MR. FALCONER:  Objection to form.  05:20

5  Objection that this is outside the scope of the  05:20

6  notice.  05:20

7      ███████  ███████████  ██████

8  ████████████████████████████  ██████

9  ████████████████████████████  ██████

10  ████████████████████████████  ██████

11  ███████████████████████████  ██████

12  ██████████████████  ██████

13  ███████  ██████

14  ████  ████████  █████████████  ██████

15  ███  ██████

16  ███████████████████████  ██████

17  ██████████████████  05:21

18        MR. FALCONER:  Objection to form.  And  05:21

19  objection, outside the scope of the notice.  05:21

20        (Pause while witness peruses document.)  05:21

21      ███████  ███████████  ██████

22  ██████████████  ██████████████  ██████

23  ████  █████████████████  ██████

24  ██████████████████  ██████

25      ███████████████████  ██████

                              Page 209

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



          1

         15    MR. FALCONER:  Objection.  Form.          05:23

         16

                                                        05:24

                                          Page 210

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     █████ ███████████████████████ ████

   █ ████████████████████████████████ ████

   █ ████████████████████████████████ ████

   █ ██████████████████ ████████████████ ████

   █ ███████                                05:24

6          MR. FALCONER:  Objection.  Form and    05:24

7     outside the scope of the topic.              05:24

8             ████████ ████████████████████ ████

   █ █████████████████████████████████ ████

   █ ███████████████████████████████ ████

   █ ███████████████████████████████ ████

   █ ██████████████████████████████ ████

   █ ████████████████████████████████ ████

   █ █████████████████████████████████ ████

   █ ██████████████████████████ ████

   █ ████████ ████

   █     ███ ██████████ ████

   █     ███ ██████████████████████ ████

   █     ███ █████████ ██████████████████████    05:25

20          MR. FALCONER:  David, I think we've got   05:25

21    about five minutes on the record left.       05:25

22          MR. KO:  So why don't -- can we just take  05:25

23    a few minutes and then come back, and I'll see if I  05:25

24    have a few more?  I think I have just a few more   05:25

25    questions.  But can we take five and then come back  05:25

                                       Page 211

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | and finish the remaining five. | 05:25 |
| 2 | MR. FALCONER:  Do you want to just do | 05:25 |
| 3 | five? | 05:25 |
| 4 | MR. KO:  Yeah.  We'll make it -- we'll | 05:25 |
| 5 | make it short. | 05:25 |
| 6 | THE VIDEOGRAPHER:  We are off the record | 05:25 |
| 7 | at 5:25 p.m. | 05:25 |
| 8 | MR. KO:  Be back at 5:31.  I promise. | 05:25 |
| 9 | (Recess.) | 05:31 |
| 10 | (Off record:  5:25 p.m.) | 05:31 |
| 11 | (On record:  5:32 p.m.) | 05:31 |
| 12 | THE VIDEOGRAPHER:  We are on the record at | 05:32 |
| 13 | 5:32 p.m. | 05:32 |
| 14 | BY MR. KO: | 05:32 |
| 15 | Q.   Welcome back from the break, Amy, and | 05:32 |
| 16 | thank you for your patience today and working | 05:32 |
| 17 | through some of these questions.  I just have a few | 05:32 |
| 18 | more questions and then you will be released from | 05:32 |
| 19 | your obligations for now. | 05:32 |
| 20 | Do you recall earlier when we were talking | 05:32 |
| 21 | about app advertisers that were also app developers? | 05:32 |
| 22 | A.   Yes. | 05:32 |
| 23 | Q.   Do you have an understanding at all of | 05:32 |
| 24 | whether or not app advertisers who are also | 05:32 |
| 25 | developers get access to user data through certain | 05:32 |

