CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
    IN RE:  FACEBOOK, INC.,      MDL No. 2843
 4  CONSUMER USER PROFILE        Case No.
    LITIGATION                   18-md-02843-VC-JSC
 5  _____
 6  This document relates to:
 7  ALL ACTIONS
 8
    _____
 9
10
11      **CONFIDENTIAL UNDER THE PROTECTIVE ORDER**
12        ZOOM DEPOSITION OF FACEBOOK's 30(b)(6)
13      CORPORATE REPRESENTATIVE - ALLISON HENDRIX
14  (Reported Remotely via Video & Web Videoconference)
15       Palo Alto, California (Deponent's location)
16                 Thursday, May 5, 2022
17                     Volume I
18
19
20
    STENOGRAPHICALLY REPORTED BY:
21  REBECCA L. ROMANO, RPR, CSR, CCR
    California CSR No. 12546
22  Nevada CCR No. 827
    Oregon CSR No. 20-0466
23  Washington CCR No. 3491
24  JOB NO. 5210138
25  PAGES 1 - 347
```

Page 1

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

   IN RE:  FACEBOOK, INC.,      MDL No. 2843

4  CONSUMER USER PROFILE         Case No.

   LITIGATION                    18-md-02843-VC-JSC

5  _____

6  This document relates to:

7  ALL ACTIONS

8

   _____

9

10

11

12

13

14

15          DEPOSITION OF ALLISON HENDRIX, taken on

16  behalf of the Plaintiffs, with the deponent located

17  in Palo Alto, California, commencing at

18  9:16 a.m., Thursday, May 5, 2022, remotely reported

19  via Video & Web videoconference before

20  REBECCA L. ROMANO, a Certified Shorthand Reporter,

21  Certified Court Reporter, Registered Professional

22  Reporter.

23

24

25

                                        Page  2

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1                    APPEARANCES OF COUNSEL
2      (All parties appearing via Web videoconference)
3
4     For the Plaintiffs:
5           KELLER ROHRBACK L.L.P.
6           BY:  DAVID KO
7           BY:  CARI CAMPEN LAUFENBERG
8           BY:  DEREK W. LOESER
9           BY:  EMMA WRIGHT
10          BY:  ADELE A. DANIEL
11          Attorneys at Law
12          1201 Third Avenue
13          Suite 3200
14          Seattle, Washington 98101
15          (206) 623-1900
16          dko@kellerrohrback.com
17          claufenberg@kellerrohrback.com
18          dloeser@kellerrohrback.com
19          ewright@kellerrohrback.com
20          adaniel@kellerrohrback.com
21
22
23
24
25    /////
```

Page 3

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1                  APPEARANCES OF COUNSEL

 2     (All parties appearing via Web videoconference)

 3

 4     For the Plaintiffs:

 5          BLEICHMAR FONTI & AULD LLP

 6          BY:  LESLEY E. WEAVER

 7          Attorney at Law

 8          555 12th Street

 9          Suite 1600

10          Oakland, California 94607

11          (415) 445-4003

12          lweaver@bfalaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25     /////
```

Page  4

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1            APPEARANCES OF COUNSEL(cont'd)

 2    (All parties appearing via Web videoconference)

 3

 4   For Facebook, Inc.:

 5        GIBSON, DUNN & CRUTCHER LLP

 6        BY:  ROBERT C. BLUME

 7        BY:  DAYNA ZOLLE HAUSER

 8        BY:  MARIE D. ZOGLO

 9        Attorneys at Law

10        1801 California Street

11        Suite 4200

12        Denver, Colorado 80202-2642

13        (303) 298-5735

14        rblume@gibsondunn.com

15        dzhauser@gibsondunn.com

16        mzoglo@gibsondunn.com

17

18

19

20

21

22

23

24

25   /////
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              APPEARANCES OF COUNSEL(cont'd)

 2    (All parties appearing via Web videoconference)

 3

 4    For Facebook, Inc.:

 5         GIBSON DUNN & CRUTCHER LLP

 6         BY:  KELLY E. HERBERT

 7         BY:  ANDREW V. KUNTZ

 8         BY:  JOE LoPRESTI

 9         Attorneys at Law

10         200 Park Avenue

11         New York, New York 10166-0193

12         (212) 351-4000

13         kherbert@gibsondunn.com

14         akuntz@gibsondunn.com

15         jlopresti@gibsondunn.com

16    and

17         BY:  PRACHI MISTRY

18         Attorney at Law

19         1881 Page Mill Road

20         Palo Alto, California 94304-1211

21         pmistry@gibsondunn.com

22

23

24

25    /////
```

Page 6

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1              APPEARANCES OF COUNSEL(cont'd)

2     (All parties appearing via Web videoconference)

3

4     For Facebook, Inc.:

5          GIBSON, DUNN & CRUTCHER LLP

6          BY:  ROSEMARIE T. RING

7          Attorney at Law

8          555 Mission Street

9          Suite 3000

10         San Francisco, California 94105-0921

11         (415) 393-8247

12         rring@gibsondunn.com

13

14         JAMS

15         BY:  DANIEL B. GARRIE

16         Special Master

17         555 W. 5th Street

18         32nd Floor

19         Los Angeles, California 90013

20         (213) 253-9706

21         dgarrie@jamsadr.com

22

23

24

25     /////
```

Page 7

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1                          APPEARANCES(cont'd)

2        (All parties appearing via Web videoconference)

3

4     ALSO PRESENT:

5            Ian Chen, Associate General Counsel, Facebook

6     Inc.

7            John Macdonell, Videographer

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     /////

                                                    Page  8

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1                    I N D E X

 2   DEPONENT                         EXAMINATION

 3   ALLISON HENDRIX                        PAGE

     VOLUME I

 4

 5                  BY MR. KO                 12

 6

 7

 8                 E X H I B I T S

 9   NUMBER                                PAGE

10                 DESCRIPTION

11   Exhibit 330  Plaintiff's Second Amended    15

12                Notice of Deposition of

13                Defendant Facebook, Inc.

14                Pursuant to Federal Rule of

15                Civil Procedure 30(b)(6);

16

17   Exhibit 331  newsroom - Better Controls   169

18                for Managing Your Content,

19                FB-CA-MDL-00005751 -

20                FB-CA-MDL-00005758.

21

22

23

24

25   /////
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              Palo Alto, California; May 5, 2022

 2                      9:16 a.m.

 3                      ---o0o---

 4

 5         THE VIDEOGRAPHER:  Okay.  We're on the        09:16:25

 6   record.  It's 9:16 a.m., Pacific Time, on

 7   May 5th, 2022.  This is the deposition of

 8   Allison Hendrix.

 9         We're here in the matter In Re:

10   Facebook, Inc. Consumer Privacy User Profile        09:16:39

11   Litigation.

12         I'm John Macdonell, the videographer with

13   Veritext.

14         Before the reporter swears the witness,

15   would counsel please identify themselves, beginning  09:16:47

16   with the noticing attorney, please.

17         MR. KO:  Good morning, everyone.

18   David Ko of Keller Rohrbach on behalf of

19   plaintiffs.

20         And with me here today is -- are           09:16:59

21   Cari Laufenberg, Derek Loeser, Emma Wright and

22   Adele Daniele, I believe, also of Keller-Rohrback.

23         MR. BLUME:  And good morning.  This is

24   Rob Blume from Gibson Dunn on behalf of

25   Ms. Ali Hendrix and Facebook.                   09:17:17
```

Page 10

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1                 And on the video is -- with me in the        09:17:22

 2      room is Prachi Mistry, Kelly Herbert and Ian Chen

 3      from Facebook and Gibson Dunn.  And on the video, I

 4      think, is Joe LoPresti, Dana Zolle Hauser,

 5      Andrew Kuntz and -- I think that's all we have.        09:17:43

 6                 SPECIAL MASTER GARRIE:  This is

 7      Special Master Garrie.  I'm here on behalf of the

 8      Court.

 9                 MR. BLUME:  And --

10                 MR. KO:  We have a big crowd for you,        09:18:01

11      Ms. Hendrix.

12                 MR. BLUME:  And the part -- as -- as we

13      spoke before we went on the record, the

14      transcript -- we seek to have the transcript marked

15      "Confidential" under the existing protective           09:18:09

16      orders.

17                 THE COURT REPORTER:  If you could raise

18      your right hand for me, please.

19                 THE DEPONENT:  (Complies.)

20                 THE COURT REPORTER:  You do solemnly         09:18:13

21      state, under penalty of perjury, that the testimony

22      you are about to give in this deposition shall be

23      the truth, the whole truth and nothing but the

24      truth?

25                 THE DEPONENT:  I do.                         09:18:13
```

Page 11

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | ALLISON HENDRIX, | 09:18:34 |
| 2 | having been administered an oath, was examined and | |
| 3 | testified as follows: | |
| 4 | | |
| 5 | EXAMINATION | 09:18:34 |
| 6 | BY MR. KO: | |
| 7 | Q.   Good morning, Ms. Hendrix. | |
| 8 | A.   Good morning. | |
| 9 | Q.   We met off the record, but my name is | |
| 10 | David Ko of Keller Rohrback and I'll be taking your | 09:18:47 |
| 11 | deposition today. | |
| 12 | I believe you have taken your dep- -- I | |
| 13 | believe you have taken a deposition before; is that | |
| 14 | correct? | |
| 15 | A.   Yes. | 09:18:58 |
| 16 | Q.   So you know how this goes a bit, but let | |
| 17 | me remind you of a few of the ground rules that are | |
| 18 | most important to me. | |
| 19 | The most important task here today is to | |
| 20 | create a clean record and for Rebecca, the | 09:19:10 |
| 21 | court reporter, to transcribe everything that we | |
| 22 | say.  So please wait until I finish my question | |
| 23 | before moving on to your answer, even though you | |
| 24 | think you know what the answer is.  And I will | |
| 25 | likewise wait until you finish your response before | 09:19:21 |

Page 12

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    moving on to my next question.                    09:19:24

2           Does that sound fair?

3       A.   Yes.

4       Q.   And to the extent I ask a yes-or-no

5    question and your response is, in fact, yes or no,   09:19:32

6    it is important for the record to answer in that

7    manner rather than shaking your head or giving an

8    inaudible response.

9           Does that sound fair?

10      A.   Yes.                                        09:19:47

11      Q.   From time to time your counsel,

12   Mr. Blume, may object to some of my questioning.

13   But unless he clearly instructs you not to answer,

14   I'd ask that you respond to my question

15   nonetheless.                                        09:19:59

16          Does that sound fair?

17      A.   Yes.

18      Q.   And we'll be here for a few hours.  It

19   won't be an entire long day of seven -- seven or

20   eight hours, like a normal deposition, but it will   09:20:10

21   be a pretty long day.  So if at any time you need a

22   break, just please let me know and I will do my

23   best to accommodate.

24          Okay?

25      A.   Yes.                                        09:20:20

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        Q.   Ms. Hendrix -- by the way, would you        09:20:25
 2   prefer Ms. Hendrix, Allison?
 3             How would you like to be addressed during
 4   this deposition?
 5        A.   Ms. Hendrix is fine.                         09:20:34
 6        Q.   Okay.  Great.
 7             Ms. Hendrix, is there anything that you
 8   can think of that will prevent you from testifying
 9   honestly or truthfully today?
10        A.   No.                                          09:20:43
11        Q.   Great.
12             Let me start by showing you the notice
13   that governs your testimony today.
14             So let's start with the 30(b)(6) notice
15   that I assume you have seen.  But we'll talk about    09:20:58
16   that here in a second.
17             I can see you're a little confused.  The
18   exhibits will be shown to you both on this platform
19   that you can access or I believe if you would like
20   we can share it on the screen for you.                09:21:18
21             Whatever you prefer?
22        A.   I wasn't sure if the machine next to me
23   was -- was what I was going to be viewing it on.
24   And it looked like it's -- you might need to log
25   back in to it.                                         09:21:38
```

Page 14

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              (Discussion off the stenographic record.)     09:21:40

 2              MR. KO:  So while that's being fired up,

 3      I will note for the record that this exhibit will

 4      be Exhibit 330.

 5              (Exhibit 330 was marked for                    09:22:03

 6      identification by the court reporter and is

 7      attached hereto.)

 8              MR. KO:  And it will be a copy of the

 9      30(b)(6) notice, dated March 1st, 2022.

10          Q.   (By Mr. Ko)  Let me know when you have        09:22:15

11      that up.

12          A.   The folder currently appears to be empty,

13      but maybe I need to do something.

14              MR. KO:  Yeah.  Just give -- give it a

15      little time.  It should --                             09:22:28

16              MR. BLUME:  Just click on that right

17      there.

18              THE DEPONENT:  Okay.

19              MR. KO:  Yeah, you can -- you can

20      refresh.                                               09:22:33

21              THE DEPONENT:  Yeah.  I got it up.

22              MR. KO:  And while you do that, just

23      so -- great.

24              While you do that, so the record is

25      clear, that exact title of this document is            09:22:37
```

Page 15

| | | |
|---|---|---|
| 1 | Plaintiffs Second Amended Notice of Deposition of | 09:22:39 |
| 2 | Defendant Facebook, Pursuant to FRCP 30(b)(6). | |
| 3 | Q. (By Mr. Ko)  Do you see that document in | |
| 4 | front of you now, Ms. Hendrix? | |
| 5 | A. I do. | 09:22:54 |
| 6 | Q. Have you seen this notice before? | |
| 7 | A. I believe so, yes. | |
| 8 | Q. You are testifying on certain topics in | |
| 9 | this notice, correct? | |
| 10 | A. Correct. | 09:23:04 |
| 11 | Q. And let me turn your attention to | |
| 12 | page 11, section III of this notice. | |
| 13 | A. I'm not seeing a section III on what | |
| 14 | appears to be page 11. | |
| 15 | Q. Well, go ahead to page 11 of the notice. | 09:23:32 |
| 16 | And I -- I don't know what PDF you may have up, but | |
| 17 | I'm talking about page 11 of the notice itself that | |
| 18 | appears at the bottom of the -- the document. | |
| 19 | A. I'm on what seems to be page 11 and it | |
| 20 | starts with "Matters For Testimony." | 09:23:46 |
| 21 | Q. Right. | |
| 22 | And so by section III, I'm just simply | |
| 23 | referring to the -- the Roman numeral III that | |
| 24 | precedes -- | |
| 25 | A. Oh, okay. | 09:23:56 |

Page 16

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        Q.    -- "Matters For Testimony."              09:23:57

 2        A.    All right.  I'm there.

 3        Q.    So do you see -- okay.  Great.

 4              Do you see under "Matters For Testimony"

 5   a topic 1?                                          09:24:06

 6        A.    Yes.

 7        Q.    Accurate to state that you are testifying

 8   on topic 1 of this notice?

 9        A.    Yes.

10        Q.    Turn with me to the next page, to         09:24:24

11   topic 3.

12              Is it accurate to state that you are

13   testifying on topic 3 of this notice?

14        A.    Yes.

15        Q.    And I'm sorry to go a little out of       09:24:41

16   order, but now go back to -- to page 11, topic 2.

17              Is it accurate to state that you are

18   testifying on some aspects of topic 2 of this

19   notice?

20        A.    Yes.                                      09:24:55

21        Q.    In particular, you are testifying as to

22   topics 2b and 2d, except as those topics relate to

23   targeted advertising, correct?

24        A.    Yes.

25        Q.    Would you agree with me that topics 2b    09:25:11
```

Page 17

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | and 2d have relation -- have some relationship to | 09:25:14 |
| 2 | topic 3? | |
| 3 | MR. BLUME:  Objection.  Form. | |
| 4 | THE DEPONENT:  What do you mean? | |
| 5 | Q.  (By Mr. Ko)  Do you understand what the | 09:25:28 |
| 6 | word "related" means? | |
| 7 | MR. BLUME:  Objection.  Form. | |
| 8 | THE DEPONENT:  I know what the word | |
| 9 | "related" means.  And if you want to repeat your | |
| 10 | question, I can slowly look at this and see. | 09:25:41 |
| 11 | Q.  (By Mr. Ko)  Sure. | |
| 12 | Are -- are topics 2b and 2d related to | |
| 13 | topic 3? | |
| 14 | MR. BLUME:  Objection.  Form. | |
| 15 | THE DEPONENT:  So you're asking me how | 09:26:06 |
| 16 | topics 2b and 2d are related to 2, 3? | |
| 17 | Q.  (By Mr. Ko)  No.  I'm not -- first of | |
| 18 | all, I'm not asking you how.  And I'm not -- I | |
| 19 | didn't talk about 2, 3. | |
| 20 | I said are topics 2b and 2d related to | 09:26:23 |
| 21 | topic 3? | |
| 22 | MR. BLUME:  Objection.  Form. | |
| 23 | MR. KO:  Mr. Blume, in the past, just so | |
| 24 | you -- for your edification, we have had a standing | |
| 25 | objection or we've stipulated to a standing | 09:26:38 |

Page 18

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1    objection as to form.  And I'm happy to do that          09:26:41

2    here, to the extent those objections are -- are

3    form objections.

4              MR. BLUME:  Well, I don't -- I don't

5    think we can have a --                                    09:26:52

6              MR. KO:  If you don't want to stipulate,

7    that's fine.

8              MR. BLUME:  I -- yeah, I'd prefer not a

9    standing objection.  I just -- I'm not sure --

10   I'm -- I'm not even sure what you mean, but               09:26:57

11   that's my -- my objection is to the form of the

12   question.

13             THE DEPONENT:  Yeah, I -- I can't --

14   I'm -- I'm going to decline to answer that because

15   like we've -- we've never sold data.  So it's            09:27:07

16   like -- I'm not going to wrap all of these

17   statements in together and say that they're

18   related.  I'm sorry.

19       Q.   (By Mr. Ko)  Okay.  Is topics -- are

20   aspects of topic 2b and 2d -- and this is not a          09:27:22

21   trick question.  This is just a basic question.

22             Are topic -- aspects of topic 2b and 2d

23   related in any way to topic 3?

24             MR. BLUME:  Objection.

25             THE DEPONENT:  What do you mean by             09:28:04
```

Page 19

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    "related"?                                          09:28:05

 2           Maybe you can help me.

 3      Q.   (By Mr. Ko)  I'm -- I'm not the Webster

 4    dictionary, but I have a very common understanding

 5    of what the word "related" means.                   09:28:14

 6           Do you have an understanding of what the

 7    word "related" means because earlier when I asked

 8    you --

 9      A.   I'd love to understand -- I'd -- I'd love

10    to understand what your common understanding is.    09:28:20

11      Q.   Is there any relation --

12      A.   That could help me answer this question.

13      Q.   So your counsel designated you, and you

14    consented to testify as to topics 2b and 2d, and

15    you answered yes to that question, correct?         09:28:40

16      A.   I can testify with respect to the topics

17    that I already acknowledged that I'm here to

18    testify.

19      Q.   So you -- I assume you have an

20    understanding of what topics 2b and 2d encompass;   09:28:53

21    is that correct?

22      A.   Yes.

23      Q.   If the Court or the jury wanted to know

24    whether or not Ms. Hendrix believed that topics 2b

25    and 2d were in any way, shape or form related to    09:29:11
```

Page 20

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1    topics 3, how would you respond to that question?        09:29:14

2              MR. BLUME:  Objection.  Speculation.

3    Vague.

4              THE DEPONENT:  So 2b is "Identification,

5    by category, of the type of Data or Information to       09:29:27

6    which Facebook sold" -- again, we've never done

7    that -- "made accessible, made available, or

8    allowed Third Parties to use to target Users,"

9    which I'm not here to testify to, on ads, "The

10   types" -- well, let's go to b.                           09:29:45

11             "The purposes for which such Data or

12   Information was shared or made" available -- "made

13   accessible, or permitted Third Parties to target,"

14   the later of which I'm not here to speak to.

15             "How Facebook ensured Third Parties' Use        09:29:57

16   of such Data or Information was limited to the Use

17   Case."

18             Then when we go to topic 3, "An overview

19   of the processes of developing Privacy or App

20   Settings or other controls made available to Users       09:30:11

21   to prevent or limit their Data or Information from

22   being accessed by Third Parties, including the

23   dates during which each such Privacy or App Setting

24   or other controls were available."

25             And I'll go ahead and help us all by not        09:30:27
```

Page 21

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1    continuing to read it.                          09:30:29

2           So topic 2 does speak to the platform.

3    And topic 3 speaks to how people could use settings

4    to control information through the platform, so

5    they are somewhat related.                      09:30:45

6       Q.   (By Mr. Ko)  Okay.  Thank you.

7           In particular, topic 3c, and which you

8    indicated earlier that you were testifying on

9    behalf of Facebook for, indicates that you will be

10   providing testimony as to Facebook's monitoring and   09:31:03

11   enforcement of contractual terms with third

12   parties.

13          Do you see that -- of course, it has some

14   extra language in there -- but do you see topic 3c?

15      A.   I do.                                    09:31:14

16      Q.   Do you feel that it -- that has any

17   relationship with topic 2d, which asks for how

18   Facebook ensured third parties' use of such data or

19   information was limited to the use case?

20          MR. BLUME:  Objection.  Form.             09:31:26

21          THE DEPONENT:  Those topics are similar.

22      Q.   (By Mr. Ko)  Great.  Thank you.

23          I believe you're also tasked -- turn --

24   turn to page 13 of the notice and, in particular,

25   topic 6.                                         09:31:54
```

Page 22

| | | |
|---|---|---|
| 1 | A.   I just read it. | 09:32:05 |
| 2 | Q.   Is it accurate to state that you are also | |
| 3 | testifying as to some aspects of topic 6 of this | |
| 4 | notice? | |
| 5 | MR. BLUME:  Objection.  She's not -- | 09:32:19 |
| 6 | we're not presenting her as a witness on topic 6. | |
| 7 | So, no, I can answer that. | |
| 8 | MR. KO:  That's con- -- that's contrary, | |
| 9 | Mr. Blume, to your own email that indicated that | |
| 10 | Ms. Hendrix is testifying as to the portions of | 09:32:30 |
| 11 | topics -- | |
| 12 | MR. BLUME:  Right.  Yeah, you're right. | |
| 13 | I'm sorry.  My -- you're absolutely right, Mr. Ko. | |
| 14 | You're -- that's correct.  My -- I'm sorry. | |
| 15 | Q.   (By Mr. Ko)  Let me restate the question. | 09:32:40 |
| 16 | A.   I am prepared to -- I'm prepared to -- | |
| 17 | Q.   Let me -- sorry.  Sorry, Ms. Hendrix.  I | |
| 18 | apologize.  Let me just -- so we have a clean | |
| 19 | record, let me just ask it again. | |
| 20 | Is it accurate to state that you are | 09:32:49 |
| 21 | testifying as to some aspects of topic 6 of this | |
| 22 | notice? | |
| 23 | A.   Yes. | |
| 24 | Q.   In particular, you are testifying as to | |
| 25 | "The development of Friend Sharing" and "the | 09:33:01 |

Page 23

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1    communication of this technology to users,              09:33:09

2    including the drafting of Facebook's Terms of

3    Service, SRR and Data and Privacy Policies" related

4    to "Friend sharing"?  And I added a "to" there.

5            But is that accurate to state, that you        09:33:24

6    are testifying as to that portion of topic 6?

7       A.   The first part, no.  But I am here to

8    talk about the -- like the drafting of Facebook's

9    terms of service, SRR and data and privacy policies

10   related to friend sharing.                              09:33:40

11      Q.   Great.  Thank you.  That's helpful.

12           So it's accurate to state that you are

13   testifying on behalf of Facebook today as to the

14   drafting of Facebook's terms and service, SRR, and

15   data and privacy policies related to friend           09:33:52

16   sharing, correct?

17      A.   Yes.

18      Q.   And for all of these topics that we just

19   went through, which is -- which are topic --

20   topics 1, portions of 2, including 2b and 2d,          09:34:06

21   topic 3 and portions of topic 6, you understand

22   that you are testifying on behalf of Facebook,

23   correct?

24      A.   Correct.

25      Q.   Do you understand that you are not            09:34:22
```

Page 24

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    testifying in your individual capacity, correct?        09:34:24

 2         A.   That's correct.

 3              And just to qualify for 2b, not the third

 4    parties to target.

 5         Q.   Correct.                                       09:34:37

 6              You -- you are not here to testify as to

 7    the aspects of topic 2 related to targeted

 8    advertising?

 9         A.   That's correct.

10         Q.   Do you understand that your testimony is      09:34:50

11    binding on the company?

12         A.   Yes.

13         Q.   Now, pursuant to the notice, this --

14    these topics and your testimony today will cover

15    the time period from January 1st, 2007 to the           09:35:09

16    present.

17              Do you understand that time period

18    reflected in the notice?

19         A.   I do.

20         Q.   Great.                                         09:35:20

21              So unless I otherwise specify a range or

22    a specific date that I am interested in, with

23    respect to my question, my questions will generally

24    relate to this entire time period.

25              Okay?                                          09:35:34
```

```
 1        A.   I understand.                              09:35:36

 2        Q.   Ms. Hendrix, what did you do to prepare

 3   for this deposition?

 4        A.   I -- I reviewed a number of documents.  I

 5   met with fellow teammates.  I met with my counsel.  09:35:52

 6   I'm --

 7        Q.   When you say --

 8        A.   Would you like me to go into detail?

 9        Q.   I can ask some follow-up questions.

10   Thank you.                                           09:36:10

11             When you say "teammates," what do you

12   mean by that?

13        A.   I -- I met with individual employees at

14   Meta Facebook so that I could prepare for these

15   topics.                                              09:36:28

16        Q.   And by the way, thank you for reminding

17   me of Facebook's new corporate name.  I just want

18   to make sure that the record is clear.

19             Your testimony today is on behalf of both

20   Meta and Facebook; is that fair?                     09:36:42

21        A.   Yes.

22        Q.   And so to the extent I say "Facebook,"

23   that will be synonymous with Meta.  And to the

24   extent I say "Meta," that will be synonymous with

25   Facebook; is that okay?                              09:36:56
```

Page 26

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        A.   Yes.                                    09:36:57

 2        Q.   And your corporate testimony, pursuant to

 3   Rule 30(b)(6), will also be on behalf of Meta and

 4   Facebook, correct?

 5        A.   Yes.                                    09:37:07

 6        Q.   So the individuals and employees that you

 7   spoke with at Facebook, what groups or departments

 8   were they a part of?

 9             MR. BLUME:  Objection.  Form.

10             THE DEPONENT:  I met with -- let's -- it   09:37:31

11   might be easier if I just state the individuals'

12   names.

13        Q.   (By Mr. Ko)  Sure.

14             What -- how many -- approximately how

15   many individuals did you meet with that were -- and   09:37:44

16   this is just with respect to the Facebook employees

17   that you described.

18        A.   So setting aside our lawyers, I met with

19   Simon Cross, Eddie O'Neil, Rob Sherman.  Pratiti --

20   her name is hard to pronounce.  It starts with a P.   09:38:05

21             I -- I think -- oh, and Kristy Cook.  I

22   think those -- I think that's a comprehensive list

23   of the people that I met with over videoconference.

24        Q.   And with respect to Kristy Cook and

25   Pratiti --                                        09:38:42
```

1        A.   Oh, I forgot.  Ed Palmieri.              09:38:42

2   Edward Palmieri.

3        Q.   So I count six individuals that you met

4   with in preparation for this deposition -- at least

5   six individuals at Facebook, setting aside your       09:38:58

6   lawyers; is that correct?

7        A.   Yes.  Those are -- those are the

8   teammates that I sought additional information

9   from.

10       Q.   And with respect to Pratiti and Kristy,    09:39:11

11  what departments at Facebook are they in?

12       A.   I'm going to refer to my notes here.

13            She -- so Pratiti is the functional head

14  for user research.  And Kristy is a member of

15  the -- I think present day, she's on the global       09:39:43

16  operations team that's led by John DeVine.

17       Q.   When you say presently that's her role,

18  what was her role prior to that?

19            MR. BLUME:  Objection.  Form.

20            THE DEPONENT:  Her role hasn't changed,     09:40:07

21  but there was -- but her team was moved into a

22  different org recently.  And I can't recall the

23  name of exactly which org she had been sitting in

24  before.  But her day-to-day responsibilities, as I

25  understand them, haven't -- haven't changed.          09:40:27

Page 28

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1          Q.   (By Mr. Ko)  And -- and you just          09:40:30

 2     indicated that you were looking at some of your

 3     notes.

 4               So I assume you brought some notes with

 5     you to this deposition today?                        09:40:37

 6          A.   Yes, I -- I did.

 7          Q.   Are they notes that you created yourself?

 8          A.   Yes.

 9          Q.   And those are notes that you've obviously

10     referred to once and that you intend to refer to     09:40:51

11     throughout this deposition, I assume?

12          A.   If needed.  I mean, I probably spent 30,

13     40 hours like preparing, just -- just meeting with

14     counsel, let alone all of time reviewing all the

15     documents.  So as I'm sure you can imagine, this is  09:41:09

16     a very lengthy period of time so I felt comfortable

17     that I wanted to be helpful to you and be able to

18     be responsive.

19               So yes, I -- I asked if I could create

20     notes and -- and I created them.                     09:41:25

21               MR. KO:  I appreciate that.

22               Counsel Blume, we would request a copy

23     and a version of these notes following this

24     deposition.

25               MR. BLUME:  Noted.                          09:41:41
```

Page 29

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.   (By Mr. Ko)  Now, earlier you had | 09:41:46 |
| 2 | asked -- or you had indicated that there were some | |
| 3 | documents that you reviewed in connection with your | |
| 4 | preparation. | |
| 5 | Did those documents consist of documents | 09:42:00 |
| 6 | that you understood were provided by plaintiffs' | |
| 7 | counsel in connection with this deposition? | |
| 8 | A.   I did receive documents that you guys | |
| 9 | sent over a handful of days ago, I think. | |
| 10 | Q.   And did you review all those documents? | 09:42:23 |
| 11 | A.   I did look through.  I didn't read every | |
| 12 | word, but I did review them all. | |
| 13 | Q.   And other than that tranche of documents, | |
| 14 | I assume you reviewed other additional documents in | |
| 15 | connection with this -- in connection with | 09:42:38 |
| 16 | preparing for this deposition? | |
| 17 | A.   Yes. | |
| 18 | Q.   Okay.  And can you describe -- tell me | |
| 19 | what those documents consisted of? | |
| 20 | A.   I probably won't be comprehensive, but | 09:42:55 |
| 21 | I'll do my best. | |
| 22 | So it's like newsroom posts, tasks, | |
| 23 | emails.  I believe the documents that we've shared | |
| 24 | with you, which -- and then transcripts from prior | |
| 25 | testimony, like -- yeah, I -- I -- I don't know if | 09:43:14 |

Page 30

1    you want me to go further, but it was, you know, a          09:43:26

2    lot of materials.

3        Q.   No, that's great.  I was just trying to

4    get a general understanding of the types and

5    categories of documents you reviewed, and so that         09:43:34

6    was helpful.

7            When you said that there were documents

8    that "we've shared with you," do you mean to talk

9    about the documents that Facebook has produced in

10   connection with discovery in this case or are you         09:43:50

11   talking about some other set of documents that were

12   shared?

13       A.   I believe these are the documents that

14   we've produced to you in connection with my

15   testimony.                                                 09:44:01

16       Q.   Okay.  So you believe that there was a

17   specific set of documents that were provided to us

18   in connection with this testimony?

19            MR. BLUME:  And -- and I'll -- I'll

20   object.  To the extent that -- that your            09:44:13

21   understanding of what was produced and when and to

22   whom came from discussions with counsel, that you

23   should not respond to that question.

24       Q.   (By Mr. Ko)  Are you going to follow your

25   counsel's instruction?                                     09:44:35

                                                        Page 31

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        A.   Yes.  I don't have anything further to        09:44:36
 2    add than what I said.
 3        Q.   Take a look at schedule B of the notice,
 4    which is Exhibit 330, and it's at page 16.
 5        A.   Okay.  I'm here.                               09:45:00
 6        Q.   There is a paragraph, paragraph 1,
 7    that -- to be fair, it doesn't ask you directly,
 8    but it asks your counsel -- to produce and provide
 9    "All documents which the person Facebook designates
10    to testify on its behalf has consulted or reviewed    09:45:17
11    or plans to consult in preparation for the
12    deposition and has relied upon or will rely upon
13    for testimony concerning the above deposition
14    topics."
15            Did I read that correctly?                      09:45:29
16        A.   Yes.
17        Q.   And you had indicated that in addition to
18    the documents we provided to you, that you have
19    reviewed a large set of additional categories of
20    documents to prepare for this deposition, correct?     09:45:41
21            MR. BLUME:  Objection.
22            THE DEPONENT:  I would bucket it into --
23    into two categories.  Those documents that you
24    noticed us on and those documents that we provided
25    to you.  I didn't --                                   09:45:57
```

Page 32

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        Q.   (By Mr. Ko)  And with --              09:46:00

 2        A.   -- review other documents.

 3        Q.   Right.  And I was talking about this --

 4   this -- that second latter category.

 5             Apologies if I was unclear.            09:46:07

 6             So --

 7        A.   Well --

 8        Q.   -- in addition --

 9        A.   -- the third bucket is my notes.

10        Q.   Okay.  Great.  Thank you for that      09:46:16

11   clarification.

12             So there -- there -- to be clear, there

13   is a set of documents that you reviewed in

14   preparation for this deposition, outside of the

15   documents we provided to you, correct?           09:46:33

16        A.   Yes.

17             MR. KO:  Okay.  Counsel Blume --

18             THE DEPONENT:  I should -- I --

19             MR. BLUME:  Yes.

20             MR. KO:  Go ahead.                      09:46:47

21             MR. BLUME:  Go ahead.

22             THE DEPONENT:  Well, I -- I -- I had a

23   deposition in another matter very, very recently.

24   And so in terms of scope and me really wanting to

25   make sure that I'm being fully responsive,         09:47:01
```

Page 33

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    you know, over the last couple of months I've had          09:47:05

2    to review documents that might have been out of

3    scope.  But -- but that would -- I -- I don't know.

4            Like, I just want to make sure -- like

5    I -- I did review documents not too long ago for          09:47:17

6    another case, but I don't know if they're relevant

7    to this.

8            MR. KO:  Understood.  Thank you for that

9    explanation.

10           So Counsel Blume, we would request,               09:47:31

11   consistent with both the schedule and our previous

12   request, that you produce to us all the documents

13   that Ms. Hendrix reviewed in connection with

14   preparing for this deposition today.

15           And I would also note that we reserve the         09:47:48

16   right to reopen this deposition after you produce

17   those documents to us.

18           MR. BLUME:  All -- all -- all of those

19   documents have been produced in discovery.  You

20   already have every document that she looked at in         09:48:01

21   preparation for this 30(b)(6) witness.  And so

22   pursuant to discovery protocol, those do not have

23   to be produced again, so -- but you have them all.

24           MR. KO:  Thank you for that explanation.

25           And our view would be that we would like          09:48:16

Page 34

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    to know the specific documents and not just a          09:48:17

 2    reference to the entire discovery production.

 3              MR. BLUME:  And that is we --

 4              MR. KO:  So we would like to --

 5              MR. BLUME:  -- we would -- sorry.  Go         09:48:24

 6    ahead.

 7              MR. KO:  Yeah.  So we -- just to clarify,

 8    we would renew our request, consistent with this

 9    notice and consistent with our prior request and

10    meet-and-confers, that you prepare and produce this     09:48:38

11    material with a specific reference to which

12    documents were reviewed by Ms. Hendrix.

13              MR. BLUME:  And we would object.  It's

14    work product.  Engages privileged conversations.

15    And pursuant to the discovery protocol, not --          09:48:51

16    we're not required to reproduce documents for

17    purposes of depositions that have already been

18    produced in discovery.  Every document that she

19    reviewed that -- in preparation for this 30(b)(6)

20    deposition, has been previously produced.                09:49:08

21              THE DEPONENT:  And I can testify --

22              MR. BLUME:  Wait for a question.

23              THE DEPONENT:  Oh, sorry.

24        Q.    (By Mr. Ko)  Sorry.

25              Ms. Hendrix, what were you going to say?        09:49:19
```

Page 35

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | A. I might have just -- | 09:49:22 |
| 2 | MR. BLUME: Is there -- is there a | |
| 3 | question? | |
| 4 | THE DEPONENT: Oh. | |
| 5 | Q. (By Mr. Ko) I said -- yeah, the question | 09:49:23 |
| 6 | was, what were you going to say? | |
| 7 | A. I might have -- | |
| 8 | Q. Go ahead. | |
| 9 | A. I might have caused us noise because I | |
| 10 | can testify -- well, I am testifying -- I didn't | 09:49:32 |
| 11 | open up any of those old -- I just was trying to be | |
| 12 | clear that I -- I've been -- review -- I've -- I've | |
| 13 | testified recently on another case. | |
| 14 | But after I testified, I never reviewed | |
| 15 | any of those documents. But it sounds like you | 09:49:49 |
| 16 | already have them anyway. | |
| 17 | Q. What case did you testify recently on? | |
| 18 | MR. BLUME: Hang on. | |
| 19 | Okay. You can answer. | |
| 20 | THE DEPONENT: It -- it was the D.C. | 09:50:09 |
| 21 | attorney general case. | |
| 22 | MR. KO: Thank you. | |
| 23 | By the way, Mr. Blume, I'm -- I'm having | |
| 24 | trouble hearing you a little bit. | |
| 25 | MR. BLUME: Oh -- | 09:50:23 |

Page 36

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              MR. KO:  So if -- if you don't mind, when       09:50:24
 2    you object or note anything for the record, if you
 3    could kind of lean over and speak into the
 4    microphone, that would helpful.
 5              Thank you.                                      09:50:30
 6              MR. BLUME:  How is that; is that better?
 7              MR. KO:  Yeah, I think so.  Thanks.
 8         Q.   (By Mr. Ko)  And when was that
 9    deposition, Ms. Hendrix?
10         A.   I don't remember the precise date.             09:50:45
11         Q.   Approximately when was that deposition,
12    Ms. Hendrix?
13         A.   It was in June.
14         Q.   June of 2021?
15         A.   2022.                                          09:51:03
16              MR. BLUME:  We're only in May.
17              MR. KO:  We're in May.  Sorry.
18              THE DEPONENT:  It was in -- oh, shit.
19    Excuse my language.
20              MR. BLUME:  That would be amazing.             09:51:11
21              THE DEPONENT:  Like I'm going backwards.
22    Sorry.
23              Last month.  April.
24         Q.   (By Mr. Ko)  Okay.  So you -- you
25    testified in the D.C. attorney general action in       09:51:20
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    April of 2022, correct?                          09:51:23

2        A.   Yes.

3             Sorry.  It looks like I'm having --

4        Q.   No worries.

5        A.   -- morning fatigue.                      09:51:30

6        Q.   Well, you know, time does generally fly

7    these days.  So, yeah, you were just getting ahead

8    of yourself a little bit.  It's okay.

9             So with respect to some of these

10   topics -- and as we discussed, because these topics   09:51:46

11   relate to various policies and contracts that were

12   applicable to users and third parties -- I assume

13   you have reviewed some of these policies and

14   contracts; is that fair to say?

15       A.   Yes.                                      09:52:07

16       Q.   And let me be a little more specific.

17            Are -- are you familiar with the

18   statement of rights and responsibilities or SRRs?

19       A.   Yes.

20       Q.   What are they?                            09:52:20

21       A.   It's not two separate things.  Like the

22   SRR is how we abbreviate the statement of rights

23   and responsibilities and it is the terms of -- of

24   service for using Facebook.

25       Q.   And throughout today, I -- I will be      09:52:40

                                                        Page 38

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    using the acronym SRR.                          09:52:42

 2         And is it okay, for purposes of the

 3    deposition, that, as you note, when I say SRR, or

 4    when you say SRR, we can assume that refers to the

 5    statement of rights and responsibilities; is that  09:52:55

 6    fair?

 7         A.   Yes.  If you would like to refer to the

 8    SRR -- that wasn't the name of it initially.  But

 9    I'm happy to know and agree that SRR means just

10    terms of service, generally.                    09:53:09

11         Q.   And -- and we'll get to the various

12    iterations and names in a moment.

13         But before we do that, let -- let me ask

14    you about Facebook's data use policy.  And I know

15    that it had different names as well.            09:53:21

16         But are you familiar with Facebook's data

17    use policy?

18         A.   I am.

19         Q.   And what is Facebook's -- what is -- what

20    is that?                                        09:53:31

21         A.   Facebook's data use policy -- which has

22    also been referred to as our privacy policy -- it

23    tells people what it is that we collect and how

24    their information can be used and -- this

25    high-level response there.                      09:53:45
```

Page 39

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1        Q.   And with respect -- to back up a little      09:53:52

2    bit.  I apologize -- on the SRR, you had indicated

3    that it reflected the terms of service for using

4    Facebook.

5             And so would that be terms of service for     09:54:02

6    the Facebook user, I assume?

7        A.   Yes.  If you sign up for Facebook, you

8    agree that you have read the data use policy and

9    you agree to the terms of service.

10       Q.   Now, I assume you are also familiar with      09:54:26

11   Facebook's platform policy; is that correct?

12       A.   Yes.

13       Q.   What is that?

14       A.   It's no longer referred to as the

15   Facebook platform policy.  It's -- we have platform    09:54:39

16   terms and developer policies.  And those are the

17   terms and policies that govern third -- developers'

18   use of our platform technologies.

19       Q.   And when did that name change occur -- or

20   when did that change occur?                            09:54:57

21            MR. BLUME:  Objection.  Form.

22            THE DEPONENT:  It was in -- we announced

23   the change in mid 2020, and the terms went into

24   effect in -- August 31st of that same year.

25       Q.   (By Mr. Ko)  So up until the middle of        09:55:19
```

Page 40

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | 2020, Facebook had something called a platform | 09:55:21 |
| 2 | policy; is that correct? | |
| 3 | A.   Yes.  We had the Facebook platform | |
| 4 | policies. | |
| 5 | Sitting here today, I know that there's | 09:55:30 |
| 6 | been another name, like developer policies.  But | |
| 7 | they are the same documents in terms of what I | |
| 8 | described the document to be earlier. | |
| 9 | MR. BLUME:  And, Mr. Ko, my -- I'm still | |
| 10 | here.  My apologies.  I just mistakenly unplugged | 09:55:45 |
| 11 | everybody.  So I'm sitting around -- I'm right | |
| 12 | here, but I just -- I'm getting back on online.  No | |
| 13 | need to wait, or you can, if you like. | |
| 14 | MR. KO:  Got it.  Thank you.  Appreciate | |
| 15 | that. | 09:56:00 |
| 16 | It was a like voice of God because I | |
| 17 | didn't see your face. | |
| 18 | Q.   (By Mr. Ko)  Now, with respect to the | |
| 19 | platform policy, can you describe at a high level, | |
| 20 | just as you did with respect to the SRR and the -- | 09:56:11 |
| 21 | the data use policy, what Facebook's platform | |
| 22 | policy attempted to do? | |
| 23 | A.   Facebook's platform terms and developer | |
| 24 | policies are our agreement with developers, with | |
| 25 | respect to how they will use the platform.  And | 09:56:30 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1      there's a number of -- it's -- it's the rules with          09:56:36

2      respect to using the technology, to the extent the

3      developer chooses to use it.  It's not always

4      relevant.

5          Q.   And that policy and contract is between         09:56:51

6      Facebook and the -- the third-party developer,

7      correct?

8          A.   Yes.  The developers -- when they create

9      and register as a developer on our platform, they

10     agree to adhere to the platform terms and -- and      09:57:04

11     developer policies.

12         Q.   And was the Facebook user -- or was a

13     Facebook user -- a party to that policy or

14     contract?

15         A.   To the extent the Facebook user, who has      09:57:21

16     agreed to our terms of service chooses to register

17     as a developer, then yes.

18         Q.   So only if the user was a developer would

19     that policy apply, correct?

20         A.   What do you mean by "apply"?                  09:57:41

21         Q.   Well, you -- you answered the question --

22     well, let me ask it this way.

23              As a general matter, the Facebook

24     platform policy governed the relationship between a

25     Facebook developer and Facebook, correct?           09:57:55

Page  42

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1      A.   That is our agreement with developers who        09:57:59

2   use our platform, yes.

3      Q.   And it wasn't a contract that governed

4   Facebook's relationship with its users because

5   those were reflected in the SRRs and DUPs, correct?      09:58:12

6      A.   To the extent a user is also a developer,

7   they agree to the platform terms and developer

8   policies, in connection with their use of the

9   platform.

10      Q.   Outside of that carve-out, Facebook             09:58:37

11   users' interactions with the Facebook platform and

12   on Facebook were governed by the SRRs and DUPs,

13   correct?

14          MR. BLUME:  Objection.  Form.

15          THE DEPONENT:  If a user does not use --         09:58:57

16   does not develop apps on our platform, then they're

17   only subject to the terms that are relevant to

18   them.

19      Q.   (By Mr. Ko)  And those terms would

20   be the -- reflected in the SRRs and DUPs, correct?      09:59:13

21      A.   If they don't use any of our other

22   products, because there's other terms of -- there's

23   other terms of use, depending on what you choose,

24   like depending on your relationship with us.

25          But if -- if you just go and just sign up        09:59:30

Page 43

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | for Facebook, all you want to do is use Facebook, | 09:59:32 |
| 2 | then the terms of service and our data use policy | |
| 3 | would be the two primary documents that you agree | |
| 4 | that you have read and will adhere to. | |
| 5 | Q.   Thank you.  Thank you. | 09:59:48 |
| 6 | And -- and it's fair to say that the vast | |
| 7 | majority of Facebook users would fall under that | |
| 8 | umbrella, correct? | |
| 9 | MR. BLUME:  Objection.  Form. | |
| 10 | THE DEPONENT:  Sitting here today, I -- I | 10:00:03 |
| 11 | don't -- I'm not -- I don't know the answer to | |
| 12 | that. | |
| 13 | Q.   (By Mr. Ko)  Do you have a general | |
| 14 | understanding of how many users were also | |
| 15 | developers on the Facebook platform, relative to | 10:00:17 |
| 16 | users that did not develop on the Facebook | |
| 17 | platform? | |
| 18 | A.   That is not a data point that I know of | |
| 19 | today. | |
| 20 | Q.   And separate and apart from a specific or | 10:00:38 |
| 21 | precise data point, do you have any understanding | |
| 22 | of the total number of users in the relevant time | |
| 23 | period that used Facebook but did not also develop | |
| 24 | on the platform, such that they were subject to the | |
| 25 | platform policy and subsequent iterations of that | 10:01:01 |

Page 44

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    platform policy?                                      10:01:04

 2             MR. BLUME:  Object -- objection.

 3             And just to be clear, what topic are we

 4    talking about, Mr. Ko?

 5             MR. KO:  All of them.                         10:01:12

 6             MR. BLUME:  That's beyond the scope.

 7    Objection.

 8             MR. KO:  You can answer, unless Mr. Blume

 9    decides to instruct you not to answer.

10             MR. BLUME:  If you know, you can answer.      10:01:23

11             THE DEPONENT:  I've already told Mr. Ko

12    that I don't know.  I can continue to repeat

13    myself.

14             I'm not prepared to speak to that.  It's

15    not on the topic.                                     10:01:33

16        Q.   (By Mr. Ko)  That's fine.

17             And I was just trying to get -- to be

18    fair, I -- I was just trying to get a general

19    understanding.

20             I -- I heard your response as saying that    10:01:40

21    you didn't have a specific data point.  And so I

22    was just curious whether or not you were aware,

23    because you seem to understand that there was a

24    distinction between users who develop and users who

25    do not.  And so the -- the natural follow-up         10:01:53
```

Page 45

```
 1    question was whether or not you knew the population      10:01:55

 2    of the former relative to the latter.

 3           And I hear your response to say that you

 4    don't know, and you don't have any idea; is that

 5    correct?                                                 10:02:04

 6      A.   I did --

 7           MR. BLUME:  Objection.

 8           THE DEPONENT:  -- not prepare to speak to

 9    that today.

10      Q.   (By Mr. Ko)  I want to show you --                10:02:14

11    because you had indicated before that there were --

12    and it's also somewhat confusing to me -- and there

13    are a lot of policies to walk through, so I want to

14    make sure that we are on the same page with respect

15    to these policies.                                       10:02:30

16           I'm going to share my screen.  And this

17    is not an exhibit, but this is just my

18    understanding of these relevant policies.

19           Do you see this in front of you,

20    Ms. Hendrix?                                             10:02:51

21           MR. BLUME:  Is -- is this a produced

22    document?

23           MR. KO:  No.  Like I said, this is

24    something that I created.

25      Q.   (By Mr. Ko)  Do you see this in front of          10:03:02
```

Page 46

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    you, Ms. Hendrix?                                    10:03:03

2         A.   Yes, I can see what you're displaying on

3    the screen.

4         Q.   Thank you.

5              And it's not -- again, I -- this is just   10:03:14

6    to help orient ourselves and to help me understand

7    what you are here to testify about.

8              So with respect to the statement of

9    rights and responsibilities, or the SRR, as you

10   described earlier, there were various names that     10:03:29

11   were associated with the SRR; is that fair to say?

12        A.   I'm only aware of two; terms of service

13   and statement of rights and responsibilities.

14        Q.   Okay.  That's helpful.

15             So the terms of service -- I believe the   10:03:46

16   terms of service is what this is called now,

17   correct?

18             MR. BLUME:  Objection.  Form.

19             THE DEPONENT:  Yes, that's my

20   understanding.                                       10:04:02

21        Q.   (By Mr. Ko)  And it's my understanding --

22        A.   And I'm going to ask you --

23        Q.   Go ahead.

24        A.   There's a lot of -- there's a lot

25   documents and materials.  And so, like, you -- I     10:04:11

                                                 Page 47

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    may need to refer back to -- to them because          10:04:13

 2    there's a lot of information that I had prepared.

 3            But go ahead.

 4        Q.   Yeah.  I -- I understand.  There's --

 5    there's a lot -- there's a lot to unpack in these     10:04:23

 6    topics, I -- I agree.

 7            So this is -- I'm not trying to put you

 8    on the spot.  I'm trying to -- hopefully, you'll

 9    see I'm trying -- I'm trying to help us all,

10    because there are so many names flying around that     10:04:35

11    I want to make sure you and I are on the same page

12    with respect to these things.

13            So as you indicated, the SRR was renamed

14    to the terms of service; is that correct?

15        A.   Yes, I believe so.                            10:04:58

16        Q.   And do you have any understanding of when

17    the SRR was renamed to the terms of service?

18        A.   I'd have to look at the documents.

19        Q.   Does it refresh your recollection at all,

20    when I put here that in 2018 -- and precisely          10:05:17

21    April 19th, 2018 -- the SRR was renamed to the

22    terms of service?

23        A.   I'd rather not rely on your document that

24    I've never seen until just now.  Like I want to see

25    the actual documents and the dates that are on         10:05:33
```

Page 48

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    them.                                                    10:05:35

2            So I'm sorry, but -- like we can get

3    the -- the terms and policies up and I can go

4    through each of the respective name change and the

5    dates, if that's how you want to use the time         10:05:43

6    today.  But I'm not going to rely on your document.

7        Q.   Sure.  That's fair enough.

8            So I'm going to delete that for you

9    because I'm not trying to present that this is the

10   Bible or that this is a canon that we have to all      10:05:56

11   follow.

12           I was trying to be helpful to both of us.

13   But you -- you acknowledge that the SRR was at some

14   point changed to the terms of service, correct?

15       A.   Yes.                                           10:06:08

16       Q.   Okay.  And you don't have a recollection

17   of when it actually changed names, right?

18       A.   I would need to refresh.  I know that I

19   know.  I know that I need to go to the documents.

20   And I'm distracted by seeing you guys typing and       10:06:26

21   like changing the text at -- live as we're sitting

22   here.

23       Q.   Yeah.  Well, the -- I -- I'm -- I

24   apologize for distracting you.

25           But I'm trying to figure out from you, as       10:06:40

                                                    Page 49

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1   the corporate designee, who you acknowledged before      10:06:43

 2   that you are here to testify as to these policies.

 3   I'm curious whether or not you know when it was

 4   renamed from the SRR to the terms of service.

 5          And your testimony is that you don't           10:06:57

 6   know, so I'm just putting a question right here for

 7   now.

 8          MR. BLUME:  Actually, objection.  That

 9   wasn't her testimony.

10          Her testimony was she wanted to see the        10:07:04

11   document, and she'd be able to do that, as opposed

12   to a memory test.

13          MR. KO:  Fair enough.

14      Q.   (By Mr. Ko)  Without looking at the

15   documents, you don't know when the name changed       10:07:12

16   from SRR to terms of service; is that correct?

17      A.   I know that I know.  I know that I don't

18   remember without referring to the dates.

19      Q.   Got it.

20          And then you said that you are only aware      10:07:28

21   of two names that this user terms of service had

22   over the relevant time period.

23          So the -- here -- and I'm happy to get

24   rid of it -- but it was my understanding that at

25   some point before the SRR, it was identified as      10:07:45
```

Page 50

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    terms of use.                                                    10:07:50

2            Does that sound familiar to you at all?

3        A.   I'd like to ask my counsel if I can have

4    access to all of these documents.  And, again,

5    you're changing the text right here live in front    10:07:58

6    of me.  And I think that is highly inappropriate.

7    I'm not a lawyer for the company, but I don't like

8    what you're doing.  So I would like my --

9        Q.   Well, this --

10       A.   I would like to see the documents before    10:08:10

11   you keep having me watch you change the text.  Like

12   this is -- this seems highly inappropriate.

13       Q.   Okay.  Well, I -- I -- it's not.  It's no

14   different than if I had you on the stand and I

15   was -- I was creating or writing down on the screen   10:08:24

16   things that were reflective -- what I thought were

17   reflective of your testimony.

18           But I understand that you are

19   uncomfortable with it, and I don't want to make you

20   uncomfortable.  So I just -- I'm just trying to get   10:08:37

21   to understand what -- how these various policies

22   were called over the relevant time period.  And

23   that was all that was an attempt to do.

24           So let me start -- let me start over.

25           You -- it's your testimony that you're       10:08:51

                                                          Page 51

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | aware of a contract that applied to Facebook users | 10:08:52 |
| 2 | and that this contract had two different names, and | |
| 3 | they were the statement of rights and | |
| 4 | responsibilities and the terms of service; is that | |
| 5 | correct? | 10:09:08 |
| 6 | A.   That's my recollection, is that we start | |
| 7 | with the term of service.  It becomes the statement | |
| 8 | of rights and responsibilities and then has | |
| 9 | subsequently been renamed.  That's my | |
| 10 | understanding. | 10:09:22 |
| 11 | I would love the benefit of reviewing | |
| 12 | these documents insofar as timing, but that's my | |
| 13 | understanding. | |
| 14 | Q.   So for purposes of today, when I refer to | |
| 15 | the SRRs, or the terms of service, they will be | 10:09:39 |
| 16 | synonymous. | |
| 17 | And that's consistent with your | |
| 18 | understanding of these contracts and policies; is | |
| 19 | that fair? | |
| 20 | MR. BLUME:  Objection.  Asked and | 10:09:54 |
| 21 | answered. | |
| 22 | THE DEPONENT:  Yes.  We already agreed to | |
| 23 | that. | |
| 24 | Q.   (By Mr. Ko)  Okay.  Now, with respect to | |
| 25 | the data use policy, you had indicated that there | 10:10:05 |

Page 52

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    were different names for that.                        10:10:08

 2            And some of the names I've seen in the

 3    documents, it referred to as -- or simply the data

 4    policy; is that consistent with your understanding?

 5            MR. BLUME:  Objection.  Form.               10:10:29

 6            THE DEPONENT:  I know we had privacy

 7    policy data, use policy.  We could have had a title

 8    data policy.

 9            I would need to refer to the terms, all

10    of which I am confident we've produced to you and    10:10:41

11    that are publicly available.  So, again, like

12    you -- you have this information.

13        Q.   (By Mr. Ko)  Right.

14            And I'm not asking about whether or not

15    we have it.  I'm -- I'm asking about -- for           10:10:54

16    purposes of this deposition -- again, this is

17    not -- I'm not trying to put you on the spot.  I'm

18    trying to understand what we are all talking about

19    here so we can speak the same language, because

20    there's a lot of names and acronyms flying around.   10:11:05

21            With respect to Facebook's data use

22    policy, you have indicated that it -- you have

23    heard of the data use policy, also referred to as

24    the data policy and the privacy policy; is that

25    correct?                                              10:11:21
```

Page 53

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | A.   I didn't say that.  I said it was | 10:11:23 |
| 2 | possible.  I'd need to refresh the titles.  But I | |
| 3 | think -- | |
| 4 | Q.   So -- | |
| 5 | A.   -- I -- I know that it was privacy | 10:11:31 |
| 6 | policy.  I'm certain it's also data use policy. | |
| 7 | Whether it has, at some point in time, been called | |
| 8 | data policy, I've reviewed all of those, like | |
| 9 | different versions.  But I just don't remember, | |
| 10 | sitting here today. | 10:11:42 |
| 11 | Q.   So for purposes of this deposition today, | |
| 12 | in our conversation, when I refer to the data use | |
| 13 | policy, that would be synonymous with at least the | |
| 14 | privacy policy and potentially the data policy; is | |
| 15 | that fair? | 10:12:02 |
| 16 | A.   Yes. | |
| 17 | Q.   And with respect to the platform policy, | |
| 18 | you had indicated that it was also changed to the | |
| 19 | platform teams and developer teams -- development | |
| 20 | teams policy in mid 2020. | 10:12:19 |
| 21 | Do you recall that? | |
| 22 | A.   I didn't say -- | |
| 23 | MR. BLUME:  Objection. | |
| 24 | THE DEPONENT:  -- either of those things. | |
| 25 | Q.   (By Mr. Ko)  Okay.  I apologize for | 10:12:27 |

Page 54

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1    putting words in your mouth.                    10:12:28

2          What is the relationship between the

3    platform teams and development teams policy and the

4    Facebook platform policy?

5          MR. BLUME:  Objection.  Form.            10:12:39

6          THE DEPONENT:  Those aren't things.

7          MR. KO:  I'm sorry.  I didn't get that

8    over your counsel's objection.

9          MR. BLUME:  Just repeat your answer.

10         THE DEPONENT:  Those aren't things.       10:12:51

11     Q.   (By Mr. Ko)  When you say "those," what

12   are you referring to?

13     A.   You said platform teams, developer teams.

14   I've never said those words today until just now.

15     Q.   Okay.  Earlier today, when you had said    10:13:03

16   that there was change to the platform policy in

17   mid 2020, what were you referring to?

18     A.    In mid 2020, but more importantly,

19   August 31st, 2020, the platform terms and developer

20   policies, which is what is -- what is live today.    10:13:29

21   So developers agree as of, and effective

22   August 31st, 2020, they agree to adhere to the

23   platform terms and the developer policies.

24     Q.   And today is there a thing that exists

25   called the Facebook platform policy?              10:13:53
```

Page 55

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        A.   That term is no longer in effect.  It is      10:14:03

 2   the platform terms and developer policies.

 3        Q.   So the platform terms and the developer

 4   policy have -- well, they -- they -- as you said,

 5   they govern the relationship between Facebook and      10:14:22

 6   its developers, correct?

 7        A.   Yes.

 8        Q.   And so is it fair, for purposes of this

 9   deposition is that -- when I refer to the platform

10   policy, I'm also referring to the platform terms      10:14:35

11   and the development policy, or would you prefer

12   that I keep those things distinct?

13        A.   If you refer to the platform policies, I

14   will understand you to be meaning the platform

15   terms and developer policies.                         10:14:51

16        Q.   That were enacted in August 31st of 2020,

17   correct?

18        A.   Yes.

19             MR. BLUME:  Objection to that --

20   objection to how that relates to your earlier         10:15:03

21   qualification that your questions cover a time

22   frame dating back to 2007.

23             So as long as you're clear -- you're

24   clear -- temporal clarity in your questions, that's

25   fine.                                                 10:15:17
```

Page 56

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        Q.   (By Mr. Ko)  Schedule B -- turning back      10:15:20

 2   to schedule B of the notice at Exhibit 330, the

 3   schedule asks for a CV of the person Facebook

 4   designates to testify on its behalf.

 5        Do you see that in paragraph 2?                    10:15:41

 6        A.   I do.

 7        Q.   Do you have a CV to offer in response to

 8   this request?

 9        A.   Not on -- not on me right now.

10        Q.   You have a copy of your CV, I assume?         10:15:57

11        A.   I -- I have a résumé on my machine at

12   home, yeah.

13        MR. KO:  Counsel Blume, consistent with

14   our request on topic 1, we would ask that you

15   provide us with a copy of Ms. Hendrix's CV.            10:16:13

16        MR. BLUME:  Noted.

17        Q.   (By Mr. Ko)  What is your current

18   position at Facebook?

19        A.   I'm a director of privacy and data

20   policy.                                                 10:16:29

21        Q.   What are your general roles and -- or

22   what is your -- what are your general

23   responsibilities in connection with that role?

24        A.   My team is accountable for the

25   development and management of all terms and             10:16:41
```

Page 57

 1    policies governing third-party data collection and          10:16:44

 2    use, as well as the education, and supporting the

 3    enforcement of the platform terms and developer

 4    policies.

 5          Q.   How long have you been in that --                10:16:57

 6               MR. BLUME:  And, Mr. Ko, this -- sorry.

 7    Just --

 8               MR. KO:  Go ahead.

 9               MR. BLUME:  We've gone about an hour.  It

10    sounds like you're in a little bit of a transition          10:17:04

11    period.  If you finish -- if this -- come to a

12    break shortly, we can take one.

13               MR. KO:  Sure.

14          Q.   (By Mr. Ko)  How long have you been in

15    that role?                                                  10:17:17

16          A.   I -- what do you mean?

17          Q.   How long have you been the director of

18    the team accountable for the develop- -- the

19    developers and the management of all terms and

20    policies governing third-party data collection and          10:17:38

21    use, as well as the education and supporting --

22    supporting of the enforcement of the platform terms

23    and developer policies?

24          A.   I've always -- I've always been involved

25    in that work.  When I was promoted to director, I          10:17:57

                                                     Page 58

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1   believe it was sometime in 2019.                    10:18:02

2        Q.   And when you say that you have always

3   been involved in that work, I assume you to -- to

4   mean that you have been involved in this type of

5   work ever since you joined Facebook in, I believe,  10:18:15

6   2008?

7        A.   Yes, I've always been involved in that

8   type of work since I joined the company.

9        Q.   And is this -- is this called the

10  platform policy team at Facebook or is there some   10:18:32

11  other name that you refer to your team as?

12       A.   My team is referred to as the data policy

13  management and enforcement team.

14       Q.   Were there any prior iterations of that

15  team name?                                          10:18:49

16            MR. BLUME:  Objection.  Form.

17            THE DEPONENT:  That -- ever since the

18  team has been created, that has been our name.

19       Q.   (By Mr. Ko)  So since you joined Facebook

20  in 2008, you have always been part of the data      10:19:08

21  policy management and enforcement team?

22            MR. BLUME:  Objection.  Form.

23            THE DEPONENT:  No.

24       Q.   (By Mr. Ko)  When you joined Facebook,

25  what team were you a part of?                        10:19:21
```

                                                        Page 59

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1          A.   I joined the developer operations team.        10:19:26

 2          Q.   How long were you part of the developer

 3     operations team?

 4          A.   I moved out of the developer operations

 5     team onto a team called global policy management.        10:19:46

 6     I believe that occurred in around 2010, but I'd

 7     need to refer to documents to be certain.  But

 8     around that time.

 9          Q.   And after you became part of the global

10     policy management team, were there any other teams       10:20:07

11     that you were involved in or associated with,

12     before you became part of the data policy

13     management and enforcement team?

14               MR. BLUME:  Objection.  Compound.

15               THE DEPONENT:  Could you repeat your            10:20:22

16     question?

17          Q.   (By Mr. Ko)  Yeah.

18               I'm just trying to get an understanding

19     of the teams that you were involved when -- in

20     between your current role and the global policy          10:20:31

21     management team.

22               Can you describe or identify what those

23     teams were?

24          A.   Developer operations is the name of the

25     team when I joined it.  They changed the name to         10:20:49
```

Page 60

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | |
|---|---|
| 1 | platform operations.  And now it's back to | 10:20:52 |
| 2 | developer operations, or at least that's how I |
| 3 | refer to that team.  And that -- and that's it, in |
| 4 | terms of the teams. |
| 5 |     Q.   And so the global policy management team, | 10:21:05 |
| 6 | was that in connection with or under the same |
| 7 | umbrella as either of the developer operations or |
| 8 | platform operations teams? |
| 9 |     A.   Global policy management is a different |
| 10 | team than developer operations, also referred to | 10:21:19 |
| 11 | previously as platform operations. |
| 12 |     Q.   So is it fair to say the sum total of |
| 13 | the -- the teams that you were involved with are -- |
| 14 | would be the developer operations team, the |
| 15 | platform operations team and the global policy | 10:21:39 |
| 16 | management team? |
| 17 |         MR. BLUME:  Objection.  Form. |
| 18 |         THE DEPONENT:  Did you leave out the team |
| 19 | that I'm on today? |
| 20 |     Q.   (By Mr. Ko)  You said that you were part | 10:21:56 |
| 21 | of the data policy management enforcement team, |
| 22 | correct? |
| 23 |     A.   That's the team that I manage today. |
| 24 |     Q.   Is that related to, in any way, with the |
| 25 | developer operations team? | 10:22:06 |

Page 61

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              MR. BLUME:  Objection.  Form.              10:22:08

 2              THE DEPONENT:  It's not the same team.

 3         Q.   (By Mr. Ko)  So -- thank you for that

 4    clarification.

 5              It sounds like there are four teams that   10:22:18

 6    you've been a part of throughout your career at

 7    Facebook; the data policy management enforcement

 8    team, the developer operations team, the platform

 9    operations team and the global policy management

10    team; is that correct?                              10:22:30

11              MR. BLUME:  Objection.

12              THE DEPONENT:  I think it's more correct

13    to say I've been on --

14              (Simultaneously speaking.)

15              MR. KO:  What's the objection, Mr. Blume?  10:22:35

16              MR. BLUME:  Are you talking about team

17    name or the -- the makeup of the teams?  Because

18    the personnel of those teams may have changed, the

19    names may not have.  But my guess is over the time

20    there have been a lot of different members of the   10:22:47

21    team.  It's like, you know -- I wish we were still

22    in the '69 Mets, but we're not, unfortunately.

23              MR. KO:  Right.  Thank you for that.  I'm

24    glad I asked because I -- I apologize if there's

25    any confusion.  I'm just talking about the team     10:23:02
```

Page 62

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    names.                                              10:23:05

 2         Q.   (By Mr. Ko)  I just want to understand

 3    the sum total of all the teams that you've ever

 4    been a part of, Ms. Hendrix, and the name by which

 5    those teams were associated with.                   10:23:12

 6              So can you describe to the Court all the

 7    team names that you have ever been involved with at

 8    Facebook?

 9         A.   I've been a part of three organizations.

10    The first -- the name was developer operations.  It 10:23:34

11    became platform operations.  I don't know if it --

12    I don't remember if it became DevOps before I

13    switched over to global policy management.

14              And then the third team is the team I'm

15    on today.  The privacy and data policy is the       10:23:51

16    ultimate org, but my team is referred to as the

17    data policy management and enforcement team.

18              MR. KO:  Okay.  Great.  Thank you.

19              And if you'd like to take the break, as

20    your counsel requested, Ms. Hendrix, I'm happy to   10:24:07

21    do so.

22              THE DEPONENT:  Sure.

23              THE VIDEOGRAPHER:  Okay.  We're off the

24    record.  It's 10:24 a.m.

25              (Recess taken.)                            10:24:17
```

Page 63

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  Okay.  We're back on | 10:43:22 |
| 2 | the record.  It's 10:43 a.m. | |
| 3 | Q.   (By Mr. Ko)  Welcome back from the break, | |
| 4 | Ms. Hendrix. | |
| 5 | By the way, you are in Palo Alto for this | 10:43:33 |
| 6 | deposition, correct? | |
| 7 | A.   Yes, I believe so.  We're the border of | |
| 8 | Los Altos so I'm just not confident.  But I'm | |
| 9 | pretty confident we're in Palo Alto. | |
| 10 | Q.   And where are you at, specifically?  Are | 10:43:46 |
| 11 | you at an office?  Are you in Facebook's office? | |
| 12 | Are you in Gibson Dunn's offices? | |
| 13 | A.   I'm in the Gibson Dunn law office. | |
| 14 | MR. BLUME:  Can't you tell by our fancy | |
| 15 | artwork? | 10:43:58 |
| 16 | MR. KO:  Sorry.  You -- I minimized your | |
| 17 | video.  So I couldn't -- couldn't tell how | |
| 18 | beautiful -- | |
| 19 | MR. BLUME:  I'm offended by that. | |
| 20 | MR. KO:  -- and modern that artwork is. | 10:44:04 |
| 21 | (Discussion off the stenographic record.) | |
| 22 | Q.   (By Mr. Ko)  And along with, I -- don't | |
| 23 | know if that was a reference to another deposition | |
| 24 | I took, but the -- along with your counsel, | |
| 25 | Mr. Blume, there are other attorneys at Gibson Dunn | 10:44:21 |

Page 64

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    present with you, I assume?                    10:44:26

2        A.   Yes, at -- at the outset of this, we said

3    who they were.

4            MR. BLUME:  Yeah.  With -- with -- with

5    me in -- with me in the room is --             10:44:39

6            MR. KO:  Go ahead.

7            MR. BLUME:  I can show you, if you want.

8            Now I lost my video.

9            Yeah.  So with me is -- is -- who is

10   here.  Prachi -- Prachi is here.  Ian is here and   10:44:52

11   Kelly.

12           MR. KO:  "Ian" being Ian Chen, an

13   employee of Facebook, correct?

14           MR. BLUME:  Ian Chen, yes.

15           MR. KO:  Okay.  Anybody else in the room   10:45:07

16   with you?

17           THE DEPONENT:  No.

18           MR. BLUME:  No.  Here, just so you can

19   see.  There is everybody.

20           MR. KO:  I -- I -- yeah.  I appreciate    10:45:16

21   that.

22       Q.   (By Mr. Ko)  I want to ask some basic

23   questions about Facebook's organizational

24   structure.  This is related to topic 1.

25           First, does Facebook have an             10:45:26

                                              Page 65

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | organizational structure? | 10:45:27 |
| 2 | A.   Yes, Facebook has an organizational | |
| 3 | structure. | |
| 4 | Q.   And I assume they have had an | |
| 5 | organizational structure since January 1 of 2007, | 10:45:41 |
| 6 | correct? | |
| 7 | A.   Yes. | |
| 8 | Q.   If I wanted to know what Facebook's | |
| 9 | organizational structure looked like, where would I | |
| 10 | look? | 10:45:55 |
| 11 | A.   You would go to what -- I believe it's | |
| 12 | called like the org -- there's an org chart.  Like | |
| 13 | you can look up a person and see what -- who they | |
| 14 | report in to. | |
| 15 | Q.   And this org chart that, I assume, has | 10:46:17 |
| 16 | existed ever since January 1 of 2007, correct? | |
| 17 | A.   Yes.  We've always been able to look up | |
| 18 | as far as -- as -- to the best of my knowledge, we | |
| 19 | can look each other up and see what team -- | |
| 20 | Q.   And when you -- | 10:46:42 |
| 21 | A.   -- they're on. | |
| 22 | Q.   And -- and when you say you can look each | |
| 23 | other up, I assume you're talking about some sort | |
| 24 | of internal tool that a Facebook employee could | |
| 25 | access to do that? | 10:46:52 |

Page 66

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        A.   Yes.  We have an internal company wiki      10:46:54

 2   where you can type in a search bar someone's name,

 3   such as myself.  And you can see who reports in to

 4   me and who I report in to.

 5        Q.   And is that true with respect to every       10:47:09

 6   employee at Facebook; in other words, if you could

 7   look up any employee at Facebook and find out who

 8   that person reports to and what persons report to

 9   her or him, to the extent those things are

10   applicable?                                            10:47:26

11        A.   For them.  And yes.

12        Q.   And other than this internal tool that

13   one could access -- or excuse me -- the -- the

14   internal wiki, are there any other documents that

15   you could point me or the Court to that reflect       10:47:41

16   Facebook's organizational structure?

17             MR. BLUME:  Pre IPO or post IPO?

18             MR. KO:  I would like to start with the

19   entire time period first.

20             MR. BLUME:  Well -- okay.  They -- they      10:47:59

21   just -- they didn't have public filings before they

22   became a public company.  That's all I'm saying.

23             MR. KO:  Well, let's just -- stop.  You

24   can object to my questions and then leave it at

25   that.                                                  10:48:08
```

Page 67

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              MR. BLUME:  Okay.                     10:48:09

 2              THE DEPONENT:  I don't believe there's

 3      been other documents like -- like what I just

 4      referred to.

 5         Q.   (By Mr. Ko)  Okay.  So other than the --  10:48:21

 6      this internal wiki, is there any other documents or

 7      information you could point me or the Court to, to

 8      show what Facebook's organizational structure

 9      looked like?

10              MR. BLUME:  Objection.               10:48:40

11              THE DEPONENT:  Not that I'm aware of.

12         Q.   (By Mr. Ko)  And when you said before

13      that you could go to this org chart, I just want to

14      make sure I understand.

15              The -- the org chart you were talking  10:49:06

16      about is synonymous with this internal wiki tool

17      and page, correct?

18         A.   No, not synonymous.  Like there's a

19      company wiki, which is internal to Facebook

20      employees, and you can look up people by name.  And  10:49:24

21      then you can click on see org, or something to that

22      effect, and then the page will display the person

23      in the way that I described.

24         Q.   And is that company wiki distinct from

25      the org chart that you had referred to before?     10:49:47
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1       A.   Think of the internal wiki as the name of        10:49:55

2   the place where you can go and see internal

3   documents and find people.  So it's -- it's not the

4   same thing.  But that's where you go to find -- to

5   look people up.                                            10:50:16

6       Q.   Yeah.  And I -- and I wasn't asking

7   whether or not it was -- anything.

8            I had asked whether or not the company

9   wiki was distinct from the org chart that you had

10  referred to before.                                        10:50:30

11      A.   I don't know what you mean.

12      Q.   In response to a question that I had

13  asked of whether or not -- this was the question --

14  question, if I wanted to know if Facebook -- what

15  Facebook's organizational -- organizational            10:50:47

16  structure looked like, where would I look?

17  Answer --

18           MR. BLUME:  Objection.

19      Q.   (By Mr. Ko)  -- "You would go to what I

20  believe -- it's called like org -- there's an org      10:50:55

21  chart.  Like you can look up a person and see

22  what -- who they report in to."

23           So I'm just asking a simple question,

24  based on that question and answer exchange.

25           When you said "org chart," what were you      10:51:11

Page 69

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    referring to?  Were you referring to the company        10:51:13
 2    wiki or something else?
 3         A.   The company wiki is what I go to, to find
 4    out who a person reports in to.  And the word "org"
 5    is there, and you click see org, or something to        10:51:31
 6    that effect, and then you'll see who reports in to
 7    them to the extent they are a manager and who they
 8    report in to.  And you do that within the company
 9    wiki.
10         Q.   Thank you.                                     10:51:54
11              And other than this -- well, you had also
12    talked about this internal wiki containing internal
13    documents.
14              Do you recall that?
15         A.   Yes.                                           10:52:15
16         Q.   What internal documents are you referring
17    to?
18         A.   So it could be a -- a host of things.  So
19    a team might create their own internal wiki page.
20    It's basically a place where you can -- you can         10:52:37
21    create a page that's -- that you -- like the
22    company wiki is -- is -- can be used for -- like a
23    place where teams can share information with each
24    other.
25              And it can be, I believe, locked down to      10:52:56
```

Page 70

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1     just certain people, or it can be a publicly          10:52:59

2     visible -- not to the public, but internal

3     employees could all be able to see the content.  It

4     just depends.

5          Q.   And would these internal documents          10:53:16

6     reflect a particular group's organizational

7     structure?

8          A.   I'm not aware of any like ability to type

9     in the word developer operations, for example,

10    and -- and see the chart.  Like don't think of the    10:53:34

11    chart that way.  It's literally you look up a human

12    by name, and then you can see what team they're on,

13    and then you can see who reports in to them.

14         But I am not aware -- aware of anything

15    else.                                                 10:53:53

16         Q.   I see.  That's helpful.

17         So it's employee- or individual-based; in

18    other words, like you said, you -- you type in

19    Allison Hendrix, and you can see every person that

20    Allison Hendrix reports to and every person that     10:54:07

21    reports to you, correct?

22         A.   Yes.

23         Q.   And you can also see what -- while you

24    can't type in DevOps or developer operations, by

25    typing in Allison Hendrix you can see what group or  10:54:21
```

Page 71

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | team you're a part of, as well as the groups or | 10:54:25 |
| 2 | teams that report to you and -- and that you report | |
| 3 | to; is that fair? | |
| 4 | A.   Yes.  You can -- you can see the | |
| 5 | reporting line.  I believe the -- using my team as | 10:54:39 |
| 6 | an example, the data policy management and | |
| 7 | enforcement team, I -- I believe it would be up to | |
| 8 | the teams to -- if it's -- because that's a team | |
| 9 | name within the broader team, so I think you have | |
| 10 | the ability to edit and get more granular with | 10:54:58 |
| 11 | respect to the specific name, if you're on it. | |
| 12 | But otherwise, like if you looked me up, | |
| 13 | it might say that I'm on the privacy and data | |
| 14 | policy because I am on.  But I'm on a sub-team | |
| 15 | within that team.  And I -- and I think that the -- | 10:55:12 |
| 16 | I think that although people might have the ability | |
| 17 | to add that, I don't -- it's -- I don't -- I -- I'm | |
| 18 | not sure. | |
| 19 | Q.   And when you say that "people might have | |
| 20 | the ability to add that," are you referring to | 10:55:31 |
| 21 | adding that as part of the search for, | |
| 22 | hypothetically, Allison Hendrix, or are you saying | |
| 23 | that that's something that IT, or someone else at | |
| 24 | Facebook, would have to revise in order for that | |
| 25 | sub-team or more granular level of -- of | 10:55:46 |

Page 72

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    information needed to be discovered?              10:55:49

 2        A.   You can look people up by individual

 3    names.  And then when you find me, there

 4    are editable sections like about me.  So I have the

 5    ability to go to myself in the team wiki and I can,  10:56:04

 6    if I choose to, like edit certain sections of my

 7    profile.

 8        Q.   Got it.  Understood.

 9             Now, it's fair to say that there are

10    groups or departments at Facebook, correct?         10:56:23

11        A.   Yes.

12        Q.   And you indicated you are part of DevOps

13    or developer operations, correct?

14        A.   I -- I joined the company.  And when I

15    joined, I joined the developer operations team.     10:56:45

16        Q.   And there are, of course, individuals and

17    employees within your team, correct?

18        A.   You cut out.  Could you say that again?

19        Q.   Sure.

20             There -- there are, of course,             10:57:01

21    individuals and employees within each team,

22    correct?

23        A.   There are employees within each team and

24    they are individuals, yes.

25        Q.   I want to show you a list of teams that    10:57:20
```

Page 73

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | I'm aware of, and -- and I want to ask you some | 10:57:23 |
| 2 | questions based upon that. | |
| 3 | You'll be pleased to know that this is | |
| 4 | PDF, and I can't type anything into here.  So | |
| 5 | hopefully that won't be distracting to you. | 10:57:41 |
| 6 | But here is a list that I'm aware of that | |
| 7 | reflects the various teams at Facebook.  And let me | |
| 8 | read them to you and into the record.  And, again, | |
| 9 | this is just designed to help us facilitate this | |
| 10 | Q and A. | 10:58:03 |
| 11 | But the groups/departments that I'm aware | |
| 12 | of are as follows:  management, legal, policy, | |
| 13 | communications, platform operations, development | |
| 14 | operations, advertising, security, privacy, human | |
| 15 | resources, growth, sales and marketing, academic | 10:58:22 |
| 16 | research, engineering, and user research. | |
| 17 | Do these all look like departments at | |
| 18 | Facebook to you? | |
| 19 | A.   So like sales and marketing are not on | |
| 20 | the same team.  Like -- and -- and this doesn't | 10:58:49 |
| 21 | seem -- like -- like, you know, we have an HR team. | |
| 22 | We have a legal team.  There's many sub-teams | |
| 23 | within teams.  We have product teams.  Multiple | |
| 24 | product teams.  Multiple comms teams within comms. | |
| 25 | We have platform -- we have marketing teams.  We do | 10:59:15 |

Page 74

1    have partnerships teams.                              10:59:21

2              I don't see -- you have -- like we

3    have -- we have a research team.  But there's also

4    other researchers embedded in team.

5              So like the way that you're structuring     10:59:35

6    this is a bit inconsistent with how we're

7    structured.  And we refer to each other more as

8    organizations like -- than departments, but -- or

9    at least I do.

10       Q.   Yeah.  It's super helpful.                   10:59:53

11             So from -- from this point forward, I

12   will do my best to refer to various the Facebook

13   teams as organizations, first of all.  I will not

14   refer to them as departments and groups.

15             And what I'm hearing you say with respect   11:00:06

16   to this list is that it's incomplete; is that

17   correct?

18       A.   Yes.  It appears to -- it appears to be

19   incomplete.  Like there's public policy teams.

20       Q.   And then I heard you -- I -- I just want     11:00:34

21   to make sure I -- I get from you -- because you are

22   the Facebook designee on Facebook's organizational

23   structure -- I want to make sure I am not missing a

24   important or major or -- or any team, for that

25   matter, any organization that -- that you can think  11:00:52

                                                          Page 75

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    of that is not listed here, I -- I want you to tell          11:00:57

2    the Court what organizations they are.

3          A.   Well, you don't have the Facebook

4    culinary team.  And you don't have like -- and I

5    don't know what you mean by privacy.  Like you               11:01:15

6    don't have the privacy and data policy org, you

7    just have the word privacy.

8               There's a privacy team that our co-chief

9    privacy officer, Michel Protti, runs.  The other

10   co-chief privacy officer is Erin Egan.  That's who          11:01:31

11   I roll up in to.

12              So it's very difficult for me to do this

13   live and be able to tell the Court accurately if

14   I've, you know -- there's a choice in competition

15   team.  And these are teams within teams as well.            11:01:51

16   And so I just -- I'm not quite sure, sitting here

17   now, that I can express competence.  But had I,

18   you know, the opportunity, I could better,

19   you know -- I just need to review some documents.

20         Q.   Well, you -- you did review documents in         11:02:16

21   connection with the deposition and you are

22   Facebook's corporate designee as to the

23   organizational structure.

24              So in light of that -- and this is --

25   this -- you're right.  This isn't meant to be a             11:02:26

Page 76

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | memory test.  So I'm just simply asking you and | 11:02:28 |
| 2 | you -- it seems like you rattled off several groups | |
| 3 | that aren't listed here.  I -- I acknowledge that | |
| 4 | this list isn't complete.  And so I need you to | |
| 5 | help me complete it. | 11:02:38 |
| 6 | So can you identify the group -- the | |
| 7 | organizations at Facebook -- not the | |
| 8 | sub-organizations -- but the organizations at | |
| 9 | Facebook that are missing from this list? | |
| 10 | A.   There's the finance and -- team.  The | 11:02:55 |
| 11 | accounting team.  The investor relations team. | |
| 12 | There's the data -- there's -- there are data | |
| 13 | science teams.  There are teams that work on our | |
| 14 | data centers.  Security teams. | |
| 15 | Well, you have that there. | 11:03:32 |
| 16 | Q.   Well, there's -- there's a security -- | |
| 17 | there's a security listed here. | |
| 18 | Super helpful.  Finance.  Accounting. | |
| 19 | Investor relations.  Data science. | |
| 20 | Earlier when you say -- said Facebook | 11:03:49 |
| 21 | culinary, did I hear that correctly? | |
| 22 | A.   Yes. | |
| 23 | Q.   Okay.  I know you guys give away a lot of | |
| 24 | free food so that -- that probably is a big team. | |
| 25 | A.   There's a facilities team.  IT teams. | 11:04:04 |

Page 77

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1        Q.   Okay.  And I want to go back to -- one of      11:04:10

2   your first responses and reactions to this list.

3             You had talked about multiple product

4   teams, right?

5        A.   Yes.                                            11:04:27

6        Q.   And obviously there's -- there are a lot

7   of product managers at Facebook working on a

8   variety of different products, correct?

9        A.   Yes.

10            MR. BLUME:  Objection.  Beyond the scope.       11:04:38

11       Q.   (By Mr. Ko)  Do -- do the product

12  managers -- do the product managers roll into a

13  team on this list or would they have a separate

14  organizational -- or would they have a separate

15  organization for themselves?                             11:04:54

16            MR. BLUME:  Objection.  Beyond the scope.

17            THE DEPONENT:  So you need to appreciate

18  that Meta has a family of apps and services.  So

19  there -- for example, using legal, there's product

20  counsel WhatsApp.  There's product counselors for       11:05:14

21  Facebook, for Instagram, et cetera.  So these teams

22  support different apps and services that we

23  provide.

24            So using the legal team, all of those

25  different people are on our legal team.  Then --        11:05:33
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    I'm just trying to go from memory here, you know.        11:05:48

 2    I -- this -- this is one of those ones where it

 3    might have been nicer for you to be typing.

 4    Because I don't remember everything I've rattled

 5    off.                                                      11:06:02

 6            But I -- I believe that I've given you

 7    all the names of teams that are relevant to the

 8    topics that I'm -- I'm -- I'm prepared to cover.

 9    So I don't think I've omitted any teams that are

10    not a part of -- like the -- like -- like I             11:06:18

11    definitely think that I've given you all the names

12    of the teams that are relevant to the topics.

13        Q.    (By Mr. Ko)  Thank you.  That's very

14    helpful.

15            And see, my typing was not intended to be        11:06:35

16    nefarious whatsoever.  I'm trying to help us in

17    this testimony.

18            So maybe I'll try typing a little bit --

19            (Simultaneously speaking.)

20            THE DEPONENT:  Well, Mr. Ko, just -- I           11:06:44

21    didn't know that -- I didn't know that the video

22    was capturing the screen.  That was what made

23    me feel uncomfortable, because I thought that I'm

24    the only one on video.  So that was what made me

25    uncomfortable, just so we're clear.                      11:06:52
```

Page 79

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              So to the extent that you continue to        11:06:55

 2    engage in these exercises, I'm totally comfortable

 3    with you typing.  So I apologize for the -- my

 4    confusion.

 5              MR. KO:  Okay.  Thank you for -- thank        11:07:04

 6    you for that.  I appreciate that.

 7         Q.   (By Mr. Ko)  One organization that you

 8    had mentioned, too, that you -- that seems to be

 9    missing here that's a pretty big one are the -- the

10    partnership teams, correct?                            11:07:17

11              Partnership organizations, correct?

12         A.   Yes.  And there's games teams, too.

13    Teams that support games within partnerships,

14    though, I believe and -- yes, that's right.

15         Q.   Great.                                       11:07:40

16              So all -- all of this is to say that this

17    list here that I'm showing you and that I read into

18    the record before is definitely incomplete as to

19    the total number of organizations at Facebook,

20    right?                                                 11:07:55

21              MR. BLUME:  Objection.  Beyond the scope.

22              THE DEPONENT:  What you're displaying is

23    complete -- is incomplete.  I supplemented it with

24    my testimony.  I can't see what I said.  But I do

25    think we've captured primarily the high-level         11:08:13
```

Page 80

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    organization structure of -- of Meta, yeah.              11:08:18

 2         Q.   (By Mr. Ko)  Great.  Thank you for that.

 3              Now, what organizations were responsible

 4    for or otherwise worked on any aspect of developer

 5    access to the Facebook platform?                         11:08:47

 6         A.   This would be -- and, again, I'm assuming

 7    this is for the entire period, relevant period?

 8         Q.   Correct.

 9         A.   Okay.  So --

10              MR. BLUME:  Hang -- hang on one second.        11:09:05

11              THE DEPONENT:  Okay.  Sorry.

12              MR. BLUME:  I'm just -- I'm -- I'm just

13    looking at the -- at the notice.

14              What topic is this?

15              MR. KO:  Topic 1, Mr. Blume.                   11:09:13

16              MR. BLUME:  Well, how is it related to

17    the --

18              (Simultaneously speaking.)

19              MR. KO:  Facebook's organizational

20    structure.                                               11:09:20

21              MR. BLUME:  As it relates -- as that

22    relates to 1a, b and c.  Which of a, b and c is it

23    relating to?

24              MR. KO:  Well, it's really referring to

25    all -- I'll -- I'll try to be helpful and tell you       11:09:28
```

Page 81

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | that it's 1b, in particular. | 11:09:31 |
| 2 | MR. BLUME:  Okay.  Thank you. | |
| 3 | THE DEPONENT:  And can I be reminded of | |
| 4 | what 1b is? | |
| 5 | I don't have the document in front of me. | 11:09:41 |
| 6 | MR. KO:  It's pretty long, but let -- | |
| 7 | it's pretty long, but let me paraphrase to you what | |
| 8 | I -- | |
| 9 | MR. BLUME:  Can I show -- | |
| 10 | MR. KO:  Yeah. | 11:09:47 |
| 11 | MR. BLUME:  Can I show her -- | |
| 12 | MR. KO:  If it's helpful -- yeah, you -- | |
| 13 | you can show it to her. | |
| 14 | But while you show it to her, really | |
| 15 | the -- the processes for drafting the various | 11:09:54 |
| 16 | policies that were in place with respect to both | |
| 17 | users and developers. | |
| 18 | THE DEPONENT:  Going back to the prior | |
| 19 | question, I did forget about the strategic response | |
| 20 | team.  And so now what teams would be working on | 11:10:16 |
| 21 | what I just read in b. | |
| 22 | At Facebook we are a team of teams and | |
| 23 | you -- we large- -- largely involve nearly all | |
| 24 | parts of the org, you know, not the culinary team | |
| 25 | for an example on -- on these kind of topics. | 11:10:36 |

Page 82

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | But it would be legal and privacy org and | 11:10:39 |
| 2 | privacy and data policy org, public policy, comms, | |
| 3 | marketing, product, eng.  I think I said comms. | |
| 4 | Partnerships can be involved. | |
| 5 | Q.   (By Mr. Ko)  How about the platform | 11:11:05 |
| 6 | and -- platform and development -- developer | |
| 7 | operations teams? | |
| 8 | A.   Developer operations would be involved as | |
| 9 | well.  It all depends on the nature and scope of | |
| 10 | the specific topic within the topics on -- listed | 11:11:21 |
| 11 | in 2b. | |
| 12 | Q.   Got it. | |
| 13 | Several -- several organizations at | |
| 14 | Facebook were responsible for -- otherwise worked | |
| 15 | on aspects of developer access to the Facebook | 11:11:36 |
| 16 | platform; is that fair to say? | |
| 17 | A.   Yes.  I mean, going back to the earlier | |
| 18 | example, it really needs to be granular.  So for | |
| 19 | example, developer operations wouldn't work closely | |
| 20 | on an update to the SRR. | 11:11:59 |
| 21 | Q.   Well -- and -- and that's -- that's a | |
| 22 | good segue into my next question, which was -- | |
| 23 | which is, which depart- -- which organizations at | |
| 24 | Facebook were responsible for drafting and | |
| 25 | enforcing the policies applicable to use of the | 11:12:18 |

Page 83

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    Facebook platform by developers?                    11:12:22

 2        A.   Drafting and enforcing are two different

 3    things.  So in regards to drafting, like the

 4    statement of rights and responsibilities, that is

 5    largely -- that is legal driven.  But with input     11:12:36

 6    from, again, multiple policy orgs; the comms team,

 7    marketing teams.

 8             And then in regards to the enforcement

 9    that, again, is my team.  Legal.  Developer

10    operations.  External datums use.  And there's an    11:13:03

11    eCrime team.

12             I forgot to mention the -- I believe it's

13    referred to now as the content policy team.  I

14    forgot to mention that earlier.  That was rebranded

15    from the global policy management team that I         11:13:26

16    referred to earlier.  So same team, different name.

17             Many teams get pulled in for both

18    drafting.  And then in -- drafting of terms and

19    policies.  And then depending on the enforcement

20    aspect of it, we collaborate on enforcement          11:13:51

21    approach with multiple teams as well.

22        Q.   And I appreciate you distinguishing the

23    difference between drafting and enforcing.  So

24    let's unpack that, and let's just focus on the

25    drafting to start with.                              11:14:13
```

Page 84

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1            You've testified as to who was part of        11:14:15

 2    the drafting of the SRRs.  Can you also describe to

 3    the Court what organizations were responsible for

 4    drafting the data use policies?

 5        A.   It would be the same response with           11:14:37

 6    respect to the drafting of the SRR for the data --

 7    for the data use policy, the same teams would be

 8    pulled in.

 9        Q.   How about with respect to the -- the

10    platform policies --                                  11:14:53

11        A.   Same response.

12        Q.   -- who -- okay.

13            And with respect to the drafting of the

14    SRRs, DUPs and platform policies, who would you

15    say -- of the organizations that you have            11:15:09

16    described, who would you say had primary

17    responsibility for drafting these policies?

18            MR. BLUME:  Objection.  Time frame.

19            THE DEPONENT:  Legal has the primary

20    responsibility of drafting all three of those.  But  11:15:29

21    then there is a period of time where -- where the

22    platform policies are managed by myself.  The team

23    I'm on, on the global policy management team.  But

24    as I said earlier, we don't do things in a vacuum.

25    But I was the person who drove the development and    11:15:53
```

Page 85

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    updates to the platform policies.                    11:15:57

2           And now -- oops -- I -- I think that's --

3    I think that's all I have -- I'm so sorry.

4           Q.   (By Mr. Ko)  And when you say that there

5    were updates made to the platform policy, in         11:16:14

6    particular, what are you referring to?

7           A.   Well, there's been multiple versions of

8    what you and I earlier agreed to.  We're just going

9    to call them platform policies.  But now, present

10   day, it's platform terms and developer policies.     11:16:38

11   But there's multiple changes over the years based

12   on a number of factors.

13          Q.   So the global policy management team for

14   which you are currently -- or were involved in,

15   they were responsible for and had primary            11:16:53

16   responsibility with respect to the drafting of

17   these platform policies and updates thereto; is

18   that fair to say?

19               MR. BLUME:  Objection.

20               THE DEPONENT:  It all depends on what     11:17:14

21   time period.  But from -- so in the context of the

22   platform terms and developer policies that we

23   launched, that was very -- like co-driven with

24   legal and -- and -- and my team working pretty much

25   side by side.  But, again, with input and feedback   11:17:38

Page 86

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1   from all of the respective teams that I outlined      11:17:41

 2   before.

 3        Q.   (By Mr. Ko)  Great.

 4            And -- and with respect to the SRRs and

 5   DUPs, and all iterations thereto, what other          11:17:52

 6   organizations, other than legal, have primary

 7   responsibility for drafting and revising and

 8   updating those respective policies?

 9            MR. BLUME:  Object- -- objection.  Form.

10            THE DEPONENT:  Legal has always, and         11:18:17

11   continues today, to be the manager of those of

12   and -- and policy --

13        Q.   (By Mr. Ko)  Are there any other --

14        A.    -- with significant input from other

15   teams, but they're the -- they're -- they hold the    11:18:31

16   pen.

17        Q.   And from the teams that you had described

18   before, and organizations, are there any that you

19   can identify that had primary responsibility or

20   co-responsibility with the drafting of these,         11:18:50

21   similar to how the global management team had

22   co-responsibility with legal as to the platform

23   policies?

24            MR. BLUME:  Objection.  Form.

25            THE DEPONENT:  I just realized I forgot       11:19:03
```

Page 87

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    to reference the content strategy team.                11:19:06

2           So having corrected myself there now, I

3    apologize, Mr. Ko.  Could you repeat your question.

4        Q.   (By Mr. Ko)  Sure.

5           And so this -- this team that you had         11:19:20

6    recalled, this content strategy team, they were --

7    or had primary responsibility along with the global

8    management team to help update the platform

9    policies with legal; is that correct?

10          MR. BLUME:  Objection.                          11:19:38

11          THE DEPONENT:  I -- I am only comfortable

12   saying that the legal team has the primary

13   responsibility for the terms and service, also

14   known as the SRR.  And the data use policy, also

15   referred to as the privacy policy.  With the next     11:19:50

16   largest contributor being the -- Erin Egan's

17   privacy and data policy team.

18          But, again, many people have eyes on

19   proposed revisions.  But those would be the two

20   teams.  Legal being primarily accountable, but        11:20:08

21   working most closely with Erin Egan's org over the

22   years.  But, again, everyone has a chance to review

23   and provide feedback and input.

24       Q.   (By Mr. Ko)  And with respect to the

25   privacy and data policy team that Erin Egan was in     11:20:29

                                                    Page 88

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    charge of, at least for some period of time, are          11:20:34

2    you saying that they were the next largest

3    contributor to legal with respect to just the SRRs

4    and data use policy, or are you saying with respect

5    to all the policies that we've been talking about,         11:20:52

6    including the Facebook platform policy?

7        A.   So Erin Egan's team, of which I'm now on,

8    primarily would play a role in the data use policy

9    updates.  Again, legal holding the pen, but -- but

10   Erin Egan's org, the privacy and data policy team,         11:21:18

11   would be providing input and feedback.  And

12   seeking, you know, feedback on -- on data policy

13   updates.  And the research team has been involved

14   as well.

15       Q.   How about with respect to the SRRs,              11:21:45

16   who -- who would -- who would you say -- or what

17   organization would you say is the next largest

18   contributor to the SRRs, outside of legal?

19       A.   I would say that both Monika Bickert's

20   content policy, global policy management team, they         11:22:05

21   and Joel Kaplan's org, which Erin reports in to

22   Joel, that they would be the primary people.

23            But legal largely drives terms -- the

24   terms of service updates.  But they do seek input,

25   again, because nothing here is done in a vacuum.           11:22:32

Page 89

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        Q.   What was the organization that          11:22:39

 2   Joel Kaplan was part of?

 3        A.   Well, Joel is still at the company.  He

 4   has -- his teams -- so Erin reports in to Joel.  So

 5   Joel is public policy and privacy and data policy    11:22:59

 6   orgs.

 7             Trying to think who else.  I might have

 8   to refresh my memory.

 9             But primarily, Joel leads the team that

10   manage our public policy privacy and data policy     11:23:19

11   teams.

12        Q.   So was Monika's content global team and

13   Joel Kaplan's public policy and privacy team that

14   were the next largest contributors, other than

15   legal, to the SRRs?                                   11:23:39

16        A.   Monika reports in to Joel --

17        Q.   Did I get --

18        A.   -- her team.

19             THE COURT REPORTER:  I'm sorry.  In to

20   who?                                                  11:23:42

21             THE DEPONENT:  Monika Bickert reports in

22   to Joel Kaplan.

23        Q.   (By Mr. Ko)  Okay.  So other than

24   legal -- I just want to make sure I'm crystal clear

25   on this.                                              11:24:05
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Other than legal, the next largest | 11:24:05 |
| 2 | contributor to the SRRs is the public policy and | |
| 3 | privacy organization; is that accurate? | |
| 4 | A.   I think it's more accurate to say, other | |
| 5 | than legal, Joel Kaplan's org teams that I just | 11:24:15 |
| 6 | outlined are the -- are given a chance to preview | |
| 7 | and provide feedback, along with other teams.  But | |
| 8 | they -- the teams that report in to Joel would have | |
| 9 | an opportunity to review and provide input on | |
| 10 | updates. | 11:24:36 |
| 11 | Q.   And Joel's team and organization selected | |
| 12 | public policy, privacy and data C [phonetic] teams, | |
| 13 | correct? | |
| 14 | A.   And the content policy team that has also | |
| 15 | been and sometimes is still currently referred to | 11:24:53 |
| 16 | as the global policy management team. | |
| 17 | So of those orgs, primarily, it would be | |
| 18 | Erin and Monika's teams.  And I wouldn't say that | |
| 19 | one had more input over the other.  They both have | |
| 20 | an opportunity to provide input.  But legal largely | 11:25:08 |
| 21 | drives updates to the terms of service. | |
| 22 | Q.   Facebook has, as you indicated before, a | |
| 23 | finance team or organization, correct? | |
| 24 | A.   Yes.  There's a finance team at Facebook. | |
| 25 | Q.   And they also have an account -- Facebook | 11:25:35 |

Page 91

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    also has an accounting organization, correct?          11:25:37

 2         A.   Yes, the finance and -- there's finance

 3    and accounting teams.

 4         Q.   And did the Facebook finance and or --

 5    and accounting organizations exist prior to            11:25:49

 6    Facebook's IPO in 2012?

 7              MR. BLUME:  Objection.

 8              THE DEPONENT:  So we -- we definitely had

 9    finance and accounting teams, yes, prior to the

10    IPO.                                                   11:26:12

11         Q.   (By Mr. Ko)  Fair to say that Facebook

12    had a finance and accounting team for the entire

13    time period that it was in existence or has been in

14    existence?

15         A.   We're just talking about during the         11:26:31

16    relevant period, right.  You're not talking about

17    when Facebook was first created.

18         Q.   Fair enough.  Yes.

19              From January 1st, 2007 to present, has it

20    always been the case that Facebook has had a           11:26:43

21    finance and accounting team?

22              MR. BLUME:  Objection.  Compound.

23              THE DEPONENT:  It is fair to say that --

24    to that there's always been -- to -- to the extent

25    it became -- becomes relevant a team that -- that      11:26:57
```

Page 92

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    works on finance and accounting.                    11:27:01

 2         Q.   (By Mr. Ko)  Approximately how many

 3    individuals have been on the finance team over the

 4    relevant time period?

 5              MR. BLUME:  In -- in total?                11:27:19

 6         Q.   (By Mr. Ko)  Do you understand the

 7    question?

 8         A.   Yes.  But I -- I don't know the -- the --

 9    I -- I don't know the answer to -- for -- from 2007

10    to 2022.  That number obviously has changed and      11:27:33

11    grown, but I don't know the specifics, sitting here

12    today.

13         Q.   Can you give the Court a general

14    understanding of the number of employees that were

15    in the finance team throughout the relevant time     11:27:49

16    period?

17              And not in total.  But just an estimate

18    as to year over year, about how many individuals

19    were on that team.

20              MR. BLUME:  Objection.  Form.              11:28:04

21              THE DEPONENT:  I --

22              MR. BLUME:  Don't guess if you --

23              THE DEPONENT:  Yeah, I can't.  I -- I

24    don't know.

25         Q.   (By Mr. Ko)  Ms. Hendrix, in -- in        11:28:12
```

Page 93

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    topic 1, one of the aspects of topic 1 that you          11:28:13

 2    have agreed to testify as to are the employees in

 3    each department as they relate to some of the

 4    sub-topics in topic 1.

 5            So let me try it again.                           11:28:28

 6            Do you have any understanding of the

 7    number of employees in the finance team over the

 8    relevant time period?

 9            MR. BLUME:  Objection.  Beyond the scope.

10            THE DEPONENT:  No, I --                           11:28:43

11       Q.   (By Mr. Ko)  I was just --

12       A.   I don't know.  I know that the finance

13    and accounting teams are accountable for valuations

14    of the company.  But I don't know -- and I know I

15    could provide you with some names of those          11:28:52

16    senior-most accountable people.  Dave Wehner being

17    you know, the obvious, chief privacy officer --

18    or chief privacy -- chief finance officer.

19            But I don't -- I can't give you numbers

20    of how many employees have come and gone from 2007     11:29:07

21    to 2022.  But I'm prepared to speak on what those

22    teams do.

23       Q.   Do you have a general understanding of

24    how many employees are currently in -- on the

25    finance team under Dave Wehner?                        11:29:24
```

Page 94

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              MR. BLUME:  Objection.  Beyond the scope.    11:29:28

 2              MR. KO:  Let me just make sure and

 3      respond to that objection on the record.

 4              The topic is clear in asking for the

 5      employees in each department.  And so one could   11:29:36

 6      easily and logically conclude that topic would

 7      relate to the amount and number of employees in

 8      that department.

 9              MR. BLUME:  And as -- sorry.

10              MR. KO:  So --                             11:29:49

11              MR. BLUME:  As the -- as the number and

12      amount of those employees relate to "The

13      calculation of revenues, gross profits, net

14      profits, goodwill, impairments and assets

15      recognized by Facebook related to Users' Data or  11:29:57

16      Information, including but not limited to

17      Facebook's public reporting," there are many in the

18      finance organization that have nothing to do with

19      user data and information.

20              And so requesting the numbers of those     11:30:11

21      people is beyond the scope of, 1 sub-topic a.

22              MR. KO:  So I had a question -- let me

23      just ask the question.

24         Q.   (By Mr. Ko)  Again, do you have an

25      understanding of how many employees are currently  11:30:26
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    under the finance team -- on the finance team under        11:30:30

2    Dave -- which is Wehner?

3              MR. BLUME:  Objection.  Same objection.

4              THE DEPONENT:  Sitting here right now, I

5    know that I could get that information, but I --           11:30:46

6    I -- in terms of how many people report in to him.

7    But I didn't interpret the topic to require me to

8    show up with numbers, but more to be prepared to

9    speak to those sub-topics.

10        Q.   (By Mr. Ko)  And so I just wanted to make         11:30:59

11   sure the record is clear.

12             Do you have an understanding as to how

13   many employees were on either the finance or

14   accounting teams at any point in time during the

15   relevant time period?                                      11:31:18

16             MR. BLUME:  Objection.  Beyond the scope.

17             THE DEPONENT:  I could find out how many

18   are on the teams today.  But I don't know the

19   numbers from January 1, 2007, up until present.

20        Q.   (By Mr. Ko)  That's helpful.                      11:31:40

21             So -- so you could -- if you -- if you

22   wanted to, one could obviously find out that

23   information right?

24             That's not hard to get, correct?

25        A.   I -- I think it might take some time              11:31:52

Page 96

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    because you have to click on -- you know, look up        11:31:54

 2    Dave Wehner's name and then see who reports in to

 3    him and keep clicking to find -- you know, all the

 4    way down the chain.  But I didn't do that.

 5         Q.   Yeah.  And I'm not asking you what you          11:32:09

 6    did.  You've made that clear in how you've

 7    interpreted this.

 8              I'm just -- I'm just simply asking you,

 9    if one wanted to find out how many individuals were

10    on the finance and accounting organizations, or any      11:32:20

11    organization for that matter, throughout the

12    relevant time period, that is information one could

13    obtain, correct?

14              MR. BLUME:  Objection.  Beyond the scope.

15              THE DEPONENT:  I don't know if we've            11:32:38

16    retained any type of records as the teams have

17    grown and changed over the years.  So I -- I don't

18    know if we could produce that.

19         Q.   (By Mr. Ko)  But produce it presently at

20    least, correct?                                           11:32:57

21              MR. BLUME:  Objection.  Beyond the scope.

22              THE DEPONENT:  I could --

23              MR. BLUME:  No.

24              THE DEPONENT:  Okay.  I won't.  I won't.

25              MR. BLUME:  It's --                             11:33:08
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        Q.   (By Mr. Ko)  So you -- you didn't get an        11:33:08

 2   instruction that you --

 3             (Simultaneously speaking.)

 4             MR. BLUME:  You're -- you're asking

 5   about --                                                  11:33:11

 6             MR. KO:  -- weren't allowed to answer the

 7   question.  I have a question --

 8             MR. BLUME:  You're asking if Ms. --

 9             MR. KO:  You can object --

10             MR. BLUME:  -- Ms. Hendrix --                   11:33:23

11             MR. KO:  The only way you can object.

12   That's it.

13             THE COURT REPORTER:  Hold on.  Hold on.

14   One at a time, please.

15             MR. BLUME:  Objection.                          11:33:24

16        Q.   (By Mr. Ko)  Remember how earlier I said

17   unless Mr. Blume clearly instructs you not to

18   answer the question, I would request that you

19   answer my question nonetheless.  That's the way

20   this -- this goes.                                        11:33:33

21             So you could produce the information as

22   to how many employees were part of a particular

23   Facebook organization, and you could find that out

24   presently if you wanted to, right?

25             MR. BLUME:  Okay.  Different ques- --           11:33:55
```

Page 98

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1      that's a different question.                          11:33:55

2              No objection to that question.

3              THE DEPONENT:  Your question doesn't make

4      sense to me.  You said "were" and then "present."

5      So are you talking past.  Are you talking present.    11:34:06

6      I think you need to be a little more clear.

7          Q.   (By Mr. Ko)  Fair enough.  Sorry for the

8      confusion.  I agree.

9              To the extent you wanted to find out the

10     number of employees within a particular               11:34:21

11     organization at Facebook, you could find that out,

12     correct?

13         A.   I have the ability to go to Dave Wehner's

14     Facebook wiki profile, click on that org button,

15     and do tons of other clicks, because I'll see who     11:34:45

16     reports in to him and then who reports in to them

17     and so on and so on and so on.  And then ultimately

18     have a number.  So that -- that is a number that --

19     that I could find out.

20         Q.   And that would be true for any               11:35:02

21     organization at Facebook, correct?

22             MR. BLUME:  Objection.  Calls for

23     speculation.

24             THE DEPONENT:  It is technically possible

25     to find a human and count the amount of humans that   11:35:13

Page 99

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    report in to that human.                          11:35:19

 2         Q.   (By Mr. Ko)  Turn to topic 1a of the

 3    notice.

 4              Do you see the items listed there?

 5         A.   May I -- may my -- Mr. -- may Rob pass me  11:35:31

 6    this.  Okay.

 7         Q.   Yeah, absolutely.

 8              And -- and just so -- for your benefit,

 9    I -- I would ask that you just have the -- the

10    notice handy throughout this deposition.  You can  11:35:41

11    have that in front of you, because obviously

12    we're -- we're referring to it a lot, so...

13         A.   I mean, it's been handy.  I just don't --

14    I'm trying to follow the rules.  So to the extent

15    you refer to it, I -- I will -- it's right here.  I  11:35:53

16    just didn't know if I was allowed to -- to ask for

17    it.

18              Okay.  I see 1a, yes.

19         Q.   Do you see the items listed there?

20         A.   Yes.                                    11:36:12

21         Q.   What employees or organizations at

22    Facebook were responsible for the items listed in

23    1a?

24         A.   Finance and accounting are the teams

25    accountable for valuations for the company.       11:36:29
```

Page 100

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1     Q.   In addition to valuations, are they also        11:36:33

2   responsible for the calculation -- calculation of

3   revenues, gross profits, net profits, goodwill,

4   impairments and assess recognized by Facebook

5   relating to its users?                                  11:36:44

6          MR. BLUME:  I'm sorry.  Related to users'

7   data and information, not the users.

8     Q.   (By Mr. Ko)  Sure.  You can answer it

9   that way.

10    A.   Well, reporting of revenue is handled by         11:37:03

11  a cross-functional team, which includes finance and

12  legal and investor relations and corporate

13  communications.

14          So for the reporting aspect, those are

15  the teams.  But just for valuations, which I -- I'm     11:37:16

16  just using that generally to talk about the

17  calculation of these things.  If you prefer I don't

18  do so, I can hammer off each word.

19          But all -- all of the calculation of --

20  of -- of revenues is done by finance and              11:37:32

21  accounting.  The reporting is done by those

22  additional teams I named.

23    Q.   Thank you.  That's helpful.

24          And, yes, we can refer to these items as

25  valuation.  Thank you for that clarification.          11:37:47

                                               Page 101

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | So this other cross-functional team, | 11:37:51 |
| 2 | what -- what was the specific cross-functional team | |
| 3 | that did the reporting of the revenues? | |
| 4 | A.   Well, it's finance, legal, investor | |
| 5 | relations and corporate communications.  But just | 11:38:03 |
| 6 | going to 1a, there's no monetization, like no user | |
| 7 | data monetization calculation.  I don't know if I | |
| 8 | should make that clear. | |
| 9 | But just the team that like calculates | |
| 10 | our revenues is finance and accounting.  But | 11:38:17 |
| 11 | there's nothing pertaining to -- of user data | |
| 12 | that's tied to that. | |
| 13 | Q.   And when you say that there's no | |
| 14 | monetization calculation or user data monetization | |
| 15 | calculation within this topic, what -- what did you | 11:38:32 |
| 16 | mean by that? | |
| 17 | A.   We don't put a number on -- a price on -- | |
| 18 | on users' data.  98 percent of our revenues are | |
| 19 | through ads. | |
| 20 | MR. KO:  It's gotten even higher in | 11:38:52 |
| 21 | recent years. | |
| 22 | MR. BLUME:  Objection. | |
| 23 | Q.   (By Mr. Ko)  With respect to -- let's | |
| 24 | unpack your statement about not putting a number on | |
| 25 | a particular user. | 11:39:07 |

Page 102

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              Is it your testimony that Facebook              11:39:09

 2    neither directly nor indirectly places a number on

 3    Facebook users' data information?

 4         A.   We --

 5              MR. BLUME:  Objection.  Form.                   11:39:21

 6              THE DEPONENT:  We -- we have never done

 7    that.  We don't -- we don't do that at all.

 8         Q.   (By Mr. Ko)  So it's your testimony that

 9    you do not place any indirect value or

10    quantification on a particular user's data           11:39:36

11    information.

12              Do I understand your testimony correctly?

13              MR. BLUME:  Objection.  Form.

14              THE DEPONENT:  I don't quite understand

15    what you mean.  But in -- in -- in regards to like   11:39:44

16    revenue, a person's data is not a factor in how

17    we -- in -- in how we make money.

18         Q.   (By Mr. Ko)  Well, don't you report --

19         A.   It's based on, again, 98 percent ads.

20         Q.   Don't Facebook's public -- publicly        11:40:04

21    available financial accounting, including their

22    10-Ks, report as a key metric of the company,

23    average revenue per user?

24              MR. BLUME:  Objection.  Beyond the scope.

25    Not your topic.                                      11:40:19
```

                                                   Page 103

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              MR. KO:  Note for the record, I highly        11:40:22

 2      disagree with that.

 3              But go ahead --

 4              MR. BLUME:  It's --

 5              MR. KO:  -- and answer that question.         11:40:25

 6              MR. BLUME:  It's -- it's covered by

 7      topic 10, David, so -- the monetization.

 8              She's here to talk about the

 9      organizational structure involved in the

10      calculation, not the calculation itself.  That's    11:40:34

11      topic 10.  So that's my objection.  And there's no

12      reason for her to speculate on that.

13              MR. KO:  Noted.  I'll ask the question

14      again.

15        Q.    (By Mr. Ko)  Doesn't Facebook's publicly     11:40:50

16      available financial documents, including their

17      10-Ks report, as key metrics of the company,

18      average revenue per user?

19              MR. BLUME:  Objection.  Instruct you not

20      to answer in the capacity of your 30(b)(6).          11:41:01

21              If you know, individually, you can

22      answer.  But not as a 30(b)(6) witness with regard

23      to this topic.

24              THE DEPONENT:  I don't know.  I know we

25      calculate a revenue by Facebook user geography       11:41:11
```

                                            Page 104

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    based on our estimate of the geography in which ad        11:41:14

 2    impressions are delivered, virtual and digital

 3    goods are purchased, or consumer hardware devices

 4    are shipped.

 5         Q.   (By Mr. Ko)  Average revenue per user an        11:41:26

 6    important metric for purposes of --

 7              MR. BLUME:  Object.

 8         Q.   (By Mr. Ko)  -- calculating revenues?

 9              MR. BLUME:  Objection.  Instruct you not

10    to answer in your role as a 30(b)(6) witness.           11:41:35

11    Beyond the scope.

12              If you know in your personal capacity, I

13    guess you can answer in that capacity, although you

14    have, Ms. Hendrix, in your personal capacity coming

15    up, so...                                               11:41:50

16         Q.   (By Mr. Ko)  So the record is clear --

17         A.   I don't remember his question.

18         Q.   -- is average revenue per user an

19    important metric for purposes of calculating

20    revenue?                                                11:42:00

21              MR. BLUME:  Objection.  Beyond the scope.

22              Please don't answer in regard to your

23    30(b)(6) capacity.

24              THE DEPONENT:  I've already said we don't

25    calculate revenue by users, like we -- we don't        11:42:12
```

Page 105

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    have that, so I -- I don't...                        11:42:16

2         Q.   (By Mr. Ko)  Is ARPU an acronym that

3    sounds familiar to you?

4         A.   No.

5         Q.   You've never heard of ARPU?               11:42:31

6              MR. BLUME:  Objection.  Her personally,

7    or her as a corporate representative?

8              MR. KO:  Well, I'll ask both.  But,

9    you know, definitely in -- in -- in your corporate

10   capacity.                                            11:42:44

11             MR. BLUME:  And I -- it's -- it's beyond

12   the scope of her corporate designation in topic 1.

13   So I instruct you not to speculate or guess.

14             THE DEPONENT:  I don't -- I don't know.

15        Q.   (By Mr. Ko)  So as I -- I just want to     11:42:56

16   make sure the record is clear.

17             As a corporate designee of Facebook, who

18   consented to testifying on behalf of the

19   corporation, as to the organizational structure,

20   including the calculation of revenues, your answer   11:43:09

21   is that you don't know and have never heard of the

22   acronym ARPU; is that correct?

23             MR. BLUME:  Objection to your

24   recharacterization of topic 1, it's the organi- --

25   organizational structure related to the calculation 11:43:22

                                                         Page 106

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1   of revenue.  Not terms involved in the calculation      11:43:25

 2   of revenue.  Beyond the scope.

 3            You have a witness to topic 10 that is

 4   upcoming.  You are free to ask those questions.

 5            So I'd instruct you not to answer to the       11:43:39

 6   extent it's beyond the scope of topic 1.

 7            MR. KO:  Yes-or-no question, Ms. Hendrix.

 8            MR. BLUME:  Instruct you not to answer --

 9            MR. KO:  As a corporate designee --

10            You can stop with these speaking              11:43:49

11   objections.  Your objection has been noted.

12            MR. BLUME:  I'm -- I'm instructing her

13   not to -- I'm instructing her not to answer.

14   That's my -- that's my objection.

15            MR. KO:  Even to say --                        11:43:57

16            (Simultaneously speaking.)

17            SPECIAL MASTER GARRIE:  Duly noted for

18   the record.  Please move forward.

19            Objection is noted for the record, Mr. --

20   Counsel Ko, please ask the question again.              11:44:05

21            MR. KO:  Please ask the question again?

22            SPECIAL MASTER GARRIE:  Did she answer

23   the question?

24            MR. KO:  No, she did not.  That's why I

25   keep asking it.  So that's why I'm a little             11:44:20
```

Page 107

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1    confused.                                          11:44:23

2            SPECIAL MASTER GARRIE:  Okay.  So we've

3    noted the objection.

4            Ms. Hendrix, could you please answer the

5    question, given the advice you received from your  11:44:26

6    counsel.

7            MR. BLUME:  If you know in your personal

8    capacity, you can answer.

9            THE DEPONENT:  I don't know that acronym.

10       Q.   (By Mr. Ko)  Have you heard of the         11:44:36

11   acronym MAU?

12       A.   Yes.

13       Q.   What does that refer to?

14       A.   Monthly active users.

15       Q.   Have you heard of the acronym DAU?         11:44:48

16       A.   Yes.

17       Q.   What does that refer to?

18       A.   Daily active users.

19       Q.   You've never heard of ARPU or average

20   revenue per user; is that correct?                 11:45:04

21           MR. BLUME:  Objection.  Asked and

22   answered in her personal capacity.

23           THE DEPONENT:  It's still correct that I

24   don't know that acronym.

25       Q.   (By Mr. Ko)  Now, turning back to the      11:45:30
```

Veritext Legal Solutions
866 299-5127

```
 1    SRRs and DUPs, are those -- is it fair to say that        11:45:32

 2    the SRRs and DUPs are how Facebook discloses to

 3    users how Facebook uses the data information

 4    Facebook collects about them?

 5         A.   So you're referring to them as -- in the        11:45:56

 6    plural.  So there's only an SRR and a DUP.  So I

 7    don't know what else you're referring to when you

 8    say SRRs and DUPs.

 9         Q.   Okay.  I was referring to them plurally

10    because -- that's fair.  And let's back up a little        11:46:12

11    bit.

12              There were various iterations of both the

13    SRR and the DUP, correct?

14         A.   Yes.

15         Q.   And so when I'm referring to them in the        11:46:24

16    plural, I'm talking about all the various versions

17    and iterations of the SRR and the DUP.

18              So, hopefully, with that clarification,

19    my question could potentially be more clear.  I'm

20    happy to try and rephrase it, but let me try again.       11:46:42

21              Would you agree with me that the SRRs and

22    the DUPs govern how Facebook uses the data and

23    information Facebook collects from and about

24    Facebook users?

25         A.   So you are breaking up, so I haven't            11:47:05
```

Page 109

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    heard all of your words.  And could someone go on        11:47:07
 2    mute?
 3              MR. BLUME:  There was -- there was -- I
 4    think there was typing.  Someone was typing.  It
 5    was -- it blocked you out.                                11:47:15
 6              Could you ask that again, David.
 7       Q.   (By Mr. Ko)  Do you agree with me that
 8    the SRRs and the DUPs govern how Facebook uses the
 9    data and information Facebook collects from and
10    about Facebook users?                                     11:47:35
11              MR. BLUME:  Objection.  Form.
12              THE DEPONENT:  The -- I agree that the
13    SRR is the terms of -- the agreement with people
14    who use our service.  And that the data use policy
15    is the document which outlines the different -- not       11:47:50
16    the different -- that the data use policy is the
17    primary document that outlines to people what we
18    collect and how we will use the information, and
19    how -- (indiscernible) it is.
20              So the DUP being the primary document in        11:48:07
21    terms of use of -- of information.  But there's a
22    whole host of educational materials out there.  But
23    those -- the DUP is the primary source.
24       Q.   (By Mr. Ko)  Okay.  Are any of these
25    educational materials, policies or contracts that         11:48:23
```

Page 110

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    Facebook asks the user to consent to?                11:48:27

2            MR. BLUME:  Objection.  Form.

3            THE DEPONENT:  When a user signs up,

4    they're -- they're agreeing that they've read the

5    data use policy and that they are going to adhere    11:48:45

6    to the terms of service --

7            THE COURT REPORTER:  Hold on.  Hold on.

8    There's some background noise coming --

9            MR. KO:  I've been getting it, too.  I --

10   I don't know if there's someone over the microphone  11:49:12

11   on your end, Ms. Hendrix.  I don't know if it's --

12   something is on top of it.

13           MR. KO:  No, there's only two.  One here

14   and one there, and they haven't moved.

15           THE COURT REPORTER:  So I just need you      11:49:12

16   to repeat that answer, please.

17           THE DEPONENT:  I don't remember the

18   question.

19       Q.   (By Mr. Ko)  Are any of these educational

20   materials, policies or contracts that Facebook --    11:49:16

21   Facebook asks the user to consent to?

22           MR. BLUME:  Objection.  Form.

23           THE DEPONENT:  They are materials

24   intended to -- to educate people, but they are

25   not -- for example, we don't agree to the help       11:49:28

Page 111

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | center. | 11:49:33 |
| 2 | Q.   (By Mr. Ko)  Let me ask it a different | |
| 3 | way.  And, again, this is just to orient ourselves | |
| 4 | for purposes of this discussion. | |
| 5 | But is it fair to say that the SRR and | 11:49:45 |
| 6 | the DUP are the two primary policies or contracts | |
| 7 | that govern how Facebook uses the data and | |
| 8 | information Facebook collects from and about users? | |
| 9 | MR. BLUME:  Objection. | |
| 10 | THE DEPONENT:  With respect to the | 11:50:05 |
| 11 | Facebook product, yes, I -- those are the two | |
| 12 | primary documents. | |
| 13 | Q.   (By Mr. Ko)  And when I say "data and | |
| 14 | information," the SRR contains a provision in it | |
| 15 | that is referred to as "content information." | 11:50:29 |
| 16 | Does that sound familiar? | |
| 17 | A.   I'd need to look at whatever version | |
| 18 | you're referring to. | |
| 19 | Q.   That -- that's fair. | |
| 20 | But without referring to a particular | 11:50:45 |
| 21 | version, let me ask it this way, does the phrase | |
| 22 | "content and information" sound familiar to you at | |
| 23 | all? | |
| 24 | MR. BLUME:  Objection.  Form. | |
| 25 | THE DEPONENT:  Yes.  And I just want to | 11:50:57 |

Page 112

```
 1    flag that we had agreed at the outset that Facebook      11:50:59
 2    and Meta would be interchangeable.  I just want to
 3    flag that, you know, the terms of service, the SRR
 4    is with -- with respect to Facebook.  But there's
 5    Instagram terms of service, for example.  So I just      11:51:12
 6    want to make sure that that point is clear.
 7              And other, you know, terms for things
 8    like Oculus and -- and, you know, WhatsApp.  So I
 9    just used Facebook in that response just to mean
10    people who use the Facebook app.                         11:51:28
11              MR. BLUME:  And, David, we've been going
12    a little more than a hour, if you're coming up to a
13    break.
14              MR. KO:  Sure.  Thank you for that
15    explanation.                                             11:51:40
16       Q.   (By Mr. Ko)  Let me ask the question I
17    was asking before.
18              Does the phrase "content and information"
19    sound familiar to you at all?
20              MR. BLUME:  Objection.                         11:51:47
21              THE DEPONENT:  Yes.
22       Q.   (By Mr. Ko)  What is your understanding
23    of content and information?
24              MR. BLUME:  Objection.  Form.
25              THE DEPONENT:  That's incredibly broad.        11:52:00
```

Page 113

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1   Like what do you mean?                          11:52:07

 2       Q.   (By Mr. Ko)  I'm asking you what your

 3   understanding -- what your understanding of

 4   content -- you said you understood what content and

 5   informa- -- content -- content information is,      11:52:12

 6   correct?

 7             MR. BLUME:  Objection.

 8             THE DEPONENT:  Yes.  But you -- you

 9   earlier said content and information as if it was a

10   header in the SRR.  One of the various versions,    11:52:21

11   many -- all of which I've reviewed.

12             Sitting here today, I'd need to look at

13   the terms of service to see if that is a header.

14   But now you've broadened us out, or so I'm

15   interpreting it.  And so now you're just asking me  11:52:37

16   generally like what the definition of content and

17   information mean to me.  So I am not sure where

18   you're heading with this.

19       Q.   (By Mr. Ko)  Let's go back to in the

20   context of the SRR.                                 11:52:51

21             Are you familiar with the phrase "content

22   and information" in the context of the SRR?

23       A.   I would need to -- to look -- I'm not --

24   I'm not just -- there's so much material, as I'm

25   sure you understand.                                11:53:11
```

Page 114

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1          I -- I don't remember.  But I'm more than        11:53:12

2    happy to be presented with whatever you apparently

3    are seeing that I'm not.  So I can --

4          Q.   I'm not seeing anything --

5          A.   -- refresh my recollection.                 11:53:24

6          Q.   We can do that in a -- in a moment,

7    but -- but before we do that, I'm just establishing

8    some foundation and some things that you know or

9    you don't know, without having to go to the

10   document.                                              11:53:37

11          So is -- is it your testimony that you

12   don't know what content and information in the

13   context of the SRRs refers to?

14          Simple yes-or-no question.

15          MR. BLUME:  Objection.  Form.  And scope.       11:53:46

16          THE DEPONENT:  It's not that I don't

17   know.  It's that I don't remember and need to

18   refresh.  I don't think the Court expects me to

19   remember every single word in every version of the

20   document.  I think that that is unfair.                11:54:00

21          Q.   (By Mr. Ko)  Okay.  Well, your -- your

22   objection is duly noted.  But I think you're

23   probably assuming way too much in my question.  I'm

24   asking you a very simple and straightforward

25   yes-or-no question.                                    11:54:14

Page 115

```
 1             Does the term "content and information"         11:54:16

 2    in the context of the SRR mean anything to you?

 3             MR. BLUME:  Objection.

 4             You can answer in your personal capacity,

 5    if it means anything to you.                             11:54:30

 6             MR. KO:  Stop -- stop, Mr. Blume.

 7             MR. BLUME:  I'm giving her instruction.

 8    You don't have to interrupt me.

 9             THE DEPONENT:  I know what content --

10    like, for example, the SRR requires you to comply       11:54:40

11    with our community standards.  And those are about

12    the types of content that you may or may not --

13    more so may not -- upload onto Facebook.

14             So content insofar as what type of

15    content you can post or content insofar as what         11:54:59

16    content we collect and what we will use with it in

17    the -- or how we can use that in the context of the

18    data use policy.

19             So, hopefully, that gave you a little bit

20    more color.  But if we're getting specific to like      11:55:15

21    is there a -- a heading content and information, I

22    don't remember.  I would need to take a look.

23             But, hopefully, that gives you more

24    clarity.  On how content can be used depends on the

25    context of the conversation or of the question of       11:55:31
```

                                               Page 116

1    which you haven't provided any.                          11:55:34

2              MR. BLUME:  Ready for a break, David?

3              MR. KO:  Almost.

4         Q.   (By Mr. Ko)  It absolutely does.  Thank

5    you.  Thank you, Ms. Hendrix, it absolutely does.        11:55:41

6    Let me just ask you a few follow-up questions.

7    This is -- it's exactly what I was just trying to

8    get -- get at.

9              You -- you've responded that you

10   understood that content and information included         11:55:51

11   information that Facebook collects and -- and --

12   and what Facebook will use with it and how Facebook

13   can use that in the context of the data use policy.

14             Do you recall -- do you recall that

15   answer a moment ago?                                     11:56:05

16        A.   I was just trying to give you examples of

17   what it could mean, if it all just depends on the

18   context of the location by which the word "content"

19   and/or "information" is.  So I don't even think my

20   response is helpful.                                     11:56:18

21        Q.   Well, it was helpful to me.

22             So in -- in the context of the SRRs, is

23   it fair to say that content and information

24   includes the type of information that Facebook

25   collects about a user?                                   11:56:37

                                                         Page 117

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1            MR. BLUME:  Objection.  Form.              11:56:41

 2            THE DEPONENT:  I -- again, I -- I need to

 3      see the section of the SRR that you're referring

 4      to.  Like there -- the data use policy is the

 5      primary document which has been referred to as the   11:57:00

 6      privacy policy that -- that is there to tell you

 7      what do you collect and how is the information

 8      used.

 9            So in the actual SRR, I would need to --

10      you know, if you don't mind showing me, like the    11:57:13

11      sentence that you're seeing that's causing you to

12      ask me that question.  But it's just -- I'm not

13      able to go further and speculate unless -- unless I

14      knew what you were talking about.  And I frankly

15      don't.                                               11:57:31

16         Q.   (By Mr. Ko)  In the data use policy, as

17      you described, it -- it governs the types of -- or

18      it governs how Facebook collects user information

19      and how it is used.

20            Are there provisions in the data use        11:57:48

21      policy, as a general matter, that deal with content

22      and information, or -- or do you not know one way

23      or the other?

24            MR. BLUME:  Objection.  Beyond the scope.

25      Form.                                                11:58:01
```

                                                    Page 118

1          THE DEPONENT:  The data use policy          11:58:02

2     absolutely discusses what information we collect

3     and how that information can be used.  It also

4     helps you learn how you can control your

5     information.                                      11:58:15

6              And -- and, yes, in the SRR, there are

7     disclosures to people about being careful about

8     what they share, for example, with their friends.

9     Because their friends could, you know, use that

10    information, so to be very careful.               11:58:30

11             So there -- there is -- that is

12    refreshing my memory of it, a section within the

13    SRR, to take you -- us back to where you were

14    going.

15             MR. BLUME:  All right.  Let's -- we've    11:58:41

16    been going an hour and 20 minutes.

17             MR. KO:  Thank you for that --

18             MR. BLUME:  Let's take a break, please.

19             THE DEPONENT:  I need a break.

20             MR. KO:  Sure.  We can take a break.      11:58:47

21    Thank you.

22             (Discussion off the stenographic record.)

23             THE VIDEOGRAPHER:  Sure.  We are off the

24    record.  It's 11:58 a.m.

25             (Recess taken.)                           11:59:34

                                               Page 119

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1              THE VIDEOGRAPHER:  We're back on the        12:15:07

2     record.  It's 12:15 p.m.

3          Q.   (By Mr. Ko)  Ms. Hendrix, welcome back

4     from the break.

5              We were talking a moment ago about the      12:15:18

6     SRRs and the DUPs.  With respect to the former, the

7     SRRs, at -- at any point in time every Facebook

8     user in the United States is subject to the same

9     SRR, correct?

10         A.   Yes, that's correct.                       12:15:39

11         Q.   And at any point in time every Facebook

12    user in the United States is subject to the same

13    DUP or data use policy, correct?

14         A.   That's correct.

15         Q.   And these contracts and policies, as       12:15:54

16    we've discussed before, have been subject to

17    various changes over time.

18              But put another way, there was only one

19    operative SRR at a time, correct?

20         A.   Yes.  There's just been the one agreement  12:16:15

21    with users who agree to use the service and not

22    two.

23         Q.   And there was only one operative DUP data

24    use policy at a time, correct?

25         A.   That's correct.  We have terms and         12:16:33
```

```
 1    privacy policy.  The term -- the terms and privacy       12:16:35

 2    policy, the names having evolved, but just those

 3    two.

 4        Q.   So in -- in 2013, for example -- let's

 5    pick a point in time -- the operative SRR at the         12:16:48

 6    time was a contract that Facebook had with every

 7    single Facebook user in the United States; is that

 8    correct?

 9        A.   Yes.

10        Q.   And same question with respect to the           12:17:02

11    DUP.

12             In -- in 2013, to pick up a time --

13    illustrative time example -- there was only one

14    data use policy that was operative and applicable

15    to a user at that time for every user in the            12:17:18

16    United States, correct?

17        A.   Yes.

18        Q.   And this would be true for the entire

19    time period from January 1st, 2000 --

20    January 1st, 2007, to present -- correct? -- there       12:17:30

21    only one operative SRR and one operative DUP,

22    correct?

23        A.   Yes.

24        Q.   And there was never a time period in

25    which there was more than one SRR that would be          12:17:42
```

Page 121

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1   applicable to a particular user, correct?                12:17:47

2        A.   That's correct.

3        Q.   And similarly, there was never a time,

4   from January 1st, 2007, to present, when there was

5   more than one DUP applicable to a particular user,       12:18:01

6   correct?

7        A.   That's -- that's correct.

8             What do you mean by "applicable"?

9        Q.   Only one contract or policy that governed

10  Facebook's relationship with users.                      12:18:25

11       A.   Okay.  So yes, I -- I don't need to

12  correct my prior responses.

13       Q.   Ms. Hendrix, are you familiar with the

14  settings that Facebook made available to its users?

15            MR. BLUME:  Objection.  Form.               12:18:48

16            THE DEPONENT:  What settings are you

17  referring to?

18       Q.   (By Mr. Ko)  Just to help -- fair enough.

19  I'm going to orient you to topic 3.

20            In topic 3, there's a description as to       12:18:59

21  the privacy and app settings.

22       A.   Okay.  Yes.  Thank you.

23       Q.   So are -- are you here today to testify

24  on behalf of Facebook as to the development and

25  revisions of those particular settings?                  12:19:23

                                                 Page 122

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        A.   Yes, how they've -- how they're developed      12:19:32

 2   and the processes for developing them.

 3        Q.   Are you specifically familiar with the

 4   privacy settings?

 5        A.   Yes.                                            12:19:46

 6        Q.   And what are they?

 7             MR. BLUME:  Objection.  Form.

 8             THE DEPONENT:  Well, they -- the privacy

 9   settings can be for your content that you're

10   uploading to Facebook.  So to the extent that we        12:19:59

11   provide you with the ability to have a privacy

12   setting attached to a given piece of content, then

13   there's those types of privacy settings.  And then

14   there's the application settings.

15        Q.   (By Mr. Ko)  So I assume then you're           12:20:19

16   familiar with -- with app settings or application

17   settings?

18        A.   Yes.

19        Q.   What is the distinction between privacy

20   settings and application settings?                      12:20:29

21        A.   Well, the privacy settings relate to and

22   are relevant to your app settings.  So you've got

23   your privacy settings and then a subset of those

24   settings are settings that you can apply to your

25   use of the Facebook platform applications.              12:20:50
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1          Q.    So the two are related, correct?          12:20:56

2          A.    Yes, that's correct.

3          Q.    And as you said, the two are relevant to

4     each other, correct?

5          A.    Yes.                                        12:21:13

6          Q.    And let me try and -- and characterize

7     what I think -- and you're more than free -- and I

8     welcome edits to this characterization or revisions

9     to this characterization.

10              But in thinking about the user privacy      12:21:28

11    settings, it occurred to me that they -- they more

12    or -- or they reflect the control that Facebook

13    allowed users to try and restrict or limit what

14    information related to the user or their friends

15    were being shared; is that a fair characterization?   12:21:45

16         A.    The friend element of your description is

17    confusing because I can't control my friend's

18    privacy settings.

19         Q.    Well, for now, let's -- let's eliminate

20    the friend -- the user's friend from that.            12:22:07

21              So is it fair to say that the privacy

22    settings reflect the control that Facebook allowed

23    its users to try and restrict or limit when -- what

24    information related to the user was being shared.

25              Do you agree with that statement?           12:22:30

                                                            Page 124

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1          A.   I would characterize it more as what          12:22:32

 2     information the user could tell Facebook that they

 3     wanted to be displayed.

 4               So for example, you might set your post

 5     to publics or everyone, or you might set your post    12:22:46

 6     to friends of friends, any custom network, or just

 7     to only me.

 8               So there's -- there's a number of

 9     settings.  It just depends on what the context is

10     of -- of what we're talking about.                    12:23:01

11          Q.   That's helpful.

12               Let's go with how you characterize it

13     and, in particular, the aspect of your response

14     that said "displayed."

15               So it's your testimony that the privacy      12:23:16

16     settings primarily governed how a Facebook user

17     could control what information was being displayed

18     on her or his Facebook profile; is that correct?

19               MR. BLUME:  Objection.

20               THE DEPONENT:  I would describe it as the    12:23:42

21     privacy settings to the extent there is a privacy

22     setting attached to the information.  So for

23     example, your name is permanently public.  Like you

24     don't hide your name.

25               But to the extent there's a privacy          12:23:55
```

Page 125

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    setting and it -- then the user has the choice to        12:23:57

 2    use that setting.  And depending what him, her or

 3    them would like to do, they will set it as public

 4    or to just their friends, or only to themselves,

 5    for example.                                             12:24:17

 6        Q.   (By Mr. Ko)  Or to a -- a custom

 7    audience, right?

 8        A.   Right.  If there's a custom network that

 9    they've created, or something like that.

10        Q.   Would it be accurate to say the privacy       12:24:34

11    settings -- well, remember how earlier I had asked

12    about whether or not the privacy settings related

13    to what information a user would want to share or

14    restrict about themselves.  And -- and I want to

15    focus in on the -- the -- the share aspect of it.      12:24:52

16             Is there any part of the privacy settings

17    that reflect what information could be shared or

18    restricted by a particular user?

19        A.   What do you mean by "shared"?

20        Q.   Well, let me ask you, because you said --      12:25:11

21    in response to the -- the question that I had

22    asked, you had talked about what a user would

23    display.

24             In what context or what -- what do you

25    mean when you say display?                              12:25:24
```

Page 126

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1         A.   I mean, let's say that I upload an album        12:25:26
 2    of photos from an event I -- I went to and took
 3    pictures and I want to upload them to my Facebook
 4    profile.
 5              In the context of doing so, I'm presented        12:25:37
 6    with the option to upload this as an only me album.
 7    So only I'm allowed to be able on Facebook to see
 8    my album or I can set it for everyone, the whole
 9    public, someone who doesn't even use Facebook could
10    navigate.  Or I could set it to my friends or the        12:25:56
11    custom piece that I referred to.
12              And then by using that setting,
13    programmatically it tells the Facebook product to
14    render or not render the content, depending on the
15    setting that I selected.                                 12:26:12
16         Q.   And the privacy settings would be
17    applicable to that process, correct?
18         A.   Right.  The product respects privacy.
19         Q.   And have you heard of the term "on
20    platform activity"?                                      12:26:27
21         A.   Yes.
22         Q.   Have you heard of the term "off platform
23    activity"?
24         A.   Yes.
25         Q.   What is your understanding of these two        12:26:37
```

Page 127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    terms?                                                    12:26:40

2         A.   It depends on the context of the use of

3    the term "platform."

4         Q.   Can we agree that the platform is --

5    let's -- let's start with the context of the              12:26:53

6    Facebook platform.

7              Does that help or do you need more --

8         A.   Not quite.

9         Q.   -- or --

10        A.   Not quite.                                       12:27:03

11        Q.   So can you describe to me what the

12   different versions of the platform you're thinking

13   of, or the various versions of the -- of the

14   platform you're thinking of?

15        A.   Well, some people will refer to -- as the       12:27:14

16   Facebook app or website as the Facebook platform.

17   I, in my years working at the company, when I hear

18   the word "platform," I am biased in the sense that

19   I've always worked on our platform technology

20   for -- to mean the -- the -- the Facebook platform       12:27:33

21   that we -- that we launched in May of 2007.

22              So that's why it's important for us to be

23   on the same page with respect to the word

24   "platform."  Because there were -- if we're just

25   going now back to the set of technologies that           12:27:49

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1    allowed third parties, you know, to connect with      12:27:52

2    the Facebook app, that -- that's the platform as I

3    am speaking to, and those apps could be either on

4    Facebook or off of Facebook, depending on where the

5    developer wanted to host them.                         12:28:07

6         Q.   Okay.  Given -- given that distinction

7    between on and off platform, do the privacy

8    settings deal with both on and off platform

9    activity, as you described?

10        A.   So the privacy settings apply to the         12:28:27

11   settings that you're setting for the content you're

12   uploading to the Facebook service.  Then there's

13   also privacy settings related to apps.  And those

14   settings can be used with respect to the

15   information that you share with third-party           12:28:44

16   applications or -- or that otherwise make available

17   through the platform.

18        Q.   And so those -- that particular setting

19   or settings, those are the app settings, correct?

20        A.   App settings, yes.  There -- those would     12:29:04

21   apply to your use of the Facebook platform, as I

22   just described my -- my understanding -- like

23   the -- the platform technologies.

24        Q.   And with respect to both of these

25   settings, which as you described were related to      12:29:23
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    each other, would it be fair to say that          12:29:27

2    collectively these settings are the controls

3    Facebook enacted to try and give Facebook users

4    control of what information they could share on

5    Facebook?                                         12:29:41

6            MR. BLUME:  Objection.  Form.

7            THE DEPONENT:  Yeah.  I -- I wouldn't say

8    try.  They always have given people control over

9    their content.

10       Q.  (By Mr. Ko)  Okay.  Collectively, is it    12:29:55

11   fair to say that these settings are the controls

12   Facebook enacted to give users control of what

13   information they could share on Facebook?

14       A.  Not quite, because -- well, I won't

15   explain my problem with your -- your question.     12:30:12

16   I -- I don't understand it.

17       Q.  Okay.  Well, I'm trying to get to a point

18   where we can come to a common understanding.  So I

19   got -- I eliminated the portion that you were

20   uncomfortable with when I removed "try" from my    12:30:24

21   question.

22            So what are the other aspects of my

23   question that are unclear?

24       A.  Please restate.

25       Q.  Collectively, is fair to say that the      12:30:36

Page 130

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    privacy and app settings are the controls Facebook        12:30:39

 2    enacted to give users control of what information

 3    they could share on Facebook?

 4         A.   No.

 5         Q.   What -- what -- what are -- are there any        12:30:52

 6    other settings that I'm missing here?

 7         A.   The settings don't necessarily -- like

 8    it's just -- I'm confused over your question.

 9              So like I could go and post hate speech

10    today, but I have agreed not to do that.  So that's        12:31:08

11    the SRR, not a privacy setting.

12         Q.   Okay.  Can you unpack that a little bit?

13         A.   No.

14         Q.   You can't.

15              Because you just gave me an explanation,         12:31:24

16    so I -- I'm trying to figure out what you mean by

17    that.

18         A.   I'm -- I mean what I said.  And I even

19    gave an example.

20         Q.   Okay.  When you -- your -- you said the          12:31:35

21    settings don't control over a hate -- a hate speech

22    post that you would make.

23              And -- and so why -- why is that?

24         A.   Privacy settings are for what you want to

25    be visible to people who use Facebook, you know.           12:31:59
```

Page 131

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    And then -- then there's app settings on -- on --        12:32:07

2    that -- you know, depending on the relevant period

3    would apply to what you want to enable to be shared

4    through the Facebook APIs.

5            So that's why your question -- and I used        12:32:23

6    the hate speech example -- none of those settings

7    with the exception of some of the ability for us to

8    prevent certain types of content from even being

9    uploaded, such as child exploitation kind of

10   content, wherever technically possible, we try to        12:32:40

11   prevent that content at the technical level, or get

12   it down ASAP.  But those settings don't control the

13   content that I am publishing.  They control who can

14   see it and where it can flow through the APIs.

15       Q.   Thank you.                                       12:33:06

16            So with respect to -- let's -- let's --

17   let's go to the app settings.

18            Is it fair to say that the app settings

19   governed the controls Facebook enacted to try

20   and -- well, to give Facebook users control of what      12:33:22

21   information could be shared on Facebook through

22   Facebook APIs?

23       A.   That question doesn't make sense.

24       Q.   You said that the way in which third

25   parties could access information about a -- about a       12:33:40

Page 132

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    Facebook user was through APIs, correct?                    12:33:43

2         A.   I did not say that.

3         Q.   Okay.  Well, let me ask it more directly.

4              Facebook APIs were the way -- or

5    accessing a Facebook API or APIs was the way in              12:33:58

6    which a third-party app developer could access

7    information about a Facebook user, correct?

8              MR. BLUME:  Objection.

9              THE DEPONENT:  Just the way that you're

10   characterizing this is just not the way that                 12:34:19

11   technically it works.

12             So for example, if I'm a developer of a

13   third-party applicant and I want to navigate to

14   John Smith's profile manually, I can go and see

15   that.  That's why I don't want to narrow.  The                12:34:32

16   developer community can actually -- although

17   they're human -- so they can go to my profile, or

18   any profile, and see what information is public.

19             Certain information is always public and

20   then other information is not public.  But that's            12:34:47

21   because the user has chosen to set their settings

22   in a -- to only me, for example.

23             So developers, of course, can get

24   information subject to the controls that we have in

25   place through the platform.  But that -- those --            12:35:04

Page 133

```
 1    that -- the data will only be accessible through        12:35:08

 2    the APIs to the extent that users didn't choose to

 3    not make their data available, for example, by

 4    opting out of the platform or by -- well, that --

 5    we should end there.                                     12:35:25

 6         Q.   (By Mr. Ko)  And I wasn't trying to be

 7    exhaustive in my question.  And I apologize if I

 8    wasn't clear -- unclear.

 9            One way in which a third-party app

10    developer accesses information on a particular user      12:35:36

11    is through an API through the Facebook platform, or

12    in connection with the Facebook platform, correct?

13         A.   If the user chooses to share that

14    information and make it accessible through the

15    platform, for example, by not opting out.                12:35:54

16         Q.   Yes or no?

17         A.   I answered your question.

18         Q.   So if the user -- if the user chooses to

19    share the information and make it accessible

20    through the platform, one way in which a                 12:36:12

21    third-party developer could access information

22    about that particular user is through an API,

23    correct?

24         A.   And -- yes, subject to the fact that the

25    platform has changed and we're on the 13th-some          12:36:28
```

Page 134

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    version.  So it's -- it's -- how it -- how it works       12:36:30

 2    depends also on when you're asking me.

 3            So like, you know, the -- the move from

 4    version 1 to version 2, there's no longer friend

 5    permissions available.  So it's all about -- so the        12:36:46

 6    friend settings wouldn't apply, right.

 7        Q.   When you said a moment ago, "if the user

 8    chooses to share that information," through what

 9    mechanism can that user decide to choose to share

10    that information?                                          12:37:04

11        A.   Well, they choose to create a Facebook

12    account.  Then they choose to decide what they want

13    to fill in and complete.  They choose what they

14    want to share.  They choose who they want to share

15    it with.  They choose whether they want to use the        12:37:19

16    platform application.  And historically, they've

17    chosen whether they want to allow their information

18    to be shared by their friends who install.

19            There's just a series of choices.  It all

20    depends on the choices each individual user makes,        12:37:36

21    and then the Facebook product respects those

22    privacy settings.

23        Q.   Back to the information that they choose

24    to share.

25            How do they decide that?                          12:37:48
```

Page 135

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        A.   I can't speak for the -- each individual       12:37:52

 2   user.  I -- I can tell you how I choose to share

 3   content.

 4        Q.   I -- I -- I understand the confusion.

 5             Technically speaking, with respect to a         12:38:01

 6   user's interaction on the Facebook platform, is

 7   there a tool or a setting that they can select in

 8   determining what to share with a third party?

 9             MR. BLUME:  And objection, to the extent

10   this relates to topic 6, and not the communication       12:38:22

11   but the technology.  I would instruct her not to

12   answer.  You have a witness on that coming.

13             MR. KO:  It's not related to topic 6,

14   just for your edification.

15             MR. BLUME:  All right.  Well, what topic        12:38:38

16   does it relate to then?

17             MR. KO:  Topic 3, privacy and app

18   settings.

19             MR. BLUME:  You asked about technology,

20   so that's what confused me.                               12:38:45

21        Q.   (By Mr. Ko)  Ms. Hendrix, what were the

22   settings that a user could utilize to control the

23   information that they wanted to share?

24        A.   And with who and where?

25        Q.   Let's start with the third-party app           12:39:08
```

Page 136

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    developer.                                      12:39:11

 2         A.   And what is the relevant period?

 3         Q.   I already instructed you that unless I

 4    specify otherwise, I'm talking about the entire

 5    time.                                           12:39:23

 6         A.   Well --

 7              MR. BLUME:  Objection.  Scope.

 8              THE DEPONENT:  From 2007 to 2022 today,

 9    those settings have changed.

10              So for example, there's not a setting for   12:39:35

11    you to specify which piece of information you're

12    comfortable -- that you've shared with your

13    friends, that's visible to your friends on

14    Facebook, that you're comfortable with them sharing

15    with third-party applications, so that those apps    12:39:50

16    can improve and socialize the user's experience.

17              For example, in a birthday app, I might

18    say, sure, you can set -- you can -- I don't care

19    if my friends take my birthday to a third-party

20    app.  That setting is no longer in -- exists         12:40:00

21    because that's no longer technically possible

22    through the product.

23              But I also might not be comfortable

24    sharing my photos, my private photos.  So I might

25    check to say, nope, you can share my birthday that   12:40:15
```

Page 137

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | I've set to private, but you can't share my photos | 12:40:18 |
| 2 | that I've set to private. | |
| 3 | Q. (By Mr. Ko) Take a look at the notice | |
| 4 | again, and on page 9 of the notice, there is a | |
| 5 | reference to "Users' Privacy Settings." | 12:40:36 |
| 6 | Do you see that? That would be | |
| 7 | paragraph 22. | |
| 8 | A. I see what it says. | |
| 9 | Q. Do you agree that a "'Users' Privacy | |
| 10 | Settings' means the audience selectors on the | 12:40:59 |
| 11 | Facebook app that purported to allow Facebook users | |
| 12 | to control with whom their information was shared"? | |
| 13 | A. I agree that's -- that that is what it | |
| 14 | says. But in the context of audience selectors, | |
| 15 | like what -- like -- does that mean to you, like | 12:41:19 |
| 16 | per object privacy, like what I'm sharing on | |
| 17 | Facebook and then whether I'm allowing that content | |
| 18 | to be shared off of Facebook. | |
| 19 | Generally, this -- the -- this could be | |
| 20 | generalized into -- into like -- I mean, these, I | 12:41:37 |
| 21 | think, are your words. But I hope I'm clear. | |
| 22 | Like every user has a choice with respect | |
| 23 | to using the product. And then to the extent we | |
| 24 | offer privacy controls, they can choose whether to | |
| 25 | use them. Those controls include whether to use | 12:41:54 |

Page 138

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    the Facebook platform or whether to, for example,    12:41:58

2    opt out.

3              So yes -- I mean, at all times people are

4    controlling their information, to the extent they

5    choose to use Facebook.                              12:42:12

6         Q.   How would you describe to the Court what

7    your understanding of users' privacy settings

8    consist of?

9         A.   I just described how it works and so

10   that's my response.                                  12:42:30

11             I mean, going back to the SRR, we tell

12   people, keep in mind that what you share and make

13   visible to your friends means that you are -- at

14   some point in time they could be doing something

15   with that information that you're not aware of,      12:42:42

16   that those disclosures have always been in place,

17   just to tell people to be careful about the content

18   that they upload and to be aware of the settings

19   that they're selecting.

20             That's why we have all of the different    12:42:55

21   educational resources on top of the data use policy

22   in the SRR that really, really help you understand

23   that these decisions you're making have potential

24   consequences, but that you ultimately control the

25   audience until you choose to share.                  12:43:14

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1          And then if you chose to share it to          12:43:16

2   everyone, or choose to share it with your friends,

3   then technically those people could do something

4   that you don't desire them to do.

5          But ultimately, the settings is the --          12:43:27

6   your decisions on the visibility of that content,

7   including whether you want to enable that content

8   to be used in the context of third-party

9   applications.

10     Q.   Great.          12:43:45

11          And that -- and that would be both the

12   privacy and app settings that we're -- we've been

13   talking about, correct?

14     A.   Privacy and app settings are the specific

15   controls.  But then the SRR, the data use policy,          12:43:56

16   the help center, all of the privacy checkups and

17   all of those are also a -- a part of the overall

18   user experience so that people have that

19   understanding of the -- of how they choose to use

20   those settings.  So it -- they all interrelate.          12:44:12

21     Q.   What -- what organization or

22   organizations at Facebook were responsible for

23   developing the privacy and app settings?

24     A.   So this would go back to my earlier

25   point.          12:44:32

Page 140

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              It's a team of teams so you need          12:44:33
 2    engineers to build.  You need product managers to
 3    drive.  You need legal to advise.  You need policy
 4    to advise.  You need comms to advise.  You need
 5    platform marketing teams to advise.                12:44:42
 6              You need to just ensure that all of these
 7    relevant stakeholders are a part of the process and
 8    that can -- they're not at the table all the time
 9    always together, but they all are a part of -- and
10    part -- and the privacy program managers.  The     12:44:58
11    privacy review teams.  Like they're all a part of
12    the teams that understand what it is that we want
13    to build and how it's going to work and how we're
14    going to communicate that.  And so it's a team of
15    teams.                                             12:45:14
16       Q.   I understand and would expect there to be
17    a lot of organizations and teams that were part of
18    it.
19              So can you identify which teams had the
20    primary responsibility for developing the privacy  12:45:25
21    and app settings?
22              MR. BLUME:  Objection.
23              THE DEPONENT:  So the platform product
24    team would be more closely involved in the app
25    setting development.  And then because -- you know, 12:45:40
```

                                                    Page 141

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | setting aside -- let's say we didn't even have a | 12:45:44 |
| 2 | Facebook platform as I've described it, you know, | |
| 3 | the third-party applications -- if you just had | |
| 4 | Facebook, you have product and engineering teams | |
| 5 | that have nothing to do with third-party | 12:45:56 |
| 6 | applications or the Facebook platform. | |
| 7 | So there's product teams, but these | |
| 8 | product teams work on different products.  And | |
| 9 | there's legal teams.  And within those legal teams, | |
| 10 | they support and counsel different product teams. | 12:46:06 |
| 11 | Same with comms.  Same with policy.  Same | |
| 12 | with marketing, for example. | |
| 13 | Q.   (By Mr. Ko)  So what were the -- I'm | |
| 14 | trying to get in -- in this instance, I am trying | |
| 15 | to get a list -- a finite list, if you will, of the | 12:46:28 |
| 16 | organizations that were part of developing the | |
| 17 | privacy settings. | |
| 18 | So I -- I had heard you to say that | |
| 19 | legal, engineers, policy, privacy, marketing, those | |
| 20 | were the teams that were responsible for developing | 12:46:48 |
| 21 | the settings, correct? | |
| 22 | MR. BLUME:  Objection.  Asked and | |
| 23 | answered. | |
| 24 | THE DEPONENT:  No.  I mean, like we have | |
| 25 | a privacy program team.  There's content | 12:47:00 |

Page 142

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | strategists.  Like it's -- like how you get | 12:47:05 |
| 2 | involved all depends on the nature and scope of | |
| 3 | what is shipping and what is -- what is being | |
| 4 | launched. | |
| 5 | So we launched a fundraiser API at one | 12:47:14 |
| 6 | point in time.  And so maybe the team that works on | |
| 7 | social good, in helping people really, you know, | |
| 8 | complement the mission of connecting people and | |
| 9 | helping people.  For example, like using the -- the | |
| 10 | API to help raise funds. | 12:47:32 |
| 11 | Q.   (By Mr. Ko)  Earlier today you were able | |
| 12 | to identify organizations that had both -- that had | |
| 13 | primarily responsibility or -- or were most | |
| 14 | important to the process of drafting the SRRs and | |
| 15 | the DUPs and the platform policies. | 12:47:55 |
| 16 | Do you recall that? | |
| 17 | A.   I do. | |
| 18 | Q.   I'm going to ask you that same type of | |
| 19 | question with respect to the privacy settings and | |
| 20 | the app settings. | 12:48:06 |
| 21 | Can you identify which Facebook | |
| 22 | organizations have the primary responsibility for | |
| 23 | developing the privacy and app settings? | |
| 24 | MR. BLUME:  Objection. | |
| 25 | THE DEPONENT:  It would be the same teams | 12:48:24 |

Page 143

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    that work on the -- the -- so we don't pull in an        12:48:26

 2    engineer to help write the terms of service.  But

 3    an engineer and product team member will need to be

 4    very deeply involved in understanding how we're

 5    describing how things work because they're the ones     12:48:40

 6    who are ensuring us that what we say is consist --

 7    in the data use policy, for example, is consist

 8    with what they've built --

 9            So it is just like nothing can be done in

10    a vacuum and it's -- I wouldn't say that there's        12:48:53

11    ever a finite list.  I always joke around that as

12    the person who's been responsible for developing

13    the Facebook platform policies since 2009, I will

14    accept a proposed policy change from a member of

15    the culinary team.                                      12:49:17

16            So we don't say you're not included just

17    because -- like there's no finite list.  There's

18    primary people and so that's the -- the way that we

19    work at this company.

20        Q.   (By Mr. Ko)  That's helpful.  And I            12:49:30

21    just -- I -- I want you to try and listen to my

22    question as closely as you can, because I was just

23    actually asking you a yes-or-no question.  And I

24    appreciated the explanation.

25            But it -- it sounds like the answer will        12:49:40
```

                                                  Page 144

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1    be no.  But my -- my question was, can you identify        12:49:42

2    which Facebook organizations have the primary

3    responsibility for developing the privacy and app

4    settings.

5            It sounds like your answer is no, you              12:49:55

6    cannot; is that fair?

7        A.   No, it is not fair.  So if you want me

8    to --

9            (Simultaneously speaking.)

10       Q.   (By Mr. Ko)  So it's --                            12:50:00

11       A.   -- just say primary -- because you had

12   said finite.

13       Q.   (By Mr. Ko)  No, I didn't.  Let me -- let

14   ask again.

15           Can you identify, yes or no, which                  12:50:08

16   Facebook organizations have the primary

17   responsibility for developing the privacy and app

18   settings, yes or no?

19           MR. BLUME:  Objection.

20           THE DEPONENT:  What do you mean by                  12:50:18

21   "developing"?

22       Q.   (By Mr. Ko)  Okay.  Do you have an

23   understanding of what the term "developing" means?

24           MR. BLUME:  Objection.

25           THE DEPONENT:  Well, yes.  But are you              12:50:31
```

Page 145

```
 1    saying developing --                              12:50:32

 2         Q.   (By Mr. Ko)  What is -- what is that

 3    understanding --

 4         A.   -- actual product or -- could you please

 5    not talk over me.                                 12:50:34

 6              MR. BLUME:  Hold on.  Let her -- let her

 7    finish, please.

 8              THE DEPONENT:  Are you saying like

 9    development insofar as actually building, writing

10    the code, or are you talking about developing as  12:50:44

11    insofar what is the content.  What is the text.

12    What is the control.  Why do we want the control

13    should we have the control.

14              It all depends on what we're talking

15    about.  So we can't just box it into a --         12:50:56

16         Q.   (By Mr. Ko)  Let's start with the latter.

17         A.   -- single piece.

18         Q.   Let's start with the latter.

19         A.   I don't remember what my latter was.

20         Q.   Your latter was developing insofar as the 12:51:06

21    content, what is the text.  What is the control.

22    Why do we want the control.  Should we have the

23    control.

24              That's what I'm referring to.

25         A.   That would be our privacy XFN, which     12:51:18
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1    consists of that -- that product teams will go to        12:51:23

2    or that will pull teams in.  So that's legal.

3    Privacy program managers.  Policy product

4    counselors.

5            And then naturally you need the product          12:51:35

6    teams because they have a vision for their product

7    and how they want it to be used and what they want

8    to build.  So it's very collaborative.

9        Q.   And with respect to the aspect of

10   development as it relates to engineers, can you          12:51:58

11   answer the question of what teams or organizations

12   at Facebook have the primary responsibility for

13   developing the privacy and app settings?

14           MR. BLUME:  Objection.  Beyond the scope

15   for designated topics.                                   12:52:15

16           THE DEPONENT:  It all depends.  So for

17   example, a research team member might conduct a

18   small study and a focus group to make sure people

19   understand these settings.  And they might conclude

20   that they could be improved upon or that we should      12:52:31

21   do things such as -- maybe I think Pratiti, when I

22   spoke with her, it was the research team -- which

23   like some researchers are embedded within their

24   product teams and then there's a research teams as

25   well.  But it was an individual research team that      12:52:49
```

Page 147

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1   was the catalyst for the development of the privacy      12:52:51

2   checkup tool.

3           So, again, it all just depends on who's

4   proposing it, going back to my annoying culinary

5   comment.                                                 12:53:01

6       Q.   (By Mr. Ko)  So there was a research team

7   that had its hand in the development of privacy and

8   app settings; is that accurate?

9           MR. BLUME:  Objection.

10          THE DEPONENT:  It is accurate to say that        12:53:17

11  we rely on internal research employees to help us

12  ensure that we are -- that people understand our

13  terms and the products, including the settings.

14      Q.   (By Mr. Ko)  And so this research team,

15  as you indicated, conducted studies, correct?           12:53:34

16          MR. BLUME:  Objection.

17          THE DEPONENT:  So there are researchers

18  at Facebook and the -- where they -- and who they

19  report in to is different, the way that it -- that

20  that works, so...                                        12:53:49

21      Q.   (By Mr. Ko)  I'm -- I'm not asking about

22  who they report to.  I just simply asked, this

23  research team conducted studies; is that correct?

24          MR. BLUME:  If it doesn't involve

25  reporting lines, then beyond the scope.                  12:54:02
```

Page 148

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              MR. KO:  Mr. Blume, topic 3 asks for an        12:54:10

 2      overview of the process for developing privacy or

 3      app settings.

 4              Okay.  Stop with those objections.

 5          Q.  (By Mr. Ko)  So I'll ask you again,            12:54:19

 6      Ms. Hendrix.

 7              This research team conducted studdies; is

 8      that correct?

 9          A.  Well, I don't know which research team

10      you're talking about.  Like --                        12:54:27

11          Q.  I'm talking about --

12          A.  -- what I'm trying to tell you is that --

13              MR. BLUME:  Let her finish, please.

14              THE DEPONENT:  I'm trying to tell you

15      that, like the research -- researchers at our         12:54:34

16      company -- and I can -- I -- are -- some of them

17      are on like a team.  And then some are embedded

18      within their team.

19              So a product manager might say, hey, I

20      have an idea for updating an app setting or -- or a    12:54:48

21      privacy setting.  And so could you help me conduct

22      research into whether or not and how we could and

23      might develop this setting, if it's new, or ensure

24      that the setting is understood.

25              So that's speaking to -- or, you know,         12:55:09
```

Page 149

1    just different teams, like a -- a colleague could          12:55:14

2    have an experience and say, hey we might want to

3    improve or this, or something, you know.  Everybody

4    can have ideas.

5         Q.   (By Mr. Ko)  I'm looking at the                  12:55:26

6    transcript and at 12:52 you gave me an example, in

7    response to your confusion over the word

8    "development."

9            You gave me an example of what certain

10   groups and teams did at Facebook.  And one example       12:55:40

11   you gave was that "a research team member might

12   conduct a small study and a focus group to make

13   sure people understand these settings that might

14   improve or be improved upon."

15           With respect to that example, and no            12:55:58

16   other example, are you talking about the

17   settings -- when you refer to the settings, you're

18   talking about the privacy and app settings,

19   correct?

20        A.   In my example, I was talking about the         12:56:13

21   privacy checkup tool.

22        Q.   Okay.  Good.

23           So in connection with the privacy checkup

24   tool, Facebook did research and conducted the

25   studies, correct?                                         12:56:29

                                                         Page 150

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              MR. BLUME:  Objection.                    12:56:35

 2              THE DEPONENT:  I know that from my

 3     conversation with Pratiti, that there was research

 4     into -- well, now I'd -- I'd have to look at my

 5     notes, if that's okay.                             12:56:50

 6         Q.   (By Mr. Ko)  Oh, yeah.  Please -- please

 7     do so.

 8              Again this was a yes-or-no question.  You

 9     gave an example and I'm just trying to clarify and

10     understand your response.                          12:57:02

11         A.   I don't agree with you that it was a yes

12     or no, but that doesn't really matter.

13              So I just want to see if I have that.

14              MR. BLUME:  Can you ask the question

15     again, David, just so we're -- the record is clear.  12:57:32

16              MR. KO:  Yeah.  But I want to wait until

17     she reviews what she needs to review so I don't

18     have to ask it again.

19              MR. BLUME:  Fair enough.

20              THE DEPONENT:  Okay.  I -- I think I       12:57:45

21     found the example -- I did find the example that I

22     was referring to.

23         Q.   (By Mr. Ko)  This is a yes-or-no

24     question.

25              Do you understand that?                   12:57:53
```

Page 151

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        A.   I don't -- I don't remember your          12:57:54

 2   question.  This -- we need to be precise here, so

 3   if you could repeat it.

 4        Q.   I -- I am about to ask a yes-or-no

 5   question.                                           12:58:02

 6             Okay?

 7        A.   You can think it is, and I can disagree

 8   with you.  But go ahead.

 9        Q.   Yes or no, when you were describing

10   research studies that Facebook did, were they in    12:58:13

11   connection with Facebook's privacy or app settings?

12             MR. BLUME:  Objection.

13             THE DEPONENT:  It was related to.  But,

14   again, from my notes here, if helpful -- because

15   it's on the topic that I think you're asking, which 12:58:30

16   is researchers will generally do a study to test

17   any change in a consent flow or a setting flow.  So

18   yes, researchers -- researchers are involved.

19        Q.   (By Mr. Ko)  Yes, researchers are

20   involved to the extent -- well, researchers are     12:58:47

21   involved and they conduct studies in connection

22   with the privacy and app settings, correct?

23             MR. BLUME:  Objection to that example.

24             THE DEPONENT:  They can be.  It all

25   depends on the nature and scope of the change.      12:59:03
```

Page 152

```
1    They're -- I'm not testifying that they're involved        12:59:04

2    in every single settings change, or text or

3    wording.

4            It's where appropriate.  And depending on

5    the catalyst for -- like because, again, product          12:59:12

6    team members will pull you in.  Researchers will

7    decide they want to conduct research on their own

8    initiative.

9            But, yes, there are times when

10   researchers are pulled in to review app -- and            12:59:23

11   conduct studies into app settings and privacy

12   settings, yes.

13       Q.   (By Mr. Ko)  And, Ms. Hendrix, this is

14   just, you know -- you don't have take my advice for

15   you to answer however you would like to -- to             12:59:36

16   answer.

17           But this will go a lot faster if you just

18   answer the yes-or-no questions yes or no.  And

19   you're free to say no.  You can say no.

20           MR. BLUME:  She -- she --                          12:59:45

21           MR. KO:  And that was --

22           (Simultaneously speaking.)

23           MR. BLUME:  She -- she --

24           MR. KO:  Hold on.  Let me finish.  Let me

25   finish, Mr. Blume.                                         12:59:49
```

Page 153

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              And if your answer is no, that's fine.        12:59:50

 2    But I'm just making a suggestion to speed things up

 3    for both of us.  Otherwise, we're going to be here

 4    for a really long time.  I was hoping that this

 5    wouldn't take long.  But if -- if you would like to    01:00:00

 6    keep not answering yes-or-no questions --

 7              MR. BLUME:  Okay.

 8              MR. KO:  -- with yes or -- neither yes

 9    nor no, then you're free to do that.  But I'm just

10    making a suggestion.                                   01:00:14

11              And with that, at 1:00 o'clock, I

12    promised that -- you can --

13              MR. BLUME:  And I'll make --

14              MR. KO:  Yeah.  Go ahead.

15              MR. BLUME:  Can I make a suggestion?         01:00:19

16              The fact is, your questions are unclear

17    and vague.  And she's trying to clarify the record

18    to make it accurate.  It's not yes or no the way

19    you want.  She's made that clear.

20              So I suggest -- my suggestion is, if your    01:00:29

21    questions become more precise, then perhaps yes or

22    no may be appropriate.  But the imprecision is

23    what's causing her to have to explain what happen

24    what -- what the answers are.

25              MR. KO:  I don't know how to get more        01:00:41
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    precise than using the answers that you provide,          01:00:42

 2    Ms. Hendrix.  So -- but it is 1:00 o'clock and we

 3    should break for lunch, as I promised we would.

 4              THE VIDEOGRAPHER:  Okay.  We're off the

 5    record.  It's 1:00 o'clock p.m.                           01:00:54

 6              (Recess taken.)

 7              THE VIDEOGRAPHER:  All right, everybody.

 8    We are back on the record.  It's 2:07 p.m.

 9         Q.   (By Mr. Ko)  Ms. Hendrix, there was a

10    research organization or team at Facebook, correct?      02:07:14

11         A.   There are people -- team -- research

12    teams and researchers on -- embedded within

13    different product teams at Facebook.

14         Q.   And these research teams and the

15    researchers conducted studies, correct?                  02:07:32

16              MR. BLUME:  Objection.

17              THE DEPONENT:  Yes, the researchers

18    conduct studies.

19         Q.   (By Mr. Ko)  Are you familiar with the

20    term UX or user experience?                              02:07:48

21         A.   Yes.

22         Q.   These researcher -- research teams and

23    researchers conducted studies in connection with

24    either the UX teem or the user experience, in

25    general; is that fair to say?                            02:08:04
```

Page 155

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              MR. BLUME:  I'm sorry.  What topic are we      02:08:07

 2    on?

 3              MR. KO:  Topic 3b, Rob.

 4        Q.  (By Mr. Ko)  More importantly, I'm

 5    following up on questions and, more importantly,      02:08:25

 6    answers, that Ms. Hendrix gave with respect to

 7    research that was done at Facebook.

 8              So let me ask again, Ms. Hendrix, were

 9    studies done in connection with the user experience

10    by these research teams and/or researchers?          02:08:43

11              MR. BLUME:  Objection.

12              THE DEPONENT:  What do you mean by the

13    user experience?

14        Q.  (By Mr. Ko)  I asked you -- I asked you a

15    moment ago whether or not you're familiar with       02:08:56

16    UX -- the term UX or user experience, right?

17        A.  I am.  I just am not sure if you are

18    familiar with my understanding.

19        Q.  What is your understanding of the term UX

20    or user experience?                                  02:09:14

21        A.  So it's generally a term that we use to

22    describe a person and their experience interacting

23    with our services.

24        Q.  Were studied done by the research team or

25    researchers at Facebook in connection with a user    02:09:30
```

Page 156

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    or person's experience interacting with Facebook        02:09:36

 2    services?

 3            MR. BLUME:  Objection.  Time frame.

 4            THE DEPONENT:  From the relevant period

 5    to today, there are researchers that conduct           02:09:50

 6    research into users' experiences using our

 7    services.

 8        Q.   (By Mr. Ko)  And in connection with that

 9    research, is it fair to say that certain studies

10    were -- were done?                                     02:10:07

11        A.   Well, that's what I just said.

12        Q.   Okay.  And these studies, I believe, you

13    had referred to earlier this afternoon -- focus

14    groups.

15            Do you remember that?                          02:10:21

16        A.   There are certain research conducted

17    where the teams will -- like depending on the

18    research, they might use a focus group.

19        Q.   So in some instances over the relevant

20    time period, there were studies done that -- by the    02:10:43

21    research team or researchers at Facebook, in which

22    they conducted or used, as you said, a focus group,

23    in connection with that study; is that fair to say?

24            MR. BLUME:  Objection.  You just asked

25    that and she just answered that.                       02:11:03
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        Q.   (By Mr. Ko)  You can answer.           02:11:07

 2        A.   Yes.

 3        Q.   Is it also fair to say that studies were

 4   done in connection with the user experience, as it

 5   relates to privacy and app settings, that a user   02:11:18

 6   could utilize?

 7        A.   Yes.

 8        Q.   Thank you.

 9             Before lunch, you had referred to, I

10   believe, the privacy checkup tool.                 02:11:40

11             Do you recall that?

12        A.   I do.

13        Q.   What is the privacy checkup tool?

14        A.   It is an educational resource type of

15   tool used to ensure that people are aware of and   02:11:56

16   remind them of their pri- -- like and -- and

17   encourage them to check the settings.  Because if

18   you joined Facebook in one year, you might get

19   older and want to change your settings.

20             So it's just the ability to check in with 02:12:18

21   people and remind them of the settings that they

22   have and give them an opportunity to make any

23   changes.  They always have that, but that's the --

24   the motivator.

25        Q.   And by "settings," I assume you're       02:12:31
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    referring to the privacy and app settings, correct?      02:12:32

 2        A.   Right.  The privacy and app settings.

 3        Q.   Do you recall when the privacy checkup

 4    tool was rolled out?

 5        A.   I'll have to check my notes.  I think I          02:12:51

 6    have that in my notes.

 7        Q.   While you check your notes, let me see if

 8    this date rings a bell to you.

 9             Is it 200- --

10        A.   It's May 2014.                                   02:13:02

11        Q.   Okay.  Great.

12             So the privacy checkup tool was rolled

13    out by Facebook in May of 2014, correct?

14        A.   Yes.

15             MR. BLUME:  Objection.  Asked and               02:13:17

16    answered.

17        Q.   (By Mr. Ko)  Was there any aspect of the

18    privacy checkup tool that disclosed to the user

19    what third-party app developers could see or obtain

20    about a user?                                             02:13:32

21        A.   I know that it lets people know what apps

22    they have and is educating on them to see if they

23    want them to still uninstall those apps or keep the

24    apps.

25             The specifics, I don't remember, sitting         02:13:50
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    here right now.                                    02:13:52

 2        Q.   Do you recall any part of the privacy

 3    checkup tool which related to any disclosure by

 4    Facebook whatsoever about what third-party app

 5    developers could obtain from a particular user?     02:14:14

 6             MR. BLUME:  Objection.

 7             THE DEPONENT:  I am not sure how granular

 8    it got.  But it's like at a up level, our practice

 9    is to point people and -- to different settings,

10    pages and stuff within the context of these tools   02:14:44

11    that we have.

12             But I don't remember specifically the

13    details for how it's evolved.

14        Q.   (By Mr. Ko)  And -- and is the privacy

15    checkup tool -- when you say that it -- it -- you   02:14:58

16    believe that it pointed users to different

17    settings, pages, is it your testimony that the

18    privacy checkup tool referred to and pointed to

19    users -- towards specifically the privacy and app

20    settings?                                           02:15:17

21        A.   I said that I don't remember.  But I'd be

22    surprised if, in fact, it did not.  It told them

23    the scope of the information that they had shared

24    and the apps that -- that -- that they had

25    installed.                                          02:15:32
```

Page 160

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1              But I don't remember specifically.         02:15:34

2    Again, I'd be incredibly shocked, given the way

3    that we have all these links to the different

4    places people can go to learn more, if it did not.

5    But that's all that I can remember, sitting here    02:15:48

6    today.

7         Q.   Do you recall whether or not there was a

8    reference in the privacy checkup tool to the SRRs?

9              MR. BLUME:  Objection.

10             THE DEPONENT:  I don't recall.            02:16:03

11        Q.   (By Mr. Ko)  Do you recall whether or not

12   there was a link or reference in the privacy

13   checkup tool to the DUPs?

14             MR. BLUME:  Objection.

15             THE DEPONENT:  I don't recall.            02:16:17

16        Q.   (By Mr. Ko)  With regard to the

17   privacy --

18        A.   But there's links all over.

19        Q.   With respect to the privacy checkup tool

20   that was enacted and rolled out at Facebook in       02:16:29

21   May of 2014, is that tool still available today?

22        A.   Yes.

23        Q.   And it had -- that tool has been, I

24   assume, available to all Facebook users from

25   May of 2014 to present, correct?                     02:16:43
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        A.   I don't know that to be true.  I imagine       02:16:50

 2   it would have been rolled out in -- in waves, but

 3   I'm not sure.

 4        Q.   Well, what do you mean when it was

 5   "rolled out in waves"?                                   02:17:02

 6        A.   Consistent with other practices, we don't

 7   just turn all users live.  There's times where you

 8   will maintain the current experience and then ship

 9   any user experience changes we want to make, and

10   then additional testing of how those changes that       02:17:26

11   we decided to make are -- are being utilized and

12   received.

13             So the -- the research doesn't begin and

14   end at the initial launch.  The -- the teams would

15   be monitoring the user experience to see if we          02:17:41

16   should roll out more broadly, or before rolling out

17   more broadly make any adjustments based on the

18   initial wave.  Some things are rolled out all at

19   once.  But some things are rolled out in waves for,

20   like, localization purposes.                            02:18:00

21        Q.   And with respect to the -- the teams that

22   would be monitoring the user experience, what --

23   what teams would those be?

24             MR. BLUME:  Objection.

25             THE DEPONENT:  Likely, the -- largely,         02:18:23
```

Page 162

```
1    the product and eng and potentially research teams.      02:18:28

2    It all depends on what change we're making would

3    factor in who would be paying most attention.  But

4    largely, it would be the product, and where

5    applicable, research-related teams.                       02:18:53

6         Q.   (By Mr. Ko)  When you said that it was

7    consistent with other practices at Facebook to roll

8    certain products or programs out in waves, could

9    you characterize for the Court to what extent it

10   was the general practice of Facebook to roll          02:19:16

11   certain programs out, relative to, as you said,

12   rolling things out all at once?

13            MR. BLUME:  Objection.

14            THE DEPONENT:  What is the scope of your

15   question?                                                 02:19:40

16        Q.   (By Mr. Ko)  I'm just trying to get an

17   understanding and unpack your response.

18            When I asked about the privacy -- privacy

19   checkup tool being rolled out in May of 2014, you

20   said that it was likely that it was rolled out in     02:19:50

21   waves, correct?

22        A.   I -- it -- I -- I mean to say, it could

23   have been.  It could have also been rolled out all

24   at once.

25        Q.   So then since you don't know exactly what  02:20:02
```

Page 163

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | happened with respect to the privacy checkup tool, | 02:20:05 |
| 2 | but you did say it was consistent with other | |
| 3 | practices at Facebook to roll things out in waves, | |
| 4 | correct? | |
| 5 | A.   So we announced the fact of the privacy | 02:20:16 |
| 6 | checkup in May.  It starts rolling out in August. | |
| 7 | So just to be clearer on that point.  I'm sorry. | |
| 8 | I don't know if it was rolled out | |
| 9 | specifically in waves. | |
| 10 | Q.   And I -- let's set aside you've made it | 02:20:35 |
| 11 | clear you don't recall specifically what happened | |
| 12 | with respect to the privacy checkup tool.  I am now | |
| 13 | focusing on the portion of your response in which | |
| 14 | you said that it was consistent with other | |
| 15 | practices to roll things out in waves. | 02:20:46 |
| 16 | Do you recall that testimony; yes or no? | |
| 17 | A.   Yes, I recall having said that. | |
| 18 | Q.   And you also said and provided testimony | |
| 19 | that sometimes Facebook rolled things out all at | |
| 20 | once, correct? | 02:21:05 |
| 21 | MR. BLUME:  Same objection. | |
| 22 | THE DEPONENT:  Correct. | |
| 23 | Q.   (By Mr. Ko)  Can you give me an | |
| 24 | understanding of -- if you know.  It's fine if you | |
| 25 | don't.  If you know -- to what extent it was the | 02:21:19 |

Page 164

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    general practice of Facebook to roll things out in        02:21:22

 2    waves or whether it was the general practice of

 3    Facebook to roll things out all at once?

 4            MR. BLUME:  Objection.  Form.

 5            THE DEPONENT:  It all depends on what is           02:21:31

 6    being launched.  If it's like a text change, it

 7    will have to be translated for the fact that it's a

 8    global company.  So we need to make sure that the

 9    language is the right language and that can take

10    some time.                                                 02:21:46

11            We also need to test features.  We want

12    the experience to be uniform across the global user

13    experience.  But we also need to know whether what

14    we've decided to test because we -- we don't always

15    want to proceed with something.  So we'll test in a       02:21:58

16    given region, see how it's performing, and decide

17    whether to open it up more broadly.

18       Q.   (By Mr. Ko)  So it's fair to say then

19    that there wasn't one general practice with respect

20    to rolling certain programs out.                          02:22:20

21            I hear you to say that sometimes it was

22    rolled out in waves and sometimes it was rolled out

23    at once.  It just depends; is -- is that correct?

24            In other words, there was no predominant

25    practice as -- as to those two methods in rolling         02:22:34
```

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | out a certain product, correct? | 02:22:37 |
| 2 | A.   So to take us a step back, the teams that | |
| 3 | are involved in the development or revisions to | |
| 4 | features, functionalities, terms, documents, they | |
| 5 | will collaborate on the launch plan.  We have to go | 02:22:50 |
| 6 | to market plans.  And everyone will align on what | |
| 7 | is the right approach for the given thing that is | |
| 8 | being updated and tested, for example. | |
| 9 | So it's -- there's a process by which we | |
| 10 | make those decisions. | 02:23:11 |
| 11 | Q.   Was there a predominant practice as to | |
| 12 | how Facebook rolled certain programs out? | |
| 13 | MR. BLUME:  Objection.  Form. | |
| 14 | THE DEPONENT:  It all depends, like I | |
| 15 | said.  So I've described the way that we approach | 02:23:26 |
| 16 | it.  It's the process of the teams that are all | |
| 17 | involved in, you know, the announcements of the | |
| 18 | launch. | |
| 19 | Using privacy checkup as an example, | |
| 20 | there will have been the teams that I referred to | 02:23:38 |
| 21 | earlier, that will align on the -- the content of | |
| 22 | that announcement.  And those similar teams will | |
| 23 | align on the timing for launching those things.  So | |
| 24 | it all just again depends on which team is | |
| 25 | launching what thing. | 02:23:55 |

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.   (By Mr. Ko)  So based on your response, | 02:23:57 |
| 2 | is it fair to say, and would you agree with me, | |
| 3 | that there was not a predominant practice as to how | |
| 4 | Facebook rolled certain programs out? | |
| 5 | A.   No. | 02:24:08 |
| 6 | Q.   Okay.  Well, which is it?  Because you're | |
| 7 | saying that -- you claim that it all depends, | |
| 8 | right? | |
| 9 |      In certain circumstances there -- there | |
| 10 | are situations in which Facebook rolled things out | 02:24:18 |
| 11 | in waves, and in certain circumstances there are | |
| 12 | situations in which Facebook rolled things out all | |
| 13 | at once. | |
| 14 |      Did I understand your testimony | |
| 15 | correctly? | 02:24:31 |
| 16 | A.   I believe that's what I said.  But like, | |
| 17 | for example, using the SRR and the data use policy, | |
| 18 | you know, that's not an example of a wave that we | |
| 19 | would do.  It -- it just all depends. | |
| 20 | Q.   Are you familiar -- | 02:24:53 |
| 21 | A.   But there's always a process. | |
| 22 | Q.   Are you familiar with privacy shortcuts? | |
| 23 | A.   Yes, I am. | |
| 24 | Q.   What is -- what is privacy shortcuts? | |
| 25 | A.   So that was launched in December of 2012, | 02:25:14 |

Page 167

```
1    and it complements the privacy tour that users --        02:25:16

2    new users go through in their new -- in the user

3    signup flow and it -- it's right -- it's -- it's

4    next to the home button.  But it's just an ability

5    to complement that privacy tour and provide you        02:25:39

6    with more information on the privacy settings.

7         Q.   I'm sorry.  And -- and you said "tour" as

8    in T-O-U-R?

9         A.   Yes.  We have a privacy tour for new

10   users.                                                02:25:56

11        Q.   In connection with the privacy tour, and

12   specifically with respect to the privacy shortcuts,

13   do you recall whether or not there was any

14   reference or disclosure to the SRR?

15        A.   I don't remember, sitting here right now.     02:26:22

16        Q.   Do you recall whether or not there was

17   any reference or disclosure in the privacy

18   shortcuts that referred the user to the DUP?

19        A.   I don't remember.

20        Q.   Are the privacy shortcuts -- so you said      02:26:48

21   that they were rolled out by Facebook in

22   December of 2012, right?

23        A.   Yes, I said that.

24        Q.   Are they still in existence today?

25        A.   Yes.  I -- I -- yes, they are.                02:27:04
```

Page 168

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              MR. KO:  Believe it or not, I have an        02:27:13

 2     exhibit for you.

 3              We're going to put on the platform a copy

 4     of what will be marked as Exhibit 331.

 5              (Exhibit 331 was marked for                  02:27:21

 6     identification by the court reporter and is

 7     attached hereto.)

 8              MR. KO:  Just give it a moment.  And

 9     while it magically arrives in your platform, the --

10     I'll note for the record that tab J is              02:27:40

11     Bates-stamped FB-CA-MDL-00005751.

12        Q.   (By Mr. Ko)  Let me know when you have a

13     copy of that.

14        A.   I have it.

15        Q.   Okay.  Does this document look familiar       02:28:19

16     at all to you, Ms. Hendrix?

17        A.   Yeah, I -- I think I've seen this before.

18     Not -- I -- yes, it looks familiar.

19        Q.   And by the way, just for your benefit,

20     you can see portions of this exhibit that is --       02:28:56

21     that is being screen-shared as well.  But it sounds

22     like you're -- or it looks like you have a good

23     handle on looking at the document directly.  So

24     whatever you choose.

25              So there's a reference in this                02:29:12
```

Page 169

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    document -- and I'm looking at the second page --        02:29:14

 2    to privacy shortcuts.

 3            Do you see that?

 4        A.   I am there.

 5        Q.   And is it fair to say, given the               02:29:30

 6    description -- and -- and take a moment to read it,

 7    if you need to -- but is it fair to say that the

 8    privacy shortcuts were designed to help users get

 9    quicker access to accessing their privacy settings

10    and controls?                                            02:29:46

11        A.   What did you say?  I'm so sorry.  I was

12    reading.

13        Q.   Is it fair to say that the privacy

14    shortcuts were designed to help users get quicker

15    access to seeing their privacy settings and           02:29:59

16    controls?

17        A.   I don't know if quick -- maybe quicker is

18    fair.  It's just making -- it's just having that

19    shortcut right next to the home button.  So it

20    makes it like prominent everywhere they go.            02:30:19

21        Q.   Let's do it that way because, you know,

22    to me, a shortcut would mean quicker.  But let's

23    just use your example as a shortcut.

24            So is it fair to say that the privacy

25    shortcuts were designed to help users access a         02:30:37
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    shortcut to see their privacy settings and          02:30:44

 2    controls?

 3         A.   I'm -- I'm just struggling to -- so I

 4    don't know if -- so some of their controls, I

 5    guess.                                               02:31:14

 6         Q.   Yeah, some of the controls, I -- I

 7    believe.

 8              Well, if you look at Exhibit 331, there's

 9    a reference to this post made by Sam Lessin, who I

10    assume you know.  But Sam Lessin describes in this   02:31:27

11    post under "Privacy Shortcuts" that there is a way

12    in which to access key settings from the privacy

13    shortcut, correct?

14         A.   Where does he say that?

15         Q.   I'm looking at the third sentence that     02:31:50

16    begins "Now."

17         A.   So, yes, it says "Now, for key settings,

18    you just go to the toolbar to help manage 'Who can

19    see my stuff?  Who can contact me,'" et cetera.

20         Q.   And so the privacy shortcuts were          02:32:10

21    designed to help users access key settings from the

22    privacy shortcut toolbar, correct?

23         A.   It's designed to improve a person's

24    access to their privacy settings and controls.

25         Q.   And do you have any understanding --       02:32:42
```

Page 171

```
 1    and -- and when Mr. Lessin describes in this post        02:32:44

 2    that there are certain key settings that a user can

 3    access, do you have an understanding of what key

 4    settings those are?

 5         A.   It would be the settings around who can        02:33:10

 6    see my stuff, who can contact me, and how do I stop

 7    someone from bothering me.

 8         Q.   And there's an example of that down

 9    below.  I know it's a little fuzzy.

10              But -- but do you see that example, which      02:33:24

11    I believe is a snapshot of the actual privacy

12    shortcut tool and the three things you just

13    described?

14         A.   Yes, I see this.

15         Q.   So according to this post, those were          02:33:35

16    the -- the key settings that a user could access

17    from the privacy shortcut tool, correct?

18              MR. BLUME:  Objection.  Asked and

19    answered.

20              THE DEPONENT:  Well, they could access         02:33:44

21    them from many other places.  This was just like an

22    improvement to the -- it -- it was a shortcut, if

23    you will.

24              Uh-oh.  What's happening?

25              MR. KO:  Nothing has happened for me.  I       02:34:01
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1    don't know if something has happened for you.        02:34:03

2            THE DEPONENT:  We have a menu that just

3    popped up on our screen.

4            MR. BLUME:  You can keep going.

5            THE DEPONENT:  Yeah.  You can keep going.     02:34:11

6            Thank you.

7        Q.  (By Mr. Ko)  Now, you -- you say that it

8    was an improvement.

9            What do you mean by that?

10       A.  Well, it was a shortcut.  So it's -- like     02:34:26

11   users had the ability to access their controls via

12   multiple interfaces, but this puts the privacy

13   shortcut on essentially every page on their

14   Facebook experience.

15           So it just -- it's an improvement in the      02:34:43

16   sense that it's right there instead of having to

17   navigate to the settings in another method.  This

18   is just -- that's what I mean.  It's an

19   improvement.

20       Q.  Because before the user had to navigate       02:34:58

21   through a separate set of pages to access this set

22   of controls, correct?

23       A.  I -- you said "pages," but --

24       Q.  Let me ask it this way.

25           The post says, at the first sentence          02:35:19
```

Page 173

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    underneath "Privacy Shortcuts, Up until now, if you      02:35:23

 2    wanted to change your privacy and timeline controls

 3    on Facebook, you would need to stop what you're

 4    doing and navigate through a separate set of

 5    pages."                                                  02:35:36

 6         A.   Okay.  Yes, it says that.

 7         Q.   "Today we're announcing new shortcuts you

 8    can easily get to.  Now, for key settings, you just

 9    go to the toolbar to help manage 'Who can see my

10    stuff?' 'Who can contact me?' and 'How do I stop        02:35:50

11    someone from bothering me?'  You can also access

12    Help Center content from these shortcuts."

13              Did I read that correctly?

14         A.   Yes.

15         Q.   So the privacy shortcuts were -- and          02:36:09

16    correct me if I'm wrong -- is it fair to say that

17    the privacy shortcuts were designed to improve the

18    way in which users could access key privacy

19    settings; is that fair to say?

20         A.   I mean, I did use the word "improve," but     02:36:28

21    it also complements the existing resources that

22    they already had.

23         Q.   So yes or no, you can -- you can answer

24    no, if you'd like.  That's totally fine.

25              Yes or no, is it fair to say that the         02:36:46
```

Page 174

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    privacy shortcuts were designed to improve the way      02:36:48

 2    in which users could access key privacy settings?

 3              MR. BLUME:  Objection.

 4              THE DEPONENT:  I mean, I feel like we

 5    just -- like I -- I -- I do view it as an               02:37:13

 6    improvement to what was already -- it wasn't a

 7    change in the -- in the controls that they had.

 8    But it was just intended to be a -- a shortcut on

 9    the Facebook site to help people further navigate

10    to the controls that they had.                          02:37:38

11       Q.   (By Mr. Ko)  Would that be a "yes" in

12    response to my question?

13              MR. BLUME:  Objection.  You're -- you're

14    characterizing it and she's explaining.

15              MR. KO:  Right.  So I --                       02:37:47

16              MR. BLUME:  This is why it's taking so

17    long.

18       Q.   (By Mr. Ko)  Yes or no, is it fair to say

19    that the privacy shortcuts were designed to improve

20    the way in which users could access key privacy         02:37:54

21    settings?

22              MR. BLUME:  Objection.  She said she saw

23    it as an improvement.  Asked and answered.

24              THE DEPONENT:  I view it as an

25    improvement to --                                       02:38:10
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        Q.   (By Mr. Ko)  Thank you.                02:38:12

 2        A.   But not as an improvement to the -- to

 3   the controls themselves.  But now you can actually

 4   get there with that on every page that shows up on

 5   the interface.                                   02:38:21

 6        Q.   Are there any studies or research done in

 7   connection with this change?

 8             MR. BLUME:  Objection.

 9             THE DEPONENT:  I don't remember.

10        Q.   (By Mr. Ko)  One of the settings that you 02:38:43

11   can access on this drop-down in the privacy

12   shortcuts is a -- at the very top of the privacy

13   shortcuts, a reference to "'Who can see my stuff?'"

14             Do you see that?

15        A.   Yes.                                    02:39:01

16        Q.   Do you know whether or not the drop-down

17   revealed -- well, first of all, there was a

18   drop-down based on that specific button, correct?

19             MR. BLUME:  Objection.  It's getting so

20   far beyond topic 3 that --                        02:39:16

21             MR. KO:  That's incredible that you say

22   that, Mr. Blume.  But your objection is noted.

23             MR. BLUME:  Thank you.  Incredible.

24             It has nothing to do with users' privacy

25   or app settings.  This is a technological change.  02:39:30
```

Page 176

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    So it goes beyond topic 3.  It's incredible.        02:39:33

 2        Q.   (By Mr. Ko)  Just so the record is

 3    clear -- and I want to make sure that -- so

 4    Ms. Hendrix, you are here to testify as to the

 5    process for developing privacy or app settings, or   02:39:47

 6    other controls made available to users to prevent

 7    or limit their data or information from being

 8    accessed by third parties.

 9             MR. BLUME:  And -- and --

10             MR. KO:  Hold on.  I'm asking --            02:39:57

11             MR. BLUME:  -- and this technology is

12    none of that, David.

13             Well, no, it goes -- it's a legal

14    question.  This technology doesn't go to any of

15    those points, David.  You have to understand it to   02:40:03

16    ask.  But it doesn't -- what you just described is

17    not what we're talking about.  So it's way beyond

18    what you just described as the topic.

19             MR. KO:  You can make an objection.

20             MR. BLUME:  It's beyond the scope.          02:40:21

21             MR. KO:  Do you have an objection?

22             MR. BLUME:  It's -- it's beyond the

23    scope.

24        Q.   (By Mr. Ko)  Ms. -- Ms. Hendrix, you are

25    here to testify to the process -- let me ask again.  02:40:27
```

Page 177

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1            Ms. Hendrix, consistent with topic 3, you      02:40:34

 2   are here to testify as to the processes of

 3   developing privacy or app settings, or other

 4   controls, made available to users to prevent or

 5   limit their data or information from being accessed   02:40:48

 6   by third parties; is that correct?

 7        A.   Yes.  But the privacy shortcuts is not a

 8   control, and it's not an app or a privacy settings.

 9            MR. BLUME:  Exactly.

10        Q.   (By Mr. Ko)  Great.  Well, this is very     02:41:06

11   helpful because my next question was, you have

12   referred throughout this day about educational --

13   certain educational materials that you believe were

14   made available to users to help them control the

15   information that they make available.                02:41:19

16            Do you recall that testimony?

17            MR. BLUME:  Objection.  That's not her

18   testimony.

19            THE DEPONENT:  I -- I refer to the

20   educa- -- the educational resources are just         02:41:33

21   additional information and attempts to have people

22   understand the controls that we provide.

23        Q.   (By Mr. Ko)  And I believe one example --

24   this is how the privacy checkup tool came about --

25   the privacy checkup tool was one such example of --   02:41:51
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | of the educational resources Facebook provided, | 02:41:54 |
| 2 | correct? | |
| 3 |     A.   Right.  It's an educational resource that | |
| 4 | tells people, you know, what their current settings | |
| 5 | are and educates them on the fact that if they want | 02:42:04 |
| 6 | to change their settings, their controls, that they | |
| 7 | can do so. | |
| 8 |     Q.   Would you characterize these privacy | |
| 9 | shortcuts to be under the same umbrella as -- or | |
| 10 | under the same umbrella of educational resources | 02:42:18 |
| 11 | that you put the privacy checkup tool under? | |
| 12 |     A.   These are -- those are different things. | |
| 13 | But it's all designed to just further explain the | |
| 14 | controls and -- and the settings that we have | |
| 15 | built. | 02:42:36 |
| 16 |     Like there's multiple ways that if a user | |
| 17 | wants to understand, they can go to the controls | |
| 18 | themselves and see what they've set.  But these are | |
| 19 | additional measures that we continue to evolve and | |
| 20 | undertake in order to further educate and remind | 02:42:50 |
| 21 | people about decisions that they've made.  Some | |
| 22 | people have set up their Facebook accounts 18-plus | |
| 23 | years ago. | |
| 24 |     So I wouldn't call them controls versus | |
| 25 | educational resources reminding them of controls. | 02:43:07 |

Page 179

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        Q.   And I was very much asking about          02:43:10

 2   educational resources only.

 3             One example of an educational resource

 4   you gave was the privacy checkup tool, and my

 5   question is whether or not you believe the privacy   02:43:20

 6   shortcut tool is also an educational resource?

 7        A.   It is a -- it is a feature within the

 8   Facebook experience that if you click on it, you

 9   can -- and then go to that toolbar and get access

10   to those things that you already read, so I -- I     02:43:58

11   will spare us -- and just helps point you to the

12   decisions that you've made or, for example, the

13   last sentence, the help center, so that you can --

14   if you have more questions, you can go to the help

15   center as well.                                      02:44:17

16        Q.   So is the privacy shortcuts tool, yes or

17   no, an example of an educational resource that you

18   were describing earlier today?

19             MR. BLUME:  Objection.  Asked and

20   answered.                                            02:44:34

21             THE DEPONENT:  It is a shortcut to

22   resources that are available.

23        Q.   (By Mr. Ko)  So do you view it as part of

24   the -- so you -- you were the one who testified as

25   to educational resources, correct?                   02:44:47
```

Page 180

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1              MR. BLUME:  Objection.  Asked and          02:44:53

2       answered.

3              THE DEPONENT:  I -- I did say -- say

4       that.

5          Q.   (By Mr. Ko)  So I have a very simple       02:44:58

6       question.

7              Do you believe -- when you're talking

8       about educational resources, is the privacy

9       shortcut tool part of the educational resources you

10      had in mind, or is it not a part of the educational  02:45:11

11      resources that you had testified to earlier?

12         A.   I view it as being a part of that in the

13      sense that it provides a shortcut to the actual

14      resources.

15             So it would be under the umbrella of what    02:45:28

16      are the features and functionalities that we offer

17      to help further educate and/or remind people of the

18      actual settings and controls that we have in place.

19         Q.   Thank you.  You we can put -- we can move

20      on from this exhibit.                                02:45:49

21             Now, in connection with the materials

22      that you reviewed in preparation for this

23      deposition, did you review any pleadings in

24      connection with this case?

25         A.   What is a pleading?                          02:46:14
```

Page 181

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        Q.   Are you familiar with the allegations in        02:46:16
 2   this case related to friend sharing or the sharing
 3   of friend data?
 4        A.   Yes.
 5             (Simultaneously speaking.)                       02:46:23
 6        Q.   (By Mr. Ko)  What is your
 7   understanding --
 8        A.   So did you mean like the complaint?  Is
 9   that a pleading?
10        Q.   We've moved on from that.  It's okay.           02:46:32
11             What is your understanding of these
12   allegations that you are familiar with?
13             MR. BLUME:  What -- how -- how is that a
14   question relevant to a corporate representative?
15        Q.   (By Mr. Ko)  In your capacity as a              02:46:50
16   corporate designee, on behalf of Facebook, are you
17   aware of the claims in this case that relate to
18   friend sharing?
19             MR. BLUME:  She -- asked and answered.
20   You already asked that question.  You're wasting         02:46:58
21   time.
22             MR. KO:  You're wasting time by injecting
23   speaking objections into the record.
24             MR. BLUME:  David, you're asking the same
25   question twice in a row even.                             02:47:11
```

                                                    Page 182

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              MR. KO:  I did not.  There was -- let --     02:47:12

 2    the record speaks for itself.

 3              MR. BLUME:  Yes, it does.

 4              MR. KO:  There were two different

 5    subtleties in that question.                           02:47:15

 6              So anyways, please just object and that's

 7    all.

 8        Q.   (By Mr. Ko)  In your capacity as a

 9    corporate designee, on behalf of Facebook, are you

10    aware of the claims in this case related to friend    02:47:24

11    sharing?

12        A.   I am here to talk about the topics and --

13    and part of that I have researched friend sharing

14    and -- and reminded myself on things that I didn't

15    know.                                                  02:47:41

16              Did I zoom in on your actual complaints?

17    I didn't think that was my job.  But I did do my

18    research into the topics.

19        Q.   You're making a lot of assumptions about

20    the questions I'm asking.                              02:47:55

21              I'm simply asking you whether or not you

22    are aware, yes or no.  I'm not asking you whether

23    or not you researched.  I'm not asking whether or

24    not you did a granular deep dive into all the

25    allegations.  I'm not asking you if you know all      02:48:07
```

Page 183

```
 1    the ins-and-outs about the allegations.            02:48:08

 2            I'm simply asking you, are you aware of

 3    the allegations in this case related to friend

 4    sharing?

 5            MR. BLUME:  David, you asked it 14:46:18    02:48:18

 6    (indiscernible) in this case --

 7            MR. KO:  I can't hear a thing you said

 8    because your microphone is so muffled.

 9            MR. BLUME:  She -- she said -- in

10    14:46:18, she -- you said "Are you familiar with  02:48:27

11    the allegations in this case related to friend

12    sharing or the sharing of friend data?"  She said

13    "Yes."

14            So it is exactly the same question and

15    it's just wasting time.  It's been asked and      02:48:39

16    answered about 30 seconds ago.

17       Q.   (By Mr. Ko)  And I am asking you, in your

18    capacity as a corporate designee, on behalf of

19    Facebook -- to make sure I address any of the

20    objections that you need to make, Mr. Blume -- are 02:48:54

21    you aware of these claims in your capacity as a

22    corporate designee on behalf of Facebook?

23            MR. BLUME:  Same objection.

24            THE DEPONENT:  I'm here to prepare to

25    speak to the topics.  And if you want to get into  02:49:08
```

Page 184

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    them, I'm more than happy to speak to them.            02:49:11

 2           I know that I've seen and had a chance to

 3    review the complaint.  I don't remember, sitting

 4    here right now, your precise -- all of the details.

 5    I'm just generally aware that it involves --          02:49:22

 6           SPECIAL MASTER GARRIE:  The answer is

 7    like -- can you just like -- the question he's

 8    asking is just yes or no, or you don't know.

 9           THE DEPONENT:  I feel like I'm getting

10    bought into --                                        02:49:34

11           MR. BLUME:  She -- she --

12           THE DEPONENT:  He --

13           MR. BLUME:  She said yes --

14           SPECIAL MASTER GARRIE:  I don't -- I

15    understand.                                           02:49:39

16           MR. KO:  She's making so many assumptions

17    about --

18           SPECIAL MASTER GARRIE:  Please listen to

19    me.

20           THE COURT REPORTER:  Hold on --              02:49:39

21           SPECIAL MASTER GARRIE:  If you don't --

22    please stop.

23           MR. KO:  Sorry.  Go ahead.

24           SPECIAL MASTER GARRIE:  Please read the

25    question back, Mr. Ko.                               02:49:43
```

Page 185

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Either you answer yes, no, or "I cannot | 02:49:44 |
| 2 | answer that question in a yes-or-no fashion."  And | |
| 3 | let's move forward. | |
| 4 | MR. KO:  Thank you, | |
| 5 | Special Master Garrie. | 02:49:53 |
| 6 | THE DEPONENT:  Thank you. | |
| 7 | SPECIAL MASTER GARRIE:  So please read | |
| 8 | the question again, Counsel Ko, and then move | |
| 9 | forward once we get -- | |
| 10 | Q.   (By Mr. Ko)  In your capacity -- in your | 02:50:01 |
| 11 | capacity as a corporate designee, on behalf of | |
| 12 | Facebook, are you aware of the claims related to | |
| 13 | friend sharing in this case? | |
| 14 | MR. BLUME:  Objection. | |
| 15 | THE DEPONENT:  I don't remember the | 02:50:17 |
| 16 | specific claims.  I'm aware -- sorry.  Sorry, | |
| 17 | Garrie [sic].  I know I said -- I need to... | |
| 18 | MR. KO:  Great.  Thank you.  That was | |
| 19 | very helpful. | |
| 20 | MR. BLUME:  Twice. | 02:50:34 |
| 21 | Q.   (By Mr. Ko)  Do you know -- with respect | |
| 22 | to friend sharing, what is your understanding of | |
| 23 | that term? | |
| 24 | A.   I don't remember if it's defined in any | |
| 25 | of this.  But I can speak, if you'd like me to | 02:51:12 |

Page 186

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    generally, about friend sharing, the topic.          02:51:15

2        Q.   Yes.  That's what I am asking.

3    I'm not -- I'm not asking you about a specific

4    definition.

5            I'm just simply asking whether or not you     02:51:26

6    understand what the concept of friend sharing

7    refers to?

8        A.   So the concept of friend sharing is you

9    create a Facebook account.  You choose to friend

10   people, so you -- you create friend connections.       02:51:41

11   And those friends, you choose whether to share

12   information with them and that's -- just for

13   purposes of time, I'll stop there.

14       Q.   For some portion of the relevant time

15   period, Facebook permitted third-party app             02:52:09

16   developers to access friend information; is that

17   correct?

18           MR. BLUME:  Object -- objection.

19           THE DEPONENT:  You're trying to get me to

20   do yes or no so I need you to actually ask the         02:52:29

21   question again.

22           MR. BLUME:  Ask an open-ended question.

23   He's --

24       Q.   (By Mr. Ko)  Is it accurate to say that

25   for any portion of the relevant time period,           02:52:40

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    Facebook permitted third-party app developers to        02:52:43

 2    access friend information?

 3              MR. BLUME:  Objection.

 4              THE DEPONENT:  I wouldn't state it that

 5    way.                                                     02:52:58

 6         Q.   (By Mr. Ko)  How would you state it?

 7         A.   During the relevant time period, for

 8    certain portions of it, Facebook enabled people to

 9    enable their friends to share certain information

10    with third-party apps.                                   02:53:10

11         Q.   So for some portions of the relevant time

12    period, Facebook enabled people to enable their

13    friends to share certain information with

14    third-party apps, correct?

15              MR. BLUME:  Objection.  Asked and             02:53:27

16    answered.  You just read her answer.

17              Is that what you said?

18              THE DEPONENT:  I think that's what I

19    said.  I -- I don't know.  If that's what I said,

20    correct.  Otherwise, let's just go with what I          02:53:40

21    said.

22         Q.   (By Mr. Ko)  All right.  And I'm reading

23    verbatim from your answer, to make you feel better.

24              And are you aware at all of what periods

25    of time within that relevant time period              02:53:53
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    Facebook -- Facebook enabled people to enable their      02:53:56

 2    friends to share certain information with

 3    third-party apps?

 4         A.   That would be up until I -- I'm not

 5    actually -- I don't remember the precise date when        02:54:17

 6    it -- of when we got everyone off of v1.  So

 7    I'm not -- I'm not sure of the precise date.

 8         Q.   And when you're referring to v1, I assume

 9    you're -- you're meaning Graph version 1 -- 1.0,

10    right?                                                    02:54:38

11         A.   That's right.

12              Anyone that developed an app after

13    April of 2014, did not have the ability to ask

14    people to share their friends information to the

15    extent their friends enabled them to do so through       02:54:51

16    their privacy app and app settings.

17         Q.   And this Graph version 1 was also

18    referred to as Graph API version 1.

19              Does that sound familiar?

20         A.   Yes.                                            02:55:09

21         Q.   And it was replaced, as you say, in

22    April of 2014, with Graph version 2 or Graph API

23    version 2; is that correct?

24         A.   I wouldn't say replaced, no.

25         Q.   How would you say it?                           02:55:30
```

Veritext Legal Solutions
866 299-5127

1     A.   We up- -- we created another version of          02:55:32

2     the Graph -- Graph API.  So it's not accurate to

3     say replaced, because version 1 and 2 were live for

4     a while at the same time.

5     Q.   And -- and how long -- because obviously         02:55:46

6     it takes time to roll things -- things out,

7     obviously it takes time to notify app developers.

8          How long was it the case that version 1.0

9     was still in existence?

10     A.   I just testified moments ago that I don't        02:56:01

11     remember the precise date when that version was no

12     longer reported.  But I do know that

13     April 14th, 2014, anything -- any app created

14     thereafter could not have been built on v1, only

15     v2.                                                   02:56:17

16     Q.   With respect to v2, your testimony is

17     that app developers on v2 could no longer access

18     certain information about a user's friend; is that

19     fair to say?

20          MR. BLUME:  Objection.  That was not her         02:56:45

21     testimony.

22          MR. KO:  You can object.

23          MR. BLUME:  Mischaracterizing her

24     testimony.

25          MR. KO:  Thank you.                              02:56:55

                                                            Page 190

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1        Q.   (By Mr. Ko)  Can you answer the question,     02:57:05

2    Ms. Hendrix?

3        A.   I didn't understand what you asked me.

4        Q.   You said in connection with Graph v. --

5    Graph v2, an app developer did not have the ability     02:57:16

6    to ask people to share their friends' information.

7             Do I understand your testimony correctly?

8        A.   To be very precise, they could still ask

9    for the inapp friend list, but no friend

10   permissions that were available in the v1.  They --     02:57:37

11   there was no friend permissions in v2.  You could

12   only ask for my inapp friend list.

13       Q.   Other than the inapp friend list, in

14   connection with Graph v2, there were no other

15   friend permissions allowed, correct?                    02:57:59

16       A.   Those were -- they were -- yes.  They

17   were deprecated.

18       Q.   Now, this change with respect to v2, as

19   it applied to app developers and their ability to

20   access certain friend permissions, was that change     02:58:26

21   reflected in Facebook's platform policies with

22   third-party app developers?

23       A.   What do you mean?

24       Q.   This was a change, correct?

25            You would agree with me on that, a change      02:58:50
```

1    in the way it reflected --                          02:58:52

2         A.   It was --

3         Q.   Go ahead.

4         A.   It was a product change.

5         Q.   In connection with that product change,    02:58:59

6    was that reflected in any policy -- platform policy

7    or --

8              MR. BLUME:  Objection.

9              THE DEPONENT:  I don't understand what

10   you mean.                                            02:59:12

11        Q.   (By Mr. Ko)  Was there a change in any

12   policy that reflected the fact that app developers

13   could no longer request friend permissions in

14   Graph v.2?

15        A.   That's not a yes-or-no question.  I'm      02:59:39

16   sorry.  Like if you ask it open-ended, like did you

17   make changes to the Facebook platform policies in

18   connection with the change from v1 to v2, I can

19   answer that.  And the answer yes.  But your

20   question doesn't make sense to me.                   02:59:52

21        Q.   Let's start that way.

22             So you made changes to the Facebook

23   platform policy in connection with the change from

24   v1 to v.2, correct?

25        A.   Yes.                                        03:00:04

                                                  Page 192

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        Q.   And I imagine that those changes were, in      03:00:06

 2   fact, made in the platform policy, the -- the --

 3        A.   I -- I just --

 4        Q.   -- policy governing -- let me just finish

 5   my question.                                             03:00:15

 6        A.   I just said that.

 7             MR. BLUME:  Asked and answered.

 8             MR. KO:  A large part of this is making

 9   sure that is the record is clear.

10             MR. BLUME:  It's just wasting time,            03:00:22

11   David.

12        Q.   (By Mr. Ko)  In connection with changes

13   made to the Facebook platform policy, there were --

14   well, I -- I -- let me ask this -- let me ask it

15   this way.                                                03:00:41

16             In connection with the change from v1 to

17   v2, there were certain changes made to the

18   platform -- Facebook platform policy, correct?

19        A.   Correct.

20        Q.   And was the change regarding third-party      03:00:53

21   access to certain friend permissions reflected in

22   any of those changes in the Facebook platform

23   policy?

24             MR. BLUME:  Objection.  Form.

25             THE DEPONENT:  No.  We don't detail the        03:01:12
```

Page 193

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    products and how they work in the -- in the          03:01:14

 2    agreement with developers.

 3         Q.   (By Mr. Ko)  Would you agree with me that

 4    this was a big change for Facebook and its app

 5    developers?                                           03:01:27

 6              MR. BLUME:  Objection.

 7              THE DEPONENT:  What do you mean by "it"?

 8              MR. KO:  "It" referring to third-party

 9    app developers access to and lack thereof of

10    certain friend permissions.                          03:01:42

11              MR. BLUME:  Objection.

12              THE DEPONENT:  I agree it was a

13    significant way that the Facebook platform worked.

14         Q.   (By Mr. Ko)  And this was a -- a big deal

15    for the app developers, too, right?                  03:02:00

16              MR. BLUME:  Objection.  It's beyond the

17    scope.  Speculation.

18              THE DEPONENT:  I am not going to -- yeah,

19    I -- I can't speculate for whether it was a big

20    deal.  I mean, at the time, we had like 43, 40-some   03:02:15

21    million apps.  So I -- like each of these apps on

22    the platform will have experienced different

23    hurdles, some of which that didn't need friend

24    permissions.

25              Obviously, that's not significant to        03:02:27
```

Page 194

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1    them.  But others would have to go in and configure      03:02:29

2    their apps and make changes and -- to adjust to

3    the -- the new way that the platform worked in v2.

4         Q.   (By Mr. Ko)  With respect to the

5    43 million or 40-some million apps that you -- you       03:02:43

6    referred to a moment ago, is that the number of

7    apps that have existed throughout the relevant time

8    period, or are you referring to some specific point

9    in time?

10        A.   I'm referring to a specific period of          03:03:03

11   time as a data point.  I'm familiar with -- of --

12   in 2013, roughly, we had about 40-some -- in the

13   lower 40 million apps on the platform.

14        Q.   And do you know how many apps are on the

15   platform today?                                          03:03:23

16             MR. BLUME:  Objection.  Beyond the scope.

17             What topic is that?

18             MR. KO:  Enforcement, Mr. Blume.

19             MR. BLUME:  Okay.  What topic is that?

20        Q.   (By Mr. Ko)  So you found it necessary          03:03:42

21   and -- and relevant to understand how many apps

22   were on the Facebook platform as of 2013, and you

23   reported that that number is about 40 to

24   43 million, correct?

25             MR. BLUME:  Objection.                          03:03:53
```

Page 195

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  Not for this case, no.        03:03:55

 2         Q.   (By Mr. Ko)  Got it.

 3              Do you have an understanding of how many

 4    apps were on the Facebook platform at any time

 5    other than 2013, sitting here today?                   03:04:05

 6              MR. BLUME:  Objection.  Beyond the scope.

 7              THE DEPONENT:  I know that I have

 8    reviewed and been provided with information

 9    throughout, for different reasons, some of which

10    have nothing to do with litigation, that I've had     03:04:17

11    numbers presented to me.

12              I know I can find how many are on the

13    platform today.  I don't know, sitting here today,

14    if I can tell you more than just that one example

15    that I remember.                                      03:04:30

16         Q.   (By Mr. Ko)  Was there any policy --

17    platform policy, or otherwise, that reflected the

18    fact that third-party app developers could no

19    longer access certain friend permissions in

20    connection with Graph v2?                             03:04:50

21              MR. BLUME:  Objection.

22              THE DEPONENT:  For like the fourth

23    time -- and I apologize I'm -- because I'm getting

24    tired and grumpy -- but like I've already told you,

25    I did make a policy change -- personally developed   03:04:59
```

Page 196

1     along with all of the other teams that work on and          03:05:01

2     develop the policies -- we did make a policy change

3     in connection with the Facebook platform change

4     from v1 to v2.

5          Q.   (By Mr. Ko)  And in connection with that          03:05:16

6     policy change, was there anything -- was there any

7     language that related to or otherwise covered the

8     fact that third-party app developers were no longer

9     accessing friend data or friend permissions?

10          MR. BLUME:  Objection.  Asked and                      03:05:35

11     answered.

12          THE DEPONENT:  Not in the specific

13     Facebook platform policy document, right.  But

14     elsewhere you could go -- like let's say you wanted

15     to go to the friend permissions page on the          03:05:44

16     developer documentation site.

17          You might see a v1 to v2 header on the

18     top explaining the fact that we had announced the

19     change and linking to the announcement.

20          But, again, I'm -- I'm -- I am trying not          03:05:56

21     to -- I should stop trying to help you with your

22     questions is what I'm giving myself feedback on.

23     But there you go.

24          Q.   (By Mr. Ko)  So after this change was

25     made with respect to third-party app developer          03:06:13

Page 197

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    access over friend permissions and friend data, you      03:06:18

 2    don't dispute that third parties continued to

 3    access this --

 4              MR. BLUME:  Objection.

 5         Q.  (By Mr. Ko)  -- information, correct?           03:06:31

 6              MR. BLUME:  Objection to the

 7    characterization.  It's inconsistent with her

 8    testimony.

 9              THE DEPONENT:  I -- I dispute what you

10    just said.                                               03:06:37

11         Q.  (By Mr. Ko)  Okay.  So you deny -- or

12    is -- is it your testimony that after

13    April of 2014, third-party app developers no longer

14    obtained information about a user's friend?

15              MR. BLUME:  Objection.  What -- how is        03:06:57

16    this monitoring the version of contractual times?

17              Ask her about the contracting terms.  But

18    other than, it's beyond the scope.  And I'll

19    instruct her not to answer.

20              MR. KO:  Can you please stop with the         03:07:08

21    speaking objections.

22              MR. BLUME:  I'm -- I'm giving her

23    instruction, David.  She has to understand my

24    instruction.  Okay?

25              My instruction is beyond --                   03:07:15
```

Page 198

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1              (Simultaneously speaking.)              03:07:15

2              MR. KO:  Correct.  And then you can

3     object to form --

4              MR. BLUME:  Beyond -- it's -- don't -- if

5     you interrupt me, she can't take down what I'm    03:07:16

6     saying.

7              My instruction is it's beyond the scope.

8     And I would instruct her not to answer.

9              MR. KO:  Special Master Garrie, there is

10    a clear and unambiguous rule in the              03:07:28

11    Northern District of California that counsel

12    defending a deposition are not permitted to lodge

13    speaking objections on the record.

14              If Mr. Blume --

15              MR. BLUME:  Unless it's an instruction -- 03:07:39

16              MR. KO:  -- has a problem --

17              MR. BLUME:  Unless it's an instruction to

18    the witness.

19              SPECIAL MASTER GARRIE:  Well, wait.  Just

20    because I'm not -- wait.  Time-out.              03:07:45

21              (Simultaneously speaking.)

22              MR. KO:  Not -- not to answer.

23              MS. WEAVER:  Time-out.  Just because I'm

24    not talking doesn't mean that it's an invitation to

25    speak.  This means I'm thinking of what I'm going  03:07:51
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    to say.                                           03:07:54

 2           I believe, Counsel Blume, you're

 3    instructing her not answer because it's beyond the

 4    scope.

 5           Is that not your instruction?             03:08:07

 6           MR. BLUME:  That is what I was

 7    articulating, yes.

 8           SPECIAL MASTER GARRIE:  Okay.  Can you

 9    lean in so I can hear the objections better, just

10    for my own edification.                          03:08:16

11           MR. BLUME:  Yeah, my -- yeah, we

12    eliminated a microphone to try to stop the

13    feedback.  So yes.

14           SPECIAL MASTER GARRIE:  Okay.  I'm

15    going to -- okay.  So that objection is fine.    03:08:25

16           The objections going forward, please

17    finish the objection and just state the objection,

18    hearsay, whatever -- everybody here knows the

19    federal rules.  So state the objection.  And we'll

20    move it forward.                                 03:08:40

21           If your instruction, though, is to

22    instruct the witness -- your witness not to answer

23    the question because it's beyond the scope, because

24    of attorney-client privilege, you're well within

25    your rights to make said instruction.            03:08:49
```

                                                      Page 200

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1              I noted, Counsel Ko, for the record.          03:08:51

2     Please, Counsel Blume, on a going forward basis,

3     make sure that you continue with your objections

4     being concise and in compliance with federal rules

5     and we will continue forward.                          03:09:04

6              Counsel Ko -- but I want to just say,

7     Counsel Blume, just instruct her not to answer.

8     The whole reason why isn't -- I instruct the

9     witness not to answer because it's beyond the scope

10    of the -- beyond -- beyond the scope.                  03:09:18

11         Okay?

12         MR. BLUME:  Understood.

13         MR. KO:  To make it clear --

14         MR. BLUME:  Is this a good time to take a

15    break.                                                 03:09:24

16         MR. KO:  To be clear -- yeah, why don't

17    we go off the record.

18         SPECIAL MASTER GARRIE:  One second,

19    Counsel Ko.  I'll welcome your comment in 30

20    seconds.                                               03:09:31

21         MR. KO:  Okay.

22         SPECIAL MASTER GARRIE:  No, I finished,

23    Counsel Blume.  I just -- I have one more sentence

24    unrelated to -- I was going to suggest, if we're at

25    a breaking point, given that we take a break after    03:09:45
```

Page 201

| | | |
|---|---|---|
| 1 | I hear from Counsel Ko's point, and then | 03:09:50 |
| 2 | Counsel Ko, I -- I welcome your point now. | |
| 3 | MR. KO:  So the -- the instruction not to | |
| 4 | answer has to relate to a privilege.  It is | |
| 5 | improper to instruct an answer -- or instruct a | 03:10:03 |
| 6 | witness not to answer on the grounds that it's | |
| 7 | beyond the scope. | |
| 8 | Mr. Blume can lodge his objection for the | |
| 9 | record and it's noted, but -- but the witness must | |
| 10 | try and answer the question.  It's not privileged. | 03:10:15 |
| 11 | This is not privileged information. | |
| 12 | SPECIAL MASTER GARRIE:  Counsel Ko -- | |
| 13 | MR. BLUME:  It is -- | |
| 14 | SPECIAL MASTER GARRIE:  Wait.  Wait. | |
| 15 | That's not a -- direct your arguments to me not to | 03:10:21 |
| 16 | each other, please. | |
| 17 | That doesn't -- noted, Counsel Ko.  It | |
| 18 | doesn't mean that he's not entitled to state his | |
| 19 | objection and state -- instructing his client not | |
| 20 | to answer.  His client can say "I am not going to | 03:10:36 |
| 21 | answer a question at -- per the direction of | |
| 22 | counsel."  And then you can then respond to | |
| 23 | accordingly.  But we have to let the process play | |
| 24 | out in the -- in that fashion and we will address | |
| 25 | it accordingly. | 03:10:50 |

Page 202

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              Counsel Blume --                    03:10:52

 2              MR. BLUME:  May I be heard?

 3              SPECIAL MASTER GARRIE:  -- what were you

 4    going to say?

 5              MR. BLUME:  Yeah.  It's -- that --   03:10:54

 6    that -- that doesn't apply in a 30(b)(6) setting

 7    when the witness has been called per notice to

 8    speak on behalf of the organization --

 9              SPECIAL MASTER GARRIE:  I haven't

10    ruled -- wait.  Time-out, Counsel Blume, I      03:11:03

11    haven't --

12              MR. BLUME:  Well, I'm responding to the

13    privilege.  That's not the standard --

14              MS. WEAVER:  I understand.  I understand.

15    Counsel Blume, I intentionally didn't rule on that  03:11:10

16    and I didn't address it --

17              MR. BLUME:  Oh, okay.

18              SPECIAL MASTER GARRIE:  -- because it's

19    not here and now.

20              MR. BLUME:  Fair enough.              03:11:16

21              SPECIAL MASTER GARRIE:  If your

22    instruction is as such, then -- and Counsel Ko

23    will -- how about this.  This what I suggest.

24              I understand your point, Counsel Ko.  You

25    can reask the question when we return from a    03:11:25
```

                                              Page 203

```
 1    five-minute break.  You can reask the question.        03:11:28

 2            If Counsel Blume wants to instruct the

 3    witness not to answer the question and Counsel --

 4    and the witness wants to respond.  And then you

 5    want to point out that that's not a valid objection    03:11:36

 6    under the federal rules.  And then Counsel Blume

 7    wanties to respond with regards to 30(b)(6) and

 8    then I get to make a ruling, great.

 9            But what we're going to do right now is

10    we're going to take a five-minute break and we'll      03:11:46

11    resume in five minutes.

12            And I note that and I appreciate,

13    Counsel Ko, your position.  And -- and

14    Counsel Blume as well.

15            Okay?                                           03:11:56

16            MR. BLUME:  Thank you, Your Honor.

17            SPECIAL MASTER GARRIE:  Thank you.  So we

18    will return in five minutes.  So I'm just looking

19    at the Zoom time clock.  Five minutes.  Whatever

20    time zone you're in.                                    03:12:05

21            THE VIDEOGRAPHER:  Okay.  And we're off

22    the record at 3:12 p.m.

23            (Recess taken.)

24            THE VIDEOGRAPHER:  Okay.  We're back on

25    the record.  It's 3:24 p.m.                             03:24:30
```

Page 204

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1            SPECIAL MASTER GARRIE:  I was giving some      03:24:34

 2    thought to a -- our prior discourse, and I just

 3    wanted to -- two important things.

 4            One, let's make sure that every -- we're

 5    not all in the same room and this is being done      03:24:42

 6    virtually, so let's make sure that we're respectful

 7    to let everybody get their words out, in part for

 8    the -- so the court reporter doesn't have to go

 9    back and listen to this whole thing, painstakingly,

10    to transcript it properly.                           03:24:55

11            Next, same for the objections.  Let --

12    let them get said.  But keep them limited to the

13    federal -- just to the rules, right.

14            And -- and from there, I'll turn it -- I

15    believe to -- Counsel Blume, you mentioned that the  03:25:11

16    witness -- you're muted so I can exactly figure out

17    who's speaking on the Zoom.  So if you wanted to

18    say anything, Counsel Blume...

19            MR. BLUME:  Yes.  Yes.  The witness has a

20    clarification.                                       03:25:26

21            SPECIAL MASTER GARRIE:  Okay.

22            THE DEPONENT:  May -- may I go ahead?

23            SPECIAL MASTER GARRIE:  Yeah.

24            THE DEPONENT:  So I want to correct my

25    earlier testimony about the fact that there was a    03:25:34
```

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | platform policy change in connection with the move | 03:25:40 |
| 2 | from the -- the launch of v2. | |
| 3 | Actually, we also, in April on the same | |
| 4 | date, announced the update to login v4.  And so the | |
| 5 | policy that I was referring to was tied to the v4 | 03:25:57 |
| 6 | login product.  But it happened at the same time as | |
| 7 | the announcement of the v2 version of the Graph | |
| 8 | API. | |
| 9 | So I just wanted to make sure I corrected | |
| 10 | myself because I was mistaken on how I communicated | 03:26:12 |
| 11 | that and realized it during the break. | |
| 12 | SPECIAL MASTER GARRIE:  Noted for the | |
| 13 | record. | |
| 14 | With that said, Counsel Ko, I'm going | |
| 15 | to -- thank you for the clarification. | 03:26:23 |
| 16 | And Counsel Ko, I'll turn it back over to | |
| 17 | you. | |
| 18 | MR. KO:  Thank you, | |
| 19 | Special Master Garrie.  And thank you, Ms. Hendrix, | |
| 20 | for that clarification. | 03:26:35 |
| 21 | Q.   (By Mr. Ko)  So let me unpack that a | |
| 22 | little bit to make sure I understand. | |
| 23 | With that clarification, are you | |
| 24 | suggesting or indicating that there was not a | |
| 25 | platform policy change in connection with the | 03:26:47 |

Page 206

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1   launch of v2?                                          03:26:50

 2       A.   Not tied to the v1 to v2, that is

 3   correct.

 4       Q.   So when Facebook began the rollout of

 5   Graph v. -- Graph v2, in April of 2014, there was      03:27:10

 6   not a corresponding platform policy change that

 7   reflected the launch of Graph v2; is that correct?

 8       A.   There's a few inaccuracies in your

 9   question in how we described the -- the v1 to v2.

10       Q.   Let me ask it this way.                       03:27:45

11            In the transition from Graph v1 to v2,

12   that began in April of 2014, was there any

13   reference to any -- to any aspect of the platform

14   policy that reflected the move by Facebook to

15   Graph v2?                                              03:28:11

16       A.   No.

17       Q.   Now, in connection with the deprecation

18   of -- by Facebook of allowing third parties to

19   access friends information, was that deprecation

20   reflected in any SRR in 2014, or otherwise?            03:28:42

21            MR. BLUME:  Objection.  Form.

22            THE DEPONENT:  Yes, as to otherwise,

23   because we're talking about 2007, all the way to

24   today.

25       Q.   (By Mr. Ko)  So the deprecation of friend     03:29:08
```

Veritext Legal Solutions
866 299-5127

1    sharing by Facebook was reflected in SRRs        03:29:13

2    post-2014, I presume; is that your testimony?

3              MR. BLUME:  Objection.

4              THE DEPONENT:  No, that's not my

5    testimony.                                        03:29:26

6         Q.   (By Mr. Ko)  Okay.  Was -- was there any

7    SRR, at any point in time over the relevant time

8    period, that reflected the deprecation of friend

9    data?

10        A.   Friend permissions.  And, yes, at some   03:29:48

11   point in time when it was appropriate, we did make

12   changes to the relevant terms and policies.

13        Q.   And when was that?

14        A.   I don't recall the precise date today,

15   but it would have been when v1 was no longer       03:30:11

16   relevant, because it would be improper to delete

17   those disclosures to people who were using apps

18   that were still using version 1 of the platform.

19        Q.   And while you don't recall the precise

20   date, do you have a general understanding of what  03:30:29

21   time period we're referring to?

22              Is it -- I'm assume it's sometime after

23   2014, right?

24              So is there a general time frame in which

25   you understand that these changes were made in the 03:30:39

                                                 Page 208

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    SRR?                                          03:30:43

 2        A.    It -- it would -- it would have been

 3    after the May 2015 date.  But the precise timing

 4    thereafter, I don't remember, sitting here today.

 5        Q.    And what's the significance of May 2015?   03:31:08

 6        A.    Well, developers -- when we announced

 7    that we were deprecating friend permissions and

 8    that's why -- sorry.  I'll stop.

 9             When we were deprecating friend

10    permissions, we gave them -- we announced that they   03:31:26

11    had a year -- subject to our breaking change policy

12    decision -- to give them a year to transition and

13    configure their apps and build them on v2.

14        Q.    And where -- when you say that "we

15    announced it," What do you mean by that?       03:31:45

16        A.    We told -- we announced at F8, our

17    developer event -- to developers that we were

18    changing the way that the platform worked;

19    specifically, moving from v1 to v2.  And that they

20    had one year up to -- to -- to make those changes    03:32:07

21    to move from v1 over to v2.

22        Q.    That announcement at the F8 conference

23    that you're referring to, that -- that was made in

24    2014, correct?

25        A.    Yes.  And there were many other like      03:32:23
```

1    public -- like newsrooms posts and things.  So I          03:32:25

2    shouldn't have limited my response to just the F8

3    developer event.  But that was one of -- of -- of

4    the announcements that I recalled.

5         Q.   And so when you're saying May 2015, are        03:32:42

6    you saying that as of May 2015, Facebook gave one

7    year to developers to conform to the new model, or

8    are you saying that by May 2015, all users were

9    expected to comply with the new depre- -- with the

10   deprecation of -- of friend data?                        03:33:01

11        MR. BLUME:  Objection.

12        THE DEPONENT:  The terms you've used

13   don't make sense.

14        Q.   (By Mr. Ko)  Okay.  You -- you testified

15   that that Facebook announced it would give              03:33:11

16   developers one year to comply.

17        Do you recall that?

18        A.   It's not compliance.  So no, I don't

19   think I said the word "comply."  If I did, maybe --

20   maybe I'm getting tired.  But I -- I don't think I     03:33:28

21   would have said that.

22        Q.   Okay.  I believe -- that's fair.  I think

23   you said "changes."

24        You said you -- Facebook announced that

25   they would give developers one year to make the        03:33:38

Page 210

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    changes to move from v1 over to v2.                    03:33:41

2              When did they make that announcement?

3         A.   The announcement was made in

4    April of 2014.  So to the extent the developers

5    wanted to continue to use the platform and offer      03:33:57

6    their apps to people, they would need to make the

7    changes by a year from the date of the

8    announcement.

9         Q.   So when you're referring to May of 2015,

10   it was Facebook's intention that all developers        03:34:11

11   would have made the changes to move from v1 over to

12   v2, correct?

13              MR. BLUME:  Objection.  Form.

14              THE DEPONENT:  The goal was to get the

15   developer community to move over.  The 90-day          03:34:33

16   breaking change policy is normally what we do.  But

17   we agreed and came up with an arbitrary date of one

18   year.

19        Q.   (By Mr. Ko)  And when you say that "We

20   agreed of an arbitrary date of one year," what         03:34:49

21   departments or individuals were responsible for

22   that decision?

23              MR. BLUME:  Objection.  Beyond the scope.

24              THE DEPONENT:  The same group of teams

25   that I've referred to earlier today that work on       03:35:06

                                                        Page 211

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    platform products and policies.                    03:35:09

 2         Q.   (By Mr. Ko)  Now, after May of 2015,

 3    certain third parties continued to access friend

 4    data, correct?

 5              MR. BLUME:  Objection.  Beyond the scope,  03:35:24

 6    which -- unless you tell me what topic, I'm going

 7    to instruct her not to answer.

 8              THE DEPONENT:  Yeah.  It's fundamentally

 9    related, Rob, to topic 3, including topic 3c.

10              MR. BLUME:  And --                        03:35:42

11         Q.   (By Mr. Ko)  Let me ask it this way,

12    Ms. Hendrix --

13              (Simultaneously speaking.)

14              MR. BLUME:  -- I'm happy to go off --

15         Q.   (By Mr. Ko)  -- are you --                03:35:45

16              MR. BLUME:  I'm happy to go off the

17    record -- so we don't waste time -- and talk about

18    it --

19              MR. KO:  No --

20              MR. BLUME:  -- but --                     03:35:45

21              MR. KO:  No, I -- I want to make this --

22              MR. BLUME:  -- the question -- yeah.

23    Well, let me finish.

24              MR. KO:  I want to put this on --

25              MR. BLUME:  And I'm happy to --           03:35:53
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1            MR. KO:  Go ahead.                        03:35:53

 2            MR. BLUME:  Then we can go on the record.

 3     And - hold on.  You -- you can -- hold -- I'm

 4     asking --

 5            SPECIAL MASTER GARRIE:  Stop.  We're        03:35:54

 6     still on the record.  You're still talking over

 7     each other and the court reporter can't type

 8     anything.

 9            So Counsel Blume, make your statement.

10     Counsel Ko, make your statement.                  03:36:02

11            MR. BLUME:  So the question --

12            SPECIAL MASTER GARRIE:  You objected --

13     what was your -- you objected, Counsel Blume,

14     saying beyond the scope.  Unless he can --

15            MR. BLUME:  Yes.                            03:36:12

16            SPECIAL MASTER GARRIE:  -- counsel can

17     provide you the indication of why -- what is within

18     the scope of what this witness has been submitted

19     to.

20            Counsel Ko, did you respond?  I believe     03:36:22

21     you did.

22            MR. BLUME:  He did.

23            SPECIAL MASTER GARRIE:  Okay.  And

24     then --

25            MR. KO:  Yeah, I identified topic 3 and      03:36:27
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1   3c, in particular.                                03:36:29

 2            SPECIAL MASTER GARRIE:  Okay.  And then,

 3   Counsel Blume, did you respond to that?

 4            MR. BLUME:  I did.  And I -- and -- and

 5   my -- well, I didn't -- but my response was that as  03:36:37

 6   it -- topic 3 is "An overview of processes of

 7   developing Privacy or App Settings or other

 8   controls made available to Users to prevent or

 9   limit their Data from being accessed by Third

10   Parties," including dates and the data.            03:36:55

11            So it's controls -- it's processes for

12   developing controls available to users.

13            And c is including "Facebook's monitoring

14   and enforcement of contractual terms with Third

15   Parties regarding their use of Users' Data or      03:37:07

16   Information, including enforcement of Policies

17   regulating access to such Data or Information

18   beyond the Use Case."

19            And the question was, certain third

20   parties continue to access friend data, which is   03:37:19

21   beyond the processes of developing apps privacy or

22   app settings made available to users.

23            SPECIAL MASTER GARRIE:  And Counsel Ko,

24   what was your response?

25            MR. KO:  My response is that Facebook's    03:37:44
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1    monitoring and enforcement of its contractual terms      03:37:47

2    with third parties regarding their use -- use of

3    users' data and -- or information, obviously

4    includes a user's -- information related to a

5    user's friends.  And also includes information           03:38:06

6    related to friend sharing, of which Ms. Hendrix has

7    clearly testified was deprecated in 2014, with a

8    one-year grace period.

9              And so in order for us to understand how

10   Facebook actually monitored and enforced this            03:38:22

11   purported deprecation, I am certainly allowed to

12   ask this witness about that monitoring and

13   enforcement.

14             And if -- I would note, if Ms. Hendrix is

15   not the appropriate witness and Mr. Blume has not        03:38:36

16   prepared Ms. Hendrix to testify as to these topics,

17   we would request that Facebook provide a witness

18   that can.

19             MR. BLUME:  There -- and there is a

20   witness on third-party data and -- and -- in             03:38:51

21   topic 2.

22             But Ms. Hendrix is here to speak about

23   processes or monitoring enforcement.  Not -- not

24   any specificity with regard to whether third

25   parties accessed friend data.  That's another topic      03:39:07
```

Page 215

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    noticed.                                          03:39:11

 2          She's here to talk about the processes of

 3    developing controls focused on monitoring

 4    enforcement, not the actual acts of the third

 5    parties in a specific date and time.               03:39:21

 6          MR. KO:  Well, Mr. Blume, I'm so glad

 7    that you referred to topic 2 --

 8          SPECIAL MASTER GARRIE:  Counsel Ko --

 9    what was your response, Counsel Ko?

10          MR. KO:  So I was saying, I'm -- I'm --     03:39:32

11    I'm glad that Mr. Blume referenced topic 2b and 2d,

12    which Ms. Hendrix testified to earlier as being

13    related to topic 3.

14          (Simultaneously speaking.)

15          MR. BLUME:  That's not what I said.          03:39:41

16          MR. KO:  But 2d, in particular -- 2d, in

17    particular, asks and requests Facebook to provide a

18    witness to identify the category and the type of

19    data or information which Facebook sold, made

20    accessible or made available, including how -- as    03:39:57

21    2d indicates, "How Facebook ensured Third Parties'

22    use of such Data or Information was limited to the

23    Use Case."

24          SPECIAL MASTER GARRIE:  Okay.  Is that

25    Ms. Hendrix or not?                                03:40:09
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1              MR. BLUME:  It --                        03:40:11

2              MR. KO:  Right.  That's what I want to

3    know.

4              MR. BLUME:  Yeah, it is -- it --

5              SPECIAL MASTER GARRIE:  No.  No.  One      03:40:15

6    second, Counsel.

7              MR. KO:  Well, who he is --

8              SPECIAL MASTER GARRIE:  I'm asking the

9    questions now.

10             So Counsel Blume --                       03:40:17

11             MR. BLUME:  Yes.

12             SPECIAL MASTER GARRIE:  -- just for my

13   clarification, has she been submitted as a

14   witness -- 30(b)(6) witness on 2e?

15             MR. BLUME:  "How Facebook ensured Third    03:40:27

16   Parties" Use of such Data."

17             It's -- it's -- it is the policies and

18   procedures that allow Facebook to monitor third

19   parties' use of data.

20             The question was:  "Question:  Now, after  03:40:37

21   May of 2015, certain third parties continued to

22   access friend data."

23             That doesn't go to Facebook's policies or

24   procedures or processes that were developed in

25   order to monitor third parties over -- between 2007  03:40:51
```

Page 217

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | and -- and present.  It goes to what were the | 03:40:54 |
| 2 | actions of third parties in May of 2015. | |
| 3 | That is beyond the scope of 2d.  It is | |
| 4 | beyond the scope of topic 3.  If they wanted to ask | |
| 5 | or create a topic that said identify all | 03:41:04 |
| 6 | third-party applications that continue to access | |
| 7 | friend data or use friend data at any time, they | |
| 8 | could have.  It's not how they worded their topics. | |
| 9 | Ms. -- Ms. -- Ms. Hendrix is a -- is -- | |
| 10 | is on -- focuses on policies, procedures.  She's | 03:41:19 |
| 11 | been doing it her whole career.  And she's happy to | |
| 12 | talk about what those policies and procedures are | |
| 13 | for monitoring the -- the -- the acts and -- and | |
| 14 | accesses of -- of third party.  And how Facebook | |
| 15 | ensured that -- that the use of data was limited to | 03:41:36 |
| 16 | the use case; that is, the agreements of the | |
| 17 | developers.  Policies and procedures not -- | |
| 18 | SPECIAL MASTER GARRIE:  I got it.  I got | |
| 19 | it. | |
| 20 | MR. BLUME:  -- actual -- | 03:41:47 |
| 21 | SPECIAL MASTER GARRIE:  I got it.  I | |
| 22 | got -- I understand Facebook's position. | |
| 23 | Counsel Ko? | |
| 24 | MR. KO:  I have two responses, | |
| 25 | Special Master Garrie. | 03:41:58 |

Page 218

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | One, it is bit divorced from reality if | 03:41:58 |
| 2 | one can only testify as to the policies and | |
| 3 | procedures and not the facts for which those | |
| 4 | policies and procedures can be applied. | |
| 5 | So my question with respect to whether or | 03:42:10 |
| 6 | not third parties continued to access information | |
| 7 | about a friend or a user's friend, obviously | |
| 8 | relates to the policies -- the ultimate policies | |
| 9 | and procedures that Facebook applied. | |
| 10 | Such that Ms. Hendrix, as Mr. Blume is | 03:42:26 |
| 11 | indicating, has spent her life enforcing certain | |
| 12 | policies and procedures that relate to the | |
| 13 | monitoring and enforcement of user information. | |
| 14 | Secondly, and a more practical point, is | |
| 15 | as follows:  Ms. Hendrix is the one that described, | 03:42:42 |
| 16 | in response to one of my questions, her knowledge | |
| 17 | of friend deprecation.  And so I am perfectly | |
| 18 | entitled to explore her knowledge of friend | |
| 19 | deprecation, which is exactly what I'm doing. | |
| 20 | And she seems to be fully aware of | 03:43:00 |
| 21 | several aspects of friend deprecation, which | |
| 22 | obviously is a key claim in this case.  And so of | |
| 23 | course -- | |
| 24 | SPECIAL MASTER GARRIE:  I got it. | |
| 25 | MR. KO:  -- I'm able to ask her questions | 03:43:11 |

Page 219

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    about that.                                   03:43:12

2          SPECIAL MASTER GARRIE:  Okay.  Okay.  So

3    just so I understand, Counsel Blume, did you

4    instruct her not to answer?

5          Just -- I can scroll back up to see     03:43:21

6    what --

7          MR. BLUME:  Yes.  I'm not -- I'm not --

8    they will have Ms. Hendrix in her personal capacity

9    and he's free to ask her what she knows.

10         But as a corporate representative,    03:43:34

11   she's un- -- she is prepared to talk about topics

12   relating to the processes and procedures, not with

13   regard to the actions of specific third parties.

14         SPECIAL MASTER GARRIE:  And I -- I

15   understand --                           03:43:46

16         (Simultaneously speaking.)

17         MR. BLUME:  Other than that -- let's put

18   it this way --

19         SPECIAL MASTER GARRIE:  And I

20   understand --                           03:43:46

21         MR. BLUME:  So, yes, I'm instructing --

22   I'm instructing her, at this point, not to answer

23   that question.  She's not prepared to speak to it

24   today.  And it's not because it's not covered by

25   her topics.                              03:43:57

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              Maybe if I can add one thing,          03:43:58

 2    Special Master Garrie, that may be helpful.

 3              The -- the -- under compulsion, Facebook

 4    provided a ton of material, as you know, on ADI,

 5    which was a review of this very question which now   03:44:41

 6    they have.  That is not a topic.  And that --

 7    because that -- and that was focused on in review

 8    of whether or not -- the very question that --

 9    that -- that Mr. Ko asked, which is did third

10    parties continue to access friend data after the    03:44:58

11    deprecation and accountability.  So it's just not

12    one of the -- the topics --

13              MS. WEAVER:  Can I ask one question?

14              SPECIAL MASTER GARRIE:  Well, no, no, no.

15    One -- one defendant and one take.  I apologize,     03:45:11

16    Counsel.  We were -- unless -- was that the

17    witness -- I can't see people who are muted.

18              But one take, one defendant.  I,

19    apologize, Counsel Weaver, that's the standard

20    here.                                                03:45:19

21              So I don't believe she's prepared --

22    the -- the witness is prepared to answer your

23    question, Counsel Ko, at this point, in capacity as

24    a 30(b)(6) witness on behalf of the company.  She's

25    here, so --                                          03:45:43
```

Page 221

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1            MR. KO:  And I --                         03:45:44

 2            SPECIAL MASTER GARRIE:  And I -- I

 3     understand your position and -- and I note it.  And

 4     I understand it.

 5            We haven't heard if she will answer or      03:45:50

 6     not.  So before we advance further down the path,

 7     Ms. Hendrix, I -- I have to -- if I look like I'm

 8     looking away, it's because I have two monitors and

 9     I'm just trying to read the prior testimony on that

10     to see if you actually -- what your answer was.     03:46:11

11            Directing her not to answer -- okay.

12     Before --

13            MR. KO:  The question was at 3:35,

14     Special Master Garrie.

15            "After May of 2015 certain third parties     03:46:36

16     continued to access friend data, correct?"

17            SPECIAL MASTER GARRIE:  Okay.  Well, in

18     the off chance, Ms. Hendrix, are you going to -- do

19     you want -- I -- are -- you've been instructed by

20     your lawyer, are you going to answer the question?   03:47:11

21            THE DEPONENT:  I thought I had said

22     earlier, I don't remember the precise -- I don't

23     remember the precise date.  I think that it's

24     actually referred to in the FTC order.

25            But to point you to a public, you know,       03:47:26
```

Page 222

```
 1    document, but -- I don't remember.  I just          03:47:28

 2    know that -- and I also would like to -- for the

 3    record, I never said grace period.  And we don't

 4    refer to our breaking changes as grace periods.

 5          So I'd like to correct that.  And I            03:47:38

 6    haven't been doing this also my entire life, I'd

 7    like to correct.  I have only been doing this since

 8    I joined in October of 2008.

 9          But all of the relevant disclosures and

10    privacy settings that needed to be in place were --  03:47:52

11    I can testify with 100 percent, that they stayed in

12    place and changes were made once that we were

13    certain no longer friend information or friend

14    permissions were being made available to

15    third-party apps.                                    03:48:08

16          SPECIAL MASTER GARRIE:  That's

17    sufficient.

18          Counsel Ko, next question.

19          THE DEPONENT:  Thank you.

20      Q.   (By Mr. Ko)  Okay.  With respect to           03:48:17

21    topic 2d, Ms. Hendrix, are you prepared to testify

22    on that topic as it relates to friend sharing and

23    the deprecation of -- of friend sharing in

24    connection with Graph v2?

25      A.   I believe I am.                               03:48:40
```

Page 223

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        Q.   Great.                                    03:48:48

 2             So since you are prepared to testify on

 3     that topic, are you aware of any third parties that

 4     continue to access friend data following the

 5     deprecation of -- of friend sharing in connection    03:48:56

 6     with Graph v1?

 7             MR. BLUME:  Objection.  Same objection.

 8             D is how Facebook ensured third parties'

 9     use of data was limited to the use case, which is

10     policies, procedures and the enforcement of          03:49:12

11     policies and procedures.

12             MR. KO:  Is there anything, Mr. Blume in,

13     topic 2 that refers to policies and procedures?

14             I don't know why you keep raising that.

15             MR. BLUME:  It -- it relates to the          03:49:23

16     category -- identification of type of data or

17     information to which Facebook sold, which it didn't

18     as she testified, made accessible, made available

19     or allowed.  So it's not what actually occurred,

20     what the third parties specifically did.             03:49:35

21             But the type of data, including d, how

22     Facebook ensured that the use of that data was

23     limited to the use case, which is enforcement

24     mechanisms behind the policies.  It's not which

25     third parties -- what third parties were doing       03:49:52
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1    when.                                              03:49:54

2           MR. KO:  Now I am going to request,

3    Special Master Garrie, that we go off the record

4    because we've been talking about this point for

5    15 minutes and I have a suggestion as to how to    03:50:01

6    move forward.

7           SPECIAL MASTER GARRIE:  Okay.  We'll go

8    off the record for -- but when we go back on the

9    record, I'm going to rule.

10          MR. KO:  Yup.  Thank you.  So I -- can we    03:50:15

11   do it this way, Special Master Garrie?  If -- if --

12   if this --

13          (Brief interruption.)

14          MR. KO:  I'm sorry.  Sorry.

15          THE COURT REPORTER:  John, go off.           03:50:23

16          THE VIDEOGRAPHER:  You guys want to go

17   off the record, just to be sure?

18          SPECIAL MASTER GARRIE:  Off the record.

19   Thank you.

20          THE DEPONENT:  Thank you.  We're off the     03:50:32

21   record.  It's 3:50 p.m.

22          (Recess taken.)

23          THE VIDEOGRAPHER:  We're back on the

24   record.  It's 4:09 p.m.

25      Q.  (By Mr. Ko)  Ms. Hendrix, thank you for      04:09:58
```

Page 225

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | allowing the lawyers and Special Master Garrie to | 04:09:59 |
| 2 | do their legal thing.  But I just want to make sure | |
| 3 | that the record is clear with respect to your | |
| 4 | answer to the following question. | |
| 5 |      With respect to topic 2d or 3c, are you | 04:10:11 |
| 6 | prepared to testify on either of these topics as | |
| 7 | they relate to friend sharing and the deprecation | |
| 8 | of friend sharing in connection with Graph v2? | |
| 9 |      MR. BLUME:  Yes, she is.  And we said | |
| 10 | that at the outset. | 04:10:38 |
| 11 |      MR. KO:  I was asking Ms. Hendrix, not | |
| 12 | you -- | |
| 13 |      (Simultaneously speaking.) | |
| 14 |      MR. BLUME:  But it's a -- it's a legal -- | |
| 15 | it's a legal question on prepare.  You already | 04:10:41 |
| 16 | asked that in the third question of the day. | |
| 17 |      Yes, she's prepared to do that, except as | |
| 18 | it relates to targeted advertising. | |
| 19 |    Q.  (By Mr. Ko)  Ms. Hendrix, can you answer | |
| 20 | that question? | 04:10:55 |
| 21 |      MR. BLUME:  It's -- it's -- okay.  You've | |
| 22 | asked and answered. | |
| 23 |      You can answer.  Go ahead. | |
| 24 |      THE DEPONENT:  It's still yes. | |
| 25 |    Q.  (By Mr. Ko)  Thank you. | 04:11:06 |

Page 226

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | And as it relates to third-party app | 04:11:07 |
| 2 | developers that actually continued to access friend | |
| 3 | information post-deprecation of this friend | |
| 4 | sharing, are you prepared to testify on that topic? | |
| 5 | MR. BLUME:  I'm -- objection. | 04:11:24 |
| 6 | THE DEPONENT:  When v1 was deprecated, | |
| 7 | there was no concept of requesting friend | |
| 8 | permissions from people. | |
| 9 | Q.   (By Mr. Ko)  What do you mean when you | |
| 10 | say there was no concept of requesting friend | 04:11:46 |
| 11 | permissions from people? | |
| 12 | A.   I mean the product -- it just wouldn't | |
| 13 | work, right.  If you didn't move your app and build | |
| 14 | off of v2, from a technical standpoint at | |
| 15 | deprecation of v1, you could no longer call the | 04:12:01 |
| 16 | Graph API and receive any friend permissions. | |
| 17 | There was no longer the ability to request friend | |
| 18 | permissions. | |
| 19 | You've said friend sharing and friend | |
| 20 | data.  I just want to make sure we're clear. | 04:12:16 |
| 21 | Because today you can ask people to share their | |
| 22 | inapp friend list which returns, of course, the | |
| 23 | friend -- public friend profile picture and name, | |
| 24 | if that person hasn't opted out of platform. | |
| 25 | So that's why this terminology is really | 04:12:30 |

Page 227

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    important here.  So friend permissions, once v1 was      04:12:34

 2    fully deprecated, are no longer a thing from a

 3    product perspective.

 4              MR. BLUME:  There you go.

 5         Q.   (By Mr. Ko)  Are you familiar with the         04:12:46

 6    term whitelisting?

 7         A.   Yes.

 8         Q.   What's your understanding of that term?

 9         A.   It's -- it's --

10              MR. BLUME:  Hold --                             04:12:54

11              THE DEPONENT:  Yeah.

12              MR. BLUME:  -- hold on.  Now, this is

13    clearly topic 7.

14              MR. KO:  That is not.  You have a

15    superficial understanding of these topics,               04:13:00

16    Mr. Blume.

17              MR. BLUME:  I --

18              (Simultaneously speaking.)

19         Q.   (By Mr. Ko)  Can you please answer that

20    question --                                              04:13:06

21              MR. BLUME:  Wow.  Was that -- was that --

22    was that -- was that a personal insult?  Wow.

23              MR. KO:  No.

24              Whitelisting -- topic 7 is discuss

25    whitelisting.  What -- the -- here -- the -- the         04:13:15
```

Page 228

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    problem is you --                              04:13:17

 2            SPECIAL MASTER GARRIE:  One sec,

 3    Counsel Blume, is your --

 4            MR. KO:  Note your objection.

 5            SPECIAL MASTER GARRIE:  Counsel Ko,    04:13:23

 6    Counsel Blume, I will say it one more time.  Say

 7    the objection.

 8            I believe the objection, Mr. --

 9    Counsel Blume, you're saying is objection.  Beyond

10    the scope of what this witness is here to testify   04:13:31

11    to.

12            Is that your objection or is --

13            MR. BLUME:  Yeah.  Well, the -- he got

14    his first answer answered.  But we thought about it

15    off the record.  So that's done.              04:13:41

16            But now he's moving it to what is

17    topic 7, whitelist particular apps.  So I'm -- I'm

18    hard-pressed to see where that falls in her topics.

19            SPECIAL MASTER GARRIE:  Is your

20    objection --                                  04:13:55

21            MR. BLUME:  So the objection is beyond

22    the scope.

23            SPECIAL MASTER GARRIE:  Got it.

24            Counsel Ko.

25            MR. KO:  Well, I mean, my position is    04:14:00
```

Page 229

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1    very consistent with how it has been before.        04:14:01

2            Mr. Blume is perfectly entitled to note

3    his objection for the record.  But I would ask that

4    Ms. Hendrix answer the question regardless.

5            And more importantly, when I asked her        04:14:11

6    first if she was familiar with the term

7    "whitelisting," she said yes.  And so I'm entitled

8    to understand what her understanding of that is.

9            MR. BLUME:  She's -- she -- as a

10   corporate representative --                           04:14:22

11           SPECIAL MASTER GARRIE:  She's here as a

12   30(b)(6) witness --

13           MR. BLUME:  Yeah.

14           SPECIAL MASTER GARRIE:  -- on specific

15   issues, Counsel Ko.  So if they relate to the        04:14:27

16   topics at issues, she is here to testify, please

17   show me the topic and issue she -- and how -- where

18   whitelist is stated.  And then I can then issue a

19   ruling on whether or not I will order the witness

20   to answer the question or not.                        04:14:45

21           MR. KO:  Special Master Garrie,

22   Facebook's monitoring and enforcement of third

23   parties is obviously related to both the continual

24   access of friends data and relatedly the

25   whitelisting by Facebook of certain third parties    04:14:59
```

Veritext Legal Solutions
866 299-5127

```
 1    to continue to access that data.                    04:15:03

 2            So the monitoring and enforcement of user

 3    information is fundamentally related to the

 4    whitelisting of these permissions.

 5            In addition, topic 2d indicates how         04:15:14

 6    Facebook ensured third parties' use of data or

 7    information was, in fact, limited to the use case.

 8            If there were whitelisting or exceptions,

 9    or any other special permissions that continued on

10    and that Facebook continued to allow third parties  04:15:30

11    to access, I am certainly entitled to explore and

12    elicit testimony regarding how Facebook monitored

13    and enforced those third parties.

14            SPECIAL MASTER GARRIE:  Can you read back

15    the question, Court Reporter.                       04:16:07

16            MR. KO:  I believe it was the question at

17    4:12:54, Rebecca.

18            THE COURT REPORTER:  So I'll read the

19    question before that.

20            (Record read as follows:                    04:16:44

21            "QUESTION: Are you familiar with the

22            term whitelisting?

23            "ANSWER:  Yes.

24            "QUESTION:  What's your understanding

25            of that term?")                              04:16:44
```

Page 231

1           MR. BLUME:  If I may be heard?              04:16:47

2           MR. KO:  I mean, the idea,

3    Special Master Garrie, is that I can't lay any

4    foundation --

5           SPECIAL MASTER GARRIE:  No, wait.  Stop.    04:16:54

6    I haven't ruled to -- just because I haven't --

7    as -- as it relates to the topics you're here to

8    testify about as whitelisting relates to those

9    topics, Ms. Hendrix, can you please answer the

10   question.                                         04:17:09

11          I note your objection, for the record,

12   Counsel Blume, but it's overruled.

13          As it relates to the topics you're here

14   to speak to, please provide your answer to the

15   question.                                         04:17:20

16          THE DEPONENT:  I just don't understand

17   how it relates to monitoring and enforcement.  If

18   friend permissions have been deprecated, then

19   there's no friend permissions to review, for

20   example, at app review, because developers from a  04:17:35

21   product technical perspective can't answer it.  So

22   it doesn't make any sense.  It's not -- it's not

23   related to why I'm here.

24      Q.   (By Mr. Ko)  Okay.  Are you prepared, in

25   connection with any of the topics that you have    04:17:50

                                                       Page 232

```
 1    been designated to speak on -- about, are you          04:17:53

 2    prepared to testify on behalf of Facebook as to any

 3    aspect of whitelisting at all?

 4              MR. BLUME:  You asked -- just asked that

 5    question and she just answered it.                     04:18:08

 6              MR. KO:  Stop, Mr. Blume.

 7              SPECIAL MASTER GARRIE:  No, you got to

 8    object, Counsel Blume, or let the question --

 9              MR. BLUME:  Asked and answered.  It

10    was --                                                 04:18:17

11              SPECIAL MASTER GARRIE:  Answer the

12    question.

13              MR. BLUME:  Special Master Garrie, it was

14    the question you just asked her.

15              SPECIAL MASTER GARRIE:  Well --              04:18:26

16              MR. BLUME:  Answer is the same.  You can

17    answer again.

18              THE DEPONENT:  I -- I agree that -- that

19    my response to Special Master Garrie's question is

20    accurate.  And I don't see how whitelisting is         04:18:36

21    relevant to the topics on why I'm -- I'm here

22    today.  Like I don't -- I don't see it.  And I'm

23    not trying to be evasive.  I just don't understand.

24    And I feel like Mr. Ko just might not understand.

25         Q.   (By Mr. Ko)  Yeah.  And -- and I'm -- I'm    04:18:53
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | trying to be very precise with my words.  And I | 04:18:54 |
| 2 | understand that you don't believe it's relevant. | |
| 3 | And so it's just a simple yes-or-no question, for | |
| 4 | the record. | |
| 5 | Are you prepared -- | 04:19:02 |
| 6 | SPECIAL MASTER GARRIE:  Go ahead. | |
| 7 | MR. KO:  Do you have an objection, Rob? | |
| 8 | MR. BLUME:  Yes.  Asked and answered now | |
| 9 | a third time.  This is just wasting time. | |
| 10 | Q.   (By Mr. Ko)  Not- -- notwithstanding | 04:19:16 |
| 11 | Mr. Blume's cracks on the record, are you prepared, | |
| 12 | Ms. Hendrix, to testify on any aspect of | |
| 13 | whitelisting as it relates to the topics you have | |
| 14 | been designated to testify on behalf of Facebook | |
| 15 | for. | 04:19:35 |
| 16 | MR. BLUME:  Objection. | |
| 17 | Special Master Garrie, does she have to | |
| 18 | now answer that a third time? | |
| 19 | SPECIAL MASTER GARRIE:  Did you -- was | |
| 20 | the answer in the affirmative, Ms. Hendrix? | 04:19:51 |
| 21 | I believe it was the first time.  The | |
| 22 | second time, I'm not sure.  The third time, I | |
| 23 | believe it was yes, but she's -- you're not sure | |
| 24 | how -- I'm -- can you just -- was it affirmative, | |
| 25 | yes? | 04:20:02 |

Page 234

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              I'm just -- I'm confused at this point.        04:20:02

 2      Just yes or no.

 3              THE DEPONENT:  I said yes to the specific

 4      question of whether I'm familiar with the topic of

 5      whitelisting, which is not a defined term.            04:20:12

 6              SPECIAL MASTER GARRIE:  No, no, no.

 7      That's not -- that's not the question.

 8              All I'm interested in is, are you -- the

 9      question was, are you prepared to testify on any

10      aspect of whitelisting as it relates to what you      04:20:24

11      have been designated to testify on behalf of

12      Facebook for.

13              THE DEPONENT:  I --

14              MR. BLUME:  Shall I read her answer?

15              She doesn't -- it doesn't -- one thing         04:20:39

16      doesn't relate to the other.  That's what she's

17      saying.  She says "I don't understand how it

18      relates."

19              And I think the problem,

20      Special Master Garrie, is that I don't think Mr. Ko   04:20:45

21      understands the concept and so -- which she said

22      now three times, "I don't understand how it relates

23      to monitoring and everyone.  If friend permissions

24      have been deprecated, then there's no friend

25      permissions to review."                               04:20:57
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1            SPECIAL MASTER GARRIE:  Well --        04:20:58

 2            MR. BLUME:  And so it doesn't relate to

 3       her topics.  It just doesn't relate.  It's the

 4       concept and that's -- my fear is that Mr. Ko

 5       doesn't understand the concept of whitelisting and   04:21:05

 6       so he's saying it --

 7            SPECIAL MASTER GARRIE:  Okay.  Then wait

 8       a second.  We can fix this.

 9            Can we -- define -- could you please

10       define, Ms. Hendrix, what whitelisting is for you?   04:21:15

11            MR. KO:  The question that I had --

12            MR. BLUME:  Personally.  But not --

13       not a -- not as a corporate representative.  How --

14       what she means -- what she --

15            (Simultaneously speaking.)                 04:21:21

16            SPECIAL MASTER GARRIE:  What she

17       understands in her capacity -- well, he -- she was

18       asked whether she is prepared to speak to

19       whitelisting in response to any of the topics she

20       is here to speak to today.                      04:21:30

21            What was stated is, she doesn't

22       understand how whitelisting applies to what she is

23       here to speak about today.

24            I'm asking her to explain to me her

25       definition of whitelisting.  So that way I can    04:21:41
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | then -- we can move forward because I don't -- so | 04:21:45 |
| 2 | can you please answer the question? | |
| 3 | MR. BLUME:  Well, with all due respect, | |
| 4 | Your Honor, it's how we prepared her.  It -- it's | |
| 5 | whether or not we -- she is sufficiently adequately | 04:21:54 |
| 6 | prepared. | |
| 7 | We have obligations under the rules to | |
| 8 | adequately prepare the witness pursuant to the | |
| 9 | topics as stated.  Her personal understanding | |
| 10 | mean -- may mean nothing.  There is a | 04:22:02 |
| 11 | topic specifically -- | |
| 12 | SPECIAL MASTER GARRIE:  I -- I | |
| 13 | understand.  My point is -- | |
| 14 | MR. BLUME:  So -- | |
| 15 | SPECIAL MASTER GARRIE:  -- that as -- as | 04:22:07 |
| 16 | it's defined, how -- however -- as the corporate | |
| 17 | representative, how -- do you not believe | |
| 18 | whitelisting relates in any way to what needs -- | |
| 19 | MR. BLUME:  It's defined -- | |
| 20 | SPECIAL MASTER GARRIE:  -- that you have | 04:22:18 |
| 21 | been designated to speak about it on. | |
| 22 | MR. BLUME:  It's defined in the document. | |
| 23 | SPECIAL MASTER GARRIE:  Well, I'd like an | |
| 24 | answer to my question, Ms. Hendrix. | |
| 25 | THE DEPONENT:  Well, do -- do they -- | 04:22:32 |

Page 237

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    does the plaintiffs' counsel -- do they define        04:22:32

 2    it -- I mean, do you want me to read their

 3    definition, if the answer is yes to that first

 4    question and then try to respond?

 5            SPECIAL MASTER GARRIE:  That would be --       04:22:40

 6    I thought the definition of whitelisting was

 7    actually in the deposition notice.  So that's what

 8    I've been operating under the understanding of what

 9    it is, but that -- so maybe -- is it not there,

10    Counsel Blume?                                         04:22:52

11            MR. BLUME:  No, it --

12            (Simultaneously speaking.)

13            MR. KO:  So also I --

14            MR. BLUME:  -- whitelisted partners --

15    it's defined as -- in -- in -- I'm not sure the --     04:22:54

16    the -- on page 10 -- in -- and a part- -- a

17    whitelisted partner is "any entity or person

18    provided access to a capability, such as permission

19    to read or write information via a specific API

20    call, that was not provided to all entities or        04:23:11

21    persons."

22            SPECIAL MASTER GARRIE:  Right.  So with

23    that understanding and that definition, Mr. Ko's

24    question is -- because I've == I've been operating

25    with that definition.  But apparently maybe this      04:23:29
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    isn't -- but the question was, from Mr. Ko,          04:23:34

2    Ms. Hendrix -- are you prepared, Ms. Hendrix, to

3    testify in any aspect of whitelisting as it relates

4    to what you have been designated to testify on

5    behalf of Facebook, using the definition that was    04:23:54

6    just read into the record?

7              THE DEPONENT:  Thank -- thank you for

8    pointing this out to me.  And -- and I don't have

9    any -- I -- I don't -- sorry that I didn't recall

10   that that was in there.                              04:24:08

11             I don't, sitting here today, think that

12   there is any relevancy with respect to anything

13   that I've been told to -- to be prepared for that

14   relates to any of those topics.

15             I can swear under oath that I just --      04:24:24

16   sitting here today, I -- I struggle to come up with

17   anything.

18             MR. BLUME:  It's not that she's not

19   prepared.  It just doesn't apply.

20             SPECIAL MASTER GARRIE:  Well --            04:24:34

21             MR. BLUME:  That's the difference.

22             SPECIAL MASTER GARRIE:  Well, you're --

23   you're -- Counsel Blume, he's entitled to ask the

24   question and she's entitled to answer the question,

25   whether whitelisting is appropriate, in her view,    04:24:47

Page 239

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | as the witness that she designated by Facebook and | 04:24:49 |
| 2 | is prepared to speak to that. | |
| 3 | And if her -- her position is, "No, it's | |
| 4 | not, and I don't understand why," which is what she | |
| 5 | has said.  So we can move forward. | 04:24:58 |
| 6 | MR. KO:  This is all -- this is all -- | |
| 7 | Special Master Garrie, this is all sort of | |
| 8 | insanity, if you will, as well, because -- | |
| 9 | SPECIAL MASTER GARRIE:  No, no | |
| 10 | adjectives.  Let me be very clear so there's no -- | 04:25:11 |
| 11 | ambiguity here. | |
| 12 | There cannot be another -- you need to | |
| 13 | take more time to think about what you're going | |
| 14 | to -- the words you're going to use.  We are going | |
| 15 | to curb our words.  You will not use insanity -- | 04:25:19 |
| 16 | you will use constructive terms for any question -- | |
| 17 | any words you want that will not further ex- -- | |
| 18 | agitate or result in further future frustration. | |
| 19 | MR. KO:  Noted.  I -- I apologize.  And I | |
| 20 | apologize that I am so frustrated today. | 04:25:36 |
| 21 | I have -- the point I wanted to make, | |
| 22 | Special Master Garrie, was I had asked the | |
| 23 | question, "Are you familiar with the term | |
| 24 | whitelisting?"  The answer was "Yes." | |
| 25 | The next question was, "What is your | 04:25:49 |

Page 240

1    understanding of that term?"  And that is what led        04:25:51

2    to this -- another 20 minutes on the record of back

3    and forth to a very basic question.

4            SPECIAL MASTER GARRIE:  Well --

5            MR. KO:  And, of course, all of my            04:26:03

6    questions relate to Ms. Hendrix' capacity as a

7    30(b)(6) witness.

8            And, again, Mr. Blume can object for the

9    record, but he certainly cannot instruct the

10   witness not to answer as he had.  That is            04:26:14

11   completely improper.

12           MR. BLUME:  I can, actually.

13           SPECIAL MASTER GARRIE:  Yeah.

14           MR. BLUME:  I actually can.

15           MR. KO:  Only with respect to privilege,      04:26:19

16   not with respect to --

17           MR. BLUME:  That is not the rules.

18           SPECIAL MASTER GARRIE:  No, for

19   30(b)(6) --

20           MR. BLUME:  No --                             04:26:22

21           SPECIAL MASTER GARRIE:  With -- with

22   regards to 30(b)(6) --

23           MR. BLUME:  It's not the rules.

24           SPECIAL MASTER GARRIE:  -- you can --

25   because the witness is here to testify on certain     04:26:26

                                                  Page 241

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    subjects, under the case law in the Ninth Circuit,        04:26:28

 2    they -- they have to preserve their rights because

 3    the witness's testimony can be called at trial

 4    accordingly.  So he is obligated to make sure that

 5    the witness testifies only on the subjects that          04:26:41

 6    they are before or been designated as.

 7              I -- I -- I -- I believe the case --

 8    don't quote me, but I want -- there's a Ninth

 9    Circuit case that brings them in line with all the

10    other circuits.  I can't remember it, as I sit here      04:27:00

11    now.

12              So he is entitled to and -- and needs to

13    rate -- and note the objection for the record.  And

14    instruct the witness because the statements are

15    binding.                                                 04:27:14

16              MR. KO:  Special Master Garrie, do you

17    mind -- I -- I -- I believe when -- on the

18    record -- I mean, Ms. Hendrix, unfortunately,

19    you -- you've been relieved at some periods of time

20    for the last hour and a half.                            04:27:32

21              But I'm dealing with a bit of a personal

22    emergency.  So I -- I was hoping that -- to take

23    five minutes to address this, and then we can get

24    back on the record, if you wouldn't mind.

25              SPECIAL MASTER GARRIE:  Yeah.  Somebody         04:27:45
```

Page 242

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    please open the breakout rooms so everybody can           04:27:46

 2    take time to -- five minutes.  And we'll reconvene

 3    in five minutes.

 4               THE VIDEOGRAPHER:  Okay.  We're off the

 5    record -- we're off the record.  It's 4:28 p.m.           04:27:56

 6               (Recess taken.)

 7               THE VIDEOGRAPHER:  We're back on the

 8    record.  It's 4:40 p.m.

 9               SPECIAL MASTER GARRIE:  Ready to go back

10    on the record?                                            04:40:58

11               MR. BLUME:  Yes.

12               SPECIAL MASTER GARRIE:  No.  Counsel Ko,

13    was that a yes from you?

14               MR. KO:  Yes.

15               SPECIAL MASTER GARRIE:  All right.  We're      04:41:03

16    going to go back on the record.  I want to make --

17    I want to make another statement before anybody

18    says anything.

19               Let's go back on the record.

20               THE VIDEOGRAPHER:  Thank you.  We're back      04:41:13

21    on record.  It's 4:41 p.m.

22               MS. WEAVER:  Okay.  This is the

23    Special Master and I'm going to remind counsel

24    again, do not talk over each other or I will make

25    all of these be in person.  So we can keep              04:41:22
```

Page 243

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | trying and endeavor to get this right. | 04:41:25 |
| 2 | But it is critical, for the purposes of | |
| 3 | the court reporter, to have a full and complete | |
| 4 | record.  We -- you are still consistently talking | |
| 5 | over each other, the witness and vice versa.  So | 04:41:37 |
| 6 | please endeavor among yourselves to allow each | |
| 7 | other to finish -- finish speaking and show the | |
| 8 | courtesy and respect and so on and so forth. | |
| 9 | With that said, I will turn it back to | |
| 10 | Counsel Ko to continue forward. | 04:41:55 |
| 11 | MR. KO:  Thank you, | |
| 12 | Special Master Garrie. | |
| 13 | And Ms. Hendrix, thank you for your | |
| 14 | patience.  I actually hope to only have a few more | |
| 15 | series of questions for you, if all goes according | 04:42:07 |
| 16 | to plan.  So the end is in sight, at least with | |
| 17 | respect to today. | |
| 18 | Q.  (By Mr. Ko)  Now, with respect to the | |
| 19 | topics that you have been designated to testify on | |
| 20 | behalf of Facebook for, are you prepared to testify | 04:42:28 |
| 21 | as to any aspect of these topics as it -- as they | |
| 22 | relate to whitelisting? | |
| 23 | MR. BLUME:  Objection.  Asked and | |
| 24 | answered. | |
| 25 | THE DEPONENT:  I've already made it | 04:42:49 |

Page 244

```
1    clear, I believe, on the record, with all due        04:42:51

2    respect, that I am prepared to speak to the topics.

3    And based on the definition here of whitelisted

4    partners, and, again, saying for the record, that

5    we do not have a fixed definition, as a corporate    04:43:06

6    company, precisely of what that means.  It can mean

7    different things to different people.  I am not

8    able, sitting here today -- after reviewing the

9    topics multiple times -- able to provide any

10   information that I think is at all relevant on my     04:43:22

11   understanding and this definition of whitelisting

12   to those topics.

13        Q.   (By Mr. Ko)  Thank you for making that

14   clear.

15             Now, with respect to the policies and       04:43:35

16   procedures that I believe your counsel has

17   indicated you can testify as to, are there any

18   policies and procedures that relate to third

19   parties' use of friend -- use of user information

20   beyond the use case?                                  04:43:55

21        A.   I need to refresh my -- use case refers

22   to the purpose for any entity to obtain user data.

23             And then your question again.  I -- I'm

24   sorry.

25        Q.   With respect to the policies and            04:44:14
```

Page 245

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    procedures that I believe you are prepared to        04:44:15

 2    testify on, are there any policies and procedures

 3    that relate to third parties' use of user

 4    information beyond the use case?

 5        A.   What -- wait.  Isn't that the opposite of   04:44:36

 6    what you asked me?

 7             Like are you asking what policies and

 8    monitoring procedures are in place that relate to

 9    user data --

10        Q.   I don't know what your --                   04:44:47

11        A.   -- for use case?

12        Q.   I don't what understanding you have of --

13    of my previous question.  But I'm simply asking you

14    this question.

15             With respect to the policies and            04:44:53

16    procedures that I believe you are prepared to

17    testify on, are there any policies and procedures

18    that relate to third parties' use of user

19    information beyond the use case?

20             MR. BLUME:  Objection.                       04:45:07

21             THE DEPONENT:  There are policies with

22    respect to the use of friend data and they exist

23    today because we still allow you to share your

24    inapp friends list.

25             And in terms of monitoring for user          04:45:31
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    information then, yes, there's an app review team.        04:45:36

 2    And there's other teams within DevOps that review

 3    apps for compliance with those policies governing

 4    use of user information.

 5         Q.   (By Mr. Ko)  And those policies that            04:45:57

 6    govern the use of user information, what are they?

 7              And to be helpful --

 8         A.   Well --

 9         Q.   -- I'm referring to the specific ones

10    that you just mentioned in your prior response.           04:46:12

11         A.   Well, I didn't mention specific policies.

12    I just said, you know, there's still a friend --

13    there are still -- a friend -- friend-related

14    policies because the login product still allows you

15    to access inapp friend lists.                             04:46:32

16              So there are friend-specific

17    provisions -- I believe there's two -- that relate

18    to use of friend information.  And then there's

19    other policies for use of user information in the

20    platform terms and the developer policies, and the        04:46:49

21    term -- terms of service perhaps elsewhere.  But

22    for the relevant topics, that's the locations that

23    come to mind.

24         Q.   Any other policies that you can think of

25    that contain this information?                            04:47:02
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              MR. BLUME:  Objection.  Form.              04:47:05

 2              THE DEPONENT:  I don't have anything

 3     further to add in response to what I said.

 4         Q.   (By Mr. Ko)  Given your understanding of

 5     the term "whitelisted apps," as indicated in this    04:47:24

 6     notice, are you aware of whether or not the -- the

 7     SRR ever indicated at any time that Facebook was

 8     going to allow whitelisted partners to continue

 9     making specific API calls with respect to friend

10     data?                                                04:47:57

11              MR. BLUME:  Objection.  Form.

12              THE DEPONENT:  I -- I -- it's hard for me

13     to answer your question because I don't like the

14     way you worded it.  So it's hard for me to do like

15     yes or no.                                           04:48:15

16         Q.   (By Mr. Ko)  What -- what part of the

17     question did you not like?

18         A.   I' -- I'm going to need you to restate

19     it.

20         Q.   You -- you have a certain understanding    04:48:29

21     of whitelisted partners; you had indicated that to

22     me earlier, right?

23         A.   Yes.  And -- and I believe that I'm

24     supposed to, for my purposes today, adopt this

25     description in No. 26; is that correct?              04:48:42
```

Page 248

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.   Given -- given the definition of | 04:48:49 |
| 2 | whitelisted partners, or whitelist, or whitelisted, | |
| 3 | or whitelisting, as indicated in paragraph 26 of | |
| 4 | the notice, do you know whether or not the SRRs at | |
| 5 | any time ever indicated that Facebook was going to | 04:49:02 |
| 6 | whitelist certain apps and permit them to continue | |
| 7 | accessing friend information after 2014? | |
| 8 |             MR. BLUME:  Objection.  Form. | |
| 9 |             THE DEPONENT:  That would not be anything | |
| 10 | in the SRR. | 04:49:20 |
| 11 | Q.   (By Mr. Ko)  Same question with respect | |
| 12 | to the data use policy or all iterations thereto. | |
| 13 |             Did -- did the data use policy at any | |
| 14 | time ever indicate that Facebook was going to | |
| 15 | whitelist certain apps and permit them to continue | 04:49:38 |
| 16 | accessing friend data after 2014? | |
| 17 |             MR. BLUME:  Objection.  Form. | |
| 18 |             THE DEPONENT:  The data use policy at all | |
| 19 | times during the relevant period made clear to | |
| 20 | people what data was available through the | 04:49:53 |
| 21 | platform. | |
| 22 |             So like I said, to the extent the v1 apps | |
| 23 | were still live, regardless of when they were | |
| 24 | deprecated, those disclosures were there in | |
| 25 | multiple locations, including the controls and | 04:50:06 |

Page 249

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    settings that people had to control their          04:50:11

 2    information.  We never removed those disclosures

 3    until it was no longer relevant to people.

 4        Q.   (By Mr. Ko)  And I know you testified

 5    that you don't recall exactly when that occurred.   04:50:24

 6            But with respect to the rolling out of v2

 7    or Graph v2, when that occurred, was there any

 8    aspect of the data use policy that ever indicated

 9    that Facebook was going to whitelist certain apps

10    and permit them to continue accessing friend data?  04:50:44

11            MR. BLUME:  Objection.

12            THE DEPONENT:  I don't believe that we

13    would have communicated that in the data use

14    policy.

15            Sorry.  I -- I hear myself speculating.     04:51:02

16    I'm having afternoon fatigue.

17            That just wouldn't be the location.

18    The -- the -- that's not the purpose of the data

19    use policy.

20        Q.   (By Mr. Ko)  So the -- to be the clear,    04:51:13

21    the data use policies did not disclose or reflect

22    any indication that Facebook was going to whitelist

23    certain apps and permit them to continue accessing

24    friend data, correct?

25            MR. BLUME:  Asked and answered.             04:51:26
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  The -- the data use policy      04:51:40

 2     told people, including the product itself, right.

 3     So when a user goes to log in, they would see that

 4     the app was requesting friend information, right.

 5     And the user's friends were still able to see that    04:51:53

 6     they could, unless they opted out of platform,

 7     enable their friends who choose to use platform and

 8     log in to apps.

 9              So all of facts with respect to how it

10     worked were available to people at all times          04:52:06

11     through both the product, and the user experience

12     by using the product, and through the privacy and

13     app settings and pri- -- data use policy and help

14     center, and all of the educational tools that we've

15     discussed throughout the day, always made it clear    04:52:23

16     that that was how the platform worked.

17              Now, a subset of the platform that's

18     developing on v2 worked in a different way.  But

19     it's more important to tell people what's happening

20     with the v1.                                          04:52:41

21        Q.   (By Mr. Ko)  So in connection with the

22     data use policy, was there ever a disclosure at any

23     time over the relevant time period that Facebook

24     was going to whitelist certain apps and permit them

25     to continue accessing friend data?                    04:52:58
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1            MR. BLUME:  Objection.  Form.            04:53:01

 2            THE DEPONENT:  I don't -- I don't know.

 3    I'm -- I -- I am sure we have versions I could find

 4    out.  I don't believe that we would have done so,

 5    because it's not the right document.  That's...     04:53:15

 6        Q.   (By Mr. Ko)  Regardless of whether or not

 7    it was the right document and you -- you have -- I

 8    mean, we provided your counsel, and it sounds like

 9    to you, ultimately, a copy of -- or at least a

10    reference to the fact that we were going to discuss  04:53:34

11    the data use policy, among the other policies that

12    are applicable to users in this case.

13            Did you, in fact, review the data use

14    policies in connection with preparing for this

15    deposition?                                          04:53:51

16        A.   I testified earlier today that I reviewed

17    multiple versions of the data use policies.  I am

18    sitting here today to tell you I don't believe that

19    the contents of any of those versions would have

20    included any topics pertaining to the word           04:54:05

21    "whitelist" because that, again, is not what

22    privacy policies or data use policies for Meta

23    purposes.

24            That's not the -- the -- that's not the

25    place I would put it, but I don't recall having      04:54:18
```

Page 252

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    seen it in the -- all of the versions that I did          04:54:21

 2    review.

 3         Q.   And in connection with the data use

 4    policies that you reviewed and were in place over

 5    the relevant time period, was there ever any             04:54:32

 6    indication or disclosure that in those data use

 7    policies, that Facebook was going to permit certain

 8    third parties to access certain friend information

 9    about a user in connection with Graph v2?

10              MR. BLUME:  Objection.  Form.                   04:55:00

11              THE DEPONENT:  To try to be helpful, like

12    there -- there was no disclosure that certain apps

13    would no longer have access to friend information.

14              MR. KO:  That is helpful.  Thank you.

15              THE DEPONENT:  And, again, I should            04:55:21

16    correct myself.

17              All apps, even to today, can get certain

18    friend data.  So I should have said friend

19    permissions.  But I -- I -- I just wanted to

20    clarify that point.                                      04:55:34

21         Q.   (By Mr. Ko)  And when you say that

22    certain apps can continue to -- continue to get

23    friend data to this day, you are just talking about

24    the carve-out that you had described before, the

25    inapp friend lists, correct?                             04:55:48
```

                                                    Page 253

```
 1        A.    Yes, through the APIs.  Because keeping        04:55:49

 2   in mind there's other methods by which friends

 3   can -- and -- and we disclose that to people when

 4   we tell them to be mindful of what they share with

 5   their friends.  So if we're just talking about the      04:56:02

 6   platform, then that's correct.

 7        Q.    Any other friend information, other than

 8   the inapp friend list, on the platform that a

 9   third-party app developer can access today?

10        A.    Ever since v2, there has not been any         04:56:18

11   friend permissions built, whether via a public API

12   or a private, or partner, rather, API.  Like I -- I

13   can confirm that -- that that friend permissions

14   have gone away.

15        Q.    Does the term -- or are you familiar with     04:57:04

16   the term "integration partner"?

17        A.    I am.

18        Q.    What is your understanding of that?

19        A.    Those are -- those are service providers

20   who build and -- they -- let's use -- I think I can      04:57:22

21   better respond with an example.

22             Like Facebook is available on BlackBerry

23   and BlackBerry is an integration partner and --

24   well, was available.  And so integration partners

25   are people -- are partners who enabled you to            04:57:38
```

Page 254

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    replicate Facebook on your -- on their devices.  So      04:57:42

 2    people could have -- so -- so I guess put

 3    differently, if you don't have -- if you don't have

 4    an integration partner, then you can't use Facebook

 5    on BlackBerry.  It just doesn't technically work.       04:57:56

 6            So they -- they replicate Facebook for

 7    people so they can use Facebook on other things,

 8    ███████████████████████████████████████████████

 9    example.

10       Q.   Are you aware of whether or not any            04:58:15

11    integration partners continue to access friend data

12    after 2014?

13            MR. BLUME:  Objection.  Beyond the scope.

14            THE DEPONENT:  Hum?

15            MR. BLUME:  Hold on.                            04:58:34

16            THE DEPONENT:  Okay.  Sorry.

17            MR. BLUME:  Same question with regard --

18    I mean, integration partners, third party.

19            Instruct you not to answer.  Beyond the

20    scope.                                                 04:58:40

21       Q.   (By Mr. Ko)  Are you going to follow that

22    instruction?

23       A.   Yes.

24       Q.   Are you aware of whether or not the SRR,

25    or any iteration thereto, ever indicated at any        04:58:57
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    time that Facebook was going to permit certain          04:59:03

2    integration partners to continue accessing friend

3    data after 2014?

4            MR. BLUME:  Objection.

5            THE DEPONENT:  I'm aware that even from          04:59:18

6    the relevant period up until today, there is a

7    service provider section within the context of the

8    data use policy which is directly incorporated by

9    reference in the terms of service and/or SRR.  And

10   that explains very clearly that there are service       04:59:31

11   providers who help us provide services, such as our

12   products -- I -- I'm -- not quoting me on the

13   language -- and then those integration partners,

14   for example, would be agreeing to terms.

15           And those terms had provisions on user          04:59:45

16   data which required those partners to be very clear

17   about what it was they were collecting and how they

18   were going to use the information.  And that could

19   only be used in accordance with our agreements with

20   those integration partners, which was to provide       04:59:58

21   Facebook, for example, on the BlackBerry service --

22   app phone, rather.

23       Q.  (By Mr. Ko)  So your understanding of --

24   sorry.

25           So your understanding of integration           05:00:12

                                                    Page 256

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    partners and your description of integration        05:00:14

 2    partners is that they fit under the umbrella of the

 3    service provider language and the data use policy?

 4        A.   Say that again.  You cut out.

 5        Q.   The description of integration partners    05:00:30

 6    that you have provided, is it your understanding

 7    that they would fit under the umbrella of the

 8    service provider language in the data use policy?

 9        A.   It does.

10        Q.   So does -- do the -- I think I know the    05:01:00

11    answer to this question, but I'm -- I'm going to

12    ask it nonetheless so that the record is clear.

13             Did the data use policies ever indicate

14    at any time that Facebook was going to permit an

15    integration partner to continue accessing friend   05:01:15

16    data after 2014?

17        A.   There's too much weaving of concepts

18    going on in your question.

19             The -- the data use policy --

20        Q.   It's a complicated case.               05:01:31

21        A.   Sorry.  Go ahead.

22        Q.   Go ahead.  Sorry.  I didn't mean to

23    interrupt.

24        A.   The data use policy told people about the

25    Facebook platform and how they could control their  05:01:40
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    information with applications on -- that use the          05:01:43

 2    Facebook platform.

 3              But there's also another section and I

 4    believe it's been mostly referred to as service

 5    providers and/or just added upon that which is          05:01:55

 6    another paragraph, which is different and distinct.

 7    And that is telling people that we have certain

 8    partners.  I -- you know, I'd have to pull up the

 9    precise language -- that help us provide our

10    products.                                                05:02:11

11              And so the example in that service

12    provider section that I'm referring to is that

13    these integration partners allow users to access --

14    ████████████████████████████████████████

      ████████████████████████████████████████    ████████

16    Like when they're on using that -- playing that

17    game and they beat their friends, they could,

18    because of their service provider relationship with

19    us, enable people to share on Facebook some story.

20    Maybe that they beat their friend in a game or that      05:02:42

21    they, you know, beat Super Mario Brothers, for

22    example.

23       Q.   So is it your testimony that there were

24    aspects of the data use policy that communicated to

25    users that service providers, including but not          05:02:54
```

Page 258

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

 1    limited to integration partners, continue to access          05:02:58

 2    information about a user's friend; is that fair to

 3    say?

 4              MR. BLUME:  Objection.  Form.

 5              Objection.  Form.                                   05:03:06

 6              THE DEPONENT:  I don't remember if the

 7    word "integration" was in there.  But the word

 8    "partners" is in there.  And the first sentence

 9    of -- of multiple versions, if not all of them, is

10    very clear to people.  That we have partners that          05:03:18

11    help us provide access to and provide -- and to

12    Facebook's products, like to improve them.

13              I should stop rambling on what it says

14    and actually refer to the precise language.  But

15    it's always been clear.                                      05:03:33

16        Q.   (By Mr. Ko)  Is there language in the

17    data use policy that reflects -- that reflects how

18    Facebook would control, or not control, the

19    information that a third party would acquire about

20    a user or a user's friend?                                   05:03:55

21              MR. BLUME:  Objection.  Form.

22              THE DEPONENT:  The data use policy has

23    always told people about what third-party

24    applications can access through our platform and

25    what -- including the information that their          05:04:11

Page 259

1    friends can share.  It's always been clear.                05:04:14

2        Q.   (By Mr. Ko)  Is there anything in the

3    data use policy that reflects any language about

4    how Facebook would monitor or enforce the use of

5    that information once it was acquired by that            05:04:32

6    third party?

7        A.   So the answer is yes, there's information

8    about the fact -- not -- I -- I really should

9    answer yes to your question.

10           So the -- the data use policy tells           05:04:49

11   people to be careful about what -- and the terms of

12   service -- tells -- tells people to be careful what

13   it is that they're sharing and be aware of the

14   information they share.  Not just with their

15   friends, but with -- with applications.                  05:05:06

16           And that those applications are required

17   to respect the user's privacy, but to be -- very

18   closely to read their terms of service because the

19   developer also has terms for use of their

20   third-party application.                                 05:05:21

21           So it cautions people.  So there's

22   relevant language always in the relevant period on

23   the topic of the fact that developers are required

24   to respect their privacy policy -- their privacy,

25   and for people to read the terms and policies of        05:05:35

                                              Page 260

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    the developer because they govern the developer's        05:05:39

 2    use of the information that the person is choosing

 3    to share.

 4        Q.    And how did Facebook ensure that third

 5    parties were, in fact, required to respect the           05:05:50

 6    user's privacy?

 7             MR. BLUME:  Objection.  Form.

 8             THE DEPONENT:  Through our agreements

 9    with -- like we ensured it because the developers

10    contractually agreed and are obligated to adhere to      05:06:04

11    those terms.  So in terms of requiring -- like that

12    is the agreements that we had with developers and

13    the provisions included therein required developers

14    to follow our terms and respect and comply with

15    their own privacy policies.                              05:06:24

16        Q.    (By Mr. Ko)  And those contractual

17    agreements -- I assume you're talking about the

18    platform policy?

19        A.    The platform terms and developer policies

20    today and any other applicable provision, to the         05:06:38

21    extent there is one.  But, yes, those are the

22    primary terms.

23        Q.    Are there any aspect -- are there any

24    policies, other than the platform terms and

25    developer policies, or the platform policy before        05:06:54
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1   that, that reflects this contractual agreement        05:07:00

2   between Facebook and a third-party app developer,

3   as to how they would go about respecting a user's

4   privacy?

5           MR. BLUME:  Objection.                          05:07:18

6           THE DEPONENT:  So the terms, the SRR

7   have -- have disclosures that there's other

8   provisions.  And at the very bottom of them, it

9   tells people that there could be additional terms

10  and policies.  And it has -- incorporates by         05:07:40

11  reference the platform terms.  And in the relevant

12  period, the platform policies.

13          So it makes people aware that there are

14  terms of use for developers who use our platform

15  and -- so that's the SRR.  And then for the data     05:07:55

16  use policy, all -- I won't repeat myself.  I think

17  I went over that.

18      Q.   (By Mr. Ko)  So is it your testimony that

19  the SRRs link to or reference the -- the platform

20  policy or the current iteration of it, which --      05:08:19

21  which are the platform terms and developer

22  policies?

23      A.   Yes.  At the -- at the bottom, it links

24  to things like the advertising guidelines and other

25  different terms associated with different products   05:08:32

Page 262

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    for the use of different apps and services that we          05:08:36

 2    offer and require third parties to adhere to.

 3         Q.   And were there specific provisions in the

 4    data use policy -- or excuse me.

 5              Were there specific provisions in the              05:08:48

 6    platform policy or the platform terms and developer

 7    policies that reflected how a third-party app

 8    developer was to respect a user's privacy?

 9              MR. BLUME:  Objection.

10              THE DEPONENT:  That's a broad statement.           05:09:12

11              But there are provisions, and always have

12    been.  Like you have to have a privacy policy that

13    tells people what it is that you collect and how

14    you will use and/or share their information.  You

15    have to comply with your privacy policy.  You have           05:09:22

16    to not be -- don't mislead, confuse or surprise

17    people, which could pertain to our topics today.

18              So there were definitely provisions that

19    are privacy related in the formerly known as -- in

20    the platform policies and current versions of the           05:09:43

21    platform terms and developer policies, such as only

22    request the information you need to meaningfully

23    improve the user's experience.

24              So it's a broad -- privacy is a broad

25    statement, and so those are examples of privacy             05:09:57
```

Veritext Legal Solutions
866 299-5127

1    related provisions.                                    05:09:59

2        Q.    (By Mr. Ko)   And with respect to the

3    provisions that you are referring to that required

4    the third-party app developers to respect the

5    user's privacy, how did Facebook monitor and          05:10:11

6    enforce those terms?

7        A.    We automa- -- we -- we monitor using both

8    automated and manual means.   So we have automated

9    tools that have been dynamic over the years, as

10   we've updated them or built different types of         05:10:33

11   automated monitoring tactics.

12            A good example would be we built a

13   privacy policy crawler that would help crawl and

14   detect broken privacy policy links because we

15   require developers to have a privacy policy.           05:10:51

16            And if it's broken and a user can't find

17   it, then the automated crawler can detect that.

18   And then a human can -- well, no, never mind.   I

19   shouldn't -- like the automated crawler can -- can

20   detect that and I believe it can automated enforce.    05:11:04

21   I don't believe it goes to a human.   So I may be

22   mistaken there.   But I'm pretty sure the automated

23   is complete.

24            But either way the -- the issue -- the

25   issue gets surfaced and addressed and -- oops, I       05:11:18

Page 264

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    should stop because I'm forgetting because I          05:11:26

 2    rambled.  Evening or late -- yeah, evening fatigue.

 3         Q.   This automatic system, is it fair to

 4    describe that as a preemptive measure --

 5              MR. BLUME:  Objection.                       05:11:37

 6         Q.   (By Mr. Ko)  -- or was it more of a

 7    reactive measure?

 8              MR. BLUME:  Objection.

 9              THE DEPONENT:  I -- I don't know what you

10    mean by "preemptive measure."                          05:11:49

11         I mean, the crawler runs.  And if the app

12    is live on the platform and not in developer mode,

13    for example, like the crawler can -- it -- I'm not

14    remembering, sitting here today, how often.  I

15    think it's each week, but I -- I do not want -- I      05:12:09

16    should stop speculating.  But the crawler

17    proactively calls and detects.  So it doesn't

18    like -- so I don't know what you mean by pre- --

19    "preemptive."

20         Q.   (By Mr. Ko)  Other than this crawler,        05:12:23

21    what were the other ways in which Facebook

22    monitored and enforced terms -- its terms with

23    third parties regarding user privacy?

24    ██   █████████████████████████████████
██   ██████████████████████████████████████        █████████████
```

Page 265

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1 ████████████████████████   ████████

████   ███████████████████████████

████   ████████████████████████

████   ███████████████████

████   █████████████████   ████████

████   ██████████████████████████

████   █████████████████████████

████   █████████████████████████

████   ██████████████████████████

████   █████████████   ████████

11          So it's just meant as a signal.  And also

12   users -- people can report apps through, for

13   example, any post that a person shares from an app.

14   There's an ability at each post for a user to

15   report what they're seeing for multiple reasons.          05:13:39

16          We also receive reports internally,

17   externally, for example, from the press, or other

18   third parties.  Like advertisers might point out

19   something or other developers might observe that

20   there's violations.                                        05:13:56

21          And so through user reports, external and

22   internal reports, and then proactive developer

23   operations.  Team members manually going in to

24   review applications for compliance with the terms

25   and policies.                                              05:14:15

Page 266

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1          And I forgot another privacy related            05:14:15

2     provision.  But like the security requirements to

3     protect data obtained from us from -- against

4     unauthorized use access or disclosure.

5     ███████████████████████████████        ██████████

██   █████████████████████████████████████

██   ██████████████████████████████

██   ████████████████████████████████████

██   ███████████████████████

██   ██████████████████████████████        ██████████

██   █████████████████████████████████████

██   ██████████████████████████████████

██   ████████████████████

14          So there's a lot of monitoring that

15    goes -- that takes place both in -- on Facebook and    05:15:01

16    then off of Facebook, depending on -- on -- yeah, I

17    should stop.  Getting tired.  Sorry.

18    Q.   Would you agree with me that it was

19    Facebook's job to police and monitor API abuse by

20    third parties on its platform?                        05:15:21

21    A.   I agree with you that we committed to --

22    to policing our platform through -- and we did so

23    through multiple measures, including agreements

24    with developers.

25          At times, we -- we introduce the formal        05:15:35

```
 1    app review team.  But there was already teams that      05:15:41

 2    were proactively reviewing apps for compliance

 3    prior to that.

 4              So I -- I do agree that Facebook needs

 5    to -- and has had like policy enforcement review        05:15:51

 6    measures that have been, you know, effective and

 7    practical and proportionate to the platform.

 8        Q.   But did Facebook succeed in its effort to

 9    police and monitor API abuse on its platform?

10              MR. BLUME:  Objection.  Hold on.              05:16:15

11              Calls for a legal conclusion.  And

12    outside the scope of the topics.

13              Instruct you not to answer on behalf of

14    the organization.

15              THE DEPONENT:  Does that mean I answer in     05:16:35

16    my personal or --

17              MR. BLUME:  No.

18              THE DEPONENT:  -- do I don't answer at

19    all.

20              MR. BLUME:  You don't answer.                05:16:40

21              THE DEPONENT:  Okay.

22        Q.   (By Mr. Ko)  You're going to follow the

23    instructions of your counsel?

24        A.   Yes, sir.

25        Q.   Would you agree with me that it was            05:16:49
```

Page 268

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    difficult, if not impossible, for Facebook to        05:16:51

 2    capture all the data abuse and misuse that was

 3    happening on its platform?

 4          MR. BLUME:  Hold on.

 5          Objection.  Compound.  Vague.  And calls        05:17:01

 6    for a legal conclusion.  And beyond the scope of

 7    the topics.

 8          And instruct you not to answer as a

 9    30(b)(6) witness.

10     Q.   (By Mr. Ko)  Are you going to follow that       05:17:23

11    instruction?

12     A.   Yes, sir.

13     Q.   Now, would you agree with me -- and, of

14    course, I'm asking as I always have been for these

15    questions -- in your capacity as a 30(b)(6) witness   05:17:38

16    that is here to testify on matters such as

17    monitoring and enforcement as reflected in topic 3,

18    would you agree that it was difficult, if not

19    impossible, for Facebook to monitor, enforce,

20    police, all the API abuse that was happening on its   05:17:55

21    platform?

22          MR. BLUME:  Objection.  Calls not for

23    facts but opinion of an organization, which is

24    beyond the scope of the 30(b)(6).

25          And, therefore, I instruct you not to           05:18:05
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    answer.                                          05:18:08

 2        Q.   (By Mr. Ko)  Are you going to follow that

 3    instruction?

 4        A.   Yes, sir.

 5        Q.   Are you aware of any facts -- speaking on  05:18:18

 6    behalf of the company, are you aware of any facts

 7    or circumstances in which it became known that it

 8    was impossible for Facebook to police and monitor

 9    all the abuse that was happening on its platform?

10            MR. BLUME:  Again, to the extent that you  05:18:33

11    are aware of any facts that relate to some

12    assessment of impossible --

13            SPECIAL MASTER GARRIE:  Counsel, is there

14    an objection?

15            MR. BLUME:  Yeah.  I'm about to -- to --    05:18:44

16    it's a privilege objection.  And so I'm defining

17    the scope of the privilege for her, if I may.

18            SPECIAL MASTER GARRIE:  Yeah.  Sure.  I

19    just wasn't sure if there was an objection.

20            MR. BLUME:  Yes.                            05:18:55

21            So to the extent that you become aware of

22    facts about the impossibility of Facebook

23    monitoring, as a result of conversations with legal

24    counsel, or based on advice from legal counsel, I'd

25    instruct you not to answer.                         05:19:09
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1              And -- and -- and, as well, I would        05:19:10

2    object that it is sufficiently vague as to be

3    outside the scope of the topics about which you're

4    testifying as a 30(b)(6) witness, which is another

5    instruction not to answer.                           05:19:30

6         Q.   (By Mr. Blume)  Are you going to follow

7    that instruction?

8         A.   I'm not sure if I'm supposed to wait for

9    Special Master Garrie because he just turned on his

10   video and he --                                      05:19:44

11             SPECIAL MASTER GARRIE:  Thank you.

12             THE DEPONENT:  -- that means he might

13   talk.

14             SPECIAL MASTER GARRIE:  That is true.

15             Counsel -- Counsel Ko, what -- what        05:19:50

16   does -- within the scope of what this witness was

17   designated to, what does that -- your question map

18   to?

19             MR. KO:  Topic 3c, Special Master.

20             SPECIAL MASTER GARRIE:  Can you read it     05:20:15

21   because I don't have it in front of me.

22             MR. KO:  "Facebook's monitoring and

23   enforcement of contractual terms with Third Parties

24   regarding their use of User's Data or Information."

25             We can -- we can screen-share it, too,     05:20:30
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1    for everyone to see.                              05:20:31

2           SPECIAL MASTER GARRIE:  That -- that

3    would be helpful.

4           MR. BLUME:  If I may, Your Honor?

5           SPECIAL MASTER GARRIE:  One second.        05:20:43

6           Yeah, Counsel Blume, please explain to me

7    how this is beyond the scope of what she was

8    designated by Facebook to testify to.

9           MR. BLUME:  The impossibility of

10   monitoring the -- is a legal conclusion.  The     05:21:13

11   concept -- concept of what constitutes abuse on the

12   platform is a legal conclusion.

13          They are also too vague terms for a

14   30(b)(6) witness to opine on.  And to the extent

15   that she's aware of those facts that led to those  05:21:31

16   conclusions, they are privileged and, therefore,

17   inappropriate.

18          SPECIAL MASTER GARRIE:  And for the

19   privilege, I get.

20          But "Facebook's monitoring and            05:21:41

21   enforcement of contractual terms with Third Parties

22   regarding their use of User Data or Information,

23   including enforcement of Policies regulating

24   access" -- "regulating access to such Data or

25   Information beyond the Use Case."                  05:21:58
```

                                              Page 272

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              And you -- Facebook put forward this        05:22:02

 2    witness to opine on this topic.

 3              MR. BLUME:  Not the -- the

 4    impossibility -- the -- the conclusion that

 5    something was impossible to monitor or that is --   05:22:11

 6    what is -- it's presumably a legal conclusion of

 7    impossibility.

 8              SPECIAL MASTER GARRIE:  But -- no.  It's

 9    impossibility to reach a --

10              (Simultaneously speaking.)                 05:22:21

11              MR. BLUME:  It's sufficiently vague and

12    undefined.

13              SPECIAL MASTER GARRIE:  Okay.  Noted.

14              Impossibility in the function not as a

15    lawyer.  But as a function of her duties as an      05:22:27

16    employee of Facebook, whether it was possible or

17    not.  Not a legal --

18              MR. BLUME:  Right.

19              SPECIAL MASTER GARRIE:  -- testifying

20    conclusion, right.                                  05:22:35

21              It's whether or not it was possible for

22    her to accomplish this.

23              And so please answer -- so overruled,

24    Counsel Blume, subject for the first -- overruled

25    with respect to the scope.  However, still with     05:22:45
```

Page 273

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1    regards to the objection with regards to privilege,      05:22:52

2    for purposes of clarity of Counsel Blume, or any

3    conversations you had with lawyers -- or

4    Counsel Blume, would you like to instruct the

5    witness again with regards to privilege?              05:23:02

6            MR. BLUME:  Actually -- actually, if we

7    can just jump off the record, I could figure out

8    what the answer is and whether it's privileged.

9    And then we can go forward.

10           SPECIAL MASTER GARRIE:  Okay.  We'll go       05:23:11

11   off the record.

12           THE VIDEOGRAPHER:  We're off the record.

13   It's 5:26.

14           (Recess taken.)

15           THE VIDEOGRAPHER:  Back on the record.        05:27:44

16   It's 5:27 p.m.

17           MR. KO:  Okay.  I just want to make sure

18   Special Master Garrie is here for this, so I'll

19   wait.

20           Hello.                                        05:28:01

21           At -- at this point, Your Honor,

22   Special Master, Mr. Blume Ms. Hendrix, I'm -- I'm

23   not going to ask any further questions and I am

24   going to reserve the right to ask questions related

25   to topics 1, topics 2b, 2d, topics 3 and portions     05:28:17
```

Veritext Legal Solutions
866 299-5127

```
 1    of topic 6, to the appropriate Facebook witness        05:28:24

 2    that can answer these questions.

 3            And we reserve the right to seek

 4    additional time so that Facebook can identify the

 5    appropriate witness such that we can have our          05:28:35

 6    substantive questions answered.

 7            But at this point, I have no further

 8    questions for you.  Thank you for your time,

 9    Ms. Hendrix.

10            MR. BLUME:  If I may,                           05:28:48

11    Special Master Garrie, respond.

12            SPECIAL MASTER GARRIE:  I mean, sure.

13    Suddenly, I think.

14            MR. BLUME:  Yeah.  Ms. Hendrix is here

15    and prepared, as she has said a number of times, to    05:28:58

16    speak on these topics.  There is no other witness

17    that will speak to those topics.  If Mr. Ko has

18    questions for Ms. Hendrix on those topics, any one

19    of them that he mentioned, he is obligated to ask

20    those today.                                           05:29:16

21            There is absolutely no reason whatsoever,

22    no good faith reason whatsoever to request any

23    other witness address those topics.  No other

24    witness will be prepared to address any of those

25    topics.  That is -- we have fulfilled our              05:29:30
```

Page 275

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | obligation by preparing Ms. Hendrix to answer on | 05:29:33 |
| 2 | those topics.  And Mr. Ko had more than sufficient | |
| 3 | time to get through them. | |
| 4 | We object not only to extending any other | |
| 5 | deposition to topics for which those witnesses are | 05:29:47 |
| 6 | not prepared.  We also object to any extensions of | |
| 7 | any time based on this deposition. | |
| 8 | I will note that plaintiffs sent | |
| 9 | Ms. Hendrix more than 150 documents to prepare for | |
| 10 | this deposition.  They asked -- they presented two, | 05:30:05 |
| 11 | maybe three, of those documents.  The fact that | |
| 12 | they chose not to go through those documents, the | |
| 13 | other 147 of them, is a choice that they made. | |
| 14 | The types of questions that Mr. Ko asked | |
| 15 | are choices he made.  And so their failure to get | 05:30:22 |
| 16 | whatever information they thought that they would | |
| 17 | want to get is a making of their own. | |
| 18 | If time is an issue, Ms. Hendrix is here. | |
| 19 | But we will not present another witness on the | |
| 20 | topics -- | 05:30:38 |
| 21 | (Technical issues.) | |
| 22 | THE COURT REPORTER:  Wait.  Wait.  You | |
| 23 | cut out with "another witness on the topics" -- | |
| 24 | MR. BLUME:  Will not -- nor will -- nor | |
| 25 | we will -- nor will we bring Ms. Hendrix back as a | 05:30:46 |

Page 276

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    30(b)(6) witness on these topics as far as Facebook        05:30:49

 2    is concerned --

 3            (Technical issues.)

 4            THE COURT REPORTER:  Hold on.  The audio

 5    is very bad.  I don't know --                               05:30:58

 6            MR. BLUME:  As far -- as far as -- as far

 7    as Facebook -- Facebook is concerned, the topics

 8    for which Ms. -- Ms. Hendrix is designated are now

 9    closed, with the conclusion of this deposition by

10    Mr. Ko, and we will move on to the other topics.           05:31:05

11            MR. KO:  I just want to note for the

12    record, Special Master Garrie and Mr. Blume, that

13    in addition to the reasons I identified earlier

14    about why we reserve to right to ask questions to

15    the appropriate witness on these topics, I just           05:31:22

16    want to make sure that the record is clear that we

17    have spent a substantial amount of time on the

18    record today having basic disputes over the

19    witness's ability to answer or not these questions

20    in response to topics.                                     05:31:41

21            And just to make clear another ground for

22    which we are seeking to reserve the right to reopen

23    the deposition is Mr. Blume's improper

24    instructions instructing the witness not to answer.

25            MR. BLUME:  I -- I would -- I would          05:32:00
```

Page 277

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    note --                                              05:32:00

 2              SPECIAL MASTER GARRIE:  Counsel Blume.

 3              MR. BLUME:  -- Special Master Garrie that

 4    the -- the purpose of -- obviously your presence is

 5    to make those decisions here.                        05:32:07

 6              The objections I made for privilege, of

 7    course, were proper.  The privilege discussion and

 8    the objections I made to scope are certainly

 9    proper.  And to the extent that those questions

10    are -- fit better in other topics, which I noted on  05:32:18

11    the record, there are other witnesses who will

12    testify that Mr. Ko has failed to make a record.

13              I will note that any of the topics for

14    which Ms. Hendrix was designated, she was -- she

15    was not prepared for.  She explained her efforts to  05:32:32

16    prepare.

17              And so, again, we object to additional

18    time.  And we object to the extension of the topics

19    or any continuation.  And we request that,

20    Special Master Garrie, you determine that            05:32:46

21    Ms. Hendrix is released from her obligations under

22    the second amended notice of deposition, pursuant

23    to Rule 30(b)(6).

24              SPECIAL MASTER GARRIE:  Well, here's the

25    good news.  I can rule on that.  Denied.             05:33:00
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1            I will take under consideration both          05:33:06

2    party's positions.  I will likely request further

3    briefing, limited briefing, in an accelerated

4    schedule on the issue.

5            And you're more than welcome to bring         05:33:16

6    this before Judge Chhabria and use the record

7    accordingly and explain it to him accordingly.

8            If you disagree with my ruling or

9    finding, if I do warrant more time or that the

10   witness, or someone else is to be produced to        05:33:29

11   respond.

12           With that noted, I thank the witness and

13   we will be finished for today, unless there are any

14   further questions or requests or rulings of

15   Counsel Blume or Counsel Ko so desire.               05:33:50

16           MR. BLUME:  I -- I would only note that

17   if I -- I make the request that if Mr. Ko has

18   additional -- additional questions on the topics

19   for which Ms. Hendrix is designated, he ask them

20   right now.  She's here and prepared to continue.     05:34:02

21           MR. KO:  I will stand by my original

22   reservation of rights, as noted in the previous

23   six minutes on the record.

24           SPECIAL MASTER GARRIE:  And just for the

25   record, to be clear, I have no position one way or    05:34:16
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    the other as to the request for relief beyond          05:34:19

 2    denying Counsel Blume's request that I make the

 3    ruling here and now.

 4             MR. BLUME:  Right.  And -- and appreciate

 5    that.                                                   05:34:29

 6             MR. KO:  Thank you.

 7             MR. BLUME:  And -- and -- that's fine.

 8    We -- we've made our -- we've made our point.

 9             SPECIAL MASTER GARRIE:  And so noted.  We

10    are done.                                               05:34:38

11             Just make sure the designation as

12    confidential has been recorded.

13             Are there any standing orders for

14    transcripts for 30(b)(6) depositions?  Are we going

15    to use the standing orders for the other witnesses?    05:34:51

16             MR. BLUME:  I believe so.  I'm the wrong

17    person to ask, but I believe that's the case.

18             MR. KO:  I -- I apologize.  I forgot one

19    thing in my haste to conclude this.

20             I forgot to make the formal request on        05:35:07

21    the record, Mr. Blume, that you provide

22    Ms. Hendrix' DC AG deposition transcript, in

23    connection with the applicable RFP asking Facebook

24    to produce all such material.  That's all --

25             MR. BLUME:  Well, the DC A -- the --          05:35:26
```

Page 280

```
 1    we'll take under consideration the DC AG transcript      05:35:26

 2    request and that's -- we'll take it under

 3    consideration.

 4            And, again, I urge you, Mr. Ko, if you

 5    have additional questions for Ms. Hendrix, we are        05:35:42

 6    not stopping the deposition.  She's here and

 7    prepared.  And if you choose to end it, I'll

 8    consider that -- that you have nothing further for

 9    her.

10            MR. KO:  So the record is clear, I, of           05:35:54

11    course, do have a lot further, but your continued

12    objections and --

13            MR. BLUME:  Well, we'll be here.

14            MR. KO:  -- instructions not -- let me

15    finish.                                                  05:36:01

16            -- continued objections and instructions

17    not to answer.  And the fact that this witness is

18    not prepared to testify as to basic issues on

19    claims and allegations regarding this case, in

20    particular, are the reasons why we would hope to        05:36:15

21    seek an actual witness, or this witness to actually

22    testify as to these topics.

23            MR. BLUME:  Well, then I think we should

24    be clear.

25            So the issues that you believe apply to         05:36:26
```

Page 281

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1    her topics include whitelisting, as it relates to        05:36:28

2    the topics that -- for which she is designated.  We

3    also understand that you asked whether or not there

4    were third-party apps who continued to be given

5    permission to access friends data after                   05:36:42

6    May of 2015, that she believed was -- that we

7    objected to under -- under topic 2d.  That is that

8    that topic.

9            Can you please state for the record any

10   other areas that -- and then privilege, of course,        05:36:59

11   which we objected to.

12           But because Ms. Hendrix is here and

13   available, if you could put on the record exactly

14   what other topics you believe she -- you were

15   prevented from asking her about under the said            05:37:16

16   topics so that we can appropriately address those

17   and deal with them, rather than burden this witness

18   with -- when she's here and available based on your

19   desire to just do it another day.

20           If you could put on the record                    05:37:32

21   specifically what it is you believe -- what

22   information you believe you were deprived from her

23   on the topics for which she was designated and

24   that -- and that -- and that were asked about --

25   and that were -- you were asked about -- and -- not       05:37:44
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | topics that you were not -- that you didn't talk | 05:37:49 |
| 2 | about.  The questions you asked and the answers of | |
| 3 | which you believe you were deprived for, in your | |
| 4 | view, objections unfounded. | |
| 5 | MR. KO:  I think the record is clear as | 05:37:58 |
| 6 | to both your instruction and the witness's | |
| 7 | inability to ask it -- answer basic questions with | |
| 8 | respect to topics 2d and 3c, in particular. | |
| 9 | But I will note for the record that all | |
| 10 | of these topics, which do relate to monitoring and | 05:38:15 |
| 11 | enforcement and how Facebook enforced its policy | |
| 12 | with respect to third party use of user information | |
| 13 | were all the type of questions that Ms. Hendrix had | |
| 14 | difficulty responding to on behalf of Facebook. | |
| 15 | MR. BLUME:  She -- she's here prepared to | 05:38:39 |
| 16 | talk about the policies with respect to the -- the | |
| 17 | use -- of use -- the third party use of | |
| 18 | information.  That's exactly what she's here to | |
| 19 | testify to. | |
| 20 | I would suggest that if you have any | 05:38:48 |
| 21 | questions you did not ask about any of her topics, | |
| 22 | you ask them now.  We can discuss later or -- or -- | |
| 23 | or debate whether or not my objections were | |
| 24 | appropriate.  But to topics, questions, issues that | |
| 25 | were -- you did not raise and -- and not give | 05:39:04 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Ms. Hendrix the opportunity to testify to, we are | 05:39:09 |
| 2 | prepared to sit here right now and -- and answer | |
| 3 | those questions. | |
| 4 | But we will not consent to simply taking | |
| 5 | an extra day with her to ask questions or to hit | 05:39:18 |
| 6 | topics that you did not cover today.  Because she | |
| 7 | is very well prepared -- | |
| 8 | MR. KO:  You've made that -- | |
| 9 | MR. BLUME:  I'm sorry -- she's very | |
| 10 | prepared to read your things with regard to | 05:39:28 |
| 11 | topics 2d and 2c and -- or 3c, in particular. | |
| 12 | She is prepared to talk about monitoring | |
| 13 | and how Facebook enforce -- how Facebook -- this is | |
| 14 | your quote from the record -- how Facebook enforced | |
| 15 | its policies with respect to third party use. | 05:39:41 |
| 16 | She is prepared to testify to that, as we | |
| 17 | said.  And so if you have questions on that topic, | |
| 18 | I -- I request that you ask them now. | |
| 19 | MR. KO:  You have made it perfectly clear | |
| 20 | that you do not consent to my request and I | 05:39:52 |
| 21 | understand and respect it. | |
| 22 | MR. BLUME:  I just said -- I just said I | |
| 23 | did.  I just said on the record, Mr. Ko, that with | |
| 24 | regard to topics 2d and 3c, you just said -- you | |
| 25 | note, for the record, quote, that all of these | 05:40:06 |

Page 284

```
 1     topics that -- which do relate to monitoring and        05:40:08

 2     how Facebook enforces policies with respect to

 3     third party use of -- third parties' use -- use of

 4     user -- of user information.

 5            That's what you just described.  And I'm         05:40:19

 6     telling you, on the record, with Ms. Hendrix, to my

 7     left, prepared to answer all of those questions.

 8            So if you have them, I beg you to ask

 9     them now.  And don't come back and ask them later.

10     We are open and willing to answer those questions,      05:40:34

11     as we have said all along.  That is -- that -- the

12     how that you just quoted was exactly the how that I

13     quoted.  And we are more than happy to answer

14     questions on that topic.

15            MR. KO:  If you had made -- if you               05:40:50

16     allowed me to finish you probably understand my

17     statement in full.

18            I understand, and you have made it

19     perfectly clear, that you do not consent to our

20     request to reopen this deposition.  And I get that.     05:41:02

21     And we obviously oppose that.

22            I will also note for the record that one

23     of the reasons why we need another deposition is

24     that you have unfairly and unreasonably limited

25     these topics, as you have noted many times on the       05:41:18
```

Veritext Legal Solutions
866 299-5127

```
 1    record today, that these topics only relate to the       05:41:20

 2    policies and procedures that Facebook enacted in

 3    connection with this topic.

 4              MR. BLUME:  You are free -- you -- you

 5    are --                                                    05:41:31

 6              MR. KO:  That's all I have to say.  I

 7    am --

 8              MR. BLUME:  You are required -- you --

 9    you are --

10              SPECIAL MASTER GARRIE:  One at a time,          05:41:34

11    Counsel.

12              Here's what we're going to do.  Here's

13    what we're going to do.

14              You both have been pontificating for some

15    time on the record.  We will cease pontification.         05:41:40

16    Here's what we will do.

17              Bear with me.

18              Ms. Hendrix, would you mind stepping out

19    for two minutes so I can speak to the lawyers.  We

20    will go off the record.                                   05:41:54

21              THE VIDEOGRAPHER:  Okay.  We're off the

22    record.  It's 5:42 p.m.

23              (Recess taken.)

24              THE VIDEOGRAPHER:  Okay.  We're back on

25    the record at 6:03 --                                     06:03:21
```

Page 286

```
  1              SPECIAL MASTER GARRIE:  All right.  Let's        06:03:22

  2      go back on the record.

  3              THE VIDEOGRAPHER:  -- 6:03 p.m.

  4              MR. KO:  Mr. Blume, your -- your begging

  5      was persuasive.  I'll try and -- and ask some more       06:03:37

  6      questions.

  7              But I will note for the record that, of

  8      course, the position that we have taken prior to

  9      this most recent break is that there are a number

 10      and myriad of examples in which this witness            06:03:54

 11      indicated she was not testi- -- prepared to testify

 12      as to certain aspects of these topics and that you

 13      have given improper instructions not to answer.

 14              So for those reasons, we reserve the

 15      right to reopen the deposition.  But as long as         06:04:10

 16      we're all here, I do want to ask some more

 17      follow-up questions with respect to these topics,

 18      if Ms. Hendrix is still available.

 19              MR. BLUME:  Okay.  Go ahead.

 20      Q.   (By Mr. Ko)  Ms. Hendrix, take -- take a          06:04:31

 21      look at the notice again.

 22      A.   I'm here.

 23      Q.   Okay.  Can you look at topic 3.

 24      A.   Yes.

 25      Q.   And can you identify for me all the               06:04:47
```

Page 287

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    instances in which Facebook was able to identify        06:04:49

 2    whether or not a third party was using Facebook

 3    users' data or information beyond the use case?

 4            MR. BLUME:  Hang on one second, please.

 5            Yeah, which -- which -- the actual uses         06:05:32

 6    of -- use of data beyond the use case is covered by

 7    which subsection of topic 3?

 8            MR. KO:  3c.

 9            MR. BLUME:  "Monitoring and enforcement

10    of contractual terms, including enforcement of          06:05:48

11    Policies regulating access," that one?

12            MR. KO:  That would be --

13            MR. BLUME:  Is that -- is that --

14            MR. KO:  -- what I said when I said 3c.

15            MR. BLUME:  Okay.  I mean, to the extent        06:06:06

16    you can answer the question with regard to an

17    overview of the processes regarding the monitoring

18    and enforcement, you can.  If not...

19            THE DEPONENT:  And the question again is

20    what?                                                   06:06:23

21        Q.  (By Mr. Ko)  Can you identify for me all

22    the instances in which Facebook was able to

23    identify whether or not a third party was using

24    Facebook's users' data information beyond the use

25    case?                                                   06:06:33
```

Page 288

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1          MR. BLUME:  And, again, this talks to        06:06:33
 2    processes, Mr. Ko.  It's just --
 3          SPECIAL MASTER GARRIE:  Counsel --
 4    Counsel, are you objecting?
 5          MR. BLUME:  I'm -- I'm objecting it's        06:06:40
 6    beyond the scope.  If -- if you're prepared to --
 7    if you've been prepared to talk to the identity of
 8    specific instances as opposed to the overview of
 9    the processes, which is what topic 3 asks for, you
10    may.  But if you're not prepared, you're not        06:06:54
11    prepared.
12          THE DEPONENT:  Well, during the relevant
13    period from 2007 to 2022, I don't believe we have
14    that logging.  But I can definitely speak to the
15    processes of developing the settings or other       06:07:17
16    controls made available to users to prevent or
17    limit their data or information from being accessed
18    by third parties, including how Facebook monitors
19    and enforces a contractual terms with those third
20    parties.                                            06:07:33
21          But the specific amounts, I don't even
22    think we, as a company, could produce that if we
23    wanted to.  And I -- so I don't come prepared with
24    the knowledge of that --
25      Q.   (By Mr. Ko)  Can you identify --            06:07:53
```

Page 289

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1        A.    -- which is outside the scope of what I'm        06:07:54

2    reading here.

3        Q.    Can you identify all the factual

4    instances or circumstances for when Facebook did,

5    in fact, detect abuse on its platform?                    06:08:04

6            MR. BLUME:   And I'd instruct you -- to

7    the extent that you've learned of "abuse" on the

8    platform through conversations with counsel, I'd

9    instruct you not to answer.

10           And I'd obviously review the topic and             06:08:16

11   the question and determine whether it's in --

12   within the scope of topic 3, as far as you are

13   concerned in your prep.

14           THE DEPONENT:   I am not prepared to

15   answer all of the -- nor do I think Facebook can          06:08:31

16   answer all of the amount or violations of policies

17   that we've surfaced -- surfaced in apps from 2007

18   to 2022.

19       Q.    (By Mr. Ko)  Can you describe to the

20   Court whether or not you're aware of the factual          06:08:51

21   circumstances in which Facebook determined that an

22   app was not complying with its policies?

23           MR. BLUME:   Objection.  How they

24   determined whether they were complying or whether

25   they are complying?                                       06:09:19

                                                          Page 290

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1            MR. KO:  I'm -- I'm -- I'm trying to ask      06:09:20

 2   questions related to this topic and you continue to

 3   object during -- for scope and privilege.  And

 4   continue to instruct the witness not to answer.

 5            I thought that your begging would allow      06:09:28

 6   me to actually ask questions that you would not

 7   object to.

 8            MR. BLUME:  If -- relevant to the

 9   topic -- Mr. Garrie, I'd ask that we -- we walk

10   through topic 3 with your instructions, sir, and      06:09:37

11   put it in -- in -- and identify how -- where it

12   talks about factual instances or circumstances of

13   abuse, where topic 3 speaks to the number of

14   instances of abuse.

15            And Mr. Garrie, if you -- if you'd show      06:09:57

16   us that -- where it is, then we'll be advised.  But

17   there's nothing I see -- I don't even see the word

18   "facts" or "instances" at all in topic 3.

19            And so I'm hard-pressed to -- to hear

20   Mr. Ko repeatedly make this witness feel as though    06:10:13

21   she's inadequately prepared when, on the face of

22   topic 3, the words that he's using in his questions

23   don't even appear.

24            MR. KO:  Pretty simple.  Well, if I -- if

25   I can respond, I will, Special Master Garrie.         06:10:30
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1            SPECIAL MASTER GARRIE:  Can you share        06:10:33

 2    your screen and then a response to the point raised

 3    by Counsel Blume.  But share your screen

 4    for topic 3.  So we all are reading it together.

 5            Okay.  Your response first, Counsel Ko,      06:10:44

 6    and then I will go through it.

 7            MR. KO:  As -- as we discussed earlier,

 8    it's a bit divorced from reality if a witness

 9    cannot testify as to the facts that apply with

10    respect to how Facebook monitored and enforced its   06:10:59

11    contractual terms of third parties.

12            Similarly, it's a bit divorced

13    from reality if Facebook is trying to suggest that

14    they cannot provide a witness that will testify as

15    to the facts that apply to how -- and this is in     06:11:12

16    connection with 2d -- how Facebook ensured third

17    parties' use of such data or information was

18    limited to the use case.

19            And so this, once again, goes back to the

20    point earlier where we were discussing where all of  06:11:25

21    these things, as Ms. Hendrix has testified before,

22    were fairly iterative and things evolved as the

23    factual circumstances changed.

24            And so the idea that she cannot sit here

25    and testify as to the facts that actually underlie   06:11:41
```

1    Facebook's monitoring and enforcement of                06:11:45

2    contractual terms is a bit unreasonable, from my

3    perspective, and does not comport with the actual

4    testimony that we would hope to elicit from this

5    witness on these topics.                                  06:12:00

6              MR. BLUME:  As Mr. Ko just described it,

7    she's prepared to do that, facts that apply with

8    respect to how -- this is his quote from what he

9    just said.  She -- and she is prepared to testify

10   as to the facts that apply with respect to how           06:12:13

11   Facebook monitored and enforced its contractual

12   terms.  She will testify to that.

13             She will also testify to the facts that

14   apply, quote, as to how and -- how -- and this is

15   in connection with 2d, he says -- how Facebook          06:12:25

16   ensured third parties' use of such data.  She's

17   completely prepared to testify to that.

18             But if you -- Mr. Ko -- if you refer to

19   his question, that's not what he's asking.  He

20   is -- he is making -- he's responding to my              06:12:39

21   objection by stating exactly what she's prepared to

22   testify to.  But then the questions he asks don't

23   ask those questions.

24             MR. KO:  Logical corollary to the facts

25   related --                                               06:12:56

Page 293

```
 1            SPECIAL MASTER GARRIE:  One second.  One      06:12:56

 2    second.

 3            You're both are repeating your arguments.

 4    Just -- just because I'm -- again, just -- so the

 5    question is, can you describe to the Court whether    06:13:02

 6    or not you are aware of the factual circumstances

 7    in which Facebook determined that an app was not

 8    complying with its policies.

 9            MR. BLUME:  That -- with all due respect,

10    that wasn't the question he asked.                    06:13:16

11            THE DEPONENT:  His question is --

12            SPECIAL MASTER GARRIE:  No, no.  Well,

13    I'm -- that's the question I -- okay.  So that's

14    one question that was asked and you objected, how

15    they determined whether they were complying or        06:13:24

16    whether they are complying.

17            And Counsel Ko responded, well -- and

18    then you responded.  And I don't think an answer

19    was ever provided by the witness.  And then there

20    was another question asked, so...                     06:13:40

21            MR. BLUME:  Right.  The question was --

22    the outstanding question is, are you -- whether or

23    not you are aware, quote, of the factual

24    circumstances in which Facebook determined that an

25    app -- specific app was not complying with its        06:13:51
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    policies.                                        06:13:54

 2          But then when he describes it in his

 3    argument to you, what he really wants to know is,

 4    quote, how and -- how -- how Facebook monitored and

 5    enforced its contractual terms.                   06:14:07

 6          If he just asked that question that he

 7    stated in his objection, Ms. Hendrix will answer

 8    that, how Facebook monitored and enforced.  She'll

 9    also answer the next question he posits in his

10    response to my objection, which is how Facebook    06:14:19

11    ensured third parties use such data.  She's

12    prepared to answer that.

13          And that speaks -- that is topic 3.

14    We're prepared.  All he has to do is ask those

15    questions and we'll move this along.  But he wants 06:14:31

16    specific instances of misconduct, which is not

17    topic 3.

18          MR. KO:  I don't understand how you could

19    talk about monitoring without specific instances of

20    misconduct, but...                                 06:14:47

21          SPECIAL MASTER GARRIE:  If you're wanting

22    to know, based on her -- his -- his argument,

23    Counsel Blume, is based on her work experiences,

24    how did that shape what -- the things she's here to

25    testify about.  It's -- that's what I understand   06:15:01
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    what Counsel Ko pointed.  Are there any --          06:15:04

 2              MR. BLUME:  Yeah, that's not the topic,

 3    though.

 4              SPECIAL MASTER GARRIE:  I'm -- I'm just

 5    communicating --                                    06:15:10

 6              MR. BLUME:  I -- I hear it.  Yeah, I get

 7    it.

 8              SPECIAL MASTER GARRIE:  All right.  Well,

 9    before I rule on it, let's go through it.

10              "An overview of the processes of          06:15:25

11    developing Privacy or App Settings or other

12    controls made available to Users to prevent or

13    limit their Data or Information from being accessed

14    by Third Parties, including the dates during which

15    each such Privacy or App Setting or other control   06:15:39

16    were available."

17              MR. BLUME:  Right.

18              SPECIAL MASTER GARRIE:  So --

19              MR. BLUME:  Pro- -- overview of processes

20    and dates.                                          06:15:48

21              SPECIAL MASTER GARRIE:  And specific --

22    dates.  Then the data and information, which is

23    defined terms, covered by -- so then they want the

24    data and information -- if you read the definition

25    of information -- can you go up --                  06:16:00
```

Page 296

```
 1           MR. KO:  Sure.                          06:16:04

 2           SPECIAL MASTER GARRIE:  -- to the

 3   definition, Counsel Ko, because I think this is

 4   where we're running into a little -- so

 5   information, as I understood it and maybe my --    06:16:08

 6   it's getting late so maybe I --

 7           MR. BLUME:  It's page 4.  Page 4.

 8           SPECIAL MASTER GARRIE:  Yeah.  "'Data' or

 9   'Information' refers to Personal Information,

10   Content and Information, and Data collected and    06:16:26

11   delivered about Users" -- users --

12           MR. BLUME:  Correct.  Right.

13           SPECIAL MASTER GARRIE:  -- including --

14   wait -- "including information ordered relevant in

15   the Court's October 29, 2020" -- this is discovery  06:16:35

16   order No. 9, which is on platform, off platform or

17   third party.  It is extremely broad --

18           MR. BLUME:  Yes.

19           SPECIAL MASTER GARRIE:  -- "which defines

20   the discoverable User Data at issue in this case to  06:16:48

21   include "Data collected from a user's on-platform

22   activity; Data obtained from third parties

23   regarding a user's off-platform activities; and

24   Data inferred from a user's on or off-platform

25   activity."                                       06:17:00
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1        So that's how we're defining information.          06:17:00

2   So going back down to where we're at --

3        MR. BLUME:  Yup.  What -- what of that is

4   covered by each setting or control is the

5   question -- is the topic, right.  What of that      06:17:11

6   broad swath of data the topic is for Ms. Hendrix to

7   says, well, that broad swath of data, what of it is

8   covered by each setting or control.

9        SPECIAL MASTER GARRIE:  Well, you asked

10  me to walk through it.  So you're saying to prevent   06:17:22

11  or limit the data or information.  Data or

12  information is on or off platform activity with

13  third parties.  It's specific technical defined

14  information.  That is how --

15       MR. BLUME:  I agree.                            06:17:36

16       SPECIAL MASTER GARRIE:  -- it's defined

17  in the Court order with Judge Corley, who had

18  spoken at length about it.

19       MR. BLUME:  Yeah.  But it's the

20  processes -- it's the first sentence.  It's the      06:17:43

21  "processes of developing Privacy -- "made available

22  to prevent or limit" -- the processes --

23       SPECIAL MASTER GARRIE:  No, no.  Privacy

24  or other controls.

25       MR. BLUME:  Yeah.  Right.  But that's not       06:17:53

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | an instance.  Those are the controls in place. | 06:17:55 |
| 2 | What is the -- | |
| 3 | SPECIAL MASTER GARRIE:  I get it.  You | |
| 4 | just asked me -- "made available to Users to | |
| 5 | prevent or limit their Data" -- | 06:18:00 |
| 6 | MR. BLUME:  Right. | |
| 7 | SPECIAL MASTER GARRIE:  -- "or | |
| 8 | Information from being accessed" -- "including the | |
| 9 | dates during which of these" -- okay. | |
| 10 | MR. BLUME:  Right. | 06:18:09 |
| 11 | SPECIAL MASTER GARRIE:  I'm -- I'm just | |
| 12 | walking through it -- covered, blah, blah, blah -- | |
| 13 | "and the Default setting for each." | |
| 14 | So you -- there's not -- | |
| 15 | MR. BLUME:  Right. | 06:18:14 |
| 16 | THE DEPONENT:  Your point is, the scope | |
| 17 | here from where -- | |
| 18 | MR. BLUME:  3b. | |
| 19 | SPECIAL MASTER GARRIE:  -- you read it -- | |
| 20 | in 3, as you read it -- | 06:18:17 |
| 21 | MR. BLUME:  Privacy, app settings and | |
| 22 | controls. | |
| 23 | SPECIAL MASTER GARRIE:  All right. | |
| 24 | MR. BLUME:  That's what it is. | |
| 25 | SPECIAL MASTER GARRIE:  And -- | 06:18:25 |

Page 299

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              MR. BLUME:  That's the scope.              06:18:25

 2              SPECIAL MASTER GARRIE:  For data or

 3     information.

 4              MR. BLUME:  Right.  Privacy for app

 5     settings or other controls.  That's what this topic   06:18:32

 6     focuses on.

 7              SPECIAL MASTER GARRIE:  So what -- the

 8     part where I struggle, Counsel Blume, is accessed

 9     by third parties, right.  So their -- and your

10     point -- your -- your argument is, that doesn't      06:18:44

11     cover the specific factual background that

12     generated --

13              MR. BLUME:  The -- well -- right.  The

14     topic is -- focuses on privacy or app settings or

15     other controls that govern all of this stuff.        06:18:54

16     That's what this focuses on.

17              They could have written a topic that said

18     identify all instances in which a third party

19     improperly accessed data.  That's not what this

20     says.  I don't deny them they want that              06:19:08

21     information.  But this specific topic talks about

22     privacy and app setting and controls --

23              SPECIAL MASTER GARRIE:  And then 3b --

24              MR. BLUME:  -- that cover all of this

25     stuff.                                               06:19:16
```

Page 300

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              SPECIAL MASTER GARRIE:  Then 3b, is she      06:19:16

 2    here for 3b or no?

 3              MR. BLUME:  Yes.

 4              MR. KO:  Yes, she is.  She's here for all

 5    topics.                                                06:19:22

 6              SPECIAL MASTER GARRIE:  So this is where

 7    I'm confused.  This is -- so --

 8              MR. BLUME:  Privacy and app settings --

 9              SPECIAL MASTER GARRIE:  Wait.  Wait.

10    Wait.                                                  06:19:24

11              MR. BLUME:  -- and controls about

12    processes, reviews and --

13              SPECIAL MASTER GARRIE:  But it says

14    "investigations" --

15              MR. BLUME:  Yeah, but --                     06:19:26

16              SPECIAL MASTER GARRIE:  -- "inquiries,

17    studies" -- just wait a sec.

18              MR. BLUME:  It's --

19              THE COURT REPORTER:  We're talking on top

20    of each other.                                         06:19:26

21              MR. BLUME:  Sorry.  It's -- it's the

22    including colon section leading to section b.

23              SPECIAL MASTER GARRIE:  Yeah.  So

24    including any process -- processes, check.

25    Reviews, check.  Investigations or particular          06:19:44
```

Page 301

```
 1    instances that would drive a particular -- you          06:19:47

 2    investigate a particular activity.  You asked me to

 3    explain it, I'm explaining --

 4            MR. BLUME:  It's the privacy or app --

 5    it's the privacy, app settings or controls that --      06:19:55

 6    that -- that monitor investigations, not the facts

 7    of the investigations --

 8            SPECIAL MASTER GARRIE:  So you're reading

 9    it the other way.

10            MR. BLUME:  -- not what goes into it.           06:20:04

11    It's privacy and apps settings and controls that

12    focus on other processes, reviews, investigations,

13    inquiries, studies, analyses.

14            It's not tell us about the investigations

15    or the queries and the studies.  It's tell us about    06:20:13

16    the -- the privacy or app setting or other

17    controls.

18            It's how they drafted it.  I mean, it's

19    their own words.  I -- I don't know how it can be

20    viewed in some way that -- that -- that requires us     06:20:22

21    to infer from the very words on the page that it

22    means something other than the plain language.

23            SPECIAL MASTER GARRIE:  And what about

24    3c?

25            MR. BLUME:  Same way.  Privacy or app           06:20:35
```

Page 302

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    settings and other controls, including those about      06:20:36

 2    Facebook's monitoring and enforcement of

 3    contractual of with third parties.

 4            The -- the premise of all subsections a,

 5    b and c is to discuss an overview of the processes      06:20:44

 6    of developing privacy or app settings or other

 7    controls.

 8            SPECIAL MASTER GARRIE:  But how does

 9    monitoring --

10            MR. BLUME:  That's your topic 3b.              06:20:54

11            SPECIAL MASTER GARRIE:  So then explain

12    to me what your reasoning -- how does monitoring

13    and enforcement relate to what you're talking

14    about.

15            MR. BLUME:  What -- what's -- what             06:21:00

16    privacy or app settings are in place that help

17    Facebook monitor and enforce contractual terms of

18    third parties.  What controls are in place to help

19    Facebook monitor and enforce the contractual terms

20    of third parties.  Not when has third parties          06:21:12

21    violated, but what does Facebook do to monitor

22    that.

23            SPECIAL MASTER GARRIE:  Just answer my

24    question.  You can keep the other part of the

25    answer.  Just focus on my questions, rather than       06:21:21
```

Page 303

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    the -- the other part.                              06:21:25

 2            MR. BLUME:  Yes.  And I'm sorry.  I

 3    thought I answered.  But that's how -- topic c.  If

 4    you -- if every -- sub-topics a, b and c are

 5    included --                                         06:21:35

 6            SPECIAL MASTER GARRIE:  I get it.  Yeah.

 7            MR. BLUME:  -- in this topic.

 8            THE DEPONENT:  Honestly --

 9            MR. BLUME:  So what are the privacy --

10    right.                                              06:21:39

11            THE DEPONENT:  Counsel --

12            MR. BLUME:  -- app settings or controls

13    for monitoring --

14            SPECIAL MASTER GARRIE:  Counsel Blume.

15    Counsel Blume, I hear you.  You've got to just take 06:21:42

16    a --

17            MR. BLUME:  Okay.

18            SPECIAL MASTER GARRIE:  -- take a

19    second -- take a breath.  I'm just going through

20    them.  Okay.                                        06:21:48

21            MR. BLUME:  Okay.

22            SPECIAL MASTER GARRIE:  I'm trying to

23    understand your position and perspective, and then

24    we can have further conversation.

25            MR. BLUME:  Right.  Yes.                    06:21:54
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              SPECIAL MASTER GARRIE:  So you prepared        06:21:56

 2   the witness to -- like from where I -- so from

 3   your -- from Facebook's perspective, the witness is

 4   prepared to testify as to the processes of

 5   developing privacy or app settings or other, blah,       06:22:08

 6   blah, blah, and the date.  So that's what --

 7   controls available, not -- and your position is

 8   having the witness as a representative of the

 9   company speak to what drove the particular

10   instances to drive those processes and actions           06:22:27

11   she -- that witness isn't prepared to testify to

12   that.

13              MR. BLUME:  Yeah.  It -- there's nothing

14   in here that speaks to --

15              SPECIAL MASTER GARRIE:  I'm not -- wait.       06:22:36

16   Wait.

17              (Simultaneously speaking.)

18              MR. BLUME:  -- facts.

19              SPECIAL MASTER GARRIE:  Answer my

20   question.                                                06:22:37

21              MR. BLUME:  So -- yes.

22              SPECIAL MASTER GARRIE:  I'm not asking --

23   I'm not asking what --

24              MR. BLUME:  Yes.  She is prepared to

25   answer here.                                             06:22:40
```

Veritext Legal Solutions
866 299-5127

```
 1              SPECIAL MASTER GARRIE:  I just want to --      06:22:40

 2              (Simultaneously speaking.)

 3              MR. BLUME:  You're absolutely right.  She

 4     is prepared to --

 5              THE COURT REPORTER:  Please -- please --      06:22:40

 6              MR. BLUME:  That's exactly what she's

 7     prepared to answer -- to testify to, exactly how

 8     you just described it, the processes -- privacy and

 9     app settings and controls.

10              SPECIAL MASTER GARRIE:  I got it.            06:22:50

11     Counsel Blume, I got it.  Answer my questions and

12     not a bunch of other questions.  It will be much

13     quicker --

14              MR. BLUME:  Gotcha.

15              SPECIAL MASTER GARRIE:  -- for us to get     06:22:57

16     this done.

17              MR. BLUME:  Under- -- understood.

18              And -- and just -- if I may, Mr. Garrie,

19     its -- it's in fairness to Ms. Hendrix, right.

20              SPECIAL MASTER GARRIE:  I understand,        06:23:17

21     Counsel.  I --

22              MR. BLUME:  She -- she has to -- right.

23              SPECIAL MASTER GARRIE:  Counsel Blume, I

24     have been a 30(b)(6) witness.

25              MR. BLUME:  Right.                           06:23:21
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1            THE DEPONENT:  I understand the concept,      06:23:22

2     the construct.  I understand the case law.  Don't

3     interpret my silence as an invitation to --

4            MR. BLUME:  No, I -- I understand.

5            SPECIAL MASTER GARRIE:  I'm just              06:23:28

6     scrolling --

7            MR. BLUME:  You're scrolling text.

8            SPECIAL MASTER GARRIE:  -- to read what

9     the question was.

10           MR. BLUME:  Understood.                       06:23:31

11           SPECIAL MASTER GARRIE:  Okay.  And your

12    instruction -- the long instruction --

13    Counsel Blume, the long and short of your

14    instruction was to instruct the witness not to

15    answer --                                            06:24:16

16           MR. BLUME:  Right.

17           SPECIAL MASTER GARRIE:  -- based on it's

18    beyond the scope.

19           MR. BLUME:  Yes, to the question,

20    identify all factual instances or circumstances     06:24:23

21    under Facebook --

22           SPECIAL MASTER GARRIE:  Nah, nah --

23           MR. BLUME:  -- did, in fact, detect --

24    that's the question -- and did, in fact, detect.

25    And we -- I object -- I objected that it is beyond   06:24:30
```

Page 307

```
 1    the scope of topic 3 simply --                    06:24:33

 2              SPECIAL MASTER GARRIE:  Okay.

 3              MR. BLUME:  -- simply enough.

 4              SPECIAL MASTER GARRIE:  Thank you.  All

 5    right, Counsel Ko.  You can stop sharing.          06:24:37

 6              Counsel Ko, any -- any point or question

 7    before --

 8              MR. KO:  Sure.  Two quick things.

 9              One, again, I just come back to the

10    simple and practical point that I'm not sure how   06:24:58

11    one could suggest that the factual circumstances

12    behind monitoring or enforcement are not related to

13    this topic.

14              And two, with respect to 2d, in

15    particular, which we've talked about quite often,  06:25:12

16    and which Mr. Blume likes to both either ignore or

17    inject policies and procedures into, there is no

18    aspect of section 2d which requires Facebook to

19    produce a witness about how Facebook ensured third

20    parties' use of data and information was limited to 06:25:31

21    the use case.

22              I'm -- I'm not quite sure how I can

23    elicit any testimony whatsoever if I'm not allowed

24    to ask questions about the factual circumstances

25    behind how Facebook ensured that.                  06:25:42
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1              MR. BLUME:  Again --                    06:25:46

2              THE DEPONENT:  Ask that question.

3              MR. BLUME:  -- he can ask that question.

4              THE DEPONENT:  Yeah.

5              MR. BLUME:  Ask the question, how did    06:25:48

6    Facebook ensure that.  Ask that question.  She'll

7    sit here and answer that as long as we -- we want.

8    Ask that question.  The very question that is

9    listed in the topic, ask that.

10             SPECIAL MASTER GARRIE:  So there's a     06:26:07

11   question pending.

12             Are you going to take the advice of your

13   counsel, Ms. Hendrix, before we --

14             THE DEPONENT:  Yeah.  I -- I don't

15   remember the -- I -- yes, I'm going to take the    06:26:19

16   advice of -- of counsel.

17             SPECIAL MASTER GARRIE:  Okay.  Good.

18             Mr. -- Counsel Ko, would you like to ask

19   another question?  I'm not -- I'm -- I'm -- the

20   parties -- I will probably -- as -- as both        06:26:31

21   parties' rights are -- can bring a motion before

22   the Special Master seeking an additional topic or

23   clarification for the 30(b)(6), accordingly for

24   said witness to be provided to speak to that.

25   However, I do -- so I remind both parties of that   06:26:49
```

Page 309

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    opportunity.                                        06:26:57

 2          With that said, Mr. -- Counsel Ko, do you

 3    have another question?

 4          MR. KO:  I do.  Thank you,

 5    Special Master.                                      06:27:05

 6          And -- and I'll note that -- just my

 7    position on the record, I'll note why the --

 8    overall that this deposition has been so unhelpful,

 9    because we just spent 17 minutes listening to

10    Mr. Blume discuss with you what this notice means   06:27:18

11    on the record.  And so I just repeated my --

12          SPECIAL MASTER GARRIE:  Counsel Ko, I

13    wouldn't worry so much about getting additional

14    time or not getting additional time at this point.

15    I'm inclined if such a request is made -- maybe not 06:27:32

16    with this witness, but if -- I wouldn't focus on

17    the time at this point.  I would just ask the

18    additional questions you may have.

19          MR. KO:  Thank you.  I appreciate that.

20          Q.   (By Mr. Ko)  With respect to data, misuse 06:27:50

21    on the Facebook platform, can you describe the

22    factual circumstances in which Facebook utilized

23    certain policies and procedures to, in fact,

24    enforce and monitor data misuse on the Facebook

25    platform?                                            06:28:14
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        A.   Yes.  So first, we develop the policies          06:28:18

 2   that developers agree to and must comply with.  We

 3   train -- for example, we -- we train the teams

 4   accountable for policing the platform, which is

 5   primarily the developer operations team.  So we          06:28:35

 6   train them on those policies and create specific

 7   guidance and instructions for how they can review

 8   apps for compliance with the terms and policies, to

 9   the extent we agree that those additional criteria

10   guidelines for reviewing for compliance might be          06:29:00

11   helpful to our teams that are actually doing the

12   review.

13        And then we train all of the different

14   teams.  So for example, the app review team, the

15   enforcement team, the investigations team, all of          06:29:17

16   the vendor -- vendors that work on reviewing apps

17   for compliance.  So we will train everyone on those

18   terms.

19        We also train our sales and partnerships

20   and other teams, including our own teams, as we          06:29:32

21   grow and build new people, so that broad wide group

22   of the company can understand what these terms are.

23   So that they can help us police the platform by

24   servicing and identifying those potential

25   violations of our terms.  And we educate them on          06:29:54
```

Page 311

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    how they can report those violations to the          06:29:55

2    appropriate teams.

3          We teach them how they can ask questions

4    about the policies, to the extent that they have

5    them.  We train the external developer community     06:30:03

6    and at times even nondevelopers on our terms where

7    applicable.

8          We do monitoring which has evolved over

9    time, different types of monitoring.  But we use

10   both automated and manual means to detect potential  06:30:27

11   violations to, again, like including like the

12   reporting channels that I -- referred to earlier.

13   ████████████████████████████████████

     ██████████████████████████████

     █████████████████████████████████████         ███████

     ████████████████████████████████

     █████████████████████████████████████

     ████████████████████████████████████

     █████████████████████████████████

     █████████████                                  ███████

21         We, present day, asked developers

22   proactively to do -- we -- we put the data use --

23   data use checkup tool in front of developers, which

24   shows them the permissions that they have.  They

25   already know that they have them and they're        06:31:33

                                            Page 312

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    available in their app dashboard and other          06:31:35

 2    settings, but we put in front of them those

 3    permissions and ask them to yearly review that and

 4    then assess whether they still need those

 5    provisions.                                          06:31:48

 6          We have automated tools in place that

 7    will prevent a developer from accessing a user's

 8    information through the platform if they haven't

 9    used the application within 90 days.

10          We -- we also put certain developers          06:32:00

11    in -- with access to certain information or to

12    higher amounts of installs through what we refer to

13    as the data protection assessment that asks them

14    questions about their data use practices, primarily

15    focused on sections 3 through 6 of the platform      06:32:23

16    terms.

17          We require apps to go through app review

18    for nearly all use of the platform.  If they want

19    to request a new permission, then so that would

20    trigger a thorough review of the app at the app      06:32:40

21    review stage.  Each time they want to decide that

22    they are building their app in a way that requires

23    the need to request permissions which require

24    review, all of which do, for Facebook login.

25          If they are asking for more than name,         06:32:59
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    profile, picture and email, even those apps that          06:33:01

2    don't require upfront app review are reviewed every

3    year during the app re-review process, where the

4    teams are asking -- are presented with a number of

5    questions designed to surface potential violations        06:33:16

6    ███████████████████████████████

     ███████████████████████████████████

     ███████████████████████████████████

     ████████████████████████████████

     ██████████████████████████████          ██████

     ███████████████████████████████████

     █████████████████████████████████

     ████████████

14           We have a data bounty program where we

15   pay external reporting parties when they report to        06:33:49

16   us.  So we incentivize the reporting of potential

17   violations as an additional monitoring and

18   enforcement tac- -- tactic.

19           We have -- there's a third party, IDAC,

20   which serves to independently be reviewing apps for       06:34:10

21   potential compliance with not just our platforms,

22   but others.  And we -- we were the leader in

23   getting that to -- to come into place.  And so we

24   engage and ask for help through the entire

25   community, again, by educating all of these              06:34:29

Page 314

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    individuals on the terms.                           06:34:32

 2           Going back to the data point program,

 3    we -- that is not just specific to platform term

 4    data collection through permissible means.  It also

 5    includes data that is accessed through unauthorized  06:34:47

 6    means by scraping us.  So that is another part of

 7    the bounty that will pay out where the criteria is

 8    met.  For example, if we already are aware of an

 9    investigation because it's been reported either

10    internally -- surfaced internally or reported by     06:35:04

11    another person externally, then we will thank the

12    reporting party.

13           We -- I feel like I've been incredibly

14    comprehensive, but please let me know if you have

15    any further questions on that point.                 06:35:19

16           MR. KO:  It sounds like you got your

17    second wind.

18           Rebecca, that was amazing.  Good job.

19           THE DEPONENT:  I'm -- I'm not Rebecca,

20    but thank you.                                       06:35:30

21           MR. KO:  Right.  I was talking to

22    Rebecca, transcribing all of that.

23           THE DEPONENT:  Oh.

24       Q.  (By Mr. Ko)  So with respect -- with --

25    with respect to --                                   06:35:39
```

Page 315

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              MR. BLUME:  But -- but good job to you,        06:35:39
 2     too.
 3              THE DEPONENT:  Oh, thanks.
 4              MR. KO:  Right.  No, I -- sorry.  I --
 5     I -- I implied that as well.                            06:35:45
 6              THE DEPONENT:  I can't see her
 7     transcribing, so I -- I didn't know what you were
 8     referring to.  I can't see whatever it is that
 9     you're referring to.  So I'm sorry.  But I thought
10     you were directing your comment to me.                  06:35:53
11         Q.   (By Mr. Ko)  In all the examples that you
12     gave in response to my question, can you identify
13     all the instances in which Facebook actually
14     applied those policies and procedures that you
15     described to a particular app?                          06:36:10
16              MR. BLUME:  Objection.  We're back to
17     topic 3.  If you can point to which of the topics
18     and sub-topics talk about particular instances of
19     application of the policies.
20              MR. KO:  So I'm now looking at topic 2d,        06:36:35
21     in particular --
22              MR. BLUME:  Okay.
23              MR. KO:  -- addition to 3c.  But -- so
24     I -- I don't know if I have to respond to that,
25     but I think --                                          06:36:42
```

Page 316

```
 1            (Simultaneously speaking.)              06:36:43

 2            MR. BLUME:  Well, she's here.

 3            MR. KO:  So let me -- I'm just going to

 4    ask the question again so the record is clear.

 5       Q.   (By Mr. Ko)  Can you identify all the    06:36:48

 6    instances in which Facebook actually applied those

 7    policies and procedures that you described to a

 8    particular app?

 9            MR. BLUME:  How -- how they -- well --

10            MR. KO:  And you object?                 06:37:00

11            MR. BLUME:  Yeah, to the extent it's 2d

12    my objection is, she -- I mean, it's clear why you

13    didn't want to ask the question.  She just

14    described how they ensure it.

15            I'm not sure how this particular          06:37:09

16    instances fits under 2d.  So if you can educate me,

17    I'll perhaps permit it.  But as I read it in the

18    plain language of the -- 2d, I think it's not --

19    what specific instances is not covered.

20            MR. KO:  I -- I don't think I have a duty 06:37:28

21    here to try and educate you.  You can object --

22            MR. BLUME:  Well, it's your topic.  If

23    you want an answer, you do, because it's your

24    topic.  So you can -- if -- you wrote it.  So if

25    you want answer --                              06:37:38
```

Page 317

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              MR. KO:  Stop repeating it -- can you         06:37:40

 2      stop --

 3              MR. BLUME:  -- I would request that you

 4      educate me on it.

 5              MR. KO:  This is why this has been a          06:37:44

 6      completely unhelpful day, the continual --

 7              MR. BLUME:  That's --

 8              SPECIAL MASTER GARRIE:  Counsel Ko --

 9              MR. BLUME:  That's -- that's not why --

10              SPECIAL MASTER GARRIE:  Counsel Blume,        06:37:51

11      stop talking.

12              MR. BLUME:  That is not why.

13              SPECIAL MASTER GARRIE:  Stop.  Put

14      yourselves on mute.

15              Can you please bring up 2d, Counsel Ko.      06:37:58

16              I will rule.  Let's see.

17              Court Reporter, I'm looking for the

18      question.  Can you read it back.

19              (Record read as follows:

20              "QUESTION: Can you identify all the          06:39:02

21              instances in which Facebook actually

22              applied those policies and procedures

23              that you described to a particular

24              app?")

25              SPECIAL MASTER GARRIE:  Counsel Ko, are      06:39:39
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    you -- when I read 2d, it says "limited to the Use        06:39:40

 2    Case."

 3              Can you clarify when you say "particular

 4    app," what do you mean?

 5              MR. KO:  So a particular -- well, I -- I         06:39:47

 6    wanted to start broad and I would hone in, which

 7    I'm entitled to do.  But I am talking about, first,

 8    if she has any understanding with respect to when

 9    or the number of times -- generally, specifically,

10    either one -- of when she was aware of the actual        06:40:05

11    times in which Facebook applied all the examples

12    she gave of the various policies and procedures

13    that Facebook enacted to a particular app that may

14    have either been using information beyond the use

15    case or in any improper way.                             06:40:28

16              SPECIAL MASTER GARRIE:  And what was your

17    issue with -- how is this beyond the scope,

18    Counsel Blume?

19              I'm trying to read your answer, but it

20    was very long.                                           06:41:13

21              MR. BLUME:  It -- because it asks how,

22    not when, not what, not which.  All words they knew

23    and could have written in this topic, but they

24    didn't.  They chose how.  And now if he's trying to

25    expand it to include when, which, what.  I mean,         06:41:28
```

Page 319

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    that's --                                         06:41:31

 2          SPECIAL MASTER GARRIE:  So is it your

 3    position that Facebook will produce -- if I,

 4    hypothetically, let the plaintiff submit another

 5    set of 30(b)(6) depositions requests, and they    06:41:38

 6    modify it accordingly, will you submit a different

 7    witness to answer these questions?

 8          MR. BLUME:  If they're somehow permitted

 9    to -- to file additional 30(b)(6)s --

10          SPECIAL MASTER GARRIE:  Yes.                 06:41:53

11          MR. BLUME:  -- we'd have to take -- we'd

12    take that under consideration as to whether -- as

13    to whether to put someone up for yet another

14    30(b)(6), which would now be their third request.

15    I mean, there are interrogatories they had --      06:42:02

16          SPECIAL MASTER GARRIE:  Well, when you

17    read it, Judge Chhabria was pretty clear as to

18    what is -- he was pretty -- I have pretty good

19    clarity as to this part.  So -- okay.

20          MR. BLUME:  If they -- they -- if --         06:42:15

21    yeah, if they -- if they want -- if you -- if you

22    want to give them permission to continue with

23    another -- with another 30(b)(6) witness on those

24    specific topics, we know they know how to ask them.

25    They should do it properly and we'll consider it    06:42:27
```

Page 320

```
 1    when we get it.                                        06:42:29

 2              SPECIAL MASTER GARRIE:  Is the -- the

 3    witness -- I mean, my concern again is the witness

 4    isn't prepared to answer the -- the other pieces of

 5    the question; is that --                               06:42:42

 6              MR. BLUME:  Yeah.

 7              SPECIAL MASTER GARRIE:  -- basically your

 8    concern?

 9              MR. BLUME:  Right.  And I would ask you

10    -- I would ask you to determine that it -- she        06:42:47

11    wasn't required to prepare because then -- because

12    that's going to -- I'll -- we'll deal with another

13    request that's separate.

14              But what I don't want this witness to

15    believe when she leaves is she read "how," and that   06:43:00

16    she should have somehow interpreted "how" to mean

17    "what" and "when" and "which."  And that she

18    somehow was inadequate in her efforts to prepare.

19              She spent a lot of time doing this and I

20    just don't think it's fair to suggest that when --    06:43:13

21    when we read "how" -- whether they're entitled to

22    do it again in another depo or another notice.  And

23    that's fine --

24              SPECIAL MASTER GARRIE:  And I got it,

25    Counsel Blume.  I noted for -- I note your request    06:43:24
```

Page 321

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    for the record.                                    06:43:26

 2            You can stop sharing, Counsel Ko.

 3            I'm going to refrain from issuing any

 4    ruling to your request, Counsel Blume, in part,

 5    because I just haven't read them all.  But I do --  06:43:40

 6            So Counsel Ko -- so Ms. Hendrix,

 7    returning back to you, which is what we're here

 8    for, I -- counsel gave the -- objected as beyond

 9    the scope.

10            Is that correct, Counsel Blume?  I         06:43:58

11    believe that was your objection.

12            MR. BLUME:  It was.

13            SPECIAL MASTER GARRIE:  Okay.  Are you

14    going to heed the advice of counsel -- so I

15    would -- have them reread it all, but we're talking 06:44:08

16    about 30 pages.  So I'm just cutting to the chase.

17            THE DEPONENT:  I'm prepared to answer

18    everything that is described in the topics.  And I

19    agree with my counsel that nothing in here asked me

20    to prepare how many violations of specific          06:44:26

21    provisions we've surfaced over the years.

22            SPECIAL MASTER GARRIE:  I -- I'm not

23    ruling any which way or the other as to that.  I

24    haven't -- I wasn't privy to the motions or -- or

25    the conversations between the lawyers.  So I -- and  06:44:38
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    we're -- and I -- and I don't know what was         06:44:42

 2    exchanged.

 3            So I -- I understand and appreciate where

 4    you're coming from.  And I -- and I -- and I

 5    commend you for your patience today and -- as I     06:44:49

 6    thought it was three hours as well.

 7            So with that said, Counsel Ko -- so are

 8    you going to answer the question or -- or follow

 9    the instructions of counsel?

10            THE DEPONENT:  I'm not prepared to answer    06:45:04

11    subjects that were not included in the topics that

12    I was asked to prepare for.  So I -- I can't answer

13    the question.  I'm going to follow my -- advice of

14    counsel.

15            SPECIAL MASTER GARRIE:  There you go.         06:45:18

16    We'll just stop there.

17            Counsel Ko, ask another question.

18       Q.   (By Mr. Ko)  So outside of the examples

19    that you gave for the various ways in which

20    Facebook would enforce, was it also the case that   06:45:31

21    individual employees often determined whether or

22    not Facebook would enforce against a particular

23    third party?

24       A.   Human beings are charged with -- to the

25    extent, they are -- for example, on developer       06:45:51
```

Page 323

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    operations, they are accountable to understand and      06:45:53

 2    know the policies.  To the extent they have

 3    questions or surface any gray areas and aren't

 4    sure, there are teams, like the data policy

 5    management and enforcement team and the product       06:46:04

 6    policy team that manages most of the provisions in

 7    the developer policies, except those that apply to

 8    collection and use of data obtained from us.

 9            They would review those applications for

10    compliance.  And to the extent they surfaced a        06:46:20

11    violation, they would look to what we refer to as

12    the enforcement rubric.  That is a -- a document

13    that outlines each provision and what the -- the

14    appropriate enforcement action is, if we surfaced

15    those violations.  And then they would be             06:46:39

16    instructed to follow those -- that -- and that take

17    that appropriate enforcement action.

18            I didn't speak in granularity with

19    respect to the enforcement actions that they could

20    take, but it's -- the enforcement actions would be    06:46:56

21    decided when we launched the policies and initially

22    developed that enforcement rubric, which first was

23    developed in 2009, because we wanted to ensure

24    consistency and uniformity in enforcement.

25            No one is accountable for making             06:47:15
```

Page 324

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    exceptions because we are not an exceptions-based       06:47:18

2    company.  If we surface a violation, we enforce

3    consistent with the enforcement rubric.  And -- and

4    we do so -- for example, today, based solely on the

5    nature, scope, severity of the violation and not       06:47:32

6    with respect to the relationship that we have with

7    the developer who has been concluded by a human as

8    violating a specific provision.

9            Speaking of how it's gone during the

10   relevant period, it is true that during a period of    06:47:50

11   time the enforcement rubric did have a protocol for

12   reaching out to anyone who managed the relationship

13   with the partner to notify them that their partner

14   has been found to be violating one or more of the

15   respective provisions.                                 06:48:07

16           That has changed and now we do not have

17   that protocol and procedure.  They are notified via

18   what we refer to as a FYI email that outlines what

19   we've surfaced and the fact that we will be

20   reaching out to their partner through the developer    06:48:23

21   operations team.  So that they can be prepared to

22   respond to the developer.

23           To the extent the developer has any

24   questions or confusion, we encourage developers to

25   reply to the communications that we've sent that       06:48:37

Page 325

```
 1    outline the violations.  But it is common --          06:48:39

 2    some -- common practice for a developer that has --

 3    that is a managed partner to reach out to their --

 4    the person at the company that they have that

 5    direct relationship with on and -- but no             06:48:53

 6    additional time is given in the context of that.

 7    So developers -- all developers, whether managed or

 8    unmanaged, must comply with the terms.  There are

 9    no exceptions.  And they have the exact same amount

10    of time afforded to them whether they are managed     06:49:11

11    or unmanaged.  And the enforcement rubric -- which

12    is what we look to when the team surfaces a

13    violation.

14        Q.   And what is the case that all developers

15    did, in fact, comply with these terms?                06:49:24

16        A.   I don't understand your question.

17        Q.   Are you aware of the instances in which

18    developers did or did not comply with the terms

19    that you had described a moment ago?

20        A.   As we've done throughout today, I will do    06:49:46

21    my own bitching and moaning.  I have already

22    answered that question twice.

23             So for the third time, I will let you

24    know that I am not prepared to tell you every

25    single violation that has been surfaced and           06:49:57
```

Page 326

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | confirmed from 2007 to 2022.  I was not asked to | 06:50:02 |
| 2 | prepare for that.  It is not included in the topics | |
| 3 | that you wrote. | |
| 4 | It's how do these processes work.  I have | |
| 5 | explained in thorough detail, potentially like | 06:50:11 |
| 6 | overly explaining how we're doing this.  But, | |
| 7 | again, I would just ask that we try not to repeat | |
| 8 | questions I've answered because I am getting tired. | |
| 9 | But I will stay here all night. | |
| 10 | Q.  Well, to be fair, Ms. Hendrix, I was | 06:50:31 |
| 11 | responding to your question -- or your response | |
| 12 | that you didn't understand my question.  But it | |
| 13 | sounds like you understood my question. | |
| 14 | MR. BLUME:  Anyway, since -- can you ask | |
| 15 | the next one. | 06:50:43 |
| 16 | Q.  (By Mr. Ko)  Wasn't it the case that | |
| 17 | Facebook's existing relationship with a third party | |
| 18 | and the type of partner they were, determined | |
| 19 | whether or not Facebook was going to enforce its | |
| 20 | policies against that third party? | 06:50:59 |
| 21 | A.  Absolutely not. | |
| 22 | Q.  With respect to the enforcement rubric, | |
| 23 | can you identify any instances in which employees | |
| 24 | went outside of that rubric to decide not to | |
| 25 | enforce against a particular third party? | 06:51:15 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1        A.   As I've just said and said earlier, we      06:51:19

 2   are not an exception-based company.  Have we given

 3   part- -- managed partners additional time to come

 4   into compliance due to the need to reach out to the

 5   managed partners so they know that we've surfaced     06:51:30

 6   an issue, the answer to that is there -- is some

 7   time during the relevant period where -- where you

 8   look to the rubric, and there's a column for

 9   managed and unmanaged, which shows the developer

10   operations team, that they need to take that         06:51:43

11   additional step of notifying the partner manager of

12   what they have surfaced within the application.

13   And -- but there's not any instances where we would

14   ignore or turn a blind eye to a violation.

15        The only distinction as between managed          06:52:02

16   and unmanaged would be there have been times where

17   a developer might get a little bit more time due to

18   the need to reach out to the partner manager.  But

19   at the end of the day, we always enforce those

20   provisions as we surface any violation.               06:52:19

21        Q.   But how did Facebook ensure that they

22   were actually enforcing those provisions?

23        A.   Through the required -- through the

24   education of the policies.  So your job on

25   developer operations is not just to enforce the      06:52:38
```

Page 328

```
 1    policies.  But in order to effectively enforce          06:52:40

 2    them, you have to ensure that you have a very

 3    strong understanding of all of the terms and

 4    policies that are applicable to each respective

 5    application.                                            06:52:50

 6            To the extent that you acquire that

 7    knowledge, if you ever are unsure, the process

 8    calls to reach out to either the data policy

 9    management and enforcement team.  Or for

10    nondata-policy-related questions, for the policy        06:53:02

11    team that handles everything that my team does not,

12    you can ask for gray areas.

13            We will either use that as a trigger to

14    inform the need to potentially develop -- going

15    back to another topic -- to develop new policies --     06:53:19

16    so if we think we need to be clearer, or we go back

17    to the -- the teammate on developer ops and we let

18    them know, hey, this is not a gray area.  This is

19    the respective provision or provisions that you

20    should cite to or give other kind of guidance or        06:53:34

21    clarity.

22            So there is -- through education.  We

23    also do Q and A, where we audit a sample of the

24    enforcement actions that we've taken to -- and

25    decisions that we've made to assess and ensure for      06:53:52
```

Page 329

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    quality assurance perspectives that we are          06:53:55

 2    effectively and accurately policing the platform

 3    consistent with the terms and policies that we have

 4    in place.

 5           So yes, leaning in on all of the             06:54:12

 6    additional methods that I described for the

 7    automated and manual means for education, review,

 8    re-review.

 9       Q.   Couldn't individuals like Mark Zuckerberg

10    or Sheryl Sandberg, or any other Facebook exec, for 06:54:29

11    that matter, determine whether or not Facebook

12    should enforce its platform policy against a

13    third party?

14           MR. BLUME:  Objection.  Was it -- was it

15    couldn't or didn't -- was what the first -- can     06:54:44

16    you -- I missed the first part of that question.

17           MR. KO:  Couldn't.

18           MR. BLUME:  Could you -- could the

19    reporter reread or you restate it.

20           MR. KO:  Sure.                               06:54:57

21       Q.   (By Mr. Ko)  Couldn't individuals like

22    Mark Zuckerberg and Sheryl Sandberg, for that

23    matter, any Facebook executive, determine whether

24    or not to enforce the platform policies -- enforce

25    Facebook's platform policy against a particular     06:55:13
```

Page 330

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    third party?                                        06:55:16

 2        A.   So you're wanting me to speculate on what

 3    our executives might be able to do, given their

 4    roles at our company?

 5        Q.   I'm not asking you to speculate --         06:55:28

 6    speculate.

 7             I'm asking you, as a corporate designee

 8    of Facebook, if you are aware of any instances, in

 9    connection with Facebook's monitoring and

10    enforcement of third parties, of whether            06:55:39

11    individuals like Mark Zuckerberg or

12    Sheryl Sandberg, or any other Facebook executive,

13    for that matter, could determine themselves whether

14    or not to enforce platform policies against a

15    third party?                                        06:55:53

16             MR. BLUME:  Objection.  Compound.  And

17    does call for speculation.

18             THE DEPONENT:  Yeah.  The word "could" --

19    of course, Mark could decide that -- if we told him

20    something was against policy, as with any human, he 06:56:06

21    could have feedback, like the culinary team, on

22    whether that policy should be in place or if it's

23    outdated or doesn't make sense, given the fact

24    that, you know, time goes go and things change.

25             So, sure, it's possible that any human,    06:56:21
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    including external people outside of the company,      06:56:23

 2    could have opinions on whether we should enforce.

 3    But those opinions would be whether the efficacy of

 4    the policy and retaining the policy itself, or

 5    whether it should be clear or not, again, we are      06:56:41

 6    not an exceptions-based policy.

 7         Q.   (By Mr. Ko)  Have you ever heard of a T0

 8    partner?

 9         A.   I've heard of T0.

10         Q.   What is your understanding of T0?          06:57:03

11         A.   I don't -- I don't remember.  I just know

12    I've heard of it.  But it doesn't apply in the

13    context of the monitoring enforcement and policing

14    of the platform and whether to enforce on

15    violations, whether you're T0 or however far the     06:57:22

16    numbers go.

17              So I'm not remembering right now.  I

18    don't -- that's not relevant to the question of

19    whether a developer with that designation has -- to

20    the extent, they even -- it's relevant to them --    06:57:37

21    has that status.  That -- that's not relevant to

22    the question of whether they're violating our

23    policies and whether we will enforce them.

24         Q.   Is there a policy or enforcement rubric

25    that governs how Facebook would enforce its          06:57:50
```

Page 332

```
 1    policies as to partners that were in the T0            06:57:51

 2    category?

 3         A.   It --

 4              MR. BLUME:  Object.  Other than the

 5    ones -- the policies she's already spoken of?          06:57:59

 6              MR. KO:  I have a question.  You can

 7    raise an objection --

 8              SPECIAL MASTER GARRIE:  Object --

 9    Counsel Blume, you didn't make an objections.

10              Are you making an objection?               06:58:12

11              MR. BLUME:  Well, I just -- I'm trying to

12    save time.  She can go back through all the

13    policies again, or is she talking about --

14              SPECIAL MASTER GARRIE:  Counsel, do you

15    have an objection to the question or not?             06:58:19

16              MR. BLUME:  No.  No objection.  Object --

17    yes.  Objection to form.

18              SPECIAL MASTER GARRIE:  There you go.

19              Please answer the question, Ms. Hendrix.

20              THE DEPONENT:  I, sitting here today,        06:58:32

21    don't believe T0, or that type of specificity.  And

22    it was managed or unmanaged columns is what I'm

23    confident saying it has been.  But it's -- that is

24    certainly not the case today.

25         Q.   (By Mr. Ko)  Have you heard of a T1 or T2    06:58:51
```

1    partner?                                              06:58:53

2        A.   Yes.  And it -- I have this -- just for

3    purposes of our time, same response, we do not take

4    into account what -- what type of partner you are.

5    And we only enforce based on the nature, scope and     06:59:06

6    severity of the violation consistent with the

7    enforcement rubric, which does not distinguish

8    between tier zero and no tier partners, or anything

9    like that.

10           It's all whether -- whether Facebook          06:59:20

11   knows who you are and works with you directly

12   through our teams or not, through just a developer

13   that we haven't any type of direct relationship

14   with, other than our contract with you to comply

15   with our provisions and adhere to our terms.  It is    06:59:38

16   not -- same response to any questions that you

17   presented with respect to tier -- tier zero.

18       Q.   So with respect to -- I just want to make

19   sure the record is clear.

20           But with respect to T0, T1 and T2, is         06:59:54

21   there any policy or rubric that governed how

22   Facebook would enforce its policies as to partners

23   in these tiers?

24           MR. BLUME:  Objection.  Asked and

25   answered.                                              07:00:10

                                                     Page 334

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | THE DEPONENT:  I have nothing further to | 07:00:12 |
| 2 | add other than what I've said. | |
| 3 | Q.  (By Mr. Ko)  Wasn't it also the case that | |
| 4 | Facebook would factor in how much third parties | |
| 5 | were spending on advertising on the Facebook | 07:00:20 |
| 6 | platform, before determining whether or not to | |
| 7 | enforce its policies against these third parties? | |
| 8 | A.  Well, the previous question was never the | |
| 9 | case.  It's -- it's we only had managed and | |
| 10 | unmanaged columns in the context of the rubric, and | 07:00:34 |
| 11 | none of that had anything to do on whether or not | |
| 12 | to enforce or not. | |
| 13 | Now, whether a developer was spending ing | |
| 14 | zero dollars, or a lot more money than zero | |
| 15 | dollars, that is not a factor in whether to | 07:00:49 |
| 16 | ultimately enforce the provision. | |
| 17 | Q.  So advertising spend was not a part of | |
| 18 | the enforcement rubric, correct? | |
| 19 | MR. BLUME:  Objection.  Asked and | |
| 20 | answered. | 07:01:05 |
| 21 | THE DEPONENT:  Correct.  It's not a part | |
| 22 | of the enforcement rubric.  Partners might be like, | |
| 23 | can we have more time; this is an important | |
| 24 | partner, yada, yada.  And we would let them know | |
| 25 | that the developer must come into compliance with | 07:01:16 |

Page 335

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    our policies.  And now, sitting here present day,        07:01:19

 2    that doesn't contemplate any extensions of time

 3    that we wouldn't afford in -- to a nonmanaged

 4    developer.

 5          And, again, those extensions are baked             07:01:29

 6    into the rubric.  So for example, you don't get an

 7    extension for severity -- high severity provisions.

 8          Q.   (By Mr. Ko)  Are you familiar with the

 9    2012 FTC consent decree?

10          A.   Yes, I am.                                     07:01:46

11          Q.   Are you aware of the subsequent 2019 FTC

12    enforcement action?

13          A.   Yes.

14          Q.   So the consent decree and the subsequent

15    enforcement action, would you agree with me, would       07:01:57

16    that relate to -- in some manner would that relate

17    to Facebook's monitoring and enforcement?

18          MR. BLUME:  Objection, to the extent it

19    calls for a legal -- to the extent you

20    understand -- to the extent the answer to that           07:02:15

21    question calls into effect conversations with

22    counsel, I'd instruct you not to answer.

23          THE DEPONENT:  So the order, which is

24    publicly available for you to read, does have a

25    section that contemplates the -- that contemplates       07:02:32
```

Page 336

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1    broadly monitoring and enforcement.                    07:02:41

 2            And -- and we did also -- and I

 3    personally remember meeting with the auditor in the

 4    context of the 12K, so I feel comfortable

 5    confirming again -- and that's public -- that, yes,   07:02:53

 6    both of those orders do speak to monitoring and

 7    enforcement.

 8        Q.   (By Mr. Ko)  Thank you.

 9            And in the -- the initial FTC consent

10    decree in 2012, Facebook agreed to certain            07:03:07

11    provisions and certain things, for lack of a better

12    term, to improve their monitoring and enforcement

13    of their policies; is that fair to say?

14            MR. BLUME:  Objection.  To the extent the

15    consent decree speaks for itself as to its terms,     07:03:30

16    it does --

17            SPECIAL MASTER GARRIE:  Counsel --

18            MR. BLUME:  -- as to specific --

19            SPECIAL MASTER GARRIE:  What's the

20    objection?                                            07:03:38

21            MR. BLUME:  That the consent decree

22    speaks for itself.  It's the best evidence of what

23    it says.

24            SPECIAL MASTER GARRIE:  Let's do with

25    best evidence.  Okay.                                 07:03:47
```

Page 337

```
1        Q.   (By Mr. Ko)  You can answer.          07:03:52

2             SPECIAL MASTER GARRIE:  Are you

3   instructing the witness not to answer the question

4   or --

5             MR. BLUME:  As to the terms of the     07:03:56

6   consent decree is beyond the scope of her topic.

7   But I'm sure -- if you want to show it to her, she

8   can walk through it with you, Mr. Ko.

9             SPECIAL MASTER GARRIE:  I don't want to

10  show it to her.  But Counsel Ko, would you like    07:04:08

11  to -- so --

12            MR. KO:  I -- I would like an answer to

13  my question.

14            SPECIAL MASTER GARRIE:  Ms. Hendrix --

15            THE DEPONENT:  Yeah.                    07:04:20

16            MR. BLUME:  If you -- if you know the

17  answer, answer.

18            THE DEPONENT:  So the only team that is

19  allowed to interpret the language of each of those

20  orders is the legal team.  The only communications  07:04:27

21  with respect to the interpretation of the order is

22  privileged conversations that we've had with the

23  legal team.

24            So their -- we can rely on the language

25  of the order, but I am not able to speak to         07:04:40
```

Page 338

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1    nonprivileged conversations about the order because      07:04:45

2    the legal team interprets and provides guidance on

3    the order.

4            And even present day, I tell my teams,

5    you do not try to interpret the order.  You go to        07:04:57

6    the legal team to interpret any questions you have

7    about the order.

8            MR. KO:  Wasn't it a widely held --

9            THE COURT REPORTER:  I need a break in

10   a -- at a convenient time.  We've been going for         07:05:04

11   over an hour.

12           MR. KO:  Sorry about that, Rebecca.

13           SPECIAL MASTER GARRIE:  What kind of a

14   break do you need?

15           THE COURT REPORTER:  Five minutes.  Ten          07:05:18

16   minutes.

17           MS. WEAVER:  Sounds good.  We are going

18   off the record.  We're talking a five-minute break.

19           THE VIDEOGRAPHER:  Okay.  We're off the

20   record.  It's 7:05 p.m.                                  07:05:28

21           (Recess taken.)

22           THE VIDEOGRAPHER:  We're back on the

23   record at 7:16 p.m.

24           MR. KO:  Ms. Hendrix, congratulations.  I

25   have no further questions.                               07:16:49
```

Page 339

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              I just want to note for the record that      07:16:50

 2      consistent with our prior representations,

 3      plaintiffs reserve the right to reopen this

 4      deposition as to these topics.

 5              MR. BLUME:  And consistent, I thought,        07:17:01

 6      with Special Master Garrie's request to finish up

 7      those topics, short of objections and debating over

 8      the questions that were asked and objected to,

 9      again, we -- we have -- we were not prepared to

10      bring this witness back on these topics.  She         07:17:20

11      remains available to answer them.  Although we've

12      gone beyond seven hours, we're still making her

13      available to answer questions on all those topics.

14              And so I, again, urge you to finish the

15      questions on these topics because those -- it's --    07:17:33

16      I'm not sure what your objection would be to

17      questions not yet asked about topics and why you

18      would be permitted to leave open the deposition to

19      cover ground you have not yet covered, when we're

20      making her available to finish this out today.        07:17:51

21              SPECIAL MASTER GARRIE:  I'll note it for

22      the record, Counsel Blume.

23              Counsel Ko, you both have extensively

24      exhausted the record on this issue two hours

25      earlier.  Both sides' positions are noted.            07:18:04
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
1              I'm still denying your request,                07:18:06

2     Counsel Blume.  And --

3              MR. BLUME:  Close it out.

4              SPECIAL MASTER GARRIE:  No further

5     questions from Counsel Ko; is that correct,            07:18:17

6     Counsel Ko?

7              MR. KO:  Correct.

8              SPECIAL MASTER GARRIE:  Counsel Blume,

9     any instructions --

10             MR. BLUME:  No, nothing from us.              07:18:28

11             SPECIAL MASTER GARRIE:  Okay.  Before we

12    go off the record, we would -- the standing orders

13    for the transcript, because this is a 30(b)(6) --

14    you weren't sure, Counsel Blume.

15             Is there anybody here from your team that     07:18:39

16    might be able to clarify?

17             MR. BLUME:  I assume would -- I -- I

18    assume it's the same standing order as -- we'll --

19    we'll -- Rebecca, we'll let you know.  But it's the

20    same standing order as we have for the other          07:18:51

21    depositions, please.

22             SPECIAL MASTER GARRIE:  As long as it's

23    the same.  That's fine.

24             MS. HERBERT:  It's the same.

25             MR. BLUME:  Yeah, the same.  Okay.            07:18:57
```

Page 341

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1              THE COURT REPORTER:  Got -- got it.        07:19:00

 2              MR. BLUME:  Excellent.

 3              THE DEPONENT:  Rebecca, thank you.

 4              Nice to meet everybody.  But a sincere

 5      thank you.  I -- I could see -- even I             07:19:06

 6      participating in that overtalking.  And I apologize

 7      for when I did it.  I'm sure everybody else has the

 8      same -- so thank you.  And I hope you have a good

 9      night's rest.

10              SPECIAL MASTER GARRIE:  You are the        07:19:24

11      witness, Ms. Hendrix.  They should never talk over

12      you.

13              MR. BLUME:  All right.  Are we off?

14              THE DEPONENT:  Thank you, John.  Thank

15      you.                                               07:19:29

16              THE VIDEOGRAPHER:  Okay to go off the

17      record everybody?

18              SPECIAL MASTER GARRIE:  Yes.

19              THE VIDEOGRAPHER:  Thank you.  We're off

20      the record.  It's 7:19 p.m.                        07:19:33

21              (TIME NOTED:  7:19 p.m.)

22

23

24                      ---o0o---

25                                                         07:19:36

                                                          Page 342
```

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1        I, ALLISON HENDRIX, do hereby declare under

2   penalty of perjury that I have read the foregoing

3   transcript; that I have made any corrections as

4   appear notes; that my testimony as contained

5   herein, as corrected, is true and correct.

6        Executed this _____ day of _____,

7   2022, at _____,_____.

8

9

10

11                    _____

                      ALLISON HENDRIX

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                          Page 343

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1      I, Rebecca L. Romano, a Registered

2  Professional Reporter, Certified Shorthand

3  Reporter, Certified Court Reporter, do hereby

4  certify:

5      That the foregoing proceedings were taken

6  before me remotely at the time and place herein set

7  forth; that any deponents in the foregoing

8  proceedings, prior to testifying, were administered

9  an oath; that a record of the proceedings was made

10  by me using machine shorthand which was thereafter

11  transcribed under my direction; that the foregoing

12  transcript is true record of the testimony given.

13      Further, that if the foregoing pertains to the

14  original transcript of a deposition in a Federal

15  Case, before completion of the proceedings, review

16  of the transcript [ ] was [X] was not requested.

17      I further certify I am neither financially

18  interested in the action nor a relative or employee

19  of any attorney or any party to this action.

20      IN WITNESS WHEREOF, I have this date

21  subscribed my name.

22

23  Dated: May 10, 2022

24      _____

          Rebecca L. Romano, RPR, CCR

25          CSR. No 12546

                                    Page 344

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    DAVID KO, ESQ.

2    dko@kellerrohrback.com

3                                    May 10, 2022

4    IN RE: FACEBOOK, INC., CONSUMER USER PROFILE LITIGATION

5    MAY 5, 2022, ALLISON HENDRIX, JOB NO. 5210138

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, noting the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23   __ Signature Waived - Reading & Signature was waived at the

24       time of the deposition.

25

                                              Page 345

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

1    __ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2    Transcript - The witness should review the transcript and

3    make any necessary corrections on the errata pages included

4    below, noting the page and line number of the corrections.

5    The witness should then sign and date the errata and penalty

6    of perjury pages and return the completed pages to all

7    appearing counsel within the period of time determined at

8    the deposition or provided by the Federal Rules.

9   _X_Federal R&S Not Requested - Reading & Signature was not

10    requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 346

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

```
 1   IN RE: FACEBOOK, INC., CONSUMER USER PROFILE LITIGATION

 2   ALLISON HENDRIX, JOB NO. 5210138

 3                   E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   WITNESS                            Date

25
```

Page 347

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.