# EXHIBIT 106
## Redacted Version of
## Document Sought to be Sealed

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE:  FACEBOOK, INC.          MDL No. 2843

CONSUMER PRIVACY USER          Case No. 18-md-02843-VC-JSC

PROFILE LITIGATION

-----------------------/

CONFIDENTIAL

REMOTE DEPOSITION OF JACKIE CHANG

Thursday, December 16, 2021

Job No. 4976949

Reported Remotely and Stenographically by:

JANIS JENNINGS, CSR No. 3942, CLR, CCRR

Pages 1 - 312

1

2

3

4

5

6

7

8          REMOTE DEPOSITION OF JACKIE CHANG, located

9     in Hillsborough, California, taken on behalf of the

10    Plaintiffs, beginning at 9:43 a.m., on Thursday,

11    December 16, 2021, sworn remotely by Janis Jennings,

12    Certified Shorthand Reporter No. 3942, CLR, CCRR,

13    located in the City of Walnut Creek, County of

14    Contra Costa, State of California.

15

16

17

18

19

20

21

22

23

24

25

```
 1   REMOTE APPEARANCES:

 2

 3       For Plaintiffs:

 4           KELLER ROHRBACK L.L.P.

 5           BY:  DEREK W. LOESER, ESQ.

 6                DAVID KO, ESQ.

 7                ADELE A. DANIEL, ESQ.

 8           1201 Third Avenue, Suite 3200

 9           Seattle, Washington  98101

10           206.623.1900

11           dloeser@kellerrohrback.com

12           dko@kellerrohrback.com

13           adaniel@kellerrohrback.com

14

15       BLEICHMAR FONTI & AULD LLP

16           BY:  LESLEY E. WEAVER, ESQ.

17                ANNE K. DAVIS, ESQ.

18                MATTHEW S. MELAMED, ESQ.

19           555 12th Street, Suite 1600

20           Oakland, California  94607

21           415.445.4003

22           lweaver@bfalaw.com

23           adavis@bfalaw.com

24           mmelamed@bfalaw.com

25
```

```
 1   APPEARANCES:

 2

 3      FOR DEFENDANT FACEBOOK, INC.:

 4             GIBSON, DUNN & CRUTCHER LLP

 5             BY:  RUSSELL H. FALCONER, ESQ.

 6                  LAURA C. MUMM, ESQ.

 7                  MATT BUONGIORNO, ESQ.

 8             2001 Ross Avenue, Suite 2100

 9             Dallas, Texas 75201

10             214.698.3100

11             rfalconer@gibsondunn.com

12             lmumm@gibsondunn.com

13             mbuongiorno@gibsondunn.com

14

15      Also Remotely Present:

16             DANIEL GARRIE, SPECIAL MASTER

17             JAMS

18             555 W. 5th Street, 32nd Floor

19             Los Angeles, California 90013

20

21             IAN CHEN, ESQ., Facebook, Inc.

22             SHAWNA HAYNES, Videographer

23

24

25
```

