# EXHIBIT 98-B

## Redacted Version of Document Sought to be Sealed

**CONFIDENTIAL ROUGH DRAFT**

1        UNCERTIFIED REALTIME ROUGH DRAFT OF

2          ISABELLA LEONE TAKEN 8/5/2022

3

4                        ***

5   THIS REALTIME ROUGH DRAFT IS UNEDITED AND

6   UNCERTIFIED AND MAY CONTAIN UNTRANSLATED

7   STENOGRAPHIC SYMBOLS, AN OCCASIONAL REPORTER'S

8   NOTE, A MISSPELLED PROPER NAME/OR NONSENSICAL WORD

9   COMBINATIONS.  PURSUANT TO CCP SECTION 2025.540(b),

10  IT MAY NOT BE USED, CITED, OR TRANSCRIBED AS THE

11  CERTIFIED TRANSCRIPT OF THE DEPOSITION PROCEEDINGS.

12  THIS REALTIME ROUGH DRAFT TRANSCRIPT MAY NOT BE

13  CITED OR USED IN ANY WAY OR AT ANY TIME TO REBUT OR

14  CONTRADICT THE CERTIFIED TRANSCRIPT OF THE

15  DEPOSITION PROCEEDINGS AS PROVIDED BY THE

16  DEPOSITION OFFICER.  THIS DOCUMENT IS NOT TO BE

17  RELIED UPON IN WHOLE OR IN PART AS THE OFFICIAL

18  TRANSCRIPT.  THIS UNCERTIFIED REALTIME ROUGH DRAFT

19  VERSION HAS NOT BEEN REVIEWED OR EDITED BY THE

20  CERTIFIED SHORTHAND REPORTER FOR ACCURACY.

21

22  ACCEPTANCE OF THIS REALTIME ROUGH DRAFT IS AN

23  AUTOMATIC FINAL COPY ORDER.  I AGREE NOT TO SHARE,

```
24   GIVE, COPY, SCAN, FAX, OR IN ANY WAY DISTRIBUTE THE

25   REALTIME ROUGH DRAFT IN ANY FORM (WRITTEN OR
```

                                                        1


                          **CONFIDENTIAL ROUGH DRAFT**

```
 1   COMPUTERIZED) TO ANY PARTY.  HOWEVER, MY OWN

 2   EXPERTS, CO-COUNSEL, CLIENT(S) AND STAFF MAY HAVE

 3   LIMITED INTERNAL USE OF SAME WITH THE UNDERSTANDING

 4   THAT I AGREE TO DESTROY ALL REALTIME ROUGH DRAFTS

 5   AND/OR COMPUTERIZED FORMS, IF ANY, AND REPLACE SAME

 6   WITH THE FINAL TRANSCRIPT AND/OR FINAL COMPUTERIZED

 7   FORM, UPON ITS COMPLETION.

 8

 9

10        Acceptance of this realtime draft is an

11   automatic final copy order.

12

13

14             THE VIDEOGRAPHER:  We're on the record.

08:04:42  15   It's 8:04 Pacific Time on August 5th, 2022.  This

16   is the deposition of Isabella Leone.  We're here in

17   the matter of Facebook Consumer Privacy User

18   Profile Litigation.

19             I'm John Macdonell, the videographer,

08:04:58  20   with Veritext.
```

```
        21           Before the reporter swears the witness,

        22    would counsel please identify themselves, beginning

        23    with the noticing attorney, please.

        24           MS. WEAVER:  Yes.  Good morning.

08:05:09 25           This is Lesley Weaver with
```

                                                            2


                          **CONFIDENTIAL ROUGH DRAFT**

```
08:05:10  1   Bleichmar Fonti & Auld on behalf of the plaintiffs.

          2   And with me today from my firm are Josh Samra and

          3   Angelica Ornelas.

          4           MR. BENJAMIN:  Good morning.

08:05:21  5           I'm Matt Benjamin of

          6   Gibson, Dunn & Crutcher on behalf of Meta Facebook

          7   and the witness.

          8           With me are Martie Kutscher Clark,

          9   Naima Farrell, Matt Boungiorno and Phuntso Wangdra,

08:05:33 10   also from Gibson Dunn.  And Ian Chen from Meta.

         11           THE COURT REPORTER:  If you could raise

         12   your right hand for me, please.

         13           THE DEPONENT:  (Complies.)

         14           THE COURT REPORTER:  You do solemnly

08:05:39 15   state, under penalty of perjury, that the testimony

         16   you are about to give in this deposition shall be

         17   the truth, the whole truth and nothing but the
```

```
          18  truth?
          19           THE DEPONENT:  I do.
08:05:39  20
          21
          22
          23
          24
08:05:39  25
```

                                                            3


                           **CONFIDENTIAL ROUGH DRAFT**

```
08:05:39   1
           2
           3
           4
08:05:39   5
           6
           7  /////
           8                    ISABELLA LEONE
           9  having been administered an oath, was examined and
08:05:55  10  testified as follows:
          11
          12                    EXAMINATION
          13  BY MS. WEAVER:
          14       Q.   Good morning, Ms. Leone.
```

08:06:01 15       A.   Good morning.

         16       Q.   Thanks for joining us today.

         17            Have -- have you been deposed before?

         18       A.   I have not.

         19       Q.   Okay.  Well, good -- good times are ahead

08:06:12 20   for you.

         21            So really briefly, I -- I know that

         22   you've covered these rules with your counsel, but

         23   it's good if we discuss it on the record.

         24            AS you can see, Ms. Romano here is

08:06:21 25   transcribing what we discuss today.  And so because

                                                                 4


                        **CONFIDENTIAL ROUGH DRAFT**

08:06:28  1   of that transcription process and because we are

          2   making a record, it's really important that we not

          3   speak over each other and that we answer questions

          4   audibly.

08:06:38  5            Does that make sense?

          6       A.   Absolutely.

          7       Q.   Okay.  If you don't understand a question

          8   that I'm asking, please just ask for clarity and

          9   I'll rephrase it, because the really important

08:06:48 10   thing is that we're communicating accurately with

         11   one another; is that fair?

12      A.   Yeah.  Absolutely.

13      Q.   Okay.  A general rule is that if there is

14   a question pending, you may not take a break, you

08:07:04 15   should answer the question.  Unless you're

16   instructed not to answer by your counsel.

17          And -- and the final point is that -- I'm

18   sure you've seen courtroom dramas where the witness

19   is on the stand and the judge is making rulings.

08:07:20 20   In a deposition, that doesn't happen.  So your

21   counsel will be inserting objections for the

22   record, but there will no ruling on them.

23          So you should answer the question, again,

24   unless you are instructed not to answer because we

08:07:32 25   are not graced with the presence of a judge saying

5

**CONFIDENTIAL ROUGH DRAFT**

08:07:34 1   overruled or sustained, so...

2          Is that fair?

3      A.   Yup.  Understood.

4          MS. WEAVER:  Okay.  And before the

08:07:43 5   deposition started, your counsel emailed a document

6   over to us today, which we have marked as

7   Exhibit 1.

8          (Exhibit 655 was marked for

```
              9   identification by the court reporter and is
08:07:53     10   attached hereto.)
             11        Q.   (By Ms. Weaver)  And did you discuss with
             12   your counsel how exhibits are marked in these
             13   remote kinds of depositions?
             14        A.   Yes.
08:08:00     15        Q.   Okay.  So do you have Exhibit Share up?
             16        A.   Uh-huh.  Yes, I have it up.
             17        Q.   And you can see Exhibit 1?
             18        A.   Yes.
             19        Q.   Okay.  And what is Exhibit 1?
08:08:18     20        A.   It's a document I put together for how I
             21   prepared for today.
             22        Q.   Okay.  And when did you prepare it?
             23        A.   I summarized this yesterday, this
             24   document.
08:08:32     25        Q.   And were there other underlying notes
```

6

**CONFIDENTIAL ROUGH DRAFT**

```
08:08:35      1   that you used to prepare this?
              2             MR. BENJAMIN:  Objection to form.
              3             THE DEPONENT:  It was a summary document
              4   so it collated my calendar to get to the -- the
08:08:44      5   hours that we looked at.
```

          6              I'm -- I'm not sure if that's exactly

          7    what you meant.

          8         Q.   (By Ms. Weaver)  No, that's fair.  That's

          9    fine.

08:08:53 10              Just trying to understand -- you actually

         11    yourself created the document; is that right?

         12         A.   Yes.

         13         Q.   Okay.  And when you -- you wrote

         14    "Approximately 36 hours with counsel."

08:09:06 15              Do you see that?

         16         A.   Yes.

         17         Q.   Which counsel are you referring to?

         18         A.   Gibson Dunn.  So Matt Benjamin and the

         19    broader team.

08:09:16 20         Q.   And who else other than Mr. Benjamin?

         21         A.   Martie Phuntso.  Matt -- Matt Boungiorno,

         22    the other Matt.  Rose Ring and Naima Farrell.

         23         Q.   Okay.  And anyone else?

         24         A.   I don't believe so from the Gibson Dunn

08:09:36 25    team.  And then Ian Chen, our -- my -- the -- the

                                                              7


                        **CONFIDENTIAL ROUGH DRAFT**

08:09:39  1    Meta lawyer who's also on the call.

          2         Q.   Okay.  Did you meet with any other

3    lawyers during those 36 hours?

4         A.    No.

08:09:49  5    Q.    Okay.  Did you meet with any lawyers to

6    prepare at all?

7         A.    No, not aside from these lawyers.

8         Q.    Okay.  Sometimes I'm asking you questions

9    and it may seem curious to you.  But again, we're

08:10:02 10   laying foundation for a record that I'm just trying

11   to make sure that I'm not missing something.

12              When did you meet with counsel during

13   those 36 hours?

14        A.    Those have been divided up over multiple

08:10:16 15   weeks.  I think originally, towards the end of May,

16   and then sessions over time that varied between an

17   hour and three to four hours long.  And I don't

18   remember the exact number of sessions.

19        Q.    And during those sessions, did counsel

08:10:32 20   provide you with documents?

21        A.    We discussed the documents for this

22   deposition.  And then as well as documents from my

23   prep, whether that was external -- Facebook

24   documents or documents that -- that we worked

08:10:46 25   through about the products or anything relevant.

8

**CONFIDENTIAL ROUGH DRAFT**

08:10:50  1    Q.   And when you say "the external," what did

       2    you mean?

       3    A.   Sorry.  I mean, articles such as like our

       4    help center or our news blog posts, areas where

08:11:01  5    we've discussed our targeting and ranking

       6    externally.  And then as well as our internal

       7    references about those products as well.

       8    Q.   And when you say "internal references,"

       9    what are you referring to?

08:11:15 10    A.   For example -- I'm trying to think of a

      11    good example that makes sense.

      12         I -- I'm -- I can double-check.  I think

      13    we used an internal Wiki, which is kind of like our

      14    version of how we -- how -- how our internal, like

08:11:41 15    way of documenting for teams to reference.

      16         And similar if -- if any internal

      17    announcements that were relevant.  So I -- I

      18    believe looking at like an internal announcement

      19    that helps us get our sales teams in -- prepared

08:11:58 20    for an external announcement.  So that's the --

      21    that's an example of -- of an internal document

      22    that I looked at.

      23    Q.   Got it.

      24         And for the internal documents, did you

08:12:09 25   provide those to counsel to discuss or did they

9

**CONFIDENTIAL ROUGH DRAFT**

08:12:11  1   provide them to you?

2          MR. BENJAMIN:  Objection to form.

3          MS. WEAVER:  Let me ask differently.

4     Q.   (By Ms. Weaver)  Did you provide any of

08:12:19  5   those internal documents to prepare for your

6   deposition?

7          MR. BENJAMIN:  Objection.  Form.

8          THE DEPONENT:  I'm -- did I provide them

9   to my counsel or in our conversations, or look at

08:12:31 10   them during those sessions?

11          I'm not totally sure what you mean.

12     Q.   (By Ms. Weaver)  Did -- did you yourself

13   identify any internal documents that you used to

14   prepare for this deposition?

08:12:46 15     A.   Without anyone else?  No, I -- I don't

16   think so.

17     Q.   Okay.  So the materials that you used to

18   prepare were largely, if not exclusively, curated

19   by the attorneys; is that right?

08:12:58 20          MR. BENJAMIN:  Objection to form.

21   Misstates.

22          THE DEPONENT:  I -- they weren't

23     exclusively from the legal team.  They could have

24     been from the groups and the people we also worked

08:13:13 25     on with my prep, our employees that aren't lawyers.

                                                          10


                    **CONFIDENTIAL ROUGH DRAFT**

08:13:18  1       Q.   (By Ms. Weaver)  And did you provide any

2     documents to prepare?

3               MR. BENJAMIN:  Objection.  Form.

4               THE DEPONENT:  I -- I don't believe I

08:13:25  5     did, no.

6          Q.   (By Ms. Weaver)  And how many documents

7     did the team that you met with provide?

8          A.   The legal team or when --

9               (Simultaneously speaking.) ***

08:13:36 10       Q.   (By Ms. Weaver)  The nonlegal --

11          A.   The legal team --

12          Q.   Sorry.

13          A.   Go ahead.

14          Q.   That's my fault.  I apologize.

08:13:45 15          How many documents did the nonlegal team

16     identify and provide for you to use in preparation

17     for this deposition?

18               MR. BENJAMIN:  Objection.  Form.  Vague.

```
        19              THE DEPONENT:  I -- I think -- I can

08:14:00 20   think of like one document that -- that one of

        21   the -- one of the people I was speaking to

        22   referenced, and then I looked for that document.

        23      Q.   (By Ms. Weaver)  And what document was

        24   that?

08:14:13 25      A.   It was one of the sales announcements
```

                                                      11


                        **CONFIDENTIAL ROUGH DRAFT**

```
08:14:14  1   that I referenced ahead of an external

        2   announcement.

        3      Q.   And did you find it useful in terms of

        4   preparing for your deposition?

08:14:24  5      A.   Not particularly, to be honest.

        6      Q.   And why is that?

        7      A.   It didn't have -- it -- it didn't really

        8   give me the information I was looking for.

        9      Q.   Okay.  And what was the information you

08:14:35 10   were looking for?

        11      A.   I was trying to understand what was an

        12   update we made in our targeting tools and it didn't

        13   actually describe it particularly in detail.  So it

        14   was not a very ref- -- helpful reference.

08:14:48 15      Q.   Got it.
```

```
          16          And what year was the update that you

          17  were thinking of?

          18      A.   It was --

          19          MR. BENJAMIN:  Objection to form.

08:14:57  20          THE DEPONENT:  Sorry.

          21          MR. BENJAMIN:  Sorry, Isabella.

          22          Objection.  Form.

          23          THE DEPONENT:  It was 20- -- 2013 or

          24  2014.

08:15:12  25      Q.   (By Ms. Weaver)  And did you find the
```

                                                              12


                       **CONFIDENTIAL ROUGH DRAFT**

```
08:15:14   1  answer that you were looking for with regard to

           2  this update in 2013 and 2014?

           3      A.   Yes, I did.

           4          MR. BENJAMIN:  Objection.

08:15:22   5      Q.   (By Ms. Weaver)  And -- and what was the

           6  issue, if you don't mind explaining?

           7      A.   Yeah, absolutely.

           8          We had -- it was actually related to one

           9  of the documents you -- you -- that's -- that was

08:15:32  10  part of the deposition, the exhibits.  It was

          11  related to the -- the removal of our reach

          12  estimates.
```

13          Q.   Okay.  We'll return to that in a bit

14    because I think what I want to do is try to be a

08:15:47 15    little more methodical and talk about definitions,

16    et cetera.

17          Returning back to Exhibit 1 for just a

18    moment, you said -- you wrote here that you spent

19    eight hours preparing on your own; is that right?

08:16:01 20    A.   Yes.

21          Q.   What did you do to prepare on your own?

22          A.   I largely reread the documents that were

23    submitted, and then read the -- the -- the

24    documents that the legal team had put together as

08:16:14 25    well.

                                                     13


                          **CONFIDENTIAL ROUGH DRAFT**

08:16:14 1          Q.   Okay.  And when you wrote, "documents

2    from Plaintiffs," did you mean the documents that

3    we identified for the deposition?

4          A.   (Deponent nods head.)

08:16:26 5          Q.   Okay.

6          A.   Those as well as just the -- I -- I'm not

7    sure if it make a difference, but the ones

8    specifically I understood like the exhibits for

9    this dep- -- deposition.  But then also like the

08:16:36 10   notice as well as the scenario documents.

      11         Q.   Great.  Thank you.

      12              And when you wrote "blog posts," what

      13   were you referring to there?

      14         A.   Our external blog posts.  So on our

08:16:50 15   Newsroom any -- any announcement we've made that

      16   were relevant.

      17         Q.   And what did you understand the focus of

      18   your testimony to be today, as you were preparing?

      19              MR. BENJAMIN:  Objection to form.

08:17:01 20              And Bella, to the extent that answering

      21   that question would require you to disclose any

      22   privileged communications or information, I'd just

      23   ask you to carve that out of your answer.

      24              But to the extent that you can answer

08:17:12 25   Ms. Weaver's question without disclosing privileged

                                                                14


                        **CONFIDENTIAL ROUGH DRAFT**

08:17:14  1   information, you should -- you should do so.

       2              THE DEPONENT:  I understood --

       3         Q.   (By Ms. Weaver)  Go ahead.

       4         A.   I understood it to be about our -- our ad

08:17:24  5   delivery.  So targeting and ranking, and the ways

       6   that advertisers can place an ad on Meta.

7        Q.   Okay.  So what do you mean by "ad

8    delivery"?

9        A.   So the way our ad system works is that it

08:17:58 10   is based on the choices advertisers make by

11   selecting a desired audience and ad settings to

12   help us understand the setup of their ad.  And then

13   there is a secondary step which is about

14   determining from that eligible audience who will

08:18:12 15   actually see that ad.  That's something we called

16   ranking.

17           That -- the end to end of this system is

18   called ad delivery.  So the starting point of an

19   advertiser creating an ad to the end point of

08:18:23 20   someone seeing that ad.

21        Q.   And what is the time frame that you

22   understand you are testifying to today?

23           MR. BENJAMIN:  Objection to form.

24           And same caution, to the extent you can

08:18:42 25   answer the question without disclosing privileged

                                                          15


                    **CONFIDENTIAL ROUGH DRAFT**

08:18:44  1   information or communications, you should do so.

2           THE DEPONENT:  I understood it to be

3    between the last 10 and 15 years.  Over the course

                    4   of the last 10 to 15 years.

08:18:55   5            Q.   (By Ms. Weaver)  Okay.  So 2012 or -- I

                    6   mean, I'll just -- I'm not -- to be transparent,

                    7   our class period is 2007 to the present.

                    8            A.   That's what I understood, yes.

                    9            Q.   Okay.  Great.

08:19:08  10                 So in 2007, was Facebook engaged in ad

                   11   delivery?

                   12            A.   We did show ads in 2007.

                   13            Q.   And how was it accomplished in 2007, and

                   14   how did it change over time, generally?

08:19:26  15                 MR. BENJAMIN:  Objection to form.

                   16   Compound.  Vague.

                   17                 THE DEPONENT:  So advertisers have -- we

                   18   it's always been that an advertiser could set up an

                   19   ad and give us the creative of what they wanted to

08:19:40  20   run -- or to -- to be for that ad, the content.

                   21                 Over the last 15 years, the system has

                   22   evolved to both provide additional targeting

                   23   options to advertisers for their selection, the

                   24   placement options, the ad ranking, the ad delivery.

08:19:59  25   Our machine learning has evolved.  So a lot of the

                                                                     16


                         **CONFIDENTIAL ROUGH DRAFT**

08:20:03  1   system has changed over time.

2          I think the fundamental pieces of the

3   advertisers' involvement down to a user seeing the

4   ad somewhere on Facebook have been consistent.  And

08:20:14  5   then over that same period, we've also updated our

6   transparency tools for users as well as the

7   controls they have for advertising.

8      Q.   (By Ms. Weaver)  So is it possible for

9   you to just lay out generally a chronology of

08:20:30 10  how -- let's carve out for a moment the

11  transparency tools and just talk about ad delivery

12  and how that changed over time at Facebook

13  beginning in 2007.

14         MR. BENJAMIN:  Objection to form.  Scope.

08:20:46 15        THE DEPONENT:  I don't think that I can

16  lay out a detailed timeline of like specific years

17  of when machine learning was updated.  But I can

18  talk through how that product has evolved, if

19  that's useful.

08:20:59 20     Q.   (By Ms. Weaver)  Great.  That would be

21  great.

22     A.   So over time you can think of our ad

23  delivery as many models that help us optimize and

24  understand some- -- whether someone would be

08:21:13 25  interested in an ad.  The way those models function

17

**CONFIDENTIAL ROUGH DRAFT**

08:21:16   1   is that we incorporate people's activity on the

         2   site, people's -- oh -- or -- and then across that

         3   timeline, also people's activity off of Facebook to

         4   help us understand whether they would be interested

08:21:26   5   in an ad.

         6         So one of the examples of an update there

         7   would be, in 2014, starting to include activity on

         8   the website or app to help inform ads.  And then

         9   there have been smaller iterations about the type

08:21:44  10   of models and how those function in ad delivery

        11   over those years.

        12    Q.   In 2007, how did Facebook record users'

        13   activity on and off the platform?

        14        MR. BENJAMIN:  Objection to form.

08:21:59  15    Q.   (By Ms. Weaver)  Or generally the --

        16   outside of the class period?

        17        MR. BENJAMIN:  Objection to form.

        18        Sorry.  Lesley, would you mind restating

        19   the question just so it's clear to all of us.

08:22:08  20    Q.   (By Ms. Weaver)  In 2007, how did

        21   Facebook record users' activity on and off the

        22   platform?

```
          23          MR. BENJAMIN:  Thank you.

          24          THE DEPONENT:  Outside of our ad system?

08:22:21  25     Q.   (By Ms. Weaver)  For -- I'm -- using your
```

                                                              18


                       **CONFIDENTIAL ROUGH DRAFT**

```
08:22:23   1  words, you said that -- well, I'll just say, yes,

           2  for use in ads -- in ads advertising, yeah.

           3     A.   Yeah.  So --

           4          MR. BENJAMIN:  Objection -- objection to

08:22:39   5  form.

           6          THE DEPONENT:  In -- in 2007, we did not

           7  use offsite, so -- or what I call offsite -- but

           8  activity off of Facebook to inform ads.  That was

           9  something that was introduced in 2014.

08:22:57  10          Prior to that, we used activity on

          11  Facebook.  So that could be information people

          12  provide as part of their profile or the

          13  interactions they have on Facebook.

          14          For example, like camp page interacting

08:23:08  15  with an ad would have informed that.  That --

          16  that's remained relatively consistent throughout

          17  this period.

          18     Q.   (By Ms. Weaver)  And when you say

          19  "interacting with an ad," what do you mean?
```

08:23:20 20      A.   That could be an ad click or ad comment.

21      Q.   And just to be specific, when you say

22   "click," you mean -- well, what do you mean by

23   "click"?

24      A.   When someone is shown an ad, there is a

08:23:36 25   call to action that the advertisers also defines in

19

**CONFIDENTIAL ROUGH DRAFT**

08:23:39  1   the setup of their ad.  That could be something

2   like learn more.  And they would go to a website,

3   it could be something looks like page.  It could be

4   respond to an event.

08:23:51  5          So any number of those call to actions --

6   usually when I say "click," I mean that the person

7   actually took that action.  They clicked on the

8   learn more.

9      Q.   And, therefore, it's not linked

08:24:02 10   excessively to example -- for example, a purchase,

11   right?

12          (Simultaneously speaking.) ***

13          MR. BENJAMIN:  Objection.

14      Q.   (By Ms. Weaver)  It can be anything?

08:24:08 15          MR. BENJAMIN:  Objection to form.

16          THE DEPONENT:  It is not specifically to

17    mean a purchase.

18         Q.   (By Ms. Weaver)  And when you said that

19    Facebook was recording users' on platform activity,

08:24:36  20    where is it recorded?

21              What did you mean by that?

22              MR. BENJAMIN:  Objection to form.

23              THE DEPONENT:  It is -- in order to run

24    our site, we maintain like a -- we understand that

08:24:52  25    the actions people take on the site, and that

                                                        20


                        **CONFIDENTIAL ROUGH DRAFT**

08:24:55   1    activity is what we then use for ads.

2         Q.   (By Ms. Weaver)  And how is that activity

3    identified and then used for ads?

4              MR. BENJAMIN:  Objection to form.

08:25:10   5    Compound.  Vague.

6              THE DEPONENT:  Can -- do you mind

7    clarifying what you mean by "identified"?

8         Q.   (By Ms. Weaver)  Sure.

9              If Facebook User A is acting on the

08:25:23  10    platform, how does Facebook -- and let's say in the

11    period 2007 to 2014 -- how did Facebook identify

12    which activity to observe and record for use in

13    ads?

            14          MR. BENJAMIN:  Objection to form.  Vague.

08:25:41 15  Calls for speculation.

            16          THE DEPONENT:  I think it wasn't that

            17  something was recorded specifically for the use in

            18  ads.

            19          So as an example, if I liked a page, we

08:25:54 20  would know that I liked a page.  And that was

            21  because also I have -- when I go to my profile, I

            22  need to see that I liked that page.  That's

            23  something that happens outside of ads completely.

            24          Ads then -- our ad system can then use

08:26:09 25  that activity in order to help inform my future ads

                                                            21


                        **CONFIDENTIAL ROUGH DRAFT**

08:26:13  1  by understanding what my interests might be.

           2          The -- does that get at what you were

           3  asking?

           4      Q.   (By Ms. Weaver)  Yes.

08:26:23  5          So when Facebook is using that activity,

           6  was Facebook looking at whether or not that

           7  activity was marked private or public by the user?

           8          MR. BENJAMIN:  Objection to form.  Scope.

           9          THE DEPONENT:  No.  Activity on Facebook

08:26:45 10  is we -- it's not quite differentiated in those two

11   buckets.  And our -- we did not reference that

12   explicitly in use for ads.

13        Q.   (By Ms. Weaver)  So if I mark -- let's

14   say I liked a product, but only a restricted

08:27:07 15   audience had access to that like, did Facebook then

16   restrict the use of that like in advertising only

17   in relation to the people with whom I had shared

18   that like?

19            MR. BENJAMIN:  Objection.  Vague.  Time

08:27:25 20   period.

21            THE DEPONENT:  I think there are a few

22   things that I -- to -- to unpack there.

23            So a product, which I understand to mean

24   maybe something that a brand has posted, would be

08:27:38 25   from like a Facebook page.  Those are public.

22

**CONFIDENTIAL ROUGH DRAFT**

08:27:41 1   There is only one setting for that -- that post.

2   And so when a user likes it, it is a public action

3   they are taking, and then we would use that for

4   ads.

08:27:49 5            I'm not sure if that gets to -- to the

6   example you gave.

7        Q.   (By Ms. Weaver)  Right.  That's -- so

8    that's one scenario.  But let's assume a scenario

9    where a friend posts something on the wall and I

08:28:00 10   like it.  And that like indicates something about

11   me.

12            Does Facebook use that like to decide how

13   to target me for ads?

14            MR. BENJAMIN:  Objection.  Form.  Vague.

08:28:14 15   Calls for speculation.

16            THE DEPONENT:  We use people's activity

17   and it could include activity from liking a post.

18   It's not that we then target an ad to someone based

19   on that.  It is still based on the advertiser's

08:28:27 20   desired audience.

21            So the way they've set up the parameters

22   for their audience.  And then the information of

23   people's activity helps us understand if they would

24   be interested in an ad.

08:28:38 25       Q.   (By Ms. Weaver)  When Facebook is using a

                                                        23


                      **CONFIDENTIAL ROUGH DRAFT**

08:28:39  1   user's activity to identify advertiser's desired

2    audiences, is Facebook limiting users' activity

3    that is public, or is it also using activity

4    that -- for which users have restricted the

08:29:00  5  audience?

          6           MR. BENJAMIN:  Objection.  Form.  Vague.

          7           THE DEPONENT:  I -- today, I do not

          8  believe that we use the -- actually, there's a

          9  clarification here that's important.

08:29:20 10           We use people's activity not just in

         11  terms of like they -- the exact action they took,

         12  but also aggregated.  So the fact that you were

         13  active on Facebook in the last month is something

         14  that we would understand and use in order to inform

08:29:37 15  an ad.

         16           There isn't a distinction there of

         17  whether or not that activity -- the fact that you

         18  were active in the last month is public or private.

         19  So I -- I'm not sure that there's a clear way to

08:29:47 20  answer what you're getting at.

         21      Q.   (By Ms. Weaver)  So for aggregated

         22  activity, there's no distinction between public and

         23  private.  And public and private access --

         24  activities are all in one bucket; is that fair?

08:30:01 25           MR. BENJAMIN:  Objection.  Form.

                                                      24


                       **CONFIDENTIAL ROUGH DRAFT**

08:30:02  1  Misstates.  Vague.

2          THE DEPONENT:  There are -- our -- the

3    way people interact with the platform and -- and

4    what they do on the platform does not fall into

08:30:17 5    buckets of private and public.  And.

6          So all -- also, when we think of like if

7    you've been active in the last month, it doesn't

8    differentiate between those because they're not a

9    concept within the activity on our platform.

08:30:29 10    Q.   (By Ms. Weaver)  So in 2014 -- let's use

11    the not aggregated example.

12          In 2014, when a user engaged in a

13    specific activity and that activity was designated

14    for a restricted audience, meaning something less

08:30:51 15    than public, did Facebook use that activity to help

16    curate audiences for advertiser?

17          MR. BENJAMIN:  Objection form.

18          THE DEPONENT:  It's not that curating

19    can -- curating audiences for advertisers, I'm not

08:31:14 20    really sure exactly what that means.

21          If it's that we have a targeting option

22    and an advertiser has defined their target audience

23    and then in order to deliver that ad, we use

24    people's activity, and it's not differentiated

08:31:30 25    between public or private.

                                                      25

**CONFIDENTIAL ROUGH DRAFT**

08:31:34  1      Q.   (By Ms. Weaver)  And is that true for the

          2  entire class period, 2007 to the present?

          3      A.   I'm not sure if there have been

          4  carve-outs in some manner throughout that.  I

08:31:48  5  think -- in -- in a way that maps to private or

          6  public.  Because, again, it -- it's not really

          7  what -- reflective of our system works.

          8      Q.   And when you say "It's not reflective of

          9  how our system works," can you describe what you

08:32:01 10  mean, or can you kind of explain what you mean?

         11      A.   Yes.  So something such as liking a page,

         12  I think, is what you're referencing as public.

         13  Other areas -- things like looking at an ad or

         14  watching or -- or -- or looking at a photo, those

08:32:19 15  are activity.

         16           I'm not sure how we would designate those

         17  as public or private because it's not something

         18  that's -- necessarily has a trace that leaves

         19  behind.  It's something that is activity that is on

08:32:30 20  our platform.  Those are interactions, even if it

         21  isn't a like or a comment.

         22      Q.   And are all of those interactions used in

         23  some form for advertising?

                24          MR. BENJAMIN:  Objection.

08:32:44 25          THE DEPONENT:  No.

                                                        26


                    **CONFIDENTIAL ROUGH DRAFT**

08:32:44  1          MR. BENJAMIN:  Form.

          2     Q.   (By Ms. Weaver)  What are the forms that

          3  are used -- what are the activities that are used

          4  for advertising?

08:32:51  5     A.   We use ** Lark -- page and ad engagement.

          6  So the interactions I was talking about before.  We

          7  use whether -- how someone has interacted with our

          8  products.  For example, how they connect to

          9  Facebook.  And if they're using browser or mobile

08:33:08 10  and that -- that type of information.  We use

         11  information they provide on their profile.

         12          And then like I was saying, the -- the

         13  more aggregated statistics of have -- have they

         14  logged in the last month.  Are they an active page

08:33:26 15  user.  Are they -- those are examples.

         16     Q.   Does Facebook use, for example,

         17  information about likes that users post for

         18  advertising?

         19     A.   Can you clarify --

08:33:46 20          MR. BENJAMIN:  Objection.

21      Q.   (By Ms. Weaver)  Do you know what a like

22   is?

23      A.   Yes.  I -- I'm not sure what you mean by

24   information about a like.  Just that a like

08:33:57 25   occurred?

                                                          27


                         **CONFIDENTIAL ROUGH DRAFT**

08:33:57  1      Q.   Sure.

       2      A.   We --

       3      Q.   Does Facebook use likes for advertising?

       4      A.   Yes, we do.  As an example, page likes

08:34:04  5   would be something that we use.  An ad like would

       6   be also another example.

       7      Q.   Does Facebook use likes on other content

       8   for advertising?

       9      A.   Yes.  I don't think that it is like all

08:34:23 10   likes.  But I'm not sure that there is a click or

      11   differentiation of what has been in the system over

      12   the entire -- from 2007 until to now -- now.

      13      Q.   Did Facebook's policy or practices change

      14   with regard to which likes it uses for advertising

08:34:40 15   over time?

      16           MR. BENJAMIN:  Objection to form and

      17   scope.

```
           18          THE DEPONENT:  I -- what -- for -- I

           19   don't think that there were like rules that have

08:34:53   20   been changed.  That -- that's not something I

           21   recall.

           22          Q.  (By Ms. Weaver)  So if a friend wrote a

           23   post and I liked it, would that be used for

           24   advertising at Facebook?

08:35:12   25          A.  That -- that example would not be used.
```

                                                                 28


                        **CONFIDENTIAL ROUGH DRAFT**

```
08:35:14    1          Q.  Why not?

            2          A.  Honestly, I think we have found that the

            3   page and ad engagement, which was the center of all

            4   of this, and activity we used up until that -- up

08:35:27    5   until the -- besides that piece, has been helpful

            6   for understanding people's interests and that

            7   wasn't something that was included.

            8          Q.  And when you say "advertising," what do

            9   you mean?

08:35:45   10          A.  I mean specifically an ad that has been

           11   created by an advertiser and placed through our ad

           12   creation tool, such as ads manager, with a desired

           13   audience and a bid.  And then that they pay for the

           14   placement of that ad.  So when we show that ad,
```

08:36:03 15   they pay for that impression.

16        Q.   I would -- I'm trying to understand what

17   is excluded by your definition of "advertising" in

18   term of ways that Facebook is compensated for

19   allowing the targeting of users.

08:36:22 20             Are there examples of ways in which

21   Facebook shares information about users that you

22   think is excluded from the definition of

23   advertising?

24             MR. BENJAMIN:  Objection to form.

08:36:38 25   Argumentative.  Vague.

                                                              29


                        **CONFIDENTIAL ROUGH DRAFT**

08:36:43 1              THE DEPONENT:  So my definition is

2    specifically about the -- what -- what is like paid

3    advertising.  I don't -- I'm not quite sure what

4    you mean in terms of other ways people could access

08:36:56 5   information.  I'm happy to -- to understand that

6    better.

7         Q.   (By Ms. Weaver)  Okay.  So you're

8    excluding, for example, research from advertising;

9    is that an example of something you're excluding?

08:37:07 10            MR. BENJAMIN:  Objection to form.

11   Misstates.  Argumentative.

```
          12              THE DEPONENT:  Do you mean research such

          13      as someone -- I'm -- I'm not -- I'm not actually

          14      sure what you mean by that.

08:37:18  15              What would be an example?

          16          Q.  (By Ms. Weaver)  Is there a research

          17      department at Facebook?

          18          A.  We do have an internal --

          19              MR. BENJAMIN:  Objection to form.

08:37:25  20      Objection to form and scope.

          21              THE DEPONENT:  We --

          22              MR. BENJAMIN:  You can answer.

          23              THE DEPONENT:  We do have an internal

          24      research department, yes.

08:37:31  25          Q.  (By Ms. Weaver)  And are you excluding
```

                                                              30


                        **CONFIDENTIAL ROUGH DRAFT**

```
08:37:33   1      from your definition of advertising the way that --

           2      that research department might use information

           3      about users, in your discussion today?

           4          A.  Yes.  I --

08:37:45   5              MR. BENJAMIN:  Objection to form.

           6      Objection to form and scope.

           7              THE DEPONENT:  Yes, I am.  But I'm not

           8      sure I understand how our internal research
```

            9  department is related to an -- an -- a nonMeta

08:37:59 10  advertiser either.

           11      Q.   (By Ms. Weaver)  Right.  Okay.  I'm just

           12  trying to understand if there are certain ways in

           13  which information about users is recorded by

           14  Facebook and still shared, but that is excluded

08:38:13 15  from your definition -- definition of advertising?

           16      A.   I wouldn't consider our internal --

           17  internal research department sharing information.

           18  It is -- they are a part of Meta.

           19      Q.   Okay.  And you're not capable of

08:38:34 20  testifying about the research department; is that

           21  right?

           22          MR. BENJAMIN:  Objection to form.  The

           23  characterization.  And also to note that the scope

           24  of the deposition was the subject of numerous

08:38:44 25  meet-and-confers and correspondence between --

                                                              31


                      **CONFIDENTIAL ROUGH DRAFT**

08:38:46  1          (Simultaneously speaking.) ***

           2          MS. WEAVER:  I just asked for an answer.

           3          THE DEPONENT:  That's correct.  I'm not

           4  an expert on the research department or the breadth

08:38:54  5  of research that we do and don't do.

6      Q.   (By Ms. Weaver)  Got it.

7           So you've defined advertising as when an

8  ad is created by an advertiser and placed through

9  our ad creation tool, such as ads manager.

08:39:28 10           If an ad is not created by the

11  advertiser, does Facebook itself create ads?

12      A.   We do not create ads for a third party.

13  We -- we do -- we are also an advertiser on our own

14  platform.  And then we also use our creation tools

08:39:47 15  to create that ad.

16      Q.   And are you testifying on that topic

17  today?

18      A.   About our -- our own ads?

19      Q.   Yes.

08:40:01 20      A.   To the extent that it relates to our

21  targeting and ad delivery, yes, because it's the

22  same system.  In terms of like our marketing

23  efforts, probably not.  No, I don't think I'm an

24  expert on that.

08:40:14 25      Q.   Okay.  And you also said you were

                                                          32


                    **CONFIDENTIAL ROUGH DRAFT**

08:40:21  1  limiting advertising -- and I'm just trying to

2  parse it out -- to "an ad is created by an

3   advertiser and placed through our ad creation

4   tool."

08:40:31 5          So are you excluding examples where the

6   ad is not placed through the ad creation tool or is

7   that just part of -- in your process?

8          A.   That's just part of the process.  It's

9   not an exclusion.  There aren't -- it's not a way

08:40:46 10  to exclude other ads.

11         Q.   Okay.  And then you said they pay for the

12  placement of that ad, or they pay for an

13  impression; is that right?

14         A.   Yes.

08:41:00 15        Q.   Okay.  Is that the only thing that third

16  parties pay Facebook for with regard to

17  advertising?

18              MR. BENJAMIN:  Objection to form.

19              THE DEPONENT:  Do you mean in terms of --

08:41:19 20  of an ad that they've tried to create and deliver.

21         Q.   (By Ms. Weaver)  Yes.

22         A.   Yes.  Is -- they pay for the impression

23  delivered or -- or the -- the fact that we have

24  shown that ad to someone is -- is what an

08:41:34 25  advertiser is paying for.

33

**CONFIDENTIAL ROUGH DRAFT**

08:41:39  1        Q.   Is it fair to say that different metrics

         2    can be established for purposes of triggering

         3    payment in an agreement with an advertiser?

         4        A.   I'm not sure what you mean.  Do you mind

08:41:53  5    clarifying.

         6        Q.   Do advertiser pay for -- can they agree

         7    to pay for views or impressions or clicks, or some

         8    other metric?

         9        A.   They -- they choose the objective of

08:42:04 10    their ad, and that is part of what defines -- what

        11    their -- the action that they're effectively paying

        12    for.  So you can -- when -- when they choose that

        13    objective, there's -- there are various options.

        14    One of them might be people's clicks and views.  So

08:42:24 15    if like a reach or brand awareness would probably

        16    be looking for views.  And those are the actions

        17    that take.

        18            The -- when -- when someone sets up their

        19    ads -- their ad, they are given the option --

08:42:38 20    look -- I said to set their objective and their

        21    bid.  And then that helps determine the payment

        22    when the ad is actually shown and that action is

        23    taken.

        24        Q.   Okay.  If we can, I'd like to break down

08:42:51 25  some of the definitions here, just to back it up a

                                                             34


                        **CONFIDENTIAL ROUGH DRAFT**

08:42:53  1  little bit.

          2          So could you identify the general buckets

          3  of actions taken for which Facebook receives

          4  payment from advertisers?

08:43:06  5          MR. BENJAMIN:  Objection to form.

          6          THE DEPONENT:  Actions taken by -- by

          7  people viewing the ad or by the advertiser?

          8          I'm sorry.

          9      Q.   (By Ms. Weaver)  By the users.

08:43:16 10      A.   So I believe that payment -- so --

         11  viewing an ad is what we charge an advertiser for.

         12  It is the impression.  There are ways to cut the

         13  cost that helps an advertiser understand whether it

         14  was the -- what the -- the -- the cost per action

08:43:41 15  was.

         16          So for example, if we show an ad 100

         17  times, there will be a cost per impression.  If

         18  we -- that ad was only clicked 20 times, there will

         19  be a cost per click.

08:43:54 20          Those are the -- the -- the breakdown of

         21  the payments that the advertiser is then invoiced

```
        22  and that they make to us is based on the

        23  performance of that ad.

        24      Q.   And when you say "view," what do you

08:44:09 25  mean?
```

                                                              35


                          **CONFIDENTIAL ROUGH DRAFT**

```
08:44:11  1      A.   If I'm going through my newsfeed and I

          2  see an ad as a user, that is an impression.  It's

          3  a -- or a view, sorry -- view is probably more

          4  colloquial.  But it is the impression of me seeing

08:44:24  5  the ad.

          6      Q.   And how does Facebook know that a user

          7  saw the ad?

          8      A.   Because we know that a user is on

          9  Facebook, and they are scrolling through their

08:44:35 10  newsfeed.

         11      Q.   And is Facebook then recording

         12  specifically what each user views?

         13      A.   We do know what people view.

         14      Q.   And does Facebook record that so it can

08:44:51 15  record it to the third party for payment purposes?

         16          MR. BENJAMIN:  Objection to form.

         17          THE DEPONENT:  I'm not sure if -- can you

         18  walk me through -- maybe "record" is throwing me
```

```
          19  here.  And what --
08:45:04  20      Q.  (By Ms. Weaver)  Okay.
          21      A.   -- do you mean by report back to the
          22  advertiser?
          23      Q.  I'm using "record" because you used
          24  record.
08:45:10  25      A.  Okay.
```

                                                              36


                        **CONFIDENTIAL ROUGH DRAFT**

```
08:45:11   1      Q.  What did you mean by "record" when you
           2  used it?
           3      A.   Just that it is logged.  So we have --
           4  when someone goes in their newsfeed and they see a
08:45:20   5  ad, we know that they saw an ad.  We do use that to
           6  say one person saw this ad.  And when we share
           7  information back to the advertiser, we share
           8  aggregated reporting information so they would know
           9  in aggregate how many people saw an ad.  We don't
08:45:37  10  share that "I, Bella, saw the ad."
          11      Q.  But in its base, Facebook must have a
          12  record that you, Bella, saw the ad because somehow
          13  you've got to aggregate, right?
          14      A.  Yes.  We do know that I saw the ad.  But
08:45:56  15  we don't share that with the advertiser.
```

```
        16      Q.   Did that change over time?

        17      A.   No, not to my knowledge.

        18      Q.   Okay.

        19      A.   Sorry, Matt.

08:46:05 20      Q.   So from 2007 to the present, did Facebook

        21 at any point in time share with advertisers who

        22 specifically saw what ad?

        23      A.   Our performance and reporting to

        24 advertisers is aggregated.  And it explains the

08:46:20 25 performance of their ads, not the people who saw
```

                                                          37


                        **CONFIDENTIAL ROUGH DRAFT**

```
08:46:22  1 their ads.  And that's been consistent.

          2      Q.   And has it -- the size of the aggregated

          3 groups that Facebook reported to advertisers

          4 changed over time?

08:46:47  5      A.   I -- I would assume it has.  I don't know

          6 what that timeline looks like or the -- the

          7 changes, specifically.

          8      Q.   In general, is it fair to say that the

          9 groups have gotten larger in part as an attempt to

08:47:06 10 protect the identification and re-identification of

         11 users, when reporting to advertisers who has seen

         12 what advertisement?
```

13          MR. BENJAMIN:  Objection to form.

14          THE DEPONENT:  Again, I don't know

08:47:19 15  exactly what those changes are or the trend in --

16  to -- to confirm that.

17      Q.  (By Ms. Weaver)  Did Facebook have a

18  policy about that?

19          MR. BENJAMIN:  Objection to form.

08:47:33 20  THE DEPONENT:  I don't think that there's

21  been an explicit consistent policy about that, in

22  terms of -- over the entire period.

23      Q.  (By Ms. Weaver)  Are you aware of any

24  policies that relate to it during any time period?

08:47:52 25         MR. BENJAMIN:  Objection to form.  Scope.

                                                    38


                    **CONFIDENTIAL ROUGH DRAFT**

08:47:55 1   THE DEPONENT:  For ads, we -- we -- we do

2  aggregate.  I don't think that -- or I'm not aware

3  of a -- a one threshold that is -- that happens

4  throughout.

08:48:09 5       I think that those are evaluations with

6  the privacy and policy and legal teams that help

7  establish it for that product and what makes sense

8  in terms of potential re-identification or not.

9      Q.  (By Ms. Weaver)  Who on those teams is

08:48:24 10   knowledgeable about this topic?

11        A.   I would expect our privacy team would be

12   and I -- I don't have a name off the top of my

13   head.

14        Q.   Okay.  If you think of a name during the

08:48:38 15   course of the deposition, will you circle back?

16        A.   Yeah.

17        Q.   Thank you.

18             When you say "that product" -- you said

19   the privacy and legal team establish a threshold

08:48:56 20   for that product, what did you mean by "product,"

21   in general?

22        A.   Yes.  Sorry.  That was very internal

23   speak.

24             That would be, as an example, something

08:49:06 25   that I consider a product or our targeting options.

                                                    39


                        **CONFIDENTIAL ROUGH DRAFT**

08:49:10  1   So one of those options could be a product.

2             In this case, I was thinking more

3   specifically about our ad reporting UI and the --

4   the metrics that we provide there as a product.

08:49:24  5        Q.   When you said "ad reporting UI," you mean

6   ad reporting user interface; is that right?

      7     A.   As an advertiser, when I create the ad in

      8  ads manager, as an example, the interface that I go

      9  back to, to understand how that ad is performing.

08:49:40 10     Q.   And what metrics are you referring to

     11  when you said the metrics we provide is a product

     12  in the UI?

     13     A.   So as an example, the number of

     14  impressions an ad has received.  The number of

08:49:54 15  clicks it's received.

     16     Q.   And to return a little bit to where we

     17  are and just close it out.

     18     Are there any other metrics that Facebook

     19  reports to advertisers?

08:50:08 20    A.   Outside of performance metrics?

     21     Q.   Yes.

     22     MR. BENJAMIN:  Objection to form.

     23     THE DEPONENT:  No.

     24     Q.   (By Ms. Weaver)  And over the class

08:50:18 25  period, is that true as well?

                                               40

                        **CONFIDENTIAL ROUGH DRAFT**

08:50:24  1     MR. BENJAMIN:  Objection.  Form.

      2     THE DEPONENT:  Again, related to ads

      3  reporting, it is based on the performance of those

4  ads.  And I'm not -- I don't think that there are

08:50:38  5  other metrics that we report outside of the

6  performance of their ads.

7     Q.   (By Ms. Weaver)  And with regard to

8  performance metrics, does -- has Facebook ever

9  provided any information other than clicks and

08:50:50 10  views?

11     A.   The cost per clicks is an example.  The

12  payment -- or the -- the -- how much it has cost

13  them to run that ad.  There's a series -- I'm

14  happy -- maybe that's -- I don't know the full

08:51:07 15  list, but I'm happy to get -- make sure that

16  there's a screenshot provided of the UI.

17     Q.   What is a cost per click?

18     A.   A cost per click is over -- the amount an

19  advertiser has spent.  If they spent five dollars

08:51:22 20  and they got 20 clicks in the delivery of that ad,

21  the cost per click is literally the -- the amount

22  spent per click.  So the average cost per click.

23     Q.   And what is payment per click?

24     A.   It's not a payment per click.  It's just

08:51:40 25  the total they spend divided by the -- how much --

41

**CONFIDENTIAL ROUGH DRAFT**

08:51:46  1   how many clicks they got.  And then their total

          2   payment is how much they're charged for that ad.

          3       Q.   Okay.  In terms of the targeting

          4   categories advertisers can identify, can you

08:52:14  5   generally describe *** all of them?

          6       A.   Yeah, absolutely.

          7            MR. BENJAMIN:  Objection.  Vague.

          8            THE DEPONENT:  For -- so just as a

          9   starting point, when we say "identify," I -- I --

08:52:27 10   this -- what I'll describe is what's in -- what we

         11   provide to advertisers for them to set their

         12   desired audience.

         13            So when an advertiser goes to create an

         14   ad, like I said, they give us the content of their

08:52:39 15   ad.  So what they want it to look like when it's

         16   run on Facebook.  And then they set up their

         17   objective and the budget, the pacing, et cetera.

         18   And then they get to the -- the audience portion.

         19            And there they're given options that we

08:52:55 20   often bucket into what's called core audiences.

         21   And that might be demographics and location.  So

         22   they're selecting whether they want to reach an age

         23   range and what that age range is.  And then whether

         24   they want to reach everyone or men or women.

08:53:10 25            And then they select the location.  So

42

**CONFIDENTIAL ROUGH DRAFT**

08:53:14  1   for example, if they want to reach all of the state

2   of Washington or -- or kind of within that, what

3   realm, where they want their ad to be shown.

4           Outside of our core audiences, we also

08:53:25  5   have what is called like detailed targeting.  And

6   that's -- that's based off -- or that's -- those

7   are -- examples are interests or behaviors.

8           So interest might be things like hobbies,

9   topics, public figures that people have engaged

08:53:41 10   with.  And then behaviors might be the way they

11   connect to Facebook, their purchase behavior.  So

12   whether they've bought things before.  If they

13   interact with games, as an example.

14           And then there are custom -- custom

08:53:56 15   audiences which largely break down into customer

16   lists.  So an advertiser providing information

17   about their existing customers in order to reengage

18   them.  Website custom audiences and app custom

19   audiences.  And then our engagement custom

08:54:15 20   audiences, which is to reengage people who already

21   interacted with your -- your page on Facebook.

22       Q.   (By Ms. Weaver)  So in your

23   understanding, is custom audiences a subset of

24   detailed targeting?

08:54:36 25        A.   No.  We usually consider it separate.

43

**CONFIDENTIAL ROUGH DRAFT**

08:54:40  1        Q.   And why is it separate?

2        A.   I mean, in large part because of the way

3   we've structured the UI and how our conversations

4   with advertiser have been about the flow of it.

08:54:52  5   It's also somewhat different in terms of the

6   information that backs those -- those targeting

7   options.

8             So detail targeting, like I said, is --

9   is -- are things like interests and behaviors.

08:55:04 10   Those are based on activity.  Whereas, something

11   like a custom audience is really much more specific

12   to that advertiser.  It's information about their

13   existing customers.  And so it's -- it's somewhat

14   distinguished both from an advertiser mental model

08:55:19 15   but also in the UI.

16        Q.   Okay.  So I'm hearing that there are --

17   well, in the -- is engagement custom audiences a

18   subset of custom audiences?

19        A.   Yes.

08:55:34 20     Q.   And is that based on a -- different

21   information that's backing it?

22     A.   Yes.

23     Q.   So just to clarify, the custom audiences,

24   they're -- those kind of three types, each one of

08:55:50 25   those would have different information that backs

                                                          44


                        **CONFIDENTIAL ROUGH DRAFT**

08:55:53 1   it.

2        Q.   And for the record, those three types

3   are?

4        A.   Customer lists.  And then website custom

08:56:03 5   audiences.  App custom audiences.  And then the

6   last kind of bucket is the engagement custom

7   audiences.

8        Q.   And what's an engagement custom audience?

9        A.   When an advertiser has a page -- page on

08:56:16 10  Facebook, people will like interact, follow that

11  page.  The engagement custom audience is a way for

12  an advertiser to say "I want the audience of my ad

13  to be the people who have chosen to follow my

14  page."

08:56:30 15      Q.   Okay.

16       A.   And so on -- on Meta or on Facebook

                17   activity to -- to -- for an advertiser to reengage

                18   with their existing audience on Facebook.

                19        Q.   So recap, is it fair to say that you've

08:56:46   20   identified three kinds of targeted advertising core

                21   audiences to detail targeting and three custom

                22   audiences?

                23        A.   Yes.

                24             MR. BENJAMIN:  Objection to form.

08:57:00   25        Q.   (By Ms. Weaver)  And other than those

                                                                45


                        **CONFIDENTIAL ROUGH DRAFT**

08:57:02    1   three, are you aware of any other kind of targeted

             2   advertising that has occurred at Facebook from 2007

             3   to the present?

             4             MR. BENJAMIN:  Objection to form.

08:57:11    5             THE DEPONENT:  Other kinds of advertising

             6   usually fit in with those three if -- those are how

             7   we've characterized and captured our targeting

             8   options for many years.

             9        Q.   (By Ms. Weaver)  And when you say "for

08:57:27   10   many years," can you identify -- be a little bit

                11   more specific?

                12        A.   I think from 2007 onwards.  I mean,

                13   that -- those -- that's how we describe the

```
        14   categories of the types of targeting.

08:57:39 15       Q.   And when you say "other kinds of

        16   advertising," are you thinking of other specific

        17   examples that you would slide into one of these

        18   three buckets?

        19       A.   As an example, we used to have partner

08:57:54 20   categories.  That's something that would have fit

        21   under the detailed targeting and has since been

        22   deprecated.

        23       Q.   Anything other than partner categories

        24   that you're thinking of?

08:58:06 25       A.   That was what I was thinking of
```

                                                          46


                       **CONFIDENTIAL ROUGH DRAFT**

```
08:58:08  1   specifically.  There have been -- I mean, changes

         2   within what we offer over the years, but I think

         3   the -- the structure of the three types is pretty

         4   consistent.

08:58:20  5       Q.   And I should have said this at the

         6   outset.  But you're here testifying on behalf of

         7   Facebook today, right, you're aware of that?

         8       A.   Yes.

         9       Q.   Okay.  So when you're saying "you," it's

08:58:29 10   the Facebook you, unless you are telling me it's
```

11   your personal knowledge, correct?

12         A.   Correct.

13         Q.   And that applies to your previous

14   testimony and your testimony going forward,

08:58:38 15   correct?

16         A.   Correct.

17         Q.   Okay.  Thank you.

18              What do you understand partner categories

19   to mean?

08:58:45 20         A.   Partner categories were targeting options

21   that were built off of agreements with data brokers

22   where we might not have had that information.  And

23   so it was a way to connect in information that

24   advertisers found relevant to their ads and provide

08:59:02 25   that as a way for them to define their audience on

                                                             47


                    **CONFIDENTIAL ROUGH DRAFT**

08:59:05 1   Facebook.

2         Q.   And in this instance, when you define

3   advertisers, are you including the data brokers or

4   Facebook as well?

08:59:18 5              MR. BENJAMIN:  Objection to form and

6   scope.

7              THE DEPONENT:  I -- the advertiser is the

8   person buying the ad.

9        I'm not sure if that answers your

08:59:29 10   question.

11        Q.   (By Ms. Weaver)  And sometimes did

12   Facebook buy an ad?

13        A.   We do run our ads on our own platform,

14   yes.

08:59:37 15        Q.   And do you know if Facebook bought ads

16   through partner categories?

17        A.   So it's not --

18             MR. BENJAMIN:  Objection to form and

19   scope.

08:59:45 20             THE DEPONENT:  It's not that you're

21   buying an ad through a partner category.  The

22   partner category, as an example, like grocery

23   shoppers, is one of the options in the creation of

24   the ad through our -- our ad creation, so like ad

09:00:02 25   manager.

                                                      48


                      **CONFIDENTIAL ROUGH DRAFT**

09:00:02  1        It would have been something someone can

2   select to define their audience.  When we create an

3   ad, we also use those options.  So I -- I honestly

4   can't definitively say whether we did or didn't

09:00:13  5    ever use a partner category.

          6         Q.   (By Ms. Weaver)  And how long were

          7    partner categories in existence?

          8         A.   They were deprecated in --

          9              MR. BENJAMIN:  Objection -- objection to

09:00:24 10    form and scope.

         11              THE DEPONENT:  They were deprecated in

         12    2018.  And they were brought onto the platform

         13    several years earlier.  But I don't know the exact

         14    year.

09:00:40 15         Q.   (By Ms. Weaver)  Who made the decision to

         16    deprecate partner categories?

         17              MR. BENJAMIN:  Objection to form and

         18    scope.

         19              THE DEPONENT:  This was not a singular

09:00:50 20    person's decision to deprecate partner categories.

         21         Q.   (By Ms. Weaver)  Okay.  But who -- who at

         22    Facebook, in general, whether it's a team or a

         23    name, decided to deprecate partner categories?

         24         A.   This would have been --

09:01:01 25              MR. BENJAMIN:  Objection to form and

                                                            49


                         **CONFIDENTIAL ROUGH DRAFT**

09:01:03  1    scope.

2            THE DEPONENT:  -- a decision across the

3    ads product policy and legal cross-functional team.

4       Q.   (By Ms. Weaver)  And what's your

09:01:12  5    understanding of why that decision was made?

6            MR. BENJAMIN:  Objection to form and

7    scope.

8            THE DEPONENT:  My understanding is that

9    we -- we felt that over time people's expectations

09:01:23 10    had evolved and that partner categories weren't

11    something that we wanted to offer any longer.

12       Q.   (By Ms. Weaver)  How were partner

13    categories not consistent with people's

14    expectations?

09:01:39 15            MR. BENJAMIN:  Objection to form.  Calls

16    for speculation.  Vague and scope.

17            THE DEPONENT:  My understanding is it's a

18    type of data coming in.  And though -- although it

19    was transparent, there was decision to not offer

09:01:55 20    those any longer.

21       Q.   (By Ms. Weaver)  And you're saying the

22    partner category is an example of detailed targeted

23    advertising, right?

24       A.   It -- it falls into that bucket, yes.

09:02:10 25       Q.   And -- and you're testifying about

50

**CONFIDENTIAL ROUGH DRAFT**

09:02:13  1  targeted advertising today, right?

2        A.   About our ad targeting and ad delivery,

3  yes.

4        Q.   Okay.  And as you sit here today, can you

09:02:24  5  explain why Facebook deprecated the kind of

6  detailed targeted advertising that was called

7  partner categories?

8              MR. BENJAMIN:  Objection to form.  Scope.

9              THE DEPONENT:  We consistently look at

09:02:43 10  the targeting options we provide.  We've deprecated

11  a number of options, to partner categories is an

12  example.  That assessment is often done across the

13  group, including with our product teams.  And this

14  wasn't a product they wanted to continue to

09:02:56 15  support.

16        Q.   (By Ms. Weaver)  That's very general and

17  it doesn't actually help me understand.  So let me

18  just try -- I'll ask a different question.  Forget

19  all the other examples.

09:03:07 20             With regard to partner categories, why

21  did Facebook -- what were the reasons that Facebook

22  decided to deprecate them?

23             MR. BENJAMIN:  Objection to form.  Scope.

```
         24              And to the extent that answering
09:03:24 25  Ms. Weaver's question would require you to disclose
```
                                                                51


                        **CONFIDENTIAL ROUGH DRAFT**

```
09:03:27  1  privileged information, please carve that out of
          2  your answer.
          3              To the extent you can answer the
          4  question, please do so.
09:03:34  5              THE DEPONENT:  I think I've answered the
          6  question to -- to that extent.
          7              I mean, we look at our products and we --
          8  we determine which ones to continue supporting.
          9  Partner categories was one that was then
09:03:46 10  deprecated.
         11      Q.   (By Ms. Weaver)  What particular
         12  characteristics of partner categories did Facebook
         13  consider and then decide the reason for deprecating
         14  it?
09:03:58 15      A.   They were -- sorry.  Go ahead, Matt.
         16              MR. BENJAMIN:  Objection to form.  Scope.
         17  And the same caution regarding privilege.
         18              THE DEPONENT:  These were a place where
         19  we had data in.  It was part of the decision, but
09:04:13 20  I -- this was just a product that was no longer
```

21   going to be supported.

22       Q.   (By Ms. Weaver)  So I'm -- I'm trying to

23   understand the reasons for the decision, and you

24   keep just telling me what the decision was.

09:04:24 25       So let me try it this way.  When Facebook

52

**CONFIDENTIAL ROUGH DRAFT**

09:04:27  1   decides to deprecate a product, what are the

2   considerations?

3       MR. BENJAMIN:  Objection to form.

4       Q.   (By Ms. Weaver)  Let me restate it.

09:04:39  5       When Facebook decides to discontinue an

6   advertising product, what are the reasons, in

7   general?

8       A.   We'll look at their use, whether it's

9   performing well.  Is it helping deliver ads that

09:04:55 10   are relevant and interesting.  Whether advertisers

11   want it or not.

12       And then also our understanding -- like

13   from the policy side, we'll also understand whether

14   or not these are areas that -- that other groups

09:05:12 15   use and industry standard.

16       I mean, there's a number of

17   considerations, all kind of from everyone's

```
          18   expertise.  And I'm sure that's what was applied in

          19   those conversations as well.

09:05:24  20       Q.   Does Facebook consider user expectations

          21   in reaching such decisions?

          22       A.   Yeah, absolutely.  We -- we work to

          23   understand what our -- what our user base would

          24   want and -- and how they would prefer our product

09:05:40  25   to be built as well.
```

                                                               53


                         **CONFIDENTIAL ROUGH DRAFT**

```
09:05:41   1       Q.   Did Facebook consider user expectations

           2   when considering whether or not to deprecate

           3   partner categories?

           4            MR. BENJAMIN:  Objection to form.  Scope.

09:05:49   5   And the same instruction regarding privilege.

           6            THE DEPONENT:  Yes.  I think because it

           7   is always a consideration across all of our

           8   decisions.

           9       Q.   (By Ms. Weaver)  Who specifically would

09:06:07  10   know why Facebook deprecated partner categories?

          11       A.   Again, it was a group decision.  I mean,

          12   across the cross-functional group.  I'm happy to --

          13   to work with the team to figure out who might be --

          14   who might have been part of that conversation,
```

09:06:22 15  specifically.

16        Q.   Yes.  We would like to know by name who

17  was involved in the decision to deprecate partner

18  categories.

19             And as you sit here today, you can't

09:06:33 20  provide that information; is that right?

21             MR. BENJAMIN:  Objection to form.

22  Misstates.  And objection to scope.

23             THE DEPONENT:  I've provided from the

24  targeting side the way that we assess these

09:06:44 25  decisions.  And I -- I'm not sure if there's much

                                                    54


                    **CONFIDENTIAL ROUGH DRAFT**

09:06:49 1  more I could say on that one.

2        Q.   (By Ms. Weaver)  Okay.  Just to be clear,

3  for the record, I'm specifically asking if you can

4  identify by name any one person involved in the

09:06:58 5  decision to deprecate partner categories.

6             Can you?

7             MR. BENJAMIN:  Objection to form and

8  scope.

9             THE DEPONENT:  A singular person or a

09:07:07 10  team?

11        Q.   (By Ms. Weaver)  Any -- any -- any names

```
           12   that you can think of.

           13        A.   I mean, Andrew Howard was involved.

           14        Q.   Anyone else?

09:07:25   15        A.   Like I said, there wasn't -- there

           16   were --

           17             (Simultaneously speaking.) ***

           18             MR. BENJAMIN:  The same -- the same

           19   objections.

09:07:29   20             THE DEPONENT:  There were multiple teams

           21   involved.  I don't know the full list of the entire

           22   cross-functional team that was involved, as they

           23   are involved when we introduce a new product or

           24   deprecate other products.

09:07:41   25        Q.   (By Ms. Weaver)  Okay.  But I'm not
```

                                                              55


                          **CONFIDENTIAL ROUGH DRAFT**

```
09:07:42    1   asking for an exhaustive and complete list.  I

            2   literally was asking if you can identify even a

            3   handful of people or one name.

            4             Other than Mr. Howard, can you identify

09:07:52    5   anybody else who was involved in the decision to

            6   deprecate partner categories?

            7        A.   Amy Dunn.

            8             MR. BENJAMIN:  Objection.  Objection --
```

```
           9  sorry, Bella.  Objection to form.

09:08:00  10            THE DEPONENT:  No, please.

          11            MR. BENJAMIN:  Asked and answered.  And

          12  scope.

          13            THE DEPONENT:  Amy Dunn.  She was a

          14  former -- she's now a former employee.  She was one

09:08:11  15  of the product marketers for targeting.  So I would

          16  assume was directly involved.

          17      Q.   (By Ms. Weaver)  Anyone else?

          18      A.   Honestly, from the top of my head, for

          19  that exact decision, I -- I wouldn't be able to

09:08:27  20  tell you many more names.

          21      Q.   Who is Andrew Howard?

          22      A.   He's on our policy team.

          23      Q.   And when you say "policy team," what do

          24  you mean?

09:08:40  25      A.   The -- across ads.  And then also other
```

56

**CONFIDENTIAL ROUGH DRAFT**

```
09:08:45   1  products, there are -- there's a policy counterpart

           2  for that product.  They participate in product

           3  development, product decisions.  They work as part

           4  of the cross-functional team involved in developing

09:08:57   5  products.  And Andrew is an example for ads.
```

                6        Q.    And when you're saying "policy," what do

                7    you mean?

                8        A.    I mean providing -- I mean -- I'm sorry.

                9              I'm not totally sure what you mean by

09:09:14   10    that question.

               11        Q.    You said there's a policy counterpart for

               12    that product.

               13              What do you mean by policy?

               14        A.    So in this case, it's privacy policy.

09:09:21   15    It's the name of the team that Andrew is on and

               16    that I'm on.  And we are -- we work with a product

               17    team as they develop products.

               18        Q.    And how many people are on the privacy

               19    policy team currently?

09:09:37   20        A.    Currently, I would, I think, ballpark

               21    probably 170.  170 people.

               22        Q.    When was the privacy policy team first

               23    established?

               24        A.    A long time ago.  I'm -- I'm not sure of

09:09:57   25    the exact date when our team was established.

                                                                    57


                            **CONFIDENTIAL ROUGH DRAFT**

09:09:59    1        Q.    Was there a privacy policy team in 2012?

                2        A.    Yes, there was.

           3        Q.   And who was on it?

           4        A.   An example would be Rob Sherman or

09:10:11   5   Erin Egan.

           6        Q.   And in 2012, how many people were on the

           7   privacy policy team?

           8        A.   I can't tell you with high requested I

           9   many not sure size of at that point.

09:10:27   10       Q.   Was it 170 people?

           11       A.   No, the team has grown in the last 12

           12  years.

           13       Q.   Was it more than 20?

           14       A.   I -- I would say yes, but I also don't

09:10:40   15  know exactly how we have reorg over that time

           16  period so it might have been a slightly different

           17  named team with different scope and yes.

           18            MR. BENJAMIN:  Ms. Weaver, we've just

           19  been going for an -- well over an hour if he coming

09:10:59   20  good time tore a break?

           21            MS. WEAVER:  Yeah, no problem let me just

           22  close this out if you don't mind.

           23            MR. BENJAMIN:  Of course.

           24       Q.   (By Ms. Weaver)  You said Amy Dunn is

09:11:07   25  former right?

                                                              58

**CONFIDENTIAL ROUGH DRAFT**

09:11:09 1     A.    Yes Amy Dunn left I believe two years ago

         2   a year ago.

         3     Q.    And where does she work now, if you know?

         4     A.    I don't know.

09:11:16 5     Q.    And it's DUNN?

         6     A.    Yes, that's correct.

         7     Q.    And how is first name spelled?

         8     A.    AMY.

         9     Q.    And other than those two individuals can

09:11:26 10  you identify anybody else who is involved in the

         11  decision to deprecate partner categories?

         12    A.    Rob Sherman would have been aware and

         13  probably involved, Victoria *chin nor land was Amy

         14  counterpart and partner.  Also on the marketing

09:11:47 15  side SPELL they would have been involved.  And then

         16  I -- I mean that's --  that's who I can think of.

         17          MS. WEAVER:  Okay.  Great.  We can take a

         18  break and go off the record.

         19          THE VIDEOGRAPHER:  Okay.  We are off the

09:12:04 20  record it's 9:12 a.m.

         21          (Recess taken.)

         22          THE VIDEOGRAPHER:  Okay.  We are back on

         23  the record it's 9:39 a.m.

         24    Q.    (By Ms. Weaver)  Ms. Leone, you

09:39:16 25   understand you are still under oath, correct?

                                                          59


                        **CONFIDENTIAL ROUGH DRAFT**

09:39:19  1      A.   Yes.

          2      Q.   Okay.  When we broke, I had asked if you

          3   could remember anybody else other than

          4   Andrew Howard, Amy Dunn, Rob Sherman and **Victoria

09:39:34  5   chin you were involved in the decision to deprecate

          6   partner categories.

          7           Do you recall that.  You had asked that,

          8   yes.

          9      Q.   Can you identify anyone other than those

09:39:43 10   four individuals who reached that decisions?

         11           MR. BENJAMIN:  Objection to form.

         12   Objection to scope.  And I'm going to instruct the

         13   witness not to answer on the basis of privilege.

         14           MS. WEAVER:  She can't identify who was

09:39:59 15   involved in the discussion on the basis of privacy

         16   if they personally knows?

         17           MR. BENJAMIN:  Well, I think this

         18   question has been asked and answered.  But

         19   Ms. Leone to the extent you can answer Ms. Weavers

09:40:10 20   question without revealing privileged information

         21   or communications, you may do so.

22          THE DEPONENT:  I know that it was across

23     functional team which is what I noted.  Those are a

24     few people that I knew were involved and beyond

09:40:24 25     that, it's attorney-client privilege.

                                                              60


                        **CONFIDENTIAL ROUGH DRAFT**

09:40:30  1     Q.   (By Ms. Weaver)  Do you have personal

2     knowledge of any other individuals who were

3     involved in the decision?

4          MR. BENJAMIN:  Objection scope and same

09:40:40  5     caution regarding privilege.

6          THE DEPONENT:  Those are -- the -- are

7     people I can think of and beyond that it was a very

8     large group as many of our product decisions are.

9     Q.   (By Ms. Weaver)  How large was the group?

09:40:54 10     A.   I can't.

11          MR. BENJAMIN:  Objection -- objection to

12     form.

13          THE DEPONENT:  I don't know an exact

14     number.

09:41:01 15     Q.   (By Ms. Weaver)  Okay.  Let's turn to

16     your testimony about the three categories of

17     targeted advertising, you listed core audiences

18     detailed targeting and custom audiences, correct?

```
          19        A.   Yes.
09:41:15 20        Q.   With regard to core audiences, how long
          21 has that program be in use is it fair to call it a
          22 program?
          23        A.   I think that's fair.  I would use the
          24 word product.  But yes.  The parts that we
09:41:35 25 categorize into core audiences I think mentioned
```

                                                                61


                        **CONFIDENTIAL ROUGH DRAFT**

```
09:41:40  1 age gender location have been part of our targeting
           2 option since we offered started to offering
           3 targeting options.
           4        Q.   And what other demographics other than
09:41:52  5 age gender and location are used in core audiences?
           6        A.   Those -- those are the core audiences
           7 demographics.
           8        Q.   And with regard to gender what do you
           9 mean?
09:42:15 10        A.   An advertiser has the option three kind
          11 of toggle reach all, reach men, reaching women.
          12        Q.   And with regard to location, what options
          13 are afforded advertisers?
          14        A.   When an advertiser goes to create their
09:42:37 15 ad in that location section, it effectively is a
```

16  map they can choose to select where they want their

17  ad to be shown.  That can be by clicking on the

18  map.  That can be by entering a -- a place -- or a

19  city a state.  They can -- keyword search to match

09:43:00 20  where they want their ad to be shown.

21      Q.   And how granular is the location

22  selection?

23          MR. BENJAMIN:  Objection to form.

24          THE DEPONENT:  An advertiser can input

09:43:13 25  really kind of whatever granularity to an extent.

                                                    62


                    **CONFIDENTIAL ROUGH DRAFT**

09:43:19 1  There is then a radius and that radius cannot be

2  smaller than 1 mile.

3      Q.   (By Ms. Weaver)  And when was the

4  restriction that the radius cannot be smaller than

09:43:31 5  1 mile implemented?

6      A.   I believe that has been in place

7  throughout.  I -- I don't believe that there was a

8  time where we didn't have that.

9      Q.   So to be clear from 2007 forward it was

09:43:55 10  Facebook's policy that for core audiences the

11  location could not be less than a 1 mile radius; is

12  that right?

```
          13       A.   So the advertiser selection of where to

          14  show their ad like that selection in terms of this

09:44:12  15  city, et cetera, I -- I don't -- I believe that

          16  there has always been -- so where those options

          17  have been provided I think there has always been

          18  the radius but I would honestly have to check on if

          19  the UI has changed in the way they select that.

09:44:36  20       Q.   Was it ever possible for an advertiser to

          21  provide map coordinates to target users?

          22            MR. BENJAMIN:  Objection.  Objection to

          23  form.

          24            THE DEPONENT:  They don't provide a map

09:44:48  25  coordinate.  They can select like I was saying
```

                                                          63


                        **CONFIDENTIAL ROUGH DRAFT**

```
09:44:52   1  there's a map they can select a point.  But it's

           2  not that they are selecting users.  They are

           3  selecting where they want their ad to be shown.

           4       Q.   (By Ms. Weaver)  And could they do that

09:45:02   5  with the specificity of a map coordinate at any

           6  point in time from 2007 to the present?

           7       A.   With the radius that I mentioned.

           8       Q.   And where would you go to confirm that

           9  the 1 mile radius was honored from 2007 to the
```

09:45:21 10   present?

11            MR. BENJAMIN:  Objection to form.

12            THE DEPONENT:  I -- I would probably

13   discuss with our engineers if they can cross-check

14   that.  I'm not sure that we have code from 20 --

09:45:38 15   from 2007.

16       Q.   (By Ms. Weaver)  Was there an enforcement

17   mechanism to ensure that the 1 mile radius was

18   included?

19            MR. BENJAMIN:  Objection to form.  Vague.

09:45:54 20            THE DEPONENT:  There -- the selection

21   from the app to enforce the selection from the

22   advertiser.

23       Q.   (By Ms. Weaver)  To gnasher Facebook's

24   policy that had to be a 1 mile radius?

09:46:08 25       A.   It was how location -- it's how location

                                                          64


                      **CONFIDENTIAL ROUGH DRAFT**

09:46:12  1   targeting is rendered it's not a subsequent

 2   enforcement.

 3       Q.   It was through the code that the 1 mile

 4   radius is enforced is that your testimony?

09:46:28  5       A.   Yes, it's -- it's through how an

 6   advertiser selects location.

7        Q.   And so what information does Facebook

8   rely onto determine whose within the selected

9   location?

09:46:52 10      A.   When a user uses Facebook we get location

11   signals within that, so for example, if they have

12   location services turned on we get that

13   information.  We understand where people are also

14   based on how they check in so when someone says I'm

09:47:11 15   at the airport, we would understand and get that

16   information and -- otherwise that people connect

17   through and connect and use our platform tells you

18   where they are.

19        Q.   What the other ways that users connect

09:47:25 20   and use the platform that tells Facebook where they

21   are?

22        A.   IP would be an example.

23        Q.   You are referring to theism P address?

24        A.   Of how they are directing in yes.

09:47:36 25      Q.   For the record what's aneurysm P address?

65

**CONFIDENTIAL ROUGH DRAFT**

09:47:40 1       A.   It's from your device how you are --

2   where you are accessing a website for connecting to

3   the Internet.

4          Q.    So in addition to check in and IP address

09:47:51  5   how else can Facebook define with users are to use

6    that information for core audiences location

7    selection?

8          A.    I think I want to make sure that we are

9    clarifying the distinction here.  An advertiser

09:48:05  10  selects where they want their ad to be shown.  Once

11   they have created that ad, we then determine who

12   matchings there a audience those parameters.  To do

13   that we use people's activity and how they are

14   connected to Facebook including like their location

09:48:23  15  services and the other pieces that I mentioned

16   there, is that what you were getting at?

17         Q.    Right.

18               And so I'm asking to make that

19   determination about whether users are within the

09:48:37  20  selected location, what information does Facebook

21   use?

22         A.    It's what I answered it's location

23   services on their device.  How they connect to

24   Facebook.  And other -- another example would be if

09:48:53  25  they check in people can also provide on their

66

**CONFIDENTIAL ROUGH DRAFT**

09:48:57  1  profile where they live.  Those -- that's an

          2  example of information we use to determine their

          3  part -- they should meet audience parameters.

          4      Q.   When you say "location services" what

09:49:10  5  does that refer to?

          6      A.   It's a setting on devices that -- of on

          7  our iPhone for example, that let's Facebook

          8  understand where you are.

          9      Q.   Does Facebook use any other information

09:49:26 10  to determine the location of users so that users

         11  are targeted through core audiences by location?

         12      A.   Yes, as I mentioned, check ins can

         13  contribute to knowing where someone is.  Same thing

         14  as where they designate their hometown or where

09:49:46 15  they live on their profile.

         16      Q.   When a user initiate a post for example,

         17  does the Meta data reflect where the user was when

         18  the user made that post?

         19          MR. BENJAMIN:  Objection to form.

09:50:18 20          THE DEPONENT:  The active there --

         21  honestly I -- that's pretty far outside of the ad

         22  specific piece.  If we -- if we collect that

         23  related to nonads someone posting something.

         24          If they were to -- the example I was

09:50:36 25  trying to give was like a page check in or where I

67

**CONFIDENTIAL ROUGH DRAFT**

09:50:39   1   specifically post I'm at the airport, because it

           2   translates into a check in.  I'm not sure if that's

           3   what -- what you are indicating.

           4        Q.   (By Ms. Weaver)  No it's not.

09:50:49   5             Let's give -- let me give a different

           6   example if somebody post a picture does the

           7   metadata on the picture indicate where the picture

           8   was taken and if it does is that the kind of

           9   information that Facebook uses to identify a user

09:51:04  10   location for use and core audiences location

          11   selection?

          12             MR. BENJAMIN:  Objection to form.

          13   Compound.  Vague.  Scope.

          14             THE DEPONENT:  If someone makes a post

09:51:19  15   they have connected to Facebook in some manner.  We

          16   do use information about how someone connects to

          17   Facebook to understand where they are and that is

          18   used also for ads.

          19        Q.   (By Ms. Weaver)  And when you say they

09:51:36  20   have connected to Facebook in some manner, what do

          21   you mean?

          22        A.   I mean you have logged in or you are on a

23  browser and you are using Facebook.

24      Q.   And does Facebook distinguish for core

09:51:50 25  audience location advertising whether that photo

68

**CONFIDENTIAL ROUGH DRAFT**

09:51:52 1  that was posted was marked public or private?

2       A.   These are very different concepts.  The

3  core audiences is simply how an advertiser selects

4  the parameter for their ad.  When we then determine

09:52:08 5  if someone is eligible to see that ad, whether they

6  meet it, it is based on people's activity on

7  Facebook.  And it's not differentiated in public or

8  private because again that's not reflective of how

9  someone's activity on Facebook is categorized.

09:52:29 10      Q.   With regard to the demographic age used

11  in core audiences what is the information Facebook

12  uses to determine someone's age?

13      A.   That's based on the -- the age they

14  provide at sign up we provide a user to provide

09:52:45 15  that age and that's also what we use to determine

16  if they should see an ad.

17      Q.   And how does Facebook determine users

18  gender the same answer?

19      A.   Yeah, yes.



09:52:58 20 ███

███

███

23       MR. BENJAMIN:  Objection to form and

24  scope.

09:53:18 25

2      Q.   (By Ms. Weaver)

09:53:31  5       MR. BENJAMIN:  Objection.

6       THE DEPONENT:  Again --

7       MR. BENJAMIN:  Form and scope.

8



          24        Q.   And Facebook's selected you as a

09:54:39  25   representative on that topic today too, right?

                                                        70


                       **CONFIDENTIAL ROUGH DRAFT**

09:54:42   1        A.   On ad targeting and ad delivery, yes.

            2        Q.   Okay.   Let's turn to detail targeting.

            3             What is detailed targeting as you have

            4   described it?

09:54:57   5        A.   Detailed targeting is how -- is how we

            6   again segment for advertisers when they are setting

            7   up their ads.   It includes interests and behavior

            8   options for targeting.

            9        Q.   And when detailed targeting first

09:55:17  10   implemented at Facebook?

           11        A.   In the form of what it looks like today

           12   it would have been I believe between like 2010,

           13   about 2010 that's -- that's -- I think it is

14   important to note the evolution of what that looks

09:55:39 15   like in the UI has changed over time.  But the idea

16   of having interest and behaviors I think was about

17   then.

18        Q.   And what team and people were responsible

19   for commencing the detail targeting at Facebook?

09:55:57 20        A.   Our ads product team.

21        Q.   And who was on the ads product team who

22   was part of that decision in 2010, if you know?

23        A.   I don't know an individual from the ads

24   product team specifically who was part of that

09:56:12 25   decision.  Again these are often large teams that

71

**CONFIDENTIAL ROUGH DRAFT**

09:56:16  1   create road maps to -- to build the tools we offer

2   advertiser or any other product at -- at Facebook.

3        Q.   Why did Facebook decide to engage in

4   detailed targeting on or around 2010?

09:56:33  5        A.   One of our core goals is to ensure that

6   the advertising experience is interesting and

7   relevant to people.  Enabling that is one way to do

8   that is to help understand what they might be

9   interested in and then an advertiser can select who

09:56:50 10   they think the audience that might be most relevant

11   for their product.  Interest, which is part of

12   detailed targeting is an example where that was

13   further to goal have having more interesting ads

14   than if it was broadly targeted and relative -- and

09:57:08 15   relevant to the person seeing it.

16       Q.   And so how did detailed targeting help

17   accomplish that goal?

18       A.   It is enabled someone an advertiser to

19   select that they wanted to reach people who have an

09:57:24 20   interest in something based on continued engagement

21   with that topic.

22       Q.   And specifically what are the topics

23   detail let's start today Facebook?

24       A.   Within interest there's quite a few I

09:57:49 25   believe about 60,000 interests are provided to

72

**CONFIDENTIAL ROUGH DRAFT**

09:57:52 1   today.  Those vary between hobbies TV shows public

2   figures any nun of topics that -- that we have seen

3   consistent engagement on that would be relevant to

4   research someone because they are interested in it

09:58:08 5   CHECK/CHECK.

6       Q.   And how is this list of 60,000 provided

7   to advertisers?

8          A.    In the ad creation flow an advertiser can

9     Brouse through a structured list, so for example,

09:58:22 10  can click and say I'm looking for things related to

11    facial entertain or the keyword search and input, a

12    search term and we'll render the ones that match

13    that search term they select individual interests

14    from there.

09:58:41 15       Q.    If a category is not on the list, can

16    advertiser propose a new interest category and then

17    use the target users?

18               MR. BENJAMIN:  Objection to form.

19               THE DEPONENT:  Do you mean through --

09:59:00 20  through the ad creation?

21        Q.    (By Ms. Weaver)  Or at all.

22        A.    There isn't a way for advertiser to

23    select something that doesn't exist and then

24    immediately enable targeting on that that's not --

09:59:13 25  that's not a functionality we offer.

                                                        73


                        **CONFIDENTIAL ROUGH DRAFT**

09:59:18  1       Q.    But can advertiser email their contact at

2     Facebook and say we would like to target based on

3     this criteria.  Can you make that happen?

4                MR. BENJAMIN:  Objection.

09:59:28  5          THE DEPONENT:  I'm sure advertiser.

        6          MR. BENJAMIN:  Objection -- objection to

        7  form.

        8          THE DEPONENT:  Advertiser could email

        9  that.  It is not something that we implement.

09:59:38 10     Q.   (By Ms. Weaver)  And why is that?

       11     A.   The interest we provide are the areas

       12  where we have seen continued engagement.  It's not

       13  based off on advertiser.  A somewhat ad hoc

       14  advertiser request.

09:59:52 15     Q.   Does -- so you've testified that to date

       16  it's roughly 60,000 interest categories; is that

       17  right?

       18     A.   Yes, that's correct.

       19     Q.   And can you describe over time perhaps

10:00:09 20  how that list has accrued?

       21          MR. BENJAMIN:  Objection to form.

       22          THE DEPONENT:  The -- the list has --

       23  like I was saying is based on topics that we see

       24  people engaging with.  So we have both added and

10:00:26 25  removed interests over time to help ensure that

                                                              74


                    **CONFIDENTIAL ROUGH DRAFT**

10:00:29  1  they remain relevant and actually useful for people

2    to see content they want to engage and for

3    advertiser to reach audience that they are trying

4    to reach.

10:00:43 5         Q.   (By Ms. Weaver)  So is that bags had on

6    both input from advertiser and internal Facebook

7    analyses?

8         A.   It's not based on input from advertiser

9    in the example we gave about an email.  But if we

10:01:03 10   understand that there is high demand to -- to reach

11   people interested in -- entertainment and we see

12   that that is something that people engage with.

13   It -- it could be an area we expand into.  That's

14   relatively common and -- and like market research

10:01:21 15  to understand like what is a useful tool.

16        Q.   And when we understand that there is high

17   demand "you mean that advertisers are interested in

18   certain categories and will pay Facebook for that";

19   is that fair?

10:01:39 20        MR. BENJAMIN:  Objection to form.

21             THE DEPONENT:  It's that we want to build

22   tools that actually enable advertiser to create an

23   ad and also that that is relevant to people and so

24   we do that the way many products are developed

10:01:54 25  through market research understanding what people

75

**CONFIDENTIAL ROUGH DRAFT**

10:01:56  1  need and then also what -- what we would or

2  wouldn't be able to provide.

3       Q.   (By Ms. Weaver)  Are there -- there any

4  other Ime pits into the creating the interest

10:02:10  5  categories that you can think refer to?

6            MR. BENJAMIN:  Objection to form vague.

7            THE DEPONENT:  It's -- again it's based

8  on our understanding what would be a useful

9  addition we haven't added new interests recently.

10:02:27 10  It's -- because the interest list is relatively

11  stable at that point you can imagine a scenario

12  where if there is a -- a new TV show.  It might

13  make sense to add that in based on the engagement

14  we are seeing.  But that would be an example of how

10:02:44 15  the process occurs.

16       Q.   (By Ms. Weaver)  When you say useful

17  addition you mean useful for purposes of

18  advertising; is that right?

19       A.   Both for advertiser to reach a relevant

10:02:58 20  audience and for people to see ads that are

21  interesting and relevant to them.

22       Q.   And how does Facebook determine what

23  users think is interesting and relevant to them?

         24        A.   Our interest are based on activity on

10:03:15 25   Facebook for example.  Continuous engagement with a

                                                           76


                       **CONFIDENTIAL ROUGH DRAFT**

10:03:18  1   topic, so if I like many pages about interior

          2   design you might assign -- you might say that I'm

          3   interested in interior design and that would be an

          4   interest so it's that topic type of topic based

10:03:35  5   understanding.

          6        Q.   Does Facebook also record users viewing a

          7   video?

          8        A.   We determine just.

          9        Q.   Sorry.

10:03:51 10        MR. BENJAMIN:  Objection to form.

         11        THE DEPONENT:  We -- if a page post a

         12   video and someone in interacts with it including

         13   viewing it, we would consider that an interaction

         14   with that page and the content of that page.  So

10:04:06 15   going back to the -- somewhat random interior

         16   design example if there is interior design page and

         17   I like it, I follow it.  And I watch the videos on

         18   that page that could contribute to my interactions

         19   with -- with that page, yes.

10:04:22 20        Q.   (By Ms. Weaver)  Does Facebook track how

21  long users have watched a specific video?

22            MR. BENJAMIN:  Objection to form and

23  scope W.

24            THE DEPONENT:  We do.  It's not a

10:04:39 25  specific piece of information that -- that I -- I

                                                        77


                    **CONFIDENTIAL ROUGH DRAFT**

10:04:49  1  don't think that there is a specific threshold in

2  that scenario that we leverage for like ads

3  interests if that's what -- yeah.

4        Q.  (By Ms. Weaver)  So to determine what

10:05:04  5  categories are targeted Facebook also looks at

6  users activity to determine whether or not those

7  categories would exist in the first place; is that

8  fair?

9            MR. BENJAMIN:  Objection to form.

10:05:20 10            THE DEPONENT:  I am sorry I think I need

11  to clarify a little bit on the question.

12        Q.  (By Ms. Weaver)  No problem.

13            We are discussing how the 60,000 interest

14  categories were created, right?

10:05:30 15        A.  Yup.

16        Q.  And one component was whether or not

17  there's high demand because advertisers are

```
       18   interested in it, right?

       19        A.   Based on our market research, yes.

10:05:41 20        Q.   And another component is whether or not

       21   users are seeing the ads Facebook thinks they would

       22   like to see, correct?

       23        A.   Another -- for interest creation

       24   specifically?

10:05:57 25        Q.   Sure.
```

78

**CONFIDENTIAL ROUGH DRAFT**

```
10:05:59  1        A.   We -- in order to generate interests, we

        2   determine what are the topics that people engage

        3   with to -- and like what are groups like -- like

        4   content on page, content -- classification those

10:06:15  5   topics that people have engaged with.  If there is

        6   a topic that nobody is engaging with it wouldn't

        7   have been something we came up with.  Because it is

        8   based on -- on understanding the topics that people

        9   engage with to provide an interest.

10:06:33 10        Q.   So is it fair to say that Facebook

       11   analysis users uses act term to what categories of

       12   into are available for advertiser to target them;

       13   is that fair?

       14        A.   At the --
```

10:06:47 15          MR. BENJAMIN:  Objection -- objection to

16     form.

17          THE DEPONENT:  It's fair to say that we

18     look at the content people engage with to determine

19     their interest and those can include them in -- in

10:07:05 20     an interest that we also provide to advertisers

21     when they are setting the parameters for their

22     audience.

23     Q.   (By Ms. Weaver)  Okay.  In general can

24     you identify roughly how many of these interest

10:07:22 25     categories tore detailed targeting that were

79

**CONFIDENTIAL ROUGH DRAFT**

10:07:24  1     available in 2012?

2     A.   Roughly several hundred thousand.

3     Q.   In 2012 there were several hundred

4     thousand and today there are 60,000?

10:07:45  5     A.   Correct.

6     Q.   So over time the number of interest

7     categories has decreased rather dramatically; is

8     that right?

9          MR. BENJAMIN:  Objection to form.

10:07:56 10          THE DEPONENT:  It has decreased over --

11     over -- over a number of years we have both added

12    in and removed interests.

13         Q.   (By Ms. Weaver)  Does Facebook have a

14    record of the categories for interest targeting

10:08:10 15    tore detailed targeting that were available in

16    2012?

17         A.   So because our system has evolved, I --

18    there isn't a comprehensive or day by day view of

19    all the interests.  We know what -- what is

10:08:30 20    provided in the product today.  And I -- there

21    isn't -- a full list over many years.

22         Q.   Is it possible to roughly piece tote what

23    those categories are over time?

24              MR. BENJAMIN:  Objection to form.

10:08:51 25              THE DEPONENT:  Not very high accuracy.

                                                    80


                      **CONFIDENTIAL ROUGH DRAFT**

10:08:58  1         Q.   (By Ms. Weaver)  Did Facebook tell users

 2    in 2010 what interest categories it was making

 3    available to advertiser for detailed targeting?

 4         A.   Users can access the ads manager.  It's a

10:09:20  5    self serve everybody is able to see what's --

 6    what's there.  And so a user would have been able

 7    to also look and see what are interest categories

 8    that are available.

```
         9       Q.   So it's your testimony that in 2012 a
10:09:37 10   user could have looked up and seen this several
        11   100,000 interest categories that advertisers were
        12   using to the -- are get them?
        13             MR. BENJAMIN:  Objection -- objection to
        14   form and misstates.
10:09:50 15             THE DEPONENT:  Yes, so yes to the
        16   objection.  Apologies.  The -- they would be able
        17   to see what are all the options in advertiser can
        18   reach.  Because our ad creation flow such as ad
        19   manager self-serve and open to the public to look
10:10:10 20   at.  So any user could go in and say here all the
        21   interest advertiser can select.  It is not an
        22   indication that they are all associated with one
        23   user.
        24       Q.   (By Ms. Weaver)  Meaning a user could not
10:10:24 25   determine which interest he or she had specifically
```

                                                       81


                     **CONFIDENTIAL ROUGH DRAFT**

```
10:10:28  1   been targeted for, correct?
         2       A.   We introduce --
         3             MR. BENJAMIN:  Objection.  Objection.
         4   Form.  Vague.
10:10:38  5             THE DEPONENT:  Today users can see the
```

```
          6    interest they are associated with and we have had

          7    had that for a number of years.

          8        Q.   (By Ms. Weaver)  And when did that

          9    commence?

10:10:50 10        A.   2014 where we launched our ad

         11    preferences.

         12        Q.   And beginning in 2014, could users see

         13    all of the interests that they were actually

         14    targeted for?

10:11:04 15        A.   They could see the interests that were

         16    associated with them that they were part of that

         17    were being used by advertiser.

         18        Q.   And could they see all of those interests

         19    or was it just a -- an overview?

10:11:20 20        A.   Do you mean immediately at launch or over

         21    time.

         22        Q.   At any point in time?

         23             MR. BENJAMIN:  Objection.

         24             THE DEPONENT:  Yes, yes.

10:11:30 25             MR. BENJAMIN:  Objection to form.
```

                                                        82


                     **CONFIDENTIAL ROUGH DRAFT**

```
10:11:34  1             THE DEPONENT:  Over the years and today,

          2    a user can open ad preferences and see all of the
```

3    interests that are associated with them that are

4    available for targeting.

10:11:45  5        Q.   (By Ms. Weaver)  And when did that

6    functionality first become effective which is to

7    say that a user could view every single interest

8    for which they have been targeted for detailed

9    targeting?

10:11:57 10        A.   In 2014, we launched ad preferences.  It

11   began with the interest that -- that were actively

12   being used, so that had an ad run against them and

13   then rolled out to include all interests that were

14   targetable.  That would have been likely over --

10:12:17 15   the course of 2014, I don't know the exact month.

16        Q.   And does Facebook generate interest

17   categories based on off platform activity?

18        A.   Interest are based on -- on-site

19   activity.

10:12:33 20        Q.   Only on platform?

21        A.   Yes.

22        Q.   Does -- do users have the capability to

23   decline being targeted for a specific interest?

24        A.   Yes.

10:12:49 25        Q.   And when was that first implemented.

**CONFIDENTIAL ROUGH DRAFT**

10:12:55   1      Q.   In 2014.   And how does Facebook enforce

         2    that a user is not targeted based on a specific

         3    interest?

         4      A.   When a user chooses to remove themselves

10:13:11   5    from an interest they are no longer included in

         6    that interest so any add that has interest as part

         7    of their audience parameters the user would not be

         8    included in that audience.

         9      Q.   And are you familiar with the concept of

10:13:27  10    opt in versus opt out?

        11      A.   Yes.

        12      Q.   And what's your understanding of what

        13    those words mean?

        14      A.   It -- my understanding would be that the

10:13:38  15    choices either you are in it and you are -- you are

        16    given the opportunity to opt out so you are making

        17    a choice to remove yourself from a state where you

        18    in it and then opt in would be the opposite you are

        19    not in it and you are given the choice to enter.

10:13:53  20      Q.   And why did Facebook decide that users

        21    should opt out rather than opt in to interest for

        22    detailed targeting?

        23      A.   We understand that people want to see

        24    relevant ads.   It is part of the experience on

10:14:08 25   Facebook otherwise they would see irrelevant ads

                                                              84

                        **CONFIDENTIAL ROUGH DRAFT**

10:14:11  1   interest is one way to do that.  And so we -- we

          2   provided people with interest and gave them the

          3   opportunity to see them those and then remove

          4   themselves.

10:14:22  5        Q.   Are you aware of internal studies at

          6   Facebook that concluded in fact users would --

          7   would prefer to opt in as opposed to to opt out?

          8             MR. BENJAMIN:  Objection to form and

          9   scope.

10:14:38 10             THE DEPONENT:  For ads I'm not aware of a

         11   study that's specifically looks at an opt in verify

         12   out opt our reference for interest.

         13        Q.   (By Ms. Weaver)  Are you aware of any

         14   studies in general that discuss opt out versus opt

10:14:49 15   out preferences for users?

         16             MR. BENJAMIN:  Objection.  To scope.

         17             THE DEPONENT:  Across all of Facebook?

         18        Q.   (By Ms. Weaver)  Well, you answered, your

         19   answer was very specific I'm trying to understand

10:15:02 20   why.

         21             You said for ads I'm not aware of a study

22   that's specifically looks at opt in or opt out for

23   ads interest.

24          So I'm just trying to ask are you aware

10:15:12 25   of a study who opt in or opt out in general?

                                                            85


                        **CONFIDENTIAL ROUGH DRAFT**

10:15:20  1          MR. BENJAMIN:  Objection.

          2          THE DEPONENT:  No.

          3          MR. BENJAMIN:  Objection to scope.

          4          MS. WEAVER:  Let's go off the record real

10:15:34  5   quickie will fix it.

          6          (Court Reporter initiates discussion off

          7   the record.)

          8          THE VIDEOGRAPHER:  Okay.  We are off the

          9   record it's 10:15 a.m.

10:16:38 10          (Recess taken.)

         11          THE VIDEOGRAPHER:  Okay.  We are back on

         12   the record it's 10:16 a.m.

         13      Q.   (By Ms. Weaver)  Are you aware of

         14   internal discussions at Facebook in regard to

10:17:02 15   whether or not users would want to opt in or opt

         16   out to certain kinds of detailed targeted

         17   advertising?

         18          MR. BENJAMIN:  Objection to scope.

          19           THE DEPONENT:  I'm not aware of

10:17:14 20  discussions on those preferences.

          21      Q.   (By Ms. Weaver)  Do you know how the

          22  decision was made that Facebook would require users

          23  to opt out rather than opt in to interest

          24  categories of detailed targeting advertising?

10:17:32 25           MR. BENJAMIN:  Objection to form.  Vague

                                                              86


                       **CONFIDENTIAL ROUGH DRAFT**

10:17:34  1  and scope.

           2           THE DEPONENT:  The product was built

           3  because we knew these -- because these were areas

           4  that people had already engaged with and we knew

10:17:46  5  that they were interested win them.  And so the

           6  control reflects that by giving them the ability to

           7  re November themselves from it.  I was by design.

           8      Q.   (By Ms. Weaver)  So in beginning do you

           9  know how many users reviewed the hundreds of

10:18:00 10  thousand interest categories and defense selected

          11  themselves?

          12           MR. BENJAMIN:  Objection to form.

          13           THE DEPONENT:  Just to be clear each user

          14  was not associated with all the interest

10:18:17 15  categories.  They wouldn't -- there -- it wouldn't

16   have been they had hundreds of thousand of their

17   interests.  Once we rolled out ad preferences I --

18   I don't know the exact number of users who -- who

19   choose to remove themselves from an interest when

10:18:37 20   that was rolled out.

21        Q.   (By Ms. Weaver)  Can you identify anyone

22   you are aware of who has ever chosen to engage in

23   that process?

24        MR. BENJAMIN:  Objection to form and

10:18:51 25   scope.

87

**CONFIDENTIAL ROUGH DRAFT**

10:18:55  1        THE DEPONENT:  Do you mean specifically

2   to remove them from an interest.

3        Q.   (By Ms. Weaver)  Yeah.  Yes?

4        A.   ████████████

10:19:00  5        Q.   ████████████████████████

████████████████████████████

7        MR. BENJAMIN:  Objection to form and

8   scope.

9        THE DEPONENT:  ████████████████

████████  ████████████████████████

██  ████████████████████

██  ████████████████████████████

13      █████████

14      Q.   (By Ms. Weaver)   Does Facebook maintain

10:19:28 15   statistics on how many users have gone to the --

16   why I am seeing this page?

17      A.   Yes.

18      Q.   And where are those statistics?

19          MR. BENJAMIN:   Objection to form.

10:19:47 20          THE DEPONENT:   We would log those ███

21      ████

22      Q.   (By Ms. Weaver)   And when you say would

23   would ████████   what do you mean knowledge I mean

24   when someone such as a hide ad or why I am seeing

10:20:04 25   this.   We -- we know or we log that that action has

                                                        88


                        **CONFIDENTIAL ROUGH DRAFT**

10:20:08  1 been taken.

2      Q.   For what time period has that activity

3   been logged ████████?

4          MR. BENJAMIN:   Objection to form.   Vague.

10:20:25  5          THE DEPONENT:   Over -- we have logged --

6   logged that activity since we launched -- is --

7   does that answer your question is that what?   Is

8   that what you are were asking?

9      Q.   (By Ms. Weaver)   When you say since we

10:20:45 10   launched you mean 2007 or 2014?

11      A.   Waste launched -- launched in 2014 why I

12   am seeing this was why I am seeing this was

13   launched in 2014.

14      Q.   Oh.

10:20:56 15      A.   Once it became a product, we began to log

16   when -- when someone would access it.

17      Q.   So for the record.  You are using an

18   acronym waste which stands for why?

19      A.   I am.

10:21:07 20      Q.   Why I many a seeing this; is that right?

21      A.   Yes, CHECK/CHECK check apologize I

22   thought I define it earlier that's my mistake.

23      Q.   Perhaps I missed it.

24         Okay.  Are there other activities that

10:21:25 25   users engage in that effect whether or not they are

                                                      89


                       **CONFIDENTIAL ROUGH DRAFT**

10:21:31  1   targeted by certain interests that are logged ■

         ■   ?

          3         MR. BENJAMIN:  Objection to form.

          4         THE DEPONENT:  Interests are based on

10:21:42  5   people's activity so for example if they

          6   consistently engage with a page or ad or any form

7   of like aggregated continuous engagement with a

8   topic is what ads someone to interest if they doing

9   that than they wouldn't be added to it.

10:22:01 10          So the -- the people's page -- page likes

11   are logged ███████ and that's an example of

12   activity that would also contribute to an interest.

13          Q.   (By Ms. Weaver)  In addition to page

14   likes what other kinds of activities are logged ███

███████████   ████   about users that you are aware of?

16          A.   For interests.

17          Q.   In general.  For interest and yes in

18   general.

19          A.   Again people's activity on the platform

10:22:35 20   is logged ███████.  So if I had a friend or if I

21   had something to my profile that's something we

22   store ██████.

23          Q.   Do you count Facebook messenger active as

24   activity on the platform in your answers?

10:22:55 25          A.   Yes.

                                                    90


                    **CONFIDENTIAL ROUGH DRAFT**

10:22:56  1          Q.   Are -- where are users Facebook Messenger

2   messages logged?

3                   MR. BENJAMIN:  Objection to form and

```
          4   scope.
10:23:08  5              THE DEPONENT:  This is pretty far outside
          6   of ads specific.  The fact that someone uses
          7   messenger is logged ████.  I think that that's
          8   what you are getting at and if they initiate
          9   threads it would -- logged there to.
10:23:24 10       Q.   (By Ms. Weaver)  When you say they
         11   initiate threads what do you mean?
         12       A.   If I create --
         13              MR. BENJAMIN:  Objection to scope.
         14              THE DEPONENT:  Creating a thread with
10:23:37 15   Matt for example would be something that we log.
         16       Q.   (By Ms. Weaver)  And so what is the log
         17   reflect does it reflect the whole thread or just
         18   the fact that a thread was initiated with time with
         19   certain users?
10:23:51 20              MR. BENJAMIN:  Objection to form and
         21   scope.
         22              THE DEPONENT:  This is something I don't
         23   know.  This is pre tee far outside ads.
         24       Q.   (By Ms. Weaver)  So this activity for
10:24:01 25   Facebook Messenger used to create interests in used
```

                                                     91

10:24:07  1  in any form of advertising not limited to detailed

         2  interest but in general?

         3          MR. BENJAMIN:  Objection to form.

         4          THE DEPONENT:  To separate out the

10:24:16  5  portions of that question, interests are based on

         6  activity on the platform.  But page and ad activity

         7  messenger is not part of that for interests.

         8  Generally across ad delivery we use information

         9  about how people use Facebook to inform what ad to

10:24:38 10  show them.  So if we know that someone has

        11  consistently messaged pages we might be more likely

        12  to show them an ad that is -- has a message

        13  objective.  So I think that answer -- is that what

        14  you are getting at.

10:24:56 15      Q.  (By Ms. Weaver)  Yes, that's exactly it

        16  toes Facebook also look at the content of messenger

        17  messages to determine what interests users might

        18  have the target --

        19      A.  No.  No.

10:25:08 20      Q.  And has Facebook ever done that?

        21      A.  No.

        22      Q.  But if they message about a page, or a

        23  group, would that information be used to target

        24  them?

10:25:23 25      A.  Would you mind clarifying what you mean

92

**CONFIDENTIAL ROUGH DRAFT**

10:25:24  1  by "message."

2     Q.   Well you testified -- so if someone has

3  consistently messaged -- messaged pages, what do

4  you mean?

10:25:36  5     A.   I meant specifically reached out to a

6  page via messenger.

7     Q.   Okay.  And would that also -- is also

8  true for groups?

9     A.   You can't message a group.

10:25:48 10     Q.   Okay.

11     A.   Or the -- let me make sure that we -- we

12  are kind of talking about the same thing.  So the

13  group product which is this is a group on Facebook

14  and I join it, that isn't connected in -- in the --

10:26:06 15  I think in the way you are thinking about it.  With

16  messenger.  You don't message into a group in the

17  same way.  And we don't use message content from

18  like between friends to inform an ad.

19     Q.   What if you are -- so you referenced a

10:26:23 20  page in the messenger communication, Facebook will

21  use that information, correct?

22     A.   Between -- no, it it is specifically if I

             23  Bella choose to message Nike's page we would know

             24  that I interacted with that page and that is

10:26:41     25  something that inform my ads because it's an

                                                                        93


                        **CONFIDENTIAL ROUGH DRAFT**

10:26:43      1  interaction with a page.

              2       Q.   Understood.

              3            Does Facebook use information in Facebook

              4  messages to calculate users desire to be targeted

10:27:11      5  with a certain kind of ad?

              6            MR. BENJAMIN:  Objection to form.

              7            THE DEPONENT:  The content of a message

              8  between friends on through messenger is not used to

              9  inform ads it would -- no be used to predict

10:27:33     10  someone's interest or whether or not they want to

             11  see an ad.

             12       Q.   (By Ms. Weaver)  Do you know if it's used

             13  for research?

             14            MR. BENJAMIN:  Objection to form and

10:27:41     15  scope.

             16            THE DEPONENT:  I do not.

             17       Q.   (By Ms. Weaver)  And why is the content

             18  of a message not used to inform ads?

             19       A.   We haven't historically used it.  It's

10:28:01 20    not an area we've -- we've explored so it's not

         21    part of why we -- the signals we use for ads.

         22        Q.    Does Facebook consider whether or not

         23    Facebook messenger messages might be considered

         24    private by users in making a decision not to use it

10:28:18 25    to target users and ads?

                                                              94


                        **CONFIDENTIAL ROUGH DRAFT**

10:28:22  1              MR. BENJAMIN:  Objection to form and

          2    scope.

          3              THE DEPONENT:  That's not the framing

          4    we've used.  We haven't used messenger content it's

10:28:34  5    not something we have explored for -- to

          6    incorporate into ads.  Like I said, we use

          7    interactions with pages and ad content to inform

          8    ads interests and then activity generally on the

          9    platform.

10:28:46 10        Q.    (By Ms. Weaver)  And I'm trying to

         11    understand why Facebook does not use messenger

         12    messages to frame interest based targeting of

         13    users?

         14              MR. BENJAMIN:  Objection to form and

10:29:05 15    scope.

         16              MS. WEAVER:  I will ask the question.

17          So can you explain why Facebook does not

18     use Facebook Messenger information to target users

19     with ads.

10:29:18 20          MR. BENJAMIN:  Objection to form.  Asked

21     and answered and outside the scope.

22          THE DEPONENT:  It -- it hasn't been an

23     area that we -- we've built out it hasn't been prop

24     to something that we want to do or is valuable.  We

10:29:30 25     have so far built our interest off of

                                                              95


                    **CONFIDENTIAL ROUGH DRAFT**

10:29:34  1     engagements -- engagement and interactions with

2     pages and ads and the information people provide

3     us.

4          Q.   (By Ms. Weaver)  When you say it hasn't

10:29:42  5     been proven to be something that we want to do or

6     is valuable, how did Facebook prove that?

7          A.   Like I said we haven't.

8          Q.   Is -- has Facebook engaged in any any

9     analysis as to whether or not using information

10:29:59 10     shared by users in Facebook's messenger would be

11     valuable in identifying their interest?

12          A.   No, not that I'm aware of.

13          Q.   Do you think a consideration that

```
           14   Facebook might engage in is whether or not using
10:30:25   15   information from Facebook Messenger messages would
           16   individual users privacy expectations?
           17          MR. BENJAMIN:  Objection to form.
           18          THE DEPONENT:  You said --
           19          MR. BENJAMIN:  Objection to form.  Calls
10:30:36   20   for speculation vague.  Outside the scope.
           21          THE DEPONENT:  Across the board we think
           22   about people have specific expectations whether or
           23   not this is something that they would understand or
           24   not.  That's -- that's a consider always.
10:30:58   25      Q.  (By Ms. Weaver)  And I'm asking
```

                                                                96


                          **CONFIDENTIAL ROUGH DRAFT**

```
10:30:59    1   specifically about Facebook Messenger and whether
            2   you believe that Facebook considered whether or not
            3   allowing information communicated in Facebook's
            4   messenger message to be used for advertising or
10:31:15    5   other purposes would envied users expectations of
            6   privacy?
            7          MR. BENJAMIN:  Objection to form.
            8          THE DEPONENT:  We haven't speculated
            9   about any specific users and whether or not they
10:31:28   10   would find that to be an envision of privacy.  We
```

11   use activity on the platform like pages and ads to

12   inform interests and the ads people see.  And --

13   and that -- and that's what transparent about to

14   users.

10:31:49 15       Q.   (By Ms. Weaver)  I'm still not getting an

16   answer to the specific question.  Can you state one

17   way or other whether or not Facebook considered

18   users expectations of privacy in Facebook's

19   messenger messages and determining whether or not

10:32:01 20   to use information contained in them to target

21   users with ads?

22       A.   What I'm struggling -- this assumes that

23   this was a specific decision and my point is that

24   it has -- this is -- the content of ads -- of

10:32:17 25   messages is not used in ads.  We use other activity

97

**CONFIDENTIAL ROUGH DRAFT**

10:32:22  1   on the platform.

2       Q.   And how does Facebook decide what

3   activity on the platform it is using for ads?

4       A.   There a number of -- I mean, we -- we are

10:32:41  5   trying to build a system that deliver ads that

6   people are interested in.  One of the things we've

7   seen that -- that is useful and that we user

8    people's engagement with pages and ads and their

9    activity that shows what they might want to see

10:32:56 10    more content of.

11              And so when we introduce interest as an

12    example, that accurate that engagement to be a

13    topic based and similarly like as product -- as --

14    as teams think about the future of what ads look

10:33:16 15    like they would look at target and industry

16    practices and -- and what people want to see and

17    how we can help enable that.  I don't think that

18    there's a set framework.

19        Q.   Okay.  I'm going to move into another

10:33:40 20    topic we can take a break now or we can continue

21    it's up to you -- you Ms. Leone I don't know how

22    are feeling?

23        A.   I'm happy to keep going.

24        Q.   Okay.  And I might ask for a break in 20

10:33:52 25    minutes but so I don't know?

                                                              98


                        **CONFIDENTIAL ROUGH DRAFT**

10:33:53  1              MS. WEAVER:  Let's break now.

          2              THE DEPONENT:  Okay.

          3              MS. WEAVER:  Let's break now and then

          4    we'll come back.

10:33:58  5          THE DEPONENT:  Cool.

          6          MS. WEAVER:  Great.  Thank you.

          7          THE VIDEOGRAPHER:  Okay.  Off the record

          8     it's 10:34 a.m.

          9          (Recess taken.)

10:49:38 10          THE VIDEOGRAPHER:  Okay.  We are back on

         11     the record it's 10:49 a.m.

         12     Q.   (By Ms. Weaver)  Ms. Leone, you are still

         13     under oath, correct?

         14     A.   Correct.

10:49:47 15     Q.   A quick question about waste for the why

         16     am I seeing this tool.  Is it your testimony that

         17     it lists interests for which have been targeted and

         18     then you can opt out?

         19     A.   Waste shows the criteria that you matched

10:50:10 20     from the audience selection that the advertiser

         21     made so it will show for that specific ad what you

         22     matched and if one of those are interests it would

         23     show their and then you would be able to remove

         24     yourself from interest.

10:50:25 25     Q.   So you only remove yourself if you

                                                          99


                         **CONFIDENTIAL ROUGH DRAFT**

10:50:26  1     already been matched, correct?

2            MR. BENJAMIN:  Objection to form.

3    Misstates.

4            THE DEPONENT:  For why I am seeing this

10:50:35  5    the goal of that tool is to provide people and

6    understanding of how the advertiser reached them

7    and so there it is based on -- in that interface

8    it's based on that interest that was matched in ad

9    persons we provide people with the -- the interest

10:50:51  10    they are targetable through.  And those are -- it's

11    not based on any one specific advertiser using it.

12            Q.   (By Ms. Weaver)  So a user would have to

13    go to those two different locations, one to disable

14    when they have already been matched and then go to

10:51:09  15    a different location to say general categories I

16    maybe don't want to be targeted for; is that right?

17            MR. BENJAMIN:  Objection to form.

18            THE DEPONENT:  The -- the tools are for

19    provide different purposes because a user might

10:51:25  20    want transparency or control or different reasons

21    at different times.  When someone sees a ad they

22    might look at the ad and say literally why I am

23    seeing hence the name of the menu that explains

24    that to them.  And then the relevant control for

10:51:39  25    that transparency.  Add persons is a central where

100

**CONFIDENTIAL ROUGH DRAFT**

10:51:44  1  someone can manage their ad settings and that

2  includes the interest they can be reached through

3  and then -- the ability to remove themselves from

4  so they are serving different purposes which is why

10:51:56  5  they look different and entry points to both of

6  them from the ad -- from waste or from our settings

7  to and other minus.

8      Q.   (By Ms. Weaver)  Why right.  I wasn't

9  asking about the purpose.  My question is if a

10:52:09 10  person wanted to prevent receiving any kinds of ads

11  they would have -- at a minimum to go to these two

12  different locations and review at waist what

13  already occurred to stop it from happening again

14  and then in ad preferences make selections to

10:52:26 15  prevent other kinds of advertising; is that fair?

16          MR. BENJAMIN:  Objection --

17          THE DEPONENT:  No.

18          MR. BENJAMIN:  -- to form.  Misstates.

19          THE DEPONENT:  No, that's -- that's not

10:52:35 20  quite what I said.

21      Q.   (By Ms. Weaver)  I know it's not said but

22  I'm a different question than your last answer.  Is

23  it true that to prevent the kind of targeting we

```
        24  have been discussing at a minimum a user would have
10:52:49 25  to go to both of these sites?
```

101

**CONFIDENTIAL ROUGH DRAFT**

```
10:52:52  1      A.   No, they could -- they -- first and

          2  foremost, there's no way to turn off on ads on

          3  Facebook that's not a setting anywhere.  We

          4  don't -- we show ads in order to provide a free

10:53:06  5  service.

          6           Users can manage their ad experience

          7  throughout ad preferences and that can be a

          8  starting point for managing their ad experience.

          9  The reason the purpose for each enter face is

10:53:21 10  important is because waist is solving why I am

         11  seeing this a solving a very specific user need

         12  which is when they see an ad they want to

         13  understand how they were reached.  They don't have

         14  to wait to see an ad and click on why I many a

10:53:35 15  seeing this in order to access their ad

         16  preferences, which are available to them and where

         17  they can manage their -- the settings for their ads

         18  as a central hub.

         19      Q.   Do?

10:53:47 20      A.   They do not need to access both.
```

```
         21      Q.   Does the ad settings list all of the

         22   60,000 interest categories used for detailed

         23   targeting?

         24      A.   No.

10:53:56 25           MR. BENJAMIN:  Objection to form.
```

                                                        102


                        **CONFIDENTIAL ROUGH DRAFT**

```
10:53:57  1           THE DEPONENT:  Because --

          2           MR. BENJAMIN:  Objection to form.

          3           THE DEPONENT:  No, because they are not

          4   all associated with any individual user.

10:54:06  5      Q.   (By Ms. Weaver)  Yes, but in order to

          6   proactively say I do not want to receive this ad,

          7   wouldn't a user have to be able to opt out of it?

          8           MR. BENJAMIN:  Objection to form.

          9           THE DEPONENT:  An interest -- just to

10:54:23 10   underlying, the removal from an interest is not

         11   about seeing an ad o not it's about the that

         12   advertiser could reach you through that interest.

         13   I think we discussed before that is something that

         14   you are in the interest and you can remove

10:54:38 15   yourself.  It's not a -- an opt or a future looking

         16   for future things that you engage with.

         17           Once you have engaged with content and
```

```
          18   you become associated with an interest, someone can

          19   go and re November themselves from it.

10:55:00  20        Q.   (By Ms. Weaver)  Is there any where on

          21   the platform that -- well, strike that.  Let's move

          22   on.

          23             You identified two subcategories of

          24   detailed targeted advertising one was interests and

10:55:14  25   the second was behavioral, correct?
```

                                                                   103


                          **CONFIDENTIAL ROUGH DRAFT**

```
10:55:17   1        A.   Behavior.

           2        Q.   Behaviors what did you mean by behaviors?

           3        A.   Behaviors are -- are targeting options

           4   based on activity on Facebook that indicate -- that

10:55:29   5   are -- that are closer to things like people's

           6   intent to purchase.  The -- he -- way they interact

           7   with commercial entities so they are often are they

           8   game -- gamers so behavior clusters are just

           9   slightly different from interest which are more

10:55:46  10   topic based.

          11        Q.   And how does Facebook infer intent?

          12        A.   Similar to -- to interest it's based on

          13   activity.  So as an example I can consistently

          14   click on an ad I -- I more likely to click on
```

10:56:04 15  future ads.  We would consider my behavior to be

16  different from someone who never engages with one.

17      Q.  Can you explain the difference between a

18  behavior and an in terms of?

19          MR. BENJAMIN:  Objection.

10:56:24 20      Q.  (By Ms. Weaver)  How Facebook makes the

21  determination for user?

22          MR. BENJAMIN:  Objection to form.

23          THE DEPONENT:  I think what you are

24  asking is how do we wire these two separate things;

10:56:40 25  is that.

                                                    104


                    **CONFIDENTIAL ROUGH DRAFT**

10:56:40  1      Q.  (By Ms. Weaver)  I'm just asking what the

2  difference is between them?

3      A.  So the difference is that the interest

4  are topic based where as behaviors active based

10:56:53  5  categorize the active more so the topic of the

6  engagement.

7      Q.  Aren't the topics derived from activity?

8      A.  Yes, they -- they are derived from

9  activity, but our -- how we have categorized it so

10:57:06 10  as an example here, an interest could be that I

11  engaged with many pages about interior design.

```
           12  We'll use that example again which is a silly one.

           13  And so I -- I'm interested in interior design

           14  because I can consistently engaged with pages about

10:57:24   15  it.  A behavior could be that I have -- I -- often

           16  will buy something online.  So I click and I buy

           17  something and so I have an intent to buy things

           18  regardless of what the topic was of what I was

           19  buying.  It's how we tried to distinguish those.

10:57:45   20  They represent different dimensions of people's

           21  activity and also different dimensions of what --

           22  how advertiser might want to define their audience

           23  topic based and behavior based.

           24      Q.   And are there categories of behaviors

10:58:01   25  that Facebook uses to define users to make
```

                                                              105


                        **CONFIDENTIAL ROUGH DRAFT**

```
10:58:04    1  available for advertising?

            2            MR. BENJAMIN:  Objection to form.

            3  Misstates.

            4            THE DEPONENT:  There's the -- the

10:58:14    5  targeting options our on categories of behaviors.

            6      Q.   (By Ms. Weaver)  And why what are those

            7  targeting options?

            8      A.   There's a number, so I think I -- I used
```

             9  a gamers many example.  They are all available in

10:58:29 10  ads manager as behaviors.

            11      Q.   And currently how many behaviors are

            12  there?

            13      A.   There's several hundred.

            14      Q.   And when were behavior targeting options

10:58:44 15  first implement ad targeting Facebook?

            16      A.   I think a clarification here which is

            17  that the categorization like those have been how we

            18  bucketed these over time.  Any individual option

            19  may have been added later on or earlier so I think

10:59:04 20  these came to be kind of this type of targeting

            21  about 2010 perhaps a little bit earlier.

            22      Q.   And who specifically was involved in the

            23  development of behavior targeting?

            24      A.   Our ad product teams and their

10:59:25 25  cross-functional team.

                                                                106


                          **CONFIDENTIAL ROUGH DRAFT**

10:59:26  1      Q.   Can you identify anyone by name who was

            2  involved in the development of behavior targeting?

            3          MR. BENJAMIN:  Objection to form and

            4  scope.

10:59:38  5          THE DEPONENT:  Not any one individual.

```
            6  This is something again it's like been -- been

            7  iterates on and evolved over many years by very

            8  large product team.

            9      Q.   (By Ms. Weaver)  And who is responsible

10:59:48   10  for it today?

           11      A.   Our ads product team.

           12      Q.   And who by name in ads product is

           13  responsible for the development of the behavior

           14  targeting?

11:00:00   15      A.   The head of our ad targeting team is

           16  George camps.

           17      Q.   And how long has he held that position?

           18      A.   Several years, I don't know the exact

           19  date.

11:00:16   20      Q.   And do you know who held the position

           21  before him?

           22      A.   He's been involved for a while.  I don't

           23  know the predecessor before I'm not sure if there

           24  was a specific one team or if it was ads product

11:00:31   25  which is an org that does this.
```

                                                    107


                        **CONFIDENTIAL ROUGH DRAFT**

```
11:00:38    1      Q.   How does Facebook create the targeting

            2  option and options in behavior targeting?
```

```
          3            MR. BENJAMIN:  Objection to form.

          4    Misstates.

11:00:54  5            THE DEPONENT:  We create those based on

          6    people's activity.

          7       Q.   (By Ms. Weaver)  Can you explain what you

          8    mean?

          9       A.   I mean that when someone specific

11:01:05 10    activity on the platform will associate someone

         11    with one of those defined behavior clusters.

         12       Q.   You previously testified that for

         13    interest based identifying a component was demand

         14    for the -- the interest.

11:01:21 15            Do you recall that?

         16       A.   Are you being specific to advertiser

         17    demand or the --

         18       Q.   Yes?

         19       A.   The fact that we have seen users engage

11:01:28 20    with that content.

         21       Q.   Right?

         22       A.   Because.

         23       Q.   I'm trying to distinguish both the

         24    question for behavior targeting options did

11:01:34 25    Facebook also consider whether demand by
```

                                                        108

**CONFIDENTIAL ROUGH DRAFT**

11:01:37  1  advertisers was high?

2          MR. BENJAMIN:  Objection to form.

3          THE DEPONENT:  Across the broad we would

4  look like things like the market demand and

11:01:51  5  industry standards to indicate what are areas that

6  would be useful tools.

7          Q.  (By Ms. Weaver)  How does Facebook assess

8  market demand and industry standards?

9          A.  We can look at other ad products and

11:02:07  10  under how those function and what they offer.  We

11  had -- we can discuss with -- we can have

12  discussions with people who use our tools and

13  understand where there's a gap.

14          Q.  And when you say discussions with people

11:02:20  15  who use our tools you mean advertisers?

16          A.  Advertisers, ad agencies.

17          Q.  Anticipate just for the record, what

18  is -- strike that.

19          You've defined and what advertiser is as

11:02:37  20  somebody who places an ad essentially on Facebook;

21  is that fair?

22          A.  Uh-huh.

23          Q.  So advertiser could also be an app or an

24  app developer or even Facebook under that

11:02:49 25  definition as long as it's somebody who placed an

                                                               109


                        **CONFIDENTIAL ROUGH DRAFT**

11:02:51  1  ad on Facebook, right?

       2          MR. BENJAMIN:  Objection to form.

       3          THE DEPONENT:  So if -- if a developer

       4  has an app and they want to tiff and they create

11:03:07  5  and buy an ad would I consider them advertiser.

       6      Q.   (By Ms. Weaver)  Have you used or heard

       7  use of the word "partner" at Facebook?

       8          THE DEPONENT:  Like a capital P partner

       9  in sense of.

11:03:23 10      Q.   (By Ms. Weaver)  Yes?

      11      A.   Designated title.

      12      Q.   Yeah?

      13      A.   What do you mean.

      14      Q.   Facebook partners this is one of

11:03:29 15  Facebook's partners would know what that means?

      16      A.   Yeah.  Columbus equally that often means

      17  like when we are using it often means that someone

      18  is advertiser.

      19      Q.   Okay.  When targeting options for

11:03:52 20  behavioral advertising was launched on or around

      21  2010 how many categories were there?

22      A.   I don't know the initial size.

23      Q.   Do you know again can you describe the

24  growth over time or decrease over time?

11:04:06 25      A.   It -- it would have been several hundred

110

**CONFIDENTIAL ROUGH DRAFT**

11:04:08  1  thousand oh sorry specific to behaviors?

2      Q.   Yes.  Yeah?

3      A.   That would have been several hundred

4  maybe -- maybe a couple thousand it was a smaller

11:04:18  5  number and that's -- that's -- it -- it is similar

6  now as several hundred but, again.  Both with like

7  as we have iterates our product we both a had had

8  in and removed.

9      Q.   And be how would one create a summary or

11:04:39 10  overview of the kinds of behavior targeting options

11  that have been available at Facebook over time?

12          MR. BENJAMIN:  Objection to form.

13          THE DEPONENT:  There would be -- do you

14  mean at like -- a category by category.

11:05:01 15      Q.   (By Ms. Weaver)  Just yeah an

16  identification of, you know, roughly from years

17  2010 to 2014 here's a list of behavioral targeting

18  options that existed at some point?

```
          19        A.   Yeah, as I was saying because the system
11:05:16  20   has evolve over time.  I don't think that there is
          21   a high accurate or high accuracy way to reconstruct
          22   that.  It would have to be an effort to understand
          23   maybe this launched at this point so we generally
          24   understand that these were the types of segments
11:05:33  25   that were available or were deprecated so as an
```

111

**CONFIDENTIAL ROUGH DRAFT**

```
11:05:37   1   example when partner categories were deprecated we
           2   know they weren't available in 2019 because they
           3   were deprecated in 2018.
           4        Q.   What did you mean by the word segment
11:05:47   5   when you said it?
           6        A.   That -- apologize interchange with a
           7   specific cluster or option within behaviors.
           8        Q.   What's a cluster or an option?
           9        A.   And I can choose a specific word here
11:06:02  10   whatever and I will stick with that one, but it's
          11   for -- when advertiser goes in and selects within
          12   the menu of options, the one they have selected so
          13   I will use option moving forward and it's the same
          14   thing as a specific interest is one option.  A
11:06:21  15   specific behavior segment is one option.
```

```
         16        Q.   And what are the specific kinds of

         17   behaviors that are the data points used to create

         18   targeting options?

         19        A.   So we take to clarify we take activity on

11:06:43 20   Facebook.  The information people provide us.  And

         21   that can associate and that is how they become

         22   associated with a behavior option that then is also

         23   a targeting parameter for advertisers to select.

         24        Q.   And what specific activity on Facebook?

11:07:03 25        A.   Like I was saying, it could be page or
```

112

**CONFIDENTIAL ROUGH DRAFT**

```
11:07:05  1   ads interactions.  Information they provide us on

          2   their profile.  The way they engage with specific

          3   types of content so if they kindly click as an

          4   example or if they are -- they don't click, if they

11:07:20  5   are -- those are some examples of activity but it's

          6   how people interact on the platform.

          7        Q.   Does it include how they interact with

          8   their friends?

          9             MR. BENJAMIN:  Objection to form.  Vague.

11:07:41 10             THE DEPONENT:  I will give an example

         11   because I think that help ground and let me know if

         12   that's close to what you -- what you mean.  We --
```

                13   an example of people provide in our profile is

                14   their hometown and they -- we also can say their

11:07:58   15   family a relationship.  So they can say.  I am a --

                16   I'm engaged or I'm in a relationship.  We could

                17   know from that information, that they are in a

                18   relationship and that would be what -- a type of

                19   targeting we offer.  So that's an example I'm not

11:08:18   20   sure gets what quite you meant by friends

                21   interactions where you say I'm engaged you might

                22   also engaged who you engaged to that is a

                23   connection between people.  And is something we use

                24   for ads.

11:08:33   25       Q.   (By Ms. Weaver)  Yeah.

                                                                 113


                          **CONFIDENTIAL ROUGH DRAFT**

11:08:33    1            So you identified two categories.  You

                 2   said one activity and two info they provide.  I

                 3   wasn't asking about info you provided you just

                 4   discussed it so set that aside.

11:08:43    5            I'm asking very specifically, what

                 6   activity on Facebook does Facebook use to create

                 7   the targeting options for behavioral advertising?

                 8            MR. BENJAMIN:  Objection to form

                 9   argumentative.

11:08:58 10        Q.   (By Ms. Weaver)  It's not limited just

        11   groups and pages is it?

        12        A.   It's not -- and I --

        13             MR. BENJAMIN:  Sorry, Bella.

        14             Objection to form.

11:09:07 15             THE DEPONENT:  Evening it's not abuse

        16   example and another type of activity is how someone

        17   engages on the platform for example, they set a --

        18   a life event or they update their relationship

        19   status.

11:09:24 20        Q.   (By Ms. Weaver)  Does it include whether

        21   or not for example they respond to certain kinds of

        22   content posted by friends?

        23             MR. BENJAMIN:  Objection to form.  Vague.

        24             THE DEPONENT:  Yes.

11:09:40 25        Q.   (By Ms. Weaver)  Does it include for

                                                        114


                      **CONFIDENTIAL ROUGH DRAFT**

11:09:40  1   example, how often they use Facebook Messenger?

         2        A.   The -- again -- similar to whether or

         3   not -- like if you ever used Facebook Messenger,

         4   yes could be something we use for ads.

11:10:01  5        Q.   Does it include the content of users

         6   posts?

7      A.   In messaged pages or generally?

8      Q.   Both.

9      A.   Like I said before.

11:10:15 10         MR. BENJAMIN:  Objection to form.

11         THE DEPONENT:  We don't use content in

12   message threads for ads.  On posts the content, for

13   example if I engaging if I post to a page that

14   could be used, if I engage with posts and the

11:10:36 15   content of those posts could be used, yes.

16      Q.   (By Ms. Weaver)  And that's without

17   regard to whether or not that content was marked

18   private or public, correct?

19         MR. BENJAMIN:  Objection to form.  Asked

11:10:46 20   and answered.  Vague.

21         THE DEPONENT:  We don't have a

22   distinction in that manner of public versus private

23   that's not -- that doesn't quite translate into our

24   product in that manner.

11:11:00 25      Q.   (By Ms. Weaver)  And that's true for the

115

**CONFIDENTIAL ROUGH DRAFT**

11:11:01 1   class period for the target options for behavior

2   advertising correct?

3         MR. BENJAMIN:  Objection to form.

```
            4            THE DEPONENT:  Yes.

11:11:15    5       Q.   (By Ms. Weaver)  And you've identified

            6    two categories users activity -- well strike that.

            7            Other than the content of Facebook's

            8    messenger is there any other activity on Facebook

            9    that users engage in that is not used for the

11:11:33   10    creation of targeting options for behavior

           11    targeting?

           12            MR. BENJAMIN:  Objection to form.

           13            THE DEPONENT:  I -- I -- I'm not sure

           14    there's a way to categorize all of the data we

11:11:53   15    don't use.  I'm -- we can -- discussing the

           16    activity that is used, I don't know the full extent

           17    of our entire product and all the data we have to

           18    define what we don't use.

           19       Q.   (By Ms. Weaver)  But as sit here today

11:12:11   20    you can't think of another category other than the

           21    content of Facebook message that is categorically

           22    not used for behavior tar target users is that

           23    fair?

           24            MR. BENJAMIN:  Objection to form.

11:12:23   25            THE DEPONENT:  No, another example is
```

                                                        116



                      **CONFIDENTIAL ROUGH DRAFT**

11:12:26  1    when someone entered a security phone number we do

       2    not use that for ads.

       3        Q.   (By Ms. Weaver)  Okay.  Anything else?

       4        A.   Not that I can come up with off -- off

11:12:39  5    the cuff again it's tough to think potentially all

       6    activity and then carve it out UID know do use for

       7    ads which I describe described.

       8        Q.   Now you've described.  So other than

       9    activity.  And other than the information that

11:12:57 10    users provide in sign up for example, is there any

      11    other data that Facebook uses to create wheelchair

      12    tar targeting options?

      13        A.   So over this period, I think we are

      14    familiar with partner categories, that's -- those

11:13:18 15    were created with data brokers information.  We --

      16    there's also activity off of Facebook.  So from

      17    apps and websites which could be used for -- could

      18    be used in -- in a targeting option.

      19        Q.   Anything else you can think of?

11:13:39 20        A.   No, I mean those are the classes of data

      21    or the categories of data that we use.

      22        Q.   How does Facebook use users activity off

      23    of Facebook to create targeting options used to

      24    target users by third parties?

11:13:57 25        A.   Whether we were discussing custom

117

**CONFIDENTIAL ROUGH DRAFT**

11:14:00  1  audiences this is an example of that.  So an -- our

2  business tools a website owner and an app owner can

3  use those tools to send information to Facebook

4  about a visit to their website.  That information

11:14:16  5  can help them then reach back out to people who I

6  have already visited their website and we use it

7  also to personalize ads.

8      Q.   Okay.  That's custom audiences.  You said

9  barely targeting is in a different bucket, right?

11:14:31 10      A.   Apologies.  Behaves a specific targeting

11  option we provide behavioral target users often

12  used a way personalize it sound lie was responding

13  to the second.  For behaves we also have used

14  offsite engagement in those.  That -- over -- over

11:14:51 15  the course of this period.  It could be very

16  similar to the options -- to -- what I assessor

17  saying about if you consistently purchase on --

18  online that could be something that informs one of

19  those options.

11:15:05 20      Q.   And does Facebook collect the information

21  about users off platform activity through the use

22  of cookies or other trackers?

```
        23          MR. BENJAMIN:  Objection to form and

        24   scope.

11:15:27 25          THE DEPONENT:  For -- for ad use we base
```

                                                            118


                        **CONFIDENTIAL ROUGH DRAFT**

```
11:15:30  1   it off of the use of our business tools, so our

          2   pixel and app SDK.

          3       Q.   (By Ms. Weaver)  And for the record what

          4   is pixel?

11:15:42  5       A.   Pixel is a cookie that is placed on a

          6   website that communicates information back to

          7   Facebook by the website owner.

          8       Q.   And when was pixel first in use?

          9       A.   20 -- for ads 2014.

11:15:59 10       Q.   Was it in use not for ads prior to that?

         11       A.   It was, it was.

         12          MR. BENJAMIN:  Objection -- objection to

         13   form and scope.

         14          THE DEPONENT:  It was something that

11:16:10 15   launched prior to that.  But use for ads in 2014.

         16       Q.   (By Ms. Weaver)  And do you know what it

         17   was used for prior to being used for ads?

         18          MR. BENJAMIN:  Objection to scope.

         19          THE DEPONENT:  It was used for website
```

11:16:26 20   owners to do analytics and understand more about

21   how their website was functioning.  I don't know

22   more generally how -- or -- or in other specifics

23   of how it was used.

24        Q.   (By Ms. Weaver)  And pixel in use today;

11:16:45 25   is that right?

                                                         119


                          **CONFIDENTIAL ROUGH DRAFT**

11:16:47  1        A.   Yes, correct.

2        Q.   And you referred to app SDK; is that

3   right?

4        A.   Yes.

11:16:57  5        Q.   What is that?

6        A.   Similar, it's a way for -- a developer a

7   app owner to provide information back to Facebook

8   about specific events in their app.

9        Q.   And what specific kinds of information do

11:17:22 10   pixel and app SDK communicate about users off

11   platform activity that is then used to target them

12   in wheelchair part of the options?

13             MR. BENJAMIN:  Objection to form.

14             THE DEPONENT:  So a -- a -- it it -- I'm

11:17:51 15   going to answer this in terms of how pixel

16   functions and I think that is.

```
17      Q.   (By Ms. Weaver)  Okay.

18      A.   Probably what we are getting to.

19           The -- when -- the way a pixel works is

11:18:03 20  that the business tool or the person who is using

21      our business tool so the website owner sets it up

22      and they translate back to us contact information

23      and event data.

24           The contact information is an identifier

11:18:17 25  which helps us understand who took that action and
```

                                                          120


                    **CONFIDENTIAL ROUGH DRAFT**

```
11:18:21  1  we hash and match that on our platform.

2            The event is about a check out.  Like

3       they choose what -- what he inventor they are

4       hoping to -- to have it at the pixel transmit back.

11:18:33  5  That could be something like they went to our menu.

6       They looked at our hours of operation.  They

7       added -- added something to the cart checked out.

8            We would receive both of those.  And the

9       event information is what helps us understand the

11:18:50 10  activity and could help personalize an ad.

11      Q.   So for example, if somebody goes onto a

12      website and puts something in a cart but doesn't

13      check outdoes Facebook still receive the
```

14   information about what was sitting in the cart?

11:19:05 15          MR. BENJAMIN:  Objection to form.

16          THE DEPONENT:  They are different

17   concepts the website owner has sent us specifically

18   an ad to cart event.  They could separately send us

19   a check out I vent those are -- those are distinct.

11:19:19 20     Q.   (By Ms. Weaver)  Okay.  But the answer is

21   yes Facebook could receive the information about

22   what was sitting in the cart but not purchased; is

23   that right?

24          MR. BENJAMIN:  Objection to form

11:19:28 25   misstates.

121

**CONFIDENTIAL ROUGH DRAFT**

11:19:32 1          THE DEPONENT:  It is not about

2   understanding the -- the -- the flow and all of the

3   purchases it's about the event that the website

4   owner chooses to send back and the information they

11:19:44 5   include and sending that back to us.

6     Q.   (By Ms. Weaver)  Okay.  And I'm being

7   very granular we but one of the events that

8   advertisers choose to send back is whether or not

9   something is sitting in a cart, but did not check

11:19:56 10   out; is that true?

```
          11              MR. BENJAMIN:  Objection to form.

          12              THE DEPONENT:  It's -- it's not that they

          13    are send us back didn't check out.  They are send

          14    us back that someone added something to the cart

11:20:10  15    it's -- it's a moment an event that is advertising

          16    remembered not a subtract of whether or not check

          17    out happened.

          18      Q.   (By Ms. Weaver)  I understand.  We are

          19    getting host a little bit systematic?

11:20:23  20      A.   Okay.

          21      Q.   Let me ask it this way, if I looked up my

          22    profile at Facebook and had the internal tools

          23    could I see instances of where I had items in my

          24    cart but they weren't purchased?

11:20:37  25              MR. BENJAMIN:  Objection to form.
```

                                                        122


                        **CONFIDENTIAL ROUGH DRAFT**

```
11:20:38   1              THE DEPONENT:  Can you collar my what you

           2    mean your -- your profile and internal tools.

           3      Q.   (By Ms. Weaver)  Okay.  For -- let me

           4    just ask this.

11:20:51   5              Does Facebook process information about

           6    users that would reflect instances where something

           7    was sitting in their chart but not purchased?
```

8              MR. BENJAMIN:  Objection to form.

9              THE DEPONENT:  Not in the way that I

11:21:05 10   think you have conceptualized it.

11        Q.   (By Ms. Weaver)  Okay.

12        A.   Which is that there is a -- this item

13   was -- was not purchased on a website.  We know if

14   someone specifically -- if -- if a website owner

11:21:18 15   passed us back pixel, that the check out pixel was

16   fired we would know that.

17              If the information passed back to us was

18   that the ad to cart pixel was fired we would know

19   that.

11:21:30 20   Q.   Okay.

21        A.   That's all I was asking.  Like -- okay,

22   that's good.

23        Q.   Does Facebook inform users which third

24   parties are collecting information about them of

11:21:59 25   their off platform activity through pixel and app

                                                        123


                    **CONFIDENTIAL ROUGH DRAFT**

11:22:04  1  SDK?

2              MR. BENJAMIN:  Objection to form and

3   scope.

4              THE DEPONENT:  The pixel and app SDK and

11:22:23  5   the -- and the -- the websites and apps that use

          6   those are shown to people in OFA which is our off

          7   Facebook activity tool.

          8       Q.   (By Ms. Weaver)  Are all of them in OFA?

          9       A.   This a little bit outside of ads.  So

11:22:40 10   yes, my understanding is that they are.  But not my

         11   expertise.

         12       Q.   And how long is OFA been functional?

         13            MR. BENJAMIN:  Objection to form.

         14            THE DEPONENT:  I believe we launched OFA,

11:23:06 15   my personal recollection that we launch between

         16   2016 and 2018 but, again, somewhat outside the

         17   scope of ads.

         18       Q.   (By Ms. Weaver)  Okay.  So we've now

         19   identified three categories of data the can be used

11:23:19 20   to create the targeting categories or options in

         21   behavior advertising and that is activity on

         22   Facebook?

         23       A.   Information users provide and off

         24   platform activity.  Is there any other categories

11:23:34 25   of data not include that we should be discussing.

                                                          124


                        **CONFIDENTIAL ROUGH DRAFT**

11:23:39  1       A.   No.

2          Q.    Okay.   Once Facebook has the data how

3     does it create the inference of an intent or a

4     behavior?

11:23:55 5          MR. BENJAMIN:   Objection to form.

6          THE DEPONENT:   So I think important to

7     understand here what trying to do if understand if

8     someone previous engagement or interest or behavior

9     would predict their future engagement or interest

11:24:15 10    in behavior so to draw that out that line pretty

11    clearly if I can consistently click on ads, we

12    said -- that would be an indication to us that I am

13    likely to click on ads.

14          So that is an example of where we are

11:24:31 15    taking someone previous behavior to -- to

16    understand their future behavior it's -- it's -- I

17    think that answer your questions just in terms of

18    how -- it's not like a labeling exercise.   It is a

19    question of you -- you've previously ebb engaged in

11:24:52 20    that way and that helps how you might engage in

21    the --

22          Q.    (By Ms. Weaver)   Is Facebook using

23    algorithms to predict the future behavior?

24          MR. BENJAMIN:   Objection to form.

11:25:05 25          THE DEPONENT:   Our ad delivery does

                                                    125

**CONFIDENTIAL ROUGH DRAFT**

11:25:06 1   include algorithms they are machine learning

2   classifiers that help us estimate people's future

3   behavior.

4        Q.   (By Ms. Weaver)  What is machine

11:25:20 5   learning.

6             THE DEPONENT:  Machine learning is -- a

7   forge of programmatically at least in the context

8   of ads of programmatically creating this

9   prediction.  So within our ad delivery we base it

11:25:38 10  object people's activity to understand their future

11  potentially engagement.

12       Q.   (By Ms. Weaver)  And is this kind of

13  analysis logged at Facebook with regard to users?

14       A.   Can you explain what you mean by "this

11:25:55 15  analysis."

16       Q.   Right.

17            You engage in a purchase and the

18  algorithm says it needs that you are like lying to

19  else ever engage in a different kind of purpose in

11:26:09 20  ten minutes is that logged somewhere that

21  prediction?

22            MR. BENJAMIN:  Objection -- objection to

23  form.

                    24          THE DEPONENT:  We -- so I think there are

11:26:20 25  a few -- a few important pieces.  Machine learning

                                                                126


                         **CONFIDENTIAL ROUGH DRAFT**

11:26:23  1  takes into account.  It's not a one to one

          2  deterministic rule which is why it's machine learn.

          3  So it's taking into account, your activity and --

          4  and that helps us develop the -- in this example we

11:26:40  5  call it the estimated action rate which is whether

          6  or not you will engage in the way -- in an ad.

          7          We -- we log the -- the activity that's

          8  feeding into because that's just the activity that

          9  we have anyway.

11:27:02 10          And we -- we know which ad we showed

         11  someone so we know the output.

         12      Q.  (By Ms. Weaver)  Let's talk about the

         13  output.

         14          Facebook makes a prediction what does it

11:27:29 15  do with that that prediction?

         16          MR. BENJAMIN:  Objection -- objection to

         17  form.

         18          THE DEPONENT:  I think it's helpful to

         19  maybe expand to ads.  So advertiser creates the ad

11:27:38 20  they give us the content.  They set the parameters

21  for their audience and their bid.  The bid is how

22  much they are willing to pay to show that ad.

23       We then move it into our ad ranking or

24  the optimization portion where we take the eligible

11:27:55 25  audience we say which ad should Bella see in order

127

**CONFIDENTIAL ROUGH DRAFT**

11:28:00 1  to determine that we -- we are using the total

2  value equation and that is the bid from the

3  advertiser, the estimated action rate that I will

4  actually want to see this and engage with this ad

11:28:14 5  and the ad quality, those are the machine learning

6  components and then the output is whether -- which

7  ad I'm shown all of the ads that eligible to see in

8  that moment.

9       Q.   (By Ms. Weaver)  So does Facebook log

11:28:31 10  which ads a specific user is shown?

11       A.   Yes.

12       Q.   And when did Facebook start logging what

13  ads a specific user is shown?

14       A.   I believe that we have -- we have --

11:28:50 15  in -- we have logged that since we started to show

16  ads.

17       Q.   Since 2007, right?

```
          18      A.   Yes.

          19      Q.   And does Facebook link the advertisement
11:29:07 20  shown to a specific user and also log the behavior

          21  that triggered the ad?

          22           MR. BENJAMIN:  Objection to form.

          23           THE DEPONENT:  What I was saying before

          24  is it's not a one to one relationship.  It's not a
11:29:22 25  singular behavior and there wouldn't be a one
```

128


                     **CONFIDENTIAL ROUGH DRAFT**

```
11:29:25  1  trigger to log with that.

           2      Q.   (By Ms. Weaver)  Is there -- are there

           3  logs that reflect series of activities that also

           4  correlate in time to the ads Facebook is showing
11:29:40  5  them?

           6           MR. BENJAMIN:  Objection to form.

           7           THE DEPONENT:  Again the assumption

           8  there's like -- a is separate set of activity from

           9  what just -- what we use for ads as people's
11:29:54 10  activity and then that is how our machine learning

          11  determines if this would be of interest and then

          12  determines the ad to show.  It's not that there is

          13  like cherry picked activity that would -- is one to

          14  one relationship with showing any given ads.  So
```

11:30:11 15  that's not -- does toe reflex how machine learn

16  works in order to login that manner.

17      Q.   (By Ms. Weaver)  Right I understand I

18  mean what trying understand though, at some point

19  machine learning is learning and it's saying this

11:30:24 20  activity -- X, right?

21          MR. BENJAMIN:  Objection to form and

22  scope.

23          THE DEPONENT:  Do you mean a specific

24  activity or Bella has -- has -- this is -- these

11:30:37 25  are Bella interactions over time.  And we think it

                                                    129


                    **CONFIDENTIAL ROUGH DRAFT**

11:30:40  1  means that this would be an ad of interest.

2      Q.   (By Ms. Weaver)  Exactly?

3      A.   Right.  So again we know activity that is

4  logged.  We know which ads I -- I have -- we know

11:30:51  5  the target of ads and then we know the ad I'm shown

6  so we know the output.

7      Q.   So the question is does Facebook maintain

8  any kind of record or log of in a given time period

9  these are the activities and these are the ads.  We

11:31:09 10  maintain records of people's activity and maintain

11  records of or we store the ads people's are shown.

```
         12      Q.   And doesn't Facebook also maintain some

         13  kind of record of the special saws that gets from A

         14  to B?

11:31:27 15           MR. BENJAMIN:  Objection to form.

         16           THE DEPONENT:  I think that is what I

         17  described.  There isn't a way to -- like there

         18  isn't storage of a specific trigger because that's

         19  not how machine learning works.

11:31:42 20      Q.   (By Ms. Weaver)  Right.  I understand

         21  what you are saying.

         22           I will come back to that.

         23           Where are the logs that you just

         24  described with regard to the activity in the ads

11:31:55 25  maintained?
```

                                                                130


                           **CONFIDENTIAL ROUGH DRAFT**

```
11:32:00  1      A.   Ads people see is success that we shore

          2  ████  people activity is also something we store

          3  ████ .

          4      Q.   Is it stored anywhere else?

11:32:11  5           MR. BENJAMIN:  Objection to form.  Vague.

          6  Compound.

          7           THE DEPONENT:  The ads information is

          8  stored ████ .  That's the database that -- that's
```

```
        9  holds it and that's the same for the activity.

11:32:25 10  There -- other -- other systems might read from it

        11  so example for to render ads reporting.  In ads

        12  manager we would read from -- from those databases.

        13      Q.   (By Ms. Weaver)  Are you familiar with

        14  the Download Your Information tool?

11:32:43 15      A.   I'm familiar that it exist and we provide

        16  access to information there.

        17      Q.   Does it read from these tables ████  do

        18  you know?

        19      A.   I.

11:32:56 20          MR. BENJAMIN:  Objection -- objection to

        21  form and scope.

        22          THE DEPONENT:  Unfortunately I don't know

        23  as part of -- of my ads expertise.

        24      Q.   (By Ms. Weaver)  Okay.

11:33:19 25          MS. WEAVER:  I think we the take -- a
```

                                                        131


                        **CONFIDENTIAL ROUGH DRAFT**

```
11:33:21  1  break now let's go over the record.

         2           THE VIDEOGRAPHER:  Okay.  We are off the

         3  record it's 11:33 a.m.

         4           (Recess taken.)

11:33:31  5   Test test test test test test test test test test
```

         6   test test test test test test

         7            THE VIDEOGRAPHER:  Okay.  We are back on

         8   the record it's 12:24 p.m.

         9       Q.   (By Questioner)  Hi Ms. Leone did you

12:24:23 10  have a good lunch?

        11       A.   I did thank you.

        12       Q.   Or lunch equivalent.

        13            I'm going to show what we mark as -- give

        14   me a moment.  656.

12:24:39 15           (Exhibit 656 was marked for

        16   identification by the court reporter and is

        17   attached hereto.)

        18            MS. WEAVER:  And while we are waiting for

        19   it to load.

12:24:48 20      Q.   (By Ms. Weaver)  Do you recall when ad

        21   preferences was created, so that users could see or

        22   try to control what ads were presented to them?

        23       A.   Ad preferences launched in 2014.

        24       Q.   Okay.  I see.  Okay.  Do we have

12:25:29 25  Exhibit 656 up.  Yes, I have it up.

                                                         132


                         **CONFIDENTIAL ROUGH DRAFT**

12:25:31 1       Q.   And looking at Exhibit 656, do you know

         2   what it is?

          3        A.    It is a Newsroom blog post from 2019

          4    announcing initials to some of our transparency

12:25:43  5    interfaces.

          6        Q.    Who is a Newsroom blog post?

          7        A.    A Newsroom blog post -- Newsroom is what

          8    we call the portion of our website where anyone can

          9    navigate on the Internet that we make

12:26:01 10    announcements.

         11        Q.    And looking at Exhibit 656, it bears a

         12    date of July 11th, 2019?

         13        A.    Yes.

         14        Q.    Why did you review this particular

12:26:16 15    document?

         16             MR. BENJAMIN:   Objection to form.

         17             THE DEPONENT:   This is part of our

         18    evolution of the tools around ads targeting an ads

         19    ranking in this case.  The transparency tools and

12:26:32 20    so I wanted to be sure that I understood what had

         21    changed in the moment.  And if I could -- do you

         22    mind.

         23        Q.    (By Ms. Weaver)  Of course.

         24        A.    Make sure and read.

12:26:42 25        Q.    Yeah.

                                                              133

**CONFIDENTIAL ROUGH DRAFT**

12:26:43  1      A.   Sorry.  Yeah, this was -- these were

2   updates to waist and part of prep I was reviewing

3   many of the updates that we have made and generally

4   understanding where -- when those were.

12:27:12  5      Q.   So this disclosure does not relate to ads

6   sent to users because of behavioral targeting

7   actions right?

8           MR. BENJAMIN:  Objection to form.

9           THE DEPONENT:  Can you clarify when you

12:27:31 10   say behavioral what -- what you mean.

11           Q.   (By Ms. Weaver)  With the data sources

12   that are -- that are -- the bases of the

13   information that's used for ad interest and then

14   there's a different dataset that is is the source

12:27:49 15   for behaviors, correct?

16           MR. BENJAMIN:  Objection to form.

17   Misstates W it sounds like you are differentiating

18   the activity more so than the fact that it's just a

19   separate set of options in the -- I for advertisers

12:28:08 20   and that's meant to reflect how they organize and

21   how they can select their audience and that's

22   really the big distinction between the two.

23           Q.   (By Ms. Weaver)  Okay.  Well, looking at

24   Exhibit 656 and turning to the page that's at --

12:28:42 25   ending in nine -945.  Yes, I so.

                                                    134


                            **CONFIDENTIAL ROUGH DRAFT**

12:28:53  1        Q.   We are updating ad preferences show more

          2   about businesses that uploads lists with your

          3   information.

          4             Do you see that?

12:29:07  5        A.   Yes, sorry I'm not sure if it was for

          6   others as well, that's actually on the -- on

          7   the -944 for me.

          8        Q.   I am sorry, so --

          9        A.   Okay.  I just want to be sure I'm at the

12:29:17 10   right spot yes, I see.

         11        Q.   So does Facebook provide businesses with

         12   lists that they can upload about information about

         13   users?

         14        A.   No.

12:29:26 15        Q.   So what does this mean when it says "we

         16   are also updating ad preferences to show more about

         17   businesses that upload lists with your

         18   information"?

         19        A.   This refers to custom audiences the

12:29:40 20   customer list form of custom audiences.

         21        Q.   Okay.  And so looking at Exhibit 656, is

```
        22   this meant -- what is the purpose of this blog?

        23        A.   This was to --

        24             MR. BENJAMIN:  Objection -- objection to

12:29:54 25   form.
```

135

```
                       **CONFIDENTIAL ROUGH DRAFT**

12:29:55  1             THE DEPONENT:  This was to announce

          2   updates to waist and ad preferences that would help

          3   users understand when an advertiser has uploaded a

          4   customer list in order to reach them with an ad.

12:30:08  5        Q.   (By Ms. Weaver)  Okay.  Well look at the

          6   page ending --943?

          7        A.   Yes.

          8        Q.   Where it says first, we'll show people

          9   more reasons why they are seeing an ad on Facebook

12:30:19 10   in the past why I am seeing this ad highlighted one

         11   or two of the most relevant reasons such as

         12   demographic information or you may have visited a

         13   website.  Now you will see more detailed targeting

         14   including the interest or categories that match you

12:30:34 15   with a specific ad.  It will also be clear where

         16   that information came from e.g., the website you

         17   may have vested or page may have liked height

         18   controls to easy here adjust your experience.
```

               19          Do you see that?

12:30:47 20     A.   Yes.

               21     Q.   So when it's referring to interest or

               22 categories that match you with a specific ad that

               23 is referring to interest advertising, right?

               24          MR. BENJAMIN:  Objection to form.  Vague.

12:31:04 25          THE DEPONENT:  So reading this blog

                                                              136


                        **CONFIDENTIAL ROUGH DRAFT**

12:31:06  1 Post-it -- it is referring to the targeting

          2 operations that are under detail targeting so

          3 interest targeting operations and -- and other

          4 categories which are the other operations within

12:31:18  5 detailed targeting.

          6     Q.   (By Ms. Weaver)  Okay.  And then a

          7 little -- little later you've said that what -- on

          8 the next page pages four and five of the document,

          9 it discusses custom advertising; is that right?

12:31:33 10          MR. BENJAMIN:  Objection to form.

         11 Misstates.

         12          THE DEPONENT:  It also notes that we --

         13 making an additional update to ad preferences and

         14 that is related to customer lists.

12:31:43 15     Q.   (By Ms. Weaver)  And why doesn't this

16   document discuss the behavioral targeting -- the

17   targeting for behavior that we spent so much time

18   discussing before the break?

19           MR. BENJAMIN:  Objection to form.

12:31:58 20   Mischaracterizes.

21           THE DEPONENT:  The so I didn't write this

22   blog post so the wording here I think it's hard to

23   speculate exactly how they drafted this.  But that

24   is what is meant by the more -- you will see more

12:32:13 25   detailed targeting including the interest or

                                                137


                    **CONFIDENTIAL ROUGH DRAFT**

12:32:16  1   categories that matched with a specific ad that

2   includes those behaviors and specifically the

3   behaviors that the advertiser chooses when creating

4   their desired audience.

12:32:31  5       Q.   (By Ms. Weaver)  Do you know why the word

6   behaviors is not used in this disclosure?

7           MR. BENJAMIN:  Objection to form and

8   scope.

9           THE DEPONENT:  I can't tell you how it

12:32:44 10   was drafted this way.  But detailed targeting

11   interests or categories we often talk about

12   targeting as categories and this -- this alliance

```
         13   with that, it doesn't use the -- the exact same

         14   indemnify nomenclature, but.

12:33:00 15        Q.   (By Ms. Weaver)  Or the word behavior.

         16   Do you know if Facebook uses the word behavior in

         17   its privacy policy or data use policy?

         18             MR. BENJAMIN:  Objection.

         19        Q.   (By Ms. Weaver)  The kinds of inferences

12:33:10 20   drawn about them based on their activity on and off

         21   the platform?

         22             MR. BENJAMIN:  Excuse me, I didn't mean

         23   to interrupt, I am sorry.

         24             Objection to form and scope.

12:33:20 25             THE DEPONENT:  I don't know if the
```

                                                           138


                       **CONFIDENTIAL ROUGH DRAFT**

```
12:33:22  1   specific word is used.  But we do use our word in

          2   it's ad product when someone goes to create an ad.

          3        Q.   (By Ms. Weaver)  You use it facing

          4   advertiser but not facing users; is that right?

12:33:34  5        A.   Again --

          6             MR. BENJAMIN:  Objection to form.

          7             THE DEPONENT:  -- that's not quite right.

          8   I said I don't know for certain if it's in or

          9   policy or data policy.  But it is displayed to
```

12:33:44 10   users in other transparency interfaces such as ad

11   preferences.

12        Q.   (By Ms. Weaver)  You are -- you are a

13   privacy and policy manager; is that right and you

14   have been since 2019?

12:33:56 15        A.   Correct.

16        Q.   And what are your duties and

17   responsibilities?

18        A.   I work with our --

19             MR. BENJAMIN:  Objection -- sorry.

12:34:04 20             THE DEPONENT:  Sorry, that was my fault.

21             MR. BENJAMIN:  Objection to form and

22   scope.

23             You can answer.

24             THE DEPONENT:  I work with our product

12:34:13 25   teams as they develop new products and we work to

                                                            139


                        **CONFIDENTIAL ROUGH DRAFT**

12:34:17  1   ensure that those would -- would be in inline with

2   what we think our privacy principle should be and

3   also conversations that we had external restraining

4   order groups and feedback generally about the

12:34:30  5   products.

6        Q.   (By Ms. Weaver)  And does that include --

                7   did the products include behavior targeting?

                8        A.   I cover ad targeting, yes.

                9        Q.   Earlier you indicated that there might be

12:34:43 10   a difference in your mind between behavioral

               11   advertising targeting and behavioral targeting; is

               12   that fair?

               13        A.   I -- I think there's -- there's the

               14   product of behavioral operations that are in our

12:34:59 15   targeting tools so what we provide to advertiser.

               16   I think there can be -- people use behavioral

               17   targeting to speak generally about post

               18   personalization about the use of specifically

               19   offsite data and so, I think -- it's like capital B

12:35:19 20   behavioral a thing we produce or we provide in our

               21   tool versus the concept of behavioral targeting and

               22   that's the distinction I see, but when were

               23   discussing it earlier I think those got a little

               24   bit mixed probably.

12:35:33 25        Q.   Okay.  And what is OBA?

                                                          140


                        **CONFIDENTIAL ROUGH DRAFT**

12:35:36  1        A.   OBA a closer to that the second it's

                2   online behavioral advertising.  It is commonly

                3   meant to mean use of -- of activity off of the

          4   platform to inform advertising.

12:35:52  5        Q.   So is it fair to say that like OBA or

          6   advertising is an industry term of art when you've

          7   been talking about the player it's a specific

          8   Facebook product.

          9        A.   Yes, it is a industry term of art.  When

12:36:09 10   were specifically talking about the behaviors the

         11   targeting options I dressed those when were talking

         12   about how we used activity generally it would also

         13   related to the industry term of online behavioral

         14   advertising.

12:36:23 15        Q.   (By Ms. Weaver)  Okay.  And then what is

         16   political targeting?

         17             MR. BENJAMIN:  Objection to form.

         18             THE DEPONENT:  Political targeting is

         19   just the -- I guess I'm -- I might need to put that

12:36:45 20   back to you.

         21             Are you thinking in the context of our

         22   tools?

         23        Q.   (By Ms. Weaver)  I'm just thinking in

         24   general, do you know what political targeting

12:36:54 25   means?

                                                          141



                    **CONFIDENTIAL ROUGH DRAFT**

12:36:56  1           MR. BENJAMIN:  Objection to form and

         2  scope.

         3           THE DEPONENT:  To me that means the

         4  options we provide for advertisers to create their

12:37:04  5  audience that are related to politics.

         6     Q.  (By Ms. Weaver)  Okay.

         7           MS. WEAVER:  Why don't we mark exhibit

         8  3 because of this scope objection.

         9           MS. WEAVER:  And for the record Exhibit 3

12:37:20 10  [sic] is a letter sent to me from Mr. Benjamin on

       11  July 29th, 2022.

       12           (Exhibit 657 was marked for

       13  identification by the court reporter and is

       14  attached hereto.)

12:37:31 15     Q.  (By Ms. Weaver)  And when it's up I will

       16  ask to turn to the second page and I will read into

       17  the record when you have it up.

       18           Do you have it available counsel?

       19     A.  Yes.

12:37:47 20     Q.  It says "Ms. Leone will be prepared to

       21  discuss the targeting and audience selection

       22  options available to advertisers including with

       23  respect to political targeting segments which we

       24  understand to be of interest to plaintiffs."

12:38:00 25           Do you see that?

142

**CONFIDENTIAL ROUGH DRAFT**

12:38:08  1       A.   Yes.

        2       Q.   So what are political targeting segment?

        3       A.   It's what I was describing as the options

        4   that we provide an advertiser to define their

12:38:18  5   audience.

        6            MS. WEAVER:  So the scope objection was

        7   meritless.

        8       Q.   (By Ms. Weaver)  The -- what -- is there

        9   a subset of political segmentation that Facebook

12:38:31 10   provides to advertisers?

       11       A.   We've provided specific targeted options.

       12   And those are when -- I think maybe segmentation

       13   here is interchangeable with options.  So there a

       14   number of political targeting options that we've

12:38:51 15   provided to advertisers.

       16       Q.   And what are they and how have they

       17   changed over time?

       18       A.   There -- there were several faces so the

       19   initial face from 2014 to 2018 was five targeting

12:39:08 20   options that were based -- that work -- that were

       21   called like very label to very conservative.  And

       22   then we multiple phases since then one face which

```
        23  segmented those five into smaller or -- or more

        24  defined groups.

12:39:27 25            And then the latest face that was -- we
```

                                                                143


                        **CONFIDENTIAL ROUGH DRAFT**

```
12:39:32  1  introduced in 2018, which went back to five top

         2  level groups and those were deprecated in 20 --

         3  2022.

         4       Q.   So going back to the segments from 2014

12:39:44  5  to 2018, what were those five targeting options?

         6       A.   Very liberal -- liberal moderate

         7  conservative and very conservative.

         8       Q.   And then you said there were -- there was

         9  a face from 2018 to 2020; is that fair?

12:40:05 10       A.   Sorry, I think my -- I said 2022 but so

        11  2018 to 2022.  And it was the same naming except it

        12  was likely to engage with and they were new

        13  segments likely to engage with very liberal content

        14  and then similar likely to engage with liberal

12:40:25 15  content likely to engage with moderate content

        16  likely to engage with conservative content, likely

        17  to engage with very conservative content and those

        18  were 2018 to 2022.

        19       Q.   And why were the words likely to engage
```

12:40:38 20   with added to the segments?

21        A.   It was a representation of how those

22   segments changed.   The naming was to reflect how we

23   developed those.

24        Q.   How did the segments change?

12:40:53 25   ██ ████████████████████████████████████

                                                144

**CONFIDENTIAL ROUGH DRAFT**



12:40:57  1

14        Q.   And you said was deprecated this year; is

12:41:51 15   that correct?

16        A.   In 2022, yes March.

```
        17      Q.   In March, why?

        18      A.   We announced last year that we were

        19  deprecating a series of targeting options include

12:42:03 20  these that we were -- we had -- had any discussions

        21  over multiple years and we felt that these no

        22  longer met people's evolving expect tailings it was

        23  something that we did -- with work with advocacy

        24  groups with others to identify in -- and face out

12:42:22 25  from our targeting system.
```

                                                              145


                          **CONFIDENTIAL ROUGH DRAFT**

```
12:42:24  1      Q.   What expectations did it not meet?

         2      A.   From our conversations, these -- these

         3  were areas that people made perceive to be

         4  sensitive and weren't ones that we wanted to

12:42:39  5  continue to support.

         6      Q.   And when you -- you say "sensitive" what

         7  do you mean?

         8      A.   I'm using the words of -- of -- of the

         9  groups we spoke to they found that these were areas

12:42:51 10  that people found sensitive and -- and -- and we

        11  decided those -- those targeting options would no

        12  longer meet people's expectations.  I can't tell

        13  you exactly what they meant by sensitive.
```

14          Q.   But I'm just asking what Facebook means

12:43:09 15   by sensitive?

16          A.   We don't take that as a definition.   It's

17   that we understood people perceived these to be

18   sensitive and and choose to -- not support them any

19   longer.

12:43:30 20   Q.   Did Facebook suffer losses in revenue by

21   deprecating the use of those political targeting

22   segments?

23              MR. BENJAMIN:   Objection to form and

24   scope.

12:43:44 25              THE DEPONENT:   Advertisers don't have

146

**CONFIDENTIAL ROUGH DRAFT**

12:43:45 1   these segments any longer.  I can't tell you if

2   that means that they stopped advertising or not.

3          Q.   (By Ms. Weaver)  Did Facebook take any

4   steps to track before or after taking the decision

12:43:57 5   the impact to revenue of deprecating these

6   political targeting segments?

7          A.   Okay.   What I explain.

8          Q.   Objection to form compound?

9              THE DEPONENT:   What I explained earlier

12:44:10 10   is relevant here too where there isn't a before and

11   after snapshot because revenue isn't associate with

12   any one targeting option.

13        Q.   (By Ms. Weaver)  Okay.  But the question

14   was, did Facebook take any steps to track before or

12:44:27 15   after making this decision the impact to revenue of

16   deprecating political targeting segments?

17             MR. BENJAMIN:  Objection.

18             THE DEPONENT:  My point is --

19             MR. BENJAMIN:  Objection to form.

12:44:39 20             THE DEPONENT:  My point is that there

21   isn't a one to one way to track that and so we did

22   not take steps to track -- explicitly the revenue

23   loss from moving these -- these segments.

24        Q.   (By Ms. Weaver)  Does Facebook in general

12:44:53 25   track revenue loss when it deprecates a product?

147

**CONFIDENTIAL ROUGH DRAFT**

12:44:56 1             MR. BENJAMIN:  Objection to form and

2   scope.

3             THE DEPONENT:  Can I clarify, do you mean

4   understanding what our revenue was before something

12:45:09 5   and then after?

6        Q.   (By Ms. Weaver)  Yes.

7        A.   We track our revenue.  There are lots of

             8   factors that influence revenue and we do not

             9   associate a change in revenue specifically with the

12:45:24    10   removal of targeting because it is not a one to one

            11   relationship and.

            12        Q.   And --

            13        A.   Yes, yeah.

            14        Q.   I understand the point but here Facebook

12:45:34    15   deprecated a product, correct?

            16        A.   We deprecated targeting options and as

            17   clarified I call those products.

            18        Q.   And products have budget, don't they?

            19             MR. BENJAMIN:  Objection to form and

12:45:47    20   scope.

            21             THE DEPONENT:  Budgets in the sense of

            22   the amounted of money Facebook uses to build those

            23   products?

            24        Q.   (By Ms. Weaver)  Yes.  And, again, we

12:45:54    25   were talking about the advertising products.

                                                              148


                         **CONFIDENTIAL ROUGH DRAFT**

12:46:00     1        A.   We -- we -- we do fund our product teams

             2   and the resources to build a product that is pretty

             3   separate from a revenue calculation.

             4        Q.   Does Facebook provide or -- strike that.

12:46:13  5          Does Facebook track the revenue that

          6  certain products generate?

          7          MR. BENJAMIN:  Objection to scope.

          8          THE DEPONENT:  For ads it is not a one to

          9  one relationship because there are multiple

12:46:34 10  targeting options involved in any ad and so there

         11  isn't a way to track it directly back to a

         12  targeting option to track revenue definitely back

         13  to a targeting option.

         14      Q.   (By Ms. Weaver)  Are you saying that this

12:46:48 15  product was a targeting option in your answer?

         16          MR. BENJAMIN:  Objection to form.

         17          THE DEPONENT:  It would be political --

         18      Q.   (By Ms. Weaver)  The reason I'm asking

         19  you are keeping answering in generalities and I'm

12:47:02 20  talking these politically targeting segments that

         21  you just discussed, did Facebook's revenue decrease

         22  when it deprecated them?

         23          MR. BENJAMIN:  Objection to scope.

         24          THE DEPONENT:  These targeting

12:47:19 25  products -- these specific political segments were

                                                          149


                          **CONFIDENTIAL ROUGH DRAFT**

12:47:24  1  deprecated there is not one to way to measure if

2   any increase or decrease in revenue is related to

3   that deprecation.

4        Q.   (By Ms. Weaver)  I'm not asking about a

12:47:30  5   one to one ratio.  I'm just asking, after Facebook

6   deprecated these products, did its targeting

7   revenue decrease?

8            MR. BENJAMIN:  Objection to form.  Asked

9   and answered.  Vague.  And outside the scope.

12:47:45  10           THE DEPONENT:  I think the issue is the

11   question assumes causality.  If revenue changed in

12   the last six months, there could be many reasons

13   for that.

14       Q.   (By Ms. Weaver)  Okay.  But as you sit

12:47:58  15  here I will worry with my experts about causation

16   I'm simply trying to get the facts.

17           As you sit here, do you know if

18   Facebook's revenue decreased after it deprecated

19   political targeted advertising segments?

12:48:12  20           MR. BENJAMIN:  Objection to form.  Asked

21   and answered.  Vague.  Argumentative.  And outside

22   the scope.

23           THE DEPONENT:  I do not know our revenue

24   decreased because of a removal of these targeting

12:48:25  25  options that is not something that we can measure.

150

**CONFIDENTIAL ROUGH DRAFT**

12:48:27  1      Q.   (By Ms. Weaver)  That's not what I'm

        2   asking.

        3           Facebook deprecated political targeting

        4   segments in March 2020, correct?

12:48:35  5      A.   2022.

        6      Q.   Sorry.  2022.

        7           Did Facebook's revenue for targeting

        8   advertising decrease in API 2022?

        9           MR. BENJAMIN:  Objection to form.  Asked

12:48:48 10   and answered repeatedly.  Argumentative.  Outside

       11   the scope.

       12           THE DEPONENT:  I don't know how else to

       13   answer the question then to help disassociate these

       14   because if our -- our -- our -- I would like our

12:49:06 15   quarterly statements represents what revenue is

       16   doing and those are not directly related and -- one

       17   to one fashion with any one product deprecation.

       18      Q.   (By Ms. Weaver)  I was just asking if

       19   revenue decreased.  Do you know the answer?

12:49:22 20           MR. BENJAMIN:  Same objections as the

       21   prior two questions.

       22           MS. WEAVER:  It's not I don't have an

       23   answer I'm entitled either you donor you don't know

```
        24  this is the question.
12:49:31 25              Between March of 2022 and April of 2022,
```

                                                                151


                      **CONFIDENTIAL ROUGH DRAFT**

```
12:49:36  1  did Facebook's targeted advertising revenue

          2  decrease.

          3              MR. BENJAMIN:  Objection to form.  Asked

          4  and answered.  Argumentative.  Vague.  Outside the

12:49:49  5  scope.

          6              THE DEPONENT:  I would have to reference

          7  our quarterly earnings statements to answer that

          8  and I don't know it more granularity.

          9      Q.   (By Ms. Weaver)  Do you receive reports

12:50:00 10  of Facebook's targeted advertising revenue on a

         11  weekly or monthly basis?

         12              MR. BENJAMIN:  Objection to form.

         13  Compound.

         14              THE DEPONENT:  I personally do not

12:50:18 15  receive a continuous update of our revenue.  No.

         16      Q.   (By Ms. Weaver)  Do you know if one

         17  exists at Facebook I wasn't asking you personally I

         18  was asking Facebook the deponent.  So does Facebook

         19  prepare and circulate weekly or monthly snapshots

12:50:36 20  of targeted advertising revenue?
```

```
              21          MR. BENJAMIN:  Objection to form and

              22   scope.

              23          THE DEPONENT:  Can I ask a clarifying

              24   question, are you specifically -- when you say

12:50:50      25   targeted advertising revenue "did you just mean our
```

                                                                      152


                              **CONFIDENTIAL ROUGH DRAFT**

```
12:50:53       1   ads business"?

               2       Q.   (By Ms. Weaver)  What is targeting?

               3       A.   Those are one in the stamp in my mind I

               4   want to.

12:50:57       5       Q.   Okay?

               6       A.   Make sure that's also the case when you

               7   are saying.

               8       Q.   Yes.  Fine ads business but broken out by

               9   with some granularity as opposed to the public

12:51:08      10   facing documents.  So let me ask it again.

              11          Does Facebook prepare and circular weekly

              12   or monthly snapshots of targeted advertising

              13   revenue?

              14          MR. BENJAMIN:  Objection to form.

12:51:31      15          THE DEPONENT:  We tracked revenue from

              16   our ads business, the -- it is not broken out by

              17   targeting by targeting option that is not a
```

```
            18   granularity that we break out because it is not a

            19   measurement of revenue.

12:51:45    20        Q.  (By Ms. Weaver)  Does it break it out by

            21   core audience, behavior and custom audience?

            22             MR. BENJAMIN:  Objection to form.

            23             THE DEPONENT:  No.

            24        Q.  (By Ms. Weaver)  How does it break it

12:51:59    25   out?
```

                                                                  153


                          **CONFIDENTIAL ROUGH DRAFT**

```
12:52:01     1        A.  It breaks out by region in the sense of

             2   where we are making this money.  And where

             3   advertisers spending on our platform.  And it

             4   breaks it out by usually by size of advertisers so

12:52:15     5   is this an advertiser we can consider a small

             6   medium business or a large advertiser.

             7        Q.  And how often are these reports

             8   circulated?

             9             MR. BENJAMIN:  Objection to form and

12:52:29    10   scope.

            11             THE DEPONENT:  Our ads leadership teams

            12   might get these once a week.

            13        Q.  (By Ms. Weaver)  What are they called?

            14        A.  I honestly don't know what the name of
```

12:52:46 15    the report or -- might be, I don't know.

16         Q.   Do you know who would know?

17              MR. BENJAMIN:  Objection to scope.

18              THE DEPONENT:  Part of our analytics team

19    would know.  But I don't know a specific name.  As

12:53:06 20    I said these -- well, yeah.

21         Q.   (By Ms. Weaver)  Who were did main

22    advertisers who were paying for political targeting

23    segments between the time period 2014 to 2022?

24         A.   To clarify.

12:53:25 25              MR. BENJAMIN:  Objection to form.

                                                        154


                      **CONFIDENTIAL ROUGH DRAFT**

12:53:28 1              THE DEPONENT:  To clarify when you saying

2    "paying for political targeting segment you mean

3    choosing to one with ad part of desired audience"?

4         Q.   (By Ms. Weaver)  Yes.

12:53:37 5         A.   Okay.  I don't know the -- the advertiser

6    entity breakdown for those over -- over seven

7    years.  But that's not something I know off the top

8    of my head.

9         Q.   I didn't ask for the advertising entity

12:53:55 10    breakdown but can you name any companies who paid

11    for political targeted advertising from the time

12   period 2014 to 2022?

13          MR. BENJAMIN:  Objection to form.

14   Argumentative.  And scope.

12:54:17 15          THE DEPONENT:  This -- I would be

16   speculating without looking at that specifically

17   that would be something that we would look up more

18   so than know generally.

19      Q.   (By Ms. Weaver)  So the name

12:54:27 20   Cambridge Analytica doesn't come to mind?

21          MR. BENJAMIN:  Objection to form.

22   Argumentative.

23          THE DEPONENT:  It didn't come to mind,

24   no.

12:54:36 25      Q.   (By Ms. Weaver)  Was Cambridge Analytica

155


**CONFIDENTIAL ROUGH DRAFT**

12:54:37 1   one of the companies that paid Facebook for

2   targeted political targeting during the time period

3   from 2014 to 2022?

4      A.   And, again, specifically meaning did

12:54:49 5   Cambridge Analytica create an ad using those

6   targeting options?

7      Q.   Yeah.

8      A.   I -- I don't know.

                  9        Q.   Do you know whether or not

12:55:03 10   Cambridge Analytica paid Facebook $100 million for

                 11   advertising of a political nature in 2016?

                 12        A.   I do know.

                 13             MR. BENJAMIN:  Objection to form.

                 14             THE DEPONENT:  That Cambridge Analytica

12:55:17 15   advertised on our platform.

                 16        Q.   (By Ms. Weaver)  But you don't know the

                 17   amount and what for?

                 18        A.   I don't know.

                 19             MR. BENJAMIN:  Objection -- objection to

12:55:27 20   form and scope.

                 21             THE DEPONENT:  I do not know the exact

                 22   amount or the exact targeting options that they

                 23   choose for their desired audience.

                 24        Q.   (By Ms. Weaver)  What do you know about

12:55:38 25   that topic?

                                                              156


                         **CONFIDENTIAL ROUGH DRAFT**

12:55:42  1             MR. BENJAMIN:  Objection to form.

                  2   Argumentative and scope.

                  3             THE DEPONENT:  About ad targeting I'm

                  4   happy to chat through more on the segments and how

12:55:54  5   anything about those.  I don't -- I'm not sure if

```
          6   that's what you meant or if you mean specifically

          7   Cambridge.

          8       Q.   (By Ms. Weaver)  I mean

          9   Cambridge Analytica which is the trigger for this

12:56:05 10   lawsuit and what Cambridge Analytica paid Facebook

         11   for targeted political advertising?

         12       A.   I do not know details about the -- the

         13   Cambridge Analytica spend specifically.

         14       Q.   Do you know anything else about what why

12:56:28 15   Cambridge Analytica was paying for Facebook for

         16   advertising in 2016?

         17            MR. BENJAMIN:  Objection to both form and

         18   scope.

         19            THE DEPONENT:  I think you are indicating

12:56:43 20   if there were other reasons they -- they paid us.

         21   I do not know of those.

         22       Q.   (By Ms. Weaver)  Did Facebook makes

         23   changes to the political targeting segments in 2018

         24   as a result of the Cambridge Analytica scandal?

12:57:13 25       A.   No.
```

                                                              157


                            **CONFIDENTIAL ROUGH DRAFT**

```
12:57:13  1       Q.   And how do you know that?

          2            MR. BENJAMIN:  Objection to form.
```

3          THE DEPONENT:  I was part of the team but

4    also from speaking to some of the -- throughout my

12:57:31 5    prep in understanding how we evolved these segments

6    and it was not linked to Cambridge Analytica.

7          Q.   (By Ms. Weaver)  When you say you were

8    part of the team, which team do you mean?

9          A.   I worked on ads as part of the policy

12:57:46 10   team and at Meta working on ads.

11         Q.   And so what was the reason for making the

12   changes to targeted advertising in 2018?

13         A.   Specifically the segments we evolved the

14   way we were creating them.   ████████████████████

████████   ████████████████████████████████████████████

       ████   ████████████████████████████████████

       ████   ████████████████████████████████████████████

18         Q.   Right.  You described that earlier.

19              The question I asked you was why.  What

12:58:30 20   is the reason?

21         A.   Those were updated models that -- that

22   would function better to show people relevant ads.

23         Q.   How would they function better and how

24   did you determine that?

12:58:48 25             MR. BENJAMIN:  Objection to form.

**CONFIDENTIAL ROUGH DRAFT**

12:58:52  1          THE DEPONENT:  When those were options

        2  are added in we found -- those -- those options

        3  were performed better to show people relevant ads.

        4          Q.  (By Ms. Weaver)  How do you know they

12:59:03  5  performed better?

        6          A.  We saw advertisers using them and we saw

        7  people engaging with those ads.

        8          Q.  Were there reports generated that

        9  reflected data to you that indicated that these ads

12:59:19 10  were performing better prior to making the change?

       11          A.  Meaning specifically was there alive test

       12  for this?

       13          Q.  I'm trying to understand the information

       14  that you use when decided to make this change.

12:59:35 15  Just telling me you -- that you made the change

       16  doesn't explain why so?

       17          A.  Yeah.

       18          Q.  I'm trying to understand the information

       19  that you used to make this change, were there

12:59:45 20  studies were there analyses?

       21          MR. BENJAMIN:  Objection to form.

       22          Q.  (By Ms. Weaver)  I ask the question

       23  again.

       24          Were there reports generated that

12:59:54 25   reflected data that indicated these ads were

                                                         159


                        **CONFIDENTIAL ROUGH DRAFT**

12:59:56  1   performing better prior to making the change?

         2        A.   Not in the form of a before and after

         3   snapshot.  Our teams build new targeting options

         4   because they want to evolve the platform and evolve

01:00:20  5   the tools we offer.  This is an example of that

         6   where the 2014 to 2018 method of creating those

         7   segments wasn't what our -- what the team felt was

         8   like the best way to do it.  And so they created

         9   the next version which was an updated way that used

01:00:42 10   content engagement and performed well for those ads

        11   he in that when we launched those advertiser used

        12   them and people saw and engaged with the ads.

        13        Q.   Did Facebook make any changes to how it

        14   conducted political targeted advertising as a

01:01:02 15   result of Cambridge Analytica scandal?

        16        MR. BENJAMIN:  Objection to form.

        17        THE DEPONENT:  No.

        18   Q.   (By Ms. Weaver)  Okay.

        19        Q.   So Facebook provides metrics to

01:01:36 20   advertisers about their advertisers, correct?

        21        A.   Yes.

22     Q.   What metrics does Facebook provide?

23     A.   We provide performance metrics to

24  advertisers.

01:01:50 25     Q.   Do you do those through the ad manager

160

**CONFIDENTIAL ROUGH DRAFT**

01:01:55  1  tool?

2     A.   That is an example place where most

3  advertisers reference and get those yes.

4     Q.   What the -- is the ad manager tool?

01:02:04  5     A.   Ads manager is the -- I that advertisers

6  can both place their ads to create the ad upload

7  the content for it and then also come back to -- to

8  understand how the ad is performing.

9     Q.   And what is ads -- does -- does Facebook

01:02:23 10  also provide metrics through ads APIs?

11     A.   Yes.

12     Q.   And what are those and what information

13  does it provides through them?

14     A.   An API --

01:02:35 15          MR. BENJAMIN:  Objection to form.

16          THE DEPONENT:  An API is a -- is a way to

17  programmatically call information instead of using

18  our -- our built interface.  The API includes the

```
            19   same information, so for an ad it would include the

01:02:55    20   impressions and clicks and the performance metrics

            21   that -- for any given ad.

            22        Q.   (By Ms. Weaver)  And does Facebook also

            23   perform an analysis of the quality of the ad?

            24             MR. BENJAMIN:  Objection to form.

01:03:17    25             THE DEPONENT:  I want to be sure this is
```

                                                                161


                         **CONFIDENTIAL ROUGH DRAFT**

```
01:03:19     1   in context that you are thinking of.

             2        Q.   (By Ms. Weaver)  Okay.

             3        A.   As part of ad delivery, our -- as part of

             4   our total value equation that I was talking about

01:03:27     5   earlier we do include ad quality.  And that is our

             6   prediction of -- of the type of ad and whether it

             7   is sensational or -- or click baity or the quality

             8   of the images of the ad.

             9        Q.   When you say sensational, what do you

01:03:48    10   mean?

            11        A.   Collar to click bait it's when like the

            12   text is -- is ten great tips for is an example.  Of

            13   sensational click bait text.

            14        Q.   So but for the record what do you mean by

01:04:07    15   click bait?
```

16      A.   Click bait is and I will -- will -- is

17   like an industry concept around ads, which is

18   usually that the ad does not provide the actual

19   message.  It is meant to entice someone to click so

01:04:25 20   it's a catching key headline in order to get to the

21   content somewhere else.

22      Q.   And do advertisers pay for more for click

23   bait?

24           MR. BENJAMIN:  Objection to form and

01:04:42 25   scope.

                                                    162


                    **CONFIDENTIAL ROUGH DRAFT**

01:04:42  1           THE DEPONENT:  So the importance of ad

2   quality in our -- in our delivery system is to help

3   us ensure that we are taking into consideration

4   different parts of the ad in order to determine who

01:04:55  5   should see it.

6           So the advertisers bid is part of it.

7   The estimated rate which represents people's

8   interest and the ad quality of the ad of lower

9   quality less likely to be delivered and ad of

01:05:08 10   higher quality that doesn't have click baity

11   content in is more likely to be delivered.

12      Q.   (By Ms. Weaver)  So how does Facebook

            13  analyze ad quality?

            14       A.   By analyze we look -- as part of our ad

01:05:26 15  delivery it's the machine-learning models also look

            16  at -- the text of the ad, the images and whether

            17  it's been -- whether people have hidden it and kind

            18  of user feedback on I as well to establish if it --

            19  a predictions of attorney-client communications

01:05:44 20  quality.

            21       Q.   And what are the factors that tend to

            22  cause people to take action about an ad which --

            23  which increases its ad quality?

            24       A.   Sorry can you clarify people take action

01:06:01 25  on ad that increases its ad quality.

                                                                    163


                             **CONFIDENTIAL ROUGH DRAFT**

01:06:03  1       Q.   Okay.  Well, you described that one of

             2  the components is for example, whether people have

             3  hidden an ad.  As well as user feedback, right?

             4       A.   Yes.

01:06:12  5       Q.   Would you describe people high hiding an

             6  ad as taking action?

             7       A.   I would.  It doesn't IP accuracy ad

             8  quality.

             9       Q.   Okay.  Are there actions that people take

01:06:22 10   that do increase ad quality?

11        A.   No we use it as a way to understand if

12   people are seeing something problematic, so it

13   is -- it is an indication of someone not wanting to

14   seek content that what's feeds into ad quality.

01:06:41 15        Q.   And how do you infer that time do want to

16   see content?

17        A.   By choosing to hide the ad Wyoming is

18   choice on the ad for people.

19        Q.   So Facebook take steps to try to identify

01:06:56 20   what ads users do not want to see?

21             MR. BENJAMIN:  Objection to form.

22             THE DEPONENT:  Can you clarify if you

23   mean generally as part of ad quality.

24        Q.   (By Ms. Weaver)  Yes.

01:07:11 25        A.   On a more individual level.

                                                    164


                    **CONFIDENTIAL ROUGH DRAFT**

01:07:14 1        Q.   Generally as part of ad quality?

2        A.   That's precisely why we include ad

3   quality in our ad delivery so is that a part of a

4   feedback loop from someone potentially not wanting

01:07:25 5   to see something that feeds into our -- our ad

6   delivery because the goal of that delivery is to

```
 7   show people ads they want to see.

 8        Q.   And what is the purpose of an ad quality

 9   score in providing it to advertisers?

01:07:40 10       A.   It provides advertisers with transparency

10  11   into how the part of their ad performance.

12        Q.   Is it true, that advertisers will pay

13   more for ads with a higher ad quality score?

14            MR. BENJAMIN:  Objection to scope.

01:08:04 15           THE DEPONENT:  Can you clarify what you

16   mean pay for more.

17        Q.   (By Ms. Weaver)  Yes.

18            How was Facebook compensated for

19   advertising?

01:08:14 20       A.   Advertisers create the ad and they pay

21   for the -- the delivery of that ad for -- for

22   the -- the -- the every time the ad is shown.

23        Q.   And if advertisers don't buy ads on

24   Facebook, Facebook doesn't earn money from them,

01:08:34 25  right?
```
165

**CONFIDENTIAL ROUGH DRAFT**

```
01:08:37 1        A.   We would not have ad spend from them,

 2   correct.

 3        Q.   And is ad spend effected by increasing ad
```

```
          4  quality scores at Facebook?

01:08:52  5      A.   So.

          6           MR. BENJAMIN:  Objection to form.

          7           THE DEPONENT:  To be clear -- to clarify,

          8  ad spend is based on how often or the fact that we

          9  have shown the ad, so it is separate from ad score.

01:09:06 10  Ad score is part of the delivery to determine who

         11  sees the ad.  It's not that they are paying for ad

         12  score.

         13      Q.   (By Ms. Weaver)  Right.  I understand

         14  that.

01:09:17 15      A.   Okay.

         16      Q.   This is not very complicated I'm just

         17  trying to get basic established.  Right.  Facebook

         18  creates ad scores so as a marketing tool to

         19  encourage people to add material vise on Facebook

01:09:28 20  because you are saying look high quality ads you

         21  are getting responses is that fair?

         22           MR. BENJAMIN:  Objection to form.

         23           THE DEPONENT:  No.  It's our assessment

         24  of the quality of their ads so that they understand

01:09:39 25  if they had low performance if it's due to a low
```

166

**CONFIDENTIAL ROUGH DRAFT**

01:09:42  1   quality ad.  Or if they need to increase their

       2   performance or increase the quality of their ads in

       3   order to see better performance because people like

       4   better ads than bad ads.

01:09:55  5       Q.   (By Ms. Weaver)  Right ads are per

       6   recalling better advertisers buy more of them less

       7   of them because they are not performing better,

       8   right?

       9            MR. BENJAMIN:  Objection to form.  And

01:10:07 10   scope.

      11            THE DEPONENT:  I think the courts.

      12       Q.   (By Ms. Weaver)  Do advertisers like to

      13   pay low performing ads or high performing ads?

      14       A.   Advertisers wouldn't be paying if the ad

01:10:22 15   isn't performing they their spend is based on the

      16   ad actually being shown and the action being taken.

      17       Q.   So cocaines the performance of the ad

      18   increases the advertisers ad spend, correct?

      19            MR. BENJAMIN:  Objection to form.

01:10:39 20            THE DEPONENT:  I think we are using the

      21   word the words differently here.  It's -- it's

      22   that -- their spend proportional to people taking

      23   the action on their ad.  People taking that action

      24   is because they want to -- so ad relevant they

01:10:59 25   click and advertiser pays for that.

167

**CONFIDENTIAL ROUGH DRAFT**

01:11:02  1          If an ad score is low, the people are

2  less leakily to take that action and it is a way

3  for advertisers to understand how to create a

4  better ad if they want to.  There is no requirement

01:11:17  5  to but if they want to create a better ad and then

6  see better performance because that ad is a better

7  ad, they will then pay for the better performance.

8      Q.   (By Ms. Weaver)  Exactly.

9          And so it's in Facebook's financial

01:11:32 10  interest to -- kinds of ads people do not want to

11  see because they will not take action and the

12  advertiser will not pay Facebook because it's not a

13  higher performing ad, right?

14          MR. BENJAMIN:  Objection to form.

01:11:51 15          THE DEPONENT:  I think what you've

16  identified is the fact that we should want to show

17  good ads because it's better for both people who

18  want to see better ads and don't want terrible ads

19  in newsfeed and for advertisers because now they

01:12:04 20  are connected in with a user.  That is very

21  different than a marketing play that I think is

22  being described here.  It is simply that we ban

```
          23   better ads on the platform and this is an example

          24   of that.

01:12:17  25        Q.   (By Ms. Weaver)  Why does Facebook want
```

                                                              168


                        **CONFIDENTIAL ROUGH DRAFT**

```
01:12:19   1   better ads on the platform?

           2        A.   To provide a free service to people.

           3        Q.   It's not because Facebook wants to make

           4   more money you remember you are under oath?

01:12:29   5        A.   We make money to provide a free service

           6   to people.

           7        Q.   Okay.

           8        MR. BENJAMIN:  An objection to the last

           9   question.

01:12:35  10        Q.   (By Ms. Weaver)  Does Facebook make more

          11   money when people take more actions on ads?

          12        MR. BENJAMIN:  Objection to form.

          13        THE DEPONENT:  Yes.

          14        Q.   (By Ms. Weaver)  Thank you.

01:12:57  15             Preparing for your deposition, did you

          16   review any reports that Facebook provides to tiff

          17   advertisers that reflects the metrics of their

          18   campaigns?

          19        A.   I -- I didn't review any specific
```

01:13:20 20   reports.

21        Q.    Do you review them on a daily basis?

22        A.    Through the course of my job, no.

23        Q.    Are they -- did you at one point when

24   were you in ads integrity?

01:13:35 25             MR. BENJAMIN:  Objection.

                                                    169


                         **CONFIDENTIAL ROUGH DRAFT**

01:13:35  1             THE DEPONENT:  Review --

2             MR. BENJAMIN:  Objection to scope.

3             THE DEPONENT:  Review reports about

4    advertisers?

01:13:42  5        Q.   (By Ms. Weaver)  Let me rephrase the

6    question.

7             Facebook?

8        A.    Yes.

9        Q.    Provides analytics to advertisers through

01:13:49 10   at least two kinds of tools, right?

11        A.    Yes.

12        Q.    What are those reports look like?

13             MR. BENJAMIN:  Objection --

14             THE DEPONENT:  In --

01:13:57 15             MR. BENJAMIN:  -- to form.

16             THE DEPONENT:  In ads manager it will

17  show for that ad as an example the aggregate count

18  of impressions or clicks it received and the

19  amounts spend.  The same information would be

01:14:10 20  provided in the API for someone to call if they

21  wanted outside of the UI.

22      Q.  (By Ms. Weaver)  And did you in preparing

23  for this deposition today review any such reports?

24      A.  I did not go and specifically look up an

01:14:29 25  ads's report, no.

                                                    170


                    **CONFIDENTIAL ROUGH DRAFT**

01:14:32  1      Q.  Can you identify the -- all of the exact

2  metrics that are provided to advertisers.

3          MR. BENJAMIN:  Objection to form and

4  scope?

01:14:47  5      A.  Off the top of my head I can explain the

6  buckets of performance metric that we provided.

7      Q.  Okay.  What are the buckets?

8      A.  As I said there -- those center around

9  the -- the performance of the ad.  So how much

01:15:02 10  impressions has it shown.  How many clicks has it

11  generated.  How many people have taken the action

12  that the advertiser that -- that objective.  Ad

13  score is also included and the amount spend.  So

14  that an advertisers understand how their ad is

01:15:19 15  delivering on Facebook.

16      Q.   And just to address again an out of scope

17  objection at the bottom of page two of Exhibit 657

18  it says, Ms. Leone will be prepared to discuss the

19  metrics Facebook provides advertisers about their

01:15:37 20  advertisements which Facebook provides through its

21  ad manager tool and ads APIs.

22          So you describe the buckets but you can't

23  identify all of the specific metrics; is that

24  right?

01:15:51 25      A.   I don't have memorized line item every

                                                        171


                    **CONFIDENTIAL ROUGH DRAFT**

01:15:55 1  single metric.  But yes the purpose and the fact

2  that we provide how the ad is delivering the

3  actions people have taken and the ad score and ad

4  spend.

01:16:07 5      Q.   And has that changed over time from 2007

6  to the present?

7      A.   Our UIs have changed over time and so the

8  format of those has changed, yes.

9      Q.   And what has changed?

01:16:24 10      A.   The way we display those has changed.  As

```
         11   we ad in a new objectives also the type of metric

         12   that relates to it would have been added in as

         13   well.

         14        Q.   When you say type of metric that relates
01:16:38 15   to it what do you mean?

         16        A.   For example, a click or if you run a a

         17   page like ad we will show you how many people

         18   actually liked the page from that ad which is

         19   different from if you run a website click ad how
01:16:56 20   many people click because the action they took is

         21   different so the metric would -- would -- would be

         22   related to the action taken.

         23        Q.   How does Facebook beside what to charge

         24   for the ads that it serves for advertisers?
01:17:21 25        A.   Our -- there two parts to this primarily.
```

                                                                172


                        **CONFIDENTIAL ROUGH DRAFT**

```
01:17:25  1   There's the advertiser sets a bid so they decide

          2   how much they want to pay to show the ad to their

          3   desired audience in then in our ad auction we take

          4   that into account.  We know for a given user, all
01:17:41  5   of the ads they are eligible to see and the bids

          6   for those ads, and out of the total value equation

          7   we determine which ads should within the auction.
```

8    At that point they are charged the second highest

9    bid.

01:17:59 10        Q.   And when you say you take into account an

11    ads a given user can see, does Facebook perform a

12    calculation of the revenue that has been associated

13    with given users?

14        A.   Can you -- can you clarify what you mean

01:18:16 15    there?

16        Q.   Does Facebook perform a calculation of

17    revenue that has been associated with ads served to

18    a given user?

19        A.   I understand you to mean whether we

01:18:30 20    calculate the total amount of -- that we were paid

21    for an impression to show a specific user.

22        Q.   Yes.

23        A.   No.

24        Q.   Facebook does and can identify all of the

01:18:44 25    ads that were shown to a specific user, right?

173

**CONFIDENTIAL ROUGH DRAFT**

01:18:48 1        A.   Yes.

2        Q.   And Facebook can also calculate how much

3    it was paid for a given -- ad campaign in which

4    those ads were shown, right?

01:18:58  5      A.   The total spend, yes.

          6      Q.   And so you would calculate the total

          7 spend by the number of users who received that ad

          8 if you wanted to calculate the average revenue per

          9 user, right?

01:19:12 10           MR. BENJAMIN:  Objection to form.

         11           THE DEPONENT:  So calculating the total

         12 spend of an ad would not get me to the individual

         13 revenue from showing an another to one user.

         14      Q.   (By Mr. Benjamin)  If divided the number

01:19:26 15 of the users by the total spend why wouldn't that

         16 give you an average revenue per user?

         17      A.   For that one ad?

         18      Q.   Or campaign or for an ad, sure?

         19      A.   Sorry to clarify if you have the total

01:19:39 20 spend from a specific ad, and you know the 200

         21 people who saw that ad, yes you would divide the

         22 total spend by the 200 impressions and then say

         23 there's a cost per impression.

         24      Q.   And does Facebook calculate whether

01:19:58 25 certain Facebook users generate more revenue for

                                                              174


                        **CONFIDENTIAL ROUGH DRAFT**

01:20:04  1 Facebook than others?

```
          2     A.   No.

          3     Q.   Based on their responses to advertising?

          4     A.   No.

01:20:11  5     Q.   So in fact all Facebook users are viewed

          6   equal lie by Facebook with regard to the amount of

          7   revenue that they generated for Facebook; is that

          8   fair?

          9          MR. BENJAMIN:  Objection to form.

01:20:24 10   Misstates.

         11          THE DEPONENT:  We just -- we don't have

         12   an assessment of user by user revenue associated

         13   with them.

         14     Q.   Great.

01:20:39 15          Did Facebook at some -- some time engage

         16   an effort to restrictive versions use of

         17   advertising related data?

         18          MR. BENJAMIN:  Objection to form.

         19          THE DEPONENT:  For advertising related

01:21:09 20   data do you mind clarifying kind of -- kind of what

         21   you are thinking of there.

         22     Q.   Sure.

         23     A.   Just so I am.

         24     Q.   Sure.  I'm reading counsel letter ad

01:21:18 25   targeting page three and it says "Ms. Leone will be
```

                                                          175

**CONFIDENTIAL ROUGH DRAFT**

01:21:21 1 prepared to discuss Facebook's policies restricting

2 advertiser use of advertising related data i.e.

3 limiting it to its use case"?

4       A.   Yes.

01:21:38 5       Q.   What is?

6       A.   So --

7       Q.   Let me ask the question?

8       A.   Yeah, yeah, please.

9       Q.   What is advertising related data mean in

01:21:46 10 that sentence?

11       A.   I'm not 100 percent sure exactly what it

12 means here.  But this is meant to indicate that we

13 have terms and policies around the use of data

14 that's related to ads and this references that, so

01:22:07 15 as an example, we have custom audience terms and we

16 have business tool terms so what are the custom

17 audience terms.

18       A.   When someone uploads a customer list,

19 they agree to those terms and those are the

01:22:32 20 policies that -- in order to use that product.

21       Q.   What is a customer list?

22       A.   A customer list is one of types of the

23 custom audiences it's a targeting opposite that an

                24   advertiser can use.

01:22:49  25        Q.   Okay.  Let's talk about custom audience

                                                                    176


                          **CONFIDENTIAL ROUGH DRAFT**

01:22:52   1   for a minute and take a pause.  What are custom

           2   audiences?

           3        A.   Custom audiences was one of that -- that

           4   kind of like third bucket of targeting tool types.

01:23:04   5   Within it customer list is one where an advertiser

           6   uploads a -- a list of their existing customers.

           7        Q.   And does Facebook then possess the

           8   customer list?

           9        A.   No.  We hash the list when an advertiser

01:23:25  10   uploads it the identifiers in that list and then we

          11   compare it to our hash data to understand a match

          12   and then we delete the advertiser list.  And we do

          13   not send them back the information about the users

          14   who matched.

01:23:46  15        Q.   What analytics does Facebook provide

          16   advertisers who advertiser through custom

          17   audiences?

          18        A.   When argumentative verify creates a

          19   custom audience or the customer list specifically

01:23:58  20   here, they would understand within ranks the size

```
           21   of it, and when they then use it for their audience

           22   they would get the same reporting metrics that we

           23   per performance metrics that we provide for any ad.

           24        Q.   And over time has the size of accustom

01:24:21   25   audience that an advertiser collects change?
```

                                                                177


                      **CONFIDENTIAL ROUGH DRAFT**

```
01:24:26    1        MR. BENJAMIN:  Objection to form.

            2        THE DEPONENT:  Can you clarify what you

            3   mean by advertiser collect here?

            4        Q.   Sorry over the time of a custom audience

01:24:43    5   Aaron reports get by an advertiser changed?

            6        MR. BENJAMIN:  Objection to form.

            7        THE DEPONENT:  The customer list is

            8   provided by the advertiser, that is something

            9   that -- that they decide.  The size of and -- and

01:24:56   10   bring in -- and uploading, so really this -- it's

           11   independent of us they -- they make that choice

           12   based on their existing customers and their desired

           13   audience.

           14        Q.   (By Ms. Weaver)  Does Facebook also

01:25:10   15   create custom audiences not from customer lists but

           16   through other characteristics?

           17        A.   There were the two other types of custom
```

18    audiences one is based on our business tools, so

19    website custom audiences or an app custom audience

01:25:30 20    and then the other category was based on engagement

21    custom audiences, which is engagement with people

22    who have interacted with your page on Facebook.

23        Q.   So what are website or app custom

24    audiences?

01:25:48 25        A.   Website and app custom audiences are re

                                                        178


                        **CONFIDENTIAL ROUGH DRAFT**

01:25:51  1    engagement through our business tools, so when --

2    when a website owner or an app has our business

3    tools, as an example, a website could say, I will

4    put the pixel on the check out.  They would then be

01:26:11  5    able to use the targeting tool to or the targeting

6    option of website custom audiences to re engage

7    with people who have taken that action on their

8    website.

9              THE DEPONENT:  Apology is my video

01:26:23 10    jumping to anybody else; it's a little bit.

11              Okay.

12              MS. WEAVER:  We can go off the record if

13    you are having an issue.

14              THE DEPONENT:  No, we are good.

01:26:30 15      Q.   (By Ms. Weaver)  Okay.  And the second is

16      engagement audiences is that correct?

17          A.   Engagement custom audiences, yes.

18          Q.   And what are those?

19          A.   Those are based on on-site engagement, so

01:26:56 20      a Facebook page, did followers of that Facebook

21      page the advertiser for that page would be able to

22      re engage, with -- with that group of users by

23      saying I want to reach back to people who have

24      engaged with -- or followed my page.

01:27:16 25      Q.   And with regard any of these three

                                                        179


                        **CONFIDENTIAL ROUGH DRAFT**

01:27:19  1      thinned audichce Facebook restricted op the size

2      of the audiences that advertiser may target from

3      2007 to the present?

4          A.   Yes.

01:27:27  5      Q.   Why?

6          A.   We've -- we have a minimum of the

7      audience side will deliver to help ensure that

8      advertisers aren't distilled information from --

9      from that delivery.

01:27:44 10      Q.   And how is it changed specifically over

11      time.

12          MR. BENJAMIN:  Objection to form.

13          THE DEPONENT:  Those thresholds have --

14   have changed -- they have increased, so for

01:28:00 15   example, it increased I know like for customer list

16   it is 100 we have to 100 match in order to use that

17   audience.

18      Q.  (By Ms. Weaver)  This is as of 2022?

19      A.  It is currently, yes and over time

01:28:23 20   that -- that was increased.  There was always a

21   minimum and I believe -- I don't know exactly what

22   that was.  But it -- we've seen -- we have

23   revisited those thresholds and we increased them I

24   believe in 2018.

01:28:43 25      Q.  Do you know generally what range they

                                                        180


                    **CONFIDENTIAL ROUGH DRAFT**

01:28:46  1   were in prior to 2018?

2          MR. BENJAMIN:  Objection to form.

3          THE DEPONENT:  I don't.  I don't recall

4   specifically what they were.

01:29:06  5      Q.  (By Ms. Weaver)  Was it less than 20?

6      A.  No, no.

7      Q.  Was there any point in time in which from

8   2007 to the present, at which advertiser could

9  target custom audiences of 20 people or fewer?

01:29:26 10        MR. BENJAMIN:  Objection to form.

11        THE DEPONENT:  No fewer than 20 people is

12  not allowed, has not been allowed in a custom

13  audience and we don't enable an advertiser to

14  target singular users that's -- that's partly why

01:29:39 15  we have this protection in place.

16    Q.   (By Ms. Weaver)  And why is that why

17  don't Facebook allow advertiser to target singular

18  users?

19    A.   That's not the way we have built our

01:29:52 20  targeting system one of our core areas is that we

21  don't tell an advertiser who you are provide

22  information to them for that purpose.

23        And a -- a protection to do is to ensure

24  that there is an audience minimum.

01:30:07 25    Q.   And I'm -- I understand what you are

                                          181


                    **CONFIDENTIAL ROUGH DRAFT**

01:30:09  1  saying what.  But I'm asking again, why does

2  Facebook allow individual users to be targeted?

3    A.   Because we -- we don't want an advertiser

4  to have information about an individual user, that

01:30:23  5  is way we have set up our system.

      6        Q.   And why doesn't Facebook want an

      7   advertiser to have information about an individual

      8   user?

      9              MR. BENJAMIN:  Objection to form.  Asked

01:30:33 10   and answered.

     11              THE DEPONENT:  We -- we specifically tell

     12   users that we don't tell an advertiser about them.

     13   And we have consistently maintained that and that's

     14   also why we build our products to ensure that --

01:30:49 15   with the protection so that that's not the outcome.

     16        Q.   (By Ms. Weaver)  And why does Facebook

     17   specifically tell users that it will not allow

     18   advertisers to individually identify them?

     19              MR. BENJAMIN:  Objection to form.

01:31:07 20              THE DEPONENT:  I'm not sure how to answer

     21   this differently.  But it's our system -- we built

     22   our system with that as a guiding principle because

     23   we think that's an important part of being on

     24   Facebook and so we have maintained that and these

01:31:20 25   are the some of the protections that help to

                                                         182


                        **CONFIDENTIAL ROUGH DRAFT**

01:31:23  1   maintain that.

      2        Q.   (By Ms. Weaver)  Is it because Facebook

         3   has promised users privacy?

         4            MR. BENJAMIN:  Objection to form.  Asked

01:31:33  5   and answered.

         6            THE DEPONENT:  I think -- we are very up

         7   front with users that we show ads and how our

         8   system works, including this portion of it.  And

         9   this helps ensure that that that is the case.  I

01:31:51 10   don't think we've -- we relate it to a nondefined

        11   concept of privacy in the way that we are talking

        12   about it right now.

        13       Q.   (By Ms. Weaver)  So Facebook is not

        14   preventing advertisers from targeting individual

01:32:09 15   users because of privacy concerns; is that your

        16   testimony?

        17       A.   That is not my testimony.

        18            MR. BENJAMIN:  Objection.  And yeah --

        19            MS. WEAVER:  I'm just trying to get --

01:32:19 20            MR. BENJAMIN:  We went out of order, I am

        21   sorry.

        22            Objection to form.  Misstates.

        23   Argumentative.

        24            You can answer.

01:32:25 25            THE DEPONENT:  It's not my testimony.

                                                         183

**CONFIDENTIAL ROUGH DRAFT**

01:32:26  1      Q.   (By Ms. Weaver)  I'm going to ask you

          2   again, is Facebook preventing advertisers from

          3   targeting individual users to protect users

          4   privacy?

01:32:42  5      A.   We do not want -- we Donald low an

          6   advertiser to target an individual user and we

          7   don't tell advertisers who saw their ad so they

          8   learn about individual users and we -- and we state

          9   that to users.

01:32:59 10      Q.   Just -- it's getting from frustrating in

         11   this deposition.  Because you are just repeating

         12   the facts and I am trying to ask why.

         13           So what is the reason that Facebook built

         14   its platform so that in advertisers could not

01:33:17 15   target individual users?

         16           MR. BENJAMIN:  Objection to form.

         17   Argumentative.  Asked and answered.

         18           You can answer.

         19           THE DEPONENT:  This is one of our guiding

01:33:28 20   principles for our ad system.  It's part of how we

         21   have built it.  And how we help users understand

         22   and maintain their trust with Facebook.

         23      Q.   (By Ms. Weaver)  Can you confirm that one

         24   of the reasons Facebook did that was to protect

01:33:43 25   users privacy?

                                                                184


                         **CONFIDENTIAL ROUGH DRAFT**

01:33:47  1          MR. BENJAMIN:  Objection to form.

          2          THE DEPONENT:  Can you provide an example

          3   of what it is you mean by users privacy and

          4   protecting it?

01:33:56  5          Q.   (By Ms. Weaver)  Well, let me go back you

          6   said it was a guiding principle of Facebook, right?

          7          A.   For building our ad system, yes.

          8          Q.   Why is it a guiding principle.

          9          A.   Because we wanted to ensure that people

01:34:14 10   both like trust the information they provide us and

         11   continue to use our platform and this was one of

         12   the areas where that was important.

         13          Q.   Thank you.

         14          MR. BENJAMIN:  Ms. Weaver we -- we have

01:34:29 15   been going for a good time over an hour would now

         16   be a good time for a break.

         17          MS. WEAVER:  Just give me a moment.

         18          MR. BENJAMIN:  Of course.

         19          Q.   (By Ms. Weaver)  You said that Facebook

01:34:45 20   at no time allowed advertisers to target a custom

         21   audience of 20 or fewer do you recall that?

22      A.   Fewer than 20.

23           MR. BENJAMIN:  Objection.  Misstates

24   testimony.

01:34:55 25      Q.   (By Ms. Weaver)  What is the -- what is

                                                        185


                    **CONFIDENTIAL ROUGH DRAFT**

01:34:58  1   lowest number that Facebook has permitted

          2   advertisers to target in terms of the size of the

          3   custom audience?

          4      A.   I believe the customer list is 20.

01:35:14  5      Q.   And what the lowest number for the other

          6   two kinds of audiences?

          7      A.   I believe also 20.

          8           MS. WEAVER:  Great.  We can take a break.

          9           THE VIDEOGRAPHER:  Okay we are off the

01:35:35 10   record it's 1:35 p.m.

         11           (Recess taken.)

         12           THE VIDEOGRAPHER:  We are back on the

         13   record it's 1:55 p.m.

         14           (Exhibit 658 was marked for

01:55:04 15   identification by the court reporter and is

         16   attached hereto.)

         17      Q.   I'm going to show what is going to be

         18   marked or what will be mark as Exhibit 658

```
         19          MS. WEAVER:  For the record it's bates
01:55:19 20  numbers FB-CA-MDL-0386899 through -907 and I think
         21  it's up.
         22          THE DEPONENT:  I have it up.
         23     Q.  (By Ms. Weaver)  Okay.  Great.
         24          When you have a moment please just tell
01:55:37 25  me what it is?
```

186

```
                  **CONFIDENTIAL ROUGH DRAFT**
01:55:49  1     A.   This was similar to alike a blog post
          2  that we put on business blog that explains machine
          3  learning in ad delivery.
          4     Q.   And looking to the second page of the
01:56:01  5  document starting at Bates number -900 are the last
          6  three digits?
          7     A.   Yup.
          8     Q.   Do you see where it says first how does
          9  Facebook decide which ads to show people and then
01:56:13 10  there's an answer below the question, right?
         11     A.   Yes.
         12     Q.   And the second paragraph begins or second
         13  paragraph begins first advertisers choose their
         14  target audience through our self service tools.
01:56:29 15          Do you see that?
```

```
         16        A.   Yes.

         17        Q.   So specifically which target audience is

         18   this document referring to here?

         19        A.   This refers to the audience selection

01:56:44 20   tools that an advertiser has in ads -- in something

         21   like ads manager.  I don't know if you mean

         22   specifically what does the hyperlink go to.

         23        Q.   Is well that would be helpful too?

         24        A.   Okay.  That I don't know off the top of

01:56:59 25   my head so that might be -- yeah.
```

                                                            187


                        **CONFIDENTIAL ROUGH DRAFT**

```
01:57:02  1        Q.   Earlier you described different kinds of

          2   custom audiences do you recall that?

          3        A.   Yes.

          4        Q.   So which audiences are being described

01:57:10  5   here?

          6        A.   This paragraph describes the totality of

          7   the way an advertiser can select their audience

          8   it's not specific to custom audiences.

          9        Q.   So when for example an advertiser wants

01:57:24 10   to use behaviors to target they first start here

         11   with this target audience; is the right?

         12        A.   What this sentence refers to is in ads
```

          13   manager when someone goes in to select their

          14   desired audience.  It's talking about all of the

01:57:42  15   options thereof which one is behaviors.  One

          16   category is behaviors, custom audience is another

          17   category.

          18        Q.   Okay.  And looking at the next page

          19   ending at Bates number -901.

01:57:58  20             Do you see a Graph on that page?

          21        A.   I see the total value equation drawn out.

          22        Q.   What is the total valuation equation?

          23        A.   Total valuation is the description of our

          24   ad auction and the -- in ad delivery.

01:58:27  25        Q.   I am sorry you said it's the description

                                                                   188


                         **CONFIDENTIAL ROUGH DRAFT**

01:58:29   1   of our ad auction in ad delivery?

           2        A.   Our -- so -- sorry.  Our ad delivery

           3   choosing the ad that we will show someone is based

           4   on our auction.  Total value score is we make that

01:58:46   5   determination it's the machine learning that is

           6   used in ad delivery to make the determination of

           7   which ad wins the auction.

           8        Q.   So the algorithm is performing an

           9   analysis of the three factors below the words total

01:59:00 10   value in the Graph to determine which ad is shown;

11   is that right?

12        A.   Multiple -- yes machine learn models are

13   performing that, yes.

14        Q.   And even though it says total value what

01:59:12 15   that actually means is the ad that is shown?

16        A.   Every ad that a person is eligible to

17   see -- receives a total value score and then the ad

18   that has highest told value score wins the auction.

19        Q.   And when it wins the auction?

01:59:35 20   A.   It do go.

21        Q.   Is Facebook then paid revenue for the

22   total value ad that is selected?

23             MR. BENJAMIN:  Objection.

24             THE DEPONENT:  The ad.

01:59:45 25             MR. BENJAMIN:  Objection to form.

                                                    189


                         **CONFIDENTIAL ROUGH DRAFT**

01:59:48  1             THE DEPONENT:  Apologies.  I didn't mean

2   to interrupt your question there.

3             The total value score is calculated the

4   one with the highest total value wins the auction

01:59:58  5   and that is the ad we show a user.  An advertiser

6   pays for the performance of their ads and the

        7  number of times an ad is shown.

        8      Q.   Got it.

        9           So looking at the components of total

02:00:10 10  value there's the advertiser bid which we

       11  discussed, right?

       12      A.   Yes.

       13      Q.   And then it says estimated action rate.

       14  What is that?

02:00:20 15      A.   The estimated action rate is the

       16  likelihood of someone taking the action that

       17  alliance with the advertisers objective.

       18      Q.   And this document describes that as -- as

       19  the business objective, right?

02:00:38 20      A.   Yes, that's the name of the ad objective.

       21      Q.   And that could be a click or a view or an

       22  impression or something else, righted?

       23           MR. BENJAMIN:  Objection to form.

       24           THE DEPONENT:  Yes, it could be that the

02:00:53 25  advertiser is trying to -- has an ad with a call to

                                                        190


                        **CONFIDENTIAL ROUGH DRAFT**

02:00:58  1  action to go to a website to sign up to like a page

        2  for brand awareness those are there objectives why

        3  are they running this ad.

```
          4        Q.    And how does Facebook calculate the
02:01:13  5   estimated action rate?

          6        A.    The estimated action rate which is for

          7   the person we are thinking about showing this ad to

          8   is the likelihood that they will take that action

          9   and that's based on their activity on Facebook.
02:01:28 10   These are the machine-learning models that -- that

         11   are involved and they take into consideration

         12   active on Facebook so the pages and ad someone has

         13   interacted with.  The way they have interacted with

         14   those and then also activity off of Facebook such
02:01:45 15   as on websites and apps.

         16        Q.    And just to clarify testimony earlier.

         17   For detailed targeting the underlying activity that

         18   is the basis for determining interests and

         19   behaviors are those the same set of inputs and let
02:02:26 20   me just I will ask a bad question and I ask good

         21   one.  I thought when we talked the first time the

         22   interest were not based on off platform activity

         23   they were limited to only pages and groups.  But

         24   that the behaviors incurred behaviors are based on
02:02:42 25   basically almost all of the activity on Facebook
```

                                                          191


**CONFIDENTIAL ROUGH DRAFT**

02:02:44  1   with some exemptions and off platform?

          2          MR. BENJAMIN:  Objection to form.

          3      Q.   (By Ms. Weaver)  Is that roughly

          4   accurate?

02:02:57  5      A.   You are correct that there are

          6   distinction between interest and behaviors.

          7   Interests are based on on-site page and add

          8   interaction behaviors are a broader set of activity

          9   on-site.  Yeah, I think that clarifies kind of what

02:03:14 10   you were getting at.

         11      Q.   Okay.  And the behavior is also offsite,

         12   correct?

         13          MR. BENJAMIN:  Objection to form.

         14          THE DEPONENT:  No, I -- so behavior

02:03:31 15   targeting options are not offsite.  Earlier when we

         16   were discussing the behavioral targeting I was

         17   referencing the broader personalization including

         18   ad delivery.

         19      Q.   (By Ms. Weaver)  Okay.  Now for the

02:03:45 20   estimated action rate, what is the core set of

         21   inputs and activities that help Facebook derive the

         22   estimated action rate?

         23          MR. BENJAMIN:  Objection to form.

         24          THE DEPONENT:  Because -- it is on-site

02:04:03 25   behavior so again people's activity on Facebook and

192

**CONFIDENTIAL ROUGH DRAFT**

02:04:06  1  offsite based on our third -- our -- our business

        2  tools and information that's shared back with us.

        3      Q.   (By Ms. Weaver)  And then is an algorithm

        4  performing an analysis to predict the next possible

02:04:23  5  action a user might make?

        6      A.   The estimated action rate is likelihood

        7  that the user takes an action and it uses those --

        8  the machine learning classifiers use that activity

        9  as input.

02:04:37 10      Q.   Okay.  And for ad quality I know we

       11  covered this, but for the record and clarity.  Ad

       12  quality what is the core set of data that Facebook

       13  draws upon to determine ad quality?

       14          MR. BENJAMIN:  Objection to form.

02:04:55 15          THE DEPONENT:  It's the content of the

       16  ads so what an assessment for example, of click

       17  bait and our understanding of -- of the content of

       18  that ad as well as users feedback such as X outs

       19  which is reporting.

02:05:12 20      Q.   (By Ms. Weaver)  And the higher the ad

       21  quality, and the higher the estimated action rate,

       22  the better the total value for the tiffing, right?

```
          23      A.   The higher the ad quality and the higher

          24   the estimated action rate the higher the total

02:05:35  25   value score will be.
```

                                                                193


                            **CONFIDENTIAL ROUGH DRAFT**

```
02:05:37   1      Q.   And then do higher total value scores

           2   correlate with increased revenue to Facebook?

           3           MR. BENJAMIN:  Objection to form and

           4   scope.

02:05:49   5           THE DEPONENT:  I think to -- to make this

           6   very clear the way we've built this total value

           7   score, helps ensure there it's not just the highest

           8   bidder that wins the action.  Otherwise we would

           9   just way whoever is highest bidding gets the spot

02:06:06  10   on the ad by including estimated action rate and ad

          11   quality we are actually taking into consideration

          12   people's preferences of what they would want to

          13   see.

          14           And the quality of that ad.  And it

02:06:18  15   actually means that the high e bidder is not -- not

          16   always going to be the winner.  So better ads that

          17   are more relevant are the ones that within and then

          18   an advertiser pays for.

          19      Q.   (By Ms. Weaver)  And when Facebook is
```

02:06:32 20   serving better ads Facebook is more successful

21   financially, right?

22          MR. BENJAMIN:  Objection to form.  Asked

23   and answered.  Vague and outside of scope.

24          THE DEPONENT:  When we serve better ads

02:06:47 25   people's experience is better and that a common

194


                    **CONFIDENTIAL ROUGH DRAFT**

02:06:51 1   goal of ours across the board.

2          Q.   (By Ms. Weaver)  Does Facebook's revenue

3   increase when they make -- serve better ads?

4          MR. BENJAMIN:  Same objections.

02:07:04 5          THE DEPONENT:  As compared to when we

6   serve bad ads.

7          Q.   (By Ms. Weaver)  Yes?

8          A.   I don't think we can -- I don't know that

9   that is a comparison we make because we strive to

02:07:13 10   show good ads so I don't have a comparison point

11   there.

12          Q.   Do advertisers put advertising on

13   Facebook if they feel their advertisements are not

14   effective?

02:07:23 15          MR. BENJAMIN:  Objection to form.  Calls

16   for speculation.  Outside of scope.

```
         17              THE DEPONENT:  If advertiser does not

         18    performance on a ad they use that how they hen

         19    those a spend their -- across platforms.

02:07:43 20         Q.   (By Ms. Weaver)  Okay.  So is it -- one

         21    last question,.

         22              The user activity just for the record,

         23    that Facebook uses to analyze and create the

         24    estimated action rate and the ad quality is not

02:08:02 25    limited only to public shared activity it includes
```
                                                          195


                        **CONFIDENTIAL ROUGH DRAFT**
```
02:08:07  1    private activity as well, correct?

          2              MR. BENJAMIN:  Objection to form.  Asked

          3    and answered.

          4              THE DEPONENT:  What I shared earlier is

02:08:18  5    relevant here as well.  We don't have a die come

          6    tee and private and public active it's not limited

          7    in that manner because it's not the way our product

          8    works.

          9         Q.   (By Ms. Weaver)  Okay.  Thank you.

02:08:28 10              (Exhibit 659 was marked for

         11    identification by the court reporter and is

         12    attached hereto.)

         13              MS. WEAVER:  We are going to mark tab
```

```
          14   four Josh if you don't mind.  We'll mark as
02:08:45  15   Exhibit 659 a document bearing Bates numbers
          16   03526129 through -6133.
          17        Q.   (By Ms. Weaver)  And while we are waiting
          18   for it to load, what is a keyword?
          19        A.   I'm -- I'm not sure what we are
02:09:17  20   researching.
          21        Q.   Okay.  Do you -- have you used the phrase
          22   keywords in the context of advertising at Facebook?
          23             MR. BENJAMIN:  Objection to form.
          24             THE DEPONENT:  It is a type of targeting
02:09:36  25   we offer.  It is how we describe what an advertiser
```

196

**CONFIDENTIAL ROUGH DRAFT**

```
02:09:39   1   inputs in a search to select the matching
           2   interests, so as I described an advertiser
           3   selects -- creates an ad selects -- selects their
           4   desired audience and they could input something
02:09:54   5   like Nike and see the interest that match that in
           6   order to select that interest that's effectively a
           7   search keyword.
           8        Q.   (By Ms. Weaver)  And does Facebook have
           9   limitations on what keywords advertisers can use?
02:10:14  10        A.   So again to be clear it's not providing
```

        11  them keyword the keyword is what an advertiser

        12  chooses to search.  They can search against

        13  whatever they want.  But we had interest that we

        14  provide and if their keyword matches we'll render

02:10:30 15  that interest.

        16      Q.   Okay.  I am sorry.  The question was does

        17  Facebook limit what keywords advertisers can use?

        18      A.   Do you mean --

        19           MR. BENJAMIN:  Objection to form.

02:10:42 20  Argumentative.  Asked and answered.

        21           THE DEPONENT:  Can you clarify what you

        22  mean.

        23      Q.   (By Ms. Weaver)  I'm not saying Facebook

        24  is providing the keyword right?

02:10:49 25      A.   I understand.

                                                        197


                    **CONFIDENTIAL ROUGH DRAFT**

02:10:50  1      Q.   Advertisers are using a keyword does

         2  Facebook say you can use these kinds of keywords?

         3      A.   Can you clarify what you mean by from the

         4  advertiser perspective?

02:11:06  5      Q.   You said a keyword can be used to search

         6  against whatever the advertiser is looking for.

         7  Right?

```
          8      A.   So an advertiser can input a word, a

          9   keyword.

02:11:18 10      Q.   Right.

         11      A.   We don't limit what they search for but

         12   we limit what we will return to our interest and we

         13   don't provide anything as an interest.  So there is

         14   a limitation on what an advertiser can use for

02:11:32 15   targeting.  They could choose to search any number

         16   of words but those won't all have a matching

         17   interest that's actually used for targeting.

         18      Q.   Okay.  I think I understand the

         19   distinction you are making but I'm not sure.

02:11:48 20           Because it's one of two things.

         21           Can an advertiser search for a word but

         22   then it just won't be used in the advertisement; is

         23   that what you are saying because I don't understand

         24   the difference?

02:12:07 25      A.   I'm saying -- the difference is we
```

198


**CONFIDENTIAL ROUGH DRAFT**

```
02:12:09  1   have -- the interest that we provide as part of the

          2   selection of the target or the desired audience and

          3   in order for an advertiser to fin which interest

          4   they want to use for targeting, they can input a
```

02:12:22  5   search term.  If that search term has no matches

          6   then there won't be anything that's a had as part

          7   of the criteria for their targeting.  If it has a

          8   match they can then collect from not matches to say

          9   I want -- if I type in shoes as an advertiser, and

02:12:41 10   there is an interest that matches that keyword

         11   search, then we'll show them shoes and they can

         12   select that interest in order to -- to define their

         13   target audience.

         14        Q.    Right.  If are there any limitations on

02:12:55 15   the search terms that will actually be employed by

         16   Facebook other than it's not one of the interests?

         17             MR. BENJAMIN:  Objection.

         18             THE DEPONENT:  The only --

         19             MR. BENJAMIN:  Objection to form.

02:13:07 20             THE DEPONENT:  -- the way we use those

         21   search terms is to render an interest for the

         22   advertiser to choose from.  If it doesn't have a

         23   match there's no other use for that keyword search

         24   term.  They have input it.

02:13:23 25        Q.   (By Ms. Weaver)  Does Facebook have any

                                                            199


                      **CONFIDENTIAL ROUGH DRAFT**

02:13:25  1   restriction on what search terms advertisers can

2    use as?

3              MR. BENJAMIN:  Objection.

4         Q.   (By Ms. Weaver)  As a matter of policy

02:13:34 5    use objection to form.  Asked and answered.  Scope.

6              THE DEPONENT:  There isn't a limit for

7    what an advertiser can type in to the search box.

8    It has to actually match -- in order to be used for

9    targeting they have to select an interest from

02:13:54 10   those search results.

11        Q.   (By Ms. Weaver)  But you are not aware

12   for example certain words blacklisted or I hear the

13   new phrase deny listed by Facebook for use in

14   keyword phrases?

02:14:12 15             MR. BENJAMIN:  Objection to form.

16             THE DEPONENT:  No.

17        Q.   (By Ms. Weaver)  Okay.  We'll, let's take

18   a look at Exhibit 658.  Oh, no.  Sorry 659.

19   Apologies?

02:14:28 20        A.   I have it up.

21        Q.   And the first question is, have you seen

22   this document before?

23        A.   Yes, I saw it as part of prep for this

24   deposition.

02:14:39 25        Q.   Okay.  In the second sentence well, let's

                                                      200

**CONFIDENTIAL ROUGH DRAFT**

02:14:42  1   start do you see the first -- the email on top

2   says, Hi John, as a technical matter, you can

3   target based on specific keywords in a status

4   update or group membership.  However, our ad

02:14:55  5   guidelines prohibitive verse from "implying by

6   targeting a users's personal characteristics within

7   the following categories" and then it list race or

8   ethnic origin.  Religion or physical belief age,

9   sexual orientation or sexual life, gender,

02:15:12 10   disability or medical continue, financial status or

11   information, membership in a trade union and

12   criminal record.

13       Do you see that?

14       A.   Yes.

02:15:23 15       Q.   So is it true that Facebook prohibits

16   advertisers from using the word keys relating to

17   the topics described there?

18       A.   This policy --

19       MR. BENJAMIN:  Objection.

02:15:39 20       THE DEPONENT:  -- this policy prohibits

21   advertisers, this is one our content policies and

22   disallows advertiser from calling out any of these

23   attributes in the content of their ad.

```
            24      Q.   (By Ms. Weaver)  And what -- why does
02:15:54 25  Facebook have that policy?
```

                                                            201


                        **CONFIDENTIAL ROUGH DRAFT**

```
02:15:59  1      A.   This policy exists because we understand
          2  that people don't want their attributes called out
          3  in an ad.
          4      Q.   And how long has this been policy been in
02:16:09  5  effect?
          6      A.   Many years.  This is like pre2008 policy.
          7      Q.   And among the attributes that users don't
          8  want call out in an ad is age, and, again,
          9  derivative identity, right?
02:16:28 10      A.   Correct.
         11      Q.   Now when we talked about core audiences
         12  you said that for core audiences Facebook targets
         13  age and, again, derivative, right?
         14      A.   Yes.
02:16:38 15      Q.   Why is there a distinction?
         16      A.   Again, this is about the ad content.  An
         17  ad content cannot call out people's specific
         18  attributes.
         19      Q.   What does -- how does core audience
02:16:54 20  function?
```

21       A.   It's not about content.

22            MR. BENJAMIN:  Objection -- objection to

23   form.

24            THE DEPONENT:  It's not about the content

02:17:00 25   of an ad.

                                                     202


                    **CONFIDENTIAL ROUGH DRAFT**

02:17:03 1       Q.   (By Ms. Weaver)  Meaning people are being

2    targeted by their age or gender, but the content of

3    the ad doesn't reveal it?

4        A.   We -- we don't allow content of the ad to

02:17:13 5   call out these attributes.  That is completely

6    separate from the audience selection by the

7    advertiser.

8        Q.   So people can be targeted by their age or

9    gender, but Facebook doesn't want the ad itself to

02:17:31 10  reveal to the user, that they are being targeted by

11   their age or gender among other things; is that

12   right?

13            MR. BENJAMIN:  Objection to form.

14   Argumentative.  Mischaracterizes.

02:17:45 15            THE DEPONENT:  We provide transparency

16   into the targeting options so a user has -- why I

17   am seeing this and they would be able to understand

18   the targeting options so that's not the rational

19   they still have that information there is content

02:18:02 20   policy.

21      Q.   (By Ms. Weaver)  When people receive an

22   ad, do they know in the moment that they receive

23   that they are being target because of their age or

24   gender especially if the ad hides that fact by not

02:18:18 25   referencing it?

                                                        203


                    **CONFIDENTIAL ROUGH DRAFT**

02:18:19  1           MR. BENJAMIN:  Objection to form.

2              THE DEPONENT:  I think that assumes that

3      all ads would reference it.  But the -- the user

4      would see an ad, they know that ads are sponsored

02:18:30  5   content and involve targeting they also have the

6      tool to see those specific parameters.

7         Q.   (By Ms. Weaver)  Okay.  Let me ask this,

8      why is it that Facebook concluded that people don't

9      want to see ads that on their face target by raise

02:18:51 10   ethnic religion or philosophical belief, age,

11   secret yawl orientation or sexual life, gender

12   identity, disability or medical continue, including

13   physical or mental health, financial status or

14   information, membership in a trade union and

02:19:06 15   criminal record?

16              MR. BENJAMIN:  Objection to form and

17   scope.

18              THE DEPONENT:  We understood that people

19   did not like those ads and we made a policy to not

02:19:17 20   allow that -- the content to call out people's

21   attributes.

22      Q.   (By Ms. Weaver)  How did Facebook decide

23   that people do not like the ads that focus on the

24   attributes that I just described?

02:19:31 25              MR. BENJAMIN:  Objection to form.  Scope.

                                                      204


                        **CONFIDENTIAL ROUGH DRAFT**

02:19:34 1              THE DEPONENT:  In the content, this is in

2   my personal experience, because it -- not related

3   to ad targeting we understand from my -- the way I

4   have understood this policy, we measure X outs

02:19:51 5   et cetera and so we know which ads have an X out

6   and this is example of where that inform our

7   policies.

8      Q.   (By Ms. Weaver)  For the record what do

9   you mean by "out"?

02:20:01 10      A.   Oh apologies, reports.

11      Q.   I am sorry was that?

         12        A.   When -- when someone sees an ad they have

         13   the ability to say, I don't want to see this ad.

         14   Is one way that we understand ads that people do

02:20:15 15   and don't want to see as -- from my understanding

         16   that's how we develop policies like this.

         17        Q.   And for this policy which you said was

         18   developed in pre2008 what was the information that

         19   Facebook relied on in determining that people don't

02:20:31 20   want to see ads that -- in their content target

         21   them for these characteristics?

         22        A.   I'm not an expert in our ad content

         23   policies and their early development that's outside

         24   of ad targeting.  The -- but in general, we use

02:20:51 25   feedback signals, X outs ask an example of that.

                                                             205


                          **CONFIDENTIAL ROUGH DRAFT**

02:20:56  1        Q.   So in fact Facebook may target users

          2   because of raise or ethnic origin, religion or

          3   physical belief, age, sexual orientation or sexual

          4   life, general integer identity, disability or

02:21:12  5   medical continue including or physical or mental

          6   health, financial status or information, membership

          7   in a trade union and criminal record.

          8             But Facebook's policy is just not make it

            9  apparent in the content of the ad; is that fair?

02:21:30 10          MR. BENJAMIN:  Objection.  Argumentative.

           11  Misstates.  Asked and answered.  Outside the scope.

           12          THE DEPONENT:  No that's not accurate.

           13  We don't provide targeting options based on this

           14  data on many -- a lot of the data you read out.

02:21:47 15  And this is specifically a content policy, it is

           16  distinct from the targeting operations we provide.

           17      Q.  (By Ms. Weaver)  Facebook does target

           18  people based on age and, again, derivative,

           19  correct?

02:21:58 20      A.  Correct the rest of the list, no.

           21      Q.  Does Facebook draw inferences about users

           22  financial status or information to determine what

           23  action they might next take?

           24      A.  No.

02:22:13 25          MR. BENJAMIN:  Objection to form.

                                                            206


                        **CONFIDENTIAL ROUGH DRAFT**

02:22:14  1      Q.  (By Ms. Weaver)  Does Facebook use any of

            2  the categories identified in Exhibit 659 in its

            3  analyses about estimated actions?

            4      A.  These categories we don't have.  All have

02:22:34  5  these categories that we do not collect raise or

              6    ethnic origin.  We don't collect disability or

              7    medical continue, financial status, trade union

              8    membership and criminal record.

              9          And we don't create inferences about

02:22:49  10    these -- any of these to determine the attribute or

              11    predict someone's attribute.

              12         Q.   Is it your testimony on behalf of

              13    Facebook that it no point in time, did Facebook

              14    infer ethnic origin or race about users?

02:23:06  15         A.   Yes, we did inference people's

              16    characteristic or their ethnic oration origin.  And

              17    maybe I should -- I was -- no, we did not.  I was

              18    saying yes to your question to clarify.

              19         Q.   Do you see a reference here to the

02:23:34  20    minimum cluster size in this document under

              21    there's -- there's a box here that says redacted

              22    privilege.

              23         A.   Yes, see the reference.

              24         Q.   What is "minimum cluster size"?

02:23:47  25         A.   This is collar to what we discussed about

                                                                       207


                              **CONFIDENTIAL ROUGH DRAFT**

02:23:49   1    the minimum audience sides we will allow for an ad

              2    to run or we require.

3      Q.   Sorry.  What's the difference between

4    minimum cluster size and minimum audience size?

02:24:03  5      A.   I understand those to be the same.

6      Q.   Okay.  So a little bit lower on that page

7    the last full paragraph do you see John patent

8    wrote to Rob Sherman so understand the idea that if

9    you provide info on Facebook even if it is

02:24:30 10    medically extensive it is ad targetable.

11           Do you see that?

12      A.   I see it.

13      Q.   And you disagree with that statement?

14      A.   Yes.

02:24:43 15      Q.   So what does Facebook do to prevent

16    information that is medically sensitive being used

17    to create inferences about users?

18           MR. BENJAMIN:  Objection.  Form.

19           THE DEPONENT:  We don't collect medical

02:25:01 20    information and we also separately do not inference

21    someone's medical continue.

22      Q.   (By Ms. Weaver)  When you say you don't

23    collect it, what do you mean?

24      A.   I mean that there isn't like a place

02:25:18 25    where someone says, similar -- as an example, to

208

**CONFIDENTIAL ROUGH DRAFT**

02:25:22 1  reference gender, we have part of profile is gender

2  or age and someone provides that.  There is not a

3  similar medical continue field that people fill out

4  or provide.

02:25:36 5       Q.   Right.  But if there are conditions for

6  example, that, you know, as marketer or something

7  like that.  Does -- does Facebook infer things

8  about users based on that information?

9            MR. BENJAMIN:  Objection.

02:25:54 10           THE DEPONENT:  We don't -- we don't have

11  that information.

12       Q.   (By Ms. Weaver)  What if I click on a

13  page for a medical provider, what does Facebook do

14  with that information?

02:26:04 15           MR. BENJAMIN:  Objection --

16           THE DEPONENT:  We --

17           MR. BENJAMIN:  -- to form.

18           THE DEPONENT:  We would know you clicked

19  on a page from a medical provider.  We are not

02:26:10 20  making an inference about your medical continue.

21       Q.   (By Ms. Weaver)  And what does Facebook

22  do with the information that I clicked on a page

23  for a medical provider?

24           MR. BENJAMIN:  Objection to form and

02:26:24 25   scope.

                                                          209


                        **CONFIDENTIAL ROUGH DRAFT**

02:26:27  1          THE DEPONENT:  Within the context of ads,

          2   as we have discussed page engagement can -- can

          3   inform the future ads people see.

          4          Q.   (By Ms. Weaver)  And what if my friend

02:26:45  5   posts something about a cancer survivor group and I

          6   like it.  Does that activity which would otherwise

          7   be included in behaviors inform what behaviors I

          8   might be included in?

          9          MR. BENJAMIN:  Objection to form.

02:27:16 10          THE DEPONENT:  We don't have a behavior

         11   targeting option that is about -- like cancer,

         12   friends of cancer survivors that's not a targeting

         13   option.

         14          Q.   (By Ms. Weaver)  Does Facebook use that

02:27:34 15   information in determining my estimated actions?

         16          A.   We don't use the content of -- of your

         17   friend's post.  That's not something we use

         18   currently.

         19          Q.   Did Facebook use the contents of my

02:27:58 20   friend's post at any point in time from 2007 to the

         21   present?

```
          22     A.   No.

          23     Q.   So why did you say currently?

          24          MR. BENJAMIN:  Objection.  Form.

02:28:10  25  Argumentative.
```
                                                        210


                        **CONFIDENTIAL ROUGH DRAFT**

```
02:28:13   1          THE DEPONENT:  I was -- I was just

           2  honestly repeating the tense of the question, it

           3  wasn't meant to be an exclusion.

           4     Q.   Do you understand how the algorithms work

02:28:30   5  and what inputs they use to create estimated

           6  actions?

           7          MR. BENJAMIN:  Objection to form.

           8  Compound.  Vague.

           9          THE DEPONENT:  I understand the machine

02:28:45  10  learning that -- that -- that is how we generate

          11  the estimated action rate and the inputs that they

          12  use.

          13     Q.   (By Ms. Weaver)  And what are the inputs

          14  for the machine learning that you just mentioned?

02:28:58  15     A.   On-site activity, and offsite activity

          16  through our business tools.

          17     Q.   And specifically what on-site activity?

          18          MR. BENJAMIN:  Objection to form.  Asked
```

```
          19  and answered.
02:29:11  20          THE DEPONENT:  The ad engagement, page

          21  engagement, people's activity, the info they

          22  provide to us, those are all parts of that

          23  estimated action rate.

          24      Q.  (By Ms. Weaver)  Does it consider what
02:29:22  25  actions I take with regard to content my friend's
```

                                                        211


                     **CONFIDENTIAL ROUGH DRAFT**

```
02:29:25   1  post?

           2      A.  No.

           3      Q.  Does it consider the contents of what I

           4  post?
02:29:51   5      A.  No.

           6      Q.  Okay.  I'm going to return to a topic we

           7  began a while ago on page three of Exhibit 656.

           8          We were discussing Facebook's policies

           9  restricting advertiser use of advertising related
02:30:27  10  data, i.e. limiting it to its use case.

          11          Do you recall that?

          12      A.  I am sorry on 656.

          13      Q.  I am sorry.  Let me make sure I have the

          14  right, 657.  I am sorry that's my fault?
02:30:43  15      A.  Yes, I have it up.
```

```
         16        Q.   So do you recall the bullet point on

         17   page 3 that we began discussing but did not

         18   complete?

         19        A.   Yes.  Sorry I am trying to find the exact

02:30:54 20   wording on here.

         21        Q.   No problem.

         22        A.   Yes.

         23        Q.   So what does -- what are Facebook's

         24   policies restricting advertisers use of advertising

02:31:14 25   related data?
```

                                                          212


                         **CONFIDENTIAL ROUGH DRAFT**

```
02:31:18  1        A.   There a few relevant policies as an

          2   example, our customer list policies limits the way

          3   people can use that information.  Our business

          4   tools do as well.  And we also require -- do not

02:31:33  5   allow advertisers to use information that they

          6   under from the ad for purposes other than

          7   understanding the performance of their ad.

          8        Q.   What policies in particular are you

          9   referring to?

02:31:50 10             MR. BENJAMIN:  Objection.

         11             THE DEPONENT:  I don't.  I can look up

         12   the exact like policy number -- do you know like in
```

            13   those terms which number.

            14        Q.   (By Ms. Weaver)  Just descriptively, what

02:32:02    15   policies are you referring to?

            16        A.   All of those terms have policies that

            17   restrict how an advertiser and the requirements for

            18   that data and disallow an advertiser from taking

            19   specific actions with it.  So as an example our

02:32:21    20   policy our ad guidelines ad policies disallow

            21   advertiser from using ad targeting to harass or

            22   provoke people it also disallows advertisers from

            23   taking information to -- for purposes of other than

            24   understanding the performance of their ad.

02:32:40    25        Q.   Okay.  What we are talking about here,

                                                                    213


                          **CONFIDENTIAL ROUGH DRAFT**

02:32:44     1   are the advertising using advertising related data

             2   beyond a use case, right?

             3        A.   Yes.

             4        Q.   What is a use case?

02:32:54     5        A.   To place the ad --

             6        Q.   You are saying --

             7        A.   -- in this context.

             8        Q.   For advertisers, the use case should be

             9   limited solely to placing an ad; is that right?

02:33:06 10      A.   Placing the ad and the -- the performance

         11  of that ad.

         12      Q.   And what does advertising related data

         13  mean in this context?

         14      A.    Related to ad targeting and ad delivery

02:33:26 15  it means the way an advertiser sets up their --

         16  their ad and the performance of that ad.

         17      Q.   Does that exclude information about who

         18  receives the ad and the -- the engagement or action

         19  rate?

02:33:52 20          MR. BENJAMIN:  Objection to form.

         21          THE DEPONENT:  Let me know if this

         22  answers your question.  We -- we -- we don't

         23  provide advertiser with -- who has seen similar ad

         24  an individual user level that's not something we

02:34:04 25  give them.

                                                          214


                      **CONFIDENTIAL ROUGH DRAFT**

02:34:05  1          They understand -- they are provided

          2  performance metrics that are aggregated and those

          3  are for the purpose of understanding the

          4  performance of that ad, that's the use case.

02:34:17  5      Q.   (By Ms. Weaver)  So at some point in

          6  time, when the audience, minimum audience No. was

             7    20, an advertiser could identify 20 people from its

             8    customer list, run an ad and then Facebook would

             9    provide aggregated mean aggregated for those 20

02:34:36    10    people how many people took action for example; is

            11    that right?

            12             MR. BENJAMIN:  Objection to form.  Calls

            13    for speculation.

            14             THE DEPONENT:  An advertiser could create

02:34:49    15    a custom customer list it would have to have at

            16    least 20 matches in order for it to be used in an

            17    ad.  They could then run that ad and we would show

            18    the reporting metrics related to that ad.  Again in

            19    an aggregated form.

02:35:05    20        Q.   (By Ms. Weaver)  And what are the

            21    reporting metrics that Facebook would provide for

            22    that ad?

            23        A.   These were the metrics categories that --

            24    that I covered earlier of impressions, so number of

02:35:17    25    impressions, number of clicks, ad spend, ad score.

                                                              215


                       **CONFIDENTIAL ROUGH DRAFT**

02:35:24     1        Q.   And for these 20 people, how many

             2    categories of interests could an advertiser seek?

             3             MR. BENJAMIN:  Objection to form.

              4  Misstates.

02:35:40   5              THE DEPONENT:  Can you clarify what you

              6  mean by an advertiser could seek interests.

              7     Q.   (By Ms. Weaver)  Sure.

              8          So I'm -- here's my audience of 20, and I

              9  want to identify the following ten categories of

02:35:52  10  interests.

             11          Is there a cap on the number of interests

             12  or behaviors that an advertiser could identify to

             13  target the 20 people?

             14     A.   An advertiser can use a customer list and

02:36:09  15  they use additional targeting options with that

             16  list.  But an ad cannot ad audience cannot be

             17  narrowed be -- below the threshold in order for us

             18  to deliver it.

             19     Q.   I'm not talking about the audience now

02:36:24  20  I'm talking about the characteristics that are

             21  being focused on, right the interests or the

             22  behaviors.  Was there a cap on the behaviors that

             23  could be used to target the audience?

             24     A.   There is not a cap in the number of

02:36:40  25  behaviors someone can choose.  But if choosing

                                                            216

                        **CONFIDENTIAL ROUGH DRAFT**

02:36:42   1   those behaviors drops the audience below a certain

           2   level, we will not deliver that ad.

           3        Q.   And what is the level below which it may

           4   not -- not drop?

02:37:01   5        A.   It is 100 people.

           6        Q.   And why is the limit 100 people?

           7        A.   We have done assessments of -- of across

           8   our system to ensure that people aren't able to

           9   re-identify that was one of the -- that was a

02:37:17  10   threshold that we felt comfortable with as a

          11   prevention.

          12        Q.   When was the 100 people threshold

          13   established?

          14        A.   I believe it was 2018 and before that

02:37:30  15   there was a threshold, it was lower but there's

          16   always been a threshold.

          17        Q.   What was the lowest threshold that that

          18   has existed?

          19             MR. BENJAMIN:  Objection to form.

02:37:46  20             THE DEPONENT:  20 I believe.

          21        Q.   (By Ms. Weaver)  And when -- for what

          22   years was the 20 threshold operative?

          23        A.   I believe up until between 2016 and 2018

          24   I'm not sure if we went straight to 100 or -- or in

02:38:21  25   between.

217

**CONFIDENTIAL ROUGH DRAFT**

02:38:23   1        Q.   And when the threshold was 20 could

           2   advertisers use Geo location as a target?

           3        A.   Advertisers can use location targeting.

           4   If the ad audience after any targeting selection

02:38:51   5   drops below the threshold of 100, it would then not

           6   deliver.  We don't deliver that ad.

           7        Q.   That's the current policy, correct?

           8        A.   Can -- yes.

           9        Q.   But if the threshold was 20 could an

02:39:11  10   identify advertiser use location targeting?

          11        A.   Yes, again, they can select location and

          12   if it ever drops below 20 that ad would not

          13   deliver.

          14        Q.   And when the threshold was 20, an

02:39:26  15   advertiser could use Geo location in combination

          16   with an unlimited number of interests or behaviors

          17   if they were within Facebook's roster of them,

          18   correct?

          19             MR. BENJAMIN:   Objection to form.

02:39:41  20             THE DEPONENT:   They can use any number to

          21   set up their targeting audience.  If it ever drops

          22   below the threshold it will not deliver regardless

23   of how many options they have selected.

24      Q.   (By Ms. Weaver)  So to be clear, until

02:39:57 25   2016 or 2018 when the threshold was raised to 100,

218


**CONFIDENTIAL ROUGH DRAFT**

02:40:02  1   an advertiser could identify its audience of up to

2   20.  It could identify Geo location and then it

3   could identify interest or behaviors and as many as

4   possible but not restriction.  And then Facebook

02:40:20  5   would run and return -- would run the ad and return

6   metrics to the advertiser assuming they did not go

7   below the threshold, and provide information about

8   engagement, view, clicks, et cetera, right?

9      A.   Can we clarify --

02:40:40 10           MR. BENJAMIN:  Objection -- objection to

11   form.

12           THE DEPONENT:  At the top there when --

13   when you were reading through or -- or top of your

14   question, identify -- I think the first part you

02:40:51 15   said identify 20, what did you mean there.

16      Q.   (By Ms. Weaver)  So let's assume the --

17   in this first scenario it's a user list.

18      A.   So a custom audience.

19      Q.   Yes.

02:41:03 20      A.   Customer list I see.  So an advertiser

         21   could upload a customer list and they could use the

         22   other targeting options to create their ad --

         23   desired audience for their ad it did not drop below

         24   the threshold we would deliver that ad and we would

02:41:19 25   provide performance metrics but those performance

                                                             219


                    **CONFIDENTIAL ROUGH DRAFT**

02:41:23  1   metrics do not include who saw the ad.  Regardless

          2   of how big the audience is or isn't.  We don't

          3   provide who saw the ad to an advertiser.

          4      Q.   And in addition to user list there were

02:41:38  5   two other kinds of audience, right?

          6      A.   Within --

          7           MR. BENJAMIN:  Objection.  Form.

          8      Q.   (By Ms. Weaver)  There's website app

          9   custom audience and there's also engagement custom

02:41:51 10   audience, right?

         11      A.   There two other types of custom audience,

         12   yes.

         13      Q.   The same would apply for those kind of

         14   audience well, as the 20 cap, maybe 100 cap for

02:42:01 15   now.  Unlimited interest in behaviors can be

         16   targeting including Geo location, right?

```
          17        A.   Those don't have the same upload

          18   functionality as a customer list.  But they also

          19   have an audience minimum and to be clear the

02:42:16  20   audience minimum is of the total targeting option

          21   selected.

          22             So it could be website custom audience

          23   with a number of interests.  Or with no interests

          24   in either scenario, there is -- it has to be above

02:42:31  25   a minimum threshold in order to run the ad.
```

                                                            220


                        **CONFIDENTIAL ROUGH DRAFT**

```
02:42:35   1    Q.   What's the minimum threshold?

           2    A.   100.

           3    Q.   And it used to be 20?

           4    A.   Yes.

02:42:43   5    Q.   Until 2016 or 2018?

           6    A.   Correct.

           7    Q.   You said they don't have the same upload

           8   functionality.  What do you mean?

           9        A.   I meant for customer list the advertiser

02:42:57  10   is uploading a list of their existing customers,

          11   that's distinct from engagement custom audience or

          12   a website custom audience, they don't -- they are

          13   not based on a customer list that the advertiser
```

             14   provides.

02:43:18 15          Q.   Is a Facebook user ID a unique

             16   identifier?

             17          MR. BENJAMIN:  Objection to form.

             18          THE DEPONENT:  Yes, every user has their

             19   own unique UID.

02:43:35 20          Q.   (By Ms. Weaver)  And Facebook doesn't

             21   provide Facebook user IDs in -- in this process of

             22   targeting advertising through custom audiences,

             23   right?

             24          A.   We do not provide UIDs to advertisers.

02:43:49 25          Q.   Does Facebook take any steps to ensure

                                                                221


                       **CONFIDENTIAL ROUGH DRAFT**

02:43:51  1   that the advertiser who are identifying their

          2   target audience do not process Facebook user IDs?

          3          A.   Let me know if gets at what your question

          4   is asking.  When an advertiser uploads a customer

02:44:07  5   list, we hash their information so we don't actual

          6   knee know exactly what -- what the -- the

          7   identifier we are not learning anything through

          8   that upload.  And after we match it to users, we

          9   don't provide anything back to the advertiser about

02:44:24 10   those users, including and definitely not their

11   user ID.

12        Q.   Facebook is aware that data broker

13   already have Facebook user IDs, right?

14             MR. BENJAMIN:  Objection to form and

02:44:37 15   scope.

16             THE DEPONENT:  I can't speak to that I'm

17   not aware.

18        Q.   (By Ms. Weaver)  So --

19        A.   If my personally capacity I don't know.

02:44:45 20        Q.   So the representation here is that

21   Facebook is not providing any personally

22   identifiable information through the targeted

23   advertising process, right?

24             MR. BENJAMIN:  Objection to form.  Vague.

02:44:58 25             THE DEPONENT:  We don't provide

                                                          222


                    **CONFIDENTIAL ROUGH DRAFT**

02:44:59 1   advertisers information about the users who -- who

2   saw their ad and how to identify those users.

3        Q.   (By Ms. Weaver)  Okay.  Well, let's go

4   back to Exhibit 658 and turn to page 5.  I will

02:45:20 5   read into the record at Bates number -907 "we don't

6   share information with advertiser that personally

7   identifies individuals unless they given us

```
         8   permission."

         9           Do you see that?

02:45:34 10   A.   Yes.

        11   Q.   And -- and that's a core promise that

        12   Facebook has made to users from 2007 to the

        13   present, right?

        14   A.   Correct.

02:45:42 15   Q.   And what does it mean in your

        16   understanding to personally identify an individual?

        17   A.   To tell an advertiser who saw their ad.

        18   Q.   So to you it just would be saying Leslie

        19   weaver saw this ad and that would be compliant with

02:46:01 20   this policy?

        21           MR. BENJAMIN:  Objection to form.

        22           THE DEPONENT:  I am sorry I don't follow

        23   what you mean.

        24   Q.   (By Ms. Weaver)  You are saying it to

02:46:13 25   tell an advertiser who saw their ad would be
```

                                                      223


                          **CONFIDENTIAL ROUGH DRAFT**

```
02:46:18  1   providing personally identifiable information,

          2   right?

          3   A.   Yes, and we do not do that.

          4   Q.   And what do you mean when you say to tell
```

02:46:25  5  a user who saw an ad?

6      A.   I am sorry --

7      Q.   What do you mean to tell an advertiser

8  who saw their ad.

9      A.   We don't tell them individual user level

02:46:38 10  information about who saw -- about the users who

11  saw their ad.

12     Q.   But when the limit was 20 people you

13  would tell them that 20 people saw their ad and

14  they would have already targeted certain data

02:46:57 15  points like Geo location and other attributes,

16  correct?

17          MR. BENJAMIN:  Objection to form.

18  Misstates.

19          THE DEPONENT:  After they have created

02:47:07 20  their audience, they would know how many people saw

21  their ad.  But that would have to be again, in

22  order to deliver that audience it has to be above

23  the threshold.

24     Q.   (By Ms. Weaver)  Which was 20 people for

02:47:22 25  most of the class period, right?

224


                    **CONFIDENTIAL ROUGH DRAFT**

02:47:25  1          MR. BENJAMIN:  Objection to form.

2          THE DEPONENT:  Through the years, yes

3   until 2016 or 2018.

4          Q.   (By Ms. Weaver)  So a separate question,

02:47:35  5   I was asking is -- is Facebook aware that in fact

6   many third parties have data that associates user

7   Facebook's IDs with individuals?

8          MR. BENJAMIN:  Objection to form and

9   scope.

02:47:56 10          THE DEPONENT:  I don't know about whether

11   third parties have UIDs.

12          Q.   (By Ms. Weaver)  Is that a concern of the

13   Facebook's targeted advertising policy team?

14          MR. BENJAMIN:  Objection to form and

02:48:09 15   scope.

16          THE DEPONENT:  We don't provide UIDs

17   through our ad system and do -- we do -- we don't

18   provide it purposefully, so that it's not available

19   to an advertiser, that's what this statement

02:48:25 20   indicates.

21          So it would -- yes, but it's not

22   something we do and we purposely don't do it.

23          Q.   (By Ms. Weaver)  And why is that?

24          A.   If we provided a UID they would be able

02:48:42 25   to tie that back to an individual and we

225

**CONFIDENTIAL ROUGH DRAFT**

02:48:44  1  specifically state that we don't give information

         2  to advertisers about who saw the ad specifically

         3  about the individual who saw the ad.

         4      Q.   What steps did Facebook take to ensure

02:49:01  5  that third parties who are were conducting

         6  targeting advertising in groups of 20 did not

         7  possess Facebook user ID or a which to re-identify

         8  users?

         9          MR. BENJAMIN:  Objection to form.

02:49:22 10          THE DEPONENT:  I think we have to

        11  differentiate -- and I -- I might be missing the

        12  link here.  The possessing UID within our ad system

        13  we don't provide UIDs an advertisers has to a meet

        14  a minimum threshold in order to run the ad and the

02:49:39 15  metrics we provide performance metrics are

        16  aggregated.  So we don't tell them information

        17  about who saw the ad specifically and so there

        18  wouldn't be something to relate back to a UID

        19  whether they possess or not and they wouldn't gain

02:49:54 20  access to the UID through our ad delivery.

        21      Q.   (By Ms. Weaver)  I understand you are

        22  saying that Facebook did not directly provide

        23  Facebook users IDs.

24          Wasn't Facebook aware that during the

02:50:06 25  close period at multiple points, third parties who

226

**CONFIDENTIAL ROUGH DRAFT**

02:50:10  1  advertised on Facebook, had obtained Facebook's

2  user IDs?

3          MR. BENJAMIN:  Objection to form.  Asked

4  and answered.  Foundation.

02:50:21  5          THE DEPONENT:  I'm just not sure what --

6  one, I don't know the scenarios we are talking

7  about.  They are outside of the ads -- my expertise

8  on ads.

9          And I'm not certain the significance of

02:50:38 10  how the UID plays into what we provide from ads

11  where it is -- has to a meet a minimum threshold

12  and we only provide aggregated performance metrics.

13     Q.   (By Ms. Weaver)  So you sit here today

14  you are not aware that anybody outside of

02:50:59 15  Facebook's scraped or obtain Facebook user IDs; is

16  that true?

17          MR. BENJAMIN:  Objection to form.

18          THE DEPONENT:  I'm not an expert on all

19  of the scraping or nonscraping that's occurred at

02:51:14 20  Facebook that's.

21      Q.   (By Ms. Weaver)  I didn't ask that

22   whether you were an expert.

23          I asked whether you were aware under oath

24   as you sit here today, that third parties have

02:51:24 25   scraped Facebook user IDs off the platform and

227

**CONFIDENTIAL ROUGH DRAFT**

02:51:30  1   policy issues possess them?

2          MR. BENJAMIN:  Objection to form and

3   scope.

4          THE DEPONENT:  I could not identify from

02:51:39  5   my personal capacity examples of what you are

6   talking -- talking about in any form that I would

7   speak to or -- or I am aware of.

8      Q.   (By Ms. Weaver)  As you sit here today

9   you are saying you are unaware that users scraped

02:51:54 10   Facebook user IDs off the platform.  You are under

11   oath?

12          MR. BENJAMIN:  Objection to form

13   argumentative.  Asked and answered.  Beyond the

14   scope.

02:52:07 15          THE DEPONENT:  I'm truly -- I'm not able

16   to speak to and I don't know scenarios of user ID

17   scraping.

```
            18       Q.   (By Ms. Weaver)  And you are part of the

            19  privacy policy team for advertising, right?

02:52:22    20       A.   Yes.

            21       Q.   How many people are on that team?

            22       A.   For advertising specifically?

            23       Q.   Yes.

            24       A.   There -- I believe there are currently

02:52:37    25  ten of us.
```

                                                                228


                          **CONFIDENTIAL ROUGH DRAFT**

```
02:52:40    1        Q.   And who the lead on that team?

             2       A.   Andrew Howard.

             3       Q.   And to whom do you report?

             4       A.   Andrew Howard.

02:52:51     5       Q.   And you are not aware of any instances of

             6  third parties obtaining Facebook's user IDs; is

             7  that right?

             8            MR. BENJAMIN:  Objection to form.  Asked

             9  and answered and to scope.

02:53:06    10            THE DEPONENT:  I -- I do not cover

            11  scrapping.  It is -- and I don't know of instances

            12  that I could speak to here or in really any

            13  capacity about whether this -- whether there has

            14  been scraping of UID.
```

02:53:20 15     Q.  (By Ms. Weaver)  Is there anyone on the

16  policy team for advertising who is in charge of

17  ensuring that advertising is not permitted by users

18  who are in the possession of Facebook's user IDs?

19     A.  Again I'm -- I'm missing the connection

02:53:40 20  here between the possession of UIDs and whether

21  someone tiff advertises.

22     Q.  Okay.  Let's say Amazon has enough data

23  and information to be able to engineer or comes

24  into the possession of Facebook users IDs.  And

02:54:00 25  Amazon runs campaigns, millions of themselves with

229

**CONFIDENTIAL ROUGH DRAFT**

02:54:04 1  the -- with the bear minor 20 or 100 people to

2  learn information about users.

3     Does Facebook have any enforcement

4  mechanism to preventive versions who Facebook knows

02:54:17 5  or has reason to believe has Facebook user IDs from

6  running that kind of campaign?

7     MR. BENJAMIN:  Yeah.  Objection to form

8  and scope.

9     THE DEPONENT:  Our protections are that

02:54:36 10  we don't provide information to the advertiser when

11  they -- on the performance of their ad or who has

12  seen their ad for it to be identified able back to

13  a user ID.

14      Q.   (By Ms. Weaver)  Is that the only

02:54:49 15  protection that Facebook itself does not provide

16  it?

17      A.   In addition to the protections of our

18  audience minimum sizes and our policies in term

19  that disallow different use.

02:55:09 20      Q.   Yes.  The many protection that Facebook

21  engages in to ensure that third parties who are

22  conducting targeted advertising with the minimum

23  threshold for which much of the period was 20

24  people, was that Facebook itself did not provide

02:55:24 25  the Facebook user ID to the advertiser, correct?

                                                        230


                    **CONFIDENTIAL ROUGH DRAFT**

02:55:29 1      A.   No.

2          MR. BENJAMIN:  Objection -- yeah

3  objection to form.  Misstates.

4          THE DEPONENT:  No our audience minimums

02:55:36 5  are a form of protection our aggregated metric are

6  a form of protection.

7          Our policies and our -- and the terms

8  that advertisers have to agree with are a form of

             9   protection and, again, this is not where I'm an

02:55:50   10   expert in, but the efforts we go also on the

            11   scraping front and protection there, are additional

            12   areas that we ensure this doesn't happen.

            13       Q.   (By Ms. Weaver)  So the efforts to

            14   prevent future scrapping doesn't address paths

02:56:06   15   scrapping, correct?

            16            MR. BENJAMIN:  Objection to form and

            17   scope.  CHECK/CHECK.

            18            THE DEPONENT:  If someone has a UID

            19   our -- our preventing future scrapping does not

02:56:21   20   remove that UID from them.

            21       Q.   (By Ms. Weaver)  And when you talk about

            22   the terms you mean that the third parties promise

            23   that they will not -- well I don't know what you

            24   mean.  In terms of the terms what do you mean in

02:56:32   25   terms of the providing protection to users whose

                                                            231


                    **CONFIDENTIAL ROUGH DRAFT**

02:56:36    1   Facebook IDs have been taken by advertiser who

             2   Facebook then allows to advertisers on their

             3   platform in group as small as 20 for the majority

             4   of the class period?

02:56:50    5            MR. BENJAMIN:  Objection to form.

6          THE DEPONENT:  I think I have to clarify

7     a question here.  Is there an assumption that the

8     UID is specifically being used for the audience?

9          Q.   (By Ms. Weaver)  I -- I don't think

02:57:04 10   there's an assumption there.

11          A.   Again we have the audience size minimum

12    and we only -- only age gender metaethics this help

13    ensure that we do not provide identifiable

14    information about whose see an ad to the advertiser

02:57:29 15   regardless of any other information they have.

16          Q.   You referenced terms as also another

17    mechanism to prevent re-identification of users,

18    correct?

19          A.   Yes.

02:57:42 20        Q.   What terms are you referring to?

21          A.   Our customer list policies and our

22    advertising terms or advertising guidelines.

23          Q.   Are the -- those enforcement mechanisms

24    or are they just agreements?

02:58:04 25        A.   Those are agreements those set -- those

                                                 232


                    **CONFIDENTIAL ROUGH DRAFT**

02:58:06  1   are the policies for -- for running ads on our

2     platform.

3        Q.   Are you aware as a member of the

4   advertising policy team of ten people of Facebook

02:58:16   5   telling advertisers that they may not tiff on

6   Facebook because they have violated the terms that

7   you are referring to because they possess Facebook

8   user IDs?

9            MR. BENJAMIN:   Objection to form.

02:58:35  10            THE DEPONENT:   I'm not aware of an

11   advertiser breaking the policy here.   And -- and.

12        Q.   (By Ms. Weaver)  Are you aware of any --

13   any enforcement actions taken by Facebook to

14   determine if that had happened?

02:58:56  15            MR. BENJAMIN:   Objection.   Asked and

16   answered.

17            THE DEPONENT:   I'm not aware of -- of us

18   being -- of there being a case where this -- like

19   where an advertiser did this that we enforced on or

02:59:12  20   that we had to enforce on.   I had -- I'm not aware

21   of cases where there's been a violation.

22        Q.   (By Ms. Weaver)  What steps has Facebook

23   taken to prevent re-identification of users

24   targeted in advertising?

02:59:35  25            MR. BENJAMIN:   Objection to form.   Asked

233

**CONFIDENTIAL ROUGH DRAFT**

02:59:36  1   and answered.

2            THE DEPONENT:  We require an audience

3   minimum.  We only provide aggregated metrics to

4   identifiers and we don't tell them who specifically

02:59:48  5   saw their ad.

6            Q.  (By Ms. Weaver)  And is that the entirety

7   of the steps that Facebook has taken to prevent

8   re-identification of users targeted in Facebook's

9   advertising?

02:59:59  10            A.  Those are the foundation of how our

11   system is built to prevent exactly that.

12            Q.  Are there any other steps that Facebook

13   has taken to prevent re-identification of users

14   targeted in Facebook's advertising?

03:00:16  15            A.  We have built our system specifically to

16   prevent it.  I'm not aware of other steps we have

17   had to take.

18            Q.  Okay.  Thank you.

19            MS. WEAVER:  How long have we been going?

03:00:35  20            THE VIDEOGRAPHER:  Okay.  Let me --

21            MS. WEAVER:  Let's go off the record.

22            THE VIDEOGRAPHER:  Okay.  Thanks.  We are

23   off the record it's 3:00 o'clock p.m.

24            (Recess taken.)

03:16:44 25          THE VIDEOGRAPHER:  Okay.  We are back on

                                                                234


                     **CONFIDENTIAL ROUGH DRAFT**

03:16:45  1   the record it's 3:16 p.m.

          2       Q.   (By Ms. Weaver)  Ms. Leone I would like

          3   to direct your attention to what is being mark

          4   right now as exhibit?

03:17:15  5          THE COURT REPORTER:  660.

          6          MS. WEAVER:  660.

          7          (Exhibit 660 was marked for

          8   identification by the court reporter and is

          9   attached hereto.)

03:17:26 10          MS. WEAVER:  For the record Bates

         11   No. FB-CA-MDL-03969858 through -862.

         12          THE DEPONENT:  I ever it up.

         13       Q.   (By Ms. Weaver)  Great.  And what is

         14   Exhibit 670 [sic]?

03:17:50 15          MR. BENJAMIN:  660.

         16          MS. WEAVER:  Sorry.

         17          THE DEPONENT:  Exhibit 660 is a help

         18   center earlier published that we put in our help

         19   center for advertisers called used detail

03:18:06 20   targeting.

         21       Q.   (By Ms. Weaver)  And it's true an

22   accurate, right?

23        A.   I'm going to read through it.  One

24   second.

03:18:16 25       Q.   Okay.

                                                    235


                        **CONFIDENTIAL ROUGH DRAFT**

03:18:40 1        A.   Yes, I read through it and yes it's

2   accurate.

3        Q.   Okay.  And this document is a current

4   document; is that right as of June 7th, 2022?

03:18:58 5        A.   Sorry do you mean that this is currently

6   in our help center.

7        Q.   Yes.

8        A.   I believe so, yes.  Yes.

9        Q.   Okay.  And it says use detailed

03:19:10 10  targeting.

11             Do you see that?

12        A.   Yes.

13        Q.   And this is in the help center for

14   advertisers; is that right?

03:19:19 15       A.   It's in what we call the business help

16   center, which is meant for active audience but it's

17   open to anyone -- anyone can navigate to this.

18        Q.   So is this describing interest targeting

```
           19  in the detailed targeting that we described at the
03:19:41   20  outset of the lit, I mean?
           21       A.   Yes.
           22       Q.   Sorry.
           23       A.   Yes, this is -- this is describing how to
           24  use detailed targeting, which is the category
03:19:55   25  for -- for audiences to select their parameters,
```

236

**CONFIDENTIAL ROUGH DRAFT**

```
03:19:59    1  which includes interest.
            2       Q.   And so it says on the first page, that
            3  you select your audience preferences by location,
            4  age, gender and language and then by detailed
03:20:11    5  targeting, correct?
            6       A.   Yes.
            7       Q.   So are you required to identify age and,
            8  again, derivative and language as a preliminary
            9  threshold?
03:20:25   10       A.   All of our ads have to have a setting for
           11  those, but you can have broad setting so it's all
           12  captures all ranges so as an example we need to
           13  have an age range for that ad but that range range
           14  would be the full range rank of people of Facebook
03:20:42   15  so 13 to 65 plus.  Similar for gender.  We have to
```

16  have a setting for it but it could just be all.  So

17  it is -- it is something that is a toggle but

18  the -- it doesn't mean you have to have a specific

19  something -- something within those.

03:21:01 20      Q.   And -- and then what about language.

21           Do you have to select a language?

22      A.   No, similar it can be all.

23      Q.   Is more expensive if it's all?

24      A.   No, that wouldn't be -- it's not going to

03:21:23 25  be a one to one if you switch out to be more

                                        237


                    **CONFIDENTIAL ROUGH DRAFT**

03:21:27 1  expensive.

2      Q.   Right.

3      A.   I'm not sure what you mean, sorry.

4      Q.   That's -- that's not a good question.

03:21:33 5  What I mean how many people speak all languages

6  this is your target audience right?

7      A.   It -- it doesn't mean that someone has to

8  speak all languages.  It means that any language

9  and perhaps the actual option is called any.  It

03:21:46 10  means that the audience can be any language.

11      Q.   I see.  Okay.  And does Facebook find

12  that targeting by language allows inferences of

         13   ethnicity?

         14            MR. BENJAMIN:  Objection to form.

03:22:11 15            THE DEPONENT:  No.  Language is based on

         16   the -- the -- the settings people have like how

         17   they set up their Facebook and the language they

         18   have chosen.  That's not something that is -- it is

         19   not a method of -- of targeting ethics tee.

03:22:34 20      Q.   (By Ms. Weaver)  Now has Facebook found

         21   that people were in permissively tar get by gender

         22   for ethics tee using its advertising platform?

         23            MR. BENJAMIN:  Objection to form.  Vague.

         24            THE DEPONENT:  Sorry, can you walk

03:22:50 25   through what mean by imper missively.

                                                            238


                         **CONFIDENTIAL ROUGH DRAFT**

03:22:55  1      Q.   (By Ms. Weaver)  Illegally.

          2            MR. BENJAMIN:  Objection to form and

          3   calls for a legal conclusion.

          4            THE DEPONENT:  Yeah, I can speak to

03:23:10  5   something if was illegal.  I can -- I can share if

          6   there's an example that you have thinking of how

          7   those were misused.

          8      Q.   (By Ms. Weaver)  As sit here today are

          9   you aware of any such examples?

03:23:23 10          MR. BENJAMIN:  Objection to form.

11          THE DEPONENT:  Specifically for -- for I

12  am sorry you mentioned did you say for gender.

13          Q.   (By Ms. Weaver)  Uh-huh.

14          A.   No, not aware of a case where it was

03:23:40 15  misused.  But it's worth noting that we don't

16  permit again integer targeting for specific types

17  of ads to help specifically to prevent misuse.  We

18  limit that and advertiser who are running housing

19  employment and credit ads cannot use gender

03:23:57 20  targeting they must maintain at all they cannot

21  select specific genders that's to prevent for

22  misuse.

23          Q.   And how long has been the days?

24          A.   That's a policy we had in place since

03:24:08 25  2018.

                                                   239


                        **CONFIDENTIAL ROUGH DRAFT**

03:24:09  1     Q.   And was that a result of litigation?

2          MR. BENJAMIN:  Objection to form and to

3  the extent you can answer without disclosing

4  privileged information or communications you can do

03:24:24  5  so.

6          THE DEPONENT:  I -- I need a quick break?

7          MS. WEAVER:  Okay.

8          THE DEPONENT:  To discuss with Matt on AC

9   privacy expectations.

03:24:37 10          THE VIDEOGRAPHER:  Okay go off the record

11   everybody.

12          MS. WEAVER:  Yeah, that's fine.

13          MR. BENJAMIN:  That's fine individual

14   okay we are off the record it's 3:24 p.m.

03:24:51 15          (Recess taken.)

16          THE VIDEOGRAPHER:  We are back on the

17   record it's 3:34 p.m.

18     Q.   (By Ms. Weaver)  There was a question

19   pending when you we took to break to consult with

03:34:28 20   your counsel.

21          Can you answer the question now?

22     A.   Do you mind repeating it.

23     Q.   Sure.

24          I think the question was was that a

03:34:35 25   result of litigation?

                                                     240


              **CONFIDENTIAL ROUGH DRAFT**

03:34:38  1     A.   We were discussing the -- the midst for

2   age ore gender targeting or housing employment and

3   credit ads.  We always -- have -- have a

                    4   longstanding policy that disallows discrimination

03:34:52   5   including through our targeting tools in 2019 I

                    6   should correct my previous answer.  We launched

                    7   specifically the targeting limitations for those

                    8   ads and what we call -- the special ad categories.

                    9   For -- as part of a settlement with litigation.

03:35:11   10        Q.   And the settlement with whom?

                   11        A.   It -- I actually don't know all the

                   12   parties involved in that litigation.  So I might

                   13   need to -- to refresh on that.

                   14        Q.   And prior to that litigation and

03:35:27   15   settlement, Facebook did not have a policy that

                   16   disallowed discrimination through the use of

                   17   targeting tools?

                   18        A.   No, sorry.  To clarify we -- that's what

                   19   I was saying we had a longstanding policy on --

03:35:42   20   that disallows discrimination.  In 2019 as part of

                   21   our settlement with this litigation, we built the

                   22   special ad category that disallowed gender

                   23   selection among or housing employment and credit ad

                   24   reporting and that was from conversations concerned

03:35:59   25   about the potential for misuse of those.

                                                                        241


                              **CONFIDENTIAL ROUGH DRAFT**

03:36:02  1     Q.   And does that same tool also prevent

          2  targeting based on race, sexual orientation,

          3  disability and religion?

          4     A.   We don't provide those targeting options

03:36:16  5  at all to any advertiser.

          6     Q.   But was it a probably nonetheless that

          7  Facebook's targeted advertising involved

          8  discrimination against people in those categories?

          9          MR. BENJAMIN:  Objection.

03:36:31 10     Q.   (By Ms. Weaver)  At any point during the

         11  class period?

         12          MR. BENJAMIN:  I am sorry I thought your

         13  question was over.

         14          Objection to form.  Misstates?

03:36:40 15          THE DEPONENT:  We don't offer those

         16  targeting gassed on those.  And so it -- it wasn't

         17  relevant to the -- the -- how we built our special

         18  ad category, which -- which restricted targeting

         19  that we do offer.

03:36:56 20     Q.   (By Ms. Weaver)  So is it your testimony

         21  that at no point did Facebook's advertising give

         22  third party advertiser the ability to exclude

         23  ethnic and religion, minority immigrants LGBTQ and

         24  other protect groups from seeing their ads

03:37:16 25  CHECK/CHECK?

242

**CONFIDENTIAL ROUGH DRAFT**

03:37:18   1          MR. BENJAMIN:  Objection to form.

         2          THE DEPONENT:  We don't offer targeting

         3   based on -- I am sorry race or ethnicity or

         4   religious views and their -- therefore there wasn't

03:37:31   5   an able to exclude those.

         6      Q.   (By Ms. Weaver)  Okay.

         7      A.   Based on that.

         8          MS. WEAVER:  Let's look at Exhibit 661.

         9          (Exhibit 661 was marked for

03:37:39  10   identification by the court reporter and is

        11   attached hereto.)

        12          MS. WEAVER:  And for the record it's an

        13   announcement from the Washington state office of

        14   the attorney general the title AG Ferguson leads to

03:37:51  15   Facebook nationwide changes to prohibit

        16   discriminatory advertisements on its platform.

        17          It is dated July 24th, 2018 and the first

        18   paragraph "attorney Bob Ferguson announced that

        19   Facebook signed a legally finding agreement with

03:38:10  20   this office to make significant changes to its

        21   advertising platform by removing the ability of

        22   third party advertisers to exclude ethnic and

```
             23  religious Monday error tee immigrants, LBGQT

             24  individuals and other protected groups from seeing

03:38:26     25  their ads."
```

243


                    **CONFIDENTIAL ROUGH DRAFT**

```
03:38:26     1        Do you see that?

             2        THE DEPONENT:  I do.

             3        MR. BENJAMIN:  Sorry objection to form

             4   counsel would provide that was document 72 hours

03:38:35     5   before the deposition.

             6        MS. WEAVER:  I don't believe so.  It's in

             7   the public domain.

             8        MR. BENJAMIN:  So your position it didn't

             9   need to be identified 72 hours before.

03:38:43    10        MS. WEAVER:  Yes.

            11        Q.  (By Ms. Weaver)  Ms. Leone, do you see

            12   that first paragraph?

            13        A.  I do.

            14        Q.  That I just read into the rope?

03:39:02    15        A.  I do.

            16        Q.  Is it your testimony that that is untrue?

            17        A.  We did not provide the ability for

            18   advertisers to include or include on the basis of

            19   their ethnic religious, immigration status, so this
```

03:39:17 20  is -- this misrepresents the options that were

21  available.

22      Q.   I don't think it's making any

23  representation about the options that are

24  available.  What it is saying is that in fact

03:39:31 25  Facebook signed an agreement so that third party

244

**CONFIDENTIAL ROUGH DRAFT**

03:39:35 1  advertisers could not discriminate against those

2  parties, right that's true you are not disputing

3  that?

4          MR. BENJAMIN:  Objection to form.

03:39:44 5  Argumentative miss mischaracterizes.

6          THE DEPONENT:  We built a -- what is

7  called the special ad category with restricted

8  targeting options for housing employment and credit

9  ads.  It wasn't that the previous options in any --

03:40:04 10  like were enabling specifically targeting or

11  exclusion on these protected characteristics.

12  Because as an example we don't have people's race

13  or ethics fee.

14      Q.   (By Ms. Weaver)  Is it your testimony

03:40:17 15  today that there was not an ethnic after finite tee

16  targeting option at Facebook ever?

```
          17      A.   We had ethics after finite tee clusters

          18   those not based on race data or someone's race or

          19   ethics tee.

03:40:32  20      Q.   Okay.  Is it your testimony that in fact

          21   individuals in these protected categories were not

          22   discriminated against through advertising and

          23   Facebook's website?

          24           MR. BENJAMIN:  Objection to form.  Calls

03:40:48  25   for a legal conclusion and scope.
```

                                                            245


                           **CONFIDENTIAL ROUGH DRAFT**

```
03:40:52   1           THE DEPONENT:  We didn't identify misuse

           2   here and we wouldn't necessarily be able to

           3   identify a discriminator use as an example.  You

           4   could run one ad that specific targeting to women.

03:41:06   5   You would then run another ad for men and overall

           6   your campaign may or may not be problematic.

           7   Similar off of Facebook you could run an ad on

           8   Google for a specific group and Facebook for

           9   another.

03:41:20  10           It -- there wasn't a specific case

          11   here -- a -- a specific misuse that was being dealt

          12   with.  It was a potential that he then we corrected

          13   we built this special ad category functionality
```

          14  for.

03:41:40 15          Q.   (By Ms. Weaver)  How long did Facebook

          16  have targeted categories for ethnic affinities

          17  African American US, Asian American US Hispanic US

          18  all Hispanic US bilingual Hispanic US Spanish

          19  bilingual and Hispanic US document CHECK/CHECK?

03:42:00 20          MR. BENJAMIN:  Objection to form to form.

          21  Compound and scope.

          22          THE DEPONENT:  Those were categories we

          23  offered as targeting up until 2020.

          24          Q.   (By Ms. Weaver)  And when did they

03:42:17 25  commence?

                                                        246


                        **CONFIDENTIAL ROUGH DRAFT**

03:42:21  1          MR. BENJAMIN:  Same objection.

           2          THE DEPONENT:  I'm not sure of the exact

           3  year but between 2012 and 2014.

           4          Q.   (By Ms. Weaver)  And why did Facebook

03:42:42  5  discontinue it in 2020 of those categories?

           6          A.   We --

           7          MR. BENJAMIN:  Same objections.

           8          THE DEPONENT:  We consistently look at

           9  the targeting we offer and whether it's being used,

03:42:52 10  whether it -- it is still relevant if there's

```
           11   duplicative options and in 2020 we under went

           12   several updates across all of or targeting and

           13   those were deprecated as part of a simplification

           14   effort.

03:43:19   15        Q.   (By Ms. Weaver)  Are you aware of whether

           16   or not in 2018 Facebook agreed to take steps to

           17   prevent third party advertisers from excluding

           18   persons -- from receiving advertisements for

           19   employment, housing, credit insurance and places of

03:43:33   20   public accommodation to the extent it effected the

           21   citizens of Washington?

           22            MR. BENJAMIN:  Objection to form and

           23   scope.

           24            THE DEPONENT:  I am sorry I missed the

03:43:45   25   beginning of the question.  It was whether we took
```

247

**CONFIDENTIAL ROUGH DRAFT**

```
03:43:48    1   steps to prevent exclusion for these ads?

            2        Q.   (By Ms. Weaver)  Whether Facebook agreed

            3   in 2018 with the state of wash top to take

            4   exception to prevent third party advertisers from

03:44:00    5   receiving advertisement for employment housing

            6   credit insurance and places in public accommodation

            7   to the extent it discriminated against people under
```

            8   those protected categories who lived in the state

            9   of Washington?

03:44:15   10           MR. BENJAMIN:  Objection to form and

           11   scope.

           12           THE DEPONENT:  I'm not -- I think I

           13   misunderstanding the question because it has

           14   exclusion and seeing an ad.  But in -- in 2018, is

03:44:28   15   when we agreed to build the category -- the housing

           16   employment and credit restrictions the flow for

           17   those ads, that limits the targeting options that

           18   they have.

           19       Q.   (By Ms. Weaver)  So Facebook agreed to do

03:44:41   20   it in 2018 but it didn't happen until 2020; is that

           21   right?

           22       A.   No.

           23           MR. BENJAMIN:  Objection.

           24       Q.   (By Ms. Weaver)  Please clarify?

03:44:52   25       A.   In 2020, we deprecated specifically among

                                                               248


                        **CONFIDENTIAL ROUGH DRAFT**

03:44:57    1   other -- other targeting options for all

            2   advertisers the multi-culture after finite tee

            3   options.  Separately, we launched in 2019 the

            4   special ad create flow which -- which was the

03:45:14  5   restricted flow for housing employment and credit

6   advertisers.

7        Q.   What are?

8        A.   Those are distip.

9        Q.   What about in size?

03:45:24 10      A.   Insurance.

11       Q.   Was that --

12       A.    Insurance is not include with -- with

13   the -- with the note if -- if it is housing

14   insurance or related mortgage insurance those are

03:45:38 15  included.

16       Q.   Okay.  Just for the record, in 2019 --

17   when Facebook launched the special ad create flow

18   to restrict the flow, you are saying it was only

19   for housing employment and credit advertisers; is

03:45:54 20  that correct?

21       A.   Yes.

22       Q.   What about insurance or places of public

23   accommodation?

24            MR. BENJAMIN:  Objection to form.

03:46:06 25      Q.   (By Ms. Weaver)  Could I just finish the

                                                     249


                    **CONFIDENTIAL ROUGH DRAFT**

03:46:07  1  question?

2          MR. BENJAMIN:  I and sorry I thought you

3    were done.

4          MS. WEAVER:  That's fine.

03:46:11  5    Q.   (By Ms. Weaver)  So what about insurance

6    or places of public accommodation, did Facebook

7    restrict the flow for -- for advertisement relating

8    to that as well in 2019?

9          MR. BENJAMIN:  Objection to form and

03:46:24 10   scope.

11          THE DEPONENT:  No.

12    Q.   (By Ms. Weaver)  Did Facebook for the

13    flow that Facebook created did it only apply to the

14    citizens of Washington did it apply to all citizens

03:46:38 15   in the United States?

16          A.   It applies to all ads bought by an

17    advertiser based in the US where -- and any ad

18    where the audience includes the US as well as now

19    we have launched it in Canada and Europe.

03:47:01 20    Q.   And with regard to the ethnic after

21    finite tee group deprecation, can you identify

22    which ethnic affinity group deprecations you are

23    reappearing to, which groups?

24          MR. BENJAMIN:  Objection to form.

03:47:17 25          THE DEPONENT:  The -- the names of the

250

**CONFIDENTIAL ROUGH DRAFT**

03:47:19  1  targeting options?

2      Q.   (By Ms. Weaver)  Yes.

3      A.   We deprecated African American US these

4  are multicultural affinity options that were

03:47:34  5  labeled and what -- that I'm listing.  African

6  American, Hispanic bilingual Hispanic Spanish

7  Hispanic English an Asian American.

8      Q.   Anything else.

9      A.   No unless I'm missing one I believe they

03:48:01 10  were five.  We deprecated all of multi-culture

11  affinities in 2022.

12      Q.   Did Facebook perform an economic analysis

13  of the impact of deprecating those affinity groups

14  as targets?

03:48:15 15          MR. BENJAMIN:  Objection to form and

16  scope.

17          THE DEPONENT:  Similar to to earlier

18  there isn't a -- an economic or revenue analysis

19  associated with individual targeting options.

03:48:33 20      Q.   (By Ms. Weaver)  I understand that I'm

21  just saying it's a pretty big deprecation to

22  deprecate these kind of targeting group there no

23  certainly analysis at Facebook of how it might

```
         24  effect revenue to deprecate those products; is that
03:48:47 25  what you are saying?
```

                                                         251


                         **CONFIDENTIAL ROUGH DRAFT**

```
03:48:49  1           MR. BENJAMIN:  Objection to form and
          2  scope.
          3           THE DEPONENT:  We don't measure --
          4  measure by a -- by targeting option basis and so
03:48:57  5  it's -- it's not how we assess a targeting option
          6  or revenue.
          7      Q.  (By Ms. Weaver)  Okay.  How about a cost
          8  benefit analysis.  Are you aware -- are you aware
          9  of external analysis at Facebook whether it good
03:49:13 10  idea or not to deprecate multicultural affinity and
         11  the Ime impact it might have on Facebook?
         12           MR. BENJAMIN:  Objection to form and
         13  scope.
         14           THE DEPONENT:  In -- making -- in
03:49:25 15  assessing whether to -- to maintain or remove
         16  those, we look at their use.  We look rat an
         17  understanding of who -- beneficial uses of those.
         18  As an example and so that was definitely part of
         19  the consideration.  But it is not in the form of a
03:49:45 20  revenue number.
```

```
         21      Q.   (By Ms. Weaver)  Okay.  So there were

         22   internal analyses that were considering whether or

         23   not to deprecate the multi multicultural affinity

         24   groups; is that right?

03:50:00 25           MR. BENJAMIN:  Objection to form
```

                                                        252


                      **CONFIDENTIAL ROUGH DRAFT**

```
03:50:01  1   misstates and scope.

          2           THE DEPONENT:  It was an internal

          3   conversation from the ads product team their policy

          4   and legal counterparts on -- on those options the

03:50:13  5   same way that we would have discussed any other

          6   option in fact the deprecation that they were part

          7   of was a broader deprecation.

          8      Q.   (By Ms. Weaver)  What was the broader

          9   deprecation that they were part of?

03:50:25 10      A.   We simplified our targeting options in

         11   August 2020 it included removing duplicative

         12   options.  Options that were unclear that

         13   advertisers didn't understand and this was part of

         14   that effort.

03:50:40 15      Q.   Who the ads product team was involved in

         16   the internal discussions regarding whether or not

         17   to deprecate the multicultural affinity groups?
```

18     A.   Our ad targeting team was involved.  Ads

19   leadership was involved.

03:50:56 20     Q.   And who by name?

21     A.   I'm -- sorry I'm trying to remember

22   specifically who was the ads lead at the time.

23   This would have been within ads product Dan Levy

24   was likely involved but I can't remember who else

03:51:45 25   on his team.

                                                          253


                        **CONFIDENTIAL ROUGH DRAFT**

03:51:47  1     Q.   And did violate Facebook's policy for

2   multicultural affinity group targeting to

3   discriminate against people who were put in those

4   target groups with respect to advertising involving

03:52:05  5   housing and employment, for example?

6               MR. BENJAMIN:  Objection to form.

7               THE DEPONENT:  So we disallowed

8   discriminatory use of our tools regardless of any

9   specific option that's -- that's not something we

03:52:24 10   permit.

11               In -- in 2018, we disallowed the use of

12   those multicultural affinity targets -- options

13   with housing employment and credit ads and in 2019

14   we created a specific flow so that they couldn't be

03:52:40 15   selected with those ads at all.

16        Q.   (By Ms. Weaver)  And I'm just trying to

17   say, so in Facebook's view, was that an abuse of

18   Facebook's advertising platform for advertisers to

19   engage in programs that discriminated against

03:52:57 20   person's in those policy enforcement protected

21   categories from receiving advertisement for

22   employment, housing and credit?

23             MR. BENJAMIN:  Objection to form.

24             THE DEPONENT:  Discriminatory uses

03:53:13 25   against our policies.  The use of these segments

                                                254


                    **CONFIDENTIAL ROUGH DRAFT**

03:53:15 1   was not discriminatory that wasn't our conclusion

2   or estimate.  As part of efforts to pro vent

3   misuse, we disallowed them being use with housing

4   an employment and credit ads and, again, to clarify

03:53:29 5   those segments are not representative or -- those

6   are not based on our representative of people's

7   race or ethnicity.

8        Q.   (By Ms. Weaver)  What are the data inputs

9   to determine multicultural affinity groups that was

03:53:45 10   the targeting categories that Facebook created?

11        A.   Those are based on info people have

12  provided us as well as their activity on Facebook.

13      Q.   And what specific activity caused

14  Facebook to put somebody in one of these

03:54:04 15  multicultural affinity groups?

16      A.   People's engagement with pages

17  co-associate them with one of these.

18      Q.   Can you give me a specific example of a

19  kind of engagement that would put a person in an

03:54:17 20  African American affinity group?

21      A.   If you engage with a page -- a cultural

22  page related to African American culture and like

23  that page you follow this could be a group you

24  could be in this target option.

03:54:33 25      Q.   What is a cultural page related to

255


            **CONFIDENTIAL ROUGH DRAFT**

03:54:36  1  African American culture?

2          MR. BENJAMIN:  Objection to form.

3          THE DEPONENT:  I don't know the exact

4  list of pages.  But an example could be black lives

03:54:47  5  matter.

6      Q.   (By Ms. Weaver)  This was of course

7  before BLM, right?

8          MR. BENJAMIN:  Objection to form.

          9        Q.   Can you give me an example of cultural

03:55:01 10   page related to African American culture that was

         11   actually used to determine whether or not somebody

         12   was in an African American affinity group?

         13        A.   I think --

         14             MR. BENJAMIN:  Objection to form and --

03:55:14 15   and scope.

         16             THE DEPONENT:  I don't have the list of

         17   pages specifically that were used that wasn't an

         18   illustrative example.  I can think of another one

         19   if that's useful.  But it's meant to -- to indicate

03:55:30 20   the type of page and you -- there's similar ones

         21   for Hispanic culture you could look cuisine pages

         22   to Hispanic cuisine would have been used as well.

         23        Q.   What does Hispanic mean in this context

         24   of Facebook's multicultural affinity group?

03:55:55 25             MR. BENJAMIN:  Objection to form and

                                                           256


                    **CONFIDENTIAL ROUGH DRAFT**

03:55:55  1   scope.

          2             THE DEPONENT:  It's simply the -- the how

          3   the naming of the page or -- of the common topics

          4   that people were engaging with.

03:56:08  5        Q.   (By Ms. Weaver)  In Facebook's view what

              6    is Hispanic mean when it created this multicultural

              7    affinity group?

              8              MR. BENJAMIN:  Objection to form and

              9    scope.

03:56:19     10              THE DEPONENT:  I don't think that we have

             11    a -- a Facebook definition of Hispanic.  This was

             12    meant to indicate that these are -- this targeting

             13    option was meant to indicate that people have

             14    engaged with Hispanic on Facebook so that would be

03:56:36     15    API cultural page there would be language in span

             16    addition there are -- are a number of reasons and

             17    ways that someone can be part of this based on the

             18    info they provided and the activity on their

             19    platform.

03:56:49     20       Q.   (By Ms. Weaver)  What does Hispanic

             21    culture mean in Facebook's view?

             22              MR. BENJAMIN:  Objection.  Asked and

             23    answered and scope.

             24              THE DEPONENT:  Again we don't have define

03:57:04     25    Hispanic culture I don't think we have a specific

                                                              257


                         **CONFIDENTIAL ROUGH DRAFT**

03:57:06   1    definition for that.

            2        Q.   (By Ms. Weaver)  You must have some

            3   definition because based on specific kinds of

            4   activity you decided that people were in and

03:57:17    5   Hispanic multicultural group so I guess I'm just

            6   wondering what the parameters were that Facebook

            7   used to decide that something was and Hispanic

            8   activity?

            9          MR. BENJAMIN:  Objection to form and

03:57:30   10   scope.

           11          THE DEPONENT:  To -- we weren't defining

           12   if somebody is a Hispanic activity.  We were

           13   looking at the -- the topics people engage with and

           14   if those topics relate to Hispanic culture so that

03:57:46   15   could be things like speaking Spanish.  It could be

           16   like Hispanic cuisine it could be Spanish speaking

           17   telenovelas.  These are things that also the pages

           18   themselves identify as part of this culture.  And

           19   the people who engage with them were then included

03:58:04   20   in this targeting option.

           21       Q.   (By Ms. Weaver)  Does Facebook have a

           22   list of the activities that it seemed sufficient to

           23   trigger inclusion in each of these ethnic

           24   multicultural affinity groups?

03:58:19   25          MR. BENJAMIN:  Objection.

                                                            258

**CONFIDENTIAL ROUGH DRAFT**

03:58:19   1             THE DEPONENT:  Facebook.

           2        Q.   (By Mr. Benjamin)  Objection to form?

           3             THE DEPONENT:  One action is not going to

           4   trigger anyone to be part of really any -- of the

03:58:31   5   interest or -- or multi-culture affinity options.

           6   This is about repeated continuous engagement.  So

           7   if someone activity over time showed that they were

           8   interested in these topics.

           9        Q.   (By Mr. Benjamin)  Okay.  You just

03:58:46  10   testified "we were looking at the topics people

          11   engage with and if those topics relate to Hispanic

          12   culture."

          13             Do you recall that?

          14        A.   Yes.

03:58:56  15        Q.   Does Facebook have a list of those topics

          16   that Facebook teamed related to Hispanic culture

          17   that were used then communication tally or

          18   individually to determine that somebody was a

          19   multicultural affinity group?

03:59:13  20             MR. BENJAMIN:  Objection to form and

          21   scope.

          22             THE DEPONENT:  This might just be the

          23   wording here, but it is when pages are -- as an

          24   example when pages are about specific topics, they

03:59:25 25  can -- those would relate to Hispanic culture and

                                                     259


                        **CONFIDENTIAL ROUGH DRAFT**

03:59:29  1  if people consistently engage they would then be

          2  part of this segment.

          3       Q.   (By Ms. Weaver)  I many adjust trying to

          4  hundred a list of description of which pages and

03:59:43  5  topics Facebook decided were triggers to include

          6  specific people and in multicultural affinity

          7  groups?

          8            MR. BENJAMIN:  Objection to form and

          9  scope.

04:00:02 10            THE DEPONENT:  It's pages that relate to

         11  this, so that could be based on a pages description

         12  saying they are related to his Hispanic culture as

         13  an example.

         14       Q.   (By Ms. Weaver)  Okay.  So does Facebook

04:00:14 15  have a list as an example, of just the pages that

         16  Facebook deemed related to multicultural affinity

         17  of the categories that were deprecated in 2020?

         18       A.   Those categories were deprecated in 2020

         19  and I believe we don't maintain that once a

04:00:34 20  category is deprecated.

         21       Q.   Are you aware and you are not aware

22  whether or not there was a litigation hold or

23  requirement as a result of litigation that Facebook

24  Maine taken those categories?

04:00:52 25          MR. BENJAMIN:  Objection.  Sorry

                                                    260

                    **CONFIDENTIAL ROUGH DRAFT**

04:00:53  1  objection to form and scope and to the extent it

        2  calls for legal analysis or conclusion.

        3          Also caution Ms. Leone to carve out of

        4  your answer, any privileged information or

04:01:05  5  communications.

        6          THE DEPONENT:  I'm not certain on -- if

        7  it was under a legal hold or not and I'm also not

        8  certain if we have it or not given that these were

        9  deprecated.

04:01:17 10      Q.  (By Ms. Weaver)  So is it your

       11  understanding that if Facebook determines a product

       12  Facebook doesn't maintain any information relating

       13  to that deprecated product?

       14          MR. BENJAMIN:  Objection to form.

04:01:29 15  Misstates and scope.

       16          THE DEPONENT:  No, that's not my

       17  understanding.  But when we deprecate a product we

       18  are not maintaining or it is not continuously

19  associating and that's what I meant.  It's not

04:01:46 20  continuously looking for pages that might be

21  related to that topic.  It's shut down.

22      Q.   (By Ms. Weaver)  So your testimony was

23  "those categories were deprecated in 2020 and I

24  believe we don't maintain that once a category is

04:02:09 25  deprecated."

261

**CONFIDENTIAL ROUGH DRAFT**

04:02:11 1          Do you recall that?

2      A.   Yes.

3      Q.   And when you say "we don't maintain that"

4  what did you mean?

04:02:19 5      A.   I mean what I was just describing.  Which

6  is that we are not continuously associating

7  engagement into those categories and I don't know

8  to whichever degree under legal hold or otherwise

9  what we maintain historically.

04:02:40 10      Q.   Now it's your testimony that Facebook has

11  not taken steps to prevent third party advertisers

12  from excluding people from receiving advertisements

13  for insurance or places of public accommodation; is

14  that right, based on these protected check the

04:03:02 15  Ethan Beard technical project disable group; is

16   that right?

17          MR. BENJAMIN:  Objection to form.

18   Misstates and compound.

19          THE DEPONENT:  Yeah, there are few parts.

04:03:12 20   We don't have targeting options related to

21   protected people's race or ethnicity as a part

22   starting point.  That's not what multicultural

23   affinities were.  House -- the -- any ad has to

24   abide by our nondiscrimination policy.  And we

04:03:30 25   don't -- including an insurance ad regardless of

                                            262


                      **CONFIDENTIAL ROUGH DRAFT**

04:03:38 1   the -- whether or not their AG their housing

2   employment or credit.

3       Q.   (By Ms. Weaver)  Okay.  Why don't we take

4   a look at Exhibit 662.

04:03:52 5          (Exhibit 662 was marked for

6   identification by the court reporter and is

7   attached hereto.)

8          MR. BENJAMIN:  And counsel was this is a

9   document that was provided to us.

04:04:12 10          MS. WEAVER:  No it's public.

11          MR. BENJAMIN:  72 hours.

12          MR. BENJAMIN:  Okay.  And what paragraph

13   of the Special Master protocol are you relying on

14   for that exception.

04:04:20 15        MS. WEAVER:  You have colloquy off the

16   record if you would like?

17        MR. BENJAMIN:  Special Master however you

18   prefer happy to discuss outside the presence of the

19   witness.

04:04:30 20        SPECIAL MASTER GARRIE:  I ask the witness

21   to -- yeah go to break out room we'll stay on the

22   record.  What's issues counsel Ben.

23        MR. BENJAMIN:  I just want to clarify

24   Special Master the Counsel Weaver's basis for not

04:04:57 25   having provided the documents under the spellings

                                                    263


                    **CONFIDENTIAL ROUGH DRAFT**

04:05:01  1   master protocol 72 hours in advance.

2        SPECIAL MASTER GARRIE:  It's public

3   available document.

4        MS. WEAVER:  Yes.

04:05:09  5        SPECIAL MASTER GARRIE:  And I believe

6   that -- well Counsel Weaver would care to explain.

7        MS. WEAVER:  Yeah, if we had provide

8   Facebook every public Facebook it would be reams we

9   have talked about the topic.  Facebook itself

04:05:22 10   identified a ton of policies talking about how

11   people may or may not target people based on gender

12   or age.  So you know from my perspective, we

13   outstanding perfectly entitled to discuss with

14   Facebook particularly given the assertions of this

04:05:41 15   don't in this deposition, that this kind of

16   targeting did not occur, these are also coming in

17   as impeachment.

18            So look, I can do two ways you can say

19   you don't have discussion these documents right

04:05:52 20   now.  And then I will file a new notice because

21   it's relevant it's obviously data misuse.  And

22   relevant to the case.  And we can call the witness

23   back at another time and do this kind of

24   questioning.  We were not trying to pull a fast

04:06:08 25   one.  It didn't occur that we had to provide to

                                                      264


                        **CONFIDENTIAL ROUGH DRAFT**

04:06:11 1   Facebook, you know, Exhibit 662 is -- is a

2   assurance of discontinuance signed by Facebook so.

3            MR. BENJAMIN:  And I all I really all

4   wanted to just to clarify the basis for using and

04:06:26 5   document as exhibit in the deposition.

6            MS. WEAVER:  Okay.

```
          7              MR. BENJAMIN:  I am happy.

          8              SPECIAL MASTER GARRIE:  I think -- so

          9    Counsel Benjamin from impeachment purposes and

04:06:35 10    there's your explanation.

         11              MR. BENJAMIN:  Yeah, I am not sure agree

         12    with characterization Special Master I'm happy to.

         13              SPECIAL MASTER GARRIE:  I'm not -- I'm

         14    not -- let's be clear my restatement isn't a

04:06:45 15    representation that I agree or disagree that is

         16    represent representation -- that is what plaintiffs

         17    stated.

         18              MR. BENJAMIN:  Understood and happy to

         19    let questioning on the document proceed on that

04:06:56 20    basis.  Thank you for clarifying.

         21              SPECIAL MASTER GARRIE:  Okay.  So with

         22    that said should we call the witness back.

         23              MS. WEAVER:  Yes.

         24              MR. BENJAMIN:  Yes.

04:07:08 25              MS. WEAVER:  Yes.
```

                                                      265


                      **CONFIDENTIAL ROUGH DRAFT**

```
04:07:09  1              MR. BENJAMIN:  I will grab her.

          2              SPECIAL MASTER GARRIE:  Thank you.

          3              John did Counsel Benjamin say we were
```

```
         4   taking a break or is getting the witness?
04:09:26 5              THE VIDEOGRAPHER:  They were just going
         6   to get the witness so we are still on the record.
         7              SPECIAL MASTER GARRIE:  Okay.
         8              MS. WEAVER:  Can we go off the record if
         9   we are just sitting here in silence.
04:10:06 10             SPECIAL MASTER GARRIE:  Well I didn't
         11  think we would be sitting here in silence, so I
         12  agree.
         13             MS. WEAVER:  Thank you.
         14             SPECIAL MASTER GARRIE:  Let's go off the
04:10:13 15  record.
         16             THE VIDEOGRAPHER:  Okay we are off the
         17  record it's 4:10 p.m.
         18             (Recess taken.)
         19             THE VIDEOGRAPHER:  Okay.  We are back on
04:12:05 20  record it's 4:12 p.m.
         21      Q.   (By Ms. Weaver)  Ms. Leone have you had a
         22  moment to look at Exhibit 662?
         23      A.   I started to read through I happy's read
         24  through but yes, I have.
04:12:19 25      Q.   Take your time and while you are reading
```

266

**CONFIDENTIAL ROUGH DRAFT**

04:12:20  1   through it?

         2             MS. WEAVER:  Just for the record, exhibit

         3   says state of Washington king county superior in re

         4   Facebook assurance of discontinuation it's dated

04:12:32  5   July 24th, 2018.

         6        Q.   (By Ms. Weaver)  And I will direct your

         7   attention to paragraph 3.2?

         8        A.   I'm there and I have read through most of

         9   3.2.

04:13:19 10        Q.   Okay.  But let me ask first were aware of

        11   this notice of discontinuance?

        12        A.   Yes.

        13        Q.   And -- and how did you become a we have

        14   of it?

04:13:31 15        A.   I was on -- I was part of the team on

        16   ads -- on ads at the time.

        17        Q.   And so were you involved in taking steps

        18   to prevent third party advertisers from excluding

        19   persons that were the subject of a lawsuit from

04:13:52 20   discrimination or from receiving advertisement

        21   based on protected characteristics?

        22             MR. BENJAMIN:  Objection to form and

        23   scope.

        24             THE DEPONENT:  I was involved in updates

04:14:06 25   to our platform to be clear, this is -- that was

267

**CONFIDENTIAL ROUGH DRAFT**

04:14:09  1  distinct from -- that -- that -- these targeted

2  operations weren't discriminatory but I was

3  involved in updating our targeting options.

4      Q.   (By Ms. Weaver)  Okay.  Look at paragraph

04:14:21  5  3.2 although Facebook denies these allegations

6  Facebook agrees to take the following steps

7  intended to prevent third party advertisers from

8  excluding person's from receiving advertisement for

9  employment, housing, credit, insurance, and/or

04:14:38 10  places of public accommodation based on the

11  protected characteristics to the extent they effect

12  citizens of Washington.

13          Do you see that?

14      A.   Yes.

04:14:50 15      Q.   And you testified that Facebook has taken

16  steps to preventives from excluding persons from

17  employment, housing and credit but not insurance or

18  places of public accommodation; is that true?

19          MR. BENJAMIN:  Objection to form.

04:15:07 20  Misstates the testimony and scope.

21          THE DEPONENT:  There -- two separate --

22  we launched the updates to housing employment and

```
          23  credit ad reporting which restricted the targeting

          24  they -- they could use when running an ad in 2018

04:15:23  25  we updated to remove the exclusion capability for
```

                                                          268

                        **CONFIDENTIAL ROUGH DRAFT**

```
04:15:27   1  all ads related -- related to the multicultural

           2  affinity segments and other interests and across

           3  the board prior to that our policy has always

           4  been -- nondiscrimination policy has always been in

04:15:42   5  place.

           6      Q.   (By Ms. Weaver)  So there was a policy

           7  that said you could not discriminate but prior to

           8  that time advertisers could exclude people based on

           9  the protected characteristics identified in 662,

04:15:56  10  right?

          11      A.   No.  Because our targeting options don't

          12  represent those protected characteristic.

          13      Q.   Did Facebook have a targeting category

          14  for wheelchair use users?

04:16:16  15      A.   There was.

          16           MR. BENJAMIN:  Objection -- objection to

          17  form.

          18           THE DEPONENT:  There was an interest

          19  called wheelchair users it was not based on whether
```

04:16:24 20    or not someone uses a wheelchair.

21         Q.   (By Ms. Weaver)  Was there a targeting

22    characteristics for Chinese people?

23              MR. BENJAMIN:  Objection to form.

24              THE DEPONENT:  There might have been an

04:16:38 25    interest called Chinese people but, again, it was

                                                        269


                         **CONFIDENTIAL ROUGH DRAFT**

04:16:40  1    not based on whether or not someone has Chinese.

2         Q.   (By Ms. Weaver)  Was there a targeting

3    characteristics for Chinese literature and

4    disability rights?

04:16:55  5              MR. BENJAMIN:  Same objection.

6              THE DEPONENT:  Yes, both of those seem

7    like they would have been interest as well.

8         Q.   (By Ms. Weaver)  Do you recall any other

9    targeting characteristics that were addressed in

04:17:04 10    this lawsuit related to the multicultural affinity

11    groups?

12              MR. BENJAMIN:  Objection to form and

13    scope.

14              THE DEPONENT:  These aren't targeting

04:17:15 15    characteristics just to be clear these list

16    targeting options is that.

```
          17      Q.   (By Ms. Weaver)  That's fine I will

          18   restate the question.

          19      A.   There -- I can think of.

04:17:27  20      Q.   Let --

          21      A.   Sorry.

          22      Q.   Let me ask the question.

          23           Are you aware as you sit here today of

          24   any other targeting options that related to the

04:17:34  25   multicultural affinity groups that were involved in
```

                                                      270


                       **CONFIDENTIAL ROUGH DRAFT**

```
04:17:37   1   the subject matter of this lawsuit?

           2      A.   So these are --

           3           MR. BENJAMIN:  Objection.  Sorry Bella.

           4           Objection to form and scope.

04:17:48   5           THE DEPONENT:  These are distinct.  These

           6   are interests they were also removed from

           7   exclusion.  Multicultural affinity targeting

           8   options are -- they their own set of options those

           9   were also we moved from exclusion more than just

04:18:01  10   these two were removed from exclusion.

          11      Q.   (By Ms. Weaver)  So can you identify any

          12   others that were removed from exclusion?

          13           MR. BENJAMIN:  Objection to scope.
```

             14          THE DEPONENT:  I -- I don't know that I

04:18:19 15  can think of an example just off the cuff of an

             16  interest we removed from exclusion at the time.

             17      Q.   (By Ms. Weaver)  Can Facebook create a

             18  list of the exclusions that were ceased as a result

             19  of this litigation?

04:18:51 20      A.   My understanding is that we could.

             21      Q.   And how would you do that?

             22      A.   I think we have maintained the one -- or

             23  maintained the a list of what we updated because

             24  some of these may still be available for inclusion

04:19:09 25  and so we would -- we would know which ones those

                                                            271


                       **CONFIDENTIAL ROUGH DRAFT**

04:19:12  1  are.

             2      Q.   Other than this instance, are you aware

             3  of other deprecated targeting options that have

             4  occurred from 2007 to the present and let's exclude

04:19:30  5  partner categories as well for now.

             6      A.   Yes, we -- we have iterates what the

             7  targeting options numerous times over the years,

             8  but adding and removing targeting options.

             9      Q.   On how many occasions?

04:19:49 10          MR. BENJAMIN:  Objection to form.  Vague.

```
        11              THE DEPONENT:  Our review and update is

        12      pretty continuous.  I don't think that there's like

        13      a -- a finite number of occasions where that's

        14      happened.

04:20:00 15          Q.   (By Ms. Weaver)  On how many occasions

        16      has Facebook deprecated targeting options as a

        17      result of litigation or regulatory investigation?

        18              MR. BENJAMIN:  Objection to form.

        19              And I would caution the witness not to

04:20:19 20      disclose privileged information in her response.

        21              THE DEPONENT:  I -- I don't think I can

        22      share an exact number.

        23          Q.   (By Ms. Weaver)  Is it more than 20?

        24          A.   Occasions?

04:20:34 25          Q.   Yes?
```

                                                              272


                         **CONFIDENTIAL ROUGH DRAFT**

```
04:20:35  1              MR. BENJAMIN:  Same objections and

         2      caution.

         3              THE DEPONENT:  I don't think I can share

         4      a response.

04:20:41  5          Q.   (By Ms. Weaver)  When you say you don't

         6      think you can share, is that because you don't know

         7      or because you think it's privileged?
```

                8       A.   More the latter.

                9            MS. WEAVER:  I just need some clarity

04:20:52 10   here counsel.  Are you asserting a privilege over

               11   the number of times that Facebook has deprecated

               12   targeting options following litigation?

               13            MR. BENJAMIN:  May I ask the witness

               14   would helpful to confer about privilege.

04:21:09 15            MS. WEAVER:  That's fine.

               16            THE DEPONENT:  That sounds good.  Sorry

               17   thank you.

               18            SPECIAL MASTER GARRIE:  Let's go off the

               19   record.

04:21:16 20            THE VIDEOGRAPHER:  Okay we are off the

               21   record it's 4:21 p.m.

               22            (Recess taken.)

               23            THE VIDEOGRAPHER:  We are back on the

               24   record it's 4:32 p.m.

04:32:10 25            MS. WEAVER:  Before we broke the pending

                                                              273


                         **CONFIDENTIAL ROUGH DRAFT**

04:32:12  1   question on how many occasions has Facebook

                2   deprecated targeting options as a result of

                3   litigation or regulatory investigation.

                4            MR. BENJAMIN:  And object to form and

04:32:22  5  scope.

          6          You can answer.

          7          THE DEPONENT:  I'm aware of two times

          8  that we've updated targeting options as a result of

          9  settlement that we came to in litigation.

04:32:35 10      Q.   (By Ms. Weaver)  And what are those two

         11  times?

         12      A.   Once is the -- the NAFTA&& settlement in

         13  2019 where re limited the targeting options for

         14  housing employment and credit ads and the -- this

04:32:48 15  other time is this one from Washington state where

         16  we moved the capability of exclusion for targeting

         17  options or several targeting options.

         18      Q.   And a later point in time Facebook

         19  removed the exclusion targeting option altogether;

04:33:03 20  is that right?

         21      A.   No.  Sorry.  We -- we you can exclude

         22  some types of targeting.  That was not a change we

         23  made.  I'm not sure if that was something I -- I

         24  confused on before.  Let me know if I can clarify.

04:33:19 25      Q.   Okay.  So for example, today, is it okay

                                                            274


                      **CONFIDENTIAL ROUGH DRAFT**

04:33:24  1  on Facebook for advertisers to exclude people with

          2   veteran or military -- military status?

          3         MR. BENJAMIN:  Objection to form and

          4   scope.

04:33:39  5         THE DEPONENT:  We don't have someone's

          6   military status.  But there that related targeting

          7   options like an interest in -- in a veteran topic

          8   would not be available for exclusion after the

          9   updates that we made in 2018.

04:33:59 10         Q.  (By Ms. Weaver)  And so prior to 2018,

         11   advertisers could exclude from related targeting

         12   options users with veteran or military status; is

         13   that right?

         14         MR. BENJAMIN:  Objection to form

04:34:23 15   misstates and scope.

         16         THE DEPONENT:  The witness, so for

         17   example, topics similar to the ones we were

         18   discussing before such as wheelchair users, those

         19   were available for inclusion and exclusion in 2018

04:34:36 20   we updated them to be inclusion only and not usable

         21   for exclusion.

         22         Q.  (By Ms. Weaver)  And the other similar

         23   interests that were available for exclusion prior

         24   to 2018 included sexual orientation and disability;

04:34:51 25   is that right?

                                                              275

**CONFIDENTIAL ROUGH DRAFT**

04:34:53 1      A.   Interests.  Again not specifically based

2   on people's characteristics.

3      Q.   And so what kind of interests are related

4   to sexual orientation in Facebook's view?

04:35:09 5          MR. BENJAMIN:  Objection to form and

6   scope.  Foundation.

7          THE DEPONENT:  An example would be a

8   cause or an organization related to LGBTQ.

9      Q.   (By Ms. Weaver)  Would it also include

04:35:26 10  visits to specific requisites looking for -- for

11  example, HIV medication?

12         MR. BENJAMIN:  Same objections.

13         THE DEPONENT:  That's not part of

14  interest targeting I'm not sure the connection in

04:35:38 15  there.

16     Q.   (By Ms. Weaver)  Okay.  What other

17  interests targeting did Facebook deem to be

18  associated with sexual orientation?

19     A.   That --

04:35:48 20         MR. BENJAMIN:  Objection -- objection to

21  form and scope.

22         THE DEPONENT:  Specifically it was

23  interest that were related to causes organizations

```
        24   or events that tied to into LGBTQ.

04:36:04 25       Q.   (By Ms. Weaver)  Does have Facebook have
```

                                                          276


                       **CONFIDENTIAL ROUGH DRAFT**

```
04:36:05  1   a list of the -- that were related to those

          2   categories as well meaning, veteran military status

          3   sexual orientation and disable?

          4            MR. BENJAMIN:  Objection to form?

04:36:17  5       A.   We have as I was explaining before we

          6   would be able to look at the interest that are

          7   currently only or that were updated to be included

          8   only.  And that would be effectively what you are

          9   asking I think.

04:36:34 10       Q.   (By Ms. Weaver)  Who you formal counsel

         11   for production of those?

         12            MS. WEAVER:  Okay.  I'm going to go back

         13   to the third time to exhibit 657 this not your put

         14   that is my fault to the bullet point Facebook's

04:36:57 15   policies re striking users advertisers of use of

         16   advertising related for the use case do you

         17   remember we tried to talk about a couple of time

         18   now.

         19            THE DEPONENT:  Yes, we discuss it

04:37:08 20   earlier.
```

```
           21        Q.   (By Ms. Weaver)  We did.  What steps did

           22   Facebook take to enforce those policies that is

           23   limited to advertisers use of advertising related

           24   data to the use case one of the impactful an --

04:37:29   25   important items that we take is that we built our
```

                                                              277


                          **CONFIDENTIAL ROUGH DRAFT**

```
04:37:32    1   product to help prevent for potentially misuse and

            2   as example we the -- the minimum audience threshold

            3   and only providing aggregated information to

            4   advertisers without disclosing to them who saw

04:37:48    5   their ad are protections.  To ensure that -- that

            6   advertisers only use advertising related data for

            7   the use case of placing ads.

            8        Q.   Is there any kind of task force that vets

            9   to make sure that advertisers are using advertising

04:38:08   10   related data only for the advertising?

           11             MR. BENJAMIN:  Objection to form.

           12             THE DEPONENT:  Again, because we don't

           13   disclose that information advertisers don't have

           14   access to who saw the ad or and they are not able

04:38:27   15   to -- to re-identify that which is the primary

           16   restriction and protection.

           17        Q.   (By Ms. Weaver)  Okay.  The question was,
```

18   is there any kind of task force at Facebook that

19   operates to make sure advertisers are using

04:38:44 20   advertising related data only for advertising?

21       A.   I'm not clear what they would look for

22   since our product does not provide the user level

23   information to advertiser.

24       Q.   Okay.  But I'm not asking I'm literally

04:39:03 25   just saying is there task force --

278

**CONFIDENTIAL ROUGH DRAFT**

04:39:07  1           MR. BENJAMIN:  Objection to form.

2           THE DEPONENT:  I -- I understand the

3   question.  It seems to assume that the task force

4   would have to look for something and my point is

04:39:17  5   that the product does not give the advertisers who

6   saw their ad so I'm not sure what the task for what

7   would accomplish.

8       Q.   (By Ms. Weaver)  Okay.  I have that

9   answer I don't give it again.  The question is

04:39:30 10   today does Facebook have a task force that is

11   focused on ensuring that advertisers use of

12   advertising related data is limited to advertising?

13           MR. BENJAMIN:  Objection to form.

14   Argumentative.  And asked and answered.

04:39:58 15            THE DEPONENT:  The product build those

16    protections in we don't have an additional task

17    force looking at this specifically because the

18    product has those protections built in.

19        Q.  (By Ms. Weaver)  Thank you.

04:40:13 20            What is the ads integrity team?

21        A.  Ads integrity was -- was a team it's been

22    renamed business integrity.  Uphold our advertising

23    policies so the policies that -- that defense date

24    the type of content and restrictions on

04:40:39 25    advertising.

                                                        279


                    **CONFIDENTIAL ROUGH DRAFT**

04:40:41 1        Q.  What specific policies does the ads

2    integrity team enforce and can you give examples of

3    such enforcement?

4            MR. BENJAMIN:  Objection to form.

04:40:52 5            THE DEPONENT:  Yeah, the -- as an example

6    under our policies, there were restricted content

7    prohibited content.  The advertiser or business

8    integrity team manages those policies and and

9    builds our detection for them.

04:41:11 10        Q.  (By Ms. Weaver)  What do you mean by

11    restricted content?

12      A.   So as an example content that we require

13   specific targeting parameters for or disallow other

14   targeting parameters for.

04:41:24 15      Q.   What is an example of content that you

16   require specific targeting parameters for?

17      A.    In order to run alcohol ad the

18   advertising must targeting 18 plus or 21 plus

19   depending on the location -- they are trying to run

04:41:40 20   their ad.

21      Q.   Any other examples that you can think of?

22      A.   Yes.  Weight loss ads must be 18 and

23   above similar gambling ads require specific half --

24   an advertisers choosing to run a gambling ad has to

04:41:57 25   also have age targeting set appropriately for their

                                                      280


                      **CONFIDENTIAL ROUGH DRAFT**

04:42:01  1   location.  Their content we also outright prohibit

2   that's under our --

3      Q.   Like what--

4      A.   We don't allow weapons to be sold in ads.

04:42:12  5   We don't allow discriminatory content.  We don't --

6   back to restricted examples we don't housing

7   employment and credit advisors to run -- they have

8   to run with the specific limited targeting options

       9   provided to them after 2019 that's an example of

04:42:29 10   the business integrity team enforces.

     11       Q.   Anything else?

     12       A.   Yes.  If -- I mean the -- the policies in

     13   our advertising policies are enforced by our

     14   business integrity team.  Those were examples.

04:42:49 15       Q.   Right.

     16            So what specific policies are you

     17   thinking of that they say that they enforce?

     18            MR. BENJAMIN:  Objection to form and

     19   scope.

04:43:05 20            THE DEPONENT:  I am sorry can you repeat

     21   the question.

     22       Q.   (By Ms. Weaver)  Yes.

     23            So I -- if go to Exhibit 657 and the --

     24   the middle bullet point says "Ms. Leone will be

04:43:16 25   prepared to discuss the role of Facebook's ads's

                   281

              **CONFIDENTIAL ROUGH DRAFT**

04:43:19  1   integrity team."

      2            Do you see that?

      3       A.   Yes.

      4       Q.   So what specific policies is the ads

04:43:26  5   integrity team enforcing?

         6      A.   Our advertising policies are what they

         7   enforce.  The examples I gave with the restricted

         8   content and prohibit content sub policies within

         9   there.  I don't know the full set of policies off

04:43:42 10   by heart.

        11      Q.   Can you think of any other examples as

        12   sit here.

        13           MR. BENJAMIN:  Objection to form.  Vague.

        14           THE DEPONENT:  In addition to the

04:43:58 15   restricted content policies that I --

        16      Q.   (By Ms. Weaver)  Yes.

        17      A.   Explained such as alcohol, gambling,

        18   weight loss, and the prohibited content, such as

        19   weapons, hateful content -- hateful anything

04:44:11 20   that -- that goes against our communication

        21   community standards if you -- you are promoted

        22   something designated a dangerous organization those

        23   all areas they were help enforce.

        24      Q.   So there's a myriad ways in Facebook can

04:44:27 25   enforce and limit the scope of advertising content

                                                          282


                        **CONFIDENTIAL ROUGH DRAFT**

04:44:31  1   sent to users, right?

          2      A.   We have enforcement for those policies,

3   yes.

4        Q.   But there is no task force to enforce

04:44:50  5   whether or not advertisers are using data for use

6   cases other than advertising, correct?

7             MR. BENJAMIN:   Objection.   Objection to

8   form.

9             THE DEPONENT:   Our protections to prevent

04:45:02  10  misuse is that we built the products so they don't

11  get that data.   That is an upstream protection that

12  is distinct from enforcing a content policy where

13  there isn't the same corollary it's -- it's a very

14  different problem space so we built it into the

04:45:21  15  product.

16       Q.   (By Ms. Weaver)  So if you learned that

17  third parties were scraping for example Facebook

18  user IDs there's no task force that could

19  investigate to prevent it Facebook simply relies on

04:45:30  20  the fact that the policy is they are not supposed

21  to do that; is that right?

22            MR. BENJAMIN:   Objection to form.

23  Misstates prior testimony.   Argumentative.

24            THE DEPONENT:   That's incorrect.   We have

04:45:43  25  team that look at scraping.   That is outside of

283

**CONFIDENTIAL ROUGH DRAFT**

04:45:46  1  advertising.  It is not relevant to the information

 2  we provide to advertisers in their performance --

 3  in the performance of their ads.

 4      Q.  (By Ms. Weaver)  And would you view

04:45:58  5  yourself as a privacy specialist?

 6      A.  That is not a title I assign to myself.

 7      Q.  Okay.  So within?

 8      A.  I'm not sure what you mean by that.

 9      Q.  Sure.

04:46:09 10      Within the scope of your -- have been the

11 privacy and privacy and policy manager at Facebook

12 since November 2019; is that right?

13     A.  Yes.

14     Q.  And what are your duties and

04:46:22 15 responsibilities in that role?

16     A.  I work with our ads product teams to

17 understand where they are going to develop future

18 products I consult with them.  I work with them on

19 updates to our current products.

04:46:36 20     Q.  So what's the privacy piece of your job

21 description that appears in your title?

22     A.  I focus on Facebook's data use.

23     Q.  And when you say Facebook's data use what

24 do you mean?

04:46:48 25      A.   I mean the type of information that we

                                                      284


                       **CONFIDENTIAL ROUGH DRAFT**

04:46:51  1   use for ads.

          2      Q.   And do you focus on what information

          3   Facebook shares with third parties?

          4      A.   That sometimes is in scope in the context

04:47:03  5   of ads.

          6      Q.   Is there somebody else whose preliminary

          7   responsible for addressing what Facebook -- what

          8   information Facebook shared with third parties and

          9   whether or not it complies with Facebook's

04:47:15 10   policies?

         11           MR. BENJAMIN:  Objection to form.

         12           THE DEPONENT:  In the context of scraping

         13   more generally across the platform, yes.

         14      Q.   (By Ms. Weaver)  And -- and even more

04:47:30 15   high level is there somebody responsible at

         16   Facebook for determining whether or not when

         17   Facebook shares data with third parties it is

         18   complying with Facebook's policies?

         19      A.   Yes.

04:47:42 20      Q.   Who is that?

         21      A.   Our -- our privacy org is part of that

22   assessment an example would be Mike Clark.

23      Q.   Anyone other than Mr. Clark?

24           MR. BENJAMIN:  Objection to form and

04:48:01 25   scope.

                                                    285


                         **CONFIDENTIAL ROUGH DRAFT**

04:48:02  1           THE DEPONENT:  He -- he's -- he is the

        2   POC I know that -- that is involved in what it

        3   sounds like you are getting at which access by

        4   third parties to data across Facebook.

04:48:16  5      Q.   (By Ms. Weaver)  What is PoC mean in this

        6   context?

        7      A.   I am sorry.  Point of contact.

        8      Q.   Another person might may think person of

        9   color?

04:48:26 10      A.   I realize.

       11      Q.   So Mike Clark is the lead person in the

       12   privacy organization responsible for enforcing

       13   whether or not Facebook's sharing of data with

       14   third parties complies with its policy; is that

04:48:43 15   right?

       16           MR. BENJAMIN:  Objection to scope and

       17   form.

       18           THE DEPONENT:  His team manages for my

19   understanding his team manages with how third

04:49:01 20   parties if they have inappropriately accessed data

21   as an example through the scraping UIDs that you

22   mentioned.

23        Q.   (By Ms. Weaver)  And what is the a name

24   of his team?

04:49:14 25        MR. BENJAMIN:  Same objections.

                                              286


                    **CONFIDENTIAL ROUGH DRAFT**

04:49:16  1        THE DEPONENT:  I'm actually not sure the

2   official name of his team.

3        Q.   (By Ms. Weaver)  In addition to scraping,

4   is his team the team that is responsible for

04:49:24  5   determining if for example, data shared with third

6   parties might allow users to be personally

7   identified?

8        MR. BENJAMIN:  One moment.

9        Objection to form and scope.

04:49:48 10        THE DEPONENT:  I -- I'm not sure of the

11   parameters of what you mean.  I don't think that

12   there is a singular POC that looks at that.  We

13   have our misuse which is what I was explaining

14   Mike Clark's team does and then we also have the

04:50:08 15   protections we have put in place within ads to

```
        16   ensure that we don't provide identifiable

        17   information to advertiser.  So I -- do you mind

        18   clarifying what with you are look are that is

        19   distinct from those two.

04:50:21 20       Q.   (By Ms. Weaver)  You understand that

        21   protections are different than enforcement, right?

        22       A.   Yes.

        23       Q.   So I'm trying to find out who is -- who

        24   is responsible for enforcing that Facebook does not

04:50:36 25   share identifiable information with third parties?
```

                                                          287


                        **CONFIDENTIAL ROUGH DRAFT**

```
04:50:42  1            MR. BENJAMIN:  Objection.

         2       Q.   (By Ms. Weaver)  That -- do you know who

         3   that is if anyone?

         4            MR. BENJAMIN:  Objection to form and

04:50:46  5   scope.

         6            THE DEPONENT:  The access third parties

         7   to our -- to do the across Facebook is something

         8   Mike Clark's team evaluates.

         9       Q.   (By Ms. Weaver)  What's your

04:51:02 10   understanding of the definition of personal's

        11   identifiable information?

        12            MR. BENJAMIN:  Scope and form.
```

13          THE DEPONENT:  Something that is

14  specifically tied to a user and uniquely tied to

04:51:17 15  and user.

16          Q.   (By Ms. Weaver)  Do you have an

17  understanding that actually personally identifiable

18  information is anything that could be used to

19  reasonably identify a person?

04:51:30 20          MR. BENJAMIN:  Objection to form and

21  scope and to the extent it calls for leverage.

22          THE DEPONENT:  I understand that's a

23  definition that you presented and I -- I understand

24  what you mean.

04:51:44 25          Q.   (By Ms. Weaver)  What is Facebook's

                                                    288


                    **CONFIDENTIAL ROUGH DRAFT**

04:51:45  1  understanding of what it means when they promise

2  that will not provide personal identifiable

3  information to advertiser?

4          A.   That we --

04:51:57  5          MR. BENJAMIN:  Objection -- objection to

6  form and scope of this deposition.

7          THE DEPONENT:  That we don't provide

8  information to advertisers so that they -- can

9  understand who saw their ad.

04:52:12 10      Q.   (By Ms. Weaver)  And just again to

11   address the scope, under topic 8 and page three of

12   Exhibit 657 of the letter that Mr. Benjamin wrote

13   me, topic 8 is type of purpose and data and

14   information Facebook provided?

04:52:31 15           MR. BENJAMIN:  Special Master?

16           MS. WEAVER:  And it's states that

17   Ms. Leone will be prepared to discuss how Facebook

18   tracks user data received from advertisers it's

19   relationships and the ads placed and tracks data if

04:52:47 20   any provided to advertisers.

21      Q.   (By Ms. Weaver)  Going back to the

22   question?

23           MR. BENJAMIN:  Special Master would

24   prefer outside of the presence of the witness.

04:52:57 25           SPECIAL MASTER GARRIE:  I would actually

                                                        289


                      **CONFIDENTIAL ROUGH DRAFT**

04:52:59  1   would be it okay Ms. Leone if you go to the

2   breakout room for -- for a few minutes.

3           THE DEPONENT:  Yup.

4           MR. BENJAMIN:  Five minutes wait until

04:53:10  5   your counsel comes and gets you.

6           MR. BENJAMIN:  Are we on the record.

```
          7              SPECIAL MASTER GARRIE:  Up.

          8              MR. BENJAMIN:  Thank you just to respond

          9    briefly to counsel's weaver Special Master so the

04:53:26 10    letter actually reads in first bullet says the

         11    tracking of the type and purpose of data and

         12    information Facebook be receives, I believe

         13    Counsel Weaver only read the part after tracking

         14    power over association and identification of user

04:53:41 15    info was you know, the subject of topic 4 and other

         16    30(b)(6) testimony.

         17              So my scope objection was asserted in

         18    legal conclusion response to a question about --

         19    ire what is Facebook's understanding what it means

04:53:57 20    when promise they will not provide personal

         21    identifiable information to advertiser.

         22              I don't think that that relates to the

         23    tracking of the type of purpose and data and

         24    information Facebook receives and, again,

04:54:10 25    plaintiffs are already taken two different 30(b)(6)
```

290


**CONFIDENTIAL ROUGH DRAFT**

```
04:54:13  1    depositions on association identification under

          2    topic 4.

          3              SPECIAL MASTER GARRIE:  Counsel Weaver is
```

       4   there anything you want to put on the record.

04:54:24 5            MS. WEAVER:  Sure.  This witness has

       6   testified already at length that Facebook is not

       7   providing personally identifiable information I am

       8   trying to understand what she's means when she says

       9   on behalf of Facebook.

04:54:38 10           MR. BENJAMIN:  I believe Ms. Leone has

      11   testified repeatedly that Facebook doesn't provide

      12   advertisers with user level data.

      13           SPECIAL MASTER GARRIE:  User -- user

      14   granular data grammar you already level yeah.

04:54:55 15           MR. BENJAMIN:  So again topic eight I

      16   just want to start reading with the letter what

      17   actually says into the record.

      18           It says that Ms. Leone basically be

      19   prepared to address first bullet the tracking of

04:55:05 20   the type and purpose of data and information

      21   Facebook received table reflects 8A.  That's the

      22   language that Counsel Weaver read in part.

      23           And she was asked to define a term

      24   personally identifiable information and I objected

04:55:20 25   to it as being out of scope.

                                                    291

                      **CONFIDENTIAL ROUGH DRAFT**

04:55:22  1          MS. WEAVER:  That's what just happened

          2  but three hours she spent along talking about

          3  certain information does not identify the user

          4  including Geo location and all of the other

04:55:32  5  categories.  I want to understand what Facebook

          6  be -- the people in Facebook advertising department

          7  who are saying we don't give third parties

          8  personally identifiable information.  I am entitled

          9  to corporate testimony on what they mean when.

04:55:48 10          SPECIAL MASTER GARRIE:  All right.  Is

         11  the witness prepared to -- well before we get into

         12  to the next -- of all is the witness to prepared to

         13  answer the question on behalf of Facebook ore not.

         14          MR. BENJAMIN:  Which question

04:56:00 15  specifically Special Master.

         16          SPECIAL MASTER GARRIE:  The one

         17  Counsel Weaver just asked that you -- you have

         18  objected that's outside of scope.

         19          MS. WEAVER:  Let me if I can just read

04:56:10 20  from 218 lines three through ten.

         21          So the representation here is that

         22  Facebook is not providing any personal identifiable

         23  information through the targeted advertising

         24  process right.

04:56:32 25          MR. BENJAMIN:  Objection to form.  Vague

292

**CONFIDENTIAL ROUGH DRAFT**

04:56:33  1   want we don't provide advertisers information about

2   the users who saw their ad and how to identify

3   those users.

4            So she's made this assertion that's a

04:56:43  5   shield for Facebook and I just want to ask what our

6   understanding of personally identifiable

7   information is.

8            MR. BENJAMIN:  That isn't -- but that

9   isn't the term that she used and you already taken

04:56:54 10   two different 30(b)(6) depositions about this

11   topic.

12            MS. WEAVER:  No I have not and in fact

13   we'll get to but Mr. Clark refused to actually

14   define the term.

04:57:04 15            MR. BENJAMIN:  She -- she's not been

16   designated to provide corporate testimony on

17   Facebook's understanding of the meaning of

18   personally identifiable information.

19            MS. WEAVER:  And here again enumerate

04:57:17 20   every question we have we were going to ask the

21   very question is what data is Facebook giving to

22   third parties.  And is it identifiable.

```
        23         MR. BENJAMIN:  That.

        24         MS. WEAVER:  The next question.

04:57:31 25         SPECIAL MASTER GARRIE:  Wait, wait
```

                                                          293


                        **CONFIDENTIAL ROUGH DRAFT**

```
04:57:32  1 everybody interpreting my -- measliest as a reason

        2 to talk it's I'm thinking.  My apologies.

        3         I guess the first question

        4 Counsel Benjamin is the witness prepared to answer

04:57:50  5 the question on behalf of Facebook?

        6         MR. BENJAMIN:  The witness was not

        7 designated to provide the company's position about

        8 the meaning of personally identifiable information.

        9         SPECIAL MASTER GARRIE:  I understand that

04:58:05 10 that's not the question that's spending.

       11         MR. BENJAMIN:  So just look before we

       12 went -- went -- went colloquy Special Master I

       13 really same page.

       14         One moment Ms. Weaver if you have in

04:58:34 15 front of I just want to make sure that we are

       16 discussing the same question.  What is Facebook's

       17 understanding this is line 12 what is Facebook

       18 understanding of what it means when they promise

       19 that will not provide person identifiable
```

331 of 383

04:58:52 20   information to advertiser.

21          That was the question that to which I

22   objected on form and scope and then Ms. Weaver went

23   to the bullet point in the letter that she read

24   part of.

04:59:07 25          SPECIAL MASTER GARRIE:  I'm very aware

**CONFIDENTIAL ROUGH DRAFT**

04:59:09  1   and my question is -- is Facebook -- is the witness

2   prepared to answer the question on behalf of

3   Facebook.

4          MR. BENJAMIN:  So I believe if question

04:59:36  5   that's pending misstates the record.

6          So I can't tell you Special Master that

7   she's prepared to answer that specific question

8   because I think it's objectionable in a number of

9   ways.  What she's said is that we don't provide

04:59:53 10   data to advertisers identifying individual users.

11   She hasn't provided testimony based on a definition

12   of personal -- of PII.  So she's very prepared to

13   explain all the ways.

14          SPECIAL MASTER GARRIE:  I just have a

05:00:09 15   simple, so -- I -- I understand your objecting to

16   the question and in the form.

17          My question is -- the question as it is

18   is she prepared to answer the question on behalf of

19   Facebook not the form of the question not whether

05:00:28 20   it's -- just and then I can.

21          MR. BENJAMIN:  Right it's just -- yeah, I

22   think the answer is Special Master it's just not in

23   scope.  So.

24          MS. WEAVER:  Okay.  I just want to go on

05:00:39 25   the record, that...

                                                    295


                   **CONFIDENTIAL ROUGH DRAFT**

05:00:41 1          SPECIAL MASTER GARRIE:  We are still

2    still on the record.

3          MS. WEAVER:  Fair enough.

4          SPECIAL MASTER GARRIE:  Can I just

05:00:45 5   finish.

6          MS. WEAVER:  Yes.

7          SPECIAL MASTER GARRIE:  Let me just --

8    just finish here.  That's fine counsel --

9    Counsel Benjamin I just so then before we go

05:00:53 10   further.  I want respectful of the witnesses's

11   time.  And the effort that has been done and if

12   there's an issue about scope and other things and

13   the witness isn't prepared to answer the question.

           14  Counsel Weaver on behalf of Facebook I mean, we --

05:01:18   15  I mean, there's -- I'm not going to permit a line

           16  of questioning whether or not prepared to answer it

           17  if so -- well Counsel Weaver if you would like to

           18  respond on the record and then Counsel Benjamin

           19  rebuttal and then I'll make the ruling quickly

05:01:37   20  okay.

           21          SPECIAL MASTER GARRIE:  Counsel Weaver.

           22          MS. WEAVER:  Question we marked as

           23  Exhibit 658 a couple of hours ago.  We covered the

           24  promise in this document -- there's a document

05:01:46   25  identified by Facebook as a document that this

                                                        296


                          **CONFIDENTIAL ROUGH DRAFT**

05:01:50    1  witness would be prepared to testify.  This is

            2  second time this has happened in this indicates.

            3  That document says at page 5 we don't share

            4  information about advertisers that personally

05:02:01    5  identifies individuals unless they have given us

            6  permission.  They then testified about this

            7  document and when I asked, the representation here

            8  is that Facebook is not providing any personally

            9  identifiable information through the targeting --

05:02:16   10  the targeted advertising process right and she said

11    we don't provide advertisers information about the

12    users who saw their ad and how to identify those

13    users.

14              Now I'm trying to dig in when we talk

05:02:28 15    about enforcement and all of sudden she can't

16    define the words in the document that Facebook

17    identified that she would be prepared to discuss

18    with regard very specifically to what Facebook

19    shares through the targeted advertising process I

05:02:42 20    think it's clearly within scope and at some point

21    we are going to bring a motion to compel Facebook's

22    to identify and define what personally identifiable

23    information is in documents that they are

24    identifying their witnesses having knowledge of use

05:03:02 25    yeah Special Master the rebuttal Counsel Weaver

297

**CONFIDENTIAL ROUGH DRAFT**

05:03:05 1    said it already.  This -- this document itself was

2    the subject of extensive testimony.  Ms. Leone

3    answer all the questions she was asked about it

4    they didn't define personally identifiable

05:03:15 5    information the question that I read is clearly

6    outside of scope.

7              Plaintiffs have already taken two

```
              8  depositions on this subject.  And we were very

              9  clear about what Ms. Leone was designated to

05:03:25     10  testify about to in -- all of the prior meet and

             11  conference so again I just want to be clear what

             12  she sit consistently throughout this deposition is

             13  that Facebook doesn't provide advertisers with user

             14  level data.

05:03:39     15          And Counsel Weaver is should feel free to

             16  explore with her what that means.  I was just

             17  logging a scope oaks to the specific question that

             18  was asked which relies on a term that Ms. Leone

             19  hasn't used and that isn't in the document that

05:03:57     20  Counsel Weaver just pointed to.

             21          MS. WEAVER:  It is in the document.  The

             22  word personal identifiable.

             23          SPECIAL MASTER GARRIE:  It's page.

             24          MS. WEAVER:  Sorry?

05:04:04     25          SPECIAL MASTER GARRIE:  85 that word it's
```

298

**CONFIDENTIAL ROUGH DRAFT**

```
05:04:08      1  potentially page five of the document I just read

              2  it myself.  So that -- unless I'm reading different

              3  document Counsel Benjamin, but.

              4          MR. BENJAMIN:  I was referring to the
```

05:04:19  5  phrase "personal identifiable information or PII"

6  which we all understand can be a term of art.  So

7  again.

8            SPECIAL MASTER GARRIE:  Counsel Weaver.

9  No I heard I understand Counsel Benjamin.

05:04:38 10            MR. BENJAMIN:  Thank you.

11            SPECIAL MASTER GARRIE:  Counsel Weaver.

12            MS. WEAVER:  I'm looking at just give me

13  a moment here.

14            MS. WEAVER:  What is difference between

05:04:50 15  information that personally identifies individuals

16  or personally identifiable information?  Aren't I

17  styled to Facebook's understanding of that the

18  sentence says, information that -- with advertiser

19  that personally identifies individual and if I ask

05:05:04 20  about personally identifiable information Facebook

21  refuse fuses to provide and this is the second time

22  and Mr. Clark's deposition he said he needed to

23  look at a document to give me testimony and when we

24  gave it to him it had this term it says personally

05:05:18 25  identifiable information in it and Facebook

                                                    299


                      **CONFIDENTIAL ROUGH DRAFT**

05:05:21  1  wouldn't provide a deposition.

2          And now Ms. Leone is saying this -- this

3    guy for responsibility for?

4          THE DEPONENT:  He doesn't what personal's

05:05:31  5    identifiable information.  Now I want to if she

6    does.

7          I don't know how to get the bottom of

8    this case.  I can bring a motion to compel to bring

9    her back.  I will.  Somebody owes got to be able to

05:05:42 10    answer that question before the close of this

11    discovery.

12          MR. BENJAMIN:  I am sorry Ms. Beaver step

13    sentences very request pick No. one I think

14    Counsel Weaver was actually examining Ms. Leone

05:05:53 15    about the document, she asked her what that

16    language meant.  And that was appropriate and I

17    think that testimony was provided.

18          If they puts the -- if puts the document

19    in front of Ms. Leone again, and ask her for

05:06:05 20    Facebook's understanding of that language in the

21    policy, maybe that's a way to cut through this.

22    All was re axing Special Master was the --

23          SPECIAL MASTER GARRIE:  No, no I get it.

24    Counsel Benjamin I understand what I get re axing

05:06:18 25    too we kind of gone off the rails a bit.  I

300

**CONFIDENTIAL ROUGH DRAFT**

05:06:20  1  recognized that.  I let you guys speak Aaron

         2  reports glee too much.

         3              Not a reflection of your litigation

         4  produce less it's just a little field of what the

05:06:35  5  action had to do with.

         6              Counsel Weaver with the information that

         7  has been provided by Counsel Benjamin, you can --

         8  the witness isn't prepared to testify on behalf of

         9  Facebook the way the question is phrased if you

05:06:55 10  want to rephrase the question and explore the topic

        11  further it's perfectly reasonable.  If you wish to

        12  bring amok to compel to get the definition of

        13  personal identifiable information from a Facebook's

        14  designated representative you are well within your

05:07:13 15  rights but this witness is prepared to testify on

        16  the topics and the question was asked, so with that

        17  in mind I ask consider as a strong ask, that you

        18  consider RID -- rephrasing your question with the

        19  information that's been provided recognizing that

05:07:39 20  the witness simply isn't prepare to testify on

        21  behalf of Facebook the way the question is being

        22  asked.

        23              MS. WEAVER:  Okay.

```
          24          MR. BENJAMIN:  Thank you Special Master.
05:07:52 25          SPECIAL MASTER GARRIE:  That doesn't just
```

                                                              301


                         **CONFIDENTIAL ROUGH DRAFT**

```
05:07:53  1  to for the record that doesn't mean plaintiffs

          2  aren't entitled to a witness to answer or explain

          3  if they feel that that information is critical or

          4  necessary to their case.

05:08:04  5          MS. WEAVER:  I mean one I would say is

          6  Facebook providing documents to us with these terms

          7  in it, and then I ask about them and they tell me

          8  it's not within the scope, I mean do I have to go

          9  through every document that has terms in it and

05:08:19 10  identify now within the document you better be able

         11  to talk about these terms?

         12          SPECIAL MASTER GARRIE:  No.

         13          MR. BENJAMIN:  Yeah.

         14          SPECIAL MASTER GARRIE:  I think -- I

05:08:28 15  think -- no.  And I -- at least from where I sit.

         16  But I would just the particular question you have

         17  asked and the way it was asked I think if you reask

         18  the question using.

         19          MS. WEAVER:  Okay.  That probably I think

05:08:49 20  Counsel Benjamin allude you had one possible
```

```
            21   approach to getting forward progress may or may

            22   not.  Depending on -- he on where we go.  So well

            23   call the witness back Counsel Benjamin and we'll

            24   keep going.

05:09:07    25          MR. BENJAMIN:  Thank you.
```

302

```
                        **CONFIDENTIAL ROUGH DRAFT**

05:09:12     1          THE COURT REPORTER:  Can we take five?

             2          SPECIAL MASTER GARRIE:  We can.

             3          MS. WEAVER:  How much time do we have?

             4   All right.  Let's go off the record.

05:09:19     5          THE VIDEOGRAPHER:  Off the record it's

             6   5:09 p.m.

             7          (Recess taken.)

             8          THE VIDEOGRAPHER:  We are back on the

             9   record it's 5:19 p.m.

05:19:41    10      Q.  (By Ms. Weaver)  Ms. Leone, I will ask

            11   you to take a look at Exhibit 658?

            12      A.  I have it up.

            13      Q.  And turning to the page we discuss

            14   earlier and on page five and there's a bullet point

05:19:57    15   that says, "we don't share information with

            16   advertisers that personally identifies individuals

            17   unless they have given us permission."
```

```
        18          Do you see that?

        19     A.   Yes.

05:20:07 20     Q.   What is your understanding of information

        21  that personally identifies individuals?

        22     A.   In the context of ads it's that we do not

        23  share with the advertiser who saw their ad so that

        24  they understand who that user was.

05:20:23 25     Q.   And when you say who -- we do not share
```

303

```
                    **CONFIDENTIAL ROUGH DRAFT**

05:20:30  1  who saw their ad.

         2          What do you mean?

         3     A.   The user who saw their ad we don't share

         4  the identity oaf that user with the advertiser.

05:20:38  5     Q.   Does Facebook share information that

         6  enables third parties to identify the user?

         7          MR. BENJAMIN:  Objection to form.

         8          THE DEPONENT:  No as I mentioned our

         9  product -- the protections in our product such as

05:20:58 10  the performance metrics are aggregated to avoid an

        11  advertiser re associating and trying to use the

        12  identifier who user the ad.

        13     Q.   (By Ms. Weaver)  And do you think that

        14  Geo location is an example of information that
```

05:21:15 15    personal identifies an individual?

         16            MR. BENJAMIN:  Objection to form.

         17            THE DEPONENT:  In the context of ads, we

         18    don't share who viewed the ad or their location

         19    with an advertiser.

05:21:37 20    Q.   (By Ms. Weaver)  But if an advertiser is

         21    seeking to advertise within a 1 mile radius and/or

         22    if they are using their own customer list, doesn't

         23    the advertisers know who the person is?

         24            MR. BENJAMIN:  Objection to form and

05:21:54 25    scope.

                                                              304


                        **CONFIDENTIAL ROUGH DRAFT**

05:21:56  1            THE DEPONENT:  No.  They, for example if

          2    someone selects a radius or selects their location

          3    targeting, they don't know who sees the ad.  We

          4    don't share the information with them about whose

05:22:10  5    seeing the ad.

          6    Q.   (By Ms. Weaver)  Okay.  So the -- is your

          7    testimony on behalf of Facebook is that because

          8    Facebook is not sharing who saw the ad, it is not

          9    sharing information that personally identifies

05:22:23 10    individuals; is that correct?

         11            MR. BENJAMIN:  Objection to form.

12   Misstates.

13          THE DEPONENT:  We don't share information

14   about who saw the ad to the advertiser so that can

05:22:38 15   identify that user.

16          Q.   (By Ms. Weaver)  I understand that you

17   have keep repeating the sentence I'm trying to

18   drill in what you mean by who saw the ad when you

19   say we don't identify who, do you mean by name?

05:22:52 20          A.   I mean individually users their name an

21   example similar to lease weaver that is not what we

22   shared with advise verse.

23          Q.   Okay.  Can you give me the full list what

24   think it is that Facebook does not share such that

05:23:06 25   it is not sharing information that personal's

305

**CONFIDENTIAL ROUGH DRAFT**

05:23:10 1   identifies individuals?

2          MR. BENJAMIN:  Objection to form.

3          THE DEPONENT:  I can't define everything

4   we don't share.  It's --

05:23:24 5          Q.   (By Ms. Weaver)  Let me put it this way.

6   What is that you think is information that

7   personally identifies individuals?

8          MR. BENJAMIN:  Objection to form.

```
          9          THE DEPONENT:  In the context.

05:23:40 10     Q.   (By Mr. Benjamin)  Sorry objection to

         11   form and scope.  I understand Counsel Weaver still

         12   to be examining you about Exhibit 658 and the

         13   language in that document.

         14          You can answer?

05:23:51 15          THE DEPONENT:  In the context of ads it's

         16   that we do not provide advertisers with information

         17   to understand who saw their ad specifically which

         18   users saw their ad.

         19     Q.   (By Ms. Weaver)  Give me the examples of

05:24:03 20   the information that you just referred to in that

         21   answer?

         22     A.   We don't -- in our -- as an example in

         23   our performance metrics those are aggregated so

         24   that an advertiser doesn't know who specifically

05:24:26 25   clicked or saw their ad.
```
                                                    306


                    **CONFIDENTIAL ROUGH DRAFT**

```
05:24:28  1     Q.   I understand.

          2          I'm asking you a different question.

          3          What is the kind of information that you

          4   think would personally identify an individual?

05:24:42  5          MR. BENJAMIN:  Objection to form.  Asked
```

6   and answered.  Vague.

7          THE DEPONENT:  In the context of ads

8   again it's who saw your ad and which users those

9   were which would personally identify someone in the

05:24:52 10   context of ads.

11      Q.   (By Ms. Weaver)  So do you mean name, or

12   email or what is the kind -- I need examples of the

13   kind of information that you say would personally

14   identify an individual?

05:25:05 15          MR. BENJAMIN:  Yeah.

16      Q.   (By Ms. Weaver)  What do you mean?

17          MR. BENJAMIN:  Objection to form.  And

18   scope and I will just make a running objection for

19   the sake of the record and so not to impede the

05:25:16 20   deposition to this entire line of questioning I

21   counsel weapon verify language within the

22   Exhibit 658 about information that personal's

23   identifies individuals.

24          On that basis you can answer.

05:25:34 25          THE DEPONENT:  As an example we don't

307

**CONFIDENTIAL ROUGH DRAFT**

05:25:36  1   share with advertisers the person who saw the ad

2   which would include their name, their UID.  Or

          3    their email because that's not information we share

          4    with our advertiser in delivering the ads that they

05:25:49  5    have placed on Facebook.

          6         Q.   (By Ms. Weaver)  What about IP address is

          7    that an example of information that could be used

          8    to personally identify an individual?

          9              MR. BENJAMIN:  Same objections to form

05:26:01  10   and scope.

          11             THE DEPONENT:  It is not information we

          12   share with an advertiser as a starting point.  In

          13   the context of ads.  Again it's not information

          14   with share with advertisers about who is seeing

05:26:24  15   their ad.

          16        Q.   (By Ms. Weaver)  If a advertiser wants to

          17   target IP addresses orgy why location, in your

          18   understanding could that be used to identify an

          19   individual?

05:26:37  20        A.   Our targeting options --

          21             MR. BENJAMIN:  Sorry, Bella.

          22             Same objections.

          23             THE DEPONENT:  Our targeting options

          24   aren't based on IP address that's not a targeting

05:26:47  25   option we offer.

                                                        308

**CONFIDENTIAL ROUGH DRAFT**

05:26:48  1      Q.   (By Ms. Weaver)  Okay.  It is something

         2    that you mentioned earlier today do you recall

         3    that?

         4      A.   To clarify, what I explained earlier was

05:26:58  5    an advertiser selects where they want their ad to

         6    be shown so if they want their ad to be shown to

         7    people in Washington state.  And then we use that

         8    to set the eligible audience for the ad, one of

         9    ways someone could be included in it.  Includes

05:27:17 10    location.  Such as IP -- based on their IP that is

        11    not the same as giving the advertiser the ability

        12    to select IP addresses to target.

        13      Q.   And is it your understanding that

        14    information that can be used one or two data points

05:27:38 15    together to identify a person would constitute

        16    information that personal's identifies individuals?

        17           MR. BENJAMIN:  Same objection to form and

        18    scope with respect to Exhibit 658.

        19           THE DEPONENT:  I can understand what you

05:27:58 20    mean by the combining data points.  I do not see

        21    the relevance of how that is happening within our

        22    ad targeting or the information we provide back to

        23    advertiser because we specifically don't provide

        24    information back to advertiser at the user -- at --

05:28:14 25  of individual or user level.

                                                             309


                        **CONFIDENTIAL ROUGH DRAFT**

05:28:16  1       Q.   (By Ms. Weaver)  On behalf of Facebook as

          2  sit here today, is Facebook aware that advertisers

          3  or AP -- developers were scrapping UIDs via the

          4  platform API?

05:28:32  5            MR. BENJAMIN:  Objection to form and

          6  asked and answered repeatedly and scope.

          7            THE DEPONENT:  I think I clarified that

          8  I'm not aware of specific instances it is not my

          9  role to be aware of specific instances of which

05:28:51 10  scrapping is occurring on the platform.

         11       Q.   (By Ms. Weaver)  Is Uber a partner who

         12  advertisers on Facebook using custom audiences?

         13            MR. BENJAMIN:  Objection to form.  Vague.

         14            THE DEPONENT:  I -- I take you mean Uber

05:29:11 15  like the ride share company in.

         16       Q.   (By Ms. Weaver)  Yes.

         17       A.   I don't know the specifics audiences or

         18  ways that they set up their ads on our platform.

         19       Q.   We'll take a look at 663 please.

05:29:29 20            (Exhibit 633 was marked for

         21  identification by the court reporter and is

22  attached hereto.)

23        THE DEPONENT:  663 I see it.

24    Q.  (By Ms. Weaver)  And take a moment to

05:29:33 25  read it and let they know when you have?

                                              310


                    **CONFIDENTIAL ROUGH DRAFT**

05:29:45  1    A.  This isn't go take me a minute I haven't

2  seen this before.

3        MS. WEAVER:  No problem.

4        MR. BENJAMIN:  Counsel was this a

05:29:52  5  document that was identified before the deposition.

6        MS. WEAVER:  No, it was not because I did

7  not expect the testimony that we got and it's in

8  for impeachment purposes.

9        THE DEPONENT:  I have read through.

05:32:09 10    Q.  (By Ms. Weaver)  Who is Ian Abernathy?

11        MR. BENJAMIN:  Objection.  Based on scope

12  I will assert that to a running objection to the

13  question on this document.

14        THE DEPONENT:  I don't know who

05:32:20 15  Ian Abernathy is I have not worked him before.

16    Q.  (By Ms. Weaver)  Do you know who

17  Grace Molnar is?

18    A.  No, I also don't know who Grace is.

```
           19       Q.   Do you know who Allison Hendrix?

05:32:32   20       A.   I do know Ali Hendrix.

           21       Q.   Who is she?

           22       A.   She's our data policy manager for a

           23   developer platform.

           24       Q.   Looking at Exhibit 663.

05:32:43   25            Do you understand it to be email from
```

                                                                311


                           **CONFIDENTIAL ROUGH DRAFT**

```
05:32:45    1   people who work at Facebook relating to their work

            2   at Facebook?

            3       A.   Yes.

            4       Q.   And looking at the lower email do you see

05:32:58    5   Grace emailed Ian "we Uber behavior targeting

            6   creating a custom audience list of UIDs that were

            7   obtain via a our API but not by them.  We are

            8   trying to determine where enforcement should sit

            9   for things looks like this."

05:33:16   10            Do you see that?

           11       A.   Yes.

           12       Q.   Have you ever been aware that Uber has

           13   created custom audience list of UIDs in or around

           14   2013?

05:33:26   15       A.   No, I was not aware.
```

```
        16      Q.   And Facebook does not maintain a list of

        17   advertisers who had scraped user IDs?

        18           MR. BENJAMIN:  Object based on scope and

        19   form.

05:33:39 20           THE DEPONENT:  To be clear, my

        21   understanding of this is not that Uber scraped

        22   these ID.

        23      Q.   (By Ms. Weaver)  Okay.  Do you have any

        24   personal knowledge of this particular issue?

05:33:51 25      A.   I don't just from reading this document
```

                                                            312


                        **CONFIDENTIAL ROUGH DRAFT**

```
05:33:55  1   I.

         2      Q.   Okay.

         3      A.   But this is the point, this document

         4   suggests that Uber had a list of user IDs, correct.

05:34:04  5      A.   Correct that they specify were obtained

         6   through an API but not by Uber.

         7      Q.   Okay.  And they were obtained through

         8   Facebook's API, right?

         9      A.   Through a platform API.

05:34:17 10      Q.   That is -- that is Facebook's platform

        11   API, correct?

        12      A.   Yes that's what this states.
```

```
          13     Q.   Okay.  And so Uber has a collection of

          14   Facebook user IDs according to this document,

05:34:29  15   right?

          16          MR. BENJAMIN:  Objection to form.

          17   Foundation and the same continuing objection based

          18   on scope.

          19     Q.   (By Ms. Weaver)  Was there any attempt by

05:34:38  20   Facebook to prevent Uber from conducting targeted

          21   advertising by Facebook knows that Uber possesses

          22   user IDs?

          23     A.   So again I'm -- I'm not familiar with

          24   this case.  This is the first time I have seen it.

05:34:55  25   This email thread reads to me as that is exactly
```

313

```
                     **CONFIDENTIAL ROUGH DRAFT**

05:34:58   1   what's being discussed.

           2     Q.   Right.

           3          But it didn't happen did it.  I mean you

           4   are in advertising and you testified that there is

05:35:07   5   no list within the advertising department of

           6   advertisers on Facebook who possess the user IDs,

           7   right?

           8     A.   No I specifically.

           9          MR. BENJAMIN:  Objection.  Objection.
```

05:35:19 10  Misstates testimony.

11        THE DEPONENT:  I specifically noted first

12  that Uber was not scrapping, that's -- that's

13  specified here.  And we -- they wouldn't -- this --

14  I think that's the answer Uber.

05:35:36 15     Q.   (By Mr. Benjamin)  You doesn't talk about

16  scraping I will read the question back.

17        You testified that there is no list

18  within the advertising department of advertiser on

19  Facebook who possess user IDs, right?

05:35:50 20        MR. BENJAMIN:  Same objection.

21        THE DEPONENT:  Do you mind reading back

22  the testimony that you are referring to.

23     Q.   (By Mr. Benjamin)  I just ask you, within

24  the advertising department, is there a list of

05:36:01 25  advertiser on Facebook that Facebook knows has come

                                                        314


                    **CONFIDENTIAL ROUGH DRAFT**

05:36:06  1  into possession of user IDs?

2        MR. BENJAMIN:  Objection to form and

3  scope.

4        THE DEPONENT:  I'm -- I'm -- I'm not sure

05:36:42  5  like -- a list of advertiser that have access to

6  UID or have obtain UIDs, is not a list that I'm

       7   aware of within ads.  Because I -- I'm not sure the

       8   connection there back to the fact that they are in

       9   advertiser.

05:37:05  10      Q.   (By Mr. Benjamin)  Does Facebook have

      11   anyway to preventives who Facebook knows possesses

      12   -- possesses user IDs from advertising on Facebook?

      13       MR. BENJAMIN:  Objection to form.  Asked

      14   and answered.

05:37:33  15      THE DEPONENT:  Possession of an ad -- the

      16   possession of UIDs by an advertiser is -- isn't a

      17   factor in -- in -- that's not and evaluation in the

      18   creation of an ad.  I'm not sure the connection

      19   here.

05:37:51  20      Q.   (By Mr. Benjamin)  Does Facebook take any

      21   steps to prevent companies that Facebook knows

      22   processes user IDs from targeting those users

      23   through Facebook's advertising platform?

      24       MR. BENJAMIN:  Same -- same objections.

05:38:08  25      THE DEPONENT:  I think this an example

                         315

**CONFIDENTIAL ROUGH DRAFT**

05:38:10  1   where like in this email thread they are discussing

       2   the steps that need to be taken here.  I'm not

       3   aware of what happened with Uber, I'm not sure the

```
           4  resolution in this one.

05:38:24   5      Q.   (By Mr. Benjamin)  And you in the

           6  advertising privacy policy team, have never seen a

           7  list of advertiser who possess users IDs or used it

           8  for the purposes of saying you may not tiff vise

           9  because you were sharing -- you would be able to

05:38:40  10  personally target individual users; is that true?

          11           MR. BENJAMIN:  Objection to form.

          12           THE DEPONENT:  I -- I don't know of any

          13  other cases aside from the one that you have

          14  presented currently.

05:38:59  15      Q.   (By Mr. Benjamin)  Does Uber currently

          16  advertise on Facebook?

          17           MR. BENJAMIN:  Objection.

          18           THE DEPONENT:  I don't know the full list

          19  of advertisers who advertise on Facebook, I -- I --

05:39:16  20  at points Uber did definitely advertise and in

          21  recent years.

          22      Q.   (By Mr. Benjamin)  Okay.  Are you

          23  prepared to testify about targeted advertisements

          24  that take the form of video?

05:39:36  25      A.   Yes.
```

316

**CONFIDENTIAL ROUGH DRAFT**

05:39:37  1        Q.   How do targeted advertisements take the

          2   form of videos?

          3        A.   When an advertisers sets up their ad --

          4   one second.

05:39:54  5             (Brief interruption.)

          6             THE DEPONENT:  Whether an advertiser sets

          7   up their ad they choose the -- the creative for

          8   their ad that includes choosing if it's going to be

          9   an image or a video and the format and then they

05:40:12 10   would upload the video that they want to use for

         11   their ad.

         12        Q.   (By Ms. Weaver)  And Facebook then takes

         13   the video and provides that video to the user; is

         14   that right on its platform?

05:40:31 15        A.   As in the case of all ads, it then enters

         16   the auction and if it wins the auction we will show

         17   that ad that has the video content in our newsfeed

         18   to users.

         19        Q.   So Facebook is isn't creating the videos;

05:40:46 20   is that right?

         21        A.   The advertiser selects the individual use

         22   and creates the video.

         23        Q.   And then Facebook's responsibility is to

         24   take the video and provide it to the user; is that

05:40:58 25   right?

317

**CONFIDENTIAL ROUGH DRAFT**

05:41:00  1          MR. BENJAMIN:  Objection to form.

          2          THE DEPONENT:  We deliver the ad to

          3   users, yes.

          4      Q.  (By Ms. Weaver)  And the ad is in video

05:41:06  5   form, right?

          6          MR. BENJAMIN:  Objection to form.

          7          THE DEPONENT:  By -- by video form which

          8   just mean it is am ad that has a video in it.

          9      Q.  (By Ms. Weaver)  Yes.

05:41:18 10      A.  Yes then we show a user that ad which

         11   involves showing them the video.

         12      Q.  And then does Facebook report back to the

         13   advertiser information about whether or not those

         14   video were obtain or received?

05:41:42 15          MR. BENJAMIN:  Objection to form.

         16          THE DEPONENT:  Do you mind clarifying

         17   what you mean by obtained or received.

         18      Q.  (By Ms. Weaver)  Do you understand what

         19   the word obtained means?

05:41:50 20      A.  I understood to -- I -- I understood it

         21   to mean removing it from the platform and I don't

         22   think that's what you mean so I want to be sure.

```
          23      Q.   Okay.

          24      A.   I'm following.

05:42:01  25      Q.   Let's try this what about receive.  Do
```

                                                                318


                        **CONFIDENTIAL ROUGH DRAFT**

```
05:42:04   1  you know what receive means?

           2      A.   Receive bide the users.

           3      Q.   Yes.

           4      A.   Yes the users -- so again the ad enters

05:42:12   5  the ad auction if it is delivered to a user the

           6  user will see it that's what I'm defining as

           7  receive they saw the ad.

           8      Q.   And then Facebook reports the view of

           9  that video back to the advertiser; is that correct?

05:42:26  10      A.   We report the aggregated number of views

          11  of video a video ad gets correct.

          12      Q.   Okay.  What is audience network?

          13      A.   Audience network was -- was effectively

          14  an ad exchange owned by Facebook would enable us to

05:42:49  15  place an ad on third-party sites and websites --

          16  third parties's websites and apps.

          17      Q.   And Facebook was placing the ad on the

          18  third party websites and was it then compensated

          19  for placing the ad?
```

05:43:14 20          MR. BENJAMIN:  Objection to form.

21          THE DEPONENT:  All with all ads the

22   advertisers pays for the ad and that was also true

23   with audience network placements.

24          Q.   (By Ms. Weaver)  And in this case, the

05:43:23 25   advertiser is Facebook; is that right?

                                                          319


                          **CONFIDENTIAL ROUGH DRAFT**

05:43:26  1          A.   No.

2          MR. BENJAMIN:  Objection to form.

3          Q.   (By Ms. Weaver)  Okay.  Facebook is

4   placing the ad on behalf of an advertiser; is that

05:43:34  5   right?

6          MR. BENJAMIN:  Objection to form.

7          THE DEPONENT:  It's a similar concept as

8   placing an ad on Facebook, the advertiser creates

9   the ad and chooses the audience.  Facebook dis--

05:43:50 10   on -- on our platform we display it here we send it

11   to a publisher so the website or app and they

12   display the ad.

13          Q.   (By Ms. Weaver)  So is Facebook involved

14   in pulling together targeted interests or behaviors

05:44:11 15   for the creation of ads in audience network?

16          A.   No.

17          MR. BENJAMIN:  Objection -- sorry to

18     Bella objection to form.  Compound.  Vague.

19          THE DEPONENT:  No, the creation of an ad

05:44:26 20     that goes on an audience network is the same of

21     creation of an ad on Facebook.  The advertiser

22     selects their desired audience through our

23     targeting options the same ones that we covered.

24     The -- our role in the audience network portion is

05:44:44 25     in plays -- is in -- is in -- I think placing is

                                                      320


                    **CONFIDENTIAL ROUGH DRAFT**

05:44:49  1     maybe confusing us.  Is in -- that ad going to a

2     third party website rather than on our platform to

3     be displayed to a user.

4          Q.   (By Ms. Weaver)  And then does Facebook

05:45:01  5     track performance measurements and report that back

6     to the advertiser?

7          MR. BENJAMIN:  Objection to form.

8          THE DEPONENT:  Similar to an ad that we

9     display on -- site and advertiser would know the

05:45:16 10     aggregate performance metric of that ad.

11          Q.   (By Ms. Weaver)  Are you aware of

12     performance measurements provided to sales force at

13     Oracle that were different than the kinds of

```
        14  performance measurements provided orderly to -- to
05:45:35 15  advertisers?
        16              MR. BENJAMIN:  Objection to form.
        17              THE DEPONENT:  In the -- can you clarify
        18  in the sense of like Salesforce and/or detail
        19  advertisers.
05:45:49 20     Q.   (By Ms. Weaver)  Yes?
        21     A.   And did we provide them with different
        22  metrics.
        23     Q.   Yes.
        24     A.   No.
05:46:22 25     Q.   Over time with regard to the performance
```

321

**CONFIDENTIAL ROUGH DRAFT**

```
05:46:25  1  metric provided by Facebook to advertisers, what
         2  are examples of metrics that are provided today
         3  that were not provided in the past?
         4     A.   As an example, I am sorry Matt I keep
05:46:45  5  jumping.
         6              When a new ad format is introduced such
         7  as video ads were not a type of ad that we had
         8  originally -- also showed the relevant performance
         9  metric of like aggregate views of that video, which
05:47:05 10  wouldn't haven't existed prior to a video ad.
```

11      Q.   Can you think of other examples that were

12   ad added our time with regard to performance

13   measurements or metrics provided to advertisers?

14           MR. BENJAMIN:  Objection to form.

05:47:20 15          THE DEPONENT:  Ad score is example that

16   has been something that we have ad had in over

17   time.

18      Q.   (By Ms. Weaver)  When ad score added?

19      A.   I don't know the exact date.  But from

05:47:33 20   2016 onwards I believe.

21      Q.   Any other examples you can think of?

22      A.   I can't think of any other examples more

23   specifically on a timeline.

24      Q.   What is conversion tracking?

05:47:57 25      A.   Conversion tracking is way to understand

322

**CONFIDENTIAL ROUGH DRAFT**

05:48:00  1   who subsequently bought an ad or -- or converted

2   on -- on the product.

3      Q.   Does Facebook provide that information to

4   advertisers?

05:48:14  5      A.   That works in conjunction with our

6   business tools.

7      Q.   Okay.  Does Facebook provide that

```
           8    information to advertisers through their business

           9    tools?

05:48:25  10         A.   We -- so for an ad that's -- that's a

          11    conversion ad, an advertiser sets up the pixel and

          12    they are able to understand and the conversions

          13    from that ad.

          14         Q.   And when you say "the advertiser sets up

05:48:43  15    the pixel" do you mean to imply that's the

          16    advertiser that is tracking the conversion for is

          17    it?

          18         A.   Yes.

          19         Q.   Is just as well through the pixel?

05:48:56  20              MR. BENJAMIN:  Objection to form.

          21              THE DEPONENT:  The advertiser sets up the

          22    pixel Facebook also receives the information from

          23    the pixel.

          24         Q.   (By Ms. Weaver)  What specifically the

05:49:09  25    information that the pixel selects with regard to
```

                                                    323


                          **CONFIDENTIAL ROUGH DRAFT**

```
05:49:11   1    conversion tracking?

           2         A.   Pixel collects two categories of

           3    information 11 is contact information which is form

           4    of identifier.  And event the event that something
```

05:49:27 5    is advertiser design in this case conversion and

6    they choose the version to send back about that

7    event.

8        Q.   And for the record, can you define

9    conversion?

05:49:41 10        A.   Conversion is -- is -- is -- the end of

11    the marketing funnel it's when someone buys the

12    product or service being advertised.

13        Q.   Is -- is it always a public chair can

14    also be just a desired action?

05:50:03 15        MR. BENJAMIN:   Objection to form.

16        THE DEPONENT:   Desired action is

17    particularly broad because advertiser having

18    desired axe with any ad they are placing, so in the

19    sense of you create an ad with alike page objective

05:50:18 20    to try and get people to like your page.  So -- are

21    more closely to take a very specific like buying

22    or -- or -- or it is the -- the -- the end of the

23    funnel that someone has completed the marketing

24    funnel.

05:50:39 25        Q.   (By Ms. Weaver)  So we a conversion a

                                                    324


                    **CONFIDENTIAL ROUGH DRAFT**

05:50:42 1    completion of a business objective?

2          MR. BENJAMIN:  Objection to form.

3          THE DEPONENT:  I don't think inaccurate I

4     don't know -- exactly how we would describe but

05:51:00 5    that -- that -- I'm fine with that description.

6          Q.   (By Ms. Weaver)  Okay.  Are you familiar

7     with something called an ad console?

8          A.   No, not -- not immediately.  Do you mind

9     walking through what your reference is.

05:51:24 10        Q.   Yeah.  Is there something internally that

11    the advertising team sees about ad came paints that

12    is not provided to the advertiser?

13         MR. BENJAMIN:  Objection to form and

14    scope.

05:51:43 15        THE DEPONENT:  An advertising team being

16    like the sales team associated with an advertiser.

17    Or.

18         Q.   Yes.

19         A.   I -- there are internal tools that are

05:52:01 20   sales team uses.  I do not -- I don't know if

21    that's specifically ad console that -- that is

22    what -- if that's what it is named CHECK/CHECK.

23         Q.   Okay.  What is an ECTR?

24         A.   The estimated click-through rate.

05:52:23 25        Q.   And how is that calculated?

325

**CONFIDENTIAL ROUGH DRAFT**

05:52:29  1      A.   The ECTR is part of the machine learning

          2  the estimated action rate that's a similar concept

          3  so it's the likelihood -- I am sorry one moment.  I

          4  want to be sure I'm also not confusing acronyms

05:52:50  5  here.

          6           MS. WEAVER:  No problem.

          7           THE DEPONENT:  I -- I apologize I don't

          8  want to definition on the definition of how we

          9  create the estimated click-through rate.

05:53:12 10      Q.   (By Ms. Weaver)  Who would know?

         11      A.   Our ad measurement team would know.

         12      Q.   Who is the -- in the ad measurement team?

         13      A.   An example is Toby Roessingh.

         14      Q.   ROSING?

05:53:33 15      A.   It's -- his last name one second.  I can

         16  spell this.

         17      A.   ROESSINGH.

         18      Q.   Is the lead on the ad measurement team?

         19           MR. BENJAMIN:  Objection to form and

05:54:04 20  scope.

         21           THE DEPONENT:  I'm not sure his exact

         22  position but he's on ad measurement.

         23      Q.   (By Ms. Weaver)  Anyone else you can

24  think of?

05:54:16 25          MR. BENJAMIN:  Same objection.

                                                    326


                    **CONFIDENTIAL ROUGH DRAFT**

05:54:18 1          THE DEPONENT:  No, he's -- he's a point

2  of contact that -- that I use for the ads's

3  measurement team.

4          Q.   (By Ms. Weaver)  Okay.  What is CPC?

05:54:35 5          A.   Cost per click.

6          Q.   And what is CPM?

7          A.   CPM stands for cost per meal which is

8  cost per 1,000 impressions.

9          Q.   And does Facebook provide to advertiser

05:54:54 10 following a campaign the metrics that include

11 clicks impressions CPM, CPC and CTR?

12         A.   Do you mean for -- those -- those

13 aggregated metrics that we provide to advertisers.

14         Q.   Does Facebook also provide revenue

05:55:15 15 information?

16         THE DEPONENT:  Revenue is -- our like

17 related to us we provide the advertiser with ad

18 spend how much they spend on that ad.

19         Q.   (By Ms. Weaver)  And then does Facebook

05:55:31 20 provide something called value to advertisers?

```
            21      A.   We do provide a metric called value.

            22      Q.   And what is value?

            23      A.   How we calculate value is something that

            24   I -- I'm afraid I will -- will misrepresent.

05:56:01 25         Q.   But Facebook does calculate value, right?
```
                                                              327


                        **CONFIDENTIAL ROUGH DRAFT**

```
05:56:08  1      A.   We so --

           2           MR. BENJAMIN:  Objection -- objection to

           3   form.

           4           THE DEPONENT:  We provide a metric called

05:56:14  5   or part of performance is -- is a metric called

           6   value.

           7      Q.   (By Ms. Weaver)  And it's the value of

           8   what?

           9      A.   I'm not certain and I don't want to

05:56:25 10   misrepresent what it stands for.

          11      Q.   Who would know?

          12      A.   Again Toby.

          13      Q.   What is ego value?  EGO value egO.

          14   Value.

05:56:45 15           THE DEPONENT:  I'm not certain.  I --

          16   I -- I -- I'm not familiar with that this yeah.

          17      Q.   (By Ms. Weaver)  Does Facebook provide
```

18   real time ads metrics to advertisers?

19          MR. BENJAMIN:  Objection to form.

05:57:08 20          THE DEPONENT:  Can you clarify for real

21   time do you mean as soon as an action happens on an

22   ad?

23          Q.   (By Ms. Weaver)  I mean, I -- I don't

24   know I don't work at Facebook.  But what is real

05:57:19 25   time mean at Facebook?

328

**CONFIDENTIAL ROUGH DRAFT**

05:57:23  1          MR. BENJAMIN:  Objection to form.

2          THE DEPONENT:  So we provide as an ad

3   begins to run we provide the aggregated metrics

4   performance metrics those aren't like a minute by

05:57:39  5   minute updated, so it's that's what we mean by real

6   time it's -- it's not how those metrics are shared

7   with advertisers.

8          Q.   (By Ms. Weaver)  How about five minute

9   level granularity is that shared with advertisers?

05:58:03 10          A.   I don't know the exact refresh rate of

11   those aggregated metrics.

12       ██    ███████████████████████████

██  ████████████████████████

██    ██    █████████████



███   ████████████████████████

```
         13      Q.   (By Ms. Weaver)  Okay.  What are QRT

         14   experiments?

05:59:58 15      A.   Those aren't specific to -- to ads a QRT

         16   is to effectively understand the change when we

         17   launch something so if we see as an example we

         18   might -- I'm trying -- probably silly am example.

         19   In ads manager we switched the order of nothing we

06:00:24 20   might run a QRT where some advertisers are in one

         21   group and other advertisers are in other group to

         22   understand if there is a difference between the --

         23   the groups and the UIs to understand if there's an

         24   impact to how they engage with our tools.

06:00:41 25      Q.   And what is QRT stand for, do you know?
```

                                                      330


                       **CONFIDENTIAL ROUGH DRAFT**

```
06:00:48  1      A.   I don't know.

          2           MR. BENJAMIN:  Objection to form and

          3   scope.

          4           THE DEPONENT:  This is probably a -- a

06:00:53  5   problem at Facebook where we were -- without ever

          6   learning the -- the fallboarding I'm not sure.  I'm

          7   not sure what the full name is or what it stands

          8   for.
```

                9      Q.   (By Ms. Weaver)  So do QRT experiments

06:01:08 10    generates ads specific metrics that are useful to

                11    Facebook in figuring out how best to target users?

                12            MR. BENJAMIN:  Objection to form.

                13            THE DEPONENT:  No, a QRT is about

                14    creating -- like a production environment that we

06:01:33 15    can understand if it's different from different

                16    production environment.  It's not a method to

                17    target users for ads.  That is still established by

                18    our targeting tools that advertisers choose.

                19      Q.   (By Ms. Weaver)  What a -- what's a

06:01:53 20    production environment?

                21            MR. BENJAMIN:  Objection.

                22            Is anyone else hearing a echo?

                23            THE COURT REPORTER:  Yes.

                24            MS. WEAVER:  I'm hearing an echo too.

06:02:11 25            MR. BENJAMIN:  Do we do want to go off

                                                          331


                          **CONFIDENTIAL ROUGH DRAFT**

06:02:12 1    the record.

                2             THE COURT REPORTER:  Sure.

                3             MS. WEAVER:  I want to continue with dep;

                4    do you have -- do we to he have.

06:02:22 5             THE DEPONENT:  18 minutes.  Is it on my

         6   own if I mute does that help.

         7             (Discussion off the stenographic record.)

         8        Q.   Okay.  Back what is production

         9   environment.

06:03:33 10        A.   That was my way of explaining that we

        11   created two versions of a UI for users who -- who

        12   are in this -- in the example I gave advertisers to

        13   interact with it's just a -- a life part of our

        14   site.  I'm not sure if like a technical term that

06:03:53 15   would be used but that's what I was describing.

        16        Q.   Are you familiar with something called

        17   deltoid?

        18             MR. BENJAMIN:  Objection to form.

        19             THE DEPONENT:  Not super specific to ad

06:04:08 20   targeting or ad ranking.  Deltoid from my

        21   understanding is low we help measure when a.

        22             THE DEPONENT:  RT is running the

        23   differences in metrics from that effectively those

        24   two environments the two versions that that we have

06:04:28 25   running.

                                                        332


                         **CONFIDENTIAL ROUGH DRAFT**

06:04:29  1        Q.   (By Ms. Weaver)  And what do you mean by

          2   the differences in metrics?

3     A.   So going back to the example of that I

4  was using of advertiser maybe we switched the.  I

06:04:40 5  in one version to understand if it's an easier UI

6  or them to use.  I mean one thing would be like ad

7  creation do we see similar rates of ad creation

8  when we make that change.

9     Q.   Got it.

06:05:02 10          So does Facebook provide to third parties

11  ad market daily metrics?

12          MR. BENJAMIN:  Objection to form to.

13     Q.   (By Ms. Weaver)  Know is that something

14  that Facebook maintains internally sorry that about

06:05:15 15  Matt?

16          MR. BENJAMIN:  Excuse me Ms. Weaver

17  apologize.

18          Objection to form and scope.

19          THE DEPONENT:  I am sorry I missed the

06:05:24 20  very beginning of your question.

21     Q.   (By Ms. Weaver)  Does Facebook provide to

22  third parties ad market daily metrics?

23          MR. BENJAMIN:  Same objections.

24          THE DEPONENT:  No my understanding is

06:05:42 25  that that's an internal table of -- of ad

                                                   333

**CONFIDENTIAL ROUGH DRAFT**

06:05:48  1  performance and metrics.

2      Q.   (By Ms. Weaver)  And does Facebook

3  maintain per impression logging with revenue

4  information for ads?

06:06:03  5      MR. BENJAMIN:  Objection to form.

6      THE DEPONENT: ███████████  we maintain

7  something called ads impressions annotated which is

8  an impression login table to be clear.  I don't

9  think it's revenue based.  Revenue again is more

06:06:19  10 specific to us rather than ad spend from the

11 advertiser.

12     Q.   (By Ms. Weaver)  And does Facebook share

13 data from the ads impressions annotated with third

14 parties?

06:06:38  15     MR. BENJAMIN:  Objection to form and

16 scope as phrased.

17     THE DEPONENT:  No, we share the

18 aggregated impression information in like our --

19 our ads manager performance metrics not the table.

06:06:51  20     Q.   (By Ms. Weaver)  And where is that

21 aggregated impressions information maintained at

22 Facebook?

23     MR. BENJAMIN:  Objection to form and

24 scope.

06:07:04 25          THE DEPONENT:  It's read from our data

                                                              334


                        **CONFIDENTIAL ROUGH DRAFT**

06:07:07 1    basis it's read from the tables but aggregated for

       2    to desired audience play to -- in our UI.

       3          Q.   (By Ms. Weaver)  I am sorry.

       4          A.   No, no.

06:07:18 5          Q.   You said read from databases which

       6    databases do you mean specifically?

       7          A.   The -- the back end here, I -- I were --

       8    this isn't specific to ads, I'm not -- I'm not sure

       9    if like our ads reporting UI reads it ████████

06:07:44 10   specifically in which case it would be the ads

      11    impressions annotated or ████████████████

      ██ ████████████   is where like the production site is

      13    run from.

      14          Q.   Is there data ████████████  which is

06:08:12 15   shared with third parties?

      16          MR. BENJAMIN:  Objection to form and

      17    scope.

      18          THE DEPONENT:  Can you -- do you mind --

      19    collar -- clarify do you mean such as like the

06:08:30 20   tables █████?

      21          Q.   (By Ms. Weaver)  Yes.

22          MR. BENJAMIN:  Same objection.

23          THE DEPONENT:  So within the context of

24     ads we don't share the tables ███████ with third

06:08:42 25     parties.

                                                         335


                    **CONFIDENTIAL ROUGH DRAFT**

06:08:44  1      Q.   (By Ms. Weaver)  Which share information

2     contained in the tables ████████ some -- some

3     portion of it with advertisers?

4          MR. BENJAMIN:  Objection to form.  Asked

06:08:55  5     and answered.

6          THE DEPONENT:  Our ad reporting metrics

7     the one we discussed the aggregated ones such as in

8     ads manager I'm not certain if those come ████████

9     if that's an age gender that's there but were

06:09:14 10     example where conceptually that might happen.  But,

11     again, it's about -- it's backing the aggregated

12     metrics that we provide to an advertiser.

13      Q.   (By Ms. Weaver)  What's the difference

14     between a raw and a legal impression?

06:09:30 15          MR. BENJAMIN:  Objection to form and

16     scope.

17          THE DEPONENT:  A legal impression is an

18     impression that we -- that is targeted ad had to

```
          19  the advertiser a raw impression is not always a
06:09:48  20  legal impression.
          21       Q.   (By Ms. Weaver)  How does Facebook decide
          22  what is a legal impression?
          23            MR. BENJAMIN:  Objection to form and
          24  scope.
06:09:58  25            THE DEPONENT:  This -- this is within ads
```

                                                                336


                          **CONFIDENTIAL ROUGH DRAFT**

```
06:10:00   1  measurement an example from -- from my knowledge is
           2  if we -- if we show an an ad multiple -- if an
           3  ad -- I am trying to explain how -- how I remember
           4  this.
06:10:28   5            If -- if an example of a raw impression
           6  is that does -- is not a legal impression because
           7  legal impressions a subset of those, would be if an
           8  ad is shown to a user potentially repeatedly and it
           9  was not -- it wasn't supposed to be so it's -- if
06:10:48  10  an indication of potentially like a miss delivery
          11  on our side so we don't charge the advertiser for
          12  it.
          13            Beyond that I, don't know all the cases
          14  and that would be something that our ads
06:10:59  15  measurement would cover.
```

16          Q.    (By Ms. Weaver)  Are you aware of a table

17     that logs per user daily key revenue metrics with

18     ads revenue?

19                MR. BENJAMIN:  Objection to form and

06:11:12 20    scope.

21                THE DEPONENT:  No.

22          Q.    (By Ms. Weaver)  So you are familiar with

23     a log called ███████████████████████

██   ███?

06:11:26 25                MR. BENJAMIN:  Same objections.

                                              337

**CONFIDENTIAL ROUGH DRAFT**

06:11:31  1                THE DEPONENT:  I'm -- I'm not familiar

2     with all of data in that table or if it reflects

3     revenue per user that's not something we calculate.

4          Q.    (By Ms. Weaver)  Do you know if -- are

06:11:50  5    you familiar with a ████████████████████

██  ██████████████████████████████████

██  ████████████████████████████

8     CHECK/CHECK?

9                MR. BENJAMIN:  Objection to form and

06:12:05 10    found and scope.

11                THE DEPONENT:  I don't know the details

12     of the columns of that ████████████████████

13          Q.   (By Ms. Weaver)  Is there a person who is

14     responsibility is to track revenue tied on a user

06:12:19 15     basis no, we don't track revenue on a user basis.

16          Q.   You said we don't you mean currently

17     Facebook doesn't do that?

18               MR. BENJAMIN:  Objection to form and

19     scope on this line.

06:12:50 20               THE DEPONENT:  We don't track per user

21     how much -- the revenue we've gain from that user

22     is what I mean.

23          Q.   (By Ms. Weaver)  Okay.  With regard to

24     conversions are you familiar with something called

06:13:07 25     an RSVP?

338

**CONFIDENTIAL ROUGH DRAFT**

06:13:12 1               MR. BENJAMIN:  To scope.

2               THE DEPONENT:  No I might need some --

3     some narrowing or clarification.

4          Q.   (By Ms. Weaver)  Sadly, I don't have any.

06:13:34 5               MS. WEAVER:  Okay I think we go off the

6     record quickly how much time do we have left.

7               THE VIDEOGRAPHER:  Let's see -- off the

8     record we about seven or eight minutes left.

9               MS. WEAVER:  Great.  Thank you.

06:13:52 10            THE VIDEOGRAPHER:  Okay.  We are off the

        11    record it's 6:13 p.m.

        12            (Recess taken.)

        13            THE VIDEOGRAPHER:  We are back on record

        14    it's 6:28 p.m.

06:28:11 15    Q.  (By Ms. Weaver)  Ms. Leone just a -- or

        16    Ms. Leone just a few more questions.  You testified

        17    the CPC is metric that refers to cost per click.

        18            Do you recall that?

        19    A.  Yes.

06:28:23 20    Q.  Can it also?

        21            MS. WEAVER:  You know, it sound like this

        22    echo is me let me try.

        23            Can you refer --

        24    A.  I am sorry, that came in and out

06:28:41 25    continuously.

                                                              339


                         **CONFIDENTIAL ROUGH DRAFT**

06:28:45  1            MS. WEAVER:  Hello, I just want back to

         2    the other Mike.

         3    Q.  Okay.  Can CPC also refer to a type of

         4    bidding that advertisers can choose where they pay

06:28:54  5    each time a user clicks on the ad?

         6    A.  It is abiding strategy that they can

        7    select when they set up their ad.

        8         Q.   And is reach the number of users who

        9    research an ad?

06:29:14 10        A.   Reach is the number of accounts that --

       11    that -- that see an ad, yes.  I think that were we

       12    are saying the same thing.

       13         Q.   And unique accounts?

       14         A.   Unique accounts.

06:29:25 15        Q.   What is frequency?

       16         A.   Together reach and frequency are a type

       17    of a membership of brand awareness of we we will

       18    try to -- to -- to optimize the ad to reach a large

       19    number of people or reach many people and multiple

06:29:50 20  times with an ad so they familiarize yourself with

       21    that brand.

       22         Q.   So is reach frequency a number of times a

       23    user is exposed to an ad?

       24         A.   Yes.

06:30:03 25        Q.   And is average frequency calculated by

                                                                  340


                           **CONFIDENTIAL ROUGH DRAFT**

06:30:06  1  dividing impressions by reach?

        2         A.   I believe so.  But I -- I would be

        3    potentially need to to -- to confirm.

4          MS. WEAVER:  Okay.  That's it I have no

06:30:25  5    further questions at this time and reserve all

6    rights and on behalf of plaintiffs.

7          MR. BENJAMIN:  Okay.  Thank you for

8    Counsel Weaver on behalf of Facebook like to have

9    an opportunity to ask the questions wanted to today

06:30:38 10   we just reserve all rights.

11         Transcript confidentiality pursuant to

12   the pending the final confidential's designation.

13         MS. WEAVER:  Great.  Thank you.  We can

14   go off the record.

06:30:50 15        THE VIDEOGRAPHER:  We are -- do you want

16   to go off the record.  I am sorry I didn't hear.

17         MS. WEAVER:  We can go off.

18         THE VIDEOGRAPHER:  Off the record.  Thank

19   you.  We are off the record.  It's 6:31 p.m.

20

21

22

23

24

25

341