# EXHIBIT 104-B
## Redacted Version of
## Document Sought to be Sealed

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC-JSC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' MOTION FOR ADDITIONAL TIME TO CONDUCT RULE 30(b)(6) DEPOSITIONS**<br><br>Judge: Hon. Vince Chhabria<br>Special Master Daniel Garrie<br><br>JAMS Ref. No.: 1200058674 |

# I.   INTRODUCTION

Plaintiffs seek an order (1) modifying the 70-hour time limit for Plaintiffs' 30(b)(6) deposition of Defendant Facebook on specific topics to permit Plaintiffs 50 hours total for all remaining 30(b)(6) testimony; and (2) compelling the attendance of Facebook's General Counsel at all remaining 30(b)(6) depositions. This relief is required because the improper conduct of Facebook, its 30(b)(6) designees, and its outside counsel have prevented Plaintiffs from obtaining the complete testimony on key topics to which they are entitled.  Facebook has refused to provide the requested relief.

# II.   BACKGROUND

The Special Master is well aware of the lengthy history of negotiations over, and disruptions to the taking of, Facebook's testimony under Rule 30(b)(6). In brief, Plaintiffs first provided Facebook with their draft 30(b)(6) deposition notice on December 23, 2021, inviting Facebook to confer. It didn't. On March 1, 2022, Plaintiffs served the 30(b)(6) notice, which included ten topics. Ex. A. On May 4, 2022, the parties agreed that Plaintiffs would have 21 total hours to complete Topics 1-4 and 6-10. Ex. B. The next day, the deposition of designee Allison Hendrix was repeatedly obstructed by defense counsel's lengthy speaking objections, instructions not to answer based on scope, and failure to prepare the witness to competently testify. Plaintiffs sought sanctions to address Facebook's misconduct, and the parties stipulated to a protocol intended to prevent future disruptions. The parties also agreed to extend the 30(b)(6) time limit on Topics 1-4 and 6-10 to 70 hours, which would not include the time spent deposing or re-deposing Ms. Hendrix. Ex. C.

As of August 3, Facebook has been on the record for 67 hours and 18 minutes of 30(b)(6) testimony on Topics 1-4 and 6-10, but testimony is not complete.[1] Plaintiffs seek, and Facebook has agreed to provide in part, additional testimony on Topics 2 (data made accessible), 6 (friend sharing), 7 (whitelisting), 8 (tracking data), 9 (VPPA), and 10 (monetization), including testimony from a witness Facebook has designated to testify about targeted advertising, which cuts across several of these topics. All of that testimony is subject to the 70-hour limit. In addition, the parties have scheduled testimony about Topic 5, and Plaintiffs seek additional testimony about preservation and testimony about FTC complaints and consent orders.

# III.   FACEBOOK HAS WASTED SUBSTANTIAL DEPOSITION TIME

**Designation of Multiple Witnesses Has Required Additional Time:** Facebook's designation of multiple representatives for single topics has required multiple depositions where one should have sufficed. For example, Facebook designated 3 witnesses to address Topic 9 (VPPA) and 4 witnesses—Ms. Hendrix, Simon Cross, Chris Casorio, and Isabella Leone—to address Topic 2 (data made accessible). Facebook also insisted on presenting distinct witnesses on Targeted Advertising and Data Brokers, which are not themselves discretely noticed 30(b)(6) topics. Instead, Facebook extracted those subjects from numerous topics, including Topics 2, 4, 8, and 9(b). Ex. D, E, F. Because each new witness requires time to ask background and

---

[1] This total overstates the on-the-record time, since the parties' May 17 Stipulation provides that "[t]ime spent arguing about objections will not count against testimony time[.]"

foundational questions, Facebook's designations have substantially encroached on the time allotted for 30(b)(6) testimony. Designating multiple witnesses also created confusion about which witnesses would cover which topics, spawning further on-the-record discussions.

**Facebook failed to prepare designees:** Facebook designees were often unprepared to answer questions that were not merely within the scope of the noticed topics, but also identified by Plaintiffs prior to the depositions. Considerable time was thus wasted on questions designees were unprepared to answer and then on discussions of the designees' knowledge and preparation.

For example, Simon Cross, designated for parts of Topics 2 (data made accessible) and 8 (tracking data), and all of Topics 6 (friend sharing) and 7 (whitelisting), was unprepared to address specific third parties that received access to friend information, Facebook's revenue from friend sharing and whitelisting, or various issues regarding private APIs. *See* Pls.' Resp. filed 7/15/22 ("Cross Response") at 4-6. Cross improperly referred Plaintiffs to other witnesses for answers to questions within the scope of his topics, *id.* at 2, and often simply read documents without being able to testify to Facebook's intent or understanding. Ex. G at 481-83, 611-16.

Mike Clark, designated for Topic 4 (pseudonymization, de-identification, association, and deletion), wasted time refusing to testify about Facebook's definition of "personal information." Ex. H at 218-226. The Special Master stated on the record that "how Facebook defines personal information" is "a critical concept" for the entire case and encouraged Facebook to produce another witness to explain Facebook's definition. *Id.* at 241-45. David Miller, designated on subtopic 9(c) (actions enabling users to access and share video content), was not prepared to testify about changes in Facebook infrastructure designed to improve access to and sharing of video content, *e.g.*, Ex. I at 39-43, or to any investments Facebook made to facilitate user access to, or sharing of, video content, *id.* at 42-43. And Michael Fahey, designated on subtopic 9(a) (changes to video content and information over time), was not prepared to talk about what caused video-watching and related metrics to change over time. Ex. J at 19-21.

These are only examples, and Plaintiffs are happy to provide more at the Special Master's request. In sum, Facebook has routinely failed to fulfill its obligation to adequately educate its designees so they were prepared to fully answer questions within the topics for which they were designated. *Bowoto v. ChevronTexaco Corp.*, 2006 WL 294799, at *1 (N.D. Cal. Feb. 7, 2006).

**Plaintiffs' Identification of Documents and Explanations Have Not Solved the Problems:** Plaintiffs routinely provide Facebook with all intended deposition exhibits at least 3 days prior to each deposition. *See* ECF No. 789 ¶ 24. But Facebook's designees often fail to review the exhibits. Indeed, in just 5 transcripts—the first three days of Mr. Cross's testimony on Topics 6 and 7, Amy Lee's testimony on Topic 10 (monetization), and Mr. Clark's testimony on Topic 4—Facebook's designees stated 109 times that they were unfamiliar with an exhibit or had not made any effort to learn about it.

For example, although Plaintiffs' repeatedly asked Facebook to ensure Ms. Lee was prepared to testify about Onavo, Ex. K, she was not prepared to discuss it during her deposition. Ex. L at 200-01.  Similarly, although Plaintiffs specifically asked Facebook to prepare Mr. Cross to address the Capabilities Tool, he was unprepared to answer at least 39 questions Plaintiffs asked about it. Cross Response at Ex. B. And although Plaintiffs identified specific cookies they intended to ask Mr. Clark about, he was unprepared to answer questions about them. Ex. H.

Plaintiffs have had to schedule numerous follow-up depositions to elicit testimony on these and other previously identified topics. They've deposed Mr. Cross for 5 days, had to depose a second designee on Topic 4 (pseudonymization, de-identification, association, and deletion), will depose Ms. Lee for a second time on Topic 10 (monetization), and will depose a second Topic 5 designee (Named Plaintiffs data). Though Facebook has cooperated in putting these additional designees forward, the process of getting answers to Plaintiffs' questions has taken far longer than anticipated. These ongoing depositions also necessitate additional time.

**Facebook's Counsel Exacerbated These Issues:** Facebook's counsel continue to object to topics as outside the scope when a witness is unprepared to address questions within the scope of the noticed topics. For example, Facebook's counsel took the position that Topic 4 concerned only the "deletion" of data, *see* Ex. M, a position flatly contradicted by the text of the notice. *Id.* Facebook later offered a designee to address data association, but this incident wasted considerable time and required a second day of testimony on the topic.

## IV.     RELIEF REQUESTED

**Extension of Cumulative Time Limit:** Plaintiffs require an extension of the time limit for the 30(b)(6) deposition of Facebook. *See* Fed. R. Civ. P. 30(d)(1) ("The court must allow additional time . . . if needed to fairly examine the deponent or if the deponent, another person, or any other circumstance impedes or delays the examination."). This time will be required to obtain testimony on the outstanding 30(b)(6) topics Plaintiffs have noticed. There are two topics on which Facebook has not offered testimony: (i) FTC complaints and consent orders; and (ii) Targeted advertising – extracted by Facebook from Topics 2, 4, 6, 8 and 9(b). Plaintiffs also require additional testimony on the following topics: (i) Named Plaintiff Data – Topic 5; (ii) VPPA – Topic 9; (iii) Monetization – Topic 10; (iv) ADI – Topic 2; and (v) Preservation.[2]

In order to simplify timekeeping, Plaintiffs believe it will be easier to start the clock over and provide Plaintiffs 50 hours from this date forward for all 30(b)(6) testimony. Plaintiffs expect this will be sufficient to complete the remaining depositions provided that, going forward, designees are appropriately prepared and counsel minimize on-the-record distractions.

**Attendance of Facebook's General Counsel:** During the July 26, 2022 case management conference, Judge Chhabria suggested ordering "Facebook's general counsel to be at every 30(b)(6) deposition" to avoid continued problems "with Facebook's witnesses not being prepare[d] to answer questions that they were on notice[] that they needed to answer or not being familiar with documents that they were on notice that they needed to answer questions about." Ex. N. Because Facebook's conduct has repeatedly wasted the on (and off) the record time of both the parties and the Special Master, and because it is reasonable to expect that the proposed relief might substantially improve the efficiency of further depositions, Plaintiffs seek an order compelling the attendance of Facebook's General Counsel at all future 30(b)(6) depositions. *See generally Hall v. Clifton Precision, Div. of Litton Sys., Inc.*, 150 F.R.D. 525, 527 (E.D. Pa. 1993) ("Taken together, Rules 26(f), 30, and 37(a), along with Rule 16, . . . vest the court with broad authority and discretion to control discovery, including the conduct of depositions.").

---

[2] Plaintiffs also reserve the right to obtain additional testimony from Simon Cross on Topics 2, 6, 7, and 8 depending on the resolution of the pending dispute regarding written questions.

Dated: August 3, 2022                                  Respectfully submitted,


KELLER ROHRBACK L.L.P.                                 BLEICHMAR FONTI & AULD LLP

By:     */s/ Derek W. Loeser*                          By:     */s/ Lesley E. Weaver*
        Derek W. Loeser                                         Lesley E. Weaver


Derek W. Loeser (admitted *pro hac vice*)              Lesley E. Weaver (SBN 191305)
Cari Campen Laufenberg (admitted *pro hac vice*)       Anne K. Davis (SBN 267909)
David Ko (admitted *pro hac vice*)                     Matthew S. Melamed (SBN 260272)
Adele A. Daniel (admitted *pro hac vice*)              Angelica M. Ornelas (SBN 285929)
Benjamin Gould (SBN 250630)                            Joshua D. Samra (SBN 313050)
Emma M. Wright (admitted *pro hac vice*)               Javier Bleichmar (admitted *pro hac vice*)
Daniel Mensher (admitted *pro hac vice*)               Joseph A. Fonti (admitted *pro hac vice*)
Michael Woerner (admitted *pro hac vice*)              555 12th Street, Suite 1600
Matthew Gerend (admitted *pro hac vice*)               Oakland, CA 94607
1201 Third Avenue, Suite 3200                          Tel.: (415) 445-4003
Seattle, WA 98101                                      Fax: (415) 445-4020
Tel.: (206) 623-1900                                   lweaver@bfalaw.com
Fax: (206) 623-3384                                    adavis@bfalaw.com
dloeser@kellerrohrback.com                             mmelamed@bfalaw.com
claufenberg@kellerrohrback.com                         aornelas@bfalaw.com
dko@kellerrohrback.com                                 jsamra@bfalaw.com
adaniel@kellerrohrback.com                             jbleichmar@bfalaw.com
bgould@kellerrohrback.com                              jfonti@bfalaw.com
ewright@kellerrohrback.com
dmensher@kellerrohrback.com
mwoerner@kellerrohrback.com
mgerend@kellerrohrback.com


Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com


Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

                            *Plaintiffs' Co-Lead Counsel*

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843 Case No. 18-md-02843-VC |
| This document relates to: ALL ACTIONS | **DECLARATION OF CARI LAUFENBERG IN SUPPORT OF PLAINTIFFS' MOTION FOR ADDITIONAL TIME TO CONDUCT RULE 30(b)(6) DEPOSITIONS** Judge: Hon. Vince Chhabria Special Master Daniel Garrie JAMS Ref. No.: 1200058674 |

I, Cari Laufenberg, declare and state as follows:

1.      I am a partner at the law firm of Keller Rohrback L.L.P. and am counsel for Plaintiffs in the above-captioned matter.

2.      I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently to them.

3.      Attached as Exhibit A is a true and correct copy of excerpts from Plaintiffs' Second Amended Notice of Deposition of Defendant Facebook, Inc. Pursuant to Federal Rule of Civil Procedure 30(b)(6), which was served on March 1, 2022.

4.      Attached as Exhibit B is a true and correct copy of the email from R. Blume, Attorney, Gibson, Dunn & Crutcher, LLP, to C. Laufenberg, Attorney, Keller Rohrback L.L.P. et al. (May 4, 2022, 5:58 PM).

5.      Attached as Exhibit C is a true and correct copy of a highlighted excerpt from the parties' Mediation Tracker (May 9, 2022).

6.      Attached as Exhibit D is a true and correct copy of the letter from M. Melamed, Attorney, Bleichmar Fonti & Auld LLP, to A. Aycock, Attorney, Gibson, Dunn & Crutcher LLP (July 15, 2022).

7.      Attached as Exhibit E is a true and correct copy of the letter from A. Schwing, Attorney, Gibson, Dunn & Crutcher LLP, to L. Weaver, Attorney, Bleichmar Fonti & Auld LLP, & D. Loeser, Attorney, Keller Rohrback L.L.P. (May 28, 2022).

8.      Attached as Exhibit F is a true and correct copy of excerpts from the email from A. Schwing, Attorney, Gibson, Dunn & Crutcher LLP, to A. Daniel, Attorney, Keller Rohrback L.L.P. et al. (July 6, 2022, 7:30 PM).

9.      Attached as Exhibit G is a true and correct copy of excerpts from the Deposition of Simon Cross 30(b)(6) Corporate Representative, Facebook, Inc. (May 9, 2022).

10.     Attached as Exhibit H is a true and correct copy of excerpts from the Deposition of Facebook's 30(b)(6) Corporate Representative – Michael Patrick Clark (May 18, 2022).

11.     Attached as Exhibit I is a true and correct copy of excerpts from the Deposition of Facebook's 30(b)(6) Corporate Representative - David Miller (July 22, 2022).

12.     Attached as Exhibit J is a true and correct copy of excerpts from the Deposition of Facebook's 30(b)(6) Corporate Representative - Michael Fahey (July 21, 2022).

13.     Attached as Exhibit K is a true and correct copy of excerpts from the email from L. Weaver, Attorney, Bleichmar Fonti & Auld LLP, to M. Kutscher Clark, Attorney, Gibson, Dunn & Crutcher LLP et al. (May 16, 2022, 9:56 AM).

14.     Attached as Exhibit L is a true and correct copy of excerpts from the Deposition of Facebook's 30(b)(6) Corporate Representative - Amy Lee (May 19, 2022).

15.     Attached as Exhibit M is a true and correct copy of the letter from J. Samra, Attorney, Bleichmar Fonti & Auld, LLP, to M. Kutscher Clark, Attorney, Gibson, Dunn & Crutcher LLP et al. (June 17, 2022).

16.     Attached as Exhibit N is a true and correct copy of excerpts from the transcript of the Case Management Conference hearing before Judge Chhabria (July 26, 2022).


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and to the best of my knowledge.


Dated August 3, 2022.


By: _____

Cari Campen Laufenberg

# Exhibit A

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

*Plaintiffs' Co-Lead Counsel*

*Additional counsel listed on signature page*

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' SECOND AMENDED NOTICE OF DEPOSITION OF DEFENDANT FACEBOOK, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)** |

**TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** under Federal Rules of Civil Procedure 26 and

30(b)(6), Plaintiffs, by their counsel, will take the deposition of Defendant Facebook, Inc.

("Facebook"), on dates and at times to be determined by the parties.  Please take notice that due

to the disruptions to travel and accompanying shelter-in-place orders caused by the COVID-19

outbreak, the deposition of Facebook will occur via remote means on and will be coordinated by

Veritext Legal Solutions, with a business address at 101 Montgomery St., Suite 450, San

Francisco, CA 94104. Contact Veritext's calendar team at ahenderson@veritext.com to retrieve

the necessary credentials to access the remote deposition, as well as information related to any

technical assistance you may require to assist with carrying out the virtual deposition.

Alternatively, if circumstances permit and the parties agree, the matter may be taken in whole or

part in-person and virtually. Those who wish to appear in the physical presence of another do so at their own election; however, this noticing party is not requiring the in-person physical attendance of counsel, the witness or any other party to this action.

The deposition will be taken before a person authorized by law to administer oaths under Federal Rules of Civil Procedure 28(a) and shall continue from one day to the next, excluding Sundays and holidays, until the examination is completed.

Pursuant to Rule 30(b)(6), Defendant is hereby notified of its duty to designate one or more officers, directors, managing agents or other persons most knowledgeable or qualified to testify on its behalf concerning the matters set forth below. Each such designee produced to testify has an affirmative duty to have first reviewed all Documents, reports, and other matters known or reasonably known or available to Facebook and to familiarize himself or herself with all potential witnesses known or reasonably available to provide informed, binding answers at the deposition. Defendant Facebook shall inform Plaintiffs of such designations(s) at a reasonable time prior to the deposition(s), but no later than 7 days before the deposition(s), by setting forth the identity of the person(s) designated to testify with respect to the matters specified below. The deposition will continue on the day noticed and for additional days, if necessary, excluding Sundays and holidays, until completed.

Under Federal Rules of Civil Procedure 30(b)(2) and 34, Defendant is requested to produce the documents responsive to the requests listed on Schedule B no fewer than five days before the deposition is to take place.

Plaintiffs reserve the right to notice and conduct additional Rule 30(b)(6) depositions of Defendant on separate, non-duplicative topics.

**NOTICE IS FURTHER GIVEN** that Plaintiffs reserve the right to conduct this

## SCHEDULE A

**I.    DEFINITIONS AND RULES OF CONSTRUCTION**

In the event of any conflict or ambiguity between the following definitions, common usage and reference to any cited rules, statutes, or regulations should be used to provide the broadest interpretation of the term in question.

