# EXHIBIT 124-B
## Redacted Version of Document Sought to be Sealed

| | |
|---|---|
| **From**: | Chaya Nayak [/O=THEFACEBOOK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=CNAYAKD5E] |
| **Sent**: | 12/23/2016 7:53:00 PM |
| **To**: | Rob Sherman [/O=THEFACEBOOK/OU=EXTERNAL (FYDIBOHF25SPDLT)/CN=RECIPIENTS/CN=3550715D57EA4CFC812736EE9E1ED7A4] |
| **CC**: | Molly Jackman [/O=THEFACEBOOK/OU=EXTERNAL (FYDIBOHF25SPDLT)/CN=RECIPIENTS/CN=5EA4869102B84BAE85A50461D376E6A9] |
| **Subject**: | Re: Data Protection Handbook |
| **Attachments**: | Handbook V 1.01 18 DEC 2016[1].docx |

Hi Rob-

I have responded to your comments in line below – they were really helpful for me as I dive into talking about these issues as we take the maps on the road. I also went through your comments in the document- they look good to me and are all clear. I deleted the inline case studies and did a little bit more pruning based on your comments below.

I'll wait and see if the rest of the group weigh in by tomorrow morning, and if not I'll send it over to Massimo then. If you have any further concerns before I press send – feel free to message me or call and I am happy to discuss.

Best,

Chaya

**From:** Rob Sherman <​​​​​​​​​​​@fb.com>
**Date:** Friday, December 23, 2016 at 12:51 PM
**To:** Chaya Nayak <​​​​​​​@fb.com>
**Cc:** Molly Jackman <​​​​​​​​​​​​@fb.com>, Emily Sharpe <​​​​​​​​@fb.com>, Steve Satterfield <​​​​​​​​​​​​​@fb.com>, Jean Niehaus <​​​​​​​​​@fb.com>
**Subject:** Re: Data Protection Handbook

A/C PRIV

Hi Chaya, thanks so much (and sorry that I'm getting this to you a bit later in the day than expected – it took a while to get through 76 pages and I had a fair amount of substantive feedback).

I'm attaching an updated version with specific comments. As you mentioned, if we were doing this from scratch I'd certainly take a different approach, and I know they are going to publish this with or without us, so I've limited my comments to specific concerns within the context of the existing draft.

In general, I was a bit surprised to see how much this was an analysis of humanitarian data uses under the GDPR (even though it doesn't mention the GDPR by name). I had understood this was a set of best practices for using data in a humanitarian context, and that's really not what this document is, so it makes me more concerned about putting our name on it directly.

On this point, I want to be sure that Jean and her team have a sufficient opportunity to review not only the FB examples themselves but the broader context in which they will sit -- since there's a lot of substance here that's relevant to how we are thinking about the GDPR. So assuming that this needs to go out today, let's pull everything that identifies FB and just provide the redlines to the draft itself. We can tell them that we will follow up with the FB-specific stuff after the holiday. But I am not comfortable being the only company to have our name on this unless the legal team is comfortable with the conclusions we'd be associating ourselves with.

Highly Confidential - Attorneys' Eyes Only

I've also copied Steve and Emily here. I know we have discussed this a few times in our team meeting but this is more FIPPs/GDPR-linked than I anticipated, so I want them to see the current draft, particularly the parts of Section 3 on legitimate interest and contractual necessity. The legitimate interest section in particular struck me as unnecessarily limiting given how much we may need to rely on legitimate interest, but I'm hoping one of them can weigh in since I'm not the best person to give meaningful feedback on the details of that.

