# Exhibit 2

**Redacted Version of
Facebook, Inc., Gibson, Dunn &
Crutcher LLP, and Orin Snyder's
Supplemental Brief in Opposition to
Plaintiffs' Motion for Sanctions
to Be Filed Under Seal**

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
   osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
   klinsley@gibsondunn.com
Rosemarie T. Ring (SBN 220769)
   rring@gibsondunn.com
Martie Kutscher (SBN 302650)
   mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
   dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
   jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,

This document relates to:

ALL ACTIONS

CASE NO. 3:18-MD-02843-VC

**FACEBOOK, INC., GIBSON, DUNN & CRUTCHER LLP, AND ORIN SNYDER'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS**

1

**TABLE OF CONTENTS**

2

Page

3

INTRODUCTION ........................................................................................................... 1

4

LEGAL STANDARD ...................................................................................................... 4

5

ARGUMENT ................................................................................................................... 5

6

I.      Plaintiffs' Supplemental Brief Improperly Includes New Requests for Relief
         Based on New and Different Allegations of Misconduct. ............................ 5

7

8

II.     Facebook Acted Reasonably and in Good Faith in Producing ADI Documents. ......... 7

9

         A.      Issue Sanctions Cannot Be Awarded. ............................................. 13

10

         B.      Issue Sanctions Are Unsupported By Any Evidence. ...................... 19

11

III.    Facebook Has Complied With All Orders and Has at All Times Taken Good
         Faith Positions Regarding NP Data. .............................................................. 22

12

         A.      *Discovery Order No. 9* Did Not Require Production of All
                  "Discoverable User Data." ............................................................ 22

13

14

         B.      Plaintiffs' Reliance On Data Preserved In Hive and ███████ Is a
                  Red Herring. .................................................................................. 23

15

         C.      There Is No Basis for Instructing the Jury Regarding Facebook's
                  Production of NP Data. ................................................................... 27

16

17

IV.     Rule 30(b)(6) Depositions Have Been Conducted Reasonably and in Good
         Faith. .............................................................................................................. 28

18

V.      Facebook Promptly and Fully Resolved Privilege-Log Disputes. ............... 33

19

         A.      Facebook's Initial Over-Designation Is Not Sanctionable. ............ 33

20

         B.      Plaintiffs' "Suspicion" of Potential Misuse of the Attorney-Client
                  Privilege Is Both Baseless and Irrelevant. ..................................... 35

21

22

         C.      There Is No Basis for Imposing Sanctions Related to the Privilege Log. ....... 36

23

VI.     Facebook Produced All Relevant Financial Documents. ............................. 37

24

VII.    The Special Master Has Confirmed That Facebook Behaved Reasonably with
         Respect to Collection and Production of Quips. ........................................... 38

25

VIII.   Plaintiffs' Request For Monetary Sanctions Is Procedurally Improper. ...... 38

26

CONCLUSION ............................................................................................................. 40

27

28

i

FACEBOOK'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS
CASE NO. 3:18-MD-02843-VC

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*4 Exotic Dancers v. Spearmint Rhino*,
2009 WL 250054 (C.D. Cal. Jan. 29, 2009) ...........................................................................6

*In re A&M Fla. Properties II, LLC*,
2010 WL 1418861 (S.D.N.Y. Apr. 7, 2010)..........................................................................15

*Allstate Indem. Co. v. Lindquist*,
2022 WL 796314 (W.D. Wash. Mar. 16, 2022) ....................................................................29

*Am. Nat. Bank & Tr. Co. of Chicago v. Equitable Life Assur. Soc. of U.S.*,
406 F.3d 867 (7th Cir. 2005)..........................................................................................33, 34

*Amchem Prod., Inc. v. Windsor*,
521 U.S. 591 (1997) ..............................................................................................................17

*America Unites for Kids v. Rousseau*,
985 F.3d 1075 (9th Cir. 2021)......................................................................................3, 5, 15

*Apple Inc. v. Samsung Elect. Co.*,
2012 WL 1511901 (N.D. Cal. Jan. 27, 2012) .......................................................................30

*AT&T Corp. v. Microsoft Corp.*,
2003 WL 21212614 (N.D. Cal. Apr. 18, 2003) ....................................................................35

*Att'y Gen. v. Facebook, Inc.*,
164 N.E.3d 873 (Mass. 2021) ...............................................................................................19

*Brown v. Google LLC*,
No. 4:20-cv-03664-YGR (N.D. Cal. May 20, 2022) ..............................................16, 17, 28

*Calendar Research LLC v. StubHub, Inc.*,
2019 WL 1581406 (C.D. Cal. Mar. 14, 2019) ...................................................................3, 15

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991)..................................................................................................................4

*Dahl v. City of Huntington Beach*,
84 F.3d 363 (9th Cir. 1996).....................................................................................................3

*Datel Holdings Ltd. v. Microsoft Corp.*,
2011 WL 866993 (N.D. Cal. Mar. 11, 2011)........................................................................35

*In re Denture Cream Prod. Liab. Litig.*,
2012 WL 5057844 (S.D. Fla. Oct. 18, 2012)........................................................................35

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Detoy v. City & County of San Francisco*,
196 F.R.D. 362 (N.D. Cal. 2000)....................................................................................32, 33

*E-Smart Techs., Inc. v. Drizin*,
2011 WL 2020710 (N.D. Cal. May 24, 2011) ...................................................................5, 15, 27

*Fairview Ritz Corp. v. Borough of Fairview*,
2013 WL 5435060 (D.N.J. Sept. 27, 2013) ............................................................................14

*First Mariner Bank v. Resolution Law Group*,
2013 WL 5797381 (D. Md. Oct. 24, 2013)............................................................................16

*Flynn v. Manufacturers & Trades Trust Co.*,
2021 WL 8326249 (E.D. Pa. Sept. 15, 2021) ...................................................................17, 36

*Githieya v. Global Tel*Link Corp.*,
2020 WL 12948011 (N.D. Ga. Nov. 30, 2020) ......................................................................17

*Glass Egg Dig. Media v. Gameloft, Inc.*,
2019 WL 5963228 (N.D. Cal. Nov. 13, 2019)........................................................................40

*Goodyear Tire & Rubber Co. v. Haeger*,
137 S. Ct. 1178 (2017) ......................................................3, 5, 15, 31, 32, 38, 39

*GoPro, Inc. v. 360Heros, Inc.*,
2018 WL 1569727 (N.D. Cal. Mar. 30, 2018) ........................................................................6

*Great Am. Ins. Co. of New York v. Vegas Constr. Co.*,
251 F.R.D. 534 (D. Nev. 2008)......................................................................................29, 30

*Grider v. Keystone Health Plane Central, Inc.*,
2004 WL 902367 (E.D. Pa. Apr. 27, 2004) ...................................................................17, 18, 37

*Griffin v. Aluminum Co. of Am.*,
564 F.2d 1171 (5th Cir. 1977)......................................................................................18

*Halaco Eng'g Co. v. Costle*,
843 F.2d 376 (9th Cir. 1988)........................................................................................2

*Hatten-Gonzales v. Hyde*,
579 F.3d 1159 (10th Cir. 2009)......................................................................................6

*Huertas v. Waite*,
2021 WL 3161494 (E.D. Wis. July 26, 2021) ........................................................................14

*Humphreys v. New York City Health & Hospitals Corp.*,
2022 WL 614677 (S.D.N.Y. Mar. 2, 2022) ............................................................................14

iii

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Johnson v. Wade*,
    2012 WL 2936368 (M.D. Ala. July 19, 2012) ..............................................................19

*Lankford v. Carnival Corp.*,
    2014 WL 11878383 (S.D. Fla. Feb. 12, 2014) ............................................................18

*LiButti v. United States*,
    107 F.3d 110 (2d Cir. 1997) ........................................................................................19

*Mailhoit v. Home Depot U.S.A., Inc.*,
    2012 WL 12884049 (C.D. Cal. Aug. 27, 2012) ..........................................................30

*Masters v. Wilhelmina Model Agency*,
    2003 WL 21089073 (S.D.N.Y. May 13, 2003) ............................................................18

*N. Am. Watch Corp. v. Princess Ermine Jewels*,
    786 F.2d 1447 (9th Cir. 1986) .....................................................................................16

*Nance v. Crockett County, Tenn.*,
    150 F. Supp. 3d 881 (W.D. Tenn. 2015) ......................................................................14

*Pall Corp. v. 3M Purification Inc.*,
    279 F.R.D. 209 (E.D.N.Y. 2011) .................................................................................14

*People of the State of Illinois v. Facebook*,
    No. 2018 CH 03868 (Cook Cnty. Cir. Ct. Mar. 2, 2021) .............................................21

*Phoenix Four, Inc. v. Strategic Resources Corp.*,
    2006 WL 1409413 (S.D.N.Y. May 23, 2006) ..............................................................15

*Primus Auto. Fin. Servs., Inc. v. Batarse*,
    115 F.3d 644 (9th Cir. 1997) .......................................................................................18

*QBE Ins. Corp. v. Jorda Enters., Inc.*,
    277 F.R.D. 676 (S.D. Fla. 2012) ..................................................................................29

*R&R Sails, Inc. v. Insurance Co. of Pa.*,
    673 F.3d 1240 (9th Cir. 2012) ..................................................................................4, 18

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
    306 F.3d 99 (2d Cir. 2002) ..........................................................................................16

*S.G.D. Eng'g, Ltd. v. Lockheed Martin Corp.*,
    2013 WL 2297175 (D. Ariz. May 24, 2013) ...............................................................33

*Sas v. Sawabeh Info. Servs.*,
    2015 WL 12711646 (C.D. Cal. Feb. 6, 2015) .............................................................16

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Sedco Int'l, S. A. v. Cory*,
  683 F.2d 1201 (8th Cir. 1982)..................................................................................34

*Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*,
  357 U.S. 197 (1958)...................................................................................................4

*Stone Brewing Co., LLC v. MillerCoors LLC*,
  2020 WL 6112188 (S.D. Cal. Oct. 16, 2020) ...........................................................14

*Suzue v. Baumgart*,
  2021 WL 2712056 (N.D. Ill. July 1, 2021)..........................................................15, 38

*In re Teleglobe Commc'ns Corp.*,
  392 B.R. 561 (Bankr. D. Del. 2008) ....................................................................33, 35

*In re Terrorist Attacks on Sept. 11, 2001*,
  2013 WL 5788307 (S.D.N.Y. Oct. 28, 2013) ...........................................................16

*Tessera, Inc. v. Sony Corp.*,
  2013 WL 5692109 (N.D. Cal. Oct. 18, 2013) .......................................................27, 28

*In re: TFT-LCD (Flat Panel) Antitrust Litig.*,
  2012 WL 12919129 (N.D. Cal. Nov. 30, 2012)...........................................................4

*United States v. HVI Cat Canyon, Inc.*,
  2016 WL 11683593 (C.D. Cal. Oct. 26, 2016) .........................................................30

*Verizon Cal. Inc. v. OnlineNIC, Inc.*,
  647 F. Supp. 2d 1110 (N.D. Cal. 2009) ......................................................................4

*Vogel v. Harbor Plaza Center, LLC*,
  893 F.3d 1152 (9th Cir. 2018)...................................................................................39

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)..............................................................................................2, 18

*Wilden v. Cnty of Yuba*,
  2012 WL 2196429 (E.D. Cal. June 14, 2012)...........................................................40

*Wilson v. Lakner*,
  228 F.R.D. 524 (D. Md. 2005) ..................................................................................30

**Statutes**

28 U.S.C. § 1927 .......................................................................................................40

Gibson, Dunn &
Crutcher LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Rules**

Civ. L. R. 37-4 ..................................................................................................................39

Fed. R. Civ. P. 7(b)(1)(A)–(C).............................................................................................6

Fed. R. Civ. P. 34(b)(2)(iii)................................................................................................27

Fed. R. Civ. P. 37(a)(5)(A) ..................................................................................................4

Fed. R. Civ. P. 37(b)(2)(A) ..................................................................................................4

**INTRODUCTION**

Six months ago, the Court invited Plaintiffs to file this sanctions motion based on its "strong preliminary view" that Facebook and its counsel, Gibson Dunn, had engaged in discovery misconduct relating to, in particular, the application developer investigation ("ADI") and named plaintiffs data ("NP data"). Dkt. 856 at 4:7–9. We came into that conference understanding that discovery in this case had become overly contentious but believing that document discovery was finally substantially complete, except for ongoing ADI productions under recent orders from the Special Master and potential future NP data productions once Special Master proceedings on that issue concluded. We left understanding that the Court believed we were responsible for the disputes and related delays and that we had lost the Court's confidence as a result.

