# EXHIBIT 98-B
**Redacted Version of Document Sought to be Sealed**

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4   IN RE:  FACEBOOK, INC.,        MDL No. 2843

5   CONSUMER USER PROFILE          Case No.

6   LITIGATION                     18-md-02843-VC-JSC

    _____

7   This document relates to:

8   ALL ACTIONS

    _____

9

10  **CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER**

11

12       ZOOM DEPOSITION OF FACEBOOK's 30(b)(6)

13       CORPORATE REPRESENTATIVE - ISABELLA LEONE

14  (Reported Remotely via Video & Web Videoconference)

15      Seattle, Washington (Deponent's location)

16              Friday, August 5, 2022

17                   Volume 1

18

19  STENOGRAPHICALLY REPORTED BY:

20  REBECCA L. ROMANO, RPR, CSR, CCR

    California CSR No. 12546

21  Nevada CCR No. 827

    Oregon CSR No. 20-0466

22  Washington CCR No. 3491

23  JOB NO. 5345580

24

25  PAGES 1 - 369

                                        Page 1

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE:  FACEBOOK, INC.,      MDL No. 2843

5    CONSUMER USER PROFILE        Case No.

6    LITIGATION                   18-md-02843-VC-JSC

7    _____

8    This document relates to:

9    ALL ACTIONS

10   _____

11

12

13

14

15       VIDEOTAPED DEPOSITION OF ISABELLA LEONE, taken

16   on behalf of the Plaintiffs, with the deponent

17   located in Seattle, Washington, commencing at

18   8:04 a.m., Friday, August 5, 2022, remotely

19   reported via Video & Web videoconference before

20   REBECCA L. ROMANO, a Certified Shorthand Reporter,

21   Certified Court Reporter, Registered Professional

22   Reporter.

23

24

25

                                        Page  2

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1                 APPEARANCES OF COUNSEL

 2    (All parties appearing via Web videoconference)

 3

 4    For the Plaintiffs:

 5         BLEICHMAR FONTI & AULD LLP

 6         BY:  LESLEY E. WEAVER

 7         BY:  ANGELICA M. ORNELAS

 8         BY:  JOSHUA SAMRA

 9         Attorneys at Law

10         555 12th Street

11         Suite 1600

12         Oakland, California 94607

13         (415) 445-4003

14         lweaver@bfalaw.com

15         aornelas@bfalaw.com

16         jsamra@bfalaw.com

17

18

19

20

21

22

23

24

25    /////
```

Page  3

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1                    APPEARANCES OF COUNSEL

 2      (All parties appearing via Web videoconference)

 3

 4      For the Plaintiffs:

 5           KELLER ROHRBACK L.L.P.

 6           BY:  CARI CAMPEN LAUFENBERG

 7           BY:  DAVID KO

 8           Attorneys at Law

 9           1201 Third Avenue

10           Suite 3200

11           Seattle, Washington 98101

12           (206) 623-1900

13           claufenberg@kellerrohrback.com

14           dko@kellerrohrback.com

15

16      For Facebook, Inc.:

17           GIBSON, DUNN & CRUTCHER LLP

18           BY:  MATT BENJAMIN

19           Attorney at Law

20           200 Park Avenue

21           New York, New York 10166-0193

22           (212) 351-6381

23           mbenjamin@gibsondunn.com

24

25      /////
```

Page  4

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1               APPEARANCES OF COUNSEL(cont'd)
 2     (All parties appearing via Web videoconference)
 3
 4    For Facebook, Inc.:
 5         GIBSON, DUNN & CRUTCHER LLP
 6         BY:  ROSEMARIE T. RING
 7         Attorney at Law
 8         555 Mission Street
 9         Suite 3000
10         San Francisco, California 94105-0921
11         (415) 393-8200
12         rring@gibsondunn.com
13    and
14         BY:  MATT BUONGIORNO
15         Attorney at Law
16         2001 Ross Avenue
17         Suite 2100
18         Dallas, Texas 75201
19         (214) 698-3206
20         mbuongiorno@gibsondunn.com
21
22
23
24
25    /////
```

Page 5

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1                 APPEARANCES OF COUNSEL(cont'd)

 2    (All parties appearing via Web videoconference)

 3

 4    For Facebook, Inc.:

 5         GIBSON, DUNN & CRUTCHER LLP

 6         BY:  MARTIE KUTSCHER CLARK

 7         BY:  PHUNTSO WANGDRA

 8         Attorneys at Law

 9         1881 Page Mill Road

10         Palo Alto, California 94304-1211

11         (650) 849-5348

12         mkutscherclark@gibsondunn.com

13         pwangdra@gibsondunn.com

14    and

15         BY:  NAIMA L. FARRELL

16         Attorney at Law

17         1050 Connecticut Avenue, N.W.

18         Washington, DC 20036-5306

19         (202) 887-3559

20         nfarrell@gibsondunn.com

21

22

23

24

25    /////
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1              APPEARANCES OF COUNSEL(cont'd)

2     (All parties appearing via Web videoconference)

3

4          JAMS

5          BY:  DANIEL B. GARRIE

6          Special Master

7          555 W. 5th Street

8          32nd Floor

9          Los Angeles, California 90013

10         (213) 253-9706

11         dgarrie@jamsadr.com

12

13

14

15

16   ALSO PRESENT:

17         Ian Chen, Associate General Counsel,

18   Litigation and Regulatory at Meta

19         John Macdonell, Videographer

20

21

22

23

24

25   /////
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1                        I N D E X

 2   DEPONENT                              EXAMINATION

 3   ISABELLA LEONE                             PAGE
     VOLUME 1

 4

 5                  BY MS. WEAVER                 13

 6

 7

 8                   E X H I B I T S

 9   NUMBER                                     PAGE

10                     DESCRIPTION

11   Exhibit 655  I. Leone CA MDL August 5,      15

12               2022 Deposition Notes,

13               ADVANCE-META-00003632;

14

15   Exhibit 656  Newsroom Article - Understand  145

16               Why You're Seeing Certain Ads

17               and How you Can Adjust Your

18               Ad Experience,

19               FB-CA-MDL-03969941 -

20               FB-CA-MDL-03969951;

21

22   Exhibit 657  Gibson Dunn Letter dated       155

23               7/29/2022;

24

25   /////
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1                E X H I B I T S(cont'd)

 2     NUMBER                                       PAGE

 3                      DESCRIPTION

 4     Exhibit 658   How Does Facebook Use            201

 5                   Machine Learning to

 6                   Delivery Ads? | Meta

 7                   For Business Article:

 8                   Good Questions, Real

 9                   Answers:  How Does

10                   Facebook Use Machine

11                   Learning to Deliver Ads?,

12                   FB-CA-MDL-03969899 -

13                   FB-CA-MDL-03969907;

14

15     Exhibit 659   Email String Subject:            211

16                   Facebook Follow-ups for BMS,

17                   FB-CA-MDL-03526129 -

18                   FB-CA-MDL-03526133;

19

20     Exhibit 660   Meta Business Help Center Use     251

21                   Detailed Targeting,

22                   FB-CA-MDL-03969858 -

23                   FB-CA-MDL-03969862;

24

25     /////
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              E X H I B I T S(cont'd)

 2    NUMBER                                    PAGE

 3                    DESCRIPTION

 4    Exhibit 661  Article - AG Ferguson          260

 5                 investigation leads to

 6                 Facebook making nationwide

 7                 changes to prohibit

 8                 discriminatory advertisements

 9                 on its platform;

10

11    Exhibit 662  Assurance of Discontinuance;    281

12

13    Exhibit 663  Email String Subject:           331

14                 PMD-related enforcement,

15                 FB-CA-MDL-02140811 -

16                 FB-CA-MDL-02140812.

17

18

19

20

21

22

23

24

25    /////
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Seattle, Washington; Friday, August 5, 2022 | 09:04:04 |
| 2 | 8:04 a.m. | |
| 3 | ---oOo--- | |
| 4 | | |
| 5 | THE VIDEOGRAPHER:  And we're on the | 07:48:14 |
| 6 | record.  It's 8:04 a.m. Pacific Time on August 5th, | |
| 7 | 2022.  This is the deposition of Isabella Leone. | |
| 8 | We're here in the matter of Facebook Consumer | |
| 9 | Privacy User Profile Litigation. | |
| 10 | I'm John Macdonell, the videographer, | 08:04:57 |
| 11 | with Veritext. | |
| 12 | Before the reporter swears the witness, | |
| 13 | would counsel please identify themselves, beginning | |
| 14 | with the noticing attorney, please. | |
| 15 | MS. WEAVER:  Yes.  Good morning. | 08:05:08 |
| 16 | This is Lesley Weaver with | |
| 17 | Bleichmar Fonti & Auld on behalf of the plaintiffs. | |
| 18 | And with me today from my firm are Josh Samra and | |
| 19 | Angelica Ornelas. | |
| 20 | MR. BENJAMIN:  Good morning. | 08:05:21 |
| 21 | I'm Matt Benjamin of | |
| 22 | Gibson, Dunn & Crutcher on behalf of Meta Facebook | |
| 23 | and the witness. | |
| 24 | With me are Martie Kutscher Clark, | |
| 25 | Naima Farrell, Matt Buongiorno and Phuntso Wangdra, | 08:05:28 |

Page 11

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    also from Gibson Dunn.  And Ian Chen from Meta.        08:05:33

 2           THE COURT REPORTER:  If you could raise

 3    your right hand for me, please.

 4           THE DEPONENT:  (Complies.)

 5           THE COURT REPORTER:  You do solemnly           08:05:39

 6    state, under penalty of perjury, that the testimony

 7    you are about to give in this deposition shall be

 8    the truth, the whole truth and nothing but the

 9    truth?

10           THE DEPONENT:  I do.                           08:05:39

11

12

13

14

15                                                          08:05:40

16

17

18

19

20                                                          08:05:40

21

22

23

24

25    /////                                                 08:05:55

                                                       Page 12
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1                    ISABELLA LEONE,               08:05:56

 2    having been administered an oath, was examined and

 3    testified as follows:

 4

 5                    EXAMINATION                   08:05:56

 6    BY MS. WEAVER:

 7        Q.   Good morning, Ms. Leone.

 8        A.   Good morning.

 9        Q.   Thanks for joining us today.

10             Have -- have you been deposed before?  08:06:06

11        A.   I have not.

12        Q.   Okay.  Well, good -- good times are ahead

13    for you.

14             So really briefly, I -- I know that

15    you've covered these rules with your counsel, but  08:06:13

16    it's good if we discuss it on the record.

17             As you can see, Ms. Romano here is

18    transcribing what we discuss today.  And so because

19    of that transcription process and because we are

20    making a record, it's really important that we not  08:06:30

21    speak over each other and that we answer questions

22    audibly.

23             Does that make sense?

24        A.   Absolutely.

25        Q.   Okay.  If you don't understand a question  08:06:39
```

Page 13

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | that I'm asking, please just ask for clarity and | 08:06:43 |
| 2 | I'll rephrase it, because the really important | |
| 3 | thing is that we're communicating accurately with | |
| 4 | one another; is that fair? | |
| 5 |     A.   Yeah.  Absolutely. | 08:06:53 |
| 6 |     Q.   Okay.  A general rule is that if there is | |
| 7 | a question pending, you may not take a break, you | |
| 8 | should answer the question.  Unless you're | |
| 9 | instructed not to answer by your counsel. | |
| 10 |         And -- and the final point is that -- I'm | 08:07:12 |
| 11 | sure you've seen courtroom dramas where the witness | |
| 12 | is on the stand and the judge is making rulings. | |
| 13 | In a deposition, that doesn't happen.  So your | |
| 14 | counsel will be inserting objections for the | |
| 15 | record, but there will be no ruling on them. | 08:07:25 |
| 16 |         So you should answer the question, again, | |
| 17 | unless you are instructed not to answer because we | |
| 18 | are not graced with the presence of a judge saying | |
| 19 | overruled or sustained, so... | |
| 20 |         Is that fair? | 08:07:39 |
| 21 |     A.   Yup.  Understood. | |
| 22 |         MS. WEAVER:  Okay.  And before the | |
| 23 | deposition started, your counsel emailed a document | |
| 24 | over to us today, which we have marked as | |
| 25 | Exhibit 1. | 08:07:52 |

Page 14

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1                    (Exhibit 655 was marked for              08:07:53

 2      identification by the court reporter and is

 3      attached hereto.)

 4          Q.    (By Ms. Weaver)  And did you discuss with

 5      your counsel how exhibits are marked in these           08:07:56

 6      remote kinds of depositions?

 7          A.    Yes.

 8          Q.    Okay.  So do you have Exhibit Share up?

 9          A.    Uh-huh.  Yes, I have it up.

10          Q.    And you can see Exhibit 1?                     08:08:07

11          A.    Yes.

12          Q.    Okay.  And what is Exhibit 1?

13          A.    It's a document I put together for how I

14      prepared for today.

15          Q.    Okay.  And when did you prepare it?           08:08:22

16          A.    I summarized this yesterday, this

17      document.

18          Q.    And were there other underlying notes

19      that you used to prepare this?

20                MR. BENJAMIN:  Objection to form.             08:08:37

21                THE DEPONENT:  It was a summary document

22      so it collated my calendar to get to the -- the

23      hours that we looked at.

24                I'm -- I'm not sure if that's exactly

25      what you meant.                                         08:08:50
```

Page 15

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1          Q.   (By Ms. Weaver)  No, that's fair.  That's      08:08:51

 2     fine.

 3               Just trying to understand -- you actually

 4     yourself created the document; is that right?

 5          A.   Yes.                                            08:08:57

 6          Q.   Okay.  And when you -- you wrote

 7     "Approximately 36 hours with counsel."

 8               Do you see that?

 9          A.   Yes.

10          Q.   Which counsel are you referring to?            08:09:09

11          A.   Gibson Dunn.  So Matt Benjamin and the

12     broader team.

13          Q.   And who else other than Mr. Benjamin?

14          A.   Martie Phuntso.  Matt -- Matt Buongiorno,

15     the other Matt.  Rose Ring and Naima Farrell.            08:09:23

16          Q.   Okay.  And anyone else?

17          A.   I don't believe so from the Gibson Dunn

18     team.  And then Ian Chen, our -- my -- the -- the

19     Meta lawyer who's also on the call.

20          Q.   Okay.  Did you meet with any other             08:09:42

21     lawyers during those 36 hours?

22          A.   No.

23          Q.   Okay.  Did you meet with any lawyers to

24     prepare at all?

25          A.   No, not aside from these lawyers.              08:09:53
```

                                                 Page 16

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1      Q.   Okay.  Sometimes I'm asking you questions        08:09:56

2   and it may seem curious to you.  But again, we're

3   laying foundation for a record that I'm just trying

4   to make sure that I'm not missing something.

5          When did you meet with counsel during           08:10:08

6   those 36 hours?

7      A.   Those have been divided up over multiple

8   weeks.  I think originally, towards the end of May,

9   and then sessions over time that varied between an

10  hour and three to four hours long.  And I don't        08:10:23

11  remember the exact number of sessions.

12     Q.   And during those sessions, did counsel

13  provide you with documents?

14     A.   We discussed the documents for this

15  deposition.  And then as well as documents from my     08:10:37

16  prep, whether that was external -- Facebook

17  documents or documents that -- that we worked

18  through about the products or anything relevant.

19     Q.   And when you say "the external," what did

20  you mean?                                              08:10:54

21     A.   Sorry.  I mean, articles such as like our

22  help center or our news blog posts, areas where

23  we've discussed our targeting and ranking

24  externally.  And then as well as our internal

25  references about those products as well.               08:11:08

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1      Q.   And when you say "internal references,"      08:11:10

2   what are you referring to?

3      A.   For example -- I'm trying to think of a

4   good example that makes sense.

5           I -- I'm -- I can double-check.  I think      08:11:30

6   we used an internal wiki, which is kind of like our

7   version of how we -- how -- how our internal, like

8   way of documenting for teams to reference.

9           And similar if -- if any internal

10  announcements that were relevant.  So I -- I          08:11:49

11  believe looking at like an internal announcement

12  that helps us get our sales teams in -- prepared

13  for an external announcement.  So that's the --

14  that's an example of -- of an internal document

15  that I looked at.                                     08:12:04

16     Q.   Got it.

17          And for the internal documents, did you

18  provide those to counsel to discuss or did they

19  provide them to you?

20          MR. BENJAMIN:  Objection to form.            08:12:14

21          MS. WEAVER:  Let me ask differently.

22     Q.   (By Ms. Weaver)  Did you provide any of

23  those internal documents to prepare for your

24  deposition?

25          MR. BENJAMIN:  Objection.  Form.             08:12:23

Page 18

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  I'm -- did I provide them      08:12:26
 2     to my counsel or in our conversations, or look at
 3     them during those sessions?
 4              I'm not totally sure what you mean.
 5         Q.   (By Ms. Weaver)  Did -- did you yourself      08:12:35
 6     identify any internal documents that you used to
 7     prepare for this deposition?
 8         A.   Without anyone else?  No, I -- I don't
 9     think so.
10         Q.   Okay.  So the materials that you used to      08:12:48
11     prepare were largely, if not exclusively, curated
12     by the attorneys; is that right?
13              MR. BENJAMIN:  Objection to form.
14     Misstates.
15              THE DEPONENT:  I -- they weren't             08:13:06
16     exclusively from the legal team.  They could have
17     been from the groups and the people we also worked
18     on with my prep, our employees that aren't lawyers.
19         Q.   (By Ms. Weaver)  And did you provide any
20     documents to prepare?                                08:13:19
21              MR. BENJAMIN:  Objection.  Form.
22              THE DEPONENT:  I -- I don't believe I
23     did, no.
24         Q.   (By Ms. Weaver)  And how many documents
25     did the team that you met with provide?              08:13:28
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        A.    The legal team or when --          08:13:34

 2              (Simultaneously speaking.)

 3        Q.    (By Ms. Weaver)  The nonlegal --

 4        A.    The nonlegal team --

 5        Q.    Sorry.                             08:13:39

 6        A.    Go ahead.

 7        Q.    That's my fault.  I apologize.

 8              How many documents did the nonlegal team

 9    identify and provide for you to use in preparation

10    for this deposition?                         08:13:51

11              MR. BENJAMIN:  Objection.  Form.  Vague.

12              THE DEPONENT:  I -- I think -- I can

13    think of like one document that -- that one of

14    the -- one of the people I was speaking to

15    referenced, and then I looked for that document.  08:14:08

16        Q.    (By Ms. Weaver)  And what document was

17    that?

18        A.    It was one of the sales announcements

19    that I referenced ahead of an external

20    announcement.                                08:14:17

21        Q.    And did you find it useful in terms of

22    preparing for your deposition?

23        A.    Not particularly, to be honest.

24        Q.    And why is that?

25        A.    It didn't have -- it -- it didn't really  08:14:28
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    give me the information I was looking for.          08:14:31

 2         Q.   Okay.  And what was the information you

 3    were looking for?

 4         A.   I was trying to understand what was an

 5    update we made in our targeting tools and it didn't  08:14:39

 6    actually describe it particularly in detail.  So it

 7    was not a very ref- -- helpful reference.

 8         Q.   Got it.

 9              And what year was the update that you

10    were thinking of?                                    08:14:53

11         A.   It was --

12              MR. BENJAMIN:  Objection to form.

13              THE DEPONENT:  Sorry.

14              MR. BENJAMIN:  Sorry, Isabella.

15              Objection.  Form.                          08:15:02

16              THE DEPONENT:  It was 20- -- 2013 or

17    2014.

18         Q.   (By Ms. Weaver)  And did you find the

19    answer that you were looking for with regard to

20    this update in 2013 and 2014?                        08:15:16

21         A.   Yes, I did.

22              MR. BENJAMIN:  Objection.

23         Q.   (By Ms. Weaver)  And -- and what was the

24    issue, if you don't mind explaining?

25         A.   Yeah, absolutely.                          08:15:26
```

Page 21

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | We had -- it was actually related to one | 08:15:27 |
| 2 | of the documents you -- you -- that's -- that was | |
| 3 | part of the deposition, the exhibits.  It was | |
| 4 | related to the -- the removal of our reach | |
| 5 | estimates. | 08:15:40 |
| 6 | Q.   Okay.  We'll return to that in a bit | |
| 7 | because I think what I want to do is try to be a | |
| 8 | little more methodical and talk about definitions, | |
| 9 | et cetera. | |
| 10 | Returning back to Exhibit 1 for just a | 08:15:53 |
| 11 | moment, you said -- you wrote here that you spent | |
| 12 | eight hours preparing on your own; is that right? | |
| 13 | A.   Yes. | |
| 14 | Q.   What did you do to prepare on your own? | |
| 15 | A.   I largely reread the documents that were | 08:16:05 |
| 16 | submitted, and then read the -- the -- the | |
| 17 | documents that the legal team had put together as | |
| 18 | well. | |
| 19 | Q.   Okay.  And when you wrote, "documents | |
| 20 | from Plaintiffs," did you mean the documents that | 08:16:18 |
| 21 | we identified for the deposition? | |
| 22 | A.   (Deponent nods head.) | |
| 23 | Q.   Okay. | |
| 24 | A.   Those as well as just the -- I -- I'm not | |
| 25 | sure if it make a difference, but the ones | 08:16:30 |

Page 22

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    specifically I understood like the exhibits for          08:16:32

2    this dep- -- deposition.  But then also like the

3    notice as well as the scenario documents.

4         Q.   Great.  Thank you.

5              And when you wrote "blog posts," what         08:16:41

6    were you referring to there?

7         A.   Our external blog posts.  So on our

8    Newsroom any -- any announcement we've made that

9    were relevant.

10        Q.   And what did you understand the focus of      08:16:54

11   your testimony to be today, as you were preparing?

12             MR. BENJAMIN:  Objection to form.

13             And, Bella, to the extent that answering

14   that question would require you to disclose any

15   privileged communications or information, I'd just      08:17:07

16   ask you to carve that out of your answer.

17             But to the extent that you can answer

18   Ms. Weaver's question without disclosing privileged

19   information, you should -- you should do so.

20             THE DEPONENT:  I understood --                08:17:16

21        Q.   (By Ms. Weaver)  Go ahead.

22        A.   I understood it to be about our -- our ad

23   delivery.  So targeting and ranking, and the ways

24   that advertisers can place an ad on Meta.

25        Q.   Okay.  So what do you mean by "ad             08:17:32

Page 23

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    delivery"?                                         08:17:50

2       A.   So the way our ad system works is that it

3    is based on the choices advertisers make by

4    selecting a desired audience and ad settings to

5    help us understand the setup of their ad.  And then    08:18:05

6    there is a secondary step which is about

7    determining from that eligible audience who will

8    actually see that ad.  That's something we called

9    ranking.

10          That -- the end to end of this system is    08:18:16

11    called ad delivery.  So the starting point of an

12    advertiser creating an ad to the end point of

13    someone seeing that ad.

14       Q.   And what is the time frame that you

15    understand you are testifying to today?    08:18:31

16          MR. BENJAMIN:  Objection to form.

17          And same caution, to the extent you can

18    answer the question without disclosing privileged

19    information or communications, you should do so.

20          THE DEPONENT:  I understood it to be    08:18:48

21    between the last 10 and 15 years.  Over the course

22    of the last 10 to 15 years.

23       Q.   (By Ms. Weaver)  Okay.  So 2012 or -- I

24    mean, I'll just -- I'm not -- to be transparent,

25    our class period is 2007 to the present.    08:19:02

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1      A.   That's what I understood, yes.                    08:19:06

2      Q.   Okay.  Great.

3           So in 2007, was Facebook engaged in ad

4   delivery?

5      A.   We did show ads in 2007.                          08:19:16

6      Q.   And how was it accomplished in 2007, and

7   how did it change over time, generally?

8           MR. BENJAMIN:  Objection to form.

9   Compound.  Vague.

10          THE DEPONENT:  So advertisers have -- we          08:19:27

11  it's always been that an advertiser could set up an

12  ad and give us the creative of what they wanted to

13  run -- or to -- to be for that ad, the content.

14          Over the last 15 years, the system has

15  evolved to both provide additional targeting           08:19:48

16  options to advertisers for their selection, the

17  placement options, the ad ranking, the ad delivery.

18  Our machine learning has evolved.  So a lot of the

19  system has changed over time.

20          I think the fundamental pieces of the            08:20:04

21  advertisers' involvement down to a user seeing the

22  ad somewhere on Facebook have been consistent.  And

23  then over that same period, we've also updated our

24  transparency tools for users as well as the

25  controls they have for advertising.                     08:20:19

Page 25

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.    (By Ms. Weaver)  So is it possible for        08:20:24

 2   you to just lay out generally a chronology of

 3   how -- let's carve out for a moment the

 4   transparency tools and just talk about ad delivery

 5   and how that changed over time at Facebook          08:20:36

 6   beginning in 2007.

 7              MR. BENJAMIN:  Objection to form.  Scope.

 8              THE DEPONENT:  I don't think that I can

 9   lay out a detailed timeline of like specific years

10   of when machine learning was updated.  But I can        08:20:51

11   talk through how that product has evolved, if

12   that's useful.

13        Q.    (By Ms. Weaver)  Great.  That would be

14   great.

15        A.    So over time you can think of our ad        08:21:01

16   delivery as many models that help us optimize and

17   understand some- -- whether someone would be

18   interested in an ad.  The way those models function

19   is that we incorporate people's activity on the

20   site, people's -- oh -- or -- and then across that        08:21:18

21   timeline, also people's activity off of Facebook to

22   help us understand whether they would be interested

23   in an ad.

24              So one of the examples of an update there

25   would be, in 2014, starting to include activity on        08:21:31
```

Page 26

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | |
|---|---|
| 1 | the website or app to help inform ads.  And then | 08:21:36 |
| 2 | there have been smaller iterations about the type |
| 3 | of models and how those function in ad delivery |
| 4 | over those years. |
| 5 |     Q.   In 2007, how did Facebook record users' | 08:21:49 |
| 6 | activity on and off the platform? |
| 7 |         MR. BENJAMIN:  Objection to form. |
| 8 |     Q.   (By Ms. Weaver)  Or generally the -- |
| 9 | outside of the class period? |
| 10 |         MR. BENJAMIN:  Objection to form. | 08:22:03 |
| 11 |         Sorry.  Lesley, would you mind restating |
| 12 | the question just so it's clear to all of us. |
| 13 |     Q.   (By Ms. Weaver)  In 2007, how did |
| 14 | Facebook record users' activity on and off the |
| 15 | platform? | 08:22:13 |
| 16 |         MR. BENJAMIN:  Thank you. |
| 17 |         THE DEPONENT:  Outside of our ad system? |
| 18 |     Q.   (By Ms. Weaver)  For -- I'm -- using your |
| 19 | words, you said that -- well, I'll just say, yes, |
| 20 | for use in ads -- in ads advertising, yeah. | 08:22:33 |
| 21 |     A.   Yeah.  So -- |
| 22 |         MR. BENJAMIN:  Objection -- objection to |
| 23 | form. |
| 24 |         THE DEPONENT:  In -- in 2007, we did not |
| 25 | use offsite, so -- or what I call offsite -- but | 08:22:47 |

Page 27

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | activity off of Facebook to inform ads.  That was | 08:22:50 |
| 2 | something that was introduced in 2014. | |
| 3 | Prior to that, we used activity on | |
| 4 | Facebook.  So that could be information people | |
| 5 | provide as part of their profile or the | 08:23:01 |
| 6 | interactions they have on Facebook. | |
| 7 | For example, like camp page interacting | |
| 8 | with an ad would have informed that.  That -- | |
| 9 | that's remained relatively consistent throughout | |
| 10 | this period. | 08:23:14 |
| 11 | Q.   (By Ms. Weaver)  And when you say | |
| 12 | "interacting with an ad," what do you mean? | |
| 13 | A.   That could be an ad click or ad comment. | |
| 14 | Q.   And just to be specific, when you say | |
| 15 | "click," you mean -- well, what do you mean by | 08:23:28 |
| 16 | "click"? | |
| 17 | A.   When someone is shown an ad, there is a | |
| 18 | call to action that the advertisers also defines in | |
| 19 | the setup of their ad.  That could be something | |
| 20 | like learn more.  And they would go to a website, | 08:23:42 |
| 21 | it could be something like like page.  It could be | |
| 22 | respond to an event. | |
| 23 | So any number of those call to actions -- | |
| 24 | usually when I say "click," I mean that the person | |
| 25 | actually took that action.  They clicked on the | 08:23:56 |

Page 28

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    learn more.                                     08:23:58

 2        Q.    And, therefore, it's not linked

 3    excessively to example -- for example, a purchase,

 4    right?

 5             MR. BENJAMIN:  Objection.             08:24:06

 6        Q.   (By Ms. Weaver)  It can be anything?

 7             MR. BENJAMIN:  Objection to form.

 8             THE DEPONENT:  It is not specifically to

 9    mean a purchase.

10        Q.   (By Ms. Weaver)  And when you said that  08:24:15

11    Facebook was recording users' on platform activity,

12    where is it recorded?

13             What did you mean by that?

14             MR. BENJAMIN:  Objection to form.

15             THE DEPONENT:  It is -- in order to run  08:24:46

16    our site, we maintain like a -- we understand that

17    the actions people take on the site, and that

18    activity is what we then use for ads.

19        Q.   (By Ms. Weaver)  And how is that activity

20    identified and then used for ads?              08:25:03

21             MR. BENJAMIN:  Objection to form.

22    Compound.  Vague.

23             THE DEPONENT:  Can -- do you mind

24    clarifying what you mean by "identified"?

25        Q.   (By Ms. Weaver)  Sure.               08:25:17
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | If Facebook User A is acting on the | 08:25:18 |
| 2 | platform, how does Facebook -- and let's say in the | |
| 3 | period 2007 to 2014 -- how did Facebook identify | |
| 4 | which activity to observe and record for use in | |
| 5 | ads? | 08:25:36 |
| 6 | MR. BENJAMIN:  Objection to form.  Vague. | |
| 7 | Calls for speculation. | |
| 8 | THE DEPONENT:  I think it wasn't that | |
| 9 | something was recorded specifically for the use in | |
| 10 | ads. | 08:25:49 |
| 11 | So as an example, if I liked a page, we | |
| 12 | would know that I liked a page.  And that was | |
| 13 | because also I have -- when I go to my profile, I | |
| 14 | need to see that I liked that page.  That's | |
| 15 | something that happens outside of ads completely. | 08:26:02 |
| 16 | Ads then -- our ad system can then use | |
| 17 | that activity in order to help inform my future ads | |
| 18 | by understanding what my interests might be. | |
| 19 | The -- does that get at what you were | |
| 20 | asking? | 08:26:21 |
| 21 | Q.  (By Ms. Weaver)  Yes. | |
| 22 | So when Facebook is using that activity, | |
| 23 | was Facebook looking at whether or not that | |
| 24 | activity was marked private or public by the user? | |
| 25 | MR. BENJAMIN:  Objection to form.  Scope. | 08:26:36 |

Page 30

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | THE DEPONENT:  No.  Activity on Facebook | 08:26:38 |
| 2 | is we -- it's not quite differentiated in those two | |
| 3 | buckets.  And our -- we did not reference that | |
| 4 | explicitly in use for ads. | |
| 5 | Q.   (By Ms. Weaver)  So if I mark -- let's | 08:26:56 |
| 6 | say I liked a product, but only a restricted | |
| 7 | audience had access to that like, did Facebook then | |
| 8 | restrict the use of that like in advertising only | |
| 9 | in relation to the people with whom I had shared | |
| 10 | that like? | 08:27:19 |
| 11 | MR. BENJAMIN:  Objection.  Vague.  Time | |
| 12 | period. | |
| 13 | THE DEPONENT:  I think there are a few | |
| 14 | things that I -- to -- to unpack there. | |
| 15 | So a product, which I understand to mean | 08:27:32 |
| 16 | maybe something that a brand has posted, would be | |
| 17 | from like a Facebook page.  Those are public. | |
| 18 | There is only one setting for that -- that post. | |
| 19 | And so when a user likes it, it is a public action | |
| 20 | they are taking, and then we would use that for | 08:27:47 |
| 21 | ads. | |
| 22 | I'm not sure if that gets to -- to the | |
| 23 | example you gave. | |
| 24 | Q.   (By Ms. Weaver)  Right.  That's -- so | |
| 25 | that's one scenario.  But let's assume a scenario | 08:27:55 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    where a friend posts something on the wall and I        08:27:57

 2    like it.  And that like indicates something about

 3    me.

 4            Does Facebook use that like to decide how

 5    to target me for ads?                                   08:28:09

 6            MR. BENJAMIN:  Objection.  Form.  Vague.

 7    Calls for speculation.

 8            THE DEPONENT:  We use people's activity

 9    and it could include activity from liking a post.

10    It's not that we then target an ad to someone based     08:28:21

11    on that.  It is still based on the advertiser's

12    desired audience.

13            So the way they've set up the parameters

14    for their audience.  And then the information of

15    people's activity helps us understand if they would     08:28:33

16    be interested in an ad.

17        Q.   (By Ms. Weaver)  When Facebook is using a

18    user's activity to identify advertiser's desired

19    audiences, is Facebook limiting users' activity

20    that is public, or is it also using activity            08:28:53

21    that -- for which users have restricted the

22    audience?

23            MR. BENJAMIN:  Objection.  Form.  Vague.

24            THE DEPONENT:  I -- today, I do not

25    believe that we use the -- actually, there's a          08:29:13
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    clarification here that's important.              08:29:18

 2            We use people's activity not just in

 3    terms of like they -- the exact action they took,

 4    but also aggregated.  So the fact that you were

 5    active on Facebook in the last month is something  08:29:30

 6    that we would understand and use in order to inform

 7    an ad.

 8            There isn't a distinction there of

 9    whether or not that activity -- the fact that you

10    were active in the last month is public or private. 08:29:41

11    So I -- I'm not sure that there's a clear way to

12    answer what you're getting at.

13        Q.   (By Ms. Weaver)  So for aggregated

14    activity, there's no distinction between public and

15    private.  And public and private access --          08:29:54

16    activities are all in one bucket; is that fair?

17            MR. BENJAMIN:  Objection.  Form.

18    Misstates.  Vague.

19            THE DEPONENT:  There are -- our -- the

20    way people interact with the platform and -- and    08:30:12

21    what they do on the platform does not fall into

22    buckets of private and public.

23            And so are also, when we think of like if

24    you've been active in the last month, it doesn't

25    differentiate between those because they're not a   08:30:25
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    concept within the activity on our platform.          08:30:27

2         Q.   (By Ms. Weaver)  So in 2014 -- let's use

3    the not aggregated example.

4              In 2014, when a user engaged in a

5    specific activity and that activity was designated    08:30:41

6    for a restricted audience, meaning something less

7    than public, did Facebook use that activity to help

8    curate audiences for advertiser?

9              MR. BENJAMIN:  Objection form.

10             THE DEPONENT:  It's not that curating        08:31:09

11   can -- curating audiences for advertisers, I'm not

12   really sure exactly what that means.

13             If it's that we have a targeting option

14   and an advertiser has defined their target audience

15   and then in order to deliver that ad, we use          08:31:25

16   people's activity, and it's not differentiated

17   between public or private.

18        Q.   (By Ms. Weaver)  And is that true for the

19   entire class period, 2007 to the present?

20        A.   I'm not sure if there have been             08:31:44

21   carve-outs in some manner throughout that.  I

22   think -- in -- in a way that maps to private or

23   public.  Because, again, it -- it's not really

24   what -- reflective of our system works.

25        Q.   And when you say "It's not reflective of    08:31:57

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | how our system works," can you describe what you | 08:31:58 |
| 2 | mean, or can you kind of explain what you mean? | |
| 3 | A.   Yes.  So something such as liking a page, | |
| 4 | I think, is what you're referencing as public. | |
| 5 | Other areas -- things like looking at an ad or | 08:32:12 |
| 6 | watching or -- or -- or looking at a photo, those | |
| 7 | are activity. | |
| 8 | I'm not sure how we would designate those | |
| 9 | as public or private because it's not something | |
| 10 | that's -- necessarily has a trace that leaves | 08:32:25 |
| 11 | behind.  It's something that is activity that is on | |
| 12 | our platform.  Those are interactions, even if it | |
| 13 | isn't a like or a comment. | |
| 14 | Q.   And are all of those interactions used in | |
| 15 | some form for advertising? | 08:32:40 |
| 16 | MR. BENJAMIN:  Objection. | |
| 17 | THE DEPONENT:  No. | |
| 18 | MR. BENJAMIN:  Form. | |
| 19 | Q.   (By Ms. Weaver)  What are the forms that | |
| 20 | are used -- what are the activities that are used | 08:32:46 |
| 21 | for advertising? | |
| 22 | A.   We use like page and ad engagement.  So | |
| 23 | the interactions I was talking about before.  We | |
| 24 | use whether -- how someone has interacted with our | |
| 25 | products.  For example, how they connect to | 08:33:02 |

Page 35

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    Facebook.  And if they're using browser or mobile      08:33:04

 2    and that -- that type of information.  We use

 3    information they provide on their profile.

 4            And then like I was saying, the -- the

 5    more aggregated statistics of have -- have they      08:33:20

 6    logged in the last month.  Are they an active page

 7    user.  Are they -- those are examples.

 8        Q.   Does Facebook use, for example,

 9    information about likes that users post for

10    advertising?                                          08:33:41

11        A.   Can you clarify --

12             MR. BENJAMIN:  Objection.

13        Q.   (By Ms. Weaver)  Do you know what a like

14    is?

15        A.   Yes.  I -- I'm not sure what you mean by      08:33:52

16    information about a like.  Just that a like

17    occurred?

18        Q.   Sure.

19        A.   We --

20        Q.   Does Facebook use likes for advertising?      08:33:59

21        A.   Yes, we do.  As an example, page likes

22    would be something that we use.  An ad like would

23    be also another example.

24        Q.   Does Facebook use likes on other content

25    for advertising?                                      08:34:14
```

Page 36

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1      A.   Yes.  I don't think that it is like all      08:34:20

2    likes.  But I'm not sure that there is a click or

3    differentiation of what has been in the system over

4    the entire -- from 2007 until to now -- now.

5      Q.   Did Facebook's policy or practices change     08:34:35

6    with regard to which likes it uses for advertising

7    over time?

8           MR. BENJAMIN:  Objection to form and

9    scope.

10          THE DEPONENT:  I -- what -- for -- I          08:34:48

11   don't think that there were like rules that have

12   been changed.  That -- that's not something I

13   recall.

14     Q.   (By Ms. Weaver)  So if a friend wrote a

15   post and I liked it, would that be used for          08:35:04

16   advertising at Facebook?

17     A.   That -- that example would not be used.

18     Q.   Why not?

19     A.   Honestly, I think we have found that the

20   page and ad engagement, which was the center of all  08:35:20

21   of this, and activity we used up until that -- up

22   until the -- besides that piece, has been helpful

23   for understanding people's interests and that

24   wasn't something that was included.

25     Q.   And when you say "advertising," what do       08:35:40

                                            Page 37

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    you mean?                                           08:35:43

2        A.   I mean specifically an ad that has been

3    created by an advertiser and placed through our ad

4    creation tool, such as ads manager, with a desired

5    audience and a bid.  And then that they pay for the  08:35:58

6    placement of that ad.  So when we show that ad,

7    they pay for that impression.

8        Q.   I would -- I'm trying to understand what

9    is excluded by your definition of "advertising" in

10   term of ways that Facebook is compensated for       08:36:13

11   allowing the targeting of users.

12           Are there examples of ways in which

13   Facebook shares information about users that you

14   think is excluded from the definition of

15   advertising?                                        08:36:33

16           MR. BENJAMIN:  Objection to form.

17   Argumentative.  Vague.

18           THE DEPONENT:  So my definition is

19   specifically about the -- what -- what is like paid

20   advertising.  I don't -- I'm not quite sure what    08:36:49

21   you mean in terms of other ways people could access

22   information.  I'm happy to -- to understand that

23   better.

24       Q.   (By Ms. Weaver)  Okay.  So you're

25   excluding, for example, research from advertising;  08:36:59
```

Page 38

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    is that an example of something you're excluding?        08:37:03

2            MR. BENJAMIN:  Objection to form.

3    Misstates.  Argumentative.

4            THE DEPONENT:  Do you mean research such

5    as someone -- I'm -- I'm not -- I'm not actually        08:37:13

6    sure what you mean by that.

7            What would be an example?

8        Q.   (By Ms. Weaver)  Is there a research

9    department at Facebook?

10       A.   We do have an internal --                        08:37:22

11           MR. BENJAMIN:  Objection to form.

12   Objection to form and scope.

13           THE DEPONENT:  We --

14           MR. BENJAMIN:  You can answer.

15           THE DEPONENT:  We do have an internal       08:37:29

16   research department, yes.

17       Q.   (By Ms. Weaver)  And are you excluding

18   from your definition of advertising the way that --

19   that research department might use information

20   about users, in your discussion today?                   08:37:39

21       A.   Yes.  I --

22           MR. BENJAMIN:  Objection to form.

23   Objection to form and scope.

24           THE DEPONENT:  Yes, I am.  But I'm not

25   sure I understand how our internal research          08:37:52
```

Page 39

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    department is related to an -- an -- a nonMeta          08:37:54

2    advertiser either.

3        Q.   (By Ms. Weaver)  Right.  Okay.  I'm just

4    trying to understand if there are certain ways in

5    which information about users is recorded by           08:38:04

6    Facebook and still shared, but that is excluded

7    from your definition -- definition of advertising?

8        A.   I wouldn't consider our internal --

9    internal research department sharing information.

10   It is -- they are a part of Meta.                      08:38:22

11       Q.   Okay.  And you're not capable of

12   testifying about the research department; is that

13   right?

14           MR. BENJAMIN:  Objection to form.  The

15   characterization.  And also to note that the scope     08:38:37

16   of the deposition was the subject of numerous

17   meet-and-confers and correspondence between --

18           (Simultaneously speaking.)

19           MS. WEAVER:  I just asked for an answer.

20           THE DEPONENT:  That's correct.  I'm not         08:38:50

21   an expert on the research department or the breadth

22   of research that we do and don't do.

23       Q.   (By Ms. Weaver)  Got it.

24           So you've defined advertising as when an

25   ad is created by an advertiser and placed through      08:39:22

                                                   Page 40

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | our ad creation tool, such as ads manager. | 08:39:24 |
| 2 | If an ad is not created by the | |
| 3 | advertiser, does Facebook itself create ads? | |
| 4 | A.   We do not create ads for a third party. | |
| 5 | We -- we do -- we are also an advertiser on our own | 08:39:40 |
| 6 | platform.  And then we also use our creation tools | |
| 7 | to create that ad. | |
| 8 | Q.   And are you testifying on that topic | |
| 9 | today? | |
| 10 | A.   About our -- our own ads? | 08:39:55 |
| 11 | Q.   Yes. | |
| 12 | A.   To the extent that it relates to our | |
| 13 | targeting and ad delivery, yes, because it's the | |
| 14 | same system.  In terms of like our marketing | |
| 15 | efforts, probably not.  No, I don't think I'm an | 08:40:11 |
| 16 | expert on that. | |
| 17 | Q.   Okay.  And you also said you were | |
| 18 | limiting advertising -- and I'm just trying to | |
| 19 | parse it out -- to "an ad is created by an | |
| 20 | advertiser and placed through our ad creation | 08:40:28 |
| 21 | tool." | |
| 22 | So are you excluding examples where the | |
| 23 | ad is not placed through the ad creation tool or is | |
| 24 | that just part of -- in your process? | |
| 25 | A.   That's just part of the process.  It's | 08:40:42 |

Page 41

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | not an exclusion.  There aren't -- it's not a way | 08:40:43 |
| 2 | to exclude other ads. | |
| 3 | Q.   Okay.  And then you said they pay for the | |
| 4 | placement of that ad, or they pay for an | |
| 5 | impression; is that right? | 08:40:56 |
| 6 | A.   Yes. | |
| 7 | Q.   Okay.  Is that the only thing that third | |
| 8 | parties pay Facebook for with regard to | |
| 9 | advertising? | |
| 10 | MR. BENJAMIN:  Objection to form. | 08:41:10 |
| 11 | THE DEPONENT:  Do you mean in terms of -- | |
| 12 | of an ad that they've tried to create and deliver. | |
| 13 | Q.   (By Ms. Weaver)  Yes. | |
| 14 | A.   Yes.  Is -- they pay for the impression | |
| 15 | delivered or -- or the -- the fact that we have | 08:41:28 |
| 16 | shown that ad to someone is -- is what an | |
| 17 | advertiser is paying for. | |
| 18 | Q.   Is it fair to say that different metrics | |
| 19 | can be established for purposes of triggering | |
| 20 | payment in an agreement with an advertiser? | 08:41:44 |
| 21 | A.   I'm not sure what you mean.  Do you mind | |
| 22 | clarifying. | |
| 23 | Q.   Do advertiser pay for -- can they agree | |
| 24 | to pay for views or impressions or clicks, or some | |
| 25 | other metric? | 08:42:00 |

Page 42

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        A.    They -- they choose the objective of        08:42:02

 2   their ad, and that is part of what defines -- what

 3   their -- the action that they're effectively paying

 4   for.  So you can -- when -- when they choose that

 5   objective, there's -- there are various options.        08:42:16

 6   One of them might be people's clicks and views.  So

 7   if like a reach or brand awareness would probably

 8   be looking for views.  And those are the actions

 9   that take.

10        The -- when -- when someone sets up their          08:42:30

11   ads -- their ad, they are given the option --

12   look -- I said to set their objective and their

13   bid.  And then that helps determine the payment

14   when the ad is actually shown and that action is

15   taken.                                                  08:42:45

16        Q.    Okay.  If we can, I'd like to break down

17   some of the definitions here, just to back it up a

18   little bit.

19        So could you identify the general buckets

20   of actions taken for which Facebook receives          08:42:57

21   payment from advertisers?

22        MR. BENJAMIN:  Objection to form.

23        THE DEPONENT:  Actions taken by -- by

24   people viewing the ad or by the advertiser?

25        I'm sorry.                                        08:43:12
```

Page 43

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   (By Ms. Weaver)  By the users.         08:43:14

 2        A.   So I believe that payment -- so --

 3   viewing an ad is what we charge an advertiser for.

 4   It is the impression.  There are ways to cut the

 5   cost that helps an advertiser understand whether it   08:43:31

 6   was the -- what the -- the -- the cost per action

 7   was.

 8             So for example, if we show an ad 100

 9   times, there will be a cost per impression.  If

10   we -- that ad was only clicked 20 times, there will   08:43:48

11   be a cost per click.

12             Those are the -- the -- the breakdown of

13   the payments that the advertiser is then invoiced

14   and that they make to us is based on the

15   performance of that ad.                               08:44:03

16        Q.   And when you say "view," what do you

17   mean?

18        A.   If I'm going through my newsfeed and I

19   see an ad as a user, that is an impression.  It's

20   a -- or a view, sorry -- view is probably more        08:44:16

21   colloquial.  But it is the impression of me seeing

22   the ad.

23        Q.   And how does Facebook know that a user

24   saw the ad?

25        A.   Because we know that a user is on          08:44:30
```

Page 44

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    Facebook, and they are scrolling through their          08:44:33

 2    newsfeed.

 3        Q.   And is Facebook then recording

 4    specifically what each user views?

 5        A.   We do know what people view.                    08:44:43

 6        Q.   And does Facebook record that so it can

 7    record it to the third party for payment purposes?

 8             MR. BENJAMIN:  Objection to form.

 9             THE DEPONENT:  I'm not sure if -- can you

10    walk me through -- maybe "record" is throwing me         08:45:01

11    here.  And what --

12        Q.   (By Ms. Weaver)  Okay.

13        A.   -- do you mean by report back to the

14    advertiser?

15        Q.   I'm using "record" because you used             08:45:07

16    record.

17        A.   Okay.

18        Q.   What did you mean by "record" when you

19    used it?

20        A.   Just that it is logged.  So we have --          08:45:14

21    when someone goes in their newsfeed and they see a

22    ad, we know that they saw an ad.  We do use that to

23    say one person saw this ad.  And when we share

24    information back to the advertiser, we share

25    aggregated reporting information so they would know      08:45:30
```

                                                    Page 45

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    in aggregate how many people saw an ad.  We don't          08:45:32

2    share that "I, Bella, saw the ad."

3         Q.   But in its base, Facebook must have a

4    record that you, Bella, saw the ad because somehow

5    you've got to aggregate, right?                            08:45:45

6         A.   Yes.  We do know that I saw the ad.  But

7    we don't share that with the advertiser.

8         Q.   Did that change over time?

9         A.   No, not to my knowledge.

10        Q.   Okay.                                            08:46:03

11        A.   Sorry, Matt.

12        Q.   So from 2007 to the present, did Facebook

13   at any point in time share with advertisers who

14   specifically saw what ad?

15        A.   Our performance and reporting to              08:46:14

16   advertisers is aggregated.  And it explains the

17   performance of their ads, not the people who saw

18   their ads.  And that's been consistent.

19        Q.   And has it -- the size of the aggregated

20   groups that Facebook reported to advertisers            08:46:36

21   changed over time?

22        A.   I -- I would assume it has.  I don't know

23   what that timeline looks like or the -- the

24   changes, specifically.

25        Q.   In general, is it fair to say that the        08:46:57

                                                      Page 46

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    groups have gotten larger in part as an attempt to        08:47:00

 2    protect the identification and reidentification of

 3    users, when reporting to advertisers who has seen

 4    what advertisement?

 5            MR. BENJAMIN:  Objection to form.              08:47:14

 6            THE DEPONENT:  Again, I don't know

 7    exactly what those changes are or the trend in --

 8    to -- to confirm that.

 9        Q.   (By Ms. Weaver)  Did Facebook have a

10    policy about that?                                       08:47:26

11            MR. BENJAMIN:  Objection to form.

12            THE DEPONENT:  I don't think that there's

13    been an explicit consistent policy about that, in

14    terms of -- over the entire period.

15        Q.   (By Ms. Weaver)  Are you aware of any          08:47:45

16    policies that relate to it during any time period?

17            MR. BENJAMIN:  Objection to form.  Scope.

18            THE DEPONENT:  For ads, we -- we -- we do

19    aggregate.  I don't think that -- or I'm not aware

20    of a -- a one threshold that is -- that happens         08:48:02

21    throughout.

22            I think that those are evaluations with

23    the privacy and policy and legal teams that help

24    establish it for that product and what makes sense

25    in terms of potential reidentification or not.          08:48:18
```

Page 47

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1      Q.   (By Ms. Weaver)  Who on those teams is      08:48:23

2   knowledgeable about this topic?

3      A.   I would expect our privacy team would be

4   and I -- I don't have a name off the top of my

5   head.                                               08:48:33

6      Q.   Okay.  If you think of a name during the

7   course of the deposition, will you circle back?

8      A.   Yeah.

9      Q.   Thank you.

10        When you say "that product" -- you said      08:48:48

11   the privacy and legal team establish a threshold

12   for that product, what did you mean by "product,"

13   in general?

14      A.   Yes.  Sorry.  That was very internal

15   speak.                                              08:49:02

16        That would be, as an example, something

17   that I consider a product or our targeting options.

18   So one of those options could be a product.

19        In this case, I was thinking more

20   specifically about our ad reporting UI and the --   08:49:16

21   the metrics that we provide there as a product.

22      Q.   When you said "ad reporting UI," you mean

23   ad reporting user interface; is that right?

24      A.   As an advertiser, when I create the ad in

25   ads manager, as an example, the interface that I go  08:49:34

                                                        Page 48

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | back to, to understand how that ad is performing. | 08:49:36 |
| 2 | Q.   And what metrics are you referring to | |
| 3 | when you said the metrics we provide is a product | |
| 4 | in the UI? | |
| 5 | A.   So as an example, the number of | 08:49:49 |
| 6 | impressions an ad has received.  The number of | |
| 7 | clicks it's received. | |
| 8 | Q.   And to return a little bit to where we | |
| 9 | are and just close it out. | |
| 10 | Are there any other metrics that Facebook | 08:50:04 |
| 11 | reports to advertisers? | |
| 12 | A.   Outside of performance metrics? | |
| 13 | Q.   Yes. | |
| 14 | MR. BENJAMIN:  Objection to form. | |
| 15 | THE DEPONENT:  No. | 08:50:15 |
| 16 | Q.   (By Ms. Weaver)  And over the class | |
| 17 | period, is that true as well? | |
| 18 | MR. BENJAMIN:  Objection.  Form. | |
| 19 | THE DEPONENT:  Again, related to ads | |
| 20 | reporting, it is based on the performance of those | 08:50:31 |
| 21 | ads.  And I'm not -- I don't think that there are | |
| 22 | other metrics that we report outside of the | |
| 23 | performance of their ads. | |
| 24 | Q.   (By Ms. Weaver)  And with regard to | |
| 25 | performance metrics, does -- has Facebook ever | 08:50:43 |

Page 49

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    provided any information other than clicks and        08:50:48

2    views?

3         A.   The cost per clicks is an example.  The

4    payment -- or the -- the -- how much it has cost

5    them to run that ad.  There's a series -- I'm         08:50:58

6    happy -- maybe that's -- I don't know the full

7    list, but I'm happy to get -- make sure that

8    there's a screenshot provided of the UI.

9         Q.   What is a cost per click?

10        A.   A cost per click is over -- the amount an    08:51:16

11   advertiser has spent.  If they spent five dollars

12   and they got 20 clicks in the delivery of that ad,

13   the cost per click is literally the -- the amount

14   spent per click.  So the average cost per click.

15        Q.   And what is payment per click?             08:51:34

16        A.   It's not a payment per click.  It's just

17   the total they spend divided by the -- how much --

18   how many clicks they got.  And then their total

19   payment is how much they're charged for that ad.

20        Q.   Okay.  In terms of the targeting           08:51:52

21   categories advertisers can identify, can you

22   generally describe all of them?

23        A.   Yeah, absolutely.

24             MR. BENJAMIN:  Objection.  Vague.

25             THE DEPONENT:  For -- so just as a         08:52:22
```

Page 50

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    starting point, when we say "identify," I -- I --        08:52:24

 2    this -- what I'll describe is what's in -- what we

 3    provide to advertisers for them to set their

 4    desired audience.

 5             So when an advertiser goes to create an          08:52:35

 6    ad, like I said, they give us the content of their

 7    ad.  So what they want it to look like when it's

 8    run on Facebook.  And then they set up their

 9    objective and the budget, the pacing, et cetera.

10    And then they get to the -- the audience portion.        08:52:49

11             And there they're given options that we

12    often bucket into what's called core audiences.

13    And that might be demographics and location.  So

14    they're selecting whether they want to reach an age

15    range and what that age range is.  And then whether      08:53:05

16    they want to reach everyone or men or women.

17             And then they select the location.  So

18    for example, if they want to reach all of the state

19    of Washington or -- or kind of within that, what

20    realm, where they want their ad to be shown.             08:53:20

21             Outside of our core audiences, we also

22    have what is called like detailed targeting.  And

23    that's -- that's based off -- or that's -- those

24    are -- examples are interests or behaviors.

25             So interest might be things like hobbies,        08:53:35
```

Page 51

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    topics, public figures that people have engaged        08:53:39

 2    with.  And then behaviors might be the way they

 3    connect to Facebook, their purchase behavior.  So

 4    whether they've bought things before.  If they

 5    interact with games, as an example.                    08:53:52

 6            And then there are custom -- custom

 7    audiences which largely break down into customer

 8    lists.  So an advertiser providing information

 9    about their existing customers in order to reengage

10    them.  Website custom audiences and app custom         08:54:08

11    audiences.  And then our engagement custom

12    audiences, which is to reengage people who already

13    interacted with your -- your page on Facebook.

14        Q.   (By Ms. Weaver)  So in your

15    understanding, is custom audiences a subset of         08:54:28

16    detailed targeting?

17        A.   No.  We usually consider it separate.

18        Q.   And why is it separate?

19        A.   I mean, in large part because of the way

20    we've structured the UI and how our conversations      08:54:47

21    with advertiser have been about the flow of it.

22    It's also somewhat different in terms of the

23    information that backs those -- those targeting

24    options.

25            So detail targeting, like I said, is --        08:55:00
```

Page 52

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    is -- are things like interests and behaviors.          08:55:02

 2    Those are based on activity.  Whereas, something

 3    like a custom audience is really much more specific

 4    to that advertiser.  It's information about their

 5    existing customers.  And so it's -- it's somewhat       08:55:12

 6    distinguished both from an advertiser mental model

 7    but also in the UI.

 8         Q.   Okay.  So I'm hearing that there are --

 9    well, in the -- is engagement custom audiences a

10    subset of custom audiences?                             08:55:30

11         A.   Yes.

12         Q.   And is that based on a -- different

13    information that's backing it?

14         A.   Yes.  So just to clarify, the custom

15    audiences, they're -- those kind of three types,        08:55:47

16    each one of those would have different information

17    that backs it.

18         Q.   And for the record, those three types

19    are?

20         A.   Customer lists.  And then website custom      08:56:01

21    audiences.  App custom audiences.  And then the

22    last kind of bucket is the engagement custom

23    audiences.

24         Q.   And what's an engagement custom audience?

25         A.   When an advertiser has a page -- page on      08:56:14
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    Facebook, people will like interact, follow that       08:56:16

 2    page.  The engagement custom audience is a way for

 3    an advertiser to say "I want the audience of my ad

 4    to be the people who have chosen to follow my

 5    page."                                                 08:56:29

 6         Q.   Okay.

 7         A.   And so on -- on Meta or on Facebook

 8    activity to -- to -- for an advertiser to reengage

 9    with their existing audience on Facebook.

10         Q.   So recap, is it fair to say that you've      08:56:44

11    identified three kinds of targeted advertising core

12    audiences to detail targeting and three custom

13    audiences?

14         A.   Yes.

15              MR. BENJAMIN:  Objection to form.            08:57:00

16         Q.   (By Ms. Weaver)  And other than those

17    three, are you aware of any other kind of targeted

18    advertising that has occurred at Facebook from 2007

19    to the present?

20              MR. BENJAMIN:  Objection to form.            08:57:10

21              THE DEPONENT:  Other kinds of advertising

22    usually fit in with those three if -- those are how

23    we've characterized and captured our targeting

24    options for many years.

25         Q.   (By Ms. Weaver)  And when you say "for        08:57:26
```

Page 54

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    many years," can you identify -- be a little bit       08:57:27

2    more specific?

3         A.   I think from 2007 onwards.  I mean,

4    that -- those -- that's how we describe the

5    categories of the types of targeting.                  08:57:36

6         Q.   And when you say "other kinds of

7    advertising," are you thinking of other specific

8    examples that you would slide into one of these

9    three buckets?

10        A.   As an example, we used to have partner        08:57:49

11   categories.  That's something that would have fit

12   under the detailed targeting and has since been

13   deprecated.

14        Q.   Anything other than partner categories

15   that you're thinking of?                                08:58:03

16        A.   That was what I was thinking of

17   specifically.  There have been -- I mean, changes

18   within what we offer over the years, but I think

19   the -- the structure of the three types is pretty

20   consistent.                                             08:58:17

21        Q.   And I should have said this at the

22   outset.  But you're here testifying on behalf of

23   Facebook today, right, you're aware of that?

24        A.   Yes.

25        Q.   Okay.  So when you're saying "you," it's      08:58:26
```

                                                    Page 55

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    the Facebook you, unless you are telling me it's          08:58:29

 2    your personal knowledge, correct?

 3         A.   Correct.

 4         Q.   And that applies to your previous

 5    testimony and your testimony going forward,               08:58:35

 6    correct?

 7         A.   Correct.

 8         Q.   Okay.  Thank you.

 9              What do you understand partner categories

10    to mean?                                                  08:58:44

11         A.   Partner categories were targeting options

12    that were built off of agreements with data brokers

13    where we might not have had that information.  And

14    so it was a way to connect in information that

15    advertisers found relevant to their ads and provide      08:58:58

16    that as a way for them to define their audience on

17    Facebook.

18         Q.   And in this instance, when you define

19    advertisers, are you including the data brokers or

20    Facebook as well?                                         08:59:15

21              MR. BENJAMIN:  Objection to form and

22    scope.

23              THE DEPONENT:  I -- the advertiser is the

24    person buying the ad.

25              I'm not sure if that answers your               08:59:28
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    question.                                      08:59:29

 2         Q.   (By Ms. Weaver)  And sometimes did

 3    Facebook buy an ad?

 4         A.   We do run our ads on our own platform,

 5    yes.                                            08:59:35

 6         Q.   And do you know if Facebook bought ads

 7    through partner categories?

 8         A.   So it's not --

 9              MR. BENJAMIN:  Objection to form and

10    scope.                                          08:59:44

11              THE DEPONENT:  It's not that you're

12    buying an ad through a partner category.  The

13    partner category, as an example, like grocery

14    shoppers, is one of the options in the creation of

15    the ad through our -- our ad creation, so like ad   08:59:57

16    manager.

17              It would have been something someone can

18    select to define their audience.  When we create an

19    ad, we also use those options.  So I -- I honestly

20    can't definitively say whether we did or didn't     09:00:11

21    ever use a partner category.

22         Q.   (By Ms. Weaver)  And how long were

23    partner categories in existence?

24         A.   They were deprecated in --

25              MR. BENJAMIN:  Objection -- objection to  09:00:23
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    form and scope.                                        09:00:24

2            THE DEPONENT:  They were deprecated in

3    2018.  And they were brought onto the platform

4    several years earlier.  But I don't know the exact

5    year.                                                  09:00:39

6        Q.  (By Ms. Weaver)  Who made the decision to

7    deprecate partner categories?

8            MR. BENJAMIN:  Objection to form and

9    scope.

10           THE DEPONENT:  This was not a singular         09:00:48

11   person's decision to deprecate partner categories.

12       Q.  (By Ms. Weaver)  Okay.  But who -- who at

13   Facebook, in general, whether it's a team or a

14   name, decided to deprecate partner categories?

15       A.  This would have been --                        09:01:01

16           MR. BENJAMIN:  Objection to form and

17   scope.

18           THE DEPONENT:  -- a decision across the

19   ads product policy and legal cross-functional team.

20       Q.  (By Ms. Weaver)  And what's your              09:01:10

21   understanding of why that decision was made?

22           MR. BENJAMIN:  Objection to form and

23   scope.

24           THE DEPONENT:  My understanding is that

25   we -- we felt that over time people's expectations    09:01:20
```

Page 58

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    had evolved and that partner categories weren't        09:01:23

 2    something that we wanted to offer any longer.

 3          Q.   (By Ms. Weaver)  How were partner

 4    categories not consistent with people's

 5    expectations?                                           09:01:36

 6               MR. BENJAMIN:  Objection to form.  Calls

 7    for speculation.  Vague and scope.

 8               THE DEPONENT:  My understanding is it's a

 9    type of data coming in.  And though -- although it

10    was transparent, there was decision to not offer        09:01:52

11    those any longer.

12          Q.   (By Ms. Weaver)  And you're saying the

13    partner category is an example of detailed targeted

14    advertising, right?

15          A.   It -- it falls into that bucket, yes.        09:02:08

16          Q.   And -- and you're testifying about

17    targeted advertising today, right?

18          A.   About our ad targeting and ad delivery,

19    yes.

20          Q.   Okay.  And as you sit here today, can you    09:02:19

21    explain why Facebook deprecated the kind of

22    detailed targeted advertising that was called

23    partner categories?

24               MR. BENJAMIN:  Objection to form.  Scope.

25               THE DEPONENT:  We consistently look at       09:02:41
```

Page 59

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    the targeting options we provide.  We've deprecated      09:02:43

 2    a number of options, to partner categories is an

 3    example.  That assessment is often done across the

 4    group, including with our product teams.  And this

 5    wasn't a product they wanted to continue to             09:02:54

 6    support.

 7         Q.   (By Ms. Weaver)  That's very general and

 8    it doesn't actually help me understand.  So let me

 9    just try -- I'll ask a different question.  Forget

10    all the other examples.                                 09:03:06

11            With regard to partner categories, why

12    did Facebook -- what were the reasons that Facebook

13    decided to deprecate them?

14            MR. BENJAMIN:  Objection to form.  Scope.

15            And to the extent that answering              09:03:21

16    Ms. Weaver's question would require you to disclose

17    privileged information, please carve that out of

18    your answer.

19            To the extent you can answer the

20    question, please do so.                                09:03:31

21            THE DEPONENT:  I think I've answered the

22    question to -- to that extent.

23            I mean, we look at our products and we --

24    we determine which ones to continue supporting.

25    Partner categories was one that was then              09:03:45
```

Page 60

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    deprecated.                                        09:03:46

2         Q.   (By Ms. Weaver)  What particular

3    characteristics of partner categories did Facebook

4    consider and then decide the reason for deprecating

5    it?                                                09:03:56

6         A.   They were -- sorry.  Go ahead, Matt.

7              MR. BENJAMIN:  Objection to form.  Scope.

8    And the same caution regarding privilege.

9              THE DEPONENT:  These were a place where

10   we had data in.  It was part of the decision, but  09:04:10

11   I -- this was just a product that was no longer

12   going to be supported.

13        Q.   (By Ms. Weaver)  So I'm -- I'm trying to

14   understand the reasons for the decision, and you

15   keep just telling me what the decision was.        09:04:22

16             So let me try it this way.  When Facebook

17   decides to deprecate a product, what are the

18   considerations?

19             MR. BENJAMIN:  Objection to form.

20        Q.   (By Ms. Weaver)  Let me restate it.       09:04:39

21             When Facebook decides to discontinue an

22   advertising product, what are the reasons, in

23   general?

24        A.   We'll look at their use, whether it's

25   performing well.  Is it helping deliver ads that   09:04:52
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | are relevant and interesting.  Whether advertisers | 09:04:55 |
| 2 | want it or not. | |
| 3 | And then also our understanding -- like | |
| 4 | from the policy side, we'll also understand whether | |
| 5 | or not these are areas that -- that other groups | 09:05:05 |
| 6 | use and industry standard. | |
| 7 | I mean, there's a number of | |
| 8 | considerations, all kind of from everyone's | |
| 9 | expertise.  And I'm sure that's what was applied in | |
| 10 | those conversations as well. | 09:05:23 |
| 11 | Q.   Does Facebook consider user expectations | |
| 12 | in reaching such decisions? | |
| 13 | A.   Yeah, absolutely.  We -- we work to | |
| 14 | understand what our -- what our user base would | |
| 15 | want and -- and how they would prefer our product | 09:05:36 |
| 16 | to be built as well. | |
| 17 | Q.   Did Facebook consider user expectations | |
| 18 | when considering whether or not to deprecate | |
| 19 | partner categories? | |
| 20 | MR. BENJAMIN:  Objection to form.  Scope. | 09:05:48 |
| 21 | And the same instruction regarding privilege. | |
| 22 | THE DEPONENT:  Yes.  I think because it | |
| 23 | is always a consideration across all of our | |
| 24 | decisions. | |
| 25 | Q.   (By Ms. Weaver)  Who specifically would | 09:06:06 |

Page 62

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    know why Facebook deprecated partner categories?        09:06:07

 2         A.    Again, it was a group decision.  I mean,

 3    across the cross-functional group.  I'm happy to --

 4    to work with the team to figure out who might be --

 5    who might have been part of that conversation,           09:06:21

 6    specifically.

 7         Q.    Yes.  We would like to know by name who

 8    was involved in the decision to deprecate partner

 9    categories.

10            And as you sit here today, you can't            09:06:31

11    provide that information; is that right?

12            MR. BENJAMIN:  Objection to form.

13    Misstates.  And objection to scope.

14            THE DEPONENT:  I've provided from the

15    targeting side the way that we assess these              09:06:42

16    decisions.  And I -- I'm not sure if there's much

17    more I could say on that one.

18         Q.    (By Ms. Weaver)  Okay.  Just to be clear,

19    for the record, I'm specifically asking if you can

20    identify by name any one person involved in the          09:06:54

21    decision to deprecate partner categories.

22            Can you?

23            MR. BENJAMIN:  Objection to form and

24    scope.

25            THE DEPONENT:  A singular person or a            09:07:05
```

Page 63

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1   team?                                          09:07:07

 2       Q.   (By Ms. Weaver)  Any -- any -- any names

 3   that you can think of.

 4       A.   I mean, Andrew Howard was involved.

 5       Q.   Anyone else?                           09:07:23

 6       A.   Like I said, there wasn't -- there

 7   were --

 8            (Simultaneously speaking.)

 9            MR. BENJAMIN:  The same -- the same

10   objections.                                     09:07:28

11            THE DEPONENT:  There were multiple teams

12   involved.  I don't know the full list of the entire

13   cross-functional team that was involved, as they

14   are involved when we introduce a new product or

15   deprecate other products.                       09:07:40

16       Q.   (By Ms. Weaver)  Okay.  But I'm not

17   asking for an exhaustive and complete list.  I

18   literally was asking if you can identify even a

19   handful of people or one name.

20            Other than Mr. Howard, can you identify 09:07:49

21   anybody else who was involved in the decision to

22   deprecate partner categories?

23       A.   Amy Dunn.

24            MR. BENJAMIN:  Objection.  Objection --

25   sorry, Bella.  Objection to form.               09:07:58
```

Page 64

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  No, please.                09:08:00

 2              MR. BENJAMIN:  Asked and answered.  And

 3    scope.

 4              THE DEPONENT:  Amy Dunn.  She was a

 5    former -- she's now a former employee.  She was one   09:08:08

 6    of the product marketers for targeting.  So I would

 7    assume was directly involved.

 8         Q.   (By Ms. Weaver)  Anyone else?

 9         A.   Honestly, from the top of my head, for

10    that exact decision, I -- I wouldn't be able to       09:08:24

11    tell you many more names.

12         Q.   Who is Andrew Howard?

13         A.   He's on our policy team.

14         Q.   And when you say "policy team," what do

15    you mean?                                             09:08:39

16         A.   The -- across ads.  And then also other

17    products, there are -- there's a policy counterpart

18    for that product.  They participate in product

19    development, product decisions.  They work as part

20    of the cross-functional team involved in developing   09:08:53

21    products.  And Andrew is an example for ads.

22         Q.   And when you're saying "policy," what do

23    you mean?

24         A.   I mean providing -- I mean -- I'm sorry.

25              I'm not totally sure what you mean by        09:09:11
```

Page 65

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    that question.                                      09:09:14

 2        Q.   You said there's a policy counterpart for

 3    that product.

 4             What do you mean by policy?

 5        A.   So in this case, it's privacy policy.      09:09:19

 6    It's the name of the team that Andrew is on and

 7    that I'm on.  And we are -- we work with a product

 8    team as they develop products.

 9        Q.   And how many people are on the privacy

10    policy team currently?                              09:09:33

11        A.   Currently, I would, I think, ballpark

12    probably 170.  170 people.

13        Q.   When was the privacy policy team first

14    established?

15        A.   A long time ago.  I'm -- I'm not sure of   09:09:53

16    the exact date when our team was established.

17        Q.   Was there a privacy policy team in 2012?

18        A.   Yes, there was.

19        Q.   And who was on it?

20        A.   An example would be Rob Sherman or         09:10:07

21    Erin Egan.

22        Q.   And in 2012, how many people were on the

23    privacy policy team?

24        A.   I can't tell you that with high

25    confidence.  I'm not sure of the size of the team   09:10:23
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    at that point.                                    09:10:25

 2         Q.   Was it 170 people?

 3         A.   No.  The team has grown in the last

 4    12 years.

 5         Q.   Was it more than 20?                     09:10:33

 6         A.   I -- I would say yes.  But I also don't

 7    know exactly how we have re-org'd over that time

 8    period.  So it might have been a slightly different

 9    named team with different scope and -- yes.

10         MR. BENJAMIN:  Ms. Weaver, we've been --      09:10:54

11    we've just been going for well over an hour, if

12    we're coming up to a good time for a break?

13         MS. WEAVER:  Yeah.  No problem.  Let me

14    just close this out, if you don't mind.

15         Is that okay?                                 09:11:03

16         MR. BENJAMIN:  Of course.

17         Q.   (By Ms. Weaver)  Okay.  You said Amy Dunn

18    is a former; is that right?

19         A.   Yes.  Amy Dunn left, I believe, two years

20    ago, a year ago.                                   09:11:11

21         Q.   And where does she work now, if you know?

22         A.   I don't know.

23         Q.   And it's D-U-N-N?

24         A.   Yes, that's correct.

25         Q.   And how is her first name spelled?        09:11:19
```

Page 67

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        A.   A-M-Y.                                    09:11:21

 2        Q.   And other than those two individuals, can

 3   you identify anybody else who was involved in the

 4   decision to deprecate partner categories?

 5        A.   Rob Sherman would have been aware and      09:11:34

 6   probably involved.  Victoria Chen Norland was Amy's

 7   counterpart and partner, also on the marketing

 8   side.  They would have been involved.

 9             And then I -- I mean, that's -- that's

10   who I can think of.                                  09:11:54

11             MS. WEAVER:  Okay.  Great.  We can take a

12   break.  Go off the record.

13             THE VIDEOGRAPHER:  Okay.  We're off the

14   record.  It's 9:12 a.m.

15             (Recess taken.)                            09:12:29

16             THE VIDEOGRAPHER:  Okay.  We're back on

17   the record.  It's 9:39 a.m.

18        Q.   (By Ms. Weaver)  Ms. Leone, you

19   understand you're still under oath, correct?

20        A.   Yes.                                       09:39:19

21        Q.   Okay.  When we broke, I had asked you if

22   you could remember anybody else, other than

23   Andrew Howard, Amy Dunn, Rob Sherman and

24   Victoria Chen Norland who were involved in the

25   decision to deprecate partner categories.           09:39:36
```

Page 68

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              Do you recall that?                    09:39:38

 2       A.   You had asked that, yes.

 3       Q.   Can you identify anyone other than those

 4   four individuals who reached that decisions?

 5              MR. BENJAMIN:  Objection to form.       09:39:46

 6   Objection to scope.

 7              And I'm going to instruct the witness not

 8   to answer on the basis of privilege.

 9              MS. WEAVER:  She can't identify who was

10   involved in the discussion on the basis of privacy  09:39:59

11   if she personally knows?

12              MR. BENJAMIN:  Well, I think this

13   question has been asked and answered.

14              But Ms. Leone, to the extent you can

15   answer Ms. Weaver's question without revealing     09:40:08

16   privileged information or communications, you may

17   do so.

18              THE DEPONENT:  I know that it was a

19   cross-functional team, which is what I noted.

20   Those are a few people that I knew were involved.  09:40:21

21   And beyond that, it's attorney-client privilege.

22       Q.   (By Ms. Weaver)  Do you have personal

23   knowledge of any other individuals who were

24   involved in the decision?

25              MR. BENJAMIN:  Objection.  Scope.        09:40:35
```

                                              Page 69

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1              And same caution regarding privilege.        09:40:40

2              THE DEPONENT:  Those are the -- the

3     people I can think of.  And beyond that, it was a

4     very large group and -- as many of our product

5     decisions are.                                        09:40:51

6         Q.  (By Ms. Weaver)  How large was the group?

7         A.  I can't --

8              MR. BENJAMIN:  Objection -- objection to

9     form.

10             THE DEPONENT:  I don't know an exact          09:40:59

11    number.

12        Q.  (By Ms. Weaver)  Okay.  Let's return to

13    your testimony about the three categories of

14    targeted advertising.

15             You listed core audiences, detailed          09:41:09

16    targeting and custom audiences, correct?

17        A.  Yes.

18        Q.  With regard to core audiences, how long

19    has that program been in use?

20             Is it fair to call it a program?             09:41:24

21        A.  I think that's fair.  I would use the

22    word "product," but yes.

23             The parts that we categorize into core

24    audiences -- I think I mentioned age, gender,

25    location -- have been part of our targeting option    09:41:41
```

Page 70

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | since we offered -- started to offer targeting | 09:41:44 |
| 2 | options. | |
| 3 | Q.   And what other demographics, other than | |
| 4 | age, gender and location, are used in core | |
| 5 | audiences? | 09:41:54 |
| 6 | A.   Those are -- those are the core audiences | |
| 7 | demographics. | |
| 8 | Q.   And with regard to gender, what do you | |
| 9 | mean? | |
| 10 | A.   An advertiser has the option -- has three | 09:42:15 |
| 11 | kind of toggles -- and they choose between reaching | |
| 12 | all, reach men, reaching women. | |
| 13 | Q.   And with regard to location, what options | |
| 14 | are afforded advertisers? | |
| 15 | A.   When an advertiser goes to create their | 09:42:35 |
| 16 | ad in that location section, it effectively is a | |
| 17 | map.  They can choose to select where they want | |
| 18 | their ad to be shown. | |
| 19 | That can be by clicking on the map.  That | |
| 20 | can be by entering a -- a place -- or -- or a city, | 09:42:50 |
| 21 | a state.  They can keyword search to match where | |
| 22 | they want their ad to be shown. | |
| 23 | Q.   And how granular is the location | |
| 24 | selection? | |
| 25 | MR. BENJAMIN:  Objection to form. | 09:43:07 |

Page 71

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  An advertiser can input        09:43:12

 2    really kind of whatever granularity, to an extent.

 3    There is then a radius and that radius cannot be

 4    smaller than one mile.

 5         Q.   (By Ms. Weaver)  And when was the             09:43:26

 6    restriction that the radius cannot be smaller than

 7    one mile implemented?

 8         A.   I believe that has been in place

 9    throughout.  I -- I don't believe that there was a

10    time where we didn't have that.                        09:43:48

11         Q.   So to be clear, from 2007 forward, it was

12    Facebook's policy that for core audiences, the

13    location could not be less than a one-mile radius;

14    is that right?

15         A.   So the -- the advertiser's selection of      09:44:04

16    where to show their ad, like that selection in

17    terms of this city, et cetera, I -- I don't -- I --

18    I believe that there has always been -- so where

19    those options have been provided, I think there has

20    always been the radius, but I would honestly have     09:44:27

21    to check on if the UI has changed in the way they

22    select that.

23         Q.   Was it ever possible for an advertiser to

24    provide map coordinates to target users?

25              MR. BENJAMIN:  Objection -- objection to      09:44:42
```

Page 72

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    form.                                         09:44:43

 2            THE DEPONENT:  They don't provide a map

 3    coordinate.  They can select -- like I was saying,

 4    there's a map.  They can select a point.  But it's

 5    not that they are selecting users.  They are       09:44:55

 6    selecting where they want their ad to be shown.

 7        Q.  (By Ms. Weaver)  And could they do that

 8    with the specificity of a map coordinate at any

 9    point in time, from 2007 to the present?

10        A.  With the radius that I mentioned.         09:45:09

11        Q.  And where would you go to confirm that

12    the one-mile radius was honored from 2007 to the

13    present?

14            MR. BENJAMIN:  Objection to form.

15            THE DEPONENT:  I -- I would probably       09:45:28

16    discuss with our engineers if they can cross-check

17    that.  I'm not sure that we have code from 20- --

18    2007.

19        Q.  (By Ms. Weaver)  Was there an enforcement

20    mechanism to ensure that the one-mile radius was    09:45:41

21    enforced?

22            MR. BENJAMIN:  Objection to form.  Vague.

23            THE DEPONENT:  There -- the selection

24    from the app to enforce the selection from the

25    advertiser?                                        09:45:59
```

Page 73

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   (By Ms. Weaver)  To enforce Facebook's        09:46:01

 2   policy that there had to be a one-mile radius.

 3        A.   It was how location -- it's how location

 4   targeting is rendered.  It's not a subsequent

 5   enforcement.                                            09:46:22

 6        Q.   And so it was through the code that the

 7   one-mile radius is enforced; is that your

 8   testimony?

 9        A.   Yes.  It's -- it's through how an

10   advertiser selects location.                           09:46:31

11        Q.   And so what information does Facebook

12   rely on to determine who's within the selected

13   location?

14        A.   When a user uses Facebook, we get

15   location signals within that.  So for example, if      09:46:57

16   they have location services turned on, we get that

17   information.  We understand where people are also

18   based on how they check in.  So when someone says

19   "I'm at the airport," we would understand and get

20   that information.  And other ways that people          09:47:14

21   connect through -- connect and use our platform

22   tells us where they are.

23        Q.   What are the other ways that users

24   connect and use the platform that tells Facebook

25   where they are?                                        09:47:28
```

                                                    Page 74

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1          A.    IP would be an example.                      09:47:29

 2          Q.    You're referring to the IP address?

 3          A.    Of how they're connecting in, yes.

 4          Q.    And for the record, what's an IP address?

 5          A.    It's -- from your device how you're --       09:47:40

 6     where you're -- you're accessing a website for

 7     connecting to the Internet.

 8          Q.    So in addition to check in and IP

 9     address, how else can Facebook divine where users

10     are to use that information for core audience         09:47:55

11     location selection?

12          A.    I think I -- I want to make sure that

13     we're clarifying the distinction here.

14                An advertiser selects where they want

15     their ad to be shown.  Once they've created that      09:48:06

16     ad, we then determine who matches that audience,

17     those parameters.

18                To do that, we use people's activity and

19     how they've connected to Facebook, including like

20     their location services and the other pieces that I    09:48:23

21     mentioned there.

22                Is that what you were getting at?

23          Q.    Right.

24                And so I'm asking, to make that

25     determination about whether users are within the       09:48:33
```

Page 75

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    selected location, what information does Facebook        09:48:37

2    use?

3         A.   It's what I answered.  It's location

4    services on their device.  How they connect to

5    Facebook.  And other -- another example would be if      09:48:49

6    they check in.  People can also provide on their

7    profile where they live.

8              Those -- that's an example of information

9    we use to determine their part -- they should meet

10   those audience parameters.                               09:49:06

11        Q.   And when you say "location services,"

12   what does that refer to?

13        A.   It's a setting on devices that -- of --

14   on your iPhone, for example, that lets Facebook

15   understand where you are.                                09:49:20

16        Q.   Does Facebook use any other information

17   to determine the location of users so that users

18   are targeted through core audiences by location?

19        A.   Yes.  As I mentioned, check-ins can

20   contribute to knowing where someone is.  Same thing      09:49:39

21   as where they designate their hometown or where

22   they live on their profile.

23        Q.   When a user initiates a post, for

24   example, does the metadata reflect where the user

25   was when the user made that post?                        09:50:00
```

Page 76

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              MR. BENJAMIN:  Objection to form.        09:50:07

 2              THE DEPONENT:  The activity there --

 3      honestly, I -- that's pretty far outside of the

 4      ad-specific piece.  If we -- if we collect that

 5      related to nonads, someone posting something.     09:50:29

 6              If they were to -- the example I was

 7      trying to give was like a page check-in, or where I

 8      specifically post "I'm at the airport," because it

 9      translates into a check-in.

10              I'm not sure if that's what -- what --     09:50:44

11      what you were indicating.

12         Q.   (By Ms. Weaver)  No, it's not.

13              Let's give it -- let me give a different

14      example.

15              If somebody posts a picture, does the      09:50:52

16      metadata on the picture indicate where the picture

17      was taken?

18              And if it does, is that the kind of

19      information that Facebook uses to identify a user's

20      location for use in core audience location         09:51:04

21      selection?

22              MR. BENJAMIN:  Objection to form.

23      Compound.  Vague.  Scope.

24              THE DEPONENT:  If someone makes a post,

25      they have connected to Facebook in some manner.  We 09:51:19
```

Page 77

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    do use information about how someone connects to          09:51:23

 2    Facebook to understand where they are, and that is

 3    used also for ads.

 4         Q.   (By Ms. Weaver)  And when you say "they

 5    have connected to Facebook in some manner," what do       09:51:36

 6    you mean?

 7         A.   I mean you have logged in or -- or you're

 8    on a browser and you're using Facebook.

 9         Q.   And does Facebook distinguish, for core

10    audience location advertising, whether that photo         09:51:50

11    that was posted was marked public or private?

12         A.   These are very different concepts.

13              The core audiences is simply how an

14    advertiser selects the parameter for their ad.

15    When we then determine if someone is eligible to          09:52:07

16    see that ad, whether they meet it, it is based on

17    people's activity on Facebook.  And it's not

18    differentiated in public or private because, again,

19    that's not reflective of how someone's activity on

20    Facebook is categorized.                                  09:52:23

21         Q.   With regard to the demographic age used

22    in core audiences, what is the information Facebook

23    uses to determine someone's age?

24         A.   That's based on the -- the age they

25    provide at sign-up.  So we require a user to              09:52:41
```

Page 78

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    provide their age.  And that's also what we use to       09:52:44

2    determine if they should see an ad.

3        Q.   And how does Facebook determine user's

4    gender; the same answer?

5        A.   Yeah.  Yes.                                      09:52:54

6        Q.   And roughly, currently ██████████████

██  ████████████████████████████████████

██  ██████████████████████████████

9             MR. BENJAMIN:  Objection to form and

10   scope.                                                    09:53:16

11            THE DEPONENT:  ██████████████████████

██   ██████████████████████████

13       Q.   (By Ms. Weaver)  How -- what's your

14   understanding of ██████████████████████████

██                ██████████████████████████      09:53:27

16            MR. BENJAMIN:  Objection --

17            THE DEPONENT:  Again --

18            MR. BENJAMIN:  -- to form and scope.

19            THE DEPONENT:  ████████████████████████

██   ████████████████████████  █████████      ████████

██   ███████████████████████████████

██   ██████████████████████████

23            And to be clear, ██████████████████████

██   █████████  ███████████████████████████████

██   ███████████████████                       09:53:56

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    Q.   (By Ms. Weaver) ████████████████████      ████████

▪    ██████████████

▪              ████████████████

4    A.   ████████████████████████

▪         ████████████████                              09:54:17

6    Q.   Yeah.

7         I'm just trying to establish how you came

8    to know and be competent to testify as you just

9    did.

10   A.   ██████████████████████          ████████

▪    ████    ██████████████████████

▪    ████████████████████

13   Q.   And Facebook selected you as the

14   representative on that topic today, too, right?

15   A.   On ad targeting and ad delivery, yes.      09:54:42

16   Q.   Okay.  Let's turn to detailed targeting.

17        What is detailed targeting, as you've

18   described it?

19   A.   Detailed targeting is -- is how we,

20   again, segment for advertisers when they're setting  09:55:00

21   up their ads.  It includes interests and behavior

22   options for targeting.

23   Q.   And when was detailed targeting first

24   implemented at Facebook?

25   A.   In the form of what it looks like today,   09:55:23

Page 80

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1      it would have been, I believe, between like 2010 --          09:55:24

2      about 2010.  That's -- that -- I think it is

3      important to note the evolution of what that looks

4      like in the UI has changed over time.  But the idea

5      of having interests and behaviors, I think, was          09:55:42

6      about then.

7           Q.   And what team and people were responsible

8      for commencing the detailed targeting at Facebook?

9           A.   Our ads product team.

10          Q.   And who was on the ads product team who          09:55:59

11     was part of that decision in 2010, if you know?

12          A.   I don't know an individual from the ads

13     product team specifically who was part of that

14     decision.

15               Again, these are often large teams that          09:56:13

16     create road maps to -- to build the tools we offer

17     advertisers or any other product at -- at Facebook.

18          Q.   Why did Facebook decide to engage in

19     detailed targeting on or around 2010?

20          A.   One of our core goals is to ensure that          09:56:33

21     the advertising experience is interesting and

22     relevant to people.  Enabling that is -- one way to

23     do that is to help understand what they might be

24     interested in.  And then an advertiser can select

25     who they think the -- the audience that might be          09:56:50

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    most relevant for their product.                    09:56:53

 2          Interest, which is part of detailed

 3    targeting, is an example of where that was to

 4    further the goal of having more interesting ads

 5    than if it was broadly targeted and relative --    09:57:03

 6    irrelevant to the person seeing it.

 7          Q.   And so how did detailed targeting help

 8    accomplish that goal?

 9          A.   It enabled someone, an advertiser, to

10    select that they wanted to reach people who have an  09:57:21

11    interest in something based on continued engagement

12    with that topic.

13          Q.   And specifically, what are the topics

14    available in detailed advertising -- let's start

15    with today -- at Facebook?                          09:57:45

16          A.   Within interests, there's -- there's

17    quite a few.  I believe about 60,000 interests are

18    provided today.  Those vary between hobbies, TV

19    shows, public figures.

20          Any number of topics that -- that we've       09:57:59

21    seen consistent engagement on that would be

22    relevant to reach someone because they're

23    interested in it.

24          Q.   And how is this list of 60,000 provided

25    to advertisers?                                     09:58:11
```

Page 82

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1         A.   In the ad creation flow, an advertiser        09:58:14

 2    can browse through a structured list.  So for

 3    example, can click and say "I'm looking for things

 4    related to fashion" or "entertainment," or they can

 5    use the keyword search and input a search term.        09:58:30

 6    And then we'll render the ones that match that

 7    search term and they can select individual

 8    interests from there.

 9         Q.   If a category is not on the list, can an

10    advertiser propose a new interest category and then    09:58:45

11    use the target users?

12              MR. BENJAMIN:  Objection to form.

13              THE DEPONENT:  Do you mean through --

14    through the ad creation?

15         Q.   (By Ms. Weaver)  Or at all.                  09:59:02

16         A.   There isn't a way for an advertiser to

17    select something that doesn't exist and then

18    immediately enable targeting on that.  That's

19    not -- that's not a functionality we offer.

20         Q.   But can an advertiser email their contact    09:59:18

21    at Facebook and say "We'd like to target" based on

22    this criteria?

23              Can you make that happen?

24              MR. BENJAMIN:  Objection.

25              THE DEPONENT:  I'm sure an advertiser --      09:59:28
```

Page 83

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1          MR. BENJAMIN:  Objection -- objection to      09:59:30

 2   form.

 3          THE DEPONENT:  An advertiser could email

 4   that.  It is not something that we implement.

 5      Q.   (By Ms. Weaver)  And why is that?            09:59:38

 6      A.   The interests we provide are the areas

 7   where we've seen continued engagement.  It's not

 8   based off of an advertiser, a somewhat ad hoc

 9   advertiser request.

10      Q.   Does -- so you've testified that to date      09:59:52

11   it's roughly 60,000 interest categories; is that

12   right?

13      A.   Yes, that's correct.

14      Q.   And can you describe over time perhaps

15   how that list has accrued?                          10:00:09

16          MR. BENJAMIN:  Objection to form.

17          THE DEPONENT:  The -- the list has --

18   like I was saying, is based on topics that we see

19   people engaging with.  So we've both added and

20   removed interests over time to help ensure that      10:00:26

21   they remain relevant and actually useful for people

22   to see content they want to engage with and for

23   advertisers to reach audiences that they're trying

24   to reach.

25      Q.   (By Ms. Weaver)  So is that based on both     10:00:43
```

Page 84

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    input from advertisers and internal Facebook          10:00:45

 2    analyses?

 3         A.   It's not based on input from advertisers

 4    in the example we gave about an email.

 5              But if we understand that there is high      10:01:02

 6    demand to -- to reach people interested in

 7    entertainment and we see that that is something

 8    that people engage with, it -- it could be an area

 9    we expand into.  That's relatively common.  And --

10    and like market research, to understand like what     10:01:20

11    is a useful tool.

12         Q.   And when you say "we understand that

13    there is high demand," you mean that advertisers

14    are interested in certain categories and will pay

15    Facebook for that; is that fair?                       10:01:35

16              MR. BENJAMIN:  Objection to form.

17              THE DEPONENT:  It's that we want to build

18    tools that actually enable an advertiser to create

19    an ad and also that is relevant to people.  And so

20    we do that the way many products are developed,        10:01:51

21    through market research, understanding what people

22    need.  And then also what -- what we would or

23    wouldn't be able to provide.

24         Q.   (By Ms. Weaver)  Are there any other

25    inputs into creating the interest categories that     10:02:08
```

Page 85

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    you can refer to?                                    10:02:10

2           MR. BENJAMIN:  Objection to form.  Vague.

3           THE DEPONENT:  It's -- again, it's based

4    on our understanding of what is -- would be a

5    useful addition.  We haven't added new interests     10:02:23

6    recently.  It's -- because the interest list is

7    relatively stable at this point.

8           You could imagine a scenario where if

9    there is a new TV show, it might make sense to add

10   that in based on the engagement we're seeing.  But   10:02:39

11   that would be an example of how the process occurs.

12      Q.   (By Ms. Weaver)  And when you say "useful

13   addition," you mean useful for purposes of

14   advertising; is that right?

15      A.   Both for advertisers to reach a relevant     10:02:55

16   audience and for people to see ads that are

17   interesting and relevant to them.

18      Q.   And how does Facebook determine what

19   users think is interesting and relevant to them?

20      A.   Our interests are based on activity on       10:03:12

21   Facebook.  For example, continuous engagement with

22   a topic.  So if I like many pages about interior

23   design, you might assign -- you might say that I'm

24   interested in interior design, and that would be an

25   interest.  So it's that type of topic-based          10:03:31

Page 86

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    understanding.                                          10:03:35

2         Q.   Does Facebook also record users' viewing

3    of videos?

4         A.   We determine just -- sorry.

5              MR. BENJAMIN:  Objection to form.             10:03:51

6              THE DEPONENT:  We -- if a page posts a

7    video and someone interacts with it, including

8    viewing it, we would consider that an interaction

9    with that page and the content of that page.

10             So going back to the -- somewhat random      10:04:05

11   interior design example, if there is an interior

12   design page and I like it, I follow it, and I watch

13   the videos on that page, that could contribute to

14   my interactions with that page, yes.

15        Q.   (By Ms. Weaver)  Does Facebook track how     10:04:22

16   long users have watched a specific video?

17             MR. BENJAMIN:  Objection to form and

18   scope.

19             THE DEPONENT:  We do.  It's not a

20   specific piece of information that -- that I -- I     10:04:39

21   don't think that there is a specific threshold in

22   that scenario that we leverage for like ads

23   interests, if that's what -- yeah.

24        Q.   (By Ms. Weaver)  So to determine what

25   categories are targeted, Facebook also looks at       10:05:04

                                                   Page 87

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | users' activity to determine whether or not those | 10:05:08 |
| 2 | categories would exist in the first place; is that | |
| 3 | fair? | |
| 4 | MR. BENJAMIN:  Objection to form. | |
| 5 | THE DEPONENT:  I'm sorry.  I think I -- I | 10:05:18 |
| 6 | need you to clarify a little bit on the question. | |
| 7 | Q.   (By Ms. Weaver)  No problem. | |
| 8 | We're discussing how these 60,000 | |
| 9 | interest categories were created, right? | |
| 10 | A.   Yup. | 10:05:30 |
| 11 | Q.   And one component was whether or not | |
| 12 | there's high demand because advertisers are | |
| 13 | interested in it, right? | |
| 14 | A.   Based on our market research, yes. | |
| 15 | Q.   And another component is whether or not | 10:05:41 |
| 16 | users are seeing the ads Facebook thinks they would | |
| 17 | like to see, correct? | |
| 18 | A.   Another -- for interest creation, | |
| 19 | specifically? | |
| 20 | Q.   Sure. | 10:05:57 |
| 21 | A.   We -- in order to generate interests, we | |
| 22 | determine what are the topics that people engage | |
| 23 | with to -- and like, what are groups -- like | |
| 24 | content on pages, con- -- classification, those | |
| 25 | topics that people have engaged with. | 10:06:15 |

Page 88

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1            If there is a topic that nobody is          10:06:19

 2    engaging with, it wouldn't have been something we

 3    came up with because it is based on -- on

 4    understanding the topics that people engage with to

 5    provide an interest.                                10:06:31

 6        Q.   So is it fair to say that Facebook

 7    analyzes users' activity to determine what

 8    categories of interests are available for

 9    advertisers to target them; is that fair?

10        A.   At the --                                  10:06:46

11            MR. BENJAMIN:  Objection -- objection to

12    form.

13            THE DEPONENT:  It's fair to say that we

14    look at the content people engage with to determine

15    their interest.  And those can include them in an   10:06:59

16    interest that we also provide to advertisers when

17    they're setting the parameters for their audience.

18        Q.   (By Ms. Weaver)  Okay.  In general, can

19    you identify, roughly, how many of these interest

20    categories for detailed targeting that were         10:07:22

21    available in 2012?

22        A.   Roughly, several hundred thousand.

23        Q.   In 2012, there were several hundred

24    thousand and today there are 60,000?

25        A.   Correct.                                   10:07:45
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1      Q.   So over time, the number of interest          10:07:46

2   categories has decreased rather dramatically; is

3   that right?

4           MR. BENJAMIN:  Objection to form.

5           THE DEPONENT:  It has decreased over --        10:07:56

6   over a number of years and we have both added in

7   and removed interests.

8      Q.   (By Ms. Weaver)  Does Facebook have a

9   record of the categories for interest targeting,

10   for detailed targeting that were available in 2012?   10:08:09

11     A.   So because our system has evolved, I --

12   there isn't a comprehensive or day-by-day view of

13   all the interests.  We know what -- what is

14   provided in the product today and I -- there

15   isn't a -- a full list over many years.              10:08:34

16     Q.   Is it possible to roughly piece together

17   what those categories are over time?

18           MR. BENJAMIN:  Objection to form.

19           THE DEPONENT:  Not with very high

20   accuracy.                                             10:08:53

21     Q.   (By Ms. Weaver)  Did Facebook tell users

22   in 2010 what interest categories it was making

23   available to advertisers for detailed targeting?

24     A.   Users can access the -- the ads manager.

25   It's a self-serve.  Everybody is able to see          10:09:19

Page 90

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    what -- what's there.  And so a user would have          10:09:24

 2    been able to also look and see what are interest

 3    categories that are available.

 4         Q.   So it's your testimony that in 2012, a

 5    user could have looked up and seen the several            10:09:37

 6    hundred thousand interest categories that

 7    advertisers were using to target them?

 8              MR. BENJAMIN:  Objection to form and

 9    misstates.

10              THE DEPONENT:  Yes.  So -- yes, to the          10:09:50

11    objection.  Apologies.

12              The -- they would be able to see what are

13    all the options an advertiser can reach.  Because

14    our ad creation flow, such as ads manager, is

15    self-serve and open to the public to look at.  So        10:10:07

16    any user could go in and say here are all the

17    interests an advertiser can select.  It is not an

18    indication that they are all associated with one

19    user.

20         Q.   (By Ms. Weaver)  Meaning a user could not       10:10:23

21    determine which interest he or she had specifically

22    been targeted for, correct?

23         A.   We introduced --

24              MR. BENJAMIN:  Objection -- objection to

25    form.  Vague.                                             10:10:35
```

Page 91

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1           THE DEPONENT:  Today users can see the        10:10:38

2      interest they are associated with.  And we've had

3      that for a number of years.

4           Q.   (By Ms. Weaver)  And when did that

5      commence?                                          10:10:47

6           A.   2014, where we launched our ad

7      preferences.

8           Q.   And beginning in 2014, could users see

9      all of the interests that they were actually

10     targeted for?                                      10:11:00

11          A.   They could see the interests that were

12     associated with them, that they were part of, that

13     were being used by advertisers.

14          Q.   And could they see all of those interests

15     or was it just a -- an overview?                   10:11:14

16          A.   Do you mean immediately at launch or over

17     time?

18          Q.   At any point in time.

19          MR. BENJAMIN:  Objection --

20          THE DEPONENT:  Yes.                            10:11:28

21          MR. BENJAMIN:  Objection to form.

22          THE DEPONENT:  I -- over the years and

23     today, a user can open ad preferences and see all

24     of the interests that are associated with them that

25     are available for targeting.                        10:11:42

                                                  Page 92

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   (By Ms. Weaver)  And when did that          10:11:45

 2    functionality first become effective, which is to

 3    say, that a user could view every single interest

 4    for which they have been targeted for detailed

 5    advertising?                                          10:11:56

 6        A.   In 2014, we launched ad preferences.  It

 7    began with the interests that were actively being

 8    used, so that had an ad running against them, and

 9    then rolled out to include all interests that were

10    targetable.                                           10:12:13

11         That would have been likely over the

12    course of 2014.  I don't know the exact month.

13        Q.   And does Facebook generate interest

14    categories based on off-platform activity?

15        A.   Interest are based on on-site activity.      10:12:29

16        Q.   Only on platform?

17        A.   Yes.

18        Q.   Does -- do users have the capability to

19    decline being targeted for a specific interest?

20        A.   Yes.                                         10:12:48

21        Q.   And when was that first implemented?

22        A.   In 2014.

23        Q.   And how does Facebook enforce that a user

24    is not targeted based on a specific interest?

25        A.   When a user chooses to remove themself       10:13:08
```

Page 93

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    from an interest, they are no longer included in        10:13:11

2    that interest.  And so any ad that has that

3    interest, as part of their audience parameters, the

4    user would not be included in that audience.

5         Q.   And are you familiar with the concept of      10:13:24

6    opt in versus opt out?

7         A.   Yes.

8         Q.   And what's your understanding of what

9    those words mean?

10        A.   It -- my understanding would be that the       10:13:36

11   choices either you are in it and you are -- you're

12   given the opportunity to opt out.  So you're making

13   a choice to remove yourself from a state where

14   you're in it.  And then opt in would be the

15   opposite, you're not in it and you're given the       10:13:50

16   choice to enter.

17        Q.   And why did Facebook decide that users

18   should opt out rather than opt in to interests for

19   detailed targeting?

20        A.   We understand that people want to see         10:14:03

21   relevant ads.  It is part of the experience on

22   Facebook.  Otherwise they would see irrelevant ads.

23   Interest is one way to do that.  And so we provided

24   people with interests and gave them the opportunity

25   to see those interests and then remove themselves.     10:14:18
```

Page 94

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1      Q.   Are you aware of internal studies at          10:14:22

2   Facebook that concluded, in fact, users would

3   prefer to opt in as opposed to opt out?

4          MR. BENJAMIN:  Objection to form and

5   scope.                                                10:14:35

6          THE DEPONENT:  For ads, I'm not aware of

7   a study that specifically looks at an opt in versus

8   out opt preference for interests.

9      Q.   (By Ms. Weaver)  Are you aware of any

10  studies in general that discuss opt in versus opt     10:14:47

11  out preferences for users?

12         MR. BENJAMIN:  Objection to scope.

13         THE DEPONENT:  Across all of Facebook?

14     Q.   (By Ms. Weaver)  Well, you answered --

15  your answer was very specific and I'm trying to       10:14:59

16  understand why.

17         You said "For ads, I'm not aware of a

18  study that's specifically looks at opt in or opt

19  out" for ads interest.

20         So I'm just trying to ask, are you aware       10:15:10

21  of a study discussing opt in or opt out in general?

22         MR. BENJAMIN:  Objection --

23         THE DEPONENT:  No.

24         MR. BENJAMIN:  Objection to scope.

25         MS. WEAVER:  Let's go off the record real      10:15:32

Page 95

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    quick.  I'll fix it.                              10:15:34

 2            (Court Reporter initiates discussion off

 3    the record.)

 4            THE VIDEOGRAPHER:  Okay.  We're off the

 5    record.  It's 10:15 a.m.                          10:15:36

 6            (Recess taken.)

 7            THE VIDEOGRAPHER:  Okay.  We're back on

 8    the record.  It's 10:16 a.m.

 9        Q.   (By Ms. Weaver)  Are you aware of

10    internal discussions at Facebook in regard to     10:17:00

11    whether or not users would want to opt in or opt

12    out to certain kinds of detailed targeted

13    advertising?

14            MR. BENJAMIN:  Objection to scope.

15            THE DEPONENT:  I am not aware of           10:17:12

16    discussions on those preferences.

17        Q.   (By Ms. Weaver)  Do you know how the

18    decision was made that Facebook would require users

19    to opt out, rather than opt in, to interest

20    categories of detailed targeted advertising?      10:17:26

21            MR. BENJAMIN:  Objection to form.  Vague

22    and scope.

23            THE DEPONENT:  The product was built

24    because we knew these -- or because these were

25    areas that people had already engaged with.  And we  10:17:44
```

Page 96

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1     knew that they were interested within them.  And so          10:17:46

2     the control reflects that by giving them the

3     ability to remove themself from it.  It was by

4     design.

5          Q.   (By Ms. Weaver)  So in the beginning, do            10:17:56

6     you know how many users reviewed the hundreds of

7     thousands of interest categories and deselected

8     themselves?

9               MR. BENJAMIN:  Objection to form.

10              THE DEPONENT:  Just to be clear, each               10:18:13

11    user was not associated with all the interest

12    categories.  They wouldn't -- there -- it wouldn't

13    have been that they had hundreds of thousands of

14    their interests.

15              Once we rolled out ad preferences, I -- I          10:18:26

16    don't know the exact number of users who -- who

17    chose to remove themself from an interest when that

18    was rolled out.

19         Q.   (By Ms. Weaver)  Can you identify anyone

20    you're aware of who has ever chosen to engage in           10:18:40

21    that process?

22              MR. BENJAMIN:  Objection to form and

23    scope.

24              THE DEPONENT:  Do you mean specifically

25    to remove themself from an interest?                         10:18:56

                                                       Page 97

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER



```
 1       Q.   (By Ms. Weaver)  Yeah.  Yes.              10:18:58

 2       A.   ████   ████████

 3       Q.   ████████████████████████████████████

 █  █████████████████████████████████████████████████

 5            MR. BENJAMIN:  Objection to form and      10:19:08

 6   scope.

 7            THE DEPONENT:  ███████████   ████████████

 █  █████████████████████████████████████████

 █  ███████████████████████████████████████████

 █  █████████████████████████████████████████████    ██████████

 █  ███████████████████████████████████████████

 █  ██████

13       Q.   (By Ms. Weaver)  Does Facebook maintain

14   statistics on how many users have gone to the "why

15   am I seeing this page"?                            10:19:31

16       A.   Yes.

17       Q.   And where are those statistics?

18            MR. BENJAMIN:  Objection to form.

19            THE DEPONENT:  We would log those█████

 █  ███████████                                        10:19:48

21       Q.   (By Ms. Weaver)  And when you say "We

22   would ████████████████" what do you mean?

23       A.   I mean when someone uses one of the

24   drop-down menus such as a hide ad, or why am I

25   seeing this, we know -- or we log that that action  10:20:04
```

Page 98

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    has been taken.                                    10:20:08

 2         Q.   And for what time period has that

 3    activity been ███████████████

 4              MR. BENJAMIN:  Objection to form.  Vague.

 5              THE DEPONENT:  Over -- we -- we log --    10:20:25

 6    have logged that activity -- that's -- I -- since

 7    WAIST launched.

 8              Did -- is that -- does that answer your

 9    question?

10              Is that what you were asking?            10:20:37

11         Q.   (By Ms. Weaver)  When you say "since we

12    launched," you mean 2007 or 2014?

13         A.   WAIST launched in 2014.  Why Am I Seeing

14    This was launched in 2014.

15         Q.   Oh.                                      10:20:53

16         A.   And so once it became a product, we began

17    to log when -- when someone would access it.

18         Q.   So for the record, you're using an

19    acronym, WAIST, which stands for Why Am I Seeing

20    This; is that right?                               10:21:06

21         A.   Yes.  Correct.

22              Apologies.  I thought I defined it

23    earlier.  That's my mistake.

24         Q.   Perhaps I missed it.

25              Okay.  Are there other activities that   10:21:16
```

                                                    Page 99

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | users engage in that affect whether or not they are | 10:21:25 |
| 2 | targeted by certain interests that are ▮▮▮▮ | |
| | ▮▮▮ | |
| 4 | MR. BENJAMIN:  Objection to form. | |
| 5 | THE DEPONENT:  Interests are based on | 10:21:41 |
| 6 | people's activity.  So for example, if they | |
| 7 | consistently engage with a page or ad, or any form | |
| 8 | of like aggregated continuous engagement with a | |
| 9 | topic is what adds someone to an interest.  If they | |
| 10 | weren't doing that, then they wouldn't be added to | 10:21:57 |
| 11 | it. | |
| 12 | So the people's page -- page likes are | |
| 13 | logged ▮▮▮▮  And that's an example of activity | |
| 14 | that would also contribute to an interest. | |
| 15 | Q.   (By Ms. Weaver)  In addition to page | 10:22:17 |
| 16 | likes, what other kinds of activities are ▮▮▮▮ | |
| | ▮▮▮ about users that you're aware of? | |
| 18 | A.   For interests? | |
| 19 | Q.   In general.  For interest.  And, yes, in | |
| 20 | general. | 10:22:30 |
| 21 | A.   Again, people's activity on the platform | |
| 22 | is ▮▮▮▮.  So if I had a friend or if I | |
| 23 | add something to my profile, that's something we | |
| 24 | store▮▮▮▮ | |
| 25 | Q.   Do you count Facebook Messenger activity | 10:22:48 |

Page 100

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    as activity on the platform in your answers?          10:22:52

2         A.   Yes.

3         Q.   Are -- where are users' Facebook

4    Messenger messages logged?

5              MR. BENJAMIN:  Objection to form and         10:23:04

6    scope.

7              THE DEPONENT:  This is pretty far outside

8    of ad specific.

9              The fact that someone uses Messenger is

10   ██████████████      I think that that's what you're    10:23:17

11   getting at.  And if they initiate threads, it would

12   be logged there, too.

13        Q.   (By Ms. Weaver)  And when you say "they

14   initiate threads," what do you mean?

15        A.   If I create --                               10:23:30

16             MR. BENJAMIN:  Objection to scope.

17             THE DEPONENT:  Creating a thread with

18   Matt, for example, would be something that we log.

19        Q.   (By Ms. Weaver)  And so what does the log

20   reflect?                                               10:23:40

21             Does it reflect the whole thread or just

22   the fact that a thread was initiated at a certain

23   time with certain users?

24             MR. BENJAMIN:  Objection to form and         10:23:52

25   scope.
```

                                                    Page 101

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  This is something I don't      10:23:54
 2    know.  This is pretty far outside ads.
 3        Q.   (By Ms. Weaver)  So this activity for
 4    Facebook Messenger is used to create interests
 5    in -- used in any form of advertising, not just       10:24:05
 6    limited to detailed interests but in general?
 7              MR. BENJAMIN:  Objection to form.
 8              THE DEPONENT:  To separate out the
 9    portions of that question, interests are based on
10    activity on the platform.  But page and ad            10:24:21
11    activity, Messenger is not part of that for
12    interests.
13              Generally, across ad delivery, we use
14    information about how people use Facebook to inform
15    what ad to show them.  So if we know that someone     10:24:37
16    has consistently messaged pages, we might be more
17    likely to show them an ad that is -- has a message
18    objective.
19              So I think that answer -- is that what
20    you're getting at?                                    10:24:55
21        Q.   (By Ms. Weaver)  Yes, that's exactly it.
22              Does Facebook also look at the content of
23    Messenger messages to determine what interests
24    users might have to target them?
25        A.   No.                                          10:25:07
```

Page 102

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1          Q.   And has Facebook ever done that?              10:25:08

 2          A.   No.

 3          Q.   But if they message about a page, or a

 4     group, would that information be used to target

 5     them?                                                   10:25:21

 6          A.   Would you mind clarifying what you mean

 7     by "message about."

 8          Q.   Well, you testified -- so if we know that

 9     somebody has consistently messaged -- messaged

10     pages, what did you mean?                               10:25:35

11          A.   I meant specifically reached out to a

12     page via Messenger.

13          Q.   Okay.  And would that also -- is that

14     also true for groups?

15          A.   You can't message a group --                  10:25:46

16          Q.   Okay.

17          A.   -- or the -- let me make sure that

18     we're -- we're kind of talking this -- about the

19     same thing.

20               So the group product, which is this is a      10:25:55

21     group on Facebook and I join it, that isn't

22     connected in -- in the -- I think in the way that

23     you're thinking about it with Messenger.  You don't

24     message into a group in the same way.  And we don't

25     use message content from like between friends to        10:26:15
```

Page 103

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    inform an ad.                                    10:26:17

2        Q.   What if you're -- so if you referenced a

3    page in the Messenger communication, Facebook will

4    use that information, correct?

5        A.   Between -- no.  It is specifically if I,    10:26:30

6    Bella, choose to message Nike's page, we would know

7    that I interacted with that page.  And that is

8    something that can inform my ads because it's an

9    interaction with a page.

10       Q.   Understood.                               10:26:46

11            Does Facebook use information in Facebook

12   messages to calculate users' desire to be targeted

13   with a certain kind of ad?

14            MR. BENJAMIN:  Objection to form.

15            THE DEPONENT:  The content of a message    10:27:21

16   between friends on -- through Messenger is not used

17   to inform ads.  It would not be used to predict

18   someone's interest or whether or not they want to

19   see an ad.

20       Q.   (By Ms. Weaver)  Do you know if it's used   10:27:35

21   for research?

22            MR. BENJAMIN:  Objection to form and

23   scope.

24            THE DEPONENT:  I do not.

25       Q.   (By Ms. Weaver)  And why isn't the         10:27:49

                                          Page 104

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    content of a message not used to inform ads?          10:27:50

2        A.   We haven't historically used it.  It's

3    not an area we've -- we've explored.  So it's not

4    part of why we -- the signals we use for ads.

5        Q.   Does Facebook consider whether or not        10:28:10

6    Facebook Messenger messages might be considered

7    private by users in making a decision not to use it

8    to target users and ads?

9             MR. BENJAMIN:  Objection to form and

10   scope.                                                10:28:23

11            THE DEPONENT:  That's not the framing

12   we've used.  We haven't used Messenger content.

13   It's not something that we've explored for -- to --

14   to incorporate into ads.

15            Like I said, we use interactions with        10:28:38

16   pages and ad content to inform ads interests and

17   then activity generally on the platform.

18       Q.   (By Ms. Weaver)  And I'm trying to

19   understand why Facebook does not use Messenger

20   messages to frame interest-based targeting of        10:28:53

21   users.

22            MR. BENJAMIN:  Objection to form and

23   scope.

24            MS. WEAVER:  I'll reask the question.

25       Q.   (By Ms. Weaver)  So can you explain why      10:29:08
```

Page 105

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    Facebook does not use Facebook Messenger       10:29:09

2    information to target users with ads?

3          MR. BENJAMIN:  Objection to form.  Asked

4    and answered.  And outside the scope.

5          THE DEPONENT:  It -- it hasn't been an     10:29:20

6    area that we've built out.  It hasn't been proven

7    to be something that we want to do or is valuable.

8          We have so far built our interests off of

9    engagements -- engagement and interactions with

10    pages and ads, and the information people provide   10:29:36

11    us.

12      Q.   (By Ms. Weaver)  When you say "It hasn't

13    been proven to be something that we want to do or

14    is valuable," how did Facebook prove that?

15      A.   Like I said, we haven't.            10:29:49

16      Q.   Is -- has Facebook engaged in any

17    analysis as to whether or not using information

18    shared by users in Facebook Messenger would be

19    valuable in identifying their interests?

20      A.   No, not that I'm aware of.         10:30:07

21      Q.   Do you think a consideration that

22    Facebook might engage in is whether or not using

23    information from Facebook Messenger messages would

24    invade users' privacy expectations?

25          MR. BENJAMIN:  Objection to --        10:30:33

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | THE DEPONENT:  You said -- | 10:30:33 |
| 2 | MR. BENJAMIN:  Objection to form.  Calls | |
| 3 | for speculation.  Vague.  Outside the scope. | |
| 4 | THE DEPONENT:  Across the board, we think | |
| 5 | about whether people have specific expectations, | 10:30:47 |
| 6 | whether or not this is something that they would | |
| 7 | understand or not.  That -- that's a consideration | |
| 8 | always. | |
| 9 | Q.  (By Ms. Weaver)  And I'm asking | |
| 10 | specifically about Facebook Messenger and whether | 10:30:59 |
| 11 | you believe that Facebook considered whether or not | |
| 12 | allowing information communicated in Facebook | |
| 13 | Messenger messages to be used for advertising or | |
| 14 | other purposes would invade users' expectations of | |
| 15 | privacy? | 10:31:18 |
| 16 | MR. BENJAMIN:  Objection to form. | |
| 17 | THE DEPONENT:  We haven't speculated | |
| 18 | about any specific users and whether or not they | |
| 19 | would find that to be an invasion of privacy. | |
| 20 | We use activity on the platform, like | 10:31:31 |
| 21 | pages and ads, to inform interests, and the ads | |
| 22 | people see.  And -- and that -- and that's what | |
| 23 | we're transparent about to users. | |
| 24 | Q.  (By Ms. Weaver)  I'm still not just | |
| 25 | getting an answer to the specific question. | 10:31:50 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              Can you state one way or another whether       10:31:52

 2    or not Facebook considered users' expectations of

 3    privacy in Facebook Messenger messages in

 4    determining whether or not to use information

 5    contained in them to target users with ads?          10:32:03

 6        A.   What I'm struggling with is this assumes

 7    that there was a specific decision.  And my point

 8    is that it has -- this is -- the content of ads --

 9    of -- of messages is not used in ads.  We use other

10    activity on the platform.                            10:32:21

11        Q.   And how does Facebook decide what

12    activity on the platform it is using for ads?

13        A.   There are a number -- I mean, we're --

14    we're trying to build a system that delivers ads

15    that people are interested in.                       10:32:43

16              One of the things we've seen that -- that

17    is useful and that we use are people's engagement

18    with pages and ads, and their activity that shows

19    what they might want to see more content of.

20              And so when we introduce interests, as an  10:32:58

21    example, that explored aggregating that engagement

22    to be a topic-based and -- and similarly, like as

23    product -- as -- as teams think about the future of

24    what ads look like, they would look at market and

25    industry practices and what people want to see and  10:33:18
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    how we could help enable that.  I don't think that        10:33:21

 2    there's a set framework.

 3              MS. WEAVER:  Okay.  I'm going to move

 4    into another topic.  We could take a break now or

 5    we can continue.                                           10:33:41

 6              It's up to you, Ms. Leone.  I don't know

 7    how you're feeling.

 8              THE DEPONENT:  I'm happy to keep going.

 9              MS. WEAVER:  Okay.

10              THE DEPONENT:  And I might ask for a             10:33:50

11    break in like 20 minutes, but -- so I don't know

12    what everyone's time zones are --

13              MS. WEAVER:  Let's break now.

14              THE DEPONENT:  Okay.

15              MS. WEAVER:  Let's break now and then            10:33:55

16    we'll come back.

17              THE DEPONENT:  Cool.

18              MS. WEAVER:  Great.  Thank you.

19              THE VIDEOGRAPHER:  Okay.  Off the record.

20    It's 10:34 a.m.                                            10:34:02

21              (Recess taken.)

22              THE VIDEOGRAPHER:  Okay.  We're back on

23    the record.  It's 10:49 a.m.

24         Q.   (By Ms. Weaver)  Ms. Leone, you're still

25    under oath, correct?                                       10:49:45
```

Page 109

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        A.    Correct.                                    10:49:46

 2        Q.    A quick question about WAIST, or the Why

 3    Am I Seeing This tool.

 4              Is it your testimony that it lists

 5    interests for which you have been targeted and then    10:50:00

 6    you can opt out?

 7        A.    WAIST shows you the criteria that you

 8    matched from the audience selections that the

 9    advertiser made.  So it will show you for that

10    specific ad what you matched.  And if one of those    10:50:14

11    are interests, it would show there.  And then you

12    would be able to also remove yourself from that

13    interest.

14        Q.    So you can only remove yourself if you've

15    already been matched, correct?                         10:50:26

16              MR. BENJAMIN:  Objection to form.

17    Misstates.

18              THE DEPONENT:  For Why Am I Seeing This,

19    the goal of that tool is to provide people an

20    understanding of how the advertiser reached them.     10:50:38

21    And so there it is based on -- in that interface,

22    it's based on that interest that was matched.

23              In ad preferences, we provide people with

24    the interest they are targetable through.  And

25    those are -- it's not based on any one specific      10:50:54
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    advertiser using it.                               10:50:57

2         Q.   (By Ms. Weaver)  So a user would have to

3    go to those two different locations.  One to

4    disable when they have already been matched, and

5    then go to a different location to say general    10:51:08

6    categories, I maybe don't want to be targeted for;

7    is that right?

8              MR. BENJAMIN:  Objection to form.

9              THE DEPONENT:  The -- the tools are

10   for -- provide different purposes because a user   10:51:21

11   might want transparency and control for different

12   reasons at different times.

13             When someone sees an ad, they might look

14   at the ad and say, literally, why am I seeing this,

15   hence, the name of the -- the -- the menu that      10:51:34

16   explains that to them, and then the relevant

17   control for that transparency.

18             Ad preferences is a central hub where

19   someone can manage their ad settings.  And that

20   includes the interest they can be reached through   10:51:47

21   and then the ability to remove themselves from it.

22             So they're serving different purposes,

23   which is why they look different and their entry

24   points to both of them from the ad, from WAIST or

25   from our settings and other menus.                  10:52:02
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   (By Ms. Weaver)  Right.  So I wasn't        10:52:05

 2   asking about the purpose.

 3            My question is, if a person wanted to

 4   prevent receiving any kinds of ads, they would

 5   have -- at a minimum, to go to these two different    10:52:14

 6   locations and review at WAIST what had already

 7   occurred to stop it from happening again.  And then

 8   in ad preferences make selections to prevent other

 9   kinds of advertising; is that fair?

10            MR. BENJAMIN:  Objection --                  10:52:32

11            THE DEPONENT:  No.

12            MR. BENJAMIN:  -- to form.  Misstates.

13            THE DEPONENT:  No, that -- that's not

14   quite what I said.

15        Q.   (By Ms. Weaver)  I -- I know it's not       10:52:38

16   what you said.  But I'm asking a different question

17   than your last answer.

18            Is it true that to prevent the kind of

19   targeting we've been discussing, at a minimum, a

20   user would have to go to both of these sites?        10:52:48

21        A.   No.  They could -- they -- first and

22   foremost, there's no way to turn off ads on

23   Facebook.  That's not a setting anywhere.  We

24   don't -- we -- we show ads in order to provide a

25   free service.                                         10:53:06
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Users can manage their ad experience | 10:53:08 |
| 2 | through ad preferences, and that can be a starting | |
| 3 | point for managing their ad experience. | |
| 4 | The reason the purpose for each interface | |
| 5 | is important is because WAIST is solving -- Why Am | 10:53:20 |
| 6 | I Seeing This -- is solving a very specific user | |
| 7 | need, which is, when they see an ad, they want to | |
| 8 | understand how they were reached. | |
| 9 | They don't have to wait to see an ad and | |
| 10 | click on Why Am I Seeing This in order to access | 10:53:34 |
| 11 | their ad preferences, which are available to them | |
| 12 | and where they can manage their -- the settings for | |
| 13 | their ads as a central hub. | |
| 14 | Q.   Does the -- | |
| 15 | A.   So they do not need to access both. | 10:53:46 |
| 16 | Q.   Does the ad settings list all of the | |
| 17 | 60,000 interest categories used for detailed | |
| 18 | targeting? | |
| 19 | A.   No -- | |
| 20 | MR. BENJAMIN:  Objection to form. | 10:53:56 |
| 21 | THE DEPONENT:  -- because -- | |
| 22 | MR. BENJAMIN:  Objection to form. | |
| 23 | THE DEPONENT:  No, because they are not | |
| 24 | all associated with any individual user. | |
| 25 | Q.   (By Ms. Weaver)  Yes, but in order to | 10:54:06 |

Page 113

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | proactively say I do not want to receive this ad, | 10:54:07 |
| 2 | wouldn't a user have to be able to opt out of it? | |
| 3 | MR. BENJAMIN:  Objection to form. | |
| 4 | THE DEPONENT:  An interest -- for -- just | |
| 5 | to -- to underline, the removal from an interest is | 10:54:22 |
| 6 | not about seeing an ad or not.  It's about the way | |
| 7 | that an advertiser could reach you through that | |
| 8 | interest. | |
| 9 | I think we discussed before that is | |
| 10 | something that you're in the interest and you can | 10:54:35 |
| 11 | remove yourself.  It's not a -- an opt in -- or a | |
| 12 | future -- looking for future things that you engage | |
| 13 | with. | |
| 14 | Once you've engaged with content and you | |
| 15 | become associated with an interest, someone can go | 10:54:49 |
| 16 | and remove themselves from it. | |
| 17 | Q.   (By Ms. Weaver)  Is there anywhere on the | |
| 18 | platform that -- well, strike that. | |
| 19 | Let's move on. | |
| 20 | You identified two subcategories of | 10:55:08 |
| 21 | detailed targeted advertising. | |
| 22 | One was interests and the second was | |
| 23 | behavioral, correct? | |
| 24 | A.   Behaviors, yes. | |
| 25 | Q.   Behaviors. | 10:55:18 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | What do you mean by behaviors? | 10:55:19 |
| 2 | A.   Behaviors are -- are targeting options | |
| 3 | based on activity on Facebook that indicate -- that | |
| 4 | are -- are closer to things like people's intent to | |
| 5 | purchase.  Their -- the way they interact with | 10:55:33 |
| 6 | commercial entities.  So are they often -- are they | |
| 7 | game -- gamers. | |
| 8 | And so behavior clusters are -- are just | |
| 9 | slightly different from interests which are more | |
| 10 | topic-based. | 10:55:46 |
| 11 | Q.   And how does Facebook infer intent? | |
| 12 | A.   Similar to -- to interest.  It's based on | |
| 13 | activity. | |
| 14 | So as an example, if I consistently click | |
| 15 | on an ad, I am more likely to click on future ads. | 10:56:00 |
| 16 | We would consider my behavior to be different from | |
| 17 | someone who never engages with one. | |
| 18 | Q.   Can you explain the difference between a | |
| 19 | behavior and an interest, in terms of -- | |
| 20 | MR. BENJAMIN:  Objection -- | 10:56:23 |
| 21 | Q.   (By Ms. Weaver)  -- how Facebook makes | |
| 22 | the determination for a user? | |
| 23 | MR. BENJAMIN:  Objection to form. | |
| 24 | THE DEPONENT:  I think what you're asking | |
| 25 | is how do we wire these two separate things; is | 10:56:35 |

Page 115

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    that --                                              10:56:40

 2        Q.   (By Ms. Weaver)  I'm just asking what the

 3    difference is between them.

 4        A.   So the difference is that interests are

 5    topic-based; whereas, behaviors are more             10:56:46

 6    activity-based and we're categorizing the activity

 7    more so than the topic of the engagement.

 8        Q.   Aren't the topics derived from activity?

 9        A.   Yes, they -- they are derived from

10    activity, but our -- how we have categorized it.     10:57:01

11        So as an example here, an interest could

12    be that I engaged with many pages about interior

13    design.  We'll use that example again, which I'm --

14    is a silly one.  And so I -- I'm interested in

15    interior design because I consistently engaged with  10:57:21

16    pages about it.

17        A behavior could be that I have -- I

18    often will buy something online.  So I click and I

19    buy something.  And so I have an intent to buy

20    things, regardless of what the topic was of what I   10:57:38

21    was buying.

22        It's how we've tried to distinguish

23    those.  They represent different dimensions of

24    people's activity and also different dimensions of

25    what -- how an advertiser might want to define       10:57:50
```

Page 116

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    their audience topic-based and behavior-based.        10:57:53

2        Q.   And are there categories of behaviors

3    that Facebook uses to define users to make

4    available for advertising?

5            MR. BENJAMIN:  Objection to form.          10:58:07

6    Misstates.

7            THE DEPONENT:  There's the -- the

8    targeting options are our categories of behaviors.

9        Q.   (By Ms. Weaver)  And what are those

10   targeting options?                                  10:58:20

11       A.   There's a number.  So I think I used a

12   gamers example.  They're all available in ads

13   manager as behaviors.

14       Q.   And currently, how many behaviors are

15   there?                                              10:58:34

16       A.   There's several hundred.

17       Q.   And when were behavior targeting options

18   first implemented at Facebook?

19       A.   I think a clarification here, which is

20   that the categorization, like those have been how   10:58:52

21   we've bucketed these over time.  Any individual

22   option may have been added later or earlier.  So I

23   think these came to be kind of this type of

24   targeting about 2010, perhaps a little bit earlier.

25       Q.   And who specifically was involved in the   10:59:14

                                                   Page 117

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    development of behavior targeting?                 10:59:17

 2         A.   Our ad product teams and their

 3    cross-functional team.

 4         Q.   Can you identify anyone by name who was

 5    involved in the development of behavior targeting?  10:59:29

 6              MR. BENJAMIN:  Objection to form and

 7    scope.

 8              THE DEPONENT:  Not any one individual.

 9              This is something -- again, it's like

10    been -- been iterated on and evolved over many      10:59:41

11    years by a very large product team.

12         Q.   (By Ms. Weaver)  And who's responsible

13    for it today?

14         A.   Our ads product team.

15         Q.   And who by name in ads products is        10:59:52

16    responsible for the development of behavior

17    targeting?

18         A.   The head of our ad targeting team is

19    George Kamps.

20         Q.   And how long has he held that position?   11:00:07

21         A.   Several years.  I -- I don't know the

22    exact date.

23         Q.   And do you know who held the position

24    before him?

25         A.   He's been involved for a while.  I -- I   11:00:20
```

Page 118

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    don't know the predecessor before.  I'm not sure if        11:00:24

 2    there was a specific one team or if it was ads

 3    product, which is an org that does this.

 4         Q.   How does Facebook create the targeting

 5    opt in options in behavior targeting?                       11:00:41

 6              MR. BENJAMIN:  Objection to form.

 7    Misstates.

 8              THE DEPONENT:  We create those based on

 9    people's activity.

10         Q.   (By Ms. Weaver)  Can you explain what you         11:00:59

11    mean?

12         A.   I mean that when someone -- specific

13    activity on the platform will associate someone

14    with one of those defined behavior clusters.

15         Q.   You previously testified that for                11:01:13

16    interest-based advertising a component was demand

17    for the -- the interest.

18              Do you recall that?

19         A.   Are you being specific to advertiser

20    demand or the --                                           11:01:25

21         Q.   Yes.

22         A.   -- fact that we've seen users engage with

23    that content --

24         Q.   Right.

25         A.   -- because --                                    11:01:29
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   I'm trying to distinguish both.                11:01:30

 2             So the question is, for behavior

 3   targeting options, did Facebook also consider

 4   whether demand by advertisers was high?

 5             MR. BENJAMIN:  Objection to form.              11:01:43

 6             THE DEPONENT:  Across the board, we would

 7   look at things like the market demand and industry

 8   standards to indicate what are areas that would be

 9   useful tools.

10        Q.   (By Ms. Weaver)  How does Facebook assess      11:01:57

11   market demand and industry standards?

12        A.   We can look at other ad products and

13   understand how those function and what they offer.

14   We had -- we can discuss with -- we can have

15   discussions with people who use our tools and         11:02:14

16   understand where there's a gap.

17        Q.   And when you say "discussions with people

18   who use our tools," you mean advertisers?

19        A.   Advertisers.  Ad agencies.

20        Q.   And just for the record, what is --            11:02:27

21   strike that.

22             You've defined what an advertiser is, as

23   somebody who places an ad essentially on Facebook;

24   is that fair?

25        A.   Uh-huh.                                        11:02:40
```

                                              Page 120

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1       Q.   So an advertiser could also be an app or        11:02:41

2   an app developer, or even Facebook, under that

3   definition, as long as it's somebody who placed an

4   ad on Facebook, right?

5            MR. BENJAMIN:  Objection to form.              11:02:54

6            THE DEPONENT:  So if -- if a developer

7   has an app and they want to advertise, and they

8   create and buy an ad, I would consider them an

9   advertiser.

10       Q.   (By Ms. Weaver)  Have you used or heard        11:03:11

11   use of the word "partner" at Facebook?

12            THE DEPONENT:  Like a capital P partner

13   in a sense of --

14       Q.   (By Ms. Weaver)  Yes.

15       A.   -- like a designated title --                 11:03:23

16       Q.   Yeah.

17       A.   -- or what do you mean?

18       Q.   Like facebook partners.  If somebody

19   said, "Oh, this is one of Facebook's partners,"

20   would you know what that means?                        11:03:29

21       A.   Yeah.  Colloquially that often means --

22   like when we're using it, it often means that

23   someone is an advertiser.

24       Q.   Okay.  When targeting options for

25   behavioral advertising was launched, on or around     11:03:52

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    2010, how many categories were there?                    11:03:55

2         A.   I don't know the initial size.

3         Q.   Do you know -- again, can you describe

4    the growth over time or decrease over time?

5         A.   It -- it would have been several hundred      11:04:06

6    thousand -- oh, sorry.

7              Specific to behaviors?

8         Q.   Yeah.

9         A.   That would have been several hundred,

10   maybe -- maybe a couple thousand.  It was a smaller      11:04:16

11   number.  And that's -- that's -- it -- it is

12   similar now as several hundred.

13             But, again, both with like -- as we've

14   iterated our product, we have both added in and

15   removed.                                                 11:04:31

16        Q.   And how would one create a summary or

17   overview of the kinds of behavioral targeting

18   options that have been available at Facebook over

19   time?

20             MR. BENJAMIN:  Objection to form.             11:04:47

21             THE DEPONENT:  There would be -- do you

22   mean at like -- a category-by-category type of --

23             (Simultaneously speaking.)

24        Q.   (By Ms. Weaver)  Just -- yeah, an

25   identification of, you know, roughly from years          11:05:03

                                                  Page 122

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    2010 to 2014, here's a list of behavioral targeting      11:05:05

2    options that existed at some point.

3         A.   Yeah.  As I was saying, because the

4    system has evolved over time, I don't think that

5    there is a high accurate -- or high accuracy way        11:05:18

6    to -- to reconstruct that.

7              It would have to be an effort to

8    understand maybe like this launched at this point

9    so we generally understand that these were the

10   types of segments that were available or were          11:05:32

11   deprecated.  So as an example when partner

12   categories were deprecated, we know they weren't

13   available in 2019 because they were deprecated in

14   2018.

15        Q.   What did you mean by the word "segment"       11:05:45

16   when you said it?

17        A.   That -- so apologies.

18             Interchangeable with a specific cluster

19   or option within behaviors.

20        Q.   What's a cluster or an option?               11:05:55

21        A.   And I can choose a specific word here

22   whatever -- and I'll stick with that one.  But it's

23   for -- when you -- an advertiser goes in and

24   selects within the menu of options the one they

25   have selected.  So I'll -- I'll use option moving      11:06:13
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    forward.  And it's the same thing as a specific        11:06:16

 2    interest is one option.  A specific behavior

 3    segment is one option.

 4         Q.   And what are the specific kinds of

 5    behaviors that are the data points used to create       11:06:31

 6    targeting options?

 7         A.   So we take -- to clarify, we take

 8    activity on Facebook.  The information people

 9    provide us.  And that can associate -- and that is

10    how they become associated with a behavior option      11:06:50

11    that then is also a targeting parameter for

12    advertisers to select.

13         Q.   And what specific activity on Facebook?

14         A.   Like I was saying, it could be page or

15    ads interactions.  Information they provide us on       11:07:05

16    their profile.  The way they engage with specific

17    types of content.  So if they consistently click,

18    as an example, or if they're -- they don't click.

19    If they're -- those are some examples of activity.

20    But it's how people interact on the platform.          11:07:22

21         Q.   Does it include how they interact with

22    their friends?

23              MR. BENJAMIN:  Objection to form.  Vague.

24              THE DEPONENT:  I'll give an example

25    because I think that might help ground.  And you        11:07:42
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    can let me know if that's close to what you're --        11:07:44

 2    what you mean.

 3            We -- an example of something people

 4    provide us in their profile is their hometown and

 5    they -- we also -- they also can say their              11:07:55

 6    family -- a relationship.  So they can say I am

 7    a -- I'm engaged or I'm in a relationship.

 8            We could know from that information that

 9    they are in a relationship.  And that would be

10    what -- a type of targeting we offer.  So that's an    11:08:13

11    example.

12            I'm not sure if that gets quite at what

13    you meant by friends interactions, where if you say

14    I am engaged, you might also list who you're

15    engaged to.  That is a connection between people       11:08:23

16    and is something we use for ads.

17        Q.   (By Ms. Weaver)  Yeah.  So you identified

18    two categories.  You said one activity and two info

19    they provide.  I wasn't asking about info they

20    provide.  You just discussed it so set that aside.     11:08:39

21            I'm asking very specifically, what

22    activity on Facebook does Facebook use to create

23    the targeting options for behavioral advertising?

24            MR. BENJAMIN:  Objection to form.

25    Argumentative.                                          11:08:56
```

                                                    Page 125

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   (By Ms. Weaver)  It's not just limited to      11:08:58

 2   groups or pages, is it?

 3        A.   It's not.  And I --

 4             MR. BENJAMIN:  Sorry, Bella.

 5             Objection to form.                              11:09:04

 6             THE DEPONENT:  It's not.  Another example

 7   and another type of activity is how someone engages

 8   on the platform.  For example, they set a -- a life

 9   event or they update their relationship status.

10        Q.   (By Ms. Weaver)  Does it include whether       11:09:24

11   or not, for example, they respond to certain kinds

12   of content posted by friends?

13             MR. BENJAMIN:  Objection to form.  Vague.

14             THE DEPONENT:  Yes.

15        Q.   (By Ms. Weaver)  Does it include, for          11:09:40

16   example, how often they use Facebook Messenger?

17        A.   The -- the -- again, similar to whether

18   or not -- like if you have ever used Facebook

19   Messenger, yes, could be something we use for ads.

20        Q.   Does it include the content of users'          11:10:01

21   posts?

22        A.   In Messenger or generally?

23        Q.   Both.

24        A.   Like I said before --

25             MR. BENJAMIN:  Objection to form.              11:10:15
```

Page 126

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | THE DEPONENT:  -- we don't use content in | 11:10:16 |
| 2 | message threads for ads.  On posts, the content -- | |
| 3 | for example, if I -- if I post to a page that could | |
| 4 | be used, if I engage with posts and the content of | |
| 5 | those posts could be used, yes. | 11:10:36 |
| 6 | Q.   (By Ms. Weaver)  And that's without | |
| 7 | regard to whether or not that content was marked | |
| 8 | private or public, correct? | |
| 9 | MR. BENJAMIN:  Objection to form.  Asked | |
| 10 | and answered.  Vague. | 11:10:46 |
| 11 | THE DEPONENT:  We don't have a | |
| 12 | distinction in that manner of public versus | |
| 13 | private.  That's not -- that doesn't quite | |
| 14 | translate into our product in that manner. | |
| 15 | Q.   (By Ms. Weaver)  And that's true for the | 11:11:00 |
| 16 | class period for the target options for behavioral | |
| 17 | advertising, correct? | |
| 18 | MR. BENJAMIN:  Objection to form. | |
| 19 | THE DEPONENT:  Yes. | |
| 20 | Q.   (By Ms. Weaver)  And you've identified | 11:11:15 |
| 21 | two categories.  Users' activity -- well, strike | |
| 22 | that. | |
| 23 | Other than the content of Facebook | |
| 24 | Messenger, is there any other activity on Facebook | |
| 25 | that users engage in that is not used for the | 11:11:29 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    creation of targeting options for behavioral          11:11:33

2    targeting?

3            MR. BENJAMIN:  Objection to form.

4            THE DEPONENT:  I -- I -- I'm not sure

5    there's a way to categorize all of the data we         11:11:50

6    don't use.  I -- I'm -- we can -- like discussing

7    the activity that is used, I don't know the full

8    extent of our entire product and all the data we

9    have to define what we don't use.

10       Q.   (By Ms. Weaver)  But as you sit here           11:12:10

11   today, you can't think of another category, other

12   than the content of Facebook messages, that is

13   categorically not used for behavioral targeting; is

14   that fair?

15           MR. BENJAMIN:  Objection to form.            11:12:23

16           THE DEPONENT:  No.  Another example is

17   when someone enters a security phone number, we do

18   not use that for ads.

19       Q.   (By Ms. Weaver)  Okay.  Anything else?

20       A.   Not that I can come up with off -- off        11:12:37

21   the cuff.  Again, like it's tough to think of

22   all -- potentially all activity and then carve it

23   out.  I know what we do use for ads, which I've

24   described.

25       Q.   Now, you've described -- so other than         11:12:52

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    activity, and other than the information that users          11:12:54

2    provide in sign-up, for example, is there any other

3    data that Facebook uses to create behavioral

4    targeting options?

5          A.   So over this period -- I think we're            11:13:12

6    familiar with partner categories.  That's -- those

7    were created with data broker information.

8               We -- there's also activity off of

9    Facebook.  So for -- from apps and websites, which

10   could be used for -- could be used in a -- a            11:13:30

11   targeting option.

12         Q.   Anything else you can think of?

13         A.   No.  I mean, those are the classes of

14   data that -- or the categories of data that we use.

15         Q.   How does Facebook use users' activity off      11:13:44

16   of Facebook to create targeting options used to

17   target users by third parties?

18         A.   When we were discussing custom audiences,

19   this is an example of that.  So an -- our business

20   tools, a website owner and an app owner can use        11:14:04

21   those tools to send information to Facebook about a

22   visit to their website.  That information can help

23   them then reach back out to people who've already

24   visited their website.  And we use it also to

25   personalize ads.                                       11:14:24

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1      Q.   Okay.  That's custom audiences.                11:14:25

2           You said behavioral targeting is in a

3      different bucket, right?

4      A.   Apologies.

5           Behaviors are a specific targeting option       11:14:33

6      we provide.  Behavioral targeting is often used as

7      a way to describe overall personalization.  It

8      sounds like -- I was responding to the second.

9           For behaviors, we also have used offsite

10     engagement in those.  That -- over -- over the       11:14:47

11     course of this period.  It could be very similar to

12     the options -- to -- to what I was saying about if

13     you consistently purchase on -- online, that could

14     be something that informs one of those options.

15     Q.   And does Facebook collect the information       11:15:05

16     about users' off-platform activity through the use

17     of cookies or other trackers?

18          MR. BENJAMIN:  Objection to form and

19     scope.

20          THE DEPONENT:  For -- for ad use, we base       11:15:27

21     it off of the use of our business tools.  So our

22     Pixel and app SDK.

23     Q.   (By Ms. Weaver)  And for the record, what

24     is Pixel?

25     A.   Pixel is a cookie that is placed on a           11:15:42

Page 130

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    website that communicates information back to        11:15:45

 2    Facebook by the website owner.

 3         Q.   And when was Pixel first in use?

 4         A.   20- -- for ads, 2014.

 5         Q.   Was it in use not for ads prior to that?   11:15:59

 6         A.   It was.  It was something --

 7              MR. BENJAMIN:  Objection -- objection to

 8    form and scope.

 9              THE DEPONENT:  It was something that

10    launched prior to that.  But use for ads was in      11:16:10

11    2014.

12         Q.   (By Ms. Weaver)  And do you know what it

13    was used for prior to being used for ads?

14              MR. BENJAMIN:  Objection to scope.

15              THE DEPONENT:  It was used for website      11:16:25

16    owners to do analytics and understand more about

17    how their website was functioning.

18              I don't know more generally how -- or --

19    or in other specifics of how it was used.

20         Q.   (By Ms. Weaver)  And Pixel is in use       11:16:44

21    today; is that right?

22         A.   Yes.  Correct.

23         Q.   And you referred to app SDK; is that

24    right?

25         A.   Yes.                                        11:16:56
```

                                                   Page 131

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   What is that?                              11:16:57

 2        A.   Similar.  It's a way for a developer or

 3    an app owner to provide information back to

 4    Facebook about specific events in their app.

 5        Q.   And what specific kinds of information do  11:17:19

 6    Pixel and app SDK communicate about users'

 7    off-platform activity that is then used to target

 8    them in behavior part of the options?

 9             MR. BENJAMIN:  Objection to form.

10             THE DEPONENT:  So a -- a -- it -- the --   11:17:39

11    I'm going to answer this in terms of how Pixel

12    functions.  And I think that is --

13        Q.   (By Ms. Weaver)  Okay.

14        A.   -- is probably what we're getting to.

15             The -- when -- the way a Pixel works is    11:17:58

16    that the business tool -- or the -- the person

17    who's using our business tool.  So the website

18    owner sets it up and they translate back to us

19    contact information and event data.

20             The contact information is an identifier   11:18:14

21    which helps us understand who took that action and

22    we hash and match that on our platform.

23             The event is about a check-out, like

24    they -- they choose what -- what event they're

25    hoping to -- to have the Pixel transmit back.  That 11:18:29
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    could be something like they went to our menu.          11:18:34

2    They looked at our hours of operation.  They

3    added -- added something to the cart, checked out.

4         We would receive both of those.  And the

5    event information is what helps us understand the       11:18:46

6    activity and could help personalize an ad.

7         Q.  So for example, if somebody goes onto a

8    website and puts something in a cart but doesn't

9    check out, does Facebook still receive the

10   information about what was sitting in the cart?         11:19:00

11        MR. BENJAMIN:  Objection to form.

12        THE DEPONENT:  There are different

13   concepts.  The website owner has sent us

14   specifically an add-to-cart event.  They could

15   separately send us a check-out event.  Those are --     11:19:15

16   are distinct.

17        Q.  (By Ms. Weaver)  Okay.  But the answer

18   is, yes, Facebook could receive the information

19   about what was sitting in the cart but not

20   purchased; is that right?                               11:19:25

21        MR. BENJAMIN:  Objection to form.

22   Misstates.

23        THE DEPONENT:  It is not about

24   understanding the -- the -- the flow, and all of

25   the purchases.  It's about the event that the           11:19:38

Page 133

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1   website owner chooses to send back and the                11:19:40

2   information they include and sending that back to

3   us.

4        Q.   (By Ms. Weaver)  Okay.  And I'm being

5   very granular.  But one of the events that              11:19:48

6   advertisers choose to send back is whether or not

7   something is sitting in a cart, but did not check

8   out; isn't that true?

9        MR. BENJAMIN:  Objection to form.

10       THE DEPONENT:  It's -- it's not that             11:20:03

11  they're sending us back didn't check out.  They're

12  sending us back that someone added something to the

13  cart.  It's a moment -- an event that is triggered,

14  not a subtraction of then whether or not check-out

15  happened.                                               11:20:18

16       Q.   (By Ms. Weaver)  I understand.  We're

17  getting lost a little bit in semantics.

18       A.   Okay.

19       Q.   Let me ask it this way.

20            If I looked up my profile at Facebook and   11:20:24

21  had the internal tools, could I see instances of

22  where I had items in my cart but they weren't

23  purchased?

24            MR. BENJAMIN:  Objection to form.

25            THE DEPONENT:  Can you clarify what you      11:20:38

Page 134

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1     mean your -- your profile and internal tools.          11:20:39

2          Q.   (By Ms. Weaver)  Okay.  For -- let me

3     just ask this.

4               Does Facebook possess information about

5     users that would reflect instances where something     11:20:53

6     was sitting in their cart but not purchased?

7               MR. BENJAMIN:  Objection to form.

8               THE DEPONENT:  Not in the way that I

9     think you've conceptualized it --

10         Q.   (By Ms. Weaver)  Okay.                        11:21:07

11         A.   -- which is that there is a -- this item

12    was or was not purchased on a website.

13              We know if someone specifically -- if --

14    if a website owner passed us back Pixel, that the

15    check-out Pixel was fired, we would know that.          11:21:20

16              If the information passed back to us was

17    that the add-to-cart Pixel was fired, we would know

18    that.  It's --

19         Q.   Okay.  That's all I was asking.  Like --

20    okay.  That's good.                                     11:21:34

21              Does Facebook inform users which third

22    parties are collecting information about them of

23    their off-platform activity through Pixel and app

24    SDK?

25              MR. BENJAMIN:  Objection to form and          11:22:10

Page 135

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    scope.                                          11:22:10

 2            THE DEPONENT:  The Pixel and app SDK and

 3    the -- and the -- the -- and the websites and apps

 4    that use those are shown to people in OFA, which is

 5    our off Facebook activity tool.                 11:22:29

 6        Q.   (By Ms. Weaver)  Are all of them in OFA?

 7        A.   This is a little bit outside of ads.  So

 8    yes, my understanding is that they are.  But not my

 9    expertise.

10        Q.   And how long has OFA been functional?    11:22:46

11            MR. BENJAMIN:  Objection to form.

12            THE DEPONENT:  I -- I believe we launched

13    OFA -- my personal recollection is that we launched

14    it between 2016 and 2018.  But, again, somewhat

15    outside the scope of ads.                       11:23:12

16        Q.   (By Ms. Weaver)  Okay.  So we've now

17    identified three categories of data that can be

18    used to create the targeting categor- -- or options

19    in behavior advertising and that is, activity on

20    Facebook, information users provide and           11:23:27

21    off-platform activity.

22            Is there any other category of data not

23    included that we should be discussing?

24        A.   No.

25        Q.   Okay.  Once Facebook has the data, how    11:23:39
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1   does it create the inference of an intent or a          11:23:45

 2   behavior?

 3            MR. BENJAMIN:  Objection to form.

 4            THE DEPONENT:  So I think what's

 5   important to understand here is what we're trying        11:24:03

 6   to do is understand if someone's previous

 7   engagement or interest or behavior would predict

 8   their future engagement or interest in behavior.

 9            So to draw that out, that line pretty

10   clearly, if I consistently click on ads, we said        11:24:19

11   that would be an indication to us that I am likely

12   to click on ads.

13            So that is an example of where we are

14   taking someone's previous behavior to -- to

15   understand their future behavior.  It --             11:24:36

16   it's based -- it -- I think that answers your

17   question, just in terms of, it's not that it's like

18   a labeling exercise.  It is a question of you --

19   you've previously engaged in this way and that

20   helps us understand how you might engage in the         11:24:53

21   future.

22       Q.   (By Ms. Weaver)  Is Facebook using

23   algorithms to predict the future behavior?

24            MR. BENJAMIN:  Objection to form.

25            THE DEPONENT:  Our ad delivery does        11:25:05
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    include algorithms.  They are machine learning          11:25:06

2    classifiers that help us estimate people's future

3    behavior.

4         Q.   (By Ms. Weaver)  What is --

5              (Court Reporter asks for clarification.)      11:25:20

6         Q.   (By Ms. Weaver)  What is machine

7    learning?

8         A.   Machine learning is a form of

9    programmatically -- at least in the context of

10   ads -- of programmatically creating this               11:25:31

11   prediction.  So within our ad delivery, we base it

12   on people's activity to understand their future

13   potential engagement.

14        Q.   And is this kind of analysis logged at

15   Facebook with regard to users?                         11:25:47

16        A.   Can you explain what you mean by "this

17   analysis."

18        Q.   Right.

19             You engage in a purchase and the

20   algorithm says it means that you're likely to          11:26:03

21   engage in a different kind of purchase in ten

22   minutes.

23             Is that logged somewhere, that

24   prediction?

25             MR. BENJAMIN:  Objection -- objection to      11:26:13

                                                            Page 138

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    form.                                              11:26:14

 2            THE DEPONENT:  We -- so I think there are

 3    a few -- a few important pieces.

 4            Machine learning takes into account --

 5    it's not a one-to-one deterministic rule, which is  11:26:25

 6    why it's machine learning.

 7            And so it's taking into account your

 8    activity and -- and that helps us develop the -- in

 9    this example, let's -- we call it the estimated

10    action rate, which is whether or not you will        11:26:42

11    engage in the way -- in -- in an ad.

12            We log the -- the activity that's feeding

13    into it, because that's just the activity that we

14    have anyway and we -- we know which ad we showed

15    someone.  So we know the output.                     11:27:07

16       Q.  (By Ms. Weaver)  Let's talk about the

17    output.

18            Facebook makes a prediction.  What does

19    it do with that prediction?

20            MR. BENJAMIN:  Objection -- objection to     11:27:31

21    form.

22            THE DEPONENT:  I think it's helpful to

23    maybe expand to ads.

24            So advertiser creates the ad.  They give

25    us the content.  They set the parameters for their   11:27:39
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    audience and their bid.  The bid is how much they        11:27:42

 2    are willing to pay to show that ad.

 3              We then move it into our ad ranking or

 4    the optimization portion where we take the eligible

 5    audience and we say who -- which ad should Bella         11:27:55

 6    see.

 7              In order to determine that, we're --

 8    we're using the total value equation and that is

 9    the bid from the advertiser, the estimated action

10    rate that I will actually want to see this and          11:28:10

11    engage with this ad and the ad quality.  Those are

12    the machine learning components.

13              And then the output is whether -- which

14    ad we -- they -- I'm shown of all the ads that I'm

15    eligible to see in that moment.                         11:28:24

16         Q.   (By Ms. Weaver)  So does Facebook log

17    which ads a specific user is shown?

18         A.   Yes.

19         Q.   And when did Facebook start logging what

20    ads a specific user is shown?                           11:28:39

21         A.   I believe that we have -- have -- we

22    have -- in -- we have logged that since we started

23    to show ads.

24         Q.   Which was in 2007, right?

25         A.   Yes.                                          11:29:01
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   And does Facebook link the advertisement        11:29:02

 2   shown to a specific user and also log the behavior

 3   that triggered the ad?

 4             MR. BENJAMIN:  Objection to form.

 5             THE DEPONENT:  What I was saying before          11:29:17

 6   is, it's not a one-to-one relationship.  It's not a

 7   singular behavior.  And so there wouldn't be a one

 8   trigger to log with that.

 9        Q.   (By Ms. Weaver)  Is there -- are there

10   logs that reflect series of activities that also          11:29:31

11   correlate in time to the ads Facebook is showing

12   them?

13             MR. BENJAMIN:  Objection to form.

14             THE DEPONENT:  Again, the assumption is

15   that there's like a -- a separate set of activity         11:29:44

16   from what just -- what we use for ads as people's

17   activity.  And then that is how our machine

18   learning determines if this would be of interest

19   and then determines the ad to show.

20             It's not that there is like cherry-picked       11:30:02

21   activity that would -- is a one-to-one relationship

22   with showing any given ads.  So that's not -- that

23   doesn't reflect how machine learning works in order

24   to log it in that manner.

25        Q.   (By Ms. Weaver)  Right.  I understand.          11:30:17
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1              I mean, what I'm trying understand,         11:30:18

2       though, at some point machine learning is learning

3       and it's saying this activity predicts X, right?

4              MR. BENJAMIN:  Objection to form and

5       scope.                                             11:30:30

6              THE DEPONENT:  Do you mean a specific

7       activity or Bella has -- has -- this is -- these

8       are Bella's interactions over time, and we think it

9       means that this would be an ad of interest.

10         Q.   (By Ms. Weaver)  Exactly.                  11:30:43

11         A.   Right.

12              So, again, we know activity that is

13      logged.  We know which ads I -- I have -- we know

14      the targeting of ads.  And then we know the ad I'm

15      shown.  So we know the output.                     11:30:54

16         Q.   So the question is, does Facebook

17      maintain any kind of record -- record or log of, in

18      a given time period, these are the activities and

19      these are the ads?

20         A.   We maintain records of people's activity    11:31:09

21      and we maintain records of -- or we -- we store the

22      ads people are shown.

23         Q.   And doesn't Facebook also maintain some

24      kind of record of the special sauce that gets them

25      from A to B?                                        11:31:24
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1            MR. BENJAMIN:  Objection to form.          11:31:27

 2            THE DEPONENT:  I think that is what I

 3    described.  There isn't a way to -- like there

 4    isn't storage of a specific trigger because that's

 5    not how machine learning works.                    11:31:40

 6       Q.  (By Ms. Weaver)  Right.  I understand

 7    what you're saying.

 8            I'll come back to that.

 9            Where are the logs that you just

10    described with regard to the activity in the ads    11:31:52

11    maintained?

12       A.  Ads people see is something that we store

13    ███████   People's activity is also something we

14    store ██████

15       Q.  Is it stored anywhere else?               11:32:06

16            MR. BENJAMIN:  Objection to form.  Vague.

17    Compound.

18            THE DEPONENT:  The ads information is

19    stored ██████.  That's the database that -- that

20    holds it.  And that's the same for the activity.   11:32:21

21    There -- other -- other systems might read from it.

22            So for example, to render ads reporting.

23    In ads manager, we would read from -- from those

24    databases.

25       Q.  (By Ms. Weaver)  Are you familiar with     11:32:40
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    the Download Your Information tool?                    11:32:40

 2         A.   I'm familiar that it exists, and we

 3    provide access to information there.

 4         Q.   Does it read from these tables ████,

 5    do you know?                                           11:32:55

 6         A.   I --

 7              MR. BENJAMIN:  Objection -- objection to

 8    form and scope.

 9              THE DEPONENT:  Unfortunately, I don't

10    know that as part of -- of my ads expertise.          11:33:02

11              MS. WEAVER:  Okay.  I think we can

12    take our -- a break now.

13              Let's go off the record.

14              THE VIDEOGRAPHER:  Okay.  We're off the

15    record.  It's 11:33 a.m.                              11:33:28

16              (Recess taken.)

17              THE VIDEOGRAPHER:  We're back on the

18    record.  It's 12:24 p.m.

19         Q.   (By Ms. Weaver)  Hi, Ms. Leone.  Did you

20    have a good lunch?                                     12:24:23

21         A.   I did.  Thank you.

22         Q.   Or lunch equivalent.

23              I'm going to show you what we've marked

24    as -- uh-oh -- Exhibit -- give me a moment -- 656.

25    /////
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              (Exhibit 656 was marked for              12:24:39

 2      identification by the court reporter and is

 3      attached hereto.)

 4          Q.   (By Ms. Weaver)  And while we're waiting

 5      for it to load, do you recall when ad preferences   12:24:43

 6      was created, so that users could see what -- or try

 7      to control what ads were presented to them?

 8          A.   Ad preferences launched in 2014.

 9          Q.   Okay.  I see.

10               Okay.  Do we have Exhibit 656 up?        12:25:17

11          A.   Yes, I have it up.

12          Q.   And looking at Exhibit 656, do you know

13      what it is?

14          A.   It is a Newsroom blog post from 2019

15      announcing additions to some of our transparency   12:25:38

16      interfaces.

17          Q.   So what is a Newsroom blog post?

18          A.   A Newsroom blog post -- Newsroom is what

19      we call the portion of our website where anyone can

20      navigate on the Internet that we make              12:25:57

21      announcements.

22          Q.   And looking at Exhibit 656, you see that

23      it bears a date of July 11th, 2019?

24          A.   Yes.

25          Q.   Why did you review this particular        12:26:13
```

                                           Page 145

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    document?                                                12:26:16

2            MR. BENJAMIN:  Objection to form.

3            THE DEPONENT:  This is part of our

4    evolution of the tools around ads targeting and ads

5    ranking.  In this case, the transparency tools.          12:26:29

6    And so I wanted to be sure that I understood what

7    had changed in this moment.

8            And if I -- do you mind if I take a

9    moment and --

10       Q.   (By Ms. Weaver)  Of course.                     12:26:40

11       A.   -- make sure that --

12       Q.   Yeah.

13       A.   Sorry.

14           Yeah, this was -- these were updates to

15   WAIST.  And as part of prep, I was reviewing many         12:27:02

16   of the updates we've made and -- and generally

17   understanding where -- when those were.

18       Q.   So this disclosure does not relate to ads

19   sent to users because of behavioral targeting

20   actions, right?                                           12:27:24

21           MR. BENJAMIN:  Objection to form.

22           THE DEPONENT:  Can you clarify when you

23   say "behavioral," what -- what you mean?

24       Q.   (By Ms. Weaver)  Okay.  With respect to

25   data sources that are bases of the information           12:27:36

                                              Page 146

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    that's used for ad interest, and then there's a          12:27:40

2    different dataset that is the source for behaviors,

3    correct?

4              MR. BENJAMIN:  Objection to form.

5    Misstates.                                               12:27:55

6              THE DEPONENT:  It sounds like you're

7    differentiating the activity more so than the fact

8    that it's just a separate set of options in the UI

9    for advertisers.  And that's meant to reflect how

10   they organize and how they can select their             12:28:10

11   audience.  And that's really the big distinction

12   between the two.

13        Q.   (By Ms. Weaver)  Okay.  Well, looking at

14   Exhibit 656 and turning to the page that's at --

15   ending in -945.                                          12:28:42

16        A.   Yes, I'm there.

17        Q.   And do you see it says "We're updating Ad

18   Preferences to show you more about businesses that

19   upload lists with your information."

20             Do you see that?                               12:28:58

21        A.   Yes.  Sorry.  I'm not sure if this is for

22   others as well.  That's actually on the -- -944 for

23   me.

24        Q.   I'm so sorry.  That --

25        A.   Okay.  I -- I just want to be sure I'm at      12:29:14

                                              Page 147

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    the right spot.                                   12:29:17

2         Yes, I see that.

3         Q.   So does Facebook provide businesses with

4    lists that they can upload with information about

5    users?                                            12:29:25

6         A.   No.

7         Q.   So what does this mean when it says

8    "We're also updating Ad Preferences to show you

9    more about businesses that upload lists with your

10   information"?                                     12:29:35

11        A.   This refers to custom audiences.  The

12   customer list form of custom audiences.

13        Q.   Okay.  And -- and so looking at

14   Exhibit 656, is this meant -- what -- what is the

15   purpose of this blog?                             12:29:49

16        A.   This was to --

17             MR. BENJAMIN:  Objection -- objection to

18   form.

19             THE DEPONENT:  This was to announce

20   updates to WAIST and ad preferences that would help   12:29:57

21   users understand when an advertiser has uploaded a

22   customer list in order to reach them with an ad.

23        Q.   (By Ms. Weaver)  Okay.  Well, look at the

24   page ending -943 --

25        A.   Yes.                                     12:30:13
```

                                              Page 148

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1          Q.    -- where it says "First, we'll show          12:30:14

2    people more reasons why they're seeing an ad on

3    Facebook.  In the past, 'Why am I seeing this ad?'

4    highlighted one or two of the most relevant

5    reasons, such as demographic information or that          12:30:24

6    you may have visited a website.  Now, you'll see

7    more detailed targeting, including the interests or

8    categories that matched you with a specific ad.  It

9    will also be clearer where that information came

10   from (e.g. the website you may have visited or Page       12:30:38

11   you may have liked), and we'll highlight controls

12   you can use to easily adjust your experience."

13          Do you see that?

14          A.    Yes.

15          Q.    So when it's referring to interest or        12:30:48

16   categories that match you with a specific ad, that

17   is referring to interest advertising, right?

18          MR. BENJAMIN:  Objection to form.  Vague.

19          THE DEPONENT:  So reading this blog post,

20   it's referring to the targeting options that are         12:31:06

21   under detailed targeting.  So interests targeting

22   options and -- and other categories which are the

23   other options within detailed targeting.

24          Q.    (By Ms. Weaver)  Okay.  And then a little

25   later, you've said that what -- on the next page,        12:31:20

Page 149

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    pages 4 and 5 of the document -- it discusses          12:31:24

 2    custom advertising; is that right?

 3            MR. BENJAMIN:  Objection to form.

 4    Misstates.

 5            THE DEPONENT:  It also notes that we're          12:31:34

 6    making an additional update to ad preferences, and

 7    that is related to customer lists.

 8        Q.   (By Ms. Weaver)  And why doesn't this

 9    document discuss the behavioral targeting -- the --

10    the targeting for behaviors that we spent so much       12:31:48

11    time discussing before the break?

12            MR. BENJAMIN:  Objection to form.

13    Mischaracterizes.

14            THE DEPONENT:  The -- so I didn't write

15    this blog post.  So the wording here -- I think         12:32:02

16    it's hard to speculate exactly how they drafted

17    this.

18            But that is what is meant by the more --

19    "you'll see more detailed targeting, including the

20    interests or categories that matched you with a         12:32:15

21    specific ad."

22            That includes those behaviors and

23    specifically the behaviors that the advertiser

24    chose when creating their desired audience.

25        Q.   (By Ms. Weaver)  Do you know why the word       12:32:31
```

Page 150

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | "behaviors" is not used in this disclosure? | 12:32:31 |
| 2 | MR. BENJAMIN:  Objection to form and | |
| 3 | scope. | |
| 4 | THE DEPONENT:  I -- I can't tell you how | |
| 5 | it was drafted this way.  But detailed targeting | 12:32:44 |
| 6 | interests or categories, we often talk about | |
| 7 | targeting as categories and this -- this aligns | |
| 8 | with that.  It doesn't use the -- the exact same | |
| 9 | nomenclature, but... | |
| 10 | Q.   (By Ms. Weaver)  Or the word "behavior." | 12:33:00 |
| 11 | Do you know if Facebook uses the word | |
| 12 | "behavior" in its privacy policy or data use | |
| 13 | policy? | |
| 14 | MR. BENJAMIN:  Objection. | |
| 15 | Q.   (By Ms. Weaver)  The -- the kinds of | 12:33:09 |
| 16 | inferences drawn about them based on their activity | |
| 17 | on and off the platform? | |
| 18 | MR. BENJAMIN:  Excuse me.  I didn't mean | |
| 19 | to interrupt.  I'm sorry. | |
| 20 | Objection to form and scope. | 12:33:17 |
| 21 | THE DEPONENT:  I don't know if the | |
| 22 | specific word is used.  But we do use that word. | |
| 23 | It's in our ad product when someone goes to create | |
| 24 | an ad. | |
| 25 | Q.   (By Ms. Weaver)  So you use it facing | 12:33:29 |

Page 151

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    advertisers, but not facing users; is that right?        12:33:30

 2         A.   Again --

 3              MR. BENJAMIN:  Objection to form.

 4              THE DEPONENT:   -- that's not quite right.

 5    I said I -- I don't know for certain if it's in our      12:33:38

 6    policy -- our -- our data policy.  But it is

 7    displayed to users in other transparency interfaces

 8    such as ad preferences.

 9         Q.   (By Ms. Weaver)  You're the -- you're a

10    privacy and policy manager -- is that right? -- and      12:33:52

11    you have been since 2019?

12         A.   Correct.

13         Q.   And what are your duties and

14    responsibilities?

15         A.   I work with our --                             12:34:00

16              MR. BENJAMIN:  Objection -- sorry.

17              THE DEPONENT:  Sorry.  That was my fault.

18              MR. BENJAMIN:  Objection to form and

19    scope.

20              You can answer.                                12:34:10

21              THE DEPONENT:  I work with our product

22    teams as they develop new products.  And we work to

23    ensure that those would -- would be in line with

24    what we think our privacy principles should be.

25    And also conversations we have with external groups      12:34:25
```

Page 152

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    and feedback generally about the products.                    12:34:28

2         Q.   (By Ms. Weaver)  And does that include --

3    do the products include behavior targeting?

4         A.   I cover ad targeting, yes.

5         Q.   Earlier you indicated that there might be      12:34:41

6    a difference in your mind between behavioral

7    advertising targeting and behavior targeting; is

8    that fair?

9         A.   I -- I think there's -- there's the

10   product of behavior operations that are in our       12:34:56

11   targeting tools.  So what we provide to advertiser.

12   I think there can be -- people use behavioral

13   targeting to speak generally about both

14   personalization, about the use of specifically

15   offsite data.                                          12:35:13

16           And so I think -- it's like capital B,

17   behavior, a thing we produce or we provide in our

18   tool versus the concept of behavioral targeting.

19   And that's the distinction I see.  But when we were

20   discussing it earlier, I think those got a little     12:35:29

21   bit mixed probably.

22        Q.   Okay.  And -- and what is OBA?

23        A.   OBA is closer to that, the second, it's

24   online behavioral advertising.  It is commonly

25   meant to mean use of -- of activity off of the        12:35:44

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    platform to inform advertising.                    12:35:49

 2         Q.   So is it fair to say that like OBA or

 3    behavioral -- behavioral advertising is an industry

 4    term of art.

 5             And when you've been talking about          12:35:59

 6    behavior, it's a specific Facebook product?

 7         A.   Yes.  It is a industry term of art.  When

 8    we were specifically talking about behaviors, the

 9    targeting options, I addressed those.  When we were

10    talking about how we use activity generally, it      12:36:15

11    would also relate to the industry term of online

12    behavioral advertising.

13         Q.   Okay.  And then what is political

14    targeting?

15             MR. BENJAMIN:  Objection to form.           12:36:33

16             THE DEPONENT:  Political targeting is

17    just the -- I guess I'm -- I might need to put that

18    back to you.

19             Are you thinking in the context of our

20    tools?                                               12:36:49

21         Q.   (By Ms. Weaver)  I'm just thinking, in

22    general, do you know what political targeting

23    means?

24             MR. BENJAMIN:  Objection to form and

25    scope.                                               12:36:57
```

Page 154

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  To me, that means the        12:36:59

 2   options we provide for advertisers to create their

 3   audience that are related to politics.

 4              MS. WEAVER:  Okay.  Well, why don't we

 5   mark Exhibit 3, because of the scope objection.        12:37:10

 6              And for the record, Exhibit 3 [sic] is a

 7   letter sent to me from Mr. Benjamin on

 8   July 29th, 2022.

 9              (Exhibit 657 was marked for

10   identification by the court reporter and is            12:37:27

11   attached hereto.)

12              MS. WEAVER:  And when it's up, I'll ask

13   you to turn to the second page, and I'll read into

14   the record when you have it up.

15              Do you have it available, Counsel?          12:37:38

16              MR. BENJAMIN:  Yes.

17        Q.   (By Ms. Weaver)  It says "Ms. Leone will

18   be prepared to discuss: The targeting and audience

19   selection options available to advertisers,

20   including with respect to political targeting          12:37:53

21   segments, which we understand to be of interest to

22   Plaintiffs."

23              Do you see that?

24        A.   Yes.

25              Sorry.                                      12:38:08
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1          Q.   Okay.  So what are political targeting          12:38:08

2     segment -- segments?

3          A.   It's what I was describing as the options

4     that we provide an advertiser to define their

5     audience.                                                 12:38:18

6               MS. WEAVER:  Okay.  So the scope

7     objection was meritless.

8          Q.   (By Ms. Weaver)  The -- what -- is there

9     a subset of political segmentation that Facebook

10    provides to advertisers?                                  12:38:31

11         A.   We've provided specific targeting

12    options.  And those are when -- I think maybe

13    segmentation here is interchangeable with options.

14    So there are a number of political targeting

15    options that we've provided to advertisers.               12:38:50

16         Q.   And what are they and how have they

17    changed over time?

18         A.   There were several phases.  So the

19    initial phase, from 2014 to 2018, was five

20    targeting options that were based -- that work --         12:39:07

21    were called like very liberal to very conservative.

22    And then we've had multiple phases since then.  One

23    phase which segmented those five into smaller or --

24    or more defined groups.

25               And then the latest phase that was -- we       12:39:27

                                                        Page 156

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1     introduced in 2018, which went back to five top        12:39:32

 2     level groups, and those were deprecated in 20- --

 3     2022.

 4          Q.   So going back to the segments from 2014

 5     to 2018, what were those five targeting options?        12:39:44

 6          A.   Very liberal, liberal, moderate,

 7     conservative and very conservative.

 8          Q.   And then you said there were -- there was

 9     a phase from 2018 to 2020; is that fair?

10          A.   Sorry.  I -- I think my -- I said 2022,       12:40:05

11     but -- so it was 2018 to 2022.  And it was the same

12     naming except it was likely to engage with.  And

13     there were new segments, likely to engage with,

14     very liberal content.  And then similar, likely to

15     engage with, liberal content.  Likely to engage        12:40:24

16     with, moderate content.  Likely to engage with,

17     conservative content.  Likely to engage with, very

18     conservative content.  And those were 2018 to 2022.

19          Q.   And why were the words "likely to engage

20     with" added to the segments?                            12:40:38

21          A.   It was a representation of how those

22     segments changed.  The naming was to reflect how we

23     developed those.

24          Q.   How did the segments change?

25          A.   ███████████████████████████████              12:40:53
```

Page 157

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER



15      Q.    And you said it was deprecated this year;      12:41:49

16   is that correct?

17      A.    In 2022, yes, March.

18      Q.    In March.

19            Why?

20      A.    We announced last year that we were      12:41:57

21   deprecating a series of targeting options including

22   these.  That we were -- we had had many discussions

23   over multiple years, and we felt that these no

24   longer met people's evolving expectations.

25            It was something that we did with -- work      12:42:14

                                                    Page 158

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    with advocacy groups and others to identify and          12:42:16

2    then phase out from our targeting system.

3         Q.   What expectations did it not meet?

4         A.   From our conversations, these -- these

5    were areas that people may perceive to be sensitive       12:42:33

6    and weren't ones that we wanted to continue to

7    support.

8         Q.   And when you say "sensitive," what do you

9    mean?

10        A.   I'm -- I'm using the words of -- of many        12:42:45

11   of the groups we spoke to.  They found that these

12   were areas that people found sensitive and --

13   and -- and we decided those -- those targeting

14   options would no longer meet people's expectations.

15   I can't tell you exactly what they meant by           12:43:04

16   sensitive.

17        Q.   But I'm just asking what Facebook means

18   by sensitive?

19        A.   We don't take that as a definition.  It's

20   that we understood people perceived these to be         12:43:16

21   sensitive and -- and choose to -- to not support

22   them any longer.

23        Q.   Did Facebook suffer a loss in revenue by

24   deprecating the use of those political targeting

25   segments?                                               12:43:35

                                                    Page 159

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1              MR. BENJAMIN:  Objection to form and        12:43:39

2      scope.

3              THE DEPONENT:  Advertisers don't have

4      these segments any longer.  I can't tell you if

5      that means that they stopped advertising or not.    12:43:48

6         Q.   (By Ms. Weaver)  Did Facebook take any

7      steps to track, before or after making the

8      decision, the impact to revenue of deprecating

9      these political targeting segments?

10        A.   Okay.  What I explained --                   12:44:03

11             MR. BENJAMIN:  Objection to form.

12     Compound.

13             THE DEPONENT:  What I explained earlier

14     is relevant here, too, where there isn't a before

15     and after snapshot because revenue isn't associated  12:44:14

16     with any one targeting option.

17        Q.   (By Ms. Weaver)  Okay.  But the question

18     was, did Facebook take any steps to track, before

19     or after making this decision, the impact to

20     revenue of deprecating political targeting           12:44:30

21     segments?

22             MR. BENJAMIN:  Objection --

23             THE DEPONENT:  My point is that --

24             MR. BENJAMIN:  Objection to form.

25             THE DEPONENT:  My point is that there        12:44:39
```

                                                        Page 160

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    isn't a one-to-one way to track that.  And so we        12:44:40

 2    did not take steps to track explicitly the revenue

 3    loss from removing these -- these segments.

 4         Q.   (By Ms. Weaver)  Does Facebook, in

 5    general, track revenue loss when it deprecates a         12:44:52

 6    product?

 7              MR. BENJAMIN:  Objection to form and

 8    scope.

 9              THE DEPONENT:  Can I clarify, do you mean

10    understanding what our revenue was before something      12:45:07

11    and then after?

12         Q.   (By Ms. Weaver)  Yes.

13         A.   We track our revenue.  There are lots of

14    factors that influence our revenue.  And we do not

15    associate a change in revenue specifically with the      12:45:20

16    removal of targeting because it is not a one-to-one

17    relationship.  And as --

18         Q.   And --

19         A.   Yeah.

20         Q.   I understand the point.                        12:45:31

21              But here Facebook deprecated a product,

22    correct?

23         A.   We deprecated targeting options.  And as

24    I clarified, I call those products.

25         Q.   And -- and products have budget, don't         12:45:40
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    they?                                              12:45:42

 2              MR. BENJAMIN:  Objection to form and

 3    scope.

 4              THE DEPONENT:  Budgets in the sense of

 5    the amount of money Facebook uses to build those   12:45:49

 6    products?

 7         Q.   (By Ms. Weaver)  Yes.

 8              And, again, we're talking about

 9    advertising products.

10         A.   We -- we do fund our product teams and   12:46:00

11    the resources to build a product.  That is pretty

12    separate from a revenue calculation.

13         Q.   Does Facebook provide or -- strike that.

14              Does Facebook track the revenue that

15    certain products generate?                         12:46:17

16              MR. BENJAMIN:  Objection to scope.

17              THE DEPONENT:  For ads, it is not a

18    one-to-one relationship because there are multiple

19    targeting options involved in any ad.  And so there

20    isn't a way to track it directly back to a         12:46:37

21    targeting option -- to track revenue directly back

22    to a targeting option.

23         Q.   (By Ms. Weaver)  Are you saying that this

24    product was a targeting option in your answer?

25              MR. BENJAMIN:  Objection to form.        12:46:54
```

Page 162

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  The political --          12:46:54

 2       Q.   (By Ms. Weaver)  The reason I'm asking

 3   is, you're -- you keep answering in generalities,

 4   and I'm talking about these political targeting

 5   segments that you just discussed, did Facebook's    12:47:05

 6   revenue decrease when it deprecated them?

 7              MR. BENJAMIN:  Objection to scope.

 8              THE DEPONENT:  These targeting

 9   products -- the specific political segments were

10   deprecated.  There is not a one-to-one way to       12:47:24

11   measure if any increase or decrease in revenue is

12   related to that deprecation.

13       Q.   (By Ms. Weaver)  I'm not asking about a

14   one-to-one ratio.

15              I'm just asking, after Facebook          12:47:31

16   deprecated these products, did its targeting

17   revenue decrease?

18              MR. BENJAMIN:  Objection to form.  Asked

19   and answered.  Vague.  And outside the scope.

20              THE DEPONENT:  I think the issue is the   12:47:45

21   question assumes causality.  If revenue changed in

22   the last six months, there could be many reasons

23   for that.

24       Q.   (By Ms. Weaver)  Okay.  But as you sit

25   here -- I'll worry with my experts about causation. 12:47:58
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    I'm simply trying to get the facts.                  12:48:01

 2            As you sit here, do you know if

 3    Facebook's revenue decreased after it deprecated

 4    political targeted advertising segments?

 5            MR. BENJAMIN:  Objection to form.  Asked       12:48:12

 6    and answered.  Vague.  Argumentative.  And outside

 7    the scope.

 8            THE DEPONENT:  I do not know that our

 9    revenue decreased because of a removal of these

10    targeting options.  That is not something that we      12:48:25

11    can measure.

12        Q.   (By Ms. Weaver)  That's not what I'm

13    asking.

14            Facebook deprecated political targeting

15    segments in March 2020, correct?                       12:48:32

16        A.   2022.

17        Q.   Sorry.  2022.

18            Did Facebook's revenue for targeted

19    advertising decrease in April 2022?

20            MR. BENJAMIN:  Objection to form.  Asked        12:48:46

21    and answered repeatedly.  Argumentative.  Outside

22    the scope.

23            THE DEPONENT:  I don't know how else to

24    answer the question than to help disassociate these

25    because if our -- our -- our -- I would say our         12:49:01
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    like quarterly statements represent what our              12:49:06

2    revenue is doing and those are not directly related

3    in one-to-one fashion with any one product

4    deprecation.

5        Q.   (By Ms. Weaver)  I was just asking if            12:49:16

6    revenue decreased.

7            Do you know the answer?

8            MR. BENJAMIN:  Same objections as the

9    prior two questions.

10           THE DEPONENT:  I -- I would --                     12:49:24

11           MS. WEAVER:  It's not.  I don't have an

12   answer.

13       Q.   (By Ms. Weaver)  And I'm entitled to a

14   direct either you know or you don't know.  This is

15   the question.                                              12:49:31

16           Between March of 2022 and April of 2022,

17   did Facebook's targeted advertising revenue

18   decrease?

19           MR. BENJAMIN:  Objection to form.  Asked

20   and answered.  Argumentative.  Vague.  Outside the         12:49:45

21   scope.

22           THE DEPONENT:  I would have to reference

23   our quarterly earning statements to answer that.

24   And I don't know it more granularly.

25       Q.   (By Ms. Weaver)  Do you receive reports           12:49:59

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    of Facebook's targeted advertising revenue on a          12:50:00

2    weekly or monthly basis?

3            MR. BENJAMIN:  Objection to form.

4    Compound.

5            THE DEPONENT:  I personally do not          12:50:16

6    receive a continuous update of our revenue.  No.

7        Q.  (By Ms. Weaver)  Do you know if one

8    exists at Facebook?

9            I wasn't asking you personally.  I was

10   asking Facebook, the deponent.          12:50:29

11           So does Facebook prepare and circulate

12   weekly or monthly snapshots of targeted advertising

13   revenue?

14           MR. BENJAMIN:  Objection to form and

15   scope.          12:50:42

16           THE DEPONENT:  Can I ask a clarifying

17   question, are you specifically -- when you say

18   "targeted advertising revenue," do you just mean

19   our ads business?

20       Q.  (By Ms. Weaver)  What is targeting --          12:50:54

21       A.  Those are one and the same in my mind.

22   But I want to --

23       Q.  Okay.

24       A.  -- make sure that's also the case in

25   your -- what you're saying.          12:51:00

                                        Page 166

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1           Q.   Yes.  Fine.  Ads business, but broken out      12:51:01

 2      by -- with some granularity, as opposed to the

 3      public facing documents.  So let me ask it again.

 4              Does Facebook prepare and circulate

 5      weekly or monthly snapshots of targeted advertising    12:51:16

 6      revenue?

 7              MR. BENJAMIN:  Objection to form.

 8              THE DEPONENT:  We track revenue from our

 9      ads business.  The -- it is not broken out by

10      targeting -- by targeting option.  That is not a      12:51:37

11      granularity, that we break it out, because it is

12      not a measurement of revenue.

13           Q.   (By Ms. Weaver)  Does it break it out by

14      core audience, behavior and custom audience?

15              MR. BENJAMIN:  Objection to form.            12:51:55

16              THE DEPONENT:  No.

17           Q.   (By Ms. Weaver)  How does it break it

18      out?

19           A.   It breaks it out by region, in the sense

20      of where are we making this money and where --        12:52:03

21      advertisers spending on our platform.  And it

22      breaks it out by -- usually by size of advertisers.

23      So is this an advertiser we consider a small,

24      medium business or a large advertiser.

25           Q.   And how often are these reports             12:52:22
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    circulated?                                    12:52:24

 2            MR. BENJAMIN:  Objection to form and

 3    scope.

 4            THE DEPONENT:  Our ads leadership teams

 5    might get these once a week.                   12:52:38

 6        Q.   (By Ms. Weaver)  What are they called?

 7        A.   I honestly don't know what the name of

 8    the report or -- might be.  I don't know.

 9        Q.   Do you know who would know?

10            MR. BENJAMIN:  Objection to scope.      12:52:54

11            THE DEPONENT:  Part of our analytics team

12    would know.  But I don't know a specific name.

13            As I said, I -- I -- these -- those --

14    well, yeah.

15        Q.   (By Ms. Weaver)  Who were the main     12:53:14

16    advertisers who were paying for political targeting

17    segments between the time period 2014 to 2022?

18        A.   To clarify --

19            MR. BENJAMIN:  Objection to form.

20            THE DEPONENT:  To clarify, when you say  12:53:28

21    "paying for political targeting segments," you mean

22    choosing to run an ad with those as part of their

23    desired audience"?

24        Q.   (By Ms. Weaver)  Yes.

25        A.   Okay.  I don't know the -- the advertiser  12:53:37
```

Page 168

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    entity breakdown for those over -- over seven        12:53:44

 2    years.  That -- that's not something I know off the

 3    top of my head.

 4        Q.   I didn't ask for the advertising entity

 5    breakdown.                                            12:53:55

 6             But can you name any companies who paid

 7    for political targeted advertising from the time

 8    period 2014 to 2022?

 9             MR. BENJAMIN:  Objection to form.

10    Argumentative.  And scope.                            12:54:08

11             THE DEPONENT:  This -- I would be

12    speculating without looking at that specifically.

13    That would be something that we would look up more

14    so than know generally.

15        Q.   (By Ms. Weaver)  So the name              12:54:25

16    Cambridge Analytica doesn't come to mind?

17             MR. BENJAMIN:  Objection to form.

18    Argumentative.

19             THE DEPONENT:  It didn't come to mind,

20    no.                                                   12:54:36

21        Q.   (By Ms. Weaver)  Was Cambridge Analytica

22    one of the companies that paid Facebook for

23    targeted political advertising during the time

24    period 2014 to 2022?

25        A.   And, again, specifically meaning did       12:54:47
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    Cambridge Analytica create an ad using those        12:54:49

2    targeting options?

3         Q.   Yeah.

4         A.   I -- I don't know.

5         Q.   Do you know whether or not             12:55:00

6    Cambridge Analytica paid Facebook $100 million for

7    advertising of a political nature in 2016?

8         A.   I do know that --

9              MR. BENJAMIN:  Objection to form.

10             THE DEPONENT:  -- that              12:55:15

11   Cambridge Analytica advertised on our platform.

12        Q.   (By Ms. Weaver)  But you don't know the

13   amount and what for?

14        A.   I don't know the --

15             MR. BENJAMIN:  Objection -- objection to    12:55:24

16   form and scope.

17             THE DEPONENT:  I do not know the exact

18   amount or the exact targeting options that they

19   choose for their desired audience.

20        Q.   (By Ms. Weaver)  What do you know about    12:55:37

21   that topic?

22             MR. BENJAMIN:  Objection to form.

23   Argumentative and scope.

24             THE DEPONENT:  About ad targeting?  I'm

25   happy to chat through more on the segments and     12:55:52
```

Page 170

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    how -- anything about those.  I don't -- I'm -- I'm    12:55:54

2    not sure if that's what you meant or if you mean

3    specifically Cambridge.

4        Q.   (By Ms. Weaver)  I mean

5    Cambridge Analytica, which is the trigger for this    12:56:02

6    lawsuit, and what Cambridge Analytica paid Facebook

7    for targeted political advertising.

8        A.   I do not know details about the -- the

9    Cambridge Analytica spend, specifically.

10        Q.   Do you know anything else about what --    12:56:26

11    why Cambridge Analytica was paying Facebook for

12    advertising in 2016?

13        MR. BENJAMIN:  Objection to both form and

14    scope.

15        THE DEPONENT:  I think you're indicating    12:56:42

16    if there were other reasons they -- they paid us.

17    I do not know of those.

18        Q.   (By Ms. Weaver)  Did Facebook make

19    changes to the political targeting segments in

20    2018, as a result of the Cambridge Analytica    12:57:05

21    scandal?

22        A.   No.

23        Q.   And how do you know that?

24        MR. BENJAMIN:  Objection to form.

25        THE DEPONENT:  I was part of the team.    12:57:24

Page 171

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    But also from speaking to some of the -- throughout        12:57:26

 2    my prep, in understanding how we evolved these

 3    segments, and it was not linked to

 4    Cambridge Analytica.

 5         Q.    (By Ms. Weaver)  When you said you were          12:57:39

 6    part of the team, which team do you mean?

 7         A.    I worked on ads as part of the policy

 8    team and -- at Meta working on ads.

 9         Q.    And so what was the reason for making the

10    changes to targeted advertising in 2018?                   12:57:53

11         A.    Specifically, the segments, we evolved

12    the way we were creating them.     ████████████████

      ██  ████████████████████████████████████████████

      ██  ████████████████████████████████████████████

      ██  ██████████████████ ████████████████████        ████████████

      ██  ██████████████████

17         Q.    Right.  You described that earlier.

18               The question I asked you was why.  What

19    is the reason?

20         A.    Those were updated models that -- that          12:58:32

21    would function better to show people relevant ads.

22         Q.    How would they function better and how

23    did you determine that?

24               MR. BENJAMIN:  Objection to form.

25               THE DEPONENT:  When those were -- options       12:58:52
```

Page 172

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    are added in, we found -- like those options          12:58:54

 2    were -- performed better to show people relevant

 3    ads.

 4         Q.   (By Ms. Weaver)  How do you know they

 5    performed better?                                      12:59:03

 6         A.   We saw advertisers using them, and we saw

 7    people engaging with those ads.

 8         Q.   Were there reports generated that

 9    reflected data to you that indicated that these ads

10    were performing better prior to making the change?     12:59:19

11         A.   Meaning specifically was there a live

12    test for this?

13         Q.   I'm trying to understand the information

14    that you use when you decided to make this change.

15              Just -- just telling me that you made the    12:59:35

16    change doesn't explain why.  So --

17         A.   Yeah.

18         Q.   -- I'm trying to understand the

19    information that you used to make this change.

20              Were there studies?  Were there analyses?    12:59:44

21              MR. BENJAMIN:  Objection to form.

22         Q.   (By Ms. Weaver)  I'll ask the question

23    again.

24              Were there reports generated that

25    reflected data that indicated these ads were           12:59:54
```

Page 173

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    performing better, prior to making the change?          12:59:56

 2         A.   Not in the form of a before and after

 3    snapshot.  Our teams build new targeting options

 4    because they want to evolve the platform and evolve

 5    the tools we offer.                                      01:00:20

 6              This is an example of that, where the

 7    2014 to 2018 method of creating those segments

 8    wasn't what our -- what the team felt was like the

 9    best way to do it.  And so they created the next

10    version which was an updated way that used content      01:00:39

11    engagement and performed well for those ads.  In

12    that when we launched those, advertisers used them

13    and people saw and engaged with the ads.

14         Q.   Did Facebook make any changes to how it

15    conducted political targeted advertising as a           01:00:58

16    result of the Cambridge Analytica scandal?

17              MR. BENJAMIN:  Objection to form.

18              THE DEPONENT:  No.

19         Q.   (By Ms. Weaver)  Okay.  So Facebook

20    provides metrics to advertisers about their             01:01:35

21    advertisements, correct?

22         A.   Yes.

23         Q.   What metrics does Facebook provide?

24         A.   We provide performance metrics to

25    advertisers.                                             01:01:46
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.    Do you do those through the ad manager        01:01:50

 2   tool?

 3        A.    That is an example place where -- where

 4   most advertisers reference and get those, yes.

 5        Q.    And what is the ad manager tool?              01:02:00

 6        A.    Ads manager is the UI that advertisers

 7   can both place their ads.  So create the ad, upload

 8   the content for it.  And then also come back to, to

 9   understand how the ad is performing.

10        Q.    And what is ads -- does -- does Facebook      01:02:18

11   also provide metrics through ads APIs?

12        A.    Yes.

13        Q.    And what are those and what information

14   does it provides through them?

15        A.    An API --                                    01:02:33

16            MR. BENJAMIN:  Objection to form.

17            THE DEPONENT:  An API is a -- is a way to

18   programmatically call information instead of using

19   our -- our built interface.  The API includes the

20   same information.  So for an ad, it would include     01:02:51

21   the impressions and clicks, and the performance

22   metrics that -- for any given ad.

23        Q.    (By Ms. Weaver)  And does Facebook also

24   perform an analysis of the quality of the ad?

25            MR. BENJAMIN:  Objection to form.             01:03:14
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1            THE DEPONENT:  I want to be sure this is      01:03:17

 2    in the context that you're thinking of.

 3         Q.   (By Ms. Weaver)  Okay.

 4         A.   As part of ad delivery, our -- as part of

 5    our total value equation that I was talking about     01:03:25

 6    earlier, we do include ad quality.  And that is our

 7    prediction of -- of the -- the type of ad and

 8    whether it is sensational or -- or "click-baity,"

 9    or the quality of the images of the ad.

10         Q.   When you say "sensational," what do you     01:03:45

11    mean?

12         A.   Similar to click bait.  It's when like

13    the text is -- is "Ten great tips for" is an

14    example of sensational click bait text.

15         Q.   So what do you mean by -- sorry -- but      01:04:05

16    for the record, what do you mean by click bait?

17         A.   Click bait is -- and I will -- I'll -- is

18    like an industry concept around ads, which is

19    usually that the ad does not provide the actual

20    message.  It is meant to entice someone to click.     01:04:21

21    So it's a catchy headline in order to get to the

22    content somewhere else.

23         Q.   And do advertisers pay more for click

24    bait?

25            MR. BENJAMIN:  Objection to form and          01:04:41
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    scope.                                                01:04:42

2            THE DEPONENT:  So the importance of ad

3    quality in our -- in our delivery system is to help

4    us ensure that we're taking into consideration

5    different parts of the ad in order to determine who   01:04:51

6    should see it.

7            So the advertiser bid is part of it.  The

8    estimated action rate, which represents like

9    people's interest, and the ad quality.  An ad of

10   lower quality is less likely to be delivered.  An     01:05:06

11   ad of higher quality that doesn't have click-baity

12   content in it is more likely to be delivered.

13       Q.   (By Ms. Weaver)  So how does Facebook

14   analyze ad quality?

15       A.   By analyze, we -- we look -- as part of       01:05:23

16   our ad delivery, it's -- the machine-learning

17   models also look at the text of the ad, the images.

18   And whether it's been -- whether people have hidden

19   it.  And kind of user feedback on it as well to

20   establish if it -- the -- a prediction of ad          01:05:41

21   quality.

22       Q.   And what are the factors that tend to

23   cause people to take action about an ad which

24   increases its ad quality?

25       A.   Sorry.  Can you clarify.  People take        01:05:58
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    action on an ad that increases its ad quality?              01:06:00

2        Q.   Okay.  Well, you described that one of

3    the components is, for example, whether people have

4    hidden an ad, as well as user feedback, right?

5        A.   Yes.                                               01:06:12

6        Q.   Would you describe people hiding an ad as

7    taking action?

8        A.   I would.  It doesn't increase ad quality.

9        Q.   Okay.  Are there actions that people take

10   that do increase ad quality?                               01:06:22

11       A.   No.  We use it as a way to understand if

12   people are seeing something problematic.  So it is

13   an indication of someone not wanting to seek

14   content and that's what feeds into ad quality.

15       Q.   And how do you infer that people do not       01:06:41

16   want to see content?

17       A.   By choosing to hide the ad, which is a

18   choice on -- on an ad for people.

19       Q.   And so does Facebook take steps to try to

20   identify what ad users do not want to see?            01:06:55

21           MR. BENJAMIN:  Objection to form.

22           THE DEPONENT:  Can you clarify if you

23   mean generally as part of ad quality --

24       Q.   (By Ms. Weaver)  Yes.

25       A.   -- or on a more individual level?           01:07:11

Page 178

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1         Q.    Generally, as part of ad quality.              01:07:14

2         A.    That's precisely why we include ad

3    quality in our ad delivery is so that there is

4    part -- a feedback loop from someone potentially

5    not wanting to see something that feeds into our --   01:07:24

6    our ad delivery.  Because the goal of that delivery

7    is to show people ads they want to see.

8         Q.    And what is the purpose of an ad quality

9    score in providing it to advertisers?

10        A.    It provides advertisers with transparency   01:07:40

11   into how the -- part of their ad performance.

12        Q.    Is it true that advertisers will pay more

13   for ads with a higher ad quality score?

14             MR. BENJAMIN:  Objection to scope.

15             THE DEPONENT:  Can you clarify what you      01:08:04

16   mean "pay more for."

17        Q.    (By Ms. Weaver)  Yes.

18             How is Facebook compensated for

19   advertising?

20        A.    Advertisers create the ad and they pay      01:08:14

21   for the -- the delivery of that ad for -- for

22   the -- the -- every time the ad is shown.

23        Q.    And if advertisers don't buy ads on

24   Facebook, Facebook doesn't earn money from them,

25   right?                                                 01:08:34
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1          A.   We would not have ad spend from them,          01:08:37

 2     correct.

 3          Q.   And is ad spend affected by increasing ad

 4     quality scores at Facebook?

 5          A.   So to clari- --                                 01:08:52

 6               MR. BENJAMIN:  Objection to form.

 7               THE DEPONENT:  To clarify, ad spend is

 8     based on how often -- or the fact that we've shown

 9     the ad.  So it is separate from ad score.

10               Ad score is part of the delivery to            01:09:06

11     determine who sees the ad.  It's not that they are

12     paying for ad score.

13          Q.   (By Ms. Weaver)  Right.  I understand

14     that.

15          A.   Okay.                                           01:09:17

16          Q.   This is not very complicated, and I'm

17     just trying to get something basic established,

18     right.

19               Facebook creates ad scores so -- as a

20     marketing tool to encourage people to advertise on     01:09:25

21     Facebook because you're saying, look, these are

22     high-quality ads and you're getting responses.

23               Is that fair?

24               MR. BENJAMIN:  Objection to form.

25               THE DEPONENT:  No.  It's our assessment        01:09:34
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    of the quality of their ads so that they understand          01:09:36

2    if they had low performance, if it's due to a low

3    quality ad, or if they need to increase their

4    performance -- or increase the quality of their ads

5    in order to see better performance, because people          01:09:49

6    like better ads than bad ads.

7         Q.   (By Ms. Weaver)  Right.  And when ads are

8    performing ing better, advertisers buy more of them

9    as opposed to less of them because they're not

10   performing better, right?                                    01:09:59

11        MR. BENJAMIN:  Objection to form and

12   scope.

13        THE DEPONENT:  I think the courts --

14        Q.   (By Ms. Weaver)  Do advertisers like to

15   pay for low performing ads or high performing ads?           01:10:14

16        A.   Advertisers wouldn't be paying if the ad

17   isn't performing.  Their spend is based on the ad

18   actually being shown and the action being taken.

19        Q.   So increasing the performance of the ad

20   increases the advertiser's ad spend, correct?               01:10:31

21        MR. BENJAMIN:  Objection to form.

22        THE DEPONENT:  I think we're using the --

23   the words differently here.

24        It's -- it's that -- their spend is

25   proportional to people taking the action on their           01:10:48

                                                     Page 181

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    ad.  People taking that action is because they want      01:10:52

 2    to state -- this was an ad that was relevant and so

 3    they might click on it.  And then an advertiser

 4    pays for that.

 5           If an ad score is low, the people are             01:11:02

 6    less likely to take that action.  And it is a way

 7    for advertisers to understand how to create a

 8    better ad, if they want to.  There is no

 9    requirement to.  But if they want to create a

10    better ad and then see better performance, because      01:11:19

11    that ad is a better ad, they will then pay for the

12    better performance.

13       Q.   (By Ms. Weaver)  Exactly.

14           And so it's in Facebook's financial

15    interest to identify the kinds of ads people do not      01:11:32

16    want to see because they will not take action and

17    the advertiser will not pay Facebook, because it's

18    not a higher performing ad, right?

19           MR. BENJAMIN:  Objection to form.

20           THE DEPONENT:  I think what you've               01:11:51

21    identified is the fact that we should want to show

22    good ads because it's better for both people who

23    want to see better ads and don't want terrible ads

24    in their newsfeed and for advertisers because now

25    they're connected in with a user.                        01:12:04
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              That is very different than a marketing      01:12:06
 2   play that I think is being described here.  It is
 3   simply that we want better ads on the platform and
 4   this is an example of that.
 5       Q.   (By Ms. Weaver)  Why does Facebook want       01:12:17
 6   better ads on the platform?
 7       A.   To provide a free service to people.
 8       Q.   It's not because Facebook wants to make
 9   more money?
10            You remember that you're under oath.         01:12:26
11       A.   We make money to provide a free service
12   to people.
13       Q.   Okay.  Does Facebook --
14            MR. BENJAMIN:  An objection to the last
15   question.                                             01:12:34
16       Q.   (By Ms. Weaver)  Does Facebook make more
17   money when people take more actions on ads?
18            MR. BENJAMIN:  Objection to form.
19            THE DEPONENT:  Yes.
20       Q.   (By Ms. Weaver)  Thank you.                  01:12:51
21            In preparing for your deposition, did you
22   review any reports that Facebook provides to
23   advertisers that reflects the metrics of their
24   advertising campaigns?
25       A.   I -- I didn't review any specific            01:13:18
```

Page 183

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    reports.                                          01:13:20

 2         Q.   Do you review them on a daily basis?

 3         A.   Through the course of my job, no.

 4         Q.   Are they -- did you at one point when you

 5    were in ads integrity?                            01:13:31

 6              MR. BENJAMIN:  Objection --

 7              THE DEPONENT:  Review --

 8              MR. BENJAMIN:  Objection to scope.

 9              THE DEPONENT:  Review reports about

10    advertisers?                                      01:13:41

11         Q.   (By Ms. Weaver)  Let me rephrase the

12    question.

13              Facebook provides --

14         A.   Yes.

15         Q.   -- provides analytics to advertisers    01:13:45

16    through at least two kinds of tools, right?

17         A.   Yes.

18         Q.   What do those reports look like?

19              MR. BENJAMIN:  Objection --

20              THE DEPONENT:  In --                     01:13:56

21              MR. BENJAMIN:  -- to form.

22              THE DEPONENT:  In ads manager, it will

23    show for that ad, as an example, the aggregate

24    count of impressions or clicks it received and the

25    amount spent.  The same information would be       01:14:07
```

Page 184

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    provided in the API for someone to call if they          01:14:10

2    wanted outside of the UI.

3         Q.   (By Ms. Weaver)  And did you, in

4    preparing for this deposition today, review any

5    such reports?                                            01:14:20

6         A.   I did not go and specifically look up an

7    ads report, no.

8         Q.   Can you identify the -- all of the exact

9    metrics that are provided to advertisers?

10             MR. BENJAMIN:  Objection to form and          01:14:37

11   scope.

12             THE DEPONENT:  Not off the top of my

13   head.  I can explain the buckets of performance

14   metrics that we provide.

15        Q.   (By Ms. Weaver)  Okay.  What are the          01:14:52

16   buckets?

17        A.   As I said, they're -- those center around

18   the -- the performance of the ad.  So how many

19   impressions has it shown.  How many clicks has it

20   generated.  How many people have taken the action     01:15:06

21   that the advertiser, the -- that objective.

22             Ad score is also included and the amount

23   spend.  So that an advertiser understands how their

24   ad is delivering on Facebook.

25        Q.   And just to address again an out-of-scope   01:15:21
```

Page 185

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    objection, at the bottom of page 2 of Exhibit 657,        01:15:26

2    it says, "Ms. Leone will be prepared to discuss:

3    The metrics Facebook provides advertisers about

4    their advertisements, which Facebook provides

5    through its Ad Manager tool and Ads APIs."              01:15:39

6            So you can describe the buckets, but you

7    can't identify all of the specific metrics; is that

8    right?

9        A.   I don't have memorized line item every

10   single metric.  But, yes, the purpose and the fact     01:15:55

11   that we provide how the ad is delivering, the

12   actions people have taken, and the ad score and ad

13   spend.

14       Q.   And has that changed over time from 2007

15   to the present?                                         01:16:10

16       A.   Our UIs have changed over time and so the

17   format of those has changed, yes.

18       Q.   And what has changed?

19       A.   The way we display those has changed.  As

20   we add in a new objectives, also the type of metric    01:16:28

21   that relates to it would have been added in as

22   well.

23       Q.   When you say "type of metric that relates

24   to it," what do you mean?

25       A.   For example, a click, or if you run a --      01:16:39

                                                 Page 186

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    a page like ad, we will show you how many people        01:16:42

2    actually liked the page from that ad, which is

3    different from if you run a website click ad, how

4    many people clicked because the action they took is

5    different.  So the metric would -- would be related     01:16:59

6    to the action taken.

7         Q.   How does Facebook decide what to charge

8    for the ads that it serves for advertisers?

9         A.   Our -- there are two parts to this,

10   primarily.  There's the advertiser sets a bid.  So      01:17:23

11   they decide how much they want to pay to show the

12   ad to their desired audience.

13            And then in our ad auction, we take that

14   into account.  We know for a given user all of the

15   ads they're eligible to see and the bids for those      01:17:42

16   ads.  And out of the total value equation, we

17   determine which ads should win the auction.  At

18   that point they are charged the second highest bid.

19        Q.   And when you say you take into account an

20   ads a given user can see, does Facebook perform a       01:18:02

21   calculation of the revenue that has been associated

22   with given users?

23        A.   Can you -- can you clarify what you mean

24   there?

25        Q.   Does Facebook perform a calculation of        01:18:19
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    revenue that has been associated with ads served to        01:18:21

 2    a given user?

 3        A.   I understand you to mean whether we

 4    calculate the total amount of -- that we were paid

 5    for an impression to show a specific user?             01:18:35

 6        Q.   Yes.

 7        A.   No.

 8        Q.   Facebook does and can identify all the

 9    ads that were shown to a specific user, right?

10        A.   Yes.                                           01:18:48

11        Q.   And Facebook can also calculate how much

12    it was paid for a given ad campaign in which those

13    ads were shown, right?

14        A.   The total spend, yes.

15        Q.   And so you would calculate the total         01:18:59

16    spend by the number of users who received that ad,

17    if you wanted to calculate the average revenue per

18    user, right?

19             MR. BENJAMIN:  Objection to form.

20             THE DEPONENT:  So calculating the total       01:19:13

21    spend of an ad would not get me to the individual

22    revenue from showing an ad to one user.

23        Q.   (By Mr. Benjamin)  If you divided the

24    number of users by the total spend, why wouldn't

25    that give you an average revenue per user?             01:19:28
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1        A.   For that one ad?                            01:19:31

2        Q.   Or campaign, or for an ad, sure.

3        A.   Sorry.

4             So to clarify, if you have the total

5   spend from a specific ad, and you know the 200     01:19:39

6   people who saw that ad, yes, you could divide the

7   total spend by the 200 impressions, and then say

8   there's a cost per impression.

9        Q.   And does Facebook calculate whether

10  certain Facebook users generate more revenue for    01:19:58

11  Facebook than others --

12       A.   No.

13       Q.   -- based on their responses to

14  advertising?

15       A.   No.                                         01:20:09

16       Q.   So, in fact, all Facebook users are

17  viewed equally by Facebook with regard to the

18  amount of revenue that they generate for Facebook;

19  is that fair?

20            MR. BENJAMIN:  Objection to form.           01:20:20

21  Misstates.

22            THE DEPONENT:  I -- we just -- we don't

23  have an assessment of user by user revenue

24  associated with them.

25       Q.   (By Ms. Weaver)  Great.                     01:20:38
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              Did Facebook at some time engage in        01:20:39

 2   efforts to restrict advertisers' use of

 3   advertising-related data?

 4              MR. BENJAMIN:  Objection to form.

 5              THE DEPONENT:  For advertising-related      01:21:08

 6   data, do you mind clarifying kind of what you're --

 7   what you're thinking of there --

 8        Q.   (By Ms. Weaver)  Sure.

 9        A.   -- just so that I'm --

10        Q.   Sure.                                        01:21:15

11              I'm -- I'm reading actually from your

12   counsel's letter ad page 3, and it says "Ms. Leone

13   will be prepared to discuss: Facebook's policies

14   restricting advertisers' use of advertising-related

15   data (i.e. limiting it to its 'use case')."           01:21:28

16        A.   Yes.

17        Q.   What is --

18        A.   So --

19        Q.   Go ahead -- let me ask the question.

20        A.   Yeah.  Yeah, please.                         01:21:41

21        Q.   What does advertising-related data mean

22   in that sentence?

23        A.   I'm not 100 percent sure exactly what it

24   means here.  But this is meant to indicate that we

25   have terms and policies around the use of data        01:21:57
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1      that's related to ads, and this references that.        01:22:03

 2              So as an example, we have custom audience

 3      terms, and we have business tool terms.

 4          Q.   So what are the custom audience terms?

 5          A.   When someone uploads a customer list,           01:22:25

 6      they agree to those terms.  And those are the

 7      policies that -- in order to use that product.

 8          Q.   What is a customer list?

 9          A.   A customer list is one of the types of

10      custom audiences.  It's a targeting option that an      01:22:44

11      advertiser can use.

12          Q.   Okay.  Let's talk about custom audiences

13      for a minute and take a pause.

14              What are custom audiences?

15          A.   Custom audiences was one of that -- that        01:22:59

16      kind of like third bucket of targeting tool types.

17      Within it, customer list is one where an advertiser

18      uploads a -- a list of their existing customers.

19          Q.   And does Facebook then possess the

20      customer list?                                           01:23:20

21          A.   No.  We hash the list when an advertiser

22      uploads it, the identifiers in that list.  And then

23      we compare it to our hash data to understand a

24      match.  And then we delete the advertiser list.

25      And we do not send them back information about the       01:23:40
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    users who matched.                                  01:23:44

 2         Q.   So what analytics does Facebook provide

 3    advertisers who advertise through custom audiences?

 4         A.   When an advertiser creates a custom

 5    audience -- or the customer list, specifically,     01:23:56

 6    here -- they would understand within ranges the

 7    size of it.  And when they then use it for their

 8    audience, they would get the same reporting metrics

 9    that we -- or performance metrics that we provide

10    for any ad.                                          01:24:14

11         Q.   And over time has the size of the -- of a

12    custom audience that an advertiser collects change?

13              MR. BENJAMIN:  Objection to form.

14              THE DEPONENT:  Can you clarify what you

15    mean by "advertiser collect" here?                   01:24:28

16         Q.   (By Ms. Weaver)  Sorry.

17              Over time has the size of a custom

18    audience targeted by an advertiser changed?

19              MR. BENJAMIN:  Objection to form.

20              THE DEPONENT:  The customer list is        01:24:47

21    provided by the advertiser.  That is something that

22    they decide.  The size of and -- and bringing --

23    and uploading.  So really this is -- is independent

24    of us.  They -- they make that choice based on

25    their existing customers and their desired           01:25:04
```

Page 192

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    audience.                                          01:25:07

 2        Q.    (By Ms. Weaver)  Does Facebook also

 3    create custom audiences not from customer lists but

 4    through other characteristics?

 5        A.    There were the two other types of custom   01:25:17

 6    audiences.  One is based on our business tools, so

 7    website custom audiences or an app custom audience.

 8    And then the other category was based on engagement

 9    custom audiences, which is engagement with people

10    who have interacted with your page on Facebook.     01:25:37

11        Q.    So what are website or app custom

12    audiences?

13        A.    Website and app custom audiences are

14    reengagement through our business tools.  So when a

15    website owner or an app developer has our business   01:25:58

16    tools, as an example, a website could say, "I'll

17    put the Pixel on the check-out."

18            They would then be able to use the

19    targeting tool to -- or the targeting option of

20    website custom audiences to reengage with people    01:26:15

21    who have taken that action on their website.

22            THE DEPONENT:  And apologies.  Is my

23    video jumpy to anyone else?  It's a little bit --

24            Okay.

25            MS. WEAVER:  We can go off the record, if    01:26:26
```

Page 193

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | you're having an issue. | 01:26:27 |
| 2 | THE DEPONENT:  No, we're good. | |
| 3 | Q.   (By Ms. Weaver)  Okay.  And the second is | |
| 4 | engagement audiences; is that correct? | |
| 5 | A.   Engagement custom audiences, yes. | 01:26:50 |
| 6 | Q.   And what are those? | |
| 7 | A.   Those are based on on-site engagement. | |
| 8 | So a Facebook page, the followers of that Facebook | |
| 9 | page, the advertiser for that page would be able to | |
| 10 | reengage with that group of users by saying "I want | 01:27:03 |
| 11 | to reach back to people who've engaged with my" -- | |
| 12 | "or followed my page." | |
| 13 | Q.   And with regard to any of these three | |
| 14 | kinds of audiences, has Facebook imposed | |
| 15 | restriction on the size of the audiences that | 01:27:20 |
| 16 | advertisers may target from 2007 to the present? | |
| 17 | A.   Yes. | |
| 18 | Q.   Why? | |
| 19 | A.   We've -- we have a minimum of the | |
| 20 | audience size we'll deliver to help ensure that | 01:27:35 |
| 21 | advertisers aren't distilling information from -- | |
| 22 | from that delivery. | |
| 23 | Q.   And how has it changed specifically over | |
| 24 | time? | |
| 25 | MR. BENJAMIN:  Objection to form. | 01:27:49 |

Page 194

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  Those thresholds have --      01:27:52

 2     have changed -- they've increased.  So for example,

 3     it increased -- I know like for customer lists, it

 4     is 100.  We have to have 100 match in order to use

 5     that audience.                                        01:28:12

 6         Q.   (By Ms. Weaver)  This is as of 2022?

 7         A.   It is current, yes.  And over time

 8     that -- that was increased.  There was always a

 9     minimum, and I believe -- I don't know exactly what

10     that was.  But it -- we've seen -- we have             01:28:29

11     revisited those thresholds.  And we increased them,

12     I believe, in 2018.

13         Q.   Do you know generally what range they

14     were in prior to 2018?

15              MR. BENJAMIN:  Objection to form.            01:28:54

16              THE DEPONENT:  I don't.  I don't recall

17     specifically what they were.

18         Q.   (By Ms. Weaver)  Was it less than 20?

19         A.   No.  No.

20         Q.   Was there any point in time in which         01:29:10

21     in -- from 2007 to the present, at which

22     advertisers could target custom audiences of

23     20 people or fewer?

24              MR. BENJAMIN:  Objection to form.

25              THE DEPONENT:  No, fewer than 20 people      01:29:28
```

Page 195

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    is not allowed and it has not been allowed in a          01:29:29

2    custom audience.  And we don't enable an advertiser

3    to target singular users.  That's -- that's been --

4    that's partly why we have this protection in place.

5         Q.   (By Ms. Weaver)  And why is that?           01:29:41

6              Why won't Facebook allow advertisers to

7    target singular users?

8         A.   That's not the way we've built our

9    targeting system.  One of our core areas is that we

10   don't tell an advertiser who you are or provide       01:29:56

11   information to them for that purpose.  And a -- a

12   protection to do that is to ensure that there is an

13   audience minimum.

14        Q.   And I'm under- -- I understand you're

15   saying what.                                           01:30:09

16             But I'm asking again, why doesn't

17   Facebook allow individual users to be targeted?

18        A.   Because we -- we don't want an advertiser

19   to have information about an individual user.  That

20   is the way we've set up our system.                    01:30:23

21        Q.   And why doesn't Facebook want an

22   advertiser to have information about an individual

23   user?

24             MR. BENJAMIN:  Objection to form.  Asked

25   and answered.                                          01:30:33

Page 196

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  We -- we specifically tell      01:30:38
 2     users that we don't tell an advertiser about them.
 3     And we've consistently maintained that.  And that's
 4     also why we build our products to ensure that --
 5     with the protection so that that's not the outcome.    01:30:49
 6         Q.   (By Ms. Weaver)  And why does Facebook
 7     specifically tell users that it will not allow
 8     advertisers to individually identify them?
 9              MR. BENJAMIN:  Objection to form.
10              THE DEPONENT:  I'm not sure how to answer      01:31:07
11     this differently.
12              But it's -- our system -- we -- we built
13     our system with that as a guiding principle because
14     we think that's an important part of being on
15     Facebook and so we've maintained that.  And these      01:31:18
16     are some of the protections that help to maintain
17     that.
18         Q.   (By Ms. Weaver)  Is it because Facebook
19     has promised users privacy?
20              MR. BENJAMIN:  Objection to form.  Asked       01:31:30
21     and answered.
22              THE DEPONENT:  I -- I think -- we're very
23     up front with users that we show ads and how our
24     system works, including this portion of it.  And
25     this helps us ensure that that's the case.             01:31:47
```

Page 197

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              I don't think we've -- we relate it to a        01:31:50
 2    nondefined concept of privacy in the way that we're
 3    talking about it right now.
 4         Q.   (By Ms. Weaver)  So Facebook is not
 5    preventing advertisers from targeting individual      01:32:05
 6    users because of privacy concerns; is that your
 7    testimony?
 8         A.   That is not my testimony.
 9              MR. BENJAMIN:  Objection.  Yeah, and
10    objection --                                          01:32:16
11              MS. WEAVER:  I'm just trying to get --
12              MR. BENJAMIN:  I'm sorry.
13              MS. WEAVER:  I'm sorry.
14              MR. BENJAMIN:  We went out of order.
15    Sorry.                                                01:32:20
16              Objection to form.  Misstates.
17    Argumentative.
18              You can answer.
19              THE DEPONENT:  It's not my testimony.
20         Q.   (By Ms. Weaver)  I'm going to ask you       01:32:26
21    again, is Facebook preventing advertisers from
22    targeting individual users to protect users'
23    privacy?
24         A.   We do not want -- we don't allow an
25    advertiser to target an individual user.  And we     01:32:45
```

Page 198

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    don't tell advertisers who saw their ad so that          01:32:48

 2    they learn about individual users.  And we -- we

 3    state that to users.

 4        Q.   I just -- this is -- this is getting very

 5    frustrating in this deposition because you're just       01:33:00

 6    repeating the facts and I am trying to ask why.

 7             So what is the reason that Facebook built

 8    its platform so that in -- advertisers could not

 9    target individual users?

10             MR. BENJAMIN:  Objection to form.              01:33:19

11    Argumentative.  Asked and answered.

12             You can answer.

13             THE DEPONENT:  This is one of our guiding

14    principles for our ad system.  It's part of how

15    we've built it and how we help users understand and     01:33:32

16    maintain their trust with Facebook.

17        Q.   (By Ms. Weaver)  Can you confirm that one

18    of the reasons Facebook did that was to protect

19    users' privacy?

20             MR. BENJAMIN:  Objection to form.              01:33:47

21             THE DEPONENT:  Can you provide an example

22    of what it is you mean by users' privacy and

23    protecting it?

24        Q.   (By Ms. Weaver)  Well, let me go back to,

25    you said it was a guiding principle of Facebook,        01:33:57
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1   right?                                              01:34:00

2        A.   For building our ad system, yes.

3        Q.   Why is it a guiding principle?

4        A.   Because we wanted to ensure that people

5   both like trust the information they provide us and   01:34:14

6   continue to use our platform.  And this was one of

7   the areas where that was important.

8            MS. WEAVER:  Thank you.

9            MR. BENJAMIN:  Ms. Weaver, we've been --

10  we've been going for a good time, over an hour.      01:34:29

11           Would -- would now be a good time for a

12  break?

13           MS. WEAVER:  Just give me a moment.

14           MR. BENJAMIN:  Of course.

15       Q.   (By Ms. Weaver)  You said that Facebook    01:34:43

16  at no time allowed advertisers to target a custom

17  audience of 20 or fewer.

18           Do you recall that?

19       A.   Fewer than 20.

20           MR. BENJAMIN:  Objection.  Misstates        01:34:54

21  testimony.

22       Q.   (By Ms. Weaver)  Right.

23           What is the -- what is the lowest number

24  that Facebook has permitted advertisers to target

25  in terms of the size of a custom audience?           01:35:04
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        A.   I believe the customer list is 20.          01:35:08

 2        Q.   And what is the lowest number for the

 3   other two kinds of audiences?

 4        A.   I believe also 20.

 5             MS. WEAVER:  Great.                          01:35:27

 6             We can take a break.

 7             THE VIDEOGRAPHER:  Okay.  We're off the

 8   record.  It's 1:35 p.m.

 9             (Recess taken.)

10             THE VIDEOGRAPHER:  We're back on the         01:55:02

11   record.  It's 1:55 p.m.

12             (Exhibit 658 was marked for

13   identification by the court reporter and is

14   attached hereto.)

15             MS. WEAVER:  I'm going to show you what      01:55:09

16   has been marked -- or will be marked Exhibit 658.

17             And for the record, it bears

18   Bates numbers FB-CA-MDL-03969899 through -907.

19             And I think it's up.

20             THE DEPONENT:  I have it up.                 01:55:33

21        Q.   (By Ms. Weaver)  Okay.  Great.

22             When you have a moment, please just tell

23   me what it is.

24        A.   This was similar -- like a blog post that

25   we put on our business blog that explains machine    01:55:54
```

Page 201

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1   learning in ad delivery.                          01:55:57

 2        Q.   And looking to the second page of the

 3   document ending in Bates number -- -900 are the

 4   last three digits.

 5        A.   Yup.                                      01:56:08

 6        Q.   Do you see where it says -- first, "How

 7   does Facebook decide which ads to show people," and

 8   then there's an answer below the question, right?

 9        A.   Yes.

10        Q.   And the second paragraph begins -- or     01:56:18

11   second paragraph begins "First, advertisers choose

12   their target audience through our self-service

13   tools."

14             Do you see that?

15        A.   Yes.                                      01:56:30

16        Q.   So specifically, which target audience is

17   this document referring to here?

18        A.   This refers to the audience selection

19   tools that an advertiser has in ads -- in something

20   like ads manager.                                   01:56:47

21             I don't know if you mean specifically

22   what does the hyperlink go to.

23        Q.   Well, that would be helpful, too.

24        A.   Okay.  That I don't know off the top of

25   my head.  So that might be -- yeah.                 01:56:59
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   Earlier you described different kinds of      01:57:02

 2   custom audiences.

 3             Do you recall that?

 4        A.   Yes.

 5        Q.   So which audiences are being described         01:57:07

 6   here?

 7        A.   This paragraph describes the totality of

 8   the way an advertiser can select their audience.

 9   It's not specific to custom audiences.

10        Q.   So when, for example, an advertiser wants      01:57:21

11   to use behaviors to target, they first start here

12   with this target audience; is the right?

13        A.   What this sentence refers to is in ads

14   manager when someone goes in to select their

15   desired audience, it's talking about all of the     01:57:39

16   options there of which one is behaviors.  One

17   category is behaviors.  Custom audience is another

18   category.

19        Q.   Okay.  And looking at the next page

20   ending at Bates number -901, do you see a graph on   01:57:55

21   that page?

22        A.   I see the total value equation drawn out.

23        Q.   What is the total value equation?

24        A.   Total value equation is the description

25   of our ad auction in the -- in -- in ad delivery.    01:58:13
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   I'm sorry.                              01:58:20

 2             You said it's the "description of our ad

 3    auction in ad delivery"?

 4        A.   Our -- so -- sorry.

 5             Our ad delivery -- choosing the ad that  01:58:35

 6    we will show someone is based on our auction.

 7    Total value score is how we make that

 8    determination.  It's the machine learning that is

 9    used in ad delivery to make the determination of

10    which ad wins the auction.                        01:58:52

11        Q.   Okay.  So the algorithm is performing an

12    analysis of the three factors below the words

13    "Total Value" in the graph to determine which ad is

14    shown; is that right?

15        A.   Multiple -- yes.  Machine learning models  01:59:06

16    are performing that, yes.

17        Q.   And even though it says "Total Value,"

18    what that actually means is the ad that is shown?

19        A.   Every ad that a person is eligible to see

20    receives a total value score, and then the ad that  01:59:19

21    has the highest total value score wins the auction.

22        Q.   And when it wins the auction --

23        A.   It doesn't show.

24        Q.   -- is Facebook then paid revenue for the

25    total value ad that's selected?                    01:59:39
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1            MR. BENJAMIN:  Objection --              01:59:44

 2            THE DEPONENT:  The ad that --

 3            MR. BENJAMIN:  Objection to form.

 4            THE DEPONENT:  And apologies.  I didn't

 5   mean to interrupt your question there.           01:59:50

 6            The total value score is calculated.  The

 7   one with the highest total value wins the auction

 8   and that is the ad we show a user.  An advertiser

 9   pays for the performance of their ads and the

10   number of times an ad is shown.                  02:00:04

11       Q.   (By Ms. Weaver)  Got it.

12            So looking at the components of total

13   value, there's the "Advertiser Bid," which we

14   discussed, right?

15       A.   Yes.                                     02:00:15

16       Q.   And then it says "Estimated Action Rate."

17            What is that?

18       A.   The estimated action rate is the

19   likelihood of someone taking the action that aligns

20   with the advertiser's objective.                 02:00:26

21       Q.   And this document describes that as the

22   business objective, right?

23       A.   Yes, that's the name of the -- the ad

24   objective.

25       Q.   And that could be a click or a view or an  02:00:41
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    impression, or something else, right?              02:00:43

 2            MR. BENJAMIN:  Objection to form.

 3            THE DEPONENT:  Yes.  It could be that the

 4    advertiser is trying to -- has an ad with a call to

 5    action to go to a website to sign up to like a page  02:00:58

 6    for brand awareness.  Those are their objectives.

 7    Why are they running this ad.

 8        Q.   (By Ms. Weaver)  And how does Facebook

 9    calculate the estimated action rate?

10        A.   The estimated action rate, which is for     02:01:16

11    the person we're thinking about showing this ad to,

12    is the likelihood that they will take that action.

13    And that's based on their activity on Facebook.

14    These are the machine-learning models that are --

15    that are involved.  And they take into              02:01:31

16    consideration activity on Facebook.  So the pages,

17    an ad someone has interacted with.  The way they've

18    interacted with those.  And then also activity off

19    of Facebook such as on websites and apps.

20        Q.   And just to clarify testimony earlier,      02:01:49

21    for detailed targeting, the underlying activity

22    that is the basis for determining interests and

23    behaviors, are those the same set of inputs?

24            And let me just -- I'll ask a bad

25    question and then I'll ask a good one.              02:02:28
```

Page 206

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1            I thought when we talked the first time       02:02:30

 2   that interests were not based on off-platform

 3   activity and that they were limited to maybe only

 4   pages and groups.  But that behaviors -- incurred

 5   behaviors are based on basically almost all the      02:02:40

 6   activity on Facebook with some exemptions and

 7   off-platform.

 8            MR. BENJAMIN:  Objection to form.

 9       Q.   (By Ms. Weaver)  Is that roughly

10   accurate?                                            02:02:56

11       A.   You're correct that there are distinction

12   between interests and behaviors.  Interests are

13   based on on-site page and ad interaction.

14   Behaviors are a broader set of activity on-site.

15            Yeah, I think that clarifies kind of what   02:03:08

16   you were getting at.

17       Q.   Okay.  And -- and behavior is also

18   offsite, correct?

19            MR. BENJAMIN:  Objection to form.

20            THE DEPONENT:  No, I -- so behavior          02:03:28

21   targeting options are not offsite.

22            Earlier when we were discussing

23   behavioral targeting, I was referencing the broader

24   personalization including ad delivery.

25       Q.   (By Ms. Weaver)  Okay.  Now, for the        02:03:43
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    estimated action rate, what is the core set of        02:03:45

2    inputs and activities that help Facebook derive the

3    estimated action rate?

4            MR. BENJAMIN:  Objection to form.

5            THE DEPONENT:  It is on-site behavior.        02:03:58

6    So, again, people's activity on Facebook and

7    offsite based on our third -- our -- our business

8    tools and information that's shared back with us.

9        Q.   (By Ms. Weaver)  And then is an algorithm

10   performing an analysis to predict the next possible   02:04:16

11   action a user might make?

12       A.   The estimated action rate is the

13   likelihood that the user takes an action and it

14   uses those -- the -- the machine learning

15   classifiers use that activity as input.              02:04:34

16       Q.   Okay.  And for "Ad Quality" -- I know we

17   covered this.

18            But for the record and clarity, ad

19   quality -- what is the core set of data that

20   Facebook draws upon to determine ad quality?         02:04:48

21            MR. BENJAMIN:  Objection to form.

22            THE DEPONENT:  It's the content of the

23   ads.  So what an assessment, for example, of click

24   bait and our understanding of the -- the content of

25   that ad, as well as users' feedback such as X outs,  02:05:03
```

Page 208

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    which is reporting.                              02:05:09

2        Q.   (By Ms. Weaver)  And the higher the ad

3    quality, and the higher the estimated action rate,

4    the better the total value for the advertising,

5    right?                                           02:05:27

6        A.   The higher the ad quality and the higher

7    the estimated action rate, the higher the total

8    value score will be.

9        Q.   And then do higher total value scores

10   correlate with increased revenue to Facebook?    02:05:41

11            MR. BENJAMIN:  Objection to form and

12   scope.

13            THE DEPONENT:  I think to -- to make this

14   very clear, the way we've built this total value

15   score helps ensure that it's not just the highest 02:05:55

16   bidder that wins the action.  Otherwise we would

17   just say whoever is highest bidding gets the spot

18   on the ad.  By including estimated action rate and

19   ad quality, we're actually taking into

20   consideration people's preferences of what they   02:06:12

21   would want to see and the quality of that ad.

22            And it actually means that the highest

23   bidder is not always going to be the winner.  So

24   better ads that are more relevant are the ones that

25   win and then an advertiser pays for.              02:06:27
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    Q.   (By Ms. Weaver)  And when Facebook is          02:06:31

2    serving better ads, Facebook is more successful

3    financially, right?

4         MR. BENJAMIN:  Objection to form.  Asked

5    and answered.  Vague.  And outside of scope.          02:06:39

6         THE DEPONENT:  When we serve better ads,

7    people's experience is better.  And that is a

8    common goal of ours across the board.

9    Q.   (By Ms. Weaver)  Does Facebook's revenue

10   increase when they make -- serve better ads?          02:06:55

11        MR. BENJAMIN:  Same objections.

12        THE DEPONENT:  As compared to when we

13   serve bad ads?

14   Q.   (By Ms. Weaver)  Yes.

15   A.   I don't think we can -- yeah.  I don't          02:07:07

16   know that that is a comparison we make because we

17   strive to show good ads.  So I don't have a

18   comparison point there.

19   Q.   Do advertisers put advertising on

20   Facebook if they feel like their advertisements are   02:07:19

21   not effective?

22        MR. BENJAMIN:  Objection to form.  Calls

23   for speculation.  Outside of scope.

24        THE DEPONENT:  If an advertiser does not

25   see performance on an ad, that -- they will use      02:07:35

Page 210

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    that information for how they then choose to spend      02:07:39

 2    their money across platforms.

 3         Q.   (By Ms. Weaver)  Okay.  So is it -- just

 4    one last question.

 5              The user activity, just for the record,       02:07:51

 6    that Facebook uses to analyze and create the

 7    estimated action rate and the ad quality is not

 8    limited only to publicly shared activity, it

 9    includes private activity as well, correct?

10              MR. BENJAMIN:  Objection to form.  Asked      02:08:11

11    and answered.

12              THE DEPONENT:  What I shared earlier is

13    relevant here as well.  We don't have a dichotomy

14    of private and public activity.  And so it's not

15    limited in that manner because it's not the way our    02:08:24

16    product works.

17              MS. WEAVER:  Okay.  Thank you.

18              (Exhibit 659 was marked for

19    identification by the court reporter and is

20    attached hereto.)                                       02:08:28

21              MS. WEAVER:  We're going to mark tab 4,

22    Josh, if you don't mind.

23              We'll mark as Exhibit 659 a document

24    bearing Bates numbers -03526129 through -133.

25         Q.   (By Ms. Weaver)  And while we're waiting      02:09:10
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    for it to load, what is a keyword?                    02:09:11

2         A.   I'm -- I'm not sure what we're

3    referencing.

4         Q.   Okay.  Do you -- have you used the phrase

5    "keywords" in the context of advertising at          02:09:22

6    Facebook?

7              MR. BENJAMIN:  Objection to form.

8              THE DEPONENT:  It is not a type of

9    targeting we offer.  It is how we describe what an

10   advertiser inputs in a search to select the          02:09:38

11   matching interests.

12             So as I described, an advertiser

13   selects -- creates an ad, selects their -- their

14   desired audience.  And they could input something

15   like Nike and see the interests that match that in  02:09:54

16   order to select that interest.  That's effectively

17   a search keyword.

18        Q.   (By Ms. Weaver)  And does Facebook have

19   limitations on what keywords advertisers can use?

20        A.   So, again, to be clear, it's not that      02:10:14

21   we're providing them keywords.  The keyword is what

22   an advertiser chooses to search.  They can search

23   against whatever they want.  But we've had

24   interests that we provide.  And if their keyword

25   matches, we'll render that interest.                 02:10:29
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1        Q.   Okay.  I'm sorry.                    02:10:30

2             The question I asked was, does Facebook

3   limit what keywords advertisers can use?

4        A.   Do you mean --

5             MR. BENJAMIN:  Objection to form.     02:10:39

6   Argumentative.  Asked and answered.

7             THE DEPONENT:  Can you clarify what you

8   mean --

9        Q.   (By Ms. Weaver)  I'm not saying Facebook

10  is providing the keyword, right?                02:10:47

11       A.   I understand.

12       Q.   Advertisers are using a keyword.

13            Does Facebook say you can't use these

14  kinds of keywords?

15       A.   Can you clarify what you mean by "use,"  02:10:56

16  for -- from the advertiser perspective?

17       Q.   You said a keyword can be used to search

18  against whatever the advertiser is looking for,

19  right?

20       A.   So an advertiser can input a word, a     02:11:11

21  keyword.

22       Q.   Right.

23       A.   We don't limit what they search for, but

24  we limit what we will return to our interests.  And

25  we don't provide anything as an interest.        02:11:24
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              So there is a limitation on what an        02:11:27

 2   advertiser could use for targeting.  They could

 3   choose to search any number of words, but those

 4   won't all have a matching interest that's actually

 5   used for targeting.                                   02:11:41

 6        Q.   Okay.  I -- I think I understand the

 7   distinction you're making, but I'm not sure because

 8   it's one of two things.

 9              Can an advertiser search for a word, but

10   then it just won't be used in the advertisement; is   02:11:55

11   that what you're saying, because I don't understand

12   the difference?

13        A.   I'm saying -- the difference is we have

14   the interests that we provide as part of the

15   selection of the target or -- or the desired          02:12:12

16   audience.  And in order for an advertiser to find

17   which interests they want to use for targeting,

18   they can input a search term.

19              If that search term has no matches, then

20   there won't be anything that's added as part of the   02:12:28

21   criteria for their targeting.

22              If it has a match, they can then select

23   from those matches to say I want -- if I type in

24   shoes, as an advertiser, and there is an interest

25   that matches that keyword search, then we'll show     02:12:42
```

Page 214

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    them shoes and they can select that interest in        02:12:45

 2    order to -- to find their target audience.

 3         Q.   Right.

 4              And so if the -- are there any

 5    limitations on the search terms that will actually      02:12:55

 6    be employed by Facebook, other than it's not one of

 7    the interests?

 8              MR. BENJAMIN:  Objection.

 9              THE DEPONENT:  The only --

10              MR. BENJAMIN:  Objection to form.            02:13:06

11              THE DEPONENT:  The way we use those

12    search terms is to render an interest for the

13    advertiser to choose from.  If it doesn't have a

14    match, there's no other use for that keyword search

15    term they've inputted.                                  02:13:22

16         Q.   (By Ms. Weaver)  Does Facebook have any

17    restrictions on what search terms advertisers can

18    use as --

19              MR. BENJAMIN:  Objection.

20         Q.   (By Ms. Weaver)  -- as a matter of           02:13:31

21    policy?

22              MR. BENJAMIN:  Objection to form.  Asked

23    and answered.  Scope.

24              THE DEPONENT:  There isn't a limit for

25    what an advertiser can type into the search box.        02:13:42
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    It has to actually match -- in order to be used for      02:13:47

2    targeting, they have to select an interest from

3    those search results.

4        Q.   (By Ms. Weaver)  But you're not aware of,

5    for example, certain words being blacklisted -- or       02:13:56

6    I hear the new phrases -- deny listed by Facebook

7    for use in keyword searches?

8            MR. BENJAMIN:  Objection to form.

9            THE DEPONENT:  No.

10       Q.   (By Ms. Weaver)  Okay.  Well, let's take        02:14:16

11   a look at Exhibit 658 -- oh, no.  Sorry 659.

12   Apologies.

13       A.   I have it up.

14       Q.   And the first question is, have you seen

15   this document before?                                    02:14:33

16       A.   Yes.  I saw it as part of prep for this

17   deposition.

18       Q.   Okay.  In the second sentence -- well,

19   let's start, do you see where the first -- the

20   email on top says, "Hi John, As a technical matter,      02:14:45

21   you can target based on specific keywords in a

22   status update or group membership.  However, our Ad

23   Guidelines prohibit advertisers from 'imply[ing] by

24   targeting...a user's personal characteristics

25   within the following categories," and then it lists      02:15:02
```

Page 216

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    "race or ethnic origin; religion or philosophical      02:15:04

 2    belief; age; sexual orientation or sexual life;

 3    gender identity; disability or medical condition;

 4    financial status or information; membership in a

 5    trade union; and criminal record."                     02:15:18

 6             Do you see that?

 7       A.   Yes.

 8       Q.   And so is it true that Facebook prohibits

 9    advertisers from using the keywords relating to the

10    topics described there?                                02:15:30

11       A.   This policy --

12             MR. BENJAMIN:  Objection.

13             THE DEPONENT:  This policy prohibits

14    advertisers -- this is one of our content

15    policies -- and it disallows advertisers from          02:15:44

16    calling out any of these attributes in the content

17    of their ad.

18       Q.   (By Ms. Weaver)  And what -- why does

19    Facebook have that policy?

20       A.   This policy exists because we understand        02:15:59

21    that people don't want their attributes called out

22    in an ad.

23       Q.   And how long has this policy been in

24    effect?

25       A.   Many years.  This is like pre 2008              02:16:13
```

Page 217

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | policy. | 02:16:16 |
| 2 | Q.   And among the attributes that users don't | |
| 3 | want called out in an ad is age and gender | |
| 4 | identity, right? | |
| 5 | A.   Correct. | 02:16:28 |
| 6 | Q.   Now, when we talked about core audiences, | |
| 7 | you said that for core audiences Facebook targets | |
| 8 | age and gender, right? | |
| 9 | A.   Yes. | |
| 10 | Q.   Why is there a distinction? | 02:16:38 |
| 11 | A.   Again, this is about the ad content.  An | |
| 12 | ad content cannot call out people's specific | |
| 13 | attributes. | |
| 14 | Q.   What does -- how does core audience | |
| 15 | function? | 02:16:54 |
| 16 | A.   It's not about the content -- | |
| 17 | MR. BENJAMIN:  Object -- objection to | |
| 18 | form. | |
| 19 | THE DEPONENT:  It's not about the content | |
| 20 | of an ad. | 02:17:00 |
| 21 | Q.   (By Ms. Weaver)  Meaning people are being | |
| 22 | targeted by their age or gender, but the content of | |
| 23 | the ad doesn't reveal it? | |
| 24 | A.   We -- we don't allow content of the ad to | |
| 25 | call out these attributes.  That is completely | 02:17:13 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    separate from the audience selection by the          02:17:18

 2    advertiser.

 3        Q.   So people can be targeted by their age or

 4    gender, but Facebook just doesn't want the ad

 5    itself to reveal to the user that they are being     02:17:31

 6    targeted by their age or gender, among other

 7    things; is that right?

 8            MR. BENJAMIN:  Objection to form.

 9    Argumentative.  Mischaracterizes.

10            THE DEPONENT:  We provide transparency        02:17:45

11    into the targeting options so a user has "Why Am I

12    Seeing This," and they would be able to understand

13    the targeting options.  So that's not the

14    rationale.  They still have that information.  This

15    is a content policy.                                 02:17:59

16        Q.   (By Ms. Weaver)  When people receive an

17    ad, do they know in the moment that they receive it

18    that they're being targeted because of their age or

19    gender, especially if the ad hides that fact by not

20    referencing it?                                      02:18:18

21            MR. BENJAMIN:  Objection to form.

22            THE DEPONENT:  I think that assumes that

23    all ads would reference it.  But the -- the user

24    would see an ad, they know that ads are sponsored

25    content and involve targeting.  They also have the   02:18:30
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    tool to see those specific parameters.            02:18:33

 2        Q.   (By Ms. Weaver)  Okay.  Let me ask this,

 3    why is it that Facebook concluded that people don't

 4    want to see ads that, on their face, target them by

 5    "race or ethnic origin; religion or philosophical  02:18:50

 6    belief; age; sexual orientation or sexual life;

 7    gender identity; disability or medical condition

 8    (including physical or mental health); financial

 9    status or information; membership in a trade union;

10    and criminal record"?                             02:19:06

11            MR. BENJAMIN:  Objection to form and

12    scope.

13            THE DEPONENT:  We understood that people

14    did not like those ads, and we made it a policy to

15    not allow that -- the content to call out people's 02:19:17

16    attributes.

17        Q.   (By Ms. Weaver)  How did Facebook decide

18    that people do not like the ads that focus on the

19    attributes that I just described?

20            MR. BENJAMIN:  Objection to form.  Scope.  02:19:31

21            THE DEPONENT:  In the content -- this is

22    from my personal experience, because it -- not

23    related to ad targeting.  We understand from my --

24    the way I've understood this policy, we measure

25    X outs, et cetera.  And so we know which ads have   02:19:50
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | an X out, and this is an example of where that can | 02:19:53 |
| 2 | inform our policies. | |
| 3 | Q.   (By Ms. Weaver)   For the record, what do | |
| 4 | you mean by "X out"? | |
| 5 | A.   Oh, apologies.  Reports. | 02:20:01 |
| 6 | Q.   I'm sorry.  What's that -- | |
| 7 | A.   When -- when someone sees an ad, they | |
| 8 | have the ability to say, "I don't want to see this | |
| 9 | ad."  That is one way that we understand ads that | |
| 10 | people do and don't want to see as -- and from my | 02:20:14 |
| 11 | understanding, that's how we develop policies like | |
| 12 | this. | |
| 13 | Q.   And for this policy, which you said was | |
| 14 | developed in pre 2008, what was the information | |
| 15 | that Facebook relied on in determining that people | 02:20:28 |
| 16 | don't want to see ads that, in their content, | |
| 17 | target them for these characteristics? | |
| 18 | A.   I'm not an expert in our ad content | |
| 19 | policies and their early development.  That's | |
| 20 | outside of ad targeting.  The -- but, in general, | 02:20:47 |
| 21 | we use feedback signals.  X outs is an example of | |
| 22 | that. | |
| 23 | Q.   So, in fact, Facebook may target users | |
| 24 | because of "race or ethnic origin; religion or | |
| 25 | philosophical belief; age; sexual orientation or | 02:21:05 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    sexual life; gender identity; disability or medical      02:21:08

2    condition (including or physical or mental health);

3    financial status or information; membership in a

4    trade union; and criminal record," but Facebook's

5    policy is just not to make it apparent in the            02:21:22

6    content of the ad; is that fair?

7              MR. BENJAMIN:  Objection.  Argumentative.

8    Misstates.  Asked and answered.  Outside the scope.

9              THE DEPONENT:  No, that's not accurate.

10   We don't provide targeting options based on this         02:21:39

11   data on many -- a lot of the data you read out.

12   And this is specifically a content policy.  It is

13   distinct from the targeting options we provide.

14        Q.   (By Ms. Weaver)  Facebook does target

15   people based on age and gender, correct?                 02:21:55

16        A.   Correct.  The rest of the list, no.

17        Q.   Does Facebook draw inferences about

18   users' financial status or information to determine

19   what action they might next take?

20        A.   No.                                            02:22:12

21             MR. BENJAMIN:  Objection -- objection to

22   form.

23        Q.   (By Ms. Weaver)  Does Facebook use any of

24   the categories identified in Exhibit 659 in its

25   analyses about estimated actions?                        02:22:21
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1          A.    These categories -- we don't have all of        02:22:31
 2     these categories.  Like we do not collect race or
 3     ethnic origin.  We don't collect disability or
 4     medical condition, financial status, trade union
 5     membership and criminal record.                             02:22:44
 6               And we don't create inferences about
 7     these -- any of these to determine the attribute or
 8     predict someone's attribute.
 9          Q.    Is it your testimony, on behalf of
10     Facebook, that at no point in time did Facebook            02:22:59
11     infer ethnic origin or race about users?
12          A.    Yes, we did not infer people's
13     characteristic, their ethnic or racial origin.  And
14     maybe I should -- I was -- no, we did not.  I was
15     saying "yes" to your question to clarify.                  02:23:21
16          Q.    Do you see a reference here to the
17     minimum cluster size in this document under
18     there -- there's a box here that says "Redacted -
19     Privileged."
20          A.    Yes, I see the reference.                       02:23:41
21          Q.    What is "minimum cluster size"?
22          A.    This is similar to what we discussed
23     about the minimum audience size we will allow for
24     an ad to run -- or we require.
25          Q.    Sorry.                                          02:23:55
```

Page 223

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              What's the difference between minimum      02:23:55

 2    cluster size and minimum audience size?

 3         A.   I understand those to be the same.

 4         Q.   Okay.  So a little bit lower on this

 5    page, the last full paragraph, do you see where    02:24:17

 6    John Patten wrote to Rob Sherman, "So under the

 7    idea that if you provide info on FB even if it is

 8    medically sensitive, it is ad targetable."

 9              Do you see that?

10         A.   I see it.                                 02:24:35

11         Q.   And you disagree with that statement?

12         A.   Yes.

13         Q.   So what does Facebook do to prevent

14    information that is medically sensitive being used

15    to create inferences about users?                  02:24:49

16              MR. BENJAMIN:  Objection.  Form.

17              THE DEPONENT:  We don't collect medical

18    information, and we also separately do not infer

19    someone's medical condition.

20         Q.   (By Ms. Weaver)  When you say you don't   02:25:10

21    collect it, what do you mean?

22         A.   I mean that there isn't like a place

23    where someone says -- similar -- as an example, to

24    reference gender, we have -- part of profile is

25    gender or age and someone provides that, there is  02:25:25
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1     not a similar medical condition field that people        02:25:29

 2     fill out or provide.

 3          Q.   Right.

 4               But if there are conditions, for example,

 5     that -- you know, asthma, or something like that,         02:25:40

 6     does -- does Facebook infer things about users

 7     based on that information?

 8               MR. BENJAMIN:  Objection.

 9               THE DEPONENT:  We don't -- we don't have

10     that information.                                         02:25:55

11          Q.   (By Ms. Weaver)  What if I click on a

12     page for a medical provider, what does Facebook do

13     with that information?

14               MR. BENJAMIN:  Objection --

15               THE DEPONENT:  We --                            02:26:05

16               MR. BENJAMIN:  -- to form.

17               THE DEPONENT:  We would know you clicked

18     on a page from a medical provider.  We're not

19     making an inference about your medical condition.

20          Q.   (By Ms. Weaver)  And what does Facebook         02:26:15

21     do with the information that I clicked on a page

22     for a medical provider?

23               MR. BENJAMIN:  Objection to form and

24     scope.

25               THE DEPONENT:  Within the context of ads,       02:26:27
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    as we've discussed, page engagement can -- can          02:26:29

2    inform the future ads people see.

3         Q.   (By Ms. Weaver)  And what if my friend

4    posts something about a cancer survivor group and I

5    like it, does that activity, which would otherwise       02:26:50

6    be included in behaviors, inform what behaviors I

7    might be included in?

8              MR. BENJAMIN:  Objection to form.

9              THE DEPONENT:  We don't have a behavior

10   targeting option that is about -- like cancer,           02:27:19

11   friends of cancer survivors.  That's not a

12   targeting option.

13        Q.   (By Ms. Weaver)  Does Facebook use that

14   information in determining my estimated actions?

15        A.   We don't use the content of your friend's      02:27:45

16   post.  That's not something we use currently.

17        Q.   Did Facebook use the contents of my

18   friend's posts at any point in time from 2007 to

19   the present?

20        A.   No.                                            02:28:03

21        Q.   So why did you say "currently"?

22             MR. BENJAMIN:  Objection.  Form.

23   Argumentative.

24             THE DEPONENT:  I was -- I was just

25   honestly repeating the tense of the question.  It        02:28:15

                                                     Page 226

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    wasn't meant to be an exclusion.                    02:28:18

2         Q.   (By Ms. Weaver)  Do you understand how

3    the algorithms work and what inputs they use to

4    create estimated actions?

5              MR. BENJAMIN:  Objection to form.        02:28:39

6    Compound.  Vague.

7              THE DEPONENT:  I understand the machine

8    learning that -- that is how we generate the

9    estimated action rate and the inputs that they use.

10        Q.   (By Ms. Weaver)  And what are the inputs   02:28:54

11   for the machine learning that you just mentioned?

12        A.   On-site activity and offsite activity

13   through our business tools.

14        Q.   And specifically what on-site activity?

15             MR. BENJAMIN:  Objection to form.  Asked   02:29:09

16   and answered.

17             THE DEPONENT:  The ad engagement, page

18   engagement, people's activity.  The info they

19   provide to us.  Those are all parts of that

20   estimated action rate.                              02:29:18

21        Q.   (By Ms. Weaver)  Does it consider what

22   actions I take with regard to content my friends

23   post?

24        A.   No.

25        Q.   Does it consider the contents of what I    02:29:43

                                          Page 227

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    post?                                              02:29:45

 2        A.   No.

 3        Q.   Okay.  I'm going to return to a topic we

 4    began a while ago on page 3 of Exhibit 656.

 5             We were discussing "Facebook's policies   02:30:21

 6    restricting advertisers' use of advertising-related

 7    data (i.e. limiting it to its 'use case')."

 8             Do you recall that?

 9        A.   I'm sorry.  On 656?

10        Q.   I'm sorry.  Let me make sure I have the   02:30:36

11    right -- 657.

12             I'm -- I'm sorry.  That's my fault.

13        A.   Yes, I have it up.

14        Q.   So do you recall the bullet point on

15    page 3 that we began discussing but did not        02:30:47

16    complete?

17        A.   Yes.

18             Sorry.  I'm trying to find the exact

19    wording on here.

20        Q.   No problem.                               02:30:56

21        A.   Yes.

22        Q.   So what does -- what are Facebook's

23    policies restricting advertisers' use of

24    advertising-related data?

25        A.   There are a few relevant policies.  As an 02:31:18
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    example, our customer list policies limits the way      02:31:21

 2    people can use that information.  Our business

 3    tools do as well.

 4          And we also require -- do not allow

 5    advertisers to use information that they understand     02:31:34

 6    from the ad for purposes other than understanding

 7    the performance of their ad.

 8        Q.   What policies in particular are you

 9    referring to?

10          MR. BENJAMIN:  Objection.                         02:31:50

11          THE DEPONENT:  I don't -- I -- I can look

12    up the exact like policy number, the -- do you mean

13    like in those terms which number?

14        Q.   (By Ms. Weaver)  Just descriptively, what

15    policies are you referring to?                          02:32:02

16        A.   All of those terms have policies that

17    restrict how an advertiser -- and the requirements

18    for that data and disallow an advertiser from

19    taking specific actions with it.

20          So as an example, our policy -- our ad            02:32:19

21    guidelines, ad policies disallow an advertiser from

22    using ad targeting to harass or provoke people.  It

23    also disallows advertisers from taking information

24    to -- for purposes other than understanding the

25    performance of their ad.                                02:32:38
```

Page 229

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1          Q.   Okay.  What we're talking about here are      02:32:40

2     the advertising of -- using advertising-related

3     data beyond a use case, right?

4          A.   Yes.

5          Q.   What is a use case?                           02:32:52

6          A.   To place the ad --

7          Q.   You're saying --

8          A.   -- in this context.

9          Q.   -- for advertisers, the use case should

10    be limited solely to placing an ad; is that right?      02:33:02

11         A.   Placing the ad and the -- the performance

12    of that ad.

13         Q.   And what does advertising-related data

14    mean in this context?

15         A.   Related to ad targeting and ad delivery,      02:33:23

16    it means the way an advertiser sets up their --

17    their ad and the performance of that ad.

18         Q.   Does that exclude information about who

19    receives the ad and the engagement or action rate?

20              MR. BENJAMIN:  Objection to form.             02:33:52

21              THE DEPONENT:  Let me know if this

22    answers your question.

23              We -- we don't provide advertisers

24    with -- who has seen their ad at an individual user

25    level.  That's not something we give them.              02:34:03
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              They understand -- they are provided        02:34:05

 2    performance metrics that are aggregated, and those

 3    are for the purpose of understanding the

 4    performance of that ad.  That's the use case.

 5         Q.   (By Ms. Weaver)  So at some point in        02:34:17

 6    time, when the audience -- minimum audience number

 7    was 20, an advertiser could identify 20 people from

 8    its customer list, run an ad, and then Facebook

 9    would provide aggregated -- meaning aggregated for

10    those 20 people -- how many people took action, for  02:34:36

11    example; is that right?

12              MR. BENJAMIN:  Objection to form.  Calls

13    for speculation.

14              THE DEPONENT:  An advertiser could create

15    a custom customer list.  It would have to have at    02:34:49

16    least 20 matches in order for it to be used in an

17    ad.  They could then run that ad.  And we would

18    show the reporting metrics related to that ad,

19    again, in an aggregated form.

20         Q.   (By Ms. Weaver)  And what are the          02:35:05

21    reporting metrics that Facebook would provide for

22    that ad?

23         A.   These were the metrics categories that --

24    that I covered earlier of impressions -- so number

25    of impressions.  Number of clicks.  Ad spend.        02:35:17
```

Page 231

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    Ad score.                                                  02:35:21

2         Q.   And for these 20 people, how many

3    categories of interests could an advertiser seek?

4              MR. BENJAMIN:  Objection to form.

5    Misstates.                                                 02:35:38

6              THE DEPONENT:  Can you clarify what you

7    mean by an advertiser could seek interests?

8         Q.   (By Ms. Weaver)  Sure.

9              So I'm -- here's my audience of 20, and I

10   want to identify the following 10 categories of           02:35:47

11   interests.

12             Was there a cap on the number of

13   interests or behaviors that an advertiser could

14   identify to target the 20 people?

15        A.   An advertiser can use a customer list and       02:36:07

16   they can use additional targeting options with that

17   list.  But an ad cannot add audience, cannot be

18   narrowed be- -- below the threshold in order for us

19   to deliver it.

20        Q.   I'm not talking about the audience now.          02:36:22

21   I'm talking about the characteristics that are

22   being focused on, right, the interests or the

23   behaviors.

24             Was there a cap on the behaviors that

25   could be used to target the audience?                      02:36:33

                                                    Page 232

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1      A.   There is not a cap in the number of          02:36:37

2    behaviors someone can choose.  But if choosing

3    those behaviors drops the audience below a certain

4    level, we will not deliver that ad.

5      Q.   And what is the level below which it may      02:36:49

6    not drop?

7      A.   It is 100 people.

8      Q.   And why is the limit 100 people?

9      A.   When we've done assessments of -- across

10   our system to ensure that people aren't able to      02:37:11

11   reidentify, that was one of the -- that was a

12   threshold that we felt comfortable with as a

13   prevention.

14     Q.   When was the 100 people threshold

15   established?                                         02:37:24

16     A.   I believe it was 2018.  And before that

17   there was a threshold.  It was lower, but there's

18   always been a threshold.

19     Q.   What was the lowest threshold that has

20   existed?                                             02:37:39

21        MR. BENJAMIN:  Objection to form.

22        THE DEPONENT:  20, I believe.

23     Q.   (By Ms. Weaver)  And when -- for what

24   years was the 20 threshold operative?

25     A.   I believe up until between 2016 and 2018.     02:38:12

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    I'm not sure if we went straight to 100 or -- or in        02:38:17

 2    between.

 3         Q.   And when the threshold was 20, could

 4    advertisers use geo location as a target?

 5         A.   Advertisers can use location targeting.         02:38:41

 6    If the ad audience, after any targeting selection,

 7    drops below the threshold of 100, it would then not

 8    deliver.  We won't deliver that ad.

 9         Q.   That's the current policy, correct?

10         A.   And -- yes.                                     02:39:06

11         Q.   But if the threshold was 20, could an

12    advertiser use location targeting?

13         A.   Yes.  Again, they can select location.

14    And if it ever drops below 20, that ad would not

15    deliver.                                                  02:39:21

16         Q.   And when the threshold was 20, an

17    advertiser could use geo location in combination

18    with an unlimited number of interests or behaviors

19    if they were within Facebook's roster of them,

20    correct?                                                  02:39:39

21              MR. BENJAMIN:  Objection to form.

22              THE DEPONENT:  They can use any number to

23    set up their targeting audience.  If it ever drops

24    below the threshold, it will not deliver,

25    regardless of how many options they've selected.         02:39:50
```

Page 234

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1        Q.   (By Ms. Weaver)  So to be clear, until      02:39:55
2    2016 or 2018, when the threshold was raised to 100,
3    an advertiser could identify its audience of up to
4    20.  It could identify geo location.  Then it could
5    identify interests or behaviors, and as many as      02:40:13
6    possible, but no restriction.
7             And then Facebook would run and return --
8    would run the ad and return metrics to the
9    advertiser, assuming they did not go below the
10   threshold, and provide information about             02:40:31
11   engagement, views, clicks, et cetera, right?
12       A.   Can we clarify --
13            MR. BENJAMIN:  Objection -- objection to
14   form.
15            THE DEPONENT:  At the top there when you     02:40:42
16   were reading through or -- or -- top of your
17   question, identify -- I think the first part was
18   you said identify 20.
19            What -- what did you mean there?
20       Q.   (By Ms. Weaver)  So let's assume the --      02:40:55
21   in this first scenario, it's a user list.
22       A.   So a custom audience.
23       Q.   Yes.
24       A.   A customer list.  I see.
25            So an advertiser could upload a customer     02:41:04
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | list, and they could use the other targeting | 02:41:07 |
| 2 | options to create their ad -- desired audience for | |
| 3 | their ad.  If it did not drop below the threshold, | |
| 4 | we would deliver that ad.  And we would provide | |
| 5 | performance metrics, but those performance metrics | 02:41:20 |
| 6 | do not include who saw the ad.  Regardless of how | |
| 7 | big the audience is or isn't, we don't provide who | |
| 8 | saw the ad to an advertiser. | |
| 9 | Q.   And in addition to user list, there were | |
| 10 | two other kinds of audiences, right? | 02:41:38 |
| 11 | A.   Within -- | |
| 12 | MR. BENJAMIN:  Objection.  Form. | |
| 13 | Q.   (By Ms. Weaver)  There's the website app | |
| 14 | custom audience and there's also engagement custom | |
| 15 | audience, right? | 02:41:51 |
| 16 | A.   Those are two other types of custom | |
| 17 | audience, yes. | |
| 18 | Q.   And so the same would apply for those | |
| 19 | kinds of audience as well.  The 20 cap, maybe 100 | |
| 20 | cap for now.  Unlimited interests and behaviors can | 02:42:01 |
| 21 | be targeted including geo location, right? | |
| 22 | A.   Those don't have the same upload | |
| 23 | functionality as a customer list.  But they also | |
| 24 | had an audience minimum.  And to be clear, the | |
| 25 | audience minimum is of the total targeting option | 02:42:16 |

Page 236

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1     selected.                                          02:42:20

2            So it could be website custom audience

3     with a number of interests or with no interests.

4     In either scenario, there is -- it has to be above

5     a minimum threshold in order to run the ad.         02:42:31

6            Q.   What's the minimum threshold?

7            A.   100.

8            Q.   And it used to be 20?

9            A.   Yes.

10           Q.   Until 2016 or 2018?                      02:42:43

11           A.   Correct.

12           Q.   You said they don't have the same upload

13    functionality.

14                What do you mean?

15           A.   I meant for customer list, the advertiser  02:42:55

16    is uploading a list of their existing customers.

17    That's distinct from engagement custom audience or

18    a website custom audience.  They don't -- they're

19    not based on a customer list that the advertiser

20    provides.                                           02:43:10

21           Q.   Is a Facebook user ID a unique

22    identifier?

23                MR. BENJAMIN:  Objection to form.

24                THE DEPONENT:  Yes, every user has their

25    own unique UID.                                     02:43:33

                                              Page 237

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1      Q.   (By Ms. Weaver)   And Facebook doesn't          02:43:35

2   provide Facebook user IDs in this process of

3   targeted advertising through custom audiences,

4   right?

5      A.   We do not provide UIDs to advertisers.          02:43:45

6      Q.   Does Facebook take any steps to ensure

7   that the advertiser who are identifying their

8   target audiences do not possess Facebook user IDs?

9      A.   Let me know if this gets at what your

10  question is asking.                                     02:44:05

11          When an advertiser uploads a customer

12  list, we hash their information so we don't

13  actually know exactly what their -- the -- the

14  identifier.  We're not learning anything through

15  that upload.  And after we match it to users, we        02:44:15

16  don't provide anything back to the advertiser about

17  those users, including -- and definitely not their

18  user ID.

19     Q.   Facebook is aware that data brokers

20  already have Facebook user IDs, right?                  02:44:33

21          MR. BENJAMIN:  Objection to form and

22  scope.

23          THE DEPONENT:  I can't speak to that.

24  I'm not aware.

25     Q.   (By Ms. Weaver)  So the --                      02:44:42

                                                   Page 238

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1        A.   In my personally capacity, I don't know.     02:44:42

2        Q.   So the representation here is that

3   Facebook is not providing any personally

4   identifiable information through the targeted

5   advertising process, right?                           02:44:52

6             MR. BENJAMIN:  Objection to form.  Vague.

7             THE DEPONENT:  We don't provide

8   advertisers information about the users who -- or

9   who saw their ad and how to identify those users.

10       Q.   (By Ms. Weaver)  Okay.  Well, let's go       02:45:06

11  back to Exhibit 658 and turn to page 5.  And I'll

12  read into the record at Bates number -903.

13            "We don't share information with

14  advertisers that personally identifies individuals

15  unless they've given us permission."                  02:45:28

16            Do you see that?

17       A.   Yes.

18       Q.   And -- and that's a core promise that

19  Facebook has made to users from 2007 to the

20  present, right?                                       02:45:39

21       A.   Correct.

22       Q.   And what does it mean in your

23  understanding to personally identify an individual?

24       A.   To tell an advertiser who saw their ad.

25       Q.   So to you, it just would be saying          02:45:55
```

Page 239

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    Lesley Weaver saw this ad, and that would be        02:45:57

2    compliant with this policy?

3             MR. BENJAMIN:  Objection to form.

4             THE DEPONENT:  I'm sorry.  I don't follow

5    what you mean.                                       02:46:05

6        Q.   (By Ms. Weaver)  You're saying it -- to

7    tell an advertiser who saw their ad would be

8    providing personally identifiable information,

9    right?

10       A.   Yes.  And we do not do that.                02:46:20

11       Q.   And what do you mean when you say to tell

12   a user who saw an ad -- I'm sorry.

13            What do you mean by "To tell an

14   advertiser who saw their ad"?

15       A.   We don't tell them individual user level   02:46:33

16   information about who saw their -- about the users

17   who saw their ad.

18       Q.   But when the limit was 20 people, you

19   would tell them that 20 people saw their ad, and

20   they would have already targeted certain data       02:46:52

21   points like geo location and other attributes,

22   correct?

23            MR. BENJAMIN:  Objection to form.

24   Misstates.

25            THE DEPONENT:  After they've created       02:47:06
```

Page 240

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    their audience, they would know how many people saw        02:47:07

2    their ad.  But that would have to be, again, in

3    order to deliver that audience, it had to be above

4    the threshold.

5        Q.   (By Ms. Weaver)  Which was 20 people for        02:47:21

6    most of the class period, right?

7            MR. BENJAMIN:  Objection to form.

8            THE DEPONENT:  Through the years, yes,

9    until 2016 or 2018.

10       Q.   (By Ms. Weaver)  So a separate question I        02:47:34

11   was asking is, is Facebook aware that, in fact,

12   many third parties have data that associates users'

13   Facebook IDs with individuals?

14           MR. BENJAMIN:  Objection to form and

15   scope.                                                 02:47:54

16           THE DEPONENT:  I don't know about whether

17   third parties have UIDs.

18       Q.   (By Ms. Weaver)  Is that a concern of the

19   Facebook targeted advertising policy team?

20           MR. BENJAMIN:  Objection to form and        02:48:08

21   scope.

22           THE DEPONENT:  We don't provide UIDs

23   through our ad system and do -- we do -- we don't

24   provide it purposefully, so that it's not available

25   to an advertiser.  That's what this statement        02:48:21

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
  1    indicates.                                        02:48:25

  2           So it would -- yes, but it's not

  3    something we do.  And we purposely don't do it.

  4           Q.   (By Ms. Weaver)  And why is that?

  5           A.   If we provided a UID, they would be able    02:48:38

  6    to tie that back to an individual.  And we

  7    specifically state that we don't give information

  8    to advertisers about who saw the ad -- specifically

  9    about the individual who saw the ad.

 10           Q.   What steps did Facebook take to ensure    02:48:58

 11    that third parties who were conducting targeting

 12    advertising in groups of 20 did not possess

 13    Facebook user IDs or a way to reidentify users?

 14           MR. BENJAMIN:  Objection to form.

 15           THE DEPONENT:  I think we have to    02:49:22

 16    differentiate -- and I'm -- I might be missing the

 17    link here, the possessing UIDs.

 18           Within our ad system, we don't provide

 19    UIDs.  An advertiser has to meet a minimum

 20    threshold in order to run the ad.  And the metrics    02:49:37

 21    we provide them, performance metrics are

 22    aggregated.

 23           So we don't tell them information about

 24    who saw the ad specifically.  And so there wouldn't

 25    be something to relate back to a UID, whether they    02:49:48
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | |
|---|---|
| 1 | possess it or not.  And they wouldn't gain access | 02:49:52 |
| 2 | to the UID through our ad delivery. | |
| 3 |      Q.   (By Ms. Weaver)  I understand you're | |
| 4 | saying that Facebook did not directly provide | |
| 5 | Facebook users IDs. | 02:50:01 |
| 6 |           Wasn't Facebook aware that during the | |
| 7 | class period, at multiple points, third parties who | |
| 8 | advertised on Facebook had obtained Facebook user | |
| 9 | IDs? | |
| 10 |           MR. BENJAMIN:  Objection to form.  Asked | 02:50:16 |
| 11 | and answered.  Foundation. | |
| 12 |           THE DEPONENT:  I'm just not sure what | |
| 13 | the -- one, I don't know the scenarios we're | |
| 14 | talking about.  They're outside of the ads -- my | |
| 15 | expertise on ads. | 02:50:32 |
| 16 |           And I'm not certain the significance of | |
| 17 | how the UID plays into what we provide from ads, | |
| 18 | where it is -- has to a meet a minimum threshold, | |
| 19 | and we only provide aggregated performance metrics. | |
| 20 |      Q.   (By Ms. Weaver)  So as you sit here | 02:50:54 |
| 21 | today, you're not aware that anybody outside of | |
| 22 | Facebook scraped or obtained Facebook user IDs; is | |
| 23 | that true? | |
| 24 |           MR. BENJAMIN:  Objection to form. | |
| 25 |           THE DEPONENT:  I am not an expert on all | 02:51:09 |

Page 243

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| 1 | of the scraping or nonscraping that's occurred at | 02:51:11 |
| 2 | Facebook.  That's -- | |

3      Q.   (By Ms. Weaver)  I didn't -- I didn't ask

4    that, whether you were an expert.

5            I asked whether you are aware, under          02:51:18

6    oath, as you sit here today, that third parties had

7    scraped Facebook user IDs off the platform and

8    possessed them?

9            MR. BENJAMIN:  Objection to form and

10   scope.                                               02:51:32

11           THE DEPONENT:  I could not identify from

12   my personal capacity examples of what you're

13   talking about in any form of -- that I could speak

14   to or -- or am aware of.

15      Q.   (By Ms. Weaver)  As you sit here today,      02:51:50

16   you are saying you are unaware that users scraped

17   Facebook user IDs off the platform?

18           You're under oath.

19           MR. BENJAMIN:  Objection to form.

20   Argumentative.  Asked and answered.  Beyond the      02:51:58

21   scope.

22           THE DEPONENT:  I'm truly -- I am not able

23   to speak to, and I don't know scenarios of user ID

24   scraping.

25      Q.   (By Ms. Weaver)  And you are part of the     02:52:16

Page 244

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    privacy policy team for advertising, right?          02:52:17

2         A.   Yes.

3         Q.   How many people are on that team?

4         A.   For advertising, specifically?

5         Q.   Yes.                                        02:52:30

6         A.   There -- I believe there are currently

7    ten of us.

8         Q.   And who's the lead on that team?

9         A.   Andrew Howard.

10        Q.   And to whom do you report?                  02:52:46

11        A.   Andrew Howard.

12        Q.   And you're not aware of any instances of

13   third parties obtaining Facebook user IDs; is that

14   right?

15             MR. BENJAMIN:  Objection to form.  Asked    02:53:00

16   and answered.  And to scope.

17             THE DEPONENT:  I -- I do not cover

18   scraping.  It is -- and I don't know of instances

19   that I could speak to here or in really any

20   capacity about whether this -- whether there has      02:53:14

21   been scraping of UIDs.

22        Q.   (By Ms. Weaver)  Is there anyone on the

23   policy team for advertising who is in charge of

24   ensuring that advertising is not permitted by users

25   who are in the possession of Facebook user IDs?       02:53:31
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        A.   Again, I'm -- I'm missing the connection      02:53:38

 2   here between the possession of UIDs and whether

 3   someone advertises.

 4        Q.   Okay.  Let's say Amazon has enough data

 5   and information to be able to engineer or comes        02:53:52

 6   into the possession of Facebook user IDs.  And

 7   Amazon runs campaigns, millions of them, with the

 8   bare minimum, 20 or 100 people, to learn

 9   information about users.

10        Does Facebook have any enforcement               02:54:10

11   mechanism to prevent advertisers, who Facebook

12   knows or has reason to believe has Facebook user

13   IDs, from running that kind of campaign?

14        MR. BENJAMIN:  Yeah.  Objection to form

15   and scope.                                            02:54:26

16        THE DEPONENT:  Our protections are that

17   we don't provide information to the advertiser when

18   they -- on the performance of their ad, or who has

19   seen their ad, for it to be identifiable back to a

20   user ID.                                              02:54:46

21        Q.   (By Ms. Weaver)  Is that the only

22   protection, that Facebook itself does not provide

23   it?

24        A.   In addition to the protections of our

25   audience minimum sizes and our policies in terms      02:55:01
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    that disallow different use.                        02:55:05

 2         Q.   Yes.

 3              The only protection that Facebook engages

 4    in to ensure that third parties who are conducting

 5    targeted advertising with the minimum threshold for  02:55:16

 6    which for much of the period was 20 people, was

 7    that Facebook itself did not provide the Facebook

 8    user ID to the advertiser, correct?

 9         A.   No.

10              MR. BENJAMIN:  Objection -- yeah,          02:55:30

11    objection to form.  Misstates.

12              THE DEPONENT:  No.  Our audience minimums

13    are a form of protection.  Our aggregated metrics

14    are a form of protection.  Our policies and our --

15    the terms that advertisers have to agree with are a  02:55:43

16    form of protection.

17              And, again, this is not where I'm an

18    expert in.  But the efforts we go also on the

19    scraping front and protection there, are additional

20    areas that we ensure this doesn't happen.            02:55:56

21         Q.   (By Ms. Weaver)  So the efforts to

22    prevent future scraping doesn't address paths

23    scraping, right?

24              MR. BENJAMIN:  Objection to form and

25    scope.                                               02:56:09
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  If someone has a UID,         02:56:15
 2    our pre- -- preventing future scraping does not
 3    remove that UID from them.
 4         Q.   (By Ms. Weaver)  And when you talk about
 5    the terms, you mean the third parties promise that    02:56:23
 6    they will not -- well, I don't know what you mean.
 7              In terms of the terms, what do you mean
 8    in terms of providing protection to users whose
 9    Facebook IDs have been taken by advertiser who
10    Facebook then allows to advertise on their platform   02:56:40
11    in groups as small as 20, for the majority of the
12    class period?
13              MR. BENJAMIN:  Objection to form.
14              THE DEPONENT:  I -- I think I have to
15    clarify a question here.                               02:56:53
16              Is there an assumption that the UID is
17    specifically being used for the audience?
18         Q.   (By Ms. Weaver)  I -- I don't think
19    there's an assumption there.
20         A.   Again, we have the audience size minimums    02:57:18
21    and we provide only aggregated metrics.  And this
22    helps ensure that we do not provide identifiable
23    information about who sees an ad to the advertiser,
24    regardless of any other information they have.
25         Q.   You referenced terms as also another         02:57:33
```

Page 248

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | mechanism to prevent reidentification of users, | 02:57:37 |
| 2 | correct? | |
| 3 | A.   Yes. | |
| 4 | Q.   What terms are you referring to? | |
| 5 | A.   Our customer list policies and our | 02:57:45 |
| 6 | advertising terms -- or advertising guidelines. | |
| 7 | Q.   Are those -- those enforcement mechanisms | |
| 8 | or are they just agreements? | |
| 9 | A.   Those are agreements.  Those set -- those | |
| 10 | are the policies for -- for running ads on our | 02:58:06 |
| 11 | platform. | |
| 12 | Q.   Are you aware, as a member of the | |
| 13 | advertising policy team of ten people, of Facebook | |
| 14 | telling advertisers that they may not advertise on | |
| 15 | Facebook because they have violated the terms that | 02:58:21 |
| 16 | you're referring to because they possess Facebook | |
| 17 | user IDs? | |
| 18 | MR. BENJAMIN:  Objection to form. | |
| 19 | THE DEPONENT:  I'm not aware of an | |
| 20 | advertiser breaking the policy here and in -- | 02:58:37 |
| 21 | Q.   (By Ms. Weaver)  Are you aware of any | |
| 22 | enforcement actions taken by Facebook to determine | |
| 23 | if that had happened? | |
| 24 | MR. BENJAMIN:  Objection.  Asked and | |
| 25 | answered. | 02:58:56 |

Page 249

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  I'm not aware of -- of us      02:59:00

 2    being -- of -- of there being a case where this --

 3    like where an advertiser did this that we enforced

 4    on, or that we had to enforce on.  We -- I -- I am

 5    not aware of cases where there's been a violation.     02:59:15

 6        Q.   (By Ms. Weaver)  What steps has Facebook

 7    taken to prevent reidentification of users targeted

 8    in advertising?

 9              MR. BENJAMIN:  Objection to form.  Asked

10    and answered.                                          02:59:36

11              THE DEPONENT:  We require an audience

12    minimum.  We only provide aggregated metrics to

13    identifiers, and we don't tell them who

14    specifically saw their ad.

15        Q.   (By Ms. Weaver)  And is that the entirety     02:59:49

16    of the steps that Facebook has taken to prevent

17    reidentification of users targeted in Facebook's

18    advertising?

19        A.   Those are the foundation of how our

20    system is built to prevent exactly that.              03:00:03

21        Q.   Are there any other steps that Facebook

22    has taken to prevent reidentification of users

23    targeted in Facebook's advertising?

24        A.   We've built our system specifically to

25    prevent it.  I'm not aware of other steps we've had    03:00:19
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    to take.                                        03:00:23

 2            MS. WEAVER:  Okay.  Thank you.

 3            How long have we been going?

 4            THE VIDEOGRAPHER:  Okay.  Let me look

 5    that number --                                  03:00:35

 6            MS. WEAVER:  Let's go off the record.

 7            THE VIDEOGRAPHER:  Okay.  Thanks.

 8            We're off the record.  It's 3:00 o'clock

 9    p.m.

10            (Recess taken.)                          03:00:42

11            THE VIDEOGRAPHER:  Okay.  We're back on

12    the record.  It's 3:16 p.m.

13        Q.   (By Ms. Weaver)  Ms. Leone, I'd like to

14    direct your attention to what is being marked right

15    now as Exhibit -- uh-oh.  670?                   03:16:56

16            THE COURT REPORTER:  660.

17            MS. WEAVER:  660.

18            (Exhibit 660 was marked for

19    identification by the court reporter and is

20    attached hereto.)                                03:17:25

21            MS. WEAVER:  And for the record,

22    Exhibit 660 bears Bates numbers FB-CA-MDL-03969858

23    through -862.

24            THE DEPONENT:  I have it up.

25        Q.   (By Ms. Weaver)  Great.              03:17:43
```

Page 251

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              And what is Exhibit 670 [sic]?           03:17:43

 2              MR. BENJAMIN:  660.

 3              MS. WEAVER:  Sorry.

 4              THE DEPONENT:  Exhibit 660 is a help

 5    center article published that we put in our help   03:17:58

 6    center for advertisers called "Use Detailed

 7    Targeting."

 8         Q.   (By Ms. Weaver)  And it's true and

 9    accurate, right?

10         A.   I'm going to read through it.  One sec.   03:18:14

11         Q.   Okay.

12         A.   Yes, I read through it.  And, yes, it's

13    accurate.

14         Q.   Okay.  And this document is a current

15    document, is that right, as of June 7th, 2022?      03:18:49

16         A.   Sorry.

17              Do you mean that this is currently in our

18    help center?

19         Q.   Yes.

20         A.   I believe so, yes.  Yes.                  03:19:04

21         Q.   Okay.  And it says "Use Detailed

22    Targeting."

23              Do you see that?

24         A.   Yes.

25         Q.   And this is in the help center for        03:19:12
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    advertisers; is that right?                          03:19:15

2         A.   It's in what we call the business help

3    center, which is meant for an advertising audience.

4    But it's open to anyone.  Anyone can navigate to

5    this.                                                 03:19:32

6         Q.   So is this describing interest targeting

7    in the detailed targeting that we described at the

8    outset of the litigation?

9              I mean --

10             (Simultaneously speaking.)                  03:19:45

11             THE DEPONENT:  Yes.

12        Q.   (By Ms. Weaver)  I'm sorry.

13        A.   Yes.  This is -- this is describing how

14   to use detailed targeting, which is the category

15   for -- for audiences to select their parameters,      03:19:55

16   which includes interests.

17        Q.   And so it says here on the first page

18   that you select your audience preferences "by

19   location, age, gender and language, then by

20   Detailed Targeting," correct?                         03:20:11

21        A.   Yes.

22        Q.   So are you required to identify age and

23   gender and language as a preliminary threshold?

24        A.   All of our ads have to have a setting for

25   those, but you can have broad settings so that it's   03:20:27

                                                          Page 253

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    all -- it captures all ranges.                          03:20:30

 2            So as an example, we need to have an age

 3    range for an ad, but that age range could be the

 4    full age range of people on Facebook, so 13 to 65

 5    plus.                                                   03:20:43

 6            Similar for gender.  We have to have a

 7    setting for it, but it could just be all.  So it

 8    is -- it is something that is a toggle, but the --

 9    it doesn't mean you have to have a specific --

10    something specific within those.                       03:20:56

11        Q.   And -- and then what about language?

12            Do you have to select a language?

13        A.   No, similar.  It can be all.

14        Q.   Is it more expensive if it's all?

15        A.   No, that wouldn't be -- it -- it's not       03:21:19

16    going to be a one to one, if you switch out, to be

17    more expensive.

18        Q.   Right.

19        A.   I'm not sure what you mean.  Sorry.

20        Q.   Yeah.  That's not a good question.           03:21:30

21            What I mean is, how many people speak all

22    languages.

23            This is your target audience, right?

24        A.   It -- it doesn't mean that someone has to

25    speak all languages.  It means that any language --   03:21:40
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    and perhaps the actual option is called any.  It          03:21:42

2    means that the audience can be any language.

3          Q.   I see.  Okay.

4               And does Facebook find that targeting by

5    language allows inferences of ethnicity?                   03:22:03

6               MR. BENJAMIN:  Objection to form.

7               THE DEPONENT:  No.  Language is based on

8    the -- the -- the settings people have, like how

9    they've set up their Facebook and the language

10   they've chosen.  That's not something that is -- it        03:22:24

11   is not a method of -- of targeting ethnicity.

12         Q.   (By Ms. Weaver)  Now, has Facebook found

13   that people were impermissibly targeted by gender

14   or ethnicity using its advertising platform?

15              MR. BENJAMIN:  Objection to form.  Vague.        03:22:47

16              THE DEPONENT:  Sorry.  Can you walk

17   through what you mean by "impermissibly"?

18         Q.   (By Ms. Weaver)  Illegally.

19              MR. BENJAMIN:  Objection to form.  And

20   calls for a legal conclusion.                              03:23:01

21              THE DEPONENT:  Yeah, I can't speak to if

22   something was illegal.  I can -- I can share if

23   there's an example that you're thinking of, of how

24   those were misused.

25         Q.   (By Ms. Weaver)  As you sit here today,         03:23:18

                                                        Page 255

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    are you aware of any such examples?                    03:23:19

2             MR. BENJAMIN:  Objection to form.

3             THE DEPONENT:  Specifically for -- for --

4    I'm sorry.  You mentioned two.

5             Did you say for gender?                       03:23:30

6        Q.  (By Ms. Weaver)  Uh-huh.

7        A.  No, not aware of -- of a case where it

8    was misused.  But it's worth noting that we don't

9    permit gender targeting for specific types of ads

10   to help -- specifically to prevent misuse.  We        03:23:46

11   limit that.

12            And advertisers who are running housing,

13   employment and credit ads cannot use gender

14   targeting.  They must maintain it at all.  They

15   cannot select specific genders that's to prevent      03:23:59

16   for misuse.

17       Q.  And how long has that been the case?

18       A.  That's a policy we've had in place since

19   2018.

20       Q.  And was that a result of litigation?          03:24:09

21            MR. BENJAMIN:  Objection to form.

22            And to the extent you can answer without

23   disclosing privileged information or

24   communications, you can do so.

25            THE DEPONENT:  I -- I think I need a          03:24:26

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    quick break --                                        03:24:27

 2              MS. WEAVER:  Okay.

 3              THE DEPONENT:  -- to discuss with Matt

 4    on -- on AC priv.

 5              THE VIDEOGRAPHER:  Okay.  Go off the        03:24:37

 6    record, everybody?

 7              MS. WEAVER:  Yeah, that's fine.

 8              MR. BENJAMIN:  Yeah, that's fine.

 9              THE VIDEOGRAPHER:  Okay.  We're off the

10    record.  It's 3:24 p.m.                               03:24:44

11              (Recess taken.)

12              THE VIDEOGRAPHER:  We're back on the

13    record.  It's 3:34 p.m.

14        Q.   (By Ms. Weaver)  There was a question

15    pending when you took a break to consult with your   03:34:25

16    counsel.

17              Can you answer the question now?

18        A.   Do you mind repeating it.

19        Q.   Sure.

20              I think the question was, was that a        03:34:33

21    result of litigation?

22        A.   We were discussing the limits for age --

23    gender targeting for housing, employment and credit

24    ads.

25              We've always -- or long- -- have a          03:34:46
```

Page 257

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    long-standing policy that disallows discrimination,          03:34:48

2    including through our targeting tools.

3              In 2019 -- I should correct my previous

4    answer -- we launched specifically the targeting

5    limitations for those ads and the spe- -- what we          03:35:00

6    call the -- the special ad categories for -- as

7    part of a settlement with litigation.

8         Q.   And the settlement with who?

9         A.   It -- I actually don't know all the

10   parties involved in that litigation.  So I might          03:35:20

11   need to -- to refresh on that.

12        Q.   And prior to that litigation and

13   settlement, Facebook did not have a policy that

14   disallowed discrimination through the use of

15   targeting tools?                                           03:35:36

16        A.   No.  Sorry.  To clarify, we -- that's

17   what I was saying.  We've had a long-standing

18   policy on -- that disallows discrimination.

19             In 2019, as part of our settlement with

20   this litigation, we built the special ad category        03:35:48

21   that disallowed gender selection among other

22   targeting for housing, employment and credit ads.

23   And that was from conversations concerned about the

24   potential for misuse of those.

25        Q.   And does that same tool also prevent          03:36:02

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | targeting based on race, sexual orientation, | 03:36:09 |
| 2 | disability and religion? | |
| 3 | A.   We don't provide those targeting options | |
| 4 | at all to any advertiser. | |
| 5 | Q.   But was it a problem nonetheless that | 03:36:18 |
| 6 | Facebook's targeted advertising involved | |
| 7 | discrimination against people in those | |
| 8 | categories -- | |
| 9 | MR. BENJAMIN:  Objection. | |
| 10 | Q.   (By Ms. Weaver)  -- at any point during | 03:36:30 |
| 11 | the class period? | |
| 12 | MR. BENJAMIN:  I'm sorry.  I thought your | |
| 13 | question was over. | |
| 14 | Objection to form.  Misstates. | |
| 15 | THE DEPONENT:  We don't offer those -- | 03:36:40 |
| 16 | targeting based on those.  And so it -- it wasn't | |
| 17 | relevant to the -- the -- how we built our special | |
| 18 | ad category, which -- which restricted targeting | |
| 19 | that we do offer. | |
| 20 | Q.   (By Ms. Weaver)  So is it your testimony | 03:36:56 |
| 21 | that at no point did Facebook's advertising give | |
| 22 | third-party advertisers "the ability to exclude | |
| 23 | ethnic and religious minorities, immigrants, LGBTQ | |
| 24 | individuals and other protected groups from seeing | |
| 25 | their ads"? | 03:37:16 |

Page 259

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              MR. BENJAMIN:  Objection to form.          03:37:18

 2              THE DEPONENT:  We don't offer targeting

 3    based on -- I'm sorry -- race or ethnicity or

 4    religious views and there -- therefore, there

 5    wasn't an ability to exclude those --             03:37:30

 6         Q.   (By Ms. Weaver)  Okay.

 7         A.   -- based on that.

 8              MS. WEAVER:  Let's look at Exhibit 661.

 9              (Exhibit 661 was marked for

10    identification by the court reporter and is       03:37:39

11    attached hereto.)

12              MS. WEAVER:  And for the record, it's an

13    announcement from the Washington State office of

14    the attorney general.  The title is "AG Ferguson

15    investigation leads to Facebook making nationwide 03:37:50

16    changes to prohibit discriminatory advertisements

17    on its platform."

18              It's dated July 24th, 2018.  And the

19    first paragraph says "Attorney General Bob Ferguson

20    today announced that Facebook signed a legally     03:38:05

21    binding agreement with his office to make

22    significant changes to its advertising platform by

23    removing the ability of third-party advertisers to

24    exclude ethnic and religious minorities,

25    immigrants, LGBTQ individuals and other protected  03:38:20
```

Page 260

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    groups from seeing their ads."                      03:38:25

 2           Do you see that?

 3           THE DEPONENT:  I do.

 4           MR. BENJAMIN:  Objection.  Sorry.

 5    Objection to form.                                   03:38:31

 6           And, Counsel, could you just confirm, was

 7    this a document that was provided to us 72 hours

 8    before the deposition?

 9           MS. WEAVER:  I don't believe so.  It's in

10    the public domain.                                   03:38:36

11           MR. BENJAMIN:  So your position is it

12    didn't need to be identified 72 hours before?

13           MS. WEAVER:  Yes.

14       Q.   (By Ms. Weaver)  So, Ms. Leone, do you

15    see that first paragraph --                          03:38:58

16       A.   I do.

17       Q.   -- that I just read into the record?

18       A.   I do.

19       Q.   Is it your testimony that that is untrue?

20       A.   We did not provide the ability for          03:39:06

21    advertisers to include, or include on the basis of

22    their ethnic, religious, immigration status.  So

23    this is -- this misrepresents the options that were

24    available.

25       Q.   I don't think it's making any               03:39:24
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    representation about the options that are          03:39:26

 2    available.

 3              What it is saying is that, in fact,

 4    Facebook signed an agreement so that third-party

 5    advertisers could not discriminate against those    03:39:35

 6    parties, right?

 7              That's true; you're not disputing that?

 8              MR. BENJAMIN:  Objection to form.

 9    Argumentative.  Mischaracterizes.

10              THE DEPONENT:  We built a -- what is        03:39:50

11    called the special ad category with restricted

12    targeting options for housing, employment and

13    credit ads.

14              It wasn't that the previous options

15    en- -- like were enabling specifically targeting or  03:40:03

16    exclusion on these protected characteristics.

17    Because as an example, we don't have people's race

18    or ethnicity.

19        Q.   (By Ms. Weaver)  Is it your testimony

20    today that there was not an ethnic affinity          03:40:17

21    targeting option at Facebook ever?

22        A.   We had ethnic affinity clusters.  Those

23    are not based on race data or someone's race or

24    ethnicity.

25        Q.   Okay.  Is it your testimony that, in        03:40:32
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1   fact, individuals in these protected categories          03:40:36

 2   were not discriminated against through advertising

 3   on Facebook's website?

 4          MR. BENJAMIN:  Objection to form.  Calls

 5   for a legal conclusion.  And scope.                       03:40:48

 6          THE DEPONENT:  We didn't identify misuse

 7   here.  And we wouldn't necessarily be able to

 8   identify a discriminatory use.

 9          As an example, you could run one ad that

10   had specific targeting to women.  You could then          03:41:04

11   run another ad for men.  And overall your campaign

12   may or may not be problematic.

13          Similar, out -- off of Facebook, you

14   could run an ad on Google for a specific group and

15   on Facebook for another.                                  03:41:18

16          It -- there wasn't a specific case

17   here -- a -- a specific misuse that was being dealt

18   with.  It was a potential that then we correct --

19   we -- we built this special ad category

20   functionality for.                                        03:41:37

21     Q.   (By Ms. Weaver)  How long did Facebook

22   have targeted categories for ethnic affinities,

23   African American US, Asian American US, Hispanic US

24   all, Hispanic US bilingual, Hispanic US Spanish

25   domi- -- dominant, and Hispanic US English                03:41:54
```

Page 263

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | dominant? | 03:41:57 |
| 2 | MR. BENJAMIN:  Objection to form. | |
| 3 | Compound and scope. | |
| 4 | THE DEPONENT:  Those were categories we | |
| 5 | offered as targeting up until 2020. | 03:42:08 |
| 6 | Q.   (By Ms. Weaver)  And when did they | |
| 7 | commence? | |
| 8 | MR. BENJAMIN:  Same objection. | |
| 9 | THE DEPONENT:  I'm not sure of the exact | |
| 10 | year, but between 2012 and 2014. | 03:42:28 |
| 11 | Q.   (By Ms. Weaver)  And why did Facebook | |
| 12 | discontinue it in 2020 -- of those categories? | |
| 13 | A.   We -- | |
| 14 | MR. BENJAMIN:  Same objections. | |
| 15 | THE DEPONENT:  We consistently look at | 03:42:47 |
| 16 | the targeting we offer and whether it's being used, | |
| 17 | whether it is still relevant, if there's | |
| 18 | duplicative options. | |
| 19 | And in 2020, we underwent several updates | |
| 20 | across all of our targeting, and those were | 03:43:02 |
| 21 | deprecated as part of a simplification effort. | |
| 22 | Q.   (By Ms. Weaver)  Are you aware of whether | |
| 23 | or not, in 2018, Facebook agreed to take steps to | |
| 24 | prevent third-party advertisers from excluding | |
| 25 | persons from receiving advertisements for | 03:43:26 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    employment, housing, credit, insurance and places        03:43:29

2    of public accommodation, to the extent it affected

3    the citizens of Washington?

4              MR. BENJAMIN:  Objection to form and

5    scope.                                                    03:43:43

6              THE DEPONENT:  I'm sorry.  I -- I missed

7    the beginning of the question.

8              It -- it was whether we took steps to

9    prevent exclusion for these ads?

10       Q.   (By Ms. Weaver)  Whether Facebook agreed         03:43:51

11   in 2018, with the State of Washington, to take

12   steps to prevent third-party advertisers from

13   receiving advertisements for employment, housing,

14   credit, insurance and places of public

15   accommodation, to the extent it discriminated           03:44:04

16   against people under those protected categories who

17   lived in the State of Washington?

18             MR. BENJAMIN:  Objection to form and

19   scope.

20             THE DEPONENT:  I -- I'm not -- I --            03:44:16

21   I'm -- I think I'm misunderstanding the question

22   because it has "exclusion" and "seeing an ad."

23             But in -- in 2018 is when we agreed to

24   build the category -- the housing, employment and

25   credit restrictions, the flow for those ads that        03:44:33
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1     limits the targeting options that they have.        03:44:37

 2         Q.   (By Ms. Weaver)  So Facebook agreed to do

 3     it in 2018, but it didn't happen until 2020; is

 4     that right?

 5         A.   No.                                         03:44:47

 6             MR. BENJAMIN:  Objection.

 7         Q.   (By Ms. Weaver)  Please clarify.

 8         A.   In 2020, we deprecated, specifically

 9     among other -- other targeting options for all

10     advertisers, the multicultural affinity options.    03:45:00

11             Separately, we launched in 2019, the

12     special ad create flow which -- which was the

13     restricted flow for housing, employment and credit

14     advertisers.

15         Q.   What about --                               03:45:20

16         A.   Those are distinct.

17         Q.   What about insurance --

18         A.   Insurance --

19         Q.   -- was that included?

20         A.   Insurance is not included with the --       03:45:27

21     with the note.  If -- if it is housing insurance or

22     related mortgage insurance, those are included.

23         Q.   Okay.  Just for the record, in 2019, when

24     Facebook launched the special ad create flow to

25     restrict the flow, you're saying it was only for     03:45:47
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    housing, employment and credit advertisers; is that        03:45:51

2    correct?

3         A.   Yes.

4         Q.   What about insurance or places of public

5    accommodation?                                              03:46:02

6              MR. BENJAMIN:  Objection to form.

7              MS. WEAVER:  I -- could I just finish the

8    question?

9              MR. BENJAMIN:  I'm sorry.  I thought you

10   were done.                                                  03:46:09

11             MS. WEAVER:  That's fine.

12        Q.   (By Ms. Weaver)  So what about insurance

13   or places of public accommodation, did Facebook

14   restrict the flow for advertisements relating to

15   that as well in 2019?                                       03:46:20

16             MR. BENJAMIN:  Objection to form and

17   scope.

18             THE DEPONENT:  No.

19        Q.   (By Ms. Weaver)  Did Facebook -- for this

20   flow that Facebook created, did it apply only to            03:46:31

21   the citizens of Washington or did it apply to all

22   citizens in the United States?

23        A.   It applies to all ads bought by an

24   advertiser based in the US where -- and any ad

25   where the audience includes the US, as well as now         03:46:49

                                                    Page 267

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1   we've launched it in Canada and Europe.                      03:46:53

2        Q.   And with regard to the ethnic affinity

3   group deprecation, can you identify which ethnic

4   affinity group deprecations you're referring to,

5   which groups?                                                03:47:12

6             MR. BENJAMIN:  Objection to form.

7             THE DEPONENT:  The -- the names of the

8   targeting options?

9        Q.   (By Ms. Weaver)  Yes.

10       A.   We deprecated African American US.  These          03:47:22

11  are all multicultural affinity options.  That's

12  what they were labeled in our -- and -- and what --

13  that I'm listing.  African American, Hispanic

14  bilingual, Hispanic Spanish, Hispanic English and

15  Asian American.                                              03:47:46

16       Q.   Anything else?

17       A.   No, unless I'm missing one.  But I

18  believe there were five.  We deprecated all of the

19  multicultural affinities in -- in 2022.

20       Q.   Did Facebook perform an economic analysis          03:48:07

21  of the impact of deprecating those affinity groups

22  as targets?

23             MR. BENJAMIN:  Objection to form and

24  scope.

25             THE DEPONENT:  Similar to -- to earlier,          03:48:20

                                                      Page 268

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    there isn't a -- an economic or revenue analysis        03:48:21

 2    associated with individual targeting options.

 3         Q.   (By Ms. Weaver)  I understand that.  I'm

 4    just saying it's a pretty big decision to deprecate

 5    these kinds of targeting group.                         03:48:37

 6             And you're saying there was no internal

 7    analysis at Facebook of how it might affect revenue

 8    to deprecate those products; is that what you're

 9    saying?

10             MR. BENJAMIN:  Objection to form and           03:48:49

11    scope.

12             THE DEPONENT:  We don't measure revenue

13    on a by targeting option basis.  And so it's not

14    how we assess a targeting option or revenue.

15         Q.   (By Ms. Weaver)  Okay.  How about a cost      03:49:03

16    benefit analysis, are you aware -- aware of any

17    internal analyses at Facebook, whether it was a

18    good idea or not to deprecate multicultural

19    affinity groups and the impact it might have on

20    Facebook?                                               03:49:20

21             MR. BENJAMIN:  Objection to form and

22    scope.

23             THE DEPONENT:  In -- making -- in

24    assessing whether to -- to maintain or remove

25    those, we look at their use.  We look at an            03:49:27
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    understanding of who -- beneficial uses of those,        03:49:34

2    as an example.  And so that was definitely part of

3    the consideration.  But it is not in the form of a

4    revenue number.

5        Q.   (By Ms. Weaver)  Okay.  So there were           03:49:46

6    internal analyses that were considering whether or

7    not to deprecate the multi- -- multicultural

8    affinity groups; is that right?

9            MR. BENJAMIN:  Objection to form.

10   Misstates.  And scope.                                   03:50:00

11           THE DEPONENT:  It was an internal

12   conversation from the ads product team, their

13   policy and legal counterparts on -- on those

14   options.  The same way that we would have discussed

15   any other option.  In fact, the deprecation that        03:50:14

16   they were part of was a broader deprecation.

17       Q.   (By Ms. Weaver)  What was the broader

18   deprecation that they were part of?

19       A.   We simplified our targeting options in

20   August 2020.  It included removing duplicative           03:50:28

21   options.  Options that were unclear that

22   advertisers didn't understand.  And this was part

23   of that effort.

24       Q.   Who, in the ads product team, was

25   involved in the internal discussions regarding           03:50:42

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    whether or not to deprecate the multicultural        03:50:45

2    affinity groups?

3         A.   Our ad targeting team was involved.  Ads

4    leadership was involved.

5         Q.   And who by name?                            03:50:56

6         A.   I'm -- I'm sorry.  I'm trying to remember

7    specifically who was the ads lead at the time.

8              This would have been within ads product.

9    Dan Levy was likely involved, but I -- I can't

10   remember who else on his team.                        03:51:44

11        Q.   And did it violate Facebook's policy for

12   multicultural affinity group targeting to

13   discriminate against people who were put in those

14   target groups with respect to advertising involving

15   housing and employment, for example?                  03:52:05

16             MR. BENJAMIN:  Objection to form.

17             THE DEPONENT:  So we disallowed

18   discriminatory use of our tools, regardless of any

19   specific option.  That's -- that's not something we

20   permit.                                               03:52:24

21             In -- in 2018, we disallowed the use of

22   those multicultural affinity targets -- options

23   with housing employment and credit ads.  And in

24   2019, we created a specific flow so that they

25   couldn't be selected with those ads at all.           03:52:39
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1         Q.   (By Ms. Weaver)  And I'm just trying to        03:52:42

 2    say, so in Facebook's view, was that an abuse of

 3    Facebook's advertising platform, for advertisers to

 4    engage in programs that discriminated against

 5    persons in those protected categories from            03:52:57

 6    receiving advertisements for employment, housing

 7    and credit?

 8              MR. BENJAMIN:  Objection to form.

 9              THE DEPONENT:  Discriminatory uses

10    against our policies.  The use of these segments      03:53:13

11    was not discriminatory.  That wasn't our conclusion

12    or estimate.  As part of efforts to prevent misuse,

13    we disallowed them being used with housing,

14    employment and credit ads.

15              And, again, to clarify, those segments      03:53:27

16    are not representative or base -- those are not

17    based on our representative of people's race or

18    ethnicity.

19         Q.   (By Ms. Weaver)  What are the data inputs

20    to determine multicultural affinity groups that was  03:53:40

21    the targeting categories that Facebook created?

22         A.   Those are based on info people have

23    provided us, as well as their activity on Facebook.

24         Q.   And what specific activity caused

25    Facebook to put somebody in one of these             03:54:00
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    multicultural affinity groups?                          03:54:04

 2         A.   People's engagement with pages could

 3    associate them with one of these.

 4         Q.   Can you give me a specific example of a

 5    kind of engagement that would put a person in an        03:54:13

 6    African American affinity group?

 7         A.   If you engage with a page -- a cultural

 8    page related to African American culture and you

 9    like that page, you follow it, this could be a

10    group that you're -- you could be in this target        03:54:30

11    option.

12         Q.   What is a cultural page related to

13    African American culture?

14              MR. BENJAMIN:  Objection to form.

15              THE DEPONENT:  I -- I don't know the           03:54:41

16    exact list of pages.  But an example could be

17    Black Lives Matter.

18         Q.   (By Ms. Weaver)  This was, of course,

19    before BLM, right?

20              MR. BENJAMIN:  Objection to form.              03:54:54

21         Q.   (By Ms. Weaver)  Could you give me an

22    example of a cultural page related to African

23    American culture that was actually used to

24    determine whether or not somebody was in an African

25    American affinity group?                                03:55:07
```

                                              Page 273

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1        A.   I think --                                03:55:12

2             MR. BENJAMIN:  Objection to form and --

3    and scope.

4             THE DEPONENT:  I don't have the list of

5    pages specifically that were used.  That was an    03:55:19

6    illustrative example.  I can think of another one,

7    if that's useful.  But it's meant to -- to indicate

8    the type of page and you -- there -- there's

9    similar ones for Hispanic culture.  You could look

10   at cuisine -- pages related to Hispanic cuisine     03:55:36

11   would have been used as well.

12        Q.   (By Ms. Weaver)  What does Hispanic mean

13   in this context of Facebook's multicultural

14   affinity group?

15             MR. BENJAMIN:  Objection to form and     03:55:55

16   scope.

17             THE DEPONENT:  It's simply the -- how --

18   the naming of the page or -- of the common topics

19   that people were engaging with.

20        Q.   (By Ms. Weaver)  In Facebook's view, what 03:56:08

21   does Hispanic mean when it created this

22   multicultural affinity group?

23             MR. BENJAMIN:  Objection to form and

24   scope.

25             THE DEPONENT:  I don't think that we have 03:56:19
```

Page 274

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    a -- a Facebook definition of Hispanic.  This was          03:56:20

2    meant to indicate that these are -- this targeting

3    option was meant to indicate that people have

4    engaged with Hispanic culture on Facebook.  So that

5    could be Hispanic culture-related pages.  It could          03:56:35

6    be because their language is in Spanish.

7              There are a number of reasons and ways

8    that someone could be part of this, based on the

9    info they provided and the activity on their

10   platform.                                                   03:56:48

11       Q.   (By Ms. Weaver)  What does Hispanic

12   culture mean, in Facebook's view?

13              MR. BENJAMIN:  Objection.  Asked and

14   answered and scope.

15              THE DEPONENT:  Again, we don't define           03:57:02

16   Hispanic culture.  I don't think we have a specific

17   definition for that.

18       Q.   (By Ms. Weaver)  But somehow you were --

19   you must have had some definition because, based on

20   specific kinds of activity, you decided that people        03:57:12

21   were in an Hispanic multicultural group.

22              So I guess I'm just wondering what the

23   parameters were that Facebook used to decide that

24   something was an Hispanic activity?

25              MR. BENJAMIN:  Objection to form and            03:57:28

                                                    Page 275

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    scope.                                           03:57:30

 2            THE DEPONENT:  To -- we weren't defining

 3    if something is a Hispanic activity.  We were

 4    looking at the topics people engage with and if

 5    those topics relate to Hispanic culture.         03:57:42

 6            So that could be things like speaking

 7    Spanish.  It could be like Hispanic cuisine.  It

 8    could be Spanish-speaking telenovelas.  These are

 9    things that also the pages themselves identify as

10    part of this culture.  And the people who engage  03:57:59

11    with them were then included in this targeting

12    option.

13        Q.   (By Ms. Weaver)  Does Facebook have a

14    list of the activities that it deemed sufficient to

15    trigger inclusion in each of these ethnic         03:58:11

16    multicultural affinity groups?

17            MR. BENJAMIN:  Objection to --

18            THE DEPONENT:  Facebook --

19            MR. BENJAMIN:  Objection to scope.

20            THE DEPONENT:  One action is not going to  03:58:25

21    trigger anyone to be part of really any of -- of

22    the interests or -- or multicultural affinity

23    options.  This is about repeated continuous

24    engagement.  So if someone's activity over time

25    showed that they were interested in these topics.  03:58:42
```

                                          Page 276

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1      Q.   (By Mr. Benjamin)  Okay.  You just          03:58:44

2   testified -- well -- "We were looking at the topics

3   people engage with and if those topics relate to

4   Hispanic culture."

5           Do you recall that?                         03:58:54

6      A.   Yes.

7      Q.   Does Facebook have a list of those topics

8   that Facebook deemed related to Hispanic culture

9   that were used then cumulatively or individually to

10  determine that somebody was in a multicultural      03:59:07

11  affinity group?

12          MR. BENJAMIN:  Objection to form and

13  scope.

14          THE DEPONENT:  This might just be the

15  wording here, but it is when pages are -- as an     03:59:16

16  example, like when pages are about specific topics,

17  they can -- those would relate to Hispanic culture.

18  And if people consistently engage, they would then

19  be part of this segment.

20     Q.   (By Ms. Weaver)  I just -- I'm just         03:59:40

21  trying to understand, is there a list or a

22  description of which pages and topics Facebook

23  decided were triggers to include specific people in

24  multicultural affinity groups?

25          MR. BENJAMIN:  Objection to form and        03:59:57

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    scope.                                              03:59:58

 2            THE DEPONENT:  It's pages that relate to

 3    this.  So that could be based on a pages

 4    description saying they are related to Hispanic

 5    culture, as an example.                             04:00:10

 6        Q.   (By Ms. Weaver)  Okay.  So does Facebook

 7    have a list, as an example, of just the pages that

 8    Facebook deemed related to multicultural affinity

 9    groups, of -- of the categories that were

10    deprecated in 2020?                                 04:00:24

11        A.   Those categories were deprecated in 2020,

12    and I believe we don't maintain that once a

13    category is deprecated.

14        Q.   Are you aware -- and you're not aware of

15    whether or not there was a litigation hold or       04:00:44

16    requirement as a result of litigation that Facebook

17    maintain those categories?

18            MR. BENJAMIN:  Objection -- sorry.

19            Objection to form and scope.  And to the

20    extent that it calls for legal analysis or          04:00:56

21    conclusion.

22            I'd also caution you, Ms. Leone, to carve

23    out of your answer any privileged information or

24    communications.

25            THE DEPONENT:  I'm not certain on -- if      04:01:08
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    it was under a legal hold or not.  And I'm also not          04:01:10

2    certain if we have it or not, given that these were

3    deprecated.

4         Q.   (By Ms. Weaver)  So is it your

5    understanding that if Facebook deprecates a               04:01:17

6    product, Facebook doesn't maintain any information

7    relating to that deprecated product?

8              MR. BENJAMIN:  Objection to form.

9    Misstates and scope.

10             THE DEPONENT:  No, that's not my               04:01:33

11   understanding.  But when we deprecate a product, we

12   are not maintaining -- or it is not continuously

13   associating.  And -- and that's what I meant.  It's

14   not continuously looking for pages that might be

15   related to that topic.  It's shut down.               04:01:49

16        Q.   (By Ms. Weaver)  So your testimony was

17   "Those categories were deprecated in 2020, and I

18   believe we don't maintain that once a category is

19   deprecated."

20             Do you recall that?               04:02:11

21        A.   Yes.

22        Q.   And when you say "we don't maintain

23   that," what did you mean?

24        A.   I mean what I was just describing, which

25   is that we're not continuously associating          04:02:21

Page 279

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    engagement into those categories.  And I don't know        04:02:24

 2    to whichever degree, under legal hold or otherwise,

 3    what we maintain historically.

 4         Q.   Now, it's your testimony that Facebook

 5    has not taken steps to prevent third-party               04:02:43

 6    advertisers from excluding people from receiving

 7    advertisements for insurance or places of public

 8    accommodation, is that right, based on these

 9    protected characteristics of the ethnic affinity

10    groups, disability, et cetera; is that right?           04:03:00

11              MR. BENJAMIN:  Objection to form.

12    Misstates and compound.

13              THE DEPONENT:  Yeah, there are a few

14    parts.

15              We don't have targeting options related        04:03:11

16    to protected -- people's race or ethnicity, as a

17    starting point.  That's not what multicultural

18    affinities were.

19              House -- the -- any ad has to abide by

20    our nondiscrimination policy.  And we don't --          04:03:26

21    including an insurance ad, regardless of the --

22    whether or not they're AG -- they're housing,

23    employment or credit.

24              MS. WEAVER:  Okay.  Why don't we take a

25    look at Exhibit 662.                                    04:03:50
```

Page 280

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              (Exhibit 662 was marked for              04:03:52

 2    identification by the court reporter and is

 3    attached hereto.)

 4              MR. BENJAMIN:  And, Counsel, is this a

 5    document that was provided to us --              04:04:10

 6              MS. WEAVER:  No, it's public.

 7              MR. BENJAMIN:  -- in 72 hours?

 8              Okay.  And what paragraph of the

 9    Special Master's protocol are you relying on for

10    that exception?                                 04:04:19

11              MS. WEAVER:  We can have a colloquy off

12    the record, if you like.

13              MR. BENJAMIN:  Special Master, however

14    you prefer.  Happy to discuss outside the presence

15    of the witness.                                 04:04:28

16              SPECIAL MASTER GARRIE:  I'd ask the

17    witness to -- yeah, go to breakout room.  We'll

18    stay on the record.

19              What's the issue, Counsel Benjamin?

20              MR. BENJAMIN:  I just wanted to clarify,  04:04:53

21    Special Master, the -- Counsel Weaver's basis for

22    not having provided the documents, under the

23    Special Master protocol, 72 hours in advance.

24              SPECIAL MASTER GARRIE:  It's a publicly

25    available document --                           04:05:05
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              MS. WEAVER:  Yes.                    04:05:09

 2              SPECIAL MASTER GARRIE:  -- and I believe

 3     that -- well, Counsel Weaver, would you care to

 4     explain?

 5              MS. WEAVER:  Yeah.  I mean, if we had to    04:05:13

 6     provide to Facebook every publicly available

 7     document about Facebook, it would be reams.

 8              We've talked about the topic.  Facebook

 9     itself identified a ton of policies talking about

10     how people may or may not target people based on    04:05:25

11     gender or age.

12              So, you know, from my perspective, we are

13     perfectly entitled to discuss this with Facebook,

14     particularly given the assertions of this deponent

15     in this deposition, that this kind of targeting did    04:05:41

16     not occur.  These are also coming in as

17     impeachment.

18              So look, I can do it two ways.  You can

19     say you don't want this witness to discuss these

20     documents right now.  And then I will file a new    04:05:52

21     notice because it's relevant.  It's obviously data

22     misuse and relevant to the case.  And we can call

23     the witness back at another time and do this kind

24     of questioning.

25              But I -- I really -- we were not trying    04:06:05
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    to pull a fast one.  It just didn't occur to me        04:06:07

 2    that we had to provide to Facebook -- you know,

 3    Exhibit 662 is an assurance of discontinuance

 4    signed by Facebook so --

 5              MR. BENJAMIN:  And -- and all I -- really      04:06:21

 6    all I wanted to do is just to clarify the basis for

 7    using the document as an exhibit in the deposition.

 8              MS. WEAVER:  Okay.

 9              MR. BENJAMIN:  So I'm happy to --

10              SPECIAL MASTER GARRIE:  And I think she        04:06:30

11    did for -- so -- so Counsel Benjamin, she said for

12    impeachment purposes and there's your explanation.

13              MR. BENJAMIN:  Yeah.  I'm not sure I'd

14    agree with that characterization, Special Master,

15    I'm happy to let the questioning --                     04:06:39

16              SPECIAL MASTER GARRIE:  I'm not -- I'm

17    not -- let's be clear, my restatement isn't a

18    representation that I agree or disagree.  That is a

19    represent -- that is what plaintiffs stated.

20              MR. BENJAMIN:  Under- -- understood.  And      04:06:51

21    happy to let questioning on the document proceed on

22    that basis.

23              Thank you for clarifying.

24              SPECIAL MASTER GARRIE:  Okay.  So with

25    that said, should we call the witness back?            04:07:03
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1              MS. WEAVER:  Yes.                        04:07:07

2              MR. BENJAMIN:  Yes.

3              MS. WEAVER:  Yes.

4              MR. BENJAMIN:  I'll -- I'll grab her.

5              SPECIAL MASTER GARRIE:  Thank you.       04:07:12

6              John, did Counsel Benjamin say we were

7      taking a break or is he getting the witness?

8              THE VIDEOGRAPHER:  They were just going

9      to go get the witness.  So we're still on the

10     record.                                          04:09:29

11             SPECIAL MASTER GARRIE:  Okay.

12             MS. WEAVER:  Can we go off the record, if

13     we're just sitting here in silence?

14             SPECIAL MASTER GARRIE:  Well, I didn't

15     think we would be sitting here in silence, so I  04:10:07

16     agree.

17             MS. WEAVER:  Thank you.

18             SPECIAL MASTER GARRIE:  Let's go off the

19     record.

20             THE VIDEOGRAPHER:  Okay.  We're off the   04:10:14

21     record.  It's 4:10 p.m.

22             (Recess taken.)

23             THE VIDEOGRAPHER:  Okay.  We're back on

24     record.  It's 4:12 p.m.

25        Q.   (By Ms. Weaver)  Ms. Leone, have you had  04:12:08
```

                                              Page 284

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | a moment to look at Exhibit 662? | 04:12:10 |
| 2 |     A.   I -- I started to read through it.  I | |
| 3 | haven't read through it.  But yes, I have. | |
| 4 |         MS. WEAVER:  Okay.  Take your time. | |
| 5 |         And while you're reading through it, just | 04:12:19 |
| 6 | for the record, Exhibit 662 says State of | |
| 7 | Washington, King County Superior Court, In re: | |
| 8 | Facebook, Respondent, Assurance of Discontinuance, | |
| 9 | and it's dated July 24th, 2018. | |
| 10 |     Q.   (By Ms. Weaver)  And I'll direct your | 04:12:48 |
| 11 | attention to paragraph 3.2. | |
| 12 |     A.   I'm there, and I've read through most of | |
| 13 | 3.2. | |
| 14 |     Q.   Okay.  But let me ask first, were you | |
| 15 | aware of this notice of discontinuance? | 04:13:23 |
| 16 |     A.   Yes. | |
| 17 |     Q.   And -- and how did you become aware of | |
| 18 | it? | |
| 19 |     A.   I was on -- I was part of the team on | |
| 20 | ads -- on ads at the time. | 04:13:37 |
| 21 |     Q.   And so were you involved in taking steps | |
| 22 | to prevent third-party advertisers from excluding | |
| 23 | persons that were the subject of a lawsuit from | |
| 24 | discrimination -- or from receiving advertisements | |
| 25 | based on protected characteristics? | 04:13:55 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              MR. BENJAMIN:  Objection to form and        04:13:59

 2     scope.

 3              THE DEPONENT:  I was involved in updates

 4     to our platform.  To be clear, this is -- that was

 5     distinct from -- that -- that -- these targeting     04:14:09

 6     options weren't discriminatory.  But I was involved

 7     in updating our targeting options.

 8         Q.   (By Ms. Weaver)  Okay.  And looking at

 9     paragraph 3.2, do you see where it says "Although

10     Facebook denies these allegations, Facebook agrees   04:14:23

11     to take the following steps intended to prevent

12     third party advertisers from excluding persons from

13     receiving advertisements for employment, housing,

14     credit, insurance and/or places of public

15     accommodation based on the Protected                 04:14:39

16     Characteristics to the extent they affect citizens

17     of Washington State."

18              Do you see that?

19         A.   Yes.

20         Q.   And you've testified that Facebook has      04:14:50

21     taken steps to prevent advertisers from excluding

22     persons from employment, housing and credit, but

23     not insurance or places of public accommodation; is

24     that true?

25              MR. BENJAMIN:  Objection to form.           04:15:06
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1   Misstates the testimony and scope.                    04:15:07

2          THE DEPONENT:  They're two separate

3   pieces.  In 2019, we launched the updates to our

4   housing, employment and credit ads, which

5   restricted the targeting they could -- they could    04:15:18

6   use when running an ad.

7          In 2018, we updated to remove the

8   exclusion capability for all ads related -- related

9   to the multicultural affinity segments and other

10  interests.  And across the board, prior to that,     04:15:34

11  our policy has always been -- our nondiscrimination

12  policy has always been in place.

13     Q.   (By Ms. Weaver)  So there was a policy

14  that said that you could not discriminate.

15          But prior to that time, advertisers could    04:15:46

16  exclude people based on the protected

17  characteristics identified in 662, right?

18     A.   No.  Because our targeting options don't

19  represent those protected characteristics.

20     Q.   Did Facebook have a targeting category       04:16:10

21  for wheelchair users?

22     A.   There was an --

23          MR. BENJAMIN:  Objection -- objection to

24  form.

25          THE DEPONENT:  There was an interest         04:16:19

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    called wheelchair users.  It was not based on          04:16:20

2    whether or not someone uses a wheelchair.

3         Q.   (By Ms. Weaver)  Was there a targeting

4    characteristics for Chinese people?

5              MR. BENJAMIN:  Objection to form.           04:16:33

6              THE DEPONENT:  There might have been an

7    interest called Chinese people.  But, again, it was

8    not based on whether or not someone was Chinese.

9         Q.   (By Ms. Weaver)  Was there a targeting

10   characteristic for Chinese literature and            04:16:47

11   disability rights?

12             MR. BENJAMIN:  Same objection.

13             THE DEPONENT:  Yes.  Both of those seem

14   like they would have been interests as well.

15        Q.   (By Ms. Weaver)  Do you recall any other   04:16:59

16   targeting characteristics that were addressed in

17   this lawsuit related to the multicultural affinity

18   groups?

19             MR. BENJAMIN:  Objection to form and

20   scope.                                               04:17:13

21             THE DEPONENT:  These aren't targeting

22   characteristics, just to be clear.  These list

23   targeting options.  Is that --

24        Q.   (By Ms. Weaver)  That's fine.  I'll

25   restate the question.                                04:17:21
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1      A.   There -- I can think of --                    04:17:25

2      Q.   Let --

3      A.   Sorry.

4      Q.   Yeah.  Let me -- let me ask the question.

5           Are you aware, as you sit here today, of       04:17:30

6      any other targeting options that related to the

7      multicultural affinity groups that were involved in

8      the subject matter of this lawsuit?

9      A.   So these are --

10          MR. BENJAMIN:  Objection.  I'm sorry,          04:17:43

11     Bella.

12          Objection to form and scope.

13          THE DEPONENT:  These are distinct.  These

14     are interests.  They were also removed from

15     exclusion.  Multicultural affinity targeting         04:17:51

16     options are their own set of options.  And those

17     were also removed from exclusion.  More than just

18     these two were removed from exclusion.

19     Q.   (By Ms. Weaver)  So can you identify any

20     others that were removed from exclusion?             04:18:06

21          MR. BENJAMIN:  Objection to scope.

22          THE DEPONENT:  I -- I -- I don't know

23     that I can think of an example, just off the cuff,

24     of an interest we removed from exclusion at the

25     time.                                                04:18:28

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   (By Ms. Weaver)  Can Facebook create a        04:18:33

 2   list of the exclusions that were ceased as a result

 3   of this litigation?

 4        A.   My understanding is that we could.

 5        Q.   And how would you do that?                    04:18:53

 6        A.   I think we've maintained the one -- or

 7   maintained a list of what we updated because some

 8   of these may still be available for inclusion.  And

 9   so we would -- we would know which ones those are.

10        Q.   Other than this instance, are you aware       04:19:17

11   of other deprecated targeting options that have

12   occurred from 2007 to the present?

13             And let's exclude partner categories as

14   well for now.

15        A.   Yes, we -- we've iterated what -- the         04:19:33

16   targeting options numerous times over the years,

17   both adding and removing targeting options.

18        Q.   On how many occasions?

19             MR. BENJAMIN:  Objection to form.  Vague.

20             THE DEPONENT:  Our review and update is       04:19:50

21   pretty continuous.  I don't think that there's like

22   a -- a finite number of occasions where that's

23   happened.

24        Q.   (By Ms. Weaver)  On how many occasions

25   has Facebook deprecated targeting options as a         04:20:02
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    result of litigation or regulatory investigating?        04:20:04

 2           MR. BENJAMIN:  Objection to form.

 3           And I'd caution the witness not to

 4    disclose privileged information in her response.

 5           THE DEPONENT:  I -- I don't think I can         04:20:25

 6    share an exact number.

 7       Q.  (By Ms. Weaver)  Is it more than 20?

 8       A.  Occasions?

 9       Q.  Yes.

10           MR. BENJAMIN:  Same objections and            04:20:35

11    caution.

12           THE DEPONENT:  I -- I don't think I can         04:20:42

13    share a response.

14       Q.  (By Ms. Weaver)  When you say you don't

15    think you can share, is that because you don't know    04:20:42

16    or because you think it's privileged?

17       A.  More the latter.

18           MS. WEAVER:  I just need some clarity

19    here, Counsel.

20           Are you asserting a privilege over the          04:20:53

21    number of times that Facebook has deprecated

22    targeting options following litigation?

23           MR. BENJAMIN:  May -- may I ask the

24    witness?  It would be helpful to confer about

25    privilege.                                             04:21:08
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1                MS. WEAVER:  That's fine.              04:21:09

 2                THE DEPONENT:  That sounds good.  Sorry.

 3     Thank you.

 4                SPECIAL MASTER GARRIE:  Let's go off the

 5     record.                                           04:21:13

 6                THE VIDEOGRAPHER:  Okay.  We're off the

 7     record.  It's 4:21 p.m.

 8                (Recess taken.)

 9                THE VIDEOGRAPHER:  We're back on the

10     record.  It's 4:32 p.m.                           04:32:08

11        Q.   (By Ms. Weaver)  Before we broke, the

12     pending question was, on how many occasions has

13     Facebook deprecated targeting options as a result

14     of litigation or regulatory investigation?

15                MR. BENJAMIN:  And object to form and    04:32:21

16     scope.

17                You can answer.

18                THE DEPONENT:  I'm aware of two times

19     that we've updated targeting options as a result of

20     settlements that we came to in litigation.         04:32:32

21        Q.   (By Ms. Weaver)  And what are those two

22     times?

23        A.   Once is the NAFFA settlement in 2019,

24     where we limited the targeting options for housing,

25     employment and credit ads.                         04:32:45
```

Page 292

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              And this -- the other time is this one        04:32:47

 2    from Washington State where we removed the

 3    capability of exclusion for targeting options --

 4    several targeting options.

 5        Q.   And then at a later point in time            04:32:56

 6    Facebook removed the exclusion targeting option

 7    altogether; is that right?

 8        A.   No.  Sorry.  We -- we -- you can exclude

 9    some types of targeting.  That was not a change we

10    made.                                                  04:33:13

11              I'm not sure if that was something I -- I

12    confused on before.  Let me know if I can clarify.

13        Q.   Okay.  So for example, today, is it okay

14    on Facebook for advertisers to exclude people with

15    veteran or military -- military status?                04:33:27

16              MR. BENJAMIN:  Objection to form and

17    scope.

18              THE DEPONENT:  We don't have someone's

19    military status.  But that related targeting

20    options, like an interest in -- in a veteran topic     04:33:47

21    would not be available for exclusion, after the

22    updates that we made in 2018.

23        Q.   (By Ms. Weaver)  And so prior to 2018,

24    advertisers could exclude from related targeting

25    options users with veteran or military status; is      04:34:11
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    that right?                                            04:34:19

2            MR. BENJAMIN:  Objection to form.

3    Misstates and scope.

4            THE DEPONENT:  The interests -- so for

5    example, topics similar to the ones we were            04:34:26

6    discussing before, such as wheelchair users, those

7    were available for inclusion and exclusion.  In

8    2018, we updated them to be inclusion only and not

9    usable for exclusion.

10       Q.   (By Ms. Weaver)  And the other similar         04:34:41

11   interests that were available for exclusion prior

12   to 2018, included sexual orientation and

13   disability; is that right?

14       A.   Interests.  Again, not specifically based

15   on people's characteristics.                           04:34:57

16       Q.   And so what kinds of interests are

17   related to sexual orientation, in Facebook's view?

18           MR. BENJAMIN:  Objection to form and

19   scope.  Foundation.

20           THE DEPONENT:  An example would be a            04:35:16

21   cause or an organization related to LGBTQ.

22       Q.   (By Ms. Weaver)  Would it also include

23   visits to specific websites looking for, for

24   example, HIV medication?

25           MR. BENJAMIN:  Same objections.                04:35:33

                                                 Page 294

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  That's not part of       04:35:35

 2    interest targeting.  I'm not sure of the connection

 3    in there.

 4         Q.   (By Ms. Weaver)  Okay.  What other

 5    interests targeting did Facebook deem to be       04:35:40

 6    associated with sexual orientation?

 7         A.   I -- that --

 8              MR. BENJAMIN:  Objection -- objection to

 9    form and scope.

10              THE DEPONENT:  Specifically, it was      04:35:50

11    interests that were related to causes,

12    organizations or events that tied into LGBTQ.

13         Q.   (By Ms. Weaver)  Does Facebook have a

14    list of the interests that related to those

15    categories as well, meaning veteran, military     04:36:07

16    status, sexual orientation and disability?

17              MR. BENJAMIN:  Objection to form.

18              THE DEPONENT:  We have a -- as I was

19    explaining before, we would be able to look at the

20    interests that are currently only -- or that were  04:36:23

21    updated to be inclusion only.  And that would be

22    effectively what you're asking, I think.

23              MS. WEAVER:  And so we're making formal

24    request, Counsel, for production of those.

25         Q.   (By Ms. Weaver)  Okay.  I'm going to go  04:36:43
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    back for the third time to Exhibit 657 -- this is        04:36:46

 2    not your fault, this is my fault -- to the bullet

 3    point that says "Facebook's policies restricting"

 4    users -- "advertisers' use of advertising-related

 5    data" limiting it to the use case.                        04:37:02

 6              Do you remember we tried to talk about

 7    that a couple times now?

 8         A.   Yes.  We discussed it earlier.

 9         Q.   We did.

10              What steps did Facebook take to enforce         04:37:09

11    those policies; that is, to limit advertisers' use

12    of advertising-related data to the use case?

13         A.   One of the most impactful and important

14    steps we take is that we build our product to help

15    prevent for potential misuse.                             04:37:33

16              And as an example, we -- the -- the

17    minimum audience threshold and only providing

18    aggregated information to advertisers without

19    disclosing to them who saw their ad are protections

20    to ensure that -- that advertisers only use              04:37:51

21    advertising-related data for the use case of

22    placing ads.

23         Q.   Is there any kind of task force that

24    investigates to make sure that advertisers are

25    using advertising-related data only for the              04:38:06
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    advertising?                                          04:38:09

 2            MR. BENJAMIN:  Objection to form.

 3            THE DEPONENT:  Again, because we don't

 4    disclose that information, advertisers don't have

 5    access to who saw their ad or they're -- and        04:38:21

 6    they're not able to -- to reidentify that, which is

 7    the primary restriction and protection.

 8        Q.   (By Ms. Weaver)  Okay.  The question was,

 9    is there any kind of task force at Facebook that

10    operates to make sure advertisers are using         04:38:41

11    advertising-related data only for advertising?

12        A.   I'm not clear what they would look for,

13    since our product does not provide the user level

14    information to advertisers.

15        Q.   Okay.  But I'm -- I'm not asking what --    04:39:00

16    I'm literally just saying, is there a task force,

17    yes or no?

18            MR. BENJAMIN:  Objection to form.

19            THE DEPONENT:  I -- I understand the

20    question.                                            04:39:13

21            It seems to assume that the task force

22    would have to look for something.  And my point is

23    that the product does not give the advertisers who

24    saw their ad.  And so I'm not sure what the task

25    force would accomplish.                              04:39:24
```

                                                      Page 297

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   (By Ms. Weaver)  Okay.  I have that          04:39:25

 2   answer.  You don't need to give it again.

 3             The question is, is today, does Facebook

 4   have a task force that is focused on ensuring that

 5   advertisers' use of advertising-related data is         04:39:36

 6   limited to advertising?

 7             MR. BENJAMIN:  Object to form.

 8   Argumentative.  And asked and answered.

 9             THE DEPONENT:  The product build those

10   protections in.  We don't have an additional task       04:39:59

11   force looking at this specifically because the

12   product has those protections built in.

13        Q.   (By Ms. Weaver)  Thank you.

14             What is the ads integrity team?

15        A.   Ads integrity was -- was a team.  It's        04:40:23

16   been renamed business integrity.  Helps uphold our

17   advertising policies.  So the policies that -- that

18   dictate the type of content and restrictions on

19   advertising.

20        Q.   What specific policies does the ads           04:40:41

21   integrity team enforce, and can you give examples

22   of such enforcement?

23             MR. BENJAMIN:  Objection to form.

24             THE DEPONENT:  Yeah.  The -- as an

25   example, under our policies, they're restricted         04:40:55
```

Page 298

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    content, prohibited content.  The advertiser -- or        04:40:58

 2    business integrity team manages those policies

 3    and -- and builds our detection for them.

 4         Q.   (By Ms. Weaver)  What do you mean by

 5    restricted content?                                        04:41:12

 6         A.   So as an example, content that we require

 7    specific targeting parameters for or disallow other

 8    targeting parameters for.

 9         Q.   What is an example of content that you

10    require specific targeting parameters for?                 04:41:27

11         A.   In order to run an alcohol ad, the

12    advertiser must set their targeting to 18 plus or

13    21 plus, depending on the location they're trying

14    to run their ad.

15         Q.   Any other examples that you can think of?        04:41:41

16         A.   Yes.  Weight loss ads must be 18 and

17    above.  Similar, gambling ads require specific --

18    have -- an advertiser choosing to run a gambling ad

19    has to also have age targeting set appropriately

20    for their location.                                        04:42:00

21           There's content we also outright prohibit

22    that's under our --

23         Q.   Like what?

24         A.   We don't allow weapons to be sold in ads.

25    We don't allow discriminatory content.  We don't --       04:42:12
```

Page 299

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    back to the restricted examples.                  04:42:16

 2            We don't allow housing, employment and

 3    credit advertisers to run -- you -- they have to

 4    run with the specific limited targeting options

 5    provided to them after 2019.  That's an example of  04:42:26

 6    something that the business integrity team

 7    enforces.

 8        Q.   Anything else?

 9        A.   Yes.  If -- I mean, the -- the policies

10    in our advertising policies are enforced on by our  04:42:42

11    business integrity team.  Those were examples.

12        Q.   Right.

13            So what specific policies are you

14    thinking of that they say that they enforce?

15            MR. BENJAMIN:  Objection to form and        04:42:56

16    scope.

17            THE DEPONENT:  I'm sorry.  Can you repeat

18    the question.

19        Q.   (By Ms. Weaver)  Yes.

20            So I -- if you go to Exhibit 657, the --    04:43:08

21    the middle bullet point says "Ms. Leone will be

22    prepared to discuss: The role of Facebook's Ads

23    Integrity Team."

24            Do you see that?

25        A.   Yes.                                        04:43:21
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   So what specific policies is the ads       04:43:21

 2   integrity team enforcing?

 3        A.   Our advertising policies are what they

 4   enforce.  The examples I gave were the restricted

 5   content and prohibited content sub-policies within    04:43:35

 6   there.  I don't know the full set of policies off

 7   by heart.

 8        Q.   Can you think of any other examples, as

 9   you sit here?

10        MR. BENJAMIN:  Objection to form.  Vague.        04:43:54

11        THE DEPONENT:  In addition to the

12   restricted content policies that I --

13        Q.   (By Ms. Weaver)  Yes.

14        A.   -- explained, such as alcohol, gambling,

15   weight loss, and the prohibited content, such as      04:44:03

16   weapons, hateful content -- hateful -- anything

17   that -- that goes against our community standards.

18   So if you're promoting something we've designated

19   as a dangerous organization, those are all areas

20   that they would help enforce.                         04:44:23

21        Q.   So there's a myriad of ways in which

22   Facebook can enforce and limit the scope of

23   advertising content sent to users, right?

24        A.   We have enforcement for those policies,

25   yes.                                                  04:44:40
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1        Q.   But there is no task force to enforce        04:44:48

2   whether or not advertisers are using data for use

3   cases other than advertising, correct?

4             MR. BENJAMIN:  Objection.  Objection to

5   form.                                                  04:44:59

6             THE DEPONENT:  Our protections to prevent

7   misuse is that we build the products so they don't

8   get that data.  That is an upstream protection that

9   is distinct from enforcing a content policy where

10  there isn't the same corollary.  It's -- it's a        04:45:14

11  very different problem space and so we built it

12  into the product.

13       Q.   (By Ms. Weaver)  So if you learned that

14  third parties were scraping, for example, Facebook

15  user IDs, there's no task force that could            04:45:25

16  investigate to prevent it.

17             Facebook simply relies on the fact that

18  the policy is they're not supposed to do that; is

19  that right?

20             MR. BENJAMIN:  Objection to form.            04:45:36

21  Misstates prior testimony.  Argumentative.

22             THE DEPONENT:  That's incorrect.  We have

23  teams that look at scraping.  That is outside of

24  advertising.  It is not relevant to the information

25  we provide to advertisers in their performance --      04:45:50
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    in the performance of their ads.                    04:45:53

 2         Q.   (By Ms. Weaver)  And would you view

 3    yourself as a privacy specialist?

 4         A.   That is not a title I assign to myself.

 5         Q.   Okay.  So within --                        04:46:04

 6         A.   I'm not sure what we mean by it.

 7         Q.   Sure.

 8              Within the scope of your -- you've been

 9    the privacy -- a privacy and policy manager at

10    Facebook since November 2019; is that right?         04:46:15

11         A.   Yes.

12         Q.   And what are your duties and

13    responsibilities in that role?

14         A.   I work with our ads product teams to

15    understand where they're going to develop future     04:46:27

16    products.  I consult with them.  I work with them

17    on updates to our current products.

18         Q.   So what's the privacy piece of your job

19    description that appears in your title?

20         A.   I focus on Facebook's data use.            04:46:42

21         Q.   And when you say "Facebook's data use,"

22    what do you mean?

23         A.   I mean the type of information that we

24    use for ads.

25         Q.   And do you focus on what information       04:46:53
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1     Facebook shares with third parties?                04:46:56

2         A.   That sometimes is in scope in the context

3     of ads.

4         Q.   Is there somebody else who's primarily

5     responsible for addressing what Facebook -- what  04:47:05

6     information Facebook shares with third parties and

7     whether or not it complies with Facebook's

8     policies?

9              MR. BENJAMIN:  Objection to form.

10             THE DEPONENT:  In the context of scraping  04:47:22

11    more generally across the platform, yes.

12             Is that --

13        Q.   (By Ms. Weaver)  And in -- at an even

14    more high level, is there somebody responsible at

15    Facebook for determining whether or not when       04:47:33

16    Facebook shares data with third parties, it is

17    complying with Facebook's policies?

18        A.   Yes.

19        Q.   Who is that?

20        A.   Our -- our privacy org is part of that    04:47:45

21    assessment.  An example would be Mike Clark.

22        Q.   Anyone other than Mr. Clark?

23             MR. BENJAMIN:  Objection to form and

24    scope.

25             THE DEPONENT:  He -- he's -- he is the     04:48:02
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    POC I know that -- that is involved in what it          04:48:04

2    sounds like you're getting at, which is access by

3    third parties to data across Facebook.

4         Q.   (By Ms. Weaver)  What does POC mean in

5    this context?                                           04:48:18

6         A.   I'm sorry.

7              Point of contact.

8         Q.   Another person might think it means

9    person of color.

10        A.   Yes, I realize once I said it.                04:48:26

11        Q.   So Mike Clark is the lead person in the

12   privacy organization responsible for enforcing

13   whether or not Facebook's sharing of data with

14   third parties complies with its policies; is that

15   right?                                                  04:48:43

16             MR. BENJAMIN:  Objection to scope and

17   form.

18             THE DEPONENT:  His team manages -- from

19   my understanding, his team manages with how third

20   parties -- if they have inappropriately accessed        04:49:01

21   data, as an example through the scraping UIDs that

22   you've mentioned.

23        Q.   (By Ms. Weaver)  And what is the name of

24   his team?

25             MR. BENJAMIN:  Same objections.               04:49:14
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1          THE DEPONENT:  I -- I'm actually not sure          04:49:14

2    the official name of his team.

3          Q.   (By Ms. Weaver)  In addition to scraping,

4    is his team the team that's responsible for

5    determining if, for example, data shared with third          04:49:24

6    parties might allow users to be personally

7    identified?

8          MR. BENJAMIN:  One moment.

9          Objection to form and scope.

10          THE DEPONENT:  I -- I'm not sure of the          04:49:48

11    parameters of what you mean.  I don't think that

12    there is a singular POC that looks at that.

13          We have our misuse, which is what I was

14    explaining Mike Clark's team does.  And then we

15    also have the protections we've put in place within          04:50:06

16    ads to ensure that we don't provide identifiable

17    information to advertisers.

18          So I -- I -- do you mind clarifying what

19    you're looking for that's distinct from those two.

20          Q.   (By Ms. Weaver)  You understand that          04:50:21

21    protections are different than enforcement, right?

22          A.   Yes.

23          Q.   So I'm trying to find out who is -- who

24    is responsible for enforcing that Facebook does not

25    share identifiable information with third parties.          04:50:36

                                                Page 306

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1              MR. BENJAMIN:  Objection.              04:50:42

2         Q.  (By Ms. Weaver)  Do you know who that is,

3    if anyone?

4              MR. BENJAMIN:  Objection to form and

5    scope.                                           04:50:46

6              THE DEPONENT:  The access third parties

7    have to our -- to data across Facebook is something

8    Mike Clark's team evaluates.

9         Q.  (By Ms. Weaver)  What's your

10   understanding of the definition of personally      04:51:02

11   identifiable information?

12             MR. BENJAMIN:  Scope and form.

13             THE DEPONENT:  Something that is

14   specifically tied to a user and uniquely tied to a

15   user.                                            04:51:17

16        Q.  (By Ms. Weaver)  Do you have an

17   understanding that actually personally identifiable

18   information is anything that could be used to

19   reasonably identify a person?

20             MR. BENJAMIN:  Objection to form and    04:51:30

21   scope.  And to the extent it calls for legal

22   conclusion.

23             THE DEPONENT:  I understand that's a

24   definition that you presented and I -- I -- I

25   understand what you mean.                         04:51:41
```

Page 307

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1        Q.   (By Ms. Weaver)  What is Facebook's        04:51:43

2    understanding of what it means when they promise

3    that they will not provide personally identifiable

4    information to advertisers?

5        A.   That we --                                 04:51:56

6             MR. BENJAMIN:  Objection -- objection to

7    form and scope of this deposition.

8             THE DEPONENT:  That we don't provide

9    information to advertisers so that they -- can

10   understand who saw their ad.                         04:52:08

11       Q.   (By Ms. Weaver)  And just, again, to

12   address the scope, under topic 8 on page 3 of

13   Exhibit 657 of the letter that Mr. Benjamin wrote

14   me, topic 8 is the "type and purpose of Data and

15   Information Facebook provided."                      04:52:26

16            MR. BENJAMIN:  Special Master --

17            MS. WEAVER:  And it states that Ms. Leone

18   will be prepared to discuss how Facebook tracks

19   user data received from advertisers, its

20   relationships and the ads placed, and tracks data,  04:52:44

21   if any, provided to advertisers.

22       Q.   (By Ms. Weaver)  Going back to the

23   question --

24            MR. BENJAMIN:  Special Master, would you

25   prefer that I respond outside the presence of the   04:52:54
```

Page 308

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    witness?                                              04:52:56

 2            SPECIAL MASTER GARRIE:  I -- I would,

 3    actually.

 4            Would be it okay, Ms. Leone, if you go to

 5    the breakout room for a few minutes.                  04:53:02

 6            THE DEPONENT:  Yup.

 7            SPECIAL MASTER GARRIE:  Say five

 8    minutes -- wait until your counsel comes and gets

 9    you.

10            MR. BENJAMIN:  Are we on the record?          04:53:20

11            SPECIAL MASTER GARRIE:  Yup.

12            MR. BENJAMIN:  Thank you.  Just to

13    respond briefly to Counsel Weaver, Special Master.

14            So the letter actually reads and the

15    first bullet says the "Tracking of '[t]he type and   04:53:27

16    purpose of Data and Information Facebook'"

17    receives.

18            I believe Counsel Weaver only read the

19    part after "Tracking."

20            Moreover association and identification       04:53:37

21    of user info was, as you know, the subject of

22    topic 4 and other 30(b)(6) testimony.

23            So my scope objection was asserted in

24    response to a question about -- I'll read it --

25    "What is Facebook's understanding of what it means   04:53:54
```

Page 309

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    when they promise that they will not provide          04:53:57

 2    personal identifiable information to advertiser."

 3             I don't think that that relates to the

 4    tracking of the type and purpose of data and

 5    information Facebook receives.  And, again,            04:54:07

 6    plaintiffs have already taken two different

 7    30(b)(6) depositions on association identification

 8    under topic 4.

 9             SPECIAL MASTER GARRIE:  Counsel Weaver,

10    is there anything you want to put on the record?       04:54:21

11             MS. WEAVER:  Sure.

12             This witness has testified already at

13    length that Facebook is not providing personally

14    identifiable information.  I'm trying to understand

15    what she means when she said that on behalf of         04:54:33

16    Facebook.

17             MR. BENJAMIN:  I believe Ms. Leone has

18    testified repeatedly that Facebook doesn't provide

19    advertisers with user level data.

20             SPECIAL MASTER GARRIE:  User -- user          04:54:48

21    granular data, I think she used.  Granular level,

22    yeah.

23             MR. BENJAMIN:  Yeah.  So, again,

24    topic 8 -- and I just want to read the -- let's

25    just start with reading what the letter actually       04:54:57
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    says into the record.                              04:54:59

 2            It says that "Ms. Leone will be prepared

 3    to address:" -- the first bullet says -- the

 4    "Tracking of '[t]he type and purpose of Data and

 5    Information Facebook received.'"                    04:55:07

 6            Topic 8(a).  That's the language that

 7    Counsel Weaver read in part.

 8            And she was asked to define a term,

 9    personally identifiable information, and I objected

10    to it as being out of scope.                        04:55:20

11         MS. WEAVER:  That's what just happened.

12    But three hours ago she spent a long time talking

13    about how certain information does not identify the

14    user, including geo location and all of the other

15    categories.                                         04:55:32

16            I want to understand what Facebook -- the

17    people in Facebook's advertising department, who

18    are saying "We don't give third parties personally

19    identifiable information," I am entitled to

20    corporate testimony on what they mean when they say 04:55:45

21    that.

22         SPECIAL MASTER GARRIE:  All right.  Is

23    the witness prepared to -- well, before we get into

24    the nits and nats of all this, is the witness

25    prepared to answer the question on behalf of        04:55:56
```

Page 311

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    Facebook or not?                                    04:55:59

 2            MR. BENJAMIN:  Which question

 3    specifically, Special Master?

 4            SPECIAL MASTER GARRIE:  The one

 5    Counsel Weaver just asked that you objected to      04:56:04

 6    that's outside of scope.

 7            MS. WEAVER:  Let me -- let me, if I can,

 8    just let me read from 218, lines 3 through 10.

 9            "So the representation here is that

10            Facebook is not providing any               04:56:25

11            personally identifiable information

12            through the targeted advertising

13            process, right?

14            Objection to form.  Vague.

15            We don't provide advertisers               04:56:32

16            information about the users who saw

17            their ad and how to identify those

18            users."

19            So she's made this assertion that's a

20    shield for Facebook, and I just want to ask what    04:56:43

21    her understanding of personally identifiable

22    information is.

23            MR. BENJAMIN:  That isn't the -- but that

24    isn't the term that she used, and you've already

25    taken two different 30(b)(6) depositions about this 04:56:53
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    topic.                                          04:56:57

 2              MS. WEAVER:  No, I have not.  And, in

 3    fact, we'll get to it, but Mr. Clark refused to

 4    actually define the term.

 5              MR. BENJAMIN:  She -- she's -- she's not  04:57:04

 6    been designated to provide corporate testimony on

 7    Facebook's understanding of the meaning of

 8    personally identifiable information.

 9              MS. WEAVER:  And here we are again.  Of

10    course we didn't enumerate every question we have  04:57:15

11    to -- we -- we were going to ask.  The very

12    question is, what data is Facebook giving to third

13    parties.  And is it identifiable.

14              MR. BENJAMIN:  That -- that is the --

15              MS. WEAVER:  The next question is, are  04:57:30

16    you going to --

17              SPECIAL MASTER GARRIE:  Wait, wait.

18    Everybody is interpreting my -- my silence as a

19    reason to talk.  It's just I'm thinking.  My

20    apologies.                                        04:57:42

21              I guess the first question,

22    Counsel Benjamin, is the witness prepared to answer

23    the question on behalf of Facebook?

24              MR. BENJAMIN:  The witness was not

25    designated to provide the company's position about  04:57:56
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    the meaning of personally identifiable information.    04:57:58

2          SPECIAL MASTER GARRIE:  I -- I understand

3    that.  That's not the question that's pending.

4          MR. BENJAMIN:  So I'm -- I'm just looking

5    at it before we went -- we went into this colloquy,    04:58:10

6    Special Master, so I'll just -- I'll read it so

7    we're all on the same page.

8          One moment.  Ms. Weaver, if you have it

9    in front of you, I just want to make sure that

10    we're discussing the same question.    04:58:36

11          "What is Facebook's understanding" --

12    this is line 12 -- "What is Facebook's

13    understanding of what it means when they promise

14    that will not provide personal identifiable

15    information to advertiser?"    04:58:52

16          That was the question that -- to which I

17    objected on form and scope.  And then Ms. Weaver

18    went to the bullet point in the letter that she

19    read part of.

20          SPECIAL MASTER GARRIE:  I -- I'm very    04:59:07

21    aware and my question is, is Facebook -- is the

22    witness prepared to answer the question on behalf

23    of Facebook?

24          MR. BENJAMIN:  So I believe the question

25    that's pending actually misstates the record.    04:59:36

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1              So I -- I can't tell you, Special Master,       04:59:42

2    that she's prepared to answer that specific

3    question because I think that it's objectionable in

4    a number of ways.

5              What she has said is that we don't             04:59:51

6    provide data to advertisers identifying individual

7    users.  She hasn't provided testimony based on a

8    definition of personal -- of PII.  So I -- she's

9    very prepared to explain all the ways --

10             SPECIAL MASTER GARRIE:  I just have a           05:00:09

11   simple -- so -- you -- I -- I understand you're

12   objecting to the question and the form.

13             My question is, the question as it is, is

14   she prepared to answer the question on behalf of

15   Facebook.  Not the form of the question and not       05:00:24

16   whether it's -- just -- and then I can --

17             MR. BENJAMIN:  Right.  It's just -- yeah,

18   I -- I think the answer, Special Master, is it's

19   just not in scope.  So...

20             MS. WEAVER:  Okay.  And I just want to go      05:00:37

21   on the record that --

22             SPECIAL MASTER GARRIE:  We're still on

23   the record.

24             MS. WEAVER:  Fair enough.

25             SPECIAL MASTER GARRIE:  So can I just          05:00:44
```

Page 315

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    finish?                                              05:00:45

2             MS. WEAVER:  Yes.

3             SPECIAL MASTER GARRIE:  Let -- let me

4    just -- just finish here.

5             That's fine, Counsel Benjamin.  I just --   05:00:48

6    so then before we go further, I want to be

7    respectful of the witness' time and the effort that

8    has been done.

9             And if there's an issue about scope and

10   other things, and the witness isn't prepared to      05:01:10

11   answer the question, Counsel Weaver, on behalf of

12   Facebook -- I mean, we -- I mean, there's -- I'm

13   not going to permit a line of questioning whether

14   or not prepared to answer it.

15            If so, if there are -- well,                 05:01:26

16   Counsel Weaver, if you would like to respond on the

17   record and then Counsel Benjamin rebuttal.  And

18   then I'll make the ruling quickly.

19            MS. WEAVER:  Okay.

20            SPECIAL MASTER GARRIE:  Counsel Weaver.       05:01:38

21            MS. WEAVER:  Yes.  We marked Exhibit 658

22   a couple of hours ago.  We covered the promise in

23   this document -- there's a document identified by

24   Facebook as a document that this witness would be

25   prepared to testify.  This is the second time this   05:01:50
```

Page 316

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    has happened in this case.                            05:01:53

2            That document says at page 5, "We don't

3    share information with advertisers that personally

4    identifies individuals unless they've given us

5    permission."                                          05:02:03

6            She then testified about this document.

7    And when I asked, the representation here is that

8    Facebook is not providing any personally

9    identifiable information through the targeting --

10   the targeted advertising process, right.              05:02:16

11           And she said "We don't provide

12   advertisers information about the users who saw

13   their ad and how to identify those users."

14           Now I'm trying to dig in, when we talk

15   about enforcement, and all of a sudden she can't      05:02:28

16   define the words in the document that Facebook

17   identified that she would be prepared to discuss

18   with regard, very specifically, to what Facebook

19   shares through the targeted advertising process.

20           I think it's very clearly within scope.       05:02:42

21   And at some point we're going to bring a motion to

22   compel Facebook to identify and define what

23   personally identifiable information is in documents

24   that they are identifying their witness as having

25   knowledge of.                                         05:02:59

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              MR. BENJAMIN:  Yeah, Special Master,        05:02:59

 2     the -- the rebuttal is very short.

 3              I -- Counsel Weaver said it already.

 4     This -- this document itself was the subject of

 5     extensive testimony.  Ms. Leone answered all the     05:03:08

 6     questions she was asked about it.  She didn't

 7     define personally identifiable information.  The

 8     question that I read is clearly outside of scope.

 9              Plaintiffs have already taken two

10     depositions on this subject.  And we were very       05:03:21

11     clear about what Ms. Leone was designated to

12     testify to in all of the prior meet-and-confers.

13              So, again, I just want to be clear, what

14     she has said consistently throughout this

15     deposition is that Facebook doesn't provide          05:03:33

16     advertisers with user level data.

17              And Counsel Weaver is -- should feel free

18     to explore with her what that means.  I was just

19     lodging a scope objection to the specific question

20     that was asked, which relies on a term that          05:03:48

21     Ms. Leone hasn't used and that isn't in the

22     document that Counsel Weaver just pointed to.

23              MS. WEAVER:  It -- it is in the document.

24     The word personally identifiable information is --

25              SPECIAL MASTER GARRIE:  It's on page 5.     05:04:02
```

Page 318

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              MS. WEAVER:  Sorry.                         05:04:03

 2              SPECIAL MASTER GARRIE:  I mean, it --

 3      that word personal -- it is on page 5 of the

 4      document.  I just read it myself.  So that --

 5      unless I'm reading a different document,           05:04:13

 6      Counsel Benjamin, but --

 7              MR. BENJAMIN:  I was -- I was referring

 8      to the phrase "personal identifiable information or

 9      PII" which -- which we all understand can be a term

10      of art.                                            05:04:25

11              So again --

12              SPECIAL MASTER GARRIE:  Counsel Weaver.

13      No, no, I heard -- I -- I understand,

14      Counsel Benjamin.

15              MR. BENJAMIN:  Thank you.                   05:04:38

16              SPECIAL MASTER GARRIE:  Counsel Weaver.

17              MS. WEAVER:  I'm looking at -- just give

18      me a moment here.

19              What is the difference between

20      information that personally identifies individuals 05:04:50

21      or personally identifiable information?

22              Aren't I entitled to explore Facebook's

23      understanding of that.  The sentence says

24      information that -- with advertisers that

25      personally identifies individual.  And if I ask    05:05:02
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | about personally identifiable information, Facebook | 05:05:04 |
| 2 | refuses to provide it.  And this is the second | |
| 3 | time. | |
| 4 | In Mr. Clark's deposition, he said he | |
| 5 | needed to look at a document to give me testimony. | 05:05:13 |
| 6 | And when we gave it to him, it had this term -- it | |
| 7 | said had personally identifiable information in it | |
| 8 | and Facebook wouldn't provide a deposition. | |
| 9 | And now Ms. Leone is saying this is the | |
| 10 | guy that's responsible for enforcement.  He doesn't | 05:05:26 |
| 11 | know what personally identifiable information is. | |
| 12 | Now I want to know if she does. | |
| 13 | I don't know how to get to the bottom of | |
| 14 | this case.  I can bring a motion to compel to bring | |
| 15 | her back.  I will.  Somebody's got to be able to | 05:05:38 |
| 16 | answer that question before the close of discovery. | |
| 17 | MR. BENJAMIN:  I'm sorry, Ms. Weaver.  I | |
| 18 | didn't mean to step on your sentence.  Just two | |
| 19 | very quick points. | |
| 20 | Number one, I think when Counsel Weaver | 05:05:48 |
| 21 | was actually examining Ms. Leone about the | |
| 22 | document, she asked her what that language meant. | |
| 23 | And that was appropriate, and I think that | |
| 24 | testimony was provided. | |
| 25 | If she puts the doc- -- if she wants to | 05:06:01 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    put the document in front of Ms. Leone again and        05:06:02

 2    ask her for Facebook's understanding of that

 3    language in the policy, maybe -- maybe that's a way

 4    to cut through this.

 5           All -- all I was reacting,                        05:06:10

 6    Special Master, was the --

 7           SPECIAL MASTER GARRIE:  No, no, I get it.

 8    I -- Counsel Benjamin, I understand.  I get what

 9    you were reacting to.  We've kind of gone off the

10    rails a bit.  I recognize that.  I let you guys         05:06:19

11    speak, arguably too much.

12           Not a reflection of your litigation

13    prowess, it's just a little bit afield of what the

14    objection had to do with.

15           Counsel Weaver, with the information             05:06:44

16    that's been provided by Counsel Benjamin, you

17    can -- the witness isn't prepared to testify on

18    behalf of Facebook the way the question is phrased.

19           If you want to rephrase the question and

20    explore the topic further, it's perfectly              05:06:58

21    reasonable.  If you wish to bring a motion to

22    compel to get the definition of personal

23    identifiable information from a Facebook designated

24    representative, you are well within your rights.

25    But this witness is prepared to testify on the         05:07:13
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    topics and the question was asked.                  05:07:17

 2           So with that in mind, I ask -- consider

 3    it as a strong ask -- that you consider re- --

 4    rephrasing your question with the information

 5    that's been provided, recognizing that the witness  05:07:36

 6    simply isn't prepared to testify on behalf of

 7    Facebook the way the question is being asked.

 8           MS. WEAVER:  Okay.

 9           MR. BENJAMIN:  Thank you, Special Master.

10           SPECIAL MASTER GARRIE:  That doesn't --      05:07:52

11    just to -- for the record, that doesn't mean

12    plaintiffs aren't entitled to a witness to answer

13    or explain, if they feel that that information is

14    critical or necessary to their case.  But this

15    witness --                                          05:08:04

16           MS. WEAVER:  I mean, the one thing I

17    would say is if Facebook is providing documents to

18    us with these terms in it, and then I ask about

19    them and they tell me it's not within the scope --

20    I mean, do I have to go through every document that  05:08:13

21    has terms in it and identify now within the

22    documents you better be able to talk about these

23    terms?

24           SPECIAL MASTER GARRIE:  No --

25           MR. BENJAMIN:  Yeah.                          05:08:27
```

Page 322

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | SPECIAL MASTER GARRIE:  -- I don't | 05:08:27 |
| 2 | think that's what's being -- | |
| 3 | MR. BENJAMIN:  Yeah. | |
| 4 | SPECIAL MASTER GARRIE:  I -- I think -- I | |
| 5 | think -- no.  I mean, I -- at least not from where | 05:08:29 |
| 6 | I sit.  But I would just -- the particular question | |
| 7 | you've asked and the way it was asked, I think if | |
| 8 | you reask the question using -- | |
| 9 | MS. WEAVER:  Okay. | |
| 10 | SPECIAL MASTER GARRIE:  -- that you | 05:08:44 |
| 11 | probably will make forward progress.  I think | |
| 12 | Counsel Benjamin alluded to one possible approach | |
| 13 | to getting forward progress may or may not -- | |
| 14 | depending on -- on where we go. | |
| 15 | So we'll call the witness back, | 05:08:59 |
| 16 | Counsel Benjamin, and we'll keep going. | |
| 17 | MR. BENJAMIN:  Thank you. | |
| 18 | THE COURT REPORTER:  Can we just take -- | |
| 19 | can we take five? | |
| 20 | SPECIAL MASTER GARRIE:  Yes, we can. | 05:09:14 |
| 21 | MS. WEAVER:  And how much time do we have | |
| 22 | left? | |
| 23 | All right.  Let's go off the record. | |
| 24 | THE VIDEOGRAPHER:  Off the record.  It's | |
| 25 | 5:09 p.m. | 05:09:20 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              (Recess taken.)                         05:09:21

 2              THE VIDEOGRAPHER:  We are back on the

 3    record.  It's 5:19 p.m.

 4         Q.  (By Ms. Weaver)  Ms. Leone, I'll ask you

 5    to take a look at Exhibit 658.                    05:19:43

 6         A.  I have it up.

 7         Q.  And turning to the page we discussed

 8    earlier, on page 5.

 9              And there's a bullet point that says, "We

10    don't share information with advertisers that      05:19:59

11    personally identifies individuals unless they've

12    given us permission."

13              Do you see that?

14         A.  Yes.

15         Q.  What is your understanding of information  05:20:07

16    that personally identifies individuals?

17         A.  In the context of ads, it's that we do

18    not share with the advertiser who saw their ad so

19    that they understand who that user was.

20         Q.  And when you say who -- "We do not share   05:20:23

21    who saw their ad," what do you mean?

22         A.  The user who saw their ad.  We don't

23    share the identity of that user with the

24    advertiser.

25         Q.  Does Facebook share information that       05:20:38
```

Page 324

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1   enables third parties to identify the user?          05:20:41

 2          MR. BENJAMIN:  Objection to form.

 3          THE DEPONENT:  No.  As I mentioned, our

 4   product -- the protections in our product, such as

 5   the performance metrics, are aggregated so to avoid  05:20:58

 6   an advertiser reassociating and trying to identify

 7   the user who saw the ad.

 8      Q.   (By Ms. Weaver)  And do you think that

 9   geo location is an example of information that

10   personally identifies an individual?                 05:21:15

11          MR. BENJAMIN:  Objection to form.

12          THE DEPONENT:  In the context of ads, we

13   don't share who viewed the ad or their location

14   with an advertiser.

15      Q.   (By Ms. Weaver)  But if an advertiser is    05:21:37

16   seeking to advertise within a one-mile radius

17   and/or if they are using their own customer list,

18   doesn't the advertiser know who the person is?

19          MR. BENJAMIN:  Objection to form and

20   scope.                                                05:21:54

21          THE DEPONENT:  No.  They -- for example,

22   if someone selects a radius or selects their

23   location targeting, they don't know who sees the

24   ad.  We don't share the information with them about

25   who's seeing the ad.                                  05:22:09
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   (By Ms. Weaver)  Okay.  So the -- then        05:22:11

 2   your testimony on behalf of Facebook is that

 3   because Facebook is not sharing who saw the ad, it

 4   is not sharing information that personally

 5   identifies individuals; is that correct?             05:22:22

 6             MR. BENJAMIN:  Objection to form.

 7   Misstates.

 8             THE DEPONENT:  We don't share information

 9   about who saw the ad to the advertiser so that they

10   can identify that user.                              05:22:37

11        Q.   (By Ms. Weaver)  I understand that you

12   have to keep repeating the sentence, and I'm trying

13   to drill in by -- on what you mean by who saw the

14   ad.

15             When you say "we don't identify who," do   05:22:45

16   you mean by name?

17        A.   I mean individual users.  Their name is

18   an example, similar to Lesley Weaver saw this ad.

19   That is not what we share with advertisers.

20        Q.   Okay.  Can you give me the full list of    05:23:00

21   what you think it is that Facebook does not share,

22   such that it is not sharing information that

23   personally identifies individuals?

24             MR. BENJAMIN:  Objection to form.

25             THE DEPONENT:  I -- I can't define         05:23:18
```

Page 326

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    everything we don't share.  It's --                 05:23:20

 2         Q.   (By Ms. Weaver)  Let me put it this way.

 3    What is that you think is information that

 4    personally identifies individuals?

 5              MR. BENJAMIN:  Objection to form.          05:23:35

 6              THE DEPONENT:  In the context --

 7              MR. BENJAMIN:  Sorry.  Objection to form

 8    and scope.

 9              I understand Counsel Weaver still to be

10    examining you about Exhibit 658 and the language in  05:23:45

11    that document.

12              You can answer.

13              THE DEPONENT:  In the context of ads,

14    it's that we do not provide advertisers with

15    information to understand who saw their ad,          05:23:56

16    specifically which users saw their ad.

17         Q.   (By Ms. Weaver)  Give me the examples of

18    the information that you just referred to in that

19    answer.

20         A.   We don't -- in our -- as an example, in    05:24:15

21    our performance metrics, those are aggregated so

22    that an advertiser doesn't know who specifically

23    clicked or saw their ad.

24         Q.   I understand.

25              I'm asking you a different question.        05:24:29
```

Page 327

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              What is the kind of information that you        05:24:31

 2    think would personally identify an individual?

 3              MR. BENJAMIN:  Objection to form.  Asked

 4    and answered.  Vague.

 5              THE DEPONENT:  In the context of ads,           05:24:44

 6    again, it's who saw your ad and which users those

 7    were, which would personally identify someone in

 8    the context of ads.

 9        Q.  (By Ms. Weaver)  So do you mean name, or

10    email, or what is the kind -- I need examples of          05:24:55

11    the kind of information that you say would

12    personally identify an individual.

13              MR. BENJAMIN:  Yeah.

14        Q.  (By Ms. Weaver)  What do you mean?

15              MR. BENJAMIN:  Objection to form and            05:25:08

16    scope.  And I'll just make a running objection for

17    the sake of the record.

18              And so as not to impede the deposition to

19    this entire line of questioning, I understand

20    Counsel Weaver to examining you about the language        05:25:19

21    within Exhibit 658 about information that

22    personally identifies individuals.

23              On that basis, you can answer.

24              THE DEPONENT:  As an example, we don't

25    share with advertisers the person who saw the ad,         05:25:36
```

Page 328

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    which would include their name, their UID, or their     05:25:39

 2    email, because that's not information we share with

 3    advertisers in delivering the ads that they've

 4    placed on Facebook.

 5         Q.   (By Ms. Weaver)  What about IP address?        05:25:51

 6    Is that an example of information that could be

 7    used to personally identify an individual?

 8              MR. BENJAMIN:  Same objections to form

 9    and scope.

10              THE DEPONENT:  It's not information we          05:26:05

11    share with an advertiser, as a starting point.  In

12    the context of ads -- again, it's not information

13    we share with advertisers about who's seeing their

14    ad.

15         Q.   (By Ms. Weaver)  If a advertiser wants to      05:26:25

16    target IP addresses or geo location, in your

17    understanding, could that be used to identify an

18    individual?

19         A.   Our targeting options --

20              MR. BENJAMIN:  Sorry, Bella.                    05:26:39

21              Same objections.

22              THE DEPONENT:  Our targeting options

23    aren't based on IP address.  That's not a targeting

24    option we offer.

25         Q.   (By Ms. Weaver)  Okay.  It is something        05:26:48

                                                Page 329
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    that you mentioned earlier today.                  05:26:49

 2          Do you recall that?

 3      A.   To clarify, what I explained earlier was

 4    an advertiser selects where they want their ad to

 5    be shown.  So if they want their ad to be shown to   05:27:01

 6    people in Washington State.  And then we use that

 7    to set the eligible audience for the ad.

 8          One of the ways someone can be included

 9    in it includes location, such as IP, based on their

10    IP.  That is not the same as giving the advertiser   05:27:21

11    the ability to select IP addresses to target.

12      Q.   And is it your understanding that

13    information that can be used one or two data points

14    together to identify a person would constitute

15    information that personally identifies individuals?  05:27:43

16          MR. BENJAMIN:  Same objection to form and

17    scope, with respect to Exhibit 658.

18          THE DEPONENT:  I can understand what you

19    mean about combining data points.  I do not see the

20    relevance of how that's happening within our ad      05:28:01

21    targeting or the information we provide back to

22    advertisers, because we specifically don't provide

23    information back to advertisers at the user --

24    at the individual or user level.

25      Q.   (By Ms. Weaver)  On behalf of Facebook,       05:28:16
```

Page 330

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1     as you sit here today, is Facebook aware that        05:28:17

2     advertisers or AP -- developers were scraping UIDs

3     via the platform API?

4              MR. BENJAMIN:  Objection to form.  And

5     asked and answered repeatedly.  And scope.           05:28:35

6              THE DEPONENT:  I think I clarified that

7     I'm not aware of specific instances.  It is not my

8     role to be aware of specific instances of where

9     scraping is occurring on the platform.

10       Q.   (By Ms. Weaver)  Is Uber a partner who        05:28:55

11    advertises on Facebook using custom audiences?

12             MR. BENJAMIN:  Objection to form.  Vague.

13             THE DEPONENT:  I -- I take it you mean

14    Uber, like the ride share company?

15       Q.   (By Ms. Weaver)  Yes.                         05:29:14

16       A.   I don't know the specific audiences or

17    ways that they set up their ads on our platform.

18             MS. WEAVER:  Will you take a look at 663,

19    please.

20             (Exhibit 663 was marked for                  05:29:29

21    identification by the court reporter and is

22    attached hereto.)

23             THE DEPONENT:  Yes.  I'm sorry.  662 --

24    oh, -3.  I see it.

25       Q.   (By Ms. Weaver)  And take a moment to         05:29:32
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    read it and let me know when you have.              05:29:33

2        A.   This is going to take me a minute.  I

3    haven't seen this before.

4             MS. WEAVER:  No problem.

5             MR. BENJAMIN:  Counsel, was this a          05:29:51

6    document that was identified before the deposition?

7             MS. WEAVER:  No, it was not, because I

8    did not expect the testimony that we got, and it's

9    in for impeachment purposes.

10            THE DEPONENT:  I -- I've read through.       05:32:07

11       Q.   (By Ms. Weaver)  Who is Ian Abernathy?

12            MR. BENJAMIN:  Objection.  Based on

13   scope.

14            And I'll assert that as a running

15   objection to the questioning on this document.       05:32:17

16            THE DEPONENT:  I don't know who

17   Ian Abernathy is.  I have not worked with him

18   before.

19       Q.   (By Ms. Weaver)  Do you know who

20   Grace Molnar is?                                     05:32:25

21       A.   No, I also don't know who Grace is.

22       Q.   Do you know who Allison Hendrix is?

23       A.   I do know Ali Hendrix.

24       Q.   Who is she?

25       A.   She's our data policy manager for our       05:32:36
```

Page 332

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    developer platform.                               05:32:38

 2        Q.   Looking at Exhibit 663, do you understand

 3    it to be an email from people who work at Facebook

 4    relating to their work at Facebook?

 5        A.   Yes.                                      05:32:53

 6        Q.   And looking at the lower email, do you

 7    see where Grace emailed Ian, "We have an escalation

 8    with Uber, who was creating a custom audience list

 9    of UIDs that were obtained via our API, but not by

10    them.  We're trying to determine where enforcement  05:33:10

11    should sit for things like this."

12             Do you see that?

13        A.   Yes.

14        Q.   Have you ever been aware that Uber had

15    created custom audience lists of UIDs, in or around  05:33:19

16    2013?

17        A.   No, I was not aware.

18        Q.   And Facebook does not maintain a list of

19    advertisers who had scraped user IDs, correct?

20             MR. BENJAMIN:  Object, based on scope and  05:33:36

21    form.

22             THE DEPONENT:  To be clear, my

23    understanding of this is not that Uber scraped

24    these IDs.

25        Q.   (By Ms. Weaver)  Okay.  Do you have any    05:33:45
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    personal knowledge of this particular issue?         05:33:47

 2         A.   I don't.  Just from reading this

 3    document, I --

 4         Q.   Okay.  But this is the point.  This

 5    document suggests that Uber had a list of user IDs,   05:33:58

 6    correct?

 7         A.   Correct, that they specify were obtained

 8    through an API, but not by Uber.

 9         Q.   Okay.  And they were obtained through

10    Facebook's API, right?                                05:34:13

11         A.   Through a platform API.

12         Q.   That is -- that is Facebook's platform

13    API, correct?

14         A.   Yes, that's what this states.

15         Q.   Okay.  And so Uber has a collection of     05:34:23

16    Facebook user IDs, according to this document,

17    right?

18              MR. BENJAMIN:  Objection to form.

19    Foundation.  And the same continuing objection

20    based on scope.                                       05:34:36

21         Q.   (By Ms. Weaver)  Was there any attempt by

22    Facebook to prevent Uber from conducting targeted

23    advertising because Facebook knows that Uber

24    possesses user IDs?

25         A.   So, again, I'm -- I'm not familiar with    05:34:49
```

Page 334

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | this case.  This is the first time I've seen it. | 05:34:51 |
| 2 | This email thread reads to me as that is exactly | |
| 3 | what's being discussed. | |
| 4 |     Q.   Right. | |
| 5 |        But it didn't happen, did it? | 05:35:00 |
| 6 |        I mean, you're in advertising and you | |
| 7 | testified that there is no list within the | |
| 8 | advertising department of advertisers on Facebook | |
| 9 | who possess the user IDs, right? | |
| 10 |     A.   No.  I specifically -- | 05:35:16 |
| 11 |        MR. BENJAMIN:  Objection.  Objection. | |
| 12 | Misstates testimony. | |
| 13 |        THE DEPONENT:  I specifically noted, | |
| 14 | first, that Uber was not scraping.  That's -- | |
| 15 | that's specified here.  And we -- there -- they | 05:35:27 |
| 16 | wouldn't -- this -- I -- I think that's the answer. | |
| 17 | Uber was -- | |
| 18 |     Q.   (By Ms. Weaver)  Uber wasn't talking | |
| 19 | about scraping.  I'll read the question back. | |
| 20 |        You testified that there is no list | 05:35:39 |
| 21 | within the advertising department of advertisers on | |
| 22 | Facebook who possess user IDs, right? | |
| 23 |        MR. BENJAMIN:  Same objection. | |
| 24 |        THE DEPONENT:  Do you mind reading back | |
| 25 | the testimony that you're referring to. | 05:35:54 |

Page 335

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1       Q.   (By Ms. Weaver)  I'll just ask you.          05:35:56

2            Within the advertising department, is

3    there a list of advertisers on Facebook that

4    Facebook knows has come into possession of user

5    IDs?                                                 05:36:07

6            MR. BENJAMIN:  Objection to form and

7    scope.

8            THE DEPONENT:  I'm -- I'm -- I'm not sure

9    like -- a -- a list of advertisers that have access

10   to UID -- or have obtained UIDs is not a list that   05:36:47

11   I'm aware of within ads because I -- I -- I'm not

12   sure the connection there back to the fact that

13   they're an advertiser.

14       Q.   (By Ms. Weaver)  Does Facebook have any

15   way to prevent advertisers who Facebook knows        05:37:06

16   possesses -- possesses user IDs from advertising on

17   Facebook?

18           MR. BENJAMIN:  Objection to form.  Asked

19   and answered.

20           THE DEPONENT:  The possession of an ad --    05:37:24

21   the possession of UIDs by an advertiser is -- isn't

22   a factor in -- in -- I -- that's not an evaluation

23   in the creation of an ad.  I'm not -- I'm not sure

24   the connection here.

25       Q.   (By Ms. Weaver)  Does Facebook take any     05:37:50

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    steps to prevent companies that Facebook knows          05:37:53

 2    possesses user IDs from targeting those users

 3    through Facebook's advertising platform?

 4            MR. BENJAMIN:  Same -- same objections.

 5            THE DEPONENT:  I think this is an example        05:38:08

 6    where, like in this email thread, they are

 7    discussing the steps that need to be taken here.

 8            I am not aware of what happened with Uber

 9    that -- I'm not sure the resolution on -- in this

10    one.                                                    05:38:24

11       Q.   (By Ms. Weaver)  And you, in the

12    advertising privacy policy team, have never seen a

13    list of advertisers who possess user IDs or used it

14    for the purposes of saying you may not advertise

15    because you will be sharing infor- -- you will be       05:38:34

16    able to personally target individual users; is that

17    true?

18            MR. BENJAMIN:  Objection to form.

19            THE DEPONENT:  I -- I don't know of any

20    other cases aside from the one that you've              05:38:55

21    presented currently.

22       Q.   (By Ms. Weaver)  Does Uber currently

23    advertise on Facebook?

24            MR. BENJAMIN:  Objection.

25            THE DEPONENT:  I don't know the full list        05:39:10
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    of advertisers who advertise on Facebook.  I --         05:39:11

2    I -- at some points Uber definitely did advertise

3    and in recent years.

4         Q.   (By Ms. Weaver)  Okay.  Are you prepared

5    to testify about targeted advertisements that take      05:39:28

6    the form of videos?

7         A.   Yes.

8         Q.   How do targeted advertisements take the

9    form of videos?

10        A.   When an advertisers sets up their ad --       05:39:42

11   one second.

12             (Brief interruption.)

13             THE DEPONENT:  When an advertiser sets up

14   their ad, they choose the -- the creative for their

15   ad.  That includes choosing if it's going to be an      05:40:06

16   image or a video and the format.  And then they

17   would upload the video that they want to use for

18   their ad.

19        Q.   (By Ms. Weaver)  And Facebook then takes

20   the video and provides that video to the users, is      05:40:22

21   that right, on its platform?

22        A.   As in the case of all ads, it then enters

23   the auction.  And if it wins the auction, we will

24   show that ad that has the video content in our

25   newsfeed to users.                                      05:40:41
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1      Q.   So Facebook isn't creating the videos; is      05:40:43
2   that right?
3      A.   The advertiser selects the video and
4   creates the video.
5      Q.   And then Facebook's responsibility is to      05:40:51
6   take the video and provide it to the user; is that
7   right?
8           MR. BENJAMIN:  Objection to form.
9           THE DEPONENT:  We deliver the ad to
10  users, yes.                                           05:41:03
11     Q.   (By Ms. Weaver)  And the ad is in video
12  form, right?
13          MR. BENJAMIN:  Objection to form.
14          THE DEPONENT:  By video -- by video form,
15  we just mean it is an ad that has a video in it?      05:41:12
16     Q.   (By Ms. Weaver)  Yes.
17     A.   Yes.  Then we show a user that ad, which
18  involves showing them the video.
19     Q.   And then does Facebook report back to the
20  advertiser information about whether or not those     05:41:32
21  videos were obtained or received?
22          MR. BENJAMIN:  Objection to form.
23          THE DEPONENT:  Do you mind clarifying
24  what you mean by obtained or received.
25     Q.   (By Ms. Weaver)  Do you understand what      05:41:48

                                                        Page 339

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    the word "obtained" means?                          05:41:48

2        A.   I understood to -- I -- I understood it

3    to mean removing it from the platform, and I don't

4    think that's what you mean.  So I want to be

5    sure --                                             05:42:00

6        Q.   Okay.

7        A.   -- I'm following.

8        Q.   Let's try this, what about receive?

9             Do you know what receive means?

10       A.   Received by the users?                     05:42:06

11       Q.   Yes.

12       A.   Yes.  The users -- so, again, the ad

13   enters the ad auction.  If it is delivered to a

14   user, the user will see it.  That's what I'm

15   defining as received.  They saw the ad.            05:42:18

16       Q.   And then Facebook reports the view of

17   that video back to the advertisers; is that

18   correct?

19       A.   We report the aggregated number of views

20   a video -- a video ad gets, correct.               05:42:31

21       Q.   Okay.  What is audience network?

22       A.   Audience network was a -- effectively an

23   ad exchange owned by Facebook that would enable us

24   to place an ad on third-party sites and website --

25   third-party websites and apps.                      05:42:52

Page 340

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   And Facebook was placing the ad on the        05:42:56

 2   third-party websites, and was it then compensated

 3   for placing the ad?

 4             MR. BENJAMIN:  Objection to form.

 5             THE DEPONENT:  As with all ads, the            05:43:15

 6   advertiser pays for the ad.  And that was also true

 7   with audience network placements.

 8        Q.   (By Ms. Weaver)  And in this case, the

 9   advertiser is Facebook; is that right?

10        A.   No.                                            05:43:26

11             MR. BENJAMIN:  Objection to form.

12        Q.   (By Ms. Weaver)  Okay.  Facebook is

13   placing the ad on behalf of an advertiser; is that

14   right?

15             MR. BENJAMIN:  Objection to form.             05:43:38

16             THE DEPONENT:  It's a similar concept as

17   placing an ad on Facebook, the advertiser creates

18   the ad and chooses the audience.  Facebook dis- --

19   on -- on our platform, we display it here.  We send

20   it to a publisher, so the website or app, and they    05:43:54

21   display the ad.

22        Q.   (By Ms. Weaver)  So is Facebook involved

23   in pulling together targeted interests or behaviors

24   for the creation of ads in audience network?

25        A.   No.                                           05:44:16
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1                MR. BENJAMIN:  Objection to -- sorry,        05:44:17

 2    Bella.

 3                Objection to form.  Compound.  Vague.

 4                THE DEPONENT:  No.  The creation of an ad

 5    that goes on an audience network is the same as the    05:44:26

 6    creation of an ad on Facebook.  The advertiser

 7    selects their desired audience through our

 8    targeting options.  The same ones that we covered.

 9                The -- our role in the audience network

10    portion is in place -- is in -- in -- I think          05:44:43

11    "placing" is maybe confusing us -- is in that ad

12    going to a third-party website rather than on our

13    platform to be displayed to a user.

14        Q.   (By Ms. Weaver)  And then does Facebook

15    track performance measurements and report that back    05:45:01

16    to the advertiser?

17                MR. BENJAMIN:  Objection to form.

18                THE DEPONENT:  Similar to an ad that we

19    display on our own site, an advertiser would know

20    the aggregated performance metrics of that ad.         05:45:15

21        Q.   (By Ms. Weaver)  Are you aware of

22    performance measurements provided to Salesforce at

23    Oracle that were different than the kinds of

24    performance measurements provided ordinarily to --

25    to advertisers?                                        05:45:35
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              MR. BENJAMIN:  Objection to form.        05:45:39

 2              THE DEPONENT:  In the -- can you clarify,

 3     in the sense of like were Salesforce and Oracle

 4     advertisers?

 5         Q.   (By Ms. Weaver)  Yes.                    05:45:49

 6         A.   And did we provide them with different

 7     metrics?

 8         Q.   Yes.

 9         A.   No.

10         Q.   Over time, with regard to the performance  05:46:22

11     metrics provided by Facebook to advertisers, what

12     are examples of metrics that are provided today

13     that were not provided in the past?

14         A.   As an example -- I'm sorry, Matt.  I keep

15     jumping.                                         05:46:45

16              When a new ad format is introduced, such

17     as video ads, were not a type of ad that we had

18     originally, we then also introduced the relevant

19     performance metric of like aggregate views of that

20     video, which wouldn't have existed prior to a video  05:47:03

21     ad.

22         Q.   Can you think of any other examples that

23     were added over time with regard to performance

24     measurements or metrics provided to advertisers?

25              MR. BENJAMIN:  Objection to form.        05:47:18
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  Ad score is an example      05:47:20

 2   that has been something we've added in over time.

 3        Q.   (By Ms. Weaver)  When was ad score added?

 4        A.   I don't know the exact date.  But from

 5   2016 onwards, I believe.                             05:47:33

 6        Q.   Any other examples you can think of?

 7        A.   I can't think of any other examples more

 8   specifically on a timeline.

 9        Q.   What is conversion tracking?

10        A.   Conversion tracking is a way to            05:47:57

11   understand who subsequently bought an ad or -- or

12   converted on -- the product.

13        Q.   Does Facebook provide that information to

14   advertisers?

15        A.   That works in conjunction with our         05:48:14

16   business tools.

17        Q.   Okay.  Does Facebook provide that

18   information to advertisers through their business

19   tools?

20        A.   We -- so for an ad that's -- that's a      05:48:25

21   conversion ad, an advertiser sets up the Pixel and

22   they are able to understand the conversions from

23   that ad.

24        Q.   And when you say "the advertiser sets up

25   the Pixel" do you mean to imply that's the          05:48:43
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    advertiser that is tracking the conversion or is        05:48:47

 2    it --

 3         A.   Yes.

 4         Q.   -- just as well through the Pixel?

 5              MR. BENJAMIN:  Objection to form.             05:48:56

 6              THE DEPONENT:  The advertiser sets up the

 7    Pixel.  Facebook also receives the information from

 8    the Pixel.

 9         Q.   (By Ms. Weaver)  And what specifically is

10    the information that the Pixel collects with regard      05:49:08

11    to conversion tracking?

12         A.   Pixel collects two categories of

13    information.  One is contact information, which is

14    a form of identifier and event.  The event is

15    something the advertiser defines.  In this case         05:49:25

16    it's a conversion.  And they choose the information

17    to send back about that event.

18         Q.   And for the record, can you define

19    conversion?

20         A.   Conversion is -- is -- is the -- the end      05:49:41

21    of the marketing funnel.  It's when someone buys

22    the product or service being advertised.

23         Q.   Is it always a purchase or can it also be

24    just a desired action?

25              MR. BENJAMIN:  Objection to form.             05:50:03
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  Desired action is        05:50:06

 2    particularly broad because advertisers usually have

 3    a desired action with any ad they're placing.

 4    So -- so in the sense of you create an ad with a

 5    like page objective to try and get people to like   05:50:16

 6    your page.

 7              So conversions are -- are most closely to

 8    take a very specific -- like buying or -- or -- or

 9    it is the -- the -- the end of the funnel that

10    someone has completed, the marketing funnel.         05:50:36

11        Q.   (By Ms. Weaver)  Could we say a

12    conversion marks completion of a business

13    objective?

14              MR. BENJAMIN:  Objection to form.

15              THE DEPONENT:  The -- I don't think        05:50:46

16    that's inaccurate.  I don't know that that's

17    exactly how we would describe it.  But that --

18    that -- I'm fine with that description.

19        Q.   (By Ms. Weaver)  Okay.  Are you familiar

20    with something called an ad console?               05:51:05

21        A.   No, not -- not immediately.

22              Do you mind walking me through what your

23    reference is.

24        Q.   Yeah.

25              Is there something internally that the     05:51:24
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | advertising team sees about ad campaigns that is | 05:51:27 |
| 2 | not provided to the advertiser? | |
| 3 |       MR. BENJAMIN:  Objection to form and | |
| 4 | scope. | |
| 5 |       THE DEPONENT:  An advertising team being | 05:51:43 |
| 6 | like the sales team associated with an advertiser | |
| 7 | or... | |
| 8 |    Q.  (By Ms. Weaver)  Yes. | |
| 9 |    A.  I -- there are internal tools that our | |
| 10 | sales team uses.  I do not -- I -- I don't know if | 05:52:01 |
| 11 | that's specifically ad console that -- that is | |
| 12 | what -- if that's what it's named. | |
| 13 |    Q.  Okay.  What is an ECTR? | |
| 14 |    A.  The estimated click-through rate. | |
| 15 |    Q.  And how is that calculated? | 05:52:23 |
| 16 |    A.  The ECTR is part of the machine learning, | |
| 17 | the estimated action rate that's a similar concept. | |
| 18 | So it's the likelihood -- I'm sorry.  One moment. | |
| 19 | I -- I want to be sure I'm also not confusing | |
| 20 | acronyms here. | 05:52:49 |
| 21 |       MS. WEAVER:  No problem. | |
| 22 |       THE DEPONENT:  I -- I -- I apologize.  I | |
| 23 | don't want to misstate on the definition of -- or | |
| 24 | how we create the estimated click-through rate. | |
| 25 |    Q.  (By Ms. Weaver)  Who would know? | 05:53:12 |

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1        A.   Our ad measurement team would know.      05:53:16

2        Q.   Who's in the ad measurement team?

3        A.   An example is Toby Roessingh.

4        Q.   R-O-S-I-N-G?

5        A.   It's in -- his last name -- one second.   05:53:33

6   I can spell this.

7             R-O-E-S-S-I-N-G-H.

8        Q.   Is he the lead on the ad measurement

9   team?

10            MR. BENJAMIN:  Objection to form and      05:54:04

11  scope.

12            THE DEPONENT:  I'm not sure his exact

13  position, but he is on ads measurement.

14       Q.   (By Ms. Weaver)  Anyone else you can

15  think of?                                           05:54:16

16            MR. BENJAMIN:  Same objections.

17            THE DEPONENT:  No, he's -- he's a point

18  of contact that I use for the ads measurement team.

19       Q.   (By Ms. Weaver)  Okay.  What is CPC?

20       A.   Cost per click.                           05:54:35

21       Q.   And what is CPM?

22       A.   CPM stands for cost per meal, which is

23  cost per 1,000 impressions.

24       Q.   And does Facebook provide to advertiser,

25  following a campaign, the metrics that include      05:54:54
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | clicks, impressions, CPM, CPC and CTR? | 05:54:58 |
| 2 | A.   Do you mean for -- those are -- those are | |
| 3 | aggregated metrics that we provide to advertisers. | |
| 4 | Q.   Does Facebook also provide revenue | |
| 5 | information? | 05:55:15 |
| 6 | A.   Revenue is -- or like related to us.  We | |
| 7 | provide the advertiser with their ad spend.  How | |
| 8 | much they spent on that ad. | |
| 9 | Q.   And then does Facebook provide something | |
| 10 | called value to advertisers? | 05:55:31 |
| 11 | A.   We do provide a metric called value. | |
| 12 | Q.   And what is value? | |
| 13 | A.   How we calculate value is something that | |
| 14 | I -- I'm afraid I will misrepresent. | |
| 15 | Q.   But Facebook does calculate value, right? | 05:56:01 |
| 16 | A.   We -- so -- | |
| 17 | MR. BENJAMIN:  Objection -- objection to | |
| 18 | form. | |
| 19 | THE DEPONENT:  We provide a metric | |
| 20 | called -- or part of performance is -- is a metric | 05:56:14 |
| 21 | called value. | |
| 22 | Q.   (By Ms. Weaver)  And it's the value of | |
| 23 | what? | |
| 24 | A.   I'm not certain.  And I don't want to | |
| 25 | misrepresent what it stands for. | 05:56:25 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.    Who would know?                          05:56:27

 2        A.    Again, Toby.

 3        Q.    What is ego value?

 4              (Court Reporter asks for clarification.)

 5              MS. WEAVER:  Ego value.  E-G-O V-A-L-U-E.   05:56:30

 6              THE DEPONENT:  I'm not certain.  I --

 7    I -- I -- I'm not familiar with that just -- yeah.

 8        Q.    (By Ms. Weaver)  Does Facebook provide

 9    real-time ads metrics to advertisers?

10              MR. BENJAMIN:  Objection to form.          05:57:05

11              THE DEPONENT:  Can you clarify, for

12    real-time, do you mean as soon as an action happens

13    on an ad?

14        Q.    (By Ms. Weaver)  I mean, I -- I don't

15    know.  I don't work at Facebook.                    05:57:16

16              But what does real-time mean at Facebook?

17              MR. BENJAMIN:  Objection to form.

18              THE DEPONENT:  We -- so we provide -- as

19    an ad begins to run, we provide the aggregated

20    metrics -- performance metrics.  Those aren't like   05:57:34

21    a minute-by-minute updated.  So it's -- that's what

22    we mean by real-time is it's not how those metrics

23    are shared with advertisers.

24        Q.    (By Ms. Weaver)  How about a five-minute

25    level granularity, is that shared with advertisers?  05:57:49
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER



1     A.   I don't know the exact refresh rate of                    05:58:03

2  those aggregated metrics.

3     Q.   ████████████████████████████████████

   ███████████████████████████

        █   ████████████████                                         05:58:16

6        MR. BENJAMIN:  Objection to form.

7        ███████████████   ███████████████████████

   ████████████████████████████.

9     Q.   (By Ms. Weaver) ████████████████

   ██████████████████████                                           05:58:29

11    A.   ████████████████████████████████████

   █████████████████████████████████████████

   █████████████████

   █   ████████████████████████████████

   █   █████████████████████████████████        ████████████

   ███████████   ██████████████████████████

   █████

   █   ████████████████████████████████████

   ███████████

20    A.   So to clarify --                                          05:59:14

21       MR. BENJAMIN:  Objection -- objection to

22  form and scope as phrased.

23       ████████████████   ███████████████████████

   ███████████████████████████████████████████████████

   ████████████████████████████████████████             05:59:31

                                                          Page 351

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1  ████████████████████████████████  ███████

▮  ██████████████

▮      ██████████████████████

▮  ████████████████████████████

▮  ███████████████████████                    05:59:46

6       Q.   (By Ms. Weaver)  Okay.  What are QRT

7  experiments?

8       A.   Those aren't specific to -- to ads.  A

9  QRT is to effectively understand the change when we

10 launch something.  So if we see -- as an example,   06:00:06

11 we might -- as I'm -- a probably silly example.

12          In ads manager, if we switched the order

13 of something, we might run a QRT where some

14 advertisers are in one group and other advertisers

15 are in another group to understand if there is a   06:00:29

16 difference between the -- the groups and the new

17 UIs.  So to understand if there's an impact to how

18 they engage with our tools.

19      Q.   And what does QRT stand for, do you know?

20      A.   I don't know.                            06:00:48

21          MR. BENJAMIN:  Objection -- objection to

22 form and scope.

23          THE DEPONENT:  This is probably a -- a

24 problem at Facebook where we use acronyms without

25 ever learning the -- the full wording.            06:00:56

                                           Page 352

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1              I'm not sure -- I'm not sure what the        06:00:57

2     full name is or what it stands for.

3          Q.   (By Ms. Weaver)  So do QRT experiments

4     generates ad-specific metrics that are useful to

5     Facebook in figuring out how best to target users?    06:01:11

6              MR. BENJAMIN:  Objection to form.

7              THE DEPONENT:  No.  A QRT is about

8     creating like a production environment that we can

9     understand if it's different from different

10    production environment.  It's not a method to         06:01:36

11    target users for ads.  That is still established by

12    our targeting tools that advertisers choose.

13         Q.   (By Ms. Weaver)  What's a production

14    environment?

15             MR. BENJAMIN:  Objection.                     06:02:00

16             Is anyone else hearing an echo?

17             THE COURT REPORTER:  Yes.

18             THE DEPONENT:  No.

19             MS. WEAVER:  I'm having an echo, too.

20             THE COURT REPORTER:  It's been happening       06:02:08

21    for a while.

22             MR. BENJAMIN:  Do you want to go off the

23    record?

24             THE COURT REPORTER:  Sure.

25             MS. WEAVER:  I mean, I'd rather continue        06:02:16
```

Page 353

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1    with the dep.                                          06:02:17

2           How much time do we have left?

3           THE VIDEOGRAPHER:  About 18 minutes.

4           (Court Reporter initiates discussion off

5    the stenographic record.)                              06:03:10

6       Q.   (By Ms. Weaver)  Okay.  Back to, what is

7    a production environment?

8       A.   That was my way of explaining that

9    we're -- we've created two versions of a UI for

10   users who -- or -- or in this -- in the example I     06:03:41

11   gave, advertisers to interact with.

12          It's just a -- a live part of our site.

13   I'm not sure if that's like a technical term that

14   would be used.  But that's what I was describing.

15      Q.   Are you familiar with something called      06:03:55

16   deltoid?

17          MR. BENJAMIN:  Objection to form.

18          THE DEPONENT:  Not super specific to ad

19   targeting or ad ranking.  Deltoid, from my

20   understanding, is how we help measure when a QRT is   06:04:13

21   running the differences in metrics from that --

22   effectively those two environments, the two

23   versions that we -- we have running.

24      Q.   (By Ms. Weaver)  And what do you mean by

25   the "differences in metrics"?                          06:04:29

                                                Page 354

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1      A.   So going back to the example if -- that I        06:04:34

2    was using of advertisers maybe we switched the UI

3    in one version to understand if it's an easier UI

4    for them to use.  I mean, one thing would be like

5    ad creation.  Do we see similar rates of ad           06:04:47

6    creation when we make that change.

7      Q.   Got it.

8           So does Facebook provide to third parties

9    ad market daily metrics?

10          MR. BENJAMIN:  Objection to form --            06:05:11

11     Q.   (By Ms. Weaver)  Is that something that

12   Facebook maintains internally.

13          MS. WEAVER:  Sorry about that, Matt.

14          MR. BENJAMIN:  Excuse me, Ms. Weaver.

15   Apologize.                                            06:05:17

16          Objection to form and scope.

17          THE DEPONENT:  I'm sorry.  I missed the

18   very beginning of your question.

19     Q.   (By Ms. Weaver)  Does Facebook provide to

20   third parties ad market daily metrics?                06:05:30

21          MR. BENJAMIN:  Same objections.

22          THE DEPONENT:  No.  My understanding is

23   that that's an internal table of ad performance and

24   metrics.

25     Q.   (By Ms. Weaver)  And does Facebook            06:05:51

Page 355

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    maintain per impression logging with revenue          06:05:52

 2    information for ads?

 3              MR. BENJAMIN:  Objection to scope.

 4              THE DEPONENT:  We --  ███████  we maintain

 5    something called ads impressions annotated, which     06:06:08

 6    is an impression login table.  To be clear, I don't

 7    think it's revenue-based.  Revenue, again, is more

 8    specific to us rather than ad spend from the

 9    advertiser.

10        Q.   (By Ms. Weaver)  And does Facebook share     06:06:24

11    data from the ads impressions annotated with third

12    parties?

13              MR. BENJAMIN:  Objection to form and

14    scope as phrased.

15              THE DEPONENT:  No.  We share the             06:06:40

16    aggregated impression information in like our --

17    our ads manager performance metrics, not the table.

18        Q.   (By Ms. Weaver)  And where is that

19    aggregated impression information maintained at

20    Facebook?                                              06:06:57

21              MR. BENJAMIN:  Objection to form and

22    scope.

23              THE DEPONENT:  It -- it is read from our

24    data basis.  It's read from the tables, but

25    aggregated for -- to display to -- in our UI.          06:07:10
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   (By Ms. Weaver)  I'm sorry.                  06:07:16

 2        A.   No, no.

 3        Q.   When you say "read from our databases,"

 4   which databases do you mean specifically?

 5        A.   The -- the back end here, I -- I --         06:07:31

 6   were -- this isn't specific to ads.  I'm not -- I'm

 7   not sure if like our ads reporting UI reads it from

 8   Hive specifically, in which case it would be the

 9   ads impressions annotated or ███████████████

██       ████████  which is where like the production site  06:07:59

11   is run from.

12        Q.   Is there data contained ███████ which is

13   shared with third parties?

14             MR. BENJAMIN:  Objection to form and

15   scope.                                                06:08:25

16             THE DEPONENT:  Can you -- do you mind --

17   clar- -- clarifying.  Do you mean such as like the

18   tables ███████

19        Q.   (By Ms. Weaver)  Yes.

20             MR. BENJAMIN:  Same objection.               06:08:34

21             THE DEPONENT:  So within the context of

22   ads, we don't share the tables ███████ with third

23   parties.

24        Q.   (By Ms. Weaver)  But do you share

25   information contained in the tables ███████          06:08:44
```

Page 357

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1      some -- some portion of it with advertisers?          06:08:48

2             MR. BENJAMIN:  Objection to form.  Asked

3      and answered.

4             THE DEPONENT:  Our ad reporting metrics,

5      the ones we've discussed, the aggregated ones, such    06:09:01

6      as in ads manager, I'm not certain if those come

7      from Hive, if that's an aggregation that's there.

8      But that would be an example of where conceptually

9      that might happen.

10            But, again, it's about -- it's backing         06:09:16

11     the aggregated metrics that we provide to an

12     advertiser.

13        Q.   (By Ms. Weaver)  What's the difference

14     between a raw and a legal impression?

15            MR. BENJAMIN:  Objection to form and           06:09:30

16     scope.

17            THE DEPONENT:  A legal impression is an

18     impression that we -- that is charged to the

19     advertiser.  A -- a raw impression is not always a

20     legal impression.                                     06:09:48

21        Q.   (By Ms. Weaver)  How does Facebook decide

22     what is a legal impression?

23            MR. BENJAMIN:  Objection to form and

24     scope.

25            THE DEPONENT:  This -- this is within ads      06:09:58
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1    measurement.  An example from -- from my knowledge        06:10:00

2    is if we -- if we show an ad multiple -- or if an

3    ad -- I'm trying to explain how -- how -- how I

4    remember this.

5            If -- if -- an example of a raw               06:10:28

6    impression is that does -- is not a legal

7    impression, because legal impressions are a subset

8    of those, would be if an ad is shown to a user

9    potentially repeatedly, and it was not -- it wasn't

10   supposed to be.  So it's -- if an indication of       06:10:46

11   potentially like a mis-delivery on our side and so

12   we don't charge the advertiser for it.

13           Beyond that, I don't know all the cases.

14   That would be something that our ads measurement

15   would cover.                                          06:10:59

16       Q.   (By Ms. Weaver)  Are you aware of a table

17   that logs per user daily key revenue metrics with

18   ads revenue?

19           MR. BENJAMIN:  Objection to form and

20   scope.                                                06:11:12

21           THE DEPONENT:  No.

22       Q.   (By Ms. Weaver)  So are you familiar with

23   a log called ███████████████████████████

     ██  ██████

25           MR. BENJAMIN:  Same objections.              06:11:26

                                              Page 359
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  I'm -- I'm not familiar          06:11:31

 2     with all of the data in that table or if it

 3     reflects revenue per user.  That's not something we

 4     calculate.

 5         Q.   (By Ms. Weaver)  Do you know if -- are         06:11:49

 6     you familiar with a log

 7     ████████████████████████████████████████████

       ████████████████████████████████████████████

       ███████████████████████

10              MR. BENJAMIN:  Objection to form.  And         06:12:04

11     foundation and scope.

12              THE DEPONENT:  I don't know the details

13     of the columns of that ████████████████████████

14         Q.   (By Ms. Weaver)  Is there a person whose

15     responsibility is to track revenue tied on a user      06:12:15

16     basis?

17         A.   No.  We don't track revenue on a user

18     basis.

19         Q.   And when you say "we don't," you mean

20     currently Facebook doesn't do that?                    06:12:39

21              MR. BENJAMIN:  Objection to form and

22     scope on this line.

23              THE DEPONENT:  We don't track per user

24     how much -- the revenue we've gained from that user

25     is what I mean.                                         06:13:00
```

Page 360

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1          Q.   (By Ms. Weaver)  Okay.  With regard to       06:13:02

2     conversions, are you familiar with something called

3     an RSVP?

4               MR. BENJAMIN:  Objection to scope.

5               THE DEPONENT:  No.  I might need some --     06:13:14

6     some narrowing or clarification.

7               MS. WEAVER:  Sadly, I don't have any.

8               Okay.  I think we can go off the record

9     quickly.

10              How much time do we have left?              06:13:36

11              THE VIDEOGRAPHER:  It's let's see -- off

12    the record, we have about seven or eight minutes

13    left.

14              MS. WEAVER:  Great.  Thank you.

15              THE VIDEOGRAPHER:  Okay.  And we're off      06:13:52

16    the record.  It's 6:13 p.m.

17              (Recess taken.)

18              THE VIDEOGRAPHER:  We're back on record.

19    It's 6:28 p.m.

20         Q.   (By Ms. Weaver)  Ms. Leone, just a -- or    06:28:11

21    Leone -- just a few more questions.

22              You testified that CPC is a metric that

23    refers to cost per click.

24              Do you recall that?

25         A.   Yes.                                         06:28:21
```

                                                         Page 361

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1         Q.   Can it also --                          06:28:23

 2              MS. WEAVER:  You know, it sounds like

 3    this echo is me.  Let me try --

 4         Q.   (By Ms. Weaver)  Can it also refer to a

 5    type of -- that advertisers can -- where they pay  06:28:32

 6    each time a user clicks on the ad?

 7         A.   I'm sorry.  That came in and out

 8    continuously.

 9              MS. WEAVER:  Hello.  I just went back to

10    the other mic.                                     06:28:46

11         Q.   (By Ms. Weaver)  Okay.  Can CPC also

12    refer to a type of bidding that advertisers can

13    choose where they pay each time a user clicks on

14    the ad?

15         A.   It is -- is a bidding strategy that they  06:28:58

16    can select when they set up their ad.

17         Q.   And is reach the number of users who

18    receive an ad?

19         A.   Reach is the number of accounts that --

20    that -- that see an ad, yes.  I -- I think that    06:29:16

21    we're saying the same thing.

22         Q.   And unique accounts?

23         A.   Unique accounts.

24         Q.   What is frequency?

25         A.   Together reach and frequency are a type  06:29:30
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    of -- of a mechanism of brand awareness where we        06:29:40

 2    will try to -- to -- to optimize the ad to reach a

 3    large number of people or reach many people and

 4    multiple times with an ad so they familiarize

 5    themselves with that brand.                             06:29:52

 6         Q.   So is reach frequency the number of times

 7    a user is exposed to an ad?

 8         A.   Yes.

 9         Q.   And is average frequency calculated by

10    dividing impressions by reach?                          06:30:06

11         A.   I believe so.  But I -- I would

12    potentially need to -- to confirm.

13              MS. WEAVER:  Okay.  That's it.  I have no

14    further questions at this time.  And reserve all

15    rights and we'll keep it open on behalf of             06:30:28

16    plaintiffs.

17              MR. BENJAMIN:  Okay.  Thank you,

18    Counsel Weaver.

19              On behalf of Facebook, it sounds like

20    plaintiffs have had the opportunity to ask the         06:30:35

21    questions they wanted to today.  We just reserve

22    all rights.

23              We designate the transcript

24    "Confidential" pursuant to the protective order

25    pending the final confidentiality designation.        06:30:44
```

Page 363

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
1              MS. WEAVER:  Great.  Thank you.            06:30:47

2              We can go off the record.

3              THE VIDEOGRAPHER:  Off the record or --

4     I'm -- I'm sorry.  I didn't -- I didn't hear it.

5              Okay.  So --                               06:30:55

6              MS. WEAVER:  Go off the record.  Sorry.

7              THE VIDEOGRAPHER:  Go off the record.

8     Okay.  Thank you.

9              We're off the record.  It's 6:31 p.m.

10             (TIME NOTED:  6:31 p.m.)                    06:31:04

11

12

13

14

15

16

17                        ---o0o---

18

19

20

21

22

23

24

25

                                                          Page 364
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1      I, Rebecca L. Romano, a Registered

2   Professional Reporter, Certified Shorthand

3   Reporter, Certified Court Reporter, do hereby

4   certify:

5      That the foregoing proceedings were taken

6   before me remotely at the time and place herein set

7   forth; that any deponents in the foregoing

8   proceedings, prior to testifying, were administered

9   an oath; that a record of the proceedings was made

10  by me using machine shorthand which was thereafter

11  transcribed under my direction; that the foregoing

12  transcript is true record of the testimony given.

13     Further, that if the foregoing pertains to the

14  original transcript of a deposition in a Federal

15  Case, before completion of the proceedings, review

16  of the transcript [x] was [ ] was not requested.

17     I further certify I am neither financially

18  interested in the action nor a relative or employee

19  of any attorney or any party to this action.

20     IN WITNESS WHEREOF, I have this date

21  subscribed my name this 10th day of August, 2022.

22

23

24     Rebecca L. Romano, RPR, CCR

25     CSR No. 12546

                                        Page 365

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    MATT BENJAMIN

 2    mbenjamin@gibsondunn.com

 3                                      August 10, 2022

 4    RE: Facebook, Inc. Consumer Privacy User Profile Litigation

 5    AUGUST 5, 2022, ISABELLA LEONE, JOB NO. 5345580

 6    The above-referenced transcript has been

 7    completed by Veritext Legal Solutions and

 8    review of the transcript is being handled as follows:

 9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, notating the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20    __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23    __ Signature Waived - Reading & Signature was waived at the

24       time of the deposition.

25
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
 1    xx Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF
 2       Transcript - The witness should review the transcript and
 3       make any necessary corrections on the errata pages included
 4       below, notating the page and line number of the corrections.
 5       The witness should then sign and date the errata and penalty
 6       of perjury pages and return the completed pages to all
 7       appearing counsel within the period of time determined at
 8       the deposition or provided by the Federal Rules.
 9    __ Federal R&S Not Requested - Reading & Signature was not
10       requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1        I, ISABELLA LEONE, do hereby declare under

2   penalty of perjury that I have read the foregoing

3   transcript; that I have made any corrections as

4   appear notes; that my testimony as contained

5   herein, as corrected, is true and correct.

6        Executed this ____ day of _____,

7   2022, at _____,_____.

8

9

10

11

12              _____

13                   ISABELLA LEONE

14

15

16

17

18

19

20

21

22

23

24

25

                                            Page 368

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

1   RE: Facebook, Inc. Consumer Privacy User Profile Litigation

2   ISABELLA LEONE (JOB NO. 5345580)

3                    E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____    _____

24  ISABELLA LEONE                       Date

25

                                              Page 369

**[& - 2019]**

| & | |
|---|---|
| **&** 1:14 2:19 3:5 4:17 5:5 6:5 11:17,22 366:23 367:9 | |

| 0 | |
|---|---|
| **00003632** 8:13 | |
| **02140811** 10:15 | |
| **02140812** 10:16 | |
| **02843** 1:6 2:6 | |
| **03526129** 9:17 211:24 | |
| **03526133** 9:18 | |
| **03969858** 9:22 251:22 | |
| **03969862** 9:23 | |
| **03969899** 9:12 201:18 | |
| **03969907** 9:13 | |
| **03969941** 8:19 | |
| **03969951** 8:20 | |

| 1 | |
|---|---|
| **1** 1:17,25 8:3 14:25 15:10,12 22:10 367:1 | |
| **1,000** 348:23 | |
| **10** 24:21,22 232:10 312:8 366:3 | |
| **100** 44:8 170:6 190:23 195:4,4 233:7,8,14 234:1 234:7 235:2 236:19 237:7 246:8 | |
| **10166-0193** 4:21 | |

**1050** 6:17
**10:15** 96:5
**10:16** 96:8
**10:34** 109:20
**10:49** 109:23
**10th** 365:21
**11:33** 144:15
**11th** 145:23
**12** 67:4 314:12
**1201** 4:9
**12546** 1:20 365:25
**12:24** 144:18
**12th** 3:10
**13** 8:5 254:4
**133** 211:24
**14** 158:7
**145** 8:15
**15** 8:11 24:21,22 25:14
**155** 8:22
**1600** 3:11
**170** 66:12,12 67:2
**18** 1:6 2:6 299:12,16 354:3
**1881** 6:9
**1:35** 201:8
**1:55** 201:11

| 2 | |
|---|---|
| **2** 186:1 | |
| **20** 21:16 44:10 50:12 67:5 73:17 109:11 131:4 157:2 195:18,23,25 200:17,19 201:1 | |

**201:4** 231:7,7,10
231:16 232:2,9
232:14 233:22
233:24 234:3,11
234:14,16 235:4
235:18 236:19
237:8 240:18,19
241:5 242:12
246:8 247:6
248:11 291:7
**20-0466** 1:21
**200** 4:20 189:5,7
**2001** 5:16
**20036-5306** 6:18
**2007** 24:25 25:3
25:5,6 26:6 27:5
27:13,24 30:3
34:19 37:4
46:12 54:18
55:3 72:11 73:9
73:12,18 99:12
140:24 186:14
194:16 195:21
226:18 239:19
290:12
**2008** 217:25
221:14
**201** 9:4
**2010** 81:1,2,11
81:19 90:22
117:24 122:1
123:1
**2012** 24:23 66:17
66:22 89:21,23
90:10 91:4
264:10
**2013** 21:16,20
333:16

**2014** 21:17,20
26:25 28:2 30:3
34:2,4 92:6,8
93:6,12,22 99:12
99:13,14 123:1
131:4,11 145:8
156:19 157:4,25
158:7 168:17
169:8,24 172:13
174:7 264:10
**2016** 136:14
170:7 171:12
233:25 235:2
237:10 241:9
344:5
**2018** 58:3 123:14
136:14 156:19
157:1,5,9,11,18
157:25 158:8,10
171:20 172:10
172:13,15 174:7
195:12,14
233:16,25 235:2
237:10 241:9
256:19 260:18
264:23 265:11
265:23 266:3
271:21 285:9
287:7 293:22,23
294:8,12
**2019** 123:13
145:14,23
152:11 258:3,19
266:11,23
267:15 271:24
287:3 292:23
300:5 303:10

Page 1

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[202 - 944]**

**202**   6:19
**2020**   157:9
  164:15 264:5,12
  264:19 266:3,8
  270:20 278:10
  278:11 279:17
**2022**   1:16 2:18
  8:12 11:1,7
  155:8 157:3,10
  157:11,18
  158:10,17
  164:16,17,19
  165:16,16
  168:17 169:8,24
  195:6 252:15
  268:19 365:21
  366:3,5 368:7
**2025.520**   366:9
  366:12
**206**   4:12
**21**   299:13
**2100**   5:17
**211**   9:15
**212**   4:22
**213**   7:10
**214**   5:19
**218**   312:8
**24th**   260:18
  285:9
**251**   9:20
**253-9706**   7:10
**260**   10:4
**281**   10:11
**2843**   1:4 2:4
**29th**   155:8

**3**

**3**   155:5,6 190:12
  228:4,15 308:12
  312:8 331:24
**3.2**   286:9
**3.2.**   285:11,13
**30**   1:12 309:22
  310:7 312:25
  367:1
**3000**   5:9
**3200**   4:10
**32nd**   7:8
**331**   10:13
**3491**   1:22
**351-6381**   4:22
**36**   16:7,21 17:6
**369**   1:25
**393-8200**   5:11
**3:00**   251:8
**3:16**   251:12
**3:24**   257:10
**3:34**   257:13

**4**

**4**   150:1 211:21
  309:22 310:8
**415**   3:13 5:11
**445-4003**   3:13
**4:10**   284:21
**4:12**   284:24
**4:21**   292:7
**4:32**   292:10

**5**

**5**   1:16 2:18 8:11
  11:1 150:1
  239:11 317:2
  318:25 319:3
  324:8 366:5

**5345580**   1:23
  366:5 369:2
**555**   3:10 5:8 7:7
**5:09**   323:25
**5:19**   324:3
**5th**   7:7 11:6

**6**

**6**   1:12 309:22
  310:7 312:25
**60,000**   82:17,24
  84:11 88:8
  89:24 113:17
**623-1900**   4:12
**65**   254:4
**650**   6:11
**655**   8:11 15:1
**656**   8:15 144:24
  145:1,10,12,22
  147:14 148:14
  228:4,9
**657**   8:22 155:9
  186:1 228:11
  296:1 300:20
  308:13
**658**   9:4 201:12
  201:16 216:11
  239:11 316:21
  324:5 327:10
  328:21 330:17
**659**   9:15 211:18
  211:23 216:11
  222:24
**660**   9:20 251:16
  251:17,18,22
  252:2,4
**661**   10:4 260:8,9

**662**   10:11 280:25
  281:1 283:3
  285:1,6 287:17
  331:23
**663**   10:13 331:18
  331:20 333:2
**670**   251:15 252:1
**698-3206**   5:19
**6:13**   361:16
**6:28**   361:19
**6:31**   364:9,10

**7**

**7/29/2022**   8:23
**72**   261:7,12
  281:7,23
**7321**   365:23
**75201**   5:18
**7th**   252:15

**8**

**8**   308:12,14
  310:24 311:6
**827**   1:21
**849-5348**   6:11
**862**   251:23
**887-3559**   6:19
**8:04**   2:18 11:2,6

**9**

**900**   202:3
**90013**   7:9
**901**   203:20
**903**   239:12
**907**   201:18
**94105-0921**   5:10
**943**   148:24
**94304-1211**   6:10
**944**   147:22

Page 2

**[945 - ad]**

**945**   147:15
**94607**   3:12
**98101**   4:11
**9:12**   68:14
**9:39**   68:17

**a**

**a.m.**   2:18 11:2,6
68:14,17 96:5,8
109:20,23
144:15
**abernathy**
332:11,17
**abide**   280:19
**ability**   97:3
111:21 221:8
259:22 260:5,23
261:20 330:11
**able**   65:10 85:23
90:25 91:2,12
110:12 114:2
193:18 194:9
219:12 233:10
242:5 244:22
246:5 263:7
295:19 297:6
320:15 322:22
337:16 344:22
**absolutely**   13:24
14:5 21:25
50:23 62:13
**abuse**   272:2
**ac**   257:4
**access**   31:7
33:15 38:21
90:24 98:10,11
99:17 113:10,15
144:3 243:1

297:5 305:2
307:6 336:9
**accessed**   305:20
**accessing**   75:6
**accommodation**
265:2,15 267:5
267:13 280:8
286:15,23
**accomplish**   82:8
297:25
**accomplished**
25:6
**account**   139:4,7
187:14,19
**accounts**   362:19
362:22,23
**accrued**   84:15
**accuracy**   90:20
123:5
**accurate**   123:5
207:10 222:9
252:9,13
**accurately**   14:3
**acronym**   99:19
**acronyms**
347:20 352:24
**acting**   30:1
**action**   28:18,25
31:19 33:3 43:3
43:14 44:6
98:25 132:21
139:10 140:9
177:8,23 178:1,7
181:18,25 182:1
182:6,16 185:20
187:4,6 193:21
205:16,18,19
206:5,9,10,12

208:1,3,11,12,13
209:3,7,16,18
211:7 222:19
227:9,20 230:19
231:10 276:20
345:24 346:1,3
347:17 350:12
365:18,19
**actions**   1:8 2:9
28:23 29:17
43:8,20,23
146:20 178:9
183:17 186:12
222:25 226:14
227:4,22 229:19
249:22
**active**   33:5,10,24
36:6
**actively**   93:7
**activities**   33:16
35:20 99:25
100:16 141:10
142:18 208:2
276:14
**activity**   26:19,21
26:25 27:6,14
28:1,3 29:11,18
29:19 30:4,17,22
30:24 31:1 32:8
32:9,15,18,19,20
33:2,9,14 34:1,5
34:5,7,16 35:7
35:11 37:21
53:2 54:8 75:18
77:2 78:17,19
86:20 88:1 89:7
93:14,15 99:3,6
100:6,13,21,25

101:1 102:3,10
102:11 105:17
107:20 108:10
108:12,18 115:3
115:13 116:6,6,8
116:10,24 119:9
119:13 124:8,13
124:19 125:18
125:22 126:7
127:21,24 128:7
128:22 129:1,8
129:15 130:16
132:7 133:6
135:23 136:5,19
136:21 138:12
139:8,12,13
141:15,17,21
142:3,7,12,20
143:10,13,20
147:7 151:16
153:25 154:10
206:13,16,18,21
207:3,6,14 208:6
208:15 211:5,8,9
211:14 226:5
227:12,12,14,18
272:23,24 275:9
275:20,24 276:3
276:24
**actual**   176:19
255:1
**ad**   8:18 23:22,24
23:25 24:2,4,5,8
24:11,12,13 25:3
25:12,13,17,17
25:22 26:4,15,18
26:23 27:3,17
28:8,12,13,13,17

**[ad – ad]**

| | | | |
|---|---|---|---|
| 28:19 30:16 | 118:2,18 120:12 | 190:12 192:10 | 263:9,11,14,19 |
| 32:10,16 33:7 | 120:19,23 121:4 | 199:1,14 200:2 | 265:22 266:12 |
| 34:15 35:5,22 | 121:8 130:20 | 202:1 203:25,25 | 266:24 267:24 |
| 36:22 37:20 | 133:6 137:25 | 204:2,3,5,5,9,10 | 271:3 280:19,21 |
| 38:2,3,6,6 40:25 | 138:11 139:11 | 204:13,18,19,20 | 287:6 296:19 |
| 41:1,2,7,13,19 | 139:14,24 140:2 | 204:25 205:2,8 | 297:5,24 299:11 |
| 41:20,23,23 42:4 | 140:3,5,11,11,14 | 205:10,23 206:4 | 299:14,18 |
| 42:12,16 43:2,11 | 141:3,19 142:9 | 206:7,11,17 | 308:10 312:17 |
| 43:14,24 44:3,8 | 142:14 145:5,8 | 207:13,24 | 317:13 324:18 |
| 44:10,15,19,22 | 147:1,17 148:8 | 208:16,18,20,25 | 324:21,22 325:7 |
| 44:24 45:22,22 | 148:20,22 149:2 | 209:2,6,18,19,21 | 325:13,24,25 |
| 45:23 46:1,2,4,6 | 149:3,8,16 150:6 | 210:25 211:7 | 326:3,9,14,18 |
| 46:14 48:20,22 | 150:21 151:23 | 212:13 216:22 | 327:15,16,23 |
| 48:23,24 49:1,6 | 151:24 152:8 | 217:17,22 218:3 | 328:6,25 329:14 |
| 50:5,12,19 51:6 | 153:4 162:19 | 218:11,12,20,23 | 330:4,5,7,20 |
| 51:7,20 54:3 | 168:22 170:1,24 | 218:24 219:4,17 | 336:20,23 |
| 56:24 57:3,12,15 | 175:1,5,7,9,20 | 219:19,24 | 338:10,14,15,18 |
| 57:15,15,19 | 175:22,24 176:4 | 220:23 221:7,9 | 338:24 339:9,11 |
| 59:18,18 71:16 | 176:6,7,9,19 | 221:18,20 222:6 | 339:15,17 |
| 71:18,22 72:16 | 177:2,5,9,9,11 | 223:24 224:8 | 340:12,13,15,20 |
| 73:6 75:15,16 | 177:14,16,17,20 | 227:17 229:6,7 | 340:23,24 341:1 |
| 77:4 78:14,16 | 177:23,24 178:1 | 229:20,21,22,25 | 341:3,6,13,17,18 |
| 79:2,21 80:10,15 | 178:1,4,6,8,10 | 230:6,10,11,12 | 341:21 342:4,6 |
| 80:15 83:1,14 | 178:14,17,18,20 | 230:15,15,17,17 | 342:11,18,20 |
| 84:8 85:19 | 178:23 179:1,2,3 | 230:19,24 231:4 | 343:16,17,21 |
| 91:14 92:6,23 | 179:6,8,11,13,20 | 231:8,17,17,18 | 344:1,3,11,20,21 |
| 93:6,8 94:2 | 179:21,22 180:1 | 231:22,25 232:1 | 344:23 346:3,4 |
| 97:15 98:10,10 | 180:3,3,7,9,9,10 | 232:17 233:4 | 346:20 347:1,11 |
| 98:24 100:7 | 180:11,12,19 | 234:6,8,14 235:8 | 348:1,2,8 349:7 |
| 101:8 102:10,13 | 181:3,16,17,19 | 236:2,3,4,6,8 | 349:8 350:13,19 |
| 102:15,17 104:1 | 181:20 182:1,2,5 | 237:5 239:9,24 | 351:8,15,15 |
| 104:13,19 | 182:8,10,11,11 | 240:1,7,12,14,17 | 353:4 354:18,19 |
| 105:16 110:10 | 182:18 184:23 | 240:19 241:2,23 | 355:5,5,9,20,23 |
| 110:23 111:13 | 185:18,22,24 | 242:8,9,18,20,24 | 356:8 358:4 |
| 111:14,18,19,24 | 186:5,11,12,12 | 243:2 246:18,19 | 359:2,3,8 362:6 |
| 112:8 113:1,2,3 | 187:1,2,3,12,13 | 248:23 250:14 | 362:14,16,18,20 |
| 113:7,9,11,16 | 188:12,16,21,22 | 254:3 258:6,20 | 363:2,4,7 |
| 114:1,6 115:15 | 189:1,2,5,6 | 259:18 262:11 | |

**[add - advertisements]**

| | | | |
|---|---|---|---|
| **add** 86:9 100:23 | 30:5,10,15,16,17 | 162:17 166:19 | 300:22 301:1 |
| 133:14 135:17 | 31:4,21 32:5 | 167:1,9 168:4 | 303:1,14,24 |
| 186:20 232:17 | 38:4 41:1,3,4,10 | 172:7,8,21 173:3 | 304:3 306:16 |
| **added** 84:19 | 42:2 43:11 | 173:7,9,25 | 308:20 324:17 |
| 86:5 90:6 | 46:17,18 47:18 | 174:11,13 175:6 | 325:12 327:13 |
| 100:10 117:22 | 48:25 49:19,21 | 175:7,10,11 | 328:5,8 329:3,12 |
| 122:14 133:3,3 | 49:23 56:15 | 176:18 179:7,13 | 331:17 336:11 |
| 134:12 157:20 | 57:4,6 58:19 | 179:23 180:22 | 338:22 341:5,24 |
| 173:1 186:21 | 61:25 65:16,21 | 181:1,4,6,6,7,15 | 343:17 348:13 |
| 214:20 343:23 | 78:3 80:21 81:9 | 181:15 182:15 | 348:18 350:9 |
| 344:2,3 | 81:10,12 82:4 | 182:22,23,23 | 351:3,7 352:8,12 |
| **adding** 290:17 | 86:16 87:22 | 183:3,6,17 184:5 | 353:11 356:2,5 |
| **addition** 75:8 | 88:16 90:24 | 184:22 185:7 | 356:11,17 357:6 |
| 86:5,13 100:15 | 91:14 94:21,22 | 186:5 187:8,15 | 357:7,9,22 358:6 |
| 236:9 246:24 | 95:6,17,19 102:2 | 187:16,17,20 | 358:25 359:14 |
| 301:11 306:3 | 104:8,17 105:1,4 | 188:1,9,13 191:1 | 359:18 360:7,8 |
| **additional** 25:15 | 105:8,14,16 | 197:23 202:7,19 | **advance** 8:13 |
| 150:6 232:16 | 106:2,10 107:21 | 202:20 203:13 | 281:23 |
| 247:19 298:10 | 107:21 108:5,8,9 | 205:9 208:23 | **advertise** 121:7 |
| **additions** 145:15 | 108:12,14,18,24 | 209:24 210:2,6 | 180:20 192:3 |
| **address** 75:2,4,9 | 112:4,22,24 | 210:10,13,17 | 248:10 249:14 |
| 185:25 247:22 | 113:13 115:15 | 219:23,24 220:4 | 325:16 337:14 |
| 308:12 311:3 | 117:12 118:14 | 220:14,18,25 | 337:23 338:1,2 |
| 329:5,23 | 118:15 119:2 | 221:9,16 225:25 | **advertised** |
| **addressed** 154:9 | 124:15 125:16 | 226:2 243:14,15 | 170:11 243:8 |
| 288:16 | 126:19 127:2 | 243:17 249:10 | 345:22 |
| **addresses** | 128:18,23 | 253:24 256:9,13 | **advertisement** |
| 329:16 330:11 | 129:25 131:4,5 | 257:24 258:5,22 | 47:4 141:1 |
| **addressing** | 131:10,13 136:7 | 259:25 261:1 | 214:10 |
| 304:5 | 136:15 137:10 | 262:13 265:9,25 | **advertisements** |
| **adds** 100:9 | 137:12 138:10 | 267:23 270:12 | 10:8 174:21 |
| **adjust** 8:17 | 139:23 140:14 | 270:24 271:3,7,8 | 186:4 210:20 |
| 149:12 | 140:17,20,23 | 271:23,25 | 260:16 264:25 |
| **administered** | 141:11,16,22 | 272:14 285:20 | 265:13 267:14 |
| 13:2 365:8 | 142:13,14,19,22 | 285:20 287:4,8 | 272:6 280:7 |
| **ads** 8:16 9:6,11 | 143:10,12,18,22 | 292:25 296:22 | 285:24 286:13 |
| 25:5 27:1,20,20 | 143:23 144:10 | 298:14,15,20 | 338:5,8 |
| 28:1 29:18,20 | 145:7 146:4,4,18 | 299:16,17,24 | |

Veritext Legal Solutions
866 299-5127

[advertiser - advertisers]

**advertiser** 24:12
25:11 34:8,14
38:3 40:2,25
41:3,5,20 42:17
42:20,23 43:24
44:3,5,13 45:14
45:24 46:7
48:24 50:11
51:5 52:8,21
53:4,6,25 54:3,8
56:23 71:10,15
72:1,23 73:25
74:10 75:14
78:14 79:21
80:5 81:24 82:9
83:1,10,16,20,25
84:3,8,9 85:18
91:13,17 110:9
110:20 111:1
114:7 116:25
119:19 120:22
121:1,9,23
123:23 139:24
140:9 148:21
150:23 153:11
156:4 167:23,24
168:25 177:7
182:3,17 185:21
185:23 187:10
191:11,17,21,24
192:4,12,15,18
192:21 194:9
196:2,10,18,22
197:2 198:25
202:19 203:8,10
205:8,13 206:4
209:25 210:24
212:10,12,22

213:16,18,20
214:2,9,16,24
215:13,25 219:2
229:17,18,21
230:16 231:7,14
232:3,7,13,15
234:12,17 235:3
235:9,25 236:8
237:15,19 238:7
238:11,16
239:24 240:7,14
241:25 242:19
246:17 247:8
248:9,23 249:20
250:3 259:4
267:24 299:1,12
299:18 310:2
314:15 324:18
324:24 325:6,14
325:15,18 326:9
327:22 329:11
329:15 330:4,10
336:13,21
338:13 339:3,20
341:6,9,13,17
342:6,16,19
344:21,24 345:1
345:6,15 347:2,6
348:24 349:7
356:9 358:12,19
359:12
**advertiser's**
32:11,18 72:15
181:20 205:20
**advertisers**
23:24 24:3
25:10,16,21
28:18 34:11

43:21 46:13,16
46:20 47:3
49:11 50:21
51:3 56:15,19
62:1 71:14
80:20 81:17
82:25 84:23
85:1,3,13 86:15
88:12 89:9,16
90:23 91:7
92:13 120:4,18
120:19 124:12
134:6 147:9
152:1 155:2,19
156:10,15 160:3
167:21,22
168:16 173:6
174:12,20,25
175:4,6 176:23
179:9,10,12,20
179:23 181:8,14
181:16 182:7,24
183:23 184:10
184:15 185:9
186:3 187:8
190:2,14 192:3
194:16,21
195:22 196:6
197:8 198:5,21
199:1,8 200:16
200:24 202:11
210:19 212:19
213:3,12 215:17
216:23 217:9,14
217:15 228:6,23
229:5,23 230:9
230:23 234:4,5
238:5 239:8,14

242:8 246:11
247:15 249:14
252:6 253:1
256:12 259:22
260:23 261:21
262:5 264:24
265:12 266:10
266:14 267:1
270:22 272:3
280:6 285:22
286:12,21
287:15 293:14
293:24 296:4,11
296:18,20,24
297:4,10,14,23
298:5 300:3
302:2,25 306:17
308:4,9,19,21
310:19 312:15
315:6 317:3,12
318:16 319:24
324:10 326:19
327:14 328:25
329:3,13 330:22
330:23 331:2
333:19 335:8,21
336:3,9,15
337:13 338:1,10
340:17 342:25
343:4,11,24
344:14,18 346:2
349:3,10 350:9
350:23,25
352:14,14
353:12 354:11
355:2 358:1
362:5,12

[advertises - allowing]

| | | | |
|---|---|---|---|
| **advertises** 246:3 | 250:18,23 253:3 | **ag** 10:4 260:14 | 283:14,18 |
| 331:11 | 255:14 259:6,21 | 280:22 | 284:16 |
| **advertising** | 260:22 263:2 | **age** 51:14,15 | **agreed** 264:23 |
| 25:25 27:20 | 271:14 272:3 | 70:24 71:4 | 265:10,23 266:2 |
| 31:8 35:15,21 | 296:4,12,21,25 | 78:21,23,24 79:1 | **agreement** 42:20 |
| 36:10,20,25 37:6 | 297:1,11,11 | 217:2 218:3,8,22 | 260:21 262:4 |
| 37:16,25 38:9,15 | 298:5,6,17,19 | 219:3,6,18 220:6 | **agreements** |
| 38:20,25 39:18 | 300:10 301:3,23 | 221:25 222:15 | 56:12 249:8,9 |
| 40:7,24 41:18 | 302:3,24 311:17 | 224:25 253:19 | **agrees** 286:10 |
| 42:9 54:11,18,21 | 312:12 317:10 | 253:22 254:2,3,4 | **ahead** 13:12 |
| 55:7 59:14,17,22 | 317:19 334:23 | 257:22 282:11 | 20:6,19 23:21 |
| 61:22 70:14 | 335:6,8,21 336:2 | 299:19 | 61:6 190:19 |
| 78:10 79:15 | 336:16 337:3,12 | **agencies** 120:19 | **airport** 74:19 |
| 81:21 82:14 | 347:1,5 | **aggregate** 46:1,5 | 77:8 |
| 86:14 93:5 | **advocacy** 159:1 | 47:19 184:23 | **alcohol** 299:11 |
| 96:13,20 102:5 | **affect** 100:1 | 343:19 | 301:14 |
| 107:13 112:9 | 269:7 286:16 | **aggregated** 33:4 | **algorithm** |
| 114:21 117:4 | **affinities** 263:22 | 33:13 34:3 36:5 | 138:20 204:11 |
| 119:16 121:25 | 268:19 280:18 | 45:25 46:16,19 | 208:9 |
| 125:23 127:17 | **affinity** 262:20 | 100:8 231:2,9,9 | **algorithms** |
| 136:19 149:17 | 262:22 266:10 | 231:19 242:22 | 137:23 138:1 |
| 150:2 153:7,24 | 268:2,4,11,21 | 243:19 247:13 | 227:3 |
| 154:1,3,12 160:5 | 269:19 270:8 | 248:21 250:12 | **ali** 332:23 |
| 162:9 164:4,19 | 271:2,12,22 | 296:18 325:5 | **aligns** 151:7 |
| 165:17 166:1,12 | 272:20 273:1,6 | 327:21 340:19 | 205:19 |
| 166:18 167:5 | 273:25 274:14 | 342:20 349:3 | **allegations** |
| 169:4,7,23 170:7 | 274:22 276:16 | 350:19 351:2 | 286:10 |
| 171:7,12 172:10 | 276:22 277:11 | 356:16,19,25 | **allison** 332:22 |
| 174:15 179:19 | 277:24 278:8 | 358:5,11 | **allow** 196:6,17 |
| 183:24 189:14 | 280:9 287:9 | **aggregating** | 197:7 198:24 |
| 190:3,5,14,21 | 288:17 289:7,15 | 108:21 | 218:24 220:15 |
| 209:4 210:19 | **afforded** 71:14 | **aggregation** | 223:23 229:4 |
| 212:5 228:6,24 | **afield** 321:13 | 358:7 | 299:24,25 300:2 |
| 230:2,2,13 238:3 | **afraid** 349:14 | **ago** 66:15 67:20 | 306:6 |
| 239:5 241:19 | **african** 263:23 | 67:20 228:4 | **allowed** 196:1,1 |
| 242:12 245:1,4 | 268:10,13 273:6 | 311:12 316:22 | 200:16 |
| 245:23,24 247:5 | 273:8,13,22,24 | **agree** 42:23 | **allowing** 38:11 |
| 249:6,6,13 250:8 | | 191:6 247:15 | 107:12 |

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[allows - approximately]**

**allows**  248:10
255:5
**alluded**  323:12
**alto**  6:10
**altogether**  293:7
**amazon**  246:4,7
**american**  263:23
263:23 268:10
268:13,15 273:6
273:8,13,23,25
**amount**  50:10,13
80:12 162:5
170:13,18
184:25 185:22
188:4 189:18
**amy**  64:23 65:4
67:17,19 68:23
**amy's**  68:6
**analyses**  85:2
173:20 222:25
269:17 270:6
351:25
**analysis**  106:17
138:14,17
175:24 204:12
208:10 268:20
269:1,7,16
278:20 351:12
**analytica**  169:16
169:21 170:1,6
170:11 171:5,6,9
171:11,20 172:4
174:16
**analytics**  131:16
168:11 184:15
192:2
**analyze**  177:14
177:15 211:6

**analyzes**  89:7
**andrew**  64:4
65:12,21 66:6
68:23 245:9,11
**angeles**  7:9
**angelica**  3:7
11:19
**annotated**  356:5
356:11 357:9
**announce**
148:19
**announced**
158:20 260:20
**announcement**
18:11,13 20:20
23:8 260:13
**announcements**
18:10 20:18
145:21
**announcing**
145:15
**answer**  13:21
14:8,9,16,17
21:19 23:16,17
24:18 33:12
39:14 40:19
60:18,19 69:8,15
79:4 95:15 99:8
102:19 107:25
112:17 132:11
133:17 152:20
162:24 164:24
165:7,12,23
197:10 198:18
199:12 202:8
256:22 257:17
258:4 278:23
292:17 298:2

311:25 313:22
314:22 315:2,14
315:18 316:11
316:14 320:16
322:12 327:12
327:19 328:23
335:16
**answered**  60:21
65:2 69:13 76:3
95:14 106:4
127:10 163:19
164:6,21 165:20
196:25 197:21
199:11 210:5
211:11 213:6
215:23 222:8
227:16 243:11
244:20 245:16
249:25 250:10
275:14 298:8
318:5 328:4
331:5 336:19
358:3
**answering**  23:13
60:15 163:3
**answers**  9:9
56:25 101:1
137:16 230:22
**anybody**  64:21
68:3,22 243:21
**anyway**  139:14
**aornelas**  3:15
**ap**  331:2
**api**  175:15,17,19
185:1 331:3
333:9 334:8,10
334:11,13

**apis**  175:11
186:5
**apologies**  91:11
99:22 123:17
130:4 193:22
205:4 216:12
221:5 313:20
**apologize**  20:7
347:22 355:15
**app**  27:1 52:10
53:21 73:24
121:1,2,7 129:20
130:22 131:23
132:3,4,6 135:23
136:2 193:7,11
193:13,15
236:13 341:20
**apparent**  222:5
**appear**  368:4
**appearances**  3:1
4:1 5:1 6:1 7:1
**appearing**  3:2
4:2 5:2 6:2 7:2
366:18 367:7
**appears**  303:19
**applied**  62:9
**applies**  56:4
267:23
**apply**  236:18
267:20,21
**approach**  323:12
**appropriate**
320:23
**appropriately**
299:19
**approximately**
16:7

**[apps - audience]**

apps   129:9 136:3
206:19 340:25
april   164:19
165:16
area   85:8 105:3
106:6
areas   17:22 35:5
62:5 84:6 96:25
120:8 159:5,12
196:9 200:7
247:20 301:19
arguably   321:11
argumentative
38:17 39:3
125:25 164:6,21
165:20 169:10
169:18 170:23
198:17 199:11
213:6 219:9
222:7 226:23
244:20 262:9
298:8 302:21
art   154:4,7
319:10
article   8:15 9:7
10:4 252:5
articles   17:21
asian   263:23
268:15
aside   16:25
125:20 337:20
asked   40:19 65:2
68:21 69:2,13
106:3 127:9
163:18 164:5,20
165:19 172:18
196:24 197:20
199:11 210:4

211:10 213:2,6
215:22 222:8
227:15 243:10
244:5,20 245:15
249:24 250:9
275:13 298:8
311:8 312:5
317:7 318:6,20
320:22 322:1,7
323:7,7 328:3
331:5 336:18
358:2
asking   14:1 17:1
30:20 63:19
64:17,18 75:24
99:10 107:9
112:2,16 115:24
116:2 125:19,21
135:19 159:17
163:2,13,15
164:13 165:5
166:9,10 196:16
238:10 241:11
295:22 297:15
327:25
asks   138:5 350:4
assert   332:14
asserted   309:23
asserting   291:20
assertion   312:19
assertions
282:14
assess   63:15
120:10 269:14
assessing   269:24
assessment   60:3
180:25 189:23
208:23 304:21

assessments
233:9
assign   86:23
303:4
associate   7:17
79:19 119:13
124:9 161:15
273:3
associated   91:18
92:2,12,24 97:11
113:24 114:15
124:10 160:15
187:21 188:1
189:24 269:2
295:6 347:6
associates
241:12
associating
279:13,25
association
309:20 310:7
assume   31:25
46:22 65:7
235:20 297:21
assumes   108:6
163:21 219:22
assuming   235:9
assumption
141:14 248:16
248:19
assurance   10:11
283:3 285:8
asthma   225:5
attached   15:3
145:3 155:11
201:14 211:20
251:20 260:11
281:3 331:22

attempt   47:1
334:21
attention   251:14
285:11
attorney   4:19
5:7,15 6:16
11:14 69:21
260:14,19
365:19
attorneys   3:9 4:8
6:8 19:12
attribute   223:7,8
attributes
217:16,21 218:2
218:13,25
220:16,19
240:21
auction   187:13
187:17 203:25
204:3,6,10,21,22
205:7 338:23,23
340:13
audibly   13:22
audience   24:4,7
31:7 32:12,14,22
34:6,14 38:5
51:4,10 53:3,24
54:2,3,9 56:16
57:18 75:10,16
76:10 77:20
78:10 81:25
86:16 89:17
94:3,4 110:8
117:1 140:1,5
147:11 150:24
155:3,18 156:5
167:14,14
168:23 170:19

Page 9

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[audience - based]**

187:12 191:2,4
192:5,8,12,18
193:1,7 194:20
195:5 196:2,13
200:17,25
202:12,16,18
203:8,12,15,17
212:14 214:16
215:2 218:14
219:1 223:23
224:2 231:6,6
232:9,17,20,25
233:3 234:6,23
235:3,22 236:2,7
236:14,15,17,19
236:24,25 237:2
237:17,18 241:1
241:3 246:25
247:12 248:17
248:20 250:11
253:3,18 254:23
255:2 267:25
296:17 330:7
333:8,15 340:21
340:22 341:7,18
341:24 342:5,7,9
**audiences**   32:19
34:8,11 51:12,21
52:7,10,11,12,15
53:9,10,15,21,21
53:23 54:12,13
70:15,16,18,24
71:5,6 72:12
76:18 78:13,22
79:7,15 84:23
129:18 130:1
148:11,12
191:10,12,14,15

192:3 193:3,6,7
193:9,12,13,20
194:4,5,14,15
195:22 201:3
203:2,5,9 218:6
218:7 236:10
238:3,8 253:15
331:11,16
**august**   1:16 2:18
8:11 11:1,6
270:20 365:21
366:3,5
**auld**   3:5 11:17
**available**   82:14
89:8,21 90:10,23
91:3 92:25
113:11 117:4,12
122:18 123:10
123:13 155:15
155:19 241:24
261:24 262:2
281:25 282:6
290:8 293:21
294:7,11 351:10
351:14,18
**avenue**   4:9,20
5:16 6:17
**average**   50:14
188:17,25 363:9
**avoid**   325:5
**aware**   47:15,19
54:17 55:23
68:5 95:1,6,9,17
95:20 96:9,15
97:20 100:17
106:20 216:4
238:19,24
241:11 243:6,21

244:5,14 245:12
249:12,19,21
250:1,5,25 256:1
256:7 264:22
269:16,16
278:14,14
285:15,17 289:5
290:10 292:18
314:21 331:1,7,8
333:14,17
336:11 337:8
342:21 359:16
**awareness**   43:7
206:6 363:1

**b**

**b**   1:12 7:5 8:8
9:1 10:1 142:25
153:16 309:22
310:7 312:25
367:1
**back**   22:10
43:17 45:13,24
48:7 49:1 68:16
79:20 87:10
96:7 109:16,22
129:23 131:1
132:3,18,25
134:1,2,6,11,12
135:14,16 143:8
144:17 154:18
157:1,4 162:20
162:21 175:8
191:25 194:11
199:24 201:10
208:8 238:16
239:11 242:6,25
246:19 251:11

257:12 282:23
283:25 284:23
292:9 296:1
300:1 308:22
320:15 323:15
324:2 330:21,23
335:19,24
336:12 339:19
340:17 342:15
345:17 354:6
355:1 357:5
361:18 362:9
**backing**   53:13
358:10
**backs**   52:23
53:17
**bad**   181:6
206:24 210:13
**bait**   176:12,14
176:16,17,24
208:24
**baity**   176:8
177:11
**ballpark**   66:11
**bare**   246:8
**base**   46:3 62:14
130:20 138:11
272:16
**based**   24:3 32:10
32:11 44:14
49:20 51:23
53:2,12 74:18
78:16,24 79:8,12
79:21 80:4
82:11 83:21
84:8,18,25 85:3
86:3,10,20,25
88:14 89:3

Page 10

**[based - benjamin]**

93:14,15,24
100:5 102:9
105:20 108:22
110:21,22,25
115:3,10,12
116:5,6 117:1,1
119:8,16 137:16
151:16 156:20
158:8,11 172:13
180:8 181:17
189:13 192:24
193:6,8 194:7
204:6 206:13
207:2,5,13 208:7
216:21 222:10
222:15 225:7
237:19 255:7
259:1,16 260:3,7
262:23 267:24
272:17,22 275:8
275:19 278:3
280:8 282:10
285:25 286:15
287:16 288:1,8
294:14 315:7
329:23 330:9
332:12 333:20
334:20 356:7
**bases**   146:25
**basic**   180:17
**basically**   207:5
**basis**   69:8,10
80:1 166:2
184:2 206:22
261:21 269:13
281:21 283:6,22
328:23 356:24
360:16,18

**bates**   201:18
202:3 203:20
211:24 239:12
251:22
**bearing**   211:24
**bears**   145:23
201:17 251:22
**began**   93:7
99:16 228:4,15
**beginning**   11:13
26:6 92:8 97:5
265:7 355:18
**begins**   202:10,11
350:19
**behalf**   2:16
11:17,22 55:22
223:9 310:15
311:25 313:23
314:22 315:14
316:11 321:18
322:6 326:2
330:25 341:13
363:15,19
**behavior**   52:3
80:21 115:8,16
115:19 116:17
117:1,17 118:1,5
118:16 119:5,14
120:2 124:2,10
132:8 136:19
137:2,7,8,14,15
137:23 138:3
141:2,7 151:10
151:12 153:3,7
153:10,17 154:6
167:14 207:17
207:20 208:5
226:9

**behavioral**
114:23 121:25
122:17 123:1
125:23 127:16
128:1,13 129:3
130:2,6 146:19
146:23 150:9
153:6,12,18,24
154:3,3,12
207:23
**behaviors**   51:24
52:2 53:1 81:5
114:24,25 115:1
115:2 116:5
117:2,8,13,14
122:7 123:19
124:5 130:5,9
147:2 150:10,22
150:23 151:1
154:8 203:11,16
203:17 206:23
207:4,5,12,14
226:6,6 232:13
232:23,24 233:2
233:3 234:18
235:5 236:20
341:23
**belief**   217:2
220:6 221:25
**believe**   16:17
18:11 19:22
32:25 44:2
67:19 72:8,9,18
81:1 82:17
107:11 136:12
140:21 195:9,12
201:1,4 233:16
233:22,25 245:6

246:12 252:20
261:9 268:18
278:12 279:18
282:2 309:18
310:17 314:24
344:5 363:11
**bella**   23:13 46:2
46:4 64:25
104:6 126:4
140:5 142:7
289:11 329:20
342:2
**bella's**   142:8
**beneficial**   270:1
**benefit**   269:16
**benjamin**   4:18
11:20,21 15:20
16:11,13 18:20
18:25 19:13,21
20:11 21:12,14
21:22 23:12
24:16 25:8 26:7
27:7,10,16,22
29:5,7,14,21
30:6,25 31:11
32:6,23 33:17
34:9 35:16,18
36:12 37:8
38:16 39:2,11,14
39:22 40:14
42:10 43:22
45:8 47:5,11,17
49:14,18 50:24
54:15,20 56:21
57:9,25 58:8,16
58:22 59:6,24
60:14 61:7,19
62:20 63:12,23

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[benjamin - benjamin]**

| | | | |
|---|---|---|---|
| 64:9,24 65:2 | 151:14,18 152:3 | 219:8,21 220:11 | 284:2,4,6 286:1 |
| 67:10,16 69:5,12 | 152:16,18 | 220:20 222:7,21 | 286:25 287:23 |
| 69:25 70:8 | 154:15,24 155:7 | 224:16 225:8,14 | 288:5,12,19 |
| 71:25 72:25 | 155:16 160:1,11 | 225:16,23 226:8 | 289:10,21 |
| 73:14,22 77:1,22 | 160:22,24 161:7 | 226:22 227:5,15 | 290:19 291:2,10 |
| 79:9,16,18 83:12 | 162:2,16,25 | 229:10 230:20 | 291:23 292:15 |
| 83:24 84:1,16 | 163:7,18 164:5 | 231:12 232:4 | 293:16 294:2,18 |
| 85:16 86:2 87:5 | 164:20 165:8,19 | 233:21 234:21 | 294:25 295:8,17 |
| 87:17 88:4 | 166:3,14 167:7 | 235:13 236:12 | 297:2,18 298:7 |
| 89:11 90:4,18 | 167:15 168:2,10 | 237:23 238:21 | 298:23 300:15 |
| 91:8,24 92:19,21 | 168:19 169:9,17 | 239:6 240:3,23 | 301:10 302:4,20 |
| 95:4,12,22,24 | 170:9,15,22 | 241:7,14,20 | 304:9,23 305:16 |
| 96:14,21 97:9,22 | 171:13,24 | 242:14 243:10 | 305:25 306:8 |
| 98:5,18 99:4 | 172:24 173:21 | 243:24 244:9,19 | 307:1,4,12,20 |
| 100:4 101:5,16 | 174:17 175:16 | 245:15 246:14 | 308:6,13,16,24 |
| 101:24 102:7 | 175:25 176:25 | 247:10,24 | 309:10,12 |
| 104:14,22 105:9 | 178:21 179:14 | 248:13 249:18 | 310:17,23 312:2 |
| 105:22 106:3,25 | 180:6,24 181:11 | 249:24 250:9 | 312:23 313:5,14 |
| 107:2,16 110:16 | 181:21 182:19 | 252:2 255:6,15 | 313:22,24 314:4 |
| 111:8 112:10,12 | 183:14,18 184:6 | 255:19 256:2,21 | 314:24 315:17 |
| 113:20,22 114:3 | 184:8,19,21 | 257:8 259:9,12 | 316:5,17 318:1 |
| 115:20,23 117:5 | 185:10 188:19 | 260:1 261:4,11 | 319:6,7,14,15 |
| 118:6 119:6 | 188:23 189:20 | 262:8 263:4 | 320:17 321:8,16 |
| 120:5 121:5 | 190:4 192:13,19 | 264:2,8,14 265:4 | 322:9,25 323:3 |
| 122:20 124:23 | 194:25 195:15 | 265:18 266:6 | 323:12,16,17 |
| 125:24 126:4,13 | 195:24 196:24 | 267:6,9,16 268:6 | 325:2,11,19 |
| 126:25 127:9,18 | 197:9,20 198:9 | 268:23 269:10 | 326:6,24 327:5,7 |
| 128:3,15 130:18 | 198:12,14 | 269:21 270:9 | 328:3,13,15 |
| 131:7,14 132:9 | 199:10,20 200:9 | 271:16 272:8 | 329:8,20 330:16 |
| 133:11,21 134:9 | 200:14,20 205:1 | 273:14,20 274:2 | 331:4,12 332:5 |
| 134:24 135:7,25 | 205:3 206:2 | 274:15,23 | 332:12 333:20 |
| 136:11 137:3,24 | 207:8,19 208:4 | 275:13,25 | 334:18 335:11 |
| 138:25 139:20 | 208:21 209:11 | 276:17,19 277:1 | 335:23 336:6,18 |
| 141:4,13 142:4 | 210:4,11,22 | 277:12,25 | 337:4,18,24 |
| 143:1,16 144:7 | 211:10 212:7 | 278:18 279:8 | 339:8,13,22 |
| 146:2,21 147:4 | 213:5 215:8,10 | 280:11 281:4,7 | 341:4,11,15 |
| 148:17 149:18 | 215:19,22 216:8 | 281:13,19,20 | 342:1,17 343:1 |
| 150:3,12 151:2 | 217:12 218:17 | 283:5,9,11,13,20 | 343:25 345:5,25 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[benjamin - business]**

346:14 347:3
348:10,16
349:17 350:10
350:17 351:6,21
352:21 353:6,15
353:22 354:17
355:10,14,21
356:3,13,21
357:14,20 358:2
358:15,23
359:19,25
360:10,21 361:4
363:17 366:1
**best** 174:9 353:5
**better** 38:23
172:21,22 173:2
173:5,10 174:1
181:5,6,8,10
182:8,10,10,11
182:12,22,23
183:3,6 209:4,24
210:2,6,7,10
322:22
**beyond** 69:21
70:3 230:3
244:20 359:13
**bfalaw.com** 3:14
3:15,16
**bid** 38:5 43:13
140:1,1,9 177:7
187:10,18
205:13
**bidder** 209:16
209:23
**bidding** 209:17
362:12,15
**bids** 187:15

**big** 147:11 236:7
269:4
**bilingual** 263:24
268:14
**binding** 260:21
**bit** 22:6 43:18
49:8 55:1 88:6
117:24 134:17
136:7 153:21
193:23 224:4
321:10,13
**black** 273:17
**blacklisted**
216:5
**bleichmar** 3:5
11:17
**blm** 273:19
**blog** 17:22 23:5
23:7 145:14,17
145:18 148:15
149:19 150:15
201:24,25
**bms** 9:16
**board** 107:4
120:6 210:8
287:10
**bob** 260:19
**bottom** 186:1
320:13
**bought** 52:4 57:6
267:23 344:11
**box** 215:25
223:18
**brand** 31:16
43:7 206:6
363:1,5
**breadth** 40:21

**break** 14:7 43:16
52:7 67:12
68:12 79:24
109:4,11,13,15
144:12 150:11
167:11,13,17
200:12 201:6
257:1,15 284:7
**breakdown**
44:12 169:1,5
**breaking** 249:20
**breakout** 281:17
309:5
**breaks** 167:19
167:22
**brief** 338:12
**briefly** 13:14
309:13
**bring** 317:21
320:14,14
321:21
**bringing** 192:22
**broad** 253:25
346:2
**broader** 16:12
207:14,23
270:16,17
**broadly** 82:5
**broke** 68:21
292:11
**broken** 167:1,9
**broker** 129:7
**brokers** 56:12
56:19 238:19
**brought** 58:3
**browse** 83:2
**browser** 36:1
78:8

**bucket** 33:16
51:12 53:22
59:15 130:3
191:16
**bucketed** 117:21
**buckets** 31:3
33:22 43:19
55:9 185:13,16
186:6
**budget** 51:9
161:25
**budgets** 162:4
**build** 81:16
85:17 108:14
162:5,11 174:3
197:4 265:24
296:14 298:9
302:7
**building** 200:2
**builds** 299:3
**built** 56:12 62:16
96:23 106:6,8
175:19 196:8
197:12 199:7,15
209:14 250:20
250:24 258:20
259:17 262:10
263:19 298:12
302:11
**bullet** 228:14
296:2 300:21
309:15 311:3
314:18 324:9
**buongiorno** 5:14
11:25 16:14
**business** 9:7,20
129:19 130:21
132:16,17

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[business - categories]**

166:19 167:1,9
167:24 191:3
193:6,14,15
201:25 205:22
208:7 227:13
229:2 253:2
298:16 299:2
300:6,11 344:16
344:18 346:12
**businesses**
147:18 148:3,9
**buy** 57:3 116:18
116:19,19 121:8
179:23 181:8
**buying** 56:24
57:12 116:21
346:8
**buys** 345:21

**c**

**ca** 8:11,19,20
9:12,13,17,18,22
9:23 10:15,16
201:18 251:22
366:9,12,20
**calculate** 79:11
79:14 104:12
188:4,11,15,17
189:9 206:9
349:13,15 360:4
**calculated** 205:6
347:15 363:9
**calculating**
188:20
**calculation**
162:12 187:21
187:25

**calendar** 15:22
**california** 1:2,20
2:2 3:12 5:10
6:10 7:9
**call** 16:19 27:25
28:18,23 70:20
139:9 145:19
161:24 175:18
185:1 206:4
218:12,25
220:15 253:2
258:6 282:22
283:25 323:15
**called** 24:8,11
51:12,22 59:22
156:21 168:6
217:21 218:3
252:6 255:1
262:11 288:1,7
346:20 349:10
349:11,20,21
354:15 356:5
359:23 361:2
**calling** 217:16
**calls** 30:7 32:7
59:6 107:2
210:22 231:12
255:20 263:4
278:20 307:21
**cambridge**
169:16,21 170:1
170:6,11 171:3,5
171:6,9,11,20
172:4 174:16
**camp** 28:7
**campaign**
188:12 189:2
246:13 263:11

348:25
**campaigns**
183:24 246:7
347:1
**campen** 4:6
**canada** 268:1
**cancer** 226:4,10
226:11
**cap** 232:12,24
233:1 236:19,20
**capability** 93:18
287:8 293:3
**capable** 40:11
**capacity** 239:1
244:12 245:20
**capital** 121:12
153:16
**captured** 54:23
**captures** 254:1
**care** 282:3
**cari** 4:6
**cart** 133:3,8,10
133:14,19 134:7
134:13,22 135:6
135:17
**carve** 23:16 26:3
34:21 60:17
128:22 278:22
**case** 1:5 2:5
48:19 66:5
146:5 166:24
190:15 197:25
228:7 230:3,5,9
231:4 250:2
256:7,17 263:16
282:22 296:5,12
296:21 317:1
320:14 322:14

335:1 338:22
341:8 345:15
357:8 365:15
**cases** 250:5
302:3 337:20
359:13
**catchy** 176:21
**categor** 136:18
**categorically**
128:13
**categories** 50:21
55:5,11,14 56:9
56:11 57:7,23
58:7,11,14 59:1
59:4,23 60:2,11
60:25 61:3
62:19 63:1,9,21
64:22 68:4,25
70:13 84:11
85:14,25 87:25
88:2,9 89:8,20
90:2,9,17,22
91:3,6 93:14
96:20 97:7,12
98:4 111:6
113:17 117:2,8
122:1 123:12
125:18 127:21
129:6,14 136:17
149:8,16,22
150:20 151:6,7
216:25 222:24
223:1,2 231:23
232:3,10 258:6
259:8 263:1,22
264:4,12 265:16
272:5,21 278:9
278:11,17

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

[categories - clarification]

279:17 280:1
290:13 295:15
311:15 345:12
**categorization**
117:20
**categorize**  70:23
128:5
**categorized**
78:20 116:10
**categorizing**
116:6
**category**  57:12
57:13,21 59:13
83:9,10 122:22
122:22 128:11
136:22 193:8
203:17,18
253:14 258:20
259:18 262:11
263:19 265:24
278:13 279:18
287:20
**causality**  163:21
**causation**
163:25
**cause**  177:23
294:21
**caused**  272:24
**causes**  295:11
**caution**  24:17
61:8 70:1
278:22 291:3,11
**ccp**  366:9,12
**ccr**  1:20,21,22
365:24
**ceased**  290:2
**center**  9:20
17:22 37:20

185:17 252:5,6
252:18,25 253:3
**central**  111:18
113:13
**certain**  8:16 40:4
85:14 96:12
100:2 101:22,23
104:13 126:11
152:5 162:15
189:10 216:5
233:3 240:20
243:16 278:25
279:2 311:13
349:24 350:6
358:6
**certified**  2:20,21
365:2,3
**certify**  365:4,17
**cetera**  22:9 51:9
72:17 220:25
235:11 280:10
**change**  25:7 37:5
46:8 157:24
161:15 173:10
173:14,16,19
174:1 192:12
293:9 352:9
355:6 369:4,7,10
369:13,16,19
**changed**  25:19
26:5 37:12
46:21 72:21
81:4 146:7
156:17 157:22
163:21 186:14
186:16,17,18,19
192:18 194:23
195:2

**changes**  10:7
46:24 47:7
55:17 171:19
172:10 174:14
260:16,22
**characteristic**
223:13 288:10
**characteristics**
61:3 193:4
216:24 221:17
232:21 262:16
280:9 285:25
286:16 287:17
287:19 288:4,16
288:22 294:15
**characterization**
40:15 283:14
**characterized**
54:23
**charge**  44:3
187:7 245:23
359:12
**charged**  50:19
187:18 358:18
**chat**  170:25
**check**  18:5 72:21
73:16 74:18
75:8 76:6,19
77:7,9 132:23
133:9,15 134:7
134:11,14
135:15 193:17
**checked**  133:3
**chen**  7:17 12:1
16:18 68:6,24
**cherry**  141:20
**chinese**  288:4,7
288:8,10

**choice**  94:13,16
178:18 192:24
**choices**  24:3
94:11
**choose**  43:1,4
71:11,17 104:6
123:21 132:24
134:6 159:21
170:19 202:11
211:1 214:3
215:13 233:2
338:14 345:16
353:12 362:13
**chooses**  93:25
134:1 212:22
341:18
**choosing**  168:22
178:17 204:5
233:2 299:18
338:15
**chose**  97:17
150:24
**chosen**  54:4
97:20 255:10
**chronology**  26:2
**circle**  48:7
**circulate**  166:11
167:4
**circulated**  168:1
**citizens**  265:3
267:21,22
286:16
**city**  71:20 72:17
**civil**  366:19,20
**clar**  357:17
**clari**  180:5
**clarification**
33:1 117:19

Page 15

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[clarification - communicates]**

138:5 350:4
361:6
**clarified** 161:24
331:6
**clarifies** 207:15
**clarify** 36:11
53:14 88:6
124:7 134:25
146:22 161:9
168:18,20
177:25 178:22
179:15 180:7
187:23 189:4
192:14 206:20
213:7,15 223:15
232:6 235:12
248:15 258:16
266:7 272:15
281:20 283:6
293:12 330:3
343:2 350:11
351:20
**clarifying** 29:24
42:22 75:13
103:6 166:16
190:6 283:23
306:18 339:23
357:17
**clarity** 14:1
208:18 291:18
**clark** 6:6 11:24
304:21,22
305:11 313:3
**clark's** 306:14
307:8 320:4
**class** 24:25 27:9
34:19 49:16
127:16 241:6

243:7 248:12
259:11
**classes** 129:13
**classification**
88:24 360:9
**classifiers** 138:2
208:15
**claufenberg** 4:13
**clear** 27:12
33:11 63:18
72:11 79:23
97:10 209:14
212:20 235:1
236:24 283:17
286:4 288:22
297:12 318:11
318:13 333:22
356:6
**clearer** 149:9
**clearly** 137:10
317:20 318:8
**click** 28:13,15,16
28:24 37:2
44:11 50:9,10,13
50:14,14,15,16
83:3 113:10
115:14,15
116:18 124:17
124:18 137:10
137:12 176:8,12
176:14,16,17,20
176:23 177:11
182:3 186:25
187:3 205:25
208:23 225:11
347:14,24
348:20 361:23

**clicked** 28:25
44:10 187:4
225:17,21
327:23
**clicking** 71:19
**clicks** 42:24 43:6
49:7 50:1,3,12
50:18 175:21
184:24 185:19
231:25 235:11
349:1 351:16
362:6,13
**client** 69:21
**close** 49:9 67:14
125:1 320:16
**closely** 346:7
**closer** 115:4
153:23
**cluster** 123:18
123:20 223:17
223:21 224:2
**clusters** 115:8
119:14 262:22
**code** 73:17 74:6
366:9,12,19,20
**collated** 15:22
**collect** 77:4
130:15 192:15
223:2,3 224:17
224:21
**collecting**
135:22
**collection**
334:15
**collects** 192:12
345:10,12
**colloquial** 44:21

**colloquially**
121:21
**colloquy** 281:11
314:5
**color** 305:9
**columns** 360:13
**combination**
234:17
**combining**
330:19
**come** 109:16
128:20 143:8
169:16,19 175:8
336:4 358:6
**comes** 246:5
309:8
**comfortable**
233:12
**coming** 59:9
67:12 282:16
**commence** 92:5
264:7
**commencing**
2:17 81:8
**comment** 28:13
35:13
**commercial**
115:6
**common** 85:9
210:8 274:18
**commonly**
153:24
**communicate**
132:6
**communicated**
107:12
**communicates**
131:1

Page 16

[communicating - consistently]

communicating
  14:3
communication
  104:3
communications
  23:15 24:19
  69:16 256:24
  278:24
community
  301:17
companies 169:6
  169:22 337:1
company 331:14
company's
  313:25
compare 191:23
compared
  210:12
comparison
  210:16,18
compel 317:22
  320:14 321:22
compensated
  38:10 179:18
  341:2
competent 80:8
complete 64:17
  228:16
completed
  346:10 366:7,17
  367:6
completely
  30:15 218:25
completion
  346:12 365:15
  367:10
compliant 240:2

complicated
  180:16
complies 12:4
  304:7 305:14
complying
  304:17
component
  88:11,15 119:16
components
  140:12 178:3
  205:12
compound 25:9
  29:22 77:23
  143:17 160:12
  166:4 227:6
  264:3 280:12
  342:3
comprehensive
  90:12 352:5
con 88:24
concept 34:1
  94:5 153:18
  176:18 198:2
  341:16 347:17
concepts 78:12
  133:13
conceptualized
  135:9
conceptually
  358:8
concern 241:18
concerned
  258:23
concerns 198:6
concluded 95:2
  220:3
conclusion
  255:20 263:5

272:11 278:21
  307:22
condition 217:3
  220:7 222:2
  223:4 224:19
  225:1,19
conditions 225:4
conducted
  174:15
conducting
  242:11 247:4
  334:22
confer 291:24
confers 40:17
  318:12
confidence 66:25
confidential 1:10
  363:24
confidentiality
  363:25
confirm 47:8
  73:11 199:17
  261:6 363:12
confused 293:12
confusing
  342:11 347:19
conjunction
  344:15
connect 35:25
  52:3 56:14
  74:21,21,24 76:4
connected 75:19
  77:25 78:5
  103:22 182:25
connecticut 6:17
connecting 75:3
  75:7

connection
  125:15 246:1
  295:2 336:12,24
connections
  172:13
connects 78:1
conservative
  156:21 157:7,7
  157:17,18
consider 40:8
  48:17 52:17
  61:4 62:11,17
  87:8 105:5
  115:16 120:3
  121:8 167:23
  227:21,25 322:2
  322:3
consideration
  62:23 106:21
  107:7 177:4
  206:16 209:20
  270:3
considerations
  61:18 62:8
considered
  105:6 107:11
  108:2
considering
  62:18 270:6
consistent 25:22
  28:9 46:18
  47:13 55:20
  59:4 82:21
consistently
  59:25 100:7
  102:16 103:9
  115:14 116:15
  124:17 130:13

Page 17

[consistently - cost]

137:10 158:12
197:3 264:15
277:18 318:14
**console** 346:20
347:11
**constitute**
330:14
**consult** 257:15
303:16
**consumer** 1:5
2:5 11:8 366:4
369:1
**cont'd** 5:1 6:1
7:1 9:1 10:1
**contact** 83:20
132:19,20 305:7
345:13 348:18
366:9
**contained** 108:5
357:12,25 368:4
**content** 25:13
36:24 51:6
84:22 87:9
88:24 89:14
102:22 103:25
104:15 105:1,12
105:16 108:8,19
114:14 119:23
124:17 126:12
126:20 127:1,2,4
127:7,23 128:12
139:25 157:14
157:15,16,17,18
158:11 172:16
174:10 175:8
176:22 177:12
178:14,16
208:22,24

217:14,16
218:11,12,16,19
218:22,24
219:15,25
220:15,21
221:16,18 222:6
222:12 226:15
227:22 298:18
299:1,1,5,6,9,21
299:25 301:5,5
301:12,15,16,23
302:9 338:24
**contents** 226:17
227:25
**context** 138:9
154:19 176:2
212:5 225:25
230:8,14 274:13
304:2,10 305:5
324:17 325:12
327:6,13 328:5,8
329:12 357:21
**continue** 60:5,24
109:5 159:6
200:6 353:25
**continued** 82:11
84:7
**continuing**
334:19
**continuous**
86:21 100:8
166:6 276:23
290:21
**continuously**
279:12,14,25
362:8
**contribute** 76:20
87:13 100:14

**control** 97:2
111:11,17 145:7
**controls** 25:25
149:11
**conversation**
63:5 270:12
**conversations**
19:2 52:20
62:10 152:25
159:4 258:23
**conversion**
344:9,10,21
345:1,11,16,19
345:20 346:12
**conversions**
344:22 346:7
361:2
**converted**
344:12
**cookie** 130:25
**cookies** 130:17
**cool** 109:17
**coordinate** 73:3
73:8
**coordinates**
72:24
**core** 51:12,21
54:11 70:15,18
70:23 71:4,6
72:12 75:10
76:18 77:20
78:9,13,22 79:7
79:15 81:20
167:14 196:9
208:1,19 218:6,7
218:14 239:18
**corollary** 302:10

**corporate** 1:13
311:20 313:6
**correct** 40:20
56:2,3,6,7 67:24
68:19 70:16
84:13 88:17
89:25 91:22
99:21 104:4
109:25 110:1,15
114:23 127:8,17
131:22 147:3
152:12 158:16
161:22 164:15
174:21 180:2
181:20 194:4
207:11,18 211:9
218:5 222:15,16
234:9,20 237:11
239:21 240:22
247:8 249:2
253:20 258:3
263:18 267:2
302:3 326:5
333:19 334:6,7
334:13 340:18
340:20 368:5
**corrected** 368:5
**corrections**
366:14,15 367:3
367:4 368:3
**correlate** 141:11
209:10
**correspondence**
40:17
**cost** 44:5,6,9,11
50:3,4,9,10,13
50:14 189:8
269:15 348:20

Veritext Legal Solutions
866 299-5127

**[cost - curious]**

348:22,23
361:23
**counsel**   3:1 4:1
5:1 6:1 7:1,17
11:13 13:15
14:9,14,23 15:5
16:7,10 17:5,12
18:18 19:2
155:15 257:16
261:6 281:4,19
281:21 282:3
283:11 284:6
291:19 295:24
309:8,13,18
310:9 311:7
312:5 313:22
316:5,11,16,17
316:20 318:3,17
318:22 319:6,12
319:14,16
320:20 321:8,15
321:16 323:12
323:16 327:9
328:20 332:5
363:18 366:18
366:21 367:7
**counsel's**   190:12
**count**   100:25
184:24
**counterpart**
65:17 66:2 68:7
**counterparts**
270:13
**county**   285:7
**couple**   122:10
296:7 316:22
**course**   24:21
48:7 67:16

93:12 130:11
146:10 184:3
200:14 273:18
313:10
**court**   1:1 2:1,21
12:2,5 15:2 96:2
138:5 145:2
155:10 201:13
211:19 251:16
251:19 260:10
281:2 285:7
323:18 331:21
350:4 353:17,20
353:24 354:4
365:3
**courtroom**   14:11
**courts**   181:13
**cover**   153:4
245:17 359:15
**covered**   13:15
208:17 231:24
316:22 342:8
**cpc**   348:19 349:1
361:22 362:11
**cpm**   348:21,22
349:1
**create**   41:3,4,7
42:12 48:24
51:5 57:18
71:15 81:16
85:18 101:15
102:4 119:4,8
121:8 122:16
124:5 125:22
129:3,16 136:18
137:1 151:23
155:2 170:1
175:7 179:20

182:7,9 193:3
211:6 223:6
224:15 227:4
231:14 236:2
266:12,24 290:1
346:4 347:24
**created**   16:4
38:3 40:25 41:2
41:19 75:15
88:9 129:7
145:6 158:1
174:9 240:25
267:20 271:24
272:21 274:21
333:15 354:9
**creates**   139:24
158:4 180:19
192:4 212:13
339:4 341:17
**creating**   24:12
85:25 101:17
138:10 150:24
172:12 174:7
333:8 339:1
353:8
**creation**   38:4
41:1,6,20,23
57:14,15 83:1,14
88:18 91:14
128:1 336:23
341:24 342:4,6
355:5,6
**creative**   25:12
338:14
**credit**   256:13
257:23 258:22
262:13 265:1,14
265:25 266:13

267:1 271:23
272:7,14 280:23
286:14,22 287:4
292:25 300:3
**criminal**   217:5
220:10 222:4
223:5
**criteria**   83:22
110:7 214:21
**critical**   322:14
**cross**   58:19 63:3
64:13 65:20
69:19 73:16
118:3
**crutcher**   4:17
5:5 6:5 11:22
**csr**   1:20,20,21
365:25
**ctr**   349:1
**cuff**   128:21
289:23
**cuisine**   274:10
274:10 276:7
**cultural**   273:7
273:12,22
**culture**   273:8,13
273:23 274:9
275:4,5,12,16
276:5,10 277:4,8
277:17 278:5
**cumulatively**
277:9
**curate**   34:8
**curated**   19:11
**curating**   34:10
34:11
**curious**   17:2

Page 19

[current - defines]

current 195:7
234:9 252:14
303:17
currently 66:10
66:11 79:6
117:14 226:16
226:21 245:6
252:17 295:20
337:21,22
360:20
custom 52:6,6,10
52:10,11,15 53:3
53:9,10,14,20,21
53:22,24 54:2,12
70:16 129:18
130:1 148:11,12
150:2 167:14
191:2,4,10,12,14
191:15 192:3,4
192:12,17 193:3
193:5,7,7,9,11
193:13,20 194:5
195:22 196:2
200:16,25 203:2
203:9,17 231:15
235:22 236:14
236:14,16 237:2
237:17,18 238:3
331:11 333:8,15
customer 52:7
53:20 148:12,22
150:7 191:5,8,9
191:17,20 192:5
192:20 193:3
195:3 201:1
229:1 231:8,15
232:15 235:24
235:25 236:23

237:15,19
238:11 249:5
325:17
customers 52:9
53:5 191:18
192:25 237:16
cut 44:4 321:4

d

d 8:1 67:23
daily 184:2
355:9,20 359:17
359:23 360:7,8
dallas 5:18
dan 271:9
dangerous
301:19
daniel 7:5
data 56:12,19
59:9 61:10
124:5 128:5,8
129:3,7,14,14
132:19 136:17
136:22,25
146:25 151:12
152:6 153:15
173:9,25 190:3,6
190:15,21,25
191:23 208:19
222:11,11 228:7
228:24 229:18
230:3,13 238:19
240:20 241:12
246:4 262:23
272:19 282:21
296:5,12,21,25
297:11 298:5
302:2,8 303:20

303:21 304:16
305:3,13,21
306:5 307:7
308:14,19,20
309:16 310:4,19
310:21 311:4
313:12 315:6
318:16 330:13
330:19 332:25
351:13,17,24
352:1 356:11,24
357:12 360:2
database 143:19
databases
143:24 357:3,4
dataset 147:2
352:1,5
date 66:16 84:10
118:22 145:23
344:4 365:20
366:16 367:5
369:24
dated 8:22
260:18 285:9
david 4:7
day 90:12,12
365:21 368:6
dc 6:18
dealt 263:17
decide 32:4 61:4
81:18 94:17
108:11 187:7,11
192:22 202:7
220:17 275:23
358:21
decided 58:14
60:13 159:13
173:14 275:20

277:23
decides 61:17,21
decision 58:6,11
58:18,21 59:10
61:10,14,15 63:2
63:8,21 64:21
65:10 68:4,25
69:24 81:11,14
96:18 105:7
108:7 160:8,19
269:4
decisions 62:12
62:24 63:16
65:19 69:4 70:5
declare 368:1
declared 158:9
decline 93:19
decrease 122:4
163:6,11,17
164:19 165:18
decreased 90:2,5
164:3,9 165:6
deem 295:5
deemed 276:14
277:8 278:8
define 56:16,18
57:18 116:25
117:3 128:9
156:4 275:15
311:8 313:4
317:16,22 318:7
326:25 345:18
defined 34:14
40:24 99:22
119:14 120:22
156:24
defines 28:18
43:2 345:15

**[defining - deponent]**

| | | | |
|---|---|---|---|
| **defining** 276:2 | 176:4 177:3,16 | 42:11 43:23 | 134:10,25 135:8 |
| 340:15 | 179:3,6,6,21 | 45:9 47:6,12,18 | 136:2,12 137:4 |
| **definitely** 238:17 | 180:10 194:22 | 49:15,19 50:25 | 137:25 139:2,22 |
| 270:2 338:2 | 202:1 203:25 | 54:21 56:23 | 141:5,14 142:6 |
| **definition** 38:9 | 204:3,5,9 207:24 | 57:11 58:2,10,18 | 143:2,18 144:9 |
| 38:14,18 39:18 | 230:15 243:2 | 58:24 59:8,25 | 146:3,22 147:6 |
| 40:7,7 121:3 | 359:11 | 60:21 61:9 | 148:19 149:19 |
| 159:19 275:1,17 | **deltoid** 354:16 | 62:22 63:14,25 | 150:5,14 151:4 |
| 275:19 307:10 | 354:19 | 64:11 65:1,4 | 151:21 152:4,17 |
| 307:24 315:8 | **demand** 85:6,13 | 69:18 70:2,10 | 152:21 154:16 |
| 321:22 347:23 | 88:12 119:16,20 | 72:1 73:2,15,23 | 155:1 160:3,13 |
| **definitions** 22:8 | 120:4,7,11 | 77:2,24 79:11,17 | 160:23,25 161:9 |
| 43:17 | **demographic** | 79:19 83:13,25 | 162:4,17 163:1,8 |
| **definitively** | 78:21 149:5 | 84:3,17 85:17 | 163:20 164:8,23 |
| 57:20 | **demographics** | 86:3 87:6,19 | 165:10,22 166:5 |
| **degree** 280:2 | 51:13 71:3,7 | 88:5 89:13 90:5 | 166:10,16 167:8 |
| **delete** 191:24 | **denies** 286:10 | 90:19 91:10 | 167:16 168:4,11 |
| **deliver** 9:11 | **deny** 216:6 | 92:1,20,22 95:6 | 168:20 169:11 |
| 34:15 42:12 | **dep** 23:2 354:1 | 95:13,23 96:15 | 169:19 170:10 |
| 61:25 194:20 | **department** 39:9 | 96:23 97:10,24 | 170:17,24 |
| 232:19 233:4 | 39:16,19 40:1,9 | 98:7,19 99:5 | 171:15,25 |
| 234:8,8,15,24 | 40:12,21 311:17 | 100:5 101:7,17 | 172:25 174:18 |
| 236:4 241:3 | 335:8,21 336:2 | 102:1,8 104:15 | 175:17 176:1 |
| 339:9 | **depending** | 104:24 105:11 | 177:2 178:22 |
| **delivered** 42:15 | 299:13 323:14 | 106:5 107:1,4,17 | 179:15 180:7,25 |
| 177:10,12 | **deponent** 2:16 | 109:8,10,14,17 | 181:13,22 |
| 340:13 | 8:2 12:4,10 | 110:18 111:9 | 182:20 183:19 |
| **delivering** | 15:21 19:1,15,22 | 112:11,13 | 184:7,9,20,22 |
| 185:24 186:11 | 20:12 21:13,16 | 113:21,23 114:4 | 185:12 188:20 |
| 329:3 | 22:22 23:20 | 115:24 117:7 | 189:22 190:5 |
| **delivers** 108:14 | 24:20 25:10 | 118:8 119:8 | 192:14,20 |
| **delivery** 9:6 | 26:8 27:17,24 | 120:6 121:6,12 | 193:22 194:2 |
| 23:23 24:1,11 | 29:8,15,23 30:8 | 122:21 124:24 | 195:1,16,25 |
| 25:4,17 26:4,16 | 31:1,13 32:8,24 | 126:6,14 127:1 | 197:1,10,22 |
| 27:3 41:13 | 33:19 34:10 | 127:11,19 128:4 | 198:19 199:13 |
| 50:12 59:18 | 35:17 37:10 | 128:16 130:20 | 199:21 201:20 |
| 80:15 102:13 | 38:18 39:4,13,15 | 131:9,15 132:10 | 205:2,4 206:3 |
| 137:25 138:11 | 39:24 40:20 | 133:12,23 | 207:20 208:5,22 |

**[deponent - describes]**

| | | | |
|---|---|---|---|
| 209:13 210:6,12 | 279:10 280:13 | 358:17,25 | 161:21,23 163:6 |
| 210:24 211:12 | 282:14 286:3 | 359:21 360:1,12 | 163:10,16 164:3 |
| 212:8 213:7 | 287:2,25 288:6 | 360:23 361:5 | 164:14 264:21 |
| 215:9,11,24 | 288:13,21 | **deponent's**  1:15 | 266:8 268:10,18 |
| 216:9 217:13 | 289:13,22 | **deponents**  365:7 | 278:10,11,13 |
| 218:19 219:10 | 290:20 291:5,12 | **deposed**  13:10 | 279:3,7,17,19 |
| 219:22 220:13 | 292:2,18 293:18 | **deposition**  1:12 | 290:11,25 |
| 220:21 222:9 | 294:4,20 295:1 | 2:15 8:12 11:7 | 291:21 292:13 |
| 224:17 225:9,15 | 295:10,18 297:3 | 12:7 14:13,23 | **deprecates**  161:5 |
| 225:17,25 226:9 | 297:19 298:9,24 | 17:15 18:24 | 279:5 |
| 226:24 227:7,17 | 300:17 301:11 | 19:7 20:10,22 | **deprecating**  61:4 |
| 229:11 230:21 | 302:6,22 304:10 | 22:3,21 23:2 | 158:21 159:24 |
| 231:14 232:6 | 304:25 305:18 | 40:16 48:7 | 160:8,20 268:21 |
| 233:22 234:22 | 306:1,10 307:6 | 183:21 185:4 | **deprecation** |
| 235:15 237:24 | 307:13,23 308:8 | 199:5 216:17 | 163:12 165:4 |
| 238:23 239:7 | 309:6 325:3,12 | 261:8 282:15 | 268:3 270:15,16 |
| 240:4,25 241:8 | 325:21 326:8,25 | 283:7 308:7 | 270:18 |
| 241:16,22 | 327:6,13 328:5 | 318:15 320:4,8 | **deprecations** |
| 242:15 243:12 | 328:24 329:10 | 328:18 332:6 | 268:4 |
| 243:25 244:11 | 329:22 330:18 | 365:14 366:19 | **derive**  208:2 |
| 244:22 245:17 | 331:6,13,23 | 366:22,24 367:8 | **derived**  79:7 |
| 246:16 247:12 | 332:10,16 | 367:10 | 116:8,9 |
| 248:1,14 249:19 | 333:22 335:13 | **depositions**  15:6 | **describe**  21:6 |
| 250:1,11 251:24 | 335:24 336:8,20 | 310:7 312:25 | 35:1 50:22 51:2 |
| 252:4 253:11 | 337:5,19,25 | 318:10 | 55:4 84:14 |
| 255:7,16,21 | 338:13 339:9,14 | **deprecate**  58:7 | 122:3 130:7 |
| 256:3,25 257:3 | 339:23 341:5,16 | 58:11,14 60:13 | 178:6 186:6 |
| 259:15 260:2 | 342:4,18 343:2 | 61:17 62:18 | 212:9 346:17 |
| 261:3 262:10 | 344:1 345:6 | 63:8,21 64:15,22 | **described**  80:18 |
| 263:6 264:4,9,15 | 346:1,15 347:5 | 68:4,25 269:4,8 | 128:24,25 143:3 |
| 265:6,20 267:18 | 347:22 348:12 | 269:18 270:7 | 143:10 172:17 |
| 268:7,25 269:12 | 348:17 349:19 | 271:1 279:11 | 178:2 183:2 |
| 269:23 270:11 | 350:6,11,18 | **deprecated** | 203:1,5 212:12 |
| 271:17 272:9 | 351:7,23 352:23 | 55:13 57:24 | 217:10 220:19 |
| 273:15 274:4,17 | 353:7,18 354:18 | 58:2 59:21 60:1 | 253:7 |
| 274:25 275:15 | 355:17,22 356:4 | 61:1 63:1 | **describes**  203:7 |
| 276:2,18,20 | 356:15,23 | 123:11,12,13 | 205:21 |
| 277:14 278:2,25 | 357:16,21 358:4 | 157:2 158:15 | |

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[describing - disability]**

describing 156:3
253:6,13 279:24
354:14
description 8:10
9:3 10:3 203:24
204:2 277:22
278:4 303:19
346:18
descriptively
229:14
deselected 97:7
design 86:23,24
87:11,12 97:4
116:13,15
designate 35:8
76:21 363:23
designated 34:5
79:22 121:15
301:18 313:6,25
318:11 321:23
designation
363:25
desire 104:12
desired 24:4
32:12,18 38:4
51:4 150:24
168:23 170:19
187:12 192:25
203:15 212:14
214:15 236:2
342:7 345:24
346:1,3
detail 21:6 52:25
54:12
detailed 9:21
26:9 51:22
52:16 55:12
59:13,22 70:15

80:16,17,19,23
81:8,19 82:2,7
82:14 89:20
90:10,23 93:4
94:19 96:12,20
102:6 113:17
114:21 149:7,21
149:23 150:19
151:5 206:21
252:6,21 253:7
253:14,20
details 171:8
360:12
detection 299:3
determination
75:25 115:22
204:8,9
determine 43:13
60:24 74:12
75:16 76:9,17
78:15,23 79:2,3
86:18 87:4,24
88:1,22 89:7,14
91:21 102:23
140:7 172:23
177:5 180:11
187:17 204:13
208:20 222:18
223:7 249:22
272:20 273:24
277:10 333:10
determined
366:18,22 367:7
determines
141:18,19
determining
24:7 108:4
206:22 221:15

226:14 304:15
306:5
deterministic
139:5
develop 66:8
139:8 152:22
221:11 303:15
developed 85:20
157:23 221:14
developer 121:2
121:6 132:2
193:15 333:1
developers 331:2
developing
65:20
development
65:19 118:1,5,16
221:19
device 75:5 76:4
devices 76:13
dgarrie 7:11
dichotomy
211:13
dictate 298:18
difference 22:25
115:18 116:3,4
153:6 214:12,13
224:1 319:19
352:16 358:13
differences
354:21,25
different 42:18
52:22 53:12,16
60:9 67:8,9
77:13 78:12
111:3,5,10,11,12
111:22,23 112:5
112:16 115:9,16

116:23,24 130:3
133:12 138:21
147:2 177:5
183:1 187:3,5
203:1 247:1
302:11 306:21
310:6 312:25
319:5 327:25
342:23 343:6
353:9,9
differentiate
33:25 242:16
differentiated
31:2 34:16
78:18
differentiating
147:7
differentiation
37:3
differently 18:21
181:23 197:11
dig 317:14
digits 202:4
dimensions
116:23,24
direct 165:14
251:14 285:10
direction 365:11
directly 65:7
162:20,21 165:2
243:4
dis 341:18
disability 217:3
220:7 222:1
223:3 259:2
280:10 288:11
294:13 295:16

Veritext Legal Solutions
866 299-5127

**[disable - draw]**

| | | | |
|---|---|---|---|
| **disable** 111:4 | **discriminatory** | **display** 186:19 | 252:14,15 261:7 |
| **disagree** 224:11 | 10:8 260:16 | 341:19,21 | 281:5,25 282:7 |
| 283:18 | 263:8 271:18 | 342:19 356:25 | 283:7,21 316:23 |
| **disallow** 229:18 | 272:9,11 286:6 | **displayed** 152:7 | 316:23,24 317:2 |
| 229:21 247:1 | 299:25 | 342:13 | 317:6,16 318:4 |
| 299:7 | **discuss** 13:16,18 | **disputing** 262:7 | 318:22,23 319:4 |
| **disallowed** | 15:4 18:18 | **distilling** 194:21 | 319:5 320:5,22 |
| 258:14,21 | 73:16 95:10 | **distinct** 133:16 | 321:1 322:20 |
| 271:17,21 | 120:14 150:9 | 222:13 237:17 | 327:11 332:6,15 |
| 272:13 | 155:18 186:2 | 266:16 286:5 | 334:3,5,16 |
| **disallows** 217:15 | 190:13 257:3 | 289:13 302:9 | **documenting** |
| 229:23 258:1,18 | 281:14 282:13 | 306:19 | 18:8 |
| **disassociate** | 282:19 300:22 | **distinction** 33:8 | **documents** |
| 164:24 | 308:18 317:17 | 33:14 75:13 | 17:13,14,15,17 |
| **disclose** 23:14 | **discussed** 17:14 | 127:12 147:11 | 17:17 18:17,23 |
| 60:16 291:4 | 17:23 114:9 | 153:19 207:11 | 19:6,20,24 20:8 |
| 297:4 | 125:20 163:5 | 214:7 218:10 | 22:2,15,17,19,20 |
| **disclosing** 23:18 | 205:14 223:22 | **distinguish** 78:9 | 23:3 167:3 |
| 24:18 256:23 | 226:1 270:14 | 116:22 120:1 | 281:22 282:20 |
| 296:19 | 296:8 324:7 | **distinguished** | 317:23 322:17 |
| **disclosure** | 335:3 358:5 | 53:6 | 322:22 |
| 146:18 151:1 | **discusses** 150:1 | **district** 1:1,2 2:1 | **doing** 100:10 |
| **discontinuance** | **discussing** 88:8 | 2:2 | 165:2 |
| 10:11 283:3 | 95:21 112:19 | **divide** 189:6 | **dollars** 50:11 |
| 285:8,15 | 128:6 129:18 | **divided** 17:7 | **domain** 261:10 |
| **discontinue** | 136:23 150:11 | 50:17 188:23 | **domi** 263:25 |
| 61:21 264:12 | 153:20 207:22 | **dividing** 363:10 | **dominant** |
| **discovery** | 228:5,15 257:22 | **divine** 75:9 | 263:25 264:1 |
| 320:16 | 294:6 314:10 | **dko** 4:14 | **double** 18:5 |
| **discriminate** | 337:7 | **doc** 320:25 | **download** 144:1 |
| 262:5 271:13 | **discussion** 39:20 | **document** 1:7 | **drafted** 150:16 |
| 287:14 | 69:10 96:2 | 2:8 14:23 15:13 | 151:5 |
| **discriminated** | 354:4 | 15:17,21 16:4 | **dramas** 14:11 |
| 263:2 265:15 | **discussions** | 18:14 20:13,15 | **dramatically** |
| 272:4 | 96:10,16 120:15 | 20:16 146:1 | 90:2 |
| **discrimination** | 120:17 158:22 | 150:1,9 202:3,17 | **draw** 137:9 |
| 258:1,14,18 | 270:25 | 205:21 211:23 | 222:17 |
| 259:7 285:24 | | 216:15 223:17 | |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[drawn - engagement]**

**drawn**  151:16
203:22
**draws**  208:20
**drill**  326:13
**drop**  98:24
233:6 236:3
**drops**  233:3
234:7,14,23
**due**  181:2
**dunn**  4:17 5:5
6:5 8:22 11:22
12:1 16:11,17
64:23 65:4
67:17,19 68:23
**duplicative**
264:18 270:20
**duties**  152:13
303:12

**e**

**e**  3:6 8:1,8 9:1
10:1 348:7
350:5,5 366:9,12
367:1 369:3,3,3
**e.g.**  149:10
**earlier**  58:4
99:23 117:22,24
153:5,20 160:13
172:17 176:6
203:1 206:20
207:22 211:12
231:24 268:25
296:8 324:8
330:1,3
**early**  221:19
**earn**  179:24
**earning**  165:23

**easier**  355:3
**easily**  149:12
**echo**  353:16,19
362:3
**economic**  268:20
269:1
**ectr**  347:13,16
**effect**  217:24
**effective**  93:2
210:21
**effectively**  43:3
71:16 212:16
295:22 340:22
352:9 354:22
**effort**  123:7
264:21 270:23
316:7
**efforts**  41:15
190:2 247:18,21
272:12
**egan**  66:21
**ego**  350:3,5
**eight**  22:12
80:10 361:12
**either**  40:2 94:11
165:14 237:4
**eligible**  24:7
78:15 140:4,15
187:15 204:19
330:7
**email**  9:15 10:13
83:20 84:3 85:4
216:20 328:10
329:2 333:3,6
335:2 337:6
**emailed**  14:23
333:7

**employed**  215:6
**employee**  65:5
365:18
**employees**  19:18
**employment**
256:13 257:23
258:22 262:12
265:1,13,24
266:13 267:1
271:15,23 272:6
272:14 280:23
286:13,22 287:4
292:25 300:2
**en**  262:15
**enable**  83:18
85:18 109:1
196:2 340:23
351:25
**enabled**  82:9
**enables**  325:1
**enabling**  81:22
262:15
**encourage**
180:20
**enforce**  73:24
74:1 93:23
250:4 296:10
298:21 300:14
301:4,20,22
302:1
**enforced**  73:21
74:7 250:3
300:10
**enforcement**
10:14 73:19
74:5 246:10
249:7,22 298:22
301:24 306:21

317:15 320:10
333:10
**enforces**  300:7
**enforcing**  301:2
302:9 305:12
306:24
**engage**  81:18
84:22 85:8
88:22 89:4,14
97:20 100:1,7
106:22 114:12
119:22 124:16
127:4,25 137:20
138:19,21
139:11 140:11
157:12,13,15,15
157:16,17,19
190:1 272:4
273:7 276:4,10
277:3,18 352:18
**engaged**  25:3
34:4 52:1 88:25
96:25 106:16
114:14 116:12
116:15 125:7,14
125:15 137:19
174:13 194:11
275:4
**engagement**
35:22 37:20
52:11 53:9,22,24
54:2 82:11,21
84:7 86:10,21
100:8 106:9
108:17,21 116:7
130:10 137:7,8
138:13 158:11
172:16 174:11

Veritext Legal Solutions
866 299-5127

**[engagement - examining]**

193:8,9 194:4,5
194:7 226:1
227:17,18
230:19 235:11
236:14 237:17
273:2,5 276:24
280:1
**engagements**
106:9
**engages** 115:17
126:7 247:3
**engaging** 84:19
89:2 173:7
274:19
**engineer** 246:5
**engineers** 73:16
**english** 263:25
268:14
**ensure** 73:20
81:20 84:20
152:23 177:4
194:20 196:12
197:4,25 200:4
209:15 233:10
238:6 242:10
247:4,20 248:22
296:20 306:16
**ensuring** 245:24
298:4
**enter** 94:16
**entering** 71:20
**enters** 128:17
338:22 340:13
**entertainment**
83:4 85:7
**entice** 176:20
**entire** 34:19 37:4
47:14 64:12

128:8 328:19
**entirety** 250:15
352:2
**entities** 115:6
**entitled** 165:13
282:13 311:19
319:22 322:12
**entity** 169:1,4
**entry** 111:23
**enumerate**
313:10
**environment**
353:8,10,14
354:7
**environments**
354:22
**equally** 189:17
**equation** 140:8
176:5 187:16
203:22,23,24
**equivalent**
144:22
**erin** 66:21
**errata** 366:14,16
367:3,5
**escalation** 333:7
**especially**
219:19
**essentially**
120:23
**establish** 47:24
48:11 80:7
177:20
**established**
42:19 66:14,16
180:17 233:15
353:11

**estimate** 138:2
272:12
**estimated** 139:9
140:9 177:8
205:16,18 206:9
206:10 208:1,3
208:12 209:3,7
209:18 211:7
222:25 226:14
227:4,9,20
347:14,17,24
**estimates** 22:5
**et** 22:9 51:9
72:17 220:25
235:11 280:10
**ethnic** 217:1
220:5 221:24
223:3,11,13
259:23 260:24
261:22 262:20
262:22 263:22
268:2,3 276:15
280:9
**ethnicity** 255:5
255:11,14 260:3
262:18,24
272:18 280:16
**europe** 268:1
**evaluates** 307:8
**evaluation**
336:22
**evaluations**
47:22
**event** 28:22
126:9 132:19,23
132:24 133:5,14
133:15,25
134:13 345:14

345:14,17
**events** 132:4
134:5 295:12
**everybody** 90:25
257:6 313:18
**everyone's** 62:8
109:12
**evolution** 81:3
146:4
**evolve** 174:4,4
**evolved** 25:15,18
26:11 59:1
90:11 118:10
123:4 172:2,11
**evolving** 158:24
**exact** 17:11 33:3
58:4 65:10
66:16 70:10
93:12 97:16
118:22 151:8
170:17,18 185:8
228:18 229:12
264:9 273:16
291:6 344:4
348:12 351:1
**exactly** 15:24
34:12 47:7 67:7
102:21 142:10
150:16 159:15
182:13 190:23
195:9 238:13
250:20 335:2
346:17
**examination** 8:2
13:5
**examined** 13:2
**examining**
320:21 327:10

Page 26

**[examining - expert]**

328:20
**example**  18:3,4
18:14 28:7 29:3
29:3 30:11
31:23 34:3
35:25 36:8,21,23
37:17 38:25
39:1,7 44:8
48:16,25 49:5
50:3 51:18 52:5
55:10 57:13
59:13 60:3
65:21 66:20
74:15 75:1 76:5
76:8,14,24 77:6
77:14 82:3 83:3
85:4 86:11,21
87:11 100:6,13
101:18 108:21
115:14 116:11
116:13 117:12
123:11 124:18
124:24 125:3,11
126:6,8,11,16
127:3 128:16
129:2,19 133:7
137:13 139:9
143:22 174:6
175:3 176:14
178:3 183:4
184:23 186:25
191:2 193:16
195:2 199:21
203:10 208:23
216:5 221:1,21
224:23 225:4
229:1,20 231:11
254:2 255:23

262:17 263:9
270:2 271:15
273:4,16,22
274:6 277:16
278:5,7 289:23
293:13 294:5,20
294:24 296:16
298:25 299:6,9
300:5 302:14
304:21 305:21
306:5 325:9,21
326:18 327:20
328:24 329:6
337:5 343:14
344:1 348:3
351:15 352:10
352:11 354:10
355:1 358:8
359:1,5
**examples**  26:24
36:7 38:12
41:22 51:24
55:8 60:10
124:19 244:12
256:1 298:21
299:15 300:1,11
301:4,8 327:17
328:10 343:12
343:22 344:6,7
**exception**  281:10
**excessively**  29:3
**exchange**  340:23
**exclude**  42:2
230:18 259:22
260:5,24 287:16
290:13 293:8,14
293:24

**excluded**  38:9,14
40:6
**excluding**  38:25
39:1,17 41:22
264:24 280:6
285:22 286:12
286:21
**exclusion**  42:1
227:1 262:16
265:9,22 287:8
289:15,17,18,20
289:24 293:3,6
293:21 294:7,9
294:11
**exclusions**  290:2
**exclusively**
19:11,16
**excuse**  151:18
355:14
**executed**  368:6
**exemptions**
207:6
**exercise**  137:18
**exhaustive**  64:17
**exhibit**  8:11,15
8:22 9:4,15,20
10:4,11,13 14:25
15:1,8,10,12
22:10 144:24
145:1,10,12,22
147:14 148:14
155:5,6,9 186:1
201:12,16
211:18,23
216:11 222:24
228:4 239:11
251:15,18,22
252:1,4 260:8,9

280:25 281:1
283:3,7 285:1,6
296:1 300:20
308:13 316:21
324:5 327:10
328:21 330:17
331:20 333:2
**exhibits**  15:5
22:3 23:1
**exist**  83:17 88:2
**existed**  123:2
233:20 343:20
**existence**  57:23
**existing**  52:9
53:5 54:9
191:18 192:25
237:16
**exists**  144:2
166:8 217:20
**expand**  85:9
139:23
**expect**  48:3
332:8
**expectations**
58:25 59:5
62:11,17 106:24
107:5,14 108:2
158:24 159:3,14
**expensive**
254:14,17
**experience**  8:18
81:21 94:21
113:1,3 149:12
210:7 220:22
**experiments**
352:7 353:3
**expert**  40:21
41:16 221:18

Veritext Legal Solutions
866 299-5127

**[expert - facebook]**

| | | | |
|---|---|---|---|
| 243:25 244:4 | 286:16 307:21 | 80:13,24 81:8,17 | 158:6 159:17,23 |
| 247:18 | **external** 17:16 | 81:18 82:15 | 160:6,18 161:4 |
| **expertise** 62:9 | 17:19 18:13 | 83:21 85:1,15 | 161:21 162:5,13 |
| 136:9 144:10 | 20:19 23:7 | 86:18,21 87:2,15 | 162:14 163:15 |
| 243:15 | 152:25 | 87:25 88:16 | 164:14 166:8,10 |
| **experts** 163:25 | **externally** 17:24 | 89:6 90:8,21 | 166:11 167:4 |
| **explain** 35:2 | | 93:13,23 94:17 | 169:22 170:6 |
| 59:21 105:25 | **f** | 94:22 95:2,13 | 171:6,11,18 |
| 115:18 119:10 | **face** 220:4 | 96:10,18 98:13 | 174:14,19,23 |
| 138:16 173:16 | **facebook** 1:4 2:4 | 100:25 101:3 | 175:10,23 |
| 185:13 282:4 | 4:16 5:4 6:4 9:4 | 102:4,14,22 | 177:13 178:19 |
| 315:9 322:13 | 9:10,16 10:6 | 103:1,21 104:3 | 179:18,24,24 |
| 359:3 | 11:8,22 17:16 | 104:11,11 105:5 | 180:4,19,21 |
| **explained** | 25:3,22 26:5,21 | 105:6,19 106:1,1 | 182:17 183:5,8 |
| 160:10,13 | 27:5,14 28:1,4,6 | 106:14,16,18,22 | 183:13,16,22 |
| 301:14 330:3 | 29:11 30:1,2,3 | 106:23 107:10 | 184:13 185:24 |
| **explaining** 21:24 | 30:22,23 31:1,7 | 107:11,12 108:2 | 186:3,4 187:7,20 |
| 295:19 306:14 | 31:17 32:4,17,19 | 108:3,11 112:23 | 187:25 188:8,11 |
| 354:8 | 33:5 34:7 36:1,8 | 115:3,11,21 | 189:9,10,11,16 |
| **explains** 46:16 | 36:20,24 37:16 | 117:3,18 119:4 | 189:17,18 190:1 |
| 111:16 201:25 | 38:10,13 39:9 | 120:3,10,23 | 191:19 192:2 |
| **explanation** | 40:6 41:3 42:8 | 121:2,4,11,18 | 193:2,10 194:8,8 |
| 283:12 | 43:20 44:23 | 122:18 124:8,13 | 194:14 196:6,17 |
| **explicit** 47:13 | 45:1,3,6 46:3,12 | 125:22,22 | 196:21 197:6,15 |
| **explicitly** 31:4 | 46:20 47:9 | 126:16,18 | 197:18 198:4,21 |
| 161:2 | 49:10,25 51:8 | 127:23,24 | 199:7,16,18,25 |
| **explore** 318:18 | 52:3,13 54:1,7,9 | 128:12 129:3,9 | 200:15,24 202:7 |
| 319:22 321:20 | 54:18 55:23 | 129:15,16,21 | 204:24 206:8,13 |
| **explored** 105:3 | 56:1,17,20 57:3 | 130:15 131:2 | 206:16,19 207:6 |
| 105:13 108:21 | 57:6 58:13 | 132:4 133:9,18 | 208:2,6,20 |
| **exposed** 363:7 | 59:21 60:12,12 | 134:20 135:4,21 | 209:10 210:1,2 |
| **extensive** 318:5 | 61:3,16,21 62:11 | 136:5,20,25 | 210:20 211:6 |
| **extent** 23:13,17 | 62:17 63:1 | 137:22 138:15 | 212:6,18 213:2,9 |
| 24:17 41:12 | 74:11,14,24 75:9 | 139:18 140:16 | 213:13 215:6,16 |
| 60:15,19,22 | 75:19 76:1,5,14 | 140:19 141:1,11 | 216:6 217:8,19 |
| 69:14 72:2 | 76:16 77:19,25 | 142:16,23 148:3 | 218:7 219:4 |
| 128:8 256:22 | 78:2,5,8,9,17,20 | 149:3 151:11 | 220:3,17 221:15 |
| 265:2,15 278:20 | 78:22 79:3,14 | 154:6 156:9 | 221:23 222:14 |

**[facebook - fb]**

| | | | |
|---|---|---|---|
| 222:17,23 | 292:13 293:6,14 | 358:21 360:20 | **factor**   336:22 |
| 223:10,10 | 295:5,13 296:10 | 363:19 366:4 | **factors**   161:14 |
| 224:13 225:6,12 | 297:9 298:3 | 369:1 | 177:22 204:12 |
| 225:20 226:13 | 301:22 302:14 | **facebook's**   1:12 | **facts**   164:1 199:6 |
| 226:17 231:8,21 | 302:17 303:10 | 37:5 72:12 74:1 | **fair**   14:4,20 16:1 |
| 235:7 237:21 | 304:1,5,6,15,16 | 79:7 121:19 | 33:16 42:18 |
| 238:1,2,6,8,19 | 305:3 306:24 | 163:5 164:3,18 | 46:25 54:10 |
| 238:20 239:3,19 | 307:7 308:15,18 | 165:17 166:1 | 70:20,21 85:15 |
| 241:11,13,19 | 309:16 310:5,13 | 182:14 190:13 | 88:3 89:6,9,13 |
| 242:10,13 243:4 | 310:16,18 311:5 | 210:9 222:4 | 112:9 120:24 |
| 243:5,6,8,8,22 | 311:16 312:1,10 | 228:5,22 234:19 | 128:14 153:8 |
| 243:22 244:2,7 | 312:20 313:12 | 250:17,23 259:6 | 154:2 157:9 |
| 244:17 245:13 | 313:23 314:21 | 259:21 263:3 | 180:23 189:19 |
| 245:25 246:6,10 | 314:23 315:15 | 271:11 272:2,3 | 222:6 315:24 |
| 246:11,12,22 | 316:12,24 317:8 | 274:13,20 | **fall**   33:21 |
| 247:3,7,7 248:9 | 317:16,18,22 | 275:12 294:17 | **falls**   59:15 |
| 248:10 249:13 | 318:15 320:1,8 | 296:3 300:22 | **familiar**   94:5 |
| 249:15,16,22 | 321:18,23 322:7 | 303:20,21 304:7 | 129:6 143:25 |
| 250:6,16,21 | 322:17 324:25 | 304:17 305:13 | 144:2 334:25 |
| 254:4 255:4,9,12 | 326:2,3,21 329:4 | 308:1 309:25 | 346:19 350:7 |
| 258:13 260:15 | 330:25 331:1,11 | 311:17 313:7 | 354:15 359:22 |
| 260:20 262:4,21 | 333:3,4,18 | 314:11,12 | 360:1,6 361:2 |
| 263:13,15,21 | 334:16,22,23 | 319:22 321:2 | **familiarize** |
| 264:11,23 | 335:8,22 336:3,4 | 334:10,12 337:3 | 363:4 |
| 265:10 266:2,24 | 336:14,15,17,25 | 339:5 | **family**   125:6 |
| 267:13,19,20 | 337:1,23 338:1 | **facing**   151:25 | **far**   77:3 101:7 |
| 268:20 269:7,17 | 338:19 339:1,19 | 152:1 167:3 | 102:2 106:8 |
| 269:20 272:21 | 340:16,23 341:1 | **fact**   33:4,9 42:15 | **farrell**   6:15 |
| 272:23,25 275:1 | 341:9,12,17,18 | 95:2 101:9,22 | 11:25 16:15 |
| 275:4,23 276:13 | 341:22 342:6,14 | 119:22 147:7 | **fashion**   83:4 |
| 276:18 277:7,8 | 343:11 344:13 | 180:8 182:21 | 165:3 |
| 277:22 278:6,8 | 344:17 345:7 | 186:10 189:16 | **fast**   283:1 |
| 278:16 279:5,6 | 348:24 349:4,9 | 219:19 221:23 | **faster**   351:25 |
| 280:4 282:6,7,8 | 349:15 350:8,15 | 241:11 262:3 | **fault**   20:7 152:17 |
| 282:13 283:2,4 | 350:16 351:4 | 263:1 270:15 | 228:12 296:2,2 |
| 285:8 286:10,10 | 352:24 353:5 | 302:17 313:3 | **fb**   8:19,20 9:12 |
| 286:20 287:20 | 355:8,12,19,25 | 336:12 | 9:13,17,18,22,23 |
| 290:1,25 291:21 | 356:10,20 | | 10:15,16 201:18 |

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[fb - form]**

| | | | |
|---|---|---|---|
| 224:7 251:22 | **fine**  16:2 167:1 | **focused**  232:22 | 56:21 57:9 58:1 |
| **fct**  359:23 360:7 | 257:7,8 267:11 | 298:4 | 58:8,16,22 59:6 |
| **federal**  365:14 | 288:24 292:1 | **follow**  9:16 54:1 | 59:24 60:14 |
| 367:1,8,9 | 316:5 346:18 | 54:4 87:12 | 61:7,19 62:20 |
| **feedback**  153:1 | **finish**  267:7 | 240:4 273:9 | 63:12,23 64:25 |
| 177:19 178:4 | 316:1,4 | **followed**  194:12 | 69:5 70:9 71:25 |
| 179:4 208:25 | **finite**  290:22 | **followers**  194:8 | 73:1,14,22 77:1 |
| 221:21 | **fired**  135:15,17 | **following**  216:25 | 77:22 79:9,18 |
| **feeding**  139:12 | **firm**  11:18 | 232:10 286:11 | 80:25 83:12 |
| **feeds**  178:14 | **first**  66:13 67:25 | 291:22 340:7 | 84:2,16 85:16 |
| 179:5 | 80:23 88:2 93:2 | 348:25 | 86:2 87:5,17 |
| **feel**  210:20 | 93:21 112:21 | **follows**  13:3 | 88:4 89:12 90:4 |
| 318:17 322:13 | 117:18 131:3 | 366:8 | 90:18 91:8,25 |
| **feeling**  109:7 | 149:1 202:6,11 | **fonti**  3:5 11:17 | 92:21 95:4 |
| **felt**  58:25 158:23 | 203:11 207:1 | **force**  296:23 | 96:21 97:9,22 |
| 174:8 233:12 | 216:14,19 | 297:9,16,21,25 | 98:5,18 99:4 |
| **ferguson**  10:4 | 235:17,21 | 298:4,11 302:1 | 100:4,7 101:5,24 |
| 260:14,19 | 253:17 260:19 | 302:15 | 102:5,7 104:14 |
| **fewer**  195:23,25 | 261:15 285:14 | **foregoing**  365:5 | 104:22 105:9,22 |
| 200:17,19 | 309:15 311:3 | 365:7,11,13 | 106:3 107:2,16 |
| **field**  225:1 | 313:21 335:1,14 | 368:2 | 110:16 111:8 |
| **figure**  63:4 | **fit**  54:22 55:11 | **foremost**  112:22 | 112:12 113:20 |
| **figures**  52:1 | **five**  50:11 | **forget**  60:9 | 113:22 114:3 |
| 82:19 158:13 | 156:19,23 157:1 | **form**  15:20 | 115:23 117:5 |
| **figuring**  353:5 | 157:5,25 268:18 | 18:20,25 19:13 | 118:6 119:6 |
| **file**  282:20 | 309:7 323:19 | 19:21 20:11 | 120:5 121:5 |
| **fill**  225:2 | 350:24 | 21:12,15 23:12 | 122:20 124:23 |
| **final**  14:10 | **fix**  96:1 | 24:16 25:8 26:7 | 125:24 126:5,13 |
| 363:25 | **floor**  7:8 | 27:7,10,23 29:7 | 126:25 127:9,18 |
| **financial**  182:14 | **flow**  52:21 83:1 | 29:14,21 30:6,25 | 128:3,15 130:18 |
| 217:4 220:8 | 91:14 133:24 | 32:6,23 33:17 | 131:8 132:9 |
| 222:3,18 223:4 | 265:25 266:12 | 34:9 35:15,18 | 133:11,21 134:9 |
| **financially**  210:3 | 266:13,24,25 | 37:8 38:16 39:2 | 134:24 135:7,25 |
| 365:17 | 267:14,20 | 39:11,12,22,23 | 136:11 137:3,24 |
| **find**  20:21 21:18 | 271:24 | 40:14 42:10 | 138:8 139:1,21 |
| 107:19 214:16 | **focus**  23:10 | 43:22 45:8 47:5 | 141:4,13 142:4 |
| 215:2 228:18 | 220:18 303:20 | 47:11,17 49:14 | 143:1,16 144:8 |
| 255:4 306:23 | 303:25 | 49:18 54:15,20 | 146:2,21 147:4 |

Veritext Legal Solutions
866 299-5127

**[form - full]**

| | | | |
|---|---|---|---|
| 148:12,18 | 233:21 234:21 | 325:11,19 326:6 | 360:11 |
| 149:18 150:3,12 | 235:14 236:12 | 326:24 327:5,7 | **four**  17:10 69:4 |
| 151:2,20 152:3 | 237:23 238:21 | 328:3,15 329:8 | **frame**  24:14 |
| 152:18 154:15 | 239:6 240:3,23 | 330:16 331:4,12 | 105:20 |
| 154:24 160:1,11 | 241:7,14,20 | 333:21 334:18 | **framework** |
| 160:24 161:7 | 242:14 243:10 | 336:6,18 337:18 | 109:2 |
| 162:2,25 163:18 | 243:24 244:9,13 | 338:6,9 339:8,12 | **framing**  105:11 |
| 164:5,20 165:19 | 244:19 245:15 | 339:13,14,22 | **francisco**  5:10 |
| 166:3,14 167:7 | 246:14 247:11 | 341:4,11,15 | **frcp**  367:1 |
| 167:15 168:2,19 | 247:13,14,16,24 | 342:3,17 343:1 | **free**  112:25 |
| 169:9,17 170:9 | 248:13 249:18 | 343:25 345:5,14 | 183:7,11 318:17 |
| 170:16,22 | 250:9 255:6,15 | 345:25 346:14 | **frequency** |
| 171:13,24 | 255:19 256:2,21 | 347:3 348:10 | 362:24,25 363:6 |
| 172:24 173:21 | 259:14 260:1 | 349:18 350:10 | 363:9 |
| 174:2,17 175:16 | 261:5 262:8 | 350:17 351:6,22 | **friday**  1:16 2:18 |
| 175:25 176:25 | 263:4 264:2 | 352:22 353:6 | 11:1 |
| 178:21 180:6,24 | 265:4,18 267:6 | 354:17 355:10 | **friend**  32:1 |
| 181:11,21 | 267:16 268:6,23 | 355:16 356:13 | 37:14 100:22 |
| 182:19 183:18 | 269:10,21 270:3 | 356:21 357:14 | 172:13 226:3 |
| 184:21 185:10 | 270:9 271:16 | 358:2,15,23 | **friend's**  226:15 |
| 188:19 189:20 | 272:8 273:14,20 | 359:19 360:10 | 226:18 |
| 190:4 192:13,19 | 274:2,15,23 | 360:21 | **friends**  103:25 |
| 194:25 195:15 | 275:25 277:12 | **formal**  295:23 | 104:16 124:22 |
| 195:24 196:24 | 277:25 278:19 | **format**  186:17 | 125:13 126:12 |
| 197:9,20 198:16 | 279:8 280:11 | 338:16 343:16 | 158:2,9,9 226:11 |
| 199:10,20 205:3 | 286:1,25 287:24 | **former**  65:5,5 | 227:22 |
| 206:2 207:8,19 | 288:5,19 289:12 | 67:18 | **front**  197:23 |
| 208:4,21 209:11 | 290:19 291:2 | **forms**  35:19 | 247:19 314:9 |
| 210:4,22 211:10 | 292:15 293:16 | **forth**  365:7 | 321:1 |
| 212:7 213:5 | 294:2,18 295:9 | **forward**  56:5 | **frustrating** |
| 215:10,22 216:8 | 295:17 297:2,18 | 72:11 124:1 | 199:5 |
| 218:18 219:8,21 | 298:7,23 300:15 | 323:11,13 | **full**  50:6 64:12 |
| 220:11,20 | 301:10 302:5,20 | **found**  37:19 | 90:15 128:7 |
| 222:22 224:16 | 304:9,23 305:17 | 56:15 159:11,12 | 224:5 254:4 |
| 225:16,23 226:8 | 306:9 307:4,12 | 173:1 255:12 | 301:6 326:20 |
| 226:22 227:5,15 | 307:20 308:7 | **foundation**  17:3 | 337:25 352:25 |
| 230:20 231:12 | 312:14 314:17 | 243:11 250:19 | 353:2 |
| 231:19 232:4 | 315:12,15 325:2 | 294:19 334:19 | |

**[function - go]**

**function** 26:18
27:3 120:13
172:21,22
218:15 360:7
**functional** 58:19
63:3 64:13
65:20 69:19
118:3 136:10
**functionality**
83:19 93:2
236:23 237:13
263:20
**functioning**
131:17
**functions** 132:12
351:11,23
**fund** 162:10
**fundamental**
25:20
**funnel** 345:21
346:9,10
**further** 82:4
316:6 321:20
363:14 365:13
365:17
**future** 30:17
108:23 114:12
114:12 115:15
137:8,15,21,23
138:2,12 226:2
247:22 248:2
303:15

**g**

**g** 348:4,7 350:5
**gain** 243:1
**gained** 360:24

**gambling** 299:17
299:18 301:14
**game** 115:7
**gamers** 115:7
117:12
**games** 52:5
**gap** 120:16
**garrie** 7:5
281:16,24 282:2
283:10,16,24
284:5,11,14,18
292:4 309:2,7,11
310:9,20 311:22
312:4 313:17
314:2,20 315:10
315:22,25 316:3
316:20 318:25
319:2,12,16
321:7 322:10,24
323:1,4,10,20
**gender** 70:24
71:4,8 79:4
217:3 218:3,8,22
219:4,6,19 220:7
222:1,15 224:24
224:25 253:19
253:23 254:6
255:13 256:5,9
256:13 257:23
258:21 282:11
**genders** 256:15
**general** 7:17
14:6 43:19
46:25 48:13
58:13 60:7
61:23 89:18
95:10,21 100:19
100:20 102:6

111:5 154:22
161:5 221:20
260:14,19
**generalities**
163:3
**generally** 25:7
26:2 27:8 50:22
102:13 105:17
123:9 126:22
131:18 146:16
153:1,13 154:10
169:14 178:23
179:1 195:13
304:11
**generate** 88:21
93:13 162:15
189:10,18 227:8
**generated** 173:8
173:24 185:20
**generates** 353:4
**geo** 234:4,17
235:4 236:21
240:21 311:14
325:9 329:16
**george** 118:19
**getting** 33:12
75:22 101:11
102:20 107:25
132:14 134:17
180:22 199:4
207:16 284:7
305:2 323:13
**gibson** 4:17 5:5
6:5 8:22 11:22
12:1 16:11,17
**gibsondunn.com**
4:23 5:12,20
6:12,13,20 366:2

**give** 12:7 21:1
25:12 51:6 77:7
77:13,13 124:24
139:24 144:24
188:25 200:13
230:25 242:7
259:21 273:4,21
297:23 298:2,21
311:18 319:17
320:5 326:20
327:17
**given** 43:11
51:11 94:12,15
141:22 142:18
175:22 187:14
187:20,22 188:2
188:12 239:15
279:2 282:14
317:4 324:12
365:12
**giving** 97:2
313:12 330:10
**go** 20:6 23:21
28:20 30:13
48:25 61:6
68:12 73:11
91:16 95:25
111:3,5 112:5,20
114:15 144:13
185:6 190:19
193:25 199:24
202:22 206:5
235:9 239:10
247:18 251:6
257:5 281:17
284:9,12,18
292:4 295:25
300:20 309:4

Page 32

**[go - help]**

315:20 316:6
322:20 323:14
323:23 353:22
361:8 364:2,6,7
**goal**  82:4,8
110:19 179:6
210:8
**goals**  81:20
**goes**  45:21 51:5
71:15 123:23
133:7 151:23
203:14 301:17
342:5
**going**  44:18 56:5
61:12 67:11
69:7 87:10
109:3,8 132:11
144:23 157:4
198:20 200:10
201:15 209:23
211:21 228:3
251:3 252:10
254:16 276:20
284:8 295:25
303:15 308:22
313:11,16
316:13 317:21
323:16 332:2
338:15 342:12
355:1
**good**  9:8 11:15
11:20 13:7,8,12
13:12,16 18:4
67:12 135:20
144:20 182:22
194:2 200:10,11
206:25 210:17
254:20 269:18

292:2
**google**  263:14
**gotten**  47:1
**grab**  284:4
**grace**  332:20,21
333:7
**graced**  14:18
**granular**  71:23
134:5 310:21,21
**granularity**  72:2
167:2,11 350:25
**granularly**
165:24
**graph**  203:20
204:13
**great**  23:4 25:2
26:13,14 68:11
109:18 176:13
189:25 201:5,21
251:25 361:14
364:1
**grocery**  57:13
**ground**  124:25
**group**  60:4 63:2
63:3 70:4,6
103:4,15,20,21
103:24 194:10
216:22 226:4
263:14 268:3,4
269:5 271:12
273:6,10,25
274:14,22
275:21 277:11
352:14,15
**groups**  19:17
46:20 47:1 62:5
88:23 103:14
126:2 152:25

156:24 157:2
159:1,11 207:4
242:12 248:11
259:24 261:1
268:5,21 269:19
270:8 271:2,14
272:20 273:1
276:16 277:24
278:9 280:10
288:18 289:7
352:16
**grown**  67:3
**growth**  122:4
**guess**  154:17
275:22 313:21
351:12
**guidelines**
216:23 229:21
249:6
**guiding**  197:13
199:13,25 200:3
**guy**  320:10
**guys**  321:10

**h**

**h**  8:8 9:1 10:1
348:7 369:3
**hand**  12:3
**handful**  64:19
**handled**  366:8
**happen**  14:13
83:23 247:20
266:3 335:5
358:9
**happened**
134:15 249:23
290:23 311:11
317:1 337:8

**happening**  112:7
330:20 353:20
**happens**  30:15
47:20 350:12
**happy**  38:22
50:6,7 63:3
109:8 170:25
281:14 283:9,15
283:21
**harass**  229:22
**hard**  150:16
**hash**  132:22
191:21,23
238:12
**hateful**  301:16
301:16
**head**  22:22 48:5
65:9 118:18
169:3 185:13
202:25
**headline**  176:21
**health**  220:8
222:2
**hear**  216:6 364:4
**heard**  121:10
319:13
**hearing**  53:8
353:16
**heart**  301:7
**held**  118:20,23
**hello**  362:9
**help**  9:20 17:22
24:5 26:16,22
27:1 30:17 34:7
47:23 60:8
81:23 82:7
84:20 109:1
124:25 129:22

Page 33

**[help - identified]**

133:6 138:2
148:20 164:24
177:3 194:20
197:16 199:15
208:2 252:4,5,18
252:25 253:2
256:10 296:14
301:20 354:20
**helpful**  21:7
37:22 139:22
202:23 291:24
**helping**  61:25
**helps**  18:12
32:15 43:13
44:5 132:21
133:5 137:20
139:8 197:25
209:15 248:22
298:16
**hendrix**  332:22
332:23
**hereto**  15:3
145:3 155:11
201:14 211:20
251:20 260:11
281:3 331:22
**hi**  144:19 216:20
**hidden**  177:18
178:4
**hide**  98:24
178:17
**hides**  219:19
**hiding**  178:6
**high**  66:24 85:5
85:13 88:12
90:19 120:4
123:5,5 180:22
181:15 304:14

**higher**  177:11
179:13 182:18
209:2,3,6,6,7,9
**highest**  187:18
204:21 205:7
209:15,17,22
**highlight**  149:11
**highlighted**
149:4
**hispanic**  263:23
263:24,24,25
268:13,14,14
274:9,10,12,21
275:1,4,5,11,16
275:21,24 276:3
276:5,7 277:4,8
277:17 278:4
**historically**
105:2 280:3
**hiv**  294:24
**hive**  98:20,22
99:3 100:3,13,17
100:22,24
101:10 143:13
143:14,19 144:4
351:8,16,18
352:4 356:4
357:8,12,18,22
357:25 358:7
359:24 360:13
**hobbies**  51:25
82:18
**hoc**  84:8
**hold**  278:15
279:1 280:2
**holds**  143:20
**hometown**  76:21
125:4

**honest**  20:23
**honestly**  37:19
57:19 65:9
72:20 77:3
168:7 226:25
**honored**  73:12
**hoping**  132:25
**hour**  17:10
67:11 200:10
**hours**  15:23 16:7
16:21 17:6,10
22:12 133:2
261:7,12 281:7
281:23 311:12
316:22
**house**  280:19
**housing**  256:12
257:23 258:22
262:12 265:1,13
265:24 266:13
266:21 267:1
271:15,23 272:6
272:13 280:22
286:13,22 287:4
292:24 300:2
**howard**  64:4,20
65:12 68:23
245:9,11
**hub**  111:18
113:13
**huh**  15:9 120:25
256:6
**hundred**  89:22
89:23 91:6
117:16 122:5,9
122:12
**hundreds**  97:6
97:13

**hyperlink**
202:22

**i**

**i.e.**  190:15 228:7
**ian**  7:17 12:1
16:18 332:11,17
333:7
**idea**  81:4 224:7
269:18
**identifiable**
239:4 240:8
246:19 248:22
306:16,25
307:11,17 308:3
310:2,14 311:9
311:19 312:11
312:21 313:8,13
314:1,14 317:9
317:23 318:7,24
319:8,21 320:1,7
320:11 321:23
**identification**
15:2 47:2
122:25 145:2
155:10 201:13
211:19 251:19
260:10 281:2
309:20 310:7
331:21
**identified**  22:21
29:20,24 54:11
114:20 125:17
127:20 136:17
182:21 222:24
261:12 282:9
287:17 306:7
316:23 317:17

Page 34

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[identified - inclusion]**

332:6
**identifier** 132:20
 237:22 238:14
 345:14
**identifiers**
 191:22 250:13
**identifies** 239:14
 317:4 319:20,25
 324:11,16
 325:10 326:5,23
 327:4 328:22
 330:15
**identify** 11:13
 19:6 20:9 30:3
 32:18 43:19
 50:21 51:1 55:1
 63:20 64:18,20
 68:3 69:3,9
 77:19 89:19
 97:19 118:4
 159:1 178:20
 182:15 185:8
 186:7 188:8
 197:8 231:7
 232:10,14 235:3
 235:4,5,17,18
 239:9,23 244:11
 253:22 263:6,8
 268:3 276:9
 289:19 307:19
 311:13 312:17
 317:13,22
 322:21 325:1,6
 326:10,15 328:2
 328:7,12 329:7
 329:17 330:14
**identifying**
 106:19 238:7

315:6 317:24
**identity** 217:3
 218:4 220:7
 222:1 324:23
**ids** 238:2,8,20
 241:13 242:13
 243:5,9,22 244:7
 244:17 245:13
 245:25 246:6,13
 248:9 249:17
 302:15 333:19
 333:24 334:5,16
 334:24 335:9,22
 336:5,16 337:2
 337:13
**illegal** 255:22
**illegally** 255:18
**illustrative**
 274:6
**image** 338:16
**images** 176:9
 177:17
**imagine** 86:8
**immediate**
 351:12
**immediately**
 83:18 92:16
 346:21
**immigrants**
 259:23 260:25
**immigration**
 261:22
**impact** 160:8,19
 268:21 269:19
 352:17
**impactful**
 296:13

**impeachment**
 282:17 283:12
 332:9
**impede** 328:18
**impermissibly**
 255:13,17
**implement** 84:4
**implemented**
 72:7 80:24
 93:21 117:18
**imply** 216:23
 344:25
**importance**
 177:2
**important** 13:20
 14:2 33:1 81:3
 113:5 137:5
 139:3 197:14
 200:7 296:13
**imposed** 194:14
**impression** 38:7
 42:5,14 44:4,9
 44:19,21 188:5
 189:8 206:1
 356:1,6,16,19
 358:14,17,18,19
 358:20,22 359:6
 359:7
**impressions**
 42:24 49:6
 175:21 184:24
 185:19 189:7
 231:24,25
 348:23 349:1
 351:15 356:5,11
 357:9 359:7
 363:10

**inaccurate**
 346:16
**inappropriately**
 305:20
**include** 26:25
 32:9 89:15 93:9
 124:21 126:10
 126:15,20 134:2
 138:1 153:2,3
 175:20 176:6
 179:2 236:6
 261:21,21
 277:23 294:22
 329:1 348:25
**included** 37:24
 94:1,4 136:23
 185:22 226:6,7
 266:19,20,22
 270:20 276:11
 294:12 330:8
 366:14 367:3
**includes** 80:21
 111:20 150:22
 175:19 211:9
 253:16 267:25
 330:9 338:15
**including** 56:19
 60:4 75:19 87:7
 149:7 150:19
 155:20 158:21
 197:24 207:24
 209:18 220:8
 222:2 236:21
 238:17 258:2
 280:21 311:14
**inclusion** 276:15
 290:8 294:7,8
 295:21

Veritext Legal Solutions
866 299-5127

**[incorporate - information]**

**incorporate**
26:19 105:14
**incorrect** 302:22
**increase** 163:11
178:8,10 181:3,4
210:10
**increased** 195:2
195:3,8,11
209:10
**increases** 177:24
178:1 181:20
**increasing** 180:3
181:19
**incurred** 207:4
**independent**
192:23
**indicate** 77:16
115:3 120:8
190:24 274:7
275:2,3
**indicated** 153:5
173:9,25
**indicates** 32:2
242:1
**indicating** 77:11
171:15
**indication** 91:18
137:11 178:13
359:10
**individual** 81:12
83:7 113:24
117:21 118:8
178:25 188:21
196:17,19,22
198:5,22,25
199:2,9 230:24
239:23 240:15
242:6,9 269:2

315:6 319:25
325:10 326:17
328:2,12 329:7
329:18 330:24
337:16
**individually**
197:8 277:9
**individuals** 68:2
69:4,23 239:14
241:13 259:24
260:25 263:1
317:4 319:20
324:11,16 326:5
326:23 327:4
328:22 330:15
**industry** 62:6
108:25 120:7,11
154:3,7,11
176:18
**infer** 115:11
178:15 223:11
223:12 224:18
225:6
**inference** 137:1
225:19
**inferences**
151:16 222:17
223:6 224:15
255:5
**influence** 161:14
**info** 125:18,19
224:7 227:18
272:22 275:9
309:21
**infor** 337:15
**inform** 27:1 28:1
30:17 33:6
102:14 104:1,8

104:17 105:1,16
107:21 135:21
154:1 221:2
226:2,6
**information**
21:1,2 23:15,19
24:19 28:4
32:14 36:2,3,9
36:16 38:13,22
39:19 40:5,9
45:24,25 50:1
52:8,23 53:4,13
53:16 56:13,14
60:17 63:11
69:16 74:11,17
74:20 75:10
76:1,8,16 77:19
78:1,22 87:20
102:14 103:4
104:4,11 106:2
106:10,17,23
107:12 108:4
124:8,15 125:8
129:1,7,21,22
130:15 131:1
132:3,5,19,20
133:5,10,18
134:2 135:4,16
135:22 136:20
143:18 144:1,3
146:25 147:19
148:4,10 149:5,9
173:13,19
175:13,18,20
184:25 191:25
194:21 196:11
196:19,22 200:5
208:8 211:1

217:4 219:14
220:9 221:14
222:3,18 224:14
224:18 225:7,10
225:13,21
226:14 229:2,5
229:23 230:18
235:10 238:12
239:4,8,13 240:8
240:16 242:7,23
246:5,9,17
248:23,24
256:23 278:23
279:6 291:4
296:18 297:4,14
302:24 303:23
303:25 304:6
306:17,25
307:11,18 308:4
308:9,15 309:16
310:2,5,14 311:5
311:9,13,19
312:11,16,22
313:8 314:1,15
317:3,9,12,23
318:7,24 319:8
319:20,21,24
320:1,7,11
321:15,23 322:4
322:13 324:10
324:15,25 325:9
325:24 326:4,8
326:22 327:3,15
327:18 328:1,11
328:21 329:2,6
329:10,12
330:13,15,21,23
339:20 344:13

Page 36

**[information - internal]**

344:18 345:7,10
345:13,13,16
349:5 356:2,16
356:19 357:25
**informed** 28:8
**informs** 130:14
**ing** 181:8 216:23
**initial** 122:2
156:19
**initiate** 101:11
101:14
**initiated** 101:22
**initiates** 76:23
96:2 354:4
**input** 72:1 83:5
85:1,3 208:15
212:14 213:20
214:18
**inputs** 85:25
206:23 208:2
212:10 227:3,9
227:10 272:19
**inputted** 215:15
**ins** 76:19
**inserting** 14:14
**instance** 56:18
290:10
**instances** 134:21
135:5 245:12,18
331:7,8
**instruct** 69:7
**instructed** 14:9
14:17
**instruction**
62:21
**insurance** 265:1
265:14 266:17
266:18,20,21,22

267:4,12 280:7
280:21 286:14
286:23
**integrity** 184:5
298:14,15,16,21
299:2 300:6,11
300:23 301:2
**intended** 286:11
**intent** 115:4,11
116:19 137:1
**interact** 33:20
52:5 54:1 115:5
124:20,21
354:11
**interacted** 35:24
52:13 104:7
158:12 193:10
206:17,18
**interacting** 28:7
28:12
**interaction** 87:8
104:9 207:13
**interactions** 28:6
35:12,14,23
87:14 105:15
106:9 124:15
125:13 142:8
**interacts** 87:7
**interchangeable**
123:18 156:13
**interest** 51:25
82:2,11 83:10
84:11 85:25
86:6,25 88:9,18
89:5,15,16,19
90:1,9,22 91:2,6
91:21 92:2 93:3
93:13,15,19,24

94:1,2,3,23
95:19 96:19
97:7,11,17,25
98:4,8 100:9,14
100:19 104:18
105:20 110:13
110:22,24
111:20 113:17
114:4,5,8,10,15
115:12,19
116:11 119:16
119:17 124:2
137:7,8 141:18
142:9 147:1
149:15,17
155:21 177:9
182:15 212:16
212:25 213:25
214:4,24 215:1
215:12 216:2
253:6 287:25
288:7 289:24
293:20 295:2
**interested** 26:18
26:22 32:16
81:24 82:23
85:6,14 86:24
88:13 97:1
108:15 116:14
276:25 365:18
**interesting** 62:1
81:21 82:4
86:17,19
**interests** 30:18
37:23 51:24
53:1 80:21 81:5
82:16,17 83:8
84:6,20 86:5,20

87:23 88:21
89:8 90:7,13
91:17 92:9,11,14
92:24 93:7,9
94:18,24,25 95:8
97:14 100:2,5,18
102:4,6,9,12,23
105:16 106:8,19
107:21 108:20
110:5,11 114:22
115:9 116:4
149:7,21 150:20
151:6 206:22
207:2,12,12
212:11,15,24
213:24 214:14
214:17 215:7
232:3,7,11,13,22
234:18 235:5
236:20 237:3,3
253:16 276:22
287:10 288:14
289:14 294:4,11
294:14,16 295:5
295:11,14,20
341:23
**interface** 48:23
48:25 110:21
113:4 175:19
**interfaces**
145:16 152:7
**interior** 86:22,24
87:11,11 116:12
116:15
**internal** 17:24
18:1,6,7,9,11,14
18:17,23 19:6
39:10,15,25 40:8

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[internal - know]**

40:9 48:14 85:1
95:1 96:10
134:21 135:1
269:6,17 270:6
270:11,25 347:9
355:23
**internally**
346:25 355:12
**internet** 75:7
145:20
**interpreting**
313:18
**interrupt** 151:19
205:5
**interruption**
338:12
**introduce** 64:14
108:20
**introduced** 28:2
91:23 157:1
343:16,18
**invade** 106:24
107:14
**invasion** 107:19
**investigate**
302:16
**investigates**
296:24
**investigating**
291:1
**investigation**
10:5 260:15
292:14
**invoiced** 44:13
**involve** 219:25
**involved** 63:8,20
64:4,12,13,14,21
65:7,20 68:3,6,8

68:24 69:10,20
69:24 80:11
117:25 118:5,25
162:19 206:15
258:10 259:6
270:25 271:3,4,9
285:21 286:3,6
289:7 305:1
341:22
**involvement**
25:21
**involves** 339:18
**involving** 271:14
**ip** 75:1,2,4,8
329:5,16,23
330:9,10,11
**iphone** 76:14
**irrelevant** 82:6
94:22
**isabella** 1:13
2:15 8:3 11:7
13:1 21:14
366:5 368:1,13
369:2,24
**issue** 21:24
163:20 194:1
281:19 316:9
334:1
**item** 135:11
186:9
**items** 134:22
**iterated** 118:10
122:14 290:15
**iterations** 27:2

**j**

**jams** 7:4

jamsadr.com
7:11
**job** 1:23 184:3
303:18 366:5
369:2
**john** 7:19 11:10
216:20 224:6
284:6
**join** 103:21
**joining** 13:9
**josh** 11:18
211:22
**joshua** 3:8
**jsamra** 3:16
**jsc** 1:6 2:6
**judge** 14:12,18
**july** 145:23
155:8 260:18
285:9
**jumping** 343:15
**jumpy** 193:23
**june** 252:15

**k**

**kamps** 118:19
**keep** 61:15 109:8
163:3 323:16
326:12 343:14
363:15
**keller** 4:5
**kellerrohrback...**
4:13,14
**key** 359:17 360:8
**keyword** 71:21
83:5 212:1,17,21
212:24 213:10
213:12,17,21
214:25 215:14

216:7
**keywords** 212:5
212:19,21 213:3
213:14 216:21
217:9
**kind** 18:6 35:2
51:19 53:15,22
54:17 59:21
62:8 71:11 72:2
77:18 103:18
104:13 112:18
117:23 138:14
138:21 142:17
142:24 177:19
190:6 191:16
207:15 246:13
273:5 282:15,23
296:23 297:9
321:9 328:1,10
328:11
**kinds** 15:6 54:11
54:21 55:6
96:12 100:16
112:4,9 122:17
124:4 126:11
132:5 151:15
182:15 184:16
194:14 201:3
203:1 213:14
236:10,19 269:5
275:20 294:16
342:23
**king** 285:7
**knew** 69:20
96:24 97:1
**know** 13:14
30:12 36:13
44:23,25 45:5,22

Page 38

**[know - legal]**

45:25 46:6,22
47:6 50:6 57:6
58:4 63:1,7
64:12 67:7,21,22
69:18 70:10
80:3,8 81:11,12
90:13 93:12
96:17 97:6,16
98:25 102:2,15
103:8 104:6,20
109:6,11 112:15
118:21,23 119:1
121:20 122:2,3
122:25 123:12
125:1,8 128:7,23
131:12,18
135:13,15,17
139:14,15
142:12,13,13,14
142:15 144:5,10
145:12 150:25
151:11,21 152:5
154:22 164:2,8
164:23 165:7,14
165:14,24 166:7
168:7,8,9,9,12
168:12,25 169:2
169:14 170:4,5,8
170:12,14,17,20
171:8,10,17,23
173:4 187:14
189:5 195:3,9,13
202:21,24
208:16 210:16
219:17,24
220:25 225:5,17
230:21 238:9,13
239:1 241:1,16

243:13 244:23
245:18 248:6
258:9 273:15
280:1 282:12
283:2 289:22
290:9 291:15
293:12 301:6
305:1 307:2
309:21 320:11
320:12,13
325:18,23
327:22 331:16
332:1,16,19,21
332:22,23
337:19,25 340:9
342:19 344:4
346:16 347:10
347:25 348:1
350:1,15 351:1,3
352:19,20
359:13 360:5,12
362:2
**knowing** 76:20
**knowledge** 46:9
56:2 69:23
317:25 334:1
359:1
**knowledgeable**
48:2
**knows** 69:11
246:12 334:23
336:4,15 337:1
**ko** 4:7
**kutscher** 6:6
11:24

**l**

**l** 1:20 2:20 6:15
350:5 365:1,24
**l.l.p.** 4:5
**labeled** 268:12
**labeling** 137:18
**language** 253:19
253:23 254:11
254:12,25 255:2
255:5,7,9 275:6
311:6 320:22
321:3 327:10
328:20
**languages**
254:22,25
**large** 52:19 70:4
70:6 81:15
118:11 167:24
363:3
**largely** 19:11
22:15 52:7
**larger** 47:1
**latest** 156:25
**laufenberg** 4:6
**launch** 92:16
352:10
**launched** 92:6
93:6 99:7,12,13
99:14 121:25
123:8 131:10
136:12,13 145:8
174:12 258:4
266:11,24 268:1
287:3
**law** 3:9 4:8,19
5:7,15 6:8,16
**lawsuit** 171:6
285:23 288:17

289:8
**lawyer** 16:19
**lawyers** 16:21,23
16:25 19:18
**lay** 26:2,9
**laying** 17:3
**lead** 245:8 271:7
305:11 348:8
**leadership** 168:4
271:4
**leads** 10:5
260:15
**learn** 28:20 29:1
199:2 246:8
**learned** 302:13
**learning** 9:5,11
25:18 26:10
138:1,7,8 139:4
139:6 140:12
141:18,23 142:2
142:2 143:5
177:16 202:1
204:8,15 206:14
208:14 227:8,11
238:14 347:16
352:25
**leaves** 35:10
**left** 67:19 323:22
354:2 361:10,13
**legal** 19:16 20:1
22:17 47:23
48:11 58:19
255:20 263:5
270:13 278:20
279:1 280:2
307:21 358:14
358:17,20,22
359:6,7 366:7

**[legally - location]**

**legally**   260:20
**length**   310:13
**leone**   1:13 2:15
    8:3,11 11:7 13:1
    13:7 68:18
    69:14 109:6,24
    144:19 155:17
    186:2 190:12
    251:13 261:14
    278:22 284:25
    300:21 308:17
    309:4 310:17
    311:2 318:5,11
    318:21 320:9,21
    321:1 324:4
    361:20,21 366:5
    368:1,13 369:2
    369:24
**lesley**   3:6 11:16
    27:11 240:1
    326:18
**letter**   8:22 155:7
    190:12 308:13
    309:14 310:25
    314:18
**level**   157:2
    178:25 230:25
    233:4,5 240:15
    297:13 304:14
    310:19,21
    318:16 330:24
    350:25
**leverage**   87:22
**levy**   271:9
**lgbtq**   259:23
    260:25 294:21
    295:12

**liberal**   156:21
    157:6,6,14,15
**life**   126:8 217:2
    220:6 222:1
**liked**   30:11,12
    30:14 31:6
    37:15 149:11
    187:2
**likelihood**
    205:19 206:12
    208:13 347:18
**likes**   31:19 36:9
    36:20,21,24 37:2
    37:6 100:12,16
**liking**   32:9 35:3
**limit**   213:3,23,24
    215:24 233:8
    240:18 256:11
    296:11 301:22
**limitation**   214:1
**limitations**
    212:19 215:5
    258:5
**limited**   102:6
    126:1 207:3
    211:8,15 230:10
    292:24 298:6
    300:4
**limiting**   32:19
    41:18 190:15
    228:7 296:5
**limits**   229:1
    257:22 266:1
**line**   137:9
    152:23 186:9
    314:12 316:13
    328:19 360:22
    366:15 367:4

369:4,7,10,13,16
    369:19
**lines**   312:8
**link**   141:1
    242:17
**linked**   29:2
    172:3
**list**   50:7 64:12
    64:17 82:24
    83:2,9 84:15,17
    86:6 90:15
    113:16 123:1
    125:14 148:12
    148:22 191:5,8,9
    191:17,18,20,21
    191:22,24 192:5
    192:20 201:1
    222:16 229:1
    231:8,15 232:15
    232:17 235:21
    235:24 236:1,9
    236:23 237:15
    237:16,19
    238:12 249:5
    273:16 274:4
    276:14 277:7,21
    278:7 288:22
    290:2,7 295:14
    325:17 326:20
    333:8,18 334:5
    335:7,20 336:3,9
    336:10 337:13
    337:25
**listed**   70:15
    216:6
**listing**   268:13
**lists**   52:8 53:20
    110:4 147:19

148:4,9 150:7
    193:3 195:3
    216:25 333:15
**literally**   50:13
    64:18 111:14
    297:16
**literature**   288:10
**litigation**   1:6 2:6
    7:18 11:9 253:8
    256:20 257:21
    258:7,10,12,20
    278:15,16 290:3
    291:1,22 292:14
    292:20 321:12
    366:4 369:1
**little**   22:8 43:18
    49:8 55:1 88:6
    117:24 134:17
    136:7 149:24
    153:20 193:23
    224:4 321:13
**live**   76:7,22
    173:11 354:12
**lived**   265:17
**lives**   273:17
**llp**   3:5 4:17 5:5
    6:5
**load**   145:5 212:1
**located**   2:17
**location**   1:15
    51:13,17 70:25
    71:4,13,16,23
    72:13 74:3,3,10
    74:13,15,16
    75:11,20 76:1,3
    76:11,17,18
    77:20,20 78:10
    79:8 111:5

Veritext Legal Solutions
866 299-5127

**[location - manager]**

234:4,5,12,13,17
235:4 236:21
240:21 253:19
299:13,20
311:14 325:9,13
325:23 329:16
330:9
**locations** 111:3
112:6
**locked** 366:12
367:1
**lodging** 318:19
**log** 98:19,22,25
99:5,17 101:18
101:19 139:12
140:16 141:2,8
141:24 142:17
351:13 359:23
360:6
**logged** 36:6
45:20 78:7 99:3
99:6 100:2,13,16
100:22 101:4,10
101:12 138:14
138:23 140:22
142:13 351:3
**logging** 140:19
356:1
**login** 356:6
**logs** 141:10
143:9 359:17
**long** 17:10 57:22
66:15 70:18
87:16 98:7
118:20 121:3
136:10 217:23
251:3 256:17
257:25 258:1,17

263:21 311:12
**longer** 59:2,11
61:11 94:1
158:24 159:14
159:22 160:4
**look** 19:2 43:12
51:7 59:25
60:23 61:24
89:14 91:2,15
102:22 108:24
108:24 111:13
111:23 120:7,12
148:23 169:13
177:15,17
180:21 184:18
185:6 216:11
229:11 251:4
260:8 264:15
269:25,25 274:9
280:25 282:18
285:1 295:19
297:12,22
302:23 320:5
324:5 331:18
**looked** 15:23
18:15 20:15
91:5 133:2
134:20
**looking** 18:11
21:1,3,19 30:23
35:5,6 43:8 83:3
114:12 145:12
145:22 147:13
148:13 169:12
202:2 203:19
205:12 213:18
276:4 277:2
279:14 286:8

294:23 298:11
306:19 314:4
319:17 333:2,6
**looks** 46:23
80:25 81:3
87:25 95:7,18
306:12
**loop** 179:4
**los** 7:9
**loss** 159:23
161:3,5 299:16
301:15
**lost** 134:17
**lot** 25:18 222:11
**lots** 161:13
**low** 181:2,2,15
182:5
**lower** 177:10
224:4 233:17
333:6
**lowest** 200:23
201:2 233:19
**lunch** 144:20,22
**lweaver** 3:14

**m**

**m** 3:7 68:1
**macdonell** 7:19
11:10
**machine** 9:5,10
25:18 26:10
138:1,6,8 139:4
139:6 140:12
141:17,23 142:2
143:5 177:16
201:25 204:8,15
206:14 208:14
227:7,11 347:16

365:10
**main** 168:15
**maintain** 29:16
98:13 142:17,20
142:21,23
197:16 199:16
256:14 269:24
278:12,17 279:6
279:18,22 280:3
333:18 351:7
356:1,4
**maintained**
143:11 197:3,15
290:6,7 351:4
356:19
**maintaining**
279:12
**maintains**
355:12
**majority** 248:11
**making** 10:6
13:20 14:12
90:22 94:12
105:7 150:6
160:7,19 167:20
172:9 173:10
174:1 214:7
225:19 260:15
261:25 269:23
295:23
**manage** 111:19
113:1,12
**manager** 38:4
41:1 48:25
57:16 90:24
91:14 117:13
143:23 152:10
175:1,5,6 184:22

**[manager - mean]**

| | | | |
|---|---|---|---|
| 186:5 202:20 | **marks** 346:12 | **matt** 4:18 5:14 | 94:9 97:24 |
| 203:14 303:9 | **martie** 6:6 11:24 | 11:21,25 16:11 | 98:22,23 99:12 |
| 332:25 352:12 | 16:14 | 16:14,14,15 | 101:14 103:6,10 |
| 356:17 358:6 | **master** 7:6 | 46:11 61:6 | 108:13 115:1 |
| **manages** 299:2 | 281:13,16,21,23 | 101:18 257:3 | 119:11,12 |
| 305:18,19 | 281:24 282:2 | 343:14 355:13 | 120:18 121:17 |
| **managing** 113:3 | 283:10,14,16,24 | 366:1 | 122:22 123:15 |
| **manner** 34:21 | 284:5,11,14,18 | **matter** 11:8 | 125:2 129:13 |
| 77:25 78:5 | 292:4 308:16,24 | 215:20 216:20 | 135:1 138:16 |
| 79:25 127:12,14 | 309:2,7,11,13 | 273:17 289:8 | 142:1,6 146:23 |
| 141:24 211:15 | 310:9,20 311:22 | **mbenjamin** 4:23 | 148:7 151:18 |
| **map** 71:17,19 | 312:3,4 313:17 | 366:2 | 153:25 159:9 |
| 72:24 73:2,4,8 | 314:2,6,20 315:1 | **mbuongiorno** | 161:9 166:18 |
| **maps** 34:22 | 315:10,18,22,25 | 5:20 | 168:21 171:2,4 |
| 81:16 | 316:3,20 318:1 | **md** 1:6 2:6 | 172:6 176:11,15 |
| **march** 158:17,18 | 318:25 319:2,12 | **mdl** 1:4 2:4 8:11 | 176:16 178:23 |
| 164:15 165:16 | 319:16 321:6,7 | 8:19,20 9:12,13 | 179:16 186:24 |
| **mark** 31:5 155:5 | 322:9,10,24 | 9:17,18,22,23 | 187:23 188:3 |
| 211:21,23 | 323:1,4,10,20 | 10:15,16 201:18 | 190:21 192:15 |
| **marked** 14:24 | **master's** 281:9 | 251:22 | 199:22 202:21 |
| 15:1,5 30:24 | **match** 71:21 | **meal** 348:22 | 205:5 213:4,8,15 |
| 78:11 127:7 | 83:6 132:22 | **mean** 17:20,21 | 221:4 224:21,22 |
| 144:23 145:1 | 149:16 191:24 | 19:4 22:20 | 229:12 230:14 |
| 155:9 201:12,16 | 195:4 212:15 | 23:25 24:24 | 232:7 235:19 |
| 201:16 211:18 | 214:22 215:14 | 28:12,15,15,24 | 237:14 239:22 |
| 251:14,18 260:9 | 216:1 238:15 | 29:9,13,24 31:15 | 240:5,11,13 |
| 281:1 316:21 | **matched** 110:8 | 35:2,2 36:15 | 248:5,6,7 252:17 |
| 331:20 | 110:10,15,22 | 38:1,2,21 39:4,6 | 253:9 254:9,19 |
| **market** 85:10,21 | 111:4 149:8 | 42:11,21 44:17 | 254:21,24 |
| 88:14 108:24 | 150:20 192:1 | 45:13,18 48:12 | 255:17 274:12 |
| 120:7,11 355:9 | **matches** 75:16 | 48:22 52:19 | 274:21 275:12 |
| 355:20 | 212:25 214:19 | 55:3,17 56:10 | 279:23,24 282:5 |
| **marketers** 65:6 | 214:23,25 | 60:23 62:7 63:2 | 299:4 300:9 |
| **marketing** 41:14 | 231:16 | 64:4 65:15,23,24 | 303:6,22,23 |
| 68:7 180:20 | **matching** 212:11 | 65:24,25 66:4 | 305:4 306:11 |
| 183:1 345:21 | 214:4 | 68:9 71:9 78:6,7 | 307:25 311:20 |
| 346:10 | **materials** 19:10 | 83:13 85:13 | 316:12,12 319:2 |
| | | 86:13 92:16 | 320:18 322:11 |

Veritext Legal Solutions
866 299-5127

**[mean - metrics]**

322:16,20 323:5
324:21 326:13
326:16,17 328:9
328:14 330:19
331:13 335:6
339:15,24 340:3
340:4 344:25
349:2 350:12,14
350:16,22
353:25 354:24
355:4 357:4,17
360:19,25
**meaning**  34:6
91:20 169:25
173:11 218:21
231:9 295:15
313:7 314:1
**means**  34:12
121:20,21,22
138:20 142:9
154:23 155:1
159:17 160:5
190:24 204:18
209:22 230:16
254:25 255:2
305:8 308:2
309:25 310:15
314:13 318:18
340:1,9
**meant**  15:25
103:11 125:13
147:9 148:14
150:18 153:25
159:15 171:2
176:20 190:24
227:1 237:15
253:3 274:7
275:2,3 279:13

320:22
**measure**  163:11
164:11 220:24
269:12 354:20
**measurement**
167:12 348:1,2,8
348:13,18 359:1
359:14
**measurements**
342:15,22,24
343:24
**measuring**  158:1
**mechanism**
73:20 246:11
249:1 363:1
**mechanisms**
249:7
**medical**  217:3
220:7 222:1
223:4 224:17,19
225:1,12,18,19
225:22
**medically**  224:8
224:14
**medication**
294:24
**medium**  167:24
**meet**  16:20,23
17:5 40:17 76:9
78:16 159:3,14
242:19 243:18
318:12
**member**  249:12
**membership**
216:22 217:4
220:9 222:3
223:5

**memorized**
186:9
**men**  51:16 71:12
263:11
**mental**  53:6
220:8 222:2
**mentioned**  70:24
73:10 75:21
76:19 227:11
256:4 305:22
325:3 330:1
**menu**  111:15
123:24 133:1
**menus**  98:24
111:25
**meritless**  156:7
**message**  102:17
103:3,7,15,24,25
104:6,15 105:1
127:2 176:20
**messaged**  102:16
103:9,9
**messages**  101:4
102:23 104:12
105:6,20 106:23
107:13 108:3,9
128:12
**messenger**
100:25 101:4,9
102:4,11,23
103:12,23 104:3
104:16 105:6,12
105:19 106:1,18
106:23 107:10
107:13 108:3
126:16,19,22
127:24

**met**  19:25
158:24
**meta**  7:18 8:13
9:6,20 11:22
12:1 16:19
23:24 40:10
54:7 172:8
**metadata**  76:24
77:16
**method**  174:7
255:11 353:10
**methodical**  22:8
**metric**  42:25
186:10,20,23
187:5 343:19
349:11,19,20
361:22
**metrics**  42:18
48:21 49:2,3,10
49:12,22,25
174:20,23,24
175:11,22
183:23 185:9,14
186:3,7 192:8,9
231:2,18,21,23
235:8 236:5,5
242:20,21
243:19 247:13
248:21 250:12
325:5 327:21
342:20 343:7,11
343:12,24
348:25 349:3
350:9,20,20,22
351:2,3 353:4
354:21,25 355:9
355:20,24
356:17 358:4,11

Page 43

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[metrics - naffa]**

359:17 360:8
**mic** 362:10
**middle** 300:21
**mike** 304:21
305:11 306:14
307:8
**mile** 72:4,7,13
73:12,20 74:2,7
325:16
**military** 293:15
293:15,19,25
295:15
**mill** 6:9
**million** 170:6
**millions** 246:7
**mind** 21:24
27:11 29:23
42:21 67:14
103:6 146:8
153:6 166:21
169:16,19 190:6
211:22 257:18
306:18 322:2
335:24 339:23
346:22 357:16
**minimum** 112:5
112:19 194:19
195:9 196:13
223:17,21,23
224:1,2 231:6
236:24,25 237:5
237:6 242:19
243:18 246:8,25
247:5 250:12
296:17
**minimums**
247:12 248:20

**minorities**
259:23 260:24
**minute** 191:13
332:2 350:21,21
350:24
**minutes** 109:11
138:22 309:5,8
354:3 361:12
**mis** 359:11
**mischaracterizes**
150:13 219:9
262:9
**misrepresent**
349:14,25
**misrepresents**
261:23
**missed** 99:24
265:6 355:17
**missing** 17:4
242:16 246:1
268:17
**mission** 5:8
**misstate** 347:23
**misstates** 19:14
33:18 39:3
63:13 91:9
110:17 112:12
117:6 119:7
133:22 147:5
150:4 189:21
198:16 200:20
222:8 232:5
240:24 247:11
259:14 270:10
279:9 280:12
287:1 294:3
302:21 314:25
326:7 335:12

**mistake** 99:23
**misunderstand...**
265:21
**misuse** 256:10
256:16 258:24
263:6,17 272:12
282:22 296:15
302:7 306:13
**misused** 255:24
256:8
**mixed** 153:21
**mkutscherclark**
6:12
**mobile** 36:1
**model** 53:6
**models** 26:16,18
27:3 172:20
177:17 204:15
206:14
**moderate** 157:6
157:16
**molnar** 332:20
**moment** 22:11
26:3 134:13
140:15 144:24
146:7,9 200:13
201:22 219:17
285:1 306:8
314:8 319:18
331:25 347:18
**money** 162:5
167:20 179:24
183:9,11,17
211:2
**month** 33:5,10
33:24 36:6
93:12

**monthly** 166:2
166:12 167:5
**months** 163:22
**morning** 11:15
11:20 13:7,8
**mortgage** 266:22
**motion** 317:21
320:14 321:21
**move** 109:3
114:19 140:3
**moved** 172:15
**moving** 123:25
**multi** 270:7
**multicultural**
266:10 268:11
268:19 269:18
270:7 271:1,12
271:22 272:20
273:1 274:13,22
275:21 276:16
276:22 277:10
277:24 278:8
280:17 287:9
288:17 289:7,15
**multiple** 17:7
64:11 79:23
156:22 158:23
162:18 204:15
243:7 359:2
363:4
**myriad** 301:21

**n**

**n** 8:1 67:23,23
348:4,7
**n.w.** 6:17
**naffa** 292:23

Page 44

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[naima - objection]**

**naima**  6:15
11:25 16:15
**name**  48:4,6
58:14 63:7,20
64:19 66:6
67:25 111:15
118:4,15 168:7
168:12 169:6,15
205:23 271:5
305:23 306:2
326:16,17 328:9
329:1 348:5
353:2 365:21
**named**  67:9
347:12
**names**  64:2
65:11 268:7
**naming**  157:12
157:22 274:18
**narrowed**
232:18
**narrowing**  361:6
**nationwide**  10:6
260:15
**nats**  311:24
**nature**  170:7
**navigate**  145:20
253:4
**necessarily**
35:10 263:7
**necessary**
322:14 366:14
367:3
**need**  30:14 85:22
88:6 113:7,15
154:17 181:3
254:2 256:25
258:11 261:12

291:18 298:2
328:10 337:7
361:5 363:12
**needed**  320:5
**neither**  365:17
**network**  340:21
340:22 341:7,24
342:5,9
**nevada**  1:21
**never**  115:17
337:12
**new**  4:21,21
64:14 83:10
86:5,9 152:22
157:13 174:3
186:20 216:6
282:20 343:16
352:16
**news**  17:22
**newsfeed**  44:18
45:2,21 182:24
338:25
**newsroom**  8:15
23:8 145:14,17
145:18,18
**nfarrell**  6:20
**nike**  212:15
**nike's**  104:6
**nits**  311:24
**nods**  22:22
**nomenclature**
151:9
**nonads**  77:5
**nondefined**
198:2
**nondiscrimina...**
280:20 287:11

**nonlegal**  20:3,4
20:8
**nonmeta**  40:1
**nonscraping**
244:1
**norland**  68:6,24
**northern**  1:2 2:2
**notating**  366:15
367:4
**note**  40:15 81:3
266:21
**noted**  69:19
335:13 364:10
**notes**  8:12 15:18
150:5 368:4
**notice**  23:3
282:21 285:15
**noticing**  11:14
**noting**  256:8
**november**
303:10
**number**  8:9 9:2
10:2 17:11
28:23 49:5,6
60:2 62:7 70:11
82:20 90:1,6
92:3 97:16
108:13 117:11
122:11 128:17
156:14 188:16
188:24 200:23
201:2 202:3
203:20 205:10
214:3 229:12,13
231:6,24,25
232:12 233:1
234:18,22 237:3
239:12 251:5

270:4 275:7
290:22 291:6,21
315:4 320:20
340:19 362:17
362:19 363:3,6
366:15 367:4
**numbers**  201:18
211:24 251:22
**numerous**  40:16
290:16

**o**

**o**  348:4,7 350:5
**o'clock**  251:8
**o0o**  11:3 364:17
**oakland**  3:12
**oath**  13:2 68:19
109:25 183:10
244:6,18 365:9
**oba**  153:22,23
154:2
**object**  218:17
292:15 298:7
333:20
**objected**  311:9
312:5 314:17
**objecting**  315:12
**objection**  15:20
18:20,25 19:13
19:21 20:11
21:12,15,22
23:12 24:16
25:8 26:7 27:7
27:10,22,22 29:5
29:7,14,21 30:6
30:25 31:11
32:6,23 33:17
34:9 35:16

Page 45

**[objection - objection]**

| | | | |
|---|---|---|---|
| 36:12 37:8 | 126:25 127:9,18 | 195:24 196:24 | 269:21 270:9 |
| 38:16 39:2,11,12 | 128:3,15 130:18 | 197:9,20 198:9 | 271:16 272:8 |
| 39:22,23 40:14 | 131:7,7,14 132:9 | 198:10,16 | 273:14,20 274:2 |
| 42:10 43:22 | 133:11,21 134:9 | 199:10,20 | 274:15,23 |
| 45:8 47:5,11,17 | 134:24 135:7,25 | 200:20 205:1,3 | 275:13,25 |
| 49:14,18 50:24 | 136:11 137:3,24 | 206:2 207:8,19 | 276:17,19 |
| 54:15,20 56:21 | 138:25,25 | 208:4,21 209:11 | 277:12,25 |
| 57:9,25,25 58:8 | 139:20,20 141:4 | 210:4,22 211:10 | 278:18,19 279:8 |
| 58:16,22 59:6,24 | 141:13 142:4 | 212:7 213:5 | 280:11 286:1,25 |
| 60:14 61:7,19 | 143:1,16 144:7,7 | 215:8,10,19,22 | 287:23,23 288:5 |
| 62:20 63:12,13 | 146:2,21 147:4 | 216:8 217:12 | 288:12,19 |
| 63:23 64:24,24 | 148:17,17 | 218:17 219:8,21 | 289:10,12,21 |
| 64:25 69:5,6,25 | 149:18 150:3,12 | 220:11,20 222:7 | 290:19 291:2 |
| 70:8,8 71:25 | 151:2,14,20 | 222:21,21 | 293:16 294:2,18 |
| 72:25,25 73:14 | 152:3,16,18 | 224:16 225:8,14 | 295:8,8,17 297:2 |
| 73:22 77:1,22 | 154:15,24 155:5 | 225:23 226:8,22 | 297:18 298:23 |
| 79:9,16 83:12,24 | 156:7 160:1,11 | 227:5,15 229:10 | 300:15 301:10 |
| 84:1,1,16 85:16 | 160:22,24 161:7 | 230:20 231:12 | 302:4,4,20 304:9 |
| 86:2 87:5,17 | 162:2,16,25 | 232:4 233:21 | 304:23 305:16 |
| 88:4 89:11,11 | 163:7,18 164:5 | 234:21 235:13 | 306:9 307:1,4,20 |
| 90:4,18 91:8,11 | 164:20 165:19 | 235:13 236:12 | 308:6,6 309:23 |
| 91:24,24 92:19 | 166:3,14 167:7 | 237:23 238:21 | 312:14 318:19 |
| 92:21 95:4,12,22 | 167:15 168:2,10 | 239:6 240:3,23 | 321:14 325:2,11 |
| 95:24 96:14,21 | 168:19 169:9,17 | 241:7,14,20 | 325:19 326:6,24 |
| 97:9,22 98:5,18 | 170:9,15,15,22 | 242:14 243:10 | 327:5,7 328:3,15 |
| 99:4 100:4 | 171:13,24 | 243:24 244:9,19 | 328:16 330:16 |
| 101:5,16,24 | 172:24 173:21 | 245:15 246:14 | 331:4,12 332:12 |
| 102:7 104:14,22 | 174:17 175:16 | 247:10,11,24 | 332:15 334:18 |
| 105:9,22 106:3 | 175:25 176:25 | 248:13 249:18 | 334:19 335:11 |
| 106:25 107:2,16 | 178:21 179:14 | 249:24 250:9 | 335:11,23 336:6 |
| 110:16 111:8 | 180:6,24 181:11 | 255:6,15,19 | 336:18 337:18 |
| 112:10 113:20 | 181:21 182:19 | 256:2,21 259:9 | 337:24 339:8,13 |
| 113:22 114:3 | 183:14,18 184:6 | 259:14 260:1 | 339:22 341:4,11 |
| 115:20,23 117:5 | 184:8,19 185:10 | 261:4,5 262:8 | 341:15 342:1,3 |
| 118:6 119:6 | 186:1 188:19 | 263:4 264:2,8 | 342:17 343:1,25 |
| 120:5 121:5 | 189:20 190:4 | 265:4,18 266:6 | 345:5,25 346:14 |
| 122:20 124:23 | 192:13,19 | 267:6,16 268:6 | 347:3 348:10 |
| 125:24 126:5,13 | 194:25 195:15 | 268:23 269:10 | 349:17,17 |

Page 46

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[objection - ones]**

| | | | |
|---|---|---|---|
| 350:10,17 351:6 | **occur** 282:16 | 41:17 42:3,7 | 224:4 228:3 |
| 351:21,21 | 283:1 | 43:16 45:12,17 | 230:1 239:10 |
| 352:21,21 353:6 | **occurred** 36:17 | 46:10 48:6 | 246:4 251:2,4,7 |
| 353:15 354:17 | 54:18 112:7 | 50:20 53:8 54:6 | 251:11 252:11 |
| 355:10,16 356:3 | 244:1 290:12 | 55:25 56:8 | 252:14,21 255:3 |
| 356:13,21 | **occurring** 331:9 | 58:12 59:20 | 257:2,5,9 260:6 |
| 357:14,20 358:2 | **occurs** 86:11 | 63:18 64:16 | 262:25 266:23 |
| 358:15,23 | **ofa** 136:4,6,10 | 67:15,17 68:11 | 269:15 270:5 |
| 359:19 360:10 | 136:13 | 68:13,16,21 | 277:1 278:6 |
| 360:21 361:4 | **offer** 55:18 59:2 | 70:12 80:16 | 280:24 281:8 |
| **objectionable** | 59:10 71:1 | 89:18 96:4,7 | 283:8,24 284:11 |
| 315:3 | 81:16 83:19 | 99:25 103:13,16 | 284:20,23 285:4 |
| **objections** 14:14 | 120:13 125:10 | 109:3,9,14,19,22 | 285:14 286:8 |
| 64:10 165:8 | 174:5 212:9 | 121:24 128:19 | 292:6 293:13,13 |
| 210:11 264:14 | 259:15,19 260:2 | 130:1 132:13 | 295:4,25 297:8 |
| 291:10 294:25 | 264:16 329:24 | 133:17 134:4,18 | 297:15 298:1 |
| 305:25 329:8,21 | **offered** 71:1 | 135:2,10,19,20 | 303:5 309:4 |
| 337:4 348:16 | 264:5 | 136:16,25 | 315:20 316:19 |
| 355:21 359:25 | **office** 260:13,21 | 144:11,14 145:9 | 322:8 323:9 |
| **objective** 43:1,5 | 366:11 | 145:10 146:24 | 326:1,20 329:25 |
| 43:12 51:9 | **official** 306:2 | 147:13,25 | 333:25 334:4,9 |
| 102:18 185:21 | **offsite** 27:25,25 | 148:13,23 | 334:15 338:4 |
| 205:20,22,24 | 130:9 153:15 | 149:24 153:22 | 340:6,21 341:12 |
| 346:5,13 | 207:18,21 208:7 | 154:13 155:4 | 344:17 346:19 |
| **objectives** | 227:12 | 156:1,6 160:10 | 347:13 348:19 |
| 186:20 206:6 | **oh** 26:20 99:15 | 160:17 163:24 | 352:6 354:6 |
| **observe** 30:4 | 121:19 122:6 | 166:23 168:25 | 361:1,8,15 |
| **obtained** 243:8 | 144:24 216:11 | 174:19 176:3 | 362:11 363:13 |
| 243:22 333:9 | 221:5 251:15 | 178:2,9 180:15 | 363:17 364:5,8 |
| 334:7,9 336:10 | 331:24 | 183:13 185:15 | **once** 75:15 97:15 |
| 339:21,24 340:1 | **okay** 13:12,25 | 191:12 193:24 | 99:16 114:14 |
| **obtaining** | 14:6,22 15:8,12 | 194:3 201:7,21 | 136:25 168:5 |
| 245:13 | 15:15 16:6,16,20 | 202:24 203:19 | 278:12 279:18 |
| **obviously** | 16:23 17:1 | 204:11 207:17 | 292:23 305:10 |
| 282:21 | 19:10 21:2 22:6 | 207:25 208:16 | **ones** 22:25 60:24 |
| **occasions** 290:18 | 22:19,23 23:25 | 211:3,17 212:4 | 83:6 159:6 |
| 290:22,24 291:8 | 24:23 25:2 | 213:1 214:6 | 209:24 274:9 |
| 292:12 | 38:24 40:3,11 | 216:10,18 220:2 | 290:9 294:5 |

Page 47

**[ones - outside]**

342:8 351:14
358:5,5
**online**  116:18
130:13 153:24
154:11
**onwards**  55:3
344:5
**open**  91:15
92:23 253:4
363:15
**operates**  297:10
**operation**  133:2
**operations**
153:10
**operative**  233:24
**opportunity**
94:12,24 363:20
**opposed**  95:3
167:2 181:9
**opposite**  94:15
**opt**  94:6,6,12,14
94:18,18 95:3,3
95:7,8,10,10,18
95:18,21,21
96:11,11,19,19
110:6 114:2,11
119:5
**optimization**
140:4
**optimize**  26:16
363:2
**option**  34:13
43:11 70:25
71:10 79:20
117:22 123:19
123:20,25 124:2
124:3,10 129:11
130:5 160:16

162:21,22,24
167:10 191:10
193:19 226:10
226:12 236:25
255:1 262:21
269:13,14
270:15 271:19
273:11 275:3
276:12 293:6
329:24
**options**  25:16,17
43:5 48:17,18
51:11 52:24
54:24 56:11
57:14,19 60:1,2
71:2,13 72:19
79:12,22,24
80:22 91:13
115:2 117:8,10
117:17 119:5
120:3 121:24
122:18 123:2,24
124:6 125:23
127:16 128:1
129:4,16 130:12
130:14 132:8
136:18 147:8
149:20,22,23
154:9 155:2,19
156:3,12,13,15
156:20 157:5
158:21 159:14
161:23 162:19
164:10 170:2,18
172:25 173:1
174:3 203:16
207:21 219:11
219:13 222:10

222:13 232:16
234:25 236:2
259:3 261:23
262:1,12,14
264:18 266:1,9
266:10 268:8,11
269:2 270:14,19
270:21,21
271:22 276:23
280:15 286:6,7
287:18 288:23
289:6,16,16
290:11,16,17,25
291:22 292:13
292:19,24 293:3
293:4,20,25
300:4 329:19,22
342:8
**oracle**  342:23
343:3
**order**  1:10 29:15
30:17 33:6
34:15 52:9
88:21 112:24
113:10,25 140:7
141:23 148:22
176:21 177:5
181:5 191:7
195:4 198:14
212:16 214:16
215:2 216:1
231:16 232:18
237:5 241:3
242:20 299:11
352:12 363:24
**ordinarily**
342:24

**oregon**  1:21
**org**  119:3 304:20
**org'd**  67:7
**organization**
294:21 301:19
305:12
**organizations**
158:14 295:12
**organize**  147:10
**orientation**
217:2 220:6
221:25 259:1
294:12,17 295:6
295:16
**origin**  217:1
220:5 221:24
223:3,11,13
**original**  365:14
366:10,21
**originally**  17:8
343:18
**ornelas**  3:7
11:19
**outcome**  197:5
**output**  139:15
139:17 140:13
142:15
**outright**  299:21
**outs**  34:21
208:25 220:25
221:21
**outset**  55:22
253:8
**outside**  27:9,17
30:15 49:12,22
51:21 77:3
101:7 102:2
106:4 107:3

Page 48

**[outside - parties]**

136:7,15 163:19
164:6,21 165:20
185:2 210:5,23
221:20 222:8
243:14,21
281:14 302:23
308:25 312:6
318:8
**overall**  130:7
263:11
**overruled**  14:19
**overview**  92:15
122:17
**owned**  340:23
**owner**  129:20,20
131:2 132:3,18
133:13 134:1
135:14 193:15
**owners**  131:16

**p**

**p**  121:12
**p.m.**  144:18
201:8,11 251:9
251:12 257:10
257:13 284:21
284:24 292:7,10
323:25 324:3
361:16,19 364:9
364:10
**pacific**  11:6
**pacing**  51:9
**page**  6:9 8:3,9
9:2 10:2 28:7,21
30:11,12,14
31:17 35:3,22
36:6,21 37:20
52:13 53:25,25

54:2,5 77:7 87:6
87:9,9,12,13,14
98:15 100:7,12
100:12,15
102:10 103:3,12
104:3,6,7,9
124:14 127:3
147:14 148:24
149:10,25
155:13 186:1
187:1,2 190:12
193:10 194:8,9,9
194:12 202:2
203:19,21 206:5
207:13 224:5
225:12,18,21
226:1 227:17
228:4,15 239:11
253:17 273:7,8,9
273:12,22 274:8
274:18 308:12
314:7 317:2
318:25 319:3
324:7,8 346:5,6
366:15 367:4
369:4,7,10,13,16
369:19
**pages**  1:25 86:22
88:24 102:16
103:10 105:16
106:10 107:21
108:18 116:12
116:16 126:2
150:1 158:12
206:16 207:4
273:2,16 274:5
274:10 275:5
276:9 277:15,16

277:22 278:2,3,7
279:14 366:14
366:17,17 367:3
367:6,6
**paid**  38:19 79:21
169:6,22 170:6
171:6,16 188:4
188:12 204:24
**palo**  6:10
**paragraph**
202:10,11 203:7
224:5 260:19
261:15 281:8
285:11 286:9
**parameter**  78:14
124:11
**parameters**
32:13 75:17
76:10 89:17
94:3 139:25
220:1 253:15
275:23 299:7,8
299:10 306:11
**park**  4:20
**parse**  41:19
**part**  22:3 28:5
40:10 41:24,25
43:2 47:1 52:19
61:10 63:5
65:19 70:25
76:9 81:11,13
82:2 92:12 94:3
94:21 102:11
105:4 132:8
144:10 146:3,15
168:11,22
171:25 172:6,7
176:4,4 177:7,15

178:23 179:1,4
179:11 180:10
197:14 199:14
214:14,20
216:16 224:24
235:17 244:25
258:7,19 264:21
270:2,16,18,22
272:12 275:8
276:10,21
277:19 285:19
295:1 304:20
309:19 311:7
314:19 347:16
349:20 354:12
**participate**
65:18
**particular**  61:2
145:25 229:8
323:6 334:1
**particularly**
20:23 21:6
282:14 346:2
**parties**  3:2 4:2
5:2 6:2 7:2 42:8
129:17 135:22
241:12,17
242:11 243:7
244:6 245:13
247:4 248:5
258:10 262:6
302:14 304:1,6
304:16 305:3,14
305:20 306:6,25
307:6 311:18
313:13 325:1
355:8,20 356:12
357:13,23

[partly - performance]

**partly** 196:4
**partner** 55:10,14
  56:9,11 57:7,12
  57:13,21,23 58:7
  58:11,14 59:1,3
  59:13,23 60:2,11
  60:25 61:3
  62:19 63:1,8,21
  64:22 68:4,7,25
  121:11,12
  123:11 129:6
  290:13 331:10
**partners** 121:18
  121:19
**parts** 70:23
  177:5 187:9
  227:19 280:14
**party** 41:4 45:7
  259:22 260:23
  262:4 264:24
  265:12 280:5
  285:22 286:12
  340:24,25 341:2
  342:12 365:19
**passed** 135:14
  135:16
**paths** 247:22
**patten** 224:6
**pause** 191:13
**pay** 38:5,7 42:3
  42:4,8,14,23,24
  85:14 140:2
  176:23 179:12
  179:16,20
  181:15 182:11
  182:17 187:11
  362:5,13

**paying** 42:17
  43:3 168:16,21
  171:11 180:12
  181:16
**payment** 42:20
  43:13,21 44:2
  45:7 50:4,15,16
  50:19
**payments** 44:13
**pays** 80:5 182:4
  205:9 209:25
  341:6
**pdf** 366:12 367:1
**penalty** 12:6
  366:16 367:5
  368:2
**pending** 14:7
  257:15 292:12
  314:3,25 363:25
**people** 19:17
  20:14 28:4
  29:17 31:9
  33:20 38:21
  43:24 45:5 46:1
  46:17 52:1,12
  54:1,4 64:19
  66:9,12,22 67:2
  69:20 70:3
  74:17,20 76:6
  81:7,22 82:10
  84:19,21 85:6,8
  85:19,21 86:16
  88:22,25 89:4,14
  94:20,24 96:25
  102:14 106:10
  107:5,22 108:15
  108:25 110:19
  110:23 120:15

120:17 124:8,20
125:3,15 129:23
136:4 142:22
143:12 149:2
153:12 159:5,12
159:20 172:14
172:21 173:2,7
174:13 177:18
177:23,25 178:3
178:6,9,12,15,18
179:7 180:20
181:5,25 182:1,5
182:15,22 183:7
183:12,17
185:20 186:12
187:1,4 189:6
193:9,20 194:11
195:23,25 200:4
202:7 217:21
218:21 219:3,16
220:3,13,18
221:10,15
222:15 225:1
226:2 229:2,22
231:7,10,10
232:2,14 233:7,8
233:10,14
240:18,19 241:1
241:5 245:3
246:8 247:6
249:13 254:4,21
255:8,13 259:7
265:16 271:13
272:22 274:19
275:3,20 276:4
276:10 277:3,18
277:23 280:6
282:10,10

287:16 288:4,7
293:14 311:17
330:6 333:3
346:5 363:3,3
**people's** 26:19
  26:20,21 32:8,15
  33:2 34:16
  37:23 43:6
  58:25 59:4
  75:18 78:17
  100:6,12,21
  108:17 115:4
  116:24 119:9
  138:2,12 141:16
  142:20 143:13
  158:24 159:14
  177:9 208:6
  209:20 210:7
  218:12 220:15
  223:12 227:18
  262:17 272:17
  273:2 280:16
  294:15
**perceive** 159:5
**perceived**
  159:20
**percent** 190:23
**percentage** 79:6
**perfectly** 282:13
  321:20
**perform** 175:24
  187:20,25
  268:20
**performance**
  44:15 46:15,17
  49:12,20,23,25
  174:24 175:21
  179:11 181:2,4,5

Veritext Legal Solutions
866 299-5127

**[performance - placing]**

181:19 182:10
182:12 185:13
185:18 192:9
205:9 210:25
229:7,25 230:11
230:17 231:2,4
236:5,5 242:21
243:19 246:18
302:25 303:1
325:5 327:21
342:15,20,22,24
343:10,19,23
349:20 350:20
351:8 355:23
356:17
**performed**  173:2
173:5 174:11
**performing**  49:1
61:25 173:10
174:1 175:9
181:8,10,15,15
181:17 182:18
204:11,16
208:10
**period**  24:25
25:23 27:9
28:10 30:3
31:12 34:19
47:14,16 49:17
67:8 99:2
127:16 129:5
130:11 142:18
168:17 169:8,24
241:6 243:7
247:6 248:12
259:11 366:18
367:7

**perjury**  12:6
366:17 367:6
368:2
**permission**
239:15 317:5
324:12
**permit**  256:9
271:20 316:13
**permitted**
200:24 245:24
**person**  28:24
45:23 56:24
63:20,25 82:6
112:3 132:16
204:19 206:11
273:5 305:8,9,11
307:19 325:18
328:25 330:14
360:14
**person's**  58:11
**personal**  56:2
69:22 136:13
216:24 220:22
244:12 310:2
314:14 315:8
319:3,8 321:22
334:1
**personalization**
130:7 153:14
207:24
**personalize**
129:25 133:6
**personally**  69:11
166:5,9 239:1,3
239:14,23 240:8
306:6 307:10,17
308:3 310:13
311:9,18 312:11

312:21 313:8
314:1 317:3,8,23
318:7,24 319:20
319:21,25 320:1
320:7,11 324:11
324:16 325:10
326:4,23 327:4
328:2,7,12,22
329:7 330:15
337:16
**persons**  264:25
272:5 285:23
286:12,22
**perspective**
213:16 282:12
**pertains**  365:13
**phase**  156:19,23
156:25 157:9
159:2
**phases**  156:18
156:22
**philosophical**
217:1 220:5
221:25
**phone**  128:17
**photo**  35:6 78:10
**phrase**  212:4
319:8
**phrased**  321:18
351:22 356:14
**phrases**  216:6
**phuntso**  6:7
11:25 16:14
**physical**  220:8
222:2
**picked**  141:20
**picture**  77:15,16
77:16

**piece**  37:22 77:4
87:20 90:16
303:18
**pieces**  25:20
75:20 139:3
287:3
**pii**  315:8 319:9
**pixel**  130:22,24
130:25 131:3,20
132:6,11,15,25
135:14,15,17,23
136:2 193:17
344:21,25 345:4
345:7,8,10,12
**place**  23:24 61:9
71:20 72:8 88:2
175:3,7 196:4
224:22 230:6
256:18 287:12
306:15 340:24
342:10 365:6
**placed**  38:3
40:25 41:20,23
121:3 130:25
308:20 329:4
**placement**  25:17
38:6 42:4
**placements**
341:7
**places**  120:23
265:1,14 267:4
267:13 280:7
286:14,23
**placing**  230:10
230:11 296:22
341:1,3,13,17
342:11 346:3

Page 51

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[plaintiffs - post]**

**plaintiffs**   2:16
  3:4 4:4 11:17
  22:20 155:22
  283:19 310:6
  318:9 322:12
  363:16,20
**platform**   10:9
  27:6,15 29:11
  30:2 33:20,21
  34:1 35:12 41:6
  57:4 58:3 74:21
  74:24 93:14,16
  100:21 101:1
  102:10 105:17
  107:20 108:10
  108:12 114:18
  119:13 124:20
  126:8 130:16
  132:7,22 135:23
  136:21 151:17
  154:1 167:21
  170:11 174:4
  183:3,6 199:8
  200:6 207:2,7
  244:7,17 248:10
  249:11 255:14
  260:17,22 272:3
  275:10 286:4
  304:11 331:3,9
  331:17 333:1
  334:11,12 337:3
  338:21 340:3
  341:19 342:13
**platforms**   211:2
**play**   183:2
**plays**   243:17
**please**   11:13,14
  12:3 14:1 60:17

  60:20 65:1
  190:20 201:22
  266:7 331:19
**plus**   254:5
  299:12,13
**pmd**   10:14
**poc**   305:1,4
  306:12
**point**   14:10
  24:11,12 46:13
  51:1 67:1 73:4,9
  86:7 92:18
  108:7 113:3
  123:2,8 142:2
  158:5 160:23,25
  161:20 184:4
  187:18 195:20
  210:18 223:10
  226:18 228:14
  231:5 259:10,21
  280:17 293:5
  296:3 297:22
  300:21 305:7
  314:18 317:21
  324:9 329:11
  334:4 348:17
**pointed**   318:22
**points**   111:24
  124:5 240:21
  243:7 320:19
  330:13,19 338:2
**policies**   47:16
  190:13,25 191:7
  217:15 221:2,11
  221:19 228:5,23
  228:25 229:1,8
  229:15,16,21
  246:25 247:14

  249:5,10 272:10
  282:9 296:3,11
  298:17,17,20,25
  299:2 300:9,10
  300:13 301:1,3,5
  301:6,12,24
  304:8,17 305:14
**policy**   37:5
  47:10,13,23
  58:19 62:4
  65:13,14,17,22
  66:2,4,5,10,13
  66:17,23 72:12
  74:2 151:12,13
  152:6,6,10 172:7
  215:21 217:11
  217:13,19,20,23
  218:1 219:15
  220:14,24
  221:13 222:5,12
  229:12,20 234:9
  240:2 241:19
  245:1,23 249:13
  249:20 256:18
  258:1,13,18
  270:13 271:11
  280:20 287:11
  287:12,13 302:9
  302:18 303:9
  321:3 332:25
  337:12
**political**   154:13
  154:16,22
  155:20 156:1,9
  156:14 158:3,6
  158:10,13,13
  159:24 160:9,20
  163:1,4,9 164:4

  164:14 168:16
  168:21 169:7,23
  170:7 171:7,19
  172:15 174:15
**politics**   155:3
**portion**   51:10
  140:4 145:19
  197:24 342:10
  358:1
**portions**   102:9
**position**   118:20
  118:23 261:11
  313:25 348:13
**possess**   135:4
  191:19 238:8
  242:12 243:1
  249:16 335:9,22
  337:13
**possessed**   244:8
**possesses**   334:24
  336:16,16 337:2
**possessing**
  242:17
**possession**
  245:25 246:2,6
  336:4,20,21
**possible**   26:1
  72:23 90:16
  208:10 235:6
  323:12
**post**   31:18 32:9
  36:9 37:15
  76:23,25 77:8,24
  127:3 145:14,17
  145:18 149:19
  150:15 201:24
  226:16 227:23
  228:1

[posted - pro]

**posted** 31:16
78:11 126:12
**posting** 77:5
**posts** 17:22 23:5
23:7 32:1 77:15
87:6 126:21
127:2,4,5 226:4
226:18
**potential** 47:25
138:13 258:24
263:18 296:15
**potentially**
128:22 179:4
359:9,11 363:12
**practices** 37:5
108:25
**pre** 217:25
221:14 248:2
**precisely** 179:2
**predecessor**
119:1
**predict** 104:17
137:7,23 208:10
223:8
**prediction**
138:11,24
139:18,19 176:7
177:20
**predicts** 142:3
**prefer** 62:15
95:3 281:14
308:25
**preference** 95:8
**preferences** 92:7
92:23 93:6
95:11 96:16
97:15 98:10
110:23 111:18

112:8 113:2,11
145:5,8 147:18
148:8,20 150:6
152:8 209:20
253:18
**preliminary**
253:23
**prep** 17:16 19:18
146:15 172:2
216:16
**preparation**
20:9
**prepare** 15:15
15:19 16:24
18:23 19:7,11,20
22:14 166:11
167:4
**prepared** 15:14
18:12 155:18
186:2 190:13
300:22 308:18
311:2,23,25
313:22 314:22
315:2,9,14
316:10,14,25
317:17 321:17
321:25 322:6
338:4
**preparing** 20:22
22:12 23:11
183:21 185:4
**presence** 14:18
281:14 308:25
**present** 7:16
24:25 34:19
46:12 54:19
73:9,13 186:15
194:16 195:21

226:19 239:20
290:12
**presented** 145:7
307:24 337:21
**pretty** 55:19
77:3 101:7
102:2 137:9
162:11 269:4
290:21
**prevent** 112:4,8
112:18 224:13
246:11 247:22
249:1 250:7,16
250:20,22,25
256:10,15
258:25 264:24
265:9,12 272:12
280:5 285:22
286:11,21
296:15 302:6,16
334:22 336:15
337:1
**preventing**
198:5,21 248:2
**prevention**
233:13
**previous** 56:4
137:6,14 258:3
262:14
**previously**
119:15 137:19
**primarily**
187:10 304:4
**primary** 297:7
**principle** 197:13
199:25 200:3
**principles**
152:24 199:14

**prior** 28:3 131:5
131:10,13 165:9
173:10 174:1
195:14 258:12
287:10,15
293:23 294:11
302:21 318:12
343:20 365:8
**priv** 257:4
**privacy** 11:9
47:23 48:3,11
66:5,9,13,17,23
69:10 106:24
107:15,19 108:3
151:12 152:10
152:24 197:19
198:2,6,23
199:19,22 245:1
303:3,9,9,18
304:20 305:12
337:12 366:4
369:1
**private** 30:24
33:10,15,15,22
34:17,22 35:9
78:11,18 105:7
127:8,13 211:9
211:14
**privilege** 61:8
62:21 69:8,21
70:1 291:20,25
**privileged** 23:15
23:18 24:18
60:17 69:16
223:19 256:23
278:23 291:4,16
**pro** 360:7

Veritext Legal Solutions
866 299-5127

**[proactively - provide]**

| | | | |
|---|---|---|---|
| **proactively** 114:1 | 99:16 103:20 | 125:4 134:20 | **protection** 196:4 |
| **probably** 41:15 | 108:23 118:2,11 | 135:1 158:3,4,6 | 196:12 197:5 |
| 43:7 44:20 | 118:14 119:3 | 224:24 366:4 | 246:22 247:3,13 |
| 66:12 68:6 | 122:14 127:14 | 369:1 | 247:14,16,19 |
| 73:15 132:14 | 128:8 151:23 | **program** 70:19 | 248:8 297:7 |
| 153:21 323:11 | 152:21 153:10 | 70:20 | 302:8 |
| 352:11,23 | 154:6 161:6,21 | **programmatic...** | **protections** |
| **problem** 67:13 | 162:10,11,24 | 138:9,10 175:18 | 197:16 246:16 |
| 88:7 228:20 | 165:3 191:7 | **programs** 272:4 | 246:24 296:19 |
| 259:5 302:11 | 211:16 270:12 | **progress** 323:11 | 298:10,12 302:6 |
| 332:4 347:21 | 270:24 271:8 | 323:13 | 306:15,21 325:4 |
| 352:24 | 279:6,7,11 | **prohibit** 10:7 | **protective** 1:10 |
| **problematic** | 296:14 297:13 | 216:23 260:16 | 363:24 |
| 178:12 263:12 | 297:23 298:9,12 | 299:21 | **protocol** 281:9 |
| **procedure** | 302:12 303:14 | **prohibited** 299:1 | 281:23 |
| 366:19,20 | 325:4,4 344:12 | 301:5,15 | **prove** 106:14 |
| **proceed** 283:21 | 345:22 | **prohibits** 217:8 | **proven** 106:6,13 |
| **proceedings** | **production** | 217:13 | **provide** 17:13 |
| 365:5,8,9,15 | 295:24 353:8,10 | **promise** 239:18 | 18:18,19,22 19:1 |
| **process** 13:19 | 353:13 354:7 | 248:5 308:2 | 19:19,25 20:9 |
| 41:24,25 86:11 | 357:10 | 310:1 314:13 | 25:15 28:5 36:3 |
| 97:21 238:2 | **products** 17:18 | 316:22 | 48:21 49:3 51:3 |
| 239:5 312:13 | 17:25 35:25 | **promised** 197:19 | 56:15 60:1 |
| 317:10,19 | 60:23 64:15 | **promoting** | 63:11 72:24 |
| **produce** 153:17 | 65:17,21 66:8 | 301:18 | 73:2 76:6 78:25 |
| **product** 26:11 | 85:20 118:15 | **proportional** | 79:1 84:6 85:23 |
| 31:6,15 47:24 | 120:12 152:22 | 181:25 | 89:5,16 98:7 |
| 48:10,12,12,17 | 153:1,3 161:24 | **propose** 83:10 | 106:10 110:19 |
| 48:18,21 49:3 | 161:25 162:6,9 | **protect** 47:2 | 110:23 111:10 |
| 58:19 60:4,5 | 162:15 163:9,16 | 198:22 199:18 | 112:24 124:9,15 |
| 61:11,17,22 | 197:4 269:8 | **protected** 259:24 | 125:4,19,20 |
| 62:15 64:14 | 302:7 303:16,17 | 260:25 262:16 | 129:2 130:6 |
| 65:6,18,18,19 | **professional** | 263:1 265:16 | 132:3 136:20 |
| 66:3,7 70:4,22 | 2:21 365:2 | 272:5 280:9,16 | 144:3 148:3 |
| 80:12 81:9,10,13 | **profile** 1:5 2:5 | 285:25 286:15 | 153:11,17 155:2 |
| 81:17 82:1 | 11:9 28:5 30:13 | 287:16,19 | 156:4 158:6 |
| 90:14 96:23 | 36:3 76:7,22 | **protecting** | 162:13 174:23 |
| | 100:23 124:16 | 199:23 | 174:24 175:11 |

**[provide - question]**

176:19 183:7,11
185:14 186:11
192:2,9 196:10
199:21 200:5
212:24 213:25
214:14 219:10
222:10,13 224:7
225:2 227:19
230:23 231:9,21
235:10 236:4,7
238:2,5,16 239:7
241:22,24
242:18,21 243:4
243:17,19
246:17,22 247:7
248:21,22
250:12 259:3
261:20 282:6
283:2 297:13
302:25 306:16
308:3,8 310:1,18
312:15 313:6,25
314:14 315:6
317:11 318:15
320:2,8 327:14
330:21,22 339:6
343:6 344:13,17
348:24 349:3,4,7
349:9,11,19
350:8,18,19
355:8,19 358:11
**provided** 50:1,8
63:14 72:19
82:18,24 90:14
94:23 156:11,15
172:14 185:1,9
192:21 231:1
242:5 261:7

272:23 275:9
281:5,22 300:5
308:15,21 315:7
320:24 321:16
322:5 342:22,24
343:11,12,13,24
347:2 366:19
367:8
**provider** 225:12
225:18,22
**provides** 156:10
174:20 175:14
179:10 183:22
184:13,15 186:3
186:4 224:25
237:20 338:20
**providing** 52:8
65:24 179:9
212:21 213:10
239:3 240:8
248:8 296:17
310:13 312:10
317:8 322:17
**provoke** 229:22
**prowess** 321:13
**public** 30:24
31:17,19 32:20
33:10,14,15,22
34:7,17,23 35:4
35:9 52:1 78:11
78:18 82:19
91:15 127:8,12
158:13 167:3
211:14 261:10
265:2,14 267:4
267:13 280:7
281:6 286:14,23

**publicly** 211:8
281:24 282:6
**published** 252:5
**publisher** 341:20
**pull** 283:1
**pulling** 341:23
**purchase** 29:3,9
52:3 115:5
130:13 138:19
138:21 345:23
**purchased**
133:20 134:23
135:6,12
**purchases**
133:25
**purpose** 112:2
113:4 148:15
179:8 186:10
196:11 231:3
308:14 309:16
310:4 311:4
**purposefully**
98:11 241:24
**purposely** 242:3
**purposes** 42:19
45:7 86:13
107:14 111:10
111:22 229:6,24
283:12 332:9
337:14
**pursuant** 1:10
363:24
**put** 15:13 22:17
154:17 158:3
193:17 201:25
210:19 252:5
271:13 272:25
273:5 306:15

310:10 321:1
327:2
**puts** 133:8
320:25
**pwangdra** 6:13

**q**

**qrt** 352:6,9,13
352:19 353:3,7
354:20
**quality** 140:11
175:24 176:6,9
177:3,9,10,11,14
177:21,24 178:1
178:8,10,14,23
179:1,3,8,13
180:4,22 181:1,3
181:4 208:16,19
208:20 209:3,6
209:19,21 211:7
**quarterly** 165:1
165:23
**question** 13:25
14:7,8,16 23:14
23:18 24:18
27:12 57:1 60:9
60:16,20,22 66:1
69:13,15 88:6
99:9 102:9
105:24 107:25
110:2 112:3,16
120:2 137:17,18
142:16 160:17
163:21 164:24
165:15 166:17
172:18 173:22
183:15 184:12
190:19 202:8

**[question - rebecca]**

205:5 206:25
211:4 213:2
216:14 223:15
226:25 230:22
235:17 238:10
241:10 248:15
254:20 257:14
257:17,20
259:13 265:7,21
267:8 288:25
289:4 292:12
297:8,20 298:3
300:18 308:23
309:24 311:25
312:2 313:10,12
313:15,21,23
314:3,10,16,21
314:22,24 315:3
315:12,13,13,14
315:15 316:11
318:8,19 320:16
321:18,19 322:1
322:4,7 323:6,8
327:25 335:19
355:18
**questioning**
282:24 283:15
283:21 316:13
328:19 332:15
**questions** 9:8
13:21 17:1
165:9 318:6
361:21 363:14
363:21
**quick** 96:1 110:2
257:1 320:19
**quickly** 316:18
361:9

**quite** 31:2 38:20
82:17 112:14
125:12 127:13
152:4 352:4

---

**r**

**r** 348:4,7 369:3,3
**r&s** 367:1,9
**race** 217:1 220:5
221:24 223:2,11
259:1 260:3
262:17,23,23
272:17 280:16
**racial** 223:13
**radius** 72:3,3,6
72:13,20 73:10
73:12,20 74:2,7
325:16,22
**rails** 321:10
**raise** 12:2
**raised** 235:2
**random** 87:10
**range** 51:15,15
195:13 254:3,3,4
**ranges** 192:6
254:1
**ranking** 17:23
23:23 24:9
25:17 140:3
146:5 354:19
**rate** 139:10
140:10 177:8
205:16,18 206:9
206:10 208:1,3
208:12 209:3,7
209:18 211:7
227:9,20 230:19
347:14,17,24

351:1
**rates** 355:5
**ratio** 163:14
**rationale** 219:14
**raw** 358:14,19
359:5
**reach** 22:4 43:7
51:14,16,18
71:12 82:10,22
84:23,24 85:6
86:15 91:13
114:7 129:23
148:22 194:11
362:17,19,25
363:2,3,6,10
**reached** 69:4
103:11 110:20
111:20 113:8
**reaching** 62:12
71:11,12
**reacting** 321:5,9
**read** 22:16
143:21,23 144:4
155:13 222:11
239:12 252:10
252:12 261:17
285:2,3,12
309:18,24
310:24 311:7
312:8 314:6,19
318:8 319:4
332:1,10 335:19
356:23,24 357:3
368:2
**reading** 149:19
190:11 235:16
285:5 310:25
319:5 334:2

335:24 366:23
367:9
**reads** 309:14
335:2 357:7
**real** 9:8 95:25
350:9,12,16,22
**realize** 305:10
**really** 13:14,20
14:2 20:25
34:12,23 53:3
72:2 147:11
192:23 245:19
276:21 282:25
283:5
**realm** 51:20
**reams** 282:7
**reask** 105:24
323:8
**reason** 61:4
113:4 163:2
172:9,19 199:7
246:12 313:19
369:6,9,12,15,18
369:21
**reasonable**
321:21
**reasonably**
307:19
**reasons** 60:12
61:14,22 111:12
149:2,5 163:22
171:16 199:18
275:7
**reassociating**
325:6
**rebecca** 1:20
2:20 365:1,24

**[rebuttal - regardless]**

**rebuttal**  316:17
  318:2
**recall**  37:13 69:1
  119:18 145:5
  195:16 200:18
  203:3 228:8,14
  277:5 279:20
  288:15 330:2
  361:24
**recap**  54:10
**receive**  114:1
  133:4,9,18
  165:25 166:6
  219:16,17 340:8
  340:9 362:18
**received**  49:6,7
  184:24 188:16
  308:19 311:5
  339:21,24
  340:10,15
**receives**  43:20
  204:20 230:19
  309:17 310:5
  345:7
**receiving**  112:4
  264:25 265:13
  272:6 280:6
  285:24 286:13
**recess**  68:15
  96:6 109:21
  144:16 201:9
  251:10 257:11
  284:22 292:8
  324:1 361:17
**recognize**  321:10
**recognizing**
  322:5

**recollection**
  136:13
**reconstruct**
  123:6
**record**  11:6
  13:16,20 14:15
  17:3 27:5,14
  30:4 45:6,7,10
  45:15,16,18 46:4
  53:18 63:19
  68:12,14,17 75:4
  87:2 90:9 95:25
  96:3,5,8 99:18
  109:19,23
  120:20 130:23
  142:17,17,24
  144:13,15,18
  155:6,14 176:16
  193:25 201:8,11
  201:17 208:18
  211:5 217:5
  220:10 221:3
  222:4 223:5
  239:12 251:6,8
  251:12,21 257:6
  257:10,13
  260:12 261:17
  266:23 281:12
  281:18 284:10
  284:12,19,21,24
  285:6 292:5,7,10
  309:10 310:10
  311:1 314:25
  315:21,23
  316:17 322:11
  323:23,24 324:3
  328:17 345:18
  353:23 354:5

  361:8,12,16,18
  364:2,3,6,7,9
  365:9,12
**recorded**  29:12
  30:9 40:5
**recording**  29:11
  45:3
**records**  142:20
  142:21
**redacted**  223:18
**reengage**  52:9
  52:12 54:8
  193:20 194:10
**reengagement**
  193:14
**ref**  21:7
**refer**  76:12 86:1
  362:4,12
**reference**  18:8
  21:7 31:3
  165:22 175:4
  219:23 223:16
  223:20 224:24
  346:23
**referenced**  20:15
  20:19 104:2
  248:25 366:6
**references**  17:25
  18:1 191:1
**referencing**  35:4
  207:23 212:3
  219:20 351:16
**referred**  131:23
  327:18
**referring**  16:10
  18:2 23:6 49:2
  75:2 149:15,17
  149:20 202:17

  229:9,15 249:4
  249:16 268:4
  319:7 335:25
**refers**  148:11
  202:18 203:13
  361:23
**reflect**  76:24
  101:20,21 135:5
  141:10,23 147:9
  157:22
**reflected**  173:9
  173:25
**reflection**  321:12
**reflective**  34:24
  34:25 78:19
**reflects**  97:2
  183:23 360:3
**refresh**  258:11
  351:1
**refused**  313:3
**refuses**  320:2
**regard**  21:19
  37:6 42:8 49:24
  60:11 70:18
  71:8,13 78:21
  96:10 127:7
  138:15 143:10
  189:17 194:13
  227:22 268:2
  317:18 343:10
  343:23 345:10
  361:1
**regarding**  61:8
  62:21 70:1
  270:25
**regardless**
  116:20 234:25
  236:6 248:24

Veritext Legal Solutions
866 299-5127

**[regardless - reporting]**

271:18 280:21
**region** 167:19
**registered** 2:21
365:1
**regulatory** 7:18
291:1 292:14
**reidentification**
47:2,25 249:1
250:7,17,22
**reidentify**
233:11 242:13
297:6
**relate** 47:16
146:18 154:11
198:1 242:25
276:5 277:3,17
278:2
**related** 10:14
22:1,4 40:1
49:19 77:5 83:4
150:7 155:3
163:12 165:2
187:5 190:3,5,14
190:21 191:1
220:23 228:6,24
230:2,13,15
231:18 266:22
273:8,12,22
274:10 275:5
277:8 278:4,8
279:15 280:15
287:8,8 288:17
289:6 293:19,24
294:17,21
295:11,14 296:4
296:12,21,25
297:11 298:5
349:6

**relates** 1:7 2:8
41:12 186:21,23
310:3
**relating** 217:9
267:14 279:7
333:4
**relation** 31:9
**relationship**
125:6,7,9 126:9
141:6,21 161:17
162:18
**relationships**
308:20
**relative** 82:5
365:18
**relatively** 28:9
85:9 86:7
**released** 366:21
**relevance** 330:20
**relevant** 17:18
18:10 23:9
56:15 62:1
81:22 82:1,22
84:21 85:19
86:15,17,19
94:21 111:16
149:4 160:14
172:21 173:2
182:2 209:24
211:13 228:25
259:17 264:17
282:21,22
302:24 343:18
**relied** 221:15
**relies** 302:17
318:20
**religion** 217:1
220:5 221:24

259:2
**religious** 259:23
260:4,24 261:22
**rely** 74:12
**relying** 281:9
**remain** 84:21
**remained** 28:9
**remember** 17:11
68:22 183:10
271:6,10 296:6
359:4
**remote** 15:6
**remotely** 1:14
2:18 365:6
**removal** 22:4
114:5 161:16
164:9
**remove** 93:25
94:13,25 97:3,17
97:25 98:4
110:12,14
111:21 114:11
114:16 248:3
269:24 287:7
**removed** 84:20
90:7 122:15
289:14,17,18,20
289:24 293:2,6
**removing** 161:3
260:23 270:20
290:17 340:3
**renamed** 298:16
**render** 83:6
143:22 212:25
215:12
**rendered** 74:4
98:9

**repeat** 300:17
**repeated** 276:23
**repeatedly**
164:21 310:18
331:5 359:9
**repeating** 199:6
226:25 257:18
326:12
**rephrase** 14:2
184:11 321:19
**rephrasing**
322:4
**report** 45:13
49:22 168:8
185:7 245:10
339:19 340:19
342:15
**reported** 1:14,19
2:19 46:20
**reporter** 2:20,21
2:22 11:12 12:2
12:5 15:2 96:2
138:5 145:2
155:10 201:13
211:19 251:16
251:19 260:10
281:2 323:18
331:21 350:4
353:17,20,24
354:4 365:2,3,3
**reporting** 45:25
46:15 47:3
48:20,22,23
49:20 143:22
192:8 209:1
231:18,21 357:7
358:4

Veritext Legal Solutions
866 299-5127

[reports - right]

**reports** 49:11
165:25 167:25
173:8,24 183:22
184:1,9,18 185:5
221:5 340:16
**represent** 116:23
165:1 283:19
287:19
**representation**
157:21 239:2
262:1 283:18
312:9 317:7
**representative**
1:13 80:14
272:16,17
321:24 351:24
**represents** 177:8
**request** 84:9
295:24
**requested**
365:16 367:1,9
367:10
**require** 23:14
60:16 78:25
96:18 223:24
229:4 250:11
299:6,10,17
**required** 253:22
**requirement**
182:9 278:16
**requirements**
229:17
**reread** 22:15
**research** 38:25
39:4,8,16,19,25
40:9,12,21,22
85:10,21 88:14
104:21

**reserve** 363:14
363:21
**resolution** 337:9
**resources** 162:11
**respect** 146:24
155:20 271:14
330:17
**respectful** 316:7
**respond** 28:22
126:11 308:25
309:13 316:16
**respondent**
285:8
**responding**
130:8
**response** 291:4
291:13 309:24
**responses**
180:22 189:13
**responsibilities**
152:14 303:13
**responsibility**
339:5 360:15
**responsible** 81:7
118:12,16 304:5
304:14 305:12
306:4,24 320:10
**rest** 222:16
**restate** 61:20
288:25
**restatement**
283:17
**restating** 27:11
**restrict** 31:8
190:2 229:17
266:25 267:14
**restricted** 31:6
32:21 34:6

259:18 262:11
266:13 287:5
298:25 299:5
300:1 301:4,12
**restricting**
190:14 228:6,23
296:3
**restriction** 72:6
194:15 235:6
297:7
**restrictions**
215:17 265:25
298:18
**result** 171:20
174:16 256:20
257:21 278:16
290:2 291:1
292:13,19
**results** 216:3
**return** 22:6 49:8
70:12 213:24
228:3 235:7,8
366:17 367:6
**returning** 22:10
**reveal** 218:23
219:5
**revealing** 69:15
**revenue** 79:11
79:15,19,20 80:4
159:23 160:8,15
160:20 161:2,5
161:10,13,14,15
162:12,14,21
163:6,11,17,21
164:3,9,18 165:2
165:6,17 166:1,6
166:13,18 167:6
167:8,12 187:21

188:1,17,22,25
189:10,18,23
204:24 209:10
210:9 269:1,7,12
269:14 270:4
349:4,6 356:1,7
356:7 359:17,18
359:23 360:3,7
360:15,17,24
**revenues** 79:7
**review** 98:4
112:6 145:25
183:22,25 184:2
184:7,9 185:4
290:20 365:15
366:8,10,13
367:2
**reviewed** 97:6
**reviewing**
146:15
**revisited** 195:11
**ride** 331:14
**right** 12:3 16:4
19:12 22:12
29:4 31:24 40:3
40:13 42:5 46:5
48:23 55:23
59:14,17 63:11
67:18 72:14
75:23 80:14
84:12 86:14
88:9,13 90:3
99:20 111:7
112:1 119:24
121:4 130:3
131:21,24
133:20 138:18
140:24 141:25

Veritext Legal Solutions
866 299-5127

**[right - says]**

142:3,11 143:6
146:20 148:1
149:17 150:2
152:1,4,10
172:17 178:4
179:25 180:13
180:18 181:7,10
182:18 184:16
186:8 188:9,13
188:18 198:3
200:1,22 202:8
203:12 204:14
205:14,22 206:1
209:5 210:3
213:10,19,22
215:3 218:4,8
219:7 225:3
228:11 230:3,10
231:11 232:22
235:11 236:10
236:15,21 238:4
238:20 239:5,20
240:9 241:6
245:1,14 247:23
251:14 252:9,15
253:1 254:18,23
262:6 266:4
270:8 273:19
280:8,10 282:20
287:17 293:7
294:1,13 300:12
301:23 302:19
303:10 305:15
306:21 311:22
312:13 315:17
317:10 323:23
334:10,17 335:4
335:9,22 338:21

339:2,7,12 341:9
341:14 349:15
**rights** 288:11
321:24 363:15
363:22
**ring** 5:6 16:15
**road** 6:9 81:16
**rob** 66:20 68:5
68:23 224:6
**roessingh** 348:3
**rohrback** 4:5
**role** 300:22
303:13 331:8
342:9
**rolled** 93:9 97:15
97:18
**romano** 1:20
2:20 13:17
365:1,24
**room** 281:17
309:5
**rose** 16:15
**rosemarie** 5:6
**ross** 5:16
**roster** 234:19
**roughly** 79:6
84:11 89:19,22
90:16 122:25
207:9
**rpr** 1:20 365:24
**rring** 5:12
**rsvp** 361:3
**rule** 14:6 139:5
**rules** 13:15
37:11 367:8
**ruling** 14:15
316:18

**rulings** 14:12
**run** 25:13 29:15
50:5 51:8 57:4
168:22 186:25
187:3 223:24
231:8,17 235:7,8
237:5 242:20
263:9,11,14
299:11,14,18
300:3,4 350:19
352:13 357:11
**running** 93:8
206:7 246:13
249:10 256:12
287:6 328:16
332:14 354:21
354:23
**runs** 246:7

**s**

**s** 8:8 9:1 10:1
348:4,7,7 369:3
**sadly** 361:7
**sake** 328:17
**sales** 18:12 20:18
347:6,10
**salesforce**
342:22 343:3
**sampled** 352:1
**samra** 3:8 11:18
**san** 5:10
**sauce** 142:24
**saw** 44:24 45:22
45:23 46:1,2,4,6
46:14,17 173:6,6
174:13 189:6
199:1 216:16
236:6,8 239:9,24

240:1,7,12,14,16
240:17,19 241:1
242:8,9,24
250:14 296:19
297:5,24 308:10
312:16 317:12
324:18,21,22
325:7 326:3,9,13
326:18 327:15
327:16,23 328:6
328:25 340:15
**saying** 14:18
36:4 55:25
59:12 65:22
73:3 84:18
123:3 124:14
130:12 141:5
142:3 143:7
162:23 166:25
180:21 194:10
196:15 213:9
214:11,13
223:15 230:7
239:25 240:6
243:4 244:16
258:17 262:3
266:25 269:4,6,9
278:4 297:16
311:18 320:9
337:14 362:21
**says** 74:18
138:20 147:17
148:7 149:1
155:17 186:2
190:12 202:6
204:17 205:16
216:20 223:18
224:23 252:21

Veritext Legal Solutions
866 299-5127

**[says - see]**

| | | | |
|---|---|---|---|
| 253:17 260:19 | 163:19 164:7,22 | 331:5 332:13 | **search** 71:21 |
| 285:6 286:9 | 165:21 166:15 | 333:20 334:20 | 83:5,5,7 212:10 |
| 296:3 300:21 | 168:3,10 169:10 | 336:7 347:4 | 212:17,22,22 |
| 309:15 311:1,2,3 | 170:16,23 | 348:11 351:22 | 213:17,23 214:3 |
| 317:2 319:23 | 171:14 177:1 | 352:22 355:16 | 214:9,18,19,25 |
| 324:9 | 179:14 181:12 | 356:3,14,22 | 215:5,12,14,17 |
| **scandal** 171:21 | 184:8 185:11,25 | 357:15 358:16 | 215:25 216:3 |
| 174:16 | 209:12 210:5,23 | 358:24 359:20 | **searches** 216:7 |
| **scenario** 23:3 | 215:23 220:12 | 360:11,22 361:4 | **seattle** 1:15 2:17 |
| 31:25,25 86:8 | 220:20 222:8 | **score** 179:9,13 | 4:11 11:1 |
| 87:22 235:21 | 225:24 238:22 | 180:9,10,12 | **sec** 252:10 |
| 237:4 | 241:15,21 | 182:5 185:22 | **second** 114:22 |
| **scenarios** 243:13 | 244:10,21 | 186:12 204:7,20 | 130:8 153:23 |
| 244:23 | 245:16 246:15 | 204:21 205:6 | 155:13 187:18 |
| **schedule** 366:10 | 247:25 263:5 | 209:8,15 232:1 | 194:3 202:2,10 |
| **scope** 26:7 30:25 | 264:3 265:5,19 | 344:1,3 | 202:11 216:18 |
| 37:9 39:12,23 | 267:17 268:24 | **scores** 180:4,19 | 316:25 320:2 |
| 40:15 47:17 | 269:11,22 | 209:9 | 338:11 348:5 |
| 56:22 57:10 | 270:10 274:3,16 | **scraped** 243:22 | **secondary** 24:6 |
| 58:1,9,17,23 | 274:24 275:14 | 244:7,16 333:19 | **section** 71:16 |
| 59:7,24 60:14 | 276:1,19 277:13 | 333:23 | **security** 128:17 |
| 61:7 62:20 | 278:1,19 279:9 | **scraping** 244:1 | **see** 13:17 15:10 |
| 63:13,24 65:3 | 286:2 287:1 | 244:24 245:18 | 16:8 24:8 30:14 |
| 67:9 69:6,25 | 288:20 289:12 | 245:21 247:19 | 44:19 45:21 |
| 77:23 79:10,18 | 289:21 292:16 | 247:22,23 248:2 | 78:16 79:2 |
| 87:18 95:5,12,24 | 293:17 294:3,19 | 302:14,23 | 84:18,22 85:7 |
| 96:14,22 97:23 | 295:9 300:16 | 304:10 305:21 | 86:16 88:17 |
| 98:6 101:6,16,25 | 301:22 303:8 | 306:3 331:2,9 | 90:25 91:2,12 |
| 104:23 105:10 | 304:2,24 305:16 | 335:14,19 | 92:1,8,11,14,23 |
| 105:23 106:4 | 306:9 307:5,12 | **screenshot** 50:8 | 94:20,22,25 |
| 107:3 118:7 | 307:21 308:7,12 | **scrolling** 45:1 | 104:19 107:22 |
| 130:19 131:8,14 | 309:23 311:10 | **scuba** 351:10,11 | 108:19,25 113:7 |
| 136:1,15 142:5 | 312:6 314:17 | 351:14,19,23 | 113:9 134:21 |
| 144:8 151:3,20 | 315:19 316:9 | 352:5 | 140:6,10,15 |
| 152:19 154:25 | 317:20 318:8,19 | **sdk** 130:22 | 143:12 145:6,9 |
| 155:5 156:6 | 322:19 325:20 | 131:23 132:6 | 145:22 147:17 |
| 160:2 161:8 | 327:8 328:16 | 135:24 136:2 | 147:20 148:2 |
| 162:3,16 163:7 | 329:9 330:17 | | 149:6,13 150:19 |

Veritext Legal Solutions
866 299-5127

**[see - services]**

153:19 155:23
177:6 178:16,20
179:5,7 181:5
182:10,16,23
187:15,20 202:6
202:14 203:20
203:22 204:19
209:21 210:25
212:15 216:19
217:6 219:24
220:1,4 221:8,10
221:16 223:16
223:20 224:5,9
224:10 226:2
235:24 239:16
252:23 255:3
261:2,15 286:9
286:18 300:24
324:13 330:19
331:24 333:7,12
340:14 352:10
355:5 361:11
362:20
**seeing**  8:16
24:13 25:21
44:21 82:6
86:10 88:16
98:8,15,25 99:13
99:19 110:3,18
111:14 113:6,10
114:6 149:2,3
178:12 219:12
259:24 261:1
265:22 325:25
329:13
**seek**  178:13
232:3,7

**seeking**  325:16
**seen**  14:11 47:3
82:21 84:7 91:5
108:16 119:22
195:10 216:14
230:24 246:19
332:3 335:1
337:12
**sees**  111:13
180:11 221:7
248:23 325:23
347:1
**segment**  80:20
123:15 124:3
156:2 277:19
360:8
**segmentation**
156:9,13
**segmented**
156:23
**segments**  123:10
155:21 156:2
157:4,13,20,22
157:24,25 158:7
159:25 160:4,9
160:21 161:3
163:5,9 164:4,15
168:17,21
170:25 171:19
172:3,11 174:7
272:10,15 287:9
**select**  51:17
57:18 71:17
72:22 73:3,4
81:24 82:10
83:7,17 91:17
124:12 147:10
203:8,14 212:10

212:16 214:22
215:1 216:2
234:13 253:15
253:18 254:12
256:15 330:11
362:16
**selected**  74:12
76:1 80:13
123:25 204:25
234:25 237:1
271:25
**selecting**  24:4
51:14 73:5,6
**selection**  25:16
71:24 72:15,16
73:23,24 75:11
77:21 155:19
202:18 214:15
219:1 234:6
258:21
**selections**  110:8
112:8
**selects**  74:10
75:14 78:14
123:24 212:13
212:13 325:22
325:22 330:4
339:3 342:7
**self**  90:25 91:15
172:14 202:12
**semantics**
134:17
**send**  129:21
133:15 134:1,6
191:25 341:19
345:17
**sending**  134:2,11
134:12

**sensational**
176:8,10,14
**sense**  13:23 18:4
47:24 86:9
121:13 162:4
167:19 343:3
346:4
**sensitive**  159:5,8
159:12,16,18,21
224:8,14
**sent**  133:13
146:19 155:7
301:23
**sentence**  190:22
203:13 216:18
319:23 320:18
326:12
**separate**  52:17
52:18 102:8
115:25 141:15
147:8 162:12
180:9 219:1
241:10 287:2
**separately**
133:15 224:18
266:11
**series**  50:5
141:10 158:21
**serve**  90:25
91:15 210:6,10
210:13
**served**  188:1
**serves**  187:8
**service**  112:25
183:7,11 202:12
345:22
**services**  74:16
75:20 76:4,11

**[serving - simplification]**

| | | | |
|---|---|---|---|
| **serving** 111:22 | **sexual** 217:2,2 | **show** 25:5 38:6 | **sic** 155:6 252:1 |
| 210:2 | 220:6,6 221:25 | 44:8 72:16 | **side** 62:4 63:15 |
| **sessions** 17:9,11 | 222:1 259:1 | 79:21 86:9 | 68:8 359:11 |
| 17:12 19:3 | 294:12,17 295:6 | 102:15,17 110:9 | **sign** 78:25 129:2 |
| **set** 25:11 32:13 | 295:16 | 110:11 112:24 | 206:5 366:16 |
| 43:12 51:3,8 | **share** 15:8 45:23 | 140:2,23 141:19 | 367:5 |
| 109:2 125:20 | 45:24 46:2,7,13 | 144:23 147:18 | **signals** 74:15 |
| 126:8 139:25 | 239:13 255:22 | 148:8 149:1 | 105:4 221:21 |
| 141:15 147:8 | 291:6,13,15 | 172:21 173:2 | **signature** 365:23 |
| 196:20 206:23 | 306:25 317:3 | 179:7 182:21 | 366:21,23,23 |
| 207:14 208:1,19 | 324:10,18,20,23 | 184:23 187:1,11 | 367:9 |
| 234:23 249:9 | 324:25 325:13 | 188:5 197:23 | **signed** 260:20 |
| 255:9 289:16 | 325:24 326:8,19 | 201:15 202:7 | 262:4 283:4 |
| 299:12,19 301:6 | 326:21 327:1 | 204:6,23 205:8 | **significance** |
| 330:7 331:17 | 328:25 329:2,11 | 210:17 214:25 | 243:16 |
| 362:16 365:6 | 329:13 331:14 | 231:18 338:24 | **significant** |
| **sets** 43:10 | 356:10,15 | 339:17 359:2 | 260:22 |
| 132:18 187:10 | 357:22,24 | **showed** 139:14 | **silence** 284:13 |
| 230:16 338:10 | **shared** 31:9 40:6 | 276:25 | 284:15 313:18 |
| 338:13 344:21 | 106:18 208:8 | **showing** 141:11 | **silly** 116:14 |
| 344:24 345:6 | 211:8,12 306:5 | 141:22 188:22 | 352:11 |
| **setting** 31:18 | 350:23,25 | 206:11 339:18 | **similar** 18:9 |
| 76:13 80:20 | 357:13 | **shown** 28:17 | 115:12 122:12 |
| 89:17 112:23 | **shares** 38:13 | 42:16 43:14 | 126:17 130:11 |
| 253:24 254:7 | 304:1,6,16 | 51:20 71:18,22 | 132:2 157:14 |
| **settings** 24:4 | 317:19 | 73:6 75:15 | 176:12 201:24 |
| 111:19,25 | **sharing** 40:9 | 136:4 140:14,17 | 223:22 224:23 |
| 113:12,16 | 305:13 326:3,4 | 140:20 141:2 | 225:1 254:6,13 |
| 253:25 255:8 | 326:22 337:15 | 142:15,22 | 263:13 268:25 |
| **settlement** 258:7 | **sherman** 66:20 | 179:22 180:8 | 274:9 294:5,10 |
| 258:8,13,19 | 68:5,23 224:6 | 181:18 185:19 | 299:17 326:18 |
| 292:23 | **shield** 312:20 | 188:9,13 204:14 | 341:16 342:18 |
| **settlements** | **shoes** 214:24 | 204:18 205:10 | 347:17 355:5 |
| 292:20 | 215:1 | 330:5,5 359:8 | **similarly** 108:22 |
| **setup** 24:5 28:19 | **shoppers** 57:14 | **shows** 82:19 | **simple** 315:11 |
| **seven** 169:1 | **short** 318:2 | 108:18 110:7 | **simplification** |
| 361:12 | **shorthand** 2:20 | **shut** 279:15 | 264:21 |
| | 365:2,10 | | |

**[simplified - special]**

**simplified**
270:19
**simply**  78:13
164:1 183:3
274:17 302:17
322:6
**simultaneously**
20:2 40:18 64:8
122:23 253:10
**single**  93:3
186:10
**singular**  58:10
63:25 141:7
196:3,7 306:12
**sit**  59:20 63:10
128:10 163:24
164:2 243:20
244:6,15 255:25
289:5 301:9
323:6 331:1
333:11
**site**  26:20 29:16
29:17 93:15
194:7 207:13,14
208:5 227:12,14
342:19 354:12
357:10
**sites**  112:20
340:24
**sitting**  133:10,19
134:7 135:6
284:13,15
**six**  163:22
**size**  46:19 66:25
122:2 167:22
192:7,11,17,22
194:15,20
200:25 223:17

223:21,23 224:2
224:2 248:20
**sizes**  246:25
**slide**  55:8
**slightly**  67:8
115:9
**small**  167:23
248:11
**smaller**  27:2
72:4,6 122:10
156:23
**snapshot**  160:15
174:3
**snapshots**
166:12 167:5
**sold**  299:24
**solely**  230:10
**solemnly**  12:5
**solutions**  366:7
**solving**  113:5,6
**somebody**  77:15
103:9 120:23
121:3,18 133:7
272:25 273:24
277:10 304:4,14
**somebody's**
320:15
**someone's**  78:19
78:23 104:18
137:6,14 223:8
224:19 262:23
276:24 293:18
**somewhat**  52:22
53:5 84:8 87:10
136:14
**soon**  350:12
**sorry**  17:21 20:5
21:13,14 27:11

43:25 44:20
46:11 48:14
61:6 64:25
65:24 87:4 88:5
122:6 126:4
146:13 147:21
147:24 151:19
152:16,17
155:25 157:10
164:17 176:15
177:25 189:3
192:16 198:12
198:13,15 204:1
204:4 213:1
216:11 221:6
223:25 228:9,10
228:12,18 240:4
240:12 252:3,16
253:12 254:19
255:16 256:4
258:16 259:12
260:3 261:4
265:6 267:9
271:6 278:18
289:3,10 292:2
293:8 300:17
305:6 319:1
320:17 327:7
329:20 331:23
342:1 343:14
347:18 355:13
355:17 357:1
362:7 364:4,6
**sounds**  130:8
147:6 292:2
305:2 362:2
363:19

**source**  147:2
**sources**  146:25
**space**  302:11
**spanish**  263:24
268:14 275:6
276:7,8
**spe**  258:5
**speak**  13:21
48:15 153:13
238:23 244:13
244:23 245:19
254:21,25
255:21 321:11
**speaking**  20:2,14
40:18 64:8
122:23 172:1
253:10 276:6,8
**special**  7:6
142:24 258:6,20
259:17 262:11
263:19 266:12
266:24 281:9,13
281:16,21,23,24
282:2 283:10,14
283:16,24 284:5
284:11,14,18
292:4 308:16,24
309:2,7,11,13
310:9,20 311:22
312:3,4 313:17
314:2,6,20 315:1
315:10,18,22,25
316:3,20 318:1
318:25 319:2,12
319:16 321:6,7
322:9,10,24
323:1,4,10,20

Page 64

[specialist - status]

**specialist** 303:3
**specific** 26:9
  28:14 34:5 53:3
  55:2,7 77:4
  79:12,20,22
  87:16,20,21
  93:19,24 95:15
  101:8 107:5,18
  107:25 108:7
  110:10,25 113:6
  119:2,12,19
  122:7 123:18,21
  124:1,2,4,13,16
  130:5 132:4,5
  140:17,20 141:2
  142:6 143:4
  149:8,16 150:21
  151:22 154:6
  156:11 163:9
  168:12 183:25
  186:7 188:5,9
  189:5 203:9
  216:21 218:12
  220:1 229:19
  254:9,10 256:9
  256:15 263:10
  263:14,16,17
  271:19,24
  272:24 273:4
  275:16,20
  277:16,23
  294:23 298:20
  299:7,10,17
  300:4,13 301:1
  315:2 318:19
  331:7,8,16 346:8
  352:8 353:4
  354:18 356:8

  357:6 360:13
**specifically** 23:1
  29:8 30:9 38:2
  38:19 45:4
  46:14,24 48:20
  55:17 62:25
  63:6,19 77:8
  81:13 82:13
  88:19 91:21
  95:7,18 97:24
  103:11 104:5
  107:10 117:25
  125:21 133:14
  135:13 150:23
  153:14 154:8
  161:15 166:17
  169:12,25 171:3
  171:9 172:11
  173:11 185:6
  192:5 194:23
  195:17 197:1,7
  202:16,21
  222:12 227:14
  242:7,8,24 245:4
  248:17 250:14
  250:24 256:3,10
  258:4 262:15
  266:8 271:7
  274:5 294:14
  295:10 298:11
  307:14 312:3
  317:18 327:16
  327:22 330:22
  335:10,13 344:8
  345:9 347:11
  357:4,8
**specificity** 73:8

**specifics** 131:19
**specified** 335:15
**specify** 334:7
**speculate** 150:16
**speculated**
  107:17
**speculating**
  169:12
**speculation** 30:7
  32:7 59:7 107:3
  210:23 231:13
**spell** 348:6
**spelled** 67:25
**spend** 50:17
  171:9 180:1,3,7
  181:17,20,24
  185:23 186:13
  188:14,16,21,24
  189:5,7 211:1
  231:25 349:7
  356:8
**spending** 167:21
**spent** 22:11
  50:11,11,14
  150:10 184:25
  311:12 349:8
**spoke** 159:11
**sponsored**
  219:24
**spot** 148:1
  209:17
**stable** 86:7
**stand** 14:12
  352:19
**standard** 62:6
**standards** 120:8
  120:11 301:17

**standing** 258:1
  258:17
**stands** 99:19
  348:22 349:25
  353:2
**start** 82:14
  140:19 203:11
  216:19 310:25
**started** 14:23
  71:1 140:22
  285:2
**starting** 24:11
  26:25 51:1
  113:2 280:17
  329:11
**state** 12:6 51:18
  71:21 94:13
  108:1 182:2
  199:3 242:7
  260:13 265:11
  265:17 285:6
  286:17 293:2
  330:6 366:9,12
**stated** 283:19
**statement**
  224:11 241:25
**statements** 165:1
  165:23
**states** 1:1 2:1
  267:22 308:17
  334:14
**statistics** 36:5
  98:14,17
**status** 126:9
  216:22 217:4
  220:9 222:3,18
  223:4 261:22
  293:15,19,25

Page 65

**[status - take]**

295:16
**stay** 281:18
**stenographic**
354:5
**stenographically**
1:19
**step** 24:6 320:18
**steps** 160:7,18
161:2 178:19
238:6 242:10
250:6,16,21,25
264:23 265:8,12
280:5 285:21
286:11,21
296:10,14 337:1
337:7
**stick** 123:22
**stipulation**
366:20
**stop** 112:7
**stopped** 160:5
**storage** 143:4
**store** 100:24
142:21 143:12
143:14
**stored** 143:15,19
**straight** 234:1
**strategy** 362:15
**street** 3:10 5:8
7:7
**strike** 114:18
120:21 127:21
162:13
**string** 9:15 10:13
**strive** 210:17
**strong** 322:3
**structure** 55:19

**structured** 52:20
83:2
**struggling** 108:6
**studies** 95:1,10
173:20
**study** 95:7,18,21
**sub** 301:5
**subcategories**
114:20
**subject** 9:15
10:13 40:16
285:23 289:8
309:21 318:4,10
**submitted** 22:16
**subscribed**
365:21
**subsequent** 74:4
**subsequently**
344:11
**subset** 52:15
53:10 156:9
359:7
**subtraction**
134:14
**successful** 210:2
**sudden** 317:15
**suffer** 159:23
**sufficient** 276:14
**suggests** 334:5
**suite** 3:11 4:10
5:9,17
**summarized**
15:16
**summary** 15:21
122:16
**super** 354:18
**superior** 285:7

**support** 60:6
159:7,21
**supported** 61:12
**supporting**
60:24
**supposed** 302:18
359:10
**sure** 14:11 15:24
17:4 19:4 22:25
29:25 31:22
33:11 34:12,20
35:8 36:15,18
37:2 38:20 39:6
39:25 42:21
45:9 50:7 56:25
62:9 63:16
65:25 66:15,25
73:17 75:12
77:10 83:25
88:20 103:17
119:1 125:12
128:4 146:6,11
147:21,25
166:24 171:2
176:1 189:2
190:8,10,23
197:10 212:2
214:7 228:10
232:8 234:1
243:12 254:19
257:19 264:9
283:13 293:11
295:2 296:24
297:10,24 303:6
303:7 306:1,10
310:11 314:9
336:8,12,23
337:9 340:5

347:19 348:12
353:1,1,24
354:13 357:7
**survivor** 226:4
**survivors** 226:11
**sustained** 14:19
**swears** 11:12
**switch** 254:16
**switched** 352:12
355:2
**system** 24:2,10
25:14,19 27:17
30:16 34:24
35:1 37:3 41:14
80:10 90:11
108:14 123:4
159:2 177:3
196:9,20 197:12
197:13,24
199:14 200:2
233:10 241:23
242:18 250:20
250:24
**systems** 143:21

| t |
| --- |

**t** 5:6 8:8 9:1 10:1
309:15 311:4
369:3,3
**tab** 211:21
**table** 355:23
356:6,17 359:16
360:2,13
**tables** 144:4
356:24 357:18
357:22,25
**take** 14:7 29:17
43:9 68:11 98:3

Veritext Legal Solutions
866 299-5127

**[take - targeting]**

| | | | |
|---|---|---|---|
| 109:4 124:7,7 | **takes** 139:4 | 271:14 273:10 | 54:12,23 55:5,12 |
| 140:4 144:12 | 208:13 338:19 | 282:10 329:16 | 56:11 59:18 |
| 146:8 159:19 | **talk** 22:8 26:4,11 | 330:11 337:16 | 60:1 63:15 65:6 |
| 160:6,18 161:2 | 139:16 151:6 | 353:5,11 | 70:16,25 71:1 |
| 177:23,25 178:9 | 191:12 248:4 | **targetable** 93:10 | 74:4 79:8,12,20 |
| 178:19 182:6,16 | 296:6 313:19 | 110:24 224:8 | 80:11,15,16,17 |
| 183:17 187:13 | 317:14 322:22 | **targeted** 54:11 | 80:19,22,23 81:8 |
| 187:19 191:13 | **talked** 207:1 | 54:17 59:13,17 | 81:19 82:3,7 |
| 201:6 206:12,15 | 218:6 282:8 | 59:22 70:14 | 83:18 89:20 |
| 216:10 222:19 | **talking** 35:23 | 76:18 82:5 | 90:9,10,23 92:25 |
| 227:22 238:6 | 103:18 154:5,8 | 87:25 91:22 | 94:19 105:20 |
| 242:10 251:1 | 154:10 162:8 | 92:10 93:4,19,24 | 112:19 113:18 |
| 264:23 265:11 | 163:4 176:5 | 96:12,20 100:2 | 115:2 117:8,10 |
| 280:24 285:4 | 198:3 203:15 | 104:12 110:5 | 117:17,24 118:1 |
| 286:11 296:10 | 230:1 232:20,21 | 111:6 114:21 | 118:5,17,18 |
| 296:14 323:18 | 243:14 244:13 | 164:4,18 165:17 | 119:4,5 120:3 |
| 323:19 324:5 | 282:9 311:12 | 166:1,12,18 | 121:24 122:17 |
| 331:13,18,25 | 335:18 | 167:5 169:7,23 | 123:1 124:6,11 |
| 332:2 336:25 | **tao** 357:10 | 171:7 172:10 | 125:10,23 128:1 |
| 338:5,8 339:6 | **target** 32:5,10 | 174:15 192:18 | 128:2,13 129:4 |
| 346:8 | 34:14 72:24 | 196:17 218:22 | 129:11,16 130:2 |
| **taken** 2:15 43:15 | 83:11,21 89:9 | 219:3,6,18 | 130:5,6 136:18 |
| 43:20,23 68:15 | 91:7 102:24 | 236:21 238:3 | 142:14 146:4,19 |
| 77:17 96:6 99:1 | 103:4 105:8 | 239:4 240:20 | 149:7,20,21,21 |
| 109:21 144:16 | 106:2 108:5 | 241:19 247:5 | 149:23 150:9,10 |
| 181:18 185:20 | 127:16 129:17 | 250:7,17,23 | 150:19 151:5,7 |
| 186:12 187:6 | 132:7 194:16 | 255:13 259:6 | 153:3,4,7,7,11 |
| 193:21 201:9 | 195:22 196:3,7 | 263:22 312:12 | 153:13,18 154:9 |
| 248:9 249:22 | 198:25 199:9 | 317:10,19 | 154:14,16,22 |
| 250:7,16,22 | 200:16,24 | 334:22 338:5,8 | 155:18,20 156:1 |
| 251:10 257:11 | 202:12,16 | 341:23 | 156:11,14,20 |
| 280:5 284:22 | 203:11,12 | **targeting** 9:21 | 157:5 158:21 |
| 286:21 292:8 | 214:15 215:2 | 17:23 21:5 | 159:2,13,24 |
| 310:6 312:25 | 216:21 220:4 | 23:23 25:15 | 160:9,16,20 |
| 318:9 324:1 | 221:17,23 | 34:13 38:11 | 161:16,23 |
| 337:7 361:17 | 222:14 232:14 | 41:13 48:17 | 162:19,21,22,24 |
| 365:5 | 232:25 234:4 | 50:20 51:22 | 163:4,8,16 |
| | 238:8 254:23 | 52:16,23,25 | 164:10,14 |

**[targeting - testimony]**

| | | | |
|---|---|---|---|
| 166:20 167:10 | 292:19,24 293:3 | 307:8 337:12 | 320:6 354:13 |
| 167:10 168:16 | 293:4,6,9,19,24 | 347:1,5,6,10 | **terms** 20:21 33:3 |
| 168:21 170:2,18 | 295:2,5 299:7,8 | 348:1,2,9,18 | 38:21 41:14 |
| 170:24 171:19 | 299:10,12,19 | **teams** 18:8,12 | 42:11 47:14,25 |
| 174:3 191:10,16 | 300:4 317:9 | 47:23 48:1 60:4 | 50:20 52:22 |
| 193:19,19 196:9 | 325:23 329:19 | 64:11 81:15 | 72:17 115:19 |
| 198:5,22 206:21 | 329:22,23 | 108:23 118:2 | 132:11 137:17 |
| 207:21,23 212:9 | 330:21 337:2 | 152:22 162:10 | 190:25 191:3,3,4 |
| 214:2,5,17,21 | 342:8 353:12 | 168:4 174:3 | 191:6 200:25 |
| 216:2,24 219:11 | 354:19 | 302:23 303:14 | 215:5,12,17 |
| 219:13,25 | **targets** 218:7 | **technical** 216:20 | 229:13,16 |
| 220:23 221:20 | 268:22 271:22 | 354:13 | 246:25 247:15 |
| 222:10,13 | **task** 296:23 | **telenovelas** | 248:5,7,7,8,25 |
| 226:10,12 | 297:9,16,21,24 | 276:8 | 249:4,6,15 |
| 229:22 230:15 | 298:4,10 302:1 | **tell** 65:11 66:24 | 322:18,21,23 |
| 232:16 234:5,6 | 302:15 | 90:21 151:4 | **terrible** 182:23 |
| 234:12,23 236:1 | **team** 16:12,18 | 159:15 160:4 | **test** 173:12 |
| 236:25 242:11 | 19:16,25 20:1,4 | 196:10 197:1,2,7 | **testified** 13:3 |
| 252:7,22 253:6,7 | 20:8 22:17 48:3 | 199:1 201:22 | 84:10 103:8 |
| 253:14,20 255:4 | 48:11 58:13,19 | 239:24 240:7,11 | 119:15 277:2 |
| 255:11 256:9,14 | 63:4 64:1,13 | 240:13,15,19 | 286:20 310:12 |
| 257:23 258:2,4 | 65:13,14,20 66:6 | 242:23 250:13 | 310:18 317:6 |
| 258:15,22 259:1 | 66:8,10,13,16,17 | 315:1 322:19 | 335:7,20 361:22 |
| 259:3,16,18 | 66:23,25 67:3,9 | **telling** 56:1 | **testify** 80:8 |
| 260:2 262:12,15 | 69:19 81:7,9,10 | 61:15 173:15 | 316:25 318:12 |
| 262:21 263:10 | 81:13 118:3,11 | 249:14 | 321:17,25 322:6 |
| 264:5,16,20 | 118:14,18 119:2 | **tells** 74:22,24 | 338:5 |
| 266:1,9 268:8 | 168:11 171:25 | **ten** 138:21 | **testifying** 24:15 |
| 269:2,5,13,14 | 172:6,6,8 174:8 | 176:13 245:7 | 40:12 41:8 |
| 270:19 271:3,12 | 241:19 245:1,3,8 | 249:13 | 55:22 59:16 |
| 272:21 275:2 | 245:23 249:13 | **tend** 177:22 | 365:8 |
| 276:11 280:15 | 270:12,24 271:3 | **tense** 226:25 | **testimony** 12:6 |
| 282:15 286:5,7 | 271:10 285:19 | **term** 38:10 83:5 | 23:11 56:5,5 |
| 287:5,18,20 | 298:14,15,21 | 83:7 154:4,7,11 | 70:13 74:8 80:2 |
| 288:3,9,16,21,23 | 299:2 300:6,11 | 214:18,19 | 91:4 110:4 |
| 289:6,15 290:11 | 300:23 301:2 | 215:15 311:8 | 198:7,8,19 |
| 290:16,17,25 | 305:18,19,24 | 312:24 313:4 | 200:21 206:20 |
| 291:22 292:13 | 306:2,4,4,14 | 318:20 319:9 | 223:9 259:20 |

Veritext Legal Solutions
866 299-5127

**[testimony - three]**

| | | | |
|---|---|---|---|
| 261:19 262:19 | 219:7 225:6 | 201:19 207:15 | 241:12,17 |
| 262:25 279:16 | 276:6,9 316:10 | 209:13 210:15 | 242:11 243:7 |
| 280:4 287:1 | 333:11 | 214:6 219:22 | 244:6 245:13 |
| 302:21 309:22 | **think** 17:8 18:3,5 | 235:17 242:15 | 247:4 248:5 |
| 311:20 313:6 | 19:9 20:12,13 | 248:14,18 | 259:22 260:23 |
| 315:7 318:5 | 22:7 25:20 26:8 | 256:25 257:20 | 262:4 264:24 |
| 320:5,24 326:2 | 26:15 30:8 | 261:25 265:21 | 265:12 280:5 |
| 332:8 335:12,25 | 31:13 33:23 | 274:1,6,25 | 285:22 286:12 |
| 365:12 368:4 | 34:22 35:4 37:1 | 275:16 283:10 | 296:1 302:14 |
| **texas** 5:18 | 37:11,19 38:14 | 284:15 289:1,23 | 304:1,6,16 305:3 |
| **text** 176:13,14 | 41:15 47:12,19 | 290:6,21 291:5 | 305:14,19 306:5 |
| 177:17 | 47:22 48:6 | 291:12,15,16 | 306:25 307:6 |
| **thank** 23:4 27:16 | 49:21 55:3,18 | 295:22 299:15 | 311:18 313:12 |
| 48:9 56:8 | 60:21 62:22 | 301:8 305:8 | 325:1 340:24,25 |
| 109:18 144:21 | 64:3 66:11 | 306:11 310:3,21 | 341:2 342:12 |
| 183:20 200:8 | 68:10 69:12 | 315:3,18 317:20 | 355:8,20 356:11 |
| 211:17 251:2 | 70:3,21,24 72:19 | 320:20,23 323:2 | 357:13,22 |
| 283:23 284:5,17 | 75:12 81:2,5,25 | 323:4,5,7,11 | **thought** 99:22 |
| 292:3 298:13 | 86:19 87:21 | 325:8 326:21 | 207:1 259:12 |
| 309:12 319:15 | 88:5 101:10 | 327:3 328:2 | 267:9 |
| 322:9 323:17 | 102:19 103:22 | 331:6 335:16 | **thousand** 89:22 |
| 361:14 363:17 | 106:21 107:4 | 337:5 340:4 | 89:24 91:6 |
| 364:1,8 | 108:23 109:1 | 342:10 343:22 | 122:6,10 |
| **thanks** 13:9 | 114:9 115:24 | 344:6,7 346:15 | **thousands** 97:7 |
| 251:7 | 117:11,19,23 | 348:15 356:7 | 97:13 |
| **themself** 93:25 | 123:4 124:25 | 361:8 362:20 | **thread** 101:17 |
| 97:3,17,25 | 128:11,21 129:5 | **thinking** 21:10 | 101:21,22 335:2 |
| **thing** 14:3 42:7 | 129:12 132:12 | 48:19 55:7,15,16 | 337:6 |
| 76:20 103:19 | 135:9 137:4,16 | 103:23 154:19 | **threads** 101:11 |
| 124:1 153:17 | 139:2,22 142:8 | 154:21 176:2 | 101:14 127:2 |
| 322:16 355:4 | 143:2 144:11 | 190:7 206:11 | **three** 17:10 |
| 362:21 | 150:15 152:24 | 255:23 300:14 | 53:15,18 54:11 |
| **things** 31:14 | 153:9,12,16,20 | 313:19 | 54:12,17,22 55:9 |
| 35:5 51:25 52:4 | 156:12 157:10 | **thinks** 88:16 | 55:19 70:13 |
| 53:1 83:3 | 163:20 171:15 | **third** 4:9 41:4 | 71:10 136:17 |
| 108:16 114:12 | 181:13,22 | 42:7 45:7 | 194:13 202:4 |
| 115:4,25 116:20 | 182:20 183:2 | 129:17 135:21 | 204:12 311:12 |
| 120:7 214:8 | 197:14,22 198:1 | 191:16 208:7 | |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[threshold - track]**

**threshold** 47:20
48:11 87:21
232:18 233:12
233:14,17,18,19
233:24 234:3,7
234:11,16,24
235:2,10 236:3
237:5,6 241:4
242:20 243:18
247:5 253:23
296:17
**thresholds** 195:1
195:11
**throwing** 45:10
**tie** 242:6
**tied** 295:12
307:14,14
360:15
**time** 11:6 17:9
24:14 25:7,19
26:5,15 31:11
37:7 46:8,13,21
47:16 58:25
66:15 67:7,12
72:10 73:9
80:12 81:4
84:14,20 90:1,17
92:17,18 98:3
99:2 101:23
109:12 117:21
122:4,4,19 123:4
141:11 142:8,18
150:11 156:17
168:17 169:7,23
179:22 186:14
186:16 190:1
192:11,17
194:24 195:7,20

200:10,11,16
207:1 223:10
226:18 231:6
271:7 276:24
282:23 285:4,20
287:15 289:25
293:1,5 296:1
311:12 316:7,25
320:3 323:21
335:1 343:10,23
344:2 350:9,12
350:16,22 354:2
361:10 362:6,13
363:14 364:10
365:6 366:10,18
366:24 367:7
**timeline** 26:9,21
46:23 344:8
**times** 13:12 44:9
44:10 111:12
205:10 290:16
291:21 292:18
292:22 296:7
363:4,6
**tips** 176:13
**title** 121:15
260:14 303:4,19
**toby** 348:3 350:2
**today** 11:18 13:9
13:18 14:24
15:14 23:11
24:15 32:24
39:20 41:9
55:23 59:17,20
63:10 80:14,25
82:15,18 89:24
90:14 92:1,23
118:13 128:11

131:21 185:4
243:21 244:6,15
255:25 260:20
262:20 289:5
293:13 298:3
330:1 331:1
343:12 363:21
**toggle** 254:8
**toggles** 71:11
**ton** 282:9
**tool** 38:4 41:1,21
41:23 85:11
110:3,19 132:16
132:17 136:5
144:1 153:18
175:2,5 180:20
186:5 191:3,16
193:19 220:1
258:25
**tools** 21:5 25:24
26:4 41:6 81:16
85:18 111:9
120:9,15,18
129:20,21
130:21 134:21
135:1 146:4,5
153:11 154:20
174:5 184:16
193:6,14,16
202:13,19 208:8
227:13 229:3
258:2,15 271:18
344:16,19 347:9
352:18 353:12
**top** 48:4 65:9
157:1 169:3
185:12 202:24
216:20 235:15

235:16
**topic** 41:8 48:2
80:14 82:12
86:22,25 89:1
100:9 108:22
109:4 115:10
116:5,7,20 117:1
170:21 228:3
279:15 282:8
293:20 308:12
308:14 309:22
310:8,24 311:6
313:1 321:20
**topics** 52:1 82:13
82:20 84:18
88:22,25 89:4
116:8 217:10
274:18 276:4,5
276:25 277:2,3,7
277:16,22 294:5
322:1
**total** 50:17,18
140:8 176:5
187:16 188:4,14
188:15,20,24
189:4,7 203:22
203:23,24 204:7
204:13,17,20,21
204:25 205:6,7
205:12 209:4,7,9
209:14 236:25
**totality** 203:7
**totally** 19:4
65:25
**tough** 128:21
**trace** 35:10
**track** 87:15
160:7,18 161:1,2

Page 70

**[track - uids]**

161:5,13 162:14
162:20,21 167:8
342:15 360:15
360:17,23
**trackers** 130:17
**tracking** 309:15
309:19 310:4
311:4 344:9,10
345:1,11
**tracks** 308:18,20
**trade** 217:5
220:9 222:4
223:4
**transcribed**
365:11
**transcribing**
13:18
**transcript**
363:23 365:12
365:14,16 366:6
366:8,10,13,13
366:21 367:2,2
368:3
**transcription**
13:19
**translate** 127:14
132:18
**translates** 77:9
**transmit** 132:25
**transparency**
25:24 26:4
111:11,17
145:15 146:5
152:7 179:10
219:10
**transparent**
24:24 59:10
107:23

**trend** 47:7
**tried** 42:12
116:22 296:6
**trigger** 141:8
143:4 171:5
276:15,21
**triggered** 134:13
141:3
**triggering** 42:19
**triggers** 277:23
**true** 34:18 49:17
103:14 112:18
127:15 134:8
179:12 217:8
243:23 252:8
262:7 286:24
337:17 341:6
365:12 368:5
**truly** 244:22
**trust** 199:16
200:5
**truth** 12:8,8,9
**try** 22:7 60:9
61:16 145:6
178:19 340:8
346:5 362:3
363:2
**trying** 16:3 17:3
18:3 21:4 38:8
40:4 41:18
61:13 77:7 80:7
84:23 95:15,20
105:18 108:14
120:1 137:5
142:1 164:1
173:13,18
180:17 198:11
199:6 206:4

228:18 271:6
272:1 277:21
282:25 299:13
306:23 310:14
317:14 325:6
326:12 333:10
351:25 359:3
**turn** 80:16
112:22 155:13
239:11
**turned** 74:16
**turning** 147:14
324:7
**tv** 82:18 86:9
**two** 31:2 67:19
68:2 111:3
112:5 114:20
115:25 125:18
125:18 127:21
147:12 149:4
165:9 184:16
187:9 193:5
201:3 214:8
236:10,16 256:4
282:18 287:2
289:18 292:18
292:21 306:19
310:6 312:25
318:9 320:18
330:13 345:12
354:9,22,22
**type** 27:2 36:2
59:9 86:25
117:23 122:22
125:10 126:7
176:7 186:20,23
212:8 214:23
215:25 274:8

298:18 303:23
308:14 309:15
310:4 311:4
343:17 362:5,12
362:25
**types** 53:15,18
55:5,19 123:10
124:17 191:9,16
193:5 236:16
256:9 293:9

| u |
| --- |

**u** 67:23 350:5
**uber** 331:10,14
333:8,14,23
334:5,8,15,22,23
335:14,17,18
337:8,22 338:2
**uh** 15:9 120:25
144:24 251:15
256:6
**ui** 48:20,22 49:4
50:8 52:20 53:7
72:21 81:4
147:8 175:6
185:2 354:9
355:2,3 356:25
357:7
**uid** 237:25 242:5
242:25 243:2,17
248:1,3,16 329:1
336:10
**uids** 238:5
241:17,22
242:17,19
245:21 246:2
305:21 331:2
333:9,15 336:10

Page 71

**[uids - use]**

336:21
uis  186:16
  352:17
unaware  244:16
unclear  270:21
underline  114:5
underlying
  15:18 206:21
understand  8:15
  13:25 16:3 21:4
  23:10 24:5,15
  26:17,22 29:16
  31:15 32:15
  33:6 38:8,22
  39:25 40:4 44:5
  49:1 56:9 60:8
  61:14 62:4,14
  68:19 74:17,19
  76:15 78:2
  81:23 85:5,10,12
  94:20 95:16
  105:19 107:7
  113:8 120:13,16
  123:8,9 131:16
  132:21 133:5
  134:16 137:5,6
  137:15,20
  138:12 141:25
  142:1 143:6
  148:21 155:21
  161:20 173:13
  173:18 175:9
  178:11 180:13
  181:1 182:7
  188:3 191:23
  192:6 196:14
  199:15 213:11
  214:6,11 217:20

219:12 220:23
221:9 224:3
227:2,7 229:5
231:1 243:3
269:3 270:22
277:21 297:19
303:15 306:20
307:23,25
308:10 310:14
311:16 314:2
315:11 319:9,13
321:8 324:19
326:11 327:9,15
327:24 328:19
330:18 333:2
339:25 344:11
344:22 352:9,15
352:17 353:9
355:3
understanding
  30:18 37:23
  52:15 58:21,24
  59:8 62:3 79:14
  85:21 86:4 87:1
  89:4 94:8,10
  110:20 133:24
  136:8 146:17
  158:1 161:10
  172:2 208:24
  221:11 229:6,24
  231:3 239:23
  270:1 279:5,11
  290:4 305:19
  307:10,17 308:2
  309:25 312:21
  313:7 314:11,13
  319:23 321:2
  324:15 329:17

330:12 333:23
352:3 354:20
355:22
understands
  185:23
understood
  14:21 23:1,20,22
  24:20 25:1
  104:10 146:6
  159:20 220:13
  220:24 283:20
  340:2,2
underwent
  264:19
unfortunately
  144:9
union  217:5
  220:9 222:4
  223:4
unique  237:21
  237:25 362:22
  362:23
uniquely  307:14
united  1:1 2:1
  267:22
unlimited
  234:18 236:20
unpack  31:14
untrue  261:19
update  21:5,9,20
  26:24 126:9
  150:6 166:6
  216:22 290:20
updated  25:23
  26:10 172:20
  174:10 287:7
  290:7 292:19
  294:8 295:21

350:21
updates  146:14
  146:16 148:20
  264:19 286:3
  287:3 293:22
  303:17
updating  147:17
  148:8 286:7
uphold  298:16
upload  147:19
  148:4,9 175:7
  235:25 236:22
  237:12 238:15
  338:17
uploaded  148:21
uploading
  192:23 237:16
uploads  191:5
  191:18,22
  238:11
ups  9:16
upstream  302:8
usable  294:9
use  9:4,10,20
  20:9 27:20,25
  29:18 30:4,9,16
  31:4,8,20 32:4,8
  32:25 33:2,6
  34:2,7,15 35:22
  35:24 36:2,8,20
  36:22,24 39:19
  41:6 45:22
  57:19,21 61:24
  62:6 70:19,21
  74:21,24 75:10
  75:18 76:2,9,16
  77:20 78:1 79:1
  83:5,11 102:13

Page 72

**[use - users]**

| | | | |
|---|---|---|---|
| 102:14 103:25 | 263:8 269:25 | 230:24 235:21 | 86:19 87:2,16 |
| 104:4,11 105:4,7 | 271:18,21 | 236:9 237:21,24 | 88:1,16 89:7 |
| 105:15,19 106:1 | 272:10 287:6 | 238:2,8,18,20 | 90:21,24 92:1,8 |
| 107:20 108:4,9 | 296:4,5,11,12,20 | 240:12,15 | 93:18 94:17 |
| 108:17 116:13 | 296:21 298:5 | 242:13 243:8,22 | 95:2,11 96:11,18 |
| 120:15,18 | 302:2 303:20,21 | 244:7,17,23 | 97:6,16 98:14 |
| 121:11 123:25 | 303:24 330:6 | 245:13,25 246:6 | 100:1,17 101:3 |
| 125:16,22 | 338:17 348:18 | 246:12,20 247:8 | 101:23 102:24 |
| 126:16,19 127:1 | 352:24 355:4 | 249:17 297:13 | 104:12 105:7,8 |
| 128:6,9,18,23 | **useful**   20:21 | 302:15 307:14 | 105:21 106:2,18 |
| 129:14,15,20,24 | 26:12 84:21 | 307:15 308:19 | 106:24 107:14 |
| 130:16,20,21 | 85:11 86:5,12,13 | 309:21 310:19 | 107:18,23 108:2 |
| 131:3,5,10,20 | 108:17 120:9 | 310:20,20 | 108:5 113:1 |
| 136:4 141:16 | 274:7 353:4 | 311:14 318:16 | 117:3 119:22 |
| 149:12 151:8,12 | **user**   1:5 2:5 11:9 | 324:19,22,23 | 126:20 127:21 |
| 151:22,25 | 25:21 30:1,24 | 325:1,7 326:10 | 127:25 129:1,15 |
| 153:12,14,25 | 31:19 34:4 36:7 | 330:23,24 | 129:17 130:16 |
| 154:10 159:24 | 44:19,23,25 45:4 | 333:19 334:5,16 | 132:6 135:5,21 |
| 173:14 178:11 | 48:23 62:11,14 | 334:24 335:9,22 | 136:20 138:15 |
| 190:2,14,15,25 | 62:17 74:14 | 336:4,16 337:2 | 145:6 146:19 |
| 191:7,11 192:7 | 76:23,24,25 | 337:13 339:6,17 | 148:5,21 152:1,7 |
| 193:18 195:4 | 78:25 91:1,5,16 | 340:14,14 | 178:20 187:22 |
| 200:6 203:11 | 91:19,20 92:23 | 342:13 359:8,17 | 188:16,24 |
| 208:15 210:25 | 93:3,23,25 94:4 | 360:3,7,8,8,15 | 189:10,16 192:1 |
| 212:19 213:3,13 | 97:11 98:11 | 360:17,23,24 | 194:10 196:3,7 |
| 213:15 214:2,17 | 111:2,10 112:20 | 362:6,13 363:7 | 196:17 197:2,7 |
| 215:11,14,18 | 113:6,24 114:2 | 366:4 369:1 | 197:19,23 198:6 |
| 216:7 221:21 | 115:22 140:17 | **user's**   32:18 | 198:22,22 199:2 |
| 222:23 226:13 | 140:20 141:2 | 77:19 79:3 | 199:3,9,15,19,22 |
| 226:15,16,17 | 177:19 178:4 | 216:24 | 208:25 218:2 |
| 227:3,9 228:6,7 | 182:25 187:14 | **users**   25:24 27:5 | 221:23 222:18 |
| 228:23 229:2,5 | 187:20 188:2,5,9 | 27:14 29:11 | 223:11 224:15 |
| 230:3,5,9 231:4 | 188:18,22,25 | 32:19,21 36:9 | 225:6 238:15,17 |
| 232:15,16 234:4 | 189:23,23 | 38:11,13 39:20 | 239:8,9,19 |
| 234:5,12,17,22 | 196:19,23 | 40:5 44:1 47:3 | 240:16 241:12 |
| 236:1 247:1 | 198:25 205:8 | 72:24 73:5 | 242:13 243:5 |
| 252:6,21 253:14 | 208:11,13 211:5 | 74:23 75:9,25 | 244:16 245:24 |
| 256:13 258:14 | 219:5,11,23 | 76:17,17 83:11 | 246:9 248:8 |

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[users - want]**

249:1 250:7,17
250:22 287:21
288:1 293:25
294:6 296:4
301:23 306:6
312:16,18 315:7
317:12,13
326:17 327:16
328:6 337:2,16
338:20,25
339:10 340:10
340:12 353:5,11
354:10 359:23
362:17
**uses** 37:6 74:14
77:19 78:23
98:23 101:9
117:3 129:3
151:11 162:5
208:14 211:6
270:1 272:9
288:2 347:10
**usually** 28:24
52:17 54:22
167:22 176:19
346:2

**v**

**v** 350:5
**vague** 20:11 25:9
29:22 30:6
31:11 32:6,23
33:18 38:17
50:24 59:7
73:22 77:23
86:2 91:25
96:21 99:4
107:3 124:23

126:13 127:10
143:16 149:18
163:19 164:6
165:20 210:5
227:6 239:6
255:15 290:19
301:10 312:14
328:4 331:12
342:3
**valuable** 106:7
106:14,19
**value** 140:8
176:5 187:16
203:22,23,24
204:7,13,17,20
204:21,25 205:6
205:7,13 209:4,8
209:9,14 349:10
349:11,12,13,15
349:21,22 350:3
350:5
**varied** 17:9
**various** 43:5
**vary** 82:18
**vc** 1:6 2:6
**veritext** 11:11
366:7,9,11
**version** 18:7
174:10 355:3
**versions** 354:9
354:23
**versus** 94:6 95:7
95:10 127:12
153:18
**veteran** 293:15
293:20,25
295:15

**victoria** 68:6,24
**video** 1:14 2:19
87:7,16 193:23
338:16,17,20,20
338:24 339:3,4,6
339:11,14,14,15
339:18 340:17
340:20,20
343:17,20,20
**videoconference**
1:14 2:19 3:2
4:2 5:2 6:2 7:2
**videographer**
7:19 11:5,10
68:13,16 96:4,7
109:19,22
144:14,17 201:7
201:10 251:4,7
251:11 257:5,9
257:12 284:8,20
284:23 292:6,9
323:24 324:2
354:3 361:11,15
361:18 364:3,7
**videos** 87:3,13
338:6,9 339:1,21
**videotaped** 2:15
**view** 44:16,20,20
45:5 90:12 93:3
205:25 272:2
274:20 275:12
294:17 303:2
340:16
**viewed** 189:17
325:13
**viewing** 43:24
44:3 87:2,8

**views** 42:24 43:6
43:8 45:4 50:2
158:3,7,10
172:15 235:11
260:4 340:19
343:19
**violate** 271:11
**violated** 249:15
**violation** 250:5
**visit** 129:22
**visited** 129:24
149:6,10
**visits** 294:23
**volume** 1:17 8:3

**w**

**w** 7:7
**waist** 99:7,13,19
110:2,7 111:24
112:6 113:5
146:15 148:20
**wait** 113:9 309:8
313:17,17
**waiting** 145:4
211:25
**waived** 366:23
366:23
**waiving** 366:20
**walk** 45:10
255:16
**walking** 346:22
**wall** 32:1
**wangdra** 6:7
11:25
**want** 22:7 51:7
51:14,16,18,20
54:3 62:2,15
71:17,22 73:6

Page 74

**[want - weaver]**

| | | | |
|---|---|---|---|
| 75:12,14 84:22 | **wants**  183:8 | 220:24 221:9 | 358:5 360:24 |
| 85:17 94:20 | 203:10 320:25 | 229:1 230:16 | **weapons**  299:24 |
| 96:11 104:18 | 329:15 | 242:13 270:14 | 301:16 |
| 106:7,13 108:19 | **washington**  1:15 | 321:3,18 322:7 | **weaver**  3:6 8:5 |
| 108:25 111:6,11 | 1:22 2:17 4:11 | 323:7 327:2 | 11:15,16 13:6 |
| 113:7 114:1 | 6:18 11:1 51:19 | 336:15 344:10 | 14:22 15:4 16:1 |
| 116:25 121:7 | 260:13 265:3,11 | 351:11 354:8 | 18:21,22 19:5,19 |
| 140:10 147:25 | 265:17 267:21 | **ways**  23:23 | 19:24 20:3,16 |
| 166:22 174:4 | 285:7 286:17 | 38:10,12,21 40:4 | 21:18,23 23:21 |
| 176:1 178:16,20 | 293:2 330:6 | 44:4 74:20,23 | 24:23 26:1,13 |
| 179:7 182:1,8,9 | **watch**  87:12 | 275:7 282:18 | 27:8,13,18 28:11 |
| 182:16,21,23,23 | **watched**  87:16 | 301:21 315:4,9 | 29:6,10,19,25 |
| 183:3,5 187:11 | **watching**  35:6 | 330:8 331:17 | 30:21 31:5,24 |
| 194:10 196:18 | **way**  18:8 24:2 | **we've**  17:23 23:8 | 32:17 33:13 |
| 196:21 198:24 | 26:18 32:13 | 25:23 52:20 | 34:2,18 35:19 |
| 209:21 212:23 | 33:11,20 34:22 | 54:23 60:1 | 36:13 37:14 |
| 214:17,23 | 39:18 42:1 52:2 | 67:10,11 82:20 | 38:24 39:8,17 |
| 217:21 218:3 | 52:19 54:2 | 84:7,19 92:2 | 40:3,19,23 42:13 |
| 219:4 220:4 | 56:14,16 61:16 | 105:3,3,12,13 | 44:1 45:12 47:9 |
| 221:8,10,16 | 63:15 72:21 | 106:6 108:16 | 47:15 48:1 |
| 232:10 282:19 | 81:22 83:16 | 112:19 116:22 | 49:16,24 52:14 |
| 310:10,24 | 85:20 94:23 | 117:21 119:22 | 54:16,25 57:2,22 |
| 311:16 312:20 | 103:22,24 108:1 | 122:13 136:16 | 58:6,12,20 59:3 |
| 314:9 315:20 | 112:22 114:6 | 144:23 146:16 | 59:12 60:7 61:2 |
| 316:6 318:13 | 115:5 123:5 | 156:11,15,22 | 61:13,20 62:25 |
| 320:12 321:19 | 124:16 128:5 | 180:8 194:19 | 63:18 64:2,16 |
| 330:4,5 338:17 | 130:7 132:2,15 | 195:10 196:8,20 | 65:8 67:10,13,17 |
| 340:4 347:19,23 | 134:19 135:8 | 197:3,15 198:1 | 68:11,18 69:9,22 |
| 349:24 353:22 | 137:19 139:11 | 199:15 200:9,10 | 70:6,12 72:5 |
| **wanted**  25:12 | 143:3 151:5 | 209:14 212:23 | 73:7,19 74:1 |
| 59:2 60:5 82:10 | 161:1 162:20 | 226:1 233:9 | 77:12 78:4 |
| 112:3 146:6 | 163:10 172:12 | 250:24,25 | 79:13 80:1 |
| 159:6 185:2 | 174:9,10 175:17 | 256:18 257:25 | 83:15 84:5,25 |
| 188:17 200:4 | 178:11 182:6 | 258:17 268:1 | 85:24 86:12 |
| 281:20 283:6 | 186:19 196:8,20 | 282:8 290:6,15 | 87:15,24 88:7 |
| 363:21 | 198:2 203:8 | 292:19 301:18 | 89:18 90:8,21 |
| **wanting**  178:13 | 206:17 209:14 | 306:15 321:9 | 91:20 92:4 93:1 |
| 179:5 | 211:15 215:11 | 344:2 354:9 | 95:9,14,25 96:9 |

**[weaver - weaver]**

| | | | |
|---|---|---|---|
| 96:17 97:5,19 | 164:12 165:5,11 | 235:1,20 236:13 | 293:23 294:10 |
| 98:1,13,21 99:11 | 165:13,25 166:7 | 238:1,25 239:10 | 294:22 295:4,13 |
| 100:15 101:13 | 166:20 167:13 | 240:1,6 241:5,10 | 295:23,25 297:8 |
| 101:19 102:3,21 | 167:17 168:6,15 | 241:18 242:4 | 298:1,13 299:4 |
| 104:20,25 | 168:24 169:15 | 243:3,20 244:3 | 300:19 301:13 |
| 105:18,24,25 | 169:21 170:12 | 244:15,25 | 302:13 303:2 |
| 106:12 107:9,24 | 170:20 171:4,18 | 245:22 246:21 | 304:13 305:4,23 |
| 109:3,9,13,15,18 | 172:5 173:4,22 | 247:21 248:4,18 | 306:3,20 307:2,9 |
| 109:24 111:2 | 174:19 175:23 | 249:21 250:6,15 | 307:16 308:1,11 |
| 112:1,15 113:25 | 176:3 177:13 | 251:2,6,13,17,21 | 308:17,22 |
| 114:17 115:21 | 178:24 179:17 | 251:25 252:3,8 | 309:13,18 310:9 |
| 116:2 117:9 | 180:13 181:7,14 | 253:12 255:12 | 310:11 311:7,11 |
| 118:12 119:10 | 182:13 183:5,16 | 255:18,25 256:6 | 312:5,7 313:2,9 |
| 120:10 121:10 | 183:20 184:11 | 257:2,7,14 | 313:15 314:8,17 |
| 121:14 122:24 | 185:3,15 189:25 | 259:10,20 260:6 | 315:20,24 316:2 |
| 125:17 126:1,10 | 190:8 192:16 | 260:8,12 261:9 | 316:11,16,19,20 |
| 126:15 127:6,15 | 193:2,25 194:3 | 261:13,14 | 316:21 318:3,17 |
| 127:20 128:10 | 195:6,18 196:5 | 262:19 263:21 | 318:22,23 319:1 |
| 128:19 130:23 | 197:6,18 198:4 | 264:6,11,22 | 319:12,16,17 |
| 131:12,20 | 198:11,13,20 | 265:10 266:2,7 | 320:17,20 |
| 132:13 133:17 | 199:17,24 200:8 | 267:7,11,12,19 | 321:15 322:8,16 |
| 134:4,16 135:2 | 200:9,13,15,22 | 268:9 269:3,15 | 323:9,21 324:4 |
| 135:10 136:6,16 | 201:5,15,21 | 270:5,17 272:1 | 325:8,15 326:1 |
| 137:22 138:4,6 | 205:11 206:8 | 272:19 273:18 | 326:11,18 327:2 |
| 139:16 140:16 | 207:9,25 208:9 | 273:21 274:12 | 327:9,17 328:9 |
| 141:9,25 142:10 | 209:2 210:1,9,14 | 274:20 275:11 | 328:14,20 329:5 |
| 143:6,25 144:11 | 211:3,17,21,25 | 275:18 276:13 | 329:15,25 |
| 144:19 145:4 | 212:18 213:9 | 277:20 278:6 | 330:25 331:10 |
| 146:10,24 | 215:16,20 216:4 | 279:4,16 280:24 | 331:15,18,25 |
| 147:13 148:23 | 216:10 217:18 | 281:6,11 282:1,3 | 332:4,7,11,19 |
| 149:24 150:8,25 | 218:21 219:16 | 282:5 283:8 | 333:25 334:21 |
| 151:10,15,25 | 220:2,17 221:3 | 284:1,3,12,17,25 | 335:18 336:1,14 |
| 152:9 153:2 | 222:14,23 | 285:4,10 286:8 | 336:25 337:11 |
| 154:21 155:4,12 | 224:20 225:11 | 287:13 288:3,9 | 337:22 338:4,19 |
| 155:17 156:6,8 | 225:20 226:3,13 | 288:15,24 | 339:11,16,25 |
| 160:6,17 161:4 | 227:2,10,21 | 289:19 290:1,24 | 341:8,12,22 |
| 161:12 162:7,23 | 229:14 231:5,20 | 291:7,14,18 | 342:14,21 343:5 |
| 163:2,13,24 | 232:8 233:23 | 292:1,11,21 | 344:3 345:9 |

Page 76

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

**[weaver - yeah]**

346:11,19 347:8
347:21,25
348:14,19
349:22 350:5,8
350:14,24 351:9
352:6 353:3,13
353:19,25 354:6
354:24 355:11
355:13,14,19,25
356:10,18 357:1
357:19,24
358:13,21
359:16,22 360:5
360:14 361:1,7
361:14,20 362:2
362:4,9,11
363:13,18 364:1
364:6
**weaver's**  23:18
60:16 69:15
281:21
**web**  1:14 2:19
3:2 4:2 5:2 6:2
7:2
**website**  27:1
28:20 52:10
53:20 75:6
129:20,22,24
131:1,2,15,17
132:17 133:8,13
134:1 135:12,14
145:19 149:6,10
187:3 193:7,11
193:13,15,16,20
193:21 206:5
236:13 237:2,18
263:3 340:24
341:20 342:12

**websites**  129:9
136:3 206:19
294:23 340:25
341:2
**week**  168:5
**weekly**  166:2,12
167:5
**weeks**  17:8
**weight**  299:16
301:15
**went**  133:1
157:1 198:14
234:1 314:5,5,18
362:9
**wheelchair**
287:21 288:1,2
294:6
**whereof**  365:20
**whichever**  280:2
**who've**  129:23
194:11
**wiki**  18:6
**willing**  140:2
**win**  187:17
209:25
**winner**  209:23
**wins**  204:10,21
204:22 205:7
209:16 338:23
**wire**  115:25
**wish**  321:21
**witness**  11:12,23
14:11 69:7
281:15,17
282:19,23
283:25 284:7,9
291:3,24 309:1
310:12 311:23

311:24 313:22
313:24 314:22
316:7,10,24
317:24 321:17
321:25 322:5,12
322:15 323:15
365:20 366:13
366:16 367:2,5
**women**  51:16
71:12 263:10
**wondering**
275:22
**word**  70:22
121:11 123:15
123:21 150:25
151:10,11,22,22
213:20 214:9
318:24 319:3
340:1
**wording**  150:15
228:19 277:15
352:25
**words**  27:19
94:9 157:19
159:10 181:23
204:12 214:3
216:5 317:16
**work**  62:13 63:4
65:19 66:7
67:21 152:15,21
152:22 156:20
158:25 227:3
303:14,16 333:3
333:4 350:15
**worked**  17:17
19:17 80:10
172:7 332:17

**working**  172:8
**works**  24:2
34:24 35:1
132:15 141:23
143:5 197:24
211:16 344:15
**worry**  163:25
**worth**  256:8
**write**  150:14
**wrote**  16:6 22:11
22:19 23:5
37:14 224:6
308:13

**x**

**x**  8:1,8 9:1 10:1
142:3 208:25
220:25 221:1,4
221:21 365:16
**xx**  367:1

**y**

**y**  68:1
**yeah**  14:5 21:25
27:20,21 48:8
50:23 62:13
67:13 79:5 80:6
87:23 98:1
121:16,21 122:8
122:24 123:3
125:17 146:12
146:14 161:19
168:14 170:3
173:17 190:20
190:20 198:9
202:25 207:15
210:15 246:14
247:10 254:20
255:21 257:7,8

Veritext Legal Solutions
866 299-5127

**[yeah - zoom]**

280:13 281:17
282:5 283:13
289:4 298:24
310:22,23
315:17 318:1
322:25 323:3
328:13 346:24
350:7
**year**   21:9 58:5
67:20 158:15,20
264:10
**years**   24:21,22
25:14 26:9 27:4
54:24 55:1,18
58:4 67:4,19
80:11 90:6,15
92:3,22 118:11
118:21 122:25
158:8,23 169:2
217:25 233:24
241:8 290:16
338:3
**yesterday**   15:16
**york**   4:21,21
**yup**   14:21 88:10
202:5 309:6,11

|  z  |
| --- |

**zones**   109:12
**zoom**   1:12

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.