# EXHIBIT 4
## Redacted Version of Document Sought to be Sealed

# Exhibit A

Derek W. Loeser (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

Additional counsel listed on signature page

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION | MDL No. 2843<br>Case No. 18-md-02843-VC |
| This document relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' MOTION TO COMPEL ADDITIONAL PRODUCTION OF QUIPS, TASKS, AND GROUPS**<br><br>Judge: Hon. Vince Chhabria<br>Special Master Daniel Garrie<br><br>JAMS Ref. No.: 1200058674 |

PLAINTIFFS' MOTION TO COMPEL
ADDITIONAL PRODUCTION OF QUIPS,
TASKS, AND GROUPS

MDL NO. 2843
CASE NO. 18-MD-02843-VC
JAMS REF. NO.: 1200058674

## I.     INTRODUCTION

Plaintiffs seek an order compelling Facebook to supplement their production of Quips, Tasks, and internal Facebook Workplace Groups. The document production and deposition testimony have confirmed that those sources contain highly probative documents responsive to a large number of Plaintiffs' document requests. For two years, Facebook has resisted disclosing how it planned to collect and produce documents from these sources and it has become clear that whatever it has done is insufficient. Plaintiffs therefore propose a collection protocol for each, set forth below, that is proportionate to the needs of this case.

## II.     BACKGROUND

As the Special Master is aware, Plaintiffs have asked Facebook to discuss production of Quips, Tasks, and Groups for more than a year. *See* Exs. 1, 2 (seeking to mediate issues related to the production of non-custodial ESI, listing Tasks, Quips, and Groups). Plaintiffs' effort has also been reflected on each iteration of the mediation issue tracker. *See, e.g.*, Ex. 3 (tracker from the week of February 14, 2022, with issues on Tasks (P05), Quips (P07), and Groups (P12)); Ex. 4 (tracker from the week ending July 29, 2022, with issues on Tasks (P05), Quips (P07), and Groups (P12)).

But the history of Plaintiffs' efforts to discuss production from these sources goes even further back. From the onset of discovery, Plaintiffs repeatedly sought to engage Facebook in discussions about how it would produce documents from these sources. *See, e.g.*, Ex. 5 at 3 (Plaintiffs' November 2020 request that Facebook propose a method for collecting and producing responsive Quips, Tasks, and Groups).

The issue finally came to a head over the past few months. In April, after a series of meet and confers during which Facebook provided shifting, partial explanations of what it had done, it proposed providing a letter explaining how it had collected and produced documents from these four sources. For months, Facebook did not send the letter. (This, too, is reflected in the weekly trackers.) When Plaintiffs raised the issue during a July 14 meet and confer, counsel expressed frustration that Plaintiffs continued to press the point. Even though counsel was present when the offer was made to provide the letter, she now questioned why Plaintiffs were entitled to any explanation of what Facebook had done. Counsel ultimately conceded that since Facebook had promised the letter, Facebook would provide it, but stated that it was the lowest priority item.

Facebook sent the letter on July 22, 2022. Its description of the steps Facebook had undertaken to collect and produce Quips, Tasks, and Groups was insubstantial. *See* Ex. 6. Nevertheless, it provided enough information to confirm that Facebook's processes for collection and production were nowhere near proportionate to the needs of the case.

## III.     FACEBOOK SHOULD PRODUCE ADDIITONAL DOCUMENTS

**Quips:** Facebook employees make extensive internal use of Quip to collaborate on the creation and editing of documents and spreadsheets called Quips. As of August 3, 2022, Facebook has produced more than 38,000 documents that refer to a Quip, but only about 3,500 Quips. The Quips that Facebook has produced demonstrate their relevance as a document source. *See, e.g.*,

Ex. 7 at CA-MDL-META-0000139629 (a November 2018 Quip identifying "API related issues we have seen this year" including "[w]e don't understand our system and lack sufficient oversight into ▮▮▮▮▮▮▮▮▮▮▮▮▮" and "▮▮▮▮▮▮▮▮▮▮ cannot easily answer questions about which ▮▮▮▮▮▮ with 3d parties").

During a May meet and confer, Facebook disclosed new information about how it had collected Quips for production. For one group of custodians, all Quips associated with them had been collected and reviewed for responsiveness. For a second group of custodians, however, technical limitations at the time of collection had prevented that manner of collection. Instead, Quips were identified and collected based on custodial interviews. Facebook has not disclosed whether it went back and collected all Quips associated with that second group of custodians now that it has the technological ability to do so. Nor has Facebook identified which custodians are in each group.

Plaintiffs ask the Special Master to order Facebook to produce all non-privileged Quips referenced in documents produced to Plaintiffs; and to collect all Quips associated with custodians whose Quips were previously identified by custodial interview, run the previously identified search strings for each such custodian against their collected Quips, and produce all non-privileged Quips surfaced by the search strings.

**Tasks:** Similar to Quips, Facebook employees made extensive use of Tasks. Whereas Quips were used to collaborate on documents, Tasks were used to identify, communicate about, and collaborate on addressing all sorts of issues at the Company. As Facebook's outside counsel stated in a letter to the California Department of Justice: "Individualized privacy decisions are also recorded in files called Tasks, which follow a general standardized format. At the top of the Task there is a description of the program or feature to be discussed, followed by a summary of the decisions intended to address the potential privacy impacts. Tasks also include information on when various teams reviewed the product, and which Facebook employee was principally responsible for leading the review." Ex. 8 at FB-CA-MDL-01794754.

