# EXHIBIT 6
**Redacted Version of**

**Document Sought to be Sealed**

# Exhibit B

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-0921
Tel 415.393.8200
www.gibsondunn.com

Rosemarie T. Ring
Direct: +1 415.393.8247
Fax: +1 415.801.7358
RRing@gibsondunn.com

August 12, 2022

CONFIDENTIAL (VIA JAMS ACCESS)

Re:     *In re Facebook, Inc. Consumer Privacy User Profile Litigation*, 3:18-md-02843

Dear Special Master Garrie:


## I. INTRODUCTION

Plaintiffs' motion to compel should be denied because Facebook's process for identification and collection of Quips, Tasks, and Workplace groups was diligent and reasonable. That process yielded a large volume of documents which have been reviewed and the responsive non-privileged documents have all been produced. Facebook has produced almost 60,000 documents from Quip, Tasks, and Workplace groups and Plaintiffs' assertion that searching for additional documents from these sources will yield a trove of unique relevant information has no basis, unduly burdensome, and disproportionate to the needs of the case. Fed. R. Civ. P. 26(b)(1), (b)(2)(C).

It is well-settled law that the party responding to discovery is best positioned to conduct the search for relevant documents. *See* The Sedona Principles, 3d. Ed., 19 SEDONA CONF. J. 1, Principle 6, 118 (2018); *see also Hastings v. Ford Motor Co.*, 2021 WL 1238870, at *3 (S.D. Cal. Apr. 2, 2021) (endorsing Principle 6). It is also well-settled law that once a reasonable search has been performed, it is the moving party's burden to identify evidence demonstrating a specific deficiency. Mere "suspicion" does not suffice. *In re: Lorazepam & Clorazepate Antitrust Litig.*, 219 F.R.D. 12, 17 (D.D.C. 2003). Tellingly, Plaintiffs cite no evidence that Facebook's search, collection, and production here was unreasonable, and their motion can be denied on that basis alone.

The additional (and unnecessary) searches Plaintiffs seek are also extraordinarily burdensome. For example, it would take roughly 500,000 hours to collect all Tasks. (Brums Decl. ¶ 16.) And Plaintiffs cite no evidence showing that these searches will yield unique, relevant documents. "Plaintiff is not entitled to every single document that could possibly have existed. Discovery must be reasonable, not perfect." *Johnson v. L'Oreal*, 2020 WL 5530022, *3 (S.D.N.Y. Sept. 15, 2020).


## II. FACEBOOK'S COLLECTION AND PRODUCTION WAS REASONABLE

Quip, Tasks, and Workplace groups are platforms that allow people to collaborate in real-time on documents. (Brums Decl. ¶¶ 4, 12, 18.) Plaintiffs argue (at 3) that there is "no reason to limit collections from a ▮▮▮▮▮▮▮▮▮▮▮▮ to custodial files," but this assertion ignores how electronic discovery is typically conducted and the law requiring discovery to be proportional. Just because a type of document is ▮▮▮▮▮▮▮▮▮ does not mean it is reasonable or appropriate to collect the source in its entirety for every employee, especially if doing so is burdensome. Indeed, email is ▮▮▮▮▮▮▮▮▮, but collections are almost always (and were here, with Plaintiffs' agreement and the Court's approval) limited to certain custodians because the feasibility, cost, and burden of collecting all email is prohibitive. Like email, each of these platforms comprise terabytes of data

CONFIDENTIAL

# GIBSON DUNN

and are used for a variety of purposes, both work and non-work related. (*Id.*, ¶¶ 4, 10, 12, 16, 18; Clews Decl., ¶ 16.) And not every Facebook employee uses them for work related to the litigation, as evidenced by the fact that many MDL custodians stated they were not likely to contain potentially relevant information. Moreover, neither Quips, Tasks, nor Workplace groups can be searched in their native systems using complex search strings (including proximity limiters) like the ones the parties negotiated here. (Brums Decl. ¶¶ 9, 14, 20.) There is also no software or automatic solution for identifying, collecting, and linking hyperlinked documents from emails–that has to be done as a manual process. (*Id.* ¶ 6.) Accordingly, it was reasonable for Facebook to focus these collections based on custodial input.