Page 212

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | capabilities or otherwise that other advertisers do | 05:32 |
| 2 | not? | 05:32 |
| 3 | MR. FALCONER:  Objection.  Outside the | 05:32 |
| 4 | scope of the notice. | 05:32 |
| 5 | THE WITNESS:  App developers, to my | 05:32 |
| 6 | understanding, do not get any differential access to | 05:33 |
| 7 | user data just because they are advertisers. | 05:33 |
| 8 | BY MR. KO: | 05:33 |
| 9 | Q.  But are there certain API capabilities | 05:33 |
| 10 | that an app developer has access to that an | 05:33 |
| 11 | advertiser does not? | 05:33 |
| 12 | MR. FALCONER:  Same objection. | 05:33 |
| 13 | THE WITNESS:  If your question is do app | 05:33 |
| 14 | advertisers get access to different API capabilities | 05:33 |
| 15 | than nonapp advertisers, the answer is yes, to my | 05:33 |
| 16 | understanding, because there are certain API | 05:33 |
| 17 | capabilities that are only relevant to app | 05:33 |
| 18 | advertisers. | 05:33 |
| 19 | BY MR. KO: | 05:33 |
| 20 | Q.  And -- sorry.  Go ahead. | 05:33 |
| 21 | A.  But any -- any advertiser who chooses to | 05:33 |
| 22 | have an app and leverage those capabilities can | 05:33 |
| 23 | access the same features. | 05:34 |
| 24 | Q.  And specifically as it relates to app | 05:34 |
| 25 | developers that are also advertisers, do those | 05:34 |

Page 213

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | developers also have access to certain API | 05:34 |
| 2 | capabilities that an advertiser that is not a | 05:34 |
| 3 | developer would have access to? | 05:34 |
| 4 | MR. FALCONER: Objection. Outside the | 05:34 |
| 5 | scope of the topic. | 05:34 |
| 6 | THE WITNESS: All app developers should | 05:34 |
| 7 | have access to the same developer API capabilities. | 05:34 |
| 8 | There are -- we also have a marketing API. This is | 05:34 |
| 9 | the API that supports our advertisers and ads | 05:34 |
| 10 | business. | 05:34 |
| 11 | If the app developer is not an advertiser, | 05:34 |
| 12 | they would -- they could in theory have access to | 05:34 |
| 13 | the marketing API, but they wouldn't be using it | 05:35 |
| 14 | unless they were also advertising. | 05:35 |
| 15 | BY MR. KO: | 05:35 |
| 16 | Q. Understood. Thank you. | 05:35 |
| 17 | You mentioned at the very beginning of | 05:35 |
| 18 | this deposition, or at least very early on, that one | 05:35 |
| 19 | of the ways you prepared for your deposition was to | 05:35 |
| 20 | communicate via chats through the Facebook Workplace | 05:35 |
| 21 | Chat function with other Facebook employees, | 05:35 |
| 22 | correct? | 05:35 |
| 23 | A. Yes. | 05:35 |
| 24 | Q. And did you rely on that information that | 05:35 |
| 25 | you learned in those chats when testifying today? | 05:35 |

Page 214

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.    Some of the information, yes.                          05:35