Page 69

1  again?                                                    11:23

2     Q.   Do you know when Facebook first started          11:23

3  using APIs with its partners?                             11:23

4     A.   I'm not sure I understand that question.          11:23

5  Technically, I don't know.                                11:23

6     Q.   Do you know who came up with the various          11:23

7  APIs that Facebook has?                                   11:23

8     A.   No.                                               11:23

9     Q.   Are you familiar with the concept of Friend       11:23

10  Sharing on the Facebook platform?                        11:23

11     A.   I think I've heard of it, but I don't know       11:23

12  what it is.                                               11:23

13     Q.   Are you aware that on the Facebook platform      11:23

14  for a period of time, when a friend downloaded an        11:24

15  app, that app could obtain access to that person's       11:24

16  friends via Friend Sharing APIs?                         11:24

17          MR. FALCONER:  Objection.  Form.                 11:24

18          Go ahead.                                        11:24

19          THE WITNESS:  I don't remember.                  11:24

20  BY MR. LOESER:                                           11:24

21     Q.   You don't remember anything about that?         11:24

22     A.   No.                                              11:24

23     Q.   That's not something you were involved at       11:24

24  all in?                                                  11:24

25     A.   I don't remember.                                11:24









Page 101



```
 1        ██   ████                                    ████
██        ████     █████                              ████
██        █████      ███████                          ████
██   ████████                                         ████
██   ███████                                          ████
██    █   ██████████████                              ████
██  ███████████████████                               ████
██  ████████████████                                  ████
██  ██████████████                                    ████
10           DEPOSITION REPORTER:   Excuse me.   There was   12:09
11   an interruption in the audio.   Can you repeat your     12:09
12   question, please, Counsel.                              12:09
13   BY MR. LOESER:                                          12:09
14        ██   ████   █████████                       ████
██  ███████████████████                               ████
██  ███████████████████                               ████
██  ████████████                                      ████
██    █   ██████████████                              ████
██  █████████                                         ████
██  ████   █████████████                              ████
██  ████   █████████████                              ████
██  ██████   ████████                                 ████
██   █   ██████████                                   ████
██   █   ████████████████                             ████
██   ██████
```

Page 104



```
 1    ██████████████████                                        ██████

██    ██    █████████████████████████████                       ██████

██    █████████████████████████████████████████                ██████

██    ████████████████████                                      ██████

██    ██    ██████████████                                       ██████

██          ██████████████   ████████████   ████████           ██████

██          ████████████   ████████████████████████            ██████

██    █████████████████████████████████████                    ██████

██    ███████████████                                           ██████

██    ██    ████████████████████████                           ██████

11          MR. FALCONER:  Objection.  Form.                    12:12

12          THE WITNESS:  Sorry.  Is that a question            12:12

13    or...                                                      12:12

14    BY MR. LOESER:                                             12:12

15    ██    ██████   ██████   ██████████████████████████████    ██████

██    █████████████████████████████████████                    ██████

██    ████████████████████                                      ██████

██    ██    ██████   ██████████████████████████████            ██████

██    ████████████████████████████████████████████            ██████

██    ████████████████████                                      ██████

██    ██    ██████████████████████████████████████            ██████

██    █████████████████████████████                            ██████

██    ██    ████████████████████████████████                   ██████

██    ██    ████████████████████████████████                   ██████

██          ████████████████████   ████████████████           ██████
```





Page 119

1 ████████████████████████████████████████ ████████

2 ████████████████████████████████████████ ████████

3 ████████████████ ████████

4     A.   I don't remember.                        12:29

5     Q.   Did you receive annual performance reviews? 12:29

6     A.   In what year?                            12:29

7     Q.   In any year.                             12:29

8     A.   I received a performance review.         12:29

9     Q.   And in connection with your performance  12:29

10 review, were you required to describe what you did 12:29

11 during the year that was being reviewed?          12:29

12     A.   I believe so, yes.                       12:29

13     Q.   And in those performance reviews, were you 12:29

14 careful to make sure that you described all of the 12:29

15 important, or at least the most important things,  12:29

16 you worked on?                                     12:29

17     A.   At that time, yes.                       12:29

18 ██ ████████████████████████████████████ ████████

19 ██ ████████████████████████████████ ████████

20 ██ ████████████████████████████████████ ████████

21 ██ ████████████████████████████████████████ ████████

22 ██ ██████████████████████ ████████

23 ██ ████ ████████████ ████████████████ ████████

24     Q.   Okay.  Would that be generally an accurate 12:30

25 statement, though, that the tasks that you performed 12:30

Page 130

```
 1            MR. FALCONER:  Yeah.  I mean, I'm not going    13:46
 2  to make that commitment to you, but like I said,      13:46
 3  I'll look into it.                                     13:46
 4  BY MR. LOESER:                                         13:46
 5  ███    ██████████████████████    ███
    ██  ████████████████████████████████  ███
    ██  ████████████                      ███
    ██    ██  ████████████████            ███
    ██    ██  ██████████████████████████  ███
    ██  ██████████████████████████████    ███
    ██  ████████    ██████████████████████  ███
    ██  ████████████████████████████████    ███
    ██  ██████████████████████            ███
    ██    ██  ████████████████████        ███
15       Q.   Is it your practice to send email that    13:46
16  includes false information?                           13:46
17       A.   I -- I don't know.  I don't really         13:46
18  understand that question.                             13:46
19       Q.   Is it your general practice when you're    13:46
20  communicating with your colleagues to send them an   13:46
21  email that contains false information?                13:46
22       A.   I -- I don't know.  I -- I usually don't   13:47
23  have that intention.                                  13:47
24       Q.   And so when you wrote this email, is it fair 13:47
25  to assume that you were endeavoring to communicate   13:47
```