1.    "API" refers to an application programming interface.

2.    "App" means an interactive software application developed to utilize the core technologies of the Facebook social networking platform.

3.    "App Developer" refers to any person or company that develops an App, software experience, game, plugin, or website that accesses User Data from Facebook's APIs or other Facebook software.

4.    "App Publisher" refers to any person or company who publishes an App on Facebook's platform.

5.    "App Settings" means the selectors on the Facebook App that purported to allow Facebook Users to prevent their Content and Information from being shared with applications. *See* SACC ¶¶ 310-321.

6.    "Business Plan" means any plan created or prepared by Facebook regarding Facebook's historical and future business strategy, including but not limited to Facebook's historical and future operations, and Facebook's historical and future financial positions.

7.    "Communication" means any contact, oral or documentary, formal or informal, at any time or place or under any circumstances whatsoever, whereby information of any nature is transmitted or transferred, including correspondence, and references to notes, letters, memorandum, e-mail, reports, or any other document by which information is passed or

conveyed from one individual or entity to another.

8.      "Computer System" or "Computer Systems" include(s), but is not limited to, any

server (whether physical or virtual), desktop computer, tablet computer, point of sale system,

smart phone, cellular telephone, networking equipment, internet site, intranet site, and the

software programs, applications, scripts, operating systems, or Databases used to control, access,

store, add, delete, or modify any information stored on any of the foregoing non-exclusive list.

9.      "Content and Information" refers to the definition in footnote 2 of the Second

Amended Consolidated Complaint ("SACC"), referring to "content" and "information" as

Facebook's Statements of Rights and Responsibilities have defined those terms. In brief,

Facebook has generally used "information" to mean facts and other information about Users,

including the actions they take, and "content" to mean anything Users post on Facebook that

would not be included in the definition of "information." Content and Information also includes

both personally identifiable user data and anonymized Data or information that is capable of

being de-anonymized. *See* SACC ¶¶ 263-264. Content and Information includes but is not

limited to Personal Information.

10.     "Data" or "Information" refers to Personal Information, Content and Information,

and Data collected and derived about Users, including information ordered relevant in the

Court's October 29, 2020 Order, Dkt. No. 557 ("Discovery Order No. 9"), which defines the

discoverable User Data at issue in this case to include "Data collected from a user's on-platform

activity; Data obtained from third parties regarding a user's off-platform activities; and Data

inferred from a user's on or off-platform activity."

11.     "Data Brokers" refer to companies that specialize in collecting personal Data or

Data about companies, mostly from public records but sometimes sourced privately, and selling

or licensing such information to third parties for a variety of uses.

12.     "Default" means the Privacy Setting or App Setting that Facebook selected for Users, and which required Users to take affirmative steps to change.

13.     "Document(s)" includes any data, document, ESI, or electronic media stored in any medium and is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34 and Federal Rules of Evidence 101(4)(6), and 1101, including, but not limited to programming source code, electronic or computerized data compilations, any writing, drawing, graph, chart, photography, phonorecord, Communications, electronic chats, instant messaging (including ephemeral ones), encrypted or self-destructing messages, email Communications, notebooks, diaries, reports, logs, digitally encoded Data, Database, graphic, other electronically stored information from Personal computers, sound recordings, photographs, hard copy Documents. and/or other Data compilations from which information can be obtained, translated if necessary, by the respondent through detection devices into reasonably usable form, or other information, including originals, translations and drafts thereof, and all copies bearing notations and marks not found on the original. The term "Document" further means any document now or at any time in the possession, custody, or control of the entity to whom this document request is directed (together with any predecessors, successors, affiliates, subsidiaries, or divisions thereof, and their officers, directors, employees, agents and attorneys), including drafts. Without limiting the term "control" as used in the preceding sentence, a Person is deemed to be in control of a document if the Person has the right or ability to secure the document or a copy thereof from another Person having actual possession thereof, including, but not limited to, work product contracted by You from others. Documents that are identical but in the possession of more than one Person or entity are separate documents

within the meaning of this term. Also, a draft or non-identical copy is a separate document within the meaning of this term.

14.    "Discovery Order No. 9" refers to the Court's October 29, 2020 Order, Dkt. No. 557, that defined the discoverable data at issue in this case to include "Data collected from a user's on-platform activity; Data obtained from third parties regarding a user's off-platform activities; and Data inferred from a user's on or off-platform activity."

15.    "Electronically-Stored Information" or "ESI" means the complete original and any non -identical copy (whether different from the original because of notations, different metadata, or otherwise) of any electronically created or stored information, including, but is not limited to, the following:

a.    All items covered by Fed. R. Civ. P. 34(a)(1)(A);

b.    Information or Data that is generated, received, processed, and recorded by computers and other electronic devices, including metadata (e.g., author, recipient, file creation date, file modification date, etc.), system data, deleted data, fragmented data, data pertaining to or maintained in Apps, database contents, and computer code;

c.    Internal or external web sites, intranets and extranets;

d.    Output resulting from the use of any software program, including, without limitation, word processing documents, spreadsheets, Database files, unorganized data, charts, graphs and outlines, e-mail, instant messaging, SMS, MMS, or other text messaging,, Facebook Messenger, WhatsApp, AOL Instant Messenger (or similar programs), and other electronic correspondence (whether active, archived, unsent, or in a sent or deleted - items folder), word- processing

files, spreadsheets, databases, presentation files, video recordings, and sound recordings, regardless of how or where the information is stored, including if it is on a mobile device, bulletin board programs, screenshots/screengrabs, screen sharing recordings, webcasts, screencasts, operating systems, source code, PRF files, PRC files, batch files, ASCII files, and all miscellaneous media on which they reside regardless of whether said electronic Data exists in an active file, a deleted file, or file fragment;

e.   Activity listings of electronic mail receipts and/or transmittals; and

f.   Any and all items stored on computer memories, hard disks, floppy disks, CDROM, magnetic tapes of all types, microfiche, flash memory devices, CDs, DVDs, Blu-ray discs, cloud storage (e.g., DropBox, Box, OneDrive, or SharePoint), or on any other media for digital Data storage, or transmittal, such as, but not limited to, personal digital assistants, (e.g., iPhones), cellular or smart phones (e.g., iPhones, tablets, BlackBerrys, iPhone, or Samsung Galaxy), personal digital assistants, or any other means for digital storage and/or transmittal and file folder tabs, or containers and labels appended to, or relating to, any physical storage device associated with each original or copy of all documents requested herein.

8.     "Friend" refers to a User whose Data or Information became accessible to a Third Party because they were Facebook friends with another User. "Friends" is the plural of Friend.

16.     "Including" means "including but not limited to," or "including, without limitation." Any examples which follow these phrases are set forth to clarify the request, definition, or instruction but not to limit the topic.

17.     "Integration Partnership" refers to any Facebook Partner for whom the purpose of the partnership was to support the functionality of the Facebook App on a device or platform.

18.     "Marketing Plan" means any plan created or prepared by Facebook regarding Facebook's historical and future marketing or advertising strategy.

19.     "Partner(s)" refers to the definition provided in Order re: Business Partners Discovery Dispute (Dkt. No. 608), as confirmed in the Special Master's Order re: Business Partners, issued November 2, 2021, Whitelisted Partners (as defined herein) and includes persons, apps and entities who accessed user information directly as well as those who were able to target users based on information derived about them by Facebook.

20.     "Personal Information" under California law at Cal. Civ. Code § 1798.140(o)(1) is information that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular User, such as:

    a.  Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

    b.  Characteristics of protected classifications under California or federal law.

    c.  Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

    d.  Biometric information.

    e.  Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a

consumer's interaction with an Internet Web site, application, or advertisement.

f.   Geolocation Data.

g.   Audio, electronic, visual, thermal, olfactory, or similar information.

h.   Professional or employment-related information.

i.   Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. section 1232g, 34 C.F.R. Part 99).

j.   Inferences drawn from any of the information identified in this paragraph to create a profile, dossier, or similar collection of information about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

21.    "Policies and Procedures" includes any formal or informal policy, procedure, rule, guideline, internal manuals, collaborative document, directive, instruction, or practice, whether written or unwritten, that You expect Your principals, directors, officers and employees to follow in performing their jobs.

22.    "Users' Privacy Settings" means the audience selectors on the Facebook App that purported to allow Facebook users to control with whom their information was shared.

23.    The "Special Master's Order Re: Plaintiffs' Motion to Compel Production of Plaintiff Data" refers to the order of that named issued by the Special Master on November 29, 2021.

24.    "Third Parties" include the following:

a.   Apps, App Developers, App Publishers, Whitelisted Partners, and Partners;

b.   Data Brokers;

    c.   Any person or company with which Facebook has or had an integration

      partnership; and

    d.   Advertisers, to the extent these are not already covered in prior categories above.

25.    "Terms of Service" refers to the documents to which a User or Third Party must agree to in order to use or access Facebook.

9.    "User" means a person who maintains or has maintained a Facebook account in the United States. "Users" is the plural of User.

10.    "Use Case" refers the purpose for an entity to obtain User Data.

11.    "API Version" refers to both major version and minor version of an API (*e.g.* Version 2.0 is different from Version 2.1).

26.    "Whitelisted Partners" means any entity or person provided access to a capability, such as permission to read or write informaiton via a specific API call, that was not provided to all entities or persons.  "Whitelist," "Whitelisted," or "Whitelisting" refers to this practice.

27.    "You" or "your" or "Facebook" or "Defendant" means Defendant Facebook, Inc., together with your predecessors, successors, parents, subsidiaries, divisions or affiliates (foreign or domestic), and their respective current and former officers, directors, agents, attorneys, accountants, employees, partners, managers, members or other persons occupying similar positions or performing similar functions, and all persons acting or purporting to act on its behalf.

28.    Words used in the plural include the singular, and words used in the singular include the plural.

## II.    RELEVANT TIME PERIOD

Unless otherwise specified or agreed upon by the parties, the relevant time period for purposes of this Notice is January 1, 2007 through the present.

## III.   MATTERS FOR TESTIMONY

1.     Your organizational structure, including (i) the names of departments or other organizational designations within Facebook, their functions, and their structure within Facebook and (ii) employees in each department (including their responsibilities and chain of command), as (i) and (ii) relate to:

    a.   The calculation of revenues, gross profits, net profits, goodwill, impairments and assets recognized by Facebook relating to Users' Data or Information, including but not limited to Facebook's public reporting of same;

    b.   The process for drafting, evaluating, approving, modifying, issuing and monitoring the effectiveness of the Statement of Rights and Responsibilities, Data Use Policies, Privacy Policies, disclosures, public statements, Facebook messages or posts by CEO Zuckerberg, Sandberg or any Facebook executive that concern: (i) the sharing of Users' Data or Information with Third Parties, (ii) the use of Users' Data or Information by Third Parties, including identification of those responsible for these functions; and (iii) Cambridge Analytica or inquiries, investigations, public response, media reports, regulatory or governmental hearings into concerns arising out of the Cambridge Analytica scandal; and

    c.   Communications with shareholders, financial stakeholders, regulatory or governmental entities, and the public arising out of the Cambridge Analytica scandal.

2.     Identification, by category, of the type of Data or Information to which Facebook sold, made accessible, made available, or allowed Third Parties to use to target Users, including:

    a.   The types of User Data or Information Facebook shared, made accessible or permitted Third Parties to target;

      b.   The purposes for which such Data or Information was shared or made accessible, or permitted Third Parties to target;

      c.   The format or formats through which it is shared or made accessible, or made available to Third Parties to target; and

      d.   How Facebook ensured Third Parties' Use of such Data or Information was limited to the Use Case.

3.      An overview of the processes of developing Privacy or App Settings or other controls made available to Users to prevent or limit their Data or Information from being accessed by Third Parties, including the dates during which each such Privacy or App Setting or other controls were available, the Data and Information covered by each Setting or control, and the Default setting for each, including:

      a.   How Privacy or App Settings or other privacy designations associated with Users' Data and Information were (or were not) communicated to Third Parties such that Third Parties could comply with them;

      b.   Processes, reviews, investigations, inquiries, studies, analyses, and Communications relating to Users' Privacy or App Settings, their efficacy, including user experience, customer service, internal regulators, whether internal or by third parties; and

      c.   Facebook's monitoring and enforcement of contractual terms with Third Parties regarding their use of Users' Data or Information, including enforcement of Policies regulating access to such Data or Information beyond the Use Case.

4.      Facebook's processes of pseudonymization, de-identification, re-identification, association, and deletion of User Data and Information.

5.      The systems, repositories, databases, and other sources (collectively herein, "Systems" or "System" when singular) containing or referencing any Data that can be associated with a User and, for each:

a.  The schemas, response schemas, and fields for the System;

b.  The type of Data stored or referenced in the System;

c.  How the data is stored in or referenced by the System;

d.  The other Systems that interact with that data, and the manner by which that interaction occurs;

e.  The manner by which Data from the System is made accessible to Third Parties, or affects in any way the way Data stored or referenced elsewhere is made available to Third Parties.

6.      The development of Friend Sharing, including but not limited to: its purpose and identification of those involved in its development; how the technology functioned; the APIs and permissions associated with Friend Sharing; the communication of this technology to users, including the drafting of Facebook's Terms of Service, SRR and Data and Privacy Policies relating Friend sharing; and the revenue impact and net profits for Facebook relating to Friend sharing throughout the Class Period.

7.      The decision to Whitelist particular apps or partners, and how Facebook determined which entities to Whitelist, including:

a.  The most efficient way to identify each Whitelisted entity (including but not limited to apps and partners) throughout the Class Period; the purpose of such Whitelisting; what Data or Information each Whitelisted entity had access to; for what period of time; and whether the access granted exceeded the Use Case;  and

when such Whitelisting ceased; and calls logs or any other tracking of third-party

Whitelisted apps or partners that had access to and made use of Friend Sharing

APIs and permissions;

b.   The most efficient way to establish payments, revenues, exchanged value, actual

or promised, Facebook received for permitting Whitelisting capabilities, and the

revenues and net profits Facebook recognized related to Whitelisting throughout

the Class Period, including the evaluation of the benefits, including goodwill,

barter or exchange benefits; and

c.   Identification of those with decision-making responsibility relating to whitelisting

throughout the Class Period, beginning with those with final and decisive

authority.

8.   The methods, tools, technologies, databases, project management tools, task lists, or other

internal sources Facebook used to track Third Parties and Data Brokers, including:

a.   The type and purpose of Data and Information Facebook received;

b.   The type and purpose of Data and Information Facebook provided;

c.   The Payments, consideration, actual or promised, Facebook provided or received

for engaging in such exchanges; and

d.   The evaluation of the Benefits to Facebook of the information provided or

received for engaging in such exchanges.

9.   Video content and information relating to video content, requested or obtained, available

to or accessed, interacted with, or shared by users on or via the Facebook platform, specifically:

a.   The amount of such content and how the amount of such content has changed or

varied over time;

b.  the records or information that Facebook has regarding such content and users' access to, interactions with or sharing of such content;

c.  Actions taken or decisions made by Facebook in order to enable users to access, interact with, or share such content, and when such actions were taken or decisions were made;

d.  Access by Third Parties to Data and Information related to users' access to, interaction with, or sharing of video content on or via the Facebook platform, and whether and how such access has changed or varied over time, including but not limited to APIs, permissions and capabilities providing access to Facebook users' video related content and information; and

e.  Which persons employed at any time by Facebook have the most knowledge related to the topics listed in paragraphs a through d above.

10. Facebook's calculation of revenues, gross profits, and net profits recognized by Facebook relating to Users' Data or Information, including but not limited to how Facebook monetized User Data or Information, how Facebook quantified the value of sharing User Data or Information, and Facebook's business and marketing strategy regarding the monetization and quantification of User Data or Information.

## **SCHEDULE B**

Pursuant to Fed. R. Civ. P. 30(b)(5) and 34, Plaintiffs request the production of or identification by Bates number of the following, at least 5 business days before testimony on one or more of the deposition topics identified in Schedule A request, via e-mail or file transfer:

1.      All documents which the person Facebook designates to testify on its behalf has consulted or reviewed or plans to consult in preparation for the deposition and has relied upon or will rely upon for testimony concerning the above deposition topics.

2.      A curriculum vitae for the person Facebook designates to testify on its behalf.

# Exhibit B

| | |
|---|---|
| **From:** | Blume, Robert C. <RBlume@gibsondunn.com> |
| **Sent:** | Wednesday, May 4, 2022 5:58 PM |
| **To:** | Cari Laufenberg; Ring, Rose; *** Service-FB-CA_MDL |
| **Cc:** | Anne Davis; David Ko; Derek Loeser; Lesley Weaver; Matt Melamed |
| **Subject:** | 30(b)(6) Depositions--time on the record |

Cari:

We considered your request for an additional **five hours** (for a total of **21 hours**) to complete the deposition testimony for all of Topics 1-10, except Topic 5, noticed in *Plaintiffs' Second Amended Notice of Deposition of Defendant Facebook, Inc. Pursuant to Federal Rule Of Civil Procedure 30(b)(6)*. We note that during our recent meet & confer, you acknowledged that the parties previously agreed to allocate 16 hours for these topics. Nevertheless, you asserted that after a good-faith assessment of Plaintiffs' 30(b)(6) deposition objectives and the fact that Facebook divided these topics between no fewer than six witnesses, Plaintiffs required this additional time.

In light of the above, Facebook accepts your proposal and agrees to present its corporate representatives for Topics 1, 2, 3, 4, 6, 7, 8, 9, and 10 for a total of **21 hours**.

Let me know if you would like to discuss.

Best,
RCB

**Robert C. Blume**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1801 California Street, Denver, CO 80202-2642
Tel +1 303.298.5758 • Fax +1 303.313.2870
RBlume@gibsondunn.com • www.gibsondunn.com

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

# Exhibit C



# Exhibit D

 

July 15, 2022

**VIA ELECTRONIC MAIL**

Amanda Aycock
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
AAycock@gibsondunn.com

Re:  *In re Facebook, Inc. Consumer Privacy User Profile Litig.*,
Northern District of California Case No. 3:18-md-02843-VC

Dear Amanda,

We write in response to your July 13 letter regarding the 30(b)(6) deposition concerning data brokers.