With apologies for the laundry list, here are some additional reactions:

- As we've discussed, this whole thing is so Europe-focused, and it doesn't even acknowledge that there are other laws in other parts of the world. It actually strikes me as a little arrogant to suggest that European law sets the standard for what organizations based in sub-Saharan Africa have to do, so I've tried to soften this and add qualification in a few places. This is helpful. Massimo's reaction to us pressing on this was that a lot of other countries (specifically in LATAM and Africa) are compiling with the Euro focus because they want to meet EU standards of adequacy so that they can operate EU services in their countries (gave the example of cost center services).
- I noticed that in 2.11 and in the intro section defining Data Processor that you highlight as important the need for a legal basis to share data. I'm not sure I understand why this is important; it seems like, if anything, saying that a legal basis is required to disclose data (which I think is generally right) NARROWS, rather than expands, what we can do with data we hold. So I am not sure I am understanding why we think emphasizing this point is important. Can you clarify? I didn't think they did a good job defining why data sharing is a form of processing, which is why I thought it was important for them to clarify. Agreed that in our case it would narrow our data capabilities. I deleted the line in question in the document.
- In the big data section we suggested adding language that disclosing even anonymized data can still expose people to harm. I think it's generally not helpful for us to highlight this since aggregation/deidentification is the key consideration that we highlight for why people should not be worried that we are doing this kind of work. If we do make a point about negative considerations we generally should not concede that "harm" can come to people from the way that we share data for humanitarian purposes. (A key question in legislation and litigation is often whether there is concrete "harm" to an individual, since if there is a harm then it makes more sense to legislate against or restrict that practice. Our general position is that the existence or sharing of data – especially anonymized data – does not inherently create harm, and that if uses of data can put people at risk then we should restrict those uses, not the data itself.) This makes sense to me. The additional context on limiting use rather than data is helpful.
- In the case studies themselves, I would be inclined to focus less on the idea that the data itself is valuable (i.e., that it is monetizable or that we collect metadata about people's interactions that we can leverage). While this is obviously true, the more impactful point in my view – and the point less likely to draw concern from privacy audiences -- is that our services and/or big data analysis can be used in ways that help people. I've suggested a number of changes in the doc that go to this point. That's a helpful caveat re the privacy audience vs. the humanitarian audience – I'll also keep this in mind as we continue to craft our story for each audience.
- (One style point: we generally try to avoid using the term "users" in favor of "people." Updated this in the first example.)
- I noticed that none of the other examples list specific organization names, whereas the Facebook examples call us out specifically. I would like to discuss this, including with Matt Steinfeld and Will Nevius, since it seems sort of weird that the entire document is hypothetical examples and then all the examples in Chapter 6 are Facebook (including using the word "our" to describe what we do). It would be good to understand whether we have considered this and whether we think being the only organization called out in this report is advantageous for us. (I'm thinking about this particularly in view of the "power" concerns that Erin raised in our crisis maps meeting.) Could we get the same benefit by having these be examples of things we have done, without naming Facebook specifically – particularly in the part of Chapter 6 that raises concerns about humanitarian use of social media data? Agreed. I have cut the Facebook specific examples from the text. We can reconvene in the new year to discuss how to integrate a case study into a separate blog post or article that we feel more comfortable with.