At the next case management conference, we expressed faith that we could change the Court's view by explaining the discovery disputes and our efforts to respond Plaintiffs' requests consistent with the rule that discovery should be relevant and proportional. Dkt. 903 at 16:6–23. The Court's response has guided our actions since: "I will look forward to reading your brief and will . . . take very seriously what you have to say, even if it might be a little bit of an uphill battle based on everything I've learned thus far." *Id.* at 17:2–6. Facebook and Gibson Dunn have spent the last six months trying to climb that hill by explaining past actions and agreeing to discovery requests in most cases without regard for relevance or burden. It is disheartening to now see these efforts used against us, but far from showing discovery misconduct, they are commendable.

Facebook has produced more than five million pages of documents from approximately 40 data sources and more than 100 custodians. For *ADI*, reports and communications under the Special Master's ADI orders were produced by March 3. When we identified limits on collections subject to the order on communications, we proactively raised them with Plaintiffs and offered to conduct new collections for ADI custodians, which were produced by April 27. When Plaintiffs then requested new collections for all MDL custodians, more than quadrupling the number of custodians, we said yes again, and made additional productions by June 15. Despite all of these efforts, Plaintiffs now seek issue sanctions based, not on ADI communications, but on five ADI reports they have had since September 21, 2021, January 21, 2022, February 11, 2022, February 28, 2022, and March 2, 2022.

1

For *NP data*, Facebook produced nearly one million pages of documents, including data in all three categories of "discoverable user data" identified in Judge Corley's Discovery Order No. 9, and user privacy settings from the Hive and ███████ systems.  In proceedings before the Special Master to determine what, if any, additional NP data should be produced, Facebook presented evidence showing why Plaintiffs' requests for all "discoverable user data" were not relevant or proportional to the needs of the case, including oral testimony from six witnesses and extensive written submissions answering technical questions about Facebook's systems, as well as engineering documentation and contracts with third parties.  Based on this evidence, the Special Master adopted in full Facebook's proposal, requiring what is essentially a data sample, mostly from Hive, which Facebook's witnesses have consistently testified is not accessible to third parties.

For *depositions*, Plaintiffs have taken nearly 100 hours of Rule 30(b)(6) testimony from 13 witnesses (three of whom sat for multiple days), and 30 fact depositions with another 14 scheduled. Facebook's Rule 30(b)(6) witnesses have spent more than 521 hours preparing with the support of outside and in-house counsel who have devoted more than 6,500 hours to these efforts.  Facebook has also agreed to six apex depositions, including Mark Zuckerberg, Sheryl Sandberg, and Javier Olivan.

Since sanctions were raised as a possibility, Plaintiffs have also asked Facebook to conduct additional document searches, and Facebook has agreed.  For example, Facebook agreed to search for certain categories of financial documents and produced more than 6,500 documents, including documents that Facebook agreed to create for Plaintiffs.  Plaintiffs are now seeking sanctions based those documents, even thought they were not responsive to any existing document request.

Despite having received everything they asked for in discovery, Plaintiffs now seek issue sanctions.  Plaintiffs claim (at 4) they are not seeking a terminating sanction, and therefore make no effort to satisfy the stringent requirements for that "drastic substitute for the adversary process of litigation."  *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 382 (9th Cir. 1988).  But the sanctions they seek—most significantly, a finding that Facebook breached a provision of its Data Use Policy for three years as to all users—would effectively terminate a significant portion of the case in Plaintiffs' favor, and decide class certification based on a sanction, rather than a "rigorous analysis" of the evidence.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).

2

Plaintiffs seek these issue sanctions not to fill any gap due to missing evidence, but to avoid having to present evidence they have and say proves these issues to a fact-finder.  For example, Plaintiffs argue (at 8) that a sweeping issue sanction establishing breach of contract is "justified by what ADI-related documents demonstrate," even though they have had those documents for between five and eleven months.  As numerous courts have held, issue sanctions are not appropriate when a party has "actually produced the documents sought."  *Calendar Research LLC v. StubHub, Inc.*, 2019 WL 1581406, at *7 (C.D. Cal. Mar. 14, 2019).  Imposing issue sanctions here would violate the well-established "preference for disposing of cases on their merits," *Dahl v. City of Huntington Beach*, 84 F.3d 363, 366 (9th Cir. 1996), and result in an impermissible punitive sanction *see America Unites for Kids v. Rousseau*, 985 F.3d 1075, 1089 (9th Cir. 2021); *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186–87 (2017).  Plaintiffs' request for monetary sanctions should also be denied because they have not cured prior deficiencies and do not estimate an amount for any new sanctions.

It is true there have been many disputes over the permissible scope of discovery in this case, and that it has taken time to resolve those disputes.  It is also true that Facebook and Gibson Dunn have not been perfect in dealing with those disputes, but their positions were always taken in good faith and never in violation of any order or for the purpose of delay.  It is no coincidence that disputes over ADI and NP data took the longest to resolve, given the significant legal privilege issues and complex technical issues addressed in proceedings before the Special Master.  For *ADI*, when those proceedings concluded and final orders issued, Facebook produced the required documents by March 3, and then agreed to additional productions that Plaintiffs now claim show discovery misconduct even though they seek issue sanctions based on documents produced *before* March 3.  For *NP data*, the proceedings are still ongoing, but the Special Master's order adopting in full Facebook's proposal on what, if any, additional NP data should be produced confirms Facebook has no violated any order on this issue.  The discovery disputes in this case have been among the most challenging that any Facebook or Gibson Dunn lawyer has seen, and we understand that the resulting delays have been frustrating to the Court.  But that delay is the result of good faith disputes that took time to resolve through the cooperative dispute-resolution processes established in the case, and Plaintiffs have all of the discovery they requested.  The Court should deny Plaintiffs' motion or hold it in abeyance.

3

**LEGAL STANDARD**

Plaintiffs seek sanctions under 28 U.S.C. § 1927, Federal Rules of Civil Procedure 37(a) and (b), and the Court's inherent power.  Mot. at 10–12.  But Section 1927 authorizes only monetary sanctions, namely, "excess costs, expenses, and attorneys' fees reasonably incurred" because of attorney conduct that "multiplies the proceedings . . . unreasonably and vexatiously"—and not the issue sanctions Plaintiffs now seek.  Likewise, Rule 37(a) allows a party to recover only fees, and only for "reasonable expenses incurred in making [a] motion" to compel discovery.  Fed. R. Civ. P. 37(a)(5)(A).  And while Rule 37(b) contemplates a broader range of sanctions, it applies only where a party "fails to obey an order to provide or permit discovery," Fed. R. Civ. P. 37(b)(2)(A), and not simply where a party does not comply as promptly as the movant might like.

Where, as here, a statute or the Federal Rules of Civil Procedure speak to the alleged conduct at issue, the Court's inherent power typically has no application.  *See Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 207 (1958) (observing that "whether a court has power to dismiss a complaint because of noncompliance with a production order depends exclusively upon Rule 37," and that "[r]eliance upon . . . 'inherent power,' can only obscure analysis of the problem").  Although "inherent power must continue to exist to fill in the interstices" left by statutes and rules, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991), it is limited to "bad-faith conduct," *id.* at 50.  The standard for bad faith "is demanding," requiring that "a party deceive[] a court 'at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the court.'"  *In re: TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 12919129, at *3 (N.D. Cal. Nov. 30, 2012).

Whatever authority is invoked, where the "sanction amount[s] to dismissal of a claim, the district court [i]s required to consider whether the claimed noncompliance involved willfulness, fault, or bad faith, and also to consider the availability of lesser sanctions."  *R&R Sails, Inc. v. Insurance Co. of Pa.*, 673 F.3d 1240, 1247 (9th Cir. 2012).  Even where the sanction does not amount to dismissal, "[t]he permissible level of sanctions for misconduct in litigation is limited by notions of proportionality."  *Verizon Cal. Inc. v. OnlineNIC, Inc.*, 647 F. Supp. 2d 1110, 1121 n.8 (N.D. Cal. 2009) (cleaned up).  A key aspect of proportionality is that any sanction must be "tailored to

4

necessarily redress th[e] misconduct." *E-Smart Techs., Inc. v. Drizin*, 2011 WL 2020710, at *3 (N.D. Cal. May 24, 2011).

And any sanction must, if issued under the Court's inherent power, "go no further than to redress the wronged party 'for losses sustained'; it may not impose an additional amount as punishment for the sanctioned party's misbehavior." *Goodyear*, 137 S. Ct. at 1186.  The relationship between misconduct and sanctions "is appropriately framed as a but-for test: The complaining party . . . may recover 'only the portion of his fees that he would not have paid but for' the misconduct." *Id.* at 1187.  This but-for standard applies to monetary and non-monetary sanctions alike. *See America Unites*, 985 F.3d at 1091 ("[I]f the district court intends to reimpose an issue preclusion sanction, it must explain how such a sanction is compensatory rather than punitive and satisfies the 'but for' standard directed in *Goodyear*.").

## ARGUMENT

### I.    Plaintiffs' Supplemental Brief Improperly Includes New Requests for Relief Based on New and Different Allegations of Misconduct.

Plaintiffs have submitted three briefs in support of their motion for sanctions, each reflecting different theories for why sanctions should be awarded.  In their supplemental brief, Plaintiffs now, for the first time, seek expansive non-monetary sanctions (in addition to more monetary sanctions).  Plaintiffs' shifting theories and requests for relief are procedurally irregular and prejudicial to Facebook, which has had only limited time and space to respond to a slew of new allegations and forms of relief.

In their initial brief, Plaintiffs sought monetary sanctions on the ground that Facebook and its counsel disobeyed orders and made frivolous legal arguments regarding ADI, NP data, and depositions.  With respect to ADI, Plaintiffs asked for sanctions "beginning April 7, 2021, the day after Judge Corley stated her view that the ADI was not protected by work-product privilege," Mot. at 25, and continuing beyond September 2021 because, "after Judge Corley issued her ADI order on September 8, 2021, Facebook chose to deliberately ignore it and delay compliance for as long as possible," *id.* at 25–26.  Plaintiffs sought sanctions relating to NP data on the ground that Facebook allegedly violated Judge Corley's Discovery Order No. 9 by "refus[ing] to produce" information "such as the behavioral inferences Facebook draws about users based on their activity and the data it

collects by tracking users on and off the Facebook platform." *Id.* at 26.

In response to Facebook's opposition, which Facebook believes disproves these accusations, Plaintiffs changed course in their reply. For example, Plaintiffs abandoned any claim for sanctions relating to Judge Corley's April 7, 2021 ADI order, shifting focus to "*after* Judge Corley's September 2021 ADI order." Reply at 2 (emphasis added). Similarly, Plaintiffs abandoned their argument that Facebook violated Discovery Order No. 9 by not producing NP data for off-platform activity and inferred data. *See id.* at 16 ("Plaintiffs do not claim that Facebook violated the orders merely because it failed to produce certain materials . . . .").

Now, in their supplemental brief, Plaintiffs change course yet again, asserting three entirely new grounds for sanctions and seeking sweeping new relief in the form of issue sanctions that, if granted, would both be tantamount to terminating sanctions and would prohibit the fulsome inquiry into class certification required by Rule 23 and due process. *See infra*, Part II.A. This plainly violates both the Federal Rules of Civil Procedure and this Court's Civil Local Rules. Under Rule 7(b), motions must "be in writing," must "state with particularity the grounds for seeking the order," and must "state the relief sought." Fed. R. Civ. P. 7(b)(1)(A)–(C). And Local Rule 7-2(b)(3) requires "a concise statement of what relief or Court action the movant seeks." While a motion need not contain "magic words," it must "be explicit" about the relief sought. *Hatten-Gonzales v. Hyde*, 579 F.3d 1159, 1166 (10th Cir. 2009); *cf. 4 Exotic Dancers v. Spearmint Rhino*, 2009 WL 250054, at *4 n.5 (C.D. Cal. Jan. 29, 2009) ("The Court will not grant relief requested initially in a reply brief.").

Between their reply and supplemental brief, Plaintiffs have submitted 62 pages of briefing and 69 exhibits advancing three new grounds for sanctions, shifting theories on two other grounds, and make new requests for issue sanctions that could take large portions of the case away from the fact-finder. While Facebook appreciates that the Court has allowed it to respond to Plaintiffs' new arguments, Plaintiffs' failure to follow the established rules governing motions practice are especially concerning, given that the new sanctions requested are "harsh penalt[ies]" that "should only be imposed in extreme circumstances." *GoPro, Inc. v. 360Heros, Inc.*, 2018 WL 1569727, at *3 (N.D. Cal. Mar. 30, 2018).

FACEBOOK'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS
CASE NO. 3:18-MD-02843-VC

Gibson, Dunn &
Crutcher LLP

## II.     Facebook Acted Reasonably and in Good Faith in Producing ADI Documents.

Plaintiffs assert that Facebook "limited its production of ADI documents" in violation of "the Special Master's January 2022 order" and "failed to comply with multiple Court deadlines for production of ADI documents."  Supp. Br. at 7.  But Plaintiffs rely on an interpretation of the January 2022 order that is inconsistent with its plain text and proceedings before the Special Master, and an interpretation of the April 27, 2022 deadline that contradicts their own statements to the Court.  As explained below, Facebook complied with these orders based on reasonable interpretations of them, which Facebook proactively raised with Plaintiffs and, in response to Plaintiffs' conflicting interpretations (which we in good faith believe are wrong), agreed to make additional productions to avoid any further disputes over ADI documents.  Plaintiffs' request for sanctions is therefore based on a (now moot) disagreement on how to interpret the ADI orders, which Facebook raised promptly and in good faith with Plaintiffs and resolved by accepting Plaintiffs' interpretation and producing additional documents.  That is not sanctionable conduct.