Facebook has produced substantially more Tasks than Quips. Those that have been produced confirm their relevance. To cite but one example of many, Exhibit 9 is a Task titled "Remove next found of temporary whitelisted v1 apps: Round 1/31/2016," dated January 27, 2016, which discusses removing whitelisted access to deprecated permissions for certain apps. (Facebook users were never informed that these apps were whitelisted for continued access to v1 permissions, such as friend_* permissions, after Graph v. 1.0 was deprecated.) Regardless, there exist hundreds of documents that reference Tasks that have not been produced. For example, Exhibit 10 is an April 2015 email string concerning the auto_granted_read_stream permission.[1] The email references a task established to track the effort to remove apps from that permission. The task—t6267101—has not been produced.

Unlike Quips, Facebook has not described Tasks as custodial documents. That's because the Task system is a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, capable of being searched. Yet Facebook's July 22

---

[1] According to other internal documents available on request, the read_stream permission "[p]rovides access to large amounts of user generated content including free form text posted by the user or potentially anyone linked to the user through news feed, posts, groups or pages."

letter states that Facebook primarily collected Tasks based on custodial interviews. Tasks were collected "through email for document custodians who indicated that Tasks were linked to their Facebook accounts, from the Tasks system for custodians who indicated that Tasks were not linked to their Facebook email accounts, and through targeted searches of the Tasks system based on interviews with knowledgeable persons." Ex. 6 at 1. There is no reason to limit collections from a ▮▮▮▮▮▮▮▮▮▮ to custodial files. Further, it is not clear what "targeted searches" Facebook conducted based on "interviews with knowledgeable persons," nor how such persons could be knowledgeable about relevant tasks from more than a decade.

Plaintiffs ask the Special Master to order Facebook to run all of the parties' previously identified search strings against all documents in the ▮▮▮▮▮▮▮ and produce all non-privileged Tasks surfaced by the search strings. If the ▮▮▮▮▮▮▮ is not capable of running the parties' search strings, Plaintiffs suggest Facebook export the Tasks to a document review platform and conduct the search in that environment.

**Groups:** Like Quips and Tasks, Facebook employees communicate with each other through internal Facebook Workplace Groups. These Groups function like the Facebook Groups available to users on the platform, except they are restricted to internal Facebook employees and, in certain circumstances, specific subsets of internal Facebook employees. While there, employees engage in conversations about numerous topics relevant to the case. For example, Exhibit 11 is an internal Facebook Workplace Group discussion from December 2018 to March 2019 titled "Comms FYI," which concerns a New York Times article alleging "that we gave large tech companies access to Facebook users' information without their knowledge, and that we were careless with people's data." *Id.* at FB-CA-MDL-02987044. What follows is more than 15 pages of employees posting questions about the allegations and trying to understand whether they were true, with some expressing substantial discomfort at what they learn.

As this example demonstrates, Facebook has produced some probative conversations from Workplace Groups. But Facebook's July 22 description of how it collected such documents describes a process not reasonably tailored to the needs of this case. Facebook wrote that the collection included "Groups identified as being potentially relevant by document custodians, as well as targeted searches of the Workplace system based on interviews with knowledgeable persons." Facebook does not identify the Groups that it determined were potentially relevant or the "targeted searches" it ran. Regardless, since there is an internal Workplace system, there was no need to solely base the collection on interviews with document custodians and knowledgeable persons.

Plaintiffs ask the Special Master to order Facebook to run all of the parties' previously identified search strings against all documents in the Workplace system and produce all non-privileged conversations surfaced by the search strings. If the Workplace system is not capable of running the parties' search strings, Plaintiffs suggest Facebook export the Workplace Groups conversations to a document review platform and conduct the search in that environment.

PLAINTIFFS' MOTION TO COMPEL
ADDITIONAL PRODUCTION OF QUIPS,
TASKS, AND GROUPS

3

MDL NO. 2843
CASE NO. 18-MD-02843-VC
JAMS REF. NO.: 1200058674

Dated: August 5, 2022

Respectfully submitted,

KELLER ROHRBACK L.L.P.

By: /s/ Derek W. Loeser
    Derek W. Loeser

Derek W. Loeser (admitted *pro hac vice*)
Cari Campen Laufenberg (admitted *pro hac vice*)
David Ko (admitted *pro hac vice*)
Adele A. Daniel (admitted *pro hac vice*)
Benjamin Gould (SBN 250630)
Emma M. Wright (admitted *pro hac vice*)
Daniel Mensher (admitted *pro hac vice*)
Michael Woerner (admitted *pro hac vice*)
Matthew Gerend (admitted *pro hac vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
dko@kellerrohrback.com
adaniel@kellerrohrback.com
bgould@kellerrohrback.com
ewright@kellerrohrback.com
dmensher@kellerrohrback.com
mwoerner@kellerrohrback.com
mgerend@kellerrohrback.com

Christopher Springer (SBN 291180)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel.: (805) 456-1496
Fax: (805) 456-1497
cspringer@kellerrohrback.com

Eric Fierro (admitted *pro hac vice*)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088
Fax: (602) 248-2822
efierro@kellerrohrback.com

BLEICHMAR FONTI & AULD LLP

By: /s/ Lesley E. Weaver
    Lesley E. Weaver

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Matthew S. Melamed (SBN 260272)
Angelica M. Ornelas (SBN 285929)
Joshua D. Samra (SBN 313050)
Javier Bleichmar (admitted *pro hac vice*)
Joseph A. Fonti (admitted *pro hac vice*)
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
mmelamed@bfalaw.com
aornelas@bfalaw.com
jsamra@bfalaw.com
jbleichmar@bfalaw.com
jfonti@bfalaw.com

*Plaintiffs' Co-Lead Counsel*

PLAINTIFFS' MOTION TO COMPEL
ADDITIONAL PRODUCTION OF QUIPS,
TASKS, AND GROUPS

4

MDL NO. 2843
CASE NO. 18-MD-02843-VC
JAMS REF. NO.: 1200058674