For MDL custodians who identified Quip as a potentially relevant data source, all Quips associated with their accounts were identified and either reviewed with the custodians to identify and collect potentially relevant Quips or were collected in full. (*Id.* ¶ 5.) For MDL custodians who confirmed that Tasks were linked to their email, Tasks were collected through email. (*Id.* ¶ 13.) For MDL custodians who did not confirm that their Tasks were linked to their email, Tasks were collected from the Tasks system. (*Id.*) For MDL custodians who identified Workplace groups as a potentially relevant data source, Workplace groups that they created or had access to were identified and reviewed with the custodians to identify and collect potentially relevant Workplace groups. (*Id.* ¶ 19.) Almost 60,000 documents were produced from Quips, Tasks, and Workplace groups. (Clews Decl. ¶ 9.)

Given Facebook's substantiated efforts, to justify a further search, Plaintiffs bear the burden to provide "concrete evidence pointing to the existence of missing documents." *See Winn-Dixie Stores v. E. Mushroom Mktg. Coop.*, 2020 WL 3498161, at *4 (E.D. Pa. June 29, 2020); *Uschold v. Carriage Svcs.*, 2019 WL 8298261, *4 (N.D. Cal. Jan. 22, 2019) ("to be both relevant and proportional to the needs of the case, a party seeking [discovery on discovery] 'must show a specific deficiency in the other party's production'"). Just as in the meet and confer, Plaintiffs do not support their assertion that anything is missing from Facebook's production.[i]

Plaintiffs claim (at 1) that "[t]he document production and deposition testimony have confirmed that those sources contain highly probative documents responsive to a large number of Plaintiffs' document requests." But Plaintiffs do not cite any deposition testimony or any evidentiary support for this sweeping claim. Indeed, the production of almost 60,000 combined documents from these sources proves otherwise. Plaintiffs cite to a handful of relevant and responsive Quips, Tasks, and Groups to claim that there must be more "probative" documents that have not been produced.[ii] Plaintiffs' argument is illogical, and does not account for the fact that these are shared documents, and therefore multiple emails are likely to reference the same linked document. Plaintiffs also point to the number of "references" to Quips in produced documents, but that says nothing about the uniqueness of the references or content, or relevance of the documents referencing them. *See Nichols v. Noom, Inc.*, 2021 WL 948646, *4 (S.D.N.Y. Mar. 11, 2021). Plaintiffs' failure to substantiate the alleged "gap" in Facebook's production is fatal. *See Sidman v. Concord Arena Parking,* 2021 WL 1940255, *3 (E.D.N.Y. May 11, 2021) ("When parties assert that they have

# GIBSON DUNN

produced all responsive documents…and the adversary believes the production is incomplete, the remedy is not to pound the table and ask the Court to order additional production."); *Haroun v. ThoughtWorks, Inc.*, 2020 WL 6828490, at *2 (S.D.N.Y. Oct. 7, 2020) (deposition testimony and documents must demonstrate "obvious gaps" before "discovery on discovery" is permitted).

## III. PLAINTIFFS' REQUESTED RELIEF IS NEITHER REASONABLE NOR PROPORTIONAL

*Quips*. Plaintiffs' requested relief with respect to Quips turns the law on its head and is not proportional. First, there is no independent obligation to search for and collect hyperlinks, like Quips, referenced in produced documents. *See Nichols,* 2021 WL 948646, *4. Hyperlinked documents are fundamentally different from attachments. *See Porter v. Equinox Holdings*, 2022 WL 887242, at *2 (Cal. Super. Mar. 17, 2022) ("linked documents [] present unique challenges that make them different from email attachments."); *Shenwick v. Twitter*, 2018 WL 5735176, at *1 (N.D. Cal. Sept. 17, 2018) ("[P]roducing a document referenced in a hyperlink–an evolving document–requires a multistep process…."). To comply with this request would take at least 6,000 hours (Brums Decl. ¶ 8), and cost more than $1 million to ingest the documents into the review platform (Clews Decl. ¶ 4). And this does not include the cost of attorney review.