2    Q.    Okay.  And you also indicated that you                05:35

3    prepared some notes yourself that you transcribed in        05:35

4    advance or in preparation for this deposition today?        05:35

5    A.    I don't know if I indicated that, but I               05:35

6    did take notes during the course of my preparation          05:36

7    discussions for today.                                      05:36

8    Q.    And those notes, you looked at those and              05:36

9    you referenced those -- or at least you looked at           05:36

10   those when you were answering some of my questions          05:36

11   throughout the day; is that correct?                        05:36

12   A.    Yes.                                                  05:36

13   MR. KO:  Just so the record is clear,                       05:36

14   Russ, I know earlier I had memorialized our request        05:36

15   for documents Ms. Lee reviewed in connection with          05:36

16   this deposition.  But just to make sure the record          05:36

17   is clear, we also include in that request the chats        05:36

18   and the note -- the chats that she had with the            05:36

19   other Facebook employees in preparation for this           05:36

20   deposition, as well as the notes Ms. Lee prepared.         05:36

21   MR. FALCONER:  Sure, yeah.  We aren't                       05:36

22   agreeing to that now, but we understand the request.       05:36

23   BY MR. KO:                                                  05:36

24   Q.    One last series of questions.  Have you              05:36

25   received any communications from anyone while              05:37

Page 215

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | testifying today? | 05:37 |
| 2 | A.   No, not during the testimony. | 05:37 |
| 3 | Q.   Okay.  All right. | 05:37 |
| 4 | MR. KO:  Well, I actually only had one | 05:37 |
| 5 | more question.  Thank you for your time today.  I | 05:37 |
| 6 | really appreciate it and I have no further | 05:37 |
| 7 | questions. | 05:37 |
| 8 | MR. FALCONER:  I just have a couple of | 05:37 |
| 9 | quick questions. | 05:37 |
| 10 | EXAMINATION | 05:37 |
| 11 | BY MR. FALCONER: | 05:37 |
| 12 | Q.   Ms. Lee, a little bit earlier, Mr. Ko was | 05:37 |
| 13 | asking you about information about Facebook users | 05:37 |
| 14 | that might have been made available to measurement | 05:37 |
| 15 | partners.  Do you remember that? | 05:37 |
| 16 | A.   Yes. | 05:37 |
| 17 | Q.   If information about Facebook users was | 05:37 |
| 18 | made available to measurement partners, would that | 05:37 |
| 19 | information be anonymized? | 05:37 |
| 20 | A.   Yes, it should have been. | 05:37 |
| 21 | Q.   And if information about Facebook users | 05:37 |
| 22 | was made available to measurement partners, would | 05:37 |
| 23 | any of it have been personally identifiable | 05:37 |
| 24 | information about a Facebook user? | 05:37 |
| 25 | A.   It should not have been. | 05:37 |

Page 216

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   So in more concrete terms, would Facebook          05:37

2  have made available to any measurement partner the          05:38

3  identity of a specific Facebook user who engaged            05:38

4  with an ad on the platform?                                 05:38

5           MR. KO:  Object to the form.                       05:38

6           THE WITNESS:  The question was would              05:38

7  Facebook have revealed the identity of a user who          05:38

8  had engaged with a specific ad?  No, we would not          05:38

9  have shared any information about a specific user's        05:38

10  identity.                                                  05:38

11  BY MR. FALCONER:                                           05:38

12      Q.   And would Facebook have made available to         05:38

13  a measurement partner any content that a user posted       05:38

14  to the platform if that user engaged with an ad on         05:38

15  the platform?                                              05:38

16      A.   No.                                               05:38

17           MR. FALCONER:  Okay.  Thank you.  That's          05:38

18  all I have.                                                05:38

19           MR. KO:  I just have one follow-up or a           05:38

20  couple follow-ups to that if you don't mind.               05:38

21                FURTHER EXAMINATION                          05:38

22  BY MR. KO:                                                 05:38

23      Q.   What is your -- what is the basis for the         05:38

24  answers that you just provided to Mr. Falconer?  Is        05:38

25  it on your general knowledge?                              05:39

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yes, it is my general knowledge as well as | 05:39 |
| 2 | the fact that when we provide data back to | 05:39 |
| 3 | measurement partners and when we have provided data | 05:39 |
| 4 | back to measurement partners, historically it's been | 05:39 |
| 5 | for the purposes -- for the purpose of enabling | 05:39 |
| 6 | these measurement partners to conduct cross | 05:39 |
| 7 | publisher measurement and measurement generally on | 05:39 |
| 8 | behalf of their advertising clients. | 05:39 |
| 9 | So personally identifiable information is | 05:39 |
| 10 | not necessary to do that, so we wouldn't have | 05:39 |
| 11 | provided it actively. | 05:39 |
| 12 | As well, we care very much about the | 05:39 |
| 13 | security and safety of our users' information, so we | 05:39 |
| 14 | would not -- we don't share PII to ads partners for | 05:39 |
| 15 | reasons like these. | 05:40 |
| 16 | Q.   Did you discuss these questions at all | 05:40 |
| 17 | with Mr. Falconer during any break during this | 05:40 |
| 18 | deposition today? | 05:40 |
| 19 | MR. FALCONER:  Objection.  I'm going to | 05:40 |
| 20 | instruct you not to answer any questions about | 05:40 |
| 21 | conversations you had with counsel. | 05:40 |
| 22 | MR. KO:  Well, for purposes -- obviously, | 05:40 |
| 23 | I'm entitled to understand whether or not this | 05:40 |
| 24 | witness was coached. | 05:40 |
| 25 | Q.   Can you explain to me whether or not you | 05:40 |