Page 131

```
 1   accurate information?                              13:47
 2           MR. FALCONER:  Objection.  Form.           13:47
 3           THE WITNESS:  So, again, I don't -- like I 13:47
 4   don't remember this.  I don't want to assume like --13:47
 5   yeah, I don't want to assume anything.             13:47
 6   BY MR. LOESER:                                     13:47
 7       Q.   I'm not asking you if you remember this   13:47
 8   email.  I'm asking you if -- you sent this email;  13:47
 9   right?                                             13:47
10       A.   That's what it says.                      13:47
11       Q.   And it was your general practice when     13:47
12   sending email to communicate accurate information; 13:47
13   right?                                             13:47
14       A.   Yes.                                      13:47
15       Q.   And it was not your general practice to   13:47
16   communicate information that you knew to be false; 13:47
17   right?                                             13:47
18       A.   Again, I feel like that's -- I don't know.13:47
19   Like I don't know what the information is, so my   13:47
20   intent generally is not -- I don't know the        13:47
21   information itself.                                13:48
22       Q.   Right.  I'm not asking you if the         13:48
23   information is or isn't false.  I'm asking you if it13:48
24   is your intent to generally communicate accurate   13:48
25   information in your --                             13:48
```

Page 132

```
 1      A.   It is my intent to, yes, provide          13:48

 2   information.                                        13:48

 3      Q.   And you testified you couldn't recall most 13:48

 4   of what we talked about with regard to this email. 13:48

 5           Is there something else that you can think 13:48

 6   of that would refresh your recollection regarding  13:48

 7   the events discussed in this email?                13:48

 8      A.   Not that I know of.                         13:48

 9      Q.   And so would you agree that this email is  13:48

10   the best evidence, that you're aware of, of what you 13:48

11   knew and were thinking at the time regarding these 13:48

12   topics?                                             13:48

13           MR. FALCONER:  Objection.  Form and        13:48

14   foundation.                                         13:48

15           THE WITNESS:  So, again, I can't make that 13:48

16   assumption.                                         13:48

17   BY MR. LOESER:                                      13:48

18      Q.   You can't make the assumption that this    13:48

19   email is the best evidence of what you were thinking 13:48

20   at the time you wrote the email?                    13:48

21      A.   Correct.  I don't know.                     13:49

22      Q.   But you can't remember -- you can't identify 13:49

23   anything else that would be a more accurate        13:49

24   reflection of what you were thinking at the time you 13:49

25   wrote this email?                                   13:49
```

Page 133

```
 1      A.   Correct.  I don't -- I don't know, so I      13:49
 2   don't know what the expanse is.                      13:49
 3      Q.   Is it fair to say that if this email doesn't 13:49
 4   refresh your recollection of the events at the time, 13:49
 5   you're not aware of anything else that would?        13:49
 6      A.   I don't -- I don't know.                      13:49
 7      Q.   You don't know if there is any other         13:49
 8   evidence that would refresh your recollection?       13:49
 9      A.   That question would assume I would know,     13:49
10   which I don't know.                                  13:49
11      Q.   But I'm asking you, do you know of any other 13:49
12   evidence that would refresh your recollection?       13:49
13      A.   I don't know.                                13:49
14      Q.   You don't know if there is any other         13:49
15   evidence that would refresh your recollection?       13:49
16      A.   Again, I don't know what I don't know, so I  13:49
17   can't make that assumption that I would know.        13:49
18      Q.   And if there were something else that might  13:50
19   refresh your recollection, what might that be?       13:50
20           MR. FALCONER:  Objection.  Asked and         13:50
21   answered.  Lack of foundation.                       13:50
22   BY MR. LOESER:                                       13:50
23      Q.   You didn't -- there's not like a recorded    13:50
24   transcripts of communications that you had, as far   13:50
25   as you know, is there?                               13:50
```