**Documents.** Thank you for identifying the documents that the designee will be prepared to address at his deposition. As required by the deposition protocol, below is a list of documents Plaintiffs anticipate we may question the designee about during the deposition. For ease of reference, the list includes the documents identified in your letter.

| | |
|---|---|
| FB-CA-MDL-03543133 | ADVANCE-META-00003593 |
| FB-CA-MDL-02242293 | ADVANCE-META-00003601 |
| Dep. Exhibit 295 (A. King) | FB-CA-MDL-03639988 |
| FB-CA-MDL-01129655 | FB-CA-MDL-01186561 |
| Dep. Exhibit 3 (Papamiltiadis) | Dep. Exhibit 370 (Lee) |
| Dep. Exhibit 415 (Lentini) | Dep. Exhibit 371 (Lee) |
| Dep. Exhibit 421 (Lentini) | ACXM_FB2_0023691 |
| Dep. Exhibit 422 (Lentini) | FB-CA-MDL-03103532 |
| FB-CA-MDL-03476912 | FB-CA-MDL-03103932 |
| FB-CA-MDL-02146206 | FB-CA-MDL-03103473 |
| ACXM_FB2_0018637 | ADVANCE-META-00003607 |
| FB-CA-MDL-02496055 | ADVANCE-META-00003611 |
| ACXM_FB2_0000122 | |
| ACXM_FB2_0730511 | |
| ADVANCE-META-00003579 | |

**Subject Matter.** Your letter provides what you describe as a representative list of the subject matter the designee will be prepared to testify about within the scope of the portions of Topics 2 and 8 as they pertain to data brokers. The representative list is helpful. But your colleagues have also identified Mr. Casorio as Facebook's designee on other topics as they relate to data brokers. On June 23, in an email about Topic 4, Heather wrote that, "[p]er my prior emails and other communications from our team . . . Chris Casorio will cover Partner

July 15, 2022                                          **KELLER ROHRBACK L.L.P.**
Page 2                                                 **BLEICHMAR FONTI & AULD LLP**

Categories." And on July 11, Austin wrote that, for Topic 9b, Plaintiffs' "questions relating to Custom Audiences should be directed to Ms. Leone and Mr. Casorio." It is all a bit of a mess.

Regardless, to assist Facebook's ability to prepare the designee, Plaintiffs are primarily interested in: (1) the types of user information Facebook received from data brokers, from which data brokers it received that information, how it used that information, and what it paid for that information; and (2) the types of user information Facebook provided data brokers, to which data brokers it provided that information, how they used that information, and what it received for such information.

But we note that Facebook's duty is not limited to preparing the designee to address those topics, or the documents it or Plaintiffs identified. Rather, Facebook "has a duty to educate its witnesses so they are prepared to fully answer the questions posed at the deposition." *Bowto v. ChevronTexaco Corp.*, 2006 WL 294799, at *1 (N.D. Cal. Feb. 7, 2006). That duty requires preparing the designee "to fully and unevasively answer questions about the designated subject matter." *Adidas Am., Inc. v. TRB Acquisitions LLC*, 324 F.R.D. 389, 394 (D. Or. 2017). This is a large, complex case spanning a long time period, and we understand that preparing the designee is burdensome. But the burden is imposed by Rule 30(b)(6), not Plaintiffs.

If you'd like to discuss anything in this letter, please let me know.

Regards,

Matthew Melamed
mmelamed@bfalaw.com

cc:     Service-FB-CA_MDL@gibsondunn.com

# Exhibit E

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-0921
Tel 415.393.8200
www.gibsondunn.com

Austin Schwing
Direct: +1 415.393.8210
Fax: +1 415.374.8458
ASchwing@gibsondunn.com

May 28, 2022

**<u>VIA ELECTRONIC MAIL</u>**

Lesley Weaver
Bleichmar Fonti & Auld LLP
555 12th Street, Suite 1600
Oakland, CA 94607

Derek W. Loeser
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101

Re:     *In re Facebook, Inc. Consumer Privacy User Profile Litigation*

Dear Counsel:

To ensure that Simon Cross's next 30(b)(6) deposition proceeds in a productive and efficient manner, we write again to explain our understanding of his designated topics and to ask that the parties try to resolve any confusion or disagreement in advance.  Specifically, if there is any remaining confusion or disagreement, we ask that you let us know sufficiently in advance of the next deposition so that we may meet and confer and, as necessary, seek assistance of our mediators and/or Special Master Garrie.  We want the remaining 30(b)(6) depositions to go smoothly and offer this summary in the spirit of achieving that mutual goal.

Mr. Cross is designated to testify on Topics 6, 7, 8, 2(a), 2(c) and 2(d), with certain exceptions explained below.  Mr. Cross testified on Topics 6 and 7 during his first two days of deposition, so we begin with those topics.

**Topic 6.**  Mr. Cross was designated to testify on Topic 6, except as it relates to communications to Users about friend sharing (including any communication via Facebook's Terms of Service, SRR, and/or Data and Privacy Policies related to friend sharing), which is being covered by Ms. Hendrix.  *See, e.g.*, Hendrix 30(b)(6) Tr. at 23:24-24:17.

Specifically, Mr. Cross was designated to testify about the technical aspects of friend sharing, including (1) the technical development of friend sharing, (2) the purpose of friend sharing, and (3) the revenue and net profits (if any) Facebook attributed directly to friend sharing.  Plaintiffs' notice does not define "friend sharing," but Facebook understands this

**GIBSON DUNN**

Lesley Weaver
Derek W. Loeser
May 28, 2022
Page 2

term to refer to permissions related to how third-party app developers and/or integration partners access the Information or Data of a User's friends.

Accordingly, Mr. Cross was prepared on and testified to the following issues, among others, during his first two days of deposition:

- Inception of friend sharing via friend permissions, including when it was developed and how it functioned over time (*see, e.g.*, Cross 30(b)(6) Tr. at 71:11-16);

- Inception of Graph API and how it evolved over time, including the reasons for such evolutions (*see, e.g.*, *id.* at 40:1-44:6);

- Definition of friend sharing (*see id.* at 68:17-70:7);

- Purpose of friend sharing (*see id.* at 70:13-71:4);

- Definition and function of integration partners (*see id.* at 52:2-21);

- Facebook Users' decision-making as to whether certain apps or integration partners obtained access to that User's friend data.  *See, e.g.*, *id.* at 82:25-83:18;

- How Facebook made Data accessible to developers (including integration partners) to allow them to build applications (*see, e.g.*, *id.* at 52:22-55:23; 195:19-196:4);

- Permissions associated with friend sharing (*see, e.g.*, *id.* at 72:7-74:25);

- How friend-sharing technology functioned, including developers' access to Data through Graph API (versions 1, 2, and 3), as well as REST API and FQL (*see, e.g.*, *id.* at 38:20-39:25; 86:5-88:4);

- Reasons behind the transition to Graph API version 2 as that transition related to the deprecation of friend permissions (*see, e.g.*, *id.* at 41:24-46:18; 253:18); and

- Revenue impact, if any, that deprecating friend permissions had on Facebook (which is different and distinct from valuing User Data, a topic Mr. Cross was not designated for) (*see, e.g.*, *id.* at 66:20-67:14; 147:3-10).[1]

During his first two days of deposition, Mr. Cross provided detailed answers to your questions, often helping to frame questions more precisely in ways that you repeatedly

---

[1]  On May 9, Plaintiffs' counsel asked Mr. Cross about "an analysis that [Mr. Cross had] seen of the impact of the Platform changes that were proposed," but Mr. Cross could not remember the document specifically.  *See* Cross 30(b)(6) Tr. at 146:25-147:18.  The document Mr. Cross was thinking of is FB-CA-MDL-01813453.

**GIBSON DUNN**

Lesley Weaver
Derek W. Loeser
May 28, 2022
Page 3

indicated was helpful. *See, e.g.*, Tr. 33:9-11 ("Q. Thank you. You've helped me understand any number of documents I have reviewed now. That's helpful information."); Tr. 54:14-15 ("Q. And, again, this clarification is really helpful."); Tr. 101:7-10 ("I've asked you some questions about the different permissions, and you've provided some helpful information about the terminology used to discuss different permissions.")

There were also instances where Mr. Cross could not answer your questions, or could not answer them with a simple "yes" or "no," which you suggested was because he was not adequately prepared or was being evasive. Mr. Cross's preparation was extensive, lasting many hours over several sessions, and it is not accurate to accuse him to being evasive because he does not believe that a question can be answer in a single word. In the interest of trying to avoid the same issues going forward, we wish to share, and discuss if you would like, a few examples of what we mean.

Plaintiffs introduced emails and documents, which Mr. Cross was not copied on and had not drafted, and asked him to explain what the authors meant. Even though these types of questions fall outside the scope of a 30(b)(6) deposition, Mr. Cross did his best to answer them in his personal capacity. That said, it is not reasonable or fair to expect Mr. Cross to get into the minds of other people to explain what they meant in emails and documents. *See, e.g.*, *id.* at 76:12-21 (asking what KP (a former employee) was referring to when he wrote the term "identity data" in a 2013 e-mail); 77:3-25 (asking Mr. Cross to make "reasonable interpretations" or "fair interpretations" of language in an e-mail); 78:1-4 (similar); 277:22-278:12 (asking Mr. Cross whether information in an email "suggest[s] to you" that Konstantinos Papamiltiadis believed that a "framework" for "sorting partners into buckets" was one that had been proposed by Jackie Chang); 279:4-280:1 (asking whether Mr. Cross could confirm, on behalf of Facebook, whether Konstantinos Papamiltiadis was making certain recommendations with respect to a "framework" articulated by Jackie Chang based on language in an email).

Plaintiffs also asked Mr. Cross questions on topics for which Facebook had designated other witnesses and advised Plaintiffs of that designation. For example, Plaintiffs asked questions about whether apps use User Data for advertising, *see id.* at 138:11-17, and whether Facebook did any financial analysis of the value of User Data it makes available to Third Parties, *see, e.g.*, *id.* at 144:18-145:1; 146:3-6. These questions fall squarely into topics for which Facebook designated other witnesses and informed Plaintiffs of those designations: Isabella Leone for targeted advertising (see below), and Amy Lee for "how Facebook quantified the value of sharing User Data" as part of Topic 10.

**Topic 7.** Mr. Cross was designated to testify on Topic 7, which covers Whitelisting as

**GIBSON DUNN**

Lesley Weaver
Derek W. Loeser
May 28, 2022
Page 4

Facebook used the term after the public deprecation of Graph API v1 (as opposed to the broader industry-wide use of the term), including (1) the purpose of Whitelisting, (2) the entities Facebook Whitelisted after announcing its decision to publicly deprecate friend permissions in Graph API v. 1, (3) the Data and Information that Users could permit Whitelisted entities to access, (4) the period of time entities were Whitelisted after the public deprecation of Graph API version 1, (5) the processes and practices undertaken to ensure that these Whitelisted entities complied with their relevant use cases, (6) the individuals or functions within Facebook who had decision-making authority related to adding or removing third-party entities to the Whitelist after the public deprecation of Graph API version 1, and (7) any payments, revenues, exchanged value, or benefit Facebook received or recognized related specifically to the decision to Whitelist entities after the public deprecation of Graph API version 1.

Before the depositions, we informed you that Mr. Cross would not be prepared to recount from memory the specific, granular detail contained in call logs, APIs, or permissions granted to any particular entity—indeed, memorizing such information on an entity-by-entity basis would be impossible given the number of developers and applications running on the platform every year between 2007 and 2018. Nevertheless, Mr. Cross provided extensive testimony on Whitelisting, including, among other things:

- What "Whitelisting" is or refers to. *Id.* at 157:13-12; 164:20-165:15. Mr. Cross testified both as to Whitelisting generally and specifically in the context of permissions granted to certain developers after friend sharing was deprecated. *See, e.g.*, *id.* at 167:21-168:5.

- What it means to Whitelist friend-sharing APIs for an app. *Id.* at 158:23-159:9.

- How developers would access publicly deprecated APIs or permissions. *Id.* at 231:20-3.

- Whether there are means other than via Whitelisting for a developer or an app that is not considered a partner of Facebook's to get access to publicly deprecated permissions. *Id.* at 163:4-19.

- How you would identify apps that had been Whitelisted and received deprecated permissions, including testimony regarding the Capabilities Tool. *Id.* at 169:4-8, 172:8-172:21.

- What "Gatekeepers" are, including their function. *Id.* at 170:22-171:10.

- The reasons why Facebook allowed certain partners to obtain friend data after the transition to Graph API version 2. *Id.* at 192:18-194:22; 232:4-233:22.

**GIBSON DUNN**

Lesley Weaver
Derek W. Loeser
May 28, 2022
Page 5

- The removal of access for Whitelisted apps and the reasons underlying such removal. *Id.* at 240:22-242:21.

As Plaintiffs' counsel acknowledged, he and Mr. Cross had an "obviously lengthy discussion about whitelisting . . . ." *Id.* at 227:13-16.

**Topic 2.** Mr. Cross is designated to testify on Topics 2(a) and 2(c), except as they relate to "targeted advertising" for which Facebook has designated Isabella Leone. "Targeted advertising" is addressed below. Mr. Cross is also designated to testify on Topic 2(d), to the extent it relates to Platform Integrity. As you know, Allison Hendrix was designated to testify as to Topic 2(d) except as it may relate to targeted advertising. *See* Hendrix 30(b)(6) Tr. at 17:15-24. For further avoidance of doubt, Mr. Cross will not testify on Topic 2(b), for which Facebook has designated Ms. Hendrix.

Specifically, Mr. Cross will be prepared to testify on the following issues:

- General categories of User Data shared or made accessible to Third Parties (not including advertisers) through the Facebook Platform ;

- How Third Parties (not including advertisers) are able to access User Data or Information on the Facebook Platform, e.g., via Graph API;

- How developers are able to query specific user data fields to build their apps;

- Process by which an app developer may access non-public User data associated with a specific permission through Graph API;

- The permissions and data points available through Facebook's public APIs;

- Data integration partners and the Data they were able to obtain through the Facebook Platform, and why; and

- Generally the steps the Platform Integrity team undertook to detect misuse.

**Topic 8.** Mr. Cross is designated to testify on Topic 8, except it relates to "targeted advertising," for which Facebook has designated Isabella Leone. "Targeted advertising" is addressed below. Specifically, Mr. Cross will be prepared to testify on the following issues:

- How Data provided to Third Parties (not including advertisers) through the Facebook Platform is tracked;

- The extent to which, if at all, Third Parties (not including advertisers) are required to pay for access to Data or Information via the Facebook Platform;

**GIBSON DUNN**

Lesley Weaver
Derek W. Loeser
May 28, 2022
Page 6

- Mechanisms by which Information or Data was transferred from Third Parties (not including advertisers) back to Facebook; and

- Whether Facebook charged for Facebook Platform API usage.

    On May 6 and May 9, 2022, Plaintiffs identified 55 documents they said they anticipate asking Mr. Cross about during his 30(b)(6) deposition.  Mr. Cross has reviewed those documents.  Mr. Cross has also reviewed, for example, Facebook's responses to FTC Requests for Information (e.g. FB-CA-MDL-01747399; FB-CA-MDL-00346000; FB-CA-MDL-01747759; FB-CA-MDL-01747773; FB-CA-MDL-01747857); white papers submitted to the FTC (e.g. FB-MDL-01194066); letters to the FTC regarding integration partnerships (FB-CA-MDL-01747655); resources from the Facebook Developer website; prior deposition testimony (e.g. Steve Elia, Mike Vernal, Simon Cross); slides regarding the estimated impact of Facebook ecosystem changes (e.g. FB-CA-MDL-01813453-54); and draft slides discussing criteria for granting Whitelisting exemptions and extensions (e.g. FB-CA-MDL-02007346).  Mr. Cross has reviewed and is prepared to testify about these documents, or aspects of those documents, that are within the scope of his designated topics.

    **Targeted Advertising**.  The parties have agreed to meet and confer on May 31, 2022, regarding the meaning of "targeted advertising" as it relates to the exceptions noted above for Topics 2 and 8.  In advance of and subject to the parties' discussions in that meet and confer, Facebook provides this initial response in hopes of facilitating those discussions.

    With respect to Topic 2, Facebook understands "targeted advertising" to mean the Data or Information, if any, that "Facebook sold, made accessible, made available, or allowed Third Parties to use to target Users" for the purpose of delivering advertisements to Users on Facebook.  Facebook understands that "targeted advertising" is not relevant to Topic 2(d), which applies only to apps and app developers, not to advertising.

    With respect to Topic 8, Facebook understands "targeted advertising" to mean the Data or Information, if any, that Facebook received from or provided to Third Parties and Data Brokers for the purpose of delivering advertisements to Users on Facebook [subtopics 8(a) and (b)], and payments, consideration, and evaluation of the benefits of any such exchanges [subtopics 8(c) and (d)].

    Facebook reserves the right to revise the above descriptions based on the parties' continuing meet and confer efforts.

    We hope that this information is helpful and provides a productive path forward.  If you would like to meet and confer on any of these issues, we should do that in advance of Mr.

# GIBSON DUNN

Lesley Weaver
Derek W. Loeser
May 28, 2022
Page 7


Cross' final deposition session.

Sincerely,


*/s/ Austin V. Schwing*
Austin V. Schwing

AVS/tm

# Exhibit F

## Cari Laufenberg

| | |
|---|---|
| **From:** | Schwing, Austin <ASchwing@gibsondunn.com> |
| **Sent:** | Wednesday, July 6, 2022 7:30 PM |
| **To:** | *** Service-FB-CA_MDL; Adele A. Daniel; Angelica Ornelas; Anne Davis; Benjamin Gould; Cari Laufenberg; Chris Springer; David Ko; Derek Loeser; Emma Wright; Eric Fierro; Josh Samra; Julie Law; Lesley Weaver; Matt Melamed; Sarah R. Skaggs |
| **Subject:** | FB MDL - Deposition topic 9 |

Dear Derek,

We write in response to your email below concerning Deposition Topic No. 9, dated July 1, 2022, which responds to our meet and confer on May 31 and our email of June 15. We appreciate your willingness to discuss the scope of Topic 9, and hope that the parties can resolve any disagreements as to the topic.  We are confused, however, by your newly provided descriptions of what you believe Topic 9 covers.  As explained below, your assertions as to the scope of Topic 9 go well beyond the plain language of Topic 9 itself.  Facebook is, of course, willing to continue to discuss a reasonable scope for each subtopic, but the deposition must be limited to Topic 9 as it was originally noticed.

We specifically address each Topic 9 subtopic in turn, below.  We are available to discuss should you have any questions.

Subtopic 9(a)

Subtopic 9(a) is directed to "[t]he amount of such [video] content and how the amount of such content has changed or varied over time."  Your July 1 email for the first time contends that this subtopic is directed to certain "infrastructure Facebook developed."  We understand "infrastructure" to refer to servers and other equipment and software that store and deliver video content.  Based on this understanding, infrastructure does not fall within the plain meaning of this subtopic—let alone within a reasonable scope for the topic as written—and it would not be reasonable to expect Facebook's witness to be prepared on it.  Accordingly, Facebook's witness on this subtopic will be prepared in accordance with my email dated June 15, 2022.  If there are specific questions concerning infrastructure that the plaintiffs seek to inquire about, please let us know and we will consider the plaintiffs' request.