Highly Confidential - Attorneys' Eyes Only

- I do think in the non-FB examples in the beginning of Chapter 6 there is an unnecessarily concerning focus on the use of "social media data," when the underlying concerns could apply to many other kinds of data (telephone communications, physical movements, etc.) so I have edited those to avoid focusing specifically on our sector.  As framed, I worry that a data protection regulator or policymaker would use these examples to show why FB should be more heavily regulated than, say, Google or Telefonica when engaging in the same activity – which I don't think we would agree with.  Same concern about framing social media data as a "public data set" but other companies' data (say, Google's index of the world's websites) as "held by private third parties."
- I cut a few places where the draft says that it is basically impossible for people to understand complex data flows and therefore consent is effectively impossible in these scenarios.  I think this is a really unhelpful conclusion for us, given that Facebook's data processing is complex and we rely on consent to justify it, so we should discourage people from making this point wherever possible.
- I've also softened a bunch of places where we say that big data analytics "presents problems for" legal requirements in Europe, since that could be read as effectively a concession that most of what we do isn't legal.  I don't think that's right and I don't think we should accept the conclusion.
- We should not include any examples that state legal conclusions relating to Facebook specifically.  (For example, unless Jean is okay with it, I would say that this document should not express an opinion about how FB's SRR specifically would or would not address European consent requirements.)
- Likewise, we should not talk about having a framework for deciding who gets our crisis maps since as I understand that framework doesn't exist yet.  What happens if some group we don't find "trustworthy" comes to us and asks?
- The Handbook says (p.64) that all commercial entities collaborating with humanitarian organizations must not commingle humanitarian data with data used for business purposes.  We don't satisfy this requirement, do we?  That is, status updates are used in the same infrastructure for both humanitarian purposes and operating our business.  That's maybe not the example that they're getting at – they are focusing on when the data comes from the humanitarian org – but this isn't made clear, and in fact the specifically say that even when commercial entities are processing the commercial entities' own personal data they should sign a contract agreeing not to use that data for business purposes, which doesn't make any sense. This was concerning to me as well.  Particularly the piece on corporate entities exploiting the data for profiling concerned me.  I have deleted that call out and softened the language on page 65 further.
- Finally, based on the index it seems like there are chapters not captured in this document.  Is that correct?  Correct. I have attached the remaining chapters to this email – Massimo sent them to me Wednesday so I haven't had a chance to go through them.  I'm happy to see if we can suggest edits to this next week when I message Massimo with the edits we have thus far.

Happy to talk through any of this if you have questions once you take a look.

Thanks again for doing all of this, and I apologize that I have so much feedback here on what I know is a tight timeline.

Rob

**From:** Rob Sherman <[redacted]@fb.com>
**Date:** Thursday, December 22, 2016 at 5:08 PM
**To:** Chaya Nayak <[redacted]@fb.com>
**Cc:** Molly Jackman <[redacted]@fb.com>
**Subject:** Re: Data Protection Handbook

This is great, thanks Chaya.  I will take a look at this tonight and get you feedback by the morning.

**From:** Chaya Nayak <[redacted]@fb.com>
**Date:** Thursday, December 22, 2016 at 4:55 PM
**To:** Rob Sherman <[redacted]@fb.com>

Highly Confidential - Attorneys' Eyes Only

FB-CA-MDL-03760653

**Cc:** Molly Jackman <​███████████@fb.com>
**Subject:** Re: Data Protection Handbook

Also – just a quick note on the call earlier this week. We spoke to Massimo and he said that we do have the opportunity to influence line-edits, but got the impression that completely overhauling the handbook is not feasible at this late date because other organizations have already weighed in.

Since Facebook will be featured, we want to make sure they are not saying something explicitly harmful, which is the goal of editing now. However, the handbook is only intended for humanitarian organizations, and ███ team is very receptive to our perspective.

They are keen to collaborate on a short case study focused on Facebook and best practices for companies, where we would have a greater opportunity for influence and this could come out as a blog post or article. They suggested presenting this joint research in Hong Kong, if that makes sense in the context of our broader strategy for the meeting.

Best,

Chaya


**From:** Chaya Nayak <​███████@fb.com>
**Date:** Thursday, December 22, 2016 at 1:50 PM
**To:** Rob Sherman <​███████@fb.com>
**Cc:** Molly Jackman <​███████████@fb.com>
**Subject:** Data Protection Handbook

Hi Rob,

I hope your well!  Molly said that you were going to take a look at the Data Protection Handbook so I wanted to pass on the most recent copy with the case studies that Steve, Will, and Jean contributed to.  Feel free to use this as the source of truth (attached).  Also feel free to edit the case studies on this quip if that is easier.

I would love to send this tonight or early tomorrow morning.

Thanks again!

Chaya

Highly Confidential - Attorneys' Eyes Only