There are six ADI production orders.  Three of these orders identify what ADI documents must be produced and three set deadlines for those productions.  As described below, Facebook complied with all of these orders.  Plaintiffs' contention (at 7) that "it remains unclear whether Facebook has yet complied with the orders" is baseless.  As Plaintiffs know, Facebook withheld documents for privilege and prepared logs in accordance with case protocols.  Ring Decl. ¶ 36.  As part of that process, some documents have been de-designated and produced (along with non-responsive documents, e.g., attachments to previously designated documents).  *Id.*  None of this means that Facebook has not complied with the ADI orders.  *Id.*

***Order #1*—ADI Reports for Exemplar Apps**.  On September 8, 2021, Judge Corley issued an order (1) holding that, "as a general matter, documents generated as part of [the ADI] were not created because of litigation," (2) directing Facebook to produce "the background and technical reports, audits and developer interviews of the six exemplar apps chosen by the parties," and (3) directing the parties to "work with the Special Master regarding production of *additional materials* consistent with the guidance offered by this Order."  Dkt. 736 at 6–7 (emphasis added); *see also* Ring Decl. ¶ 10.  Facebook produced "the background and technical reports, audits and

1   developer interviews of the six exemplar apps chosen by the parties" within two weeks of this order.

2   Dkt. 915 ¶ 11(c); Ring Decl. ¶ 11.

3        *Orders #2 and #3—*ADI Reports and ADI Communications**.  Consistent with Judge

4   Corley's order, the Special Master issued orders regarding the production of additional materials,

5   which resulted in the following two final orders on ADI documents: (1) December 20, 2021 order

6   requiring Facebook to produce "all memoranda prepared by [Facebook's outside consultants] and all

7   background reports, technical reports, audits, and [non-attorney] developer interviews in connection

8   with the ADI" ("*December 20 ADI Reports Order*"), Ring Decl. ¶ 13(a); Dkt. 916-7, and (2) January

9   31, 2022 order requiring Facebook to produce "all documents relating to the ADI from all custodians

10  that the parties have identified and collected" ("*January 31 ADI Communications Order*"), Ring

11  Decl. ¶ 17; Dkt. 910-28.  .

12       ***Order #4—*March 3 Deadline for *Orders #2 and #3***.  On February 10, 2022, the Court

13  ordered Facebook to complete ADI productions by March 3, 2022.  Dkt. 856 at 13:8–10.  Plaintiffs

14  do not dispute that Facebook met this deadline for the *December 20 ADI Reports Order*, which

15  means Plaintiffs have had all ADI reports, audits, and non-attorney interviews for nearly six months.

16  Ring Decl. ¶ 19.  Instead, Plaintiffs seek sanctions based on Facebook's alleged failure to meet the

17  March 3 deadline (and later the April 27 deadline) for the *January 31 ADI Communications Order*.

18       Facebook reasonably interpreted the *January 31 ADI Communications Order*, requiring

19  production of ADI communications for "all custodians that the parties have identified and *collected*,"

20  to cover its collected review set for all custodians (i.e., no new collections, no new search strings).

21  *Id.* ¶ 20 (emphasis added).  This interpretation is based on its plain text requiring production of

22  "collected" documents and, as explained below, related proceedings before the Special Master.

23       On January 10, 2022, the Special Master issued a supplemental order regarding production of

24  ADI communications ("*January 10 Supplemental Order*"), requiring production of "all documents

25  relating to the ADI, including communications that include attorneys as lists recipients or cc'd except

26  for documents created for the sole and specific purpose of obtaining legal advice from attorneys."

27  Ring Decl. ¶ 21.  Two days later, on January 12, 2022, the Special Master sent a message to the

28  parties through JAMS, stating that "the [*January 10 Supplemental Order*] and the other ADI Orders

do not add any new custodians." *Id.* ¶ 22 & Ex. 50.

On January 19, 2022, Facebook filed a motion for reconsideration of the *January 10 Supplemental Order* seeking amendments to address the following objections: (1) *Process*: Order should provide for a process to determine which of "all ADI documents" should be produced; (2) *Legal standards*: Order should apply applicable standards for privilege and work product protections; (3) *Relevance*: Order should make clear that it does not require production of irrelevant documents; and (4) *Scope*: Order should apply only to collected review sets (i.e., no new collections, no new search strings).  Ring Decl. ¶ 23.  On (4), Facebook argued that, while the Special Master had made clear that ADI orders do not require new custodians, "even limiting the order to the current custodians may require new collections, and would certainly require new search strings," and therefore requested an amendment to the order making clear that the order did not require additional collections and therefore "applies only to documents in Facebook's review set."  *Id.*

On January 20, 2022, the Special Master issued a tentative amended supplemental order ("*January 20 Tentative Amended Supplemental Order*"), requiring production of "all documents relating to the ADI from all custodians that the parties have *identified* and *collected*."  *Id.* ¶ 24 (emphases added).  Facebook interpreted this amendment as addressing objection (4).  *Id.*  Plaintiffs' response, filed a few days later, suggests the same, arguing that "Facebook raises objections that either lack merit or have been addressed by the [*January 20 Tentative Amended Supplemental Order*]," and stating that they would only "respond to the objections that lack merit" and then saying nothing about objection (4).  *Id.*

On January 31, 2022, the Special Master issued the *January 31 ADI Communications Order*, which adopted the *January 20 Tentative Amended Supplemental Order* verbatim.  *Id.* ¶ 18.  Based on the above, Facebook interpreted the *January 31 ADI Communications Order* as covering its collected review sets for MDL custodians and ADI custodians agreed upon by the parties in the ADI proceedings before Judge Corley.  *Id.*  For MDL custodians, the review set included documents collected using search strings negotiated by the parties and ordered by Judge Corley for requests for production that Plaintiffs claim cover all ADI documents.  *Id.*  For ADI custodians, the review set included documents collected using the same type of search terms negotiated by the parties and

ordered by Judge Corley in the ADI proceedings.  *Id.*

By March 3, 2022, Facebook produced documents from the collected review sets for all custodians (MDL custodians and ADI custodians), and therefore completed its production under the *January 31 ADI Communications Order*.  *Id.*  The March 3 production included 1,053 documents for MDL custodians, *id.*, which disposes of Plaintiffs' contention that Facebook was "reckless" in limiting the March 3 production to only the ADI custodians.  It did not.

There is also no basis for Plaintiffs' contention (at 5) that, after confirming compliance with the March 3 deadline, Facebook "reversed course" in "late March and early April."  Within a week of the March 3 production, Facebook sent an email to Plaintiffs confirming compliance and asking for a meet and confer "to discuss whether [the parties] need to add another issue to the [discovery mediation] tracker relating to ADI," since Facebook had "identified a couple of categories of ADI documents that are not called for by the orders."  *Id.* ¶ 28.  A few days later, Facebook explained that it "want[ed] to discuss . . . limits of the [*January 31 ADI Communications Order*]" with the "goal [of making] sure we have a meeting of the minds on this and avoid any further ADI-related disputes."  *Id.*  To that end, the parties held a meet and confer on March 16, 2022.  *Id.*

During the March 16 meet and confer, Facebook's counsel explained to Plaintiffs that it interpreted the *January 31 ADI Communications Order* as covering documents in collected review sets and that certain ADI custodians had only been collected through August 2019.  *Id.* ¶ 29.  Because ADI continued into mid-2020, Facebook said it was willing to conduct new collections for ADI custodians and proposed that the parties request clarification from the Special Master.  *Id.*

The parties held another meet and confer on March 28, 2022, during which Plaintiffs said they thought new collections should also be done for some MDL custodians, in addition to ADI custodians, and offered to send a list of MDL custodians they believed were involved in ADI.  *Id.* ¶ 30.  Facebook explained that it believed that the new collections should be limited to ADI custodians, since the parties had previously agreed to them in the ADI proceedings before Judge Corley, and that conducting new collections for MDL custodians would be unduly burdensome.  *Id.* Plaintiffs also asked Facebook to explain what had been included in the review sets produced on March 3, 2022.  *Id.*

***Order #5—April 27 Deadline for New ADI Custodian Collections for Order #3.*** During the March 30, 2022 case management conference, the Court ordered production of ADI communications to the present by April 27, 2022. Dkt. 903 at 7:14-24. Facebook interpreted this order to require new collections for ADI custodians, consistent with the joint case management statement submitted by the parties in advance of that conference and the Court's reference to collections through August 2019, which only applied to ADI custodians. Ring Decl. ¶ 31. Plaintiffs now claim this order required new collections for all MDL custodians by the April 27 deadline. *Id.* As explained below, while Facebook agreed to conduct these new collections, this is not a reasonable or fair interpretation of the April 27 deadline. *Id.*

In advance of the March 30, 2022 case management conference, consistent with the parties' March 16, 2022 meet and confer, Plaintiffs reported to the Court that Facebook had informed them that the "collection and production of documents for certain *ADI custodians* ended in August 2019" and said it would "look into whether additional communications and related documents from *these custodians* exist and will be produced," and that Plaintiffs were "amenable to consider a proposed clarification" of the *January 31 ADI Communications Order.* Dkt. 882 at 1–2 (emphasis added). Likewise, Facebook reported that it had "requested a meet and confer with plaintiffs to discuss potential additional productions, since the [*January 31 ADI Communications Order*] is limited to 'custodians that the parties have identified and collected,' and *some custodians* had only been collected through August 2019," and that Facebook had therefore "proposed that the parties request that the Special Master amend his order to address this issue, and said they would conduct additional collections for *these custodians* and produce responsive documents, if any." *Id.* at 5 (emphasis added). During the March 30, 2022 case management conference, the Court ordered that the *January 31 ADI Communications Order* should extend "up to the current day as opposed to limit it to August of 2019," which applied only to ADI custodians. Dkt. 903 at 5:5-7. If Plaintiffs wanted an order covering all MDL custodians, they should have made that clear during the March 30, 2022 case management conference.

Instead, *after* the March 30, 2022 case management conference, Plaintiffs sent an email asking Facebook to include a list of 25 MDL custodians they had "identified as being involved in

ADI" in the new collections ordered by Judge Chhabria and to "explain why if Facebook would not agree." Ring Decl. Ex. 53 at 12. Plaintiffs also asserted, for the first time, that they "expect[ed]" the April 27, 2022 production to include the following: "(1) [a]ll responsive documents touching all MDL custodians as well as the ADI custodians; (2) [a]ll documents relating to ADI, without limitation to documents previously identified as related to ADI in the course of Facebook's document review to-date; and (3) [t]he production will not be limited in any other fashion, including by documents previously identified with MDL search terms or only searching documents from the sampling/logging process." *Id.* After discussing the review sets produced on March 3, 2022, Plaintiffs also demanded that Facebook agree to new search strings to be negotiated by the parties. Ring Decl. ¶ 30.

In subsequent meet and confers, Facebook reiterated its view that conducting new collections for all MDL custodians was unduly burdensome, and explained that it understood the April 27 deadline to apply to new collections for ADI custodians, as the parties had discussed and reported to the Court in advance of the March 30, 2022 conference where that deadline was set. *Id.* Plaintiffs continued to demand new collections for all MDL custodians and divided into two groups: (1) "exemplar" MDL custodians, which are the 25 custodians Plaintiffs said they had identified as being involved in ADI; and (2) "straggler" MDL custodians, which are the 53 remaining MDL custodians. *Id.* ¶ 34; *id.*, Ex. 53 at 12–13.

To avoid further ADI disputes, Facebook agreed *both* to conduct new collections for all MDL custodians and to negotiate and apply new search strings. *Id.* ¶ 32. Consistent with its interpretation of the April 27 deadline as applying to ADI custodians, Facebook met that deadline by completing the new collections for those custodians, applying the new search terms, and producing documents by April 27, 2022. *Id.* While Facebook made every attempt to include the "exemplar" MDL custodians in that production, it was unable to do so. *Id.* Indeed, it took a team of more than *900 attorneys* who spent more than *70,000 hours* collecting, processing, and reviewing *1.35 million documents* to meet the April 27 deadline for the ADI custodians. *Id.*

On April 19, 2022, Facebook informed Plaintiffs that it would complete the new collections and produce documents for the "exemplar" MDL custodians by June 3, 2022, and for the "straggler"

MDL custodians by June 15, 2022, Ring Decl. ¶ 34, which it did through the efforts of more than *600 attorneys* who spent more than *70,000 hours* collecting, processing, and reviewing more than *2 million documents*, *id.*.  Plaintiffs' insistence on new collections and broad new search strings for all of the MDL custodians required these extraordinary efforts, which, unsurprisingly, yielded far fewer responsive documents for MDL custodians than for ADI custodians.  The responsiveness rate for ADI custodians during the course of review was approximately eight times higher than the responsiveness rate for MDL custodians (which was approximately 3%).