Second, Plaintiffs have identified no evidence that the additional collections from Quip would yield unique, responsive documents. *Nichols*, 2021 WL 948646, at *4 (denying motion to compel because it was "entirely speculative how many underlying hyperlinked documents are relevant and material to this case"); *Vaigasi v. Solow Mgmt.*, 2016 WL 616386, *14 (S.D.N.Y. Feb. 16, 2016) ("Proportionality focuses on the marginal utility of the discovery sought.").

Third, Facebook has already agreed to search for and produce the Quips Plaintiffs identify (*id.* ¶ 3), an approach that is well-supported by caselaw. *Nichols*, 2021 WL 948646, at *4; *U.S. v. Google*, No. 1:20-cv-03010, Hr'g Tr. 26:9-11, Minute Ord. (D.D.C. June 17, 2022). Facebook has repeatedly invited Plaintiffs to identify particular Quips, Tasks, or Groups of "interest" to them, and when they have done so, Facebook has searched for, collected, reviewed, and produced the responsive, non-privileged documents it could identify. (Ring Decl. ¶ 7.) Tellingly, Plaintiffs do not argue that any of the Quips Facebook produced through this process comprised unique, non-cumulative information.

*Tasks and Workplace groups*. Plaintiffs' request that Facebook export the entirety of its Tasks and Workplace groups is even more unreasonable. If ordered to gather all Tasks and Workplace groups, Facebook would have to manually collect the contents of each platform. This process would take *years* to complete (Brums Decl. ¶¶ 16, 22 ), and cost more than $12.5 million to ingest the collection into the review platform (Clews Decl. ¶¶ 15-16). And this does not include the cost of attorney review.

**GIBSON DUNN**

Sincerely,

 /s/  Rosemarie T. Ring
        Rosemarie T. Ring

cc:      Lesley E. Weaver, Derek W. Loeser

---

[i] Facebook has explained its collection process to Plaintiffs multiple times (Ring Decl. ¶¶ 4-6 ), and Plaintiffs' sole basis for any alleged deficiency is that they expected "more" of these documents to be produced.

[ii] The single Task identified will be produced if it can be located and is responsive.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br> This document relates to: <br><br> ALL ACTIONS | CASE NO. 3:18-MD-02843-VC <br><br> **DECLARATION OF RICARDO BRUMS IN SUPPORT OF FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL FURTHER PRODUCTION OF QUIPS, TASKS, GROUPS** <br><br> DISCOVERY SPECIAL MASTER DANIEL GARRIE, ESQ. |

CONFIDENTIAL

I, Ricardo Brums, declare as follows:

1.       I am a Forensic Technology Lead on the eDiscovery & Information Governance team ("eDisco") at Facebook, Inc. ("Facebook").  I have held this position for over 4 years.  My job responsibilities include, among other things, locating and collecting documents and information necessary for responding to discovery as it relates to data sources at issue in this motion.

2.       I submit this declaration in support of Facebook's Opposition to Plaintiffs' Motion to Compel Further Production of Quips, Tasks, and  Groups in In re: Facebook, Inc. Consumer Privacy User Profile Litigation ("Privacy MDL").  Unless otherwise stated, I have personal knowledge of the facts set forth herein, and, if called as a witness, I could and would competently testify thereto.