Page 218

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | had a conversation -- without divulging the contents | 05:40 |
| 2 | of the conversation, can you describe to me whether | 05:40 |
| 3 | or not you had a conversation with Mr. Falconer | 05:40 |
| 4 | about your testimony and what questions you might | 05:40 |
| 5 | expect to answer from him? | 05:40 |
| 6 | MR. FALCONER:  Again, I'm going to | 05:40 |
| 7 | instruct the witness not to answer on privilege | 05:40 |
| 8 | grounds any questions about anything she discussed | 05:40 |
| 9 | with her lawyers today. | 05:40 |
| 10 | BY MR. KO: | 05:40 |
| 11 | Q.   And I'm not asking you to divulge the | 05:40 |
| 12 | contents of the conversation.  I'm just asking you | 05:40 |
| 13 | whether or not you actually had a conversation with | 05:40 |
| 14 | Mr. Falconer about your testimony today and what | 05:40 |
| 15 | questions he might ask. | 05:40 |
| 16 | MR. FALCONER:  Again, same instruction. | 05:40 |
| 17 | On privilege grounds, the witness is not going to | 05:40 |
| 18 | answer questions about anything she talked about | 05:41 |
| 19 | with us today. | 05:41 |
| 20 | MR. KO:  Russ, did you coach the witness | 05:41 |
| 21 | during that break? | 05:41 |
| 22 | MR. FALCONER:  I'm also not going to | 05:41 |
| 23 | reveal anything that I talked about with my client | 05:41 |
| 24 | today. | 05:41 |
| 25 | MR. KO:  We'll reserve the right to seek | 05:41 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    appropriate relief on that.                      05:41
 2        Q.   Going back to the substance of the      05:41
 3    back-and-forth questions and answers on measurement   05:41
 4    partners, just so we're clear, measurement partners   05:41
 5    are distinct from data partners or data brokers,   05:41
 6    correct?                                          05:41
 7        A.   I would say they serve different purposes   05:41
 8    for the advertisers and their -- their -- the reason   05:41
 9    Facebook has a relationship with these partners is   05:41
10    groups of partners is different.                  05:41
11            But there are a handful -- during the time   05:41
12    period in question, 2012 to 2017, there may have   05:41
13    been certain partners who were both data partners   05:41
14    that Facebook partnered with as well as -- at the   05:42
15    same time as they were measurement partners.      05:42
16        Q.   Okay.  And which entities were those?    05:42
17        A.   I don't know which entities those would   05:42
18    ████████████████████████████  ███         ███
      ████████████████████████████████          ███
      ███████████████████████████               ███
      ███████████████████████████████████       ███
      ███████████████████████████████           ███
      ██████████████████████████████████        ███
      ██████████████████████████████████        ███
      ███████████████████                       05:42
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So just to be clear, those are -- your | 05:42 |
| 2 | testimony today is that the data partners or data | 05:43 |
| 3 | brokers described there are synonymous with | 05:43 |
| 4 | measurement partners? | 05:43 |
| 5 | MR. FALCONER:  Objection.  Form. | 05:43 |
| 6 | BY MR. KO: | 05:43 |
| 7 | Q.   Are they distinct? | 05:43 |
| 8 | A.   I would say that those three companies | 05:43 |
| 9 | were both data partners that Facebook had a | 05:43 |
| 10 | relationship for purposes of partner categories, and | 05:43 |
| 11 | also we had a relationship with them based on their | 05:43 |
| 12 | measurement partner capabilities they supplied to | 05:43 |
| 13 | advertisers. | 05:43 |
| 14 | Q.   And I noticed when you said that -- in | 05:43 |
| 15 | response to the question of whether or not this | 05:43 |
| 16 | information that was made available to measurement | 05:43 |
| 17 | partners was anonymized, you said it should have | 05:43 |
| 18 | been.  Do you recall that? | 05:43 |
| 19 | A.   Yes. | 05:43 |
| 20 | Q.   And then when you said whether or not this | 05:43 |
| 21 | information that -- whether or not this information | 05:43 |
| 22 | reflected or included personally identifiable | 05:43 |
| 23 | information about a Facebook user, you said it | 05:43 |
| 24 | should have been, correct? | 05:44 |
| 25 | A.   Yes. | 05:44 |