Page 134

```
 1      A.   I don't -- to my knowledge, I don't think    13:50
 2   so.                                                   13:50
 3      Q.   Is it fair to say that if someone wanted to  13:50
 4   figure out what you were thinking about these topics 13:50
 5   at the time of this email, this email would be a     13:50
 6   good guide for what you were thinking?               13:50
 7           MR. FALCONER:  Objection.  Form and          13:50
 8   foundation.                                          13:50
 9           THE WITNESS:  Again, I can't speculate on    13:50
10   that.                                                13:50
11   BY MR. LOESER:                                       13:50
12      Q.   I'm not asking you to speculate on anything. 13:50
13   I'm just asking you if you think this email would be 13:50
14   a good guide of what you were thinking about the     13:50
15   topics discussed in the email --                     13:50
16      A.   Well, that would require me to speculate.    13:51
17      Q.   What would it require you to speculate at?   13:51
18      A.   You're asking me if I know if this is the    13:51
19   best, which would assume I know what everything is   13:51
20   and I don't know what everything is, so I don't      13:51
21   know.  So I can't make that assumption.              13:51
22      Q.   Let me be specific.  Would you agree that    13:51
23   this email is a good guide of what you were thinking 13:51
24   about the topics discussed in the email at the time  13:51
25   you sent the email?                                  13:51
```

Page 135

| 1 | MR. FALCONER:  Objection.  Form.  Foundation | 13:51 |

1      MR. FALCONER:  Objection.  Form.  Foundation  13:51

2  and asked and answered.                          13:51

3      THE WITNESS:  Again, when you say "good," I  13:51

4  don't know where I could like -- where I could say I  13:51

5  know what a definition of good means.            13:51

6  BY MR. LOESER:                                   13:51

7     Q.   I will try one more time.  Would you agree  13:51

8  that the email that you wrote is evidence of what  13:51

9  you were thinking about the subjects discussed in  13:51

10  your email at the time you sent the email?       13:52

11      MR. FALCONER:  Objection.  Excuse me.        13:52

12  Objection.  Form.                                13:52

13      THE WITNESS:  Again, I don't remember.  I    13:52

14  know the email is there, so I don't want to      13:52

15  speculate what I was thinking because I don't know.  13:52

16  BY MR. LOESER:                                   13:52

17     Q.   Do you ever go back and read your old emails  13:52

18  to try and understand what you were thinking at some  13:52

19  earlier time?                                    13:52

20     A.   Generally, no.  I have a lot of emails.  13:52

21     Q.   Have you ever done that?                 13:52

22     A.   Have I ever looked at an email?          13:52

23     Q.   Have you ever gone back and looked at an  13:52

24  email you wrote earlier to refresh your recollection  13:52

25  about what you were thinking at the time on a    13:52





Page 164



Page 165



19          MR. LOESER:  We can go to the next exhibit.     14:31

20          (Exhibit 13 marked for identification.)         14:32

21   BY MR. LOESER:                                          14:32

22      Q.   This will be Exhibit 13, which is an            14:32

23   email from Simon Cross to you and others, dated         14:32

24

Page 168

1

2

3

4

5

6      SPECIAL MASTER GARRIE:  Sorry.  When we get      14:36

7 to a breaking point -- any idea when that may be?      14:36

8      MR. FALCONER:  I was thinking after the      14:36

9 next -- after we are done with this document.      14:36

10      MR. LOESER:  That's fine.      14:36

11      SPECIAL MASTER GARRIE:  And then I would      14:36

12 like all the lawyers to be moved into another room.      14:36

13 Thank you.      14:36

14 BY MR. LOESER:      14:36

15

Page 169



Page 170



```
19          MR. LOESER:  This is a fine time to take a      14:38

20   break, as Special Master Garrie has requested.        14:38

21          THE VIDEOGRAPHER:  Okay.  This marks the end    14:39

22   of media No. 3 in the deposition of Jackie Chang.     14:39

23   Going off the record.  The time is 2:39.              14:39

24          (Off the record.)                              14:39

25          THE VIDEOGRAPHER:  This marks the beginning     15:04
```



Page 216

```
 1
```

```
19    Q.    Who would know that?                    16:25

20    A.    I don't -- I don't know.                16:25

21    Q.    Okay.  You have no idea?                16:25

22    A.    Not for an individual person, no.       16:25

23    Q.    And so in your work now with academic   16:25

24    partnerships, if you wanted to figure out if an  16:25

25    academic partner had continued access to friends  16:25
```