Subtopic 9(b)

Subtopic 9(b) is directed to "[t]he records or information that Facebook has regarding such content and users' access to, interactions with or sharing of such [video] content."  Your July 1 email for the first time contends that this subtopic is directed to certain "policies, procedures (and implementation of such policies and procedures) and practices."  As with the prior subtopic, policies, procedures, and practices do not fall within the plain meaning of this subtopic, and it would not be reasonable to expect Facebook's witness to be prepared on it.  Accordingly, Facebook's witness on this subtopic will be prepared in accordance with my email dated June 15, 2022.  Further, it is not clear what "policies, procedures … and practices" you are even referring to, so this is not a reasonably particularized request.  If there are specific questions concerning policies, procedures, and practices that the plaintiffs seek to inquire about, please let us know and we will consider the plaintiffs' request.

Your email also indicates that the plaintiffs "seek to know whether Facebook and third parties used the Custom Audience feature to match persons with Facebook users who accessed, interacted with, or shared video content—and records, logs or other records that relate to this use."  This again is outside the plain meaning of this subtopic.  In any event, the Custom Audience feature is an advertising feature.  Facebook's advertising witnesses (Isabella Leone and Chris Casorio) will address advertising products and features.

Subtopic 9(c)

With respect to subtopic 9(c), as you know, my email dated June 15, 2022, indicates that Facebook "interpret[s] this topic to be seeking testimony regarding (1) the origin of video becoming a type of content on Facebook that users could access, interact with, or share, and (2) significant additional or different ways that became available for users to access, interact with, or share video content over time."  Your July 1 email agrees that these two subject areas are included within this subtopic, but asserts that the subtopic may encompass *other* subject matter as well.  It is unclear to us, however, what other subject matter could fall within the scope as set forth in your July 1 email—*i.e.*, "an action or decision by Facebook [that] did materially affect how and to what extent the Facebook platform was tailored to delivering video content to users."  What is it you have in mind?  Your requests need to be reasonably particularized so that a witness may be adequately prepared.  If there are specific additional areas of testimony that fall within this subtopic that are not addressed by items (1) and (2) above, please let us know so that we may consider it.


Subtopic 9(d)


With respect to subtopic 9(d), the witness will be reasonably prepared to testify generally as to the subject, with the exception that it would be unreasonable to expect the witness to remember the requested information regarding the number of third parties with access to APIs etc. and to identify those third parties (*i.e.*, the third and fourth top-level bullet points in your email).  There are numerous APIs, permissions and capabilities, and numerous third party developers.  A deposition is not a memory contest.  The witness also cannot be expected to memorize every API, permission, capability, or tool or other product, but will be prepared generally in this area.  If there are a reasonable number of particular APIs, permissions, or capabilities that you are interested in, we request that you let us know this week what they are.


Subtopic 9(e)


We have already expressed our thoughts below.


Best regards,
Austin


---

**From:** Derek Loeser <dloeser@KellerRohrback.com>
**Sent:** Friday, July 1, 2022 12:20 AM
**To:** Schwing, Austin <ASchwing@gibsondunn.com>
**Cc:** Cari Laufenberg <claufenberg@KellerRohrback.com>; *** Service-FB-CA_MDL <Service-FB-CA_MDL@gibsondunn.com>; Adele A. Daniel <ADaniel@KellerRohrback.com>; Anne Davis <adavis@bfalaw.com>; Benjamin Gould <bgould@KellerRohrback.com>; Chris Springer <cspringer@KellerRohrback.com>; David Ko <dko@KellerRohrback.com>; Emma Wright <ewright@kellerrohrback.com>; Josh Samra <jsamra@bfalaw.com>; Lesley Weaver <lweaver@bfalaw.com>; Matt Melamed <mmelamed@bfalaw.com>
**Subject:** Re: FB MDL - Deposition topic 9 - corrected


**[WARNING: External Email]**
**[Please disregard my prior email on this, and use this corrected version – thank you]**

Dear Austin,

This responds to your email about deposition topic 9. In that email, you provided your understanding of the subtopics covered by topic 9 and stated what your designees would and would not be prepared to testify about. We do not agree that the topics are overbroad or lack particularity, and while we are willing accept your understanding of the topics in some respects, in other respects we believe your interpretation is too narrow, as set forth in detail below.

# Exhibit G

                              CONFIDENTIAL

```
 1            THE DEPONENT:  There were some apps that      09:58:17

 2    could access --

 3            SPECIAL MASTER GARRIE:  I'm instructing

 4    the witness to answer the question yes or no.

 5            MR. BLUME:  Mr. Garrie, if there's no yes     09:58:26

 6    or no, can he answer that way as well?

 7            SPECIAL MASTER GARRIE:  If he -- if he's

 8    not able to answer the question, he can say "I'm

 9    not able to answer the question" certainly.  But

10    either "Yes," "No," or "I can't answer the           09:58:34

11    question."

12            Any time you can't answer a question, say

13    "I can't answer."  But he's asking you yes or no,

14    so -- or you can't answer.

15            THE DEPONENT:  It -- it doesn't make --       09:59:00

16    it doesn't make a statement here about like all

17    apps or any apps or some apps.  It just says apps.

18    And at this point, you know, the vast majority of

19    apps could no longer access friend permissions.

20            So it doesn't -- it doesn't -- the            09:59:14

21    statement isn't qualified enough for me to give a

22    yes-or-no answer.

23            SPECIAL MASTER GARRIE:  Okay.

24        Q.  (By Mr. Loeser)  Mr. Cross -- sorry,

25    Special Master Garrie.                                09:59:25
```

                                             Page 481

CONFIDENTIAL

```
 1              SPECIAL MASTER GARRIE:  No.  Go ahead,        09:59:27

 2     Counsel.

 3         Q.  (By Mr. Loeser)  On March 14th, 2016, it

 4     was not true that apps can no longer access friend

 5     permissions, right?                                    09:59:38

 6              MR. BLUME:  Asked and answered.  Scope.

 7     And form.

 8              THE DEPONENT:  There were some apps in

 9     2016 that could still access friend permissions.

10         Q.  (By Mr. Loeser)  And that is not what KP       10:00:01

11     was indicating Ms. Peace should report to

12     USA Today; is that right?

13              MR. BLUME:  Objection.  Form.  Scope.

14              THE DEPONENT:  I can't -- I can't confirm

15     what KP's statement of intent was here.  This is      10:00:16

16     him writing not the -- this is him writing.

17         Q.  (By Mr. Loeser)  So Mr. Cross, he's

18     responding to an email in which Ms. Peace is asking

19     if she should say only a few apps have access to

20     this information, is he not?                           10:00:35

21              MR. BLUME:  Objection.  Form.  Scope.

22     Argumentative.

23              THE DEPONENT:  He's certainly replying to

24     an email from Johanna.

25         Q.  (By Mr. Loeser)  Okay.  And does he not        10:00:47
```

```
 1    say "In the spirit of fairness I would not        10:00:48

 2    say anything around the lines that 'only a few apps

 3    have access to this information'"?

 4         A.   That's what's on the page.

 5         Q.   And does he not say that he would        10:00:59

 6    "suggest that this option under the App Settings is

 7    an artifact of what used to be true and enforce our

 8    messaging that apps can no longer access

 9    friend_*permissions"?

10         A.   Again, those words are written on the    10:01:14

11    page.

12              MR. LOESER:  We can go to the next

13    exhibit.  And I think this will be the last thing

14    that we do today to abide by your request that we

15    stop at the -- the late hour that it is now for     10:01:34

16    you.

17              THE DEPONENT:  I'd appreciate that.

18    Thank you.

19              (Exhibit 344 was marked for

20    identification by the court reporter and is         10:01:38

21    attached hereto.)

22              MR. LOESER:  So this as -- okay.  This

23    will be marked Exhibit 344.

24         Q.   (By Mr. Loeser)  And Mr. Cross, I'm

25    showing you what's been marked as Exhibit 344.  And 10:02:21
```

Page 483

1      Q.   But the idea certainly was to ▮▮▮▮▮         06:02:42

2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮, right?

4      A.   My understanding is yes, the intent of

5    this was to -- was to do a -- perform a         06:02:52

6    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ -- of

7    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮

9      Q.   Okay.  If we can go down to the

10   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ And you         06:03:05

11   see the first bullet there.

12        And it states:  ▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮."         06:03:26

16        Did I read that correctly?

17     A.   You did, yeah.

18     Q.   And so fair to say that Facebook believes

19   that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮?         06:03:41

21        MR. SCHWING:  Object to the form.

22   Outside the scope.

23        THE DEPONENT:  So, again, this is an

24   email from KP, and KP is asserting that he believes

25   that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮         06:03:55

Page 611

1    ████████████                                          06:03:59

2        Q.    (By Mr. Loeser)   And was KP considered a

3    knowledgeable person about these topics at

4    Facebook?

5            MR. SCHWING:   The question is vague.        06:04:08

6    Calls for speculation.

7            THE DEPONENT:   Yeah.  I mean, hard --

8    hard -- hard to answer that question.  Yeah, I

9    don't know how KP was perceived by -- by various

10   people at the company.  He was certainly          06:04:19

11   knowledgeable as a platform partnerships person.

12       Q.    (By Mr. Loeser)   And fair to say that

13   Facebook believed that he had an adequate

14   understanding of what a sensitive private API was?

15           MR. SCHWING:   Outside of the scope.        06:04:34

16   Object to the form.

17           THE DEPONENT:   Yeah, hard for me to

18   answer on behalf of Facebook and what -- what

19   Facebook as -- as an entity thinks.

20           I can give you my -- my view.  But -- but   06:04:45

21   I don't feel I can answer that on behalf of the

22   company as such.

23           I think he was knowledgeable about --

24   about the Facebook developer platform and which

25   APIs existed and what -- what they were being used  06:05:00

                                              Page 612

HIGHLY CONFIDENTIAL

1    by -- how they were being used by developers.          06:05:07

2         Q.   (By Mr. Loeser)  Who at Facebook can

3    answer the question in the way that -- that would

4    describe Facebook's corporate understanding of what

5    is a sensitive private API?                             06:05:21

6              MR. SCHWING:  Object to the scope.  Calls

7    for speculation.

8              THE DEPONENT:  I mean, it -- I think,

9    again, "sensitive" is -- is a subjective

10   definition.  "Private API," I think we've covered.      06:05:36

11   "Sensitive" is subjective.

12             I would think that maybe the legal policy

13   teams would be well placed to opine on that.

14             But, again, "sensitive" is not -- is a

15   subjective term.                                        06:05:56

16        Q.   (By Mr. Loeser)  So who in the policy

17   team could opine on -- on what Facebook means by

18   "sensitive private API"?

19             MR. SCHWING:  Outside the scope.  Calls

20   for speculation.                                        06:06:09

21             THE DEPONENT:  Yeah, I -- I don't know

22   who at the company would like names of -- of people

23   that -- that would be able to give you an

24   authoritative answer.  Again, you're asking a very

25   broad question.                                         06:06:22

HIGHLY CONFIDENTIAL

```
 1         Q.   (By Mr. Loeser)  And do APIs that emit        06:06:24

 2    friend data emit PII data?

 3              MR. SCHWING:  Object -- sorry.

 4              Objection.  Vague.  Outside the scope.

 5              THE DEPONENT:  Can you help me understand      06:06:40

 6    what -- what you mean by PII data?

 7         Q.   (By Mr. Loeser)  Well, what does it mean

 8    here on this -- on this communication?

 9              MR. SCHWING:  Calls for speculation.

10    Outside the scope.                                      06:06:51

11              THE DEPONENT:  Yeah, I -- yeah, I can't

12    give you an authoritative answer to that.  I have

13    my own understanding, but KP is the -- is the

14    author of the email, and he's -- he's the one

15    making these statements.                                06:07:07

16         Q.   (By Mr. Loeser)  Do you know what "PII"

17    stands for?

18         A.   My understanding in this context is "PII"

19    stands for personally identifiable information.

20         Q.   And does friend data provide personally       06:07:18

21    identifiable information?

22              MR. SCHWING:  Objection.  Vague.  Calls

23    for a legal conclusion.

24              THE DEPONENT:  Yeah, it's -- I'm not --

25    I'm not able to make a formal determination of what     06:07:30
```

Page 614

HIGHLY CONFIDENTIAL

1    PII includes or counts as PII.                    06:07:33

2        Q.   (By Mr. Loeser)  So you're saying -- your

3    testimony under oath today is you cannot testify as

4    to whether friend data includes PII?

5        A.   By giving you -- again, I'm trying to do    06:07:48

6    my best here and give you an accurate -- an

7    accurate and complete answer.

8             The definition of "PII" is -- is not

9    defined, and so it's hard to give -- me to give you

10   a complete -- complete answer.  Right?              06:08:00

11            So I -- I just -- I'm not sure I can

12   answer that question in a way that's like -- fully

13   accurate.  I could, you know, speculate and give

14   you my personal take, but you're asking me to

15   testify as to what Facebook considers PII, which is  06:08:14

16   a -- a thing I'm -- I don't believe I'm well placed

17   to give.

18       Q.   Well, Mr. Cross, what do you believe PII

19   is?

20       A.   I think there's a range of definitions     06:08:28

21   of -- of PII.  One definition would be somebody's

22   name and maybe their profile picture.  You could

23   argue that that is personally identifiable.  There

24   are cases where it's not personally identifiable.

25   So hence -- hence the challenge giving a complete    06:08:50

                                            Page 615

HIGHLY CONFIDENTIAL

```
 1    answer there.                                    06:08:55

 2         Q.   Okay.

 3              MR. LOESER:  Why don't we go to the

 4    PowerPoint itself.  It's Exhibit 405.

 5              (Exhibit 405 was marked for            06:09:10

 6    identification by the court reporter and is

 7    attached hereto.)

 8         Q.   (By Mr. Loeser)  Again, Mr. Cross, you've

 9    had a chance to review this PowerPoint previously,

10    right?                                           06:09:23

11         A.   I have, yes.

12         Q.   And did you also read it to prepare for

13    your testimony today?

14         A.    It was -- yes, it was supplied as one of

15    the documents I -- I think you were potentially    06:09:32

16    going to show me, so I -- I reviewed it in

17    preparation for today, yes.

18         Q.   And the title slide states ▮▮▮▮▮▮▮▮▮▮

▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ right?

20         A.   I see that, yeah.                       06:09:45

21         Q.   And what were the ▮▮▮▮▮▮▮▮▮▮▮

▮▮    ▮▮▮▮▮

23              MR. SCHWING:  Objection.  Vague.

24              THE DEPONENT:  Yeah, I think there's a --

25    hard for me to -- to -- there's a number of the    06:09:59
```

Page 616

# Exhibit H

```
 1        A.    That is correct.                          01:10:37

 2        Q.    Okay.  Let me ask you this question.

 3              When was the last time you saw this

 4   document?

 5        A.    I would need to go refer to my notes to    01:10:48

 6   see if I saw this one.

 7        Q.    Okay.  Go ahead and refer to your notes.

 8        A.    I -- I just honestly -- I -- I don't

 9   think --

10        Q.    I think it's fine to look at your notes.   01:10:57

11        A.    I don't know that I had in my notes which

12   documents -- I would -- I would need to physically

13   go look in the binder to see if I saw this one.

14        Q.    Okay.  I'll try to see if opposing

15   counsel produced that document.                       01:11:12

16              But while we're working on that, I wanted

17   to ask a couple questions about Exhibit 348.

18        A.    Specifically, the example earlier that I

19   was looking for?

20        Q.    Uh-huh.                                    01:11:32

21        A.    And the question you answered -- or

22   asked, was in 347, under "Overview," where there

23   were just examples of what UII -- that have been

24   generated in more than 90 days ago, included

25   emails, IP addresses, names, locations, cookies.      01:11:45
```

Page 118

```
 1        Q.    And when you say "cookies," what do you        01:11:48

 2   mean?

 3        A.    Web browser cookies.

 4        Q.    Such as?

 5              MR. BLUME:  Objection.  Form.                   01:11:58

 6              THE DEPONENT:  Cookies that Web browsers

 7   use for the sake of authentication or similar

 8   functions.

 9        Q.    (By Ms. Weaver)  Facebook uses cookies,

10   right?                                                    01:12:18

11        A.    Facebook does use cookies.

12        Q.    And what Facebook cookies are you aware

13   of --

14              MR. BLUME:  Objection.  Form.

15        Q.    (By Ms. Weaver)  -- that are UII?              01:12:27

16              MR. BLUME:  Objection.  Form.

17              THE DEPONENT:  I can't actually recollect

18   without looking at my -- looking at -- looking back

19   in some of the prior documents.  I -- there's --

20   there's a variety of -- there's -- there's a number      01:12:46

21   of different cookies.

22        Q.    (By Ms. Weaver)  Okay.  Are you familiar

23   with the datr cookie?

24        A.    I'm familiar with the datr cookie.

25        Q.    And datr --                                    01:12:57
```

Page 119

```
 1          A.    D-A -- sorry -- D-A-T-R.                    01:12:59

 2          Q.    Yes.

 3                What is the datr cookie?

 4                MR. BLUME:  Objection.  Form.  Scope.

 5                THE DEPONENT:  The datr cookie is a         01:13:13

 6     unique browser identifier.

 7          Q.    (By Ms. Weaver)  And when you say it's a

 8     "unique browser identifier," is it unique to

 9     browsers, or is it unique to a specific visit by a

10     device to a browser?                                  01:13:35

11                MR. BLUME:  Form.

12                THE DEPONENT:  That -- that question is

13     technically inaccurate.  If you could ask it in a

14     different way.

15          Q.    (By Ms. Weaver)  Well, let me put it this   01:13:47

16     way.  Sometimes cookies have lots of different

17     identifiers contained in them.  Datr -- the cookies

18     can have the identifier of the browser and the

19     device ID and a number of things.

20                I'm asking what information is contained    01:13:59

21     in the datr cookie?

22          A.    The datr cookie specifically is tied to

23     the browser.

24          Q.    And the browser only?

25          A.    It is -- it is the browser as it exists.    01:14:13
```

```
 1    And -- and so it's -- it's -- it's the browser as        01:14:15

 2    it's operating.

 3         Q.   Okay.  And you're aware of other Facebook

 4    cookies as well; is that right?

 5         A.   I am.  I would need to refresh my               01:14:27

 6    recollection.

 7         Q.   And how would you refresh your

 8    recollection?

 9         A.   I would -- there's -- I would -- I'd

10    probably look back at the filing I helped put             01:14:42

11    together which described all the Facebook cookies

12    from before.

13         Q.   Do you mean --

14         A.   I just don't remember the names of all of

15    them.                                                     01:14:55

16         Q.   Do you mean your notes?

17         A.   No, I do not mean -- mean my notes.  I --

18    the --

19         Q.   What filings did you put together which

20    described all the Facebook cookies from before?          01:15:02

21         A.   Not that I personally put together.  It

22    was one that -- as Facebook, we had put together

23    that had all of them -- provided clarity on the

24    names and descriptions of all of them.  And I

25    just -- I'm struggling to remember the names of all       01:15:22
```

```
 1    the cookies.                                      01:15:25

 2         Q.   Where is that document?

 3         A.   In a binder sitting across the room.

 4         Q.   Can you look at the document?

 5         A.   Yeah.                                    01:15:35

 6              MR. BLUME:  Objection.  Form.

 7              MS. WEAVER:  Mr. Blume, will you allow

 8    him to look at the document that he needs to

 9    testify regarding these cookies?

10              MR. BLUME:  Objection to the scope of the  01:15:46

11    list of cookies as it relates to topic 4.

12              MS. WEAVER:  I sent an email identifying

13    these cookies, and I'm assuming that's why he

14    prepared this.

15              Why don't we go off the record.          01:16:00

16              SPECIAL MASTER GARRIE:  Actually, let's

17    wait.

18              MS. WEAVER:  Okay.

19              SPECIAL MASTER GARRIE:  I actually was on

20    these emails -- I was on these emails exchanged as  01:16:07

21    a Special Master, and I'm just a bit -- is that --

22    before we just say this emails and cookies, do you

23    want to -- are we all on the same page when we say,

24    did you receive the emails, Counsel Blume?  And are

25    we talking apples to apples with regards to the     01:16:25
```