> ***Order #6—June 3/June 15 Deadlines for New MDL Custodian Collections for Order #3***.  During the June 9, 2022 case management conference, the Court ordered the above agreed-upon deadlines for "exemplar" and "straggler" MDL custodians, which Facebook also met.  Ring Decl. ¶¶ 33-34 33.

Plaintiffs' request for sanctions based on alleged violations of ADI orders is baseless.  It is also disappointing, given Facebook's transparency with Plaintiffs about its interpretation of the *January 31 ADI Communications Order* and related March 3 and April 27 deadlines, its agreement to additional productions based on Plaintiffs' competing (and we believe wrong) interpretation, and the overwhelming efforts it devoted to collecting and reviewing millions of additional documents to avoid further ADI disputes.  Indeed, it is telling that Plaintiffs do not rely on a single document produced under the *January 31 ADI Communications Order* in support of the issue sanctions they are seeking. *See Id.* ¶ 35.

A.  **Issue Sanctions Cannot Be Awarded.**

Plaintiffs seek issue sanctions related to ADI documents that the law and record do not support.  Plaintiffs ask the Court to find, or to establish a presumption, "that Facebook breached the following contractual clause, which was in the Data Use Policy from at least September 7, 2011 through January 29, 2015: 'If an application asks permission from someone else to access your information, the application will be allowed to use that information only in connection with the person that gave the permission and no one else.'"  Supp. Br. at 8.  And if it is determined, contrary to an express provision in Facebook's policies stating otherwise, that Facebook had a duty to prevent third parties from improperly collecting, storing, obtaining, or selling users' data, Plaintiffs further

Gibson, Dunn &
Crutcher LLP

ask the Court to find, or to establish a presumption, that "Facebook violated that duty as to all Facebook users through April 30, 2015." *Id.* at 11.  But the ADI documents Plaintiffs rely on were produced between five and eleven months ago.  Ring Decl. ¶ 35.  In fact, Facebook has produced over 8,000 ADI Reports comprising nearly 300,000 pages, Dkt. 915 ¶ 11(f), and over 350,000 ADI Communications comprising nearly 1.3 million pages, Ring Decl. ¶ 34.  Plaintiffs' proposed remedies are improper for at least four reasons.

*First*, issue sanctions are generally not available where evidence sought in discovery has been produced rather than destroyed or withheld.  As many courts have recognized, "[t]he public policy favoring disposition on the merits . . . counsels against [a] request for further evidentiary sanctions" when all "documents have at long last been produced."  *Stone Brewing Co., LLC v. MillerCoors LLC*, 2020 WL 6112188, at *3 (S.D. Cal. Oct. 16, 2020).  This makes sense, as "[a] jury need not infer anything adversely when that jury can review the document itself."  *Fairview Ritz Corp. v. Borough of Fairview*, 2013 WL 5435060, at *6 (D.N.J. Sept. 27, 2013).  Where "the jury will have that evidence before it, there will be no need for it to make any assumptions as to the document's contents."  *Nance v. Crockett County, Tenn.*, 150 F. Supp. 3d 881, 890 (W.D. Tenn. 2015).  In such situations "an adverse inference instruction and preclusion . . . 'will usually interfere with the overriding policy of deciding cases on their merits.'"  *Pall Corp. v. 3M Purification Inc.*, 279 F.R.D. 209, 213 (E.D.N.Y. 2011).

Plaintiffs do not (and cannot) argue that Facebook has spoliated evidence.  *Cf. Huertas v. Waite*, 2021 WL 3161494, at *1 (E.D. Wis. July 26, 2021) ("[T]here was no spoliation of evidence; thus, an adverse inference would also be inappropriate."); *Fairview Ritz Corp.*, 2013 WL 5435060, at *6 ("In order to impose an adverse inference, 'it must appear that there has been actual suppression or withholding of the evidence.'"); *Humphreys v. New York City Health & Hospitals Corp.*, 2022 WL 614677, at *4 (S.D.N.Y. Mar. 2, 2022) ("Delay in production is not grounds for spoliation sanctions.").  To the contrary, Plaintiffs attempt to justify the requested issue sanctions based on evidence Facebook *has* produced, claiming that "the ADI documents *themselves* suggest that the issues that Plaintiffs ask the Court to deem established are in fact true."  Supp. Br. at 8 (emphasis added); *see also id.* ("This sanction is justified by what ADI-related documents demonstrate[.]"); *id.*

14

at 10–11 ("The record therefore amply supports the conclusion that, where 'an application ask[ed] permission from someone else to access your information, the application' was not limited to 'us[ing] that information only in connection with the person that gave the permission and no one else.'").

As explained below, the ADI documents cited by Plaintiffs do not support either issue.  But what matters is that Plaintiffs *have* this evidence.  "With the missing evidence no longer missing, the adverse inference remedy is no longer available[.]"  *Suzue v. Baumgart*, 2021 WL 2712056, at *6 (N.D. Ill. July 1, 2021); *see also, e.g.*, *Calendar Research*, 2019 WL 1581406, at *7 ("Adverse inference sanctions . . . would appear particularly inappropriate under the facts of this case because Gray and Efremidze have by now actually produced the documents sought by Plaintiff and have represented that they will supplement that production as soon as they receive the remaining Slack files from their vendor."); *In re A&M Fla. Properties II, LLC*, 2010 WL 1418861, at *6 (S.D.N.Y. Apr. 7, 2010) (finding "an adverse inference instruction . . . overly harsh" where "the Defendant was able to obtain the desired emails and there was no evidence of bad faith on the part of GFI's counsel"); *Phoenix Four, Inc. v. Strategic Resources Corp.*, 2006 WL 1409413, at *7 (S.D.N.Y. May 23, 2006) ("Although Phoenix has established the elements necessary for an adverse inference instruction, I find that such a severe sanction is not warranted here where the SRC Defendants have come forward with the evidence, even if after the close of discovery.").

If Plaintiffs believe this evidence "amply supports" their position, Supp. Br. at 10, then issue sanctions are not "tailored to necessarily redress th[e] misconduct" because Plaintiffs have not been prejudiced in their ability to present their case to the fact-finder.  *E-Smart Techs.*, 2011 WL 2020710, at *3.  And imposing such a sanction—one disconnected from any actual harm to Plaintiffs' ability to present their case to the fact-finder—would be precisely the type of punishment that Supreme Court and Ninth Circuit authority foreclose.  *See Goodyear*, 581 U.S. at 1186 ("To level that kind of separate penalty, a court would need to provide procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof."); *America Unites*, 985 F.3d at 1089.  Accusations of delay in obtaining discovery cannot justify excusing Plaintiffs from the task of proving their claims.

Plaintiffs twist the parties' good faith negotiations about the scope of the *January 31 ADI*

15

*Communications Order* to argue that "it remains unclear whether Facebook has yet complied with the orders." Supp. Br. at 7. As explained above, there is no basis for this assertion. In any event, the standard is not whether production is *perfect*, but whether it has been *sufficient* to allow discovery to move forward. *See First Mariner Bank v. Resolution Law Group*, 2013 WL 5797381, at *14 (D. Md. Oct. 24, 2013) ("While this [adverse inference] sanction may have been appropriate if material evidence was destroyed or entirely withheld, here defendants have produced sufficient information to allow the plaintiff to engage in further investigation and discovery by deposition and to allow the jury to reach their own conclusion on this central issue"); *In re Terrorist Attacks on Sept. 11, 2001*, 2013 WL 5788307, at *15 (S.D.N.Y. Oct. 28, 2013) ("Since they have the documents and will have that opportunity [to conduct follow-up discovery], however, I find it inappropriate to impose an adverse inference sanction[.]"). Here, this standard has been met.

       *Second*, this case does not fall within the narrow subset of cases where delayed production might justify issue sanctions "on the basis that the evidence was not produced *in time for use at trial*." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (emphasis added). No trial date has been set in this case, there is no deadline for summary judgment motions, and briefing on class certification is still over six months away. This fact alone distinguishes the few cases in which courts have imposed issue sanctions for late discovery. *See, e.g.*, *N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986) (affirming issue sanctions where "appellant's willful violation of the discovery order had, given the imminence of the trial date, prejudiced North American's ability to prepare for trial"); *Sas v. Sawabeh Info. Servs.*, 2015 WL 12711646, at *11 (C.D. Cal. Feb. 6, 2015) (imposing preclusion sanctions where, less than one month before trial, the defendants still had not complied with a discovery order); *Brown v. Google LLC*, No. 4:20-cv-03664-YGR (N.D. Cal. May 20, 2022), Dkt. 588 at 39 ("Plaintiffs received virtually no discovery concerning is_chrome_incognito and is_chrome_non_incognito prior to the filing of this Motion on the eve of the close of fact discovery. Before that time, Google identified just one document alluding to just one of these bits.") (available at Dkt. 985-11).

       Here, in stark contrast, Plaintiffs have had all ADI Reports since March 3 at the latest (Dkt. 915, ¶ 11(f)), and most of the ADI Communications since April 27 at the latest (Ring Decl. ¶¶ 32,

16

34)—ample time to conduct further discovery and use these documents to prepare for trial.  As discussed above, the only ADI documents Plaintiffs rely on in seeking issue sanctions were produced between five and eleven months ago.  *Id.* ¶ 35.  Plaintiffs' request that the Court depart from the long line of cases holding that issue sanctions may not be awarded merely for late production should be rejected.

*Third*, the issue sanctions that Plaintiffs request are improper because they would circumscribe Facebook's ability to argue, and the Court's ability to evaluate, the propriety of class certification based on the evidence.  To certify a class, Plaintiffs will bear the burden of showing that Facebook's alleged noncompliance with the Data Use Policy can be proven on a classwide basis.  But Plaintiffs' request that the Court alleviate them of this burden by finding, as a sanction, "that Facebook breached that contractual provision *as to all Facebook users*."  Supp. Br. at 8 (emphasis added).  Likewise, Plaintiffs will bear the burden at class certification of showing that Facebook's alleged breach of duty can be proven on a classwide basis.  But Plaintiffs request a sanction finding that "Facebook violated that duty *as to all Facebook users*" without requiring it to provide any proof. *Id.* at 11 (emphasis added).

A "[c]ourt cannot grant class certification as a sanction."  *Githieya v. Global Tel*Link Corp.*, 2020 WL 12948011, at *5 (N.D. Ga. Nov. 30, 2020).  Similarly, "precluding evidence in response to a class certification motion for a party's alleged discovery violations would not be an appropriate remedy."  *Flynn v. Manufacturers & Trades Trust Co.*, 2021 WL 8326249, at *9 (E.D. Pa. Sept. 15, 2021).  This is because the prerequisites to class certification in Rule 23 exist not only to protect defendants, but to protect *absent third parties* who might not wish to be a part of the class, and whose rights might therefore be litigated without their knowledge, participation, or consent.  *See, e.g.*, *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (noting that the requirements of Rule 23 are "designed to protect absentees").

In deciding class certification, a court's "duty is to the absent potential class members and their rights," and thus "any evidence that is helpful in making [a] class certification decision . . . should be considered."  *Grider v. Keystone Health Plane Central, Inc.*, 2004 WL 902367, at *5 (E.D. Pa. Apr. 27, 2004).  This rule reflects the Supreme Court's instruction that "Rule 23 does not set forth

17

Gibson, Dunn &
Crutcher LLP

1    a mere pleading standard," and thus requires courts to engage in a "rigorous analysis" of the

2    requirements for class certification under Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350

3    (2011).  To the extent that issue sanctions, including preclusion and adverse inference instructions,

4    would interfere with the Court's duty to fully assess the propriety of class certification, they are

5    inappropriate.  *See, e.g.*, *Lankford v. Carnival Corp.*, 2014 WL 11878383, at *1 (S.D. Fla. Feb. 12,

6    2014) (rejecting request to bar defendant from raising defenses to class certification because, "[t]o the

7    extent Plaintiffs seek this sanction as a way to obtain class certification by default, the Court must

8    reject that request as improper"); *Masters v. Wilhelmina Model Agency*, 2003 WL 21089073, at *2–3

9    (S.D.N.Y. May 13, 2003) ("[T]he sanction of striking Elite's opposition to plaintiffs' motion for class

10   certification is inappropriate here because of the potential effect on third parties."); *Grider*, 2004 WL

11   902367, at *5 (holding that "total preclusion of all evidence by defendants" in opposition to a motion

12   for class certification "is an inappropriate remedy").  Plaintiffs' requested sanctions do precisely that

13   by effectively barring evidence proving that breach of the Data Use Policy and breach of a duty

14   cannot be established on a classwide basis.