## QUIPS

3.       My understanding is that Plaintiffs have filed a motion seeking an order requiring Facebook to (1) collect and search all Quips associated with all document custodians for the Privacy MDL ("MDL custodians") who previously identified Quips as a potentially relevant source, and (2) search for, collect, and produce all Quips referenced in all documents produced in the Privacy MDL to date.  Based on my personal knowledge and discussions with the eDisco team, below I explain what Facebook has done to collect and search for documents from this document source for MDL custodians, and the feasibility of and work required to conduct the additional searches Plaintiffs are now requesting.

4.       **Quip**.  Quip is a Salesforce SaaS collaboration tool and productivity platform that allows groups of people to create and edit documents in real-time.  Quip data is stored ███████████ ███████████████████████.  Quips can be shared through the Quip platform and through

1

hyperlinks in emails and other documents. Within Facebook, Quips are used for various purposes, including substantive projects, planning social events, and administrative tasks such as tracking travel expenses, among other uses.

5. **Collection of Quips for the Privacy MDL**. For MDL custodians who identified Quip as a potentially relevant data source, all Quips associated with their accounts were identified and either reviewed with the custodians to identify and collect potentially relevant Quips or were collected in full.

6. **Quips "Referenced" In Documents**. Hyperlinked documents present unique collection, review, and production challenges that make them different from email attachments. In my experience and to the best of my knowledge, there exists no discovery tool or system that automatically identifies, collects, and associates underlying documents to hyperlinks found in a production, regardless of source. Searching for, collecting, and linking underlying documents to hyperlinks must be done manually, on a source-by-source, hyperlink-by-hyperlink basis.

7. Assuming the linked Quip is accessible (i.e. the hyperlink is still active and not broken), a person must then identify the corresponding admin ID to locate and collect that Quip. Depending on the privacy settings of the linked Quip, additional steps may be required.

8. I understand Plaintiffs are asking Facebook to search for and collect nearly 38,000 Quips that Plaintiffs claim are referenced in documents produced to date. Based on my experience, assuming Plaintiffs provide all of the Quip hyperlinks they say they have identified in documents produced to date, I estimate that it would take at least 6,000 hours to identify, analyze, search for and export these Quips. If we need to search for and identify the Quip hyperlinks ourselves, locate the native version of the document containing the link, and extract the link, that will substantially increase this time estimate.

CONFIDENTIAL

9.      **Searching the Quip platform**.  The Quip platform cannot be searched using complex search strings like those negotiated by the parties.

10.     **Exporting the Quip platform**.  As of August 8, 2022, Facebook's Quip platform contains ███████ Quips.  Quip does not provide a feature that identifies the total volume of data in the platform.   Based on eDisco's experience, 10,000 Quips equate to roughly 5 gigabytes of data when exported.  Thus, the entire Quip platform equates to approximately ████████ of exported data.  I am not aware of any case in which Facebook has undertaken an effort to export the entire Quip platform.

## TASKS

11.     My understanding is that Plaintiffs have filed a motion seeking an order requiring Facebook to run all search strings negotiated by the parties against the Tasks system, and if such complex search strings cannot be run in the Tasks system, to export all Tasks to a document review platform and run the search strings there.  Based on my personal knowledge and discussions with members of the eDisco team, below I explain what Facebook has done to collect documents from this document source for MDL custodians, and the feasibility of and work required to conduct the additional searches Plaintiffs are now requesting.

12.     **Tasks Overview**.  Tasks is a ticketing and project management system.  Within Facebook, Tasks is used for a variety of purposes, including substantive work and administrative tasks such as tracking delivery of new devices and internal IT support tickets.  Tasks are linked to the email of Task creators and subscribers by default.

13.     **Collection of Tasks for the Privacy MDL**.  For MDL custodians who confirmed that Tasks were linked to their email, Tasks were collected through email.  For MDL custodians who

CONFIDENTIAL

did not confirm that their Tasks were linked to their email, Tasks were collected from the Tasks system.

14. **Searching the Tasks System**. The Tasks system cannot be searched using complex search strings like those negotiated by the parties.