Page 221

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Do you know that to be unequivocally the | 05:44 |
| 2 | case that it was, or you're just saying the policy | 05:44 |
| 3 | was that it should have been? | 05:44 |
| 4 | A.   Sorry.  The last thing that you -- the | 05:44 |
| 5 | last statement that you mentioned, can you repeat | 05:44 |
| 6 | that?  I said yes to something I didn't mean to say | 05:44 |
| 7 | yes to. | 05:44 |
| 8 | Q.   Sure.  Are you talking about the PII? | 05:44 |
| 9 | A.   Yes, just the last statement, if you could | 05:44 |
| 10 | repeat it. | 05:44 |
| 11 | Q.   Okay.  I was just -- I was just asking, do | 05:44 |
| 12 | you recall the testimony you gave in response to | 05:44 |
| 13 | your counsel's question with respect to PII being | 05:44 |
| 14 | delivered to a measurement partner? | 05:44 |
| 15 | You said that it -- it should have been | 05:44 |
| 16 | the case that there was not PII delivered to the | 05:44 |
| 17 | measurement partner; is that correct? | 05:44 |
| 18 | A.   Yes. | 05:44 |
| 19 | Q.   And you said it should have been. | 05:44 |
| 20 | And my follow-up question to that is, do | 05:44 |
| 21 | you know whether or not that was unequivocally the | 05:44 |
| 22 | case? | 05:44 |
| 23 | A.   I -- I -- I do not know whether that was | 05:44 |
| 24 | unequivocal -- unequivocally the case, but given my | 05:45 |
| 25 | understanding of why we supplied data to these | 05:45 |

Page 222

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    measurement partners in the first place, and given      05:45

2    the fact that we do not share PII with                  05:45

3    individuals -- with external advertising partners       05:45

4    for -- for -- for reasons like this, yeah, it --        05:45

5    it -- I cannot imagine a scenario where we would        05:45

6    have shared this data.                                  05:45

7    ███ ████████████████████████████            ███

█ ███████████████████████████████               ███

█ ██████ █████████████████████████              ███

█ ████████████████████████████████              ███

█ █████████████████████████████████             ███

█ ████████████████████████████████████          ███

█ ████████████████████████████████████          ███

█ █████████████████████                                     05:46

15              MR. FALCONER:  Objection.  Form.            05:46

16   ████████████ ███████████████████████       ███

█ █████████████████████████████████             ███

█ ██████████████████████████████                ███

█ ██████████████████████████████                ███

█ ██████████████                                 ███

█ ████████████████████████████████              ███

█ ███████████████████████████████               ███

█ █████████████                                  ███

█ ██ ███████████████████████████████            ███

█ ████████████████████                                      05:47

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          MR. FALCONER:  Objection.  Form.            05:47

 2          (Pause while witness peruses document.)     05:47

 3    ████████████  █████████████████████             █████  05:47

      █████████████████████████████████              █████

      ██████████████████████████████████             █████

      ███████████████████████████████                █████

      ███████████████████████████████                █████

      ██████████  ███████████████████████            █████

      █████████████████████████████████              █████

   ██  ████████████                                  █████

   ██  █████████████                                    05:48

12          Q.   Okay.  By the way, what's your          05:48

13    understanding of what PII consists of?             05:48

14          A.   It stands for personally identifiable   05:48

15    information.  So it could include things like name, 05:48

16    email address, phone number, mailing -- a physical  05:48

17    address, things that could be associated with the   05:48

18    person's real identity.                             05:48

19          Q.   All right.                               05:48

20          MR. KO:  And that's -- unless Mr. Falconer    05:48

21    has any further questions, that's it for me.  So    05:48

22    thank you for your time, Amy.                       05:48

23          THE WITNESS:  Thank you.                      05:48

24          MR. FALCONER:  Nothing here.  Thank you.      05:48

25          And we'd like to mark the transcript for      05:48
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    today highly confidential.                              05:48

2            THE VIDEOGRAPHER:  We are off the record        05:48

3    at 5:48 p.m.  This concludes today's testimony given    05:48

4    my Amy Lee.  The total number of media units used       05:48

5    was five and will be retained by Veritext Legal         05:49

6    Solutions.                                              05:49

7            (At the time of 5:48 p.m. the deposition        05:49

8             was concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                                                    Page 225

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            CERTIFICATE OF REPORTER
 2       I, ASHALA TYLOR, CSR No. 2436, in and for the State
 3   of California, do hereby certify:
 4       That the foregoing proceedings were taken before me
 5   at the time and place herein set forth; that any
 6   witnesses in the foregoing proceedings, prior to
 7   testifying, were placed under oath; that a verbatim
 8   record of the proceedings were made by me using machine
 9   shorthand which was thereafter transcribed under my
10   direction; further that the foregoing is an accurate
11   transcription thereof.
12       That before the completion of the deposition,
13   review of the transcript was not requested.
14       I further certify that I am neither financially
15   interested in this action nor a relative or employee of
16   any attorney or any of the parties hereto.
17       In compliance with Section 8016 of the Business and
18   Professions Code, I certify under penalty of perjury
19   that I am a Certified Shorthand Reporter with
20   California License No. 2436 in full force and effect.
21   WITNESS my hand this 27th day of February, 2021.
22
23
24
25       Ashala Tylor, CSR #2436, RPR, CRR, CLR