Page 219

```
 1   know if it could be classified as whitelist.        16:28
 2       Q.   The term "whitelist" is not one you have   16:28
 3   used so frequently that you remember to this day    16:28
 4   what it means?                                      16:28
 5       A.   No.                                        16:28
 6       Q.   Do you have any idea of the process that's 16:28
 7   used to determine if an app developer or partner is 16:28
 8   whitelisted so that they have continued access to   16:28
 9   friends permissions?                                16:28
10       A.   Yeah.  I don't recall it.                  16:28
11       Q.   Do you know if Facebook keeps records of   16:28
12   whitelisted developers/partners?                    16:28
13       A.   I don't know.                              16:28
14       Q.   You have no recollection at all as to      16:28
15   whether that information is collected and maintained 16:29
16   in one place so that someone could easily find out  16:29
17   who are all of the whitelisted partners or          16:29
18   developers?                                         16:29
19       A.   So again --                                16:29
20            MR. FALCONER:  Asked and answered.         16:29
21            THE WITNESS:  -- that's outside my scope, so 16:29
22   I don't know.                                       16:29
23   BY MR. LOESER:                                      16:29
24   ███  ████████████████████████████  ████
   ██  ██████████████████████  ████████████████  ████
```

Page 223

1  ████████ ████████████████ ████

███ ████████████████████ ████

3   BY MR. LOESER:                                        16:34

4       Q.   Did you have any interaction with a partner  16:35

5   in a discussion of the information -- the             16:35

6   permissions the partner was interested in, where     16:35

7   they said to you, Hey, we want to arrange so that we  16:35

8   have permission to access friends_video?             16:35

9       A.   I don't remember specifically like           16:35

10  individual permissions.                               16:35

11      Q.   Okay.  Do you remember any conversations at   16:35

12  all about friends permissions with any partner?       16:35

13      A.   I don't remember specifically anything about  16:35

14  friends permission.                                   16:35

15      Q.   Do you remember anything generally about      16:35

16  friends permissions?  And particularly, I'm asking    16:35

17  if any partner that you have worked with raised that  16:35

18  as a permission that they were interested in gaining   16:35

19  access to.                                            16:35

20      A.   I don't -- I don't -- I don't recall.         16:35

21          MR. LOESER:  Okay.  We can go to Exhibit 21.   16:36

22          (Exhibit 20 marked for identification.)        16:36

23          MR. LOESER:  Oh, is it 20?  Yeah.              16:36

24          While that's being loaded, for the record,     16:36

25  this is an email from Simon Cross to, among others,    16:36



Page 225

1　████████████████████████　　　███████

2　　A.　 I don't recall it specifically.　　16:38

3　　Q.　 Do you recall it at all?　　16:38

4　　A.　 No, I don't.　　16:38

5　　Q.　 And can you tell me what "app-based GKs"　16:38

6　are?　　16:38

7　　A.　 I don't know.　　16:38

8　　Q.　 You have no recollection whatsoever?　16:38

9　　A.　 No.  Again, I'm not -- I'm not the technical　16:38

10　person, so I just don't -- I don't know technically　16:38

11　what it would mean.　　16:38

12　　Q.　 Okay.  Do you know what the Capabilities　16:38

13　tool was?　　16:38

14　　A.　 Not specifically.  I've heard of it, but I　16:38

15　don't know it in detail.　　16:39

16　　Q.　 Well, what have you heard about it?　16:39

17　　A.　 It looks like some sort of permissioning　16:39

18　tool.　　16:39

19　　Q.　 And what does that mean?　　16:39

20　　A.　 It grants permissions.　　16:39

21　　Q.　 Who does it grant permissions to?　16:39

22　　A.　 So, again, I don't -- I don't know the　16:39

23　technical specifics, so I don't feel comfortable　16:39

24　talking about it in depth because I might　16:39

25　mischaracterize it.　　16:39

Page 226

```
 1     Q.   Okay.  You've said all that you feel      16:39

 2  comfortable saying about it?                       16:39

 3     A.   Well, like all that I know about it.       16:39

 4
```



Page 240



1

25    Q.    Did you have any involvement at any point in 17:03

Page 250

