Page 122

```
 1    exhibit.                                        01:16:28

 2            So Counsel, we identified multiple

 3    cookies.  You extend that to Counsel Blume,

 4    correct?

 5            MS. WEAVER:  Yes.                        01:16:37

 6            SPECIAL MASTER GARRIE:  Now, you're

 7    asking about those specific cookies, not other

 8    cookies, correct?

 9            MS. WEAVER:  Yes.

10            SPECIAL MASTER GARRIE:  Okay.  So then   01:16:42

11    have you -- and I believe those cookies we're

12    discussing are the ones that -- we -- that you

13    emailed about are the ones we're discussing now,

14    correct?

15            MS. WEAVER:  Yes.                        01:16:52

16            SPECIAL MASTER GARRIE:  Okay.  And

17    then --

18            MR. BLUME:  Do you want to put those up?

19            SPECIAL MASTER GARRIE:  Well, before --

20    she can share with the email but -- or we can enter   01:16:58

21    it into the record.  But I just want to make sure I

22    understand before I -- before we go off the record,

23    that I understand what -- what's occurring.

24            So now, you're asking the witness about

25    those cookies.  And Mr. Clark, when you said       01:17:14
```

```
 1    "cookies," were you referring -- you were referring     01:17:16

 2    to the cookies that Counsel Weaver was asking you

 3    about, correct?

 4              THE DEPONENT:  I was given an open-ended

 5    question on a list of cookies.  And I just couldn't     01:17:26

 6    recollect the list of cookies.  And so I -- I'm not

 7    aware of --

 8              SPECIAL MASTER GARRIE:  That's why I'm

 9    confused.

10              THE DEPONENT:  Yeah.                           01:17:31

11              SPECIAL MASTER GARRIE:  So when we're

12    saying list of cookies --

13              THE DEPONENT:  Yeah.

14              SPECIAL MASTER GARRIE:  -- what do you

15    mean by "list of cookies"?                               01:17:35

16              MS. WEAVER:  You're asking me?

17              SPECIAL MASTER GARRIE:  Like what I'm

18    confused is, Counsel --

19              MS. WEAVER:  I want to ask this --

20              SPECIAL MASTER GARRIE:  -- when you were       01:17:39

21    emailed a list of cookies to Counsel Blume, we were

22    talking about those cookies.  But you said "list of

23    cookies," and I was just -- I just -- I want to

24    make sure we're all talking about the same cookies.

25              MS. WEAVER:  Let me be clear.  I am            01:17:53
```

Page 124

```
 1    seeking to elicit testimony about the cookies that        01:17:54
 2    I emailed Mr. Blume about.  It seemed to me that
 3    Mr. Clark had prepared regarding those cookies,
 4    Rob, and --
 5            SPECIAL MASTER GARRIE:  That's what I --          01:18:05
 6    that's what I'm trying to figure out.
 7            MS. WEAVER:  Yeah.
 8            SPECIAL MASTER GARRIE:  That it's not
 9    other cookies that aren't related to the ones you
10    asked about.  That's...                                   01:18:11
11            MS. WEAVER:  Is there a document
12    that the --
13            MR. BLUME:  And so put that -- if we put
14    that --
15            MS. WEAVER:  Can I -- can I just ask, is          01:18:14
16    there a document that the witness prepared in
17    response to the questions I asked about those
18    cookies?
19            SPECIAL MASTER GARRIE:  Maybe you could
20    provide --                                                01:18:22
21            (Simultaneously speaking.)
22            MR. BLUME:  The list --
23            SPECIAL MASTER GARRIE:  -- that email
24    with the list of the cookies just so we're all on
25    the same page.                                            01:18:26
```

Page 125

```
 1              I apologize, Counsel Weaver, but -- I do      01:18:27

 2   recollect it.  But I don't -- I don't have it right

 3   before me right now.

 4              MS. WEAVER:  You want me to just email it

 5   around, Special Master Garrie, right now?               01:18:35

 6              SPECIAL MASTER GARRIE:  Well, if you can

 7   put it on the screen so we can all see it --

 8              MR. BLUME:  Put it on the screen.

 9              SPECIAL MASTER GARRIE:  -- that would be

10   helpful.  Because it is, it is helpful.                 01:18:42

11              (Discussion off the stenographic record.)

12              MS. WEAVER:  Can we go off the record?  I

13   just need to find this.

14              SPECIAL MASTER GARRIE:  We can go off the

15   record while you find it, of course.                    01:19:27

16              MR. BLUME:  Should we break for lunch?

17              MS. WEAVER:  No.  I'm in the middle of

18   questioning.

19              SPECIAL MASTER GARRIE:  No.

20              MR. BLUME:  Okay.  Okay.  Just a             01:19:35

21   suggestion.

22              SPECIAL MASTER GARRIE:  We're in the

23   middle of a question.

24              MR. BLUME:  Just a suggestion.  Okay.

25              SPECIAL MASTER GARRIE:  Forget it.          01:19:39
```

Veritext Legal Solutions
866 299-5127

```
 1              MR. BLUME:  Okay.                    01:19:39

 2              THE VIDEOGRAPHER:  Okay.  We're off the

 3    record.  It's 1:19 p.m.

 4              (Recess taken.)

 5              THE VIDEOGRAPHER:  We're back on the   01:25:27

 6    record.  It's 1:25 p.m.

 7         Q.   (By Ms. Weaver)  What information does

 8    the datr cookie hold?

 9              MR. BLUME:  Objection.  Form.  Scope.

10              THE DEPONENT:  While I didn't          01:25:42

11    specifically prepare for this as part of my

12    representation -- as being a representative of

13    Facebook, in my personal experience, datr cookie is

14    a cookie that tracks the browser as a unique

15    identifier for the browser.                     01:26:01

16         Q.   (By Ms. Weaver)  Does the datr cookie

17    contain a URL?

18         A.    I didn't specifically prepare for that as

19    part of my testimony, as a representative of

20    Facebook, but in my personal experience, I -- I do   01:26:21

21    not believe it contains any URL, but I don't know.

22              (Exhibit 349 was marked for

23    identification by the court reporter and is

24    attached hereto.)

25         Q.   (By Ms. Weaver)  Okay.  Take a look at   01:26:27
```

Page 127

```
 1    know as a result of conversations with counsel, I'd      01:27:47

 2    instruct you not to answer.

 3              THE DEPONENT:  I only know that because

 4    it was part of the conversation with counsel.

 5              MS. WEAVER:  Rob, your position is you          01:28:03

 6    telling him who knows about the datr cookie is

 7    privileged; is that right?

 8              MR. BLUME:  No.  Your question was, who

 9    gave the information with regard to this letter

10    about datr -- datr cookies.  That's privileged.          01:28:12

11              MS. WEAVER:  Okay.

12              MR. BLUME:  To the extent he knows that

13    information from discussions with counsel.

14        Q.   (By Ms. Weaver)  You're not prepared to

15    testify about the datr cookie, is that right,            01:28:23

16    Mr. Clark?

17              MR. BLUME:  Object -- objection.  Form.

18              THE DEPONENT:  I'm not prepared to

19    testify about the datr cookie as a representative

20    of Facebook.  Only from personal experience.            01:28:39

21        Q.   (By Ms. Weaver)  And you, from personal

22    experience, don't -- well, strike that.

23              Do you know how -- what -- strike that.

24              Do you know how the datr cookie

25    identifies a Web browser?                               01:28:52
```

                                                          Page 129

```
 1          A.   It -- I'm not prepared to answer that as        01:28:55

 2     part of testifying as a representative of Facebook.

 3     But in my personal experience, that -- the

 4     datr cookie is a generated unique identifier to a

 5     browser.  How that occurs and -- and exactly the        01:29:09

 6     content in it, I do not know.

 7          Q.   Who would know?

 8          A.   I -- I -- I am not prepared to testify to

 9     that as a representative of Facebook.  In my

10     personal experience, I don't have a specific name      01:29:25

11     that I would know that would know that part of the

12     process.

13          Q.   Can you -- can you identify anybody that

14     you work with at Facebook who knows how the datr

15     cookie functions?                                       01:29:41

16          A.   As of -- I -- I didn't prepare for that

17     as part of my testimony as a representative of

18     Facebook.  But in my personal experience, I -- I

19     would go look up who I would need to, to go have

20     that conversation.  I don't -- I don't know a name     01:29:59

21     offhand.

22          Q.   Okay.  Do you know -- okay.  Strike that.

23               What is the fpb cookie?

24          A.   I didn't specifically prepare for that as

25     part of my testimony representing Facebook.  But in    01:30:14
```

Page 130

```
 1    my personal experience and -- I -- I would refer to        01:30:17

 2    the -- I would refer to the filing for that detail.

 3            The underscore FB cookie is set on the

 4    third-party domain only if the advertiser/publisher

 5    has installed the Facebook pixel business tool and        01:30:28

 6    opted into the use of these cookies.

 7            The cookie has its own -- or has a

 8    browser identifier and -- and in the epoch time

 9    when the cookie was created.  And then for

10    additional details, there's documentation on the        01:30:43

11    external developer Facebook side.

12        Q.    And you said the epoch time?

13            It's a little unclear.  I just didn't

14    understand what you said.

15        A.    The -- yeah, it's -- it's E-P-O-C-H.        01:31:01

16    It's -- it's a time commonly used in -- in computer

17    languages and UNIX time systems.  The -- the time

18    since -- and I should know it offhand -- but

19    sometime in 1969 or 1970, and the number of

20    seconds that's --        01:31:21

21        Q.    Sorry.  It's just that I couldn't

22    understand you and it didn't come through on the

23    transcript.  That's fine.

24            Okay.  What is the ███████████████

25            MR. BLUME:  Objection.  Form.  Scope.        01:31:34
```

Page 131

```
 1              THE DEPONENT:  I didn't prepare to        01:31:37
 2   specifically talk about that as a representative of
 3   Facebook.
 4              But in my personal experience, those are
 5   the cookies that are used for ████████████    ████████
     ██████████████████████████████████  And so
 7   that's -- that's where ████████████████
     ████████████████████████
 9      Q.   (By Ms. Weaver)  Do third parties
10   transmit the Facebook user ID through ██████    ████████
     ██████████
12      A.   I didn't specifically prepare to talk to
13   that as a representative of Facebook.
14              But in my personal experience, those
15   cookies are only scoped to Facebook.com.  So third   01:32:15
16   parties should not have access to that.
17      Q.   They are not supposed to have access to
18   the Facebook user ID is your testimony?
19              MR. BLUME:  Objection.  Form.  And scope.
20              THE DEPONENT:  I didn't specifically      01:32:34
21   prepare for that as part of my testimony.
22              But in my personal experience, that --
23   that question is very, very generic and -- and --
24   and inaccurate.
25              What I had stated before is the ████████   01:32:46
```

Page 132

1     the ████████████████████████████████   ███████████

2     ████████████████, and third parties are not

3     authorized or should not have access to those

4     cookies in the browser as they're scoped to

5     Facebook.com.                              01:33:07

6             And to further reiterate, that is why we

7     have third-party application-scoped IDs and other

8     kinds of IDs, so that we don't give third parties

9     the canonical Facebook user ID.

10    Q.   (By Ms. Weaver)  You're referring to the     01:33:26

11   ASID; is that correct?

12   A.   That is correct.

13   Q.   Okay.  We'll come back to that.

14          Why did Facebook create -- well, strike

15   that.                                     01:33:35

16         You said that the -- the fbc cookie is

17   used for authentication.

18         How does that function?

19         MR. BLUME:  Objection.  Form.  Beyond the

20   scope.                                  01:33:46

21         THE DEPONENT:  That -- that wasn't what I

22   said.  I didn't specifically prepare for that as

23   part of my testimony.

24         But in my personal experience, the

25   ██████████████████████████████ are what are used   01:33:56

```
1    for authentication and identify for users logged        01:34:03

2    in.

3            The_fbc cookie is a cookie that is set on

4    third-party domain only if the advertiser and

5    publisher has installed the Facebook pixel business     01:34:15

6    tool.  And it is set only if the click originated

7    from the Facebook service.

8            For instance, when clicking on an ad in

9    Facebook newsfeed.  And the_fbc cookie contains an

10   encrypted user ID.                                       01:34:32

11      Q.   (By Ms. Weaver)  And who encrypts the

12   user ID?

13           MR. BLUME:  Objection.  Form.  Scope.

14           THE DEPONENT:  I didn't prepare for that

15   as part of my testimony.                                 01:34:43

16           In my personal experience, I don't know.

17      Q.   (By Ms. Weaver)  Okay.  And so just

18   the record -- so the record is clear, you did not

19   prepare to testify regarding the fpb cookie,

20   the_fbc cookie, the ███████████████████      ██████████

     █   ████████████████   or fr cookies; is that right?

22           MR. BLUME:  Objection.  And to the extent

23   the question asks for preparation beyond topic 4 is

24   beyond the scope.

25           THE DEPONENT:  I did not.  As a -- as a        01:35:19
```

```
 1    representative of Facebook, I didn't prepare for          01:35:20

 2    that topic.

 3         Q.   (By Ms. Weaver)  And did you prepare for

 4    whether or not those cookies contained information

 5    such as fbid, fbtype or URL?                              01:35:26

 6              MR. BLUME:  Same objection.

 7         Q.   (By Ms. Weaver)  Are you answering the

 8    question?

 9         A.   As a part of my preparation, as a

10    representative of Facebook, I did not prepare for         01:36:03

11    that.

12         Q.   Did you prepare to discuss the datr

13    cookie?

14              MR. BLUME:  Objection, to the extent the

15    question seeks information beyond topic 4 is beyond       01:36:17

16    the scope.

17              THE DEPONENT:  As a part of my

18    representation as a representative of Facebook, I

19    did not prepare for that.  But did share -- from my

20    personal experience.                                     01:36:30

21              MS. WEAVER:  Okay.  We'll move on.

22         Q.   (By Ms. Weaver)  Do you know who at

23    Facebook would be qualified to discuss those

24    cookies?

25              MR. BLUME:  Objection.  Form.               01:36:47
```

Page 135

```
 1              THE DEPONENT:  As a representative of --      01:36:52

 2   as my preparation as a representative of Facebook

 3   for this testimony, I didn't prepare for that.

 4              In my personal experience, I -- I do not

 5   have a name.                                             01:37:03

 6        Q.   (By Ms. Weaver)  Okay.  Going back to

 7   Exhibit 348.

 8              Let me just ask a question.  You

 9   testified a moment ago that there was a binder in

10   the room that you used to prepare -- prepare that        01:37:21

11   included Exhibit 349; is that right?

12        A.   Yes.

13        Q.   And you reviewed and -- and recalled that

14   it referenced cookies, right?

15        A.   That is correct.                               01:37:45

16        Q.   Did -- did you discuss whether you would

17   testify regarding those cookies?

18              MR. BLUME:  Objection.  Form.

19              THE DEPONENT:  I did not.

20        Q.   (By Ms. Weaver)  Okay.  Going back to          01:37:59

21   348.

22              Do you see that there's a reference in

23   the first paragraph -- I'm sorry.  Okay.

24              There's a sentence that says "This means

25   we need to ███████████████████████████ -             01:38:20
```

Page 136

```
 1    record.  It's 1:53 p.m.                          01:53:34

 2            MR. BLUME:  So with regard to topic 4,

 3    which speaks to the processes related to deletion,

 4    pseudonymization, de-identification,

 5    re-identification association and deletion of user    01:53:48

 6    data and information, as that relates to cookies,

 7    Mr. Clark is prepared to discuss whether Facebook

 8    uses cookies as identifiers; specifically,

 9    identifiers for users.  And if so, how Facebook

10    treats those cookies within the deletion framework.   01:54:07

11            It was -- it is -- it's our position that

12    to discuss the processes of that deletion

13    framework, to talk about the specific cookies, what

14    they are specifically, what information they get is

15    beyond the scope.                                  01:54:25

16            He's certainly prepared to talk about how

17    the framework -- deletion framework deals with

18    cookies, to the extent those cookies are

19    identifiers.  But not any specific cookie or its

20    purpose or the information it gets.                01:54:37

21            SPECIAL MASTER GARRIE:  He can do the

22    high level, but getting into the technical ways of

23    how the cookies operationally work within the

24    different frameworks he describes is beyond the

25    scope.                                             01:54:48
```

Veritext Legal Solutions
866 299-5127

```
 1              Is that what -- the gist of what we're          01:54:49

 2    getting at?

 3              MR. BLUME:  Well, let -- let me clarify.

 4              He can talk about the -- the details of

 5    how the deletion framework deals with cookies to         01:54:55

 6    the -- to the extent cookies are -- are

 7    identifiers.  But what is specific cookie seeks --

 8              SPECIAL MASTER GARRIE:  That's what I

 9    mean.  The specific cookies that were emailed or

10    identified by plaintiffs, they identified a subset      01:55:08

11    of specific cookies, those interworkings of how

12    those specific cookies interoperate with those

13    frameworks is -- he is not prepared to testify

14    about.

15              MR. BLUME:  Except to the extent that          01:55:21

16    they --

17              SPECIAL MASTER GARRIE:  The technical.

18              MR. BLUME:  Right.

19              Except to the extent that those cookies

20    are considered identifiers and -- and are part of       01:55:26

21    the process.

22              It doesn't matter what the specific

23    cookie is, as far as the deletion framework.  Every

24    cookie would be treated the same way.  And he's

25    prepared to talk about how the deletion framework       01:55:41
```