15       *Fourth*, the issue sanctions Plaintiffs seek might well "amount to dismissal of a claim," yet

16   Plaintiffs cannot show that "the claimed noncompliance involved willfulness, fault, or bad faith," and

17   they do not even address "the availability of lesser sanctions."  *R&R Sails*, 673 F.3d at 1247; *see also

18   Griffin v. Aluminum Co. of Am.*, 564 F.2d 1171, 1172 (5th Cir. 1977) ("Central to this review of

19   discretion is whether the district court could have fashioned an equally effective but less drastic

20   remedy.").  Plaintiffs do not dispute this, emphasizing instead that they "neither ask that judgment be

21   entered on any claim nor seek any other sanction that is tantamount to a judgment in their favor."  Supp.

22   Br. at 4.  But Plaintiffs' say-so is not dispositive.  If the Court accepts Plaintiffs' interpretation of the

23   Data Use Policy (which the record contradicts and Facebook vigorously disputes), or that Facebook

24   has violated a duty with respect to *all* Plaintiffs, then Plaintiffs' proposed issue sanctions could

25   potentially resolve the bulk of the case, leaving only assorted collateral issues to litigate.  As explained

26   above, Facebook did not agree with Plaintiffs' interpretation of the *January 31 ADI Communications

27   Order* but that does not mean that it violated that (or any other) ADI order, let alone in bad faith.  *See

28   Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) ("We insist on the finding

FACEBOOK'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS
CASE NO. 3:18-MD-02843-VC

of bad faith because it ensures that 'restraint is properly exercised,' and it preserves a balance between protecting the court's integrity and encouraging meritorious arguments."). And the alleged "foot-dragging" before Judge Corley and the Special Master does not establish bad faith because Facebook was acting to protect its privilege claims. *See Johnson v. Wade*, 2012 WL 2936368, at *2 (M.D. Ala. July 19, 2012) ("[T]he denials and affirmative defenses appear to be consistent with the preservation of arguments in the future after discovery is conducted, rather than being filed in bad faith for an improper purpose."). These privilege claims were not only asserted in good faith, but were endorsed by the Massachusetts Supreme Judicial Court, which held that the attorney-client privilege covered "confidential communications relating to the ADI among Facebook, Gibson Dunn, and other members of the ADI team[,] including Facebook's outside consultants." *Att'y Gen. v. Facebook, Inc.*, 164 N.E.3d 873, 888 (Mass. 2021).

### B. Issue Sanctions Are Unsupported By Any Evidence.

Although it has nothing to do with the propriety of sanctions (to the contrary, it shows why sanctions are unwarranted), Plaintiffs devote a significant portion of their supplemental brief arguing that the ADI documents amply support that Facebook breached the Data Use Policy's provision that "[i]f an application asks permission from someone else to access your information, the application will be allowed to use that information only in connection with the person that gave the permission and no one else." Supp. Br. at 8–11. These arguments go to the merits, not to whether sanctions are proper. But even if the Court looks to the merits, it should deny Plaintiffs' requested sanction deeming Facebook to have violated the Data Use Policy because the evidence *contradicts* this inference. *See LiButti v. United States*, 107 F.3d 110, 124 (2d Cir. 1997) ("[T]he overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth."). For the same reason, Plaintiffs' request that Facebook be deemed to have violated the purported duty to ensure that apps did not improperly collect, store, obtain, or sell users' information should likewise be denied.

*First*, the documents do not show that any third-party app "use[d]" third-party information in a manner that was not "connect[ed] with the person that gave the permission"—or even that they actually accessed any particular data. Dkt. 988-7 at 10 (pdf pagination). Rather, they discuss the

FACEBOOK'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS
CASE NO. 3:18-MD-02843-VC

"permissions" granted to certain apps—i.e., the type of data (such as a user's friends, education history, or tagged photos) an app *could* access *if* users gave it permission to do so.  *See, e.g.*, Dkt. 988-8 at FB-CA-MDL-02014221 ("███████████████████████████████████[.]").  Even then, just because an app had user permission to access certain data does not mean that the app actually *did* access that data.  Moreover, the memoranda Plaintiffs cite were not final reports with final conclusions reached at the end of an app investigation.  To the contrary, these reports were the first step in the investigation, intended to "issue-spot" by surveying public records and Facebook's own systems for indicia of possible misuse of user data.  Dkt. 905-2 ¶ 61.  If an investigator was uncertain of an app's "use case," for example, it would be noted in the report and counsel would determine which further investigative steps should then be taken, which may include following up with the app developer to explore the issue in greater depth.  *Id.*; *see also, e.g.*, Dkt. 988-8 at FB-CA-MDL-02014238 ████████████████████████████████████████████ ██ .

        *Second*, the documents show only that apps may have had *access to* data that *may* have been beyond what the app needed to provide an experience for "the person that gave the permission."  Supp. Br. at 9 ████████████████████████████████████ ████████████████" (cleaned up; emphasis added)).  But the Data Use Policy does not promise that apps will not have *access to* data—rather, it says that apps are not "*allowed*" to use it in a manner unconnected with the person that gave the permission.  The Data Use Policy also cautioned users to "[r]emember that these games, applications and websites are created and maintained by other businesses and developers who are not part of, or controlled by, Facebook[.]"  Ring Decl., Ex. 54.  While Facebook's policies have long barred app developers from using data for purposes other than providing the app to the user, the fact that some apps may have violated those policies does not establish that "the application [was] allowed" to do so—*i.e.*, that Facebook permitted applications to misuse user data.  At least one other court has rejected Plaintiffs' interpretation of the Data Use Policy as promising to police potential misuse of user data by applications.  *See id.*, Ex. 55 [Memo. of Op. at 11, *People of the State of Illinois v. Facebook*, No. 2018 CH 03868 (Cook Cnty. Cir. Ct. Mar. 2, 2021)] ("This Court finds that FAC as it currently stand[s] does not provide a plausible basis to

conclude that a reasonable person reading these policies might believe that their data was guaranteed to be safe from third-party app developers, especially third-party developers who might violate Facebook's Data Use Policy.").  Even this Court has acknowledged there is ambiguity on this point. *See* Dkt. 298 at 27–28.  Imposing sanctions establishing that Facebook violated this provision would therefore be highly improper.

Plaintiffs contend that Facebook could have taken further steps to prohibit unauthorized use of user data, including by blocking apps from accessing certain types of data.  *See* Supp. Br. at 8 ("Facebook did not limit applications' use of friend data accessed through the users of the apps."). Even if this were true, it does not support an inference that Facebook breached the Data Use Policy because the Data Use Policy does not represent that Facebook will take those steps.  Indeed, not only does this interpretation of the Data Use Policy contradict its plain terms, it does not make sense as a practical matter because it would undermine a user's choice and experience by categorically blocking access to certain types of user data that Plaintiffs believe are inappropriate; alternatively, data that Plaintiffs believe may be validly used "in connection with the person that gave the permission" could still be improperly used by an app developer.

Apparently recognizing this fact, Plaintiffs suggest that "Facebook permitted apps to access friend information *without* any 'use case'—*i.e.*, without [*any*] realistic use of 'that information only in connection with' the app user."  Supp. Br. at 8.  But the ADI documents Plaintiffs cite do not even support this.  Rather, they reflect a preliminary review of the user data certain apps could access. Some documents acknowledge a valid use case but note evidence suggesting that the app might be exceeding that use.  *See, e.g.*, Dkt. 988-9 (█████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████  Other documents flag apps that appear to have access to unnecessary data without drawing any conclusion.  *See, e.g.*, Dkt. 988-9 (███████████████████████████████████████████████████████████████ █████████████████████████████████████████." (emphasis added)); Dkt. 988-10 (████████████████████████████████████████████████████

FACEBOOK'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS
CASE NO. 3:18-MD-02843-VC

Gibson, Dunn &
Crutcher LLP

1 ████████████████████████████████████████████████

2 ██████████████████████." (emphasis added)).  But none supports an inference that

3 there was in fact no use case for the data, much less that Facebook breached the Data Use Policy by

4 not barring those apps from accessing the data.

5      *Third*, even if the ADI documents could support an inference that Facebook breached the Data

6 Use Policy for certain users or apps (and they do not), that does not support the *classwide* inference

7 Plaintiffs request for all users across the tens of thousands of apps (where no evidence of data misuse

8 exists), including apps created by companies like Airbnb, Netflix, and Spotify.

9 **III.   Facebook Has Complied With All Orders and Has at All Times Taken Good Faith
Positions Regarding NP Data.**

10      In their opening brief, Plaintiffs assert that Facebook (1) "disobeyed Judge Corley's

11 [Discovery Order No. 9] for more than a year," Dkt. 873-3 at 32, and (2) engaged in "deliberate foot

12 dragging" to delay the Special Master proceedings on the issue of NP data, *id.* at 26–27.  Plaintiffs

13 now argue in their supplemental brief (at 12–16) that Facebook should also be sanctioned because it

14 preserved but did not produce NP data from the Hive and ████████ systems.  Neither position has

15 any merit.

16      **A.  *Discovery Order No. 9* Did Not Require Production of All "Discoverable User Data."**

17      As Facebook explained in its opposition, Judge Corley's Discovery Order No. 9 did not

18 require Facebook to produce all "discoverable user data" identified in the order.  Dkt. 557 at 2.

19 Instead, the order identified three categories of user data that were subject to discovery by Plaintiffs,

20 and was followed by another order allowing Plaintiffs to do just that by taking a Rule 30(b)(6)

21 deposition to understand what NP data in those categories might exist beyond what Facebook had

22 already produced from the DYI system.  Dkt. 588 at 1–2.  Plaintiffs took that deposition and then

23 continued to demand production of all "discoverable user data" without regard to whether it was

24 relevant or proportional to their claims, ultimately filing a motion seeking that relief from the Special

25 Master.  *See* Opp. at 23–35.  On July 1, 2022, after six months of proceedings involving testimony

26 from six Facebook witnesses and 14 written submissions answering high-technical questions about

27 over 100 data systems (including the DYI system), identifiers used to store and track user data, and

28

FACEBOOK'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS
CASE NO. 3:18-MD-02843-VC

Facebook API data sources, as well as engineering documentation, contracts with third parties involving user data, and schema for thousands tables in the Hive system (Facebook's data warehouse), the Special Master adopted in full Facebook's proposal, which is essentially a sampling of data from two systems. *Compare* Dkt. 981-4 at 10–11 (.pdf pagination) ("*July 1 NP Data Order*") *with id*. at 781-85 (Facebook's May 30, 2022 proposal) and 823-25 (Facebook's June 16, 2022 submission offering to produce additional data). The *July 1 NP Data Order* therefore (at last) confirms that Plaintiffs' interpretation of Discovery Order No. 9 as requiring Facebook to produce all "discoverable user data" is wrong.

Plaintiffs' interpretation of *Discovery Order No. 9* wrongly equates Judge Corley's ruling that the scope of discovery includes three categories of "discoverable user data" with an order finding that Facebook must produce all "discoverable user data." These are distinct legal issues. Just because a certain topic is within the scope of discovery does not mean that requiring production of all documents relating to that topic is proportional to the needs of the case, as required by Rule 26. This distinction is clear from the plain text of Discovery Order No. 9, which states that the issue being decided is "the proper scope of discovery related to the data Facebook accumulates about the named Plaintiffs." *Id*. at 1–2. It is also consistent with Judge Corley's description of the Special Master proceedings resulting in the *July 1 NP Data Order* as "work[ing] with the parties to determine what, *if any*, data from [systems other than DYI] should be produced consistent with *Federal Rule of Civil Procedure 26(b)*." Dkt. 807 at 4 (emphasis added).

Consistent with Discovery Order No. 9 and Judge Corley's description of these proceedings are determining whether Plaintiffs' requests for NP data were proportional to the needs of the case under Rule 26, the *July 1 NP Data Order* rejected Plaintiffs' demand for production of all "discoverable user data," and therefore the basis for their request for sanctions relating to NP data.

**B. Plaintiffs' Reliance On Data Preserved In Hive and ███████ Is a Red Herring.**

Plaintiffs argue (at 12–16) that, because Facebook preserved ███ tables in the Hive system and user account "snapshots" in the ███████ system, Facebook violated Discovery Order No. 9 by not producing the data in these tables and snapshots. Plaintiffs again wrongly equate two distinct legal issues (preservation and production), and then wrongly conclude that all of the data in these

23

Gibson, Dunn & Crutcher LLP

tables and snapshots are NP data, that it has not already been produced to Plaintiffs, and that, to the extent it has not produced, that Facebook was required to produce it under Discovery Order No. 9. As explained below, there is no basis for any of the conclusions.

For *Hive*, Facebook preserved a large volume of data, including in Hive tables, in connection with Cambridge Analytica matters. The vast majority of that data has nothing to do with NP data. Indeed, in September 2018, Facebook told Plaintiffs that it intended to preserve NP data by "creat[ing] snapshots" of their "user accounts." Richardson Decl., Ex. 58. These snapshots were then created through the DYI and ██████████ systems and have been produced to Plaintiffs. For Hive tables that contain ███████████ such that they can be searched for NP data, Facebook has either produced data from those tables or provided Plaintiffs with detailed information about them, and Plaintiffs have not identified any reason to believe that the data had not already been produced to them or were relevant to their claims. Richardson Decl. ¶ 5.