15. **Exporting All Tasks to Review Platform**. I understand that, since the Tasks system cannot be searched using complex search strings, Plaintiffs are seeking an order requiring Facebook to export the entire Tasks system to a document review platform. I am not aware of any case in which Facebook has undertaken such an effort.

16. As of August 8, 2022, the Tasks system contained ████████████ representing █ ███████ of data. To estimate the time it would take to collect all Tasks, the eDisco team collected a sample of 1,000 Tasks which took 4 hours to complete. Based on this sample, it would take approximately ███████████ to collect all Tasks. This is a conservative estimate because collection times vary depending on the size of individual Tasks, which vary significantly, and export format, and it does not include the time to ingest the collected Tasks into a document review platform.

## WORKPLACE GROUPS

17. My understanding is that Plaintiffs filed a motion seeking an order requiring Facebook to run all search strings agreed upon by the parties against Workplace groups, and if such complex search strings cannot be run against Workplace groups, to export Workplace groups to a document review platform and run the search strings there. Based on my personal knowledge and discussions with Facebook's eDisco team, below I explain what Facebook has done to collect documents from this document source for MDL custodians, and the feasibility of and work required to conduct the additional searches Plaintiffs are now requesting.

CONFIDENTIAL

18.     **Workplace groups**.  Workplace groups provide a space for Facebook employees to communicate on a variety of topics, including work projects, administrative tasks, and social connections (e.g., affinity groups).  Facebook employees can create groups, add and remove members, and create posts within each group.  Workplace groups have privacy settings to control access and can be unrestricted or restricted.

19.     **Collection of Workplace groups for the Privacy MDL**.  For MDL custodians who identified Workplace groups as a potentially relevant data source, Workplace groups that they created or had access to were identified and reviewed with the custodians to identify and collect potentially relevant Workplace groups.

20.     **Searching Workplace groups**.  Workplace groups cannot be searched through the platform using complex search strings like those negotiated by the parties in this case.

21.     **Exporting All Workplace groups to Review Platform**.  I understand that, since Workplace groups cannot be searched using complex search strings, Plaintiffs are seeking an order requiring Facebook to export Workplace groups to a document review platform.  I am not aware of any case in which Facebook has undertaken such an effort.

22.     To collect posts in a Workplace group, the eDisco team has to access each Workplace group and then collect the posts.  For a test case restricted Workplace group, it took 30 minutes to access and collect a single post, and for a test case unrestricted Workplace group it took 9 minutes to access and collect a single post.  As of August 10, 2022, there were approximately ████████████████████, of which approximately ██████ were restricted.  Based on these test cases, even if we assume there is only one post in a Workplace group (and there is not), it would take at least ████████ to collect posts from restricted Workplace groups and ████████ to collect posts from unrestricted Workplace groups for a total of ████████.

CONFIDENTIAL

I declare under penalty of perjury that the foregoing is true and correct, and that I executed this

Declaration on August 12, 2022, in Los Angeles, California.

Ricardo Brums

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice*)
   osnyder@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
   klinsley@gibsondunn.com
Martie Kutscher (SBN 302650)
   mkutscherclark@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Deborah Stein (SBN 224570)
   dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua S. Lipshutz (SBN 242557)
   jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION,<br><br>This document relates to:<br><br>ALL ACTIONS | CASE NO. 3:18-MD-02843-VC<br><br>**DECLARATION OF MARK CLEWS IN SUPPORT OF FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL FURTHER PRODUCTION OF QUIPS, TASKS, GROUPS**<br><br>Discovery Special Master Daniel Garrie, Esq. |

**CONFIDENTIAL**
CONFIDENTIAL

I, Mark Clews, declare as follows:

1.      I am a Senior Managing Director in Ankura Consulting's Data and Technology practice, located in Irvine, California.  I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true.  If called as a witness, I could and would competently testify to the matters stated herein.