                                       Page 226
```

**ERRATA SHEET**

REGARDING THE DEPOSITION OF: <u>AMY LEE</u>

TAKEN ON: <u>FEBRUARY 24, 2021</u>

IN THE MATTER OF: <u>IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION</u>

DOCKET NO.: <u>3:18-MD-02843-VC</u>

IN: <u>U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION</u>

BEGINNING: <u>11:08 AM</u>

ENDING: <u>5:48 PM</u>

REPORTED BY: <u>Ashala Tylor, CSR #2436, CLR, CRR, RPR</u>

JOB NO.: <u>4473156</u>

**INSTRUCTIONS FOR READING/CORRECTING YOUR DEPOSITION**

To assist you in making corrections to your deposition testimony, please
Follow the directions below. If additional pages are necessary, please furnish
Them and attach the pages to the back of the errata sheet.

This is the final version of your deposition transcript.

Please read it carefully. If you find any errors or changes you wish to make,
Insert the corrections on the errata sheet beside the page and line numbers.

If you are in possession of the original transcript, do NOT make any changes directly
on the transcript.

Do NOT change any of the questions.

After completing your review, please sign the last page of the errata sheet,
Above the designated "Signature" line and return the transcript to your attorney.

ERRATA SHEET

| Page | Line | | |
|------|------|--------|---|
| 15 | 6 | Change: | "Margaret Wrenn" should be "Margaret Ren" |
| | | Reason: | Transcription Error |
| 18 | 2 | Change: | "Margaret Wrenn" should be "Margaret Ren" |
| | | Reason: | Transcription Error |
| 18 | 11 | Change: | "getting her contacts" should be "getting her context" |
| | | Reason: | Transcription Error |

| 28 | 23 | Change: | "test those ads product"  should be "test those ads products" |
| | | Reason: | Transcription Error |
| 35 | 1 | Change: | "experience in understanding" should be "experience and understanding" |
| | | Reason: | Transcription Error |
| 37 | 18 | Change: | "we like for" should be "we'd like for" |
| | | Reason: | Transcription Error |
| 47 | 6 | Change: | "it's a set of ad products" should be "there's a set of ad products" |
| | | Reason: | Transcription Error |
| 48 | 14 | Change: | "estimated auction rate" should be "estimated action rate" |
| | | Reason: | Transcription Error |
| 56 | 18 | Change: | "So include" should be "So it includes" |
| | | Reason: | Transcription Error |
| 56 | 22 | Change: | "other" should be "another" |
| | | Reason: | Transcription Error |
| 65 | 7 | Change: | "revenue is quite" should be "revenue as quite" |
| | | Reason: | Transcription Error |
| 66 | 18 | Change: | "to check that" should be "to track that" |
| | | Reason: | Transcription Error |
| 68 | 7 | Change: | "finance team" should be "growth team" |
| | | Reason: | To Correct The Record |
| 86 | 18 | Change: | "but -- so that we tracked" should be "but know that we tracked" |
| | | Reason: | Transcription Error |
| 122 | 25 | Change: | "it's a reference" should be "it's a reference to" |
| | | Reason: | Transcription Error |
| 124 | 9 | Change: | "where I believe happened" should be "where I believe that happened" |
| | | Reason: | Transcription Error |
| 140 | 7 | Change: | "putting ad spin behind" should be "putting ad spend behind" |
| | | Reason: | Transcription Error |

| 141 | 6 | Change: | "and my product team" should be "and the product team" |
| | | Reason: | Transcription Error |
| 145 | 18 | Change: | "using our platform for a time" should be "using our platform over time" |
| | | Reason: | Transcription Error |
| 150 | 13 | Change: | "what industry protocol" should be "what industry or vertical" |
| | | Reason: | Transcription Error |
| 159 | 24 | Change: | "in page 2 of 2020" should be "in H2 of 2020" |
| | | Reason: | Transcription Error |
| 164 | 8 | Change: | "will be in this kind" should be "will be and this kind" |
| | | Reason: | Transcription Error |
| 164 | 16 | Change: | "which might be a time-closed" should be "which might be kind of close" |
| | | Reason: | Transcription Error |
| 184 | 15 | Change: | "we receive data" should be "we received data" |
| | | Reason: | Transcription Error |
| 191 | 24 | Change: | "Why am I seeing this go?" should be "Why am I seeing this?" |