Page 146

```
 1    deals with cookies as -- en masse.  But any            01:55:43

 2    specific cookies, he -- is beyond -- we would argue

 3    is beyond the scope.

 4           They're all treated the same way.  Every

 5    cookie is treated the same way within the processes    01:55:55

 6    of pseudonymization, de-identification,

 7    re-identification, associations, deletion.  It

 8    doesn't matter which cookie.  They're all treated

 9    the same.

10           MS. WEAVER:  So if I may --                      01:56:09

11           (Simultaneously speaking.)

12           SPECIAL MASTER GARRIE:  Didn't -- didn't

13    he testify --

14           MS. WEAVER:  The topic includes

15    association.  We identified, for example, the named    01:56:13

16    plaintiffs' DYI files complaining -- containing

17    datr cookies precisely so we could understand what

18    data and information that's in the description.

19    User data and information is expressed through

20    those cookies, which the witness said and is           01:56:33

21    factually correct, are identifiers.

22           So Facebook is collecting and tracking

23    through the datr cookie which websites users visit,

24    and I -- I attempted to get testimony about that

25    today after sending --                                 01:56:48
```

Page 147

```
 1            SPECIAL MASTER GARRIE:  But he --        01:56:50

 2            MS. WEAVER:  -- an email two weeks ago

 3       to -- only to find out in the deposition that in

 4       preparation here, counsel has not had the person

 5       prepare on any of those cookies.               01:57:00

 6            SPECIAL MASTER GARRIE:  Well, one sec.  I

 7       don't want to -- let's not go down a rabbit hole

 8       here because that's where we're heading and we

 9       still have deposition left.

10            At the end of the day, prepared or not,    01:57:11

11       we can take that offline at a separate point.  The

12       bottom line is the witness that's here now isn't

13       prepared to speak about those specific technical

14       cookies that are associated with this specific

15       topic, as it relates to how you just described it.  01:57:28

16       It is what it is, right?

17            MS. WEAVER:  Yup, I understand.

18            SPECIAL MASTER GARRIE:  But --

19            MR. BLUME:  Hold on.  Hold on.

20            Just to be clear, he's prepared to         01:57:36

21       testify about whether Facebook uses the datr cookie

22       as an identifier.  That's -- so he can speak to

23       that.

24            SPECIAL MASTER GARRIE:  But those were --

25            MR. BLUME:  And then if so, how -- what's   01:57:44
```

Page 148

```
 1   that?                                                01:57:47

 2            SPECIAL MASTER GARRIE:  Where -- where

 3   I'm confused is those cookies she's referring to

 4   are those, those things, like this is -- those are

 5   the specific cookies that consist of what you're     01:57:53

 6   talking about.  So where I --

 7            MR. BLUME:  Right.

 8            SPECIAL MASTER GARRIE:  -- where I'm

 9   getting confused is, those cookies that she

10   identified -- that are identified by plaintiffs     01:58:02

11   are -- I don't think all -- but a subset of the

12   exact topic you're talking about.  But --

13            MR. BLUME:  Any facts --

14            SPECIAL MASTER GARRIE:  -- those are

15   technical tools --                                  01:58:12

16            MR. BLUME:  Well, but if -- if -- yeah.

17   Are the -- are -- is the following cookie -- does

18   Facebook consider the following cookie to be an

19   identifier.  If yes, how does -- how does Facebook

20   deal with it within the deletion framework.         01:58:22

21            He's prepared to answer those questions.

22   But the -- but if -- if -- but the specific --

23   if -- if Facebook doesn't consider a specific

24   cookie to be an identifier, then it's not caught up

25   within the deletion framework, which is what he's   01:58:34
```

```
 1    here to testify about.                        01:58:37

 2              MS. WEAVER:  So he's only here about

 3    deletion.  But the topic talks about association of

 4    user data and information.  That's what the topic

 5    says.                                          01:58:44

 6              MR. BLUME:  The processes of -- the --

 7    the processes of pseudonymization,

 8    de-identification, re-identification, association

 9    and deletion of --

10              MS. WEAVER:  Of --                   01:58:54

11              MR. BLUME:  -- of user data --

12              MS. WEAVER:  -- user data.

13              MR. BLUME:  -- within that -- it's the

14    process --

15              MS. WEAVER:  Association of user data and  01:58:58

16    information --

17              SPECIAL MASTER GARRIE:  No, let me -- let

18    me --

19              MS. WEAVER:  Yeah.

20              SPECIAL MASTER GARRIE:  The part      01:59:01

21    that I -- so what she's saying is that those

22    cookies are used to associate with specific users

23    by Facebook as tools.  And she's asking him

24    specific questions about those cookies that are

25    believed and been represented, I believe, to  01:59:14
```

Page 150

```
 1    associate user activity or make the association of      01:59:17

 2    a Facebook user and their activity.  Those specific

 3    subset of cookies.  And then --

 4              MR. BLUME:  Yes.  If Facebook --

 5              SPECIAL MASTER GARRIE:  -- association is      01:59:29

 6    done via that cookie.

 7              MR. BLUME:  If Facebook -- if Facebook

 8    considers the particular cookie to be an identifier

 9    associated with a user and that -- and is part of

10    that process, he's -- he is happy to talk about it.     01:59:40

11              SPECIAL MASTER GARRIE:  But he can talk

12    about those cookies.

13              MR. BLUME:  He -- he can -- he can answer

14    the question whether -- whether Facebook considers

15    those cookies to be identifiers.  It says --           01:59:49

16              (Simultaneously speaking.)

17              SPECIAL MASTER GARRIE:  But to know how

18    they -- she wants -- the question is how does

19    Facebook associate.  How is that Facebook -- maybe

20    I'm missing something.  But I believe what's being      01:59:59

21    asked is how is that association done by Facebook

22    with those cookies.  Like what is the process

23    through which -- technical process through which

24    Facebook makes an association.

25              Maybe I'm misreading or mishearing what       02:00:13
```

1    plaintiffs are asking about.  And my question is,         02:00:16

2    can he talk about how -- maybe I'm

3    misunderstanding.

4            Is he prepared to testify about the

5    technical process of how Facebook makes those          02:00:25

6    associations?

7            MR. BLUME:  To the extent the -- by

8    "association," you mean identify -- identifiers?

9    In other words --

10           SPECIAL MASTER GARRIE:  The user.            02:00:42

11           MR. BLUME:  -- did he identify a user and

12   how that -- how that information is then captured

13   within these processes, as set forth in topic 4,

14   yes.

15           SPECIAL MASTER GARRIE:  So if we open up      02:00:52

16   the cookie, we can -- he can walk us through how

17   that cookie makes those associations?

18           MR. BLUME:  No.  He can identify whether

19   or not these cookies are considered by Facebook to

20   be identifiers, generally.  Not how they work.  But   02:01:04

21   whether they are in the process, in the deletion

22   framework, considered to be identifiers.  In other

23   words, used to identify the user.

24           SPECIAL MASTER GARRIE:  Okay.  The

25   specific --                                            02:01:14

                                                           Page 152

| | |
|---|---|
| 1 | MS. WEAVER:  I think -- well, we can save | 02:01:15 |
| 2 | for another day -- |
| 3 | SPECIAL MASTER GARRIE:  The technical -- |
| 4 | he's not -- |
| 5 | MS. WEAVER:  -- because it seems very | 02:01:17 |
| 6 | clear that despite the fact that plaintiffs |
| 7 | identified specific pages pulled out of the DYI |
| 8 | file with datr cookies associated with the named |
| 9 | plaintiffs, this witness does not -- according to |
| 10 | the instructions of counsel, doesn't interpret the | 02:01:34 |
| 11 | datr cookie to be an identifier for users.  And for |
| 12 | that reason, this witness is not prepared to |
| 13 | testify on that topic. |
| 14 | MR. BLUME:  Well, you never asked -- you |
| 15 | never asked him that question.  Ask him that | 02:01:47 |
| 16 | question. |
| 17 | MS. WEAVER:  Either way -- Rob, you |
| 18 | excluded your preparation -- |
| 19 | MR. BLUME:  No, ask him the question. |
| 20 | THE COURT REPORTER:  Hold on.  Hold on. | 02:01:52 |
| 21 | Hold on. |
| 22 | SPECIAL MASTER GARRIE:  No, you guys are |
| 23 | doing this again.  Time out.  Time out. |
| 24 | We'll go off the record and I'll reset |
| 25 | everything.  And I will take time away from -- take | 02:02:00 |

Page 153

```
 1    time and add time, so we may end up at zero.          02:02:02

 2              But the point being is stop and listen to

 3    each other.  The net/net is that what Counsel Blume

 4    is saying, the question you just asked,

 5    Counsel Weaver, you can ask the question and hear      02:02:13

 6    the answer.

 7              Did I miss that, Counsel Blume?

 8              MR. BLUME:  That's correct.  No, that is

 9    absolutely correct.

10              SPECIAL MASTER GARRIE:  And then based --     02:02:22

11    based on that answer, Counsel Weaver, you may

12    find --

13              MS. WEAVER:  I think he said that's

14    incorrect.

15              MR. BLUME:  No, I said that's absolutely      02:02:28

16    correct.  Ask him if he considers the datr cookie

17    to be an identifier.  If so, how it fits in the

18    process.  And ask for --

19              MS. WEAVER:  But the question is

20    whether -- sorry.                                      02:02:36

21              The question is whether it's associated

22    with user data and information.  That's the topic.

23              MR. BLUME:  The --

24              MS. WEAVER:  Facebook's process of

25    association of user data and information.              02:02:46
```

                                              Page 154

```
 1              MR. BLUME:  And -- and for purposes of        02:02:52

 2     pseudonymization, de-identification,

 3     re-identification, that association is identifiers.

 4     And so asking if it's -- if he considers it for

 5     purposes of the deletion framework, which is what       02:03:02

 6     he's here to testify, whether it's considered an

 7     identifier.  If it is, it fits into the process.

 8     If it's not, then it doesn't.  He's here to talk

 9     about that deletion, de-identification,

10     pseudonymization and association with regard to         02:03:15

11     those that -- and within that process.  Just ask

12     him the ordinary question.

13              SPECIAL MASTER GARRIE:  That's a broad

14     question.

15              MS. WEAVER:  I'll just -- Special Master,       02:03:23

16     I don't want to waste any more time.  It's very

17     difficult to take depositions and have arguments

18     like this in the middle of a dep.  So let's --

19              MR. BLUME:  I agree.

20              MS. WEAVER:  -- refer this to a different        02:03:32

21     time.  And I would just note -- have you pay

22     attention, Rob, to the Oxford comma.  In topic --

23     in topic 4, there's a comma after association.

24              SPECIAL MASTER GARRIE:  Wait.  Wait.

25              MS. WEAVER:  All of those topics are            02:03:42
```

Veritext Legal Solutions
866 299-5127

```
 1    individual.                                      02:03:43

 2              SPECIAL MASTER GARRIE:  I think -- I

 3    think you made a good point.  We're not

 4    accomplishing anything here.

 5              MS. WEAVER:  Right.                     02:03:48

 6              SPECIAL MASTER GARRIE:  I give 15

 7    minutes --

 8              MR. BLUME:  Right.

 9              SPECIAL MASTER GARRIE:  -- back to

10    plaintiffs here because this was at my request.  02:03:50

11              I was just trying to see if we could

12    avoid the downstream issue that looks inevitable,

13    to come.  So we will -- we will put a pin in it and

14    I will -- we will -- we will figure if it is

15    appropriate or whether it was or was not, or so on  02:04:06

16    and so forth.

17              I was hoping it would be resolved herein,

18    but it does not seem foreseeable.

19              MR. BLUME:  Well, not -- yeah.

20              SPECIAL MASTER GARRIE:  I understand,   02:04:15

21    Counsel Blume, your position.  I fully get it.  I

22    understand, Counsel Weaver, your position.  I

23    realize there's a fundamental issue there that will

24    not be resolved during this break.

25              So everybody should go get lunch, and we  02:04:25
```

Page 156

```
 1    will resume -- I was duly hopeful that I was          02:04:26

 2    misreading what I thought, but it is fine --

 3            MR. BLUME:  Well, welcome your -- this

 4    question, as you --

 5            SPECIAL MASTER GARRIE:  I mean, I thought      02:04:42

 6    that -- you know, fair enough.  I think there's

 7    just a -- so you can take a break.  Everybody get

 8    lunch.  And we'll put a pin in it and we'll resume.

 9            MS. WEAVER:  Okay.  When do we want to

10    get -- come back?                                      02:04:50

11            MS. LAUFENBERG:  We're still on the

12    record, by the way.

13            THE COURT REPORTER:  Can we go off?

14            THE VIDEOGRAPHER:  Sure.  We're off the

15    record.  It's 2:05 p.m.                                02:05:01

16            (Recess taken.)

17            THE VIDEOGRAPHER:  We're back on the

18    record.  It's 2:55 p.m.

19        Q.  (By Ms. Weaver)  Hello, Mr. Clark.

20            Did you have a good lunch?                      02:55:21

21        A.  I did.

22        Q.  Okay.  You know that you're still under

23    oath, right?

24        A.  That is correct.

25        Q.  Okay.  I'd like to ask you to just turn        02:55:29
```

```
 1    can't answer that.  But I can answer that I believe        05:04:43

 2    that's part of why we make UII even broader.

 3         Q.   (By Ms. Weaver)  Broader than what?

 4         A.   Specific -- when you get to the

 5    definition of UII meaning both types of data, but           05:04:55

 6    combinations of types of data.

 7         Q.   Okay.  As you sit here today, can you

 8    state what personal information is under the CCPAA,

 9    as referenced in this document?

10         MR. BLUME:  Objection.  Form.  Scope.                   05:05:18

11    Calls for a legal conclusion.

12         THE DEPONENT:  I -- I can't quote the

13    CCPA off the top of my head.

14         Q.   (By Ms. Weaver)  So you don't know what

15    the definition of "is personal information under            05:05:28

16    the CCPA" as referenced in this document?

17         A.   As -- as I just am seeing this document

18    for myself, I -- I'm familiar with personal

19    information under CCPA, but just don't -- don't

20    have that analysis or didn't prepare for -- to             05:05:45

21    answer that question.

22         Q.   Do you know what personal infor- -- how

23    personal information is defined under the CCPA?

24         MR. BLUME:  Objection.  Calls for a legal

25    conclusion.  Form.  And scope.                             05:06:03
```

                                                    Page 218

```
 1                   THE DEPONENT:  I -- I don't know how to        05:06:15

 2      answer that.

 3                   I -- in -- in my personal experience, I

 4      would work with product counsel and counsel.  And

 5      in that definition, I -- I -- as I said, I did not    05:06:24

 6      prepare to have an answer for that today.

 7          Q.   (By Ms. Weaver)  Okay.  So it's really --

 8      this really is very simple.  It's a yes-or-no

 9      question.

10                   As you sit here today, can you define        05:06:33

11      personal information under the CCPA?

12                   MR. BLUME:  Same objections.

13                   THE DEPONENT:  I'm -- I'm truly

14      struggling to answer that, but -- I have prepared

15      context.  But I can't answer yes or no to that.       05:06:43

16          Q.   (By Ms. Weaver)  Isn't the answer "no,"

17      that you don't know, as you sit here today, how

18      CCPA defines personal information?

19          A.   I do in my personal experience and as I

20      work as a product manager day-to-day, but I do so    05:06:57

21      with guidance and direction from counsel.  And I --

22      I didn't -- I don't have a prepared answer or

23      didn't prepare to answer it in this context.

24          Q.   Well, what is your personal understanding

25      of what personal information is under the CCPA?       05:07:11
```

Page 219

```
 1        A.   As I said, I've worked with counsel on        05:07:32
 2   that.  I just -- I don't have it at the end of the
 3   day for you.
 4             If -- if you'd like to put it up, I can
 5   read what it is.  I just -- I don't have that          05:07:40
 6   answer right here in front of me.
 7        Q.   Okay.  So that's fine.
 8             So the answer is you don't know, right?
 9             MR. BLUME:  Same objections.
10             THE DEPONENT:  As a representative of         05:07:52
11   Facebook, I didn't prepare to answer that.  In my
12   personal experience, I work with it.  But I -- I
13   just -- I can't articulate it right now.  So I --
14        Q.   (By Ms. Weaver)  So the answer is, as you
15   sit here right now, you don't know what the            05:08:11
16   definition of personal information under the CCPA
17   is, correct?
18             In your personal or in the corporate
19   capacity; is that right?
20             MR. BLUME:  Objection.  Scope.               05:08:21
21             You can answer yes or no in your personal
22   capacity.
23             THE DEPONENT:  In -- in my personal
24   capacity, I work with product counsel on a regular
25   basis on the definition of what personal              05:08:31
```

Page 220

| | | |
|---|---|---|
| 1 | information is under CCPA, which is a long and | 05:08:33 |
| 2 | nuanced answer in the context of working with that | |
| 3 | data every day, because I have come up with and | |
| 4 | developed that definition under guidance and | |
| 5 | direction of counsel. | 05:08:45 |
| 6 | In my personal experience, I -- I -- I | |
| 7 | did not prepare to answer that question, so I | |
| 8 | cannot answer that I don't know. | |
| 9 | Q.   (By Ms. Weaver)  Okay.  Well, so -- we | |
| 10 | have a 30(b)(6) deposition here.  You've asked for | 05:09:03 |
| 11 | this document that refers to personal information | |
| 12 | under CCPA, which is part of the definition of UII, | |
| 13 | which is within the scope of what data is deleted, | |
| 14 | and I'm just answering -- I'm just asking, for | |
| 15 | the jury, can you tell me today, as you sit here, | 05:09:20 |
| 16 | how does Facebook define personal information? | |
| 17 | MR. BLUME:  Objection.  Form.  And scope. | |
| 18 | And calls for a legal conclusion under the CCPA. | |
| 19 | THE DEPONENT:  And I -- I really am | |
| 20 | trying to be responsive.  And that's why I'm making | 05:09:39 |
| 21 | sure that it's on the record that I'm answering | |
| 22 | that I don't know.  In -- | |
| 23 | Q.   (By Ms. Weaver)  Okay. | |
| 24 | A.   -- preparation for this, I came prepared | |
| 25 | to answer the things related to question 4.  And | 05:09:48 |