Plaintiffs' also argue (at 13) that Facebook's preservation of Hive tables is inconsistent with statements it has made regarding the difficulty of searching Hive for NP data. There is no inconsistency. The first two statements were made in response to Plaintiffs' demand that NP data includes data that is aggregated and anonymized and simply explains the technical infeasibility of reverse engineering data that is not associated with any individual user. Dkt. 910-6. For the next statement, that "[e]ven a large team of engineers working full time for several years likely could not" "identify all of the information plaintiffs seek," Dkt. 498 at 6–7, Plaintiffs do not explain why that statement is inconsistent with having preserved Hive tables. Finally, the statement that "compiling the remaining information would take more than one year of work and would require coordination across dozens of Facebook teams and hundreds of Facebook employees," Supp. Br. at 13, has nothing to do with searching Hive, but instead responds to an order from the Special Master asking for detailed information about the data in 149 different systems, Dkt. 916-7, which resulted in the Special Master amending his order based on evidence Facebook provided in support of this statement. *See* Dkt. 780 at 1 n.1. Plaintiffs have not identified any inconsistency between any statement by Facebook regarding the difficulty of searching Hive for NP data and Facebook's preservation of certain tables in Hive relating to the Cambridge Analytica matters, and there is none.

Gibson, Dunn &
Crutcher LLP

For ███████ Plaintiffs argue (at 14–16) that Facebook's preservation of account snapshots for the named plaintiffs in the ███████ system shows that Facebook withheld data about the named plaintiffs. This is false. The ███████ snapshots contain categories of data that are either a subset of categories that have already been produced to Plaintiffs from the DYI system in another format and with immaterial differences, or are available to Plaintiffs through transparency tools (e.g. the user's privacy settings). Richardson Decl. ¶¶ 7–8. In contrast to DYI files, ███████ snapshots also contain data about other users (e.g. users who have blocked named plaintiff user accounts), *id.* ¶ 9, and may contain information created exclusively ███████ ███████████████████████████████████████████ Dkt. 981-4 at 823–24 (.pdf pagination). As explained below, Plaintiffs elevate form over substance simply to manufacture arguments that Facebook withheld NP data. These arguments have no merit.

- ***Cookies Data***. Plaintiffs say that, in contrast to the DYI system, ███████ snapshots show "the full alphanumeric identifier for each cookie associated with the named plaintiffs' devices as well as the accounts associated with that cookie, the number of times that cookie was seen, and the date and time it was seen." Supp. Br. at 16. But the ***exact same*** device cookies appear in DYI files, and both systems show the number of times each cookie was "seen" (by Facebook, not a third party), and the dates and times Facebook saw the cookie. Richardson Decl. ¶ 8. That the full alphanumeric string appears in ███████ but not DYI, is an immaterial difference that Plaintiffs do not contend has any impact whatsoever on their claims.

- ***Blocking Data***. Plaintiffs point to data "about the accounts the user has blocked and been blocked by," as being in ███████ and not DYI. But Plaintiffs can access data about users they blocked through their accounts, Richardson Decl. ¶ 7, and have repeatedly indicated they are not seeking data to which they already have access, *see, e.g.,* Opp. at 35 n.2; Dkt. 873-3 at 28. In any event, data about the activities of ***other users*** who blocked the named plaintiffs does not fall into any of the categories of "discoverable user data" identified in Discovery Order No. 9. Indeed, Facebook redacted this data from its production of ███████ data without objection from Plaintiffs, Richardson Decl. ¶ 9, which is consistent with the fact that Plaintiffs do not contend this data is relevant to their claims.

25

Gibson, Dunn &
Crutcher LLP

- ***Facebook Groups, Business Pages, and Advertising Accounts***.  Plaintiffs also point to data regarding user activity on Facebook Groups, Business Pages, and Advertising Accounts.  But data about these activities for the named plaintiffs have either been produced to Plaintiffs from the DYI system or are available to them through transparency tools.  Richardson Decl. ¶ 10 (Pages and Groups); Dkt. 981-4 at 824 (.pdf pagination) (Advertising Accounts).  The additional data in ▉▉▉▉▉▉ screenshots is the activity of ***other users***, Richardson Decl. ¶ 10, including the contents of other users' communications, which Plaintiffs implicitly admit is not NP data since they did not include it in reporting (at 15) the number of pages of ▉▉▉▉▉ snapshots that were produced "about the Named Plaintiffs."

- ***Privacy Settings***.  Plaintiffs' assertion that ▉▉▉▉▉ snapshots include "[i]nformation about privacy settings" that is not in DYI is true, which is why Facebook produced the named plaintiffs' privacy settings from ▉▉▉▉▉ two years ago.  Dkt 981-4 at 824 (.pdf pagination).  Moreover, a user's privacy settings are also available in their account settings, which all named plaintiffs could have accessed at any point.  Richardson Decl. ¶ 7.  Given Facebook produced this data and makes it available on users' accounts, this certainly is not a basis to issue sanctions.

Having failed to identify any data in ▉▉▉▉▉ snapshots that are relevant to their claims, have not already been produced, or are not available through their accounts or transparency tools, Plaintiffs' fallback position (at 16) is to argue that the ▉▉▉▉▉ snapshots are "easier to use" than DYI files based on deposition testimony that they misconstrue.  The witness testified that ▉▉▉▉▉ data can be produced in a "more usable way" than DYI data, but that would not be true here given Plaintiffs' request for *all data* in the ▉▉▉▉▉ snapshots.  Richardson Decl. ¶ 11.  While ▉▉▉▉▉ data can be provided as a single PDF as opposed to individual files, Dkt. 992-3 at 42:2, a single PDF containing all data in the ▉▉▉▉▉ snapshots for the named plaintiffs would be nearly impossible to review and navigate.  Dkt. 981-4 at 824 (pdf pagination).  Indeed, as Plaintiffs know, Facebook produced the ▉▉▉▉▉ data and, due to the volume of data, Facebook was not even able to process some snapshots as single files and instead had to break them into multiple files, which is why 106 documents were produced.  Richardson Decl. ¶ 11.  Even then, several files are over 20,000 pages and one is over 45,000 pages.  *Id*.  In contrast, DYI contains multiple files so that

26

Gibson, Dunn &
Crutcher LLP

users can select and download individual categories of data to review. *Id.*; Dkt. 891-4 at 824 (.pdf pagination).  So, here, the DYI files are "easier to use" than a single PDF that is tens of thousands of pages.  In any event, even though Facebook agreed to and has produced these snapshots, "[a] party need not produce the same electronically stored information in more than one form," Fed. R. Civ. P. 34(b)(2)(iii).

Finally, Plaintiffs' grossly overstate the volume of ▆▆▆▆▆ snapshots.  *First*, Facebook produced two snapshots for each of the named plaintiffs' accounts taken at different points in time. Richardson Decl. ¶ 6.  Each snapshot contains data existing at the time of the snapshot since account signup, so the two snapshots are duplicates except for changes that occurred between snapshots. *Second*, as discussed above, each snapshot contains data about ***other users***, which though redacted in some places remains in the file allowing Plaintiffs to use it to inflate the volume.

Far from showing any discovery misconduct, Plaintiffs' reliance on ▆▆▆▆▆ snapshots as containing NP data they believe should have been produced confirms that relevant NP data was either produced by Facebook years ago or has always been accessible to Plaintiffs.

### C.  There Is No Basis for Instructing the Jury Regarding Facebook's Production of NP Data.

Plaintiffs request that the Court "instruct the jury that Facebook deliberately failed to disclose NP data, including evidence about what Facebook collected about them and what Facebook did with it." Supp. Br. at 17.  But this relief is improper because it is not "tailored to necessarily redress th[e] misconduct." *E-Smart Techs.*, 2011 WL 2020710, at *3.  Where this sanction has been awarded, it has been to explain a disparity in the evidence presented by the parties.  For example, in *Tessera, Inc. v. Sony Corp.*, 2013 WL 5692109 (N.D. Cal. Oct. 18, 2013), Sony failed to disclose internal sales data to the plaintiff but provided that data to its own damages expert.  *Id.* at *3.  The plaintiff "request[ed] that the Court order exclusion of evidence and testimony from [Sony's expert] based on the withheld sales data," but the Court found this sanction "disproportionate to Sony's offense," and opted instead to inform the jury of the discovery issue to mitigate the risk that "the jury may tend to give more credit to the conclusions of Sony's damages expert, who used actual internal sales data, than to Tessera's expert, who used publicly available data." *Id.*

FACEBOOK'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS
CASE NO. 3:18-MD-02843-VC

Gibson, Dunn &
Crutcher LLP

Plaintiffs' reliance on *Brown v. Google LLC*, No. 4:20-cv-03664-YGR (N.D. Cal. May 20, 2022), Dkt. 588 (available at Dkt. 985-11) is also misplaced.  In that case, the plaintiffs sought "a jury instruction that 'Google concealed and altered evidence regarding its ability to identify Incognito traffic,'" a remedy that the court found "not warranted or appropriate on the facts of th[e] case." No. 4:20-cv-03664-YGR, Dkt. 588 at 41–42.  Instead, the court approved an instruction that "Google failed to disclose to Plaintiffs the names of key Google employees responsible for developing and implementing Google's Incognito-detection bits" and that "Google failed to disclose relevant data sources reflecting the use of the Incognito-detection bits"—but only "*if* in the course of proceedings before the trial judge it is determined that Google's discovery misconduct is relevant to an issue before the jury." *Id.* at 42 (emphasis added).  Moreover, unlike in this case, the plaintiffs in *Brown* received "virtually no discovery" on the relevant topic until "the eve of the close of fact discovery." *Id.* at 39.

Here, there is no disparity in the evidence the parties may present to the fact-finder.  To the contrary, Plaintiffs concede that Facebook has "produced 106 ████████ snapshots for the Named Plaintiffs, consisting of over 170,000 pages of information about the Named Plaintiffs," Supp. Br. at 15, while negotiations concerning the production of Hive tables is ongoing, *id.* at 14.  Informing the jury of the parties' discovery dispute would therefore bear no relationship to any prejudice caused by delayed production, and would instead serve only to prejudice Facebook.

## IV.   Rule 30(b)(6) Depositions Have Been Conducted Reasonably and in Good Faith.

Plaintiffs do not seek sanctions relating to Rule 30(b)(6) depositions.  It is therefore improper to even put the issue before the Court, particularly in light of the ongoing proceedings before the Special Master regarding Rule 30(b)(6) depositions.  In any event, Plaintiffs' complaints about the Rule 30(b)(6) depositions are based on an issues that occurred in the first of these depositions that have not occurred since and a standard of perfection that is not required or attainable, and certainly not one that warrants sanctions.

*First*, Plaintiffs accuse the Rule 30(b)(6) witnesses of "not ma[king] an effort to learn" about their areas of expertise, Supp. Br. at 21, and charge Facebook with "fail[ing] to fulfill its obligation to adequately educate its designees so they were prepared to fully answer questions within the topics for

which they were designated," *id.* at 20.  Nothing could be farther from the truth.  Facebook's 13 Rule 30(b)(6) witnesses collectively spent 521 hours preparing for nearly 100 hours of deposition. Schwing Decl. ¶ 6.  They were prepared with the support of Facebook's in-house and outside counsel, who devoted nearly 6,500 hours to those preparation efforts.  *Id.* ¶ 6.

The three witnesses cited as examples of this supposed lack of preparation—Simon Cross, Amy Lee, and Mike Clark—together spent more than 185 hours preparing for their depositions, interviewing 35 Facebook employees and reviewing hundreds of documents:

- Simon Cross spent approximately *100 hours* preparing for his 27 hour, 40 minute deposition, interviewing *15 Facebook employees*, Schwing Decl. ¶ 4;

- Amy Lee spent approximately 32 *hours* preparing for her 7 hour 48 minute deposition, interviewing *13 Facebook employees*, *id.* ¶ 5;

- Mike Clark spent approximately *55 hours* preparing for his 5 hour, 33 minute deposition, interviewing *7 Facebook employees*, *id.* ¶ 5.

This does not come close to the type of preparation that has been found inadequate.  *See, e.g.*, *Great Am. Ins. Co. of New York v. Vegas Constr. Co.*, 251 F.R.D. 534, 542 (D. Nev. 2008) ("[The witness] testified that he had not even read the deposition notice in its entirety, had only spoken 'briefly' with counsel, and had not done anything to prepare to answer questions on the noticed topics."); *QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 693 (S.D. Fla. 2012) ("Mr. O'Brien did not personally interview any employees from the condominium association or the developer entities.  He did not review any association documents unless they were submitted as part of the claim in the underlying lawsuit, and he did not review any documents produced by the developer which were in QBE's possession."); *Allstate Indem. Co. v. Lindquist*, 2022 WL 796314, at *6 (W.D. Wash. Mar. 16, 2022) (witness spoke with no one "with first-hand knowledge" of the issue, which "prevented him from testifying knowledgeably about the events more central to this action.").