2.      I have over 20 years' experience providing expert advice and innovative solutions to clients and their counsel for the management of electronically stored evidence. I specialize in the preservation and investigation of electronic evidence from digital devices, the interrogation of complex data sets and the management of large-scale electronic discovery matters for law firms and corporations.

3.      My expertise covers the entire lifecycle of the electronic discovery reference model, from providing proactive guidance on information governance and discovery readiness consulting, to the preservation, processing and review of data for production purposes. I have led hundreds of engagements on a wide variety of matters ranging from forensic analysis of a single machine through to multi-jurisdictional class action disputes containing custodians across multiple continents.

4.      My team and I have been assisting Facebook navigate their data challenges in responding to regulatory investigations and legal actions since 2012.  During that time, I have become familiar with many of the data sources that their employees regularly use to collaborate, and the challenges relating to preserving, transforming, reviewing, and producing these data sources.

CONFIDENTIAL
CONFIDENTIAL

5.      I submit this declaration in support of Facebook's Opposition to Plaintiffs' Motion to Compel Further Production of Quips, Tasks, and Groups in In re: Facebook, Inc. Consumer Privacy User Profile Litigation ("Privacy MDL").  Based on my personal knowledge and discussions with my team, below I explain what documents have been produced from the sources at issue in the Privacy MDL, and the cost Facebook would incur if required to conduct the additional searches Plaintiffs are now requesting.

6.      Based on work performed by the Ankura team and at counsels' direction, as of August 8, 2022, 1,140,640 documents have been produced to Plaintiffs in this litigation from the Ankura databases associated with this matter.

7.      I understand that documents have additionally been produced to Plaintiffs from another vendor's database. The counts and estimates I provide in this declaration relate only to the documents produced from the Ankura databases and the work performed by Ankura.

8.      My understanding is that Plaintiffs have filed a motion seeking an order regarding further collection of Quips, Tasks, and Workplace Groups.  For Quips, Plaintiffs ask that Facebook be ordered to (1) collect and search all Quips associated with all document custodians for the Privacy MDL ("MDL custodians") who previously identified Quips as a potentially relevant source, and (2) search for, collect, and produce all Quips referenced in all documents produced in the Privacy MDL to date. For Tasks, Plaintiffs seek an order requiring Facebook to run all the Privacy MDL search strings agreed upon by the parties against the Tasks system, and if such complex search strings cannot be run in the native Tasks system, to export all Tasks to a document review platform and run the search strings there. For Workplace groups, Plaintiffs seek an order requiring Facebook to run the Privacy MDL all search strings agreed upon by the parties against all Workplace groups, and if such complex search strings cannot be run against

3

Workplace groups, to export all Workplace groups to a document review platform and run the search strings there. In this declaration, I address the cost and burden associated with complying with these requests, to the extent compliance would even be possible.

## I.    Processing Quips, Tasks, and Workplace Groups

9.      It is my best estimate that, as of August 8, 2022, almost 60,000 documents from Quips, Tasks, and Workplace groups have been produced from Ankura's platform.

10.     For each of these document types, once Ankura receives the documents from Facebook, it has to engage in multiple steps to prepare the documents for review and, ultimately, production.  These are the same steps Ankura would have to take to process the documents that Plaintiffs are seeking in this motion.

11.     The documents would first be collected by the Facebook team.  They would then be transferred to the Ankura team via secure file transfer ("SFTP").  Once the native files are staged on Ankura's servers, they would then be ingested into our processing application, where they would be uniquely identified, indexed, deduplicated, and quality-controlled. During this process the files' metadata and extractable text is parsed into fields in the database where files without extractable text are identified and an Optical Character Recognition process ("OCR") is applied. Other potential file issues such as password protection and corruption would also be identified during this process.