| | | Reason: | Transcription Error |
| ___ | ___ | Change: | _____ |
| | | Reason: | _____ |
| ___ | ___ | Change: | _____ |
| | | Reason: | _____ |
| ___ | ___ | Change: | _____ |
| | | Reason: | _____ |
| ___ | ___ | Change: | _____ |
| | | Reason: | _____ |
| ___ | ___ | Change: | _____ |
| | | Reason: | _____ |
| ___ | ___ | Change: | _____ |
| | | Reason: | _____ |

_____      _____      Change: _____

                      Reason: _____

_____      _____      Change: _____

                      Reason: _____


Subject to the above  changes, I certify that the transcript is true and correct.

No changes have been made.  I certify that the transcript is true and correct.

                                                April 28, 2021
_____     _____
(signature)                                (date)

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

2001 Ross Avenue
Dallas, TX 75201-2911
Tel 214.698.3100
www.gibsondunn.com

March 5, 2021

<u>VIA ELECTRONIC MAIL</u>

Lesley Weaver
Bleichmar Fonti & Auld LLP
555 12th Street
Suite 1600
Oakland, CA 94607

Derek W. Loeser
David Ko
Keller Rohrback LLP
1201 Third Avenue
Suite 3200
Seattle, WA 98101

Re:   <u>*In re Facebook, Inc. Consumer Privacy User Profile Litigation* (N.D. Cal.), Case No.
      3:18-md-02843-VC</u>

Dear Counsel:

Under Section 4(A) of the Stipulation and Order Re Clawback and Privileged Document
Pursuant to Fed. R. Evid. 502(D) & (E) entered in the above-referenced matter (ECF 422),
defendant Facebook, Inc. hereby provides a Clawback Notice for the testimony that appears
at the following portions of the transcript of the February 24, 2021 deposition of Amy Lee in
her capacity as Facebook's 30(b)(6) designee on the topic of how Facebook monetizes—
directly or indirectly—and thus values user data (the "Inadvertently Provided Testimony"):

- 21:18–21
- 22:2–3

The "Inadvertently Provided Testimony" reflects attorney-client privileged information and
was inadvertently provided by the witness.

Replacement copies of the relevant pages of the deposition transcript, with the privileged
material redacted, are attached to this letter.  Facebook requests that Plaintiffs (i) sequester
the Inadvertently Provided Testimony, all copies thereof, and any notes that reproduce, copy,
or otherwise disclose the substance of the Inadvertently Provided Testimony; (ii) refrain from
making any use of the Inadvertently Provided Testimony; and (iii) within fifteen calendar
days return and/or certify destruction of the Inadvertently Provided Testimony, all copies
thereof, and any notes that reproduce, copy, or otherwise disclose the substance of the
Inadvertently Provided Testimony, and certify in writing to that fact.

**GIBSON DUNN**

Lesley Weaver
March 5, 2021
Page 2

Sincerely,

Russell H. Falconer

RHF/sg



Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
866 299-5127



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
866 299-5127



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
866 299-5127



Veritext Legal Solutions
866 299-5127



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
866 299-5127



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
866 299-5127



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 23

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 26

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
866 299-5127



Page 28

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





Page 31



Page 32

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 33

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
866 299-5127



Page 35



Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 37

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 42

**[yeah - zoom]**

109:3 111:17
112:24 114:23
121:9,13 122:22
133:17 141:21
163:12,12 174:24
189:17 210:3
212:4 215:21
223:4

**year**   90:1,10,18
91:18,25 105:3
111:18,18 159:22
159:24 160:5,7,8,9
211:4

**years**   30:8 31:2
33:21 63:19 78:12
79:17 86:4 89:18
90:2 92:18 106:3
107:1,1,8 108:1
110:10

**yesterday**   31:19
80:15 173:21
174:15

**yoga**   58:18,19,21
58:21

**z**

**z**   55:5
**zoom**   1:16 2:17

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.