Page 221

```
 1    am -- am not counsel and can't make a legal          05:09:52

 2    conclusion to that.

 3         Q.   I'm not asking for a legal conclusion.

 4              I am asking for Facebook's understanding

 5    of what personal information is.                      05:10:03

 6         A.   And as -- as I've already identified, it

 7    wasn't in the scope of what I prepared in the

 8    context of this deposition for the jury.

 9              MS. WEAVER:  And, Rob, why is it that you

10    think the definition of personal information is not   05:10:23

11    within the scope of user data and information?

12              MR. BLUME:  It's defined in the CCPA,

13    which is a statute, and that is the definition.

14    Whether he can articulate it word for word or

15    whether he refers to the CCPA's definition is what    05:10:37

16    it is under the statute.

17              MS. WEAVER:  I believe this is what --

18              (Simultaneously speaking.)

19              MR. BLUME:  That is the definition --

20              MS. WEAVER:  Rob, if you listen to the      05:10:46

21    question -- because you're objecting off point.

22              Could you please read back --

23              MR. BLUME:  Your -- your question was --

24              SPECIAL MASTER GARRIE:  All right.  Stop.

25    We are not going off the rails.  We are way too far   05:10:52
```

Page 222

| | | |
|---|---|---|
| 1 | into this today. | 05:10:55 |
| 2 | So read the question back. | |
| 3 | Counsel Blume, if you want to respond, and you feel | |
| 4 | you're responding, please do so.  And we'll note | |
| 5 | the objection for the record and we will then move | 05:11:05 |
| 6 | forward. | |
| 7 | MS. WEAVER:  The question is at page 196, | |
| 8 | line 9. | |
| 9 | MR. BLUME:  Can you read it again? | |
| 10 | SPECIAL MASTER GARRIE:  196. | 05:11:31 |
| 11 | MR. BLUME:  The question I have is -- | |
| 12 | MS. WEAVER:  I'm sorry.  It's line 3. | |
| 13 | MR. BLUME:  Yeah, I'm -- I'm -- you're | |
| 14 | asking me -- I'm happy to read the question. | |
| 15 | "So the answer is, here right now, you | 05:11:37 |
| 16 | don't know what the definition of personal | |
| 17 | information is" -- | |
| 18 | MS. WEAVER:  Rob. | |
| 19 | MR. BLUME:  -- "under the CCPA; is that | |
| 20 | correct?" | 05:11:44 |
| 21 | That's the question. | |
| 22 | MS. WEAVER:  Rob, it's line 3. | |
| 23 | I'm not asking for a legal conclusion. | |
| 24 | This is the question:  What is Facebook's | |
| 25 | understanding of what personal information is? | 05:11:51 |

Page 223

```
 1              MR. BLUME:  He said it was the CCPA.  And      05:11:55

 2    that's a statute that you're --

 3              (Simultaneously speaking.)

 4              MS. WEAVER:  Okay.  But you're not

 5    testifying, Mr. Blume --                                 05:11:59

 6              SPECIAL MASTER GARRIE:  Wait.  Wait.

 7    Everybody just -- for some reason you guys

 8    interpret my silence as a permission to keep

 9    talking.

10              The objection is pending.  I hear it.         05:12:06

11    And we will go from there.

12              Counsel Weaver, what was -- so I'm

13    looking at this.  You asked a question to the

14    witness.  The witness -- all right.  It says "I'm

15    not asking for a legal conclusion.  I'm asking for     05:12:25

16    Facebook's understanding of what the personal

17    information.

18              And then there's an answer.

19              And what is your -- your -- and then --

20    so help -- walk -- work with me.                       05:12:36

21              So what is the issue, Counsel Weaver?

22              MS. WEAVER:  I would like an answer to

23    the question of what Facebook's understanding of

24    personal information is.

25              SPECIAL MASTER GARRIE:  Okay.  That is       05:12:46
```

                                                    Page 224

| | | |
|---|---|---|
| 1 | the question that is pending to the witness. | 05:12:48 |
| 2 | Is there an objection, Counsel Blume? | |
| 3 | MR. BLUME:  The objection is to the | |
| 4 | extent it calls for a legal conclusion. | |
| 5 | SPECIAL MASTER GARRIE:  Noted -- | 05:13:00 |
| 6 | MR. BLUME:  That is -- that's -- that's | |
| 7 | my objection. | |
| 8 | SPECIAL MASTER GARRIE:  Noted for the | |
| 9 | record. | |
| 10 | Mr. Clark, please answer the question to | 05:13:06 |
| 11 | the best of your ability. | |
| 12 | THE DEPONENT:  To -- to the best of my | |
| 13 | ability, as a representative of Facebook, I -- I | |
| 14 | didn't prepare for that in -- in the context of | |
| 15 | answering No. 4. | 05:13:18 |
| 16 | In my personal experience, the definition | |
| 17 | that I have, I have gotten in working under | |
| 18 | guidance and direction of counsel for the sake of | |
| 19 | product work.  And -- and I -- I don't know what I | |
| 20 | can say and what I can't say. | 05:13:39 |
| 21 | I'm -- if -- if I were asked and even if | |
| 22 | I were read is the CCPA definition of this, this, | |
| 23 | then I could give an observation or factual answer, | |
| 24 | I could answer that.  But understanding implies | |
| 25 | much more -- | 05:14:03 |

Page 225

```
 1              SPECIAL MASTER GARRIE:  Counsel Weaver,        05:14:05

 2    you can follow --

 3              THE DEPONENT:  -- than what I had

 4    prepared.

 5              SPECIAL MASTER GARRIE:  Go ahead.  Sorry.      05:14:08

 6    I didn't mean to interrupt.

 7              THE DEPONENT:  Oh, than -- than what I

 8    had prepared for.

 9              SPECIAL MASTER GARRIE:  Counsel Weaver.

10              MS. WEAVER:  This is a fundamental             05:14:18

11    question to the case and relates directly to the

12    data that is deleted and collected by Facebook.

13              What is Facebook's definition of personal

14    information?

15              I'm not asking for a legal conclusion.        05:14:27

16    I'm just asking --

17              SPECIAL MASTER GARRIE:  Hey.

18              MS. WEAVER:  Yeah.

19              SPECIAL MASTER GARRIE:  The witness

20    testified he's not prepared to answer that on           05:14:33

21    behalf of Facebook as the witness -- I mean, I can

22    read you back what he said, but -- I mean --

23              MS. WEAVER:  Okay.  Well, I'll move on.

24    Sanctionable.

25         Q.   (By Ms. Weaver)  Looking at this              05:14:49
```

Page 226

```
 1      what was said.                                         05:33:41

 2              Okay.  Noted for the record.

 3              But the definition of how Facebook

 4      defines personal information, I would go with being

 5      a critical concept for the -- the case as its         05:34:00

 6      entirety.  And so for Facebook, it may -- I'll

 7      leave it to the parties, having read the

 8      stipulation to -- having reserved all the time and

 9      allocated accordingly -- to have this conversation

10      among themselves, but I would -- I would encourage    05:34:21

11      the idea of producing a witness that can define how

12      Facebook defines personal -- personal --

13              MR. BLUME:  If I may, Your Honor --

14              SPECIAL MASTER GARRIE:  -- information.

15              MR. BLUME:  Yeah.  If I may --               05:34:36

16              MS. WEAVER:  You're interrupting him.

17              MR. BLUME:  How -- if I may, personal

18      information is defined by Facebook as it sets forth

19      in Exhibit 359.  That is the definition under the

20      CCPA.  Facebook does not use the term "personal"      05:34:45

21      information."  That's why we -- it -- as the

22      witness said, the Facebook term for that -- for

23      something that subsumes personal information is

24      UII.  That is the term that Facebook uses.  And

25      it's important to note, that as the document --       05:35:03
```

Page 241

```
1              SPECIAL MASTER GARRIE:  But --          05:35:07

2              MR. BLUME:  -- says, UII does not

3    directly map to personal information, so...

4              SPECIAL MASTER GARRIE:  Well, that's --

5    that's where I got confused.                      05:35:11

6              So if someone who does know the CCPA and

7    the different articles and can recite it to you, I

8    have a serious concern with the very construct that

9    it subsumes the definition of personal information,

10   so I would expect that Facebook --                05:35:21

11             MR. BLUME:  Well --

12             (Simultaneously speaking.)

13             SPECIAL MASTER GARRIE:  -- can product a

14   witness -- don't interrupt me again.  You interrupt

15   me again and we will have a problem.              05:35:27

16             MR. BLUME:  Okay.

17             SPECIAL MASTER GARRIE:  Okay.  Thank you.

18             MR. BLUME:  Okay.

19             SPECIAL MASTER GARRIE:  Thank you very

20   much.                                             05:35:34

21             So what I'm trying -- and what I was

22   saying is that it subsumes the definition.

23   Thereby, they must have some understanding of what

24   constitutes personal information.

25             I have reviewed countless exhibits and   05:35:44
```

Page 242

```
 1    materials your client has produced referencing          05:35:47

 2    personal information as a term and a concept.

 3    Whether or not you personally want to take a

 4    position on behalf of your client that they have no

 5    position as to what personal information is in the       05:35:58

 6    786-plus documents that I can cite to you that use

 7    the term "personal information" is a bit

 8    disconcerting to me.

 9             But with that even said, I still expect

10    that Facebook would feel incentivized to provide a       05:36:12

11    witness that could attest to how it defines the

12    concept of personal information, which is subsumed

13    by this broader construct.  Because I can't exactly

14    understand how they are differentiating the two.

15    And I read the exhibit and I heard the testimony.        05:36:28

16             So I advise you to take this under

17    advisement accordingly before I order it.  And I

18    will encourage you again that whatever witness --

19    if he's not prepared to testify as to how Facebook,

20    as a corporate representative, defines personal          05:36:45

21    information, that's noted for the record and will

22    be reflected accordingly as one of your comments.

23             We're done.  We're off the record.

24             MR. BLUME:  All right.  I do not mean --

25             SPECIAL MASTER GARRIE:  Thank you very          05:36:58
```

Page 243

```
 1    much.                                                  05:36:58

 2            MR. BLUME:  I did not mean subsumed.  I

 3    meant to read the document, which is directly --

 4    does not directly map to personal information.

 5    That is how we define the term.                        05:37:06

 6            SPECIAL MASTER GARRIE:  Right.  I know.

 7    But it -- so I've read the documents, actually, all

 8    of them.  And there is -- if Facebook's position is

 9    they cannot define what personal information is,

10    that is fine.                                          05:37:21

11            (Simultaneously speaking.)

12            MR. BLUME:  That's not --

13            SPECIAL MASTER GARRIE:  They can go on

14    the record -- all that was asked is how Facebook

15    defined personal information and he said he is not     05:37:28

16    prepared to testify to that.

17            I said that is fine.  Right.  I said that

18    is fine.  I understand it was a concept of that

19    document.  But the question was a broader question

20    asked by the attorney and the witness stated that      05:37:40

21    they were not prepared -- maybe there was

22    confusion.  Maybe there wasn't.  Fine.

23            My point is, is Facebook would -- I would

24    recommend find a witness that can define how

25    Facebook, the company, defines personal               05:37:55
```

Page 244

```
1    information.  That's it.                          05:37:58

2            There's no further conversation.

3            MR. BLUME:  Under- -- understood.

4            And with all due respect, it's -- he --

5    all he said was he couldn't reflect -- he couldn't  05:38:05

6    testify to the definition under the CCPA, which is

7    how it's referenced in this document.  That is his

8    testimony.

9            SPECIAL MASTER GARRIE:  Well, there was

10   actually multiple -- there -- there -- well, it     05:38:17

11   doesn't matter.  The testimony is captured for the

12   record and -- and I read 196, line 3, accordingly,

13   with the subsequent six lines of answers, as well

14   as the four other references.

15           But that's neither here nor there.  And I   05:38:27

16   will leave it in the hands of counsel to review it.

17           All I'm saying to Facebook is, find a

18   witness that can define what personal information

19   is, if there is not an agreement on this.  Because

20   I get a lot of briefs from everybody citing to this  05:38:43

21   constructs of personal information and not personal

22   information, as does Judge Chhabria.  And if your

23   client doesn't have a definition, we'd all like to

24   know.

25           So with that in mind, we're going to go     05:38:55
```

Veritext Legal Solutions
866 299-5127

# Exhibit I

HIGHLY CONFIDENTIAL

1    saying what I just told you.                          01:35:45

2         Q.   Okay.  What changes to its infrastructure

3    has Facebook made since 2007 to facilitate the

4    uploading and sharing of video content?

5              MR. SCHWING:  The question is vague.         01:36:18

6              THE DEPONENT:  I -- I understand -- I

7    think I understand what you're asking.

8              And the way I think about it is from the

9    time that Facebook allowed for video on the

10   platform, let's -- let's say maybe 2007.  And I        01:36:36

11   think you're asking me from -- are you asking me

12   from 2007 through today infrastructure changes that

13   have -- and then I'll let -- is that what you're

14   asking me and --

15        Q.   (By Mr. Gould)  Right.  Right.  So let me     01:36:52

16   then rephrase.

17        A.   Right.

18        Q.   I'm asking about infrastructure changes

19   from 2007 to the present that have been made in

20   order to facilitate access to --                       01:37:05

21        A.   Right.

22        Q.   -- uploading or sharing of video content.

23             Is that a subject you're prepared to --

24   to talk about?

25             MR. SCHWING:  I guess --                      01:37:25

                                                   Page 39

HIGHLY CONFIDENTIAL

```
 1              THE DEPONENT:  Without getting into too        01:37:27

 2   much detail about the -- the changes themselves,

 3   here's what I am prepared to talk about.

 4              If you just look at the amount of

 5   video -- or maybe in this case we'll call it        01:37:43

 6   digital video, right, as opposed to video that we

 7   were discussing -- like nondigital video that we

 8   were discussing.

 9              But if you think about the number of

10   users on Facebook, and if you think about whether      01:37:55

11   or not video was popular -- and, obviously, I think

12   it's fair to say that video has become a more

13   popular medium over time.

14              And if you were to compare users'

15   appetite for sharing video, you know, producing --     01:38:14

16   making video and watching video, and if you were to

17   think about the growing popularity of video as a

18   medium and also think about the user increase, in

19   order to successfully allow users to upload video

20   and -- and -- and interact with video and watch        01:38:43

21   video on the platform, what I can tell you is

22   infrastructure improvements had to take place,

23   you know, at a high level.

24              And I'm not prepared to talk about the --

25   the technical -- I mean, if -- if I think about the     01:39:05
```

Page 40

HIGHLY CONFIDENTIAL

```
1    topic that I'm prepared to talk about, the changes      01:39:11

2    that we made to allow for the ways that users

3    interact with video, of course, we want users to

4    have a successful experience.

5           So what does that mean.  It means, it           01:39:25

6    doesn't -- the upload doesn't fail or the playback

7    doesn't fail.

8           So at a high level, I can only say

9    that -- a quality experience, a good user

10   experience like that is important to Facebook.  So     01:39:44

11   infrastructure improvements to allow for a larger

12   number of video files being uploaded and played

13   had to have -- had to have taken place.  And -- and

14   that's really the depth of the infrastructure

15   preparation that I did.                                 01:40:01

16      Q.  (By Mr. Gould)  Okay.  So in order to not

17   waste your time, are you prepared to talk, at a

18   high level, about the kind -- general kinds of

19   infrastructure changes that have been made in order

20   to facilitate the access to uploading of and           01:40:18

21   sharing of video content?

22          MR. SCHWING:  We haven't -- just to be

23   clear, we haven't designated Mr. Miller to talk

24   about like technical infrastructure.

25          MR. GOULD:  Okay.                                01:40:34
```

Page 41

HIGHLY CONFIDENTIAL

```
 1              MR. SCHWING:  But, you know, storage or        01:40:35

 2     showing video, that's not something we understood

 3     that you --

 4              MR. GOULD:  Okay.

 5              MR. SCHWING:  -- you intended to ask           01:40:42

 6     about.  And that's not part of topic 9c, as we've

 7     understood it.

 8              Mr. Miller is focused on -- on the

 9     actions taken, decisions made that would allow

10     people to kind of interact, like on surfaces that    01:40:55

11     he's been discussing.

12              So I hope that -- that helps to clarify.

13     He's not going to be able to talk about like the

14     servers and the server system and that kind of

15     thing.                                                01:41:05

16        Q.   (By Mr. Gould)  If I were to ask you,

17     you know, Mr. Miller, since 2007, what are the

18     major investments that Facebook has made,

19     generally, in order to facilitate user access to

20     and sharing of and uploading of video content, is    01:41:26

21     that, at a high level, a question that you're

22     prepared to answer?

23        A.   I would say that the -- the lowest level

24     that I could answer is improvements in storage, in

25     coding and playback.  And not -- I'm not prepared     01:41:52
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL

```
 1   to talk -- I think that that would be the          01:42:03

 2   high-level answer to your original question.

 3           But regarding the specifics under those

 4   high-level areas, I didn't find that as relevant to

 5   my topic and the research that I did.                01:42:20

 6       Q.   Okay.  What improvements since 2007 --

 7   major improvements since 2007 have been made in

 8   order to facilitate access to sharing of and

 9   uploading of video content?

10       A.   I can give examples of the way that we      01:42:52

11   recommend or rank video as a -- as basically a -- a

12   bucket of improvements that we've made.

13       Q.   What -- okay.  Well, then -- let me then

14   be more specific and we'll talk about maybe kinds

15   of improvements.                                     01:43:17

16       A.   Okay.

17       Q.   That might focus our discussion.

18           One of those kinds that you mentioned

19   earlier was improvements in storage.

20           Since 2007, what are the major, at a high    01:43:26

21   level, improvements that Facebook has made in order

22   to facilitate access to sharing of, uploading of

23   video content?

24       A.   Oh, you -- I'm confused.  You mentioned

25   storage, and then you mentioned my topic.  But help  01:43:49
```

Page 43

# Exhibit J

HIGHLY CONFIDENTIAL

```
 1    would be great.                                10:31:26

 2           (Exhibit 619 was marked for

 3    identification by the court reporter and is

 4    attached hereto.)

 5           MR. SPRINGER:  Got it.                   10:31:31

 6           The first document has been introduced as

 7    Exhibit 619.

 8       Q.   (By Mr. Gould)  Okay.  So that should be

 9    showing up, and let me know when it's up for you,

10    Mr. Fahey.                                      10:31:46

11       A.   I have it up.

12       Q.   Okay.  Fabulous.

13           And did you review this document in

14    advance of this deposition?

15       A.   I did.                                  10:31:52

16       Q.   Okay.  Let -- let me just ask you a

17    couple of preliminary questions just so -- because

18    I don't want to waste your or anyone's time.

19           Are you prepared today to testify about

20    what drove changes in these numbers?            10:32:05

21           MR. SCHWING:  Object to form.

22           THE DEPONENT:  When you say "drove

23    changes," I -- I wouldn't necessarily know exactly

24    what you mean there.  Could you --

25       Q.   (By Mr. Gould)  Sure.  Of course.       10:32:29
```

Page 19

```
1        A.    -- be a little bit more specific.          10:32:31

2        Q.    Fair to say that a lot of the numbers

3    we're going to be talking about today, numbers that

4    you reviewed in advance of this deposition, went up

5    and down, yes?                                         10:32:42

6        A.    Yes, the numbers changed.

7        Q.    Those are the kinds of changes I am

8    talking about.