Despite the significant amount of time these witnesses spent preparing for their depositions, Plaintiffs insist they were not adequately prepared because they could not answer all of Plaintiffs' questions.  But "Rule 30(b)(6) is not designed to be a memory contest," *Great Am. Ins.*, 251 F.R.D. at 539, and "it is 'simply impractical to expect Rule 30(b)(6) witnesses to know the intimate details of

29

Gibson, Dunn &
Crutcher LLP

everything,'" *United States v. HVI Cat Canyon, Inc.*, 2016 WL 11683593, at \*7 (C.D. Cal. Oct. 26, 2016).  To the contrary, "the purpose served by Fed. R. Civ. P. 30(b)(6)—to require an organization to identify and designate a witness who is knowledgeable on the noticed topic . . . —does not extend to burdening the responding party with production and preparation of a witness on every facet of the litigation." *Apple Inc. v. Samsung Elect. Co.*, 2012 WL 1511901, at \*2 (N.D. Cal. Jan. 27, 2012).  Rather, "a rule of reason applies." *Wilson v. Lakner*, 228 F.R.D. 524, 529 n.7 (D. Md. 2005).

There is nothing unreasonable about the three witnesses Plaintiffs identify being unable to answer some questions over the course of over 40 hours of testimony, spanning thousands of pages of transcripts and covering scores of exhibits.  That is to be expected where, as here, Plaintiffs have served Rule 30(b)(6) notices covering broad topics such as "[t]he systems, repositories, databases, and other sources containing or referencing any Data that can be associated with a User," and "what Data or Information each Whitelisted entity had access to [and] for what time period."  Schwing Decl. ¶ 8, Ex. 77.  "For 'Rule [30(b)(6)] to effectively function, the requesting party must designate, *with painstaking specificity*, the particular areas that are intended to be questioned, and that are relevant to the issues in dispute.'" *Mailhoit v. Home Depot U.S.A., Inc.*, 2012 WL 12884049, at \*2 (C.D. Cal. Aug. 27, 2012) (emphasis added).  This specificity is critical, as "th[e] task [of preparing a Rule 30(b)(6) witness] becomes less realistic and increasingly impossible as the number and breadth of notice subject areas expand." *Apple*, 2012 WL 1511901, at \*2.

Plaintiffs' complaint (at 21) that "some of the designees have been unprepared to discuss" documents provided by Plaintiffs in advance of the depositions is an attempt to use the procedures established for remote depositions to gain a tactical advantage.  Under the protocol for remote depositions, Plaintiffs are required to provide to Facebook at least 72 hours in advance documents they intend to use at the deposition so that they can be located and made available to the witnesses and counsel.  Schwing Decl. ¶ 9, Ex. 78 (Dep. Protocol § IV.C.24).  It was adopted in part to facilitate remote depositions during the COVID-19 pandemic, not to require witnesses to investigate documents' context or meaning by interviewing their authors and recipients, as Plaintiffs repeatedly asserted during the depositions and again in their supplemental brief.  Such a task would be impossible to perform in 72 hours—especially since Plaintiffs have identified tens or even more than

30

Gibson, Dunn &
Crutcher LLP

one hundred documents at a time, sometimes on a Friday in advance of a Monday deposition.  *See* Schwing Decl. ¶ 7, Ex. 75 (127 documents provided before Ms. Hendrix's May 5, 2022 deposition); *id.* ¶ 7, Ex. 76 (80 total documents provided before Mr. Cross's depositions).[1]  And the protocol for remote depositions certainly did not allow Plaintiffs to expand the scope of the noticed topic simply by sending a document 72 hours in advance of the deposition, which Plaintiffs have done repeatedly.

The Special Master's recent order regarding Rule 30(b)(6) depositions underscores why sanctions are not appropriate.  In that order, the Special Master found that "some of Facebook's 30(b)(6) designees were properly prepared for their depositions," but others "were not properly prepared to answer questions within the scope of their noticed topics."  Schwing Decl. ¶ 14, Ex. 81 ¶¶ 10–11.  Facebook disagrees with the Special Master's conclusion that certain witnesses were not adequately prepared, and it intends to file a motion for reconsideration.  But at this stage, any harm Plaintiffs may have suffered has already been cured by the Special Master's allowance of an additional 20 hours of Rule 30(b)(6) depositions.  *Id.* ¶ 12.  Indeed, Plaintiffs have taken nearly 100 hours of Rule 30(b)(6) testimony, more than 14 times what is provided for under the FRCP, from 13 witnesses (three of whom sat for multiple days), and 30 fact depositions with another 14 scheduled. *Id.* ¶ 10.  To impose sanctions at this point would be impermissibly punitive.  *See Goodyear*, 137 S. Ct. at 1186.

*Second*, Plaintiffs complain that Facebook's counsel made "improper interruptions" during the depositions, Supp. Br. at 19, and "substantially impeded Plaintiffs' ability to procure testimony," *id.* at 18.  They focus on the May 5, 2022 deposition of Ms. Hendrix, *id.* at 18–19, which cannot support sanctions because Facebook proactively addressed the issues arising out of that deposition by agreeing to allow Plaintiffs to re-depose Ms. Hendrix and to reimburse their costs.  *See id.* at 19 (citing Dkt. 936).  Plaintiffs also demanded that Facebook agree to an additional 70 hours of Rule 30(b)(6) testimony in exchange for withdrawing the sanctions motion they filed *after* Facebook had already agreed to the relief they were seeking.  Plaintiffs' reliance on this withdrawn motion violates

---

[1]    Plaintiffs complain (at 21) that Mr. Cross, the Rule 30(b)(6) designee for whitelisting, did not know what another employee meant in a document from 2013 about "a framework" for "whitelisting."  Dkt. 984 at 21.  In reality, Mr. Cross testified that this email did not describe what was "ultimately implemented."  Schwing Decl. ¶ 15, Ex. 82, at 263:17–264:6, 269:8–13.

Gibson, Dunn &
Crutcher LLP

the Supreme Court's teaching that sanctions "may go no further than to redress the wronged party 'for losses sustained'" as a result of the alleged misconduct.  *Goodyear*, 137 S. Ct. at 1186.

Plaintiffs' remaining complaints about counsel's conduct are meritless.  For example, Plaintiffs point to "Facebook's counsel repeatedly objecting to questions about, and Mr. Clark being unable to answer, how Facebook defined 'personal information,' a concept that underpins this case and is fundamental to how data is pseudonymized, de-identified, re-identified, associated, and deleted."  Supp. Br. at 20.  But the question Plaintiffs' counsel put to Mr. Clark involved the definition of "personal information" *under the California Consumer Privacy Act* ("CCPA"), and Mr. Clark declined to answer on grounds of attorney-client privilege:

> Q. (By Ms. Weaver) So the answer is, as you sit here right now, you don't know what the definition of personal information under the CCPA is, correct?  In your personal or in the corporate capacity, is that right?
>
> . . .
>
> THE DEPONENT: In – in my personal capacity, I work with product counsel on a regular basis on the definition of what personal information is under CCPA, which is a long and nuanced answer in the context of working with that data every day, because I have come up with and developed that definition under guidance and direction of counsel.

Schwing Decl. ¶ 12, Ex. 79 (May 18, 2022 Clark 30(b)(6) Dep. Tr. at 220:14–221:5).  There is nothing improper about a witness declining to answer a question that might infringe on the attorney-client privilege.  *See, e.g.*, *Detoy v. City & County of San Francisco*, 196 F.R.D. 362, 367 (N.D. Cal. 2000) ("Counsel shall refrain from instructing a [Rule 30(b)(6)] witness not to answer, except . . . to preserve a privilege[.]").  And Plaintiffs never sought to compel a response to this question.

Likewise, Plaintiffs assert that "[w]hen Ms. Leone was asked '[w]hat is Facebook's understanding of what it means when they promise that they will not provide personal identifiable information to advertisers,' Facebook objected that the question was 'out of scope,' even though a document that Facebook had identified prior to the deposition used that express language."  Supp. Br. at 20.  The fact that a document uses a particular term does not bring the meaning of that term within the scope of a Rule 30(b)(6) topic.  More fundamentally, Plaintiffs omit the fact that, after counsel explained the basis for the objection and proposed how Plaintiffs could obtain testimony about the

document and within the scope of the 30(b)(6) deposition (all outside the presence of the witness), Ms. Leone *answered Plaintiffs' question.* Schwing Decl. ¶ 13, Ex. 80 (August 5, 2022 Leone 30(b)(6) Dep. Tr. at 324:15–329:14). This is precisely what is expected of counsel and the witness— to object where there is a reasonable basis for doing so in order to preserve the issue, and to otherwise answer the question, at minimum, in an individual capacity. *See Detoy*, 196 F.R.D. at 367 (noting that "[i]f Defendants have objections to . . . questions outside the scope of the 30(b)(6) question," then "counsel shall state the objection on the record and the witness shall answer," but "[c]ounsel may note on the record that answers to questions beyond the scope of the Rule 30(b)(6) designation are not intended as the answers of the designating party and do not bind the designating party").

## V.      Facebook Promptly and Fully Resolved Privilege-Log Disputes.

There is no basis for sanctioning Facebook over privilege-log disputes that have now been resolved. "In complex litigation it is not unusual for counsel to claim privilege initially as to many documents which on further review are not covered and have to be produced." *In re Teleglobe Commc'ns Corp.*, 392 B.R. 561, 584 (Bankr. D. Del. 2008). That is all that happened here.

### A.      Facebook's Initial Over-Designation Is Not Sanctionable.

"[I]t is expected that clients and their attorneys will zealously protect documents believed, in good faith, to be within the scope of the privilege." *Am. Nat. Bank & Tr. Co. of Chicago v. Equitable Life Assur. Soc. of U.S.*, 406 F.3d 867, 878–79 (7th Cir. 2005) (citations omitted). In "large-volume document cases," "it is not unusual for the privilege proponent to revise the details of its privilege log." *S.G.D. Eng'g, Ltd. v. Lockheed Martin Corp.*, 2013 WL 2297175, at *8 (D. Ariz. May 24, 2013). When disputes arise, "[p]arties are expected to confer . . . and attempt to resolve their differences." *Id.* Facebook did precisely that here. When Plaintiffs challenged certain categories on the privilege log, Facebook promptly and voluntarily began a re-review of the log and served an amended log on June 24, 2022, as the Court directed. Richardson Decl. ¶ 13; *see* Dkt. 939 at 11.[2]

Not only did Facebook voluntarily re-review the log, it prioritized the documents Plaintiffs

---

[2]   While Facebook disagrees that 233,544 documents were added to the privilege log (the log in its entirety had only 196,243 entries, Richardson Decl. ¶ 12), there is no question the volume was significant. But the volume was dictated by the breadth of Plaintiffs' requests, which demanded documents on a wide range of topics over a nearly 15-year period, including requests that, as phrased, necessarily encompassed a large volume of privileged documents.

Gibson, Dunn &
Crutcher LLP

were most likely to use earlier than the June 24 deadline—including by prioritizing witnesses whose depositions had been scheduled and committing to complete the re-review and production of those witness' documents before the depositions.  Richardson Decl. ¶ 13.  As further evidence of its good faith, Facebook offered to prioritize the re-review of any other categories of documents Plaintiffs would like expedited.  *Id.*  Plaintiffs did not identify any categories beyond those that Facebook identified.  *Id.*

That Facebook removed a significant number of documents from the amended log is not evidence of bad faith.  The custodians included several attorneys; the privilege calls were challenging because, as courts recognize, "legal advice concerning commercial transactions is often intimately intertwined with and difficult to distinguish from business advice," *Sedco Int'l, S. A. v. Cory*, 683 F.2d 1201, 1205 (8th Cir. 1982); and Facebook was working under a severe time constraint.  Nevertheless, Facebook met the Court's deadline, and Plaintiffs' claim that it failed to do so is false.  Richardson Decl. ¶¶ 13–14.

Moreover, Facebook completed its production of the de-designated documents on July 5.  Richardson Decl. ¶ 15.   Plaintiffs' suggestion that documents remain outstanding is inaccurate.  *Id.* ¶¶ 15–16.  Plaintiffs fail to identify a single document from the privilege log that they contend is wrongly being withheld.  Nor do they identify a single witness whose deposition needs to be re-opened based on recently de-designated documents.  Plaintiffs elected to postpone the depositions.  *Id.* ¶ 16.  Thus, no depositions have been impacted, and Plaintiffs now have all of the documents de-designated from the March log.