12.     After the initial processing is complete, the search strings negotiated  by the parties would be applied.

13.     Similar to other collaboration tools, Quips and Workplace groups contain extended metadata that does not transfer with the native files themselves. This extended metadata includes Quip Author ID, Thread Members, Title, Quip Created Date for Quips, and WP

CONFIDENTIAL
CONFIDENTIAL

Group_Number of posts, WP Group_Number of Comments, WP Group_Last Comment DateTime, Group_First Comment DateTime for Workplace groups. This requires a separate export by Facebook from each platform and an overlay created to associate the metadata with the documents.

## II.    Cost of Processing Quip, Tasks, and Workplace Groups

14.    Based on my experience with Quip data, my best estimate is that it would cost approximately $840,000 to ingest the data in Quip, assuming it contains ███████ of data. After ingestion, the data would need to be processed and readied for review through the steps outlined above, which based on historic metrics of existing Quip data, I estimate would take around 600 hours of consultant time, totaling $165,000.

15.    Based on my experience with Tasks, my best estimate is that it would cost approximately $9,750,000 to ingest the data in the entire Tasks platform assuming that it contains ██████ of data.  After ingestion, the data would need to be processed and readied for review, which I estimate would take around 1,500 consultant hours, for a total of $412,000.

16.    Based on my experience with Workplace groups, my best estimate is that it would cost approximately $2,070,000 to ingest the data from Workplace groups, assuming it contains ██████ of data. This size estimate is based on the number of Workplace groups at Meta (as identified in the Declaration of Ricardo Brums), and the average size of the Workplace groups that have previously been ingested into Ankura's review platform. After ingestion, the data would need to be processed and readied for review, which I estimate would take 1,200 hours and cost $330,000.

17.    I believe these estimates understate the cost associated with having to ingest this data and prepare it for production for the following reasons: I am working with estimated data

CONFIDENTIAL
CONFIDENTIAL

sizes, unknown required deadlines, unintended impact on Ankura's infrastructure, custom data handling requirements, unknown data quality issues and the Ankura resources to complete all of the above.

18.     These estimates do not include the cost to assist the Facebook eDiscovery team in locating the Quips referenced in the documents produced in this matter if the Plaintiffs do not identify the Bates stamps of the pertinent documents. These estimates also do not include the cost of reviewing the "hits" on the search strings (which would be done by attorneys), or processing the productions (the cost of which would depend on the volume and complexity of the data).

## III.    Timeline for Processing Data

19.     In total, my current best estimate is that, without any other responsibilities or deadlines, the processes described above would take approximately 6-12 months.  This estimate does not include the additional time to review the data.

20.     The Ankura team will be significantly impacted if required to receive, process, analyze, and export the volume of data requested. This same team is also responsible for assisting Facebook in-house and outside counsel in active litigations and other legal matters. Therefore, not all resources of the team could be diverted to completing these tasks.


I declare under penalty of perjury that the foregoing is true and correct, and that I executed this Declaration on August 12, in Irvine, California.

_Mark Clews_          8/12/2022
_____     _____

Mark Clews

**CONFIDENTIAL**
CONFIDENTIAL

CONFIDENTIAL

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION, <br><br> This document relates to: <br><br> ALL ACTIONS | CASE NO. 3:18-MD-02843-VC <br><br> **DECLARATION OF ROSEMARIE T. RING IN SUPPORT OF FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL FURTHER PRODUCTION OF QUIPS, TASKS, GROUPS** <br><br> DISCOVERY SPECIAL MASTER DANIEL GARRIE, ESQ. |

I, Rosemarie T. Ring, hereby declare as follows:

1.      I am a partner at the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for Facebook, Inc. ("Facebook") in the above-captioned matter.  I am a member in good standing of the State Bar of California.

2.      I submit this declaration in support of Facebook, Inc.'s Opposition to Plaintiffs' Motion To Compel Further Production Of Quips, Tasks, Groups (the "Motion").

3.      I make this declaration based on my own knowledge, information contained in the case file, and discussions with members of my team, and, if called as a witness, could and would testify competently to the matters stated herein.