9              And by "drive," I just am talking about

10   what caused them to go up and down.                   10:32:55

11             Does that clarify sufficiently for you

12   what I'm talking about?

13             MR. SCHWING:  Object to form.

14       Q.    (By Mr. Gould)  All I'm asking is whether

15   you understand what I mean.  That's all.              10:33:08

16       A.    I understand what you mean by drive, yes.

17       Q.    Okay.  Great.

18             So -- and, again, this is so that we're

19   not wasting time.

20             Are you prepared today to testify about     10:33:21

21   what drove changes in the numbers we're going to be

22   talking about today?

23             MR. SCHWING:  Object to form.

24             THE DEPONENT:  I feel comfortable talking

25   about the numbers as they're presented.  My area of   10:33:37
```

Page 20

HIGHLY CONFIDENTIAL

1    expertise is not product strategy or -- or anything        10:33:42

2    else --

3         Q.   (By Mr. Gould)  Okay.

4         A.   -- that might -- might have had -- had an

5    impact on how the numbers changed.                         10:33:52

6              MR. GOULD:  That is super helpful.

7    That's great.

8              I just wanted to say, for the record,

9    that -- that Mr. -- Mr. Schwing, we'll expect that

10   the -- the witness designated to testify on               10:34:01

11   subtopic c will be able to testify on what drove

12   changes in the numbers.

13        Q.   (By Mr. Gould)  I want to direct your

14   attention, Mr. Fahey, again to the -- to the

15   spreadsheet that's open here.                              10:34:18

16             Are -- are you prepared to testify about

17   the resources that Facebook devotes to keeping

18   track of this data?

19             MR. SCHWING:  Object to form.

20             THE DEPONENT:  Again, what I -- what I            10:34:46

21   prepared for was to talk about the numbers.

22        Q.   (By Mr. Gould)  In other words, you're

23   prepared -- oh, sorry.  Go ahead.

24        A.   No, please, go ahead.

25        Q.   In other words, you're prepared to talk          10:34:58

                                                                Page 21

# Exhibit K

| | |
|---|---|
| **From:** | Lesley Weaver <lweaver@bfalaw.com> |
| **Sent:** | Monday, May 16, 2022 9:56 AM |
| **To:** | Kutscher Clark, Martie; Blume, Robert C.; Cari Laufenberg; Ring, Rose; *** Service-FB-CA_MDL |
| **Cc:** | Daniel Garrie; Anne Davis; David Ko; Derek Loeser; Matt Melamed; Julie Law; Ulmer, Mike M. |
| **Subject:** | FB 30(b)(6) - Identification of documents and topics for Topic 10 (deposition of Amy Lee, set for Thursday, May 16) |

Good morning,

I hope everyone had a good weekend.

Pursuant to the Amended Deposition Protocol, below please find a list of documents that Plaintiffs may mark in the upcoming 30(b)(6) deposition of Facebook relating to Topic 10 set for Thursday, May 16, 2022. For ease of reference, here is Topic 10:

> Facebook's calculation of revenues, gross profits, and net profits recognized by Facebook relating to Users' Data or Information, including but not limited to how Facebook monetized User Data or Information, how Facebook quantified the value of sharing User Data or Information, and Facebook's business and marketing strategy regarding the monetization and quantification of User Data or Information.

To help focus witness preparation, Plaintiffs include here the seven categories of revenue  information the parties have previously discussed in the context of Facebook's search for financial documents, including but not limited to how Facebook monetizes data acquired about users by sharing it, matching it with other data, making it available through APIs, etc.  These topics, provided before and most recently on February 23, 2022, include:

> (1) Financial/economic impact of transition to API v1 to v2 and other APIs, including, but not limited to impact of deprecating friends and read permissions,  and the impact of whitelisting apps and partners;

> (2) Financial/economic impact of expanding or limiting privacy restrictions (including changing privacy controls available to users), or limiting or expanding access to user data via whitelisting apps and partners, including Facebook's calculation of partners' revenues to Facebook throughout the Class Period, and the impact of cutting their access to data off, suspending them from the platform, or anything in

> (3) Marketing and business plans (including any internal financial plans, presentations, or onboarding materials) related to the valuation/quantification/monetization of Facebook user data, including how Facebook uses off-platform user data to track conversions used in calculating revenue;

> (4) Documents and materials Facebook prepared for any third party re quantification of Facebook data and/or user content and information, including in connection w/ 2012 IPO;

> (5) Documents related to any payments made to third parties for access or use of user data (e.g., Onavo, paying data brokers for data, etc.);

> (6) Financial impact of third parties accessing or using FB user content and information in ways that violate FB platform policies (including, but not limited to, e.g., documents supporting Facebook's positions in Rankwave lawsuit in which it valued the amount of data Rankwave was wrongfully obtaining);

(7) Documents supporting Facebook's public reporting of revenues and FB's, including but not limited to average revenue per user (ARPU), lifetime value of users (LTV), user engagement, active users, and the information relating to users Facebook made available to third parties to generate those revenues

FB-CA-MDL-01151469

FB-CA-MDL-01191359

FB-CA-MDL-01191318

FB-CA-MDL-00178146

FB-01221432

FB-CA-MDL-02335774

FB-CA-MDL-02335850-854

FB-CA-MDL-00183183-198

FB-CA-MDL-02140898-900

FB-CA-MDL-01755575

PwC_CPUP_FB00027903

FB-CA-MDL-00237409-423

FB-CA-MDL00203217-242

FB-CA-MDL-01662971-74

FB-CA-MDL-01813445-447

FB-CA-MDL-00214777-779

FB-CA-MDL-02148187

FB-CA-MDL-02255648=50

FB-CA-MDL-02261206

FB-CA-MDL-01191149-53

FB-CA-MDL-02861135

FB-CA-MDL-03055702-707

META-CA-MDL-0000411990

FB-CA-MDL-01835372

FB-CA-MDL-00165410-493 (see Bates ## ending at 460-463)

FB-CA-MDL-00186675-682

FB-CA-MDL-03122034-39

FB-CA-MDL-029550555-559

FB-CA-MDL-02134359-362

FB-CA-MDL-0268005464

ACXM_FB2_1815367

FB-CA-MDL-00237409

FB-CA-MDL-02944234

FB-CA-MDL-01151469

FB-CA-MDL-03103473

FB-CA-MSL 0310207.PPTX

FB-CA-MDL-02003962

FB-CA-MDL-02135819

FB-CA-MDL-01994696

FB-CA-MDL-01995859

FB-CA-MDL-02980484

FB-CA-MDL-02882405

FB-CA-MDL-02130569

---

**From:** Kutscher Clark, Martie <MKutscherClark@gibsondunn.com>
**Sent:** Friday, May 13, 2022 7:36 PM
**To:** Lesley Weaver <lweaver@bfalaw.com>; Blume, Robert C. <RBlume@gibsondunn.com>; Cari Laufenberg
<claufenberg@kellerrohrback.com>; Ring, Rose <RRing@gibsondunn.com>; *** Service-FB-CA_MDL <Service-FB-
CA_MDL@gibsondunn.com>
**Cc:** Daniel Garrie <DGarrie@jamsadr.com>; Anne Davis <adavis@bfalaw.com>; David Ko <dko@kellerrohrback.com>;
Derek Loeser <dloeser@kellerrohrback.com>; Matthew Melamed <mmelamed@bfalaw.com>; Julie Law
<jlaw@bfalaw.com>; Ulmer, Mike M. <MUlmer@gibsondunn.com>
**Subject:** Re: FB 30(b)(6) - Topic 4 Request for Documents

Lesley,

# Exhibit L

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | and I'm not able to provide a full -- I don't -- I | 03:39:34 |
| 2 | don't know the full list of partners where -- where | |
| 3 | we had arrangements like this. | |
| 4 | Q.   (By Ms. Weaver)  Who would know? | |
| 5 | A.   People working on our data partnerships | 03:39:51 |
| 6 | team at the time would know. | |
| 7 | Q.   And who specifically by name? | |
| 8 | A.   Fred Leach is one person that comes to | |
| 9 | mind. | |
| 10 | Q.   Anyone else? | 03:40:01 |
| 11 | A.   He is the main person that -- that comes | |
| 12 | to mind for me. | |
| 13 | Q.   Other than the two use cases that you | |
| 14 | discussed, are you aware of Facebook paying any | |
| 15 | other third parties for data? | 03:40:16 |
| 16 | MR. DAVIS:  Object to the form. | |
| 17 | THE DEPONENT:  I -- I don't recall any | |
| 18 | other -- other instances right now. | |
| 19 | Q.   (By Ms. Weaver)  Did Facebook ever pay | |
| 20 | users for their data? | 03:40:53 |
| 21 | MR. DAVIS:  Object to the form. | |
| 22 | THE DEPONENT:  Not to my knowledge. | |
| 23 | Q.   (By Ms. Weaver)  Are you familiar with | |
| 24 | the Onavo program? | |
| 25 | A.   No. | 03:41:16 |

Page 200

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.   Were you prepared, in your deposition | 03:41:18 |
| 2 | testimony today, to discuss Onavo app? | |
| 3 | MR. DAVIS:  Object to the form.  Scope. | |
| 4 | THE DEPONENT:  No. | |
| 5 | Q.   (By Ms. Weaver)  Are you aware that | 03:41:34 |
| 6 | Facebook paid users ages 13 to 35 for their mobile | |
| 7 | data through the Onavo app? | |
| 8 | MR. DAVIS:  Object- -- | |
| 9 | MS. WEAVER:  Well, strike that.  Let me | |
| 10 | ask a better question. | 03:41:44 |
| 11 | Q.   (By Ms. Weaver)  Are you aware that | |
| 12 | Facebook paid Onavo for data for -- of users ages | |
| 13 | 13 to 35 to follow their mobile data? | |
| 14 | MR. DAVIS:  Objection.  Scope.  Form. | |
| 15 | THE DEPONENT:  I'm not aware of this. | 03:42:02 |
| 16 | Q.   (By Ms. Weaver)  What is | |
| 17 | "Facebook Viewpoints"? | |
| 18 | A.   I'm not familiar with the term. | |
| 19 | Q.   Do you know a market research app that | |
| 20 | Facebook launched in 2019 called | 03:42:14 |
| 21 | Facebook Viewpoints? | |
| 22 | MR. DAVIS:  Objection.  Scope. | |
| 23 | THE DEPONENT:  No, it doesn't sound | |
| 24 | familiar. | |
| 25 | Q.   (By Ms. Weaver)  Do you know if Facebook | 03:42:25 |

Page 201

Veritext Legal Solutions
866 299-5127

# Exhibit M

 

June 17, 2022

**VIA ELECTRONIC MAIL**

Martie Kutscher Clark
Gibson, Dunn & Crutcher LLP
1881 Page Mill Road
Palo Alto, CA 94304
mkutscherclark@gibsondunn.com

Russell H. Falconer
Gibson, Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
rfalconer@gibsondunn.com

Deborah L. Stein
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
dstein@gibsondunn.com

Colin B. Davis
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive,
Irvine, CA 92612-4412
cdavis@gibsondunn.com

Rosemarie Ring
Gibson, Dunn & Crutcher LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
rring@gibsondunn.com

> Re:  *In re Facebook, Inc. Consumer Privacy User Profile Litig.*,
>       Northern District of California Case No. 3:18-md-02843-VC
>       Follow-up to the Topic 4 Deposition

Dear Counsel,

This letter concerns the May 18, 2022 30(b)(6) deposition of Facebook's corporate representative Mike Clark, and responds to Facebook's June 6th and 15th letters regarding the same.

In its letters, Facebook mischaracterizes deposition testimony and ignores prior correspondence. While we write to correct inaccuracies in Facebook's correspondence, we hope that going forward Facebook will dispense with the position statements and engage in a good faith discussion.

### A.  Facebook's Mischaracterization of the Record

Facebook mischaracterizes the record to argue that Plaintiffs should have known that Facebook had narrowed the scope of Topic 4 to its "deletion framework." June 6, 2022 Letter from Martie Kutscher Clark ("June 6 Letter") at 2. As previously explained, Plaintiffs' May 6 and 8, 2022 emails showed that they did not believe this topic was limited to Facebook's deletion framework. May 25, 2022 Letter from L. Weaver at 2. Facebook's May 8, 2022 email also did

not disclose Facebook's intent to narrow the scope of this topic. Rather, the email reiterated that Facebook would be prepared to testify on "the policies and 'processes' Facebook has in place relating to 'pseudonymization, de-identification, re-identification, association, and deletion of User Data and Information.'" The serial comma following "association" makes it clear that this term was meant to be treated separately and not, as Facebook argues, only in the context of deletion. *See O'Connor v. Oakhurst Dairy*, 851 F.3d 69, 70 (1st Cir. 2017) (explaining that activities separated by a serial comma would clearly be encompassed by the statute). In reality, Facebook did not disclose its decision to narrow the scope of this Topic until Plaintiffs were in the middle of questioning the witness. Clark 30(b)(6) Dep. Tr. at 145:2-10.

Facebook argues that its position should have been clear from review of the documents it provided in anticipation of this deposition. But these documents concern a variety of Facebook's activities and products, including: Facebook's Privacy Program, App-Scoped IDs, and RIDs. *See, e.g.*, FB-CA-MDL-00254680, FB-CA-MDL-00254642, ADVANCE-META-00000008, ADVANCE-META-00000028. Regardless, Plaintiffs should not have to engage in a guessing game based on the documents Facebook discloses. In the future, if Facebook has unilaterally narrowed Plaintiffs' discovery requests, it should expressly say so and not rely on mind-reading.

Facebook also argues that Mr. Clark was prepared to address "how any data obtained through a cookie may be associated to a user and pseudonymized, de-identified, and deleted." June 6 Letter at 11. But Mr. Clark could not answer basic questions regarding how cookies functioned. And when asked whether he was prepared to testify "regarding the fpb cookie, the_fbc cookie, ███████████████████, the ████████████ or fr cookies," Mr. Clark responded, "as a representative of Facebook, I didn't prepare for that topic." Clark 30(b)(6) Dep. Tr. at 134:17-135:2; *see also id.* at 135:12-20 (stating that Mr. Clark did not prepare to discuss the datr cookie). Mr. Clark's admission is shocking, given that Plaintiffs' May 6 email expressly identified these cookies as a topic of the deposition.

In addition, Facebook argues that Plaintiffs did not "explore" the topic of Facebook's controls and safeguards regarding pseudonymization, de-identification, reidentification, association, and deletion. That's false. Plaintiffs asked Mr. Clark about Facebook's privacy controls. *E.g. id.* at 27:11-22; 30:10-13; 65:23-25. Plaintiffs also spent significant time on Facebook's policies regarding pseudonymization and de-identification, such as the ████████ ███████. *Id.* at 53:24-54:7; 67:18-22; 97:5-7. A cursory review of the transcript shows Facebook's characterization is untrue.

Further, Facebook asserts—without citing to any specific questions—that Plaintiffs asked Mr. Clark to "decipher and then explain" what authors of emails and other documents meant. June 6 Letter at 12. Not so. Plaintiffs never asked Mr. Clark to speculate as to what the author of a document or email meant. Instead, Plaintiffs asked for Facebook's understanding of the terms set out in certain Exhibits. *E.g.*, Clark 30(b)(6) Dep. Tr. at 48:22-23 ("What's your understanding of what user data means?"); 78:22-23 (asking if what is reflected in the Exhibit is consistent with Mr. Clark's understanding).

     This letter responds to just some examples of the mischaracterizations made in Facebook's June 6 and 15 Letters. In the future, we hope Facebook will engage in a good faith conversation with Plaintiffs rather than relying on position statements.

### B.    Request for Additional Testimony and Documents

     Plaintiffs have sought additional testimony regarding how Facebook associates and re-identifies data and information, and how Facebook uses cookies to associate data and track users on and off the platform. May 18 Letter at 3-4. In response, Facebook has stated that the additional testimony sought will be covered by the Topic 5 deponents (concerning "systems, repositories, databases, and other sources . . . containing or referencing any Data that can be associated with a User."). June 15 Letter at 1-2. However, Facebook only proposed dates for the Topic 5 depositions in July. In other words, Facebook will not provide an additional witness on Topic 4 before the June 30, 2022 deadline imposed by Judge Chhabria. Dkt. No. 941.

     In addition, Facebook has declined to provide the deposition transcript and related exhibits from Mr. Clark's deposition to the FTC. Notably, Mr. Clark testified that his testimony to the FTC concerned "data deletion," which is the **only** topic that Facebook admits is within the scope of Topic 4. Clark 30(b)(6) Dep. Tr. at 20:19. Plaintiffs understand the parties are at impasse regarding this request.

     Plaintiffs also understand the parties are at impasse regarding Plaintiffs' request for the documents Mr. Clark reviewed in preparation for his deposition and that were not identified by Plaintiffs or Facebook prior to the deposition. *Id.* at 26:17-23. In response to Plaintiffs' request, Facebook has only reiterated that it previously produced a limited set of documents Mr. Clark was prepared to testify on, as well as the additional wiki pages Plaintiffs requested. Plaintiffs will thus seek appropriate relief regarding this request.

     Plaintiffs are available to meet and confer, should you wish to discuss any issues raised in this letter.

Regards,

Joshua D. Samra
jsamra@bfalaw.com

# Exhibit N

5

1  whether it will be by oral testimony or not and whether

2  there will be some more time.

3          THE COURT:  Okay.  And obviously I'm not -- I

4  haven't read anything about these most recent 30(b)(6)

5  depositions, so I can't reach any independent conclusion

6  about whether -- whose fault it is or whatever.

7      But to the extent that there continue to be the same

8  kinds of problems with the 30(b)(6) depositions that

9  occurred before -- that I was privy to that occurred before

10 with Facebook's witnesses not being prepared to answer

11 questions that they were on notice, that they needed to

12 answer or not being familiar with documents that they were

13 on notice that they needed to answer questions about, what

14 should I do to try to fix that for any future, you know, new

15 depositions or redos, re-depositions that take place?

16     Should I order Facebook's general counsel to be at

17 every 30(b)(6) deposition for the remainder of this case,

18 for example?  What --

19          MR. LOESER:  Fine --

20          THE COURT:  Again, I don't know, maybe the special

21 master will conclude that Facebook was not at fault for the

22 latest problems, right?  But assuming it continues to be

23 Facebook's fault, it seems to me that some additional

24 measure needs to be taken to ensure that it stops happening.

25          MR. LOESER:  I think that's correct, your Honor.