In sum, "[Facebook] sought to protect documents for which a good-faith argument in support of privilege could be made, and it did so while treading in an area of privilege law that is generally recognized to be especially difficult, namely, distinguishing in-house counsels' legal advice from their business advice." *Am. Nat. Bank*, 406 F.3d at 879 (quotations omitted).  Given the volume of documents, it is "not surpris[ing] that [Facebook] had to review the privilege log continually to ascertain whether the documents were privileged." *In re Teleglobe*, 392 B.R. at 584.  Further, when Plaintiffs raised issues, Facebook "acted promptly in reviewing the privilege log and producing documents when it determined that the privilege did not apply." *Id.*   None of this is sanctionable

conduct.

Citing three cherry-picked documents (out of the thousands logged), Plaintiffs claim that Facebook's designations lacked merit because some documents involved non-attorneys.  Supp. Br. at 23–24.  Asserting privilege over communications between non-attorneys is not improper. "Communications between non-lawyer employees about matters which the parties intend to seek legal advice are . . . cloaked by attorney-client privilege."  *AT&T Corp. v. Microsoft Corp.*, 2003 WL 21212614, at *3 (N.D. Cal. Apr. 18, 2003); *see also Datel Holdings Ltd. v. Microsoft Corp.*, 2011 WL 866993, at *5 (N.D. Cal. Mar. 11, 2011) ("The attorney-client privilege may attach to communications between nonlegal employees where: (1) the employees discuss or transmit legal advice given by counsel; and (2) an employee discusses her intent to seek legal advice about a particular issue." (quotations omitted)).  "To conclude otherwise would result in a somewhat absurd finding that a document generated for purposes of obtaining and/or assisting in the transmission of legal advice would [lose its privilege] merely because the author and recipient were not attorneys." *In re Denture Cream Prod. Liab. Litig.*, 2012 WL 5057844, at *13 (S.D. Fla. Oct. 18, 2012).  In any event, Facebook de-designated these documents and Plaintiffs now have them.

**B.   Plaintiffs' "Suspicion" of Potential Misuse of the Attorney-Client Privilege Is Both Baseless and Irrelevant.**

Plaintiffs' accusation—which has no connection to their sanctions request—that "Facebook employees improperly tried to shield nonprivileged communications with attorney-client privilege" is, as they concede, nothing more than a "suspicion."  Supp. Br. at 24.  Plaintiffs base their "suspicion"—which obviously cannot support any sanctions—on two emails they misconstrue and take out of context, and which they concede are "not conclusive."  *Id.*

Plaintiffs first cite an exchange regarding the use of Quip by Facebook employees, and take it out of context.  Dkt. 988-30.  When one employee asks if it is permitted to use Quip—a third party service—to discuss "escalations," another responds it is "approved."  A third employee then adds the reasonable point that sometimes escalations may require the guidance of a lawyer.  Plaintiffs then ignore that the third employee directed the first to internal company policies which explain the proper metes and bounds of the attorney-client privilege.  The third employee did exactly the right thing: he

Gibson, Dunn &
Crutcher LLP

directed his colleague to contact in-house counsel or to consult internal company policies regarding privilege issues.

Plaintiffs next cite a lengthy exchange involving a developer seeking approval to use user data for back-end purposes. Dkt. 988-29. The email exchange outlines a mistaken approval given to a developer, and an employee asks a colleague how to proceed going forward. *Id.* The colleague replies, "[C]an we discuss in person? Else we need to make this a/c priv and add a lawyer in the thread." *Id*. There is nothing wrong with stating that a communication may raise privilege issues and that adding an attorney might be prudent. And while Facebook ultimately decided to withdraw the designation to avoid a dispute, its initial designation—made in the process of reviewing hundreds of thousands of documents—was reasonable.

In any event, neither exchange supports Plaintiffs' accusation, which is an attempt to slander Facebook and embarrass its employees.

### C. There Is No Basis for Imposing Sanctions Related to the Privilege Log.

There is no evidence of bad faith and no prejudice to Plaintiffs, so there is no basis for Plaintiffs' requested sanctions, which are also overboard and inconsistent with their theory that Facebook intentionally withheld documents. *First*, Plaintiffs ask that Facebook "be precluded from making affirmative use of any de-designated document from the privilege log issues in March of this year, whether to defeat class certification, to obtain a dispositive order, or at trial." Supp. Br. at 27. This request is a tacit admission that Facebook did not strategically withhold documents that are helpful to Plaintiffs; if it had, Plaintiffs would be clamoring to include them in the record, not fighting to prevent Facebook from relying on them. Moreover, as explained above, this sanction would impermissibly prevent the Court from considering all relevant evidence in deciding class certification. *See, e.g.*, *Flynn*, 2021 WL 8362649, at *9 ("[P]recluding evidence in response to a class certification motion for a party's alleged discovery violations would not be an appropriate remedy."); *Grider*, 2004 WL 902367, at *5 (explaining that because courts have an independent duty to ensure that Rule 23's requirements are met, "any evidence that is helpful in making [the] class certification decision . . . should be considered").

*Second*, Plaintiffs ask that they "be permitted, at their discretion, to conduct depositions, after

FACEBOOK'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS
CASE NO. 3:18-MD-02843-VC

the fact-discovery cutoff but no later than 30 days before trial, of individuals who are active contributors in the de-designated documents."  Supp. Br. at 27.  Such open-ended relief is neither warranted nor proportional.  Plaintiffs fail to identify a single deposition that has been impacted by de-designations.

## VI.   Facebook Produced All Relevant Financial Documents.

Facebook has never denied that it has financial information, but it has explained that it does not have the specific type of financial information requested by Plaintiffs—i.e., documents assigning monetary "value" to user data. Dkt. 589 at 9:3–9.  Prior to the substantial completion deadline, Facebook searched for and produced financial documents using agreed-upon search strings, *id.* at 9:12–23, as well as annual reports and financial information it produced to the FTC.  And as Plaintiffs know, when Facebook told Plaintiffs it did not have the documents they were seeking, Judge Corley allowed them to take a Rule 30(b)(6) deposition to "narrow" their requests to seek documents that exist. Dkt. 588 at 1–2.  Plaintiffs took that deposition in February 2021 but did not serve narrowed requests.  A year later, during a discovery mediation session, Plaintiffs asked Facebook to search for specific types of financial documents. Dkt. 939 at 9.  Although Facebook did not agree that these documents were covered by any written discovery request, it agreed to conduct the search and produced thousands of documents.  *Id.*  Plaintiffs point to those documents as showing that Facebook has now produced financial documents it previously said did not exist, but not one of them reflects the "value of" user data, and therefore they are not responsive to Plaintiffs' previous requests.

Plaintiffs attempt to recast their past requests more broadly, as seeking financial documents about revenue received as a "result of allowing third parties to access users' data," Supp. Br. at 27, but this language appears nowhere in Plaintiffs' the previous requests.  Plaintiffs point to a single document produced in 2021. Supp. Br. at 28 (citing Dkt. 988-53).  But that document does not, in fact, value user data or reflect revenue received as a "result of allowing third parties to access users' data."  It is a document Facebook created for purposes of this litigation reflecting the company's total revenue by channel. Dkt. 988-53.  Plaintiffs complain (at 28) that the document was "not sufficiently detailed or meaningful to provide the information Plaintiffs sought," but that is because Facebook

Gibson, Dunn &
Crutcher LLP

does not "value" user data in the way Plaintiffs speculate it does, nor are any of its revenues allocated to "user data."

Plaintiffs ask that Facebook "be precluded from affirmatively arguing at any stage of the case that the information in the financial documents is incomplete, untrue, or inaccurate, or cannot provide a basis for the calculation of restitution, should the Court determine that restitution is an available remedy for any claim." Supp. Br. at 30. In addition to Plaintiffs' inability to point to any sanctionable conduct, such an issue sanction is improper. Even assuming Plaintiffs' previous request was as broad as they now say, which it was not, Plaintiffs acknowledge that the documents are being produced, *id.* at 29; *see, e.g.*, *Suzue*, 2021 WL 2712056, at *6 ("With the missing evidence no longer missing, the adverse inference remedy is no longer available[.]"). Such a sanction would also operate as an impermissible penalty because it would prevent Facebook from fully litigating Plaintiffs' eligibility for an entire class of remedy—restitution. *See Goodyear*, 137 S. Ct. at 1186.

## VII. The Special Master Has Confirmed That Facebook Behaved Reasonably with Respect to Collection and Production of Quips.

Plaintiffs seek sanctions for Facebook's alleged failure to reasonably collect Quips. Plaintiffs also filed a motion to compel with the Special Master, making the same arguments they do here and seeking an order requiring Facebook to collect and produce additional Quips. As an initial matter, it was premature and improper for Plaintiffs to seek sanctions based on a discovery dispute that was the subject of a pending motion before the Special Master. In any event, the Special Master denied Plaintiffs' motion a few days ago, "find[ing] that Facebook's collection and production of Quips . . . was reasonable and proportional to the needs of the case." Richardson Decl. ¶ 18 & Ex. 57. Accordingly, there is no basis for imposing sanctions on Facebook relating to its collection and production of Quips.

## VIII. Plaintiffs' Request For Monetary Sanctions Is Procedurally Improper.

While Plaintiffs are not entitled to *any* sanctions for the reasons outlined above, the Court need not even reach the merits to dispose of Plaintiffs' request for monetary sanctions because Plaintiffs fail to provide any accounting for the fees they seek.

Plaintiffs "submitted no time records or billing statements" with their motion, but rather "simply recite[d] that each attorney performed a list of tasks associated with each of the three issues

38

on which Plaintiffs seek fees." Opp. at 45. Without such documentation, the Court cannot discharge its "'duty to ensure that claims for attorneys' fees are reasonable.'" *Id.* at 44 (emphasis omitted) (quoting *Vogel v. Harbor Plaza Center, LLC*, 893 F.3d 1152, 1160 (9th Cir. 2018)). Plaintiffs' supplemental brief is even more perfunctory. Whereas the motion at least provided the total fees requested for each instance of claimed misconduct, *see* Mot. at 26; *id.* at 37; *id.* at 42, Plaintiffs now assert that they "will submit additional records reflecting the time and expenses incurred" if and when their motion is granted, Supp. Br. at 8. Plaintiffs claim that "[i]t is common practice to grant a motion for sanctions and then invite the moving party to submit substantiation," Reply at 26, but this Court's rules clearly foreclose this approach:

> When, in connection with a dispute about disclosure or discovery, a party moves for an award of attorney's fees or other form of sanction under Fed. R. Civ. P. 37, *the motion must*:
> . . .
> (b) Be accompanied by competent declarations which:
> . . .
> (3) If attorney fees or other costs or expenses are requested, *itemize with particularity the otherwise unnecessary expenses, including attorney fees, directly caused by the alleged violation or breach*, and set forth an appropriate justification for any attorney-fee hourly rate claimed.

Civ. L. R. 37-4 (emphasis added).

Plaintiffs seek monetary sanctions under Rule 37. *See, e.g.*, Mot. at 37 ("For disobedience of Judge Corley's order on the scope of discoverable data, sanctions should be imposed under Rule 37(b)."); Supp. Br. at 16–17 ("Plaintiffs' opening brief sought monetary sanctions under Rule 37(b)[.]"). As a result, Local Rule 37-4(b)(3) requires a particularized itemization of fees "directly caused" by the alleged misconduct. Without this itemization, the Court cannot ensure that Plaintiffs "may recover 'only the portion of [their] fees that [they] would not have paid but for' the misconduct." *Goodyear*, 581 U.S. at 1187. But Plaintiffs make no effort at all to comply with this requirement. The Court should therefore join the numerous others that have denied motions for monetary sanctions in similar circumstances. *See, e.g.*, *Glass Egg Dig. Media v. Gameloft, Inc.*, 2019 WL 5963228, at *1 (N.D. Cal. Nov. 13, 2019) ("Because GLSE's Motion fails to set forth a particularized itemization of the allegedly unnecessary expenses it has incurred, or a statement of the

FACEBOOK'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS
CASE NO. 3:18-MD-02843-VC

hourly rate(s) claimed, or an appropriate justification for such rate(s), the Motion is both non-compliant with Local Rule 37-4(b)(3), and the Motion is such that this court is unable to determine whether the lump sums claimed are reasonable under the circumstances."); *Wilden v. Cnty of Yuba*, 2012 WL 2196429, at *1 (E.D. Cal. June 14, 2012) (denying a motion for sanctions under 28 U.S.C. § 1927 where "Defendants submitted a declaration indicating the $14,293 was expended on defending the entirety of the action, but they did not present an itemized accounting of the fees incurred").

## CONCLUSION

Plaintiffs' motion for sanctions should be denied.  In the alternative, the Court should hold the motion in abeyance until the completion of all discovery.

DATED: August 22, 2022

*/s/ Rosemarie T. Ring*

Rosemarie T. Ring (SBN 220769)

GIBSON, DUNN & CRUTCHER LLP
rring@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Facebook Inc.*

Gibson, Dunn &
Crutcher LLP

FACEBOOK'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS
CASE NO. 3:18-MD-02843-VC