4.      I joined this case in mid-February 2022.  On February 14, 2022, I attended a discovery mediation session during which Plaintiffs ███████████████████████████ ████████████████████████████████████████ had been ███████████████ meaning that they were ████████████████████ instead of the ███████████████████████ ██████████, and that ███████████████████████████████████████████ ████████████████ based ████████. Plaintiffs also inquired as to ███████████████ █████████████████████████████████████.

5.      In meet and confers on February 21 and 22, I explained to Plaintiffs that, based on over a decade representing Facebook in other cases, I did not understand these collections to have been performed in the ways that concerned them, and that I did not believe it was possible to run centralized searches of these systems using the type of complex search strings that would be necessary to yield a reasonable review population.  That said, I agree that I would investigate to confirm how these collections had been done and that, for Quips and Tasks, we would be

CONFIDENTIAL

happy to search for and produce any responsive, non-privileged hyperlinked documents Plaintiffs believe had not already been produced.

6.  I explained the results of that investigation to Plaintiffs several times during meet and confers. I also explained why the results show that the collections were not subject to the concerns Plaintiffs raised, and that it was therefore not necessary to conduct additional searches. I also explained that the additional "centralized searches" Plaintiffs inquired about were not feasible. And, I again offered to search for and produce any responsive, non-privilege hyperlinked documents Plaintiffs believed had not already been produced.

7.  Plaintiffs eventually did provide a list of hyperlinks for Quips and Tasks. Facebook investigated those hyperlinks and produced all Quips and Tasks it was able to find, regardless of whether they were responsive. Plaintiffs never indicated whether those Quips and Tasks were responsive or contained unique information and have not identified any never identified any other hyperlinks. Indeed, I do not recall Plaintiffs ever referencing these documents again.

8.  When Facebook proposed to close entries relating to the collection of Quips, Tasks and Workplace groups in the mediation tracker, Plaintiffs demanded that we provide a letter with the same information we provided during meet-and-confers and insisted that these entries remain open.

9.  I did not, and do not, see the need for a letter, given the detailed explanations I and members of my team have provided to Plaintiffs on these issues. Plaintiffs now claim in the Motion that "Facebook proposed providing a letter." That is false. Plaintiffs demanded the letter, and Facebook repeatedly and consistently said it was not necessary.

DECLARATION OF ROSEMARIE T. RING
CASE NO. 3:18-MD-02843-VC

CONFIDENTIAL

10. Plaintiffs continued pressing for a letter in meet-and-confers with my team and asked the Special Master to declare impasse to allow briefing on the issue of whether Facebook should be required to provide a letter. The Special Master rejected Plaintiffs request for impasse, rightly noting that Plaintiffs had not identified any case authority requiring Facebook to provide a letter.

11. During a discovery mediation session that I attended on May 5, 2022, Plaintiffs ███████████████. I ██████████ that I thought ██████████████ especially given the ████████████████████, but that ███████████████████ I understand that ███████████████████ in subsequent meet and confers, and then ████████████████.

12. I did not discuss the letter with Plaintiffs again until July 11, 2022, during a meet and confer in which Plaintiffs describe me as expressing frustration and saying the letter was my lowest priority. I did feel frustrated because I had spent a significant amount of time personally investigating the issues Plaintiffs raised and then explaining the results of that investigation to them, only to have Plaintiffs persist in demanding a letter that I had explained was not necessary and a burden given all of the other discovery demands in the case. It felt (and feels) harassing to me. That said, since my team had agreed to provide the letter, I said we would abide by that agreement but that, given all of the other ongoing and time-sensitive discovery work in the case, it would be my lowest priority.

///


///

CONFIDENTIAL

13.     On July 22, 2022, we provided the letter to Plaintiffs.

I declare under penalty of perjury that the foregoing is true and correct, and that I executed this

Declaration on August 12, in San Francisco, California.

_____

Rosemarie T. Ring

105665269.1

CONFIDENTIAL